NO. _____ (CAPITAL CASE)

# IN THE
# SUPREME COURT OF THE UNITED STATES

JAMES GARFIELD BROADNAX,
*PETITIONER*,

v.

STATE OF TEXAS,
*Respondent*.

## On Petition for a Writ of Certiorari to
## the Texas Court of Criminal Appeals

## PETITION FOR WRIT OF CERTIORARI

Lydia M.V. Brandt
THE BRANDT LAW FIRM, P.C.
Texas Bar No. 00795262
lydiamb@airmail.net
P.O. Box 850843
Richardson, Texas 75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

MEMBER, BAR OF THE SUPREME COURT AND
COUNSEL OF RECORD FOR PETITIONER

## QUESTIONS PRESENTED

I.      Whether as part of the substantive guarantee of the Sixth Amendment, Mr. Broadnax, a capital-murder defendant, was entitled to appointment of counsel at Texas Magistration

II.     Whether Mr. Broadnax and his counsel were entitled to notification of the impending post-attachment  interviews by the media, who were state agents, with counsel present as a requisite to conducting them, in the absence of a valid waiver, because the post-attachment media-interviews were a critical stage in the legal proceedings.

## LIST OF PARTIES

JAMES GARFIELD BROADNAX, Petitioner

STATE OF TEXAS, Respondent.

## ABBREVIATIONS

Appx        Appendix followed by the number of the document appended at the end of this petition

CR          Clerk's Record that contains the pleadings, court orders, etc.

RR          Reporter's Record of the trial or pre-trial hearings in State v. Broadnax, followed by the volume number, and the page

SWH         Reporter's Record of the State Writ Hearing, followed by the volume number, and the page

SWH DX-_    State Writ Hearing Defense Exhibit, followed by the exhibit number

ii

TABLE OF CONTENTS

QUESTIONS PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

LIST OF PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

ABBREVIATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

OPINIONS AND ORDERS BELOW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CONSTITUTIONAL PROVISIONS INVOLVED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    Pre-2002 enactment of TFDA – The magistrate appointed counsel in Dallas County, TX for a capital-murder defendant within approximately 30 minutes to one (1) hour after Texas Magistration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    Post-2002 enactment of TFDA – Appointment of counsel for capital-murder defendants was based on a statutorily-specified time period, rather than on the need for counsel in a critical stage, creating an Appointment Gap. . . . . . . . . . . . . . . . . 4
        1.    During the Appointment Gap, which can span hours, days, or even weeks between the request-for and appointment-of counsel, the Dallas County Sheriff's Department ("Dallas County Jailers") facilitate media-access to capital-murder defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.    The Dallas County Jailers block attorney-access to the client, to facilitate the media interviews. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    C.    From at least 2007 to 2012, by exploiting the Appointment Gap using the Media Access Procedure, the Dallas County Jailers encouraged, solicited, coordinated and facilitated the media interviews of capital-murder defendants, including Mr. Broadnax in 2008. The State "must have known" that the media, as its agent, was likely to obtain incriminating statements in the absence of counsel. . . . . . . . . . . . 8
        1.    The Dallas County Jailers created a sample-letter or template (Template) for the media to pattern their requests for an inmate-interview. For Broadnax, who suffered years of traumatic abuse and neglect, the Template's language was beguiling in its promise to give him voice to "tell his side of the story." The letters from the Media, addressing "James" personally, are identical and/or substantially similar to the Template. . . . . . . . . . . . . . . . . . . . . . . . 9
        2.    The Dallas County Jailers knew that on June 21, 2008 Mr. Broadnax had invoked his Sixth Amendment right to counsel at Texas Magistration. . . 10

3.      On June 23, 2008, the Dallas County Jailers knew the letters from the Media to Mr. Broadnax did not comply with the Media Access Procedure.  The Dallas County Jailers filled in the missing, but required, information. . . 13

4.      On June 23, 2008, Officer Spratling hand-delivered the letters from the Media to 19-year old, psychotic Mr. Broadnax, who was housed in the psychiatric ward of the jail; she witnessed his signature purporting to consent to the interviews. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5.      On June 23, 2008, the Dallas County Jailers set up and escorted the media to the interview room, gave them each 30 minutes for the interview, and were present during the media interviews of Mr. Broadnax. . . . . . . . . . . . . . . 15

6.      On June 23, 2008, the same day the media conducted their interviews of Mr. Broadnax, this Court decided *Rothgery*.  *Rothgery* reaffirmed the 1991 holding in *McNeil* that the Sixth Amendment right to counsel attaches at first formal appearance and recognized the overwhelming consensus practice of making  counsel available at that time; ruled that Texas had not offered an acceptable justification of its minority practice of denying counsel at Texas Magistration; and left open the question whether there is a substantive Sixth Amendment right to appointment of counsel *at* Texas Magistration. . . . . 15

7.      The Media Interviews are a critical stage because they were structured to, and did, elicit from Mr. Broadnax: a confession, statements of lack of remorse and that death is an appropriate punishment because he would kill again; the prosecutor subpoenaed the videotaped interviews. . . . . . . . . . . . . . . . . . . 17

        a.      *Did you do it?*        Broadnax "confessed to murdering two defenseless men in order to steal their car so he could return home... [and] shot each man a second time after their initial wounds failed to kill them immediately. Then ... rifled through their pockets;". . . . 17

        b.      *Are you remorseful?*   "When asked if he had anything to say to the victims' families, the appellant responded, 'Fuck 'em.' To the specific question by the interviewer, 'Do you have any remorse, none whatsoever?' the appellant only shook his head.". . . . . . . . . . . . . 18

        c.      *What punishment?*       "Hopefully the death penalty.... 'Cuz they give me life I'ma' kill somebody else. Straight up. I'm telling you right now. I can't do no motherfuckin' life.". . . . . . . . . . . . . . . . . . . . . . 18

8.      On Tuesday June 24, 2008, after an Appointment Gap of three (3) calendar days, counsel was appointed for Mr. Broadnax. . . . . . . . . . . . . . . . . . . . . . 18

D.   The Motion to Suppress the videotaped interviews. . . . . . . . . . . . . . . . . . . . . . . . 19

    1.      Right to Counsel Trial Claim:  Facts & Legal Theory. . . . . . . . . . . . . . . . 19

        a.      At the time of the media interviews, Mr. Broadnax was in a psychotic rage because of intoxicants he had ingested.  . . . . . . . . . . . . . . . . 22

        b.      The Dallas County Jailers violated their own written policy; they gave the media access to a mentally ill defendant, Mr. Broadnax, . . . . 22

    c.  The media were state agents because *Mr. Broadnax was in custody*; without the cooperation of the Dallas County Jailers, the media would not have had access to Mr. Broadnax. . . . . . . . . . . . . . . . . . . . . . 22

   2. At the suppression hearing, the trial court ruled: "*On this record we cannot conclude that the reporter was acting as a State agent* when he interviewed appellant," and "*whether the defense was able to prove an agency relationship*, which they must in order for their argument to succeed, *is not even a close one*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

 E. The videotaped interviews of the psychotic, 19-year old Broadnax were played at trial, and during deliberations, at the jurors' request; having extensively discussed the videotaped interviews, the Texas Court of Criminal Appeals affirmed the conviction and death sentence on direct appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

 F. The State Post Conviction claims are *different* from the one raised at trial.. . . . . 27

   1. The 6th & 14th Amendment Habeas Claims:  Facts and Legal Theory.. . . 27

      a.  Broadnax had a substantive 6th amendment right to counsel *at* Texas Magistration, but counsel was appointed based on a statutorily-specified period after magistration instead, creating an Appointment Gap, *citing Michigan v. Harvey*, 494 U.S. 344, 357-58 (1990) ("A defendant is entitled to the aid of his lawyer from the time of arraignment 'when consultation, thoroughgoing investigation and preparation [are] vitally important,' *citing Powell v. Alabama,* 287 U.S. 45, 57 (1932), through the time of first appeal. ...."*); Rothgery*, 554 U.S. 191. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      b.  The Dallas County Jailers exploited the Appointment Gap using the Media Access Procedure to solicit, encourage, coordinate, and facilitate interviews of Broadnax by the media, who acted as state agents.  The State "must have known" that the media, as its agent, was likely to obtain incriminating statements in the absence of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      c.  The videotaped-interviews of Mr. Broadnax were a critical stage, structured to elicit: a confession, statements of lack of remorse, and that lethal injection was an appropriate punishment because he would kill again if given life, *citing White v. Maryland*, 373 U.S. 59 (1963). They were played in all phases of the trial by the prosecutor. . . . 28

      d.  Trial counsel was ineffective in failing to raise Sixth and Fourteenth Amendment challenges based on the aforementioned facts and legal theory, *citing Strickland*, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

   2. State post-conviction evidence showed trial counsel was ineffective . . . 29

REASONS FOR GRANTING THE WRIT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

 I. As part of the substantive guarantee of the Sixth Amendment, Mr. Broadnax, a capital-murder defendant, was entitled to appointment of counsel at Texas Magistration.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

A.     There is a national consensus that counsel should be appointed "certainly no later than the accused's initial appearance before a judicial officer". . . . . 31

B.     There is no justification for the minority practice in Texas. . . . . . . . . . . 32

C.     Broadnax is an example of how the failure to appoint counsel at Texas Magistration perpetuates discrimination between impecunious defendants (Mr. Broadnax) and those of means (the reporters). . . . . . . . . . . . . . . . 33

II.     The post-attachment media-interviews were a critical stage in the legal proceedings. Thus, Mr. Broadnax and his counsel were entitled to be notified of them, with counsel present as a requisite to conducting them. . . . . . . . . . . . . . . . . . . . . . . . . 35

A.     The media were state agents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B.     The media interviews were a critical stage. . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

APPENDICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Appendix 1:     *Ex parte James Garfield Broadnax*, Nos. WR-81,573-01 (Tex. Crim. App. May 20, 2015) (slip op.). . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Appendix 2:     Findings of Fact and Conclusions of Law, *Ex parte James Garfield Broadnax*, No. W08-24667-Y(A) (Crim. Dist. Ct. #7, Dallas County, TX, Sept .17, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Appendix 3:     Court Order, 12-06-2012, Denying State Post-Conviction Broadnax Discovery Motion & Grant State Motion to Quash. . . . . . . . . . . . 41

Appendix 4:     Court Order, 12-20-2012, denying the Broadnax State Post-Conviction Reconsideration Motion. . . . . . . . . . . . . . . . . . . . . . . 41

Appendix 5:     Media Access Procedure, including "Template" drafted by the Dallas County Jailers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Appendix 6:     Interview-Request Letters from Media to James Broadnax. . . . . . 41

Appendix 7:     Motion to Suppress. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Appendix 8:     Broadnax: Arraignment Sheet, Affidavit of Indigence, and Instructions Relating to Preliminary Initial Appearance. . . . . . . . 41

Appendix 9:     Interview-Request Letters from Media to Franklin Davis. . . . . . . 41

**TABLE OF AUTHORITIES**

**CASES**

*Arizona v. Fulminante*, 499 U.S. 279 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 40

*Atkins v. Virginia*, 536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Broadnax v. State*, AP-76,207, 2011 WL 6225399 (Tex. Crim. App. 2011) (not designated for publication). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 24, 26, 27, 29, 40

*Bruton v. United States*, 391 U.S. 123 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 40

*Coleman v. Alabama,* 399 U.S. 1 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 38

*Escobedo v. Illinois*, 378 U.S. 478 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Estelle v. Smith,* 451 U.S. 454 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 31

*Faretta v. California*, 422 U.S. 806 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Hamilton v. State of Ala.*, 368 U.S. 52 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Rabb*, 293 S.W.3d 865 (Tex. App. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 33

*Johnson v. Zerbst*, 304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Kuhlmann v. Wilson*, 477 U.S. 436 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Maine v. Moulton*, 474 U.S. 159 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 37

*McNeil v. Wisconsin,* 501 U.S. 171 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19, 31

*Michigan v. Harvey*, 494 U.S. 344 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 31

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

*Patterson v. Illinois*, 487 U.S. 285 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Pecina v. State*, 361 S.W. 3d 68 (Tex. Crim. App. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Powell v. Alabama,* 287 U.S. 45 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 33

*Rompilla v. Beard*, 545 U.S. 374 (2005) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Roper v. Simmons*, 543 U.S. 551 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Rothgery v. Gillespie County*, TX, 554 U.S. 191 (2008).. . . . . . . . . . . . . . . . . . . . . . 11, 15, 28, 37

*United States v. Ash*, 413 U.S. 300 (1973).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 35, 37

*United States v. Gouveia,* 467 U.S. 180 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Henry*, 447 U.S. 264 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

*United States v. Wade,* 388 U.S. 218 (1967). . . . . . . . . . . . . . . . . . . . 4, 17, 30-32, 35, 38, 40

*White v. Maryland*, 373 U.S. 59 (1963).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31, 37, 39

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S. CONST. amend. XIV.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## STATUTORY PROVISIONS

28 U.S.C. § 1257(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TEX. CODE CRIM. PROC. Art. 1.051. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## OTHER AUTHORITY

*Rothgery*, *Amicus Curiae* Brief of American Bar Association . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

### PETITION FOR WRIT OF CERTIORARI

Petitioner, JAMES GARFIELD BROADNAX, petitions for a writ of certiorari to review the order and opinion of the Texas Court of Criminal Appeals in *Ex parte James Garfield Broadnax*, Nos. WR-81,573-01 (Tex. Crim. App. May 20, 2015) (slip op.), adopting the Findings of Fact and Conclusions of Law (FFCL) of the trial court sitting in state habeas in *Ex parte James Garfield Broadnax,* No. W08-24667-Y(A) (Crim. Dist. Ct. #7, Dallas County, TX, Sept .17, 2014).

### OPINIONS AND ORDERS BELOW

| | |
|---|---|
| Appendix 1: | *Ex parte James Garfield Broadnax*, Nos. WR-81,573-01 (Tex. Crim. App. May 20, 2015) (slip op.) |
| Appendix 2: | *Ex parte James Garfield Broadnax,* Findings of Fact and Conclusions of Law (FFCL) No. W08-24667-Y(A) (CDC #7, Dallas County, TX, Sept. 17, 2014) |
| Appendix 3: | Court Order, 12-06-2012, Denying State Post-Conviction Broadnax Discovery Motion & Grant State Motion to Quash |
| Appendix 4: | Court Order, 12-20-2012, denying Reconsideration Motion |

### JURISDICTION

The Court has jurisdiction to review the order and opinion of the Texas Court of Criminal Appeals pursuant to 28 U.S.C. § 1257(a).

### CONSTITUTIONAL PROVISIONS INVOLVED

U.S. CONST. amend. VI, which provides: "In all criminal prosecutions, the accused shall enjoy the right to ...  have the assistance of counsel for his defense."

U.S. CONST. amend. XIV, which provides: "...  nor shall any State deprive any person of life, liberty, or property, without due process of law; ...."

**STATEMENT OF THE CASE**

A.    **Pre-2002 enactment of TFDA  – The magistrate appointed counsel in Dallas County, TX  for a capital-murder defendant within approximately 30 minutes to one (1) hour after Texas Magistration**

Prior to the 2002 enactment of the Texas Fair Defense Act (TFDA), a capital-murder defendant was brought before a Dallas County Magistrate, who apprised the defendant of the accusation against him, among other things.  ("Texas Magistration") (SWH Vol 3:58).  Immediately after the hearing, and drawing from a list of qualified capital defense lawyers, the Magistrate called counsel, until he found an attorney who was both willing to represent the defendant _and_ report to the Lew Sterrett Justice Center (Dallas County Jail),  (SWH Vol 3:44  – Bernhardt[1]), to meet with and advise the defendant within thirty (30) minutes to one (1) hour of receiving the call  –  even if the call had been placed at night, on a weekend, on a holiday, or during regular business hours.  (SWH Vol 3:52-53 – Busbee[2]); (SWH Vol 3:90  – Johnson[3]);   (SWH Vol 3:115  – Parks[4]);   (SWH Vol

---

[1]    Catherine Bernhardt is a criminal defense attorney who graduated from University of Texas in 1987, and was licensed to practice in 1987.  She worked in the Staff Attorney's Office for the Criminal District Courts of Dallas County, followed by employment in the Dallas County Public Defender's Office until September 2002, when she went into private practice doing criminal defense work.  (SWH Vol 3:23).

[2]    Brooke Busbee graduated from law school in 1979, and has been doing capital defense since 1989.  Board certified in criminal law, Busbee practices exclusively in the Dallas County criminal courts and in federal court.  (SWH Vol 3:51).

[3]    Karo Johnson was licensed to practice law in 1976, and his practice is exclusively criminal defense.  His first capital case was in 1994.  (SWH Vol 3:89).

[4]    Douglas (Doug) Parks was co-counsel representing Mr. Broadnax.  Mr. Parks was licensed to practice law in Texas in 1970, and is board certified in criminal law.  Mr. Parks is a member of the First Administrative District that approves the applications of lawyers to be placed on the list for capital appointments.(SWH Vol 3:114-116).

2

3:163-164 – Lollar[5]).  Mr. Lollar, testified that in the 1990s: "I was one of those counsel who was frequently called on the weekends by the magistrates at Sterrett." (SWH Vol 3:163-164 – Lollar).

After the attorney accepted the appointment, he would report to central intake at Sterrett, be given a badge, and then proceed to the interview room where counsel and client would meet.  (SWH Vol 3:90-91 – Johnson).  Counsel would tell the defendant of the court-appointment, explain that their communications were confidential, provide information about the situation that the defendant found himself in, and advise the defendant about the importance of not speaking to anyone except the defense team about the offense.   (SWH Vol 3:91 – Johnson).

Experienced capital defense counsel testified that immediate appointment of counsel following Texas Magistration is crucial because "whether they're mentally challenged or highly intelligent, they're in an excited state ...  the fog of war, in a sense.  They certainly need somebody to ... help them understand what their situation is. ..... [Without counsel to advise them], .... typically, the only people they're going to have contact with in that situation is going to be law enforcement or other people that are incarcerated with them." (SWH Vol 3:93, 94 – Johnson). *See also* (SWH Vol 3:44 – Bernhardt);  (SWH Vol 3:54, 69 – Busbee).

Prior to 2002, because the appointment was immediate following Texas Magistration, capital defense counsel prevented media interviews occurring at the Dallas County Jail without counsel's knowledge or presence.  Attorney Busbee testified: "I went down there and caught them [the media] in the sallyport [at the Dallas County Jail] and stopped them from taking a statement from [the

---

[5]        Bradley (Brad) Lollar was first chair in the Broadnax capital murder case.  Mr. Lollar graduated from SMU Law School in 1977, and had been doing criminal defense for thirty-five (35) years.  He worked for the Dallas District Attorney's Office from 1977 to 1982, and then went into private practice.  From 2005 to 2008, Mr. Lollar was appointed as the Chief Public Defender for Dallas County. (SWH Vol 3:131-132).

client].[6] So it was good for him that I showed up ... within the time period to assist.  Not so good

from their standpoint."  (SWH Vol 3:55 – Busbee).

Typically upon appointment, the Dallas County capital defense attorneys (both pre-and post

enactment of the TFDA) send a Do Not Interview Letter to the Dallas County Jailers ("Do Not

Interview Letter"). (SWH Vol 3:44 – Bernhardt); (SWH Vol 3:109 – Johnson); (SWH Vol 3:69 –

Busbee);  (SWH Vol 3:136 – Lollar). The Do Not Interview Letter filed with the Dallas County

Sheriff's Department ("Dallas County Jailers") prevents the Dallas County Jailers from giving the

media access to the capital-murder defendant.  (SWH Vol 3:44-45 – Bernhardt); (SWH Vol 3:68 –

Busbee) (RR Vol 41:14 - July 27, 2009 hearing - Leach).


**B.      Post-2002 enactment of TFDA  – Appointment of counsel for capital-murder defendants was based on a statutorily-specified time period, rather than on the need for counsel in a critical stage, creating an Appointment Gap**

The Texas Fair Defense Act (TFDA) became effective on January 1, 2002 radically changing

the procedure for the appointment of counsel for defendants charged with capital crimes in Dallas

County.  Although the defendant still requests counsel at Texas Magistration, "when" counsel is

appointed is governed by the time-period specified in the statute ("Appointment Time Period"). Only

after the capital case has been assigned to a particular district court ("Assigned Court") *and* the judge

receives the case, does the district judge of the Assigned Court  –  not the magistrate  – appoint

counsel.

---

[6]      *See  United States v. Wade,* 388 U.S. 218, 227 (1967), *citing Miranda v. Arizona*, 384 U.S. 436, 480-481 (1966) ("to refuse to recognize the right to counsel for fear that counsel will obstruct the course of justice is contrary to the basic assumptions upon which this Court has operated in Sixth Amendment cases.  We rejected similar logic in *Miranda v. State of Arizona*, concerning presence of counsel during custodial interrogation.").

The applicable provision in the TFDA statute in Mr. Broadnax's case was TEX. CODE CRIM. PROC. Art. 1.051, Right to Representation by Counsel (amendments effective September 1, 2007). It provided:

> "In a county with a population of 250,000 or more, ***the court*** or the courts' designee ***shall appoint counsel*** as required by this subsection as soon as possible, but ***not later than the end of <u>the first working day after the date on which the court</u>*** or the courts' designee <u>***receives the defendant's request***</u> ***for appointment of counsel***." (hereinafter "Appointment Time Period") (emphasis supplied).

Several factors in Dallas County create a significant delay or gap ("Appointment Delay" or "Gap") between the date the defendant requested counsel at Texas Magistration, and the actual appointment of counsel by the district judge of the Assigned Court. The first of these is that the presiding judge over all the Criminal District Courts in Dallas County, must decide which criminal district court (CDC) the case will be assigned to, so that the capital case load was/is evenly distributed among the courts. (SWH Vol 3:64 – Busbee); (SWH Vol 3:94 – Johnson); (SWH Vol 3:27 – Bernhardt). The second of these is that the Appointment Time Period includes only business days, and excludes Saturdays, Sundays, and holidays. (SWH Vol 3:107-108 – Johnson).

The three (3) calendar-day Appointment Gap in *Broadnax* resulted from the first two factors, plus an additional third factor: the case was reassigned from CDC #1 (Judge Burns) to CDC #7 (Judge Snipes) in order to keep co-defendants' cases (Cummings and Broadnax), before the same district court judge. Appx 8: Broadnax Arraignment Sheet, Affidavit of Indigence, and Instructions Relating to Preliminary Initial Appearance.

1.    **During the Appointment Gap, which can span hours, days, or even weeks between the request-for and appointment-of counsel, the Dallas County Sheriff's Department ("Dallas County Jailers") facilitate media-access to capital-murder defendants**

The Appointment Gap can span hours, days, and sometimes weeks between the request-for and appointment-of counsel. Some representative examples of the Gap for the time period 2007 to 2012 among the various Dallas County criminal district courts ("CDC") included:

Clients of Capital Trial Attorney Catherine Bernhardt
Defendant:    Teresa Renee Price, CDC #1, 5 day Gap (SWH Vol 3:34-36);
Defendant:    Mark Anthony Spears, CDC #7, 3 day Gap (SWH Vol 3:36);
Defendant:    Brandon Jared Fulwood, CDC #2, 2 day Gap (SWH Vol 3:39);
Defendant:    Chloe Menager, CDC #2, approx. 14 hours (SWH Vol 3:42-47).

Clients of Capital Trial Attorney Brook Busbee (SWH Vol 3:61-64)
Cause No. F11-61285; Defendant:    Galaviz; 8 day Gap (2011 case), 282nd Dist. Court
Cause No. F07-33618; Defendant:    Francisco Martinez; 5 day Gap (2007 case)
Cause No. F07-51820; Defendant:    Santiago Lara; 6 day Gap (2007 case)
Cause No. F10-13206; Defendant:    Amelia Guerrero; 5 day Gap (2010 case)
Cause No. F07-59596; Defendant:    Adrian Lopez; 4 day Gap (2007 case)
Cause No. F08-53019; Defendant:    Raul Salazar; 6 day Gap (2008 case)

The Dallas County capital defense bar is aware that the State was/is exploiting the Gap to its benefit, (SWH Vol 3:48 – Bernhardt); (SWH Vol 3:95, 96 – Johnson), even when the Gap is of short duration. In the *Chloe Menager* capital case, the Gap was only of a 14-hour duration between arraignment at 2:30 am September 7, 2012, and counsel-appointment on September 7, 2012 at 4:11 pm. Nevertheless, the Dallas County Jailers exploited the short Gap, and facilitated media access to Ms. Menager. The media broadcast the interviews over the television and internet that same day. (SWH Vol 3:42-47). *See e.g.,* Andrew Pantazi, published: September 7, 2012 4:14 pm[7]

---

[7]

http://crimeblog.dallasnews.com/2012/09/mother-accused-of-killing-her-1-year-old-son-in-west-oak-cliff-bathtub-denies-guilt-from-jail.html/

**2.    The Dallas County Jailers block attorney-access to the client, to facilitate the media interviews**

While a capital case ping-pongs through the administrative machinery of the Dallas County courthouse, the media and the Dallas County Jailers are coordinating their efforts to expedite media-access to the capital-murder defendant at the Dallas County Jail.  Capital defense attorneys William E. Karo Johnson (counsel for Franklin Davis) and former Assistant Dallas Public Defender Janet Cook (counsel for Charles Payne) testified that the Dallas County Jailers blocked access to their respective clients, to give the media time to interview the defendant.  *See* (SWH Vol 3:95-96 – Johnson); (*State v Broadnax*, RR Vol 41:86 - July 27, 2009 hearing); (SWH Vol 4: DX-1C);  (SWH Vol 3:56  - Busbee).

In the 2009 *Payne* case, Janet Cook, an Assistant Dallas County Public Defender, represented Charles Payne.[8]  *See*  (RR Vol 41:86 - July 27, 2009 hearing); (SWH Vol 4: DX-1C Letter/Affidavit of Janet Cook).  When Ms. Cook arrived at the jail to see her client, the Dallas County Jailers blocked her access to Mr. Payne.  The Dallas County Jailers made Ms. Cook wait, while other Dallas County Jailers escorted Fox 4 employees (media) to the interview room where the media conducted an interview of Mr. Payne.  *See* (RR Vol 41:86 - July 27, 2009 hearing); (SWH Vol 4: DX-1C Letter/Affidavit of Janet Cook).  Ms. Cook's letter to Dallas County Sheriff Lupez Valdez documents the episode:

---

[8]    Mr. Lollar introduced this evidence at the suppression hearing, but it does not support the trial theory that the Dallas County Jailers violated their own policy by making mentally ill clients available to the media for an interview.  There is no evidence Mr. Payne was mentally ill.

Nor did Mr. Lollar develop any details about the timing of the request for, and appointment of  Ms. Cook to show that the Dallas County Jailers were exploiting the Appointment Gap, notwithstanding that Mr. Lollar had argued at the August 4, 2009 pre-trial hearing that "the Sheriff's Department used the press to get what the police could not get, ...." (RR Vol 43:109).  *See* (SWH RR 3:120, 128).

7

> I was denied access to my client; my client was denied access to his attorney and investigator by the Sheriff's Office in a timely manner. I believe it was done intentionally to allow Fox news to get in and interview a potential death penalty defendant. The interview would not have happened without the Sheriff's office aiding Fox 4 to have access to my client and denying me access. My investigator and I were there prior to Fox 4's arrival and were kept waiting longer than 15 minutes after they were taken upstairs.

(RR Vol 41:86 - July 27, 2009 hearing); (SWH Vol 4: DX-1C Letter/Affidavit of Janet Cook).

In the 2012 *Davis* case, Mr. Johnson and other counsel had been appointed to represent Mr. Franklin Davis. Because of the time it took to assemble the entire defense team, they all arrived at the Dallas County Jail within two hours after their appointment, and submitted their bar cards and drivers' licenses in return for a pass that would allow an attorney/client visit. (SWH Vol 3:95-96 – Johnson). Attorney Johnson testified that the Dallas County Jailers deliberately delayed their access to Mr. Davis. The deputy for the Dallas County Jailers, who was in charge of visitation passes, suggested to Mr. Johnson that the defense team should wait. Mr. Johnson insisted on seeing his client. (SWH Vol 3:95-96 – Johnson). Eventually the Dallas County Jailers gave passes to the defense team, who proceeded to the visitation room. However, a TV crew was already in the attorney visitation room conducting an interview of Mr. Davis. (SWH Vol 3:96 – Johnson).

**C.    From at least 2007 to 2012, by exploiting the Appointment Gap using the Media Access Procedure, the Dallas County Jailers encouraged, solicited, coordinated and facilitated the media interviews of capital-murder defendants, including Mr. Broadnax in 2008. The State "must have known" that the media, as its agent, was likely to obtain incriminating statements in the absence of counsel**

Although never investigated or presented at trial, at the state post-conviction hearing, evidence was introduced that demonstrated how – by exploiting the Appointment Gap using the Media Access Procedure, *see* Appx. 5 – the State of Texas solicits, encourages, coordinates and facilitates interviews of capital defendants by the media (its agent), and that the State "must have

known" that the media, as its agent, was likely to obtain incriminating statements from capital-murder defendants, particularly Mr. Broadnax, in the absence of counsel.

> **1.      The Dallas County Jailers created a sample-letter or template (Template) for the media to pattern their requests for an inmate-interview.  For Broadnax, who suffered years of traumatic abuse and neglect, the Template's language was beguiling in its promise to give him voice to "tell his side of the story."  The letters from the Media, addressing "James" personally, are  identical and/or substantially similar to the Template**

The Dallas County Jailers have a written procedure (*see* Appx 5, hereinafter "Media Access Procedure") that facilitates and expedites media access to capital defendants.  (SWH Vol 3:56 – Busbee; SWH Vol 3:95 – Johnson).  It includes a form-letter or template ("Template") to request an interview with a capital defendant.  For an individual like James Broadnax, who suffered traumatic childhood abuse and neglect, the template's language is beguiling in its promise to give him voice to "tell [his] side of the story." *See*  Appx 5.  The Template reads:

> Media Logo On This Request Form
>
> Channel "?" requests an interview with you regarding the charges that have been filed against you. ***We would like to give you an opportunity to tell your side of the story***. If you are interested, please sign below so that the Sheriff's Department can notify us as soon as they receive your response about your situation.

(SWH Vol 3:102-105 – Johnson); (SWH Vol 4:DX-1A & DX-14).  *See also* Appx 5: Template.

The Inmate Interview-Request Letters from the Media to James Broadnax,[9] contain language that is identical, and/or substantially similar, to the Template.  Presuming first-name familiarity, the salutation in the Fox 4 letter opens with a greeting to "James," and continues:

---

[9]      Except for the letters from Channels 8 and 4, the Dallas County Jailers were not able to produce any of the other media letters in response to an open records request by Mr. Broadnax.

9

[Fox 4 Logo reproduced at the top of the letter]

***James***,

KDFW-TV Fox 4 would like to request an interview with you regarding the charges that have been filed against you. ***We are hoping by speaking with you***, ***you will be given this opportunity to tell your side of the story***. If you are interested in talking with KDFW-TV Fox 4, please notify the Sheriff's department as soon as they deliver this letter.

*Compare  Broadnax* Case:  Appx 5: Template <u>with</u> Appx 6: Media Interview Request Letters to Broadnax; *also reproduced at* (SWH Vol 4:DX-1A and DX-14 <u>with</u> SWH Vol 4:DX20).[10]

### 2.    The Dallas County Jailers knew that on June 21, 2008 Mr. Broadnax had invoked his Sixth Amendment right to counsel at Texas Magistration

At least as early as Friday, June 20, 2008, at 7:38, while *Mr. Broadnax was still in the Garland City Jail*, television Channels 4, 5, 8, and 11 faxed their Inmate Interview-Request Letters addressed to Mr. Broadnax to the attention of Ms. Leach, the Public Relations/Information Officer (PIO) and employee of the Dallas County Jailers *at the Dallas County Jail*.  (Carmen Castro was her successor). (RR Vol 41:18-20 - July 27, 2009 hearing).  On June 21, 2008, Mr. Broadnax was transferred to the Dallas County Jail.  State Application Exhibit 3:  Business Records Affidavit, and Sheriff's Dept Records (Dallas County Book In). *See also* RR 39:14-15.

Mr. Broadnax had twice invoked his Sixth Amendment right to counsel.  His first request occurred when he was incarcerated in the City of Garland Jail on June 20, 2008, (RR Vol 43:17, 106).  After Mr. Broadnax was transferred from the Garland City Jail to the Dallas County Jail where he was booked-in on June 21, 2008 (Saturday), a weekend, he requested counsel for a second time.

---

[10]    The 2012 Letters from the Media to Mr. Davis also contained language that is identical, and/or substantially similar, to the content of the Template.  It too urged Mr. Davis "to tell his side of the story." Appx 9: Interview Request Letters from Media to Davis. *Compare* SWH Vol 3:98-101 <u>with</u> 102-105 (Template) (Attorney Johnson testifying to content of letters and Template).

10

Specifically, at 5:45 am on Saturday, June 21, 2008, Mr. Broadnax appeared before a magistrate in Dallas County on capital murder charges, and invoked his Sixth Amendment right to counsel.  Appx 8: Broadnax: Arraignment Sheet, etc.; (RR Vol 43:106; SWH Vol 4:DX-17).

However, no counsel was appointed for Mr. Broadnax on June 20th or 21st, 2008 or immediately thereafter  – notwithstanding that at the conclusion of the state post-conviction proceeding, the Texas court ruled that "[a]n article 15.17 initial appearance and magistration marks the initiation of adversarial judicial proceedings in Texas and 'plainly signals' the attachment of a defendant's Sixth Amendment right to counsel.  *Pecina v. State*, 361 S.W. 3d 68, 77 (Tex. Crim. App. 2012) (*citing Rothgery*, 554 U.S. at 212)."  App. 2:  *Ex parte Broadnax*, FFCL #18.

The Dallas County Jailers had actual and/or constructive knowledge that Mr. Broadnax had invoked his Sixth Amendment right to counsel at Texas Magistration.  Mr. Lollar, lead counsel for Mr. Broadnax, had practiced criminal law for thirty-five (35) years in Dallas County. His wife was a Dallas County Magistrate who conducted arraignments in Dallas County Criminal Courts over a seven year period, including in 2008 when Mr. Broadnax's case was pending in Dallas County. (SWH Vol 3:132).  Mr. Lollar  testified to the actual and/or constructive knowledge of the Dallas County Jailers that Mr. Broadnax had invoked his Sixth Amendment right to counsel:

Q.    And who brings them [the defendants] before the magistrate?

A.    The jailers.

Q.    And do the jailers stay in the courtroom with the defendant?

A.    Yes.

Q.    Yes. So both the defendant and the jailers are in the same room and the magistrate is there. And then what happens?

A.    Well, it's a courtroom. And the magistrate will arraign the defendants. Tell them what they're charged with, set their bonds, tell them their rights and have them -- then have their clerks hand the paperwork to the jailers to

11

deliver to the defendants, the affidavits of indigency and whether they're requesting counsel. The –

Q.     So the jailers are actually taking them [the paperwork] to the defendant?

A.     Yes.

Q.     Okay.

A.     And then the defendants will fill them [the paperwork] out.

Q.     And who do they fill them [the paperwork] out in front of?

A.     The jailers.

Q.     Okay. Where do they get the pen from?

A.     The jailer.

Q.     Okay.

A.     They can't have a pen so the jailer has to stand there with them [the defendants] while they fill out the paperwork.

Q.     Okay. Go ahead.

A.     So the paperwork is taken back from the defendant, along with the pen. They take that to the magistrate's clerks and then that is delivered to the magistrate. And that paperwork –

Q.     When you're talking about they, you're talking about the jailers bringing this paperwork from the defendant that they witnessed the signature on to the magistrate's clerks; is that correct?

A.     Yes.

Q.     ***So would you agree that the Dallas County jailers knew or should have known that the capital defendant had invoked his rights to counsel?***

A.     ***Well, it is done right in front of them, yes, and they're delivering the paperwork.***

Q.     Okay.

A.     And then that paperwork is forwarded on to the district courts.

12

(Emphasis supplied) (SWH Vol 3:133-135 - Lollar). *See  Maine v. Moulton*, 474 U.S. 159, 176

(1985) ("The Sixth Amendment guarantees the accused, at least after the initiation of formal charges,

the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee

includes the State's affirmative obligation not to act in a manner that circumvents the protections

accorded the accused by invoking this right.").

> **3.    On June 23, 2008, the Dallas County Jailers knew the letters from the Media to Mr. Broadnax did not comply with the Media Access Procedure. The Dallas County Jailers filled in the missing, but required, information**

On Monday June 23, 2008, Ms. Leach reviewed the Inmate Interview-Request Letters from

Channels 4, 5, 8, and 11.  The letters did not comply with the Media Access Procedure, *see* Appx

5.  Ms. Leach testified:  "For instance, on the first one that Fox sent over, they did not put the book-

in number or West Tower.  These are some things I [the Media Access Procedure] require."  (RR

Vol 41:19 - July 27, 2009 hearing).  To bring the letters into compliance, "I had to go in and look

that up, put that on there ...." (RR Vol 41:20 - July 27, 2009 hearing).  There were other omissions

as well, and her handwritten corrections are on the letters.[11]  (RR Vol 41:42 - July 27, 2009 hearing);

Appx 6: Media Interview Request Letters to Broadnax.    After Ms. Leach filled in the omitted

information that the media were required to provide, she faxed the letters into the jail.

On June 23, 2008  –  the day of the media interviews, James Broadnax was housed in the

West Tower in 3P05, the psychiatric ward for the Dallas County Jail, where he was in closed

behavioral observation.  Two hours before the media interviews, Mr. Broadnax had been seen by a

---

[11]    *See also* Appx 9:  Letters from Media to Davis.  It also appears the PIO had hand-written in on the Media letters to Franklin Davis, the missing information required by the Media Access Procedure (*e.g.,* book-in number, location, etc).

jail psychiatrist and psychological assessor, who determined that Mr. Broadnax was psychotic due to polysubstance abuse. (SWH Vol 3:144 – Lollar). The medical records reflect that before his arrest, and on June 23, 2008, nineteen-year-old Mr. Broadnax had been having auditory and visual hallucinations and was delusional, that he had no memory of talking to reporters on June 23, 2008, and that he was on "whack" [the street term for PCP] at the time of the commission of the charged offense. (RR 50:86-87). Whack (PCP) is a substance that can cause psychosis even a month after its ingestion. (RR 50:89-92).

**4.      On June 23, 2008, Officer Spratling hand-delivered the letters from the Media to 19-year old, psychotic Mr. Broadnax, who was housed in the psychiatric ward of the jail; she witnessed his signature purporting to consent to the interviews**

Officer Spratling, Badge #5795, hand-delivered to Mr. Broadnax, the Inmate Interview-Request Letters from the media that had been faxed into the jail by PIO Leach. Officer Spratling handed Mr. Broadnax a pen, and witnessed his signature which purports to be his consent to be interviewed, by affixing her signature beneath his.[12] (RR Vol 41:18-21 - July 27, 2009 hearing); (SWH Vol 3:150 - Lollar; SWH Vol 4:DX-20); (SWH Vol 3:56 – Busbee). No counsel had been appointed for Mr. Broadnax at that time, so "typically, the only people they're [an accused is] going to have contact with in that situation is going to be law enforcement or other people that are incarcerated with them." (SWH Vol 3:93, 94 – Johnson). *See also* (SWH Vol 3:44 – Bernhardt); (SWH Vol 3:54, 69 – Busbee). Attorney Busbee testified in the state post-conviction evidentiary hearing that on more than one occasion: "My clients have told me they have been encouraged by the jailers to talk to the press." (SWH Vol 3:56 – Busbee).

---

[12]      Officer Spratling was not subpoenaed to testify at the suppression hearing or trial. Appx 6: Interview-Request Letters from the Media to Broadnax.

**5.      On June 23, 2008, the Dallas County Jailers set up and escorted the media to the interview room, gave them each 30 minutes for the interview, and were present during the media interviews of Mr. Broadnax**

Ms. Leach set up the interview room in the Dallas County Jail, and told the media: "You're going to get 30 minutes each.  ....  Once the 30 minutes were up, I told them to go upstairs and the officer escorted them upstairs and then I escorted the next media in so I could kind of keep it on track." (RR Vol 41:24-25 - July 27, 2009 hearing).

Officer Hicklen brought Mr. Broadnax from the closed behavioral unit to a visitation room. She testified she saw no signs of psychosis in him, and agreed with the prosecutor's leading question that on the way up to the visitation room, she and Mr. Broadnax did not have any conversations as to what he should or should not do about the media interviews.  However, Officer Hicklen admitted she did not know that she was taking Mr. Broadnax to be interviewed by the media, until she saw the media setting up in the visitation room.  Officer Hicklen and other officers remained there while the media interviews were in progress.  (RR Vol 41:65-66, 70-71 - July 27, 2009 hearing; SWH Vol 3:148-149, 153 – Lollar).  Ms. Leach was present during the media interviews as well. (RR Vol 41:29 - July 27, 2009 hearing).

**6.      On June 23, 2008, the same day the media conducted their interviews of Mr. Broadnax, this Court decided _Rothgery_.  _Rothgery_ reaffirmed the 1991 holding in _McNeil_ that the Sixth Amendment right to counsel attaches at first formal appearance and recognized the overwhelming consensus practice of making counsel available at that time; ruled that Texas had not offered an acceptable justification of its minority practice of denying counsel at Texas Magistration; and left open the question whether there is a substantive Sixth Amendment right to appointment of counsel _at_ Texas Magistration**

On June 23, 2008 (the same day the media conducted their interviews of Mr. Broadnax), this Court had decided _Rothgery v. Gillespie County, TX_, 554 U.S. 191 (2008).  _Rothgery_ cited long-

established precedent for the proposition that "[t]he Sixth Amendment right to counsel attaches at the first formal proceeding against an accused," 554 U.S. at 203, *citing McNeil*, 501 U.S. at 180-181. Defense counsel for Mr. Broadnax failed altogether to cite to *Rothgery* and argue that Mr. Broadnax's Sixth Amendment right to counsel had attached at Texas Magistration.

*Rothgery* had also recognized "the overwhelming consensus practice conforms to the rule that the first formal proceeding is the point of attachment," and "in most States, at least with respect to serious offenses, free counsel is made available at that time."   *Rothgery*, 554 U.S. at 205. *Rothgery* ruled that "neither the [Fifth Circuit] Court of Appeals in its opinion, nor [Gillespie] County[, TX]  in its briefing to us, has offered an acceptable" "justification for the minority practice" in Texas of denying appointment of counsel at Texas Magistration.[13] *Id.* at 205. In his concurrence, Justice Alito noted that the question of whether "the assistance of counsel in the wake of a Texas magistration is part of the substantive guarantee of the Sixth Amendment ... lies beyond our reach, petitioner having never sought our review of it." *Id.* at 216 (Alito, Scalia, JJ. and Roberts, CJ., concurring).

Defense counsel failed to present this Sixth Amendment question in *Broadnax* (a case that was the perfect vehicle in which to do so), despite the fact that *Rothgery* cited a line of controlling precedent[14] that suggests that the answer is:  "Yes,  the assistance of counsel in the wake of a Texas

---

[13]    Six months after Texas Magistration, Rothgery was finally assigned a lawyer, who promptly obtained a bail reduction (so Rothgery could get out of jail), and had the indictment dismissed.  554 U.S. at 196-197.

[14] *See  Rothgery*, 554 U.S. at 203 (In *McNeil v. Wisconsin,* 501 U.S. 171 (1991), "we went on to reaffirm that '[t]he Sixth Amendment right to counsel attaches at the first formal proceeding against an accused,' and observed that 'in most States, at least with respect to serious offenses, free counsel is made available at that time ....' *Id.,* at 180–181"); *Rothgery*, 554 U.S. at 217 ("At the same time, we have recognized that certain pretrial events may so prejudice the outcome of the defendant's prosecution that, as a practical matter, the defendant must be represented at those events in order to enjoy genuinely effective assistance at trial. *See*, *e.g., United States v. Ash*, 413 U.S. 300, 309–310,

16

magistration *is* part of the substantive guarantee of the Sixth Amendment."  Except for citing *Miranda*, trial counsel did not rely on any other case law in its Motion to Suppress  –  not to *Ash*, *Coleman, Estelle, Harvey, McNeil, Rothgery, Wade*, or *White*.  Nor did defense counsel's suppression argument place the judge on notice of any of this Sixth Amendment precedent, *see infra*.

> **7.     The Media Interviews are a critical stage because they were structured to, and did, elicit from Mr. Broadnax: a confession, statements of lack of remorse and that death is an appropriate punishment because he would kill again; the prosecutor subpoenaed the videotaped interviews**

Capital defense counsel testified that the media interviews consist of three topics:  1.  Did you do it? 2.  Are you remorseful? 3.  Do you deserve a death sentence?  (SWH Vol 3:97, 111-112 - Johnson). When the answers "are incriminating, they invariably end up  being used [by the prosecutor] at trial." (SWH Vol 3:46 - Bernhardt).  The media asked Mr. Broadnax the same three questions the media consistently ask capital-murder defendants, (SWH Vol 3:97, 111-112  – Johnson). *See also* (SWH Vol 3:46, 47 - Bernhardt):

> a.     *Did you do it?*     Broadnax "confessed to murdering two defenseless men in order to steal their car so he could return home... [and] shot each man a second time after their initial wounds failed to kill them immediately. Then ... rifled through their pockets;"

---

(1973); *United States v. Wade,* 388 U.S. 218, 226 (1967). .... *see also White v. Maryland,* 373 U.S. 59 (1963) *(per curiam)*. We have also held that the assistance of counsel is guaranteed at a pretrial lineup, since "the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *Wade, supra,* at 228.  Other "critical stages" of the prosecution include pretrial interrogation, a pretrial psychiatric exam, and certain kinds of arraignments. *See Michigan v. Harvey,* 494 U.S. 344, 358, n. 4 (1990) (Stevens, J., dissenting); *Estelle v. Smith,* 451 U.S. 454, 470–471 (1981); *Coleman v. Alabama,* 399 U.S. 1, 7–8 (1970) (plurality opinion)."); *Rothgery*, 554 U.S. at 225 ("In a line of constitutional cases in this Court stemming back to the Court's landmark opinion in *Powell v. Alabama,* 287 U.S. 45 (1932), it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.").

17

b.   *Are you remorseful?*   "When asked if he had anything to say to the victims' families, the appellant responded, 'Fuck 'em.' To the specific question by the interviewer, 'Do you have any remorse, none whatsoever?' the appellant only shook his head."

c.   *What punishment?*   "Hopefully the death penalty.... 'Cuz they give me life I'ma' kill somebody else. Straight up. I'm telling you right now. I can't do no motherfuckin' life."

*Broadnax v. State*, AP-76, 207, 2011 WL 6225399, *17 (Tex. Crim. App. 2011) (not designated for

publication).   "Shortly thereafter, the Dallas County District Attorney's Office (the "DA's Office")

subpoenaed the video out takes of these interviews...." (CR 2:348; RR 43:3); (SWH Vol 3:139-140,

149 – Lollar). "The taped footage from these interviews [was] provided to the State," *In re Rabb*,

293 S.W.3d 865, 866 (Tex. App. 2009).

**8.    On Tuesday June 24, 2008, after an Appointment Gap of three (3) calendar days, counsel was appointed for Mr. Broadnax**

On Tuesday, June 24, 2008 about 9:30 am,[15] Judge Snipes in CDC #7, (and not Judge Burns

in CDC #1), appointed Mr. Lollar as Mr. Broadnax's counsel.  (SWH Vol 3:135-138 – Lollar).  In

the *Broadnax* case, the three (3) calendar-day Gap included not only the weekend, but also a business

day (Monday June 23, 2008), during which time the *Broadnax* case was reassigned from CDC #1

(Judge Burns) to CDC #7 (Judge Snipes) because Judge Snipes was already presiding over the

*Cummings* case (Broadnax's co-defendant).  (SWH Vol 3:137-138 – Lollar).  In Dallas County,

co-defendant cases are presided over by the same judge.

Immediately upon his appointment on Tuesday June 24, 2008, Mr. Lollar sent a Do Not

Interview Letter to the Dallas County Jailers.  It was too late.  The media had already videotaped and

broadcast their interviews of Mr. Broadnax on June 23, 2008.   (SWH Vol 3:136 – Lollar).

---

[15]    Although Mr. Lollar's billing records showed an appointment date of June 23, 2008, Mr. Lollar testified that that was a scrivener's error. (SWH Vol 3:139-140 – Lollar).

18

### D.    The Motion to Suppress the videotaped interviews

### 1.    Right to Counsel Trial Claim:  Facts & Legal Theory

On April 2, 2009, defense counsel filed a Motion to Suppress Statements Made to the Media. It plead, among other things, that Mr. Broadnax had not been given *Miranda*[16] warnings, and "[t]hese statements were made after the defendant had invoked his right to counsel upon being magistrated in the Dallas County jail and after the Magistrate Judge had approved appointment of counsel, but before counsel had been appointed." Appx 7: Motion to Suppress (Trial CR Supp. Index 1:201-202).

---

[16]    The state habeas court ruled that trial counsel raised a Sixth Amendment failure-to-appoint counsel claim at trial.  *See*  FFCL #74 ("Contrary to Applicant's allegation, *trial counsel did object to the admissibility of the media interviews based on violations of the Sixth Amendment*. (RR 43:105-106)"); FFCL #14 ("*This Court and Court of Criminal Appeals **have already rejected** Applicant's Sixth Amendment claim* that the reporters were acting as agents of the state during the interviews.  (RR 43:111-13); *Broadnax*, 2011 Tex. Crim. App. Unpub. LEXIS 920, at *28-30.") (emphasis supplied).

However, there is scant record evidence that a Sixth Amendment right-to-counsel claim was raised and preserved.  The only reference to a Sixth Amendment right to counsel in RR 43:105-106, to which the FFCL #74 cites, *supra*, is Lollar's argument on page 105: "Globally, our objection to the introduction of these tapes are under the Fifth, *Sixth*, Eighth and 14 Amendments of the United States Constitution...."  (Emphasis added).

*In contrast, the trial record supports that  Mr. Lollar made a Fifth Amendment right to counsel argument* at the suppression hearing, by citing to the Fifth Amendment, *Miranda*, and specific facts that "the defendant had twice requested appointment of counsel.... [B]y the time the Sheriff's Department allowed the defendant to be interviewed, clearly he was in custody ... of the Dallas County Jail...." (emphasis added) (RR Vol 43:105-109).  The Texas Court of Criminal Appeals in the direct appeal opinion recognized the claim as a Fifth, not Sixth, amendment right to counsel: "Specifically, the appellant argues that these reporters were *de facto* agents of the State, and, as such, were required to properly *Mirandize* the appellant in compliance with the United States Constitution and the Texas Code of Criminal Procedure." *Broadnax v. State*, No. AP 76,207, 2011 WL 6225399, at *10 (Tex. Crim. App. Dec. 14, 2011).

Except for *Miranda*,[17] no other case law was cited in the motion, nor did trial counsel's suppression argument place the judge on notice of any caselaw, except for *Miranda*.

On July 27, 2009, the court held a pre-trial hearing, for which the prosecutor had subpoenaed Dallas County Jail personnel (PIO Leach and Officer Hicklen), as well as the reporters who interviewed Mr. Broadnax, to appear. *See e.g.* (RR Vol 41 – July 27, 2009 hearing). The reporters did not testify at all at the July 27, 2009 hearing. "The State claims to need testimony to discuss the physical and mental condition of Broadnax during the various interviews as well as the procedural steps taken by the reporters to obtain the interviews .... [However, the reporters] ... moved to quash the subpoenas, ... argu[ing] that the subpoenas cannot be enforced under the Texas Free Flow of Information Act, which was enacted by the legislature on May 13, 2009." *In re Rabb*, 293 S.W.3d 865, 866-867 (Tex. App. 2009). The reporters lost. The court ruled: "By its very terms, the 'Act applies only to information, documents, or items or the source of any information, document, or item obtained or prepared for publication in a news medium or communication service provider *on or after* the effective date of this Act.'... It is undisputed the evidence sought through the subpoenas relates to information obtained or prepared long before the effective date of the Act." *In re Rabb*, 293 S.W.3d at 867 (emphasis in original).

---

[17]    This Court in *McNeil* distinguished an accused's Sixth Amendment right to counsel from the *Miranda/Edwards* Fifth Amendment right to counsel. "As to the former: The purpose of the Sixth Amendment counsel guarantee – and hence the purpose of invoking it – is to 'protec[t] the unaided layman at critical confrontations' with his 'expert adversary,' the government, *after* 'the adverse positions of government and defendant have solidified' with respect to a particular alleged crime. *United States v. Gouveia,* 467 U.S. 180, 189 (1984).

The purpose of the *Miranda–Edwards* [Fifth Amendment] guarantee, on the other hand – and hence the purpose of invoking it – is to protect a quite different interest: the suspect's 'desire to deal with the police only through counsel,' *Edwards, supra,* 451 U.S., at 484. This is in one respect narrower than the interest protected by the Sixth Amendment guarantee (because it relates only to custodial interrogation) and in another respect broader (because it relates to interrogation regarding *any* suspected crime and attaches whether or not the 'adversarial relationship' produced by a pending prosecution has yet arisen)." *McNeil v. Wisconsin*, 501 U.S. 171, 177-178 (1991).

20

Despite the July 31, 2009 *In re Raab* decision, there is no record of a defense motion-to-continue the suppression hearing scheduled for August 4, 2009 or the trial.  Unlike the prosecutor, the defense failed to make any effort to investigate and discover from the reporters, the assignments-editors, or any other media wellspring, "the source of any information" about events which culminated in the media interviews of Mr. Broadnax at the Dallas County Jail.  *See* (Trial Clerk's Record).  Neither had the defense made any attempt before the suppression hearing to talk to the first-responders, such as  law-enforcement and beat-reporters, or the Dallas County Jailers (*e.g.,* Officer Spratling).  Mr. Lollar and Mr. Parks admitted in the state post-conviction hearing, they did no pre-trial investigation to learn the answers to the who/what/when/where/why questions about first-contact between media and law enforcement.  (SWH Vol 3:151-152 – Lollar);   (SWH Vol 3:121-122 – Parks).

Likewise, despite this Court's June 23, 2008 decision in *Rothgery,* and prior precedent cited therein, trial counsel had not investigated into, or talked to any of the Dallas County capital defense bar about, the Appointment Gap, (SWH Vol 3:120 - Parks), nor asserted that as part of the substantive guarantee of the Sixth Amendment, Mr. Broadnax, a capital-murder defendant, was entitled to appointment of counsel <u>at</u> Texas Magistration. (SWH Vol 3:165 – Lollar).

On August 4, 2009, the court held another pre-trial hearing on the Motion to Suppress Statements Made to the Media and the reporters testified at this hearing.  According to Mr. Lollar, the defense theory was that the Dallas County Jailers had violated their written policy by allowing the media to interview Mr. Broadax who was psychotic at that time due to polysubstance abuse. (SWH Vol 3:144  –  Lollar).  The written policy, however, stated: "Interviews ***may*** [not shall] be denied based upon jail staffing, emergency condition or the inmate's physical or mental condition at the time of the request."  (emphasis supplied) (SWH Vol 4:DX-1A and DX-14).

The facts underpinning the right-to-counsel trial claim were that:

a.      At the time of the media interviews, Mr. Broadnax was in a psychotic rage because of intoxicants he had ingested, *see* FFCL #105;

b.      The Dallas County Jailers violated their own written policy; they gave the media access to a mentally ill defendant, Mr. Broadnax, *see* (SWH Vol 4:DX-21 (also Defense Trial Exhibit 10) (Trial Vol. 43:105-106, *infra*); and

c.      The media were state agents because *Mr. Broadnax was in custody*; without the cooperation of the Dallas County Jailers, the media would not have had access to Mr. Broadnax.  (RR Vol 43:105-106 – Lollar)

It was the defense position that the reporters were state agents because there was "cooperation of the Sheriff's Department, as all these reporters stated they would not be able to get up to see the defendant." (Trial Vol. 43:105-106).  But the prosecutor had pointedly asked each reporter if he or she had "had any conversations with anybody from law enforcement about interviewing the defendant?"  Each responded: "No." (Shawn Rabb KDFW (Channel 4, Fox News) – RR 43:7, 9); (Rebecca Lopez  WFAA (Channel 8) –  RR 43:40, 60-61); (Steve Pickett ( Channel 11)  –  RR 43:66); (Ellen Goldberg (Channel 5)  –  RR 43:88).

One reporter testified that the interview arrangements had been made by "someone at the station [who] files an interview request."  (RR 43:7).  That "someone" was an assignments-editor, who in turn assigned a reporter to go to the Dallas County Jail and interview Mr. Broadnax. None of the assignments-editors[18] were subpoenaed to testify at the suppression hearing or at the trial.

In closing argument, Mr. Lollar argued to Judge Snipes:

> Globally, ***our objection to the introduction of these tapes are under the Fifth, Sixth, Eighth and 14 Amendments of the United States Constitution***, Article

---

[18]     The signature block of Gregg Millett, Assignments Editor for Fox 4 News, and of Carlos Rosales, the Assignments Editor for WFFA Channel 8 News, were on their respective Inmate Interview-Request Letters faxed to  the Dallas County Jail. Neither Millett nor Rosales were subpoenaed to testify at the July 27, 2009 hearing (Vol 41), or the August 4, 2009 hearing on the Motion to Suppress (Vol 43). *See*  Appendix 6:  Interview-Request Letters to Broadnax.

I, Section 92, 13, 15 and 19, the Texas State Constitution and Article 38.23 of the Texas Code of Criminal Procedure. We would suggest to the Court that what the Court has seen here is a concerted effort by law enforcement, that being the Sheriff's Office to get these reporters up to see the defendant in violation of his constitutional rights.

We suggest that the defendant – *the evidence shows that the defendant had twice requested appointment of counsel. That had not been complied with*. *Yet by the time the Sheriff's Department allowed the defendant to be interviewed, clearly he was in custody ... of the Dallas County Jail, and without the cooperation of the Sheriff's Department, all these reporters stated they would not be able to get to see the defendant*.

Secondly, we suggest *because the defendant was in the mental state he was, it was a violation of the sheriff's own written policies to allow a defendant to be interviewed in the mental state that he was*. The record clearly shows that at the time the defendant was interviewed, he had been seen by the psychiatric staff at the jail.    ....

... his Fifth Amendment right not to incriminate himself, were violated. The right to counsel has been violated in violation of the Fifth Amendment. His right to a fair trial had been violated by all of these proceedings conducted through *the Dallas County Sheriff's Office*, which is a law-enforcement agency that had care, custody and control of the defendant at the time he [sic] *had allowed them to have them [sic] despite their written procedures and policies, which would deny a person of his mental condition being allowed by the Sheriff's Department to make statements to the press*.

*The records reflect that I was not appointed by this Court until the next day following these interviews, and at that time I immediately cut off his access to the press and to other law-enforcement agencies*. We feel that under his constitutional rights, his rights have been violated and the court should suppress the admission of all these videotapes.    ....

... *the Sheriff's Department used the press to get what the police could not get, and that was a confession from the defendant. They did it while he was in a state of psychosis* as is given by the medical records, and will be proven during trial of the testimony of the psych assessor and psychiatrist who saw him on the morning of June 23rd.

(Emphasis supplied) (RR Vol 43:105-109); *See also* (SWH Vol 3:143-144, 148-149 – Lollar).

23

**2.      At the suppression hearing, the trial court ruled: "*On this record we cannot conclude that the reporter was acting as a State agent* when he interviewed appellant," and "*whether the defense was able to prove an agency relationship*, which they must in order for their argument to succeed, *is not even a close one***

It was unremarkable that the trial judge denied the Motion to Suppress.  (RR 43:113).The Texas court rulings in state post-conviction lend themselves to the mis-impression that the trial judge had ruled the media were not acting as state agents based on a well-developed record.  *Compare* FFCL # 14, 23 ("The reporters who interviewed Applicant were not acting as agents of the State. RR 43:111-13.").  In point of fact, the trial court ruling on the Motion to Suppress was considerably more narrow. The trial court ruling could be better characterized as a finding of trial counsel deficiency for failure to adequately develop and present facts of agency:

> "*On this record* **we cannot conclude that the reporter was acting as a State agent** when he interviewed appellant," and "**whether the defense was able to prove an agency relationship**, which they must in order for their argument to succeed, **is not even a close one**."

(RR 43:113) (emphasis supplied).

The Texas Court of Criminal Appeals affirmed:  "Here, all four interviewers testified that they had no such agreement with law enforcement personnel, and the appellant points to no evidence of any agreement."  *Broadnax v. State*, No. AP,76, 207, 2011 WL 6225399, *17 (Tex. Crim. App. 2011) (not designated for publication)*, B. The Appellant's Television Interviews*.

**E.      The videotaped interviews of the psychotic, 19-year old Broadnax were played at trial, and during deliberations, at the jurors' request; having extensively discussed the videotaped interviews, the Texas Court of Criminal Appeals affirmed the conviction and death sentence on direct appeal**

The videotapes infected every aspect of the trial.  In opening statement, the prosecutor argued to the jury:  "[T]he defendant gave interviews to the media, and you'll get to see three of [them].... The defendant is going to tell you about this cold, calculated, execution style murder/robbery, ....

24

[With] absolutely no remorse.... [he] stares straight into the camera and says Fuck them [the victims]. Fuck them and their fucking families. .... [Y]ou'll see in those videos a cold, calculated person... you'll get to see it for yourself." (Trial Vol. 45:56-58). The videotaped interviews of Mr. Broadnax were admitted into evidence in the guilt/innocence phase on August 10 & 11, 2009. (Trial Vol. 45, 46, 47; SWH Vol 3:151 – Lollar). As promised in the opening statement, the prosecutor played the media interviews of Mr. Broadnax on each day. (Channel 11 videotape played 08-10-2009 (Trial Vol. 45:125-26); Channel 5 videotape played 08-10-2009 (Trial Vol. 45:277); Channel 4 videotape played 08-11-2009 (Trial Vol. 46:230, 233)). The jury returned a verdict of guilty of capital murder. (Trial Vol. 47:203; Trial Clerk's Record 3:635).

The videotapes became the focal point of the punishment phase as well. Among other things, the prosecutor used the media interviews to cross-examine defense expert, Dr. Roache. Dr. Roache deflected the prosecutor's assertion: "we could replay it," by replying that he had reviewed a portion of the videotape the night before. But then, referring to Mr. Broadnax's statements in the media interviews, the prosecutor ensnared Dr. Roache into answering "yes," to the prosecutor's questions: You would agree that "*we have seen* ... calculation, [and] manipulation, and ... some great memory about exactly what he did." (Emphasis supplied) (Trial Vol. 50:212-213). Thereafter in closing, the prosecutor argued Mr. Broadnax was a future danger because he exhibited characteristics that fit the HARE psychopathy checklist: "My God, so cold, so calculated.... conning and manipulative." (Trial Vol.53:69, 70; Exhibit 595).

During their deliberations, the jury sent out a note requesting, among other things: "video of channel 5 interview." (Trial Clerk's Record 3:648). The trial judge responded, in pertinent part: "The Bailiff will come to the jury room and play the video of Channel 5 shortly." (Trial Clerk's Record 3:649).

25

On August 21, 2009, the trial judge imposed a death sentence pursuant to the jury's answers to the two Texas punishment phase special issues: "Yes" (Special Issue #1:  future dangerousness); "No" (Special Issue #2:  mitigating circumstances warrant life instead of death) (Trial Clerk's Record 3:650-651; 698).

The Texas Court of Criminal Appeals extensively discussed the videotaped interviews in its direct appeal opinion affirming the conviction and death sentence:

*H. Sufficiency of the Evidence  – Future Dangerousness*

... sufficient evidence of future dangerousness can be inferred from the offense itself. [footnote 113 omitted].    Here, ***the appellant confessed to murdering two defenseless men in order to steal their car so he could return home***. The appellant ***described to reporters how he shot each man a second time after their initial wounds failed to kill them immediately. Then***, when the appellant was sure the victims had expired, ***he rifled through their pockets***.

The probability of appellant's future dangerousness also can be inferred from evidence ***showing a lack of remorse***. [footnote 114 omitted].  In the same television interviews discussed above, ***the appellant coldly and calmly walked reporters through the murders. When asked if he had anything to say to the victims' families, the appellant responded, "Fuck 'em." To the specific question by the interviewer, "Do you have any remorse, none whatsoever?" the appellant only shook his head.***

(Emphasis supplied)  *Broadnax*, 2011 WL 6225399, at \*17.

The media interviews also asked Mr. Broadnax about punishment:

Reporter:      What do you think's going to happen to you now?

Appellant:      Whatever they throw at me. ***Hopefully the death penalty***.

Reporter:      Hopefully?

Appellant:      Yea. '***Cuz they give me life I'ma' kill somebody else.*** Straight up. I'm telling you right now. I can't do no motherfuckin' life. I'ma' go crazy.

Reporter:      So you want the death penalty?

Appellant:      They better. Pick one [the appellant holds up each arm, presumably referencing the lethal injection method of execution]. Or **you gon' have some more bodies**.

Reporter:       Oh, in here you're gonna kill someone?

Appellant:      Nah. **Whichever penitentiary they send me to.** They better put me on death row. Tell you just like I'ma tell the judge.

(Emphasis supplied)  *Broadnax*, 2011 WL 6225399, at \*17, B. The Appellant's TV Interviews.

## F.     The State Post Conviction claims are *different* from the one raised at trial

The Sixth and Fourteenth Amendment right-to-counsel claims raised in Grounds One, Two and Three of the state habeas Application challenging the media interviews, are _different factually_, _and_ relied on a _different legal theory_, from the right-to-counsel claim raised at trial.[19]

### 1.     The 6th & 14th Amendment Habeas Claims:  Facts and Legal Theory

Mr. Broadnax plead and proved in state habeas that his Sixth and Fourteenth Amendment rights to counsel and to procedural and substantive due process were violated because:

a.      Broadnax had a substantive 6th amendment right to counsel _at_ Texas Magistration, but counsel was appointed based on a statutorily-specified period after magistration instead, creating an Appointment Gap, *citing Michigan v. Harvey*, 494 U.S. 344, 357-58 (1990) ("A defendant is entitled to the aid of his lawyer from the time of arraignment 'when consultation, thoroughgoing investigation and preparation [are] vitally important,' *citing Powell v. Alabama,* 287 U.S. 45, 57 (1932), through the

---

[19]      In addition to the December 7, 2012 evidentiary hearing on the state habeas claims, on December 6, 2012, the trial court held a hearing on Mr. Broadnax's Motion for Court-Ordered Discovery, For Court-Ordered Brady Material from the Dallas DA, & For Continuance of the Evidentiary Hearing, a Motion for Evidentiary Hearing, and Motion for Oral Argument Before the Texas Court of Criminal Appeals (collectively "Discovery Motion").  The court denied the Discovery Motion in full.  Appx 3: Court Order, 12-12-2012.  It also denied the Motion To Reconsider & Rescind the 12-12-2012 Order, To Reopen the Evidentiary Hearing, To Compel Rosales, Lopez, and WFAA-TV To Testify & Produce Documents ("Reconsideration Motion"). Appx 4: Court Order, 12-20-2012.

27

time of first appeal. ....")*; Rothgery*, 554 U.S. 191, State Application, Grounds One and Two, at 20, 21;

b.  The Dallas County Jailers exploited the Appointment Gap using the Media Access Procedure to solicit, encourage, coordinate, and facilitate interviews of Broadnax by the media, who acted as state agents. The State "must have known" that the media, as its agent, was likely to obtain incriminating statements in the absence of counsel; *Maine v. Moulton*, 474 U.S. 159, 176 (1985), and *id*., at n.12;

c.  The videotaped-interviews of Mr. Broadnax were a critical stage, structured to elicit: a confession, statements of lack of remorse, and that lethal injection was an appropriate punishment because he would kill again if given life, *citing White v. Maryland*, 373 U.S. 59 (1963). They were played in all phases of the trial by the prosecutor. State Application, Grounds One and Two, at 30;

d.  Trial counsel was ineffective in failing to raise Sixth and Fourteenth Amendment challenges based on the aforementioned facts and legal theory, *citing Strickland*, *See* State Application, Ground Three, pp. 44, 47-48, n.10; Grounds One and Two, pp. 5-6 incorporated by reference

A simple comparison of the aforementioned 6th Amendment Claim <u>with</u> *D. The Motion to Suppress the videotaped interviews, 1. The Right to Counsel Trial Claim: Facts and Legal Theory*, *supra*, makes it obvious that the Sixth and Fourteenth Amendment claims raised in state habeas are factually different and rely on a different legal theory from the right to counsel claim raised at trial.

However, in denying Mr. Broadnax's state habeas claims, the Texas courts summarily treated the Sixth and Fourteenth Amendment claims in state post-conviction as though they were identical in law and facts to the right-to-counsel claim trial claim, relied exclusively on the inadequate trial record to rule in state habeas that the reporters were not state agents, and failed to address altogether the facts adduced at the state-habeas, evidentiary hearing showing that the media were state agents.[20]

---

[20]    *See* Appx 2: FFCL #69 ("*Applicant alleges that trial counsel was ineffective for failing to investigate and raise the precise Sixth Amendment claims he raises in his first and second grounds for relief*. Applicant alleges that he was prejudiced by trial counsel's failure to challenge the admissibility of the media interviews on Sixth Amendment grounds because the interviews were a vital part of both phases of the trial."); FFCL #74 ("Contrary to Applicant's allegation, *trial counsel did object to the admissibility of the media interviews based on violations of the Sixth Amendment*. (RR 43:105-106)"); FFCL #14 ("*This Court and Court of Criminal Appeals **have***

28

Further, in conflict with long-established Supreme Court precedent, the Texas courts ruled in FFCL #47 that there was no Sixth Amendment violation because counsel was appointed within the statutorily-specified time frame. *But see Rothgery*, 554 U.S. 191, *citing Powell v. Alabama,* 287 U.S. 45, 57 (1932) ("A defendant is entitled to the aid of his lawyer *from the time of arraignment* 'when consultation, thoroughgoing investigation and preparation [are] vitally important,' through the time of first appeal. ....") (emphasis supplied).

### 2.    State post-conviction evidence showed trial counsel was ineffective

The testimony of Brad Lollar and Doug Parks at the state habeas evidentiary hearing showed that their decision to run the right-to-counsel claim they ran at trial was *not* strategic because the pre-trial investigation was *not* adequate. During the state habeas evidentiary hearing, Mr. Lollar testified to facts showing that he was aware of the Appointment Gap, which the Dallas County Jailers exploited to give the media access to capital-murder defendants to conduct interviews.[21] However, the defense did no pre-trial investigation into this area at all because according to Mr. Lollar, he "had not thought about it." (SWH Vol 3:1164-165 – Lollar). Mr. Parks asserted either that Mr. Lollar was responsible for certain tasks or that he (Mr. Parks) "ha[d] been doing this [death penalty defense] a long time," (SWH Vol 3:129 – Parks). None of these rationales are strategic tactical decisions.

---

*already rejected Applicant's Sixth Amendment claim* that the reporters were acting as agents of the state during the interviews. (RR 43:111-13); *Broadnax*, 2011 Tex. Crim. App. Unpub. LEXIS 920, at *28-30.") (emphasis supplied).

[21]    Mr. Lollar testified that he had been court-appointed to represent capital defendants in Dallas County both before and after the passage of the TFDA, (SWH Vol 3:163 – Lollar); that after the enactment of the TFDA: "I knew that our rules were not as strict in that regard, that there was some leeway in our laws to allow for appointment at the first convenience rather than the first necessity," (SWH Vol 3:153-154, 163-164 – Lollar); that he "absolutely" agreed the TFDA gave rise to an Appointment Gap, which the Dallas County Jailers exploited to give the media access to capital-murder defendants to conduct interviews, (SWH Vol 3:164 – Lollar); and that at the time the *Broadnax* case was pending, at least 43 jurisdictions were appointing counsel at first appearance, (SWH Vol 3:153 – Bradley Lollar).

29

In *Sears v. Upton*, 130 S.Ct. 3259, 3265 (2010) this Supreme Court "rejected any suggestion that a decision to focus on one potentially reasonable trial strategy ... was 'justified by a tactical decision' when 'counsel did not fulfill their obligation to conduct a thorough investigation'...." *See also Wiggins v. Smith*, 539 U.S. 510, 527–28 (2003) ("In assessing the reasonableness of an attorney's investigation, however, a court must consider... whether the known evidence would lead a reasonable attorney to investigate further."); *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005) ("[T]he attorneys' decision not to obtain Rompilla's prior conviction file was ... the result of inattention, not reasoned strategic judgment.") (internal citation omitted).  Yet, in conflict with Supreme Court precedent, the Texas courts ruled in post-conviction "that ***based on their extensive experience***, trial counsel made a sound and reasonable strategic decision regarding which legal arguments to raise and pursue in challenging the admissibility of the media interviews.  (Writ RR3:121-125,128)," *see* Appx 2: FFCL #89  (emphasis supplied).

The *un*counseled admissions of Mr. Broadnax in the media interviews unfairly prejudiced the outcome of his prosecution because they "come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. [They] ... have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."  *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991), *quoting Bruton v. United States*, 391 U.S. 123, 139-40 (1968).  As a practical matter, Mr. Broadnax had to be represented sufficiently in advance of, and at those interviews in order to enjoy genuinely effective assistance at trial.  *See Rothgery v. Gillespie County*, TX, 554 U.S. 191, 217 (2008) (Alito, J., concurring) *citing United States v. Ash*, 413 U.S. 300, 309-310 (1973); *United States v. Wade*, 388 U.S. 218, 226 (1967).  *See* State Application, Ground Three, pp. 44, 47-48, n.10; Grounds One and Two, pp. 5-6 incorporated by reference.

**REASONS FOR GRANTING THE WRIT**

The Texas courts' rulings in *Broadnax* are in conflict with long-established relevant decisions of the Supreme Court, such as *Coleman v. Alabama,* 399 U.S. 1 (1970); *Estelle v. Smith,* 451 U.S. 454 (1981); *McNeil v. Wisconsin,* 501 U.S. 171 (1991); *Michigan v. Harvey,* 494 U.S. 344 (1990); *United States v. Ash*, 413 U.S. 300 (1973); *United States v. Wade,* 388 U.S. 218 (1967); and *White v. Maryland*, 373 U.S. 59 (1963), which have recognized that "that certain pretrial events may so prejudice the outcome of the defendant's prosecution that, as a practical matter, the defendant must be represented at those events in order to enjoy genuinely effective assistance at trial." *Rothgery*, 554 U.S. at 217 (Alito, Scalia, JJ. and Roberts, CJ., concurring); SUP. CT. R.10.

**I.      As part of the substantive guarantee of the Sixth Amendment, Mr. Broadnax, a capital-murder defendant, was entitled to appointment of counsel at Texas Magistration**

As part of the substantive guarantee of the Sixth Amendment, Mr. Broadnax, a capital-murder defendant, was entitled to appointment of counsel <u>at</u> Texas Magistration, the first initial appearance before a judicial officer.  Instead the court appointed counsel for Mr. Broadnax based on a statutorily-specified time period, which is contrary to national consensus, long-standing Supreme Court precedent, and has no justifiable argument for its continuation.

**A.      There is a national consensus that counsel should be appointed "certainly no later than the accused's initial appearance before a judicial officer"**

There is a national consensus that a defendant is entitled to counsel at first appearance:

[In *McNeil v. Wisconsin,* 501 U.S. 171 (1991)], we went on to reaffirm that ***"[t]he Sixth Amendment right to counsel attaches at the first formal proceeding against an accused," and observed that "in most States, at least with respect to serious offenses, free counsel is made available at that time* ....**" *Id.,* at 180–181.
....
***That was 17 years ago, the same is true today***, and ***the overwhelming consensus practice*** conforms to the rule that the first formal proceeding is the point of attachment. We are advised without contradiction that not only the Federal Government, including the District of Columbia, but 43 States take the first step

31

toward *appointing counsel "before, at, or just after initial appearance*." App. to Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 1a; see *id.,* at 1a-7a (listing jurisdictions); [footnote omitted] *see also* Brief for American Bar Association as *Amicus Curiae* 5-8 (describing *the ABA's position for the past 40 years that counsel should be appointed "certainly no later than the accused's initial appearance before a judicial officer"*). And even in the remaining Seven States (Alabama, Colorado, Kansas, Oklahoma, South Carolina, Texas, and Virginia) the practice is not free of ambiguity. *See* App. to Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 5a-7a (suggesting that the practice in Alabama, Kansas, South Carolina, and Virginia might actually be consistent with the majority approach); *see also* n. 7, *supra*. In any event, to the extent these States have been denying appointed counsel on the heels of the first appearance, they are a distinct minority.

(Emphasis supplied) *Rothgery*, 554 U.S. at 204-205.

Reliance on the national consensus is sufficient to hold that as part of the substantive guarantee of the Sixth Amendment, counsel should be appointed "certainly no later than the accused's initial appearance before a judicial officer." ABA *Amicus Curiae* at 5-8. This outcome is consistent with prior precedent, such as *Atkins* and *Roper*, in which this Court relied on a national consensus in ruling there was a constitutional law violation, albeit in the 8th amendment context. *See Atkins v. Virginia*, 536 U.S. 304, 317 (2002) ("This consensus unquestionably reflects widespread judgment about the relative culpability of mentally retarded offenders, and the relationship between mental retardation and the penological purposes served by the death penalty."); *Roper v. Simmons*, 543 U.S. 551, 564 (2005) ("The evidence of national consensus against the death penalty for juveniles is similar, and in some respects parallel, to the evidence *Atkins* held sufficient to demonstrate a national consensus against the death penalty for the mentally retarded.").

**B.      There is no justification for the minority practice in Texas**

Further justification for appointing counsel at Texas Magistration can be found in *Rothgery*, 554 U.S. at 205, in which the majority made clear that there was no acceptable justification for the current Texas minority practice. *See also United States v. Wade*, 388 U.S. 218, 226 (1967) ("As

32

early as *Powell v. State of Alabama, supra*, we recognized that the period from arraignment to trial was 'perhaps the most critical period of the proceedings ...' *id.*, at 57, during which the accused 'requires the guiding hand of counsel ...,' *id.,* at 69,  if the guarantee is not to prove an empty right.").

  **C.**  **Broadnax is an example of how the failure to appoint counsel at Texas Magistration perpetuates discrimination between impecunious defendants (Mr. Broadnax) and those of means (the reporters)**

  And finally, the *Amicus Curiae* filed by the ABA in *Rothgery* discusses several reasons why counsel must be appointed at the time of initial appearance.  The *Broadnax* case exemplifies, among others, the last enumerated reason:  the failure to appoint counsel at the time of initial appearance "may also deny indigent defendants crucial protections and, in so doing, perpetuate discrimination between impecunious defendants [Mr. Broadnax] and those of means [reporters]."   In *Broadnax*, the prosecutor had issued subpoenaes to the educated, experienced reporters for various pretrial hearings and the trial of Mr. Broadnax.  *See supra D. The Motion to Suppress the videotaped interviews, 1. The Right to Counsel Trial Claim:  Facts & Legal Theory*.  The reporters immediately retained counsel  –  reputable Dallas law firms such as Jackon Walker, LLP, Vincent & Elkins, and Sedgwick, Detert, Moran & Arnold, LLP.  Retained counsel immediately challenged the subpoenas, appealed the rulings, and stood with each of the reporters during the pre-trial hearings and at the trial itself.  *See* RR 43:13, 29, 34, 99; CR 2:280, 345, 347.  *See  In re Rabb*, 293 S.W.3d at 866.

  In contrast, Mr. Broadnax was an uneducated, impoverished, 19 years old, who was experiencing a drug-induced psychosis at the onslaught of the media requests from channels 4, 5, 8, and 11.  (RR 50:86-87, 89-92).  He did not waive his right to counsel.  Yet Mr. Broadnax's June 20, 2008 (Garland City Jail) and June 21, 2008 (Dallas County Jail) requests-for-counsel languished for days.  Mr. Broadnax was left to fend for himself.  Had he the financial means to secure immediate representation, experienced capital defense counsel would have stopped the media

interviews with a Do Not Interview Letter, and prevented prejudice to Mr. Broadnax's rights.

The media inquiries mirrored the presentation of the prosecutor at trial:  Did he do it?  Was he remorseful?  Was he a future danger and deserved death?  When the videotaped interviews were played at trial and during jury deliberations on punishment, Mr. Broadnax was forced into the same posture as that of a "litigant [who] was required to 'appear before the court in his own person and conduct his own cause in his own words." *Faretta v. California*, 422 U.S. 806, 823 (1975). However, his self-representation at trial was completely devoid of the "rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial." *Patterson v. Illinois*, 487 U.S. 285, 298 (1988).

Only because of his indigency (in contrast to the reporters), was Mr. Broadnax forced into a position of having "relinquished ... the traditional benefits associated with the right to counsel." *Faretta*, 422 U.S. at 835, *citing Johnson v. Zerbst*, 304 U.S. 458, 465 (1938) ("The purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights, and the guaranty would be nullified by a determination that an accused's ignorant failure to claim his rights removes the protection of the Constitution"). *See also  United States v. Henry*, 447 U.S. 264, 273 (1980) ("[T]he concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed [government agent].... In that setting, [the defendant], being unaware that [the Government agent was] ... expressly commissioned to secure evidence, cannot be held to have waived his right to the assistance of counsel.").

34

**II.    The post-attachment media-interviews were a critical stage in the legal proceedings.  Thus, Mr. Broadnax and his counsel were entitled to be notified of them, with counsel present as a requisite to conducting them**

The post-attachment media-interviews were a critical stage in the legal proceedings.  Mr. Broadnax did not waive his right-to-counsel at them. Thus he and his counsel were entitled to notification of the impending post-attachment interviews by the media, with counsel present as a requisite to conducting them.  *See  Rothgery*, 554 U.S. at 217 (2008) (Alito, J., concurring) *citing Ash*, 413 U.S. at 309-310; *Wade*, 388 U.S. at 226 ("certain pretrial events may so prejudice the outcome of the defendant's prosecution that, as a practical matter, the defendant must be represented at those events in order to enjoy genuinely effective assistance at trial.").

**A.    The media were state agents**

In state post conviction, the Texas court relied exclusively on the trial record to hold that the reporters were not state agents and failed to address altogether the facts of agency adduced in state habeas.  The Texas court rulings in state post-conviction lend themselves to the mis-impression that the trial judge had ruled the media were not acting as state agents based on a well-developed record. *Compare*  FFCL # 14, 23 ("The reporters who interviewed Applicant were not acting as agents of the State.  RR 43:111-13.").  In point of fact, the trial court ruling on the Motion to Suppress was considerably more narrow. The trial court ruling could be better characterized as a finding of defense counsel deficiency for failure to adequately develop and present facts of agency:

> "*On this record* we cannot conclude that the reporter was acting as a State agent when he interviewed appellant... (Trial Vol. 43:113)," and "whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, is not even a close one. (RR 43:113)."

Further, the Texas court erred in treating the state habeas Sixth and Fourteenth Amendment claims challenging the media interviews as though they were identical to the right to counsel trial claim seeking to suppress the videotaped media interviews. *See*  Appx 2:  FFCL #14 , 69, 74.  The

35

state habeas claims are *different* factually, *and* relied on a different legal theory, from the trial claim seeking to suppress the videotaped interviews. *Compare D. The Motion to Suppress the videotaped interviews, 1. Right to Counsel Trial Claim: Facts & Legal Theory with F. The State Post Conviction claims ..., 1. The 6th & 14th Amendment Habeas Claims: Facts and Legal Theory*

The *Broadnax* evidentiary hearing in state post-conviction showed a combination of circumstances that are sufficient to prove the media were state agents, *supra,* despite absence of direct proof. *Statement of the Case, A.-C. See Maine v. Moulton*, 474 U.S. 159, 176 (1985), *citing United States v. Henry*, 447 U.S. 264, 270 (1980) ("Direct proof of the State's knowledge will seldom be available to the accused. However, as *Henry* makes clear, proof that the State 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation.").

It was *not* "by luck or happenstance" that the Dallas prosecutor obtained the videotaped statements of Mr. Broadnax after his right to counsel had attached. *Compare Kuhlmann v. Wilson*, 477 U.S. 436, 437 (1986) ("the Sixth Amendment is not violated whenever  –  by luck or happenstance  –  the State obtains incriminating statements from the accused after the right to counsel has attached, ....").  Although Mr. Broadnax was incarcerated in the Garland City Jail on June 20, 2008, the media made a choice *not* to interview him there.  Instead, at least as early as Friday, June 20, 2008, the media began their coordinated efforts with the Dallas County Jailers, who were sure to facilitate access to Mr. Broadnax *at the Dallas County Jail* using the Media Access Procedure. The procedure had been drafted by law enforcement exclusively for the media.  (RR Vol 41:18, 21 - July 27, 2009 hearing); *see also* Appx 6: Channel 8 letter (time and date fax-stamp).  The Inmate Interview-Request Letters from the Media to Mr. Broadnax were identical or substantially similar to the Template.  Any deficiencies in the letters were corrected by the Dallas County Jailers,

36

which expedited access of the media to Mr. Broadnax before counsel could be appointed. Although the letters pitched the interviews to "James" as giving him the "opportunity to tell [his] side of the story," they were the State's vehicle to secure a conviction and death sentence.   Appx 5 & 6.

The Dallas County Jailers had actual and constructive knowledge that Mr. Broadnax, like other capital-murder defendants, had invoked his Sixth Amendment right to counsel. *See Statement of the Case: C. From at least 2007 to 2012,.... 2. The Dallas County Jailers knew Mr. Broadnax requested counsel at Texas Magistration*.  However, Mr. Broadnax was made to wait for the appointment of counsel, while in the interim, the Dallas County Jailers exploited the Appointment Gap, and ensured the media interviews would happen before counsel was appointed. *See Maine v. Moulton*, 474 U.S. 159, 176 (1985) ("knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.").

The prosecutor subpoenaed the videotaped interviews, which were structured to elicit admissions of guilt, lack of remorse ('Fuck 'em.' [the victims' families]), and admissions of future dangerousness ('Cuz they give me life I'ma' kill somebody else).  The prosecutor played the videotapes at trial – and the videotapes were played again during jury deliberations on punishment at the jurors' request. *See Statement of the Case: E. The videotaped interviews of the psychotic, 19-year old Broadnax were played in every phase of the trial ....* Thus, the media were state agents.

### B.      The media interviews were a critical stage

The Texas courts' rulings are in conflict with *Rothgery v. Gillespie County*, *TX,* 554 U.S. 191, 194-195 (2008), *United States v. Ash*, 413 U.S. 300, 312-313 (1973); and *White v. Maryland*,

373 U.S. 59 (1963) – the very Supreme Court precedent that the Texas courts cite to deny the state habeas Sixth and Fourteenth Amendment claims.

Having relied exclusively on the trial record, the Texas Court in its state habeas FFCL #24 concluded: "Because the reporters were not acting as agents of the State during their interviews, the interviews were not critical stages. *See Ash*, 413 U.S. at 312-13 (1973); *see also Rothgery*, 554 U.S. at 212 n.15." In the state habeas FFCL #26, the Texas court found that "Applicant presents no legal authority supporting his proposition that interviews conducted by private media outlets are critical stages, and the Court finds there is no such authority." And in the state habeas FFCL #27, the Texas court ruled that

> *White* is distinguishable from the instant case. In *White*, the Supreme Court held that a preliminary hearing where White entered a plea was a 'critical stage' requiring counsel. *White*, 373 U.S. at 59-60. The hearing in *White* clearly involved State action. The media interviews in this case did not involve any State action.

Following therefrom, in the state habeas FFCL #29 the Texas court "conclude[d] that Applicant's Sixth Amendment right to effective assistance of counsel and his due process rights were not violated."

The Texas court decision is in conflict with Supreme Court precedent because Mr. Broadnax is _not_ required to cite to a factually identical Supreme Court precedent with the precise holding that "interviews conducted by private media outlets are critical stages." (FFCL#26). Rather, *Coleman* teaches that "[t]he determination whether [an event] is a 'critical stage' requiring the provision of counsel depends ... upon an analysis of 'whether potential substantial prejudice to defendant's rights inheres in the ... confrontation and the ability of counsel to help avoid that prejudice.'" *Coleman v. Alabama,* 399 U.S. 1, 9 (1970) (plurality opinion), *citing United States v. Wade,* 388 U.S. 218, 227 (1967). *White* exemplifies how this determination is made.

38

In *White*, the defendant plead guilty at a preliminary hearing without counsel having been appointed.  When he was later arraigned and had appointed counsel to represent him, Mr. White entered pleas of "not guilty" and "not guilty by reason of insanity."  But then at the trial, Mr. White's uncounseled plea of guilty at the preliminary hearing was introduced into evidence by the government.  Nothing appointed counsel could do in the subsequent trial would ever cure the substantial prejudice that arose from the one-sided confrontation that yielded White's uncounseled plea of guilty.  *Compare  Ash*, 413 U.S. at 315, 316 (1973); *Wade*, 388 U.S. at 227-228 ("[T]he subsequent trial would cure a one-sided confrontation between prosecuting authorities and the uncounseled defendant" because "through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts," served as a substitute for counsel at the pretrial confrontation.).

*White* held the preliminary hearing to be a "critical stage" because "'[o]nly the presence of counsel could have enabled this accused to know all the defenses available to him and to plead intelligently.'"  *White*, 373 U.S. at 60.  *See also  Hamilton v. State of Ala*., 368 U.S. 52, 54 (1961) (arraignment held to be a critical stage, despite a plea of not guilty by the accused, because "available defenses [such as a plea of insanity] may be irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes").

The holding in *White* is applicable to *Broadnax*.  The post-attachment, media-interviews in *Broadnax* were a critical stage in the prosecution because only the presence of counsel would have "'protec[ted] the unaided layman at [these] critical confrontations' with his 'expert adversary,' the government." *Gouveia,* 467 U.S., at 189.  Defense counsel at trial could do nothing to cure the

39

substantial prejudice to Mr. Broadnax when his <u>un</u>counseled admissions[22] on the videotaped-media-interviews were played to the jury at trial, and again during deliberations on punishment. *Compare Broadnax*, 2011 WL 6225399 at *17 ("appellant confessed [to reporters] to murdering two defenseless men ...."); <u>with</u> *Wade*, 388 U.S. at 225–226 *citing Escobedo v. Illinois*, 378 U.S. 478, 487-488 (1964) (The "'right to use counsel at the formal trial [was] a very hollow thing [because] for all practical purposes, the conviction [was] already assured by the pretrial examination.'").

### CONCLUSION

Mr. Broadnax was entitled to the appointment of counsel at Texas Magistration, and Mr. Broadnax and his counsel should have been notified of the impending post-attachment media interviews, and counsel's presence should have been a requisite to conducting them, in the absence of a valid waiver. Therefore, this Court should grant the petition for writ of certiorari to answer the questions posed above, and, thereafter, remand the case back to the lower courts for resolution of the IAC claim.

Respectfully submitted,

Lydia M. V. Brandt
TX Bar No. 00795262
lydiamb@airmail.net
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843; Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL OF RECORD FOR JAMES BROADNAX

---

[22]   *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991), *quoting Bruton v. United States*, 391 U.S. 123, 139-40 (1968) ("The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. [They] ... have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.").

**APPENDICES**

Appendix 1:    *Ex parte James Garfield Broadnax*, Nos. WR-81,573-01 (Tex. Crim. App. May 20, 2015) (slip op.)

Appendix 2:    Findings of Fact and Conclusions of Law, *Ex parte James Garfield Broadnax*, No. W08-24667-Y(A) (Crim. Dist. Ct. #7, Dallas County, TX, Sept .17, 2014)

Appendix 3:    Court Order, 12-06-2012, Denying State Post-Conviction Broadnax Discovery Motion & Grant State Motion to Quash

Appendix 4:    Court Order, 12-20-2012, denying the Broadnax State Post-Conviction Reconsideration Motion

Appendix 5:    Media Access Procedure, including "Template" drafted by the Dallas County Jailers

Appendix 6:    Interview-Request Letters from Media to James Broadnax

Appendix 7:    Motion to Suppress

Appendix 8:    Broadnax: Arraignment Sheet, Affidavit of Indigence, and Instructions Relating to Preliminary Initial Appearance

Appendix 9:    Interview-Request Letters from Media to Franklin Davis

41