W08-24667-Y(A)

| | | |
|---|---|---|
| EX PARTE | § I | THE CRIMINAL |
| | § | |
| | § | DISTRICT COURT NO. 7 |
| | § | |
| JAMES GARFIELD BROADNAX | § | DALLAS COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having considered the application for writ of habeas corpus, the State's original answer, official court documents and records, and the Court's personal experience and knowledge, the Court makes the following findings of fact and conclusions of law:

## PROCEDURAL HISTORY

A Dallas County jury found Applicant guilty of capital murder. (CR: 698; RR47: 203). In accordance with the jury's answers to the special issues, the trial court sentenced Applicant to death on August 20, 2009. (CR: 650-51, 698; RR54: 4-7). Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b), (e)(1), (g) (West Supp. 2013). On December 14, 2011, the Court of Criminal Appeals affirmed Applicant's conviction. *See Broadnax v. State*, No. AP-76,207, 2011 Tex. Crim. App. Unpub. LEXIS 920 (Tex. Crim. App. Dec. 14, 2011) (not designated for publication).

Applicant filed his application for writ of habeas corpus on December 20, 2011. Applicant alleged eight grounds for relief. The State filed its original answer to the application on June 15, 2012. A hearing was conducted in this Court on December 7, 2012. (Writ RR3: 1).[1]

---

[1] The reporter's record from the trial will be referred to as RR# and the reporter's record from the writ hearing will be referred to as Writ RR#.

## TABLE OF CONTENTS

The following table indicates the pages on which the Court's findings and conclusions for each ground may be found:

LENGTH OF EVIDENTIARY HEARING:............................................................2
GROUNDS ONE AND TWO.....................................................................3
GROUND THREE.........................................................................10
GROUND FOUR...........................................................................15
GROUND FIVE............................................................................22
GROUND SIX ............................................................................23
GROUND SEVEN .........................................................................25
GROUND EIGHT..........................................................................30

## SPECIFIC FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes the following findings of fact and conclusions of law:

## LENGTH OF EVIDENTIARY HEARING:

1. Applicant asked the Court to grant him several days over which to present evidence in the form of live testimony.

2. The Court declined that request, limiting the parties to one full day of testimony (December 7, 2012). *See* "State's Filing of Additional Exhibit" (filed 10/4/13). On December 6, 2012, however, the Court agreed to reconsider this limitation and informed the parties that it could hear testimony on December 10 and 11, 2012, if necessary. (Writ RR3: 6).

3. In the end, the Court determined that no additional evidence by way of live testimony was necessary.

4. Nevertheless, neither party has been limited in presenting evidence in other forms since the December 2012 hearing. *See* "State's Filing of Additional Exhibit" (filed 10/4/13); Applicant's "Motion to Reconsider & Rescind the 12-12-2012 Order, to Reopen the Evidentiary Hearing, & to Compel Rosales, Lopez, and WFAA-TV to Testify & Produce Documents" (filed 12/18/12).

2

## GROUNDS ONE AND TWO:
### Lack of Counsel During Media Interviews

5.   In his first and second grounds for relief, Applicant claims he was entitled to the appointment of counsel to represent him at the time of his various interviews with the media. Applicant argues that the failure to appoint counsel prior to the media interviews violated his Sixth Amendment right to counsel and his Fourteenth Amendment rights to procedural and substantive due process and to equal protection. Applicant further alleges that the Texas Fair Defense Act and the Dallas County Procedures for the Appointment of Counsel in Death Penalty Cases are unconstitutional because they fail to provide for the assistance of counsel during media interviews.

### Claims Are Procedurally Barred

6.   Matters not raised at trial cannot form the basis for habeas relief. *See Ex parte Dutchover*, 779 S.W.2d 76, 77 (Tex. Crim. App. 1989); *Ex parte Crispen*, 777 S.W.2d 103, 105 (Tex. Crim. App. 1989); *Ex parte Bagley*, 509 S.W.2d 332, 333 (Tex. Crim. App. 1974) ("The same rule as to the necessity of an objection to complained of evidence has been applied by this Court in habeas corpus cases."). Additionally, habeas corpus is not to be used as a substitute for appeal. *Ex parte Clore*, 690 S.W.2d 899, 900 (Tex. Crim. App. 1985) (en banc).

7.   If a claim could have been raised on appeal, but was not, the Applicant is procedurally barred from raising the issue for the first time through habeas. *See Ex parte Cruzata*, 220 S.W.3d 518, 520 (Tex. Crim. App. 2007); *see, e.g., Ex parte Ramos*, 977 S.W.2d 616, 617 (Tex. Crim. App. 1998) (holding that because claims concerning the jury charge at punishment should have been raised on direct appeal, the claims will not be addressed on habeas).

8.   Habeas corpus is not to be used to relitigate matters that were addressed on appeal. *See Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App. 1994); *see, e.g., Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984) (holding that matters addressed on direct appeal need not be addressed on habeas).

9.   Applicant could have but did not previously assert at trial or on appeal that the Texas Fair Defense Act and the Dallas County Procedures for the Appointment of Counsel in Death Penalty Cases are unconstitutional. Therefore, these claims are procedurally barred.

3

10.    Applicant could have but did not previously assert at trial or on appeal that his constitutional right to equal protection was violated. Therefore, this claim is procedurally barred.

11.    Applicant's allegation that the media interviews violated his constitutional rights to procedural and substantive due process could have been but was not presented on appeal. Therefore, this claim is procedurally barred.

12.    At trial and on appeal, Applicant alleged a violation of his Sixth Amendment rights and argued that he was incapacitated and could not have consented to the interviews.  (RR43: 101-09); *Broadnax*, 2011 Tex. Crim. App. Unpub. LEXIS 920, at *28-30.

13.    Applicant's first and second grounds for relief necessitate a finding of State agency in order for relief to be granted on this issue.  *United States v. Ash*, 413 U.S. 300, 312-13 (1973); *see also Rothgery*, 554 U.S. at 212 n.15.

14.    This Court and the Court of Criminal Appeals have already rejected Applicant's Sixth Amendment claim that the reporters were acting as agents of the State during the interviews. (RR43: 111-13); *Broadnax*, 2011 Tex. Crim. App. Unpub. LEXIS 920, at *28-30.

15.    Applicant is procedurally barred from relitigating the issue of State agency on habeas and, thus, his Sixth Amendment claim should be dismissed.

### Applicant's Rights to Counsel and Due Process Were Not Violated by Media Interviews

16.    The United States Supreme Court has held that the Sixth Amendment right of the accused to assistance of counsel in all criminal prosecutions is limited by its terms: "it does not attach until a prosecution is commenced." *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008).

17.    The United States Supreme Court has, for purposes of the right to counsel, pegged commencement to the "initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* Once attachment occurs, the accused at least is entitled to the presence of appointed counsel during any "critical stage" of the post-attachment proceedings. *Id.* at 212. Thus, counsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself. *Id.*

4

18. Generally, an article 15.17 initial appearance and magistration marks the initiation of adversarial judicial proceedings in Texas and "plainly signals" the attachment of a defendant's Sixth Amendment right to counsel. *Pecina v. State*, 361 S.W.3d 68, 77 (Tex. Crim. App. 2012) (citing *Rothgery*, 554 U.S. at 212).

19. Applicant's argues that counsel was not appointed soon enough to provide him with adequate representation at the media interviews, which he asserts was a "critical stage." In support of his arguments, Applicant points to several facts and circumstances surrounding the timing of the appointment of his lead counsel, Brad Lollar. (Broadnax's Writ App., pp. 7-20).

20. Applicant also argues that the Texas Fair Defense Act and the Dallas County Procedures for the Appointment of Counsel in Death Penalty Cases are unconstitutional because (1) they do not anticipate that the media may want to speak with an inmate prior to the appointment of counsel and (2) they do not provide for the appointment of counsel before a media interview occurs.

21. The United States Supreme Court has held that a critical stage is a proceeding between an individual and an agent of the State that amounts to a "trial-like confrontation," at which counsel would help the accused in coping with legal problems or meeting with his adversary. *United States v. Ash*, 413 U.S. 300, 312-13 (1973); *see also Rothgery*, 554 U.S. at 212 n.15. Accordingly, in order for a stage to be "critical" for purposes of the Sixth Amendment, there necessarily must be interaction with a State agent.

22. Attachment in this case occurred when Applicant went before the magistrate on June 21, 2008; at that point, he was entitled to the appointment of counsel within a reasonable time to allow for adequate representation during any "critical stage."

23. The reporters who interviewed Applicant were not acting as agents of the State. (RR43: 111-13).

24. Because the reporters were not acting as agents of the State during their interviews, the interviews were not critical stages. *See Ash*, 413 U.S. at 312-13; *see also Rothgery*, 554 U.S. at 212 n.15.

25. The fact that counsel may not have been appointed until after the media interviews in this case is of no moment because the media interviews were not critical stages.

26. Applicant presents no legal authority supporting his proposition that interviews conducted by private media outlets are critical stages, and the Court finds there is no such authority.

27. Applicant argues that the United States Supreme Court's decision in *White v. Maryland*, 373 U.S. 59 (1963) is directly applicable to his case. However, *White* is distinguishable from the instant case. In *White*, the Supreme Court held that a preliminary hearing where White entered a plea was a "critical stage" requiring counsel. *White*, 373 U.S. at 59-60. The hearing in *White* clearly involved State action. The media interviews in this case did not involve any State action.

28. Applicant fails to establish by a preponderance of the evidence that his Sixth Amendment right to counsel or his due process rights were violated.

29. Accordingly the Court concludes that Applicant's Sixth Amendment right to effective assistance of counsel and his due process rights were not violated.

### Applicant's Equal Protection Rights Were Not Violated by Media Interviews

30. Applicant alleges that his right to equal protection was violated because his co-defendant, Demarius Cummings, was appointed counsel one day prior to him, despite the fact that they requested the appointment of counsel at the same time.

31. The Equal Protection Clause requires that all similarly situated persons be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

32. The purpose of the Equal Protection Clause is to prevent the government from discriminating against any person or class of persons. *Ingram v. State*, 124 S.W.3 d672, 677 (Tex. App. – Eastland 2003, no pet.).

33. Equal protection is implicated if a classification interferes with a fundamental right or burdens a suspect class. *Clark v. State*, 665 S.W.2d 476, 580-81 (Tex. Crim. App. 1984).

34. If no fundamental right or suspect classifications are involved, the challenged government action does not violate equal protection "so long as unequal treatment of persons is based upon a reasonable and substantial classification of person." *Vasquez v. State*, 739 S.W.2d 37, 43 (Tex. Crim. App. 1987).

6

More simply put, the classification will not be set aside if it is rationally related to a legitimate state interest. *Clark*, 665 S.W.2d at 481.

35. Lastly, equal protection does not require things that are different in fact to be treated in law as though they were the same. *Smith v. State*, 898 S.W.2d 838, 847 (Tex. Crim. App. 1995).

36. Applicant and his codefendant were not treated differently. Each was arraigned, permitted to invoke their right to counsel, and received counsel within 3 days of their request.

37. As constitutionally required, the appointment of counsel for both occurred within a reasonable amount of time from their request for counsel.

38. Applicant's attorney was appointed and notified of his appointment the morning after Cummings attorney was appointed. At this point, Applicant had already given the complained-of media interviews.

39. The delay was not the product of any discriminatory intent, however. The Court notified Applicant's counsel of his appointment at the earliest opportunity, after receiving notification of Applicant's arraignment and invocation of his right to counsel.

40. The appointment of Applicant's counsel was not delayed because of Applicant's race or any other suspect classification. And the delay did not implicate any fundamental right of Applicant's. As previously noted, Applicant did not have a right to counsel at the time of his media interviews.

41. Applicant fails to prove by a preponderance of the evidence a violation of his constitutional right to equal protection.

42. The Court concludes that Applicant's right to equal protection was not violated.

43. Applicant also argues a violation of a statute, namely Texas Code of Criminal Procedure 1.051(i), in the delay of appointment of his trial counsel.

44. Habeas corpus is available only to review jurisdictional defects or denials of fundamental or constitutional rights. *See Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989). Claims alleging a violation of a statute are not cognizable in a writ of habeas corpus. *Ex parte Graves*, 70 S.W.3d 103, 109 (Tex. Crim. App. 2002).

45. To the extent Applicant's claim alleges a statutory violation, it is not cognizable on habeas and, thus, it is procedurally barred.

46. Even assuming this allegation was cognizable, Applicant fails to prove by a preponderance of the evidence any statutory violation.

47. Cummings and Applicant were appointed counsel within the statutorily-required time frame, and there is no statutory requirement that co-defendant's be appointed counsel at the same time. *See* Tex. Code Crim. Proc. art. 1.051(i) (West Supp. 2013).

48. There was no statutory violation.

49. Lastly, Applicant fails to prove he was harmed by any violation, constitutional or statutory.

50. On habeas review, Applicant bears the burden of proving by a preponderance of the evidence that the alleged error actually contributed to his conviction or punishment. *Ex parte Fierro*, 943 S.W.2d 370, 374-75 (Tex. Crim. App. 1996).

51. The decision to speak to the media belonged to Applicant, and Applicant fails to show that he would have taken counsel's advice and declined the interviews.

## Applicant's Contention that the Interviews Were Material and Unfairly Prejudicial

52. Applicant also alleges that "[t]he media interviews were material and unfairly prejudicial, rendering defense counsel ineffective throughout the entirety of trial." In the body of his argument, Applicant asserts that (1) counsel would have stopped the media interviews had he been appointed sooner; (2) Dallas County judges, prosecutors, and the defense bar are aware that the media seeks to have access to persons accused of capital crimes, including Applicant; (3) the presiding judge in this case is aware of the material and unfair prejudice done by uncounseled media interviews; (4) the media interviews were the focal point at both phases of the trial; (5) the Court of Criminal Appeals referred to the media interviews in upholding the sufficiency of the evidence to support the jury's determination that Applicant was a future danger; and (6) the media interviews heavily influenced the jury's verdict.

8

53.    This allegation does not present a constitutional violation distinct from the previously addressed claims. Rather, it appears to be a harm argument regarding the alleged Sixth Amendment violation.

54.    As set out above, however, the Court found and concluded that there was no Sixth Amendment or other constitutional violation. Therefore, a harm analysis is not applicable.

55.    If Applicant's allegations were intended as a separate, non-constitutional challenge to the admissibility of the media interviews, they are not cognizable.

56.    The alleged violation of a statute, rule, or non-constitutional doctrine is not cognizable in a writ of habeas corpus. *Ex parte Graves*, 70 S.W.3d 103, 109 (Tex. Crim. App. 2002).

57.    To the extent these allegations are premised on the affidavit of Jennifer Reif (Applicant's Exhibit 23), the affidavit is not competent evidence and is inadmissible under Texas Rule of Evidence 606(b).

58.    Ms. Reif, an intern for the Texas Defender Service, interviewed three of Applicant's jurors – John Vessels, William Kreighbaum, and Alex James Folz – about Applicant's media interviews and the role those interviews played in their deliberations. (Applicant's Exhibit 23).

59.    Rule 606(b) prohibits testimony or affidavits from a juror "as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict." There are only two exceptions to this prohibition. A juror may attest (1) to whether an outside influence was improperly brought to bear upon any juror and (2) to rebut a claim that the juror was not qualified to serve. Tex. R. Evid. 606(b).

60.    The jurors' statements to Ms. Reif do not meet either of the exceptions of Rule 606(b).

### There is No Constitutional Requirement that an Inmate Knowingly and Voluntarily Consent to Media Interviews

61.    Lastly, Applicant alleges that he did not knowingly or voluntarily consent to the media interviews.

62.    Habeas corpus is available only to review jurisdictional defects or denials of fundamental or constitutional rights. *See Ex parte Banks*, 769 S.W.2d at 540.

9

63. Applicant does not cite to any fundamental or constitutional right that was allegedly violated. Thus, this allegation is not cognizable. *See Ex parte Banks*, 769 S.W.2d at 540.

64. Moreover, Applicant could have but did not raise on direct appeal the allegation that his consent to the interviews was unknowing and involuntary. Thus, it is procedurally barred.

65. Lastly, even assuming Applicant's allegation is of constitutional dimension, it fails on the merits.

66. Applicant fails to prove by a preponderance of the evidence that his consent to the media interviews was unknowing and involuntary.

67. Accordingly, the Court concludes Applicant's consent to the media interviews was knowing and voluntary.

68. In sum, all of the relief requested in Applicant's first and second grounds should be denied.

## GROUND THREE:
### Counsel's Investigation and Presentation of Sixth Amendment Claim

69. In his third ground for relief, Applicant alleges that trial counsel was ineffective for failing to investigate and raise the precise Sixth Amendment claims he raises in his first and second grounds for relief. Applicant alleges that he was prejudiced by trial counsel's failure to challenge the admissibility of the media interviews on Sixth Amendment grounds because the interviews were a vital part of both phases of the trial.

70. The benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986).

71. An Applicant asserting a claim of ineffective assistance has the burden to prove, by a preponderance of the evidence, the following: (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Thompson v. State*, 9

10

S.W.3d 808, 812 (Tex. Crim. App. 1999) (explaining the standard under *Strickland*).

72.    Effective assistance of counsel does not mean errorless counsel. *See Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993).

73.    To prevail on a claim of ineffective assistance, the Applicant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. *See Ex parte McFarland*, 163 S.W.3d 743, 753 (Tex. Crim. App. 2005); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). This highly deferential review is applied to avoid "the distorting effect of hindsight." *Ex parte McFarland*, 163 S.W.3d at 753 (quoting *Strickland*, 466 U.S. at 689).

74.    Contrary to Applicant's allegation, trial counsel did object to the admissibility of the media interviews based on violations of the Sixth Amendment. (RR43: 105-06).

75.    Having found that the reporters were not agents of the State and the media interviews were not "critical stages," Applicant's Sixth Amendment right to counsel was not violated during the media interviews.

76.    Catherine Bernhard, a criminal defense attorney, testified at the writ hearing held on December 7, 2012. (Writ RR3: 22-23). Ms. Bernhard testified regarding her personal experience regarding the past and present procedures on being appointed counsel in capital murder cases and her experience handling media interviews in the high-profile cases. (Writ RR3: 22-49).

77.    Brooke Busbee, a criminal defense attorney, testified at the writ hearing held on December 7, 2012. (Writ RR3: 51). Ms. Busbee testified regarding her own personal experience regarding media interviews in high-profile cases. (Writ RR3: 51-65).

78.    Although much attention during the testimony was given to the change in appointment procedures for capital cases in 2002, Ms. Busbee testified that media interviews still occurred under the prior procedures. (RR2: 68).

79.    William E. Karo Johnson, a criminal defense attorney, testified at the writ hearing held on December 7, 2012. (Writ RR3: 88). Mr. Johnson testified regarding his personal experience with being appointed to high-profile capital murder cases that involve media interviews. (Writ RR3: 88-108).

11

80. The testimony of Ms. Bernhard, Ms. Busbee, and Mr. Johnson established that in 2002, the Texas Fair Defense Act allowed for a greater time in which counsel could be appointed.

81. The testimony of Ms. Bernhard, Ms. Busbee, and Mr. Johnson did not establish that there is state action in media interviews.

82. The testimony of Ms. Bernhard, Ms. Busbee, and Mr. Johnson did not establish that the Texas Fair Defense Act was unconstitutional.

83. The testimony of Ms. Bernhard, Ms. Busbee, and Mr. Johnson did not establish that the defense's representation in this case fell below an objective standard of reasonableness.

84. The testimony of Ms. Bernhard, Ms. Busbee, and Mr. Johnson did not establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

85. Brad Lollar was lead counsel for Applicant during trial. (Writ RR3: 119). Douglas Parks was Applicant's second-chair counsel during trial and was responsible for conducting legal research. (Writ RR3: 119, 123). Attorney Kerri Mallon had a limited role in Applicant's trial team. (Writ RR3: 119).

86. Brad Lollar and Douglas Parks testified at the hearing held on December 7, 2012. The Court finds that Mr. Parks and Mr. Lollar were credible witnesses.

87. Mr. Lollar has been an attorney for 35 years and a criminal defense attorney since 1982. (Writ RR3: 131).

88. Mr. Parks was licensed to practice law in 1970 and has been active in criminal defense since 1972. (Writ RR3: 114). He has focused on criminal defense work since the late 1970's. (Writ RR3: 114). He is the criminal defense lawyer member of the committee for the First Administrative District that approves the applications of other lawyers to be on the list of lawyers who can be appointed as first and second-chair counsel in capital cases. (Writ RR3: 116).

89. The Court finds that based on their extensive experience, trial counsel made a sound and reasonable strategic decision regarding which legal arguments to raise and pursue in challenging the admissibility of the media interviews. (Writ RR3: 121-25, 128).

90.    Mr. Parks did not review the record prior to his testimony at the writ hearing held on December 7, 2012. (Writ RR3: 120). Mr. Parks remembered that he talked with Mr. Lollar regarding strategy to exclude the videotapes of the media interviews. (Writ RR3: 121).

91.    Their strategy was to show that the media interviews of Applicant were a product of state action. (Writ RR3: 121).

92.    Although Mr. Parks could not recall if the defense team had discussed challenging the constitutionality of the Texas Fair Defense Act, he would not have made the challenge because the trial court had already decided that there was no State action. Without state action, such a challenge could not succeed. (Writ RR3: 128).

93.    Mr. Lollar chose not to challenge the constitutionality of the Texas Fair Defense Act because their primary position was that the Sheriff's Department was active in facilitating the interviews. (Writ RR3: 154).

94.    Defense counsel did, in fact, object to the admission of the media interviews on Sixth and Fourteenth Amendment grounds. (Writ RR3: 155; RR43: 105-06).

95.    Applicant was booked into the Dallas County Jail in the early morning hours of June 21, 2008. (Writ RR3: 136). He appeared before Judge Jonathan Vickery approximately three hours after his book-in and requested the appointment of an attorney. (Writ RR3: 137).

96.    Sharon Johnson, court coordinator for Criminal District Court Number 7, contacted Mr. Lollar on June 24, 2008 at the start of the business day regarding his appointment in this case. (Writ RR3: 135).

97.    Shortly thereafter, Mr. Lollar typed a letter to the Dallas County Sheriff's Department stating that Applicant was not to be interviewed by media or law enforcement. (Writ RR3: 135-36). This was standard practice for Mr. Lollar in handling his high-profile cases. (Writ RR3: 136).

98.    At a pretrial hearing, Kimberly Leach, an employee of the Dallas County Jail, testified that she was in charge of getting the media's requests for interviews to inmates, including Applicant. (RR41: 8).

99.    At a pretrial hearing, Ms. Leach outlined the process of getting the media's requests to inmates, including the procedure used in this case. (RR41: 9-29).

13

100. Trial counsel attempted to use Ms. Leach's testimony at the pretrial hearing to establish state action in support of the constitutional challenges to the media interviews. (RR43: 105-09).

101. Mr. Lollar was satisfied with calling Ms. Leach as the only witness regarding the procedure by which the media obtained access to Applicant. (Writ RR3: 150, 152).

102. The reporters and assignments editors would not speak with the defense team outside of court. (Writ RR3: 151).

103. The defense team attempted to establish state action by showing that the Dallas County Sheriff's Office facilitated the interviews, that the sheriff's deputies were present during the interviews, and that Applicant had refused to speak with law enforcement but was willing to speak with the media. (Writ RR3: 152-53).

104. During the pretrial hearing, Mr. Lollar sought to make clear that the defense's position was that lawyers are not appointed quickly enough to prevent media interviews. (Writ RR3: 155-56, 164).

105. The crux of the defensive theory at trial was that Applicant was intoxicated at the time of the offense and during the media interviews. (Writ RR3: 124-25).

106. Although counsel can advise a client not to speak with the media, the ultimate decision is left to the client.

107. Media interviews can be used by an accused to deny involvement in the charged offense or to downplay their role in the charged offense. (Writ RR3: 125).

108. Indeed, Applicant first denied involvement in the murders to Channel 11. (Writ RR3: 125).

109. Applicant fails to rebut the presumption that counsels' decisions regarding what challenges to raise regarding the media interviews constituted sound, reasonable trial strategy.

110. Applicant fails to establish a constitutional deficiency in counsels' decisions regarding what challenges to raise regarding the media interviews.

111. Counsels' attempts to exclude Applicant's statements during the media interviews did not fall below an objective standard of reasonableness.

14

112. Also, there is no reasonable probability that had counsel raised additional constitutional challenges to the media interviews, the result of the proceeding would have been different.

113. Counsel was not constitutionally ineffective.

114. The relief requested in Ground Three should be denied.

## GROUND FOUR:
### Detective B. K. Nelson's Testimony

115. In his fourth ground for relief, Applicant alleges that his federal constitutional rights to due process and to be free from cruel and unusual punishment were violated when Detective Barrett Keith Nelson gave false and misleading testimony for the State regarding Applicant's gang membership. According to Applicant, Detective Nelson's testimony was false and misleading because he did not follow the statutory criteria of section 71.01 of the Texas Penal Code and article 61.02 of the Texas Code of Criminal Procedure in determining that Applicant was a member of the criminal street gang the Gangster Disciples.

### The Allegations Are Not Cognizable in a Writ of Habeas Corpus

116. Claims alleging a violation of a statute are not cognizable in a writ of habeas corpus. *Ex parte Graves*, 70 S.W.3d at 109.

117. Applicant's allegation that Detective Nelson's testimony was false and misleading is based in large part on his claim that the testimony did not meet the statutory requirements set forth in Chapter 61 of the Texas Code of Criminal Procedure.

118. Chapter 61 does not govern the admission of evidence regarding gang membership but, rather, governs the compilation of information pertaining to criminal street gangs into intelligence databases. *See* Tex. Code Crim. Proc. Ann. arts. 61.01-61.12 (West 2006 & Supp. 2013).

119. Applicant's reliance on Chapter 61 of the Texas Code of Criminal Procedure is misplaced.

120. To the extent Applicant is alleging a statutory violation, his fourth ground for relief is procedurally barred and relief should be denied.

15

## Claims Procedurally Barred

121. The Court of Criminal Appeals has held that matters not raised at trial cannot form the basis for habeas relief. *See Dutchover*, 779 S.W.2d at 77; *Crispen*, 777 S.W.2d at 105; *Bagley*, 509 S.W.2d at 333 ("The same rule as to the necessity of an objection to complained of evidence has been applied by this Court in habeas corpus cases."). At the pre-trial hearing, Applicant objected to Detective Nelson's testimony under Rules 401 and 403 of the Texas Rules of Evidence and the First and Fourteenth Amendments to the United States Constitution. (RR40: 6, 35).

122. To the extent Applicant contends that Detective Nelson's testimony should have been excluded because it did not comply with the requirements of article 61.02 of the code of criminal procedure and section 71.01 of the penal code, he could have raised these contentions at trial, but did not. Thus, they are procedurally barred and should be dismissed.

## Applicant's Due Process Rights Were Not Violated by Admission of Detective Nelson's Testimony

123. A conviction procured through the use of false testimony is a denial of the due process guaranteed by the Federal Constitution. *Ex parte Ghahremani*, 332 S.W.3d 470, 477 (Tex. Crim. App. 2011). The use of false testimony at the punishment phase is also a due-process violation. *Id.* A due-process violation may arise not only through false testimony specifically elicited by the State, but also by the State's failure to correct testimony it knows to be false. *Id.* It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence. *Id.*

124. Though case law in this area frequently refers to "perjured" testimony, there is no requirement that the offending testimony be criminally perjurious. *Id.* It is sufficient if the witness's testimony gives the trier of fact a false impression. *Id.* These rules are not aimed at preventing the crime of perjury – which is punishable in its own right – but are designed to ensure that the defendant is convicted and sentenced on truthful testimony. *Id.* at 477-78.

125. To constitute a violation of due process under federal precedent, the State must knowingly use false testimony. *Id.* at 478. The Court of Criminal Appeals allows applicants to prevail on due-process claims when the State has unknowingly used false testimony. *Id.* Even under this expanded notion of

16

due process, however, the State's knowledge is still a relevant factor to determine the standard the Court uses for reviewing an applicant's habeas claim. *Id.*

126. The knowing use of false testimony violates due process when there is a "reasonable likelihood" that the false testimony affected the outcome. *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). The Court of Criminal Appeals has characterized this as a requirement that the false testimony must have been material. *Id.* This standard is more stringent than the standard applied to *Brady* claims of suppressed evidence, which requires the defendant to show a "reasonable probability" that the suppression of evidence affected the outcome. *Id.* The "reasonable likelihood" standard is equivalent to the standard for constitutional error, which "requires the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 680 n.9 (1985) (plurality op.)).

127. The Court notes that even if conflicting testimony is presented, that fact alone would not indicate perjury. *Losada v. State*, 721 S.W.2d 305, 312 (Tex. Crim. App. 1986); *Brown v. State*, 477 S.W.2d 617, 623 (Tex. Crim. App. 1972).

128. In addition to his due process claim, Applicant alleges a violation of the Eighth Amendment's proscription against cruel and unusual punishment.

129. The use of false testimony is a violation of due process. It does not implicate the Eighth Amendment. Thus, Applicant's reliance on the Eighth Amendment is misplaced.

130. At trial, Detective Nelson testified that he has been a member of the Dallas Police Department's Gang Unit for twelve years. (RR49: 79-81). At the request of the Dallas County District Attorney's Office, he researched the criminal street gangs Gangster Disciples and Folk Nation. (RR49: 82-83).

131. Detective Nelson testified that the Gangster Disciples and Folk Nation were originally founded in Chicago and are primarily Midwestern gangs. (RR49: 85-86). It is not common to come into contact with a member of the Gangster Disciples in the Dallas/Fort Worth area. (RR49: 82).

132. Detective Nelson reviewed the media interviews, Applicant's phone calls, photographs of Applicant's jail cell, and art, letters, and other writings found in Applicant's notebooks. (RR49: 83-130).

17

133. According to Detective Nelson, the Gangster Disciples is a part of the Folk Nation and is a criminal gang involved in multiple criminal activities. (RR49: 86, 91-93).

134. After reviewing the media interviews, Applicant's phone calls, photographs of Applicant's jail cell, and art, letters, and other writings found in Applicant's notebooks, Detective Nelson concluded that Applicant had self-admitted to being a member of the Gangster Disciples. (RR49: 84-133).

135. Detective Nelson testified that the term "Folk" is indicative of the Folk Nation, that the Gangster Disciples use a pitchfork as a symbol of their gang, that the number 74 is a direct reference to the Gangster Disciples (G being the seventh letter of the alphabet and D the second), that the six-pointed star of David is used by the Gangster Disciples as a symbol of their gang, and that Gangster Disciples utilize wings in their drawings. (RR49: 84-103).

136. Detective Nelson based his opinion on the following: (1) Applicant's repeated use of the word "Folk" in his writings and in one of the media interviews; (2) Applicant's use of a pitchfork hand-signal during one of the media interviews; (3) Applicant's reference to wrapping his flag around his pistol during one of the media interviews; (4) Applicant's repeated use of the pitchfork in his drawings; (5) Applicant's reference to his mother's boyfriend as an OG74; (6) Applicant's use of the six-pointed star of David in his artwork; (7) Applicant's sign of allegiance to the founder of the Black Gangster Disciples in his writings; and (8) Applicant's use of wings in his artwork. (RR49: 84-103).

137. Applicant presented the affidavit and testimony of Dwight Stewart in support of his claim that Detective Nelson testified falsely.

138. In his affidavit, Mr. Stewart made the following statements and conclusions:

> (a) that Detective Nelson gave false and misleading testimony regarding Applicant's membership in the Gangster Disciples and the Folk Nation;
>
> (b) that Applicant did not meet the statutory criteria for gang membership set forth in Chapter 61 of the Texas Code of Criminal Procedure;
>
> (c) that the Gangster Disciples and Folk Nation are not recognized criminal street gangs in Dallas;

18

(d) that Mr. Stewart has presented Continuing Legal Education seminars on the subject of gang education, specifically for attorneys practicing capital defense;

(e) that Detective Nelson did not offer evidence that Applicant was associated with or frequented any area in which the Gangster Disciples operated as a criminal street gang in the Dallas/Fort Worth area;

(f) that Detective Nelson's testimony offered no evidence that Applicant had anything other than incidental use of various gang references;

(g) that Applicant was not listed in any Dallas gang database;

(h) that Applicant does not have any specific gang-related tattoos, which, according to Mr. Stewart, is a strong indicator that Applicant is not a gang member;

(i) that one of the bases for concluding that Applicant was a member of a gang – Applicant's statement during an interview with the media that he was a "Folk" – was misleading because the terms "Folk" and "Folk Nation" have no current meaning;

(j) that members of gangs reference their individual gangs by signs and symbols, and that Applicant made no mention of the Gangster Disciples in the media interviews;

(k) that based on his experience, a true gang member would have made a "shout out" to his gang in all of the media interviews, not just one; and

(l) that Applicant was not a member of a gang but was, in fact, a "gangsta wanna-be."

(Defense Writ Ex. 25).

139. At trial, Detective Nelson testified that Applicant self-admitted to being a member of the Folk Nation and Gangster Disciples in a phone call to his mother's boyfriend during which Applicant asked the man if he was a member of OG74, a reference to the Gangster Disciples. (RR49: 94-95; State's Trial Ex. 553). In his affidavit, Mr. Stewart stated that this was merely a reference to the older man's knowledge and experience. (Defense Writ Ex. 25).

19

140. Detective Nelson based part of his opinion regarding Applicant's membership in the Gangster Disciples on his review of notebooks belonging to Applicant that were found in the victim's car. (RR49: 105). These notebooks contained rap lyrics that reference the gang and symbols used by the gang. (RR49: 105-33). In his affidavit, Mr. Stewart stated that rap lyrics that reference gang membership denote a macho reputation, not membership in the gang. (Defense Writ Ex. 25). He also stated that gang symbolism is merely a prop to portray a macho reputation, financial success, and attractiveness to the opposite sex. (Defense Writ Ex. 25).

141. Detective Nelson testified at trial that Applicant has a tattoo of "MOB." According to Nelson, "MOB" symbolizes the Gangster Disciples' rivalry with the Bloods gang; it stands for "money over bitches" and is indicative of a mentality of getting money any way possible. (RR49: 111-12). Mr. Stewart stated that "MOB" is a popular tattoo that is frequently seen on rap stars and in its popular usage has no relevance to gang membership. (Defense Writ Ex. 25).

142. In his affidavit, Mr. Stewart stated that he reviewed the following materials in reaching his professional opinion that Applicant was not a member of the Gangster Disciples or Folk Nation: (1) David Barger's testimony; (2) Darrell Doty's testimony; (3) Detective Nelson's testimony; (4) Assistant Warden Melodye Nelson's testimony; (5) and State's Exhibit at Trial 405. (Defense Writ Ex. 25).

143. Mr. Stewart also testified at the hearing on Applicant's application for writ of habeas corpus held on December 7, 2012.

144. At the hearing, Mr. Stewart testified that he is an educator with the Texas School Safety Center, but that he did not provide his affidavit in his capacity as an educator, that his employer was unaware that he had provided the affidavit, and that his employer was unaware that he was testifying. (Writ RR3: 71).

145. Mr. Stewart also testified that he was a certified gang awareness trainer. To obtain certification, he only had to take a certain number of classes, and was not required to take an examination. (Writ RR3: 72).

146. Mr. Stewart admitted that he did not know that Chapter 61 of the Texas Code of Criminal Procedure does not govern the admissibility of gang testimony. (Writ RR3: 75). He also admitted that he was unaware that the Court of

20

Criminal Appeals had already held that Detective Nelson's testimony was properly admitted at trial. (Writ RR3: 75).

147. Also, Mr. Stewart acknowledged that the Gangster Disciples are a recognized criminal street gang in Dallas. (Writ RR3: 75).

148. Although Mr. Stewart stated in his affidavit that Applicant was not in the Dallas gang database, at the hearing, he admitted that he did not check the database and does not have access to the database. (Writ RR3: 77).

149. Also, Mr. Stewart admitted at the hearing that he was unaware that Applicant was not from Dallas, but had lived in Michigan and Georgia. (Writ RR3: 78).

150. Mr. Stewart admitted that he could not testify about the presence of the Gangster Disciples in Michigan or Georgia and that he did not know that Detective Nelson had consulted gang officers in Chicago prior to entering his opinion in this case. (Writ RR3: 78-79).

151. State's Exhibit 1, which was offered at the hearing, is a printout of a Powerpoint presentation created by Mr. Stewart and used by him in giving presentations as part of his responsibilities with the Texas School Safety Center. (Writ RR3: 79-80). The Powerpoint presentation was created after Stewart provided his affidavit in this case. (Writ RR3: 80). The presentation includes a slide titled "Folk Nation." (Writ RR3: 80). On this slide, Stewart states that the six-point star, the pitchfork, the number 26, and wings are all symbols of Folk Nation. (Writ RR3: 80; State's Hearing Ex. 1).

152. At the hearing, Mr. Stewart admitted that he did not know that Detective Nelson had relied on the same symbols in reaching his opinion in this case or that Applicant had drawn these symbols. (Writ RR3: 80-82).

153. At the hearing, Mr. Stewart testified that he did not view any of the exhibits offered during trial that Detective Nelson had relied on in forming his opinion in this case. (Writ RR3: 82, 84).

154. Finally, Mr. Stewart admitted that he did not know that Applicant's brother was a member of the Gangster Disciples. (Writ RR3: 83).

155. Mr. Stewart disavowed his entire affidavit accusing Detective Nelson of giving false and misleading testimony and agreed with much of Nelson's trial testimony.

156. Thus, Mr. Stewart's affidavit is not credible or reliable evidence.

21

157. Applicant has not shown that any part of Detective Nelson's testimony was false or misleading.

158. Detective Nelson was a credible witness.

159. Detective Nelson's testimony was true and accurate, not false or misleading in any respect.

160. The Court concludes Applicant's due process rights were not violated by the State's use of Detective Nelson's testimony.

161. Furthermore, even assuming it was implicated, the Eighth Amendment's proscription against cruel and unusual punishment was not violated by the State's use of Detective Nelson's testimony.

162. Applicant's fourth ground for relief should be denied.

## GROUND FIVE:
### Applicant's Writings

163. In his fifth ground for relief, Applicant alleges that the State violated his First Amendment rights by using his various writings to demonstrate that he was a member of a street gang.

164. During the punishment phase, Detective Nelson testified that he reviewed some of the writings and artwork found in Applicant's cell and notebooks found in Swan's car. Detective Nelson testified that several of Applicant's artwork and writings indicated that he was a member of the Gangster Disciples, a criminal street gang. (RR49: 97-125).

165. Applicant alleges that the State violated his rights under the First Amendment to the United States Constitution by using his writings to demonstrate that he was a member of a criminal street gang.

166. States cannot criminalize thoughts. *Goldberg v. State*, 95 S.W.3d 345, 373 (Tex. Crim. App. 2002).

167. Also, the First Amendment prevents a State from using evidence of a defendant's abstract beliefs against him at trial, unless those beliefs have a bearing on the issues in the case. *See id.* (citing *Dawson v. Delaware*, 503 U.S. 159, 167-68 (1992)).

22

Case 3:15-cv-01758-N   Document 2-3   Filed 05/21/15   Page 23 of 34   PageID 84

168. Applicant was not on trial for the ideas expressed in his writings and art work; he was on trial for murder. The issue is not, therefore, whether Applicant's writings and artwork were protected First Amendment speech, but whether they were relevant to an issue in the case.

169. The relevancy of the complained-of evidence has already been raised and rejected. Both this Court and the Court of Criminal Appeals have previously held that the evidence was, indeed, relevant. *Broadnax*, 2011 Tex. Crim. App. Unpub. LEXIS 920, at *44-49.

170. Thus, Applicant's allegation is procedurally barred and should be dismissed. *See Ex parte Ramos*, 977 S.W.2d at 617.

171. Assuming the claim were reviewable on the merits, however, the complained-of evidence was relevant. *See Broadnax*, 2011 Tex. Crim. App. Unpub. LEXIS 920, at *44-49.

172. Applicant fails to establish by a preponderance of the evidence any violation of his First Amendment rights.

173. The State did not violate Applicant's First Amendment right to free speech by using his writings or artwork to prove his gang membership.

174. Thus, Applicant's claim for relief should be denied.

## GROUND SIX:
### Counsel's Response to State's Evidence that Applicant Was a Member of a Criminal Street Gang

175. In his sixth ground for relief, Applicant alleges that trial counsel was ineffective for failing to refute the State's evidence that Applicant was a member of the Gangster Disciples, a criminal street gang.

176. The benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland*, 466 U.S. at 686; *Hernandez*, 726 S.W.2d at 57.

177. An Applicant asserting a claim of ineffective assistance has the burden to prove, by a preponderance of the evidence, the following: (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result

23

of the proceeding would have been different. *See Thompson*, 9 S.W.3d at 812 (explaining the standard under *Strickland*).

178. Effective assistance of counsel does not mean errorless counsel. *See Kunkle*, 852 S.W.2d at 505.

179. To prevail on a claim of ineffective assistance, the Applicant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. *See McFarland*, 163 S.W.3d at 753; *Jackson*, 877 S.W.2d at 771.

180. This highly deferential review is applied to avoid "the distorting effect of hindsight." *McFarland*, 163 S.W.3d at 753 (quoting *Strickland*, 466 U.S. at 689).

181. Applicant alleges that his trial counsel was ineffective because he conducted only a superficial investigation into Applicant's gang membership. He claims that counsel should have objected to Detective Nelson's testimony and/or cross-examined Detective Nelson to show that (1) the criteria set forth in Chapter 61 was not met, (2) Applicant does not have any gang tattoos, and (3) Applicant was not located in the Dallas gang database. He also contends that counsel should have objected to the admission of Detective Nelson's testimony as a violation of the First Amendment and should have called a gang expert who would have refuted Detective Nelson's testimony.

182. At the hearing conducted on Applicant's application for writ of habeas corpus, Brad Lollar testified that he made a strategic decision to downplay evidence of Applicant's gang membership because there was no evidence that the murders were gang-related. (Writ RR3: 162).

183. Mr. Lollar made a strategic decision not to call a gang expert. Instead, he decided to call family members, such as Applicant's sister, to testify that Applicant was not a member of the gang, but was merely a "wannabe" who had learned about the Gangster Disciples from his older brother. (Writ RR3: 162-63).

184. Mr. Lollar testified that Applicant had self-admitted membership in the gang and that it would be difficult to present a credible case that Applicant's use of gang symbolism was meaningless. He believed that if he attempted to argue that the symbolism was meaningless, he would lose credibility with the jury. (Writ RR3: 161-62).

185. Applicant alleges that trial counsel should have called Dwight Stewart to contradict Detective Nelson's testimony. In support of this allegation, Applicant relies heavily on Mr. Stewart's affidavit.

186. As noted above, however, Mr. Stewart's affidavit was not credible or reliable. Stewart disavowed the statements in his affidavit at the writ hearing and agreed with much of Detective Nelson's trial testimony. (Writ RR3: 72-84).

187. As noted above, defense counsel did object to Detective Nelson's testimony on First Amendment grounds. (RR40: 6).

188. It would have been futile to object to Detective Nelson's testimony under Chapter 61 of the Texas Code of Criminal Procedure because the chapter deals with the creation of gang intelligence databases by law enforcement agencies and not the admissibility of gang evidence at trial. (Writ RR3: 160).

189. Applicant fails to rebut the presumption that his trial counsels' response to the State's offer of evidence of his gang membership constituted reasonable trial strategy. He also fails to demonstrate that counsels' response was deficient and that he was prejudiced by any alleged deficiency.

190. Counsel was not deficient and there is no reasonable probability that, but for counsels' strategic decisions, the result of the proceeding would have been different.

191. The Court concludes that Counsel was not constitutionally ineffective, and relief should be denied.

### GROUND SEVEN:
### Dr. Price's Testimony

192. In his seventh ground for relief, Applicant alleges his federal constitutional rights to due process and freedom from cruel and unusual punishment were violated by false and misleading testimony from Dr. Jack Randall Price concerning anti-social personality disorder (ASPD) and the Hare Psychopathy Checklist – Revised (PCL-R). According to Applicant and his current psychological expert, Dr. Edens, "[t]here seems to be no scientifically valid or reliable reason to have introduced evidence concerning the PCL-R in this case in response to earlier testimony concerning ASPD – which is itself largely

extraneous to a scientifically based assessment of risk factors for future violence in prison." (Application, p. 83; Defense Writ Ex. 26).

## The Allegations Are Not Cognizable in a Writ of Habeas Corpus

193. Claims alleging a violation of a statute, rule, or non-constitutional doctrine are not cognizable in a writ of habeas corpus. *Ex parte Graves*, 70 S.W.3d at 109.

194. Although Applicant couches his argument as a violation of due process due to false and misleading evidence, he argues that Dr. Price's testimony did not meet the requirements for admissibility under the evidentiary rules governing relevancy, unfairly prejudicial evidence, and expert testimony.

195. Thus, Applicant merely alleges a violation of a rule or non-constitutional doctrine, which is not cognizable in writ of habeas corpus.

## The Allegations Are Procedurally Barred

196. To the extent Applicant merely alleges a violation of evidentiary rules, his claim is procedurally barred.

197. At trial, Applicant objected to the admission of Dr. Price's testimony under Rules of Evidence 401, 403, and 702. He did not, however, challenge the Court's ruling on those objections on direct appeal.

198. Habeas review is not to be used as a substitute for direct appeal. *Clore*, 690 S.W.2d at 900. If a claim could have been raised on appeal, but was not, the Applicant is procedurally barred from raising the issue for the first time on habeas. *See Cruzata*, 220 S.W.3d at 520; *Ramos*, 977 S.W.2d at 617.

199. Because Applicant could have raised his evidentiary-rule-based challenges on appeal but did not, they are procedurally barred and should be dismissed.

200. Even if construed as a constitutional claim, Applicant's allegation is meritless.

201. The Eighth Amendment's proscription against cruel and unusual punishment is not implicated by the State's use of false or misleading testimony. The use of false testimony implicates only Applicant's due process rights.

202. A conviction procured through the use of false testimony is a denial of the due process guaranteed by the federal constitution. *Ghahremani*, 332 S.W.3d at 477. The use of false testimony at the punishment phase is also a due-process violation. *Id.* A due-process violation may arise not only through

26

false testimony specifically elicited by the State, but also by the State's failure to correct testimony it knows to be false. *Id.* It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence. *Id.*

203. Though case law in this area frequently refers to "perjured" testimony, there is no requirement that the offending testimony be criminally perjurious. *Id.* It is sufficient if the witness's testimony gives the trier of fact a false impression. *Id.* These rules are not aimed at preventing the crime of perjury – which is punishable in its own right – but are designed to ensure that the defendant is convicted and sentenced on truthful testimony. *Id.* at 477-78.

204. The presentation of conflicting testimony alone does not establish a due process violation. *Losada*, 721 S.W.2d at 312; *Brown*, 477 S.W.2d at 623.

205. To constitute a violation of due process under federal precedent, the State must knowingly use false testimony. *Id.* at 478. The Court of Criminal Appeals has held that the State's unknowing use of false testimony may also give rise to a due process claim. *Id.* Even under this expanded notion of due process, however, the State's knowledge is still relevant to determining the standard for reviewing an Applicant's habeas claim. *Id.*

206. The knowing use of false testimony violates due process when there is a "reasonable likelihood" that the false testimony affected the outcome. *Id.* (quoting *Agurs*, 427 U.S. at 103). The Court of Criminal Appeals has characterized this as a requirement that the false testimony must have been material. *Id.* This standard is more stringent than the standard applied to *Brady* claims of suppressed evidence, which requires the defendant to show a "reasonable probability" that the suppression of evidence affected the outcome. *Id.* The "reasonable likelihood" standard is equivalent to the standard for constitutional error, which "requires the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *Bagley*, 473 U.S. at 680 n.9).

207. Applicant fails to establish any due process violation.

208. Dr. Price testified at trial that he has a Bachelor's, Master's, and Ph.D in psychology, that he has been licensed to practice psychology in Texas since 1983, that he has taught psychology for thirty-eight years, and that he has had a psychology practice for twenty-five years. (RR52: 239-40).

209. At a hearing held outside the presence of the jury, Dr. Price testified that he had not been asked to testify regarding whether or not Applicant was a psychopath, but that his role was to educate the jury on the characteristics of a psychopathic personality. (RR52: 219-20).

210. At trial, Dr. Price utilized a Power-Point presentation in testifying about the traits of a psychopathic personality. (RR52: 245-46; State's Ex. at trial, 597). He testified regarding the 20 characteristics of psychopathy. (RR52: 249-59). He stated that not all 20 characteristics need to be present in order for a person to be deemed a psychopath. (RR52: 257).

211. Dr. Price testified that psychopathy is a very persistent condition, that in his experience there is no effective treatment, and that under certain conditions, the behavior can be managed. (RR52: 258).

212. Dr. Price testified that he did not obtain the 20 characteristics of psychopathy from the DSM-IV, that the DSM-IV does not contain the diagnosis of psychopathy, and that the closest diagnosis to psychopathy that is contained in the DSM-IV is anti-social personality disorder. (RR52: 259).

213. Dr. Price testified that anyone who has one of the 20 traits discussed is not per se a psychopath. There are people who are immature that would show some of the traits. (RR52: 260, 262-63).

214. Dr. Price testified that he testifies 60% of the time on behalf of the State and 40% of the time on behalf of the defense. (RR52: 262).

215. In support of his claim that Dr. Price's testimony was false and misleading, Applicant relies heavily on an affidavit from Dr. John Edens. (Defense Writ Ex. 26).

216. In his affidavit, Dr. Edens stated that he is a licensed psychologist in the State of Texas and a Professor in the Department of Psychology at Texas A&M University. Since 2000, he has consulted on numerous federal and state death penalty cases in regards to the assessment of future dangerousness and the role of mental health. He has conducted extensive research on psychological assessment and the prediction of human behavior. He is familiar with the checklist used by Dr. Price in his trial testimony. (Defense Writ Ex. 26). He has published on the potential misuses and abuses of the psychopathy scales in forensic evaluations, especially in the context of capital murder trials. (Defense Writ Ex. 26).

28

217.  Dr. Edens opined that there was essentially no scientific justification for introducing evidence of an anti-social personality disorder diagnosis in Applicant's trial. According to Dr. Edens, the diagnosis and presentation of the personality traits of a psychopath had little or nothing to do with Applicant's likelihood of future dangerousness if not put to death. (Defense Writ Ex. 26).

218.  Dr. Edens stated that at the time of trial, there were published scholarly reviews criticizing the use of psychopathy and anti-social personality disorder diagnoses in capital murder cases. He also stated that numerous experts would have been available to aid in a challenge to the admission of this evidence. (Defense Writ Ex. 26).

219.  Dr. Edens stated that Dr. Price treated the diagnoses of anti-social personality disorder and psychopathy as interchangeable. (Defense Writ Ex. 26).

220.  Dr. Edens stated that admission of evidence regarding the term "psychopath" and the traits typically associated with it are likely to unfairly prejudice jurors against a capital defendant. (Defense Writ Ex. 26).

221.  Dr. Edens stated that he conducted a study in which 60% of the participants would support a death sentence for a defendant who had been described as a psychopath, 38% did so when the defendant was described as non-mentally disordered, and 30% did so when the defendant was described as experiencing delusions and hallucinations. (Defense Writ Ex. 26).

222.  Dr. Edens stated that the unfair prejudicial effects of introducing evidence of the psychopathy checklist were magnified by the direct testimony of Dr. Price that there is essentially no treatment for psychopathy. (Defense Writ Ex. 26).

223.  Dr. Edens stated that there are recent published studies that suggest that there are interventions that can significantly reduce the likelihood for future violent behavior among individuals with psychopathic traits, particularly those who are relatively young. (Defense Writ Ex. 26).

224.  Dr. Edens stated that aside from having an unfair prejudicial impact and having little or no demonstrated probative value concerning future dangerousness in capital cases, it is also worth stressing that a growing body of scientific research indicates that scores using the checklist are highly unreliable in real world criminal cases. (Defense Writ Ex. 26).

225. In addition to his sworn written statements, Dr. Edens testified at the hearing on Applicant's application for writ of habeas corpus held on December 7, 2012.

226. Dr. Edens testified that the only portions of the record he reviewed prior to his affidavit were provided to him by writ counsel. (Writ RR3: 166-67).

227. Dr. Edens did not recall whether the defense had called mental health experts at trial. (Writ RR3: 167).

228. Dr. Edens was not aware that trial counsel had a mental health expert that was prepared to rebut Dr. Price's testimony. (Writ RR3: 167).

229. Applicant has not shown that Dr. Price's testimony was false, misleading, or perjurious. At most, he has shown a difference of opinion between two qualified experts. If Dr. Edens had testified at Applicant's trial, it would simply have been a "battle of the experts."

230. Dr. Price did not give false, misleading, or perjured testimony.

231. The Court concludes Applicant's due process rights were not violated by the State's use of Dr. Price's testimony.

232. Furthermore, even assuming it was implicated, the Eighth Amendment's proscription against cruel and unusual punishment was not violated.

233. For the above reasons, Applicant's seventh ground for relief should be denied.

## GROUND EIGHT:
### Counsel's Handling of Testimony Regarding Anti-Social Personality Disorder and Psychopathy

234. In his eighth ground for relief, Applicant alleges his trial counsel was ineffective for (1) opening the door to Dr. Price's testimony, (2) failing to use Dr. Frank Lane or another defense expert to explain why anti-social personality disorder is not a good indicator of future dangerousness and why it was not intended for use in a criminal setting, and (3) failing to cross-examine Dr. Price altogether and to rebut the reliability and validity of the PCL-R in the future dangerousness determination.

235. The Court notes that the benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland*, 466 U.S. at 686; *Hernandez*, 726 S.W.2d at 57.

236. An Applicant asserting a claim of ineffective assistance has the burden to prove, by a preponderance of the evidence, the following: (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Thompson*, 9 S.W.3d at 812 (explaining the standard under *Strickland*).

237. Effective assistance of counsel does not mean errorless counsel. *See Kunkle*, 852 S.W.2d at 505.

238. To prevail on a claim of ineffective assistance, the Applicant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. *See McFarland*, 163 S.W.3d at 753; *Jackson*, 877 S.W.2d at 771.

239. This highly deferential review is applied to avoid "the distorting effect of hindsight." *McFarland*, 163 S.W.3d at 753 (quoting *Strickland*, 466 U.S. at 689).

240. Applicant alleges that trial counsel did not cross-examine Dr. Price. Applicant is incorrect.

241. The Court told counsel that he would allow a liberal cross-examination of Dr. Price and defense counsel, Doug Parks, effectively questioned him. (RR52: 230, 259-63; Writ RR3: 125-26).

242. In particular, he examined him regarding the fact that psychopathy is not in the DSM-IV, the fact that the closest thing to psychopathy that is in the DSM-IV is anti-social personality disorder, the fact that people may have traits of a psychopath and not be a psychopath, and the fact that some of the traits of a psychopath are traits of an immature person. (Writ RR3: 126).

243. Also, Mr. Parks objected to the admissibility of Dr. Price's testimony based on Texas Rules of Evidence 401, 403, and 702. (RR52: 227-28).

244. Applicant's trial counsel, Brad Lollar, argued during closing argument that it was not possible for the jury to determine if Applicant was a psychopath because it lacked the relevant historical information. (Writ RR3: 160).

31

245. At the hearing on the writ of habeas corpus held on December 7, 2012, Mr. Lollar testified that the trial team did have a mental health expert – Dr. Gilda Kessner. She sat through Dr. Price's testimony and counsel was prepared to call her if needed. Moreover, defense counsel used Dr. Kessner to prepare their cross-examination questions for Dr. Price. (Writ RR3: 157-58).

246. At the conclusion of Dr. Price's testimony, the entire trial team debated whether to call Dr. Kessner, who was present and prepared to testify. (Writ RR3: 158).

247. If defense counsel had called Dr. Kessner to testify, they risked the possibility that the State would pose a hypothetical question using facts related to Applicant and get Kessner to admit that, under the hypothetical, Applicant was a psychopath. (Writ RR3: 159).

248. Defense counsel did not want to take that risk because Dr. Price, the State's witness, had not diagnosed Applicant as a psychopath. (Writ RR3: 159).

249. Brad Lollar and Doug Parks called other mental health experts during the punishment phase: Jason Varghese, Dr. Haideh Mirmesdagh, Cheryl Silver, and Frank Lane. (Writ RR3: 156-57).

250. The defense used Dr. Lane, a jail psychologist, to show Applicant's medical history while in jail, including Applicant's substance abuse. (RR50: 77-99).

251. Dr. Lane did indicate that he believed Applicant may be a psychopath. (RR50: 99-100). But Mr. Lollar questioned Dr. Lane about his inability to make such a diagnosis because he lacked the necessary information regarding Applicant's background and history. (RR50: 100). Moreover, no one at trial testified that Applicant had been diagnosed with psychopathy.

252. Trial counsel was not ineffective for calling Dr. Lane or for failing to call another mental health expert.

253. Applicant fails to rebut the presumption that defense counsel exercised reasonable trial strategy by calling Dr. Lane and not calling another mental health expert.

254. Counsels' representation did not fall below an objective standard of reasonableness, and there is no reasonable probability that, but for the alleged deficiency, the result of the proceeding would have been different.

255. The Court concludes that Counsel was not constitutionally ineffective, and relief should be denied.

## ORDER

THE CLERK IS **ORDERED** to prepare a transcript of all papers in cause number W08-24667-Y(A) and to transmit same to the Court of Criminal Appeals as provided by article 11.071 of the Texas Code of Criminal Procedure. The transcript shall include certified copies of the following documents:

1. The Application for Writ of Habeas Corpus filed in cause number W08-24667-Y(A), including any exhibits;

2. The State's Original Answer to the Application for Writ of Habeas Corpus filed in cause number W08-24667-Y(A), including any exhibits;

3. The State's and Applicant's proposed findings of fact and conclusions of law;

4. Any and all other pleadings filed by either party under cause number W08-24667-Y(A);

5. This Court's findings of fact, conclusions of law, and order;

6. This Court's order designating the issues for further evidence gathering;

7. Any and all other orders issued by the Court under cause number W08-24667-Y(A);

8. The Reporter's Record of the writ hearing (December 6-7, 2012); and

9. The indictment, judgment, sentence, docket sheet, and appellate record in cause number W08-24667-Y(A), unless these have been previously forwarded to the Court of Criminal Appeals.

33

THE CLERK IS FURTHER **ORDERED** to send a copy of this Court's findings of fact and conclusions of law, including its order, to Lydia Brandt, attorney for Applicant, The Brandt Law Firm, P.C., P.O. Box 850843, Richardson, Texas 75085, and to Lisa Smith, Assistant District Attorney, counsel for the State.

SIGNED the __17__ day of September, 2014.

Judge Michael Snipes
Criminal District Court No. 7
Dallas County, Texas

34