**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

JAMES GARFIELD BROADNAX,

           Petitioner,

    v.

WILLIAM STEPHENS,
Director, Texas Department
of Criminal Justice,
Correctional Institutions Division,

           Respondent.

Civil Action No. 3:15 Civ. 01758

**<u>CAPITAL CASE</u>**

---

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PRISONER IN STATE CUSTODY**

---

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

Steven C. Herzog
Livia Fine
Adam Ross Mandelsberg
Jordana L. Haviv
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

**BURLESON, PATE & GIBSON, LLP**

Camille M. Knight
900 Jackson Street, Suite 330
Dallas, TX 75202
(214) 871-4900

Counsel for Petitioner James Garfield Broadnax

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... viii

PRELIMINARY STATEMENT ...................................................................................1

PROCEDURAL HISTORY............................................................................................2

STATEMENT OF THE CASE......................................................................................3

    A.    While in State Custody, Mr. Broadnax Submitted to
            Uncounseled Media Interviews......................................................................4

    B.    Mr. Broadnax's Trial Was Plagued by Prejudicial
            Irregularities and Misconduct .....................................................................7

          1.    The State Endeavored to Seat an All-White
                    and Biased Jury and Largely Succeeded.........................................8

    C.    The State Engaged in Unconstitutional Conduct to
            Secure a Death Sentence ...............................................................................9

    D.    The Court Improperly Permitted the State to Introduce
            Testimony Describing Mr. Broadnax as a "Psychopath" .........................13

    E.    The State Presented Faulty Expert Evidence to Falsely
            Claim That Mr. Broadnax Was a Gang Member.....................................14

GROUNDS SUPPORTING THE PETITION FOR RELIEF .......................................17

    I.    MR. BROADNAX'S CONSTITUTIONAL RIGHTS WERE
        VIOLATED PRIOR TO TRIAL THROUGH MEDIA
        INTERVIEWS WHILE IN STATE CUSTODY................................................17

    A.    Mr. Broadnax Was Denied His Constitutional Protection
            Against Self-Incrimination When He Was Compelled to
            Provide Interviews to Media Outlets While in State Custody ...................17

          1.    The Media Interviews Mr. Broadnax Gave Were Custodial
                    Interrogations to Which the *Miranda* Doctrine Applies................18

               (a)    *Mr. Broadnax Was in Custody at the Time*
                         *of the Media Interviews*.......................................................18

               (b)    *The Media Interviews Were Unconstitutional*
                         *"Interrogations"*...............................................................19

                     (i)    The State Knew or Acquiesced
                              in the Intrusive Conduct.......................................20

i

**TABLE OF CONTENTS**

**(cont.)**

**Page**

      (ii)    The Media Affiliates Intended to Assist Law
Enforcement and Further Their Own Interest........21

2.    Mr. Broadnax Did Not Waive His *Miranda*
Rights at or Before the Uncounseled Media
Interviews at the Dallas County Jail .............................................22

3.    Section 2254 Poses No Bar to Mr. Broadnax's Properly
Exhausted Claim That He Was Denied His Constitutional
Protection Against Self-Incrimination ..........................................24

B.    Mr. Broadnax's Statements to the Media Were
Involuntarily Coerced ...................................................................25

1.    Evaluating the Totality of the Circumstances,
Mr. Broadnax's Statement Was Involuntarily Coerced.................26

2.    Mr. Broadnax's Statements Were Made as a
Result of a Coordinated Police Effort, Not
Mr. Broadnax's Voluntary Decisions ...........................................29

3.    The Court Erred in Not Holding a Voluntariness Hearing ............30

4.    The State Did Not Prove Voluntariness.........................................31

5.    Mr. Broadnax's Trial Counsel Was Constitutionally
Ineffective in Failing to Present Dr. Roache's Testimony
About Mr. Broadnax's Capacity to Consent..................................33

6.    Section 2254 Poses No Bar to Mr. Broadnax's
Properly Exhausted Claim That His Statements
to the Media Were Involuntarily Coerced .....................................35

C.    Mr. Broadnax Was Denied His Sixth Amendment Right to
"Assistance of Counsel for His Defense" at a Critical Stage....................35

1.    Highly Publicized Pre-Trial Interactions with Media While
in State Custody Constitute Critical Stages of the
Proceedings to Which the Right to Counsel Attaches ...................36

2.    Mr. Broadnax's Uncounseled Media Interviews While in
State Custody Violated His Sixth Amendment Right to
Counsel and Had a Prejudicial Impact at Trial .............................40

3.    Section 2254 Poses No Bar to Mr. Broadnax's Properly
Exhausted Claim That He Was Denied His Sixth
Amendment Right to Counsel.......................................................44

ii

**TABLE OF CONTENTS**
**(cont.)**

**Page**

D.    The Texas Fair Defense Act Is Unconstitutional Because It Unreasonably Delays the Appointment of Counsel in Violation of the Sixth Amendment Right to Counsel .......................................................45

        1.    Section 2254 Poses No Bar to Mr. Broadnax's Claim That the Texas Fair Defense Act Is Unconstitutional, and Any Procedural Default Is Excused by Ineffective Assistance of Counsel ....................................................48

II.    MR. BROADNAX'S CONSTITUTIONAL RIGHTS WERE VIOLATED DURING JURY SELECTION ...........................................................................49

    A.    The Trial Court Erred in Denying Seven *Batson* Challenges Raised by Mr. Broadnax at Trial ...........................................................................49

        1.    It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Shaven McCraney ..............................................53

        2.    It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Mattie Vation ......................................................56

        3.    It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Ashley Rivera.....................................................58

        4.    It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Curtis Riser ......................................................61

        5.    It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Agwana Long.....................................................62

        6.    It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Betty Jackson .....................................................64

        7.    It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Dedrick Morrison..............................................66

        8.    Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That the Denial of His *Batson* Challenges Violated the Fourteenth Amendment .........................67

    B.    The Trial Court's Remedy of Reseating a Single African-American Juror Was not a Sufficient Remedy for the *Batson* Violation as to Juror Patterson, or for the other *Batson* violations ...................................68

        1.    Section 2254 Poses No Bar to Mr. Broadnax's Claim That the Trial Court Imposed a Constitutionally Inadequate Remedy for the *Batson* Violation as to Juror Patterson and Failure to Exhaust Is Excused by Ineffective Assistance of Counsel...........................................70

**TABLE OF CONTENTS**
**(cont.)**

                                                                                    **Page**

C.     The Trial Court Erred in Denying Mr. Broadnax's
       "For Cause" Challenges ...............................................................71

       1.     The Trial Court Improperly Denied Mr. Broadnax's "For
              Cause" Challenge to Juror John Vessels, Who Plainly
              Stated He Would not Consider Mitigating Evidence....................74

       2.     The Trial Court Improperly Denied Mr. Broadnax's "For
              Cause" Challenges to Other Jurors Unwilling to Consider
              Mitigating Evidence....................................................................75

       3.     Section 2254 Poses No Bar to Mr. Broadnax's Properly
              Exhausted Claim That the Trial Court Unconstitutionally
              Denied His "For Cause" Challenges.............................................81

D.     Mr. Broadnax Was Denied his Right to Effective Assistance of
       Counsel During Jury Selection ...................................................82

       1.     Trial Counsel Provided Constitutionally Deficient
              Performance in Failing to Protect Mr. Broadnax's
              Right to an Impartial Jury ...............................................83

       2.     Section 2254 Poses No Bar to Mr. Broadnax's Claim
              That He Was Denied Effective Assistance of Counsel at
              Jury Selection and Failure to Exhaust Is Excused by the
              Ineffective Assistance of Counsel.................................................86

III.   MR. BROADNAX'S CONSTITUTIONAL RIGHTS WERE VIOLATED
       DURING TRIAL .........................................................................87

A.     The Admission of Evidence Discovered During an Illegal Search
       of Mr. Broadnax's Cell Violated the Fourth Amendment ........................87

       1.     Section 2254 Poses No Bar to Mr. Broadnax's Properly
              Exhausted Claim That the Admission of Evidence
              Discovered During an Illegal Search of His Cell
              Violated the Fourth Amendment ...................................94

B.     The Admission of Dr. Price's Testimony Concerning Psychopathy
       Denied Mr. Broadnax Due Process.............................................94

       1.     Dr. Price's Testimony ..................................................96

       2.     Dr. Price's Testimony Was Irrelevant and Did Not Fit the
              Facts of This Case........................................................97

       3.     The PCL-R Test Is Unreliable and Bears a High Rate of
              Error in Predicting Future Dangerousness..................................101

iv

TABLE OF CONTENTS
(cont.)

**Page**

(a)    Mr. Broadnax Is Not a Psychopath, According to the PCL-R, and the Introduction of Testimony That He Is Was so Fundamentally Unfair That His Death Sentence Should Be Vacated ...........................................103

4.    Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That the Admission of Dr. Price's Testimony Concerning Psychopathy Denied Mr. Broadnax Due Process................................................104

5.    Mr. Broadnax's Trial Counsel Was Ineffective in Failing to Present Witnesses to Rebut Dr. Price and to Show That Mr. Broadnax Is Not a Psychopath............................106

6.    Mr. Broadnax's Appellate Counsel Was Ineffective in Failing to Appeal Issues Relating to the Admissibility of Dr. Price's Testimony......................................107

7.    Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That Counsel Were Ineffective in Rebutting Dr. Price's Testimony ..................................108

8.    New Evidence That Mr. Broadnax Is Not a Psychopath Provides Clear and Convincing Evidence of Mr. Broadnax's Actual Innocence of the Death Penalty .............109

C.    Mr. Broadnax's Constitutional Rights Were Violated by the Admission of False and Misleading Gang Expert Testimony and his Counsel's Total Failure to Address It ...............................................111

1.    Mr. Nelson's Testimony About Mr. Broadnax's Alleged Gang Membership Was False and Misleading and the State Violated the Eighth and Fourteenth Amendments By Introducing It .................................................112

2.    The Qualification of Mr. Nelson as an Expert Rendered the Trial Fundamentally Unfair, in Violation of the Fourteenth Amendment ....................................116

3.    Mr. Nelson's Testimony About Mr. Broadnax's Supposed Gang Membership Violated the First and Fourteenth Amendments.............................................117

4.    Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That His Constitutional Rights Were Violated by the Admission of Mr. Nelson's Testimony..............121

**TABLE OF CONTENTS**
**(cont.)**

**Page**

5.  Mr. Broadnax's Trial Counsel Was Ineffective in Failing to Cross-Examine Mr. Nelson or Offer Expert Testimony..............121

6.  Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That His Counsel Were Ineffective in Failing to Rebut Mr. Nelson's Testimony ...................................123

IV.  TEXAS'S CAPITAL SCHEME VIOLATED MR. BROADNAX'S CONSTITUTIONAL RIGHTS AND IS UNCONSTITUTIONAL ON ITS FACE...............................................124

A.  Mr. Broadnax Was Prosecuted on the Basis of His Race, In Violation of the Equal Protection Clause of the Fourteenth Amendment....................................................................124

1.  Section 2254 Poses No Bar to Mr. Broadnax's Claim That His Prosecution Was Racially Motivated and Failure to Exhaust Is Excused by the Futility of Pursuing State Remedies................................................................129

B.  The Jury Instructions Required by the Texas Capital Sentencing Scheme Violated Mr. Broadnax's Constitutional Rights.........................130

1.  The Improper Allocation of the Burden of Proof in the Texas Jury Instructions Violated Mr. Broadnax's Sixth and Fourteenth Amendment Rights.....................................................130

2.  The Failure to Define the Vague Terms in its "Special Issues" Instruction to the Jury Violated Mr. Broadnax's Constitutional Rights ...................................................................134

3.  The Requirement of Ten "No" Votes on the Special Issue Violated Mr. Broadnax's Rights to Due Process and Right to a Trial by Jury.........................................................................136

4.  The Trial Court Deprived Mr. Broadnax of Appropriate Jury Instructions by Failing to Instruct the Jury That They Must Consider Mitigation Evidence Individually........................138

5.  Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claims About the Jury Instructions in the Texas Capital Sentencing Scheme........................................................141

C.  The Death Penalty Is Unconstitutional ...................................................142

1.  The Death Penalty Is Unconstitutional Because It Constitutes Cruel and Unusual Punishment................................142

**TABLE OF CONTENTS**
**(cont.)**

**Page**

2.    The Death Penalty Is Unconstitutional Because of Its
Unreliable Application.................................................................145

3.    Section 2254 Poses No Bar to Mr. Broadnax's Properly
Exhausted Claim That the Death Penalty Is
Unconstitutional.........................................................................147

PRAYER FOR RELIEF ........................................................................................148

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen* v. *Texas*,
108 S.W.3d 281 (Tex. Crim. App. 2003) (en banc) .............................................................134

*Alleyne* v. *United States*,
133 S. Ct. 2151 (2013) ................................................................................................131, 134

*Apprendi* v. *New Jersey*,
530 U.S. 466 (2000) ....................................................................................................131, 132

*United States* v. *Armstrong*,
517 U.S. 456 (1996) .....................................................................................................124, 128

*Atkins* v. *Virginia*,
536 U.S. 304 (2002) ............................................................................................................143

*Bartee* v. *Quarterman*,
574 F. Supp. 2d 624 (W.D. Tex. 2008) ..............................................................................101

*United States* v. *Bass*,
536 U.S. 862 (2002) ............................................................................................................128

*Batson* v. *Kentucky*,
476 U.S. 79 (1986) ......................................................................................................... *passim*

*Bell* v. *Wolfish*,
441 U.S. 520 (1979) .............................................................................................................90

*Bey* v. *Scott*,
77 F.3d 477, 1995 WL 798579 (5th Cir. 1995) ...................................................................75

*Bigby* v. *Dretke*,
402 F.3d 551 (5th Cir. 2005) ..............................................................................................99

*Block* v. *Rutherford*,
468 U.S. 576 (1984) .......................................................................................................89, 90

*United States* v. *Blocker*,
104 F.3d 720 (5th Cir. 1997) ....................................................................................20, 21, 22

*Boyde* v. *California*,
494 U.S. 370 (1990) .............................................................................................72, 138, 139

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

*Brecht* v. *Abrahamson*,
    507 U.S. 619 (1993)........................................................................................117, 120, 139, 140

*Brewer* v. *Williams*,
    430 U.S. 387 (1977)...................................................................................................26, 36

*Ex Parte Broadnax*,
    No. WR-81,573-01, 2015 WL 2452758 (Tex. Ct. Crim. App. May 20, 2015) ........................3

*Broadnax* v. *Texas*,
    133 S. Ct. 103 (2012).......................................................................................................3

*Broadnax* v. *Texas*,
    136 S. Ct. 77 (2015).........................................................................................................3

*Broadnax* v. *Texas*,
    No. AP-76207, 2011 WL 6225399 (Tex. Crim. App. Dec. 14, 2011)............................ *passim*

*Calderon* v. *Coleman*,
    525 U.S. 141 (1998).................................................................................................139, 141

*Ex Parte Campbell*,
    226 S.W.3d 418 (Tex. Ct. Crim. App. 2007).......................................................................130

*United States* v. *Cardenas*,
    410 F.3d 287 (5th Cir. 2005) ...........................................................................................26

*United States* v. *Chavira*,
    614 F.3d 127 (5th Cir. 2010) ...........................................................................................21

*United States* v. *Cohen*,
    796 F.2d 20 (2d Cir. 1986)...............................................................................................88

*Coleman* v. *Alabama*,
    399 U.S. 1 (1970) (plurality opinion) ................................................................................38

*Coleman* v. *Thompson*,
    501 U.S. 722 (1991)................................................................................................ *passim*

*Daubert* v. *Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)................................................................................................100, 101

*Davis* v. *Sec'y for Dep't of Corr.*,
    341 F.3d 1310 (11th Cir. 2003) ........................................................................................83

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

*Dawson* v. *Delaware*,
503 U.S. 159 (1992)...................................................................................117, 118, 120

*Diaz* v. *Dretke*,
No. M-04-225, 2005 WL 2264966 (S.D. Tex. Aug. 19, 2005) ............................................119

*Diaz* v. *Quarterman*,
228 F. App'x 417 (5th Cir. 2007) .......................................................................120

*Dickerson* v. *United States*,
530 U.S. 428 (2000).........................................................................................18, 22

*Duckworth* v. *Serrano*,
454 U.S. 1 (1981).................................................................................................129

*E.I. du Pont de Nemours & Co.* v. *Robinson*,
923 S.W.2d 549 (Tex. 1995)........................................................................100, 101

*Eagle* v. *Linahan*,
279 F.3d 926 (11th Cir. 2001) ..........................................................................83

*Eddings* v. *Oklahoma*,
455 U.S. 104 (1982)......................................................................................72, 79, 138

*Edwards* v. *Arizona*,
451 U.S. 477 (1981)............................................................................................26

*United States* v. *Elrod*,
441 F.2d 353 (5th Cir. 1971) .............................................................................32

*Oregon* v. *Elstad*,
470 U.S. 298 (1985)..........................................................................................17

*Estelle* v. *Smith*,
451 U.S. 454 (1981).........................................................................................19, 23

*Estes* v. *Texas*,
381 U.S. 532 (1965)........................................................................................39, 40

*Fields* v. *Thaler*,
588 F.3d 270 (5th Cir. 2009) ..........................................................................61

*Ford* v. *Wainwright*,
477 U.S. 399 (1986).........................................................................................103

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

*Fuller* v. *Johnson*,
   114 F.3d 491 (5th Cir. 1997) ...................................................................................118

*Gamble* v. *Oklahoma*,
   583 F.2d 1161 (10th Cir. 1978) ...............................................................................93

*Garza* v. *Thaler*,
   No. 5:10-CV-013-C, 2013 WL 9747673 (N.D. Tex. Mar. 6, 2013)......................119

*Gen. Elec. Co.* v. *Joiner*,
   522 U.S. 136 (1997)................................................................................................101

*Gideon* v. *Wainwright*,
   372 U.S. 335 (1963)..................................................................................................82

*Giglio* v. *United States*,
   405 U.S. 150 (1972)...............................................................................104, 112, 116

*Glossip* v. *Gross*,
   135 S. Ct. 2726 (2015)....................................................................................145, 147

*Glover* v. *United States*,
   531 U.S. 198 (2001)..................................................................................................38

*Godfrey* v. *Georgia*,
   446 U.S. 420 (1980)........................................................................................135, 142

*United States* v. *Gonzalez-Lopez*,
   548 U.S. 140 (2006)............................................................................................36, 44

*Gregg* v. *Georgia*,
   428 U.S. 153 (1976).............................................................................135, 143, 145

*Grosjean* v. *Am. Press Co.*,
   297 U.S. 233 (1936)..................................................................................................36

*United States* v. *Guanespen-Portillo*,
   514 F.3d 393 (5th Cir. 2008) ...................................................................................30

*United States* v. *Guerrero*,
   986 F.2d 1419 (5th Cir. 1993) ............................................................................26, 31

*Han Tak Lee* v. *Glunt*,
   667 F.3d 397 (3d Cir. 2012)...................................................................................100

xi

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

*Hankins* v. *State*,
132 S.W.3d 380 (Tex. Crim. App. 2004).............................................................................134

*United States* v. *Hubbell*,
530 U.S. 27 (2000).............................................................................................................18, 24

*Hudson* v. *Palmer*,
468 U.S. 517 (1984)...........................................................................................................89, 90

*Hurst* v. *Florida*,
136 S. Ct. 616 (2016)......................................................................................................131, 134

*Rhode Island* v. *Innis*,
446 U.S. 291 (1980)................................................................................................................19

*Jackson* v. *Denno*,
378 U.S. 368 (1964).............................................................................................................26, 30

*Jackson* v. *Herring*,
42 F.3d 1350 (11th Cir. 1995) ...............................................................................................83

*James* v. *Collins*,
987 F.2d 1116 (5th Cir. 1993) .............................................................................................134

*Janecka* v. *Cockrell*,
301 F.3d 316 (5th Cir. 2002) ...............................................................................................117

*Johnson* v. *Clay*,
No. 2:08 Civ. 2035, 2011 WL 1668416 (E.D. Cal. May 2, 2011).........................................57

*Johnson* v. *Mississippi*,
486 U.S. 578 (1988)..............................................................................................103, 104, 112

*Johnson* v. *State*,
43 S.W.3d 1 (Tex. Crim. App. 2001)..................................................................................73, 80

*Johnson* v. *Zerbst*,
304 U.S. 456 (1938)................................................................................................................36

*United States* v. *Jones*,
287 F.3d 325 (5th Cir. 2002) ..............................................................................126, 127, 129

*Jones* v. *Cain*,
600 F.3d 527 (5th Cir. 2010) .................................................................................................99

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

*Jordan* v. *Texas*,
   928 S.W.2d 550 (Tex. Crim. App. 1996)......................................................................100, 101

*Jurek* v. *Texas*,
   428 U.S. 262 (1976)..................................................................................................................136

*Kelly* v. *State*,
   824 S.W.2d 568 (Tex. Crim. App. 1992) (en banc)..............................................................100

*Kennedy* v. *Louisiana*,
   554 U.S. 407 (2008)..................................................................................................................143

*Kotteakos* v. *United States*,
   328 U.S. 750 (1946)..........................................................................................................139, 141

*United States* v. *Kreczmer*,
   636 F.2d 108 (5th Cir. 1981) ....................................................................................................29

*Kubat* v. *Thieret*,
   867 F.2d 351 (7th Cir. 1989) ..................................................................................................138

*Lafler* v. *Cooper*,
   132 S. Ct. 1376 (2012)..........................................................................................................37, 38

*Lego* v. *Twomey*,
   404 U.S. 477 (1972)....................................................................................................................31

*Lockett* v. *Ohio*,
   438 U.S. 586 (1978)............................................................................................................ *passim*

*Lockhart* v. *Fretwell*,
   605 U.S. 364 (1993)....................................................................................................................82

*Lutz* v. *Collins*,
   No. 04-08-00496-CV, 2009 WL 330958 (Tex. App. Feb. 11, 2009) ....................................90

*Martinez Perez* v. *Dretke*,
   172 F. App'x 76 (5th Cir. 2006) ............................................................................................119

*Martinez* v. *Ryan*,
   132 S. Ct. 1309 (2012)..................................................................................................70, 85, 86

*United States* v. *Martinez-Salazar*,
   528 U.S. 304 (2000)..............................................................................................................73, 80

xiii

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

*Mathis* v. *United States*,
    391 U.S. 1 (1968)..................................................................................................19, 23

*Maynard* v. *Cartwright*,
    486 U.S. 356 (1988)........................................................................................135, 136

*State* v. *McCollum*,
    433 S.E.2d 144 (N.C. 1993).................................................................................68, 85

*McNeil* v. *Wisconsin*,
    501 U.S. 171 (1991)..................................................................................................46

*Miller-El* v. *Dretke*,
    545 U.S. 231 (2005)........................................................................................ *passim*

*United States* v. *Mills*,
    122 F.3d 346 (7th Cir. 1997) ...................................................................................25

*Mills* v. *Maryland*,
    486 U.S. 367 (1988)............................................................137, 138, 139, 141

*Minniefield* v. *State*,
    539 N.E.2d 464 (Ind. 1989) ...............................................................................69, 85

*Miranda* v. *Arizona*,
    384 U.S. 436 (1966)........................................................................17, 22, 23, 31

*Monge* v. *California*,
    524 U.S. 721 (1998)................................................................................................146

*Moran* v. *Burbine*,
    475 U.S. 412 (1986)..................................................................................................25

*Morgan* v. *Illinois*,
    504 U.S. 719 (1992)............................................................................................72, 73

*Morris* v. *Dretke*,
    379 F.3d 199 (5th Cir. 2004) ...................................................................... *passim*

*Maine* v. *Moulton*,
    474 U.S. 159 (1985)............................................................................................39, 41

*Murray* v. *Carrier*,
    477 U.S. 478 (1986)................................................................................................109

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

*Murray* v. *Earle*,
   405 F.3d 278 (5th Cir. 2005) ........................................................................................19

*O'Neal* v. *McAninch*,
   513 U.S. 432 (1995)...................................................................................139, 140, 141

*Owens* v. *McLaughlin*,
   733 F.3d 320 (11th Cir. 2013) ...................................................................................140

*United States* v. *Pape*,
   917 F. Supp. 2d 888 (D. Minn. 2013)...........................................................................27

*Parker* v. *Gladden*,
   385 U.S. 363 (1966)................................................................................................73, 80

*Paulino* v. *Harrison*,
   542 F.3d 692 (9th Cir. 2008) .......................................................................................65

*Payne* v. *Tennessee*,
   501 U.S. 808 (1991)....................................................................................................117

*United States* v. *Pollani*,
   146 F.3d 269 (5th Cir. 1998) .......................................................................................36

*Porter* v. *McCollum*,
   558 U.S. 30 (2009)..........................................................................................35, 44, 49

*Powell* v. *Alabama*,
   287 U.S. 45 (1932)..........................................................................................36, 38, 39, 43

*United States* v. *Price*,
   599 F.2d 494 (2d Cir. 1979)..........................................................................................27

*Price* v. *Sec'y, Fl. Dep't of Corr.*,
   548 F. App'x 573 (11th Cir. 2013) ...............................................................................83

*United States* v. *Quinones*,
   196 F. Supp. 2d 416 (S.D.N.Y. 2002)..........................................................................146

*United States* v. *Quinones*,
   205 F. Supp. 2d 256 (S.D.N.Y. 2002)..........................................................................146

*United States* v. *Renteria*,
   625 F.2d 1279 (5th Cir. 1980) .......................................................................................30

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

*Rideau* v. *Louisiana*,
    373 U.S. 723 (1963)......................................................................................39, 42

*Ring* v. *Arizona*,
    536 U.S. 585 (2002)....................................................................................132, 133

*Romano* v. *Oklahoma*,
    512 U.S. 1 (1994)..............................................................................................117

*Roper* v. *Simmons*,
    543 U.S. 551 (2005)..........................................................................................143

*Rose* v. *Clark*,
    478 U.S. 570 (1986)..........................................................................................139

*Ross* v. *Oklahoma*,
    487 U.S. 81 (1988)..................................................................................73, 75, 80

*Rothgery* v. *Gillespie Cnty.*,
    554 U.S. 191 (2008)..................................................................................... *passim*

*United States* v. *Salerno*,
    481 U.S. 739 (1987)............................................................................................47

*Sawyer* v. *Whitley*,
    505 U.S. 333 (1992)....................................................................................109, 110

*Scheanette* v. *Quarterman*,
    482 F.3d 815 (5th Cir. 2007) ............................................................................133

*Scheanette* v. *State*,
    144 S.W.3d 503 (Tex. Crim. App. 2004) (en banc)............................................134

*Schneckloth* v. *Bustamonte*,
    412 U.S. 218 (1973)..................................................................................... *passim*

*Schriro* v. *Landrigan*,
    550 U.S. 465 (2007)............................................................................................99

*Missouri* v. *Seibert*,
    542 U.S. 600 (2004)............................................................................................31

*Maryland* v. *Shatzer*,
    559 U.S. 98 (2010)........................................................................................23, 24

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

*Sheppard* v. *Maxwell*,
    384 U.S. 333 (1966)..................................................................................................39

*United States* v. *Smith*,
    260 F.3d 922 (8th Cir. 2001) ...................................................................................27

*Smith* v. *State*,
    779 S.W.2d 417 (Tex. Crim. App.1988) (en banc)................................................133

*Snyder* v. *Louisiana*,
    552 U.S. 472 (2008)......................................................................................54, 58, 61

*Soria* v. *Johnson*,
    207 F.3d 232 (5th Cir. 2000) .............................................................................73, 80

*Soria* v. *State*,
    933 S.W.2d 46 (Tex. Crim. App. 1996)..................................................................89

*United States* v. *Stevens*,
    559 U.S. 460 (2010)................................................................................................47

*Stone* v. *Powell*,
    428 U.S. 465 (1976)................................................................................................91

*Strickland* v. *Washington*,
    466 U.S. 668 (1984)......................................................................................... *passim*

*United States* v. *Taylor*,
    320 F. Supp. 2d 790 (N.D. Ind. 2004) .................................................................102

*Tennard* v. *Dretke*,
    542 U.S. 274 (2004)................................................................................................72

*Townsend* v. *Sain*,
    372 U.S. 293 (1963)................................................................................................92

*Trevino* v. *Thaler*,
    133 S. Ct. 1911 (2013).......................................................................48, 70, 86, 105

*Trop* v. *Dulles*,
    356 U.S. 86 (1958)................................................................................................143

*United States* v. *Wade*,
    388 U.S. 218 (1967)................................................................................................37

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

*People* v. *Wheeler*,
   583 P.2d 748 (Cal. 1978) ...................................................................................................85

*Witherspoon* v. *Illinois*,
   391 U.S. 510 (1968)..........................................................................................................72

*Wood* v. *Quarterman*,
   503 F.3d 408 (5th Cir. 2007) .....................................................................................99, 117

*Zant* v. *Stephens*,
   462 U.S. 862 (1983)........................................................................................................133

**Statutes**

28 U.S.C. § 2254................................................................................................ *passim*

S.C. App. Ct. R. 602(c) (amended 2009).........................................................................47

Tex. Code Crim. Proc. Ann. Art. 1.051(c) (West 2015)...........................................46, 47

Tex. Code Crim. Proc. Ann. Art. 11.071 ...............................................3, 71, 86, 129

Tex. Code Crim. Proc. Ann. Art. 15.17 ...................................................................4, 45, 46

Tex. Code Crim. Proc. Ann. Art. 37.071 ................................................................. *passim*

Tex. Code Crim. Proc. Ann. art. 61.02(c)......................................................................114

Texas Penal Code Section 19.03(a) .................................................................................2

**Other Authorities**

*2008 DMN Texan of the Year: Craig Watkins,* Dallas Morning News (Nov. 5,
   2010, 5:05 AM) .............................................................................................................124

*Dallas Chief Prosecutor Craig Watkins Fights Injustice and Racism*, Guardian
   US Edition (Apr. 20, 2010, 2:54 PM),
   http://www.theguardian.com/world/2010/apr/20/dallas-prosecutor-craig-
   watkins-injustice ...........................................................................................................125

David DeMatteo & John F. Edens, *The Role and Relevance of the Psychopathy
   Checklist-Revised in Court* ........................................................................................96, 102

David Freedman, *False Prediction of Future Dangerousness: Error Rates and
   Psychopathy Checklist-Revised* ....................................................................................102

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

David Schoetz, *Christian Musicians Killed Over a Crown Vic* (June 20, 2008),
http://abcnews.go.com/US/story?id=5211275 ...........................................................................7

*Death Penalty in Flux*, Death Penalty Information Center,
http://www.deathpenaltyinfo.org/death-penalty-flux (last visited May 15,
2016) ....................................................................................................................................144

Death Penalty Information Center, http://www.deathpenaltyinfo.org/death-
sentences-year-1977-2009 (last visited May 15, 2016) ........................................................145

*Death Sentences in the United States from 1977 by State and by Year*, Death
Penalty Information Center, http://www.deathpenaltyinfo.org/death-sentences-
united-states-1977-2008 (last visited May 15, 2016) ...........................................................145

*Executions by Year,* Death Penalty Information Center,
http://www.deathpenaltyinfo.org/executions-year (last visited May 15, 2016) ....................145

Governor Tom Wolf, Memorandum (Feb. 13, 2015), *available at*
http://www.pennlive.com/politics/index.ssf/2015/02/gov_tom_wolf_declares_
moratori.html ........................................................................................................................144

Jennifer Emily, "Dallas County DA Craig Watkins Leads State in Death Penalty
Convictions," *Dallas Morning News* (Dec. 29, 2013 11:53 PM),
http://www.dallasnews.com/news/local-news/20131229-dallas-county-da-
craig-watkins-leads-state-in-death-penalty-convictions.ece .................................................125

Jennifer Emily, *Dallas County DA Touts Conviction Rate That Includes Guilty
Pleas*, Dallas Morning News (Aug. 22, 2010, 2:32 AM)........................................................125

Jennifer S. Forsyth & Leslie Eaton, *The Exonerator: The Dallas D.A. is
Reviewing Old Cases, Freeing Prisoner— and Riling his Peers*, Wall St. J.
(Nov. 15, 2008, 11:59 PM) .................................................................................................125

Maria L. La Ganga, *Washington State Governor Declares Moratorium on Death
Penalty, Los Angeles Times* (Feb. 11, 2014)
http://articles.latimes.com/2014/feb/11/ nation/la-na-death-penalty-20140212 ...................144

*Murder Suspects Describe Two Killings in $2 Robbery*, Fox News (June 25, 2008)......................7

*Offenders on Death Row*, Texas Department of Criminal Justice,
https://www.tdcj.state.tx.us/death_row/dr_offenders_on_dr.html (last visited
May 15, 2016)......................................................................................................................125

**TABLE OF AUTHORITIES**
**(cont.)**

**Page(s)**

Population estimates, as of July 1, 2015, from U.S. Census Bureau,
     http://www.census.gov/quickfacts/table/PST045215/48113,48201 (last visited
     May 15, 2016).........................................................................................................125

Rule 6 of the Rules Governing Habeas Corpus Cases.................................................148

Scott Goldstein, *Man Held in Double Shootings in East Oak Cliff Had History in
     the Area*, Dallas Morning News (May 5, 2011, 11:33 PM).....................................128

*South Dallas Convenience Store Shooting*, CBS DFW (May 4, 2011),
     http://dfw.cbslocal.com/2011/05/04/2-dead-in-south-dallas-convenience-store-
     shooting/;.................................................................................................................128

*States With and Without the Death Penalty*, Death Penalty Information Center,
     http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited
     May 15, 2016).........................................................................................................144

Tex. R. Evid. 401 ................................................................................................107, 108

Tex. R. Evid. 403 ................................................................................................107, 108

Tex. R. Evid. 702 .................................................................................100, 107, 108, 116

Zac Crain, *Dallas DA Craig Watkins on Witnessing His First Execution*, D Mag.
     (Feb. 22, 2012), http://www.dmagazine.com/publications/d-
     magazine/2012/april/dallas-da-craig-watkins-on-witnessing-his-first-
     execution?single=1 .................................................................................................125

James Garfield Broadnax, who currently is incarcerated in Texas, petitions this Court for relief from his convictions for capital murder and sentence of death, which were obtained in violation of the U.S. Constitution and federal law.

### PRELIMINARY STATEMENT

James Broadnax was arrested on June 19, 2008. He was 19 years old, African-American, had survived a horrific childhood, and was experiencing delusions caused by drug-induced psychosis. He twice requested a lawyer, and was placed in the Dallas County Jail's Mental Health Unit. But shortly after he had been examined and placed in the Mental Health Unit because he was delusional, he was removed from that unit by the Dallas County Sheriffs so that he could be interrogated. He still had no lawyer.

Under the watchful eye of several deputies, Mr. Broadnax was interrogated by four experienced Dallas television reporters. Under repeated, tough questioning, the delusional Mr. Broadnax confessed to two murders. The confessions were broadcast on Dallas television. A lawyer was appointed for Mr. Broadnax the next day. The confessions were the only non-circumstantial evidence of Mr. Broadnax's involvement in these crimes.

These illegal interrogations were just the start of an odyssey of unfairness and constitutional violations. The District Attorney, who had a practice of seeking the death penalty more frequently against African-Americans, particularly if the victim was white—as was the case here—struck every single minority member from his jury (eight in total), in violation of *Batson* v. *Kentucky*, 476 U.S. 79 (1986). The trial court also denied thirteen well-founded applications to excuse jurors who testified that they could not consider mitigating evidence, forcing Mr. Broadnax to use all of his peremptory

strikes, and resulting in the seating of at least one unqualified juror.  And the District Attorney directed an illegal search of Mr. Broadnax's property, without a warrant, that resulted in the seizure of his writings and reading materials, which were then improperly and misleadingly used against him at trail.

Trial was equally unfair.  Mr. Broadnax and his counsel presented a powerful mitigation case, including testimony by numerous witnesses about his childhood, character, and psychosis at the time of the crime and thereafter.  That case was undermined by the State's introduction of false and improper testimony and argument (i) that Mr. Broadnax was a psychopath, which he is not, and (ii) that he was a gang member, which he also is not.  In essence, the State secured a death sentence against Mr. Broadnax under false pretenses; the evidence concerning psychopathy and gang membership was neither true nor competent, and was admitted in violation of Mr. Broadnax's constitutional rights.

Mr. Broadnax should not be on death row.  His conviction and sentence were the result of the State's illegal actions and violations of Mr. Broadnax's rights.  We respectfully request that this Court issue a writ of habeas corpus and vacate Mr. Broadnax's conviction and sentence.

## **PROCEDURAL HISTORY**

Mr. Broadnax was tried and sentenced for capital murder under Texas Penal Code Section 19.03(a) in the Criminal District Court No. 7 of Dallas County, Texas.  Pretrial hearings began on April 7, 2009, and jury selection took place from April 24 through July 20, 2009.  The guilt/innocence phase of the bifurcated trial began on August 10, 2009.  The jury found Mr. Broadnax guilty on August 12, 2009.  On

August 20, 2009, the jury returned its verdict on punishment, and the trial court sentenced Mr. Broadnax to death.

Mr. Broadnax appealed to the Texas Court of Criminal Appeals, which affirmed his conviction and sentence in an unpublished opinion on December 14, 2011. *Broadnax* v. *Texas*, No. AP-76207, 2011 WL 6225399 (Tex. Crim. App. Dec. 14, 2011). His petition for writ of certiorari to the Supreme Court of the United States was filed on March 9, 2012, and denied on October 1, 2012. *Broadnax* v. *Texas*, 133 S. Ct. 103 (2012) (mem.).

Mr. Broadnax filed a post-conviction petition for writ of habeas corpus in the Texas Court of Criminal Appeals under Section 11.071 of the Texas Code of Criminal Procedure on December 20, 2011, On December 7, 2012, an evidentiary hearing was held in connection with the post-conviction petition.  The trial court entered findings of fact and conclusions of law recommending that habeas corpus relief be denied on September 17, 2014.  The Court of Criminal Appeals adopted the trial court's findings and denied habeas corpus relief on May 20, 2015.  *Ex Parte Broadnax*, No. WR-81,573-01, 2015 WL 2452758 (Tex. Ct. Crim. App. May 20, 2015).  Mr. Broadnax again petitioned the United States Supreme Court for a writ of certiorari; his petition was denied on October 5, 2015.  *Broadnax* v. *Texas*, 136 S. Ct. 77 (2015) (mem.).

## STATEMENT OF THE CASE

James Broadnax and his cousin, Demarius Cummings, were detained during a traffic stop in Texarkana, Texas, on the evening of June 19, 2008.  (RR45: 241-

46.)[1]  Messrs. Broadnax and Cummings, who are African-American, were subsequently

arrested in connection with the murder of two white men, Stephen Swan and Matthew

Butler, who had died from gunshot wounds outside a music studio during an apparent

robbery in Garland, Texas, some 150 miles away.  (*Broadnax* v. *State*, No. AP-76207,

2011 WL 6225399, *1 (Dec. 14, 2011)).  At the time, Mr. Broadnax was 19 years old,

and had no history of violent crime; his only previous criminal conviction was for

possession of marijuana.  (Trial State's Ex. 454A.)

> **A.**     **While in State Custody, Mr. Broadnax**
>            **Submitted to Uncounseled Media Interviews**

After his arrest, Mr. Broadnax was taken to the Garland City jail.  There

the Garland police began to interrogate Mr. Broadnax, who promptly requested the

assistance of a lawyer.  (RR41: 48.)  Soon after he invoked his right to counsel,

Mr. Broadnax was transferred to Dallas County Jail.  He was "book[ed]-in" at 2:51 AM

on June 21, 2008, and was arraigned on a charge of capital murder three hours later

before Magistrate Jonathan Vickery pursuant to Texas Code of Criminal Procedure

Section 15.17.  (S.H. RR4 at 22,  Petitioner's Ex. 16; S.H. RR4 at 23, Petitioner's Ex.

17).  At the arraignment, Mr. Broadnax again requested appointed counsel, this time via

---

[1]  Mr. Broadnax will cite the reporter's record of his trial proceedings as "RR[volume number]: [page number]," and the clerk's record, which includes pre-trial motions and other documents filed in the trial court, as "CR[volume number]: [page number]."

Citations to documents from Mr. Broadnax's direct appeal of his conviction to the Texas Court of Criminal Appeals will be preceded by "D.A."

Citations to the clerk's record from Mr. Broadnax's petition to the Texas Court of Criminal Appeals for a writ of habeas corpus will be preceded by "S.H." to indicate that it is from the state habeas stage.  Citations to the reporter's record from the evidentiary hearing on the state writ will also be preceded by "S.H."

affidavit.  (State Habeas Writ Def. Ex. 17: Affidavit of Indigence).  Magistrate Vickery signed the affidavit, but did not appoint counsel at, or shortly after, the arraignment.

In the meantime, the Dallas County Sheriff's Office had apparently received requests from at least four local television stations seeking to interview Mr. Broadnax.  (RR41: 20-23; *see* S.H. RR4 at 24, Petitioner's Ex. 20).  The Sheriff's Office employed a Public Information Officer tasked with liaising between prisoners and the media.  (RR41: 8).  Form letters derived from a template prepared by the Sheriff's Office were delivered to Mr. Broadnax by representatives of the Sheriff's department on June 23, 2008, the same day the interviews were conducted.  (RR41: 18-21, 31-32; ECF No. 2-6).  Those letters instructed Mr. Broadnax, if interested in interviewing, to sign the in the signature line so that "the Sheriff's Department c[ould] notify" the media outlets of his willingness to interview.  (RR58: 16, State's Ex. 16; *see* S.H. CR1 at 148, State's Ex. 7).  Also on June 23, 2008, Mr. Broadnax signed his name beside a handwritten "Yes" on two of the four local stations' interview request forms; the Record is silent as to Mr. Broadnax's response to the other affiliates' requests.  (RR41: 31-32; ECF No. 2-7).

On the morning of June 23, 2008, Mr. Broadnax was examined by Dr. Haideh Mirmesdagh, and preliminarily diagnosed with polysubstance abuse.  (RR47: 69, 72, 81, 98; RR68: 9, Def.'s Ex. 7).  He was experiencing auditory hallucinations and paranoia.  (RR47: 31, 32).  These hallucinations and paranoia were the result of his ingestion of PCP and formaldehyde, in the form of a "wet blunt," in the period immediately before the alleged crime.  (RR47: 34; RR50: 177-80, 183; RR68: 9, Def.'s Ex. 7).  When later examined by a psychiatrist on July 20, 2008, it was determined that

5

Mr. Broadnax was suffering from drug-induced psychosis, and he continued to manifest symptoms from that condition for a period of nearly four months.  (RR50: 94-97).

Notwithstanding Mr. Broadnax's impaired mental state, just a few hours after his initial diagnosis a detention service officer retrieved Mr. Broadnax from closed observation in the Mental Health Unit and escorted him to the visitation area. (RR47: 160-62, 164.)  There, officers wired Mr. Broadnax with a microphone, and he was interviewed by four reporters in turn, each affiliated with a different local television station.  (RR47: 164-66.)  The interviews were conducted through the glass of the visitors' receiving area:  throughout the interviews, the reporters remained on the visitors' side, while Dallas County Sheriff's officers stood behind, and at times beside, Mr. Broadnax.  (RR61: 96, State's Ex. 404; RR61: 97, State's Ex. 405; RR61: 99, State's Ex. 407.)  Mr. Broadnax, at this time, had not yet been appointed a lawyer, notwithstanding his repeated requests for counsel.

Each of the experienced reporters who questioned Mr. Broadnax sought to extract a confession from Mr. Broadnax.  Mr. Broadnax initially denied any involvement in the killings, and repeated his requests for counsel.  But under sustained, combative, and at times deceptive questioning—including a reporter's suggestion that "[i]f you tell me the truth, you may, your life may be spared"—Mr. Broadnax changed his answers, and confessed to the murders.  (State's Ex. 404 at 9:10, 13:22-16:29.)

Asked if he was remorseful, Mr. Broadnax initially answered, "I kind of regret what I did, but shit, you can't change it."  (State's Ex. 407 at 3:55).  And when told by reporters that "people might say you are the devil," and asked what he had to say to the victim's families, the mentally impaired and hallucinating Mr. Broadnax responded,

6

"Fuck 'em." (*See id.* at 4:27; State's Ex. 405 at 8:15). When asked if he deserved the death penalty, Mr. Broadnax said that he welcomed death, "because they give me life I'm gonna kill somebody else. Straight up. I'm telling you right now. I can't do no motherfucking life, I'm a go crazy." (State's Ex. 405 at 5:22). These statements would prove to be the only non-circumstantial evidence of Mr. Broadnax's involvement in these crimes.

Mr. Broadnax was placed in the suicide observation tank as soon as the interviews concluded. (RR47: 39.) Prejudicial excerpts of the interviews aired on four Dallas-area television stations, and became notorious in the Dallas-Fort Worth area.[2] Mr. Broadnax was finally appointed counsel on June 24, 2008, the day after the interviews. (S.H. CR3 at 228, Findings of Fact and Conclusions of Law ¶ 96, Sept. 17, 2014). He continued to suffer from drug-induced psychosis for a period of four to five months, and later had no recollection of the interviews. (RR50: 86-87, 94-95.).

### B. Mr. Broadnax's Trial Was Plagued by Prejudicial Irregularities and Misconduct

Mr. Broadnax's case received widespread public attention. His trial demonstrates that the Dallas County District Attorney's Office was determined not only to obtain a conviction, but to do so without regard to Mr. Broadnax's constitutional rights.

The prosecution (i) struck all prospective jurors of color on the basis of their race, in violation of the Constitution's Equal Protection Clause; (ii) presented, over

---

[2] (RR69: 5, Jury Selection State's Exhibit A at 3); *see Murder Suspects Describe Two Killings in $2 Robbery*, Fox News (June 25, 2008), http://www.foxnews.com/story/2008/06/25/murder-suspects-describe-two-killings-in-2-robbery.html; David Schoetz, *Christian Musicians Killed Over a Crown Vic* (June 20, 2008), http://abcnews.go.com/US/story?id=5211275.

Mr. Broadnax's objections, extremely prejudicial testimony that Mr. Broadnax was a "psychopath" and a "gang member," despite the fact that he was and is neither; and (iii) ordered an illegal search of Mr. Broadnax's writings, drawings and reading matter and used the materials obtained in the search to present a distorted and false picture that implied, for example, that because Mr. Broadnax was reading Sun Tzu's classic *The Art of War*, that he was likely to commit criminal acts of violence in the future.

### 1. The State Endeavored to Seat an All-White and Biased Jury and Largely Succeeded

During voir dire, the State used its peremptory challenges to strike every single non-white member of the venire. (RR38: 8, 14, 21, 26, 44, 51, 69, 71.) In the face of defense objections pursuant to *Batson* v. *Kentucky*, 476 U.S. 79 (1986), the trial court accepted the pretextual explanations offered by the State as to seven (of a total of eight) minorities on the jury panel. When prosecutors struck the lone remaining African-American on the venire (Juror Patterson), the trial court eventually sustained the defense's objection, found a *Batson* violation, and voiced discomfort with the State's effort to obtain an all-white jury. (RR42: 34 ("[I]t does concern me quite a bit that one hundred percent of the African-American jurors were struck from the panel and that there are none on the jury.")). The trial court explained, "I'm going to grant the *Batson* challenge and I'm going to do so because of the fact that there are no African-American jurors on this jury and there was a disproportionate number of African-Americans who were struck." (RR42: 35.)

Restoring Juror Patterson as a token minority juror did not cure the fact that the State had inappropriately struck seven other minority jurors on grounds no less pretextual than Patterson. In addition, the trial court overruled numerous meritorious

8

defense applications to excuse jurors for cause, and at least one juror, Mr. Vessels, was seated notwithstanding the fact that he was not qualified because he was unwilling to consider mitigating evidence.  (RR35: 79-81.)

At the guilt phase of Mr. Broadnax's trial, the State relied heavily on the videos of his interviews at the Dallas County Jail.  The videos were played for the jury each day of his trial, and were characterized during the State's opening statement as "the most interesting thing that you will find in this case."  (RR45: 56, RR45: 124-26 (Channel 11), 276-77 (Channel 5); 46:232-33 (Fox 4)).  Moreover, the State made unabashed appeals to the nearly-all-white jury's racial prejudices, telling jurors during opening statements that Mr. Broadnax "went to Garland because that's where the rich white folks live," and cautioning the jury that it would "hear quite a bit of street talk in this case."  (RR45: 50.)

The jury returned a guilty verdict.

**C.    The State Engaged in Unconstitutional Conduct to Secure a Death Sentence**

During the penalty phase of his trial, the State continued to rely on Mr. Broadnax's uncounseled media interviews, and undermined the compelling mitigation case the defense presented by introducing faulty expert testimony and argument concerning Mr. Broadnax's purported psychopathy and gang membership. Mr. Broadnax is not a psychopath.  (Affidavit of Stephen A. Thorne, Ph.D. at 2, May 16, 2016 (hereinafter "Thorne Aff.").)  Nor has he ever belonged to a gang.  (Affidavit of Lisa Taylor-Austin at 2, May 13, 2016 (hereinafter "Taylor-Austin Aff."); RR51: 121, 164, 211-12, 245, 273.)  Yet the State relied upon this inappropriate and inadmissible testimony, arguing that Mr. Broadnax was a psychopath and a member of a violent gang,

in order to inflame the jury and distract it from Mr. Broadnax's credible, and compelling, case for mitigation.

Mr. Broadnax grew up in an abusive household.  He never knew his biological father.  (RR50: 299-300.)  His mother was an unstable alcoholic who was involved in a series of abusive relationships.  (RR50: 258, 306; RR51: 38-39, 45-46, 59-60, 71, 263.)  From the age of twelve through his teenage years, Mr. Broadnax frequently saw his mother physically abused by her partners.  (RR51: 46, 60.)  He sometimes tried to intervene, but never resorted to violence.  (RR51: 46, 91-92.)

When Mr. Broadnax was still an infant, his mother left her husband, after whom Mr. Broadnax is named, taking Mr. Broadnax and his two sisters with her.  (RR50: 304-05).  Her husband chased after her, ramming his vehicle into her car and causing it to flip over.  (RR50: 306).  Mr. Broadnax, his mother, and sisters all suffered injuries, though none were life-threatening.  Mr. Broadnax was scarred by broken glass, and had to be taken to the hospital.  (RR50: 306-07).

Mr. Broadnax's mother was also abusive.  She beat Mr. Broadnax, leaving knots on his head, bruises on his body, and open cuts on his back.  (RR52: 10-11, 41-43).  Because of his mother's instability, Mr. Broadnax had to leave his home and live with his great aunt, Betty Eason, for extended periods.  When Mr. Broadnax was a toddler, his mother struck one of his sisters so hard that she broke her arm.  (RR51: 39-41.)  The police brought criminal charges against her, and child protective services took custody of both of Mr. Broadnax's sisters.  (RR50: 234-35; RR51: 40, 263-64.)

Ms. Eason disdained Mr. Broadnax, even as a young child, because his father was white.  She called him a "half breed," among other slurs, and told him that "his

10

mother didn't want him." (RR50: 257; RR51: 236.)  When Mr. Broadnax was twelve or thirteen, he was sent to live with Ms. Eason while his mother served a prison sentence for writing fraudulent checks.  (RR51: 44, 47.)  Ms. Eason continued to abuse Mr. Broadnax verbally and physically because of his mixed race.  (RR51: 265-68.)  She often hit him with both an open and a closed fist, leaving marks.  (RR51: 266, 271.)  She denied him access to food and water, and would lock him outside of the house on hundred-degree days.  (RR51: 237-38, 267.)  She once threw an ashtray at him.  (RR: 266.)  Eventually this combination of verbal, physical, and psychological abuse drove him from the house. (RR51: 48-50.)

As a young teenager, Mr. Broadnax moved back in with his mother after her release from prison.  (RR51: 50.)  Mr. Broadnax's mother then became involved with a succession of abusive partners, including one who was addicted to crack cocaine and convicted of drug trafficking, (RR51: 61, 66), and another who was convicted of molesting Mr. Broadnax's sister.  (RR51: 51-52.)  Mr. Broadnax and his mother continued to move from one location to another.  (RR51: 51-62, 66-71.)  Mr. Broadnax missed so much school that he had to repeat several grades.  (RR51: 66-67.)  After his mother took a job as a truck driver, Mr. Broadnax, still a teenager, traveled between Georgia, Texas, Michigan, and Arkansas, sometimes staying with relatives or acquaintances.  (RR51: 71-74, 76, 78, 80-82, 161-63.)  At other times, he slept in a homeless shelter.  (RR51: 161.)  Despite these hardships, Mr. Broadnax was never violent.  (RR50: 232; RR51: 91-92, 164, 245, 273.)  Those who knew him thought he was decent and respectful.  (RR50: 233; RR51: 273.)  They often asked him to care for their

11

children.  (RR51: 76, 162.)  But he felt misplaced and unwanted, alone and unloved. (RR51: 234-35.)

Mr. Broadnax called several expert witnesses to establish additional mitigating factors.  Dr. Lane, a University of Texas-trained psychiatrist, who had evaluated Mr. Broadnax one month after his arrest, concluded that he suffered from "a substance induced psychosis," among other psychological maladies.  (RR50: 86-89.) Dr. Lane testified that Mr. Broadnax described experiencing "hallucinations and sleep disturbance, mood disturbance, anxiety symptoms and nightmares" while in custody. (RR50: 86.)  He attributed Mr. Broadnax's substance induced psychosis to his ingestion of PCP and marijuana prior to his arrest.  Specifically, Dr. Lane testified that because the drug "is deposited in fat and brain," it "can come out of storage in fat and brain at different times, even four months after[ ]" ingestion.  (RR50:  90.)

Fellow psychiatrist Dr. John Roache, Chief of the Division of Alcohol and Drug Addiction at the University of Texas Health Science Center, San Antonio, agreed with Dr. Lane's conclusions.  Based on his review of Mr. Broadnax's medical records, the dashboard camera footage of Mr. Broadnax's arrest, a videotaped interview conducted by the Garland police, and subsequent interviews at the Dallas County Jail conducted by local media outlets, Dr. Roache testified that he believed that when the charged crime was committed, Mr. Broadnax was "under the influence of marijuana and . . . wet blunt, which is probably PCP and formaldehyde."  (RR50: 177.)  Dr. Roache further noted that PCP induces "depersonalization" and "derealization where people feel . . . out of the ordinary, out of place."  (RR50: 180.)

12

Finally, Dr. Cheryl H. Silver, a University of Texas-trained school psychologist, testified, on the basis of recently conducted brain imaging studies, that a nineteen-year-old's brain does not function at the same level as "a normal adult." (RR50: 45.)  Dr. Silver noted that two essential cognitive processes, the growth of branches between neurons to make connections throughout the brain and the pruning of branches to make the brain more efficient, "haven't reached their peak to reach adult maturation of the brain" at that age.  (RR50: 45.)  As a consequence, Dr. Silver explained, adolescents—more so than adults with fully matured brains—tend to "act on emotions and to be very reactive about emotions and not engage our frontal lobes to think about whether that's a good thing to do."  (RR50: 49-50.)

Despite his reputation as a peaceful and respectful young man, the prosecution portrayed Mr. Broadax as cold, heartless, and violent.  The State recast Mr. Broadnax's interests, from the high-brow to the low-brow, as depraved.  Thus, the State went so far as to claim that Mr. Broadnax was dangerous because—as prosecutors discovered from an unconstitutional search of Mr. Broadnax's cell while he awaited trial—he was reading Sun Tzu's *Art of War*, which prosecutors described as a book "about tactics of killing people."  (RR49: 70.)  The unconstitutional search also revealed medication Mr. Broadnax had been prescribed, pictures of "bikini-clad women," and several of Mr. Broadnax's writings and drawings, which prosecutors baselessly described as "related to murder, robbery, and gang lifestyle."  (RR48: 14-16; RR49: 38-59.)

**D.      The Court Improperly Permitted the State to Introduce Testimony Describing Mr. Broadnax as a "Psychopath"**

In order to undermine the compelling mitigation case the defense had presented, the State called to the stand Dr. Jack Randall Price, a clinical and forensic

13

psychologist who had never examined, tested, or even met, Mr. Broadnax.  At the outset, the State disclaimed any intention to obtain a diagnosis of Mr. Broadnax from Dr. Price on the stand.  In fact, a prosecutor asked Dr. Price specifically, "And you don't have any intentions of going in front of this jury and saying to them that James Broadnax is a psychopath, do you?"  (RR52: 220.)  Dr. Price responded, "I do not."  (RR52: 220.)

Dr. Price testified that he had agreed to "go through" Mr. Broadnax's "police reports, medical records, jail phone calls," and other information related to the case, and "educate" the jury about psychopathy so that they could "apply the facts just as well as" he could.  (RR52: 220-21.)  Thus, the State offered and the Court admitted into evidence a list of the "characteristics of a psychopathic personality" that Dr. Price had created, based on the Psychopathy Checklist Revised.  (RR52: 218-22.)

In its closing argument, the State abandoned any pretense that Dr. Price's testimony was less salient than a proper medical diagnosis.  The State concluded its argument for death:  "Dr. Price told you [psychopathy] can't be cured . . . .  And that's the fact, folks.  He will never change.  He will always be a cold-blooded person with no remorse. . . .  And because he's a psychopath and because he'll never change, it is a continuing threat to society that will not ever change."  (RR53: 75-77.)

### E.     The State Presented Faulty Expert Evidence to Falsely Claim That Mr. Broadnax Was a Gang Member

The State also claimed that Mr. Broadnax was dangerous because of his interest in gangster rap music and culture.  In support of the false claim that Mr. Broadnax belonged to a gang, prosecutors offered supposed expert testimony from Barrett Keith "BK" Nelson, a Dallas Police Department gang unit officer who was not involved in the investigation or arrest of Mr. Broadnax.  Mr. Nelson did not, in fact, have

14

the expertise to offer this testimony.  He testified, without basis, that Mr. Broadnax belonged to the Gangster Disciples, a gang that Mr. Nelson had never researched until he was asked to testify in this case.

Mr. Nelson testified that he believed Mr. Broadnax to be a member of the Gangster Disciples, based on his review of a television interview Mr. Broadnax gave while in jail, a recording of a phone call he made, letters he received while in custody, and his sketches and rap lyrics.  (RR49: 85, 89-90, 98-99, 103-04.)  But Mr. Nelson's conclusion was not supported by the very evidence he cited.  For instance, Mr. Nelson noted that Mr. Broadnax used the phrase "MOB" in his writing and had a MOB tattoo. Mr. Nelson testified that the acronym could signify either "member of the Blood family" or "money over bitches."  (RR49: 111.)  But neither meaning tends to connote an association with the Gangster Disciples.  In fact, "Gangster Disciples do not get along with Bloods," and "money over bitches" is no more than a generic slogan.  (RR49: 111.) Similarly, after reading a passage from Mr. Broadnax's journal indicating that he was considering joining the Army, Mr. Nelson ignored the possibility that Mr. Broadnax was moved by patriotism and instead remarked, "Black Gangster Disciples like to send their recruits to the military."  (RR49: 126.)

Mr. Nelson also misconstrued Mr. Broadnax's spoken-word poetry and rap lyrics.  Mr. Broadnax's lyrics were identified with the "gangster rap" genre popularized by artists like Tupac Shakur, Notorious B.I.G., and Jay-Z.  But while Mr. Broadnax's lyrics incorporate "street" language and attendant cultural references, they do not—and should not—impute gang affiliations to their composers.

15

Mr. Broadnax has never belonged to the Gangster Disciples or any other gang.  (Taylor-Austin Aff. at 2.)  Nonetheless, Mr. Nelson's racially-infused, misinformed testimony was offered to further bolster the State's argument that Mr. Broadnax posed a future danger to society, and thereby undercut Mr. Broadnax's mitigation case.  And as the State had hoped, the jury apparently regarded evidence of Mr. Broadnax's purported gang membership as highly significant.  During deliberations, jurors sent three notes to the court, each requesting to see evidence Mr. Nelson had identified as dispositive of Mr. Broadnax's gang affiliation, including Mr. Broadnax's rap lyrics, journals, and phone call transcripts.  (CR3: 645-46, 648.)

The jury was charged with answering two special issues as required by Article 37.071 of the Texas Code of Criminal Procedure.  The first special issue asked whether the jury found "beyond a reasonable doubt that there is a probability that [Mr. Broadnax] would commit criminal acts of violence that would constitute a continuing threat to society."  The jury answered "Yes."  (RR54: 4-5.)  The second special issue asked whether, taking into account all of the evidence and circumstances of the offense, there was "a sufficient mitigating circumstance or circumstances to warrant" a sentence of "life imprisonment without parole, rather than the death sentence."  The jury answered "No."  (RR54: 5.)  Mr. Broadnax was then sentenced to death.  (RR54: 7.)

\*       \*       \*

Mr. Broadnax respectfully requests the authority and a sufficient period of time to issue subpoenas for witnesses and discovery of documents, and other information necessary to prove the facts as alleged in this petition.  Given that Mr. Broadnax has been unable, to date, to review the District Attorney's file relating to his case, Mr. Broadnax also requests the opportunity to seek discovery and assert any new or amended claims

16

that may arise as a result of his review of that file.  Mr. Broadnax also requests an

evidentiary hearing at which he may present evidence on his claims (and any other claims

developed as a result of newly discovered evidence), as well as the opportunity to file

briefs on issues of law and of fact raised by this petition or such hearing, or both.

Mr. Broadnax further requests the opportunity to amend this petition as may be necessary

or appropriate, and to present oral argument in support of his claims on issues of law and

fact.

**GROUNDS SUPPORTING THE PETITION FOR RELIEF**

I.      **MR. BROADNAX'S CONSTITUTIONAL RIGHTS
        WERE VIOLATED PRIOR TO TRIAL THROUGH
        MEDIA INTERVIEWS WHILE IN STATE CUSTODY**

        A.      **Mr. Broadnax Was Denied His Constitutional Protection
                Against Self-Incrimination When He Was Compelled to
                Provide Interviews to Media Outlets While in State Custody**

        The Fifth Amendment guarantees that no person "shall be compelled in

any criminal case to be a witness against himself."  U.S. Const. amend. V.

        "[W]hen an individual is taken into custody or otherwise deprived of his

freedom by the authorities in any significant way and is subjected to questioning, the

privilege against self-incrimination is jeopardized."  *Miranda* v. *Arizona*, 384 U.S. 436,

478 (1966).  A criminal defendant must be warned of his rights, including "the right to

the presence of an attorney," "prior to any questioning."  (*Id.* at 479.)  Moreover,

"[o]pportunity to exercise these rights must be afforded to him throughout the

interrogation."  (*Id.*)  The *Miranda* doctrine "provides a remedy even to the defendant

who has suffered no identifiable constitutional harm."  *Oregon* v. *Elstad*, 470 U.S. 298,

307 (1985).  Any communications offered by a criminal defendant that are testimonial,

17

incriminating, and compelled must be suppressed.  *See United States* v. *Hubbell*, 530 U.S. 27, 34-38 (2000).

While Mr. Broadnax was in state custody, and after he had invoked his right to the presence of an attorney under *Miranda*, he was nonetheless subjected to a series of interrogations, conducted by investigative reporters in coordination with the Dallas County Sheriff's Office.  Mr. Broadnax was denied access to counsel in preparation for, and during, those interrogations.  The State's failure to afford Mr. Broadnax an opportunity to exercise his right to an attorney during a custodial interrogation as provided in *Miranda* amounted to a Fifth Amendment violation. Because Mr. Broadnax's responses to questions posed while in custody were testimonial, incriminating, and compelled, the Constitution requires their suppression.

### 1.    The Media Interviews Mr. Broadnax Gave Were Custodial Interrogations to Which the *Miranda* Doctrine Applies

A criminal defendant's *Miranda* rights attach during all custodial interrogations.  *See Dickerson* v. *United States*, 530 U.S. 428, 435 (2000) ("[T]he coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" (quoting *Miranda*, 384 U.S. at 439).)

### (a)    *Mr. Broadnax Was in Custody at the Time of the Media Interviews*

"A suspect is 'in custody' for [Fifth Amendment] purposes either (1) when he is formally arrested or (2) when a reasonable person in the position of the suspect would understand the situation to constitute a restraint on freedom of movement to the

18

degree that the law associates with formal arrest." *Murray* v. *Earle*, 405 F.3d 278, 286 (5th Cir. 2005) (internal quotation marks omitted).

At the time he was interviewed by local media outlets, Mr. Broadnax was being held in the Dallas County Jail on $1 million bail. (RR68: 11, Def.'s Ex. 9.) Because he was *both* "formally arrested" *and* restrained from free movement "to the degree that the law associates with formal arrest," it is clear that Mr. Broadnax was "in custody" when he submitted to these media interviews. *Murray*, 405 F.3d at 286.

### (b)    *The Media Interviews Were Unconstitutional "Interrogations"*

The Supreme Court has defined "interrogation" broadly for purposes of the *Miranda* doctrine. Thus, "interrogation" refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island* v. *Innis*, 446 U.S. 291, 301 (1980). Such "actions on the part of the police" include agency relationships with non-state intermediaries who elicit testimony that would be inadmissible if obtained directly by law enforcement. *See, e.g.*, *Estelle* v. *Smith*, 451 U.S. 454, 466-67 (1981) (un-*Mirandized* statements to a court-appointed, "neutral" psychiatrist who interviewed the defendant in jail inadmissible to prove future dangerousness in the penalty phase of a capital murder trial); *Mathis* v. *United States*, 391 U.S. 1, 2-4 & n.2 (1968) (un-*Mirandized* statements to an IRS tax investigator who interviewed the defendant in state prison about his tax returns inadmissible to prove that the defendant committed tax fraud).

19

Based on Fifth Circuit precedent, the Dallas County Sheriff's Office maintained agency relationships with the media outlets who interrogated Mr. Broadnax. In *United States* v. *Blocker*, 104 F.3d 720 (5th Cir. 1997), the Fifth Circuit prescribed a two-pronged test to ascertain whether a private party functioned as an "instrument or agent" of the State, under which a court must ask "(1) whether the Government knew or acquiesced in the intrusive conduct; and (2) whether the private party intended to assist law enforcement efforts or to further his own ends." *Id.* at 725. In Mr. Broadnax's case, both prongs of the *Blocker* test have been met.

*(i)      The State Knew or Acquiesced*
*in the Intrusive Conduct*

The Dallas County Sheriff's Office not only was aware that the intrusive, prejudicial interviews of Mr. Broadnax would be conducted, but also facilitated those interviews and has a well-documented practice of denying access to counsel in order to *ensure* that such prejudicial interviews occur. The Public Information Officer for the Dallas County Sheriff's Office, Kimberly Leach, personally fielded and relayed to Mr. Broadnax interview requests from various local television stations, demonstrating knowledge and acquiescence in the interrogations. (RR41: 18-21; RR58: 16, State's Ex. 16.) In addition, the media outlets clearly coordinated the interviews by encouraging and instructing Mr. Broadnax—in a prepared form letter—to contact the Sheriff's department to arrange the interview. (S.H. CR1: 148-153, State's Ex. 7).

Indeed, the Dallas County Sheriff's Office has a demonstrated history of knowingly acquiescing in this kind of intrusive conduct, denying timely access to counsel in order to facilitate uncounseled, highly prejudicial pre-trial media interviews with a capital defendant while in custody. In January 2009, an Assistant Public Defender

20

complained she was denied access to her client "intentionally to allow Fox news to get in and interview a potential death penalty defendant. The interview would not have happened without the Sheriff's office aiding Fox 4 to have access to [the] client and denying [counsel] access." (S.H. RR4: 4, Petitioner's Ex. 1C at 1). Similarly, Dallas defense attorneys Catherine Bernhardt and Karo Johnson testified about specific instances in which their appointment had been delayed until after their clients had provided media interviews. (S.H. RR3: 42-44, 95.) The urgency of the requests to interview Mr. Broadnax, the speed with which they were processed, and the Dallas County Sheriff's Office's documented practice of delaying appointment of counsel bely any explanation other than a coordinated effort to deprive Mr. Broadnax of counsel, whose appointment would likely have had the show-stopping effect of preventing the interview.

### (ii)    The Media Affiliates Intended to Assist Law Enforcement and Further Their Own Interest

The reporters who interviewed Mr. Broadnax "intended to assist law enforcement efforts or to further [their] own ends." *See Blocker*, 104 F.3d. at 725. Mr. Broadnax's media-affiliated interviewers, intent on eliciting damaging statements from their subject, evinced a determined bias in the questions they asked and the tone in which they conducted the interviews. When the subject of questioning "transform[s] from routine questioning . . . to questions calculated and intended to elicit a criminally incriminating response," that transformation marks the onset of an *interrogation* for purposes of the *Miranda* Doctrine. *See United States* v. *Chavira*, 614 F.3d 127, 133 n.8 (5th Cir. 2010).

21

The interviews of Mr. Broadnax focused almost exclusively on three areas—his guilt, remorse, and appropriate punishment—each of which assisted the State in ultimately securing a conviction and sentence of death.  Both the Sheriff's Department and the various local media outlets worked to ensure that the interviews conducted at the Dallas County Jail were as incriminating and damaging toward Mr. Broadnax's prospective trial defense as possible.  *See Blocker*, 104 F.3d at 725.

Because Mr. Broadnax's statements to reporters were elicited in the course of custodial interrogations, his *Miranda* rights clearly attached to those exchanges.  *See Dickerson*, 530 U.S. at 435.  By depriving Mr. Broadnax of an attorney, as he repeatedly requested during the interrogations, the State, in concert with its media agents, therefore impermissibly denied him the "[o]pportunity to exercise" his Fifth Amendment rights "throughout the interrogation."  *See Miranda*, 384 U.S. at 479.

> **2.     Mr. Broadnax Did Not Waive His *Miranda* Rights at or Before the Uncounseled Media Interviews at the Dallas County Jail**

The facts surrounding Mr. Broadnax's post-arraignment custodial submission to media interviews do not meet the standard required to prove that a criminal defendant intended to waive his Fifth Amendment rights even though he signed certain media outlets' interview request forms.  After *Miranda* warnings are administered, "if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present . . . .  To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the high standard of proof for the waiver of constitutional rights."  *Maryland* v. *Shatzer*, 559 U.S. 98, 104 (2010) (internal citations omitted).

22

Here, Mr. Broadnax *twice* invoked his right to an attorney prior to giving the interviews in question.  At no point before or during the interviews with local media outlets did Mr. Broadnax withdraw or repudiate his invocation of the right to an attorney. In fact, he reiterated his interest in obtaining counsel.  (*See* State's Ex. 404 at 3:38).  The signatures that were obtained on interview request forms provided by two of the four news channels that interviewed Mr. Broadnax (the only signatures obtained) do not qualify as the kind of unequivocal waivers that meet the "high standard of proof for the waiver of constitutional rights" required by the Supreme Court.  *See Shatzer*, 559 U.S. at 104.

*First*, the State engaged in impermissible subterfuge to obtain Mr. Broadnax's purported consent.  A waiver of *Miranda* rights may not be inferred from a defendant's incriminating conversation with a court-appointed psychiatrist, *Estelle*, 451 U.S. at 466-67, or an IRS tax investigator, *Mathis*, 391 U.S. at 2-4.  Similarly, the State may not elicit a waiver after the defendant's invocation of his right to an attorney by engaging media agents when the State itself would plainly be proscribed from doing so. *See Shatzer*, 559 U.S. at 104; *Miranda*, 384 U.S. at 473-76.

*Second*, the media consent forms the State arranged for Mr. Broadnax to sign fall far short of demonstrating the required "knowing, intelligent, and voluntary" waiver.  Mr. Broadnax was severely intoxicated at the time he signed the forms and unable to intelligently consent.  The evidence at trial clearly indicated that Mr. Broadnax's ability to knowingly "waive" his rights by the consent forms was impaired before, during, and after the charged offense was committed.  At the time the charged offense was committed, Mr. Broadnax was on a form of PCP that has profound

23

and debilitating effects on users even a month after ingestion.  (RR50: 86-92.)  These debilitating effects were confirmed to have lasted at least two days after his arraignment—through the time of his media interviews—when he was diagnosed as psychotic due to polysubstance abuse.  Affidavit of John D. Roache, Ph.D. ("Roache Aff.") at 2-3 (Mr. Broadnax's PCP and marijuana use caused him "to act in a self-injurious manner and make decisions without awareness of its effects on his capacity for self-determination.")  (RR43: 74; RR50: 85-86.)

In light of Mr. Broadnax's consistent post-arrest invocation of his right to counsel, the State's use of media agents to obtain his consent, and Mr. Broadnax's impairment at the time he signed the consent forms, the State cannot "show that the [purported] waiver was knowing, intelligent, and voluntary under the high standard of proof for the waiver of constitutional rights."  *Shatzer*, 559 U.S. at 104.

Mr. Broadnax's statements to the reporters who interviewed him while in custody were incriminating and compelled—and therefore should have been suppressed. *Hubbell*, 530 U.S. at 34-38.  Mr. Broadnax requests that habeas corpus relief be granted so as to preserve his constitutional entitlement to be tried without resort to such illegally obtained evidence.

**3.      Section 2254 Poses No Bar to Mr. Broadnax's
          Properly Exhausted Claim That He Was Denied
          His Constitutional Protection Against Self-Incrimination**

Mr. Broadnax unambiguously advanced the claim that he was denied his Fifth Amendment protection against self-incrimination at trial, (RR43: 105-09) and on

24

direct appeal, (D.A. Appellant's Br. at 86-92).[3]  Accordingly, that claim was properly exhausted.  28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) ("The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court.").

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim because the Texas Court of Criminal Appeals' decision overruling Mr. Broadnax's claim, *Broadnax* v. *Texas*, No. AP-76207, 2011 WL 6225399, at *10 (Tex. Crim. App. Dec. 14, 2011), is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law," and therefore it is not entitled to deference.  28 U.S.C. § 2254(d)(1).

**B.      Mr. Broadnax's Statements to the Media Were Involuntarily Coerced**

Even if Mr. Broadnax's statements to the four Dallas-area news channels had not been obtained contrary to the *Miranda* doctrine, Mr. Broadnax did not make the statements voluntarily.  Determining a confession's voluntariness is "virtually indistinguishable" from, but additional to, an inquiry into whether a defendant waived his *Miranda* rights.  *See United States* v. *Mills*, 122 F.3d 346, 351 (7th Cir. 1997).  The evidence shows that Mr. Broadnax did not waive his *Miranda* rights, see *supra*, and that his confession to the media was far from voluntary under the relevant standard, which the State has the burden to meet:  a voluntary confession is one that is the product of "a free and deliberate choice," and free from "intimidation, coercion, or deception."  *See Moran*

---

[3]    The state habeas tribunal did not permit Mr. Broadnax's counsel to re-litigate this claim on collateral review because it had already been presented on direct appeal. (S.H. Findings ¶ 15).

v. *Burbine*, 475 U.S. 412, 421 (1986); *see also Edwards* v. *Arizona*, 451 U.S. 477, 482 (1981); *Brewer* v. *Williams*, 430 U.S. 387, 404 (1977).

Voluntariness comes with "no talismanic definition," but requires a highly fact-specific inquiry to determine whether a defendant's will has been overborne. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 224 (1973). Courts complete this inquiry by assessing "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation"—to make a proper determination of voluntariness. *Id.* at 226; *see also United States* v. *Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005); *United States* v. *Guerrero*, No. 92-7455, 1993 WL 59020, at *2. And defendants are constitutionally entitled to "a fair hearing and a reliable determination on the issue of voluntariness," uninfluenced by the truth or falsity of the so-called confession. *Jackson* v. *Denno*, 378 U.S. 368, 377 (1964). Admitting Mr. Broadnax's involuntarily coerced media statements without the required voluntariness hearing was contrary to, and involved an unreasonable application of, clearly established U.S. Supreme Court precedent.

### 1. Evaluating the Totality of the Circumstances, Mr. Broadnax's Statement Was Involuntarily Coerced

At the time of his statements to the media, Mr. Broadnax was neither free from coercion, nor able to make a deliberate choice, nor aware of the consequences of abandoning his right to remain silent and his right to consult with a lawyer. The U.S. Supreme Court encourages a careful analysis of the circumstances surrounding the defendant's confession, including the defendant's background, to determine voluntariness. Voluntariness decisions take into account a defendant's age, education, comprehension of rights, prior encounters with law enforcement, and intoxication in

26

assessing the voluntariness of consent.  *E.g.*, *Schneckloth*, 412 U.S. at 226*; United States* v. *Smith*, 260 F.3d 922, 924 (8th Cir. 2001).

*First*, Mr. Broadnax's personal background rendered him especially vulnerable to coercion and being unaware of the consequences of the media interviews. At the time of his arrest, Mr. Broadnax was a teenager with a severe history of childhood abuse and an eighth-grade education.

*Second*, the circumstances of Mr. Broadnax's statements to the media similarly indicate that he was not aware of the consequences of abandoning his rights to remain silent and consult with a lawyer.  Unlike many repeat offenders, Mr. Broadnax did not have a history of prior encounters with law enforcement that could have informed his understanding of his rights.  He did not have the kind of "extensive prior experience" with law enforcement that might otherwise render him able to protect and understand his right to remain silent when placed in jail or when faced with news cameras.  *United States* v. *Pape*, 917 F. Supp. 2d 888, 901 n.14 (D. Minn. 2013) (Defendant was aware of his rights because "Defendant was middle age and . . . had extensive prior experience with the criminal justice system."); *see United States* v. *Price*, 599 F.2d 494, 503 (2d Cir. 1979).  Moreover, there is no evidence that Mr. Broadnax was reminded of his *Miranda* rights at any time prior to giving the media interviews.

Third, Mr. Broadnax's statements were not voluntary because, in the depths of a drug-induced psychosis, he was not able to make a deliberate choice to abandon his right to remain silent and his right to consult with a lawyer.  Weighing the totality of circumstances for voluntariness requires considering "the possibly vulnerable subjective state of the person who consents."  *Schneckloth*, 412 U.S. at 229.  When "a

27

person is unconscious or drugged or otherwise lacks capacity for conscious choice," a confession cannot be voluntary. *See id.* at 224.  Mr. Broadnax was suffering from a substance-induced psychosis due to his consumption of PCP laced with neurotoxins. (RR50: 17-18, 87-89.)  More than any other factor, this rendered Mr. Broadnax unable to make a free and deliberate choice to waive his right to not make an involuntary confession.  (*See* Roache Aff. at 2-3.)

At no point was Mr. Broadnax sufficiently aware of the right he was abandoning.  In fact, he was so unaware of the abandonment of his rights, that he told the reporters—on tape—that he was waiting for a lawyer.[4]  Mr. Broadnax clearly did not know that the video could be any kind of admissible confession.

Three of the specialists who examined Mr. Broadnax noted his drug-addled state, and his psychosis.  Two of those individuals, Jason Varghese[5] and Dr. Haideh Mirmesdagh,[6] examined Mr. Broadnax *before* he spoke to the media.  They both concluded that he was suffering from delusions and acting strangely, and Dr. Mirmesdagh recommended he be placed under close supervision.  Later, Dr. Frank Lane confirmed that Mr. Broadnax was suffering from a drug-induced psychosis (RR50: 88), which was controlled only after eight months and a series of treatments.

---

[4]   "Q.  And again, he told you he was not represented by counsel?  A. He said that he was waiting for a lawyer, on the tape."  (RR43, 96.)

[5]   Mr. Varghese, a licensed psychological counselor, examined Mr. Broadnax at the jail before he had the opportunity to be seen by a psychiatrist.  Mr. Broadnax reported auditory hallucinations.  (RR47: 31.)  Mr. Varghese noted that Mr. Broadnax's mood was dysphoric and overall agitated.  (RR47: 34-35.)  Mr. Broadnax reported having smoked a wet blunt in the days prior.  (RR47: 34-35.)

[6]   Dr. Mirmesdagh, a psychiatrist, believed Mr. Broadnax to be experiencing delusions and acting paranoid.  (RR47: 79-80.)  Thus, she ordered that he be kept in closed behavioral observation.  (RR47: 86-87.)

(RR50: 113, 164). Dr. John Roache, a pharmacologist, confirmed the effects of PCP and explained how the drug "causes hallucinations, and in some cases, psychotic behavior." (RR50: 179).

Mr. Broadnax's mental impairment was such a severe level of psychosis that it bears relevance because "if the defendant is so intoxicated by alcohol or other drugs . . . the confession is not rationally and freely given." *United States* v. *Kreczmer,* 636 F.2d 108, 110 (5th Cir. 1981) (citing *United States* v. *Taylor*, 508 F.2d 761 (5th Cir. 1975)).

### 2. Mr. Broadnax's Statements Were Made as a Result of a Coordinated Police Effort, Not Mr. Broadnax's Voluntary Decisions

A statement is not voluntary if the defendant was the victim of even "subtl[e]" police coercion. *See Schneckloth*, 412 U.S. at 229. The officers at the Dallas County Jail placed Mr. Broadnax in an inherently coercive environment knowing that he was in a vulnerable and delusional state.

Following his arraignment, Mr. Broadnax was held under mandatory close observation in the Dallas County Jail's psychiatric ward because of his vulnerable and psychotic state. Ignoring the medical note in his chart directing that Mr. Broadnax be kept under closed behavioral observation, Ms. Leach, the media liaison for the Sheriff's Office, directed Mr. Broadnax to be removed from closed behavioral observation to speak with the media. (RR41: 47.) But for Ms. Leach's intervention, the media would have been unable to circumvent the normal visitation procedures and would not have been able to obtain statements from Mr. Broadnax. (RR41: 53-54 (Ms. Leach made "special arrangements" to let the press in to see Mr. Broadnax).) A detention service officer, Christie Hicklen, retrieved Mr. Broadnax from the jail's psychiatric unit, took

29

him to be interviewed, and then attached the microphone to Mr. Broadnax's clothing to ready him for the interviews.  (RR41: 70-75.)  Officers of the Dallas County Jail were present throughout Mr. Broadnax's interviews with the media, in some cases standing directly in Mr. Broadnax's cell.

Collectively, the actions of the various Dallas County Jail officers who took advantage of Mr. Broadnax, in his delusional state, placed him in an inherently coercive environment.  This coordinated, subtle police coercion, with full awareness of Mr. Broadnax's vulnerable mental state, demonstrates that Mr. Broadnax's statements to the media were involuntarily coerced and should not have been admitted at trial.

**3.     The Court Erred in Not Holding a Voluntariness Hearing**

The trial court's decision not to hold a hearing to determine the voluntariness of Mr. Broadnax's statements to the press was "contrary to," and represented "an unreasonable application of, clearly established Federal law."  *See* 28 U.S.C. § 2254(d).  Defendants are constitutionally entitled to "a fair hearing and a reliable determination on the issue of voluntariness," uninfluenced by the truth or falsity of the so-called confession.  *Jackson* v. *Denno*, 378 U.S. 368, 377 (1964).  Where the evidence reflects a question of whether or not consent was given voluntarily, the trial court is obliged to hold a hearing on its own motion.  *United States* v. *Guanespen-Portillo*, 514 F.3d 393, 399 (5th Cir. 2008); *United States* v. *Renteria*, 625 F.2d 1279, 1283 (5th Cir. 1980).

The evidence in this case reflected the imperative to engage a meaningful analysis on voluntariness.  Mr. Broadnax objected to the use of the media interviews and brought to the court's attention the fact that they were clearly involuntary confessions while in state custody without the presence of an attorney.  (RR43: 110.)  The evidence

showed, at a minimum, that Mr. Broadnax was "[un]able to integrate information and use it properly" due to drug-induced psychosis. (RR50: 90.) The trial court, however, concluded that any debate as to whether the interview was a product of voluntary consent was "fanciful," (RR43: 111), and neglected even to enter findings of fact or conclusions of law on the issue.

Given evidence of Mr. Broadnax's repeated requests for counsel, medical evidence of his drug-induced psychosis, and his presence in the jail's psychiatric unit, the trial court's decision not to hold a voluntariness hearing was contrary to, and an unreasonable application of, clearly established federal law.

### 4. The State Did Not Prove Voluntariness

The Supreme Court has long held that it is the State's burden, in seeking to admit a defendant's confession, to prove that the confession was made voluntarily. *Miranda* v. *Arizona*, 384 U.S. 436, 475-76 (1966) (State holds a "heavy burden" to prove voluntariness); *Missouri* v. *Seibert*, 542 U.S. 600, 608 n.1 (2004) (prosecution bears the burden of proving the voluntariness of a confession); *Lego* v. *Twomey*, 404 U.S. 477 (1972) (State must prove by at least a preponderance of the evidence that any confession was made voluntarily); *United States* v. *Guerrero*, 986 F.2d 1419 (5th Cir. 1993) (the State bears the burden of proving the confession was made voluntarily).

When proving voluntariness, the State must do more than show that the defendant made a "knowing choice," or a "choice of alternatives." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 224 (1973). However, the State "proved" that Mr. Broadnax voluntarily made those statements to the media through the same kind of circular reasoning that is expressly prohibited by *Schneckloth*: "[T]he best way to look at [the

31

question of voluntariness] is to look at the tape . . .[Mr. Broadnax] said what he wanted to say because that's what he wanted to do."  (RR43: 110.)

Moreover, voluntariness cannot merely be based on the interviewer's subjective belief that Mr. Broadnax was "of sound mind."  *United States* v. *Elrod*, 441 F.2d 353, 356 (5th Cir. 1971).  "No matter how genuine the belief of the officers is that the consenter is apparently of sound mind and deliberately acting," meaningful consent will fail if the so-called consenter lacked the mental capacity to give consent, or lacked a reasonable appreciation for the nature of his actions.  *Id.*  But, in this case, the State's "proof" of the voluntariness of Mr. Broadnax's statement *was* based on the subjective beliefs of the interviewers.  The State asked each media reporter whether Mr. Broadnax appeared to be speaking out of his own free will, and each responded in the affirmative.[7] Moreover, in closing argument at trial, the State invited the jury to determine voluntariness on this improper subjective basis, arguing that that they could "see the wheels turn in [Mr. Broadnax's] head," and they could thus "see the voluntariness of what he was doing" in speaking to the media.  (RR47:193.)

The State of Texas had the burden to prove that any confession made was done so voluntarily and was not the product of coercion.  The State showed neither that Mr. Broadnax's statements to the media on the afternoon of June 23, 2008 were the product of a free and deliberate choice without the influence of police coercion, nor that

---

[7]  For example, the State asked Shaun Rabb, the reporter from FOX Channel 4, "Was there anything about your exchange before what we see on the tape that would make you think that he was not voluntarily talking to you?"  The reporter responded, "Not that I recall . . .My posture is to introduce myself and say, You have agreed to talk to us.  The defendant says yes . . . .  And I go forward."  (RR46:231.)  Rabb was then asked whether he "d[id] anything . . . to overcome the defendant's free will to talk to" him, to which Rabb responded that he did nothing to "force" Mr. Broadnax to speak with him.  (RR46: 232:5-13.)

Mr. Broadnax fully comprehended that he was abandoning his right to not confess.

Those statements should never have been admitted into evidence at trial.

> **5.    Mr. Broadnax's Trial Counsel Was Constitutionally Ineffective in Failing to Present Dr. Roache's Testimony About Mr. Broadnax's Capacity to Consent**

Mr. Broadnax's Sixth Amendment rights were violated when his trial counsel failed to offer pertinent and easily available expert testimony to show that Mr. Broadnax's drug-induced psychosis rendered his statements to the media involuntary. Criminal defendants are guaranteed the right to the effective assistance of counsel under the Sixth Amendment. *Strickland* v. *Washington*, 466 U.S. 668, 686 (1984). A defendant has been denied this right when the counsel's performance "fell below an objective standard of reasonableness" and consequently, there lies "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Reasonably competent counsel would have made three critical choices to confront the prosecution's use of Mr. Broadnax's videotaped statements with actual testimony about Mr. Broadnax's competence at the time. First, trial counsel would have decided to put Dr. Roache, an expert in psychiatry and clinical pharmacology, on the stand during the hearing on the motion to suppress Mr. Broadnax's statements. Second, reasonably competent counsel would have asked Dr. Roache to testify during the guilt and innocence phase of the trial. Third, at penalty phase, reasonably competent counsel would have asked Dr. Roache the crucial question whether or not drug-induced psychosis impaired Mr. Broadnax's ability to give a voluntary statement to the media. Counsel's failure to present this essential testimony was objectively unreasonable. *Strickland*, 466 U.S. at 694.

33

As an expert in psychiatry and clinical pharmacology, Dr. Roache would have been equipped to opine on the effects of PCP on Mr. Broadnax's decision-making capability and capacity to understand his surroundings. When he testified at the penalty phase, Dr. Roache confirmed the assessment that Mr. Broadnax was suffering from a drug-induced psychosis. (RR50: 88, 177). Dr. Roache described the effects of PCP and chronic marijuana use on the brain, explaining that it caused hallucinations and psychotic behavior, among other symptoms. (RR50: 88, 177). He also explained that Mr. Broadnax continued to suffer from the psychosis for an extended period of time because body tissues store the chemicals latent in PCP, leading to persistent, long-term behavioral effects. (RR50: 178-81).

However, Dr. Roache was not asked what he has now explained—that the chemical and neurological factors of PCP use negated Mr. Broadnax's ability to meaningfully consent to speak to the media. (Roache Aff. at 1-3.) Had Mr. Broadnax's trial counsel offered this testimony about the issue of Mr. Broadnax's capacity to consent and, therefore, the voluntariness of his statements to the media—when the evidence was admitted, during his evaluation of guilt, or even during punishment—Dr. Roache's testimony likely would have negated a finding that Mr. Broadnax's so-called "confession" was freely and voluntarily given.

Voluntariness is constitutionally required for a confession to be admissible, *Schneckloth*, 412 U.S. at 228. Proving Mr. Broadnax's lack of voluntariness would cast a serious doubt on the admissibility of Mr. Broadnax's statements to the media. Thus, failing to present evidence that the drug psychosis overcame his free will stripped Mr. Broadnax of a complete defense.

34

**6.      Section 2254 Poses No Bar to Mr. Broadnax's
Properly Exhausted Claim That His Statements
to the Media Were Involuntarily Coerced**

Mr. Broadnax unambiguously advanced the claim that his statements to

the media were involuntarily and unconstitutionally coerced at trial, (RR43: 105-09), and

on direct appeal, (D.A. Appellant's Br. at 86-92.)[8]  Accordingly, that claim was properly

exhausted.  28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir.

2004) ("The exhaustion requirement is satisfied when the substance of the federal habeas

claim has been fairly presented to the highest state court.").

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's

claim.  The Court should review this claim *de novo* because the Texas Court of Criminal

Appeals did not actually rule on whether Mr. Broadnax's statements were involuntarily

and unconstitutionally coerced, *Broadnax* v. *Texas*, No. AP-76207, 2011 WL 6225399

(Tex. Crim. App. Dec. 14, 2011).  *See Porter* v. *McCollum*, 558 U.S. 30, 39 (2009).  If,

on the other hand, the Texas Court of Criminal Appeals' decision encompasses a merits

determination that Mr. Broadnax's statements were constitutionally and voluntarily

given, such a decision is both "based on an unreasonable determination of the facts" and

"contrary to, or involv[ing] an unreasonable application of, clearly established Federal

law."  28 U.S.C. § 2254(d)(1), (2).  It is therefore not entitled to deference.

**C.      Mr. Broadnax Was Denied His Sixth Amendment Right to
"Assistance of Counsel for His Defense" at a Critical Stage**

The Sixth Amendment guarantees defendants against whom adversary

criminal proceedings have been initiated "the Assistance of Counsel," U.S. CONST.

---

8      The state habeas tribunal did not permit Mr. Broadnax's counsel to re-litigate this
claim on collateral review because it had already been presented on direct appeal.
(S.H. Findings ¶ 15).

amend. VI, both at trial and at all "critical stage[s] of pretrial proceedings." *Brewer* v. *Williams*, 430 U.S. 387, 398-99, 404 (1977). The Supreme Court has characterized the right to counsel as "fundamental." *See, e.g.*, *Johnson* v. *Zerbst*, 304 U.S. 456, 463-63 (1938); *Grosjean* v. *Am. Press Co.*, 297 U.S. 233, 243-44 (1936); *Powell* v. *Alabama*, 287 U.S. 45 (1932). Accordingly, any deprivation of the right to counsel "unquestionably qualifies as structural error," which is not subject to harmless-error analysis, since it "affect[s] the framework within which the trial proceeds." *United States* v. *Gonzalez-Lopez*, 548 U.S. 140, 148-50 (2006) (internal quotation marks and brackets omitted); *United States* v. *Pollani*, 146 F.3d 269, 274 (5th Cir. 1998) ("[T]he fundamental nature" of a deprivation of the right to counsel "means that the convictions must [be] reversed without regard to whether [the defendant] suffered any prejudice.").

Mr. Broadnax was plainly deprived of this fundamental constitutional right when he was denied access to counsel after his arraignment and when he was subjected to highly prejudicial interviews—while in state custody—that later aired on four local television stations and formed the basis of the prosecution's case-in-chief at trial. Because this deprivation constituted a structural error, Mr. Broadnax requests that this Court grant habeas corpus relief, vacating his conviction and sentence of death.

**1.** **Highly Publicized Pre-Trial Interactions with Media While in State Custody Constitute Critical Stages of the Proceedings to Which the Right to Counsel Attaches**

The Supreme Court held in *Powell* v. *Alabama*, 287 U.S. 45 (1932), that capital defendants were unconstitutionally denied their right to counsel because attorneys had not been appointed to represent them until the morning of their trial. The Court explained:

36

during perhaps the most critical period of the proceedings against these defendants, that is to say, *from the time of their arraignment until the beginning of their trial*, when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself.

*Id.* at 57 (emphasis added).

In *Powell* and several decisions since, the Supreme Court has emphasized that the constitutionally conferred right to counsel encompasses more than mere representation on the record in a court of law. Instead, the Court has embraced a functional approach, recognizing that all too often when a defendant lacks adequate pre-trial representation, the die is cast even before the jury's empanelment.

A two-pronged, case-specific inquiry is used to assess whether a Sixth Amendment violation has occurred. *First*, a court must determine whether "adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"—have been initiated. *Rothgery* v. *Gillespie Cnty.*, 554 U.S. 191, 198 (2008). *Second*, the court must decide if the right-to-counsel deprivation occurred at a critical stage of the proceedings. "[W]hat makes a stage critical is what shows the need for counsel's presence." *Id.* at 212; *see United States* v. *Wade*, 388 U.S. 218, 226 (1967) ("the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial").

The Supreme Court has held that such critical stages, where counsel's presence is constitutionally required, might occur in myriad settings outside the courtroom and long before trial commences. In *Lafler* v. *Cooper*, 132 S. Ct. 1376 (2012), for instance, the Court held that counsel's deficient performance during plea bargaining

37

negotiations occurred during a "critical stage" in the proceedings and therefore amounted to a Sixth Amendment violation.  The *Cooper* Court made clear that the Sixth Amendment right to counsel "is not so narrow in its reach" as to protect only "the right to a fair trial."  (*Id.* at 1385.)  Instead, the constitutional entitlement "applies to **pretrial critical stages that are part of the whole course of a criminal proceeding**, a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice."  (*Id.* (emphasis added).)[9]

At the very heart of the Sixth Amendment right to counsel is a criminal defendant's entitlement to *counsel*, in a substantive sense, while navigating unfamiliar terrain where each misstep might foreclose an otherwise viable defense at trial.  In *Powell* v. *Alabama*, the Supreme Court characterized this constitutionally safeguarded function as "consultation, thorough-going investigation and preparation."  287 U.S. at 57.  The Court feared that without the assistance of counsel engaged in the requisite consultative and preparatory aspects of a client's defense,

> [e]ven the intelligent and educated layman . . . may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible . . . .  He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction . . . .

*Id.* at 69.

---

[9]    The Supreme Court has extended the right to counsel to numerous proceedings other than merits adjudications of guilt or innocence.  These "critical stages" at which counsel is constitutionally required include sentencing hearings, *Glover* v. *United States*, 531 U.S. 198, 203-04 (2001); pre-indictment preliminary hearings at which the "sole purposes . . . are to determine whether there is sufficient evidence against the accused to warrant presenting his case to the grand jury, and, if so, to fix bail," *Coleman* v. *Alabama*, 399 U.S. 1, 8-10 (1970) (plurality opinion); and plea bargaining negotiations with prosecutors, *Cooper*, 132 S. Ct. at 1384.

The Supreme Court has described the Sixth Amendment's guarantee as ensuring a criminal defendant's "right to rely on counsel as a 'medium' between him and the State." *Maine* v. *Moulton*, 474 U.S. 159, 176 (1985).  A defendant who is denied the opportunity, after his arraignment, to consult with a reliable "medium" at a critical stage of the proceedings is deprived of his right to counsel under the Sixth Amendment.

Because interactions between the media (and in particular *local* media outlets) and a criminal defendant in state custody awaiting trial are fraught with the potential for far-reaching prejudice, media-initiated interviews conducted under such circumstances must be considered "critical stages" at which defendants are entitled to "the guiding hand of counsel." *See Powell*, 287 U.S. at 69.  The Supreme Court has long cautioned that proceedings tainted by unduly prejudicial pretrial publicity defy due process.  *See Rideau* v. *Louisiana*, 373 U.S. 723, 725-27 (1963) (reversing conviction obtained after a local television station broadcast the defendant's pre-trial interview while in state custody without counsel present, because the Constitution "commands that no such practice as that disclosed by this record shall send any accused to his death"); *see also Sheppard* v. *Maxwell*, 384 U.S. 333, 353-58 (1966) (reversing murder conviction in light of the "carnival atmosphere at trial," where reporters "hound[ed] most of the participants in the trial, especially [the defendant]," and prior to which the defendant had been "examined for more than five hours without counsel during a three-day inquest" "televised live from a high school gymnasium"); *Estes* v. *Texas*, 381 U.S. 532, 535-36 (1965) (reversing conviction on due process grounds, where "[m]assive pretrial publicity," including live broadcasts of initial hearings, disturbed the "judicial serenity and calm to which [the defendant] was entitled").

The Supreme Court's description of the proceedings in *Rideau* is particularly instructive:

> What the people [in the community from which the jury was drawn] saw on their television sets was [the defendant], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the [crimes charged] . . . .  For anyone who has ever watched television the conclusion cannot be avoided that *this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was [the defendant's] trial— at which he pleaded guilty to murder*.  Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

(*Id.* at 725-26 (emphasis added).)

Where pre-trial publicity renders the trial itself a mere formality or "spectacle," the defendant's fair trial rights are plainly impinged.  *See, e.g.*, *Estes*, 381 U.S. at 536 (noting that "[p]retrial can create a major problem for the defendant in a criminal case.  Indeed, it may be more harmful than publicity during the trial for it may well set the community opinion as to guilt or innocence.").

Precisely because of the potential prejudice occasioned by a trial conducted in the media—and in this case, an interrogation conducted *by* the media—it is imperative that legal counsel be made available to an arraigned defendant in state custody *in advance* of any such media contact.

### 2. Mr. Broadnax's Uncounseled Media Interviews While in State Custody Violated His Sixth Amendment Right to Counsel and Had a Prejudicial Impact at Trial

Mr. Broadnax was convicted and sentenced to death in no small part because of the contents of the media interviews he gave while acutely psychotic—after his arraignment, while in custody, and without the advice of counsel (which he had twice requested).  Had counsel been appointed sooner, such interviews would never have taken place.  Indeed, within hours of his appointment as Mr. Broadnax's counsel, Brad Lollar

40

wrote to the Public Information Officer at the Dallas County Sheriff's Office to instruct her that his client was not to be "interviewed by any further media or law enforcement." (S.H. RR3 at 136; S.H. CR3 at 236, Findings of Fact and Conclusions of Law ¶ 97).

By withholding counsel from Mr. Broadnax in the days between his arraignment and interviews with the local news media, the State effectively deprived him of his constitutionally required "medium" at precisely the point he needed it most. *See Moulton*, 474 U.S. at 176; *Rothgery*, 554 U.S. at 212.[10]  Though Mr. Broadnax, then a nineteen-year-old high school dropout, could scarcely have foreseen it, the interviews to which he submitted while in custody were, in essence, journalistic ambushes.  Thus, the interviewers' questions focused on three topics central to the State's case-in-chief:  (1) whether Mr. Broadnax committed the crime for which he was charged[11]; (2) whether he is remorseful;[12] and (3) whether he deserved the death penalty.[13]

Without the guidance of counsel, and while suffering from psychosis, Mr. Broadnax's responses were inconsistent, at turns dramatic, and wholly devoid of strategic foresight.  For instance, in the first interview, Mr. Broadnax reiterated several times that he did not commit the crime of which he was accused.[14]  However, after

---

[10]  Notably, Mr. Broadnax invoked his right to counsel on at least two separate occasions before submitting to interviews while in state custody:  first, when he was initially transported to the Garland City jail, (RR41:48), and second, at his arraignment, this time in writing (RR68: 11, Def.'s Ex. 9).  Mr. Broadnax also referred to his invocation of the right to counsel during the first media interview he gave.  (*See* State's Ex. 404 at 3:48 ("Like I told them, the FBI, whoever the fuck they is, I want my motherfucking lawyer.").)

[11]  *See* State's Ex. 404 at 1:10; State's Ex. 407 at 0:08; State's Ex. 405 at 1:38.

[12]  S*ee* State's Ex. 407 at 3:55; State's Ex. 405 at 4:49.

[13]  *See* State's Ex. 407 at 4:09; State's Ex. 405 at 5:10.

[14]  *See* State's Ex. 404 at 2:54 ("I don't know nothing about no motherfucking capital murder or none of that shit."), 3:42 ("I ain't confessed shit, because I ain't killed

persistent, aggressive, and threatening questioning (e.g., "If you tell me the truth, you may, your life may be spared,")[15] and under the gaze of two armed correctional officers, he changed his answer.[16]  In addition, he first indicated that he regretted what he did,[17] but after continued media prompting, he gave the media what they wanted: explosive quotes to get ratings.[18]

These uncounseled and explicit media interviews, given while in state custody, created a highly prejudicial pre-trial spectacle observed by prospective jurors. Mr. Broadnax was featured on the Dallas local news (including four different evening news broadcasts), behind bars, confessing to the commission of the murder for which he was charged in vivid and provocative terms.  *See Rideau*, 373 U.S. at 725.  As in *Rideau*, "this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was [Mr. Broadnax's] trial—at which he pleaded guilty to murder."  (*Id.* at 726.)

The State amplified this spectacle—and the violation of Mr. Broadnax's constitutional rights—by choosing a trial strategy that focused on the jailhouse interviews from beginning to end.  During opening statements at trial, the State previewed for the jury the "shocking" media coverage that it had coordinated to interrogate Mr. Broadnax.

> Now the most interesting thing that you will find in this case, the evidence that you will hear is going to come from the defendant's own mouth,

---

nobody."), 6:57 ("I ain't killed nobody."); 10:41 ("I ain't murdered nobody [].  I ain't got no reason to.  I don't want nobody to kill me.").

[15]  *Id.* at 9:10 (Tr. at 12).

[16]  *Id.* at 16:00.

[17]  *See* State's Ex. 407 at 3:55 ("I kind of regret what I did, but shit, you can't change it. Ain't no use crying over it.")).

[18]  When pressed about what he would say "to the families of the two men you killed," Mr. Broadnax responded, "Fuck 'em.  Straight up."  (*Id.* at 4:28; *see* State's Ex. 405 at 11:01).

> because after he was booked into the Dallas County jail . . . the media came to the jail to interview the defendant . . . .  And, folks what you're going to hear the defendant say in these interviews, the evidence is going to show, it's going to be shocking.  It's going to be shocking.

(RR45: 56.)

The State played for the jury the videotapes of Mr. Broadnax's interviews *every day* of the guilt phase of Mr. Broadnax's trial.  (RR 45: 125-26 (Channel 11), 277 (Channel 5); 46: 232-33 (Fox 4).)  And in the penalty phase, the State repeatedly used the media interviews to argue for the aggravating "future dangerousness" special issue.  (RR 50: 212-13; 53:68-69, 74).

If, as the Court has instructed, "what makes a stage critical is what shows the need for counsel's presence," *Rothgery*, 554 U.S. at 212, it is difficult to envision a more pressing, and potentially outcome-determinative, *need* than that of Mr. Broadnax in advance of predictably prejudicial post-arraignment, pre-trial interviews with local media.  Counsel's presence—and attendant "consultation, thorough-going investigation and preparation," *Powell*, 287 U.S. at 57—would likely have prevented the interviews from occurring, in accordance with Mr. Lollar's "standard practice."  (CR3 at 236, Findings of Fact and Conclusions of Law ¶ 97).  At a minimum, counsel would have provided Mr. Broadnax a more informed basis on which to give the interviews and would have served as a resource and advocate in the face of hostile interrogations.  *See Powell*, 287 U.S. at 69 (A criminal defendant "requires the guiding hand of counsel at every step in the proceedings against him.")  Without that guiding hand, Mr. Broadnax's Sixth Amendment rights were violated and the interviews should have been suppressed—rather than emphasized—at Mr. Broadnax's trial.

43

Because the interviews Mr. Broadnax gave while in custody at the Dallas County Jail after he was arraigned were critical stages in the proceedings against him, he was entitled to the assistance of counsel in preparation for and during those interviews and the interviews should not have been played at trial. The State's failure to honor Mr. Broadnax's request of counsel between his arraignment and these critical stages constitutes a violation of his Sixth Amendment rights, and given the State's use of the interviews at trial, the Sixth Amendment violation is a "structural error" which requires that habeas corpus relief be granted. *See Gonzalez-Lopez*, 548 U.S. at 148-49.

### 3.     Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That He Was Denied His Sixth Amendment Right to Counsel

Mr. Broadnax unambiguously advanced the claim that he was denied his Sixth Amendment right to counsel at trial, (RR43: 105-09), and on direct appeal before the Texas Court of Criminal Appeals, (D.A. Appellant's Br. at 86-92).[19]  Accordingly, that claim was properly exhausted. 28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004).

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim. The Court should review this claim *de novo* because the Texas Court of Criminal Appeals did not actually rule on whether Mr. Broadnax's Sixth Amendment rights were violated, *Broadnax* v. *Texas*, No. AP-76207, 2011 WL 6225399 (Tex. Crim. App. Dec. 14, 2011). *See Porter* v. *McCollum*, 558 U.S. 30, 39 (2009). If, on the other hand, the Texas Court of Criminal Appeals' decision encompasses a merits determination that

---

[19]   The state habeas tribunal did not permit Mr. Broadnax's counsel to re-litigate this claim on collateral review because it had already been presented on direct appeal. (S.H. Findings ¶ 15).

Mr. Broadnax's Sixth Amendment right to counsel was not violated, such a decision is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law" and therefore it is not entitled to deference.  28 U.S.C. § 2254(d)(1).

### D.      The Texas Fair Defense Act Is Unconstitutional Because It Unreasonably Delays the Appointment of Counsel in Violation of the Sixth Amendment Right to Counsel

As discussed above, the Sixth Amendment right to counsel attaches upon "initiation of adversary judicial criminal proceedings," including "the initial appearance before a judicial officer."  *Rothgery*, 554 U.S. at 198, 199.  After attachment, "counsel must be appointed within a reasonable time . . . to allow for adequate representation at any critical stage before trial, as well as at trial itself."  *Id.* at 212.

It is undisputed that Mr. Broadnax's right to counsel *attached* when he first appeared before a magistrate pursuant to Texas Code of Criminal Procedure article 15.17 on the morning of Saturday, June 21, 2008.  (S.H. CR3 at 228, Findings of Fact and Conclusions of Law ¶ 22, Sept. 17, 2014); *see Rothgery*, 554 U.S. at 199 ("Texas's article 15.17 hearing is an initial appearance.").  Nonetheless, Mr. Broadnax, who unequivocally invoked his right to an attorney both before and at the initial appearance, was not provided access to counsel until Tuesday, June 24, by which time he had already submitted to highly prejudicial interviews while in custody, which were broadcast on four separate Dallas evening newscasts.  Any statutory framework that permits such tardy appointment of counsel is plainly inconsistent with the constitutional requirement that a criminal defendant be provided access to an attorney "within a reasonable time after attachment."  *See Rothgery*, 554 U.S. at 212.

The Texas Fair Defense Act requires that courts appoint counsel on behalf of indigent defendants who request such assistance "if adversarial judicial proceedings

have been initiated against the defendant . . . not later than (1) ***the end of the third working day*** after the date on which the court or the courts' designee receives the defendant's request for appointment of counsel, if the defendant is arrested in a county with a population of less than 250,000; or (2) ***the end of the first working day*** after" receipt of a defendant's request in more populous counties.  Tex. Code Crim. Proc. Ann. art. 1.051(c) (West 2015) (emphases added).

Texas's approach to the appointment of counsel embodies a "minority practice" that the Supreme Court has found constitutionally deficient.  *See id.* at 196-98, 205 (reversing grant of summary judgment, in civil rights action, in favor of Texas county that denied appointed counsel to criminal defendant, released on bail, for six months after his initial appearance before a magistrate).  In holding, in 2008, that "Texas's article 15.17 hearing plainly signals attachment" of a defendant's Sixth Amendment right to counsel, the Supreme Court noted that 43 States, the District of Columbia, and the Federal Government each "take the first step toward appointing counsel before, at, or just after initial appearance."  *Id.* at 203-04, 212 (internal quotation marks and citation omitted); *see also McNeil* v. *Wisconsin*, 501 U.S. 171, 180-81 (1991). Of the remaining seven states whose statutes do not unambiguously require appointment of counsel before, at, or immediately after a defendant's initial appearance by statute, two states, Virginia and Alabama, have a consistent practice of doing so.  *See* Br. of Amicus Curiae, the National Ass'n of Criminal Defense Lawyers in Support of Pet'r at App. 5a-6a, *Rothgery* v. *Gillespie Cnty.*, 554 U.S. 191 (2008) (No. 07-440), 2008 WL 218874. Moreover, since the Supreme Court's *Rothgery* ruling, South Carolina amended its Court

46

Rules to provide for the "immediate[ ]" appointment of counsel for indigent defendants after an initial appearance. *See* S.C. App. Ct. R. 602(c) (amended 2009).

Texas is not merely one member of this steadily-dwindling cadre of states that does not guarantee appointed counsel before, at, or immediately after a defendant's initial appearance. Rather, Texas stands ***alone*** in prescribing a statutorily codified safe harbor, during which time the appointment of counsel may be delayed under color of state law—even after a defendant's initial appearance and irrespective of any critical stages that may emerge in the interim.

Here, as in *Rothgery*, 554 U.S. at 205, there is no "acceptable" justification for Texas's statutory framework that sanctions the denial of counsel to criminal defendants for up to three "working day[s]" after a criminal defendant's initial appearance. *See* Tex. Code Crim. Proc. Ann. art. 1.051(c). Because it expressly sanctions the frustration of an indigent defendant's best efforts to "get a lawyer working" for several days after his initial appearance—regardless of the circumstances—the Texas Fair Defense Act, by its very design, deprives defendants like Mr. Broadnax of their Sixth Amendment right to appointed counsel "within a reasonable time" of an initial appearance. *See Rothgery*, 554 U.S. at 210, 212. The statute, in its present form, is invalid under any set of circumstances and therefore unconstitutional on its face. *See United States* v. *Stevens*, 559 U.S. 460, 472 (2010); *United States* v. *Salerno*, 481 U.S. 739, 745 (1987).

Accordingly, Mr. Broadnax requests that this Court grant habeas corpus relief with instructions that his conviction be vacated. *See Stevens*, 559 U.S. at 467.

### 1. Section 2254 Poses No Bar to Mr. Broadnax's Claim That the Texas Fair Defense Act Is Unconstitutional, and Any Procedural Default Is Excused by Ineffective Assistance of Counsel

Mr. Broadnax unambiguously advanced the claim that the Texas Fair Defense Act infringes upon defendants' Sixth Amendment rights in his application for state habeas corpus relief.  (S.H. Appellant's Br. at 27-31.)  Accordingly, that claim was properly exhausted.  28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004).

The state habeas tribunal found that Mr. Broadnax's claim concerning the constitutionality of the Texas Fair Defense Act was "procedurally barred" because Mr. Broadnax "could have but did not previously assert at trial or on appeal that the Texas Fair Defense Act . . . [is] unconstitutional."  (S.H. Findings ¶ 9.)

The Court may, however, excuse the procedural default of a federal constitutional claim caused by counsel's ineffective assistance because, according to the Supreme Court, "Texas procedure makes it virtually impossible for appellate counsel to adequately present" such claims on direct review.  *See Trevino* v. *Thaler*, 133 S. Ct. 1911, 1918-20 (2013) (internal quotation marks and citation omitted).

The Supreme Court has held that Texas's approach to the appointment of counsel embodies a constitutionally deficient "minority practice."  *Rothgery,* 554 U.S. at 196-97, 205.  Counsel's failure to challenge the constitutionality of the Texas Fair Defense Act therefore plainly demonstrated performance that "fell below an objective standard of reasonableness," portending "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See Strickland* v. *Washington*, 466 U.S. 668, 694 (1984).  Any procedural default should be

48

excused because the default stemmed from counsel's failure to object to the constitutionality of the Texas Fair Defense Act at trial and on direct appeal. In addition, failure to consider Mr. Broadnax's claim concerning the constitutionality of the Texas Fair Defense Act would "result in a fundamental miscarriage of justice." *Coleman* v. *Thompson*, 501 U.S. 722, 750 (1991).

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim. The Court should review this claim *de novo* because the state habeas tribunal did not actually rule on the constitutionality of the Texas Fair Defense Act, (S.H. Findings ¶ 20). *See Porter* v. *McCollum*, 558 U.S. 30, 39 (2009). If, on the other hand, the state habeas tribunal's decision encompasses a merits determination that the Texas Fair Defense Act is constitutional, such a decision is "contrary to," and represents "an unreasonable application of, clearly established Federal law" and is therefore owed no deference. *See* 28 U.S.C. § 2254(d).

## II.   MR. BROADNAX'S CONSTITUTIONAL RIGHTS WERE VIOLATED DURING JURY SELECTION

### A.   The Trial Court Erred in Denying Seven *Batson* Challenges Raised by Mr. Broadnax at Trial

Mr. Broadnax was denied his rights to due process and equal protection when the State struck, over objection, every single African-American or Latino juror from his jury. As a result, Mr. Broadnax was left with a jury from which all but one of the minority jurors on his jury panel were excluded, and which was unable to fully consider the compelling mitigation evidence that Mr. Broadnax would later present at trial. These errors, individually and cumulatively, entitle Mr. Broadnax to habeas corpus relief.

The State repeatedly offered nonsensical, illogical, and implausible pretextual reasons for striking every juror of color from Mr. Broadnax's jury. For example, the State repeatedly justified its strikes of minority jurors by referring to their answers to a question on their jury questionnaire concerning their views on the death penalty. The State stated, in support of its strikes, that it was striking all jurors who had selected answer number "3" on the questionnaire. But it made that argument several times with respect to African-American jurors who had actually selected answer number "2," an answer the State had consistently found to be acceptable for white jurors.

In addition, the State, in several instances, said that it was striking a minority juror because of flimsy justifications like the "feeling" the prosecutor had about the juror, or because of the juror's demeanor or "nervousness." Yet the State's allegations regarding these issues were disputed, and the disputes never resolved by the Court. And the State, repeatedly, accepted similar white jurors. Moreover, the trial court made no on-the-record findings concerning the State's reasons for exercising its strikes; accordingly, its decisions upholding the strikes should not be accorded deference.

Mr. Broadnax requested that the voir dire examination in this case be videotaped. That request was made specifically so that the State would not be permitted to offer "subjective explanations not supported by the record." (RR38: 13.) But the trial court denied that request, and the evidence purportedly supporting the prosecutor's race-neutral reasons for striking every single African-American and Hispanic juror from Mr. Broadnax's jury panel was not preserved for appellate review. Mr. Broadnax is thus entitled to have his conviction vacated.

50

As detailed below, defense counsel raised eight *Batson* objections. Each one had merit. And in each instance, the State's explanation for striking the juror simply did not accord with the evidence. Of these eight clear violations, the trial court acknowledged only one, implementing the inadequate remedy of re-seating a single African-American juror on to a jury otherwise devoid of minorities. This remedy was insufficient in light of the seven other *Batson* violations that were ignored, the racial dimensions of this crime, the Dallas County District Attorney's Office pattern and practice of eliminating minority jurors. As a result, Mr. Broadnax is entitled to habeas corpus relief.

The U.S. Supreme Court has affirmed that the Constitution prohibits all forms of purposeful racial discrimination in jury selection. *Batson* v. *Kentucky*, 476 U.S. 79, 88 (1986). Specifically, the Equal Protection Clause forbids a prosecutor from challenging potential jurors solely on account of their race or on the assumption that, for example, African-American jurors as a group will be unable to impartially consider the State's case against an African-American defendant. (*Id.* at 89). Thus, a defendant is deprived of his constitutional rights when a prosecutor strikes prospective jurors from the panel on the basis of race alone. As detailed below, Mr. Broadnax was deprived of his Fourteenth Amendment rights when the trial court rejected <u>seven</u> *Batson* challenges. The Texas courts' adjudication of these *Batson* challenges resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established U.S. Supreme Court precedent. Accordingly, habeas corpus relief is warranted.

Under *Batson* v. *Kentucky*, a defendant may establish a prima facie case of purposeful discrimination in jury selection by showing that he is a member of a

51

cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.  (*Id.* at 96.)  Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a race-neutral explanation for the challenges.  (*Id.* at 97.)  The "core guarantee of equal protection," ensuring citizens that their State will not discriminate on account of race, would be "meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race."  (*Id.* at 97-98.)  If the trial court decides that the facts establish prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, the petitioner's conviction must be reversed.  (*Id.* at 100.)

Mr. Broadnax is an African-American male and thus he is a member of a protected class for purposes of Batson.  At Mr. Broadnax's trial, after qualifying 47 potential jurors to serve,[20] the parties were given the opportunity to exercise peremptory strikes on July 20, 2009.  (*Id.*; Def.'s Br. in Supp. of Batson Mot. 1, July 27, 2009.)  One venire member was Hispanic and seven were African American.  (*Id.*)  The State used a peremptory strike to exclude every single one.  (*Id.*)  African American venire members constituted 15% of the venire panel, yet the State used 47% of its peremptory strikes to eliminate 100% of the African Americans on the panel.  (*Id.*)  African-Americans and Hispanics constituted 17% of the venire panel, and the State used 53% of its peremptory strikes to eliminate 100% of them.  (*Id.*)  These facts are sufficient to raise an inference of discrimination.  *Miller-El* v. *Dretke*, 545 U.S. 231, 240-41 (2005) ("The numbers describing the prosecution's use of peremptories are remarkable.  Out of 20 black

---

[20]   Forty-eight potential jurors were originally qualified.  However, Juror No. 596, Rindy Woodward, became disabled before the parties exercised their peremptory strikes.

members of the 108-person venire panel for Miller-El's trial, only one served. Although 9 were excused for cause or by agreement, 10 were peremptorily struck by the prosecution. The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members . . . . Happenstance is unlikely to produce this disparity.'" (internal citations and quotation marks omitted)).

At trial, Counsel raised seven *Batson* challenges. The trial court rejected all of them, except for one pertaining to Juror Patterson, *see infra*. The rejection of these seven *Batson* challenges was clear constitutional error.

### 1. It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Shaven McCraney

The trial court improperly denied Mr. Broadnax's *Batson* challenge with respect to Shaven McCraney, an African-American juror. The record shows that the State did not challenge Ms. McCraney for cause. (RR10: 83.) To the contrary, the State exercised a peremptory strike against Ms. McCraney, (RR38: 9), which the trial court accepted over Mr. Broadnax's *Batson* objection. (RR38: 13.) In response to trial counsel's *Batson* challenge, the State asserted a number of pretextual reasons for striking Juror McCraney. Chief among them was that even "before she came into the room, [Juror McCraney] was an extremely nervous person" who "seemed to be very un-at-ease with the whole situation." (RR38: 11, Hearing, Selection of the Trial Jurors, July 20, 2009.) Moreover, Juror McCraney allegedly "would not look at the defendant at all." (RR38: 11) Yet the record reflects that Mr. Broadnax's counsel explained that "[Ms. McCraney] was no more nervous than anybody else put in a position of walking into the room and finding a good 12, 15 people looking at her. . . . [S]he did look at the

53

defendant on many occasions during the course of her examination by both the defense and the State." (RR38:12-13.)

The trial court never resolved this factual dispute, making no findings regarding to the State's assertions concerning Ms. McCraney's demeanor. (RR38: 13.) The State also claimed to be "concern[ed]" about Ms. McCraney because she was a "single woman with no children" and she had "taken it upon herself to mentor young adult men, particularly the ones without a father figure." (RR38: 10.)

The trial court's acceptance of the State's speculative, vague, and pretextual reasons for striking Juror McCraney was constitutional error. Most significantly, "nervousness cannot be shown from a cold transcript." *Snyder* v. *Louisiana*, 552 U.S. 472, 479 (2008). While it is true that the trial court's evaluation of a demeanor-related objection may be afforded deference, such deference is afforded only where the trial court has "made a finding that an attorney credibly relied on demeanor in exercising a strike." *Id.* Here, however—as in *Snyder*—the trial court made no such determination. To the contrary, in response to Mr. Broadnax's *Batson* objection to the State's striking of Juror McCraney, the trial court stated simply, without elaboration, "The *Batson* challenge will be denied." (RR38: 13.)

Moreover, here, as in *Snyder*, Ms. McCraney was not challenged until almost two months after she was questioned, and by that time over 100 other jurors had been questioned.[21] *Snyder*, 552 U.S. at 479 (refusing to presume that the trial court credited the prosecutor's assertion that the challenged juror "was nervous" where the juror "was not challenged until the day after he was questioned, and by that time dozens

[21]   Juror McCraney was voir dired on May 28, 2009, (RR10: 16-83), and challenged by the State on July 20, 2009 (RR38: 8).

54

of other jurors had been questioned"). Thus, the trial court "may not have recalled [Ms. McCraney's] demeanor." *Id.* As a result, it is impermissible now to "presume that the trial judge credited the prosecutor's assertion that [Ms. McCraney] was nervous." *Id.* The error in denying this *Batson* challenge is exacerbated where, as here, the trial court did not indicate which of the proffered reasons he was accepting as sufficiently "race-neutral" to justify denial of Mr. Broadnax's *Batson* challenge. Thus, the trial court's findings are not entitled to deference. *See id.* And as a result of this clear constitutional error, Mr. Broadnax is entitled to have his conviction reversed and a new jury empaneled.

The record demonstrates that Ms. McCraney was a highly qualified juror. She stated that she was in favor of the death penalty, and her answer to another question on her Juror Questionnaire indicated that she could apply the death penalty if the law said she needed to.[22] In response to questions on the record, Ms. McCraney indicated that if Mr. Broadnax was found guilty, she would wait to see the evidence before assessing punishment, either life in prison or death. (RR10: 41). She stated that it was possible that a person convicted of capital murder would be a future danger. (RR10: 46.) She stated that she did not think that not having a father was an excuse for murder. (RR10:57). Ms. McCraney's answers to the voir dire questions of both the State and the Defense showed an intelligent, thoughtful juror, who was in favor of applying the death penalty in the appropriate circumstances.

---

[22] Specifically, Ms. McCraney answered the question "[W]hich of the following statements best represents your feelings?" on page 1 of the juror questionnaire with the response numbered 3, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances." (RR55: 102 (McCraney Juror Questionnaire at 1).)

In light of her answers during voir dire, and the pretextual reasons offered by the State for striking her, it was error for the trial court to deny the *Batson* challenge with respect to Juror McCraney.

### 2. It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Mattie Vation

The trial court improperly denied Mr. Broadnax's *Batson* challenge as to Juror Mattie Vation, an African-American juror. The State exercised a peremptory strike against Ms. Vation, (RR38: 14), which the trial court accepted over Mr. Broadnax's *Batson* objection. (RR38: 19.) Again, in response, the State offered a variety of speculative, vague and ambiguous purportedly race-neutral reasons for striking Juror Vation, including, among others, that her questionnaire was "full of spelling errors" and grammar errors, that she expressed "compassion" in her questionnaire, that she has a daughter who struggles with drug addiction, and that she had served as a juror before in a case where the defendant was found not guilty. (RR38: 15-17.) The State also asserted that it was striking jurors who had either been "classified as a 3 on the scale, or who have stated that [they] are not in favor of the death penalty . . ." (RR38: 14). The prosecutor also said that Juror Vation "seemed entirely too anxious to get on this jury." (RR38: 17.) Furthermore, the State had concerns about the fact that Ms. Vation had two family members who had spent time in jail. (RR38: 17-18.)

Most problematic with respect to Juror Vation is the State's fundamental mischaracterization of her juror questionnaire and her feelings towards the death penalty. At trial, the State asserted that it was striking all jurors who were opposed to the death penalty and answered "3" to the first question on page 1 of the jury questionnaire—i.e., those prospective jurors who said that although they thought the death penalty ought not

56

be imposed, they could apply it if the law so provided.  The State then said that Ms. Vation "f[e]ll into that category *on page 1 of her questionnaire*."  (RR38:15 (emphasis added).)  But Ms. Vation in fact circled option 2, "I believe that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty."[23]  Every juror accepted by the State was ranked a "2" with respect to this question.  Ms. Vation also ranked herself a "5" out of 10 in how strongly she supported the death penalty.  (RR55: 162 (Vation Juror Questionnaire at 4).)  The State accepted Elaine Clements and Kelly McDonald, both of whom ranked themselves as a "5" with respect to their support for the death penalty, and both of whom were white.  Thus, the State's purportedly race-neutral explanation with respect to Ms. Vation's feelings on the death penalty was, at its core, false.  The State's purported race-neutral reasons for striking Ms. Vation cannot support the denial of a *Batson* challenge here.

Nor does the State's assertion that Ms. Vation's questionnaire included spelling and grammar errors have any merit.  Indeed, federal courts have recognized that poor spelling is "a trivial reason in many circumstances."  *Johnson* v. *Clay*, No. 2:08 Civ. 2035, 2011 WL 1668416, at *12 (E.D. Cal. May 2, 2011), *aff'd*, 488 F. App'x 255 (9th Cir. 2012).  These vague and ambiguous assertions do not constitute race-neutral reasons sufficient to justify denial of a *Batson* violation.

Moreover, as with Juror McCraney, the trial court made no on-the-record determination as to what purportedly race-neutral reasons he was accepting in rejecting

---

23   When asked if she was in favor of the death penalty, Ms. Vation answered no because she believes in second chances.  But her answer to the very next question, that she believes the death penalty is appropriate in some murder cases, nonetheless undermines the State's argument.  (RR55: 159) (Vation Juror Questionnaire at 1).

the *Batson* challenge as to Juror Vation. Thus, with respect to the State's characterizations of Ms. Vation's demeanor and behavior, the trial court is not entitled to deference. *Snyder*, 552 U.S. at 479. Moreover, Ms. Vation was not challenged until almost two months after she was questioned, and by that time over 100 other jurors had been questioned.[24] *Id.* (refusing to presume that the trial court credited the prosecutor's assertion that the challenged juror "was nervous" where the juror "was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned"). Thus, the trial court "may not have recalled [Ms. Vation's] demeanor." *Id.* As a result, it is impermissible now to "presume that the trial court credited the prosecutor's assertion" that Ms. Vation "seemed entirely too anxious to get on this jury." *See id.*; (RR38: 17).

It was constitutional error to deny the *Batson* challenge to Juror Vation. The State's answers with respect to excluding Ms. Vation on the basis of her feelings towards the death penalty when she was in fact in support of the death penalty have no merit. Moreover, because the cold record does not reveal what reasons the trial court deemed sufficiently race-neutral to justify a *Batson* violation, this denial cannot be upheld on appeal. As a result of this clear constitutional error, Mr. Broadnax is entitled to have his conviction reversed and empanel a new jury.

### 3. It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Ashley Rivera

The trial court denied Mr. Broadnax's *Batson* challenge to Juror Ashley Rivera, a Hispanic-American juror. The State exercised a peremptory strike against

---

[24] Juror Vation was voir dired on May 29, 2009 (RR11:115-175), and challenged by the State on July 20, 2009 (RR38:14).

Ms. Rivera, (RR38: 21), which the trial court accepted over Mr. Broadnax's *Batson* objection (RR38: 26).  In response to Mr. Broadnax's *Batson* challenge, the State again offered varied purported race-neutral reasons for striking Juror Rivera, including that she was allegedly not in favor of the death penalty, that she had four children and no job, that she studied ministry, that she did not watch television, that she had a relative murdered, and that her answers to the questions were given in order to "sound intelligent." (RR38: 21-24.)  None of these reasons justified the denial of the *Batson* challenge.

As an initial matter, Ms. Rivera was not opposed to the death penalty.[25] Indeed, like Juror Vation, she answered the question on the first page of the questionnaire with "2," meaning that she "believe[d] that the death penalty is appropriate in some murder cases, and [she] could return a verdict in a proper case which assessed the death penalty." (RR55:197 (Rivera Juror Questionnaire at 1).)  This is the question which the State purportedly used to strike almost all of the minority jurors.  But every juror accepted by the State was ranked a "2" with respect to this question, which means that the State's purportedly race-neutral reasons for striking Juror Rivera were mere pretext.

Further, the error with respect to Ms. Rivera is even more pronounced given that she was a competent and intelligent juror who expressed, if anything, pro-prosecution tendencies.  She repeatedly stated during voir dire that she would follow the law, and that she could sentence someone to death.  Ms. Rivera also stated that she could find a defendant to be a future danger even if he had never been convicted of anything

---

[25]   Although Ms. Rivera checked the box for "no" when asked if she was in favor of the death penalty, her written answers explained that she only thought it was not the appropriate punishment in all cases: "I don't think this is the answer to all cases; but could be the only solution with all the proper evidence I could be decided to take this action." (RR55: 197 (Rivera Juror Questionnaire at 1).)

before. (RR13:193.) She also thought it was possible to predict whether or not someone would continue to commit acts of violence. (RR13: 193.) Despite the State's argument that Ms. Rivera was raising the burden of proof on the State, Ms. Rivera also said that she would require the State to prove its case only beyond a reasonable doubt. (RR13: 199.)

Moreover, many of the State's proffered reasons for striking Juror Rivera cannot be accepted where the record is cold, and many of those purportedly race-neutral reasons were based on unverifiable demeanor-related issues. More specifically, the prosecutor was "getting" the "feeling . . . for this woman [Juror Rivera]." (RR38: 24.) According to the State, Ms. Rivera was a "woman who doesn't watch TV. She just doesn't get out there and really avail herself of other experiences. She's just very much into following her Christian beliefs and learning the ministry." (RR38: 24.) The State also said that "in talking to [Ms. Rivera], it was [the prosecutor's] impression she so desperately wanted to sound intelligent, but she absolutely could not give a straight answer." (RR38: 22.) Mr. Broadnax contested all of these observations about Ms. Rivera's intent and state of mind. Specifically, Mr. Broadnax contested the State's contentions that Juror Rivera "showed hesitation" and disagreed that she "answered the questions as if [she] wanted to sound intelligent." (RR38: 25.)

The trial court accepted the State's reasons for striking Juror Rivera without making *any* findings resolving these factual disputes, or as to whether or why he was accepting the State's explanation for its strike. (RR38: 26 (stating only that "[t]he *Batson* challenge is denied.").) And here again, Ms. Rivera was not challenged until almost two months after she was questioned, and by that time over 100 other jurors had

60

been questioned.[26]  *Snyder*, 552 U.S. at 479 (refusing to presume that the trial court credited the prosecutor's assertion that the challenged juror "was nervous" where the juror "was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned").  Thus, the trial court "may not have recalled [Ms. Rivera's] demeanor."  *Id.*)  As a result, it is impermissible now to "presume that the trial judge credited the prosecutor's assertion[s]" regarding Ms. Rivera's demeanor, and any trial court determinations as to Ms. Rivera's demeanor are not entitled to deference. (*Id.*)

### 4. It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Curtis Riser

The trial court denied Mr. Broadnax's *Batson* challenge to Curtis Riser, an African-American male.  The State exercised a peremptory strike against Mr. Riser, (RR38: 26), which the trial court accepted over Mr. Broadnax's *Batson* objection. (RR38: 30.)  The State claimed to exercise a strike against Juror Riser because he was allegedly opposed to the death penalty; because he "believe[s] in rehabilitation"— according to the prosecutor; because he had two good parents (which the State considered would be a benefit to the defense); and because he had a relative in the penitentiary. (RR38: 28.)

But none of these reasons are specific to Juror Riser, and they were all pretextual.  *See Miller-El*, 545 U.S. at 241 ("More powerful than [ ] bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve."); *Fields* v. *Thaler*, 588 F.3d 270, 276 (5th Cir.

---

[26] Juror Rivera was voir dired on June 1, 2009, (RR13: 163-231), and challenged by the State on July 20, 2009, (RR38: 21).

61

2009) (noting that *Miller-El* requires a comparative juror analysis).  Three other white jurors—Alex Folz, Jerome Williams, and William Kreighbaum—all voiced opinions that questioned the imposition of the death penalty, and all were accepted by the State.  Furthermore, Mr. Riser said during voir dire that he could in fact impose the death penalty.  (RR13: 244, 248-49.)  Many of the white jurors accepted by the State, and indeed, many of the jurors who ultimately sat on the jury, said that they believe the penitentiary does rehabilitate people.  The same is true of white jurors with friends or relatives who had been in the penitentiary.  And the idea that it was appropriate to strike a person because he "had two good parents," (RR38: 28), is absurd.

It was error to reject the *Batson* challenge to Juror Riser.  As a result, Mr. Broadnax is entitled to have his conviction and sentence vacated.

### 5.    It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Agwana Long

The trial court denied Mr. Broadnax's *Batson* challenge as to Juror Agwana Long, an African-American juror.  The State exercised a peremptory strike against Ms. Long, (RR38: 44), which the trial court accepted over Mr. Broadnax's *Batson* objection.  (RR38: 51.)  The State claimed that it struck Juror Long because she allegedly had mixed feelings about the death penalty, she believed that intoxication was a mitigating circumstance, and she purportedly seemed to side with the defense.  (RR38: 45, 47-48.)  It was error for the trial court to accept these pretextual reasons for striking Juror Long.

As an initial matter, Juror Long answered the question on page 1 of the juror questionnaire by selecting "2,"—that she "believe[s] the death penalty is appropriate in some murder cases" and she "could return a verdict in a proper case which

62

assessed the death penalty." (RR57: 103 (Long Juror Questionnaire at 1).) While the State said it was striking all jurors who were "Category 3," Juror Long did not fall into this group. In fact, *all* of the jurors accepted by the state had, like Juror Long, selected a "2," so selecting this answer cannot be a race-neutral reason for excluding a prospective African-American juror. Juror Long also affirmatively stated that she was in favor of the death penalty on the first page of her juror questionnaire. (RR57: 103 (Long Juror Questionnaire at 1).) Moreover, Juror Long ranked herself a "7" in how strongly she supported the death penalty, (RR57:106 (Long Juror Questionnaire at 4)), and the State accepted four other white jurors, Kimberly Morris (RR56: 122 (Morris Juror Questionnaire at 4)) and Alex Folz (RR55: 181 (Folz Juror Questionnaire at 4)), who ranked themselves as "7," and Elaine Clements, (RR55: 124 (Clements Juror Questionnaire at 4)), and Kelly McDonald, (RR55: 276 (McDonald Juror Questionnaire at 4)), who both ranked themselves a "5."

The record further reflects that Ms. Long did not have mixed feelings about the death penalty. She stated that she would never automatically answer any of the special issues so that a person did not receive a death sentence. (RR30:56.) She stated that she could find a person who did not pull the trigger guilty of capital murder. (RR30: 60.) Thus, the purportedly race-neutral reasons offered by the State are mere pretext when considered in the context of the record.

The record also reflects that while Juror Long may have believed that intoxication was a mitigating circumstance (which it in fact can be under U.S. Supreme

63

Court precedent),[27] she agreed with the law that voluntary intoxication is not a defense to capital murder. (RR30: 65.) She stated that she thought a person was still responsible for their actions if voluntarily intoxicated. (RR30: 66.) Moreover, while the State struck Juror Long on this basis, Juror No. 8, William Stinson, who the State did not strike, specifically stated that he could consider voluntary intoxication to be a mitigating factor. (RR57: 51 (Stinson Juror Questionnaire at 6).) The only difference, of course, is that Juror Long is African-American, and Juror Stinson is white. It was constitutional error to deny the *Batson* challenge with respect to Juror Long. *Miller-El*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise similar non black [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . .")

### 6.      It Was Reversible Error to Deny the *Batson* Challenge as to Prospective Juror Betty Jackson

The trial court denied Mr. Broadnax's *Batson* challenge to Betty Jackson, an African-American juror. The State exercised a peremptory strike against Ms. Jackson, (RR38: 69), which the trial court accepted over Mr. Broadnax's *Batson* objection. (RR38: 71.) The State said that it was striking Juror Jackson because she was not in favor of the death penalty. More specifically, the State posited a hypothetical to illustrate the prosecutor's speculative assumptions as to Ms. Jackson's state of mind: "I think that if the Court had questioned her and had asked her specifically, 'will you only give the death penalty in a case of a child rapist or murderer,' she would have said 'yes,' instead

---

[27] *See Lockett* v. *Ohio*, 438 U.S. 586, 604 (1978) (The "Eighth and Fourteenth Amendments require that the sentence[r] . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (emphasis in original)).

of the way that you posed it to her with 'yes' or 'no' answers." (RR38: 70.) This is the paradigm of speculation. The State based its decision to strike this African-American juror on the ground that it supposedly thought the juror would have answered in the affirmative a question *which she already answered in the negative* had the trial court asked the question in a slightly different manner. Mere speculation of this nature is insufficient to justify the denial of the *Batson* challenge with respect to Ms. Jackson. *See Paulino* v. *Harrison*, 542 F.3d 692, 701-02 (9th Cir. 2008) (where prosecutor's explanations for his strikes were mere speculation and failed to satisfy their burden of articulating a race-neutral reason, the court must continue to step three and determine whether the discrimination was purposeful).

Further, it is clear from the record that Ms. Jackson would have been able to apply the law. She said that she would require the State to prove their case only beyond a reasonable doubt, and not just beyond any doubt. (RR34: 58-59, 61.) She stated that she could follow the law as given to her by the trial court. (RR34: 69.) She stated that she could follow the law with regards to Special Issue No. 2, and that she could answer Special issue No. 3 as a "no" and would not automatically answer it "yes." (RR34: 61-62, 72-74.) In sum, her voir dire demonstrated that she was a competent juror who would apply the law as instructed. Moreover, to the extent there was any indication that she had doubts about the imposition of the death penalty in all cases, three white jurors accepted by the State—Alex Folz, Jerome Williams, and William Kreighbaum— all voiced opinions that questioned the imposition of the death penalty. Thus, the reasons offered for striking Juror Jackson were not race-neutral, and Mr. Broadnax is entitled to a new trial.

**7.      It Was Reversible Error to Deny the *Batson*
Challenge as to Prospective Juror Dedrick Morrison**

The trial court denied Mr. Broadnax's *Batson* challenge to Juror Dedrick Morrison, an African-American juror.  The State exercised a peremptory strike against Mr. Morrison, (RR38: 71), which the trial court accepted over Mr. Broadnax's *Batson* objection.  (RR38: 79.)  The State offered as purportedly race-neutral reasons for striking him that Juror Morrison did not support the death penalty, and that he would consider intoxication as a mitigating circumstance.  (RR38: 72-73.)  But as noted previously, the State stated on the record that they struck all jurors who selected Category 3 on the first page of the juror questionnaire—meaning that although they believe the death penalty ought not be invoked, they could assess it under the proper set of circumstances.  But Juror Morrison answered the question on the first page of the jury questionnaire by selecting Category 2, meaning that Juror Morrison believed the death penalty is appropriate in some murder cases, and could return a verdict in a proper case which assessed the death penalty.  (RR57: 198.)  Every single juror that was accepted by the State and every single juror that eventually was on the jury selected Category 2.  In addition, the State accepted a white juror, William Stinson, who like Juror Morrison, said he would consider voluntary intoxication as a mitigating factor, while rejecting Juror Morrison, an African-American juror who would consider the same.  *Miller-El*, 545 U.S. at 241.  The denial of the *Batson* challenge to Juror Morrison's exclusion was error.

*      *      *

In sum, the State violated the Equal Protection Clause of the Fourteenth Amendment when it used its peremptory strikes against potential jurors Sharon McCraney, Mattie Vation, Angela Rivera, Curtis Riser, Agwana Long, Betty Jackson,

66

and Dedrick Morrison in a racially discriminatory manner contrary to the holding of *Batson* v. *Kentucky*. The State's reasons for striking minority jurors because of the jurors' feelings toward the death penalty were unsupported by the record, and discredited by the State's acceptance of white jurors who had given exactly the same answers on this issue. The State's various demeanor-related reasons for striking several of the jurors of color are equally unsupportable. Those reasons were contested by defense counsel, and the trial court made no findings concerning those contested issues—nor could it have done so, as those matters were not decided until approximately two months after the jurors had been questioned. In sum, a review of the record reveals that the State's purported race-neutral reasons for striking these seven jurors were pretextual. It was error for the trial court to deny these *Batson* challenges, and as a result, Mr. Broadnax is entitled to a new trial.

> **8. Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That the Denial of His *Batson* Challenges Violated the Fourteenth Amendment**

Mr. Broadnax unambiguously objected to the State's striking of jurors on the basis of their race in violation of *Batson* v. *Kentucky*, 476 U.S. 79 (1986), at trial (RR38: 8, 14, 21, 26, 44, 51, 69, 71), and argued that the denial of seven of his eight *Batson* claims violated the Equal Protection Clause of the Fourteenth Amendment on direct appeal before the Texas Court of Criminal Appeals, (D.A. Appellant's Br. at 27-32). Accordingly, that claim was properly exhausted. 28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) ("The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court.").

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim because the Texas Court of Criminal Appeals' decision overruling Mr. Broadnax's claims, *Broadnax* v. *Texas*, No. AP-76207, 2011 WL 6225399, at \*4 (Tex. Crim. App. Dec. 14, 2011), is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law," and therefore it is not entitled to deference.  28 U.S.C. § 2254(d)(1).

### B.   The Trial Court's Remedy of Reseating a Single African-American Juror Was not a Sufficient Remedy for the *Batson* Violation as to Juror Patterson, or for the other *Batson* violations

While denying seven other *Batson* challenges raised by Mr. Broadnax at trial, the trial court granted the *Batson* challenge pertaining to Juror Patterson. Specifically, the trial court found that Mr. Broadnax had "shown and the record supports that there was evidence of disparate treatment on the part of the State."  (CR3: 618, Order on Def.'s Batson Objection 1, Aug. 7, 2009.)  The court also found that the State had "violated article 35.261 of the Code of Criminal Procedure and the holding of *Batson* v. *Kentucky*, 476 U.S. 79 (1986)."  (CR3: 618.)  The Court ultimately ordered Mr. Patterson be restored as a juror in this case.  (CR3: 618.)

However, upon finding that there was a *Batson* violation, the trial court should have struck the entire jury panel, and begun voir dire again.  Indeed, the trial court's remedy of reinstating a single African-American juror onto the jury was insufficient to protect Mr. Broadnax's constitutional rights, particularly in light of the seven other legitimate *Batson* challenges the trial court had already denied.  *See State* v. *McCollum*, 433 S.E.2d 144, 159 (N.C. 1993), *cert. denied, McCollum* v. *North Carolina*, 512 U.S. 1254 (1994) (noting in the context of a *Batson* violation, "the simpler, and . . .

68

clearly fairer, approach is to begin the jury selection anew" and not to reseat a juror); *Minniefield* v. *State*, 539 N.E.2d 464, 466 (Ind. 1989) (trial court erred by failing to grant mistrial to remedy prosecution's *Batson* violation).

The error in rejecting these *Batson* challenges was heightened by other aspects of Mr. Broadnax's prosecution and trial. This is a case involving the prosecution of two African-American men who were alleged to have killed two white men. During the period when Mr. Broadnax was prosecuted, the Dallas County District Attorney was seeking the death penalty against African-American defendants who killed white victims in disproportionate numbers compared to other murder cases. And the broadcast, in this case, of videotaped statements by Mr. Broadnax on several Dallas television stations had the effect of inflaming racial passions, as did the State's request for a death sentence based on racially-tinged evidence of Mr. Broadnax's supposed gang membership.

This conduct occurred in a jurisdiction that has already been found to have a history of purposeful discrimination when selecting jurors in capital cases. In *Miller-El* v. *Dretke*, the Supreme Court found that there was a "body of evidence" confirming the conclusion that Dallas County prosecutors' peremptory strikes were exercised on the basis of race in a systematic fashion:

> [F]or decades leading up to the time [Miller-El] was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries . . . . Although most of the witnesses . . . denied the existence of a systematic policy to exclude African-Americans, others disagreed. A Dallas County district judge testified that, when he had served in the District Attorney's Office from the late-1950's to early-1960's, his superior warned him that he would be fired if he permitted any African-Americans to serve on a jury. Similarly, another Dallas County district judge and former assistant district attorney from 1976 to 1978 testified that he believed the office had a systematic policy of excluding African-Americans from juries. Of more importance, the defense presented evidence that the District Attorney's Office had adopted a

69

formal policy to exclude minorities from jury service . . . .  A manual entitled "Jury Selection in a Criminal Case" [sometimes known as the Sparling Manual] was distributed to prosecutors.  It contained an article authored by a former prosecutor (and later a judge) under the direction of his superiors in the District Attorney's Office, outlining the reasoning for excluding minorities from jury service.  Although the manual was written in 1968, it remained in circulation until 1976, if not later, and was available at least to one of the prosecutors in Miller-El's trial."  Prosecutors here marked the race of each prospective juror on their juror cards.

*Miller-El*, 545 U.S. at 263-64.

Failure to seat an entirely new jury resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law.  Accordingly, habeas corpus relief is warranted.

**1.**    **Section 2254 Poses No Bar to Mr. Broadnax's Claim That the Trial Court Imposed a Constitutionally Inadequate Remedy for the *Batson* Violation as to Juror Patterson and Failure to Exhaust Is Excused by Ineffective Assistance of Counsel**

Mr. Broadnax has not previously advanced the claim that the trial court's remedy of reseating a single black juror was inadequate in light of the *Batson* violation found by the court.  The Court may excuse a petitioner's failure to exhaust a federal constitutional claim where, as here, the failure was caused by counsel's ineffective assistance both at trial and at "initial-review collateral proceedings."  *Martinez* v. *Ryan*, 132 S. Ct. 1309, 1315 (2012); *see Trevino* v. *Thaler*, 133 S. Ct. 1911, 1918-20 (2013).

As discussed *infra* in Part III.D, trial counsel's failure to object to the inadequacy of the trial court's *Batson* remedy and state habeas counsel's failure to advance a claim of ineffective assistance of trial counsel on that basis *both* plainly demonstrated performance that "fell below an objective standard of reasonableness," portending "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See Strickland* v. *Washington*, 466

70

U.S. 668, 694 (1984).  Mr. Broadnax's failure to exhaust state remedies should therefore be excused because the lack of exhaustion was no fault of his own, but rather a result of counsel's constitutional ineffectiveness.  This Court's failure to consider Mr. Broadnax's claim about the inadequacy of the trial court's *Batson* remedy would "result in a fundamental miscarriage of justice."  *Coleman* v. *Thompson*, 501 U.S. 722, 750 (1991).[28]

Moreover, section 2254(e)(2) permits this Court to hold an evidentiary hearing to develop the record on Mr. Broadnax's claim that the trial court imposed an inadequate remedy for the *Batson* violation.  The "factual predicate" for this claim "could not have been previously discovered through the exercise of due diligence" and, as discussed *supra*, "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  (*Id.* § 2254(e)(2)(A)(ii), (B).)

**C.     The Trial Court Erred in Denying Mr. Broadnax's "For Cause" Challenges**

In addition to denying relief for seven clear *Batson* violations, *see supra*, the trial court improperly denied Mr. Broadnax's applications to excuse "for cause" jurors who were unwilling to consider mitigating evidence.  As a result, Mr. Broadnax was left with a jury that was unable to consider the very mitigation evidence that Mr. Broadnax was later able to present.  These errors, individually and cumulatively, entitle Mr. Broadnax to habeas corpus relief.

---

28   Should the Court nonetheless find that this claim is unexhausted, Mr. Broadnax requests that these proceedings be stayed so that he may file a subsequent petition for state habeas corpus relief on this ground pursuant to Texas Code of Criminal Procedure section 11.071(5)(a)(1).

Mr. Broadnax was initially given fifteen peremptory strikes, and the court later provided him with one additional peremptory strike. *Broadnax* v. *State*, No. AP 76207, 2011 WL 6225399, at *4 (Tex. Crim. App. Dec. 14, 2011). At least thirteen venire members struck by Mr. Broadnax should have been excused for cause on the basis of their unwillingness to properly consider mitigating evidence in the imposition of the death penalty. The trial court's errors both limited Mr. Broadnax's ability to properly exercise Mr. Broadnax's peremptory strikes, and resulted in the seating of at least one juror who should have been excused for cause because he was unwilling to consider mitigating evidence.

Due process requires that a jury judging a capital defendant at the sentencing phase "stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan* v. *Illinois*, 504 U.S. 719, 727 (1992). More specifically, established federal law requires that a juror in a capital case be able to consider and give effect to mitigating evidence. *Eddings* v. *Oklahoma*, 455 U.S. 104, 114 (1982) (the sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence" (emphasis in original)). Indeed, a sentencer's failure to consider a defendant's mitigating evidence violates the Eighth and Fourteenth Amendments to the Federal Constitution. *Tennard* v. *Dretke*, 542 U.S. 274, 285 (2004); *see also Boyde* v. *California*, 494 U.S. 370, 377-78 (1990); *Lockett* v. *Ohio*, 438 U.S. 586, 604 (1978).

Under *Witherspoon* v. *Illinois*, 391 U.S. 510, 518-19 (1968), a capital defendant may challenge for cause any prospective juror who will automatically vote for the death penalty. Seating such a juror violates the defendant's rights because such a juror is unwilling to in good faith consider evidence of aggravating and mitigating

72

circumstances.  *Morgan*, 504 U.S. at 729.  Because limiting the mitigating factors a sentencer may consider is improper under *Lockett*, 438 U.S. at 608, a prospective capital juror must, under the Eighth and Fourteenth Amendments, be able to consider any mitigation evidence the defense seeks to rely upon.  The issue is whether the juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright* v. *Witt,* 469 U.S. 412, 424 (1985).  *See Soria* v. *Johnson*, 207 F.3d 232, 245 (5th Cir. 2000) ("because the voir dire examination of venire member Pollard indicates that he could not consider a defendant's youth in mitigation of the death penalty, it appears that Pollard's views were such that he should have been excused for cause").  If even one such juror who cannot consider mitigating evidence is empaneled and the death sentence is imposed, the State is not entitled to execute the sentence.  *See Johnson* v. *State*, 43 S.W.3d 1, 7 (Tex. Crim. App. 2001) (explaining how appellant's harm from the denial of challenges for cause entitled him to a new trial).

Thus, if a "for cause" challenge is improperly rejected and a biased juror seated on the jury which ultimately sentences the defendant to death, the defendant is entitled to have his sentence overturned.  *Ross* v. *Oklahoma*, 487 U.S. 81, 85 (1988) ("Had [the biased juror] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove [the juror] for cause, the sentence would have to be overturned."); *see also United States* v. *Martinez-Salazar*, 528 U.S. 304, 316-17 (2000) (same); *Parker* v. *Gladden*, 385 U.S. 363, 366 (1966) (a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors").

**1.      The Trial Court Improperly Denied Mr. Broadnax's "For Cause" Challenge to Juror John Vessels, Who Plainly Stated He Would not Consider Mitigating Evidence**

In Mr. Broadnax's case, juror John Vessels was ultimately seated on the jury that sentenced him to death.  Juror Vessels stated in voir dire that he could not think of circumstances that would sufficiently mitigate against a death sentence for someone convicted of capital murder.  Mr. Broadnax objected to Juror Vessels—both during voir dire and during the July 20, 2009 hearing, at which the jury was selected—and asked that he be excused for cause.  (RR35: 80; RR38: 80.)  Both of these objections were overruled.  (RR35: 81; RR38: 81.)  These rulings resulted in the seating of a juror who was unable to follow the law and would not give effect to mitigating evidence, and, as a result, Mr. Broadnax is entitled to habeas corpus relief.

During voir dire, Juror Vessels testified that he would be unable to consider mitigating circumstances when deciding whether to impose the death penalty.  Specifically, in response to a question as to whether he could "think of some things that [he] might [him]self consider to be a sufficient mitigating circumstance to change a death sentence to a life sentence or an intentional murder," he replied that he could not "think of anything."  (RR35: 79.)  He stated that he disagreed with established Texas law that evidence of intoxication may be considered in mitigation of punishment, stating instead that "most actions made under intoxication are just suppressed aspects of the personality hence could have been committed anyway."  (RR57: 241 (Vessels Juror Questionnaire at 6) .)  He also said he would not consider "genetics, circumstances of birth, upbringing and environment" in mitigation, except where there was evidence of "actual organic brain disfunction [sic]"—i.e., he was not able to consider exactly the type of mitigation evidence Mr. Broadnax would present.  (RR57: 243 (Vessels Juror Questionnaire at 8) .)

74

Mr. Broadnax's application to excuse Mr. Vessels "for cause" was denied, and

Mr. Vessels was seated on and was a member of the jury that convicted Mr. Broadnax

and sentenced him to death.  This was constitutional error.[29]

### 2. The Trial Court Improperly Denied Mr. Broadnax's "For Cause" Challenges to Other Jurors Unwilling to Consider Mitigating Evidence

In addition to Juror Vessels, the trial court improperly failed to grant

Mr. Broadnax's applications to excuse *thirteen* other jurors for cause because they were

unwilling to consider mitigating evidence when deciding whether Mr. Broadnax should

receive the death penalty.  As a result, Mr. Broadnax was forced to use peremptory

strikes on these jurors, exhausting his peremptory strikes and resulting in the seating of

Mr. Vessels, an unqualified juror, as well as the seating of other unfavorable jurors who

could have been struck had the trial court properly granted the applications to excuse for

cause.  Because at least one incompetent juror was "forced upon him," failure to excuse

these jurors for cause constituted reversible error.  *Ross* v. *Oklahoma*, 487 U.S. 81, 89

(1988).

Specifically:

- Mr. Desmond stated that he would not consider alcohol or drug intoxication to be a mitigating factor.  (RR9: 164-65 (stating that he could not consider the fact that a defendant was voluntarily intoxicated by either drugs or alcohol as mitigation evidence).)  In his juror questionnaire, he disagreed with established Texas law that evidence of intoxication may be considered in mitigation of punishment, stating that he did not agree with the law and he does not "think intoxication should be considered as an

---

[29] Moreover, because the trial court made no on-the-record findings as to whether Mr. Vessels "indicated in voir dire that [he] could consider [certain] mitigating factor[s]," its findings are not entitled to a presumption of correctness under 28 U.S.C. § 2254(d).  *Cf. Bey* v. *Scott*, 77 F.3d 477, No. 95-10263, 1995 WL 798579, at *3 (5th Cir. Dec. 27, 1995).

excuse to murder."  (RR55: 69 (Desmond Juror Questionnaire at 6).)
Mr. Broadnax objected to Juror Desmond, both during voir dire and
during the July 20, 2009 hearing where the jury was selected, and asked
that he be excused for cause.  (RR9: 165; RR38: 8.)  This request was
denied, both initially and upon Mr. Broadnax's renewed objection.
(RR9: 167-68; RR38: 8.)

- Ms. Noble could not consider mitigation either.  Ms. Noble stated that
  Mr. Broadnax's background and how he was raised would not make any
  difference to her.  (RR15:94-95.)  She also stated on her juror
  questionnaire that "genetics, circumstances of birth, upbringing and
  environment" should not "ha[ve] a bearing on determining the proper
  punishment—everyone should have the same punishment depending on
  the crime."  (RR56: 14 (Noble Juror Questionnaire at 8))  Ms. Noble also
  stated that if the defendant were older than 18 years old, age would not be
  a mitigating factor.  (RR15: 95.)  Nor did Ms. Noble acknowledge that
  intoxication could be a mitigating factor.  (RR15: 96)  She stated in her
  Juror Questionnaire that evidence of intoxication "could be used in minor
  crimes, *but not crimes with death penalty or life sentence cases*"—i.e.,
  the very type of case at issue here.  (RR56: 12 (Noble Juror Questionnaire
  at 6) (emphasis added))  Mr. Broadnax objected to Juror Noble, both
  during voir dire and during the July 20, 2009 hearing where the jury was
  selected, and asked that she be excused for cause.  (RR15: 102; RR38: 31.)
  This request was denied, both initially and upon Mr. Broadnax's renewed
  objection.  (RR15: 103; RR38: 32.)

- Mr. Henry testified that he did not think genetic circumstances of birth,
  upbringing or environment "would ever be sufficient mitigating
  circumstances" to avoid imposition of the death penalty.  (RR15: 190.)
  When asked on his questionnaire whether he thought that "genetics,
  circumstances of birth, upbringing and environment should be considered
  when determining the proper punishment of someone convicted of a
  crime," he answered that he "do[es] not agree" and that convicts "choose
  their path of crime."  (RR56: 33 (Henry Juror Questionnaire at 8).)  Nor
  would drug or alcohol use, sexual abuse of a child, or age be mitigating
  factors in Mr. Henry's mind.  (RR56: 31 (Henry Juror Questionnaire at 6);
  *see also* RR15:190-91 (drug use and sexual abuse as a child would not be
  a sufficient mitigating circumstance)).  Mr. Broadnax objected to Juror
  Henry, twice during voir dire and during the July 20, 2009 hearing where
  the jury was selected, and asked that he be excused for cause.
  (RR15: 194-96, 206-07; RR38: 32-33.)  This request was denied, both
  initially and upon Mr. Broadnax's renewed objection.  (RR16: 5;
  RR38: 33.)

- Mr. Maguire testified that he would not give meaningful consideration to
  any testimony of the defense's expert witnesses on mitigation (RR17: 64-
  65), nor would he give meaningful consideration to any other mitigation

evidence presented by the defense.  (RR17: 79.)  He also wrote on his juror questionnaire that he could not consider intoxication as a mitigating circumstance if it was voluntary intoxication—i.e. precisely the type of mitigation evidence that was presented here.  (RR56: 69 (Maguire Juror Questionnaire at 6).)  And he indicated that he would not consider "genetics, circumstances of birth, upbringing and environment" in determining the proper punishment because those are just "excuses" for what someone chooses to do.  (RR56: 71 (Maguire Juror Questionnaire at 8).)  Mr. Broadnax objected to Juror Maguire, both during voir dire and during the July 20, 2009 hearing where the jury was selected, and asked that he be excused for cause.  (RR17: 83-84; RR38: 33-34.)  This request was denied, both initially and upon Mr. Broadnax's renewed objection.  (RR17: 85; RR38: 34.)

- Ms. Davison said she would not consider mitigating factors including voluntary intoxication; age; whether the defendant was a leader or a follower; and whether the defendant had been physically, sexually, or mentally abused.  (RR18: 87-89.)  She also stated that she disagreed with Texas law providing that evidence of intoxication may be considered in mitigation, stating that intoxication is "[n]ot a defense" because it is "most times voluntary."  (RR56: 88 (Davison Juror Questionnaire at 6).)  Mr. Broadnax objected to Juror Davison, both during voir dire and during the July 20, 2009 hearing where the jury was selected, and asked that she be excused for cause.  (RR18: 93-95; RR38: 35.)  This request was denied, both initially, and upon Mr. Broadnax's renewed objection.  (RR18: 95-96; RR38: 35.)

- Mr. McDonald also indicated that he would not consider voluntary intoxication as a mitigating circumstance.  Indeed, Mr. McDonald stated that he disagree with established Texas law that provides that evidence of intoxication may be considered in mitigation of punishment, stating instead that "one knows right from wrong."  (RR56 (McDonald Juror Questionnaire at 6).)  Mr. McDonald also indicated that he would not consider evidence of "genetics, circumstances of birth, upbringing and environment" because "all have a knowledge of right from wrong." (RR56 (McDonald Juror Questionnaire at 6).)  Mr. Broadnax objected to Juror McDonald, both during voir dire and during the July 20, 2009 hearing where the jury was selected, and asked that she be excused for cause.  (RR20: 86; RR38: 36.)  This request was denied, both initially and upon Mr. Broadnax's renewed objection.  (RR20: 89; RR38: 36.)

- Ms. Randeals stated that she would not consider mitigation evidence the defense would present: she did not think age should be a mitigating factor, and she stated that if the defendant was over the age of 18 and was not mentally retarded, and there was no duress, self-defense, accident, mistake, or insanity, she would probably find him guilty and sentence him to death.  (RR21: 88, 90-91.)  Ms. Randeals also indicated that she would

77

not consider "genetics, circumstances of birth, upbringing and environment" in determining the proper punishment because individuals still "have a choice." (RR56 (Randeals Juror Questionnaire at 8).) Mr. Broadnax objected to Juror Randeals, both during voir dire and during the July 20, 2009 hearing where the jury was selected, and asked that she be excused for cause. (RR21: 92-93; RR38: 37.) This request was denied, both initially and upon Mr. Broadnax's renewed objection. (RR21: 94; RR38: 37.)

- Mr. Cantwell testified that he could not give meaningful consideration to mitigating factors presented by the defense. He answered "no" to the question concerning whether or not genetics, circumstances of birth, upbringing and environment should be considered in determining punishment. (RR24: 83; *see also* RR56: 185 (Cantwell Juror Questionnaire at 8).) He thought he would have a hard time considering voluntary intoxication as mitigating circumstance. (RR24: 87.) Indeed, he stated that he did not agree with Texas law providing that intoxication may be considered in mitigation of punishment. (RR56: 183 (Cantwell Juror Questionnaire at 6).) He also stated that he would not consider the life history of the defendant. (RR24: 87.) He also stated that he would not consider physical, sexual or mental abuse as a child as a mitigating circumstance. (RR24: 87-88.) Mr. Broadnax objected to Juror Cantwell, both during voir dire and during the July 20, 2009 hearing where the jury was selected, and asked that he be excused for cause. (RR24: 92-93; RR38: 39.) This request was denied, both initially and upon Mr. Broadnax's renewed objection. (RR24: 94; RR38: 39-40.)

- Mr. Konkle's testimony indicated that he would not give sufficient consideration to mitigation, including genetics and voluntary intoxication. (RR25: 71-73.) With respect to intoxication, Juror Konkle stated that it is "a persons [sic] own fault," indicating that he could not consider it to be a mitigating circumstance. (RR56: 202 (Konkle Juror Questionnaire at 6).) He also answered "no" to the question concerning whether or not genetics, circumstances of birth, upbringing and environment should be considered in determining punishment. (RR56: 204 (Konkle Juror Questionnaire at 8).) Mr. Broadnax objected to Juror Konkle, both during voir dire and during the July 20, 2009 hearing where the jury was selected, and asked that he be excused for cause. (RR25: 78; RR38: 40-41.) This request was denied, both initially and upon Mr. Broadnax's renewed objection. (RR25: 80; RR38: 41.)

- Mr. Livingston stated that he would not consider the age of the Defendant, whether he was a leader or a follower, or the Defendant's behavior on the day of the incident. (RR29: 78.) He also said he did not know if he agreed with Texas law providing that evidence of intoxication may be considered in mitigation of punishment. (RR57: 70 (Livingston Juror Questionnaire at 6).) Mr. Broadnax objected to Juror Livingston, both

78

during voir dire and during the July 20, 2009 hearing where the jury was selected, and asked that he be excused for cause. (RR29: 86-87; RR38: 42.) This request was denied, both initially and upon Mr. Broadnax's renewed objection. (RR29: 87, 89-90; RR38: 42.)

- Ms. Stockton said she would not consider age as a mitigating factor. (RR29: 177.) Nor would she consider whether Mr. Broadnax came from a privileged background or was raised in poverty. (RR29: 181.) Indeed, she could not consider the "genetics, circumstances of birth, upbringing and environment" in determining the proper punishment. (RR57: 91 (Stockton Juror Questionnaire at 8).) Nor would she consider intoxication as a mitigating factor. To the contrary, Juror Stockton disagreed with Texas law that evidence of mitigation could be considered in mitigation punishment, stating instead that "it was a choice of the defendant to drink, if this may have led to an exacerbation of the criminal act, but it does not excuse it." (RR57: 89 (Stockton Juror Questionnaire at 6).) Mr. Broadnax objected to Juror Stockton, both during voir dire and during the July 20, 2009 hearing where the jury was selected, and asked that he be excused for cause. (RR29: 183:21-185:18; RR38: 43.) This request was denied, both initially and upon Mr. Broadnax's renewed objection. (RR29: 185; RR38: 43.)

- Ms. Hodges indicated that she would not give meaningful consideration to the mitigating factor of voluntary intoxication the defense would present at trial. (RR33: 79-80.) Indeed, she stated that she did not agree with established Texas law that intoxication "may be considered in mitigation of punishment." (RR57: 165 (Hodges Juror Questionnaire at 6).) Mr. Broadnax objected to Juror Hodges during the July 20, 2009 hearing where the jury was selected, and asked that she be excused for cause. (RR38: 68-69.) This request was denied by the trial court. (RR38: 69.)

For all of the reasons described above, Juror Vessels, and prospective Jurors Desmond, Noble, Henry, Maguire, Davison, McDonald, Randeals, Cantwell, Konkle, Livingston, Strockton, and Hodges should all have been excused for cause because they stated on the record that they were unable to consider all mitigating circumstances in assessing the death penalty as is required of capital murder jurors pursuant to binding U.S. Supreme Court precedent. *See Eddings*, 455 U.S. at 115 (a sentencer's refusal to consider mitigating evidence, including age and evidence of difficult family history, is constitutional error). As a result, these jurors should have been

excused for cause.  *See Soria*, 207 F.3d 232, 245 (5th Cir. 2000) ("because the voir dire examination of venire member Pollard indicates that he could not consider a defendant's youth in mitigation of the death penalty, it appears that Pollard's views were such that he should have been excused for cause").

If even *one juror who cannot consider mitigating evidence* is empaneled and the death sentence is imposed, *the State is disentitled to execute the sentence*. *Johnson*, 43 S.W.3d, at 7:

> We hold that . . . harm was shown for the erroneous denial of the appellant's challenges for cause because the record indicates that the appellant (1) used a peremptory challenge to remove the venire members, (2) exhausted his peremptory challenges, (3) requested and was denied additional peremptory challenges, and (4) identified [ ] objectionable venire members who sat on the jury and on whom the appellant would have exercised peremptory challenges had he not exhausted his peremptory challenges to correct the trial court's erroneous denial of his challenges for cause."

Here, Juror Vessels was biased and was nonetheless seated on the jury.  As a result of this error, Mr. Broadnax is entitled to have his conviction reversed.  *Ross*, 487 U.S. at 81, 85 ("Had [the biased juror] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove [the juror] for cause, the sentence would have to be overturned."); *see also Martinez-Salazar*, 528 U.S. at 316-17 (same); *Parker*, 385 U.S. at 366 (a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors").  The Texas courts' adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law, and thus Mr. Broadnax is entitled to habeas corpus relief.

Failing to grant "for cause" challenges to the above-described jurors, and in particular with respect to Juror Vessels, who sat on the jury that ultimately sentenced

Mr. Broadnax to death, deprived him of his constitutional rights.  Taking individually, and taken together, the denial of these "for cause" challenges violated Mr. Broadnax's Sixth, Eighth, and Fourteenth Amendment rights.  Mr. Broadnax is thus entitled to a new trial to protect his constitutional rights to an impartial jury.

> **3.     Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That the Trial Court Unconstitutionally Denied His "For Cause" Challenges**

Mr. Broadnax unambiguously objected, "for cause," to the seating of jurors who expressed an unwillingness to consider mitigating evidence at trial, (RR9: 165-66; RR15: 102, 194-96, 206; RR17: 83-84; RR18: 93-95; RR20: 86-87; RR21: 92-93; RR24: 92-93; RR25: 78; RR29: 86-87, 183-85; RR38: 8, 31-43, 68-69, 80), and argued on direct appeal that the denial of his "for cause" challenges violated his constitutional right to a fair trial, (D.A. Appellant's Br. at 43-81).  Accordingly, that claim was properly exhausted.  28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) ("The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court.").

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim because the Texas Court of Criminal Appeals' decision rejecting Mr. Broadnax's claims, *Broadnax* v. *Texas*, No. AP-76207, 2011 WL 6225399, at *4-9 (Tex. Crim. App. Dec. 14, 2011), is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law," and therefore it is not entitled to deference.  28 U.S.C. § 2254(d)(1).

**D.    Mr. Broadnax Was Denied his Right to Effective Assistance of Counsel During Jury Selection**

The U.S. Supreme Court repeatedly has affirmed that the Sixth Amendment guarantees criminal defendants the right to the assistance of counsel because such assistance is essential to the constitutional guarantee of a fair trial.  *See Strickland* v. *Washington*, 466 U.S. 668, 684 (1984); *see also Gideon* v. *Wainwright*, 372 U.S. 335, 340 (1963).  The Supreme Court accordingly has held that "the right to counsel is the right to the effective assistance of counsel."  *Strickland*, 466 U.S. at 686 (quoting *McMann* v. *Richardson*, 397 U.S. 759, 771 n.14 (1970)).

A defendant is deprived of effective assistance of counsel where the attorney's performance falls "below an objective standard of reasonableness," and there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

As detailed below, Mr. Broadnax was deprived of his Sixth and Fourteenth Amendment rights to effective assistance of counsel during jury selection during his capital murder trial.  Trial counsel's various failures were not part of a "sound trial strategy," and, considered individually or cumulatively, "were so serious as to deprive [Mr. Broadnax] of a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 691; *Lockhart* v. *Fretwell*, 605 U.S. 364, 369 (1993).  Indeed, there is a reasonable probability that, but for trial counsel's numerous failures, Mr. Broadnax would not have been convicted of capital murder or sentenced to death.  *See Strickland*, 466 U.S. at 691.

The Texas state courts' adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established U.S. Supreme Court precedent. Accordingly, habeas corpus relief is warranted.

### 1. Trial Counsel Provided Constitutionally Deficient Performance in Failing to Protect Mr. Broadnax's Right to an Impartial Jury

A defendant is denied effective assistance where counsel fails to competently object to a *Batson* violation during jury selection and there is a reasonable probability that "the result of the proceeding would have been different" but for counsel's failure. *See Strickland*, 466 U.S. at 694; *Price* v. *Sec'y, Fl. Dep't of Corr.*, 548 F. App'x 573, 576 (11th Cir. 2013). To determine whether the result of the proceeding would have been different, a reviewing court must determine whether "an African-American juror would have seen the evidence any differently than the white jurors seated on the jury." *Price*, 548 F. App'x at 576. To do so, the reviewing court must search the record for evidence that "indicates that a racially balanced jury would have been more likely to acquit or convict of a lesser charge" than the jury formed by racial discrimination. *Jackson* v. *Herring*, 42 F.3d 1350, 1362 (11th Cir. 1995); *see also Eagle* v. *Linahan*, 279 F.3d 926, 943 n.22 (11th Cir. 2001) ("[W]e are troubled by the practical implication of [the *Strickland*] requirement when the alleged deficient performance is failure to raise a *Batson*-type claim at trial or on appeal. How can a petitioner ever demonstrate that the racial make-up of the jury that convicted him affected its verdict?"). Where a defendant contends that a claim was not properly preserved for appeal due to counsel's failure, the defendant need only demonstrate "a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved." *Davis* v. *Sec'y for Dep't of Corr.*, 341 F.3d 1310, 1316 (11th Cir. 2003).

83

Here, Mr. Broadnax was denied effective assistance of counsel when his trial counsel—while properly raising a *Batson* objection—failed to object to the trial court's purported remedy. Trial counsel initially objected to remedy of restoring Mr. Patterson to the jury, but later withdrew that objection. (Hearing Transcript Aug. 6, 2009 at 6.) But the trial court's restoration of Mr. Patterson to the jury, was nothing more than window dressing in light of the near total exclusion of African-Americans and Hispanics from the jury. The restoration of Mr. Patterson could hardly remedy the prosecution's improper actions here. The prosecution had struck every single minority juror from the jury, and the trial court rejected seven *Batson* claims brought by the defense. Competent counsel would have raised this fact, and would additionally have directed the trial court to the fact that the reseating of Juror Patterson was insufficient in light of the fact that at the time of Mr. Broadnax's trial, the Dallas County District Attorney's Office had a history of exercising unconstitutional peremptory challenges. *See, e.g.*, *Miller-El*, 537 U.S. at 347 (recognizing court should consider history of the particular district attorney's office, and whether that office has a culture of making peremptory challenges based on race or gender).

This history is especially significant given the racial dimensions of this case—two African-Americans defendants and two white victims, and no non-circumstantial evidence (besides the media interviews which should have been excluded) directly linking Mr. Broadnax to the murders other than the testimony of his alleged accomplice. Competent counsel would have argued that the facts of this case, and this history, further supported an inference of discrimination in the State's jury selection for Mr. Broadnax's trial that could not be remedied by merely reseating one minority juror.

84

As discussed *supra,* the trial court's remedy of reinstating Mr. Patterson was insufficient to protect Mr. Broadnax's constitutional rights.  *See State* v. *McCollum,* 433 S.E.2d 144, 159 (N.C. 1993) (noting that while neither reseating the stricken jury nor discharging the entire panel was inconsistent with the procedure required by *Batson* to remedy such a violation, "the simpler, and . . . clearly fairer approach is to begin the jury selection anew . . . "); *People* v. *Wheeler,* 22 Cal.3d 258, 148 Cal. Rptr. 890, 907, 583 P.2d 748, 765 (1978).  *See Minniefield* v. *State,* 539 N.E.2d 464 (Ind. 1989) (holding that the trial court erred by failing to grant mistrial as result of prosecution's *Batson* violation).

This is especially so given the context of Juror Patterson's reseating. Because his trial counsel failed to object to the insufficient remedy of reinstating a single African-American juror, particularly in light of the seven other rejected *Batson* claims, and the racial dimensions of this case, Mr. Broadnax was denied the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments.

This error was compounded by Mr. Broadnax's state habeas counsel's failure to raise this challenge.  Those failures, however, do not bar this Court from adjudicating this claim.  *Martinez* v. *Ryan*, 132 S. Ct. 1309 (2012) (AEDPA does not bar petitioner from using ineffectiveness of his post-conviction attorney to establish "cause" for his procedural default).

In sum, the errors described above with respect to jury selection deprived Mr. Broadnax of his constitutional rights to a fair and impartial jury.  For the foregoing reasons, Mr. Broadnax's conviction should be vacated.

85

### 2. Section 2254 Poses No Bar to Mr. Broadnax's Claim That He Was Denied Effective Assistance of Counsel at Jury Selection and Failure to Exhaust Is Excused by the Ineffective Assistance of Counsel

Mr. Broadnax has not previously advanced the claim that he was denied the effective assistance of counsel during jury selection. But the Court may excuse a petitioner's failure to exhaust a federal constitutional claim where, as here, the failure was caused by counsel's ineffective assistance both at trial and at "initial-review collateral proceedings." *Martinez* v. *Ryan*, 132 S. Ct. 1309, 1315 (2012); *see Trevino* v. *Thaler*, 133 S. Ct. 1911, 1918-20 (2013).

As discussed above, trial counsel's failure to object to the inadequacy of the court's *Batson* remedy and state habeas counsel's failure to advance a claim of ineffective assistance of trial counsel on that basis *both* plainly demonstrated performance that "fell below an objective standard of reasonableness," portending "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland* v. *Washington*, 466 U.S. 668, 694 (1984). Mr. Broadnax's failure to exhaust state remedies should therefore be excused because the lack of exhaustion was no fault of his own, but rather that of trial counsel's and state habeas counsel's inefficacy. In addition, failure to consider Mr. Broadnax's claim concerning his ineffective assistance of counsel during jury selection would "result in a fundamental miscarriage of justice." *Coleman* v. *Thompson*, 501 U.S. 722, 750 (1991).[30]

---

[30] Should the Court nonetheless find that this claim is unexhausted, Mr. Broadnax requests that the present proceedings be stayed so that he may file a subsequent petition for state habeas corpus relief on this ground pursuant to Texas Code of Criminal Procedure section 11.071(5)(a)(1).

Moreover, section 2254(e)(2) permits this Court to hold an evidentiary hearing to develop the record on Mr. Broadnax's claim that he was deprived of effective counsel during jury selection, since the "factual predicate" for that claim "could not have been previously discovered through the exercise of due diligence" and, as discussed *supra*, "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." (*Id.* § 2254(e)(2)(A)(ii), (B).)

## III.   MR. BROADNAX'S CONSTITUTIONAL RIGHTS WERE VIOLATED DURING TRIAL

### A.   The Admission of Evidence Discovered During an Illegal Search of Mr. Broadnax's Cell Violated the Fourth Amendment

On June 19, 2009, Mr. Broadnax's possessions and cell were searched while he was still awaiting trial in the instant case. (RR44: 25.) The search was initiated, and conducted, by the Dallas County District Attorney's office, not the jail or Sheriff, and was done in order to obtain evidence to bolster the State's case at trial. The State did not obtain a warrant for this search, nor did the State provide notice of the warrantless search to Mr. Broadnax or his counsel. Prosecutors discovered that Mr. Broadnax had the following items in his cell: Sun Tzu's book, *The Art of War*, photographs of bikini-clad women, medication that he had been prescribed, and. various writings and drawings . The State introduced each of these items against Mr. Broadnax during the penalty phase of the trial to argue that Mr. Broadnax was a "future danger" and should be sentenced to death. In particular, the State argued that Mr. Broadnax's writings and drawings were "related to murder, robbery, and gang lifestyle." (RR48: 14:3-10.)

The search of Mr. Broadnax's cell while he was awaiting trial violated his rights under the Fourth Amendment, and as a result, the evidence admitted against him

should have been suppressed as fruits of an illegal search.  This objection was preserved on the record at the trial court.  (RR49: 41:15-17.)

A pre-trial detainee does not forfeit his right to privacy against warrantless searches by virtue of his arrest and detention.  *See United States* v. *Cohen*, 796 F.2d 20, 24 (2d Cir. 1986) (pretrial search of inmate's cell initiated by prosecution and not prison officials could be challenged for violation of detainee's Fourth Amendment rights). Unlike a search by prison officials for institutional security purposes, the search here was initiated and organized by the Dallas County District Attorney's Office, <u>not</u> the sheriff. (RR48:126 (Prosecutor David Alex:  "It was actually at our request, the District Attorney's Office request to shake down the cell."); *see also* RR49: 13:9-15:5 (Prosecutor David Alex or Investigator David Barger decided to search Mr. Broadnax's cell, and District Attorney's office "initiated" the search)).  The purpose of the search was to find evidence and contraband to be used at Mr. Broadnax's trial.  The District Attorney's office sent one of its own investigators, Darrell Doty, to document and collect any such evidence.  (RR48: 125-26 (Investigator Doty:  "I was to take photographs and photograph any contraband that they recovered."); *see also* RR49: 21:17-19 (District Attorney's office "sent Darrell Doty over there [to the jail] to take any photographs in— in the cell of anything that would be of value to us.")).

Because there was neither an administrative nor a security reason for this warrantless search, the search and subsequent seizure violated Mr. Broadnax's Fourth Amendment rights.  *United States* v. *Cohen*, 796 F.2d 20, 23 (2d Cir. 1986) (suppressing evidence obtained from illegal search initiated by the prosecution where the "decision to search for contraband was not made by those officials in the best position to evaluate the

88

security needs of the institution, nor was the search even colorably motivated by institutional security concerns").  To the extent that the Supreme Court  has held that a convicted prisoner's rights to privacy are sometimes outweighed by the security concerns of penal institutions, it has never "contemplate[d] a cell search intended solely to bolster the prosecution's case against a pre-trial detainee awaiting his day in court.".  (*Id.* (citing *Hudson* v. *Palmer*, 468 U.S. 517 (1984).)  Indeed, the Second Circuit held that a pre-trial detainee

> retains an expectation of privacy within his cell sufficient to challenge the investigatory search ordered by the prosecutor.  Because his effects were searched at the instigation of non-prison officials for non-institutional security related reasons, the validity of the search may be challenged.  An individual's mere presence in a prison cell does not totally strip away every garment cloaking his Fourth Amendment rights, even though the covering that remains is but a small remnant.

(*See Id.* at 24.)  The rationale underlying *Cohen* has not been questioned by either the Supreme Court or the Fifth Circuit.

Indeed, the Texas Court of Criminal Appeals' reliance on *Soria* v. *State*, 933 S.W.2d 46, 60 (Tex. Crim. App. 1996), was deeply misplaced.  *See Broadnax* v. *Texas*, No. AP-76207, 2011 WL 6225399, at *10 (Tex. Crim. App. Dec. 14, 2011).  The Texas Court of Criminal Appeals read *Soria* to hold "broadly, that a shakedown search of a pretrial detainee's cell does not violate the Fourth Amendment or due process."  *See id*.  But a fair reading of that case demonstrates that its holding was much more limited.  That court relied on *Hudson* v. *Palmer*, 468 U.S. 517 (1984) and *Block* v. *Rutherford*, 468 U.S. 576 (1984) to find that the "Supreme Court has held that a prisoner has no Fourth Amendment expectation of privacy in his cell" and that thus, "a shakedown search of a pretrial detainee's cell does not violate the Fourth Amendment or due process."  *Soria*, 933 S.W.2d at 60.  But *Hudson* involved a convict "serving sentences for forgery,

89

uttering, grand larceny, and bank robbery convictions." *Hudson* v. *Palmer*, 468 U.S. 517, 519 (1984). And the Supreme Court has recognized that pretrial detainees likely retain a "diminished" but not non-existent, "expectation of privacy after commitment to a custodial facility." *Bell* v. *Wolfish*, 441 U.S. 520, 557 (1979). In fact, since *Soria* was decided, the Texas Court of Appeals has recognized a distinction between the privacy rights owed to pre-trial detainees and post-conviction prisoners. *See Lutz* v. *Collins*, No. 04-08-00496-CV, 2009 WL 330958, at *4 (Tex. App. Feb. 11, 2009).

Moreover, the Supreme Court in *Block* focused on shakedown searches of cells that are responsive to "legitimate security concerns." *Block* v. *Rutherford*, 468 U.S. 576, 588 (1984). But as discussed above, the search at issue here was not motivated by security concerns, but by a desire to bolster the State's case against Mr. Broadnax. Thus, *Soria*, which relies on the Supreme Court's holding in *Block*, is inapposite.

Because the search of Mr. Broadnax's cell was illegal, the use of evidence gathered during that search against Mr. Broadnax at trial likewise violated the Fourth Amendment. Moreover, the introduction of the seized evidence caused substantial prejudice to Mr. Broadnax because it was relied upon by the gang expert to bolster the State's argument that Mr. Broadnax was a future danger, and thus that he should be sentenced to death. In particular, the State introduced approximately forty different photographs taken by Investigator Doty of Mr. Broadnax's cell. (RR49: 37:18-38:13.)

Exhibits 497, 498, and 499 were used to demonstrate that Mr. Broadnax had in his cell pictures of "bikini-clad" women. (RR48: 14-15; RR49: 56:7-24.) The State also introduced Exhibit 463 to show that Mr. Broadnax had a pill in his cell— medication that he had been prescribed—which was purportedly a "violation of the rules

90

at the jail." (RR49: 45:22-46:17.)  Exhibits 463 and 473 both demonstrated that

Mr. Broadnax had numerous books, including a copy of Sun Tzu's *The Art of War*, on a

shelf in his cell, which the State described as a book "about tactics of killing people."

(RR49: 47:2-18, 49:5-9, 70.)  The State also used State's Exhibits 500, 501, 502, and 503

to demonstrate that Mr. Broadnax had "drawings in [his] cell," (RR49: 56:25-57:10), that

were allegedly "related to murder, robbery, and gang lifestyle."  (RR48: 14:3-10.)  State's

Exhibits 458 and 475 likewise depicted what the State's expert characterized as gang-

related drawings on the inside of Mr. Broadnax's cell.  (RR49: 42:17-43:5.)  State's

Exhibits 6, 8, and 9 were also drawings of Mr. Broadnax's that the State introduced at

trial to bolster its argument that Mr. Broadnax would be a future danger, and thus that he

should be sentenced to death.  (RR49: 58:11-60:7.)  Similarly, the State introduced

Exhibit 476, a letter Mr. Broadnax had in his cell, in order to suggest that Mr. Broadnax

had ties to gangs.  (RR49: 57:11-58:2 (letter made reference to "74GD").)  State's Exhibit

461 was a photograph of a razor blade that Mr. Broadnax had in his cell.  (RR49: 43:23-

45:21 (Investigator Doty testified, over Mr. Broadnax's objection, that he would be

concerned that an inmate with a razor blade in his cell would "[u]se it as a weapon.")).

All of this evidence was relied upon by the State's gang expert in support of the State's

argument that Mr. Broadnax was a future danger, and that he should be executed.

*Stone* v. *Powell*, 428 U.S. 465 (1976), does not bar this claim.  In *Stone*,

the court held that where the state has provided "an opportunity for full and fair litigation

of a Fourth Amendment claim," a state prisoner cannot be granted habeas corpus relief on

the ground that evidence obtained through an unconstitutional search and seizure was

introduced as his trial.  428 U.S. at 494.  But here, Mr. Broadnax was not afforded an

91

opportunity for "full and fair" litigation of his Fourth Amendment claim.  A federal court must grant an evidentiary hearing to a habeas corpus applicant if "the merits of the factual dispute were not resolved in the state hearing" or if "for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Townsend* v. *Sain*, 372 U.S. 293, 313 (1963) *overruled on other grounds by Keeney* v. *Tamayo-Reyes*, 504 U.S. 1 (1992).  Here, the trial court's decision law clearly warrants further review.

First, the trial judge did not resolve any of the factual disputes related to the illegal search and seizure.  Rather, he overruled Mr. Broadnax's objections based on an incorrect reading of the law, holding that *Soria* "pretty clearly does not make a distinction between pretrial detainees and convicts as far as the Fourth Amendment." (RR49 8-9.)  As discussed *supra*, this conclusion was contrary to clearly established Supreme Court precedent and misreads the *Soria* decision.

Because the trial court rejected Mr. Broadnax's argument based on this incorrect legal premise, it did not make a factual finding whether there was a legitimate security reason for the illegal search of Mr. Broadnax's cell, or whether the search was initiated at the behest of the District Attorney, as opposed to the Sheriff's Office or the Jail.  (RR49: 8-9.)  Because the trial judge did not resolve these disputed material issues of fact, Mr. Broadnax is entitled to an evidentiary hearing on this claim.  *Townsend*, 372 U.S. at 313-14 ("There cannot even be the semblance of a full and fair hearing unless the state court actually reached and decided the issues of fact tendered by the defendant."). "The duty to try the facts anew exists in every case in which the state court has not after a full hearing reliably found the relevant facts."  *Id.*

Mr. Broadnax is also entitled to a hearing in this Court because the state court applied the incorrect law. The guarantee of a "full and fair evidentiary hearing" "contemplates recognition and at least colorable application of the correct Fourth amendment constitutional standards." *Gamble* v. *Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978). A "federal court is not precluded from considering Fourth Amendment claims in habeas corpus proceedings where the state court willfully refuses to apply the correct and controlling constitutional standards." Here, the Texas state court wrongfully applied binding Texas precedent (*Soria*), and in turn misread the Supreme Court holdings that *Soria* itself relied upon. Because "[d]eference to state court consideration of Fourth Amendment claims does not require federal blindness to a state court's willful refusal to apply the appropriate constitutional standards," *Id.*, Mr. Broadnax is entitled to federal review of the trial court's erroneous resolution of his Fourth Amendment claim.

The warrantless search of Mr. Broadnax's cell violated the Fourth Amendment; all of this evidence should therefore have been suppressed. The Texas Court of Criminal Appeals' adjudication of this claim was contrary to clearly established Supreme Court precedent. Given that this evidence was a focus of the prosecution's arguments in the penalty phase at trial and was also used to support the testimony of State experts presented during the penalty phase, there is a substantial likelihood that the introduction of this evidence affected the outcome of the trial, and that without this evidence, Mr. Broadnax would not have been sentenced to death. Accordingly, Mr. Broadnax is entitled to a new trial, without the use of illegally seized evidence.

93

1.    **Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That the Admission of Evidence Discovered During an Illegal Search of His Cell Violated the Fourth Amendment**

Mr. Broadnax unambiguously objected on Fourth Amendment grounds to the admission of evidence discovered during a pre-trial search of his cell at trial, (RR48: 122-29), and argued on direct appeal that the Constitution compels suppression of the fruits of that search, (D.A. Appellant's Br. at 92-93). Accordingly, that claim was properly exhausted. 28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) ("The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court.").

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim because the Texas Court of Criminal Appeals' decision rejecting Mr. Broadnax's claims, *Broadnax* v. *Texas*, No. AP-76207, 2011 WL 6225399, at *10 (Tex. Crim. App. Dec. 14, 2011), is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law," and therefore it is not entitled to deference. 28 U.S.C. § 2254(d)(1).

B.    **The Admission of Dr. Price's Testimony Concerning Psychopathy Denied Mr. Broadnax Due Process**

During the penalty phase of Mr. Broadnax's trial, the State introduced the testimony of J. Randall Price, a forensic psychologist, concerning psychopathy and a test for psychopathy, the PCL-R, which is used by psychologists to assess whether a person is a psychopath.

Dr. Price never examined Mr. Broadnax, nor had he administered the PCL-R to Mr. Broadnax. He did not, in his testimony, testify that Mr. Broadnax was a psychopath, or attempt to apply the PCL-R to Mr. Broadnax. In fact, there was no

evidentiary basis whatsoever for the proposition that Mr. Broadnax is a psychopath, and thus no basis at all for the introduction of testimony about psychopathy or the PCL-R. Mr. Broadnax is not a psychopath, as a recent administration of the PCL-R confirms. Mr. Broadnax's objections to the introduction of this testimony were overruled.

Dr. Price's testimony could not have been more prejudicial to Mr. Broadnax. During closing, the State relied upon Dr. Price's testimony discussing the PCL-R, and purported to apply the test to Mr. Broadnax and invite the jury to do so as well. Based on this testimony and argument, the State argued that Mr. Broadnax was a "psychopath" and would thus forever be dangerous in the future, even in a prison setting. The State, in essence, used Dr. Price's improper testimony as a basis for the *jury* to "diagnose" Mr. Broadnax as a psychopath, something Dr. Price could not and did not do. The State's introduction of this irrelevant testimony, without any scientific basis, and its argument based on that testimony, were devastating, and undermined the true picture that had been presented at the penalty phase by Mr. Broadnax's counsel, namely that of a 19 year-old man who had experienced a horrific childhood and who was suffering from drug induced psychosis at the time of the crime and for weeks thereafter. The improper admission of Dr. Price's testimony was likely the reason Mr. Broadnax was sentenced to death.

The admission of Dr. Price's testimony thus undermined the fundamental fairness of the entire punishment phase of Mr. Broadnax trial. By allowing Dr. Price to imply that Mr. Broadnax was a psychopath without examining him, and providing the State with a basis to argue at closing that he was a psychopath, the court committed a profound error that violated Mr. Broadnax's right to due process and a fair trial.

95

### 1.   Dr. Price's Testimony

Dr. Price testified as a rebuttal witness during the punishment phase of Mr. Broadnax's  trial, near the eve of closing argument.  He presented a checklist of twenty factors from Dr. Robert Hare's Psychopathy Checklist-Revised ("PCL-R").  Those factors range from superficial charm and a grandiose sense of self-worth to juvenile delinquency and promiscuous sexual behavior.  (State's Exhibit 595.)  The test combines information from a semi-structured interview and other available collateral information on the individual.  Affidavit of John F. Edens, Ph.D. ("Edens Aff.") at 2.  Those who score above 30 points are typically classified as psychopaths.  David DeMatteo & John F. Edens, *The Role and Relevance of the Psychopathy Checklist-Revised in Court*, 12 Psychol. Pub. Pol'y & L. 214, 216 (2006).  The State sought Dr. Price's testimony about the PCL-R in order to imply an individual's propensity for future dangerousness.  (RR52: 191 ("THE COURT: [Dr. Price's testimony is] for purposes of the jury's evaluation of future dangerousness?  MR. ALEX: Yes, sir.");  RR53: 77 (Mr. Alex says in closing about Mr. Broadnax, "And because he's a psychopath and because he'll never change, it is a continuing threat to society that will not ever change.").)

Dr. Price testified that psychopathy is immutable, and that it can never be effectively treated.  ( RR: 52, 226 ("There is no effective treatment [for] these behaviors, these typical behaviors, feelings, thoughts, interactions with others.  There's no effective treatment."); RR52: 258 ("It's a very persistent condition; that the research, in our experience, is that there is no effective treatment.").)

Dr. Price did not examine Mr. Broadnax, and did not administer or score the PCL-R for Mr. Broadnax.  He did not, in fact, link his testimony about psychopathy and the PCL-R to Mr. Broadnax at all.

### 2.    Dr. Price's Testimony Was Irrelevant and Did Not Fit the Facts of This Case

Dr. Price's testimony was clearly inappropriate for at least two reasons. First, the testimony had no relevance, as it did not fit the facts of this case, and its relevance was vastly outweighed by its prejudice.  Second, even if it had been relevant, Dr. Price's testimony concerning future dangerousness has no scientific basis.

The State argued that the testimony of Dr. Frank Lane provided a basis for the introduction of Dr. Price's testimony.  It did not.  Dr. Lane treated Mr. Broadnax in jail after his arrest.  He testified that Mr. Broadnax appeared agitated and paranoid, with slow speech, and that he suffered from "a substance induced psychosis, anxiety, versus malingering mental illness, antisocial personality traits."  (RR50: 88.)  Dr. Lane prescribed Mr. Broadnax the following medications: Trazodone, an antidepressant, Benadryl, an antihistamine that also helps with sleep, Bupropion, an antidepressant, Clonazepam, an anti-anxiety agent, and Risperdal, an anti-psychotic medicine—all to treat Mr. Broadnax's psychosis, anxiety, and inability to sleep.  (RR50: 88:15-16).  He concluded that Mr. Broadnax was suffering from the effects of PCP and marijuana, causing psychosis lasting over a month.  (RR50: 88-89).  The treatment Dr. Lane provided improved Mr. Broadnax's symptoms.  (RR50: 97 ("It seemed that his psychotic symptoms had improved, but the toxic exposure was probably fading" by November of 2008.))

97

Dr. Lane mentioned in his notes that there was a possibility Mr. Broadnax had anti-social personality disorder ("APD"). He did not make a diagnosis, or reach a conclusion—just noted a clinical impression. Dr. Lane testified that such characteristics are found in the vast majority of those in jail or those who break the law. (RR50:100.) He noted that he did not have sufficient background information, or information concerning Mr. Broadnax's adolescent behavior, to determine whether or not he actually suffered from APD. (RR50: 99-100).

Dr. Lane did not note, testify, or say anything, ever, about Mr. Broadnax being a psychopath. Yet the State argued that this clinical observation of a possibility of APD was sufficient to introduce evidence about psychopathy—an entirely different, more severe, and profoundly more prejudicial diagnosis. The State's arguments conflated the two diagnoses, arguing that "You've even had Dr. Lane talk about a psychopath when he talked about antisocial personality disorder," which was untrue, both because Dr. Lane never mentioned or talked about psychopathy, and because Dr. Lane never diagnosed Mr. Broadnax as suffering from antisocial personality disorder. (RR52: 229:2-4.) And the State explicitly argued that it intended to use Dr. Price's testimony to support the State's plan to call Mr. Broadnax a psychopath in its closing argument, thus making clear that it intended to use this testimony in an improper and extremely prejudicial way. (RR51: 228; 229 ("THE COURT: How is it helpful to the jury, Mr. Alex?" The State prosecutor responds, "I'm going to be using it in my closing argument. And I think the fact of the matter is that if the jury can be educated on what psychopathy is and what a psychopath is, then it will be extremely helpful to them in understanding the facts of this case.").)

As Dr. John Edens, a forensic psychologist and professor at Texas A&M, explained in an affidavit submitted during the state habeas proceedings, APD and psychopathy are not interchangeable mental health issues.  Affidavit of John F. Edens, Ph.D. ("Edens Aff.") at 3.  The criteria to qualify for each disorder are distinct, with very little overlap.  Dr. Price testified about the Psychopathy Checklist Revised ("PCL-R"), a commercially-marketed scale developed by a Canadian psychology professor, Dr. Hare, whereas APD is a DSM-IV diagnosis with broad scientific acceptance.[31]  (*Id.* at 3-4.)  While the vast majority of jail inmates meet the diagnostic criteria for APD, a *much* smaller percentage would be considered psychopathic.  (*Id.* at 4.)  As Dr. Edens explained, equating the two is "at best confusing and at worst misleading."  *Id.*

Allowing a mere clinical impression of antisocial personality characteristics to open the door to testimony concerning psychopathy is contrary to any requirement that an expert's testimony "fit" the facts of the case.  It is similar, for example, to permitting an expert to testify about DNA evidence when there is no evidence that the DNA found matches the defendant's.

Under AEDPA, the Court must assess whether the state court's evidentiary determination was unreasonable.  *Schriro* v. *Landrigan*, 550 U.S. 465, 473-74 (2007).  The issue is "whether the admission of this testimony violated Petitioner's federal constitutional rights."  *Wood* v. *Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007). The Court has an "independent duty" to determine whether the state court's application of the state's evidence rules violates the Constitution.  *Jones* v. *Cain*, 600 F.3d 527, 536 (5th Cir. 2010); *Bigby* v. *Dretke*, 402 F.3d 551, 563 (5th Cir. 2005).

---

[31]   *See supra* for discussion on the PCL-R's lack of reliability.

Texas state law requires that courts admit only "sufficiently reliable and relevant" evidence. *See Kelly* v. *State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992) (en banc). And, in adopting the United States Supreme Court's holding in *Daubert* v. *Merrell Dow*, the Supreme Court of Texas requires the proponent of expert testimony to show its "relevan[ce] to the issues in the case," and that the evidence is "based upon a reliable foundation." *E.I. du Pont de Nemours & Co.* v. *Robinson*, 923 S.W.2d 549, 555-56 (Tex. 1995).

*Daubert's* holding, codified by Rule 702 of the Federal Rules of Evidence, requires that there be a "fit" between the proposed testimony and the facts of the case at hand. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (explaining that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes"). Similarly, both the Court of Criminal Appeals and the Supreme Court of Texas have held that an expert's testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," *Robinson*, 923 S.W.2d at 556, and that the expert "must make an effort to tie pertinent facts of the case to the scientific principles which are the subject of his testimony," *Jordan* v. *Texas*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996).

The admission of Dr. Price's testimony concerning psychopathy "undermined the fundamental fairness of the entire trial," as the probative value of Dr. Price's testimony—on an issue that did not fit the facts of this case—was "greatly outweighed by the prejudice to the accused from its admission." *Han Tak Lee* v. *Glunt*, 667 F.3d 397, 403-04 (3d Cir. 2012). This Court must grant habeas corpus relief when a

100

state error is "so egregious it renders the petitioner's trial fundamentally unfair." *Bartee*

v. *Quarterman*, 574 F. Supp. 2d 624, 706-07 (W.D. Tex. 2008) (citing *Payne* v.

*Tennessee*, 501 U.S. 808,  825 (1991); *Darden* v. *Wainwright*, 477 U.S. 168, 179-83

(1986)).  The admission of Dr. Price's testimony on psychopathy was just such an error.

### 3. The PCL-R Test Is Unreliable and Bears a High Rate of Error in Predicting Future Dangerousness

Dr. Price's testimony concerning a link between psychopathy, as

measured by the PCL-R test, and future dangerousness, also should not have been

admitted.  As a purported predictor of future dangerousness, the PCL-R is unreliable,

unsupported by scientific studies, and lacking in scientific acceptance.  *See Daubert*, 509

U.S. at 594 (the rate of error in a scientific test and general acceptance in a scientific

community are both markers of reliability).

One of the purposes of *Daubert* was to guide courts in weeding out junk

science masquerading as expert testimony.  "An example of 'junk science' that should be

excluded under *Daubert* as too unreliable would be the testimony of a phrenologist who

would purport to prove a defendant's future dangerousness based on the contours of the

defendant's skull." *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 153 (1997); *see also*

*Robinson*, 923 S.W.2d at 553-54 ("trial judges have a heightened responsibility to ensure

that expert testimony show some indicia of reliability," especially "when it is based upon

novel scientific theories"); *Jordan*, 928 S.W.2d at 555 ("While 'junk science' or

otherwise inadequately tested scientific theories might be shown to relate to the facts of a

case and to that extent be of assistance to the jury, it will not have a sufficiently sound

scientific basis to be reliable.")

Although not phrenology, the results of the PCL-R, like "contours of the defendant's skull," are unreliable and not statistically correlated to violent behavior in U.S. prisons.  There is no demonstrated evidence that PCL-R scores are probative of future dangerousness in a prison setting—and ample evidence to the contrary.  (Edens Aff. at 45.)  Because the purpose of allowing Dr. Price to testify concerning the checklist was to lay a foundation for the State to label Mr. Broadnax as a psychopath, inclined toward future violence, Dr. Price's testimony should not have been admitted.

Research demonstrates, first, that the PCL-R is "highly *unreliable*" in actual criminal cases, as opposed to in controlled scientific experiments.  (Edens Aff. at 5 (emphasis in original).)  Scores can diverge significantly and the test lacks broad scientific acceptance.  (Edens Aff. at 5.)  It is therefore unsurprising that the U.S. District Court for the Northern District of Indiana prohibited the government from performing a PCL–R evaluation on a capital defendant "due to the uncertainty of the validity and reliability of the PCL-R as it is used in capital sentencing hearings," after reviewing literature from Edens and other experts that the PCL-R may not be a reliable indicator of a defendant's future dangerousness.  *United States* v. *Taylor*, 320 F. Supp. 2d 790, 794 (N.D. Ind. 2004).  *See also* DeMatteo & Edens, *The Role and Relevance of the Psychopathy Checklist-Revised in Court*, 12 Psychol. Pub. Pol'y & L. at 227-28 (studies from 1999 to 2004 demonstrated "essentially no empirical support for the assertion that PCL-R scores were predictive of serious institutional violence, particularly in high-security federal prisons in the United States that would house life-sentenced offenders"); David Freedman, *False Prediction of Future Dangerousness: Error Rates and Psychopathy Checklist-Revised*, 29 J. Am. Acad. Psych L. 89, 91 (2001) ("[T]he use of

the PCL-R to predict violent behavior involves substantial and unacceptable rates of error," as the test is "worse than a coin toss in predictive ability.") Admission of this unreliable and extremely prejudicial testimony was fundamentally unfair, and thereby a violation of due process.

> **(a)   Mr. Broadnax Is Not a Psychopath, According to the PCL-R, and the Introduction of Testimony That He Is Was so Fundamentally Unfair That His Death Sentence Should Be Vacated**

Mr. Broadnax is not, in fact, a psychopath.  Dr. Stephen Thorne, a forensic psychologist, has recently administered the PCL-R to Mr. Broadnax.  PCL-R scores can range from 0 to 40.  Mr. Broadnax scored a 20, well below the score of 30 needed to qualify as a "psychopath."  Affidavit of Stephen A. Thorne, Ph.D. ("Thorne Aff.") at 2.  Had such a test been done at the time of trial, the results would have been similar.  (Thorne Aff. at 2.)  Thus, Mr. Broadnax was sentenced to death based on a demonstrably false basis.  This was fundamentally unfair, and his death sentence should therefore be vacated.

Particularly in capital cases, the Eighth Amendment imposes "a special need for reliability in the determination that death is the appropriate punishment in any capital case." *Johnson* v. *Mississippi*, 486 U.S. 578, 584 (1988).  Capital proceedings warrant "a heightened standard of reliability," because "death is different." *Ford* v. *Wainwright*, 477 U.S. 399, 411 (1986).

Dr. Price's testimony was not only misleading, but it was used by the prosecution to seek a death sentence on a demonstrably false basis.  When a prosecutor introduces false testimony against a criminal defendant, "[a] new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the

103

jury." *Giglio* v. *United States*, 405 U.S. 150, 154 (1972) (internal alterations omitted). The erroneous admission of Dr. Price's testimony violated Mr. Broadnax's Constitutional rights under the Fourteenth Amendment's Due Process Clause and the Eighth Amendment.

The testimony of Dr. Price was intended to support the State's position on Special Issue Number 1—whether or not Mr. Broadnax posed a continuing threat to society through possible criminal acts in the future. (RR53: 5.) The jury was required to agree unanimously on this issue in order to sentence Mr. Broadnax to death. (RR53: 6.) Without Dr. Price's false testimony, there would have been insufficient evidence to support a finding of future dangerousness, which the State was required to prove beyond a reasonable doubt. (RR53: 5.)

Dr. Price's testimony thus caused Mr. Broadnax's punishment proceedings to be fundamentally misleading. Particularly in light of the special need for reliability in capital proceedings, *Johnson* , 486 U.S. at 584, Mr. Broadnax's death sentence should be vacated.

**4.      Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That the Admission of Dr. Price's Testimony Concerning Psychopathy Denied Mr. Broadnax Due Process**

Mr. Broadnax unambiguously objected to the admission of Dr. Price's testimony as irrelevant and unreliable at trial, (RR52: 192-94, 227-28). In his application for state habeas corpus relief, Mr. Broadnax advanced the claim that the trial court's admission of Dr. Price's testimony concerning psychopathy denied his constitutional right to due process. (S.H. Appellant's Br. at 75-85.) Accordingly, that claim was properly exhausted. 28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004).

104

With respect to Mr. Broadnax's claims concerning the admission of Dr. Price's testimony at trial, the state habeas tribunal found that, because Mr. Broadnax "could have raised his evidentiary-rule-based challenges on appeal but did not, they are procedurally barred." (S.H. Findings ¶ 199.) This Court may nonetheless review Mr. Broadnax's claim that the admission of Dr. Price's testimony violated the Fourteenth Amendment's Due Process Clause because the state habeas tribunal reviewed Mr. Broadnax's constitutional claim on the merits, (S.H. Findings ¶ 200), and did not "clearly and expressly rely on" a state procedural rule. *See Coleman* v. *Thompson*, 501 U.S. 722, 735 (1991).

Even if the state habeas tribunal's procedural default finding were found to be applicable to Mr. Broadnax's claim regarding the admission of Dr. Price's testimony, this Court may excuse the procedural default of this federal constitutional claim caused by counsel's ineffective assistance because, according to the Supreme Court, "Texas procedure makes it virtually impossible for appellate counsel to adequately present" such claims on direct review. *See Trevino* v. *Thaler*, 133 S. Ct. 1911, 1918-20 (2013) (internal quotation marks and citation omitted).

As discussed in Part III.B.vi, counsel's failure to challenge the constitutionality of the admission of Dr. Price's penalty-phase testimony concerning psychopathy on direct appeal plainly demonstrated performance that "fell below an objective standard of reasonableness," portending "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland* v. *Washington*, 466 U.S. 668, 694 (1984). Any procedural default should be excused because the default stemmed from counsel's failure to object to the

105

constitutionality of the admission of Dr. Price's testimony on direct appeal.  Failure to consider Mr. Broadnax's claim concerning the admission of Dr. Price's testimony concerning psychopathy would "result in a fundamental miscarriage of justice." *Coleman* v. *Thompson*, 501 U.S. 722, 750 (1991).

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim.  The state habeas tribunal's finding that Mr. Broadnax's claim regarding the admission of Dr. Price's was "meritless" "[e]ven if construed as a constitutional claim," (S.H. Findings ¶ 200), is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law," and therefore it is not entitled to deference.  28 U.S.C. § 2254(d)(1).

**5.      Mr. Broadnax's Trial Counsel Was Ineffective in
Failing to Present Witnesses to Rebut Dr. Price and
to Show That Mr. Broadnax Is Not a Psychopath**

Criminal defendants are guaranteed the right to the effective assistance of counsel, under the Sixth Amendment.  *Strickland* v. *Washington*, 466 U.S. 668, 686 (1984).  A defendant has been denied this right when the counsel's performance "fell below an objective standard of reasonableness" and consequently, there lies "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 687-88, 694.

The State introduced Dr. Price to the trial court as a potential rebuttal witness on August 19th, and advised the Court and the defense that it intended to call Dr. Price to discuss future dangerousness and psychopathy.  (RR52, 84, 191-92.)

Reasonably competent counsel, after learning that Dr. Price would testify on psychopathy, would have retained rebuttal experts to address his testimony, and particularly, to address the issue of psychopathy.  Such counsel would have retained an

106

expert to actually examine Mr. Broadnax and testify that he is *not* a psychopath.  As noted above, had Dr. Thorne been asked to examine Mr. Broadnax, he would have found that Mr. Broadnax is not a psychopath, based on an administration of the PCL-R. (Thorne Aff. at 2.)  Second, an expert should have testified about the shortcomings of the PCL-R as a scientific predictor of future dangerousness.  As noted above, Dr. Edens could have testified about the unreliability of the PCL-R as a such a predictor.  (Edens Aff. at 4-5.)

Counsel's failure to present such testimony was objectively unreasonable. *Strickland*, 466 U.S. at 687-88.  Such a witness or witnesses would have mitigated the trial court's error in allowing Dr. Price to testify.  *See id.* at 694.  Accordingly, trial counsel's failure to retain an expert to administer the PCL-R and testify concerning psychopathy was ineffective assistance of counsel, and Mr. Broadnax is entitled to habeas corpus relief.

**6.  Mr. Broadnax's Appellate Counsel Was Ineffective in Failing to Appeal Issues Relating to the Admissibility of Dr. Price's Testimony**

Mr. Broadnax's Sixth Amendment rights were violated when his appellate counsel failed to appeal the trial court's decision to admit Dr. Price's testimony concerning psychopathy.  Reasonably competent counsel would have made two critical arguments on direct appeal: first, that the trial court erred in admitting Dr. Price's expert testimony per Rules 401, 403, and 702 of the Texas Rules of Evidence; and second, that allowing Dr. Price to testify concerning psychopathy denied Mr. Broadnax due process. Counsel for Mr. Broadnax on direct appeal argued neither.

Counsel's failure to present these challenges was objectively unreasonable.  *Strickland*, 466 U.S. at 694.  Rule 401 details the requirement that

evidence be relevant in order to be admissible. Rule 403, similar to its counterpart in the Federal Rules of Evidence, requires exclusion of evidence that is substantially more prejudicial than probative. And Rule 702 codifies the trial court's gatekeeping obligation for experts. Courts must exclude expert testimony that is irrelevant to the case or unreliable. The admission of Dr. Price's testimony was contrary to all three rules: his testimony concerning psychopathy was irrelevant to Mr. Broadnax's case, it was highly prejudicial with negligible probative value, and it lacked scientific validity. Moreover, Dr. Price's testimony was so prejudicial that it violated Mr. Broadnax's right to a fundamentally fair punishment proceeding, by implying that he was a psychopath. *See* Parts III.B.2-iii, *supra*.

Without Dr. Price's testimony, the State likely would not have been able to obtain a sentence of death. Appellate counsel's failure to raise the admissibility of Dr. Price's testimony on direct appeal deprived Mr. Broadnax of his right to effective assistance of counsel, and Mr. Broadnax is entitled to habeas corpus relief.

**7.    Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That Counsel Were Ineffective in Rebutting Dr. Price's Testimony**

Mr. Broadnax unambiguously advanced the claim that his trial counsel was ineffective in failing to rebut Dr. Price's inaccurate, highly misleading, testimony concerning psychopathy in his application for state habeas corpus relief. (S.H. Appellant's Br. at 86-90.) Accordingly, that claim was properly exhausted. 28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) ("The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court.").

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim. The state habeas tribunal's finding that trial counsel "was not constitutionally ineffective" in failing to rebut Dr. Price's testimony, (S.H. Findings ¶ 255), is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law," and therefore it is not entitled to deference. 28 U.S.C. § 2254(d)(1).

**8.      New Evidence That Mr. Broadnax Is Not a Psychopath Provides Clear and Convincing Evidence of Mr. Broadnax's Actual Innocence of the Death Penalty**

A petitioner for federal habeas corpus relief may properly raise even a procedurally defaulted claim if he "establishes that under the probative evidence he has a colorable claim of factual innocence." *Sawyer* v. *Whitley*, 505 U.S. 333, 339 (1992) (brackets and citation omitted); *see Murray* v. *Carrier*, 477 U.S. 478, 495-96 (1986). Where a petitioner asserts his actual innocence of the death penalty on the basis of new evidence, he must show, "based on the evidence proffered plus all record evidence, a fair probability that a rational trier of fact would have entertained a reasonable doubt as to the existence of those facts which are prerequisites under state or federal law for the imposition of the death penalty." *Sawyer*, 505 U.S. at 346-47.

For a death sentence to be imposed in Texas, all twelve jurors must answer a special issue affirming beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. Ann. Art. 37.071 § 2(d)(2). As discussed above, the State relied on the testimony of Dr. J. Randall Price concerning the characteristics of a psychopath (reduced to a test known as the PCL-R) to prove the existence of the special issue of future dangerousness at Mr. Broadnax's trial.

Dr. Price never administered the PCL-R to Mr. Broadnax, nor had Dr. Price ever examined Mr. Broadnax before testifying at the penalty phase of his trial. Nonetheless, in urging an affirmative finding on the future dangerousness special issue, the State purported to apply Dr. Price's testimony directly to Mr. Broadnax *as if it were a diagnosis*. Thus, the State concluded its closing argument for death:

> Dr. Price told you [psychopathy] can't be cured . . . . And that's the fact, folks. He will never change. He will always be a cold-blooded person with no remorse. . . . And because he's a psychopath and because he'll never change, it is a continuing threat to society that will not ever change.

(RR53: 75-77.)

But new evidence underscores the false premise underpinning the State's future dangerousness argument. Dr. Stephen Thorne recently evaluated Mr. Broadnax and concluded that he is not a "psychopath." (Thorne Aff. at 2). The same finding could have been made at the time of trial. (Thorne Aff. at 2) ("[I]f the PCL-R: 2nd Edition had been properly administered to Mr. Broadnax at the time of his trial in 2008, he would *not* have been found to be a psychopath at that time.").)

Confronted with this new evidence, which directly contradicts the State's justification for Mr. Broadnax's future dangerousness, there is "a fair probability that a rational trier of fact would have entertained a reasonable doubt as to" whether Mr. Broadnax would commit future criminal acts of violence that would constitute a continuing threat to society. *See Sawyer*, 505 U.S. at 346-47. Given the State's focus on Dr. Price's misleading testimony and its demonstrably erroneous pseudo-diagnosis of Mr. Broadnax at closing argument, Dr. Thorne's evaluation demonstrates, by "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty" under Texas law. *See id.* at 336.

110

Because a unanimous, affirmative answer to the future dangerousness special issue is a "prerequisite[ ] under state . . . law for the imposition of the death penalty," *id.* at 347, Mr. Broadnax is entitled to habeas corpus relief.

**C.      Mr. Broadnax's Constitutional Rights Were Violated by the Admission of False and Misleading Gang Expert Testimony and his Counsel's Total Failure to Address It**

At trial, the State called Barrett Keith Nelson, a detective in the gang unit of the Dallas Police Department and a member of the Texas Gang Investigators Association (an organization of police officers who investigate gang activity), as an expert to testify that Mr. Broadnax was a member of the Gangster Disciples gang. (RR49: 77.)  Mr. Broadnax objected to Mr. Nelson's testimony on evidentiary grounds, and on the ground that the testimony violated the First and Fourteenth Amendments of the U.S. Constitution.  (RR40: 36.)  The trial court overruled the objections.  (RR40: 37.)

This testimony should not have been admitted, both because it was false and because Mr. Nelson was not qualified to offer it.  Mr. Broadnax has never belonged to the Gangster Disciples, or to any other gang.  (RR51: 121, 164, 211-12, 245, 273; RR52: 110-11, 182; Taylor-Austin Aff., at 2-3.)  He was simply a young man who lived in poor neighborhoods steeped in gang culture and grew up admiring his older brother, who was a Gangster Disciple.  (RR52: 110-12, 122, 135; Taylor-Austin Aff., at 2, 5-6.)  As an aspiring spoken-word poet and artist, Mr. Broadnax drew on his knowledge of gang language and iconography in his work.  (Taylor-Austin Aff., at 6.)  But he was never involved in any gang activity, and he often acted in ways that a Gangster Disciple would not, such as spending time with a member of a rival gang.  (RR52: 111, 128;

111

Taylor-Austin Aff., at 2.)  At other times, he demonstrated that he lacked knowledge that true gang members would have.  (RR52: 111.)[32]

The introduction of this testimony violated Mr. Broadnax's Eighth and Fourteenth Amendment rights because it was false and denied him a fair trial and sentencing hearing, and it violated his First and Fourteenth amendment rights by using his artistic expressions as the basis for imposing the death penalty.  Mr. Broadnax was also denied the effective assistance of counsel in violation of the Sixth Amendment when his attorneys failed to cross-examine Mr. Nelson or to call their own gang expert to testify.

### 1. Mr. Nelson's Testimony About Mr. Broadnax's Alleged Gang Membership Was False and Misleading and the State Violated the Eighth and Fourteenth Amendments By Introducing It

When a prosecutor introduces false testimony against a criminal defendant, "[a] new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (internal alterations omitted).  In a capital trial, the Eighth Amendment imposes "a special need for reliability in the determination that death is the appropriate punishment in any capital case." *Johnson*, 486 U.S. at 584 (quotation marks omitted).  Mr. Nelson's testimony was false and misleading.

---

[32]  For example, the State introduced testimony from an inmate who was incarcerated with Mr. Broadnax who claimed to know that Mr. Broadnax belonged to a gang. When the State asked how he knew, the witness testified that it was because Mr. Broadnax referred to the day he joined a gang as his "B-day": "Just because the day he got in is his—whatever he said, B-day, whatever it is.  That's all I know." (RR48: 253-54.)  Gangster Disciples refer to the day they joined as their "G-day," not their "B-day."  (Taylor-Austin Aff., at 4 n.1).  If Mr. Broadnax did, in fact, use the term B-day, it would indicate that he *lacked* insider knowledge of the Gangster Disciples, not that he *was* a member Gangster Disciples.

Although Mr. Nelson was presented as an expert, he was unable to name a concrete qualification for service in the police department's gang unit. (RR49: 78.) No specialized training is required for the position. (RR49: 79.) Mr. Nelson's experience with gangs was confined to the Dallas-Fort Worth Area, and he testified that he rarely encountered the Gangster Disciples. (RR49: 82.) He made his "expert" determination based on information provided to him by the state prosecutors and a survey of a website purporting to be run by the Gangster Disciples. (RR49: 81, 83, 115.)

This sparse investigation falls far short of the standards typically followed by an investigator in a gang unit—or by an expert witness at trial. Mr. Nelson testified about the process a gang unit investigator follows, noting that most gangs "have their own web sites, so you can click on any gang nowadays and you can get everything about them." (RR49: 81.) The State elicited additional testimony:

> The State: But, if you were gathering intelligence, a gang officer wouldn't stop there, would they?
>
> Mr. Nelson: No, sir.
>
> The State: A gang officer would want to corroborate that, wouldn't they?
>
> Mr. Nelson: Yes, sir.
>
> The State: And how would you do that?
>
> Mr. Nelson: By talking to other officers, other gang unit people who've hopefully contacted that certain gang or that individual; getting any kind of information by talking to those officers. Talking to principals, talking to teachers, people who have had contact with these individuals.

(RR49: 81-82.)

But Mr. Nelson did not do those things here. Before the trial, Mr. Nelson had never met Mr. Broadnax. He was not involved in the murder investigation or the arrest. Nor, after he was asked to testify, did he conduct an investigation that would

113

satisfy his own standards.  He did not interview Mr. Broadnax's principals or teachers.

He did not review Mr. Broadnax's criminal history, which is negligible.  He did not

contact Mr. Broadnax's friends or family, or indeed anyone who had ever had spoken

with Mr. Broadnax before—except, perhaps, the prosecutors.  Mr. Nelson based his

belief that Mr. Broadnax was a member of the Gangster Disciples on a cursory review of

a television interview Mr. Broadnax gave, a recording of a phone call he made, letters he

received while in prison, and his sketches and rap lyrics.  (RR49: 85, 88-90, 96-97, 103-

04.)[33]  He did none of the things that he testified that an officer in the gang unit should do

to determine whether someone belonged to a gang.

In short, Mr. Nelson's investigation did not satisfy the gang unit standards

he set out *in his own testimony*.  The evidence that he relied on and presented to the jury

was insufficient under Texas law to place Mr. Broadnax in the state gang database, let

alone on death row.  *See* Tex. Code Crim. Proc. Ann. art. 61.02(c); (Taylor-Austin Aff. at

7-8).

Mr. Nelson's testimony was unreliable, false, and misleading.  For

example, Mr. Nelson noted that Mr. Broadnax used the phrase "MOB" in his writing and

had a MOB tattoo.  (RR49: 111.)  To the extent that "MOB" has any gang connotation, it

---

[33]   Mr. Nelson testified that Mr. Broadnax self-admitted gang membership in a television interview when he referred to himself as a "folk."  (RR49: 84-85,87-91.)  But broadcasting his affiliation so publicly would, in fact, have been a violation of the gang stricture against "snitching," and been at odds with the tight-lipped discipline of the Gangster Disciples.  (Taylor-Austin Aff., at 5-6.)

Mr. Nelson also exaggerated the importance of a letter Mr. Broadnax received in prison that contained Gangster Disciple references and symbols, and a phone call in which he asked an older acquaintance if he was "OG74" and said he was "a part of that organization."  (RR49: 88-90, 131-32.)  Both communications are an outgrowth of Mr. Broadnax's interest in gang culture and his tendency to emulate his brother.  (Taylor-Austin Aff., at 6-7.)  Neither suggests that Mr. Broadnax actually belonged to the Gangster Disciples.  (Taylor-Austin Aff., at 6-7.)

114

refers to the Blood family of gangs, a rival of the Gangster Disciple gang.  Mr. Nelson

acknowledged that "Gangster Disciples do not get along with Bloods," but nevertheless

claimed there was "not a contradiction whatsoever."  (RR49: 111-12.)  Mr. Nelson

testified that "MOB" can also mean "money over bitches," which he described as the

mentality of "[a]ny street-hustling gangster, the first thing to him is money.  I'm going to

get my money."  (RR49: 112).  But "money over bitches" is a common term in rap music

and African-American youth culture, with no specific gang connotation.  To the extent

that "MOB" referenced a gang, it contradicted Mr. Nelson's theory that Mr. Broadnax

was a Gangster Disciple.

Similarly, Mr. Nelson interpreted a comment Mr. Broadnax made in a

journal that he was thinking about joining the military as an indication of gang

membership, because "Black Gangster Disciples like to send their recruits to the

military."  (RR49: 126.)

Mr. Broadnax's supposed gang membership was an important part of the

State's case for the death penalty.  Indeed, Prosecutor David Alex told the jury that the

State would demonstrate future dangerousness by establishing that Mr. Broadnax was a

member of "one of the oldest criminal street gangs in the country" that was "involved in

murders and robberies."  (RR48: 23-24.)

This inaccurate portrayal of Mr. Broadnax resonated with the jury.  During

deliberations, the jury sent three notes to the court.  In each, the jury asked to see

evidence that Mr. Nelson had testified demonstrated Mr. Broadnax's gang affiliation,

including the rap lyrics, journals, and transcripts of the phone call.  (CR3: 645-46, 648.)

115

By exploiting this false and misleading testimony, the State deliberately deceived the jury in violation of the Eighth and Fourteenth Amendment. *Giglio*, 405 U.S. at 154. The Texas state courts' adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established U.S. Supreme Court precedent. Accordingly, habeas corpus relief is warranted.

### 2. The Qualification of Mr. Nelson as an Expert Rendered the Trial Fundamentally Unfair, in Violation of the Fourteenth Amendment

Mr. Nelson should not have been qualified as an expert and should not have been permitted to testify. An expert may only testify "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. Mr. Nelson's purported expertise was based on his position in the gang unit of the Dallas Police Department, but Mr. Nelson was unable to specify a qualification for service in that unit, and testified that no specialized training was required. (RR49: 79-80.) By his own admission, he did not have any specialized knowledge or experience with the Gangster Disciples: he encountered them rarely, if ever, in his work, and based his testimony on cursory internet research. (RR49: 82, 115.) In short, Mr. Nelson did not have any expert knowledge of the Gangster Disciples. [34] (Taylor-Austin Aff., at 4-5.)

Despite lacking the prior knowledge necessary to form an expert opinion about Mr. Broadnax's supposed membership in the Gangster Disciples, the trial court

---

[34] Despite numerous attempts to obtain Mr. Nelson's *curriculum vitae*, introduced at trial as State's Exhibit 13, the Dallas District Court has not provided the item to Mr. Broadnax's present counsel. A clerk of the court has advised present counsel that the document may be located only on the hard drive of a computer that is currently in storage. Mr. Broadnax reserves his right to supplement or amend these allegations after his counsel is provided access to State's Exhibit 13.

qualified him as an expert and permitted his testimony.  (RR40: 37.)  The admission of

this evidence was "so unduly prejudicial that it renders the trial fundamentally unfair," in

violation of the Due Process Clause of the Fourteenth Amendment.  *Payne* v. *Tennessee*,

501 U.S. 808, 825 (1991); *Wood* v. *Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007).  The

testimony had a "substantial and injurious effect or influence in determining the jury's

verdict," as evidenced by the jury's repeated requests during deliberations for documents

related to Mr. Nelson's testimony.  (CR 3: 645-46, 648); *Brecht* v. *Abrahamson*, 507 U.S.

619, 623 (1993); *Janecka* v. *Cockrell*, 301 F.3d 316, 328-29 (5th Cir. 2002).

 The Texas state courts' adjudication of this claim resulted in a decision

that was contrary to, and involved an unreasonable application of, clearly established

U.S. Supreme Court precedent.  Accordingly, habeas corpus relief is warranted.

### 3. Mr. Nelson's Testimony About Mr. Broadnax's Supposed Gang Membership Violated the First and Fourteenth Amendments

 Evidence of "[a]n aggravating circumstance" is inadmissible if "it

authorizes a jury to draw adverse inferences from conduct that is constitutionally

protected."  *Romano* v. *Oklahoma*, 512 U.S. 1, 10-11 (1994) (quoting *Zant* v. *Stephens*,

462 U.S. 862, 885 (1983)).  It is a violation of a defendant's First and Fourteenth

Amendment rights to admit evidence of a defendant's gang membership during the

penalty phase of a trial unless it is relevant to an issue to be decided at the penalty phase.

*Dawson* v. *Delaware*, 503 U.S. 159, 160 (1992).

 The court admitted into evidence Mr. Broadnax's drawings, lyrics, and

spoken-word poetry in an effort to portray him as a hardened gang-banger.  But

Mr. Broadnax did not belong to a gang.  His fascination with gangs and gang culture

emerged from growing up in poor neighborhoods where gang culture is predominant, and

from his admiration of his older brother, who was a member of the Gangster Disciples. (Taylor-Austin Aff., at 2, 4.)  For Mr. Broadnax, gang language and symbols were a system through which he could express himself, and the framework for a fantasy in which he was empowered and powerful, compared to his reality, where he was forgotten and powerless.  (Taylor-Austin Aff., at 6-7.)  Furthermore, "gangster rap" is a widely popular genre of rap music, and frequently emulated by young men aspiring to be rap artists.  (Taylor-Austin Aff., at 6.)  A young African-American man's interest in gangster rap is no more indicative of future dangerousness than a young white man's interest in video games.

In *Dawson*, the Supreme Court held that it was constitutional error to admit evidence that the defendant belonged to the Aryan Brotherhood during the penalty phase of a murder trial.  The Court noted that the prosecution had not presented evidence about the acts of the chapter of the gang to which the defendant belonged and the "evidence was not tied in any way to the murder."  *Dawson*, 503 U.S. at 165-66.  In dicta, the Court stated that "[i]f credible and otherwise admissible evidence" was presented that the defendant belong to a gang that posed a specific threat at the prison because it was "associated with drugs and violent escape attempts at prisons" and "advocate[d] the murder of fellow inmates," the facts would present "a much different case."  *Id.* at 165.

The Fifth Circuit has followed the *Dawson* dicta, allowing evidence of gang membership during the penalty phase if "[a] reasonable juror could conclude that membership in such a gang is relevant to future dangerousness."  *Fuller* v. *Johnson*, 114 F.3d 491, 498 (5th Cir. 1997).  The *Fuller* court upheld the State's evidence that the

118

defendant was a member of a prison gang "that had committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults." *Id.*

Following *Fuller*, courts in the Fifth Circuit have applied the *Dawson* dicta only when "gang involvement concerned the motive and reason for the murders" or the defendant actively coordinated with gang members while incarcerated. *E.g., Martinez Perez* v. *Dretke*, 172 F. App'x 76, 82 (5th Cir. 2006); *Garza* v. *Thaler*, No. 5:10-CV-013-C, 2013 WL 9747673, at *15 (N.D. Tex. Mar. 6, 2013). Indeed, the proposition that "the mere fact" that a defendant belongs to a gang "is relevant to the future dangerousness special issue" is "completely contrary to *Dawson*," and introducing evidence on that basis violates the First Amendment." *Diaz* v. *Dretke*, No. M-04-225, 2005 WL 2264966, at *12 (S.D. Tex. Aug. 19, 2005), *subsequently aff'd sub nom. Diaz* v. *Quarterman*, 239 F. App'x 886 (5th Cir. 2007).

Here, the State did not suggest that the crimes Mr. Broadnax stood accused of committing were in any way related to his alleged gang membership. They did not suggest that Mr. Broadnax was coordinating with gang members in prison. Nor did the State establish that the Gangster Disciples posed a security threat in Texas state prisons, or otherwise explain how membership in that gang would indicate future dangerousness in an inmate confined to prison for life without the opportunity for parole. (RR49: 163.)

The State did not present evidence that Mr. Broadnax was affiliated with a particular chapter, or connect him to any known gang associates. Mr. Nelson linked Mr. Broadnax to the Gangster Disciples through his sketches of pitchforks and other imagery, and his references in rap lyrics to historical gang figures. But he also noted that

119

Mr. Broadnax could just as easily have been linked to a rival and incompatible gang organization through his tattoo.  These general markers of "gang culture" overlap considerably with aspects of American youth culture, particularly in the poor communities in which Mr. Broadnax grew up.  (*See* RR52: 135.)  If these general markers were sufficient to establish gang membership, any teenager writing gangster rap lyrics or flashing a "gang sign" in a Facebook photograph would be implicated.

This testimony had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623.  In contrast to *Diaz*, the State did not introduce "ample evidence of a history of crime and violence," because there was no such evidence.  *Diaz* v. *Quarterman*, 228 F. App'x 417, 428 (5th Cir. 2007).  The State instead constructed a false impression of dangerousness by claiming that Mr. Broadnax belonged to a violent street gang, and used that impression to displace the reality, attested to by those who knew him before the alleged crime, that Mr. Broadnax was a respectful, artistic young man.  (RR51: 136-37, 164.)

By permitting the introduction of this evidence, the trial court invited jurors to impose the death sentence based on irrelevant and constitutionally protected speech and self-expression in violation of the First and Fourteenth Amendments.  *Dawson*, 503 U.S. at 160.  The jury relied on this evidence, (CR 3: 645-46, 648), and sentenced Mr. Broadnax to death.  The Texas state courts' adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established U.S. Supreme Court precedent.  Accordingly, habeas corpus relief is warranted.

**4.    Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That His Constitutional Rights Were Violated by the Admission of Mr. Nelson's Testimony**

Mr. Broadnax unambiguously objected to the introduction of Mr. Nelson's expert testimony about Mr. Broadnax's alleged gang association on First and Fourteenth Amendment grounds at trial, (RR40: 6), and advanced the claim that the introduction of Mr. Nelson's testimony violated his First and Fourteenth Amendment rights in his application for state habeas corpus relief, (S.H. Appellant's Br. at 66-67).  Accordingly, that claim was properly exhausted.  28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) ("The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court.").

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim.  The state habeas tribunal's findings that Mr. Broadnax's "due process rights were not violated by the State's use of Detective Nelson's testimony," (S.H. Findings ¶ 160), and that "[t]he State did not violate Applicant's First Amendment right to free speech by using his writings or artwork to prove his gang membership," (S.H Findings ¶ 173), are "contrary to, or involve[s] an unreasonable application of, clearly established Federal law," and therefore not entitled to deference.  28 U.S.C. § 2254(d)(1).

**5.    Mr. Broadnax's Trial Counsel Was Ineffective in Failing to Cross-Examine Mr. Nelson or Offer Expert Testimony**

The Sixth Amendment guarantees all criminal defendants the right to the effective assistance of counsel.  *Strickland*, 466 U.S. at 686.  A defendant is deprived of that right when his or her counsel performs "below an objective standard of

121

reasonableness" and, as a result, there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Mr. Nelson testified on August 14th, over two months after trial counsel knew that the State planned to call him, (CR2: 528, State's Potential Witnesses, June 22, 2009), and two weeks after he was qualified as an expert. Knowing that Mr. Nelson would be called to testify that Mr. Broadnax was a gang member, any reasonably effective attorney would have retained an expert to evaluate whether Mr. Broadnax did, in fact, belong to a gang.

At the very least, a reasonably effective attorney would have cross-examined Mr. Nelson. Trial counsel did not question his qualifications or lack of training. They did not question him about his sources or their reliability. They did not question his lack of experience with the gang in question. They did not question his position that every single characteristic he was presented with—including even the ambition to join the military—was an indication of gang membership. Instead, at the conclusion of the State's questioning, when the court asked Mr. Broadnax's trial counsel if he wanted to cross-examine the witness, defense counsel replied, "Uh-uh." (RR49: 133.)

Had Mr. Nelson been cross-examined, the jury would have learned that he did not have first-hand knowledge of the Gangster Disciples, and in fact that his knowledge of the gang was not specialized, but rather derived from an internet search. (Taylor-Austin Aff., at 4-5.) Had Mr. Broadnax's trial counsel called an expert to testify, the jury would have learned that many young people, especially those who grow up in poor and disadvantaged communities, use the language and imagery of gangs as cultural

122

or geographical markers without having any actual affiliation with criminal organizations. (Taylor-Austin Aff., at 4, 6.) They would have learned that Mr. Broadnax has no record of involvement with gangs of any kind. (Taylor-Austin Aff., at 7-8.) They would have learned that many young men who have had Mr. Broadnax's experiences use rap music and gangster imagery to express and empower themselves, to connect with and explore their roots and communities, and to come to terms with trauma. (Taylor-Austin Aff. at 4, 6.) And they would have learned that many of the things that Mr. Broadnax said and did were inconsistent with gang membership, and conveyed a lack of insider knowledge. (Taylor-Austin Aff., at 2, 4 n.1, 5-6.)

Because his trial counsel failed to challenge or counter the testimony the State offered on gang membership, or to call a witness to testify on gangs, Mr. Broadnax was denied the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments.

6.    **Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That His Counsel Were Ineffective in Failing to Rebut Mr. Nelson's Testimony**

Mr. Broadnax unambiguously advanced the claim that his trial counsel was ineffective in failing to rebut Mr. Nelson's inaccurate and highly prejudicial gang expert testimony in his application for state habeas corpus relief. (S.H. Appellant's Br. at 68-73.) Accordingly, that claim was properly exhausted. 28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) ("The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court.").

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim. The state habeas tribunal's finding that Mr. Broadnax's trial counsel "was not

123

constitutionally ineffective" in failing to rebut Mr. Nelson's faulty expert testimony, (S.H

Findings ¶ 191), is "contrary to, or involve[s] an unreasonable application of, clearly

established Federal law," and therefore is entitled to no deference.  28 U.S.C.

§ 2254(d)(1).

IV.     **TEXAS'S CAPITAL SCHEME VIOLATED**
        **MR. BROADNAX'S CONSTITUTIONAL RIGHTS**
        **AND IS UNCONSTITUTIONAL ON ITS FACE**

        A.      **Mr. Broadnax Was Prosecuted on the Basis of His Race, In Violation**
                **of the Equal Protection Clause of the Fourteenth Amendment**

        The Dallas County District Attorney sought the death penalty against

Mr. Broadnax because of his race.  Had Mr. Broadnax been white, the District Attorney

would not have pursued a death sentence.  Because Mr. Broadnax was selectively

prosecuted on the basis of race, his death sentence should be overturned.  *United States* v.

*Armstrong*, 517 U.S. 456, 465 (1996).  Mr. Broadnax is also entitled to discovery of the

District Attorney's records for further evidence that his prosecution was racially

motivated.  (*Id.* at 468.)

        Craig Watkins served as the District Attorney for Dallas County from

January 2007 through January 2015.  Mr. Watkins rose to fame statewide and then

nationally for his work investigating and exonerating defendants who had been convicted

124

by his predecessors.[35]  Using new technological breakthroughs in DNA testing,

Mr. Watkins ordered investigations into over 400 guilty verdicts.[36]

But Mr. Watkins was concerned that he could be tagged with a reputation

for being soft on crime, or, in his words, as "a criminal-loving DA, a hug-a-thug DA."

*Id.*  Accordingly, he aggressively pursued the death penalty.[37]  During his tenure, his

office obtained 12 death sentences, the same number as Harris County, despite the fact

that Harris County has a population of over 4.5 million, compared with less than 2.6

million in Dallas County.[38]

Mr. Watkins also took pride in his office's conviction rate, boasting that

his prosecutors secured convictions in 99.4 percent of cases.[39]  In order to bolster both his

---

[35]  *E.g. 2008 DMN Texan of the Year: Craig Watkins,* Dallas Morning News (Nov. 5, 2010, 5:05 AM), http://www.dallasnews.com/opinion/texan-of-the-year/headlines/20101105-2008-DMN-Texan-of-the-Year-2826.ece; Chris McGreal, *Dallas Chief Prosecutor Craig Watkins Fights Injustice and Racism*, Guardian US Edition (Apr. 20, 2010, 2:54 PM), http://www.theguardian.com/world/2010/apr/20/dallas-prosecutor-craig-watkins-injustice.

[36]  Jennifer S. Forsyth & Leslie Eaton, *The Exonerator: The Dallas D.A. is Reviewing Old Cases, Freeing Prisoner— and Riling his Peers*, Wall St. J. (Nov. 15, 2008, 11:59 PM), http://www.wsj.com/articles/SB122669736692929339

[37]  Zac Crain, *Dallas DA Craig Watkins on Witnessing His First Execution*, D Mag. (Feb. 22, 2012), http://www.dmagazine.com/publications/d-magazine/2012/april/dallas-da-craig-watkins-on-witnessing-his-first-execution?single=1.

[38]  Death Row statistics from *Offenders on Death Row*, Texas Department of Criminal Justice, https://www.tdcj.state.tx.us/death_row/dr_offenders_on_dr.html (last visited May 15, 2016).  Population estimates, as of July 1, 2015, from U.S. Census Bureau, http://www.census.gov/quickfacts/table/PST045215/48113,48201 (last visited May 15, 2016).  *See also* Jennifer Emily, "Dallas County DA Craig Watkins Leads State in Death Penalty Convictions," *Dallas Morning News* (Dec. 29, 2013 11:53 PM), http://www.dallasnews.com/news/local-news/20131229-dallas-county-da-craig-watkins-leads-state-in-death-penalty-convictions.ece.

[39]  Jennifer Emily, *Dallas County DA Touts Conviction Rate That Includes Guilty Pleas*, Dallas Morning News (Aug. 22, 2010, 2:32 AM),

125

success rate and the public perception that he is tough on crime, Mr. Watkins pursued the death penalty almost exclusively against minority offenders: of the twelve men sentenced to die, eight are black, three are Hispanic, and only one is white.

The racial discrepancy in Mr. Watkins's pursuit of the death penalty cannot be explained by the underlying crime rate. Professor Jonathan Sorensen, a criminologist and the author of numerous quantitative studies of the death penalty, has studied homicide and death penalty data in Dallas County from 2007 through 2014, corresponding to Mr. Watkins's tenure as District Attorney. [40] During that time, white offenders made up 17.4% of all homicide arrests but only 8.3% of death sentences, while black offenders made up 53% of arrests but 66.7% of death sentences. (Affidavit of Professor Jonathan Sorensen, dated May 13, 2016, at 2 (Ex. X)). Offenders whose alleged victims were white were also sentenced to die at a much higher rate. While only 23.2% of victims were white, offenders whose victims were white were sentenced to death 41.7% of the time. (*Id*).

The racial discrepancy also cannot be explained by the circumstances and seriousness of the crimes. Professor Sorensen prepared an index of crime seriousness, ranging from zero to three, taking into account whether the crime was committed in the commission of a felony, whether the offender knew the victim , the cause of death, the number of victims, and whether the victim was very young or very old. Controlling for

---

http://www.dallasnews.com/news/community-news/dallas/headlines/20100821-Dallas-County-DA-touts-conviction-rate-9970.ece.

[40] Because these statistics reflect the actions of a single decision-maker, the Court should consider them as an objective indication of racial discrimination by Mr. Watkins. *See United States* v. *Jones,* 287 F.3d 325, 335 (5th Cir. 2002) (stating that the court was unconvinced by a statistical showing of discriminatory prosecution by "a single actor that was responsible and acted with discriminatory intent" because it included data from before the decision-maker took office).

these factual circumstances, minority offenders were more likely than white offenders to receive the death penalty, and the death penalty was more likely to be imposed when the victim was white. (*Id.* at 4-5.) Indeed, the only white offender who was sentenced to death scored 3.0, indicating the highest level of seriousness. For minority offenders with white victims, the average score was 2.0, a full point less on the three point scale.

These stark disparities demonstrate that the District Attorney's Office under Mr. Watkins engaged in "racial discrimination in the administration of capital punishment." *United States* v. *Jones*, 287 F.3d 325, 334 (5th Cir. 2002) (quoting *United States* v. *Webster*, 162 F.3d 308, 334 (5th Cir. 1998). Knowing that it would be easier to secure the death penalty against racial minorities, Mr. Watkins effectively treated a black or Hispanic defendant's race as an aggravating factor when deciding how to charge a defendant and whether to seek the death penalty. His office in effect created two systems of justice, one for black and Hispanic offenders and another for everyone else.

Mr. Broadnax was subjected to this two-tiered system. When Mr. Watkins and his office examined the facts of Mr. Broadnax's alleged crime, they noted that he allegedly killed two men with a handgun in the course of a robbery, and they noted that he was black. On these facts, Mr. Watkins decided to seek the death penalty. If the offender had not been black, but the facts were otherwise the same, Mr. Watkins would not have pursued a death sentence.

Two years after Mr. Broadnax was sentenced to death, just such a case landed on Mr. Watkins's desk. In 2011, a man entered a convenience store and demanded money. He then shot two store clerks and the owner, killing two of the men and badly injuring the other. But, unlike Mr. Broadnax, the man was not black. The

127

murders were charged as a capital crime, but the District Attorney sought life in prison instead of the death penalty.[41]

Mr. Broadnax was charged under the same circumstances—the alleged murder of two men in the course of a robbery, using a handgun—but the District Attorney decided that Mr. Broadnax should die and the other man should live.  The only explanation for this disparity is that "racial considerations played a part in his sentence." *McCleskey*, 481 U.S. at 292-93.

Selective prosecution on the basis of race exceeds the bounds of a prosecutor's discretion and violates the defendant's equal protection rights under the Constitution.  *Armstrong*, 517 U.S. at 464-65.  A defendant is entitled to discovery into a prosecutor's selective prosecution on the basis of race if there is evidence of discriminatory intent and discriminatory effect.  (*Id.*; *McCleskey*, 481 U.S. at 292.)  The *Armstrong* standard is satisfied if a defendant facing the death penalty makes "credible showing" that the prosecutor did not pursue the death penalty against "similarly situated individuals of a different race."  *United States* v. *Bass*, 536 U.S. 862, 863 (2002) (quoting *Armstrong*, 517 U.S. 456 at 470).  Mr. Broadnax has made that showing, and he is entitled to habeas corpus relief.  The State should not be permitted to carry out his racially motivated death sentence, and his request for discovery should be granted.

---

[41]  *2 Dead in South Dallas Convenience Store Shooting*, CBS DFW (May 4, 2011), http://dfw.cbslocal.com/2011/05/04/2-dead-in-south-dallas-convenience-store-shooting/; Scott Goldstein, *Man Held in Double Shootings in East Oak Cliff Had History in the Area*, Dallas Morning News (May 5, 2011, 11:33 PM), http://www.dallasnews.com/news/community-news/dallas/headlines/20110505-man-held-in-double-shootings-in-east-oak-cliff-had-history-in-the-area.ece.

**1.    Section 2254 Poses No Bar to Mr. Broadnax's Claim That His Prosecution Was Racially Motivated and Failure to Exhaust Is Excused by the Futility of Pursuing State Remedies**

Mr. Broadnax has not previously advanced the claim that his prosecution was racially motivated, and therefore violated the Equal Protection Clause of the Fourteenth Amendment. However, section 11.071(5)(a)(1) of the Texas Code of Criminal Procedure permits a "subsequent application for a writ of habeas corpus [ ] filed after filing an initial application" where "the current claims and issues have not been and could not have been presented previously in a timely initial application . . . because the factual or legal basis for the claim was unavailable on the date" the initial application was filed. In this case, the factual predicate on which Mr. Broadnax's claim is based was unavailable until after the "single actor that was responsible" for Mr. Broadnax's prosecution, Craig Watkins, retired as the Dallas County District Attorney at the end of 2014. *See United States* v. *Jones*, 287 F.3d 325, 335 (5th Cir. 2002).

Mr. Broadnax's claim that the racially motivated nature of his prosecution violated the Fourteenth Amendment is properly reviewed by this Court in the first instance because filing a subsequent state habeas petition "would plainly be futile." *See Morris* v. *Dretke*, 379 F.3d 199, 205 (5th Cir. 2004); *see also Duckworth* v. *Serrano*, 454 U.S. 1, 3 (1981) ("An exception [to the exhaustion requirement] is made only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief.").[42] There would be no opportunity for Mr. Broadnax to obtain redress in state court because a recent Texas Court of

---

[42]    Should the Court nonetheless find that this claim is unexhausted, Mr. Broadnax requests that the present proceedings be stayed so that he may file a subsequent petition for state habeas corpus relief on this ground pursuant to Texas Code of Criminal Procedure section 11.071(5)(a)(1).

Criminal Appeals decision bars a subsequent habeas petition as "abuse of the writ" even where the factual predicate for the claim was concededly unavailable when the petitioner filed his previous applications. *See Ex Parte Campbell*, 226 S.W.3d 418, 421-22, 425 (Tex. Ct. Crim. App. 2007).

Moreover, section 2254(e)(2) permits this Court to hold an evidentiary hearing to develop the record on Mr. Broadnax's discriminatory prosecution claim, since the "factual predicate" for that claim "could not have been previously discovered through the exercise of due diligence" and, as discussed *supra*, "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." (*Id.* § 2254(e)(2)(A)(ii), (B).)

> **B.**    **The Jury Instructions Required by the Texas Capital Sentencing Scheme Violated Mr. Broadnax's Constitutional Rights**
>
> **1.**    **The Improper Allocation of the Burden of Proof in the Texas Jury Instructions Violated Mr. Broadnax's Sixth and Fourteenth Amendment Rights**

The "mitigation" special issue in Texas, and the one applied in this case reads:

> Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole, rather than a death sentence, be imposed?

(RR53: 5.)

Consistent with current Texas law, the court's instruction did not require that the jury find an absence of mitigation beyond a reasonable doubt—or, in fact, by any standard at all. Mr. Broadnax objected at trial to the jury charge on the mitigation issue

130

(RR52: 293), but his objection was overruled. (RR52: 295.) Mr. Broadnax also challenged the constitutionality of this special issue in his direct appeal, which was denied. (D.A. Appellant's Br. 114-15, Feb. 8, 2011.)

The mitigation special issue had the effect of increasing Mr. Broadnax's punishment and is the functional equivalent of an element of an offense greater than the one covered by the jury's guilty verdict. Therefore, under well-established U.S. Supreme Court precedent, that special issue must be found unanimously by a jury beyond a reasonable doubt. *Hurst* v. *Florida*, 136 S. Ct. 616, 621 (2016); *Alleyne* v. *United States*, 133 S. Ct. 2151, 2156 (2013); *Apprendi* v. *New Jersey*, 530 U.S. 466, 494 (2000). Because the mitigation special issue fails to require that the State prove lack of sufficient mitigation beyond a reasonable doubt, the Texas death penalty scheme violates the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *See Hurst*, 136 S. Ct. at 621.

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." The U.S. Supreme Court has repeatedly found that this right, in conjunction with the Due Process Clause of the Fourteenth Amendment, requires that each element of a crime be proved to a jury beyond a reasonable doubt. *Hurst*, 136 S. Ct. at 621; *Alleyne*, 133 S. Ct. at 2156. In *Apprendi*, the Court held that any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an "element" that must be submitted to a jury. 530 U.S. at 494.

The Supreme Court requires not only that a fact increasing the defendant's maximum penalty from time in prison to death be submitted to a jury, but also that the

131

jury make that factual finding unanimously, and *beyond a reasonable doubt*. This is so irrespective of whether such a finding is labeled as a "sentencing factor" or an "aggravating factor." *See Ring* v. *Arizona*, 536 U.S. 585, 588-89 (2002); *Apprendi*, 530 U.S. at 492.

As the Supreme Court would later put it, *Apprendi* held that, under the Fourteenth Amendment's Due Process Clause and the guarantees of the Sixth Amendment, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of fact, that fact—no matter how the state labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602 (citing *Apprendi*, 530 U.S. at 482-83). An aggravating factor, like a sentencing factor, "is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense." (*See Id.* at 482-83, 494 n.19.)

*Apprendi's* "element's rule" was extended to capital prosecutions in *Ring* v. *Arizona*. In *Ring*, the Supreme Court held that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." 536 U.S. at 609 (quoting *Apprendi*, 530 U.S. at 494 n.19). Ring's death sentence, based on these aggravating factors, therefore violated his right to have a jury find the facts behind his punishment. *Id.*

In Mr. Broadnax's case, and under the Texas death penalty scheme, the special issues are factors which are aggravating circumstances and "the functional equivalent of an element of a greater offense." An aggravating circumstance is any

finding by a capital sentencer that "circumscribe[s] the class of persons eligible for the death penalty." *Zant* v. *Stephens*, 462 U.S. 862, 878 (1983).  An affirmative finding to the first special issue and a negative response to the second comprise a finding on an aggravating circumstance as defined by the Supreme Court in *Zant*.  Indeed, the Texas Court of Criminal Appeals has held that the special issues comprise aggravating circumstances under the Constitution:  "[T]he function of Article 31.071 [is] to further narrow the class of death-eligible offenders to less than all those who have been found guilty of" capital murder.  *Smith* v. *State*, 779 S.W.2d 417, 420 (Tex. Crim. App.1988) (en banc).

In Texas, the jury's guilty verdict will result in a life sentence unless and until the jury answers the first two special issues affirmatively.  The additional requirement of proving the first two special issues converts a life sentence to a death sentence.  Thus, the special issues are factors setting the outer limits of a sentence, and serve as the functional equivalent of an element of a greater offense, which must be proven to a jury beyond a reasonable doubt.  *See Ring*, 536 U.S. at 602 (citing *Apprendi*, 530 U.S. at 482-83); *Smith* v. *State*, 779 S.W.2d 417, 420 (Tex. Crim. App. 1988).

Although the Fifth Circuit previously rejected this argument, *see Scheanette* v. *Quarterman*, 482 F.3d 815, 828-29 (5th Cir. 2007), the basis of that decision has been undermined by intervening Supreme Court authority.  In *Scheanette*, the Fifth Circuit upheld a state court decision rejecting a habeas petitioner's challenge to the constitutionality of the burden of proof—or lack thereof—in the Texas mitigation special issue.  (*Id.* at 828.)  But the state court ruling relied on the Texas Court of Criminal Appeals' mistaken belief that "*Apprendi* did not address who bears the burden

133

of proof but focused on who should be the fact-finder for sentence enhancement." *Allen*

v. *Texas*, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003) (en banc).[43]  The Supreme Court

has since rejected the Texas Court of Criminal Appeals' reading of *Apprendi* and

clarified the required burden of proof:  "[E]ach element of a crime [must] be proved to

the jury *beyond a reasonable doubt*."  *See Alleyne*, 133 S. Ct. at 2156 (emphasis added);

*see also Hurst*, 136 S. Ct. at 621.

Because the mitigation special issue fails to require that the State prove

lack of sufficient mitigation—an element of a death sentence—beyond a reasonable

doubt, the Texas death penalty scheme violates the Sixth Amendment and the Due

Process Clause of the Fourteenth Amendment.

**2.      The Failure to Define the Vague Terms in its**
**          "Special Issues" Instruction to the Jury**
**          Violated Mr. Broadnax's Constitutional Rights[44]**

In the punishment phase, the jury was instructed pursuant to Article

37.071 of the Texas Code of Criminal Procedure as follows:

Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a
probability that the defendant would commit criminal acts of violence that
would constitute a continuing threat to society?

Special Issue No. 2

---

[43]   *Allen* was cited as the basis for denial of relief in *Hankins* v. *State*, 132 S.W.3d 380,
386 (Tex. Crim. App. 2004), which in turn served as the sole justification for denial
of relief on *Apprendi* grounds in *Scheanette* v. *State*, 144 S.W.3d 503, 505 (Tex.
Crim. App. 2004) (en banc).

[44]   Mr. Broadnax acknowledges that this claim (that the terms used in the special
instructions given to Texas juries in death penalty cases are unconstitutionally vague)
has been rejected by the Fifth Circuit.  *James* v. *Collins*, 987 F.2d 1116, 1120 (5th
Cir. 1993).  He wishes to preserve this error for further review in the event relief is
not otherwise granted herein.

134

> Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole, rather than a death sentence, be imposed?

(RR53: 5.)

These Texas special issues are unconstitutionally vague and fail to meaningfully narrow the class of death-eligible defendants. They violate the "hallmark of our legal system that juries be carefully and adequately guided in their deliberations." *Gregg* v. *Georgia*, 428 U.S. 153, 193 (1976). In capital cases, full and correct jury instructions are essential to avoid the risk that the jury's decision-making processes are influenced by arbitrary and capricious considerations that run afoul of the Eighth and Fourteenth Amendments to the U.S. Constitution. *Gregg*, 428 U.S. at 192-95.

A sentence of death may not be imposed using a vague aggravating factor unless the state court cures such vagueness by applying a valid limiting construction, thereby providing the sentencer specific and detailed guidance concerning its scope. *Maynard* v. *Cartwright*, 486 U.S. 356, 363-65 (1988). In Mr. Broadnax's case, the jury received no instructions concerning the meaning of the crucial terms in the special issues, specifically, the terms "probability," "criminal acts of violence," or "continuing threat to society." This failure to define these operative words and phrases violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of the death penalty. *See Godfrey* v. *Georgia*, 446 U.S. 420 (1980).

The various words and phrases in the special issues, viewed individually or as a whole, did not provide the jury any uniform guidance in how to apply terms

135

crucial to the decision to impose the ultimate sentence.  In the first special issue, the word

"probability" has no common or uniform meaning.  Jurors in the instant case were left to

apply any possible interpretations of the word.  One can imagine a juror's interpretation

ranging from "any chance at all" to "substantial likelihood," to a "fifty-percent chance."

The jurors were also denied any definition for the phrases "criminal acts of

violence" or "continuing threat to society."  In *Jurek* v. *Texas*, 428 U.S. 262, 272 (1976),

a plurality of the Supreme Court noted that "[t]he Texas Court of Criminal Appeals has

yet to define precisely the meanings of such terms as 'criminal acts of violence' or 'a

continuing threat to society.'"  Such failure has rendered the special issues

unconstitutional.

Because the Texas special issues contain terms that are unconstitutionally

vague, the special issues are unconstitutional as applied to Mr. Broadnax.  *See Maynard*,

486 U.S. at 363-65 (1988).  His death sentence must therefore be vacated.

> **3.      The Requirement of Ten "No" Votes on the**
> **Special Issue Violated Mr. Broadnax's Rights**
> **to Due Process and Right to a Trial by Jury**

In Texas, all twelve jurors must answer the first special issue (future

dangerousness) affirmatively before the trial court may impose the death penalty.  A life

sentence, on the other hand, requires that at least ten jurors answer the special issue

negatively.  Tex. Code Crim. Proc. Ann. art. 37.071 § 2(d)(2).  Unanimity must also exist

for the jury to enter a negative finding on the mitigation issue, while ten of twelve jurors

must vote to grant leniency.  (*Id.* § 2(f)(2).)  The trial court instructed the jury

accordingly.  (RR53: 6.)

The failure of a capital jury to garner the requisite number of votes either

way results in a life sentence.  Tex. Code Crim. Proc. Ann. art. 37.071 § 2(g).  The trial

court, counsel, and the parties may not disclose to the jury that their failure to unanimously agree on an answer to either special issue results in a life sentence. (*Id.* § 2(a)(1).)

Article 37.071 of the Texas code of Criminal Procedure thus creates the potential for considerable confusion among reasonable jurors. The rule misleads jurors otherwise pre-disposed to hold out for a life sentence and encourages them to conform to a "go along with the majority" mentality. A juror may reasonably believe that his vote in favor of a life sentence is worthless unless nine others join him. If a majority of other jurors are firmly voting "yes," holdouts may feel an obligation to join them since there would appear to be no possibility of a life sentence, and the jury has been instructed to return a verdict. Juries "do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation unless they are expressly instructed to do so." *Mills* v. *Maryland*, 486 U.S. 367, 383 (1988) (citation omitted).

The 12/10 Rule violates the Eighth Amendment because it is unconstitutional to instruct capital sentencing jurors in a manner leading reasonable jurors to believe that their individual vote for a life sentence is worthless unless some threshold number of jurors agree that particular mitigating factors exist. *Id* at 384.

Under the Texas scheme, a reasonable juror, instructed pursuant to Article 37.071, is led to believe that his or her vote in favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined him or her. In a case involving a similar sentencing scheme, the Seventh Circuit found a *Mills* violation:

> [The defendant's] jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty

137

should not be imposed, [the defendant] would not be sentenced to death ... [T]here is a substantial possibility that one or more of [the] jurors might have been precluded from granting mercy to [the defendant] because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Kubat* v. *Thieret*, 867 F.2d 351, 373 (7th Cir. 1989), *cert. denied*, 493 U.S. 874 (1989).

In Mr. Broadnax's case, as in *Kubat*, reasonable jurors could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life. Texas jurors are erroneously led to believe that, even if they want to vote for life, a mistrial, or possibly a death sentence will result unless nine other jurors join them in their vote. This feature of Article 37.071 creates the potential for considerable confusion among reasonable jurors. Because "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevented the consideration of constitutionally relevant evidence," Mr. Broadnax was sentenced to death in an unconstitutional manner. *Boyde* v. *California*, 494 U.S. 370, 380 (1990).

> **4.    The Trial Court Deprived Mr. Broadnax of Appropriate Jury Instructions by Failing to Instruct the Jury That They Must Consider Mitigation Evidence Individually**

The U.S. Supreme Court has long held that a capital jury must be permitted to consider any and all mitigating circumstances that might counsel against imposition of a death sentence. *See Lockett* v. *Ohio*, 438 U.S. 586, 604 (1978); *Mills v. Maryland*, 486 U.S. 367, 374-75 (1988); *Eddings* v. *Oklahoma*, 455 U.S. 104, 110 (1982). Accordingly, the sentencing jury or trial court may not be "precluded from considering any relevant mitigating evidence." *Mills*, 486 U.S. at 374-75; *see also Eddings*, 455 U.S. at 114. Moreover, the Eighth and Fourteenth Amendments require "*individualized* consideration of mitigating factors," meaning that each juror must be free

138

to independently consider any mitigation evidence, irrespective of whether and how other jurors consider that evidence. *Lockett*, 438 U.S. at 606 (emphasis added); *see Mills*, 486 U.S at 382. Such individualized consideration is necessary in capital cases because "the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett*, 438 U.S. at 604 (quoting *Woodson* v. *North Carolina*, 428 U.S. 280, 303 (1976) (plurality opinion)).

In evaluating jury instructions, where an instruction might give rise to either a constitutional or an unconstitutional interpretation, the reviewing court must determine whether there is a reasonable likelihood that the jury interpreted the instruction in the unconstitutional manner. *Boyde* v. *California*, 494 U.S. 370, 380 (1990); *see also Calderon* v. *Coleman*, 525 U.S. 141, 146 (1998) (holding that where instruction might give rise to a constitutional or unconstitutional interpretation, court must determine whether the jury might have interpreted the instruction "to prevent consideration of constitutionally relevant evidence"). Where the reviewing court finds a reasonable likelihood that the jury interpreted the instruction in the unconstitutional manner, that court must determine whether the erroneous instruction was harmless. *O'Neal* v. *McAninch*, 513 U.S. 432, 438-9 (1995); *Brecht* v. *Abramson*, 507 U.S. 619, 638 (1993); *Rose* v. *Clark*, 478 U.S. 570, 576 (1986); *Kotteakos* v. *United States*, 328 U.S. 750, 776 (1946).

An erroneous instruction is not harmless where it exerted a "substantial and injurious effect or influence in determining the jury's verdict," irrespective of

whether the jury's verdict would have been different but for the erroneous instruction. *Brecht*, 507 U.S. at 623 (quoting *Kotteakos*, 328 U.S. at 776); *see also O'Neal*, 513 U.S. at 436-37 (recognizing error might not have been harmless even where there was sufficient other evidence to support the jury's verdict). Indeed, an erroneous instruction is not harmless where "the record is so evenly balanced" that the reviewing court cannot determine whether the error exerted substantial and injurious effect or influence. *O'Neal*, 513 U.S. at 436-37; *see also Owens* v. *McLaughlin*, 733 F.3d 320, 328 (11th Cir. 2013).

During the penalty phase of Mr. Broadnax's trial, the trial court failed to clearly instruct the jury that each juror should individually consider the mitigation evidence presented, despite the constitutional obligation for such individualized consideration. (*See* RR53: 4-10.) Such an instruction was essential because the process for determining the presence or absence of mitigating factors (i.e., individualized consideration) differed meaningfully from the process the jury had been directed to implement previously (i.e., deliberation to reach unanimous verdict). (RR47: 186, 198.) In fact, every instruction that the trial court made during the penalty phase regarding the process for considering evidence could have been reasonably interpreted to imply that jurors had to deliberate and vote on the presence or absence of mitigating factors. (*See* RR53: 4-10.) Such a requirement is inconsistent with each juror's obligation to individually consider any mitigating circumstances.

The trial court's instructions thus reasonably could have led the jury to believe they were obligated to deliberate and agree as to the presence or absence of any mitigation factor—either by unanimous agreement (as was necessary during the guilt phase deliberations) or by agreement among at least ten jurors—to consider that factor.

140

Either interpretation would have resulted in each juror considering only part of the mitigation evidence (i.e., those circumstances agreed upon by some number of jurors) that the juror was entitled to consider; this is an unconstitutional limitation on the jury's consideration of mitigating evidence. *See Mills*, 486 U.S. at 374-75; *see also Lockett*, 438 U.S. at 604.

Given the trial court's failure to clearly instruct the jury on its duty to independently consider the mitigation evidence and the court's multiple instructions that reasonably could have been interpreted to unconstitutionally require agreement among the jurors, it is difficult to fathom how the jurors would *not* have interpreted the trial court's instructions in an unconstitutional manner. Thus, there is a reasonable probability that the jury unconstitutionally interpreted the trial court's instructions. *See Calderon*, 525 U.S. at 146.

Moreover, there is a reasonable probability that the unconstitutional interpretation exerted a "substantial and injurious effect or influence in determining the jury's verdict," and therefore the trial court's error was not harmless. *O'Neal*, 513 U.S. at 436, 438-39; *Kotteakos*, 328 U.S. at 776. Had the jurors who voted in favor of a death sentence understood they should individually consider the mitigation evidence, each might have considered more of the mitigation evidence presented—rather than considering only the mitigating circumstances agreed upon unanimously or by at least ten jurors—and voted in favor of life imprisonment, rather than death.

**5.   Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claims About the Jury Instructions in the Texas Capital Sentencing Scheme**

Both at trial and on direct appeal before the Texas Court of Criminal Appeals, Mr. Broadnax unambiguously objected to the constitutionality of the jury

141

instructions' improper allocation of the burden of proof, (CR Supp. 1: 32-33; D.A. Appellant's Br. at 112-14); the vagueness of the "special issues" instructions (CR Supp. 1: 38-39; D.A. Appellant's Br. at 117); the requirement for ten "no" votes to answer the future dangerousness special issue in the negative (CR Supp. 1: 36-37; D.A. Appellant's Br. at 115-17); and the trial court's failure to instruct the jury to consider mitigation evidence individually (CR Supp. 1: 35; D.A. Appellant's Br. at 111-12).  Accordingly, those claims were properly exhausted.  28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) ("The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court.").

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claims because the Texas Court of Criminal Appeals' decision overruling Mr. Broadnax's claims, *Broadnax* v. *Texas*, No. AP-76207, 2011 WL 6225399, at *20 (Tex. Crim. App. Dec. 14, 2011), is "contrary to, or involve[s] an unreasonable application of, clearly established Federal law," and therefore it is not entitled to deference.  28 U.S.C. § 2254(d)(1).

### C.    The Death Penalty Is Unconstitutional

The death penalty is unconstitutional because it constitutes cruel and unusual punishment and is applied in an arbitrary, capricious, and unreliable manner.

#### 1.    The Death Penalty Is Unconstitutional Because It Constitutes Cruel and Unusual Punishment

The death penalty violates the Eighth and Fourteenth Amendments.  *See Godfrey* v. *Georgia*, 446 U.S. 420, 433 (1980) (Marshall, J., concurring) ("[T]he death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and

142

Fourteenth Amendments."); *Gregg* v. *Georgia*, 428 U.S. 227, 229 (1976) (Brennan, J., dissenting) ("[O]ur civilization and the law ha[ve] progressed to th[e] point" where "the punishment of death, for whatever crime and under all circumstances, is cruel and unusual in violation of the Eighth and Fourteenth Amendments of the Constitution.").  As the U.S. Supreme Court has explained, under Eighth Amendment jurisprudence, "cruel and unusual punishment" draws its meaning from the "evolving standards of decency that mark the progress of a maturing society."  *Trop* v. *Dulles*, 356 U.S. 86, 101 (1958).  Societal standards of decency have evolved significantly since the Supreme Court reinstated the death penalty in 1976 in *Gregg* v. *Georgia*, and now compel a finding that the death penalty is inherently unconstitutional.

In holding that the execution of certain categories of offenders violated evolving standards of decency, and thus constituted cruel and unusual punishment, the Supreme Court considered trends in state legislation, sentencing rates, and execution rates.  *See Kennedy* v. *Louisiana*, 554 U.S. 407, 421 (2008) (evolving standards of decency prohibit executing child rapists); *Roper* v. *Simmons*, 543 U.S. 551, 564-67, 578 (2005) (evolving standards of decency prohibit executing juveniles); *Atkins* v. *Virginia*, 536 U.S. 304, 313-16 (2002) (evolving standards of decency prohibit executing mentally retarded).  These same factors now indicate that the Supreme Court would hold that evolving standards of decency prohibit all executions.

Trends in state legislation and policy have shifted toward abolition of the death penalty.  Since the Supreme Court reinstated the death penalty in 1976, nine states

143

and the District of Columbia have abolished the death penalty.[45]  Nineteen jurisdictions now prohibit the death penalty.  *Id.*  Eight of the nine states that have abolished the death penalty since 1976 have done so in the past ten years.  *See id.*

In addition, twelve states currently have a moratorium, or a de facto moratorium on the death penalty.[46]  For example, Governor Jay Inslee of Washington declared a moratorium on all executions because he was "not convinced that equal justice is being served," and called for a debate on the death penalty.[47]  More recently, Governor Tom Wolf of Pennsylvania did the same, recognizing that the state's capital sentencing "system is riddled with flaws, making it error prone, expensive, and anything but infallible."[48]

Furthermore, an additional eight states and the federal government have placed a temporary hold on executions pending a review of the lethal injection statutes or protocols.  *See Death Penalty in Flux, supra*.  Thus, there are now 39 jurisdictions that do not currently administer the death penalty.

The number of death sentences imposed each year has also dramatically decreased on a national basis, from 315 death sentences in 1994 to seventy-three death

---

[45]  *See States With and Without the Death Penalty*, Death Penalty Information Center, http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited May 15, 2016).

[46]  *See Death Penalty in Flux*, Death Penalty Information Center, http://www.deathpenaltyinfo.org/death-penalty-flux (last visited May 15, 2016).

[47]  *See* Maria L. La Ganga, *Washington State Governor Declares Moratorium on Death Penalty, Los Angeles Times* (Feb. 11, 2014) http://articles.latimes.com/2014/feb/11/nation/la-na-death-penalty-20140212.

[48]  *See* Governor Tom Wolf, Memorandum (Feb. 13, 2015), *available at* http://www.pennlive.com/politics/index.ssf/2015/02/gov_tom_wolf_declares_morator i.html.

sentences in 2014.[49]  Similarly, the number of executions each year has decreased

dramatically over the past fifteen years, from ninety-eight executions in 1999 to twenty-

eight executions in 2015.[50]  Over half of the forty-nine death sentences imposed by the

states in 2015 were imposed in only three states (Alabama, Florida, and California),

reflecting the increasing isolation and infrequency of the death penalty.[51]  The clear shift

in each of these trends away from the use of the death penalty demonstrates that

"standards of decency" have evolved to prohibit this punishment as cruel and unusual in

violation of the Eighth and Fourteenth Amendments.

But the death penalty is not merely unusual.  It is a cruel punishment,

marked by a lack of reliability, arbitrary application, and excessive delays.  *See Glossip* v.

*Gross*, 135 S. Ct. 2726, 2757, 2759, 2764 (2015) (Breyer, J., dissenting).  This Court

should hold that the Eighth and Fourteenth Amendments prohibit Mr. Broadnax's

execution.

### 2.   The Death Penalty Is Unconstitutional Because of Its Unreliable Application

The U.S. Supreme Court has held that the Eighth and Fourteenth

Amendments prohibit the infliction of the death penalty in an unreliable, arbitrary

manner.  *See Gregg* v. *Georgia*, 428 U.S. 153, 188 (1976) (plurality opinion) ("[T]he

Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death

---

[49]   *See National Death Sentences by Year: 1976-2014*, Death Penalty Information Center, http://www.deathpenaltyinfo.org/death-sentences-year-1977-2009 (last visited May 15, 2016).

[50]   *See Executions by Year,* Death Penalty Information Center, http://www.deathpenaltyinfo.org/executions-year (last visited May 15, 2016).

[51]   *See Death Sentences in the United States from 1977 by State and by Year*, Death Penalty Information Center, http://www.deathpenaltyinfo.org/death-sentences-united-states-1977-2008 (last visited May 15, 2016).

under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.") (quoting *Furman*, 408 U.S. at 309-310 (Stewart, J., concurring)).  "Because the death penalty is unique 'in both its severity and its finality,'" there exists "an acute need for reliability in capital sentencing proceedings."  *Monge* v. *California*, 524 U.S. 721, 732 (1998) (quoting *Gardner* v. *Florida*, 430 U.S. 349, 357 (1977)).

Despite the recognized need for procedural safeguards in capital cases, evidence indicates that "innocent people—mostly of color—are convicted of capital crimes they never committed, their convictions affirmed, and their collateral remedies denied, with a frequency far greater than previously supposed."  *United States* v. *Quinones*, 196 F. Supp. 2d 416, 417 (S.D.N.Y. 2002), *rev'd*, 313 F.3d 49 (2d Cir. 2002).  Indeed, as of more than twelve years ago, "DNA testing ha[d] established the factual innocence of no fewer than 12 inmates on death row, some of whom came within days of being executed and all of whom have now been released."  *Id.*  Moreover, "at least 20 additional defendants who had been duly convicted of capital crimes and were facing execution [were] exonerated and released" as of more than fourteen years ago, based upon post-conviction reinvestigation not based upon DNA evidence.  *Id.* at 418 (using an avowedly conservative measure of the number of innocent people exonerated after having been sentenced to death); *see also United States* v. *Quinones*, 205 F. Supp. 2d 256, 264 (S.D.N.Y. 2002), *rev'd*, 313 F.3d 49 (2d Cir.).

According to a 2000 empirical study, "the overall rate of prejudicial error in the American capital punishment system is a remarkable 68%."  (*Id.* (citing James S. Liebman et al., *A Broken System: Error Rates in Capital Cases, 1973-1995*, at ii (June 12, 2000)) (internal quotation marks omitted).)  This extraordinarily high error rate in the

application of the death penalty violates due process and the prohibition on cruel and unusual punishment.

Justice Breyer recently observed that "in this Nation, we can have a death penalty that at least arguably serves legitimate penological purposes *or* we can have a procedural system that at least arguably seeks reliability and fairness in the death penalty's application.  We cannot have both."  *Glossip*, 135 S. Ct. at 2772.  The very fact that the death penalty's application cannot be reconciled with the reliability and fairness that our Constitution demands "strongly supports the claim that the death penalty violates the Eighth Amendment."  *Id.*

Given its proven unreliability, the death penalty, and Texas's capital scheme in particular, is unconstitutional, and Mr. Broadnax's death sentence pursuant to this scheme violates his Sixth, Eighth, and Fourteenth Amendment rights.

> **3.     Section 2254 Poses No Bar to Mr. Broadnax's Properly Exhausted Claim That the Death Penalty Is Unconstitutional**

Mr. Broadnax unambiguously objected to the constitutionality of the death penalty both at trial, (CR Supp. 1: 17-41), and on direct appeal before the Texas Court of Criminal Appeals, (D.A. Appellant's Br. at 123-24).  Accordingly, that claim was properly exhausted.  28 U.S.C. § 2254(b)(1)(A); *see Morris* v. *Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) ("The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court.").

Section 2254(d) does not foreclose this Court's review of Mr. Broadnax's claim because the Texas Court of Criminal Appeals' decision overruling Mr. Broadnax's claims, *Broadnax* v. *Texas*, No. AP-76207, 2011 WL 6225399, at *20 (Tex. Crim. App. Dec. 14, 2011), is "contrary to, or involve[s] an unreasonable application of, clearly

established Federal law," and therefore it is not entitled to deference.  28 U.S.C. § 2254(d)(1).

## **PRAYER FOR RELIEF**

For all of the above-stated reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Mr. Broadnax respectfully requests that this Honorable Court grant him the following relief:

(a)     Issue a writ of habeas corpus granting Mr. Broadnax relief from his convictions and sentences obtained in violation of the U.S. Constitution and federal law;

(b)     Afford Mr. Broadnax an opportunity to reply to any responsive pleading filed by Respondent;

(c)     Grant Mr. Broadnax discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and a sufficient period of time to conduct discovery, and grant Mr. Broadnax authority to obtain subpoenas to further discovery and prove the facts set forth in this petition, particularly in light of the District Attorney's failure to make available for review the District Attorney's Office file;

(d)     Grant Mr. Broadnax an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition, particularly in light of the District Attorney's failure to make available for review the District Attorney's Office file;

(e)     Permit Mr. Broadnax, after additional factual development, an opportunity to brief and argue the issues presented in this petition;

148

      (f)       Grant Mr. Broadnax leave to amend this petition (as to

which Mr. Broadnax reserves all his rights), particularly in light of the District

Attorney's failure to make available for review the District Attorney's Office file,

as permitted by the Federal Rules of Civil Procedure, the United States

Constitution, and as justice may require;

      (g)       Grant such further and other relief as may be appropriate,

and dispose of the matter as law and justice require.

Dated:     May 18, 2016
           New York, New York

                       Respectfully submitted,

                 By:   */s/  Steven C. Herzog*
                     Steven C. Herzog (admitted *pro hac vice*)
                       N.Y. Bar No. 2173623
                       sherzog@paulweiss.com
                     Livia Fine
                     Adam Ross Mandelsberg
                     Jordana L. Haviv
                     PAUL, WEISS, RIFKIND,
                       WHARTON & GARRISON LLP
                     1285 Avenue of the Americas
                     New York, NY 10019
                     (212) 373-3000

                     Camille M. Knight
                       T.X. Bar No. 24027125
                       cknight@bp-g.com
                     BURLESON, PATE & GIBSON, LLP
                     900 Jackson Street, Suite 330
                     Dallas, TX 75202
                     (214) 871-4900

                     *Counsel for Petitioner James Garfield Broadnax*

149

## CERTIFICATE OF SERVICE

I hereby certify that, on May 18, 2016, the foregoing document was transmitted electronically via CM/ECF to the Clerk of the Court for filing and transmittal of Notice of Electronic Filing to all attorneys of record who are ECF registrants.


Dated:  May 18, 2016                    */s/ Steven C. Herzog*
                                         Steven C. Herzog