AP76207

***** DEATH PENALTY *****
Supplemental
Volume Two

# C L E R K ' S    R E C O R D

Volume of __2__ Of __2__
Trial Court Cause Number __F08-24667-Y__
In the __CRIMINAL__ District Court __NO. 7__
of Dallas County, Texas,

Honorable __MIKE SNIPES__, Judge Presiding.

=============================================

__THE STATE OF TEXAS__, Plaintiff

vs.

__JAMES GARFIELD BROADNAX__, Defendant

=============================================

Appealed to the Court of
Criminal Appeals of Texas at Austin, Texas

**FILED IN
COURT OF CRIMINAL APPEALS**

=============================================

**JAN 06 2010**

Name __John Tatum__
Address __990 S. Sherman, Richardson, TX   75081__
Telephone No. __972.705.9200__
Fax No. __972.690.9901__
SBOT No. __19672500__
Attorney for: __James Garfield Broadnax__

**Louise Pearson, Clerk**

=============================================

Delivered to the Court of Criminal Appeals of Texas at Austin, Texas
_____ day of _____, _____

**RECEIVED IN
COURT OF CRIMINAL APPEALS**

Signature of Clerk _____
Name of Clerk _____
Title _____

**JAN 04 2010**

**Louise Pearson, Clerk**

=============================================

Appellate Court Cause No.
Filed in the Court of Criminal Appeals of Texas at Austin, Texas
this __21st__ day of __December__, __2009__.

GARY FITZSIMMONS, DALLAS COUNTY DISTRICT CLERK

By __Ana McDaniel__, Deputy

SCANNED

_____
DATE

JAMES GARFIELD BROADNAX                                      PAGE    4

F08-24667-Y

===================================================================

## SUPPLEMENTAL

## INDEX

Supplemental Motion to Quash Subpoena and Motion for        Vol. 2-308
Reconsideration of Non-Party Shaun Rabb Hearing Notebook
- Laura Lee Prather      (01 Jun 09)

Supplemental Motion to Quash Subpoena and                   Vol. 2-309
Motion for Reconsideration of Non-Party Shaun Rabb

1)  Motion to Quash Subpoena on Non-Party Shaun             Vol. 2-326
Rabb      Exhibit 1 &  Exhibits A,B,C,D,E,F,G,H, & I

2)  Order    (28 May 09)        Exhibit 2                   Vol. 2-372

3)  Non-Party Ellen Goldberg's Motion to Quash              Vol. 2-374
Trial Subpoena      Exhibit 3   &   Exhibit B

4)  TEXAS v LYON      Exhibit 4                             Vol. 2-394

5) Memo - Shaun Rabb Subpoena       Exhibit 5               Vol. 2-398

Table of Contents                                           Vol. 2-399

1)   William Wade Allen                                     Vol. 2-402

2)   Blank Page                                             Vol. 2-412

3)   Paul M. Branzburg                                      Vol. 2-414

4)   James Campbell and Felix Sanchez                       Vol. 2-465

5)   Channel Two Television Company                         Vol. 2-478

6)   Lawron Eugene COLEMAN v The STATE of Texas             Vol. 2-484

7)   Aaron Cooper v the STATE of Texas                      Vol. 2-492

JAMES GARFIELD BROADNAX                                    PAGE   5

F08-24667-Y

=====================================================

Supplemental Motion to Quash Subpoena    (Continued)

8)   The Dallas Morning News                        Vol. 2-501

9)   Willie Bob Goodlow                             Vol. 2-518

10) Randy Eli Grothe                                Vol. 2-524

11) Eddie James Johnson                             Vol. 2-531

12) Larry Gohring                                   Vol. 2-546

13) Willie Bob Goodlow                              Vol. 2-558

14) Troy Lee Grimes                                 Vol. 2-564

15) James H. Holt                                   Vol. 2-576

16) Bruce Selcraig                                  Vol. 2-579

17) Merchants Fast Motor Lines                      Vol. 2-594

18) James Musgrove                                  Vol. 2-608

19) O'Neill v Oakgrove Constr.                      Vol. 2-615

20) Robert Earl Overton                             Vol. 2-625

21) Charles Ramsey and Kenneth Woods                Vol. 2-633

22) Francisco Rodriguez                             Vol. 2-640

23) Craig Hill Johnson                              Vol. 2-645

24) John F. Healey                                  Vol. 2-650

25) TEXAS v LYON                                    Vol. 2-661

26) Thompson v State of Utah                        Vol. 2-665

Clerk's Certification that Appellate Record is True and    Vol. 2-672
Correct

Cause No. F08-24667-Y

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JAMES BROADNAX | § | CRIMINAL COURT # 7 |

## June 1, 2009

# SUPPLEMENTAL MOTION TO QUASH SUBPOENA AND MOTION FOR RECONSIDERATION OF NON-PARTY SHAUN RABB HEARING NOTEBOOK

# Laura Lee Prather

00308

Cause No. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JAMES BROADNAX | § | CRIMINAL COURT # 7 |

## SUPPLEMENTAL MOTION TO QUASH SUBPOENA AND MOTION FOR RECONSIDERATION OF NON-PARTY SHAUN RABB

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Shaun Rabb ("Rabb") non-party in the foregoing matter and files this Supplemental Motion to Quash Subpoena and Motion for Reconsideration and would respectfully show the Court the following:

## I.
## INTRODUCTION

On May 27, 2009, Rabb filed a Motion to Quash, including a request for a hearing, in the foregoing case relying upon the newly enacted reporter's privilege. *See* Exhibit 1. On May 28, 2009, this Court entered an Order Denying the Motion to Quash without a hearing. *See* Exhibit 2. The Court ruled that the newly enacted reporter's privilege did not apply because by its terms, "this Act applies only to information, documents, or items or the source of any information, document or item obtained or prepared for publication in a news medium or communication service provider on or after the effective date of this Act." The Court held that the Act does not apply retroactively. Rabb respectfully disagrees with this holding and files this Motion in support of same. On May 29, 2009, non-party Ellen Goldberg (an NBC reporter) filed a Motion to Quash based on defective service of subpoena, the best evidence rule, and the statutory reporter's privilege. *See* Exhibit 3. Rabb supports Goldberg's Motion and files this Motion expanding on Section 3 of the statutory reporter's privilege and its applicability and asserting common law bases for granting the motion to quash.

00309

## II.

## PROCEDURAL BACKGROUND AND SUMMARY OF ARGUMENT

On or about June 23, 2008 Rabb, a reporter for KDFW Fox 4 ("KDFW"), conducted an interview of defendant James Broadnax ("Broadnax"). The entire interview was taped and has been posted, in its entirety, on the KDFW website since shortly after the interview was conducted.[1] Rabb was not the first reporter to interview Broadnax. Before Broadnax spoke to Rabb, he gave interviews to several other local television stations. Shortly thereafter, the Dallas County District Attorney's Office (the "DA's Office"), subpoenaed the video outtakes of these interviews from the television stations, including KDFW. Like other stations, KDFW complied with the subpoena, producing all tapes of its interview with Broadnax. *See* Exhibit 1(B). To alleviate any need for further production or testimony, KDFW also gave the DA's Office an affidavit from the station's custodian of records, which establishes the tapes authenticity as a business record. *See* Exhibit 1(C).

On May 20, 2009, the DA's Office attempted to issue a second subpoena – this time for Rabb to testify as a State's witness in the case against Broadnax. It is not a duces tecum subpoena; therefore, Section 3 of the newly enacted reporter's privilege does not apply to the subpoena at issue. This subpoena is for the reporter – not for the "information, documents or items" gathered by the reporter. *See* Tex. H.B. 670, 81st Leg., R.S. (2009); Act of May 13, 2009, 81st Leg., R.S., H.B. 670 (to be codified at Tex. Code of Crim. Proc. arts. 38.11 and 38.111)(the "Act"). *See* Exhibit 1(D). By the plain meaning of the statute, Section 3 of the newly enacted legislation speaks solely to the items gathered prior to the enactment of the legislation. Section 3 of the Act does not vitiate the testimonial privilege of the reporter, only the product of his or her

---

[1] The entire interview can be found on the KDFW website located at the following link: http://www.myfoxdfw.com/dpp/news/GRAPHIC_VIDEO_F_Victims_Families

00310

reporting which was gathered prior to the enactment of the bill. The rest of the legislation is effective immediately as provided by Section 4 of the Act. *See also,* Exhibit 1(E). Furthermore, the procedural requirements of the Act, including that the subpoena be signed by the elected District Attorney are in immediate effect and have not been complied with herein.

Finally, there are multiple common law bases for granting Rabb's Supplemental Motion to Quash including the fact that the reporter's testimony is not the best evidence of the statements made by Rabb, and the best evidence has already been produced to the State in the form of the authenticated interview in its entirety. The reporter's fuzzy recollection of an interview that took place almost a year ago is not relevant nor is it material to the State's case and it is merely cumulative and duplicative of information that the State has from the three other reporters subpoenaed as well as all of the interviews produced by each of them. The speculative nature of any testimony Rabb could provide would be highly prejudicial, misleading and confusing and not admissible under Rule 403; and, more importantly, any opinions that he formed and espoused would be subject to objection for invading the province of the jury and irrelevant and inadmissible as an opinion by a non-expert. Finally, the subpoena at issue does not comply with Texas Code of Criminal Procedure 24.03, and there is no reason – other than harassment – to require one to be present on June 1, 2009 when the pretrial hearing is set for seven weeks later.

### III.
### ARGUMENTS AND AUTHORITIES

Rabb did not witness the crime and has no personal knowledge pursuant to Rule 602 regarding any potential criminal conduct nor does he have discoverable knowledge regarding the underlying issues. Rabb conducted a jailhouse interview after-the-fact, much like the three other reporters who have been subpoenaed to appear before the Court. His was not the first of the interviews, and the entirety of what was said to him has been produced to the DA's Office.

00311

**A.    The Testimony Sought is Not the Best Evidence as Required by Texas Rule of Evidence 1002.**

Assuming it is the criminal defendant's statements to Rabb that are of interest to the prosecution, a copy of the entire jailhouse interview was provided to the DA's Office with an authenticating affidavit almost a year ago, and the entire interview has been posted on the KDFW website for all the world to see for almost a year now.  Rabb had no additional conversations with the criminal defendant and his recollection of what transpired in one interview almost a year ago is much more speculative than an actual tape of the interview.  Thus, the State already has the best evidence of the interview — an authenticated copy of the interview, a complete rendition of what transpired.  *See* Texas Rules of Evidence 1001-1004.

To the extent the State is trying to get Rabb to testify as to Broadnax's state of mind, the best evidence of Broadnax's state of mind during the interview is the taped interview itself.  *See* Tex. R. Evid. 1002, 1003; *Overton v. State*, 409 S.W.2d 556, 559 (Tex. Crim. App. – 1973).  In *Overton*, the Court of Criminal Appeals (reviewing a Dallas County District Court ruling) found that the best evidence to prove the contents of documents concerning a robbery was the documents themselves because they were much more reliable, complete and accurate than an employee's description thereof.  *See also, Ramsey v. Jones v. Enterprises*, 810 S.W.2d 902 (Tex. App.--Beaumont 1991, writ denied)(documents are best evidence; oral testimony about same is inadmissible).  Rabb cannot recall every detail regarding an interview that took place almost a year ago.  His testimony on this issue would thus be far more speculative and far less reliable than the videotape of the interview itself.  The interview is already available to the Court and the jury, and Rabb's testimony concerning same would be inadmissible.

00312

**B.    A Reporter's Mental Impressions Would Be Inadmissible and Invade the Province of the Jury.**

There is also no basis for compelling Rabb to testify about the mental impressions he may have formed during his interview with Broadnax. Nor are those mental impressions admissible. Whatever opinion Rabb has formed is subject to objection of invading the province of the jury and irrelevant, and not admissible as an opinion by a non expert. Rabb's speculative testimony concerning Broadnax's state of mind, based on his imperfect recollection, would be highly prejudicial, misleading and confusing. Tex. R. Evid. 403 (relevant evidence should be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.").

**C.    Texas Code of Criminal Procedure 24.03 and the Common Law Require the State to Show Rabb's Testimony Would Be Highly Material and Relevant (Not Merely Cumulative).**

Texas Code of Criminal Procedure 24.03 requires that an application for subpoena state that the testimony of the witness is material to the State or to the defense. The subpoena issued to Rabb made no such statement. The requirement of materiality is an important one and is one that has been consistently re-iterated by the Texas Court of Criminal Appeals. Texas courts have made clear that parties in criminal proceedings — whether they are prosecutors or defendants — are barred from subjecting non-party witnesses to the considerable time and expense of appearing in court, unless they make a particularized showing that the testimony sought is highly material and relevant (not merely cumulative) to their case. When a person is subpoenaed as a witness in a criminal case, it is the burden of the party seeking the testimony to establish the matters to which the witness might testify, and the relevance and *demonstrable materiality* of those matters to the success of the prosecution or defense. *See Coleman v. State*, 966 S.W.2d

00313

525, 527-28 (Tex. Crim. App. 1998); *see also*, Texas Rules of Evidence 401 and 402. The Texas Code of Criminal Procedure and case law limit compulsory process to "material" witnesses and evidence. *See* Tex. Code Crim. Proc. art. 24.03; *Coleman*, 966 S.W.2d 525; *Dix & Dawson*, 41 Texas Practice: Criminal Practice & Procedure §27.51 at p. 764 (1995).

Rabb was not an eyewitness to any crime and had no prior (or subsequent) relationship or contact with the criminal defendant. The State has offered nothing to establish that his testimony is relevant and material to the State's case. Once one files to quash such a subpoena, the burden of producing substantial evidence sufficient to overcome the claim shifts to the party issuing the subpoena. *In re Selcraig*, 705 F.2d 789, 792 (5th Cir. 1983); *Dallas Morning News Co. v. Garcia*, 822 S.W.2d 675, 680 (Tex. App. – San Antonio 1991, orig. proceeding); *Channel Two Television Co. v. Dickerson*, 725 S.W.2d 470, 472 (Tex. App. – Hou. [1st Dist.] 1987, orig. proceeding). Thus, the DA's Office, as the issuer of the subpoena, must make a plausible showing to the trial court that Rabb's testimony would be both material and favorable to its position. *See also, Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646 (1972). At the time of the issuance of the Court's Order on May 28, 2009, the State was not required to make such a showing – the Motion to Quash was denied without a hearing.

There is nothing material that Rabb can add to the case at hand. His testimony is not needed to authenticate the tape for several reasons. First, it is self-authenticating under the new reporter's privilege. *See* Tex. Code Crim. Proc. art. 38.111. Second, the State has a business records affidavit proving up the interview and has had it for almost a year now. Third, presumably the Jail records all of these conversations, and the State has a copy from the Jail that can be proven up by the jailhouse personnel. Regardless, Rabb's testimony would merely be cumulative of others, and, as such, would not be material under Article 24.03 of the Texas Code

00314

of Criminal Procedure and likely would be inadmissible under Rule 403 — permitting exclusion on the grounds that it would be a "needless presentation of cumulative evidence."

In *Coleman*, the Texas Court of Criminal Appeals confirmed that general rules concerning subpoenas apply when a reporter is subpoenaed from a media organization in a criminal case.[2] More specifically, the Court applied a relevance and materiality test to determine a reporter did not have to testify. In *Coleman*, as here, the reporter's knowledge was duplicative, and therefore, the "relevance and importance" of the testimony could not be shown, and the subpoena issued was properly quashed. 966 S.W.2d 525, 528. *See Gohring v. State*, 967 S.W.2d 459 (Tex. App. – Beaumont 1998, no writ)(court granted motion to quash subpoena for reporter's notes when party issuing the subpoena made no plausible showing to the court that the reporter's testimony would actually be material and favorable to his theories).

It is important to note that Rabb was not an eyewitness to a crime. It is when a reporter has been the eyewitness to a crime that relevance and materiality have been found by the highest criminal court, and the reporter has taken the stand. *See, e.g., Ex parte Grothe*, 687 S.W.2d 736 (Tex. Crim. App. 1984); *Healey v. McMeans*, 884 S.W.2d 772 (Tex. Crim. App. 1994).[3] The facts in this case, however, are similar to those in *State v. Lyon* and *Campbell v. Klevenhagen* because the party subpoenaed was not an eye-witness to criminal activity. *See State v. Lyon*, 19 Med. L. Rptr. 2153 (Dallas Crim. Dist. Ct. 1991)[4](notes taken by reporters at press conference held by murder defendant and his attorney are not necessary or critical to maintenance of prosecution); *see also, Campbell v. Klevenhagen*, 760 F. Supp. 1206, 18 Med. L. Rptr. 2113

---

[2] This is the most recent case from the highest criminal court in the State addressing the issue.

[3] In *Healey v. McMeans* and in *Ex parte Grothe*, the materials held by the news organization were actual photographs of the crime taking place and incriminating comments about the crime at issue made by the accused — both of which were crucial to the case and could not be obtained from alternative sources. Rabb, in our case, has no such critical information or knowledge.

[4] A true and correct copy of which is attached hereto as Exhibit 4 for the Court's convenience.

00315

(S.D. Tex. 1991)(reporter was not required to disclose his confidential source in a murder trial where evidence sought from reporter was speculative, hearsay, and cumulative). In both *Lyon* and *Klevenhagen*, the reporter did not have to take the stand. In *Lyon*, the Dallas County Judge granted the motion to quash because the need for the information sought was speculative and was not material and relevant to the merits of the case. In *Klevenhagen*, the reporter refused to testify before the trial court and was held in contempt of court. The contempt ruling was overturned when the latter court found the evidence sought was cumulative. Unlike the materials sought in *Healey* and *Grothe* where the reporter was forced to testify, there is absolutely nothing that Rabb could testify about that the parties do not already possess and that would in any way impact the outcome of this case.

**D.    Section 3 of the Statutory Reporter's Privilege Does Not Apply to the Testimonial Privilege – It Only Applies to Material Produced by a Reporter.**

As mentioned in Rabb's prior Motion to Quash, Texas has recently enacted a reporter's privilege entitled the Texas Free Flow of Information Act. *See* Act of May 13, 2009, 81st Leg. R.S., H.B. 670 (to be codified at Tex. Code of Crim. Proc. arts. 38.11 and 38.111); Exhibit 1(D). In denying Rabb's Motion to Quash, this Court relied on Section 3 of the Act as a basis for ruling that the reporter's privilege does not apply; however, the section relied upon, by its own terms, only applies to <u>information gathered</u> prior to the date of the Act but not to the reporter and the reporter's testimony. The express terms of the section state "This Act only applies *to* information, documents or items ... prepared for publication .. on or after the effective date of this Act." The way that the Court has interpreted this Section, to date, is to read into the Section the word "if" ᴐ "were " rather than "to" and, by doing so, the Court limits the privilege in its entirety to after May 13, 2009. That is not how the statute reads nor is it what was intended. Courts must follow the plain language in the statute. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991); *State v.*

Supplemental Motion to Quash and Motion to Reconsider - Page 8 of 15

00316

*Johnson*, 198 S.W.3d 795 (Tex. Crim. App. 2007). The plain language of Section 3 only applies to items gathered prior to the effective date, and those materials have already been produced to the State and are self-authenticating. The reporter cannot be required to testify under the terms of the Act after May 13, 2009. A procedural statute controls litigation from its effective date, and it may be applied to trials for offenses committed before its effective date and to proceedings pending at the time of its enactment. *Goodlow v. State*, 766 S.W.2d 352, 354 (Tex. App. – Texarkana 1989, pet. ref'd); *Rodriguez v. State*, 779 S.W.2d 884, 885 (Tex. App. – Corpus Christi 1989, *aff'd by*, 779 S.W.2d 884 (Tex. Crim. App. 1991). Furthermore, evidentiary rules that are in existence at the time of trial are the ones that should be used. *Musgrove v. State*, 82 S.W.3d 34 (Tex. App. – San Antonio 2002, pet. ref'd). Thus, it is clear that the evidentiary requirements under the new Texas Free Flow of Information Act apply to the trial and pre-trial matters in the case at hand.

> **E.** **Procedural Changes in the Law Are Not Prohibited by the Ex Post Facto Clause, and Courts Have Universally Applied them Retrospectively.**

The enactment of a reporter's privilege is a change in procedural law that applies retroactively pursuant to well established Texas law. *See, e.g., Holt v. State*, 2 Tex. 363 (Tex. 1847). Among other things, the special procedural requirement that the elected District Attorney sign subpoenas to media personnel became effective on May 13, 2009, and the subpoena at issue does not comply with the new law. *See* Tex. Code Crim. P. art. 38.11, section 4(d). Further, the provision that broadcasts are self-authenticating is another purely procedural aspect of the legislation that also takes effect immediately and is not affected by Section 3 of the Act. *See* Tex. Code Crim. P. art. 38.111 and H.B. 670 §4.

Procedural changes in the law are not within the prohibition imposed by the Texas Constitution on the retroactive application of laws. *See Grimes v. State*, 807 S.W.2d 582 (Tex. Crim. App. 1991); *Ex parte Allen*, 699 S.W.2d 886 (Tex. App. – Dallas 1985, pet. ref'd). What is

U0317

meant by "procedure" in this context refers to changes in the process by which a criminal case is adjudicated as opposed to changes in substantive law of crimes. *Musgrove v. State*, 82 S.W.3d 34 (Tex. App. – San Antonio 2002, pet. ref'd)(the retroactive application of procedural laws is not considered ex post facto). A litigant has no vested right in procedural mechanisms -- even if the change in law results in less testimony being available. *Id.* at 37-38 (Change in Tex. R. Evid. 606(b) concerning circumstances under which a juror can testify is not a violation of the Constitution); *Thompson v. Utah*, 170 U.S. 343, 18 S.Ct. 620 (1898); *Merchants Fast Motor Lines, Inc. v. Railroad Comm'n of Texas*, 573 S.W.2d 502, 504-505 (Tex. 1978); *Cooper v. State*, 769 S.W.2d 301, 306 (Tex. App. – Hou. [1st Dist.] 1989, no pet.).

Because it has long been the law in Texas that the prohibition as to ex post facto laws, Constitution, art. 1, section 14, only extends to substantive changes in the law, it is clear that the reporter's privilege can and should be applied retroactively as to the testimonial privilege for the reporter (as distinguished from the materials subject to Section 3). *See, e.g. Holt v. State*, 2 Tex. 363 (Tex. 1847). Laws which do not amend substantive law by defining criminal acts or providing for penalties are procedural in nature and are not within the prohibition against ex post facto laws. *Ex parte Johnson*, 697 S.W.2d 605, 607 (Tex. Crim. App. 1985); *Rodriguez v. State*, 779 S.W.2d 884 (Tex. App. – Corpus Christi 1989), *aff'd by* 808 S.W.2d 496 (Tex. Crim. App. 1991). The enactment of a reporter's privilege in Texas is not a change in substantive law; thus, it does apply to the testimonial subpoena issued to Rabb in this matter. To preserve his argument under the statutory reporter's privilege as grounds for appeal (if necessary), Rabb asserts that his testimony is covered by the reporter's privilege and is not subject to Section 3 because the journalist's qualified testimonial privilege is broader than the mere items gathered in the newsgathering process. With regard to a reporter being forced to testify, the decision must be

00318

governed by the newly established reporter's privilege pursuant to the immediate effect provision contained in Section 4 of the Act.[5]  Under the express terms of the Act, unpublished information, would have to be, among other things, central to the investigation or prosecution of the case (and there had to have been exhaustion of alternative sources).  Furthermore, the information sought cannot be speculative.  *See* Tex. Code of Crim. P.  art. 38.11, sec. 5(a)-(b). These and other requirements of the reporter's privilege cannot be satisfied here, and, as a result, Rabb's Supplemental Motion to Quash and Motion to Reconsider should be granted.

**F.      Forcing Rabb (and Other Reporters) to Testify and be Subject to the Witness Rule so They Cannot Report on the Trial Would be an Unconstitutional Prior Restraint and Would Violate the First Amendment to the United States Constitution and Article 1, Section 8 of the Texas Constitution.**

The State has subpoenaed reporters from four different television stations who interviewed the criminal defendant to appear and be sworn in more than seven weeks prior to the article 28.01 hearing in this case.  Further, the Assistant District Attorney has indicated that he cannot guarantee that the Rule barring witnesses from speaking about the case will not be invoked when the witnesses are sworn in on June 1, 2009.  *See* Exhibit 5.  Invocation of the Rule would have the practical effect of preventing further coverage by these employees of this trial.  In circumstances, such as these, the Court must conduct a First Amendment balancing test.  *See Ex parte Grothe*, 687 S.W.2d 736, 740 (Tex. Crim. App. 1984).  Invoking the Rule will create an unlawful prior restraint and effectively cease reporting on the trial.  The alternative would be to pick a new reporter to cover the trial which would be a person who does not have any familiarity with the case.  Further, with the declining number of personnel in Texas newsrooms, there are

---

[5] In Corpus Christi, in a case with facts substantially similar to the ones herein, Judge Sandra L. Watts applied the new law at issue and quashed a subpoena issued to KIII-TV3 and its reporter/journalist, Katy Kiser on May 26, 2009.  Like KDFW FOX 4, the KIII-TV 3 reporter had interviewed a criminal defendant almost a year ago, and KIII-TV 3 had already produced a self-authenticating copy of the broadcast at issue to the State.  The Court held that the reporter's privilege applied and the reporter did not have to testify.  See Exhibit 1(I).

00319

simply fewer reporters to choose from to cover matters. If this Court does not quash the subpoenas, invokes the Rule and shuts down the reporting on this trial, justice will not be served.

**G.      Swearing the Witness In Seven Weeks Before Pre-trial and Calling Him To Testify in the Same Case Multiple Times Is Unnecessary and Harassing.**

There is no reason for Rabb or any of the other reporters to have to come to court on June 1, 2009. There is no hearing set that day. Further, according to counsel, the Article 28.01 hearing is not set until July 23, 2009. When asked if the June 1, 2009 date could be moved to the same date or shortly before the Article 28.01 hearing, the Assistant District Attorney refused to do so. *See* Exhibit 5. The rationale expressed by the Assistant District Attorney was because he did not want to have the subpoena issued multiple times. This position flies in the face of the very terms of the subpoena which command the person who has been subpoenaed to appear from day to day and from term to term until the judge releases him or her. So, a single subpoena will assure a witnesses' attendance. It is not the proper administration of justice to drag multiple witnesses to a non-event.

Furthermore, compelling testimony of reporters at multiple proceedings in every case in which they have spoken to a litigant, especially in circumstances similar to these,[6] causes serious detriment to the press's future ability to gather and disseminate news of matters of public concern and coverage of judicial proceedings. This type of unnecessary fishing expedition and harassment by the State is exactly what the constitutional protections and common law are designed to prevent. There is a very real concern for any media organization in a situation like this that the journalist will appear to be an investigative arm of law enforcement or a research tool for the government. Moreover, the threat of administrative and judicial intrusion into the

---

[6] In this instance, the reporter spoke to the criminal defendant, after-the-fact, and the reporter has nothing additional to offer through testimony than information that was already provided to the State through the self-authenticating jailhouse interview.

00320

newsgathering and editorial process could become so great, and the burden imposed by the steady stream of subpoenas resulting from stories about important or controversial matters so overwhelming, that the media will be deterred from reporting on such issues. Because "journalists typically gather information about accidents, crimes, and other matters of special interest that often give rise to litigation," the "consequent diversion of journalistic effort and disruption of newsgathering activity" is potentially substantial if the subpoena in this case were the norm. *O'Neil v. Oak Grove Const., Inc.*, 71 N.Y.2d 521, 527, 528 N.Y.S. 1, 3 (1988). Ultimately, it is the public that suffers.

By requiring the four reporters who conducted jailhouse interviews to all appear on June 1 (for no hearing at all), on July 23 for the Article 28.01 pretrial hearing, and at the trial, the Assistant District Attorney is merely harassing the witnesses and imposing unnecessary burden and expense on their employers. Furthermore, in addition to the financial harm caused by this unnecessary appearance, another very significant practical impact if reporters are hauled into court multiple times throughout a case whenever they talk to a criminal defendant, is that reporters will quit conducting interviews and accountability of the government and prosecutors will become nonexistent.

## IV.
## CONCLUSION AND PRAYER

Texas criminal courts must enforce non-party subpoena rules without regard to the status of the non-party witness and without favoring the State, the criminal defendant or the non-party witness. If courts are permitted to ignore the requirements of Article 24.03, and to compel non-parties (who have no knowledge material or relevant to the case) to testify at the whim of a prosecutor or defendant, the public-at-large will suffer. Prosecutors and criminal defendants will be able to drag any person — a government official, company executive, community activist or

00321

celebrity — into court for an improper purpose, such as bolstering a party's credibility in front of the jury, sensationalizing the trial, or silencing the media. Forced compliance with such frivolous subpoenas places an unreasonable and expensive burden on the non-party. It also creates tremendous doubt about the integrity of the legal system and whether laws are being applied equally. For a media organization, such subpoenas will raise the cost of newsgathering and result in less news coverage. In fact, knowing that reporters can be hauled into court to testify in a criminal trial every time they interview a criminal defendant will ensure that media conducts fewer interviews. Who then will fulfill the role of being a government watchdog? More importantly, permitting such an abuse of Rabb's rights, a non-party witness, sends a signal to the public at large that the average Texas citizen — with fewer resources and less immediate access to the public airwaves than a reporter for a media organization — cannot trust Texas courts to enforce the law and to protect citizens' rights.

WHEREFORE PREMISES CONSIDERED, Movant Shaun Rabb hereby requests that this motion be set for hearing, and that upon such hearing the Court reconsider and vacate its prior ruling and (1) grant this motion; (2) quash the trial subpoena for Shaun Rabb; (3) enter a protective order; and (4) grant such other and further relief to which Rabb may be justly entitled.

00322

Respectfully Submitted,

SEDGWICK, DETERT, MORAN & ARNOLD LLP

By _(signature)_
Laura Lee Prather
Texas State Bar No. 16234200
919 Congress Avenue, Suite 1250
Austin, Texas 78701-3656
Tel.: (512) 481-8400
Fax.: (512) 481-8444

**ATTORNEYS FOR SHAUN RABB**

## CERTIFICATE OF CONFERENCE

Telephone conferences were attempted or had with Assistant District Attorney David Alex on May 26, 27, 28, and 29, as well as electronic communications, on May 29, 2009. Agreement could not be reached on the substance of this motion; therefore, it is being presented to this Court for determination.

_(signature)_
Laura Lee Prather

## CERTIFICATE OF SERVICE

This is to certify that the foregoing document was served on all counsel of record via hand delivery on __1 st__ day of June 2009.

_(signature)_
Laura Lee Prather

00323

# Exhibits

1. Motion to Quash Subpoena of Non-party Shaun Rabb

2. Order Denying Shaun Rabb's Motion to Quash Subpoena

3. Non-party Ellen Goldberg's Motion to Quash Trial Subpoena

4. State v. Lyon, 19 Med. L. Rptr. 2153 (Dallas Crim. Dist. Ct. 1991)

5. Email Correspondence from May 29, 2009 from Assistant District Attorney David Alex Concerning Need of Journalists' to Appear Seven Weeks Prior to Pre-trial Hearing and Invocation of the Witness Rule

1

00325

Cause No. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JAMES BROADNAX | § | CRIMINAL COURT # 7 |

## MOTION TO QUASH SUBPOENA OF NON-PARTY SHAUN RABB

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, KDFW FOX 4 and Shaun Rabb ("Rabb") (collectively herein, "Movants"), non-parties in the foregoing matter and file this Motion to Quash Subpoena of Shaun Rabb, and would respectfully show the Court the following:

### I.

### SUMMARY OF ARGUMENT

THE STATE'S SUBPOENA SERVED UPON MOVANTS SHOULD BE QUASHED BECAUSE IT VIOLATES THE RECENTLY ENACTED TEXAS FREE FLOW OF INFORMATION ACT, UNDER WHICH JOURNALISTS HAVE A QUALIFIED TESTIMONIAL PRIVILEGE IN CRIMINAL PROCEEDINGS.

### II.

### BACKGROUND

1.1     KDFW FOX 4 is a television station located in Dallas, Dallas County, Texas and licensed as such by the Federal Communications Commission.

1.2     Rabb is a television journalist employed by KDFW FOX 4. *See* Rabb Aff., Exhibit A. On or about June 19, 2008 KDFW FOX 4 aired a news broadcast that included an interview that Rabb had conducted with the Defendant in this case. Rabb conducted the interview in his capacity as a journalist for KDFW FOX 4. *Id.*

MOTION TO QUASH AND OBJECTIONS TO THE SUBPOENA OF SHAUN ROBB                Page 1

**EXHIBIT**

\1

00326

1.3     On or about June 25, 2008, the Dallas County District Attorney's Office served KDFW FOX 4 with a Subpoena requesting a copy of the broadcast. *See* Exhibit B. KDFW FOX 4 complied with the subpoena and produced an entire copy of the interview between Rabb and the Defendant as well as a business records affidavit proving up same. *See* Affidavit of Jay R. Soules a true and correct copy of which is attached hereto as Exhibit C.

1.4     On May 13, 2009, Texas Governor Rick Perry signed into law, Texas House Bill 670, also known as the Free Flow of Information Act, which establishes a qualified testimonial privilege for journalists. *See* Tex. H.B. 670, 81st Leg., R.S. (2009); Act of May 13, 2009, 81st Leg., R.S., H.B. 670, (to be codified at TEX. CODE OF CRIM. PROC. ANN. arts. 38.11 and 38.111)(the "Act"). *See* Exhibit D. The Act became effective immediately once it was signed into law by the Governor. *See* Press Release of Gov. Perry, Exhibit E. Under the Act, Texas journalists and media outlets enjoy certain protections, including the following:

> Except as otherwise provided by this article, a judicial, legislative, administrative, or other body with the authority to issue a subpoena or other compulsory process **may not compel a journalist to testify regarding or to produce or disclose in an official proceeding (1) any confidential or nonconfidential unpublished information, document, or item obtained or prepared while acting as a journalist; or (2) the source of any information, document, or item described by subdivision (1).** A subpoena or other compulsory process may not compel the parent, subsidiary, division or affiliate of a communication service provider or news medium to disclose the unpublished information, documents or items or the source of any information, documents, or items that are privileged from disclosure under subsection (a).

*See* Act of May 13, 2009, 81st Leg., R.S., H.B. 670 at § 3(a) - (b) (to be codified at TEX. CODE OF CRIM. PROC. ANN. arts. 38.11 and 38.111). *See* Exhibit D.

1.5     The Act also requires that a subpoena of a journalist issued by an attorney representing the State, **must be signed by the elected district attorney, elected criminal district attorney, or**

00327

**elected county attorney, as applicable.** *See* Act of May 13, 2009, 81st Leg. R.S., HB 670 at § 4(d)(to be codified at TEX. CODE OF CRIM. PROC. ANN. arts. 38.11 and 38.111); Exhibit D.

1.6    Furthermore, the Act also states that extrinsic evidence of the authenticity of evidence in a criminal proceeding is **not** required with respect to a recording that purports to be a broadcast by a television station.    *See Id.* at Article 38.111; Exhibit D.

1.7    Despite the prior production of the entire interview between Rabb and the criminal defendant – which is both self authenticating and for which a business records affidavit was produced prior to the enactment of the Texas Free Flow of Information Act, the State served Rabb with a second subpoena on Friday, May 22, 2009 at approximately 5:50 p.m.    *See* Exhibit F, a true and correct copy of the subpoena at issue.

1.8    The State has indicated that Rabb is required to testify as a witness in this case in order to "authenticate" the aired broadcasts in question, which is already in the State's possession. Under the Act, no such testimony is needed in order to authenticate the aired broadcasts in question. *See Act,* Tex. Code of Crim. Pro. art. 38.111. As provided for in Article 38.111, Movants ask the Court to take judicial notice, under Rule 201, Texas Rules of Evidence, that KDFW FOX 4 holds a license under the Federal Communications Commission, which was also in effect at the time of the aired broadcasts in question. *See* Exhibits A and G. Thus, Rabb should not be required to appear as a witness to testify in this case, because his testimony is not necessary for purposes of authenticating the aired broadcasts in question.

1.9    Alternatively, and in the event the State has subpoenaed Rabb in order to attempt to elicit testimony beyond the mere authentication of the aired broadcasts in question, those efforts should also fail, because the Act provides that journalists, like Rabb, have a qualified testimonial privilege concerning unpublished information. *See Act,* Tex. Code of Crim. Proc. art. 38.11, Section 5. Rabb

MOTION TO QUASH AND OBJECTIONS TO THE SUBPOENA OF SHAUN ROBB                Page 3

00328

hereby asserts and invokes said privilege. Given that the State already has in its possession the aired broadcasts in question, the State cannot make the clear and specific showing required to overcome the privilege under Section 5 of the Act.

2.0    Furthermore, the subpoena at issue does not comply with the requirements under the Act because it is not signed by the elected criminal district attorney as required under Section 4(d) of the Act. *See Act.,* Texas Code of Crim. Proc. art. 38.11, Section 4(d).

2.1    Movants made several attempts to resolve this matter with the State prior to filing this Motion including in house counsel for KDFW FOX 4 calling and speaking with the Assistant District Attorney. During the course of the conversation between KDFW FOX 4's in house counsel and the State's attorney, counsel informed the State about the new law of which he was unaware, and the Assistant District Attorney indicated that it did not matter because he was sure Rabb was going to testify. *See* Exhibit G.

2.2    On May 26, 2009, outside counsel for Rabb also contacted the State's attorney in an effort to resolve this matter prior to court intervention, however, she was never able to have a substantive conversation with the State's attorney. Rabb's counsel called the State's attorney at the time he said he would be available to discuss the subpoena, but, to date, the call has not been returned. After leaving a phone message, Rabb's counsel immediately sent a copy of the new Act to the State's attorney in a further effort to resolve this matter and avoid the necessity of filing of this Motion to Quash. *See* Exhibit H.

2.3    Based on the foregoing, the State's Subpoena should be quashed, and the State should reimburse Movants for their fees and costs as provided under Section 9 of Art. 38.11 of the Act. Additionally, given that the State had prior notice of Movants' intent to seek relief under the Act, the

00329

State should also be required to reimburse Movants for their reasonable and necessary attorneys' fees incurred in preparing and presenting this Motion to the Court.

2.4    Finally, in a case with facts substantially similar to the ones herein, Judge Sandra L. Watts applied the new law at issue and quashed a subpoena issued to KIII-TV3 and its reporter/journalist, Katy Kiser earlier this week. Like KDFW FOX 4, the KIII-TV 3 reporter had interviewed a criminal defendant and KIII-TV 3 had already produced a copy of the broadcast at issue. In light of the reporter's privilege, the Court held the Assistant District Attorney had no right to call the journalist to testify in the criminal proceeding. A true and correct copy of the order is attached hereto as Exhibit I.

## III.

### CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Movants pray that the Subpoena to Rabb be QUASHED, that the Court sustain their objections to the Subpoena and that Rabb not be required to testify in this case under the said Subpoena or any other Subpoena. Movants further pray that they be reimbursed for their costs and for the reasonable and necessary attorneys' fees incurred in preparing and presenting this Motion. Movants further pray for general relief and for such other relief to which they may be justly entitled.

00330

Respectfully Submitted,

SEDGWICK, DETERT, MORAN & ARNOLD LLP

By: _____

Laura Lee Prather
Texas State Bar No. 16234200
919 Congress Avenue, Suite 1250
Austin, Texas 78701-3656
Tel.: (512) 481-8400
Fax.: (512) 481-8444

ATTORNEYS FOR SHAUN ROBB AND
KDFW FOX 4

## CERTIFICATE OF SERVICE

This is to certify that the foregoing document was served on all counsel of record via fax on 27ᵗʰ day of May 2009.

_____

Laura Lee Prather

MOTION TO QUASH AND OBJECTIONS TO THE SUBPOENA OF SHAUN ROBB          Page 6

U0331

# Exhibits

A.     Affidavit of Shaun Rabb

B.     Subpoena to KDFW FOX 4 dated June 25, 2008 requesting copies of all audio/video broadcast tapes (or digital media), out-takes (recorded but not aired)

C.     Business Records Affidavit of Jay R. Soules, Custodian of Records for KDFW FOX 4 (which was enclosed with a copy of the complete interview between Shaun Rabb and James Broadnax)

D.     The Texas Free Flow of Information Act, Tex. H.B. 670, 81st Leg., R.S. (2009); Act of May 13, 2009, 81st Leg. R.S., H.B. 670 (to be codified at Tex. Code of Crim. Proc. Ann. arts. 38.11 and 38.111) – the Texas Reporter's Privilege Statute

E.     News Release from Governor Rick Perry regarding H.B. 670, dated May 13, 2009 announcing that the bill takes effect immediately.

F.     Subpoena to Shaun Rabb, KDFW FOX 4 demanding appearance on June 1, 2009 to testify as a witness on behalf of the State in Criminal Court #7 of Dallas County, Texas

G.     Affidavit of Carolyn Forrest

H.     Correspondence from Laura Lee Prather to Assistant District Attorney David Alex enclosing a copy of HB 670, dated May 26, 2009

I.     Order Granting Motion to Quash Subpoena signed by Honorable Sandra Watts in State of Texas v. Kenneth Hubbard, Cause No. 08-CR-3439-B in Nueces County, Texas dated May 26, 2009

DL/2302745v1

00332

## AFFIDAVIT OF SHAUN RABB

STATE OF TEXAS                                    §
                                                 §
                                                 §
COUNTY OF _____                                §

BEFORE ME, the undersigned authority, a Notary Public, in and for Dallas County, Texas, on this day personally appeared SHAUN RABB, who, being duly sworn upon his oath, deposes and stated the following:

"My name is SHAUN RABB. I am over 18 years of age. I have never been convicted of any crime or offence involving moral turpitude. I am fully competent to testify to the factual matters contained in this affidavit. All matters contained herein are based my personal knowledge and are true and correct.

1. For a substantial portion of my livelihood, I gather, compile, prepare, collect, record, write, edit, report and/or investigate news or information that is disseminated by KDFW FOX 4. In my capacity as a journalist, I reported during a news broadcast aired by KDFW FOX 4 on or about June 19, 2008. The broadcast included an interview that I, as a journalist, had conducted with Mr. James Broadnax, who is the Defendant in the case styled, State of Texas v. James Broadnax, Cause No. F08-24667-Y, pending in Criminal District Court #7 of Dallas County, Texas.

2. On or about May 22, 2009, I received a subpoena by hand delivery at approximately 5:50 p.m. from David Alex, Assistant District Attorney for Dallas County, at my place of employment, KDFW FOX 4 in Dallas, Texas. A copy of the subpoena I received is attached to this affidavit.

Further Affiant Sayeth Not.

_____
Shaun Rabb

Sworn and subscribed to before me, the undersigned authority, by SHAUN RABB, on this _____ day of _____, 2009.

_____
Notary Public in and for
The State of Texas

> MONICA MARTINEZ
> Notary Public, State of Texas
> My Commission Expires
> December 14, 2012

**EXHIBIT**

**A**

DL/2302525v1

00333

Case 3:15-cv-01758-N    Document 38-13    Filed 06/28/16    Page 30 of 158    PageID 1791

00334

THE STATE OF TEXAS
TO ANY SHERIFF OR ANY CONSTABLE OR ANY PEACE OFFICER
OF THE STATE OF TEXAS – GREETINGS:
YOU ARE HEREBY COMMANDED TO SUMMON

SHAUN RABB, FOX 4 NEWS
UNKNOWN
DALLAS, TEXAS

To be and appear before the CRIMINAL District Court #7 of Dallas County, Texas at the courthouse of said County, in the City of Dallas, on the 1ST day of JUNE, 20 09, at 8:30 o'clock A. M., Then and there to testify as a witness in behalf of the STATE in a criminal Action pending in said court, wherein THE STATE OF TEXAS is plaintiff, and JAMES BROADNAX Defendant No. F08-24667-Y

DUECES TECUM (IF APPLICABLE)                    ☒ NOT APPLICABLE
and that he bring with him and produce in said Court, at said time and place,

desired as evidence in said Criminal action, to-wit: in a certain suit pending in said court.

and there remain from day to day and from term to term until discharged by the Court
HEREIN FAIL NOT, But of this Writ make due return, showing how you have executed the same.

OUT OF COUNTY (IF APPLICABLE)                    ☒ NOT APPLICABLE
A DISOBEDIENCE OF this Subpoena is punishable by fine not exceeding $500, to be collected as Fines and costs in other criminal cases.

WITNESS MY OFFICIAL SIGNATURE, THIS 20TH day of MAY, 20 09

Gary Fitzsimmons
Clerk, District Courts
Dallas, County, Texas

By _____ Deputy
T. JACKSON

NO.F08-24667-Y

CRIMINAL DISTRICT COURT #7
DALLAS COUNTY, TEXAS

THE STATE OF TEXAS
VS.

JAMES BROADNAX.

CAPITAL MURDER

SUBPOENA

ISSUED
This 20TH day of MAY, 20 09
Gary Fitzsimmons
Clerk, District Courts
Dallas County, Texas
By T. JACKSON Deputy

ATTORNEY:

DAVID ALEX
ASSISTANT DISTRICT ATTORNEY
133 N. INDUSTRIAL BLVD., LB 19
DALLAS, TEXAS 75207
214-653-3600

REPORT TO:

FRANK CROWLEY COURTS BLDG.
133 N. INDUSTRIAL BLVD.
DALLAS, TEXAS 75207

06/25/2008 11:13 FAX    ☑001



**CRAIG WATKINS**
CRIMINAL DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

June 25, 2008

To: News Director

Subject: Evidence preservation

ATTN- Jay Soules
Fox 4 News
400 N. Griffin St.
Dallas, TX 75202
Fax 214-720-3263

The Dallas District Attorney's Office is investigating the Garland, Texas capital murder involving the suspects James Broadnax and Demarius Cummings; victims are Matthew Butler and Stephen Swan. This offense occurred Thursday, June 9, 2008 and there was subsequent media coverage from your station.

Grand jury subpoena applications are pending for **COPIES OF ALL AUDIO/VIDEO BROADCAST TAPES (OR DIGITAL MEDIA), OUT-TAKES (RECORDED BUT NOT AIRED)** regarding interviews with these suspects and related news stories. The Dallas District Attorney's Office requests that this information be preserved.

If you have any questions please call my cell #, 214-549-9074.

David N. Barger, Lt./ Investigation Division



EXHIBIT

B

Frank Crowley Courts Building ● 133 N. Industrial Blvd., L.B. 19 ● Dallas, Texas 75207-4399 ● 214/653-3600

00335

07/07/2008 12:41 FAX                                                      ☒001



## CRAIG WATKINS

CRIMINAL DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Boulevard, L.B. 19
Dallas, Texas 75207-4399
Office: 214.653.3600

### FACSIMILE COVER SHEET

DATE: July 7, 2008
TOTAL PAGES, Including Cover: 6

| To: Jay Soukes | Dept./Agency: KDFW Ch 4 |
|---|---|
| Fax #: 214-720-3263 | Phone #: 214-720-3314 |

From: David Barger, Lt./ Inv. Division       Direct #:214-653-3614   Fax#:214-653-2924
Email: dbarger@dallascounty.org

Comments:

**Grand Jury subpoena attached regarding James Broadnax news stories.**

CONFIDENTIALITY NOTICE

The information contained in this facsimile message is privileged and confidential and is intended only for the exclusive use of the addressee. The term privileged and confidential includes, without limitation, attorney-client privileged communications, attorney work product, and any other proprietary information. Nothing in this facsimile is intended by the attorney to constitute a waiver of the confidentiality of this message. If the reader of this message is not the intended recipient, or employee/agent of the intended recipient, you are hereby notified that any use, disclosure, dissemination, duplication, distribution or the taking of any action because of this communication is unauthorized and strictly prohibited. If you have received this facsimile transmission in error, please notify us by telephone immediately so that we can arrange for the return of the original documents.

00336

07/07/2008 12:41 FAX                                                                    @002

IN RE INVESTIGATION                              IN THE GRAND JURY OF

OF                                               DALLAS COUNTY, TEXAS

JAMES BROADNAX                                   JULY TERM, A.D., 2008


### LAW ENFORCEMENT AGENCY REQUEST FOR APPLICATION FOR ISSUANCE OF SUBPOENA DUCES TECUM SUMMONING PERSON TO APPEAR BEFORE GRAND JURY


TO THE FOREMAN OF THE GRAND JURY OF DALLAS COUNTY:

I, **David N. Barger, a peace officer under the laws of the State of Texas**, do hereby request that the Foreman of the Grand Jury of the County of Dallas, State of Texas make application to the District Court of Dallas County for issuance of a subpoena duces tecum summoning **CUSTODIAN of RECORDS** (or designee) for:
**KDFW Channel 4, 400 N. Griffin St., Dallas, Texas** and to produce the following records or documents for use in a legitimate law enforcement investigation which is being conducted under auspices of the Grand Jury:

**COPIES OF ALL AUDIO/VIDEO BROADCAST TAPES, OUT-TAKES (RECORDED BUT NOT AIRED), INTERVIEW NOTES AND CORRESPONDENCE REGARDING THE MURDER OF MATTHEW BUTLER AND STEPHEN SWAN IN GARLAND, TEXAS ON JUNE 19, 2008 INCLUDING INTERVIEWS OF THE SUSPECTS JAMES BROADNAX AND DAMARI S CUMMINGS.**


I hereby certify that the testimony of the said witness is believed to be material.


**David N. Barger**
**Investigator, Dallas District Attorney**
Frank Crowley Courts Building
133 N. Industrial Blvd., LB 19
Dallas, Texas 75207-4399
(214) 653-3614


Grand Jury Subpoena
Page 1 of 5


U0337

07/07/2008 12:41 FAX                                                                ☑003

| IN RE INVESTIGATION | | IN THE GRAND JURY OF |
|---|---|---|
| | | |
| OF | | DALLAS COUNTY, TEXAS |
| | | |
| JAMES BROADNAX | | JULY TERM, A.D., 2008 |

### APPLICATION FOR ISSUANCE OF SUBPOENA DUCES TECUM
### SUMMONING PERSON TO APPEAR BEFORE GRAND JURY

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES the Foreman of the Grand Jury of the County of Dallas, State of Texas, and pursuant to TEX. CODE CRIM. PROC. ANN. art. 20.11 (Vernon 1977), requests that the Court issue forthwith a subpoena duces tecum summoning **CUSTODIAN of RECORDS** (or designee) for: **KDFW Channel 4, 400 N. Griffin St., Dallas, Texas** to appear before the **Dallas County Grand Jury, Frank Crowley Courts Bldg., 133 N. Industrial Blvd. , Dallas, Texas, forthwith** late of **July 21, 2008** , and to produce for the said Grand Jury at the said time and place the following records and documents:

**COPIES OF ALL AUDIO/VIDEO BROADCAST TAPES, OUT-TAKES (RECORDED BUT NOT AIRED), INTERVIEW NOTES AND CORRESPONDENCE REGARDING THE MURDER OF MATTHEW BUTLER AND STEPHEN SWAN IN GARLAND, TEXAS ON JUNE 19, 2008 INCLUDING INTERVIEWS OF THE SUSPECTS JAMES BROADNAX AND DAMARIUS CUMMINGS.**

The testimony of the said witness is believed to be material.

_____
Foreman of The Grand Jury

Grand Jury Subpoena
Page 2 of 5

00338

07/07/2008 12:41 FAX                                                                      @004

*CSC #1*

| | |
|---|---|
| IN RE INVESTIGATION | IN THE GRAND JURY OF |
| OF | DALLAS COUNTY, TEXAS |
| JAMES BROADNAX | JULY TERM, A.D., 2008 |

## SUBPOENA DUCES TECUM
## SUMMONING WITNESS TO
## APPEAR BEFORE GRAND JURY

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS, TO THE SHERIFF OF DALLAS COUNTY, TEXAS OR ANY CONSTABLE OR PEACE OFFICER OF THE STATE OF TEXAS ............. GREETINGS:

YOU ARE COMMANDED TO SUMMON............ CUSTODIAN of RECORDS (or designee) for: **KDFW Channel 4, 400 N. Griffin St., Dallas, Texas** to appear before the **Dallas County Grand Jury, Frank Crowley Courts Bldg., 133 N. Industrial Blvd. , Dallas, Texas,** forthwith late of **July 21, 2008** , and to produce for the said Grand Jury at the said time and place the following records and documents:

**COPIES OF ALL AUDIO/VIDEO BROADCAST TAPES, OUT-TAKES (RECORDED BUT NOT AIRED), INTERVIEW NOTES AND CORRESPONDENCE REGARDING THE MURDER OF MATTHEW BUTLER AND STEPHEN SWAN IN GARLAND, TEXAS ON JUNE 19, 2008 INCLUDING INTERVIEWS OF THE SUSPECTS JAMES BROADNAX AND DAMARIUS CUMMINGS.**

DISCLOSURE OF THE EXISTENCE OF THIS SUBPOENA WILL INTERFERE WITH AN ONGOING CRIMINAL INVESTIGATION AND IS, THEREFORE, NOT AUTHORIZED. NOTICE: UNDER **TEX. CODE CRIM. PROC. ANN.** art. 24.05 (Vernon 1977) REFUSAL TO OBEY THIS SUBPOENA MAY RESULT IN THE IMPOSITION OF A FINE.

Grand Jury Subpoena
Page 3 of 5

00339

07/07/2008 12:41 FAX                                                    ☑ 005

CDc # 1

IN RE INVESTIGATION                    IN THE GRAND JURY OF

OF                                     DALLAS COUNTY, TEXAS

JAMES BROAD NAX                        JULY TERM, A.D., 2008

*In lieu of personally appearing before the said Grand Jury at the said time and place, the said witness may comply with this subpoena by furnishing true and correct copies of the aforesaid records to the following-named person at the following address:*

**David N. Barger, Lt./Investigation Division**
**Dallas District Attorney**
**Frank Crowley Courts Building 11th Floor**
**133 N. Industrial Blvd., LB 19**
**Dallas, Texas 75207-4399**
**(214) 653 3614**

HEREIN FAIL NOT, but of this writ make due return, showing how you have executed the same.

WITNESS MY OFFICIAL SIGNATURE, this ___ day of July ___, A.D., 2008.

JUDGE,
_____ District Court ___
Dallas County, Texas

Grand Jury Subpoena
Page 4 of 5

00340

07/07/2008 12:41 FAX                                                                        ☑006

| | |
|---|---|
| IN RE INVESTIGATION | IN THE GRAND JURY OF |
| OF | DALLAS COUNTY, TEXAS |
| JAMES BROADNAX | JULY TERM, A.D., 2008 |

## RETURN

CAME TO HAND on this _____ day of _____, A.D., 2008, and executed by summoning the within-named witness on the _____ day of _____, A.D., 2008.

Criminal District Attorney, Dallas County, Texas

By _____ Investigator

**Sheriff, Constable or Peace Officer**

Grand Jury Subpoena
Page 5 of 5

00341

IN RE GRAND JURY PROCEEDINGS:

Subpoena duces tecum for production of documents regarding James Broadnax

## AFFIDAVIT OF JAY R. SOULES

STATE OF TEXAS      §
                          §
COUNTY OF DALLAS    §

BEFORE ME, the undersigned authority, personally appeared Jay R. Soules, who, being by me duly sworn deposed as follows:

1.    "My name is Jay R. Soules, I am over the age of eighteen years, am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

2.    "I am a custodian of records of NW Communications of Texas, Inc., on behalf of its television KDFW FOX 4, ("KDFW FOX 4") in Dallas, Texas.

3.    "Attached hereto is a true and correct copy of the KDFW FOX 4 reports and out-takes concerning the murder of Matthew Butler and Stephen Swan in Garland, TX on June 19, 2008 including interviews of suspects James Broadnax and Damarius Cummings. These said tapes are kept by KDFW FOX 4 in the regular course of business, and it was the regular course of business of KDFW FOX 4 for an employee or representative of KDFW FOX 4, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or an exact



EXHIBIT
C

J0342

duplicate of the original reports that aired concerning the murder of Matthew Butler and Stephen Swan in Garland, TX on June 19, 2008 including interviews of suspects James Broadnax and Damarius Cummings."

Further Affiant sayeth not.

_____
Jay R. Soules


[printed name and title]

SWORN TO AND SUBSCRIBED before me on the ___9th___ day of July, 2008.

[Seal]    MARY F. KNIGHT
          M  Commission Expires
          July 28, 2011

_____
Notary Public, State of Texas

_____
[printed name]

My Commission Expires:

_____

- 2 -

00343

H.B. No. 67

## AN ACT

relating to a qualified privilege of a journalist not to testify.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Chapter 22, Civil Practice and Remedies Code, is amended by adding Subchapter C to read as follows:

SUBCHAPTER C. JOURNALIST'S QUALIFIED TESTIMONIAL PRIVILEGE IN CIVIL PROCEEDINGS

Sec. 22.021.  DEFINITIONS. In this subchapter:

(1)  "Communication service provider" means a person or the parent, subsidiary, division, or affiliate of a person who transmits information chosen by a customer by electronic means, including:

(A)  a telecommunications carrier, as defined by Section 3, Communications Act of 1934 (47 U.S.C. Section 153);

(B)  a provider of information service, as defined by Section 3, Communications Act of 1934 (47 U.S.C. Section 153);

(C)  a provider of interactive computer service, as defined by Section 230, Communications Act of 1934 (47 U.S.C. Section 230); and

(D)  an information content provider, as defined by Section 230, Communications Act of 1934 (47 U.S.C. Section 230).

(2)  "Journalist" means a person, including a parent, subsidiary, division, or affiliate of a person, who for a substantial portion of the person's livelihood or for substantial financial gain, gathers, compiles, prepares, collects, photographs, records, writes, edits, reports, investigates, processes, or publishes news or information that is disseminated by a news medium or communication service provider and includes:

(A)  a person who supervises or assists in gathering, preparing, and disseminating the news or information; or

(B)  notwithstanding the foregoing, a person who is or was a journalist, scholar, or researcher employed by an institution of higher education at the time the person obtained or prepared the requested information, or a person who at the time the person obtained or prepared the requested information:

(i)  is earning a significant portion of the person's livelihood by obtaining or preparing information for dissemination by a news medium or communication service provider; or

(ii)  was serving as an agent, assistant, employee, or supervisor of a news medium or communication service provider.

(3)  "News medium" means a newspaper, magazine or periodical, book publisher, news agency, wire service, radio or television station or network, cable, satellite, or other transmission system or carrier or channel, or a channel or programming service for a station, network, system, or carrier, or an audio or audiovisual production company or Internet company or provider, or the parent, subsidiary, division, or affiliate of that entity, that disseminates news or information to the public by any means, including:

(A)  print;

(B)  television;

(C)  radio;



EXHIBIT

D

00344

(D) photographic;
(E) mechanical;
(F) electronic; and
(G) other means, known or unknown, that are accessible to the public.
(4) "Official proceeding" means any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant, including a proceeding under Rule 202, Texas Rules of Civil Procedure.
(5) "Public servant" means a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if the person has not yet qualified for office or assumed the person's duties:
(A) an officer, employee, or agent of government;
(B) a juror;
(C) an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy;
(D) an attorney or notary public when participating in the performance of a governmental function; or
(E) a person who is performing a governmental function under a claim of right, although the person is not legally qualified to do so.
Sec. 22.022.    PURPOSE. The purpose of this subchapter is to increase the free flow of information and preserve a free and active press and, at the same time, protect the right of the public to effective law enforcement and the fair administration of justice.
Sec. 22.023.    PRIVILEGE. (a) Except as otherwise provided by this subchapter, a judicial, legislative, administrative, or other body with the authority to issue a subpoena or other compulsory process may not compel a journalist to testify regarding or to produce or disclose in an official proceeding:
(1) any confidential or nonconfidential information, document, or item obtained or prepared while acting as a journalist; or
(2) the source of any information, document, or item described by Subdivision (1).
(b) A subpoena or other compulsory process may not compel the parent, subsidiary, division, or affiliate of a communication service provider or news medium to disclose the information, documents, or items or the source of any information, documents, or items that are privileged from disclosure under Subsection (a).
Sec. 22.024.    LIMITED DISCLOSURE GENERALLY. After notice and an opportunity to be heard, a court may compel a journalist, a journalist's employer, or a person with an independent contract with a journalist to testify regarding or to produce or disclose any information, document, or item or the source of any information, document, or item obtained while acting as a journalist, if the person seeking the information, document, or item or the source of any information, document, or item makes a clear and specific showing that:
(1) all reasonable efforts have been exhausted to obtain the information from alternative sources;
(2) the subpoena is not overbroad, unreasonable, or oppressive and, when appropriate, will be limited to the verification of published information and the surrounding circumstances relating to the accuracy of the published information;
(3) reasonable and timely notice was given of the demand for the information, document, or item;

00345

(4) in this instance, the interest of the party subpoenaing the information outweighs the public interest in gathering and dissemination of news, including the concerns of the journalist;

(5) the subpoena or compulsory process is not being used to obtain peripheral, nonessential, or speculative information; and

(6) the information, document, or item is relevant and material to the proper administration of the official proceeding for which the testimony, production, or disclosure is sought and is essential to the maintenance of a claim or defense of the person seeking the testimony, production, or disclosure.

Sec. 22.025. NOTICE. An order to compel testimony, production, or disclosure to which a journalist has asserted a privilege under this subchapter may be issued only after timely notice to the journalist, the journalist's employer, or a person who has an independent contract with the journalist and a hearing. The order must include clear and specific findings as to the showing made by the person seeking the testimony, production, or disclosure and the clear and specific evidence on which the court relied in issuing the court's order.

Sec. 22.026. PUBLICATION OF PRIVILEGED INFORMATION. Publication or dissemination by a news medium or communication service provider of information, documents, or items privileged under this subchapter is not a waiver of the journalist's privilege.

Sec. 22.027. NEWS MEDIA RECORDINGS. Extrinsic evidence of the authenticity of evidence as a condition precedent to the admissibility of the evidence in a civil proceeding is not required with respect to a recording that purports to be a broadcast by a radio or television station that holds a license issued by the Federal Communications Commission at the time of the recording. The court may take judicial notice of the recording license as provided by Rule 201, Texas Rules of Evidence.

SECTION 2. Chapter 38, Code of Criminal Procedure, is amended by adding Articles 38.11 and 38.111 to read as follows:

Art. 38.11. JOURNALIST'S QUALIFIED TESTIMONIAL PRIVILEGE IN CRIMINAL PROCEEDINGS

Sec. 1. DEFINITIONS. In this article:

(1) "Communication service provider" means a person or the parent, subsidiary, division, or affiliate of a person who transmits information chosen by a customer by electronic means, including:

(A) a telecommunications carrier, as defined by Section 3, Communications Act of 1934 (47 U.S.C. Section 153);

(B) a provider of information service, as defined by Section 3, Communications Act of 1934 (47 U.S.C. Section 153);

(C) a provider of interactive computer service, as defined by Section 230, Communications Act of 1934 (47 U.S.C. Section 230); and

(D) an information content provider, as defined by Section 230, Communications Act of 1934 (47 U.S.C. Section 230).

(2) "Journalist" means a person, including a parent, subsidiary, division, or affiliate of a person, who for a substantial portion of the person's livelihood or for substantial financial gain, gathers, compiles, prepares, collects, photographs, records, writes, edits, reports, investigates, processes, or publishes news or information that is disseminated by a news medium or communication service provider and includes:

(A) a person who supervises or assists in

00346

gathering, preparing, and disseminating the news or information; or

    (B)  notwithstanding the foregoing, a person who is or was a journalist, scholar, or researcher employed by an institution of higher education at the time the person obtained or prepared the requested information, or a person who at the time the person obtained or prepared the requested information:

    (i)  is earning a significant portion of the person's livelihood by obtaining or preparing information for dissemination by a news medium or communication service provider; or

    (ii)  was serving as an agent, assistant, employee, or supervisor of a news medium or communication service provider.

    (3)  "News medium" means a newspaper, magazine or periodical, book publisher, news agency, wire service, radio or television station or network, cable, satellite, or other transmission system or carrier or channel, or a channel or programming service for a station, network, system, or carrier, or an audio or audiovisual production company or Internet company or provider, or the parent, subsidiary, division, or affiliate of that entity, that disseminates news or information to the public by any means, including:

    (A)  print;
    (B)  television;
    (C)  radio;
    (D)  photographic;
    (E)  mechanical;
    (F)  electronic; and
    (G)  other means, known or unknown, that are accessible to the public.

    (4)  "Official proceeding" means any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant.

    (5)  "Public servant" means a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if the person has not yet qualified for office or assumed the person's duties:

    (A)  an officer, employee, or agent of government;
    (B)  a juror or grand juror;
    (C)  an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy;
    (D)  an attorney or notary public when participating in the performance of a governmental function; or
    (E)  a person who is performing a governmental function under a claim of right, although the person is not legally qualified to do so.

    Sec. 2.  PURPOSE. The purpose of this article is to increase the free flow of information and preserve a free and active press and, at the same time, protect the right of the public to effective law enforcement and the fair administration of justice.

    Sec. 3.  PRIVILEGE. (a) Except as otherwise provided by this article, a judicial, legislative, administrative, or other body with the authority to issue a subpoena or other compulsory process may not compel a journalist to testify regarding or to produce or disclose in an official proceeding:

    (1)  any confidential or nonconfidential unpublished information, document, or item obtained or prepared while acting as a journalist; or
    (2)  the source of any information, document, or item

00347

described by Subdivision (1).

(b)  A subpoena or other compulsory process may not compel the parent, subsidiary, division, or affiliate of a communication service provider or news medium to disclose the unpublished information, documents, or items or the source of any information, documents, or items that are privileged from disclosure under Subsection (a).

Sec. 4.  PRIVILEGE CONCERNING CONFIDENTIAL SOURCES.  (a)  A journalist may be compelled to testify regarding or to disclose the confidential source of any information, document, or item obtained while acting as a journalist if the person seeking the testimony, production, or disclosure makes a clear and specific showing that the source of any information, document, or item:

(1)  was observed by the journalist committing a felony criminal offense and the subpoenaing party has exhausted reasonable efforts to obtain from alternative sources the confidential source of any information, document, or item obtained or prepared while acting as a journalist;

(2)  is a person who confessed or admitted to the journalist the commission of a felony criminal offense and the subpoenaing party has exhausted reasonable efforts to obtain from alternative sources the confidential source of any information, document, or item obtained or prepared while acting as a journalist;

(3)  is a person for whom probable cause exists that the person participated in a felony criminal offense and the subpoenaing party has exhausted reasonable efforts to obtain from alternative sources the confidential source of any information, document, or item obtained or prepared while acting as a journalist; or

(4)  disclosure of the confidential source is reasonably necessary to stop or prevent reasonably certain death or substantial bodily harm.

(b)  If the alleged criminal conduct is the act of communicating, receiving, or possessing the information, document, or item, this section does not apply, and Section 5 governs the act.

(c)  Notwithstanding Subsection (b), if the information, document, or item was disclosed or received in violation of a grand jury oath given to either a juror or a witness under Article 19.34 or 20.16, a journalist may be compelled to testify if the person seeking the testimony, production, or disclosure makes a clear and specific showing that the subpoenaing party has exhausted reasonable efforts to obtain from alternative sources the confidential source of any information, document, or item obtained. In this context, the court has the discretion to conduct an in camera hearing. The court may not order the production of the confidential source until a ruling has been made on the motion.

(d)  An application for a subpoena of a journalist under Article 24.03, or a subpoena of a journalist issued by an attorney representing the state under Article 20.10 or 20.11, must be signed by the elected district attorney, elected criminal district attorney, or elected county attorney, as applicable. If the elected district attorney, elected criminal district attorney, or elected county attorney has been disqualified or recused or has resigned, the application for the subpoena or the subpoena must be signed by the person succeeding the elected attorney.  If the elected officer is not in the jurisdiction, the highest ranking assistant to the elected officer must sign the subpoena.

Sec. 5.  PRIVILEGE CONCERNING UNPUBLISHED INFORMATION, DOCUMENT, OR ITEM AND NONCONFIDENTIAL SOURCES.  (a)  After service

00348

of subpoena and an opportunity to be heard, a court may compel a journalist, a journalist's employer, or a person with an independent contract with a journalist to testify regarding or to produce or disclose any unpublished information, document, or item or the source of any information, document, or item obtained while acting as a journalist, other than as described by Section 4, if the person seeking the unpublished information, document, or item or the source of any information, document, or item makes a clear and specific showing that:

(1)   all reasonable efforts have been exhausted to obtain the information from alternative sources; and

(2)   the unpublished information, document, or item:

(A)   is relevant and material to the proper administration of the official proceeding for which the testimony, production, or disclosure is sought and is essential to the maintenance of a claim or defense of the person seeking the testimony, production, or disclosure; or

(B)   is central to the investigation or prosecution of a criminal case and based on something other than the assertion of the person requesting the subpoena, reasonable grounds exist to believe that a crime has occurred.

(b)   The court, when considering an order to compel testimony regarding or to produce or disclose any unpublished information, document, or item or the source of any information, document, or item obtained while acting as a journalist, should consider the following factors, including but not limited to whether:

(1)   the subpoena is overbroad, unreasonable, or oppressive;

(2)   reasonable and timely notice was given of the demand for the information, document, or item;

(3)   in this instance, the interest of the party subpoenaing the information outweighs the public interest in gathering and dissemination of news, including the concerns of the journalist; and

(4)   the subpoena or compulsory process is being used to obtain peripheral, nonessential, or speculative information.

(c)   A court may not consider a single factor under Subsection (b) as outcome-determinative in the decision whether to compel the testimony or the production or disclosure of the unpublished information, document, or item, or the source of any information, document, or item.

Sec. 6.   NOTICE. An order to compel testimony, production, or disclosure to which a journalist has asserted a privilege under this article may be issued only after timely notice to the journalist, the journalist's employer, or a person who has an independent contract with the journalist and a hearing. The order must include clear and specific findings as to the showing made by the person seeking the testimony, production, or disclosure and the clear and specific evidence on which the court relied in issuing the court's order.

Sec. 7.   PUBLICATION OF PRIVILEGED INFORMATION. Publication or dissemination by a news medium or communication service provider of information, documents, or items privileged under this article is not a waiver of the journalist's privilege regarding sources and unpublished information, documents, or items.

Sec. 8.   PUBLISHED INFORMATION. This article does not apply to any information, document, or item that has at any time been published or broadcast by the journalist.

Sec. 9.   REIMBURSEMENT OF COSTS.   The subpoenaing party shall pay a journalist a reasonable fee for the journalist's time and

00349

costs incurred in providing the information, item, or document subpoenaed, based on the fee structure provided by Subchapter F, Chapter 552, Government Code.

Art. 38.111.  NEWS MEDIA RECORDINGS.  Extrinsic evidence of the authenticity of evidence as a condition precedent to the admissibility of the evidence in a criminal proceeding is not required with respect to a recording that purports to be a broadcast by a radio or television station that holds a license issued by the Federal Communications Commission at the time of the recording. The court may take judicial notice of the recording license as provided by Rule 201, Texas Rules of Evidence.

SECTION 3.  This Act applies only to information, documents, or items or the source of any information, document, or item obtained or prepared for publication in a news medium or communication service provider on or after the effective date of this Act.

SECTION 4.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2009.

_____          _____
President of the Senate                  Speaker of the House

I certify that H.B. No. 670 was passed by the House on April 2, 2009, by the following vote:  Yeas 146, Nays 0, 1 present, not voting; and that the House concurred in Senate amendments to H.B. No. 670 on April 30, 2009, by the following vote:  Yeas 146, Nays 0, 1 present, not voting.

                                         _____
                                         Chief Clerk of the House

I certify that H.B. No. 670 was passed by the Senate, with amendments, on April 28, 2009, by the following vote:  Yeas 31, Nays 0.

                                         _____
                                         Secretary of the Senate

APPROVED: _____
                      Date

          _____
                    Governor

*[handwritten margin note:] Section 4 + 5 of the Act refer to journalist testifying re: or an order to compel testimony re: — This section only deals w/ work product.*

00350

## Texas Legislature Online
## Actions

**Bill:** HB 670     **Legislative Session:** 81(R)        **Author:** Martinez Fischer

**Actions**: (descending date order)
Viewing Votes: Most Recent House Vote | Most Recent Senate Vote

| | Description | Comment | Date ▼ | Time | Journal Page |
|---|---|---|---|---|---|
| E | Effective Immediately | | 05/13/2009 | | |
| E | Signed by the Governor | | 05/13/2009 | | 3680 |
| E | Sent to the Governor | | 05/04/2009 | | 2554 |
| S | Signed in the Senate | | 05/04/2009 | | 1947 |
| H | Signed in the House | | 05/04/2009 | | 2427 |
| H | Reported enrolled | | 05/04/2009 | 07:57 AM | 2554 |
| S | House concurs in Senate amendment(s)-reported | | 04/30/2009 | | 1872 |
| H | Record vote | RV#411 | 04/30/2009 | | 2160 |
| H | Text of Senate Amendment(s) | | 04/30/2009 | | 2160 |
| H | House concurs in Senate amendment(s) | | 04/30/2009 | | 2160 |
| H | Senate Amendments Analysis distributed | | 04/28/2009 | 10:26 PM | |
| H | Senate Amendments printed and distributed | | 04/28/2009 | 10:05 PM | |
| H | Senate passage as amended reported | | 04/28/2009 | | 2007 |
| S | Record vote | | 04/28/2009 | | 1707 |
| S | Passed | | 04/28/2009 | | 1707 |
| S | Read 3rd time | | 04/28/2009 | | 1707 |
| S | Record vote | | 04/28/2009 | | 1706 |
| S | Three day rule suspended | | 04/28/2009 | | 1706 |
| S | Vote recorded in Journal | | 04/28/2009 | | 1706 |
| S | Passed to 3rd reading | | 04/28/2009 | | 1706 |
| S | Amendment withdrawn | | 04/28/2009 | | 1706 |
| S | Motion withdrawn | | 04/28/2009 | | 1706 |
| S | Motion to table | | 04/28/2009 | | 1706 |
| S | Amendment(s) offered | FA1 Williams | 04/28/2009 | | 1705 |
| S | Read 2nd time | | 04/28/2009 | | 1705 |
| S | Rules suspended-Regular order of business | | 04/28/2009 | | 1705 |
| S | Placed on intent calendar | | 04/22/2009 | | |
| S | Committee report printed and distributed | | 04/20/2009 | 02:55 PM | |
| S | Recommended for local & uncontested calendar | | 04/20/2009 | | |
| S | Reported favorably as substituted | | 04/20/2009 | | 1226 |
| S | Testimony taken in committee | | 04/15/2009 | | |
| S | Considered in public hearing | | 04/15/2009 | | |
| S | Scheduled for public hearing on . . . | | 04/15/2009 | | |
| S | Referred to Jurisprudence | | 04/07/2009 | | 911 |

00351

| | | | | |
|---|---|---|---|---|
| S Read first time | | 04/07/2009 | | 911 |
| S Received from the House | | 04/06/2009 | | 888 |
| H Reported engrossed | | 04/03/2009 | 07:50 AM | 1093 |
| H Record vote | RV#91 | 04/02/2009 | | 1045 |
| H Passed as amended | | 04/02/2009 | | 1045 |
| H Amended | 1-Martinez Fischer | 04/02/2009 | | 1045 |
| H Read 3rd time | | 04/02/2009 | | 1044 |
| H Record vote | RV#86 | 04/01/2009 | | 1022 |
| H Passed to engrossment as amended | | 04/01/2009 | | 1022 |
| H Amended | 1-Martinez Fischer | 04/01/2009 | | 1022 |
| H Read 2nd time | | 04/01/2009 | | 1022 |
| H Placed on Major State Calendar | | 04/01/2009 | | |
| H Considered in Calendars | | 03/30/2009 | | |
| H Committee report sent to Calendars | | 03/27/2009 | | |
| H Committee report printed and distributed | | 03/26/2009 | 10:45 PM | |
| H Comte report filed with Committee Coordinator | | 03/26/2009 | | 989 |
| H Reported favorably as substituted | | 03/23/2009 | | |
| H Testimony taken/registration(s) recorded in committee | | 03/23/2009 | | |
| H Committee substitute considered in committee | | 03/23/2009 | | |
| H Vote reconsidered in committee | | 03/23/2009 | | |
| H Considered in public hearing | | 03/23/2009 | | |
| H Reported favorably w/o amendment(s) | | 03/16/2009 | | |
| H Considered in public hearing | | 03/16/2009 | | |
| H Left pending in committee | | 03/02/2009 | | |
| H Testimony taken/registration(s) recorded in committee | | 03/02/2009 | | |
| H Considered in public hearing | | 03/02/2009 | | |
| H Scheduled for public hearing on . . . | | 03/02/2009 | | |
| H Referred to Judiciary & Civil Jurisprudence | | 02/18/2009 | | 326 |
| H Read first time | | 02/18/2009 | | 326 |
| H Filed | | 01/16/2009 | | |

00352



### OFFICE OF THE GOVERNOR
### Rick Perry

**For Immediate Distribution**          **Governor's Press Office: 512-463-1826**
May 13, 2009                        Allison Castle: allison.castle@governor.state.tx.us
News Release                        Katherine Cesinger: kcesinger@governor.state.tx.us

## Gov. Perry Signs House Bill 670

AUSTIN – Gov. Rick Perry has signed House Bill 670, which provides a qualified privilege to prevent journalists who receive a subpoena from having to testify or produce documents gathered while acting as a journalist. The bill also allows journalists to protect their sources in certain cases.

"This was a complex issue that required thoughtful consideration, and I am pleased that lawmakers were able to strike a balance between protecting the rights of the people and the press," Gov. Perry said. "I want to thank Rep. Martinez Fisher and Sen. Ellis for their work on this bill."

Exceptions to the bill include instances when the requestors have proven that they have exhausted all reasonable efforts to get the information elsewhere, the subpoena does not ask for more than is necessary, and the interest in obtaining the information outweighs the public's interest in protecting journalists.

Journalists are also required to identify a confidential source in a criminal case if the source was observed by the journalist committing a felony, confessed to the journalist that he committed a felony, or if there is probable cause to believe that the confidential source committed a felony and the prosecutor has exhausted all efforts to obtain the source's identity. The journalist could also be made to reveal the source if disclosure is necessary to prevent certain death or substantial bodily harm.

This bill takes effect immediately.

# # #



00353

Case 3:15-cv-01758-N    Document 38-13    Filed 06/28/16    Page 50 of 158    PageID 1811

00354

THE STATE OF TEXAS
TO ANY SHERIFF OR ANY CONSTABLE OR ANY PEACE OFFICER
OF THE STATE OF TEXAS – GREETINGS:
YOU ARE HEREBY COMMANDED TO SUMMON

NO.F08-24667-Y

CRIMINAL DISTRICT COURT #7
DALLAS COUNTY, TEXAS

SHAUN RABB, FOX 4 NEWS
UNKNOWN
DALLAS, TEXAS

THE STATE OF TEXAS
VS.

To be and appear before the CRIMINAL District Court #7 of Dallas County, Texas at the courthouse of said County, in the City of Dallas, on the 1ST day of JUNE, 20 09, at 8:30 o'clock A. M., Then and there to testify as a witness in behalf of the STATE in a criminal Action pending in said court, wherein THE STATE OF TEXAS is plaintiff, and JAMES BROADNAX Defendant No. F08-24667-Y

JAMES BROADNAX,

CAPITAL MURDER

SUBPOENA

DUECES TECUM (IF APPLICABLE)                          ☒ NOT APPLICABLE
and that he bring with him and produce in said Court, at said time and place,

ISSUED
This 20TH day of MAY, 20 09
Gary Fitzsimmons
Clerk, District Courts
Dallas County, Texas
By T. JACKSON Deputy

desired as evidence in said Criminal action, to-wit: in a certain suit pending in said court.

and there remain from day to day and from term to term until discharged by the Court
HEREIN FAIL NOT, But of this Writ make due return, showing how you have executed the same.

OUT OF COUNTY (IF APPLICABLE)                          ☒ NOT APPLICABLE
A DISOBEDIENCE OF this Subpoena is punishable by fine not exceeding $500, to be collected as Fines and costs in other criminal cases.

EXHIBIT
F

ATTORNEY:

DAVID ALEX
ASSISTANT DISTRICT ATTORNEY
133 N. INDUSTRIAL BLVD., LB 19
DALLAS, TEXAS 75207
214-653-3600

REPORT TO:

FRANK CROWLEY COURTS BLDG.
133 N. INDUSTRIAL BLVD.
DALLAS, TEXAS 75207

WITNESS MY OFFICIAL SIGNATURE, THIS ____ day of MAY, 20 09
Gary Fitzsimmons
Clerk, District Courts
Dallas County, Texas

By _____ Deputy
T. JACKSON

## AFFIDAVIT OF CAROLYN FORREST

STATE OF GEORGIA       §
             §
             §
COUNTY OF DEKALB      §

BEFORE ME, the undersigned authority, a Notary Public, in and for DeKalb County, Georgia, on this day personally appeared CAROLYN FORREST, who, being duly sworn upon her oath, deposes and stated the following:

"My name is CAROLYN FORREST. I am over 18 years of age. I have never been convicted of any crime or offence involving moral turpitude. I am fully competent to testify to the factual matters contained in this affidavit. All matters contained herein are based my personal knowledge and are true and correct.

1. I am the Vice President Legal Affairs for Fox Television Stations, Inc. In that capacity, I act as in-house counsel for KDFW FOX 4, a television station in Dallas, Dallas County, Texas, which operates under a license issued by the Federal Communications Commission. My duties include overseeing the compliance with subpoenas received by KDFW FOX 4 and its employees.

2. On or about June 19, 2008 KDFW FOX 4 aired a news broadcast that included an interview Shaun Rabb conducted with criminal defendant James Broadnax. Shortly after the broadcast aired, KDFW FOX 4 received a subpoena from the Dallas County District Attorneys' Office requesting a copy of the interview. KDFW FOX 4 complied with the request and provided a complete copy of the interview between reporter Shaun Rabb and criminal defendant James Broadnax along with a business records affidavit signed by the custodian of records for KDFW FOX 4. These materials were supplied to the Dallas County District Attorneys' Office on or about July 9, 2008.

3. On our about May 20, 2009, KDFW FOX 4 received a second subpoena in the State v. James Broadnax case – this one was delivered by email and was for the testimony of Shaun Rabb. The subpoena was issued by Assistant District Attorney David Alex. Upon receiving the subpoena, I called Mr. Alex to discuss the subpoena and to try to resolve the issues without court intervention. I informed him of the newly enacted Texas Free Flow of Information Act and offered to send him a copy of the new law that provides a reporter's privilege for Texas journalists. He responded that he was not interested in trying to work out a compromise and that the law did not really matter because this is a capital case, and Rabb was going to appear on Monday, June 1, 2009 and testify.



**EXHIBIT**
G

DL/2302692v1

Further Affiant Sayeth Not.

_Carolyn Y. Forrest_
Carolyn Forrest

Sworn and subscribed to before me, the undersigned authority, by CAROLYN FORREST, on this ___27th___ day of ___May___, 2009.

_Joan E. Gibbs_
Notary Public in and for
The State of Georgia



JOAN E GIBBS
NOTARY PUBLIC
DEKALB COUNTY, GEORGIA
My Commission Expires
10-30-2009

Page 2 of 2

DL/2302692v1

00356

919 CONGRESS AVENUE, SUITE 1250   AUSTIN, TEXAS 78701-3656
www.sdma.com   512.481.8400 phone   512.481.8444 fax

## Sedgwick
### DETERT, MORAN & ARNOLD LLP

May 26, 2009

*Via Facsimile (214) 653-2924*
David Alex
Assistant District Attorney
Dallas County District Attorneys Office
133 N. Industrial Blvd., LB 19
Dallas, Texas  75207

Re:  State of Texas v. James Broadnax; Cause No. F08-24667-Y; Criminal District Court No. 7, Dallas
County, Texas

Dear Mr. Alex:

I represent KDFW and reporter Shaun Rabb. I am writing this letter in furtherance to our brief discussion this morning about the subpoena served on Mr. Rabb. As we discussed, I will be out of town on June 1, 2009 and since there are no pretrial matters in this case until July 23, 2009, it is my understanding that we can agree on a different date and mutually convenient time for a Motion to Quash to be heard should one be necessary.

I am hopeful, however, that no such motion will be necessary. To that end, I am sending you a copy of the recent reporter's privilege passed into law in Texas on May 13, 2009. Pursuant to the newly enacted statute, Mr. Rabb's testimony should not be compelled because KDFW has already given you the entirety of the interview between Mr. Rabb and the criminal defendant. It is my understanding that these materials were given to you prior to the Act becoming law so a business records affidavit was included in the materials provided. Under the existing law, the tape would be self authenticating as well. *See* Texas Code of Criminal Procedure Art. 38.111. The new law provides for reimbursement of costs when a journalist is required to testify and should we have to file a Motion to Quash we will seek reimbursement of said costs and fees. Further, the subpoena issued does not comply with the requirements outlined in the law and as such cannot be enforced.

Please call me after you have had a chance to review HB 670. I can be reached on my direct line at (512) 481-8414.

Sincerely,

Laura Lee Prather
Sedgwick, Detert, Moran & Arnold LLP

**EXHIBIT**

H

DL/2302568v1

*Celebrating 75 Years of Service-1933-2008*

H.B. No. 67

AN ACT

relating to a qualified privilege of a journalist not to testify.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Chapter 22, Civil Practice and Remedies Code, is amended by adding Subchapter C to read as follows:

SUBCHAPTER C. JOURNALIST'S QUALIFIED TESTIMONIAL PRIVILEGE IN CIVIL PROCEEDINGS

Sec. 22.021.  DEFINITIONS.  In this subchapter:

(1)  "Communication service provider" means a person or the parent, subsidiary, division, or affiliate of a person who transmits information chosen by a customer by electronic means, including:

(A)  a telecommunications carrier, as defined by Section 3, Communications Act of 1934 (47 U.S.C. Section 153);

(B)  a provider of information service, as defined by Section 3, Communications Act of 1934 (47 U.S.C. Section 153);

(C)  a provider of interactive computer service, as defined by Section 230, Communications Act of 1934 (47 U.S.C. Section 230); and

(D)  an information content provider, as defined by Section 230, Communications Act of 1934 (47 U.S.C. Section 230).

(2)  "Journalist" means a person, including a parent, subsidiary, division, or affiliate of a person, who for a substantial portion of the person's livelihood or for substantial financial gain, gathers, compiles, prepares, collects, photographs, records, writes, edits, reports, investigates, processes, or publishes news or information that is disseminated by a news medium or communication service provider and includes:

(A)  a person who supervises or assists in gathering, preparing, and disseminating the news or information; or

(B)  notwithstanding the foregoing, a person who is or was a journalist, scholar, or researcher employed by an institution of higher education at the time the person obtained or prepared the requested information, or a person who at the time the person obtained or prepared the requested information:

(i)  is earning a significant portion of the person's livelihood by obtaining or preparing information for dissemination by a news medium or communication service provider; or

(ii)  was serving as an agent, assistant, employee, or supervisor of a news medium or communication service provider.

(3)  "News medium" means a newspaper, magazine or periodical, book publisher, news agency, wire service, radio or television station or network, cable, satellite, or other transmission system or carrier or channel, or a channel or programming service for a station, network, system, or carrier, or an audio or audiovisual production company or Internet company or provider, or the parent, subsidiary, division, or affiliate of that entity, that disseminates news or information to the public by any means, including:

(A)  print;

(B)  television;

(C)  radio;

00358

(D) photographic;
(E) mechanical;
(F) electronic; and
(G) other means, known or unknown, that are accessible to the public.
(4) "Official proceeding" means any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant, including a proceeding under Rule 202, Texas Rules of Civil Procedure.
(5) "Public servant" means a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if the person has not yet qualified for office or assumed the person's duties:
(A) an officer, employee, or agent of government;
(B) a juror;
(C) an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy;
(D) an attorney or notary public when participating in the performance of a governmental function; or
(E) a person who is performing a governmental function under a claim of right, although the person is not legally qualified to do so.
Sec. 22.022. PURPOSE. The purpose of this subchapter is to increase the free flow of information and preserve a free and active press and, at the same time, protect the right of the public to effective law enforcement and the fair administration of justice.
Sec. 22.023. PRIVILEGE. (a) Except as otherwise provided by this subchapter, a judicial, legislative, administrative, or other body with the authority to issue a subpoena or other compulsory process may not compel a journalist to testify regarding or to produce or disclose in an official proceeding:
(1) any confidential or nonconfidential information, document, or item obtained or prepared while acting as a journalist; or
(2) the source of any information, document, or item described by Subdivision (1).
(b) A subpoena or other compulsory process may not compel the parent, subsidiary, division, or affiliate of a communication service provider or news medium to disclose the information, documents, or items or the source of any information, documents, or items that are privileged from disclosure under Subsection (a).
Sec. 22.024. LIMITED DISCLOSURE GENERALLY. After notice and an opportunity to be heard, a court may compel a journalist, a journalist's employer, or a person with an independent contract with a journalist to testify regarding or to produce or disclose any information, document, or item or the source of any information, document, or item obtained while acting as a journalist, if the person seeking the information, document, or item or the source of any information, document, or item makes a clear and specific showing that:
(1) all reasonable efforts have been exhausted to obtain the information from alternative sources;
(2) the subpoena is not overbroad, unreasonable, or oppressive and, when appropriate, will be limited to the verification of published information and the surrounding circumstances relating to the accuracy of the published information;
(3) reasonable and timely notice was given of the demand for the information, document, or item;

00359

(4) in this instance, the interest of the party subpoenaing the information outweighs the public interest in gathering and dissemination of news, including the concerns of the journalist;

(5) the subpoena or compulsory process is not being used to obtain peripheral, nonessential, or speculative information; and

(6) the information, document, or item is relevant and material to the proper administration of the official proceeding for which the testimony, production, or disclosure is sought and is essential to the maintenance of a claim or defense of the person seeking the testimony, production, or disclosure.

Sec. 22.025. NOTICE. An order to compel testimony, production, or disclosure to which a journalist has asserted a privilege under this subchapter may be issued only after timely notice to the journalist, the journalist's employer, or a person who has an independent contract with the journalist and a hearing. The order must include clear and specific findings as to the showing made by the person seeking the testimony, production, or disclosure and the clear and specific evidence on which the court relied in issuing the court's order.

Sec. 22.026. PUBLICATION OF PRIVILEGED INFORMATION. Publication or dissemination by a news medium or communication service provider of information, documents, or items privileged under this subchapter is not a waiver of the journalist's privilege.

Sec. 22.027. NEWS MEDIA RECORDINGS. Extrinsic evidence of the authenticity of evidence as a condition precedent to the admissibility of the evidence in a civil proceeding is not required with respect to a recording that purports to be a broadcast by a radio or television station that holds a license issued by the Federal Communications Commission at the time of the recording. The court may take judicial notice of the recording license as provided by Rule 201, Texas Rules of Evidence.

SECTION 2. Chapter 38, Code of Criminal Procedure, is amended by adding Articles 38.11 and 38.111 to read as follows:

Art. 38.11. JOURNALIST'S QUALIFIED TESTIMONIAL PRIVILEGE IN CRIMINAL PROCEEDINGS

Sec. 1. DEFINITIONS. In this article:

(1) "Communication service provider" means a person or the parent, subsidiary, division, or affiliate of a person who transmits information chosen by a customer by electronic means, including:

(A) a telecommunications carrier, as defined by Section 3, Communications Act of 1934 (47 U.S.C. Section 153);

(B) a provider of information service, as defined by Section 3, Communications Act of 1934 (47 U.S.C. Section 153);

(C) a provider of interactive computer service, as defined by Section 230, Communications Act of 1934 (47 U.S.C. Section 230); and

(D) an information content provider, as defined by Section 230, Communications Act of 1934 (47 U.S.C. Section 230).

(2) "Journalist" means a person, including a parent, subsidiary, division, or affiliate of a person, who for a substantial portion of the person's livelihood or for substantial financial gain, gathers, compiles, prepares, collects, photographs, records, writes, edits, reports, investigates, processes, or publishes news or information that is disseminated by a news medium or communication service provider and includes:

(A) a person who supervises or assists in

00360

gathering, preparing, and disseminating the news or information; or
                (B) notwithstanding the foregoing, a person who is or was a journalist, scholar, or researcher employed by an institution of higher education at the time the person obtained or prepared the requested information, or a person who at the time the person obtained or prepared the requested information:
                        (i) is earning a significant portion of the person's livelihood by obtaining or preparing information for dissemination by a news medium or communication service provider; or
                        (ii) was serving as an agent, assistant, employee, or supervisor of a news medium or communication service provider.
        (3) "News medium" means a newspaper, magazine or periodical, book publisher, news agency, wire service, radio or television station or network, cable, satellite, or other transmission system or carrier or channel, or a channel or programming service for a station, network, system, or carrier, or an audio or audiovisual production company or Internet company or provider, or the parent, subsidiary, division, or affiliate of that entity, that disseminates news or information to the public by any means, including:
                (A) print;
                (B) television;
                (C) radio;
                (D) photographic;
                (E) mechanical;
                (F) electronic; and
                (G) other means, known or unknown, that are accessible to the public.
        (4) "Official proceeding" means any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant.
        (5) "Public servant" means a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if the person has not yet qualified for office or assumed the person's duties:
                (A) an officer, employee, or agent of government;
                (B) a juror or grand juror;
                (C) an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy;
                (D) an attorney or notary public when participating in the performance of a governmental function; or
                (E) a person who is performing a governmental function under a claim of right, although the person is not legally qualified to do so.
        Sec. 2. PURPOSE. The purpose of this article is to increase the free flow of information and preserve a free and active press and, at the same time, protect the right of the public to effective law enforcement and the fair administration of justice.
        Sec. 3. PRIVILEGE. (a) Except as otherwise provided by this article, a judicial, legislative, administrative, or other body with the authority to issue a subpoena or other compulsory process may not compel a journalist to testify regarding or to produce or disclose in an official proceeding:
        (1) any confidential or nonconfidential unpublished information, document, or item obtained or prepared while acting as a journalist; or
        (2) the source of any information, document, or item

00361

described by Subdivision (1).

(b)  A subpoena or other compulsory process may not compel the parent, subsidiary, division, or affiliate of a communication service provider or news medium to disclose the unpublished information, documents, or items or the source of any information, documents, or items that are privileged from disclosure under Subsection (a).

Sec. 4.  PRIVILEGE CONCERNING CONFIDENTIAL SOURCES.  (a)  A journalist may be compelled to testify regarding or to disclose the confidential source of any information, document, or item obtained while acting as a journalist if the person seeking the testimony, production, or disclosure makes a clear and specific showing that the source of any information, document, or item:

(1)  was observed by the journalist committing a felony criminal offense and the subpoenaing party has exhausted reasonable efforts to obtain from alternative sources the confidential source of any information, document, or item obtained or prepared while acting as a journalist;

(2)  is a person who confessed or admitted to the journalist the commission of a felony criminal offense and the subpoenaing party has exhausted reasonable efforts to obtain from alternative sources the confidential source of any information, document, or item obtained or prepared while acting as a journalist;

(3)  is a person for whom probable cause exists that the person participated in a felony criminal offense and the subpoenaing party has exhausted reasonable efforts to obtain from alternative sources the confidential source of any information, document, or item obtained or prepared while acting as a journalist; or

(4)  disclosure of the confidential source is reasonably necessary to stop or prevent reasonably certain death or substantial bodily harm.

(b)  If the alleged criminal conduct is the act of communicating, receiving, or possessing the information, document, or item, this section does not apply, and Section 5 governs the act.

(c)  Notwithstanding Subsection (b), if the information, document, or item was disclosed or received in violation of a grand jury oath given to either a juror or a witness under Article 19.34 or 20.16, a journalist may be compelled to testify if the person seeking the testimony, production, or disclosure makes a clear and specific showing that the subpoenaing party has exhausted reasonable efforts to obtain from alternative sources the confidential source of any information, document, or item obtained. In this context, the court has the discretion to conduct an in camera hearing. The court may not order the production of the confidential source until a ruling has been made on the motion.

(d)  An application for a subpoena of a journalist under Article 24.03, or a subpoena of a journalist issued by an attorney representing the state under Article 20.10 or 20.11, must be signed by the elected district attorney, elected criminal district attorney, or elected county attorney, as applicable. If the elected district attorney, elected criminal district attorney, or elected county attorney has been disqualified or recused or has resigned, the application for the subpoena or the subpoena must be signed by the person succeeding the elected attorney.  If the elected officer is not in the jurisdiction, the highest ranking assistant to the elected officer must sign the subpoena.

Sec. 5.  PRIVILEGE CONCERNING UNPUBLISHED INFORMATION, DOCUMENT, OR ITEM AND NONCONFIDENTIAL SOURCES.  (a)  After service

00362

of subpoena and an opportunity to be heard, a court may compel a journalist, a journalist's employer, or a person with an independent contract with a journalist to testify regarding or to produce or disclose any unpublished information, document, or item or the source of any information, document, or item obtained while acting as a journalist, other than as described by Section 4, if the person seeking the unpublished information, document, or item or the source of any information, document, or item makes a clear and specific showing that:

    (1) all reasonable efforts have been exhausted to obtain the information from alternative sources; and

    (2) the unpublished information, document, or item:

        (A) is relevant and material to the proper administration of the official proceeding for which the testimony, production, or disclosure is sought and is essential to the maintenance of a claim or defense of the person seeking the testimony, production, or disclosure; or

        (B) is central to the investigation or prosecution of a criminal case and based on something other than the assertion of the person requesting the subpoena, reasonable grounds exist to believe that a crime has occurred.

    (b) The court, when considering an order to compel testimony regarding or to produce or disclose any unpublished information, document, or item or the source of any information, document, or item obtained while acting as a journalist, should consider the following factors, including but not limited to whether:

    (1) the subpoena is overbroad, unreasonable, or oppressive;

    (2) reasonable and timely notice was given of the demand for the information, document, or item;

    (3) in this instance, the interest of the party subpoenaing the information outweighs the public interest in gathering and dissemination of news, including the concerns of the journalist; and

    (4) the subpoena or compulsory process is being used to obtain peripheral, nonessential, or speculative information.

    (c) A court may not consider a single factor under Subsection (b) as outcome-determinative in the decision whether to compel the testimony or the production or disclosure of the unpublished information, document, or item, or the source of any information, document, or item.

    Sec. 6. NOTICE. An order to compel testimony, production, or disclosure to which a journalist has asserted a privilege under this article may be issued only after timely notice to the journalist, the journalist's employer, or a person who has an independent contract with the journalist and a hearing. The order must include clear and specific findings as to the showing made by the person seeking the testimony, production, or disclosure and the clear and specific evidence on which the court relied in issuing the court's order.

    Sec. 7. PUBLICATION OF PRIVILEGED INFORMATION. Publication or dissemination by a news medium or communication service provider of information, documents, or items privileged under this article is not a waiver of the journalist's privilege regarding sources and unpublished information, documents, or items.

    Sec. 8. PUBLISHED INFORMATION. This article does not apply to any information, document, or item that has at any time been published or broadcast by the journalist.

    Sec. 9. REIMBURSEMENT OF COSTS. The subpoenaing party shall pay a journalist a reasonable fee for the journalist's time and

00363

costs incurred in providing the information, item, or document subpoenaed, based on the fee structure provided by Subchapter F, Chapter 552, Government Code.

Art. 38.111.  NEWS MEDIA RECORDINGS. Extrinsic evidence of the authenticity of evidence as a condition precedent to the admissibility of the evidence in a criminal proceeding is not required with respect to a recording that purports to be a broadcast by a radio or television station that holds a license issued by the Federal Communications Commission at the time of the recording. The court may take judicial notice of the recording license as provided by Rule 201, Texas Rules of Evidence.

SECTION 3.  This Act applies only to information, documents, or items or the source of any information, document, or item obtained or prepared for publication in a news medium or communication service provider on or after the effective date of this Act.

SECTION 4.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2009.


_____                  _____
President of the Senate                     Speaker of the House


I certify that H.B. No. 670 was passed by the House on April 2, 2009, by the following vote:  Yeas 146, Nays 0, 1 present, not voting; and that the House concurred in Senate amendments to H.B. No. 670 on April 30, 2009, by the following vote:  Yeas 146, Nays 0, 1 present, not voting.


                                         _____
                                          Chief Clerk of the House


I certify that H.B. No. 670 was passed by the Senate, with amendments, on April 28, 2009, by the following vote:  Yeas 31, Nays 0.


                                         _____
                                          Secretary of the Senate


APPROVED: _____
              Date


          _____
              Governor

00364

Case 3:15-cv-01758-N    Document 38-13    Filed 06/28/16    Page 61 of 158    PageID 1822

**Texas Legislature Online**
**Actions**

**Bill:** HB 670        **Legislative Session:** 81(R)        **Author:** Martinez Fischer

**Actions:** (descending date order)
Viewing Votes: Most Recent House Vote | Most Recent Senate Vote

| Description | Comment | Date ▾ | Time | Journal Page |
|---|---|---|---|---|
| E  Effective immediately | | 05/13/2009 | | |
| E  Signed by the Governor | | 05/13/2009 | | 3680 |
| E  Sent to the Governor | | 05/04/2009 | | 2554 |
| S  Signed in the Senate | | 05/04/2009 | | 1947 |
| H  Signed in the House | | 05/04/2009 | | 2427 |
| H  Reported enrolled | | 05/04/2009 | 07:57 AM | 2554 |
| S  House concurs in Senate amendment(s)-reported | | 04/30/2009 | | 1872 |
| H  Record vote | RV#411 | 04/30/2009 | | 2160 |
| H  Text of Senate Amendment(s) | | 04/30/2009 | | 2160 |
| H  House concurs in Senate amendment(s) | | 04/30/2009 | | 2160 |
| H  Senate Amendments Analysis distributed | | 04/28/2009 | 10:26 PM | |
| H  Senate Amendments printed and distributed | | 04/28/2009 | 10:05 PM | |
| H  Senate passage as amended reported | | 04/28/2009 | | 2007 |
| S  Record vote | | 04/28/2009 | | 1707 |
| S  Passed | | 04/28/2009 | | 1707 |
| S  Read 3rd time | | 04/28/2009 | | 1707 |
| S  Record vote | | 04/28/2009 | | 1706 |
| S  Three day rule suspended | | 04/28/2009 | | 1706 |
| S  Vote recorded in Journal | | 04/28/2009 | | 1706 |
| S  Passed to 3rd reading | | 04/28/2009 | | 1706 |
| S  Amendment withdrawn | | 04/28/2009 | | 1706 |
| S  Motion withdrawn | | 04/28/2009 | | 1706 |
| S  Motion to table | | 04/28/2009 | | 1706 |
| S  Amendment(s) offered | FA1 Williams | 04/28/2009 | | 1705 |
| S  Read 2nd time | | 04/28/2009 | | 1705 |
| S  Rules suspended-Regular order of business | | 04/28/2009 | | 1705 |
| S  Placed on intent calendar | | 04/22/2009 | | |
| S  Committee report printed and distributed | | 04/20/2009 | 02:55 PM | |
| S  Recommended for local & uncontested calendar | | 04/20/2009 | | |
| S  Reported favorably as substituted | | 04/20/2009 | | 1226 |
| S  Testimony taken in committee | | 04/15/2009 | | |
| S  Considered in public hearing | | 04/15/2009 | | |
| S  Scheduled for public hearing on . . . | | 04/15/2009 | | |
| S  Referred to Jurisprudence | | 04/07/2009 | | 911 |

00365

| | | | |
|---|---|---|---|
| S  Read first time | | 04/07/2009 | 911 |
| S  Received from the House | | 04/06/2009 | 888 |
| H  Reported engrossed | | 04/03/2009  07:50 AM | 1093 |
| H  Record vote | RV#91 | 04/02/2009 | 1045 |
| H  Passed as amended | | 04/02/2009 | 1045 |
| H  Amended | 1-Martinez Fischer | 04/02/2009 | 1045 |
| H  Read 3rd time | | 04/02/2009 | 1044 |
| H  Record vote | RV#86 | 04/01/2009 | 1022 |
| H  Passed to engrossment as amended | | 04/01/2009 | 1022 |
| H  Amended | 1-Martinez Fischer | 04/01/2009 | 1022 |
| H  Read 2nd time | | 04/01/2009 | 1022 |
| H  Placed on Major State Calendar | | 04/01/2009 | |
| H  Considered in Calendars | | 03/30/2009 | |
| H  Committee report sent to Calendars | | 03/27/2009 | |
| H  Committee report printed and distributed | | 03/26/2009  10:45 PM | |
| H  Comte report filed with Committee Coordinator | | 03/26/2009 | 989 |
| H  Reported favorably as substituted | | 03/23/2009 | |
| H  Testimony taken/registration(s) recorded in committee | | 03/23/2009 | |
| H  Committee substitute considered in committee | | 03/23/2009 | |
| H  Vote reconsidered in committee | | 03/23/2009 | |
| H  Considered in public hearing | | 03/23/2009 | |
| H  Reported favorably w/o amendment(s) | | 03/16/2009 | |
| H  Considered in public hearing | | 03/16/2009 | |
| H  Left pending in committee | | 03/02/2009 | |
| H  Testimony taken/registration(s) recorded in committee | | 03/02/2009 | |
| H  Considered in public hearing | | 03/02/2009 | |
| H  Scheduled for public hearing on . . . | | 03/02/2009 | |
| H  Referred to Judiciary & Civil Jurisprudence | | 02/18/2009 | 326 |
| H  Read first time | | 02/18/2009 | 326 |
| H  Filed | | 01/16/2009 | |

00366

05/26/2009 15:39 FAX                                                    ☒001

```
**********************
*** TX REPORT ***
**********************

TRANSMISSION OK

TX/RX NO              2480
RECIPIENT ADDRESS     167*12146532824
DESTINATION ID
ST. TIME              05/26 15:35
TIME USE              03'20
PAGES SENT            11
RESULT               OK
```

919 CONGRESS, SUITE 1250   AUSTIN, TEXAS 78701

*www.sdma.com*   512.481.8400 *phone*   512.481.8444 *fax*

# Sedgwick
DETERT, MORAN & ARNOLD LLP

## Facsimile Transmittal Sheet

DATE: May 26, 2009

TIME: 3:25 PM

NUMBER OF PAGES: 2 (Including cover page)

If any portion of the following document is
illegible or missing, please call our Fax Center
at 512.481.8444 as soon as possible.

**TO:**

| NAME | COMPANY | TELEPHONE | FACSIMILE |
|---|---|---|---|
| David Alex Assistant District Attorney | Dallas County District Attorneys Office | | (214) 653-2924 |

**FROM:**

NAME: Laura Lee Prather    FAX BACK NUMBER: 512.481.8444

OFFICE: Austin    OUR FILE NO.: 3546-10

RE: State of Texas v. James Broadnax; Cause No. F08-24667-Y; Criminal District Court No. 7, Dallas County, Texas

**MESSAGE:**

00367

08-CR-3439-B

| | | |
|---|---|---|
| STATE OF TEXAS, | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | 117TH JUDICIAL DISTRICT |
| | § | |
| KENNETH HUBBARD | § | |
| AGG SEXUAL ASSAULT | § | NUECES COUNTY, TEXAS |

### ORDER GRANTING MOTION TO QUASH SUBPOENA

On this day came on to be heard the Motion to Quash Subpoena filed by non-parties, KIII-TV3 and its reporter/journalist, Katy Kiser. Having reviewed the Motion, its exhibits, applicable authorities and the argument of counsel, the Court finds that, in accordance with the provisions of the newly-enacted Free Flow of Information Act, the Motion is well-taken and that the Motion should be and it is hereby GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Subpoena issued at the request of the State of Texas and served on Katy Kiser summoning her to testify as a witness for the State in this cause is hereby QUASHED.

It is further ORDERED that no other subpoenas in this cause, directed at either KIII-TV3 or Katy Kiser, shall be issued nor served on either KIII-TV3 or Katy Kiser without leave of this Court first being obtained.

SIGNED this _____ day of _____, 2009.

STATE OF TEXAS
COUNTY OF NUECES

The above and foregoing is a true and correct copy as the same appears on file and/or recorded in the appropriate records of Nueces County, Texas

I hereby certify on _____

May 26, 2009

PATSY PEREZ
NUECES COUNTY DISTRICT CLERK
CLERK OF THE DISTRICT AND COUNTY COURTS AT LAW

Hon. Sandra L. Watts
Presiding Judge, 117th District Court

**EXHIBIT**

I

00368

```
********************
***  TX REPORT  ***
********************

TRANSMISSION OK

TX/RX NO           2077
CONNECTION TEL     92146532924
SUBADDRESS
CONNECTION ID
ST. TIME           05/27 16:37
USAGE T            08'57
PGS. SENT          46
RESULT             OK
```

919 CONGRESS, SUITE 1250   AUSTIN, TEXAS 78701

*www.sdma.com*   512.481.8400 *phone*   512.481.3444 *fax*

# Sedgwick
### SEDGWICK, MORAN & ARNOLD LLP

## Facsimile Transmittal Sheet

DATE:   May 27, 2009

TIME:   3:17 PM

NUMBER OF PAGES: 46 (including cover page)

If any portion of the following document is
illegible or missing, please call our Fax Center
at 512.481.8444 as soon as possible.

**TO:**

| NAME | COMPANY | TELEPHONE | FACSIMILE |
|---|---|---|---|
| Bradley K. Lollar | Public Defender | | 214-653-3539 |
| David Alex | Asst. District Attorney | | 214-653-2924 |

**FROM:**

NAME: Laura Lee Prather          FAX BACK NUMBER:   512.481.8444

OFFICE: Austin                   OUR FILE NO.:

RE: The State of Texas v. James Broadnax; Cause No. F08-24667-Y; In the Criminal District Court
Number 7

MESSAGE:   The attached document is being filed today. Attached is your courtesy copy. Please call if you have any
questions. Thanks!

00369

```
                    ***********************
                    ***   TX REPORT   ***
                    ***********************

        TRANSMISSION OK

        TX/RX NO              2076
        CONNECTION TEL                  92146533539
        SUBADDRESS
        CONNECTION ID
        ST. TIME              05/27 16:17
        USAGE T               07'46
        PGS. SENT             46
        RESULT                OK
```

## Sedgwick
### DETERT, MORAN & ARNOLD LLP

919 CONGRESS, SUITE 1250   AUSTIN, TEXAS 78701

www.sdma.com   512.481.8400 phone   512.481.8444 fax

## Facsimile Transmittal Sheet

DATE:  May 27, 2009

TIME:  3:17 PM

NUMBER OF PAGES: 46 (including cover page)

If any portion of the following document is
illegible or missing, please call our Fax Center
at 512.481.8444 as soon as possible.

TO:

| NAME | COMPANY | TELEPHONE | FACSIMILE |
|---|---|---|---|
| Bradley K. Lollar | Public Defender | | 214-653-3539 |
| David Alex | Asst. District Attorney | | 214-653-2924 |

FROM:

NAME:  Laura Lee Prather          FAX BACK NUMBER:  512.481.8444

OFFICE:  Austin                   OUR FILE NO.:

RE:  The State of Texas v. James Broadnax; Cause No. F08-24667-Y; In the Criminal District Court Number 7

MESSAGE:  The attached document is being filed today. Attached is your courtesy copy. Please call if you have any questions. Thanks!

2

00371

CAUSE NO. F08-24667-Y

THE STATE OF TEXAS              *          IN THE DISTRICT COURT OF
                               *
VS.                            *          DALLAS COUNTY, TEXAS
                               *
JAMES BROADNAX                 *          CRIMINAL COURT #7

## O R D E R

Before the Court is Movants' Motion to Quash the subpoena of non-party Shaun Rabb.  The Dallas County District Attorney's Office served KDFW Fox 4 with the subpoena on June 25, 2008.

The Movants' cite the recently enacted Texas Free Flow of Information Act in support of their Motion to Quash.  By its terms, "this Act applies only to information, documents, or items or the source of any informtion, document or item obtained or prepared for publication in a news medium or communication service provider on or after the effective date of this Act."  (Emphasis added.) The Act does not apply retroactively.

The effective date of the Act was May 13, 2009.  The subpoenaed broadcast was dated June 19, 2008.  It is clear then that the Act does not apply to the subpoenaed broadcast.

Accordingly, without otherwise addressing the merits of the Movants' Motion to Quash, the motion is DENIED.

SO ORDERED.

_Michael R. Snipes_                28 MAY 2009
JUDGE MICHAEL R. SNIPES
CRIMINAL DISTRICT COURT 7
DALLAS COUNTY, TEXAS

**EXHIBIT**
2

**3**

00373

Vinson&Elkins

**Marc A. Fuller** mfuller@velaw.com
Tel 214.220.7881 Fax 214.999.7881

May 29, 2009

**BY HAND DELIVERY**
Ms. LaMonica Littles, Chief Clerk
Criminal District No. 7
Frank Crowley Courts Bldg.
133 N. Industrial Blvd., 7th Floor
Dallas, TX 75207

Re:    *The State of Texas v. James Broadnax*, Cause No. F08-24667-Y in the District Court of Dallas County, Texas, Criminal Court #7

Dear Ms. Littles:

I enclose for filing an original and two copies of Non-Party Ellen Goldberg's Motion to Quash Trial Subpoena.

Please file the original and return the file-stamped copies to my messenger. Thank you for your assistance.

Sincerely,

Marc A. Fuller

Enclosures
Dallas 1568368v1

c:    David Alex, Esq. (w/encl.) (via fax and U.S. Mail)



EXHIBIT
3

Vinson & Elkins LLP Attorneys at Law
Abu Dhabi Austin Beijing Dallas Dubai Hong Kong Houston
London Moscow New York Shanghai Tokyo Washington

Trammell Crow Center, 2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
Tel 214.220.7700 Fax 214.220.7716 www.velaw.com

00374

CASE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | |
| | § | |
| JAMES BROADNAX. | § | DALLAS COUNTY, TEXAS |
| | § | |
| | § | |
| | § | CRIMINAL COURT No. 7 |
| | § | |

## NON-PARTY ELLEN GOLDBERG'S MOTION TO QUASH TRIAL SUBPOENA

TO THE HONORABLE COURT:

Ellen Goldberg files this Motion to Quash Trial Subpoena, and respectfully shows this Court the following:

### I.   Background

On June 23, 2008 Ellen Goldberg, a reporter for KXAS NBC-5 ("NBC-5"), conducted an interview of defendant James Broadnax. The entire interview was taped. Before Broadnax spoke to Goldberg, he gave interviews to several other local television stations. In the first interview, Broadnax initially denied killing two men outside a Christian recording studio in Garland a few days earlier. But, as the interview progressed, he began to change his story and eventually confessed to the two murders.[1] During later interviews (including a brief interview with Goldberg), Broadnax gave similar confessions.

Shortly thereafter, the Dallas County District Attorney's Office (the "DA's Office") subpoenaed the video outtakes of these interviews from the television stations, including NBC-5. Like other stations, NBC-5 complied with the subpoena, producing all tapes of its interview with Broadnax. To alleviate any need for further production or testimony, NBC-5 gave the DA's

---

[1] That interview is broadcast in its entirety on the CBS-11 website, http://cbs11tv.com/video/?id=29586@ktvt.dayport.com.

MOTION TO QUASH SUBPOENA                                            PAGE 1

00375

Office an affidavit from the station's custodian of records, which establishes the tapes' authenticity as business records.[2]

On May 20, 2009, the DA's Office attempted to issue a second subpoena—this time for Goldberg to testify as a State's witness in the case against Broadnax. The new subpoena was not served on Goldberg. Instead, it was emailed to Sharla Alford, the assistant to the news director for NBC-5.[3] Counsel for NBC-5 has attempted to confer with the DA's office regarding the defective service of the subpoena and to understand what evidence the DA's Office seeks from Goldberg. Despite these attempts, however, the DA's Office has refused to withdraw the subpoena.

## II.     Summary of Argument

Ellen Goldberg should not be compelled to testify because she was never properly served with the subpoena. Instead, that subpoena was emailed, without request for acknowledgment of receipt, to the NBC-5 news director's assistant, Sharla Alford. Ms. Alford is not authorized to accept service of the subpoena on Goldberg's behalf. Moreover, the email sent to Ms. Alford did not comply with the requirements for electronic transmission under Article 24.04 of the Texas Code of Criminal Procedure.

Even if Goldberg had been properly served, she should not be compelled to provide testimony for the State. It is impossible to imagine what Goldberg's testimony would add to the admissible evidence currently in the State's possession. The State already has the entire taped interview that Goldberg conducted with Broadnax. It also has a business records affidavit from NBC-5 to establish the authenticity of the tapes. These video tapes are the best evidence of what

---

[2] A copy of that affidavit is attached to the Affidavit of Sharla Alford ("Alford Affidavit") as Exhibit A.

[3] A copy of the email is attached as Exhibit B to the Alford Affidavit.

MOTION TO QUASH SUBPOENA                                      PAGE 2

00376

Broadnax said and did during his interview with Goldberg. There is no reason to force Goldberg to provide her own account of the interview, which would be based on her imperfect recollections from nearly one year ago.

## III.    Argument and Authorities

### A.    Goldberg Has Not Been Properly Served With The Subpoena.

The subpoena at issue was not properly served on Goldberg. As noted above, it was emailed to the assistant to the station's news director, Sharla Alford. Ms. Alford is not authorized to accept the subpoena on Goldberg's behalf, nor is she required to do so under law.[4] Moreover, even if the email had been sent to Goldberg, it would not have satisfied the requirements for electronic service under Article 24.04 of the Texas Code of Criminal Procedure. Article 24.04(a)(3) allows email service of a subpoena only if the email is accompanied by a request for acknowledgment of receipt by the witness. TEX. CODE CRIM. P. art. 24.04(a)(3). There was no such request here.[5] Furthermore, the email did not contain the required "notice that an acknowledgment of receipt of the subpoena must be made in a manner enabling verification of the person acknowledging receipt." TEX. CODE CRIM. P. art. 24.04(c). Based on this defective service, the subpoena should be quashed.

### B.    Goldberg's Testimony Is Unnecessary And Immaterial.

Even if service had been proper, it is clear that Goldberg has nothing to add to the evidence already in the possession of the DA's Office. As noted above, Goldberg's entire interview with Broadnax was taped, and the DA's Office has those tapes. To the extent that the

---

[4] Alford Affidavit ¶ 6.
[5] Id. ¶ 5; Ex. B.

MOTION TO QUASH SUBPOENA                                          PAGE 3

00377

State wishes to introduce the tapes into evidence, it has a business records affidavit sufficient to establish their authenticity. It does not need Goldberg's testimony.[6]

Moreover, there is no basis for Goldberg to testify about the mental impressions she formed during her interview with Broadnax, including regarding Broadnax's state of mind. Nor are those mental impressions even admissible. Surely, the best evidence of Broadnax's state of mind during the interview is the taped interview itself. *See* TEX. R. EVID. 1002, 1003; *Ramsey v. Jones Enters*, 810 S.W.2d 902, 905 (Tex. App.—Beaumont 1991, writ denied); *Overton v. State*, 490 S.W.2d 556, 559 (Tex. Crim. App.—1973). Goldberg cannot be expected to accurately recount every important detail regarding what Broadnax said and did during the June 2008 interview. Her testimony on this issue would therefore be far more speculative and far less reliable than the video record itself, which is available to the Court and the jury. In addition, to the extent that any inferences regarding Broadnax's state of mind during the June 2008 interview can be drawn, that task is properly within the province of the Court or the jury—not a reporter. Goldberg's speculative testimony on this point, based on her imperfect recollection, would be highly prejudicial, misleading, and confusing. *Cf.* TEX. R. EVID. 403 (relevant evidence should be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence").

There is no other colorable reason why Goldberg should be required to provide testimony in this case. In fact, this is just the sort of speculative fishing expedition that courts have rejected in similar cases. For example, the Texas Court of Criminal Appeals has held that a party seeking testimony from a reporter must show that the testimony is material. *See Coleman v. State*, 966

---

[6] In fact, it is not even clear that Goldberg is the appropriate witness to authenticate these tapes, even if live testimony is needed.

<u>MOTION TO QUASH SUBPOENA</u>            PAGE 4

S.W.2d 525, 527-28 (Tex. Crim. App. 1998) (affirming trial court's order granting motion to quash subpoena of reporters, where requesting party had failed to make showing that reporter testimony would be material); *see also Gohring v. State*, 967 S.W.2d 459, 465 (Tex. App.—Beaumont 1998, no writ). This authority, which is based on a simple relevancy test, not the application of a "reporter's privilege," is consistent with Justice Lewis Powell's admonition in *Branzburg v. Hayes* that the "courts will be open" to journalists who need protection from subpoenas like this one, which are overbroad, harassing, and do not seek any relevant evidence. *See* 408 U.S. 665, 710 (1972) (Powell, J., concurring).

### C.    The Subpoena Must Be Quashed Based On Texas's New Shield Law.

Given the defective service, as well as the irrelevance and immateriality of Goldberg's testimony, the Court need not decide whether the subpoena can be enforced consistent with Texas's newly enacted shield law, the Free Flow of Information Act, Tex. H.B. 670 (to be codified at Tex. Code of Crim. P. Arts. 38.11 and 38.111) ("the Shield Law"). NBC-5 is aware that the Court has already held, in response to another television station's motion, that the Shield Law does not apply here. NBC-5 respectfully disagrees with this holding. To preserve its argument under the Shield Law as grounds for appeal (if necessary), however, NBC-5 briefly notes that the subpoena does not comply with the Shield Law's special procedural requirements, including that the subpoena must be signed by the elected District Attorney. *See* Tex. Code Crim. P. art. 38.11, section 4(d). Moreover, the Shield Law explicitly provides that broadcasts are self-authenticating.[7] Tex. Code Crim. P. art. 38.111. Both of these provisions take effect immediately and are not affected by Section 3 of the Act. *See* HB 670 § 4. Furthermore, to the extent that the DA's Office seeks evidence that has not already been obtained, such as mental

---

[7] Goldberg's entire interview of Broadnax is broadcast at NBC-5's website, http://www.nbcdfw.com/news/local/Jailhouse_Interview_James_Broadnax_Dallas-Fort_Worth.html.

00379

impressions that have not already been formed, such newly obtained evidence also would not be affected by Section 3 of the Act and therefore would be subject to the requirements of the Shield Law (such as the exhaustion of alternative sources and a "clear and specific showing" that the information being sought is material and essential to the case), which cannot be satisfied here. *See* TEX. CODE CRIM. P. art. 38.11, section 5(a)-(b).

## IV.     Conclusion

WHEREFORE, Ellen Goldberg respectfully requests that this Court: (1) grant this motion; (2) quash the trial subpoena; (3) enter a protective order; and (4) grant such further relief to which she may be entitled.

Respectfully submitted,

Thomas S. Leatherbury
  State Bar No. 12095275
Marc A. Fuller
  State Bar No. 24032210
VINSON & ELKINS L.L.P.
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
214-220-7881
214-999-7881 (fax)

**ATTORNEYS FOR ELLEN GOLDBERG**

00380

## CERTIFICATE OF CONFERENCE

Telephone conferences were held on May 27 and 28, 2009 with Assistant District Attorney David Alex on the merits of this motion. Agreement could not be reached; therefore, it was presented to the Court for determination.

_____
Marc A. Fuller

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served by fax and mail to counsel below on this 29th day of May, 2009.

David Alex, Esq.
Assistant District Attorney
133 N. Industrial Blvd., LB 19
Dallas, TX 75207

_____
Marc A. Fuller

1567632_1.DOC

00381

CASE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | IN THE DISTRICT COURT |
| v. | § | |
| | § | |
| JAMES BROADNAX. | § | DALLAS COUNTY, TEXAS |
| | § | |
| | § | CRIMINAL COURT No. 7 |

### AFFIDAVIT OF SHARLA ALFORD

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

Before me, the undersigned Notary Public, on this day personally appeared Sharla Alford, who being duly sworn according to law on her oath deposed and said:

1.  My name is Sharla Alford. I am over eighteen years of age, have never been convicted of a crime, and am fully competent to make this Affidavit.

2.  I am an assistant to the news director at KXAS-TV NBC-5 ("NBC-5").

3.  In June 2008, NBC-5 received a subpoena from the Dallas District Attorney's Office, requesting copies of video tapes of an interview that NBC-5 reporter Ellen Goldberg had conducted with James Braoadnax (the "June 2008 Subpoena").

4.  NBC-5 complied fully with the June 2008 Subpoena, producing all tapes of the interview and the broadcasts in which interview footage was used. In addition, NBC-5 provided a business records affidavit, a copy of which is attached as Exhibit A.

5.  On May 20, 2009, I received the email attached as Exhibit B. The email attached a subpoena for Ms. Goldberg, which is also attached in Exhibit B.

00382

6.    I was not (and still am not) authorized to accept service of this subpoena on Ms. Goldberg's behalf.

FURTHER AFFIANT SAYETH NOT.

SHARLA ALFORD

Before me the undersigned notary public on this day personally appeared Sharla Alford, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 29ᵗʰ day of May



NOTARY PUBLIC

MY COMMISSION EXPIRES: 8-9-2011

1568280_1.DOC

2

00383

## Grand Jury Subpoena

THE STATE OF TEXAS

COUNTY OF DALLAS

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

### AFFIDAVIT

Before me, the undersigned authority, personally appeared SHARLA ALFORD, who, being by me duly sworn, deposed as follows:

My name is SHARLA ALFORD, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

1.     I am the Custodian of Records for NBC Subsidiary (KXAS-TV), a Division of Station Venture Operations, LP ("KXAS") and I am responsible for responding to the Subpoena in the above-captioned matter (the "Subpoena").  I have the authority to certify the videotape of the requested footage and copies of it.

Exhibit A

00384

2.    Attached hereto is video footage that is an exact duplicate of the original footage described in the Subpoena. This video footage is from KXAS-TV, a Division of Station Venture Operations, L.P. Said video footage is kept by KXAS in the regular course of business, and it was the regular course of business of KXAS for an employee or representative of KXAS, with knowledge of the acts, events, conditions, opinions or information recorded, to make the record or transmit information thereof to be included in such record. Such record was made at or near the time of the events, or reasonably soon thereafter.



SHARLA ALFORD
EXECUTIVE ASSISTANT
NBC SUBSIDIARY (KXAS-TV), A Division of Station Venture Operations L.P.
AFFIANT

SWORN TO AND SUBSCRIBED before me on the ___11___ day of July, 2008.

MARTHA STALLARD
My Commission Expires
August 9, 2011

Notary Public, State of Texas

Notary's printed name:

_Martha Stallard_

My commission expires: ___8-9 2011___

00385

②002

07/07/2008 11:57 FAX

IN RE INVESTIGATION

OF

JAMES BROADNAX

IN THE GRAND JURY OF

DALLAS COUNTY, TEXAS

JULY TERM, A.D., 2008

## LAW ENFORCEMENT AGENCY REQUEST FOR APPLICATION FOR ISSUANCE OF SUBPOENA DUCES TECUM SUMMONING PERSON TO APPEAR BEFORE GRAND JURY

TO THE FOREMAN OF THE GRAND JURY OF DALLAS COUNTY:

I, David N. Barger, a peace officer under the laws of the State of Texas, do hereby request that the Foreman of the Grand Jury of the County of Dallas, State of Texas make application to the District Court of Dallas County for issuance of a subpoena duces tecum summoning CUSTODIAN of RECORDS (or designee) for:
KXAS Channel 5, 3900 Barnett St., Ft. Worth, Texas and to produce the following records or documents for use in a legitimate law enforcement investigation which is being conducted under auspices of the Grand Jury:

COPIES OF ALL AUDIO/VIDEO BROADCAST TAPES, OUT-TAKES (RECORDED BUT NOT AIRED), INTERVIEW NOTES AND CORRESPONDENCE REGARDING THE MURDER OF MATTHEW BUTLER AND STEPHEN SWAN IN GARLAND, TEXAS ON JUNE 19, 2008 INCLUDING INTERVIEWS OF THE SUSPECTS JAMES BROADNAX AND DAMARIUS CUMMINGS.

I hereby certify that the testimony of the said witness is believed to be material.

David N. Barger
Investigator, Dallas District Attorney
Frank Crowley Courts Building
133 N. Industrial Blvd., LB 19
Dallas, Texas 75207-4399
(214) 653-3614

Grand Jury Subpoena
Page 1 of 5

00386

☑003

07/07/2008 11:58 FAX

| | |
|---|---|
| IN RE INVESTIGATION | IN THE GRAND JURY OF |
| OF | DALLAS COUNTY, TEXAS |
| JAMES BROADNAX | JULY TERM, A.D., 2008 |

## APPLICATION FOR ISSUANCE OF SUBPOENA DUCES TECUM SUMMONING PERSON TO APPEAR BEFORE GRAND JURY

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES the Foreman of the Grand Jury of the County of Dallas, State of Texas, and pursuant to TEX. CODE CRIM. PROC. ANN. art. 20.11 (Vernon 1977), requests that the Court issue forthwith a subpoena duces tecum summoning CUSTODIAN of RECORDS (or designee) for: KXAS Channel 5, 3900 Barnett St., Ft. Worth, Texas to appear before the Dallas County Grand Jury, Frank Crowley Courts Bldg., 133 N. Industrial Blvd., Dallas, Texas, forthwith date of July 21, 2008, and to produce for the said Grand Jury at the said time and place the following records and documents:

COPIES OF ALL AUDIO/VIDEO BROADCAST TAPES, OUT-TAKES (RECORDED BUT NOT AIRED), INTERVIEW NOTES AND CORRESPONDENCE REGARDING THE MURDER OF MATTHEW BUTLER AND STEPHEN SWAN IN GARLAND, TEXAS ON JUNE 19, 2008 INCLUDING INTERVIEWS OF THE SUSPECTS JAMES BROADNAX AND DAMARIUS CUMMINGS.

The testimony of the said witness is believed to be material.

Foreman of The Grand Jury

Grand Jury Subpoena
Page 2 of 5

00387

07/07/2008 11:58 FAX    @004

*QDC#1*

IN RE INVESTIGATION

OF

JAMES BROADNAX

IN THE GRAND JURY OF

DALLAS COUNTY, TEXAS

JULY TERM, A.D., 2008

## SUBPOENA DUCES TECUM
## SUMMONING WITNESS TO
## APPEAR BEFORE GRAND JURY

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS, TO THE SHERIFF OF DALLAS COUNTY, TEXAS OR ANY CONSTABLE OR PEACE OFFICER OF THE STATE OF TEXAS ............ GREETINGS:

YOU ARE COMMANDED TO SUMMON............ CUSTODIAN of RECORDS (or designee) for: **KXAS Channel 5, 3900 Barnett St., Ft. Worth, Texas** to appear before the **Dallas County Grand Jury, Frank Crowley Courts Bldg., 133 N. Industrial Blvd. , Dallas, Texas,** forthwith date of **July 21, 2008** , and to produce for the said Grand Jury at the said time and place the following records and documents:

COPIES OF ALL AUDIO/VIDEO BROADCAST TAPES, OUT-TAKES (RECORDED BUT NOT AIRED), INTERVIEW NOTES AND CORRESPONDENCE REGARDING THE MURDER OF MATTHEW BUTLER AND STEPHEN SWAN IN GARLAND, TEXAS ON JUNE 19, 2008 INCLUDING INTERVIEWS OF THE SUSPECTS JAMES BROADNAX AND DAMARIUS CUMMINGS.

DISCLOSURE OF THE EXISTENCE OF THIS SUBPOENA WILL INTERFERE WITH AN ONGOING CRIMINAL INVESTIGATION AND IS, THEREFORE, NOT AUTHORIZED. NOTICE: UNDER TEX. CODE CRIM. PROC. ANN. art. 24.05 (Vernon 1977), REFUSAL TO OBEY THIS SUBPOENA MAY RESULT IN THE IMPOSITION OF A FINE.

Grand Jury Subpoena
Page 3 of 5

00388

ODC#1

| | | |
|---|---|---|
| IN RE INVESTIGATION | | IN THE GRAND JURY OF |
| | | |
| OF | | DALLAS COUNTY, TEXAS |
| | | |
| JAMES BROADNAX | | JULY TERM, A.D., 2008 |

*In lieu of personally appearing before the said Grand Jury at the said time and place, the said witness may comply with this subpoena by furnishing true and correct copies of the aforesaid records to the following-named person at the following address:*

**David N. Barger, Lt./Investigation Division**
**Dallas District Attorney**
**Frank Crowley Courts Building 11th Floor**
**133 N. Industrial Blvd., LB 19**
**Dallas, Texas 75207-4399**
**(214) 653-3614**

HEREIN FAIL NOT, but of this writ make due return, showing how you have executed the same.

WITNESS MY OFFICIAL SIGNATURE, this ⁷ᵗ day of Ju , A.D., 2008.

JUDGE,
Cri—l District Court 1
Dallas County, Texas

Grand Jury Subpoena
Page 4 of 5

00389

07/07/2008 11:58 FAX                                                              ☑008

IN RE INVESTIGATION                    |          IN THE GRAND JURY OF

OF                                     |          DALLAS COUNTY, TEXAS

JAMES BROADNAX                         |          JULY TERM, A.D., 2008


## RETURN

CAME TO HAND on this _____ day of _____, A.D., 2008, and executed by summoning the within-named witness on the _____ day of _____ A.D., 2008.

Criminal District Attorney, Dallas County, Texas

By _____ Investigator

**Sheriff, Constable or Peace Officer**


Grand Jury Subpoena
Page 5 of 5

00390

05/29/2009 08:12:23 PM          SDMA          415-781-2635          Page 19
Case 3:15-cv-01758-N    Document 38-13    Filed 06/28/16    Page 87 of 158    PageID 1848

Page 1 of 1

**Alford, Sharla (NBC Universal, KXAS)**

| | |
|---|---|
| **From:** | BARGER DAVID N [DAVID.BARGER@dallascounty.org] |
| **Sent:** | Wednesday, May 20, 2009 3:01 PM |
| **To:** | Alford, Sharla (NBC Universal, KXAS) |
| **Cc:** | ALEX DAVID M |
| **Subject:** | Broadnax Cap Murder Trial |
| **Attachments:** | Goldberg Subpoena.pdf |

Sharla,

I've attached a subpoena for Ellen Goldberg for an appearance on 6/1/09 in CDC #7, Judge Michael Snipes' court. Ms. Goldberg or the station's attorney can contact Asst. D.A. David Alex with any questions. His cell #972-983-2900.

Thanks.

Lt. David Barger
Dallas District Attorney's Office
Investigation Division
133 N. Industrial Blvd. LB 19
Dallas, TX 75207-4399
214-653-3614
http://dallasda.com/investigation-division.html

5/29/2009

Exhibit B

00391

Case 3:15-cv-01758-N Document 38-13 Filed 06/28/16 Page 88 of 158 PageID 1849

05/29/2009 08:12:23 PM

SDMA

415-781-2635

Page 20

**THE STATE OF TEXAS**
**TO ANY SHERIFF OR ANY CONSTABLE OR ANY PEACE OFFICER**
**OF THE STATE OF TEXAS – GREETINGS:**
**YOU ARE HEREBY COMMANDED TO SUMMON**

ELLEN GOLDBERG, KXAS CH 5 NEWS
UNKNOWN
DALLAS, TEXAS

To be and appear before the <u>CRIMINAL</u> District Court <u>#7</u> of Dallas County, Texas at the courthouse of said County, in the City of Dallas, on the <u>1ST</u> day of <u>JUNE</u>, 20 <u>09</u>, at <u>8:30</u> o'clock <u>A.</u> M., Then and there to testify as a witness in behalf of the <u>STATE</u> in a criminal Action pending in said court, wherein THE STATE OF TEXAS is plaintiff, and <u>JAMES BROADNAX</u> Defendant No. <u>F08-24667-Y</u>

**DUECES TECUM (IF APPLICABLE)**   ☒ NOT APPLICABLE
and that he bring with him and produce in said Court, at said time and place,

desired as evidence in said Criminal action, to-wit: in a certain suit pending in said court.

and there remain from day to day and from term to term until discharged by the Court
HEREIN FAIL NOT, But of this Writ make due return, showing how you have executed the same.

**OUT OF COUNTY (IF APPLICABLE)**   ☒ NOT APPLICABLE
A DISOBEDIENCE OF this Subpoena is punishable by fine not exceeding $500, to be collected as Fines and costs in other criminal cases.

WITNESS MY OFFICIAL SIGNATURE,      20TH day of MAY, 20 09
Fitzsimmons
District Courts
nty Texas

By                                         Deputy
AC   ON

---

NO F08-24667-Y

U0392

CRIMINAL DISTRICT COURT #7
DALLAS COUNTY, TEXAS

THE STATE OF TEXAS
VS.

JAMES BROADNAX.

CAPITAL MURDER

SUBPOENA

ISSUED
This <u>20TH</u> day of <u>MAY</u>, 20 09
Gary Fitzsimmons
Clerk, District Courts
Dallas County, Texas
By <u>T. JACKSON</u> Deputy

ATTORNEY:

DAVID ALEX
ASSISTANT DISTRICT ATTORNEY
133 N. INDUSTRIAL BLVD., LB 19
DALLAS, TEXAS 75207
214-653-3600

REPORT TO:

FRANK CROWLEY COURTS BLDG.
133 N. INDUSTRIAL BLVD.
DALLAS, TEXAS 75207

**4**

JU393

and economically outside the of the general public. Such a tionalization is frightening. The sic ontending that govern- ver- save the city time and this is undoubtedly true. Gov- cover-ups also save the city's from embarrassment and ac- ity. It seems fundamental that a ative democracy cannot function in informed constituency. Con- he constituency of this truism is task. When the public actively information about its government's ng, then, every effort should be accommodate this interest. Ar- it the public will eventually dis- settlement or active litigation does quately address the issue. A can wait several years before bringing suit and settlements on claim could occur years after ed wrongdoing. Little or no ac- lity is left for the responsible ent officials or departments at time.

ity also urges that the public has acy to inject extraneous issues wsuit, clouding the actual dis- the municipality believes a par- wsuit is being muddied by irrel- or tangential issues, the ality certainly has the opportuni- orm the public of this belief. It qually likely, however, that the will more readily recognize the ture projected by the lawsuit, he for the trees, and the aim be extraneous and irrel- the municipality will actually be important policy considerations would like to avoid. It is only by and addressing the inadequa- inequities within a governmen- that a governmental entity will of the people, by the people, the people." The City of St. ould rather sweep the dispute at nder the rug and hope that any issues this dispute might involve go away. I find this extremely

majority seems to agree that the rationalizations behind shielding ice of claim from public scrutiny cast tenuous. Yet the majority also that such policy determinations are legislature. It appears, however, majority has nonetheless taken it hemselves to edit the confusing "retained in anticipation of a civil legal action" to make the

phrase intelligible. The majority has ba- sically ignored the word "pending" and allowed the statute to protect all data "retained in anticipation of a civil legal action." Rewriting poorly crafted statu- tory language seems to be as much a function of the legislature as analyzing the likely policy ramifications of a statute.

Additionally, the in camera review by the trial court should not be considered an effective judicial check on the clearly overbroad discretion granted to the city attorney to determine whether a civil legal action is pending. In order for such a review to be meaningful, the court would have to allow counsel for the par- ties to participate and present arguments outlining how the language used in the specific document either does or does not "threaten litigation." This is not a situa- tion wherein the trial court is merely analyzing proffered evidence to deter- mine its admissibility in a trial. Rather, the document being analyzed is the actu- al subject of the dispute.

The public has a right to know when a citizen has alleged its government has committed a legal wrong. The newspa- pers should be allowed to see the notice of claim letter as Minn. Stat. §13.39 was not meant to protect such a document.

# TEXAS v. LYON

## Texas Criminal District Court
## Dallas County

STATE OF TEXAS v. RICHARD LYON, No. F-9141619, December 13, 1991

### NEWSGATHERING

Forced disclosure of information— Disclosure of unpublished infor- mation—In criminal actions (§60.1005)

Reporters have qualified First Amend- ment privilege not to disclose unpub- lished notes and other resource materials subpoenaed in criminal action; state's failure to show that notes taken by re- porters at press conference held by mur- der defendant and his attorney are neces- sary or critical to maintenance of

prosecution, or to show compelling need for disclosure of such information, war- rants quashing of subpoena.

———

Reporters file motions to quash sub- poenas entered in criminal prosecution. Motions granted.

Robert P. Latham, of Jackson & Walker, Dallas, Texas, for reporters.

*Full Text of Opinion*

Creuzot J.:

The Court has been presented with the motions to quash two subpoenas, one served on KDFW-TV, Inc. and Jim Reed of KDFW, as records custodian, and a second served on Lori Montgom- ery, a reporter employed by the *Dallas Times Herald*, a daily newspaper, (herein- after "Petitioners") by the State of Tex- as. The Court has conducted a hearing on said motions and for reasons hereinaf- ter enumerated finds that the motions to quash should be in all things GRANTED.

On or about March 22, 1991, Defend- ant Richard Lyon and his attorney Dan Guthrie held a press conference to com- ment on stories that the police had identi- fied Richard Lyon as the prime suspect in the death of his wife. Various mem- bers of the media attended the press conference. The Times Herald Printing Company, publisher of *Dallas Times Her- ald* ("Times Herald") assigned reporter Lori Montgomery to attend the press conference and prepare reports on the proceedings for possible publication. Likewise, KDFW, Inc., the operator of a television station in Dallas, assigned a camera crew and a reporter to cover the press conference. Approximately six days prior to the trial of Richard Lyon for the murder of his wife, the government served a subpoena duces tecum upon Lori Montgomery and upon KDFW-TV seeking unpublished information regard- ing the March 22, 1991 press confer- ence.[1] Petitioners assert a qualified

———

[1] The subpoena served upon KDFW T.V. requested "any and all videos of the press conference held by Richard Lyon and Dan Guthrie on March 22, 1991." The subpoena served upon Lori Montgomery of the Times Herald requested "any and all reports, tapes, accounts, notes and documents of any nature pertaining to Richard A. Lyon." Published or broadcast accounts of the press conference were not in issue.



EXHIBIT
4

19 Med. L. Rptr.   2154

privilege under the First Amendment to the United States Constitution and Article 1 Section 8 of the Texas Constitution which, they argue, requires the subpoenas to be quashed.

The prosecuting attorney who caused the subpoenas to be served upon Petitioners indicated to Petitioners' counsel and the Court that the government was seeking notes, outtakes or tapes from the March 22, 1991 press conference. The State contends that notes, outtakes or tapes which Petitioners might have of the press conference would be relevant to the issues of disqualification of defense counsel and impeachment of Defendant or Defendant's attorney regarding statements Defendant's attorney made at the press conference. Accordingly, the Court is presented with a conflict between the First Amendment privileges of the press and the ability of counsel in a criminal proceeding to discover information relating to a criminal investigation.

The questions of when to allow a qualified privilege protecting reporters and what showing is necessary to overcome it is well established in our state law. Article 1 §8 of the Texas Constitution provides that ". . . no law shall ever be passed curtailing the liberty of speech or of the press." The courts interpret this to mean that once the qualified privilege is asserted, the party seeking disclosure of the outtakes, investigative materials, and notes must demonstrate that there is a compelling and overriding need for the information. Specifically, when a member of the press is subpoenaed in a case when the press is not a party, there is a qualified privilege which shifts the burden to the party seeking the information to establish that 1) the reporter has information *highly* relevant to a claim or defense in the underlying litigation; 2) there is a compelling need for disclosure sufficient to override the First Amendment privilege; and 3) the information is unavailable from any other sources less chilling of First Amendment freedoms. *Channel Two Television Co. v. Dickerson,* 725 S.W.2d 470 [13 Med.L.Rptr. 2133] (Tex. App.—Houston [1st Dist] 1987 no writ) (citing *United States v. Burke,* 700 F.2d 70, 76–77 [9 Med.L.Rptr. 1211] (2d Cir. 1983), cert. den'd. 464 U.S. 816, 104 S.Ct. 72, 78 L. Ed. 2d 85 (1983). The latter element requires, in most instances, a showing that the party seeking the information has unsuccessfully attempted to obtain the information from the other sources.

The State asserts that the Petitioners have no qualified privilege to withhold documents, outtakes, notes or testimony at a criminal trial, or, alternatively, that the state has shown the necessity for the information and has thereby, overcome the qualified privilege.

The gathering of news, as well as its reporting, is an activity protected by the First Amendment to the United States Constitution. *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed. 2d 626 [1 Med.L.Rptr. 2617] (1972). The protection afforded is not altered by the fact that the case pending is criminal rather than civil. *Channel Two Television Co. v. Dickerson,* 725 S.W.2d 470, 472 (Tex. App.—Houston [1st Dist] 1987) no writ; relying on *New York Times v. Sullivan,* 376 U.S. 254, 265, 84 S.Ct. 710, 718 [1 Med.L.Rptr. 1527] (1964). The job of the media is to gather as much information as it possibly can with respect to all facets of activity of interest and importance to readers. If it does its job well, it logically will be the repository of much information concerning controversial or highly publicized events which take place in the area which it serves. As recognized by the court in *United States v. Cuthbertson* (5th Cir. 1980) 630 F.2d 139 [6 Med.L.Rptr. 1933], the interests of the press that form the foundation of the qualified privilege are not diminished because the nature of the underlying proceeding out of which the request for the information arises is a criminal trial. *Id.* at 147. The court in *Cuthbertson* ruled that the privilege extends not only to the protection of confidential sources, but also to unpublished notes or other resource material held by the press which is the subject of the subpoena duces tecum in this case. *Id.*

The State next suggests that it needs to see the investigative material or work product first before a showing can be made sufficient to overcome the first part of the test outlined above. That procedure however, is not contemplated by the privilege. If the State's contention in this regard were the law, it would surely swallow up the rule because the press would constantly be called upon to divulge the very information they have a privilege to protect. The State has, therefore, failed to sustain its burden of prov-

*Texas v. Lyon*                    *Bedingfield v. The Birmingham News Co.*                    19 Med. L. Rptr.   2155

btain the information from irces.

asserts that the Petitioners ilified privilege to withhold outtakes, notes or testimony l trial, or, alternatively, that shown the necessity for the and has thereby, overcome privilege.

ring of news, as well as its an activity protected by the lment to the United States. *Branzburg v. Hayes,* 408 S.Ct. 2646, 33 L.Ed. 2d 626 otr. 2617] (1972). The pro- led is not altered by the fact pending is criminal rather *'hannel Two Television Co. v.* 5 S.W.2d 470, 472 (Tex. ton [1st Dist] 1987) no writ; *w York Times v. Sullivan,* 376 65, 84 S.Ct. 710, 718 [1 15 1964). The job of to ga..cr as much informa- sibly can with respect to all vity of interest and impor- ers. If it does its job well, it be the repository of much concerning controversial or ized events which take place hich it serves. As recognized in *United States v. Cuthbertson* 1980) 630 F.2d 139 [6 1933], the interests of the orm the foundation of the ilege are not diminished be- ture of the underlying pro- of which the request for the irises is a criminal trial. *Id.* court in *Cuthbertson* ruled lege extends not only to the confidential sources, but blished notes or other re- ial held by the press which of the subpoena duces te- ase. *Id.*

iext suggests that it needs to stigative material or work before a showing can be it to overcome the first part utlined above. That proce- , is not contemplated by the he State's contention in this the law, it would surely the r' because the press ntly called upon to di- y information they have a rotect. The State has, there- sustain its burden of prov-

ing by substantial evidence the first prong of the test.

Next, the State has failed to demon- strate that the notes, tape recordings, outtakes or testimony are necessary or critical to the maintenance of its prosecu- tion of Defendant Lyon. The United States Supreme Court has held that in- formation that the press obtains by its investigations is protected. *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L. Ed. 2d 626 (1972). Since *Branzburg,* other courts have discussed more fully the chilling affect that discovery of the journalistic process would have on the uncovering of news. *See Larouche v. Na- tional Broadcasting Co.,* 780 F.2d 1134, 1139, [12 Med.L.Rptr. 1585] (4th Cir. 1986) cert den'd. 492 U.S. 818, 107 S.Ct. 79, 93 L. Ed. 2d 34 (1986).; *United States v. Cuthbertson,* 630 F.2d 139, 147 (3rd Cir. 1980) cert den'd. 454 U.S. 1056 102 S.Ct. 604, 70 L. Ed. 2d 594 (1981).

The State's asserted need for the infor- mation from Petitioners is based on spec- ulation and a series of contingencies un- related to the main claim. The State's rationale is that the Defendant's attorney during the press conference identified three potential suspects other than the Defendant, thereby making himself a po- tential witness, and if the Defendant seeks to call his attorney as a witness to reveal those suspects, then the States could also call Defendant's attorney as a witness and thus, seek his disqualifica- tion; if the Defendant testifies the State will seek to question the Defendant con- cerning the identity of those three poten- tial suspects.

In applying the second prong of the three prong test to determine whether the qualified privilege was overcome by the State, the Court finds that the need for this evidence bears at most a remote, tenuous and speculative relationship to the actual merits of the State's case against Defendant. The Court notes that the three part test outlined above is most often utilized to balance a reporter's privileges with the State's or the ac- cused's rights to information regarding criminal conduct. Here, the reporters were not witnesses to criminal conduct and the information they possess, if any, is far removed from the criminal conduct at issue. The State has not presented the Court with any authority indicating that a reporter's qualified privilege can be overcome by a need for information that

might possibly be relevant to a motion to disqualify an attorney or might be rel- evant to impeach Defendant by using statements of his attorney. Therefore, the State has failed to satisfy the second part of the test.

The third-prong need not be addressed as counsel for the State in his argument before the Court indicated that there were numerous other individuals present at the March 22 press conference and that some of those persons could or would be called as witnesses.

The likelihood or even possibility of court ordered disclosure of investigative material in a civil or a criminal case diminishes the flow of news by encourag- ing self censorship by newsgatherers. To make the press, in effect, the investigative arm of every civil or criminal litigant throughout the State of Texas inevitably will constrict the flow of information to the press, and ultimately to us all.

The Motions to Quash are in all things GRANTED.

IT IS SO ORDERED.

---

## BEDINGFIELD v. THE BIRMINGHAM NEWS CO.

### Alabama Supreme Court

HOYT BEDINGFIELD v. THE BIRMINGHAM NEWS CO., No. 1901321, February 28, 1992

#### NEWSGATHERING

Access to records—In general (§38.01)

Statutory right of access—State open records acts (§44.17)

Internal audit report of Alabama city council offices is "public writing" subject to Alabama public records statute, Ala. Code 36-12-40, and is not exempt from disclosure.

---

Action by newspaper seeking disclo- sure of audit reports. From decision of

**5**

00397

## Prather, Laura

**From:** David Alex [DAVID.ALEX@dallascounty.org]
**Sent:** Friday, May 29, 2009 4:21 PM
**To:** Prather, Laura
**Cc:** LISA SMITH
**Subject:** RE: Shaun Rabb subpoena

Mr. Rabb needs to be in court Monday per the subpoena. I can not give you anything in writing regarding the Wit Rule because I'm not the Judge and without authority to bind the court. The MTQ has been denied, there is no legal bar. Mr. Rabb is a witness and from this point on I will treat him like any other witness who has been subpoenaed for court. If you have a legal motion to file, file it and we'll discuss the merits in front of the Judge.

By the way, after we spoke, I saw Mr. Rabb getting on the elevator as I was getting off. I don't think coming to the courthouse is a huge inconvenience.

**From:** Prather, Laura [laura.prather@sdma.com]
**Sent:** Friday, May 29, 2009 2:11 PM
**To:** David Alex
**Subject:** Shaun Rabb subpoena

Hi David,
I left you a voicemail message a few minutes ago explaining the following. Mr. Rabb understands he is under subpoena. He and his employer are concerned, however, if he is sworn in on Monday -- for testimony to be provided at a pretrial hearing seven weeks later, it will interfere with his reporting ability. You've mentioned that the Rule will not be invoked, but is there a way we can get that in writing so we don't have to worry about seeking some sort of relief from the court on this issue. Also do we know Mr Lollar's position on the issue. Lastly, we are happy to agree to continuing the subpoena until july 23 without the need for reissuance or service which may be the preferable way to handle the issue for all involved.
Please let me know. Thanks and take care,
Laura

The information in this email is intended for the named
recipients only.  It may contain privileged and confidential
matter.  If you have received this email in error, please
notify the sender immediately by replying to this email.
Do not disclose the contents to anyone.  Thank you.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance
with Treasury Department regulations, we inform you that
any U.S. federal tax advice contained in this correspondence
(including any attachments) is not intended to be used, and
cannot be used, for the purpose of (i) avoiding penalties that
may be imposed under the U.S. Internal Revenue Code or
(ii) promoting, marketing or recommending to another party
any transaction or matter addressed herein.



**EXHIBIT**
**5**

5/31/2009

00398

**TABLE OF CONTENTS**

00399

1. *Ex parte Allen*, 699 S.W.2d 886 (Tex.Crim.App.1985)

2. *Boykin v. State*, 818 S.W.2d 782 (Tex. Crim. App. 1991) — *Jerd. must apply statute as worded*

3. *Branzburg v. Hayes*, 92 S.Ct. 2646 (1972)

4. *Campbell v. Klevenhagen*, 760 F.Supp. 1206, (S.D. Tex. 1991)

5. *Channel Two Television Co. v. Dickerson*, 725 S.W.2d 470, (Tex. App.--Houston [1st Dist.] 1987)

6. *Coleman v. State*, 966 S.W. 2d 525, (Tex. Crim. App. 1998) — *reporter to testify no violation of 6th Am*

7. *Cooper v. State*, 769 S.W.2d 301, (Tex. App.—Houston 1997, no pet.)

8. *Dallas Morning News Co. v. Garcia*, 822 S.W.2d 675, (Tex. App. — San Antonio 1991)

9. *Goodlow v. State*, 766 S.W.2d 352, (Tex. App.Texarkana 1989)

10. *Ex Parte Grothe*, 687 S.W.2d 736, (Tex. Crim. App. 1984) — *obstruction of passage — reporter present had to testify*

11. *Ex Parte Johnson*, 697 S.W.2d 605, (Tex. Crim. App. 1985) — *proc. law applied retro.*

12. *Gohring v. State*, 967 S.W.2d 459, (Tex. App.— Beaumont 1998)

13. *Goodlow v. State*, 766 S.W.2d 352, (Tex. App.Texarkana 1989)

14. *Grimes v. State*, 807 S.W.2d 582 (Tex. Crim. App. 1991)

15. *Holt v. State*, 2 Tex. 363 (1847) — *no ex post facto; procedural law applied retro.*

16. *In re Selcraig*, 705 F.2d 789 (5th Cir.1983)

17. *Merchants Fast Motor Lines, Inc. v. Railroad Commission of Texas*, 573 S.W.2d 502 (Tex. 1978)

18. *Musgrove v. State*, 82 S.W.3d 34 (Tex. App.- San Antonio 2002) — *Lit. has no vested rt. in procedure. evidentiary rules @ time of trial applies*

19. *O'Neill v. Oakgrove Construction, Inc.*, 71 N.Y.2d 521 (N.Y. Ct. App. 1988)

20. *Overton v. State*, 490 S.W.2d 556 (Tex. Crim. App. 1973)

21. *Ramsey v. Jones Enterprises*, 810 S.W.2d 902 (Tex. App.—Beaumont 1991)

22. *Rodriguez v. State*, 779 S.W.2d 884 (Tex.App.--Corpus Christi 1989)

23. *State v. Johnson*, 198 S.W.3d 795 (Tex. App.-San Antonio 2006)

24. *State v. McMeans*, 884 S.W.2d 772 (Tex. Crim. App 1994)

25. *Texas v. Lyon*, 19 Med. L. Rptr. 2153 (Tex. Dist. Ct.--Dallas 1991)

26. *Thompson v. State of Utah*, 170 U.S. 343 (1898)

DL/2303204v1

00400

1

00401

Westlaw.

699 S.W.2d 886
699 S.W.2d 886
(Cite as: 699 S.W.2d 886)



Page 1

**H**

Court of Appeals of Texas,
Dallas.

Ex parte William Wade ALLEN, Applicant.
No. 05-85-00180-CR.

Aug. 30, 1985.
Rehearing Denied Nov. 7, 1985.

Accused sought a writ of habeas corpus by which he sought to avoid extradition to Tennessee. The Criminal District Court, Dallas County, Ron Chapman, J., denied the writ, and accused appealed. The Court of Appeals, Guittard, C.J., held that: (1) the affidavit of identification was not requisite to a proper order of extradition; (2) the Texas governor's warrant and its attached documents were sufficient to show the accused's presence in Tennessee on the date of the offense; and (3) the order authorizing extradition was not defective because proceedings were conducted before a magistrate, rather than a district judge.

Affirmed.

Whitham, J., dissented with opinion.

West Headnotes

[1] Extradition and Detainers 166 ⚷—36

166 Extradition and Detainers
    166I Extradition
        166I(B) Interstate
            166k36 k. Warrant for Arrest and Delivery.
Most Cited Cases
Affidavit of identification is not requisite to proper order for extradition and, therefore, governor's warrant was valid even though it was issued before affidavit of identification was signed.

[2] Extradition and Detainers 166 ⚷—36

166 Extradition and Detainers
    166I Extradition
        166I(B) Interstate

166k36 k. Warrant for Arrest and Delivery.
Most Cited Cases
Texas governor's warrant and its attached documents were sufficient to show accused's presence in demanding state at time of offense which gave rise to extradition.

[3] Extradition and Detainers 166 ⚷—39

166 Extradition and Detainers
    166I Extradition
        166I(B) Interstate
            166k39 k. Examination, Determination, and Review of Proceedings. Most Cited Cases
Extradition hearing was not trial on merits and, thus, could be referred to magistrate. Vernon's Ann.Texas Civ. St. art. 1918c, § 4(a)(6), (b).

[4] Extradition and Detainers 166 ⚷—39

166 Extradition and Detainers
    166I Extradition
        166I(B) Interstate
            166k39 k. Examination, Determination, and Review of Proceedings. Most Cited Cases
Accused may waive hearing before district judge and consent to determination of extradition matter by magistrate. Vernon's Ann.Texas C.C.P. arts. 1.14, 51.13, § 25a.

[5] Extradition and Detainers 166 ⚷—39

166 Extradition and Detainers
    166I Extradition
        166I(B) Interstate
            166k39 k. Examination, Determination, and Review of Proceedings. Most Cited Cases
Any objection to hear extradition hearing before magistrate was expressly waived by defendant's waiver of having cause heard by district judge. Vernon's Ann.Texas C.C.P. arts. 1.14, 51.13, § 25a.

[6] Extradition and Detainers 166 ⚷—39

166 Extradition and Detainers
    166I Extradition
        166I(B) Interstate
            166k39 k. Examination, Determination, and Review of Proceedings. Most Cited Cases

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

699 S.W.2d 886
699 S.W.2d 886
(Cite as: 699 S.W.2d 886)

Page 2

Order referring extradition matter to magistrate adequately specified duties of magistrate so as to confer jurisdiction on magistrate. Vernon's Ann.Texas Civ. St. art. 1918c, § 4(c).

[7] Extradition and Detainers 166 ⬦39

166 Extradition and Detainers
  166I Extradition
    166I(B) Interstate
      166k39 k. Examination, Determination, and Review of Proceedings. Most Cited Cases
Actions of magistrate in conducting extradition hearing were not rendered void by failure to reduce findings to writing. Vernon's Ann.Texas Civ. St. art. 1918c, § 7(a).

[8] Extradition and Detainers 166 ⬦34

166 Extradition and Detainers
  166I Extradition
    166I(B) Interstate
      166k34 k. Requisition and Accompanying Documents. Most Cited Cases
Tennessee supporting papers attached to extradition application directed to Texas governor were authenticated by demand which stated that Tennessee governor certified papers as authentic and duly authenticated. Vernon's Ann.Texas C.C.P. art. 51.13. § 3.

[9] Extradition and Detainers 166 ⬦22

166 Extradition and Detainers
  166I Extradition
    166I(B) Interstate
      166k22 k. Constitutional and Statutory Provisions. Most Cited Cases
Amendments which abolished right to motion for rehearing in extradition appeals when order approving extradition has been affirmed applied from effective date of legislation where amendments were procedural and did not alter substantive law defining criminal acts or providing for penalties; the amendments therefore applied to both pending and future actions. Vernon's Ann.Texas C.C.P. art. 44.38.

[10] Constitutional Law 92 ⬦2800

92 Constitutional Law
  92XXIII Ex Post Facto Prohibitions
    92XXIII(B) Particular Issues and Applications

92k2800 k. In General. Most Cited Cases
(Formerly 92k199)

Statutes 361 ⬦278.25

361 Statutes
  361VI Construction and Operation
    361VI(D) Retroactivity
      361k278.24 Validity of Particular Retroactive Statutes
        361k278.25 k. In General. Most Cited Cases
(Formerly 92k199)

Extradition and Detainers 166 ⬦22

166 Extradition and Detainers
  166I Extradition
    166I(B) Interstate
      166k22 k. Constitutional and Statutory Provisions. Most Cited Cases
Amendments abolishing right to motion for rehearing in extradition appeals when order approving extradition has been affirmed were not retroactive and did not violate constitutional prohibition against ex post facto laws where amendments came into effect before extradition order was affirmed so that right to rehearing did not come into existence until that time. Vernon's Ann.Texas Const. Art. 1, § 16; Vernon's Ann.Texas C.C.P. art. 44.38.

*887 J. Thomas Sullivan, Director SMU Appellate Clinic, Kathryn Rice, Elizabeth Slate, Student Attys. SMU, Dallas, for appellant.

Henry Wade, Crim. Dist. Atty., Tom Streeter, Asst. Dist. Atty., Dallas, for appellee.

Before GUITTARD, C.J., and WHITHAM and DEVANY, JJ.

GUITTARD, Chief Justice.

William Wade Allen appeals the denial of his writ of habeas corpus by which he sought to avoid extradition to the state of Tennessee where he was charged with armed robbery. Allen complains that the evidence is insufficient to support the judgment and that the extradition hearing conducted before a magistrate is void. We disagree. Consequently, we affirm.

[1] In his first ground of error, appellant contends that the evidence is insufficient to support the judgment in several

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

699 S.W.2d 886
699 S.W.2d 886
(Cite as: 699 S.W.2d 886)

Page 3

respects. First he argues that the governor's warrant issued on January 23, 1985, could not rely upon an affidavit of identification signed on January 25, 1985. The affidavit of identification is not requisite to a proper order of extradition. See *Ex parte Trisler,* 605 S.W.2d 619, 620 (Tex.Crim.App.1980). An affidavit such as this showing that the person detained is in fact the person sought by the demanding state is not necessary to the validity of the warrant and may be made at any time. See *Ex parte Viduari,* 525 S.W.2d 163, 164 (Tex.Crim.App.1975).

Appellant also complains that the indictment is insufficient in that it recites the date of the offense as, "On the day of July. A.D. 1984." This exact contention was expressly rejected in *Ex parte Heck,* 434 S.W.2d 855, 857 (Tex.Crim.App.1968).

[2] Next appellant asserts that the State failed to show his presence in the demanding state on the date of the offense. At the hearing appellant, his wife, and a friend denied his presence in Tennessee, on that date. Nonetheless, appellant's presence in the demanding state was alleged in the requisition signed by the Governor of Tennessee. Additionally, an "affidavit of identifying witness" and a photograph from the demanding state were introduced at the hearing. The Texas Governor's warrant and its attached documents are sufficient to show appellant's presence in the demanding state. *Ex parte Johnson,* 651 S.W.2d 439, 440 (Tex.App.-Dallas 1983, no pet.) Accordingly, we overrule appellant's first ground of error.

[3] In four related grounds of error, appellant attacks the order authorizing extradition because the proceedings were conducted before a magistrate rather than a district judge. Initially, appellant asserts that the magistrate's actions were tantamount to presiding over a trial upon the merits, which is expressly prohibited by the Dallas County Magistrates Act, TEX.REV.CIV.STAT.ANN. art. 1918c. § 4(b) (Vernon Supp.1985). We disagree. The extradition hearing did not involve a ruling on any *888

issue of law or fact of which the determination could result in dismissal of the case. See *Kelley v. State,* 676 S.W.2d 104, 107 (Tex.Crim.App.1984). We conclude that it was not a "trial on the merits" within section 4(b) of the Act, but was rather one of the "other matters" that section 4(a)(6) of the Act authorizes to be referred to a magistrate.

This conclusion is supported by *Ex parte Scarbrough,* 604 S.W.2d 170, 173 (Tex.Crim.App.1980), in which the Court of Criminal Appeals held that an extradition hearing was not a trial on the merits and, therefore, the applicant's right to confrontation was not violated by introduction of the governor's warrant and supporting papers. Further support for our conclusion is found in *Scott v. State,* 690 S.W.2d 256, 259 (Tex.Crim.App.1985) (magistrate may hold hearing to fix punishment pursuant to plea bargain without a specific agreement as to punishment), and *Ex parte Howard,* 685 S.W.2d 672, 674 (Tex.Crim.App.1985) (magistrate may hear motion to proceed to adjudication after order of unadjudicated probation).

[4][5] Moreover, in the present case, any objection to the hearing before the magistrate was expressly waived by appellant. The record contains the following document:

WAIVER OF HAVING CAUSE HEARD BY DISTRICT JUDGE REQUEST FOR REFERRAL TO MAGISTRATE

NOW COMES, William Wade Allen, defendant in the above numbered and titled cause and freely and voluntarily waives his right to have said cause heard by a District Judge, and requests that said cause be heard and determined by a Magistrate, having been informed of his right to have this matter heard by the District Judge and defendant understanding this right and the possible consequences of it.

| /s/John T. Boyce | /s/William Allen |
|---|---|
| Counsel for Defendant | Defendant |

Article 1.14 of the Texas Code of Criminal Procedure provides: "The defendant in a criminal prosecution for any offense may waive any rights secured him by law except the right of trial by jury in a capital felony case." An accused may waive extradition altogether and return

voluntarily to the demanding state. TEX.CODE CRIM.PROC.ANN. art. 51.13, § 25a (Vernon 1979). Furthermore, one may waive extradition in advance as a condition of parole. *Ex parte Johnson,* 610 S.W.2d 757, 759-60 (Tex.Crim.App.1980); *Ex parte Williams,* 472 S.W.2d 779, 780 (Tex.Crim.App.1971). Consequently, we see no

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

699 S.W.2d 886
699 S.W.2d 886
(Cite as: 699 S.W.2d 886)

Page 4

reason why he may not waive a hearing before the district judge and consent to determination of the matter by a magistrate. Appellant's complaint concerning the hearing before the magistrate is, accordingly, overruled.

[6] Appellant also contends that the district judge's order referring his cause to the magistrate was insufficient to confer jurisdiction on the magistrate to hear the cause. We disagree. After reciting that appellant's written waiver, consent, and request for referral to a magistrate was approved, the judge's order of referral states: "This cause is hereby referred to a Criminal District Magistrate of Dallas County, Texas pursuant to Article 1918c V.A.C.S."

Appellant argues that this statement is insufficient to confer jurisdiction on the magistrate because it fails to specify the duties of the magistrate as required by TEX.REV.CIV.STAT.ANN. art. 1918c. § 4(c) (Vernon Supp.1985). In the context of this referral order, we conclude that the judge adequately specified the duties of the magistrate-*i.e.*, to hear appellant's application for writ of habeas corpus-so as confer jurisdiction on the magistrate to hear the cause. After approving appellant's request to have the extradition proceeding "heard and determined" by a magistrate, the judge was not required by section 4(c) of article 1918c to direct the magistrate specifically to "hear appellant's application" by hearing evidence, making findings of fact, formulating conclusions of *889 law, recommending rulings or judgments, etc. *See* generally TEX.REV.CIV.STAT.ANN. art. 1918c. § 5 (Vernon Supp.1985).

[7] Appellant further contends that the actions of the magistrate were void because his findings were not reduced to writing. However, nowhere in article 1918c. § 7(a) does such a requirement appear. In a footnote in *Kelley v. State*, 676 S.W.2d 104, 108 (Tex.Crim.App.1984), Judge Miller observed:

The form motions, orders, and judgment which were used in this case have created confusion. We caution the bench and bar if they are to continue to use these forms, as economy will probably dictate, that they pay attention to what is included therein. We also note that Art. 1918c. Sec. 7, clearly *requires that the magistrate transmit all the papers relating to the case to the district judge for action.* To avoid confusion in the future, *it would be advisable* for Dallas County to develop a clear mechanism for doing so, and *for noting the recommendations and findings of the magistrate* along with the referring court's specific adoption or revision of same. (Emphasis added).

Although we agree that written findings and recommendations are advisable to avoid confusion, the findings need not be expressed in writing in order to satisfy the statute.[FN1]

> FN1. We also note an apparent inconsistency between two orders, both of which were signed by the trial judge on the same day. One "specifically adopts and ratifies the action taken by Magistrate Paul Brauchle." The other, a judgment denying the writ, recites that the judge had examined the writ and return and all documents attached and has "heard the testimony offered by both sides." Only one order is appropriate here, and it should accurately reflect that the judgment is based on the recommendation of the magistrate, as authorized by section 7 of article 1918c. This use of apparently inconsistent forms is confusing, and should be avoided, but does not affect our disposition of the appeal.

[8] In his final ground of error, appellant multifariously attacks the sufficiency of the Tennessee supporting papers attached to the application directed to the Governor of that state. The demand for extradition of the Governor of the State of Tennessee provides:

WHEREAS, it appears by the annexed application and copies of indictment and capias, *which I certify are authentic and duly authenticated in accordance with the laws of the State of Tennessee,* that under the laws of this State William Wade Allen stands charged with the crime of armed robbery committed in this State, and it has been represented and is satisfactorily shown to me that the accused was present in this State at the time of the commission of said crime and thereafter fled from the justice of this State, and has taken refuge and is now to be found in the State of Texas.... [Emphasis added.]

In *Ex parte Reagan,* 549 S.W.2d 204, 205 (Tex.Crim.App.1977), the court of criminal appeals held that such recitation was sufficient to authenticate all supporting papers under section 3 of the Uniform Criminal Extradition Act, TEX.CODE CRIM.PROC.ANN. art. 51.13. § 3 (Vernon 1979). We are bound by this determination. Consequently, we hold that the papers in this case are properly authenticated.

All of appellant's grounds of error are overruled and the judgment is affirmed.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00405

699 S.W.2d 886
699 S.W.2d 886
(Cite as: 699 S.W.2d 886)

Page 5

WHITHAM, J. dissents.
WHITHAM, J., dissenting.
I respectfully dissent. I agree that the evidence is sufficient; however, I would sustain appellant's fourth and fifth grounds of error and reverse and remand. Before addressing the reasons why I would reverse and remand, I must express my disagreement with certain of the majority's holdings pertaining to the magistrate practice.

*The majority's first erroneous holding*

I cannot agree with the majority's holding that "we see no reason why [appellant] may not waive a hearing before the district judge and consent to determination of the *890 matter by a magistrate." The waiver reads:

NOW COMES, William Wade Allen, defendant in the above numbered and titled cause and freely and voluntarily waives his right to have said cause heard by a District Judge, and requests that said cause be heard and determined by a Magistrate, having been informed of his right to have this matter heard by the District Judge and defendant understanding this right and the possible consequences of it.

To my mind, appellant's waiver fails to reach as far as the majority would have it do. Pertinent to appellant's fourth ground of error, appellant's waiver cannot relieve the district judge from making a proper order of referral to the magistrate. Pertinent to appellant's fifth ground of error, appellant's waiver cannot relieve the magistrate from making written findings, conclusions and recommendations to be submitted to the district judge.

Moreover, appellant waived "his right to have said cause heard by a district judge," and requested "that said cause be *heard and determined* by a magistrate." (emphasis added). Thus, appellant agreed that the merits of his extradition could be decided by a magistrate. Such a procedure is contrary to TEX.REV.CIV.STAT.ANN. art. 1918c, § 4(b) (Vernon Supp.1985), which provides "[i]n no event may a judge refer to a magistrate a criminal case permitting the magistrate to preside over a trial on the merits, either with or without a jury." In my view, the phrase "trial on the merits" as used in section 4(b) includes the merits of appellant's extradition. Therefore, the magistrate would have no right in this extradition case to order appellant's extradition to a sister state. Certainly, I recognize that an application for writ of habeas corpus in an extradition proceeding does not constitute a trial on the merits of the criminal accusations against an accused in a sister state. *Ex parte Scarbrough,* 604 S.W.2d 170, 172-73 (Tex.Crim.App.1980).

Furthermore, appellant cannot be bound by an agreement to be tried by a tribunal created contrary to the constitution of the State of Texas. Appellant did so when he agreed that his case could "be heard and *determined* by a magistrate." By holding appellant bound by the language of the waiver, the majority applies article 1918c in an unconstitutional manner.

A court is an instrumentality of sovereignty, the repository of its judicial power, with authority to adjudge as to the rights of person or property between adversaries. The presence of a judge or judges is necessary as an essential element of a court. A "court" was defined by Bacon to be "an incorporeal being, which requires for its existence the presence of the judges or a competent number of them."

*Mengel Box Co. v. Fowlkes,* 135 Tenn. 202, 186 S.W. 91, 92 (1916). I conclude that the State of Texas, as sovereign, has placed none of its judicial power, with authority to adjudge as to the rights of person or property between adversaries, in magistrates appointed pursuant to article 1918c. The State of Texas, as sovereign, created district courts, and provided for judges of those courts, in article V, sections 1 and 7 of its constitution and placed its judicial power in all criminal cases of the grade of felony in those district courts. TEX.CONST. art. V, § 8. The constitution vests no judicial power of the State of Texas in the magistrate to order appellant's extradition to a sister state. Therefore, the magistrate had no power to *determine* appellant's case.

What I said in my concurring opinion in *Kelley v. State,* 669 S.W.2d 329, 333 (Tex.App.-Dallas 1983), rev'd, 676 S.W.2d 104 (Tex.Crim.App.1984), applies in the present case:

In my view [what we have in the present case] is a "rubber stamp" judicial system which is not permitted under the Constitution of this state. I cannot accept a magistrate system in which district judges are permitted to "sign off" on their judicial powers exercised by a number of court appointed surrogates. Such a system is one in which district courts *891 create other district courts and appoint the judges of those courts. If that is the interpretation to be made of TEX.REV.CIV.STAT.ANN. art. 1918c (Vernon Supp.1982-1983), then it is unconstitutional on its face under Article V, §§ 1, 7 and 8 of the Constitution of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00406

699 S.W.2d 886
699 S.W.2d 886
(Cite as: 699 S.W.2d 886)

Page 6

Texas.

Indeed, the form waiver executed by appellant in the present case evidences the fact that district court judges are creating other district courts and appointing the judges of those courts. I refer to the waiver executed by appellant in which he requested "that said cause be *heard and determined* by a magistrate." (emphasis added). In my view, when the district court provides a person with the form of waiver used in the present case, it cannot be disputed that the district court has authorized the transfer of the case to another "court." Magistrate's are not courts. Magistrates are surrogates of district court judges appointed to assist district court judges in certain limited matters. *Kelley v. State, 676 S.W.2d at 107.* Consequently, I cannot condone a system in which district court judges convert an assistant into a court contrary to the constitution of this state. Contrary to the majority's holding that "we see no reason why [appellant] may not waive a hearing before the district judge and consent to determination of the matter by a magistrate," I would hold that appellant's waiver did no more than acquiesce in the district judge's exercise of whatever power, if any, the district judge had to make a referral.

*The majority's second erroneous holding*

I cannot agree with the majority's holding that a magistrate's findings "need not be expressed in writing." Article 1918c, section 7(a), provides that "[o]n the conclusion of the proceedings, the magistrate shall transmit to the referring court all papers relating to the cases involved, together with the findings, conclusions, orders, recommendations, or other actions taken." The phrase "together with the findings, conclusions, orders, recommendations, or other actions taken" means written documents to me. Presumably, the majority permits the magistrate's *findings,* conclusions, orders and recommendations to be made orally by the magistrate and thereafter further orally conveyed to the district judge. To my mind, that is a frightening manner in which to make a record in a criminal case. In this connection, I point to the observations of the court of criminal appeals in footnote five in *Kelley v. State, 676 S.W.2d 104 (Tex.Crim.App.1984):*

The form motions, orders, and judgment which were used in this case have created confusion. We caution the bench and bar if they are to continue to use these forms, as economy will probably dictate, that they pay attention to what is included therein. We also note that *Art. 1918c, Sec. 7, clearly requires that the magistrate transmit all*

*the papers relating to the case to the district judge for action.* To avoid confusion in the future, it would be advisable for Dallas County to develop a clear mechanism for doing so *and for noting the recommendations and findings* of the magistrate along with the referring court's specific adoption or revision of same. [emphasis added].

*676 S.W.2d at 108.* The majority's opinion in the present case, however, does nothing but postpone *Kelley's* plea that Dallas County develop a clear mechanism for transmitting papers from magistrate to judge and "for *noting* the recommendations and *findings* of the magistrate." (emphasis added). A writing would constitute a more suitable means of *noting* a *finding* than the oral communication approved by the majority.

*The reasons requiring reversal and remand*

With those comments expressed, I turn to the reasons I would reverse and remand. Although I find merit in all of appellant's arguments under his four grounds of error challenging disposition of the present case by a magistrate, I address only appellant's fourth and fifth grounds of error.

*892 In his fourth ground of error, appellant complains of the trial court's failure to comply with the requirements of article 1918c, section 4(c). That section provides that "[t]o refer a case to a magistrate, the judge shall issue an order of referral specifying the duties of the magistrate." The trial court in the present case made only the following referral:

The above and foregoing waiver, consent, and request for referral to a Magistrate having been presented to me, same is hereby in all things approved. This cause is hereby referred to a Criminal District Magistrate of Dallas County, Texas pursuant to Article 1918c V.A.C.S.

Therefore, the order fails to specify the duties of the magistrate as required by statute. I recognize that appellant waived "his right to have said cause heard by a district judge, and requests that said cause be heard and determined by a magistrate." I cannot agree, however, that such a waiver includes a relinquishment of the right to have a district judge follow the statutory law of this state. For additional emphasis, I repeat the observation of the court of criminal appeals in footnote five in *Kelley:*

The form motions, orders, and judgment which were used in this case have created confusion. *We caution the bench and bar if they are to continue to use these forms, as*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00407

699 S.W.2d 886
699 S.W.2d 886
(Cite as: 699 S.W.2d 886)

Page 7

*economy will probably dictate, that they pay attention to what is included therein.* We also note that Art. 1918c, Sec. 7, clearly requires that the magistrate transmit all the papers relating to the case to the district judge for action. To avoid confusion in the future, it would be advisable for Dallas County to develop a clear mechanism for doing so and for noting the recommendations and findings of the magistrate along with the referring court's specific adoption or revision of same. (emphasis added).

676 S.W.2d at 108. I read the footnote as a warning to district judges that if they use magistrates under article 1918c "that they pay attention to what is included [in their orders]." In the present case, the trial court failed *to pay attention* to what was included in the purported order of referral. The failure to pay attention resulted in omission of the required specifications of the duties of the magistrate. To my mind, appellant was entitled to have the proceedings conducted by the magistrate strictly in accordance with duties specified by the district judge. No duties were specified. Thus, the magistrate was free to conduct the proceedings as he wished. Article 1918c does not permit magistrates to conduct proceedings before them as they wish. The court of criminal appeals opinion in *Kelley* issued on July 3, 1984. The district judge signed the purported order of referral in the present case on February 6, 1985. Given this time interval, I can only conclude that the trial court refused to heed *Kelley's* admonition to pay attention. Thus, the magistrate acted absent a specification of his duties. Therefore, the magistrate's actions were not permitted by law. Consequently, I would sustain appellant's fourth ground of error and reverse and remand.

In his fifth ground of error, appellant complains of the trial court's order authorizing extradition because it is not based upon any findings by either the magistrate or district judge. First, the matter of findings by the district judge. With respect to any perceived proceedings before the district judge, the record contains a form of judgment which reads in pertinent part:

On this, the 6th day of February, A.D., 1985, came on to be heard the application for the Writ of Habeas Corpus against William Wade Allen, and the Respondent, Jim Bowles, Sheriff of Dallas County, Texas, having made due return on said Writ of Habeas Corpus herein served upon him and having produced before me the person of the said William Wade Allen, I proceeded to hear said application and after having examined the Writ and return of said Respondent, Jim Bowles and all papers and documents attached thereto, and having heard the testimony

offered on both sides, I am of the opinion that the said William Wade Allen, is legally held in custody and under the restraint*893 of his liberty by the said Respondent, Jim Bowles, Sheriff.

Thus, the record reflects that the bench and bar also failed to "pay attention to what is included in [the judgment]." The judgment recitals indicate that the trial judge and not the magistrate heard this case from beginning to end. *See Ex parte Stacey,* 682 S.W.2d 348 (Tex.App.-Dallas 1984, pet. granted) and my dissent. It is difficult to understand why it is so hard to draft a final judgment reflecting a magistrate referral and adoption of the magistrate's findings, conclusions and recommendations,

On the record in the present case, I can no more agree that the district judge conducted a hearing on the application for writ of habeas corpus from beginning to end than I could in *Ex parte Stacey,* 682 S.W.2d at 351. In the present case, as in *Stacey,* there is the identical showing in the record negating the presumption of regularity of the proceedings before the district judge. Here, as similar to *Stacey,* the record contains only one court reporter's transcript of the proceedings. That transcript begins with these words:

BE IT REMEMBERED that on the 6th day of February, A.D., 1985, the above styled and numbered cause came on for trial before the HONORABLE PAUL BRAUCHLE, Magistrate sitting for the HONORABLE RON CHAPMAN, Judge of the Criminal District Court of Dallas County, Texas, and that the following is a true, accurate and complete transcript of the proceedings had:

Here, as similar to *Stacey,* the court reporter's transcript ends with this certificate of the Honorable Ron Chapman, Judge of the Criminal District Court of Dallas County, Texas:
The above and foregoing Writ of Habeas Corpus Hearing, certified by the Acting Official Court Reporter, having been presented to me, same is examined and approved as the Writ of Habeas Corpus Hearing in this cause.

Dated this 11 day of March, A.D., 1985.

/s/ Ron Chapman

Judge
Here, as similar to *Stacey,* the only entry on the docket sheet reads:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00408

699 S.W.2d 886
699 S.W.2d 886                                                                                    Page 8
(Cite as: 699 S.W.2d 886)

Feb. 6. 1985 St's 1 (governor's warrant) admitted without objection St's 2 admitted without objection D1 also admitted without objection both sides rest and close Writ denied [appellant] gives notice of appeal appeal bond set at $15,000 /s/Paul Brauchle

Therefore, the court reporter's transcript begins and ends virtually identical to the record in *Stacey*. Furthermore, the docket sheet entry by the magistrate is virtually the same as in *Stacey. Stacey, 682 S.W.2d at 351*.

Thus, in the present case, as in *Stacey*, the docket sheet suggests that the district court judge never conducted a hearing in this matter, never heard the application, and never heard testimony. Furthermore, in the present case, as in *Stacey*, the district court judge's own certificate establishes that this proceeding was held before a magistrate. Since the transcript of proceedings and docket sheet show that the February 6, 1985, hearing was held before a magistrate, not the district court judge, the presumption that the district court judge heard the application and testimony stands rebutted. Consequently, in the present case, as in *Stacey*, I am unwilling to blindly accept recitals in the trial court's judgment which would have us believe that two hearings were held in this proceeding, both being held on February 6, 1985, the first hearing being before the magistrate and the second before the district judge. In my view, the district judge used the wrong judgment form in a case heard by a magistrate. Accordingly, I am unwilling to ignore reality and treat that form as sacrosanct. To my mind, therefore, there were no proceedings and no hearing before the district judge in the present case. If there were no proceedings and no hearing before the district judge, then the district judge was incapable of making findings. It must follow that there are no findings by the district judge in the present case. Consequently,*894 the trial court's order authorizing extradition cannot be based on findings by the district judge.

Therefore, I consider if the record contains findings by the magistrate authorizing extradition upon which the district judge could rely. My examination of the record reflects that no findings were made by the magistrate. As pointed out above, article 1918c, section 7(a), provides that "[o]n the conclusion of the proceedings, the magistrate shall transmit to the referring court all papers relating to the cases involved, together with the findings, conclusions, orders, recommendations, or other actions taken." In my view, that language requires that the magistrate make written findings, conclusions and recommendations and

transmit these findings, conclusions and recommendations to the district judge for his use and possible action. No required findings were made by the magistrate. Consequently, the trial court's separate order also rendered February 6, 1985, "that the court specifically adopts and ratifies the actions taken by Magistrate Paul Brauchle on behalf of this court in compliance with Article 1918c V.A.C.S." can have no validity. The order can have no validity because there are no written findings, conclusions and recommendations upon which the district judge could adopt and ratify. Accordingly, the trial court's order authorizing extradition cannot be based upon findings by the magistrate.

It follows, and I would so hold, that the trial court's order authorizing extradition must be reversed because the order is not based upon findings by either the magistrate or the district judge. Therefore, I would sustain appellant's fifth ground of error and reverse and remand.

### ON MOTION FOR REHEARING

GUITTARD, Chief Justice.
On August 30, 1985, we affirmed the trial court's denial of William Wade Allen's application for a writ of habeas corpus by which he sought to avoid extradition to Tennessee. Applicant, by motion, now seeks an order allowing him to file a motion for rehearing contending that the amendments to article 44.38 of the Code [FN1] constitute an ex post facto law in violation of Article I, § 16 of the Texas Constitution. We disagree. Accordingly, we deny applicant's motion and direct the clerk of this court to issue a mandate consistent with our opinion and judgment of August 30, 1985.

> FN1. All references are to the Texas Code of Criminal Procedure unless otherwise indicated.

On February 6, 1985, the trial court entered an order denying Allen's application for a writ of habeas corpus and further ordered his extradition to Tennessee. The offense for which extradition was sought was an armed robbery alleged to have occurred in Madison County, Tennessee, in July of 1984. Applicant appealed the trial court's denial of his application for writ of habeas corpus to this court and filed his brief, and the case was argued and submitted before June 11, 1985, the effective date of the amendment to article 44.38 of the Code of Criminal Procedure, which abolished the right to a motion for rehearing in extradition appeals when the order approving extradition has been affirmed.[FN2] *895 On August 30 we affirmed the trial

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

699 S.W.2d 886
699 S.W.2d 886
(Cite as: 699 S.W.2d 886)

Page 9

court's order, and on September 15 applicant tendered his motion for rehearing to the clerk of this court for filing. The clerk initially accepted the motion but then struck through the file mark that had been placed on the motion and returned the motion to applicant. Applicant asserts that the refusal to allow him a motion for rehearing is an ex post facto application of article 44.38, as amended, in violation of Article 1, § 16 of the Texas Constitution because he was entitled to the benefit of the rules in effect at the time he commenced his appeal. We disagree. While it is true that article 1, § 16 of the Texas Constitution declares that "No ... ex post facto law ... shall be made," there is no violation of the Texas Constitution in the present case.

FN2. SECTION 2. Article 44.38. Code of Criminal Procedure, 1965 as amended, is amended to read as follows:

Article 44.38. Judgment Conclusive. (a) The judgment of the Court of Appeals in appeals under habeas corpus shall be final and conclusive if discretionary review is not granted by the Court of Criminal Appeals. If discretionary review is granted, the judgment of the Court of Criminal Appeals under habeas corpus shall be final and conclusive. In either case, no further application in the same case can be made for the writ, except in cases specially provided for by law.

(b) Notwithstanding any other provision of this code, where on appeal in a habeas corpus proceeding, the Court of Appeals has

(1) *affirmed the judgment of a trial court in an extradition proceeding and has, in effect, approved the extradition of the appellant;* or

(2) *reversed the judgment of a trial court in a proceeding in which the issue was whether bail should be granted or whether the amount of bail should be reduced and has, in effect, either granted bail or reduced the amount of bail;*

The Court of Appeals shall enter judgment on the date of and in conformity with its opinion. *In such cases, no motion for rehearing shall be permitted, and the judgment shall become final at the end of business on the 10th day after entry of judgment, on which date the mandate*

*will issue .... (emphasis added)*

Act of June 11, 1985, ch. 440, § 1, 1985 Tex.Sess.Law Serv. 2993 (Vernon).

Although ordinarily laws changing procedure are not within the prohibition against ex post facto laws, still if a procedural change is retroactive and results in depriving the accused of substantive protection, it is unconstitutional. *Ex parte Abahosh*, 561 S.W.2d 202, 203 (Tex.Crim.App.1978).

[9] Since the amendments to article 44.38 do not alter substantive law defining criminal acts or providing for penalties, they are procedural in nature. *Ex parte Johnson*, 697 S.W.2d 605, 607 (Tex.Crim.App.1985). Further, in the absence of express legislative intent to the contrary, the new law controls litigation from its effective date and applies to both pending and future actions. *Id.* Because there is no express legislative intent to the contrary, we hold that the amendments to article 44.38 apply from the effective date of the legislation, namely, June 11, 1985.

[10] We now determine whether the amendments to article 44.38, if applied to applicant, are retroactive. In most cases, the date or key event used in determining whether a law is retroactive is the date the crime was committed. *See Ex parte Abahosh*, 561 S.W.2d at 203. If a law takes effect after the commission of a crime yet acts on that crime, it is retroactive. *Id.*

In *Abahosh*, however, the date or key event used in determining retroactivity was not the date of the offense but the date the defendant pleaded guilty in reliance on the law then in force. The Court of Criminal Appeals held that an amendment to the Code requiring permission of the trial judge for an appeal from a conviction resulting from a plea bargain could not affect the right to appeal of a defendant who pleaded guilty before the amendment became effective, even though sentence was not imposed and notice of appeal was not given until after the effective date of the amendment.

The Court of Criminal Appeals did not focus on the date of the offense but on the date of another event-the date of entry of the pleas of guilty. The corresponding date in the present case is not the date the appeal commenced, or even the date the offense was argued and submitted, but the date of this court's decision, which was after the effective date of the amendment abolishing the right to file a motion for rehearing. Here appellant did nothing before

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

699 S.W.2d 886
699 S.W.2d 886
(Cite as: 699 S.W.2d 886)

Page 10

the change in the law-as Abahosh did by his pleas of guilty-that could have been affected by the change.

More nearly in point here is *Millican v. State, 145 Tex.Cr.R. 195, 167 S.W.2d 188 (Tex.Crim.App.1943)*. In *Millican*, after a suspended sentence was imposed, the Code was amended to prohibit an appeal from revocation of a suspended sentence. After the amendment became effective, the suspension was revoked, a prison term was assessed, and the defendant attempted to appeal. The Court of Criminal Appeals held that there was no ex post facto violation because the amendment did not alter any right that the defendant had prior to its adoption. *Id.* The defendant had no right of appeal while sentence was suspended*896 before the revocation and, by the amendment, had none thereafter. *Id.*

Accordingly, in this case we decline to look to the time the appeal was commenced, or even the time it was argued and submitted, to determine retroactivity. Instead we look to the date when appellant's right to a rehearing would have come into existence if the amendments had not taken effect. That date was August 30, 1985-the date this court decided appellant's case. Until then, appellant's right to a rehearing was no right at all because the right to a rehearing does not come into existence until the delivery of a decision by the appellate court. Tex.R.Crim.App. P. 208. Therefore, since the decision was not delivered until August 30, 1985, after the amendments' effective date, and appellant took no action before that date that could be affected by the amendments, we hold that the amendments apply to applicant, are not retroactive, and do not violate the constitutional prohibition against ex post facto laws.

Applicant's application for a writ of mandamus against our clerk, which we treat as a motion for an order allowing him to file a motion for rehearing, is DENIED. The clerk is ordered to issue the mandate consistent with our opinion and judgment of August 30, 1985.

Tex.App. 5 Dist.,1985.
Ex parte Allen
699 S.W.2d 886

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00411

2

00412

**3**

00413

05/29/2009 05:15:13 PM          SDMA          415-781-2635          Page 37
Case 3:15-cv-01758-N    Document 38-13    Filed 06/28/16    Page 110 of 158    PageID 1871

Page 2 of 52

## Westlaw.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665; 92 S.Ct. 2646)

Page 1

▷

Supreme Court of the United States
Paul M. BRANZBURG, Petitioner,
v.
John P. HAYES, Judge, etc., et al.
In the Matter of Paul PAPPAS, Petitioner.
UNITED STATES, Petitioner,
v.
Earl CALDWELL.
Nos. 70-85, 70-94, 70-57.

Argued Feb. 22, 23, 1972.
Decided June 29, 1972.

Certiorari was granted to review judgment of the United States Court of Appeals for the Ninth Circuit, 434 F.2d 1081, upholding refusal of newsman to appear and testify before grand jury with respect to confidential sources, and judgments of the Court of Appeals of Kentucky, at 461 S.W.2d 345 and in an unreported case, and the Supreme Judicial Court of Massachusetts, 358 Mass. 604, 266 N.E.2d 297, rejecting claimed rights of newsmen to refuse to testify before grand juries with respect to confidential sources. The Supreme Court, Mr. Justice White, held that requiring newsmen to appear and testify before state or federal grand juries does not abridge the freedom of speech and press guaranteed by the First Amendment; and that a newsman's agreement to conceal criminal conduct of his news sources, or evidence thereof, does not give rise to any constitutional testimonial privilege with respect thereto.

Judgment at 434 F.2d 1081 reversed; judgments at 461 S.W.2d 345 and 266 N.E.2d 297, and in unreported Kentucky case, affirmed.

Mr. Justice Powell filed concurring opinion; Mr. Justice Douglas dissented and filed opinion, see 92 S.Ct. 2686; Mr. Justice Stewart dissented and filed opinion in which Mr. Justice Brennan and Mr. Justice Marshall joined.

West Headnotes

[1] Constitutional Law 92 ⚷2117

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(V) Judicial Proceedings
            92XVIII(V)2 Criminal Proceedings
                92k2117 k. Grand Juries. Most Cited Cases
    (Formerly 92k90.1(3))
Requiring newsmen to appear and testify before state or federal grand juries does not abridge the freedom of speech and press guaranteed by the First Amendment. U.S.C.A.Const. Amend. 1.

[2] Federal Courts 170B ⚷508

170B Federal Courts
    170BVII Supreme Court
        170BVII(E) Review of Decisions of State Courts
            170Bk508 k. Time and Manner of Raising Federal Question in State Court. Most Cited Cases
    (Formerly 106k396(7))
Constitutional claim to newsman's privilege was properly preserved for review by certiorari where it was presented to state court, though newsman in state court relied primarily upon state statute creating a newsman's privilege and though the state court considered that such reliance constituted abandonment of the constitutional claim and did not consider the latter claim. U.S.C.A.Const. Amend. 1; K.R.S. 421.100.

[3] Grand Jury 193 ⚷36.2

193 Grand Jury
    193k36 Witnesses and Evidence
        193k36.2 k. Witnesses and Evidence Subject to Compulsion; Relevancy and Materiality. Most Cited Cases
    (Formerly 193k36, 193k6)
News reporters have the same obligation as other citizens to respond to grand jury subpoenas and to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00414

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 2

answer questions relevant to an investigation into the commission of crime. U.S.C.A.Const. Amend. 1.

[4] Constitutional Law 92 ⚖️2117

92 Constitutional Law
 92XVIII Freedom of Speech, Expression, and Press
  92XVIII(V) Judicial Proceedings
   92XVIII(V)2 Criminal Proceedings
    92k2117 k. Grand Juries. Most Cited Cases
  (Formerly 92k90.1(3))

Grand Jury 193 ⚖️36.3(2)

193 Grand Jury
 193k36 Witnesses and Evidence
  193k36.3 Grounds for Refusal to Appear, Testify, or Produce Evidence
   193k36.3(2) k. Privilege. Most Cited Cases
  (Formerly 410k196)
Neither the First Amendment nor any other constitutional provision protects citizens from disclosing to a grand jury information that they have received in confidence. U.S.C.A.Const. Amend. 1.

[5] Constitutional Law 92 ⚖️2072

92 Constitutional Law
 92XVIII Freedom of Speech, Expression, and Press
  92XVIII(U) Press in General
   92k2072 k. Enforcement of Generally Applicable Laws. Most Cited Cases
  (Formerly 92k90(3))
The First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability. U.S.C.A.Const. Amend. 1.

[6] Constitutional Law 92 ⚖️2077

92 Constitutional Law
 92XVIII Freedom of Speech, Expression, and

Press
 92XVIII(U) Press in General
  92k2077 k. Access To, and Publication Of, Public Information or Records. Most Cited Cases
  (Formerly 92k90(3))
The First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. U.S.C.A.Const. Amend. 1.

[7] Grand Jury 193 ⚖️26

193 Grand Jury
 193k24 Powers and Duties
  193k26 k. Offenses and Accusations. Most Cited Cases
Grand jury has the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions.

[8] Constitutional Law 92 ⚖️4579

92 Constitutional Law
 92XXVII Due Process
  92XXVII(H) Criminal Law
   92XXVII(H)4 Proceedings and Trial
    92k4578 Charging Instruments; Indictment and Information
     92k4579 k. In General. Most Cited Cases
  (Formerly 92k265)
Indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment. U.S.C.A.Const. Amend. 14.

[9] Grand Jury 193 ⚖️36.1

193 Grand Jury
 193k36 Witnesses and Evidence
  193k36.1 k. In General; Obligation to Testify. Most Cited Cases
  (Formerly 193k36)
The public has a right to every man's evidence be-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617　　　　　　Page 3
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

fore a grand jury except for those persons protected by a constitutional, common law, or statutory privilege.

**[10] Grand Jury 193 ☞36.3(2)**

193 Grand Jury
　　193k36 Witnesses and Evidence
　　　　193k36.3 Grounds for Refusal to Appear, Testify, or Produce Evidence
　　　　　　193k36.3(2) k. Privilege. Most Cited Cases
　　(Formerly 193k36)
Only where a reporter's news sources themselves are implicated in crime or possess information relevant to the grand jury's task need they or the reporter be concerned about grand jury subpoenas.

**[11] Constitutional Law 92 ☞2074**

92 Constitutional Law
　　92XVIII Freedom of Speech, Expression, and Press
　　　　92XVIII(U) Press in General
　　　　　　92k2074 k. Disclosure of Sources. Most Cited Cases
　　(Formerly 92k90.1(3))

**Constitutional Law 92 ☞2101**

92 Constitutional Law
　　92XVIII Freedom of Speech, Expression, and Press
　　　　92XVIII(V) Judicial Proceedings
　　　　　　92XVIII(V)2 Criminal Proceedings
　　　　　　　　92k2101 k. Conduct of Proceedings in General. Most Cited Cases
　　(Formerly 92k90.1(3))

**Constitutional Law 92 ☞2117**

92 Constitutional Law
　　92XVIII Freedom of Speech, Expression, and Press
　　　　92XVIII(V) Judicial Proceedings
　　　　　　92XVIII(V)2 Criminal Proceedings
　　　　　　　　92k2117 k. Grand Juries. Most Cited

Cases
　　(Formerly 92k90.1(3))
When a newsman is subpoenaed to testify before a grand jury, the First Amendment does not protect his agreement to conceal the criminal conduct of a news source, or evidence thereof. U.S.C.A.Const. Amend. 1.

**[12] Grand Jury 193 ☞36.3(2)**

193 Grand Jury
　　193k36 Witnesses and Evidence
　　　　193k36.3 Grounds for Refusal to Appear, Testify, or Produce Evidence
　　　　　　193k36.3(2) k. Privilege. Most Cited Cases
　　(Formerly 193k36)
Public interest in possible future news about crime from undisclosed, unverified sources does not take precedence over public interest in pursuing, by grand jury investigation, and prosecuting those crimes reported to the press by informants, and in thus deterring the commission of such crimes in the future. U.S.C.A.Const. Amend. 1.

**[13] Grand Jury 193 ☞25**

193 Grand Jury
　　193k24 Powers and Duties
　　　　193k25 k. In General. Most Cited Cases
The investigative power of the grand jury is necessarily broad if its public responsibility is to be adequately discharged. Fed.Rules Crim.Proc. rule 6(e), 18 U.S.C.A.

**[14] Constitutional Law 92 ☞2117**

92 Constitutional Law
　　92XVIII Freedom of Speech, Expression, and Press
　　　　92XVIII(V) Judicial Proceedings
　　　　　　92XVIII(V)2 Criminal Proceedings
　　　　　　　　92k2117 k. Grand Juries. Most Cited Cases
　　(Formerly 92k90.1(3))
Any indirect burden on First Amendment rights im-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

posed by calling newsmen to testify before a grand jury where it is likely that they can supply information to aid in determination of whether illegal conduct has occurred and whether there is sufficient evidence to return an indictment is justified by the fundamental governmental role of the grand jury in securing the safety of the person and property of the citizen by the investigation of crime; the governmental interest in such role is compelling and paramount and calling newsmen in such circumstances bears a reasonable relationship to the achievement of the governmental purpose. U.S.C.A.Const. Amend. 1.

[15] Constitutional Law 92 ⚯2074

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(U) Press in General
            92k2074 k. Disclosure of Sources. Most Cited Cases
    (Formerly 92k90.1(3))

Constitutional Law 92 ⚯2117

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(V) Judicial Proceedings
            92XVIII(V)2 Criminal Proceedings
                92k2117 k. Grand Juries. Most Cited Cases
    (Formerly 92k90.1(3))
It is not necessary under the First Amendment that, before a newsman may be called to testify before a grand jury with respect to information obtained from confidential sources, it be shown that a crime has been committed and that the newsman possesses relevant information not available from other sources. U.S.C.A.Const. Amend. 1.

[16] Constitutional Law 92 ⚯2070

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and

Press
    92XVIII(U) Press in General
        92k2070 k. In General. Most Cited Cases
    (Formerly 92k90(2))
Freedom of the press is a fundamental personal right which is not confined to newspapers and periodicals. U.S.C.A.Const. Amend. 1.

[17] Constitutional Law 92 ⚯2117

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(V) Judicial Proceedings
            92XVIII(V)2 Criminal Proceedings
                92k2117 k. Grand Juries. Most Cited Cases
    (Formerly 92k90.1(3))

Grand Jury 193 ⚯33

193 Grand Jury
    193k33 k. Conduct of Proceedings in General. Most Cited Cases
Grand juries must operate within the limits of the First Amendment as well as the Fifth and may not harass the press for purposes not of law enforcement but of disrupting a reporter's relationship with his news sources. U.S.C.A.Const. Amends. 1, 5.

[18] Constitutional Law 92 ⚯2101

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(V) Judicial Proceedings
            92XVIII(V)2 Criminal Proceedings
                92k2101 k. Conduct of Proceedings in General. Most Cited Cases
    (Formerly 92k90.1(3))

Constitutional Law 92 ⚯2117

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(V) Judicial Proceedings

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 5

92XVIII(V)2 Criminal Proceedings
92k2117 k. Grand Juries. Most Cited Cases
(Formerly 92k90.1(3))
There is no First Amendment newsman's testimonial privilege, either qualified or absolute, arising from receipt of confidential information, to refuse to answer relevant and material questions asked during a good-faith grand jury investigation. U.S.C.A.Const. Amend. 1.

[19] Grand Jury 193 ⚮36.3(2)

193 Grand Jury
193k36 Witnesses and Evidence
193k36.3 Grounds for Refusal to Appear, Testify, or Produce Evidence
193k36.3(2) k. Privilege. Most Cited Cases
(Formerly 193k36.2, 193k36)
Newsman had no constitutional privilege to refuse to appear before a grand jury until the government demonstrated some compelling need for his testimony. U.S.C.A.Const. Amend. 1.

[20] Privileged Communications and Confidentiality 311H ⚮404

311H Privileged Communications and Confidentiality
311HVII Other Privileges
311Hk404 k. Journalists. Most Cited Cases
(Formerly 410k196.1, 410k196)
Where newsman had observed violations of state narcotics laws, he had no privilege to refuse to answer questions that directly related to the criminal conduct. U.S.C.A.Const. Amend. 1; K.R.S. 218.010(14), 218.210.

[21] Grand Jury 193 ⚮36.3(2)

193 Grand Jury
193k36 Witnesses and Evidence
193k36.3 Grounds for Refusal to Appear, Testify, or Produce Evidence
193k36.3(2) k. Privilege. Most Cited

Cases
(Formerly 193k36.2, 193k36)
Newsman had duty to appear before grand jury and answer questions put to him, subject to supervision of presiding judge as to the propriety, purposes and scope of the grand jury inquiry and of the pertinence of the probable testimony.

**2648 *665 Syllabus[FN*]

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

The First Amendment does not relieve a newspaper reporter of the obligation that all citizens have to respond to a grand jury subpoena and answer questions relevant to a criminal investigation, and therefore the Amendment does not afford him a constitutional testimonial privilege for an agreement he makes to conceal facts relevant to a grand jury's investigation of a crime or to conceal the criminal conduct of his source or evidence thereof. Pp. 2655-2670.

No. 70-85, 461 S.W.2d 345, and Kentucky Court of Appeals judgment in unreported**2649 case of Branzburg v. Meigs; and No. 70-94, 358 Mass. 604, 266 N.E.2d 297, affirmed; No. 70-57, 434 F.2d 1081, reversed.
On Writ of Certiorari to the Court of Appeals of Kentucky.

On Writ of Certiorari to the Supreme Judicial Court of Massachusetts.

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit.

Edgar A. Zingman, Louisville, Ky., for petitioner Paul M. Branzburg in No. 70-85; Robert C. Ewald, Louisville, Ky., on the briefs.

E. Barrett Prettyman, Jr., Washington, D.C., for pe-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00418

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 6

titioner, the Commonwealth of Mass. in No. 70-94; William H. Carey, New Bedford, Mass., on the briefs.

Solicitor Gen., Erwin Griswold for the United States in No. 70-57; David A. Wilson, Jr., Peterson, Asst. Attys. Gen., William Bradford Reynolds, Beatrice Rosenberg, and Sidney M. Glazer, Washington, D.C., on the briefs.

*666 Edwin A. Schroeting, Jr., Louisville, Ky., for respondents John P. Hayes and others in No. 70-85; W. C. Fisher, Jr., Louisville, Ky., on the brief.

Joseph J. Hurley, First Asst. Atty. Gen., for respondent, Commonwealth of Mass., in No. 70-94; Robert H. Quinn, Atty. Gen., Walter H. Mayo III, Asst. Atty. Gen., and Lawrence T. Bench, Deputy Asst. Atty. Gen., on the brief.

Anthony G. Amsterdam, Washington, D.C., for respondent Earl Caldwell in No. 70-57; Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston, New York City, and William Bennett Turner, San Francisco, Cal., on the brief.

William Bradford Reynolds, Washington, D.C., for the United States as amicus curiae urging affirmance in Nos. 70-85 and 70-94; Sol. Gen. Erwin Griswold, Asst. Atty. Gen., David B. Wilson, Jr., and Beatrice Rosenberg, Washington, D.C., on the brief.

Briefs of amici curiae urging affirmance in No. 70-57 and reversal in Nos. 70-85 and 70-94 were filed by Alexander M. Bickel, New Haven, Conn., Lawrence J. McKay, Floyd Abrams, Daniel Sheehan, Corydon B. Dunham, Clarence Fried, Alan J. Hruska, New York City, Robert S. Rifkind, Washington, D.C., Anthony A. Dean, and Edward C. Wallace, New York City, for New York Times Co., Inc., and others; by Don H. Reuben, Lawrence Gunnels, Steven L. Bashwiner, and Thomas F. Ging, Chicago, Ill., for Chicago Tribune Co.; by Arthur B. Hanson, Washington, D.C., for American Newspaper Publishers Assn.; and by Irving

Leuchter, Newark, N.J., for American Newspaper Guild, AFL-CIO, CLC.
John T. Corrigan, Cleveland, Ohio, filed a brief for the National District Attorneys Association urging reversal in No. 70-57 and affirmance in No. 70-94.

Briefs of amici curiae urging affirmance in No. 70-57 were filed by Irwin Karp, New York City, for Authors League of America, Inc.; by W. Theodore Pierson and J. Laurent *667 Scharff, Washington, D.C., for Radio Television News Directors Assn.; and by Earle K. Moore and Samuel Rabinove, New York City, for Office of Communication of the United Church of Christ and others.

Briefs of amici curiae in No. 70-57 were filed by Leo P. Larkin, Jr., Stanley Godofsky, and John J. Sheehy, New York City, for Washington Post Co. and others; by Richard M. Schmidt, Jr., for American Society of Newspaper Editors and others; by Roger A. Clark, New York City, for National Press Photographers Assn.; and by Melvin L. Wulf, New York City, Paul N. Halvonik, San Francisco, Cal., A. L. Wirin, Fred Okrand and Lawrence R. Sperber, Los Angeles, Cal., for American Civil Liberties Union and others.

Opinion of the Court by Mr. Justice WHITE, announced by THE CHIEF JUSTICE.

[1] The issue in these cases is whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech **2650 and press guaranteed by the First Amendment. We hold that it does not.

I

The writ of certiorari in No. 70-85, Branzburg v. Hayes and Meigs, brings before us two judgments of the Kentucky Court of Appeals, both involving petitioner Branzburg, a staff reporter for the Courier-Journal, a daily newspaper published in Louisville, Kentucky.

On November 15, 1969, the Courier-Journal carried

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 7

a story under petitioner's by-line describing in detail his observations of two young residents of Jefferson County synthesizing hashish from marihuana, an activity which, they asserted, earned them about $5,000 in three weeks. The article included a photograph of a pair of hands working above a laboratory table on which was a substance identified by the caption as hashish. The article stated that petitioner had promised not to *668 reveal the identity of the two hashish makers.[FN1] Petitioner was shortly subpoenaed by the Jefferson County grand jury; he appeared, but refused to identify the individuals he had seen possessing marihuana or the persons he had seen making hashish from marihuana.[FN2] A state trial court judge[FN3] ordered petitioner to answer these questions and rejected his contention that the Kentucky reporters' privilege statute, Ky.Rev.Stat. s 421.100 (1962),[FN4] the First Amendment of the United States Constitution, or ss 1, 2 and 8 of the Kentucky Constitution authorized his refusal to answer. Petitioner then sought prohibition and mandamus in the Kentucky Court of Appeals on the same grounds, but the Court of Appeals denied the petition. *669Branzburg v. Pound, 461 S.W.2d 345 (1970), as modified on denial of rehearing, Jan. 22, 1971. It held that petitioner had abandoned his First Amendment argument in a supplemental memorandum he had filed and tacitly rejected his argument based on the Kentucky Constitution. It also construed Ky.Rev.Stat. s 421.100 as affording a newsman the privilege of refusing to divulge the identity of an informant who supplied him with information, but held that the statute did not permit a reporter to refuse to testify about events he had observed personally, including the identities of those persons he had observed.

FN1. The article contained the following paragraph: "'I don't know why I'm letting you do this story,' (one informant) said quietly. 'To make the narcs (narcotics detectives) mad, I guess. That's the main reason.' However, Larry and his partner asked for and received a promise that their names would be changed.' App. 3-4.

FN2. The Foreman of the grand jury reported that petitioner Branzburg had refused to answer the following two questions: '#1. On November 12, or 13, 1969, who was the person or persons you observed in possession of Marijuana, about which you wrote an article in the Courier-Journal on November 15, 1969? #2. On Novebmer 12, or 13, 1969, who was the person or persons you observed compounding Marijuana, producing same to a compound known as Hashish?' App. 6.

FN3. Judge J. Miles Pound. The respondent in this case, Hon. John P. Hayes, is the successor of Judge Pound.

FN4. Ky.Rev.Stat. s 421.100 provides:

'No person shall be compelled to disclose in any legal proceeding or trial before any court, or before any grand or petit jury, or before the presiding officer of any tribunal, or his agent or agents, or before the General Assembly, or any committee thereof, or before any city or county legislative body, or any committee thereof, or elsewhere, the source of any information procured or obtained by him, and published in a newspaper or by a radio or television broadcasting station by which he is engaged or employed, or with which he is connected.'

The second case involving petitioner Branzburg arose out of his later story published on January 10, 1971, which described in detail the use of drugs in Frankfort, Kentucky. The article reported that in order to provide a comprehensive survey of the 'drug scene' in Frankfort, petitioner had 'spent two weeks interviewing several dozen drug users in the capital city' and had seen some of them smoking marihuana. A number of conversations with and observations of several unnamed drug users were recounted. Subpoenaed to appear before a Franklin County

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

grand jury 'to testify in the matter of violation of statutes concerning**2651 use and sale of drugs,' petitioner Branzburg moved to quash the summons;[FN5] the motion was denied, although*670 an order was issued protecting Branzburg from revealing 'confidential associations, sources or information' but requiring that he 'answer any questions which concern or pertain to any criminal act, the commission of which was actually observed by (him).' Prior to the time he was slated to appear before the grand jury, petitioner sought mandamus and prohibition from the Kentucky Court of Appeals, arguing that if he were forced to go before the grand jury or to answer questions regarding the identity of informants or disclose information given to him in confidence, his effectiveness as a reporter would be greatly damaged. The Court of Appeals once again denied the requested writs, reaffirming its construction of Ky.Rev.Stat. s 421.100, and rejecting petitioner's claim of a First Amendment privilege. It distinguished Caldwell v. United States, 434 F.2d 1081 (CA9 1970), and it also announced its 'misgivings' about that decision, asserting that it represented 'a drastic departure from the generally recognized rule that the sources of information of a newspaper reporter are not privileged under the First Amendment.' It characterized petitioner's fear that his ability to obtain *671 news would be destroyed as 'so tenuous that it does not, in the opinion of this court, present an issue of abridgement of the freedom of the press within the meaning of that term as used in the Constitution of the United States.'

> FN5. Petitioner's Motion to Quash argued: 'If Mr. Branzburg were required to disclose these confidences to the Grand Jury, or any other person, he would thereby destroy the relationship of trust which he presently enjoys with those in the drug culture. They would refuse to speak to him; they would become even more reluctant than they are now to speak to any newsman; and the news media would thereby vitally hampered in their ability to cover

the views and activities of those involved in the drug culture.

'The inevitable effect of the subpoena issued to Mr. Branzburg, if it not be quashed by this Court, will be to suppress vital First Amendment freedoms of Mr. Branzburg, of the Courier-Journal, of the news media, and of those involved in the drug culture by driving a wedge of distrust and silence between the news media and the drug culture. This Court should not sanction a use of its process entailing so drastic an incursion upon First Amendment freedoms in the absence of compelling Commonwealth interest in requiring Mr. Branzburg's apearance before the Grand Jury. It is insufficient merely to protect Mr. Branzburg's right to silence after he appears before the Grand Jury. This Court should totally excuse Mr. Branzburg from responding to the subpoena and even entering the Grand Jury room. Once Mr. Branzburg is required to go behind the closed doors of the Grand Jury room, his effectiveness as a reporter in these areas is totally destroyed. The secrecy that surrounds Grand Jury testimony necessarily introduces uncertainties in the minds of those who fear a betrayal of their confidences.' App. 43-44.

[2] Petitioner sought a writ of certiorari to review both judgments of the Kentucky Court of Appeals, and we granted the writ.[FN6] 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109 (1971).

> FN6. After the Kentucky Court of Appeals' decision in Branzburg v. Meigs was announced, petitioner filed a rehearing motion in Branzburg v. Pound suggesting that the court had not passed upon his First Amendment argument and calling to the court's attention the recent Ninth Circuit decision in Caldwell v. United States, 434 F.2d 1081 (1970). On Jan. 22, 1971, the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 9

court denied petitioner's motion and filed an amended opinion in the case, adding a footnote, 461 S.W.2d 345, at 346 n. 1, to indicate that petitioner had abandoned his First Amendment argument and elected to rely wholly on Ky.Rev.Stat. s 421.100 when he filed a Supplemental Memorandum before oral argument. In his Petition for Prohibition and Mandamus, petitioner had clearly relied on the First Amendment, and he had filed his Supplemental Memorandum in response to the State's Memorandum in Opposition to the granting of the writs. As its title indicates, this Memorandum was complementary to petitioner's earlier Petition, and it dealt primarily with the State's construction of the phrase 'source of any information' in Ky.Rev.Stat. s 421.100. The passage that the Kentucky Court of Appeals cited to indicate abandonment of petitioner's First Amendment claim is as follows:

'Thus, the controversy continues as to whether a newsman's source of information should be privileged. However, that question is not before the Court in this case. The Legislature of Kentucky has settled the issue, having decided that a newsman's source of information is to be privileged. Because of this there is no point in citing Professor Wigmore and other authorities who speak against the grant of such a privilege. The question has been many times debated; and the Legislature has spoken. The only question before the Court is the construction of the term 'source of information' as it was intended by the Legislature.'

Though the passage itself is somewhat unclear, the surrounding discussion indicates that petitioner was asserting here that the question of whether a common-law privilege should be recognized was irrelevant

since the legislature had already enacted a statute. In his earlier discussion, petitioner had analyzed certain cases in which the First Amendment argument was made but indicated that it was not necessary to reach this question if the statutory phrase 'source of any information' were interpreted expansively. We do not interpret this discussion as indicating that petitioner was abandoning his First Amendment claim if the Kentucky Court of Appeals did not agree with his statutory interpretation argument, and we hold that the constitutional question in Branzburg v. Pound was properly preserved for review.

*672 In re Pappas, No. 70-94, originated when petitioner Pappas, a television newsman-photographer working out of the Providence, Rhode Island, office of a New Bedford, Massachusetts, television station, was called to New Bedford on July 30, 1970, to report on civil disorders there which involved fires and other turmoil. He intended to cover a Black Panther news conference at that group's headquarters in a boarded-up store. Petitioner found the streets around the store barricaded, but he ultimately gained entrance to the area and recorded and photographed a prepared statement read by one of the Black Panther leaders at about 3 p.m.**2652 [FN7] He then asked for and received permission to re-enter the area. Returning at about 9 o'clock, he was allowed to enter and remain inside Panther headquarters. As a condition of entry, Pappas agreed not to disclose anything he saw or heard inside the store except an anticipated police raid, which Pappas, 'on his own,' was free to photograph and report as he wished. Pappas stayed inside the headquarters for about three hours, but there was no police raid, and petitioner wrote no story and did not otherwise reveal what had occurred in the store while he was there. Two months later, petitioner was summoned before the Bristol *673 County Grand Jury and appeared, answered questions as to his name, address, employment, and what he had seen and heard outside Panther headquarters, but

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

05/29/2009 05:15:13 PM    SDMA    415-781-2635    Page 46
Case 3:15-cv-01758-N    Document 38-13    Filed 06/28/16    Page 119 of 158    PageID 1880

Page 11 of 52

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 10

refused to answer any questions about what had taken place inside headquarters while he was there, claiming that the First Amendment afforded him a privilege to protect confidential informants and their information. A second summons was then served upon him, again directing him to appear before the grand jury and 'to give such evidence as he knows relating to any matters which may be inquired of on behalf of the Commonwealth before . . . the Grand Jury.' His motion to quash on First Amendment and other grounds was denied by the trial judge who, noting the absence of a statutory newsman's privilege in Massachusetts, ruled that petitioner had no constitutional privilege to refuse to divulge to the grand jury what he had seen and heard, including the identity of persons he had observed. The case was reported for decision to the Supreme Judicial Court of Massachusetts.[FN8] The record there did not include a transcript of the hearing **2653 on the motion to quash, nor did it reveal the specific questions petitioner had refused to answer, the expected nature of his testimony, the nature of the grand jury investigation, or the likelihood of the grand jury's securing the information it sought from petitioner by other means.[FN9] The *674 Supreme Judicial Court, however, took 'judicial notice that in July, 1970, there were serious civil disorders in New Bedford, which involved street barricades, exclusion of the public from certain streets, fires, and similar turmoil. We were told at the arguments that there was gunfire in certain streets. We assume that the grand jury investigation was an appropriate effort to discover and indict those responsible for criminal acts.' 358 Mass. 604, 607, 266 N.E.2d 297, 299 (1971). The court then reaffirmed prior Massachusetts holdings that testimonial privileges were 'exceptional' and 'limited,' stating that '(t)he principle that the public 'has a right to every man's evidence" had usually been preferred, in the Commonwealth, to countervailing interests. Ibid. The court rejected the holding of the Ninth Circuit in Caldwell v. United States, supra, and 'adhere(d) to the view that there exists no constitutional newsman's privilege, either qualified or absolute, to refuse to appear and testify before a

court or grand jury.'[FN10] 358 Mass., at 612, 266 N.E.2d, at 302-303. Any adverse effect upon the free dissemination of news by virtue of petitioner's being called to testify was deemed to be only 'indirect, theoretical, and uncertain.' Id., at 612, 266 N.E.2d, at 302. The court concluded that '(t)he obligation of newsmen . . . is that of every citizen . . . to appear when summoned, with relevant written or other material when required, and to answer relevant and reasonable inquiries.' Id., at 612, 266 N.E.2d, at 303. The court nevertheless noted that grand juries were subject to supervision by the presiding*675 judge, who had the duty 'to prevent oppressive, unnecessary, irrelevant, and other improper inquiry and investigation,' ibid., to insure that a witness' Fifth Amendment rights were not infringed, and to assess the propriety, necessity, and pertinence of the probable testimony to the investigation in progress.[FN11] The burden was deemed to be on the witness to establish the impropriety of the summons or the questions asked. The denial of the motion to quash was affirmed and we granted a writ of certiorari to petitioner Pappas. 402 U.S. 942, 91 S.Ct. 1619, 29 L.Ed.2d 110 (1971).

FN7. Petitioner's news films of this event were made available to the Bristol County District Attorney. App. 4.

FN8. The case was reported by the superior court directly to the Supreme Judicial Court for an interlocutory ruling under Mass.Gen.Laws, c. 278, s 30A and Mass.Gen.Laws, c. 231, s 111 (1959). The Supreme Judicial Court's decision appears at 358 Mass. 604, 266 N.E.2d 297 (1971).

FN9. 'We do not have before us the text of any specific questions which Pappas has refused to answer before the grand jury, or any petition to hold him for contempt for his refusal. We have only general statements concerning (a) the inquiries of the grand jury, and (b) the materiality of the testimony sought from Pappas. The record does not show the expected nature of his

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

testimony or what likelihood there is of being able to obtain that testimony from persons other than news gatherers.' 358 Mass., at 606-607, 266 N.E.2d, at 299 (footnote omitted).

FN10. The court expressly declined to consider, however, appearances of newsmen before legislative or administrative bodies. Id., at 612 n. 10, 266 N.E.2d, at 303 n. 10.

FN11. The court noted that 'a presiding judge may consider in his discretion' the argument that the use of newsmen as witnesses is likely to result in unnecessary or burdensome use of their work product, id., at 614 n. 13, 266 N.E.2d, at 304 n. 13, and cautioned that: 'We do not suggest that a general investigation of mere political or group association of persons, without substantial relation to criminal events, may not be viewed by a judge in a somewhat different manner from an investigation of particular criminal events concerning which a newsman may have knowledge.' Id., at 614 n. 14, 266 N.E.2d, at 304 n. 14.

United States v. Caldwell, No. 70-57, arose from subpoenas issued by a federal grand jury in the Northern District of California to respondent Earl Caldwell, a reporter for the New York Times assigned to cover the Black Panther Party and other black militant groups. A subpoena duces tecum was served on respondent on February 2, 1970, ordering him to appear before the grand jury to testify and to bring with him notes and tape recordings of interviews given him for publication by officers and spokesmen of the Black Panther Party concerning the aims, purposes, and activities**2654 of that organization.FN12 Respondent objected to the scope *676 of this subpoena, and an agreement between his counsel and the Government attorneys resulted in a continuance. A second subpoena, served on March 16, omitted the documentary requirement and simply ordered Caldwell 'to appear . . . to testify before the Grand Jury.' Respondent and his em-

ployer, the New York Times,FN13 moved to quash on the ground that the unlimited breadth of the subpoenas and the fact that Caldwell would have to appear in secret before the grand jury would destroy his working relationship with the Black Panther Party and 'suppress vital First Amendment freedoms . . . by driving a wedge of distrust and silence between the news media and the militants.' App. 7. Respondent argued that 'so drastic an incursion upon First Amendment freedoms' should not be permitted 'in the absence of a compelling governmental interest-not shown here-in requiring Mr. Caldwell's appearance before the grand jury.' Ibid. The motion was supported by amicus curiae memoranda from other publishing concerns and by affidavits from newsmen asserting the unfavorable impact on news sources of requiring reporters to appear before grand juries. The Government filed three memoranda in opposition to the motion to quash, each supported by affidavits. These documents stated that the grand jury was investigating, among other things, possible violations of a number of criminal statutes, including 18 U.S.C. s 871 (threats against the President), *67718 U.S.C. s 1751 (assassination, attempts to assassinate, conspiracy to assassinate the President), 18 U.S.C. s 231 (civil disorders), 18 U.S.C. s 2101 (interstate travel to incite a riot), and 18 U.S.C. s 1341 (mail frauds and swindles). It was recited that on November 15, 1969, an officer of the Black Panther Party made a publicly televised speech in which he had declared that '(w)e will kill Richard Nixon' and that this threat had been repeated in three subsequent issues of the Party newspaper. App. 66, 77. Also referred to were various writings by Caldwell about the Black Panther Party, including an article published in the New York Times on December 14, 1969, stating that '(i)n their role as the vanguard in a revolutionary struggle the Panthers have picked up guns,' and quoting the Chief of Staff of the Party as declaring that: 'We advocate the very direct overthrow of the Government by way of force and violence. By picking up guns and moving against it because we recognize it as being oppressive and in recognizing that we know that the only

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 12

solution to it is armed struggle (sic).' App. 62. The Government also stated that the Chief of Staff of the Party had been indicted by the grand jury on December 3, 1969, for uttering threats against the life of the President in violation of 18 U.S.C. s 871 and that various efforts had been made to secure evidence of crimes under investigation through the immunization of persons allegedly associated with the Black Panther Party.

> FN12. The subpoena ordered production of '(n)otes and tape recordings of interviews covering the period from January 1, 1969, to date, reflecting statements made for publication by officers and spokesmen for the Black Panther Party concerning the aims and purposes of said organization and the activities of said organization, its officers, staff, personnel, and members, including specifically but not limited to interviews given by David Hilliard and Raymond 'Masai' Hewitt.'App. 20.

> FN13. The New York Times was granted standing to intervene as a party on the motion to quash the subpoenas. Application of Caldwell, 311 F.Supp. 358, 359 (ND Cal. 1970). It did not file an appeal from the District Court's contempt citation, and it did not seek certiorari here. It has filed an amicus curiae brief, however.

**2655 On April 6, the District Court denied the motion to quash, Application of Caldwell, 311 F.Supp. 358 (NDCal.1970), on the ground that 'every person within the jurisdiction of the government' is bound to testify upon being properly summoned. Id., at 360 (emphasis in original). Nevertheless, the court accepted respondent's First Amendment arguments to the extent of issuing a protective order providing that although respondent had to divulge*678 whatever information had been given to him for publication, he 'shall not be required to reveal confidential associations, sources or information received, developed or maintained by him as a professional journalist in the course of

his efforts to gather news for dissemination to the public through the press or other news media.'The court held that the First Amendment afforded respondent a privilege to refuse disclosure of such confidential information until there had been 'a showing by the Government of a compelling and overriding national interest in requiring Mr. Caldwell's testimony which cannot be served by any alternative means.' Id., at 362.

Subsequently,FN14 the term of the grand jury expired, a new grand jury was convened, and a new subpoena ad testificandum was issued and served on May 22, 1970. A new motion to quash by respondent and memorandum in opposition by the Government were filed, and, by stipulation of the parties, the motion was submitted on the prior record. The court denied the motion to quash, repeating the protective provisions in its prior order but this time directing Caldwell to appear before the grand jury pursuant to the May 22 subpoena. Respondent refused to appear before the grand jury, and the court issued an order to show cause why he should not be held in contempt. Upon his further refusal to go before the grand jury, respondent was ordered committed for contempt until such time as he complied with the court's order or until the expiration of the term of the grand jury.

> FN14. Respondent appealed from the District Court's April 6 denial of his motion to quash on April 17, 1970, and the Government moved to dismiss that appeal on the ground that the order was interlocutory. On May 12, 1970, the Ninth Circuit dismissed the appeal without opinion.

*679 Respondent Caldwell appealed the contempt order,FN15 and the Court of Appeals reversed. Caldwell v. United States, 434 F.2d 1081 (CA9 1970). Viewing the issue before it as whether Caldwell was required to appear before the grand jury at all, rather than the scope of permissible interrogation, the court first determined that the First Amendment provided a qualified testimonial privilege to newsmen; in its view, requiring a reporter

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

like Caldwell to testify would deter his informants from communicating with him in the future and would cause him to censor his writings in an effort to avoid being subpoenaed. Absent compelling reasons for requiring his testimony, he was held privileged to withhold it. The court also held, for similar First Amendment reasons, that, absent some special showing of necessity by the Government, attendance by Caldwell at a secret meeting of the grand jury was something he was privileged to refuse because of the potential impact of such an appearance on the flow of news to the public. We granted the United States' petition for certiorari.[FN16] 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109 (1971).

> FN15. The Government did not file a cross-appeal and did not challenge the validity of the District Court protective order in the Court of Appeals.

> FN16. The petition presented a single question: 'Whether a newspaper reporter who has published articles about an organization can, under the First Amendment, properly refuse to appear before a grand jury investigating possible crimes by members of that organization who have been quoted in the published articles.'

## II

Petitioners Branzburg and Pappas and respondent Caldwell press First Amendment claims that may be simply put: that to gather news it is often necessary**2656 to agree either not to identify the source of information published or to publish only part of the facts revealed, or both; that if the reporter is nevertheless *680 forced to reveal these confidences to a grand jury, the source so identified and other confidential sources of other reporters will be measurably deterred from furnishing publishable information, all to the detriment of the free flow of information protected by the First Amendment. Although the newsmen in these cases do not claim an absolute privilege against official interrogation in all circumstances, they assert that the reporter should not be forced either to appear or to testify before a grand jury or at trial until and unless sufficient grounds are shown for believing that the reporter possesses information relevant to a crime the grand jury is investigating, that the information the reporter has is unavailable from other sources, and that the need for the information is sufficiently compelling to override the claimed invasion of First Amendment interests occasioned by the disclosure. Principally relied upon are prior cases emphasizing the importance of the First Amendment guarantees to individual development and to our system of representative government,[FN17] decisions requiring that official action with adverse impact on First Amendment rights be justified by a public interest that is 'compelling' or 'paramount,'[FN18] and those precedents establishing the principle that justifiable governmental goals may not be achieved by unduly broad means having an unnecessary impact *681 on protected rights of speech, press, or association.[FN19] The heart of the claim is that the burden on news gathering resulting from compelling reporters to disclose confidential information outweighs any public interest in obtaining the information.[FN20]

> FN17. Curtis Publishing Co. v. Butts, 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967) (opinion of Harlan, J.); New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964); Talley v. California, 362 U.S. 60, 64-65, 80 S.Ct. 536, 538-539, 4 L.Ed.2d 559 (1960); Bridges v. California, 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192 (1941); Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936); Near v. Minnesota, 283 U.S. 697, 722, 51 S.Ct. 625, 633, 75 L.Ed. 1357 (1931).

> FN18. NAACP v. Button, 371 U.S. 415,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00426

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

439, 83 S.Ct. 328, 341, 9 L.Ed.2d 405 (1963); Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945); DeGregory v. Attorney General of New Hampshire, 383 U.S. 825, 829, 86 S.Ct. 1148, 1151, 16 L.Ed.2d 292 (1966); Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960); Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939); NAACP v. Alabama, 357 U.S. 449, 464, 78 S.Ct. 1163, 1173, 2 L.Ed.2d 1488 (1958).

FN19. Freedman v. Maryland, 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965); NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 1313, 12 L.Ed.2d 325 (1964); Martin v. City of Struthers, 319 U.S. 141, 147, 63 S.Ct. 862, 865, 87 L.Ed. 1313 (1943); Elfbrandt v. Russell, 384 U.S. 11, 18, 86 S.Ct. 1238, 1241, 16 L.Ed.2d 321 (1966).

FN20. There has been a great deal of writing in recent years on the existence of a newsman's constitutional right of nondisclosure of confidential information. See, e.g., Beaver, The Newsman's Code, The Claim of Privilege and Everyman's Right to Evidence, 47 Ore.L.Rev. 243 (1968); Guest & Stanzler, The Constitutional Argument for Newsmen Concealing Their Sources, 64 Nw.U.L.Rev. 18 (1969); Note, Reporters and Their Sources: The Constitutional Right to a Confidential Relationship, 80 Yale L.J. 317 (1970); Comment, The Newsman's Privilege: Government Investigations, Criminal Prosecutions and Private Litigation, 58 Calif.L.Rev. 1198 (1970); Note, The Right of the Press to Gather Information, 71 Col.L.Rev. 838 (1971); Nelson, The Newsmen's Privilege Against Disclosure of Confidential Sources and Information, 24 Vand.L.Rev. 667

(1971).

We do not question the significance of free speech, press, or assembly to the country's welfare. Nor is it suggested that news gathering does not quality for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated. But these cases involve no intrusions**2657 upon speech or assemby, no prior restraint or restriction on what the press may publish, and no express or implied command that the press publish what it prefers to withhold. No exaction or tax for the privilege of publishing, and no penalty, civil or criminal, related to the content of published material is at issue here. The use of confidential sources by the press is not forbidden or restricted; reporters remain free to seek news from *682 any source by means within the law. No attempt is made to require the press to publish its sources of information or indiscriminately to disclose them on request.

[3][4] The sole issue before us is the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime. Citizens generally are not constitutionally immune from grand jury subpoenas; and neither the First Amendment nor any other constitutional provision protects the average citizen from disclosing to a grand jury information that he has received in confidence.FN21 The claim is, however, that reporters are exempt from these obligations because if forced to respond to subpoenas and identify their sources or disclose other confidences, their informants will refuse or be reluctant to furnish newsworthy information in the future. This asserted burden on news gathering is said to make compelled testimony from newsmen constitutionally suspect and to require a privileged position for them.

FN21. In general, then, the mere fact that a communication was made in express confidence, or in the implied confidence of a confidential relation, does not create a privilege.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

05/29/2009 05:15:13 PM          SDMA          415-781-2635          Page 51

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

'. . . No pledge of privacy nor oath of secrecy can avail against demand for the truth in a court of justice.' 8 J. Wigmore, Evidence s 2286 (McNaughton rev. 1961). This was not always the rule at common law, however. In 17th century England, the obligations of honor among gentlemen were occasionally recognized as privileging from compulsory disclosure information obtained in exchange for a promise of confidence. See Bulstrod v. Letchmere, 2 Freem. 6, 22 Eng.Rep. 1019 (1676); Lord Grey's Trial, 9 How.St.Tr. 127 (1682).

[5] It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability. Under prior cases, otherwise valid laws serving substantial public interests may be enforced against the press as against others, despite *683 the possible burden that may be imposed. The Court has emphasized that '(t)he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.' Associated Press v. NLRB, 301 U.S. 103, 132-133, 57 S.Ct. 650, 656, 81 L.Ed. 953 (1937). It was there held that the Associated Press, a news-gathering and disseminating organization, was not exempt from the requirements of the National Labor Relations Act. The holding was reaffirmed in Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 192-193, 66 S.Ct. 494, 497-498, 90 L.Ed. 614 (1946), where the Court rejected the claim that applying the Fair Labor Standards Act to a newspaper publishing business would abridge the freedom of press guaranteed by the First Amendment. See also Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607 (1946). Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), similarly overruled assertions that the First Amendment precluded application of the Sherman Act to a news-gathering and disseminating organiz-

ation. Cf. Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 293 U.S. 268, 276, 55 S.Ct. 182, 184, 79 L.Ed. 356 (1934); Citizen Publishing Co. v. United States, 394 U.S. 131, 139, 89 S.Ct. 927, 931, 22 L.Ed.2d 148 (1969); Lorain Journal Co. v. United States, 342 U.S. 143, 155-156, 72 S.Ct. 181, 187-188, 96 L.Ed. 162 (1951). Likewise, a newspaper may be subjected to nondiscriminatory forms of general taxation. **2658Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936); Murdock v. Pennsylvania, 319 U.S. 105, 112, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943).

The prevailing view is that the press is not free to publish with impunity everything and anything it desires to publish. Although it may deter or regulate what is said or published, the press may not circulate knowing or reckless falsehoods damaging to private reputation without subjecting itself to liability for damages, including punitive damages, or even criminal prosecution. See *684New York Times Co. v. Sullivan, 376 U.S. 254, 279-280, 84 S.Ct. 710, 725-726, 11 L.Ed.2d 686 (1964); Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); Curtis Publishing Co. v. Butts, 388 U.S. 130, 147, 87 S.Ct. 1975, 1987, 18 L.Ed.2d 1094 (1967) (opinion of Harlan, J.,); Monitor Patriot Co. v. Roy, 401 U.S. 265, 277, 91 S.Ct. 621, 628, 28 L.Ed.2d 35 (1971). A newspaper or a journalist may also be punished for contempt of court, in appropriate circumstances. Craig v. Harney, 331 U.S. 367, 377-378, 67 S.Ct. 1249, 1255-1256, 91 L.Ed. 1546 (1947).

[6] It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. Zemel v. Rusk, 381 U.S. 1, 16-17, 85 S.Ct. 1271, 1280-1281, 14 L.Ed.2d 179 (1965); New York Times Co. v. United States, 403 U.S. 713, 728-730, 91 S.Ct. 2140, 2148-2149, 29 L.Ed.2d 822 (1971), (Stewart, J., concurring); Tribune Review Publishing Co. v. Thomas, 254 F.2d 883, 885 (CA3 1958); In the Matter of United

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00428

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 16

Press Assns. v. Valente, 308 N.Y. 71, 77, 123 N.E.2d 777, 778 (1954). In Zemel v. Rusk, supra, for example, the Court sustained the Government's refusal to validate passports to Cuba even though that restriction 'render(ed) less than wholly free the flow of information concerning that country.' 381 U.S., at 16, 85 S.Ct., at 1281. The ban on travel was held constitutional, for '(t)he right to speak and publish does not carry with it the unrestrained right to gather information.' Id., at 17, 85 S.Ct., at 1281.[FN22]

> FN22. 'There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right.' 381 U.S., at 16-17, 85 S.Ct., at 1281.

Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or *685 disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal. In Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), for example, the Court reversed a state court conviction where the trial court failed to adopt 'stricter rules governing the use of the courtroom by newsmen, as Sheppard's counsel requested,' neglected to insulate witnesses from the press, and made no 'effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides.' Id., at 358, 359, 86 S.Ct., at

1520. '(T)he trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters.' Id., at 361, 86 S.Ct., at 1521. See also Estes v. Texas, 381 U.S. 532, 539-540, 85 S.Ct. 1628, 1631-1632, 14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963).

It is thus not surprising that the great weight of authority is that newsmen are not exempt from the normal duty of appearing before a grand jury and answering questions relevant to a **2659 criminal investigation. At common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury. See, e.g., Ex parte Lawrence, 116 Cal. 298, 48 P. 124 (1897); Plunkett v. Hamilton, 136 Ga. 72, 70 S.E. 781 (1911); Clein v. State, 52 So.2d 117 (Fla.1950); In re Grunow, 84 N.J.L. 235, 85 A. 1011 (1913); People ex rel. Mooney v. Sheriff, 269 N.Y. 291, 199 N.E. 415 (1936); Joslyn v. People, 67 Colo. 297, 184 P. 375 (1919); Adams v. Associated Press, 46 F.R.D. 439 (SD Tex. 1969); Brewster v. Boston Herald-Traveler Corp., 20 F.R.D. 416 (D.C.Mass.1957). See generally Annot., 7 A.L.R.3d 591 (1966). In 1958, a news gatherer asserted for the first time that the First Amendment*686 exempted confidential information from public disclosure pursuant to a subpoena issued in a civil suit, Garland v. Torre, 259 F.2d 545 (CA2),cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958), but the claim was denied, and this argument has been almost uniformly rejected since then although there are occasional dicta that, in circumstances not presented here, a newsman might be excused. In re Goodfader, 45 Haw. 317, 367 P.2d 472 (1961); In re Taylor, 412 Pa. 32, 193 A.2d 181 (1963); State v. Buchanan, 250 Or. 244, 436 P.2d 729,cert. denied, 392 U.S. 905, 88 S.Ct. 2055, 20 L.Ed.2d 1363 (1968); Murphy v. Colorado (No. 19604 Sup.Ct.Colo.), cert. denied, 365 U.S. 843, 81 S.Ct. 802, 5 L.Ed.2d 810 (1961) (unreported, discussed in In re Goodfader, supra, 45 Haw., at 366, 367

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

05/29/2009 05:15:13 PM          SDMA          415-781-2635          Page 53

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

P.2d, at 498 (Mizuha, J., dissenting)). These courts have applied the presumption against the existence of an asserted testimonial privilege, United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950), and have concluded that the First Amendment interest asserted by the newsman was outweighed by the general obligation of a citizen to appear before a grand jury or at trial, pursuant to a subpoena, and give what information he possesses. The opinions of the state courts in Branzburg and Pappas are typical of the prevailing view, although a few recent cases, such as Caldwell, have recognized and given effect to some form of constitutional newsman's privilege. See State v. Knops, 49 Wis.2d 647, 183 N.W.2d 93 (1971) (dictum); Alioto v. Cowles Communications, Inc., C.A. No. 52150 (ND Cal.1969); In re Grand Jury Witnesses, 322 F.Supp. 573 (ND Cal.1970); People v. Dohrn, Crim.No. 69-3808 (Cook County, Ill., Cir.Ct.1970).

[7][8][9] The prevailing constitutional view of the newsman's privilege is very much rooted in the ancient role of the grand jury that has the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded*687 criminal prosecutions.[FN23] Grand jury proceedings are constitutionally mandated for the institution of federal criminal prosecutions for capital or other serious crimes, and 'its constitutional prerogatives are rooted in long centuries of Anglo-American history.' Hannah v. Larche, 363 U.S. 420, 489-490, 80 S.Ct. 1502, 1544, 4 L.Ed.2d 1307 (1960). (Frankfurter, J., concurring in result). The Fifth Amendment provides that '(n)o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury.'[FN24] The adoption **2660 of the grand jury 'in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice.' Costello v. United States, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). Although state systems of criminal procedure differ greatly among themselves, the grand jury is similarly guaranteed by many state constitutions and plays an important role in fair and effective law enforcement in the overwhelming*688 majority of the States.[FN25] Because its task is to inquire into the Existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad.'It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime.' Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919). Hence, the grand jury's authority to subpoena witnesses is not only historic, id., at 279-281, 39 S.Ct., at 470-471, but essential to its task. Although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle that 'the public . . . has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege, United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950); Blackmer v. United States, 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375 (1932); 8 J. Wigmore, Evidence s 2192 (McNaughton rev. 1961), is particularly applicable to grand jury proceedings.[FN26]

FN23.'Historically, (the grand jury) has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused . . . to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.' Wood v. Georgia, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962) (footnote omitted).

FN24. It has been held that 'infamous' punishments include confinement at hard

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00430

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617                              Page 18
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

labor, United States v. Moreland, 258 U.S. 433, 42 S.Ct. 368, 66 L.Ed. 700 (1922); incarceration in a penitentiary, Mackin v. United States, 117 U.S. 348, 6 S.Ct. 777, 29 L.Ed. 909 (1886); and imprisonment for more than a year, Barkman v. Sanford, 162 F.2d 592 (CA5),cert. denied, 332 U.S. 816, 68 S.Ct. 155, 92 L.Ed. 393 (1947).Fed.Rule Crim.Proc. 7(a) has codified these holdings: 'An offense which may be punished by death shall be prosecuted by indictment. An offense which may be punished by imprisonment for a term exceeding one year or at hard labor shall be prosecuted by indictment, or, if indictment is waived, it may be prosecuted by information. Any other offense may be prosecuted by indictment or by information.'

FN25. Although indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment, Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), a recent study reveals that 32 States require that certain kinds of criminal prosecutions be initiated by indictment. Spain, the Grand Jury, Past and Present: A Survey, 2 Am.Crim.L.Q. 119, 126-142 (1964). In the 18 States in which the prosecutor may proceed by information, the grand jury is retained as an alternative means of invoking the criminal process and as an investigative tool. Ibid.

FN26. Jeremy Bentham vividly illustrated this maxim:

'Are men of the first rank and consideration-are men high in office-men whose time is not less valuable to the public than to themselves-are such men to be forced to quit their business, their functions, and what is more than all, their pleasure, at the beck of every idle or malicious adversary, to dance attendance upon every petty cause? Yes, as far as it is necessary, they and everybody. . . . Were the Prince of Wales, the Archbishop of Canterbury, and the Lord High Chancellor, to be passing by in the same coach, while a chimney-sweeper and a barrow-woman were in dispute about a halfpennyworth of apples, and the chimney-sweeper or the barrow-woman were to think proper to call upon them for their evidence, could they refuse it? No, most certainly.' 4 The Works of Jeremy Bentham 320-321 (J. Bowring ed. 1843).

In United States v. Burr, 25 Fed.Cas. pp. 30, 34 (No. 14,692d) (C.C.Va.1807), Chief Justice Marshall, sitting on Circuit, opined that in proper circumstances a subpoena could be issued to the President of the United States.

*689 A number of States have provided newsmen a statutory privilege of varying breadth,[FN27] but the majority have not **2661 done so, and none has been provided by federal statute.[FN28] Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution*690 is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.[FN29] Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process. On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant *691 questions put to them in the course of a valid grand jury investigation or crimin-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00431

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 19

al trial.

FN27. Thus far, 17 States have provided some type of statutory protection to a newsman's confidential sources:

Ala.Code, Tit. 7, s 370 (1960); Alaska Stat. s 09.25.150 (Supp.1971); Ariz.Rev.Stat.Ann. s 12-2337 (Supp.1971-1972); Ark.Stat.Ann. s 43-917 (1964); Cal.Evid.Code s 1070 (Supp.1972); Ind.Ann.Stat. s 2-1733 (1968), IC 1971, 34-3-5-1; Ky.Rev.Stat. s 421.100 (1962); La.Rev.Stat.Ann. ss 45:1451-45:1454 (Supp.1972); Md.Ann.Code, art. 35, s 2 (1971); Mich.Comp.Laws s 767.5a (Supp.1956), Mich.Stat.Ann. s 28.945(1) (1954); Mont.Rev.Codes Ann. s 93-601-2 (1964); Nev.Rev.Stat. s 49.275 (1971); N.J.Rev.Stat. ss 2A:84A-21, 2A:84A-29 (Supp.1972-1973); N.M.Stat.Ann. s 20-1-12.1 (1970); N.Y.Civil Rights Laws, McKinney's Consol.Laws, c. 6, s 79-h (Supp.1971-1972); Ohio Rev.Code Ann. s 2739.12 (1954); Pa.Stat.Ann., Tit. 28, s 330 (Supp.1972-1973).

FN28. Such legislation has been introduced, however. See, e.g., S. 1311, 92d Cong., 1st Sess. (1971); S. 3552, 91st Cong., 2d Sess. (1970); H.R. 16328, H.R. 16704, 91st Cong., 2d Sess. (1970); S. 1851, 88th Cong., 1st Sess. (1963); H.R. 8519, H.R. 7787, 88th Cong., 1st Sess. (1963); S. 965, 86th Cong., 1st Sess. (1959); H.R. 355, 86th Cong., 1st Sess. (1959). For a general analysis of proposed congressional legislation, see Staff of Senate Committee on the Judiciary, 89th Cong., 2d Sess., The Newsman's Privilege (Comm. Print 1966).

FN29. The creation of new testimonial privileges has been met with disfavor by commentators since such privileges ob-struct the search for truth. Wigmore condemns such privileges as 'so many derogations from a positive general rule (that everyone is obligated to testify when properly summoned)' and as 'obstacle(s) to the administration of justice.' 8 J. Wigmore, Evidence s 2192 (McNaughton rev. 1961). His criticism that 'all privileges of exemption from this duty are exceptional, and are therefore to be discountenanced,' id., at s 2192, p. 73 (emphasis in original) has been frequently echoed. Morgan, Foreward, Model Code of Evidence 22-30 (1942); 2 Z. Chafee, Government and Mass Communications 496-497 (1947); Report of ABA Committee on Improvements in the Law of Evidence, 63 A.B.A. Reports 595 (1938); C. McCormick, Evidence 159 (2d ed. 1972); Chafee, Privileged Communications: Is justice Served or Obstructed by Closing the Doctor's Mouth on the Witness Stand?, 52 Yale L.J. 607 (1943); Ladd, Privileges, 1969 Law & the Social Order 555, 556; 58 Am.Jur., Witnesses s 546 (1948); 97 C.J.S. Wtinesses s 259 (1957); McMann v. Securities and Exchange Commission, 87 F.2d 377, 378 (CA2 1937) (L. Hand, J.). Neither the ALI's Model Code of Evidence (1942), the Uniform Rules of Evidence of the National Conference of Commissioners on Uniform State Laws (1953), nor the Proposed Rules of Evidence for the United States Courts and Magistrates (rev. ed. 1971) has included a newsman's privilege.

[10] This conclusion itself involves no restraint on what newspapers may publish or on the type or quality of information reporters may seek to acquire, nor does it threaten the vast bulk of confidential relationships between reporters and their sources. Grand juries address themselves to the issues of whether crimes have been committed and who committed them. Only where news sources themselves are implicated in crime or possess in-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 20

formation relevant to the grand jury's task need they or the reporter be concerned about grand jury subpoenas. Nothing before us indicates that a large number or percentage of all confidential news sources falls into either category and would in any way be deterred by our holding that the Constitution does not, as it never has, exempt the newsman from performing the citizen's normal duty of appearing and furnishing**2662 information relevant to the grand jury's task.

The preference for anonymity of those confidential informants involved in actual criminal conduct is presumably a product of their desire to escape criminal prosecution, and this preference, while understandable, is hardly deserving of constitutional protection. It would be frivolous to assert-and no one does in these cases-that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws. Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news. Neither is immune, on First Amendment grounds, from testifying against the other, before the grand jury or at a criminal trial. The Amendment does not reach so far as to override the interest of the public in ensuring*692 that neither reporter nor source is invading the rights of other citizens through reprehensible conduct forbidden to all other persons. To assert the contrary proposition

'Is to answer it, since it involves in its very statement the contention that the freedom of the press is the freedom to do wrong with impunity and implies the right to frustrate and defeat the discharge of those governmental duties upon the performance of which the freedom of all, including that of the press, depends. . . . It suffices to say that however complete is the right of the press to state public things and discuss them, that right, as every other right enjoyed in human society, is subject to the restraints which separate right from wrong-doing.'

Toledo Newspaper Co. v. United States, 247 U.S. 402, 419-420, 38 S.Ct. 560, 564, 62 L.Ed. 1186 (1918).[FN30]

FN30. The holding in this case involved a construction of the Contempt of Court Act of 1831, 4 Stat. 487, which permitted summary trial of contempts 'so near (to the court) as to obstruct the administration of justice.'The Court held that the Act required only that the conduct have a 'direct tendency to prevent and obstruct the discharge of judicial duty.' 247 U.S., at 419, 38 S.Ct., at 564. This view was overruled and the Act given a much narrower reading in Nye v. United States, 313 U.S. 33, 47-52, 61 S.Ct. 810, 815-817, 85 L.Ed. 1172 (1941). See Bloom v. Illinois, 391 U.S. 194, 205-206, 88 S.Ct. 1477, 1484-1485, 20 L.Ed.2d 522 (1968).

[11] Thus, we cannot seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it. Insofar as any reporter in these cases undertook not to reveal or testify about the crime he witnessed, his claim of privilege under the First Amendment presents no substantial question. The crimes of news sources are no less reprehensible and threatening to the public interest when witnessed by a reporter than when they are not.

*693 There remain those situations where a source is not engaged in criminal conduct but has information suggesting illegal conduct by others. Newsmen frequently receive information from such sources pursuant to a tacit or express agreement to withhold the source's name and suppress any information that the source wishes not published. Such informants presumably desire anonymity in order to avoid being entangled as a witness in a criminal trial or grand jury investigation. They may fear that disclosure will threaten their job security or personal

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

05/29/2009 05:15:13 PM          SDMA          415-781-2635          Page 57
Case 3:15-cv-01758-N    Document 38-13    Filed 06/28/16    Page 130 of 158    PageID 1891

Page 22 of 52

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617          Page 21
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

safety or that it will simply result in dishonor or embarassment.

The argument that the flow of news will be diminished by compelling reporters to aid the grand jury in a criminal investigation is not irrational, nor are the records before us silent on the matter. But we remain unclear how often and to what extent informers are actually deterred from furnishing information when newsmen are forced to testify before a grand jury. The available data **2663 indicate that some newsmen rely a great deal on confidential sources and that some informants are particularly sensitive to the threat of exposure and may be silenced if it is held by this Court that, ordinarily, newsmen must testify pursuant to subpoenas,[FN11] but the evidence fails to demonstrate that there would be a significant construction of the flow of news to the public if this Court reaffirms the prior common-law and constitutional rule regarding the testimonial obligations of newsmen. Estimates of the inhibiting effect of such subpoenas on the willingness of informants to make disclosures to newsmen are widely divergent and *694 to a great extent speculative.[FN12] It would be difficult to canvass the views of the informants themselves; surveys of reporters on this topic are chiefly opinions of predicted informant behavior and must be viewed in the light of the professional self-interest of the interviewees.[FN13] Reliance by the press on confidential informants does not mean that all such sources will in fact dry up because of the later possible appearance of the newsman before a grand jury. The reporter may never be called and if he objects to testifying, the prosecution may not insist. Also, the relationship of many informants to the press is a symbiotic one which is unlikely to be greatly inhibited by the threat of subpoena: quite often, such informants are members of a minority political or cultural group that *695 relies heavily on the media to propagate its views, publicize its aims, and magnify its exposure to the public. Moreover, grand juries characteristically conduct secret proceedings, and law enforcement officers are themselves experienced in dealing with informers, and have their own methods for protecting them without interference with the effective administration of justice. There is little before us indicating that informants whose interest in avoiding exposure is that it may threaten job security, personal safety, or peace of mind, would in fact be in a worse position, or would think they would be, if they risked placing their trust in public officials as well as reporters. We doubt if the informer who prefers anonymity but is sincerely interested in furnishing evidence of crime will always or very often be deterred by the prospect of dealing with those public authorities characteristically charged with the duty to protect the public interest as well as his.

FN31. Respondent Caldwell attached a number of affidavits from prominent newsmen to his initial motion to quash, which detail the experiences of such journalists after they have been subpoenaed. Appendix to No. 70-57, pp. 22-61.

FN32. Cf. e.g., the results of a study conducted by Guest & Stanzler, which appears as an appendix to their article, supra, n. 20. A number of editors of daily newspapers of varying circulation were asked the question, 'Excluding one-or two-sentence gossip items, on the average how many stories based on information received in confidence are published in your paper each year? Very rough estimate.' Answers varied significantly. e.g., 'Virtually innumerable,' Tucson Daily Citizen (41,969 daily circ.), 'Too many to remember,' Los Angeles Herald-Examiner (718,221 daily circ.), 'Occasionally,' Denver Post (252,084 daily circ.), 'Rarely,' Cleveland Plain Dealer (370,499 daily circ.), 'Very rare, some politics,' Oregon Journal (146,403 daily circ.). This study did not purport to measure the extent of deterrence of informants caused by subpoenas to the press.

FN33. In his Press Subpoenas: An Empirical and legal Analysis, Study Report of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 22

the Reporters' Committee on Freedom of the Press 6-12, Prof. Vince Blasi discusses these methodological problems. Prof. Blasi's survey found that slightly more than half of the 975 reporters questioned said that they relied on regular confidential sources for at least 10% of their stories. Id., at 21. Of this group of reporters, only 8% were able to say with some certainty that their professional functioning had been adversely affected by the threat of subpoena; another 11% were not certain whether or not they had been adversely affected. Id., at 53.

[12] Accepting the fact, however, that an undetermined number of informants not themselves implicated in crime will nevertheless, for whatever reason, refuse to talk to newsmen if **2664 they fear identification by a reporter in an official investigation, we cannot accept the argument that the public interest in possible future news about crime from undisclosed, unverified sources must take precedence over the public interest in pursuing and prosecuting those crimes reported to the press by informants and in thus deterring the commission of such crimes in the future.

We note first that the privilege claimed is that of the reporter, not the informant, and that if the authorities independently identify the informant, neither his own reluctance to testify nor the objection of the newsman would shield him from grand jury inquiry, whatever the impact on the flow of news or on his future usefulness as a secret source of information. More important, *696 it is obvious that agreements to conceal information relevant to commission of crime have very little to recommend them from the standpoint of public policy. Historically, the common law recognized a duty to raise the 'hue and cry' and report felonies to the authorities.[FN34] Misprision of a felony-that is, the concealment of a felony 'which a man knows, but never assented to . . . (so as to become) either principal or accessory,' 4 W. Blackstone, Commentar-

ies, *121, was often said to be a common-law crime.[FN35] The first Congress passed a statute, 1 Stat. 113, s 6, as amended, 35 Stat. 1114, s 146, 62 Stat. 684, which is still in effect, defining a federal crime of misprision:

> FN34. See Statute of Westminster First, 3 Edw. 1, c. 9, p. 43 (1275); Statute of Westminster Second, 13 Edw. 1, c. 6, pp. 114-115 (1285); Sheriffs Act of 1887, 50 & 51 Vict., c. 55, s 8(1); 4 W. Blackstone, Commentaries *293-295; 2 W. Holdsworth, History of English Law 80-81, 101-102 (3d ed. 1927); 4 id., at 521-522.

> FN35. See, e.g., Scrope's Case, referred to in 3 Coke's Institute 36; Rex v. Cowper, 5 Mod. 206, 87 Eng.Rep. 611 (1969); Proceedings under a Special Commission for the County of York, 31 How.St.Tr. 965, 969 (1813); Sykes v. Director of Public Prosecutions, (1961) 3 W.L.R. 371. But see Glazebrook, Misprision of Felony-Shadow or Phantom?, 8 Am.J.Legal Hist. 189 (1964). See also Act 5 & 6 Edw. 6, c. 11 (1552).

'Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be (guilty of misprision).'18 U.S.C. s 4.[FN36]

> FN36. This statute has been construed, however, to require both knowledge of a crime and some affirmative act of concealment or participation. Bratton v. United States, 73 F.2d 795 (CA10 1934); United States v. Farrar, 38 F.2d 515, 516 (Mass.), aff'd on other grounds, 281 U.S. 624, 50 S.Ct. 425, 74 L.Ed. 1078 (1930); United States v. Norman, 391 F.2d 212 (CA6),cert. denied, 390 U.S. 1014, 88

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

S.Ct. 1265, 20 L.Ed.2d 163 (1968); Lancey v. United States, 356 F.2d 407 (CA9),cert. denied, 385 U.S. 922, 87 S.Ct. 234, 17 L.Ed.2d 145 (1966). Cf. Marbury v. Brooks, 7 Wheat. 556, 575, 5 L.Ed. 522 (1822) (Marshall, C.J).

*697 It is apparent from this statute, as well as from our history and that of England, that concealment of crime and agreements to do so are not looked upon with favor. Such conduct deserves no encomium, and we decline now to afford it First Amendment protection by denigrating the duty of a citizen, whether reporter or informer, to respond to grand jury subpoena and answer relevant questions put to him.

Of course, the press has the right to abide by its agreement not to publish all the information it has, but the right to withhold news is not equivalent to a First Amendment exemption from the ordinary duty of all other citizens to furnish relevant information to a grand jury performing an important public function. Private restraints on the flow of information are not so favored by the First Amendment that they override all other public interests. As Mr. Justice Black declared in another context, '(f)reedom of the press from governmental **2665 interference under the First Amendment does not sanction repression of that freedom by private interests.' Associated Press v. United States, 326 U.S., at 20, 65 S.Ct., at 1425.

Neither are we now convinced that a virtually impenetrable constitutional shield, beyond legislative or judicial control, should be forged to protect a private system of informers operated by the press to report on criminal conduct, a system that would be unaccountable to the public, would pose a threat to the citizen's justifiable expectations of privacy, and would equally protect well-intentioned informants and those who for pay or otherwise betray their trust to their employer or associates. The public through its elected and appointed *698 law enforcement officers regularly utilizes informers, and in proper circumstances may assert a privilege against

disclosing the identity of these informers. But

'(t)he purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.' Roviaro v. United States, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957).

Such informers enjoy no constitutional protection. Their testimony is available to the public when desired by grand juries or at criminal trials; their identity cannot be concealed from the defendant when it is critical to his case. Roviaro v. United States, supra, at 60-61, 62, 77 S.Ct. at 627-628, 629; McCray v. Illinois, 386 U.S. 300, 310, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62 (1967); Smith v. Illinois, 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968); Alford v. United States, 282 U.S. 687, 693, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). Clearly, this system is not impervious to control by the judiciary and the decision whether to unmask an informer or to continue to profit by his anonymity is in public, not private, hands. We think that it should remain there and that public authorities should retain the options of either insisting on the informer's testimony relevant to the prosecution of crime or of seeking the benefit of further information that his exposure might prevent.

We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history teaches us. As noted previously, the common law recognized no such privilege, and the constitutional argument was not even asserted until 1958. From the beginning of our country the press has operated without constitutional protection*699 for press informants, and the press has flourished. The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press.[FN37]

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 24

FN37. Though the constitutional argument for a newsman's privilege has been put forward very recently, newsmen have contended for a number of years that such a privilege was desirable. See, e.g., Siebert & Ryniker, Press Winning Fight to Guard Sources, Editor & Publisher, Sept. 1, 1934, pp. 9, 36-37; G. Bird & F. Merwin, The Press and Society 592 (1971). The first newsman's privilege statute was enacted by Maryland in 1896, and currently is codified as Md.Ann.Code Art. 35, s 2 (1971).

It is said that currently press subpoenas have multiplied,[FN38] that mutual distrust and tension between press and officialdom have increased, that reporting styles have changed, and that there is now more need for confidential sources, particularly where the press seeks news about minority cultural and political groups or dissident organizations suspicious of the law and public officials. These developments, even if true, are treacherous grounds for a far-reaching **2666 interpretation of the First Amendment fastening a nationwide rule on courts, grand juries, and prosecuting officials everywhere. The obligation to testify in response to grand jury subpoenas will not threaten these sources not involved with criminal conduct and without information relevant to grand jury investigations, and we cannot hold that the Constitution places the sources in these two categories either above the law or beyond its reach.

FN38. A list of recent subpoenas to the news media is contained in the appendix to the brief of amicus New York Times in No. 70-57.

[13] The argument for such a constitutional privilege rests heavily on those cases holding that the infringement of protected First Amendment rights must be no broader than necessary to achieve a permissible governmental purpose, see cases cited at n. 19, supra. We do not deal, however, with a governmental institution that has abused *700 its proper function, as a legislative committee does when it

'expose(s) for the sake of exposure.' Watkins v. United States, 354 U.S. 178, 200, 77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273 (1957). Nothing in the record indicates that these grand juries were 'prob(ing) at will and without relation to existing need.' DeGregory v. Attorney General of New Hampshire, 383 U.S. 825, 829, 86 S.Ct. 1148, 1151, 16 L.Ed.2d 292 (1966). Nor did the grand juries attempt to invade protected First Amendment rights by forcing wholesale disclosure of names and organizational affiliations for a purpose that was not germane to the determination of whether crime has been committed, cf. NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), and the characteristic secrecy of grand jury proceedings is a further protection against the undue invasion of such rights. See Fed.Rule CrimProc. 6(e). The investigative power of the grand jury is necessarily broad if its public responsibility is to be adequately discharged. Costello v. United States, 350 U.S. 359, at 364, 76 S.Ct. 406, at 409, 100 L.Ed. 397 (1956).

[14] The requirements of those cases, see n. 18, supra, which hold that a State's interest must be 'compelling' or 'paramount' to justify even an indirect burden on First Amendment rights, are also met here. As we have indicated, the investigation of crime by the grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen, and it appears to us that calling reporters to give testimony in the manner and for the reasons that other citizens are called 'bears a reasonable relationship to the achievement of the governmental purpose asserted as its justification.' Bates v. Little Rock, supra, 361 U.S. at 525, 80 S.Ct. at 417. If the test is that the government 'convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest,' *701 Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 546, 83 S.Ct. 889, 894, 9 L.Ed.2d 929 (1963), it is quite apparent (1) that the State has the neces-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 25

sary interest in extirpating the traffic in illegal drugs, in forestalling assassination attempts on the President, and in preventing the community from being disrupted by violent disorders endangering both persons and property; and (2) that, based on the stories Branzburg and Caldwell wrote and Pappas' admitted conduct, the grand jury called these reporters as they would others-because it was likely that they could supply information to help the government determine whether illegal conduct had occurred and, if it had, whether there was sufficient evidence to return an indictment.

[15] Similar considerations dispose of the reporters' claims that preliminary to requiring their grand jury appearance, the State must show that a crime has been committed and that they possess relevant information not available from other sources, for only the grand jury itself can make this determination. The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining **2667 whether a crime has been committed and who committed it. To this end it must call witnesses, in the manner best suited to perform its task.' When the grand jury is performing its investigatory function into a general problem area . . . . society's interest is best served by a thorough and extensive investigation.' Wood v. Georgia, 370 U.S. 375, 392, 82 S.Ct. 1364, 1374, 8 L.Ed.2d 569 (1962). A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.' United States v. Stone, 249 F.2d 138, 140 (C.A.2 1970). Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. Costello v. United States, 350 U.S., at 362, 76 S.Ct., at 408. It is *702 only after the grand jury has examined the evidence that a determination of whether the proceeding will result in an indictment can be made.

'It is impossible to conceive that in such cases the examination of witnesses must be stopped until a

basis is laid by an indictment formally preferred, when the very object of the examination is to ascertain who shall be indicted.' Hale v. Henkel, 201 U.S. 43, 65, 26 S.Ct. 370, 375, 50 L.Ed. 652 (1906).

See also Hendricks v. United States, 223 U.S. 178, 32 S.Ct. 313, 56 L.Ed. 394 (1912); Blair v. United States, 250 U.S., at 282-283, 39 S.Ct., at 471, 63 L.Ed. 979. We see no reason to hold that these reporters, any more than other citizens, should be excused from furnishing information that may help the grand jury in arriving at its initial determinations.

The privilege claimed here is conditional, not absolute; given the suggested preliminary showings and compelling need, the reporter would be required to testify. Presumably, such a rule would reduce the instances in which reporters could be required to appear, but predicting in advance when and in what circumstances they could be compelled to do so would be difficult. Such a rule would also have implications for the issuance of compulsory process to reporters at civil and criminal trials and at legislative hearings. If newsmen's confidential sources are as sensitive as they are claimed to be, the prospect of being unmasked whenever a judge determines the situation justifies it is hardly a satisfactory solution to the problem.[FN39] For **2668 them, it would appear that only an absolute privilege would suffice.

FN39.'Under the case-by-case method of developing rules, it will be difficult for potential informants and reporters to predict whether testimony will be compelled since the decision will turn on the judge's ad hoc assessment in different fact settings of 'importance' or 'relevance' in relation to the free press interest. A 'general' deterrent effect is likely to result. This type of effect stems from the vagueness of the tests and from the uncertainty attending their application. For example, if a reporter's information goes to the 'heart of the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 26

matter' in Situation X, another reporter and informant who subsequently are in Situation Y will not know if 'heart of the matter rule X' will be extended to them, and deterrence will thereby result. Leaving substantial discretion with judges to delineate those 'situations' in which rules of 'relevance' or 'importance' apply would therefore seem to undermine significantly the effectiveness of a reporter-informer privilege.'Note, Reporters and Their Sources: The Constitutional Right to a Confidential Relationship, 80 Yale L.J. 317, 341 (1970).

In re Grand Jury Witnesses, 322 F.Supp. 573 (ND Cal.1970), illustrates the impact of this ad hoc approach. Here, the grand jury was, as in Caldwell, investigating the Black Panther Party, and was 'inquiring into matters which involve possible violations of Congressional acts passed to protect the person of the President (18 U.S.C. s 1751), to free him from threats (18 U.S.C. s 871), to protect our armed forces from unlawful interference (18 U.S.C. s 2387), conspiracy to commit the foregoing offenses (18 U.S.C. s 371), and related statutes prohibiting acts directed against the security of the government.' Id., at 577. The two witnesses, reporters for a Black Panther Party newspaper, were subpoenaed and given Fifth Amendment immunity against criminal prosecution, and they claimed a First Amendment journalist's privilege. The District Court entered a protective order, allowing them to refuse to divulge confidential information until the the Government demonstrated 'a compelling and overriding national interest in requiring the testimony of (the witnesses) which cannot be served by any alternative means.' Id., at 574. The Government claimed that it had information that the witnesses had associated with persons who

had conspired to perform some of the criminal acts that the grand jury was investigating. The court held the Government had met its burden and ordered the witnesses to testify:

'The whole point of the investigation is to identify persons known to the (witnesses) who may have engaged in activities violative of the above indicated statutes, and also to ascertain the details of their alleged unlawful activities. All questions directed to such objectives of the investigation are unquestionably relevant, and any other evaluation thereof by the Court without knowledge of the facts before the Grand Jury would clearly constitute 'undue interference of the Court.'' Id., at 577.

Another illustration is provided by State v. Knops, 49 Wis.2d 647, 183 N.W.2d 93 (1971), in which a grand jury was investigating the August 24, 1970, bombing of Sterling Hall on the University of Wisconsin Madison campus. On August 26, 1970, an 'underground' newspaper, the Madison Kaleidoscope, printed a front-page story entitled 'The Bombers Tell Why and What Next-Exclusive to Kaleidoscope.'An editor of the Kaleidoscope was subpoenaed, appeared, asserted his Fifth Amendment right against self-incrimination, was given immunity, and then pleaded that he had a First Amendment privilege against disclosing his confidential informants. The Wisconsin Supreme Court rejected his claim and upheld his contempt sentence: '(Appellant) faces five very narrow and specific questions, all of which are founded on information which he himself has already volunteered. The purpose of these questions is very clear. The need for answers to them is 'overriding,' to say the least. The need for these answers is nothing short of the public's need (and right) to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

protect itself from physical attack by apprehending the perpetrators of such attacks.' 49 Wis.2d, at 658, 183 N.W.2d, at 98-99.

*703 [16] We are unwilling to embark the judiciary on a long and difficult journey to such an uncertain destination. The administration of a constitutional newsman's privilege*704 would present practical and conceptual difficulties of a high order. Sooner or later, it would be necessary to define those categories of newsmen who qualified for the privilege, a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods. Cf. In re Grand Jury Witnesses, 322 F.Supp. 573, 574 (ND Cal.1970). Freedom of the press is a 'fundamental personal right' which 'is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.' Lovell v. City of Griffin, 303 U.S. 444, 450, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). See also *705Mills v. Alabama, 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966); Murdock v. Pennsylvania, 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943). The informative function asserted by representatives of the organized press in the present cases is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists. Almost any author may quite accurately assert that he is contributing to the flow of information to the public, that he relies on confidential sources of information, and that these sources will be silenced if he is forced to make disclosures before a grand jury.FN40

> FN40. Such a privilege might be claimed by groups that set up newspapers in order to engage in criminal activity and to therefore be insulated from grand jury inquiry,

regardless of Fifth Amendment grants of immunity. It might appear that such 'sham' newspapers would be easily distinguishable, yet the First Amendment ordinarily prohibits courts from inquiring into the content of expression, except in cases of obscenity or libel, and protects speech and publications regardless of their motivation, orthodoxy, truthfulness, timeliness, or taste. New York Times Co. v. Sullivan, 376 U.S. 254, at 269-270, 84 S.Ct. 710, at 720-721, 11 L.Ed.2d 686; Kingsley International Pictures Corp. v. Regents, 360 U.S. 684, 689, 79 S.Ct. 1362, 1365, 3 L.Ed.2d 1512 (1959); Winters v. New York 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948); Thomas v. Collins, 323 U.S. 516, at 537, 65 S.Ct. 315, at 326, 89 L.Ed. 430.By affording a privilege to some organs of communication but not to others, courts would inevitably be discriminating on the basis of content.

**2669 In each instance where a reporter is subpoenaed to testify, the courts would also be embroiled in preliminary factual and legal determinations with respect to whether the proper predicate had been laid for the reporter's appearance: Is there probable cause to believe a crime has been committed? Is it likely that the reporter has useful information gained in confidence? Could the grand jury obtain the information elsewhere? Is the official interest sufficient to outweigh the claimed privilege?

Thus, in the end, by considering whether enforcement of a particular law served a 'compelling' governmental interest, the courts would be inextricably involved in *706 distinguishing between the value of enforcing different criminal laws. By requiring testimony from a reporter in investigations involving some crimes but not in others, they would be making a value judgment that a legislature had declined to make, since in each case the criminal law involved would represent a considered legislative judgment, not constitutionally suspect, of what

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 28

conduct is liable to criminal prosecution. The task of judges, like other officials outside the legislative branch, is not to make the law but to uphold it in accordance with their oaths.

At the federal level, Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned and, equally important, to refashion those rules as experience from time to time may dictate. There is also merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards in light of the conditions and problems with respect to the relations between law enforcement officials and press in their own areas. It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute.

In addition, there is much force in the pragmatic view that the press has at its disposal powerful mechanisms of communication and is far from helpless to protect itself from harassment or substantial harm. Furthermore, if what the newsmen urged in these cases is true-that law enforcement cannot hope to gain and may suffer from subpoenaing newsmen before grand juries-prosecutors will be loath to risk so much for so little. Thus, at the federal level the Attorney General has already fashioned a set of rules for federal officials in connection*707 with subpoenaing members of the press to testify before grand juries or at criminal trials.[FN41] These rules are a major step in the direction the reporters**2670 herein desire to move. They may prove wholly sufficient to resolve the bulk of disagreements and controversies between press and federal officials.

> FN41. The Guidelines for Subpoenas to the News Media were first announced in a speech by the Attorney General on August 10, 1970, and then were expressed in Department of Justice Memo. No. 692 (Sept.

2, 1970), which was sent to all United States Attorneys by the Assistant Attorney General in charge of the Criminal Division. The Guidelines state that: 'The Department of Justice recognizes that compulsory process in some circumstances may have a limiting effect on the exercise of First Amendment rights. In determining whether to request issuance of a subpoena to the press, the approach in every case must be to weigh that limiting effect against the public interest to be served in the fair administration of justice' and that: 'The Department of Justice does not consider the press 'an investigative arm of the government.' Therefore, all reasonable attempts should be made to obtain information from non-press sources before there is any consideration of subpoenaing the press.' The Guidelines provide for negotiations with the press and require the express authorization of the Attorney General for such subpoenas. The principles to be applied in authorizing such subpoenas are stated to be whether there is 'sufficient reason to believe that the information sought (from the journalist) is essential to a successful investigation,' and whether the Government has unsuccessfully attempted to obtain the information from alternative non-press sources. The Guidelines provide, however, that in 'emergencies and other unusual situations,' subpoenas may be issued which do not exactly conform to the Guidelines.

[17] Finally, as we have earlier indicated, news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment.[FN42] Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship*708 with his news sources would have no justification.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 29

Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth.

> FN42. Cf. Younger v. Harris, 401 U.S. 37, 49, 53-54, 91 S.Ct. 746, 753, 754-755, 27 L.Ed.2d 669 (1971).

### III.

[18][19] We turn, therefore, to the disposition of the cases before us. From what we have said, it necessarily follows that the decision in United States v. Caldwell, No. 70-57, must be reversed. If there is no First Amendment privilege to refuse to answer the relevant and material questions asked during a good-faith grand jury investigation, then it is a fortiori true that there is no privilege to refuse to appear before such a grand jury until the Government demonstrates some 'compelling need' for a newsman's testimony. Other issues were urged upon us, but since they were not passed upon by the Court of Appeals, we decline to address them in the first instance.

[20] The decisions in No. 70-85, Branzburg v. Hayes and Branzburg v. Meigs, must be affirmed. Here, petitioner refused to answer questions that directly related to criminal conduct that he had observed and written about. The Kentucky Court of Appeals noted that marihuana is defined as a narcotic drug by statute, Ky.Rev.Stat. s 218.010(14) (1962), and that unlicensed possession or compounding of it is a felony punishable by both fine and imprisonment. Ky.Rev.Stat. s 218.210 (1962). It held that petitioner 'saw the commission of the statutory felonies of unlawful possession of marijuana and the unlawful conversion of it into hashish,' in Branzburg v. Pound, 461 S.W.2d, at 346. Petitioner may be presumed to have observed similar violations of the state narcotics laws during the research he did for the story that forms the basis of the subpoena in Branzburg v. Meigs. In both

cases, if what petitioner wrote was true, *709 he had direct information to provide the grand jury concerning the commission of serious crimes.

[21] The only question presented at the present time in In re Pappas, No. 70-94, is whether petitioner Pappas must appear before the grand jury to testify pursuant to subpoena. The Massachusetts Supreme Judicial Court characterized the record in this case as 'meager,' and it is not clear what petitioner will be asked by the grand jury. It is not even clear that he will be asked to divulge information received in confidence. We affirm the decision of the Massachusetts Supreme Judicial Court and hold that petitioner must appear before the grand jury to answer the questions put to him, subject, of course, to the supervision of the presiding judge as to 'the propriety, purposes, and scope of the grand jury inquiry and the pertinence of the probable testimony.' 358 Mass., at 614, 266 N.E.2d, at 303-304.

So ordered.

Judgment at 434 F.2d 1081 reversed; judgments at 461 S.W.2d 345 and 266 N.E.2d 297 affirmed.
**2671 Mr. Justice POWELL, concurring.
I add this brief statement to emphasize what seems to me to be the limited nature of the Court's holding. The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources. Certainly, we do not hold, as suggested in Mr. Justice STEWART's dissenting opinion, that state and federal authorities are free to 'annex' the news media as 'an investigative arm of government.' The solicitude repeatedly shown by this Court for First Amendment freedoms should be sufficient assurance against any such effort, even if one seriously believed that the media-properly free and untrammeled in the fullest sense of these terms-were not able to protect themselves.

As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will *710 be tolerated. If a newsman believes that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 30

the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.FN*

> FN* It is to be remembered that Caldwell asserts a constitutional privilege not even to appear before the grand jury unless a court decides that the Government has made a showing that meets the three preconditions specified in the dissenting opinion of Mr. Justice Stewart. To be sure, this would require a 'balancing' of interests by the court, but under circumstances and constraints significantly different from the balancing that will be appropriate under the court's decision. The newsman witness, like all other witnesses, will have to appear; he will not be in a position to litigate at the threshold the State's very authority to subpoena him. Moreover, absent the constitutional preconditions that Caldwell and that dissenting opinion would impose as heavy burdens of proof to be carried by the State, the court-when called upon to protect a newsman from improper or prejudicial questioning-would be free to balance the competing interests on their merits in the particular case. The new constitutional rule endorsed by that dissenting opinion would, as a practical matter, defeat such a

fair balancing and the essential societal interest in the detection and prosecution of crime would be heavily subordinated.

In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection.

*725 Mr. Justice STEWART, with whom Mr. Justice BRENNAN and Mr. Justice MARSHALL join, dissenting.

The Court's crabbed view of the First Amendment reflects a disturbing insensitivity to the critical role of an independent press in our society. The question whether a reporter has a constitutional right to a confidential relationship with his source is of first impression here, but the principles that should guide our decision are as basic as any to be found in the Constitution. While Mr. Justice POWELL'S enigmatic concurring opinion gives some hope of a more flexible view in the future, the Court in these cases holds that a newsman has no First Amendment right to protect his sources when called before a grand jury. The Court thus invites state and federal authorities to undermine the historic independence of the press by attempting to annex the journalistic profession as an investigative arm of government. Not only will this decision impair performance of the press' constitutionally protected functions, but it will, I am convinced, in the **2672 long run, harm rather than help the administration of justice.

I respectfully dissent.

I

The reporter's constitutional right to a confidential relationship with his source stems from the broad societal interest in a full and free flow of information to the public. It is this basic concern that underlies the Constitution's*726 protection of a free press, Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660; New York Times Co. v. Sullivan, 376 U.S. 254, 269, 84

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 31

S.Ct. 710, 720, 11 L.Ed.2d 686,[FN1] because the guarantee is 'not for the benefit of the press so much as for the benefit of all of us.' Time, Inc. v. Hill, 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456.[FN2]

> FN1. We have often described the process of informing the public as the core purpose of the constitutional guarantee of free speech and a free press. See, e.g., Stromberg v. California, 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117; De Jonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278; Smith v. California, 361 U.S. 147, 153, 80 S.Ct. 215, 218, 4 L.Ed.2d 205.

> FN2. As I see it, a reporter's right to protect his source is bottomed on the constitutional guarantee of a full flow of information to the public. A newsman's personal First Amendment rights or the associational rights of the newsman and the source are subsumed under that broad societal interest protected by the First Amendment. Obviously, we are not here concerned with the parochial personal concerns of particular newsmen or informants.

> 'The newsman-informer relationship is different from . . . other relationships whose confidentiality is protected by statute, such as the attorney-client and physician-patient relationship. In the case of other statutory privileges, the right of nondisclosure is granted to the person making the communication in order that he will be encouraged by strong assurances of confidentiality to seek such relationships which contribute to his personal well-being. The judgment is made that the interests of society will be served when individuals consult physicians and lawyers; the public interest is thus advanced by creating a zone of privacy that the individual can control. However, in the case of the reporter-informer relationship,

society's interest is not in the welfare of the informant per se, but rather in creating conditions in which information possessed by news sources can reach public attention.'Note, 80 Yale L.J. 317, 343 (1970) (footnotes omitted) (hereinafter Yale Note).

Enlightened choice by an informed citizenry is the basic ideal upon which an open society is premised,[FN3] and a free press is thus indispensable to a free society. Not only does the press enhance personal self-fulfillment *727 by providing the people with the widest possible range of fact and opinion, but it also is an incontestable precondition of self-government. The press 'has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences . . .' Estes v. Texas, 381 U.S. 532, 539, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543; Mills v. Alabama, 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484; Grosjean, supra, 297 U.S. at 250, 56 S.Ct. at 449. As private and public aggregations of power burgeon in size and the pressures for conformity necessarily mount, there is obviously a continuing need for an independent press to disseminate a robust variety of information and opinion through reportage, investigation, and criticism, if we are to preserve our constitutional tradition of maximizing freedom of choice by encouraging diversity of expression.

> FN3. See generally Z. Chafee, Free Speech in the United States (1941); A. Meikeljohn, Free Speech and Its Relation to Self-Government (1948); T. Emerson, Toward a General Theory of the First Amendment (1963).

A

In keeping with this tradition, we have held that the right to publish is central to the First Amendment

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 32

and basic to the existence of constitutional democracy. Grosjean, supra, at 250, 56 S.Ct. at 449; New York Times, supra, 376 U.S. at 270, 84 S.Ct. at 720.

A corollary of the right to publish must be the right to gather news. The **2673 full flow of information to the public protected by the free-press guarantee would be severely curtailed if no protection whatever were afforded to the process by which news is assembled and disseminated. We have, therefore, recognized that there is a right to publish without prior governmental approval, Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822, a right to distribute information, see, e.g., Lovell v. Griffin, 303 U.S., 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949; Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265; Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313; Grosjean, supra, and a right to receive printed matter, Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398.

*728 No less important to the news dissemination process is the gathering of information. News must not be unnecessarily cut off at its source, for without freedom to acquire information the right to publish would be impermissibly compromised. Accordingly, a right to gather news, of some dimensions, must exist. Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179.[FN4]Note, The Right of the Press to Gather Information, 71 Col.L.Rev. 838 (1971). As Madison wrote: 'A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or perhaps both.' 9 Writings of James Madison 103 (G. Hunt ed. 1910).

> FN4. In Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179, we held that the Secretary of State's denial of a passport for travel to Cuba did not violate a citizen's First Amendment rights. The rule was justified by the 'weightiest considerations of

national security' and we concluded that the 'right to speak and publish does not carry with it the unrestrained right to gather information.' Id., at 16-17, 85 S.Ct. at 1281 (emphasis supplied). The necessary implication is that some right to gather information does exist.

B

The right to gather news implies, in turn, a right to a confidential relationship between a reporter and his source. This proposition follows as a matter of simple logic once three factual predicates are recognized: (1) newsmen require informants to gather news; (2) confidentiality-the promise or understanding that names or certain aspects of communications will be kept off the record-is essential to the creation and maintenance of a news-gathering relationship with informants; and (3) an unbridled subpoena power-the absence of a constitutional right protecting, in any way, a confidential relationship from compulsory process-will either deter sources from divulging information or deter reporters from gathering and publishing information.

*729 It is obvious that informants are necessary to the news-gathering process as we know it today. If it is to perform its constitutional mission, the press must do far more than merely print public statements or publish prepared handouts. Familiarity with the people and circumstances involved in the myriad background activities that result in the final product called 'news' is vital to complete and responsible journalism, unless the press is to be a captive mouthpiece of 'newsmakers.'[FN5]

> FN5. In Caldwell v. United States, 434 F.2d 1081, the Government claimed that Caldwell did not have to maintain a confidential relationship with members of the Black Panther Party and provide independent reporting of their activities, since the Party and its leaders could issue statements on their own. But, as the Court of Appeals

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

for the Ninth Circuit correctly observed:

'(I)t is not enough that Black Panther press releases and public addresses by Panther leaders may continue unabated in the wake of subpoenas such as the one here in question. It is not enough that the public's knowledge of groups such as the Black Panthers should be confined to their deliberate public pronouncements or distant news accounts of their occasional dramatic forays into the public view. The need for an untrammeled press takes on special urgency in times of widespread protest and dissent. In such times the First Amendment protections exist to maintain communication with dissenting groups and to provide the public with a wide range of information about the nature of protest and heterodoxy.' Citing Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013; Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093. Id., at 1084-1085.

**2674 It is equally obvious that the promise of confidentiality may be a necessary prerequisite to a productive relationship between a newsman and his informants. An officeholder may fear his superior; a member of the bureaucracy, his associates; a dissident, the scorn of majority opinion. All may have information valuable to the public discourse, yet each may be willing to relate that information only in confidence to a reporter whom he trusts, either because of excessive caution or because of a reasonable fear of reprisals or censure for unorthodox *730 views. The First Amendment concern must not be with the motives of any particular news source, but rather with the conditions in which informants of all shades of the spectrum may make information available through the press to the public. Cf. Talley v. California, 362 U.S. 60, 65, 80 S.Ct. 536, 539, 4 L.Ed.2d 559; Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480; NAACP v. Alabama, 357 U.S. 449, 78 S.Ct.

1163, 2 L.Ed.2d 1488.[FN6]

FN6. As we observed in Talley v. California, 362 U.S 60, 80 S.Ct. 536, 4 L.Ed.2d 559, 'Anonymous pamphlets, leaflets, brochures and even books have played an important rule in the progress of mankind. . . . Before the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts. . . . Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes.' Id., at 64-65, 80 S.Ct., at 538. And in Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398, we recognized the importance to First Amendment values of the right to receive information anonymously.

In Caldwell, the District Court found that 'confidential relationships . . . are commonly developed and maintained by professional journalists, and are indispensable to their work of gathering, analyzing and publishing the news.'[FN7] Commentators and individual reporters have repeatedly noted the importance of confidentiality.[FN8] **731 And surveys among reporters and editors indicate that the promise of nondisclosure is necessary for many types of news gathering.[FN9]

FN7. Application of Caldwell, 311 F.Supp. 358, 361.

FN8. See, e.g., F. Chalmers, A Gentleman of the Press: The Biography of Colonel John Bayne MacLean 74-75 (1969); H. Klurfeld, Behind the Lines: The World of Drew Pearson 50, 52-55 (1968); A. Krock, Memoris: Sixty Years on the Firing Line 181, 184-185 (1968); E. Larsen, First with the Truth 22-23 (1968); R. Ottley, The

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00446

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617          Page 34
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Lonely Warrior-The Life and Times of Robert S. Abbott 143-145 (1955); C. Sulzberger, A Long Row of Candles; Memoirs and Diaries 241 (1969).

As Walter Cronkite, a network television reporter, said in an affidavit in Caldwel: 'In doing my work, I (and those who assist me) depend constantly on information, ideas, leads and opinions received in confidence. Such material is essential in digging out newsworthy facts and, equally important, in assessing the importance and analyzing the significance of public events.' App. 52.

FN9. See Guest & Stanzler, The Constitutional Argument for Newsmen Concealing Their Sources, 64 Nw.U.L.Rev. 18 (1969); V. Blasi, Press Subpoenas: An Empirical and Legal Analysis, Study Report of the Reporters' Committee on Freedom of the Press 20-29 (hereinafter Blasi).

Finally, and most important, when governmental officials possess an unchecked power to compel newsmen to disclose information received in confidence, sources will clearly be deterred from giving information, and reporters will clearly be deterred from publishing it, because uncertainty about exercise of the power will lead to 'self-censorship.' Smith v. California, 361 U.S. 147, 149-154, 80 S.Ct. 215, 216-219, 4 L.Ed.2d 205; New York Times Co. v. Sullivan, 376 U.S., at 279, 84 S.Ct., at 725. The uncertainty arises, of course, because the **2675 judiciary has traditionally imposed virtually no limitations on the grand jury's broad investigatory powers. See Antell, The Modern Grand Jury: Benighted Supergovernment, 51 A.B.A.J. 153 (1965). See also Part II, infra.

After today's decision, the potential informant can never be sure that his identity or off-the-record communications will not subsequently be revealed through the compelled testimony of a newsman. A public-spirited person inside government, who is

not implicated in any crime, will now be fearful of revealing corruption or other governmental wrongdoing, because he will now know he can subsequently be identified by use of compulsory process. The potential source must, therefore, choose between risking exposure by giving information or avoiding the risk by remaining silent.

The reporter must speculate about whether contact with a controversial source or publication of controversial material will lead to a subpoena. In the event of a *732 subpoena, under today's decision, the newsman will know that he must choose between being punished for contempt if he refuses to testify; or violating his profession's ethics[FN10] and impairing his resourcefulness as a reporter if he discloses confidential information.[FN11]

FN10. The American Newspaper Guild has adopted the following rule as part of the newsman's code of ethics: '(N)ewspapermen shall refuse to reveal confidences or disclose sources of confidential information in court or before other judicial or investigating bodies.' G. Bird & F. Merwin, The Press and Society 592 (1971).

FN11. Obviously, if a newsman does not honor a confidence he will have difficulty establishing other confidential relationships necessary for obtaining information in the future. See Siebert & Ryniker, Press Winning Fight to Guard Sources, Editor & Publisher, Sept. 1, 1934, pp. 9, 36-37.

Again, the commonsense understanding that such deterrence will occur is buttressed by concrete evidence. The existence of deterrent effects through fear and self-censorship was impressively developed in the District Court in Caldwell.[FN12] Individual reporters[FN13] and commentators[FN14] have noted such effects. Surveys have verified that an unbridled subpoena power will substantially *733 impair the flow of news to the public, especially in sensitive areas involving governmental officials,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00447

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617                    Page 35
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

financial affairs, political figures, dissidents, or minority groups that require in-depth, investigative reporting.[FN15] And the Justice Department has recognized that 'compulsory process in some circumstances may have a limiting effect on the exercise of First Amendment right.'[FN16] No evidence **2676 contradicting the existence of such deterrent effects was offered at the trials or in the briefs here by the petitioner in Caldwell or by the respondents in Branzburg and Pappas.

FN12. The court found that 'compelled disclosure of information received by a journalist within the scope of . . . confidential relationships jeopardizes those relationships and thereby impairs the journalist's ability to gather, analyze and publish the news.' Application of Caldwell, 311 F.Supp., at 361.

FN13. See n. 8, supra.

FN14. Recent commentary is nearly unanimous in urging either an absolute or qualified newsman's privilege. See, e.g., Goldstein, Newsmen and Their Confidential Sources, New Republic, Mar. 21, 1970, pp. 13-14; Yale Note, supra, n. 2; Comment, 46 N.Y.U.L.Rev. 617 (1971); Nelson, The Newsmen's Privilege Against Disclosure of Confidential Sources and Information, 24 Vand.L.Rev. 667 (1971); Note, The Right of the Press to Gather Information, 71 Col.L.Rev. 838 (1971); Comment, 4 U.Mich.J.L.Ref. 85 (1970); Comment, 6 Harv.Civ.Rights-Civ.Lib.L.Rev. 119 (1970); Comment, The Newsman's Privilege; Government Investigations; Criminal Prosecutions and Private Litigation, 58 Calif.L.Rev. 1198 (1970). But see the Court's opinion, ante, at 2660 n. 29. And see generally articles collected in Yale Note, supra, n. 2.

Recent decisions are in conflict both as to the importance of the deterrent effects and,

a fortiori, as to the existence of a constitutional right to a confidential reporter-source relationship. See the Court's opinion, ante, at 2658-2659, and cases collected in Yale Note, at 318 nn. 6-7.

FN15. See Blasi 6-71; Guest & Stanzler, supra, n. 9, at 43-50.

FN16. Department of Justice Memo. No. 692 (Sept. 2, 1970).

The impairment of the flow of news cannot, of course, be proved with scientific precision, as the Court seems to demand. Obviously, not every news-gathering relationship requires confidentiality. And it is difficult to pinpoint precisely how many relationship do require a promise or understanding of nondisclosure. But we have never before demanded that First Amendment rights rest on elaborate empirical studies demonstrating beyond any conceivable doubt that deterrent effects exist; we have never before required proof of the exact number of people potentially affected by governmental action, who would actually be dissuaded from engaging in First Amendment activity.

Rather, on the basis of common sense and available information, we have asked, often implicitly, (1) whether there was a rational connection between the cause (the governmental action) and the effect (the deterrence or *734 impairment of First Amendment activity), and (2) whether the effect would occur with some regularity, i.e., would not be de minimis. See, e.g., Grosjean v. American Press Co., 297 U.S., at 244-245, 56 S.Ct., at 446-447; Burstyn, Inc. v. Wilson, 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098; Sweezy v. New Hampshire, 354 U.S. 234, 248, 77 S.Ct. 1203, 1210, 1 L.Ed.2d 1311 (plurality opinion); NAACP v. Alabama, 357 U.S., at 461-466, 78 S.Ct., at 1171-1174; Smith v. California, 361 U.S., at 150-154, 80 S.Ct., at 217-219; Bates v. City of Little Rock, 361 U.S., at 523-524, 80 S.Ct., at 416-417; Talley v. California, 362 U.S., at 64-65, 80 S.Ct., at 538-539; Shelton v. Tucker, 364 U.S. 479, 485-486, 81 S.Ct. 247,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 36

250-251, 5 L.Ed.2d 231; Cramp v. Board of Public Instructions, 368 U.S. 278, 286, 82 S.Ct. 275, 280, 7 L.Ed.2d 285; NAACP v. Button, 371 U.S. 415, 431-438, 83 S.Ct. 328, 337-341, 9 L.Ed.2d 405; Gibson v. Florida Legislation Investigation Committee, 372 U.S. 539, 555-557, 83 S.Ct. 889, 898-899, 9 L.Ed.2d 929; New York Times Co. v. Sullivan, 376 U.S., at 277-278, 84 S.Ct., at 724-725; Freedman v. Maryland, 380 U.S. 51, 59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649; DeGregory v. Attorney General of New Hampshire, 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292; Elfbrandt v. Russell, 384 U.S. 11, 16-19, 86 S.Ct. 1238, 1240-1242, 16 L.Ed.2d 321. And, in making this determination, we have shown a special solicitude towards the 'indispensable liberties' protected by the First Amendment, NAACP v. Alabama, supra, 357 U.S., at 461, 78 S.Ct. at 1171; Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66, 83 S.Ct. 631, 637, 9 L.Ed.2d 584, for '(f)reedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference.' Bates, supra, 361 U.S., at 523, 80 S.Ct., at 416.[FN17] Once this threshold inquiry has been satisfied, we have then examined the competing interests in determining whether *735 there is an unconstitutional infringement of First Amendment freedoms.

> FN17. although, as the Court points out, we have held that the press is not free from the requirements of the National Labor Relations Act, the Fair Labor Standards Act, the antitrust laws, or nondiscriminatory taxation, ante, at 2657, these decisions were concerned 'only with restraints on certain business or commercial practices' of the press. Citizen Publishing Co. v. United States, 394 U.S. 131, 139, 89 S.Ct. 927, 931, 22 L.Ed.2d 148. And due weight was given to First Amendment interests. For example, 'The First Amendment, far from providing an argument against application of the Sherman Act . . . provides powerful reasons to the contrary.' Associ-

ated Press v. United States, 326 U.S., at 20, 65 S.Ct., at 1424.

For example, in NAACP v. Alabama, supra, we found that compelled disclosure of the names of those in Alabama who belonged to the NAACP 'is likely to affect**2677 adversely the ability (of the NAACP) and its members to pursue their . . . beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.' Id., at 462-463, 78 S.Ct., at 1172. In Talley, supra, we held invalid a city ordinance that forbade circulation of any handbill that did not have the distributor's name on it, for there was 'no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression.' Id., 362 U.S., at 64, 80 S.Ct., at 538. And in Burstyn, Inc., supra, we found deterrence of First Amendment activity inherent in a censor's power to exercise unbridled discretion under an overbroad statute. Id., 343 U.S., at 503, 72 S.Ct., at 781.

Surely the analogous claim of deterrence here is as securely grounded in evidence and common sense as the claims in the cases cited above, although the Court calls the claim 'speculative.' See ante, at 2662. The deterrence may not occur in every confidential relationship between a reporter and his source.[FN18] But it will certainly*736 occur in certain types of relationships involving sensitive and controversial matters. And such relationships are vital to the free flow of information.

> FN18. The fact that some informants will not be deterred from giving information by the prospect of the unbridled exercise of the subpoena power only means that there will not always be a conflict between the grand jury's inquiry and the protection of First Amendment activities. But even if the percentage of such informants is relatively large compared to the total 'universe' of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 37

potential informants, there will remain a large number of people in 'absolute' terms who will be deterred, and the flow of news through mass circulation newspapers and electronic media will inevitably be impaired.

To require any greater burden of proof is to shirk our duty to protect values securely embedded in the Constitution. We cannot await an unequivocal-and therefore unattainable-imprimatur from empirical studies.[FN19] We can and must accept the evidence developed in the record, and elsewhere, that overwhelmingly supports the premise that deterrence will occur with regularity in important types of news-gathering relationships.[FN20]

FN19. Empirical studies, after all, can only provide facts. It is the duty of courts to give legal significance to facts; and it is the special duty of this Court to understand the constitutional significance of facts. We must often proceed in a state of less than perfect knowledge, either because the facts are murky or the methodology used in obtaining the facts is open to question. It is then that we must look to the Constitution for the values that inform our presumptions. And the importance to our society of the full flow of information to the public has buttressed this Court's historic presumption in favor of First Amendment values.

FN20. See, e.g., the uncontradicted evidence presented in affidavits from newsmen in Caldwell, Appendix to No. 70-57, pp. 22-61 (statements from Gerald Fraser, Thomas Johnson, John Kifner, Timothy Knight, Nicholas Proffitt, Anthony Ripley, Wallace Turner, Gilbert Noble, Anthony Lukas, Martin Arnold, David Burnham, Jon Lowell, Frank Morgan, Min Yee, Walter Cronkite, Eric Sevareid, Mike Wallace, Dan Rather, Marvin Kalb).

Thus, we cannot escape the conclusion that when neither the reporter nor his source can rely on the shield of confidentiality against unrestrained use of the grand jury's subpoena power, valuable information will not be published and the public dialogue will inevitably be impoverished.

II

Posed against the First Amendment's protection of the newsman's confidential relationships in these cases is society's interest in the use of the grand jury to administer*737 justice fairly and effectively. The grand jury serves two important functions: 'to examine into the commission of crimes' and 'to stand between the prosecutor and the accused, and to **2678 determine whether the charge was founded upon credible testimony or was dictated by malice or personal ill will.' Hale v. Henkel, 201 U.S. 43, 59, 26 S.Ct. 370, 373, 50 L.Ed. 652. And to perform these functions the grand jury must have available to it every man's relevant evidence. See Blair v. United States, 250 U.S 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979; Blackmer v. United States, 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375.

Yet the longstanding rule making every person's evidence available to the grand jury is not absolute. The rule has been limited by the Fifth Amendment, [FN21] the Fourth Amendment,[FN22] and the evidentiary privileges of the common law.[FN23] So it was that in Blair, supra, after recognizing that the right against compulsory self-incrimination prohibited certain inquiries, the Court noted that 'some confidential matters are shielded from considerations of policy, and perhaps in other cases for special reasons a witness may be excused from telling all that he knows.' Id., 250 U.S. at 281; 39 S.Ct. at 471 (emphasis supplied). And in United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724,94 L.Ed. 844, the Court observed that any exemption from the duty to testify before the grand jury 'presupposes a very real interest to be protected.' Id., at 332, 70 S.Ct. at 731.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00450

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 38

FN21. See Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170; Quinn v. United States, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964; Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225; Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653.

FN22. See Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319.

FN23. See Committee on Rules of Practice and Procedure of Judicial Conference of the United States, Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates (1971); 8 J. Wigmore, Evidence ss 2290-2391 (McNaughton rev. 1961).

Such an interest must surely be the First Amendment protection of a confidential relationship that I have discussed above in Part I. As noted there, this protection does not exist for the purely private interests of the *738 newsman or his informant, nor even, at bottom, for the First Amendment interests of either partner in the news-gathering relationship.[FN24] Rather, it functions to insure nothing less than democratic decisionmaking through the free flow of information to the public, and it serves, thereby, to honor the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' New York Times Co. v. Sullivan, 376 U.S., at 270, 84 S.Ct., at 721.

FN24. Although there is a longstanding presumption against creation of common-law testimonial privileges, United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884, these privileges are grounded in an 'individual interest which has been found . . . to outweigh the public interest in the search for truth' rather than in the broad public concerns that inform the First Amendment. Id., at 331, 70 S.Ct., at 730.

In striking the proper balance between the public interest in the efficient administration of justice and the First Amendment guarantee of the fullest flow of information, we must begin with the basic proposition that because of their 'delicate and vulnerable' nature, NAACP v. Button, 371 U.S., at 433, 83 S.Ct., at 338, and their transcendent importance for the just functioning of our society, First Amendment rights require special safeguards.

A

This Court has erected such safeguards when government, by legislative investigation or other investigative means, has attempted to pierce the shield of privacy inherent in freedom of association.[FN25] In no previous case have **2679 we considered the extent to which the First Amendment limits the grand jury subpoena power. But the *739 Court has said that '(t)he Bill of Rights is applicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press . . . or political belief and association be abridged.' Watkins v. United States, 354 U.S. 178, 188, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273. And in Sweezy v. New Hampshire, it was stated: 'It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas.' 354 U.S., at 245, 77 S.Ct., at 1209 (plurality opinion).

FN25. The protection of information from compelled disclosure for broad purposes of public policy has been recognized in decisions involving police informers, see Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639; United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684; Aguilar v.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646.
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 39

Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723; McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62, and military and state secrets, United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727.

The established method of 'carefully' circumscribing investigative powers is to place a heavy burden of justification on government officials when First Amendment rights are impaired. The decisions of this Court have 'consistently held that only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.' NAACP v. Button, 371 U.S., at 438, 83 S.Ct., at 341. And 'it is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest.' Gibson v. Florida Legislative Investigation Committee, 372 U.S., at 546, 83 S.Ct., at 894 (emphasis supplied). See also DeGregory v. Attorney General of New Hampshire, 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292; NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488;Sweezy, supra;Watkins, supra.

Thus, when an investigation impinges on First Amendment rights, the government must not only show that *740 the inquiry is of 'compelling and overriding importance' but it must also 'convincingly' demonstrate that the investigation is 'substantially related' to the information sought.

Governmental officials must, therefore, demonstrate that the information sought is clearly relevant to a precisely defined subject of governmental inquiry. Watkins, supra;Sweezy, supra.[FN26]They must demonstrate that it is reasonable to think the witness in question has that information.Sweezy, supra;Gibson, supra.[FN27]And they must **2680 show that there is not any means of obtaining the information less destructive of First Amendment

liberties. Shelton v. Tucker, 364 U.S., at 488, 81 S.Ct., at 252; Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 296-297, 81 S.Ct. 1333, 1335-1336, 6 L.Ed.2d 301.[FN28]

FN26. As we said in Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273,

'(W)hen First Amendment rights are threatened, the delegation of power to the (legislative) committee must be clearly revealed in its charter.''It is the responsibility of the Congress . . . to insure that compulsory process is used only in furtherance of a legislative purpose. That requires that the instructions to an investigating committee spell out the group's jurisdiction and purpose with sufficient particularity. . . . The more vague the committee's charter is, the greater becomes the possibility that the committee's specific actions are not in conformity with the will of the parent House of Congress.' Id., at 198, 201, 77 S.Ct., at 1186.

FN27. We noted in Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311:

'The State Supreme Court itself recognized that there was a weakness in its conclusion that the menace of forcible overthrow of the government justified sacrificing constitutional rights. There was a missing link in the chain of reasoning. The syllogism was not complete. There was nothing to connect the questioning of petitioner with this fundamental interest of the State.' Id., at 251, 77 S.Ct. at 1212 (emphasis supplied).

FN28. See generally Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969).

These requirements, which we have recognized in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 40

decisions involving legislative and executive investigations, serve established policies reflected in numerous First *741 Amendment decisions arising in other contexts. The requirements militate against vague investigations that, like vague laws, create uncertainty and needlessly discourage First Amendment activity.[FN29] They also insure that a legitimate governmental purpose will not be pursued by means that 'broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' Shelton, supra, 364 U.S. at 488, 81 S.Ct. at 252.[FN30] As we said in Gibson, supra, 'Of course, a legislative investigation-as any investigation-must proceed 'step by step,' . . . but step by step or in totality, an adequate foundation for inquiry must be laid before proceeding in such a manner as will substantially intrude upon and severely curtail or inhibit constitutionally protected activities or seriously interfere with similarly protected associational rights.' 372 U.S., at 557, 83 S.Ct., at 899.

FN29. See Watkins, supra, 354 U.S. at 208-209, 77 S.Ct. at 1189-1190. See generally Baggett v. Bullitt, 377 U.S. 360, 372, 84 S.Ct. 1316, 1322, 12 L.Ed.2d 377; Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460; Ashton v. Kentucky, 384 U.S. 195, 200-201, 86 S.Ct. 1407, 1410-1411, 16 L.Ed.2d 469; Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22; Smith v. California, 361 U.S., at 150-152, 80 S.Ct., at 217-218; Winters v. New York, 333 U.S. 507, 68 S.Ct. 665; 92 L.Ed. 840; Stromberg v. California, 283 U.S., at 369, 51 S.Ct., at 535. See also Note, The Chilling Effect in Constitutional Law, 69 Col.L.Rev. 808 (1969).

FN30. See generally Zwickler v. Koota, 389 U.S. 241, 249-250, 88 S.Ct. 391, 396-397, 19 L.Ed.2d 444; and cases cited therein; Coates v. Cincinnati, 402 U.S. 611, 616, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214; Cantwell v. Connecticut, 310 U.S.

296, 307, 60 S.Ct. 900, 904, 84 L.Ed. 1213; De Jonge v. Oregon, 299 U.S., at 364-365, 57 S.Ct., at 259-260; Schneider v. State, 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155; Cox v. Louisiana, 379 U.S. 559, 562-564, 85 S.Ct. 476, 479-481, 13 L.Ed.2d 487. Cf. NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405. See also Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970).

I believe the safeguards developed in our decisions involving governmental investigations must apply to the grand jury inquiries in these cases. Surely the function of the grand jury to aid in the enforcement of the law is no more important than the function of the legislature, and its committees, to make the law. We have long recognized the value of the role played by legislative investigations, see e.g., *742United States v. Rumely, 345 U.S. 41, 43, 73 S.Ct. 543, 544, 97 L.Ed. 770; Barenblatt v. United States, 360 U.S. 109, 111-112, 79 S.Ct. 1081, 1085, 3 L.Ed.2d 1115, for the 'power of the Congress to conduct investigations is inherent (encompassing) surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.' Watkins, supra, 354 U.S., at 187, 77 S.Ct., at 1179. Similarly, the associational rights of private individuals, which have been the prime focus of our First Amendment decisions in the investigative sphere, are hardly more important than the First Amendment rights of mass circulation newspapers and electronic media to disseminate ideas and information, and of the general public to receive them. Moreover, the vices of vagueness and overbreadth that legislative**2681 investigations may manifest are also exhibited by grand jury inquiries, since grand jury investigations are not limited in scope to specific criminal acts, see e.g., Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771; Hendricks v. United States, 223 U.S. 178, 184, 32 S.Ct. 313, 316, 56 L.Ed. 394; United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

and since standards of materiality and relevance are greatly relaxed. Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021; Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397. See generally Note, The Grand Jury as an Investigatory Body, 74 Harv.L.Rev. 590, 591-592 (1961).[FN31] For, as the United States notes in its brief in Caldwell, the *743 grand jury 'need establish no factual basis for commencing an investigation, and can pursue rumors which further investigation may prove groundless.'

FN31. In addition, witnesses customarily are not allowed to object to questions on the grounds of materiality or relevance, since the scope of the grand jury inquiry is deemed to be of no concern to the witness. Carter v. United States, 9 Cir., 417 F.2d 384, cert. denied, 399 U.S. 935, 90 S.Ct. 2253, 26 L.Ed.2d 807. Nor is counsel permitted to be present to aid a witness. See In re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376.

See generally Younger, The Grand Jury Under Attack, pt. 3, 46 J.Crim.L.C. & P.S. 214 (1955); Recent Cases, 104 U.Pa.L.Rev. 429 (1955); Watts, Grand Jury: Sleeping Watchdog or Expensive Antique, 37 N.C.L.Rev. 290 (1959); Whyte, Is the Grand Jury Necessary, 45 Va.L.Rev. 461 (1959); Note, 2 Col.J.Law & Soc.Prob. 47, 58 (1966); Antell, The Modern Grand Jury: Benighted Supergovernment, 51 A.B.A.J. 153 (1965); Orfield, The Federal Grand Jury, 22 F.R.D. 343.

Accordingly, when a reporter is asked to appear before a grand jury and reveal confidences, I would hold that the government must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law;[FN32] (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information.[FN33]

FN32. The standard of proof employed by most grand juries, federal and State, is simply 'probable cause' to believe that the accused has committed a crime. See Note, 1963 Wash.U.L.Q. 102; L. Hall et al., Modern Criminal Procedure 793-794 (1969). Generally speaking, it is extremely difficult to challenge indictments on the ground that they are not supported by adequate or competent evidence. Cf. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397; Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98.

FN33. Cf. Garland v. Torre, 259 F.2d 545. The Court of Appeals for the Second Circuit declined to provide a testimonial privilege to a newsman called to testify at a civil trial. But the court recognized a newsman's First Amendment right to a confidential relationship with his source and concluded: 'It is to be noted that we are not dealing here with the use of the judicial process to force a wholesale disclosure of a newspaper's confidential sources of news, nor with a case where the identity of the news source is of doubtful relevance or materiality. . . . The question asked . . . went to the heart of the plaintiff's claim.' Id., at 549-550 (citations omitted).

This is not to say that a grand jury could not issue a subpoena until such a showing were made, and it is not to say that a newsman would be in any way privileged to ignore any subpoena that was issued. Obviously, before the government's burden to make such a showing were triggered, the reporter would have to move to quash the subpoena, asserting the basis on which he considered the particular relationship a confidential one.

*744 B

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 42

The crux of the Court's rejection of any newsman's privilege is its observation that only 'where news sources themselves are implicated in crime or possess information relevant to the grand jury's task need they or the reporter be concerned about grand jury subpoenas.'See ante, at 2661 (emphasis **2682 supplied). But this is a most misleading construct. For it is obviously not true that the only persons about whom reporters will be forced to testify will be those 'confidential informants involved in actual criminal conduct' and those having 'information suggesting illegal conduct by others.'See ante, at 2661, 2662. As noted above, given the grand jury's extraordinarily broad investigative powers and the weak standards of relevance and materiality that apply during such inquiries, reporters, if they have no testimonial privilege, will be called to give information about informants who have neither committed crimes nor have information about crime. It is to avoid deterrence of such sources and thus to prevent needless injury to First Amendment values that I think the government must be required to show probable cause that the newsman has information that is clearly relevant to a specific probable violation of criminal law.[FN34]

> FN34. If this requirement is not met, then the government will basically be allowed to undertake a 'fishing expedition' at the expense of the press. Such general, exploratory investigations will be most damaging to confidential news-gathering relationships, since they will create great uncertainty in both reporters and their sources. The Court sanctions such explorations, by refusing to apply a meaningful 'probable cause' requirement. See ante, at 2666-2667. As the Court states, a grand jury investigation 'may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors.'Ante, at 2666. It thereby invites government to try to annex the press as an investigative arm, since any time government wants to probe the rela-

tionships between the newsman and his source, it can, on virtually any pretext, convene a grand jury and compel the journalist to testify.

The Court fails to recognize that under the guise of 'investigating crime' vindictive prosecutors can, using the broad powers of the grand jury which are, in effect, immune from judicial supervision, explore the newsman's sources at will, with no serious law enforcement purpose. The secrecy of grand jury proceedings, affords little consolation to a news source; the prosecutor obviously will, in most cases, have knowledge of testimony given by grand jury witnesses.

*745 Similarly, a reporter may have information from a confidential source that is 'related' to the commission of crime, but the government may be able to obtain an indictment or otherwise achieve its purposes by subpoenaing persons other than the reporter. It is an obvious but important truism that when government aims have been fully served, there can be no legitimate reason to disrupt a confidential relationship between a reporter and his source. To do so would not aid the administration of justice and would only impair the flow of information to the public. Thus, it is to avoid deterrence of such sources that I think the government must show that there are no alternative means for the grand jury to obtain the information sought.

Both the 'probable cause' and 'alternative means' requirements would thus serve the vital function of mediating between the public interest in the administration of justice and the constitutional protection of the full flow of information. These requirements would avoid a direct conflict between these competing concerns, and they would generally provide adequate protection for newsmen. See Part III, infra.[FN35]No doubt the courts would be required to make some delicate judgments in working out this accommodation. But that, after all, *746 is the function of courts of law. Better such judgments,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 43

however difficult, than the simplistic and stultifying absolutism adopted by the Court in denying any force to the First Amendment in these cases.[FN36]

> FN35. We need not, therefore, reach the question of whether government's interest in these cases is 'overriding and compelling.' I do not, however, believe, as the Court does, that all grand jury investigations automatically would override the newsman's testimonial privilege.

> FN36. The disclaimers in Mr. Justice POWELL'S concurring opinion leave room for the hope that in some future case the Court may take a less absolute position in this area.

**2683 The error in the Court's absolute rejection of First Amendment interests in these cases seems to me to be most profound. For in the name of advancing the administration of justice, the Court's decision, I think, will only impair the achievement of that goal. People entrusted with law enforcement responsibility, no less than private citizens, need general information relating to controversial social problems. Obviously, press reports have great value to government, even when the newsman cannot be compelled to testify before a grand jury. The sad paradox of the Court's position is that when a grand jury may exercise an unbridled subpoena power, and sources involved in sensitive matters become fearful of disclosing information, the newsman will not only cease to be a useful grand jury witness; he will cease to investigate and publish information about issues of public import. I cannot subscribe to such an anomalous result, for, in my view, the interests protected by the First Amendment are not antagonistic to the administration of justice. Rather, they can, in the long run, only be complementary, and for that reason must be given great 'breathing space.' NAACP v. Button, 371 U.S., at 433, 83 S.Ct., at 338.

III

In deciding what protection should be given to information a reporter receives in confidence from a news source, the Court of Appeals for the Ninth Circuit affirmed the holding of a District Court that the grand *747 jury power of testimonial compulsion must not be exercised in a manner likely to impair First Amendment interests 'until there has been a clear showing of a compelling and overriding national interest that cannot be served by any alternative means.' Caldwell v. United States, 434 F.2d 1081, 1086. It approved the request of respondent Caldwell for specification by the government of the 'subject, direction or scope of the Grand Jury inquiry.' Id., at 1085. And it held that in the circumstances of this case Caldwell need not divulge confidential information.

I think this decision was correct. On the record before us the United States has not met the burden that I think the appropriate newsman's privilege should require.

In affidavits before the District Court, the United States said it was investigating possible violations of 18 U.S.C. s 871 (threats against the President), 18 U.S.C. s 1751 (assassination, attempts to assassinate, conspiracy to assassinate the President), 18 U.S.C. s 231 (civil disorders), 18 U.S.C. s 2101 (interstate travel to incite a riot), 18 U.S.C. s 1341 (mail fraud and swindles) and other crimes that were not specified. But, with one exception, there has been no factual showing in this case of the probable commission of, or of attempts to commit, any crimes.[FN37] The single exception relates to the allegation that a Black Panther Party leader, David Hilliard, violated 18 U.S.C. s 871 during the course of a speech in November 1969. But Caldwell was subpoenaed two months after an indictment was returned against Hilliard, and that charge could not, subsequent to the indictment, be investigated by a grand jury. See In re National Window Glass Workers, D.C. 287 F. 219; *748United States v. Dardi, 2 Cir., 330 F.2d 316, 336.[FN38]Furthermore, **2684 the record before us does not show that Caldwell probably had any information about the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 44

violation of any other federal criminal laws,[FN39] or that alternative *749 means of obtaining the desired information were pursued.[FN40]

FN37. See Blasi 61 et seq.

FN38. After Caldwell was first subpoenaed to appear before the grand jury, the Government did undertake, by affidavits, to 'set forth facts indicating the general nature of the grand jury's investigation (and) witness Earl Caldwell's possession of information relevant to this general inquiry.' In detailing the basis for the belief that a crime had probably been committed, the Government simply asserted that certain actions had previously been taken by other grand juries, and by Government counsel, with respect to certain members of the Black Panther Party (i.e., immunity grants for certain Black Panthers were sought; the Government moved to compel party members to testify before grand juries; and contempt citations were sought when party members refused to testify). No facts were asserted suggesting the actual commission of crime. The exception, as noted, involved David Hilliard's speech and its republication in the party newspaper, the Black Panther, for which Hilliard had been indicted before Caldwell was subpoenaed.

FN39. In its affidavits, the Government placed primary reliance on certain articles published by Caldwell in the New York Times during 1969 (on June 15, July 20, July 22, July 27, and Dec. 14). On Dec. 14, 1969, Caldwell wrote:

"We are special,' Mr. Hilliard said recently 'We advocate the very direct overthrow of the Government by way of force and violence. By picking up guns and moving against it because we recognize it as being oppressive and in recognizing that we

know that the only solution to it is armed struggle.'

'In their role as the vanguard in a revolutionary struggle, the Panthers have picked up guns.

'Last week two of their leaders were killed during the police raid on one of their offices in Chicago. And in Los Angeles a few days earlier, three officers and three Panthers were wounded in a similar shooting incident. In these and in some other raids, the police have found caches of weapons, including high-powered rifles.' App. in No. 70-57, p. 13.

In my view, this should be read as indicating that Caldwell had interviewed Panther leaders. It does not indicate that he probably had knowledge of the crimes being investigated by the Government. And, to repeat, to the extent it does relate to Hilliard's threat, an indictment had already been brought in that matter. The other articles merely demonstrate that Black Panther Party leaders had told Caldwell their ideological beliefs-beliefs that were readily available to the Government through other sources, like the party newspaper.

FN40. The Government did not attempt to show that means less impinging upon First Amendment interests had been pursued.

In the Caldwell case, the Court of Appeals further found that Caldwell's confidential relationship with the leaders of the Black Panther Party would be impaired if he appeared before the grand jury at all to answer questions, even though not privileged. Caldwell v. United States, 434 F.2d, at 1088. On the particular facts before it,[FN41] the court **2685 concluded that the very *750 appearance by Caldwell before the grand jury would jeopardize his relationship with his sources, leading to a severance of the news-gathering relationship and impairment

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

05/29/2009 05:15:13 PM          SDMA          415-781-2635          Page 81

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

of the flow of news to the public.[FN42]

FN41. In an affidavit filed with the District Court, Caldwell stated:

'I began covering and writing articles about the Black Panthers almost from the time of their inception, and I myself found that in those first months . . . they were very brief and reluctant to discuss any substantive matter with me. However, as they realized I could be trusted and that my sole purpose was to collect my information and present it objectively in the newspaper and that I had no other motive. I found that not only were the party leaders available for in-depth interviews but also the rank and file members were cooperative in aiding me in the newspaper stories that I wanted to do. During the time that I have been covering the party, I have noticed other newspapermen representing legitimate organizations in the news media being turned away because they were not known and trusted by the party leadership.

'As a result of the relationship that I have developed, I have been able to write lengthy stories about the Panthers that have appeared in The New York Times and have been of such a nature that other reporters who have not known the Panthers have not been able to write. Many of these stories have appeared in up to 50 or 60 other newspapers around the country.

'The Black Panther Party's method of operation with regard to members of the press is significantly different from that of other organizations. For instance, press credentials are not recognized as being of any significance. In addition, interviews are not normally designated as being 'backgrounders' or 'off the record' or 'for publication' or 'on the record.' Because no substantive interviews are given until a re-

lationship of trust and confidence is developed between the Black Panther Party members and a reporter, statements are rarely made to such reporters on an expressed 'on' or 'off' the record basis. Instead, an understanding is developed over a period of time between the Black Panther Party members and the reporter as to matters which the Black Panther Party wishes to disclose for publications and those matters which are given in confidence. . . . Indeed, if I am forced to appear in secret grand jury proceedings, my appearance alone would be interpreted by the Black Panthers and other dissident groups as a possible disclosure of confidences and trusts and would similarly destroy my effectiveness as a newspaperman.'

The Government did not contradict this affidavit.

FN42.'Militant groups might very understandably fear that, under the pressure of examination before a Grand Jury, the witness may fail to protect their confidences . . . . The Government characterizes this anticipated loss of communication as Black Panther reprisal . . . But it is not an extortionate threat we face. It is human reaction as reasonable to expect as that a client will leave his lawyer when his confidence is shaken. . . . As the Government points out, loss of such a sensitive news source can also result from its reaction to indiscreet or unfavorable reporting or from a reporter's association with Government agents or persons disapproved of by the news source. Loss in such a case, however, results from an exercise of the choice and prerogative of a free press. It is not the result of Government compulsion.' Caldwell v. United States, 434 F.2d, at 1088.

'Appellant asserted in affidavit that there is nothing to which he could testify (beyond that which he has

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00458

92 S.Ct. 2646
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617
(Cite as: 408 U.S. 665, 92 S.Ct. 2646)

Page 46

already made public and for which, therefore, his appearance is unnecessary) that is not protected by the District Court's order. If this is true-and the Government apparently has not believed it necessary to dispute it-appellant's response to the subpoena would be a barren performance*751 -one of no benefit to the Grand Jury. To destroy appellant's capacity as news gatherer for such a return hardly makes sense. Since the cost to the public of excusing his attendance is so slight, it may be said that there is here no public interest of real substance in competition with the First Amendment freedoms that are jeopardized.

'If any competing public interest is ever to arise in a case such as this (where First Amendment liberties are threatened by mere appearance at a Grand Jury investigation) it will be on an occasion in which the witness, armed with his privilege, can still serve a useful purpose before the Grand Jury. Considering the scope of the privilege embodied in the protective order, these occasions would seem to be unusual. It is not asking too much of the Government to show that such an occasion is presented here.' Id., at 1089.

I think this ruling was also correct in light of the particularized circumstances of the Caldwell case. Obviously, only in very rare circumstances would a confidential relationship between a reporter and his source be so sensitive that mere appearance before the grand jury by the newsman would substantially impair his news-gathering function. But in this case, the reporter made out a prima facie case that the flow of news to the public would be curtailed. And he stated, without contradiction, that the only nonconfidential material about which he could testify was already printed in his newspaper articles.[FN43] Since the United States has not attempted to *752 refute this assertion, the appearance of Caldwell would, on these facts, indeed be a 'barren performance.' But this aspect of **2686 the Caldwell judgment I would confine to its own facts. As the Court of Appeals appropriately observed: '(T)he rule of this case is a narrow one. . . .' Caldwell,

supra, at 1090.

FN43. Caldwell stated in his affidavit filed with the District Court, see n. 40, supra:

'It would be virtually impossible for me to recall whether any particular matter disclosed to me by members of the Black Panther Party since January 1, 1969, was based on an understanding that it would or would not be confidential. Generally, those matters which were made on a nonconfidential or 'for publication' basis have been published in articles I have written in The New York Times; conversely, any matters which I have not thus far disclosed in published articles would have been given to me based on the understanding that they were confidential and would not be published.'

Accordingly, I would affirm the judgment of the Court of Appeals in No. 70-57, United States v. Caldwell.[FN44] In the other two cases before us, No. 70-85, Branzburg v. Hayes and Meigs, and No. 70-94, In re Pappas, I would vacate the judgments and remand the cases for further proceedings not inconsitent with the views I have expressed in this opinion.

FN44. The District Court reserved jurisdiction to modify its order on a showing of a governmental interest which cannot be served by means other than Caldwell's grand jury testimony. The Government would thus have further opportunity in that court to meet the burden that, I think, protection of First Amendment rights requires.

U.S.Cal. 1972.
Branzburg v. Hayes
408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Date of Printing: May 29, 2009

KEYCITE

▷ Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617 (U.S.Ky.,Jun 29, 1972) (NO. 70-85, 70-94, 70-57)

History

Direct History

▶ 1 Application of Caldwell, 311 F.Supp. 358 (N.D.Cal. Apr 06, 1970) (NO. MISC. 10426)

*Order Vacated by*

▶ 2 Caldwell v. U.S., 434 F.2d 1081 (9th Cir.(Cal.) Nov 16, 1970) (NO. 26025)

*Certiorari Granted by*

H 3 U.S. v. Caldwell, 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109 (U.S.Cal. May 03, 1971) (NO. 1114)

*AND Judgment Reversed by*

⇒ 4 Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617 (U.S.Ky. Jun 29, 1972) (NO. 70-57, 70-85, 70-94)

*For Dissenting Opinion, see*

H 5 United States v. Caldwell, 408 U.S. 665, 92 S.Ct. 2686, 33 L.Ed.2d 657 (U.S.Cal. Jun 29, 1972) (NO. 70-57)

H 6 Branzburg v. Pound, 461 S.W.2d 345 (Ky. Nov 27, 1970)

*Certiorari Granted by*

H 7 Branzburg v. Hayes, 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109 (U.S.Ky. May 03, 1971) (NO. 1381)

*AND Judgment Affirmed by*

⇒ 8 Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617 (U.S.Ky. Jun 29, 1972) (NO. 70-57, 70-85, 70-94)

*For Dissenting Opinion, see*

H 9 United States v. Caldwell, 408 U.S. 665, 92 S.Ct. 2686, 33 L.Ed.2d 657 (U.S.Cal. Jun 29, 1972) (NO. 70-57)

H 10 Branzburg v. Meigs, 503 S.W.2d 748 (Ky. Jan 25, 1971)

*Judgment Affirmed by*

⇒ 11 Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617 (U.S.Ky. Jun 29, 1972) (NO. 70-57, 70-85, 70-94)

*For Dissenting Opinion, see*

© 2009 Thomson Reuters. All rights reserved.



**H**    12 United States v. Caldwell, 408 U.S. 665, 92 S.Ct. 2686, 33 L.Ed.2d 657 (U.S.Cal. Jun 29, 1972) (NO. 70-57)

**H**    13 In re Pappas, 358 Mass. 604, 266 N.E.2d 297, 21 Rad. Reg. 2d (P & F) 2038 (Mass. Jan 29, 1971)

*Certiorari Granted by*

**H**    14 Matter of Pappas, 402 U.S. 942, 91 S.Ct. 1619, 29 L.Ed.2d 110 (U.S.Mass. May 03, 1971) (NO. 1434)

*AND Judgment Affirmed by*

=>    15 Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, 1 Media L. Rep. 2617 (U.S.Ky. Jun 29, 1972) (NO. 70-57, 70-85, 70-94)

*For Dissenting Opinion, see*

**H**    16 United States v. Caldwell, 408 U.S. 665, 92 S.Ct. 2686, 33 L.Ed.2d 657 (U.S.Cal. Jun 29, 1972) (NO. 70-57)

## Negative Citing References (U.S.A.)

*Not Followed as Dicta*

**H**    17 Smith v. Plati, 258 F.3d 1167, 155 Ed. Law Rep. 1090, 29 Media L. Rep. 2305, 2001 DJCAR 3888 (10th Cir.(Colo.) Jul 30, 2001) (NO. 99-1375) ★ ★ ★ HN: 6,11,17 (S.Ct.)

*Not Followed on State Law Grounds*

▷    18 People v. Santiago, 185 Misc.2d 138, 712 N.Y.S.2d 244, 2000 N.Y. Slip Op. 20344 (N.Y.Co.Ct. May 05, 2000) (NO. 210/99, 3903/99) ★ ★ HN: 11 (S.Ct.)

*Disagreement Recognized by*

▷    19 Kidwell v. State, 696 So.2d 399, 22 Fla. L. Weekly D1416, 25 Media L. Rep. 1929 (Fla.App. 4 Dist. Jun 11, 1997) (NO. 96-3423), rehearing denied (Jul 14, 1997) ★ ★ ★ ★ HN: 10,11,18 (S.Ct.)

*Called into Doubt by*

▷    20 New York Times Co. v. Gonzales, 382 F.Supp.2d 457 (S.D.N.Y. Feb 24, 2005) (NO. 04 CIV. 7677 (RWS)), as amended (Mar 02, 2005) ★ ★ ★ ★ HN: 11,15,18 (S.Ct.)

*Distinguished by*

▷    21 Baker v. F and F Inv., 470 F.2d 778, 16 Fed.R.Serv.2d 945, 1 Media L. Rep. 2551 (2nd Cir.(N.Y.) Dec 07, 1972) (NO. 173, 72-1413) ★ ★ ★ HN: 14,15,18 (S.Ct.)

▷    22 CBS Inc. v. Young, 522 F.2d 234, 1 Media L. Rep. 1024 (6th Cir.(Ohio) Jul 02, 1975) (NO. 75-1646) ★ ★ ★ HN: 11,17 (S.Ct.)

▷    23 Britt v. Superior Court, 20 Cal.3d 844, 574 P.2d 766, 143 Cal.Rptr. 695 (Cal. Mar 27, 1978) (NO. L.A. 30786) ★ ★ ★ HN: 11 (S.Ct.)

▷    24 Reporters Committee for Freedom of Press v. American Tel. & Tel. Co., 593 F.2d 1030, 192 U.S.App.D.C. 376, 4 Media L. Rep. 1177 (D.C.Cir. Aug 11, 1978) (NO. 76-2057) ★ ★ ★ ★ HN:

© 2009 Thomson Reuters. All rights reserved.

11,18,20 (S.Ct.)

**C**   25 People v. Willie, 69 Ill.App.3d 964, 388 N.E.2d 102, 26 Ill.Dec. 478 (Ill.App. 1 Dist. Mar 09, 1979) (NO. 78-362) ★ ★ HN: 15 (S.Ct.)

**C**   26 In re 1979 Grand Jury Subpoena, 478 F.Supp. 59 (M.D.La. Oct 12, 1979) (NO. MISC. 79-51-A) ★ ★ HN: 15,19 (S.Ct.)

**▷**   27 Marshall v. J. P. Stevens Emp. Ed. Committee, 495 F.Supp. 553, 108 L.R.R.M. (BNA) 2015, 90 Lab.Cas. P 12,421 (E.D.N.C. Jul 15, 1980) (NO. 80-38-CIV-8, 80-39-CIV-8) ★ ★ HN: 14 (S.Ct.)

**H**   28 Dalitz v. Penthouse International, Ltd., 168 Cal.App.3d 468, 214 Cal.Rptr. 254, 11 Media L. Rep. 2153 (Cal.App. 2 Dist. May 21, 1985) (NO. CIV. 69025), review denied (Sep 19, 1985) ★ ★ ★ ★ HN: 11,15,18 (S.Ct.)

**▷**   29 Copley Press, Inc. v. City of Springfield, 143 Ill.App.3d 370, 493 N.E.2d 127, 97 Ill.Dec. 645, 13 Media L. Rep. 1028 (Ill.App. 4 Dist. May 13, 1986) (NO. 4-85-0629), appeal denied (Oct 02, 1986) ★ ★ HN: 15 (S.Ct.)

**▷**   30 In re Schuman, 114 N.J. 14, 552 A.2d 602, 16 Media L. Rep. 1092 (N.J. Jan 23, 1989) (NO. A-63) ★ ★ ★ ★ HN: 4,11,14 (S.Ct.)

**H**   31 U.S. v. Coffelt, 960 F.2d 150 (6th Cir.(Tenn.) Apr 17, 1992) (Table, text in WESTLAW, NO. 91-5703), rehearing denied (Jul 16, 1992) ★ HN: 12 (S.Ct.)

**▷**   32 Swidler & Berlin v. U.S., 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379, 66 USLW 4538, 159 A.L.R. Fed. 729, 40 Fed.R.Serv.3d 745, 49 Fed. R. Evid. Serv. 1, 98 Daily Journal D.A.R. 6932, 98 CJ C.A.R. 3175, 11 Fla. L. Weekly Fed. S 687 (U.S.Dist.Col. Jun 25, 1998) (NO. 97-1192) ★ HN: 9 (S.Ct.)

**H**   33 U.S. v. Matthews, 11 F.Supp.2d 656, 26 Media L. Rep. 2163 (D.Md. Jun 29, 1998) (NO. CRIM. A. AW-97-270) ★ ★ ★ ★ HN: 11,14,17 (S.Ct.)

**C**   34 In re Grand Jury Subpoenas Served on Nat. Broadcasting Co., Inc., 178 Misc.2d 1052, 683 N.Y.S.2d 708, 1998 N.Y. Slip Op. 98670 (N.Y.Sup. Nov 02, 1998) (NO. 28186/98Q) ★ ★

**▷**   35 Miller v. Superior Court, 21 Cal.4th 883, 986 P.2d 170, 89 Cal.Rptr.2d 834, 28 Media L. Rep. 1161, 99 Cal. Daily Op. Serv. 8763, 1999 Daily Journal D.A.R. 11,183 (Cal. Nov 01, 1999) (NO. S073888) ★ ★ ★ ★ HN: 15,17 (S.Ct.)

**▷**   36 Fox v. Township of Jackson, 64 Fed.Appx. 338 (3rd Cir.(N.J.) Apr 28, 2003) (Not selected for publication in the Federal Reporter, NO. 02-1870) ★ ★ HN: 1,11 (S.Ct.)

37 Asociacion de Periodistas de Puerto Rico v. Mueller, 2007 WL 5312566 (D.Puerto Rico Jun 12, 2007) (NO. CIV. 06-1931 (JAF)) ★ ★

*Limitation of Holding Recognized by*

**H**   38 Lee v. Department of Justice, 401 F.Supp.2d 123, 68 Fed. R. Evid. Serv. 1005, 34 Media L. Rep. 1033 (D.D.C. Nov 16, 2005) (NO. CIV.A. 99-3380 (RMC)) ★ ★ ★ ★ HN: 4,15,18 (S.Ct.)

**Court Documents**

**Appellate Court Documents (U.S.A.)**

© 2009 Thomson Reuters. All rights reserved.