U.S. Appellate Briefs

39 U.S. v. Caldwell, 1970 WL 122404 (Appellate Brief) (U.S. Jan. 01, 1970) Brief of the National Press Photographers Association, Inc., as Amicus Curiae, in Support of Respondent (NO. 70-57)

40 U.S. v. Caldwell, 1971 WL 133337 (Appellate Brief) (U.S. Jan. 22, 1971) Reply Memorandum for the United States (NO. 70-57)

41 U.S. v. Caldwell, 1971 WL 133336 (Appellate Brief) (U.S. Jul. 10, 1971) Brief of Amicus Curiae the National District Attorneys Association. (NO. 70-57)

42 U.S v. Caldwell, 1971 WL 133339 (Appellate Brief) (U.S. Jul. 10, 1971) Brief for the American Newspaper Guild, A.F.L.-C.I.O., C.L.C. As Amicus Curiae (NO. 70-57, 70-94)

43 U.S. v. Caldwell, 1971 WL 133330 (Appellate Brief) (U.S. Sep. 1971) Brief of the Washington Post Company and Newsweek, Inc., as Amici Curiae, in Support of Respondent (NO. 70-57)

44 U.S. v. Caldwell, 1971 WL 133332 (Appellate Brief) (U.S. Sep. 13, 1971) Brief of American Society of Newspaper Editors, Sigma Delta Chi, and Dow Jones & Company, Inc., as Amici Curiae, in Support of Earl Caldwell. (NO. 70-57)

45 U.S. v. Caldwell, 1971 WL 133333 (Appellate Brief) (U.S. Sep. 18, 1971) Brief of the New York Times Company, Inc., National Broadcasting Company, Inc., Co. Lumbia Broadcasting System, Inc., American Broadcasting Companies, Inc., Chicago Suntimes, Chicago Daily News, Assoc (NO. 70-57)

46 U.S v. Caldwell, 1971 WL 133334 (Appellate Brief) (U.S. Sep. 20, 1971) Brief for Amicus Curiae the American Newspaper Publishers Association (NO. 70-57, 70-85, 70-94)

47 U.S v. Caldwell, 1971 WL 133335 (Appellate Brief) (U.S. Sep. 20, 1971) Brief for Radio Television News Directors Association, as Amicus Curiae (NO. 70-57)

48 U.S. v. Caldwell, 1971 WL 133340 (Appellate Brief) (U.S. Sep. 20, 1971) Brief for Chicago Tribune Company as Amicus Curiae. (NO. 70-57)

49 U.S. v. Caldwell, 1971 WL 133331 (Appellate Brief) (U.S. Oct. 01, 1971) Brief of the Authors League of America, Inc., As Amicus Curiae (NO. 70-57)

50 U.S. v. Caldwell, 1971 WL 133338 (Appellate Brief) (U.S. Oct. 06, 1971) Brief of the American Civil Liberties Union, the American Civil Liberties Union of Northern California, and the American Civil Liberties Union of Southern California, Amici Curiae (NO. 70-57)

51 U.S. v. Caldwell, 1972 WL 135512 (Appellate Brief) (U.S. Feb. 02, 1972) Reply Brief for the United States (NO. 70-57)

© 2009 Thomson Reuters. All rights reserved.

00463

4

00464

Westlaw.

760 F.Supp. 1206                                                                                            Page 1
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

▷

United States District Court,
S.D. Texas,
Houston Division.

James CAMPBELL and Felix Sanchez, Petitioners,
v.
Hon. Johnny KLEVENHAGEN, Sheriff of Harris
County, Texas and Hon. William T. Harmon, Judge
of the 178th Judicial District Court of Harris
County, Texas, Respondents.
**Civ. A. No. H-91-339.**

March 5, 1991.

Newspaper reporters were held in contempt by state trial court for refusing to disclose their confidential sources at murder trial. Reporters petitioned for habeas corpus. The District Court, Hoyt, J., adopted report of Nancy K. Pecht, United States Magistrate Judge, and held that criminal defendant's right to compulsory process did not overcome reporters' qualified privilege where evidence sought from reporters was speculative, hearsay, and cumulative.

Petition granted.

West Headnotes

**[1] Habeas Corpus 197 ☞765.1**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(C) Proceedings
            197III(C)4 Conclusiveness of Prior Determinations
                197k765 State Determinations in Federal Court
                    197k765.1 k. In General. Most Cited Cases
    (Formerly 197k765)
Where habeas corpus petition presents mixed questions of law, federal district court is not required to accord presumption of correctness to state court's

determination of factual issues.

**[2] Habeas Corpus 197 ☞770**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(C) Proceedings
            197III(C)4 Conclusiveness of Prior Determinations
                197k765 State Determinations in Federal Court
                    197k770 k. Particular Issues and Problems. Most Cited Cases
Assertion of qualified privilege under First Amendment by newspaper reporters in petition for habeas corpus from state court contempt order for failure to disclose confidential sources during murder trial presented mixed question of fact and law; federal district court was required to reexamine facts critical to resolution of issue of reporters' qualified privilege. 28 U.S.C.A. § 2254(d)(3); U.S.C.A. Const.Amend. 1.

**[3] Constitutional Law 92 ☞2074**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(U) Press in General
            92k2074 k. Disclosure of Sources. Most Cited Cases
    (Formerly 92k90.1(8))

**Privileged Communications and Confidentiality 311H ☞404**

311H Privileged Communications and Confidentiality
    311HVII Other Privileges
        311Hk404 k. Journalists. Most Cited Cases
    (Formerly 410k196.1, 92k90.1(8))
First Amendment provides reporters with qualified privilege to refuse to disclose confidential sources in both civil and criminal cases. U.S.C.A. Const.Amend. 1.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00465

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 2

**[4] Witnesses 410 ⚷21**

410 Witnesses
    410I In General
        410k21 k. Punishment of Disobedience to Subpoena as Contempt. Most Cited Cases
State trial judge had authority to enforce order to compel newspaper reporters to attend murder trial for purposes of identifying undisclosed confidential sources by contempt to enforce criminal defendant's right to compel attendance of witnesses in spite of reporters' qualified First Amendment privilege since trial judge had jurisdiction over persons and proceedings in his court. U.S.C.A. Const.Amends. 1, 6.

**[5] Witnesses 410 ⚷2(1)**

410 Witnesses
    410I In General
        410k2 Right of Accused to Compulsory Process
            410k2(1) k. In General. Most Cited Cases
To establish violation of constitutional right to compulsory process, criminal defendant must show that testimony sought is both material and favorable to his defense; fact that defendant may not be able to detail lost testimony because he was unable to interview witnesses does not relieve him of duty to make some showing of materiality. U.S.C.A. Const.Amend. 6.

**[6] Witnesses 410 ⚷2(1)**

410 Witnesses
    410I In General
        410k2 Right of Accused to Compulsory Process
            410k2(1) k. In General. Most Cited Cases
Criminal defendant's right to compulsory process under Sixth Amendment comprises right to present testimony in his favor before trier of fact; right does not grant investigative services to or force interviews with defense counsel under guise of trial subpoena where no otherwise relevant or material testimony can be elicited or where testimony could be

cumulative. U.S.C.A. Const.Amend. 6.

**[7] Habeas Corpus 197 ⚷495**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for Detention in General
            197k495 k. Witnesses; Examination. Most Cited Cases
State court order which compelled newspaper reporters to speak with defense counsel off witness stand and to remain in courtroom during murder trial to identify undisclosed confidential sources to protect criminal defendant's compulsory process rights did not afford reporters independent ground for habeas corpus relief in federal court, even if the state trial court exceeded its authority, since order did not violate newspaper reporters' constitutional rights. U.S.C.A. Const.Amend. 6.

**[8] Constitutional Law 92 ⚷2074**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(U) Press in General
            92k2074 k. Disclosure of Sources. Most Cited Cases
    (Formerly 92k90.1(8))

**Privileged Communications and Confidentiality 311H ⚷404**

311H Privileged Communications and Confidentiality
    311HVII Other Privileges
        311Hk404 k. Journalists. Most Cited Cases
    (Formerly 410k196.1, 92k90.1(8))
Party seeking to overcome reporter's First Amendment qualified privilege to not disclose confidential sources must show, by substantial evidence, that information sought is relevant, alternative means to obtain information have been exhausted, and there is compelling interest in information. U.S.C.A. Const.Amend. 1.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00466

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 3

**[9] Witnesses 410 ☞2(1)**

410 Witnesses
  410I In General
      410k2 Right of Accused to Compulsory Process
         410k2(1) k. In General. Most Cited Cases
Newspaper reporters could not be compelled to attend state murder trial to identify undisclosed confidential sources because of defendant's Sixth Amendment compulsory process right where reporters did not witness crime, had not personally communicated with defendant, and allegedly were not able to recognize sources who had been interviewed four months earlier for only ten minutes. U.S.C.A. Const.Amends. 1, 6.

**[10] Constitutional Law 92 ☞2074**

**92 Constitutional Law**
  92XVIII Freedom of Speech, Expression, and Press
      92XVIII(U) Press in General
         92k2074 k. Disclosure of Sources. Most Cited Cases
    (Formerly 92k90.1(3), 92k90.1(8))

**Witnesses 410 ☞21**

410 Witnesses
  410I In General
      410k21 k. Punishment of Disobedience to Subpoena as Contempt. Most Cited Cases
State trial court contempt order for newspaper reporters' failure to identify confidential sources at murder trial unconstitutionally violated reporters' qualified privilege under First Amendment, even if reporters may have provided exculpatory information which could be useful to defendant for impeachment purposes, where defendant's need for information was based on series of contingencies, court-appointed investigator interviewed state's witnesses, and defendant's need for information became more remote when state conceded that one decedent was aggressor and five witnesses testified that other decedent also used baseball bat in threat-

ening manner; thus, possible identity of reporters' sources as to who was aggressor was speculative, hearsay, and cumulative. U.S.C.A. Const.Amends. 1, 6.

*1207 William W. Ogden, Liddell Sapp, Zivley, Houston, Tex., for Campbell.

Tom Godbold and Bill Boyce, Fulbright & Jaworski, Houston, Tex., Stanley G. Schneider, for Sanchez.

Harris County Atty., Houston, Tex., Ann Hardy, for respondents.

## FINAL JUDGMENT

HOYT, District Judge.

The Court has reviewed the Report and Recommendation in this cause. The findings of fact and conclusions of law are adopted.

Because the adjudication of contempt is an unconstitutional violation of the petitioners' qualified privilege under the First Amendment, it is:

ORDERED that the application for writs of habeas corpus is GRANTED and the sentences of 30 days each and the fines of $500 each are set aside. In this regard, the respondent, Johnny Klevenhagen is ORDERED to release the petitioners from his custody, forthwith.

In the usual course of events, the parties are permitted to file written objections within 10 days pursuant to 28 U.S.C. § 636(b)(1)(C) and General Order 80-5, S.D. Texas. Because final judgment is being *1208 entered at this time, the rules of post-judgment and appellate review will appertain upon entry of this judgment.

Finally, it is ORDERED that Judge William T. Harmon is DISMISSED from this proceeding.

## REPORT AND RECOMMENDATION

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 4

NANCY K. PECHT, United States Magistrate Judge.

Pending before the court are James Campbell's and Felix Sanchez' Applications for Writs of Habeas Corpus. The petitioners are reporters for the *Houston Chronicle* and *Houston Post,* respectively. They have been adjudged in criminal contempt for refusing to disclose confidential sources at a state murder trial.

After considering the pleadings on file, the evidence presented, and the argument of the parties, the court RECOMMENDS that the Applications for Writs of Habeas Corpus be GRANTED.

I.

*Introduction*

On May 20, 1990, the petitioners interviewed several teenagers about a double murder which had taken place the night before at a graduation party. The interviews, which were granted on condition of anonymity, resulted in the publication of two articles about the murder in each of the reporters' newspapers. David Charles Taylor was charged with both murders.

Taylor's defense attorneys subpoenaed the petitioners as witnesses at the trial. The petitioners appeared, but, asserting a qualified privilege under the first amendment, they defied the court's order to respond to defense counsel's request to reveal their confidential sources. The petitioners refused to state whether any witnesses, spectators, or other persons present in the courtroom were individuals with whom they had spoken on condition of anonymity. The petitioners were found in contempt of court by the Honorable William T. Harmon, Judge of the 178th Judicial District Court of Harris County, who ordered that they be held in custody in his court during trial proceedings and pending sentencing for contempt. During the trial, the petition-

ers refused two additional opportunities to purge themselves of the contempt. Therefore, at the conclusion of the trial, they were each sentenced to thirty days in jail and fined $500.00.

The petitioners sought relief from the adjudication of contempt by writ of habeas corpus in the Court of Criminal Appeals. That court refused their application without comment.

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 2241 and 2254. The petitioners were granted bail *pendente lite* by this court on February 7, 1991, and a hearing on these applications was held on February 11, 1991, before the undersigned magistrate judge.

The facts necessary to the resolution of this case are largely undisputed and are discernible from the record and exhibits submitted at the evidentiary hearing. At that hearing, the petitioners presented testimony from editors of the *Houston Chronicle* and *Houston Post* to support their assertion that a qualified privilege protecting reporters from disclosing confidential sources is necessary to the free flow of information to the press. Without the privilege, sources could not remain anonymous and would not come forward with information. In view of the court's conclusion that the reporters may assert a qualified privilege under the first amendment and under the law of the Fifth Circuit, the editors' testimony regarding the need for the privilege will not be discussed in this report.

II.

*Findings of Fact*

On May 20, 1990, reporters James Campbell and Felix Sanchez went to the Houston neighborhood where the murders had occurred the previous day. They interviewed several teenagers who asked to remain unidentified. Campbell and Sanchez each wrote an article about the murders which *1209 ap-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 5

peared in their respective publications on May 21, 1990.

Campbell's article reported that David Charles Taylor was charged with the murders of Percy Banyon and Calvin Sanders. The incident occurred outside a private residence where a graduation party was in progress. The account of the incident as related by the sources to Campbell corroborated Homicide Detective Talton's version of the events. Banyon apparently started the fight that led to the shootings. Taylor was one of five young people who arrived at the party late and got into an argument with Banyon and Sanders. When Banyon attempted to strike at one of the five with a bat, Taylor shot him. Sanders then grabbed the bat and was also shot. (The detective added that Taylor was carrying the firearm illegally.)

Sanchez reported that, according to county investigators and youngsters who attended the party, the shooting began when Taylor and his group arrived at the party and an argument erupted among Taylor's group, Banyon, and Sanders. When one of the five threatened Banyon and Sanders with a bat, a fistfight began. According to one of the partygoers, Banyon grabbed the bat and struck one of the five youngsters, who then pulled a gun and shot Banyon. Sanders then grabbed the bat and was also shot.

In August 1990, James Campbell and Felix Sanchez were each served with a subpoena *duces tecum*, issued at the request of Taylor's defense counsel. The subpoenas required Campbell and Sanchez to appear on September 21, 1991, as non-party witnesses in the murder trial of David Charles Taylor, pending in the 178th Judicial District Court of Harris County, Texas. (*State v. David Charles Taylor,* Cause No. 564,821.) Campbell's subpoena directed him to "list and provide to the court names and addresses of all persons interviewed re: This case-Reveal identities of persons mentioned in story of Monday May 21, 1990 who corroborated Detective M.H. Talton's account who are listed as having spoken on condition of anonymity [sic]". A similar

subpoena *duces tecum* directed to Sanchez required him to "provide names & addresses of all persons interviewed in reference to this case particularly reveal identity of individuals mentioned in story as having asked to remain unidentified on 5/21/90 [sic]".

Campbell and Sanchez filed motions to quash the subpoenas, asserting a qualified privilege from disclosure of confidential sources and objecting to being used as investigators for the defense. Both petitioners argued that the subpoena impermissibly impinged on their newsgathering activities protected by the first amendment. On September 21, 1990, Judge Harmon summarily denied the motions to quash. Thereafter, a hearing was held on the subject of the subpoenas. Sanchez produced his notes as ordered. Contained in those notes was a reference to a person named "Derick". However, Sanchez stated that he did not know the identities of the persons interviewed and that he would not recognize them if he saw them. Taylor's defense attorney, Kevin Oncken, stated that he wished to have Sanchez,

... on call under my subpoena throughout the trial. I may in fact have Mr. Sanchez present throughout the trial to view the witnesses who appear during the trial so that if one of the individuals that he talked to out there that morning are in fact present in court whether in the audience or on the witness stand, he recognizes those individuals we can then have that identification made so that we can talk to those individuals.

THE COURT: And the same holds true for Mr. Campbell?

MR. KEVIN ONCKEN: Yes, sir.

. . . . .

THE COURT:

No question about it, the potential for there to be some exculpatory information to have been gained ...

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 6

. . . . .

MR. KEVIN ONCKEN:

... [b]oth reporters can be required to view each of the witnesses for the State at one time at the outset of the trial ...

. . . . .

*1210 [T]he only way that we can adequately protect Mr. Taylor in the sense that we might otherwise overlook exculpatory evidence that would suggest to the jury that he was justified in the two homicides, the only way that we can avoid that from happening and protect Mr. Taylor is to have these individuals view all of the State's witnesses to determine whether any of those individuals were within the group that they spoke to for impeachment purposes as well; and, second, Your Honor, the only way to ensure that the identity of those individuals comes to the attention of the Defense is to have these gentlemen present during trial so that they can view the gallery, because you know from past experience in cases similar to this that many of the people in the community come out to watch and they may not end up on the witness stand on behalf of the defendant. At the same time they may in fact be the individuals that were talked to by either or both attorneys and if they are the defendant is entitled to know about that exculpatory evidence and present it on his behalf so that the jury can consider it during its deliberation.

THE COURT: Okay. Yes.

Sanchez' attorney objected to the order requiring Sanchez to "sit through a trial to help the defense attorney as a private investigator". However, Taylor's defense attorney, Mr. Oncken, insisted that,

These are potential defense witnesses these two men. Because if we find these individuals through their identification and those individuals deny their statements, then certainly these two in-

dividuals here, Mr. Campbell and Mr. Sanchez, become defense witnesses for impeachment purposes, and they're certainly material in that respect.

The court ruled that,

I'm going to require these reporters to come down here and look at these witnesses at their request, if I deem their request to be reasonable. I'm not going to make them sit throughout the whole trial. You know, this is not a violation of the rule against witnesses being present in the courtroom because they're not going to be sworn as witnesses. I am going to keep it, so long as their request is reasonable, I am going to grant it. I'm going to require these two guys to come down here and view these individuals when they testify to see if they can make an identification as to whether or not they were the individuals they talked to the following day.

The court stated that it would require the reporters to identify the witnesses or other persons in the gallery and that the reporters should remain on call to come to the courthouse and identify any persons who may appear during trial. The court added that if the reporters were able to identify a witness and to impeach that witness' testimony, then the court would examine the witness' reasons for confidentiality.

Campbell also testified that he did not know the names of the persons whom he had interviewed, and that he would not recognize them if he saw them. He stated that he had discarded all his notes of the interview. He added that he had given defense counsel all his information about the events.

Campbell and Sanchez were each served with a second subpoena requiring them to appear on October 8, 1991, as witnesses. Each reporter filed a second motion to quash which, following a second hearing on October 8, 1991, was denied.

The judge ruled that the defense had met its burden

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 7

to overcome the petitioners' assertion of a qualified first amendment privilege as announced in *Channel Two Television Co. v. Dickerson,* 725 S.W.2d 470 (Tex.App.-Houston [1st Dist.] 1987, no writ). The court in *Dickerson* ruled that a party seeking to overcome such a privilege must make a clear and specific showing that the information sought is (1) highly material and relevant, (2) necessary or critical to the maintenance of the claim, and (3) not obtainable from other available sources.

The defense attorneys again insisted that they required the reporters' presence on each day of trial, so each reporter could *1211 view witnesses and spectators and possibly identify one of the persons he had interviewed. It was also established at this hearing that the State of Texas had supplied its list of witnesses to the defense, and that the defense had a court-appointed investigator who was attempting to locate individuals mentioned in Sanchez' notes and who may have spoken with the reporters. The court ordered the reporters to appear in court, to remain on call to identify any of their sources who might be present, and to impeach a source's testimony if necessary. The court added:

> And I completely agree with, I believe, Mr. Godbold's opening statement that this is absolutely highly speculative. But it's absolutely necessary.

The trial court entered an order on October 18, 1990 confirming and carrying over the subpoenas served upon Campbell and Sanchez until the trial date of February 4, 1991, and ordering the reporters to be available and on call for the court. Each petitioner sought leave to file a petition for writ of mandamus in the Fourteenth Court of Appeals; leave was denied on October 17, 1990. The petitioners also filed motions for leave to file a petition for writ of mandamus in the Court of Criminal Appeals and those motions were denied on January 17, 1990.

The affidavit of the defendant's attorney (offered by Respondent Klevenhagen at the evidentiary hearing, and attached to Respondent Harmon's Exhibit

No. 2) also indicates that the defendant required the petitioners to appear and testify as "potential impeachment witnesses".

On February 5, 1991, both reporters appeared at trial in compliance with the subpoenas and with the court's order of October 18, 1990. Before the jury was seated and before the taking of any testimony, the reporters were advised that they were still under the oath or affirmation given at the earlier hearings. Each was asked to respond to defense counsel's inquiry by viewing six to eight persons in the courtroom, stating whether or not he recognized any as being a person with whom he had spoken about the murder, on condition of anonymity. The court also acceded to the defense counsel's request that after Campbell and Sanchez surveyed the individuals present, the attorney would be permitted to confer with the reporters before the reporters were released, subject to their being recalled to perform the process again. The reporters refused to respond to the question posed and were admonished that their refusal constituted contempt, punishable by up to six months in jail and a $500.00 fine. The reporters continued to refuse to respond, and were adjudged in contempt and ordered into the sheriff's custody. That evening the petitioners were released on $500.00 bond. At this hearing, counsel for Campbell confirmed that,

> We understand a purpose of the subpoena to be-to verify remarks made by a detective who is quoted in his published newspaper article as an attributed source dealing with this story.

> We have no objection to that-to his being here to testify for that purpose. We do reserve our objections to his being down here for reasons other than testifying about potentially material and relevant facts.

> . . . . .

> ... I believe it is clear Mr. Campbell and Mr. Sanchez are refusing the, one, exercise requested of them by Mr. Oncken. As I stated at the outset,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 8

they are not refusing to testify from the witness stand as to material attributed facts published in their article and were in their knowledge.

On February 5, 1991, the Court of Criminal Appeals refused their applications for habeas corpus relief.

On February 6, 1991, the petitioners were again asked to state whether or not individuals in the courtroom were persons whom they had interviewed in connection with the murder. They refused to respond and were ordered back into custody as before, but released on bond in the evening.

On February 7, 1991, the judge again gave the petitioners the opportunity to purge themselves of the contempt. After six witnesses for the State testified that they did not speak with Sanchez or Campbell*1212 or with any other news reporters, Sanchez and Campbell were asked whether any of these six witnesses was a confidential source for the articles. Sanchez and Campbell again refused to respond and the judge sentenced them both to thirty days in jail and imposed a $500.00 fine. Bond was denied.

III.

*Conclusions of Law*

The petitioners' request for habeas corpus relief is founded on their assertion of a reporter's qualified privilege under the first amendment. They claim that this qualified privilege permits them to refuse to disclose confidential sources under compulsion of subpoena absent a showing that the testimony is highly material and relevant, necessary to the maintenance of the claim and unavailable from other sources. The reporters also argue that the state trial judge exceeded his authority under the sixth amendment's guarantee to accused persons "to have compulsory process for obtaining witnesses in [their] favor" by compelling them to act as investig-

ators for the defense.

Respondent, Johnny Klevenhagen, argues that the petitioners have no qualified privilege to withhold documents or testimony at a criminal trial, or, alternatively, that the defendants have shown the necessity for the information and have overcome the qualified privilege. Respondent also contends that Judge Harmon has the authority to enforce his jurisdiction by the contempt sanction.[FN1]

> FN1. Respondent Judge Harmon filed a motion to dismiss the petition against him in that he is not a proper party respondent to such a proceeding under 28 U.S.C. § 2254 and the Rules Governing Section 2254 Cases in the United States District Courts. *See also* 28 U.S.C. § 2243.

[1][2] The issues in the instant petition present mixed questions of fact and law; therefore, as a threshold matter, this court is not required to accord a presumption of correctness to the state court's determination of the factual issues. *O'Bryan v. Estelle,* 714 F.2d 365, 403 (5th Cir.1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). *See Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963); 28 U.S.C. § 2254(d). Further, on the basis of the record before the court, facts critical to the resolution of the issue of privilege may be re-examined under 28 U.S.C. § 2254(d)(3).

The seminal Supreme Court decision relied upon by both parties in support of their opposed views on the existence of a reporter's qualified privilege is *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). That opinion was rendered by a plurality of four justices with a concurrence by Justice Powell. According to Justice Brennan (a dissenter in *Branzburg* ), the Court in *Branzburg* held "that the First Amendment does not provide newsmen with an absolute or qualified testimonial privilege to be free of relevant questioning about sources by a grand jury." *In re Roche,* 448 U.S. 1312, 1314, 101 S.Ct. 4, 6, 65 L.Ed.2d 1103 (1980)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00472

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 9

(stay of contempt order granted to reporter who refused to disclose sources in connection with a disciplinary proceeding against judge). Justice Brennan went on to write that,

> [a]t the same time, there is support for the proposition that the First Amendment interposes a threshold barrier to the subpoenaing of confidential information and work product from a newsgatherer. Four dissenting Justices in Branzburg discerned at least some protection in the First Amendment for confidences garnered during the course of newsgathering ... And Mr. Justice Powell, who joined the Court in Branzburg, wrote separately to emphasize that requests for reporter's documents should be carefully weighed with due deference to the "vital constitutional and societal interests" at stake. Consequently, I do not believe that the Court has foreclosed news reporters from resisting a subpoena on First Amendment grounds.

*Id.* at 1314-1315, 101 S.Ct. at 6.

[3] The Court of Appeals for the Fifth Circuit, citing *Branzburg,* has ruled that reporters have a qualified privilege to refuse*1213 to disclose confidential sources. *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 725 (5th Cir.), *modified on rehearing,* 628 F.2d 932 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981). Respondents urge this court to limit that holding to civil cases, as the issue in *Miller* arose in the context of a suit for libel. However, three years after *Miller,* the Fifth Circuit unequivocally reaffirmed its earlier view that the first amendment protects reporters from unqualified compelled disclosure of confidential sources. In *In re Selcraig,* 705 F.2d 789, 792 (1983), the court wrote,

> We have recognized that the first amendment shields a reporter from being required to disclose the identity of persons who have imparted information to him in confidence. *Miller v. Transamerican Press,* 621 F.2d 932 (5th Cir.), *modified on rehearing,* 628 F.2d 932 (5th

Cir.1980), *cert denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981). Our course was dictated by our careful reading of the plurality and concurring opinions in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The privilege, we held, is not absolute, but qualified.

The *Selcraig* court did not suggest that its holding was limited to civil cases (*Selcraig* was a civil rights action for denial of procedural due process by a discharged school district employee). Its ruling was issued in clear, declarative statements. It is noteworthy that in other circuits the qualified privilege has been extended to criminal proceedings. *See, e.g., United States v. Cuthbertson,* 630 F.2d 139, 147 (3rd Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *United States v. Cuthbertson,* 651 F.2d 189, 191, 195-196 (3rd Cir.), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981); *see also United States v. Caporale,* 806 F.2d 1487, 1504 (11th Cir.1986), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987) (applying the Fifth Circuit's tripartite test for overcoming the assertion of the privilege); *United States v. Burke,* 700 F.2d 70, 77 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983) (tripartite test applied).

As recognized by the court in *Cuthbertson,* 630 F.2d at 147, "the interests of the press that form the foundation for the privilege are not diminished because the nature of the underlying proceeding out of which the request for the information arises is a criminal trial." Nor is the privilege required to yield automatically because of the countervailing interest of the defendant under the sixth amendment. The court in *Cuthbertson,* quoting from *Nebraska Press Association v. Stuart,* 427 U.S. 539, 561, 96 S.Ct. 2791, 2803-04, 49 L.Ed.2d 683 (1976) wrote:

> The authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other ... [I]f the authors of these guarantees, fully aware of the potential conflicts

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00473

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 10

between them, were unwilling or unable to resolve the issue by assigning to one priority over the other, it is not for us to rewrite the Constitution by undertaking what they declined to do.

*Cuthbertson,* 630 F.2d at 147. The court in *Cuthbertson* ruled that the privilege extends not only to disclosure of confidential sources, but also to unpublished notes or other resource material held by the press. *Id.,* at 147.

Notwithstanding the urging of Respondents that this court not extend the privilege to criminal cases, and the recent decision in the Western District of Texas, *Karem v. Priest,* 744 F.Supp. 136 (W.D.Tex.1990), which refused to recognize the existence of such a privilege when asserted in a criminal proceeding, it is not the prerogative of this court to dismiss the precedent of the circuit.

Before analyzing whether the defendant in the *Taylor* murder trial has overcome the assertion of the reporters' qualified privilege, the court will first address the petitioners' second ground for habeas corpus relief.

[4] The petitioners argue that Judge Harmon exceeded his authority under the sixth amendment to compel attendance of *1214 witnesses for the defense. Judge Harmon, having jurisdiction over the proceeding and persons in his court, had the authority to enforce his order by contempt. Persons wishing to resist such orders are put to a choice between compliance and contempt. *Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1978). No suggestion is made that the judge lacked jurisdiction over the persons or proceedings in his court.

Another question raised by petitioners' argument, however, is whether there is a constitutional dimension to the petitioners' refusal to testify on the ground that the sixth amendment guarantee also protects witnesses from compulsory process. The sixth amendment, provides:

"In all criminal prosecutions, the accused shall en-

joy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; *to have compulsory process for obtaining witnesses in his favor,* and to have the Assistance of Counsel for his defence."

U.S. Const. amend VI. By its terms, the amendment applies to the defendant in a criminal proceeding. However, sixth amendment guarantees, and the parameters of the compulsory process clause in particular, while not conferring constitutional safeguards upon witnesses, do inform this court's assessment of the relevance and need for the reporters' testimony under the three-pronged test which defines the privilege cited in *Miller,* 621 F.2d 721, 726. Thus, while not furnishing an independent ground for federal habeas corpus relief, sixth amendment considerations are integral to an analysis of the applicability of the constitutional privilege under the circumstances presented by the instant case, in order to make an accommodation between the reporters' qualified privilege under the first amendment and the defendant's right to a fair trial under the sixth amendment. *See United States v. Valenzuela-Bernal,* 458 U.S. 858, 870, 102 S.Ct. 3440, 3448, 73 L.Ed.2d 1193 (1982).[FN2]

> FN2. In *Valenzuela-Bernal,* the court cited *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), which discussed balancing the government's interest in refusing disclosure of an informer's identity and defendant's interest in material testimony. 458 U.S. 858, 870, 102 S.Ct. 3440, 3448, 73 L.Ed.2d 1193 (1982).

[5] To establish a violation of the constitutional right to compulsory process, a criminal defendant must show that the testimony sought is both material and favorable to his defense. *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 873, 102 S.Ct. 3440, 3446, 3449, 73 L.Ed.2d 1193.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00474

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 11

Moreover, that a defendant may not be able to detail the lost testimony because he was unable to interview witnesses does not relieve him of the duty to make some showing of materiality. *Id.* at 873, 102 S.Ct. at 3449.

[6] The right to compulsory process under the sixth amendment is not absolute. It comprises the right to present testimony in one's favor before the trier of fact. It does not conceive the right to grant investigative services to or force interviews with defense counsel under the guise of a trial subpoena where no otherwise relevant or material testimony can be elicited or where the testimony would be cumulative. *See United States v. Fischel,* 686 F.2d 1082, 1092 (5th Cir.1982) (no right to interview a witness); *see also, Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 652, 98 L.Ed.2d 798 (1988); *Roussel v. Jeane,* 842 F.2d 1512, 1515-1516 (5th Cir.1988) (no right to cumulative testimony or to bolster credibility); *Ross v. Estelle,* 694 F.2d 1008, 1011 (5th Cir.1983) (no right to cumulative testimony).

[7] Whether the compulsory process provision may be used to compel any citizen to talk with government or defense counsel off the witness stand, or to compel a citizen to remain in the courtroom in the hope that that citizen might recognize another court spectator is questionable at best. The right to compulsory process serves only to compel testimony before the trier of fact. *Taylor v. Illinois,* 108 S.Ct. at 652.

*1215 Even though this court believes the state district judge exceeded his authority in this respect, this does not raise a violation of petitioners' constitutional rights and hence does not afford petitioners an independent ground for habeas corpus relief.

[8] With respect to petitioners' first amendment claims, a party seeking to overcome the reporters' qualified privilege must show that the information sought is relevant, that alternative means to obtain the information have been exhausted, and that there is a compelling interest in the information. *Miller v. Transamerican Press Inc.,* 621 F.2d at 726. The

party who seeks to overcome the privilege bears the burden and must show that the test has been met by substantial evidence. *In re Selcraig,* 705 F.2d at 792.

[9] No assertion was made or could be made that the petitioners were witnesses to the crime or had personally communicated with the defendant. Additionally, the petitioners had averred that they would not be able to recognize their sources, as the sources had been interviewed four months earlier for only ten minutes. The mere hunch that the petitioners may be able to identify persons present at a trial, who may supply the defendant with information that may be useful for impeachment purposes, is not a sufficient basis upon which to compel a witness' attendance in conformity with the compulsory process provision of the sixth amendment. *United States v. Valenzuela-Bernal,* 458 U.S. at 866-867, 102 S.Ct. at 3446.

[10] The defendant, however, argued that the petitioners' testimony was necessary because it was exculpatory and could be useful for impeachment purposes. Prior to the seating of the jury or the taking of any testimony, the defense sought to have the petitioners view the persons in the court to determine whether present among them were their anonymous sources. As the defendant's attorneys had earlier indicated, they would require the petitioners to be on call to periodically survey the crowd and, if possible, identify their sources. However, the defendant did not show that exculpatory information was not forthcoming from other sources, such as the list of witnesses for the State, which had been furnished to the defense. Nor had the necessity for impeachment of a witness been shown. *Cf. United States v. Cuthbertson,* 651 F.2d 189, 195 (necessity for impeachment testimony was premature; and under Fed.R.Crim.Pro.Rule 17(c), "naked exculpatory material held by third parties that does not rise to the dignity of admissible evidence simply is not within the rule").

The defendant's asserted need for the information from the petitioners was based on a series of con-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00475

760 F.Supp. 1206
760 F.Supp. 1206, 18 Media L. Rep. 2113
(Cite as: 760 F.Supp. 1206)

Page 12

tingencies: if the reporters were able to recognize their sources, if those sources were called to testify, and if those sources were to give testimony which was otherwise inconsistent with the defense's theory of self defense then the petitioners would be called to impeach that testimony. Before either of these contingencies materialized, the petitioners were adjudged in contempt for refusing to disclose their sources.

In applying the three-pronged test to determine whether the qualified privilege was overcome by the plaintiff, the Court of Appeals for the Fifth Circuit in *In re Selcraig*, 705 F.2d 789, analyzed the case before it minutely, finding that the need for the evidence and the order compelling its production were premature. Similarly, this court believes that the state court's order in *State v. Taylor* to produce the information sought was premature.

Between the adjudication of contempt on February 5, 1991, and the sentencing on February 7, 1991, the defendant's need for the information became even more remote. On February 4, 1991, the defendant's court-appointed investigator interviewed the State's witnesses. On February 6, 1991, the state conceded that, according to the testimony, Percy Banyon, one of the decedents, was the aggressor. The testimony of at least five State's witnesses at the trial also indicated that Sanders was brandishing a bat threatening to strike at anyone who opposed his cousin, Banyon. Thus, in the closing hours of the trial, it became even more apparent that the evidence that was sought from petitioners, concerning the possible identity of sources who held a *1216 belief as to who was the aggressor, was speculative, hearsay and cumulative.

Although the petitioners had no material and favorable evidence to offer, could not identify their sources, and indicated that the defense had access to other exculpatory testimony, the court insisted that the petitioners attempt to identify their sources and remain on call to attempt to identify other potential witnesses or sources whose statements might be used for impeachment purposes. This order was

in excess of the mandate of the sixth amendment and required production of privileged information, which was already available and the compelling interest for which had not been shown.

While this court can conceive of other scenarios in which a reporter's qualified privilege to preserve confidential sources must yield to a defendant's rights to compulsory process and a fair trial, this is not such a case.

The adjudication of contempt is unconstitutional as a violation of the petitioners' qualified privilege under the first amendment. Accordingly, it is RECOMMENDED that the application for a writ of habeas corpus be GRANTED, and that Respondent, Johnny Klevenhagen be ORDERED to release the petitioners from his custody.

S.D.Tex.,1991.
Campbell v. Klevenhagen
760 F.Supp. 1206, 18 Media L. Rep. 2113

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00476

**5**

00477

Westlaw.

725 S.W.2d 470
725 S.W.2d 470, 13 Media L. Rep. 2133
(Cite as: 725 S.W.2d 470)

Page 1

▷

Court of Appeals of Texas,
Houston (1st Dist.).

CHANNEL TWO TELEVISION COMPANY, Relator,
v.
The Honorable Charles A. DICKERSON, Judge of
the 240th Judicial District Court of Fort Bend
County, Texas, Respondent.
**No. 01-86-0385-CV.**

Feb. 12, 1987.

Television station brought petition for writ of mandamus seeking to compel vacation of order compelling production of reporter's notes, outtakes, records and other documents relating to broadcast aired concerning lawsuit between litigant and his former business partner. The Court of Appeals, Hoyt, J., held that litigant, who issued broad subpoena duces tecum asking for reporter's notes, outtakes, records and other documents relating to broadcast aired concerning lawsuit between litigant and his former business partner, failed to make showing that information sought was subject to disclosure, after television station asserted qualified privilege.

Writ of mandamus granted.

Levy, J., concurred and filed opinion.

West Headnotes

**[1] Constitutional Law 92 €⟶2070**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(U) Press in General
            92k2070 k. In General. Most Cited Cases
    (Formerly 92k90.1(8))
First Amendment protection afforded information

that press obtains by its investigations is not altered by fact that case pending is civil rather than criminal. U.S.C.A. Const.Amend. 1.

**[2] Privileged Communications and Confidentiality 311H €⟶26**

311H Privileged Communications and Confidentiality
    311HI In General
        311Hk24 Evidence
            311Hk26 k. Presumptions and Burden of Proof. Most Cited Cases
    (Formerly 410k222)

**Privileged Communications and Confidentiality 311H €⟶31**

311H Privileged Communications and Confidentiality
    311HI In General
        311Hk28 Determination
            311Hk31 k. In Camera Review. Most Cited Cases
    (Formerly 410k223)
Under rules of civil procedure, before privilege may be invoked to prevent production of certain materials, party claiming privilege must assert it and affirmatively show that materials sought qualify for privilege, and this affirmative showing can generally be accomplished by tendering materials to court for in camera inspection. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 3.

**[3] Constitutional Law 92 €⟶2075**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(U) Press in General
            92k2075 k. Discovery Requests and Subpoenas. Most Cited Cases
    (Formerly 92k90.1(8))

**Privileged Communications and Confidentiality**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

725 S.W.2d 470
725 S.W.2d 470, 13 Media L. Rep. 2133
**(Cite as: 725 S.W.2d 470)**

Page 2

**311H ☛404**

311H Privileged Communications and Confidentiality
    311HVII Other Privileges
       311Hk404 k. Journalists. Most Cited Cases
    (Formerly 410k196.1, 92k90.1(8))
Once qualified privilege protecting reporter's investigative information is asserted, party seeking disclosure of reporter's investigative materials and notes must demonstrate that there is compelling and overriding need for information, and at a minimum, litigant must make clear and specific showing in trial court that information sought is highly material and relevant, necessary or critical to maintenance of claim and not obtainable from other available sources. Vernon's Ann.Texas Const. Art. 1, § 8.

**[4] Constitutional Law 92 ☛2138**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
       92XVIII(W) Telecommunications and Computers
          92k2135 Television
             92k2138 k. Journalists. Most Cited
    (Formerly 92k90.1(9))
Litigant, who issued broad subpoena duces tecum seeking reporter's notes, outtakes, records and other documents relating to broadcast aired concerning lawsuit between litigant and his former business partner, failed to make specific showing that information was subject to disclosure, after television station and reporter asserted materials were protected from disclosure by qualified privilege. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 3; Vernon's Ann.Texas Const. Art. 1, § 8; U.S.C.A. Const.Amend. 1.
*471 Richard A. Sheehy, Cook, Davis & McFall, David B. Black, Black & Ewart, Houston, for relator.

James R. Moriarty, Russell H. McMains, Edwards, McMains & Constant, Randall W. Wilson, Susman,

Godfrey & McGowan, Houston, for respondent.

Before DUGGAN, HOYT and LEVY, JJ.

OPINION

HOYT, Justice.

In this original proceeding on writ of mandamus, Channel Two Television seeks to compel the trial judge, the Hon. Charles A. Dickerson, to vacate his order compelling production of material that Channel Two claims is covered by a qualified reporter's privilege. We conditionally grant the writ of mandamus.

This proceeding arises out of a lawsuit between Jack Fletcher and George Aubin, two former business partners. Fletcher sued Aubin, claiming that Aubin had made a number of misrepresentations to him concerning their business ventures. Fletcher also alleged that Aubin's negligent conduct caused the death of a very successful quarterhorse owned by them as one of their ventures. Aubin generally denied Fletcher's claims and filed a counterclaim alleging contract violations and torts by Fletcher.

Channel Two became aware of the lawsuit between the two and prepared and broadcasted an investigative report on the horse's death and the dispute between the two. When Aubin learned of the report, he caused a subpoena *duces tecum* to issue requiring a representative of Channel Two to appear at a deposition and to produce the following:

Documents, notes, video-tape, film, and any other tangible documents relating or referring to George Aubin, Jack Fletcher, Brigand Silk (the racehorse), Mercury Savings Association of Texas, and Ben Milam Savings & Loan Association.

Channel Two filed a motion to quash the deposition and subpoena *duces tecum,* arguing that the materials subpoenaed by Aubin were protected by a quali-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00479

725 S.W.2d 470
725 S.W.2d 470, 13 Media L. Rep. 2133
(Cite as: 725 S.W.2d 470)

Page 3

fied privilege that protects reporters' notes and other investigative materials. Channel Two claimed that the scope of the subpoena *duces tecum* included reporter's notes, scripts, and information not actually broadcast on the air. It maintained that Aubin did not need to look at the reporter's investigative materials because the alleged slanderous act by Aubin was contained in the broadcast itself, not the underlying materials. When the motion was denied, Channel Two filed this proceeding in this Court. Thereafter, Aubin filed suit for libel and slander against Channel Two and the reporter involved in the report.

In this mandamus action, Channel Two seeks to have this Court hold that the materials sought are subject to a reporter's privilege and thus are not subject to compelled disclosure.

[1] The United States Supreme Court has held that a qualified privilege protects information that the press obtains by its investigations. *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Since *Branzburg,* other courts have discussed more fully the chilling effect that discovery of the journalistic process would have on the uncovering of news. *See LaRouche v. National Broadcasting Co.,* 780 F.2d 1134, 1139 (4th Cir.1986), *cert. denied,* 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986); *U.S. v. Cuthbertson,* 630 F.2d 139, 147 (3rd Cir.1980), *cert. *472 denied,* 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981). A paramount public interest in the maintenance of a vigorous, aggressive, and independent press, capable of unfettered debate over controversial matters, is reflected in the courts' close scrutiny of any infringement on First Amendment protection. *Baker v. F & F Investment,* 470 F.2d 778, 782 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973) (citing *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). The protection afforded is not altered by the fact that the case pending is civil rather than criminal, *New York Times v. Sullivan,* 376 U.S. at 265, 84 S.Ct. at 718.

[2] Texas law recognizes certain privileges established by our rules of procedure, Tex.R.Civ.P. 166b.3 and also a privilege based upon freedom of speech and of the press. Tex.Const. art. 1, sec. 8. Under our rules of procedure, before a privilege will be invoked to prevent the production of certain materials, the party claiming a privilege must assert it and affirmatively show that the materials sought qualifies for the privilege. *Peeples v. Hon. Fourth Supreme Judicial District,* 701 S.W.2d 635, 637 (Tex.1985). This affirmative showing can generally be accomplished by tendering the materials to the Court for an in-camera inspection. *Victoria Lloyds Insurance Co. v. Gayle,* 717 S.W.2d 166 (Tex.App.-Houston [1st Dist.] 1986, orig. pro.).

[3] The questions of when to allow a qualified privilege protecting reporters and what showing is necessary to overcome it are not so clearly defined in our state law. Texas Const. art. 1, sec. 8 provides that "... no law shall ever be passed curtailing the liberty of speech or of the press." We interpret this to mean that once the privilege is asserted, the party seeking disclosure of the reporter's investigative materials and notes must demonstrate that there is a compelling and overriding need for the information. At a minimum, the litigant must make a clear and specific showing in the trial court that the information sought is: (1) highly material and relevant; (2) necessary or critical to the maintenance of the claim; and (3) not obtainable from other available sources. *United States v. Burke,* 700 F.2d 70, 76, 77 (2d Cir.1983), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *In re Petroleum Products Antitrust Litigation,* 680 F.2d 5, 7-8 (2nd Cir.1982) (per curiam), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *Zerilli v. Smith,* 656 F.2d 705, 713-715 (D.C.Cir.1981); *Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433, 438 (10th Cir.1977).

[4] In this case, Aubin has issued a broad subpoena *duces tecum* asking for reporter's notes, outtakes, records, and other documents relating to the broadcast aired concerning the Aubin-Fletcher dispute.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

C0480

725 S.W.2d 470
725 S.W.2d 470, 13 Media L. Rep. 2133
**(Cite as: 725 S.W.2d 470)**

Page 4

He presented no evidence at the hearing on the motion to quash other than a copy of the broadcast. There is no showing that the information sought fulfills the criteria we have previously set out, and the trial court therefore had an insufficient basis for ordering production of the requested material.

This is not to say that Aubin could not demonstrate that some of the designated material sought may be subject to disclosure. But unless the elements of the qualified privilege are established for each item sought, the presumption for each item must be in favor of First Amendment considerations.

The application for writ of mandamus is granted. We have no doubt that Judge Dickerson will vacate his order denying the motion to quash, and the Clerk of this Court will be directed to issue the writ of mandamus only in the event he fails to do so.

LEVY, J., concurs.LEVY, Justice, concurring.
I agree with the majority's reasoning and disposition of the mandamus application, which vacates the trial judge's order compelling discovery, but because of the overriding importance of a free press, it seems appropriate to observe that Texas law grants protection, as well as does the federal constitution's First Amendment, from *473 compelled disclosure of information that the press obtains through its investigations.

When addressing the issue of a reporter's privilege *as a matter of state constitutional law,* we are not obligated to follow the U.S. Supreme Court's interpretation of the First Amendment. As the majority noted in *Branzberg v. Hayes,* 408 U.S. at 706, 92 S.Ct. at 2669 (1972):

... we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute.

Our Texas Constitution's "free press" provision is thus not a mere shadow of the comparable First Amendment. No matter how eloquent or persuasive

its analysis of the federal constitution may be, the United States Supreme Court will not presume that the Supreme Court of Texas (or lower Texas Courts) will modify its interpretation of Texas law whenever the U.S. Supreme Court interprets comparable federal law differently. If a state court judgment is premised on an adequate state ground, that ground must be presumed *independent* unless the *state* court suggests otherwise.[FN1]

> FN1. "[W]e will not review a judgment of a state court that rests on an adequate and independent state ground. Nor will we review one until the fact that it does not do so appears of record." *Herb v. Pitcairn,* 324 U.S. 117, 128, 65 S.Ct. 459, 464, 89 L.Ed. 789 (1945).

Tex.Const. art. 1, sec. 8 is Texas's guarantee of freedom of the press. It provides:

"... no law shall ever be passed curtailing the liberty of speech or of the press."

This language is sweeping, and deliberately so. In its application, I think it means that before a reporter can be ordered to turn over material acquired in the investigation and dissemination of a news story, the litigant seeking the information must show more than that the material be highly significant and relevant, necessary to his claim, and not available from other sources. The litigant should demonstrate the existence of a *compelling* need for the information, which should not be required to be predicated on economic interest alone.

A free press promotes, or ideally should promote, dissemination of the widest possible range of fact and opinion in an open society such as ours. To carry out its prescribed role effectively, the press must be relatively unrestrained in acquiring and compiling information, modified, inter alia, by the individual's rights to privacy and dignity. The likelihood or even possibility of court-ordered disclosure of confidential sources diminishes the flow of news by encouraging self-censorship by news-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00481

725 S.W.2d 470
725 S.W.2d 470, 13 Media L. Rep. 2133
(Cite as: 725 S.W.2d 470)

Page 5

gatherers and by dissuading potential informants from divulging their information. *United States v. Caldwell,* 408 U.S. 665, 711, 720, 92 S.Ct. 2646, 2686, 2691, 33 L.Ed.2d 626 (1972) (Douglas, J., dissenting) (holding that a reporter should have an absolute privilege to withhold the identity of a source).

Applying this strict standard would involve minimal evidentiary loss, encourage the necessary flow of information, and, perhaps even more, strengthen the protection of important but confidential sources.

Thus, I fully concur in the majority opinion, adding this only for emphasis.

Tex.App.-Hous. [1 Dist.],1987.
Channel Two Television Co. v. Dickerson
725 S.W.2d 470, 13 Media L. Rep. 2133

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00482

**6**

00483

Westlaw.

966 S.W.2d 525                                                          Page 1
966 S.W.2d 525, 26 Media L. Rep. 1668
(Cite as: 966 S.W.2d 525)

▷

Court of Criminal Appeals of Texas,
En Banc.
Lawron Eugene COLEMAN, Appellant,
v.
The STATE of Texas.
No. 0491-96.

April 1, 1998.

Defendant was convicted in the 283rd District
Court, Dallas County, Virgil Mulanax, J., of
murder, and punishment was assessed at 25 years in
prison. Defendant appealed. The Court of Appeals,
Vance, J., 915 S.W.2d 80, reversed and remanded.
The Court of Criminal Appeals, Mansfield, J., held
that defendant failed to show that newspaper report-
ers' testimony would actually be material and favor-
able to either of his defensive theories, and thus,
Sixth Amendment did not require trial court to
compel reporters to testify.

Vacated and remanded.

Overstreet, J., filed dissenting opinion, in which
Baird, J., joined.

West Headnotes

[1] Constitutional Law 92 €═2075

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and
Press
        92XVIII(U) Press in General
            92k2075 k. Discovery Requests and Sub-
poenas. Most Cited Cases
            (Formerly 92k90.1(8))

Privileged Communications and Confidentiality
311H €═404

311H Privileged Communications and Confidenti-
ality

311HVII Other Privileges
    311Hk404 k. Journalists. Most Cited Cases
    (Formerly 410k196.1)
Newspaper reporters seeking to resist subpoenas *ad
testificandum* had no First Amendment privilege re-
garding their investigative work concerning gangs
at issue in murder prosecution. U.S.C.A.
Const.Amend. 1.

[2] Witnesses 410 €═2(1)

410 Witnesses
    410I In General
        410k2 Right of Accused to Compulsory Pro-
cess
            410k2(1) k. In General. Most Cited Cases
Sixth Amendment right to compulsory process is
right to present defense, the right to present defend-
ant's version of facts as well as prosecution's to jury
so it may decide where truth lies. U.S.C.A.
Const.Amend. 6.

[3] Witnesses 410 €═2(1)

410 Witnesses
    410I In General
        410k2 Right of Accused to Compulsory Pro-
cess
            410k2(1) k. In General. Most Cited Cases
Sixth Amendment does not guarantee right to se-
cure attendance and testimony of any and all wit-
nesses; rather, it guarantees only compulsory pro-
cess for obtaining witnesses whose testimony
would be both material and favorable to defense.
U.S.C.A. Const.Amend. 6.

[4] Witnesses 410 €═2(1)

410 Witnesses
    410I In General
        410k2 Right of Accused to Compulsory Pro-
cess
            410k2(1) k. In General. Most Cited Cases
To exercise Sixth Amendment right to compulsory
process, defendant must make plausible showing to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00484

966 S.W.2d 525
966 S.W.2d 525, 26 Media L. Rep. 1668
**(Cite as: 966 S.W.2d 525)**

Page 2

trial court, by sworn evidence or agreed facts, that witness' testimony would be both material and favorable to defense. U.S.C.A. Const.Amend. 6.

**[5] Witnesses 410 ☞2(1)**

410 Witnesses
    410I In General
        410k2 Right of Accused to Compulsory Process
            410k2(1) k. In General. Most Cited Cases
Defendant who has not had opportunity to interview witness may make necessary showing to exercise Sixth Amendment right to compulsory process by establishing matters to which witness might testify and relevance and importance of those matters to success of defense. U.S.C.A. Const.Amend. 6.

**[9] Witnesses 410 ☞4**

410 Witnesses
    410I In General
        410k3 Persons Who May Be Required to Appear and Testify
            410k4 k. In General. Most Cited Cases
Murder defendant failed to show that newspaper reporters' testimony would actually be material and favorable to either of his defensive theories, lack of requisite intent and sudden passion, and thus, Sixth Amendment did not require trial court to compel reporters to testify; defendant argued vaguely that reporters could "enlighten" jury "as to the atmosphere" in city "that could relate back to [his] state of mind" when he shot victim. U.S.C.A. Const.Amend. 6.

*526 Robert J. Reagan, Dallas, for appellant.

Kimberly Schaefer, Assistant District Attorney, Dallas, Matthew Paul, State's Attorney, Betty Marshall, Assistant State's Attorney, Austin, for State.

**OPINION ON STATE'S MOTION FOR RE-HEARING**

MANSFIELD, Judge, delivered the opinion for the Court.

Both the State and the State Prosecuting Attorney have filed motions for rehearing in this case. Believing now that we erred in our opinion on original submission, we withdraw that opinion and substitute the following.

We originally granted the State's petition for discretionary review to determine whether the Tenth Court of Appeals [FN1] had erred in holding that the 283rd District Court of Dallas County had violated appellant's Sixth Amendment right to compulsory process.[FN2] We hold now that the Tenth Court of Appeals did err.

> FN1. The Texas Supreme Court transferred the case from the Fifth Court of Appeals to the Tenth Court of Appeals. See Tex. Gov't Code § 73.001.
>
> FN2. The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." This right to compulsory process was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967).

*The Relevant Facts*

In the fall of 1993, appellant was a member of the "Oak Cliff Mafia" street gang in Dallas. On November 24, 1993, members of a rival gang, the "Junior Homeboys," carried out a drive-by shooting in which appellant's younger brother was seriously wounded. On November 30, 1993, Victor Manuel Alvarez, a member of the "Junior Homeboys," was himself killed in a drive-by shooting. The Dallas County Grand Jury later indicted appellant for the intentional murder of Alvarez. See Tex. Penal Code

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00485

966 S.W.2d 525
966 S.W.2d 525, 26 Media L. Rep. 1668
(Cite as: 966 S.W.2d 525)

§ 19.02(b)(1).[FN3]

> FN3. At the time of appellant's offense, intentional murder was prohibited by Texas Penal Code § 19.02(*a*)(1).

[1] At trial in the 283rd District Court, appellant put forth two defenses. First, he admitted shooting Alvarez, but he denied he had had the intent to kill. Second, he argued that even if the jury believed he had intended to kill Alvarez, it should still find him guilty only of voluntary manslaughter, because he had acted under the immediate influence of sudden passion arising from the shooting of his brother.[FN4] In furtherance of both defenses, appellant, during trial, applied for, and caused to be issued, subpoenas *ad testificandum* for two reporters on the staff of *The Dallas Morning News* newspaper. See Tex.Code Crim. Proc. art. 24.03(a). The reporters, however, promptly filed a joint motion to have the subpoenas quashed on the basis of a claimed First Amendment privilege.[FN5]

> FN4. The voluntary manslaughter statute was repealed in 1994.

> FN5. No such privilege exists. *Healey v. McMeans*, 884 S.W.2d 772, 775 (Tex.Crim.App.1994).

The District Court held a hearing on the motion to quash shortly after the State rested at the guilt/inocence stage. At that hearing, the reporters elaborated on the legal argument they had made in their motion, but they presented no evidence. Appellant opposed the reporters' motion by arguing that their testimony would be crucial to his defense:

> As the court is well aware of, the whole contribution of the defense in this case deals with the state of mind of the defendant, and the purpose of subpoenaing the reporters is the fact they've done an extensive*527 amount of investigative work concerning the two so-called gangs that we have involved in this. They have done extensive research talking to witnesses, talking in the neigh-

borhood, and they're well aware of the atmosphere that was present at the time that allegations against this defendant came forth. And, therefore, it is the defense's position that they could enlighten this jury as to the atmosphere out there that could relate back to the state of mind of this defendant, which is a very critical issue in this case.

Appellant cited no specific statutory or constitutional provision in support of his position, but he did offer in evidence the two subpoenas and an article, written by one of the reporters, from the January 9, 1994, edition of *The Dallas Morning News.* The article discussed the history and culture of the "Junior Homeboys," and it included a brief discussion of the killing of Alvarez.

At the conclusion of the hearing, the District Court granted the motion to quash, but it gave no explanation for its decision. The jury later convicted appellant of murder and assessed his punishment at imprisonment for 25 years and a $10,000 fine.

Appellant brought six points of error in his brief to the Tenth Court of Appeals. He argued in his first and second points that the District Court had violated his Sixth Amendment right to compulsory process when it granted the motion to quash.[FN6] After a rather complicated analysis, the Court of Appeals agreed with appellant's Sixth Amendment claim, reversed the judgment of the District Court, and remanded the case for retrial. *Coleman v. State,* 915 S.W.2d 80, 87 (Tex.App.-Waco 1996). More specifically, the Court of Appeals held that (1) no First Amendment privilege existed, (2) the reporters in question had had the burden of showing some basis on which to quash the subpoenas, (3) the reporters had failed to carry that burden, (4) the District Court had therefore violated appellant's Sixth Amendment right to compulsory process, and (5) no harmless error analysis was possible. *Id.* at 84, 86-87.

> FN6. Since appellant did not rely upon the Sixth Amendment in the District Court, he

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00486

966 S.W.2d 525                                                                    Page 4
966 S.W.2d 525, 26 Media L. Rep. 1668
(Cite as: 966 S.W.2d 525)

did not preserve a Sixth Amendment complaint for appellate review. See Tex.R.App. Proc. 33.1(a)(1)(A); *Robinson v. State,* 851 S.W.2d 216, 222, 225 (Tex.Crim.App.1991), *cert. denied,* 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994); G. Dix & R. Dawson, *Texas Criminal Practice and Procedure* § 42.02 (1995). Nevertheless, the Court of Appeals addressed his Sixth Amendment complaint. We express no opinion on the propriety of the Court of Appeals' action. But see *Hughes v. State,* 878 S.W.2d 142, 151 (Tex.Crim.App.1992) (requirement that error be preserved is a "systemic" one), *cert. denied,* 511 U.S. 1152, 114 S.Ct. 2184, 128 L.Ed.2d 902 (1994).

We subsequently granted the State's petition for discretionary review to consider whether the Court of Appeals had erred in its Sixth Amendment analysis. See Tex.R.App. Proc. 66.3(c). The State argues now that (1) under the Sixth Amendment Compulsory Process Clause, appellant had the burden of showing in the District Court that the testimony of the witnesses he sought would be both material (*i.e.,* relevant and important, and not merely cumulative) and favorable to his defense, and (2) appellant failed to carry that burden. Appellant argues in response that (1) the mere fact that he obtained the subpoenas amounted to a *prima facie* showing of materiality because, under Article 24.03(a), an application for a subpoena must include a sworn statement that the testimony of the witness sought would be material to the defense, and (2) at the hearing on the motion to quash, he established the materiality of the reporters' expected testimony when he explained what they would testify about and how their testimony would relate to his defense.

### Analysis

[2][3][4][5] The Sixth Amendment right to compulsory process "is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). The Sixth Amendment does not guarantee, however, the right to secure the attendance and testimony of any and all witnesses; rather, it guarantees only compulsory process for obtaining witnesses *528 whose testimony would be both material and favorable to the defense. *United States v. Valenzuela-Bernal,* 458 U.S. 858, 866-67, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). To exercise the federal constitutional compulsory process right, the defendant must make a plausible showing to the trial court, by sworn evidence or agreed facts, that the witness' testimony would be both material and favorable to the defense. *Ex parte Scarbrough,* 604 S.W.2d 170, 173-174 (Tex.Crim.App.1980); *Perez v. State,* 590 S.W.2d 474, 479 (Tex.Crim.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2157, 64 L.Ed.2d 790 (1980); *Spencer v. State,* 503 S.W.2d 557, 560-561 (Tex.Crim.App.1974); *Jones v. State,* 501 S.W.2d 677, 679 (Tex.Crim.App.1973); *Hardin v. State,* 471 S.W.2d 60, 62-63 (Tex.Crim.App.1971); accord, *United States v. Mejia-Uribe,* 75 F.3d 395, 399-400 (8th Cir.), *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 97 (1996); 22A C.J.S. *Criminal Law* § 473 (1989). A defendant who has not had an opportunity to interview a witness may make the necessary showing by establishing the matters to which the witness might testify and the relevance and importance of those matters to the success of the defense. See *United States v. Valenzuela-Bernal,* 458 U.S. at 869-71, 102 S.Ct. at 3448. Were the burden of showing materiality and favorableness not placed on the defendant, "frivolous and annoying requests [c]ould make the trial endless and unduly burdensome on the Court and all officers thereof." *Ross v. Estelle,* 694 F.2d 1008, 1011 (5th Cir.1983).

[6] On the record before us, it is clear that appellant did not make the necessary showing. Although he argued vaguely to the District Court that the report-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

966 S.W.2d 525                                                                 Page 5
966 S.W.2d 525, 26 Media L. Rep. 1668
(Cite as: 966 S.W.2d 525)

ers could "enlighten" the jury "as to the atmosphere" in Dallas "that could relate back to [his] state of mind" when he shot Alvarez, he made no plausible showing to the court that the reporters' testimony would actually be *material* and *favorable* to either of his defensive theories. Absent such a showing, the Sixth Amendment did not require the District Court to compel the reporters to testify. The Court of Appeals erred in holding otherwise.

Accordingly, we VACATE the judgment of the Court of Appeals and REMAND the case to that court so that it may consider appellant's remaining points of error.

OVERSTREET, J., filed a dissenting opinion, in which BAIRD, J., joined.
MEYERS, J., not participating.
OVERSTREET, Judge, dissenting on state's rehearing.
On original submission, by a 5-3 vote, we upheld the Tenth Court of Appeals' holding that the trial court reversibly erred in granting a motion to quash appellant's subpoenas of two newspaper reporters. However, after granting motions for rehearing filed by both the District Attorney and the State Prosecuting Attorney, we now reverse ourselves and conclude that there was no error in quashing the subpoenas. Because I think that we had it right the first time, I respectfully dissent to this Court's sudden about-face.

On original submission, we held that subpoenaed witnesses, i.e. in this case the reporters, have the burden "to come forward with evidence, either live testimony or affidavit, in support of their motion to quash[.]" *Coleman v. State*, (Tex.Cr.App. No. 491-96, delivered April 30, 1997, slip op. at 7). Thus the Waco Court of Appeals did not err in holding that because the reporters failed to come forward with such evidence the trial court erroneously granted their motion to quash. *Id.* As we indicated on original submission, that holding is quite consistent with existing law. However, on rehearing, a majority of this Court chooses to "modify" our interpretation of existing law.

On rehearing, this Court holds that the defendant has the burden of showing materiality and favorableness as to the subpoenaed witnesses' prospective testimony, and that "it is clear that appellant did not make the necessary showing." *Coleman v. State*, 966 S.W.2d 525, 528 (Tex.Cr.App.1998) (op. on reh'g). What of our previous holding on original submission that the reporters had the burden to come forward with evidence in support of their motion to quash?

*529 The majority states that "[a] defendant who has not had an opportunity to interview a witness may make the necessary showing by establishing the matters to which the witness might testify and the relevance and importance of those matters to the successes of the defense." *Id.* However, in light of the fact that a witness is not required to even talk with the defendant or his attorneys, such a showing may be quite difficult, if not impossible, when a prospective witness refuses to be interviewed. That is what the subpoena is for-to get the witness into court so that he can be questioned. If a defendant has been unable to interview a prospective witness, how is he going to know specifically what the witness knows? And as the majority opinion notes, appellant did argue to the trial court that the reporters could enlighten the jury as to the atmosphere in Dallas that could relate back to his state of mind. Obviously, he was referring to the rival gang activities since the subject matter of the reporters' newspaper articles was such gang activity and violence. There was nothing mysterious or cryptic about the basis of appellant's desire for these reporters to testify. This case involved rival gang activity, and the reporters had written articles thereon. Without being able to force the reporters to submit to an interview, such is the best showing appellant could make.

How does one acquire the information necessary to make the showing of materiality and relevance? Pursuant to the majority's opinion on rehearing, obviously not via compulsory process subpoena. Perhaps via crystal ball or psychic hot-line?

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00488

966 S.W.2d 525                                                        Page 6
966 S.W.2d 525, 26 Media L. Rep. 1668
**(Cite as: 966 S.W.2d 525)**


In light of the facts of this case, and the reporters' newspaper articles involving the rival gangs, I believe that appellant made a sufficient showing to justify his subpoenas, and that because the reporters failed in their burden to support their motion to quash, I believe appellant was entitled to have his subpoenas enforced. Because the majority of this Court now concludes otherwise, I respectfully dissent.

BAIRD, J., joins.
Tex.Crim.App.,1998.
Coleman v. State
966 S.W.2d 525, 26 Media L. Rep. 1668

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00489

Westlaw.

Date of Printing: May 29, 2009

KEYCITE

▷ Coleman v. State, 966 S.W.2d 525, 26 Media L. Rep. 1668 (Tex.Crim.App.,Apr 01, 1998) (NO. 0491-96)

History

Direct History

▷     1 Coleman v. State, 915 S.W.2d 80 (Tex.App.-Waco Jan 10, 1996) (NO. 10-94-074-CR), rehearing
        denied (Feb 14, 1996), petition for discretionary review granted (May 22, 1996)
                    *Judgment Vacated by*

=>    2 Coleman v. State, 966 S.W.2d 525, 26 Media L. Rep. 1668 (Tex.Crim.App. Apr 01, 1998) (NO.
        0491-96)

                    *On Remand to*

▷     3 Coleman v. State, 979 S.W.2d 438 (Tex.App.-Waco Nov 18, 1998) (NO. 10-94-074-CR)


▷     4 Lawron Coleman v. State, 1997 WL 209530, 25 Media L. Rep. 1769 (Tex.Crim.App. Apr 30,
        1997) (NO. 491-96), rehearing on petition for discretionary review granted (Sep 24, 1997)
                    *Opinion Withdrawn and Superseded on Rehearing by*

=>    5 Coleman v. State, 966 S.W.2d 525, 26 Media L. Rep. 1668 (Tex.Crim.App. Apr 01, 1998) (NO.
        0491-96)

                    *On Remand to*

▷     6 Coleman v. State, 979 S.W.2d 438 (Tex.App.-Waco Nov 18, 1998) (NO. 10-94-074-CR)

Negative Citing References (U.S.A.)

*Declined to Follow by*

H     7 State v. Davis, 720 So.2d 220, 23 Fla. L. Weekly S557, 26 Media L. Rep. 2457 (Fla. Oct 22,
        1998) (NO. 90,457) ★ ★

© 2009 Thomson Reuters. All rights reserved.

**7**

00491

Westlaw.

769 S.W.2d 301
769 S.W.2d 301
**Partial Publication**
(Cite as: 769 S.W.2d 301)

**H**

Court of Appeals of Texas,
Houston (1st Dist.).

Aaron COOPER, Appellant,
v.
The STATE of Texas, Appellee.
**No. 01-86-00032-CR.**

March 23, 1989.
Rehearing Denied April 27, 1989.
Published in Part Pursuant to Tex.R.App.P. 90.

Defendant was convicted of burglary of a building, in the 228th District Court, Harris County, Ted Poe, J., and defendant appealed. The Court of Appeals, Cohen, J., held that: (1) defendant received ineffective assistance of counsel at punishment phase of trial, and (2) statute allowing defendant new trial on only punishment when error occurs at punishment stage applied to defendant's appeal, although statute did not take effect until after defendant's trial ended.

Reversed in part and remanded.

West Headnotes

**[1] Criminal Law 110 ⟨key⟩671**

110 Criminal Law
   110XX Trial
      110XX(C) Reception of Evidence
         110k671 k. Presence of Jury During Inquiry as to Admissibility. Most Cited Cases
Hearing outside jury's presence to determine admissibility of void conviction is required, upon request, as matter of federal constitutional law, and by rules of criminal evidence. Rules of Crim.Evid., Rule 104(a, c).

**[2] Witnesses 410 ⟨key⟩305(2)**

410 Witnesses

410III Examination
   410III(D) Privilege of Witness
      410k305 Waiver of Privilege
         410k305(2) k. Waiver by Accused in Criminal Prosecutions. Most Cited Cases
(Formerly 410k305)
By testifying as to admissibility of void conviction outside hearing of jury, accused does not subject himself to cross-examination on other issues. Rules of Crim.Evid., Rule 104(d).

**[3] Criminal Law 110 ⟨key⟩1955**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1952 Sentencing in General
               110k1955 k. Presentation of Evidence Regarding Sentencing. Most Cited Cases
(Formerly 110k641.13(7))
Defendant received ineffective assistance of counsel during punishment phase of trial; counsel's error in allowing defendant to testify before jury as to void conviction, rather than in proceeding outside presence of jury, allowed prosecution to cross-examine defendant about 14 convictions from other jurisdictions, which apparently would not have been revealed in absence of defendant's testimony, and trial counsel failed to object to inadmissible portion of penitentiary packet regarding another conviction. U.S.C.A. Const.Amend. 6.

**[4] Sentencing and Punishment 350H ⟨key⟩318**

350H Sentencing and Punishment
   350HII Sentencing Proceedings in General
      350HII(F) Evidence
         350Hk318 k. Documentary Evidence. Most Cited Cases
(Formerly 110k986.6(3))
Portion of penitentiary packet from defendant's prior conviction, which stated that defendant had been previously convicted of felony, but upon motion of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 1

00492

769 S.W.2d 301
769 S.W.2d 301
**Partial Publication**
**(Cite as: 769 S.W.2d 301)**

State the enhancement paragraph was abandoned and dismissed, was inadmissible in punishment phase of defendant's trial, and thus should have been excised from exhibit upon timely and proper motion.

**[5] Criminal Law 110 ☞1883**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)1 In General
                110k1879 Standard of Effective Assistance in General
                    110k1883 k. Prejudice in General. Most Cited Cases
        (Formerly 110k641.13(1))
For defense counsel's error to be so serious as to deprive defendant of fair trial, there must be reasonable probability that but for counsel's unprofessional errors, result of proceeding would have been different. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 ☞1953**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1952 Sentencing in General
                    110k1953 k. In General. Most Cited Cases
        (Formerly 110k641.13(7))
Defense counsel may be found ineffective, even when there is single error affecting only punishment assessed. U.S.C.A. Const.Amend. 6.

**[7] Statutes 361 ☞278.13**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies and Procedures
                361k278.13 k. In General. Most Cited Cases

(Formerly 361k267(1))

**Statutes 361 ☞278.14**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies and Procedures
                361k278.14 k. Application to Pending Actions and Proceedings. Most Cited Cases
        (Formerly 361k267(2))
Absent express provision to contrary, procedural statutes control litigation from their effective date and apply to litigation then pending.

**[8] Constitutional Law 92 ☞2792**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2792 k. Vested Rights in General. Most Cited Cases
        (Formerly 92k191, 92k106)
Litigant has no vested right in procedural remedy under due course of law or ex post facto clauses of State Constitution. Vernon's Ann.Texas Const. Art. 1, §§ 16, 19.

**[9] Criminal Law 110 ☞1189**

110 Criminal Law
    110XXIV Review
        110XXIV(U) Determination and Disposition of Cause
            110k1185 Reversal
                110k1189 k. Ordering New Trial. Most Cited Cases
Statute allowing only new trial on punishment, rather than on both punishment and guilt, when reversible error occurs at punishment stage, applied to defendant's appeal, even though defendant's trial for burglary of building ended before statute became effective. Vernon's Ann.Texas C.C.P. art. 44.29(b).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00493

769 S.W.2d 301
769 S.W.2d 301
**Partial Publication**
**(Cite as: 769 S.W.2d 301)**

Page 3

*302 Steven Wisch, Richard Frankoff, Henry Burkholder III, Houston, for appellant.

John B. Holmes, Dist. Atty., Harris County, Cathy Herasimchuk, Katy, for appellee.

Before EVANS, C.J., and COHEN and DUGGAN, JJ.

## OPINION ON SECOND MOTION FOR REHEARING

COHEN, Justice.

Our prior opinion is withdrawn, and this opinion is substituted in its stead. Appellant's second motion for rehearing is overruled.

After finding appellant guilty of burglary of a building, the jury found one of two enhancement paragraphs to be true, and assessed punishment at life imprisonment.

This case requires us to decide 1) whether appellant had ineffective assistance of counsel at the punishment stage of his trial, and 2) if so, whether the remedy is an entirely new trial, as provided by law in effect on the date of the crime and the date of the trial, or merely a new punishment hearing, as provided by Tex.Code Crim.P.Ann. art. 44.29(b) (Vernon Supp.1989), which took effect while this case was pending on appeal. We hold that counsel was ineffective and that a remand for a new punishment hearing is the appropriate remedy.

Appellant asserts that his trial counsel was ineffective at the punishment stage of trial where he failed to object to a void prior conviction alleged for enhancement, and where his trial counsel, by having appellant testify before the jury, incompetently allowed the State to cross-examine him about his lengthy criminal background. Appellant makes no complaints about his trial attorney's performance at the guilt stage of the trial.

The first enhancement paragraph alleged that appellant had been convicted in cause number 110646 in 1965 in Harris County for felony theft. The second alleged that appellant had been convicted in cause number 389272 in 1983 in Harris County for unauthorized use of a motor vehicle. Appellant pled not true to both paragraphs.

After the court admitted into evidence two penitentiary packets proving these two convictions, defense counsel called appellant to testify for "the purpose of making a record on 110646." Sensing trouble and trying to prevent it, the careful trial judge warned appellant's retained counsel, Thomas Jackson, as follows:

[THE COURT]: Mr. Jackson, you mentioned calling him for a specific purpose and I just want to advise you that if the defendant takes the stand, he takes the stand for all purposes.

*303 [APPELLANT'S COUNSEL]: I understand.

[THE COURT]: I knew you did, but I wanted the record to know so that there in no confusing [sic].

Appellant then testified *before the jury* that cause number 110646 had been reversed on appeal. He offered no evidence of this, other than his own testimony. The prosecutor cross-examined appellant about other prior convictions, whereupon appellant admitted to 11 felony convictions in Louisiana for crimes including auto theft, unauthorized use of a motor vehicle, larceny, escape, and theft, and to one federal conviction for interstate transportation of stolen vehicles. The prosecutor asked appellant about the convictions one by one, identifying each by date, state, crime, and punishment. In answer to the prosecutor's questions, appellant denied another federal conviction for "flight to avoid justice" and a Missouri conviction for theft. All of this occurred before the jury, and without objection.

The jury found the first enhancement allegation (number 110646) to be not true and found the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00494

769 S.W.2d 301
769 S.W.2d 301
**Partial Publication**
(Cite as: 769 S.W.2d 301)

second enhancement allegation to be true. This apparently occurred because the prosecutor requested such findings in his unrecorded jury argument at the punishment stage. We glean this from the jury's note to the court during punishment deliberations stating, "The jury wishes to know: ... (2) reasons the D.A. wishes us to deem not true to enhancement number one."

Appellant's retained counsel was replaced on appeal by court-appointed counsel, who filed an amended motion for new trial asserting for the first time that cause number 110646 was void because in that case, the State had enhanced the punishment by proving two Louisiana felony convictions that had been obtained without counsel and without waiver of counsel. Attached to the motion was the Court of Criminal Appeals mandate and opinion granting post-conviction habeas corpus relief to appellant in *Ex parte Cooper,* 493 S.W.2d 810 (Tex.Crim.App.1973). This was the first time that appellant had proved the invalidity of cause number 110646. Moreover, the Louisiana convictions declared void in *Ex parte Cooper* were among the 11 convictions that appellant admitted during cross-examination. All 12 convictions occurred between 1950 and 1962, before the landmark decision in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

We must decide whether counsel was ineffective in exposing appellant to cross-examination *before the jury* concerning his long criminal history for the sole purpose of challenging the void conviction in cause number 110646. Counsel persisted in this tactic despite the court's warning that appellant would be subject to full cross-examination. Moreover, the record shows that appellant was not questioned on direct examination about anything other than cause number 110646. Appellant's direct examination consisted of five questions (his name, age, whether he remembered cause number 110646, whether he was imprisoned on that cause, and its outcome). Appellant's direct examination testimony totaled 21 words and presented no information to the jury on

any other matter affecting his punishment. Thus, the decision to have appellant testify at the punishment stage was not made in order to present to the jury any other, generally beneficial information in an effort to get a lenient sentence. As trial counsel stated in offering appellant's testimony, it was only to inform the jury that cause number 110646 had been reversed. Plainly, no trial strategy justified having appellant testify before the jury, when the same testimony could have been presented outside their hearing without exposing the existence of the other convictions.

[1][2] Trial counsel made no request for a hearing outside the jury's presence, as contemplated by Tex.Code Crim.P.Ann. art. 40.09, § 6(d)(3), ch. 722, § 1, 1965 Tex.Gen.Laws 317, 481 *repealed by* ch. 685, § 4, 1985 Tex.Gen.Laws 2472, 2473. A hearing outside the jury's presence to determine the admissibility of a void conviction is required, upon request, as a matter of federal constitutional law, *304Burgett v. Texas,* 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), and by the Texas Rules of Criminal Evidence, which took effect after the trial of this case, *see*Tex.R.Crim.Evid. 104(a), (c). By testifying upon such a preliminary matter out of the hearing of the jury, the accused does not subject himself to cross-examination on other issues. *Simmons v. United States,* 390 U.S. 377, 389-94, 88 S.Ct. 967, 973-76, 19 L.Ed.2d 1247 (1968). *Simmons* held that such a rule was required by the United States Constitution, and the same result is now required by Tex.R.Crim.Evid. 104(d).

[3][4][5][6] It further appears that but for counsel's error in having appellant testify before the jury, none of the 14 convictions from Louisiana, federal court, and Missouri would have been revealed. Appellant did not testify at the guilt stage of the trial, and none of the convictions were disclosed then. Nothing in the record indicates that the State could have proved these convictions without appellant's testimony. Indeed, the record indicates the opposite. Appellant at first denied seven of the Louisiana convictions, and consistently denied one of the fed-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00495

769 S.W.2d 301
769 S.W.2d 301
**Partial Publication**
(Cite as: 769 S.W.2d 301)

Page 5

eral convictions and the Missouri conviction. He admitted them only after the prosecutor inquired further. Indeed, the prosecutor reminded appellant that he was under oath, subject to prosecution for perjury, and told appellant that, "documentation of all of this information does exist somewhere...." The State produced no proof of any of the 14 convictions, except appellant's testimony before the jury on cross-examination.

Once trial counsel learned that 110646 had been reversed, he could have proved its voidness conclusively by checking the index to the Southwestern Reporter, or by calling the Harris County District Clerk to testify about the contents of file number 110646. This would have prevented a disclosure of the void conviction, instead of having the prosecutor request a not true verdict from puzzled jurors, who were understandably reluctant to find a proved fact not true without an explanation from the court.

Finally, we note that trial counsel failed to object to an inadmissible portion of the penitentiary packet from cause number 389272, the subject of the second enhancement paragraph. That judgment reflects that appellant was convicted of unauthorized use of a motor vehicle, "and heretofore the defendant had been once previously convicted of a felony, but upon motion of the State the enhancement paragraph was abandoned and dismissed...." Such language should have been excised from the exhibit upon timely and proper objection.

Thus, if defense counsel had excised the objectionable part of the judgment in cause number 389272, and had obtained a hearing outside the jury's presence concerning cause number 110646, the jury would have heard of one prior conviction, rather than 16. The jury would have then determined an appropriate punishment for a 56-year-old defendant convicted of a second degree felony property offense, whose only validly proved previous conviction had occurred two years before and was for the third degree felony property offense of unauthorized use of a motor vehicle. The punishment range would have been five years to life, rather than 25

years to life.

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), held that ineffective assistance of counsel is shown only when the attorney's errors are so serious that he was not functioning as counsel guaranteed by the sixth amendment, and in addition, the defendant was deprived of a fair trial because of the error. For an error to reach that magnitude, there must be a reasonable probability, that is, a probability sufficient to undermine confidence in the trial's outcome, that but for counsel's unprofessional errors, the result of the proceeding would have been different. However, the Supreme Court in *Strickland* also held:

On the other hand, we believe that *a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case....* The result of a proceeding can be rendered unreliable, and hence, the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance\*305 of the evidence to have determined the outcome.

*Id.* at 694, 104 S.Ct. at 2068 (emphasis added).

The court further wrote that the test was a flexible one, not rigid in application:

A court should keep in mind that the principles we have stated do not establish mechanical rules.... [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding.... *In every case the court should be concerned with whether ... the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.*

*Id.* at 696, 104 S.Ct. at 2069 (emphasis added).

An attorney's performance must be gauged by the totality of his representation. *Mercado v. State*, 615 S.W.2d 225, 227-28 (Tex.Crim.App.1981). This does not mean, however, that relief will never be granted because of a single error solely affecting

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

.00496

769 S.W.2d 301
769 S.W.2d 301
**Partial Publication**
**(Cite as: 769 S.W.2d 301)**

Page 6

punishment. "Sometimes a single error is so sub-stantial that it alone causes the attorney's assistance to fall below the Sixth Amendment standard." *Nero v. Blackburn,* 597 F.2d 991, 994 (5th Cir.1979). Courts have frequently found counsel ineffective because of a single error affecting only the punish-ment assessed. *Ex parte Scott,* 581 S.W.2d 181, 182 (Tex.Crim.App.1979); *May v. State,* 660 S.W.2d 888, 890 (Tex.App.-Austin, 1983), *aff'd,* 722 S.W.2d 699 (Tex.Crim.App.1984); *Snow v. State,* 697 S.W.2d 663 (Tex.App.-Houston [1st Dist.] 1985, pet. ref'd); *Burnworth v. State,* 698 S.W.2d 686 (Tex.App.-Tyler 1985, pet. ref'd). To ignore a grievous error simply because it is single, while granting relief where multiple errors cumulatively reach the same magnitude, would be contrary to the reasons that caused the creation of the doctrine of ineffective assistance of counsel. *See Snow v. State,* 697 S.W.2d at 667.

The adversarial process broke down at the punish-ment stage in the instant case. Counsel's attempt to avoid the effect of one void conviction resulted in the jury's hearing of 14 more convictions, at least two of which were also void, 12 of which were ob-tained prior to *Gideon v. Wainwright,* and none of which were proved by other evidence. Such a per-formance cannot be justified by any trial strategy within our imagination. Any reasonably competent attorney would have attacked the validity of cause number 110646 outside the jury's presence. Moreover, there is a strong possibility that avoiding this error would have brought about a lower sen-tence. We hold that the *Strickland* standard has been met. *See also Ex parte Cruz,* 739 S.W.2d 53 (Tex.Crim.App.1987).

Point of error one is sustained.

We must next determine the appropriate remedy. Formerly, a new trial on both guilt and punishment was required when the jury had assessed punish-ment and reversible error had occurred at the pun-ishment stage. *Daniel v. State,* 585 S.W.2d 688, 693 (Tex.Crim.App.1979). Texas law changed in this respect on August 31, 1987, after the date of appellant's trial, when Texas Code of Criminal Pro-cedure article 44.29 took effect. Section (b) of that article provides:

If the court of appeals or the Court of Criminal Ap-peals awards a new trial to the defendant only on the basis of an error or errors made in the punish-ment state of the trial, the cause shall stand as it would have stood in case the new trial had been granted by the court below, except that the court shall commence the new trial as if a finding of guilt had been returned and proceed to the pun-ishment stage of the trial under Subsection (b), Section 2, Article 37.07, of this code. If the de-fendant elects, the court shall impanel a jury fo the sentencing stage of the trial in the same man-ner as a jury is impaneled by the court for other trials before the court. At the new trial, the court shall allow both the State and the defendant to in-troduce evidence to show the circumstances of the offense and other evidence as permitted by Section 3 of Article 37.07 of this code.

Appellant contends that this statute does not apply to his case on appeal, because it *306 did not take effect until after his trial ended. We disagree.

It has long been the law in Texas that when a judge, rather than a jury, assesses punishment and revers-ible error occurs at the punishment stage, the cause is remanded only for another punishment hearing; the finding of guilt is undisturbed. *Ex parte Hill,* 528 S.W.2d 125, 127 (Tex.Crim.App.1975); *Brumfield v. State,* 445 S.W.2d 732, 740 (Tex.Crim.App.1969).

A new trial to determine guilt is unnecessary to cure error at the punishment stage because, in a bi-furcated trial, punishment stage error could not have affected the determination of guilt. The enact-ment of article 44.29(b) recognizes this fact and does away with the undesirable former procedure that granted more relief than was necessary to cure errors affecting only punishment. The statute pro-tects the defendant's right to choose a judge or jury to assess punishment and protects all parties' rights

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00497

769 S.W.2d 301
769 S.W.2d 301
**Partial Publication**
**(Cite as: 769 S.W.2d 301)**

Page 7

to present evidence relevant to punishment. This is a vast improvement on former law, and such a statute should be construed so as to cure the harm that led to its enactment.

[7][8] The general rule is that absent an express provision to the contrary, procedural statutes control litigation from their effective date and apply to litigation then pending. *Wade v. State,* 572 S.W.2d 533, 534 (Tex.Crim.App.1978); *Granviel v. State,* 552 S.W.2d 107, 116 (Tex.Crim.App.1976); *Wilson v. State,* 473 S.W.2d 532, 535 (Tex.Crim.App.1971). This is because a litigant has no vested right in a procedural remedy under the due course of law or ex post facto clauses of the Texas Constitution. *Merchants Fast Motor Lines, Inc. v. Railroad Comm'n of Texas,* 573 S.W.2d 502, 504-05 (Tex.1978).

[9] We have reviewed the legislature history of article 44.29. Neither the bill analysis or the tapes of hearings on Senate Bill 43 indicate whether the new law should be applied to persons whose crimes or trials occurred before its effective date.

We view article 44.29 as a procedural statute. *See Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (statute held procedural that gave judge death penalty sentencing discretion formerly reserved for jury; thus, it did not violate ex post facto clause of federal constitution to apply new law to a capital murder that occurred before its effective date, even though doing so deprived Dobbert of the benefit of a jury verdict that, under prior law, would have saved him from the death penalty). Article 44.29(b) does not punish an act that was innocent when done; it does not increase the punishment for a crime after its commission; and it does not abolish any defense to crime or lessen the State's burden of proof. "It is ... well settled ... that the (ex post facto clause) does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed." 432 U.S. at 293; 97 S.Ct. at 2298 (citation omitted). The ex post facto clause was "not (intended) to limit the legislative control of remedies and modes of proced-

ure which do not affect matters of substance." *Id.* Moreover, "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not ex post facto." *Id.*

The rule in *Dobbert* is consistent with the long-standing rule in Texas. "Laws which affect the remedy or procedure merely are not within the scope of the inhibition against retroactive laws, unless the remedy be entirely taken away or so encumbered with conditions as to render it useless or impracticable." *Ex parte Roper,* 61 Tex.Crim. 68, 134 S.W. 334, 339 (1911). Thus, the court has upheld a statute that abolished appeals from trials resulting in suspended sentences, *Millican v. State,* 145 Tex.Crim. 195, 167 S.W.2d 188 (1942), and a statute that tolled the statute of limitations after an offense was committed, *Hill v. State,* 146 Tex.Crim. 333, 171 S.W.2d 880 (1943) (affirming a death penalty, after retrial following reversal by the United States Supreme Court, despite the fact that defense counsel filed no appellate brief).

The statute upheld in *Millican* went further than article 44.29(b). It deprived the probationer of an entire stage of proceedings, i.e., the appellate review of the "first conviction," 167 S.W.2d at 190. The court *307 held that the right to appeal in Texas was entirely statutory, not constitutional, and existed "only as a legislature privilege," for the legislature "to award as it saw fit." *Id.* Because "the right of review pertains merely to the remedy, and it is not a natural, inherent, or vested right," it is "within the power of the legislature ... to impose such conditions and restrictions as it may see fit, even when federal rights or questions are involved." *Id.* The legislature "had the right to give, and having given, would have the right to take away." *Id.*FN1 A legislature having such power surely would be empowered to limit the court-made remedy for punishment stage error. *See Hill v. State,* 171 S.W.2d at 884.

> FN1. Likewise, there is no right under the United States Constitution to appeal a state court criminal conviction, *Griffin v.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00498

769 S.W.2d 301
769 S.W.2d 301
**Partial Publication**
**(Cite as: 769 S.W.2d 301)**

Page 8

*Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956), much less a right to a new trial on guilt as an appellate remedy for error at the punishment stage.

Considering the purpose and content of the statute, the absence of a contrary legislative history, and the Texas and federal authorities cited, we hold that article 44.29(b) provides the proper remedy in this case.

The judgment is reversed only as to the assessment of punishment, and the cause is remanded for a punishment hearing in accordance with article 44.29. The remainder of the opinion is ordered not published.

In his second point of error, appellant contends that the trial court committed reversible error in overruling his motion for new trial, on the ground that at the punishment phase of trial, the jury learned of his prior felony convictions that were void under the sixth amendment. We overrule the second point of error and the second motion for rehearing.

A motion for new trial is addressed to the sound discretion of the trial court. The court's decision in denying a new trial will not be disturbed absent an abuse of discretion.McMillon v. State, 505 S.W.2d 872, 874 (Tex.Crim.App.1974).

Appellant filed a timely motion for new trial that merely alleged that his counsel "believes" that the Court of Criminal Appeals had reversed one of his prior convictions. Appellant also alleged that "he was not afforded effective assistance of counsel in the trial of this case." This motion was not verified, and these allegations were not supported by affidavits or exhibits. Allegations in a motion for new trial are not self-proving, *Rios v. State,* 510 S.W.2d 326, 328-29 (Tex.Crim.App.1974), and this motion contained only allegations.

Almost two months after the sentence was imposed, appellant filed an amended motion for new trial. That motion also was not verified and was not sup-

ported by affidavit. Appellant, however, did attach the mandate and opinion in *Ex parte Cooper,* 493 S.W.2d 810 (Tex.Crim.App. 1973), reversing cause no. 110646. Appellant did not allege ineffective assistance of counsel in the motion. Appellant did allege that he was "denied a fair trial" and "denied due process and equal protection of the law."The amended motion, however, was not timely filed. The then-applicable rule, Tex. Code Crim. P. art. 40.05(b), ch. 722, §1, 1965 Tex. Gen. Laws 317, 477, amended by ch. 291 §107, 1981 Tex. Gen. Laws 803, repealed by, ch. 685, §4, 1985 Tex. Gen. Laws 2472, 2473, permitted the filing of an amended motion for new trial without leave of court if filed "within 30 days after the sentence is imposed."The amended motion was not filed within 30 days of the imposition of sentence, and nothing in the record indicates appellant obtained leave of court to file the amended motion. Thus, the trial court lacked jurisdiction to grant the motion.

Finally, a statement of facts from the hearing on the motion for new trial has not been brought forward on appeal. Thus, we cannot review the evidence, if any, that was presented to the trial court at this hearing. Based on the record before us, we cannot conclude that the trial court abused its discretion in overruling the motion for new trial.

Appellant's second point of error is overruled.

The judgment is reversed only as to the assessment of punishment, and the cause is remanded for a punishment hearing in accordance with article 44.29.
Tex.App.-Hous. [1 Dist.],1989.
Cooper v. State
769 S.W.2d 301

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00499

8

00500

Westlaw.

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 1

C

Court of Appeals of Texas,
San Antonio.

The DALLAS MORNING NEWS COMPANY, d/
b/a The Dallas Morning News, A.H. Belo Corpora-
tion, David Hanners, David McLemore, and Gayle
Reaves, Relators,
v.
Honorable Ricardo H. GARCIA, Respondent.
No. 04-91-00472-CV.

Dec. 11, 1991.

Newspaper publisher and other defendants in libel actions by county sheriff and son of county commissioner petitioned for writ of mandamus directing the 229th District Court, Starr County, Ricardo H. Garcia, J., to rescind his order compelling their disclosure of identity of sources used in preparation of subject articles. The Court of Appeals, Butts, J., held that plaintiffs had failed to meet their burden of overcoming journalists' qualified privilege.

Writ conditionally granted.

Chapa, J., concurred in part and dissented in part and filed opinion.

West Headnotes

[1] Privileged Communications and Confidentiality 311H €➞404

311H Privileged Communications and Confidentiality
    311HVII Other Privileges
        311Hk404 k. Journalists. Most Cited Cases
    (Formerly 410k196.1)
Federal and State Constitutions provide qualified privilege against compelled disclosure of confidential information possessed by journalist. Vernon's Ann.Texas Const. Art. 1, § 8; U.S.C.A. Const.Amend. 1.

[2] Privileged Communications and Confidentiality 311H €➞404

311H Privileged Communications and Confidentiality
    311HVII Other Privileges
        311Hk404 k. Journalists. Most Cited Cases
    (Formerly 410k196.1)
In applying journalists' qualified privilege, courts will look to facts on case-by-case basis in course of balancing need for testimony in question against claims of news gatherer that public's right to know is impaired. Vernon's Ann.Texas Const. Art. 1, § 8; U.S.C.A. Const.Amend. 1.

[3] Mandamus 250 €➞32

250 Mandamus
    250II Subjects and Purposes of Relief
        250II(A) Acts and Proceedings of Courts, Judges, and Judicial Officers
            250k32 k. Proceedings in Civil Actions in General. Most Cited Cases
Mandamus is appropriate remedy when party is harmed by order requiring disclosure of privileged material.

[4] Privileged Communications and Confidentiality 311H €➞26

311H Privileged Communications and Confidentiality
    311HI In General
        311Hk24 Evidence
            311Hk26 k. Presumptions and Burden of Proof. Most Cited Cases
    (Formerly 307Ak41)
Burden of proof to establish existence of discovery privilege rests on party asserting it.

[5] Privileged Communications and Confidentiality 311H €➞25

311H Privileged Communications and Confidentiality

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00501

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 2

311HI In General
   311Hk24 Evidence
      311Hk25 k. In General. Most Cited Cases
(Formerly 307Ak41)

**Privileged Communications and Confidentiality 311H ⚷—26**

311H Privileged Communications and Confidentiality
   311HI In General
      311Hk24 Evidence
         311Hk26 k. Presumptions and Burden of Proof. Most Cited Cases
   (Formerly 307Ak41)
Party resisting discovery must produce evidence supporting particular privilege, immunity, or exclusion claimed; evidence may be in form of affidavits or live testimony.

**[6] Privileged Communications and Confidentiality 311H ⚷—404**

311H Privileged Communications and Confidentiality
   311HVII Other Privileges
      311Hk404 k. Journalists. Most Cited Cases
   (Formerly 410k223)
Libel defendants resisting discovery of identities of confidential sources met burden of establishing journalists' privilege through affidavits of reporters who authored articles complained of in which they stated that, in course of preparing articles, they assured certain news sources that they would keep their identities and certain information they provided confidential. Vernon's Ann.Texas Const. Art. 1, § 8; U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 4.

**[7] Pretrial Procedure 307A ⚷—411**

307A Pretrial Procedure
   307AII Depositions and Discovery
      307AII(E) Production of Documents and Things and Entry on Land
         307AII(E)4 Proceedings

      307Ak411 k. Determination. Most Cited Cases
When party seeks to exclude materials from discovery on basis of invasion of constitutional rights, in camera inspection is not necessary. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 4.

**[8] Privileged Communications and Confidentiality 311H ⚷—404**

311H Privileged Communications and Confidentiality
   311HVII Other Privileges
      311Hk404 k. Journalists. Most Cited Cases
   (Formerly 410k223)
Once journalists' privilege has been asserted, burden of producing substantial evidence sufficient to overcome privilege shifts to party seeking discovery. Vernon's Ann.Texas Const. Art. 1, § 8; U.S.C.A. Const.Amend. 1.

**[9] Privileged Communications and Confidentiality 311H ⚷—404**

311H Privileged Communications and Confidentiality
   311HVII Other Privileges
      311Hk404 k. Journalists. Most Cited Cases
   (Formerly 410k196.1)
Journalists' privilege is qualified and can be overcome in libel cases if party who seeks disclosure establishes by substantial evidence that statement attributed to informant was published and is false and defamatory, that reasonable efforts have been made to learn informant's identity by alternative means but that no other reasonable means is available and that knowledge of informant's identity is necessary or critical to proper preparation and presentation of case; last element is sometimes expressed in terms of whether there is "compelling interest" in information. Vernon's Ann.Texas Const. Art. 1, § 8; U.S.C.A. Const.Amend. 1.

**[10] Libel and Slander 237 ⚷—112(1)**

237 Libel and Slander

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00502

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 3

237IV Actions
   237IV(C) Evidence
      237k112 Weight and Sufficiency
         237k112(1) k. In General. Most Cited
Cases
Burden to refute frivolousness of libel suit is neither a minimal nor a trivial one; it requires plaintiff to establish by substantial evidence that informants' statements are false and defamatory.

**[11] Constitutional Law 92 ⬅️2171**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and Press
      92XVIII(X) Defamation
         92k2171 k. Discovery in Defamation Actions. Most Cited Cases
   (Formerly 92k90.1(8))
If libel plaintiff cannot at minimum produce enough evidence to establish probable falsity of defendant's statements, he may not, at expense of defendant's constitutional rights, conduct fishing expedition through its confidential sources in effort to contrive such claim. Vernon's Ann.Texas Const. Art. 1, § 8; U.S.C.A. Const.Amend. 1.

**[12] Privileged Communications and Confidentiality 311H ⬅️404**

311H Privileged Communications and Confidentiality
   311HVII Other Privileges
      311Hk404 k. Journalists. Most Cited Cases
   (Formerly 410k196.1)
County sheriff bringing libel action as result of newspaper article accusing him of being involved with drug trafficking and other illegal activity failed to meet burden of producing substantial evidence of falsity of statements attributed to confidential sources so as to overcome journalists' qualified privilege through self-serving opinion testimony providing falsity of statement that Mexican judge, who was identified in article, had raised questions regarding legality of dismissal of murder charges against that sheriff in Mexico and that sheriff was

not aware that record owner of house he purchased was wife of alleged drug kingpin. Vernon's Ann.Texas Const. Art. 1, § 8; U.S.C.A. Const.Amend. 1.

**[13] Privileged Communications and Confidentiality 311H ⬅️404**

311H Privileged Communications and Confidentiality
   311HVII Other Privileges
      311Hk404 k. Journalists. Most Cited Cases
   (Formerly 410k196.1)
While county sheriff would not have to depose all 48 persons named by libel defendants as having knowledge of relevant facts before disclosure of confidential sources would be compelled, his attempts to exhaust alternative sources of information were inadequate; sheriff's primary proof came from testimony of his attorney that sheriff had "talked apparently to people and made inquiries."

**[14] Privileged Communications and Confidentiality 311H ⬅️404**

311H Privileged Communications and Confidentiality
   311HVII Other Privileges
      311Hk404 k. Journalists. Most Cited Cases
   (Formerly 410k196.1)
Although son of county commissioner had made some effort to locate the source who falsely identified him as the person who pleaded guilty to possession of illegal drugs, he had not exhausted alternative means of discovering identities of remaining sources for article that mentioned him or even taken obvious step of deposing author of allegedly libelous sentence and thus had not overcome journalist's qualified privilege from compelled disclosure of sources' identities. Vernon's Ann.Texas Const. Art. 1, § 8; U.S.C.A. Const.Amend. 1.

**[15] Pretrial Procedure 307A ⬅️40**

307A Pretrial Procedure
   307AII Depositions and Discovery

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00503

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 4

307AII(A) Discovery in General
      307Ak36 Particular Subjects of Disclos- ure
         307Ak40 k. Identity and Location of
Witnesses and Others. Most Cited Cases
Matters attributable to confidential source must be material and critical to plaintiff's case, i.e., must go to heart of case and be central to issue of alleged defamation, and disclosure of confidential sources whose testimony would go only to collateral issue or to one not essential to plaintiff's case-in-chief will not be permitted.

[16] Privileged Communications and Confidentiality 311H ⬅⇒404

311H Privileged Communications and Confidentiality
    311HVII Other Privileges
        311Hk404 k. Journalists. Most Cited Cases
    (Formerly 410k196.1)
For purposes of their request to compel disclosure of confidential sources in libel actions, neither county sheriff nor son of county commissioner had shown compelling need for disclosure of collateral sources and sheriff had not even shown material or critical need for identities of those sources who provided information about him. Vernon's Ann.Texas Const. Art. 1, § 8; U.S.C.A. Const.Amend. 1.
*676 Thomas G. Sharpe, Jr., Craig A. Stokes, Kathryn M. Kase, Oppenheimer, Rosenberg,*677 Kelleher, Luther H. Soules, III, Thomas Black, Soules & Wallace, San Antonio, James P. Wallace, Soules & Wallace, Austin, William D. Sims, Jr., Dallas, Jorge Rangel, Rangel & Chriss, Corpus Christi, David C. Garza, Brownsville, for relators.

Robert Anderson, Jr., Andrew J. Lehrman, David T. Bright, Sorrell, Anderson, Lehrman, Wanner & Thomas, Corpus Christi, for respondent.

Before BUTTS, CHAPA and PEEPLES, JJ.

ON RELATORS' PETITION FOR WRIT OF MANDAMUS

BUTTS, Justice.

PETITION FOR WRIT OF MANDAMUS CONDITIONALLY GRANTED

This original mandamus proceeding arises out of two libel actions against relators.[FN1] Respondent, Ricardo H. Garcia, judge of the 229th District Court of Starr County, has ordered relators to disclose to the libel plaintiffs the identity of the sources used in the preparation of the articles. Relators have asked for a writ of mandamus directing Judge Garcia to rescind his order compelling disclosure. They argue that he has abused his discretion because the identities of their sources are confidential and are protected from compelled disclosure by the journalist's privilege. We conditionally grant the writ of mandamus.

> FN1. Relators are the Dallas Morning News Company, the publisher of the Dallas Morning News; A.H. Belo Corporation, owner of the Dallas Morning News Company; and David Hanners, David McLemore, and Gayle Reaves, the three reporters who authored the newspaper articles at issue in the libel actions.

The libel actions are based on a series of news articles entitled, "Texas' Little Columbia," investigating illegal drug trafficking in Starr and Hidalgo Counties. These counties border Mexico along the Rio Grande River. The series consisted of 20 articles that ran in the Morning News October 14 through 19, 1990. Plaintiffs complain that they were libeled by the nine articles in the series published on October 14, 15, and 17.

The first libel action, cause number 8845, was brought by the parents of Eloy Garza, Jr. as his next friends.[FN2] Garza claims he was libeled in an article published on October 15, 1990. This article attempted to show how the drug trade and drug

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00504

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 5

money had corrupted various government officials in Starr and Hidalgo counties. One sentence in the article falsely stated that Eloy Garza, Jr. had pleaded guilty to possession of small amounts of cocaine and marijuana. His father, Eloy Garza, Sr., is a county commissioner in Starr County. Discovering that the guilty party was another Eloy Garza, Jr., and not the commissioner's son, who was six years old at the time, the Morning News printed a retraction.

> FN2. The Garza plaintiffs will sometimes be referred to as "Garza."

The plaintiff in cause number 8846, the second libel action, is Gene Falcon, Sheriff of Starr County. One article in the series, published October 17, 1990 (the Falcon article), featured Sheriff Falcon. Falcon claims that this article falsely accused him by innuendo and by direct allegation of having been involved with drug trafficking and other illegal activity. He further claims that the articles published on October 14 and 15 libeled him by accusing him of the commission of criminal acts.

The Falcon article accused the sheriff of being friends with drug dealers and other criminals, of making little effort to combat drug trafficking in the county, of associating with an alleged drug kingpin, and of rerouting patrols to let drug shipments pass through the county unmolested. These accusations were attributed to sources such as "observers," "local residents," "ex-drug dealers," and "former deputies." The article mentioned that Falcon had been charged in Mexico for the drug-related murder of a hospitalized Mexican prisoner, and that Mexican authorities had issued a warrant for his arrest. The article also charged that the sheriff had purchased a large home in Starr County for less than its appraised value, and that the *678 home had been owned previously by the wife of Ramon Garcia Rodriguez, who was identified in the article as "an alleged drug kingpin and federal fugitive."

Relators pleaded that the articles are true, that they were not published with actual malice, that they are

not actionable because they are statements of opinion, that they are privileged as fair comment or criticism under TEX.CIV.PRAC. & REM.CODE ANN. § 73.002(b)(2) (Vernon 1986), that they are privileged because they are neutral reporting by responsible persons or organizations on matters of legitimate public interest, and that plaintiffs have not been damaged.

Plaintiffs filed a series of interrogatories and requests for production in which they sought the names of all third-party sources that were interviewed, or from whom statements were obtained or relied upon in preparing the nine articles. Relators assert that they have answered each interrogatory except those that would lead to disclosure of their confidential sources. They also claim that they have produced all requested documentary information, except that the names of their confidential sources have been expunged from the documents provided.

Plaintiffs filed motions to compel responses to their interrogatories and requests for production. In response, relators asserted that the information requested was protected by the journalist's privilege against forced disclosure of confidential sources.

A hearing was held on the motions to compel. In each case the court found that relators failed to prove the existence of their privilege; that the identities of the confidential sources for the articles in question (October 14, 15, and 17 in the Falcon case, and October 15 in the Garza case) are highly relevant and material, and necessary and critical to the trial of plaintiffs' cases; that there are no other means available to determine the confidential sources; and that plaintiffs have exhausted all available means to determine the identity of the sources.

In the Falcon case, respondent granted plaintiff's motion to compel in each particular, except one. Relators were not ordered to disclose confidential sources who are former Starr County sheriff's deputies because the court found that Falcon had not exhausted all available means to determine their identities. The Garza motion was granted in its entirety.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 6

Except for the former deputies, relators were ordered to disclose their sources for all nine art- icles.

## I. THE JOURNALIST'S PRIVILEGE

[1] In *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) the Supreme Court held that a journalist does not have an absolute privilege under the First Amendment to refuse to disclose confidential sources to a grand jury conducting a criminal investigation. The court, however, explicitly recognized that news gathering is not without first amendment protection. 408 U.S. at 707, 92 S.Ct. at 2670. "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." *Id.* at 681, 92 S.Ct. at 2656. Since *Branzburg,* the courts have recognized a qualified First Amendment privilege against compelled disclosure of confidential information possessed by a journalist. *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 725 (5th Cir.), *modified on rehearing,* 628 F.2d 932 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981).

The qualified privilege is also grounded in TEX.CONST. art. I, § 8, the free speech and press clause. *Channel Two Television Co. v. Dickerson,* 725 S.W.2d 470, 472 (Tex.App.-Houston [1st Dist.] 1987, no writ). Given the overriding importance to our society of a free press, we feel it is important to emphasize that our decision today is based on both the First Amendment of the federal constitution and on article I, section 8 of our own constitution. *See Channel Two,* 725 S.W.2d at 472-73 (Levy, J., concurring).

[2] Falcon's attorney admitted the existence of the qualified privilege at the hearing on the motion to compel. At issue is the application of the privilege to the *679 facts and circumstances of this case. The courts will look to the facts on a case-by-case basis in the course of balancing the need for the testimony in question against the claims of the news gatherer that the public's right to know is impaired. *Carey v. Hume,* 492 F.2d 631, 636 (D.C.Cir.), *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974). *See also Branzburg,* 408 U.S. at 710, 92 S.Ct. at 2671 (Powell, J., concurring). When striking this balance, we are mindful of the preferred position of the First Amendment and the importance of a vigorous and unfettered press. *Zerilli v. Smith,* 656 F.2d 705, 712 (D.C.Cir.1981). We are also aware that the duty of a witness to testify in a court of law, and the correlative right of a litigant to obtain judicial compulsion of that testimony, are essential to the fabric of our society. *Garland v. Torre,* 259 F.2d 545, 548-49 (2d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958).

## II. PROPRIETY OF MANDAMUS

[3] Mandamus is an appropriate remedy when a party is harmed by an order requiring the disclosure of privileged material. *West v. Solito,* 563 S.W.2d 240, 244 (Tex.1978). A trial court order that compels disclosure of privileged matters constitutes an abuse of discretion which may be corrected by mandamus. *Wal-Mart Stores, Inc. v. Street,* 754 S.W.2d 153, 155 (Tex.1988). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable." *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990). "In order to find an abuse of discretion, the reviewing court must conclude that the facts and circumstances of the case extinguish any discretion in the matter." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 918 (Tex.1985).

## III. RELATORS' BURDEN

[4][5] The burden of proof to establish the existence of a privilege rests on the party asserting it. *Jordan v. Fourth Court of Appeals,* 701 S.W.2d 644, 648-49 (Tex.1985). The party resisting discovery must produce evidence supporting the particular

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00506

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 7

privilege, immunity or exclusion claimed. TEX.R.CIV.P. 166b(4); *Weisel Enterprises, Inc. v. Curry*, 718 S.W.2d 56, 58 (Tex.1986); *Channel Two*, 725 S.W.2d at 472. The evidence may be in the form of affidavits or live testimony. Rule 166b(4).

[6] Relators have met this burden. Their proof consisted, in part, of the affidavits of the three reporters who authored the articles complained of. They stated in their affidavits that they are reporters employed by the Morning News, and that in the course of preparing the articles they assured certain news sources that they would keep their identities and certain information they provided confidential.[FN3]

> FN3. The reporters also averred that the articles were researched for approximately a year prior to publication; that they were not based solely on the confidential sources, but were also based on numerous "on-the-record" sources and approximately 20,000 pages of documents that have been identified and produced at discovery; that they believe that many of the confidential sources fear retaliation against them if their identities are disclosed; that the only documentary information not produced is that for which relators claim confidential source, attorney-client, and attorney work-product privileges; and that they believed the articles to be true at the time they were published.

Plaintiffs cite language in *Channel Two* in arguing that relators had the burden to tender the information sought to be protected to the trial court for an *in camera* inspection. Relators did not do this. *Channel Two* mentions this requirement, but does not indicate whether materials were produced in that case. 725 S.W.2d at 472.

[7] An *in camera* inspection was not required. When a party seeks to exclude materials from discovery on the basis of the invasion of constitutional rights, an *in camera* inspection is not necessary.

TEX.R.CIV.P. 166b(4); *Hoffman v. Fifth Court of Appeals*, 756 S.W.2d 723, 723 (Tex.1988). Further, plaintiffs' purpose in these proceedings has been to obtain the names of relators' confidential sources. A mere list of names would not help respondent determine*680 whether those persons were the confidential sources relied upon by the reporters. The issue is not who the sources are, but whether disclosure of their identities will be compelled.

### IV. PLAINTIFFS' BURDEN

[8] Once the journalists' privilege has been asserted, the burden of producing substantial evidence sufficient to overcome the privilege shifts to the party seeking discovery. *In re Selcraig*, 705 F.2d 789, 792 (5th Cir.1983); *Channel Two*, 725 S.W.2d at 472. Plaintiffs' attorneys admitted at oral submission that the burden had shifted to them.

[9] Because the journalist's privilege is a qualified one, it can be overcome in certain circumstances. It can be overcome in libel cases if the party who seeks disclosure establishes by substantial evidence (1) that the statement attributed to the informant was published and is false and defamatory; (2) that reasonable efforts have been made to learn the informant's identity by alternative means, but that no other reasonable means is available; and (3) that knowledge of the informant's identity is necessary or critical to proper preparation and presentation of the case. *Selcraig*, 705 F.2d at 792; *Miller*, 628 F.2d at 932. This last element is sometimes expressed in terms of whether there is a "compelling interest" in the information. *LaRouche v. National Broadcasting Co.*, 780 F.2d 1134, 1139 (4th Cir.), *cert. denied*, 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986); *Miller*, 621 F.2d at 726.

Plaintiffs again turn to *Channel Two* to support their argument that they are not required to offer substantial evidence of the falsity of the statements. But *Channel Two* does not mention that requirement. That case was decided in favor of the privilege based on the plaintiff's failure to make a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00507

822 S.W.2d 675                                                                Page 8
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

showing that the information sought met the other criteria of the test. 725 S.W.2d at 472.

Several cases, including *Channel Two,* 725 S.W.2d at 472, require a showing that the identities of the confidential sources are "highly material and relevant." *Channel Two* includes this requirement in place of the "falsity" requirement. In setting out its three-prong test, *Channel Two* relies on the initial *Miller* opinion. *Miller,* 621 F.2d at 726. On rehearing, the Fifth Circuit modified the test set out in its initial opinion by deleting the relevancy requirement and adding the "substantial evidence of falsity" requirement. *Miller,* 628 F.2d at 932. The Fifth Circuit has since reaffirmed the modified *Miller* test. *Selcraig,* 705 F.2d at 792. That is the test we adopt today. We believe it strikes the proper balance between the obligation of all citizens to give relevant testimony and the freedom of the press as guaranteed in the federal and Texas constitutions. *See Branzburg,* 408 U.S. at 710, 92 S.Ct. at 2671 (Powell, J., concurring).

The deletion of "relevancy" as a separate requirement does not significantly alter the plaintiff's burden of proof. "Relevancy" is no more than the standard established in *Carey* that the sources' identities must "go to the heart" of the plaintiff's libel claim. 492 F.2d at 636. In other words, the information sought must be "critical" to the plaintiff's case. *Id.* at 637. The relevancy requirement adds nothing to the test that is not already encompassed in the "necessary or critical" element. If the information is necessary or critical to the plaintiff's case, it follows that it is also highly material and relevant. Significantly, *Carey* discussed these elements together, holding that the information sought must go to the heart of the plaintiff's libel action, and finding that the identities of the defendants' sources in that case were critical to the plaintiff's claim. 492 F.2d at 636-37.

[10] Plaintiffs argue that at the most their burden is satisfied by a "minimal" showing that their suit is neither frivolous, nor manufactured as a pretense for a discovery request. They cite *Zerilli,* and *Bruno*

*& Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 597 (1st Cir.1980). They apparently seize on the use of the word "frivolous" in those cases as an indication that the proof required is frivolous, in the sense of "trivial" or "inconsequential." "Frivolous" does not describe the **\*681** amount of proof required, but rather the substance or nature of the suit. The burden to refute the "frivolousness" of a libel suit is neither a minimal nor a trivial one; it requires the plaintiff to establish by substantial evidence that the informants' statements are false and defamatory.

In *Zerilli,* the court of appeals affirmed the district court's denial of the appellants' motion to compel discovery. While the opinion noted in passing that the appellants' suit was not frivolous, the case turned on the fact that the appellants had not exhausted possible alternative sources of the information. 656 F.2d at 714.

*Bruno & Stillman* indicates that the plaintiff must show, as a threshold matter, that its "claim is not frivolous, a pretense for using discovery powers in a fishing expedition." 633 F.2d at 597. It then provides some guidelines for making this showing. The plaintiff must show that it can raise jury issues on the essential elements of its case. For example, the falsity of the news gatherer's charges should be drawn into question and established as a jury issue before discovery of the confidential sources will be compelled. *Id.*

This principle is further illustrated in *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973). Disclosure will not be compelled until there is a "concrete demonstration" that the identity of the sources will lead to persuasive evidence on the issue of malice. 464 F.2d at 994. If, during the course of discovery, the plaintiff uncovers *substantial evidence* tending to show that the published assertions are so inherently improbable or are untrue, the reasons favoring compulsory disclosure are more compelling. *Id.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00508

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 9

The requirement that substantial evidence of falsity must be shown is designed as a threshold criterion in order to prevent forced disclosure of confidential sources based on a mere pleading that the plaintiff has been injured by an untrue statement. *See Miller,* 628 F.2d at 932.

The point of principal importance is that there must be a showing of cognizable prejudice before the failure to permit examination of anonymous news sources can rise to the level of error. Mere speculation or conjecture about the fruits of such examination simply will not suffice.

*Cervantes,* 464 F.2d at 994.

The courts in journalist privilege cases recognize the heavy burden a public official has to meet in order to prove libel. Plaintiffs in those cases must prove "actual malice"-that the statement was made with knowledge of its falsity or with reckless disregard of whether it was false or not. *New York Times v. Sullivan,* 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). Frequently, proof of actual malice will depend on knowing the informant's identity, because the plaintiff will have to show that the informant was unreliable and that the journalist failed to take adequate steps verify his story. *Zerilli,* 656 F.2d at 714. *See also, Herbert v. Lando,* 441 U.S. 153, 170, 174, 99 S.Ct. 1635, 1645, 1648, 60 L.Ed.2d 115 (1979) (defamation case involving disclosure of defendants' "editorial processes"); *Carey,* 492 F.2d at 634. Even Garza, who is not a public figure, must meet the *Sullivan* standard in order to recover the exemplary damages he seeks. *Gertz v. Welch,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974).

Yet the courts are also jealous guardians of the press freedoms guaranteed in the First Amendment.

In the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege. Indeed, if the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished. Unless potential

sources are confident that compelled disclosure is unlikely, they will be reluctant to disclose any confidential information to reporters.

*Zerilli,* 656 F.2d at 712.[FN4] It is the citizenry's interest, after all, in the full and free ＊682 flow of information and ideas that is the basis for the Constitution's protection of the press. "Enlightened choice by an informed citizenry is the basic ideal upon which an open society is premised, and a free press is thus indispensable to a free society." *Branzburg,* 408 U.S. at 726, 92 S.Ct. at 2672 (Stewart, J., dissenting) (footnote omitted). The guarantee of a free press is "not for the benefit of the press so much as for the benefit of all of us." *Time, Inc. v. Hill,* 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967).

> FN4. Allowing perfunctory invasion of confidential sources would promote a chilling effect that would impede the free flow of information from sources, through the news gatherers as proxies for the public, and ultimately to the public itself. As the court said in *Sullivan* in formulating its actual malice test, "would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court, or fear of the expense of having to do so." 376 U.S. at 279, 84 S.Ct. at 725. *See also Channel Two,* 725 S.W.2d at 473 (Levy, J., concurring).

[11] The burden imposed in *Bruno & Stillman, Cervantes,* and *Miller* goes beyond a "minimal" showing that the libel suit is not frivolous or manufactured. If the plaintiff cannot at a minimum produce enough evidence to establish the probable falsity of the defendant's statements, he may not, at the expense of the defendant's constitutional rights, conduct a fishing expedition through its confidential sources in an effort to contrive such a claim.[FN5]

> FN5. Even if the plaintiff can meet this de-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00509

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 10

mand, it may be that the defendant can resist disclosure by coming forward with its own evidence to establish that it made a careful and comprehensive effort to corroborate independently the information provided by the informant, and that on that basis the defendant believed the information to be true. *See Cervantes,* 464 F.2d at 994. If the defendant can make such a showing, the need for the informant's identity would be less compelling because the informant's reliability would be less at issue. *See* Note, *Reporters and Their Sources,* 80 YALE L.J. 317, 362 (1970).

## V. HAVE PLAINTIFFS MET THEIR BURDEN?

*A. Substantial evidence of falsity.*

[12] Falcon testified at the hearing on the motion to compel that the statements attributed to confidential sources in the Falcon article are, in his opinion, false. The article contained a statement that a Mexican judge had raised some questions regarding the legality of the dismissal of murder charges against Falcon in Mexico. Falcon testified that this statement was false. He also testified that he was not aware that one of the record owners of the house he purchased was the wife of Ramon Garcia Rodriguez, the alleged drug kingpin. This is all the proof he offered. It should be noted that the Mexican judge was identified in the article, and that none of the story relating to the purchase of the home was attributed to confidential sources.

Relators have included in the record the documentary evidence they produced at discovery. The evidence includes banking and real estate documents relating to Falcon's purchase of the home, and an interview with the Mexican judge. Falcon admits that he was a suspect in the murder and that murder charges were filed against him in Mexico. Sources specifically connecting Falcon with illegal drug trafficking are identified in the documents.

That Falcon's proof falls well short of substantial evidence of falsity can be illustrated by comparing his proof with that offered by the plaintiff in *Cervantes.* In that case, the mayor of St. Louis sued *Life* magazine contending that four paragraphs of an 87 paragraph article libeled him by asserting that he had personal ties to organized crime. Mayor Cervantes "undertook extensive pretrial discovery," including the deposition of the reporter who gathered the information that formed the basis for most of the story. 464 F.2d at 988. When the reporter refused to disclose his sources, the mayor filed a motion to compel disclosure. *Life* responded by moving for summary judgment on the grounds that it had acted in good faith in publishing the article and that it believed the statements to be true. The district court granted the motion for summary judgment.

To rebut substantial evidence submitted by *Life* documenting that the information *683 for the article was carefully compiled and verified, the mayor presented "little more than a series of self-serving affidavits ... together with other evidentiary materials which framed but a minimal assault on the truth of the matters contained in the four paragraphs." 464 F.2d at 994. The mayor apparently put on more proof than Falcon, yet his motion to compel disclosure was not even reached. Rather, *Life* 's motion for summary judgment was affirmed.

Falcon's self-serving opinion testimony does not meet the requirement of substantial evidence. Indeed, it is even difficult to stretch it to meet the "minimal" burden plaintiffs set for themselves. Every plaintiff in every libel case will testify that he or she believes the published statements are false. If this were the only requirement, the qualified privilege would be no privilege at all; anyone could overcome it merely by filing a libel suit and expressing the opinion that the defendant's statements were false.

Garza's case is different, however, in that relators have admitted the falsity of the sentence mentioning Garza, Jr. The substantial evidence of falsity

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00510

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

test has been met. Even for Garza, however, the inquiry is not at an end. Like Falcon, before he can obtain an order compelling discovery, he must also meet the two remaining requirements of his burden of proof.

*B. Exhaustion of alternative sources of information.*

[13] Falcon testified that he has made inquiries among different people but has been unsuccessful in locating the confidential sources. Falcon's attorney testified that Falcon had made "substantial" efforts to identify the sources-he "talked apparently to people and made inquiries." He said Falcon was unable to contact the presumed sources because he could not confirm that they were the confidential sources. The attorney indicated that he considered it futile to attempt to depose presumed sources until it is known for sure that they are the confidential sources relied upon by relators.

Falcon's attorney admitted that relators have furnished at least 48 names of persons having knowledge of relevant facts. Relators have also included in the record a vast amount of documentary evidence that they produced at discovery. Further, sources linking Falcon to illegal drug trafficking were identified in those documents. In the face of this wealth of information, Falcon has taken only one deposition, that of Gayle Reaves. Ms. Reaves continually refused to identify her sources.[FN6]

> FN6. In *Carey*, the court intimated that requiring 60 depositions to be taken was not overly burdensome. 492 F.2d at 639. Apparently, the 48 names disclosed by relators do not include those of the confidential sources. It is not unreasonable to suppose, however, that if plaintiffs were to depose at least some of these persons, they would have a much better understanding of the information used by relators in the preparation of the articles. They might also be led to the identity of confidential sources. We do not suggest that these persons will be

adequate substitutes for the confidential sources. They may or may not. Nor do we suggest, as the concurring and dissenting justice concludes, that all 48 of these persons must be deposed before the disclosure of confidential sources will be compelled. We only note that plaintiffs have failed to investigate another possible store of information provided them by relators.

Falcon's attorney testified that the attorneys for both sides had agreed to depose the reporters before anyone else. Such an agreement, however, has been held insufficient to override the First Amendment's protection of confidential sources. *Liberty Lobby, Inc. v. Rees,* 111 F.R.D. 19, 22 (D.D.C.1986). In any event, they deposed only one reporter before they filed their motion to compel.

It is apparent that Falcon abandoned any attempts to discover alternative sources in favor of his motion to compel. Perhaps the most damning testimony came from Falcon's counsel when he was being cross-examined about efforts made to locate and depose confidential sources. He said, "I made the decision as an attorney for Sheriff Falcon to wait and find out who the confidential sources are when the newspaper discloses it." This court will not sanction*684 the use of a motion to compel disclosure of confidential sources as a preliminary discovery matter rather than as a "last resort." *See Carey,* 492 F.2d at 638 (compelled disclosure of confidential sources is "normally the end, and not the beginning, of the inquiry."); *Mize v. McGraw-Hill, Inc.,* 82 F.R.D. 475, 478 (S.D.Tex.1979).

[14] Garza's attorney testified that in an effort to locate the source of the statement about Garza, Jr., he examined the criminal record of the Eloy Garza, Jr. who had pleaded guilty. He also talked to the persons who were involved in the case of the other Garza, Jr.-the district attorney, the defense attorney, the officers involved in the arrest, and the probation officer. None admitted to being the source.

It would seem that David Hanners, author of the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 12

sentence about Garza, Jr., would be another logical source of information. Hanners, however, has not been deposed. *See LaRouche,* 780 F.2d at 1139. Garza's attorney indicated that he believed Hanners would also refuse to answer any questions regarding the identity of confidential sources. The attorney's belief is not substantial evidence that Hanners would refuse to answer, or would refuse to provide information that would lead to discovery of the identity of the source.

Garza's attorney admitted that the only statement Garza is complaining of is the one in the October 15 article accusing Garza, Jr. of possession of illegal drugs. He asserted that he nevertheless is seeking the identity of all sources that contributed to any part of that particular article. He has not offered proof of any attempt to exhaust alternative means of locating these sources.

We conclude that Falcon's attempts to exhaust alternative sources of information were inadequate. His primary proof comes from the testimony of his attorney. The only other evidence is Falcon's testimony that he had talked to people and made inquiries. This is not substantial evidence of exhaustion of all alternative means. Aside from his deposition of Ms. Reaves, Falcon has not shown that he has made any effort to use the information provided by relators.[FN7]

> FN7. The concurring and dissenting justice agrees that the forced disclosure of sources in the Falcon case was in error, and yet he suggests that Falcon should not be put to the trouble and expense of making even a cursory investigation of the information provided by relators during discovery. He apparently subscribes to plaintiffs' argument that "unless they first tell us who the sources are, we can never find them for ourselves." The acceptance of this argument would effectively eliminate the requirement that plaintiffs must make a reasonable effort to exhaust possible alternative sources of the information they seek.

Garza, on the other hand, has made a more exhaustive effort to locate the source who identified him as the person who pleaded guilty to possession of illegal drugs. We cannot hold that his investigation is complete, however, until he has at least taken the obvious step of deposing the author of the allegedly libelous sentence. We reiterate, however, that Garza has offered no evidence that he has exhausted alternative means of discovering the identities of the remaining sources for the article that mentions him.

*C. Material or critical need for the information.*

Plaintiffs sought disclosure of all sources for all nine articles even though only one article-and possibly a paragraph in another article-focused on Falcon, and only one sentence mentioned Garza, Jr. The reporters stated in their affidavits that many sources provided information wholly unrelated to Falcon, and that only one confidential source provided information about the statement relating to Garza, Jr. Yet the orders in question compel disclosure of every confidential source who contributed to each of the nine articles, with no attempt to distinguish sources who provided information about plaintiffs and sources who had nothing at all to say about them.

[15][16] The matters attributable to the confidential source must be material and critical to the plaintiff's case; that is, they must go to the heart of the case and be central to the issue of the alleged defamation.***685** *Carey,* 492 F.2d at 636; *Garland,* 259 F.2d at 550; *Liberty Lobby,* 111 F.R.D. at 21-22. Disclosure of confidential sources whose testimony would go only to a collateral issue, or to one not essential to the plaintiff's case-in-chief will not be permitted. *Dowd v. Calabrese,* 577 F.Supp. 238, 245 (D.D.C.1983); *Liberty Lobby,* 111 F.R.D. at 22. Plaintiffs have not shown a compelling need for the disclosure of the confidential sources who provided no information about them. They have not demonstrated that this information is highly material and relevant, or necessary or critical to their libel claims.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00512

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
(Cite as: 822 S.W.2d 675)

Page 13

Garza sought the names of all the sources for the article that mentioned Garza in order to determine whether the reporters were generally responsible in their reliance on these sources in writing that article. But the issue in Garza's case is not whether the reporters are generally responsible and careful, but whether Hanners was responsible and careful in relying on the source who provided the particular information that allegedly libeled Garza. Garza has not shown a critical need for these collateral sources.

In addition, Falcon has not shown by substantial evidence a material or critical need for the identities of the particular sources who provided information about him. It may be that he can establish a case for actual malice based on the 48 disclosed but undeposed sources, or on the other information provided by relators during discovery. *See Miller,* 621 F.2d at 726 ("it will often be possible to establish malice or lack of malice without disclosure of the identity of the informant."). Even if he cannot, he must first make the attempt before disclosure of confidential sources will be compelled. *Liberty Lobby,* 111 F.R.D. at 22. Compelled disclosure is "a last resort after pursuit of other opportunities has failed." *Carey,* 492 F.2d at 639.

Again, we reach a different determination in the Garza case. Many of the cases ordering disclosure have done so on the basis that the defendants' only source for the allegedly libelous statements is the informant. *Miller,* 621 F.2d at 726; *Carey,* 492 F.2d at 637; *Garland,* 259 F.2d at 547. Hanners got his information about Garza, Jr. from the court records and from one confidential source. It is crucial to Garza's proof of malice to interview the source to determine whether Hanners was reasonable in his reliance on the source.

## VI. CONCLUSION

Falcon has failed to offer substantial proof of the falsity of the allegations attributable to confidential sources. Relators admit, however, that the statement

regarding Garza, Jr. was false.

Neither of the plaintiffs has shown that he has exhausted all alternative means of learning the identities of the sources. Falcon has made little effort at all, choosing to rely on his motion to compel. Garza has neglected to depose the author of the allegedly libelous statement.

Neither plaintiff has made a showing of material or critical need for the identities of collateral sources- those sources who did not provide information about them. Nor can we say at this point that Falcon has shown a material or critical need even for the identities of the sources who provide information about him. He has not demonstrated that he is unable to make his case without the identities of these sources. Garza, however, has shown a critical need, but only for the one source who provided information relating to the statement he alleges has libeled him.

We do not say that plaintiffs will never be entitled to disclosure of the identities of the confidential sources, only that they have so far failed to make a case for disclosure. But we also reiterate and emphasize that disclosure of confidential sources will be compelled only as a last resort after pursuit of all other opportunities has failed.

In light of plaintiffs' failure to meet their burden in support of disclosure, we conclude that the trial court abused its discretion by ordering disclosure of the identities of the confidential sources. The petition for writ of mandamus is conditionally granted. We are confident that Judge Garcia will vacate his September 5, 1991 orders granting plaintiffs' motions to compel discovery*686 in cause numbers 8845 and 8846. The writ will issue only if he fails to do so.

CHAPA, Justice, concurring and dissenting.

The majority has granted a writ of mandamus directing Judge Garcia to rescind his two orders compelling disclosure on behalf of both Sheriff Falcon and Eloy Garza, Jr. In doing so, the majority has concluded that the trial court abused its discretion

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00513

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
**(Cite as: 822 S.W.2d 675)**

Page 14

in issuing both orders. I concur in the result as to the order involving Sheriff Falcon, but respectfully dissent as to the order involving Eloy Garza, Jr.

In my view, the issue before this court is not whether there was sufficient evidence before the trial court to justify its orders of disclosure as apparently perceived by the majority, but simply whether the trial court abused its discretion.

The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-43 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 443 (Tex.1984). Rather, a trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Downer,* 701 S.W.2d at 241-43; *Cessna Aircraft Co.,* 665 S.W.2d at 443; *Bush v. Vela,* 535 S.W.2d 803, 805 (Tex.Civ.App.-Corpus Christi 1976, no writ); *King v. Guerra,* 1 S.W.2d 373, 376 (Tex.Civ.App.-San Antonio 1927, writ ref'd).

In ascertaining whether the trial court abused its discretion, the reviewing court must determine if the trial court acted without reference to any guiding rules and principles. *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297, 298 (Tex.1986). The trial court is free, however, to consider the entire record of the case up to and including the motions to be considered. *Downer,* 701 S.W.2d at 241. It is also well settled in Texas, that "[i]nferences may be drawn from actual facts proved." *Beazley v. McEver,* 238 S.W. 949, 952 (Tex.Civ.App.-Dallas 1922, no writ). Moreover, the burden is on appellant to see that a sufficient record is presented to show error requiring reversal. TEX.R.APP.P. 50(d).

Unlike the issue presented before this court, everyone recognizes that what was before the trial judge involved the balancing of the plaintiff's need for the testimony in question against the First Amendment claims of the news gatherer that the public's right to know was being impaired. *Carey v. Hume,* 492 F.2d 631, 636 (D.C.Cir.), *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974). *See also Branzburg v. Hayes,* 408 U.S. 665, 710, 92 S.Ct. 2646, 2671, 33 L.Ed.2d 626 (1972) (Powell, J., concurring). While the majority concentrates on the importance of a vigorous and unfettered press which I recognize, we must also acknowledge the fundamental rights of an allegedly, falsely accused litigant to be presumed innocent, to be confronted by his accuser, and to obtain judicial compulsion of the accuser's testimony.

The presumption of innocence can be described as one of the most fundamental, if not the most fundamental, principle of our judicial system. While it is generally applicable in a criminal setting, it is nevertheless so ingrained in our general concept of justice that it has otherwise been invoked as recently as the U.S. Senate Confirmation Hearings of Supreme Court Nominee Judge Clarence Thomas. Moreover, harm to an individual's reputation, whether administered through indictment or on the front pages of a newspaper, is nevertheless harm and equally punishing. Further, Supreme Court Justice Anthony Scalia recently recognized the profound importance of the right of confrontation in an analysis which could easily apply to the type of litigation presently before us:

> The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it. A witness "may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the *687 facts. He can now understand what sort of human being that man is." [Citation omitted.] It is always more difficult to tell a lie about a person "to his face" than "behind his back." In the former context, even if the lie is told, it will often be told less convincingly.

*Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 2802, 101 L.Ed.2d 857 (1988).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
**(Cite as: 822 S.W.2d 675)**

Page 15

These fundamental rights of allegedly, falsely accused litigants have a special meaning considering that such litigants are heavily burdened with the obligation of having to not only prove that the publications are false, but also that the publications were made with knowledge of their falsity or with reckless disregard of whether they were false or not. *New York Times v. Sullivan*, 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). In striking a proper balance, caution should be exercised to prevent a result which would only permit the very wealthy to avail themselves of the courts to protect their good name [FN1], considering that to many, the only thing they possess of value is their good name. Ultimately, the purpose of any trial is to find the truth, which can hardly be accomplished by hiding any part of it.

> FN1. One such factor which could very well preclude a vast number of people from availing themselves of our courts is the requirement that numerous depositions be taken before the court even considers revealing confidential sources.

Nevertheless, I concur with the result as to the order involving Sheriff Falcon, because Falcon's counsel clearly conceded in the record that he "made the decision as an attorney for Sheriff Falcon to wait and find out who the confidential sources [were] when the newspaper disclose[d] it." Therefore, Falcon's counsel admitted that his motion to disclose the confidential sources had not been preceded by any significant efforts on his part, as required by case law.[FN2] *See Carey*, 492 F.2d at 638; *Mize v. McGraw-Hill, Inc.*, 82 F.R.D. 475, 478 (S.D.Tex.1979).

> FN2. Strangely enough, the majority interprets this to mean that I would not require Falcon to make "even a cursory investigation of the information provided by relator during discovery."

However, I disagree with the majority's suggestion that Falcon's testimony was all that the trial court

had before it to consider when it made its ruling. The trial court was free to consider the entire record of the case up to, and including, both motions by the plaintiffs, and any inferences which could be drawn from the evidence presented on both motions. *Morrow*, 714 S.W.2d at 298; *Beazley*, 238 S.W. at 952. The trial judge could certainly consider that the publication pertaining to the cocaine conviction of the five year old Garza child was flagrantly false. The trial judge could also consider that had the defendants conducted the most meager confirmation efforts, they would have necessarily discovered that the subject of the false Garza article was only five years old. These factors further justified the consideration by the trial judge of any reasonable inferences which flowed therefrom, which this court is prohibited from second guessing by the abuse of discretion standard which should guide us. This is especially true considering the fact that we were not present to see and hear the witnesses.

I further disagree with the majority's suggestion that depositions of all 48 witnesses listed by the defendants as prospective witnesses should be taken before the court can consider forcing disclosure of the confidential sources. The majority makes this suggestion in spite of the fact that they acknowledge both that the confidential sources are not included in the list and that the discovery of the confidential sources would not be assured by the taking of the 48 depositions. As a matter of fact, oral arguments before this court revealed that even if the depositions of the entire community were taken, the discovery of the confidential sources would not be assured since the sources may be from an entirely different community, they may refuse to admit they are the confidential sources, or they may not know they are the sources the news gatherers relied upon. Thus, even if those deposed admitted being the confidential sources, there is no assurance that they were the sources the news gatherers relied upon. In suggesting such *688 a requirement, the majority has cast upon all such plaintiffs an unfair onus, which has a potential burden that only the wealthy few could possibly bear.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00515

822 S.W.2d 675
822 S.W.2d 675, 19 Media L. Rep. 2033
**(Cite as: 822 S.W.2d 675)**

Page 16

Although I agree with the majority that the Garza case is different, where the majority would require the doing of a useless thing, I would approve the order of disclosure as far as it pertains to any confidential sources or documents involving the Garza article. While the majority recognizes that the acknowledged falsity of the Garza publication goes a long way towards justifying the disclosure order of the trial court, they would nevertheless require the deposition of defendant David Hanners, the author of the Garza article. I disagree, since the law should not require the doing of a useless thing.

The record reflects that interrogatories requesting the disclosure of the confidential sources were properly propounded to all the defendants, "The Dallas Morning News Company d/b/a The Dallas Morning News ('The News'), A.H. Belo Corporation ('Belo'), *David Hanners,* David McLemore, and Gayle Reaves." All the defendants, including *David Hanners,* responded by refusing to reveal the confidential sources. I can see no useful purpose in requiring the taking of Hanners' deposition when he has already clearly indicated he will not reveal the confidential sources. Although the disclosure order of the court as to Garza was too broad, I would approve that part of the order that pertained to the article involving the Garza child.

In my view, the majority has approached this case more from a sufficiency of the evidence standpoint rather than an abuse of discretion standpoint. The proper function of this court lies not in weighing the evidence which was before the trial court, but in determining whether the appellants have complied with their burden of showing that the trial court "acted without reference to any guiding rule and principles," or "reached a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Morrow,* 714 S.W.2d at 298; *Downer,* 701 S.W.2d at 241-43. As to the relevant part of the Garza disclosure order, I cannot agree that the appellants have complied with their burden.

Tex.App.-San Antonio,1991.
Dallas Morning News Co. v. Garcia

822 S.W.2d 675, 19 Media L. Rep. 2033

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00516

**9**

00517

Westlaw.

766 S.W.2d 352
766 S.W.2d 352
(Cite as: 766 S.W.2d 352)

Page 1

**H**

Court of Appeals of Texas,
Texarkana.

Willie Bob GOODLOW Appellant,
v.
The STATE of Texas Appellee.
No. 6-88-038-CR.

Feb. 8, 1989.
Rehearing Denied Feb. 28, 1989.

Defendant was convicted of delivery of marijuana of less than four ounces but more than one quarter of an ounce. After matter was remanded, the 276th Judicial District Court, Titus County, William R. Porter, J., proceeded to punishment stage of trial and entered judgment on jury's punishment assessment, and defendant appealed. The Court of Appeals, Grant, J., held that application to defendant of procedural rule directing district court to proceed to punishment stage of trial did not violate ex post facto prohibition.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 ⟨⟩2789**

92 Constitutional Law
　92XXIII Ex Post Facto Prohibitions
　　92XXIII(A) Constitutional Prohibitions in General
　　　92k2789 k. Penal Laws in General. Most Cited Cases
　　(Formerly 92k203)

**Constitutional Law 92 ⟨⟩2790**

92 Constitutional Law
　92XXIII Ex Post Facto Prohibitions
　　92XXIII(A) Constitutional Prohibitions in General

　　　92k2790 k. Punishment in General. Most Cited Cases
　　(Formerly 92k203, 92k200)
Ex post facto prohibition bars enactment of any law which exacts punishment for act which was not punishable at time it was committed or which imposes greater punishment than that prescribed when act was committed. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 10, cl. 1.

**[2] Constitutional Law 92 ⟨⟩2793**

92 Constitutional Law
　92XXIII Ex Post Facto Prohibitions
　　92XXIII(A) Constitutional Prohibitions in General
　　　92k2793 k. Remedies and Procedure in General. Most Cited Cases
　　(Formerly 92k197)
Laws which do not amend substantive law by defining criminal acts or providing for penalties are procedural in nature, and are not usually within ex post facto prohibition. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 10, cl. 1.

**[3] Constitutional Law 92 ⟨⟩2791**

92 Constitutional Law
　92XXIII Ex Post Facto Prohibitions
　　92XXIII(A) Constitutional Prohibitions in General
　　　92k2791 k. Substantive Rights in General. Most Cited Cases
　　(Formerly 92k197)

**Constitutional Law 92 ⟨⟩2793**

92 Constitutional Law
　92XXIII Ex Post Facto Prohibitions
　　92XXIII(A) Constitutional Prohibitions in General
　　　92k2793 k. Remedies and Procedure in General. Most Cited Cases
　　(Formerly 92k197)
Procedural statute is not ex post facto merely be-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00518

766 S.W.2d 352
766 S.W.2d 352
(Cite as: 766 S.W.2d 352)

Page 2

cause it works to defendant's disadvantage; however, if procedural change is retroactive and results in deprivation of substantive protection it is unconstitutional. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 10, cl. 1.

**[4] Statutes 361 ☞278.6**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.4 Prospective Construction
                361k278.6 k. Presumptions. Most Cited Cases
        (Formerly 361k263)

**Statutes 361 ☞278.7**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.7 k. Express Retroactive Provisions. Most Cited Cases
        (Formerly 361k263)
Statute is presumptively prospective in application unless it is expressly made retrospective. V.T.C.A., Government Code § 311.022.

**[5] Statutes 361 ☞278.13**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies and Procedures
                361k278.13 k. In General. Most Cited Cases
        (Formerly 361k267(1))

**Statutes 361 ☞278.14**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies and Procedures
                361k278.14 k. Application to Pending

Actions and Proceedings. Most Cited Cases
    (Formerly 361k267(2))
Procedural statute controls litigation from its effective date, and may be applied to trials for offenses committed before its effective date and to proceedings pending at time of its enactment.

**[6] Constitutional Law 92 ☞2810**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(B) Particular Issues and Applications
            92k2809 Criminal Proceedings
                92k2810 k. In General. Most Cited
    (Formerly 92k197)

**Criminal Law 110 ☞1005**

110 Criminal Law
    110XXIV Review
        110XXIV(A) Nature and Form of Remedy
            110k1005 k. Constitutional and Statutory Provisions. Most Cited Cases
Application to defendant of procedural statute, directing trial court to proceed to punishment stage of trial when appellate court has awarded new trial on basis of error in punishment stage of trial, did not violate ex post facto prohibition, though judgment and mandate of appellate court recited that judgment was reversed in all things and ordered new trial and defendant maintained he relied upon judgment and mandate of appellate court in not pursuing further appellate review, where appellate court's judgment was not rendered until after effective date of amended rule. Vernon's Ann.Texas C.C.P. art. 44.29(b); U.S.C.A. Const. Art. 1, § 10, cl. 1; Vernon's Ann.Texas Const. Art. 1, § 16.
*353 R.L. Whitehead, Jr., Longview, for appellant.

Charles C. Bailey, Dist. Atty., Mt. Pleasant, for appellee.


GRANT, Justice.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00519

766 S.W.2d 352
766 S.W.2d 352
(Cite as: 766 S.W.2d 352)

Page 3

Willie Bob Goodlow appeals from a conviction for delivery of marihuana of less than four ounces but more than one-quarter of an ounce. A jury assessed his punishment at two years of confinement in the Texas Department of Corrections and a fine of $2,500.

In his sole point of error, Goodlow contends that the trial court erred by proceeding to the punishment stage of the trial because application of Tex.Code Crim.Proc.Ann. art. 44.29(b) (Vernon Supp.1989) to his cause violates the prohibition against ex post facto legislation found in U.S. Const. art. I, § 10 and Tex. Const. art. I, § 16.[FN1]

> FN1. U.S. Const. art. I, § 10 provides in part that: "No State shall ... pass any ... ex post facto law...." Tex. Const. art. I, § 16 provides: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."

On August 27, 1986, Goodlow was convicted of the offense of delivery of marihuana of less than four ounces but more than one-quarter ounce. The same jury then assessed his punishment at ten years of confinement in the Texas Department of *354 Corrections. Goodlow then perfected an appeal to this Court. On October 27, 1987, this Court, in an unpublished opinion, reversed the judgment of the trial court and remanded the case to the trial court for a new trial based upon impermissible jury argument at the punishment stage of his trial. The judgment and the mandate both recited that the judgment was reversed in all things and ordered a new trial. On remand, the trial court granted the State's motion to proceed to the punishment stage of the trial. A jury then assessed his punishment at two years of confinement in the Texas Department of Corrections and a fine of $2,500.

Article 44.29(b) provides in part that:

If the court of appeals ... awards a new trial to the defendant only on the basis of an error or errors made in the punishment stage of trial, the cause shall stand as it would have stood in case the new trial had been granted by the court below, except that the court shall commence the new trial as if a finding of guilt had been returned and proceed to the punishment stage of the trial....

The effective date of this amendment was August 31, 1987. (Act of May 26, 1987, ch. 179, 1987 Tex.Gen. Laws 1387). This article is directed to the trial court. *Ex parte Sewell,* 742 S.W.2d 393 (Tex.Crim.App.1987) (Opinion on motion for rehearing); *Ex parte Klasing,* 738 S.W.2d 648 (Tex.Crim.App.1987) (Opinion on motion for rehearing).

[1][2][3] The ex post facto prohibition bars the enactment of any law which exacts a punishment for an act which was not punishable at the time it was committed or which imposes a greater punishment than that prescribed when the act was committed. *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17, 22 (1981). Laws which do not amend substantive law by defining criminal acts or providing for penalties are procedural in nature. *Ex parte Johnson,* 697 S.W.2d 605, 607 (Tex.Crim.App.1985); *Ex parte Allen,* 699 S.W.2d 886, 895 (Tex.App.-Dallas 1985, pet. ref'd) (Opinion on motion for rehearing). Remedial or procedural laws are not usually within the ex post facto prohibition. *Ex parte Allen, supra;* 18 Tex.Jur.3d *Criminal Law* § 11 (1982); 1 C. Torcia, *Wharton's Criminal Law* § 13 (14th ed. 1978). A procedural statute is not ex post facto merely because it works to a defendant's disadvantage. *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344, 356 (1977). However, if a procedural change is retroactive *and* results in a deprivation of a substantive protection it is unconstitutional. *Ex parte Abahosh,* 561 S.W.2d 202, 203 (Tex.Crim.App. [Panel Op.] 1978); *Ex parte Allen, supra.*

[4][5] A statute is presumptively prospective in application unless it is expressly made retrospective. *Nichols v. State,* 754 S.W.2d 185, 204

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00520

766 S.W.2d 352
766 S.W.2d 352
(Cite as: 766 S.W.2d 352)

Page 4

(Tex.Crim.App.1988); *Ex parte Abahosh, supra,* at 204; *Ridyolph v. State,* 545 S.W.2d 784, 786 (Tex.Crim.App.1977); *Pesch v. State,* 524 S.W.2d 299, 301 (Tex.Crim.App.1975); Tex.Gov't Code Ann. § 311.022 (Vernon 1988). A procedural statute controls litigation from its effective date, *Granviel v. State,* 552 S.W.2d 107, 117 (Tex.Crim.App.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977), and it may be applied to trials for offenses committed before its effective date and to proceedings pending at the time of its enactment. 18 Tex.Jur.3d *Criminal Law* § 11 (1982).

[6] Goodlow contends that, although Article 44.29(b) is a procedural statute, its application in this instance is unconstitutional because it deprives him of substantive protections. Goodlow first argues that the application of this statute to his case deprives him of the right to a new trial on guilt-innocence which was a right he had when the offense was committed. This court determined that Goodlow had received a trial on guilt or innocence in which there was no harmful error. The Constitution does not require that a defendant receive two error-free trials on guilt or innocence.

He does assert that his case is similar to *Ex parte Bonham,* 707 S.W.2d 107 (Tex.Crim.App.1986). In *Bonham,* the Court held that the retroactive application of Tex.Penal Code Ann. § 12.46 (Vernon Supp.1989)\*355 (permitting a conviction to be used more than once for enhancement purposes) to offenses committed before its effective date violated the constitutional prohibition against ex post facto laws. In *Bonham,* the statute subjected the defendant to a harsher penalty. In the instant case, Goodlow is not subjected to a harsher penalty: he is merely denied the privilege of relitigating an error-free stage of the proceedings.

Goodlow further contends that the trial court's application of Article 44.29(b) deprived him of his right of appeal. During the oral argument of this case, appellant's counsel maintained that Goodlow relied upon the judgment and mandate of this Court

as an indication that he would receive a new trial, on guilt-innocence and on punishment. On the basis of these directions, counsel argues, further appellate review was not pursued.

First, the judgment and mandate from this Court should have been construed with the opinion finding error only in the punishment stage and Tex.Code Crim.Proc.Ann. art. 44.29(b) which required the trial court to proceed to trial at the punishment stage.

We next observe that federal constitutional considerations have never mandated that states afford convicted criminal defendants appellate review. *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974); *McKane v. Durston,* 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894). Convicted criminal defendants in Texas do enjoy a prescribed first appeal as a matter of right; however, discretionary review by the Court of Criminal Appeals is not a matter of right. Tex. Const. art. V, § 5; Tex.Code Crim.Proc.Ann. arts. 4.04, 44.02 (Vernon Supp.1989); Tex.R.App.P. 200(b). Furthermore, Goodlow did not file a motion for rehearing or seek further review by the Court of Criminal Appeals on the points of error overruled by this Court. Thus, Goodlow has not been deprived of his right to appeal.

Goodlow contends that his predicament is similar to that of the defendant in *Ex parte Abahosh, supra. Abahosh* concerned the 1977 amendment to Tex.Code Crim.Proc.Ann. art. 44.02, which limited a defendant's right to appeal from judgments entered upon guilty pleas in certain plea bargain situations. In *Abahosh,* the defendant had pled guilty, and the judgment had been entered prior to the effective date of the amendment. The application of the amendment deprived the defendant of a "substantive protection," his right to appellate review. Goodlow, however, was not barred from seeking appellate review: he did in fact have this Court's review of his case, and he did have the opportunity to seek further review.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00521

766 S.W.2d 352
766 S.W.2d 352
(Cite as: 766 S.W.2d 352)

Page 5

The instant case is more nearly akin to *Ex parte Allen, supra.* In *Allen,* the court considered the application of the 1985 amendment to Article 44.38, which abolished the right to a motion for rehearing in extradition appeals when the order approving extradition had been affirmed. In its consideration of the retroactivity issue, the court looked to the date the appellant's right to a rehearing would have come into existence, the date of its decision. *Ex parte Allen, supra,* at 896. The court then reasoned that since its decision was not rendered until after the effective date of the amendment, and since the appellant's right could not accrue until after the decision was rendered, the application was not retroactive.

Similarly, any right Goodlow had to a new trial on guilt-innocence could not have existed until this Court held that the trial court had committed reversible error. Since this Court's judgment was rendered after the effective date of the amendment, Goodlow was not retroactively deprived of a substantive right.

Accordingly, we affirm the judgment of the trial court.

Tex.App.-Texarkana,1989.
Goodlow v. State
766 S.W.2d 352

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00522

**10**

00523

Westlaw.

687 S.W.2d 736
687 S.W.2d 736, 10 Media L. Rep. 2009
(Cite as: 687 S.W.2d 736)

Page 1

**H**

Court of Criminal Appeals of Texas,
en banc.

Ex parte Randy Eli GROTHE.
No. 69275.

July 3, 1984.
Rehearing Denied April 24, 1985.

In prosecution for obstructing public passageway wherein key issue was whether defendant had chained himself to doorway during protest, defendant sought to subpoena newspaper photographer who had been at scene of protest. When photographer refused to divulge contents of his photographs on First Amendment grounds, the County Criminal Court No. 10, Dallas County, Robert Moss, J., held him in contempt, and photographer filed application for writ of habeas corpus. The Court of Criminal Appeals, Campbell, J., held that photographer did not have First Amendment privilege to refuse to produce photographs of alleged criminal offense occurring in public place, and was properly held in contempt for his failure to do so.

Application denied.

Clinton, J., concurred in denial of leave to file motion for rehearing, and file opinion.

West Headnotes

[1] Criminal Law 110 ⟿662.1

110 Criminal Law
　　110XX Trial
　　　110XX(C) Reception of Evidence
　　　　110k662 Right of Accused to Confront Witnesses
　　　　　110k662.1 k. In General. Most Cited Cases

Criminal Law 110 ⟿662.7

110 Criminal Law
　　110XX Trial
　　　110XX(C) Reception of Evidence
　　　　110k662 Right of Accused to Confront Witnesses
　　　　　110k662.7 k. Cross-Examination and Impeachment. Most Cited Cases

**Witnesses 410 ⟿266**

410 Witnesses
　　410III Examination
　　　410III(B) Cross-Examination
　　　　410k266 k. Right to Cross-Examine and Re-Examine in General. Most Cited Cases
Citizen accused of crime has right to confront and fully cross-examine all persons who have testimony relevant to criminal charges. U.S.C.A. Const.Amend. 6.

**[2] Constitutional Law 92 ⟿2121**

92 Constitutional Law
　　92XVIII Freedom of Speech, Expression, and Press
　　　92XVIII(V) Judicial Proceedings
　　　　92XVIII(V)3 Contempt
　　　　　92k2121 k. Press. Most Cited Cases
　　(Formerly 92k90.1(3), 92k90.1(8))
Newspaper photographer did not have First Amendment privilege to refuse to produce, in criminal prosecution, photographs of alleged criminal offense occurring in public place, and was properly held in contempt for refusing to produce such photographs and to testify concerning them. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

*737 John H. McElhaney, Roark Reed, Dallas, for applicant; George R. Milner, Ronald L. Goranson, Dallas, of counsel.

Lawrence B. Mitchell, R.K. Weaver and Kerry Fitzgerald and Henry Wade, Dist. Atty. and Karen Chilton Beverly, Asst. Dist. Atty., Dallas, for Judge

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00524

687 S.W.2d 736
687 S.W.2d 736, 10 Media L. Rep. 2009
(Cite as: 687 S.W.2d 736)

Page 2

Moss.

Robert Huttash, State's Atty., Austin, for the State.

Before the court en banc.

OPINION

CAMPBELL, Judge.

This is an original application for writ of habeas corpus wherein applicant requests that this Court issue a writ of habeas corpus and relieve him from an order of contempt entered by respondent judge during the pendency of a criminal trial. See Art. V, Sec. 5, Tex.Const. and *Ex Parte Sheppard*, 548 S.W.2d 414 (Tex.Cr.App.1977). This application presents a very narrow question, to wit: whether the First Amendment to the United States Constitution or Art. 1, Sec. 8 of the Texas Constitution create a privilege whereby photo journalists are excused from testifying and from producing photographs of alleged criminal activity witnessed in a public place. To this narrow question we answer in the negative and deny relief.

Applicant is and was at all relevant times employed as a photographer for the Dallas Morning News. On the morning of September 23, 1983, applicant was assigned to cover a protest demonstration occurring outside the offices of Dallas Power and Light on Commerce Street in downtown Dallas. Applicant proceeded to the above location and took photographs of the demonstration and the subsequent arrest and removal of certain demonstrators, including Mavis Belisle. The following day the Dallas Morning News ran a photograph taken by applicant of Belisle being physically removed from the site by arresting officers.

Subsequently Belisle and two co-defendants were charged by information with violation of V.T.C.A. Penal Code Sec. 42.03(a)(1), obstructing a public passageway. In so charging Belisle, the State spe-cifically pled that the obstruction of the passageway was accomplished "by chaining himself to the said doorway of a public building."

At trial on the merits Belisle admitted participation in the demonstration but specifically denied she had at any time been chained to the building. The State called the arresting officer and a security guard for Dallas Power and Light, both of whom testified to having personally observed Belisle chained to the doorway. The defense called Belisle and one of the demonstrators (who was allegedly closest to Ms. Belisle), both of whom testified that Belisle was never at any time chained to the doorway. *738 Thus the central issue at trial was whether the defendant was chained to the doorway.

Belisle sought to subpoena applicant to present testimony as to his personal observations of the demonstration and Belisle's activities.

Applicant filed a motion to quash the subpoena alleging, inter alia, that the First Amendment created a privilege for newspaper reporters and that defendant Belisle had failed to make a substantial showing as to what applicant claimed was required by *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). After an extensive hearing the respondent held that applicant would be required to testify as to his personal observations. Prior to testifying, applicant, by his attorney, acknowledged that, as to his personal observations of alleged criminal activity, he was on the same footing as a layperson and therefore he would testify. He nonetheless sought to limit his testimony just to personal observation and continued to invoke a privilege not to answer any questions which encroached upon his status as a reporter. Applicant testified as to his observations. He testified that he *believed* [FN1] that defendant Belisle was chained to the doorway; however, he admitted that he had, on a prior occasion, told his attorney that he did not remember whether defendant Belisle was chained. Significantly, he further testified that the photographs he took would probably show whether the defendant was in fact chained and would refresh his recollec-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00525

687 S.W.2d 736
687 S.W.2d 736, 10 Media L. Rep. 2009
(Cite as: 687 S.W.2d 736)

Page 3

tion. Subsequently, the defense requested that applicant be ordered to review his photographs. Respondent, after further argument by all parties, ordered applicant to review his photos and have the photos available for cross-examination. To this order applicant refused to comply and accordingly was held in contempt by respondent, and ordered jailed until he purged himself. This writ immediately followed.[FN2]

> FN1. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

> FN2. It is this Court's understanding that applicant was immediately released on bail and did not pursuant to this contempt order, actually spend any time jailed.

Applicant argues that the U.S. Constitution requires that courts recognize a qualified privilege for the press not to be required to testify. Applicant urges that by reading Justice Stewart's dissent with Justice Powell's concurrence in *Branzburg*, supra, a balancing test is required before a reporter will be ordered to divulge sources to courts or grand juries. We decline to adopt any combination of the dissenting and concurring opinions. The four justice plurality opinion in which Justice Powell concurred quite clearly found that no balancing was required. *Branzburg*, supra, at pp. 705-06, 92 S.Ct. at 2668-69. In a footnote in *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), Justice Powell clarified his position in *Branzburg*, observing that any press interests can be weighed in the regular subpoena process. Justice Powell specifically found no exception to the requirements of a subpoena for media personnel based upon the First Amendment. *Zurcher*, supra., concurring opinion, footnote 3 at 570, 98 S.Ct. footnote 3 at 1984.

Assuming arguendo, that the dissent in *Branzburg* did in fact recognize some sort of media privilege based upon the First Amendment, it is abundantly clear that the facts in *Branzburg* are much closer

constitutionally than the limited facts in the case sub judice.

*Branzburg* involved three differing claims of privilege, basically centering on appearing before a grand jury and disclosing confidential sources. One of the reporters in *Branzburg* had, by virtue of a confidential informer relationship, witnessed and photographed the making of hashish. He was required to come forward and divulge "secret" information. We fail to discern any greater interest for applicant here, who allegedly witnessed a crime in a public place. If in fact any weighing of interests is required for requiring the press to divulge confidential informants, *739 that issue is not presented today and we do not decide it.

In *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) the Supreme Court held that nothing in the First Amendment exempted the press from being subject to a search for proof of criminal activity. We find the facts in *Zurcher* very similar to the instant case. *Zurcher*, supra, involved the search of a student newspaper office for photographs of a student demonstration wherein several police officers were injured. The State desired to identify possible defendants for criminal charges through the photographs. The Supreme Court upheld the search and stated:

"We finally note that if the evidence sought by warrant is sufficiently connected to the crime to satisfy the probable cause requirement, it will very likely be sufficiently relevant to justify a subpoena and to withstand a motion to quash." [FN3] *Zurcher*, supra at 566, 98 S.Ct. at 1982.

> FN3. We recognize that the Texas Legislature has adopted a search shield law which provides more protection than the Zurcher court did. Art. 18.01(e), V.A.C.C.P. However, to this date the Legislature had *not* adopted a newspaper testimonial privilege, a reporter's sources shield statute or excluded newspapers from

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00526

687 S.W.2d 736
687 S.W.2d 736, 10 Media L. Rep. 2009
(Cite as: 687 S.W.2d 736)

Page 4

subpoenas.

Thus implicitly, the Supreme Court has recognized that the press is not immune from subpoena. Although we find *Zurcher* factually less compelling than the case sub judice, we nevertheless believe that it is persuasive in its analysis of First Amendment privileges.

We are not unmindful of the important place of a free press in our society, see *New York Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Grosjean v. American Press,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Houston Chronicle Pub. Co. v. Shaver,* 630 S.W.2d 927 (Tex.Cr.App.1982). Not to be forgotten, however, is the interest in protecting the integrity of the criminal justice system. See *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

In *Nixon,* supra, the Supreme Court was weighing the asserted right of presidential privilege versus the criminal justice system's need for relevant, material evidence. While the Court did recognize a constitutionally based presidential privilege, that privilege had to give way to the criminal defendant's rights and the integrity of the criminal justice system. The need to develop all facts in an adversarial system of criminal justice is fundamental and comprehensive. *Nixon,* supra.

[1] Additionally, a citizen accused of crime has the right to confront and fully cross-examine all persons who have testimony relevant to criminal charges. See *Davis v. Alaska,* 415 U.S. 308, 311, 94 S.Ct. 1105, 1107, 39 L.Ed.2d 347 (1974); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). As the Supreme Court noted in *United States v. Nixon,* supra:

"The right to production of all evidence at a criminal trial similarly has constitutional dimensions.

The Sixth Amendment explicitly confers upon every defendant in a criminal trial the right 'to be confronted with the witnesses against him and to have compulsory process for obtaining witnesses in his favor... It is the manifest duty of the courts to vindicate those guarantees and to accomplish that, it is essential that all relevant and admissible evidence be produced." *United States v. Nixon,* 418 U.S. at p. 711, 94 S.Ct. at p. 3109.

Applicant cites us to many authorities from other jurisdictions, urging that a balancing test be adopted and applied to the instant case. We note that most of the cases cited deal with disclosure in civil actions or disclosure of confidential sources; as such we find them to be unpersuasive and not controlling. Moreover, we fail to see a hypothetical case wherein a weighing process would result in suppression of highly relevant personal observation of public criminal activity.

*740 [2] In light of the foregoing, we fail to see how applicant's rights will be in any way diminished in requiring production of photographs of an alleged criminal offense occurring in a public place.

The application for writ of habeas corpus is denied. It is so ordered.

TEAGUE and CLINTON, JJ., concur in this opinion.
W.C. DAVIS and TOM G. DAVIS, JJ., and ONION, P.J., not participating.

### OPINION CONCURRING IN DENIAL OF LEAVE TO FILE APPELLANT'S MOTION FOR REHEARING

CLINTON, Judge.
Applicant complains the Court on original submission misread *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) [hereafter *Branzburg* ] in refusing to recognize the constitutional necessity for a balancing of First and Sixth Amendment interests in cases such as this; he argues that this refusal, in turn, results in adoption of an

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00527

687 S.W.2d 736
687 S.W.2d 736, 10 Media L. Rep. 2009
(Cite as: 687 S.W.2d 736)

"absolutist position" which denies the existence of *any* First Amendment privilege of journalists to decline to reveal unpublished material.

I agree that our opinion on original submission may have been hasty in concluding that the *Branzburg* plurality "quite clearly found that no balancing was required;" however, the balancing test advocated by applicant today is virtually identical to that advanced by Justice Stewart in dissent in *Branzburg,* a position which *was* quite clearly rejected by five members of the Supreme Court.

As I read *Branzburg,* the "balancing" endorsed by the plurality and Justice Powell is more in the nature of weighing considerations relevant to a motion to quash a subpoena within the context of First vis-a-vis Sixth Amendment concerns: whether a grand jury investigation is instituted or conducted in good faith; whether subpoenas are issued, not for legitimate purposes of law enforcement, but to instead harass the press or disrupt a reporter's relationship with news sources; consideration of the propriety, purposes, scope of the judicial proceeding and the pertinence of the evidence sought; etc.

But applicant would read *Branzburg* to require this criminally accused, before seeking to exercise a Sixth Amendment right to compulsory process in order to prepare a defense to the accusation, to show (1) she has "exhausted alternative sources" for what is revealed in applicant's subpoenaed photographs; (2) she has "a compelling need for" them; and, (3) that the photos are "highly relevant to the defense."

I simply do not read into *Branzburg* any such test, much less any allotment of that burden on a party to a criminal prosecution. On the contrary, the concurring opinion observed that such a rule would,

"as a practical matter, defeat ... a fair balancing and the essential societal interest in the detection and prosecution of crime would be heavily subordinated."

408 U.S. at 710, 92 S.Ct. at 2671.

Moreover, in *Branzburg,* the Court's majority specifically refused to accord any privilege whatever to journalists to choose not to even *appear* when summoned by lawful subpoena.[FN1] Further, a majority of the Court was not persuaded that the litigants claiming a right to protect confidential sources had demonstrated any intolerable burden on news gathering or other clear First Amendment rights.[FN2] And the plurality discussed at some length the well *741 recognized limitations on the press demonstrating that the First Amendment is not absolute in its operation.[FN3]

> FN1. As I understand the dissenting positions in *Branzburg,* the "balancing" criteria advocated by our applicant here would place the three burdens discussed *ante* on the State or accused before the journalist in question would be required to even *appear* pursuant to a subpoena.
>
> FN2. The Court observed that the facts of the cases did not implicate recognized First Amendment concerns such as intrusions upon speech or assembly, prior restraint or restriction on publication; express or implied command that the press publish what it prefers to withhold; exaction or tax for publishing privilege; penalty, civil or criminal, related to the content of published material; restriction on use of confidential sources; any requirement that the press publish its sources of information or indiscriminately disclose them on request.
>
> FN3. The plurality mentioned, for example, that the press may not circulate knowing or reckless falsehoods damaging to private reputation; the First Amendment does not guarantee the press a constitutional right of special access to information not available to the general public; the press is regularly excluded from grand jury proceedings, court conferences, meetings of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

687 S.W.2d 736
687 S.W.2d 736, 10 Media L. Rep. 2009
(Cite as: 687 S.W.2d 736)

Page 6

official bodies and private organizations; newsmen have no constitutional right to access to the scenes of crime or disaster when the public is excluded and may be prohibited from attending or publishing information about criminal trials in order to assure the fairness of the proceeding.

While many of the issues advanced in applicant's motion for rehearing are provocative, important and deserving of serious consideration by this Court in a proper context, I do not perceive that they are presented by the facts of the instant case. As I understand those facts, the applicant was assigned by *The Dallas Morning News* to photograph a protest demonstration outside the Dallas Power and Light offices in downtown Dallas. Applicant took photographs of the demonstration as well as the arrest and removal of certain demonstrators, including Mavis Belisle. Belisle was subsequently charged with a penal offense, obstructing a public passageway, and sought applicant's testimony, and later, his photographs, for her trial. Applicant's refusal to make his photos available to Belisle for purposes of crossexamination forms the basis of this contempt proceeding.

In declining to recognize a newsman's unqualified right to refuse to reveal confidential sources under the three fact situations presented in *Branzburg,* the plurality stated:

'On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but *uncertain,* burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial."

408 U.S. at 690-691, 92 S.Ct. at 2661-2662.

From this record one cannot perceive any certain burden on news gathering that might result from re-

quiring the applicant here to turn over photographs which may exonerate a person criminally accused, and which applicant took in a public place apparently accessible to the public at large. Neither do I read applicant's motion for rehearing to argue that his evidence established any such realistic burden.

If the Court's opinion on original submission is limited, as it clearly states it is, to the "narrow question" presented by the facts, damage to the First Amendment cannot be seriously read into it. It is therefore appropriate to reiterate here the concluding paragraph of Justice Powell's concurring opinion in *Branzburg:*

'In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection."

408 U.S. at 710, 92 S.Ct. at 2671.

Such legitimate interests are simply not presented today.

Therefore I concur in the Court's denial of leave to file.

Tex.Criminal App.,1984.
Ex parte Grothe
687 S.W.2d 736, 10 Media L. Rep. 2009

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00529

11

00530

Westlaw.

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 1

▷

Court of Criminal Appeals of Texas,
En Banc.

Ex parte Eddie James JOHNSON.
No. 69480.

Oct. 9, 1985.

Petitioner filed postconviction writ of habeas corpus. The 262nd Judicial District Court, Harris County, Doug Shaver, J., denied petitioner's writ, and he appealed. The Court of Criminal Appeals, Miller, J., held that: (1) verdict and judgment containing $10,000 fine in addition to enhanced prison sentence as repeat and habitual offender was not authorized by law; (2) statute requiring an appellate court to reform judgments containing punishment unauthorized by law applied to litigation pending at time of statute's enactment as well as all future actions; and (3) reformation was required where trial court failed to do so.

Affirmed as reformed.

Campbell, J., concurred and filed opinion.

Onion, P.J., and Clinton and Teague, JJ., dissented and filed opinions.

West Headnotes

[1] Robbery 342 ⬅30

342 Robbery
    342k30 k. Sentence and Punishment. Most Cited Cases

Sentencing and Punishment 350H ⬅1421

350H Sentencing and Punishment
    350HVI Habitual and Career Offenders
        350HVI(L) Punishment
            350Hk1421 k. Robbery. Most Cited Cases
    (Formerly 110k1203 1/2)

Imposition of fine of $10,000 in addition to enhanced prison term as repeat and habitual offender for second count of aggravated robbery was not authorized by law; however, imposition of fine of $5,000 in addition to prison term for first count of aggravated robbery was authorized where enhancement paragraph was abandoned. V.T.C.A., Penal Code § 12.42(c).

[2] Criminal Law 110 ⬅1184(4.1)

110 Criminal Law
    110XXIV Review
        110XXIV(U) Determination and Disposition of Cause
            110k1184 Modification or Correction of Judgment
                110k1184(4) Sentence or Punishment
                    110k1184(4.1) k. In General. Most Cited Cases
    (Formerly 110k1184(4))

Verdict and judgment containing unauthorized punishment of $10,000 fine in addition to enhanced prison term as repeat and habitual offender required reformation by Court of Criminal Appeals where trial court failed to remove unauthorized fine. Vernon's Ann.Texas C.C.P. art. 37.10(b).

[3] Criminal Law 110 ⬅1005

110 Criminal Law
    110XXIV Review
        110XXIV(A) Nature and Form of Remedy
            110k1005 k. Constitutional and Statutory Provisions. Most Cited Cases
    (Formerly 110k13.2)

Statute [Vernon's Ann.Texas C.C.P. art. 37.10(b)] requiring reformation by appellate court of judgments containing punishments not authorized by law, where trial court failed to do so, was applicable to litigation pending on statute's effective date as well as to future actions, in that statute contained no express legislative intent to the contrary directing that it become applicable to cases begun, tried

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00531

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 2

or indicted after particular date.
*605 Eddie James Johnson, pro se.

John B. Holmes, Jr., Dist. Atty. and Karrie Key, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

Before the court en banc.

OPINION

MILLER, Judge.

This is a post-conviction writ of habeas corpus brought pursuant to Art. 11.07, V.A.C.C.P. Applicant complains that his convictions for two aggravated robberies are void and requests a new trial.

The record shows that applicant was indicted in Cause No. 314983, in the 262nd District Court of Harris County, for an aggravated robbery committed on February 29, 1980. The indictment also contained an enhancement paragraph alleging that applicant had been previously convicted of felony armed robbery in Coahoma County, Mississippi. A second indictment was returned against applicant in Cause No. 314984, also in the 262nd District Court, which charged applicant with another aggravated robbery committed on April 22, 1980. The second indictment also contained an enhancement paragraph alleging the prior Mississippi felony conviction.

The judgment for Cause No. 314983 indicates that the jury found applicant guilty of aggravated robbery, and reflects that the State abandoned the enhancement paragraph. The jury assessed punishment at *606 50 years confinement in the Texas Department of Corrections, and a fine of $5,000.00.

The judgment for Cause No. 314983 indicates that the jury found applicant guilty of aggravated robbery, and reflects that the State abandoned the enhancement paragraph. The jury assessed punishment at 50 years confinement in the Texas Department of Corrections, and a fine of $5,000.00.

The judgment for Cause No. 314984 indicates the jury found applicant guilty of the second aggravated robbery, and further found true the enhancement allegation. Punishment was assessed at 50 years confinement in the Texas Department of Corrections, and a fine of $10,000.00.

Applicant contends that the jury's assessment of total fines in the amount of $15,000.00 in addition to terms of years as punishment is unauthorized by law and therefore the verdicts are void and any subsequent judgments and sentences based thereon are void.

In *Bogany v. State,* 661 S.W.2d 957 (Tex.Cr.App.1983), the defendant was convicted of aggravated robbery. On a finding of one prior conviction for enhancement, punishment was assessed by the jury at 60 years and a $10,000.00 fine. We held that V.T.C.A. Penal Code, § 12.42(c), which provides the penalties for repeat and habitual felony offenders convicted of first degree felonies, did not authorize a fine in addition to enhancement of punishment. See also *Releford v. State,* 683 S.W.2d 385 (Tex.Cr.App.1984); *Diaz v. State,* 663 S.W.2d 114 (Tex.App.-Houston [1st] 1983). Since the verdict was unauthorized by law, the court of appeals was without authority to reform the verdict. We remanded the case for a new trial.

[1] Applying *Bogany* to the instant case, the $10,000.00 fine assessed in Cause No. 314984 was not authorized by law. Since the enhancement paragraph was abandoned in Cause No. 314983, the $5000.00 fine assessed was permissible under V.T.C.A. Penal Code, § 12.32. We now turn to the proper remedy needed to correct the improper verdict in Cause No. 314984.

In prior cases, when a jury returned a verdict unauthorized by law, the judgment was rendered void. In *Ex parte McIver,* 586 S.W.2d 851 (Tex.Cr.App.1979), the jury found the defendant guilty of felony possession of marihuana. The jury

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00532

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 3

verdict stated:

"[We] assess his punishment at 5 years confinement in the Texas Department of Corrections and hereby further assess a fine in the amount of 5.000 [sic] Dollars and we, the jury, do hereby recommend that such fine be probated for a period of 10 years."

The district judge signed an instrument which stated in part:
"It is, therefore, Considered and Adjudged by the Jury that the defendant ... be punished by confinement ... for a term of not more than five (5) years nor less than two (2) years, and a fine in the amount of $5,000.00 with recommendation the fine be probated."

We found that Art. 42.12, V.A.C.C.P., did not authorize the jury to assess punishment of confinement *without* a recommendation of probation and also a fine *with* a recommendation of probation. *McIver,* supra at 854. We held that since the verdict assessed punishment unauthorized by law, it was void at its inception, citing *Smith v. State,* 479 S.W.2d 680 (Tex.Cr.App.1972).

In *Smith,* the defendant was convicted for possession of dangerous drugs. The jury found the defendant guilty and assessed punishment at one year in jail followed by a twelve month probation period. The trial court struck the portion of the jury's verdict stating "followed by a twelve month probation period." We held that the verdict was void at its inception since the law did not authorize punishment of jail time followed by probation, and further held that the trial court did not have the authority to change the verdict by deleting the offending portion. *Id.* at 681.

Last, in *Spaulding v. State,* 687 S.W.2d 741 (Tex.Cr.App.1985), the defendant was *607 convicted for aggravated sexual abuse. The jury assessed a $10,000.00 fine in addition to a term of years as punishment. We found that the verdict was unauthorized by law and therefore void, citing *Bogany,* supra. We further held that the Governor

was without authority to remit or commute that portion of the sentence assessing the fine since the judgment was void at its inception. *Spaulding,* at 743.

The preceding cases all share a common premise and conclusion. The premise in each case is that the jury rendered a verdict that was unauthorized by law, *viz:* the punishment assessed was not within the universe of punishments applicable to the offense. The common conclusion reached was that the judgment based upon such a verdict was void.

The logic connecting the premise and conclusion involves the lack of a specific vehicle by which the improper verdict could be reformed. A court was permitted only to reform the judgment in a given case so that it properly reflected the true verdict reached by the jury. See *Releford,* supra at 387, citing *Milczanowski v. State,* 645 S.W.2d 445 (Tex.Cr.App.1983); *Chudleigh v. State,* 540 S.W.2d 314 (Tex.Cr.App.1976); *Anderson v. State,* 504 S.W.2d 507 (Tex.Cr.App.1974); *Castaneda v. State,* 491 S.W.2d 885 (Tex.Cr.App.1973); *Batiste v. State,* 464 S.W.2d 149 (Tex.Cr.App.1971); and *Cedargreen v. State,* 432 S.W.2d 524 (Tex.Cr.App.1968). Thus, when a jury rendered a verdict unauthorized by law, the only course of action available was to remand the case for a new trial.[FN1] Cf. *Cooper v. State,* 527 S.W.2d 898 (Tex.Cr.App.1975); *Saunders v. State,* 511 S.W.2d 281 (Tex.Cr.App.1974); and *Miller v. State,* 472 S.W.2d 269 (Tex.Cr.App.1971). In this sense, a judgment and sentence were considered void since *there was no way to cure the infirmity.* See *Spaulding,* supra. See also *Releford,* supra at 387; and *Ramirez v. State,* 587 S.W.2d 144 (Tex.Cr.App.1979).

> FN1. Writing for this Court in *Bogany,* supra, Judge Odom stated:
>
> "The controlling law did not authorize the Court of Appeals to change the verdict rendered by the jury. The verdict was unauthorized by law and ... was

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00533

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 4

'void at its inception.' The verdict must be set aside."

*Id.*, at 959.

In his concurring opinion to *Bogany,* Judge Teague stated:

"[The Legislature] has never seen fit to give this Court or any intermediate appellate court of this State authority to assess punishment or reduce punishment assessed by a jury where the conviction was for a non-capital felony.... [T]he intermediate appellate court and this Court are without authority to either assess a different punishment, reduce the punishment assessed, or reform the punishment assessed."

*Id.*

Since the previous cases were decided, however, the Legislature has enacted a new law which enlarges the authority of courts to reform judgments, thus providing a way to cure the infirmity. Senate Bill 1349, Acts, 69th Leg., effective June 11, 1985, amended Article 37.10, V.A.C.C.P., by adding paragraph (b), which provides:

"If the jury assesses punishment in a case and in the verdict assesses both punishment that is authorized by law for the offense and punishment that is not authorized by law for the offense, the court shall reform the verdict to show the punishment authorized by law and to omit the punishment not authorized by law. If the trial court is required to reform a verdict under this subsection and fails to do so, the appellate court shall reform the verdict as provided by this subsection."

Thus, under the new law, a court is authorized to reform a verdict and judgment containing unauthorized punishment, an infirmity which would have previously rendered the verdict void.

Given the verdict and judgment in the instant case

was, in part, not authorized by law, we must determine whether Art. 37.10(b) applies to Cause No. 314984.

[2][3] Since the amendment does not constitute substantive law defining criminal acts or providing for penalties, it is procedural in nature. Thus, in the absence of express legislative intent to the contrary,*608 FN2 the new law controls litigation from its effective date and applies to both pending and future actions. See *Wade v. State,* 572 S.W.2d 533 (Tex.Cr.App.1978), and cases cited therein at 534. See also *Patterson v. State,* 650 S.W.2d 453 (Tex.App.-Houston [14th] 1982). We must therefore follow the Legislature's mandate and reform that portion of the verdict unauthorized by law.

> FN2. We especially note the absence of any language directing that this amendment shall apply to cases begun, tried or indicted, etc., after a particular date. Cf. the treatment of Art. 32A.02, V.A.C.C.P. in both Acts 1977, 65th Leg., p. 1970., ch. 787, eff. July 1, 1978, and in Acts 1979, 66th Leg., p. 4, ch. 3, § 1, eff. Sept. 1, 1979.

Assessment of the $10,000.00 fine against applicant in Cause No. 314984 was unauthorized. We therefore reform the verdict and judgment in that cause to delete the improper fine. Since the $5,000.00 fine assessed in Cause No. 314983 was authorized, applicant's request for relief in that case is denied. The Clerk of this Court shall send a copy of this order to the Texas Department of Corrections.

TOM G. DAVIS, J., not participating.CAMPBELL, Judge, concurring.
In order to harmonize my opinion in *Ex parte Spaulding,* 687 S.W.2d 741 (Tex.Cr.App.1985), with this Court's majority today, I offer the following observations.

This Court's past use of the term "void at its inception" to describe the status of the *entire* FN1 verdict and judgment, as we did in *Bogany v. State,* 661

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00534

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 5

S.W.2d 957 (Tex.Cr.App.1983), has not been entirely accurate. See also, *Ex parte McIver,* 586 S.W.2d 851 (Tex.Cr.App.1979). By characterizing the entire verdict and judgment as "void at its inception" in *Bogany*-type situations, we have implied that no cure for an unauthorized sentence could ever be supplied by an appellate court other than reversal of the entire conviction. *Spaulding,* supra at 743.

> FN1. All emphasis is supplied by the author unless otherwise indicated.

The voidness of the *entire* verdict and judgment in *Bogany,* supra at 958 and 959, depended directly upon the unavailability of any remedy at law other than reversal of the entire conviction. However, the only *portion* of the verdict and judgment that was truly void was that portion which included an unauthorized fine. The error in the verdict might have been more accurately designated as a *partially* void verdict from which this Court lacked any remedy other than reversal. Because this Court lacked any authority to separate the void portion of the verdict from the remaining valid portion of the verdict, we were forced to "void" the entire verdict and judgment by reversing the entire conviction.

In such context, the opinion in *Spaulding* was correct in noting that the verdict was "void at its inception," at least as to that portion of the verdict which contained an unauthorized fine. Because we did not yet have a remedy for *Bogany* error, we had no choice but to "void" the remainder of the verdict by reversing the conviction.

The remedies available to a court regarding a *partially* void verdict differ from the remedies available where an *entire* verdict is void. A verdict which is entirely void at its inception generally results from a defective condition, such as a lack of jurisdiction, permeating the entire verdict and creating a defect from which no remedy *ever could* be supplied by this Court other than reversal. *Ex parte Charles,* 582 S.W.2d 836, 837 (Tex.Cr.App.1979).

The legislature, by granting this Court the power to regulate the assessment of an unauthorized verdict, has not removed from the jury the power to set punishment. The authorized portion of the verdict is retained, and the defendant has been gratuitously benefited by an arguably lesser sentence than might otherwise have been assessed.

In deliberating over the proper punishment to be assessed in this case, the jury effectively was given a greater range of punishment than legally should have been *609 allowed. The jury had no authority to include a fine; therefore, our removal of the fine takes nothing away from the jury's function. By reducing the sentence, through elimination of the fine, this Court has only retained that portion of the verdict which was properly returned by the jury.

With these comments, I join the opinion and judgment of the Court.

ONION, Presiding Judge, dissenting.
The question posed by this case is whether the Court of Criminal Appeals may utilize the 1985 amendment to Article 37.10, V.A.C.C.P., in a post-conviction writ of habeas corpus proceedings under Article 11.07, V.A.C.C.P., and reform a jury's verdict in 1980 which was void from its inception.

The majority says it can be done. I do not agree.

The applicant was charged with aggravated robbery in Cause No. 314984 in the 262nd District Court. In addition to the proper range of punishment for the first-degree felony charged where a prior felony has been alleged and proved, V.T.C.A., Penal Code, § 12.42 (1974), the court in its jury charge authorized the jury to return a fine not to exceed $10,000.00. The jury instruction as to fine was improper. It was not a valid punishment. See *Bogany v. State,* 661 S.W.2d 957 (Tex.Cr.App.1983). The jury returned a verdict on June 17, 1980, assessed 50 years' imprisonment in the Department of Corrections and also assessed a $10,000.00 fine. When the jury verdict was accepted and the jury discharged on the same date, the verdict was void at its inception. The judg-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00535

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 6

ment that was subsequently entered and which had to be based on the verdict was also void as well as the sentence based on the judgment. See Article 42.01 and 42.02, V.A.C.C.P., in effect at the time. Thus applicant's conviction was void.

Appellant appealed his 1980 conviction for aggravated robbery (Cause No. 314984) to the Court of Criminal Appeals, and it was filed as Cause No. 68,733. Only one ground of error was raised which concerned the admission into evidence of certain State's exhibits. The improper assessment of punishment was not mentioned. The conviction was affirmed on November 9, 1983 in an unpublished per curiam opinion which did not consider the assessment of punishment. This was prior to the *Bogany* decision.

We now know that in situations such as applicant's appellate courts, at least prior to the 1985 amendment to Article 37.10, supra, could not reform the jury's verdict. *Bogany v. State, supra.* Nor could the Governor, using his constitutional powers of clemency, make things right. *Ex parte Spaulding,* 687 S.W.2d 741 (Tex.Cr.App.1985). All the King's men and all the King's horses could not put Humpty Dumpty together again. Lewis Carroll, "Alice in Wonderland."

On May 3, 1985, applicant filed his post-conviction writ of habeas corpus in the convicting district court. See Article 11.07, V.A.C.C.P. He sought the same relief as *Bogany* and *Spaulding* and company.[FN1] The judge of the convicting court entered an order recommending that such relief be denied in Cause No. 314984. The record was transmitted to this Court and received on May 29, 1985. On June 19, 1985, eight days after the effective date of the 1985 amendment to Article 37.10, this Court ordered the habeas corpus proceedings to be filed and submitted.

FN1. See *Releford v. State,* 683 S.W.2d 385 (Tex.Cr.App.1984); *Carey v. State,* 677 S.W.2d 821 (Tex.App.-Ft. Worth 1984); *Westerholt v. State,* 681 S.W.2d 67

(Tex.App.-Houston [14th] 1984-Discretionary Review Refused). See also *Diaz v. State,* 663 S.W.2d 114 (Tex.App.-Houston [1st] 1983); *Henderson v. State,* 666 S.W.2d 522 (Tex.App.-Waco [10th] 1983).

In response to the overreaction to *Bogany* by some, the Legislature amended Article 37.10, V.A.C.C.P., by adding subsection (b), which reads:

"(b) If the jury assesses punishment in a case and in the verdict assesses both punishment that is authorized by law for the offense and punishment that is not authorized by law for the offense, the court shall reform the verdict to show *610 the punishment authorized by law and to omit the punishment not authorized by law. If the trial court is required to reform a verdict under this subsection and fails to do so, the appellate court shall reform the verdict as provided by this subsection." (Acts 1985, 69th Leg., p. 3009, ch. 442, S.B. 1349, effective June 11, 1985.)

Does this 1985 Act apply to the 1980 verdict? Can it be applied retroactively? That is the question.

Article I, § 16, Texas Constitution, provides:

"No bill of attainder, ex post facto low, retroactive law, or any law impairing the obligations of contracts, shall be made."

In the Interpretive Commentary to Article I, Sec. 16, of the Texas Constitution (Vol. I, pp. 371, 372, Vernon's Constitution of the State of Texas, Annotated), it is written:

"An ex post facto law, constitutionally speaking, is one that makes an action done before the passage of the law, and which was innocent when done, criminal, and punishes such action, *De Cordova v. Galveston,* 4 T. [Tex.] 470 (1849); that aggravates a crime, or makes it greater than it was when committed, *Holt v. State,* 2 T. [Tex.] 363 (1847); that changes the punishment and inflicts a greater punishment than the law annexed to the crime when

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00536

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 7

committed, *Holt v. State,* supra; or which changes the rules of evidence, and receives less or different testimony, than the law required at the time of the commission of the offense in order to convict the offender. *Holt v. State,* supra. Although ordinarily laws changing procedure are not within the inhibition, still if a procedural change is retroactive and results in depriving the accused of substantial protection, it is unconstitutional. *Ex parte Roper,* 61 [Tex.] Cr.R. 68, 134 S.W. 334 (1911).

"The Texas Constitution goes further than the United States Constitution for the former is not confined to forbidding ex post facto laws, i.e., retroactive penal legislation, but it also lays a ban on any retroactive law. In prohibiting retroactive laws, the Texas Constitution seeks to safeguard rights not guaranteed by other constitutional provisions such as the impairment of the obligation of contracts and due process of law clauses. *Mellinger v. City of Houston,* 68 T. [Tex.] 37, 3 S.W. 249 (1887).

"A retroactive law is one meant to act on things that are past. As such, a statute is retroactive which takes away or impairs vested rights acquired under existing laws, or creates new obligations, imposes new duties, or adopts a new disability in respect to transactions or considerations already past, and which affects acts or rights accruing before it came into force. *Turbeville v. Gowdy,* [Tex.] Civ.App., 272 S.W. 559 (1925)."

In 53 Tex.Jur.2d, Statutes, § 29, pp. 49-50, it is written:

"A prospective law is distinguished from one that is retroactive by the fact that the latter affects acts or transactions that occurred before it came into effect, or concerns rights that have already accrued. The constitution prohibits the making of retroactive laws. But the constitutional provision is construed merely as forbidding the enactment of any law that will prejudicially affect existing, vested rights, whether arising out of contract or tort, or the operation of a law in such a manner as to have that effect. The inhibition is not ordinarily extended to a

procedural or remedial statute, such as a curative act, or, in fact, to any act that does not disturb or impair vested rights."

It appears clear then the constitutional inhibition does not ordinarily apply to procedural or remedial statutes unless the individual is deprived of substantial protection, *Ex parte Roper,* supra, or his rights are impaired.[FN2]

> FN2. In *McCain v. Yost,* 284 S.W.2d 898, 900 (Tex.1955), the Supreme Court of Texas stated:
>
> "A statute cannot be said to be a retroactive law prohibited by the Constitution unless it can be shown that the application of the law would take away or impair vested rights acquired under existing law."

*611 Entirely apart from any state constitutional impediment, retrospective laws are commonly regarded with disfavor. *Hutchings v. Slemons,* 141 Tex. 448, 174 S.W.2d 487 (1943); 53 Tex.Jur.2d, Statutes, § 29, p. 51. Generally statutes are not to be applied retroactively. *Ex parte Abahosh,* 561 S.W.2d 202, 204 (Tex.Cr.App.1978); *Ridyolph v. State,* 545 S.W.2d 784 (Tex.Cr.App.1977); *Pesch v. State,* 524 S.W.2d 299 (Tex.Cr.App.1975). The general presumption is that an act is intended to operate prospectively and not retroactively and any doubt is to be resolved against retroactive application. *Ex parte Abell,* 613 S.W.2d 255 (Tex.1981); *Gov.' & Personnel Mutual Life Ins. Co. v. Wear,* 251 S.W.2d 525 (Tex.1952). A statute will not be applied retrospectively unless it appears by fair implication from the language used in the entire act that it was the intent of the Legislature to make it applicable to both past and future actions. *Ex parte Abell,* supra, and cases there cited. See also *Fed-Mart of Texas, Inc. v. Calvert,* 474 S.W.2d 297 (Tex.Civ.App.-Austin 1971); *Harvey v. Denton,* 601 S.W.2d 121 (Tex.Civ.App.-Eastland 1980, ref. n.r.e.). Manifest intention of the Legislature is controlling circumstance in interpreting a statute as

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00537

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 8

having retrospective or only prospective effect. *Deacon v. City of Euless,* 405 S.W.2d 59, 61 (Tex.1966); *Sloan v. Calvert,* 497 S.W.2d 125 (Tex.Civ.App.-Austin 1973).

The language in some of the cases are not always consistent with regard to procedural and remedial matters. Some cases indicate the Legislature must indicate, at least by fair implication, that a statute will be retroactive for it to be such, even with respect to procedural matters. *Simpson v. Texas Employers Ins. Assoc.,* 519 S.W.2d 209, 213 (Tex.Civ.App.-Ft. Worth 1975), and cases there cited. Other cases cite the general rule that statutes will not be given retroactive effect in absence of clearly expressed legislative intent, with a recognized exception where the statute deals with procedural or remedial matters as opposed to substantial rights. *Cass v. McFarland's Estate,* 564 S.W.2d 107 (Tex.Civ.App.-El Paso 1978); 53 Tex.Jur.2d, Statutes, § 28, p. 51.

Since there are recognized exceptions to the general rule of the statutory matter, it is procedural or remedial, and does not impair vested rights, *Exxon Corporation v. Brecheen,* 526 S.W.2d 519, 515 (Tex.1975); *Southwestern Bell Tel. Co. v. City of Kountze,* 543 S.W.2d 871, 875 (Tex.Civ.App.-Beaumont 1976), it is observed that unless otherwise provided such procedural or remedial applies to both pending and future actions and becomes operative on the effective date of the legislation. *Wade v. State,* 572 S.W.2d 533 (Tex.Cr.App.1978); *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App.1976), cert. den. 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250; *Wilson v. State,* 473 S.W.2d 532 (Tex.Cr.App.1971). See also *Patterson v. State,* 650 S.W.2d 453 (Tex.App.-Houston [14th] 1982).

The majority views the 1985 amendment to Article 37.10 as a procedural statute. It also appears remedial. See *Pratt v. Story,* 530 S.W.2d 325 (Tex.Civ.App.-Tyler 1975). Nevertheless, the rules as to such statutes are generally the same. There is no dispute that the verdict returned against applic-

ant in trial court Cause No. 314984 was void ab initio and that his final conviction based thereon was void, although not legally adjudicated as such prior to said statutory amendment. Without said amendment there would be no question but what he would be entitled to relief the same as *Bogany, Spaulding* and company. If the 1985 amendment is applied retroactively, applicant will be entirely deprived of that relief. If applied retroactively, then what was a void verdict at its inception in 1980 will now become a valid verdict in 1985 by this Court's action pursuant to the amendment to Article 37.10 in a post-conviction habeas corpus proceedings under Article 11.07, V.A.C.C.P., initiated by applicant prior***612** to the effective date of the said amendment.

It is clear that manifest intention of the Legislature is the controlling circumstance in interpreting whether a statute can be applied retroactively or only prospectively. *Deacon v. City of Euless,* supra; *Sloan v. Calvert,* supra. Only a glance at the amendment shows that the Legislature intended for the statute to have prospective application only. It provides in part:

"If the trial court is required to reform a verdict *under this subsection* and fails to do so, the appellate court shall reform the verdict as provided by this section."

When the verdict in the instant case was returned and accepted and the jury discharged, this amendment or subsection was not in effect. The wording of the amendment clearly indicates the legislative intent that the act was to be utilized by an appellate court only where the trial court was "required to reform a verdict under this subsection" and failed to do so. The amendment not being in effect in 1980, it has no application to applicant's cause or to the action of this Court on his application for post-conviction writ of habeas corpus.

If the majority is determined to apply the statute retroactively merely because it is procedural in nature, then it must, in fairness to the bench and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00538

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 9

bar, come to grips with other questions. It must be decided whether such procedural statute has retroactive application to post-conviction habeas corpus proceedings as a pending or future action. It must decide, despite the claimed procedural nature of the statute, whether it deprives the applicant of substantial protection, due process of law, due course of the law of the land (Article I, § 19, Tex.Const.), the constitutional right of trial by jury, and generally whether the Legislature may validate void convictions in such a manner.[FN3]

> FN3. The guarantee of a right to trial by jury in the Sixth Amendment, United States Constitution, is made applicable to the States by the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Article I, § 10 of the Texas Constitution provides that an accused in a criminal prosecution shall have a speedy public trial by an impartial jury. Article I, § 15 of the said State Constitution provides that the right of trial by jury shall remain inviolate. See also Article 1.12, V.A.C.C.P.; 35 Tex.Jur.2d, Jury, § 9, p. 45. When the jury is to assess punishment under Article 37.07, V.A.C.C.P., the jury must assess in their verdict the punishment intended to be imposed where it is not otherwise fixed by law. Under these circumstances assessment of punishment is exclusively within the province of the jury. See 57 Tex.Jur.2d, Trial, § 393, p. 28.

> It has been fundamental that a trial judge does not have the authority to receive a jury's verdict and then refuse to abide by it, *Hardy v. State*, 261 S.W.2d 172 (Tex.Cr.App.1953), nor change the verdict in any material part, *Champion v. State*, 19 S.W.2d 63, 65 (Tex.Cr.App.1929), nor give effect to part of the verdict and ignore some other part and enter another and different judg-

ment from that called for by the jury's verdict. *Combes v. State*, 162 Tex.Cr.R. 482, 286 S.W.2d 949 (1956); *King v. State*, 135 Tex.Cr.R. 71, 117 S.W.2d 800 (1938).

*Castro v. State*, 118 Tex.Cr.R. 53, 42 S.W.2d 779 (1931), held void the trial court's action in disregarding (upon the State's motion) the recommendation of the jury that the sentence be suspended. There this Court held the action of the trial court violated the

"... fundamental principle that the judge presiding over a trial has no right and no power to change a verdict rendered by the jury unless with their consent and before their discharge. The rights of the accused, under such circumstances, to have the judgment follow the verdict, if formal and agreeable to the issues submitted, is absolute...."

In *Smith v. State*, 479 S.W.2d 680 (Tex.Cr.App.1972), the court on its own, struck a portion of the punishment assessed by the jury. Since the verdict assessed an unauthorized punishment, the verdict was held void at its inception and that the trial court had no authority to change the verdict by deleting the offending portion. See also *McIver v. State*, 586 S.W.2d 851 (Tex.Cr.App.1979).

For the reasons stated, I vigorously dissent to the action of the majority. The applicant is entitled to relief.

CLINTON, Judge, dissenting.

Finding that our prior decisions regarding an unauthorized jury verdict "share a common premise and conclusion," the majority believes that "[t]he logic connecting the premise and conclusion involves the lack of specific vehicle by which the improper verdict could be reformed." Slip Opinion, p. 3. The

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00539

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 10

majority is mistaken. *613 The real reason for the rule flows from the constitutional character and immutable principles of trial by jury in a criminal action. Article I, §§ 10 and 15, Constitution of the State of Texas; see, e.g., *Freeman v. State,* 143 Tex.Cr.R. 265, 186 S.W.2d 683 (1945);[FN1] *Moreau v. Bond,* 114 Tex. 468, 271 S.W. 379 (1925); [FN2] *Ex parte Quintanilla,* 151 Tex.Cr.R. 328, 207 S.W.2d 377 (1947, 1948).[FN3]

> FN1. "The right of trial by jury is one of the sacred rights which our courts should accord every person charged with crime, independent of his guilt or innocence. Our Constitution guarantees to every person charged with crime a fair and impartial trial, with the right to submit the matter of punishment to a jury, even when he pleads guilty to the offense ... unless and until waived in accordance with law." *Id.,* 186 S.W.2d at 684.

> FN2. "Those rights, fundamental in their nature, which have been guaranteed by the Bill of Rights cannot be the subject of judicial discretion. Judicial discretion is a legal discretion and not a personal discretion-a legal discretion to be exercised in accordance with the Constitution and the laws of the land." *Id.,* 207 S.W.2d at 379-380.

> FN3. "The record before this court shows affirmatively by the recitals in the judgment that no punishment was assessed by the jury, but was fixed by the ... Judge. Such a judgment in this character of case is void." *Id.,* 207 S.W.2d at 379.

The dual guarantees of the right of an accused to trial by jury in Article I, §§ 10 and 15 of the Constitution of the State of Texas must be construed together. *Dabney v. State,* 124 Tex.Cr.R. 21, 60 S.W.2d 451 (1933); *Ex parte Holland,* 91 Tex.Cr.R. 339, 238 S.W. 654, 655 (1922); *Moore v. State,* 22 Tex.App. 117, 2 S.W. 634, 635 (1886). Though the latter authorizes the Legislature to pass laws "to

regulate the same, and to maintain its purity and efficiency," it is axiomatic that the clause "does not permit reduction of the right," Interpretive Commentary to § 15, or, as stated by Mr. Bishop, "the substance of it cannot be impaired," 1 Bishop, Criminal Procedure (3rd.Ed.) § 893, quoted approvingly in *Moore v. State,* supra, 2 S.W. at 636.[FN4]

> FN4. "It is also the well settled law of this state that a jury in district court means a jury composed of 12 jurors. Such is the requirement of the Constitution of Texas, Art. V. § 13. *Clark v. State,* Tex.Cr.App., [161 Tex.Cr.R. 278] 276 S.W.2d 819 [1955]." *Houston v. State,* 162 Tex.Cr.R. 551, 287 S.W.2d 643, 652 (Tex.Cr.App.1956), cert. denied 351 U.S. 975, 76 S.Ct. 1042, 100 L.Ed. 1492 (1956), rehearing denied 352 U.S. 861, 77 S.Ct. 28, 1 L.Ed.2d 72 (1956). So, for example, a legislative provision for a jury of six in a district court "violates Article 1, Section 15" and is, therefore, "invalid." *Jordan v. Crudgington,* 149 Tex. 237, 231 S.W.2d 641, 646-647 (1950); see also dissenting opinion of Smedley, J., 231 S.W.2d at 651, and of Griffin, J., 231 S.W.2d at 654.

The constitutional right to trial by jury includes, among other prerequisites, that jurors must take an oath that each "will *a true verdict* render according to the law and evidence ...,"Article 35.22, V.A.C.C.P.[FN5], and "[i]t has been held by all the courts ... that [jurors] sitting in judgment, unsworn, do not constitute a jury," and that "a conviction by an unsworn jury is a mere nullity," *Crisp v. State,* 87 Tex.Cr.R. 137, 220 S.W. 1104, 1106 (1920).[FN6] That requisite is laid down because the ultimate function and plain duty of a jury in this State have practically always been, first, to "speak the truth between the State and the defendant by their verdict of 'guilty' or 'not guilty' of any one of the offenses of which he may be convicted" and, secondly, "to assess the punishment if the same is not absolutely fixed by law." *Buster v. State,* 42 Tex. 315,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00540

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 11

318-319 (1875). By our current statutory definition, "A 'verdict' is a written declaration by a *jury* of *its decision* of the issue submitted to it in the case." Article 37.01, V.A.C.C.P. And, where the issue of punishment is referred to the jury, "the verdict shall not be complete until the jury has rendered a verdict on both the guilt or innocence of the defendant and the amount of punishment, *614 where the jury finds the defendant guilty." Article 37.07, § 3(c). Misdemeanor cases within the jurisdiction of justice and municipal courts aside, "Article 37.07 applies to *all* criminal cases ... with the express exception [§ 2(b)] as to who is to assess punishment in cases under Article 37.071, supra," *Eads v. State,* 598 S.W.2d 304, 308 (Tex.Cr.App.1980) (emphasis in original opinion).

> FN5. All emphasis is mine throughout unless otherwise indicated.

> FN6. The finding of the Court in *Crisp v. State,* supra, and in *Hewey v. State,* 87 Tex.Cr.R. 248, 220 S.W. 1106, 1108 (1920), that the oath actually taken must include "so help you [me] God" was overruled in *Craig v. State,* 480 S.W.2d 680, 684 (Tex.Cr.App.1972).

A trial court "cannot render a verdict or any part thereof," *Harrison v. State,* 162 Tex.Cr.R. 301, 284 S.W.2d 367 (1955). When Judge Woodley wrote that he was echoing what dissenting Judge W.L. Davidson had insisted in his repetitive way was the law in *Bessett v. State,* 78 Tex.Cr.R. 110, 180 S.W. 249 (1915), *viz:*

"An illegal verdict is a paradox. If illegal, it is not to be received or enforced. * * * The judge cannot render a verdict, or any portion of it, except as the jury returns it. He must either take the verdict as it is, or send the jury back to agree in accordance with law. * * * The judge is not a juror, and cannot render a verdict, or any part of it, in a felony case, nor can he substitute his judgment for the verdict of a jury. He has the power to cause a correct and proper verdict to be returned, and, if such verdict is not rendered, he can retire the jury till they agree on such verdict. He cannot substitute his judgment, however, for an incorrect or illegal verdict."

*Id.,* 180 S.W. at 250-251. Of course, as a general proposition, Judge Davidson was correct then,[FN7] and in the context stated his views came to be accepted by the Court. See *Pritchard v. State,* 117 Tex.Cr.R. 106, 35 S.W.2d 717 (1931); see also *Castro v. State,* 118 Tex.Cr.R., 53, 42 S.W.2d 779 (1931). Today, though a trial court may cause to be corrected an informal, contradictory or otherwise illegal verdict in accordance with Article 37.10, V.A.C.C.P., *Ex parte McIver,* 586 S.W.2d 851, 854 (Tex.Cr.App.1979), it is still true that "the court cannot substitute its judgment for the jury's verdict,"*Eads v. State,* 307.

> FN7. *Slaughter v. The State,* 24 Tex. 410, 413-416 (1859); *Alston v. The State,* 41 Tex. 39 (1874); *May v. State,* 6 Tex.App. 191 (Ct.App.1879); *Jones v. State,* 7 Tex.App. 103 (Ct.App.1879); *Gage v. State,* 9 Tex.App. 259 (Ct.App.1880); *Wooldridge v. State,* 13 Tex.App. 443, 454-462 (Ct.App.1883); *Walker v. State,* 13 Tex.App. 618 (Ct.App.1883); *Taylor v. State,* 14 Tex.App. 340 (Ct.App.1883); *Robinson v. State,* 23 Tex.App. 315, 4 S.W. 904 (Ct.App.1887); *Guest v. State,* 24 Tex.App. 530, 7 S.W. 242 (Ct.App.1888); *Rocha v. State,* 38 Tex.Cr.R. 69, 41 S.W. 611 (1897); *Jones v. State,* 54 Tex.Cr.R. 507, 113 S.W. 761 (1908); *Murphree v. State,* 55 Tex.Cr.R. 316, 115 S.W. 1189, 1190 (1909).

That admonishment is especially compelling "where the defect or insufficiency in the verdict relates to the assessment of punishment,"*id.,* at 306. *Horn v. State,* 117 Tex.Cr.R. 22, 35 S.W.2d 145, 146-147 (1931). It is not, as the majority would have it, "the lack of a specific vehicle by which the improper verdict could be reformed" which precludes a court from reforming the verdict. Rather, the problem is that neither the trial court nor an ap-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00541

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 12

pellate court is capable of determining with confidence "the true finding of the [jury as] fact finder" on the matter of punishment.[FN8] Thus, an unauthorized verdict is held to be "void at the inception," *Releford v. State,* 683 S.W.2d 385, 386 (Tex.Cr.App.1984); *Bogany v. State,* 661 S.W.2d 957, 959 (Tex.Cr.App.1957), because only in that way may the right to trial by jury with "a true verdict" remain inviolate.

> FN8. As the Supreme Court pointed out more than one hundred years ago in *Buster v. The State,* supra, at 319:
>
> "To support the judgment, the court must be *able to see from the verdict* of 'guilty' returned by the jury, that it authorizes and requires the assessment of a penalty affixed by law, or that the penalty assessed is warranted by law. And also that the jury are not mistaken in degree of the offense of which they have, in fact, found the defendant guilty, and imposed a penalty not affixed to it by law. How can the court *know this,* unless the verdict finds the offense, or its degree, as well as the penalty?"

With deference, I respectfully dissent.
TEAGUE, Judge, dissenting.
It is true, as Judge Miller points out in the majority opinion he authors for the *615 Court, that in the concurring opinion that I filed in *Bogany v. State,* 661 S.W.2d 957 (Tex.Cr.App.1983), I opined: "[The Legislature] has never seen fit to give this Court or any intermediate appellate court of this State authority to assess punishment or reduce punishment assessed by a jury where the conviction was for a non-capital felony." I also opined, by way of dictum, that "[because] the jury [in that case] could not assess a fine, in addition to the time assessed, *its verdict was void at the inception.*" (My emphasis).

However, the main issue in *Bogany v. State,* supra, was not whether the jury had returned an unauthorized verdict, concerning punishment, but, instead, was whether the court of appeals had the authority and jurisdiction to reform on direct review the judgment of conviction in that cause, by deleting therefrom the fine that had been assessed by the jury. This Court held that it did not have such authority and reversed; thus making the above-underscored dictum. Soon thereafter, I discovered that I had opined too much in the opinion that I filed in *Bogany v. State,* supra.

When the first opportunity presented itself, I attempted to clarify my dictum. In *Ex parte Spaulding,* 687 S.W.2d 741 (Tex.Cr.App.1985), I did so by filing a concurring and dissenting opinion. I wrote, not because I believed that in the future the Legislature of this State would enact a new law giving trial and appellate courts of this State the authority to reform verdicts or judgments, where the punishment assessed was not authorized by law, which it did during the recent, but last regular session of the Legislature, because I am not prescient, but did so because I believed that it was necessary to clarify the above underscored portion of the opinion that I had filed in *Bogany,* supra. In *Ex parte Spaulding,* supra, I agreed, for the reasons stated therein, with the result that the majority opinion authored by Judge Campbell had reached. I did so because the Governor had violated the division of powers that the Constitution of Texas mandates. He was thus without lawful authority to order a remission of the defendant's sentence. However, I attempted in my opinion to point out to the other members of this Court, among other things, that there was a distinction between a void judgment and a voidable judgment. I stated that, "... barring any other facts, that which the Governor did in this cause was a valid act ...," because he was dealing, not with a void judgment, but, instead, was dealing with a voidable judgment. My opinion, however, was not a very convincing one; it received only one vote-mine.

Judge Campbell, however, in *Ex parte Spaulding,* supra, made no bones about what he stated or what

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00542

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 13

he intended to state for this Court, when it came to "Bogany error." Judge Campbell, unequivocally, and without any ifs, ands, or buts, expressly held for the Court that "Bogany error" rendered a judgment of conviction totally and absolutely void, *void ab initio* if you please, thus relegating such to be equivalent to a dead limb on a tree, with such being vulnerable to being chopped off at any time, or, to put it in legalese language, "[I]t is a nullity from the beginning, and may be treated as such without further proceedings to have such nullity judicially declared." Teague, J., Concurring and Dissenting Opinion in *Ex parte Spaulding,* supra.

After quoting from *Black's Law Dictionary* 1745 (Fourth Ed. 1968, West Publishing Co.), Judge Campbell then reemphasized the Court's holding: "Void is further defined in Black's as *that which nothing can cure,*" (My emphasis), and implicitly applied such definition to the judgment in that cause.

Furthermore, but in order to make sure that nobody misunderstood what he was saying, or what he intended to state for the Court, Judge Campbell further stated: "Such judgment and sentence being void, the error is *incurable* and any subsequent attempt at remitting (reforming, in this instance) the fine portion of a void sentence is also void." (My emphasis.) Unquestionably, Judge Campbell did not mince any words about the subject, and made clear to *616 all what this Court was holding when it came to "Bogany error," namely, that if there was "Bogany error" in the verdict of the jury, such rendered the conviction *void ab initio.*

I pause to point out that only Judge White dissented, without opinion, in *Ex parte Spaulding,* supra. Judge Clinton, joined by Presiding Judge Onion, filed a concurring opinion, opining that "we need not strain [today] to distinguish the judgments in those cases from the one here by calling the former 'voidable' and the latter 'void.'" I pointed out in my opinion that "In this instance, I believe that it is necessary that we so strain." However, Judge Clinton, like Judge Campbell did, also did not mince

any words about the matter, and told us what the "true" rule was: "The true rule in Texas is that an appellate court 'may not reduce the punishment assessed by the jury.'" And, he may be right, notwithstanding that his opinion received only two votes: his and Presiding Judge Onion's.

Judge Miller, the author of the majority opinion, who did not write in *Ex parte Spaulding,* supra, implicitly declares for the Court today that even though this Court made the above express and unequivocal statements in *Ex parte Spaulding,* supra, that that is not what the Court actually meant to state, but the Court, instead, actually intended to state the following: "In this sense, [when an unauthorized verdict is returned by a jury and accepted by the trial judge], a judgment and sentence [are] ... void since there [is] no way to cure the infirmity," and reasons that because of the recently enacted legislation "Bogany error" can now be cured by reformation. Facially, this sounds all well and good. However, that is the problem with the majority opinion; it is only facial; it lacks depth and complete analysis.

Presiding Judge Onion of this Court is often prone to utter, when he reads something in law that to him is without legal foundation: "Color Me Amazed." After reading what Judge Miller has written, I am compelled to echo Judge Onion's exclamation.

For the reasons that I stated in the concurring and dissenting opinion that I filed in *Ex parte Spaulding,* supra, now that the Legislature has given this Court, among others, the authority to reform an unauthorized verdict, I am unable to facially state that any judgment of conviction occurring *after* the effective date of that legislation is coram non judice or brutum fulmen, rather than being only a voidable judgment, subject only to direct attack on appeal.

However, but in light of what Judge Clinton has stated, it should be incumbent upon this Court to discuss why that is so, rather than to hide behind the time-worn expression that "even though I said it, that is not what I intended to say, because I

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00543

697 S.W.2d 605
697 S.W.2d 605
(Cite as: 697 S.W.2d 605)

Page 14

meant to say the following." [FN1]

> FN1. Cf. *Alice's Adventures in Wonderland*, by Lewis Carroll.

In light of what this Court stated in *Ex parte Spaulding*, supra, if for no other reason than for this Court to save face, I would only apply the new legislation prospective from the date it became effective, and not make it retroactive as the majority does. I dissent to such action by the majority.

I also dissent because of the failure of the majority to discuss in its opinion the issue that Judge Clinton raises in the concurring opinion he has filed, namely, that no court has the authority or power to "monkey" with a jury's verdict on punishment.

In general, because I cannot adopt what the majority has stated, I must respectfully dissent.

Tex.Cr.App.,1985.
Ex parte Johnson
697 S.W.2d 605

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00544

**12**

00545

Westlaw.

967 S.W.2d 459                                                      Page 1
967 S.W.2d 459
(Cite as: 967 S.W.2d 459)

▷

Court of Appeals of Texas,
Beaumont.
Larry GOHRING, Appellant,
v.
The STATE of Texas, Appellee.
No. 09-96-104 CR.

Submitted Nov. 20, 1997.
Decided March 18, 1998.

Defendant was convicted in the District Court, Liberty County, W.G. Woods, J., of two counts of aggravated sexual assault of child and three counts of indecency with child. He appealed. The Court of Appeals at Beaumont, John Hill, J. (Assigned), held that: (1) testimony of drama therapist was admissible as statements made for purposes of medical diagnosis or treatment; (2) testimony of social worker was not admissible as statement made for purposes of medical diagnosis or treatment; (3) erroneous admission of testimony of social worker did not affect defendant's substantial rights; (4) defendant was not entitled to reporter's notes and memos from magazine article written about his abuse of his children; and (5) evidence was sufficient to show that defendant was charged within ten year statute of limitations.

Affirmed.

West Headnotes

[1] Criminal Law 110 ☞367

110 Criminal Law
   110XVII Evidence
      110XVII(E) Res Gestae
         110k362 Res Gestae; Excited Utterances
            110k367 k. Statements as to and Expressions of Personal Injury or Suffering. Most Cited Cases
Victim's statements to drama therapist were admissible in aggravated sexual assault case under excep-

tion to hearsay rule as statements made for purposes of medical diagnosis or treatment; victim's statements to therapist were made during therapy, and therapist was working under supervision of licensed psychologist and could be considered "medical person." Fed.Rules Evid.Rule 803(4), 28 U.S.C.A.

[2] Criminal Law 110 ☞367

110 Criminal Law
   110XVII Evidence
      110XVII(E) Res Gestae
         110k362 Res Gestae; Excited Utterances
            110k367 k. Statements as to and Expressions of Personal Injury or Suffering. Most Cited Cases
Part of victim's declaration to drama therapist identifying defendant as her abuser was pertinent to medical treatment of the victim and, thus, came within exception to hearsay rule. Fed.Rules Evid.Rule 803(4), 28 U.S.C.A.

[3] Criminal Law 110 ☞367

110 Criminal Law
   110XVII Evidence
      110XVII(E) Res Gestae
         110k362 Res Gestae; Excited Utterances
            110k367 k. Statements as to and Expressions of Personal Injury or Suffering. Most Cited Cases
Victim's statements to social worker were not admissible in aggravated sexual assault case under exception to hearsay rule as statements made for purposes of medical diagnosis or treatment; social worker working as investigator in child abuse cases was not recognizable health professional, and it would not be reasonable to assume victim would be aware that her statement to social worker would be for purposes of medical diagnosis or treatment. Fed.Rules Evid.Rule 803(4), 28 U.S.C.A.

[4] Criminal Law 110 ☞367

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00546

967 S.W.2d 459
967 S.W.2d 459
(Cite as: 967 S.W.2d 459)

Page 2

110 Criminal Law
   110XVII Evidence
      110XVII(E) Res Gestae
         110k362 Res Gestae; Excited Utterances
            110k367 k. Statements as to and Expressions of Personal Injury or Suffering. Most Cited Cases
Medical treatment exception to hearsay rule is based on assumption that patient appreciates that effectiveness of treatment may depend upon accuracy of information provided to physician. Fed.Rules Evid.Rule 803(4), 28 U.S.C.A.

[5] Criminal Law 110 ⟜1153.1

110 Criminal Law
   110XXIV Review
      110XXIV(N) Discretion of Lower Court
         110k1153 Reception and Admissibility of Evidence
            110k1153.1 k. In General. Most Cited Cases
   (Formerly 110k1153(1))

Criminal Law 110 ⟜1153.10

110 Criminal Law
   110XXIV Review
      110XXIV(N) Discretion of Lower Court
         110k1153 Reception and Admissibility of Evidence
            110k1153.10 k. Hearsay. Most Cited Cases
   (Formerly 110k1153(1))
Appellate standard preventing reversal of evidentiary ruling that is within "zone of reasonableness" does not require reviewing court to uphold the trial court's erroneous admission of hearsay testimony because a court somewhere has expressed an opinion that the testimony was admissible.

[6] Criminal Law 110 ⟜1043(2)

110 Criminal Law
   110XXIV Review
      110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
         110XXIV(E)1 In General
            110k1043 Scope and Effect of Objection
               110k1043(2) k. Necessity of Specific Objection. Most Cited Cases
Defendant made sufficiently specific objection at trial to preserve issue of admissibility of testimony of social worker for appeal, where defense counsel specifically pointed out to the trial court, before the trial court ruled on the hearsay objection, that the testimony was not admissible under hearsay exception because the witness was not an emergency room nurse nor a medical care provider. Fed.Rules Evid.Rule 803(4), 28 U.S.C.A.

[7] Criminal Law 110 ⟜1169.1(9)

110 Criminal Law
   110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
         110k1169 Admission of Evidence
            110k1169.1 In General
               110k1169.1(9) k. Hearsay. Most Cited Cases

Criminal Law 110 ⟜1169.2(6)

110 Criminal Law
   110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
         110k1169 Admission of Evidence
            110k1169.2 Curing Error by Facts Established Otherwise
               110k1169.2(6) k. Admissions, Declarations, and Hearsay; Confessions. Most Cited Cases
Erroneous admission of testimony of social worker regarding her conversations with defendant's daughter about defendant's sexual abuse did not affect defendant's substantial rights in aggravated sexual assault case, in view of entire record, including testimony of other witnesses who testified concerning abuse. Rules App.Proc., Rule 44.2(b).

[8] Privileged Communications and Confidenti-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00547

967 S.W.2d 459
967 S.W.2d 459
(Cite as: 967 S.W.2d 459)

Page 3

ality 311H ☞404

311H Privileged Communications and Confidentiality
   311HVII Other Privileges
      311Hk404 k. Journalists. Most Cited Cases
   (Formerly 110k627.6(4))
Reporter's notes and memos from magazine article written about defendant's abuse of his children, which defendant alleged would show conspiracy against him, were immaterial to defendant's motion for change of venue, and thus not subject to discovery, in light of reporter's statements in affidavit that she had no knowledge concerning the amount or nature of publicity concerning defendant outside of the article she wrote, she was not familiar with the circulation of the magazine in defendant's county, she did not have the documents sought, and she would not reveal the name of any confidential source. Vernon's Ann.Texas C.C.P. art. 31.03.

[9] Criminal Law 110 ☞565

110 Criminal Law
   110XVII Evidence
      110XVII(V) Weight and Sufficiency
         110k565 k. Time of Commission of Offense and Limitations. Most Cited Cases
Evidence was sufficient to show that defendant was charged with sexual abuse within 10 year statute of limitations, where testimony by various witnesses all placed acts of abuse within 10 year period.
*460 Steve Hebert, Steve Hebert and Associates, Baytown, for appellant.

Michael R. Little, Dist. Atty., Steve Greene, Asst. Dist. Atty., Liberty, for State.

Before BURGESS, STOVER and HILL,[FN1] JJ.

      FN1. The Honorable John Hill, sitting by assignment pursuant to TEX. GOV'T CODE ANN. § 74.003(b) (Vernon 1988).

OPINION

HILL, Justice (Assigned).

Larry Gohring appeals his conviction by a jury of two counts of aggravated sexual assault of a child and three counts of indecency with a child. The jury assessed his punishment at twenty years' confinement in the Texas Department of Criminal Justice, Institutional Division and a $10,000 fine for his conviction under count one; ten years' confinement under count two; twenty years' confinement under count three; ten years' confinement under count four; and five years' confinement under count five. Gohring contends in seven points of error that the trial court abused its discretion when it granted a reporter's motion to quash her subpoena and that the trial court erred in: (1) receiving prejudicial hearsay testimony from prosecution witness Sandra Taylor over his timely objection; (2) receiving prejudicial hearsay testimony from witness Marie Woods Petite, over his timely objection; (3) receiving prejudicial hearsay testimony from witness Eunice Contrares over his timely *461 objection; (4) failing to sustain his motion to quash the charging instrument because it appears the offense was barred by limitations; and (5) failing to comply with art. 4495b, § 5.08(g)(10), TEX.REV.CIV. STAT. ANN. The State, in a single cross-point of error, urges that the trial court erred in failing to instruct the jury that the burden of proof on the issue of limitations was by a preponderance of the evidence.

We affirm for the reasons set forth in this opinion.

[1] Gohring asserts in point of error three the trial court erred in receiving prejudicial hearsay testimony from Marie Rence Woods Petite. Petite testified she is a drama therapist and had been employed in that capacity for thirteen years. She said she has a master's degree from New York University in drama therapy, had post master's training, and is a registered play therapist. Petite indicated that in April 1992 while working under the supervision of Dr. Martha Kennedy, a licensed psycholo-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

967 S.W.2d 459
967 S.W.2d 459
(Cite as: 967 S.W.2d 459)

Page 4

gist, the Children's Protective Services (CPS) office in Liberty assigned her to be a therapist for one of Gohring's daughters, C.G. Petite said she saw C.G. for six sessions and that in talking with C.G. about the alleged abuse, her purpose was to provide psychological treatment for C.G. Petite testified C.G. told her that she had been sexually abused by her father.

TEX.R.CRIM. EVID. 803(4) provides that statements made for purposes of medical diagnosis or treatment are not excluded by the hearsay rule, even though the declarant is available as a witness.

In the case of this witness, we hold the trial court did not err in admitting this evidence under Rule 803(4) because it would be a reasonable inference that C.G., who was a high school student, would have understood she was seeing Petite for the purpose of medical treatment in connection with the abuse, and that C.G.'s statements to Petite were made for the purpose of medical diagnosis or treatment.

Gohring argues Petite was not a "medical person," but the trial court could have reasonably determined from the evidence that Petite, as a drama therapist working under the supervision of a licensed psychologist for the purpose of providing psychological treatment, was a "medical person." In any event, if the statement is made to another for the purpose of medical treatment, the person to whom the statement is made does not necessarily have to be a "medical person." See FED.R.EVID. 803(4) advisory committee's note.

[2] Gohring also suggests the part of the declaration identifying the abuser should have been excluded, apparently on the basis it is not pertinent to medical treatment of the victim. However, it has been held that such testimony is admissible because it is pertinent to medical treatment of the victim. Tissier v. State, 792 S.W.2d 120, 125 (Tex.App.-Houston [1st Dist.] 1990, pet. ref'd) (citing United States v. Renville, 779 F.2d 430 (8th Cir.1985)); see also Castoreno v. State, 932 S.W.2d 597, 602

(Tex.App.-San Antonio 1996, pet. ref'd); and Fleming v. State, 819 S.W.2d 237, 247 (Tex.App.-Austin 1991, pet. ref'd).

Gohring relies upon the case of United States v. Nick, 604 F.2d 1199 (9th Cir.1979). In Nick, the trial court admitted statements made to a physician by a child who was the victim of sexual assault, but did not allow admission of the child's statement to the physician as to the identity of the assailant. Id. at 1201-02. In affirming the defendant's conviction for the offense of sexual assault, the Court held the statement admitted was admissible under Rule 803(4), but was not required to and did not rule on the correctness of the trial court's ruling, excluding the child's statement identifying the assailant. Id. at 1202. We overrule point of error three.

Gohring contends in point of error four the trial court erred in receiving testimony of a similar nature from Eunice Contrares, the psychotherapist of Gohring's other daughter, J.G. His arguments under this point are the same as in point three. For the reasons discussed in point three, we overrule point of error four.

[3] Gohring contends in points of error one and two the trial court erred by allowing Sandra Taylor to give hearsay testimony. *462 Sandra Taylor, an employee of CPS, testified on the occasion in question she was in intake and investigation and investigated cases of child abuse and opened cases for ongoing services. She indicated if the complaint brought to her attention were a valid complaint, she would look at things in terms of having the children treated either medically or psychologically. She talked to two of Gohring's daughters, C.G. and J.G., both of whom indicated their father had sexually abused them. C.G. was deceased at the time of trial.

Gohring objected to Taylor's statements concerning what his daughters told her about the abuse. The State apparently did not meet the requirements of TEX.CODE CRIM. PROC. ANN. art. 38.072 (Vernon Pamp.1998), which, under certain circumstances, allows the admission of evidence of state-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

05/29/2009 05:15:13 PM          SDMA          415-781-2635          Page    6
Case 3:15-cv-01758-N    Document 38-14    Filed 06/28/16    Page 88 of 148    PageID 2007

Page 6 of 13

967 S.W.2d 459
967 S.W.2d 459
(Cite as: 967 S.W.2d 459)

Page 5

ments made to others by victims of enumerated offenses, when the victim is twelve years of age or younger.

Rather, the State relies upon TEX.R.CRIM. EVID. 803(4). As previously noted, that rule provides evidence is not excluded by the hearsay rule, even if the declarant is available as a witness, when it is a statement "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

[4] "The medical treatment exception to the hearsay rule is based on the assumption that the patient appreciates that the effectiveness of the treatment may depend upon the accuracy of the information provided to the physician." *Fleming,* 819 S.W.2d at 247. While this assumption might be valid where the person to whom the statement is made is a recognized medical professional, there is no basis for such an assumption where, as here, the individual to whom the statement is made is an investigator for CPS, not a recognized medical professional. Even if a part of the witness's duties for the State included the possibility of referral for medical treatment or possible counseling with the child, as suggested by the State, there is no showing the child would have had any appreciation of that fact. Without the child appreciating that any statement made to the witness was for the purpose of medical treatment, there is no basis for the statement having the trustworthiness upon which this exception is based. *See United States v. White,* 11 F.3d 1446 (8th Cir.1993). Consequently, the trial court erred in admitting the testimony because it does not fall within the exception set forth in Rule 803(4).

The State relies upon *United States v. Balfany,* 965 F.2d 575 (8th Cir.1992), and *United States v. DeNoyer,* 811 F.2d 436 (8th Cir.1987), as authority for its assertion that statements made to a social worker are admissible under Rule 803(4). In *DeNoyer,* a five-year-old child's statements to social workers

was found admissible by the trial court under both Rule 803(4) and Rule 803(24) of the Federal Rules of Evidence. *DeNoyer,* 811 F.2d at 438. Rule 803(24) provides for the admissibility, under certain circumstances, of statements not covered by any of the other exceptions to the hearsay rule that have an equivalent circumstantial guarantee of trustworthiness. In its discussion, the Court did not say as to which rule it was basing its approval of the trial court's admission of the testimony; it referred to its prior opinion in *United States v. Renville,* 779 F.2d 430, 439 (8th Cir.1985), in which it held that the child's identification of the abuser was pertinent to medical treatment; and it related its approval of a policy allowing, in the case of young child witnesses, the admission of statements made in a more relaxed environment without the possible harm of traumatic courtroom encounter. *DeNoyer,* 811 F.2d at 438.

None of the bases stated by the Court in *DeNoyer* as justification for the trial court's admission of the social workers' testimony supports the conclusion that a statement made to one who appears to be a social worker is admissible under Rule 803(4) where the child making the statement has not been made aware of any medical significance to the interview.

In *Balfany,* the Court held the trial court did not abuse its discretion in admitting into evidence statements concerning abuse made *463 by an eight-year-old girl to a social worker who testified the information received from the victim was pertinent to diagnosis and treatment of her emotional and psychological injuries. *Balfany,* 965 F.2d at 581. The Court principally relied upon its opinions in *United States v. Provost,* 875 F.2d 172, 176-77 (8th Cir.1989), and *United States v. DeNoyer, supra.* All three of the witnesses whose statements were admitted in *Provost* were either medical doctors or psychologists. *Provost,* 875 F.2d at 176. The real issue in that case appears to be the issue presented in *Renville* as to whether the identity by the declarant of the abuser was pertinent to medical treatment. *Id.* at 176-77. We have previously noted that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

967 S.W.2d 459
967 S.W.2d 459
(Cite as: 967 S.W.2d 459)

Page 6

the Eighth Circuit, in its subsequent opinion in *White*, has held that before such statements made to someone in this witness's position are admissible, the government must show that the victim understood he or she was speaking to a trained professional for the purpose of obtaining diagnosis of, or treatment for, emotional or psychological injuries. *White*, 11 F.3d at 1449-50.

The State relies upon several other opinions, including *Butler v. State*, 892 S.W.2d 138 (Tex.App.-Texarkana 1994, no pet.); *Syndex Corp. v. Dean*, 820 S.W.2d 869, 873 (Tex.App.-Austin 1991, writ denied); *Fleming*, 819 S.W.2d at 237; *Torres v. State*, 807 S.W.2d 884, 886-87 (Tex.App.-Corpus Christi 1991, pet. ref'd); *Macias v. State*, 776 S.W.2d 255 (Tex.App.-San Antonio 1989, pet. ref'd); *In the Interest of L.S.*, 748 S.W.2d 571 (Tex.App.-Amarillo 1988, no pet.); and *Morgan v. Foretich*, 846 F.2d 941 (4th Cir.1988). We find these cases distinguishable because all involve some type of recognizable health professional, such as a physician, nurse, psychologist, or mental health therapist. In those situations, one might reasonably assume, except in some cases involving very young children, that the child understood the statement to such a professional is made for the purpose of medical diagnosis and treatment. A social worker working as an investigator in child abuse cases is not a recognizable health professional in the same way as a physician, nurse, psychologist, or mental health therapist. Consequently, it would not be reasonable to assume the child would be aware that his or her statement to such a social worker would be for the purposes of medical diagnosis or treatment.

The State refers us to that part of the comment to Rule 803(4) of the Federal Rules of Evidence providing that statements to hospital attendants, ambulance drivers, or even members of the family might be included. We first note the comment says that such statements might be included, not that they are included in all circumstances. We find nothing inconsistent between our holding and the comment because we do not hold such statements might never be admissible, only that they are not admissible in the case of a social worker employed as a child abuse investigator unless there is a showing both that there is a medical care component to the worker's employment and that the declarant is aware of that medical care component.

[5] The State urges that because there is authority that would justify the admission of this evidence, the trial court's ruling was within the "zone of reasonable disagreement" and does not constitute reversible error. The State relies upon *Green v. State*, 934 S.W.2d 92, 101-02 (Tex.Crim.App.1996); *Waldie v. State*, 923 S.W.2d 152, 157-58 (Tex.App.-Beaumont 1996, no pet.); *Dillard v. State*, 931 S.W.2d 689, 698-99 (Tex.App.-Dallas 1996, pet. ref'd, untimely filed); and *Williams v. State*, 916 S.W.2d 53, 55-56 (Tex.App.-Houston [1st Dist.] 1996, no pet.). In *Green*, the Court held we are to review the trial court's decision to admit or exclude evidence under an abuse of discretion standard, and that we should not reverse a trial judge whose ruling is within the "zone of reasonable disagreement." *Green*, 934 S.W.2d at 101-02. The additional cases cited by the State make similar holdings. We do not read these cases in such a way as to adopt the State's theory that we must uphold the trial court's erroneous admission of hearsay testimony because a court somewhere has expressed an opinion that the testimony was admissible.

The State suggests Gohring's points of error one and two are multifarious, but even if they are we have chosen to address them. *464 See Arnold v. State*, 873 S.W.2d 27, 29, n. 2 (Tex.Crim.App.1993).

[6] The State also suggests Gohring's objection at trial was insufficient to preserve error. As the State points out in its brief, however, counsel for Gohring specifically pointed out to the trial court, before the trial court ruled on the hearsay objection, that the testimony was not admissible under Rule 803(4) because the witness was not an emergency room nurse nor a medical care provider. We hold the ob-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

967 S.W.2d 459
967 S.W.2d 459                                                              Page 7
(Cite as: 967 S.W.2d 459)

jection was sufficiently specific to call the trial court's attention to the error and was sufficient to preserve error for review.

[7] However, in view of the entire record, including the testimony of other witnesses who testified concerning the abuse, any error in admitting this testimony did not affect Gohring's substantial rights. TEX.R.APP. P. 44.2(b). We overrule points of error one and two.

[8] Gohring argues in point of error five the trial court erred in quashing his subpoena for Cindy Horswell, a reporter for the Houston Chronicle. He had subpoenaed Horswell, who earlier had written an article in Texas Magazine concerning the relationship between Gohring and his daughter. The subpoena sought production of the reporter's notes and memos for the article, as well as any copies of all CPS files relating to the daughter and any other family member. The Chronicle and Horswell moved to quash the subpoena, alleging she had no information or knowledge relevant to Gohring's motion for change of venue. The motion stated she had no knowledge of how many people had read the article or of any other issue relevant to a venue hearing. It further said she had no knowledge of the nature or extent of publicity concerning Gohring. The second reason given for quashing the subpoena was that it sought to compel the reporter to reveal confidential sources and unpublished materials concerning her news gathering activities, both of which it alleged were privileged. Horswell attached her affidavit to the motion. In the affidavit, Horswell swore she had no knowledge concerning the amount or nature of publicity concerning Gohring outside of the article she wrote. Horswell stated she was not familiar with the circulation of the Houston Chronicle in Liberty County, did not have the documents sought, and would not reveal the name of any confidential source.

In his response, Gohring indicates he was seeking Horswell's testimony concerning who had provided her access to the CPS file because he was seeking to show at the venue hearing that there was a con-

spiracy against him by influential persons or persons in position of power and authority over him. The trial court granted the motion to quash Horswell's subpoena, holding that the information sought by virtue of the subpoena would not be relevant or material to any issue properly before the court.

As we have just indicated, the only fact Gohring proposed to use Horswell's testimony to establish was that there was a conspiracy against him by influential persons or persons in position of power and authority over him. In his motion to transfer, one of the bases Gohring alleged in support of the motion was that there was a dangerous combination against him. Gohring swore in his supporting affidavit there was such a conspiracy of influential citizens against him that he could not get a fair trial in Liberty County. No other affidavit submitted in support of his motion contained a statement that Gohring could not get a fair trial in Liberty County because of any combination or conspiracy of citizens against him. The other affidavits all contained an averment that there existed so great a prejudice in Liberty County against Gohring that he could not obtain a fair and impartial trial in Liberty County.

TEX.CODE CRIM. PROC. ANN. art. 31.03 (Vernon 1989), provides that:

(a) A change of venue may be granted in any felony or misdemeanor case punishable by confinement on the written motion of the defendant, supported by his own affidavit and the affidavit of at least two credible persons, residents of the county where the prosecution is instituted, for either of the following causes, the truth and sufficiency of which the court shall determine:

*465 1. That there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial; and

2. That there is a dangerous combination against him instigated by influential persons, by reason

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

967 S.W.2d 459
967 S.W.2d 459
(Cite as: 967 S.W.2d 459)

Page 8

of which he cannot expect a fair trial.

We interpret this article to mean that because Gohring was the only affiant to indicate there is a dangerous combination against him, the only issue at his change of venue hearing would be whether there was so great a prejudice against him in Liberty County that he could not obtain a fair and impartial trial.

Witnesses may contest their being compelled to appear by means of a motion to quash the subpoena. *Coleman v. State*, No. 491-96, 1997 WL 209530, at *3 (Tex.Crim.App. April 30, 1997) (reh'g granted). Having properly applied for the Horswell subpoena, Gohring made a *prima facie* showing of materiality of her testimony. *Id.* at *4. Horswell was then obligated to come forward with some testimony, either in the form of live testimony or affidavits, in support of her motion. *Id.* Horswell did present an affidavit, which established her testimony was not material to any issue before the trial court. When she did so, the burden shifted to Gohring to show what she would have testified to that would have been material to his defense. *Id.* As previously indicated, the only thing Gohring indicated he wanted her testimony for was to establish who gave her the CPS file so he could establish there was a conspiracy of influential persons or persons in position of power and authority over him. Inasmuch as that issue was not before the court, Gohring failed to meet his burden to show her testimony was material to his defense. Consequently, the trial court did not err in granting the motion to quash.

Gohring relies upon the court of appeals opinion in *Coleman*, because his brief was written before the opinion was issued by the Texas Court of Criminal Appeals. *Coleman v. State*, 915 S.W.2d 80 (Tex.App.-Waco 1996), *aff'd* 1997 WL 209530. We find *Coleman* to be distinguishable. In *Coleman*, the Court held the trial court erred by granting a reporter's motion to quash because there is no reporter's privilege in criminal cases in Texas and because the reporters who brought the motion had presented no testimony, either by affidavit or live testimony.

*Coleman*, 915 S.W.2d at 84. In this case Horswell presented an affidavit showing her testimony lacked materiality. At that point the burden fell on Gohring to show materiality, which he failed to do. Given the difference in facts, we rely on *Coleman* in support of this opinion.

Gohring suggests the burden did not shift because Horswell filed an affidavit but did not testify. The witness's showing of lack of materiality may be made by affidavit. *Coleman*, 1997 WL 209530, at *4. We overrule point of error five.

[9] Gohring contends in point six the trial court erred by failing to sustain his motion to quash the charging instrument because it appears the offense was barred by limitations. Construing the point of error together with its accompanying argument, we interpret it as a contention the evidence is insufficient to establish the offense was committed within the statute of limitations.

The indictment in this case was filed August 10, 1994 and alleged August 23, 1984, as the date of the offense. The statute of limitations for this offense is ten years. Act of June 15, 1991, 72nd Leg., R.S. ch. 565, § 6, 1991 Tex. Gen. Laws 2004 (amended 1995, 1997) (current version at TEX.CODE CRIM. PROC. ANN. arts. 12.01(2)(D), (5) (Vernon Supp.1998)). The trial court instructed the jury the evidence was sufficient if it established beyond a reasonable doubt that the offense was committed after August 10, 1984 and before August 10, 1994.

In reviewing the legal sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to support the judgment. *See Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim.App.1992). The critical inquiry is whether, after so viewing the evidence, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Emery v. State*, 881 S.W.2d 702, 705 (Tex.Crim.App.1994). The only deficiency in the proof *466 complained of by Gohring relates to the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

967 S.W.2d 459
967 S.W.2d 459
(Cite as: 967 S.W.2d 459)

Page 9

issue of limitations.

The indictment in this case was returned on August 10, 1994. Sandra Taylor testified C.G. told her in 1992 that the sexual abuse committed on her by her father had occurred four or five years previously. Taylor said Gohring told her it happened in 1987.

Brenda Mayne, a psychologist, said Gohring told her his offenses had occurred in 1984, and that in her interview with him they only talked of one incident.

Dr. Ted Krell, a psychiatrist, said his dictated report reflected that in 1992 Gohring told him that during a period of time five or six years previously, during which he used cocaine, he had all three of his younger children fondle him on several occasions.

Marie Petite, the drama therapist, said C.G. told her in 1992 that she had been sexually abused by her father five years previously.

Eunice Contrares, a clinical psychotherapist, indicated J.G. testified she had performed oral sex upon her father, who had requested it on several occasions. She talked of incidents in which he would take three of the children, herself, C.G., and G.G., to a back room. Contrares said J.G. did not recall the date exactly, but placed it as being when she was around the age of ten. J.G. was born in 1979.

Earline Riser testified that she is a marital and family therapist. Riser had a 1993 memo in which she wrote, "Larry has with remorse, full effect, related every detail in his memory of his inappropriate sexual behavior six years ago."

Dr. Michael Dennis Cox, a clinical psychologist and associate professor in the Department of Psychiatry in Behavioral Sciences at Baylor College of Medicine, testified that, according to his records, Gohring indicated he had exposed himself to his three younger children and had exposed himself to C.G. when she was seven or eight. She turned eight on June 22, 1985.

Dr. Gladys Beale-Ganzhorn, who had been C.G.'s physician, stated her records reflected C.G. had told her in 1992 that there had been a history of sexual abuse by her father six years previously.

G.G., the brother of the victims, testified that the event, which he indicated was May 3, 1984, happened, he thought, while he was in the sixth grade at Colbert Intermediate School. He indicated that from that time until he moved out of the house no similar event occurred again to his knowledge. School records showed that Gene attended the sixth grade at that school from August 1984 to May 1985.

Gohring's wife, Cindy, related what happened on May 3, 1984. Cindy said she believed she was attending Midway Baptist Church when this happened. Cindy said she was a charter member of the church and believed it was already formed at that time. Church records reflect Cindy joined the church on December 5, 1984, within a few months of when the church opened.

Susan Heimbaugh, a nurse and marriage and family therapist, testified she had in her file, in her handwriting, a document dated September 27, 1992, that stated, "History of sexual molestation by father and brother six years ago." She said that was not what C.G. told her and she did not know why she put "six years ago."

We hold the evidence is sufficient to establish the offense was not barred by limitations and overrule point of error six. The State contends in a crosspoint that the trial court erred by failing to instruct the jury that the burden of proof on this issue is by a preponderance of the evidence rather than by beyond a reasonable doubt. In view of our determination of point six, we need not consider this crosspoint.

Gohring argues in point of error seven the trial court erred by failing to comply with TEX.REV.CIV. STAT. ANN. art. 4495b, § 5.08(g)(10) (Vernon Pamp.1998), stating that in a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00554

967 S.W.2d 459
967 S.W.2d 459
(Cite as: 967 S.W.2d 459)

criminal prosecution where a patient is a victim, witness, or defendant, certain records are not discoverable until the court makes an in camera determination as to their relevancy. As noted by Gohring, the record does not reflect whether the trial court made such a determination. Also, the record does not reflect Gohring objected to any such *467 failure on the part of the trial court. Gohring does not contend that any of the records were not material nor any other harm that might have stemmed from such a failure. Nothing is presented for review. *See* TEX.R.APP. P. 33.1(a).

Gohring insists in connection with this point that certain exhibits contained in the court's record were not admitted at trial. He asserts these exhibits were considered by the jury although they were inadmissible. There is nothing in the record reflecting that any such exhibits were considered by the jury. Nothing is presented for review. We overrule point of error seven.

We AFFIRM the judgment.

Tex.App.-Beaumont,1998.
Gohring v. State
967 S.W.2d 459

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Date of Printing: May 29, 2009

## KEYCITE

⊳ Gohring v. State, 967 S.W.2d 459 (Tex.App.-Beaumont,Mar 18, 1998) (NO. 09-96-104 CR)

### History

### Direct History

-->    1 Gohring v. State, 967 S.W.2d 459 (Tex.App.-Beaumont Mar 18, 1998) (NO. 09-96-104 CR)

### Negative Citing References (U.S.A.)

*Distinguished by*

⊳    2 Moore v. State, 82 S.W.3d 399 (Tex.App.-Austin Mar 28, 2002) (NO. 03-01-00176-CR, 03-01-00177-CR), rehearing overruled (May 02, 2002), petition for discretionary review refused (Aug 21, 2002) * * * HN: 1,2,3 (S.W.2d)

⊳    3 Powell v. State, 88 S.W.3d 794 (Tex.App.-El Paso Oct 03, 2002) (NO. 08-01-00406-CR), rehearing overruled (Dec 04, 2002), petition stricken (Apr 23, 2003) * * * HN: 1,2,3 (S.W.2d)

**H**    4 Horner v. State, 129 S.W.3d 210 (Tex.App.-Corpus Christi Feb 19, 2004) (NO. 13-01-637-CR), rehearing overruled (Apr 08, 2004), petition for discretionary review refused (Oct 13, 2004) * * HN: 3 (S.W.2d)

© 2009 Thomson Reuters. All rights reserved.

00556

**13**

00557

Westlaw.

766 S.W.2d 352
766 S.W.2d 352
(Cite as: 766 S.W.2d 352)

*[handwritten: marijuana delivery case / A in procedural rule does not violate ex post facto.]*

Page 1

**H**

Court of Appeals of Texas,
Texarkana.

Willie Bob GOODLOW Appellant,
v.
The STATE of Texas Appellee.
No. 6-88-038-CR.

Feb. 8, 1989.
Rehearing Denied Feb. 28, 1989.

Defendant was convicted of delivery of marijuana of less than four ounces but more than one quarter of an ounce. After matter was remanded, the 276th Judicial District Court, Titus County, William R. Porter, J., proceeded to punishment stage of trial and entered judgment on jury's punishment assessment, and defendant appealed. The Court of Appeals, Grant, J., held that application to defendant of procedural rule directing district court to proceed to punishment stage of trial did not violate ex post facto prohibition.

Affirmed.

West Headnotes

[1] Constitutional Law 92 ⊂⊃2789

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2789 k. Penal Laws in General. Most Cited Cases
            (Formerly 92k203)

Constitutional Law 92 ⊂⊃2790

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General

92k2790 k. Punishment in General. Most Cited Cases
(Formerly 92k203, 92k200)
Ex post facto prohibition bars enactment of any law which exacts punishment for act which was not punishable at time it was committed or which imposes greater punishment than that prescribed when act was committed. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 10, cl. 1.

[2] Constitutional Law 92 ⊂⊃2793

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2793 k. Remedies and Procedure in General. Most Cited Cases
            (Formerly 92k197)
Laws which do not amend substantive law by defining criminal acts or providing for penalties are procedural in nature, and are not usually within ex post facto prohibition. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 10, cl. 1.

[3] Constitutional Law 92 ⊂⊃2791

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2791 k. Substantive Rights in General. Most Cited Cases
            (Formerly 92k197)

Constitutional Law 92 ⊂⊃2793

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2793 k. Remedies and Procedure in General. Most Cited Cases
            (Formerly 92k197)
Procedural statute is not ex post facto merely be-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00558

766 S.W.2d 352
766 S.W.2d 352
(Cite as: 766 S.W.2d 352)

Page 2

cause it works to defendant's disadvantage; however, if procedural change is retroactive and results in deprivation of substantive protection it is unconstitutional. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 10, cl. 1.

[4] Statutes 361 ☞278.6

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.4 Prospective Construction
                361k278.6 k. Presumptions. Most Cited Cases
        (Formerly 361k263)

Statutes 361 ☞278.7

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.7 k. Express Retroactive Provisions. Most Cited Cases
        (Formerly 361k263)
Statute is presumptively prospective in application unless it is expressly made retrospective. V.T.C.A., Government Code § 311.022.

[5] Statutes 361 ☞278.13

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies and Procedures
                361k278.13 k. In General. Most Cited Cases
        (Formerly 361k267(1))

Statutes 361 ☞278.14

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies and Procedures
                361k278.14 k. Application to Pending

Actions and Proceedings. Most Cited Cases
        (Formerly 361k267(2))
Procedural statute controls litigation from its effective date, and may be applied to trials for offenses committed before its effective date and to proceedings pending at time of its enactment.

[6] Constitutional Law 92 ☞2810

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(B) Particular Issues and Applications
            92k2809 Criminal Proceedings
                92k2810 k. In General. Most Cited
        (Formerly 92k197)

Criminal Law 110 ☞1005

110 Criminal Law
    110XXIV Review
        110XXIV(A) Nature and Form of Remedy
            110k1005 k. Constitutional and Statutory Provisions. Most Cited Cases
Application to defendant of procedural statute, directing trial court to proceed to punishment stage of trial when appellate court has awarded new trial on basis of error in punishment stage of trial, did not violate ex post facto prohibition, though judgment and mandate of appellate court recited that judgment was reversed in all things and ordered new trial and defendant maintained he relied upon judgment and mandate of appellate court in not pursuing further appellate review, where appellate court's judgment was not rendered until after effective date of amended rule. Vernon's Ann.Texas C.C.P. art. 44.29(b); U.S.C.A. Const. Art. 1, § 10, cl. 1; Vernon's Ann.Texas Const. Art. 1, § 16.

*353 R.L. Whitehead, Jr., Longview, for appellant.

Charles C. Bailey, Dist. Atty., Mt. Pleasant, for appellee.

GRANT, Justice.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00559

766 S.W.2d 352
766 S.W.2d 352
(Cite as: 766 S.W.2d 352)

Page 3

Willie Bob Goodlow appeals from a conviction for delivery of marihuana of less than four ounces but more than one-quarter of an ounce. A jury assessed his punishment at two years of confinement in the Texas Department of Corrections and a fine of $2,500.

In his sole point of error, Goodlow contends that the trial court erred by proceeding to the punishment stage of the trial because application of Tex.Code Crim.Proc.Ann. art. 44.29(b) (Vernon Supp.1989) to his cause violates the prohibition against ex post facto legislation found in U.S. Const. art. I, § 10 and Tex. Const. art. I, § 16.[FN1]

> FN1. U.S. Const. art. I, § 10 provides in part that: "No State shall ... pass any ... ex post facto law...." Tex. Const. art. I, § 16 provides: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."

On August 27, 1986, Goodlow was convicted of the offense of delivery of marihuana of less than four ounces but more than one-quarter ounce. The same jury then assessed his punishment at ten years of confinement in the Texas Department of *354 Corrections. Goodlow then perfected an appeal to this Court. On October 27, 1987, this Court, in an unpublished opinion, reversed the judgment of the trial court and remanded the case to the trial court for a new trial based upon impermissible jury argument at the punishment stage of his trial. The judgment and the mandate both recited that the judgment was reversed in all things and ordered a new trial. On remand, the trial court granted the State's motion to proceed to the punishment stage of the trial. A jury then assessed his punishment at two years of confinement in the Texas Department of Corrections and a fine of $2,500.

Article 44.29(b) provides in part that:

If the court of appeals ... awards a new trial to the defendant only on the basis of an error or errors made in the punishment stage of trial, the cause shall stand as it would have stood in case the new trial had been granted by the court below, except that the court shall commence the new trial as if a finding of guilt had been returned and proceed to the punishment stage of the trial....

The effective date of this amendment was August 31, 1987. (Act of May 26, 1987, ch. 179, 1987 Tex.Gen. Laws 1387). This article is directed to the trial court. *Ex parte Sewell,* 742 S.W.2d 393 (Tex.Crim.App.1987) (Opinion on motion for rehearing); *Ex parte Klasing,* 738 S.W.2d 648 (Tex.Crim.App.1987) (Opinion on motion for rehearing).

[1][2][3] The ex post facto prohibition bars the enactment of any law which exacts a punishment for an act which was not punishable at the time it was committed or which imposes a greater punishment than that prescribed when the act was committed. *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17, 22 (1981). Laws which do not amend substantive law by defining criminal acts or providing for penalties are procedural in nature. *Ex parte Johnson,* 697 S.W.2d 605, 607 (Tex.Crim.App.1985); *Ex parte Allen,* 699 S.W.2d 886, 895 (Tex.App.-Dallas 1985, pet. ref'd) (Opinion on motion for rehearing). Remedial or procedural laws are not usually within the ex post facto prohibition. *Ex parte Allen, supra;* 18 Tex.Jur.3d *Criminal Law* § 11 (1982); 1 C. Torcia, *Wharton's Criminal Law* § 13 (14th ed. 1978). A procedural statute is not ex post facto merely because it works to a defendant's disadvantage. *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344, 356 (1977). However, if a procedural change is retroactive *and* results in a deprivation of a substantive protection it is unconstitutional. *Ex parte Abahosh,* 561 S.W.2d 202, 203 (Tex.Crim.App. [Panel Op.] 1978); *Ex parte Allen, supra.*

[4][5] A statute is presumptively prospective in application unless it is expressly made retrospective. *Nichols v. State,* 754 S.W.2d 185, 204

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00560

766 S.W.2d 352
766 S.W.2d 352
(Cite as: 766 S.W.2d 352)

Page 4

(Tex.Crim.App.1988); *Ex parte Abahosh, supra,* at 204; *Ridyolph v. State,* 545 S.W.2d 784, 786 (Tex.Crim.App.1977); *Pesch v. State,* 524 S.W.2d 299, 301 (Tex.Crim.App.1975); Tex.Gov't Code Ann. § 311.022 (Vernon 1988). A procedural statute controls litigation from its effective date, *Granviel v. State,* 552 S.W.2d 107, 117 (Tex.Crim.App.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977), and it may be applied to trials for offenses committed before its effective date and to proceedings pending at the time of its enactment. 18 Tex.Jur.3d *Criminal Law* § 11 (1982).

[6] Goodlow contends that, although Article 44.29(b) is a procedural statute, its application in this instance is unconstitutional because it deprives him of substantive protections. Goodlow first argues that the application of this statute to his case deprives him of the right to a new trial on guilt-innocence which was a right he had when the offense was committed. This court determined that Goodlow had received a trial on guilt or innocence in which there was no harmful error. The Constitution does not require that a defendant receive two error-free trials on guilt or innocence.

He does assert that his case is similar to *Ex parte Bonham,* 707 S.W.2d 107 (Tex.Crim.App.1986). In *Bonham,* the Court held that the retroactive application of Tex.Penal Code Ann. § 12.46 (Vernon Supp.1989)*355 (permitting a conviction to be used more than once for enhancement purposes) to offenses committed before its effective date violated the constitutional prohibition against ex post facto laws. In *Bonham,* the statute subjected the defendant to a harsher penalty. In the instant case, Goodlow is not subjected to a harsher penalty: he is merely denied the privilege of relitigating an error-free stage of the proceedings.

Goodlow further contends that the trial court's application of Article 44.29(b) deprived him of his right of appeal. During the oral argument of this case, appellant's counsel maintained that Goodlow relied upon the judgment and mandate of this Court

as an indication that he would receive a new trial, on guilt-innocence and on punishment. On the basis of these directions, counsel argues, further appellate review was not pursued.

First, the judgment and mandate from this Court should have been construed with the opinion finding error only in the punishment stage and Tex.Code Crim.Proc.Ann. art. 44.29(b) which required the trial court to proceed to trial at the punishment stage.

We next observe that federal constitutional considerations have never mandated that states afford convicted criminal defendants appellate review. *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974); *McKane v. Durston,* 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894). Convicted criminal defendants in Texas do enjoy a prescribed first appeal as a matter of right; however, discretionary review by the Court of Criminal Appeals is not a matter of right. Tex. Const. art. V, § 5; Tex.Code Crim.Proc.Ann. arts. 4.04, 44.02 (Vernon Supp.1989); Tex.R.App.P. 200(b). Furthermore, Goodlow did not file a motion for rehearing or seek further review by the Court of Criminal Appeals on the points of error overruled by this Court. Thus, Goodlow has not been deprived of his right to appeal.

Goodlow contends that his predicament is similar to that of the defendant in *Ex parte Abahosh, supra. Abahosh* concerned the 1977 amendment to Tex.Code Crim.Proc.Ann. art. 44.02, which limited a defendant's right to appeal from judgments entered upon guilty pleas in certain plea bargain situations. In *Abahosh,* the defendant had pled guilty, and the judgment had been entered prior to the effective date of the amendment. The application of the amendment deprived the defendant of a "substantive protection," his right to appellate review. Goodlow, however, was not barred from seeking appellate review: he did in fact have this Court's review of his case, and he did have the opportunity to seek further review.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

766 S.W.2d 352
766 S.W.2d 352
**(Cite as: 766 S.W.2d 352)**

Page 5

The instant case is more nearly akin to *Ex parte Allen, supra.* In *Allen,* the court considered the application of the 1985 amendment to Article 44.38, which abolished the right to a motion for rehearing in extradition appeals when the order approving extradition had been affirmed. In its consideration of the retroactivity issue, the court looked to the date the appellant's right to a rehearing would have come into existence, the date of its decision. *Ex parte Allen, supra,* at 896. The court then reasoned that since its decision was not rendered until after the effective date of the amendment, and since the appellant's right could not accrue until after the decision was rendered, the application was not retroactive.

Similarly, any right Goodlow had to a new trial on guilt-innocence could not have existed until this Court held that the trial court had committed reversible error. Since this Court's judgment was rendered after the effective date of the amendment, Goodlow was not retroactively deprived of a substantive right.

Accordingly, we affirm the judgment of the trial court.

Tex.App.-Texarkana,1989.
Goodlow v. State
766 S.W.2d 352

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00562

**14**

00563

05/29/2009 10:27 FAX

Westlaw.

807 S.W.2d 582
807 S.W.2d 582
(Cite as: 807 S.W.2d 582)

Page 1

C

Court of Criminal Appeals of Texas,
En Banc.

Troy Lee GRIMES, Appellant,
v.
The STATE of Texas, Appellee.
No. 769-88.

March 27, 1991.

Defendant was convicted in the 223rd Judicial District, Gray County, Don E. Cain, J., of aggravated sexual assault, and he appealed. The Amarillo Court of Appeals, Seventh Supreme Judicial District, reversed for full new trial, finding that application of statute that would deprive defendants of retrial on guilt or innocence for errors in sentencing phase of trial would violate ex post facto provisions of State Constitution. State petitioned for discretionary review. On grant of petition, the Court of Criminal Appeals, McCormick, P.J., held that application of statute to defendant would not constitute ex post facto law, even though statute became effective after defendant's trial, but prior to reversal of his conviction.

Vacated and remanded with instructions.

Miller, J., filed concurring opinion.

Baird, J., filed dissenting opinion.

Clinton, J., dissented.

West Headnotes

[1] Constitutional Law 92 2782

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2782 k. Relationship Between Federal and State Provisions. Most Cited Cases
    (Formerly 92k199, 92k18)

Proscription against ex post facto laws in State Constitution is interpreted to have same meaning as proscription against ex post facto laws contained in Federal Constitution; test is whether statute assigns more disadvantageous criminal or penal consequences to act than did law in place when act occurred, but whether statutory change touches any vested or substantial rights is irrelevant. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, §§ 9, cl. 3, 10, cl. 1.

[2] Constitutional Law 92 2810

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(B) Particular Issues and Applications
            92k2809 Criminal Proceedings
                92k2810 k. In General. Most Cited Cases
    (Formerly 92k199)

Criminal Law 110 906

110 Criminal Law
    110XXI Motions for New Trial
        110k906 k. Constitutional and Statutory Provisions as to New Trial. Most Cited Cases
Statute that deprived defendant of retrial on grounds of guilt and innocence for errors in sentencing phase and that was enacted after defendant's trial, but prior to reversal of his conviction, was not ex post facto law; statute did not have effect of punishing defendant for crime previously committed which was innocent when done, did not make more burdensome punishment for crime after its commission, and did not deprive defendant of any defense available at time act was committed. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 10, cl. 1; Vernon's Ann.Texas C.C.P. art. 44.29(b).

[3] Criminal Law 110 906

110 Criminal Law
    110XXI Motions for New Trial
        110k906 k. Constitutional and Statutory Provisions as to New Trial. Most Cited Cases

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00564

807 S.W.2d 582
807 S.W.2d 582
(Cite as: 807 S.W.2d 582)

Page 2

Statutes 361 €⟶278.29

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.24 Validity of Particular Retroactive Statutes
                361k278.29 k. Criminal Law. Most Cited Cases
    (Formerly 92k188)
Statute that deprived defendant of retrial on grounds of guilt or innocence for errors that occurred in sentencing phase of trial was not proscribed retroactive law, though statute was enacted after defendant's trial, but prior to reversal of his conviction; statute affected matters of procedure only. Vernon's Ann.Texas C.C.P. art. 44.29(b); Vernon's Ann.Texas Const. Art. 1, § 16.
*583 J. Pink Dickens,Clyde M. Hudson, Amarillo, for appellant.

Guy Hardin, Dist. Atty., and Harold L. Comer, Asst. Dist. Atty., Pampa, Robert Huttash, State's Atty. and Alfred Walker, First Asst. State's Atty., Austin, for the State.

Before the court en banc.

OPINION ON THE STATE'S PETITIONS FOR DISCRETIONARY REVIEW

McCORMICK, Presiding Judge.

A jury convicted appellant, Troy Lee Grimes, of aggravated sexual assault for which he was sentenced to life imprisonment and ordered to pay a $10,000.00 fine. For reasons not important to this opinion, the Amarillo Court of Appeals reversed the conviction "for errors committed in the punishment phase only."[FN1] Grimes v. State, (Tex.App.-Amarillo, No. 07-87-0137-CR, delivered May 23, 1988) (unpublished opinion). Instead of simply remanding the case to the trial court, the Court of Appeals, after it held that application of Article 44.29(b), V.A.C.C.P., would violate the Ex Post Facto Provision of the Texas Constitution, ordered the trial court to provide appellant with "a full new trial." Grimes v. State, (Tex.App.-Amarillo, No. 07-87-0137-CR, delivered June 21, 1988) (unpublished opinion on rehearing).

Both the District Attorney and State Prosecuting Attorney petitioned this Court for discretionary review. Both petitions were granted to determine the correctness of the Court of Appeals' holding. We will reverse.

> FN1. In the Court of Appeals, appellant asserted that certain errors had occurred in the guilt/innocence phase of trial along with errors in the punishment phase. The Court of Appeals decided the point of error concerning the guilt/innocence phase of trial adversely to appellant and that issue is not before this Court.

Article 44.29(b) became effective after appellant's trial but before his conviction was reversed on appeal; it provides in part:

"If the court of appeals or the Court of Criminal Appeals awards a new trial to the defendant only on the basis of an error or errors made in the punishment stage of the trial, the cause shall stand as it would have stood in case the new trial had been granted by the court below, except that the court shall commence the new trial as if a finding of guilt had been returned and proceed to the punishment stage of the of the trial...." The Court of Appeals noted that " laws changing procedure are not generally within the prohibition imposed by the Texas Constitution on the retroactive application of criminal statutes" but that if it is shown that the ex post facto application of Article 44.29(b) deprives the accused of "substantial protection," such application is unconstitutional. Slip op. pp. 2-3, citing Ex parte Abahosh, 561 S.W.2d 202, 203 (Tex.Cr.App.1978), and Ex parte Roper, 61 Tex.Crim. 68, 134 S.W. 334, 339 (1911). The lower appellate court observed that Article 44.29(b)"deprives the appellant of a retrial on his guilt or innocence," and from this premise the court concluded that "application of the statute was improper." Slip op. p. 3.

[1] Article 1, Section 16, of the Texas Constitution provides that "[n]o bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." The term "ex post facto law" literally means any law passed "after the fact" or commission of an act, *584 which retrospectively changes the consequences of such act. However, as early opinions from the United States Supreme Court

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

807 S.W.2d 582
807 S.W.2d 582
(Cite as: 807 S.W.2d 582)

Page 3

have explained, "ex post facto law" is a term of art that had an established meaning at the time of the framing of the United States Constitution. *Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).* Justice Chase's opinion in *Calder v. Bull, 3 Dall. 386, 391, 1 L.Ed. 648 (1798),* was the first to delineate those legislative acts which implicated the *Ex Post Facto* Clause of the United States Constitution:

"1st. Every law that makes an action done before passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender." *Calder, 3 Dall. at 390.*

The early opinions from the Supreme Court accepted the *Calder* definition of "ex post facto" as being exclusive. See, e.g., *Fletcher v. Peck, 6 Cranch 87, 138, 3 L.Ed. 162 (1810); Cummings v. Missouri, 4 Wall. 277, 325-326, 18 L.Ed. 356 (1867); Gut v. State, 9 Wall. 35, 38, 19 L.Ed. 573 (1870); Hopt v. Utah, 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884).*[FN2] With the passage of time, however, the Supreme Court added to the *Calder* definition.

> FN2, Cases subsequent to *Calder* made clear that the *Ex Post Facto* Clause was not intended to prohibit application of new evidentiary rules in trials for offenses committed before the changes. See *Thompson v. Missouri, 171 U.S. 380, 386-387, 18 S.Ct. 922, 924-25, 43 L.Ed. 204 (1898); Hopt v. Utah, 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884).*

In *Thompson v. Utah, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898),* the Supreme Court held that a Utah law which reduced the size of juries in criminal cases from twelve persons to eight persons deprived Thompson of "a substantial right involved in his liberty." Consequently, when the new law was utilized in his trial after the commission of the offense, such was said to violate the *Ex Post Facto* Clause of the

United States Constitution. *170 U.S. at 352, 18 S.Ct. at 623.* The *Thompson* concept of extending the *Ex Post Facto* Clause to protect "substantial rights involved in liberty" has since evolved to prohibit subsequently enacted laws affecting "matters of substance," by depriving a defendant of "substantial protection with which the existing law surrounds the person accused of crime," *Duncan v. Missouri, 152 U.S. 377, 382-383, 14 S.Ct. 570, 571-572, 38 L.Ed. 485 (1894),* or which arbitrarily infringe upon preexisting "substantial personal rights." *Malloy v. South Carolina, 237 U.S. 180, 183, 35 S.Ct. 507, 508, 59 L.Ed. 905 (1915).* See also *Kring v. Missouri, 107 U.S. 221, 228, 2 S.Ct. 443, 444, 27 L.Ed. 506 (1883)* (defining ex post facto laws as those which "in relation to the offense or its consequences, alters the situation of a party to his disadvantage").

When interpreting our state constitution's *Ex Post Facto* Provision, Texas cases have followed the Supreme Court lead. Of particular interest is the case of *Ex parte Abahosh,* cited by the Court of Appeals in this case to support its holding. In *Abahosh,* a panel of this Court held that a statute, enacted after a defendant had pled guilty to criminal charges and which restricted his privilege to appeal from that plea, acted to deprive the defendant of "substantial protections." Specifically, Presiding Judge Onion, writing for the panel, stated:

"At the time of the guilty pleas and the entry of the judgments assessing punishment, appellant's plea bargain did not give the trial court the authority to nullify his right to appeal. To apply the 1977 amendment of Article 44.02, supra, retroactively merely because there was a delay and the imposition of sentence and the giving of the notice of appeal were after the effective date of the amendment *would result in depriving the petitioner of substantial protection* -the *585 right to appellate review. See *Ex parte Roper,* supra. This would be a violation of Article 1, § 16 of our State Constitution, and further violate fundamental fairness embodied in 'the due course of the law of the land.' Article 1, § 19, Texas Constitution." *561 S.W.2d at 204* (emphasis added).

Other Texas cases utilizing the *Thompson* "substantial protections" concept of ex post facto analysis are: *Ex parte Alegria, 464 S.W.2d 868, 872 (Tex.Cr.App.1971)* (recognizing "substantial disadvantage" test); *Ex parte Rutledge, 741 S.W.2d 460,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

807 S.W.2d 582
807 S.W.2d 582                                                                    Page 4
(Cite as: 807 S.W.2d 582)

461-462 (Tex.Cr.App.1987) (same); *Hill v. State,* 146 Tex.Crim. 333, 171 S.W.2d 880, 883-884 (App.1943) (Court seemingly adopts "substantial disadvantage" test but purports to accept *Calder v. Bull* definition as exclusive test for *ex post facto* analysis). Recently, however, the Supreme Court, utilized a case originating in this State to reevaluate *Thompson* and its progeny.

In *Collins v. Youngblood,* supra, the Court was asked to determine if Article 37.10(b), V.A.C.C.P.,[FN3] when applied to a defendant after the commission of his crime but before appellate review, violated the *ex post facto* prohibition of Article 1, Section 10, of the United States Constitution. The Court found that it did not and in so doing disavowed the *Thompson* line of cases. The Court wrote:

> FN3. Article 37.10(b) provides:
>
> "If the jury assesses punishment in a case and in the verdict assesses both punishment that is authorized by law for the offense and punishment that is not authorized by law for the offense, the court shall reform the verdict to show the punishment authorized by law. If the trial court is required to reform a verdict under this subsection and fails to do so, the appellate court shall reform the verdict as provided by this subsection."

"Several of our cases have described as 'procedural' those changes which, even though they work to the disadvantage of the accused, do not violate the *Ex Post Facto* Clause. [Citations omitted.] While these cases do not explicitly define what they mean by the word 'procedural,' it is logical to think that the term refers to changes in the procedures by which a criminal case is adjudicated, as opposed to changes in the substantive law of crimes. Respondent correctly notes, however, that we have said a procedural change may constitute an *ex post facto* violation if it 'affects matters of substance,' *Beazell [v. Ohio,* 269 U.S. 167, 171, 46 S.Ct. 68 [69], 70 L.Ed. 216 (1925)] by depriving a defendant of 'substantial protections with which the existing law surrounds the person accused of crime,' *Duncan v. Missouri,* 152 U.S. 377, 382-383, 14 S.Ct. 570 [571-572], 38 L.Ed. 485 (1894), or arbitrarily infringing upon 'substantial personal rights.' *Mallory v. South Carolina,* 237 U.S.

180, 183, 35 S.Ct. 507 [508], 59 L.Ed. 905 (1915); *Beazell,* supra, 269 U.S. at 171 [46 S.Ct. at 69].

"We think this language from the cases cited has imported confusion into the interpretation of the *Ex Post Facto* Clause." 110 S.Ct. at 2720.

The *Youngblood* Court determined that the interpretation most faithful to the "original understanding" of the *Ex Post Facto* Clause is that espoused in *Calder* and that case law adopting the *Thompson* analysis is inconsistent "with the understanding of the term 'ex post facto' at the time the Constitution was adopted." 110 S.Ct. at 2722.[FN4] The Court determined that Article 37.10(b) "does not punish as a crime an act previously committed, which was innocent when done; nor make more burdensome the punishment for a crime after its commission; nor deprive one charged with crime of any defense available according to law at the time when the act was committed." The Court ultimately concluded that Article 37.10(b)'s application to Youngblood was not prohibited by the *Ex Post Facto* Clause of the federal Constitution. 110 S.Ct. at 2724.

> FN4. *Collins v. Youngblood,* besides disavowing the use of language such as "substantial protections" and "personal rights" in any of its prior cases purporting to perform an *ex post facto* analysis, specifically overruled *Kring v. Missouri* and *Thompson v. Utah,* 110 S.Ct. at 2723 and 2724.

We have since adopted the *Collins v. Youngblood* analysis as proper in interpreting*586 our state constitutional proscription of *ex post facto* legislation. Judge Clinton, writing for a unanimous Court in *Ex parte Robinson,* 792 S.W.2d 109 (Tex.Cr.App.1990), declared: "[T]he amendment to [Section 54.02(h) of the Texas Family Code] affects neither the definition or gravity of the crime itself nor the degree or manner of the punishment therefor. We perceive no [State or federal] *ex post facto* violation." 792 S.W.2d at 110, citing, inter alia, *Collins v. Youngblood* and *Calder v. Bull.*

Since Texas first became a State, we have constitutionally prohibited the making of *ex post facto* legislation, see Texas Constitution Article 1, Section 16, (1845)Texas Constitution Article 1, Section 14 (1861, 1866 and 1869); Texas Constitution Article 1, Section

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

U0567

807 S.W.2d 582
807 S.W.2d 582
(Cite as: 807 S.W.2d 582)

Page 5

16 (1876), and in so doing Texas courts have followed the Supreme Court's analysis in interpreting the Texas Constitutions. For example, *Holt v. State*, 2 Tex. 363 (1847), was one of the first cases in which the Court undertook to interpret our constitutional prohibition against *ex post facto* legislation. There the court was asked to determine whether a statute which mandated jury sentencing where prior law had mandated judge sentencing violated the Texas Constitution of 1845 when applied to crimes that were committed prior to adoption of the legislation. The *Holt* court adopted the *Calder* definition when it wrote:

"The acts ... requiring the jury in certain cases to assess the amount of punishment to be inflicted, only provides a different mode of ascertaining the amount of fine or duration of imprisonment from that before existing. It merely substitutes the opinion of the jury for that of the judge ... but it does in no respect operate to the prejudice of the accused, and is not, therefore, an *ex post facto* law in reference to offenses for which these were prosecutions pending at the time of its enactment. The prohibition as to *ex post facto* laws, Constitution, art. 1, section 14, has been held to extend only to a law which makes an act done before its passage, and which was innocent when done, criminal; or which aggravates a crime and makes it greater than when committed; or which changes a punishment and inflicts a greater punishment than the law annexed to the crime when committed; or which alters the legal rules of evidence and receives less or different testimony than the law required at the time of the commission of the offense, in order to convict the offender." *Holt*, 2 Tex. at 364, citing, inter alia, *Calder v. Bull.*

*Holt* is consistent with a basic tenet of constitutional interpretation. That is, "if a term appears to have received a judicial construction prior to its use in a constitutional provision, the inference is that it bears this signification." *Gallagher v. State*, 690 S.W.2d 587, 592 (Tex.Cr.App.1985). See also *Carr v. Tucker*, 42 Tex. 330, 337 (1875). "*Ex post facto*" had a special significance prior to the adoption of the Texas Constitution. The *Youngblood* Court observed:
"The *Beazell [v. Ohio*, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925) ] is faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause: Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts. Several earlier state constitutions em-

ployed this definition of the term, and they appear to have been a basis for the Framers' understanding of the provision." 110 S.Ct. at 2719.

As such, we, like the Supreme Court, adopt the *Calder* and *Youngblood* definition of "*ex post facto*" and hold that such is to be used in interpreting the same term found in Article I, Section 16 of the Texas Constitution. Moreover, we disavow the past use of the *Thompson*-like analysis-as it relates to interpreting the *Ex Post Facto* Provision of the Texas Constitution-in any of our prior cases.

In the case before us today, the Court of Appeals utilized *Thompson*'s now disavowed concept of *ex post facto* proscription to find that appellant was entitled to a new trial after a reversal of his conviction: the Court of Appeals held that appellant had a "substantial right" in re-litigating his guilt and therefore Article 44.29(b) could not *587 take away that right. This is an incorrect analysis under the *Ex Post Facto* Clause of the United States Constitution, the *Ex Post Facto* Provision of the Texas Constitution and our opinion today. "When a court engages in *ex post facto* analysis, [it should be] concerned solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred, [and] it is irrelevant whether the statutory change touches any vested rights." *Weaver v. Graham*, 450 U.S. 24, 29 n. 13, 101 S.Ct. 960, 964 n. 13, 67 L.Ed.2d 17 (1981).[FN5]

FN5. The Supreme Court explained that a law need not impair a "vested" right to violate the *ex post facto* prohibition and that evaluating whether a right has vested "is important under the Contracts or Due Process Clauses which solely protect pre-existing entitlements." *Weaver v. Graham*, 450 U.S. at 29-30, 101 S.Ct. at 964-965. The Court further explained:

"The presence or absence of an affirmative, enforceable right is not relevant, however, to the *ex post facto* prohibition, which forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00568

807 S.W.2d 582
807 S.W.2d 582
(Cite as: 807 S.W.2d 582)

Page 6

fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Id. at 30, 101 S.Ct. at 965.

Also, some prior cases have dealt with changes in laws which have disadvantaged the accused but because they were deemed "procedural" changes (as opposed to "substantive" changes) were said not to violate the Ex Post Facto Clause. See, e.g., Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) and cases cited therein. These too are obsolete after Collins v. Youngblood. As the Court observed, "by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the Ex Post Facto Clause." Youngblood, 110 S.Ct. at 2721.

[2] In the case before us, application of Article 44.29(b) does not punish as a crime an act previously committed, which was innocent when done; it does not make more burdensome the punishment for a crime after its commission; it does not deprive appellant of any defense available according to law at the time when the act was committed. Its application to appellant therefore is not prohibited by the Ex Post Facto Clause of the United States Constitution or the Ex Post Facto Provision of the Texas Constitution. See Collins v. Youngblood, 110 S.Ct. at 2724.

[3] Appellant argues, however, that the Texas Constitution affords him more protection than the United States Constitution since the Texas Constitution not only prohibits ex post facto legislation but also prohibits any "retroactive" legislation. Assuming without deciding that Article 1, Section 16's proscription against retroactive legislation is applicable to criminal cases, [FN6] that provision has never been made applicable to statutes merely affecting matters of procedure which do not disturb vested, substantive rights. See Holder v. Wood, 714 S.W.2d 318, 319 (Tex.1986); Ex parte Abell, 613 S.W.2d 255, 260-262 (Tex.1981); Merchant's Fast Motor Lines, Inc. v. Railroad Commission of Texas, 573 S.W.2d 502, 504-505 (Tex.1978).[FN7] Clearly, a defendant has no vested right to an entirely new trial when errors relating only to the assessment of his punishment are

committed. See and compare Ex parte Johnson, 697 S.W.2d 605 (Tex.Cr.App.1985) (statutory amendment providing for reformation on appeal of judgments with unlawful punishments, rather than remanding for new trial, held applicable to all cases pending on *588 appeal at the time of amendment). As observed by the concurrence in Youngblood:

> FN6. See Ex parte Rutledge, 741 S.W.2d 460, 461-462 (Tex.Cr.App.1987) (Clinton, J., concurring). But see Cooley, A Treatise on Constitutional Limitations, 773 n. 1 (8th ed. 1927). See generally 16A C.J.S., Constitutional Law, § 390.

> FN7. In using the concept of "substantial" or "vested" rights the Court of Appeals apparently drew on the test for evaluating retrospective laws only appropriate in a civil context and inappropriate in an ex post facto analysis of criminal laws conducted under the federal Constitution. Weaver v. Graham, 450 U.S. 24, 31 n. 13, 101 S.Ct. 960, 965 n. 13, 67 L.Ed.2d 17 (1981). See 2 Sands, Sutherland on Statutory Construction, § 41.06 (4th ed. 1973); Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv.L.Rev. 692, 696 (1960); Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn.L.Rev. 775, 782 (1936); Cooley, A Treatise on Constitutional Limitations, 773 n. 1 (8th ed. 1927). See generally 16A C.J.S., Constitutional Law, § 390. This test may be proper, however, in analyzing whether legislation may be applied retroactively under the State Constitution.

"Respondent does not claim that he was denied any procedural protections relevant to the determination of his guilt or innocence. Nor does he claim that his life sentence was unauthorized by law, or that it was the consequence of improper procedures. Finally, he does not argue that he has been deprived of any avenue of review for correcting errors that may have vitiated the validity of his conviction or sentence.... Youngblood wishes to have a new trial according to the same procedures, regulated by the same laws, open to the same evidence, and capped by the same sentencing limitations that resulted in his conviction

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

807 S.W.2d 582
807 S.W.2d 582
(Cite as: 807 S.W.2d 582)

Page 7

and his life sentence....

"Whatever else may be said of the factors that determine whether a procedural protection affects substantial rights, it is difficult to imagine how a retroactive law could, when viewed from the standpoint of the date the offense was committed, implicate substantial rights of any defendant if the law does no more than expand flexibility of post conviction processes available to the State with respect to a defendant who is subject to a valid conviction and sentence. Indeed, respondent has barely even attempted to articulate any justification for the Texas procedure that the legislature abolished. *The mere possibility of a capricious and unlikely windfall is not the sort of procedural protection that could reasonably be judged substantial from the perspective of the defendant at the time the offense was committed.*" 110 S.Ct. at 2728-2729 (Stevens, J., concurring) (emphasis added and footnotes omitted).[FN8]

> FN8. The concurrence in *Youngblood* would have affirmed the conviction but would have left intact the *Thompson* line of cases.

We agree. Accordingly, we also hold that the State's constitutional prohibition against retroactive legislation is not violated by Article 44.29(b)'s application in the trial court to cases which have been reversed on appeal for errors committed only in the punishment phase of trial.[FN9]

> FN9. The Government Code also provides that "[a] statute is presumed to be prospective in its operation unless expressly made retrospective." V.T.C.A., Gov't Code, Section 311.022. We discern no conflict between Section 311.022 and application of Article 44.29(b) to the cases now on appeal since Article 44.29 will be applied prospectively in the trial courts after the causes have been remanded from this Court or the Courts of Appeals. See *Zimmerman v. State,* 750 S.W.2d 194, 202-204 (Tex.Cr.App.1988) (Court holding that absent an express legislative intent to the contrary, procedural statutes control litigation from their effective date; i.e., they apply to both pending and future actions); *Wade v. State,* 572 S.W.2d 533, 534 (Tex.Cr.App.1978) (same).

That portion of the Court of Appeals' opinion indicating that the trial court is to afford appellant "a full new trial" is vacated and the cause is remanded to the trial court for further proceedings consistent with this opinion.

CLINTON, J., dissents. MILLER, Judge, concurring. Although I am in sympathy with much that Judge Baird's dissent says about the proper interpretation of Tex. Const. art I, Sec. 16, the nature of what I and the majority opinion perceive to be a substantial right in Texas criminal jurisprudence compels the conclusion that the statutory "right" under former Art. 44.29, V.A.C.C.P., to have the error free guilt stage of a trial relitigated because of an error in the punishment phase, is not substantial. Opinion at pages 587 and 588.

Thus I concur in the result reached by the majority.

BAIRD, Judge, dissenting.
In this case of first impression, we are called upon to determine whether the federal and/or state constitutions prohibit the retroactive application of Tex.Code Crim.Proc.Ann. art. 44.29(b) to cases tried before, but pending on appeal, at the time of the article's effective date.[FN1] I respectfully *589 dissent to the majority opinion because I believe that appellant is entitled to relief for the following reasons.

> FN1. The District Attorney's ground for review states, "The Court of Appeals erred in holding that application of Art. 44.29(b), V.A.C.C.P., was retroactive and improper."
>
> The State Prosecuting Attorney's grounds for review state:
>
> 1) The Court of Appeals erred in remanding the case for a full trial.
>
> 2) The Court of Appeals erred in holding that Art. 44.29(b) as applied to appellant constituted an unconstitutional retroactive ex post facto law.

I. FACTUAL SUMMARY

The facts are not disputed. At the punishment phase, the State introduced evidence, over objection, con-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

807 S.W.2d 582
807 S.W.2d 582
(Cite as: 807 S.W.2d 582)

Page 8

trary to our holding in *Walker v. State, 610 S.W.2d 481, 483 (Tex.Cr.App.1980).* The jury sentenced appellant to the maximum punishment, life imprisonment and a $10,000 fine. On appeal, the State confessed error. The Court of Appeals found that the law in effect at the time of trial entitled appellant to a new trial as to guilt/innocence for error committed in the punishment phase of trial and remanded the cause to the trial court for a "full new trial." *Grimes v. State,* No. 07-87-0137-CR (Tex.App.-Amarillo delivered June 21, 1988).

## II. UNITED STATES CONSTITUTION

I agree with the majority's treatment of *Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990),* wherein the Supreme Court dramatically altered the concept of what constitutes ex post facto laws under the federal constitution. That case interpreted Tex.Code Crim.Proc.Ann. art. 37.10(b) (allowing appellate courts to reform an improper verdict that assessed a punishment not authorized by law, where prior case law required a new trial), and rejected the proposition that art. 37.10(b) violated the ex post facto clause of U.S. Const. art. I, § 10.[FN2]

> FN2. U.S. Const. art. I, § 10 provides in part that, "No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any title of Nobility."

*Youngblood* limits ex post facto laws to those which: 1) punish as a crime an act previously committed, which was innocent when done, 2) creates a more burdensome punishment for a crime after the crime was committed or 3) deprives one charged with a crime of any defense available according to the law in effect at the time the act was done. *Youngblood* expressly overruled former Supreme Court authority suggesting that ex post facto laws included those which affected "substantial" rights. *Youngblood,* 497 U.S. at ----, 110 S.Ct. at 2724.

The case at bar involves application of Tex.Code Crim.Proc.Ann. art. 44.29(b) (error in the punishment phase of noncapital trials requires a retrial only as to punishment). Under *Youngblood*'s narrow definition of ex post facto, art. 44.29(b) does not offend the ex post facto prohibition in the Federal Constitution. I

therefore agree with the majority's conclusion that *Youngblood* precludes appellant from relief under art. I, § 10 of the Federal Constitution.

## III. TEXAS CONSTITUTION

### A. Retroactive Legislation

Tex. Const. art. I, § 16 is worded differently than its federal counterpart. In addition to forbidding ex post facto laws, the Texas Constitution also prohibits "retroactive law." [FN3] Of course, we "can invalidate a Texas law under § 16 without regard to whether the United States Supreme Court would invalidate the same law under § 10 of Art. I (of the United States Constitution)." Braden, *The Constitution of the State of Texas: An Annotative and Comparative Analysis* 59 (1977). See also *Cooper v. California, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967)* (state courts are free to impose stricter standards than mandated by federal constitution).

> FN3. Art. I, § 16 provides, "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."

The majority "assum[es]" without deciding that Article I, Section 16's proscription against retroactive law(s) is applicable to criminal cases. *Grimes,* slip op. at 9 (footnote omitted). In my view, the proscription against retroactive laws of art. I, § 16 is *590 not limited to civil matters. The Interpretive Commentary to art. I, § 16, with emphasis added, explains retroactive laws:

The Texas Constitution goes further than the United States Constitution for the former is not confined to forbidding ex post facto laws, i.e., retroactive penal legislation, but *it also lays ban on any retroactive law.* In prohibiting retroactive laws, the Texas Constitution seeks to safeguard rights *not* guaranteed by other constitutional provisions such as the impairment of the obligation of contracts and due process of law clauses. *Mellinger v. City of Houston, 68 Tex. 37, 3 S.W. 249 (1887).*

A retroactive law is one meant to act on things that are past. As such, a statute is retroactive which *takes away* or impairs *vested rights acquired under existing*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00571

807 S.W.2d 582
807 S.W.2d 582
(Cite as: 807 S.W.2d 582)

Page 9

*laws*, or creates new obligations, imposes new duties, or adopts a new disability in respect to transactions or considerations already past, and which affects acts or rights accruing before it came into force. *Turbeville v. Gowdy*, Civ.App., 272 S.W. 559 (1925).

In *Ex parte Alegria*, 464 S.W.2d 868 (Tex.Cr.App.1971), the Court addressed whether a statute increasing the minimum period served for parole eligibility violated both art. I, § 10 of the Federal Constitution and art. I, § 16 of the state constitution when applied retroactively to an inmate. Presiding Judge Onion, writing for an unanimous Court, concluded both constitutions were violated; in so doing, he cited the above quoted Interpretive Commentary to art. I, § 16.

Additionally, when this Court held that the Prison Management Act violated both the federal and state constitutional provisions, Judge Clinton, in concurrence, reiterated that art. I, § 16 is broader than the federal prohibition.

I write to point out that our own prohibition against such laws is broader than the restrictive construction given "ex post facto law." Under Article I, § 16 there is also a ban on any "retroactive law."

. . . . .

Including "retroactive law" in § 16 "evidences an intention to place a further restriction on the power of the legislature; and it must be held to protect *every right* [emphasis added] ... which may accrue under existing laws prior to the passage of any, which, if permitted a retroactive effect, would take away that right. A right has been well defined to be a well-founded claim, and a well-founded claim means nothing more nor less than a claim recognized and secured by law." *Mellinger v. City of Houston*, 68 Tex. 37, 3 S.W. 249, 253 (1887). See also *Turbeville v. Gowdy*, 272 S.W. 559, 561[4] (Tex.Civ.App.-Fort Worth 1925).

*Ex parte Rutledge*, 741 S.W.2d 460, 463 (1987) (Clinton, J., joined by Miller and Duncan, JJ., concurring).

While the majority of the case law interpreting the retroactive law portion of art. I, § 16 concerns civil cases, that section also applies to criminal cases. *Rutledge*, 741 S.W.2d at 463; *Alegria*, 464 S.W.2d at 872; *Mellinger*, 3 S.W. at 253. Therefore, I believe the majority errs in suggesting that the retroactive law prohibition may not apply to criminal matters. It does apply to criminal matters, and this Court has never interpreted the article to the contrary.[FN4]

> FN4. The majority opinion cites Cooley, *A Treatise on Constitutional Limitations*, 773 n. 1 (8th ed. 1927) for the proposition that the retroactive law language in art. I, § 16 does not apply to criminal cases. *Grimes*, slip op. at 9 n. 6. Interestingly, the United States Supreme Court has noted that Professor Cooley's nineteenth century treatise contributed to the "confusion into the interpretation of the Ex Post Facto Clause." *Youngblood*, 497 U.S. at ----, 110 S.Ct. at 2715.

Further, I believe the majority opinion applies art. 44.29(b) in such a manner as to deprive appellant of a vested right acquired at the time of his trial. Therefore, this application art. 44.29(b) is a retroactive law prohibited by Art. I, § 16 of our Constitution.

### B. Procedural Matters

The majority opinion contends that the retroactive law prohibition in art. I, § 16 "has never been made applicable to statutes *591 merely affecting matters of procedure which do not disturb vested, substantive rights." *Grimes*, slip op. at 9-10, citing *Ex parte Abell*, 613 S.W.2d 255 (Tex.1981); *Merchant's Fast Motor Lines, Inc. v. Railway Commission of Texas*, 573 S.W.2d 502, 503 (Tex.1978). Those cases, and the cases cited therein, discuss what constitutes "vested substantive rights" in the civil context. *Ex parte Abell*, 613 S.W.2d at 260-261, contains a list of cases wherein no vested substantive right has been found. Such situations include authorization of additional remedy for collecting past-due child support, repeal prior to filing suit of statute granting statutory cause of action, change in municipal annexation law, change in city ordinance reducing salary of city employee and change in worker's compensation statute for determining average weekly wage. While those cases find no vested substantive right, they clearly do not control what is a "right" in a criminal context.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

807 S.W.2d 582
807 S.W.2d 582
(Cite as: 807 S.W.2d 582)

Page 10

It is well established that by simply labelling a law "procedural," a legislature does not thereby immunize it from scrutiny under art. I, § 10 of the Federal Constitution. *Youngblood,* 497 U.S. at ----, 110 S.Ct. at 2721; *Gibson v. Mississippi,* 162 U.S. 565, 590, 16 S.Ct. 904, 910, 40 L.Ed. 1075 (1896). Nor should a **procedural** label preclude our analysis of the statute's constitutionality under art. I, § 16's proscription of retroactive laws. Consistent with the federal constitutional analysis, whether a **procedural change** has a sufficiently drastic impact on a defendant should be characterized as "substantial" for purposes of art. I, § 16, is a matter of degree. *Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925).

Clearly, the majority opinion affects a substantial right in contravention of art. I, § 16. As stated earlier, a right under art. I, § 16 has been defined as a well-founded claim; a well-founded claim means nothing more nor less than a claim recognized and secured by law. *Ex parte Rutledge,* 741 S.W.2d at 463, citing *Mellinger,* 68 Tex. at 45, 3 S.W. at 253.

At the time appellant elected to have the jury assess his punishment, he had a right to an entirely new trial if harmful error occurred at the punishment phase of his trial. Prior to trial, appellant had to evaluate the relative merits of the judge or jury assessing punishment. During this evaluation, appellant and his counsel undoubtedly considered the effects of error before a jury-a new trial on the merits. For cases where the judge assesses punishment, appellate courts either treat the error as presumptively disregarded or remand the cause for the trial court to reassess punishment. *Tolbert v. State,* 743 S.W.2d 631 (Tex.Cr.App.1988) and cases cited therein.

Under the circumstances of the instant case, appellant would not have been entitled to any relief if he had elected to have the court assess punishment. See *Miffleton v. State,* 777 S.W.2d 76, 82 (Tex.Cr.App.1989). Thus, even if appellant and his counsel had perceived the trial court as more lenient than the jury, appellant relied upon the law in effect at the time of his trial (error at the punishment phase before a jury would entitle him to an entirely new trial). Simply put, had appellant known that error in the punishment phase would have resulted in a retrial on punishment only, his initial decision regarding punishment by the jury may have been different.

This is not to say that every procedural rule affects a substantial right. For example, in *Ex parte Johnson,* 697 S.W.2d 605 (Tex.Cr.App.1985), a plurality of this Court held that art. I, § 16 was not offended by the retroactive application of Tex.Code Crim.Proc.Ann. art. 37.10(b) (reformation on appeal of judgments with unlawful punishments, rather than remanding for new trial). However, the right affected in *Ex parte Johnson* does not embrace a law relied upon when making strategy decisions. See also *Youngblood v. Collins,* 497 U.S. 37, 110 S.Ct. 2715.

Article 44.29(b) came into effect *after* appellant and his counsel made the punishment election. Retroactive application of art. 44.29(b) undoubtedly works to the detriment of appellant, not merely by removing a right to which he was entitled at the *592 time of trial, but also by removing a right upon which he likely relied in making trial strategy decisions. Therefore, it is implausible to conclude that retroactive application of art. 44.29(b) does not affect a substantial right for purposes of art. I, § 16.

### C. Prospective Operation

The majority opinion also states that "a defendant has no vested right to an entirely new trial when errors relating only to the assessment of his punishment are committed. See *Ex parte Johnson,* 697 S.W.2d 605 (Tex.Cr.App.1985) (statutory amendment providing for reformation on appeal of judgments with unlawful punishments, rather than remanding for new trial, held applicable to all cases pending on appeal at the time of amendment)." *Grimes,* slip op. at 10. In my judgment, the majority fails to recognize that the retroactive application of art. 37.10(b) does not involve a strategy decision, as does art. 44.29(b).

Moreover, the precedential force of *Ex parte Johnson* is questionable. First, it is a plurality opinion. Second, as stated above, the retroactive application of reforming a judgment on appeal affects a less substantial right; that is, it does not involve a law relied upon to make a strategy decision. Third, *Ex parte Johnson* is limited by the language employed therein: "Thus, *in the absence of express legislative intent to the contrary,* the new law controls litigation from its effective date and applies to both pending and future actions." *Ex parte Johnson,* 697 S.W.2d at 607-608 (footnote omitted) (emphasis added). The statute at issue in *Ex parte Johnson,* art. 37.10(b), which be-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

05/29/2009 10:32 FAX                                                        ☑0038/061

807 S.W.2d 582
807 S.W.2d 582                                                      Page 11
(Cite as: 807 S.W.2d 582)

came effective June 11, 1985, is devoid of any lan-
guage as to whether the amendment shall apply to
cases tried or indicted after a particular date.

*After* the effective date of art. 37.10(b), the legislature
passed Tex.Gov't Code Ann. § 311.022 (effective
October 1, 1985), which provides that, "A statute *is
presumed to be prospective* in its operation unless
expressly made retrospective." (Emphasis added.)
Art. 44.29 was enacted *after* § 311.022, and thus it is
subject to § 311.022's prospective application.

Retrospective laws are commonly regarded with dis-
favor, *Hutchings v. Slemons,* 141 Tex. 448, 174
S.W.2d 487 (1943), and statutes generally are not be
to applied retroactively. *Ex parte Abahosh,* 561
S.W.2d 202, 204 (Tex.Cr.App.1978); *Ridyolph v.
State,* 545 S.W.2d 784 (Tex.Cr.App.1977).

Lastly, the majority opinion also errs in its construc-
tion of § 311.022, where it "discerns no conflict"
between § 311.022 and the application of art. 44.29
to the case at bar because art. 44.29 "will be applied
prospectively in the trial courts after the causes have
been remanded." *Grimes,* slip op. at 11 n. 9. That
argument is essentially a *non sequitur.* That construc-
tion of § 311.022 overlooks the obvious: Article
44.29 concerns an act occurring in the future, namely,
procedure on *re* trial; simply because it concerns a
future event does not mean that the **procedural**
mechanism can be applied **retroactively** to cases
tried before its effective date. The article is not pro-
spective for purposes of § 311.022.

Such a construction is inconsistent with the plain
language of § 311.022, that a statute is presumed to
be prospective in its operation *unless expressly made
retrospective.* Article 44.29 is not expressly retro-
spective; therefore, it is presumed to apply prospec-
tively. Clearly, § 311.022 is required to be read in
compliance with art. 1, § 16's prohibition against "ret-
roactive law". Tex.Gov't Code Ann. § 311.021(1).

IV. CONCLUSION

For these reasons, I respectfully dissent to the major-
ity opinion.

Tex.Crim.App.,1991.
Grimes v. State

807 S.W.2d 582

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00574

**15**

00575

Westlaw.

2 Tex. 363
2 Tex. 363, 1847 WL 3568 (Tex.)
(Cite as: 2 Tex. 363, 1847 WL 3568 (Tex.))

C

Supreme Court of Texas.
JAMES H. HOLT
v.
THE STATE
December Term, 1847.

*1 Writ of Error from Washington County.

The act of 1846, requiring the jury in certain cases to assess the amount of punishment to be inflicted, is not an *ex post facto* law in reference to offenses for which there were prosecutions pending at the period of its enactment. [ 6 Tex. 347; 14 Tex. 402.]

West Headnotes

Jury 230 🗝21.2

230 Jury
    230II Right to Trial by Jury
        230k20 Criminal Prosecutions
            230k21.2 k. Statutory Provisions. Most Cited Cases
    (Formerly 92k203)

Constitutional Law 92 🗝2810

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(B) Particular Issues and Applications
            92k2809 Criminal Proceedings
                92k2810 k. In General. Most Cited Cases
    (Formerly 92k203)
The law giving the jury the power to determine the extent of punishment and amount of fine is not an ex post facto law in regard to past offenses or existing prosecutions at the time of its enactment.

Sentencing and Punishment 350H 🗝8

350H Sentencing and Punishment
    350HI Punishment in General
        350HI(A) In General

350Hk5 Constitutional, Statutory, and Regulatory Provisions
    350Hk8 k. Validity. Most Cited Cases
    (Formerly 110k1206(1))
Law giving jury power to determine extent of punishment and amount of fine is not unconstitutional.
*Gillespie,* for plaintiff in error.

*Harris,* Attorney General, for defendant in error.

Mr. Justice WHEELER delivered the opinion of the court.

James H. Holt was indicted for an affray at the fall term, 1844, of the Washington district court. The prosecution was pending until the fall term, 1846, when the accused was tried and found guilty, and judgment was pronounced against him, the prosecution being then conducted in the name of the state.

He subsequently prosecuted this writ of error to reverse the judgment, upon the ground that "the indictment and alleged offense are both previous to the passage of the law authorizing the assessing of fines by juries."

This prosecution was pending at the period of the adoption of the state constitution, and comes within the express provision of the 2d section of its 9th article. It was prosecuted to judgment in literal compliance with that provision.

The act, Stats. 1846, 161, requiring the jury in certain cases to assess the amount of punishment to be inflicted, only provides a different mode of ascertaining the amount of fine or duration of imprisonment from that before existing. It merely substitutes the opinion of the jury for that of the judge in those cases, but it does in no respect operate to the prejudice of the accused, and is not, therefore, an *ex post facto* law in reference to offenses for which there were prosecutions pending at the period of its enactment. The prohibition as to *ex post facto* laws, Constitution, art. 1, section 14, has been held to extend only to a law which makes an act done before its passage, and which was innocent when done, criminal; or which aggravates a crime and makes it greater than when

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00576

2 Tex. 363
2 Tex. 363, 1847 WL 3568 (Tex.)
(Cite as: 2 Tex. 363, 1847 WL 3568 (Tex.))

Page 2

committed; or which changes a punishment and inflicts a greater punishment than the law annexed to the crime when committed; or which alters the legal rules of evidence and receives less or different testimony than the law required at the time of the commission of the offense, in order to convict the offender. 1 Kent, 408; 3 Dall. 386; 1 Blackf. 193; 6 Cranch. 138.

*2 The act of 1846 does not come within this definition, and its application in the present case does in no respect conflict with the constitutional prohibition. The judgment must therefore be affirmed.

Tex. 1847.
Holt v. State
2 Tex. 363, 1847 WL 3568 (Tex.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00577

**16**

00578

Westlaw.

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
(Cite as: 705 F.2d 789)

Page 1

☞

United States Court of Appeals,
Fifth Circuit.
In re Bruce SELCRAIG, Appellant.
No. 82-1067.

May 27, 1983.

Discharged school official brought Civil Rights Act suit against school district and several officials thereof seeking compensatory and punitive damages for allegedly publicizing false and stigmatizing charges and failing to afford a name-clearing hearing. Discovery was sought of news reporter as to his source of knowledge of charges originally filed with the district. The United States District Court for the Northern District of Texas, Patrick E. Higginbotham, J., held reporter in contempt for failure to reveal name of confidential source, and reporter appealed. The Court of Appeals, Alvin B. Rubin, Circuit Judge, held that: (1) a discharged official had no substantive due process claim but was entitled to procedural due process in nature of a name-clearing hearing; (2) until it was shown that a hearing had been refused, discovery could not be had of reporter, whose information was relevant only to punitive damages claim; and (3) the *Miller* standard was appropriate, notwithstanding that reporter was not seeking to protect himself against the libel suit.

Vacated.

West Headnotes

[1] Constitutional Law 92 ☜2074

92 Constitutional Law
  92XVIII Freedom of Speech, Expression, and Press
    92XVIII(U) Press in General
      92k2074 k. Disclosure of Sources. Most Cited Cases
  (Formerly 92k90.1(8), 92k90.1(1))

Privileged Communications and Confidentiality
311H ☜404

311H Privileged Communications and Confidentiality
  311HVII Other Privileges
    311Hk404 k. Journalists. Most Cited Cases
  (Formerly 410k196.1, 92k90.1(8), 92k90.1(1))
First Amendment shields a reporter from being required to disclose identity of persons who have imparted information to him in confidence. U.S.C.A. Const.Amend. 1.

[2] Constitutional Law 92 ☜2074

92 Constitutional Law
  92XVIII Freedom of Speech, Expression, and Press
    92XVIII(U) Press in General
      92k2074 k. Disclosure of Sources. Most Cited Cases
  (Formerly 92k90.1(8), 92k90.1(1))

Privileged Communications and Confidentiality
311H ☜404

311H Privileged Communications and Confidentiality
  311HVII Other Privileges
    311Hk404 k. Journalists. Most Cited Cases
  (Formerly 410k196.1, 92k90.1(8), 92k90.1(1))
A reporter's First Amendment privilege concerning disclosure of identity of informant is qualified and not absolute. U.S.C.A. Const.Amend. 1.

[3] Constitutional Law 92 ☜2171

92 Constitutional Law
  92XVIII Freedom of Speech, Expression, and Press
    92XVIII(X) Defamation
      92k2171 k. Discovery in Defamation Actions. Most Cited Cases
  (Formerly 92k90.1(5))
In libel cases, a reporter's First Amendment priv-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00579

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
**(Cite as: 705 F.2d 789)**

Page 2

ilege concerning disclosure of identity of informant can be overcome, but only if the party seeking disclosure establishes by substantial evidence that the statement attributed to the informant was published and is both factually untrue and defamatory, that reasonable efforts have been made to learn identity of the informant by alternative means, that no other reasonable means is available and that knowledge of identity of the informant is necessary to proper presentation and preparation of the case. U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law 92 ☞3876**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and Deprivations Prohibited in General
            92k3876 k. Arbitrariness. Most Cited Cases
    (Formerly 92k278(1), 92k255(1))
Due process clause protects against arbitrary deprivation of both property and liberty interests. U.S.C.A. Const.Amends. 5, 14.

**[5] Constitutional Law 92 ☞4040**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)1 In General
                92k4040 k. Reputation; Defamation. Most Cited Cases
    (Formerly 92k254.1)

**Constitutional Law 92 ☞4161**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)7 Labor, Employment, and Public Officials
                92k4160 Reputational Interests in General, Protection and Deprivation of

                92k4161 k. In General. Most Cited Cases
    (Formerly 92k254.1)
Official publication of a stigmatizing charge against a public employee, without discharge, is not of itself constitutionally prohibited as reputation alone, apart from some more tangible interest such as employment, is not a liberty or property interest sufficient to invoke procedural protections of the due process clause. U.S.C.A. Const.Amends. 5, 14.

**[6] Civil Rights 78 ☞1038**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1030 Acts or Conduct Causing Deprivation
            78k1038 k. Defamation. Most Cited Cases
    (Formerly 78k115, 78k13.1)
Damage to reputation alone, unaccompanied by other injury, will not suffice for recovery under Civil Rights Act of 1871. 42 U.S.C.A. § 1983.

**[7] Constitutional Law 92 ☞4040**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)1 In General
                92k4040 k. Reputation; Defamation. Most Cited Cases
    (Formerly 92k255(2))
A constitutional deprivation of liberty occurs when there is some injury to employment or employment opportunities in addition to damage to reputation and a subsequent denial of procedural due process to redress that injury. U.S.C.A. Const.Amends. 5, 14.

**[8] Constitutional Law 92 ☞4173(1)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00580

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
(Cite as: 705 F.2d 789)

Page 3

tions
     92XXVII(G)7 Labor, Employment, and Public Officials
     92k4163 Public Employment Relationships
     92k4173 Reputational Interests, Protection and Deprivation of
     92k4173(1) k. In General. Most Cited Cases
     (Formerly 92k278.4(1))
To prove deprivation of a due process liberty interest, a public employee must show that his employer has made or is likely to make allegedly stigmatizing charges public in an official or intentional manner. U.S.C.A. Const.Amends. 5, 14.

[9] Constitutional Law 92 ⚷4173(4)

92 Constitutional Law
     92XXVII Due Process
     92XXVII(G) Particular Issues and Applications
     92XXVII(G)7 Labor, Employment, and Public Officials
     92k4163 Public Employment Relationships
     92k4173 Reputational Interests, Protection and Deprivation of
     92k4173(4) k. Notice and Hearing; Proceedings and Review. Most Cited Cases
     (Formerly 92k278.4(1))
Due process hearing is not a prerequisite to government employer's publication of stigmatizing charges concerning an employee and government is not obliged to tender a hearing but need only make known to the stigmatized employee that he or she may have an opportunity to clear his name on request and government need not initiate the hearing process. U.S.C.A. Const.Amends. 5, 14.

[10] Constitutional Law 92 ⚷4161

92 Constitutional Law
     92XXVII Due Process
     92XXVII(G) Particular Issues and Applications

     92XXVII(G)7 Labor, Employment, and Public Officials
     92k4160 Reputational Interests in General, Protection and Deprivation of
     92k4161 k. In General. Most Cited Cases
     (Formerly 92k277(2))

Constitutional Law 92 ⚷4173(4)

92 Constitutional Law
     92XXVII Due Process
     92XXVII(G) Particular Issues and Applications
     92XXVII(G)7 Labor, Employment, and Public Officials
     92k4163 Public Employment Relationships
     92k4173 Reputational Interests, Protection and Deprivation of
     92k4173(4) k. Notice and Hearing; Proceedings and Review. Most Cited Cases
     (Formerly 92k278.4(5))
Reputation per se is not a property interest protected against state infringement and what is protected is the maligned employee's right to a procedure that will afford him a chance to refute unfounded charges and, thus, a state employee claiming to be maligned by publication of allegedly stigmatizing information cannot successfully assert a substantive due process claim but is entitled only to procedural due process. U.S.C.A. Const.Amends. 5, 14.

[11] Civil Rights 78 ⚷1133

78 Civil Rights
     78II Employment Practices
     78k1129 Education, Employment in
     78k1133 k. Discharge or Layoff. Most Cited Cases
     (Formerly 78k146, 78k13.3(2))
Discharged school official could establish his Civil Rights Act claim of denial of procedural due process, i.e., lack of name clearing hearing, by showing district's publication of the allegedly defamatory charges, injury to employment and denial of a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00581

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
**(Cite as: 705 F.2d 789)**

Page 4

hearing, and publication could be shown by revelation of the charges and official interviews with the press and it was not necessary to also show a prior secret disclosure to the press, although such was immaterial to claim for punitive or exemplary damages against individual school officials. U.S.C.A. Const.Amends. 5, 14; 42 U.S.C.A. § 1983.

**[12] Constitutional Law 92 €⟶4203**

92 Constitutional Law
 92XXVII Due Process
  92XXVII(G) Particular Issues and Applications
   92XXVII(G)8 Education
    92k4196 Employment Relationships
     92k4203 k. Reputational Interests, Protection and Deprivation Of. Most Cited Cases
 (Formerly 92k278.5(2.1), 92k278.5(2))
Regardless of how many times school district repeated alleged stigmatizing charges against school official, official's due process rights arose from denial of a name clearing hearing, and extent of publication was relevant only to amount of damages and there was no right to recover independently for each dissemination as the disseminations themselves were not a constitutional deprivation. U.S.C.A. Const.Amends. 5, 14.

**[13] Civil Rights 78 €⟶1474(2)**

78 Civil Rights
 78III Federal Remedies in General
  78k1466 Monetary Relief in Employment Practices Cases
   78k1474 Exemplary or Punitive Damages
    78k1474(2) k. Government Liability. Most Cited Cases
 (Formerly 78k275(2), 78k13.17(7), 78k13.17)
Punitive damages were not recoverable from school district in Civil Rights Act suit although such damages would be recovered from individual school officials on showing that they maliciously made charges stigmatizing school official's reputation. 42 U.S.C.A. § 1983.

**[14] Federal Civil Procedure 170A €⟶1275**

170A Federal Civil Procedure
 170AX Depositions and Discovery
  170AX(A) In General
   170Ak1272 Scope
    170Ak1275 k. Identity and Location of Witnesses and Others. Most Cited Cases
Need to learn news reporter's initial source of charges concerning discharged school official was premature, for purposes of holding reporter in contempt for failing to reveal whether a school district officer was the initial source, where source's name was relevant only to punitive damages issue and the official, who brought Civil Rights Act suit charging lack of name clearing hearing, had not yet established prima facie case. U.S.C.A. Const.Amends. 1, 5, 14; 42 U.S.C.A. § 1983.

**[15] Constitutional Law 92 €⟶2073**

92 Constitutional Law
 92XVIII Freedom of Speech, Expression, and Press
  92XVIII(U) Press in General
   92k2073 k. Reporter's Privilege. Most Cited Cases
 (Formerly 92k90.1(8), 92k90.1(1))

**Privileged Communications and Confidentiality 311H €⟶404**

311H Privileged Communications and Confidentiality
 311HVII Other Privileges
  311Hk404 k. Journalists. Most Cited Cases
 (Formerly 410k196.1, 92k90.1(8), 92k90.1(1))
Method of establishing necessity for confidential information from a newspaper reporter, claiming First Amendment privilege, depends on the circumstance of the case in which it is sought, including the issue to which the information is relevant. U.S.C.A. Const.Amend. 1.

**[16] Civil Rights 78 €⟶1038**

78 Civil Rights

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00582

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
(Cite as: 705 F.2d 789)

Page 5

78I Rights Protected and Discrimination Prohibited in General
 78k1030 Acts or Conduct Causing Deprivation
  78k1038 k. Defamation. Most Cited Cases
(Formerly 78k115, 78k13.4(1))
Stigmatizing charges publicly made to the press by school district officials, coupled with discharge of school administrator and denial of opportunity thereafter to clear his name, stated a claim on which relief could be granted under Civil Rights Act based on denial of procedural due process. 42 U.S.C.A. § 1983; U.S.C.A. Const.Amend. 14.

[17] Federal Civil Procedure 170A ⟲1957.1

170A Federal Civil Procedure
 170AXV Trial
  170AXV(A) In General
   170Ak1957 Separate Trial of Issues Raised by Particular Pleadings
    170Ak1957.1 k. In General. Most Cited Cases
 (Formerly 170Ak1957)
Procedure in Civil Rights Act suit brought by former school official seeking damages for publicizing allegedly false and stigmatizing charges was not required to be bifurcated to protect First Amendment privilege of newspaper reporter, who refused to disclose source of initial information concerning the charges, especially considering limited scope of questions to reporter, notwithstanding that his information was relevant only to punitive damages claim. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

[18] Privileged Communications and Confidentiality 311H ⟲404

311H Privileged Communications and Confidentiality
 311HVII Other Privileges
  311Hk404 k. Journalists. Most Cited Cases
 (Formerly 170Ak1600(4), 170Ak1600.3)
Fact that in failing to reveal name of initial source of information about charges levied against now

discharged school official news reporter was merely trying to protect the source and was not invoking qualified First Amendment privilege to protect himself or publisher against a libel suit did not require adoption of a test other than the governing *Miller* test and if official could make out a prima facie case that he had been improperly deprived of a name clearing hearing the reporter's privilege was to succumb to discovery needs. U.S.C.A. Const.Amend. 1.
*791 Thomas S. Leatherbury, Charles L. Babcock, Dallas, Tex., for appellant.

John J. Watkins, School of Law, Baylor University, Waco, Tex., for amicus curiae Soc. of Professional Journalists, etc.

Frank M. Gilstrap, Arlington, Tex., for Dr. Paul Trautman.

J. Carlisle DeHay, Jr., David W. Townend, John T. Sears, Dallas, Tex., for all defendants.

Appeal from the United States District Court for the Northern District of Texas.

Before WISDOM, RUBIN and TATE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A discharged school official, seeking to recover compensatory and punitive damages from a school district and two of its officers for publicizing false and stigmatizing charges against him, contends that the *792 two officers disseminated the defamatory charges by secretly imparting them to a newspaper reporter and that, as a result, the reporter made open inquiries that resulted in publication of the charges. The discharged official contends that he was denied due process by the failure of the school district to afford him a hearing on the charges and a chance to prove his innocence. After proceedings to assure that whether the school district's officers were the source of the reporter's information was

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00583

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
(Cite as: 705 F.2d 789)

Page 6

central to the claim; that circumstantial evidence pointed to a school district officer or employee as the communicant; and that alternative ways of confirming that hypothesis had been exhausted, the district court ordered that the journalist testify *in camera* and there respond to narrowly limited questions directed only to ascertaining whether a school district officer was the source of his information. Upon his refusal to do so, the court cited the reporter for civil contempt. The reporter appeals, invoking the journalist's qualified privilege under the first amendment not to reveal his confidential sources. Despite the care taken by the district court, we find that the necessity of obtaining the information was not yet established and the reporter's qualified privilege, therefore, not yet overcome. We, therefore, vacate the contempt decree.

I.

[1][2][3] We have recognized that the first amendment shields a reporter from being required to disclose the identity of persons who have imparted information to him in confidence. *Miller v. Transamerican Press,* 621 F.2d 721 (5th Cir.), *modified on rehearing,* 628 F.2d 932 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981). Our course was dictated by our careful reading of the plurality and concurring opinions in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The privilege, we held, is not absolute, but qualified. In libel cases, it can be overcome, but only if the party who seeks disclosure of the identity of a confidential informant establishes by substantial evidence that the statement attributed to the informant was published and is both factually untrue and defamatory; that reasonable efforts have been made to learn the identity of the reporter's informant by alternative means; that no other reasonable means is available; and that knowledge of the identity of the informant is necessary to proper preparation and presentation of the case. *Miller,* 628 F.2d at 932. Determining the relevance of the confidential informant's identity and the need for its disclosure in

this § 1983 action requires us to review the parties' allegations and the information developed in discovery proceedings. No trial having yet been held and no summary judgment on these issues having yet been granted, the accuracy of these factual allegations is untested.

Dr. Paul Trautman, a professional school administrator, was employed by the Dallas Independent School District (DISD) under a one-year contract. During the year, he was appointed Acting Assistant Superintendent for Support Services to replace an employee suspended for alleged misuse of funds. Soon after his appointment, a DISD custodial employee, Anita Horton, reported derogatory information about Trautman.

Bruce Selcraig, then education reporter for the *Dallas Morning News* (the *News* ), somehow learned of Horton's report. He interviewed DISD Superintendent Linus Wright and another DISD officer, Robby Collins, in Wright's office. These officers confirmed some of the information about which Selcraig inquired. Selcraig also telephoned Trautman to get Trautman's reactions to the allegations. Trautman testified in a deposition that he first learned of the charges against him from Selcraig's phone call, and then categorically denied them. He also testified that, in this conversation, he asked where Selcraig had gotten his information, and that Selcraig said it came from "two high-placed administrators."

On October 4, 1979, the *News* published an article by Selcraig giving a detailed account of the allegations about Trautman and quoting his denial. The article reported that DISD had forwarded an affidavit *793 executed by Horton to the local district attorney. It also stated that Superintendent Wright had asked Trautman to take a polygraph test, that Trautman had not yet responded to the request, that Wright declined to comment on the specifics of the investigation, and that Collins declined to comment on the case. In addition to relying on the Horton affidavit and interviews with Trautman, Wright, Collins, and others the article attributed information

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
**(Cite as: 705 F.2d 789)**

Page 7

to "sources close to the investigation" and to "individuals familiar with the district's internal investigations." That afternoon the *Dallas Times Herald* (the *Herald* ) published an article on the Trautman story. As the controversy continued, the allegations against Trautman reappeared in news articles that reported attributed statements of DISD officials.

On October 6, 1979, Superintendent Wright placed Trautman on administrative leave with pay until the investigation of his activity was completed. Three months later Trautman still had not been restored to duty. On January 11, 1980, Trautman wrote to Wright, offering to resign when his contract ended on August 31, 1980. Wright responded with a letter stating that he was recommending Trautman's immediate termination and advising Trautman of his right to appeal termination. On January 24, 1980, Trautman made written demand on DISD for a due process hearing so that he would have a chance to clear his name. He contends that he was informed a hearing would be accorded him, but none was scheduled. In June another DISD official, John Santillo, solicited a resolution of the matter. Santillo and Trautman agreed that DISD would provide Trautman with letters of recommendation and acknowledgments of his good character and capable performance of his duties. In return, Trautman would waive the anticipated due process hearing and would resign.

Trautman resigned effective July 1, two months before the end of his contract term, withdrawing his demand for a hearing. He now contends that his resignation was procured by fraud: DISD did not intend to keep its deal, and never did. Seeking to set aside his resignation and to obtain damages, he sues DISD; the members of its Board of Trustees in their official capacities; and Wright and Santillo in both their individual and official capacities. Trautman's complaint alleges that the defendants deprived him of substantive due process by invading his constitutionally protected liberty interest when they "caused to be made public in an official and/or in-

tentional way, false and stigmatizing allegations against him." This, he contends, was arbitrary and capricious state action. He also contends that he was deprived of his liberty interest by the failure and refusal of the defendants to provide him with a due process hearing "prior or subsequent to such deprivation" and by the defendants' fraudulent inducement of his resignation. Last, he contends that, in violation of his agreement with Santillo, Wright and Santillo publicly disseminated additional stigmatizing allegations against him after his resignation without affording him a name-clearing hearing. He admits, however, that he did not request any such hearing after he resigned.

While Trautman alleges that his constitutionally protected property rights were also invaded by these actions, he does not contend that Selcraig's testimony is relevant to his property-deprivation claims. We focus, therefore, only on the claims based on damage to his liberty interest, that is his reputation, by the stigmatizing charges made without granting him a name-clearing hearing. As we have noted, these are two-fold: denial of substantive due process by arbitrary action and denial of procedural due process by failure to hold a hearing. Trautman contends that identification of Selcraig's sources [FN1] is essential because he has a *794 right to exemplary or punitive damages if the publication was malicious [FN2] and the making of a clandestine communication to Selcraig would demonstrate such an intent.

> FN1. Trautman alleges that, in the telephone conversation he had with Selcraig before the October 4 article was published, Selcraig stated that he got his information from "two high-placed administrators." Trautman interprets this to mean that Selcraig has two confidential sources who are DISD administrators. Selcraig refuses to confirm or deny this theory. For convenience in reporting Trautman's claims, we refer to Selcraig's confidential source(s) in the plural.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00585

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
**(Cite as: 705 F.2d 789)**

Page 8

FN2. *See Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d ---- (1983) (jury may assess punitive damages in § 1983 action when defendant's conduct motivated by evil motive or intent).

During discovery, Trautman subpoenaed five reporters whose bylines had appeared on articles concerning him published in the *News* and the *Herald.* The subpoenas directed the reporters to appear for depositions and to produce all notes on which they relied in writing articles about Trautman. Selcraig was among the reporters subpoenaed. At his deposition, Selcraig confirmed that, in an interview with Wright and Collins, these two made statements to him on which he based, at least in part, the *News* article that broke the story about Trautman. Selcraig declined, however, to identify the confidential sources who had given him the initial information about Horton's report and the other information that launched his open inquiries to Wright and Collins. He claimed the qualified reporter's privilege recognized in *Miller.*

Trautman took depositions from Wright and Collins, each of whom denied giving Selcraig information before the interview in Wright's office. Trautman also submitted interrogatories to DISD, seeking to learn Selcraig's source. DISD responded that it had sent twenty-three questionnaires "to the [DISD] executive team" and twenty-three replies had been received. "The results of the investigation did not disclose the identity of anyone who furnished the [Horton] affidavit to Mr. Selcraig." Pursuant to the court's instructions, the DISD trustees held two closed meetings with Wright and DISD's lawyers. The trustees and Wright "confirmed that they [did] not know who furnished the Horton affidavit" to Selcraig.

Trautman then filed a motion to compel Selcraig to reveal these sources. In support of his motion, he averred that, if Selcraig's confidential sources held managerial positions in DISD, their identities would support his claim that DISD had itself published the charges against him. Furthermore, if the confidential sources had been Selcraig's original sources of information, their initial dissemination of the charges would provide the evidence of malice Trautman needed to recover punitive damages.

The district court postponed ruling on Trautman's motion until after a hearing on the nature and legal validity of Trautman's claims and on the relevance of the information Trautman sought from Selcraig. The court requested the parties to address four issues at the hearing. The first two issues would clarify whether Trautman stated a sufficient claim for relief.[FN3] The second two issues would show the need for Selcraig's testimony.[FN4] After the hearing, the district *795 judge found that Trautman had exhausted all reasonable alternative means of learning whether Selcraig's confidential sources had been DISD officials and that circumstantial evidence "sufficiently raised the probability that the school district was [Selcraig's] source as to justify an *in camera* proceeding," to be held without counsel present.

FN3. The first set of issues was:

(1) Whether, after *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), a public employee has a constitutional right to be free of false, stigmatizing charges by state officials which damage his reputation *irrespective of* any loss, or alteration of, his *current* employment rights; that is, whether the dissemination of false, stigmatizing charges in advance of a due process hearing, alone, or in conjunction with probable detriment to *future* employment opportunities, is sufficient to state a claim under 42 U.S.C. § 1983.

(2) Whether, by entering into a settlement agreement, Dr. Trautman waived his right, if any, to complain of the alleged denial of procedural due process in connection with (a) the alleged dissem-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00586

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
(Cite as: 705 F.2d 789)

Page 9

ination of false, stigmatizing charges or (b) Defendants' alleged alteration of Plaintiff's employment contract with the DISD.

FN4. The second set was:

(3) Do discovery materials on file, or to be filed, indicate that Defendants, or other DISD employees, furnished Mr. Selcraig the allegedly false and stigmatizing information reported in his October 4, 1980 [sic] article, and, if so, what purposes will be served by compelling disclosure of the identity of Selcraig's "sources"?

(4) Has Plaintiff exhausted all reasonable alternative means to ascertain the identity of Selcraig's sources?

Although the phrasing of the last issue suggests an improper focus on who Selcraig's sources were rather than whether they were DISD officials, the district judge, in later proceedings, made clear that he was concerned only with whether DISD was implicated.

The court set out an order of inquiry for the *in camera* hearing that would protect Selcraig's qualified first amendment privilege as far as possible. The court would first ask Selcraig whether his confidential sources occupied such positions that their publication of the charges against Trautman could be attributed to DISD. If Selcraig answered that the sources were not connected with DISD, the inquiry would stop there. If the sources had some connection with DISD, Selcraig would have to name their positions more precisely. For example, if the sources were DISD secretaries, their revelations to Selcraig would not be attributable to the school district. The court would proceed to the second stage of the inquiry only if necessary. At this stage, Selcraig would be asked to divulge the identity of the sources and, if needed, the information they impar-

ted to him. Only if the inquiry reached the second stage would the court reveal anything to counsel. The court would decide how much was to be disclosed. Any revelations to counsel would be under a protective order to insure confidentiality so far as possible. It is thus apparent that the court proceeded in a deliberate manner before ordering any disclosure and that it protected the privilege by requiring disclosure only *in camera* and by proposing a sequence of questions that would prevent disclosure of the identity of the confidential informants until their connection with DISD and Trautman's need to know their identities was established.

Selcraig attended the *in camera* hearing with counsel, but he refused to testify in accordance with the court's order. The district court, therefore, held Selcraig in contempt of court and ordered his imprisonment until he testified or otherwise purged himself of the civil contempt. This order was stayed pending appeal.

Selcraig first urged that the contempt proceedings be stayed because Trautman's action might be dismissed on motion for summary judgment. However, after we heard oral argument in this appeal, the district judge, acting on remand for the purpose of considering the motions for summary judgment proffered by the defendants, denied them. He reasoned that whether Trautman had waived his right to a post-termination administrative hearing was a disputed question of fact. He also deemed it inappropriate to grant summary judgment against Trautman before his right to discover Selcraig's testimony had been determined.

II.

[4][5][6] The due process clause protects against arbitrary deprivation of both property and liberty interests. However, official publication of a stigmatizing charge against an employee, without discharge, is not of itself constitutionally prohibited, for, "The words 'liberty' and 'property' as used in the Fourteenth Amendment do not in terms single

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00587

705 F.2d 789

705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705

(Cite as: 705 F.2d 789)

Page 10

out reputation as a candidate for special protection over and above other interests that may be protected by state law." *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405, 413 (1976). "[R]eputation alone, apart from some more tangible interests such as employment, is [not] 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Id.* at 701, 96 S.Ct. at 1161, 47 L.Ed.2d at 413. Damage to reputation alone, unaccompanied by other injury, will not, therefore, suffice for recovery under 42 U.S.C. § 1983, which protects only against "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

*796 [7][8][9] A constitutional deprivation of liberty occurs when there is some injury to employment or employment opportunities in addition to damage to reputation and a subsequent denial of procedural due process [FN5] to redress that injury. *Compare Huntley v. Community School Board,* 543 F.2d 979 (2d Cir.1976), *cert. denied,* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773 (1977) (termination of untenured school principal in course of announcing charges of incompetence impaired his *property* interest in future *government* employment).[FN6] "[T]he remedy mandated by the Due Process Clause of the Fourteenth Amendment is 'an opportunity to refute the [stigmatizing] charge.' " *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 624, 626-627, 51 L.Ed.2d 92, 95-96 (1977).[FN7] If the charges were true, a hearing would not redress the stigmatization, for it would only demonstrate their verity. "No hearing would [in that case] afford a promise" of providing a person about whom derogatory information had been published with "an opportunity to clear his name." *Codd v. Velger,* 429 U.S. at 627, 97 S.Ct. at 884, 51 L.Ed.2d at 96. The hearing, then, is not a prerequisite to publication and the state is not obliged to tender one.[FN8] The state need only make known to the stigmatized employee that he may have an opportunity to clear his name upon request. It need not initiate the hearing process of its own accord.

FN5. *Paul v. Davis.* See also *Dennis v. S & S Consolidated Rural High School District,* 577 F.2d 338, 341 (5th Cir.1978).

FN6. To prove deprivation of such a liberty interest, a public employee must show that his employer "has made or is likely to make the allegedly stigmatizing charges public 'in any official or intentional manner.' " *Ortwein v. Mackey,* 511 F.2d 696, 699 (5th Cir.1975), *quoting Kaprelian v. Texas Woman's University,* 509 F.2d 133, 139 (5th Cir.1975).

FN7. *Accord Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548, 558 (1972) (due process requires that the employee have an opportunity of refutation if the state, in discharging or failing to rehire him, makes a "charge against him that might seriously damage his standing and associations in the community" or that imposes "a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities"); *Patterson v. Ramsey,* 552 F.2d 117, 118 (4th Cir.1977) (per curiam); *Austin v. Board of Education,* 562 F.2d 446, 449-51 (7th Cir.1977).

FN8. See *Perry v. Sinderman,* 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570, 580 (1972) (if Sinderman proved property interest in continued employment, he would be entitled to a hearing on request).

[10] Trautman contends that the act of publishing the information about him constitutes a denial of substantive due process. *Paul v. Davis* and *Codd v. Velger* both necessarily imply that the fourteenth amendment provides only procedural protection against injury inflicted by state officers to the interest state employees have in their reputation. *See also Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515, 519 (1971)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00588

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
(Cite as: 705 F.2d 789)

Page 11

(where government action injured reputation, notice and opportunity to be heard prescribed); *White v. Thomas,* 660 F.2d 680, 685 (5th Cir.1981) (plaintiff to be afforded only opportunity to refute charge). It follows from these authorities and what we have already said that reputation per se is not a property interest protected against state infringement; what is protected is the maligned employee's right to a procedure that will afford him a chance to refute unfounded charges,[FN9] and that Trautman *797 cannot successfully assert a substantive due process claim.

> FN9. Procedural due process was the right protected not only in *Wisconsin v. Constantineau,* but also in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (termination of public assistance payments); *Bell v. Garson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (revocation of driver's license); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (revocation of probation); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (revocation of prisoner's good time credit); *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (nonrenewal of college teacher's contract); *see also Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (no right to hearing before termination of a nontenured college teacher's employment because he had no property interest in employment and the decision effected no constitutionally significant change to his reputation).

[11][12][13] Trautman may establish his § 1983 claim for denial of procedural due process by showing DISD's publication of the charges, the injury to his employment, and the denial of a name-clearing hearing. Publication is shown by the official inter-

views with the press. It is not necessary to proof of his claim that he establish also a prior secret disclosure to Selcraig.[FN10] Whether such an earlier dissemination occurred is material only to the recovery of punitive or exemplary damages. While Trautman has no right to punitive damages against DISD,[FN11] if he can establish all the other elements of his claim, he has, indeed, a right to such damages against the individual defendants if he can show that they made the charges maliciously. *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d --- --- (1983).

> FN10. Trautman argues that he has a right to recover independently for each dissemination, but this argument is premised on the erroneous theory, discussed in the preceding paragraph, that the dissemination itself is a constitutional deprivation. However many times DISD repeated the charges, Trautman's right to recover arises from the denial of a hearing to refute the charges. The extent of publication would be relevant only to the amount of damages suffered. In view of the wide publicity given to the charges by the newspaper articles, Trautman could not have suffered additional damage by a covert disclosure to Selcraig.

> FN11. Only individual defendants are liable for exemplary damages. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Webster v. City of Houston,* 689 F.2d 1220, 1228-29 (5th Cir.1982).

[14][15] At this stage, the record does not establish even prima facie, by affidavit or deposition, the elements of a claim for liability. It has not been shown that DISD deprived Trautman of his right to a hearing.[FN12] Unless he can set aside the waiver contained in his resignation, he cannot establish that he was denied a hearing, and thus he cannot establish the defendants' liability under 42 U.S.C. § 1983. And, of course, he cannot recover punitive damages

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00589

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
(Cite as: 705 F.2d 789)

Page 12

against the individual defendants until their primary liability is established. Because Selcraig's testimony is necessary. only to determine Trautman's punitive damages claim, it is evident that Trautman has not yet shown the necessity for it. In short, he has not yet overcome Selcraig's qualified privilege not to reveal confidential news sources. We do not intimate that in every case necessity must be demonstrated by marshalling evidentiary material, by successfully resisting motions for summary judgment, or by other protracted preliminary proceedings. The method of establishing necessity for the confidential information depends on the circumstances of the case in which it is sought, including the issue to which the information is relevant.

> FN12. We express no opinion concerning whether this claim, standing alone, would confer federal jurisdiction because it must begin with an effort to set aside the resignation. Until that is accomplished, the right to the due process hearing is not established. Of course, the court might have jurisdiction of this claim as a state cause of action pendent to the other federal claims asserted by Trautman.

Trautman admits that he has not requested a hearing since his resignation, nor has he formally asked that his resignation be withdrawn. Thus, he has not shown any factual basis for his charge that he has been denied a hearing at any time. He contends that it is unnecessary for him formally to set aside his resignation because the defendants fraudulently induced it and thereafter refused to honor the promises by which they procured it. Once the defendants' fraud was exposed, Trautman continues, his position automatically reverted to the *status quo ante, i.e.,* before his resignation was tendered. The defendants counter that Trautman, by failing to renew his request for a hearing after his resignation and by failing formally to rescind his resignation, "intentionally and voluntarily" waived his right to a hearing. They sought summary judgment on this theory, but the district court declined to rule on the

issue, reasoning that "[w]aiver of constitutional rights is not to be lightly inferred" and "that a jury question is presented." We agree that whether the resignation was *798 fraudulently induced presents a question of fact. But the existence of this fact question demonstrates that, at this stage, the necessity of Selcraig's testimony has not been shown. Trautman should be required at least to demonstrate by affidavits or depositions, and not by mere allegation, a prima facie case of his right to set the waiver aside and thus to reach the true federal constitutional issue, whether he has been denied due process.

In order to determine whether there is a need for Selcraig's testimony, the record should also be clarified concerning whether Trautman seeks a "delayed *Roth* hearing ... at which he would have the opportunity to refute the charge in question," or whether he seeks only the "damages resulting from the [previous] denial of such [a] hearing." *Codd v. Velger,* 429 U.S. at 627 n. 1, 97 S.Ct. at 883 n. 1, 51 L.Ed.2d at 96 n. 1.[FN13] If he now seeks a delayed hearing, it is at least possible that DISD would grant such a hearing without prejudice to its defenses. In that event, the question of the truth or falsity of the charges against Trautman might be resolved. Even if their falsity is shown, the permanent stigmatizing effect and the consequent damage to Trautman would be affected.

> FN13. *See Love v. Sessions,* 568 F.2d 357, 360 n. 6 (5th Cir.1978) (per curiam) (seeking damages) and *McKnight v. Southeastern Pennsylvania Transportation Authority,* 583 F.2d 1229 (3d Cir.1978) (same).

[16] If, but only if, Trautman has been denied a hearing to which he has a facial entitlement would it be necessary for him to know the source of the information that guided Selcraig to elicit public comment on the charges from DISD officials. Until Trautman establishes that he has been refused a hearing, he may not compel Selcraig's testimony. This does not imply that, without Selcraig's testi-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00590

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705
(Cite as: 705 F.2d 789)

Page 13

mony, Trautman has no procedural due process claim against the defendants for damaging his reputation. The charges publicly made to the press, coupled with his discharge and the denial of an opportunity thereafter to clear his name, suffice to state a claim for which relief may be granted. The reply to press inquiry by DISD officials was not per se improper, even if it led to the publication of derogatory information. Public officials are not obliged to stonewall. They act properly when they respond to public inquiry. If, however, they do respond, they are obliged thereafter to afford procedural due process to the person charged.

[17] In order to facilitate proceedings on remand, we discuss other issues raised by the parties. As we have pointed out, it will be necessary to know the identity of Selcraig's informants only to establish the right to punitive damages. Selcraig argues that, therefore, the trial should be divided into stages and he should be compelled to answer the questions put to him only if Trautman establishes liability. We do not think it appropriate to require that the trial procedure be altered, simply to protect the reporter's privilege. Bifurcating the trial would either require the damage case to be presented without adequate pretrial discovery, or else would require a delay between the two trial stages. Noting the limited scope of the court's questions to Selcraig, we do not condition its right to compel answers on severance of trial issues, if Trautman can satisfy the court that he has a prima facie case for setting aside his resignation and waiver and that he has been refused a post-stigmatization administrative hearing.

[18] Selcraig also contends that his qualified privilege ought to be upheld and disclosure ought not be required, even if Trautman establishes the predicate for his testimony, because his position differs from that of reporters in other situations. In this case, he suggests, he is simply a witness trying to protect his sources, not a party invoking the qualified privilege to protect himself or his publication against a libel suit.FN14 But the fact that he is a witness to a *799 material fact at issue makes the

Miller test we formulated for use in libel suits, when generalized from its preoccupation with libel claims, a sufficient measure of the strength of his privilege. He is not being asked to divulge his sources to locate other witnesses or to get on the scent of evidence. He is a percipient witness to a fact at issue: the identity of the informants.FN15 Manifestly, then, his testimony is relevant and necessary to the resolution of Trautman's claim for punitive damages. The district court found that Trautman has shown the probability that school district officers were Selcraig's informants and that Trautman has exhausted alternative means of establishing that fact. We accept these findings as not clearly erroneous. Fed.R.Civ.P. 52(a). In these circumstances, if Trautman can satisfy the district court that he can make out a prima facie case that he has not waived the right to, and has not been afforded, a hearing, Selcraig's qualified privilege must succumb to Trautman's discovery needs. If Selcraig is called to testify in further proceedings, the district court's carefully structured request for information might well serve as a model for any other inquiries.

> FN14. A test similar to that formulated by us in *Miller* has been applied in such cases. *E.g., Garland v. Torre,* 259 F.2d 545 (2d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958).

> FN15. *Compare In re Ziegler,* 9 Med.L.Rep. 1013 (W.D.N.Y.1982) (journalist who witnessed and reported on assault not excused from testifying before grand jury as to what he observed); *State v. Knorr,* 8 Med.L.Rep. 2067 (Or.Cir.Ct.1982); *Rosato v. Superior Court,* 51 Cal.App.3d 190, 218, 124 Cal.Rptr. 427, 446 (1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976) (Supreme Court has denied that first amendment shields newsmen from testifying about criminal activity they observed); *People v. Dan,* 41 App.Div.2d

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00591

705 F.2d 789
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965; 9 Media L. Rep. 1705
(Cite as: 705 F.2d 789)

Page 14

687, 342 N.Y.S.2d 731,*appeal dismissed,* 32 N.Y.2d 764, 344 N.Y.S.2d 955, 298 N.E.2d 118 (1973) (newsmen may refuse to divulge to grand jury identity of informant, but they must testify about events they observed personally, including identity of people they observed); *Lightman v. State,* 15 Md.App. 713, 294 A.2d 149, 156-57,*aff'd per curiam,* 266 Md. 550, 295 A.2d 212 (1972), *cert. denied,* 411 U.S. 951, 93 S.Ct. 1922, 36 L.Ed.2d 414 (1973) (when newsman observes criminal activity, he, not the people observed, is the source of information, and he can be directed to disclose identity of people observed); *State v. Knops,* 49 Wis.2d 647, 183 N.W.2d 93 (1971) (privilege not to reveal confidential sources must yield to public's need to know those sources whom reporter has intimated were responsible for bombing university building); *Branzburg v. Pound,* 461 S.W.2d 345 (Ky.App.1970), *aff'd sub nom. Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (reporter's privilege under state law not to reveal source of published information does not protect reporter from testifying about events he observes personally, including identity of people observed); *see generally*Goodale, Branzburg v. Hayes and the Developing Qualified Privilege for Newsmen, 26 Hastings L.J. 709 (1975).

We have not overlooked the contention made by Selcraig and by the amicus curiae that the *Miller* test is not strict enough to protect the reporter's privilege in civil cases when the reporter is a nonparty witness and that the reporter's privilege is invadable only if it is shown that there is a "compelling need" for the information or that it is "absolutely critical" to a claim or defense. *Miller* establishes the rule for this circuit. We deem its criterion an adequate shield.

For these reasons, the order of civil contempt is

VACATED.

C.A.Tex.,1983.
In re Selcraig
705 F.2d 789, 36 Fed.R.Serv.2d 841, 10 Ed. Law Rep. 965, 9 Media L. Rep. 1705

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00592

**17**

00593

Westlaw.

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

Page 1

**H**

Supreme Court of Texas.
MERCHANTS FAST MOTOR LINES, INC., et al.
v.
RAILROAD COMMISSION OF TEXAS et al.
NO. B-6594.

Oct. 25, 1978.
Rehearing Denied Dec. 13, 1978.

Railroad Commission and motor carrier which had been granted certain changes in its common carrier certificate appealed from an order of the 200th District Court, Travis County, Charles D. Mathews, J., which set aside the Commission's order. The Austin Court of Civil Appeals, Third Supreme Judicial District, Shannon, J., 545 S.W.2d 198, ruled that provisions of Administrative Procedure Act authorizing court to remand to the Commission were applicable to case, and reversed and remanded. On appeal, the Supreme Court, Daniel, J., held that: (1) administrative order made prior to effective date of Administrative Procedure Act must be reviewed under laws applicable when order was promulgated and Administrative Procedure Act review provisions are not applicable thereto, and (2) form and content of certificate application as well as notice and hearing failed to comply with Commission's rule relating to rates requiring filing of new application.

Court of Civil Appeals reversed; District Court affirmed.

Chadick, J., dissented and filed opinion.

West Headnotes

[1] Statutes 361 278.9

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.9 k. Statutes Affecting Vested

Rights. Most Cited Cases
    (Formerly 361k265, 361k263)
Statutes operate prospectively, but they may operate retrospectively when no impairment of vested rights results. Vernon's Ann.St.Const. art. 1, § 16.

[2] Statutes 361 278.7

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.7 k. Express Retroactive Provisions. Most Cited Cases
    (Formerly 361k263)
Statutes will not be applied retrospectively unless it appears by fair implication from language used that it was intent of Legislature to make it applicable to both past and future transactions. Vernon's Ann.St.Const. art. 1, § 16.

[3] Statutes 361 278.14

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies and Procedures
                361k278.14 k. Application to Pending Actions and Proceedings. Most Cited Cases
    (Formerly 361k267(2))
As to procedural statutes, Legislature may make changes applicable to future steps in pending cases because litigant has no vested right in procedural remedy. Vernon's Ann.St.Const. art. 1, § 16.

[4] Statutes 361 205

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k204 Statute as a Whole, and Intrinsic Aids to Construction
                361k205 k. In General. Most Cited
Legislative intent should be ascertained from entire

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00594

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

Page 2

act, and not from isolated portions thereof. Vernon's Ann.Civ.St. art. 10, subd. 6.

**[5] Administrative Law and Procedure 15A ☞ 4.1**

15A Administrative Law and Procedure
    15AI In General
        15Ak4 Constitutional and Statutory Provisions in General
            15Ak4.1 k. In General. Most Cited Cases
        (Formerly 15Ak4)

**Administrative Law and Procedure 15A ☞ 651**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(A) In General
            15Ak651 k. In General. Most Cited Cases
Administrative Procedure Act was intended to apply only to administrative orders promulgated after January 1, 1976, including judicial review provisions of Act. Vernon's Ann.Civ.St. arts. 911b, § 20, 6252-13a, § 19(e).

**[6] Administrative Law and Procedure 15A ☞ 651**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(A) In General
            15Ak651 k. In General. Most Cited Cases
Administrative order made prior to effective date of Administrative Procedure Act must be reviewed under laws applicable when order was promulgated, and Administrative Procedure Act review provisions are not applicable thereto. Vernon's Ann.Civ.St. arts. 911b, § 20, 6252-13a, § 19(e).

**[7] Automobiles 48A ☞ 121**

48A Automobiles
    48AIII Public Service Vehicles
        48AIII(C) Regulation of Operation and Management

        48Ak121 k. Fares. Most Cited Cases
Where form and content of application for motor carrier's certificate amendments which was ruled upon before effective date of Administrative Procedure Act, as well as notice and hearing, failed to comply with Railroad Commission's rules relating to rates, new application was required rather than remand to Commission. Vernon's Ann.Civ.St. arts. 911b, § 20, 6252-13a, § 19(e).

*503 Jerry C. Prestridge, Robinson, Felts, Starnes & Nations, Timothy K. Mashburn and Phillip J. Robinson, Austin, for petitioners.

John L. Hill, Atty. Gen., John David Hughes, Asst. Atty. Gen., Rogers, Hughes & Herman, Timothy J. Herman, Lanham, Hatchell & Sedberry, Austin L. Hatchell, Austin, for respondents.

DANIEL, Justice.

A controlling question in this case is whether review of an administrative order made by the Texas Railroad Commission prior to the effective date of the Administrative Procedure Act should be reviewed under the provisions of that Act or as provided by the law in effect when the administrative order was promulgated and the review was sought.

Morgan Express, Inc., applied for and the Railroad Commission granted an order on June 11, 1975, substantially amending and enlarging its motor carrier authority and prescribing certain new rate schedules for Morgan. Merchants Fast Motor Lines, Inc., and six other competing carriers contested the application and challenged the validity of the order by petition filed in the District Court of Travis County on August 13, 1975, as provided in Sec. 20 of the Motor Carrier Act, Article 911b.[FN1]

    FN1. All statutory references are to Vernon's Annotated Texas Civil Statutes unless otherwise noted.Sec. 20 of Art. 911b provides in part as follows:

    "Sec. 20. If any motor carrier or other

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00595

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

Page 3

party at interest be dissatisfied with any decision, rate, charge, rule, order, act, or regulation adopted by the Commission, such dissatisfied person, association, corporation, or party after failing to get relief from the Commission may file a petition setting forth the particular objection to such decision, rate, charge, rule, order, act or regulations, or to either or all of them in the District Court in Travis County, Texas, against said Commission as defendant. . . . Either party to said action may appeal to the Appellate Court having jurisdiction of said cause and said appeal shall be at once returnable to said Appellate Court having jurisdiction of said cause . . . ."

The trial court completed its hearing of the appeal on November 20, 1975, and entered judgment setting aside the order on January 12, 1976, eleven days after the new Administrative Procedure Act became effective on January 1, 1976.[FN2] The trial court held the Morgan order to be invalid for several reasons, including a lack of substantial evidence in support of the order and a lack of due process with respect to changes in the applicable rates. The Court of Civil Appeals agreed with the trial court on the errors in the Commission order relating to rates, but did not pass on the substantial evidence and other points raised by Morgan. Instead, the Court of Civil Appeals reversed the trial court and remanded the cause to that court with directions to remand it to the Commission "to give the Commission an opportunity to correct any errors in its order of June 11, 1975, all pursuant to s 19(e) of the Administrative Procedure Act." 545 S.W.2d 198. We reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court.

FN2. Article 6252-13a (1975), known as the Administrative Procedure and Texas Register Act, effective January 1, 1976, which will be referred to herein as the Administrative Procedure Act or the APA.

*504 By application dated August 20, 1971,

amended on January 3, 1973, Morgan sought a Commission order removing certain restrictions from its Common Carrier Certificate No. 3063 and the addition of other transportation services. Prior to this application, Morgan's certificate authorized it to transport over regular routes "Goods, Wares and Merchandise, in packages not to exceed fifty (50) pounds each in weight, and Newspapers, Newsreels, Films, and Theater supplies, in packages or bundles not to exceed one hundred (100) pounds each in weight, and the transportation not to exceed three thousand (3000) pounds per single unit." The certificate also contained the restriction that, "The holder of this certificate is authorized to charge a rate for such services, the minimum of which shall not be lower than the lowest maximum rate charged by any other common carrier transporting like commodities over the route, or parts thereof, set out hereinafter . . . ."

On June 11, 1975, the Railroad Commission granted part of the requested changes, including an increase in the weight restrictions and changes in the rate tariffs prescribed for Morgan's account. As heretofore stated, the seven competing carriers filed a petition on August 13, 1975, challenging the validity of the order in accordance with Sec. 20 of Art. 911b. Hearings were held in the trial court on November 18, 19, and 20, 1975, after which the trial court asked for briefs and took the case under advisement. On January 12, 1976, the trial court rendered judgment declaring the order void, setting it aside, and enjoining the issuance of the amended certificate. The trial court filed eighty conclusions of law on February 6, 1976, and an additional four conclusions of law on February 27, 1976, in which it stated reasons for its action.

In the meantime, on February 9, 1976, the Commission filed a motion in the trial court praying for a recision of the court's prior judgment and for a remand of the cause to the Commission "for further proceedings on all issues raised in this case and other instructions deemed appropriate by the Court . . . .", pursuant to the authority for remand granted

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00596

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

Page 4

by Section 19(e) of the Administrative Procedure Act. The trial court denied this motion on the grounds that the APA was inapplicable to the proceeding.

*Intent of the Administrative Procedure Act*

Petitioners, hereinafter referred to as Merchants or the competing carriers, insist that review of the Commission's order should be under the law which was in effect when the order was promulgated. It is clear that all administrative proceedings in this case were conducted and decided before the APA became effective. During such time, a suit to set aside a Railroad Commission order in motor carrier cases was governed by Sec. 20 of Art. 911b, and the order was either affirmed or set aside. Remand to the Commission was without statutory authority. Railroad Commission v. Oil Field Haulers Association, 442 S.W.2d 874 (Tex.Civ.App.1969, writ ref'd n.r.e.).

Morgan contends that Sec. 19(e) of the APA (Art. 6252-13a) which provides for affirmance, reversal or remand of administrative decisions should be retroactively applied since it is a procedural statute.

[1][2] Retroactive laws are prohibited by Article 1, Sec. 16, of the Texas Constitution. As a general rule, statutes operate prospectively, but they may operate retrospectively when no impairment of vested rights results. Cox v. Robison, 105 Tex. 426, 150 S.W. 1149 (1912). Moreover, statutes will not be applied retrospectively unless it appears by fair implication from the language used that it was the intent of the Legislature to make it applicable to both past and future transactions. State v. Humble Oil & Refining Co., 141 Tex. 40, 169 S.W.2d 707 (1943).

[3] On the other hand, as to procedural statutes, it is settled that the Legislature may make changes applicable to future steps in pending cases. *505Phil H. Pierce Co. v. Watkins, 114 Tex. 153, 263 S.W. 905 (1924); Regal Properties v. Donovitz, 479

S.W.2d 748 (Tex.Civ.App.1972, writ ref'd n.r.e.); Boyd v. Dean, 515 S.W.2d 753 (Tex.Civ.App.1974, no writ). This is because a litigant has no vested right in a procedural remedy.Phil H. Pierce Co. v. Watkins, supra. In the above cases, the legislative intent was either clearly stated [FN3] or there was nothing in the Act which expressed or implied a contrary intent. Sections 13-18 of the APA (Art. 6252-13a) provide standards for administrative hearings and records, and the relevant Sections applicable to judicial review are as follows:

> FN3. For instance, in Phil H. Pierce Co. v. Watkins, supra, the relevant statute provided: "(A)ll inconsistent laws and rules of practice and procedure shall be inoperative in the civil district courts of the class included within this act."

"Sec. 19. (a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this Act. This section is cumulative of other means of redress provided by statute.

". . .ess

"(d)(3) the review is conducted by the court sitting without a jury and is confined to the record, except that the court may receive evidence of procedural irregularities alleged to have occurred before the agency but which are not reflected in the record.

"(e) The scope of judicial review of agency decisions is as provided by the law under which review is sought. Where the law authorized appeal by trial de novo, the courts shall try the case in the manner applicable to other civil suits in this state and as though there had been no intervening agency action or decision. Where the law authorizes review under the substantial evidence rule, or where the law does not define the scope of judicial review, the court may not substitute its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion but may af-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

Page 5

firm the decision of the agency in whole or in part and shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

"(1) in violation of constitutional or statutory provisions;

"(2) in excess of the statutory authority of the agency;

"(3) made upon unlawful procedure;

"(4) affected by other error of law;

"(5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

"(6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

". . .bit

"Sec. 22. Chapter 274, Acts of the 57th Legislature, Regular Session, 1961, as amended (Article 6252-13, Vernon's Texas Civil Statutes), and all other laws and parts of laws in conflict with this Act are repealed. . . ."

[4] The Administrative Procedure Act does not specifically state that its judicial review provisions shall or shall not apply to administrative hearings and decisions which have been concluded prior to the effective date of the Act. The above cited cases suggest various conclusions or interpretations when a remedial statute does not contain express words as to its prospective or retrospective application. We deem it more appropriate, however, to follow the fundamental rule that legislative intention should be ascertained from the entire act, and not from isolated portions thereof. Woods v. Littleton, 554 S.W.2d 662 (Tex.1977); City of Mason v. West Texas Utilities Co., 150 Tex. 18, 237 S.W.2d 273 (1951). The Legislature has declared: "In all inter-

pretations, the court shall look diligently for the intention of the Legislature, keeping in view at all times the old law, the evil and the remedy."Art. 10, Sec. 6, Texas Revised Civil Statutes. The purposes of the APA stated in Sec. 1 include the following: ". . .*506 to afford minimum standards of uniform practice and procedure for state agencies . . . and to restate the law of judicial review of agency action."

When the APA was enacted in 1975, there were no uniform rules for conducting, deciding and appealing from administrative decisions. Under the old law, numerous administrative agencies conducted hearings according to their own applicable rules, some of which required findings of fact and conclusions of law in support of their decisions and some of which did not. Review of administrative orders under the substantial evidence rule was by trial in the district court upon a new record without regard to the evidence heard by the administrative agency.[FN4] This type of substantial evidence review of a newly developed court record, which often differed from the evidence heard by the agency, came under severe criticism.[FN5] It was an "evil" of the old law. The remedy provided by the APA was to require a more complete administrative record, with findings of fact and conclusions of law, and to limit judicial review to the record made before the administrative agency. The intended effect of this change was noted by this Court in Imperial American Resources Fund v. Railroad Commission, 557 S.W.2d 280 (Tex.1977), as follows:

FN4. The only exception prior to 1976 was under the Savings and Loan Act of 1963, Art. 852a, Sec. 11.12(5)(b), in which the Legislature first limited judicial review to the record made before the administrator.

FN5. See Reavley, Substantial Evidence and Insubstantial Review in Texas, 23 Sw.L.J. 239 (1969) and Walker, The Application of the Substantial Evidence Rule in Appeals from Orders of the Railroad Commission, 32 Tex.L.Rev. 639 (1954).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00598

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

Page 6

". . . Through enactment of the Administrative Procedure Act . . . the Legislature has made a far-reaching change in limiting judicial review under the substantial evidence rule to the records made before the administrative agencies. The result is that the agencies and the courts now consider the same evidence. Judicial review under the essential standards of the substantial evidence rule has been preserved, but the courts now test the substantiality of the evidence upon which an administrative agency made its decision. . . ."

[5] Judicial knowledge can be taken of the fact that some administrative proceedings were being conducted and some decisions were made under pre-existing laws between the final enactment of the APA on April 22, 1975, and its effective date of January 1, 1976. It can be assumed that the Legislature knew such proceedings were ongoing, which may account for the setting of the later effective date. We find no indication in the Act that it was intended to apply to administrative records and orders which were made pursuant to hearings conducted under pre-existing laws. From a careful study of the structure of the entire APA, we conclude that it was intended to apply only to administrative orders promulgated after January 1, 1976. This conclusion applies to the judicial review provisions of the Act, because under the APA, such review is limited to the record made in the administrative hearing. Otherwise, all of the pre-APA orders would be subject to remand and retrial in accordance with APA standards.

[6] It is undisputed that in this case the administrative record and decision of June 11, 1975, did not meet APA standards. Those standards were not then in effect. The competing carriers sought and obtained judicial review under Sec. 20 of the Motor Carrier Act (Art. 911b), which was the only right of appeal available to them at the time. It is impossible to apply APA standards of review to a record and a decision made under different standards of pre-existing law. Accordingly, we hold that an administrative order made prior to the effective date of the

APA must be reviewed under the laws applicable when the order was promulgated, and that APA review provisions are not applicable thereto.

*Errors Upon Which Reversal Was Based*

The question to be decided on review is whether the Commission's order of June 11, *507 1975, was, on that date, valid or invalid. The trial court based its decision of invalidity upon numerous errors, including several relating to rates. The Court of Civil Appeals also ruled that the amendment of the certificate relating to rates was a nullity. We agree. Indeed, Morgan does not seriously contend otherwise. As heretofore stated, there is no provision in the appeal procedure provided by Sec. 20 of Art. 911b for a remand to the Commission. An order appealed under that pre-existing law must stand or fall as it is brought to court. The order in this case falls, if for no other reason, because of the invalidity of its provision prescribing rates for Morgan's existing and newly authorized services. The new rate provisions are interwoven with the additional operating rights granted Morgan. It cannot be assumed that the Commission would have granted other certificate amendments apart from the changes relating to rates.

[7] We agree with the reasons stated by the Court of Civil Appeals in holding the rate changes to be invalid, but we do not agree that they constitute procedural errors which would be subject to correction by the Commission if a remand were permissible. On the contrary, the portion of the order dealing with rates was without due process. The form and content of the application as well as the notice and hearing failed to comply with the Commission's Rule 13(E) relating to rates. There is no way for those errors to be corrected except by filing a new application and complying with the law in a new hearing under the APA standards, which are now in effect. In view of our holding as to the effect of the errors relating to rates and our previous holding that the permissive remand provisions of the APA are inapplicable to this case, it is unnecessary for us to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

pass upon other points raised by the parties here or in the Court of Civil Appeals.

Accordingly, the judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

CHADICK, J., dissents.
CHADICK, Justice, dissenting.
The majority disposes of this appeal under the Texas Motor Carriers Act, Tex.Rev.Civ.Stat.Ann. art. 911b, s 20, by affirming the trial court judgment. I understand the Railroad Commission proceedings may be immediately refiled. Disposition under the Texas Administrative Procedure Act, Tex.Rev.Civ.Stat.Ann. art. 6252-13a s 19(a), which I propose in this dissent, would remand the case to the Commission for full rehearing on the issues properly before it. Except for substantial expense and slight delay, so far as the parties are concerned it would make little difference which is done. But consigning to the ash can most of the labor and expense invested by all the parties to the proceeding seems unjustifiable as a practical matter and more so from a legal standpoint.

I feel the majority is out of step with sound precedent and that there is no valid reason to overturn long settled rules and waste the time of the courts and litigants as is being done here. The majority has generalized that it is impossible to apply APA standards of review to a record and a decision made under the different standards of pre-existing law. No conflicting standards are identified or complaint made of injury inflicted by reason of a conflict. The majority neglects to point out a single substantive right of respondents that is or has been impaired or denied by court review or remand to the Railroad Commission under the provisions of the APA. The petitioners would probably be as pleased as everyone else to know which of their substantive rights has been or will be nullified or impaired by remand to the Railroad Commission, and I think greatly surprised, as their briefs do not claim the loss or impairment of an identifiable substantive right. The majority has simply conjured up a scary apparition,

completely without substance, and flee in terror before it. I am compelled to dissent.

Petitioner, Merchants Fast Motor Lines, Inc., and six other certificated motor carriers, brought suit as authorized by the Texas *508 Motor Carriers Act, Tex.Rev.Civ.Stat.Ann. art. 911b, s 20,[FN1] to nullify an order of the Respondent, Railroad Commission of Texas amending the permanent certificate of convenience and necessity which the Respondent, Morgan Express, Inc., is operating.

FN1.Article 911b, Section 20.

If any motor carrier or other party at interest be dissatisfied with any decision, rate, charge, rule, order, act, or regulation adopted by the Commission, such dissatisfied person, association, corporation, or party after failing to get relief from the Commission may file a petition setting forth the particular objection to such decision, rate, charge, rule, order, act or regulations, or to either or all of them in the District Court in Travis County, Texas, against said Commission as defendant. Said action shall have precedence over all other causes on the docket of a different nature and shall be tried and determined as other civil causes in said court. Either party to said action may appeal to the Appellate Court having jurisdiction of said cause and said appeal shall be at once returnable to said Appellate Court having jurisdiction of said cause and said action so appealed shall have precedence in said Appellate Court over all causes of a different character therein pending; provided, that if the court be in session at the time such right of action accrues the suit may be filed during such term and stand ready for trial after ten days' notice. In all trials under this section the burden of proof shall rest upon plaintiff, who must show by the preponderance of evidence that the decisions, rates, regulations, rules, orders, classifications,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00600

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

acts, or charges complained of are unreasonable and unjust to it or them. The Commission shall not be required to give any appeal bond in any cause arising hereunder and no injunction shall be granted against any order of the Commission without hearing unless it shall clearly appear that irreparable injury will be done the complaining party if the injunction is not granted.

The trial court set aside the Commission's order on the ground that it was not supported by substantial evidence [FN2] and overruled the Commission's motion to remand the order to the Commission for further consideration pursuant to the remand provision of the Texas Administrative Procedure Act, Tex.Rev.Civ.Stat.Ann. art. 6252-13a, s 19(e).[FN3] The Court of Civil Appeals held that remand pursuant to Section 19(e) was proper and concluded that the Commission's order granting Morgan a change in freight rates was defective for want of procedural predicate. Without considering other points of error the court reversed the judgment of the trial court and remanded the cause to that court with instructions that it remand the order, pursuant to Section 19(e), to the Commission to give that agency "an opportunity to correct any errors" in its order. 545 S.W.2d 198.

> FN2. The 84 conclusions of law filed by the trial judge are a classic example of judicial overkill. By finding fatal error in almost every act performed by the Commission the credibility of the trial court judgment is put in question. It seems highly unlikely that the Commission might commit error in its every meaningful act in view of its long experience in the regulatory field. I am inclined to assume that the trial judge left it to the prevailing parties to write conclusions and that they prepared an instrument that would fix the opposition's "little red wagon."

> FN3. Article 6252-13a, Section 19(e).

The scope of judicial review of agency decisions is as provided by the law under which review is sought. Where the law authorizes appeal by trial de novo, the courts shall try the case in the manner applicable to other civil suits in this state and as though there had been no intervening agency action or decision. Where the law authorizes review under the substantial evidence rule, or where the law does not define the scope of judicial review, the court may not substitute its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion but may affirm the decision of the agency in whole or in part and shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) in violation of constitutional or statutory provisions;

(2) in excess of the statutory authority of the agency;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

This appeal presents several problems. The primary questions are (1) whether the remand provision of Section 19(e) is applicable to this action; (2) whether the Court of Civil Appeals erred in failing to affirm the trial court judgment that the Commission's order was not supported by substantial

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00601

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

**\*509** and (3) whether remand for further Commission consideration or reversal and rendition is appropriate under the circumstances of this record. I would hold that Section 19(e) is applicable, that the Court of Civil Appeals did not err in failing to affirm the trial court judgment and that the judgment of the Court of Civil Appeals remanding the cause should be modified and affirmed.

I.

APPLICABILITY OF SECTION 19(e)

Before enactment of Section 19(e) of the Texas Administrative Procedure Act a suit to set aside a Railroad Commission's order was governed by Section 20 of the Motor Carriers Act. Under Section 20 a court could only affirm or reverse an agency order. Railroad Commission v. Oilfield Haulers Association, 442 S.W.2d 874 (Tex.Civ.App.1969). See also Trapp v. Shell Oil Company, Inc., 145 Tex. 323, 198 S.W.2d 424 (1946). In contrast, Section 19(e) provides that a reviewing court may affirm, reverse or remand agency orders.

The Commission's order was entered June 11, 1975 and suit was instituted August 13, 1975. Introduction of evidence began in the trial court August 18, 1975, and was concluded within three days. The trial judge took the case under advisement. On January 1, 1976, Section 19(e) became effective and on January 12, the trial judge rendered judgment. Thus, all proceedings and acts preliminary to judgment occurred while Section 20 was solely applicable although judgment was actually rendered after Section 19(e) became effective.

The petitioners assert that the Commission's order exceeded Commission authority and was not supported by substantial evidence, and that they are entitled to rendition of judgment nullifying the order under Section 20 practice as it existed June 11, 1975, the date the order was rendered. Accordingly, they claimed to be harmed because remand to the

Commission deprives them of a pre-existing right to rendition. Stated more concisely, the petitioners contend that the Section 19(e) authorized remand by the Court of Civil Appeals gives retroactive effect to a statute that did not exist when the Commission acted and deprives them of a favorable judgment, which they claim as a vested right. As a general proposition retroactive statutes are prohibited by fundamental law.Tex.Const. art. 1, s 16. Nevertheless, the petitioners' claim runs counter to the posture of this action and the firmly settled principle that a litigant has no vested right in a particular mode of procedure.

It is evident that Section 19(e) remand authority is procedural, as it directs the course a court is empowered to follow in the enforcement of a litigant's rights. The procedural nature of the Section is also revealed by the declaration in a preceding Section (art. 6352-13a, s 19(a)) that the Texas Administrative Procedure Act is cumulative of other "means of redress." Although Texas courts have not directly ruled thereon, courts of other jurisdictions support the statement in 16 Am.Jur.2d, Const.Law, s 427 (1964) that ". . . it has become firmly established that there is no vested right in any particular mode of procedure or remedy."Ex parte Collett, 337 U.S. 55, 69 S.Ct. 944, 93 L.Ed. 1207 (1949); Winter v. Barrett, 352 Ill. 441, 186 N.E. 113, 89 A.L.R. 1398 (1933). See also Miller v. Letzerich, 121 Tex. 248, 49 S.W.2d 404 (1932); Church v. Crites, 370 S.W.2d 419 (Tex.Civ.App. San Antonio 1963, writ ref'd n. r. e.); City of Fort Worth v. Morrow, 284 S.W. 275 (Tex.Civ.App. Fort Worth 1926, writ ref'd). Moreover, a procedural statute, as Section 19(e) clearly is, controls proceedings pending at the time the statute becomes effective. Phil H. Pierce Company v. Watkins, 114 Tex. 153, 263 S.W. 905 (1924). See also Ex parte Collett, supra; Exxon Corporation v. Brecheen, 526 S.W.2d 519 (Tex.1975); Wilson v. Work, 122 Tex. 545, 62 S.W.2d 490 (1933).Section 19(e) is not in fact a retroactive enactment as the record shows it effective before final judgment was rendered in the trial court and application of its remand provision is

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00602

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

Page 10

available as the remand authorized is procedural.

### *510 II.

### COURT'S DUTY TO DETERMINE ISSUES

While the Court of Civil Appeals determined that remand pursuant to Section 19(e) was proper and the certificate amendment granting Morgan a change in freight rates was defective, it did not consider other issues pending before it relative to Commission action and substantial evidence. The full extent of a court's duty to consider and decide pending issues pertaining to agency error when reviewing an agency's order has not had the attention of our courts. The Texas Administrative Procedure Act is silent on the question.

In First Savings & Loan Association of Del Rio v. Lewis, 512 S.W.2d 62 (Tex.Civ.App. Austin 1974, writ ref'd n. r. e.), the trial court found a Savings and Loan Commissioner's order defective in three particulars because recitations of fact therein were not supported by evidence in the record. The trial court remanded the case to the Commissioner for further proceedings "consistent with this opinion" expressly by-passing determination of "any questions with regard to substantial evidence."The Court of Civil Appeals affirmed saying the trial court ". . . may draw upon its general equity powers and adjust its relief to the exigencies of the case in accordance with equitable principles . . . ." The United States Supreme Court has said that when a court finds a ground sufficient to set aside an administrative order no principle or procedure governing the review of the administrative order requires a court to examine other grounds of attack. Ford Motor Company v. N. L. R. B., 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221 (1938). And in this jurisdiction it is said that courts of civil appeals need not decide questions unnecessary to disposition of a cause. Mooneyhan v. Benedict, 284 S.W.2d 741 (Tex.Civ.App. Austin 1955, writ ref'd n. r. e.).

However, in Lewis v. Gonzales County Savings and Loan Association, 474 S.W.2d 453 (Tex.1971), the Court of Civil Appeals did not consider a point of error pending before it that an agency's order was not supported by substantial evidence. The Supreme Court decided the evidence issue should be addressed and proceeded to a determination that there was substantial evidence to support the order. A concurring opinion expressed doubt about the propriety of considering substantial evidence points before an otherwise valid order was before the court. A problem similar to that in Gonzales was dealt with in Bay City Savings and Loan Association v. Lewis, 474 S.W.2d 459 (Tex.1971), with a similar disposition and concurring opinion.

All of these cases, including First Savings and Loan Association of Del Rio v. Lewis, supra, as later discussion will demonstrate, are basically consistent with and do not limit broad judicial policy that favors expeditious disposition and termination of litigation. This favored policy may at times require consideration of issues by courts reviewing agency orders which are not strictly necessary to disposition, but which will expedite termination of litigation.

First Savings and Loan Association of Del Rio is distinguishable from the case before the Court in that the reviewing district court found three errors underlying the Commission's order and remanded it for "further proceedings consistent with this opinion."In the present case one Commission error is pointed out by the reviewing court and remand is ordered to give the agency "an opportunity to correct any errors in its order."More specific court guidance in First Savings and Loan Association of Del Rio would have been salutary. However, delay in disposition would have been approximately equal whether remand was first to the trial court or first to the agency. A remand to the trial court at that point in the progress of the case would not have assured a more expeditious end to the litigation than would acceding to the trial court's disposition.

In the present appeal the Commission was given no guidance, except as to the deficiency in the rate

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00603

573 S.W.2d 502
573 S.W.2d 502                                                    Page 11
(Cite as: 573 S.W.2d 502)

amendment, and was told to search out and correct any errors underlying its order. To remand without *511 guidance suggests and sanctions a system of winnowing out error by successive remands until an errorless order is produced by the Commission. A "merry-go-round" correction procedure of this nature seriously violates the policy of expeditious disposition and termination of litigation. A rational observance of the imperatives of precedent and policy requires the reviewing court to consider all of the issues before it, and if remand is appropriate, to give the administrative agency as much legal guidance as sound judicial discretion and the exigencies of a case permit. In the present case the Court of Civil Appeals should have examined the several allegations of Commission error that were before it to determine proper disposition of the appeal and, if remand was indicated, should have given the Commission appropriate guidance.

Four of the six points of error in respondents' (appellants') brief in the Court of Civil Appeals questioned Commission action. One of these points, that the Commission did not have jurisdiction to prescribe or adjust rates under Morgan's application, was determined by the intermediate court and is no longer in the case. Another point raised the issue of whether substantial evidence supported the Commission's order. Although the Court of Civil Appeals did not dispose of the substantial evidence issue, it should be considered by this Court as writ of error was granted on a similar point. The remaining points pertaining to Commission error are concerned with matters that are correctable by the Commission if further Commission consideration is found appropriate. The questions raised by these points are not before this Court and additional comment will be omitted.

III.

SUBSTANTIAL EVIDENCE ISSUE

Morgan's permanent certificate authorized it to

transport over designated routes on a fixed schedule Goods, wares, merchandise, newspapers, films and Theater supplies subject to weight and freight rate restrictions. Morgan's application to amend the certificate sought authority to transport General commodities moving in express service to, from and between points specified in the application; to eliminate the existing certificate weight and rate restrictions; to coordinate proposed service with existing service, and to interline with other express carriers at appropriate points; as well as, to replace the rate restriction with another that provided a formula for the calculation of rates. The Commission amended the certificate by eliminating existing weight and rate restrictions and added authority for Morgan to transport General commodities, not to exceed 350 pounds in weight, including Newspapers, newsreels, films, and Theater supplies along designated routes slightly different from Morgan's existing routes at rates to be calculated by a prescribed formula.

The voluminous record contains evidence showing the scope of transportation services offered and provided by petitioners along their routes of operation. Witnesses produced by petitioners testified to the public's general satisfaction with petitioners' existing service and facilities. For individual business reasons, witnesses relied upon existing service and said they would be adversely affected if petitioners' service was impaired by favorable Commission action on Morgan's application. Morgan's witnesses testified in general terms, and without reference to shipments of less than 350 pounds in weight,[FN4] to their need, and probable use of Morgan's proposed additional services and to the inadequacy of petitioners' service to meet their business needs.

FN4. The Commission's order restricted the General commodity authority granted Morgan to shipments not exceeding 350 pounds in weight. Morgan's application did not propose such restriction.

Petitioners focus upon transit time performance, pick-up and delivery service and direct service to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

Page 12

smaller authorized service points as elements of Morgan's cause before the Commission and assert that these areas of carrier service are not supported by substantial evidence. No evidence was produced*512 showing Morgan's past or prospective dependable transit time performance while evidence and documents were offered to show petitioners' favorable performance in this regard. No complaint as to dependable pick-up and delivery service by petitioners (existing carriers) was tendered but evidence of dissatisfaction with the dependability and adequacy of Morgan's service and prospective service was produced. Some evidence was offered of failure or refusal of petitioners to perform direct service to, from and between, some of their smaller authorized service points. On the other hand evidence was produced that Morgan presently and prospectively failed and refused to provide direct service to one-third of its smaller service points. Morgan's delivery practice at smaller service points, according to the evidence, is to notify a consignee by mail of arrival of freight which may be picked up at Morgan's closest larger town agency.

Evidence is characterized as substantial when reasonable minds might accept it as adequate to support a conclusion. Consolidated Edison v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). This Court has said that evidence is substantial when ". . . the evidence as a whole is such that reasonable minds could have reached the conclusion that the Railroad Commission must have reached in order to justify its action." Auto Convoy Company v. Railroad Commission, 507 S.W.2d 718, 722 (Tex.1974). See also Trapp v. Shell Oil Company, Inc., 145 Tex. 323, 198 S.W.2d 424 (Tex.1946); Shupee v. Railroad Commission of Texas, 123 Tex. 521, 73 S.W.2d 505 (1934). The burden is upon an applicant, Morgan in this instance, to show by substantial evidence that existing transportation facilities are not reasonably adequate as well as satisfying other statutory prerequisites to a grant of highway carrier authority.Article 911b, ss 8 and 9.

From the facts noted above there is substantial evidence that in isolation would support a Commission finding that existing service is adequate. On the other hand there is evidence of a public need for and probable use of Morgan's proposed service as well as testimony of the inadequacy of existing carrier's service. The evidence favorable to Morgan's application is substantial in nature and tends to rebut a prima facie showing by the petitioners that existing service was adequate. That existing carrier service provides incidental conveniences, or advantages in limited areas of service that proposed carrier service does not contemplate, match or exceed will not deprive the Commission of discretion to determine the ultimate question of adequacy of existing service, need of or demand for additional service, and other statutory prerequisites to a grant of transportation authority. The weight of evidence is for Commission determination. North East Texas Motor Lines, Inc., v. Texas and Pacific Motor Transport Company et al., 159 S.W.2d 926 (Tex.Civ.App. Austin 1941, no writ). The Commission as arbiter decided in Morgan's favor. This Court has no power to substitute its own judgment for that of the Commission. Auto Convoy Company v. Railroad Commission, supra; Gulf Land Company v. Atlantic Refining Company, 134 Tex. 59, 131 S.W.2d 73 (1939). I would conclude that substantial evidence supports the Commission's order. The Court of Civil Appeals did not err in refusing to affirm the trial court judgment that this order was not supported by substantial evidence.


IV.


DISPOSITION OF APPEAL

Discretion to issue motor carrier certificates of convenience and necessity and to authorize transportation of freight for compensation over Texas highways is vested in the Railroad Commission. Texas Motor Carriers Act, Tex.Rev.Civ.Stat.Ann. art. 911b. In this instance the amendment to Morgan's

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00605

573 S.W.2d 502
573 S.W.2d 502
(Cite as: 573 S.W.2d 502)

certificate altering rates was adjudged a nullity by both the trial and intermediate appellate courts.[FN5] No party now *513 questions these adjudications. Morgan's application was unitary in nature and a change in rates appears to have been an integral part of the application and the Commission's order. It cannot be assumed that the Commission would have granted the several certificate amendments mentioned apart from the change in the rate structure. Accordingly, Morgan's application should be reconsidered and determined in the light of the fact that the rate structure cannot be adjusted in this proceeding. The Commission should be completely free to exercise the discretion vested in it in making a determination of issues properly presented by Morgan's application. To that end the judgment of the Court of Civil Appeals should be modified by vacating the Commission's order of June 11, 1975, and the cause should be remanded to the trial court, as ordered by the Court of Civil Appeals, for remand by that court to the Commission with instructions to redetermine the issues presented by Morgan's application and any proper amendments thereto. Modified as indicated, I would affirm the judgment of the Court of Civil Appeals.

> FN5. Morgan's application did not comply with Commission regulations prescribing rules governing rate applications and procedure thereunder. Error in this respect cannot be corrected in this proceeding.

Tex.,1978.
Merchants Fast Motor Lines, Inc. v. Railroad Commission of Texas
573 S.W.2d 502

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00606

**18**

00607

Westlaw.

82 S.W.3d 34
82 S.W.3d 34
(Cite as: 82 S.W.3d 34)

Page 1

**H**

Court of Appeals of Texas,
San Antonio.
James MUSGROVE, Appellant,
v.
The STATE of Texas, Appellee.
No. 04-01-00017-CR.

Feb. 6, 2002.
Rehearing Overruled April 30, 2002.
Discretionary Review Refused Oct. 9, 2002.

Defendant, who was previously convicted of burglary of a habitation, was resentenced following remand, 986 S.W.2d 738, in the 175th Judicial District Court, Bexar County, Phil Chavarria, Jr., J., after denial of defendant's motion for new trial. Defendant appealed. The Court of Appeals, Sandee Bryan Marion, J., held that: (1) trial court's ruling that certain testimony was inadmissible was not contrary to appellate mandate, and (2) application of version of evidentiary rule in effect at time of defendant's new trial hearing, and not former rule in effect at time defendant filed motion for new trial, did not violate defendant's constitutional rights.

Affirmed.

West Headnotes

[1] Criminal Law 110 ⟊1181.5(1)

110 Criminal Law
  110XXIV Review
    110XXIV(U) Determination and Disposition of Cause
      110k1181.5 Remand in General; Vacation
        110k1181.5(1) k. In General. Most Cited Cases
When a trial court's judgment is reversed and the case remanded without instructions to render a specific judgment, the effect is to restore the parties to the same situation as that in which they were prior to the appeal.

[2] Criminal Law 110 ⟊1181.5(3.1)

110 Criminal Law
  110XXIV Review
    110XXIV(U) Determination and Disposition of Cause
      110k1181.5 Remand in General; Vacation
        110k1181.5(3) Remand for Determination or Reconsideration of Particular Matters
          110k1181.5(3.1) k. In General. Most Cited Cases
If a remand is accompanied by instructions to retry certain issues, the scope of the trial must be limited to those issues and the parties may not relitigate issues settled by the appellate court.

[3] Criminal Law 110 ⟊1181.5(3.1)

110 Criminal Law
  110XXIV Review
    110XXIV(U) Determination and Disposition of Cause
      110k1181.5 Remand in General; Vacation
        110k1181.5(3) Remand for Determination or Reconsideration of Particular Matters
          110k1181.5(3.1) k. In General. Most Cited Cases
Within the scope of the issues to be tried on remand, the parties are allowed to proceed in the court below and have their rights determined in the same manner and to the same extent as if their cause had never been heard or decided by any court, leaving the trial court entirely free to exercise its own judgment upon the evidence.

[4] Criminal Law 110 ⟊1192

110 Criminal Law
  110XXIV Review
    110XXIV(U) Determination and Disposition of Cause
      110k1192 k. Mandate and Proceedings in Lower Court. Most Cited Cases
Appellate court's mandate directing trial court to hold an evidentiary new trial hearing limited the scope of the hearing to those issues pertinent to defendant's motion for new trial.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00608

82 S.W.3d 34
82 S.W.3d 34
(Cite as: 82 S.W.3d 34)

Page 2

[5] Criminal Law 110 ⚷1192

110 Criminal Law
    110XXIV Review
        110XXIV(U) Determination and Disposition
of Cause
            110k1192 k. Mandate and Proceedings in
Lower Court. Most Cited Cases
Appellate court's mandate directing the trial court to
hold an evidentiary new trial hearing did not dictate
to the trial court what evidence to admit or exclude,
but left admission of evidence to the trial court's dis-
cretion, and thus, trial court's ruling that certain tes-
timony was inadmissible was not contrary to man-
date.

[6] Criminal Law 110 ⚷957(3)

110 Criminal Law
    110XXI Motions for New Trial
        110k948 Application for New Trial
            110k957 Statements, Affidavits, and Tes-
timony of Jurors
                110k957(3) k. Misconduct of Jurors, in
General. Most Cited Cases
Defendant had no vested right in the procedural
mechanisms for reviewing his conviction or punish-
ment, and thus, application of version of evidentiary
rule in effect at time of defendant's new trial hearing,
and not former rule in effect at time defendant filed
motion for new trial, did not violate the State Consti-
tution's prohibition against retroactive laws, even if
former rule, which governed competency of a juror to
testify in an inquiry into the validity of a verdict,
would have permitted jurors to testify about juror
misconduct. Vernon's Ann.Texas Const. Art. 1, § 16;
Rules of Evid.. Rule 606(b); Rules of Crim.Evid.,
Rule 606(b) (Repealed).

[7] Criminal Law 110 ⚷957(2)

110 Criminal Law
    110XXI Motions for New Trial
        110k948 Application for New Trial
            110k957 Statements, Affidavits, and Tes-
timony of Jurors
                110k957(2) k. Denying or Explaining
Assent to Verdict. Most Cited Cases
Under former rule of criminal evidence governing

competency of a juror to testify in an inquiry into the
validity of a verdict, a juror could testify about both
internal and external influences on the verdict. Rules
of Crim.Evid., Rule 606(b) (Repealed).

[8] Statutes 361 ⚷278.9

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.9 k. Statutes Affecting Vested
Rights. Most Cited Cases
    (Formerly 92k190)
The retroactive laws provision State Constitution
prohibits the application of statutes that disturb
vested, substantive rights. Vernon's Ann.Texas Const.
Art. 1, § 16.

[9] Statutes 361 ⚷278.13

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies
and Procedures
                361k278.13 k. In General. Most Cited
Cases
    (Formerly 92k191)
Laws that alter procedure generally do not fall
within state constitutional prohibition against retro-
active laws. Vernon's Ann.Texas Const. Art. 1, § 16.

[10] Criminal Law 110 ⚷13.2

110 Criminal Law
    110I Nature and Elements of Crime
        110k12 Statutory Provisions
            110k13.2 k. Retroactive Operation. Most
Cited Cases
Laws that do not amend substantive law by defining
criminal acts or providing for penalties are proce-
dural in nature, for purposes of state constitutional
prohibition against application of statutes that disturb
vested, substantive rights. Vernon's Ann.Texas Const.
Art. 1, § 16.

[11] Criminal Law 110 ⚷13.2

110 Criminal Law
    110I Nature and Elements of Crime

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

82 S.W.3d 34
82 S.W.3d 34
(Cite as: 82 S.W.3d 34)

Page 3

110k12 Statutory Provisions
110k13.2 k. Retroactive Operation. Most Cited Cases

For purposes of state constitutional prohibition against retroactive substantive, but not **procedural**, laws, " procedure" refers to changes in the process by which a criminal case is adjudicated as opposed to changes in the substantive law of crimes. Vernon's Ann.Texas Const. Art. 1, § 16.

[12] Statutes 361 ⬚278.14

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies and Procedures
                361k278.14 k. Application to Pending Actions and Proceedings. Most Cited Cases
    (Formerly 361k267(2))

**Procedural** statutes control pending litigation from their effective date, absent an express provision to the contrary.

[13] Statutes 361 ⬚278.15

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies and Procedures
                361k278.15 k. Evidence. Most Cited Cases
    (Formerly 92k191)

The rules of evidence are **procedural** provisions, for purposes of state constitutional prohibition against retroactive application of statutes that disturb vested, substantive rights. Vernon's Ann.Texas Const. Art. 1, § 16.

[14] Criminal Law 110 ⬚1176

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1176 k. Decisions on Motion for New Trial. Most Cited Cases

In light of appellate determinations ultimately adverse to defendant concerning his new trial hearing, defendant was not prejudiced by passage of time, and

thus, his due process rights were not violated, even though disposition of his appeal took several years.
*35 Nancy B. Barohn, San Antonio, for Appellant.

Edward F. Shaughnessy, III, Assistant Criminal District Attorney, San Antonio, for Appellee.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

Opinion by SANDEE BRYAN MARION, Justice.

This is an appeal from the trial court's denial of defendant James Musgrove's motion for new trial. The essence of defendant's complaint is that the trial court improperly applied the version of Texas Rule of Evidence 606(b) that was in effect when the new trial hearing was held, instead of the version of Rule 606(b) that *36 was in effect when he filed his motion for new trial. We disagree and affirm.

### PROCEDURAL HISTORY

In 1992, a jury found the defendant guilty of burglary of a habitation, and assessed punishment at forty-five years' confinement. The defendant filed a motion for new trial, alleging jury misconduct at the punishment phase of his trial. The motion was denied. In 1995, this court affirmed the trial court's judgment in an unpublished opinion. See Musgrove v. State, No. 04-92-00407-CR (Tex.App.-San Antonio 1992) (unpublished). The Court of Criminal Appeals granted review on whether the defendant's motion for new trial had been "presented" to the trial court. On January 7, 1998, the Court of Criminal Appeals vacated the judgment in part, and remanded the case for consideration of whether the defendant should be granted a hearing on his motion for new trial. See Musgrove v. State, 960 S.W.2d 74 (Tex.Crim.App.1998). On January 27, 1999, this court held that the defendant was entitled to a hearing on his complaint of jury misconduct, and abated the appeal for that purpose. See Musgrove v. State, 986 S.W.2d 738 (Tex.App.-San Antonio 1999, pet. ref'd). On June 30, 1999, the Court of Criminal Appeals refused the State's petition for discretionary review. This court's mandate issued on August 16, 1999.

A new trial hearing was held on November 22, 1999,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.