82 S.W.3d 34
82 S.W.3d 34
(Cite as: 82 S.W.3d 34)

Page 4

at which time the defendant attempted to offer the testimony of two jurors regarding the alleged misconduct. The State objected that such testimony was inadmissible under Texas Rule of Evidence 606(b). The trial court sustained the objection, and no other evidence was offered. The court denied the motion for new trial, and the defendant appealed.

On April 4, 2000, after determining the defendant was required to ask the trial court to resentence him, this court ordered the defendant to show cause why his appeal should not be dismissed for lack of jurisdiction. On June 9, 2000, the defendant filed a motion with the trial court asking that he be resentenced pursuant to this court's August 16, 1999 mandate. That motion was granted, and the defendant filed a motion in this court asking that his appeal be dismissed, without prejudice. On June 28, 2000, this court dismissed the defendant's appeal, without prejudice to him starting "the appeal process anew." See Musgrove v. State, No. 04-99-00939-CR, 2000 WL 863102 (Tex.App.-San Antonio, June 28, 2000). This court's mandate issued on September 18, 2000.

On December 6, 2000, the trial court reimposed the defendant's 1992 sentence. On January 5, 2001, the defendant filed this appeal, alleging the trial court erred in excluding from evidence the testimony of the juror-witnesses during the new trial hearing.

### DISCUSSION

### THIS COURT'S MANDATE

In his first issue, the defendant asserts the trial court erred in refusing to hear evidence in violation of the August 16, 1999 mandate, which read, in part, as follows:

Accordingly, we abate this appeal, remand the case to the trial court, and order the trial court to conduct an evidentiary hearing on Musgrove's motion for new trial. This order reinstates jurisdiction over the case in the trial court and returns Musgrove to the stage of the proceeding before imposition of sentence and filing of the notice of appeal. If the trial court denies the motion for new trial, the sentence must be reimposed, and Musgrove, if he so wishes, must start the appeal process anew.

*37 The defendant contends the mandate required an "evidentiary hearing" and the trial court violated the mandate by refusing to hear the only evidence he had to offer in support of his motion for new trial-the testimony of the juror-witnesses.

[1][2][3] When a trial court's judgment is reversed and the case remanded, without instructions to render a specific judgment, the effect is to restore the parties to the same situation as that in which they were prior to the appeal. Film Adver. Corp. v. Camp, 137 S.W.2d 1068, 1069 (Tex.Civ.App.-Dallas 1940, no writ). If the remand is accompanied by instructions to retry certain issues, the scope of the trial must be limited to those issues and the parties may not relitigate issues settled by the appellate court. Ballard v. Cantrell, 597 S.W.2d 41, 42 (Tex.Civ.App.-Fort Worth 1980, writ ref'd n.r.e). Within the scope of the issues to be tried on remand, the parties are allowed to proceed in the court below, and have their rights determined in the same manner and to the same extent as if their cause had never been heard or decided by any court, leaving the trial court entirely free to exercise its own judgment upon the evidence. Film Adver., 137 S.W.2d at 1069; see also Ballard, 597 S.W.2d at 42 (court properly admitted evidence not produced at first trial, but relevant to issue on remand); Forister v. Coleman, 538 S.W.2d 14, 16 (Tex.Civ.App.-Austin 1976, writ ref'd n.r.e) (court properly excluded evidence not relevant to issue on remand).

[4][5] This court's mandate directed the trial court to hold an evidentiary new trial hearing; thus, limiting the scope of the hearing to those issues pertinent to the defendant's motion for new trial. The mandate did not dictate to the trial court what evidence to admit or exclude because the admissibility of evidence is left to the trial court's discretion. Mendoza v. State, 30 S.W.3d 528, 530 (Tex.App.-San Antonio 2000, no pet.). The trial court conducted the hearing and allowed the defendant to offer such evidence as he considered pertinent to his motion for new trial; he offered only the testimony of the two juror-witnesses. Because this court's mandate left the admission of evidence to the trial court's discretion, the trial court's ruling that the jurors' testimony was inadmissible was not contrary to the mandate.

### CONSTITUTIONAL COMPLAINTS

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

82 S.W.3d 34
82 S.W.3d 34                                                                    Page 5
(Cite as: 82 S.W.3d 34)

[6] In his second issue, the defendant asserts that the application of Texas Rule of Evidence 606(b), as it existed at the time of the hearing rather than as it existed when he filed his motion for new trial, violated his federal and state constitutional rights against the retroactive application of any law that deprives him of a vested, substantive right. In his third issue, the defendant asserts his due process rights have been violated by the retroactive application of Rule 606(b) because it deprived him of an adequate opportunity to present his claims in the context of the appellate process.

When the new trial hearing was conducted, the trial court applied the current version of Rule 606(b), which provides as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, *a juror may testify:* (1) *38 whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.*

TEX.R. EVID. 606(b) (emphasis added). Thus, under Rule 606(b), a juror may testify about any improper outside influence or the juror's qualifications to serve, but cannot testify about matters or statements occurring during deliberations. At the new trial hearing, the defendant attempted to introduce the testimony of two jurors in support of his allegation that juror misconduct occurred during the punishment phase of his trial because the jury considered how the parole law would apply to his case. The defendant does not dispute that under the current version of Rule 606(b) such testimony is not admissible.

[7] Instead, the defendant alleges the version of Rule 606(b) as it existed when he filed his motion for new trial should have been applied. That version read as follows:

Upon an inquiry into the validity of a verdict or in-

dictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, *except that a juror may testify as to any matter relevant to the validity of the verdict or indictment.* Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Former TEX.R.CRIM. EVID. 606(b) (emphasis added).[FN1] Under former Rule 606(b), a juror could testify about both internal and external influences on the verdict. See *Buentello v. State,* 826 S.W.2d 610, 613 (Tex.Crim.App.1992). The defendant asserts the testimony of the jurors would have been admissible under former Rule 606(b) and the application of current Rule 606(b) was a retroactive application of a law in violation of Texas Constitution article 1, section 16.

> FN1. The Texas Rules of Criminal Evidence were amended on March 1, 1998, at which time they were combined with the Texas Rules of Civil Evidence to make up the Texas Rules of Evidence.

[8][9] The Texas Constitution prohibits both *ex post facto* and retroactive laws. TEX. CONST. art. 1, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligations of contract shall be made."). The retroactive laws provision of Article 1, section 16, prohibits the application of statutes that disturb vested, substantive rights. *Ibarra v. State,* 11 S.W.3d 189, 192 (Tex.Crim.App.1999), *cert. denied,* 531 U.S. 828, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000). Laws that alter procedure generally do not fall within the prohibition. *Id.*

[10][11][12] Laws that do not amend substantive law by defining criminal acts or providing for penalties are procedural in nature. *Ex parte Johnson,* 697 S.W.2d 605, 607 (Tex.Crim.App.1985); *Carter v. State,* 813 S.W.2d 746, 747 (Tex.App.-Houston [1st Dist.] 1991, no pet.). " Procedure" refers to changes in the process by which a criminal case is adjudicated as opposed to changes in the substantive law of crimes. *Ex parte Scales,* 853 S.W.2d 586, 588

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

82 S.W.3d 34
82 S.W.3d 34
(Cite as: 82 S.W.3d 34)

Page 6

(Tex.Crim.App.1993). **Procedural** statutes control pending litigation from their effective date, absent an express provision to the contrary. *Ex parte Johnson,* 697 S.W.2d at 607-08; *Medina v. State,* 828 S.W.2d 268, 272 (Tex.App.-San Antonio 1992, no pet.); *39*Freeman v. State,* 786 S.W.2d 56, 58 (Tex.App.-Houston [1st Dist.] 1990, no pet.).* The order approving the revisions to the Texas Rules of Evidence stated that the amended rules take effect March 1, 1998 and "apply to all proceedings on or after that date." *See* Court Order on Final Approval of Revisions to the Texas Rules of Evidence, printed in 61 TEX. BAR J. 373 (Apr.1998).

[13] The rules of evidence are procedural provisions. *Buffington v. State,* 801 S.W.2d 151, 154 (Tex.App.-San Antonio 1990, pet. ref'd). Because current Rule 606(b) was in effect at the time of the defendant's new trial hearing, it was applicable as a procedural provision and the trial court was bound to follow it during the hearing. *Id.; Freeman,* 786 S.W.2d at 58 (rules of evidence govern case even though offense committed before their enactment); *Medrano v. State,* 768 S.W.2d 502, 504 (Tex.App.-El Paso, 1989 pet. ref'd) (same); *see also Hart v. State,* 15 S.W.3d 117, 124 (Tex.App.-Texarkana 2000, pet. ref'd) (holding that trial court correctly sustained State's Rule 606(b) objection even though alleged misconduct occurred before rule's amendment).

The defendant attempts to circumvent such a conclusion by arguing that the retroactive application of current Rule 606(b) disturbs his substantive right to appellate review of his complaint. Although the defendant has a vested, substantive right to legislatively-granted appellate review, he has no vested right in the procedural mechanisms for reviewing his conviction or punishment. *See Fowler v. State,* 991 S.W.2d 258, 261 (Tex.Crim.App.1999) ( procedural mechanisms for reviewing conviction not a vested and substantive right); *Montez v. State,* 975 S.W.2d 370, 372 (Tex.App.-Dallas 1998, no pet.)(holding rules of appellate procedure are obviously procedural in nature). Therefore, the trial court's application of the current version of the rule did not violate the Texas Constitution's prohibition of retroactive laws, and did not violate the defendant's due process rights.

[14] In his fourth issue, the defendant complains that his due process rights were violated by the inordinate delay in the disposition of his appeal. The defendant's direct appeal has lasted almost nine years. His petition for discretionary review was pending before the Court of Criminal Appeals for almost three years before the case was remanded in March 1998. The new trial hearing was conducted in November 1999, and the defendant asserts that the delay from then to now is attributable to the trial court's failure to carry out this court's mandate. The defendant contends he has been prejudiced by the delay because the jurors' memory has been impaired by the passage of time, and he has suffered anxiety and concern awaiting the outcome of his appeal. Because we have determined that the trial court did not violate this court's mandate and because current Rule 606(b) was applicable to the defendant's new trial hearing and precludes the testimony of the juror-witnesses, the defendant has not been prejudiced by the passage of time; therefore, his due process rights have not been violated.

### CONCLUSION

Although the amendment to Rule 606(b) worked to the defendant's disadvantage, its application was not prohibited by the United States or Texas Constitutions. Therefore, we affirm the trial court's judgment.

Tex.App.-San Antonio,2002.
Musgrove v. State
82 S.W.3d 34

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00613

**19**

00614

Westlaw.

71 N.Y.2d 521

Page 1

71 N.Y.2d 521
**(Cite as: 71 N.Y.2d 521, 523 N.E.2d 277)**

▷

James M. O'Neill, Respondent,
v.
Oakgrove Construction, Inc., et al., Defendants.
Gannett Rochester Newspapers, Appellant.
Court of Appeals of New York

Argued February 9, 1988;
decided March 29, 1988

CITE TITLE AS: O'Neill v Oakgrove Constr.

## SUMMARY

Appeal, on constitutional grounds, from an order of the Supreme Court (Eugene W. Bergin, J.), entered January 17, 1987 in Monroe County, which directed Gannett Rochester Newspapers to produce 19 photographs of an accident scene for inspection and copying by plaintiff. The appeal brings up for review a prior order of the Appellate Division of the Supreme Court in the Fourth Judicial Department, which modified, on the law, and, as modified, affirmed an order of the Supreme Court (Eugene W. Bergin, J.), entered in Monroe County, (1) granting a motion by plaintiff to direct Gannett Rochester Newspapers, as a nonparty, to produce 58 photographs of an accident scene for inspection and copying, and (2) denying a cross motion by Gannett Rochester Newspapers for a protective order. The modification consisted of reversing so much of Supreme Court's order as granted plaintiff's motion and remitting the matter to Supreme Court for an in camera examination of the photographs to determine the relevance of the photographs and an actual need for their production.

*O'Neill v Oakgrove Constr.*, 122 AD2d 570, reversed.

## HEADNOTES

Disclosure--Material Exempt from Disclosure--Qualified Reporter's Privilege under State Consti-

tution--Nonconfidential Photographs Taken in Course of Newsgathering and Kept as Resource Material

(1) In a personal injury action arising from an automobile accident, nonconfidential photographs of the accident scene taken by a nonparty journalist in the course of newsgathering activities and kept as resource material are protected from compelled disclosure by a qualified reporter's privilege under the State Constitution. NY Constitution, article I, § 8 provides a reporter's privilege which extends to confidential and nonconfidential materials and which, albeit qualified, is triggered where the material sought for disclosure was prepared or collected in the course of newsgathering. The ability of the press freely to collect and edit news, unhampered by repeated demands for its resource materials, requires more protection than that afforded by the disclosure statute (CPLR 3101). The guarantee of a free press in NY Constitution, article I, § 8 independently mandates the protection afforded by the qualified privilege to prevent undue diversion of journalistic effort and disruption of press functions. The privilege bars coerced disclosure of resource materials, which are obtained or otherwise *522 generated in the course of newsgathering or newspreparing activities, unless the litigant seeking disclosure demonstrates clearly and specifically, that the items sought are (1) highly material, (2) critical to the litigant's claim and (3) not otherwise available. This tripartite test is, however, but a complement to the general principles governing compelled disclosure where they are applied to a reporter's photographs. Thus, in deciding whether to order disclosure of photographs prepared or obtained in the course of newsgathering, a court would consider the extent, if any, that press activities are affected and, if they are, whether such is justified by the interest to be served. Together with the particularized constitutional test, these basic protections are wholly available to control disclosure in this sensitive area.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00615

71 N.Y.2d 521

Page 2

71 N.Y.2d 521
**(Cite as: 71 N.Y.2d 521, 523 N.E.2d 277)**

Appeal--Court of Appeals--Comment on Federal Constitutional Issues When Disposing of Case on State Constitutional Grounds--Qualified Reporter's Privilege .

(2) In holding that NY Constitution, article I, § 8 provides a qualified reporter's privilege, which extends to confidential and nonconfidential materials and is triggered where the material sought for disclosure was prepared or collected in the course of newsgathering, the Court of Appeals notes its agreement with the Federal courts that have reached the same result under the First Amendment of the Federal Constitution in order that the Court of Appeals might express its own view of the Federal guarantee of a free press which the Court of Appeals is also bound to uphold. This practice is in accord with the proper role of the Court of Appeals in helping to expound the Federal, as well as the State, Constitution and it contributes to the development of a body of case law of potential use to Federal and other State courts.

### TOTAL CLIENT SERVICE LIBRARY REFERENCES

CLS, US Const 1st Amend; NY Const, art I, §8.

NY Jur 2d, Constitutional Law, §259 *et seq.*

### POINTS OF COUNSEL

*John B. McCrory* and *William S. Brandt* for appellant. I. A First Amendment privilege protects unpublished information gathered by qualified journalists. (*People v Korkala*, 99 AD2d 161;*United States v Burke*, 700 F2d 70, 464 US 816;*People v Bova*, 118 Misc 2d 14;*Wilkins v Kalla*, 118 Misc 2d 34;*United States v Criden*, 633 F2d 346,*cert denied sub nom.Schaffer v United States*, 449 US 1113;*Silkwood v Kerr-McGee Corp.*, 563 F2d 433;*Montezuma Realty v Occidental Petroleum Corp.*, 494 F Supp 780;*Baker v F & F Inv.*, 470 F2d 778, 411 US 966;*Loadholtz v Fields*, 389 F Supp 1299;*Miami Herald Publ. Co. v Tornillo*, 418 US 241.)II. Plaintiff totally failed to meet his burden

under the balancing test. *523(*Riley v City of Chester*, 612 F2d 708;*Silkwood v Kerr-McGee Corp.*, 563 F2d 433;*Carey v Hume*, 492 F2d 631, 417 US 938;*Gulliver's Periodicals v Levy Circulating Co.*, 455 F Supp 1197;*Baker v F & F Inv.*, 470 F2d 778, 411 US 966;*United States v Orsini*, 424 F Supp 229, 559 F2d 1206, 434 US 997;*United States v Burke*, 700 F2d 70, 464 US 816;*People v Marahan*, 81 Misc 2d 637;*People v Monroe*, 82 Misc 2d 850;*In re Petroleum Prods. Antitrust Litig.*, 680 F2d 5,*cert denied sub nom.Arizona v McGraw-Hill, Inc.*, 459 US 909.)

*Alexander Geiger* for respondent. I. Any constitutional reporter's privilege against disclosure is, at most, a qualified privilege. (*Matter of Beach v Shanley*, 62 NY2d 241;*Matter of Knight-Ridder Broadcasting v Greenberg*, 70 NY2d 151;*Matter of Consumers Union*, 495 F Supp 582;*United States v Cuthbertson*, 630 F2d 139, 449 US 1126;*Herbert v Lando*, 441 US 153.)II. Respondent in this case has overcome any applicable qualified privileges. (*Koump v Smith*, 25 NY2d 287;*People v Wolf*, 39 AD2d 864;*Allen v Crowell-Collier Publ. Co.*, 21 NY2d 403;*Matter of Maryland v Ambach*, 59 NY2d 711.)

*Peter L. Danziger, Barbara G. Billet, Ralph Huber, Richard N. Winfield, Steven Sadicario, John Zucker, Sandra Baron, Andrew Hughes, George Freeman* and *Peter G. Stone* for New York Newspaper Publishers Association, Inc., and others, *amici curiae.*I. Compelled disclosure of unpublished information and work product, whether confidential or otherwise, would substantially impair the effective functioning of a free press, to the detriment of an informed public. (*Zerilli v Smith*, 656 F2d 705;*Wilkins v Kalla*, 118 Misc 2d 34;*Matter of Knight-Ridder Broadcasting v Greenberg*, 70 NY2d 151.)II. The reporter's privilege under the First Amendment extends to all unpublished journalistic work product and information. (*von Bulow by Auersperg v von Bulow*, 811 F2d 136;*Loadholtz v Fields*, 389 F Supp 1299;*Matter of Consumers Union*, 495 F Supp 582;*United States v Cuthbertson*, 630 F2d 139, 449 US 1126;*Continental Cablevision v Storer Broadcasting Co.*, 583 F Supp 427;*Alte-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00616

71 N.Y.2d 521

Page 3

71 N.Y.2d 521
**(Cite as: 71 N.Y.2d 521, 523 N.E.2d 277)**

*mose Constr. Co. v Building & Constr. Trades Council,* 443 F Supp 489;*People v Korkala,* 99 AD2d 161;*Wilkins v Kalla,* 118 Misc 2d 34;*People v Bova,* 118 Misc 2d 14;*People v Troiano,* 127 Misc 2d 738.)III. A broad reporter's privilege should be recognized under article I, § 8 of the NY Constitution. *(People ex rel. Arcara v Cloud Books,* 68 NY2d 553;*SHAD Alliance v Smith Haven Mall,* 66 NY2d 496;*Bellanca v New York State Liq. Auth.,* 54 NY2d 228,*524456 US 1006; *PruneYard Shopping Center v Robins,* 447 US 74;*People v P. J. Video,* 68 NY2d 296;*People v Adams,* 53 NY2d 241;*Cooper v Morin,* 49 NY2d 69;*Sharrock v Dell Buick-Cadillac,* 45 NY2d 152;*People v Hobson,* 39 NY2d 479;*People v Settles,* 46 NY2d 154.)

OPINION OF THE COURT

Hancock, Jr., J.
(1) The question presented is whether nonconfidential photographs taken by journalists in the course of newsgathering activities and kept as resource material are protected from compelled disclosure by a qualified reporter's privilege under the State or Federal Constitution.[FN1]The Appellate Division held that protection from disclosure was limited to situations involving "a confidential relationship with a source" and to those involving "private sources where discovery would substantially intrude upon the privacy of press functions" (122 AD2d, at 571). We disagree. Article I, § 8 of the New York State Constitution and, we believe, the First Amendment of the Federal Constitution as well, provide a reporter's privilege which extends to confidential and nonconfidential materials and which, albeit qualified, is triggered where the material sought for disclosure--the photographs here--was prepared or collected in the course of newsgathering.

> FN1 This appeal does not involve the statutory privilege under New York's Shield Law (Civil Rights Law. § 79-h) which provides *unqualified* protection to a reporter's *confidential* sources and materials *(Matter of Knight-Ridder Broadcasting v*

*Greenberg,* 70 NY2d 151;*Matter of Beach v Shanley,* 62 NY2d 241). Rather, it involves the question of a constitutional privilege, State or Federal, providing *qualified* protection to materials which, although the product of newsgathering, were not obtained in confidence and, therefore, do not fall within the reach of the statute.

(2) Our decision is based on an adequate and independent ground under our State Constitution. Nevertheless, we are noting our agreement with the Federal courts that have reached the same result under the Federal Constitution in order that we might express our own view of the federal guarantee of a free press which, of course, we are also bound to uphold. This practice is in accord with our proper role in helping to expound the Federal, as well as our State, Constitution and, as some of the commentators have explained, it contributes to the development of a body of case law of potential use to federal and other state courts *(see, e.g.,* Utter, *525Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues when Disposing of Cases on State Constitutional Grounds,* 63 Tex L Rev 1025, 1029-1030, 1050; Pollock, *Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts,* 63 Tex L Rev 977, 985-986;*Developments in the Law--The Interpretation of State Constitutional Rights,* 95 Harv L Rev 1324, 1357). We have followed the practice in other cases and see no reason for hesitancy in doing so here *(see, e.g., Matter of Patchogue-Medford Congress of Teachers v Board of Educ.,* 70 NY2d 57, 64-65;*People v Stith,* 69 NY2d 313, 316, n; *People v Donovan,* 13 NY2d 148, 151-152).

I

Plaintiff was injured when his automobile hit a concrete median after sliding off a roadway which was under construction. Seventeen photographs of the accident scene were taken by a police photographer. Additionally, a photojournalist employed by ap-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00617

71 N.Y.2d 521

Page 4

71 N.Y.2d 521
(Cite as: 71 N.Y.2d 521, 523 N.E.2d 277)

pellant, Gannett Rochester Newspapers (Gannett), took 58 photographs, one of which was published in the *Democrat and Chronicle* the following day.

Plaintiff brought an action for personal injury against the contractors and subcontractors responsible for the construction project, alleging hazardous conditions at the construction site and various safety violations. When his informal request to examine Gannett's photographs was refused, plaintiff moved pursuant to CPLR 3120 (b) for an order directing Gannett, as a nonparty, to produce those photographs for inspection and copying. Gannett cross-moved for a protective order arguing that its unpublished photographs are privileged under the free press and speech guarantees of the Federal and State Constitutions.

Special Term granted the motion, denied the cross motion, and ordered that Gannett produce the photographs. On appeal, the Appellate Division agreed with the denial of Gannett's cross motion on the ground that "there is no compelling reason for extending the scope of the [First Amendment reporter's] privilege to nonconfidential materials" and because the "facts of this case do not warrant affording [Gannett] greater protection under the State Constitution" (122 AD2d, at 571). The court modified the order of Special Term, however, by reversing the grant of plaintiff's discovery motion and remitting the matter for an in camera examination of the photographs and a routine discovery motion determination of *526 the "relevance of the information and an actual need for its production." (See, CPLR 3101 [a]: "[t]here shall be full disclosure of all evidence material and necessary".) On remand, Supreme Court determined that 19 of the Gannett photographs "depict relevant evidence not shown in the police photographs" and ordered their production.

Gannett, raising a substantial constitutional issue, brought this appeal as of right (CPLR 5601 [b]). For the following reasons, we reverse the order of the Appellate Division thus presented for our review.

II

In the ordinary case, the scope of discovery available against a nonparty is governed solely by the "sweeping exhortation" of CPLR 3101 which requires "full disclosure of all evidence material and necessary in the prosecution or defense of an action," wherever "sufficient independent evidence" is not obtainable *(Cirale v 80 Pine St. Corp.,* 35 NY2d 113, 116-117). The prerequisites of materiality and necessity, though placing some limit on entitlement to disclosure, extend to any information or items "bearing on the controversy" which will be an aid to trial preparation, sharpening of the issues, or reducing delay. The test in such cases is "usefulness and reason" *(Allen v Crowell-Collier Publ. Co.,* 21 NY2d 403, 406). Where, however, the nonparty against whom discovery is sought is engaged in newsgathering or reporting activities, and the materials requested are photographs taken in the course of such endeavors, additional considerations are involved.

The ability of the press freely to collect and edit news, unhampered by repeated demands for its resource materials, requires more protection than that afforded by the disclosure statute (CPLR 3101). The autonomy of the press would be jeopardized if resort to its resource materials, by litigants seeking to utilize the newsgathering efforts of journalists for their private purposes, were routinely permitted *(see, Miller v Mecklenburg County,* 602 F Supp 675, 679; *Maurice v National Labor Relations Bd.,* 7 Med L Rptr 2221, 2223 [SD NY], *vacated on other grounds* 691 F2d 182; *Wilkins v Kalla,* 118 Misc 2d 34, 35). Moreover, because journalists typically gather information about accidents, crimes, and other matters of special interest that often give rise to litigation, attempts to obtain evidence by subjecting the press to discovery as a *527 nonparty would be widespread if not restricted on a routine basis. The practical burdens on time and resources, as well as the consequent diversion of journalistic effort and disruption of newsgathering activity, would be particularly inimical to the vigor of a free press.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

71 N.Y.2d 521

Page 5

71 N.Y.2d 521
(Cite as: 71 N.Y.2d 521, 523 N.E.2d 277)

For these reasons, the courts in New York and elsewhere, Federal and State, have recognized a reporter's qualified privilege under the First Amendment guarantee of free press and speech *(see, United States v Burke,* 700 F2d 70, 77 [2d Cir], cert denied 464 US 816;*Zerilli v Smith,* 656 F2d 705, 713-715 [DC Cir]; *United States Criden,* 633 F2d 346, 358-359 [3d Cir], *cert denied sub nom.Schaffer v United States,* 449 US 1113;*Silkwood v Kerr-McGee Corp.,* 563 F2d 433, 438 [10th Cir]; *People v Korkala,* 99 AD2d 161, 167;*People v Bova,* 118 Misc 2d 14). As formulated by the decisions of these courts, the privilege bars coerced disclosure of resource materials, such as photographs, which are obtained or otherwise generated in the course of newsgathering or newspreparing activities, unless the moving litigant satisfies a tripartite test which is more demanding than the requirements of CPLR 3101 (a). Under the tripartite test, discovery may be ordered only if the litigant demonstrates, clearly and specifically, that the items sought are (1) highly material, (2) critical to the litigant's claim, and (3) not otherwise available. Accordingly, if the material sought is pertinent merely to an ancillary issue in the litigation, not essential to the maintenance of the litigant's claim, or obtainable through an alternative source, disclosure may not be compelled *(see, e.g., In re Petroleum Prods. Antitrust Litig.,* 680 F2d 5, 9 [2d Cir], *cert denied sub nom.Arizona v McGraw-Hill, Inc.,* 459 US 909;*Riley v City of Chester,* 612 F2d 708, 717 [3d Cir]; *Silkwood v Kerr-McGee Corp.,* supra, at 438 [10th Cir]; *Baker v F & F Inv.,* 470 F2d 778, 784 [2d Cir], *cert denied 411 US 966;Montezuma Realty Corp. v Occidental Petroleum Corp.,* 494 F Supp 780 [SD NY]).

The considerations underlying this *qualified* privilege are not peculiar to materials obtained in confidence. (Contrast the specific concerns about *confidential* sources addressed by the *absolute* protection of the Shield Law [Civil Rights Law § 79-h; *see, Matter of Knight-Ridder Broadcasting v Greenberg,* 70 NY2d 151, 155-157].) As many of the courts have already noted, confidentiality or the lack thereof has little, if anything, to do with the

burdens on the time and resources of the press that would inevitably result from discovery without special restrictions *(see, *528von Bulow by Auersperg v von Bulow,* 811 F2d 136, 143 [2d Cir], *cert denied sub nom.Reynolds v von Bulow,* -- US ___, 107 S Ct 1891;*United States v Cuthbertson,* 630 F2d 139, 147 [3d Cir], *cert denied 449 US 1126;Matter of Consumers Union,* 495 F Supp 582, 586 [SD NY]; *Loadholtz v Fields,* 389 F Supp 1299, 1303 [MD Fla]; *People v Korkala,* 99 AD2d 161, 167,*supra).*

Although the Supreme Court has yet to recognize a reporter's privilege *(see, e.g., Branzburg v Hayes,* 408 US 665, 682-683;*see generally,* discussion in Tribe, American Constitutional Law § 12-22, at 971-977 [2d ed]) and, indeed, declined to adopt the three-pronged test when requested to do so in the context of a grand jury investigation *(see, Branzburg v Hayes,* supra, at 702-704;*id.,* at 710 [Powell, J., concurring]; *compare with id.,* at 740, 743 [Stewart, J., dissenting]), we agree with those Federal courts that have found the qualified privilege necessary to insure the protections guaranteed by the First Amendment.[FN2]Moreover, "construing [our] own constitution so as to recognize a newsman's privilege", as the *Branzburg* court foresaw we might (408 US, at 706,*supra),* we have no difficulty in concluding that the guarantee of a free press in article I, § 8 of the New York Constitution independently mandates the protection afforded by the qualified privilege to prevent undue diversion of journalistic effort and disruption of press functions. The expansive language of our State constitutional guarantee *(compare,*NY Const, art I, §8, *with*529US Const 1st Amend),[FN3] its formulation and adoption prior to the Supreme Court's application of the First Amendment to the States *(compare,*NY Const of VII, § 8; and *Brandreth v Lance,* 8 Paige 24 [283 US 697 [other New York cases with approval, *id.,* at 719, n 11]), the recognition in very early New York history of a constitutionally guaranteed liberty of the press *(see,* Jay, *Address to the People of the State of New York, May 1788,* 3 American Museum [No. 6] 559

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

71 N.Y.2d 521

Page 6

71 N.Y.2d 521
**(Cite as: 71 N.Y.2d 521, 523 N.E.2d 277)**

[1792], reprinted in 3 Roots of the Bill of Rights, at 554, 560 [Schwartz ed]; Smith, *Address to the People of the State of New York, May 1788--Postscript* [agreeing with Jay on that point], reprinted in *id.*, at 566, 576), and the consistent tradition in this State of providing the broadest possible protection to "the sensitive role of gathering and disseminating news of public events" *(Matter of Beach v Shanley,* 62 NY2d 241, 256 [Wachtler, J., concurring]), all call for particular vigilance by the courts of this State in safeguarding the free press against undue interference.

> FN2 To be sure, in some of the cases in which a constitutional reporter's privilege was recognized, the countervailing government interest was not as compelling as the grand jury investigation in *Branzburg v Hayes* (408 US 665). Nevertheless, the courts have held the three-pronged test applicable regardless of the criminal or civil context *(see, e.g., United States v Burke,* 700 F2d 70;*United States v Criden,* 633 F2d 346;*United States v Cuthbertson,* 630 F2d 139;*cf., In re Petroleum Prods. Antitrust Litig.,* 680 F2d 5 [discovery sought by several States which had jointly brought an antitrust action]). (This being a civil case, we, of course, do not consider the different factors present in criminal cases.)
> One commentator, in questioning any reliance on *Branzburg,* or on any other Supreme Court decision on the subject, as a basis for finding a First Amendment reporter's privilege, has noted: "Despite the holding in *Branzburg* and the discouraging tone of the majority opinion, the lower federal courts have consistently read the case to support some kind of qualified privilege for reporters" because five Justices apparently believed "that the Constitution may at times protect the confidentiality of a journalist's sources" (Tribe, American Constitutional Law § 12-22, at 972 [2d ed]). As already noted, however, the courts

have held the privilege necessary to protect nonconfidential materials as well *(see, e.g., von Bulow by Auersperg v von Bulow,* 811 F2d 136;*United States v Cuthbertson, supra; Matter of Consumers Union,* 495 F Supp 582;*Loadholtz v Fields,* 389 F Supp 1299).

FN3 The protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the First Amendment *(see, People ex rel. Arcara v Cloud Books,* 68 NY2d 553, 557-558;*Matter of Beach v Shanley,* 62 NY2d 241, 255 [Wachtler, J., concurring]; *Bellanca v New York State Liq. Auth.,* 54 NY2d 228, 235).Article I, § 8 of the Constitution assures, in affirmative terms, the right of our citizens to *"freely speak, write and publish"* and prohibits the use of official authority which acts to *"restrain or abridge the liberty of speech or of the press".*

While we agree with the three-part test articulated in the Federal courts and, moreover, adopt it under our State Constitution, it must be noted that this test is but a complement to the general principles governing compelled disclosure where they are applied to a reporter's photographs. Under our discovery statutes and case law, competing interests must always be balanced; the need for discovery must be weighed against any special burden to be borne by the opposing party *(see, e.g., Cynthia B. v New Rochelle Hosp. Med. Center,* 60 NY2d 452, 460-462;*CPLR 3101, 3103).* Thus, in deciding whether to order disclosure of photographs prepared or obtained in the course of newsgathering, a court would consider the extent, if any, that press activities will be affected and, if so, whether such is justified by the interest to be served. Together with the particularized constitutional test we recognize today, these basic protections pertaining to discovery are, *530 of course, wholly available to control disclosure in this sensitive area *(see, Cynthia B. v*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00620

71 N.Y.2d 521                                                                Page 7

71 N.Y.2d 521
(Cite as: 71 N.Y.2d 521, 523 N.E.2d 277)

*New Rochelle Hosp. Med. Center, supra;*CPLR 3103; *cf., Branzburg v Hayes, supra,* at 680-681, 699-700).

Finally, contrary to plaintiff's contention, neither *Matter of Beach v Shanley (supra)* nor *Matter of Knight-Ridder Broadcasting v Greenberg (supra)* supports a different result. In *Matter of Beach v Shanley,* where we held that the categorical protection against compulsory disclosure of confidential sources provided by statute in this State *(see,*Civil Rights Law § 79-h [Shield Law]) extended to Grand Jury investigations, we declined to find a similar protection under the State Constitution only because it was unnecessary to reach the constitutional issue in that case (62 NY2d, at 254,*supra).* In *Matter of Knight-Ridder Broadcasting v Greenberg,* where we held that the same absolute Shield Law protection did not extend to nonconfidential sources, we simply noted, with regard to constitutional questions, that the Supreme Court's decision in *Branzburg v Hayes (supra)* provided no additional First Amendment protection where relevant information was sought in a Grand Jury investigation, and that the issue, whether protection was afforded by the State Constitution, had not been preserved for our review (70 NY2d, at 160,*supra).*

### III

In the present case, the Appellate Division, finding no constitutional protection for nonconfidential press materials, returned plaintiff's discovery motion to Supreme Court for a hearing to determine whether the photographs sought "depict[ed] relevant evidence not shown in the police photographs" and were, therefore, "material and necessary" to plaintiff's personal injury claim within the meaning of CPLR 3101. As discussed above, that standard affords inadequate protection to the newsgathering activities of the press. The more stringent, constitutionally mandated test that we have outlined should be applied.

Accordingly, the order of Supreme Court appealed

from and the order of the Appellate Division brought up for review should be reversed, and the matter remitted to Supreme Court for a determination in accordance with the principles enunciated herein.
Kaye, J.
(Concurring).

I concur in the result reached today *531 and in the court's opinion, except insofar as the court decides the case under the Federal Constitution. In my view the case is correctly resolved under the State Constitution alone.

Issues involving free expression have long been viewed as matters peculiarly implicating local concerns and local standards *(see, e.g., People v P. J. Video,* 68 NY2d 296, 308;*People ex rel. Arcara v Cloud Books,* 68 NY2d 553, 557). As the opinion acknowledges, the language of article I, § 8 of our State Constitution is materially different--more expansive--than the First Amendment; article I, § 8 has a longer, independent history; and we have maintained a consistent tradition in this State of providing the broadest possible protection to "the sensitive role of gathering and disseminating news of public events." *(Matter of Beach v Shanley,* 62 NY2d 241, 256 [Wachtler, J., concurring].) I therefore cannot understand--or join--the decision to premise the qualified privilege we now adopt on the Federal Constitution in addition to the State Constitution. The fact that Federal law remains unsettled *(see,* majority opn, at 528) leads me particularly to question why we would deliberately choose to surround our new privilege with any of the uncertainty that presently accompanies the Federal law, when we could very respectably resolve the issue with clarity and finality for the citizens of this State under the State Constitution.

The court offers two answers: that we decide the issue under both Constitutions because we have used that methodology before, and because it accords with our proper role in the Federal system (majority opn, at 524-525). But neither answer is satisfactory here. *First,* in resolving issues raised under parallel

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00621

71 N.Y.2d 521                                                                              Page 8

71 N.Y.2d 521
**(Cite as: 71 N.Y.2d 521, 523 N.E.2d 277)**

provisions of the State and Federal Constitutions, this court has not been wedded to any particular methodology. Depending on the matter at issue, we have decided parallel constitutional questions under the State Constitution alone *(see, e.g., Rivers v Katz,* 67 NY2d 485, 498) and under both *(see, e.g., People v Stith,* 69 NY2d 313, 316, n). The issue before us is strikingly appropriate for disposition under the State Constitution without the additional overlay of the First Amendment: this court balances the interests of the press against the State statutory rights of New York litigants seeking particular materials in discovery, and adopts a solution that best accommodates the interests of both. *Second,* in resolving the question solely as a matter of State law, we still might look to Federal precedents as well as those of other States, and by our decision help to expound Federal law and furnish guidance for *532 sister States. We thereby do fulfill our proper role in the Federal system, which is first and foremost to settle issues as definitively as possible for the people of this State.

Bellacosa, J.
(Concurring).

Although I concur in the court's decision to reverse, I write separately to express my different perspective on the rationale of the majority opinion.

The material sought to be discovered by the plaintiff in this case consists of unpublished photographs taken by a photojournalist employed by a Rochester newspaper. Neither the newspaper nor the photojournalist are parties to the automobile accident case seeking damages for negligence, but plaintiff argues that the photos are discoverable because they are "material and necessary" to his case.

As is evident from the language of CPLR 3101, civil discovery is meant to be generous and sweeping. Subdivision (a) sets the tone by announcing: "There shall be full disclosure of all evidence material and necessary in the prosecution or defense of an action", with subdivisions (b), (c) and (d) serving as limitations on the general availability *(see,* Siegel, NY Prac § 344, at 420-423). In this

framework, exceptions to the demand for all relevant evidence should " 'not [be] lightly created nor expansively construed, for they are in derogation of the search for truth' " in the adjudication of disputes within the judicial system *(Herbert v Lando,* 441 US 153, 175, quoting *United States v Nixon,* 418 US 683, 710;*see also, Cynthia B. v New Rochelle Hosp. Med. Center,* 60 NY2d 452, 460-462).

The court is confronted in this case with two competing interests: the interest in maintaining the free flow of information by the organized press and the evidentiary needs of an injured litigant.

Clearly, the special sanctuary sought by the publisher Gannett Rochester Newspapers cannot be justified solely on the basis of its photojournalist's role as a private citizen or as an employee, because that would contradict the general susceptibility of all citizens and entities to broadly available judicial process. The only rationale for cloaking the press with this exceptional protection rests on the unique role of reporters as purveyors of information to the public and of newspapers as forums for criticism, discussion and debate.

That rationale tips the balance in favor of a constitutional qualified privilege for the press in this case, because without the extra gloss of protection against ordinary disclosure the *533 unique functions of the press could be seriously interdicted. The nature of the press function makes it a more likely target for subpoenas which, in turn, will generate cost and diversion in time and attention from journalistic pursuits. Indeed, the real threat that unpublished photos may eventually be "material and relevant" in some litigation between private parties may induce reporters to discard, in the ordinary course, potentially discoverable materials to avoid exposure to judicial process by subpoena duces tecum. Journalists should be spending their time in newsrooms, not in courtrooms as participants in the litigation process *(Matter of Knight-Ridder Broadcasting v Greenberg,* 70 NY2d 151, 168 [dissenting opn]).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00622

71 N.Y.2d 521

Page 9

71 N.Y.2d 521
**(Cite as: 71 N.Y.2d 521, 523 N.E.2d 277)**

This case will for all practical purposes eclipse the purpose of the Shield Law (Civil Rights Law § 79-h) except in the narrowest circumstance--the small residuum between the constitutional qualified privileged confidential materials and the absolutely confidential kind. Thus, the state of the law left in the wake of the cramped statutory construction in *Matter of Knight-Ridder Broadcasting v Greenberg* (70 NY2d 151,*supra)* adds a special impetus for the court to declare a State constitutionally protected qualified privilege as to nonconfidential photographic materials to complement the statutorily shielded confidential materials. Otherwise, photographs like these, acquired in a "nonconfidential" manner, would remain amenable to normal demands and distractions already evident in the often-abused discovery process of civil litigation.

As I understand the new test, the State constitutionally based qualified privilege simply elevates the CPLR 3101 thresholds from "material" to "highly" so, from "necessary" to "critical", and from "insufficiently independent availability" to "not otherwise available"; and, it inverts the burden or imposes a presumption in favor of the protected press over the ordinary litigant.

I unhesitatingly join in the reversal because this decision substantially fills the policy gap created by the holding in *Matter of Knight-Ridder Broadcasting v Greenberg* (70 NY2d 151,*supra)*, and does so on a higher order of law--the State Constitution. Nevertheless, while I am satisfied that a distinction can and has been made justifying invocation of a State constitutional right to create a qualified privilege to the press, an incongruity may be inferred from this holding because the court refused to do that very thing in favor of a pamphleteer in a private shopping mall, based on the free speech right *534 *(SHAD Alliance v Smith Haven Mall,* 66 NY2d 496, 508 [Wachtler, Ch. J., dissenting]).

Chief Judge Wachtler and Judges Simons, Kaye and Alexander concur with Judge Hancock, Jr.; Judge Kaye concurs in a separate concurring opinion; Judge Bellacosa concurs in result in another concurring opinion; Judge Titone taking no part.

Order of Supreme Court appealed from and order of the Appellate Division brought up for review reversed, with costs, and matter remitted to Supreme Court, Monroe County, for further proceedings in accordance with the opinion herein. *535

Copr. (c) 2009, Secretary of State, State of New York N.Y. 1988.
O'NEILL v OAKGROVE CONSTR.

71 N.Y.2d 521

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00623

20

00624

*[handwritten: Use records to establish of robbery instead of employee's testimony]*

Westlaw.

490 S.W.2d 556
490 S.W.2d 556
(Cite as: 490 S.W.2d 556)

Page 1

**C**

Court of Criminal Appeals of Texas.
Robert Earl OVERTON, Appellant,
v.
The STATE of Texas, Appellee.
No. 45334.

Jan. 24, 1973.
Rehearing Denied Mar. 7, 1973.

Defendant was convicted in the 195th District Court, Dallas County, R. T. Scales, J., of robbery, and he appealed. The Court of Criminal Appeals, Roberts, J., held that state's attempt to prove ownership of money bag taken in robbery by records belonging to robbed establishment through testimony of employee instead of through the records themselves was violation of best evidence rule, but where employee had already testified that it appeared to be same money bag taken in robbery and another witness and arresting officer testified that they recognized the money bag as one recovered from trunk of automobile rented in name of person found in same Motel room as defendant, wrongful admission of the testimony was not prejudicial.

Judgment affirmed.

West Headnotes

[1] Jury 230 ⟜64

230 Jury
    230IV Summoning, Attendance, Discharge, and Compensation
        230k60 Jury List
            230k64 k. Replacing Names and Revision of List. Most Cited Cases
Where state's attorney told court, subsequent to his reply to bailiff that there was not going to be a motion to shuffle the jurors, but prior to voir dire examination of the jurors, that there would be a motion to shuffle, granting of motion did not violate statute relating to shuffling of jurors and was not

error. Vernon's Ann.C.C.P. art. 35.11.

[2] Criminal Law 110 ⟜437

110 Criminal Law
    110XVII Evidence
        110XVII(P) Documentary Evidence
            110k431 Private Writings and Publica- tions
                110k437 k. Maps, Plats, and Diagrams. Most Cited Cases
Where drawing of scene of robbery, which was admittedly not drawn to scale, was not admitted for its accuracy, but for the limited purpose of laying floor plan of the establishment and the adjoining streets, any inaccuracy in scale of drawing did not affect its admissibility, and admission of diagram into evidence was not error.

[3] Criminal Law 110 ⟜400(1)

110 Criminal Law
    110XVII Evidence
        110XVII(J) Best and Secondary Evidence
            110k399 Record or Other Writing as Best Evidence
                110k400 In General
                    110k400(1) k. In General. Most Cited Cases
The best evidence rule is confined in its application to the requirements that to prove the contents of a document, the original document must be produced; the rule rests on the fact that a document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description.

*[handwritten margin: ✳ to prove contents of docs — docs that is much more reliable, complete + accurate than anyone's description]*

[4] Criminal Law 110 ⟜400(8)

110 Criminal Law
    110XVII Evidence
        110XVII(J) Best and Secondary Evidence
            110k399 Record or Other Writing as Best Evidence
                110k400 In General

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 S.W.2d 556
490 S.W.2d 556
(Cite as: 490 S.W.2d 556)

Page 2

110k400(8) k. Books of Account.
Most Cited Cases
The recording of certain facts in books of account
or other business records does not preclude the
proof of the facts independently of the books;
however, if proof of the facts is sought to be made
by showing the contents of the books and records,
the best evidence rule still applies.

[5] Criminal Law 110 €400(4)

110 Criminal Law
    110XVII Evidence
        110XVII(J) Best and Secondary Evidence
            110k399 Record or Other Writing as Best
Evidence
                110k400 In General
                    110k400(4) k. Unofficial Records
in General. Most Cited Cases

Criminal Law 110 €1169.2(4)

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1169 Admission of Evidence
                110k1169.2 Curing Error by Facts Es-
tablished Otherwise
                    110k1169.2(4) k. Immaterial and
Incompetent Evidence in General. Most Cited Cases
        (Formerly 110k1169.2(2))
State's attempt to prove ownership of money bag
taken in robbery by records belonging to robbed es-
tablishment through testimony of employee instead
of through the records themselves was violation of
best evidence rule, but where employee had already
testified that it appeared to be same money bag
taken in robbery and another witness and arresting
officer testified that they recognized the money bag
as one recovered from trunk of automobile rented
in name of person found in same motel room as de-
fendant, wrongful admission of the testimony was
not prejudicial.

[6] Criminal Law 110 €404.75

110 Criminal Law
    110XVII Evidence
        110XVII(K) Demonstrative Evidence
            110k404.35 Particular Objects
                110k404.75 k. Stolen Goods. Most
Cited Cases
        (Formerly 110k404(4))
Inquiry to employee of robbed establishment as to
whether or not a money bag appeared to be same
one taken in robbery would have been a sufficient
predicate to introduce money bag into evidence in
robbery prosecution.

[7] Criminal Law 110 €400(4)

110 Criminal Law
    110XVII Evidence
        110XVII(J) Best and Secondary Evidence
            110k399 Record or Other Writing as Best
Evidence
                110k400 In General
                    110k400(4) k. Unofficial Records
in General. Most Cited Cases
Where there is no bona fide dispute as to contents
of business records, production of original docu-
ment may be dispensed with, in trial court's discre-
tion, when no other useful purpose will be served
by requiring production under best evidence rule.

[8] Criminal Law 110 €2179

110 Criminal Law
    110XXXI Counsel
        110XXXI(F) Arguments and Statements by
Counsel
            110k2164 Rebuttal Argument; Responsive
Statements and Remarks
                110k2179 k. Comments on Character
or Conduct. Most Cited Cases
        (Formerly 110k726)
Where defense counsel had pleaded to jury to re-
flect on facts and determine for themselves whether
or not robbery was work of a professional criminal,
the subject matter of prosecutor's subsequent argu-
ment that defendant was a professional criminal had
been invited by the defense and was not improper.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 S.W.2d 556
490 S.W.2d 556
(Cite as: 490 S.W.2d 556)

Page 3

|9| Criminal Law 110 ☞2089

110 Criminal Law
    110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
       110k2088 Matters Not Sustained by Evidence
        110k2089 k. In General. Most Cited Cases
     (Formerly 110k719(1))

Criminal Law 110 ☞2199

110 Criminal Law
    110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
       110k2191 Action of Court in Response to Comments or Conduct
        110k2199 k. Matters Not Sustained by Evidence. Most Cited Cases
     (Formerly 110k730(7))
Where prosecutor's argument in robbery prosecution that defendant was a professional criminal since he did not leave fingerprints was, with respect to lack of fingerprints, outside the record, statement relating to fingerprints should not have been made, but the remark was not so inflammatory that its effect could not be overcome by court's instruction to disregard.

|10| Criminal Law 110 ☞1130(2)

110 Criminal Law
    110XXIV Review
      110XXIV(I) Briefs
       110k1130 In General
        110k1130(2) k. Specification of Errors. Most Cited Cases
     (Formerly 110k130(2))
Grounds of error which consisted of one sentence allegations and which were not briefed or argued would not be reviewed on appeal. Vernon's Ann.C.C.P. art. 40.09.
*557 Don Metcalfe, Dallas, for appellant.

Henry Wade, Dist. Atty., W. T. Westmoreland, Jr., asst. Dist. Atty., Dallas, and Jim D. Vollers, State's Atty., and Robert A. Huttash, Asst. State's Atty., Austin, for the State.

OPINION

ROBERTS, Judge.

This appeal is taken from a conviction for the offense of robbery. Punishment was assessed at 15 years' confinement.

Appellant alleges nine grounds of error. The sufficiency of the evidence is not challenged.

A witness for the State, David Pope, testified that on the night in question, January 25, 1971, he was employed at Church's Fried Chicken in Mesquite. Near closing time, he saw appellant and another man standing at the window of the store. They ordered some chicken and then had Pope and his co-worker come to the front of the store. The robbers then each pulled a gun, and demanded money. They were given about $350.00, Pope and his co-worker were forced into a walk-in cooler, and then the offenders fled.

Another State's witness, an employee for a car rental agency, testified that on January 26, 1971, he went to a Mesquite motel to check on a rental car, because of some concern over its rental status. The car had been rented to a Stuart Suedkamp. Finding that the rental stickers had been scraped off the car, the car rental agency employee pulled the coil wire off the automobile. A police officer came up and asked what was going on. Satisfied with the explanation he received, the policeman and the car rental agency employee went to one of the motel rooms, where Suedkamp, appellant and another man were present. With Suedkamp's consent, the car was examined, and a money bag, two loaded guns, and cash were found in the trunk of the car. The police officer corroborated this story.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 S.W.2d 556
490 S.W.2d 556
(Cite as: 490 S.W.2d 556)

Page 4

No defense witnesses were presented.

[1] In appellant's first ground of error, he argues that the court erred in granting *558 the State's motion to shuffle the jurors. It is appellant's contention that the bailiff asked the State's attorney if there was going to be a motion to shuffle,[FN1] and the State's attorney replied that there would not be. However, the State's attorney subsequently told the court, Prior to the voir dire examination of the jurors, that there would be a motion to shuffle. Such motion was granted by the trial court, and the trial judge noted in the record that the motion was made prior to the seating of the jurors. The present situation is unlike the recent case of Griffin v. State, 481 S.W.2d 838 (Tex.Cr.App.1972), wherein it was held that defense counsel was too late in filing his motion to shuffle the venire list when he did so only after unlimited questioning of the panel. Appellant has failed to show a violation of Article 35.11, Vernon's Ann.C.C.P., and his first ground of error is overruled.[FN2]

> FN1. Article 35.11, V.A.C.C.P., states:
>
> 'The trial judge, upon the demand of the defendant or his attorney, or of the State's counsel, shall cause the names of all the members of the general panel drawn or assigned as jurors in such case to be placed in a receptacle and well-shaken, and the clerk shall draw therefrom the names of a sufficient number of jurors from which a jury may be selected to try such case, and such names shall be written, in the order drawn, on the jury list from which the jury is to be selected to try such case, and write the names as drawn upon two slips of paper and deliver one slip to the State's counsel and the other to the defendant or his attorney.'
>
> FN2. This Court has held that an error under Art. 35.11, V.A.C.C.P., is not ordinarily of a constitutional dimension, nor one that would require discussion under Sec.

13 of Art. 40.09, V.A.C.C.P. See Bellah v. State, 415 S.W.2d 418, 421 (Tex.Cr.App.1967).

[2] In his second ground of error, appellant contends that the trial court erred in allowing into evidence a sketch that was not to scale and was clearly distorted. The sketch was of the Church's Fried Chicken where the robbery occurred. The following colloquy occurred when witness Pope testified:

'Q * * * Does this represent or is it an attempt to represent the Church's Fried Chicken where you worked as it appeared back on the 25th of January 1971?

'A Yes.

'Q More specifically, is that basically the way it appeared at about 10:00 p.m., just about closing time on that day?

'A Yes.

'Q All right. Realizing that this State's Exhibit No. 1 is not to scale, does it nonetheless fairly and accurately reflect the relative position of objects within the store as well as the layout, the floorplan of the interior of the store as well as the adjoining streets?

'A Yes.

'MR. SCOTT: Your Honor, we will offer this as State's Exhibit 1.'

The drawing was not admitted for its accuracy, but for the limited purpose of laying the floorplan of the establishment and the adjoining streets. Any inaccuracy in the scale of the drawings would not, under the circumstances, affect its admissibility. The court did not err in admitting the diagram into evidence. Burrell v. State, 487 S.W.2d 84 (Tex.Cr.App.1972); Jackson v. State 477 S.W.2d 879 (Tex.Cr.App.1972); Holding v. State, 460 S.W.2d 133 (Tex.Cr.App.1970); Chapin v. State, 167 Tex.Cr.R. 390, 320 S.W.2d 341, 344 (1959).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 S.W.2d 556
490 S.W.2d 556
(Cite as: 490 S.W.2d 556)

Page 5

In appellant's ground of error #5, he alleges that the court erred in allowing testimony that a money bag found in the trunk of the rental car was the very same bag taken in the robbery. The record reflects*559 the following questioning of witness Pope by the prosecutor:

'Q Does that-does State's Exhibit No. 10 look exactly like the bank bag that this redhead, Dunham, had in his possession once you saw him again after he was inside the place of business?

'A Yes.

'Q State the facts with reference to whether or not you know that your all's records reflect that this is the very number of the bank bag that Dunham took from your boss, Mr. Calvert, out there on this particular night.

'MR. METCALFE: Objection Your Honor. The records themselves would be the best evidence of what they-

'THE COURT: If the witness knows, he may answer.'

Defense counsel further inquired of Pope:

'Q * * * My question is-I'm sorry. Is that the only way you have of ascertaining whether or not this is the same bag or not, is by some written records out at your place of business, Church's Fried Chicken?

'A Yes.'

[3] Thus, appellant's objection is that the best evidence rule was violated. Since this rule is infrequently written on by this Court, it seems appropriate to outline the purpose of the rule and exactly what it does require. First, the best evidence rule is confined in its application to the requirement that to prove the contents of a document, the original document must be produced. 2 C. McCormick and R. Ray, Texas Evidence, s 1561 (2d ed. 1956). The best evidence rule rests on the fact that a document is a more reliable, complete, and accurate source of information as to its contents and meaning than anyone's description. Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953). It should be stressed that the rule applies only where the purpose of the offered evidence is to prove the contents of the document. Cage v. State, 167 Tex.Cr.R. 355, 320 S.W.2d 364 (1958), cert. denied, 360 U.S. 917, 79 S.Ct. 1434, 3 L.Ed.2d 1533 (1959), rehearing denied, 361 U.S. 855, 80 S.Ct. 45, 4 L.Ed.2d 94 (1959). Therefore, this Court has held that the rule was not violated where the State offered evidence only to show the Existence of a license, and not to prove its content. Reyna v. State, 477 S.W.2d 564 (Tex.Cr.App.1972).[FN3] See also Cage, supra.

> FN3. We refer the reader to the Missouri case of State v. Coleman, 441 S.W.2d 46 (Mo.Sup.Ct.1969). In that cause, the victim of a robbery testified to the taking of an envelope containing $50.00. His identification of the envelope was based in part on a notation he had written on it before it was taken. An objection was made, based on the best evidence rule, to testimony concerning writing on the envelope. The Supreme Court of Missouri correctly held that insofar as the envelope was concerned, the notations about which the victim testified were significant only from the standpoint of identification of the envelope returned to him. The object of his testimony was not to establish as a relevant matter what had been Written on the envelope. Instead, the presence of the writing was the basis of his identification of the envelope, just as a distinctive color or shape might have been. Therefore, the best evidence rule was not applicable.

[4][5][6][7] Also, the recording of certain facts in books of account or other business records does not preclude the proof of the facts independently of the books. McCormick & Ray, supra, s 1566. Arguably, that is what the State did in the present case.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00629

490 S.W.2d 556
490 S.W.2d 556
(Cite as: 490 S.W.2d 556)

Page 6

However, if the proof of the facts is sought to be made by showing the Contents of the books and records, the best evidence rule still applies. For example, in the arson case of Lembley v. State, 135 Tex.Cr.R. 148, 117 S.W.2d 435 (1937), the State undertook\*560 to prove ownership to the property burned, by a record title, and having attempted to do this the State was bound by the rules of evidence regarding the documents offered. Similarly, in the instant case, the State sought to prove the ownership of the money bag, as alleged by the records belonging to Church's Fried Chicken. It was error for the court to overrule appellant's objection, and the best evidence rule was violated.

The prosecutor might well have avoided the present problem by going no further than inquiring of witness Pope whether or not the money bag appeared to be the same one taken in the robbery. This would have been a sufficient predicate to introduce it into evidence. See Alejandro v. State, 394 S.W.2d 523 (Tex.Cr.App.1965); Alexander v. State, 476 S.W.2d 10 (Tex.Cr.App.1972).

Nevertheles, we are unable to say that appellant was prejudiced by the wrongful admission of this testimony. Witness Pope had already testified that it appeared to be the same money bag taken in the robbery. In addition, both the rental car agency employee and the arresting officer testified that they recognized the money bag as the one recovered from the trunk of the rental car.[FN4] The error is not such as requires reversal. Biggerstaff v. State, 108 Tex.Cr.R. 631, 2 S.W.2d 256 (1927); Davis v. State, 54 Tex.Cr.R. 236, 114 S.W. 366 (1908). We also question whether or not there was any bona fide dispute as to the contents of these business records. In such cases production of the original document may be dispensed with, in the trial court's discretion, when no other useful purpose will be served by requiring production. Ex parte Moore, 436 S.W.2d 901 (Tex.Cr.App.1969), citing Wigmore on Evidence.

> FN4. No chain of custody argument has been raised in this cause.

[8][9] In appellant's ground of error #9, he alleges that the prosecutor improperly argued that appellant was a professional criminal, since he did not leave fingerprints. (An examination of the record reveals an absence of any testimony relating to fingerprints.) The prosecutor's argument was in response to a plea by defense counsel for the jury to reflect on the facts and determine for themselves whether or not this robbery was the work of a professional criminal. Therefore, the subject matter of the prosecutor's argument was invited by the defense. See Hefley v. State, and cases cited therein, 489 S.W.2d 115 (Tex.Cr.App.1973). Yet the specific statement made relating to the lack of fingerprints was outside the record and should not have been made. Appellant's objection was sustained by the trial court, and an instruction for the jury to disregard was granted. We hold that the remark was not so inflammatory that its effect could not be overcome by the court's instruction.

[10] Appellant's remaining grounds of error consist of one-sentence allegations, which are not briefed or argued. These points are not in accordance with Article 40.09, V.A.C.C.P., and will not be reviewed. Thompson v. State, 480 S.W.2d 624 (Tex.Cr.App.1972); Hefley v. State, supra.

The judgment is affirmed.

Tex.Cr.App. 1973.
Overton v. State
490 S.W.2d 556

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00630

Westlaw.

Date of Printing: May 29, 2009

## KEYCITE

C Overton v. State, 490 S.W.2d 556 (Tex.Crim.App.,Jan 24, 1973) (NO. 45334)

### History

### Direct History

=>          1 Overton v. State, 490 S.W.2d 556 (Tex.Crim.App. Jan 24, 1973) (NO. 45334)

© 2009 Thomson Reuters. All rights reserved.

21

00632

Westlaw.

810 S.W.2d 902
810 S.W.2d 902
(Cite as: 810 S.W.2d 902)

*Docs are evidence of best evidence in trespass to try title case & oral testimony re: same is inadmissible*

Page 1

**H**

Court of Appeals of Texas,
Beaumont.

Charles RAMSEY and Kenneth Weeks, Appellants,
v.
JONES ENTERPRISES, Appellee.
No. 09-90-071 CV.

June 20, 1991.
As Corrected Aug. 14, 1991.

In trespass to try title action, the 1-A District Court, Newton County, Monte D. Lawlis, J., awarded plaintiff title to land and damages for loss of timber, and defendants appealed. The Court of Appeals, Walker, C.J., held that plaintiff could not prove title by only oral expert testimony of title examiner.

Reversed and rendered.

West Headnotes

[1] Trespass to Try Title 387 ⊜⇒41(1)

387 Trespass to Try Title
    387II Proceedings
        387k37 Evidence
            387k41 Weight and Sufficiency
                387k41(1) k. In General. Most Cited Cases
Plaintiff in trespass to try title case could not prove title by only oral expert testimony of title examiner. V.T.C.A., Property Code § 22.002; Rules of Civ.Evid., Rules 702-704.

[2] Trespass to Try Title 387 ⊜⇒6.1

387 Trespass to Try Title
    387I Right of Action and Defenses
        387k5 Title to Support Action
            387k6.1 k. Sufficiency in General. Most Cited Cases

(Formerly 387k6(1))
To recover in trespass to try title, plaintiff must recover on strength of his own title and not on weakness of defendant's title, and may recover by proving: regular chain of conveyances from sovereign; superior title out of common source; title by limitation; or prior possession that has not been abandoned. V.T.C.A., Property Code § 22.002.

[3] Quieting Title 318 ⊜⇒44(4)

318 Quieting Title
    318II Proceedings and Relief
        318k44 Evidence
            318k44(4) k. Sufficiency of Evidence of Title. Most Cited Cases
In actions where title to property is the ultimate issue for determination, proof of such title must be shown by instruments of title themselves.

[4] Evidence 157 ⊜⇒181

157 Evidence
    157V Best and Secondary Evidence
        157k180 Preliminaries to Admission of Secondary Evidence
            157k181 k. In General. Most Cited Cases
Hearsay oral testimony of title examiner was inadmissible to prove up content of documents in trespass to try title case, absent proper showing that documents were unavailable through no fault or failure on part of party offering them. Rules of Civ.Evid., Rule 1002.

[5] Trespass to Try Title 387 ⊜⇒38(1)

387 Trespass to Try Title
    387II Proceedings
        387k37 Evidence
            387k38 Presumptions and Burden of Proof
                387k38(1) k. Title in General. Most Cited Cases

Trespass to Try Title 387 ⊜⇒38(3)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

810 S.W.2d 902
810 S.W.2d 902
(Cite as: 810 S.W.2d 902)

Page 2

387 Trespass to Try Title
   387II Proceedings
      387k37 Evidence
         387k38 Presumptions and Burden of Proof
           387k38(3) k. Possession or Right
Thereto. Most Cited Cases
In trespass to try title actions where defendant is shown to be in possession, judgment will be entered for defendant where plaintiff has failed in its burden of proving prima facie right to title and possession.

*903 Charles R. Mitchell, San Augustine, William H. Vidor, Tonahill, Hile, Leister & Jacobellis, Jasper, for appellants.

T. Alan Hart, Jasper, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This appeal comes to us as a result of judgment rendered by the 1-A District Court of Newton County, Texas. Trial was before a jury which awarded appellee title to land and damages for loss of timber.

Judgment was signed February 2, 1990 and Motion for New Trial was denied March 14, 1990. Appeal has been duly perfected to this Court. Factually, on August 16, 1987 appellant Ramsey, by deed from Elmer Simmons, obtained 22 acres of land out of the James Lewis Survey in Newton County, Texas. This deed was filed of record on September 8, 1987. Appellant Ramsey contacted appellant Kenneth Weeks, a logging contractor, to cut the timber on the tract showing him the deed from Elmer Simmons to Ramsey. Later on Ramsey conveyed a timber deed to Weeks which was also filed of record.

Appellant Weeks cut the timber on the property covered by the referenced deed without getting a title opinion. Appellee Jones Enterprises subsequently learned that this particular tract of land had been cut and sought to contact appellant Weeks. Being unsuccessful in this effort, appellee wrote a letter to Weeks on September 14, 1987 claiming ownership to the timber and the property. Appellant Weeks later contacted appellee Jones on September 22, 1987 and informed appellee that he, Weeks, had purchased the timber from appellant Ramsey upon being shown a deed.

This case was tried before a jury which awarded appellee Jones all its requested relief with the exception of exemplary damages.

At trial, appellee attempted to prove superior title to the tract in question based solely upon the testimony of an expert witness, Mr. Gary Gatlin, attorney. Counsel for appellants objected to Mr. Gatlin's testimony on the grounds that proper predicate had not been laid for such testimony and that the best evidence of title would exist in the deeds themselves. Other than the opinion testimony of Mr. Gatlin, there was never any documentary evidence of title admitted before the jury which established title in appellee. The only documents of title admitted into evidence at trial were the Warranty Deed from Elmer Simmons to Charles Ramsey and the Timber Deed from Charles Ramsey to Kenneth Weeks.

*904 At the close of appellants' case-in-chief, appellants moved for directed verdict, same being overruled by the trial court. This Motion for Directed Verdict was re-urged orally by counsel for appellant Ramsey which was also overruled. On January 16, 1990 prior to entry of judgment, appellants filed a joint Motion for Judgment Notwithstanding the Verdict. All motions were overruled by the trial court. Appellants bring five points of error to this Court; however, we see no need in addressing appellants' points of error three, four and five and shall limit our address to points of error one and two.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00634

810 S.W.2d 902
810 S.W.2d 902
(Cite as: 810 S.W.2d 902)

Page 3

Point of error number two contends that the trial court erred in allowing expert testimony regarding sufficiency of title without actual documents of title being before the court and the jury.

The trial court, over the objections of appellants allowed the testimony of Mr. Gary Gatlin, a title examiner, as to the sufficiency of Jones' title to the land in question. Appellants do not, nor does this Court, question the qualifications of Mr. Gatlin as an expert witness. Appellee, in his brief, states the crucial issue before this Appellate Court; i.e., whether or not a plaintiff, in a trespass to try title case, can prove title by expert opinion alone.

Appellee presents two theories of argument to this Court. First, that Rules 702, 703, and 704 of the TEX.R.CIV.EVID. allow expert testimony and opinion to fill the gap created through the failure or refusal to produce written documents proving up chain of title in trespass to try title cases. Second, appellee contends that Rule 1002 of the TEX.R.CIV.EVID., sometimes referred to as the "Best Evidence Rule", is inapplicable since Rule 704 allows an expert to form an opinion embracing the ultimate issue to be decided in the case.

[1] We hold that the trial court erred in allowing appellee to prove up title, in a trespass to try title action, by nothing more than the oral expert testimony of an attorney.

"Parole evidence in the form of opinions and conclusions without documentary basis is inadmissible to establish such title, and even if admitted without objection is of no probative force." *City of Mission v. Popplewell*, 156 Tex. 269, 294 S.W.2d 712 (Tex.1956).

Recorded testimony shows that in 1984 appellee Jones began to negotiate purchase of a tract of land located in abstract 277 of the James Lewis Survey. Appellee wanted this parcel of land because it adjoined a tract already owned by appellee. Appellee had been buying and selling timber and land for thirty years and always checked title to the land.

Appellee had been on the subject tract of land before and engaged in negotiations to purchase same while actually on the land.

The expert witness, Mr. Gary Gatlin, was contacted to do the necessary legal work and to issue a title policy to appellee. The title policy was issued.

From this foregoing evidence we are at a loss to understand why appellee chose not to produce the documentary evidence to establish title as opposed to mere oral testimony. Our task, however, is not to guess but to rule.

Appellee's total reliance upon Rules 702, 703 and 704 of the TEX.R.CIV.EVID. is misplaced as is appellee's position that Rule 1002, sometimes referred to as the "Best Evidence Rule", TEX.R.CIV.EVID. is inapplicable.

The substantive action in trespass to try title is specifically provided by statute. TEX.PROP.CODE ANN. ch. 22 (Vernon 1984). Section 22.002 of chapter 22 sets out what we perceive to be the minimum requirement to maintain a trespass to try title action. "A headright certificate, land script, bounty warrant, or other evidence of legal right to located and surveyed land is sufficient to maintain a trespass to try title action ..."TEX.PROP.CODE ANN. § 22.002 (Vernon 1984).

The procedural requisites in trespass to try title are specifically set forth in TEX.R.CIV.P. 783 through 809. Interestingly, TEX.R.CIV.P. 791 provides for the demanding of an abstract of title by either party; we quote:

*905 "After answer filed, either party may, by notice in writing, duly served on the opposite party or his attorney of record, not less than ten days before the trial of the cause, demand an abstract in writing of the claim or title to the premises in question upon which he relies."

Appellee takes the position that since appellant failed to timely demand an abstract as permissively authorized by TEX.R.CIV.P. 791, that such failure

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

810 S.W.2d 902
810 S.W.2d 902
(Cite as: 810 S.W.2d 902)

Page 4

now allows appellee to prove its case by oral testimony only. Appellee further says that appellant was on notice that appellee intended to rely on expert testimony and having this knowledge, failed to depose appellee's expert.

[2] We find no merit in these arguments. Appellee, Jones Enterprises, as plaintiff, had the burden of proving that title resided in plaintiff. To recover in trespass to try title, plaintiff must recover on the strength of his own title and not on the weakness of defendant's title, and may recover by proving: a regular chain of conveyances from the sovereign; superior title out of common source; title by limitation; or prior possession that has not been abandoned. *Land v. Turner,* 377 S.W.2d 181 (Tex.1964); *Hancock v. Booker,* 608 S.W.2d 811 (Tex.Civ.App.-Waco 1980, ref'd n.r.e.); *Jeffus v. Coon,* 484 S.W.2d 949 (Tex.Civ.App.-Tyler 1972, no writ); *Oswald v. Staton,* 421 S.W.2d 174 (Tex.Civ.App.-Waco 1967, ref. n.r.e.).

Appellee has failed in that burden in that appellee has come forward with no evidence that title resided in appellee. We cannot and do not consider the hearsay oral testimony of appellee's expert as any evidence whatsoever regarding the issue of title. Other than this hearsay testimony, our record is void of evidence supporting appellee's trespass to try title action.

[3][4]     Appellee's     contention     that TEX.R.CIV.EVID. 1002 is inapplicable must also fail. In actions where title to property is the ultimate issue for determination, proof of such title must be shown by the instruments of title themselves. Appellee's expert gave hearsay testimony as to the existence and content of documents in writing, but such documents were never produced and admitted into evidence. This is precisely what TEX.R.CIV.EVID. 1002 was adopted to prevent. The best evidence of the content of documents is the documents themselves. The trial court erred in admitting hearsay testimony to prove up the content of documents without a proper showing that the subject documents were unavailable through no

fault or failure on the part of the party offering same. *Gillum v. Temple,* 546 S.W.2d 361 (Tex.Civ.App.-Corpus Christi 1976, writ ref'd n.r.e.).

It is the opinion and holding of this Court that in trespass to try title actions where documents pertaining to title exist, that testimony of an expert witness standing alone, constitutes no evidence of titles. We further hold that in trespass to try title actions, Rules 702, 703 nor 704 TEX.R.CIV.EVID. do not excuse the necessity for the production and admission of documentary evidence regarding title to real property. We also hold that in trespass to try title actions, Rule 1002 TEX.R.CIV.EVID. requires that if documentary evidence exist as to title to to real property, that such documentary evidence must be produced and admitted.

Legal history as well as public policy requires that proof in trespass to try title actions be as certain as available documentary evidence will allow. Establishing legal or equitable interest or title to real property demands far more than a swearing match among witnesses, whether expert or otherwise. It demands strict proof based in records and documents.

We sustain appellants' points of error one and two and hold that the trial court erred in failing to direct a verdict in favor of appellant, holding as a matter of law that appellee presented no evidence which would show title in appellee.

Appellee, as plaintiff below, having failed in its affirmative burden to show its right of recovery upon the strength of its own title, must now suffer the rendition of judgment in favor of appellant Ramsey without necessity of determining the validity of appellant Ramsey's title. *906Trevino v. Munoz,* 583 S.W.2d 840 (Tex.Civ.App.-San Antonio 1979, no writ).

The only documents of title before the trial court and the jury was a warranty deed from Elmer Simmons to appellant Ramsey and a timber deed from

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

810 S.W.2d 902
810 S.W.2d 902
(Cite as: 810 S.W.2d 902)

Page 5

appellant Ramsey to appellant Weeks. These deeds constitute hard evidence of possession and the right to possession by Ramsey. This evidence also shows appellant Week's rights to possession of the timber by timber deed.

[5] In trespass to try title actions where defendant is shown to be in possession, judgment will be entered for defendant where plaintiff has failed in its burden of proving prima facie right to title and possession. *Tate v. Johnson,* 140 S.W.2d 288 (Tex.Civ.App.-Waco 1940, error dismissed, judgment correct).

We, therefore, reverse the judgment of the trial court in its entirety and in accordance with TEX.R.APP.P. 81(c) render judgment that title to the following real property be established in appellant Charles Ramsey as against appellee:

ALL that certain tract of land lying and being situated in Newton County, Texas, being a part of the James Lewis Survey, Abstract No. 227 and described as follows:

BEING twenty-two (22) acres of land, more or less, and being out of a 60 acre tract out of said James Lewis Survey, described as follows to-wit:

BEGINNING at the Northwest corner of said 22 acre tract in the North line of Lewis Survey, corner being marked by a pine stake, same being the Northeast corner of a tract owned by C.S. Jones.

THENCE North 82 degrees East along the North line at 242 vrs. to a stake for the Northeast corner.

THENCE South along the East line with a fence at 245 vrs. to a stake on the North bank of Cat Creek.

THENCE Southeast along said creek to a stake for corner in a fence line.

THENCE South 6 degrees West, cross Cat Creek 246 vrs. A stake for the Southeast corner of said 22 acre tract and the Southwest corner of the John Cade 40 acre tract.

THENCE North 89 degrees West along a fence to a stake for the Southwest corner.

THENCE North along the West line with a fence at 588 vrs. to the place of beginning and described in the Deed Records of Newton, County, Texas in Volume 347, at pages 171 and 172, and in other Deed Records of said County.

Appellants' points of error three, four and five require no address in that so doing would be redundant.

REVERSED AND RENDERED.

Tex.App.-Beaumont,1991.
Ramsey v. Jones Enterprises
810 S.W.2d 902

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Date of Printing: May 29, 2009

KEYCITE

**H** Ramsey v. Jones Enterprises, 810 S.W.2d 902 (Tex.App.-Beaumont,Jun 20, 1991) (NO. 09-90-071 CV)

History

Direct History

=>      1 Ramsey v. Jones Enterprises, 810 S.W.2d 902 (Tex.App.-Beaumont Jun 20, 1991) (NO.
        09-90-071 CV), writ denied (Oct 16, 1991), rehearing of writ of error overruled (Jan 22, 1992)

© 2009 Thomson Reuters. All rights reserved.

00638

22

00639

Westlaw.

779 S.W.2d 884
779 S.W.2d 884
(Cite as: 779 S.W.2d 884)

Page 1

*[handwritten marginalia: "crim case aggravated robbery"]*

*[handwritten marginalia: "Ded rules triels re: new trial for innocence / for guilt"]*

**H**

Court of Appeals of Texas,
Corpus Christi.

Francisco RODRIGUEZ, Appellant,
v.
The STATE of Texas, Appellee.
**No. 13-88-534-CR.**

Oct. 12, 1989.
Rehearing Denied Nov. 16, 1989.

Defendant was convicted of aggravated robbery, and he appealed. The Corpus Christi Court of Appeals, Thirteenth Supreme Judicial District, 745 S.W.2d 572, reversed and remanded due to error in punishment stage of trial. On remand, the 139th District Court, Hidalgo County, Raul L. Longoria, J., denied defendant's request for second jury trial on question of guilt or innocence, and defendant appealed. The Court of Appeals, Benavides, J., held that retroactive application of amended statute denying defendant second trial on question of guilt or innocence did not violate United States or Texas Constitutions.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 ⟳2789**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2789 k. Penal Laws in General. Most Cited Cases
    (Formerly 92k203)

**Constitutional Law 92 ⟳2790**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General

            92k2790 k. Punishment in General. Most Cited Cases
    (Formerly 92k203, 92k200)
Ex post facto prohibition bars enactment of any law which exacts punishment for act which was not punishable at time it was committed or which imposes greater punishment than that prescribed when act was committed. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 9, cl. 3.

**[2] Constitutional Law 92 ⟳2793**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2793 k. Remedies and Procedure in General. Most Cited Cases
    (Formerly 92k197)
Laws which do not amend substantive law by defining criminal acts or providing for penalties are procedural in nature, and are thus not usually within constitutional prohibition on ex post facto laws. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 9, cl. 3.

**[3] Constitutional Law 92 ⟳2793**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2793 k. Remedies and Procedure in General. Most Cited Cases
    (Formerly 92k197)
Procedural statute is not ex post facto merely because it works to defendant's disadvantage; however, if procedural change is retroactive and results in deprivation of substantive protection, it is unconstitutional. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 9, cl. 3.

**[4] Statutes 361 ⟳278.6**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00640

779 S.W.2d 884
779 S.W.2d 884
(Cite as: 779 S.W.2d 884)

Page 2

361k278.4 Prospective Construction
361k278.6 k. Presumptions. Most Cited Cases
(Formerly 361k263)

**Statutes 361 ⇐278.7**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.7 k. Express **Retroactive** Provisions. Most Cited Cases
            (Formerly 361k263)
Statute is presumptively prospective in application unless it is expressly made **retroactive.**

**[5] Statutes 361 ⇐278.14**

361 Statutes
    361VI Construction and Operation
        361VI(D) Retroactivity
            361k278.12 Statutes Relating to Remedies and Procedures
                361k278.14 k. Application to Pending Actions and Proceedings. Most Cited Cases
            (Formerly 361k267(2))
**Procedural** statute controls litigation from its effective date, and may be applied to trials for offenses committed before its effective date and to proceedings pending at time of its enactment. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 9, cl. 3.

**[6] Constitutional Law 92 ⇐2792**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2792 k. Vested Rights in General. Most Cited Cases
        (Formerly 92k191, 92k106)
Litigant has no vested right in procedural remedy under due course of law or ex post facto clauses of United States and Texas Constitutions. Vernon's Ann.Texas Const. Art. 1, §§ 16, 19; U.S.C.A. Const. Art. 1, § 9, cl. 3; Amend. 14.

**[7] Constitutional Law 92 ⇐2810**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(B) Particular Issues and Applications
            92k2809 Criminal Proceedings
                92k2810 k. In General. Most Cited Cases
        (Formerly 92k199)

**Criminal Law 110 ⇐14**

110 Criminal Law
    110I Nature and Elements of Crime
        110k12 Statutory Provisions
            110k14 k. Amendment. Most Cited Cases
Retroactive application of amendment to statute governing procedure on remand of criminal cases does not violate prohibitions against ex post facto laws in Federal and State Constitutions. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 9, cl. 3.

**[8] Criminal Law 110 ⇐14**

110 Criminal Law
    110I Nature and Elements of Crime
        110k12 Statutory Provisions
            110k14 k. Amendment. Most Cited Cases
Amended statute denying defendant second jury trial on issue of guilt or innocence following remand based on error in punishment stage of trial could be applied to defendant whose conviction occurred prior to amendment's effective date, where appellate court judgment setting aside trial court judgment was not rendered until after amendment's effective date. Vernon's Ann.Texas Const. Art. 1, § 16; U.S.C.A. Const. Art. 1, § 9, cl. 3.

**[9] Criminal Law 110 ⇐1130(5)**

110 Criminal Law
    110XXIV Review
        110XXIV(I) Briefs
            110k1130 In General
                110k1130(5) k. Points and Authorities. Most Cited Cases
Defendant waived point of error on appeal, where he did not discuss any facts or cite any authorities to maintain that point. Rules App.Proc., Rule 74(f).
*885 Joseph A. Connors, III, McAllen, for appellant.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00641

779 S.W.2d 884                                             Page 3
779 S.W.2d 884
(Cite as: 779 S.W.2d 884)

Theodore C. Hake, Asst. Criminal Dist. Atty., Hidalgo County Courthouse, Edinburg, for appellee.

Before NYE, C.J., and BENAVIDES and KENNEDY, JJ.

OPINION

BENAVIDES, Justice.

Appellant was convicted by a jury of aggravated robbery and sentenced to twenty-five years of imprisonment. He appealed, and this Court reversed because of error in the punishment stage of the trial, set aside the judgment, and remanded the cause to the trial court for further proceedings in accordance with *Ex parte Klasing,* 738 S.W.2d 648, 650 (Tex.Crim.App.1987). *Rodriguez v. State,* 745 S.W.2d 572 (Tex.App.-Corpus Christi 1988, pet. ref'd). On remand he was resentenced by the court to twelve years of imprisonment. He appeals the trial court's denial of a jury trial on the guilt-innocence phase of his case on remand. We affirm the judgment of the trial court.

On appeal from remand, appellant raises ten points of error, presented in one argument, all of which relate to the trial court's denial of his motion for a jury trial at the guilt-innocence phase of his trial, the refusal of the trial court to apply Tex.Code Crim.Proc.Ann. art. 44.29 (Vernon 1985), and the trial court's application of Tex.Code Crim.Proc.Ann. art. 44.29(b) (Vernon Supp.1989). He specifically alleges violations of his constitutional rights regarding ex post facto or retroactive laws under Tex. Const. art. 1, § 16 and U.S. Const. art. 1, § 9, clause 3. He also alleges violations of his constitutional right to fundamental fairness, due process and equal protection under Tex. Const. art. 1, § 19 and U.S. Const. Amend. XIV. Appellant further alleges that the district court violated the separation of powers doctrine of the Tex. Const. art. II, § 1 by violating the due process and ex post facto provisions of the Texas Constitution. He finally alleges that the district court ignored the provisions of Tex.Gov't Code Ann. § 311.022 (Vernon 1985). The core of all his points is that the court's application of art. 44.29(b) retroactively deprived him of his substantive rights.

On remand, the trial court applied Tex.Code Crim.Proc.Ann. art. 44.29(b) (Vernon Supp.1989). The judge commenced the new trial as if a finding of guilt had been returned and proceeded only with the punishment stage of the trial. The appellant's attorney objected and requested a new trial both as to guilt-innocence and punishment. The judge overruled his objection and assessed punishment.

Article 44.29(b) provides in part that:

If the court of appeals ... awards a new trial to the defendant only on the basis of an error or errors made in the punishment stage of the trial, the cause shall stand as it would have stood in case the new trial had been granted by the court below, except that the court shall commence the new trial as if a finding of guilt had been returned and proceed to the punishment stage of the trial....

The effective date of this amendment was August 31, 1987. Act of May 26, 1987, ch. 179 (Tex.Gen.Laws 1387). This article is directed to the trial court. *Ex parte Sewell,* 742 S.W.2d 393 (Tex.Crim.App.1987) (Opinion on motion for rehearing); *Ex parte Klasing,* 738 S.W.2d 648 (Tex.Crim.App.1987) (Opinion on motion for rehearing); *Goodlow v. State,* 766 S.W.2d 352, 354 (Tex.App.-Texarkana 1989, pet. ref'd).

[1][2][3] The ex post facto prohibition bars the enactment of any law which exacts a punishment for an act which was not punishable at the time it was committed or which imposes a greater punishment than that prescribed when the act was committed. *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). Laws which do not amend substantive law by * defining criminal acts or providing for penalties are procedural in nature. *Ex parte Johnson,* 697 S.W.2d 605, 607 (Tex.Crim.App.1985); *Ex parte Allen,* 699 S.W.2d 886, 894 (Tex.App.-Dallas 1985, pet. ref'd) (Opinion on motion for rehearing). Remedial or procedural laws are not usually within the ex post facto prohibition. *Klasing v. State,* 771 S.W.2d 684 (Tex.App.-Corpus Christi 1989, pet. filed); *Ex parte Allen,* 699 S.W.2d at 895. A procedural statute is not ex post facto merely because it works to a defendant's disadvantage. *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977). If a procedural change is retroactive *and* results in a deprivation of a substantive protection, however, it is unconstitu-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

779 S.W.2d 884                                                                          Page 4
779 S.W.2d 884
(Cite as: 779 S.W.2d 884)

tional. *Ex parte Abahosh, 561 S.W.2d 202, 203 (Tex.Crim.App.1978)* (panel op.); *Ex parte Allen, 699 S.W.2d at 895.*

[4][5][6][7] A statute is presumptively prospective in application unless it is expressly made retrospective. *Nichols v. State, 754 S.W.2d 185, 204 (Tex.Crim.App.1988); Ex parte Abahosh, 561 S.W.2d at 204;* Tex.Gov't Code Ann. § 311.022 (Vernon 1988). A procedural statute controls litigation from its effective date, and it may be applied to trials for offenses committed before its effective date and to proceedings pending at the time of its enactment. *Goodlow, 766 S.W.2d at 354.* This is because a litigant has no vested right in a procedural remedy under the due course of law or ex post facto clauses of the United States and Texas Constitutions. *Thompson v. Utah, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898); Merchants Fast Motor Lines, Inc. v. Railroad Comm'n of Texas, 573 S.W.2d 502, 504-05 (Tex.1978); Cooper v. State, 769 S.W.2d 301, 306 (Tex.App.-Houston [1st Dist.] 1989, no pet.).* Retroactive application of amended article 44.29(b) to cases originally tried before the effective date of the amendment does not violate prohibitions against ex post facto laws in the federal and state constitutions. *Klasing v. State, 771 S.W.2d at 686.*

[8] Appellant argues that the application of article 44.29(b) to his case deprives him of the right to a new trial on guilt-innocence which was a right he had when the offense was committed. This court determined that appellant had received a trial on guilt or innocence in which there was no harmful error. *Rodriguez, 745 S.W.2d 572.* The Constitution does not require that a defendant receive two error free trials on guilt or innocence. *Goodlow, 766 S.W.2d at 354.*

Any right appellant had to a new trial on guilt-innocence could not have existed until this Court held that the trial court had committed reversible error. *Goodlow, 766 S.W.2d at 355; see also Ex parte Allen, 699 S.W.2d at 896.* Since this Court's judgment was rendered after the effective date of the amendment, appellant was not retroactively deprived of a substantive right.

[9] Appellant failed to argue his point of error alleging he was denied equal protection of the law. He did not discuss any facts or cite any authorities to main-

tain this point of error, and appellant, therefore, waived this point of error. *Richardson v. State, 753 S.W.2d 759, 769 (Tex.App.-Dallas 1988, no pet.); Hefner v. State, 735 S.W.2d 608, 627 (Tex.App.-Dallas 1987, pet. ref'd);* Tex.R.App.Proc.Ann. 74(f) (Vernon Supp.1989).

Accordingly, we overrule appellant's ten points of error and AFFIRM the judgment of the trial court.

Tex.App.-Corpus Christi,1989.
Rodriguez v. State
779 S.W.2d 884

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

23

00644

**Westlaw.**

198 S.W.3d 795
198 S.W.3d 795
(Cite as: 198 S.W.3d 795)

Page 1

**H**
Editor's Note: Additions are indicated by <u>Text</u> and deletions by ~~Text~~.

Court of Appeals of Texas,
San Antonio.
The STATE of Texas, Appellant,
v.
Craig Hill JOHNSON, Appellee.
**No. 04-04-00332-CR.**

May 17, 2006.
Discretionary Review Granted Sept. 13, 2006.

**Background:** Defendant moved to suppress evidence after he was charged with felony driving while intoxicated (DWI). The 216th Judicial District Court, Gillespie County, Stephen B. Ables, J., granted motion. The state appealed.

**Holding:** The Court of Appeals, Sarah B. Duncan, J., held that police officer had reasonable suspicion that defendant was violating statute governing visibility of license plates and, thus, was justified in making traffic stop.

Reversed and remanded.

West Headnotes

**[1] Statutes 361 ☞241(1)**

361 Statutes
    361VI Construction and Operation
        361VI(B) Particular Classes of Statutes
            361k241 Penal Statutes
                361k241(1) k. In General. Most Cited Cases
Unless found in the Texas Penal Code, a penal statute must be strictly construed. V.T.C.A., Penal Code § 1.05(a).

**[2] Statutes 361 ☞241(1)**

361 Statutes

361VI Construction and Operation
    361VI(B) Particular Classes of Statutes
        361k241 Penal Statutes
            361k241(1) k. In General. Most Cited Cases
When a penal statute must be strictly construed, a forbidden act must come clearly within the prohibition of the statute, and any doubt as to whether an offense has been committed should be resolved in favor of the accused.

**[3] Statutes 361 ☞208**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k204 Statute as a Whole, and Intrinsic Aids to Construction
                361k208 k. Context and Related Clauses. Most Cited Cases

**Statutes 361 ☞235**

361 Statutes
    361VI Construction and Operation
        361VI(B) Particular Classes of Statutes
            361k235 k. Liberal or Strict Construction as Affected by Nature of Act in General. Most Cited Cases
A strict construction of a statutory provision does not mean that an appellate court isolates terms or phrases from the context in which they appear; rather, the appellate court always strives to give words and phrases meaning within the context of the larger provision.

**[4] Statutes 361 ☞235**

361 Statutes
    361VI Construction and Operation
        361VI(B) Particular Classes of Statutes
            361k235 k. Liberal or Strict Construction as Affected by Nature of Act in General. Most Cited Cases
A strict construction of a statutory provision does

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00645

198 S.W.3d 795
198 S.W.3d 795
(Cite as: 198 S.W.3d 795)

Page 2

not mean that an appellate court ignores the plain meaning of terms.

**[5] Automobiles 48A ☞349(5.1)**

48A Automobiles
   48AVII Offenses
      48AVII(B) Prosecution
         48Ak349 Arrest, Stop, or Inquiry; Bail or Deposit
            48Ak349(2) Grounds
               48Ak349(5.1) k. License Plates and Registration Stickers, in General. Most Cited Cases
    (Formerly 48Ak349(4))
Police officer had reasonable suspicion that defendant was violating statute governing visibility of license plates and, thus, was justified in making traffic stop; dealer-installed frame for Texas license plate on defendant's vehicle entirely covered phrase "THE LONE STAR STATE" and probably covered images of space shuttle and starry night, and phrase and images were all original design elements of license plate. V.T.C.A., Transportation Code § 502.409(a)(7)(B).
*796 E. Bruce Curry, Dist. Atty., Kerrville, and Matthew W. Paul, State's Prosecuting Atty., Austin, for appellant.

George Scharmen, San Antonio, for appellee.

Sitting: SARAH B. DUNCAN, Justice, PHYLIS J. SPEEDLIN, Justice, REBECCA SIMMONS, Justice.

## OPINION

Opinion by SARAH B. DUNCAN, Justice.

The State of Texas appeals the trial court's order granting Craig Hill Johnson's pretrial motion to suppress. The State argues a license plate frame that obscures the words "THE LONE STAR STATE" and certain images on the license plate violates section 502.409(a)(7) of the Texas Transport-

ation Code and therefore provided a valid basis for the traffic stop that resulted in Johnson's arrest for felony driving while intoxicated. We agree and therefore reverse the trial court's order and remand the cause to the trial court for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 13, 2003, Fredericksburg Police Officer Christopher Joseph Torres stopped the vehicle being driven by Craig Hill Johnson solely because the license plate on Johnson's vehicle was partially obscured by the dealer-installed license plate frame. Johnson was subsequently charged with felony driving while intoxicated.

Before trial Johnson moved to suppress "all items of evidence and fruits of [his] arrest and search," because the arrest was "without a warrant and without reasonable suspicion to stop or probable cause to arrest." In his testimony, Officer Torres identified a photograph of the license plate with the license plate frame; and Johnson in his testimony identified a photograph of the license plate without the dealer-installed frame. A comparison of the two photographs establishes that the frame entirely covers the phrase "THE LONE STAR STATE" and probably covers the images of the space shuttle and the starry night. The trial court granted Johnson's motion, reasoning as follows:

Boy, I do not know. I am afraid that all these logo plates are going to do a little obscuring, and the courts may need to tell us if they're talking about obscuring what really matters, and what really matters, I think, is the numbers, the license number, and you can tell that it's a Texas plate. It has got the state of Texas, you know. I mean, there is a picture of the state of Texas in there. Even though if somebody doesn't think they can extrapolate the bottom of it, they can see the state of Texas and see the cowboy which is particular to our logo, so a photograph is going to be able

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00646

198 S.W.3d 795
198 S.W.3d 795
(Cite as: 198 S.W.3d 795)

Page 3

**\*797** to tell that it's a Texas license plate, and you can clearly see the license number.

The State appealed.

## STANDARD OF REVIEW AND APPLICABLE LAW

Because the pertinent facts are undisputed and the only issue is the proper application of section 502.409 of the Texas Transportation Code, we review the trial court's order granting Johnson's motion to suppress *de novo. See State v. Ross,* 32 S.W.3d 853, 858 (Tex.Crim.App.2000).

[1][2][3][4] Unless found in the Texas Penal Code,[FN1] a penal statute must be strictly construed. *United States v. Granado,* 302 F.3d 421, 424 (5th Cir.2002) (noting that prior version of section 502.409 must be "strictly construe[d]"); *see, e.g., Thomas v. State,* 919 S.W.2d 427, 430 (Tex.Crim.App.1996) (recognizing that "State Securities Act is highly penal in nature and requires that it be strictly construed") (quoting *Bruner v. State,* 463 S.W.2d 205, 215 (Tex.Crim.App.1970)). Accordingly, "[a] forbidden act must come clearly within the prohibition of the statute and any doubt as to whether an offense has been committed should be resolved in favor of the accused." *Thomas,* 919 S.W.2d at 430 (quoting *Bruner,* 463 S.W.2d at 215). "However, a strict construction does not mean that we isolate terms or phrases from the context in which they appear." *Thomas,* 919 S.W.2d at 430. Rather, "[w]e always strive to give words and phrases meaning within the context of the larger provision." *Id.* "Neither does a strict construction mean that we ignore the plain meaning of terms." *Id.*

> FN1. *See* TEX. PEN.CODE ANN. § 1.05(a) (Vernon 2003) ("The rule that a penal statute is to be strictly construed does not apply to this code.")

## DISCUSSION

Before its amendment in 2003, section 502.409(a) of the Texas Transportation Code provided in relevant part as follows:

A person commits an offense if the person attaches to or displays on a motor vehicle a number plate or registration insignia that:

..

(5) has letters, numbers, or other identification marks that because of blurring matter are not plainly visible at all times during daylight;

(6) is a sticker, decal, or other insignia that is not authorized by law and that interferes with the readability of the letters or numbers on the plate; or

(7) has a coating, covering, or protective material that distorts angular visibility or detectability.

Act of May 30, 1999, 76th Leg., R.S., ch. 1189, § 17, 1999 Tex. Gen Laws 4153, 4161 (amended 2003) (current version at TEX. TRANSP.CODE ANN. § 502.409(a) (Vernon Supp.2005)); *see Granado,* 302 F.3d at 423-24. "[S]trictly constru[ing]" this version of the statute, the Fifth Circuit Court of Appeals held that a license plate frame that partially obscures the name of the issuing state-but does not otherwise obscure the letters or numbers on the plate-does not violate section 502.409(a)(5) because "[v]isibility of identifying marks ... is not obscured by 'blurring matter.' " *Id.* at 423-24. Nor does the frame violate section 502.409(a)(6) because "[t]here is no 'sticker, decal, or other insignia' that interferes with readability." *Id.* at 424 n. 2 & accompanying text. Nor does the frame violate section 502.409(a)(7) because there is no " 'coating, covering, or protective material' disturbing angular visibility.' " *Id.* at 424 n. 3 & accompanying text.

**\*798** After *Granado,* the Texas Legislature amended section 502.409 to provide as follows:

A person commits an offense if the person attaches

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00647

198 S.W.3d 795
198 S.W.3d 795
(Cite as: 198 S.W.3d 795)

Page 4

to or displays on a motor vehicle a number plate or registration insignia that:

(5) has letters, numbers, or other identification marks that because of blurring *or reflective* matter are not plainly visible at all times during daylight;

(6) ~~is a~~has *an attached illuminated device or* sticker, decal, *emblem,* or other insignia that is not authorized by law and that interferes with the readability of the letters or numbers on the plate *or the name of the state in which the vehicle is registered;* or

(7) has a coating, covering, or protective material that:

(*A*) distorts angular visibility or detectability; *or*

(*B*) *alters or obscures the letters or numbers on the plate, the color of the plate, or another original design feature of the plate.*

TEX. TRANSP. CODE ANN. § 502.409(a) (Vernon Supp.2005) (redlining added). Interpreting this version of the statute, which became effective September 1, 2003,[FN2] the Southern District of Texas recently ruled that a license plate frame that covers the space shuttle and starry night images on a Texas license plate violates section 502.409(a)(7) because the frame is "a covering" that "obscure[s]" "original design feature[s] of the plate." *United States v. Flores-Fernandez,* 418 F.Supp.2d 908, 912-13 (S.D.Tex.2006) ("The statute clearly applies to any object, including a license plate frame, which hides the letters, numbers, color, or original design features of a license plate from view."). We agree.

> FN2. Act of May 28, 2003, 78th Leg., R.S., ch. 837, § 3, 2003 Tex. Gen. Laws 2625, 2625.

[5] Section 502.409(a)(7) prohibits "a ... covering

... that obscures ... [an] original design feature of the plate." It therefore prohibits a license plate frame "that is placed over" a license plate if the frame "conceal[s] or hide[s]" an original design element of the plate. *See*WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 300, 815 (Merriam-Webster, Inc.1984) (defining "cover" and "obscure"). It is beyond dispute that the license plate frame on Johnson's vehicle entirely covered the phrase "THE LONE STAR STATE" and probably covered the images of the space shuttle and the starry night; and these images and phrase are all original design elements of the plate. Accordingly, we hold Officer Torres had reasonable suspicion of a violation of section 502.409(a)(7) and a valid basis to make the stop; consequently, the trial court erred in granting Johnson's motion to suppress. We therefore reverse the trial court's order and remand the cause for further proceedings consistent with this opinion.

Tex.App.-San Antonio,2006.
State v. Johnson
198 S.W.3d 795

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00648

U0649 **24**

Westlaw.

884 S.W.2d 772                                                          Page 1
884 S.W.2d 772, 22 Media L. Rep. 1705
(Cite as: 884 S.W.2d 772)

▷

Court of Criminal Appeals of Texas,
En Banc.

The STATE of Texas, ex rel., John F. HEALEY, Jr.,
District Attorney, Relator,
v.
Honorable Walter S. McMEANS, Judge, County
Court at Law No. 2, Respondent.
No. 71715.

April 13, 1994.
Judge Baird Filed Opinion Concurring in Denial of
Rehearing Oct. 5, 1994.

Defendant was charged with abuse of corpse. The
County Court at Law No. 2, Fort Bend County,
Walter S. McMeans, J., granted motions to quash
subpoenas served upon television news personnel.
Prosecution brought original mandamus action to
compel disclosure. The Court of Criminal Appeals,
Campbell, J., held that state law did not recognize
newsperson's privilege to withhold information.

Writ granted.

Maloney, J., joined and filed note.

Meyers, J., dissented and filed opinion in which Clin-
ton, Miller and Overstreet, JJ., joined.

Baird, J., concurred in denial of rehearing and filed
opinion.

West Headnotes

[1] Mandamus 250 ⚷3(2.1)

250 Mandamus
    250I Nature and Grounds in General
        250k3 Existence and Adequacy of Other
Remedy in General
            250k3(2) Remedy at Law
                250k3(2.1) k. In General. Most Cited
Cases

Mandamus 250 ⚷12

250 Mandamus
    250I Nature and Grounds in General
        250k12 k. Nature of Acts to Be Commanded.
Most Cited Cases
Writ of mandamus relief is available only when rela-
tor can establish no other adequate remedy at law is
available, and that act he seeks to compel is ministe-
rial. Vernon's Ann.Texas Const. Art. 5, § 5.

[2] Mandamus 250 ⚷12

250 Mandamus
    250I Nature and Grounds in General
        250k12 k. Nature of Acts to Be Commanded.
Most Cited Cases
Act is "ministerial," for purposes of allowing issu-
ance of writ of mandamus, when law clearly spells
out duty to be performed with such certainty that
nothing is left to exercise of discretion or judgment.
Vernon's Ann.Texas Const. Art. 5, § 5.

[3] Mandamus 250 ⚷4(1)

250 Mandamus
    250I Nature and Grounds in General
        250k4 Remedy by Appeal or Writ of Error
            250k4(1) k. In General. Most Cited Cases
Limitations on right of state to appeal, in criminal
cases, are not an impediment to state's use of man-
damus to correct judicial action that is clearly con-
trary to well-settled law, whether that law is derived
from statute, rule, or opinion of court. Vernon's
Ann.Texas Const. Art. 5, § 5; Vernon's Ann.Texas
C.C.P. art. 44.01.

[4] Mandamus 250 ⚷4(4)

250 Mandamus
    250I Nature and Grounds in General
        250k4 Remedy by Appeal or Writ of Error
            250k4(4) k. Modification or Vacation of
Judgment or Order. Most Cited Cases
Prosecution seeking to compel trial court to order
television reporters to disclose information in crimi-
nal case satisfied requirement for obtaining writ of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

884 S.W.2d 772
884 S.W.2d 772, 22 Media L. Rep. 1705
(Cite as: 884 S.W.2d 772)

Page 2

mandamus, that there was no other adequate remedy at law; trial court's determination that reporters could withhold information under as privileged could not be appealed under Code of Criminal Procedure, and if prosecution proceeded to trial without reporters' evidence and jury acquitted defendant, there would be no appellate avenue available for review of that order. Vernon's Ann.Texas C.C.P. art. 44.01.

[5] Privileged Communications and Confidentiality 311H ⊂⊃404

311H Privileged Communications and Confidentiality
    311HVII Other Privileges
        311Hk404 k. Journalists. Most Cited Cases
    (Formerly 410k196.1)
Texas law does not recognize privilege of reporters to withhold evidence in criminal trial. U.S.C.A. Const.Amend. 1.

[6] Mandamus 250 ⊂⊃61

250 Mandamus
    250II Subjects and Purposes of Relief
        250II(A) Acts and Proceedings of Courts, Judges, and Judicial Officers
            250k61 k. Criminal Prosecutions. Most Cited Cases
Prosecution seeking to compel trial court to require television reporters to disclose information in criminal action satisfied requirement for obtaining writ of mandamus, that action required of public official be ministerial and not involve exercise of discretion; contrary to position taken by trial court, there was no privilege allowing reporters to withhold information, and trial court consequently had only ministerial duty to order disclosure. Vernon's Ann.Texas Const. Art. 1, § 8; Art. 5, § 5; U.S.C.A. Const.Amend. 1.

[7] Privileged Communications and Confidentiality 311H ⊂⊃404

311H Privileged Communications and Confidentiality
    311HVII Other Privileges
        311Hk404 k. Journalists. Most Cited Cases
    (Formerly 410k196.1)
Assuming there was a reporter's privilege to withhold information in some contexts, such privilege would

have to yield in face of fundamental need, on part of both prosecution and defense, to develop all facts in adversarial system of criminal justice. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.
*773 John F. Healey, Jr., and J. Sidney Crowley, Asst. Dist. Atty., Richmond, for relator.

Charles L. Babcock, N. David Bleisch, Houston, Robert Huttash, State's Atty., Austin, for the State.

Before the court en banc.

## OPINION ON RELATOR'S APPLICATION FOR WRIT OF MANDAMUS

CAMPBELL, Judge.

Relator John F. Healey, Jr., District Attorney of Fort Bend County, seeks a writ of mandamus from this Court directing respondent Walter S. McMeans, Judge of County Court at Law Number Two of Fort Bend County, to vacate his orders granting motions to quash four subpoenas. The subpoenas in question commanded four newsmen to appear and give evidence in a pending criminal prosecution. We will conditionally grant the writ.

*The Relevant Facts*

Sometime in late 1992 or early 1993, relator presented an information in respondent's court charging Newell Willard Evans, a funeral home operator, with abuse of a corpse. See Tex.Penal Code § 42.10. On June 17, 1993, relator subpoenaed four local television newsmen, commanding them to give testimony and produce any videotapes they had concerning the alleged offense.[FN1] The newsmen*774 promptly filed motions to quash on the ground that they had a qualified privilege, under the First Amendment to the United States Constitution [FN2] and Article 1, § 8, of the Texas Constitution, [FN3] not to testify or produce other evidence at any criminal trial. See 1 J. Strong (ed.), *McCormick on Evidence* § 76.2 (4th ed. 1992) (discussing alleged "newsman's privilege").

> FN1. More specifically, the subpoenas commanded the newsmen to testify and to produce "any coverage shot of the Newell Evans/Larry Bojorski body dumping case

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

U0651

884 S.W.2d 772                                                                           Page 3
884 S.W.2d 772, 22 Media L. Rep. 1705
(Cite as: 884 S.W.2d 772)

which occurred during the week of October 12, 1992."

FN2. The First Amendment's guarantee of the freedom of the press was made applicable to the states by the due process clause of the Fourteenth Amendment. *Near v. Minnesota,* 283 U.S. 697,707,51 S.Ct.625,267-28.75 L.Ed.1357 (1931).

FN3. Article 1, § 8, provides in relevant part that "no law shall ever be passed curtailing the liberty of ... the press."

On June 29, 1993, respondent held a hearing on the newsmen's motions to quash. A Fort Bend County assistant district attorney testified at the hearing that he had been assigned to prosecute Evans and that he had reason to believe that the newsmen had heard and videotaped Evans making incriminating statements regarding the alleged offense. The newsmen argued in response at the hearing that they had a qualified constitutional privilege not to give any evidence unless the State could show that it had a compelling need for the evidence. They argued further that the State had not shown such a need. On July 9, 1993, respondent granted the motions to quash.

On July 16, 1993, relator, relying upon *Ex parte Grothe,* 687 S.W.2d 736 (Tex.Crim.App.1984), asked this Court for a stay of all proceedings in the trial court and a writ of mandamus ordering respondent to vacate his orders granting the motions to quash. On August 16, 1993, we stayed the proceedings below and ordered this case filed and set for submission.

*The Law of Mandamus*

[1][2] This Court is empowered by Article V, § 5, of the Texas Constitution to issue writs of mandamus in all criminal law matters. *Lanford v. Fourteenth Court of Appeals,* 847 S.W.2d 581, 584 (Tex.Crim.App.1993). A writ of mandamus is a drastic remedy, however, to be invoked only in extraordinary situations. *Perkins v. Third Court of Appeals,* 738 S.W.2d 276, 284 (Tex.Crim.App.1987). Accordingly, mandamus relief is available only when the relator can establish two things: first, that no other adequate remedy at law is available; and second, that the act he seeks to compel is ministerial. *Braxton v.*

*Dunn,* 803 S.W.2d 318, 320 (Tex.Crim.App.1991). An act is ministerial "when the law clearly spells out the duty to be performed ... with such certainty that nothing is left to the exercise of discretion or judgment." *Texas Dept. of Corrections v. Dalehite,* 623 S.W.2d 420, 424 (Tex.Crim.App.1981).

[3] Of course, mandamus "is not a substitute for and cannot be used to perform the office of an appeal." *Bradley v. Miller,* 458 S.W.2d 673, 675 (Tex.Crim.App.1970). Thus, mandamus may not be used to give the State a right to appeal that was not granted by the Legislature in Article 44.01 of the Texas Code of Criminal Procedure. But the limitations in Article 44.01 on the State's right to appeal are no impediment to the State's use of mandamus to correct judicial action *that is clearly contrary to well-settled law,* whether that law is derived from a statute, rule, or opinion of a court. As two eminent commentators have explained: "In limiting the government's right to appeal, ..., the legislature has made clear that the government cannot complain of ordinary trial errors, but it cannot have intended that the [g]overnment be obliged to submit to arbitrary judges who refuse to behave as judges." W. LaFave & J. Israel, *Criminal Procedure* § 27.4 at 1155-1156 (2nd ed. 1992) (some punctuation omitted). In other words, the Legislature, in enacting Article 44.01, cannot have intended that mandamus be unavailable to correct judicial action that ignores clear, binding precedent from a court of superior jurisdiction. Trial judges do not enjoy the freedom to ignore the law.

*Application*

[4] Applying these principles to the case *sub judice,* we conclude that relator has established*775 the prerequisites to mandamus relief. First, he has demonstrated that he has no other adequate remedy at law. He cannot appeal respondent's orders under Article 44.01, and if he proceeds to trial without the newsmen's evidence and the jury acquits Evans, he (i.e., relator) will have no appellate avenue available for review of respondent's orders.

[5][6] Second, relator has demonstrated that respondent has a ministerial duty to vacate the orders granting the motions to quash. This is so because the recognition of a "newsman's privilege" is clearly contrary to well-settled law. Although Article V of the Texas Rules of Criminal Evidence contains a variety

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

884 S.W.2d 772
884 S.W.2d 772, 22 Media L. Rep. 1705
(Cite as: 884 S.W.2d 772)

Page 4

of evidentiary privileges, it does not contain a privilege for newsmen. The privileges that *are* contained in Article V were not lightly created and were carefully designed to protect important interests which clearly outweigh the competing public interest in the search for truth. Furthermore, under our decision in *Ex parte Grothe*, 687 S.W.2d 736, which is binding on all lower criminal courts in Texas, newsmen have no constitutional privilege, qualified or otherwise, to withhold evidence relevant to a pending criminal prosecution.[FN4] *See Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (rejecting claim of newsman's privilege under the First Amendment); *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 669, 111 S.Ct. 2513, 2518, 115 L.Ed.2d 586 (1991) (reaffirming *Branzburg*); *Univ. of Penn. v. E.E.O.C.*, 493 U.S. 182, 200-01, 110 S.Ct. 577, 588 (1990) (same).

FN4. We note also that the Legislature has not enacted a statutory newsman's privilege.

[7] Even if we were to assume *arguendo* the existence of a newsman's privilege in some contexts, it, like the presidential privilege implicit in the separation of powers doctrine and Article II of the United States Constitution, would have to yield in the face of the fundamental need, on the part of both the prosecution and the defense, to develop all facts in an adversarial system of criminal justice. *See United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). As the Supreme Court explained in *Nixon*,

[t]he ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

* * * * * *

... [T]he allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts.... [T]he constitutional need for production of relevant evidence in a criminal proceeding is specific and central to the fair adjudication of a particular criminal case in the administration of justice. Without access to specific facts a criminal prosecution may be totally frustrated.

*United States v. Nixon*, 418 U.S., at 709, 712-713, 94 S.Ct. at 3108, 3110.

The application of Article V and *Grothe* to the facts of this case requires no act of discretion or judgment on the part of respondent; he need only read Article V and *Grothe* and apply them, just as he might read and apply a statute. In other words, the application of Article V and *Grothe* to the facts of this case is "ministerial" as we have previously defined that term. That being the case, respondent is not free to simply ignore the existing law and thereby thwart compulsory process vital to the commencement and completion of a criminal trial.

### Conclusion

Relator has established the prerequisites for mandamus relief. As is our custom, we will withhold issuance of the writ and accord respondent an opportunity to conform his actions to this opinion. Only if such action is not taken will the writ of mandamus issue.

*776 MALONEY, J., joins with note: The parties do not address the ramifications of article 18.01(e) of the Code of Criminal Procedure which precludes the issuance of an evidentiary search warrant for articles located in an office of a newspaper, news magazine, television station, or radio station" except for property or items described in subsections 1"- of article 18.02. Admittedly an evidentiary search warrant is a much more drastic invasion of privacy than a subpoena; but the Legislature has at least evidenced some intent to maintain the privacy of a news office and its contents in passing article 18.01(e). We might ask if you can't seize it by court order (search warrant), how can you subpoena it by clerk order? However, the implications of article 18.01 are not before us. Accordingly I join the opinion of the Court.
MEYERS, Judge, dissenting.
The Court here says, as it has so often in the past, that the writ of mandamus is available exclusively to compel the performance of a ministerial duty which

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00653

884 S.W.2d 772                                                                    Page 5
884 S.W.2d 772, 22 Media L. Rep. 1705
(Cite as: 884 S.W.2d 772)

cannot be enforced by other available means. This is the traditional and conservative view of mandamus, and it is the one to which I subscribe. But it is not the only view supportable by this Court's recent case law, and it is not the one actually applied by the Court in this case. Indeed, it is apparent to me that the Court has, during its relatively brief period of general mandamus jurisdiction, begun to transform the law of mandamus in ways which fundamentally alter its historic purpose and threaten to damage the orderly procedure of appellate review promulgated by the Legislature. The instant case is yet another example of this disturbing trend.

In my estimation, the best expression of mandamus law to appear from this Court in recent years, at least as regards the "ministerial duty" requirement, is the opinion in *State ex rel. Curry v. Gray*, 726 S.W.2d 125 (Tex.Crim.App.1987) (opinion on rehearing). In that case, the Criminal District Attorney of Tarrant County asked this Court to order the Judge of Tarrant County Criminal District Court Number Four to withdraw his pretrial order sustaining a plea of former jeopardy in a pending criminal prosecution. We declined to do so. Elaborating the requirement that mandamus will lie only to compel ministerial duties, we concluded that:

If a trial judge has jurisdiction over a particular issue, he is empowered to decide that issue in any way he has authority to do so; however, he cannot be *required*, by extraordinary writ of mandamus or prohibition, to decide that issue "correctly." This is one reason why extraordinary relief is not available to compel a particular outcome where deciding that outcome involves a discretionary or judicial act. The law confers the authority to decide upon the judge, and the correctness of his or her decision may not be supervised at every step by appellate courts.

The question is not whether respondent made an incorrect decision regarding the motion. The question is did the respondent have the *authority* to rule in any way he believed proper. In the case before us, respondent had the jurisdiction and the complete authority to consider and rule upon the motion presented by Battie regarding collateral estoppel, regardless of the propriety of the actual ruling made.

726 S.W.2d at 128-29 (citations omitted) (emphasis in original).

Barely a month later, however, the Court carved out a dramatic exception to this rule. Jealous of its own supremacy in matters of criminal law, and unable to stomach the possibility that some criminal law matters might be finally resolved in the lower appellate courts, this Court announced that "the traditional two-part test for determining whether mandamus should issue ... is altered [only by] adoption today of the clear abuse of discretion standard in reviewing the mandamus actions of the courts of appeals." *Dickens v. Second Court of Appeals*, 727 S.W.2d 542, 550 (Tex.Crim.App.1987). The Court's entire explanation for adoption of this admittedly new rule in criminal law matters is as follows:

[U]nder this Court's present test for issuance of original mandamus in criminal law matters, we would never be able to review mandamus actions of the courts of appeals because those actions could always be characterized as discretionary in nature. *777 Such a circumstance, if allowed to continue, would allow the courts of appeals to interpret criminal law in writs of mandamus independent of any review by this Court. This unusual circumstance *requires* that we use our original mandamus jurisdiction in criminal law matters to determine whether issuance of mandamus by a court of appeals constitutes a clear abuse of discretion.

*Id.* at 550 (footnote omitted) (emphasis added). In this way, the Court set a rather clear precedent for openly amending its own constitutional and statutory jurisdiction to correct the mistake made by Texans and their elected representatives when they opted to provide that certain decisions of the lower appellate courts not be subject to further judicial review.

Since *Dickens* the Court has continued to insist that the "clear abuse of discretion" exception only applies under limited conditions to supervision of the lower appellate courts. *Ater v. Eighth Court of Appeals*, 802 S.W.2d 241, 243 (Tex.Crim.App.1991). Yet in spite of these assurances and its unambiguous adherence to the traditional rule in *Gray*, the Court has nevertheless declined to follow its own precepts in practice. Take, for example, *Stearnes v. Clinton*, 780 S.W.2d 216 (Tex.Crim.App.1989), decided only two years later, holding that mandamus will lie to force with-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

884 S.W.2d 772                                                                    Page 6
884 S.W.2d 772, 22 Media L. Rep. 1705
(Cite as: 884 S.W.2d 772)

drawal of a trial judge's order removing appointed counsel. The Court speaks at great length about the rights of indigent defendants to be represented by vigorous advocates and about the lack of judicial authority arbitrarily to remove a defense attorney. But it openly acknowledges that trial judges do have authority to remove appointed counsel, albeit they err to do so except under certain narrowly defined circumstances. Nevertheless, the Court grants mandamus relief in *Stearnes* upon the patently fictional ground that respondent judge "acted without authority." 780 S.W.2d at 223. This is like saying that no one has authority to do the wrong thing, that everyone has a ministerial duty to do what's right. In a sense, of course, it's true. But it's not what traditional mandamus law means by "ministerial duty," and it is clearly inconsistent with the holding in *Gray*.

Similarly, in *State ex rel. Eidson v. Edwards*, 793 S.W.2d 1 (Tex.Crim.App.1990) (plurality opinion), the Court holds that mandamus will lie to compel vacation of a district court order removing the District Attorney's Office from prosecution of a criminal case. Holding that mandamus is available, not only to compel a ministerial duty, but also "to nullify a void order," 793 S.W.2d at 5, the Court then proceeds to reason that the order disqualifying the District Attorney in that case was void because, among other things, it did not appear that any of the three statutory grounds for removal had been proved. In short, the judge, who undoubtedly had authority to prevent conflicts of interest by attorneys practicing in his court, merely erred so do so in *Edwards*, and was accordingly made to withdraw his order. *Compare State ex rel. Thomas v. Banner*, 724 S.W.2d 81 (Tex.Crim.App.1987) (mandamus will lie to force withdrawal of an order granting shock probation entered before the trial judge acquired jurisdiction to do so); *State ex rel. Holmes v. Salinas*, 784 S.W.2d 421 (Tex.Crim.App.1990) (mandamus will lie to compel withdrawal of void order prohibiting prosecutors from seeking an indictment until after completion of an examining trial); *State ex rel. Cobb v. Godfrey*, 739 S.W.2d 47 (Tex.Crim.App.1987) (mandamus will lie to force withdrawal of an order granting a new trial after a motion for new trial has been overruled by operation of law); *State ex rel. Holmes v. Klevenhagen*, 819 S.W.2d 539 (Tex.Crim.App.1991) (mandamus will lie to direct rescission of order granting habeas corpus relief from extradition warrant when habeas judge adjudicated all disputed facts in a manner favorable to the extradition warrant, but re-

fused extradition anyway); *State ex rel. Curry v. Carr*, 847 S.W.2d 561 (Tex.Crim.App.1992) (mandamus will lie ordering trial court to empanel jury when prosecuting authorities refuse to approve jury waiver).

These cases are merely examples of irregular application by the Court. They do not, by any means, exhaust the list of inconsistent holdings. But they have led ultimately to an even more profound difficulty. The vocabulary of mandamus law is itself changing, apparently to accommodate the more relaxed *778 attitude of the Court toward its extraordinary original jurisdiction. Thus, in *State ex rel. Sutton v. Bage*, 822 S.W.2d 55 (Tex.Crim.App.1992), which holds that mandamus will not lie to compel a court of appeals clerk to file an untimely notice of appeal, the Court identifies the first prerequisite for mandamus relief as requiring relator to show "that under the relevant law and facts, he has a *clear* right to the relief sought, i.e., the act he seeks to compel is ministerial[.]" 822 S.W.2d at 57 (internal quotation marks omitted). The Court apparently accepts, without really addressing the issue, that clerks are not obliged to receive for filing papers which have not been timely tendered. Given the Court's conclusion that the papers were not timely tendered in this case, it is apparent that the clerk had no duty, ministerial or otherwise, to accept them. Thus, the *Bage* Court does not illuminate the "ministerial duty" requirement at all, at least not so as to distinguish it from other legal duties, and is interesting only because, without further elaboration, it equates this prerequisite to the Court's exercise of its mandamus jurisdiction with "a clear legal right to the relief sought," citing *Braxton v. Dunn*, 803 S.W.2d 318 (Tex.Crim.App.1991) and *State ex rel. Wade v. Mays*, 689 S.W.2d 893 (Tex.Crim.App.1985).

But neither *Braxton* nor *Mays* actually supports the equation. *Braxton*, for example, merely observes in passing that "[m]andamus will issue where there is but one proper order to be entered[,]" relying oddly enough on *Gray*. This proposition is very different, however, both as an historical matter and as applied in *Gray*, from the "clear legal right" formulation now gaining currency. Thus, in *Gray*, the Court describes a duty as ministerial if it is "clearly fixed and required by law[,] ... unequivocal, unconditional and present." Likewise, *Mays* only employs the language "clear legal right," citing *Wortham v. Walker*, 133 Tex. 255, 128 S.W.2d 1138 (1939), to demonstrate

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

U0655

884 S.W.2d 772                                                                 Page 7
884 S.W.2d 772, 22 Media L. Rep. 1705
(Cite as: 884 S.W.2d 772)

that legal disputes, as well as factual controversies, are not cognizable by the Court in an application for mandamus relief unless the action sought to be compelled is "manifestly ministerial ... as opposed to judicial or discretionary." 689 S.W.2d at 898 (internal quotation marks omitted). _Wortham,_ in turn, found the phrase in an old legal treatise and made use of it to argue that "[t]he office of mandamus is to execute, not to adjudicate." 128 S.W.2d at 1151.

Thus, until fairly recently, the case law would not support use of the phrase "clear legal right" in place of "ministerial duty" to describe the limits of a court's mandamus jurisdiction. Indeed, the phrase is still commonly used to identify an additional prerequisite to mandamus relief which imposes a standing-like requirement on the relator which is distinct from the requirement that respondent have a ministerial duty. _See, e.g., Collins v. Kegans,_ 802 S.W.2d 702, 704 n. 7 (Tex.Crim.App.1991). To the extent that analogous terminology was actually employed in earlier cases, it was plainly not to suggest that a duty should be considered ministerial whenever the relator would clearly have been entitled to prevail on the merits of his claim in an ordinary legal action. Rather, it has traditionally been available only to enforce nonjudicial, nondiscretionary compliance with strictly ministerial duties.

Nevertheless, two years ago in _Buntion v. Harmon,_ 827 S.W.2d 945 (Tex.Crim.App.1992), the Court held that mandamus will lie to force withdrawal of an order appointing new counsel to represent an indigent defendant on appeal. In the process, it purported to complete transformation of the second prerequisite to mandamus relief from a requirement that the respondent have a "ministerial duty" to perform a certain act into a requirement that the relator have a _"clear_ right to the relief sought." 827 S.W.2d at 947. In a footnote, the Court explains that a "discretionary function may become ministerial when the facts and circumstances dictate but one rational decision [.]" 827 S.W.2d at 948 n. 2. The Court then proceeds to hold that, while replacement of appointed counsel is ordinarily within discretion of a trial judge, "[t]here must be some principled reason, apparent from the record, to justify the trial judge's sua sponte replacement of appointed counsel [.]" 827 S.W.2d at 949. Because the judge did not give a "principled reason" in _Harmon,_ the Court held that relator had a clear right to set aside the removal order.

*779 Thus, _Harmon_ not only reaches a result inconsistent with _Gray_ in exactly the same way as _Stearnes_ and _Edwards_ do, but supports its rationale with an altogether new standard for determining the availability of mandamus relief. _See also Curry v. Wilson,_ 853 S.W.2d 40, 43 (Tex.Crim.App.1993); _Lanford v. Fourteenth Court of Appeals,_ 847 S.W.2d 581, 586 (Tex.Crim.App.1993). All of this has apparently happened, and continues to happen, without any serious debate of the issue, either in briefs of the parties or among the judges of this Court. Yet, it represents a profound shift of focus which, if pursued further, will ultimately supplant much of the existing appellate process and permit an appeal in cases which, by law, are not appealable.

It is a symptom of these changes that, in recent years, our mandamus jurisprudence has often focussed on the other prerequisite to mandamus relief, that is the inadequacy or unavailability of ordinary legal remedies to vindicate important interests of litigants in criminal cases. Most of this law has been written in context of mandamus applications from prosecuting authorities who may have no review of adverse trial-level rulings at all if not by writ of mandamus because the rulings about which they wish to complain are often not of a kind which they have a right to appeal. Accordingly, it has been established that the absence of a right to appeal from a judicial order is enough to meet the prerequisite to mandamus relief that there be no other adequate remedy. _E.g., State ex rel. Holmes v. Kleyenhagen,_ 819 S.W.2d 539, 541-42 (Tex.Crim.App.1991) (mandamus will lie to direct rescission of an order granting habeas corpus relief from an extradition warrant).

This proposition is, if anything, even more problematic than the "clear right to relief" rule because it implicates separation-of-powers issues. Plainly, it is the policy of our Legislature that the State not be permitted to appeal judicial rulings in criminal cases except under those circumstances expressly permitted by statute. _See_ Tex.Code Crim.Proc.Ann. art. 44.01 (West Supp.1993). If a statute does not allow the appeal of a ruling, then the exercise of our extraordinary writ jurisdiction to review it frustrates the evident design of our statute law, brazenly seizing from the legislative department ultimate authority to determine what is appealable. Such a practice is fundamentally at odds with our form of government.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00656

884 S.W.2d 772
884 S.W.2d 772, 22 Media L. Rep. 1705
(Cite as: 884 S.W.2d 772)

Page 8

Rather than circumvent the ordinary appellate process, we should instead insist that mandamus not lie merely to evaluate the correctness of court decisions which are not reviewable on appeal, no matter how plainly erroneous those ruling may seem. Since mandamus is not available to force a particular result in matters calling for the exercise of judgment or discretion anyway, the Court should not invoke absence of an appellate remedy to justify use of its original jurisdiction as a convenient vehicle for the judicial review of otherwise unappealable orders.

Although, in the instant cause, the Court pays lip service to these precepts, its behavior once again parts company with its principles. Acknowledging that "mandamus may not be used to give the State a right to appeal that was not granted by the Legislature," the Court then blinks reality in its next sentence by pretending that statutory limitations on the right to appeal pose "no impediment to the State's use of mandamus to correct judicial action *that is clearly contrary to wellsettled law*." Slip Op. at 3 (emphasis in original). Surely, no one is really expected to believe this. Even on direct appeal, this Court and the lower appellate courts may not reverse or reform the judgments or orders of trial courts unless those courts have acted contrary to existing law, probably not unless they have clearly done so. Yet, it is upon the basis of this distinction that we are expected to recognize a significant difference between mandamus proceedings and direct appeals. The expectation is really nothing but wishful thinking, for there is no difference in fact. Everyone knows that the judgment of a court should not be set aside by any method, including mandamus *and* direct appeal, unless there is error in it.

The writ of mandamus is supposed to be an extraordinary remedy, exercised only when the law imposes a clear ministerial duty upon a public official which cannot be *780 judicially enforced by any other means. Having a legal remedy does not mean winning on the merits. It means having access to the courts. Assuming that Respondent in the instant cause had refused to perform a ministerial duty of his office and that Relator was clearly entitled to the performance of that duty on his behalf or for his benefit, then mandamus would undoubtedly be available to compel its performance, assuming that no ordinary and adequate legal avenue for obtaining the same relief was available. But because Relator was given a

full and fair hearing of his position on the question of constitutional privilege by an impartial judge, and because that question was resolved by the exercise of judicial and discretionary authority, it follows not only that Relator's application in the instant cause fails to seek performance of a ministerial duty, but also that his legal remedy in the trial court was adequate, whether or not the judge's ruling might have been erroneous in fact. Because Relator was legally disentitled to appeal that ruling, the absence of an appellate remedy is no basis, standing alone, for extraordinary relief.

Our mandamus jurisprudence is greatly in need of coherent principles and consistent application. The present body of case law, written by this Court during the last ten years, inexplicably fails to meet this need, and the Court's opinion in this case only exacerbates the problem by encouraging invocation of its mandamus authority for the review of ordinary judicial errors. What we are left with is a system perilously close to full appellate supervision of lower court decision-making by means of mandamus and prohibition. The only pretext which still inhibits review of all such errors through the extraordinary writ process is the undefinable, and ultimately indefensible, notion that some decisions of the lower courts are more obviously wrong than others. I cannot join in such a cavalier dismantling of the appellate process.

CLINTON, MILLER and OVERSTREET, JJ., join BAIRD, Judge, concurring to the Denial of Motion for Rehearing.

Relator, Fort Bend County District Attorney, subpoenaed the real parties in interest, four television news reporters, and certain evidence in their possession, hereinafter "newsmen." The newsmen moved to quash the subpoenas contending the First Amendment and Tex. Const. art. 1, § 8 provide a qualified journalistic privilege. Respondent, a County Court at Law Judge in Fort Bend County, heard evidence on the motion and quashed the subpoenas. Relator sought mandamus from this Court setting aside respondent's order quashing the subpoenas. On original submission we conditionally granted the requested relief but withheld the issuance of the writ of mandamus to allow respondent an opportunity to conform his actions to our opinion. The newsmen now seek rehearing contending: 1) our failure to recognize a qualified reporter's privilege violated rights held by the newsmen under the First Amendment of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

884 S.W.2d 772                                                                Page 9
884 S.W.2d 772, 22 Media L. Rep. 1705
(Cite as: 884 S.W.2d 772)

the United States Constitution and art. 1, § 8 of the Texas Constitution; and, 2) mandamus may not lie because respondent's actions were discretionary and not in conflict with clear, binding precedent from this Court. Motion for Rehearing pg. 2. I believe our opinion on original submission adequately considered and addressed the constitutional issues raised by the newsmen and no further discussion is warranted here. However, I write separately to address the questions that have arisen concerning our mandamus authority.

## I.

Our authority to issue writs of mandamus is derived from Tex. Const. art. V., § 5 ("... the Court of Criminal Appeals and the Judges thereof shall have the power to issue the writ of habeas corpus, and, in criminal law matters, the writs of mandamus, procedendo, prohibition and certiorari.") and Tex.Code Crim.Proc.Ann. art. 4.04(1). To be entitled to mandamus relief, relator must demonstrate: 1) there is no other adequate remedy at law available; and, 2) the act sought to be compelled is a ministerial act. *Braxton v. Dunn,* 803 S.W.2d 318, 320 (Tex.Cr.App.1991); *State ex rel. Holmes v. Salinas,* 784 S.W.2d 421 (Tex.Cr.App.1990); and, *781Stearnes v. Clinton,* 780 S.W.2d 216 (Tex.Cr.App.1989).[FN1] Neither respondent nor the newsmen contend relator had an adequate remedy. Therefore, relator has satisfied the first requirement. However, whether respondent's actions were ministerial or discretionary is an issue which has not only divided the parties, but this Court as well.

> FN1. In several recent opinions our focus on whether the act was ministerial appeared to change slightly when we considered whether the relator held a "clear right" to the relief sought. However, this apparent change did not alter our traditional mandamus approach. As we held in *State ex rel. Sutton v. Bage,* 822 S.W.2d 55 (Tex.Cr.App.1992):
>
> > ... [W]e have repeatedly held that [mandamus] is available when the relator can establish two things: first, that under the relevant law and facts, he has a *clear right to the relief sought, i.e., the act he seeks to compel is "ministerial"....*
>
> *Id.,* 822 S.W.2d at 57.

## II.

In *Curry v. Gray,* 726 S.W.2d 125 (Tex.Cr.App.1987), Judge Gray granted a motion to dismiss a capital murder prosecution after finding the prosecution was barred by the prohibitions against double jeopardy. Relator sought a writ of mandamus to set aside Judge Gray's order. *Id.,* 726 S.W.2d at 126-127. We denied the application holding Judge Gray's order was a discretionary act and not ministerial:

> Deciding *how* to rule after considering a motion to dismiss, however, is not a ministerial act ... Although the court may be compelled to consider a motion, mandamus or prohibition is not available to require that the judge rule a certain way on that motion.

*Id.,* 726 S.W.2d at 128.

In the instant case, Judge Meyers and the newsmen believe that the instant order quashing the subpoenas is the equivalent of Judge Gray's dismissal order. Thus, they believe our opinion on original submission constituted a departure from *Gray,* and that we have deleted the requirement that the acts sought to be compelled be ministerial. According to the newsmen, mandamus will now lie to correct any legal error committed by a trial judge. *See,* Motion for Rehearing pp. 4-5. I disagree.

In *Gray,* we acknowledged that the trial judge:

> ... had to consider the sufficiency of the motion, the facts supporting the motion, and decide whether the law applied to those facts. The particular ruling made on the motion was clearly a discretionary/judicial act, and *not an act compelled by law.*[FN2]
>
> > FN2. All emphasis is supplied unless otherwise indicated.

*Id.,* 726 S.W.2d at 128. Thus, Judge Gray was required to determine the applicable facts, research and determine the applicable law, and apply that law to the facts. Such an act is clearly discretionary.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00658

884 S.W.2d 772                                                                          Page 10
884 S.W.2d 772, 22 Media L. Rep. 1705
(Cite as: 884 S.W.2d 772)

### III.

While *Gray* recognized a trial judge's limited right to be wrong in his discretionary judgment, *Id., 726 S.W.2d at 128,* *Gray* is inapplicable to the instant case. An act which is theoretically discretionary "may nonetheless be 'ministerial' in *application* if the facts and circumstances of a given case lead to but one rational course of action." *Buntion v. Harmon, 827 S.W.2d 945, 947 n. 2 (Tex.Cr.App.1992)* (emphasis in original). A trial judge has the discretion to determine facts at issue and the law which governs those facts, but a trial judge has no discretion to ignore the Texas Rules of Evidence or controlling precedent from this Court. When a trial judge is presented with an issue where there is no factual dispute, and clear, binding and unequivocal precedent compels resolution of the issue in only one manner, the trial judge has a ministerial duty to resolve that issue in that manner; the trial judge's actions are compelled by law. *Perkins v. Court of Appeals, 738 S.W.2d 276, 284 (Tex.Cr.App.1987)* ("We agree with the court of appeals that 'A trial court may be directed by mandamus to enter a particular judgment if it is the only proper judgment that can be rendered in the circumstances ...' "). As we stated in *Texas Dept. of Corrections, Etc. v. Dalehite, 623 S.W.2d 420 (Tex.Cr.App.1981):*

... An act is said to be ministerial where the law clearly spells out the duty to be performed ... and does so with such certainty that nothing is left to the exercise of discretion or judgment.

*Id., 623 S.W.2d at 424* (citing *Forbes v. City of Houston, 356 S.W.2d 709 (Tex.Civ.App.1962).*

*782 In the instant case, the facts underlying the issue presented to the trial judge were not disputed. Further, resolution of the issue presented, whether the news reporters held a qualified journalistic privilege under either the First Amendment or Tex. Const. art. 1, § 8, required no judicial or legal reasoning. Tex.R.Crim.Evid. 501 provided:

Except as otherwise provided by these rules or by Constitution, statute, or court rule prescribed pursuant to statutory authority, no person has a privilege to:

(1) Refuse to be a witness; or

(2) Refuse to disclose any matter; or

(3) Refuse to produce any object or writing; or

(4) Prevent another from being a witness or disclosing any matter or producing any object or writing.

As we stated on original submission, no constitutional provision, statute or court rule provided the newsmen with a "privilege, qualified or otherwise, to withhold evidence relevant to a pending criminal prosecution." *State ex rel. Healey v. McMeans, 884 S.W.2d 772, 775 (Tex.Cr.App.1994); and, Tex.Code Crim.Proc.Ann. Chapter 5.* Indeed, in *Ex parte Grothe, 687 S.W.2d 736 (Tex.Cr.App.1984),* we considered the relationship between the "free press in our society" and the society's interest in the production of all relevant evidence at a criminal trial. *Id., 687 S.W.2d at 739.* Nevertheless, we rejected the journalistic privilege, finding "[t]he need to develop all facts in an adversarial system of criminal justice is fundamental and comprehensive." *Id., 687 S.W.2d at 739.* Therefore, respondent was presented with clear, binding and unequivocal precedent which compelled rejection of the journalistic privilege claimed by the newsmen; respondent had no discretion to consider and create such a privilege.

For these reasons, I join in the denial of the motion for rehearing.

Tex.Crim.App.,1994.
State ex rel. Healey v. McMeans
884 S.W.2d 772, 22 Media L. Rep. 1705

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00660

*St. Peter Herald v. St. Peter*

*Texas v. Lyon*

nd economically outside the the general public. Such a non-... ation is frightening. The [sic] ...ontending that govern- ...-ups save the city time and is is undoubtedly true. Gov- ...over-ups also save the city's from embarrassment and ac- ...ty. It seems fundamental that a ...ve democracy cannot function ...informed constituency. Con- he constituency of this truism is task. When the public actively ...nation about its government's ...then, every effort should be ...commodate this interest. Ar- a... the public will eventually dis- ...ttlement or active litigation does ...ately address the issue. A ...in wait several years before ...bringing suit and settlements on if claim could occur years after ...wrongdoing. Little or no ac- ...is left for the responsible ...officials or departments at ...time.

...ity also urges that the public has ...to inject extraneous issues ...suit, clouding the actual dis- ...the municipality believes a par- ...lawsuit is being muddied by irrel- ...tangential issues, the ...ly certainly has the opportuni- ...in the public of this belief. It ...qually likely, however, that the ...will more readily recognize the ...r..." projected by the lawsuit, ...st for the trees, and the ...am... to be extraneous and irrel- ...the municipality will actually be ...important policy considerations ...uld like to avoid. It is only by ...ind addressing the inadequa- ...inequities within a governmen- ...that a governmental entity will ...of the people, by the people, ...he people." The City of St. ...ould rather sweep the dispute at ...der the rug and hope that any ...es this dispute might involve ...away. I find this extremely

...majority seems to agree that the rationalizations behind shielding ...of claim from public scrutiny ...tenuous. Yet the majority also ...such policy determinations are ...legislature. It appears, however, ...ajority has nonetheless taken it ...nselves to edit the confusing ...etained in anticipation of a ...civil legal action" to make the

phrase intelligible. The majority has basically ignored the word "pending" and allowed the statute to protect all data "retained in anticipation of a civil legal action." Rewriting poorly crafted statutory language seems to be as much a function of the legislature as analyzing the likely policy ramifications of a statute.

Additionally, the in camera review by the trial court should not be considered an effective judicial check on the clearly overbroad discretion granted to the city attorney to determine whether a civil legal action is pending. In order for such a review to be meaningful, the court would have to allow counsel for the parties to participate and present arguments outlining how the language used in the specific document either does or does not "threaten litigation." This is not a situation wherein the trial court is merely analyzing proffered evidence to determine its admissibility in a trial. Rather, the document being analyzed is the actual subject of the dispute.

The public has a right to know when a citizen has alleged its government has committed a legal wrong. The newspapers should be allowed to see the notice of claim letter as Minn. Stat. §13.39 was not meant to protect such a document.

# TEXAS v. LYON

### Texas Criminal District Court Dallas County

STATE OF TEXAS v. RICHARD LYON, No. F-9141619, December 13, 1991

#### NEWSGATHERING

Forced disclosure of information— Disclosure of unpublished information—In criminal actions (§60.1005)

Reporters have qualified First Amendment privilege not to disclose unpublished notes and other resource materials subpoenaed in criminal action; state's failure to show that notes taken by reporters at press conference held by murder defendant and his attorney are necessary or critical to maintenance of

prosecution, or to show compelling need for disclosure of such information, warrants quashing of subpoena.

———

Reporters file motions to quash subpoenas entered in criminal prosecution. Motions granted.

Robert P. Latham, of Jackson & Walker, Dallas, Texas, for reporters.

*Full Text of Opinion*

Creuzot J.:

The Court has been presented with the motions to quash two subpoenas, one served on KDFW-TV, Inc. and Jim Reed of KDFW, as records custodian, and a second served on Lori Montgomery, a reporter employed by the *Dallas Times Herald*, a daily newspaper, (hereinafter "Petitioners") by the State of Texas. The Court has conducted a hearing on said motions and for reasons hereinafter enumerated finds that the motions to quash should be in all things *GRANTED*.

On or about March 22, 1991, Defendant Richard Lyon and his attorney Dan Guthrie held a press conference to comment on stories that the police had identified Richard Lyon as the prime suspect in the death of his wife. Various members of the media attended the press conference. The Times Herald Printing Company, publisher of *Dallas Times Herald* ("Times Herald") assigned reporter Lori Montgomery to attend the press conference and prepare reports on the proceedings for possible publication. Likewise, KDFW, Inc., the operator of a television station in Dallas, assigned a camera crew and a reporter to cover the press conference. Approximately six days prior to the trial of Richard Lyon for the murder of his wife, the government served a subpoena duces tecum upon Lori Montgomery and upon KDFW-TV seeking unpublished information regarding the March 22, 1991 press conference.[1] Petitioners assert a qualified

———

[1] The subpoena served upon KDFW T.V. requested "any and all videos of the press conference held by Richard Lyon and Dan Guthrie on March 22, 1991." The subpoena served upon Lori Montgomery of the Times Herald requested "any and all reports, tapes, accounts, notes and documents of any nature pertaining to Richard A. Lyon." Published or broadcast accounts of the press conference were not in issue.

19 Med. L. Rptr. 2154

*Texas v. Lyon*

privilege under the First Amendment to the United States Constitution and Article 1 Section 8 of the Texas Constitution which, they argue, requires the subpoenas to be quashed.

The prosecuting attorney who caused the subpoenas to be served upon Petitioners indicated to Petitioners' counsel and the Court that the government was seeking notes, outtakes or tapes from the March 22, 1991 press conference. The State contends that notes, outtakes or tapes which Petitioners might have of the press conference would be relevant to the issues of disqualification of defense counsel and impeachment of Defendant or Defendant's attorney regarding statements Defendant's attorney made at the press conference. Accordingly, the Court is presented with a conflict between the First Amendment privileges of the press and the ability of counsel in a criminal proceeding to discover information relating to a criminal investigation.

The questions of when to allow a qualified privilege protecting reporters and what showing is necessary to overcome it is well established in our state law. Article 1 §8 of the Texas Constitution provides that ". . . no law shall ever be passed curtailing the liberty of speech or of the press." The courts interpret this to mean that once the qualified privilege is asserted, the party seeking disclosure of the outtakes, investigative materials, and notes must demonstrate that there is a compelling and overriding need for the information. Specifically, when a member of the press is subpoenaed in a case when the press is not a party, there is a qualified privilege which shifts the burden to the party seeking the information to establish that 1) the reporter has information *highly* relevant to a claim or defense in the underlying litigation; 2) there is a compelling need for disclosure sufficient to override the First Amendment privilege; and 3) the information is unavailable from any other sources less chilling of First Amendment freedoms. *Channel Two Television Co. v. Dickerson*, 725 S.W.2d 470 [13 Med.L.Rptr. 2133] (Tex. App.—Houston [1st Dist] 1987 no writ) (citing *United States v. Burke*, 700 F.2d 70, 76–77 [9 Med.L.Rptr. 1211] (2d Cir. 1983), cert. den'd. 464 U.S. 816, 104 S.Ct. 72, 78 L. Ed. 2d 85 (1983). The latter element requires, in most instances, a showing that the party seeking the information has unsuccessfully attempted to obtain the information from the other sources.

The State asserts that the Petitioners have no qualified privilege to withhold documents, outtakes, notes or testimony at a criminal trial, or, alternatively, that the state has shown the necessity for the information and has thereby, overcome the qualified privilege.

The gathering of news, as well as its reporting, is an activity protected by the First Amendment to the United States Constitution. *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed. 2d 626 [1 Med.L.Rptr. 2617] (1972). The protection afforded is not altered by the fact that the case pending is criminal rather than civil. *Channel Two Television Co. v. Dickerson*, 725 S.W.2d 470, 472 (Tex. App.—Houston [1st Dist] 1987) no writ; relying on *New York Times v. Sullivan*, 376 U.S. 254, 265, 84 S.Ct. 710, 718 [1 Med.L.Rptr. 1527] (1964). The job of the media is to gather as much information as it possibly can with respect to all facets of activity of interest and importance to readers. If it does its job well, it logically will be the repository of much information concerning controversial or highly publicized events which take place in the area which it serves. As recognized by the court in *United States v. Cuthbertson* (5th Cir. 1980) 630 F.2d 139 [6 Med.L.Rptr. 1933], the interests of the press that form the foundation of the qualified privilege are not diminished because the nature of the underlying proceeding out of which the request for the information arises is a criminal trial. *Id.* at 147. The court in *Cuthbertson* ruled that the privilege extends not only to the protection of confidential sources, but also to unpublished notes or other resource material held by the press which is the subject of the subpoena duces tecum in this case. *Id.*

The State next suggests that it needs to see the investigative material or work product first before a showing can be made sufficient to overcome the first part of the test outlined above. That procedure however, is not contemplated by the privilege. If the State's contention in this regard were the law, it would surely swallow up the rule because the press would constantly be called upon to divulge the very information they have a privilege to protect. The State has, therefore, failed to sustain its burden of prov-

*Texas v. Lyon*

he information from

rts that the Petitioners
d privilege to withhold
notes or testimony
or, alternatively, that
wn the necessity for the
has thereby, overcome
e.

news, as well as its
ctivity protected by the
t to the United States
*burg v. Hayes,* 408
46, 33 L.Ed. 2d 626
7] (1972). The pro-
not altered by the fact
g is criminal rather
*Two Television Co. v.*
2d 470, 472 (Tex
1st Dist] 1987) no writ;
*Times v. Sullivan,* 376
t. 710, 718 [1
4). The job of
ther as much informa-
can with respect to all
interest and impor-
does its job well, it
the repository of much
rning controversial or
nts which take place
erves. As recognized
*States v. Cuthbertson*
630 F.2d 139 [6
3], the interests of the
foundation of the
e not diminished be-
or the underlying pro-
ich the request for the
a criminal trial. *Id.*
n *Cuthbertson* ruled
ends not only to the
ifidential sources, but
ed notes or other re-
by the press which
subpoena duces te-
*Id.*

suggests that it needs to
material or work
a showing can be
overcome the first part
d above. That proce-
ontemplated by the
s contention in this
y, it would surely
ul cause the press
b led upon to di-
f nation they have a
t he State has, there-
ain its burden of prov-

---

*Bedingfield v. The Birmingham News Co.*                    19 Med. L. Rptr.   2155

ing by substantial evidence the first prong of the test.

Next, the State has failed to demonstrate that the notes, tape recordings, outtakes or testimony are necessary or critical to the maintenance of its prosecution of Defendant Lyon. The United States Supreme Court has held that information that the press obtains by its investigations is protected. *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L. Ed. 2d 626 (1972). Since *Branzburg,* other courts have discussed more fully the chilling affect that discovery of the journalistic process would have on the uncovering of news. *See Larouche v. National Broadcasting Co.,* 780 F.2d 1134, 1139, [12 Med.L.Rptr. 1585] (4th Cir. 1986) cert den'd. 492 U.S. 818, 107 S.Ct. 79, 93 L. Ed. 2d 34 (1986).; *United States v. Cuthbertson,* 630 F.2d 139, 147 (3rd Cir. 1980) cert den'd. 454 U.S. 1056 102 S.Ct. 604, 70 L. Ed. 2d 594 (1981).

The State's asserted need for the information from Petitioners is based on speculation and a series of contingencies unrelated to the main claim. The State's rationale is that the Defendant's attorney during the press conference identified three potential suspects other than the Defendant, thereby making himself a potential witness, and if the Defendant seeks to call his attorney as a witness to reveal those suspects, then the States could also call Defendant's attorney as a witness and thus, seek his disqualification; if the Defendant testifies the State will seek to question the Defendant concerning the identity of those three potential suspects.

In applying the second prong of the three prong test to determine whether the qualified privilege was overcome by the State, the Court finds that the need for this evidence bears at most a remote, tenuous and speculative relationship to the actual merits of the State's case against Defendant. The Court notes that the three part test outlined above is most often utilized to balance a reporter's privileges with the State's or the accused's rights to information regarding criminal conduct. Here, the reporters were not witnesses to criminal conduct and the information they possess, if any, is far removed from the criminal conduct at issue. The State has not presented the Court with any authority indicating that a reporter's qualified privilege can be overcome by a need for information that

---

might possibly be relevant to a motion to disqualify an attorney or might be relevant to impeach Defendant by using statements of his attorney. Therefore, the State has failed to satisfy the second part of the test.

The third-prong need not be addressed as counsel for the State in his argument before the Court indicated that there were numerous other individuals present at the March 22 press conference and that some of those persons could or would be called as witnesses.

The likelihood or even possibility of court ordered disclosure of investigative material in a civil or a criminal case diminishes the flow of news by encouraging self censorship by newsgatherers. To make the press, in effect, the investigative arm of every civil or criminal litigant throughout the State of Texas inevitably will constrict the flow of information to the press, and ultimately to us all.

The Motions to Quash are in all things GRANTED.

IT IS SO ORDERED.

---

## BEDINGFIELD v. THE BIRMINGHAM NEWS CO.

### Alabama Supreme Court

HOYT BEDINGFIELD v. THE BIRMINGHAM NEWS CO., No. 1901321, February 28, 1992

**NEWSGATHERING**

Access to records—In general (§38.01)

Statutory right of access—State open records acts (§44.17)

Internal audit report of Alabama city council offices is "public writing" subject to Alabama public records statute, Ala. Code 36-12-40, and is not exempt from disclosure.

---

Action by newspaper seeking disclosure of audit reports. From decision of

**26**

00664

**Westlaw.**

18 S.Ct. 620
170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061
**(Cite as: 170 U.S. 343, 18 S.Ct. 620)**

Page 1

Supreme Court of the United States
THOMPSON
v.
STATE OF UTAH.
No. 553.

April 25, 1898.

In Error to the Supreme Court of the State of Utah.

West Headnotes

**Jury 230 ☞2**

230 Jury
  230I Nature and Constitution of Juries
    230k2 k. Constitutional and Statutory Provisions. Most Cited Cases
It was not competent for state of Utah, on its admission into Union, to provide that persons charged with a felony while a territory should be tried otherwise than by a jury such as is provided for by federal constitution, and provisions of state constitution for trial of criminal cases not capital, by jury composed of 8 persons, is void as applied to such cases.

**Jury 230 ☞4**

230 Jury
  230I Nature and Constitution of Juries
    230k4 k. Number of Jurors. Most Cited Cases
The jury referred to in the federal constitution and in the sixth amendment thereto, which guaranty a jury trial in criminal prosecutions, is a jury constituted of 12 jurors, as at common law.

**Territories 375 ☞8**

375 Territories
  375k8 k. Application of Constitution and Laws of United States to Territory Acquired. Most Cited Cases

The provisions of the federal constitution relating to trials by jury for crimes and to criminal prosecutions apply to the territories of the United States.

**Jury 230 ☞2**

230 Jury
  230I Nature and Constitution of Juries
    230k2 k. Constitutional and Statutory Provisions. Most Cited Cases
  (Formerly 92k199)

**Constitutional Law 92 ☞2810**

92 Constitutional Law
  92XXIII Ex Post Facto Prohibitions
    92XXIII(B) Particular Issues and Applications
      92k2809 Criminal Proceedings
        92k2810 k. In General. Most Cited
  (Formerly 92k199)
It was not competent for the state of Utah, on its admission into the Union, to provide that persons charged with the commission of felony within its limits while a territory should be tried otherwise than by a jury such as is provided for by the constitution of the United States, and provisions of the state constitution for the trial, in courts of general jurisdiction, of criminal cases not capital, by a jury composed of 8 persons, is, in its application to such cases, ex post facto legislation, and void.
**\*\*620 \*344** J. W. N. Whitecotton, for plaintiff in error.

L. T. Michener, for defendant in error.

Mr. Justice HARLAN delivered the opinion of the court.

By an indictment returned in the district court of the Second judicial district of the territory of Utah at its May term, 1895,-that being a court of general

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00665

18 S.Ct. 620
170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061
(Cite as: 170 U.S. 343, 18 S.Ct. 620)

Page 2

jurisdiction,-the plaintiff in error and one Jack Moore were charged with the crime of grand larceny, alleged to have been committed March 2, 1895, in Wayne county, of that territory, by unlawfully and feloniously stealing, taking, and driving a way one calf, the property of Heber Wilson.

The case was first tried when Utah was a territory, and by a jury composed of twelve persons. Both of the defendants were found guilty as charged, and were recommended to the mercy of the court. A new trial having been granted, the case was removed for trial to another county. But it was not again tried until after the admission of Utah into the Union as a state.

At the second trial the defendant was found guilty. He moved for a new trial upon the ground, among others, that the jury that tried him was composed of only eight jurors; whereas by the law in force at the time of the commission of the alleged offense a lawful jury in his case could not be composed of less than twelve jurors. The application for a new trial having been overruled, and the accused having been called for sentence, he renewed his objection to the composition of the jury, and moved by counsel that the verdict be set aside, and another trial ordered.

This objection was overruled, the accused duly excepting to the action of the court. He was then sentenced to the state prison for the term of three years. The judgment of conviction was affirmed by the supreme court of Utah, the court *345 holding that the trial of the accused by a jury composed of eight persons was consistent with the constitution of the United States. 50 Pac. 409.

By the statutes of the territory of Utah in force at the time of the commission of the alleged offense it was provided that a trial jury in a district court should consist of twelve, and in a justice's court of six, persons, unless the parties to the action or proceeding, in other than criminal cases, agreed upon a less number; that a felony was a crime punishable with death or by imprisonment in the penitentiary,

every other crime being a misdemeanor; that the stealing of a calf was grand larceny, and punishable by confinement in the penitentiary for not less than one nor more than ten years; that no person should be convicted of a public offense unless by the verdict of a jury, accepted and recorded by the court, or upon a plea of guilty, or upon judgment against him upon a demurrer, or upon the judgment of a court, a jury having been waived in a criminal action not amounting to a felony; and that issues of fact should be tried by jury, unless a trial in that mode was waived in criminal cases not amounting to a felony by the consent of both parties expressed in open court and entered in its minutes. 2 Comp. Laws Utah 1888, §§ 3065, 4380, 4643, 4644, 4790, 4997.

**621 By the constitution of the state of Utah it is provided: 'In capital cases the right of trial by jury shall remain inviolate. In courts of general jurisdiction, except in capital cases, a jury shall consist of eight jurors. In courts of inferior jurisdiction a jury shall consist of four jurors. In criminal cases the verdict shall be unanimous.'Const. art. 1, § 10. Also: 'All criminal prosecutions and penal actions which may have arisen or which may arise before the change from a territorial to a state government, and which shall then be pending, shall be prosecuted to judgment and execution in the name of the state and in the court having jurisdiction thereof. All offenses committed against the laws of the territory of Utah before the change from a territorial to a state government, and which shall not have been prosecuted before such change, may be prosecuted in the name and by the authority of the state *346 of Utah with like effect, as though such change had not taken place, and all penalties incurred shall remain the same as if this constitution had not been adopted.'Id. art. 24, § 6.

As the offense of which the plaintiff in error was convicted was a felony, and as, by the law in force when the crime was committed, he could not have been tried by a jury of less number than twelve jurors, the question is presented whether the provision

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00666

18 S.Ct. 620
170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061
(Cite as: 170 U.S. 343, 18 S.Ct. 620)

Page 3

in the constitution of Utah, providing for a jury of eight persons in courts of general jurisdiction, except in capital cases, can be made applicable to a felony committed within the limits of the state while it was a territory, without bringing that provision into conflict with the clause of the constitution of the United States prohibiting the passage by any state of an ex post facto law.

The constitution of the United States provides: 'The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed; but when not committed within any state, the trial shall be at such place or places as the congress may by law have directed.'Const. U. S. art. 3, § 2. And by the sixth amendment of the constitution it is declared: 'In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.'

That the provisions of the constitution of the United. States relating to the right of trial by jury in suits at common law apply to the territories of the United States is no longer an open question. Webster v. Reid, 11 How. 437, 460; Publishing Co. v. Fisher, 166 U. S. 464, 468, 17 Sup. Ct. 618; Springville City v. Thomas, 166 U. S. 707, 17 Sup. Ct. 717. In the last-named case it was claimed that the territorial legislature of Utah was empowered by the organic act of the territory of September 9, 1850 (9 Stat. 453, c. 51, § 6), to provide that unanimity*347 of action on the part of jurors in civil cases was not necessary to a valid verdict. This court said: 'In our opinion, the seventh amendment secured unanimity in finding a verdict as an essential feature of trial by jury in common-law cases, and the act of congress could not impart the power to change the con-

stitutional rule, and could not be treated as attempting to do so.'

It is equally beyond question that the provisions of the national constitution relating to trials by jury for crimes and to criminal prosecutions apply to the territories of the United States.

The judgment of this court in Reynolds v. U. S., 98 U. S. 145, 154,-which was a criminal prosecution in the territory of Utah,-assumed that the sixth amendment applied to criminal prosecutions in that territory.

In Callan v. Wilson, 127 U. S. 540, 548, 551, 8 Sup. Ct. 1301, which was a criminal prosecution by information in the police court of the District of Columbia, the accused claimed that the right of trial by jury was secured to him by the third article of the constitution as well as by the fifth and sixth amendments. The contention of the government was that the constitution did not secure the right of trial by jury to the people of the District of Columbia; that the original provision, that when a crime was not committed within any state 'the trial shall be at such place or places as the congress may by law have directed,' had, probably, reference only to offenses committed on the high seas; that in adopting the sixth amendment the people of the states were solicitous about trial by jury in the states, and nowhere else, leaving it entirely to congress to declare in what way persons should be tried who might be accused of crime on the high seas and in the District of Columbia and in places to be thereafter ceded for the purposes, respectively, of a seat of government, forts, magazines, arsenals, and dock yards; and, consequently, that that amendment should be deemed to have superseded so much of the third article of the constitution as related to the trial of crimes by jury. That contention was overruled, this court saying: 'As the guaranty of a trial by jury, in the third article, implied *348 a trial in that mode, and according to the settled rules of the common law, the enumeration, in the sixth amendment, of the rights of the accused in criminal prosecutions, is to be taken as a declaration of what

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00667

18 S.Ct. 620                                                    Page 4
170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061
(Cite as: 170 U.S. 343, 18 S.Ct. 620)

those rules were, and is to be referred to the anxiety of the people of the states to have in the supreme law of the land, and so far as the agencies of the general government were concerned, a full and distinct recognition of those rules, as involving the fundamental rights of **622 life, liberty, and property. This recognition was demanded and secured for the benefit of all the people of the United States, as well those permanently or temporarily residing in the District of Columbia as those residing or being in the several states. There is nothing in the history of the constitution or of the original amendments to justify the assertion that the people of this District may be lawfully deprived of the benefit of any of the constitutional guaranties of life, liberty, and property; especially of the privilege of trial by jury in criminal cases.'"We cannot think,' the court further said, 'that the people of this District have, in that regard, less rights than those accorded to the people of the territories of the United States.'

In Late Corporation of Church of Jesus Christ of Latter-Day Saints v. U. S., 136 U. S. 1, 44, 10 Sup. Ct. 792, one of the questions considered was the extent of the authority which the United States might exercise over the territories and their inhabitants. In the opinion of Mr. Justice Bradley reference was made to previous decisions of this court, in one of which- National Bank v. County of Yankton, 101 U. S. 129, 133-it was said that congress, in virtue of the sovereignty of the United States, could not only abrogate the laws of the territorial legislatures, but may itself legislate directly for the local government; that it could make a void act of the territorial legislature valid, and a valid act vold; that it had full and complete legislative authority over the people of the territories and all the departments of the territorial governments; that it 'may do for the territories what the people, under the constitution of the United States, may do for the states.'Reference was also made to Murphy v. Ramsey, 114 U. S. 15, 44, 5 Sup. Ct. 747, in which it was said: 'The people of the United States, *349 as sovereign owners of the national territories, have supreme power over them and their inhabitants. In the exercise of

this sovereign dominion they are represented by the government of the United States, to whom all the powers of government over that subject have been delegated, subject only to such restrictions as are expressed in the constitution, or are necessarily implied in its terms.'The opinion of the court in Late Corporation of Church of Jesus Christ of Latter-Day Saints v. U. S. then proceeded: 'Doubtless congress, in legislating for the territories, would be subject to those fundamental limitations in favor of personal rights which are formulated in the constitution and its amendments; but these limitations would exist rather by inference and the general spirit of the constitution, from which congress derives all its powers, than by any express and direct application of its provisions. The supreme power of congress over the territories and over the acts of the territorial legislatures established therein is generally expressly reserved in the organic acts establishing governments in said territories. This is true of the territory of Utah. In the sixth section of the act establishing a territorial government in Utah, approved September 9, 1850, it is declared 'that the legislative powers of said territory shall extend to all rightful subjects of legislation, consistent with the constitution of the United States and the provisions of this act. * * * All the laws passed by the legislative assembly and governor shall be submitted to the congress of the United States, and if disapproved shall be null and of no effect.'9 Stat. 454.'

Assuming, then, that the provisions of the constitution relating to trials for crimes and to criminal prosecutions apply to the territories of the United States, the next inquiry is whether the jury referred to in the original constitution and in the sixth amendment is a jury constituted, as it was at common law, of twelve persons, neither more nor less. 2 Hale, P. C. 161; 1 Chit. Cr. Law, 505. This question must be answered in the affirmative. When Magna Charta declared that no freeman should be deprived of life, etc., 'but by the judgment of his peers or by the law of the land,' it referred to a trial by twelve jurors. Those who emigrated to this *350 country from England brought with them this great

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00668

18 S.Ct. 620                                                                                    Page 5
170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061
(Cite as: 170 U.S. 343, 18 S.Ct. 620)

privilege 'as their birthright and inheritance, as a part of that admirable common law which had fenced around and interposed barriers on every side against the approaches of arbitrary power.'2 Story, Const. § 1779. In Bac. Abr. tit. 'Juries,' it is said: 'The trial per pais, or by a jury of one's country, is justly esteemed one of the principal excellencies of our constitution; for what greater security can any person have in his life, liberty, or estate than to be sure of the being devested of nor injured in any of these without the sense and verdict of twelve honest and impartial men of his neighborhood? And hence we find the common law herein confirmed by Magna Charta.'So, in 1 Hale, P. C. 33: 'The law of England hath afforded the best method of trial that is possible of this and all other matters of fact, namely, by a jury of twelve men all concurring in the same judgment, by the testimony of witnesses viva voce in the presence of the judge and jury, and by the inspection and direction of the judge.'It must consequently be taken that the word 'jury' and the words 'trial by jury' were placed in the constitution of the United States with reference to the meaning affixed to them in the law as it was in this country and in England at the time of the adoption of that instrument; and that when Thompson committed the offense of grand larceny in the territory of Utah-which was under the complete jurisdiction of the United States for all purposes of government and legislation-the supreme law of the land required that he should be tried by a jury composed of not less than twelve persons. And such was the requirement of the statutes of Utah while it was a territory.

Was it, then, competent for the state of Utah, upon its admission into the Union, to do, in respect of Thompson's crime, what the United States could not have done while Utah **623 was a territory, namely, to provide for his trial by a jury of eight persons?

We are of opinion that the state did not acquire, upon its admission into the Union, the power to provide, in respect of felonies committed within its limits while it was a territory, *351 that they should be tried otherwise than by a jury such as is provided by the constitution of the United States. When Thompson's crime was committed, it was his constitutional right to demand that his liberty should not be taken from him except by the joint action of the court and the unanimous verdict of a jury of twelve persons. To hold that a state could deprive him of his liberty by the concurrent action of a court and eight jurors would recognize the power of the state not only to do what the United States, in respect of Thompson's crime, could not, at any time, have done by legislation, but to take from the accused a substantial right belonging to him when the offense was committed.

It is not necessary to review the numberous cases in which the courts have determined whether particular statutes come within the constitutional prohibition of ex post facto laws. It is suflicient now to say that a statute belongs to that class which by its necessary operation and 'in its relation to the offense, or its consequences, alters the situation of the accused to his disadvantage.' U. S. v. Hall, 2 Wash. C. C. 366, Fed. Cas. No. 15,285; Kring v. Missouri, 107 U. S. 221, 228, 2 Sup. Ct. 443; In re Medley, 134 U. S. 160, 171, 10 Sup. Ct. 384. Of course, a statute is not of that class unless it materially impairs the right of the accused to have the question of his guilt determined according to the law as it was when the offense was committed. And therefore it is well settled that the accused is not entitled of right to be tried in the exact mode, in all respects, that may be prescribed for the trial of criminal cases at the time of the commission of the offense charged against him. Cooley, in his Treatise on Constitutional Limitations, after referring to some of the adjudged cases relating to expost facto laws, says: 'But, so far as mere modes of procedure are concerned, a party has no more right, in a criminal than in a civil action, to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place. Remedies must always be under the control of the legislature, and it would create endless confusion in legal proceedings if every case was to be

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00669

18 S.Ct. 620
170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061
(Cite as: 170 U.S. 343, 18 S.Ct. 620)

Page 6

conducted only in accordance with the rules of practice and heard only by the courts in existence*352 when its facts arose. The legislature may abolish courts and create new ones, and it may prescribe altogether different modes of procedure in its discretion, though it cannot lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime.'Chapter 9, *272. And this view was substantially approved by this court in Kring v. Missouri, above cited. So, in Hopt v. Utah, 110 U. S. 574, 590, 4 Sup. Ct. 202, it was said that no one had a vested right in mere modes of procedure, and that it was for the state, upon grounds of public policy, to regulate procedure at its pleasure. This court, in Duncan v. Missouri, 152, U. S. 378, 382, 14 Sup. Ct. 570, said that statutes regulating procedure, if they leave untouched all the substantial protections with which existing law surrounds the person accused of crime, are not within the constitutional inhibition of ex post facto laws. But it was held in Hopt v. Utah, above cited, that a statute that takes from the accused a substantial right given to him by the law in force at the time to which his guilt relates would be ex post facto in its nature and operation, and that legislation of that kind cannot be sustained simply because, in a general sense, it may be said to regulate procedure. The difficulty is not so much as to the soundness of the general rule that an accused has no vested right in particular modes of procedure as in determining whether particular statutes by their operation take from an accused any right that was regarded, at the time of the adoption of the constitution, as vital for the protection of life and liberty, and which he enjoyed at the time of the commission of the offense charged against him.

Now, Thompson's crime, when committed, was punishable by the territory of Utah proceeding in all its legislation under the sanction of and in subordination to the authority of the United States. The court below substituted, as a basis of judgment and sentence to imprisonment in the penitentiary, the unanimous verdict of eight jurors in place of a un-

animous verdict of twelve. It cannot therefore, be said that the constitution of Utah, when applied to Thompson's case, did not deprive him of a substantial right involved in his liberty, and *353 did not materially alter the situation to his disadvantage. If, in respect to felonies committed in Utah while it was a territory, it was competent for the state to prescribe a jury of eight persons, it could just as well have prescribed a jury of four or two, and, perhaps, have dispensed altogether with a jury, and provided for a trial before a single judge.

The supreme court of Utah held that this case came within the principles announced by it in State v. Bates, 14 Utah, 293, 301, 47 Pac. 78. In the latter case no reference was made to the ex post facto clause of the constitution of the United States. But it was held that the requirement of eight jurors in courts of general jurisdiction, except in capital cases, was not in conflict with the sixth amendment of the constitution of the United States,-the court saying that, 'if a jury of eight men is as likely to ascertain the truth as twelve, that number secures the end,' and that 'there can be no magic in the number twelve, though hallowed by time.'But the **624 wise men who framed the constitution of the United States and the people who approved it were of opinion that life and liberty, when involved in criminal prosecutions, would not be adequately secured except through the unanimous verdict of twelve jurors. It was not for the state, in respect of a crime committed within its limits while it was a territory, to dispense with that guaranty simply because its people had reached the conclusion that the truth could be as well ascertained, and the liberty of an accused be as well guarded, by eight as by twelve jurors in a criminal case.

It is said that the accused did not object, until after verdict, to a trial jury composed of eight persons, and therefore he should not be heard to say that his trial by such a jury was in violation of his constitutional rights. It is sufficient to say that it was not in the power of one accused of felony, by consent expressly given or by his silence, to authorize a jury

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

00670

18 S.Ct. 620
170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061
(Cite as: 170 U.S. 343, 18 S.Ct. 620)

Page 7

of only eight persons to pass upon the question of his guilt. The law in force when this crime was committed did not permit any tribunal to deprive him of his liberty, except one constituted of a court and a jury of twelve persons. In the case of Hopt v. Utah, above cited, the question arose whether *354 the right of an accused, charged with felony, to be present before triors of challenges to jurors was waived by his failure to object to their retirement from the court room, or to their trial of the several challenges in his absence. The court said: 'We are of opinion that it was not within the power of the accused or his counsel to dispense with the statutory requirement as to his personal presence at the trial. The argument to the contrary necessarily proceeds upon the ground that he alone is concerned as to the mode by which he may be deprived of his life or liberty, and that the chief object of the prosecution is to punish him for the crime charged. But this is a mistaken view as well of the relations which the accused holds to the public as of the end of human punishment. The natural life, says Blackstone, cannot legally be disposed of or destroyed by any individual, neither by the person himself nor by any other of his fellow creatures, merely upon their own authority. 1 Bl. Comm. 133. The public has an interest in his life and liberty. Neither can be lawfully taken except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life and liberty cannot be dispensed with or affected by the consent of the accused, much less by his mere failure, when on trial and in custody, to object to Unauthorized methods. The great end of punishment is not the expiation of atonement of the offense committed, but the prevention of future offenses of the same kind. 4 Bl. Comm. 11. Such being the relation which the citizen holds to the public, and the object of punishment for public wrongs, the legislature has deemed it essential to the protection of one whose life or liberty is involved in a prosecution for felony that he shall be personally present at the trial; that is, at every stage of the trial when his substantial rights may be affected by the proceedings against him. If he be deprived of his life or liberty without being so

present, such deprivation would be without that due process of law required by the constitution.'

If one under trial for a felony the punishment of which is confinement in a penitentiary could not legally consent that the trial proceed in his absence, still less could he assent to be *355 deprived of his liberty by a tribunal not authorized by law to determine his guilt.

In our opinion, the provision in the constitution of Utah providing for the trial in courts of general jurisdiction of criminal cases, not capital, by a jury composed of eight persons, is ex post facto in its application to felonies committed before the territory became a state, because, in respect of such crimes, the constitution of the United States gave the accused, at the time of the commission of his offense, the right to be tried by a jury of twelve persons, and made it impossible to deprive him of his liberty except by the unanimous verdict of such a jury.

The judgment is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion. Reversed.

Mr. Justice BREWER and Mr. Justice PECKHAM, dissented.
U.S. 1898
Thompson v. State of Utah
170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## CERTIFICATION

The State of Texas                          §

County of Dallas                           §

I, Gary Fitzsimmons, Clerk of the    Criminal District Court No. 7    of Dallas County, Texas do hereby certify that the documents contained in this record to which this certification is attached are all of the documents specified by Texas Rule of Appellate Procedure 34.5 (a) and all other documents timely requested by a party to this proceeding under Texas Rule of Appellate Procedure 34.5 (b).

GIVEN UNDER MY HAND AND SEAL at my office in Dallas County, Texas this __21st__ day of __December__ , __2009__ .

Signature of Clerk: _Ana Mc Daniel_

Name of Clerk:       Ana McDaniel

Title:                        Deputy Clerk

00672