AP-76207    1

REPORTER'S RECORD

VOLUME 2 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE CRIMINAL DISTRICT |
| | ) | |
| VS. | ) | COURT NO. 7 |
| | ) | |
| JAMES GARFIELD BROADNAX | ) | Of DALLAS COUNTY, TEXAS |

ORIGINAL

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

PRETRIAL HEARING    Louise Pearson, Clerk

=============================================

RECEIVED IN
COURT OF CRIMINAL APPEALS

AUG 03 2010

Louise Pearson, Clerk

On the 7th day of April, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

SHARON HAZLEWOOD, CSR                 972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

A P P E A R A N C E S

FOR THE STATE OF TEXAS:

   HONORABLE DAVID M. ALEX
   SBOT NO. 24003256
   HONORABLE GORDON HIKEL
   SBOT NO. 00787696
   133 N. INDUSTRIAL BLVD.
   FRANK CROWLEY COURTHOUSE
   DALLAS, TEXAS 75207
   TEL. 214-653-3600

FOR THE DEFENDANT:

   HONORABLE BRAD LOLLAR
   SBOT NO. 12508700
   1700 COMMERCE ST, STE. 404
   DALLAS, TEXAS 75201
   TEL. 214-384-8178

   HONORABLE DOUGLAS H. PARKS
   SBOT NO. 15520000
   321 CALM WATER LANE
   HOLLY LAKE RANCH, TEXAS 75765
   TEL. 903-769-3465

   HONORABLE KERI MALLON
   SBOT NO. 24049165
   DALLAS COUNTY PUBLIC DEFENDERS OFFICE
   133 N. INDUSTRIAL BLVD., LB 2
   FRANK CROWLEY COURT BLDG.
   DALLAS, TEXAS  75207
   TEL. 214-653-3550

**VOLUME 2**

**PRETRIAL HEARING**

<u>APRIL 7TH, 2009</u>

|  | PAGE | VOL. |
|---|---|---|
| PROCEEDINGS..................................... | 3 | 2 |
| CASE CALLED BY THE COURT.................... | 3 | 2 |
| ADJOURNMENT...................................... | 34 | 2 |
| REPORTER'S CERTIFICATE........................ | 35 | 2 |

<u>DEFENSE EXHIBITS</u>

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 1 | DRAFT OF QUESTIONNAIRE | 12 | - - | 2 |

*SHARON HAZLEWOOD, CSR          972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

REPORTER'S RECORD

VOLUME 2 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

THE STATE OF TEXAS ) IN THE CRIMINAL DISTRICT

VS. ) COURT NO. 7

JAMES GARFIELD BROADNAX ) Of DALLAS COUNTY, TEXAS

==============================================================

PRETRIAL HEARING

==============================================================

On the 7th day of April, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

SHARON HAZLEWOOD, CSR        972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

VOLUME 2

PRETRIAL HEARING

APRIL 7TH, 2009                          PAGE   VOL.

PROCEEDINGS.............................    3      2

CASE CALLED BY THE COURT.................   3      2

ADJOURNMENT..............................  34      2

REPORTER'S CERTIFICATE...................  35      2

DEFENSE EXHIBITS

NO.  DESCRIPTION        OFF. ADM. VOL.

1    DRAFT OF QUESTIONNAIRE    12    --    2

---

APPEARANCES

FOR THE STATE OF TEXAS:

HONORABLE DAVID M. ALEX
SBOT NO. 24003256
HONORABLE GORDON HIKEL
SBOT NO. 00787696
133 N. INDUSTRIAL BLVD.
FRANK CROWLEY COURTHOUSE
DALLAS, TEXAS 75207
TEL. 214-653-3600

FOR THE DEFENDANT:

HONORABLE BRAD LOLLAR
SBOT NO. 12508700
1700 COMMERCE ST, STE. 404
DALLAS, TEXAS 75201
TEL. 214-384-8178

HONORABLE DOUGLAS H. PARKS
SBOT NO. 15520000
321 CALM WATER LANE
HOLLY LAKE RANCH, TEXAS 75765
TEL. 903-769-3465

HONORABLE KERI MALLON
SBOT NO. 24049165
DALLAS COUNTY PUBLIC DEFENDERS OFFICE
133 N. INDUSTRIAL BLVD., LB 2
FRANK CROWLEY COURT BLDG.
DALLAS, TEXAS 75207
TEL. 214-653-3550

---

PROCEEDINGS

(Court reconvened.)

THE COURT:  This is the State of Texas versus James -- is it Gardeal?

MR. LOLLAR:  Garfield.  That's a misspelling of the defendant's middle name that I guess we need to get a name change on.

THE COURT:  Yeah, let's do that, okay?

Let me start at the beginning.  We've got two cases here, so which one are we going on, or are we going on both of them?

MR. PARKS:  It's our understanding we're going on the second number down on the --

MR. LOLLAR:  24667.

MR. PARKS:  -- 24667.

THE COURT:  Okay.

MR. ALEX:  And I'm -- I'm getting file marked right now, Judge, the motion in support of the proposed questionnaire, and I will speak directly to that.  Mr. Hikel is going to hand it to you.

THE COURT:  Are y'all wanting to respond to this, Mr. Parks?

MR. PARKS:  Well, I think that --

MR. LOLLAR:  Yes, sir.

THE COURT:  In writing or not?

MR. PARKS: No, I've got objections in the file.

THE COURT: Okay. Written objections.

And y'all are okay with the defendant not being here, right?

MR. LOLLAR: Yes.

MR. PARKS: Yes.

THE COURT: Okay. What's -- what's your opposition, Brad?

MR. LOLLAR: Judge, we had -- the Court, I, Mr. Parks, and Mr. Alex had exchanged e-mails with regard to the questionnaire here last week, and I think I had sent an e-mail to everybody listing about six areas that we felt needed to be addressed in the questionnaire. Maybe we can take up those, at least five of those at this point. I believe one had to do with questions on Page 6 --

THE COURT: Okay. Hold on. Let me get there.

MR. LOLLAR: -- of the questionnaire.

THE COURT: Okay.

MR. LOLLAR: The third question down, have you, a family member, or close friend ever been diagnosed with post-traumatic stress disorder, and I had objected to the inclusion of that question because we don't think that that's going to be relevant in this case at all. We don't think the defendant, to our knowledge anyway, has been treated for post-traumatic stress disorder, and don't feel that that will be raised in the evidence at all, so we had objected to the inclusion of that question.

THE COURT: Response, Mr. Alex?

MR. ALEX: Yes, sir. And Judge, the -- the e-mails that were being sent back and forth obviously weren't part of the record, so my response is the same as it was in my e-mail, and that is, that question was there from a previous questionnaire.

However, I am aware that the defendant suffered a traumatic event in a car wreck, and it's been -- it's been forwarded to me that that perhaps would be part of the defense's case. And I know that when the trial gets started, you never really know which direction it's going to go, but I can -- I can agree to remove that if -- and I'm not going to hold the defense to anything at this point. If I've got their sort of gentlemen's understanding that there is not going to be a -- some last minute post-traumatic stress claim here that we wouldn't have a chance to voir dire the jury on at all, and I -- I know that I can't commit them to that, but at least as it relates to the questionnaire. What -- what I'm hearing is, it's not a part of this case, and I will agree to it.

MR. LOLLAR: Well, let me do this in an abundance of caution. Tests are still being done on the defendant and we are -- we know what Mr. Alex is talking about there, so why don't we just leave that in.

But the second part of Mr. Alex's response, or I guess the first part was, you said in an e-mail that you sent back to us; we didn't get that e-mail.

MR. ALEX: Okay. And that's the reason we're here today, is because the e-mails aren't part of record.

THE COURT: Okay. And that's kind of the problem with e-mails is we're going to lose track of this, so at least I am -- I mean, that -- that's why I would prefer that e-mails not be about substantive items and so forth.

MR. ALEX: The State understands, Your Honor.

MR. LOLLAR: So let's leave that in there, if that's all right with the Court.

The second one is the next -- following question: Have you ever known anyone to experience any kind of trauma related to war or warfare, and our defendant has not --

MR. ALEX: We'll agree to the exclusion of that one, Judge.

THE COURT: Yeah, I don't want that in there.

MR. LOLLAR: Now, let's see, Doug, where was the other one?

MR. PARKS: Oh, it was one of these --

MR. LOLLAR: It was here. At the bottom of Page 5. The last question, would a person's use of drugs or alcohol at the time of the offense automatically prevent you from assessing the death penalty if you found him guilty of capital murder. Number 1, technically, the jury does not assess the death penalty or assess a life sentence. They answer Special Issues.

And since the use of drugs or alcohol can be found by a jury to be a mitigating factor which would result in them answering Special Issue Number 3 no, we feel that that's an improper question to be asking the jury at this point in time. We particularly are offended by the word automatically prevent. We don't know what that means.

THE COURT: Response?

MR. ALEX: Yes, sir. Judge, I think the word automatically is the reason the question is there. We ask those questions all the time and that -- and that means just because you hear that, you're going to be so affected by the drug or alcohol use that you're not going to be able to weigh anything else. You're going to automatically say No, I can't answer these Special Issues that would cause the defendant to die.

And it's a pretty straightforward question. We use it in every questionnaire that I've reviewed, and I've reviewed tons of them in trying to put this together. And you know, I can't speak to whether it has been objected to before, but I can tell the Court from all indications in this case, this case is all about drugs. And to not be able to ask the jury questions about how the mention of drugs in this case, if it would trigger an emotional response where they would automatically say No, I couldn't answer these Special Issues that would cause a person's death.

I think it is a perfect question for this case, primarily because of the primary issue in the case, in my opinion, is going to be drugs.

THE COURT: Mr. Lollar?

MR. LOLLAR: Well, you know, they've asked two preceding questions, actually three preceding questions about the usage of drugs.

On Page 5, we feel that those -- the answers we would get on those three questions ought to tell us as lawyers in the case everything we need to know about the juror's feelings in regard to ...

THE COURT: I'm going to allow the question.

Next objection?

MR. LOLLAR: The -- and then that brings us to our major concern with the questionnaire, Judge, and that is on Page 2, going into Page 3, where the question propounded to the jury panel deals with reports that they have heard in the media or otherwise in regard to the alleged facts in the case. And to that, I would like Mr. Parks to speak. He has written our formal objection to that part of the questionnaire.

But it just seems to me like, you know, the point of all of this is to find out and identify those jurors who, because of the massive media that we had in this case back at the time it occurred, and since then, we're trying to find out which of those jurors have seen that media, have been affected by that media and have formed conclusions either as to the guilt of the defendant or as to the proper punishment in the case.

We're trying to identify those people, and I don't see how in the world we can identify those people unless you give them more information than what the State proposes to do here.

In fact, it would seem to me, just reading it, that this is kind of misleading the juror. And the juror might be thinking based on what the State says here in the -- in the paragraph, it's alleged on June 19th, 2008, Stephen Swan was shot to death outside of a Garland music studio, that that might trigger some memory that they have, but they're going to be thinking, well, weren't there two people killed here? Maybe I've got the wrong case in mind.

THE COURT: What do you propose?

MR. LOLLAR: We propose -- well, if I could turn this over to Mr. Parks at this time.

MR. PARKS: Well, Judge, basically what we propose is what the jury is going to hear about anyway. I don't think that the State's assertion that they're only trying one case so we only have to put in the information about one case answers the issue. They're going to put both cases, both complainants on during the course of the trial.

The jury's going to hear about all of it and I think that in fairness, they ought to hear about all of it to the extent that it would at least trigger their recollection of the facts.

THE COURT: I agree with that.

You probably don't oppose to that, do you, Mr. Alex?

MR. ALEX: Judge, what I had suggested in my response was, -- and I'm going to be reasonable about this, Judge. I think I agree with the Court and the defense that the idea is to give them a limited amount of facts to trigger in their mind, if it does, whatever it is.

However, I don't think that the names of these individuals is going to trigger anything. What's going to trigger it is the Garland music store, that it was a robbery and the person was shot to death. And what I suggested in my answer was that we include that in the course of a robbery, at the end of that question, and after talking to my appellate lawyers, Judge, I don't -- I don't object to including the name of the second victim, but we may also add in there in the course of a robbery, rather than just leave it as -- I think the way it sounds now, like it was just a straight running murder, and when I wrote this -- this question, I don't think that I had decided that we were just going to go on the murder/robbery. I think in my

**12**

mind we were going to go on the two -- the killing of two people, if that makes sense. I know it's a little convoluted.

MR. LOLLAR: We wouldn't have any objection, Judge, if the State wants to add the second name and say during the course of the robbery.

MR. ALEX: Judge, that's -- that's what I would propose.

THE COURT: Okay. That's what we're going to do.

MR. PARKS: And the second one, Judge, is the one we've probably got the biggest disagreement about, and it may be more philosophical than anything else.

The State, in the questionnaire, and I'm going to offer a draft of the questionnaire as Defendant's Exhibit 1 so that the record will know what we're talking about.

After the recitation of the facts, they then go into --

THE COURT: What page are you on?

MR. PARKS: Page 2, bottom of Page 2.

THE COURT: Okay.

MR. PARKS: Top of Page 3. Go into a recitation that, quite frankly, was in the

**14**

or the punishment, they front-loaded the rehabilitation, basically, and essentially tells the juror that it doesn't matter if they've read or heard about these things. It really doesn't matter if they formed an opinion as to his guilt on what punishment ought to be assessed, so long as they can tell us -- and it goes on to say you're not going to be qualified to sit in this case unless you tell us you can set aside those -- those opinions.

So essentially what it does is, it does what the statute, in my opinion, says ought not to be done, which is to rehabilitate persons who have expressed a bias or prejudice against the defendant, so that by the time the defense gets to that person, not only have they read about this in the questionnaire, but the State has done their portion of the voir dire first. By the time the defense gets to them and asks the statutory question, then it's -- it's -- it's too late. It doesn't matter. They've been instructed and educated what to say if they --

THE COURT: What do you propose as an alternative?

MR. PARKS: I propose that as an alternative, the form that is in my objections, which would essentially be to give them the factual outline

**13**

questionnaire in the Newberry trial, that was the second of the Texas 7 trials, and I -- I objected in Newberry pretty much the same as I'm objecting here. That was raised on direct appeal, and the Court of Criminal Appeals, in all honesty, upheld the State's position in Newberry.

That does not, it seems to me, necessarily answer the question just because it passed muster in Austin.

What the issue is is this. The statute says that the Court is to inquire of the jury panel regarding opinion, which case law says includes their opinion that they have reached as a result, perhaps, of ingesting hearsay evidence in one form or another. So that if they have -- if the Court inquires about that opinion, they indicate that they have received some hearsay information about the case, then the Court is to inquire whether or not that caused them to form an opinion. The Court's aware of that statute. And if it does, would influence their finding of a verdict in the case, they are to be dismissed without any further inquiry from either party or the Court.

So what the State has done in order to avoid the consequences of losing jurors who have already formed an opinion as to the defendant's guilt

**15**

that we've agreed upon.

THE COURT: Where is this? I have your objections.

MR. PARKS: Okay. Go to Page 5.

THE COURT: Okay.

MR. PARKS: And in the beginning in order to comply with the statute. Short rendition of the agreed facts, which we've discussed already, and then simply the statutory language: Do you think you've heard about this case? Yes or no.

Based upon anything you've read, have you formed an opinion? Yes or no.

And there we have it. That's what the statute, I believe, contemplates that we do.

THE COURT: Response?

MR. ALEX: Yes, sir. Judge, this wording that we have in the questionnaire is word-for-word out of the Newberry case.

Mr. Parks argued to the trial court then that it shouldn't be that way. It was denied and it was upheld on appeal.

Now, that doesn't say why it was upheld on appeal.

THE COURT: Where in the case is that?

MR. ALEX: If you'll look at the page --

starting on page -- it's going to be Page 3 as the -- the case is printed, Judge, but for the record, it's actually of the opinion, it's going to be Page 26.

So the cite of the opinion says it starts at Page 22, but what you're looking at is going to be on Page 3. And if you look at the second column where it starts on based upon anything you have heard, --

THE COURT: Right.

MR. ALEX: I'm sorry, Judge, that's -- that's incorrect. Where it starts with There has been news media coverage, if you track that language and you look at the language that I proposed in the questionnaire, it is word-for-word.

And the rationale from the Court of Criminal Appeals was this, Judge, and that is, both sides are going to get a chance to do individual voir dire. The Court is not, by putting this in the questionnaire, denying either side the right to get a fair jury, but what the Court said was this is just the law, and there's nothing wrong with giving the jury the law before asking them a question.

We all know that when we sit in voir dire, if we start asking the jury questions about following the law before we tell them what the law is, we get stuff from A to Z and then after we explain the law to them, they're like, Oh, okay. Now I understand the law, and I'm fine with that.

And that's basically the rationale behind the Court when it -- when it upheld Newberry. It said, Hey, look. You're going to get a chance to talk to these folks, and if they formed an opinion, then there's not going to be any rehab on that, but giving them this question in the questionnaire does not violate any of the defendant's rights, either State or constitutional.

And I would say this to the Court, Judge. The -- what's not being said in this case is this. We have a high profile case. We're going to start off with a panel at -- one in the morning and one in the evening. Logistically, you're going to have five, 600 people that are filling out this questionnaire. If we start then, before doing anything else, asking them if they have formed an opinion on the limited facts they have here, we'll be trying to get a panel next year this time. That's not what's being said in this questionnaire.

And, you know, the thing is, we're not talking about rehabbing a person before they give you -- before they can tell you whether they have an opinion. All we're talking about is logistically

letting them fill the questionnaire out, not just based on just a bare question, but on giving them the law first, and I think what's probably most glaring about this whole -- this whole case and this whole issue is it's just practical. It is as practical as anything else that we do.

If -- and what the legislative intent was, I think the primary objective was to Article 35.16(a)(10). And, you know, when the Court looked at the legislative intent, and you can see this on page -- I'm sorry, Judge, I had it outlined here. I think it's going to be Page 5. I'm sorry. Give me one second, Judge. I don't have the one.

Okay. It's going to be Page 7 of that case in Newberry. They went back to 1965 and they looked at the legislative intent to say, Okay, so what is this all about? Why are we saying you -- that when a -- a juror says, I've formed an opinion, and there's no more -- no more questions being asked, the notion that there is something to, well, we're not going to ask any more questions, they said the only thing that they were concerned about is all the back and forth that goes on after a jury has given an answer trying to rehab, that was their primary concern.

So there wasn't some big deal about trying to rehab the person. That was their primary concern.

And I would say practically speaking, the way the questionnaire is worded right now in giving them the law, does not violate any of the defendant's rights, and it's going to give us an opportunity to get a jury in a reasonable amount of time that would be fair to all sides.

MR. HIKEL: Judge, --

THE COURT: Go ahead.

MR. HIKEL: May we have one second?

Judge, just for the record, to be -- in response to defense motion, we're reciting Article 35.16(a)(10) of the Code of Criminal Procedure which proposes, Judge, that if the juror has formed an opinion as to the defendant's guilt, the juror can be struck for cause.

If you can look at 35.16(a), it talks about questioning the individual juror to establish a challenge for cause, which in conjunction with Article 35.17 in voir dire examination where you have to propound to the -- the big panel principles of laws and get their opinion, even 35.17 of CCP said the jurors have to be questioned individually. So both Article 36.10 -- I'm sorry. Article 36 -- 35.16(a)(10) and Article 35.17, both contemplate questioning the jurors

individually about their opinions as to the defendant's guilt before they can be struck for cause.

And what the defense is proposing in the motion, Judge, is simply deny the State, and even the defense, the right to question jurors individually to see whether or not they have formed an opinion as to the defendant's guilt, which cannot be accomplished if you ask them the ultimate question in the questionnaire. They have to be asked this question individually, Judge, and that's what 35.17 and 35.16 both contemplate. And the Newberry case also.

MR. LOLLAR: And in response, Your Honor, two things.

Mr. Alex has stated that the way these two paragraphs on Page 2 and 3 are presented to them is the law. Well, it's not the law. They're the not getting that from this statute. They're not getting that from any code. What that is, is a recitation made by an assistant district attorney of Dallas County, Texas, that has been presented before in previous capital murder juries.

Now, there's nothing in there that is not true. However, it doesn't address the issue that we're trying to do with these questionnaires.

And the other point that Mr. Alex made was if we really do what the defense is suggesting, we'll be here next year picking the jury, was his language. Well, if that's -- if knowledge about this case is so prevalent in the community that it's going to take us a year to pick this jury, then that's what we need to do.

THE COURT: Okay. I'm not going to decide this right now. I'm going to take that under advisement.

What other objections do we have?

MR. LOLLAR: I believe that's it.

MR. PARKS: I would like to have one addition. We haven't talked to the State about it and I think they'll disagree with it. On Page 5, David.

MR. ALEX: I'm sorry. If you'll give me one second.

MR. PARKS: In the questionnaire.

Questionnaire, in the middle of the page. What purpose, if any, do you believe that life without parole serves, --

MR. ALEX: Uh-huh.

MR. PARKS: -- under that I'd like to include What purpose, if any, do you believe the death penalty serves.

MR. ALEX: Isn't that there?

MR. PARKS: No.

MR. ALEX: It's nowhere on the questionnaire?

MR. PARKS: Nope. I always ask it, but it's never been in the questionnaire.

MR. HIKEL: I don't have any objection to it being in there.

THE COURT: I want it in there.

MR. ALEX: And what we can do, Judge, is we can get together and make those corrections that we talked about today and see if we both agree on them as corrected and just submit it to the Court. Is that okay?

THE COURT: Yes.

MR. ALEX: And I think for printing purposes, we probably need some deadline for that. Let me just look at my calendar. We can do that -- can you guys -- can you do that today, make the corrected changes and make an agreement so we can get them to the printer soon.

MR. LOLLAR: Sure.

MR. ALEX: Okay. Y'all got time for that?

MR. LOLLAR: Once we have the Court's ruling.

MR. ALEX: Oh, that's right. We need a ruling.

THE COURT: I'll have a decision for you as to the objection to the language, the bottom of Page 2 later today.

MR. ALEX: Judge, I wanted to bring up, if -- if that was it on the questionnaire, I wanted to bring up one other issue we haven't gotten on the record about.

And the Court had asked for a script for the big panel, and I didn't have any objections to what the defense had proposed, but there -- I think we do need to make some changes. What I -- what I did was, Judge, I prepared, sort of in script form, all of the issues that I'm going to tender to counsel.

I pulled up a -- well, I didn't. I can't take credit for this. Mr. Hikel pulled up an old big panel, the transcript from it, that would include all the points of the law that defense counsel had included in their highlighted point. I don't know if the Court is interested in that or not. I can present it to the Court.

The -- the only thing that's really substantive is when we give them the brief statement of facts, I think in the proposed script we were talking about during the -- taking the life of two people, and we're changing that because in the Indictment we're

**Page 24**

going to go on is going to be the murder/robbery of the one person. So I'm going to give it to the Court, the script form as you would normally speak it.

And I know counsel is going to want some time to read it. Do you -- the only -- the only thing that I'm not sure about, Judge, and it probably will be for lawyers -- lawyers smarter than me, the transcript that I read on the qualifications of a juror who has served on a jury in the past, and counsel and I talked about it when he first gave me the script, and it seems to be, for lack of a better term, two different answers to that question. The one that we give to the jurors where they -- they get in the mail, it tells them if they've served on more than five days --

THE COURT: Where are you referring now?

MR. ALEX: This is going to be on Page 1, 2, 3, 4, 5, 6. It's going to be on Page 4 of the proposed script, and there is a copy of what the jurors actually get in the mail that tells them they can check this box to claim an exemption if they want to. And it's just that --

THE COURT: Let me see that.

MR. ALEX: It's just that -- just that situation that arises when you've served on a misdemeanor or a felony in the past and whether or not

**Page 25**

you can claim an exemption.

When I read the transcripts of the prior big panels, they all stuck to what's on that card. And I think what we have on the proposed -- on the proposed script now is -- is different. I'm not sure which one is the right answer, but I -- what I can say to the Court is I've read a few transcripts now on what the Court has said in the past. It seems like a pretty easy research issue. I just haven't been able to get --

MR. LOLLAR: It's more complicated and I've taken this up with Kerry and with Christina.

MR. ALEX: Okay. Well, I will defer to counsel, Judge, because he's done the research on it.

MR. LOLLAR: And the Court's briefing clerks, and they will research it. There are three different sections.

THE COURT: Where are we talking about?

MR. LOLLAR: Well, Judge, the deal is there's an exemption from jury service, and there's an old state statute that says if you've served as a petit juror during the previous 24-month period, then you can claim an exemption, and that's for a county -- oh, let's see. Of at least 200 thousand. Okay. So that would appear to apply to Dallas County.

**Page 26**

There's another state statute that says if you've been summoned for service in a county with a population of at least 150 thousand, and you've been a petit juror in the last three years, so those both apply to Dallas County. And one says two years and one says three years.

And if you look at what Dallas County is currently doing and on the card they send out, they say if you have served as a petit juror since April the 28th of 2008. Well, that doesn't appear to be in any of the state statutes. It doesn't appear to comply with them. But what we're told is, is that Dallas County rewrote the wheel on April 25th of 2008 and the jurors that are receiving juror summons in the mail today are being told that language, that they can exempt themselves from jury service if they've served within basically the last year, which doesn't comply with either of the two state statutes.

So perhaps we need to call Christina. I know she was doing some research on this issue, and they were going to get with jury services and find out what --

THE COURT: Why don't we just go with three years.

MR. LOLLAR: Well, you know,

**Page 27**

Your Honor, --

THE COURT: Because that takes into account everything.

MR. LOLLAR: But it may not be the law. We're excluding the people that have served as jurors within the past three years, and the law may be that they can't claim an exemption if it's over a year.

MR. ALEX: Judge, you know, the practical effect, Judge, is that it's something that they can use to claim or not.

So if a person chooses to claim it and then we have enlarged it, I don't see -- I mean, they could choose to claim it or not claim it.

I think the issue really lies on what I can't answer, Judge, and that's that it says unless the county uses a jury plan under Section 62.011 of the goveernment code, so the county can come up with their own plan as long as it complies with 62.011 and then they can make it whatever they want, as long as it fits under 62.011.

And so I think that's the real issue. Does the present county have a plan, and is that why this card says what it does. If it does, the statute clearly allows it.

I mean, is that your reading of it,

**28**

Mr. Lollar, that it says unless the county has a plan?

MR. LOLLAR: Well, that is my reading of it, but that's what they were checking out, the legitimacy of the county plan and whether that fit within either of the two state statutes.

MR. ALEX: I think that's the issue, is if the county has devised a plan, does it comport with 62.011. If it does, then the card is correct.

MR. LOLLAR: I'll agree with that.

THE COURT: Okay.

MR. ALEX: So that should be pretty simple.

THE COURT: So we need to find out if the county devised a plan.

MR. LOLLAR: Right. If the county is doing the right thing. We all want to do the right thing.

MR. ALEX: Were you giving this back to me?

THE COURT: Yeah.

MR. LOLLAR: And, I'm sorry, I can't remember Christina's last name.

THE COURT: O'Neal.

MR. LOLLAR: O'Neal, all right.

And, Your Honor, referring to --

**30**

mentioned under -- okay. That is 35.16. So it's at least mentioned in those two places.

MR. LOLLAR: Well, I included that in the waiver because that was listed under Article 35.16.

MR. ALEX: Sure. And my -- my only point, Judge, is this: Challenges for cause is something we do all the time in a big panel or in individuals, so we all have an opportunity to ask this question again. The Court only needs to ask it once. It doesn't need to ask -- it doesn't need to ask the jury twice and go down to all the different challenges for cause, because obviously, -- let's see, there's another one here that's a good example of that. It asks that, you know, it's a challenge for cause if the juror is a witness in the case.

Obviously, that's something the lawyers would know, or flush out, or -- or whatever, but anyway, the point is we don't need to ask it a million times if it's written in the code many times.

And the proposed script that I wrote out, counsel will get a chance to read it, and the Court will get a chance to read it, and I think it mentioned it just logically.

THE COURT: I agree with that.

MR. LOLLAR: Whatever the Court wants to

**29**

THE COURT: I'll find that out too.

In regard to the other notations you've made, David, I see that on the second page you crossed out under the challenges for cause, Number 2, that the juror has been convicted of misdemeanor theft or a felony.

MR. ALEX: No, I -- I'm not saying that, you know, and I don't -- I don't mean to talk across the bar, Judge. I'll just speak to -- what -- the notations that I made on the proposed script was just to say that I don't think that we need to ask the same question ten times if it's in ten different sections of the code.

Once you ask the jury if they have been, you know, statutorily convicted of theft or a felony, are under indictment, I think it doesn't need to be asked five times just because there's five different sections of the code that talks about it.

MR. LOLLAR: Where else -- where else in the proposed script do we talk about that?

MR. ALEX: Well, you've got it under 32.12, 35.12 in the mode of questioning which they are under Indictment for theft or felony.

MR. LOLLAR: Okay.

MR. ALEX: And then I think it is also

**31**

do on that.

THE COURT: All right. So I owe y'all two things, right?

MR. LOLLAR: Yes, sir.

THE COURT: Okay. What else?

The next thing we're doing is serving the defendant on April 16th, right?

MR. LOLLAR: Yes, sir.

MR. ALEX: And we -- we may want to set a schedule for the Court to hear the -- the voluminous pretrial motions that was --

MR. LOLLAR: That's just mine. Doug's got his coming.

MR. ALEX: Oh, okay. So there's still more to come. I don't know. Do you want to set it -- because we're getting pretty close. Do you want to set a time for us to hear those motions?

THE COURT: You have to respond to those first.

MR. ALEX: Right. But that would at least give us a timetable to get it done if we set a date to do it.

THE COURT: When will you respond?

MR. ALEX: Well, I guess when I get them all. I think he's telling me that Mr. Parks is going

to file some more?

MR. LOLLAR: That won't stop you. Start the --

MR. ALEX: Well, no. Is the State is working to them and they respond to these on a regular basis.

THE COURT: How does two weeks from today sound?

MR. ALEX: For the ones we currently have? That's fine with us.

You want to go on the record two weeks from today with those?

MR. PARKS: We can go on the record on deadlines. When are you going to get discovery.

MR. ALEX: When you --

MR. LOLLAR: I haven't gotten them. We haven't gotten anything from the Garland Police Department.

MR. PARKS: All we've got is pros --

MR. LOLLAR: Prosecution report, arrest report, autopsy.

MR. ALEX: You got the disk.

MR. LOLLAR: That's just --

MR. PARKS: That's just Texarkana stuff.

MR. ALEX: We'll cover -- when we leave

---

here, I will see what you got and whatever you don't have, you'll get it today, how's that?

MR. LOLLAR: All right.

MR. ALEX: But the last disk I gave you was a single disk, right?

MR. LOLLAR: Yeah. Uh-huh.

MR. ALEX: And that single disk had the Garland Police Department --

THE COURT: Go off the record on this.

(Off-the-record discussion was had.)

THE COURT: Okay. Do I need to be here for this?

MR. LOLLAR: No, sir.

THE COURT: We'll have a hearing on Broadnax motions on April the 21st at 9:00 o'clock.

MR. ALEX: And if they file more motions between now and then, Judge, it's going to depend -- my appellate lawyer who's going to be answering these just got out of the hospital on a bicycle accident, so I've got somebody else working on it who's also working on two other death cases, so if they file another three volumes like this, I may need more time to respond to them.

MR. PARKS: It won't be that many, I promise you.

---

MR. ALEX: Okay.

MR. PARKS: I promise you.

MR. ALEX: Okay.

MR. PARKS: It's just going to be a few kind of specialized motions.

THE COURT: Okay.

MR. ALEX: Okay.

THE COURT: Anything else, guys?

We're in recess until April 21st. I'll get you your answers to your two issues later today.

MR. LOLLAR: Thank you, Your Honor.

MR. HIKEL: And April 16th, Judge, we'll come back and serve the defendant?

THE COURT: Yes.

MR. HIKEL: Okay.

(Court adjourned.)

---

THE STATE OF TEXAS )

COUNTY OF DALLAS   )

I, SHARON HAZLEWOOD, Official Court Reporter in and for Criminal District Court No. 7 of Dallas County, State of Texas, do HEREBY CERTIFY that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

Witness my hand this the _____ day of _____, 2009.

_____
SHARON HAZLEWOOD, CSR
Certified Shorthand Reporter
Official Court Reporter
Criminal District Court No. 7
972-739-3906
Texas CSR No. 628
Expiration Date: 12/31/10