**REPORTER'S RECORD**
**VOLUME 7 OF 42**
**CAUSE NO. F08-24667Y**

THE STATE OF TEXAS        )        IN THE CRIMINAL DISTRICT
                          )
VS.                       )        COURT NO. 7
                          )
JAMES BROADNAX        .   )        DALLAS COUNTY, TEXAS

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

**INDIVIDUAL VOIR DIRE**

A P P E A R A N C E S

REPRESENTING STATE OF TEXAS:        REPRESENTING DEFENDANT:

**MS. ANDREA HANDLEY**               **MR. BRAD LOLLAR**
SBOT #: 08898800                     SBOT #: 12508700
Assistant District Attorney          Attorney at Law
**MR. GORDON HIKEL**                 1700 Commerce Street
SBOT #: 00787696                     Suite 450
Assistant District Attorney          Dallas, Texas   75248
**MS. ELAINE EVANS**                 (214)384-8178
SBOT #: 24032880                     **MR. DOUG PARKS**
Assistant District Attorney          SBOT #: 15520000
**MR. DAVID ALEX**                   Attorney at Law
SBOT #: 24003256                     3300 Oak Lawn Avenue
Assistant District Attorney          Suite 600
133 Riverfront Boulevard             Dallas, Texas   75219
Dallas, Texas   75207                (214)521-2670
(214)653-3600                        **MS. KERI MALLON**
                                     SBOT #: 24049165
ALSO PRESENT:                        Public Defender Office
Zandra Robinson, Intern              133 Riverfront Boulevard
                                     Dallas, Texas   75207
                                     (214)653-3550

    On the 26th day of May 2009, the above-styled and numbered cause came on for hearing, and the following proceedings were had before the Honorable Webb Biard, Judge presiding, in and for the Honorable Mike Snipes, held in Dallas, Dallas County, Texas:

        Proceedings reported by machine shorthand.

## C H R O N O L O G I C A L   I N D E X
### VOLUME 7 OF 42
### CAUSE NO. F08-24667-Y

May 26, 2009                                        Page      Vol.

Case called. . . . . . . . . . . . . . . . . .4      7
Pretrial motions . . . . . . . . . . . . . . .4      7

### CHRONOLOGICAL VOIR DIRE

**PROSPECTIVE JURORS**           **Voir Dire**              **Vol.**
JEROME WILLIAMS              24, 60, 61                  7
Party's Challenge for Cause . . . . . . . . .90      7
Court's ruling. . . . . . . . . . . . . . . .91      7
Party's Objection to Court's ruling . . . . .91      7
Venireperson accepted . . . . . . . . . . . .91      7

JACK BRAGG                   93, 125
Party's Challenge for Cause. . . . . . . . .131      7
Court's ruling . . . . . . . . . . . . . . .131      7
Venireperson Excused for Cause . . . . . . .131      7

MATTHEW DUZAN                     136
Court's general instructions . . . . . . . .132      7
Party's Challenge for Cause. . . . . . . . .138      7
Court's ruling . . . . . . . . . . . . . . .138      7
Venireperson Excused for Cause . . . . . . .139      7

JASON ROSS                  144, 181, 191
Venireperson accepted. . . . . . . . . . . .193      7

MICHAEL TRULL                    196
Venireperson Excused for Cause . . . . . . .209      7
Party's agreement to Excuse for Cause. . . .209      7

BRANDON MORRISON                 211
Party's Challenge for Cause. . . . . . . . .213      7
Court's ruling . . . . . . . . . . . . . . .213      7
Venireperson Excused for Cause . . . . . . .213      7

### ALPHABETICAL VOIR DIRE

**PROSPECTIVE JURORS**           **Voir Dire**              **Vol.**
JACK BRAGG                   93, 125
Party's Challenge for Cause. . . . . . . . .131      7
Court's ruling . . . . . . . . . . . . . . .131      7
Venireperson Excused for Cause . . . . . . .131      7

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

**VOLUME 7 OF 42**
**CAUSE NO. F08-24667-Y**
**ALPHABETICAL VOIR DIRE (CONT.)**

May 26, 2009                                    Page        Vol.

**PROSPECTIVE JURORS**              Voir Dire                    Vol.

MATTHEW DUZAN                  136
Court's general instructions . . . . . . . . .132       7
Party's Challenge for Cause. . . . . . . . .138         7
Court's ruling . . . . . . . . . . . . . . .138         7
Venireperson Excused for Cause . . . . . . .139         7

BRANDON MORRISON               211
Party's Challenge for Cause. . . . . . . . .213         7
Court's ruling . . . . . . . . . . . . . . .213         7
Venireperson Excused for Cause . . . . . . .213         7

JASON ROSS              144, 181, 191
Venireperson accepted. . . . . . . . . . . .193         7

MICHAEL TRULL                  196
Venireperson Excused for Cause . . . . . . .209         7
Party's agreement to Excuse for Cause. . . .209         7

JEROME WILLIAMS              24, 60, 61                  7
Party's Challenge for Cause . . . . . . . . .90         7
Court's ruling. . . . . . . . . . . . . . . .91         7
Party's Objection to Court's ruling . . . . .91         7
Venireperson accepted . . . . . . . . . . . .91         7

Comments regarding dismissal of Juror #24
     Ms. Dorothy Fontaine . . . . . . . . . .213

Reporter's Certificate . . . . . . . . . . .215

**EXHIBIT INDEX**

(NONE OFFERED OR ADMITTED)

P R O C E E D I N G S

(May 26, 2009; 9:46 a.m.)

(Open court, defendant present, no juror)

THE COURT:  This is F08-24667Y, State of Texas versus James Broadnax for individual voir dire.

What says the State of Texas?

MS. HANDLEY:  State is ready.

THE COURT:  What says Mr. Broadnax?

MR. LOLLAR:  We're ready, Your Honor.

THE COURT:  Are there any pretrial motions that haven't been addressed?  And let the record reflect -- I'm sorry -- that Mr. Broadnax is in court with his counsel, and State's counsel is present.

Are there any pretrial motions or issues that need to be addressed and haven't?

MR. LOLLAR:  No, sir.  I believe Judge Snipes has addressed all of the pretrial motions filed by both sides.

MR. PARKS:  Except for those motions that dealt specifically with voir dire, and I know we have two pending motions.  One is more along the lines of -- I hate to say admonishment to the Court, but it's sort of that, the motion to consider the holding of Jones v. State -- the Court's advised that the Court has taken that motion under consideration --

THE COURT:  I have.

MR. PARKS:  -- and reviewed that case.  And also we have a motion in limine in voir dire, chiefly dealing with practices that in the past at least have been engaged in by the State.  We just bring that motion to the State's -- to the Court's attention, and I suppose it probably would not be appropriate for us to object until and unless the State does begin those practices which were enumerated in that motion.  But I do want to give the State notice and the Court notice that we will be objecting if they use those tactics in voir dire.

THE COURT:  I have read the motion.

MR. LOLLAR:  There was a third motion, Your Honor, that Judge Snipes originally considered, and that was to allow us to videotape the individual voir dire.  The jurors at our initial hearing denied the motion.  I raised it again on the second time we considered pretrial motions with Judge Snipes.  At that time he said he would take it under consideration.  I met with him last Friday to find out if he had come to a conclusion, and he indicated to me that he upheld his original ruling which was not to allow us to videotape the individual voir dire.

THE COURT:  The record shall so reflect.

MR. ALEX: And, Judge, I think that the very last thing that we have not put on the record, and that was how far down we were going to go in lessers. I suggested to the Court was that -- this morning for the first time we found the defense wants to go into criminal negligent homicide and manslaughter in addition to the murder for the lessers. At this time the only thing I think we'll object to is the criminal negligent homicide, and we will hold off until we get any further case law on the manslaughter lesser.

MR. LOLLAR: To which the defendant objects. We have the right to go into that, all of the culpable mental states with each prospective juror and how they might apply in this case and how they might be raised by the evidence in this case.

THE COURT: All right. The Court will allow the parties to voir dire on lesser included offenses down to manslaughter but not on down to criminal negligent homicide.

MR. LOLLAR: If the Court would permit us to particularly object under Ruffin (phonetic) versus State, Mays versus State, both of which cases handed down within the past year have demonstrated that the evidence in the case may show that a defendant did not have the capacity to form any culpable mental state and,

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

therefore, it defaults down to criminally negligent homicide.  It defaults to the mental state of negligence if the evidence shows, due to a number of different factors, whether it be mental retardation, mental illness, drug usage, whatever the facts may show, and those facts are going to get in because of Article 38.36 of the Code of Criminal Procedure, which allows evidence to be presented by either side on the condition of the defendant -- at the time of the commission of the offense the condition of the mind of the defendant.

So if the evidence shows that there was some condition of the mind of the defendant such as would prevent him from forming a culpable mental state of intentional, knowing, or reckless, because all three of those require him to form a mental state that he's aware of or intending or knowing that something's going to happen.

If he's simply not of the capacity to do that and the evidence shows that, then you default down to criminally negligent homicide down to with negligence, which says he should have been aware of something but wasn't aware of it.  Under those circumstances, if the evidence shows he was of that state of mind, then we would get criminally negligent homicide because it doesn't require that he form an

intent, a knowing act, or aware of something and consciously disregarding it. It defaults down to criminally negligent homicide.

And the findings or the holdings of the Court of Criminal Appeals in Ruffin and Mays and several other cases -- which I could have brought to the Court had I known this was going to be an issue this morning. Following the federal law, Jackson v. State and Park versus Arizona, which is the federal case, the Supreme Court case from the United States Supreme Court saying those are all admissible, and that may be something we want to talk to these jurors about here this morning.

THE COURT: State's response?

MR. ALEX: Judge, we don't believe that you can end round -- what counsel has basically said, if there is no mens rea due to some mental illness, then you get negligent homicide. If there's no mens rea due to a mental illness, then you plead insanity and you go that way. You don't say that the guy doesn't have a mens rea at all so we default to negligent homicide.

MR. PARKS: That's just plain not the law.

MR. LOLLAR: That's not the law.

MR. ALEX: Well, it would be nice to see the cases that you're talking about since you're going to cite them here this morning for the first time. I

mean, isn't that the way we do things?  If we're going to cite some cases, we present them to everybody and show them what we're talking about.

But that's my response, Judge.

THE COURT:  Well --

MR. ALEX:  Judge, you know what, in an abundance of caution --

THE COURT:  Let me just say to begin with, the Court's going to allow you to go all the way down at this time, subject to the Court reviewing the law.

Now, I understood there were some agreements, but I'm not for sure that's the case.  Now, I was under the assumption that we were going to limit voir dire to 45 minutes per side.  What's the State's position on that?

MR. ALEX:  That was my understanding as well.

THE COURT:  Mr. Lollar?

MR. LOLLAR:  Yes, sir.

THE COURT:  All right.  We are ready for Mr. Williams.

(Mr. Jerome Williams enters room)

(Open court, defendant and juror present)

THE COURT:  Here you go, Mr. Williams, if you would please.  There you go, sir.  Right there.

(Mr. Williams is seated)

THE COURT: Thank you, Mr. Williams. Please be seated, folks. Do this for me before we go any further, Mr. Williams. Raise your right hand.

Do you solemnly swear you'll give true answers made to questions that will be asked of you concerning your qualifications as a juror in this case so help you God? You'll answer "I do."

MR. WILLIAMS: I do.

THE COURT: Mr. Williams, again, my name is Webb Biard, and we previously met, and I've already told you how much I appreciate you being here, being on time. That means a lot to me, and I apologize for the delay. I assure you it's none of these folks's fault. That's the way it is, Tuesday morning. I told you this is the first day of voir dire, and you're the first prospective juror.

Let me introduce some other folks to you at this time if I can, Mr. Williams. David Alex.

MR. ALEX: Good morning, sir.

THE COURT: Andrea Handley.

MS. HANDLEY: Good morning, Mr. Williams.

THE COURT: Gordon Hikel.

MR. HIKEL: Good morning, sir.

THE COURT: Elaine Evans.

MS. EVANS:  Good morning.

THE COURT:  Zandra Robinson.

MS. ROBINSON:  Good morning.

THE COURT:  These folks represent Dallas County and the State of Texas.

Also, Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  Doug Parks.

MR. PARKS:  Hi.

THE COURT:  Keri Mallon, and they represent Mr. James Broadnax.  Mr. Broadnax.

MR. BROADNAX:  Yes.

MR. WILLIAMS:  Good morning.

THE COURT:  All right.  Did you have an opportunity to read this pamphlet?

MR. WILLIAMS:  Yes.

THE COURT:  Did that help you just a little bit to have a better understanding --

MR. WILLIAMS:  Yes.

THE COURT:  -- of what the procedure is in this case?

MR. WILLIAMS:  Yes.

THE COURT:  Well, let me -- I think it helps to have some idea of what to anticipate.  As I understand it -- and, by the way, again, my name is Webb

Biard, and I'll be with you today, but the presiding judge of this court is Mike Snipes. You met Judge Snipes in the central jury room, and should you be selected as a juror, Judge Snipes will preside over the trial.

Now, the way we're going to proceed with jury selection is we're going to qualify some 50 prospective jurors. Some people will not be qualified for one reason or another, but we're going to qualify some 50. And then once that's done, then the attorneys are allotted so many strikes per side, and then they'll exercise what's called a preemptive challenge.

So I will tell you this morning whether or not you are a qualified juror or not, but that decision won't be made until all the 50 are qualified, and then from that 50 the actual 12 will be selected. Does that make sense to you?

MR. WILLIAMS: Yes.

THE COURT: Also, since it's going to be some time from now before that's done, we're going to take a picture that will be kept here by the attorneys, and so when they start to do their selection they'll remember -- put the name with the face.

MR. WILLIAMS: Sure.

THE COURT: If that's all right with you?

MR. WILLIAMS: Sure.

THE COURT: And the sheriff will do that. So that's kind of the way we'll proceed.

Now, Judge Snipes has told us that he anticipates for trial to start -- when, Mr. Alex?

MR. ALEX: August the 10th, Judge.

THE COURT: August the 10th; is that correct, Mr. Parks?

MR. PARKS: Yes, sir.

THE COURT: August the 10th. And what's the anticipated length of the trial?

MR. ALEX: Two weeks will be I think what we're going to allow for.

THE COURT: Is that in the pamphlet?

MR. ALEX: It is, Judge.

THE COURT: Did you see that -- did you see that?

MR. WILLIAMS: Yes, sir, I did.

THE COURT: Oh, there it is. All right. So August the 10th up to two weeks, Monday through Friday, nine to five. Break in the morning, break in the afternoon, and there will be a lunch break. The jury will not have to stay together over night unless and until -- this is a possibility -- you are deliberating your verdict, and you know what I mean by

that?

MR. WILLIAMS: Yes.

THE COURT: And let's say you went late into the evening and the jurors became mentally fatigued, and you still hadn't reached a verdict, there's a possibility you'd all be taken to a fine hotel at the County's expense, individual private room, spend the night, and then come back together the next morning to avoid any outside influence.

MR. WILLIAMS: Okay.

THE COURT: Before we go any further, I've given you that August 10th date, Monday through Friday, up to two weeks. As you sit here now, are you aware of anything that would be occurring in either your personal or professional life that would prohibit you from being a juror in this case?

MR. WILLIAMS: No, sir.

THE COURT: Good. All right. Now, I'm going to talk to you for just a little bit. It's usually longer than I mean to. And then one of the attorneys from each side will talk to you for up to 45 minutes. And I'll tell you here in court whether or not you're a qualified juror for this case or not.

Now, let me tell you, these are outstanding lawyers or they wouldn't be involved in this case. They

are also outstanding people. Out of the question that anybody sitting in your chair is going to be intentionally embarrassed or intimidated or cajoled in any way. So just put that aside. Also, you see we all drink water. If you need water, coffee, Coke, let me know and we'll get it. Okay?

MR. WILLIAMS: Yes.

THE COURT: Now, here's what I want to talk to you about just a little bit before the attorneys talk to you. If you'll look at that pamphlet with me, please.

MR. WILLIAMS: (Complies.)

THE COURT: If you go to page 2. At the top of the page, murder and then capital murder. As you sit here now, from hearing Judge Snipes's remarks and filling out your questionnaire -- which by the way we appreciate. I have it here. The attorneys might want to talk to you about some of your answers, and you'll have it to refer to.

MR. WILLIAMS: Okay.

THE COURT: But filling out the questionnaire, from appearing here today and reading this pamphlet, are you aware that this is a capital murder case?

MR. WILLIAMS: Yes, sir.

THE COURT:  The State of Texas is seeking the death penalty.

MR. WILLIAMS:  Yes, sir.

THE COURT:  You understand that.  And this is the reason we have this individual voir dire.

MR. WILLIAMS:  Yes, sir.

THE COURT:  This is the only type of case that I know of, a capital murder case, where the jurors talk to the lawyers individually.

MR. WILLIAMS:  Yes.

THE COURT:  Have you ever sat on a jury before?

MR. WILLIAMS:  Yes, I have.

THE COURT:  A criminal jury?

MR. WILLIAMS:  Civil.

THE COURT:  All right.  All criminal jury trials are in two parts.  First part is called the guilt/innocence phase.  The only issue is whether the person is guilty or not guilty.  If the person is found not guilty, the trial is over.  Found guilty, you go into the second part, which is called the punishment phase.  And you'll know which part you're in.

MR. WILLIAMS:  Yes.

THE COURT:  And in the punishment phase you'll hear evidence about the person on trial; good

deeds, bad deeds, prior record, no prior record.

Now, if you'll look at "murder" with me.  A person commits the offense if he intentionally or knowingly causes the death of an individual.

MR. WILLIAMS:  (Nods head.)

THE COURT:  All right.  That's not a car wreck.  Intentionally or knowingly.

MR. WILLIAMS:  (Nods head.)

THE COURT:  It's not a hunting accident.  It's not a mistake.  It's not insanity.  It's not self-defense.

MR. WILLIAMS:  Okay.

THE COURT:  That's murder.

MR. WILLIAMS:  Okay.

THE COURT:  Capital murder is murder -- intentionally and knowingly causing the death of an individual and certain facts and specific situations.  Murder of a policeman, murder of a fireman, murder of a child under the age of six, murder of someone while robbing them or kidnapping them, burglarizing their home, sexually assaulting them, murder of more than one person in a single episode; that's capital murder.

MR. WILLIAMS:  Okay.

THE COURT:  It's murder in certain specific fact situations.

MR. WILLIAMS: Okay.

THE COURT: All right. Now, murder is the only -- capital murder is the only crime in Texas in which you -- the death penalty is a possible punishment.

MR. WILLIAMS: I understand.

THE COURT: All right. The death penalty is not a possible punishment for murder.

MR. WILLIAMS: Okay.

THE COURT: The range of punishment for murder is not less than five or more than 99 years or life, and it's a possibility that the person is eligible and if the jury thinks that's the thing to do, probation is a possibility. If that's eligible and then if that's what the jury thinks is the right thing.

MR. WILLIAMS: Okay.

THE COURT: Capital murder, there's two possible punishments --

MR. ALEX: Excuse me, Judge. May I just butt in for a second?

THE COURT: Yes.

MR. ALEX: This is going to be after the probation for murder, isn't it?

MR. LOLLAR: I'm sorry?

MR. ALEX: This offense happened after the

probation for murder statute.

MR. LOLLAR: Yes, sir.

MR. ALEX: So this offense, probation is not an option.

THE COURT: Probation is not an option. Okay. I'm sorry.

MR. ALEX: Once that --

THE COURT: Thank you --

MR. ALEX: -- the offense starts --

THE COURT: -- thank you. I'm sorry.

MR. ALEX: Okay.

THE COURT: So probation is not a possible punishment for murder.

MR. WILLIAMS: Okay.

THE COURT: Now, there might be some lesser included offenses, but the attorneys can talk to you about that and explain that to you.

Thank you, Mr. Alex.

MR. ALEX: You're welcome.

THE COURT: Now, that's the range of punishment for murder, five to 99 or life. The range of punishment for capital murder, there is only two possible punishments. That's life in prison without parole. Okay? Life in prison without parole or death.

MR. WILLIAMS: Okay.

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

THE COURT: There's only two possible punishments. Now, the way the jury decides the punishment in a capital murder case, and this is what I'm going to spend some time with you on, by answering these three special issues. Now, if you look on the second page, constitutional rights. And the lawyers are going to talk to you about those, and they're very, very important because they're U.S. constitutional rights and Texas constitutional rights. But those are concepts I would imagine you've known about since grade school, the concept.

MR. WILLIAMS: Yes.

THE COURT: And you'll be asked whether or not you can follow that law. But the reason I want to talk to you about these special issues is because I've got a feeling you probably never addressed those special issues before. Is that correct?

MR. WILLIAMS: That would be correct.

THE COURT: Let me tell you, 95 percent of the lawyers in this courthouse aren't aware of these special issues, so don't worry about that. And they're going to give you plenty of time to understand it, but I want you to have somewhat of a grasp about these special issues before the lawyers start talking to you. And we'll take as long as it takes for you to tell me I see

PATRICIA HOLT, CSR        972/741-7086        DALLAS, TEXAS

what you're talking about.

MR. WILLIAMS:  Okay.

THE COURT:  If you'll look at special issue number one.  Now, here's the context of where and when you'll be called upon to answer that special issue.  If you've been selected as a juror, if you found the person guilty of capital murder, there had been that second phase of the trial, the punishment phase, the judge would have read you the law, you'd be back in the jury -- and the attorneys presented final argument and you'd be back in the jury room to deliberate your verdict.  Then and only then is when you'll address these special issues.

MR. WILLIAMS:  Okay.

THE COURT:  Some people think we're going to ask you to vote right now or before you found the person guilty.  You never see these special issues unless you found someone guilty of capital murder.

MR. WILLIAMS:  Okay.  I understand.

THE COURT:  Now, look at one, if you would.  You can read better than I can.

Do you find beyond a reasonable doubt -- the State of Texas has the burden of proving that beyond a reasonable doubt there is a probability that James Broadnax would commit criminal acts of violence and

constitute a continuing threat to society. Now, you answer that based on the evidence.

MR. WILLIAMS: Correct.

THE COURT: And you answer "yes" or "no." And you see if you answer it "no," then that's a life sentence.

MR. WILLIAMS: Yeah.

THE COURT: If you answer it "yes," you go to two. And that's called the parties issue, the special issue on parties.

Do you find from the evidence beyond a reasonable doubt that the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated a human life would be taken.

If you answer that "no," then it's a life sentence.

MR. WILLIAMS: Okay.

THE COURT: If you answer it "yes," then you go to three. If you'll just read three to yourself. There is no burden on three on either side. There is never a burden on the defendant --

MR. WILLIAMS: Okay.

THE COURT: -- in any aspect of the trial.

MR. WILLIAMS: Okay.

THE COURT: All right. If you answer one, yes; two, yes; three, no; it's the death sentence. If you answer them any other way other than yes, yes, no, it's a sentence of life in prison without parole.

MR. WILLIAMS: Okay.

THE COURT: And your answers aren't advisories to the judge. In other words, the judge is not going to see the way y'all answered the question and then say, okay, well, I heard the evidence and here's what I'm going to do. A yes, yes, no is a death sentence. The judge cannot set punishment in a capital murder case. It must be done by the jury.

MR. WILLIAMS: Okay.

THE COURT: So, yes, yes, no is a death sentence. Any other combination is a sentence of life in prison.

MR. WILLIAMS: Okay.

THE COURT: I know I ran through that real fast. The attorneys are going to take more time and explain it better than I did, but I want you to have some understanding of those special issues and when you'd be called upon to answer them, if you ever were.

MR. WILLIAMS: Okay.

THE COURT: Did that help you just a little bit?

MR. WILLIAMS:  Yes, sir.

THE COURT:  Do you have any questions of me before we go on further?

MR. WILLIAMS:  I don't think so.

THE COURT:  Okay.  Feel free to stop and say I don't understand what you're saying, because these attorneys are able to explain things to you.

MR. WILLIAMS:  Okay.

THE COURT:  If you need to take a break -- like I say, the State's going to talk to you 45 minutes.  If you need to take a break, we will, to get water, whatever you need, and then we'll conclude.

MR. WILLIAMS:  Okay.

THE COURT:  Without anything further from me, I want to reintroduce to you Andrea Handley, who's going to speak to you on behalf of Dallas County and the State of Texas.

**JEROME WILLIAMS,**

having been previously duly sworn, testified as follows:

<u>VOIR DIRE EXAMINATION</u>

<u>BY MS. HANDLEY:</u>

Q.  Good morning, Mr. Williams.  This kind of looks like the beginning of a bad joke:  How many lawyers does it take to pick a jury.

The Judge used the key term here.  What

we're trying to do is qualify a pool of jurors, and I think it's fair to say that in order for you to be qualified as a potential juror, you have to understand the law.  You have to, most importantly, agree to follow the law.

A.  Yes.

Q.  You have to base your verdict only on the evidence in the case and nothing else, and you have to be fair and impartial and nonbiased.  We all have our biases.  We all have our prejudices, but you have to leave those aside and you have to come in with an even playing field, and that is what makes a person a qualified juror.

What I feel my opinion as a representative of the State over here and their opinions as representatives for the defendant in the case I think is fair to say are worlds apart.  My opinion and their opinion, that and a buck and a quarter will get you a cold bottle of water at the snack shop.  What we need today is we need to know your honest true feelings.

A.  Okay.

Q.  We'll walk you through the laws and see if you understand the laws.  I might give you some hypotheticals.  Keep in mind I'm never talking about the facts of this case, but just some things to illustrate

what we're talking about. If you have any questions, then, by all means, jump in and let me know.

Honestly, I've read your questionnaire, Mr. Williams, and it looks to me like -- I'll be honest with you, you're a pretty good candidate here for this case. It looks like you obviously have some legal background. You're a paralegal.

A.   Yes.

Q.   And you've been involved in some programs with the federal public defenders office and had visited the penitentiary; is that correct?

A.   That's correct.

Q.   So I don't think a lot of this is going to be so over your head because you're also studying criminal justice.

A.   Correct.

Q.   How far are you in that right now?

A.   I am probably about two-thirds of the way through the program.

Q.   What do you want to do with this criminal justice degree?

A.   I just want to continue to be a paralegal. I have no aspirations to go to law school or anything. Nothing against the attorneys. But I just feel like my best work is done as a paralegal, gathering and

organizing information for the attorneys.

Q. Mostly civil work, or do you work in criminal also?

A. Mostly civil work right now. I wouldn't mind doing a little more criminal work at some point, but if that's down the road, that's down the road.

Q. What kind of criminal work have you done so far?

A. At the federal public defender's office we represented mostly probation violations, some drug cases, illegal reentry, cases like that.

Q. Okay. You went and talked to these people in the prison?

A. A couple of our clients --

Q. Okay.

A. -- that I spoke with. It was mostly to get information from them, take information, take forms for them to fill out.

Q. Okay. Okay.

A. Things like that.

Q. Would you say that you came to form more than just a professional relationship with some of these people? Did you start to like these clients?

A. No, I kept it professional the entire time.

Q. Did you ever feel sorry for them?

A.   Honestly, there was one client that we had that everyone in the office felt like he was at the wrong place at the wrong time.

Q.   What was he charged with?

A.   I believe it was a drug possession.

Q.   Okay.  What was it that made you feel sorry for him?

A.   He was a young kid, probably in his mid to late twenties and had a -- had a wife, small child, and just kind of basically starting out and happened to be at the wrong place at the wrong time.  He was working very hard to turn things around to try to better himself, and we all saw that he was making great strides, and it was even noticed by his probation officer that he was making great strides.

Q.   I see.  Okay.  Okay.  Just at the wrong place at the wrong time is what you think?

A.   Yes.

Q.   You had some time to think about the death penalty, obviously, after filling out this questionnaire.  How do you feel about being here, about potentially being on a jury?

A.   Well, it's important.  It's an important part of the judicial process.  It's an important part of the process -- just, you know, a duty as a citizen being

here.  I mean, we're all entitled to a jury of our peers, and I take that very seriously, and I would be -- I would just be very open and come in with a clean slate, clean mind, and just take everything in from both sides.

Q.  Do you think we need the death penalty in Texas?

A.  I -- I hedge, but probably yes.

Q.  Okay.  Why do you hedge?  Why do you say probably?

A.  I don't want to come across as -- you know, as bias one way or the other.  I would have to see the -- I would have to see what brought the situation up.  Why would death be a viable option.

Q.  Uh-huh.  Okay.  So if you had your druthers, if you were governor for a day, you wouldn't necessarily do away with the death penalty then?

A.  No.

Q.  Okay.  Okay.  And that's why we're here, and now it's kind of speak now or forever hold your peace, Mr. Williams, because I will tell you as a representative of the State that I believe we have the quality, quantity, and the type of evidence that will convince 12 jurors that the defendant is guilty of capital murder.  I think we also have the quality and

type of evidence that will convince 12 fair-minded jurors that a sentence of death versus life in prison without parole is the appropriate thing to do.

And I think you understand that once we give you that evidence, if we prove that to you beyond a reasonable doubt, once that happens the judge will have no alternative other than to sign pretty much that death warrant.  He will be taken to Huntsville.  He will be given an execution date.  He will die by lethal injection, and you will have played a significant part in that.

How does that rest with you, knowing that you might potentially play a part in someone's death?

A.    I -- I could still be at peace with myself.  I could still go on with my life and go forward if that were the -- if that were the case.  I wouldn't have any reservations about did I make the right decision --

Q.    Okay.

A.    -- or did I choose the right thing, if I were convinced without any reservation whatsoever.

Q.    Okay.  And the name of the game I think through all of this -- I hate to call it a game.  It's not a game.  This is serious business.  But the thing here is, under all the circumstances, the punishment should fit the crime.  I'm sure you've heard of that expression

before.  Be it a capital murder, be it a life sentence or a death sentence, be it theft of a bicycle, whatever the punishment may be, the punishment should fit the crime.  And all jurors -- the State as well as the defendant, we have a right to have 12 people judge the evidence as it is, follow the law, agree to follow the law.

You looked at the pamphlet before.  You saw that there were some fundamental principles of law set out for you in there:  Defendant's Fifth Amendment right to remain silent, presumption of innocence, the State has the burden of proof.  Are you pretty well versed on all of those, or is that still kind of a vague concept for you in your studies?

A.  I think I'm pretty well versed on those.

Q.  Okay.  Then you understand and would agree that at this stage of the proceedings, the defendant, as he sits here today, you are to presume him innocent?

A.  Correct.

Q.  Basically that goes hand in hand with the State's burden of proof, that you always look to the State to bring you the evidence in the case.  You never look to the defense to do that.

A.  Correct.

Q.  And then if and until we prove to you

otherwise, the defendant is to be presumed innocent, and you can do that?

A. Yes.

Q. You understand also that our burden of proof is beyond a reasonable doubt?

A. Yes.

Q. Now, there is no definition necessarily of reasonable doubt. Reasonable doubt is whatever you think it is. It's not beyond all doubt whatsoever. It's not 100 percent certainty. You know, there is some room there for doubt. What do you think reasonable doubt is?

A. Reasonable doubt, you just have that inkling that something just can happen or some instance can take place to where I -- you know, in a case -- in a criminal case, and I guess I have to use that as an example as probably the best way for me to answer it. If I am on a criminal jury and the State has the burden of proof, they have to convince me that there is no other way that this instance could have happened. There is no other way that -- that the events that took place would have happened.

Q. Okay.

A. No other way.

Q. And I think that when you talk about reasonable

doubt and you talk about doubt, anything's possible, isn't it?

A.   Correct.

Q.   So I think that, theoretically, there are a thousand different ways that the offense could have occurred.

A.   Yes.

Q.   Okay.  So when you said that we'd have to prove to you that there is no other way that could have happened, how do you square that with anything is possible?

A.   I guess I should say the defendant's actions, his actions or her actions.

Q.   Uh-huh.

A.   I have to be just very well convinced that the defendant would not have acted in any other way.

Q.   Okay.  Okay.  You understand also the defendant has a right to not testify and you can't hold that against him, which basically means if we fail to prove our case to you, you can't go in and say because he didn't testify, I'm going to hold that against him.

A.   I understand.  That's correct.

Q.   Let's talk a little bit about the law of capital murder and murder and other things we call lesser included offenses.

A.    Okay.

Q.    Capital murder, as His Honor said, is an intentional murder plus something else.  For example, an intentional murder while in the course of committing a robbery, that is a capital murder offense.  If you're found guilty of capital murder, one of two things are going to happen.  You're either going to get the death sentence or you're going to get life in prison without parole.

A.    Right.

Q.    We have to prove to you in this case that the defendant committed capital murder.  If we fail to prove to you the entire capital murder, it might not be done.  There might still be something other than a not guilty charge.

Let's say, for example, that we did not prove that a defendant intended to cause the death of an individual.  So it's not an intentional death, so now it's not capital murder but it could be what we call a lesser included murder.  As His Honor said, that's still a first-degree felony.  It carries anywhere from five to 99 years and life.  The jury would assess punishment.  They would be called upon to assess the punishment anywhere in that range, between five to 99 years or life.

It can even go farther down from that. We've got capital murder, which is the biggest offense you can commit. Then there's murder. There are different forms, different ways you can commit murder also. You can commit what is called a manslaughter, which means you recklessly killed the individual.

You go down a step further. You could have committed negligent criminal homicide, which is a State jail felony. That carries all the way from six months in State jail up to two years, all the way down to it was a sheer accident, which is not a criminal offense at all.

So when you as a juror look at the facts, you assess whether or not we've proved to you; was it a capital, was it a murder, was it a manslaughter, was it a State jail felony? If it's a capital murder, you're going to be asked to do one of two things, life in prison or death. And you'll come to that conclusion based on the questions that you answered, the special issues that the Judge read to you.

A.    Okay.

Q.    If it's anything less than that, Mr. Williams, then you as a juror will be called upon to assess the defendant's punishment, within whatever range is given to you.

A.    Okay.

Q.    It could be anywhere for murder five to 99 years or life, or it could be a criminally negligent homicide which could carry probation all the way up to two years in jail.

A.    Okay.

Q.    In order to be a qualified juror, you must agree that you will let the punishment fit the crime. In other words, you will consider the entire range of punishment; you will consider the crime itself; you will consider anything else that happens in trial; and you'll make your determination on what's the right thing to do based on what you have heard in trial.

A.    Correct.

Q.    If I were to say to you -- and there's so many different ways, for example, one could commit a murder. If I was to say a 35-year-old man plans the murder of a helpless eight-year-old boy and actually carries it out and does it, sound pretty bad?

A.    Yes.

Q.    And you would be called upon -- it would just be a murder.  That's not a capital murder.

A.    Correct.

Q.    You would be called upon to assess that individual's punishment.  Now, probably your snap vision

is, I'm going to put this guy under the prison, right?

A.    Yeah.

Q.    Sounds pretty bad, doesn't it?

A.    Yeah.    It does.

Q.    Let me change it up for you a little bit, just to kind of give an illustration of where we're going with range of punishment.    Let's say that 35-year-old man, that eight-year-old boy is actually his son, and that eight-year-old boy is at Children's Medical Hospital.    He is dying of incurable cancer.    He is not going to get better.    It's killing him slowly, killing him painfully, and he's suffering.

Every day that little boy suffers and he writhes in pain, and this 35-year-old man who has never been in trouble a day in his life, he's been a good father, a great dad, great citizen, out of nothing but sheer motivation to end his son's suffering, decides he's going to go in and give his son a high dose of morphine because that will be the easiest most painless way to take his death (sic), he goes in and he does that.

That.could be a first-degree murder, you know, versus the man who walks out to the park, takes out a gun and puts five bullets in a random eight-year-old's head.    Those are both first-degree murders.

A.   Okay.

Q.   In deciding the punishment -- I mean, why do you think -- can you see why we would have a big range of punishment?

A.   Sure.

Q.   Because the punishment needs to fit the crime.

A.   Uh-huh.

Q.   And that's why Texas is giving you this wide range of punishment.  That applies for any offense, Mr. Williams, be it a State jail, manslaughter, whatever the range of punishment is, you have to let the punishment fit the crime and you can't go in with your mind already made up.  Do you think that is something you can do?

A.   Absolutely.

Q.   Will you base your verdict on the evidence presented in the case?

A.   Solely on the evidence presented in the case.

Q.   If you felt, for example, probation were the appropriate thing to do in a particular case, would you do it?

A.   Yes.

Q.   If you felt the maximum would be the proper thing to do in a case, would you do it?

A.   Yes.

Q.    That's what we call lesser included offenses, and sometimes there might be a chance that something like that can happen.  There is also a lesser included offense in capital murder of robbery.  As we told you, capital murder is murder plus something.  For example, the murder of a peace officer while in the course of his official duties.  It's a murder during the commission of another felony.  It's murder of a child under six years of age.  It's murder of more than one person.  Okay?  That's capital murder.

Traditionally and in this case, we're talking about murder in the course of committing another felony offense.  If we fail to prove to you as the State that there was a murder in this case, you know, you might still be called upon to determine whether or not there was actually a robbery in this case.  Do you see where I'm going with that?

A.    Yes.  Yes.

Q.    For example, let's say the father went in -- same scenario with the boy who's dying of cancer.  He goes in, he doesn't have morphine, doesn't know how to get it but he knows the hospice nurse has it.  So he goes to the hospice nurse that he's been working with for a long time, he grabs her by the wrist and he twists it and says, Mary, I'm sorry I have to do this but give

me some morphine, and so she hands him some morphine.

Robbery is theft, the taking of something and either threatening a person while doing it or causing bodily injury. By twisting her arm, he's causing her bodily injury. She gives him the morphine. He goes in, gives his son the high dose of Morphine. Later on it was determined that the son was actually already dead. He died of an aneurism an hour earlier.

Let's say we can't prove he killed his son. The son was already actually dead. Do you see where I'm going with that?

A. Yes.

Q. Is he guilty of murder?

A. I don't think --

Q. The son was already dead, wasn't he?

A. Yes.

Q. Is he guilty of robbery?

A. Yes.

Q. So that's one way you might have to consider a lesser of robbery.

A. Okay.

Q. Again, whatever that punishment may be, you let the punishment fit the crime.

A. Yes.

Q. Does that make sense to you?

A.    Yes.

Q.    Okay.  Let me cover one more thing with you now, because this is also going to become a special issue.  Special issue number two, and that's parties to an offense.  In Texas it is possible that a person could be found guilty of capital murder and even assessed a death sentence even when they were not, for lack of a better word, the triggerman, okay?

A.    Okay.

Q.    Let me give you an example here.  Let's say that -- let's say that my brother and I are planning to rob the local 7-Eleven.  My brother goes and he buys the gun.  My brother goes and he buys the bullets.  We sit down at the kitchen table.  We talk about how we're going to do it.  He even tells me 11 o'clock at night is a good time.  There's an elderly clerk on duty.  There's slow foot traffic.

My brother drives us over there.  My brother hands me the gun, loads it, hands it to me, says go on in there.  I say, all right, I'm going to go on in, you be the lookout driver.  And I tell my brother as he loads the gun and hands it to me, I tell him, I'm not going to leave any witnesses, you know that.  And he says, I know it; go get it done.  I go in.  I rob the clerk.  I take the money.  I shoot and kill the clerk

and come back out to the car and we leave. I could be guilty of capital murder, right? I've robbed the clerk. I've even killed the clerk, haven't I?

A.    Yes.

Q.    I've committed an intentional murder during the course of a felony.

A.    Yes.

Q.    The law states that my brother could also be guilty of capital murder and potentially subject to the death penalty.

A.    Okay.

Q.    The reason being is he could be found guilty of capital murder if a jury found that he was a party to the offense. Did he aid, assist, encourage, or direct? Did he participate in the commission of this offense? Fair to say that he bought the gun. He bought the bullets. We planned it out. He drove us up there. In order for him to be guilty of capital murder as a party, you as a juror must find that he should have anticipated that somebody could die. Do you see where I'm going?

A.    Yes.

Q.    I tell him, you know I'm not leaving any witnesses. So fair to say that he should have anticipated somebody would die?

A.    Yes.

Q. In order for him to be subject to the death penalty, though, you would have to find as a special issue that he did anticipate somebody was going to die.

A. Yes.

Q. There's I should have, and there's I did anticipate.

A. Okay.

Q. Okay. If the jury finds that, then my brother could potentially be subject to the death penalty even though he's not the actual triggerman. How do you feel about that?

A. If that's -- if the law is written that way and I'm instructed to consider that as a form of punishment, then I will follow that.

Q. Do you have any qualms with somebody getting the death penalty who didn't actually pull the trigger?

A. I'd have to say no. I'd have to say no because they were there. They were part of the -- part of the commission. They were part of the planning, and they knew what the potential ramifications were and the potential outcome.

Q. Okay. Let's talk about the second part of the trial, and as His Honor told you earlier, in a case like this there is really two parts. It's almost like two mini-trials if you will. In the first part of the

trial, you're called upon to decide one issue and one issue only: Is the defendant guilty of capital murder or what is he guilty of. Okay? All those principles of law apply in that.

Assuming we prove our case to you beyond a reasonable doubt and you find the defendant guilty of capital murder, then we're going to move on to the second phase of the trial. And that's where it's really kind of different or it's a lot different from most criminal cases. You don't just go back there now, sit around and go, okay, should we give him life in prison without parole or should we give him death. Instead, you're going to come to your verdict on how you answer these three special issues. Does that make sense to you?

A. Yes.

Q. And all the rules of law that applied in the first part apply in the second part again.

A. Okay.

Q. Remember how you were to presume he was innocent in the first part until we prove to you otherwise?

A. Yes.

Q. In a death penalty case, you are to go into the second part of the trial presuming that a life sentence

is the appropriate sentence.

A.    Okay.

Q.    Because one of two things happen, life or death.

A.    Yes.

Q.    You go in, right off the bat you are to presume life is the appropriate thing to do here, because, again, it goes to our burden of proof.  It goes to the State.

A.    Okay.

Q.    Until I prove to you beyond a reasonable doubt otherwise, he gets a life sentence.  Make sense?

A.    Makes sense.

Q.    Okay.  Some people say, look, if he's guilty of a capital murder, then, you know, obviously, I'm going to assume that death is more appropriate.  That person is not a qualified juror because they've made a presumption without hearing the evidence or without answering the special issues.

So you go back and you can consider everything you heard in the first part of the trial, and you may very well hear more evidence again.  Now there is an opportunity for us to put on more evidence.  You can hear other things that maybe you couldn't have heard about in the first part of the trial.

A.    Okay.

Q.    But you most definitely can consider everything you heard in the first part of the trial.

A.    Okay.

Q.    So the first question that you go back there and you have to decide amongst you and the jurors is that first special issue.

THE COURT:    Also it's in the pamphlet.

Q.    (By Ms. Handley)    Right.    Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.    We didn't write that question, okay?

A.    (Laughter.)

Q.    We might have written it maybe a little bit differently.    But basically, Mr. Williams, what we call that is the future danger in this issue.    We are asking you as a jury to make a prediction, and that is to make a prediction as to whether or not it's more likely than not that this defendant is going to be a future danger. Okay?    There is no definitions really given for you in this particular charge here.    We can go through it.    It says -- and, again, reasonable doubt; that goes to our burden.    You always look to us.    You never look to the defense to prove anything, okay?

A.   Okay.

Q.   You look to us.  That there is a probability. Anything's possible, right, Mr. Williams?

A.   Yes.

Q.   Anything's possible.

A.   Yes.

Q.   It's possible I could win the Miss Texas pageant, but it sure isn't probable.  A little long gone for me.  Maybe Ms. Evans could, but not me.  But the probability, what do you think that means, the probability?

A.   That chances are that it could happen again.

Q.   If I were to tell you more likely than not, would you agree with that?

A.   More likely than not, yes.

Q.   More likely than not.  Okay.  That there is a probability that it's more likely than not that the defendant would commit criminal acts of violence. Again, nobody defined that for you.  Criminal acts of violence are whatever you think they may be.  They didn't say it was more likely than not that the defendant will commit another murder or that the defendant will commit a rape or that the defendant would punch somebody in the face.  They didn't define that for you.  It's for you to decide what criminal acts of

violence include.

If I were to reach over and push my cocounsel out of her chair, would you consider that a criminal act of violence?

A. Well, in a fit of rage, maybe. It could be.

Q. When do you think me pushing her out of her chair to the floor would not be an act of violence?

A. If she knew that was a possibility of happening.

Q. Like if we were joking around you mean or something?

A. Yeah.

Q. No, I mean she's sitting there minding her own business, and I say, You know what, Miss Texas, I'll make sure you're not Miss Texas, and I hit her in the face. What do you think about that?

A. Then I think that would be a criminal act.

Q. Okay. You seem hesitant about that.

A. I guess it would depend on the circumstance. I mean, if it's just out of the blue, yes, I would think that would be a criminal act. But if you two were joking around and all of a sudden it happened, yeah, a surprise, but I don't think criminal.

Q. Okay. Okay. Maybe mutual combat is what you're thinking?

A.   I'm not sure I understand that.

Q.   I guess I'm --

A.   Mutual combat.

Q.   Like we agree to go to fisticuffs, like we were fighting?

A.   Oh.  This situation is just kind of taking me aback.  I guess because you're intentionally injuring someone that -- then I -- if you do that, then I -- I can see that being a criminal act.

Q.   Sure.  Some people have even said it doesn't necessarily have to become physical.  It could be enough that I'm making threats, you know.  I'm making threats that I'm going to go over to Ms. Evans' house tonight and I'm going to mess her up.  That I'm threatening to do something.  What do you feel about that?

A.   That could be, you know, a criminal act if I feel like the person is serious enough about carrying out something.

Q.   Uh-huh.

A.   You know, going over to someone's house and carrying out something like that.

Q.   Sure.

A.   I would consider that a criminal act.

Q.   Okay.  That it's more likely than not that the defendant will commit a criminal act of violence,

whatever that may be, that will constitute a continuing threat to society. Now, at this point, Mr. Williams, he's been found guilty of capital murder. One of two things is going to happen, right?

A. Yes.

Q. Life or death. So where is he right now?

A. Still at life.

Q. He is sitting at a life sentence, and where will he serve that life sentence?

A. I guess over at Lew Sterrett.

Q. It's not a trick question. He's going to be in the penitentiary. You would assume so. Because when they say "society" -- when I hear "society," I think of our society at large. I think of going to the grocery store and the post office. We live in a society, right?

A. Yes. Yes.

Q. I think there is a contemplation that prison can also constitute a society. You've been to the penitentiary before, you say, in your work.

A. Yes.

Q. And you see that there are people there other than inmates?

A. Yes.

Q. You got staff, you got guards, visitors, paralegals coming in, counselors coming in, clergy and

teachers.  It's a society in itself; is it not?

A.  Correct.

Q.  So basically what they're asking you to do here is make a prediction as to whether or not it's more likely than not he will commit a criminal act of violence wherever he may be, even if it's in the prison.  Does that make sense to you?

A.  Yes.

Q.  This question, Mr. Williams, could be answered by you just based solely on the circumstances of the offense that you found him guilty of.  Do you understand that?

A.  I think -- yes, I think I can see that.

Q.  Okay.  Does that make sense to you?  Does that seem like something that's possible, that you can make a prediction on this just based strictly on the offense at hand?

A.  For me personally, no.  I'd want to see the evidence.  I'd want to hear the evidence.

Q.  Hear additional evidence besides just the offense that he committed?

A.  Yes.

Q.  What kind of things would you look for to make that determination?

A.  Just past tendencies.  What has he done in the

past.  What do people say that he's capable of doing.

Q.  Okay.  Okay.  And you understand that's our burden?  You can't look to the defense or anything to do that.

A.  Correct.

Q.  But you would want something else?  You would want something more besides just of the criminal offense itself?

A.  Yes.

Q.  Okay.  Any questions about that special issue or how you would arrive at that?

A.  No.

Q.  You understand, if you answered that special issue "no," then that's it.  That presumption of a life sentence stays.  That's it.  That's all.  We're out of here.

A.  Yes.

Q.  Okay.  But if you and the other jurors find that, yeah, we think that there is a probability that that's going to happen and he's a future danger, then you move on to this second special issue.

Now, we talked about earlier the parties offense, where you could be a party to a capital murder if you anticipate -- if you should have anticipated that a life could be taken, correct?

A.    Correct.

Q.    Well, now, in order for you to be eligible for the death penalty, we have to either prove to you that either the person caused the death himself --

A.    Uh-huh.

Q.    -- of the person or he actually anticipated someone was going to die.  Does that make sense to you?

A.    Yes.

Q.    And, again, evidence -- you can look at everything that happened in the first part of the trial, and that will probably help you make your determination as to whether or not he should have anticipated and he actually did anticipate that a life would be taken.

A.    Yes.

Q.    Make sense?

A.    Yes.

Q.    Any questions on that?

A.    No, I think I have it.

Q.    If you answer that question "no," then we stop and we're still sitting on that life sentence and we don't go any further.  If you answer that question "yes," then you move to the last question and that's the final question.

A.    Okay.

Q.    That's what we often refer to as our mitigating

circumstances question.  And, again, we didn't write any of these questions here.  They're kind of wordy.  But I think maybe the best way to put this, Mr. Williams, is that it's basically a safety-net question.  It's that opportunity for the juror to take one last look at everything, sit back, absorb everything and determine is the death sentence the actual way we should go with this case.  Because at this point, Mr. Williams, you found him guilty of capital murder, right?

A.    Uh-huh.

Q.    Now you come in with a blank slate again to look at the evidence, presume life was the thing to do, but you found that he's a future danger, right?

A.    Yes.

Q.    You have found that he, in fact, anticipated somebody would die.

A.    Okay.

Q.    Okay.  And now you're going into this last question, and basically what you and the other jurors are asking yourselves are is there anything sufficiently mitigating about this particular defendant that would make us go with a life sentence versus a death sentence.

And it kind of takes a little bit of mental gymnastics because, remember, he's guilty of capital

murder. He's a future danger. He knew somebody was going to die or he killed them himself. So a lot of people go, what in the world would be sufficiently mitigating if he's that bad a guy, right?

But, again, you go into this with an open mind. That is always the name of the legal process. You haven't made up your mind yet. No assumptions are made. You have to go in, be open, listen to the evidence, judge each piece of evidence. You decide what weight to give it and you decide what weight it merits.

A.   Correct.

Q.   Okay. A mitigating circumstance is whatever you think it is. Okay? Some people might say, well, you know, he had a lousy childhood or, you know, he was raised in a closet and fed dog food his whole life and they put cigarettes out on him, and you know what, he just turned out to be a monster because his parents turned him into one. And I know he's dangerous and I know he's a capital murderer, but that's a mitigating circumstance and it's so substantial we're going to give him life instead of death. See where I'm going with that?

A.   Yes.

Q.   I can't pin you down to what you think is mitigating or when you would do that. That would be

inappropriate for me or anybody to do that.

A. Uh-huh.

Q. But I would like to feel you out about it. You've spent some time talking to some inmates. You said that there was one that you kind of felt sorry for.

A. Uh-huh.

Q. And I think you mentioned his age that you kind of felt sorry for him. Is that -- tell me what would move you in that direction.

A. Well, in that instance it wasn't solely his age. It was the fact that, you know, he had a young family and that he was -- you know, he knew that what had happened was wrong, it was against the law and -- you know, but he was working very hard with getting -- getting people to -- getting friends and family to testify, to write letters saying that, you know, he knew what it was -- he knows the difference between right and wrong and he was just caught up in the wrong place at the wrong time. You know, we felt like that we had a really good chance of getting him probation.

Q. Okay.

A. And everybody was saying, yeah, he's going to get it, and the judge said no, he's going to be going to the pen for X number of months. Even after our

client -- the defendant testified, there was barely a dry eye in the courtroom, because I was there.

Q.   Okay.  Okay.

A.   And, you know, we were just all shocked by it.

Q.   So fair to say in that instance you felt the proper punishment for that case was probation.

A.   Yes.

Q.   Somebody else thought it wasn't.

A.   Correct.

Q.   But you were making the judgement call there.

A.   Right.

Q.   But with that particular defendant, with his circumstances and his history, you felt that that was the proper thing to do in that case?

A.   Yes.  Yes.

Q.   Do you think that is something you could do, Mr. Williams, after finding somebody guilty of capital murder, finding they're a future danger, finding they actually killed a person and knew it was going to happen, that you could still consider whether or not to turn that death sentence into a life sentence?

A.   Yes.

MS. HANDLEY:  Judge, I haven't been keeping track of the time.  I beg your pardon.

THE COURT:  You've got ten minutes.

MS. HANDLEY:  Ten minutes.  Thank you, sir.

Judge, may I reserve my ten minutes?

THE COURT:  Certainly.

MS. HANDLEY:  I'm going to reserve my ten minutes.  Thank you, Mr. Williams.  I'll pass this juror.

THE COURT:  We'll take a short five-minute break.

THE BAILIFF:  All rise for the juror.

(Mr. Williams exits conference room)

THE COURT:  Court will remain in order.  I don't want to -- I want the State to use their time, but there might be something that is relevant for you to address.  But, normally, when the State concludes their conversations, that will be it.

MR. LOLLAR:  Well, and we were asking ourselves what does it mean to reserve their time?

MS. HANDLEY:  It means when you're done I can use ten more minutes.

MR. LOLLAR:  No --

THE COURT:  No, not --

MS. HANDLEY:  That's what I hoped it meant.

THE COURT:  Well, it might be so to clear up something, but not going into something else or starting --

MS. HANDLEY:  Sure.  Sure.

MR. LOLLAR:  Well, I'm not sure what that meant, to clear up something.

THE COURT:  Well, I'll allow the State's counsel to -- if there is a question or two she wants to ask, and I'll just see whether or not that's rebuttal or something just new that --

MS. HANDLEY:  I can go ahead and use my ten minutes now if you want.

MR. LOLLAR:  Yeah.

THE COURT:  But I mean we don't want to do that -- we're not going to ping-pong, in other words.

MR. LOLLAR:  Right.

MR. HIKEL:  Are we standing up for now, Judge?

THE COURT:  Yeah.

MR. HIKEL:  Are we taking a ten-minute break?

THE COURT:  Yeah.

(Recess taken from 10:47 to 10:57 a.m.)

THE BAILIFF:  All rise for the juror.

(Mr. Jerome Williams enters room)

(Open court, defendant and juror present)

THE COURT:  Thank you, Mr. Williams.  There you go, sir.  Once again, we appreciate you.

PROSPECTIVE JUROR:  Sure.

THE COURT:  Ms. Handley has a couple more questions.

FURTHER VOIR DIRE EXAMINATION

BY MS. HANDLEY:

Q.  You know, Mr. Williams, just one more question.  I was looking at your answers there, and you have a daughter that goes to UT?

A.  Yes.

Q.  What is she studying?

A.  Geophysics.

Q.  Geophysics.  That sounds like --

A.  She wants to go into meteorology.

Q.  Amazing.  Amazing.  I was just wondering if she had any issues following in her father's footsteps, if she had any involvement in the legal process or anything like that?

A.  No.  At one time I wanted to go into meteorology, so I guess following in the footsteps that way, but, no, she has no inclinations of going into the legal field.

Q.  And you said you had a sister who a while ago was in the police explorer program; is that correct?

A.  Yes.

Q.  Okay.  Do you have any family in law

enforcement?

A. No.

Q. Okay. That's what I wanted to know. Thank you for clearing that up.

A. Thank you.

THE COURT: Now, Mr. Lollar?

MR. LOLLAR: Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. LOLLAR:

Q. How are you, Mr. Williams?

A. Doing well, sir. How are you?

Q. Oh, we're doing fine. Let me reintroduce myself. I'm Brad Lollar, and this is Doug Parks, Keri Mallon, James Broadnax. Thank you for being a juror for us, first of all, and you are our guinea pig. You are our very number one juror to talk to in this case. We had 800 people fill out questionnaires, and we're going to go through that panel as long as we need to to get 50 qualified people.

Let me impress upon you that this is kind of informal, formal in a sense but kind of informal. This is the only stage of the trial where we get to talk to you and you get to talk back to us and tell us what you're thinking. Now, at this point you have not taken an oath to follow the law. All you've done is taken an

oath to tell us the truth.

A. Correct.

Q. And, really, all we care about here is how you feel about things.

A. Okay.

Q. Obviously, we didn't anticipate that you would have been familiar with these special issues in a capital murder case or know the nuances of the laws, intentional as opposed to knowing as opposed to reckless, and all that type of thing. But you're being hit with a lot here today, and we appreciate that. We understand that you're being hit with a lot of things you haven't thought about.

What I'd really like to talk to you more about is the things you put on your questionnaire --

A. Okay.

Q. -- and the way you felt when you answered the questionnaire prior to the time you get hit with all these legal concepts.

A. All right.

Q. All right. Now, I see, obviously, number one, that you're a paralegal and your entire career has been working around the law. I see that you work for David Vereeke.

A. Uh-huh.

Q.   And David, a long time ago when I first started, was a lawyer who did some criminal law.

A.   Yes.

Q.   So that's where I came to know David was back when he was practicing criminal law.  But I understand he's all civil now; is that correct?

A.   Yes.

Q.   And I see you worked for Judge Ashmore.

A.   Yes.

Q.   Was that after he left the bench?

A.   Yes.  Yes, it was.  I think it was right after he left the bench he opened up his own practice, and I started there.

Q.   Well, I know both of them and think very highly of both of them.  Tell me about your experience in the federal public defender's office.

A.   My first job after I graduated from paralegal school was in the federal public defender's office.

Q.   What year would that have been?

A.   1990.

Q.   1990.  Okay.

A.   And I've told people had I not -- I was living in Fort Worth at the time.  Had I not made the move back to Dallas I would probably still be there because it was a very good experience for me.

Q.    What did you like about that?

A.    The people there knew that I was very new to the legal profession, so they were very giving of their knowledge and shared a lot of their knowledge and wisdom with me, and I guess I was just a sponge and was absorbing everything, and they were encouraging me to continue to learn and to go into the field.

Q.    Good.  Now, looking at your questionnaire, the first thing I want to talk to you about is that on page 3 you indicate that you have heard about this case.

A.    Yes.

Q.    Due to some media coverage of the case.

A.    Yes.

Q.    So I guess the first thing we need to ask is have you formed any opinion about the guilt or innocence of Mr. Broadnax or about what the appropriate punishment for him should be based on what you have seen or heard in the media accounts?

A.    No, I have not.

Q.    Okay.  Tell me about that.

A.    Well, I -- one of the things that I've learned both in paralegal school and in my career in the law is that there are two sides to every story.  I've only seen one side.  And I think for me to form a fair and honest opinion, I would need to have all information.

Q.   Okay.  Going on to your questionnaire, we asked you on the very first page if you were in favor of the death penalty, and you indicated that you were, and you said that you thought it was appropriate in some murder cases and that you could return a verdict which assessed the death penalty in a proper case, in what you thought to be a proper case.

A.   Correct.

Q.   Then in explaining your answer you said you believe that if someone takes another person's life, that person should be made aware of the seriousness of his actions and feel what the victim felt at the time of the offense.  Tell me what you were thinking about there.

A.   Well, if -- you know, if you take something from someone that you know is -- a possession from them that you know that they hold near and dear to their heart, you need to know what it is that you did that caused them the pain that they felt.

Q.   Uh-huh.

A.   And you should be able -- at some point, not necessarily immediately but at some point realize what your actions caused -- what harm that caused that person.

Q.   Okay.  And do you think that imposition of the

death penalty is the only appropriate way for them to feel that?

A.    It depends on if I'm given the evidence to come to that conclusion beyond any doubt.

Q.    Okay.  On page 4 we ask, do you think that there are some crimes which call for the death penalty solely because of the severe facts and circumstances of that offense that was committed, regardless of whether or not the guilty person has committed any prior violent acts, and you said, yes, anything involving the intentional taking of a person's life.  Okay?

A.    Uh-huh.

Q.    And then further on page 5 we asked you what purposes, if any, do you believe the death penalty serves, and you said it helps increase safety of society by taking those who intentionally harm others off the streets.  Then the next question, what would be important to you in deciding whether a person received a death sentence rather than a life sentence in a capital murder case, and your answer was, were the defendant's actions intentional.

Okay.  So it just seems to me reading those three answers that we just talked about, you key in on a defendant's intentional act or the conduct of the defendant and whether or not it was intentional.

A.    (Nods head.)

Q.    Okay.  And that to you is the dividing line between the life sentence and the death sentence, just based on what I'm seeing on your questionnaires.  Is that a fair statement?

A.    Probably.  But, again, I would -- I would need to know all the -- all the circumstances, all the events that took place, what was going -- what led up to the act that happened.

Q.    Tell me why that would be important to you.

A.    Taking someone's life is very serious, and if I'm in the position to where I'm going to determine whether someone is going to either serve a life sentence without the possibility of parole or be executed, I would need to make sure that I would have all available information so that I can make an informed decision.

Q.    Okay.  This is where I get lost in reading your questionnaire, and I want to make sure that I understand what you're saying.  Okay?

A.    Okay.

Q.    If you look at the indictment that's there on that very first page.

A.    Okay.

Q.    Okay.  Now, in a capital murder it is required that the State prove beyond a reasonable doubt that the

defendant intentionally killed the victim. Okay? And what we mean by intentionally is that in his -- in doing whatever he did, he intended to cause the death --

A. Uh-huh.

Q. -- of the individual, of the victim. Okay?

A. (Nods head.)

Q. And that's an element that the State has got to prove beyond a reasonable doubt. Okay?

So, for example, if I'm robbing a gas station and I tell the teller -- okay, I'm up there robbing the teller and I've got my gun in my hand, and I tell the teller, now, you've given me the money. I'm fixing to leave here, but if you chase me out the door, you'll see which way I go. I don't want that to happen, so if you come around that counter I'm going to shoot you in the kneecap. So that's exactly what happens. He starts to go out. The teller goes around the counter. He shoots him in the kneecap. He didn't intend to kill him, just intended to prevent him from following him out and see which way he went.

A. Uh-huh.

Q. Okay. And you believe that from the evidence.

A. Okay.

Q. Now, unfortunately, in hitting him in the kneecap, he hits the femoral artery and the man bleeds

to death.  So he has caused the death of that individual, and he did it during the robbery in this hypothetical case.  But the question here is did he intend to cause the death.  Okay?  Do you see the distinction I'm making?

A.   Yes.

Q.   And in that case, the answer would be no.  He intended to shoot him in the kneecap.  He did not intend to cause his death.  That would not be a capital murder.

A.   Correct.

Q.   So, see, the State has got to prove that it was an intentional murder, that that was in his mind at the time of the commission of the offense was to cause death.  Okay?  And if they fail to prove that, you don't just find him not guilty, you find him guilty of the lesser included offense of murder.  Okay?

A.   Correct.

Q.   So that's where we get into this business about lesser included offenses.

A.   Right.  Right.

Q.   But it's going to be the jury's job to look at all the facts and circumstances, and that's one of the things that the State has to prove beyond a reasonable doubt, that a defendant intentionally caused the death

of the victim --

A. Uh-huh.

Q. -- for their to be a finding of guilt for capital murder. Okay?

A. Yes.

Q. But let's say now that the State, by through whatever means -- there's a lot of different ways they can show what a person's intent was. Let's say that they do prove that the murder was committed intentionally in our hypothetical case, okay, and that it occurred during the course of a robbery. Well, then if they've proved all of the other elements, that it happened in Dallas County on or about a particular date, then the jury is going to return a verdict of guilty for capital murder. Okay?

Now, this is -- this is where I want to understand what you're telling me from your questionnaire. It just seemed to me that -- to you, in asking you your feelings about the death penalty versus a life sentence, the dividing line was whether he did it intentionally. Okay? So you can now see that in every capital murder case like this, the State has to prove beyond a reasonable doubt that it was done intentionally.

A. Yes.

Q.   So I'm sitting here thinking, okay, if that's the dividing line for Mr. Williams, then it seems to me like in every capital murder case where the State has proven an intentional act that resulted in the death of the victim, Mr. Williams is going to go for the death penalty.  Okay?

A.   I probably should have quantified that, and I do apologize.

Q.   First of all, do you think that?

A.   Do I think --

Q.   Yes, that in every intentional murder that the person -- the murder committed during the course of a robbery.  Okay?  If the State proves that a robbery was going on and that the defendant intentionally caused the death of the victim, okay, that that person should receive the death penalty?

A.   If they directly caused the -- intentionally took a person's life?

Q.   Intentionally took their life.

A.   I would have to say yes.

Q.   Okay.  That's what I was reading from your questionnaire, and that's what I wanted to confirm with you here today.

A.   Okay.

Q.   So stick with me now, okay, on that issue.

Your thought is that if the State shows you that a person was voluntarily robbing someone -- they weren't being made to do it. They weren't being forced to do it. They wanted to engage in a robbery -- and that they had a handgun, which is what the allegation in the indictment is here, and that they intentionally caused the death of the victim, in other words, they meant to cause his death; not to wound them, not to scare them, not to anything else, but they intended to cause their death and they did that, okay, that your feeling is that that person should receive the death penalty?

A. Based on all of the evidence that's admitted in the case.

Q. Right. And the State would be required to prove all those things beyond a reasonable doubt, including the element of intentional, that he did the action intentionally to cause the death of the individual.

A. If everything was pointed to where -- you know, all the questions were answered, the State completely met its burden.

Q. Okay. Now, we're not even talking about the special issues yet.

A. Okay.

Q. What we're saying is it is the duty of the

State, understanding the defendant enjoys a presumption of innocence.

A.    Right.

Q.    But the State gets to present evidence in the first part of the trial.  It's the guilt or innocence phase.

A.    Okay.

Q.    And they get to present whatever evidence they want; eyewitnesses, confessions, whatever.

A.    Okay.

Q.    But it is required that they prove that the defendant intentionally caused the death of the victim and he was engaged in the offense of robbery at the time he did that.  Okay?  But if they do that --

A.    Uh-huh.

Q.    -- okay, see, then we go into a penalty phase. But if I've understood what you've told me, you think that if the State proves beyond a reasonable doubt that the defendant was engaged in a robbery of the victim and intentionally caused his death and they proved that beyond any reasonable doubt --

A.    Uh-huh.

Q.    -- and you are absolutely comfortable in finding him guilty --

A.    Yes.

Q.   -- no doubt in your mind --

A.   No.

Q.   -- okay, that you feel that the appropriate punishment is death and not life?

A.   Yes.

Q.   So if I understand correctly then, when looking -- all right, now, understand where we are now. Now we're in the punishment phase.  Okay?  You hear evidence.  You can consider the evidence you heard in the first part of the trial.  You can consider whatever else the State may bring, whatever else we may bring, and then you get to these special issues.  Well, the first special issue is do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence in the future which would constitute a continuing threat to society.  Okay?

Now, see, you understand you're answering that in the context of already having found him guilty of capital murder.  In other words, you have found that he intentionally caused the death of the victim during the course of a robbery.

A.   Uh-huh.

Q.   Okay.  Or you wouldn't be there.  You wouldn't be at the point where you are asked that question.  You

already found him guilty of capital murder.

A.   Right.   Right.

Q.   So you're back there being asked this special issue number one.  Do you find beyond a reasonable doubt that there is a probability that he would continue to commit criminal acts of violence to constitute a continuing threat to society, and that obviously means in the future.  Okay?  But you already found him to be a person who committed an intentional killing during the course of a robbery.

A.   In this particular case.

Q.   Right.  So would you -- I guess what I'm asking is this:  If you found that a person has committed that type of a capital murder, intentionally killing during a robbery, would you automatically believe that that person is the type of person who would constitute a continuing threat to society in the future?

A.   Not automatically, no.

Q.   Okay.  Why not?

A.   It could be -- it could be brought out during the penalty phase if something happened, we could be convinced -- the jurors could be convinced it was just a one-time thing.

Q.   Okay.  Okay.  So you would not automatically answer that first question no based on the fact that you

had found him guilty of the capital murder?

A.   That I wouldn't answer it no?  I'm not sure I follow the question.  Sorry.

Q.   Right.  I'm trying to decide in my mind, you've already told me now --

THE COURT:  I believe you said you would not automatically answer it no.

Q.   I'm sorry.  Not automatically answer it yes. I'm sorry.  I'm confusing myself.

A.   Correct.  I would not automatically answer it yes.

Q.   Okay.  Okay.  And then you go to special -- okay.  Only in the event that the State persuades you beyond a reasonable doubt that there is a probability that the defendant is the type of person who's going to continue to commit criminal acts of violence in the future can you answer that question yes.

A.   Yes.

Q.   Okay.  And, again, the law starts out with a presumption that the answer to the question is no.

A.   Yes.

Q.   Okay?

A.   That is correct.

Q.   So, again, the State has got to present evidence to you to change that "no" to a "yes" before

you can proceed to the second special issue.

A.    Yes.

Q.    Okay.  And as you've noted here today, if you could be persuaded or you feel there is a lack of testimony, lack of evidence to show you that this was not a one-time deal, that is something that might persuade you to answer that question no?

A.    That is correct.

Q.    Okay.  While we're on this, do you understand that the death penalty is never required under Texas law?  Never, ever, ever?

A.    Yes.

Q.    Okay.  In other words, the legislature has never said if you find a person guilty of, say, the intentional murder of a police officer and that requires the death penalty.

A.    Yes, I do.

Q.    Do you understand that?

A.    Yes, I understand that, yes.

Q.    There is no requirement under any circumstance that you are required to return the death penalty.

A.    Yes.

Q.    Okay.  And we get jurors who want to know about this business of life without parole.  Okay?  How long do you think a person really has to serve if they're

assessed to life without parole?

A.   That's hard to say.   I don't know that you really can put a finite number on something like that.

Q.   Because?   Why?

A.   Well, they can -- they can -- they should be given the opportunity to rehabilitate themselves if they want to.

Q.   Okay.

A.   If they really want to become, you know, better members of society in general and be able to serve their community in some way, shape, or form, they should be able to do so.

Q.   So you think that there is a chance that a person who is assessed life without parole can do something in the future which would reduce that sentence?   Is that what you understand?

A.   Yes.   Yes.

Q.   Let me disabuse you of that notion and tell you that under the law of the State of Texas, life without parole means life in the penitentiary until they die.

A.   Okay.

Q.   Okay.   Now, that can be tomorrow.   That can be ten years from now.   That can be seven years from now.   Okay?   But regardless of what they do, regardless of whatever good acts that they may do --

A. Okay.

Q. -- they can discover -- you know, they can get a Nobel prize for the discovery of something, it doesn't matter --

A. Right.

Q. -- they are going to die in the penitentiary.

A. Okay.

Q. So that's what we mean when we say life without parole, and, obviously, that is a significant sentence.

A. Yes.

Q. You've been to the penitentiary. You see how it's like there.

A. Just in the visit area, but I can --

Q. You have an idea?

A. I have an idea, yes.

Q. I just want to make sure you understand that when we're talking about the two options now. We're talking about death or we're talking about a penitentiary sentence until the person dies.

A. Right. I understand.

Q. All right. Now, do you understand that once you have found a person guilty of capital murder, one of those two things is going to happen to them. Okay? Either death or life in the penitentiary, permanent imprisonment, permanent incarceration until they die.

A.    Yes.  Yes.

Q.    So either one is a big deal.

A.    It's a big decision.

Q.    You can't get any bigger than that.

A.    Yes.

Q.    So these special issues are set up by the legislature to allow jurors to decide which of the individuals gets life without parole and which get a lethal injection.  Okay?

A.    Okay.

Q.    The first special issue, then, there is a presumption that the answer is no, okay, and it requires the State to convince you beyond a reasonable doubt that not only is this a person who has committed an intentional murder in the past, but they are the type of person who is likely to continue to commit criminal acts of violence that would constitute a continuing threat to society.  Okay?

So you look at the evidence.  You and the other jurors in the room discuss that, and you then vote on whether the State has proven that beyond a reasonable doubt.  If you feel that they really haven't, then that's it.  You quit your deliberations.  You sign that on the verdict form, knock on the door, and the bailiff comes to get you and come back to tell us.  Then the

judge is required to sentence the person to life without parole.

A. Okay.

Q. Okay. Is that clear?

A. Yes.

Q. Okay. If you decide that the State has convinced you of that -- it's not over with yet -- then you go to special issue number two. And this is only given to you in the circumstance where there is more than one person involved in the commission of the offense. Okay?

A. Okay.

Q. But you can see what it says: Do you find from the evidence beyond a reasonable doubt -- and, again, we start with the presumption that the answer is no.

A. Correct.

Q. And it's required that the State again present evidence to you that convinces you that the answer should be yes, and the question is: Do you find from the evidence beyond a reasonable doubt that the defendant, the one on trial, actually caused the death of the victim or he didn't, he was a party, but he intended to kill the deceased or another or anticipated that a human life would be taken. Okay? So they've got to show you that either he was the shooter himself, the

one that intentionally caused the death --

A.    Uh-huh.

Q.    -- or that if he was not the shooter, that he anticipated a human life would be taken or intended that a human life would be taken.  And they have got to prove that beyond a reasonable doubt.

A.    Yes.

Q.    Okay.  Now, let's say that they failed to prove that to you, just can't figure that part out.  Again, you sign that to the verdict form, knock on the door, come back in and say, no, the State hadn't proven that beyond a reasonable doubt.  And then, boom, the judge has got to sentence him to life without parole again.  Okay?

A.    Okay.

Q.    Is that clear?

A.    Yes.

Q.    Okay.  Now, if you find the answer to be yes, okay, now consider what you found.  You have found a person guilty of the intentional murder of an innocent individual during the course of a robbery.  You have found that he's a future danger beyond a reasonable doubt, and you have found that either he did it himself or he anticipated that human life be taken or intended that human life be taken.  Okay?  Now, I want to put you

at that position where you have found all those things to be true.  Would you feel that a death sentence would be the only appropriate sentence for that person?  Guilty of capital murder, guilty of intentional murder proven to you beyond a reasonable doubt that he's a future danger?

A.    Would I -- would I vote to impose a death penalty then?

Q.    Is there anything that could dissuade you from imposing a death penalty at that point?

A.    Would there be a way -- I guess, would we find out during that time some of the evidence of his character during that --

Q.    Well, now, that gets into that third special issue.

A.    I don't know if I'd be jumping the gun.  I'd probably want to see if there was any evidence as to his character.

Q.    Okay.  Let me go on and talk to you about that special issue number three.

A.    Okay.

Q.    What the law says is it's not enough that the State proves to you that the person's guilty of capital murder.  It's not enough that they prove to you that he's going to be a future danger.  It's not enough that

you answer special issue number two "yes." Okay? Even then you get to choose between death and life without parole. Okay? And you do that by looking at evidence that can be presented by both sides that are relevant to this third special issue. This is what we call the mitigation issue.

And let's read that together. It says: Do you find, taking into consideration all of the evidence -- that means all the evidence you heard in the first part as well as all the evidence you heard in the second part of the trial -- including the circumstances of the offense, the defendant's character and background, and the personal, moral culpability of the defendant, okay, that there is a sufficient mitigating circumstance or circumstances to warrant this sentence of life in prison without parole rather than the death sentence be imposed. Okay?

So that does allow you to go from -- well, let me put it this way. There is no burden of proof on that third special issue. Nobody has to prove it to you beyond a reasonable doubt. And what the law says is that you can consider anything you want to be a mitigating circumstance. Okay? For instance, we can look at the age of the person at the time they committed the offense. Would that be something that you might

want to consider in determining whether or not that's a mitigating factor?

A.    It might be a possibility, yes.

Q.    Okay.  We can talk about whether or not the person has a significant prior criminal history.

A.    Yes.

Q.    Or lack of a significant prior criminal history or violent history.

A.    Yes.

Q.    Would that be important to you?

A.    Yes, it would.

Q.    Okay.  We can talk about things from the evidence that you might determine that he was not the leader of this enterprise, he was a follower.  Leader as opposed to being a follower?

A.    That would be something to probably consider as well.

Q.    You might determine that at the time of the commission of the offense his mind was clouded by some substance, by some drug or alcohol.  Might that be a factor you want to look at?

A.    I would probably -- yes, I would probably want to look at every available piece of information.

Q.    But that's something you would consider maybe?

A.    Yes.

Q. Okay. Would you want to hear about his life history that brought him to that point where the offense was committed?

A. I think it would be important, yes.

Q. Okay. And whether or not friends and relatives say that this was an abhorrent thing for him to have done. It was out of character for him. That's where you talked about the character issue.

A. Yes.

Q. Would that be important to you?

A. Yes, it would.

Q. Okay. Well, see, the law allows you at that point when you're talking about this special issue number three and you're talking about these mitigating factors, is what we call them, and there could be other mitigating factors. There could be mental illness present. There can be life of abuse from other people. You know, there could be abject poverty that might be considered by some to be a mitigating factor in their upbringing. The things that happened to them when they were a child and young teenager. That type of thing.

You see, the law allows you to make a personal moral judgment about whether something's a mitigating factor. Okay?

A. Yes.

Q.    And if you decide that there is something that you think is significant, then that's it.  I mean, you've decided that, right?

A.    Yes.

Q.    And what's going to happen as a result of that?  Does the person get the death penalty?

A.    No.

Q.    Okay.  Okay.  So just so I'm clear, Mr. Williams, and so that we understand each other and everybody in this room understands what you're telling us, are you telling me that you would not vote for a death penalty just because you found somebody guilty of capital murder and found that they were a future danger?

A.    Correct.

Q.    And you would want to hear these other things that the law requires you to look at in consideration of this third special issue?

A.    Yes.

Q.    And that would make a difference to you, what you heard from that?  Could make a difference.  Not would, could.

A.    Like I said before, if I'm in the position to determine the fate of someone, I would want to make sure that I have and understand every, every bit of information that's available.

Q.   Okay.

A.   Because it's a very serious decision to make and one that should not be made, you know, on a knee-jerk reaction.

Q.   Okay.  Any questions that you have about your ability as a juror to do that?

A.   No.

Q.   Okay.  Let me push the envelope here a little bit and let's say you're the only one in the room that thinks there is a mitigating circumstance, how are you going to --

A.   I'll stand on my convictions.  I'll stand on my beliefs.

Q.   Okay.  And you understand when it gets down to it, it gets back to this issue, you making a personal moral judgment about whether something's a mitigating circumstance, okay, sufficient to avoid the death penalty.

A.   Yes.

Q.   And that's your right as a juror.

A.   Yes.

Q.   Just like going to a restaurant.  You don't have the right to criticize somebody else's order off the menu.

A.   Right.

Q.    It's not -- you know, it's you raising your own kid and, you know, the personal moral values that you install in your children.

A.    Uh-huh.

Q.    Okay?  And that may be different than somebody else down the hall.

A.    True.

Q.    Okay.  But you have a right to do that yourself.

A.    Yes.

Q.    And you have a right to stick to your guns.

A.    Yes.

Q.    Okay.  Hold on for just a second.

Mr. Williams, I don't believe we have any further questions.  I want to thank you for your participation here and coming down and talking to us.

A.    Sure.

Q.    Do you have any questions of us?

A.    Not that I can think of right off the top of my head.

Q.    Okay.

A.    I am glad I was able to give you the information that you were looking for.

Q.    I'm sorry?

A.    I was just hoping I was able to give you enough

information that you were looking for.

Q. Well, we're not looking for anything in particular. We're just trying to figure out where you are on this great spectrum of jurors and where you fit.

Thank you, Mr. Williams. We appreciate it.

THE COURT: Mr. Williams, you're going to be stepping right outside with the sheriff, and then you'll be coming right back in.

THE BAILIFF: All rise for the juror.

(Mr. Williams exits room)

(Open court, defendant present, no juror)

THE COURT: Let the record reflect we're in open court outside of the presence of the juror Williams, but we are in the presence of Mr. Broadnax.

What says the State of Texas?

MS. HANDLEY: State finds this juror acceptable.

THE COURT: What says Mr. Broadnax?

MR. LOLLAR: Your Honor, the defendant suggests that the juror has disqualified themselves when they said that he believed that a person who intentionally causes the death of an individual during the course of a robbery should be getting the death penalty.

THE COURT: It will be denied. All right. We're going to -- off the record.

(Off the record for 30 seconds)

MR. PARKS: This would be a person -- a prospective juror that would not be acceptable to the defense.

THE COURT: All right. That's part of the record. Yes. Ask him to return please, Bob.

(Open court, defendant and juror present)

THE COURT: Thank you, Mr. Williams. Mr. Williams, of course you are chosen as a qualified juror by the attorneys. Now, you remember how this process is going to work? Once we qualify a sufficient number, then actual jurors will be selected. Is your telephone numbers and address on your questionnaire still the correct numbers to reach you?

MR. WILLIAMS: Yes, sir, they are.

THE COURT: All right. The sheriff is going to give you the card of the court coordinator.

MR. WILLIAMS: Okay.

THE COURT: Should anything occur in your personal or professional life that might affect the service and you think we need to know about it, give her a call and we'll come back down and we'll deal with it.

MR. WILLIAMS: Okay.

Case 3:15-cv-01758-N    Document 39-6    Filed 06/28/16    Page 92 of 215    PageID 2442

THE COURT: As that August 10th date draws near, the coordinator will be getting in touch with you. If she doesn't and you think, wait a minute, what's up; give her a call. It's been a real pleasure meeting you, sir.

MR. WILLIAMS: Thank you, sir.

THE COURT: Now, do this for me. You said that you have seen some media coverage.

MR. WILLIAMS: Yes.

THE COURT: I ask you to avoid at all costs any media, and I always say newspaper but my young associates tell me Internet also, all right?

MR. WILLIAMS: Absolutely.

THE COURT: It would be a shame if somebody like you would be disqualified.

MR. WILLIAMS: Sure. Thank you. Thank you all.

THE COURT: Glad to have you in the legal profession.

(Off the record from 11:41 to 11:42 a.m.)

THE BAILIFF: All rise.

(Jack Bragg, Jr. enters room)

(Open court, defendant and juror present)

THE COURT: Here you go, sir. Thank you very much. Please be seated. Be seated, counsel.

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

Do this for me, sir, before we go any further. Raise your right hand for me.

MR. BRAGG: (Complies.)

THE COURT: Do you solemnly swear you'll give true answers made to questions that will be asked to you concerning your qualifications as a juror in this case so help you God? And you'll answer "I do."

MR. BRAGG: I do.

THE COURT: Thank you, sir. I got your questionnaire here that you filled out. I appreciate you filling it out. The attorneys have read it. I know it took a long time to fill it out, but it will save you much time during the day. The State is going to talk to you first and then Mr. Broadnax's attorneys, and they have had an opportunity to read that questionnaire and they want to address some of the points that you made when you answered it under oath.

Without anything further from me, Andrea Handley is now going to speak to you on behalf of the State of Texas.

MS. HANDLEY: Thank you, Your Honor.

**JACK BRAGG, JR.,**

having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION

BY MS. HANDLEY:

Q.   Good morning, Captain.  How are you?

A.   Just fine.

Q.   My name is Andrea Handley here with my colleagues Elaine Evans, David Alex, and Gordon Hikel. We all work for the district attorney's office.  We are in charge of picking a jury for this case.  Mr. Alex is presenting the evidence in this case.

Before we get too far into this, let me clear a few things up and ask you a couple of questions. Okay?  You indicated, sir, and I think you have your questionnaire in front of you on page number three where:  Have you heard about this case.  And you said: Yes, I'm the captain of the property crimes section of the Dallas PD and have personnel who have been assisting in the preparation of this case.

You work for Dallas Police Department, correct?

A.   Yes.

Q.   Okay.  What do you think this case is about? I'm wondering if you're not confusing it with a different case.

A.   And that's quite possible.  A couple of weeks ago -- I think this is a capital murder case.  Is it?

Q.   Yes.  Yes.  We're here because it's a capital murder case.

A.   And a couple of weeks ago I think the DA's office and homicide was meeting regarding this case, and at that time they requested that if -- they sent out an email to everybody and they said if there was anybody else that might have possibly handled the defendant or might have had some other cases.  I think we all -- not knowing, I sent representatives from each of my seven investigative units to see if there was anything other --

Q.   Without giving you a bunch of facts about the case, we're talking about an offense that's alleged to have occurred in Garland.

A.   Then it may just be another case that was similar to this case.

Q.   Okay.  And you were called upon on an email about whether or not you had prior contact with the defendant for a Dallas capital murder case?

A.   I thought it was the same case.  It may have been a different case.

Q.   Okay.  Okay.  Do you remember the defendant in that case?

A.   It was a similar case.  That's all -- you know, I probably just confused the names.

Q.   Okay.  When we gave you the -- we gave you just a short summary in the questionnaire there that it's

alleged on June 19th, Steven Swan and Matthew Butler were shot to death outside of a music studio during the course of a robbery. Do you think that any of the personnel that you've been working with would have had any type of dealings with the Garland --

A. Not since it's a Garland case. I don't think so.

Q. Okay. You don't do cross-investigation?

A. Yes and no.

Q. Okay.

A. If you had said it was July 4th, well, then that week I was the duty commander and I was over there when that guy was shooting at all the trucks. And so twice a year I'm the city-wide duty commander for the City of Dallas. So, yes, I was in Garland and I was in Waxahachie, and then whenever they ask us for assistance, I'm also the dive team commander, so if somebody wants help, I'll go help them. And then I was in charge of crime scene.

Q. All right. And, you know, I remember that. I was over at homicide and we were working with Garland, so we had Garland officers and DPD and vice versa, so there is a chance that you were working with --

A. There is a possibility that I might, but I don't recall it specifically.

Q. Okay. Okay. And if -- you know, Captain, if you were, in fact, seated as a juror on this particular case and one of the people who you've worked with or who you worked for were called upon to take the stand and testify, you know, you understand that you'd have to judge their credibility as you would anybody else.

A. Yes.

Q. You couldn't automatically believe everything that they're going to say before you hear something that they say.

A. Yes.

Q. And you also understand, sir, that while a lot of people hear things in the news or read things in the newspaper, that doesn't necessarily mean that you're disqualified to serve as a juror. It just means you cannot base your verdict on anything you heard outside. You got to base your verdict strictly on the evidence in the case. You understand that?

A. Yes, ma'am.

Q. You've been in law enforcement how long now?

A. Thirty-five years.

Q. Thirty-five years. I'd like to say as long as I've been --

A. Thirty-four years, seven months, and a few days.

Q. Okay. I'd like to say as long as I've been alive, but I'm older than that. But, gosh, you've been doing this longer than most people have been around.

Let me just also jump to the chase with you here because I read your questionnaire. Before I even knew what you did I thought that this was just the text book answers just spot on. You know, that your answers to the legal propositions were spot on. You had a good appreciation for what the law is and fairness and how things should go. It's a pleasure seeing somebody well-versed like that reading their questionnaire.

But we do get to page 17 where it says: How would you feel about being chosen as a juror in this case. And you said: It would not appear to be fair to the defendant to put an actively serving captain in charge of investigations in the department prosecuting on this case.

Okay. I think we've cleared up that you don't have any involvement in the actual investigation of this case, correct?

A. Not that I'm aware of.

Q. Okay. And that if somebody else in your department did and they took the stand, that obviously they don't get a leg up. You judge their credibility as you would anybody else, correct?

A.    Correct.

Q.    Even having said that, sir, you are -- having cleared that up, would that change your response to that question there?

A.    Well, I said it would not appear.  I think that the general public would normally -- that might raise an eyebrow.  I wouldn't know.  I'm not an attorney.  I'm a police captain, and I'm just saying that sometimes appearance is more important than actual facts.

Q.    Sure.

A.    And I would do my best to be fair to both sides in any case.

Q.    And I appreciate that, and I think you would, sir.  I think you would, and I can appreciate your comments, that it just might not -- the appearance of impropriety might be there.  That you might have already come in with a bias against the defendant because knowing so much about the legal system and knowing so much how things really work down here.  Is that fair to say?

A.    I've been to the courthouse many times in the last 34 years, yes.

Q.    Okay.  And while jurors might be told to disregard a certain piece of evidence, you might look at that a little bit differently because you might really

know what's going on or, as I said, how things really work?

A.   Well, here I was just speaking to the issue of people outside the criminal justice system might -- I mean, that would just -- the question was how would you feel about being chosen as a juror.  And the answer there is that I personally would do whatever -- I've been on civil cases before, and I would do my best to be fair to both sides.

Q.   Okay.

A.   But my reservations would be it just might not appear fair to the defendant.

Q.   All right.  So your reservations are that other people might consider it not fair, but you're telling us right now you could be fair and impartial?

A.   Yes.

Q.   That you would base your verdict on the evidence in the case?

A.   Yes.

Q.   That whatever the law is, even if you don't like the law or agree with the law, you're going to follow the law?

A.   Yes.

Q.   You're going to come into this with an open mind; is that correct, sir?

A. Yes.

Q. You haven't already made your mind up, have you?

A. I don't know anything about it.

Q. And just because an individual is found guilty of capital murder, you understand, sir, that that doesn't mean they automatically receive the death penalty. Are you familiar with that?

A. Yes.

Q. Okay. Well, let me just go through a couple of things with you and highlight some high points, because I don't want to insult you by covering things that you know a whole lot about.

You understand, sir, going into this capital murder case that we're going to have to prove to you beyond a reasonable doubt that the defendant's guilty of capital murder. If we fail to prove any one of those elements of the offense, then he's obviously not guilty, correct, sir?

A. Yes.

Q. And even then, if, for example, the State failed to prove there was an actual robbery, it wouldn't be a capital murder, but then it would be a murder. You heard of the term lesser included offenses?

A. Yes.

Q. And you know there is several steps down from murder. There's capital murder, murder, manslaughter, criminally negligent homicide. Whatever the facts show in the particular case, that's how you make your determination, correct?

A. Yes, ma'am.

Q. Just because we come forward with an indictment for capital murder, we failed to carry that burden and all we show you is a criminally negligent homicide and that's what we prove to you beyond a reasonable doubt, would you return that verdict?

A. Yes.

Q. Okay. You wouldn't instead go, I'm not going to do that, I'm going to find him guilty of capital murder anyway because I don't want the guys at the station giving me the stink eye?

A. No.

Q. You're going to stand by what's right and what's the proper thing to do?

A. That's right.

Q. And you also understand, sir, that along with lesser included offenses, if it's capital murder, you get life or you get death. That's it. That's all. If it's anything below that, what happens? Jury decides the punishment, don't they?

A.    Yes.

Q.    With a first degree murder all the way down to a criminally negligent homicide or a robbery, you're looking at the range of punishment of anything from two years probation up to life in prison, right?

A.    Yes.

Q.    And you, I'm sure, have heard and would stand by the principle, "let the punishment fit the crime"?

A.    Yes.

Q.    All right.  I can't commit you today nor can they commit you today under what circumstances you would give somebody two years of probation or under what circumstances you would give life in prison.  We can't do that.  It's improper.  And, also, you don't know what you're going to do in this case because how much have you heard?

A.    I haven't heard a thing.

Q.    Haven't heard a thing.  So in order for you to base your verdict on the evidence in this case, you simply can't do it right now, can you?

A.    Right.

Q.    You understand that proposition of law, sir?

A.    Yes.

Q.    Do you agree to follow that?

A.    Yes.

Q. Whatever the evidence is, you'll base your verdict on the evidence in the case, correct?

A. Yes.

Q. Be it a lesser included murder?

A. Yes.

Q. Be it a lesser included criminal negligent homicide?

A. Yes.

Q. Be it if we fail to prove any kind of murder and it was just a robbery, correct?

A. Yes.

Q. And whatever -- if it's not capital murder, whatever punishment it is, you will do what is proper for that particular case?

A. Yes, ma'am.

Q. Consider the full range of punishment?

A. Yes, ma'am.

Q. Okay. Have you ever been involved in the investigation of a capital murder case before?

A. Well, I'm involved on a daily basis with a lot of cases.

Q. Okay.

A. So the answer is yes. Personally, not as a detective that worked the case, but I've been a captain since '91 and I've been a lieutenant since 1982.

Q.    Okay.

A.    And no one above the rank of police officer or sergeant actually works a case and fills it.  They submit it to us to review, and we make management decisions about cases, but I haven't worked any cases.

Q.    Tell me exactly what you do then.

A.    Well, right now I'm the captain in charge of seven property crimes investigative lieutenants.  There's -- the stations each have them.  I have five lieutenants.  Two of them handle two stations, and the other three have cases.  We have about 14 detectives and 115 -- or 14 sergeants and 115 detectives, and we handle all of the property crimes; burglary, theft, criminal mischief.  There's about 41 to 45 different types of cases that we prosecute.  We also prosecute robbery of an individual and some other things.

Q.    All right.

A.    That's my current assignment.

Q.    Okay.  So you're also well-versed in the offense of robbery, that it's taking something from somebody without their consent, either threatening to cause bodily injury or actually causing bodily injury?

A.    Yes, ma'am.

Q.    Okay.  Let me tell you, then, a little bit about what happens in a capital murder case.  Normally

speaking, and you may have been part of this, in any criminal trial there is two parts to it, obviously. First part of the trial, the question that you're called to answer is has the State carried it's burden of proof. Have we proved to you beyond a reasonable doubt that the defendant is guilty of capital murder. It's the only question you're answering then, correct?

A.   Yes.

Q.   And you're basing that decision on the evidence in the case and nothing else, correct?

A.   Yes.

Q.   If you find -- if you find him guilty of capital murder, sir, that's when we're going to move into the second phase of the trial. Normally speaking, other trials that go on in the courthouse here, a person is found guilty, the jury goes in and they assess the punishment. They give that range, you know, anywhere from probation, if it's applicable, anywhere up to life in prison. Whatever that range is. They come to the range.

In a capital murder case, though, there is no range. It's either life in prison without parole, and that means life in prison without parole. He'll die in the penitentiary, or he'll be given the death sentence. Normally speaking, you don't go back into the

jury room as a collective body and sit down and go, should he live or should he die. That's now how you reach your verdict.

You had an opportunity to read the pamphlet. Did that make sense to you?

A. Yes, ma'am.

Q. You come to the determination of life or death based on how you answer the questions. Okay? Just like there's a presumption of innocence in the first part of the trial. As we sit here today you are to presume him innocent, correct?

A. Yes.

Q. And that goes with our burden of proof. You have to presume him innocent because I haven't proved anything yet. That's my obligation and you'll hold me to that, correct?

A. Yes.

Q. Going into the second phase of the trial, sir, is the exact same thing. As you go into the second phase, he's been found guilty of capital murder. So what's the best he can hope for at this point?

A. Life in prison.

Q. Life in prison without parole. Nothing is going to change about that. He's already sitting on life without parole. Going into the second phase, that

presumption of innocence that he had before, that presumption carries over now and you're to presume that life in the penitentiary without parole is the proper thing to do, and the reason you have to make that presumption is I haven't proven anything to you otherwise, have I?

A. No, ma'am.

Q. And until I can prove to you that the proper sentence is death, that presumption stays at life in prison. Some people say, he's committed capital murder. He's intentionally killed someone. He's done it in the course of committing another felony offense. I think he's worthy of the death penalty. It's certainly an option at this point, you know, but there is nothing automatic about it. Make sense to you, sir?

A. Yes, ma'am.

Q. And you agree, would you automatically vote to give somebody the death penalty just because they're guilty of capital murder?

A. No, ma'am.

Q. You wouldn't do that. You would wait and hear the evidence and base your verdict on the evidence in the case?

A. Yes, ma'am.

Q. Okay. I'm going kind of quickly here. Some

things I haven't covered with you but I might come back to.

Based on how you answer the special issues is what makes that determination. This first special issue, you've had an opportunity to read that before. That's what we refer to as the future danger question. Have you ever heard that before?

A. Yes, ma'am.

Q. And you hear that with respect to capital murder cases, don't you?

A. Yes, ma'am.

Q. Okay. We're asking the jury to make a prediction as to whether or not the defendant is more likely than not to commit criminal acts of violence that will be a threat to the society in which he is in at the time. You don't receive any definitions on what these things mean here. Probability -- you know, anything is possible, correct?

A. Yes, ma'am.

Q. Probability, would you agree with me that that means more likely than not?

A. Preponderance of the evidence.

Q. Preponderance of the evidence. More likely than not that the defendant would commit criminal acts of violence. It doesn't say that he would commit

another murder, that he would commit a rape, that he would hit somebody in the face. It's really whatever you think it is, but it's a criminal act of violence. I mean, if I were to ball my fist up and hit my cocounsel, would you consider that a criminal act of violence?

A. Yes.

Q. Okay. That would constitute a continuing threat to society. Well, what society is he in and amongst at this time?

A. Jail population.

Q. Jail population. You know, society for me is going to the Kroger and the post office and all that. If you're sitting on life in prison without parole, your society is the penitentiary. And there's guards there and teachers there and clergy and staff. It's kind of a self-contained kind of society in and of itself.

We're asking you to make that decision right there whether or not he's a future danger, whether or not -- in all probability, more likely than not, he's going to be a continuing threat to the prison population. You can decide that question based strictly on the circumstances of the offense at hand. That's fine to do that. Or you can also at that time in the second phase of the trial, you might hear some more evidence then, you know, whether or not a history on the

defendant or circumstances -- more circumstances surrounding the offense, you know, to help you decide that question as to whether or not he's a continuing threat to society.

But the question for you right now, Captain, is this: Just because you found a guy guilty of capital murder, of intentionally causing the death of another person, would you automatically answer this question "yes"?

A. No.

Q. Okay. You would wait to hear the evidence? You would base your decision as to yes or no based on the evidence in the case?

A. Yes.

Q. And you would wait for us to prove it to you beyond a reasonable doubt that he is, in fact, a future danger?

A. Yes.

Q. If you answered no to that question, he would receive that life sentence that he's already got and we would go home. That's it. That's all. If you answer yes, he's a continuing threat to society, we would move on to that second question. This is a parties question. This has to do with somebody being found guilty as a party to an offense. I'll give you a second to read

that.

A.    (Nods head.)

Q.    Okay.  In criminal law -- and I think you understand this, sir.  A person doesn't necessarily have to be the triggerman in order to be held guilty --

A.    Yes, ma'am.

Q.    -- or to be held liable for an offense.  You've seen that before in your work.  If I plan with Ms. Evans to go rob the 7-Eleven and she buys the gun and she buys the bullets and she holds the meeting at her kitchen table and she drives us over there and she tells me what's the best time to go in and she sits in the car and plans to be a lookout and she hands me the gun and loads it for me -- you know, hands it to me and says, don't leave any witnesses.  I go in, I rob the store and kill the clerk.  I'm guilty of capital murder, right?

A.    (Nods head.)

Q.    You understand that the law says that if she is a party to that offense; if she aided, assisted, encouraged, or participated, then she could be criminally liable for the offense, correct?

A.    Yes, ma'am.

Q.    In a capital murder case it goes a little bit further, and it says that if she should have anticipated that somebody could die, then she could also be liable

113

for capital murder.  Does that make sense to you?

A.  Yes, ma'am.

Q.  Okay.  In order for you to find Ms. Evans guilty of capital murder in the first part of the trial, you have to find she participated in the offense and you also have to find that she should have anticipated somebody was going to die.  Okay?

A.  Yes.

Q.  Now, in the second part of the trial, when we get to the punishment issue, this special issue here, it's basically asking you now:  Do you find from the evidence that the defendant actually caused the death of the person, or if they didn't cause the death of the person, that they anticipated that person would die.

A.  Yes.

Q.  Not should have anticipated but actually anticipated they would die.  Does that make sense to you?

A.  Yes, ma'am.

Q.  Okay.  And there might be a circumstance where -- you know, that she might have never thought that I would go in and kill somebody, that she handed me an unloaded gun, that she actually didn't want to see anybody get killed and unloaded the gun in secret, and she truly didn't know that I was going to go in and load

the gun.  There could be many circumstances where, truly, I never anticipated somebody was going to die. Does that make sense?

A.  Yes, ma'am.

Q.  If I didn't anticipate a person was going to die or if I didn't actually kill them myself, then the answer to that question is "no."

A.  No.

Q.  Correct?  If I answer no to that question, what happens?

A.  Life in prison.

Q.  That's right.  Life in prison.  We all go home.  That's it.  That's all.  If, however, sir, you answer this question "yes," then we go to the third issue.  And, again, keep in mind nothing is automatic here.  Each question you look at individually and separately and make no immediate assumptions about it.

You found this person guilty of capital murder.  They intentionally caused the death during the course of a felony.  You found that they are a future danger to society, the society in which they are in. You found that they were a party to this offense.  They either killed the person themselves or knew it was going to happen.

One more question you guys have to ask and

consider back there in that jury room, and that's what we call the mitigation question. And, basically, it's a lot of words to these questions. We didn't write these questions, us in this room here. These were written by smarter people than I, I'm guessing. The legislature put these together. But I'll paraphrase for you and tell you that basically what it is is a safety-net question for you. It takes into account that what we're doing here is pretty darned serious, that this is a death penalty case. There might be some circumstances out there because no two cases are alike, are they?

A. No.

Q. No two defendants are ever alike, are they?

A. No.

Q. Every case is unique in itself, isn't it?

A. Yes.

Q. It recognizes and anticipates that there might, in fact, be some cases where there is some kind of mitigation in the case. There's something about the particular offense, about the defendant, about his background, his character, that even though he's a capital murderer, even though he's a future danger, even though he's a party to it, we're going to turn that sentence around and give him life instead of the death penalty. You know, maybe he was the lookout guy. Maybe

he stayed behind and tried to save the victim.  Maybe he turned everybody else in and wanted to -- maybe he was remorseful.  Whatever's mitigating isn't for me to say, necessarily.  It's for you to decide.

And there could be a million mitigating circumstances out there.  You might think something's mitigating.  I might not think it's mitigating.  You know, we don't necessarily have to come to an agreement on that.  I might think that how he was raised is mitigating.  You might say that's nonsense; I was raised in harder circumstances than that.  The point being, you decide what's mitigating.  Not only is it mitigating but is it substantial enough to overturn that death sentence to now what would be a life sentence.  Does that seem fair -- or make sense to you, sir?

A.  Yes.

Q.  Does that seem fair to you also?

A.  Yes.

Q.  Do you see how that can actually be a possibility?

A.  (Nods head.)

Q.  It seems like a great leap, doesn't it?  And I think sometimes we'd like to go, well, gee whiz, he's a capital murderer and he's dangerous and he was a party so how in the world can you find something mitigating.

I can't ask you what you would find to be mitigating, but I can ask you can you follow the law and base your verdict strictly on the evidence in the case?

A.  I can.

Q.  Okay.  Do you -- do you have any questions about that?

A.  No.

Q.  Okay.  Let me ask you this too, sir, before we move on.  I mean, I understand your concern about how it might look to the public to have a police captain on this jury, but if you tell us that you can give the defendant a fair trial, it doesn't mean that you're automatically on this jury.  Once you're qualified, both sides have an opportunity to talk to you here, okay?  I understand your public concerns.  How the public might see it I don't think is necessarily your problem.  Is that fair to say that?

A.  No.

Q.  It's not really your problem, is it?  The question becomes can you give the defendant a fair trial.

A.  Yes, ma'am.

Q.  Are you going to be so concerned with what the public might see that that would alter the way you looked at the evidence?

A.    No.

Q.    If you were to get back there, sir, and say, you know what, I just don't think the State did it; I don't think they proved it; I don't think they proved this case beyond a reasonable doubt; and this offense is a shame and it's a tragedy, but I don't think they proved the case beyond a reasonable doubt, how is that going to weigh on you?  Let's talk truthfully.  How is that going to weigh on you when you go back to work and they go, Jack, you got to be kidding me.  You are a police captain --

A.    I do that every day right now.  That's part of my job.  If cases do not make the muster, we do not send them to the courthouse.

Q.    All right.

A.    I'm the first level of authority that can dismiss and do things, so I do it before the cases ever get here if they're not any good.

Q.    All right.

A.    So I already do that, not on a capital murder case, obviously, but I do that on serious felonies and stuff like that.

Q.    So you're not afraid about hurting people's feelings then --

A.    No.  No.

Q. You're going to tell them, what, they just don't have it and they might hurt their feelings --

A. If you don't have it, you don't have it. That's the way it works.

Q. Okay. Okay. That's fundamentally what we're going after here, sir, is if we don't have it, tell us we don't have it. We're not looking for a leg up here. It's not going to hurt our feelings. We wouldn't be here right now if we didn't think we had the type and the quality and quantity of evidence to find him guilty of capital murder and also convince a jury that he deserves the death penalty.

But we also know we got our opinions. We work for the State. Our opinions and their opinions are a world apart. I think you can appreciate that, you know. Personally, I've had juries return verdicts of not guilty before or maybe lesser included offenses, and maybe it hurt my feelings a little bit, but when I sat back and really thought about it, I thought, you know what, they did the right thing. I think the jury always does the right thing. So you seem to have a good appreciation. You are not going to worry about hurting our feelings?

A. No.

Q. If he doesn't deserve the death penalty, you're

not going to give it to him, are you?

A. No.

Q. And you understand this is because of the way you would answer the questions?

A. Yes.

Q. Okay, sir.

MS. HANDLEY: How much time do I have?

THE COURT: I'd say about --

MR. PARKS: She has until 12:30.

THE COURT: Twelve-thirty? I wasn't ten minutes -- yeah, about ten minutes.

MS. HANDLEY: Okay.

Q. (By Ms. Handley) Any questions about the trial process or the capital murder process?

A. No, not right now.

Q. You're just kind of looking at me like, young lady, I have heard this all before --

A. I'm sorry. I teach at three universities. I teach administrative law in Tiffin, Ohio. I've taught a course up there a couple of times. I teach at Midwestern. I build courses, and I instructed the Dallas Police Academy. I'm sure there are some things I don't know, just like I mistakenly thought this was the same case that I sent the guys on because of the timing on it. I mean, one week I'm sending guys down here on a

capital murder case -- and I don't know what the guy's name was, but I thought it was the same case.

Q. Let me hit something with you, then, here. This is on page 7 where it says: Do you believe police officers are more likely to tell the truth than the average person. You said: Yes, most officers will. There have been some exceptions, but in my experience most really try to serve, protect with honor, dignity, and compassion and fairness, truthfully doing their job.

Very well said, sir. I think you recognize that -- well, let me ask you this. I'm sure in your extensive -- you've come across some officers that were some bad seeds?

A. I've had to arrest police officers.

Q. And I've had to prosecute police officers. So you can appreciate, sir, that just because somebody's a police officer doesn't necessarily --

A. That's correct.

Q. -- mean that they come in with a halo on their head and an automatic stamp of approval. Fundamentally -- that goes to one of those fundamental principles of law.

A. Yeah.

Q. Just like the presumption of innocence and the burden of proof, and you always hold us to the burden of

proof and the preponderance of the evidence -- not preponderance, I'm sorry. Can't hold it against the defendant if he doesn't testify. You understand that.

A. Yes.

Q. Can't give us a special leg up. But it also goes to witnesses. While it's okay to respect a certain class of people or a certain group of people, what you can't do is say I will automatically believe a police officer.

A. (Nods head.)

Q. Does that make sense to you?

A. I --

Q. I'm talking about in a trial situation.

A. Yes.

Q. You cannot say if a police officer comes up, I'm telling you I will automatically believe a police officer or I will --

MR. LOLLAR: Your Honor, we're going to have to object to the prosecutor instructing the juror what they must say in order to qualify.

THE COURT: I'll overrule the objection. To be a qualified juror, you have to judge everybody on their own testimony. I think you understand that.

PROSPECTIVE JUROR: I do understand that.

Q. (By Ms. Handley) And that's what I'm getting

to, sir.  You have to start everybody out on a level playing field, and until that person takes the stand and you put eyes on them and you listen to them and you assess what they're saying, then you make a determination of their credibility.  Does that make sense to you?

A.  Yes.

Q.  And it sounds like you already know exactly what I'm talking about.  If somebody took the stand, just because they're wearing a uniform, you're going to make that credibility issue, aren't you?

A.  Yes.

Q.  So while you say yes on here, it sounds to me like you've made an assumption that they would certainly be telling the truth and certainly would hold true to their profession and what they stand for, but you will reserve your assessment of their credibility until they actually testify from the witness stand.

A.  Yes.

Q.  You agree to follow that law, sir?

A.  I will.

Q.  Okay.  All right.  And then just to sum up, sir, because like I said, I don't mean to preach to the choir here because I think you have a good appreciation for everything that's going on.  You would follow the

law in this case? You would follow the law in the case?

A. Yes.

Q. You would base your verdict on the evidence in the case and the evidence only?

A. Yes.

Q. And whatever the law is, whatever the law is that the judge gives you, you understand that's the law in the case?

A. Yes.

Q. Your verdict would be based entirely on the evidence in the case and nothing else?

A. Yes.

Q. You would hold the State to our burden of proof to prove to you beyond a reasonable doubt each and every element of the offense?

A. Yes.

Q. If -- and you understand that that's each and every element of the offense. If I failed to prove to you that this offense occurred in Dallas County, Texas, if I, in fact, proved to you it happened in Tarrant County, Texas, you know, your verdict would have to be?

A. Not guilty.

Q. Not guilty. And as soon as you return the not guilty verdict --

A. Unless it was within so many feet of the

boarder.

Q.   There you go.  Okay.  Or let's say I alleged a gun but I proved it was a knife.  You get it.  It's an extreme example, but you are not going to give the State any kind of leg up, are you?

A.   No.

Q.   Okay.  And you are telling us right now that you can give this defendant a fair trial?

A.   Yes.

Q.   Anything you want to tell us that I haven't asked you?

A.   I don't have anything to add.

Q.   All right.  Thank you, sir.

THE COURT:  Now, Mr. Parks will talk to you on behalf of Mr. Broadnax.

VOIR DIRE EXAMINATION

BY MR. PARKS:

Q.   Captain Bragg, I really don't know where to start, so I'll just hop into it.  You've been a police officer how long?

A.   Thirty-four years, seven months, and a few days I think.

Q.   You've been captain how long?

A.   Since 1991.

Q.   And you've been in the property crimes for how

long?

A.    Since October --

Q.    Okay.

A.    -- of this past year, 2008.

Q.    So you would not have supervised Sergeant D.C. Martin?

A.    No, I did not.

Q.    Do you know who I'm talking about?

A.    I think you're talking about Dave Martin.

Q.    David Martin.  Okay.  And you didn't supervise him?

A.    No, but I have worked with him.

Q.    That's my brother-in-law.

A.    I have worked with him.

Q.    So I'm entitled to some sympathy from you on account of that.

A.    Is he doing well?

Q.    He's doing well.  Fishing every day -- well, I started to say every day the sun shines.  That's not even -- he's fishing when the sun doesn't shine too.

Anyway, you're obviously -- Captain, I appreciate everything you've told us today, and I don't want to give you the impression by anything I say or by anything that I ask that I'm not giving full faith and credit to what you're saying to us.  My concerns are not

with your ability as a person to be fair and impartial. My concerns are your ability as a police officer, because I know the same as my being a criminal defense lawyer, it influences my core beliefs, if you will, or whatever you want -- it influences the way I make decisions. It influences my beliefs. It influences my biases and prejudices.

I think that's true of all of us in whatever walk of life we find ourselves. And my concern is, is that on a day-to-day basis, you're on their side in what you do. That is to say you're in law enforcement. That's your job. It's the job that you've chosen. You present cases to the district attorney for their consideration. You come and testify on behalf of the State of Texas where that's necessary or the people that you supervise come and testify for the State of Texas where that's necessary. You testify, I'm assuming, for the Grand Jury from time to time, have in the past.

A.   I have.

Q.   People that you supervise testify to the Grand Jury. So y'all are active on a day-to-day basis in the business of the prosecution of cases against accused citizens. That's obvious to us all. Is that fair to say?

A.   Well, I like to think of it that, when I teach my officers, that we are to be finders of fact and truth and that cases work out wherever the truth and the facts dictate.

Q.   Sure.

A.   I think that as officers of the court it's incumbent upon all of us to find the truth.  I think that's really what it's about.  Now, yes, I am an active-duty police officer, and pursuant of the Code of Criminal Procedure, it's my job to stop all crimes that are occurring and to report it to the Court and get it prosecuted if possible.  So with or without warrant, we're going to do our best to stop you and arrest you and put you in jail if you're doing the wrong thing, and that's what I do on a day-to-day basis.

Q.   Absolutely.  And sometimes people are arrested for whatever reason when the facts just ultimately don't justify that arrest, the same as --

A.   As I testified earlier, I do dismiss cases and we make decisions based on the quality of the facts.

Q.   You review the cases?

A.   When it gets to me, yes, sir.  It's serious business.

Q.   Are they reviewed at all before they get to you?

A.   Oh, two or three times.

Q.   So cases are weeded out before they get to you?

A.   I only see the exceptional ones.  Most of the time they'll go straight to the DA's office.

Q.   You have or can, at lease, have the power to weed cases out when they get to you, if you feel like they don't justify --

A.   Sometimes.

Q.   I would guess, in your experience, you or those people working under your supervision have submitted cases directly to the district attorney's office that have been refused?

A.   Yes.

Q.   Have you ever testified or people under your supervision ever testified at the Grand Jury where cases were no-billed?

A.   Yes, sir.

Q.   So you know the process that cases have to go through in order to get where they are -- where this case is?

A.   Yes, sir.

Q.   It's been reviewed by the police department.  It's been reviewed by supervisors in the police department.  It's been reviewed by the district attorney's office.  It's been reviewed by the Grand

Jury.

A.  Yes.

Q.  You know all of that.  The regular citizen out there generally does not.  And that's something, frankly, Captain, that concerns me is because you can't keep from thinking, I would imagine, that here's a case that's made it through all of those screenings and all of that process so there must be something to it or we wouldn't be here.

A.  Well, you know, I put that on that paper --

Q.  I understand.

(Laughter)

A.  I've already --

Q.  I understand.

A.  I already told you the truth.

Q.  I understand.  And I thought I knew where you were in the deal when we started, but I wasn't sure when we finished.

A.  You know, I'll do my best, but it's like I told you, it's my professional opinion.  Whether it's as a captain of police or professor of criminal justice, I would tell you that I think that's a pretty good hill for you to have to climb.

THE COURT:  All right.  You said for him to have to climb?

PROSPECTIVE JUROR:  That's right.

THE COURT:  All rise for the very honorable captain.  Very impressive, sir.  If you'll step outside.

(Captain Jack Bragg exits room)

(Open court, defendant present, no juror)

THE COURT:  What says the State?

MS. HANDLEY:  He's acceptable for the State, Your Honor.

MR. PARKS:  Defense would submit for cause, Your Honor.

THE COURT:  It will be granted.

(Captain Jack Bragg enters room)

THE COURT:  You are free to go.

MR. BRAGG:  Thank you.

THE COURT:  Thank you, sir.  Have a good day.

MS. HANDLEY:  Thank you, sir.

(Lunch recess from 12:24 to 1:20 p.m.)

(Mr. Matthew Duzan enters room)

(Open court, defendant and juror present)

THE COURT:  Please be seated, folks.

Good afternoon to you, Mr. Duzan.  How do you pronounce this?

MR. DUZAN:  Duzan.

THE COURT:  Do this for me.  Raise your

right hand, please.

MR. DUZAN:  (Complies.)

THE COURT:  Do you solemnly swear you will true answers make to questions that will be asked of you concerning your qualifications as a juror in this case so help you God?  And you'll answer "I do."

MR. DUZAN:  I do.

THE COURT:  I'm going to say good afternoon to you again.  My name is Webb Biard, and I'll be with you today.  Now, the presiding judge of this court is Judge Michael Snipes.  That's who you met at that general session, that big room where you filled out the questionnaire.

By the way, I have your questionnaire here and the attorneys -- we appreciate you filling it out.  The attorneys might want to talk to you about some of your answers.  You'll have it there.  In that regard, let me introduce some other folks to you.  We have David Alex.

MR. ALEX:  Good morning, sir -- afternoon.

THE COURT:  Andrea Handley.

MS. HANDLEY:  Hi.  How are you?

THE COURT:  Gordon Hikel.  Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  And Zandra Robinson,

representing Dallas County and the State of Texas.

Also Brad Lollar --

MR. LOLLAR:  Hi.

THE COURT:  -- Doug Parks and Keri Mallon represent Mr. James Broadnax.

The way we're going to proceed, I'm going to talk to you for a little bit, and then one of the attorneys will talk to you up to 45 minutes a side. What we're in the process of doing is qualifying some 50 jurors.  Once that's done -- which it will take a couple of months or a month and a half.  Once that's done, then the actual jury will be selected from that group.  So what you'll know when you leave here this afternoon is whether or not you're a qualified juror or not and subject to return.

I'm going to stress to you these are good lawyers.  They're good people.  It's out of the question anybody's going to mistreat a prospective juror.  You are not expected to know the law.  This isn't some pop quiz where we're trying to find out who knows the law and then they're on the jury.  It doesn't have anything to do with it.  These fine lawyers will explain the law to you.

The bottom line, what we're trying to find is 12 people who can keep an open mind, listen to the

evidence, follow the law, and then base their verdict on what they hear in the courtroom. If you can do that, you're a qualified juror. And if for some reason, whatever it is, you can't do that, you're not a qualified juror. What does that mean? All that means is you wouldn't be able to serve on this jury. You've done all you're required to do by showing up this afternoon and agreeing to tell us the truth. Fair enough?

MR. DUZAN: Yes, sir.

THE COURT: Okay. Now, Judge Snipes has told us and it's in that pamphlet that this trial is going to start August the 10th, and it's going to last up to two weeks. That's Monday through Friday, nine to five. There will be a break in the morning, break in the afternoon, lunch break. The jury would not have to stay together overnight unless and until there is a possibility you were deliberating your verdict late into the night, you became weary, mentally fatigued, unable to reach a verdict, and there's a chance -- and the judge will tell you with plenty of advanced notice to bring an overnight bag, and you'd all be taken to a fine hotel, county expense, individual private rooms, spend the night, come back together as a group to avoid any outside influence on your verdict.

Now, I tell you that to ask you this:  As you sit here now, are you aware of anything that will be occurring or any reason during that time frame or any reason why you think you wouldn't be able to sit as a juror in this case?

MR. DUZAN:  I'm currently enrolled in EMT school right now, and it's from six to ten.

THE COURT:  What is that?

MR. DUZAN:  Emergency medical technician.

THE COURT:  And it's from when to when?

MR. DUZAN:  Six to ten, Tuesdays and Thursdays.

THE COURT:  Six to ten?

MR. DUZAN:  Six to ten at night, yes, sir.

THE COURT:  Oh, I see.  Now, remember, we'd be here from nine to five.  Do you think that would affect your ability to sit as a juror?

MR. DUZAN:  I'm not sure.  Seventy-five traffic is pretty heavy.

THE COURT:  I don't believe that's a actual statutory legal disqualification.  If you would step out for just a minute, let me talk to the attorneys for just a second.

All rise for Mr. Duzan.

(Mr. Duzan exits room)

(Off the record from 1:24 to 1:27 p.m.)

(Mr. Duzan enters room)

(Open court, defendant and juror present)

THE COURT:  Thank you, sir.  Here you go. I want to -- please be seated.  I want to reintroduce to you Ms. Andrea Handley who is going to speak to you on behalf of the State of Texas.

**MR. MATTHEW DUZAN,**

having been previously duly sworn, testified as follows:

VOIR DIRE EXAMINATION

BY MS. HANDLEY:

Q.  Good afternoon, Mr. Duzan.  I just want to flush out a couple of things for you in terms of your schedule.  Now, you're going to be going to EMT school. How long does that last?

A.  I think my last class is September 15th.

Q.  Okay.  Okay.  And I don't know if this is part of your motivations for going, but everybody's always happy to see EMT's show up.  Good guys are always there to save the day.

Correct me if I'm wrong, Mr. Duzan.  When the judge gave you our schedule and you need to be in class from six to ten on Tuesdays and Thursdays, I saw a little bit of anxiety there at the thought that if we work late that day, if we're running late, you've got 75

traffic to worry about.  Your mind is going to be on the fact that you're missing your classes; is that correct?

A.    Right.

Q.    And I would assume that in EMT school, you don't get to pick and choose which classes you go to.  You got to be there every time, don't you?

A.    Yes.

Q.    And on time and ready to give a hundred percent of your time to that class, right?

A.    Yes.

Q.    And you're talking about learning how to save people's lives.  If the case were running long for some reason on a Tuesday or Thursday, is it fair to say that you wouldn't be giving a hundred percent of your attention and commitment to the case; that you might be worrying and sweating about what's going on with you missing classes?

A.    It's a possibility, yes.

Q.    Okay.  So in other words, we can't -- we cannot depend entirely on you being able to give us a hundred percent of your commitment and time and attention?

A.    I wouldn't say so.

Q.    Thank you very much.  That's all I have to ask you, so thank you for your time.

THE COURT:  I'm going to ask you to step

out.

MS. HANDLEY: Thank you, sir.

THE COURT: You'll be coming right back in.

(Mr. Duzan exits room)

(Open court, defendant present, no juror)

THE COURT: Let the record reflect we're in the presence of Mr. Broadnax.

What says the State?

MS. HANDLEY: We would challenge this juror, Your Honor.

THE COURT: It will be granted.

MS. HANDLEY: We would also -- I think you wanted to put something on the record, Mr. Lollar, for afterwards.

MR. LOLLAR: Well, yes. We also note we are in agreement with the challenge for cause for this juror. He's got a questionnaire that exhibits many contradictory stands that he has on the death penalty. He says he's not in favor of it, but he says on a scale of one to ten, he's a nine in favor of it. He says if the offense took place right by his parent's house -- and he says a lot of other things during the course of the questionnaire that give us both, the State and the defendant, pause.

THE COURT: Let the record reflect also on page 17: Do you have any specific problems, illness, stress or pressure, and he marks "yes" and then he explains what they were.

Ask him to return, please.

(Mr. Duzan enters conference room)

THE COURT: You are free to go, sir. Thanks a lot. Good luck to you.

(Recess taken from 1:30 to 2:24 p.m.)

(Mr. Jason Ross enters room)

(Open court, Defendant and juror present)

THE COURT: Thank you, Mr. Ross. Come right through here. Please be seated, folks.

Mr. Ross, good afternoon to you. My name is Webb Biard, and I'll be with you this afternoon during the jury selection process.

MR. ROSS: Okay.

THE COURT: The presiding judge of this court, if you remember, is Judge Michael Snipes, and should you be selected as a juror, Judge Snipes will preside over the trial. So that will make a little sense to you.

Also, I want to introduce these other folks to you, and make sure I say it right. We've got David Alex and Andrea Handley and Elaine Evans for Dallas

County and the State of Texas.  Also Brad Lollar, Doug Parks, Keri Mallon, and they represent Mr. James Broadnax.  And Mr. Broadnax.  Thank you, Mr. Broadnax.

The way we're going to proceed, Mr. Ross, is I'm going to talk to you for a little period of time.  Not that long, I hope.  And then one of the attorneys for each side will talk to you for up to 45 minutes.  So in about an hour and a half when that's done, I'll tell you here whether or not you're accepted as a qualified juror.

What that means is we're in the process of qualifying some 50 jurors.  From that 50 man/woman pool, the actual 12 will be selected.  We anticipate that that will be done probably in late July, early August, and you'll be notified at that time if you are or are not on the jury.

I want to give you some dates and see how that might affect your jury service.  Did you have an opportunity to read this pamphlet?

MR. ROSS:  I did.

THE COURT:  Did that help you some?

MR. ROSS:  Yes.

THE COURT:  Good.  Judge Snipes has told us that the trial -- anticipates the trial starts August 10th.  You saw the length and the time.  That's a Monday

through Friday, nine to five, break in the morning, break in the afternoon, lunch break. The jury would not have to stay together overnight unless and until you went into deliberations, it went late into the night, became weary, unable to reach a verdict, wanted to come back the next day. You'd be taken to a fine hotel as a group, individual private rooms, county expense, and then come back in the morning to avoid any outside influence. That could happen.

Should it happen, I'm confident that Judge Snipes will give you advanced notice by saying, okay, now, tomorrow night there's a good chance the jury's going to get the case so bring an overnight bag. That could happen. I tell you all that to ask you this: As you sit here now, are you aware of anything that will be occurring in your personal or professional life during that time frame that would prevent your ability to sit as a juror in this case?

MR. ROSS: No, I don't. If there is anything that would come up at work, I think we could cover it.

THE COURT: Good. Okay. You took a long time to fill out that questionnaire. We appreciated it. The attorneys have all read it. It took you time to fill it out, but it's going to save you time here today.

I'm sure there are some answers in your questionnaire that the attorneys want to follow up on, but we're not going to go back over it, just detail.  I don't read the questionnaire near as thoroughly as the attorneys, but I did notice that you're a lawyer and you do some criminal work --

MR. ROSS:  Yes, sir.

THE COURT:  -- and civil work.  The -- are you familiar with the capital murder procedure in Texas at all?

MR. ROSS:  Yes.  It's been a few years.

THE COURT:  Okay.

MR. ROSS:  But, yes.

THE COURT:  All right.  Were you aware of those special issues before you came here today?

MR. ROSS:  Yes, I'm familiar with the statutes.

THE COURT:  And you know that they're to be answered if and only if you find somebody guilty of capital murder?

MR. ROSS:  Correct.

THE COURT:  Of course, you can imagine some people come in here and they think they're supposed to answer them this afternoon or in the guilt/innocence phase, but you know if they're found not guilty of

capital murder, you never get to those special issues. And they're answered in the punishment phase.

MR. ROSS: Right.

THE COURT: And doing white collar crime, I guess you do federal work and, of course, the judge sets the sentencing. But in a capital murder case, the State court in Texas, that must be decided by the jury. And it's either life in prison or death, and the way the decision is -- the verdict is rendered or the punishment is rendered is by answering those special issues. Do you want to look at them again with me just briefly?

MR. ROSS: Sure, if you like.

THE COURT: I just want to go over it with you. Did you read the consequences of your answers?

MR. ROSS: As far as?

THE COURT: What a "yes" or "no" means.

MR. ROSS: If "yes," go on; if "no," stop.

THE COURT: You got it. I'm not even going to take up your time by going over these constitutional issues. You're more aware of them than I am. I'm not going -- usually I spend about 15 or 20 minutes at this point, but I'm not going to go into it any further. It looks like you have a mature understanding, and the lawyers can explain it better than I can.

If there is anything you think before the

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

lawyers start talking to you that you need to tell us that you've been thinking about, well, they need to know this that might affect my service?

MR. ROSS:  Nothing that's not in the questionnaire.

THE COURT:  All right.  I want to reintroduce to you at this time Andrea Handley, who is going to speak to you on behalf of Dallas County and the State of Texas.

**MR. JASON ROSS,**

having been previously duly sworn, testified as follows:

VOIR DIRE EXAMINATION

BY MS. HANDLEY:

Q.   Good afternoon, Mr. Ross.  How are you doing?

A.   Pretty good.

Q.   In a way I'm kind of relieved that you're an attorney so I don't have to talk to you a lot about the law and the concepts and things like that.  Mostly I want to talk to you about the answers in your questionnaire and get to know you a little bit.

Now, you're a litigation attorney?

A.   Correct.

Q.   Are you trying cases in front of a jury?

A.   Yes.  Honestly, not that often.  I know it's different in State court and criminal where you're in

court every day --

Q. Right. And in federal court the jury selection is a lot different than in State court. Is it not? Does the judge ask the questions and things --

A. Yes, I've had one where we had the attorneys do the questioning and --

Q. Okay.

A. -- after the judge's experience with that, she said she would never allow it again.

Q. Okay. All right. Well, let me ask you this, then, from your experience. Have you ever noticed that, you know, you'll talk to a jury and you'll be explaining things to them and you'll ask them questions, and they'll give you these answers. They'll tell you these answers that you like and you agree with and everything, and then they get back to the jury room and they come back with whatever verdict, you know, and you talk to them afterwards and you realize this person was not really shooting straight with me. I mean, they said one thing on paper and they said something else to my face, but the fact of the matter is I know that isn't how they feel. I think they just wanted to say what I wanted to hear. Have you ever had that experience?

A. I think, although we never really got to question juries afterwards.

Q. We do that a lot. We get in front of a big panel and we don't talk to them one-on-one like this. They tell us they can follow the law; oh, no, I have no bias or prejudice; oh, yeah. I'll go straight down the line, and then they get back to the jury room and come back with their verdict, and we are often given that opportunity to talk to them, and you get to know these people and you find out this person had an agenda or this person really wasn't honest with me.

A. I definitely understand that.

Q. Yeah. And not fair, would you say?

A. Fair to say.

Q. And not a fair situation for somebody not to be honest with you.

A. Right.

Q. Because I'll tell you, Mr. Ross, that as a representative of the State, and particularly on this case here, I obviously have strong feelings about this case.

A. Right.

Q. You know, how I think it should go and how I think the evidence is going to bear out, and what I think the verdict is going to be and should be. And that's that I think 12 fair-minded reasonable people would find the man guilty of capital murder and sentence

him to death versus life. And I have read your questionnaire. I think you're obviously a well-versed attorney. I think your answers are pretty neutral on a lot of things, but what I need to know and feel out from you is how you really feel about stuff; not just what we're supposed to say as lawyers, but just as a regular person, not as a lawyer, how you feel about things. Okay?

A. Okay.

Q. Now, I noticed that you worked with the UT law clinic and you worked on capital cases. When was that?

A. That would have been in 2000.

Q. How many capital cases do you think you worked on?

A. Probably -- I think maybe just two or three.

Q. Those were death penalty cases?

A. Yeah. These were post-conviction habeas proceedings.

Q. Did you have an opportunity to review the facts of the case and review what the offense was and --

A. Yeah. That was actually most of what I was doing was going over all the transcripts and looking for issues --

Q. So these were all cases where people had been found guilty and assessed the death penalty?

A. Correct.

Q. Looking back -- did you ever meet the defendants then afterwards, one-on-one?

A. Yes, I met two of the defendants.

Q. Okay. Okay. Now, honestly --

A. Uh-huh.

Q. -- do you think the jury did the right thing in those cases with respect to those men, assessing the death sentence?

A. From what I remember of the two cases, I think the jury probably returned a fair verdict based on what was put before them. I think the issues we were looking at is what was put before them and was it in the bounds of the law.

Q. Do you remember the names of these defendants?

A. I don't.

Q. Were they convictions out of Dallas County?

A. One was out of Fort Worth, I believe, and I don't remember his name but I think, oddly enough, it was in the news fairly recently. It was a case where the defendant was white and he was convicted by an all-white jury, and it was some issue regarding a Batson claim --

Q. Batson. Okay.

A. That wasn't an issue I worked on, but I saw an

interview with his family on the news and I thought that kind of looks familiar. And the other one, I'm not sure where it was, and that was a federal case.

Q.    I guess what kind of struck me about your questionnaire is that you put in here, with respect to the death penalty and when it's appropriate and all that, and you say:  In some cases; in those cases where...  I mean, do you have a particular case where you've seen it and you've said they were right on the money, that that was appropriate?

A.    Tim McVeigh, I think.

Q.    Tim McVeigh.  Okay.

A.    Yeah.  You know, beyond that, I think, you know, it shouldn't necessarily be used in every murder, as it's not.

Q.    Right.

A.    But, you know, I definitely feel there are cases that demand it.

Q.    Like what?

A.    I think murder and rape.

Q.    Okay.

A.    Murder during the course of a rape.

Q.    Murder during the course of a felony rape?

A.    Yeah.  I think child murders.

Q.    Murder of a child under six years of age?

A.  Uh-huh.  You know, I think robberies can warrant it, you know, murders in the commission of another felony.

Q.  Uh-huh.

A.  You know, depending on the facts.

Q.  Sure.  Sure.  I guess what I'm looking at is, in your experiences, have you come to a point where you think -- have you seen a case where a person was convicted of a capital murder, sentenced to death, where you thought personally, I don't think the facts really bear that out?  I don't think a death sentence is appropriate in that case?

A.  One of the two cases I worked on, I think it was a little more marginal.  It was a federal case, and it was a -- it was a drug deal gone bad.  It was a murder during the course of a drug deal.  And it was federal because it involved -- it was across state lines.

Q.  Was it one drug dealer killing another drug dealer?

A.  Yeah.  Yeah.

Q.  Was that what you took issue with?

A.  Not necessarily.  I think human life is valuable whether someone's a drug dealer or not.

Q.  Yeah.  Yeah.

A.    To me, you know, in what I knew about the case it just didn't -- there was nothing particularly striking about it being, I guess, extra bad --

Q.    Yeah.  Yeah.

A.    -- you know, versus -- I mean, murder is definitely bad --

Q.    Sure.

A.    -- and definitely --

Q.    Well, is it fair to say -- because there is nobody here going to arrest you or call your boss, but does the fact that the victim was a drug dealer factor into that point?  The victim of the offense, would that factor in?

A.    I think it's something fair to consider.  I don't -- again, I don't think that, you know, one person's life should be more valuable than others in terms of, you know, if he wasn't a drug dealer and everything else was the same.  I mean, I guess, you know, if it was just an innocent bystander, that may be different.

Q.    Okay.  That may be different for you.  Okay. But you haven't blocked yourself into an area where only certain cases are where you think you could give the death penalty?

A.    No.

Q.    Okay.  Because you understand, obviously, every case is judged on its own merit?

A.    Absolutely.

Q.    And you arrive at that verdict by answering the special issues such as that?

A.    Yes.

Q.    Okay.  You also put in here when we asked you if the death penalty is used too often or too seldom, and you said in some places --

A.    Uh-huh.

Q.    -- in Texas.  What places are you talking about?

A.    You know, I guess Dallas County is getting better.  You know, it had the reputation, I think, for a long time of being maybe a little too tough on crime, and I think, you know, the -- it's kind of the nature of the beast that we elect our county prosecutor and it becomes who can be -- it becomes a little bit of one-upsmanship, that I'm tougher on crime than the other guy and -- but I do think Dallas County is getting better.

Q.    So you think Dallas at one time, and maybe not too long ago, that maybe we sought the death penalty too often?

A.    Yeah.

Q.   Any particular case that you can think of where you think that probably shouldn't have gone for death on that one?

A.   No, I think it was just my general perception.

Q.   Okay.  Do you think it was motivated by political things, just trying to look like a tough DA or --

A.   Yes.

Q.   Okay.  And now our current DA is Mr. Craig Watkins.  What's your feeling about our current office situation?

A.   I think the -- the office, at least the way I perceive it, is making some real improvements.  I think that the office is still focused on prosecuting crimes and putting criminals away, which, I mean, that's -- that's the job.  That's the mission.  But at the same time, you know, I think has a keen understanding that the mission is to do justice.

Q.   Sure.  Does it give you any pause with what you felt about our office before and what we're doing today?  You know --

A.   No.

Q.   -- the feelings that you had before, do you bring that over into what's going on today, or is it fair to say that you have even more confidence in it

today, that when we're doing something we're doing it for the right reasons?

A. I feel good about the office now.

Q. Okay. In your work and in your dealings with states and prosecutions and, again, particularly your capital murder prosecutions or reviews, did you feel the State was fair or did you -- I mean, how did you -- how did you view a lot of what was going on?

A. No, I mean, my experience really with prosecutors -- and it's mostly, you know, federal prosecutors that I'm dealing with in my professional life. But, you know, I think they're good hard-working people that want to do the right thing, and, you know, it's -- I don't really have a -- you know, even as being an adversary in some ways, I don't feel like there's any corrupt motive or --

Q. Okay.

A. -- you know.

Q. Let me explore that a little bit with you, because I see that you're involved in a lot of volunteer work --

A. Yeah.

Q. -- with the programs. Is this inside our jails or prisons? Exactly where is it that you're going to do that?

A.   Actually, what I do -- I think you're referring to the PEP program.

Q.   Yeah.

A.   They do have a program where they bring civilians and mostly nonlawyers into the prisons to do programs with prisoners.  I haven't gone to any of those.  Really what most of my volunteer work consists of is -- the director of the program who works down in Houston, her name is Catherine Rohr.  I've kind of become her go-to person for random legal questions --

Q.   Okay.

A.   -- where so-and-so is up for parole and -- you know, and it's always things like that.

Q.   Okay.

A.   It's like -- I feel like I'm more giving her pep talks than helping sometimes.

Q.   Do you feel kind of like it's -- I don't know how to nicely put this here, but is it just that it's part of your job or are you self-motivated to be doing that, that kind of work?

A.   Both I would say.

Q.   Okay.

A.   It's something I kind of got involved in through my church.  She came and spoke at the church I was going to at the time.  I kind of became familiar

with it there.

Q. Okay.

A. So it's definitely something I want to do just as a good citizen.

Q. Sure.

A. But, you know, at the same time I bring my skills to it. I believe it can't have --

Q. Here's what I want to know from you then. Here's what I'm interested in knowing. You're involved in a program that, quite frankly, I think is a very worthy program. If people are going to do their time and they're going to come out, they ought to come out with skills and be able to get into the job market and get on the right path. So I'm all for that program. I appreciate that. But I also understand that at times it requires a lot of interpersonal reaction with inmates. You get to know them and get to know about their families and such as that.

What I wonder from you, Mr. Ross, is that you sit on a case about capital murder where the evidence shows he's guilty of capital murder. If the evidence shows that the question should be answered in such a way as to assess the death penalty, how it is that you're going to walk back into the penitentiary and be able to shake one of these guys' hands and say:

Trust me, I got your best interest in mind, even though I just killed someone?

A.   Yeah.  I see.  I honestly haven't thought about that.

Q.   Well, what do you think about that?  I mean, how is that going to -- the thought that you might very well be a part of it, it's a very real -- I mean, I don't have to tell you that, but it's very real that if the answers are -- if the questions are answered in a certain way, the judge will have no choice --

A.   Right.  Yeah.

Q.   -- and then design this man's execution, and you can't assume there will be a lot of brilliant UT students working on postconviction -- I mean, you've got to assume he's going to die and you're a part of that, and people watch the news and they read the newspapers, and you got to assume that maybe people in your project are going to know about that.  How is that going to affect you?

A.   I guess what I can tell you is, you know, I -- as a lawyer I do take that oath very, very seriously, and, you know, if a case calls for death, I would be willing to vote for death.  I know that would have consequences both -- you know, I mean, that's something you can't just walk out of that room and forget.  That's

something that would follow you.

Q.   Do you think those guys you work with are going to trust you?

A.   The guys I work with in the volunteer program?

Q.   Yeah.  That you're giving assistance to?

A.   I would hope that they would, and, honestly, if that's something that I felt was, you know, going to prevent me from doing the best for the people that I do volunteer work for, then I may have to find a new volunteer program.  I don't think that would be the case.

Q.   Okay.

A.   But, you know, I'm --

Q.   Sure.

A.   -- I do take this very seriously and ...

Q.   I can tell you do.  As a criminal defense attorney, particularly also your activities in the penitentiary, I think it's fair to say that you're an advocate.  You're an advocate for your clients.  True?

A.   (Nods head.)

Q.   And an advocate for the defendants.  For a lot of defendants, you're an advocate for the defense of persons accused of crime, correct?

A.   Yes.

Q.   Seems to me you are also a very strong advocate

for men who are currently incarcerated, maybe men and women who are currently incarcerated, correct?

A.   I guess.

Q.   Okay.  Okay.  If we -- if you were -- let me throw this out.  Let's say we had a captain with the police department, he had been a captain with the Dallas Police Department for 35 years, very committed to law enforcement, very well educated, knows the law, understands the law, gets it, you know, says I understand the law, I can follow the law; but at the same time I'm a DPD police captain, but, yeah, I can sit on this jury and be fair.  What do you think about that?

A.   I think that, you know, there may be some people that would just be trying to get on the jury.  You know, but, you know, with -- and I think that's part of what this process is for.  Without knowing more, I can't -- I wouldn't necessarily question -- out of hand say that, you know, he's just trying to get on the jury so he can -- you know, have some private motivation.

Q.   Do you think that by virtue of the fact of him having been a police captain for so long and in law enforcement that there is just an inherent bias to lean toward the State?

A.   There may be.

Q.   And you being an advocate for the defense --

A.    Uh-huh.

Q.    -- an advocate for the rights of the defendant and having particularly looked at something so -- with a microscope and everything, honestly, Mr. Ross, do you think that there might be somewhat of an inclination towards the defense side, given your occupation and your voluntary activities?

A.    I mean, I don't think so.  That's all I can say.

Q.    You don't think so?

A.    No.

Q.    Okay.

A.    And I know that, you know, a lot of people we work with are guilty, you know, and I'm not saying that they are in their because they have been wronged or, you know, the system was out to get them.  They are in there because they committed a crime.

Q.    Okay.  Let me -- and I believe you.  I hope you don't think I'm trying to attack your credibility --

A.    No.  No.  I know.

Q.    -- I just truly want to know.

Let me ask you something else.  Are you still active with the University of Texas or any of their programs?

A.    No.

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

Q.    You're not?

A.    No.

Q.    So you don't really keep up with what they're doing over there?

A.    No.

Q.    There is apparently an initiative with the UT clinic, I believe, and I hope I don't totally misspeak here, that they're trying to abolish the parties -- law of parties as it applies to capital murder.  Let me just bring you up to speed here.  I'm sure you're going to know what I'm talking about here.

As you know, it's possible in Texas for a person to be convicted of murder even though they're not the actual triggerman --

A.    Right.

Q.    -- and through the law of parties.  Well, the same applies in a capital murder.  If the jury finds that the individual participated in the offense and should have anticipated that a murder would occur, they could be found guilty of capital murder.  Do you understand that?

A.    Yes.

Q.    You knew that?  And before a person can be assessed the death penalty, the jury must find that he did, in fact, anticipate that a murder would occur.

A.    Right.

Q.    And, therefore, that makes him eligible for the death penalty now.  And there is an initiative now with the UT clinic to abolish that.  And, quite frankly, I think the feelings are that that's really gone way too far.  We are now seeking the death penalty on people who are not the actual triggerman in a case.  I mean, what do you think about that?

A.    I guess I'd like to hear their arguments.  I don't know -- I mean, from my own perspective, I don't know that that's really used that often, but I think, you know, there may be cases where it is warranted to seek the death penalty where if it's -- if I'm the mastermind and I tell you I want you to -- like a gang hit, for instance.

Q.    Uh-huh.

A.    I'm telling you, here's the gun, go out, do this and if you don't, you know, you might get popped.

Q.    Yeah.

A.    You know, I think that person should be as culpable as the triggerman.

Q.    When you say if you're the mastermind, are you envisioning a certain circumstance where you --

A.    No, I'm just thinking hypothetically that, you know, abolishing that may cut the prosecution off from

certain circumstances where, you know, it is reasonable and warranted to seek the death penalty against someone who did not actually pull the trigger.

Q.   Okay.  And maybe not even as far as the death penalty, but, you know, for example, let's say I had to take my brother with me and my brother is very mentally slow, not mentally retarded but mentally slow.  This is a hypothetical.  My brother is actually just fine.  But let's say, hypothetically, I've got my mentally slow brother.

I pretty much raised him because our parents had been out of the scene.  He depends on me a hundred percent completely.  And basically I've kind of just trained him to do what I tell him to do.  He knows right from wrong, and I tell him we're going to go rob the 7-Eleven, and he's going to get part of the proceeds and he can go buy all the candy he wants with it.  But I need to go get a gun first, and he's going to go buy one because I'm a convicted felon and I can't.  And I tell him to also go buy the bullets, and he does, and I tell him we're taking your car and driving up to the 7-Eleven.

And I take the gun from him and I load it full of the bullets and everything, and I say, you sit here and honk the horn if you see anybody come in, and

I'm going to go rob this clerk, and let me tell you something, I'm not going to leave any witnesses. And you'll get your money for candy afterwards. And I go in and I rob the clerk. I shoot him in the head and I kill him. Obviously, I'm guilty of capital murder.

A. Right.

Q. What about my brother being guilty of capital murder?

A. You know, I think there might be some mental capacity issues there.

Q. He knows right from wrong. He's not mentally retarded. He will tell you I know she's doing wrong, but I -- I -- she's my sister.

A. Uh-huh.

Q. I'm sorry. Go ahead. What do you think about that? What's your gut on that, that that guy can be found guilty of capital murder and spend the rest of his life in prison?

A. That's a tough one. That's a real tough one.

Q. I mean, do you feel like -- you say it's a tough one. In what way is it tough?

A. Yeah. Well, I just don't know if -- if that would necessarily meet my personal definition of capital murder, what I think of when I think of capital murder.

Q. What's your personal definition of capital

murder?

A.    I don't know.

Q.    Well, I'll tell you that capital murder is intentional murder --

A.    Right.

Q.    -- one of the ways is that if it's an intentional murder in the course of committing another felony offense.  For me having gone into the 7-Eleven, I've shot the clerk in the head five times, it's pretty clear I've intended to cause that person's death, and I've taken that money out of the cash register.  That is a capital murder.  Would you agree with me there?

A.    Yeah.

Q.    The law expands on that, you know, with respect to my slow brother in the passenger seat, and says:  To be guilty of capital murder he aided, assisted, participated, encouraged, directed in the commission of it, and he should have anticipated somebody would die. He is also guilty of capital murder.  He bought the gun.  He bought the bullets.  He knew what I was going to do, and I even told him, look, you sit right here and blow this horn if you see somebody coming because I'm going to kill this man.  I'm not leaving any witnesses.

So the law says if you're a party to it and you should have anticipated, I mean, what do you think

about that and your personal definition of capital murder?

A.   Yeah.  I mean, it seems harsh, but I think also the way you've described it, it does meet the definition of capital murder.

Q.   It meets the definition of capital murder, but does that make it fair?  I mean, honestly, what would you -- honestly, what would you do in a situation like that?

A.   If I was on that jury?

Q.   Yeah.  And you knew if you found my brother guilty, he'd spend life in prison without parole?

A.   I don't know.

Q.   You just can't answer that question?

A.   I think -- that's a hard case, yeah.

Q.   And I will add this.  If the evidence proved to you beyond a reasonable doubt that he was a party to the offense --

A.   Right, and I think --

Q.   -- and the evidence revealed beyond a reasonable doubt that he did anticipate that a life would be taken.  I'll say that.

A.   Right.  Right.  And I think that's where, you know, you would have to take all the evidence in, and, yeah, if he knew right from wrong and knew that a murder

was going to be committed and assisted in that, then, yeah, that's capital murder and I would be willing to vote that way.

Q.   You would be willing to vote that way?

A.   Yeah.

Q.   Even though -- so you're telling us, absolutely, you could follow the law in a situation like that?

A.   Yes.  Yes.  I mean, you know, it would be hard. You know, I think that's why you have jurors to consider all the evidence.

Q.   Right.  Right.  And let me ask you this because we're talking about a party to an offense.  We're talking about not the triggerman in the case, and we're talking about life without parole.  Talking about dying in prison, basically.

A.   Right.

Q.   Never coming out.  You'd have to admit that's a far cry different than trying a traffic ticket.

A.   Oh, yeah.

Q.   The stakes are a lot higher here.  We're talking about life.  In a death penalty case, we're talking about death.  We're talking about killing somebody.

A.   Right.

Q. In terms of what we would have to show you, Mr. Ross, would the stakes be higher in a case like that?

A. I'm sorry. I kind of lost you in the question. In terms of -- would the stakes be higher --

Q. In terms of what we would have to prove to you. In terms of what we would have to show to you.

A. Well, I just know that the facts you would have to prove are a lot tougher in a murder case than a traffic ticket, just in terms of the --

Q. Yeah.

A. -- you know, the -- it's not you get the cop up there and he says I was going 60 and you got the little camera --

Q. Right. Right.

A. -- and that's pretty much it. It's a lot more complex factually.

Q. Yeah. Probably going to have a lot more exhibits in a case like this.

A. And witnesses.

Q. Sure. Would it be fair to say you -- would your deliberations in the traffic ticket be any different than your deliberations in the capital murder case?

A. Well, I mean, it all comes down to I think

reasonable doubt, and there is a lot more facts to plug in in a complex murder case with more witnesses and judging credibility both ways versus --

Q. Sure.

A. -- you know, that 20 minutes, get two people on the stand --

Q. Sure. Sure.

A. -- and I believe this one and not this one and it's done. So, yeah, in terms of weighing things out and, you know, who do you believe, how much are you going to believe, there is just more to think about. Does that mean there would be a higher standard, you know, higher than reasonable doubt? No.

Q. Okay. What is reasonable doubt to you?

A. I think you just weigh out all the facts and all the evidence and look at each element and say did the prosecution really prove that. You know, did they really prove their case.

Q. Right.

A. Or do I -- you know, and -- I don't know that the jury instruction ever really gets at that.

Q. It doesn't. We will not give you a definition of reasonable doubt.

A. Right.

Q. We did at one time. We got rid of it.

Reasonable doubt is whatever you think it is. You know, it's certainly not 100 percent beyond all doubt whatsoever.

A. Right.

Q. You know, and I guess that's what I want to know from you --

A. Uh-huh.

Q. -- you know, is what your feelings are on reasonable doubt. What it is and what it is not.

A. Uh-huh.

Q. It's hard to articulate, but do you think you can --

A. Yeah. I think it's got to be something beyond just, you know, sympathy for the defendant or, you know, just I have a gut feeling that the facts are different than anything that's been presented.

Q. Sure. Sure.

A. You know, I've been in mock jury situations where you actually get to hear what juries are saying.

Q. Uh-huh.

A. You know, it just kind of makes you sick sometimes, you know, what stories are come up, but, yeah, what may pass one way or the other in terms of that.

Q. Let me ask you this. You're a lawyer. You're

very smart. You're very versed on the law. I don't know if maybe this happened to you in some of your jury trials. You're sitting around waiting on the verdict and a note comes out from the jury. Has that ever happened to you where they sent a note out?

A. Yes.

Q. And they say what does such-and-such mean or what is da-da-da, and they'll ask something and the judge will send back a note saying you have all the law you need, meaning it's in the charge.

A. Right. Yes.

Q. Has that ever happened --

A. Yes.

Q. Okay. And you sit there and you think why don't we just explain it to them. You know, let's just agree and let's just explain it to them in laymen's terms or something. But instead the note goes back and it says: You have all the law that you need.

So you're the jury back there in the capital murder case. They have a question. They send out a note. You know what the answer is or at least you think you know how to interpret a piece of law or something. But you let them send out the note and it comes back from the judge and says: Cannot answer this question; you have all the law that you need. What do

you do now, Mr. Ross, as a lawyer who has been to law school? You're a lawyer. You can explain the law to them. Outside of what's in the charge, what are you going to do?

A. What am I going to do if I'm the lawyer sitting outside the room?

Q. You're in the jury. You're in the jury room.

A. Oh, I'm in the jury.

Q. You're in the jury room, and you got your Court's charge with the law and everything, and the jurors have a question about what something means about the law, and so they send the question back to the judge and it comes back: Not going to answer this question; you have all the law you need.

A. No, I mean, if you're asking, you know, am I going to say, well, back in law school, or here's how we do it in cases I'm in, or kind of bring my own interpretation of the law --

Q. Uh-huh.

A. -- you know, into the jury room, you know, again, I know that that's an absolute no-no and I would not do it.

Q. Even though they look at you and they go you're a lawyer --

A. Right.

Q.    -- tell us --

A.    Yeah.  And I can tell them I know that's frustrating and it's going to drive you crazy, but let's look through this charge again; let's think about it, you know, and let's all talk about what this means.  I don't want to impose my will or my views beyond the normal course of deliberation and what's appropriate into what -- you know, here's what this definition of this is and kind of ...

Q.    I got you.  I got you.  I haven't talked a lot about the law, particularly about what applies in here because mostly I just wanted to pick your brain here about all this.  But, again, you know, as I've gone through your questionnaire, I've seen some things where, you know, it says "appropriate in some circumstances."  The death penalty, I've seen some parts of Texas that -- you'd explained that, that you think at one time maybe Dallas was a bit too zealous or maybe had the wrong reasons for doing something.  You're telling us you're comfortable with the state of our affairs now?

A.    Correct.

Q.    Okay.  You understand the parties offense and that the death penalty can be an option available to a person who never pulled the trigger?

A.    Correct.

Q.  And you are generally okay with that?

A.  Oh, absolutely.

Q.  Okay.

A.  Yeah.

Q.  Okay.  So ultimately -- and you spent some time in the Netherlands?

A.  Yes.

Q.  My family is Dutch.  Beautiful country, isn't it?

A.  Yeah.

Q.  Okay.  So I guess ultimately what I'm looking for you, Mr. Ross, and the defense will ask you their own separate questions, is how you really -- well, if you're not looking for a particular situation in mind that you go, yeah, that's death penalty worthy, I'm thinking maybe you got a factual situation that you're kind of stuck to, that if it's not this, then I don't think it's death penalty worthy.

A.  I really don't think that's the case.

Q.  Okay.  All right.  And you understand, you read the questions before this, that obviously we have to prove that the defendant is a future danger to society.  You're familiar with that already from your work.

A.  Correct.

Q.  Okay.  And that you can obviously -- you can

base your decision on this question on the facts of the offense alone or even on additional evidence offered in the punishment phase.

A.   Correct.

Q.   And I'm not sure how you responded to that question of whether or not you think the circumstances alone could ever be sufficient for you to render a sentence of death.  Do you think you could envision that, sir, that you could ever answer that question just based strictly on the offense itself, the circumstances of the offense?

A.   I guess -- is your question could there ever --

Q.   Do you think it's a question that could be answered by just looking at the facts of the offense itself?

A.   Yes.

Q.   Okay.  Okay.  And, obviously, if he's not a future danger, then that's it; he spends his life in prison.  If you do find he's a future danger to society, and obviously that society is --

A.   Wait.  I'm confused.  Go back one.

Q.   I'm jumping ahead quick because I'm running out of time.  But the first special issue has to do with future dangerousness.  Is he going to be a future danger to the society in which he's in.  He's in prison.  Is

there a probability that he will commit criminal acts of violence.

A.    Right.

Q.    What is your definition of probability?

A.    More certain than not.

Q.    Okay.  Criminal acts of violence is not defined for us, but what would you consider a criminal act of violence?

A.    Hurting -- injuring someone, attempting to injure someone.

Q.    Okay.

A.    But I guess my question is, you know, I think there are circumstances where that can be answered yes, there is a future danger without moving on to other evidence, you know, just from the facts alone.

Q.    Sure.  Just from the facts of the offense itself, yeah.

A.    But I guess I was wondering were you asking me do I believe that that answer could be "no" based on the --

Q.    Oh, no.

A.    Okay.

Q.    What do you think?

A.    Okay.

Q.    It could be no.  Yeah.  That's true.  That's

true.  Yeah.  And you make that determination based on the evidence you've already received from the first part of the trial.  You may or may not receive more evidence, and that's how you decide whether or not he's a future danger.

A.  Yeah.  I guess -- I guess -- I was just wondering --

Q.  I'm sorry --

A.  -- you weren't trying to say that I would foreclose any other evidence -- you know, this crime means he's not a future danger no matter what we may learn.

Q.  No.

A.  Okay.

Q.  And, obviously, nothing's automatic.  Just because you're guilty of capital murder doesn't necessarily mean you're a future danger to society.

A.  Right.

Q.  That's a question you'll ask yourself in the punishment phase, separately and apart from the guilt/innocence phase.

A.  Right.

Q.  If you answer that "yes," you're going to move on to that second issue which concerns that party issue where you're going to have to make a determination, did

PATRICIA HOLT, CSR        972/741-7086        DALLAS, TEXAS

this person actually kill the person himself or if they weren't the triggerman, so to speak, did they know. Did they anticipate that somebody was going to die.

A. Right.

Q. If you also answer that question "yes," now he's sitting on the death penalty verdict.

A. Right.

Q. And then the last situation is a mitigation issue, which I think you're familiar with also in your work --

A. Right.

Q. -- where you're looking, and if everything is in its entirety, seeing if there's something sufficiently mitigating to warrant a sentence of life versus death.

A. Right.

Q. In terms of mitigating evidence, obviously, I can't pin you down to what you will or will not say is mitigating in this particular case, but I want to feel you out about that. You made some mention in your questionnaire about drugs or intoxication, that that should be considered in assessing a person's punishment. Expand on that a little bit for me. What are your feelings about that?

A. Well, I guess I just don't want to foreclose

that the -- that either side, you know, may bring something like that up, and either way I wouldn't be inclined to just dismiss it out of hand.

Q. Sure.

A. Oh, no, drugs are never aggravating; drugs are never mitigating; or just, you know, I don't want to think about it.

Q. As we sit here today, though, what do you think of in terms of involuntary intoxication and accountability?

A. I feel like people should be responsible for their actions. It's -- you know, I think it would be a shame if -- you know, just generally speaking, if being intoxicated meant that an otherwise horrible crime, you know, that goes unpunished or goes punished less than, you know, someone not intoxicated.

Q. What about in reverse? What about the reverse of that, that because I was intoxicated I committed the offense, and but for me being intoxicated I probably wouldn't have done something as horrific as that. What are your thoughts on that?

A. Using it as a mitigation?

Q. Sure.

A. Yeah. I think that's what I'm talking about. It shouldn't necessarily mean that, you know, someone is

less culpable.

Q. Do you think people still know what they're doing even though they're intoxicated?

A. They can. I don't necessarily think in all cases.

Q. Like in what cases?

A. Someone, you know, gets drunk, uses drugs and blacks out, you know.

Q. All right. Okay. What else would you see as a potentially mitigating piece of evidence?

A. I think traumatic abuse.

Q. Okay.

A. Either, you know, as a child, you know, or in a domestic violence type of situation.

Q. What if you're just having a tough life?

A. We all got tough lives, don't we?

Q. Yeah. I'm sure you maybe heard that a lot as an excuse with the clients that you work with. You know, I just didn't have it so good as a kid. What do you think about that excuse? Well, I'm from a single-parent household and I didn't have a lot of money like you did. What do you think when you hear people say things like that?

A. I think that doesn't excuse you from the consequences of your actions. People still have to know

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

right and wrong and do right and wrong.

Q. Right.

A. For some people, the circumstances of their life makes it harder, but that's still what we as a society expect.

Q. Sure. Sure.

MS. HANDLEY: I do believe I'm out of time, sir. Thank you so much for answering my questions.

THE COURT: Now, Doug Parks will talk to you on behalf of Mr. Broadnax, unless you need to take a short break.

PROSPECTIVE JUROR: No, I'm fine.

THE COURT: Mr. Parks?

VOIR DIRE EXAMINATION

BY MR. PARKS:

Q. Mr. Ross, I don't expect I'm going to take my full 45 minutes. We get the benefit of listening to the State's 45 minutes, so very often we don't take as long as the State does.

I'm going to say some things and make some comments that I will apologize to you for ahead of time because they're going to maybe sound a little simplistic to you. We don't get to talk to people all that often who understand the concepts as well as you do. But you know from having worked, I suppose, with the folks down

at the University of Texas as our papers get graded, so I don't want to just say, oh, I'm not going to talk to you anymore. I do want to know that I've covered some ground that I like to cover with all prospective jurors, and if it sounds a little simplistic, I don't mean to be insulting you. Okay?

Obviously -- well, first let me -- before I get into that, does the name Jonathan Bruce Reed ring a bell to you?

A. No.

Q. I thought that might be one of the two cases that you worked on.

A. Oh, that may be.

Q. That sounds kind of like one that came --

A. Okay. Yeah. I mean, it's still not completely clicking, but that may have been.

Q. It could have been. Okay. It doesn't matter. I just thought maybe that that might ring a bell with you.

One of the things that I'm going to talk to you about or some of the things, Mr. Ross, has been suggested to us by studies that have been conducted with jurors who have sat in capital murder cases and what their beliefs seem to be after they completed their service that just scares the dickens out of me, and I

don't expect that these apply to you but I want to make sure.

One of the things that we found is that a pretty large percentage of jurors kind of make up their mind about the case after opening statements before they've ever heard any evidence whatsoever. You may have seen some of these studies. And you, of course, realize that if you sit on the jury, you have an obligation to wait until all of the evidence is in before you make up your mind one way or the other whether the defendant's guilty or not guilty.

A.   Right.

Q.   And you'd be able to do that?

A.   Yes.

Q.   Wait and hear the whole thing? I'm not going to go into all of the things that I might typically do at guilt/innocence, burden of proof, reasonable doubt. You know all about that. What I do want to say is this: We spend a great deal of our time talking about these punishment issues, and very often I become concerned that jurors believe that because we do that, that a guilty verdict is a foregone conclusion, and we certainly want to disabuse everybody of that. There may not be a punishment phase to the trial, depending upon what the jury's verdict in the first phase is. You know

that --

A.    Right.

Q.    -- perfectly well.  So that when we talk about these special issues, we do so in the context of a juror having already heard evidence that convinces him and all the other members of the jury beyond a reasonable doubt that the defendant is guilty exactly as he is charged in the indictment.  So that's the context in which we ask these questions.

And the concept that we have, and I'm probably telling you things that you already know, in the State of Texas is this is the scheme that we have determined to use that, for want of a better way to put it, weeds the sheep from the goats.  That is, obviously, the idea is that not everyone guilty of capital murder should receive the death penalty, and there has to be some way of determining which is which.

A.    Right.

Q.    Different states use different methods of doing it.  The federal system uses a different method.  In fact, I believe only Oregon and Texas use this particular way of doing things, of using these special issues.  Most of the time there are mitigators and aggravators, and the jury finds whether or not various aggravators or mitigators have been proven, and that all

gets weighed in the process.  Here we just answer these questions.

But what is very often lost, I think, to the run-of-the-mill juror is that these questions really are -- at least the first two special issues are the same as an indictment.  They have to be proven by the State beyond a reasonable doubt, and in all of the things that are in their have to be proven.

Do you have any problem with that concept of -- what I typically tell prospective jurors is this: You can read special issue number one, for instance, and nowhere in that question does it inquire whether the defendant deserves the death penalty because that's not the determination to be made --

A.  Right.

Q.  -- by the jury.  And that if a juror were to go back into the jury room and decide whether he did or did not deserve the death penalty and then answer those questions according with that determination, they would be violating their oath.

A.  Right.

Q.  And so, again, you know with yourself, this is an easy conversation to have.  Do you feel like that if you were on the jury that you could put the burden of proof on special issue number one on the State?  If they

prove that it should be answered "yes," answer it "yes," and if they fail to prove it, answer it "no"?

A. Right. Yeah. If they prove beyond a reasonable doubt that --

Q. That there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

A. Yeah. I'm going to answer it based on what the evidence is.

Q. And, frankly, as the prosecutor indicated to you earlier, our law is that it's possible for the facts of the case itself to prove that to a jury, although this is a different question from "is the defendant guilty."

A. Right.

Q. It's a whole different question. But it's possible that the facts could prove the answer to that to be "yes." The flip side of that coin, though, is this: If you as a prospective juror said to Ms. Handley, you know, Ms. Handley, I don't believe the facts of the case alone would ever prove that question yes to me, you're still qualified to serve because it's up to you as a juror to determine what facts you believe to be relevant in answering that question and whether or not the State has proven that issue to you. Does that

make sense to you?

A. Yeah. I think there can be cases where the facts alone --

Q. Would be relevant and sufficient?

A. Right. But not necessarily.

Q. Not necessarily. Special issue number two is the parties issue. I'm not even going to talk to you about that. We've talked about that. Special issue number three I want to visit with you about for just a little while, and I'll be done, Mr. Ross.

And if I keep -- I just had Lasik surgery and I can't decide whether I need these glasses or not. My glasses were that thick earlier --

A. I had it a few years ago and loved it. Changed my life.

Q. They're going to tweak mine in about a month, which is why I have these. But it's a lifesaver, and I don't know why I didn't do it 20 years ago.

At any rate, here's the thing about special issue number three. It has no burden of proof. It is probably unconstitutional if held to the literal meaning of that particular question, because the question has you take into consideration circumstances of the offense and the defendant's character and background and the personal, moral culpability of the defendant.

I will tell you that mitigation is not limited just to those things, according to the federal law, okay? And our court of criminal appeals has said that the only thing that saves special issue number three from being declared unconstitutional is that in practice we don't limit mitigation to just what's in that special issue. Mitigation is whatever any individual juror decides it is for him or her.

It can be circumstances of the defendant's character or background. It can be mercy, if one wants to just -- if a juror in the State of Texas decides I've heard all of the evidence; I've decided that this person is guilty of capital murder; I've looked at special issue number one, listened to the evidence. I'm convinced that he is, in fact, a future danger, but I just feel that I am not comfortable assessing the death penalty for this particular person. I don't have to articulate why to any member of the jury. I don't have to explain to any other member of the jury why I feel the way I do. I just happen to decide that mercy is the policy that I want to follow that day.

And the law says that's fine because, contrary to what about 20 percent of jurors who actually serve on capital murder juries believe, the death penalty is never mandatory and the life penalty is

always an appropriate punishment in the State of Texas. And I think I'm probably preaching to someone who knows that already.  Is that fair to say?

A.  Yeah.  It's been a few years since I looked at that issue.

Q.  And what happens, a lot of times people -- and I guess it's because we don't really do as good a job as we think we do explaining the law to jurors, but somewhere between 15 to 20 percent of jurors have actually said -- jurors in capital murder cases believe that once they find a person guilty of capital murder it is mandatory that they assess the death penalty.  And how they can come away with that belief after they go through this process I do not know, but they do.

You've done mock juries.  It's enough to raise the hair on your head sometimes on what goes on back there.  But it's not mandatory.  It's never mandatory.  I think a significant number of jurors believe that if they don't give the death penalty, somehow or another the defendant walks right out the courtroom door and into the street, even though we tell them that the life penalty is the only other alternative to the death penalty.  It just doesn't seem to soak in to a lot of our jurors' minds.  But you understand all of that, that this --

A.    I think so.  Yeah.

Q.    -- what happens depends solely upon what the evidence shows, and then ultimately the individual juror making his or her own individual decision, moral decision about what is right in the case.  Anything about that process that you feel like you couldn't participate in?

A.    No, I believe I can.

Q.    Thank you, Mr. Ross.  You've been very patient with us.

THE COURT:  We thank you, Mr. Parks.

You may step right outside for just a minute and then you'll be coming right back in in just a minute.

(Mr. Ross exits room)

(Open court, defendant present, no juror)

THE COURT:  Let the record reflect we're outside the presence of the juror but in the presence of Mr. Broadnax.

What says the State of Texas?

MS. HANDLEY:  Juror's -- one moment.

MR. ALEX:  Who are y'all's private investigators?

MR. LOLLAR:  Well, Rex Reynolds is one.  Leonard Clemmons is another.

MR. ALEX:  The only thing that I was curious about was that if he hired the same private investigators that these guys have used before -- did he say that he did work with the clinic and --

MS. HANDLEY:  Well, I don't know what that name was that they threw out.

MR. ALEX:  Rex Reynolds or -- could we just ask him if he's familiar with Rex Reynolds, if he's ever done any work with him?

THE COURT:  Yeah.

MR. ALEX:  That will be a simple question. I think we know the answer, but I just --

MS. HANDLEY:  Is that the only name, Rex Reynolds?

MR. ALEX:  What's his name?

MS. MALLON:  Leonard Clemmons.

MS. HANDLEY:  Leonard Clemmons.

(Mr. Ross enters room)

(Open court, defendant and juror present)

THE COURT:  Couple more questions.

PROSPECTIVE JUROR:  All right.

FURTHER VOIR DIRE EXAMINATION

BY MS. HANDLEY:

Q.  Hopefully just a few, Mr. Ross.  I'm interested in the private investigators that you've used before in

your work.

A. Uh-huh.

Q. Are you familiar with a gentleman by the name of Leonard Clemmons?

A. I don't think so, no.

Q. What about Rex Reynolds?

A. No, doesn't ring a bell.

Q. Any particular private investigators that you would say you use on a regular basis?

A. I was involved in -- or am still involved in the Enron litigation, and we use a guy named Sonny Hildreth from down in the valley just to find witnesses.

Q. Okay.

A. And who else did we use. There is a guy I have used for some background checks, and I can't remember his name. He's a former postal inspector. I don't know his name offhand.

Q. Okay.

A. And we use Kroll sometimes.

Q. Kroll did you say?

A. Yeah. Kroll Investigations.

Q. Kroll Investigations. Okay. All right.

A. But that's more accounting type investigations.

Q. Yeah. Okay.

MS. HANDLEY: Any other?

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

MR. ALEX:  No, that's it.  Thank you.

THE COURT:  One more time.

MS. HANDLEY:  Thank you so much.

(Mr. Ross exits room)

(Open court, defendant present, no juror)

THE COURT:  Now what says the State of Texas?

MS. HANDLEY:  Juror's acceptable with the State.

MR. PARKS:  Juror is acceptable.

THE COURT:  Ask him to return, Bobby.

(Mr. Ross enters room)

(Open court, defendant and juror present)

THE COURT:  Mr. Ross, of course the attorneys have agreed that you are a qualified juror. Again, remember how the procedure is going to work?  I'm going to ask you to do this for me.  Don't -- avoid any outside influence at all costs.

MR. ROSS:  I will.

THE COURT:  Like the TV or the Internet. The sheriff is going to give you the card of the judge's coordinator should anything occur in your life between now and April -- August the 10th that you think might affect your service.  You need to give her a call and we'll come back up --

MR. ROSS: Okay.

THE COURT: -- and address it. Now, the -- and she's going to be calling you --

MR. ROSS: Okay.

THE COURT: -- and letting you know one way or the other whether or not it's the 12th. Is your information on your questionnaire still correct?

MR. ROSS: Yes.

THE COURT: It's been a real pleasure to meet you, sir. Good luck to you, sir.

MR. ROSS: All right. Thank you.

(Recess taken from 3:30 to 3:41 p.m.)

MR. ALEX: Elaine is going to handle this.

(Mr. Michael Trull enters room)

(Open court, defendant and juror present)

THE COURT: Thank you very much. Appreciate you being here. Please be seated.

Be seated, folks.

MS. HANDLEY: Thank you.

THE COURT: Mr. Trull, please do this for me, sir. Raise your right hand.

Do you solemnly swear you will true answers make to the questions that will be asked of you concerning your qualifications as a juror in this case so help you God? You'll answer "I do."

MR. TRULL:  I do.

THE COURT:  Mr. Trull, I want to introduce myself to you.  My name is Webb Biard, and I'll be with you this afternoon during this part of the jury selection process.  If you recall, the presiding judge of this court is Michael Snipes.  Judge Snipes, should you be selected as a juror in this case, will actually preside over the trial, so this is the only opportunity we'll have to be together.

Also, in that regard, I want to introduce some other folks to you.  I want to make sure I pronounce their names correctly.  Mr. David Alex.

MR. ALEX:  Good afternoon.

THE COURT:  Andrea Handley.

MS. HANDLEY:  Good afternoon, sir.

THE COURT:  Elaine Evans.

MS. EVANS:  Good afternoon, sir.

THE COURT:  They represent Dallas County and the State of Texas.

Also we have Brad Lollar, Doug Parks, Keri Mallon -- she's not here right now -- and they represent Mr. James Broadnax.

And Mr. Broadnax.  Thank you, Mr. Broadnax.

Without anything further from me, I'm going to reintroduce you to Elaine Evans who is going to talk

to you on behalf of the State of Texas. Now, you filled out a questionnaire, and we have it here in case you need to refer to it.

There it is right there. I know it took you time to fill it out, but it will save you time here today. They might want you to be able to look at some of your answers and expound on them.

Ms. Evans?

MS. EVANS: Thank you, Your Honor.

**MICHAEL TRULL,**

having been previously duly sworn, testified as follows:

VOIR DIRE EXAMINATION

BY MS. EVANS:

Q. Good afternoon, Mr. Trull. I'm going to direct your attention just to this first page here on the questionnaire. It's been a while since you've filled this out for us down there in the central jury room.

A. Right.

Q. Have you thought any more about your personal feelings about the death penalty since the time you filled out this questionnaire?

A. Not really, no.

Q. Okay. Are your feelings pretty much the same as you have indicated here? I see on your answer regarding which statement best represents your feelings,

you circled number four, which would be:  I believe that the death penalty is appropriate in some murder cases but I could never return a verdict which assesses the death penalty.

A.   Yeah.

Q.   Is that still your view here today, Mr. Trull?

A.   Well, I guess it is kind of my view, but also the part that I have written, unless there is overwhelming evidence and, you know, under circumstances like that, then, yes.

Q.   Okay.  And when you say overwhelming evidence, the State of Texas has the same burden as it would in a case where somebody's speeding, like a traffic ticket.

A.   Right.

Q.   Or misdemeanor DWI down there in the misdemeanor courts or aggravated robbery up in the felony courts or like a petty theft case.  It's beyond a reasonable doubt.  That burden is the same in a capital murder case, same burden in a capital murder case where the State is seeking the death penalty, which is the case here.

A.   Yeah.

Q.   The State is seeking the death penalty in this case before you.  Do you think that you would feel that maybe the State should have a higher burden where we're

asking jurors, such as could potentially be you, to assess the death penalty?

A.   Uh --

Q.   Higher burden than beyond a reasonable doubt?

A.   No, I don't think so.

Q.   Okay.  You think that the same burden, beyond a reasonable doubt, for a traffic ticket would be okay here in a capital murder?

A.   Actually, I think when I put overwhelming evidence, I guess that would be the same as what I meant by reasonable doubt.

Q.   Okay.  What does beyond a reasonable doubt or what does reasonable doubt mean to you?

A.   Lots of evidence.  Mainly evidence.  And if the person admits that he did it, you know, something like that.

Q.   Okay.  Now, understand that a defendant, whether it be, you know, the DWI downstairs, misdemeanor court I'm talking about, or here in a capital murder, they don't have to testify.  The defendant has an absolute right to remain silent, Fifth Amendment right.  The State of Texas can't call him to testify.  The defense can't call him to testify.  If you don't hear from a criminal defendant, are you going to hold that against them in any way?

A.   No.

Q.   If you don't hear from them?

A.   No.

Q.   You would not?  It's the State's burden at all times to prove our case beyond a reasonable doubt, the elements in the indictment.  I think you read what the State was alleging here in this case, correct?

A.   Yes.

Q.   Okay.  And you could hold the State to the burden of beyond a reasonable doubt?

A.   Yes.

Q.   Understanding that beyond a reasonable doubt does not mean 100 percent.  It doesn't mean beyond all doubt, but it means whatever it means to you, but it doesn't mean 100 percent.

A.   Okay.

Q.   Or beyond all doubt because if you were that sure, you would probably be a witness yourself, correct, and not called upon to serve as a juror in this case, correct?

A.   Yes.

Q.   So understanding what we're talking about, you know -- it causes me a little pause seeing -- I understand what you mean that there has got to be evidence, and of course there would be.

A.  Uh-huh.

Q.  The State has to prove their case, bringing evidence, whatever form that may be.  The law doesn't tell us, State, you must bring DNA evidence; you must bring eyewitness testimony; you must bring three eyewitnesses or two.  I mean, we can prove our case based on circumstantial evidence alone.  Do you understand what that means?

A.  Yes.

Q.  Circumstantial evidence can be anywhere from fingerprint or DNA or a situation such that maybe, say, for example, you come home and you see a guy running out of your house with a TV in their hand.  You didn't see them go in and take the TV, right?  But circumstances are such where you believe he just committed a burglary, correct?

A.  I saw him with my TV, yeah.

Q.  Okay.  State of Texas can prove a capital murder where we're seeking the death penalty by way of circumstantial evidence and circumstantial evidence alone.  You don't have to have an eyewitness to it.  Are you still okay with that, given your feeling here where you say you would never be able to return a verdict which would assess the death penalty?

A.  I'm okay with that.

Q.   Okay.  Let me also direct your attention to page 17.  You talked a little bit about on the day you came down to fill this out you'd had a health episode, maybe -- are you diabetic?

A.   Yes.

Q.   Do you take insulin for that?

A.   Yes.

Q.   And even though you medicate yourself for the diabetes, do you still have issues with that?

A.   Sometimes I do.  Not very often.  The day that I came here, that morning I had a real dizzy spell.

Q.   Uh-huh.

A.   It's only happened twice in the last year.

Q.   Okay.  This trial we anticipate to last two weeks.  It's going to start on August 10th.

A.   Uh-huh.

Q.   Do you feel that based on your health or the fact that you -- even though you say it doesn't happen very often, do you think you would find it difficult to concentrate and give your full attention to a case such as this that may require you to endure a two-week time period being here?

A.   I think I could, because when I take my insulin I take it once in the morning and once at night, once with food when I leave for work and once at night, so I

think I'm okay.

Q.   So you think you would be okay and you would be able to concentrate and focus --

A.   I think so.

Q.   -- if need be?

I'm also going to talk to you a little bit about -- you said that you had heard something about this case.

A.   That morning that I filled the questionnaire out, I had no clue until I was reading along in here, and I remember it was on the news, almost every channel.

Q.   Okay.  Tell us what you remember hearing about that.

A.   I just remember hearing it on the news.  Also the church I go to, I think one of the wives gave a little speech at church with a teaching pastor one night.  I think it was on a video clip that we watched.

Q.   Okay.

A.   That's why --

Q.   What church do you attend?

A.   LakePointe Church in Rockwall.

Q.   Was that one of the wives of the victims that gave the teaching point?

A.   Yes.  I think so.

Q.   What affect did that have on you whenever you

watched it?

A.   I just thought it was really sad.

Q.   And based on what you saw, do you have an opinion as you sit here now as to the guilt of James Broadnax?

A.   No, I don't have any opinion on that.

Q.   Because you understand that as he sits here, this defendant is presumed to be innocent.  The law is very clear about that.  Just because a person has been accused or there has been an indictment in this case, there's no evidence of his guilt.

So given that one of the wives of the victims came and gave a teaching point at your church --

A.   Yeah.  It was just a small video clip, and I think, actually, she said at one point that she said a prayer for him.

Q.   Said a prayer for Mr. Broadnax?

A.   Yes.

Q.   Okay.  And you said that that was very sad to you.

A.   I think it's sad when anybody dies.

Q.   Absolutely.  Have you, though, formed an opinion as to what punishment, if found guilty -- you've already said you can presume this defendant guilty, just as you would have to in any type of criminal case --

THE COURT:  Not guilty.

Q.   I'm sorry.  Presume the defendant not guilty. Have you already made up in your mind, if the State proves beyond a reasonable doubt that this defendant is guilty of capital murder --

A.   I haven't made any --

Q.   -- as to what punishment?

A.   I haven't made my mind up as to any kind of punishment.

Q.   So you're not going to rely on what you saw in church or what you saw in the news media?

A.   Yeah.

Q.   Is that fair to say?

A.   Yeah.

Q.   You're going to rely on the evidence that you hear in the courtroom.  The evidence comes from the witness stand.

A.   Yes.

Q.   And you're going to rely on that and that alone?

A.   Yes.

Q.   Okay.  I saw where you talk about on page 5 if a person ingests alcohol or drugs or any type of controlled substance to the point of intoxication, that is not a legal defense here in Texas.

A.    Right.

Q.    So say I go and drink a fifth of vodka and then go get behind the wheel of a car and hit somebody, I can't say, well, I was too drunk; I didn't know what I was doing, you know, when I got behind the wheel of a car.  I can't drink a fifth of vodka and go in 7-Eleven and steal a pack of gum and say, oh, the vodka made me do it.  You understand that?

A.    Uh-huh.

Q.    The same applies to a capital murder, that voluntary intoxication is not a defense to any crime.  And I believe you say on your questionnaire that you do not agree with that law.  Can you explain what you meant by that?

A.    Well, I don't drink.  I don't do drugs.  But I think anybody that does, they're going to make some kind of stupid mistake because they shouldn't be drinking or driving.  If they do anything like that, they're going to do something wrong where somebody's going to get hurt, I think.

Q.    So if I'm understanding you, what is your opinion on whether or not somebody should be able to use the drugs or alcohol as a legal defense?

A.    I don't think so, no.

Q.    And say they're justified because of the drugs

or alcohol --

A. No. No.

Q. Okay. So, actually, you do agree that voluntary intoxication should not be a defense?

A. Yeah.

Q. Okay. Do you believe that it can be mitigating or could cause a person not to be as guilty of an offense --

A. I think they're still guilty --

Q. -- that they're charged -- what do you think it affects?

A. I think the alcohol or drugs affects their brain, mental and physically. But if they do it, they made the decision and whatever they do after that, they should pay for their crimes or whatever they do.

Q. Okay. Now, you talked about that you would be able to listen to and evaluate the evidence that comes from the witness stand, the evidence that you hear there in court. There could be a number of people come and testify; civilians, police officers. You say in your questionnaire that you do believe police officers will be more likely to tell the truth than the average person.

Understand what the law says, that if a police officer comes and testifies, whether it be police

officer, a prostitute, a priest, nun, drug user, all witnesses start off on an equal playing field. It's not until you hear them begin to testify and tell you what they're going to tell you that you can then start to judge their credibility and determine if you believe that they are more credible or less credible. You can't just start somebody out.

Would you -- if a police officer, just simply by virtue of the fact that he's a police officer, would you tend to start that individual out higher than the average citizen before hearing what they have to say?

A.   Not as an average citizen, but I think I would rely on what they say because of their evidence and their duty as a police officer to protect the people and tell the truth.

Q.   Okay. But are you going to wait and judge each --

A.   I would have to --

Q.   -- each individual officer --

A.   Yes.

Q.   -- that you hear from after you hear what they have to say?

A.   Yes.

Q.   Or are you going to --

A.    I would have to listen to the whole thing and listen to every one of them -- I mean, throughout the whole ordeal before I could make my mind up.

THE COURT:  Okay.  I need to take a short break.  It doesn't have anything to do with you.  I need to look up something real quick.  If you'll step outside for just a second.

THE BAILIFF:  All rise for the juror.

THE COURT:  You'll be coming right back in.  Thank you.

(Mr. Trull exits the room)

(Off the record from 3:57 to 4:01 p.m.)

(Open court, defendant and juror present)

THE COURT:  Mr. Trull, you're Michael Dell Trull; is that correct?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  And you were born December 12, 1959?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  In Dallas, Texas?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  All right.  Mr. Trull, I talked to the attorneys and the fact that you had that attack -- insulin attack while you were here at the courthouse that time you came up here, we'd hate to put

you through that possibility of that again.  I'm personally aware of the devastating affects of diabetes, so we appreciate you being here, and you're going to be excused, and you will not have to return.  Thank you very much.

THE BAILIFF:  All rise for the juror.

(Mr. Michael Trull exits room)

THE COURT:  The Court excuses the juror for medical reasons.  What says the State?

MR. ALEX:  The State agrees with that, Judge.  He put on his questionnaire that he did have that medical problem.  He also put on the questionnaire -- he answered question number four that he could never return a verdict which assesses the death penalty.  And in addition to that, the same person with the same date of birth had a conviction for possession of marijuana in 1985 which he did not disclose on his questionnaire.  And for all those reasons we concur that he should be excused.

THE COURT:  Any objection from the defendant?

MR. LOLLAR:  We would agree to excuse him based on his medical condition.

THE COURT:  All right.  Are we ready for Morrison?  Is that correct?

MR. ALEX:  Yes, sir.

(Off the record from 4:03 to 4:06 p.m.)

THE BAILIFF:  All rise for the juror.

(Mr. Brandon Morrison enters room)

(Open court, defendant and juror present)

THE COURT:  Mr. Morrison, please be seated.  Counsel, please be seated.

Mr. Morrison, I'm going to say good afternoon to you, sir.  Raise your right hand for me.

Do you solemnly swear you will true answers make to questions to be asked of you concerning your qualifications as a juror in this case so help you God?

And you'll answer "I do."

MR. MORRISON:  I do.

THE COURT:  Mr. Morrison, I'm going to hand you your questionnaire.  I appreciate you filling that out.  Let me introduce myself to you.  My name is Webb Biard, and I'll be with you this afternoon.  The presiding judge of this court is Michael Snipes, and that's who you met in the large room.  Also, I want to introduce the -- David Alex.

MR. ALEX:  Good afternoon.

THE COURT:  Andrea Handley.

MS. HANDLEY:  Good afternoon.

THE COURT:  And Elaine Evans --

MS. EVANS: Good afternoon.

THE COURT: -- and they represent Dallas County and the State of Texas.

Also, Doug Parks.

MR. PARKS: Hi.

THE COURT: Brad Lollar and they represent -- and, I'm sorry, Keri Mallon, and they represent Mr. James Broadnax.

Ms. Handley has got some questions for you, and tell us how you honestly feel. Fair enough?

MR. MORRISON: (Nods head.)

MS. HANDLEY: Actually, Judge, I'm going to have my cocounsel, Mr. Alex --

MR. ALEX: I'll ask the questions, Judge. Thank you.

**BRANDON MORRISON,**

having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION

BY MR. ALEX:

Q. Sir, my name is David Alex, and, actually, I only have a few questions for you; is that all right?

A. Yes, sir.

Q. And your questionnaire, do you have that in front of you?

A. Yes, sir.

Q.   We're going to go over a couple of questions on there, if that's okay.

A.   All right.

Q.   On page 1, you were asked about your feelings on the death penalty, and you circled number one.  Do you see that there?

A.   (Nods head.)

Q.   Okay.  And that's still how you feel today?

A.   Yes, sir.

Q.   Okay.  If you'll go to page 5 for me.

A.   (Complies.)

Q.   And somewhere around the middle of the page we -- again, we sort of asked the same question but just a different way.  Your response is:  Like I said, if you murder someone then you don't deserve your life.  Is that still the way you feel today?

A.   Yes, sir.

Q.   And then -- let's see.  I think there is one other question I just wanted to make sure.  You know, when you filled this questionnaire out, it cuts out a lot of time we have to spend talking to you because it gives us a good feeling of where you're at on the death penalty.  But those two questions are probably my biggest concern.

And I want to thank you for your time,

sir.

THE COURT:  Thank you, Mr. Morrison. You're free to go, and you don't have to return.

MR. MORRISON:  Thank you.

(Mr. Brandon Morrison exits room)

(Open court, defendant present, no juror)

THE COURT:  Let the record reflect we're in the presence of Mr. Broadnax.

What says the State of Texas?

MR. ALEX:  We would remove Mr. Morrison, Judge, for cause.

THE COURT:  Mr. Lollar?

MR. LOLLAR:  No objection.

THE COURT:  Granted.

MR. LOLLAR:  Judge, do we need to put on the record about Ms. Fontaine?

MR. ALEX:  We should.

THE COURT:  Yes.

MR. LOLLAR:  And this was juror number 24, was scheduled to come down here today. The court coordinator has been trying to get ahold of her since the time we had the big panel and has never been able to reach her at any of the numbers she left for us. She is not here today. We don't believe she knew to be here today, but in that -- since this has all happened with

her, we would agree to excuse her.

MR. ALEX:  Agreed.

THE COURT:  It will be granted.

(Proceedings concluded at 4:09 p.m.)

PATRICIA HOLT, CSR          972/741-7086          DALLAS, TEXAS

STATE OF TEXAS)

COUNTY OF DALLAS)


    I, Patricia Holt, deputy court reporter in and for the Criminal District Court No. 7 of Dallas County, Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.


    WITNESS MY HAND this the 30th day of March, 2010.


_____
Patricia Holt, CSR #7974
Expiration date: 12/31/10
P.O. Box 570929
Dallas, Texas   75228
972/741-7086