ORIGINAL

1

AP-76207

REPORTER'S RECORD

VOLUME 9 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | ( | IN THE CRIMINAL DISTRICT |
| VS. | ( | COURT NUMBER SEVEN |
| JAMES GARFIELD BROADNAX | ( | OF DALLAS COUNTY, TEXAS |

* * * * * * * * * * * * * * * * * * * * *

INDIVIDUAL VOIR DIRE EXAMINATION

* * * * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 27th day of May, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

**Anne B. Meredith**
Certified Shorthand Reporter

2

A P P E A R A N C E S:


HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas  75207-4313
Telephone No. 214 653-3600

BY:  MR. DAVID ALEX, SBOT No. 24003256
     MS. ANDREA HANDLEY, SBOT No. 08898800
     MS. ELAINE EVANS, SBOT No. 24032880
     MR. GORDON HIKEL, SBOT No. 00787696
     Assistant District Attorneys

     Also present:  Ms. Zandra Robinson


          APPEARING FOR THE STATE OF TEXAS



MR. BRADLEY LOLLAR, SBOT No. 12508700
Attorney at Law
1700 Commerce, Suite 450
Dallas, Texas  75201
Telephone No. 214 384-8178

MR. DOUGLAS PARKS, SBOT No. 15520000
Attorney at Law
321 Calm Waters Lane
Holly Lake Ranch, Texas  75765
Telephone No. 903 769-3120

DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
133 N. Industrial Blvd., LB 2
Dallas, Texas  75207-4399
Telephone No. 214 653-3550

BY:  MS. KERI MALLON, SBOT No. 24049165
     Assistant Public Defender

          APPEARING FOR THE DEFENDANT

CHRONOLOGICAL INDEX - VOLUME 9

|                          |       |       |         | PAGE |
|--------------------------|-------|-------|---------|------|
| Proceedings - May 27, 2009 |     |       |         | 5    |

| VENIRE PERSON              | COURT | STATE | DEFENSE | |
|----------------------------|-------|-------|---------|------|
| JOHN WHERRY                | 7     | 13    | 49      |      |
| State's Challenge          |       |       |         | 57   |
| Court's Ruling             |       |       |         | 57   |
| PHILLIP SWIFT              | 60    | 68    | 72      |      |
| Excused by the Court       |       |       |         | 75   |
| JON DESMOND                | 77    | 89    | 134     |      |
| Defendant's Challenge      |       |       |         | 165  |
| Court's Ruling             |       |       |         | 166  |
| SUE McCORMICK              | 168   | 182   | 212     |      |
| State's Challenge          |       |       |         | 235  |
| Court's Ruling             |       |       |         | 236  |
| MICHAEL POTTER             |       | 238   |         |      |
| Defendant's Challenge      |       |       |         | 240  |
| Court's Ruling             |       |       |         | 240  |
| PAHIA DEWS                 |       | 241   |         |      |
| State's Challenge          |       |       |         | 243  |
| Court's Ruling             |       |       |         | 243  |
| KIMBERLY ADAMS             |       | 243   |         |      |
| State's Challenge          |       |       |         | 245  |
| Court's Ruling             |       |       |         | 245  |
| Court adjourned for the day |     |       |         | 245  |
| Reporter's Certification   |       |       |         | 246  |

**Anne B. Meredith**
Certified Shorthand Reporter

ALPHABETICAL INDEX - VOLUME 9

| VENIRE PERSON | COURT | STATE | DEFENSE | PAGE |
|---|---|---|---|---|
| ADAMS, KIMBERLY | | 243 | | |
| State's Challenge | | | | 245 |
| Court's Ruling | | | | 245 |
| | | | | |
| DESMOND, JON | 77 | 89 | 134 | |
| Defendant's Challenge | | | | 165 |
| Court's Ruling | | | | 166 |
| | | | | |
| DEWS, PAHIA | | 241 | | |
| State's Challenge | | | | 243 |
| Court's Ruling | | | | 243 |
| | | | | |
| McCORMICK, SUE | 168 | 182 | 212 | |
| State's Challenge | | | | 235 |
| Court's Ruling | | | | 236 |
| | | | | |
| POTTER, MICHAEL | | 238 | | |
| Defendant's Challenge | | | | 240 |
| Court's Ruling | | | | 240 |
| | | | | |
| SWIFT, PHILLIP | 60 | 68 | 72 | |
| Excused by the Court | | | | 75 |
| | | | | |
| WHERRY, JOHN | 7 | 13 | 49 | |
| State's Challenge | | | | 57 |
| Court's Ruling | | | | 57 |

**Anne B. Meredith**
Certified Shorthand Reporter

P R O C E E D I N G S:

(Defendant present).

THE COURT: Court will come to order.

Now comes Cause Number F08-24667, Texas versus Broadnax.

Let the record reflect we are in open court in the presence of Mr. Broadnax and his counsel, the State's counsel.

State ready for the juror?

MR. ALEX: Yes, sir.

THE COURT: And Mr. Lollar?

MR. LOLLAR: Yes, sir.

THE COURT: All right. Ready for the juror.

(Prospective Juror No. 34, John Wherry, enters the courtroom).

THE COURT: Good morning, sir.

PROSPECTIVE JUROR WHERRY: Good morning.

THE COURT: Thank you again. You'll have a seat right there, please. There you go.

Please be seated, folks.

Is it Mr. Wherry?

PROSPECTIVE JUROR WHERRY: Wherry.

THE COURT: Wherry?

PROSPECTIVE JUROR WHERRY: Yes, sir.

THE COURT: Good morning to you again, Mr.

Wherry.  My name is Webb Biard and I will be with you this morning during the jury selection process.

If you will remember, the Presiding Judge of this Court is Judge Michael Snipes, and you met Judge Snipes in that large central jury room.  He spoke, he was the judge at that.  And should you be selected as a juror, Judge Snipes will preside at the trial, for whatever that's worth.  It might make a little more sense to you.

Do this for me, please, before we go any further.

(Prospective Juror Wherry sworn).

THE COURT:  Thank you, Mr. Wherry.

Mr. Wherry, I also want to introduce some folks to you at this time.  Andrea Handley.

MS. HANDLEY:  Good morning.

THE COURT:  David Alex.

MR. ALEX:  Good morning.

THE COURT:  Elaine Evans.

MS. EVANS:  Good morning.

THE COURT:  And Zandra Robinson.

MS. ROBINSON:  Good morning.

THE COURT:  They represent Dallas County and the State of Texas.

Further on down is Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT: Doug Parks. And they represent --
and I'm sorry, Keri Mallon. And they represent Mr. James
Broadnax.

Mr. Hikel is back there also.

MR. HIKEL: I'm Gordon Hikel.

THE COURT: I'm sorry, Gordon.

MR. HIKEL: Nothing personal, Judge.

JOHN WHERRY,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q   The way we are going to proceed, I'm going to talk
to you for a minute, and then one of the attorneys for each
side will talk to you for up to forty-five minutes. So
approximately an hour and a half from now I will tell you
whether or not you have been selected as a qualified juror.

What that means is we are in the process of
qualifying some fifty prospective jurors. And from that
fifty, then the actual jury will be selected. That will
be done sometime in late July or early August.

Did you notice that Judge Snipes has told
us in that pamphlet that the trial is going to start August
the 10th?

A   (Nods head).

Q   All right. Now, and it's going to last anywhere

up to two weeks.  Did you see that, Mr. Wherry?

A    Yes.

Q    All right.  I give you that time and the dates and tell you the trial will go Monday through Friday 9:00 to 5:00, break in the morning, break in the afternoon, be a lunch break.  The jury will not have to stay together overnight unless and until you were deliberating late into the night, became weary, unable to reach a verdict.  There is a possibility -- I want to alert you to it -- you could all be taken to a fine hotel, county expense, individual private rooms, to avoid any outside influence.  That could happen.

If it did happen, Judge Snipes would give you plenty of advance notice, like two days from now bring your overnight bag, tell your loved ones there is a chance you'll be sequestered overnight.  That could happen.

I give you those dates to ask you a couple of questions.  As you sit here now, are you aware of anything that might be occurring in either your personal or professional life during that time frame that would interfere with your ability to sit as a juror?

A    Not during that time frame.  But in early September, starting the first weekend of September I have a planned vacation for a week and a half.

Q    All right.  Well, I think Judge Snipes is precise

on his timetable, and I think this case will go to trial on August the 10th. And that's -- So you'll be all right, then?

A    (Nods head).

Q    Good. Did you have an opportunity to read that pamphlet?

A    Yes.

Q    Did that help you a little bit to understand the procedure?

A    A bit, yes.

Q    Okay, fine. The attorneys have a unique ability to explain that to you, and they will. It's not your job to know the law. It's not some legal pop quiz where we are trying to find out who knows the law, then they are on the jury. That doesn't have anything to do with it.

The law will be explained to you. And then the bottom line question is going to be, once you understand what the law is, would you be able to follow the law and perform your duties and consider the full range of punishment should you find Mr. Broadnax guilty of whatever offense, and that's going to be kind of the bottom line question.

A couple of things I would like to stress to you before the attorneys talk to you. If you'll look, the definition of murder, it's in that pamphlet. I think it's on page two.

The definition of murder is intentionally or

knowingly causing the death of an individual. And I want to stress this because it seems like, and I have done this many times, a few times, and I have a hard time sometimes getting this across. If you'll look at it, murder is intentionally or knowingly causing the death of an individual.

Intentionally. It's not an accident; it's not a car wreck; it's not a hunting accident; it's not self-defense; it's not insanity; a person is not under legal duress. But to be convicted of murder, you have to intentionally or knowingly cause the death of an individual.

Some people say, well, I could -- I could consider this or that unless I found that it was intentional. Well, if you are found guilty of murder, it's intentional.

If you're found guilty of capital murder, if you'll look at it, it's intentional. To be found guilty of capital murder, it's intentional.

Capital murder is murder in certain specific fact situations; murder of a policeman, murder of a fireman, murder of a child under the age of six, murdering someone while robbing them, kidnapping them, sexually assaulting them, arson. Those are examples of capital murder.

So, if someone is found guilty of capital murder, the jury would have found that they intentionally caused the death of an individual in a certain fact

**Anne B. Meredith**
Certified Shorthand Reporter

situation.  Did you follow me?  Are you with me on that?

A    Yes.

Q    All right.  Have you ever served on a criminal jury before?

A    One time I was on a jury where really all we were discussing was whether the person was competent to stand trial --

Q    Okay.  All right.

A    -- at that time.

Q    That can be considered a criminal case.  I understand that.  It's whether someone is competent to go to trial in a criminal case, right?

A    Right.

Q    That was a unique type of trial.  But in all actual criminal cases, be it theft of a bicycle or a capital murder case, they are tried in two parts.  The first part is called the guilt/innocence phase and the second part is the punishment phase.  If a person is found not guilty, obviously there is not a punishment phase.

So, if you're in the punishment phase, you would have found a person guilty.  And if you're in the punishment phase of a capital murder case, you would have found somebody guilty of -- I mean if you're trying to decide the punishment for capital murder, you would have found that person guilty of capital murder.

Did you see those three special issues?

A    Yes.

Q    Had you ever seen them before?

A    No.

Q    We would all be very surprised if you had.  I tell you, I would say 95 percent of the lawyers in this courthouse have never seen those special issues, so don't let that bother you.  The lawyers are going to spend quite a bit of time with you on those issues.

And the way you set punishment in a capital murder case, should you find someone guilty of capital murder, is you answer those three special issues.  And you answer them yes or no depending on the evidence at the end of all the evidence.  Does that make sense to you?

A    Yes.

Q    You're not going to be called upon to answer them today.  Some people think you're called upon to answer them this morning.  Some people think you're called upon to answer them in the guilt/innocence phase.  The only time you would ever see those questions or issues is if you had found someone guilty of capital murder.

In the first part of a criminal case the only issue is, is a person guilty or not guilty.  Did the State prove what they charged beyond a reasonable doubt?  Not guilty, go home.

If you're found guilty, then you go into that punishment phase. In that part of the trial, you can hear about the person on trial, good deeds, bad deeds, prior record, no criminal record, childhood, mental, physical, anything that either side thinks will help you decide what's the proper punishment.

And if someone is found guilty of capital murder, there's only two possible punishments. Do you know what they are?

A    My understanding would be either a death sentence or life without parole.

Q    That's right. And by the way, I want to stress to you, life without parole means life without parole. It's not a wink and a nod. There was a time when it didn't mean that. But now, if someone is found guilty of capital murder and is given life, it's life without parole. Take my word on that, okay?

A    (Nods head).

Q    Without anything further from me, I want to reintroduce to you David Alex who will speak to you on behalf of the State of Texas.

THE COURT:  Mr. Alex.

EXAMINATION

BY MR. ALEX:

Q    Good morning, Mr. Wherry.

A    Good morning.

Q    And just to make sure, Gordon Hikel, he's also on our team.

How are you doing this morning?

A    Fine, thank you.

Q    Are you comfortable?

A    Yes.

Q    If you get -- And sometimes this takes a little bit longer than people are used to being questioned.  If you're getting uncomfortable, if you need something to drink or anything like that, we've got some water, the judge has got his.  Okay?

A    Okay.

Q    Have you had a chance to think about -- Do you remember filling out the questionnaire?

MR. ALEX:  Does he have a questionnaire there?

THE COURT:  He does.  Thank you.  We appreciate you filling that out, sir.

Q    What the judge just handed to you, I know it was some time ago that you filled it out, but it's sort of our first introduction to you, Mr. Wherry.  And do you remember filling it out?

A    Oh, yes.

Q    Okay, very good.  That sounds like a definite yes.

And have you had a chance to think about some

of the issues?  And you've got to know that the biggest issue here is the death penalty issue.

Have you had a chance to think about that since you filled it out?

A     Possibly a little bit.

Q     Okay.

A     You know, some of the questions that were posed in there I hadn't really thought about much before in the way they were worded and things like that.  So, yeah, I put some thought into it.

Q     Okay.  And anything significant about what you put here that may be different than what you're feeling like today?

A     Well, frankly, since this was forty, forty-five days ago --

Q     Right.

A     -- I can't recall exactly what I put down.

Q     I understand completely.

A     But I don't think that there would be a lot of variance.

Q     Okay, very good.  And what we'll do is we'll go over that a little bit.  How about that?  And you have got your copy there in front of you.

A     Right.

Q     Let's just start out with your -- you know, what

we would like to talk about is your feelings, okay?  We have feelings about, you know, the issues that we are going to talk about, specifically the death penalty.  Obviously the defense has their feelings.

If you had to guess, would you think we are all in line here about what our feelings are?

A    No.

Q    Okay.  Well, whose feeling is going to be important this morning is going to be yours because you're a person who potentially would sit on this jury and decide this case.  So, that's why we want to find out about your feelings.

And it's important that you understand that sometimes when you sit amongst lawyers and a judge and bailiffs who potentially have guns and we ask you your feelings on the law, sometimes people feel like they have got to give the correct answer, they have got to say what you think that we want to hear.

And what I want to try and put you at ease is that what we are most concerned about is your feelings and not necessarily what do you think we want to hear.  Okay.  Can we make that agreement?

A    Yes.

Q    Okay.  I've read your questionnaire and you seem to be pretty candid about your answers in here and, so, I don't think that we will have much of a problem with that.

Okay. So, let's talk a little bit about some of the stuff that we have in the questionnaire. If we look at the first page here, the very first set of questions that we ask about is your feelings on the death penalty and you circled the two there.

Is that -- Read that to yourself for a second and tell me if you think that's the way you still feel or do you think that one of the other answers would be more appropriate?

A      I think two is.

Q      Okay. And when I read that answer I say, okay, here's a person who believes in the death penalty. And you know the death penalty is, for lack of a better legal terminology, it is legal in Texas. It's not outlawed in Texas. And that you could return a verdict in the proper case.

But when we look at the question right before that you say, under very limited circumstances. And tell me what that means to you so we will have an understanding of it.

A      Well, what that means to me is that the person let's say has a history of violence.

Q      Okay.

A      That there doesn't appear to be any, any possibility of changing that, and that, given the

opportunity, the person would kill again.

Q    Okay.  And when you said under limited circumstances, in a nutshell, that's what you mean.

A    And I am talking about all three of those things.

Q    Together.

A    I'm not talking about one exclusive of the others.

Q    Got you.  And at this point you think you would pretty much need to hear something on all of those factors?

A    Pretty much, yes.

Q    Okay.  And we are going to go to page two, if you don't mind.  And if you want to expound on any of these answers, don't feel like you have to stay within the confines of what that question is asking.

One of the things that I'm interested in on page two is when we ask about the best argument against the death penalty, now, this didn't ask what your opinion was, right?  It just asked what would be the best argument against it.  Tell me what you wrote there.

A    What I actually wrote?

A    Yes, sir.

Q    Okay.

A    Okay.  Taking a life under any circumstance is wrong and it's an irrevocable act.  In other words, you do it, it's done.  You don't get a do over.

Q    Okay.  Tell me what you think about the first

part of that statement, taking a life under any circumstance is wrong.

Now, tell me what you feel about that statement. I know that's not what the question asked, but tell me what you mean about that statement.

A    Again, under the type of circumstances that I spoke about --

Q    Right.

A    -- I don't see that as an issue.

Q    Okay. Right.

A    But I am aware that that is an argument against the death penalty.

Q    I understand completely.

And then if we go to page three.

(Phone ringing).

Q    Is that you?

A    No, I don't know whose phone it is.

Q    You thought there was a signal there. Okay.

A    Wrong answer.

Q    Actually it probably was the right answer because you were just telling us how you felt.

All right. Let's look at -- Let's look at page three there for a second. Now, that's a whole lot of words on that page. But if you look at the top of it, it's really a question asking you about have you heard about this

case before.  And the blurb that we give you to trigger your memory, if it does, it is alleged that on June --

Well, I tell you what, you read that for me, if you will.

A    It is alleged that on June 19th, 2008, Stephen Swan and Matthew Butler were shot to death outside of a Garland music studio, during the course of a robbery.

Q    And your response to basically that whether or not you heard about the case was no.  And since then, have you -- did you -- do you think that you have heard anything about this case at all or read about it since then?

A    You know, I may have heard about it, you know, in retrospect but, frankly and unfortunately, there's so many circumstances like this that it tends to get blurred over time.

Q    Okay.  And that's the common experience, unfortunately.

A    And I think the thing that kicked in later was when we talked about a music studio in Garland, it was that type of thing, you know.

Q    Okay.  And I am going to do a little skipping around here.  And when you think about it in retrospect and you say to yourself, well, I may have heard about it, and if you've had a chance to think about it, anything about that at this point in time that you would say to yourself, I

formed an opinion on whether this guy is guilty or not guilty? Anything about that that would say to you, I formed an opinion either way?

A    No.

Q    Okay. And anything about that that you recall where you said, you know, I think I formed an opinion on what the proper punishment might be?

A    No.

Q    Okay. Let's skip all the way to page ten, if you don't mind, and I want you to reconcile this for me, if you would.

And Mr. Wherry, I want you -- I want to say this to you, and I am going to let you do most of the talking. But you've got to understand that this is real serious business, right?

A    Right.

Q    And you know that part of what our job is is to root out, as much as we can, what your true feelings are. But sometimes it takes a little bit to get underneath that surface feeling to the true feeling, okay?

And there may be times where you feel like, well, is this guy being antagonistic or what? If you get that feeling, it's not my intention at all. Sometimes, sometimes what I do is I needle you just a little bit just to see whether or not you're giving me what you really feel.

And I don't want you to think that at any point of this I have anything personal against you or I'm trying to go after you, okay?

A    I understand.

Q    Are we on the same page?

A    Yeah.

Q    Okay.  And there's some answers that I read here that in my mind, because I don't know you, that seems a little inconsistent, so I'm going to try and reconcile those if I can, okay?

Now, I want you to look at the third answer there and it's -- that question asks, have you ever been interested in the outcome of a criminal case, and your answer was what?

A    I sometimes follow high profile cases.

Q    Through TV --

A    TV, paper.

Q    -- paper, news, magazines.

A    Right.

Q    Okay.  Tell me what that means.

A    Well, part of this really goes back thirty so years ago.

Q    Okay.

A    I lived in Tallahassee, Florida during the time that Ted Bundy was there.

Q    All right.

A    And that had a real effect on the town.  It had an effect on me and everybody that was there.  And, so, I have a tendency to follow things such as that --

Q    Okay.

A    -- in papers and things like this.  And that's about the extent of it.

Q    Okay.  And, so, since then when you see something on the news or you read about it in the paper, it peaks your interest?

A    Occasionally.

Q    Okay.  All right.  But is it, is it the type of scenario where you would go on line after you saw it on the news and would sort of follow up on it?

You know, some people -- When I read this, my first inclination is to think, okay, here's a guy who likes to stay current and these are the things that really sort of peak his interest.

Like for me, it's more outdoors type of stuff, sometimes I'll go look it up, dig into it, see what's the best place to go diving or something like that.

Would you say that this answer has anything to do with what you would do after you saw something on the news or in the paper, or not?

A    I don't -- Help me out a little.  I don't

understand your question.

Q    Okay.  And I guess the key here is you say sometimes you follow the high profile cases.

A    Right.

Q    And let's say, for instance, you were on this jury. You would -- You would be instructed by the judge that you can't read any papers, you can't do any of that, any of that. Would that cause you any concern?

A    No.

Q    Okay.  All right.  You would be fine with that?

A    Yeah.

Q    All right.  And at any time before we leave today, if you recall anything about this case or this defendant, or anything like that, you would let us know, right?

A    Yes.

Q    Okay.  I'm going to move on.  All right.

        Now, the other thing I was going to ask you about -- and we're going to stick with the questionnaire for now.  I'm going to follow up a little bit on the Ted Bundy comment that you had.  And you followed -- you followed that pretty closely.

A    Very closely.

Q    Okay.  And prior to Ted Bundy going on his spree, did he have any type of criminal history?

A    Oh, yes.

Q    Did he?

A    Yeah.

Q    And --

A    Well, prior, prior to him -- prior to him arriving in Florida --

Q    Okay.

A    -- yes.

Q    Okay.  All right.  And you followed all of that?

A    Right, I've read quite a bit about it.

Q    Okay.

A    Things like that.

Q    All right.  And, so, when it comes to people -- what did --

When you looked at that, what did you think was the proper punishment for Mr. Bundy?

A    Death.

Q    Okay.  No problem with that?

A    No.

Q    Okay.  And when you look at the death penalty in general and you talk about question number one that we talked about, you said very limited circumstances.

Would the Bundy situation be sort of your base line as far as the death penalty is concerned or would that be --

A    Base line meaning?

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Meaning anything there --

A    Ted Bundy and above?

Q    And above.

A    No.

Q    Okay.

A    It would go below Ted Bundy.

Q    Okay.

A    I mean the massive number of killings and things like that.

Q    Okay.

A    So, the type of things that we talked about before, you know, does a person have a history of violence, does there not seem to be any, you know, way to remedy future acts and things like that, that can occur under a lot less severe circumstances than Bundy.

Q    Okay, very good.  Thank you, sir.

All right.  We are going to go back to page four.  And I know I'm skipping around a little bit, but I'm going to try and reconcile some questions that I have, if you don't mind.

You were asked, do you think the death penalty is used too often or too seldom?  And your answer, that you can't recall a case in Texas that you heard about where it seemed inappropriate.

Do you think, if I were to ask you if you sort

27

of followed in Texas, what would be your -- sort of the basis of your knowledge about our office and how often we seek the death penalty and that kind of thing?

A    I have very little knowledge.

Q    Okay.  But if you think back in your mind, you can't really think of anything that jumps out at you and says that was inappropriate?

A    No.

Q    Okay.  All right.  Now, the next question, do you think the death penalty is ever misused?  And you said that, I'm certain that some innocent people have been put to death. Tell me what that means, you're certain.

A    Well, maybe my background as a statistician and things like that.

Q    Okay, very good.  So, when we say probability, to you that takes on a whole different meaning, doesn't it?

A    Yes.

Q    Okay.

A    That particularly with the number of situations these days where you see people released because of DNA evidence and things like this.

Q    Right.

A    If I'm having people released of lesser crimes, and those people were convicted, you know, based on the evidence that was presented, there is bound to be a

situation where we have done the same thing and put a person to death.

Q    Okay.

A    I mean it's just --

Q    Okay.  The numbers.

A    Yeah.

Q    Okay.  Because you're a numbers guy.

How long have you been a statistician?

A    Well, my educational background was a statistician. I do computer work for hospitals.

Q    Okay.  And stats, that was probably the most complex class I ever took.  But I got to know my stats professor pretty good, and the way that his mind worked was so much more complicated than my mind would ever have worked.

And this is what I'm -- this is what I'm wondering about.  If you're certain that an innocent person has been put to death because of the numbers, the sheer numbers, the probability of something happening, how could you ever feel comfortable sitting on this kind of a jury?

A    Because I individually would be weighing the evidence and participating.

Q    Okay.

A    And there would have to be very compelling evidence.

Q    Okay.

A    Regardless of whether it's this type of case or another type of case, a criminal case.

Q    Okay.  Let me -- Let me ask you this.  Do you think that -- We are going to talk about some very basic principles of law in a little bit.  But do you know what the burden of proof is in a criminal case?

A    Yes.

Q    Okay.  Tell me what it is.

A    Well, I know it's a --

Q    Beyond a reasonable doubt.

A    Beyond a reasonable doubt.

Q    Okay.  And you know, people use a lot of other terms --

A    Yeah.

Q    -- in the movies and that stuff, but it's beyond a reasonable doubt.  And that doesn't mean that it's beyond all possible doubt.

A    Right.

Q    You understand that?

And, so, do you think that because of your background in statistics and numbers --

Well, let me ask it to you this way.  When you say overwhelming proof, can you give me some idea of what that means to you?

Case 3:15-cv-01758-N    Document 39-8    Filed 06/28/16    Page 30 of 246    PageID 2600

30

A    Well, to me, I would feel very uncomfortable, and I couldn't imagine that a case like this would be prosecuted based on what I call like eyewitness type things. I think you would need some physical evidence that was pretty compelling to me to set things beyond a reasonable doubt, so.

Q    Okay. And, so, what I'm hearing you say is that you would, you have a -- and it's probably -- I mean we've all seen the exonerations and all that.

And what you're -- what you're telling me is that eyewitness testimony probably wouldn't be enough for you in a case like this.

A    I would be very uncomfortable if that was the sole thing, yes.

Q    Okay. And you understand that what the law basically says is that we have to prove our case beyond a reasonable doubt, okay, to each juror, and then collectively. They have to have a unanimous verdict in the guilt/innocence phase, okay?

A    Uh-huh.

Q    It doesn't say that it has to be all physical evidence or all eyewitness evidence or a mixture of both, just that we have to prove it.

A    Right.

Q    Right? And what is your opinion on eyewitness testimony?

**Anne B. Meredith**
Certified Shorthand Reporter

Do you have an opinion as you sit there right now?

A    Again, I think it alone, I couldn't -- it would be hard for me to convict a person purely on eyewitness testimony.

Q    Okay.

A    Okay.  So, I need -- I think I would need a combination of evidence.

Q    Okay.  And believe me, I understand that --

A    Right.

Q    -- completely.  But I want us to be on the same page as to what the law requires.

A    Right.

Q    And the law doesn't require any specific type of evidence.  Okay, we are on the same page there?

And it's really, it's one of those kind of things, whatever it takes to convince you beyond a reasonable doubt is what it takes, right?

So, the law doesn't say to the State or to the defense or the citizens that they must bring this type of evidence or that type of evidence.  So, before the trial starts, you have to be open to be able to convict somebody --

And let me -- Let me put it to you this way.  You probably never could envision a situation where eyewitness testimony alone could convince you of anything beyond a reasonable doubt, right?

A    Correct.

Q    Okay.  And if -- Okay.  And you know, I'm going to move on just a little bit and we will come back to that, all right?

The burden of proof doesn't change depending on the kind of case it is, okay?

A    Right.

Q    You with me on that one?

A    Yes.

Q    All right.  Whether it's a capital murder case where the State is seeking the death penalty or whether let's say it's a possession of marijuana, the burden of proof is still the same.  You with me there?

A    Correct.

Q    Okay.  And if you would say to me, Mr. Alex, you know what -- And there is no right or wrong answers here, okay?  I don't want you to think -- remember when we talked about saying what you think somebody wants to hear?  There's no right or wrong answers here.

A    Right.

Q    And I am just sort of digging a little bit.  You can tell, can't you?

A    Yeah.

Q    Okay, very good.  If you were to say to me, Mr. Alex, I could be convinced in a possession of marijuana case

based on eyewitness testimony alone but not in a capital murder case where the State is seeking the death penalty, you see how that's raising our burden because of the type of case it is?  And there is nothing wrong with that if that's the way you feel.

A    That's not the way I feel.

Q    Okay.  All right.

A    The way I feel is that it would be difficult for me to convict anyone for any type of crime based purely on I saw him.

Q    Okay.

A    On eyewitness evidence.

Q    Okay.  All right.  And that's understandable, completely understandable.  All right.  And -- But you're not saying you've completely foreclosed the situation where that could happen, right?

A    No.

Q    Okay.

A    It's just that it would be --

Q    I understand.

A    It would be real tough to do it.

Q    Right.  I think it would be tough for everybody, okay?

All right.  And I am going to move on to --
So, when we talked about, when you said overwhelming evidence

and you say highly likely as a statistician of somebody in that field, when we say probability, your definition of probability would be what? I know it's going to be very technical.

A    No, not really.

Q    So that we can understand, what would be your definition?

A    A probability is greater than a 50 percent chance.

Q    Okay. More likely than not?

A    More likely than not.

Q    Okay. All right. And I'm gonna, I'm gonna move just a little bit because I think we are communicating very well. I think I understand everything you're saying. I think you're understanding me okay.

So, when you look at -- I'm going to go totally off the questionnaire for a second because I'm looking at the words here on page four where you say overwhelming likelihood of further acts. You see that question I'm talking about?

A    Right, right.

Q    Okay. And I want you to look in that juror orientation guide, if you don't mind. And when the judge kind of went over with you the way the process works where we have a guilt/innocence phase, right?

A    Uh-huh.

Q    And we have to prove the case to you by what burden?  Beyond a reasonable doubt.

A    Beyond a reasonable doubt.

Q    Okay, very good.  And then if all twelve of you vote guilty, then we go into the punishment phase.  And the judge sort of talked to you a little bit about how you get there and what you do in the punishment phase.

And I think one of the things you said when he asked you if you understood what you read in the orientation guide, you said you understood it a bit, which made me think that maybe you had a question or two you wanted to ask.

A    I'm probably more so a person that I don't believe everything is black and white.

Q    Okay.

A    That saying stuff in absolutes such as yes, I understand or no, I don't understand, you know.

Q    Sure, I understand.  I do, I do.  You probably would make a good lawyer, too.

But I'm going to ask you about specifically this first issue.  Okay.  So, once we've -- Assuming that you've found a defendant guilty, then you're going to have some special issues to answer in order to get either a life without parole or a death sentence, okay?

The first issue --

THE COURT:  They are in that pamphlet, too.

Q    Yeah, and you don't have to read it from up there. You know what, I'm going to let you read it.  Would you read the first issue to yourself real quickly?  Well, not quickly, but just so that you feel like you understand it.

A    Uh-huh.

Q    Okay.  Now, that says that there would be a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

And you probably didn't write this law, but when you explained to me what you meant by very limited circumstances, that was kind of one of your things, wasn't it, that criminal acts of violence that would be a continuing threat to society and all that?

A    Right.

Q    The only thing that was different from what you -- your answer here is on page four, and that is, when we say probability, all the law requires in order for you to answer that question yes is what, probability meaning?

A    Probability.

Q    Which means?

A    Meaning to me more than a 50 percent chance.

Q    Right, more likely than not.

A    Right.

Q    And what I'm hearing you say is that it's going to take an overwhelming likelihood of further violent acts.

And not to play on words or anything, but I think you really feel that, in your heart, that it's got to be more than just more likely than not on the criminal acts of violence in his future.

A    Correct.

Q    Okay.  And if you were looking at this standard here of probability, for you, it would take a bit more than that, wouldn't it?

A    Right.  And the best example I could say just right off the top of my head is if this is a first-time occurrence --

Q    Right.

A    -- I don't think there would be any basis for saying that there was a probability that it would occur again.

Q    Okay.  And you think that that's pretty rooted in how you feel about it?

A    Yes.

Q    Okay.  And one of the things that the law allows you to do is it allows you to take the circumstance alone and conclude that the person would be a future danger.  It allows you to do that.

It doesn't say to you, Mr. Wherry, that you have to do that, but it allows you to do that.  So that before you start, you need to at least have an open mind to

the idea because, before you sit on the jury, if you've already foreclosed that as a possibility, you can see where that would run afoul of what the law allows.

You see what I'm --

A    Yeah.

Q    Are we on the same page?

A    Yes.

Q    For instance, if before you, before you sat on the jury, you already knew that you would have to have this, even though the law says it does not require it if there is anything else, then you can see where you would have a problem following that.

Okay. And when we combine that -- And I want to see if I can paraphrase that just a little bit because I want to make sure we are on the same page.

The law doesn't say that you have to consider -- The law doesn't say that if a person doesn't have any prior acts of violence, okay, the law doesn't say that you have to look at the circumstances alone and then conclude whether he could be a future danger, but it says that you can do that.

A    Right.

Q    Okay. But are you saying that you, in your heart, you already know that you would have to have more?

A    I am pretty -- I've never been faced --

Q    Sure, right.

A    -- with a situation like this.

Q    I understand.

A    I am imagining, and it partly comes back to what we talked about very early, which is, have you put some thought to this --

Q    Right.

A    -- since you sat down with us before --

Q    Right.

A    -- and filled out this questionnaire, is it would be extraordinarily difficult for me to think that there would be a probability that a defendant would do this if this was a sole act and that there haven't been prior type of violent acts before that.

Q    Okay.

A    And a lot of it again has to do with the circumstances.

Q    Okay.  That's kind of one of those answers I'm not going to get into an issue on that.  It's kind of like the black and white.

A    I guess not.

Q    Okay.  But I get the impression that you feel pretty strongly about that.

A    Yes, I do.

Q    Okay.  And it's one of those strong beliefs that it's difficult for you to say to me, Mr. Alex, yeah, I'm

going to have to have something more. But in your heart, you're feeling that way, aren't you?

A    Yes.

Q    Okay. All right. And when we talk about the probability of future acts being more likely than not, you would actually require more than just a probability. You would require overwhelming; is that right?

A    I would -- I would probably need more than a 51 percent.

Q    Okay. All right. And that probably, I'm not going to get you to say yes or no, am I? And that's okay.

A    Probably not.

Q    That's all right. That's okay. That's all right. And you know, sometimes this is the way I -- this is the way I like to talk when we get to those areas because I have -- if we put either one of these lawyers right there where you're at, that's the way we talk. We very rarely talk in absolutes, and it's difficult.

But if I was to say to you, Mr. Wherry, this is a very serious case, you understand that, right? It's probably as serious as if you were getting on a plane and you walked up to the pilot and you said to the pilot, can you fly this plane, and he said to you, I think I can, maybe, yeah, probably, would you get on that plane?

A    No.

Q    No.  All right.  This is just as serious as that, so sometimes I may try to push you into a yes or no.

A    I understand.

Q    But don't think I'm trying to be mean or anything like that, okay?

A    Okay.

Q    And if you can give me a yes or no, I would appreciate that.

A    I understand.

Q    And the other part is -- Okay, I'm going to move on because I'm going to try and cover all the bases here if I can.

On the questionnaire, tell me about on page six, is it -- who was it that worked for the Director of Planning for the Community Mental Health from '77 to '80, was it you?

A    Me.

Q    Okay.  Tell me about that experience.

A    It was a community mental health center in Tallahassee, Florida.  And we provided services, drug, alcohol rehab, short-term institutionalization, the whole gambit.  It was part of the community health -- the Community Mental Health Center acts.

Q    Okay.

A    And it was a great experience.

Q    Sure.

A    In terms of just getting out of college and doing it in a small organization like that where you get to do a little bit of everything, even though you're just right out of school. And it had a lot of, you know, sort of a feel good thing, you're helping people out and stuff.

Q    Right.

A    So it was great.

Q    Okay. And it probably taught you a lot of the -- and how old were you then?

A    I was 25 to -- about 25 years old.

Q    Okay.

A    Right in the middle of that.

Q    It probably taught you the dangers of drug abuse, didn't it?

A    Actually, in my position, I was a little bit apart from the actual treatment program --

Q    Okay.

A    -- and things like that. But I've always had a healthy respect for that.

Q    For the dangers of drug abuse?

A    Yes.

Q    And that's kind of where, when you said community mental health, do you have any opinions as it relates to your experience in this? Did you not have much hands on with the

population of people y'all were helping or --

A    Not in my position.

Q    Okay.

A    Okay.  That was left to the counselors and the psychiatrists and things like that.

I was involved in working with them to develop the program, to funding from the government, track progress, things like that.  So, sort of in the statistical bend, you know.

Q    I understand.

A    Are we doing what we need to do.

Q    The numbers part of it.

A    Yeah.

Q    Got you.  And then we may come back to the mental health a little bit here in a second.

And we are going to move to page eight.  I'm moving kind of quickly.  I think that I don't want to put you to sleep over here, you know.  It's 10:00 o'clock and I probably started about 25 minutes ago, 35 minutes ago.

There is a question here that I'm really curious about on page eight.  And it is, you know, we ask about rehabilitation, and your response was, right in the middle of the page, would you read it for me?

A    Rehabilitation is the biggest problem with the system.

Q    Tell me what you mean by that.

A    Well, again, it's one of those sort of opinions formed by reading, or this or that, which is there seems to be a tremendous amount of recidivism.

Q    Okay.

A    And we don't hardly ever hear any good things about prisons in terms of rehabilitating people.

Q    Okay.

A    You hear -- you know, and maybe it's just the way the news is slanted and things like that.  All you hear is the bad things.  You hear about the murders inside the prison, you hear about lack of institutional controls, things like this.  So, I don't have a lot of faith that the prison system can rehabilitate a person, so.

Q    Okay.  So, what would your solution be to that?

A    Well, my solution is somehow, some way, we've got to change it.

Q    Okay.

A    You know, it's a tough issue.  You know, obviously, or at least as far as I can tell, we haven't been able to solve that yet, but there has got to be a better way of doing things.

Q    I agree.

A    And I don't hold a crystal ball, so I don't know.

Q    Okay.  Some people would say that since the prison

system doesn't work very well at rehabilitating people, then we should try more on putting people out on the street on some kind of probation rehab.

Is that, is that -- Would you lean toward that or would you think that a more controlled situation would be better for rehabilitating?

A    I'm a bit uncomfortable with putting people out on the street.

Q    Okay.

A    I mean if you don't think that they are going to -- you know, you need to have some confidence that they are going to go forward.

Q    Okay.  All right.  Page nine, you say your son Jeff is getting a degree in criminal justice.  Do y'all talk about issues like this very often?

A    You know, not -- not a whole lot.  Actually since I read this, he got his degree.

Q    Okay.  What are his plans?

A    He is staying -- he graduated from UNLV.  He's staying in Las Vegas and he is working as a fledgling counselor with youth advocacy programs.

Q    Okay.

A    Just started out about a week or two ago.

Q    On page ten.  I'm going to move a little bit quicker.  We spent a bit of time talking about the things

that I was probably most concerned about already.  Your spouse has been over the crime watch block.  Is she the crime watch block captain?

A     She -- she was.

Q     Okay.

A     And now she is president of our little homeowners association, but their main deal over the last year was to put in CCTV cameras in the neighborhood and stuff, so she's been, you know, talking with police and security folks and all that stuff.

Q     Okay.  Do you have an involvement in that or is that mostly her deal?

A     No, I try to stay away from that as much as possible.

Q     Okay, very good.  Let's go to page eleven.  It's an interesting quote that I hear from time to time.  It's better that ten guilty people go free than one innocent man be convicted.  And your response was what?

A     This is basically another way of saying beyond a reasonable doubt.

Q     Tell me what that means.

A     Well --

Q     You said it like you were a lawyer.  You been to law school?

A     No.

Q    Okay.  All right.  Tell me what that means.

A    Well, all I'm suggesting here is that you have to have that evidence.  And going to prison and what occurs to a person is a horrible, horrible thing.  And the idea that you could incarcerate an innocent man is just terrible.

Q    Okay.

A    Just, just it changes lives, it changes families.  So, we can't afford to do that.  That's all I meant by it.

Q    Okay.  All right.  And when asked about how you feel about being chosen as a juror in this case -- and I am going to really needle you a little bit on this if you don't mind.

A    What page is that?

Q    We are on page seventeen.  And I want you to think about the last answer you just gave me because let me say this to you.  You took an oath for this part of the trial to basically tell the truth, okay?

A    Uh-huh.

Q    No other oaths.  And nobody can make you take the oath to be a juror, okay?

A    Right.

Q    Nobody can tell you that you have to be on this jury.  Nobody can make you say you have to take that oath, okay?

And what I hear from you in your heart is

that the risk of an innocent person being convicted is huge on your mind and that, being a numbers person, those numbers start rationing up, you've already thought about what kind of evidence definitely wouldn't do it.  You think -- I'm going to come back to that question.

I want you to think about you being a part of this process, okay?  And I am going to tell you that we wouldn't be sitting here talking to you if we didn't think we had the type and the quality and quantity of evidence to convict the defendant of capital murder, okay?

MR. LOLLAR:  Judge, excuse me, but we will object to the prosecutor asserting his personal opinion about the strength of the case.

THE COURT:  Overruled.

Q    (By Mr. Alex)  And we wouldn't be sitting here if -- And you know that we are seeking the death penalty, is that right?

A    Correct.

Q    And you know that if the jury answers the questions here -- and you have read the questions -- if they answer the questions yes, yes and no, that the judge would not have a choice in deciding that death penalty; you understand that?

A    Yes.

Q    Okay.  And you understand that once he does that, the folks over at Huntsville won't have a choice but to take

that young man right there and give him a lethal injection that will cause his death; you understand that?

A    I understand.

Q    Okay.  And understanding all of that, and the last answer you just gave me, you feel comfortable that you can take part in this process?

A    Yes.

Q    Okay, very good.

THE COURT:  Thank you, Mr. Alex.

Do you need a short break?  You have been here since early this morning.  We can take a five minute break if you want to.

PROSPECTIVE JUROR WHERRY:  That would be great.

THE COURT:  Okay.  Five minutes.  All rise for Mr. Wherry, please.

(After a recess, Defendant and Prospective Juror Wherry present in open court).

THE COURT:  Court will come to order.  Please be seated.

I want to reintroduce to you now Keri Mallon who will speak to you on behalf of Mr. Broadnax.

EXAMINATION

BY MS. MALLON:

Q    Good morning, Mr. Wherry.  We get the benefit I

guess of talking to you second so I've got a whole lot of information before I start to speak with you. But there are some things I want to go over with you, okay?

A    Okay.

Q    And I do, I do want to reiterate what Mr. Alex said. At this point the only oath you've taken is to tell the truth. Okay. You have not taken an oath to follow the law. So, again, I just want to stress how important it is, we just need to know what your truth is.

Okay. Now, we are also in kind of a difficult position that we have to talk to you about punishment before there has even been a guilt or innocence decision. So I want you to know that, just because we have to do that, doesn't mean in any, way, shape or form that we think Mr. Broadnax is guilty. Okay.

We just -- And we need to make sure that you can still presume him innocent even though we are talking about the penalty phase of a potential case. Can you do that for me?

A    Yes.

Q    Okay. Now, I want to go over a few things that Mr. Alex talked to you about. We were talking about on your questionnaire the kind of evidence that you look for and what you want to see in a trial, and so forth.

Now, their burden of proof is proof beyond a

reasonable doubt, and the law does not define that for us. That's your decision. Okay. You define that for yourself.

Now, if you are called to sit as a juror in this case, you could hold them to their burden, couldn't you?

A    Yes.

Q    Okay. Would you -- You wouldn't require them to prove it beyond all doubt, would you?

A    No.

Q    Okay. So, you wouldn't expect anything more of them than the law requires; is that right?

A    I -- Yes.

Q    Okay. Okay, good. And when we are talking about eyewitness testimony, you would agree with me, wouldn't you, that sometimes there are good eyewitnesses and sometimes there are bad eyewitnesses?

A    Correct.

Q    Okay. And regardless of what evidence they bring to you, you're not going to hold them to a higher burden than proof beyond a reasonable doubt.

A    Correct.

Q    Okay, good. Now, let's talk a little bit -- One thing again I wanted to stress is that the judge already told that to you, but based on your questionnaire, I want to make sure you know.

If you find Mr. Broadnax guilty of capital

murder beyond a reasonable doubt, there are only two options at that point, life without parole and the death penalty. Okay. And as the judge told you, life without parole means just exactly that. Do you understand that?

A    Yes.

Q    Okay. Because I think you had some question about that in your questionnaire, that you didn't think life actually meant life, but it does.

A    Right.

Q    Okay.

A    I did question that and the clarification was of value.

Q    Okay. I just wanted to make sure. Now, after or if a jury has decided proof beyond a reasonable doubt that a person has been convicted of capital murder, then we go to these special issues. And I want to talk to you about special issue one because that seemed to be where you spent a lot of time with Mr. Alex.

Now, again, the law does not define, does not define probability. Okay. There is nowhere in the law where that is defined. However, in special issue one, what I think maybe wasn't clear is that the prosecution has to prove to you beyond a reasonable doubt the probability. Okay. Does that make sense?

A    Yes.

Q    Okay.  So, that seems reasonable, right?

A    Uh-huh.

Q    Okay.  Now, you were talking about a situation where you couldn't imagine or foresee a case where the circumstances of the case were enough to convince you that a person might be a future danger.

A    Could you say that again?

Q    Sure.  I'm sorry.  We tend to be a little longwinded.  I believe, and tell me if I'm wrong, you were talking to Mr. Alex about the future danger issue.  That's what we call it.  And you -- I believe you said that it would be -- I think you said it would be difficult for you to imagine a case where the act alone, the capital murder alone, was enough for you to believe that there was a future danger.

A    Correct.

Q    Okay.  But let's -- What about Timothy McVeigh, his act, his crime, was that enough to convince you that he would be a danger in the future?

A    Yes.

Q    Okay.  So you can, you can foresee some situations where the murder itself might be enough to convince you that the person was a future danger.

A    Yes.

Q    Okay.  And let me tell you --

A    Using that as an example, yes.

Q    Okay.  And let me tell you, too, that the law presumes life, okay?  After the person has been convicted of capital murder, the law assumes life.  Death is never automatic.  No matter how horrible or heinous the crime is, the death penalty is never automatic.  It presumes life, and it's up to these guys to prove differently, okay?

A    Right.

Q    They have to prove each of these issues beyond a reasonable doubt.

THE COURT:  First two, first two.

Q    (By Ms. Mallon)  I'm sorry.  First two issues beyond a reasonable doubt.  Does that make sense?

A    Yes.

Q    And do you believe that's reasonable?

A    Yeah.

Q    Okay.  So, what I would like to talk to you about is special issue number three.  Okay.  That's what we call the mitigation --

THE COURT:  It's in the pamphlet too.  It's just whatever.

Q    That's what we call the mitigation issue.  And if you will just read over that for me, Mr. Wherry, before we talk about it.

A    Okay.

Q    Okay.  Now, you can see how the two phases of the

trial are very different, right, the guilt/innocence phase versus the penalty phase?  The guilt/innocent is very fact based.  They have to prove facts beyond a reasonable doubt that convince you that someone is guilty of capital murder.

However, once we get to the penalty phase, it's completely different.  There is no right or wrong. There is no burden.  It's up to each individual juror's personal moral judgment.  Does that make sense?

A     I understand.

Q     Okay.  So, there is no guidance from the judge, there is no guidance from the lawyers.  That decision is completely up to you as an individual juror, and it's based on your personal moral judgment.  Does that make sense to you?

A     Yes.

Q     Okay.  And your personal moral judgment is up to you and it should be respected by all the other jurors. Does that make sense to you?

A     Yes.

Q     Okay.  And we like to compare your personal moral judgment when we talk about that with perhaps a religious belief.  It would be strange if you went back into the jury room and all twelve of you had the same religious beliefs, wouldn't it?

A     Yes.

Q    Okay.  Or if you all agreed on how to raise your kids.  So, that's what we are saying when we talk about your personal moral judgment.  It's completely up to you, okay?

And you don't have to --

THE COURT:  On special issue number three.

MS. MALLON:  Special issue number three, Judge, yes.  That's what we are talking about.

Q    (By Ms. Mallon)  And you don't have to debate it, discuss it, define it.  You don't even have to know what it is as long as it's within your heart.  Does that make sense to you?

A    Yes.

Q    Okay.  And that's your decision.  It can be as big as you want or as little as you want.  It's completely up to you.  It's your personal moral judgment.  Does that make sense?

A    I understand.

Q    Okay.  Mercy alone can be enough for you to give a sentence of life without parole.  Does that make sense as well?

A    I understand.

Q    All right.  Mr. Wherry, I think that's all I have.  Thank you very much.

THE COURT:  All rise for Mr. Wherry, please.

You'll be stepping outside, then you'll be coming right back in, sir.  Take all your belongings.

(Prospective Juror Wherry exits the courtroom).

THE COURT:  Let the record reflect we are in the presence of Mr. Broadnax.  The juror has exited the courtroom.

What says the State of Texas?

MR. ALEX:  Judge, the State would submit the juror for cause.

THE COURT:  It will be denied.

What says the --

MR. LOLLAR:  We accept the juror.

THE COURT:  Okay.  Ask him to return.

(Prospective Juror Wherry returns to the courtroom).

THE COURT:  Mr. Wherry, of course, you have been accepted by the attorneys as a qualified juror.

Now, again, what that means is we are in the process of qualifying some fifty.  You make number three, so this is a process that's going to take some time, as you can tell.  You've personally experienced it.

Now, have you changed the phone number or the address that was on your questionnaire?

PROSPECTIVE JUROR WHERRY:  No, I haven't.

THE COURT:  All right.  The sheriff is going

to give you a personal card of the judge's, Judge Snipes' coordinator.  Should anything occur in your personal or professional life in this time frame between now and the 10th of August that you think might affect your jury service, give her a call and we'll come up and deal with it.

Now, as that day draws near, you'll be contacted by the coordinator if you have been accepted as an actual juror on the case.  The twelve will be taken from that fifty person pool, and you understand that.

PROSPECTIVE JUROR WHERRY:  I understand.

THE COURT:  Also, this case has received some media attention, so I ask that you avoid all outside information about the case, newspaper, Internet, TV, radio, and I am sure you'll do that.  It would be a shame if you were disqualified.

Thanks a lot.  It's been a pleasure meeting you.  Good luck to you, sir.  Thank you.

(Prospective Juror Wherry excused from the courtroom).

THE COURT:  Court's in recess for five minutes.

(After a recess, Defendant present).

THE COURT:  Everybody ready for Mr. Swift? Okay, here we go.

(Prospective Juror No. 98, Phillip Swift, enters the courtroom).

THE COURT:  Right over here, Mr. Swift.  There you go.  Thank you very much.  Good to see you again.  Please be seated, Mr. Swift.

PROSPECTIVE JUROR SWIFT:  Thank you.

THE COURT:  I want to say hi to you again, Mr. Swift.  My name is Webb Biard, and I will be with you today during the jury selection process.

The Presiding Judge of this Court is Michael Snipes and he will actually preside over the trial.

Also at this time I would like to introduce to you Andrea Handley.

MS. HANDLEY:  Good morning.

THE COURT:  David Alex.

MR. ALEX:  Good morning.

THE COURT:  Elaine Evans.

MS. EVANS:  Good morning.

THE COURT:  They represent Dallas County and the State of Texas.  And also we have Gordon Hikel.

MR. HIKEL:  Good morning, sir.

THE COURT:  And Zandra Robinson.

They represent Dallas County and the State of Texas.

And then further Mr. Brad Lollar.

MR. LOLLAR:  Hi.

THE COURT:  Mr. Doug Parks.

MR. PARKS: Good morning, sir.

THE COURT: Keri Mallon.

MS. MALLON: Good morning.

THE COURT: And they represent Mr. James Broadnax, Mr. Broadnax.

Thank you, sir.

PHILLIP SWIFT,

testified as follows:

EXAMINATION

BY THE COURT:

Q    I think it helps to have some idea of what's fixing to happen. I'm going to talk to you just a little bit. Then the attorneys are going to talk to you for up to forty-five minutes a side.

So, sometime around noon today we will conclude our conversation with you and at that time I will inform you here in this courtroom whether or not you have been accepted as a qualified juror.

What that means is we are in the process of qualifying up to some fifty prospective jurors and, from that fifty jury pool, the actual twelve jurors will be selected. And you'll be told today whether or not -- whether you are or not going to be in that pool.

And then from reading that pamphlet, did you see that the trial starts August the 10th?

A     Yes, sir.

Q     You see where it will last two weeks -- up to two weeks?  That will be Monday through Friday, as it says, 9:00 to 5:00.  It will be a break in the morning, break in the afternoon.  The jury will not have to stay together overnight unless and until, a possibility, if you are deliberating late into the night and became mentally fatigued, you would be taken as a group to a fine hotel, county expense, individual private rooms, spend the night and come back to avoid any outside influence.

That could happen.  If it did, I know Judge Snipes well enough to know that he would be on top of it and he would give you advance notice for you to bring an overnight bag, tell the people close to you that you would be -- a possibility of spending the night.  That could happen.  It may or may not.  That wouldn't happen during the trial.  I'm not saying that.  It would only be once you're deciding the verdict.

In that regard, have you sat on a criminal jury before?

A     Oh, many years ago there was a gentleman -- I think it was a criminal -- he had socked somebody in the nose.  He got off a bus.  He got on a bus in Memphis, Tennessee.  He got off here in Dallas, and he was confused.  And they asked us to give him some help, for the jury.

Q    Okay.

A    And that's what everybody was pressing us to do, so.

Q    That's not important.  Sometimes it will give you a little bit of an idea how things work.

Now the sheriff, the bailiff told me -- I wouldn't bring this up otherwise -- that you told him that you have some difficulty in hearing.

A    Yes, sir.

Q    Would you tell us exactly what the situation is on your hearing?

A    I probably lost about 70 percent in my right ear, probably 30 percent in my left ear.  And I do have, when people do not speak or enunciate clearly, I have trouble hearing.

Q    Okay.  If you were on the jury, this case will be tried in a much larger courtroom.  You have been in a courtroom.

A    Uh-huh.

Q    You've sat in a jury box, right?

A    Yes, sir.

Q    And you know, have some idea how the courtroom is structured.  Let me ask you, do you think you would be able to hear sufficiently to be able to sit on a -- feel comfortable or think you could sit as a juror in a case

that could involve the punishment of either life in prison or death?

A    With the magnitude of this, I would be -- would say that I might have some problems and I wouldn't want to miss anything by sitting in a courtroom.

Q    Well, I'm going to let the lawyers talk to you about that.

A    Okay.

Q    And I'm kind of going to leave that up to you if you think you could.  There's microphones in the courtroom, but that's the -- I'm going to leave that up to you.

A    Okay.

Q    You say yes or no, that's the way it's going to be, and you are probably going to have to say yes or no.

A    No problem.

Q    You know what I'm saying?

A    Yes, sir.

Q    All right.  Now, all criminal jury trials are in two parts.  The first part is called the guilt/innocent phase.  The second part, if the person is found guilty, is called the punishment phase.

And that's the way all criminal jury trials are tried, whether it's theft of a bicycle or a capital murder case, two parts.

If a person is found not guilty, the trial

is over, you go home.  If a person is found guilty, then you go into that punishment phase.

Capital murder is different from any other type of offense because capital murder is the only crime in Texas for which you can receive the death penalty.  You cannot receive the death penalty for any other offense except capital murder.

If you're found guilty of capital murder, the punishment is either going to be life in prison without parole -- It's not a wink and a nod.  That's not after you serve forty years you'll be brought up for consideration. It's life in prison without parole.  If you believe anything I say, believe that.  You've got my word on that.  -- or the death penalty.

And should you find someone guilty of capital murder, the way you make that decision is to answer those special issues issues.  Have you had an opportunity to read them?

A    Yes, sir.

Q    Did they make any sense to you?

A    The second one I don't understand at all.

Q    Well, let me -- let me address that just for a minute, but the lawyers will go into a lot more detail.

In Texas we have what's called the law of parties.  I have been doing this a long time and at one

time it was called something different about aiding or abetting or --

But the law of parties means that if you, even though you're not what we sometimes refer to as the triggerman -- in other words, you're not the one that did the shooting -- if you aid, encourage, direct, assist the shooter in the commission of the offense, or robbing a bank or breaking into a home or stealing a cow, if you drive the pickup where the guy goes out and lassoes a cow, you can be held just as legally guilty as the person who actually stole the cow.  Does that make sense to you?

A     Yes, sir.

Q     But to be guilty, you have to be able to -- you should have anticipated that the offense was going to occur. In other words, if somebody says, give me a ride to the bank, and all you're doing is giving them a ride to the bank, and they hold the bank up and you didn't know they were going to do it, didn't know they had a gun, it had never been mentioned, then you wouldn't be guilty.

But if you know they are fixing to rob the bank and you drive them in your car to the bank so they can get there and so they can get away, then you are just as guilty as if you went in the bank.  Does that make sense to you?

A     Yes, sir.

Q    You see that?  Here's the distinction.  To be guilty, you have to -- should have anticipated, should.  You understand what that words means?

A    Uh-huh.

Q    Should have anticipated.  To receive the death penalty and for special issue number two to be answered yes, you have to find that you actually did anticipate.  The difference between should and actually.

A    Okay.

Q    Do you understand that?

A    I believe so, sir.

Q    You sure?

A    I've still got a little bit of problem with the verbiage.

Q    I got you.  There is a difference between should have anticipated and actually did.  Like you should have anticipated it was going to rain, but that's the difference between actually did anticipate it was going to rain.

A    Oh, okay, I think I understand now.

Q    Do you?

A    I think so.

Q    The lawyers will get into it later.  And is there anything else about those special issues?

A    No, I just had a little trouble with the verbiage on number two.

Q   Okay.  And again, if special issue number one is answered yes and two is answered yes and three is answered no, that results in the death penalty.  The lawyers are going to talk to you about that.  If they are answered any other way, it's a sentence of life in prison.

So, what does that mean to you?  It means that the jury doesn't write down on a blank line life in prison without parole or death.  They answer those three special issues and, depending on how they are answered, yes or no, determines the punishment.  Do you follow me on that?

A   Yes, sir.

Q   Okay.  Now, of course, we are sitting a yard apart.  Have you been able to hear me?

A   Yes, sir.

Q   Okay.  Okay.  I'm going to let the lawyers talk to you about it and just -- they might, they might get into it right off the bat.

And if you say yes, you can sit -- because being unable to hear is an exemption or a disqualification to sit as a juror.  That's a legal disqualification, so that's up to you.

A   I hear you, sir.

Q   You got me?

A   Yes, sir.

THE COURT:  Ms. Handley.

Ms. Handley now is going to talk to you on behalf of the State of Texas.

EXAMINATION

BY MS. HANDLEY:

Q    Good morning, Mr. Swift.  How are you?

A    I'm good.  How are you?

Q    I'm just fine, thank you.

I want to ask you something before we move on.  I notice that you work for Main Steel.

A    Yes, ma'am.

Q    Do you actually roll steel?

A    No, we actually take it to our customers and we make a flat sheet out of it.

Q    Okay.  Okay.  I recently met somebody who actually rolled steel.

A    Oh, okay.

Q    And I was surprised at how dangerous that job can be, and he had arms that were amazing from actually rolling steel.  Okay.  Well, thanks for clearing that up with me.

Before we get into the actual details of this voir dire and I talk to you, I do want to explore -- and I have a copy of the questionnaire that you filled out earlier for us.  We appreciate that.  We've read it.  All of us have read it.  It helps us to prepare in talking to you some more.

But I do want to explore something with you

about the hearing.  And you said that it's -- You said you have about 70 percent loss; is that right?

A    In my right ear.

Q    Seventy percent loss in your right ear.  And then your left ear?

A    About 30 percent.

Q    About 30 percent.  Is that from working in the steel?

A    I've been doing it 25 years.

Q    Okay, that will do it.  My dad was a fighter pilot.  He puts the TV on ten and he tells me it's from standing out on a flight line all those years.

A    Sure.

Q    It's just after a while it gets to you.

Here's what I want to explain to you because I have been doing this almost twenty years, trying cases, you know, and we don't always -- we are not always necessarily able to pick our witnesses.

If we could pick our witnesses, the people who maybe witnessed the crime or the people who have to come in and testify, I would pick articulate people with perfect grammar, you know, and maybe people who were on a school bus going to church choir practice too, you know, but we don't necessarily pick our witnesses.

We don't necessarily pick our evidence

sometimes too.  Sometimes evidence is not necessarily just the person talking from the witness stand, which you might have to look at a piece of video evidence, maybe something taken on a surveillance camera.

And I don't know if you're familiar with that kind of technology, but it's really kind of hit and miss. You know, sometimes you can hear it, sometimes you can't. It's not very clear.  And you don't always necessarily maybe get an opportunity to see the person articulate or follow them in that -- in that sense.

So, I can't make representations to you that every person who is going to come to trial will speak, articulate and enunciate and speak clearly and speak loudly for you.  Some people just have a mushmouth.  Some people have a really thick maybe accent.

And what both sides need from you in this case is we need to have that absolute assurance from you that you can take in all of the evidence, you know, because your verdict is going to be based entirely on the evidence, and the evidence alone.

It's not going to be based on what you heard outside the courthouse or the opinion of somebody else outside of trial.  It's based on the evidence you receive in the courtroom.

If you're not receiving a hundred percent

**Anne B. Meredith**
Certified Shorthand Reporter

of the evidence because people aren't articulating or the quality of the evidence isn't up to par, then my concern is you're not taking in a hundred percent of the evidence.

A    Then I don't think I can help you.

Q    Okay.  So, you are certain then that, given your hearing loss, that you're not going to be able to take everything in and --

A    Not if I can't ask questions and ask somebody to speak up.

Q    And I will say that I think sometimes you maybe can raise your hand, but I don't know from a practical standpoint that we could change people's --

A    Right.

Q    -- inability to articulate for you.

A    I understand.

Q    Okay.  So, you wouldn't be able to give it a hundred percent of your concentration and --

A    I would give it a hundred percent concentration, but I probably couldn't hear a hundred percent.

Q    You wouldn't receive all of the evidence in the case.

A    Right.

Q    And your verdict then wouldn't be based on all of the evidence in the case.

A    No, ma'am.

Q    Okay.  Okay.

MS. HANDLEY:  Continue?

EXAMINATION

BY MR. PARKS:

Q    Mr. Swift, do you wear hearing aids?

A    No, sir.

Q    Are you able to hear me okay?

A    Yes, sir.

Q    The law doesn't assume that all of us can predict the future.  I would expect that anyone that was brought in here and asked the very same questions that you have been asked would have to answer them pretty much the same way you've answered them because no one can say with absolute certainty that they are going to hear and understand every word that's ever going to come in a trial, for whatever reason, whether they have diminished hearing capacity.  I don't hear as well as I used to.  Sometimes I miss things.

But I can tell you one thing.  I know Judge Snipes well enough to know that to be able to say that if you're having difficulty hearing a witness, you have every right in the world as a juror to say, Judge, can you have this witness speak up.  I can't under -- they are not speaking loud enough for me to hear them.

There is nothing wrong with that.  You're not prohibited from making sure, as a juror, that you're able to

hear everything that's going on.  And if you're not able to, you've got a right to speak up and say so, so that you can.

I mean it's not a situation where you have to use sign language or anything like that.

A    No, sir.

Q    You can hear.

A    Uh-huh.

Q    You can understand people if they talk loud enough where you can hear them.

A    Yes, sir.

Q    The way -- Well, I can't remember that particular courtroom which way -- which ear would be most pointed toward --

MR. LOLLAR:  Right.  I'm sorry.  The left.

Q    It would be the left so that, you know, you would have your good ear to the witness, I can tell you, in that particular courtroom.

A    Yes, sir.

Q    And it's one thing to have concerns, and I appreciate anyone having concerns that they might have some difficulties.  But, yeah, is it, is it that, is it a concern that you might not be able to hear everything that's said without some prompting, or are you convinced that you're just not going to be able to hear everything?

A    Well, I've never sat in anything of this magnitude.

Q    Sure.

A    And I just want to make sure that I hear everything.

Q    Sure.

A    And I don't want to disturb the proceedings unless it's okay with everybody saying, speak up, speak up.

Q    Listen, I can tell you that probably if you're having difficulty hearing them, I would be having difficulty hearing them.  And I would probably be saying, Judge, I can't hear this witness.  I do that from time to time.  I know other people do it.

I know judges who do it, who say, listen, you're going to have to sit up closer to this microphone and speak up.  Hold your voice up so everybody on this jury can hear you.  I've heard that admonishment from judges, I can't tell you how many times, over the course of years.

So, you know, I guess it is just as Judge said, if, you know, if it is a concern for you that you would need to make people speak in such a way that you can hear them, you have a right to make them do that.  If it's a concern that you just would not be able to do it, I'll leave it to you.

I just don't want to give you the impression that, as a citizen of this state and this county, that you're not qualified to sit as a juror like other citizens

are simply because you have some diminished hearing capacity. The system will make accommodations for you. The system will make accommodations for people who cannot hear at all.

It is not a disqualification. If jurors were otherwise qualified to sit and they were deaf, then interpreters could be provided for them. Sign interpreters could be provided for them. So, it doesn't make you a second class citizen is what I'm trying to say.

A    I understand.

Q    But you have an absolute right to sit on a jury. You understand what I'm saying?

A    Yes, sir, I do.

Q    Having said all of that, tell us what your real and true feelings are about this.

A    I think that I would have trouble hearing what's going on and I don't want to disrupt the proceedings more than one time, you know, to keep saying, I can't hear, I can't hear. I don't think that would be fair to anybody.

MR. PARKS: That's all the questions I have.

THE COURT: I'm going to take you at your word. You're going to be excused by the Court for being unable to hear the proceedings.

MS. HANDLEY: Thank you, Mr. Swift. Appreciate your time.

PROSPECTIVE JUROR SWIFT: Thank you very much.

MS. HANDLEY:  Thank you so much.

(Prospective Juror Swift excused from the courtroom).

THE COURT:  The Court excused the juror over the defendant's objection.

MR. PARKS:  Yes, sir.

THE COURT:  1:00 o'clock or 1:15?

MR. LOLLAR:  1:00 o'clock.

THE COURT:  The jurors get here at 1:00, so let's say 1:15.  Okay?

(After the lunch recess, Defendant present).

THE COURT:  Let the Court come to order.  Back on the record in Texas versus Broadnax.

Thank you again.

(Prospective Juror No. 101, Jon Desmond, enters the courtroom).

THE COURT:  Please be seated, sir.

Please be seated, folks.

Mr. Desmond, we have already met but let me introduce myself for the record, please.  My name is Webb Biard and I will be here with you this afternoon during the jury selection process.

If you recall, the Presiding Judge of this Court is Michael Snipes.  That's who you met at the large jury panel.  Should you be selected as a juror, Judge Snipes

will be the Presiding Judge during the trial.

Do this for me before we go any further.

(Prospective Juror Desmond duly sworn).

JON DESMOND,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Let me give you a little idea of what -- the way we are going to proceed this afternoon.

We are in the process of qualifying some fifty jurors.  From that fifty pool of jurors, the actual trial jurors will be selected.  We anticipate that this qualifying process will take through late July, early August.

A    Okay.

Q    And when that's done, then the actual trial jurors will be selected.  If you are selected, you will be notified at that time.

A    Okay.

Q    And I will tell you today when you leave here this afternoon whether or not you are a qualified juror.

A    Okay.

Q    I'm going to talk to you for a little bit and then the attorneys will talk to you for up to forty-five minutes a side.

A    Okay.

Q    So, in approximately an hour and a half you will know if you are going to be in that pool of fifty jurors.

A    Uh-huh.

THE COURT:  Also, I want to introduce at this time to you Andrea Handley.

MS. HANDLEY:  Good afternoon.

PROSPECTIVE JUROR DESMOND:  How are you?

MS. HANDLEY:  Fine, thank you.

THE COURT:  And I'm sorry, Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  And Gordon Hikel.

PROSPECTIVE JUROR DESMOND:  Good afternoon, sir.

THE COURT:  They represent Dallas County and the State of Texas.

Further on down the table is Doug Parks.

MR. PARKS:  Hi.

THE COURT:  And Brad Lollar.

MR. LOLLAR:  Hi.

PROSPECTIVE JUROR DESMOND:  How are you?

THE COURT:  And they represent -- I'm sorry.

Terry -- Keri Mallon.  And they represent Mr. James Broadnax.

Q    (By the Court)  And one of the attorneys from the State and the defense will talk to you.

A     Okay.

Q     To be a qualified juror you don't have to know the law. You're not expected to necessarily agree with the law. But after the law is explained to you by these fine attorneys, you'll be asked the bottom line question. Now that you know that is the law, can you follow the law and perform your duties as a juror?

A     Okay.

Q     And can you consider the full range of punishment in the appropriate case? If you can, basically you would be a qualified juror. If you can't, in other words, you've already got your mind made up or, for some reason, you cannot follow the law of the United States and Texas, then you wouldn't be a qualified juror.

I don't want to sound flippant, but the attorneys and I didn't get together last night and decide how we're going to proceed today or what laws we are going to use. These laws are decades, centuries old, and they are your laws as much as they are ours.

And I think you'll be familiar with most of them. It will be some that I would imagine might be some new concepts for you, but there is nothing you won't be able to understand.

A     Okay.

Q     Now, you filled out your questionnaire. We

appreciate that very much.  It wasn't some idle exercise. It took a time to do it, I know, but it's going to save you actually more time today than it took you to fill it out because the attorneys have read it.

A    Okay.

Q    And they are not going to waste your time going back over a lot of that information.  But there will be some of your answers, I don't know which ones they are, that they will want you to amplify on or explain just a little further.

A    Okay.

Q    Now, have you ever sat on a criminal jury before?

A    Yes, a couple of them.  One of them --

Q    Good.  It's not a requirement but I think it will help you a little bit.

A    Okay.

Q    Will you tell us a little bit about that?

A    I sat on a jury for an aggravated robbery probably about ten years ago.  We did come to a verdict and we found that person guilty.

Q    All right.  Did you set punishment?

A    Yes, we did.

Q    All right.

A    Then the last one I was on was a drug case.  That was probably about four or five years ago, and we did find that person guilty as well.

Q    Set punishment?

A    Yes, we did.

Q    All right.  From those experiences, it gives you a little leg up on a lot of the prospective jurors.

Did you understand the concept that they were both tried in two parts?

A    Yes.

Q    By that I mean guilt/innocence phase, punishment phase.

A    That is correct, yes.

Q    And you knew during the trial, you knew which part of the trial y'all were in, right?

A    Absolutely, yes.

Q    You knew you were in the guilt/innocence and you knew you were in the punishment.  You heard different kinds of evidence; is that right?

A    Yes, sir.

Q    That's the way every case in Texas is tried whether it's the theft of a bicycle or a capital murder case.

A    Okay.

Q    Two parts.  First part guilt/innocence.  Not guilty, the trial's over.  The second part is the punishment if you find the person guilty of whatever crime it may be.

A    Okay.

Q    That's the truth.

Now, from reading -- Did you have an opportunity to read that pamphlet?

A    Yes, I did.

Q    Do you think it helped you just a little bit to understand this procedure?

A    Yeah, it clarified it a little more since I have a little bit of experience with being in the court.  Yes, it kind of clarified it a little bit.

Q    Good.  Now, you understand this is a capital murder case.

A    Yes, I do.

Q    You understand the State of Texas is seeking the death penalty.

A    Yes, I do.

Q    And because of that the law is allowing this individual one on one.  This is not the way the jury was selected on the cases you were previously in; is that right?

A    That's right.

Q    Okay.  Now, if someone is found not guilty of capital murder, there is such a thing called lesser included offenses where, if you're not guilty of capital murder, in certain situations you could be guilty of murder or robbery or on down, okay?

A    Uh-huh.

Q    But should the jury find the person guilty of

capital murder, then you go into that punishment phase that you've already been in twice.

And the punishment phase of a capital murder case is a lot like the ones you were in. You can hear good deeds, bad deeds, prior record, no prior record, childhood, mental condition, physical condition, anything that any of the lawyers think will help you decide what's the right punishment.

A    Uh-huh.

Q    Now, if someone is found guilty of capital murder, there's only two possible punishments, and that's either life in prison without parole or death.

A    Okay.

Q    And when I say life in prison without parole, that's not a wink and a nod. That doesn't mean that we are hiding from you that in a certain number of years someone becomes eligible for parole. Now life in prison in Texas means life in prison. Believe me when I say that on my word, okay?

A    Uh-huh, I do.

Q    All right. Now, in the case you were in I venture to guess that when the jury set punishment, you go back after hearing all the evidence and you are in the jury room and you're working on your decision and you got that verdict form that says, we the jury having found the person on trial guilty of aggravated robbery -- Did it say that?

A    Yes.

Q    -- set his or her punishment at blank number of years, and you write in the number of years.

A    That's correct.

Q    Now, in a capital murder case, when the jury is setting punishment -- By the way, I want to stress that in those cases that you were on, a judge could have set punishment if that's what all the parties wanted to happen, but in a capital murder case the jury must set punishment.

A    Okay.

Q    It's either going to be life in prison without parole or death, and the jury sets punishment.  But they do not write down on a blank line life in prison without parole or death.  That's the way it's going to be, but that's not the way they decide punishment.

The way the jury decides punishment in a capital murder case is they answer three special issues. Do you remember reading those special issues in that pamphlet?

A    Yes, I do.

Q    Would you like to read them to yourself one more time?

A    Yeah, I think I would.

Q    Would you do that, please, sir.  Take your time. Read them to yourself.  They start on page two, I think.

See if one isn't.

A    Special issue.

Q    Is that one?

A    Yes.

Q    Okay.  Start with one and read those to yourself, and then I'm going to talk to you a little bit and then the attorneys are going to spend quite a bit of time.  And they talk about that punishment phase a lot because, like I say, you know all the other -- most of the other laws that pertain to guilt/innocence.

A    Uh-huh.

Q    But this is something unique to most people and that's the reason we spend more time on it.

A    Okay.

Q    All right?

       All right.  Now, if you'll look again with me.

A    Yes.

Q    One.

A    Yes.

Q    All right.  If that's answered yes, you go to two just like that.  You'll get that verdict form.

A    Uh-huh.

Q    The jury's charge, Charge of the Court, and it will tell you that.

A    Okay.

Q   You'll see that.  If you answer one yes, you go to two.  If you answer one no, you stop and the judge pronounces a sentence of life imprisonment.

A   Okay.

Q   So if you answered yes, you go to two.  If you answer two yes, then you proceed to three.  If you answer two no after answering one yes, you stop and the judge prounounces a sentence of life in prison.

A   Got you.

Q   If you answer one yes, two yes, you go to three.  All right?

A   Uh-huh.

Q   If you answer three no, it's the death sentence.

A   Got you.

Q   If you answer three yes, in other words, there is sufficient mitigating evidence, it's a sentence of life imprisonment.

A   Okay.

Q   It's either going to be life in prison.

A   Right.

Q   If you are answering those questions, issues, if you ever got to that point, you had found someone guilty of intentionally causing the death of an individual.  It wouldn't have been a car wreck.

Sometimes people go, well, I could answer it

a certain way if it was a hunting accident.  But when you're there, you have found someone guilty of intentionally causing the death of an individual.

Are you with me on that?

A    Yes, I am.

Q    Okay.  And what the lawyers are going to be asking you is, even though you were on -- if you should happen to be on the jury, not necessarily talking about this one, and you found somebody guilty of capital murder, could you still go to those special issues and answer them yes or no depending on the evidence, or would you already have your mind made up of what you were going to do?  And each --

A    I'm sorry.

Q    And each issue is to be answered independently of the others.

A    Okay.

Q    You started to say something.  I interrupted.

A    I was going to say yes, I think I could.

Q    Okay.  Now, if for some reason you change your mind, let us know.

A    Okay.

Q    Fair enough?

A    Sure.

Q    Now, I should have asked you this right at first and I'm sorry.  Judge Snipes, as you saw on that pamphlet,

intends to start this trial August the 10th.  We anticipate it will last up to two weeks.  That's Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, lunch break.

The jury will not have to stay together overnight unless and until you start your deliberations -- and you know what that means.

A    Yes, I do.

Q    Let's say you went late into the night, hadn't reached a verdict yet but wanted to keep working but were just mentally fatigued.  The jury would be taken as a group to a fine hotel, individual private rooms, county expense, spend the night, come back together, to avoid any outside influence, and then continue with your deliberations.

I don't anticipate that occurring during the actual trial.

A    Okay.

Q    Only during deliberations.  That can happen.  I ask you that -- I tell you that to ask you this.  As you sit here now, are you aware of anything that will be occurring in your life during that time frame that would interfere with your ability to sit as a juror?

A    Not that I'm aware of.

Q    Good.  All right.  Without anything further from me, I'm going to reintroduce to you Andrea Handley who is

going to talk to you on behalf of the State of Texas.

A    Okay.

MS. HANDLEY:  Thank you, your Honor.

EXAMINATION

BY MS. HANDLEY:

Q    Good afternoon, Mr. Desmond.  How are you doing today?

A    Pretty good.  How are you?

Q    Good.  I appreciate you being here and being on time.

I have, as the judge said, I have had an opportunity to review your questionnaire.  I studied that and fully absorbed it and I think it gives me a good impression about you and the possibility of you becoming a juror on this particular case.

I think you have an advantage here, at least it makes it I think easier for me to talk to you about the law and what's going on here in that you've served on a jury twice before.

A    Correct.

Q    And in both instances you had the guilt phase and then you went on to the punishment phase.  And I am going to make an assumption there that you ended up on both of those juries because both sides felt that you were fair minded, unbiased, could follow the law.  In other words, you were

qualified to sit as a juror in that particular case.

I will, just for the benefit of the record and just to make sure everything is clear, I want to cover that a little bit with you some more because the name of the game -- and I say game for lack of a better description because this is not a game.

I mean this is a case where we are seeking the death penalty, and I think you can appreciate that the stakes don't get any higher than that, do they?

A    Right.

Q    You know, I firmly believe that we have the type and the quality of evidence that will convince twelve fair minded jurors that the defendant is guilty of capital murder.

MR. PARKS:  Your Honor, we would again object to the district attorney saying her personal opinion about the facts and circumstances of the case.

THE COURT:  Overruled.

Q    (By Ms. Handley)  I also think we have the type and quality and quantity of evidence that will convince twelve fair minded jurors to answer those questions in a way that will result in the death penalty in this case.

And once that happens, sir, it's done.  The judge has no choice at that point other than to physically sign a warrant for the death and the execution of the defendant.  He will be taken to Huntsville, an execution

date will be set, and he will be killed by lethal injection.

And I think you have a pretty good appreciation for what's going on here, don't you?

A    Yes, I do.

Q    Have you givan any more thought to that since we had you fill out the questionnaires and how you feel about participating in such a process like this?

A    Yes, I have given it more thought and I understand the gravity of the situation so, yes, I think I could be fair and openminded --

Q    Okay.

A    -- to both parties.

Q    Okay.  And I'm going to assume then that you understand the gravity of it and, therefore, you understand the necessity that we have jurors that will agree to follow the law in the case, that they will agree to base their verdict on the evidence in the case and nothing else.

A    Right.

Q    Not on outside influence, not on what their neighbor told them, but you'll base your verdict on the evidence in the case, and that only.

A    Right.

Q    That when it comes to the punishment phase, if we get to the special issue questions or be it that it's not a capital murder and it's a lesser included offense, that

regardless of what happens, Mr. Desmond, you will base your verdict on the evidence in the case and nothing else.

A    That's what I would do.

Q    Okay.  You are I believe familiar, as most people are, with the fundamental propositions of the law that apply in every case that have been around for a long time because they are good laws.

A    Uh-huh.

Q    And they are what make our system work.  First and foremost, the defendant has been indicted.  In the real world you could say, well, where there's smoke there's fire, but we are not -- we are not out there in the community saying that at the coffee shop.

In a court of law, just because somebody has been indicted for an offense, it doesn't mean a thing to you.

A    Uh-huh.

Q    Okay.  It is never, under any circumstances, to be used as a piece of evidence of guilt against the defendant. You can't go back there, in other words, and go, well, the grand jury indicted him, he must be guilty.

Do you agree to follow that, to not consider the indictment as any evidence of guilt?

A    I do.

Q    You also understand that, as we sit here today, Mr. Broadnax is presumed innocent.

*Anne B. Meredith*
Certified Shorthand Reporter

A    (Nods head).

Q    That goes hand in hand with really the fact that I, as a representative of the State, I carry the burden of proof in this case.

A    Uh-huh.

Q    And I carry the burden to prove my case to you beyond a reasonable doubt. And quite frankly, I think that's just fair. If I'm the one bringing the charges, I ought to be bringing the proof, right?

A    I agree.

Q    And until, if and until I can prove my case to you beyond a reasonable doubt, he remains -- he continues to have that presumption of innocence. Does that sound fair, sir?

A    Yes, it does.

Q    Will you hold me to that?

A    Yes, I will.

Q    Will you presume him innocent until I prove to you otherwise?

A    Absolutely.

Q    And will you always look to the State -- and this goes with the burden of proof -- will you always look to the State to prove the case to you?

A    Yes.

Q    You understand they have absolutely no obligation

whatsoever other than to show up, and I am talking about the defense.

And I know these gentlemen and I know they are fine attorneys and I assume they would do more.  But they literally have no obligation to do anything in this case.  Do you understand that?

A    Uh-huh.

Q    And you appreciate that, correct?

A    Yes, I do.

Q    And will you then hold that burden of proof to the State and to the State only?

A    Yes.

Q    Okay.  You'll never let it shift.

A    No, I don't think so.

Q    Now, you say, I don't think so.

A    No, I mean -- I'll put it this way.  Yes, I agree that the burden of proof is to the State.

Q    Yes.

A    Can I be swayed one way or the other by both sides?  Yes, but they have to prove their points.  That's where I was heading.

Q    Okay.  And when you say they have to prove their points, I just want to make this crystal clear to you, that you understand I have to do the proving.

A    Yes, I do, yeah.

Q    Okay.  And you understand they don't have an obligation to prove a single thing.

A    Okay.

Q    You understand that?

A    Yes, ma'am.

Q    If I put on my entire case and they do nothing but work a crossword during the whole case, and you look at everything that I've offered and you say, that's a pretty darn good case, they have proved it to me beyond a reasonable doubt, then what's your verdict?

A    It would have to be guilty.

Q    Guilty.  If I put on my entire case and they have done absolutely nothing but work a crossword over there, can you go back there with the other jurors, you say, I don't think they got there, I mean I think there is something there but, quite frankly, they haven't proved it to me beyond a reasonable doubt, then what's your verdict?

A    Then it would be not guilty.

Q    It's not guilty.

What you can't do is say, but since they didn't do anything, I'm going to give the State a leg up and I am going to find him guilty.  Does that make sense to you?

A    It does, yes.

Q    And can you follow that law, then?

A    Yes, I can.

Q    Okay.  That goes along with that fifth amendment right for a defendant to elect not to testify.  We've all heard your right to remain silent.

A    Uh-huh.

Q    That goes right along with that.  I can't make a defendant testify.  That would be a defendant's choice whether or not to testify.  And the choice to testify or not to could be for a hundred million different reasons.

You know, maybe I just didn't prove my case.  Why get on the stand and let me have a hack at him?  You know, maybe he has a speech impediment.  Maybe he's just not good at talking in front of people.  I mean the reasons are infinite, right?

A    Yes.

Q    But the simple fact of the matter remains that if a defendant elects not to testify, you cannot hold that against him.

In other words, I put my entire case on.  You go back there and you say, they didn't quite get there, they didn't prove to me beyond a reasonable doubt that he was guilty.  You can't say, but because he didn't testify, I'm going to assume he's guilty or I'm going to hold that against him.  You can't do that.

Does that make sense to you?

A    Yeah.

Q    And you agree to follow that law?

A    Yes.

Q    And the same thing, as you said, you could be swayed either way.  I might put my whole case on.  They might do nothing.  And you get back there and go, that's a pretty compelling case on the State's part and I am inclined to find him guilty.  If he testified, my opinion might be different, but it's not.  Then it is what it is, right?

A    Right.

Q    Okay.  So, you understand that you would not hold that against a defendant if he elected not to testify.

A    That's correct.

Q    Fundamental propositions of law that apply in every case.  That burden of proof to prove our case beyond a reasonable doubt goes to every element in the indictment.

We have to prove to you when it happened, who did it, where it happened, in Dallas County, and all the elements of the offense.  You know that.  You have been in trial before.

A    Uh-huh.

Q    You also understand that it's not five out of six elements.  You know, it's all of the elements.

A    Right.

Q    And each one carries a full weight and each one needs to be proved to you, correct?

**Anne B. Meredith**
Certified Shorthand Reporter

A       Correct.

Q       And just a crazy out there hypothetical, Mr. Desmond. If I had charged, tried somebody and charged him with the murder of another individual by shooting them, and then I get to trial and you have no question in your mind that the defendant actually killed this other person, but it wasn't with a gun like I indicted him, it was because he stabbed him, then I wouldn't have proved my case, would I?

A       That's correct.

Q       Because I've alleged a gun, haven't I?

A       That's correct.

Q       And what would be your verdict, sir?

A       It would be not guilty.

Q       Not guilty. The next thing you should do is go upstairs and tell my boss that there is a big problem with me.

        But it's an out way -- it's a way out there example, but you understand that and you can agree to follow that also.

A       Uh-huh.

Q       Let's talk about a juror's duty, and that is to assess the credibility of the witnesses. That is something that is entirely up to the jury. You've done it twice before now. People hit the stand, and what did you do?

        You sat there and you listened to them, you

eyeballed them, you watched them, you took in everything that's got you through life and all your experiences in assessing that credibility and you decided, is this man cutting straight with me, do I believe him, right?

A    That's correct.

Q    And then you went back and you talked about it, you know, because you can believe some, all or none of what a person says. That's the duty of a juror.

The law says this, that you cannot automatically believe a certain, a certain person, like a certain group of people. I noticed in your questionnaire, for example, when it came to the question about police officers --

A    Uh-huh.

Q    -- that you had put in here when asked if do you believe police officers are more likely to tell the truth than the average person, you said, yes, most police officers seem to be held to a higher standard.

A    Uh-huh.

Q    Okay. Quite frankly, I would agree. I think that they are held to a higher standard, you know, than the regular citizen, Joe citizen out there. There is nothing wrong with you having that opinion. A lot of people have that opinion. I have that opinion.

But what you can't do in order -- You're not

a qualified juror if you say, I will automatically believe police officers every time.

And do you think that would really be fair to automatically believe every peace officer?

A    No.

Q    They are human too, aren't they?

A    Absolutely.

Q    If you have ever known one outside of a law enforcement situation, you see they are actually just men and women like you and me --

A    Yeah.

Q    -- in a lot of respects.  They have got grass to mow, they have kids that need to go to the doctor.  They make mistakes, don't they?  They are human.

A    Uh-huh.

Q    So, what the laws says, Mr. Desmond, is that for any witness that takes the stand, you judge their credibility once they hit the stand.

A    Okay.

Q    You look at them, you check them out, you listen to what they are saying.  You take it all into consideration. And the police officer, you might say, that's exactly what I thought, he's entirely credible.  Or you might go, I think he's mistaken on that, maybe I think he's lying about that.

But you judge the credibility from the

**Anne B. Meredith**
Certified Shorthand Reporter

witness stand.  Can you do that?

A    Yes.

Q    Would you do that?

A    Yes.

Q    Would you automatically say, I'm going to believe this man just because he's a peace officer?

A    No.

Q    Okay.  I want to touch then along the lines -- along those lines with you on your brother-in-law who you say is a prison guard.

A    That's correct.

Q    Where is he a prison guard?

A    In West Texas up around Childress.  I'm not sure what the name of that prison is, but.

Q    It's not the Preston Smith unit, is it?

A    No, ma'am, I don't rightly recall the name of the prison.

Q    Okay.  How long has he been a prison guard?

A    Probably about ten, eleven years, something like that.

Q    Okay.  Do you have a lot of contact with him?

A    Two or three times a year.  You know, we get together for family reunions, that type of thing.

Q    Yeah.  Does he -- Does he tell you about his job and what's going on in the prison, things like that?

A    Oh, yeah.

Q    Okay.  Okay.

A    Quite horrific, a lot of the things that go on inside a prison.

Q    Okay.  Okay.  All right.  And I want to explore this with you and explain something to you, make sure that you understand this.  And, again, your answers are your answers.  I'm not here to change your mind about anything.

But, you know, along with the judging the credibility of the witness once they hit the stand, you understand that what's important in every criminal case is that you base your verdict on the evidence in the case, correct?

A    Uh-huh.

Q    The evidence comes to you from the witness stand.

A    Correct.

Q    It can come to you in the form of testimony, from documents, from video, from laboratory results, but it comes to you technically from the witness stand, okay?

A    Uh-huh.

Q    In a case like this you might hear evidence from people who work in the penitentiaries.

A    Right.

Q    From people who work in the prisons, maybe a warden, maybe a prison guard, okay?

A    Uh-huh.

Q    You need to -- They may hypothetically testify about the prison, they may testify about issues of horrendous things, they may testify about good things that are going on in the prison, okay?

A    Uh-huh.

Q    And their testimony might be there in order for you to answer questions about prison, about prison as a society and such as that.

What you can't do, Mr. Desmond, is you can't say, you know what, that's all fine and good what those guys said, but let me tell you what my brother-in-law said. Because has your brother-in-law testified?

A    No.

Q    Has he brought evidence into the case?

A    No, he has not.

Q    No.  Now, I can't -- nobody can give you an injection that erases your memory.

A    Right.

Q    That's impossible and that's too far out there to expect people to erase their memory or to come in absent of all the things that made them who they are and helped them form their opinions.  So, I can't do that.

But I can ask you and I think the Court can insist upon you that if you are put on a jury in this case,

if you hear testimony from, for example, a prison guard, as much what your brother-in-law does, that with respect to his testimony and any questions that go to that issue, that you will make your determination based on that person's testimony.

A    Yeah.

Q    That you would not say, well, let me tell everybody in the room during deliberations what my brother-in-law said, here's what you guys need to know that you didn't hear.

Does that make sense to you?

A    Yes.

Q    Is that something that you think you can do?

A    I think I can.

Q    Okay.  And, now, when you say you think you can, it's kind of like saying -- kind of like being maybe a little bit pregnant.  I mean you are or you aren't, you know.

So, I kind of need to pin you down, but I want you to appreciate where I'm going with this.  There might be stuff in the back of your mind.  You can't get rid of that stuff.  But ultimately the verdict that you, that you come to, the evidence that you absorb has to be from inside the courtroom.

Would you base your verdict strictly on the testimony in the case?

A    Yes.

Q    Will you bring into the jury room and add in evidence into the equation stuff that you have heard from your brother-in-law?

A    If I'm instructed not to say anything about what's going on or that I've heard from my brother-in-law, absolutely it would not come out of my mouth.

Q    The instruction you will basically get is that the evidence you receive is the evidence received in the courtroom.

A    Absolutely.

Q    Okay.  And you are telling me that you can then follow that law.

A    Yes, I can.

Q    Okay.  Okay.  Whether I ask you that or whether anybody else asks you that, that's your honest answer?

A    Yes, it is.

Q    Okay, fair enough.

Along that line is also one more thing that I want to hit on you and hit on with you is on page three where we asked if you have heard about this case, and you said yes, you surf the television.  I heard the original story on the news but I just remembered a couple of basics about the case.

That goes right along with what I was telling you before about your brother-in-law being a prison guard.

A    Okay.

*Anne B. Meredith*
Certified Shorthand Reporter

Q    If we only had jurors that never read a newspaper or watched a TV, we probably wouldn't get a jury.

A    Right.

Q    You know, people watch the TV.

A    Sure.

Q    They get on the Internet.

What's important, Mr. Desmond, is that, is that you don't use that, what you heard on the outside, as evidence of the case on the inside.

A    Uh-huh.

Q    That you base your verdict strictly on what you hear in the courtroom and not on what you heard from the television.  Does that make sense to you?

A    Yes, it does.

Q    Is that a law that you could also follow?

A    Yes, it is.

Q    You said just -- I remember just basically.  And is that fair to say that you don't remember a lot of details about it?

A    · That's true, yeah.

Q    Okay.  Is it fair to say, I mean have you already formed an opinion as to the guilt or innocence of the defendant?

A    No, I have not.

Q    Okay.  Okay.  So, what you heard on the television,

that's not going to influence you in arriving at your verdict in this case.

A    No.

Q    Okay.  Let's, let's go through this process then again.  You stop me if you've got any questions, okay?

A    Uh-huh.

Q    Because it kind of goes -- we kind of go all around sometimes in these voir dires here to cover maybe any possible situation that could come up.

As the judge said, capital murder is, it's an intentional murder.  It's an intentional murder plus something else.  That's what makes it capital murder.  Not every murder is a capital murder.  Not every murder is eligible for the death penalty.

Capital murder is murder plus something.  It's murder of a peace officer who is in the official line of duty; it's the intentional murder of a child six years of age or younger; it's the intentional murder of more than one person during the same criminal episode; or it is, and what we hear most often and see most often maybe is the intentional murder of an individual during the course of committing another felony offense, intentionally killed somebody while robbing them or while committing rape or while committing burglary of a habitation.  You understand that?

A    Uh-huh.

Q    If I just pulled a gun out of my briefcase and just boom, shot my co-counsel here right now, I think you would assume that's pretty bad, isn't it?

A    Uh-huh.

Q    And that would be, fair to say, an intentional murder. That's not a capital murder, though, because it doesn't have that extra aggravating factor. So, not every murder case is eligible for the death penalty.

Do you think that's fair?

A    Yes, it is.

Q    Okay. Now, we look for that extra element before we move on to that higher punishment of the death sentence.

The judge hit on this a little bit with you and I want to talk to you about this, about something that we call lesser included offenses.

A    Uh-huh.

Q    We have alleged in our indictment that the defendant is guilty of capital murder by intentionally murdering someone in the course of committing robbery.

If we fail to prove any elements of the offense, it might not necessarily mean that everybody goes home, but instead you may be called upon to decide he's not guilty of capital murder, maybe he's guilty of something else. Maybe he's guilty of one of those lesser offenses.

A    Uh-huh.

Q    You see what I'm saying?  Maybe I have failed to prove that the murder was intentional, you know.  That hypothetically in a case maybe somebody goes in to rob the convenience store clerk and they actually get the money, they commit the robbery but they don't want to kill the clerk and, so, they shoot him in the foot, you know, to keep him from going and calling the police.  Well, they happen to hit him in an important artery and the man dies.  Okay?

A    Uh-huh.

Q    You as a juror might say, I don't think the intent of her was to kill him; I think the intent of her was to maybe hurt him but not to kill him.  Does that make sense to you?

A    Yes.

Q    And in a case like that, sir, I wouldn't be guilty of capital murder, but I might be guilty of that lesser of murder.  All right?

A    Yes.

Q    Let's say I'm putting on a case for capital murder and I just flat out fail to prove that there was a murder. You know, nobody died, you know, but I sure did rob somebody, or maybe somebody else killed the person but it wasn't me. I'm not guilty of any kind of murder, but I might be guilty of a robbery.

A    Uh-huh.

Q    And then you might be called upon as a juror to determine that and also to decide the punishment on that.

Capital murder, if you're guilty of capital murder, one of two things is going to happen, right?  You're going to get life in prison without parole or you're going to get the death sentence, right?

A    Correct.

Q    That's it, that's all, one of two options.  Anything else, any lesser included offenses goes to the jury, much as you did before, for you to decide what the punishment should be, right?

A    Yes.

Q    And keep in mind there is capital murder, there is murder.  There's actually several different ways that you can commit a felony murder in Texas.  You might be called upon to determine if it was any one of those lesser things.

Was it a first degree murder?  No.  Maybe it was a manslaughter.  It wasn't intentionally or knowingly, but it was reckless.  Maybe it was a criminally negligent homicide where I didn't know the person would die, but I should have known they would die.  And that's all the way down to a state jail felony offense.

So, what your obligation is and I need to know from you is, you know, will you base your verdict on

what the evidence is?  If I didn't prove capital murder but I proved a criminally negligent homicide, what would you find him guilty of?

A    Negligent homicide.

Q    Criminally negligent homicide if the facts fit the particular verdict in that case.

Of these lesser includeds, as you know, you would be called upon to assess the punishment.

A    Uh-huh.

Q    In those cases I'm sure that, you tell me, in the punishment phase, did you then receive other evidence in the punishment phase for you to take into consideration?

A    You mean back --

Q    Back on your prior service, yeah.

A    Yeah, you're talking about considering his background and that type of thing?

Q    Yes, sir.

A    Yes.

Q    Sure.  You didn't hear it in the first phase of the trial, but after you found him guilty, now you heard some additional evidence, didn't you?

A    Yes.

Q    And then, normally speaking, that might happen in the punishment in cases that you'll now hear additional evidence to help you make your determination to assess the

punishment.

You were qualified before and I am assuming, because you made representations to the Court, that you would base your punishment verdict on the evidence in the case; is that correct?

A    That's correct.

Q    You've heard the expression, let the punishment fit the crime?

A    Uh-huh.

Q    And is that what you did?

A    Yes, we did.

Q    You went back there and talked about all the evidence, talked about the defendant, talked about the circumstances, and came up with a decision as to what the appropriate punishment was for that particular case.

A    That's correct.

Q    I'm sure you had a wide range of everything from, you know, some cases, for example, a robbery, you could be given an option of anywhere from two years probation up to twenty years in prison.

A    That's true.

Q    On a murder case you could be given anywhere from five years in prison up to 99 years or life, you know.

A    Uh-huh.

Q    You know, if I say to you, can you consider giving

the minimum in a -- you know, there's all different ways you can commit first degree murder, I'm sure you can imagine. And if I said to you, imagine, if you will, a 35 year old man who actually plans out and carries out the murder of an innocent, helpless ten year old boy, what do you think?

A    If he planned it out and you prove it to me, he's going to be guilty.

Q    Yeah.  And in terms of assessing his punishment, that sounds pretty bad, doesn't it?

A    Uh-huh.

Q    You immediately envision a situation, don't you?

A    Yes.

Q    But then you get to trial and you hear the 35 year old man is actually the father of that boy, that that ten year old boy is in Children's Medical Hospital, he has terminal cancer, he is not going to be cured, he is going to die.  He suffers every single day, hour and minute of his life.  There is nothing they can do for him.  He writhes in pain.

This father of this boy who has been nothing but a good father, an outstanding husband in the community, a fantastic citizen, just an asset to the community, out of nothing but sheer love and devotion and affection for his young boy, decides to take a hot shot of morphine because he thinks that will be the least painful way to end his life.

He goes to the hospital, he does it, he kills his boy.

Has he murdered a helpless ten year old boy?

A    Yes, he has.

Q    He has, but it sounds different than the guy who maybe took an AK-47, went out, just picked a ten year old boy right out of the playground.

A    Uh-huh.

Q    You understand that, in that case, that's why you get that wide range of punishment.

A    Right.

Q    Correct?  And will you, regardless of what you find the defendant guilty of, if it's a lesser, will you let the punishment fit the crime?

A    Sure.

Q    You'll base your verdict on the evidence in the case.

A    Uh-huh.

Q    Okay.  Let's talk about capital murder now.

As the, as the judge said, you know, if you find an individual guilty of capital murder, then we do go into a punishment phase again.  And it's not really like the cases you did before where you all sit down and go, okay, what are we going to do.

You know, you don't go back there and go, should we give him life without parole or should we give

him the death sentence. It's a different process. There is no, you know, which is it, life or death. Instead, you answer questions, and based on how you answer those questions will determine whether or not the person gets life or death.

A    Uh-huh.

Q    If you answer those questions yes, yes, no, he's going to get a death sentence. If you answer them any other way, he's going to get life imprisonment.

Now understand, once you've found a person guilty of capital murder, what's the best they can get?

A    Life.

Q    Life, life without parole, right?

A    Uh-huh.

Q    Remember there was a presumption of innocence in the first phase of the trial, right?

A    Right.

Q    Where you were to presume him innocent until what?

A    Until he was found guilty or you've proven your case.

Q    Until I have proved it to you beyond a reasonable doubt, right?

A    Right.

Q    That presumption of innocence that went to my obligation of proving that case, now we are in a separate

trial here, kind of a separate punishment phase trial. That presumption of innocence, there is now a presumption in the second part of the trial. And you are to presume, going into the second phase, you are to presume that a life sentence is the appropriate thing to do in the case.

A    Okay.

Q    Until, if and until I prove to you beyond a reasonable doubt that it should be a death sentence, you are to presume --

A    Life.

Q    -- life is the proper thing to do, and that's because you look to me, don't you?

A    Uh-huh.

Q    I carry that burden of proof. So, let's talk about how we do that. Let's talk about the special issues.

The first question. And you may, you may not receive additional evidence in the second part of the trial, you know. You can consider everything that you heard in the first part of the trial. You take all that testimony, all that evidence into the second part of the trial in helping you to assess and helping you to make your decision.

A    Uh-huh.

Q    And at this point you know one thing. You know he's guilty of capital murder.

A   Right.

Q   Okay.  The first question we are going to have you answer, and the jurors collectively answer this first special issue, we refer to this special issue as the future dangerous special issue.

And basically we are asking you to make a prediction as to whether or not it's more likely than not that this particular defendant will commit criminal acts of violence in the future in whatever society he may be in.  Is he a future danger is what we are asking you.

A   Uh-huh.

Q   We didn't, as the judge said, we didn't write these questions.  We didn't submit -- These are questions that have been written by our legislature.  They have been around a long time.  Okay.

And what's interesting is that they don't necessarily give you any definitions, Mr. Desmond.  They let you decide what certain things mean.  You decide what reasonable doubt means.  You know, there is no definition of it.  It's for you to decide what that means.

The same thing with the special issues.  Do you find from the evidence beyond a reasonable doubt -- that goes to my burden, have I proved to you that there is a probability that the defendant would commit.

Probability is not defined for you.  Let me

ask you, what do you -- I think -- Do you see a distinction between a possibility and a probability?

A    Yes.

Q    I mean, anything is possible, right?

A    Right.

Q    It's possible I could win the Olympic gold, you know, come the next Olympics, in running.  You know, it's probable I'm not since I can barely run to the mailbox right now.  But anything is possible, right?

A    Right.

Q    So, probability is not a possibility.

A    Correct.

Q    Some people say that it is more likely than not.  Does that sound fair to you?

A    Uh-huh.

Q    Okay.  Do you find beyond a reasonable doubt that it's more likely than not that the defendant would commit criminal acts of violence?

You notice what they didn't put in here, Mr. Desmond, is that the defendant will commit another murder or that the defendant will commit a rape or that the defendant will commit an assault on someone.  They didn't, they didn't say -- they didn't define it specifically what that is.  They just said criminal acts of violence.

When I say that to you, what do you think of

as an act of violence, a criminal act of violence?

A    It could be a multitude of things, assault and battery, rape, and the list goes on and on and on.

Q    Absolutely, you're absolutely right, it could be a multitude of things.  And it's for you to decide what it is, what is and what is not a criminal act of violence.

If I sock my co-counsel in the head, would you consider that an act of violence, a criminal act of violence?

A    Uh-huh, yes.

Q    Sure, it could be or maybe it couldn't be.  It's entirely up for you to decide.

So, if I prove to you that there is -- it's more likely than not that the defendant will commit a criminal act of violence --

MR. PARKS: Your Honor, we object as a misstatement of the law.  It plainly says criminal acts of violence, not a criminal act, not a singular act.

THE COURT:  Sustained.

Q    (By Ms. Handley)  I beg your pardon.  You see it speaks for itself, acts.  I said act.  Acts.

-- that would constitute a continuing threat to society.  Society is not defined for you either.  When I think of society, I think of going to the grocery store and the post office and coming to work.  I mean this is the

society in which I live.

The defendant's been found guilty of capital murder. Where is he going to be the rest of his life?

A    In prison.

Q    Prison. Can you see that prison might also be considered a society?

A    Sure.

Q    Sure. There's other people in the prison system besides the prisoners, aren't there?

A    Uh-huh.

Q    You have guards, prison guards, wardens, you have people who come to visit, you've got teachers, you have custodians. All kinds of people work there and all kinds of people live there, too, don't they?

A    (Nods head).

Q    And can you envision that a person in prison is, in fact, living and operating within a society itself?

A    Sure.

Q    So the question is asking you, Mr. Desmond, if we prove to you that it's more likely than not that the defendant will commit criminal acts of violence that will be a continuing threat to the society in which he currently lives in, wherever that may be.

A    Uh-huh.

Q    Okay. I will tell you that you could answer this

special issue just based on the evidence that I have shown you in the first part of the trial. You could make that determination on that. You don't have to. You know, you can require more.

But you could feasibly say, just looking at what he's done that I found him guilty of, I'm comfortable answering this question yes. You don't have to do that, though. You can insist on seeing more evidence to do that.

What are the kind of things that you think you would have to see to make a determination as to whether or not somebody is a future danger?

A    Probably historical, what has he done in the past. Has he committed other criminal acts or crimes in the past. Again, that could be a multitude of different things, but I would need to see that type of history.

Q    Okay. Would you, if you were -- You say, I would need to see that type of history. Do you think it's ever possible --

Do you know who Tim McVeigh is?

A    I'm sorry?

Q    Tim McVeigh.

A    Uh-huh.

Q    Okay. To your knowledge, had he ever committed any criminal acts of violence before he --

A    I don't know.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Okay.  Assuming if he hadn't, do you think that he would still have been a continuing threat to society?

A    Could have been.

Q    Could have been.  Could have been, yeah.

But you're saying that you would like to see maybe a history of violence.

A    I'm just saying that that would be a pretty good indicator.

Q    Yeah, that a man might be known by his past actions.

A    Correct.

Q    Okay.  Anything else that could help you determine whether or not somebody was --

A    It could be, well, not evidence.  But it could be other people, friends, neighbors, that type of thing, a character witness, eyewitnesses.  It could be -- let's see, what else.  My God, I can't think of anything else now.

Q    It's hard to predict.

A    Yes.

Q    Yeah, and I don't mean to put you on the spot. It's one of those things where maybe you'll know it when you see it.

A    Correct.

Q    And right now it's really not appropriate for either side to say, tell me this, you have to tell me this

**Anne B. Meredith**
Certified Shorthand Reporter

now.  You know, that's not a fair thing to do and I don't mean to put you on the spot.

A    That's fine.

Q    I'm just kind of feeling you out.  But do you understand what we are going for here?

A    Uh-huh.

Q    And you understand that it's my obligation.  And I say my.  It could be any one of the State's attorneys.  It's our obligation to prove to you beyond a reasonable doubt that the person would be a future danger.  You get that.

A    Yes, I do.

Q    Okay.  You'll always look to us to do that.

A    Uh-huh.

Q    And if I fail to do that, what's the answer to this question?

A    No.

Q    No, and that's it, that's all.

A    That's correct.

Q    That life sentence that he's presumed to be proper, it stays, doesn't it?

A    Yes.

Q    It stays.

You can't make any automatic assumptions.  Just because somebody is guilty of capital murder, you can't say, we're going to automatically assume they are a

future danger.  And it sounds like you wouldn't do that either.

A    I don't think so.

Q    Okay.  Again, I don't think so.

A    I don't think so.

Q    Okay.  But I will tell you that you can't make any automatic assumptions in this business.

A    That's exactly why I said I don't think so.

Q    Okay.

A    I would have to listen to everything that's being said.

Q    Okay.  So, what I'm hearing from you is, I'll make my decision after I hear everything.

A    Correct.

Q    Okay.  But I'm not hearing from you, if I find him guilty of capital murder, I'll tell you right now I will always find somebody is a future danger.

A    No, I'm not going to say that.

Q    Okay.  That's sort of -- Thank you for clearing that up with me.

A    Okay.

Q    If you answer no, that's it, that's all.

A    Uh-huh.

Q    Okay.  If you answer yes to the first special issue, he's now, he's now closer to that death sentence.

Okay. Now we move on to the second special issue. And this one kind of gives people a little bit of pause sometimes. It's what we refer to as a parties issue.

Let me back up a little bit when we talked about murder and capital murder and such as that. In the State of Texas we have something called the law of parties where theoretically an individual in a murder case who was not the triggerman could actually be found guilty and held liable for the murder itself as if he had pulled the trigger.

A    Okay.

Q    It's called the law of parties. And it states that if an individual aids, assists, encourages or directs, in other words, if he participates in the commission of an offense, he may very well be liable for it as if he had done it himself.

To give you an example. My brother and I, my brother and I decide that we are going to rob the 7-Eleven. You know, we sit at the kitchen table, we plan it out together. I go and buy the gun. He goes and buys the bullets. We talk about the store we are going to go to. We even case it out.

We drive up there together. I take -- He hands me the gun, he loads it for me, hands it to me. I take the gun. He says, I'll sit in the car and I will be a lookout for you. If anybody comes, I'm gonna honk that horn.

I say, all right. And I look at him and I

say, you know, I'm not leaving any witnesses.  He goes, I know, do what you gotta do.  Don't leave any witnesses.

I go in that store, I rob that store clerk for her money, and I kill her.  I shoot her five times.  I mean to kill her, and I do.

Fair to say I'm guilty of capital murder?

A     Uh-huh.

Q     I have murdered somebody in the course of a robbery, haven't I?

A     Yeah.

Q     What about my brother?

A     The one that actually --

Q     The lookout.

A     The lookout, he's just as guilty.

Q     Okay.  Under the law of parties, you may very well find that, that he aided, he assisted, he participated in that offense, didn't he?

Let me go one step further with you, though.  In a capital murder case, in order for you to find him guilty also of the capital murder that I committed, we would have to prove to you that he should have anticipated that somebody was going to die.  He should have anticipated.

You can make that determination by looking at the surrounding circumstances.  You know, I said, you know, I'm not leaving any witnesses.

A    Yeah.

Q    Or he put a loaded gun in my hand.  Well, when he put a loaded gun in my hand and he saw me go into a store to rob it, is it fair to say that maybe he should have anticipated somebody would die?

A    Pretty good, it's very likely.

Q    Very likely.  But, again, that's something that would have to be fleshed out in the evidence.  In order for you to find him guilty of a capital murder, before we get to the punishment phase, you have to find that he should have anticipated that somebody would die.

Now we are in the punishment phase.  And if I'm trying somebody who is a party to an offense, you've found him guilty of capital murder, he should have known, he should have anticipated, you've found he's a future danger to society.

Now you're called upon to answer this question.  Was he either the person who actually caused the death of the person --

A    Uh-huh.

Q    -- of the victim, or, if he didn't actually cause the death of the person who died, for example, my brother, did he actually anticipate somebody would die.

A    Okay.

Q    That's the question now, not just should he, but

did he.

A    Got you.

Q    You know.

A    Uh-huh.

Q    I'm not leaving any witnesses.  Don't leave any witnesses.

You know, so that's the question you're called upon there to decide, if he was a party.

Are you comfortable with the law of parties?

A    I believe so.  I didn't understand it before until you started describing it, so.

Q    Okay.  And here is the thing.  We could go out -- I can go out on a crazy example here and just to see how you feel about this, okay?

A    Uh-huh.

Q    You know, normally speaking, on all those lesser includeds, you've got that wide range of punishment, don't you?

A    Right.

Q    Where you can take all of those things into consideration, can't you?

A    Right.

Q    In determining punishment.  If you are guilty of capital murder, even as a party, what's the best you're looking at?

A    Life in prison.

Q    Life in prison.

Well, my brother might be my slow brother. You know, he knows what's going on. He's not the brightest bulb in the box, you know. But I've kind of told him what to do for a long time and I've kind of trained him to do what I want him to do and I manipulated him and he does what I tell him to do.

And he knows what's right from wrong, he does. He's not insane, he's not mentally retarded, but he's kind of gullible. And I kind of talked him into it but he goes voluntarily and he knows what I'm going to do and he knows I'm going to kill someone, you know. And he has never been in any trouble before in his life, okay?

A    Uh-huh.

Q    Does that mean he's still not guilty of capital murder?

A    He's just as guilty.

Q    He's just as guilty. Kind of sad, isn't it?

A    Yeah.

Q    You know, probably I should be -- you know, you would want to put me under the prison for something like that. But that's where you're -- That's where I'm testing your qualifications is can you follow the law.

A    Right.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    And you see where I'm going with that.

A    Yes, I do.

Q    That's that second special issue. If you find yourself in a situation in a particular case where maybe there's two or more people involved, he's the one who actually killed him or did he actually anticipate that the other person would kill him.

A    Okay.

Q    Any questions about that?

A    No, I don't think so.

THE COURT:  Five minutes.

MS. HANDLEY:  Thank you, sir.

Q    If you find that answer is no, life in prison, that's it.

A    Yes.

Q    If that special issue is yes, we move on to the final issue, the final special issue. And I will tell you this. That whole burden of proof that I've talked about before, on this last question here, there is no burden of proof for either side.

A    Okay.

Q    Okay. We call it -- We call it the mitigation question. And basically, Mr. Desmond, I think the best way I can describe it is it's a safety net, okay?

A    Uh-huh.

Q    Okay.  It's a safety net.  It's appreciated within the law and what we are doing that the stakes are pretty high and that maybe there is something out there, maybe there is a particular circumstance that, in spite of all this, in spite of the person being a capital murderer and a future danger and a party to the offense, that maybe he doesn't deserve the death penalty.

A    Okay.

Q    Maybe there is something there, okay?  Maybe there is a mitigating circumstance and it is sufficiently mitigating that you would flop from that death, you would turn it back over to life.

You think it's fair that you have that final option?

A    Absolutely.

Q    Absolutely.  I would say I have to agree with you, sir.  Because what it does, it doesn't tie your hands, does it?

A    Right.

Q    You don't go in going, well, can't we take into consideration the fact that he's gullible, that he's always done everything that his sister told him to do, that the only reason he's dangerous is because she is around.

I mean and that's just one of many examples, but it's there as a safety net for you to consider.  There

can be a million mitigating things about a particular defendant. The question becomes is it sufficient.

A    Got you.

Q    And what you might think is mitigating I might not think is mitigating. And it doesn't matter. It doesn't matter, okay? We don't have to agree on what is and what is not mitigating.

The question to you, sir, is even though you found somebody guilty of capital murder, even though you found that they are a future danger, even though they are a party to the offense, will you still go into that final question with an open mind?

A    Yes, I can.

Q    And will you, if you feel that there is sufficient mitigating circumstances to turn that verdict back over to a life sentence, will you do that?

A    Uh-huh.

Q    Will you make any automatic assumptions in the evidence?

A    No.

Q    Will you always base your verdict on the evidence in the case?

A    Correct.

Q    You'll always follow the law in the case?

A    Correct.

Q    And any personal biases or prejudices or feelings that you may have about certain people or groups, you will set that aside and base your verdict on the evidence?

A    Yes.

Q    Okay. I'm almost out of time. Is there anything you want to ask me specifically before counsel --

A    No. I just wanted to make one comment.

Q    Yes, sir.

A    On the special issue number two, I'm glad you defined that for me because I was kind of struggling with that in my own mind.

Q    It's a little -- it's a little tricky. But is that clear for you now?

A    I think so, yes.

Q    Should have anticipated it in the first part, and now I anticipated somebody would die.

A    Right.

Q    Okay. All right. Thank you, Mr. Desmond. I appreciate your time.

THE COURT:  We thank you, Ms. Handley.

I know you have been here since 12:30. You need to take a five minute break?

PROSPECTIVE JUROR DESMOND:  If you don't mind.

THE COURT:  We will do it.

**Anne B. Meredith**
Certified Shorthand Reporter

All rise, please.

(After a recess, Defendant and Prospective Juror Desmond present).

THE COURT:  Now Mr. Doug Parks is going to talk to you on behalf of Mr. Broadnax.

EXAMINATION

BY MR. PARKS:

Q    How are you doing, Mr. Desmond?

A    I'm great.  How are you?

Q    That break was good.  I'm glad you called for it because I liked it.  I've been wrestling with my grand-children all weekend and my back is stiff and I like to stand up a little bit.

Mr. Desmond, let me kind of lay the ground rules out for you a little bit or at least give you some little roadmap of where we are headed.

A    Okay.

Q    I want to talk to you first about some of the matters that were in your questionnaire just so that I can understand where you're coming from.

A    Okay.

Q    And then we will talk about the legal issues that Ms. Handley talk to you about again just to make sure that we are all on the same page that you are.

Now, I'm not going to tell you what I believe

the evidence will or will not show or how much confidence I have or do not have in the State's case because that doesn't amount to a hill of beans.

Whenever you take an oath as a juror, as I'm sure you did the other two times, that you will return a true verdict according to the law and the evidence, it didn't make any difference what the opinion of the prosecutor was or the opinion of the defense lawyer was. It was based on the evidence; is that correct?

A    Correct.

Q    As you recall it?

A    Uh-huh.

Q    That's just the way it is in this case, okay?

A    Okay.

Q    All right. Now, the first thing I want to ask you about, Mr. Desmond, is over on page nine of your questionnaire you indicate to us that your dad had been kidnapped at gunpoint and robbed, and I was wondering about how long ago that was.

A    That occurred about five or six years ago.

Q    Was that here in Dallas?

A    No, it was in Tyler, outside of Tyler, Texas.

Q    Okay. And what happened basically with that? Was he injured?

A    No, he was not injured physically. He was

basically pumping gas at a Wal-Mart and a man came, after he finished pumping the gas, a man came up behind him, forced him into his own pickup, made him drive the truck at gunpoint. An accomplice, a lady jumped in with him.

They tried to force him to go to the bank, withdraw a bunch of money out from his ATM, which he only had a few hundred dollars.

Q    Sure.

A    But at any rate he -- how do I put this?  He was born and raised during the depression time period, and he just didn't have a whole lot of faith in the banks, so he kept a lot of cash at home in a safe.

Q    Sure.

A    They forced him to go home, open up the safe and withdraw.  They got all that money, which was about $30,000. At any rate, they ended up getting away with the whole thing, never did catch them.

Q    And, so, they must have had him for some little time.

A    Yeah, a couple of hours.

Q    A couple of hours.

A    Yeah.

Q    How did that affect your dad?

A    Oh, he was devastated for quite some time, actually.  I mean, he was a man in his early eighties.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Sure.

A    Or, I'm sorry, mid seventies at that time, so.

Q    So, not only did he lose a good part of what he had, but there was the trauma attached to it also.

A    Uh-huh.

Q    Is your dad still alive?

A    Yes, he is.

Q    And has he pretty much recovered?

A    Yeah, it took a while and some therapy but, yes, he did, he did recover.

Q    And the reason I go into this as much as I do, Mr. Desmond, as you can see from the indictment there in this case is that the allegations are that this offense occurred during the commission of a robbery or attempted commission of a robbery.

How does that play into this, if at all, as far as --

A    I don't think it would, really. The way I see it, every case is a little -- is different.

Q    Sure.

A    And should be weighed and judged on its own merits.

Q    Okay, fair enough. So, and would I be correct in saying, then, that if you are selected as a juror in this case, what happened to your dad is not going to play any part in your deliberations --

A    No.

Q    -- and decisions?

A    It shouldn't have any bearing on this.

Q    Fair enough.  You can understand why we would be anxious to know about that.

A    Oh, yeah.

Q    I want to go a little bit further, Mr. Desmond, with respect to the publicity in the case.  And you've indicated that you remember a couple of basics about the case, but that's about as far as you've taken it.

Can you tell us what you do remember?

A    I remember seeing it on TV.  It kind of -- I work in the Garland area.

Q    Okay.

A    And if I recall, that's where this -- the incident took place was in Garland.

If I recall, there were two people that were killed, if I remember right, at a music studio of some sort.

Q    Okay.

A    I remember it was late at night when it occurred. And the part that I remember on TV watching was one of the people that was killed, I think it was his wife appeared on TV and, you know, how distraught that person was.

As far as the details of how many people were involved, what they were after, or whatever, no, I

don't, I don't really remember that kind of thing.

Q    Do you recall whether you saw either person or any of the people give any kind of accounts or being interviewed?

A    No, I didn't see that.  I just remember seeing the wife of one of the deceased, and I recall seeing the pictures or photographs of the -- one of the guys that was murdered.

Q    Did you form any opinions at all based upon that?

A    No, except for just, you know, how horrific it was.

Q    Sure.

A    And it being so close in proximity to where I worked and that type of thing.

Q    Okay, fair enough.

I want to touch just a little bit, before we go into some of these other issues -- and I am going to spend a good part of my time, Mr. Desmond, talking about the punishment issues.

A    Uh-huh.

Q    And I don't -- It's always a concern that we will inadvertently give the impression to prospective jurors that, because we are talking mostly about the punishment phase of the trial, that we consider it's a foregone conclusion that we are going to get there, and that would not be the intention, certainly, of that.

You don't get to the punishment phase of the

trial until and unless a jury finds the defendant guilty as charged, and that has yet to be determined. But, you know, it's -- It probably won't surprise you to learn that, in litigation of this kind, a good deal of thought is put into not only the law and dynamics of the trial but also with the perceptions of jurors who have served in cases of this kind, that we've learned that very often jurors get the wrong impression that, because we spend so much time on punishment, that everybody is just kind of conceding that it's going there, and that would be a misperception on their part. Do you understand that?

A    Uh-huh.

Q    You know that the State has got the burden to prove that indictment just exactly as they have selected it to be. They get to write that indictment. It's only fair, I think, that they have to prove it beyond a reasonable doubt.

A    Correct.

Q    Do you agree with me about that?

A    Yes, I do.

Q    And they have to prove it exactly as it's stated there. And I want to make the point, and it's the same point that Ms. Handley made too, but she went over it kind of quickly. I want to make sure that you understand the importance of that indictment. And I do it because it's

**Anne B. Meredith**
Certified Shorthand Reporter

going to translate later when we get to the punishment issues in just a few minutes.

The law is so adamant on the issue that, just as the example she used, if you were selected in a murder case that said that the defendant had caused the death of the deceased by shooting him with a deadly weapon, to-wit: a firearm, and you were in the jury box and the State called the medical examiner, and the medical examiner said, I did the autopsy in this case and it's true, the defendant was in fact shot, but the gunshot wound wasn't sufficient. What actually caused death was a stab wound that I found in another part of his body.

So, all of a sudden, you're confronted with evidence right in your face that shows that, in fact, while the indictment said caused his death by shooting him with a firearm, the medical examiner's evidence shows that the death was, in fact, caused by stabbing.

And it may be that you've already heard a confession that was admitted into evidence where the defendant admitted having killed the deceased which leaves absolutely no doubt in your mind that the defendant is guilty of having committed the offense of murder by stabbing with a knife, but the indictment says that he did it by shooting with a gun. The only difference is that manner and means.

Do you understand that you would be obligated to follow your oath and find the defendant not guilty even though you knew perfectly well that he had done the murder?

A    Right.

Q    Now, some jurors tell us that they understand that principle of law, that it makes sense to them, but they know themselves well enough to know that if they were in that position that they are not going to be able to let a murderer walk out the back door of what they consider to be a technicality. How do you feel about that yourself?

A    I mean, I agree that he committed the murder but, irregardless of what method, yeah, he -- the law states that he still has to be found not guilty, so.

Q    And you would be able to do that.

A    Yes.

Q    Okay. And you understand the presumption of innocence.

A    Sure.

Q    That's what the law says.

A    Right.

Q    I've done this long enough, Mr. Desmond, to know that there is a substantial number of people who really don't presume accused citizens to be innocent. They figure that if a person has been arrested, indicted, brought to trial, that where there is smoke there is fire. And while

the principle is fine, it's just not a law that they would afford an accused citizen.

Is that your feeling or not?

A    I don't really know.

Q    Let me put it another way.

A    Please.

Q    Can you and do you presume Mr. Broadnax to be innocent as he sits here this afternoon?

A    Yes.

Q    And you will continue with that presumption until and unless the State can prove their case; is that fair to say?

A    That's correct, I understand that.

Q    Well, I know that you have been on these other two juries and I am not going to beat the dickens out of the first phase of the trial so long as you and I are on the same page that we are not conceding anything.

A    That's correct.

Q    Let me go, then, to the punishment phase of the trial. And I know that on the front page here of your questionnaire, Mr. Desmond, you were asked whether or not you're in favor of the death penalty.

A    Uh-huh.

Q    And you marked that that you are, and went on to say, in most cases, if a life is taken by another, then yes,

they in turn should be put to death.

Is that how you felt when you filled out the questionnaire?

A    Uh-huh.

Q    And would that be a fair assumption on my part?

A    I believe so, yes.

Q    I'm assuming from that that you feel like in most cases the death penalty would be appropriate for someone who has taken another person's life, that there might be situations where it would not be appropriate.

Do you have any idea, can you give us some idea of what that minority of cases might be that you feel like it may not be appropriate?

A    Well, it all depends on the circumstances and what exactly transpired.

Q    Okay.

A    But if it was unintentional --

THE COURT:  No, no, no.

PROSPECTIVE JUROR DESMOND:  I'm sorry.

THE COURT:  Remember we said once you get to the punishment issues --

PROSPECTIVE JUROR DESMOND:  Yes.

THE COURT:  -- you found it is intentional.

PROSPECTIVE JUROR DESMOND:  Oh, okay, sir.

THE COURT:  Remember?

PROSPECTIVE JUROR DESMOND:  Got you.

THE COURT:  I'm sorry, Mr. Parks.  Thank you.

MR. PARKS:  That's fine.

Q   (By Mr. Parks)  All right.  Go ahead, I just want to hear your thoughts about that.

THE COURT:  I'm sorry, but that's okay.  All right.

Q   Well, let me follow up with what Judge said.

A   Okay.

Q   Because that's where we were going to be going anyway.  It is not-- It's not at all uncommon, Mr. Desmond, for prospective jurors to say things to us like it would depend on whether or not it was self-defense or an accident or something of that kind.

You have been given a definition of murder in the pamphlet before you there, but it's not the entire definition.  Okay.  And there is nothing wrong with that. I just want to try to make a point by giving you the entire definition.

Murder is where one person knowingly or intentionally takes the life of another person without any legal excuse or justification.  Now, there are legal means to those terms, as you might expect.

A justification would be self-defense.  A person is justified in taking another person's life

intentionally if they do so under circumstances that amount to self-defense, or defense of a third person, or even in some circumstances defense of property. That's what we call a justification.

So if a person is justified, then they are not guilty of murder at all.

A    Uh-huh.

Q    If they have a legal excuse, that is another way of saying that they were legally insane. If they had no appreciation for the difference between right and wrong and would not conform their actions to the law, then the law excuses their behavior.

That doesn't mean they get to go out in society like so many people think, that they just walk out among society. That's not what happens. There is no reason for us to go into that, but they don't go home free. But it is an excuse, a legal excuse. It's something that excuses them from the criminal liability for the taking of a person's life.

So, when we are talking about murder in the context of capital murder, we are not talking about legal justification or legal excuse. We are not talking about accidents. If something is truly an accident, it's no offense at all.

If a person is driving down the street in a

lawful manner, observing the traffic laws, keeping a good watch, sober as the Baptist preacher, and a child dashes out between two cars right in front of his automobile and he hits that child, had no opportunity to miss him, an awful thing, that's not murder.

In the first place, he didn't intentionally kill anybody. You see, it's something that's called a culpable mental state. That's an accident. So, we are not talking about those sort of things.

So, basically what I want to do, Mr. Desmond, is set a scenario for you that would essentially be necessary before a person would ever be called upon to answer and given these special issues. It's kind of like setting the context of where these issues are.

So, what I would like for you to do for me, please, is to assume that you are on a jury, that you and eleven others have heard the evidence in a capital murder case. I want you to assume that the defendant is eighteen years of age or older, that he's not mentally retarded, and it was not an accident, there was no duress, no one made him do it at the expense of him receiving some physical harm or even death himself.

So, there was no duress, there was no self-defense, he's not insane, he's not mentally retarded. The victim did nothing to provoke him. The victim was

perfectly innocent in the matter. And the defendant intentionally took that person's life during the course of the commission of another felony offense.

Now, what would your feelings about the appropriateness of the death penalty be in a case of that nature?

A    I think, as we discussed earlier, as long as we answer the three questions, we make it through all three of the issues, then it would be appropriate for a death penalty to be imposed.

But from what I understand, after listening to Ms. Handley and yourself and trying to understand your positions, you would have to go through that process in order to come to that conclusion.

Q    I understand.

A    Is that what you're --

Q    But we are entitled to ask you about your feelings about it. I understand, I understand that you know what the law is. But what would --

See, you've told us that you believe in most cases, where a life is taken by another, they in turn should be put to death, and then I put a scenario to you. And I am wondering if that falls into that category of cases where you feel a person ought to be put to death where they have made a decision to take another person's life. That's what

intentionally means.

You've heard us speak to the culpable mental states, knowingly or intentionally taking another's life. The distinction there is this. That a person can do an act clearly dangerous to human life that causes another person's death, even though they did not intend that that death be caused.

Ms. Handley gave you an example of that by the person who shot the other one in the foot. Now, shooting another person, I think most people would agree, is an act clearly dangerous to human life. All right. And it can cause death, even if a person does not intend that death be caused. Okay.

That's different from an intentional killing. Our law says that a person acts intentionally when it is their conscious objective or desire to cause the result, not just do the act.

Now, that's a fancy way of saying that a person has made the determination that they want to kill another person and they will do whatever it takes to accomplish that goal.

A     That's correct.

Q     So, you will have had to have found that before you can ever get to these questions because, if you didn't believe that a person had intentionally taken another

person's life, you would have found a different verdict from guilty of capital murder.

A    Okay.

Q    Not guilty, maybe guilty of some lesser offense, but it wouldn't be guilty of capital murder.  And these questions are only asked about persons who have intentionally taken another person's life without any legal excuse or justification, in those circumstances only.

Okay.  So, I'm just -- I'm just wondering at this point whether or not that is the kind of situation that you had in mind when you said that you felt that in most cases where a person intentionally killed another, they deserved the death penalty.

A    If it's an intentional act where they intentionally went out to kill a specific person, then yes, I would say yes, they would probably need to be executed.

Q    I understand.

A    Yeah.

Q    And I thought that's what you were telling us.

A    Yeah.

Q    And it's -- I know it must probably be frustrating to sit where you're sitting because you're down here for the first time going through this process.

A    Uh-huh.

Q    And we do this day after day.  Now, this is only

our second day in this case.

A    Okay.

Q    But we've done it in other cases.

A    Right.

Q    And long experience tells me that it's a hard concept sometimes for people to understand that these questions are never given unless they have been convinced beyond a reasonable doubt that the accused on trial formed as his goal taking another human life --

A    Uh-huh.

Q    -- because that's what he wanted to do, okay?

A    Okay.

Q    So, what I hear you saying is that in circumstances like that, it's your belief that the death penalty would be an appropriate punishment in that case.

A    I believe that is correct.

Q    Okay.  Now, and that's fine.  You know, we are not here to judge people on their views.  Everybody is entitled to their own.

A    Uh-huh.

Q    All we are trying to do, frankly, Mr. Desmond, is find out where everybody is.

A    Sure.

Q    Because no two people obviously think just alike in their thoughts.

I want you to assume that you've now sat on the jury and you found someone guilty of capital murder, just like we have been talking about. And you're convinced and eleven other of your fellows on the jury are convinced that this was an intentional murder, took somebody's life, did it during the course of the commission of another felony.

Now you are confronted with the special issues. Okay. Special issue number one, I'm not going to read it to you. It's the one that -- unless you feel like you need for me to.

A    No.

Q    I know you've seen it several times now. It's the future dangerousness issue.

A    Uh-huh.

Q    And it's -- Let me put it this way. In my experience, I've found that people generally fall into one of about three categories when they view that particular issue in light of having found someone guilty of committing an intentional murder. You may not fall into any of the three, but let me kind of go over them and see where you best fit.

One category of person will say, I've read that thing and, frankly, it would seem to be almost impossible for the State of Texas to prove beyond a reasonable doubt what a person will probably do over a

continuing period of time. That's making a prediction to the future and we are just not capable of doing that. So, in this hypothetical juror's mind, it is impossible for the State to ever prove that to their satisfaction.

A     Okay.

Q     See what I'm saying?

A     Uh-huh.

Q     There is, on the other end of that spectrum, there is the prospective juror who says, listen, I've just heard evidence that convinces me beyond a reasonable doubt that the person on trial made a decision to kill another human being because that's what he wanted to do and he did it. And not only that, committed another serious felony in the process.

That's the kind and type of person who, to my way of thinking, would always commit acts of violence in probability. They may not with certainty, but would probably commit acts of violence in the future that would constitute a continuing danger. So the fact that I have been convinced he's a capital murderer also proves to me that that question should be answered yes.

A     Uh-huh.

Q     See? And then I think there is another category of jurors who say, I believe that it is capable of proof, that question. The State could prove beyond a reasonable doubt that a particular person was a continuing danger. And

*Anne B. Meredith*
Certified Shorthand Reporter

not only could, I think that the fact that this is a capital murderer probably does prove that he would be a continuing danger to society.

But my mind is open to the possibility that he might not be and that, if the defense could convince me that he's not a continuing threat, then I could answer that question no; otherwise, I'm going to answer it yes.

So, there is kind of three categories there. That person that would say no, I could never answer yes, it's not capable of proof. That person who would say it's capable of proof and probably is proven by the guilty verdict, but I could be convinced otherwise by the defense. And the third category is it would always be a yes to me because a person is, in fact, a capital murderer.

Do you see yourself fitting into any one of those three categories, or do you have any other different feelings for me than I've expressed? I know it's a long question.

A     Yeah.   Probably somewhere in the middle.  I agree that the State would have to prove that this person would have to be a threat to society in the future.  I guess it can be, can be proven.  But, again, I think I would be somewhere in the middle.

Q     And I am not trying to lay behind the law here at all.  But the law says that the presumption is that the

**Anne B. Meredith**
Certified Shorthand Reporter

answer to that question is no, okay? But I know that, from doing this, that some jurors presume that the answer to that question really is yes, that anybody who is a capital murderer is going to be a future danger, but they would hold out the possibility that the defense could come forward and prove that the answer is no.

That's not what the law says ought to happen. What ought to happen is is that the jury presumes it to be no and makes the State prove to them that it will be yes.

A    Uh-huh.

Q    Some jurors just can't do that. If it's a capital murderer, they are going to presume it's yes and make us prove to them that it should be no.

Is that the way you feel or do you feel like that you could presume it no and have the State --

A    I would presume it no and then the State would have to prove it to me.

Q    Now, let us assume, Mr. Desmond, that they are able to do that. I'm not going to concede. Don't misunderstand me.

A    I understand.

Q    But they could. But let's go forward and assume that they have proven that to you. I'm not going to talk to you, I'll tell you right now, about special issue number two. They have beaten on that a while and I am just going to skip

over it, okay?

But let's assume one step further that now you have sat on a jury that has found a defendant is an intentional murderer, that he killed a person because he wanted to, just like he's indicted. And now you have heard evidence, whether it's just solely the evidence from the case itself or any additional evidence that may have come to you, on the issue of special issue number one.

A    Uh-huh.

Q    Now you and eleven other jurors have found that, not only is he a potential capital murderer, but he is going to probably commit acts of violence in the future that would constitute a continuing danger to society. You found that beyond a reasonable doubt.

And you are now faced with special issue number three with that added fact. And special issue number three is different, Mr. Desmond, which is another reason I'm asking you these questions the way I am.

You've found an intentional murderer, you've found he is going to be a future danger, and you now have to determine whether or not there are any mitigating circumstances sufficient to spare his life.

What are your feelings at this point about whether or not you believe a person would -- that the death penalty would be appropriate for a person who is not only

an intentional murderer but he's a continuing danger to society?

A    I think, if I'm understanding your question correctly, the prosecution and the defense would have to show some kind of mitigating circumstances as to why he would not be executed or go forward with the death penalty; is that correct?

Q    Well, let me explain that to you.

A    Is that your question?

Q    Why things are a little bit different here with this special issue.  On guilt/innocence, the State has got a burden of proof.

A    Right.

Q    They do with special issue number one, they do with special issue number two.

A    Right.

Q    When you get to special issue number three, that goes away.

A    Got you.

Q    No one has the burden of proof on special issue number three.

A    Right.

Q    What special issue number three is designed for is to allow a jury to go back over all the evidence and essentially decide whether they really want to impose the

death penalty or not is what it really amounts to.

I will tell you that for a very long time we did not have special issue number three. That has arisen only through litigation from the defense bar. It used to be that jurors were put into a position of, if they answered the special issue one and special issue number two both yes, a defendant got the death penalty.

And you could have twelve people back in that jury who didn't believe that under whatever the facts and circumstances might have been that that was the right thing to do. It didn't matter whether they felt it was the right thing to do. They had to go ahead and assess the death penalty whether they liked it or not and live with it, okay?

A    (Nods head).

Q    So, finally the law changed and we got this third special issue so that at least it gives the jurors an opportunity to reassess where they are and make their own individual moral judgment about whether or not the death penalty is appropriate, okay?

A    Okay.

Q    Now, different people, different jurors see that very differently, as you would expect they would.

A    Uh-huh.

Q    And some jurors say, you know, I'm sure glad that that special issue number three is there because I really

don't care for the death penalty. And while I might, if I sat on a jury, have to find somebody guilty if the State proves their guilt, and I might have to answer special issue number one and special issue number two yes if the State actually proved that they should be yes because, if I'm following my oath, I have to do what I have to do.

But when I get to special issue number three, that gives me an opportunity to say, even if I did say guilty and yes and yes, I can end this right now and impose the life on this defendant because I don't really like the death penalty.

By the same token, we have jurors who say, you know, I am absolutely fair and impartial. I can put the State to the test on guilt/innocence, and if they don't prove the defendant guilty, I'll find him not guilty and we'll go on from there. But if they prove him guilty, I'm going to find him guilty, and I will go to the test on special issue number one and special issue number two.

And if they prove those, prove special issue number one to me yes, that he is going to be a future danger, I'm going to answer it yes. And I know that when I get to special issue number three, I'm answering that question about an intentional murderer that would be a future danger, and while I'll consider it, you know, I'll look at whatever it is that thing asks me to look for, I'm never going to find

**Anne B. Meredith**
Certified Shorthand Reporter

a mitigating circumstance or circumstances that in my mind will justify a life sentence for an intentional murderer who is a future danger.

And Mr. Desmond, I'll be real honest with you. I think that's where you are. I might be wrong about that. But I want you to be honest with me, please, because I'm looking right here at the questionnaire where you say that if a life is taken while committing a robbery, then that person should be put to death.

A    Uh-huh.

Q    And based on your answers to us, I think you're a perfectly honest person.

A    Uh-huh.

Q    I think you answered this thing honestly and I believe that's honestly the way you feel. Am I right about that?

A    Yes, uh-huh.

Q    Would I be right in saying that if you heard a case that the evidence convinced you that the defendant was guilty of capital murder and would be a future danger, would I be right in saying that special issue number three is not going to keep you from assessing the death penalty because you believe that's what should happen?

A    Again, I'll say this again. There are exceptions to every rule. When I get to special issue number three, I

am open to listen to all the arguments, go back through all the evidence, and if there is something that was missed and I feel that that person, even though he was found guilty and we went through special issue one and two, we got to number three, do I believe that he automatically should just be given the death penalty? No, there is always -- There is always hope, let's put it that way.

Q    You see that special issue number three speaks to the defendant's character and background. Different jurors tell us different things about those sorts of things. You know, a person's background might be something that they want to hear about. But such things as being raised in poverty, being abused physically or mentally or sexually all sound awful, but a lot of people don't consider those kinds of things, that would not be something that they would consider in answering that question. Other people believe it is something that should be considered.

How do you feel about that?

A    Somewhere in the middle, honestly.

Q    A lot of times what people say to us is that, well, you know, so and so, that's not an excuse.

And we are not talking about excuses when we talk about mitigation. Mitigation may be an explanation, but it's certainly not an excuse. Excuse generally means something that absolves somebody of responsibility, and we

are not talking about that.

Mitigation is not something that's defined for you. That is to say nobody ever says this or that or the other thing is mitigating with the exception of mental retardation.

For years we talked about mental retardation to jurors and whether or not they can consider it. Now the Supreme Court has said it absolutely is a mitigating factor such that no person who is mentally retarded can be executed constitutionally, so that's out of the picture now.

But it could be such a thing as mental illness, for instance, that does not rise to the level of being criminally insane. So, these are the kinds of things that we are talking about.

And what the law says is is that we are entitled to have a juror that can give meaningful consideration, not lip service, not, you know, I'll listen to the evidence. Of course, people listen to the evidence. But there is a difference between saying I'll listen to the evidence and being able to give meaningful consideration to potential mitigating testimony.

Do you feel like in your mind frame that you could give meaningful consideration to potential mitigation?

A    Well, yes. Again, I'll say that I think of myself as a very fair person. I'll listen to all the arguments.

And if I feel that the death penalty needs to be imposed, then I will go that route.

If I feel that there is something that is not quite there, then I would not have any problem with going with life imprisonment. If that answers your question.

Q    Well, let me back up just a second. I'm not sure how much time I have left.

THE COURT: You've got three or four minutes.

Q    Something that I talk to prospective jurors about is that jurors have an obligation to answer the questions or answer them and not change what those questions say.

For instance, you are never asked whether or not you believe the defendant deserves the death penalty. It's not in any of these questions, okay?

Now, it may be that jurors have a tendency to go back into the jury room and say, well, my God, these are awful facts, I never heard of anything worse than this in my life. If there was ever a person that deserves the death penalty, it's this guy. So what we've got to do is answer these questions in such a way that he gets the death penalty.

That is absolutely a violation of a person's oath. Okay. You can't make a decision of what he ought to have and then answer the questions accordingly.

You may believe that a person absolutely deserves the death penalty, but the State hadn't proven he

would be a future danger continually, so your obligation would be to say no. It's not likely that he walks out the door. He would have to die in the penitentiary. It's a death sentence. It's just a question of when and under what circumstances would he die --

A    Right.

Q    -- rather than on a gurney with a defense lawyer. Do you understand what I'm saying?

A    Yes, I do.

Q    I'm going to ask you one other question. We asked about intoxication and told you that it was not a defense, and you indicated that you agree with that law, that voluntary intoxication should not be a defense.

A    Uh-huh.

Q    We asked whether or not you believed evidence of intoxication may be considered in mitigation. You answered no, that's not something that you could consider in answering special issue -- well, in mitigation, which is the special issue number three. Is that still your position?

A    I believe so, yes.

Q    So that if you heard evidence that the offense was committed under -- at the time of the commission, that he was voluntarily intoxicated either by alcohol or drugs, or something like that, that would not be one of those things that you would consider as mitigating.

A    I don't believe so.

MR. PARKS:  I believe that's all I have, Judge.

THE COURT:  Thank you, Mr. Parks.

All rise, please, for Mr. Desmond.

You'll be stepping out, then you'll be coming right back in, sir.

PROSPECTIVE JUROR DESMOND:  Okay.

(Prospective Juror Desmond exits the courtroom).

THE COURT:  Let the record reflect we are outside the presence of Mr. Desmond, in the presence of Mr. Broadnax.

What says the State of Texas?

MS. HANDLEY:  Jon Desmond, Juror 101, is acceptable to the State.

THE COURT:  Mr. Parks.

MR. PARKS:  Your Honor, we would submit Mr. Desmond for cause for the reason that he cannot give meaningful consideration to mitigating evidence that this defendant will rely upon in this case in the event he is found guilty of the offense, that is to say voluntary intoxication.

We understand that the law in the State of Texas does not define any particular thing as mitigation. However, we would refer the Court to Morgan versus Illinois which says that we are entitled to a jury that can give

meaningful consideration to any -- and give effect to any mitigating evidence that is propounded or proffered by the defense.  Even Justice Scalia in the assenting opinion in that case recognized that jurors who could not, for example, consider a bad childhood to ever be mitigating would be excluded from a jury.

This juror cannot consider our mitigation and ought to be excluded under Morgan versus Illinois and the constitutional provisions that case relies upon.  Additionally, Eddings versus Oklahoma.

THE COURT:  It will be denied.

Ask him to return, please.

(Prospective Juror Desmond returns to the courtroom).

THE COURT:  Mr. Desmond, of course, you have been accepted as a qualified juror by the attorneys.

Now, I want to tell you, this case might receive some media attention.  I want you to avoid that at all costs.

PROSPECTIVE JUROR DESMOND:  Okay.

THE COURT:  It would be a shame if somebody like you were inadvertently disqualified.

PROSPECTIVE JUROR DESMOND:  Okay.

THE COURT:  The Sheriff is going to give you a card of the judge's coordinator.  Should anything occur

between now and August the 10th you think might affect your jury service, give her a call and we will deal with it.

PROSPECTIVE JUROR DESMOND:  Okay.

THE COURT:  Is the telephone number and address on your personal questionnaire still the same?

PROSPECTIVE JUROR DESMOND:  Yes, it is.

THE COURT:  In case we need to find you?

All right.  It's been a real pleasure meeting you, sir.  Thanks for being here.  And you will hear from the coordinator whether or not you will be an actual member of the trial jury or not.  All right?

PROSPECTIVE JUROR DESMOND:  Okay.

THE COURT:  Thank you.

MS. HANDLEY:  Thank you, sir.

PROSPECTIVE JUROR DESMOND:  Thank you.

(Prospective Juror Desmond excused from the courtroom).

THE COURT:  The juror is here.  Let's take a ten minute recess.

MR. PARKS:  Before we go off the record, we would just like the record to reflect that this would be a person who is not acceptable to the defense.

THE COURT:  The record shall so reflect.

(After a recess, Defendant and Prospective Juror No. 123, Sue McCormick, present).

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT: Here you go, Ms. McCormick. Thank you. Please be seated. Thank you very much.

I'll say good afternoon to you again, Ms. McCormick.

Please be seated, counsel.

SUE McCORMICK,

testified as follows:

EXAMINATION

BY THE COURT:

Q   Again, my name is Webb Biard and I'll be the judge this afternoon. I'll be with you this afternoon.

The Presiding Judge of this Court is Michael Snipes. That's who you met in the big central jury room.

A   Right.

Q   Judge Snipes will actually preside over the trial should you be selected as a juror. In that regard, let me go over a couple of things with you.

What we are doing right now, we are in the process of qualifying some fifty prospective jurors. Once that's done, the actual trial jury will be selected from that group of people.

Did you see in that pamphlet that the judge anticipates this case going to trial August the 10th? So, that means sometime around late July or early August we will have our fifty folks. At that time the jury will be

selected, and you will be notified at that time whether or not you're actually on the jury.

Now, before you leave here today, I will tell you in person whether or not you are a qualified juror.

A     One of the fifty.

Q     That's one of the fifty, exactly.

Let me introduce some other people to you at this time.

Andrea Handley.

MS. HANDLEY:  Good afternoon.

PROSPECTIVE JUROR McCORMICK:  Good afternoon.

THE COURT:  Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  And I keep -- I keep having a hard time with Mr. --

MR. HIKEL:  Gordon, Gordon Hikel.

THE COURT:  I've been calling him -- I've wanted to call him Gregory since the first day we met and I have called him Gregory too many times.  I apologize, sir.

They represent Dallas County and the State of Texas.

And further down we have Brad Lollar.

MR. LOLLAR:  Hi.

THE COURT:  And Doug Parks.

MR. PARKS:  Hi.

THE COURT:  And these two gentlemen have heard me call them by -- I've called Mr. Lollar Doug Lollar and I have called Mr. Parks Brad Parks so many times in the past that they don't know who I'm talking about.

Then we have Keri --

MS. MALLON:  Hi.

THE COURT:  Malloy, and they represent Mr. James Broadnax.

MR. LOLLAR:  Mallon.

THE COURT:  Mallon.  I'm sorry.  All right. I'm going to have to just keep reading.

Q    (By the Court)  Here we go.  I told you they were a good bunch of people, remember?

A    Yes.

Q    They are.

Now, before we go any further, the judge has told us the trial is going to start August 10th.  It's going to last up to two weeks.  Monday through Friday 9:00 to 5:00, break in the morning, break in the afternoon, a lunch break.

The jury will not have to stay together overnight unless and until you enter into your deliberations and should you go late into the night, unable to reach a verdict, became mentally fatigued, there is a possibility, and I want you to be aware of it, that the jury as a group would be taken to a fine hotel, county expense, individual

private rooms, spend the night, and then come back the next day as a group, to avoid any outside influence.  That would not be the situation during the actual trial or presentation of evidence.

A    Okay.

Q    It might not even ever happen.

A    All right.

Q    But if it did, Judge Snipes would give you advanced notice like, a good chance tomorrow we are going to go late, bring your overnight bag, tell the people close to you you might have to spend the night.  Of course, you would be allowed to make a phone call and say I am or not.

A    Okay.

Q    I tell you that, I give you those dates and length of the trial, the procedure, to ask you a couple of questions.

As you sit here now, are you aware of anything that will be going on in your life at that time that would interfere with your ability to sit as a juror in this case?

A    No.

Q    All right.  Is there anything else you need to tell us before we -- you know, I told you we are going to talk to you for about an hour and a half max -- that you need to tell us before we get into it that you think we need to know about your ability to sit as a juror?  I'm talking about any work, physical.

A    Okay.  I'm retired, but --

Q    Okay.

A    -- the only problem I would have on a daily basis is that I have back trouble, kind of a handicap situation where I have a handicapped sticker, and it's the walking that would -- from where I have to go to.

Q    The what?

A    The walking that would bother me, not the sitting or anything.

Q    Okay.

A    It's just the distance from to.

Q    All right.  Well --

A    That's the only -- It's minor.  It's minor, really.

Q    Okay, good, good.  Well, I'll let you -- I'm not going to go into that any further.

A    Okay.

Q    I think you'll be fine.

A couple of things from me.  You've read the pamphlet.

A    Uh-huh.

Q    Did it help you have a little bit better idea --

A    Uh-huh.

Q    -- of the way the trial goes?

A    Uh-huh.

Q    Okay.  Have you ever sat on a criminal jury before?

A    No.

Q    All criminal juries are in two parts, whether it be theft of a bicycle or a capital murder case. The first part is called the guilt/innocence phase. The next part is called the punishment phase.

If the person is found not guilty, the trial is over. There wouldn't be a second part of the trial. If you are found guilty, then you go into the second part of the trial.

And in that part of the trial you can hear evidence about the person on trial, good deeds, bad deeds, prior record, school, mental condition, physical condition, anything that either side thinks will help you decide what's the proper punishment for this person who you have found guilty of capital murder, or any crime. Okay?

A    Uh-huh.

Q    Now, you understand this is a capital murder case.

A    Uh-huh.

Q    You've filled out your questionnaire. We have that right here and you will have it. And I'm sure the lawyers will want to ask you a couple of questions about some of your answers. I don't know what they are, but you'll have it. It took a long time to fill it out, but it will save you more time today because we are not going to go over it word for word. Okay?

From filling that out, hearing Judge Snipes, being in the large central jury room, filling out your questionnaire, I mean reading the pamphlet and appearing here today, you know this is a capital murder case.

A       (Nods head).

Q       You know the State of Texas is seeking the death penalty.

A       Uh-huh.

Q       All right.  And say yes or no as much as you can.

A       Okay.

Q       And I understand.

A       Sorry.

Q       If you don't do it, you don't do it, but I just wanted to tell you.

All right.  So, you understand the situation.

A       Yes.

Q       And what we are doing, in the process of doing, is talking to -- we're not talking to all of the jurors.  A lot of jurors, simply by filling out the questionnaire, we could tell there was no way that they could sit as a juror in this type of case for one reason or another.  But your questionnaire indicates that you may can and that's what we are going to talk to you about.

Now, to be a qualified juror, you don't have to know the law.  Don't worry about that.  It's not some pop

quiz. We are not trying to find out who knows the most law and then they are on the jury. It doesn't have anything to do with it.

It's the attorneys' responsibility, and mine sometimes, to explain the law to you, Ms. McCormick. And then, after that's done, you'll be asked, now that you know that's the law, whether you knew that before or whether you thought it was something else, but now that you know that's the law, can you follow the law and perform your duties as a juror. That's going to be the bottom line question.

Because all you've done so far is taken an oath to God that you're going to tell us the truth. But to sit on the jury, you're going to have to take an oath and be able to take it and mean it, that you will base your verdict on the law and the evidence.

A    Okay.

Q    Are you with me?

A    Yes.

Q    Now, and also you would have to tell us, and mean it, that you would be able to consider the full range of punishment in the proper case.

And that's, that's -- That's what it takes to be basically a qualified juror, in other words, not already have your mind made up.

A    Oh, no.

Q    If you have already got your mind made up what you're going to do, then you wouldn't be a qualified juror. You have to be able to wait, listen, and then decide.

All right.  Now, I could spend three hours talking to you about different aspects, legal aspects, but I'm not going to do that.  I'm going to try to shorten my talk with you or conversation with you.

If someone is found guilty of capital murder, there's only two possible punishments.  Do you know what they are?

A    Death and life imprisonment.

Q    That's right, life in prison without parole.  And when I say life in prison without parole, Ms. McCormick, I mean life in prison without parole.

Until about three or four years ago, there was always a possibility of parole.  That's no longer the case.  Take my word for it.  Life in prison --

A    Means life.

Q    -- means life in prison without parole.  It means life in prison, right.

Now, if somebody is tried for capital murder and they are found not guilty, the trial is over.  And if they are found not guilty, what's called lesser included offenses, the lawyers might talk to you about that.  There are lesser included offenses to capital murder, murder,

**Anne B. Meredith**
Certified Shorthand Reporter

robbery, manslaughter.  It can be, all right?

So if someone is found -- If they are tried for capital murder and found not guilty, the trial is over. If they are found guilty, then the jury goes into the punishment phase.  And you would know which part of the trial you're in because, one, you've already gone back, deliberated, come back in the courtroom, say, we, the jury find the defendant guilty.

And there might be an hour break, there might be an entire day break, overnight break in the trial, but then you would come back in the courtroom and the judge would say, present your evidence in the punishment phase.

So, now you know you're in the punishment phase.  And you would hear evidence about the person on trial, good deeds, bad deeds, just like I said, prior record, no prior record, childhood, mental condition, physical condition, anything the lawyers think will help you decide what's the proper punishment for this person on trial, okay?

A     Uh-huh.

Q     And in every other type case except a capital murder case, when you set punishment, you would write down on a blank line either the number of months or years that the person is going to serve and whether or not it's going to be probated.  At times, it's probated.

In a capital murder case, it's either going to be life in prison without parole or death. But the jury does not write down on a blank line life in prison without parole or death. They answer three special issues, questions. Do you remember those in the pamphlet?

A    Yes, I remember them.

Q    Have you had an opportunity to read them?

A    Uh-huh.

Q    Do you have a small grasp of them now?

A    Yes, I do.

Q    All right. You've never seen those before in your life, have you?

A    No.

Q    Did you even know they existed?

A    No.

Q    Ninety-five percent of the lawyers in this building, this Crowley Criminal Courts Building don't know about those special issues. Don't worry about that. We didn't expect you to.

What I want you to do is look in that pamphlet and read those special issues to yourself one more time. And when you do, just kind of nod at me because we are going to talk to you about them, I would imagine, in some detail.

A    (Prospective juror complies).

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Okay?

A    (Nods head).

Q    You see there where it says you answer them yes or no.

A    Yes.

Q    And the effects of your answers.

A    Yes.

Q    And that's -- When you get that verdict form, it's going to read something like that.  It will have basically that same language.  All right.  You see if you answer one yes, you go to two.  If you answer two yes, you go to three.  If you answer three no, it's a death sentence.  Yes, yes, no is the death penalty.

A    Okay.

Q    If you answer one no, you're supposed to stop, come back in the courtroom, and the judge pronounces a sentence of life imprisonment.

If you answer one yes and go to two and you answer two no, you come back in the courtroom, the judge pronounces a sentence of life imprisonment.

If you answer one yes, two yes, three yes, the judge pronounces a sentence of life in prison.

Yes, yes and no is the death sentence.

A    Okay.

Q    And you know, I'm telling you that now, and you

will know that if you're on the jury and in the jury room, okay?

A    Okay.

Q    And when I say the judge pronounces a sentence, that's all the judge does.  The jury decides the sentence. The judge cannot look and say, well, I wondered what Ms. McCormick and those other jurors thought, but here's what I am going to do.

A yes, yes and no means a death sentence. Any other combination is a life sentence just like you had written down life imprisonment, okay?

A    (Nods head).

Q    Now, here's the context of when and where you would be called upon to answer those special issues, and only in this situation.  You and the eleven other members of the jury would have found the person on trial, not necessarily this trial but a capital murder trial, guilty of intentionally and knowingly causing the death of an individual.  Intentionally causing the death of an individual in certain fact situations such as in a robbery, kidnapping, burglary, sexual assault, a child under the age of six, a policeman, fireman, arson, murder for hire.  You would have found that person guilty of intentionally causing the death of an individual in one of those type situations.

You would come back in, the judge would read

guilty.  You would have heard evidence in the punishment phase.  Remember I told you --

A    Yeah.

Q    -- good deeds, bad deeds, priors.  The judge would have read you the law.  The jury would have given final -- I mean the lawyers would have given final arguments, and you would be back in the jury room.  That's when you answer those questions.  And the person on trial, if you're in that situation, he's either going to receive life in prison without parole or death.

What the lawyers are going to be talking to you about, even though you had found someone guilty of capital murder, would you still be able to answer those special issues yes or no depending on the evidence?

A    Yes.

Q    Okay.  See what I'm saying?

A    Yeah.

Q    If you can't, you would go a long way from being a qualified juror.  If for some reason you decide you can't in the next hour and a half, all you need to do is tell us.  Is that a fair deal?

A    (Nods head).

Q    Do you have any questions of me?

A    No, sir.

Q    Okay.  Ms. Evans now will speak to you on behalf of

Dallas County and the State of Texas.

A    Okay.

Q    If you need to take a break, let me know, please.

MS. EVANS:  Your Honor, briefly, has she been sworn?

THE COURT:  I'm sorry.  Okay.  Thank you. Raise your right hand for me.

(Prospective Juror McCormick sworn).

MS. EVANS:  Thank you, your Honor.

SUE McCORMICK,

having been duly sworn, testified as follows:

EXAMINATION

BY MS. EVANS:

Q    Good afternoon, Ms. McCormick.  The reason, you know, I noticed that you hadn't taken that oath yet is because it's very important that you just tell the truth, just give us true answers to the questions we are asking you right now.  Because this process right now, we do it whether it's a misdemeanor DWI or here in this capital murder, it's the only time the lawyers really get a chance to talk to you about how you feel, about how you feel about this type of case and about the laws that you're going to be asked to follow if you take that additional oath to sit as a juror in this case.

And, so, we want you to understand the law

that you'll be dealing with in a case such as capital murder, and not only be able to consider that law but be able to follow that law. And when you're asked to follow that law, we don't want you to do violence to your conscience or make you feel like you're having to go against your own personal beliefs to do that.

Does that make sense?

A    Uh-huh.

Q    So, basically, when we talk to jurors, regardless of the type of case, we usually kind of give an example that if over the weekend your house had been broken into and you came down here for jury service and you were asked to serve as a juror on a burglary of a habitation case where somebody's house had been broken into, can you see where it might be a little bit difficult --

A    Yes.

Q    -- to serve as a juror in that type of case?

Me personally, I had my car broken into and I still get angry. That was two years ago. But I had my own property stolen, you know, camera, cell phone. And it wasn't the things, it was just the fact that somebody did that. You understand?

A    Uh-huh.

Q    And, so, I wouldn't be a good juror --

A    Right.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    -- where somebody broke into somebody's car, I just wouldn't.  No matter how fair I wanted to be or wanted to tell people I would be fair, I just couldn't.  And there is nothing wrong with -- You know, it kind of sounds weird to say I couldn't be fair or I couldn't give the State a fair trial or I couldn't give the defense a fair trial, for whatever that reason may be.  But there is nothing wrong with it.

And, so, I just want you to understand that neither side is going to try to change your answers, change your opinions, or change your beliefs regarding anything here today, okay?

A    Okay.

Q    You're entitled to those.  You had them when you filled out this questionnaire.

A    Yeah.

Q    You had them before you filled out the questionnaire, and I imagine you've thought a little bit about your feelings regarding the death penalty since you filled out the questionnaire.

And, so, you can have those same feelings and beliefs whenever you leave here today.  It's just a question of whether or not those feelings and beliefs translate into you being able to take that additional oath to follow the law and render a true verdict based on the

law and evidence in this type of case, okay?

So, where you may be a great juror in a DWI or an aggravated robbery, maybe capital murder where the State is seeking the death penalty isn't the appropriate case for every juror.

Sometimes we talk to jurors where their feelings and beliefs are so strong regarding the death penalty, they feel like whenever any person loses their life, when a murder has been committed, it doesn't matter if it's a capital murder, which in Texas is the only type of murder eligible for the death penalty, it doesn't matter to them. If somebody loses their life at the hands of another intentionally, they believe that person should get the death penalty.

Then we have other jurors at the other end of the spectrum that tell us under no way, no circumstance, no how am I going to be part of a process that kills another human being. I don't care what the law says. I don't care that the legislature has said the death penalty is okay and the State of Texas executes people sometimes on a, you know, weekly basis. It doesn't matter to me because I am not in favor of the death penalty.

And that's okay. We just need to know where you fall up in there, okay?

A    I really don't know. I don't know what I could do

in that situation.  I don't know if I could -- I could do either way, I think.

Q    I understand.  And I am not asking you to tell us today.  Neither side is going to ask you today to tell us how you would -- whether you would say guilty or not guilty or whether you would answer those special issues yes, yes and no or any combination thereof.  We are not going to ask you that today.

We just need to know how you feel about these issues to get an idea because you understand the State is in this case -- you know, I want you to understand that we are seeking the death penalty in this case.  We believe that we have the type, quality and the quantity of evidence that is going to lead the twelve jurors who serve in this case, the evidence is going to lead them to a verdict of guilty of capital murder.

And then, further, we believe that we have the same type, quantity and quality of evidence that's going to lead them to answer those special issues yes, yes and no that will result --

MR. LOLLAR:  Your Honor, we again object to the prosecutor stating their personal opinion about the strength of their case and what the jury is likely to do.

THE COURT:  Overruled.

MR. PARKS:  May we have a running objection?

THE COURT: You may, sir. Yes, sir.

Q    (By Ms. Evans)    If those twelve jurors answer those special issues yes, yes and no, the judge will have no choice but to sign a death warrant. And at some point in the future this young man down here, Mr. Broadnax, is going to be given an execution date and he is going to be dead laying on the gurney with a needle in his arm in Huntsville, Texas.

And this is the process that we are asking you to be a part of, so we want to make sure that every juror, each of the twelve jurors that sit and serve on this case are able to, if the evidence leads them to it, that they are able to listen to, evaluate, consider the evidence, and if the evidence leads them to a sentence of death, that they are able to carry that out.

And there is nothing wrong with it if you can't. If you can't take that additional oath to render a true verdict based on the law and the evidence in this type of case because it could lead you to a sentence of death and you don't want to be a part of a process that could potentially sentence this young man to die, we understand that.

So, Ms. McCormick, and the reason I say that is I've read your questionnaire, I've looked at your struggles, you know, with the death penalty, and you are not unlike any other juror that we see come in here. So, I don't

want you to feel like I'm singling you out or anything like that.

I just saw where you say that society, if society says the death penalty is okay, then I would do it if the law tells me to. But I want you to understand that you don't have to. You don't have to sit and serve as a juror in this type of case if it's not the case for you.

How do you honestly feel, Ms. McCormick, about participating in a process that the evidence could lead you to a verdict that would render a sentence of death?

A    I don't know.

Q    And I understand you say you don't know. But you understand sitting in our situation here and when the defense asks you some questions down the road, they are going to have to pin you down, too, on some answers.

Because, as you might imagine, if you were about to get on an airplane and you walked up to the cockpit and asked the pilot, well, sir, you think you can fly this plane, and he says, I don't really know, I'm going to try to do my best to fly it, are you going to get on that airplane?

A    No.

Q    No. And, so, understand that's why we pin you down. It's not to -- And these are issues and topics that you probably never put -- Had you ever put a whole lot of thought into your feelings on the death penalty before asked

**Anne B. Meredith**
Certified Shorthand Reporter

to answer these questions?

A    No.

Q    And, so, I understand that it's all new for you. It's all new for every juror we see. But I am going to have to pin you down on it. If you -- If you feel like this is the type of case and if the evidence led you to where you had to answer those special issues yes, yes and no based on the evidence that you heard, would you be able to do that?

A    I think so.

Q    Okay. And, again, you kind of qualify it with I think.

A    It's with the circumstances, I guess, is what it all boils down to as to the decision I'm going to make.

Q    Okay, absolutely. I mean you'll hear evidence in the case to make that determination.

But understand, have you -- Have you ever seen individuals down here in downtown Dallas or other places cleaning the windows of big, tall skyscrapers?

A    (Nods head).

Q    You've seen that?

A    (Nods head).

Q    And what are they standing on up there?

A    A scaffold.

Q    A scaffold, up high in the air, right?

A    Right.

Q   They may be 22, 23 stories high on there.

A   Uh-huh.

Q   You think it's a good thing that windows on those skyscrapers get cleaned?

A   No.

Q   No?

A   They are too dangerous.

Q   They are too dangerous?  Well, but do you think, you know, for the people inside that building on the 23rd floor --

A   They need to be cleaned.

Q   -- what if the windows got so dirty that they couldn't see out?

A   Yeah.

Q   It's a job that has to be done, right?

A   Right.

Q   Somebody's got to do it.

A   Yes.

Q   But I can tell you right now, I'm kind of like you when you said no, it's too dangerous.  If somebody came and said, Elaine Evans, it is your job now to clean the windows on this skyscraper, I'm not gonna do it.

I mean I might say -- You know, if they told me, well, it's the only paid job you're going to get so long as you live.  If you don't become a skyscraper, you'll never

make another dime a day in your life.  How are you going to eat?

I might say, well, I'll try to go clean those windows, but I can tell you I am not going to be comfortable.  All I'm going to think about 23 or more stories high is what's down there on the ground.  I'm going to be paying attention to that.  And if that thing moves and juggles me in any way, I'm going to be a nervous wreck.

A    Uh-huh.

Q    I'm not going to be concentrating on what it is I need to be concentrating on, which is cleaning those windows.  Do you understand what I'm saying?

A    Yes, ma'am.

Q    So, it's a process that we want you to be comfortable with because it's not something that's for everybody, just as going and washing windows on skyscrapers, too dangerous, don't want to do it.

Do you still feel like this is a process you can participate in, understanding that you do not have to take the additional oath, and would you be able to give your full attention to the evidence in the case to be able to base a verdict?

A    I guess it would all be, you know -- All I can say is yes, I probably can.  Well, see, there I go again.

Q    There you go with probably.  You know, just be

comfortable to say whatever it is you want to say.

I also noticed in your questionnaire that you made the comment, face-to-face I don't know if I could do it. What do you mean by that when you say face-to-face?

A    Sit there and be responsible for sending him to his death.

Q    Okay.  And I understand.  I saw you look down at Mr. Broadnax whenever you said that when I asked you that question.  So, you mean having to look at this young man today, and the twelve jurors that are selected to serve as a jury in this case that are there in the courtroom listening to and trying to evaluate the evidence, every day that you walk in and you are listening to the evidence in this case, you are going to be face-to-face with Mr. Broadnax, knowing that if the State brings you the type of evidence that we believe we will in this case, it's going to result in a guilty verdict on capital murder and it's going to result in a death sentence, or it's going to result in the jurors answering those special issues yes, yes and no.

Do you feel like, face-to-face, you can face this young man that you know you may be sentencing to death? You may be called upon to do that if the evidence leads you in that direction.

And I know that it's -- I can tell you're struggling because every time the judge would kind of bring

**Anne B. Meredith**
Certified Shorthand Reporter

up those special issues and said that, you know, if you answer those yes, yes, no that it's going to result in a death sentence, you kind of under your breath said oh kind of quiet.

And, so, don't feel like you can't be honest with us because this is your only shot too, it's your opportunity to tell us how you really feel. Because as you can imagine, if you're uncomfortable now thinking about it and you're qualifying things with probably, can you imagine how uncomfortable you're going to be sitting there as one of the twelve jurors that does walk in face-to-face and see this young man daily and how uncomfortable you're going to be if the evidence does lead you in that direction and you are called upon to render a verdict of guilty in a capital murder and answer those special issues yes, yes and no, if you really don't -- if your heart of hearts tells you that the death penalty may not be for you?

Can you understand how that would be uncomfortable?

A       (Nods head).

Q    So, how do you really feel if you were to serve as a juror in this case?

A       I guess with the evidence that's, you know, with the evidence that's presented, I could do it.

Q       Okay.  And I understand you say you could do it.

But on your questionnaire I believe you said that you don't feel good. It says not good.

A    No.

Q    Is that still how you feel today?

A    Uh-huh.

Q    Okay. And you understand what I'm telling you, that you do not have to take that additional oath.

A    Yes, ma'am.

Q    Okay. I would like to talk to you about a few other things in your questionnaire. On page four -- And if you would like to turn to it and look at it, you can. -- you talk about, do you ever think the death penalty is misused? And you said yes, you do, that innocent people -- and I can't really read what you put after that.

A    Innocent people are destroyed.

Q    Okay. And who are you referring to as being destroyed?

     I know it's been a while since you filled that out so, if you want to get your thoughts together, take your time.

A    I'm just deciding now what that really is.

Q    Uh-huh.

A    Yeah, that's what I put, destroyed. Okay. The lives of the people that -- their loved ones. And then you come back later and find out that the evidence was incorrect

and wasn't as it should -- as it was presented.  It's destroyed a life that didn't deserve it.

Q    Okay.

A    And plus his family or her family.

Q    I understand.  And Ms. McCormick, I think I saw you put somewhere in here that you are moderately in favor of a life sentence because it gives a person time to prove they are innocent.

A    Correct.

Q    How do you feel about that?  Do you think that there have been people put to death that you believe are innocent or --

A    Yes.

Q    Okay.  You do?

A    (Nods head).

Q    And you know, have you seen the reports on the people that have served time in prison that have now been released because DNA has exonerated them?

A    Yes.

Q    How do you feel about that?

A    I think it's wonderful.

Q    Okay.

A    DNA has released them.

Q    That the people are being exonerated and found to be --

A    Correct.

Q    And I completely agree with you.  They shouldn't be there if they don't deserve to be, absolutely not.

Based on, based on that -- Have you seen a lot of those reports?  Have you followed it quite a bit?

A    No, I haven't followed it quite a bit, just the news.

Q    Know that it exists.

A    Yeah, I know that it exists.

Q    What do you base your feelings on that innocent people have actually been executed?

A    Many of us have made the mistake, you know, where they have been in jail, and how many people that were murdered or put to death have been innocently, because there is a -- I don't know how to explain it.

If you've got ten people out of 500, you know, that are innocent, well, then maybe you've got one out of 500 that's innocent that was put to death.

Q    Okay.  So, the statistics or the numbers tend to suggest that maybe that could be so.

A    Yes.

Q    Okay.  And Ms. McCormick, again, I kind of noticed there whenever you were, when you were illustrating your point there, you said, how many that we have murdered and then you changed your verbiage to put to death.

**Anne B. Meredith**
Certified Shorthand Reporter

A    Uh-huh.

Q    Do you feel like the State of Texas, in carrying out death sentences, is committing murder?

A    No.

Q    No?

A    No.

Q    Okay.  Why did you choose that term and then go back and change it?

A    Just terminology that popped out of my mouth before I used my head.

Q    Okay.  And do you think, you know, the reports you've seen about those people that were, in fact, innocent and have been exonerated, do you think you would be thinking about those people in those situations when listening to and evaluating the evidence in this case?

A    No.  For me to really put down yes, yes and no, I would have to totally, really, really be convinced.

Q    Okay.  And when you have to say totally, really, really be convinced --

A    Uh-huh.

Q    -- you understand that in this courthouse we have -- we try misdemeanor level cases all the way to felony cases in here, capital murder.  The State's burden of proof, the level of proof that we have to present in any type of case, any type of criminal case, is beyond a reasonable doubt.

And that includes traffic tickets, petty theft, DWIs.

A    Yes.

Q    All the way up to aggravated robbery, murder and capital murder, including capital murder where we are seeking the death penalty, the State's burden is just beyond a reasonable doubt.

A    Yes.

Q    Okay.  Whenever you say that we would have to really, really prove it or the evidence would have to really, really prove it, do you believe that the State's burden should be higher in a capital murder case where the State is seeking death because, as you say, that you're destroying a person's life if it turns out not to be correct?  Is there room for any doubt in this type of case where the State is seeking death?

A    I don't totally grasp what you're asking me, I'm sorry.

Q    Well, the burden of proof.  The law says that the State has to prove its case beyond a reasonable doubt.

A    Yes, ma'am.

Q    Any reasonable doubt.  And that -- Beyond a reasonable doubt is not defined here in Texas.  There is no definition for it.  It's what each individual juror believes it to be.  But it's certainly not beyond all doubt and it's not with 100 percent certainty.

**Anne B. Meredith**
Certified Shorthand Reporter

MR. PARKS:  Your Honor, we are going to object to that misstatement of the law and ask that the juror be instructed as to what the Court will say regarding beyond a reasonable doubt, that it to say that it does not -- that it has not been defined.

THE COURT:  I understand.  I'll allow Ms. Evans to continue with her examination of this juror.  But there is going to come a time that I'm going to read the words from the Court's -- what I assume will be the Court's charge.

Please proceed.

MS. EVANS:  Thank you, your Honor.

Q    (By Ms. Evans)  The law allows for there to be a residual doubt.  Beyond a reasonable doubt is the State's burden.  It's not anything higher than that, but it's whatever you believe it to be, but not beyond all doubt, a hundred percent certainty.

Do you believe -- Do you agree with that law, or are you going to, based on the type of case it is, because we are talking about a man potentially losing his life if those special issues are answered yes, yes and no, do you believe that in this type of case that there is any room for any doubt, any residual doubt, even though the law allows for it?

A    There shouldn't be any, no.

Q    Okay.

THE COURT:  Ma'am --

MR. PARKS:  Judge, we are going to object. The law does not allow for any residual reasonable doubt. The Court will admonish the jury that the State is not required to prove their case beyond all possible doubt, but must prove their case beyond all reasonable doubt.

THE COURT:  All right.  Well, I'm not going to say that that might not be the charge.  But there is going to come a time in this examination that I will read what I anticipate the Court's charge to be.

I'm going to allow Mr. Lollar an opportunity to talk to you, too.

PROSPECTIVE JUROR McCORMICK:  Okay.

THE COURT:  All right.  Please proceed.

Q    (By Ms. Evans)  Okay.  I believe if you'll turn to page five of your questionnaire, it's asking what is the purpose of the death penalty or what purpose does it serve.

Do you see that question?

A    Uh-huh.

Q    And your answer to that is none.  What is your thought about that?

Do you believe the death penalty serves a purpose?

A    Yes.  I don't know why I put none.  There are those

that need to be taken out of society.

Q    Okay.  What type of person would that be?

A    Child molesters.  Not necessarily the death penalty. I would find other ways that they couldn't do that any more. It definitely does take the people off the streets that are doing harm to others.

Q    Okay.  Now, whenever you said you would find other ways --

A    Right.

Q    -- you're speaking of child molesters.

A    When I say that word, yes.

Q    If you were appointed governor for the day, so you're no longer a prospective juror in this case, you're Governor McCormick, would you abolish the death penalty here in Texas or would you still have it?

A    No, I wouldn't abolish it.

Q    You would not because you do believe that there are some people --

A    Some people, yes, ma'am.

Q    Okay.  If you could square that, that you believe that there are some people that you have to take off the streets, with your statement on page eight, you said everybody deserves a second chance.

A    Uh-huh.

Q    And in regards to that I've got to ask you, I mean,

do you literally mean everybody or what do you mean by that?

A    No, I didn't -- not everybody.

Q    Okay.

A    Not murderers and child molesters.  This is just misdemeanors and things of this nature that I was saying that yes, they needed to serve time for it, be rehabilitated.

Q    Okay.  And, so, basically you -- if you, if you felt like the death penalty were appropriate or that the answers to those special issues should be yes, yes and no based on the evidence, you would be able to answer those.

A    Yes, ma'am.

Q    As such.

A    Yes, ma'am.

Q    Of course, based on the law and the evidence.

A    Yes, ma'am.

Q    Okay.  Let me talk a little bit about the process a bit.  As I explained to you, there is all sort of types of offenses here.  And you saw in the pamphlet there is a difference between capital murder versus murder, and the judge has explained those to you --

A    Yes.

Q    -- correct?

A    Uh-huh.

Q    And there are capital murders where the State doesn't seek the death penalty.  In this case the State is

seeking the death penalty. I've explained that to you, right?

A    Uh-huh.

Q    I saw on page four that you talk about -- page four of your questionnaire, that you talk about when you believe the death penalty is appropriate, and you said in premeditated, premeditated murder.

Understand that whether it be a capital murder or plain vanilla murder where I just turn to my co-counsel and shoot her in the head and I sit here and laugh about it and say, good, she's dead, the State of Texas does not have to prove premeditation in capital murder or plain vanilla murder, for lack of a better term.

Intent can be formed in an instant. Just like that somebody can decide to do something. Do you agree with that?

A    Uh-huh.

Q    And, so, there may not be premeditation on the part of a defendant in any given case, okay, and the State doesn't have to prove that there was. Just the only thing the State has to prove are the elements in that indictment that you read earlier, correct?

A    Correct.

Q    It's really just like a checklist. Did we prove those things? Nothing more, nothing less.

If a case doesn't involve some sort of premeditated, planned out killing, are you going to be able to find somebody guilty of capital murder?

A    Yes.

Q    Okay. And are you understanding that the law doesn't require the State at any, at any point, either in the guilt/innocence, to prove premeditation? Are you going to be able to render a death sentence if the act wasn't premeditated?

A    Yeah.

Q    Okay. So, basically, after -- If you have found a defendant guilty of capital murder, you move on to the special issues; you understand that. And the State's burden is the same as it is in the guilt/innocence phase, okay, beyond a reasonable doubt. The State's burden is beyond a reasonable doubt in answering those special issues that could render a sentence of death. All right?

A    Yes.

Q    And the burden on the first two special issues is always on the State just as it is in the guilt/innocence. We do the accusing, we do the proving, okay?

A    Yes, ma'am.

Q    Special issue number one as to future dangerousness, we have to prove that beyond a reasonable doubt as you saw it there and as you see it on this board.

A    Uh-huh.

Q    Do you find from the evidence beyond a reasonable doubt that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society?  You understand that.

A    Yes.

Q    Okay.  I'm going to come back to that special issue.  The State has to prove that beyond a reasonable doubt.  If you do believe from the evidence that the defendant is going to be a future danger, in other words, a continuing threat to society, then you answer that special issue yes.

If you believe no, that we haven't proved it beyond a reasonable doubt, no elevated burden, but beyond a reasonable doubt, then you answer no, and you stop right there.

If you answer it yes, you move on to special issue number two.  Special issue number two involves the law of parties.  And basically in Texas, say for example, if I do what I said earlier which is just lean over and shoot my co-counsel, Ms. Handley here, then I take her pen from her and take off running, I'm guilty of capital murder.  You understand?  I took the pen from her and I committed a murder right here.

A    (Nods head).

Q    So, murder plus robbery. Murder plus something else is capital murder. You got that?

A    Yes.

Q    Now, let's say move this to a 7-Eleven type robbery situation. And I don't want to go at it alone to go take the money so I get my co-counsel over here to go rob the 7-Eleven with me.

And I tell Mr. Hikel, look, this is how we are going to do it. We are going to go to the 7-Eleven at midnight tonight. I'm going to go in, stick the clerk up. You're going to sit out in the car, and I want that car running. I want you to be ready to step on the gas. Now, where is my gun?

Mr. Hikel goes, gets a gun for me. He goes and buys the ammunition. We roll up at the 7-Eleven together. I go into the 7-Eleven, I shoot the clerk and I take the cash register. Before I go in, Mr. Hikel says, you better not leave any witnesses, and I didn't because I shot the clerk and I came running out with a cash register in hand.

In the State of Texas, under the law of parties, I'm guilty of what?

A    Murder.

Q    Capital murder, right? Murder plus a robbery, that aggravating factor.

**Anne B. Meredith**
Certified Shorthand Reporter

A    Right.

Q    What is Mr. Hikel guilty of?

A    Aiding.

Q    Aiding. So, since he's aiding, assisting and participating, based on the facts I gave you, you believe him to be doing that, correct?

A    Uh-huh.

Q    He too would be guilty of capital murder. Do you understand that?

A    Yeah, I understand that.

Q    Okay. And if he should have anticipated, based on -- you can consider the surrounding facts. If he should have anticipated that a life would be taken in that 7-Eleven robbery, then he's guilty of capital murder.

A    Correct.

Q    Now, moving to these special issue questions, what you see here, if he actually -- it's not should have anticipated, but if he actually anticipated that a life would be taken, then you can answer that special issue as to the party if you believe he's aiding and assisting.

A    Yes.

Q    And, so, let me get your opinion. You know, we've talked a lot early on about your opinion regarding the death penalty, right?

A    Yes.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    And your body language still seems to suggest that you may have some reservations. Am I right about that or no?

A    Yes.

Q    Okay. And you said the face-to-face you would have trouble, or you don't know what you would do --

A    That's correct.

Q    Face-to-face in any given situation.

And I believe you said you don't know if you could do it, you have mixed emotions.

Understanding that and understanding the law in Texas says that a party, if they aid and assist and if they should have known that a life would be taken, they are guilty of capital murder, and they too, Mr. Hikel in my example, could receive a sentence of death for aiding and assisting, even though he never went in the store.

A    No, but he told you not to leave any witnesses, so he's just as guilty as you are.

Q    And what if, let's say -- let's change the example up a little bit, okay? And let's say that Mr. Hikel is, basically he's just kind of my brother that does what I tell him to do. He's my younger brother. He's kind of a follower. He's -- He understands right from wrong and he knows when I tell him to do something that maybe it's not the right thing to do. He's never been in trouble before. But he goes and participates in this act and assists as a party.

**Anne B. Meredith**
Certified Shorthand Reporter

Would you still be able to find that person guilty of capital murder?

A      No.

Q      Why not?

A      Circumstantial, following a person.

Q      Okay.

A      Your brother needed help not to be a follower.

Q      Well, but if the law or I mean if the evidence proved that Mr. Hikel was there with me, he aided me in going to get me a gun because I told him I need a gun and I told him I'm not leaving any witnesses, I'm the one who says this.  I'm going in there, I'm not leaving any witnesses.  You have this car gassed up and ready to go because we are hightailing it out as soon as I get the money.

And he comes with me, he provides me that gun, he loads it for me because I've told him we are going to do this, come on, younger brother.  And, so, all of the evidence shows that certainly I am guilty of capital murder when I do it.  Would you be able to convict --

A      Convict, maybe a life sentence.

Q      -- my younger brother of capital murder?

A      I would just go for the life sentence.

Q      Would you automatically give a life sentence in that, or would you be able to then go through and answer and

give full consideration and credit to each of those special issues in determining whether or not, first, he's a future danger, answering that question and then moving on to the second issue, whether or not he acts as a party and he did in fact anticipate that a life be taken, and then move on to mitigation, or would you automatically in that situation not be able to consider the special issues?

A    I would consider the special issues, yes.

Q    Okay.

A    But I just still don't believe that I could say that he is as guilty as you are.

Q    Okay. And I am not trying to pin you down to a specific set of circumstances or facts. I just want to make sure. Because you do, I mean, Ms. McCormick, you do have very strong opinions, and it's okay. As I told you before, you are entitled to your opinions on the death penalty. You don't have to check those at the door.

I just want to make sure you're being honest with yourself and honest with the parties in this case regarding those feelings because, as I told you before, it's going to be mighty uncomfortable if you walk in day in and day out and see this individual and then the evidence leads you to answer those questions in such a way that are going to render -- cause you to need to render a sentence of death based on the law and the evidence, answer those special

issues in such a way that would do that, because I still see hesitation out of you.

A    It all goes back to saying I don't know what I would do face-to-face I would put up against that problem.    I feel like I could probably do the death sentence if the evidence is strong enough and without a doubt, see.  And other than that, I can't tell you any more about what I feel.

Q    Ms. McCormick, you know, I could, I could consider something or think about something for any given period of time.  But if I already kind of have strong feelings and beliefs and opinions as to something, I may consider it for one second, but I know in my heart of hearts that I'm not going to be able to do it, such as that washing the windows on a skyscraper, not happening, it's not.  Sorry, I may never eat another day in my life.  I'm not doing it.

And that's what we are talking about here, that serious, and it's that important for both the State and the defense to get a fair trial here.  And, so, if you honestly don't believe that this is the type of case for you, there is nothing wrong with that.

But it's something that, you know, when you're qualifying things with I think I could and I honestly believe I could, I know it's hard because you don't want to say that you couldn't follow the law in any type of given situation or case.

**Anne B. Meredith**
Certified Shorthand Reporter

But if you can't, you're not going to hurt anybody's feelings here. We just need to know it now because it's going to be too late if you are already serving as a juror over there and then you think to youself, you know, I can't do this.

A    Well, I have enough doubts that I guess I have to say that I can't do this.

Q    And that's how you really believe, isn't it, Ms. McCormick?

A    Yes.

Q    And I got that from reading the questionnaire. And there is nothing wrong with that, okay?

A    Okay.

THE COURT: All right. Mr. Lollar.

MR. LOLLAR: Thank you, Judge.

EXAMINATION

BY MR. LOLLAR:

Q    Hi, Ms. McCormick. How are you?

A    Fine, thank you.

Q    Well, listen, I want to talk to you for just a little bit. But understand there is nothing you can tell me that's the wrong answer, okay, because there are no right or wrong answers in this discussion that we are having.

We are trying to figure out where you are in the group of jurors that we have of 800 jurors that came

down and filled out questionnaires for this case, okay?

A    Right.

Q    And this is our second day of talking to jurors individually. Okay. And that's the thing I want to impress upon you is nothing you tell us is a wrong answer. There can only be a dishonest answer.

A    May I have some water?

THE COURT:  You sure can.

Q    Do you need to take a break, by the way, or anything? Are you okay?

A    Yeah, I'm fine. I'm just thirsty.

Q    All right. And let me say on behalf of myself and Mr. Parks and Ms. Mallon and Mr. Broadnax that we couldn't disagree with what they have been talking about more, okay?

But I want to talk to you about some of the things you've mentioned. And I've read your questionnaire and I've heard you talk obviously here for over half an hour and I think I have an understanding of where you are, but tell me if I'm wrong, okay?

You're a type of person who thinks there should be a death penalty on the books.

A    Uh-huh.

Q    Okay. Reserved for the very worst offenders.

A    Uh-huh.

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT:  Again, I apologize.  Is that yes?

PROSPECTIVE JUROR McCORMICK:  Yes.

Q    Okay.  And you think that there is also value in having life without parole for some people.

A    Yes.

Q    Okay.  And you particularly mentioned child molesters, you think that's a good person to put in the penitentiary for life.

A    Yes.

Q    Okay.  You've also mentioned premeditated murders. And I want to talk about the issue of premeditation versus intentional here in just a minute.

But is that the type of person you also think should be in the penitentiary for life or face the death penalty if the facts call for that, a premeditated murderer?

A    Yes.

Q    Okay.  Okay.  Now, the question becomes, and as you originally told us, we asked you here on the very first page of your questionnaire, we asked you which of the following statements best represent your feelings.

And you said, although I don't believe the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper set of circumstances.

Is that still the way you feel?

**Anne B. Meredith**
Certified Shorthand Reporter

A    Yes.

Q    Okay.  Now, and I say that because you have just indicated to Ms. Evans here that you didn't think you could do that, sit as a juror in this type of a case and listen to all the evidence and return a verdict which would mean a person gets executed.

But from what you just told me, you think that you could do it under the proper set of circumstances; is that right?

A    Yes.

Q    Okay.  You wouldn't want to.

A    No.

Q    Is that fair to state?

A    No.

Q    Okay.  Because on a scale of one to ten, I see that you're a four on believing and using the death penalty which is, you know, down here instead of way up here like we've seen some of these other jurors that have come down and sat in your chair, okay?

A    Yes.

Q    But that's fine as long as you're saying that I can be fair in a case like this.  I understand that there is a presumption of innocence.  Okay.  I would hold the State to the burden of proof that I know the law puts upon them. They would have to prove this case to me beyond a reasonable

doubt before I would find a person guilty of this offense.

And then they would have to prove to me that that person would be a future danger, that there is a probability that he would continue to commit criminal acts of violence that would constitute a continuing threat to society.

And they would have to prove to me, if it is a parties case, that if he was -- that he's either the gunman himself or, if he wasn't the gunman, that he intended the gunman to kill the victim, or he did anticipate that the gunman would kill the victim. Okay. They would have to prove that to me beyond a reasonable doubt.

And it would have to be a situation where I found there were no mitigating circumstances sufficient to change my mind.

Okay. If you say in the special issues yes, yes, no, then that means the person gets the death penalty, okay?

A    Yes.

Q    But, see, those are all fact things. Those are all things that can be proven to you. Okay.

On the special issue number three, there is no burden of proof. Both sides are allowed to bring evidence before you, and you decide if something is a mitigating factor.

Now, mitigating means, well, it's kind of the opposite of aggravating. Okay. Aggravating is something that makes something worse. Mitigating is something that makes something a little bit less worse. Okay?

And you mentioned in your questionnaire that you think that sometimes a person's life history can be something that you might look at as being a mitigating factor which would cause you to not want to give him the death penalty. Okay. I believe you indicated that to us in your questionnaire here.

A    Yes.

Q    And you have also indicated -- let me find the right page -- that -- Where is it? Here we are on page eight of your questionnaire. We asked you the question, some people feel genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of somebody convicted of a crime. And your answer was, I think the above should be considered before sentencing.

A    Yes.

Q    Okay. So, those are mitigating factors. Those were some examples of mitigating factors, okay? And you might hear a case where there aren't any mitigating factors. There is just nothing. There is no good explanation of why the person did what they did.

They were raised in a good family. They had

food on the table in their house, you know, a roof over their heads. They had good education, good parents. Okay. There is just no explanation, so there is no mitigating factor, okay?

A     Yes.

Q     And you could hear that.

A     Yes.

Q     You could come to that conclusion, okay?

A     Yes, sir.

Q     On the other hand, you might hear a case where you might hear that a person has not had those benefits and that you can be shown the story of how they got to the point where they are committing a capital murder, okay?

A     Yes.

Q     And you can believe that some of those factors might influence how they got to that point and some of those factors might be of such a mitigating nature that after hearing about those things you might decide that, even though you've decided that the State has proven him guilty beyond a reasonable doubt and that, yes, he's even a future danger, you still don't want to give him the death penalty.

          And that's fine because what I want you to understand is the law never requires that a jury return a verdict of death, never under any circumstances, okay?

**Anne B. Meredith**
Certified Shorthand Reporter

A    Okay.

Q    That is a decision that the twelve jurors make but it's an individual decision that the twelve jurors make. Okay. The law says that all twelve have to be unanimous that there is no mitigating factor, okay, sufficient to avoid the death penalty.

Okay. One juror, for instance, if you are a juror who thinks, but wait a minute, I've heard something that I think is a mitigating factor, okay, well, what that means is the person is going to end up with a life sentence. Okay. Because the law says all twelve jurors have to agree that there are no mitigating factors sufficient to avoid the death penalty.

Okay. See what I'm saying?

A    Yes.

Q    Okay. So, the point I'm trying to make is this. You've seen the law explained to you. You know this is a capital murder case. You've seen what the State is required to prove to you, beyond a reasonable doubt.

Okay. Let's say that you're selected as a juror in this type of a case, in this case. Okay. And you were brought down, you were sworn in as a juror with eleven other jurors.

Okay. And you are sitting in the jury box and you are hearing evidence. And the State brings you

evidence that convinces you beyond a reasonable doubt the defendant is guilty of capital murder. Okay?

A    Yes.

Q    Then you go into the penalty phase. They bring you evidence that convinces you beyond a reasonable doubt that he's a future danger. Okay. They bring you evidence to convince you that he anticipated or was actually the gunman himself. Okay?

A    Yes.

Q    And they bring -- Well, let's not say that they bring you because nobody has a burden of proof in special issue number three. Okay. But let's say that you do not find any mitigating factor. Okay. Don't find anything sufficiently mitigating to avoid a sentence of death.

A    Okay.

Q    So, in all honesty, you've got to write no.

A    Correct.

Q    Okay. Now, that's going to result in a death sentence; you understand that.

A    Yes.

Q    Okay. Are you saying you could do that if that's what the evidence leads you to do?

        Whoops, I dropped my pen.

A    Yes.

Q    Okay. Now, let's talk about this issue of

reasonable doubt. Okay. Now, television shows, okay, we've all seen television shows where they talk about doubt.

Okay. First of all, those shows are made in California and New York.

A    Yes.

Q    Okay. They are not made in Texas.

A    Right.

Q    Okay. And they use phrases like shadow of a doubt. You know, beyond a shadow of a doubt, I hear that all the time. Well, that may be what the law is in California. I've only been to California twice and that was on my honeymoon, okay, and then one other time we went out to a football game. Okay, and that's it. I've heard about California, and I have been to New York a few times, okay, but I don't know what their law is either.

But in the law in the State of Texas is that is the burden of proof on the State to prove something beyond a reasonable doubt, okay?

A    Yes.

Q    Now, at the same time, they don't define what that means. It doesn't say in the law, well, what does it mean, beyond a reasonable doubt?

All it does say is this. It doesn't mean proof beyond all possible doubt, okay, all possible doubt. It does mean proof beyond a reasonable doubt. Okay.

Now, my definition in my mind of what proof beyond a reasonable doubt is may be different from what might be in Mr. Hikel's mind about his definition of reasonable doubt. Okay. And both of ours might be different from what yours may be, okay?

A    Yes.

Q    And that's fine. Okay. A person may say in their own mind, okay, to me -- Well, let me, let me throw this in the mix also.

If you were a juror in a civil case, okay, the burden of proof over in a civil case where somebody is fighting about property or money is preponderance of the evidence, and that's 51 percent of the believable evidence, just a little bit more.

A    Yes.

Q    That's the side that the jury is supposed to go with, okay?

A    Yes.

Q    And if you are a juror on a case out in the Henry Wade Juvenile Center, okay, out on Interstate 30 -- you might have seen it going west of Fort Worth over on the side of the road -- out there CPS has the ability to file a case against somebody to take away their children, okay?

A    Right.

Q    Permanently. Now, that's a serious matter when

you talk about taking away somebody's children permanently, right?

A    Right.

Q    Okay.  And that's really, if you think about it, more important than fighting about money or property, and the law says there is a different burden of proof out there. And the law says that in that type of a case the CPS, the prosecutors, the movant, whoever it is, has got to prove by clear and convincing evidence.  That's the phrase they use, clear and convincing evidence.  Okay?

A    Yes.

Q    That's their burden of proof out there, and that's higher than presumption of the evidence that they use over in the civil building.

A    Right.

Q    Okay.  Then we get down to this courthouse.  And in this courthouse, whether you're trying a theft of a bicycle or a DWI or a burglary or a rape or a murder or a capital murder, the burden of proof is higher than what they have in those two other buildings.  Okay.  It's beyond preponderance, it's beyond clear and convincing, and it is proof beyond a reasonable doubt, okay?

A    Yes.

Q    So, you can see how that is a higher burden because what is at stake here is somebody's literal life or

**Anne B. Meredith**
Certified Shorthand Reporter

liberty, right?

A    Yes.

Q    Okay.  Now, having said all that, you had indicated to the State that you thought in this type of a case, since it's a capital murder where there is so much at stake, that you might hold the State to even a higher burden than proof beyond a reasonable doubt.

But now that we've talked about it, do you see that that is the burden that you're going to have to follow?

A    Yes.

Q    And would you be able to follow that in this type of a case?

A    Yes.

Q    Okay.  See, in my mind we keep talking about these opposites.  We've talked about capital murder on this side and theft of a bicycle down here.  But I would want not to convict somebody of theft of a bicycle unless it's proven to me beyond a reasonable doubt, the same level of prove that I would require of a capital murder because I know that that theft conviction is going to stick with that kid for a long time, too.

A    Yes.

Q    For the rest of his life.  So, it's not, it's not that you start at the basement and go to the attic in terms

of, you know, requiring proof of a certain nature; it's that you start at the attic and look back to the basement and say, I'm going to require the same level of proof if we are talking about a theft of a bicycle as I'm going to require if we are talking about a capital murder.

Does that seem fair to you?

A   Yes.

Q   Okay.  And that's something you can do?

A   Yes.

Q   Okay.  Now, the other thing I wanted to talk about was this issue of premeditation.  Okay.  And that's another one of those California and New York phrases because we don't have that in Texas law.  There is nowhere in Texas law that you'll find the word premeditated.

But if you think about it, what does that word mean?  Pre means before.  Meditated means think about it.  So, you thought about it before you did it.

A   Okay.

Q   Now, and I understand if you're talking about a person that plans to kill somebody over a long period of time, has lots of time to reflect about it, consider it, and then they still go ahead and do it, still decide to go ahead and do it, okay, now, that's clearly premeditated murder.  Okay?

A   Yes.

Q    But the word we use that we need to concentrate on is intentional.  Okay.  Now, intentional means I meant to cause the result.  I intended to cause the result.  Okay?

A    Okay.

Q    And, now, that can be formed in a minisecond.  Okay.  I can decide right now to reach over and steal Mr. Hikel's cell phone.  Okay.  Now, I didn't have to think about that for ten minutes or an hour.  But I intended, I formed in my mind the intent to do that and I did it.

Okay.  I took his cell phone.  Okay.  So, I intentionally committed that act, even though there is no proof that I thought about it for ten days or two weeks.  See what I'm saying?

A    Yes.

Q    Okay.  By the same token, you can say I premeditatedly stole his phone because I thought about it and I did it and, so, I thought about it before I did it, so that's premeditation.  Okay?

A    Okay.

Q    So, I don't want to confuse you, but the thing is that we don't use the phrase premeditation in cases, but it means about the same thing as intentional.

A    Yes.

Q    Okay.  You formed an intent, excuse me, in your mind to do something, to cause the result, and you did it.

That's what intentional means. It means the same thing as premeditated. Okay.

What the law requires of the State in this type of a case is that they must prove that the murder of the individual was committed intentionally. Okay. In other words, they must prove in a case like this that the person on trial intended to cause the death of the victim and did what it took to get them there. Okay?

A    Yes.

Q    That is what they have got to prove. That's an element right there on the first page of your --

MR. LOLLAR: Is it the first page where we have the indictment or is that some place else?

THE COURT: Well, the indictment is in a separate booklet.

MR. LOLLAR: Where is the indictment?

THE COURT: Far left, ma'am. Far left.

Q    (By Mr. Lollar) There you go. See, that's a copy of the indictment here in this case.

A    Okay.

Q    Okay. And the operative elements are, that the State must prove, are that the defendant here, Mr. Broadnax, intentionally caused the death of Stephen Swan during the course of a robbery. Okay?

A    Okay.

Q    And that is something -- That mindset is something the State has to prove.  If they don't prove that he intentionally caused the death, then he's not guilty of capital murder.

Now, he may be guilty of murder or voluntary manslaughter or criminally negligent homicide.  Those are what are called lesser included offenses within the pyramid that is capital murder.  Okay?

A    Yes.

Q    But, see, that's something they have got to prove. And there is a presumption that the defendant is not guilty. Okay.  And, so, that is something they have got to prove beyond a reasonable doubt.

Okay.  And if you don't believe, after hearing all the evidence, that that's something they proved, then you can't find him guilty of capital murder, but you can find him guilty of something lesser.  Okay?

A    Yes.

Q    Which would take the death penalty off the table.

A    Yes.

Q    Okay.  You see?

A    Yes.

Q    Because you only get to the death penalty if you are found guilty of capital murder.  You can't get to the death penalty if you are found guilty of murder.  Okay?

*Anne B. Meredith*
Certified Shorthand Reporter

A    Got you, yes.

Q    Okay.  Any questions about that?

A    No, sir.

Q    Okay.  All right.  So, we understand now the difference between intentional and premeditation?

A    Yes.

Q    And you would be able to hold the State to what the law in Texas is, to prove that the act was committed intentionally.

A    Yes.

Q    And if they don't do that, you'll find him not guilty or find him guilty of a lesser offense.  If they do do that, you'll find him guilty of capital murder.

A    Yes.

Q    Okay.  All right.  Now, the other thing that I think we need to talk about, I'm not sure if we need to, but we talked about the law -- well, we.  You talked to the prosecutors about the law of parties.

       Okay.  Now, that's accomplices, the law regarding accomplices or someone who helps out with the commission of the offense.

A    Yes.

Q    Okay.  And what you said is very perspicuous because there is a bill in the legislature right now that would prevent the nonshooter from getting the death penalty.

Okay.  Now, I don't know if that bill is going to pass or not, but you're certainly not the first one to think that that's the right thing to do and only give the death penalty, only make the death penalty appropriate for the shooter.

A    Right.

Q    Okay.  Like I say, I don't know if that bill is going to pass.  It may already be dead.  I don't know.  But I know there was some support for that in the lesiglature that's pending right now in Austin.  Okay?

A    Yes.

Q    So, but the law says this.  And understand -- Let me take you through what party is again.

A party is somebody who, acting with the intent to promote or assist the commission of the offense, directs, solicits, aids, encourages or directs or attempts to aid another person to commit an offense.  Okay?

A    Yes.

Q    So, in the example that Ms. Evans was using to you, Mr. Hikel was an accomplice with her in committing a capital murder.  Okay.  And I can't remember who was who in the example but, you know, somebody was driving the getaway car, somebody got the gun.  Okay?

A    Uh-huh.

Q    And then she went in and robbed the store, or whatever it was, killed the clerk, came out.  He knew it

was going to happen or should have anticipated it was going to happen.

So, under the law, he is just as guilty of the offense of capital murder as she is, okay, as Ms. Evans was. And you agreed with that; is that correct?

A    That he was as guilty as --

Q    Yes.  He was as guilty as she was.

A    Only because he --

Q    Right.

A    Yes.

Q    Because he was a party to the commission of it under the law.

A    Yes.

Q    Okay.  So, then the issue became, though, these special issues.  Let's forget number one because that's not really relevant to what we are talking about.

But number two, see, the law says that again there is a presumption that the answer to special issue number two is no, and this is something the State's got to prove to you beyond a reasonable doubt.  Okay?

A    Right.

Q    But the question is, do you find from the evidence beyond a reasonable doubt that the defendant -- now that means the person on trial.

A    Right.

Q    -- actually caused the death of the deceased.  And what that means was the gunman.  Or, if they are not the gunman, did not actually cause the death of the deceased but intended to kill the deceased or another or did anticipate that a human life would be taken by the other person.

Okay.  See what that's saying?

A    Yes.

Q    And it's making the State prove that beyond a reasonable doubt.  Okay?

A    Yes.

Q    So, if the State can present evidence to you that convinces you beyond a reasonable doubt that that is exactly what the nonshooter did, that he anticipated that a human life would be taken and he was a party to the commission of the offense, okay, then the law allows a jury to sentence him to death as well.  It never requires that anybody be sentenced to death, okay?

A    Yes.

Q    But it allows it.  And you know, we have had cases here in Dallas County.  And I can't remember the name of the defendant but I remember what the other guy said.  A guy by the name of Howie Ray Robinson and another guy went into a store.  And this was a robbery at a store where the clerk got killed.  And there was a videotape running.  Okay.  You've seen how those videotapes run.

**Anne B. Meredith**
Certified Shorthand Reporter

And sure enough, here is the guy who is on trial saying, Howie, shoot him, kill him. Okay. And Howie Ray Robinson did just that. Okay. So, here is the guy saying, who didn't have a gun, but he was clearly involved in the robbery and he is saying, Howie, shoot him, kill him. So, he intended that Howie Ray Robinson kill the poor victim, and he did.

A     Yes.

Q     Okay. So, you know, Howie Ray Robinson was convicted of capital murder and so was this guy, okay, because he said right there on the tape, you could hear it clear as a bell, Howie, kill him, shoot him. Okay?

A     Yes.

Q     That's a nonparty that the State was able to show beyond any reasonable doubt that he had in his mind that the co-defendant kill the victim.

A     Right.

Q     Okay. So they can, it's capable of proof. That's something they can show. Okay.

So, you know, we are not saying what would you do in that situation. But you see how there are situations that can arise and evidence can be presented to you which might lead you to cause a nonshooter to get the death penalty?

A     Yes.

Q     Okay. Do you have any problem with that? It can

happen, right?

A    Yes.

Q    Okay.  Well, Ms. McCormick, do you have any questions?  Let me hold off for one second.

Ms. McCormick, do you have any questions about anything?

A    No.

Q    Okay.  Well, thank you so much for coming down and visiting with us.

THE COURT:  Thank you, Mr. Lollar.

Keep your seat, folks.

Ms. McCormick, understandably you've given a couple of conflicting answers.

PROSPECTIVE JUROR McCORMICK:  I know.

THE COURT:  You remember when we first started, I told you all I want you to do is tell me the truth.

PROSPECTIVE JUROR McCORMICK:  Uh-huh.

THE COURT:  But guess what?  I mean you understand how the procedure works.

PROSPECTIVE JUROR McCORMICK:  Yes, sir.

THE COURT:  You understand that if you answer those special issues a certain way, it will result in the death penalty.

PROSPECTIVE JUROR McCORMICK:  Yes.

THE COURT:  If you answer them another way, it will result in a sentence of life in the penitentiary.  Okay.  Can you answer those questions yes or no based on the evidence or do you already have your mind made up how you're going to answer them?

PROSPECTIVE JUROR McCORMICK:  My mind is not made up and yes.

THE COURT:  You can answer them based on the evidence.

PROSPECTIVE JUROR McCORMICK:  Yes.

THE COURT:  Even though it will result in the death of the person on trial.

PROSPECTIVE JUROR McCORMICK:  Yes.

THE COURT:  All right.  All rise, please.

Thank you, Ms. McCormick.  You'll be coming right back in, please.

PROSPECTIVE JUROR McCORMICK:  Okay.

(Prospective Juror McCormick exits the courtroom).

THE COURT:  Let the record reflect Ms. McCormick has left the courtroom.  We're in the presence of Mr. Broadnax.

What says the State of Texas?

MS. HANDLEY:  Your Honor, we would challenge this juror on her statement that, "I have enough doubts that

I have to say I cannot do this". I think it's certainly amplified by what the record may not show in that this woman was extremely nervous every time, uncertain about her answers, and audibly kind of gulping and moving in her chair, and such as that. I don't think she was confident really with what she was saying. I think it's also evidenced by the statements set out in her questionnaire here. And in addition, as the Court noticed also, the conflict in the answers.

But I think that the tenor of this woman, her answers and everything all involved here, I think the truest thing she said was, "I have enough doubts that I have to say I cannot do this".

THE COURT: It will be denied.

Mr. Lollar.

MR. LOLLAR: She is acceptable to the defense, your Honor.

And might I further say this is a perfect reason why there should be video recording in this proceeding. I would like that answer by the State typed up so I can take that to Judge Snipes. And I will reurge my motion to videotape this recording -- this proceeding.

THE COURT: You want to address Judge Snipes about --

MS. HANDLEY: That might make more sense if

**Anne B. Meredith**
Certified Shorthand Reporter

the judge had sustained my challenge.

(Prospective Juror McCormick returns to the courtroom).

THE COURT:  You have been accepted as a qualified juror.  Here's what we are going to do.  We are going to give you a card of the court coordinator.  And I told you about when the time the actual twelve will be selected.  Should you actually be on the jury, you'll be given a phone call.

Please avoid any media contact, you know, any outside influence.  We don't want you to be inadvertently disqualified.  Also, the telephone numbers and the addresses on your questionnaire are still the same, correct?

PROSPECTIVE JUROR McCORMICK:  Yes.

THE COURT:  Okay, good deal.  Thank you very much.  I appreciate you being here.

PROSPECTIVE JUROR McCORMICK:  Thank you.

THE COURT:  Should anything occur, should anything occur in your life that you think might affect this service, give her a call.

PROSPECTIVE JUROR McCORMICK:  I sure will.

THE COURT:  Glad to have met you, ma'am.

(Prospective Juror McCormick excused from the courtroom.

(Discussion off the record).

**Anne B. Meredith**
Certified Shorthand Reporter

(Prospective Juror No. 79, Michael Potter, enters the courtroom).

THE COURT:  Yes, sir.  Here you go, sir.  Be seated, please.  Do this for me.  Raise your right hand, please, sir.

(Prospective Juror Potter duly sworn).

THE COURT:  All right.  Thank you, sir. Without anything further from me, I'm going to introduce Mr. Gordon Hikel who is going to speak to you on behalf of the State of Texas.

Mr. Hikel.

MR. HIKEL:  Thank you, Judge.

MICHAEL POTTER,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. HIKEL:

Q    Mr. Potter, do you have your questionnaire?

A    No.

THE COURT:  That's my fault once again.  Here you go, sir.

PROSPECTIVE JUROR POTTER:  That's not me.

MR. HIKEL:  Number 79.

PROSPECTIVE JUROR POTTER:  Michael Potter.

THE COURT:  Potter.  I'm sorry.

Please proceed.

MR. HIKEL:  Thank you, Judge.

Q    (By Mr. Hikel)  Mr. Potter, you remember filling out this questionnaire about over a month ago with the big panel?

A    Yes.

Q    Okay.  And I think you were just handed it a second ago.  I know you may not remember filling out all of the question you were asked.  But is there anything in the questionnaire you have answered that you believe you've changed your mind about, for example, anything in particular?

A    I would have to look through the questionnaire first.  The only thing, I just, you know, I thought I recognized the defendant's name.  And just the more I thought about it, and I do just briefly remember hearing about the case from the news and stuff.  It's been a couple of years ago, I guess.  I recall that.

Q    Okay.  On the very first page there on the bottom of that questionnaire you're asked a question about, with reference to the death penalty, which of the following statements best represents your feelings?  And you believe -- You said, I believe that the death penalty is appropriate in all murder cases.

A    Uh-huh.

Q    Is that still how you feel?

A    Yep.

Q    Okay.  You understand that is not the law in Texas, correct?

A    Yes.

Q    All right.  But that's still how you feel about it today?

A    Yes, it is.

Q    Okay.

THE COURT:  All right.  Anything further?

Thank you, Mr. Potter.  You'll be excused, sir.

PROSPECTIVE JUROR POTTER:  All right.

THE COURT:  Appreciate you coming down.  You fulfilled your duty.  We appreciate it.

PROSPECTIVE JUROR POTTER:  Thank you.

(Prospective Juror Potter excused from the courtroom).

THE COURT:  Are you going to challenge him for cause?

MR. LOLLAR:  Yes.

MR. HIKEL:  On the record.

MR. LOLLAR:  Yes, we will challenge him for cause.

THE COURT:  It will be granted.

THE COURT:  Dews.

(Prospective Juror No. 15, Pahia Dews enters

**Anne B. Meredith**
Certified Shorthand Reporter

the courtroom).

THE COURT:  Good afternoon, Ms. Dews.  Thank you very much.  Let me hand you -- Please have a seat.

PROSPECTIVE JUROR DEWS:  Right here?

THE COURT:  Yes.  Let me hand you your questionnaire.  It's a little crowded here, isn't it?

There you go, Ms. Dews.

Pease be seated, counsel.

Mr. Dews, do this for me, please, ma'am.

(Prospective Juror Dews duly sworn).

THE COURT:  All right.  I don't think it matters what hand.

Please proceed, counsel.

MR. HIKEL:  Thank you, your Honor.

PAHIA DEWS,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. HIKEL:

Q    Ms. Dews, my name is Gordon Hikel.  On behalf of the State, I just have a few questions to ask you.

A    Uh-huh.

Q    The questionnaire you have in front of you, you remember filling out that questionnaire and signing it about a month ago?

A    Yes.

242

Q    In the questionnaire, I think it was the first page, you were asked a question, with reference to the death penalty, which of the following statements best represents your feelings.  Do you see that question there?

A    Yes.

Q    And you circled five which says that you could never, under any circumstances, return a verdict which assesses the death penalty.

A    Yes.

Q    Okay.  Is that still how you feel today?

A    Yes.

MR. HIKEL:  All right.  No further questions.

THE COURT:  You'll be excused, ma'am.

MR. HIKEL:  Ms. Dews, thank you for your time.

THE COURT:  You will not have to return. You're free to go.  If you will leave that, please, ma'am. You're free to go.  Thank you.

PROSPECTIVE JUROR DEWS:  Thank you.

(Prospective Juror Dews excused from the courtroom).

THE COURT:  What says the State of Texas?

MR. HIKEL:  We submit Juror number 135, Ms. Dews, for cause.

THE COURT:  It will be granted.

Adams.

*Anne B. Meredith*
Certified Shorthand Reporter

(Prospective Juror No. 156, Kimberly Adams, enters the courtroom).

THE COURT:  Good afternoon, Ms. Adams.

PROSPECTIVE JUROR ADAMS:  Hello.

THE COURT:  Good afternoon, Ms. Adams. Please, ma'am, right here, please, ma'am.  Come through this maze.  You'll have a seat there, please, ma'am.  Yes, ma'am.

Please be seated, folks.

I want to say good afternoon to you, Ms. Adams. Do this for me, please, ma'am, raise your right hand.

(Prospective Juror Adams duly sworn).

THE COURT:  I'm going to introduce to you at this time, ma'am, Gordon Hikel who will speak to you on behalf of the State of Texas.

MR. HIKEL:  Thank you, Judge.  Did she get her questionnaire?

THE COURT:  I do.  There you go, ma'am.

KIMBERLY ADAMS,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. HIKEL:

Q    Ms. Adams, I just have quick questions for you, a couple of questions, ma'am.  If you -- Is that your questionnaire you filled out about a month ago when you

came to this courthouse; you remember filling that out?

A    Yes.

Q    Okay.  Would you flip to the second page for me, please.  The second question there asks, do you have any moral, religious or personal beliefs that would prevent you from sitting in judgment of another human being?  You put yes, and you said, I feel it is not right to judge others.

You see that in your questionnaire?

A    Uh-huh.

Q    Okay.  And then the following, the next question asks you basically the same thing but asks for an explanation.

A    Uh-huh.

Q    And you said because of your religious beliefs.

A    Yes.

Q    Okay.  Is it -- Today as you sit here before us, is it still your religious belief that, and whatever your beliefs are, that that religious belief you have would prevent you from sitting in judgment of another human being?

A    Yes.

MR. HIKEL:  Okay.  I have no further questions.

THE COURT:  You'll be excused, ma'am.  You will not have to serve.  You're free to go.  You do not have to return.

PROSPECTIVE JUROR ADAMS:  Okay.

THE COURT:  Walk right through there, please,

*Anne B. Meredith*
Certified Shorthand Reporter

ma'am.

MR. HIKEL:  Thank you, Ms. Adams.

(Prospective Juror Adams excused from the courtroom).

THE COURT:  What says the State of Texas?

MR. HIKEL:  Judge, the State would submit Ms. Adams for cause.

THE COURT:  It will be granted.

THE COURT:  9:00 o'clock.

(Court adjourned for the day).

**Anne B. Meredith**
Certified Shorthand Reporter

THE STATE OF TEXAS    (

COUNTY OF DALLAS      (

  I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 27th day of May, 2009.

  I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

  I further certify that the total cost for the preparation of this Reporter's Record (Volume 9) is $1,665 and will be paid by Dallas County.

  WITNESS MY OFFICIAL HAND this the 29th day of November, 2009.

_Anne B Meredith_
_____
Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter