R E P O R T E R' S R E C O R D.
VOLUME 10 OF ____ VOLUMES
TRIAL COURT CAUSE NO. F08-24667-Y

STATE OF TEXAS ) IN THE CRIMINAL DISTRICT

VS ) COURT NUMBER SEVEN OF

JAMES BROADNAX ) DALLAS, COUNTY, TEXAS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

INDIVIDUAL VOIR DIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FILED IN
COURT OF CRIMINAL APPEALS
SEP 16 2010
Louise Pearson, Clerk

ORIGINAL

On the 28th day of May, A.D., 2009, the above entitled and numbered cause came on to be heard for trial in the said Criminal District Court No. 7, with the Honorable Michael Snipes, Judge presiding, and the following proceedings were held, to wit:

Proceedings reported by COMPUTERIZED STENOTYPE MACHINE; Reporter's Record produced BY COMPUTER-ASSISTED TRANSCRIPTION.

A P P E A R A N C E S


MS. ANDREA HANDLEY
SBTN:  08898800
MS. ELAINE EVANS
SBTN: 24032880
MR. DAVID ALEX
SBTN: 24003256
MR. GORDON HIKEL
SBTN: 00787696
133 North Industrial Boulevard
Dallas, Texas  75207
(214) 653-3600
ATTORNEYS FOR THE STATE


MR. BRAD LOLLAR
SBTN: 12508700
1700 Commerce Street, Suite 450
Dallas, Texas  75201
(214)384-8178
MR. DOUG PARKS
SBTN: 15520000
321 Calm Water Lane
Holly Lake Ranch, Texas  75765
(903)769-3120
MS. KERI MALLON:
SBTN: 24049165
133 North Industrial Boulevard
Dallas, Texas  75207
(214) 653-3600
ATTORNEYS FOR THE DEFENDANT

INDIVIDUAL QUESTIONING OF PROSEPCTIVE JURORS
CHRONOLOGICAL INDEX

(VOLUME 10)

May 28, 2009

| PROSPECTIVE JUROR | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|
| SHARRON MCCRANEY | 16 | 58 | | 10 |
| Venireperson accepted......................83 | | | | |
| ELAINE CLEMENTS | 95 | 132 | | 10 |
| Venireperson accepted......................160 | | | | |
| MICHAEL DOBBINS | 162 | | | 10 |
| State's challenge for cause...............163 | | | | |
| Court's ruling...........................163 | | | | |
| Venireperson excused for cause...........163 | | | | |
| MIRA JOSEPHINA MARTINEZ | 163 | | | 10 |
| State's challenge for cause...............165 | | | | |
| Court's ruling...........................165 | | | | |
| Venireperson excused for cause...........165 | | | | |
| AMY ANNAB | 181 | | | 10 |
| State's challenge for cause...............183 | | | | |
| Court's ruling...........................183 | | | | |
| Venireperson excused for cause...........183 | | | | |
| BRADLEY WILTSHIRE | 185 | 220 | | 10 |
| Venireperson accepted......................236 | | | | |
| | | | PAGE | |
| Court adjourned...........................237 | | | | 10 |
| Court Reporter's certificate..............238 | | | | 10 |

INDIVIDUAL QUESTIONING OF PROSEPCTIVE JURORS
ALPHABETICAL INDEX

(VOLUME 10)

| PROSPECTIVE JUROR | STATE | DEFENSE | VOL. |
|---|---|---|---|
| AMY ANNAB | 181 | | 10 |
| ELAINE CLEMENTS | 95 | 132 | 10 |
| MICHAEL DOBBINS | 162 | | 10 |
| SHARRON MCCRANEY | 16 | 58 | 10 |
| BRADLEY WILTSHIRE | 185 | 220 | 10 |

P R O C E E D I N G S

(Venireperson McCraney enters courtroom.)

THE COURT:  Ms. McCraney, I want to say good morning to you, again, on behalf of all of us.  We appreciate you being here.  My name is Webb Biard and I'll be with you this morning during the jury selection process.  The presiding judge of this court is Michael Snipes, who you met in that general voir dire, the big courtroom.  And should you be selected as a juror, Judge Snipes will actually preside over the trial.

I'll ask you to do this for me, please, before we go any further.  Raise your right hand.

(Venireperson McCraney was sworn.)

THE COURT:  Also, I want to introduce to you at this time Andrea Handley.

MS. HANDLEY:  Good morning.

THE COURT:  David Alex.

MR. ALEX:  Good morning.

THE COURT:  Elaine Evans.

MS. EVANS:  Good morning.

THE COURT:  Gordon Hikel.

MR. HIKEL:  Good morning.

THE COURT:  Sandra Robins.

MS. ROBINS:  Good morning.

THE COURT:  They represent Dallas County

PROCEEDINGS

(Venireperson McCraney enters courtroom.)

THE COURT: Ms. McCraney, I want to say good morning to you, again, on behalf of all of us. We appreciate you being here. My name is Webb Biard and I'll be with you this morning during the jury selection process. The presiding judge of this court is Michael Snipes, who you met in that general voir dire, the big courtroom. And should you be selected as a juror, Judge Snipes will actually preside over the trial.

I'll ask you to do this for me, please, before we go any further. Raise your right hand.

(Venireperson McCraney was sworn.)

THE COURT: Also, I want to introduce to you at this time Andrea Handley.

MS. HANDLEY: Good morning.

THE COURT: David Alex.

MR. ALEX: Good morning.

THE COURT: Elaine Evans.

MS. EVANS: Good morning.

THE COURT: Gordon Hikel.

MR. HIKEL: Good morning.

THE COURT: Sandra Robins.

MS. ROBINS: Good morning.

THE COURT: They represent Dallas County and the State of Texas.

Also, we have Brad Lollar.

MR. LOLLAR: Good morning.

THE COURT: Doug Parks.

MR. PARKS: Good morning.

THE COURT: Keri Mallon.

MS. MALLON: Good morning.

THE COURT: And they represent Mr. James Broadnax. I want to give you your questionnaire, that I should have already done.

Now, I know that took a lot of time for you to fill out, but the attorneys are ready and it is going to save you time here today.

Ms. McCraney, as we sit here now, are you aware from filling out that questionnaire and reading the pamphlet -- did you have the opportunity to do that?

VENIREPERSON MCCRANEY: Did I read the pamphlet?

THE COURT: Yes, ma'am.

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: And you heard Judge Snipes in general voir dire. Are you aware that this is a capital murder case?

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: And do you understand the State of Texas is seeking the death penalty?

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: Because of that, we have -- you have the opportunity to talk to us individually, one-on-one, because of this type of case. This is the only type of case in which a juror actually comes in and talks to the lawyers one-on-one.

Now, these are outstanding lawyers or they wouldn't be involved in this case, but they're also outstanding people. It is out of the question that anybody involved in this is going to intentionally embarrass or intimidate you or talk hard to you. That's not going to happen. Also, you're not expected to know the law. That doesn't have anything to do with this. It is our job to explain the law to you and then you'll be asked what you think you have a fairly good understanding of the law that applies to this case, would you be able to follow the law. Does that make sense to you?

VENIREPERSON MCCRANEY: I think so, yes, sir.

THE COURT: Okay. If you can follow the law and consider the full range of punishment and just base your verdict on the evidence, the facts you hear in the trial, you'll be a qualified juror. If for some reason you can't, in other words, you already have your mind made up as to what you might do, then you wouldn't be a qualified juror. Does that make sense to you?

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: Okay. Now, Judge Snipes, if you know him from reading that pamphlet, he told us this trial is going to start August 10th. It is going to last two weeks, Monday through Friday, 9:00 to 5:00. There will be a break in the morning, a break in the afternoon and a lunch break. The jury will not have to stay together overnight unless and until your're deliberating your verdict.

Have you ever sat on a jury before?

VENIREPERSON MCCRANEY: No, sir.

THE COURT: Okay. Deliberating your verdict means that you've heard all of the evidence and you decide what your verdict is going to be. In other words, you're back in the jury room. Let's say you deliberate late into the night and became weary and unable to reach a verdict and just couldn't really concentrate anymore, there is a possibility you will all be taken to a fine hotel, County expense, individual private rooms, and then you'd all be brought back together the next morning to avoid any outside influence. That would be only while you're deciding

your verdict, not during the actual presentation of the evidence. That would be one or two nights at the most. And Judge Snipes would give you advance notice about that, should that look like it is a possibility.

Now, I tell you all of that, those dates August 10th, two weeks, 9:00 to 5:00, Monday through Friday, possibility of maybe having to stay overnight, one night or so in your own room. Is anything going to be going on in your life during that period of time that you think would affect your ability to sit as a juror in this case?

VENIREPERSON MCCRANEY: Not right now, no, sir. I don't know of anything.

THE COURT: Okay. All right. Good. Now, I'm not going to spend a lot of time. The attorneys are going to talk to you for 45 minutes each, for about an hour and a half. You will know whether or not you're a qualified juror in this case. I'll tell you before you leave the building today. By that, I mean, Ms. McCraney, that we're in the process of qualifying some 50 jurors. Once that's done, the actual twelve will be selected from that 50. So when you leave here today, you'll know whether or not you're a qualified juror, but you won't know whether or not for sure that you're actually on the jury. Does that make sense to you?

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: You'd be notified some time near the end of July or early August who actually made it on the jury. I want you to understand that.

Now, you did read the pamphlet and you think that helped you some.

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: Okay. One thing I want you to have an understanding of is all criminal jury trials in Texas, whether it is a theft of a bicycle or a capital murder case, are in two parts. The first part is the guilt or innocence phase, the second part is the punishment phase. And you'll know which part of the trial you're in. A person found not guilty, they're in the punishment phase. So to have a punishment phase, you've had to have found the person guilty. Does that make sense to you?

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: Now, capital murder is the only crime in Texas where the death penalty is a possible punishment. You cannot get the death penalty for murder. So what does that mean? That means there must be some difference between murder and capital murder. Murder is intentionally or knowingly causing the death

of an individual. It is not a car wreck, not an accident, not a mistake, not self-defense. Intentionally or knowingly causing the death of an individual, that's murder.

Capital murder is intentionally or knowingly causing the death of an individual, a conscious objective or desire in certain fact specific situations. Murder of a policeman, a fireman, a child under the age of six, murder someone while robbing them, kidnapping them, sexually assaulting them, burglarizing their home, committing arson, murder for hire, murder of more than one person in a single episode. Those are some examples of capital murder. So there is a difference between murder and capital murder.

I use this example -- by the way, we use some examples. Some of them are outlandish, we know it, but we're not allowed to talk about the facts, anything near the reported facts of this case.

Two men driving down Central Expressway. It is a hot afternoon, they get into a road rage. They pull over, they both get out, one has a gun, he shoots and kills the other man. Is that murder?

VENIREPERSON MCCRANEY: Yes.

THE COURT: Is it capital murder?

VENIREPERSON MCCRANEY: No.

THE COURT: You're exactly right. You're exactly right. One thing I want to stress -- it seems like I don't have the ability to do this very well -- before someone can be guilty of capital murder, they have to intentionally cause the death of an individual. Some people say, well, I think I can be fair. I didn't think they really meant to do it. For somebody to be guilty of capital murder, they have to have intentionally caused the death. Does that make sense to you?

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: Okay. Now, if somebody is found guilty of a capital murder, there's only two possible punishments. Do you know what they are?

VENIREPERSON MCCRANEY: No, sir.

THE COURT: Okay. You're not expected to know anything. If somebody is found guilty of capital murder, they're either going to receive life in prison without parole -- and when I say life in prison without parole, Ms. McCraney, I mean life in prison without parole -- death. If you're found guilty of capital murder, you're either going to receive life in prison without parole or death. The way the jury decides whether the punishment should be life in prison without parole or death is answering those three special issues.

13

Do you remember those special issues in that pamphlet?

VENIREPERSON MCCRANEY: No, sir, I don't remember.

THE COURT: What I want you to do is just read them to yourself and then the lawyers are going to start talking to you about it. They are going to spend quite a bit of time, I guarantee it, on these special issues. And I'll bet you haven't ever seen them before or heard about them, because nobody else in this courthouse has, except very few people, so if you'll take your time and read them.

VENIREPERSON MCCRANEY: Can you explain number two?

THE COURT: Yes, ma'am, I think I can. The lawyers are going to spend a lot -- let me give you a better understanding of that. That's called the law of parties. They used to call it, way back when I was your age, they would call it aiding or abetting. Now, it means this: If somebody assists, directs, aids, encourages somebody else to commit a crime, then they're just as guilty as the person who committed the crime. By that, I mean, if I'm going to go rob a bank and my best friend, my partner, drives the car to the bank and lets me out and knows I'm going to rob a bank and I go in and rob it and I come back out and then we drive off

14

and I wouldn't have been able to pull the bank robbery off without him, he's just as guilty as if he'd gone in the bank. Does that make sense to you?

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: All right. That's to be found guilty, whether or not he should have known that I was going to rob that bank, but to be given the death penalty, and to answer Special Issue No. 2, you have to be able to find that that person who drove the car actually did know I was going to rob the bank. So there's a difference between should have and actually did.

VENIREPERSON MCCRANEY: Okay.

THE COURT: Do see that difference?

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: Some people just can't see it, but to be a qualified juror, you're going to have to be able to see that difference. You can be guilty if you should have, but you can't receive the death penalty unless you actually did.

VENIREPERSON MCCRANEY: Okay. I think I got it.

THE COURT: I think you do too. Okay. And you see there it tells you if you answer a certain way where you go after that?

15

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: Okay. Finally, a yes to 1, a yes to 2 and a no to 3 is a death sentence.

In other words, he's going to be a future danger, it doesn't say that, but, yes, a future danger. Two, he or she actually did anticipate and three, no, there's no sufficient mitigating circumstances, it is a death sentence. If you answer no to one, it is a life sentence. If you answer no to two, it is a life sentence. If you answer yes to three, it is a life sentence.

The lawyers are going to spend a lot of time with you on this, this morning. Even though you have found someone guilty of capital murder -- one more time, Ms. McCraney, that's intentionally causing the death of an individual in one of those specific situations -- can you still, in the punishment phase, go to those special issues and just answer them yes or no based on the evidence? Does that make sense to you?

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: Do you have anymore questions of me?

VENIREPERSON MCCRANEY: No, sir.

THE COURT: Okay. Should you have any questions of any of us, feel free to ask us. If you

16

need water or a Coke, need to take a break, let me know. All of us are either drinking either coffee, Coke or water, you're certainly entitled to it.

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: Without anything further, I'm going to reintroduce to you Andrea Handley. She's going to talk to you on behalf of the State of Texas.

MS. HANDLEY: Thank you, Your Honor.

SHARRON MCCRANEY, having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION FROM THE STATE
QUESTIONS BY MS. ANDREA HANDLEY:

Q. Good morning again. How do you feel being here?

A. A little nervous.

Q. I think I would too. Have you ever seen so many lawyers in one room staring you down?

A. No, ma'am.

Q. It's kind of -- I can't speak for you, but I would think it is a little bit intimidating. You've never been in a situation like this before?

A. No, ma'am.

Q. Okay. That you're a little nervous, is perfectly natural. I would be nervous too if I was called down here and I had a judge talking to me and a

bunch of lawyers talking to me about something that is so important as to a death penalty case.

I'd like to talk to you a lot about the law. And here's the thing, what is this Special Issue No. 2? A lot of people come in and go, what in the world does that mean? We didn't write the laws in here. Somebody else did from the Texas legislature. And I've been doing this 20 years, and sometimes I have to read stuff 15 times to go, What in the world were they talking about? So, if you don't understand something or most particularly, if you don't understand something we're asking you, by all means, stop us and make us explain it to you again, okay?

A.  Yes, ma'am.

Q.  And I'll tell you this, Ms. McCraney, is that at this point -- and have you sworn the juror in?

THE COURT:  I'm sorry.  Wait a minute, I did.

MS. HANDLEY:  Okay.

Q.  (By Ms. Handley)  At this point, Ms. McCraney, all you're obligated to do by the oath that you've taken so far is to tell the truth.  You are not sworn in as a juror on a case or anything like that.  You're here to tell the truth to us.  I think you can appreciate that you're here on an extremely important case.  We're talking about the ultimate punishment that a jury can render.  And that is what?

A.  The sentencing part.

Q.  Yes.

A.  Either life or death.

Q.  All right.  We're talking about you potentially being a part of taking another person's life.  If you are ultimately on a jury in this case and we ultimately prove our facts to you beyond a reasonable doubt, and prove those special issues to you that would have you have to vote yes, yes, and no, then what that means, Ms. McCraney, is that the judge has no discretion.  He will have to go and sign a warrant for the death of the defendant and that's the defendant sitting down there. I don't know if you got a good look at him.  Take a good look at him.  Are you okay with that?

A.  Yes, ma'am.

Q.  Does that make you a little nervous to look at him?

A.  Yes, ma'am.

Q.  Tell me why.

A.  It's a little bit uncomfortable for me to be sitting in the same room with someone that I have to make that type of a decision.

Q.  And that's perfectly natural and that's what I want to explore with you.  I've read your questionnaire and I think you sound like a pretty fair-minded woman and it looks like we like the same TV shows.  I'd probably enjoy having a cup of coffee with you.  But what I don't get from that piece of paper, from reading that piece of paper is whether or not you're the right juror for this particular case.  It is very easy, I think -- and keep in mind, what I think is my opinion and what they think and their opinions, that and a buck and a quarter will get you a cup of coffee.  It doesn't amount to a hill of beans what my opinion is at this point.  What amounts to a hill of beans is your opinion and that's what's important.

I don't want you to tell me what the politically correct answer is.  I don't want you to tell me what you think I want to hear.  You're not here for that.  You're not here for that.  And nobody is going to -- at the end of this if you say, I can't participate in a case like this, this isn't for me, this would violate my personal feelings and convictions about the death penalty, nobody is going to say, gheez, what a weak link.  There is nothing like that going on here. Nobody is going to write a letter or put something in the newspaper saying, Ms. McCraney doesn't have the guts to participate.  That's absurd.  I think you can appreciate that this kind of case is not right for everybody.  And I can kind of tell, because you even have a hard time even looking at him over there right now, right?

A.  Yes, ma'am.

Q.  Okay.  You put in your questionnaire when we said, how would you feel about being chosen to be seated in this case?  And you said, it doesn't matter.  You said it doesn't matter.  What do you mean by that, it doesn't matter?

A.  The way he explained it to us is that there was a possibility that we may be chosen.  Basically, he was saying, don't make up excuses to not do your civil duty. And when the question came to me on the questionnaire I put, it really doesn't matter.  I feel that I can do it if I had to, but sitting here, I am a little uncomfortable to sit in the same room, but I think I can say if a person is guilty or not guilty based upon facts.

Q.  Okay.  And that's what it comes down to, Ms. McCraney.  That's what it comes down to, as to whether or not you can render a verdict of whether or not the person is guilty and whatever they may be guilty of and whether or not you can go into the second stage of the trial, listen to the evidence and base your

verdict just on the evidence, versus how you may feel about the death penalty or being extremely uncomfortable with it.

If that were to cloud how you looked at the evidence, if that were to maybe make you answer the question in a certain way so that it didn't happen, so that the death penalty didn't happen because of how you felt about it versus the evidence, that's important. I will tell you from doing this for a long time, there are a lot of people that say, I can't honestly tell you, Ms. Handley, that I can base my verdict strictly on the evidence. I'm uncomfortable with this. I am physically uncomfortable with this. I won't give 100 percent of my attention to this because that will cloud how I perceive the evidence. Do you hear what I'm saying?

A. Yes, ma'am.

Q. Does that make sense to you?

A. Yes, ma'am.

Q. And let's talk a little bit about that, then, because I cannot make you come down here and do something and violate your personal feelings or your personal moral convictions or your stance or -- do you know what I'm saying? I can't do that. I wouldn't do that. I think that would be absolutely absurd and I think that if the tables were turned, maybe, and you had a relative, God forbid, you know, who was the victim of an offense and the person who killed that relative was going to trial and you felt that justice needed to be done and you felt that justice in that case was that that person should receive the death penalty, would you feel comfortable having people on the jury who just say, okay, answer the questions, yes, I can follow the law, but in reality, when it really came down to it, they couldn't because they just knew in their heart of hearts that it wasn't the right case for them, but they wouldn't speak up. How would you feel about that?

A. I would think they should have said something if their reasoning wasn't cloudy.

Q. That you're nervous about this is perfectly natural.

People who come in here and say, yes, I'm fine with that. As a matter of fact, I think everybody who commits murder should get the death penalty. I don't want that person on my jury.

MR. PARKS: Your Honor, we will at this point renew our motion in limine and ask that the State be prohibited from giving their personal opinion regarding the death penalty without explaining the law.

THE COURT: Overruled.

Q. (By Ms. Handley) Again, I'm trying to speak to you one on one. What I say is my opinion doesn't matter. I'm just trying to talk to you. The people who say, under no circumstances whatsoever could I ever do it, they're not qualified to sit. And those who say, I'd do it every single time regardless, they're not qualified to sit as a juror. But the people who say, I don't feel great about this, but I can do it if you prove the case to me, is probably the person we're looking for. But we have to make an ultimate decision on whether or not you're that person. We have to be comfortable that we're not putting somebody on there who we're going to hurt mentally and emotionally.

Talk to me about that. If you ultimately found yourself on a case where I had proved to you beyond a reasonable doubt the person was guilty of capital murder and I had proved to you beyond a reasonable doubt those special issues should be answered in a way that means you're going to kill him --

A. Um-hum.

Q. -- that means he's going to go to Huntsville and receive a lethal injection and he is going to die on a gurney, how do you feel about that?

A. Personally, if it was just me making that decision, I really don't know. I think I would go backwards and forwards with it. I would want to make sure that every "I" was dotted and every "T" was crossed because I wouldn't want to live with that. But because it is not just up to me, it is the consensus of twelve people, then I would feel more comfortable with that. But if it was just left up to me by myself, then, no, I wouldn't want that decision, not by myself. But if I'm able to discuss it with other people and we're speaking backwards and forwards on everything and we're all going basically the same way, I'm okay with that. To answer your question, just me, personally, no, ma'am, I wouldn't want it all by myself.

Q. And there's a difference between I wouldn't want to do it and I couldn't do it. Are you saying if it is just you, a one-woman jury, are you saying you couldn't do it or you wouldn't do it? That you wouldn't want to do it or that you just couldn't if it was just you?

A. I wouldn't want to do it -- Can I give you an example?

Q. Yes, please.

A. I believe that, like, people that do things to children, because they're defenseless, if something happens to them, then so be it. But if it is maybe two guys in a fight or something and one guy got hurt, I feel different. That's the best way I can explain to

25

you what I'm saying. If I just had to, then, yes, but I wouldn't want the responsibility. Does that make sense to you?

Q. That makes perfect sense to me. That makes absolute perfect sense to me.

A. Okay.

Q. Let me talk to you a little bit about the law and everything. I'm going to cover a lot of stuff with you and I don't want to overwhelm you, so tell me if I need to slow down. I tend to talk fast if I have a lot to cover in a little bit of time.

As the judge stated very well, what we're talking about is a capital murder. Not every murder is a capital murder. A murder is that you intentionally caused the death of someone, just like the judge stated in his road rage example. That's an intentional murder. It is not a capital murder. A capital murder is a murder plus something else, plus some aggravating factor, like, murder, intentional murder of a child under six years of age. It is that under six years of age that's the aggravating factor. The intentional murder of a peace officer while he's on the job. It is the murder of more than one person during the same criminal episode. It is the murder of a person during the course of committing another felony offense. And

26

that's usually the one that we sometimes hear most about, the guy who goes into the 7-Eleven to rob it. He robs it, that's a felony offense and he kills the clerk, that's capital murder, you know, versus the guy who goes in and kills the clerk just because he doesn't like him. That's not a capital murder. It has to be murder plus something else. Does that make sense to you?

A. Yes, ma'am.

Q. And if I don't prove that plus aggravating factor to you, then what happens?

A. Then it is not --

Q. It is not capital murder, right, but it could be something else, couldn't it?

A. Yes, ma'am.

Q. It could be murder. There are several different, actually, ranges of murder in Texas in our Texas law. We have the highest one, that capital murder, that murder plus something. Then we have the next one, which is just first-degree murder, where if I'm found guilty of first-degree murder, I can be looking at anywhere from 5 to 99 years or life in prison. And then there's even a lower category that's called manslaughter, where I didn't intend to kill the person, but my actions were reckless. I didn't intend to kill him. I might not have even intended to hurt

27

him, but I did something so reckless that I caused somebody's death. That's a second-degree felony. I could be looking at 2 to 20 years in prison. And then there's one even lower than that called criminally negligent homicide. That's something where I could get anywhere from six months in jail up to two years in jail. I killed somebody because I was negligent. Maybe I was in my car, I wasn't paying attention, I'm screwing around with my radio, I never saw the person and I hit him and I killed him. I didn't know they were there, but I should have, shouldn't I?

A. Yes, ma'am.

Q. And you as a juror might be confronted with that question of: Is this capital, no. Is this murder, no. Was it manslaughter, no. Was this criminally negligent, no. Does that make sense to you? The facts might not show a capital, right, but they might show a murder, right?

A. Right.

Q. It might show a negligent homicide. Does that make sense to you? Certain things might be missing.

A. Yes, ma'am.

Q. And capital murder -- before we get to that, if you're guilty of capital murder, one of two things is going to happen, isn't it? One of two sentences is

28

going to happen, right?

A. Right, yes, ma'am.

Q. You're going to get death or spend the rest of your life in prison, right?

A. Right.

Q. Those are the only two options if you're guilty of capital. If you're guilty of something less, a lesser, there's a range of punishment that goes into play. And the jury assesses that punishment in that range of punishment. Does that make sense?

A. Yes, ma'am.

Q. If you find a person guilty of murder, then you're called upon to decide what they should get in the second phase of the trial. And you ask yourself, should they get five years in prison or anywhere in between that or maybe life in prison. As a juror you have to base your verdict -- you have to decide what happens to them based on what the evidence is. It goes back to that always base your verdict on the evidence in the case.

You're sitting on the jury and you have found an individual guilty of murder in the first degree and you're called to assess punishment and, again, this is just the hypothetical, but if I were to say to you, let's take a first-degree murder and envision a

29

35-year-old man who plans out and actually does murder a helpless 10-year-old boy. What is the first thing you will think of?

A. He killed a defenseless little boy.

Q. Yes. He should probably be under the prison, shouldn't he?

A. Yes, ma'am.

Q. Let alone life in prison, right?

A. Yes, ma'am.

Q. Well, let me change that scenario for you a little bit now, okay?

A. Um-hum.

Q. This is just to illustrate an example of the range of punishment and why we have it. That 35-year-old man I just explained to you, that's actually the father of that 10-year-old boy. And that 10-year-old boy is at Children's Medical Hospital and he's hooked up to tubes and IVs because he's dying of terminal cancer and he has for a long time. He's not going to get better, he's going to die. And unfortunately, he's not dying quickly. It is painful, he's suffering, he writhes in pain every day, there isn't anything he can do for him. And that man sits there with nothing but love and affection for that little boy that he has loved and cared for and taken to

30

Boy Scouts his whole life, with tears in his eyes, and watches his son suffer. And he says, I can't take this. I'm going to find some morphine. And he does find it and knowing that's probably the most decent, painless way to kill him, he gives him a shot. He holds him in his arms until his boy dies. That's a whole different way, isn't it? That's murder, isn't it?

A. Yes, ma'am.

Q. Okay. But do you see why we have that range of punishment?

A. Um-hum.

Q. Because of the facts -- you've heard of the expression, let the punishment fit the crime?

A. Yes, ma'am.

Q. That's what we're talking about. Whether we're talking about a criminally negligent homicide, whether we're talking about a capital murder with special issues, you have to let the punishment fit the crime. Does that make sense to you?

A. Yes, ma'am.

Q. And you can't make any automatic assumptions. There's rules of law that come into play in all criminal cases. And you've probably heard these, you read -- I don't know what kind of books you read, but you watch the TV and you hear things, like, reasonable doubt, the

31

right to remain silent, the presumption of innocence, have you heard of all of this?

A. Yes, ma'am.

Q. Those are fundamental principles of law. They apply in every single case. As we sit here today, the defendant is presumed innocent. If I asked you to return a verdict right now, your verdict would have to be not guilty, assuming you were sworn in as a juror, because I haven't proved a single thing to you, have I?

A. No.

Q. Does that make sense to you?

A. Yes, ma'am.

Q. Yes. And the presumption of innocence stays there if and until I can prove to you beyond a reasonable doubt that he is guilty of the crime, okay? I have to prove all of the elements of the crime to you. I don't get points for proving five out of six. I have to prove everything to you beyond a reasonable doubt. I can't tell you what reasonable doubt means, necessarily. I think it is your definition of what reasonable doubt is. What do you think that is?

A. I think that's an individual thing, the reasonable doubt part. What may be doubting your mind may not be doubting my mind.

Q. You're absolutely right. Do you think beyond a

32

reasonable doubt is beyond all doubt whatsoever?

A. Yes.

Q. Okay. The law states that as a representative of the State, I have to prove my case to you beyond a reasonable doubt. And you're right, your definition is your own, but are you saying to me that I would have to prove it to you beyond all doubt whatsoever before you could find somebody guilty of capital murder?

A. Is your question, like, if you give me ten things, if out of those ten things one of them I have a reasonable doubt about, then that means there's some doubt in my mind. Is that what you're asking me?

Q. I have to prove every element of the offense, the person, the date, the place that they killed them, all of that.

A. Right. And if all of that is proven to me, there is no reasonable doubt, but if one of those has not been -- if there is still some question in my mind about one of those, then there is reasonable doubt.

Q. You're absolutely right. I'm going to say you're absolutely right on that. What I'm trying to get from you and make sure we're on the same page or to see if we have a different opinion is, the law says I only have to prove those things to you beyond a reasonable doubt. Not beyond all doubt whatsoever. Some people

will say, we're here on a capital murder case. You're having me participate in something where I have to kill someone. I get this reasonable doubt and everything, but in my mind, you have to prove it to me beyond all doubt whatsoever. How do you feel about that?

A. Okay. You're confusing me a little bit. Could you ask the question again, because I thought we just went over that. When you said it the second time -- for instance, if we all walked out of this room and somebody's purse was missing and you said, the judge did it. And then you said, well, the judge came back in the room, but that doesn't necessarily mean someone else didn't come in the room. There's room for doubt, so -- is that what you're asking me or no?

Q. I think you have a good appreciation for that. There's room for doubt and if that doubt is reasonable, then it is reasonable to assume someone else would have done it. That's reasonable doubt, but are you telling me that there can be no room for doubt whatsoever? I can't prove something to you beyond all reasonable doubt whatsoever, unless you were there. If you were there, would you be a juror?

A. No.

Q. You would be a witness, right?

A. Right.

Q. Okay. So there is that room for some doubt, but it is reasonable doubt. Some people still say, I don't care about that. I have to know 100 percent beyond all doubt. There can be no doubt in my mind even not beyond a reasonable doubt.

A. Okay. Yes, ma'am, I think we understand each other.

Q. Okay. Like I said, I have to prove all of the elements to you and I think you have a good appreciation for that. If I fail to prove one of those elements, then your verdict is not guilty. Do you get that? I think you get that, and I'm not going to belabor that point with you.

I want to talk to you about something else before we move on to capital murder, and you already brought this up with what the judge talked about with law of parties. He's absolutely right that in Texas you could be held liable for a murder even though you were not the trigger man.

A. Okay.

Q. If me and my brother decide to rob the 7-Eleven and we sit down at the kitchen table and we plan it and he goes and gets a gun and I go and get the bullets and we talk about what store we're going to go to and he drives me up there in his car and he says, I'll honk if

I see anything and he sees me take the gun inside the store and he's sitting out there acting as a lookout and I go in there and I shoot someone during a robbery, I'm guilty of capital murder, aren't I?

A. Yes, ma'am.

Q. Now, the law states that you can also find him guilty of capital murder just as if he had pulled the trigger himself as long as he actually participated in the offense. Do you think he participated?

A. Yes, ma'am, because he was there.

Q. Okay. The law also says that in order to find him guilty of that capital murder, you have to find that he should have anticipated that I was going to kill somebody. Do you think he should have anticipated I was going to kill someone?

A. Yes, ma'am.

Q. Why would you say that?

A. Because he assisted.

Q. Okay. Now, let's say that we sat there at the kitchen table and we planned a robbery. I said, look, I'll go in and I'm going to threaten the clerk because I know she's an elderly woman and I'm going to threaten her and scare her and get some money.

And he says, all right. And we drive up there together and he doesn't see a gun on me or anything. He thinks I'm just going to go in and be mean and nasty to her.

And I say, okay, I'm going to go in. I'll be out in a second. Honk the horn if you hear anything. He's sitting there waiting and he hears gunshots and I come running out and I have the money in my hand.

He says, what in the world did you do?

And I say, well, I shot her. I didn't want to leave any witnesses.

A. Okay.

Q. Now, do you think he should have anticipated I would have killed someone?

A. No.

Q. Okay. And that becomes an important factor. I might still be guilty of robbery, though, right?

A. Right.

Q. But I'm not guilty of capital murder, right?

A. Right.

Q. Okay. In order for us to get to that issue in a death penalty case, you're going to have to find that I actually did anticipate or my brother actually anticipated I was going to go in and kill someone. The thing about finding someone guilty of capital murder, where you're not necessarily seeking the death penalty is, if he's guilty of capital murder, one or two things

is going to happen, right?

A. Um-hum.

Q. Life in prison, you're never coming out or you're going to get the lethal injection.

A. Right.

Q. In a sense, ma'am, it kind of takes discretion away from you. Remember you had that wide range of punishment where you can decide what you're going to do with the father who killed his boy out of compassion and love?

A. Yes, ma'am.

Q. You had that wide range and you saw that he was not a bad guy and his motivations weren't ugly and you had that wide range and you had to decide what was appropriate. If you find somebody guilty of capital murder, though, you don't get that discretion. If you find somebody guilty of capital murder and I'm not seeking the death penalty, what is going to happen?

A. Live in prison.

Q. Without parole, right?

A. Um-hum.

Q. They're going to die in prison. I want to talk to you about whether or not you're comfortable with that proposition, because some people aren't. It takes that discretion away from you, in terms of what happens to them. There are so many ways that an offense like that can happen. Same hypothetical, my brother, though, he's actually disabled. He cannot walk, but he does get around. He has a vehicle to help him get around. He's come across hard times, just like a lot of people have today. I know he needs some money to help him get some things that he needs.

And I tell him, look, we can go to that 7-Eleven and I can go in there and I can rob that place and all you have to do is sit in the car and if you see somebody or something like that you just honk that horn and let me know. And I say, I need you to get me a gun. So my brother gives me a gun, but before he gives it to me, he unloads it. He gives me an unloaded gun. So we go up there I start to go in the store and he starts to think about it and he says, I unloaded that gun, but who am I kidding?

My brother would say, she's a hot head. She always carries extra bullets in her pocket. The first thing she always does is check her gun to see if it is loaded and if it is not she reloads it. I think she's going to kill somebody. There is a really good chance she kills that clerk, because she doesn't want to get caught. So he's sitting there thinking about it and says, I need to do something. I need to get out my cell phone and call somebody. And before he can actually get his cell phone and make that call to 911, he hears a shot. I've killed that clerk in that store, right? Is he guilty of capital murder?

A. Yes.

Q. He's never been in trouble before in his life. Is he guilty of capital murder?

A. Yes.

Q. He is a man in a wheelchair. He is a man who had a moment of desperation and he is a man who was about to try to make everything get undone, but now you have no discretion. He's going to go to prison for the rest of his life. How do you feel about that? Do you think that's fair?

A. Yes.

Q. Okay. Let's talk about capital murder sentencing. Understand before you ever get to this stage, just like Your Honor told you, you will have found that the defendant intentionally caused the death of somebody. It wasn't a mistake. It wasn't like you said, maybe two guys brawling or something. He killed somebody and he meant to kill them, or at least he was a party to it and he anticipated it would happen, okay?

A. Okay.

Q. Now, the second stage of the trial is like you're having a second mini-trial at this point. And all of those presumptions and all of those rules of law required in the first part, they apply again in the second part.

A. Okay.

Q. Remember how you presumed him innocent until I proved him guilty?

A. Um-hum.

Q. When you go into that second stage, that presumption, it applies again. But this time you're to presume that a life sentence is the appropriate thing. Only one or two things is going to happen, life or death, right?

A. Right.

Q. Okay. You can't -- he has intentionally killed somebody in the course of a felony. Does that mean he should automatically get the death penalty?

A. No.

Q. Why not?

A. Because if you're saying that he did it in the course of a felony without the circumstances being known, like you just gave me in the other situation, then, no, I can't just say he should receive the death penalty. Maybe, like you said if he was going through something mentally, there are some circumstances and

41

situations that could maybe justify it. I mean, there is no justification to take an innocent life, but maybe there were some things that were going on that triggered it.

Q. I think you kind of hit the nail on the head. Basically, what I'm hearing from you, ma'am, is that you have to wait and see the evidence first, don't you?

A. Yes, ma'am.

Q. And you have to see if it appropriately makes you vote "yes" on this special issue or "no" on this special issue, right?

A. Yes, ma'am.

Q. You haven't heard enough, have you, to make that decision?

A. No.

Q. So you can't go in and automatically say, he's guilty of capital murder, he's going to die. So that presumption of a life sentence is most appropriate until I prove to you beyond a reasonable doubt that the question should be answered in a certain way that would show a death penalty. Does that make sense?

A. Yes, ma'am.

Q. You always look to me for that evidence. And you don't go back and sit down with everybody and say, well, should we kill him or let him live. That's not

42

how it works. Instead, you answer those questions.

Let's start with the first question that you are called upon to answer. We refer to this as the future --

THE COURT: It is on that pamphlet.

Q. (By Ms. Handley) Right. You have it in front of you and you have it back here.

Do you find from the evidence beyond a reasonable doubt there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

What's interesting here is, like I said, we call it the future dangerous list question, because we're calling upon you to make a prediction as to whether or not somebody is going to be a danger in the future. Do you think that's possible to do that?

A. It is possible.

Q. How do you think you can ever predict whether or not somebody is going to be a future danger?

A. Well, I don't know that you're going to have a guarantee, but if a person does something heartless -- I mean, if they just walk up to somebody and just shoot somebody for no reason, I would think they would do it again, because they did it for no reason. There was nothing to trigger it. That is my assumption.

43

But, again, if they were in a brawl or something and it happened, I would think, well, maybe next time they would think before -- that's just my opinion.

Q. Right. I got you. And what I'm hearing from you is that you could maybe consider this question as to whether or not that person is going to be a danger in the future, based on what they did, just by the offense. And you are allowed to do that. You are allowed to just look again back at the evidence you heard in the first part and answer that question just based on that, but you don't have to. You can also now hear additional evidence to help you make up your mind on that, but that's completely appropriate. You can't say automatically, well, he just walked up and killed an innocent guy, so I'm automatically going to answer this question "yes." Does that make sense to you?

A. Yes, ma'am.

Q. You have to go back and sit back and think about it again. Do the circumstances of the offense that he committed, does that mean that question should be "yes"?

They don't define certain terms on there for you. You know, they do say, have I proved to you beyond a reasonable doubt, again, it is my burden, that

44

there is a probability? Do you see a difference between a probability and a possibility?

A. Yes, ma'am.

Q. Okay. I think you used the word "guarantee." You know, a probability isn't a guarantee either. Anything is possible, right?

A. Right.

Q. I mean, it is possible I could win an Olympic gold medal in swimming and beat Michael Phelps, right?

A. Um-hum.

Q. It is really not probable, considering I'm not a good swimmer. Anything is possible, right?

A. Yes, ma'am.

Q. What we're asking you is, is it probable and would you agree that probability is something that is more likely than not?

A. Yes, ma'am.

Q. Okay. Do you have any different definitions than that?

A. No, ma'am.

Q. Okay. So they're asking you, if I prove to you beyond a reasonable doubt that it is more likely than not that the defendant will commit criminal acts of violence -- what it doesn't say is, is that the defendant will commit another murder or that the

45

defendant will commit a rape or that the defendant will commit a robbery. It doesn't say that, does it?

A. No.

Q. It just says, criminal acts of violence.

A. Right.

Q. That's for you to decide what a criminal act of violence is. If I ball up my fist and I hit Mr. Alex right in his head, do you think that would be a criminal act of violence?

A. Yes, ma'am.

Q. Okay. And that's for you to decide what is and what is not a criminal act of violence. There's no definition to it.

Is it more likely than not the defendant will commit criminal acts of violence that will constitute a continuing threat to society?

When I say "society", what do you think I mean by that?

A. Us.

Q. That's us, right. That's me going to the grocery store, picking up my dry cleaning. But if a defendant gets found guilt of capital murder, where is he?

A. In jail.

Q. He's not at Kroger with you?

46

A. No.

Q. No. He is in the penitentiary. Have you ever been to the penitentiary, a prison?

A. No, ma'am.

Q. Okay. Do you understand that there's lots of people in the penitentiary besides inmates?

A. Well --

Q. You have guards.

A. Oh, yes, ma'am.

Q. Right. People who go in and teach, instructors, nurses, doctors, wardens, visitors. There's lots of people there, but that's where these people live, don't they? They eat there, they work there, they live there. Do you see how society could also, then, include a prison society?

A. Yes, ma'am.

Q. Okay. This is the question they're asking you: Based on the evidence that you heard, and you can think about the evidence in the first part of the case, too, and maybe anything else that we've offered, based on that, do you think it is more likely than not that the defendant will commit criminal acts of violence that will constitute a continuing threat to society? Do you think it is possible to answer that question?

A. Yes, ma'am.

47

Q. And the question is, ma'am: Would you automatically answer that question "yes" just because he was found guilty of capital murder?

A. No, ma'am.

Q. Even if it was the most heinous capital murder you had ever seen in your whole life?

A. The details, again, would make me weigh one way or the other.

Q. Right. But would you wait and say, okay, I'm going to presume a life sentence is appropriate, but now let me think about this. Let me discuss this and let me make my decision about that.

A. You said can I?

Q. Yes.

A. Yes, ma'am.

Q. And you would do that?

A. Yes, ma'am.

Q. Okay. If you answer that question "yes", he's come off of that life sentence. He's closer to a death sentence now, okay?

A. Okay.

Q. But it is not over with yet. Now, you have to answer the second issue. And that's that party issue that the judge explained to you that we talked a little bit about.

48

Do you find from the evidence, again, beyond a reasonable doubt -- what does that mean? Who is proving it to you?

A. The attorneys are proving their side.

Q. The State. You always look to the State.

A. Okay.

Q. You never look to the defense, do you?

A. Well, they do have a side.

Q. They do have a side, and I'm going to come back to that, but let me touch on that with you because it is very important for you to understand, okay?

A. Okay.

Q. And, again, we use those outrageous examples and stuff to make our points, but the State always has the burden of proof. I did the charging, I have to bring the proving, okay?

A. Okay.

Q. Do you think that's fair?

A. Yes, ma'am.

Q. Absolutely. I have no problems with it whatsoever. That's a fundamental proposition of law and it is how it should be. I have to prove my case. They don't have to prove a thing.

A. Okay.

Q. They could figuratively, and I'm sure they

49

won't, because I know these lawyers over here and they're brilliant and they're talented, but they could figuratively sit there and work a crossword puzzle during the whole trial. Their only obligation in this case is to show up. Literally, their only obligation is to show up.

Do I think they'll do that, no. I mean, lawyers will traditionally cross-examine witnesses. They'll test the credibility of the witnesses. They'll argue their different points with witnesses, but literally, they don't have to. Do you see what I'm saying?

A. Yes.

Q. Literally, they don't have to. And what the law says to you is, you can't look to them to have him prove his innocence.

A. Okay.

Q. Does that make sense to you?

A. Yes, ma'am. You have to prove he's guilty.

Q. I have to prove it. Do you ever look over there?

A. No, ma'am.

Q. No. Does he ever have to prove his innocence?

A. No, ma'am.

Q. Okay. If they do ask questions, if they do

50

bring witnesses, then you can consider that as part of the evidence. And if he testifies, then you can consider that, but other than that, you look to me.

A. Yes, ma'am.

Q. Have you ever heard of the Fifth Amendment right to remain silent?

A. Yes, ma'am.

Q. If a defendant elects not to testify, the law states you can't use that as evidence against him. Everybody says, if I wasn't guilty I would testify. And that's fine and that's good and I appreciate that, but you can't hold it against them if they elect not to testify. There's probably a million reasons not to testify if you're on trial.

What you can't do is this. Let's say I put my whole case on for you, okay?

A. Um-hum.

Q. And you go back to the jury room and say, I don't think they proved it to me. They're this close from proving their case to me beyond a reasonable doubt, the State, I don't think they did it, but because he didn't testify, I'm going to hold that against him and I'm going to give the State that extra boost and find him guilty. You can't do that. Does that make sense?

A. Yes, ma'am.

51

Q. Okay. Any questions about that and their burden of proof and their obligations?

A. No, ma'am, I understand that.

Q. Okay. So you move to that second question, which is that parties question. In the first part of the trial, if you found the person guilty of capital murder, that means you have found that they participated in the offense and you have found that they should have anticipated somebody was going to die.

Now, you look at this and you're asked to answer the question, do you find that the defendant is actually the one of the party that actually killed the person, and if he's not the person who actually killed the victim in the offense, did he anticipate that person was going to die? Not should he have anticipated it, like, when my brother is, you know, she's a hot head, she carries a gun, versus if I was sitting next to him I loaded that gun up, I looked at him and I said, you know I'm not leaving any witnesses? Should he have anticipated that?

A. Yes, ma'am.

Q. Do you think he did anticipate that?

A. Yes, ma'am.

Q. Do you see the difference there?

A. Yes, ma'am.

52

Q. Okay. You're called upon to answer that question there.

A. Okay.

Q. Did he kill the person himself or did he anticipate that person was going to die, okay?

A. Yes, ma'am.

Q. And, again, you answer this question separately. You don't make any automatic assumptions, do you?

A. No, ma'am.

Q. You base that on the evidence?

A. Right.

Q. Okay. If you answer that question "yes", he's sitting on a death sentence now, okay?

A. Um-hum.

Q. All right. It is at that point then that you answer the final question and that final question is No. 3. We call that the mitigating circumstances issue. I see you looking and it is quite a mouthful. I'll read it out loud with you. Do you find taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, the moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life in prison

53

without parole, versus a death sentence. Okay?

A. Um-hum.

Q. Let me try to explain what that is there. We ask all of the safety net questions, all right?

A. Um-hum.

Q. We don't want you on a jury to -- on a case of this magnitude to have your hands tied, okay. And I think you kind of already touched on this before a little bit where you said, you know, technically the person is guilty of capital murder and, yes, he was a party to it and I think he's a future danger. I think if his brother is around all of the time as long as his brother is around, he's going to be like that. I believe that. I think he intended to kill somebody. I think he's a future danger and I think he was a party to it, but there's some surrounding circumstances there that I don't think he deserves death.

It gives the jury that option. And you can either say you want to show him mercy, you know, or you might look at the evidence in its entirety and go, there was something about that. You know, maybe it is the defendant who after his buddy shot and killed the clerk he stayed behind and tried to save their life and he turned everybody else in and he was remorseful and begged for forgiveness from the family's every day. You

54

know, maybe he's that guy. I can't tell you what is or isn't a mitigating circumstance. Some people say age. Some people say -- it could be anything. And I can't pin you down right now as to what you should think is mitigating, okay?

A. Um-hum.

Q. What's interesting about this final question -- remember I've been talk about the burden of proof?

A. Um-hum.

Q. There's no burden of proof on this on either side. I don't have to prove anything to you and they don't have to prove anything to you. Does that make sense, because I just totally turned that around on you now, haven't I?

A. Yes, because now where does that information come from?

Q. I'll tell you exactly where it comes from.

A. Okay.

Q. I'll tell you exactly where it comes from. It is everything that you heard in trial from the opening, you know, from the first witness hitting the stand to the last thing. You're back there now and you're looking at absolutely everything you heard in trial and it could have been testimony from a police officer. It could have been testimony from a witness. It could have

55

been something you just saw from the offense, but you've taken it all in now and you're looking at it again and you're saying, is there something here? Is there something here that tells me that it is mitigating, that it lessens his moral culpability? Is there something about his background? Was he raised in a closet and fed dog food and had cigarettes put out on him? You know, is there something there that tells me -- that's mitigating. That lessens his moral culpability. You know, it gives you that option. Do you think that's fair?

A. Yes, ma'am.

Q. Yes, it is necessary?

A. Yes, ma'am.

Q. Yes. It is a necessary option that should in all fairness be there for you. Do you think, ma'am, if you found somebody guilty and were a future danger and you found they were a party to it, are you going to automatically go in and decide, there isn't anything that's going to change my mind?

A. No, I wouldn't say that.

Q. Okay. You'd base that decision on the evidence?

A. Yes, ma'am.

MS. HANDLEY: How much time do I have?

56

THE COURT: Two minutes.

Q. (By Ms. Handley) Before we continue on here, are you still unemployed? Are you looking for work?

A. I work with a relative at a daycare, but it is not constant.

Q. Okay. Little kids?

A. Yes, ma'am.

Q. How old?

A. From two months to 14 years old.

Q. Fourteen-year-olds, I don't know. Which do you like best, the babies or the teenagers?

A. Actually, I kind of like the teenage boys, because they're looking for someone to look up to and I try to spend time with them. Actually, I spend more time with the older children than I do with the smaller children.

Q. Are you trying to mentor them? Give them a good example?

A. I try.

Q. What's going on there?

A. Well, two of the older boys are -- there's no father in the home. I'm not taking the place of their father, but I do weekends with them. Like, on the weekends we might go to the circus or we may go to the movies. Just things like that, because these kids need

57

another outlet.

Q. Sure.

A. And then I have an older nephew that I go and get so he can go with me, so it is not they're bonding with another female.

Q. What if one of those boys who didn't have a father got into some kind of trouble. How is the fact that they didn't have a father factor into that?

A. I think it plays a role, but an extremely smaller role. I think that -- an escape goat. You have single parents that raise their children every day and that doesn't make them turn out to be a bad person. And I teach them, I mean, look, you guys get into trouble -- if you get a girl pregnant, you're going to be responsible. If I have anything to do with it, I teach them, you know, the basics. I don't use that as an excuse.

Q. Well, I appreciate you doing that. I appreciate your commitment. My time is over, but thank you for being honest with me.

VENIREPERSON MCCRANEY: Judge, may I have some water?

THE COURT: We will take a break.

Q. (By Ms. Handley) I think you might have -- let me ask you about the very last page of your

58

questionnaire. Turn to that for me there. The question is written kind of strange, but I need to know if this is your answer. The question is: I have never been convicted of any felony. I have never been convicted of any kind of theft or shoplifting. I am not under indictment, nor under any legal accusation for any grade of theft or any felony. As applied to you, is the above statement true and correct?

A. Yes.

Q. You had listed "yes."

A. Yes. I'm not in trouble for anything.

Q. Okay. A lot of people answer that differently and that's why we ask you about that.

A. No, ma'am. You can look. I'm not in any trouble.

THE COURT: We would have all been shocked. I know you've been going at least since 6:00 or 7:00.

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: Let's take a five-minute break.

(Recess from 10:07 to 10:17 a.m.)

THE COURT: Mr. Brad Lollar is going to speak to you on behalf of Mr. Broadnax.

VOIR DIRE EXAMINATION FROM THE DEFENSE

QUESTIONS BY MR. BRAD LOLLAR:

Q. How are you, Ms. McCraney?

59

A. Fine.

Q. Let me get this correct, your first name is Sharron?

A. Yes, sir.

Q. Okay. We need to correct that on our paperwork. We had it down as Shaud, S-h-a-u-d. We figured it was probably Sharron, and sure enough it is. Sharron, how are you today?

A. I'm fine.

Q. Well, thank you for coming down and talking to us. I'm sure there are a million of other things you'd rather be doing than being down here. We talked about how intimidating this must be to a person, such as yourself, to come into a room and see a bunch of people you've never seen before, but you're doing just fine. You started off just fine.

The reason we do this is to figure out if you can be an acceptable juror for both sides in this type of a case.

A. Yes, sir.

Q. And this is the only type of a case where we get to talk to you one-on-one, as opposed to talking to you in a big group of 60 people or so.

THE COURT: If you would rather move your chair where you could look right at Mr. Lollar.

60

VENIREPERSON MCCRANEY: Yes, sir.

Q. (By Mr. Lollar) We do appreciate the time that you took to fill out the questionnaire. We've all read it and we see what you've said and I've had the advantage of hearing everything that you talked to with Ms. Handley, so I probably won't take my entire 45 minutes with you. That's the good news.

Now, as I understand it, were you born and raised here in Dallas?

A. Yes, sir.

Q. Which schools did you go to?

A. I went to South Oak Cliff High School and I went to John 23rd, which is a catholic school. Do you want elementary schools?

Q. Sure.

A. I went to Claire Oliver, Boude Storey Middle School. I went to (Inaudible) Juror College.

Q. What did you study there?

A. At the junior college?

Q. Um-hum.

A. Computer science.

Q. Okay. And I see you have worked as an office manager in a doctor's office?

A. Yes, sir.

Q. And that you've done data entry work and

bookkeeping?

A. Yes, sir.

Q. And you are now, as you told us earlier, currently working in a daycare?

A. Yes, sir.

Q. With a relative of yours?

A. Yes, sir.

Q. Okay. I was interested to hear you say that you kind of like being around the older ones, particularly closer to the fourteen year age and that you try to mentor them?

A. Yes, sir.

Q. And that's very admirable of you and I'm sure they appreciate that you are doing that.

Ms. McCraney, what we want to talk about here for a little while is -- I think you caught on very quickly what the nature of what we're about down here is. You've seen, although you've not been a juror in this case before, you've seen how there are two parts to a trial. The first part is the guilt or innocence phase, where it is required that the State prove each and every element of the indictment beyond a reasonable doubt, okay?

A. Yes, sir.

Q. Now, you have before you there somewhere is the indictment in this case. If you can just take a moment to look at that.

A. Okay.

Q. That's kind of what Judge Snipes did and told you about back when we had the big panel over here in the central jury room about one month ago.

A. Yes, sir.

Q. In talking about proof beyond a reasonable doubt, as Ms. Handley has explained to you, what the law says is, is that doesn't mean beyond all doubt, because if it was beyond all doubt, you would be a witness to the case and obviously you couldn't be a juror if you're a witness.

A. Right.

Q. But it does mean beyond all reasonable doubt. That is not defined in our law and what may be beyond a reasonable doubt to me may be slightly different than what is beyond a reasonable doubt to Ms. Evans here or to you. We all have different concepts about what that means. Can you kind of tell me in your own words what beyond a reasonable doubt means to you?

A. It means, as I explained it before, it is going to be different to each and every individual. If you're saying something to me -- the example I gave was the judge and the purse being in here. If I walked out of

the room and we all walked out of the room and the purse went missing and someone said the judge came back in here and he got it, well, to me, it is reasonable doubt, because was the judge the only one to come back in. You know, did someone else come back in here before and you didn't see them or I didn't see them, that is the best way I can explain it to you. That's my reasonable doubt.

Q. So you'd want to be sure about something before you found somebody guilty?

A. Yes, sir.

Q. Okay. That's fine. That's a good enough explanation for me. You want to be sure in your own mind that what you're doing is right?

A. Yes, sir.

Q. Okay. Now, it is true that you would be a member of a jury of twelve people and that to find somebody guilty beyond a reasonable doubt, all twelve of you would have to come to a consensus on that.

A. Okay.

Q. Do you understand that?

A. Yes, sir.

Q. If only seven of you are convinced of guilt and there are five of you that are not convinced of guilt, then there is not a consensus and the end result would be there that there would not be a verdict; do you understand that?

A. Yes, sir.

Q. Okay. But in the event that you find somebody guilty and all twelve of you agree that the State has proven their case beyond a reasonable doubt, then you go into the punishment phase of the trial. And the punishment ranges varies depending on what type of offense you're talking about. And I think you understand that in this type of a case that if the jury unanimously agrees that the State has carried their burden of proving each and every element of the offense beyond a reasonable doubt, then if the jury makes that determination, then we're in a situation where in the punishment phase there's only two possible things that can happen, death or life in prison without parole. Would you agree with me that either one of those are very serious punishments?

A. Yes, sir.

Q. Okay. Ms. McCraney, one of the things that Ms. Handley talked to you about and the judge mentioned to you, in this type of a case it has to be shown to you beyond a reasonable doubt that the person on trial intentionally caused the death of the victim, okay?

A. Okay.

65

Q. And if you have a doubt about that, then you are perfectly justified in resolving that against the State and really finding him not guilty of capital murder. Let me give you some examples maybe to illustrate what we're talking about. You see on the indictment that that is the culpable mental state, that's what we call it, the mens rea and that is intentional in this case. What intentional means under the law is that the person intended to cause the result and in this case that would obviously mean that he intended to cause the death of the individual -- the victim and did what -- took whatever actions he needed to do to cause that death. That's what it means when we say intentional.

Let's say we have a hypothetical situation where a person goes in to rob a 7-Eleven store and is in the process of robbing with a gun and robbing the lady behind the counter there and what he says to her is, okay, now I'm fixing to leave. You give me the money. That's all I need. I don't need to hurt you, but don't try follow me out to see where I go and I'll get caught.

A. Okay.

Q. But sure enough, she does. She comes around the counter and starts to follow him out and so to stop her from following him, he shoots her in the foot or in

66

the kneecap, okay?

A. Okay.

Q. Now, he didn't mean to kill her, but he runs off and he does escape and sure enough, the bullet has cut the femoral artery and she bleeds to death before the ambulance can get there.

A. Okay. Can I ask you a question?

Q. Yes, ma'am.

A. You say he didn't mean to shoot her?

Q. He meant to shoot her.

A. Okay.

Q. Did but not to kill her.

A. Okay.

Q. Do you see what I'm saying?

A. Yes.

Q. That's why he shot her in the leg to keep her from following him out, like he said. So you see how that would be a murder, but it is not a capital murder, because he didn't intentionally cause the death. He did not mean to cause her death when he shot her in the foot. Now, he did in fact cause her death, so we do have a criminal offense there certainly, but it is not capital murder. It is murder or voluntary, but it is not capital murder; do you see that?

A. Right. Because of what you explained to me

67

earlier, it is the different degree?

Q. Right. That's exactly correct.

A. Okay.

Q. So sometimes facts can come up during the trial of a case where a jury gets to consider what are called lesser included offenses.

A. Okay.

Q. And in that example, the lesser included could be certainly aggravated robbery, which the person would be guilty of. He robbed a person at gunpoint and took their money, or it could be murder, but you see how it is not capital murder, because the State would be unable to prove that he intentionally caused her death when he shot her in the foot, okay?

A. Yes, sir, I follow you.

Q. Very good. Okay. Ms. McCraney, let me explain one thing: Now, the law in Texas allows either side during this first part of the trial, the guilt or innocence part of the trial, to present evidence as to the condition of the mind of the defendant at the time they committed the offense. It goes to that element of what we call mens rea, the culpable mental state, intentional, knowing, reckless or with criminal negligence, okay?

A. Okay.

68

Q. Now, intentional, as I've already talked about, means they intended to cause the end result. They intended to. A knowing would be a murder where maybe they didn't intend to cause the death, but by doing whatever they did, they knew that that might result -- that that would result.

A. Okay.

Q. Reckless, let me give you an example of how a murder can be committed recklessly, and that would drop us down to what we call manslaughter. Sometimes on New Year's Eve people go out and shoot guns in the air. They're not supposed do that. That's against the law. It can hurt people, because if a bullet goes up, it has to come down somewhere and people get injured sometimes. People actually get killed sometimes by those falling bullets.

Now, in that type of a case the actor, by shooting the gun up in the air, has to be aware that something like that could happen, but they consciously disregard that risk, and if the jury finds in a given fact situation that the person was aware that the result may occur, but they consciously disregarded that risk, then the jury may find that that person committed the offense of manslaughter, okay? Do you see that?

A. Right.

69

Q. Okay. And then we have another one called with criminal negligence. That's the mental state there with criminal negligence. That is when they should have been aware that a bad result could happen, but they were not. They should have been aware, but they were not aware, okay?

A. Well, that's the same thing as you said about the gun being shot up in the air.

Q. No. In that instance he was aware that the result may occur and consciously disregarded the risk.

A. Okay.

Q. And then with criminal negligence he wasn't aware that something bad would happen, okay?

A. Okay.

Q. That's just a thumbnail sketch of the four mental states that we have here in Texas law. And it may come up during the course of the trial that you may be required to examine the facts before you to determine which of those mental states the defendant had at the time of the commission of the offense, because the law allows us to present evidence as to the condition of the mind of the defendant at the time of the comission of the offense.

A. Yes, sir.

Q. Okay. Do you have any questions about the

70

guilt or innocence phase of this type of a trial?

A. No, sir. After hearing the information, basically, you just determine the facts, if the person is guilty or innocent. Is that what you're asking me?

Q. That's it in a nutshell. Now, let's turn the tables here a little bit and we're going to talk about punishment in a capital murder case. Let's say that you are the queen of Texas, you are the absolute ruler, there isn't any legislature, there isn't any State senate, you get to do what you want to do, okay?

A. Okay.

Q. Would you have a death penalty on the books?

A. For certain situations, yes, sir. There are certain crimes that deserve -- yes, sir, I do believe that in certain crimes there should be.

Q. Okay. And would you have the possibility of life without the possibility of parole on the books?

A. Yes, sir.

Q. Okay. Very good. So in essence, you theoretically agree with what is in place right now that you've heard about here today?

A. Yes, sir.

Q. Now, do you understand that never in Texas law is it required that a jury return a death penalty?

A. No, sir, I don't know anything about the law.

71

Q. Okay. Let me just tell you that. It is never required that a jury return a death penalty, okay?

A. Okay.

Q. The way that we determine under our law who gets life without parole and who gets death are by answering these three special issues here that we talked about. The first one -- now, understand that at the point you're considering these three special issues, you've already found the defendant guilty of capital murder, okay?

A. Okay.

Q. Now, in the second phase in that punishment phase of the trial, the law allows the State to present whatever additional evidence that they want to, to help the jury answer these three special issues. And the defense gets to offer whatever we want to, to help the jury decide these three special issues, okay?

A. Okay.

Q. If we turn to Special Issue No.1, what the law says is that the jury back in deliberations must consider Special Issue No. 1 first. You have to start with No. 1, okay?

A. Okay.

Q. And what the law says that it is not simply enough that you have found a person guilty of capital

72

murder, that does not mean you automatically answer No. 1 yes, okay?

A. Okay.

Q. In fact, there is a presumption under law that the correct answer is no. And, again, it requires the State to prove that the answer should be yes before you can answer it yes and it requires them to prove that beyond a reasonable doubt, just as high a burden as they had when they were required to prove the case to you, the indictment to you, beyond a reasonable doubt.

A. Okay.

Q. All right. And the issue, again, is: Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? So that means in the future.

A. Right.

Q. No matter where he is. Even if he's in the penitentiary. They have to prove that beyond a reasonable doubt that there is a probability that he's going to continue to be violent and continue to commit criminal acts of violence even if he's in the penitentiary, okay? Do you see that?

A. Yes, sir.

73

Q. Okay. Now, the phrases are not defined. What does probability mean to you?

A. It could happen. It is a possibility.

Q. Let me throw this at you: More likely than not.

A. Yes.

Q. Okay. Not just a possibility. I don't think they would put that word in there. They didn't put that word in there.

A. Right. It has a slight different meaning, but -- yes, sir.

Q. More likely than not?

A. Yes, sir.

Q. So that's something they have to prove to you and they have to prove that beyond a reasonable doubt, okay?

A. Okay.

Q. Now, like I said, the jury is required to answer that question first. So I guess you can say that's one of the main things, obviously. Now, if the jury is convinced, if all twelve of you are convinced beyond a reasonable doubt that there is a probability, then you sign that on the jury verdict and then you go on to talk about Special Issue No. 2, okay?

A. Yes.

74

Q. But -- and here is what I want you to understand, if the jury decides that the answer to that question is no, that the State has not proven beyond a reasonable doubt that he is the type of person that is more likely than not going to be committing criminal acts of violence in the penitentiary that would constitute a threat to society, then, you say no and that's the end of it. You come back into court and you tell the judge, you've already written it out on your verdict sheet and say no, the State has not proven this to us beyond a reasonable doubt. And at that point the judge then sentences that defendant to life without parole. You don't get to the death penalty. You never get any further than that, okay?

A. Okay.

Q. That's the first special issue.

A. So if the answer to the first question is no, then basically you do nothing else?

Q. Right.

A. And you're basing that information off of what the State has to prove, correct?

Q. Yes.

A. Okay. I understand.

Q. In light of what the State has to prove and the presumption that the answer is no, they have to overcome

75

that presumption. Now, you can consider everything you heard in the first part of the trial as well as anything you might hear in the second part of the trial.

A. Okay.

Q. Okay?

A. Yes, sir.

Q. Now, just looking at that question if you can give us some idea, and you don't have to, but if you can, give us some idea of what might be helpful to you in determining to you whether or not a person is probably going to be a person who is going to continue to commit criminal acts of violence in the future.

A. I guess you can maybe say the testimonies of their character witnesses. People that talk about how they -- maybe the police or whoever came to the crime to tell the details of how it happened and maybe that person's state of mind. There is quite a few things.

Q. There are. You're dead-on. You're just dead-on in saying those things. That's exactly right. What their state of mind was, their character, certainly. If they have a violent history, is that something you might want to look at?

A. Yes, sir.

Q. So if we're talking about if they've been violent many times in the past and in addition committed

76

this capital murder, that might be something you'd want to look at there, right?

A. Yes, sir.

Q. On the other hand, if there is no prior violent history, is that something that would be important to you?

A. If there's not one, but still, it would be, like, what caused this to happen? Because even though they may not have a past like that, something could have triggered it. It could go either way.

Q. Okay. Anything else we need to talk to you about in Special Issue No. 1?

A. No, sir.

Q. So do you understand if you answer that no, that's it? You come back in and tell us it is a life sentence without parole.

A. Yes, sir, I understand.

Q. Now, if you as a jury have decided unanimously that the answer to No. 1 is yes, then you go on to talk about Special Issue No. 2. And, again, if the answer is no, the law puts a burden upon the State to prove the answer should be yes before you can find it to be yes, and, again, they have to prove it beyond a reasonable doubt.

Now, No. 2 applies to the parties issue and

77

asks, do you find from the evidence beyond a reasonable doubt that the defendant here on trial is the one who actually was the gunman that caused the death or if he was not the gunman, but he was a party, as you've already decided by finding him guilty and that he actually did anticipate that the death would occur or he actually did intend that the death would occur. Okay?

A. Okay.

Q. And, again, that's something that you can determine looking at the evidence that's been placed before you.

Now, again, if the jury looks at that and considers that and decides that, no, this was not the person who was the actual gunman and, no, he should have anticipated, or you wouldn't have found him guilty, but he actually did not anticipate. If it wasn't proven that he did anticipate, then you answer that question no and it is over. Then you go back into court and tell the judge life without parole and you don't get to the issue of the death penalty. Do you understand all of that?

A. Yes, sir.

Q. Very good. Now, let's say you're at the point in your deliberations where you and all of the other jurors have unanimously decided that the answer to

78

Special Issue No. 1 is yes and the answer to Special Issue No. 2 is yes and only at that point do you take a look at Special Issue No. 3, the mitigation issue. And let's read that again, do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment without parole, rather than a death sentence be imposed. I think that poster might be blocking part of your view there.

Let's talk about that issue. I want you to understand that neither side has to prove that to you beyond a reasonable doubt. Neither side has to prove that to you. There is no burden of proof on that at all. What the law says is this: You can look at all of the evidence that's been presented by both sides and it requires you to consider the defendant's character. It requires you to consider the background of the defendant and the personal moral culpability of the defendant.

Now, in answering that, and this is where I really want to spend my time talking to you, one of the first things you said was there has to be a consensus of twelve people. Not on this issue. The law says each of

79

you twelve jurors should issue your own personal moral judgment on this issue, okay?

A. Okay.

Q. Your own personal moral judgment. And you can look at everything that's been presented and you determine in your mind whether for you something that has been presented is a mitigating circumstance and whether or not that mitigating circumstance rises to something, which you would call a sufficient mitigating circumstance. And if you find that it does, then for you, the State hasn't got you there. They haven't proven their death penalty case. But that's your own personal decision. And what you may view as being a sufficient mitigating circumstance may not be something that the juror sitting next to you thinks is a mitigating circumstance. Do you see that?

A. Yes, sir.

Q. And likewise, something they consider is a mitigating circumstance may not be to you, okay?

Let's talk about a few of these things just to see how you feel about them, certain circumstances, as Ms. Handley has explained to you. A juror might feel that because the defendant is of a certain age, that that alone may be a sufficient mitigating circumstance to spare his life. Some people may think that. Others

80

may think that the lack of a significant prior criminal history or history of violence, despite the fact that obviously he's guilty of this offense because you found him to be guilty of this offense, might be sufficient to be a mitigating circumstance that would spare his life. Do you see how some people might think that?

A. Um-hum.

Q. Okay. The fact that he may be a follower and not a leader in this this situation that brought him to that point. He did the act, but he wasn't the one that got him there. The fact that a person might be under the influence of alcohol or drugs at the time they did the act, that they were not in their right mind, that they were under the influence to the degree where they were not acting in their right mind and that relatives and friends may come and testify that this act was an aberration for them, that they're not normally like that, they're not normally a violent person; do you see how that may be a mitigating circumstance?

A. Yes.

Q. And, again, some people may feel that as the law requires them to look at Special Issue No. 3 at the background of the defendant, that the life story and the events that impacted the defendant that led him to that point in time where the capital murder was committed can

81

be a mitigating circumstance, okay?

A. Yes, sir.

Q. Do you see how all of those things may be -- of course that would depend on what you hear.

A. Yes, sir.

Q. Now, let me impress upon you that in hearing those things and making that decision, you impose your own personal moral judgment on whether or not we have a mitigating circumstance sufficient to avoid the death penalty okay?

A. Okay.

Q. You make that decision for yourself, okay?

A. Um-hum.

Q. Now, the law says that only in the event that all twelve jurors unanimously agree that there are no mitigating circumstances sufficient to avoid the death penalty, do we get to a death penalty.

A. You confused me. You said for the third issue, I'm on my own, basically, right?

Q. Right.

A. That the twelve doesn't count, right?

Q. Right.

A. But then you came back and said -- go ahead.

Q. Right. What I'm saying is this, and follow along with me when I say this, only in the event that

82

all twelve jurors unanimously agree that there are no mitigating circumstances does a person get the death penalty.

A. Okay.

MS. HANDLEY: Actually, Judge, we'll object. It is sufficiently mitigating circumstances that are sufficient, not just that they are mitigating circumstances.

MR. LOLLAR: I'll agree with that.

Q. (By Mr. Lollar) The law says that all twelve jurors must unanimously agree that there is not a sufficient mitigating circumstance to avoid the death penalty. If all twelve jurors unanimously agree, then death is what will result. The death penalty is what will result; do you understand that?

A. Yes, sir, now I do.

Q. But if the jurors think that there are sufficient mitigating circumstances, or if one juror thinks that there is a mitigating circumstance sufficient to avoid the death penalty, this is where this personal moral judgment comes in that you make individually, then life will result, okay?

A. Okay.

Q. Do you have any questions about anything?

A. No, sir, you just answered them.

83

Q. Okay. Ms. McCraney, we're delighted to have you down here and I appreciate you coming down and talking to us. Thank you so much.

THE COURT: Thank you, Mr. Lollar. All rise for Ms. McCraney. Step outside and then you'll be coming right back.

(Venireperson McCraney exits courtroom.)

Let the record reflect we are in the presence of Mr. Broadnax.

What says the State of Texas?

MS. HANDLEY: The State find Ms. McCraney to be a suitable juror.

THE COURT: What says Mr. Broadnax?

MR. LOLLAR: We accept the juror.

(Venireperson McCraney enters courtroom.)

THE COURT: Ms. McCraney, the court says you have been accepted as a qualified juror. Remember, what that means is, you're qualified with fifty.

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: And then once that's done, then twelve will be selected.

VENIREPERSON MCCRANEY: Yes, sir.

THE COURT: We're going to be in touch with you at the end of July, early August and then when that's done, the court coordinator will call you and let

84

you know.

Have you changed your telephone number or address since you filled out your questionnaire?

VENIREPERSON MCCRANEY: No, sir. Everything is still the same.

THE COURT: Okay. I'm going to ask you to avoid any media coverage at all cost. Don't try to find out anything about this case. Don't talk to anybody about this case. Even though you're not yet on the jury, it would be a shame if somebody like you was inadvertently disqualified.

VENIREPERSON MCCRANEY: Yes, sir, okay.

THE COURT: The Sheriff is going to give you the name of the coordinator. It has been a real pleasure meeting you.

VENIREPERSON MCCRANEY: Thank you.

(Venireperson McCraney exits courtroom.)

THE COURT: The Court is in recess for five minutes.

(Recess from 10:49 to 10:57 a.m.)

(Venireperson Clements enters courtroom.)

THE COURT: Ms. Clements, I'm going to hand you your questionnaire. Before we go any further, I'd like for you to do this for me. Please raise your right hand.

85

(Venireperson Clements was sworn.)

THE COURT: Ms. Clements, my name is Webb Biard and I'll be with you this morning. And like I told you earlier, we'll probably go some past noon, but you said you'd agree that you'd rather do that than stop and come back. Also, I want to introduce some other folks to you at this time, we have Andrea Handley.

MS. HANDLEY: Hi.

THE COURT: David Alex.

MR. ALEX: Good Morning.

THE COURT: Gordon Hikel.

MR. HIKEL: Good morning, ma'am.

THE COURT: Elaine Evans.

MS. EVANS: Good morning.

THE COURT: Sandra Robinson.

MS. ROBINSON: Good morning.

THE COURT: They represent Dallas County and the State of Texas.

And also we have Doug Parks.

MR. PARKS: Good morning.

THE COURT: And Keri Mallon.

MS. MALLON: Good morning.

THE COURT: And they, with Brad Lollar, which he will be arriving shortly.

MR. PARKS: Well, he may not get here.

86

THE COURT: Okay. That's no problem. Should you be selected as a juror, Brad Lollar also represents Mr. James Broadnax.

As you sit here now from filling out your questionnaire, which we appreciate very much, and you have it here and I know it took a while for you to do it that day, but it is going to save you that much time or more today.

The attorneys have read it, but they're not going to go back over it in detail, but I'm sure there'll be an answer or two they'll want you to expound on. You heard Judge Snipes' remarks and you now appeared and read that pamphlet. As you sit here, are you aware that is a capital murder case?

VENIREPERSON CLEMENTS: Yes, sir.

THE COURT: Do you understand the State of Texas is seeking the death penalty?

VENIREPERSON CLEMENTS: Yes.

THE COURT: All right. Because of that, the law of Texas requires that you and the other prospective jurors have an opportunity to talk to us individually one-on-one. And let me tell you, Ms. Clements, I've got enough country common sense to know that this can be intimidating for some people. I understand that. There might not be anything I can say

87

to make it not be intimidating, but I will tell you, these are outstanding lawyers or they wouldn't be involved in this case. Let me tell you something, more importantly to me, they're good people. It is out of the question that anybody involved in this process on this side of the table would intentionally or knowingly intimidate a prospective juror. You are to be totally respected and they will respect you.

Now, Judge Snipes -- one thing I want to address before we go too far, Judge Snipes has told us, and it is in that pamphlet, that he's going to start this trial August 10th and we anticipate it will last up to two weeks. That is Monday through Friday, 9:00 to 5:00 a break in the morning and a break in the afternoon a lunch break. The jury will not have to stay together overnight, unless and until you deliberate on your verdict. Have you sat on a criminal jury before?

VENIREPERSON CLEMENTS: No, sir.

THE COURT: Okay. Do you know what deliberating a verdict means?

VENIREPERSON CLEMENTS: Yes.

THE COURT: Okay. I don't want to talk down to you, but I just want to make sure you do. Sometimes we ask you questions and we assume you know. Okay. If you're deliberating your verdict

88

-- the jury was and you deliberate late into the evening and became mentally fatigued, haven't yet reached a verdict, but wanted to keep working on the case, there's a chance that you would be given ample notice that the jury would be taken as a group to a fine hotel at the County's expense, individual private rooms where you'd spend the night and come back in the morning as a group to avoid any outside influence.

That's not during the trial, but when you're deliberating the verdict. I tell you that to let you know.

Now, as you sit here now, are you aware of anything that will be occurring in your life during that time frame that would prevent you from serving as a juror in this case?

VENIREPERSON CLEMENTS: No, sir.

THE COURT: Good. Okay. There are some things I'd like to address and then the attorneys are going to talk to you for about 45 minutes maximum per side, and as I told you -- I don't know if I told you this or not, but what we're in the process of doing is we're qualifying some fifty jurors. There's a pool. From those fifty, more or less, actually twelve will be selected once that's done. This is our first week, so it is going to take a while. And then when the jury is

89

selected, we assume that's going to be around late July or early August, you will then be notified, but you will know when you leave here today if you are a qualified juror.

So what does that mean, a qualified juror? What does that mean? It doesn't have anything to do with your intelligence or your commitment as a citizen. You have done all you are required to do by being here today and by taking the oath to tell us the truth.

Now, by being a qualified juror, what I mean is, is once these very abled lawyers explain the law to you -- that's their job, not your job. Once they explain the law to you, you'll be asked -- now that you know that's the law, can you follow the law and perform your duties as a juror, and in the proper case can you consider the full range of punishment in the case you found someone guilty and base your verdict on the evidence that you hear in the courtroom? Does that make sense to you?

VENIREPERSON CLEMENTS: Yes, sir.

THE COURT: If you can, you're a qualified juror. If in some way, whatever it is you can't, you wouldn't be a qualified juror. All that means is you wouldn't be able to serve on this case. I can't stress this enough, Ms. Clements, now is your opportunity to

90

talk to us about that. And whatever you say will be accepted by me and the attorneys. If there's a law that applies to this case that you just say, well, I just can't take an oath to follow it, then now is the time to tell us, because to sit on this jury, you have to take another oath that you haven't taken yet, and that's that you base your verdict on the law and the evidence.

Now, briefly, there's a difference between murder and capital murder. I don't expect you to know that, but there is a difference between murder and capital murder. Murder is intentionally causing the death of an individual. They meant to do it. Capital murder is murder intentionally, knowingly causing the death of an individual and certain facts to a specific situation. Murder of a policeman, murder of a fireman, murder a child under the age of six, murder more than one person in a single episode, murder someone while robbing them by burglarizing their home, sexually assaulting them, kidnapping, committing arson, murder for hire. Those are some examples of capital murder. A capital murder is the only offense in Texas in which you can possibly receive the death penalty. You cannot receive the death penalty for murder.

Again, I would not expect you to know that. Capital murder is the only offense in which you can

91

receive the death penalty. Do you see the difference?

VENIREPERSON CLEMENTS: Yes, sir.

THE COURT: Okay. And there's only two possible punishments for someone who is found guilty of capital murder. Do you know what they are?

VENIREPERSON CLEMENTS: Life in prison or the death penalty.

THE COURT: That's right. It is life in prison without parole. That is not a wink and a nod. Take me on my word as a judge, life in prison without parole means life in prison without parole. There has been a time in my career where someone was found guilty of murder and they would possibly be eligible for parole after a certain number of years. It doesn't mean they would get it, but they would be eligible. That is no longer the law. Life in prison without parole is life in prison without parole.

Now, the range of punishment for murder is not less than five to more than 99 years or life. The way the jury sets punishment in a murder case is they go back in the jury room and after hearing all of the evidence they write on a blank line on the verdict form the number of years. Capital murder is different, unique. The jury sets punishment and it is either life in prison without parole or death, but the jury does not

92

write down on a blank line those two punishments. What the jury dose in assessing punishment is, is the jury is the body that assesses the punishment. Not a judge. A judge can't set the punishment in a capital murder case. It must be done by the jury. The way the jury sets punishment is by answering three special issues.

Do you remember reading those special issues?

VENIREPERSON CLEMENTS: Yes, sir.

THE COURT: Did you even know they existed?

VENIREPERSON CLEMENTS: Not really.

THE COURT: You had never seen them before. Well, let me tell you, 95 percent of the lawyers in this courthouse, in this criminal courthouse, 95 percent of the lawyers in this courthouse have never seen them. Don't worry about that. We're going to spend as long as it takes for you to grasp them. What I'd like for you to do for me, as I conclude, is to read those special issues to yourself one more time. Would you do that for me?

VENIREPERSON CLEMENTS: Yes, sir.

THE COURT: When you're done, just nod at me.

(Venireperson Clements complies.)

THE COURT: Let me tell you the context of

93

when and where you'd be called upon to answer those special issues, not necessarily in this case, but in this case or any capital murder case, you would have been selected as a juror in a capital murder case.

You and the other eleven members of the jury would have found the person guilty of capital murder. You would have come back in the courtroom and handed the verdict to the judge, the defendant would have stood up and the judge would have read it out loud, we, the jury find the defendant guilty of capital murder. You would know that. There would probably be a break or a pause in the trial. It might be an hour or one day. You then go into the punishment phase and you know you're in the punishment phase, because you would have come to the courtroom and said, guilty. That's when you're in the punishment phase.

In this part of the trial you can hear evidence about the person on trial, the defendant, good deed, bad deed, prior record, no prior record, childhood, mental or physical condition, you hear that. The lawyers conclude their evidence and the judge reads the law that applies to the case and the attorneys present final arguments and you're back in the jury room. All of the evidence is over. That's when you answer those three special issues. Are you with me on

94

when? Some people come in here and they think they'll have to answer today. They don't have to answer them before the trial starts. They have to answer them in the guilt or innocence phase.

VENIREPERSON CLEMENTS: Yes.

THE COURT: I want to stress this as much as I can. I want to stress this, if you're ever called upon to answer those special issues in a capital murder case, you would have found the person on trial guilty of intentionally causing the death of an individual. Some people say, yes I can be fair if I didn't think he really meant to do it. If you're called upon to answer those special issues, you have already found the person intentionally caused the death of an individual. Are you with me on that?

VENIREPERSON CLEMENTS: Yes, sir.

THE COURT: In a capital murder of one of those crimes I was telling you about. That's what the lawyers are going to spend time with you about. All I want you to do is tell us how you feel. Even though you have found someone guilty of capital murder, can you still go into that punishment phase with an open mind and then answer those special issues yes or no, based on the evidence, with the understanding that a yes to 1, yes to 2 and a no to 3 is a death sentence? Any other

95

combination of answers, a "no" to 1 is a sentence of life in prison without parole. A "no" to 2 is a sentence of life in prison without parole. Let's say you decide on a yes to 1, a yes to 2 and a yes to 3, that is life in prison without parole. A yes, yes, no, is the death sentence.

They're going to be talking to you about that. Can you answer it yes or no, based on that?

VENIREPERSON CLEMENTS: Yes, sir, I can.

THE COURT: Do you think you can do that?

VENIREPERSON CLEMENTS: Yes, sir.

THE COURT: And you're going to have one hour and a half to decide if that is the case. It either is or isn't; does that sound fair?

VENIREPERSON CLEMENTS: Yes.

THE COURT: Okay. Without anything further from me, Andrea Handley is now going to talk to you on behalf of the State of Texas. If you need to take a break, let us know.

MS. HANDLEY: Thank you, Your Honor.

ELAINE CLEMENTS, having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION FROM THE STATE

QUESTIONS BY MS. ANDREA HANDLEY:

Q. Good afternoon. How are you?

96

A. Good.

Q. How do you feel being down here knowing that you might potentially be on a jury that is called upon to maybe sentence an individual to death?

A. Nervous about it.

Q. Okay. What makes you nervous about it?

A. It is an issue that, being in Texas, I've heard many times throughout my lifetime and it never really hit home until I sat in the courtroom and was told that I might need to make that decision, and I've never wanted to be in a situation that I was -- that I had to sit in judgment of another person.

Q. Sure. It is one thing to sit and talk about it academically or over coffee and I think a lot of people might hit the coffee shop and say, I'd kill him myself, but then as you're put in that position, it becomes a whole different thing, doesn't it?

A. Yes, ma'am.

Q. Okay. And a lot of what we want to do today is not just tell you about the law, because there's all kinds of statutes of law that can come into play here, but we really want to get your feelings about how you feel on being a part of this. Nobody can make you come down here and violate your own personal feelings or your morals for or against the death penalty or make you do

something that you are just fundamentally uncomfortable doing.

While some people say, academically, I get it, it is a necessity, and, yes, I'm a rule follower. You know, I'd like to say I can follow the law, in this case, not so much. I just don't think I can do that. As the judge said, you have an hour and a half as we talk to you, and unfortunately we do most of the talking because we have to get a lot of information to you, but don't sit on your hands and say, I really want to say something, but I don't think it is politically correct to say it or I'm uncomfortable saying it. You just have to say it. Because His Honor is absolutely right. I mean, the name of the game here -- and I hate to call it a game, just for lack of a better word, because this is serious. You've probably gotten a good feel for that. You've probably never been in a room full of so many lawyers and you wouldn't choose to be, nor would I.

It is a very serious matter. In any criminal trial, be it theft of a bicycle or a capital murder case, you know, it always comes down to this: To be a qualified juror, you have to agree to follow the law. You don't have to agree to like the law, but you have to be able to follow the law. And you have to base your verdict on the evidence in the case and nothing

else. There are some cases where people are just not the right juror for that particular case. If my home got broken into last night and I came down here for jury duty for a burglary case, I'm going to tell you I'm not the right person for that jury that day.

A death penalty case, academically, some people say, I agree with it, but I'm not the person to do it. I don't want spiders in my house. I want somebody to kill them, but I don't want to kill them. It is kind of like -- you see the people who wash the windows on the eighty-foot story buildings?

A. Yes, ma'am. I work on the ninth floor of a building.

Q. Okay. It is kind of like that. And I have to tell you, if you ask me how I feel about cleaning windows on a skyscraper, I'm going to tell you I'm 100 percent for it. I think they should be cleaned. I think somebody should clean them, absolutely.

Now, if you hand me the squeegee and the bucket of soap and tell me to get on the scaffold, I'm going to say, I can't do it. The window needs to be clean, but I'm just not the person for it. I could sit here and I can brave about it and say, well, I'm going to say I can do it because I don't want them to get mad if I say I won't do it or can't do it, I'm going to try

to be brave. I'm going to say I can do it. I'm going to get on that scaffold, but I know the fact of the matter is, I'm not thinking about cleaning the windows. I'm not giving one hundred percent of my time and attention. I'm not doing the job that needs to be done up there. And sometimes capital murder cases are like that for some people. I get it. I get the death penalty. It is appropriate in some cases and I get somebody who needs to do it, but I'm not the person who needs to do it. How do you feel in that context, ma'am?

A. Honestly, deep within my heart if I was called to do it, I think I could do a very good, reasonable, fair job. I would never have asked to be a part of it, but I would never run from it.

Q. Okay. And that's a very reasonable position that you've taken. People say, kill them all and let God sort them out. That is not appropriate for this case and it is not fair to anybody. The people who say, I just can't. I just can't do it. That is not fair either. This is for the people who can follow the law, base their verdict on the law and are 100 percent comfortable with it, because it tells me you have a real feel and have a deep appreciation for what's going on here. I appreciate that.

Right now you've only taken an oath to tell me the truth. You haven't taken an oath to follow law or anything like that. Just tell the truth and speak now or forever hold your peace.

I've read your questionnaire. I will tell you, thank you, first of all, for filling it out and being thorough in your answers. It really helps us out a lot in just getting to know you and an appreciation for whether or not you can follow the law. And sometimes you're telling us things in your answers and I'm, like, she gets it. I don't think she's realizing she's answering her questions appropriately. I think she gets it.

There is something that I think we definitely all got from this questionnaire from you, though, and that is you are really cool because you ride a Harley Davidson. There's not going to be -- what kind of bike is it?

A. A Softail.

Q. Good for you. All right. Let me launch into now talking to you about criminal law and fundamental principles of law and things such as that. As the judge stated, it is all about can you follow the law and will you base your verdict on the law and most appropriately, Ms. Clements, will you keep an open mind? Will you reserve your decision, your judgment on the evidence

101

until you've heard it? Will you not automatically go in and say, look, I've already made up my mind. If you prove to me he's guilty of capital murder, he's going to get the death penalty, because you wouldn't be appropriate for the case. You wouldn't be qualified. You've never sat on a jury before?

A. No, ma'am.

Q. Okay. A lot of these things I would think you need to have been on a jury to understand this. If you watch TV or read books or something you hear a lot about this and a lot of it is fair and makes sense, in my opinion. There's certain fundamental principles of law that applies in every criminal case, be it misdemeanor theft or be it a capital murder case such as this.

The defendant has been indicted at this point. The formal charges have been brought against him. There's absolutely no evidence of his guilt. You have a copy of the indictment in front of you. Literally, all it is is just a piece of paper. It tells him what he's been charged with. And the law states you can't say, because he's been indicted I'm going to use that as a piece of evidence against him. Do you understand that?

A. Yes, ma'am.

Q. Do you agree to follow that?

102

A. Yes.

Q. As he sits here today, as any defendant would sit here today, you are to presume him innocent. You are to presume him not guilty as he sits here today. The reason for that is because it goes hand-in-hand with what we call the State's burden of proof and what I have to prove to you beyond a reasonable doubt. I do the charging in this case as a representative of the State, and therefore I have to do the proving in this case. Does that not seem fair to you?

A. Yes, ma'am.

Q. I shouldn't be able to run out and get an indictment against you and tell you to come in here and prove your innocence. So his presumption of innocence goes to my burden of proof. If and until I -- and I say, "I." There are many attorneys on this case, but if and until we prove our case to you beyond a reasonable doubt, you are to assume he is innocent of the charges. Does that make sense to you?

A. Yes.

Q. And can you do that as you sit here today and presume him innocent?

A. Absolutely I could.

Q. Excellent. And will you wait until I prove my case to you beyond a reasonable doubt before you find

103

him guilty of the charge?

A. Yes.

Q. Okay. That burden of proof, you always look to the State. A lot of people say, look, if I was on trial, you know, I would want to prove my innocence. I would want to testify. They need to prove he's not guilty, and that's really not true.

Literally, in figuratively speaking, you always look to us to prove the case. Always look to us. You never look to the defensive side of the table. They could literally sit in the middle of trial and work a crossword puzzle. They can do that, because their only obligation is to show up. And the reason is, is because it is my obligation. It is my burden to carry the case. It's my burden to prove the case to you. They are fine attorneys. I have seen them before. I've worked with them before. I don't think they're going to work a crossword in all reality, and that doesn't mean they can't cross-examine witnesses or bring their own evidence or call their own witnesses, but it goes to that proposition, that they don't have to do anything, because who do you always look to? To the State, right?

A. Yes.

Q. You never look to them to prove his innocence or to persuade you otherwise. It goes with that Fifth

104

Amendment right not to testify. A lot of that is based just in that, is that he doesn't have -- any defendant doesn't have to testify. I can't make a defendant testify. Nobody can make them testify. And there are probably one hundred thousand reasons someone would not testify in a criminal case when charges are brought against them. He's not good on the stand. The State hasn't proven their case, why put him on? The point is this, the law says if he elects not to testify, you can't use it as evidence against him. I probably -- in your house when your kids ever got into trouble or something you get them all in a room and say start talking, right? And if one of your kids said, Mom, I plead the Fifth. There is no Fifth Amendment in this house. You start talking, right? Well, that's the real world. And not that this isn't the real world, but it is different in court. The way that works is, let's say we put on our case, the State, and you go back to deliberate and you look at the evidence and say, you know what, the State did not quite prove this person guilty beyond a reasonable doubt. They came this close, but they didn't quite get there, but because he didn't testify, I'm going to hold that against him and I'm going to find him guilty. You can't do that. Does that make sense?

105

A. Yes.

Q. Okay. If I prove my case to you beyond a reasonable doubt and a defendant doesn't testify and you say, it might have been different if he testified, that's fine, but I've proven my case.

Okay. Something that's also important in criminal cases -- and I want to touch on that with you because of one of your answers is that you as a juror, your job as a juror is to assess the credibility of the witnesses in the case and assess the evidence and you decide what kind of weight to give it. The evidence comes to you in trial strictly from the witness stand. The evidence you get is either people talking to you from the witness stand, documents, maybe videos, maybe doctors or something, but it is everything inside the courtroom is how you get the evidence in the case.

And just because somebody takes the stand, puts their hand up and swears to tell the truth and the whole truth, do you think some people don't?

A. Yes. Some people don't tell the truth.

Q. That's right. Some people lie, and quite frankly, ma'am, some people are just mistaken. They're just mistaken. It is not they're lying or telling the truth, some people just got it wrong. And that's for you to decide if the person -- you can believe some, all

106

or none of what they say. But the law states this: You can't say, I will automatically believe a certain class of witnesses. In your questionnaire, we asked you about officers testifying. I believe that's on Page No. 7. We asked you, do you believe police officers are more likely to tell the truth than the average person and you said, yes. You said, it is their role in society to serve and protect. If you can't trust a police officer, then who can be trusted.

Okay. I like your answer. I agree with you. There's nothing wrong with that and there's nothing wrong with that brief in taking that position. But what you can't say is, if you tell me a police officer is going to testify, I'm going to automatically believe him. Would you automatically believe somebody just because they were a police officer?

A. Not automatically, but in general, if you had several different people in different positions, I would hope that I could trust the police officer. My oldest son is a fireman and my 17-year-old has friends whose fathers are police officers and I haven't had any bad experiences with police officers.

Q. And it is reasonable to assume that they're held to a higher standard. That law enforcement is their life, it is their career and maybe them in

107

comparison with another witness, they might have a better vantage point or appreciation for what's going on, but the point is, is that you can't say as we sit here today, I would automatically believe a police officer over any other witness. Would you automatically believe a police officer over any other witness before you've heard a word they say?

A. No.

Q. Okay. And do you think police officers are sometimes mistaken?

A. Yes. I know they're just people, but they take an oath.

Q. They're just people like you and me. They have mortgages. Their kids need orthodontics. You know, the whole thing. They are people just like you and me. The appreciation you have for them and their expectation, what you have to do is once that witness takes the stand, be if it is a police officer or a fireman, you have to wait and listen to them first. And if within the first two seconds you say, yep, that's everything I thought he would be, then that's fine. That's fine, but you have to wait until they actually take the stand to say, now I've listened to their evidence. Now I believe what this person is saying or now I don't believe what this person is saying. Does that make sense to you?

108

A. I understand. And I understand why you would question me, because of the answer I gave.

Q. Sure, because you can't make any automatic assumptions. You can't, but I can't say that you can't respect police officers over other people. That's ridiculous. There's no problem with that or even having assumptions about them. You have to say, I'll reserve my assessment of their testimony before they take the stand. Will you do that?

A. Yes.

Q. Okay. A police officer might take the stand and say quite frankly, I saw Richard Nixon run across the parking lot and I think he's the one who did it and his spaceship was around the corner. What are you going to say to that? He's lost his mind. You know, and it would have been a shame to have automatically believed him. You have to set the credibility. You can't say on the other hand either that if you're telling me that you're going to put a prostitute on the stand, I automatically won't believe her. Would that be fair?

A. No.

Q. Okay. Is that something you can do? Can you wait until a person testifies to assess their credibility.

A. Absolutely.

109

Q. Okay. Is your answer going to be any different if I asked you it or if the defense asked you it or if the judge asked you it? Would it be any different?

A. No.

Q. Okay. Because I think what you might get picked at a little bit is, come on, tell us the truth. You're not being honest, are you, if a cop takes the stand you're automatically going to believe them, aren't you? That's what I need. I need your answer. What is your position?

A. I would listen to their testimony. I've always told my kids to have respect for authority and that's where my answer came from, is that whether it is their teachers, police officers, there is no -- they know my stand, but you have respect for all authority, because without it, they would be in serious trouble. That's just my belief.

Q. I got you. I appreciate that.

A. But that doesn't change that in this instance testimony has to be weighed and I have to listen to it and not have an automatic opinion because of who it is is taking the stand.

Q. You're absolutely right, I'll tell you that. You're absolutely right. Those are propositions of law that carry throughout an entire trial, through the first

110

part of the trial through the second part of the trial. A death penalty case is a little bit different in the second part, but I still want to talk to you about the first part of any criminal case.

We are here on a capital murder case and not all murders are capital murders. It is actually a very limited category of what constitutes capital murder. It is, as the judge said, it is an intentional murder. I meant to do it, but it is a murder, plus something else. For example, it is murder of a child under six years of age or murder of a police officer who is in the line of his official duties. It's murder of two or more people that are in the same criminal episode or the intentional murder during the course of committing another felony offense, robbery, burglary sexual assault, something like that. It is a murder, but it has that additional aggravating factor. Does that make sense to you?

A. Yes.

Q. Does that seem fair to you?

A. Yes.

Q. Okay. I think you put in your questionnaire that any intentional killing should maybe probably subject to the death penalty, but do you understand that not all murders are necessarily capital murders?

111

A. Yes.

Q. And not all murders are going to have the possibility of the death penalty.

A. Yes.

Q. Do you respect that? Would you change that? Is there anything about that you would change? Are you sure?

A. Yes.

Q. It looks like maybe you had something in mind. Okay. That's capital murder. It is an intentional murder plus something else. Now, the case that you're sitting on or may be called upon in this case is a capital murder. You've seen the indictment. We've alleged an intentional murder in the course of committing a robbery. As I stated to you earlier, we carry that burden to prove that to you beyond a reasonable doubt. Not only do we have to prove that it was the defendant who did it, that it was done on a certain day, that it was intentional, that it was done during a robbery and that it occurred in Dallas, County Texas. Those are what we call the elements of our offense.

There may be a possibility that we may fail to prove one of the elements of that offense. I might not be able to prove to you that there was an actual

112

robbery in the case. I might not be able to prove to you, as relative to the State in any criminal case, I'm not just talking about this, that this was not an intentional murder, and if I fail to prove that it was an intentional murder, it may not necessarily mean that we all grab our purse and go home. That comes -- you may find yourself in a situation of saying, okay, this person is not guilty of capital murder. There is no intentional murder here, but maybe they're guilty of a lesser included offense. Maybe they're guilty of just murder. There's actually several ways and several different degrees of committing murder in Texas. There's capital murder, where you can get the death sentence. There's just that first-degree murder, where you're still looking at life in prison, but not the death sentence. There's actually another degree lesser than that called manslaughter where it's alleged you've killed somebody. I've killed somebody, but I didn't mean to kill him, I didn't want to kill him, but my actions were so reckless that it resulted in their death.

And then there's even a lesser category than that called criminally negligent homicide, where I killed somebody because I was just negligent. I didn't mean to kill him. I didn't want him dead. Gosh, I

didn't even know that the person was out there, but nevertheless, I was so negligent I caused their death. You're driving in a car on the highway or going through a neighborhood and I'm screwing around with my radio and I'm not paying attention and all of a sudden I hit somebody. You know, I didn't mean to kill him. I didn't want to kill him. I didn't even see them, but I probably should have, right?

So there's several different categories and degrees of how somebody can commit murder. Does that make sense to you?

A.   Yes.

Q.   If you're a juror on a case, you might be called upon to consider which one of these types of murder is a defendant guilty of. You would look at the evidence given to you in the case and you would make that decision based on the evidence that you heard in the case. You would decide what was that person's culpable mental state. If you find somebody guilty of capital murder, only one of two things can happen, okay? They're going to get the death sentence or they're going to get life without parole, all right?

A.   Okay.

Q.   If you don't find the capital murder -- if you find them guilty of a lesser, let's say of murder, then the punishment phase is a lot different. Now, it is not, are they going to get life in prison or automatic life in prison, now you're called upon to decide what kind of punishment should they get.

You get a whole range of punishment options. That person can get five years in prison up to 99 years in prison. You've heard the expression, let the punishment fit the crime. That's what it is all about. The law doesn't say, look, if you find this guy guilty of first-degree murder, he will automatically get 25 to life in prison. You hear that on TV a lot. It doesn't work like that. There is nothing automatic about it. Instead, if he is guilty of first degree, you go back to that jury room and you look at the case and you look at all of the evidence and let the punishment fit the crime and decide what's most appropriate in the case. And I believe there is a wide range of punishment for a reason. If I was to say to you, a man goes out and he intentionally plans out the murder of an 89-year-old woman, what is the first thing you think of?

A.   A helpless victim.

Q.   A helpless 89-year-old woman. You immediately think that sounds pretty bad, doesn't it? He intentionally killed a helpless 89-year-old woman. That's pretty bad. He probably needs to be under the

prison. That's cold-blooded. But change that hypothetical or that fact scenario that the man that took the life of that 89-year-old woman was her husband. They had been high school sweethearts since grade school. They have never spent a night apart, except for when he fought overseas in the war. They have ten kids and twenty grand kids. The sun rises over this woman and he is just over the moon for her. He's loved her every day of his life and now she's dying and she's sick and she's going to die and she's not going to get any better and she suffers every single day she's alive. He has had nothing but sheer love and devotion for this woman and not wanting to see her suffer, he goes into the hospital and gives her a shot of morphine because he knows that it is the least painful way she can go. Is that murder?

A.   No.

Q.   Why do you say that?

A.   Because I remember sitting in my dad's hospital bedroom because he was dying of cancer thinking I was a coward for not putting a pillow over his head and suffocating him. I know there are times when -- I just felt like a coward for watching him suffer so badly.

Q.   Okay. Let me explore that with you a little bit. And that was probably not an appropriate example for me to give. I'm sorry. I guess my point is, just that, is that, technically, it would be murder. It would be, I went in there and I intended to cause her death and I did what I had to do to cause her death and I knew I would and I wanted to and I did it. You know, but it is a lot different from the guy that takes an AK47 and just shoots her. It seems to be worlds apart, doesn't it? It is just an illustration that the facts are always different in every kind of case.

If you thought you were a coward, I take issue with that. I use that example as a real extreme example, because the fact of the matter is, we don't get a lot of cases like that. It is a hard thing to do. It is a hard thing to do and I hope you still don't feel that way, do you?

A.   It has almost been ten years.

Q.   Okay. I'm sorry you had to do through that, but you said that you don't think that that would be a murder. Do you still feel that way?

A.   Well, it's just the first thing that I recalled in my mind whenever you mentioned that. I wasn't really thinking, would it be a murder. Of course, I thought it would or I wouldn't have sat there and nodded.

Q.   Okay.

A.   But it was one of those times -- that was one

s

**117**

of those times when you don't know how you're going to take something until it is faced with you personally.

Q. Sure. And my heart really feels for you. I also read your questionnaire and I know you lost a baby girl, also. I can't even imagine. That was twenty-three years ago?

A. Yes.

Q. That that happened. And you received some counseling and I hope that helped you. And now with this situation with your father -- I want to know from you, because the defendant is obviously somebody's son. We're asking you to take part in a situation where if he's found guilty of capital murder and given the death sentence, he's going to be strapped to a gurney and fed a lethal injection until he dies. We are going to kill him. And you, as a juror, would be taking part in that. You had the loss of your father, which I can tell was obviously a hard thing to do through. You literally held your child for her last moments. Having been placed in that situation, how do you feel now being a part of something where you're being called upon to take part in it again?

A. Well, I feel it is a duty. I feel like I am someone who is not a judgmental person by nature. And I feel that I'm very fair and I would be fair to both

**118**

sides, because I do love my sons and I also would want to protect them. So there's fairness on both sides of that story.

Q. I appreciate that you give that equal scenario.

A. Okay.

Q. Back to my example, my point being, depending on the evidence a person can be guilty of many things. Are you open that, that whatever the evidence is you would let that fit what he is actually guilty of. Be it a capital murder, be it a criminal negligent homicide, is that something you could do and would do?

A. Yes.

Q. And if you were called upon to assess punishment, would you have the punishment fit the crime?

A. Absolutely.

Q. And you would look at the surrounding circumstances and you would decide where in that range of punishment that would fit?

A. Yes.

Q. And if you thought that five years in prison was the proper thing to do, would you do that?

A. Yes.

Q. If you thought life in prison was the right thing to do, would you do that?

A. I would refuse to do it if I didn't feel like I

**119**

could.

Q. What do you mean?

A. I would refuse to serve as a juror if I didn't think I would be fair.

Q. Okay. If you didn't think you could actually consider the entire --

A. If I couldn't be fair.

Q. Okay. I appreciate that. You wouldn't be qualified if you couldn't consider the entire range of punishment, but you're saying you can?

A. Yes, ma'am.

Q. Okay. That takes into account with other offenses. Let me touch one more thing with you before we talk about the punishment phase. In Texas we have something called the law of parties. Sometimes on TV they call it aiding and abetting. We call it the law of parties where a person could literally be held liable for the murder of another individual, even though they never were the trigger man, so to speak.

Let me give you a quick example here: In the law of parties, if an individual participates in the commission of a criminal offense, they aid, assist, participate, encourage or direct in that, they might be held liable as if they had pulled the trigger themselves.

**120**

If Mr. Alex and I sat at my kitchen table and decided that we were going to rob the local 7-Eleven and we planned it out. He went and got the gun and I went and bought the bullets and we took his car down there. He drove down there, he had already picked out the place and we decided I was going to go in there with the gun. He was going to stay as a lookout and honk the horn if anybody came. I take that gun, I walk into that store, I go in there, I rob that clerk and I shot that clerk and I come back out and get in the car. Am I guilty of capital murder? I killed a clerk in the commission of robbing the clerk.

A. That would be the definition?

Q. That would be the definition, yes. The question becomes then, is Mr. Alex also guilty of capital murder?

A. He could be.

Q. That's right. He could be. If he assisted and participated in the commission of the offense. In this case, do you think he did?

A. Sound like from your story he did.

Q. Yes. And it goes one step further. If he should have anticipated that somebody would die, then he too can be held liable for capital murder. When I get a gun and I'm going in, do you think it is fair to say he

121

should have anticipated somebody might die?

A. Yes.

Q. That would be a question for you to decide whether or not he should have anticipated it. And if he did, he's just as guilty as I am, even though he didn't pull the trigger. Is that fair to you?

A. Yes.

Q. Okay. He might also be eligible for the death penalty, even though he didn't pull the trigger if he actually anticipated that I was going to kill someone. Not just he should have known, he knew I was going to kill somebody when I went in there. He is also now eligible for the death penalty. Does that seem fair to you?

A. It is fair, but it is tough.

Q. Yes. He did not pull the trigger, did he?

A. No.

Q. He did not pull the trigger. He sat in the car.

A. But he did participate.

Q. He did participate.

A. And he didn't stop it.

Q. And he didn't stop it. He didn't stop it. And he could actually receive the death penalty, even though he did not pull the trigger. Is that something you can

122

take part in?

A. I think so.

Q. Okay. Let's move on into the punishment phase of the trial. Understand, as the judge said, we never get to that punishment phase in a death penalty case unless you have found that the person intentionally caused the murder in the course of a commission of a felony offense. If it is anything less than that, we might do that other stuff we talked about, but assuming now you have found him guilty.

The second part of the trial is a lot like a mini trial. It is like a second trial, if you will. That presumption of innocence we talked about before, that presumption carries over into the second part of the case also and so does that burden of proof that I have. Again, look to me, look to me. Just as you were to presume him innocent in the first part until I found him guilty, now, you are to presume that a life sentence is the most appropriate thing to do. Because he's guilty of capital murder, so what's the best he can have?

A. Life in prison.

Q. Life in prison. He's already sitting on a life in prison sentence. And you are to presume at this point before you go into this second stage that that's

123

the appropriate thing to do. The reason you have to presume that is because I haven't proved to you that he should receive the death penalty yet. Does that make sense?

A. Yes.

Q. And if and until I prove to you beyond a reasonable doubt that that is the appropriate sentence, you have to give him life sentence. Does it make sense?

A. Yes.

Q. Sound fair?

A. Yes.

Q. Okay. You always look to me, did I bring you the evidence to do that. You don't go back there and say, should we give him life or lethal injection? Instead, as the judge said, you come to that determination by answering those special issues.

Going in, you start with the first question, Special Issue No. 1. Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that could constitute a continuing threat to society? We didn't write that. Somebody in the legislature wrote that. We refer to that as the future dangerous issue. Basically, ma'am, we have to prove to you is that he is going to be a future danger.

124

We're going to ask you to make a prediction as to whether or not that defendant would be a danger in the future. Do you think it is possible to make a prediction like that?

A. Yes.

Q. Okay. They didn't give you any definitions in here either in this first special issue. It is up to me to prove to you that he is going to be a future danger. That's what that beyond a reasonable doubt thing is. Look to me to prove it. They ask you, have I shown to you that there is a probability. Would you agree with me that there is a difference between possibility and probability? Do you see a difference?

A. "Probably" means there's a very good chance. "Possibly" means slightly.

Q. Anything is possible, right? Anything is possible. Would you agree with me "probability" is more likely than not?

A. Yes.

Q. Okay. I have to prove it is more likely than not the defendant will commit criminal acts of violence. It doesn't say that I will prove to you beyond a reasonable doubt that he will commit another murder or commit another assault or that he'll commit a rape. It doesn't line out that, it just says that it is more

125

likely than not that he will commit some criminal acts of violence, whatever that is, is for you to decide what the criminal acts of violence is.

If I balled up my fist and Mr. Alex is minding his own business over here and I punched him in the head, would you think that would be a criminal act of violence?

A. It would be violence.

Q. And could he potentially press charges?

A. Yes.

Q. Probably. Yes. I mean, it is for you to decide which criminal acts -- but it doesn't narrow it for you there. It is for you to decide what it is.

If I prove to you it is more likely than not he will commit those criminal acts of violence that would constitute a threat to society -- when I think of society -- what do you think of society?

A. Other people.

Q. Other people. I think of going to Kroger. I think of going to the post office, things like that. This is the society in which I live in. If the defendant is found guilty of capital murder, where is he going to be?

A. In prison.

Q. Yes. He's going to be in prison the rest of

126

his life, isn't he?

A. Yes.

Q. And do you see how society could include the definition that the penitentiary is actually a society itself? Have you ever been to a penitentiary?

A. No.

Q. It is not a pretty place. It's not like Elvis's house or something better than that, but there are people there other than inmates. There's guards there, doctors, teachers. People come visit. People live in that place, literally, don't they? Prisoners live there. They eat there. They sleep there. Do you see how that can include the definition of a prison population?

A. Yes.

Q. Okay. We have to prove that to you that he is going to be a future danger to you. We do that by allowing you to -- maybe bringing you more evidence to show to you. You're allowed to look at the crime itself, and maybe the crime itself that he committed that you just found him guilty of will tell you that he's a future danger. Maybe you need more and that's fine, too, but when you go into that first question, do you make any automatic assumptions?

A. No.

127

Q. What do you base your verdict on?

A. I would have to hear that he had a pattern of violence.

Q. Tell me what you would want to hear or see that would help you answer that question as to whether or not somebody would be a future danger.

A. I would just have to know that there were other factors, other problems in his life, not just that one incident. I think that because most people just don't run out and kill or do something really bad and never have done anything before. I used to have a daycare in my home and I had up to one dozen kids in my house, which was the State limit, and there were a couple of little kids that as soon as I turned my back to cook, one wanted to fight another one. It was just that very instant, that very second you turned your back on them, something really bad would happen. As much as -- those little kids were between the ages of two and four and I knew they needed help more than any of the rest of them, but I had to protect the kids in the group, so I had to tell that parent I couldn't watch him anymore, even though it meant $75 to $100 less a week for me.

Q. Sure.

A. And it also meant that I felt bad because I couldn't help that child, but there's times when you

128

have to look at the group and protect them.

Q. I might use that example in the future. There are two kids that are really kind of a threat to the rest of the children in your daycare.

If you believe we proved this to you that the person is going to be a future danger, the answer to that question is yes. And if you answer that question yes, you're going to move on to the next special issue. If you don't think we've proved to you he will be a future danger and your answer is no, the defendant gets a life sentence.

If, however, you answer that question yes, he's going to be a future danger, then you move on to that second special issue. We talked about that earlier. That's that whole parties issue. You know, where you decided in the first part of the trial, was he a party to this offense, should he have anticipated somebody was going to die and if you decided yes, then that is what made him guilty of capital murder, right?

A. Yes.

Q. But now in order for him to be eligible or looking at the death penalty, it is not just, should he have anticipated somebody was going to die, but did he anticipate it. And you asked the question, is he the person who actually killed the victim or was he a party

129

to it and he knew that victim was going to die and he participated in that offense? Does that make sense to you the, whole parties issue there?

A. Yes.

Q. Okay. Are you sure?

A. Yes. I can see how it can get real tough.

Q. And there is kind of a slight distinction, between, you know sitting in the car with Mr. Alex --

A. But you know what you're there to do.

Q. I might have not had a gun on me. I might have just said -- or maybe Mr. Alex handed me a gun, but he unloaded it earlier, because he didn't want anybody to get hurt. And I said, I'm going in. And I go in and he starts thinking, are you kidding me, I know Andrea. She always got bullets in her pocket. She's a hot head and the first thing that she does is she checks her gun and if it is unloaded she loads it. She's going to hurt somebody. I think she might hurt somebody. I'm anticipating that -- he's anticipating that I might hurt somebody. He thinks he might want to stop it. He thinks he needs to get to a phone. Before he even can, he hears the shots fired and he knows I've killed somebody. Should he have anticipated I was going to hurt somebody?

A. Well --

130

Q. It is a tricky question, isn't it? And I can't pin you down, but that might be what you're called upon to answer. It's not only, should he have anticipated it, because he knows me and he know's what I'm made of and he knows I carry bullets, but this is the question: Did he anticipate I was going to kill somebody? Maybe the real answer is no. He never thought I would ever kill somebody, he just thought I was going to rob them.

THE COURT: Five minutes.

MS. HANDLEY: Thank you.

Q. (By Ms. Handley) So it is a tricky question. If you don't think he is the person who actually killed him and you don't think he anticipated somebody would die, the answer to that question is no and they receive that life sentence.

If you answer yes to that and you answer yes to that, I'm going to tell you, he's sitting there looking at a death sentence now, but you still have one more question to answer. It is that third special issue and we call it the mitigating circumstances issue.

In a nutshell, this is what it is: It is a safety-net question. What it tells the jurors is, look, I want you to go now and look at this question separately, go back and look at all of the evidence one more time. Everything you've heard in every part of

131

this trial, be it about the circumstances of the offense, be it about the defendant's character, look at everything. And even though you have decided he was a murderer, a capital murderer, decided he was a future danger, and you decided he was a party to this offense, is there something about this defendant that tells you that we need to overturn that death sentence and give him life in prison? Is there some mitigating circumstance, and not only is it mitigating, is it sufficiently mitigating to warrant an actual life sentence? Maybe he was raised in a closet his whole life, fed dog food and people put cigarettes out on him. Maybe that's something sufficiently mitigating for people to say, you know what, he is a monster, but he is what he is because of his parents. There might be 100 mitigating circumstances, but it doesn't necessarily mean they're sufficient. People might say, life is tough. Well, it is tough for everybody. I feel bad for you, but it is not enough to turn it around. Does that make sense to you?

A. Yes, it does.

Q. And what you may think is mitigating, I might not think is mitigating. That doesn't matter. The question is, is there a mitigating circumstance to turn all of that around?

132

I wish I had more time to talk to you. I know I talked at you quite a bit, but hopefully you will get an opportunity to talk now with co-counsel. Thank you very much, ma'am. I appreciate it.

THE COURT: We thank you, Ms. Handley. Ma'am, do you need a five-minute break?

VENIREPERSON CLEMENTS: No, thank you.

THE COURT: Okay. Thank you. Mr. Parks.

MR. PARKS: Thank you, Your Honor.

THE COURT: Doug Parks will now talk to you on behalf of James Broadnax.

VOIR DIRE EXAMINATION FROM THE DEFENSE QUESTIONS BY MR. DOUG PARKS:

Q. I'm trying to keep my time here so we don't run over. As the judge told you, my name is Doug Parks, along with Mr. Lollar and Ms. Mallon, we represent Mr. Broadnax down here at the end of the table.

I may talk to you for my whole forty-five minutes and I may not. I do have the benefit, of course, of listening to the State's portion of voir dire and sometimes we learn a good deal from jurors from that and sometimes we learn almost nothing from jurors depending on how that is conducted.

I want to try to learn as much as I can. Do you feel like you have a basic grasp of how this

133

system works?

A.  Yes, sir.

Q.  I hope.  The judge's remarks also help us a good deal.  We're kind of at a disadvantage.  We're stuck off down here.  The court reporter is way there and my natural tendency is to talk kind of low anyway.  Seinfeld would say I'm a "low-talker".  I'll try to speak up loud enough.

THE COURT:  Let me say this, if you'd like to sit in this middle chair.

A.  I don't mind.

Q.  (By Mr. Parks)  I'm okay.

THE COURT:  Okay.  Just let me know.

Q.  (By Mr. Parks)  I'm mostly admonishing myself and I have to keep my voice up so you can hear me and so the court reporter can.

You feel like you have a pretty good grasp of the concept so far; is that fair to say?

A.  Yes.

Q.  All right.  Let me first talk to you a little bit about the first phase of the trial and then I want to move into the punishment phase and satisfy myself that we're all on the same page here.  And I want to admonish you, I suppose that you're not to read anything into the fact that I spend a good deal of time talking

134

about punishment issues.

This is a two-phase trial.  If this jury returns a verdict of not guilty, we'll never get into the punishment phase of the trial.  If the jury returns a verdict of guilty of something other than capital murder, we will get into the punishment phase, but we won't be dealing with these questions -- special issues.

These are the only cases where we use these special issues.  Consequently, the general public generally doesn't know anything about these things.  The judge told you, most lawyers don't know anything about these special issues.  They may know they exist, but that would be the extent of their knowledge.  We feel like we need to spend some time dealing with these issues so we all understand, but you're not to read into that, that Mr. Lollar, Ms. Mallon and I believe the jury is going to find him guilty; do you understand?

A.  Yes.

Q.  Now, I'm not going to talk to you too much about presumption of innocence.  I will tell you that I don't believe that it is human nature for people to presume and accuse citizens to be innocent when they're sitting on a docket in a courtroom.  They been charged, arrested, indicted and brought to trial.  I just don't believe that's the natural human inclination.  I think

135

we have to work at presuming someone to be innocent.  I know that because I'm a criminal defense lawyer and have been for a long time, yet, when the television comes on or I pick up the newspaper and hear some crime has been committed and someone has been apprehended, my first inclination is to so say, boy, I'm glad they got him off of the street.  And I think that's probably true to pretty much everybody in this room.

Now, does that mean that if I come to trial and if I'm selected as a juror in that case that I can't presume that person innocent?  No, it doesn't mean that.  It does mean that I have to work to do that.  I have to set aside my natural inclination to think that if a person has been arrested and charged, they're probably guilty.  Do you see what I'm saying?

A.  Yes.

Q.  Do you believe that you do, in fact, as we sit here this morning, presume Mr. Broadnax to be innocent?

A.  Yes, sir.  I have to believe that.  If I was in his position I would want the person sitting on my jury to assume I was innocent.

Q.  Sure.  And I'll go into that with you a little bit, Mr. Broadnax -- I'm sorry, Ms. Clements, because of the views about police officers.  My brother-in-law has been a police officer for years.  My niece is a police

136

officer here in Dallas.  I have a great deal of respect for police officers, but I also am realistic in knowing that police officers are human beings just like the rest of us.

Can you tell me what your position is with respect to police officers and their likelihood of being truth tellers.  Do you believe that a police officer can ever take the stand and tell a lie knowingly?

A.  Yes.  We're all human beings, and yet we're supposed to respect authority.  That's the role a police officer has, is automatic respect, but at the same time, yes, they are just human beings and capable of anything and so I would not say that just because someone is a police officer that --

Q.  Let me ask you a question, and it is going to sound awfully strange to you, but why do we have to respect authority?

A.  Otherwise, we'd live in a totally lawless society.

Q.  Respecting authority is different from living and abiding the laws.

A.  Well, to me, if you don't start with the basic respect, you lose --

Q.  Let me be real honest with you, Ms. Clements, that's the authority right down there.  That's the State

137

of Texas. Are they going to have a leg up on us because of your respect for the authority and your beliefs that we ought to respect authority? When they stand before you in front of the jury and say, the State of Texas demands this or that or the other things, is just the fact that they are the authority alone going to be persuasive to you in any degree?

A. No, sir.

Q. Okay. I have to make sure about that, because there are people that come down and are prospective jurors in these kinds of cases who (Inaudible) by the State of Texas. We don't get to stand up on behalf of Mr. Broadnax and say, the State of Texas wants this or that. Do you understand that?

A. Yes, sir. If I felt like I was biased in that way, I would automatically feel like I did not qualify to be a juror and I would not want to do it.

Q. You know, Ms. Clements, I'll tell you the way I feel about trying these cases and about jurors: The judge gave you an oath a while ago, which you swore you would tell us the truth. The other oath that you would take if you were selected as a juror, is that you will a true verdict render according to the law and the evidence. And that is all any of us can ask of from a prospective juror, is they return a true verdict

138

according to the law and the evidence, but we all have an absolute right to expect that of jurors. Does that make sense to you?

A. Yes, sir.

Q. And when we're talking about following the law in cases of this kind, again, it sometimes runs contrary, I think, to what people may believe is required of them or expected of them. We're going to talk about that more in a minute, and I'll try to -- where that makes sense to you.

I want to go back for just a minute to the portion of the trial where you're going to be called upon to decide whether or not the State has proven what they have alleged in that indictment and the indictment is a very important document. It is not evidence, just like Ms. Handley told you, but it is important, because it tells the State of Texas what they must prove to a jury beyond a reasonable doubt if they are to hope to get a conviction. If they fail to prove anything in that indictment, any of the elements of that indictment, then the accused citizens are entitled to a not guilty verdict or a verdict of some lesser offense, depending upon the circumstances.

And jurors have no real way of knowing what in that indictment may come to be an important

139

consideration for them, because we're not allowed to talk to them about the facts of the case. And that indictment says that on or about a certain date in Dallas County, Texas, and that means just exactly that, in Dallas County, Texas. Not in Tarrant County or in Collin County, they must prove it happened in Dallas County. And they must prove that the accused committed the offense. It might be the case where identity could be an issue for the jury to decide and in another case it might not be -- identity might be clear.

Then it goes on to say that the accused did intentionally cause the death of a certain person. Theoretically, it might be a contest whether or not that was the person that was actually killed, you see, if they've alleged the wrong person in the indictment. That would be a rare circumstance, but it is possible. And that they did that by what we call shooting them with a firearm, a deadly weapon, okay? And it is possible that that could be an issue.

It may be that they alleged drowning and the evidence will show strangling or shooting with a firearm and the medical examiner comes down and says, no, he was stabbed with a knife. You see, that could be an issue. And under circumstances like that, if you sat on a jury and you heard a case that was alleged that the

140

defendant killed the deceased by shooting him with a firearm and the medical examiner came down and said, yes, this person was shot, but that didn't kill him. He was also stabbed, and the stab wound was what killed him. So he was actually killed by the stabbing.

Well, this indictment says shooting with a gun. We have no doubt that the defendant killed the deceased. Now, it is just a question of whether or not he did it with a gun or a knife. The evidence says he did it with a knife, the allegations are he did it with a gun, what to you do? You find him not guilty.

Now, some jurors tell us that's not something they can do, that that's a technicality, that if they were convinced that the defendant intentionally caused the death of another person, without any legal excuse or justification no matter how, they're still guilty of murder. The law would say the State has to prove what they allege. How do you feel about all of that?

A. Well, I would say that it is my job as a juror to carry out the law.

Q. Exactly. And if it alleged shooting with a gun and the evidence is he was stabbed with a knife, your verdict would be?

A. He would be acquitted.

141

Q. Not guilty, exactly. I use that example to you, Ms. Clements, just to try to point out how serious the law takes the requirement that the State prove what the law says they must prove and that we don't help them along with that. They understand what their job is and they accept that job. You, as a juror, are not in a place to where you can help them out with that if they fall short; does that make sense to you?

A. Yes, sir.

Q. It might be where that indictment alleges they intentionally caused the death of somebody by whatever manner or means and it may be that that culpable mental state would be at issue. There are four culpable mental states in the State of Texas. Intentional, knowing, reckless and with criminal negligence. And depending on the facts and circumstances, even though the State alleges an intentional murder, it might be that the evidence would show something less than intentional. Either side is entitled in a murder case to bring evidence to the jury that shows the condition of the mind of the defendant at the time the offense was committed.

So based upon what that evidence shows, it might be that there would be an issue as to whether or not the defendant acted with the culpable mental state

142

that the State has alleged. Let me give you a quick example and I'll move on. The difference between -- for instance, intentional and knowing. An intentional killing is where someone has set as their goal the ending of another person's life by whatever means at hand. The legal definition is a person acts intentionally when it is their conscious objective or desire to cause the result. That is, they form in their mind a goal to take another person's life. That's what they want to do and they do whatever it takes to accomplish that goal.

Now, with knowingly, a person might intentionally do an act that actually causes another person's death without really intending to do that. They don't necessarily want to kill someone or cause a certain result, but they do an act that does that. It is murder if a person commits an act clearly dangerous to human life and causes death, whether they intend for that result to occur or not.

If a person shoots another person in the leg and doesn't want to kill them, but for whatever reason wants to teach them a lesson or whatever their purpose might be -- and severs an artery and that person bleeds to death, that person would still be guilty of murder, because they've done an act dangerous to another

143

person's life. They shot a person with a firearm. They didn't necessarily intend the ultimate result. Does that make sense to you? Do you see the difference between "knowingly" and "intentionally"?

A. Yes. There is a fine line there.

Q. Well, there really isn't, because it is the state of mind of the person and what they want to do. The law considers it a little worse to form as a goal the ending of another person's life and doing something that happens to cause another person's death. Do you see the difference there?

A. I think I understand what you're trying to say, yes. There is a premeditated and then there's an accidental because of your actions?

Q. Well, it is not really an accident. An accident is an accident. Let me put it to you this way: An example of a person going through a school zone and let's say that you're driving through a school zone and observing the speed limit and watching out and being as careful as you can be, not violating the law in any way and all of a sudden a child darts out in front and there's nothing to be done, there's absolutely no time to keep from running that child over and the child dies. That's an accident.

Now, let's say you're going through that

144

same school zone, you're going the speed limit like you're supposed to be doing, but you've gotten a phone call on your telephone and you're messing with that phone and you're not looking where you're going and a child runs out. If you had been looking you could have stopped, but you weren't looking and you run that child over. The jury, in that circumstance, might decide you were criminally negligent and that you should have been watching where you were going.

Then you have another situation where you're speeding through that school zone. Now, maybe not by a whole lot, but you're going faster than you ought to have been going and you know there are children there, but you consciously disregard the danger of that and the possibility that a child might run out in front of you and you not be able to stop. You know that can happen and you don't want it to happen, but you decide to speed anyway and a child does run out and you run over that child.

Under that circumstance, that probably would be a manslaughter case, because you realized there was a danger and you consciously disregarded that danger.

Then, I can go with intentional. An Intentional situation would be if you took your car and

145

you saw a kid and you wanted to run over and kill him and you chased him on the sidewalk to run over him, you see there are different scenes there. That is something that might be an issue. The point of it is it really depends upon what's going on in the person's mind.

A. Okay.

Q. Now, you said a couple of things that bothered me, quite frankly. And I want to make sure you understand that the law sets these rules and boundaries and guidelines that we as jurors are not free to impose our own situation. I'm not demonstrating with you, but when you were talking to Ms. Handley about the law of parties, you indicated that a person -- she gave you an example and you agreed this person would be just as guilty as another person because, for one reason, he didn't stop it.

Let me tell you, this may not be important in this case, but I use it as an example to try to explain to you that you've got to do this by the rules. Knowing that an offense is going to happen does not mean you're under any obligation to stop it under the law. Being at a place where an offense was committed does not make you a party to that offense. Your neighbor can say to you, Ms. Clements, I'm going to run down to the bank and rob it. I'll see you in twenty minutes. And he

146

goes down to the bank and robs it and you haven't done a thing in the world about it. You didn't pick up the phone or do anything. You're not a party to that offense.

A. Knowing my neighbors, I would think they were serious.

Q. Even if you did believe it and he showed you the gun and the mask and said, I'm going to go rob a bank, you have no legal obligation to try to stop it. That's the police's job, not yours. You don't even have a legal obligation to pick up the phone call to the police to try to stop it.

Now, if he asks you to participate in some way and says, would you drive me to a bank so I can rob it, now, acting with the intent that the offense be committed, you have aided, directed, solicited or attempted to do that. If you're at the bank and he's coming down the sidewalk with the intention to rob the bank and you open the door so he can go in, but you don't know he's going to rob the bank and he robs it, that doesn't make you a party even though you've aided him by opening the door to let him in, because you didn't do that with the intent the offense be committed. Do you see what I'm saying?

A. Yes, sir.

147

Q. These are all things that would be explained to you. The point of them is that whatever the law is, you have to follow it. "I will a true verdict render according to the law." Would you be able to do that?

A. Yes, sir. I'm not a law student, so I would need someone to explain it to me as I go along.

Q. And that's why you don't have to know any of the law. Judge Snipes will tell you all you need to know in order to reach the proper verdict in this case, but you have to be able to follow that law.

A. Yes, sir, I'm certainly willing to do that.

Q. Okay. That leads us, Ms. Clements, into this punishment phase of the trial. And I hope this will begin to make sense to you why I've been banging on this subject for so long.

As the judge here told you, no juror is ever called upon to answer any of these special issues, unless they have already found a defendant guilty of capital murder, which means they are convinced beyond a reasonable doubt from the evidence that the person about whom they are answering these special issues intentionally took another human being's life without any legal excuse or legal justification and did so during the course of the commission of another serious felony that would have to be true or you would never be

148

put in that position. That's the context to which these questions are asked. Does that make sense to you?

A. Yes, sir.

Q. Now, these special issues are like the indictment. Ms. Handley said the legislature wrote these special issues and maybe if we were called upon to write them, we might write them differently, but this is what the legislature intended the State to have to prove and not something else.

The jury is not entitled to rewrite these special issues when they get back in the jury room. I've been doing this long enough to know that very often we talk in terms of whether or not you assess the death penalty to someone, whether or not jurors feel a person deserves the death penalty. You see, if the legislature wanted jurors to make this determination based on what they thought the defendant deserved, they could have put that in that question, but they didn't. Nowhere is a juror called upon to make this decision, based upon what they think is deserved.

The theory behind this is the law recognizes there are some persons who are capital murderers who cannot even be incarcerated without the danger of them hurting other people in that incarceration. The purpose of this is to try to

determine which of those persons cannot be contained, but have to be eliminated. And it doesn't say that it happened to one-third of them or one-tenth of them or one in one hundred. It is designed to try to identify those persons who would, in probability, commit acts of violence in the future in the penitentiary that would be a continuing danger to society.

It is the State's responsibility to prove if the answer to that question is yes, if they can, from the evidence and not from speculation. When we talk about what that Special Issue No. 1 says is, there is one word that at least jumps out at me and it is the word "would." That the defendant "would" commit criminal acts of violence. The legislature could have put the word "could" in there. But if they had done that, that would mean that that question would always be answered "yes" because any of us could do something in the future. That means it is a possibility, but they didn't, they put the word, would commit criminal acts of violence, so that the idea obviously is, that if you believe that at some point in time a particular defendant might do something that would amount to a criminal act of violence, that is not sufficient.

You have to believe he would commit criminal acts of violence, plural, and not just that he would commit criminal acts of violence, but that those criminal acts of violence would constitute a continuing threat to society, okay?

A. Okay.

Q. Now, it is not up to the defense to prove to you. You can't go into this process with the mindset that if a person is a capital murderer, of course he would commit other acts of criminal violence in the future. They are entitled to that opinion, they can say that and they can put the burden on us to prove that it should be enough, but that's not what the law says.

How do you feel about that? Do you see that as a real question and as a real barrier, as it is intended to be in the position of the death penalty?

A. I would have to see with whenever that time comes up. I would have to have proof.

Q. What kind of proof do you think the State could bring to you to prove beyond a reasonable doubt what a person would probably do in the future?

A. What he's done in the past.

Q. Okay. Prior history?

A. Yes.

Q. Whether it be a violent past history or a nonviolent past history would be relevant to you. Is that what I'm understanding you're saying?

A. Yes.

Q. What about conditions in situations at the penitentiary? Ms. Handley mentioned to you that there are other people other than inmates that are in and around the penitentiary, guards, visitors, doctors, prisoners. Would it be relevant to you to know whether or not prisoners are allowed to roam free in the penitentiary or whether they're under some kind of authority and restraint when you're in the penitentiary? Do you think that might be relevant to you?

A. It doesn't sound like it has anything to do with the question.

Q. Why not?

A. Because it is asking you to decide whether he is a probable threat.

Q. No. It doesn't ask you that. It asks you whether he would commit criminal acts of violence. Would it not be relevant to you whether or not the prison authorities have the capability of preventing inmates from doing just that very thing?

A. I'm not sure. I guess there is a probability whether the defendant would commit criminal acts of violence and would constitute a continuing threat.

Q. That's not a theoretical question. You know the name Charles Manson?

A. Yes.

Q. Awful offenses, right?

A. Yes.

Q. He did not receive the death penalty, are you aware of that?

A. Yes.

Q. He's been in the California penitentiary for forty years or more. Are you aware of him ever committing acts of violence in the penitentiary that could constitute a continuing threat to society?

A. No, sir. I haven't followed it.

Q. You see, the purpose of that question is to identify those people that we cannot even incarcerate without the fear of that continuing threat to society in which they are in. That's the purpose of that question.

Now, do you believe that you can hold the State of Texas to the burden that that question puts on them, or are you going to assume that if a person is capable of committing capital murder, then they're automatically going to be a person that would probably commit acts of violence in the future?

A. Not automatically.

Q. Are you going to make us prove that he would not?

A. No. That would be impossible.

153

Q. Are you going to make the State prove he would?

A. They would have to prove he has a sufficient prior history.

Q. Do you believe there are some people who are capable of being violent and would be violent in free society that would not be violent in a penitentiary context?

A. I haven't really thought about that subject before. I'm sorry.

Q. And that's why we talk about it. This is not something that people generally think about and consider, but it is central to this process. It is central to identifying those persons whom we can put in the penitentiaries for the rest of their lives and those that we cannot. And the way we determine that is what the evidence will show what kind of prisoner they would be.

You see, if there's not a way, if we assume that all capital murderers would constitute a future danger, then there would be no use to have this question. It is intended to do something or we wouldn't have it. And I'm not trying to preach to you, because this is a hard concept for jurors a lot of times to get, because they really don't see the purpose of this question, because it is asking about a person who

154

they've already determined is a murderer.

While they can tell us that they wouldn't automatically find that a person would find a person to be a continuing danger to society, they can't process in their mind how that could not possibly be. Do you see what I'm saying?

A. Well, I know some people might --

Q. But you don't see it that way?

A. No. I understand what you're saying. I think some people are put in situations and they make bad decisions and things happen in life that you can't take back, but some people are generally violent in nature.

Q. Well, all people who have committed capital murder have done a violent act, otherwise they wouldn't be in the position they're in.

I guess, one way you can look at it -- I'm not going to ask you to think back at any bad things that you've ever done or any good things that you've ever done, but I think generally people would be willing to agree that none of us are as good as the best things we've ever done and none of us are as bad as the worst thing we've ever done. And the idea here is to look at the complete picture of the individual person and make that determination based on the evidence.

Very often we might hear evidence of the

155

State that somebody is coming from the penitentiary saying, well, back so-and-so we had something bad happen in the penitentiary. This inmate or that inmate did something or -- that may or may not have any relevance to you, but in answering this question, yes, the idea is you have to make the determination on the individual before you, not what some other individual did at some other point in time. And not just what a lot of times what a witness will say to you is there is a potential for a person to do that again. There might be an opportunity for a person to do this, that or the other thing.

Well, that doesn't prove that the individual on trial is the kind of person who has the mindset that he would take that opportunity. Just because a person has an opportunity to do violence, doesn't mean that person will do violence. We all have an opportunity to do violence, but we don't. What the State has to prove to you is that a particular individual fits that definition. And if they don't, then you have to say no. And they have to prove it to you, not having to speculate on it, not having to guess about it, not have you answer in fear that he might, but they must bring solid proof to you that it should be answered yes. Can you do that? Can you promise us that

156

you will put the State to that prove?

A. Yes, sir, I believe I can.

Q. All right. I'm going to move on.

Ms. Clements, I'm not going to talk to you about Special Issue No. 2. I'm going to talk to you about Special Issue No. 3. Let me tell you -- for instance, if you found Special Issue No. 1 had not been proven by the State and answered it no, just like the law presumes it should be answered, the trial is over at that point.

You don't go to these other special issues. You stop right then and you return a verdict in open court, because it is a life penalty at that point.

Only if you find Special Issue No. 1 is yes, this is a person that would be a future danger, would you go to Special Issue No. 2 if you get to it. You don't always go to Special Issue No. 2. You may not ever see that again. You don't know. You have to wait and see what the evidence says.

Special Issue No. 3 you will get. All jurors have to answer Special Issue No. 3. It is different from 1 and it is different from 2 and there is no burden of proof on that special issue. We don't have to prove that there are mitigating circumstances that would justify a life sentence. The State doesn't have

157

to prove there are not. It is just an opportunity for you and the other jurors to look at the evidence that's before you to make that determination of whether or not there is anything contained in the evidence, circumstances of the offense, the defendant's character, the background, that would be a sufficient mitigating circumstance.

THE COURT: Five minutes, Mr. Parks.

MR. PARKS: Thank you.

Q. (By Mr. Parks) Now, what that really calls for each individual juror to do is to make their own personal moral judgment about whether or not the death penalty is appropriate in the case based upon the facts and circumstances that you've heard. We will not list for you these things that are mitigating, because the law in the State of Texas doesn't list mitigating factors. Mitigating evidence is whatever you as an individual juror believe mitigating evidence is. It is strictly up to you as an individual to determine what weight you will give that mitigating evidence and determine if it is a sufficient mitigating circumstance to justify a life sentence.

I will tell you that what is mitigating to one juror may not be to another and it may be aggravating to another. That doesn't matter. What the

158

law contemplates is, is that each individual juror will deliberate, and that doesn't mean argue or fight or debate what your individual moral judgment is. To deliberate means to carefully consider, and if after careful consideration you have made a determination that death penalty is not appropriate in the case, you are entitled to that personal moral judgment and you do not have to justify it to anyone. You don't have to explain it to anyone. You don't have to debate it with anyone, any more than you would have to justify or debate what church you went to or how you raised your children.

If you have made a personal moral judgment as you have to teach your children to respect authority, that is your right. You don't have to justify it to me or anyone else. You don't have to explain it to nobody. It is the same with that. If you go back in that jury room and say, I have heard the evidence in this case and I have carefully considered the evidence in this case and it is my personal moral judgment that the death penalty is not appropriate, you're entitled to do that and the law is satisfied with that. The death penalty is never required and never presumed, okay?

You can do it and you can point to evidence or you can say, I cannot point the evidence. I have decided that today mercy is appropriate. That doesn't

159

mean that a defendant is entitled to mercy. You might say to yourself, today I am merciful and I will give the gift of life and I don't have to justify that. This person -- if you're on the death penalty jury and you sit in judgment of another, the only way that defendant can be executed is if each individual juror wants him to be. You have the right and the authority to say for whatever reason, I choose to let him have the life penalty and die in the penitentiary. It is the same as the death sentence. The only difference is, is we don't know how long or how, but I choose to allow him die in the penitentiary away from society and not in the method that the State of Texas has selected for execution.

That's my right. That's what you want to do. That's my personal moral judgment and that's what I'm going to stick to. Do you understand that you have that authority?

A. Yes, sir.

Q. And that may ultimately, Ms. Clements, be the hardest job you will have. Can you do that? Can you make the decision how to answer that question?

A. I believe I can.

Q. Thank you, ma'am.

MR. PARKS: That's all the questions I have.

160

THE COURT: Thank you, Mr. Parks. Step outside for just a moment and then you'll come right back in. Thank you so much.

(Venireperson Clements exits courtroom.)

Let the record reflect that Ms. Clements has left the courtroom. We're in the presence of Mr. Broadnax and his counsel. What says the State of Texas?

MS. HANDLEY: We believe Juror No. 134 is a qualified juror, Your Honor.

THE COURT: What says Mr. Broadnax?

MR. LOLLAR: We believe she is a qualified juror, Judge.

THE COURT: All right. Ask her to return, please.

(Venireperson Clements enters courtroom.)

Of course, the attorneys have accepted you as a qualified juror. I 100 percent agree. Now, remember how this is going to proceed, once, more or less, fifty are qualified, then the actual jury will be selected. I anticipate that will be done late July, early August. The time that's done you will be notified by Judge Snipes or the court coordinator.

The sheriff is going to give you her telephone number and should anything occur in your life

161

that you think might affect your jury service between now and then, give her a call and then we'll deal with it.

Also, the telephone numbers and address on your questionnaire, are they still correct?

VENIREPERSON CLEMENTS: Yes, sir.

THE COURT: Okay. That's in case we need to contact you.

Now, I don't know if this case is going to receive any media attention, but I want you to avoid at all cost any outside influence. It would be a shame if somebody like you were inadvertently disqualified because of outside information. That includes the newspaper or the Internet or TV.

It has been a real pleasure and good luck to you, ma'am. Thank you.

THE COURT: The court is in recess until 1:15.

(Venireperson Clements exits courtroom.)

(Recess from 12:43 p.m. to 1:15 p.m.)

(Venireperson Dobbins enters courtroom.)

THE COURT: Let the record reflect Michael Dobbins is here. Before we go any further, Mr. Dobbins, will you raise your right hand for me, please.

(Venireperson Dobbins was sworn.)

162

THE COURT: I want to introduce to you Gordon Hikel, who is going to talk to you briefly for the State of Texas.

MICHAEL DOBBINS,

having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION FROM THE STATE

QUESTIONS BY MR. GORDON HIKEL:

Q.   Good morning, Mr. Dobbins.

A.   Good morning.

Q.   Do you remember a few months ago you came down here and you filled out a questionnaire about eighteen pages long?

A.   Yes.

Q.   And one of the questions you were asked on the questionnaire was -- with reference to the death penalty, which of the following statements best represents you and there are five choices and you circled there that I could never, under any circumstances, return a verdict with a death penalty. Do you remember answering that?

A.   Um-hum.

Q.   Is that a yes, for the court reporter?

A.   Yes.

Q.   Is that still your view today?

A.   Yes, it is.

163

Q.   Okay.

MR. HIKEL: No further questions.

THE COURT: All rise for Mr. Dobbins.

Mr. Dobbins, you will be excused. You are free to go. You don't have to return. Thank you.

MR. HIKEL: Thank you, Mr. Dobbins.

(Venireperson Dobbins exits courtroom.)

THE COURT: What says the State of Texas?

MR. HIKEL: For the record, the State challenges Juror No. 213, Mr. Michael Dobbins, for cause.

THE COURT: Granted.

Let's call Ms. Mira Martinez.

(Venireperson Martinez enters courtroom.)

Thank you, Ms. Martinez. Just for the record, please state your name.

Ms. Martinez: Mira Josephina Martinez.

THE COURT: Okay. Please raise your right hand for me, please.

(Venireperson Martinez was sworn.)

THE COURT: Thank you. Gordon Hikel.

MR. HIKEL: Thank you, Your Honor.

MIRA JOSEPHINA MARTINEZ,

having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION FROM THE STATE

164

QUESTIONS BY MR. GORDON HIKEL:

Q.   Ms. Martinez, I just have a couple of questions for you.

A.   Okay.

Q.   Remember about one month ago or so you appeared downstairs in a big panel and you filled out an eighteen-page questionnaire?

A.   Um-hum.

Q.   And if you remember in that questionnaire, among the questions you were asked is, with reference to the death penalty, which of the following statements best represents your feelings and you circled No. 4 that says, I believe the death penalty is perfect in some murder cases, but I could never return a verdict, which assesses the death penalty. Do you remember circling that choice?

A.   Vaguely, but I agree with it.

Q.   Okay. Is that still how you feel today, that you could never return a verdict which assesses the death penalty?

A.   Correct.

Q.   Is that because you believe only God has the power to do that? Is that still your belief?

A.   Yes.

Q.   And that hasn't changed today?

165

A.    No.

MR. HIKEL:  No further questions.

THE COURT:  All rise for Ms. Martinez. Ms. Martinez, you'll be excused.  You are free to go. You don't have to return.  Thank you so much.

MS. MARTINEZ:  Thank you.

THE COURT:  It was a pleasure meeting you earlier.

MS. MARTINEZ:  Thank you.

(Venireperson Martinez exits courtroom.)

THE COURT:  What says the State of Texas?

MR. HIKEL:  The State would challenge Juror No. 206, Ms. Mira Martinez, for cause.

THE COURT:  Granted.

(Venireperson Annab and Venireperson Wiltshire enter courtroom.)

THE COURT:  Please be seated.  Let the record reflect we're here in open court in the presence of Mr. Broadnax.  With us we have Amy Annab and Bradley Wiltshire.  I want to introduce myself to you folks.  My name is Webb Biard and I'll be with you this afternoon during the jury selection process.  Also some other folks I want to introduce to you, Andrea Handley.

MS. HANDLEY:  Good afternoon.

THE COURT:  Grodon Hikel.

166

MR. HIKEL:  Good afternoon.

THE COURT:  Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  They represent Dallas County and the State of Texas.

Further on down is Brad Lollar.

MR. LOLLAR:  Hi.

THE COURT:  Doug Parks.

MR. PARKS:  Hello.

THE COURT:  Keri Mallon.

MS. MALLON:  Hi.

THE COURT:  And they represent Mr. James Broadnax.  Before we go any further, folks, I want you to do this for me, please.  Raise your right hand.

(Venireperson Annab and Venireperson Wiltshire were sworn.)

Folks, I think you know from filling out your questionnaire and appearing here today, in this pamphlet -- have you both had an opportunity to read this pamphlet?

VENIREPERSON ANNAB:  I did.

VENIREPERSON WILTSHIRE:  Yes.

THE COURT:  All right.  This is a capital murder case.  Do you understand the State of Texas is seeking the death penalty?  Do you both understand that?

167

VENIREPERSON ANNAB:  Yes.

VENIREPERSON WILTSHIRE:  Yes.

THE COURT:  Because of that, the law of Texas provides for each of you in a moment individually, we'll talk to you individually here in a moment, to have an opportunity to talk to us one-on-one individually. And just a way the computer printout goes, Mr. Wiltshire, it means Ms. Annab will be first. Sometimes that can take up to one hour and a half, sometimes less.  But today before you-all leave here today, you will both know whether or not you're a qualified juror.  I'm not going to have anybody come back.  We will finish today.

In that respect, let me tell you that what we're in the process of doing is qualifying more or less fifty prospective jurors in this case.  Once that's done, the actual twelve who are going to sit on the jury will be selected from that group.  You'll know today whether or not you're a qualified juror.  That doesn't mean you will be a trial juror.  That will be determined probably late July or early August and you'll be notified by the judge's court coordinator when that decision is made.

I'm going to talk to you both together for a minute and then one of the attorneys for each the

168

State and the defendant will talk to you, again, like I say, for up to forty-five minutes each.

Have either of you served on a criminal jury before?

VENIREPERSON ANNAB:  No.

VENIREPERSON WILTSHIRE:  I have.

THE COURT:  All right.  Did the jury reach a verdict?

VENIREPERSON WILTSHIRE:  Yes.

THE COURT:  Did the jury set punishment?

VENIREPERSON WILTSHIRE:  No.

THE COURT:  Did you understand -- did the jury find the person not guilty?

VENIREPERSON WILTSHIRE:  No.

THE COURT:  The judge set punishment?

VENIREPERSON WILTSHIRE:  Yes.

THE COURT:  From that experience you understood that in every criminal jury trial there are two parts.  There's the guilt or innocence phase, which you participated in.  And then when you find somebody guilty, Ms. Annab, if you do, there's that punishment phase.  And you understood that?

VENIREPERSON WILTSHIRE:  Yes.

THE COURT:  But evidently the parties elected the judge to set punishment for whatever reason?

VENIREPERSON WILTSHIRE: Yes.

THE COURT: Okay. I'll tell you this. This is a capital murder case. In a capital murder case, only a jury can set punishment in a capital murder case. Everybody in the courtroom or the judge cannot set the punishment. It cannot be done. The punishment has to be set by the jury.

Now, you have an opportunity to read that pamphlet. Do you think it helped you, Mr. Wiltshire? Do you think that helped you in reading that pamphlet a little bit?

VENIREPERSON WILTSHIRE: Yes. I understand more.

THE COURT: Is it giving you a little bit better idea of the procedure?

VENIREPERSON WILTSHIRE: Yes.

THE COURT: Did you see those three special issues? Do you remember seeing those?

VENIREPERSON WILTSHIRE: Yes.

THE COURT: Did you see them, Ms. Annab?

VENIREPERSON ANNAB: Yes, I did.

THE COURT: I assume neither one of you-all have ever seen them before. I'd be shocked if you had.

VENIREPERSON ANNAB: No.

VENIREPERSON WILTSHIRE: No.

THE COURT: Okay. Very few people, even lawyers, don't know about those special issues, because they only pertain to a capital murder case. And we'll spend a lot of time on the special issues and the main reason is, is because some of these laws that you saw in the constitutional law, you've known since the fourth grade. We're just not going to spend -- we only have so long to talk to you. The attorneys, they'll talk about them, but not as much in detail as the special issues, simply because for a normal person that is a concept they haven't really thought about or even knew about. That is the purpose.

What kind of case were you on, Mr. Wiltshire?

VENIREPERSON WILTSHIRE: It was a federal criminal case.

THE COURT: Okay. You were in federal. The judge always sets punishment in federal cases. That's the way that works. What kind of case?

VENIREPERSON WILTSHIRE: Theft.

THE COURT: Okay. And do you understand this is a capital murder case?

VENIREPERSON WILTSHIRE: Yes.

THE COURT: We're going to be talking about the legal concept that nobody expects you to know. It is not your job to know. It's not some legal pop quiz where we try to find out what twelve people know the most law. It doesn't have anything to do with it. It is our job, our responsibility to explain the law to you. And then once that's done, we'll ask if you think you understand it and then you'll eventually, hopefully say, yes, I understand it.

And then the bottom line question will be, will you be able to follow the law and perform your duties as a juror. That's the bottom line question. Whatever your answer is, is correct. If after the law is explained to you and you say, I hear you, I understand it, but I can't follow it for whatever reason, you wouldn't be a qualified juror.

Now, what does that mean? It just simply means you wouldn't be able to sit on this case. That's all it means, because you have to form everything asked of you by coming here and taking an oath to God you will agree to tell us the truth. Some people can and some people can't follow the law.

Also, in the proper case, under the proper facts, you have to be able to tell us that you can consider the full range of punishment. In other words, not only having your minds made up, well, if I find somebody guilty of "X", I know I'm going to do "Y". You have to say, I can see it and listen and then whatever I think is the right thing to do, I can do it.

There is a difference -- there are some things I don't expect you to know. There is a difference between murder and capital murder. Did you know that?

VENIREPERSON ANNAB: I did from when you read that thing to us.

THE COURT: Okay. Now, you told me you recognized me from the jury room. Let me tell you something, I wish I was.

VENIREPERSON ANNAB: I understand.

THE COURT: I'm a visiting judge from Paris. The presiding judge in this court is Michael Snipes. That's who you saw the most of.

VENIREPERSON ANNAB: Okay. But he read some of this to us.

THE COURT: Yes. And should you be selected as a juror in this case, Judge Snipes will have to preside over this trial. I'm just helping him with this part of it.

VENIREPERSON ANNAB: Okay.

THE COURT: And did you understand there is a difference between murder and capital murder?

VENIREPERSON WILTSHIRE: Yes.

173

THE COURT: Okay. I can understand why someone wouldn't. I'll try to really get this across. To be found guilty of murder, you have to be found guilty that you knowingly or intentionally caused the death of an individual. Sometimes people say yes, I can be fair in a murder case if I thought he really didn't mean to do it or it was a car wreck. To be found guilty of murder, you have to find someone intentionally or knowingly caused the death of an individual. Not a car wreck, not a hunting accident. It's not some mistake. It is not self-defense. It is not insanity. It is knowingly and intentionally causing the death of an individual.

Capital murder is knowingly and intentionally causing the death of an individual in certain fact specific situations. Knowingly and intentionally causing the death of an individual while in the course of committing robbery, burglary, sexual assault, arson, kidnapping, murder of a policeman, fireman in the line of duty, murder of a child under the age of six, murder more than one person in one single episode, those are examples of capital murder.

I'm going to ask you, Ms. Annab, I'm going to give you an example -- by the way, we use hypotheticals. Some of them are absurd and we know

174

that, but we're not allowed to even come close to the reported facts of the case, so we use these examples. Two men driving down Central Expressway, hot afternoon, road rage, both pull over, both get out, one has a gun, shoots and kills the other man and kills him. Is that murder?

VENIREPERSON ANNAB: Yes.

THE COURT: Is that capital murder?

VENIREPERSON ANNAB: No.

THE COURT: Exactly. Do you see the difference?

VENIREPERSON WILTSHIRE: Yes.

THE COURT: You know why? He wasn't robbing him.

VENIREPERSON ANNAB: Um-hum.

THE COURT: There's another difference between murder and capital murder. The range of punishment for murder is not less than five or more than 99 years or life. You can say, well, Judge, that sure is a wide range of punishment, and I'm going to say, there's 95 possible different things why that's five to ninety-nine. And I agree that's a wide range, but I've been doing this a long time, just like I told you earlier at noon, I'm going on 40 years as a lawyer and a judge. And I've seen things that happen in the

175

courtroom that when people walk in a courtroom they say, Oh God, when I first got there I didn't have any idea that the way it was really going to play out. Things can happen in one million different ways. That's the reason there's such a wide range of punishment. We leave it up to people like you with common sense, life experiences from your job and family or whatever. You listen to the facts and you decide what's the right thing to do. Not some already preconceived idea. All of the way from five, twenty, seventeen, forty, fifty, twenty-five, whatever the jury thinks is the right thing to do. Does that make sense to you?

VENIREPERSON ANNAB: Yes.

VENIREPERSON WILTSHIRE: Yes.

THE COURT: Now, in that federal case you were in, Mr. Wiltshire, they have sentencing guidelines and it is kind of like an algebra freshman high school formula. Did you learn that from that deal?

VENIREPERSON WILTSHIRE: I've heard of it before.

THE COURT: Well, these categories, they add and take off and the federal judge or probation officer gives him a presentence report and the federal judge just reads it off. That's not the way it happens in State court. We leave it up to the people to make

176

the decision. That's the deal for murder. Capital murder -- if somebody is found guilty of capital murder, which means intentionally knowingly causing the death of an individual. There's only two possible punishments. Do you know what they are, Mr. Wiltshire?

VENIREPERSON WILTSHIRE: Life without parole or death.

THE COURT: That's right. When we say, life without parole, I mean life without parole. There was a time in my career where if someone was given life in prison in a capital murder case, the defendant could become eligible for parole at a later date. That's no longer the law. Believe me on that. Trust me. I give you my word. If someone is found guilty of capital murder and given life in prison without parole, they will spend life in prison without parole. It is life in prison without parole or death if you're found guilty of capital murder.

Here's another difference between murder and capital murder. You go into the trial just like you were in and find the person guilty of murder and there's that punishment phase. The jury comes back and they hear evidence about good deeds, bad deeds, prior record, no prior record, mental condition, physical condition, childhood, anything that the attorneys think will help

177

you decide what the proper punishment is for this person who you found guilty of murder. And of course you can consider everything you heard in the first part of the trial about the crime itself. That makes sense, right?

The jury goes back in the jury room and they have a verdict form and they write on the very back, we the jury having found the defendant guilty of murder hereby assess his punishment at blank number of years in prison. A presiding juror writes down whatever that number is, life, forty, seven, five sixteen, the jury comes back out into the courtroom and hands it to the judge and the judge has the defendant rise and reads it out loud.

Having found you guilty of murder, I hereby assess your punishment at blank number of years. That's the way punishment is set in a murder trial. In a capital murder case, there are two parts. The first part is the guilt or innocence phase. If a person is found not guilty, the trial is over. If they are found guilty, you go into the punishment phase.

What are you going to hear? Probably everything there is to no know about this person on trial. In capital murder cases there is a good chance you will know everything that there is relevant to know about the person, good or bad. The judge reads you the

178

law, the attorneys present the final arguments, you go back to the jury room, you're going to set punishment and it is either going to be what, Ms. Annab? What is it going to be?

VENIREPERSON ANNAB: Life without parole or death.

THE COURT: That's right. But the jury does not write down on a blank line, life in prison or death like they would in any other type case. They answer these three special issues yes or no. Did you read them in that pamphlet?

VENIREPERSON WILTSHIRE: Yes.

THE COURT: All right. What I'd like for you-all to do is -- because the attorneys aren't going to spend enough time with you on them, and I feel it is my responsibility to give you a better grasp of what they mean -- take your time read them to yourself and when you've done that, look at me and nod. I will talk to you about them just for a minute and then we will talk to Ms. Annab.

(Venireperson Annab and Venireperson Wiltshire nod.)

Is everybody okay? All right. Now, I think one of my main responsibilities is to convey this concept.

179

This is the context of when and where you'll be called upon to answer those special issues and only in this situation. In no other situation will you be called upon to answer those special issues. You would have gone through a general voir dire like you did with Judge Snipes. You would have come up to an individual voir dire in a capital murder case. You would have been selected as a juror in the case. You would have been on the jury. You would have found the person guilty of capital murder. And what does that mean, again, Mr. Wiltshire? Intentionally causing the death of an individual in one of those fact situations. If you didn't do that, you'll never see those special issues.

You would have found the person guilty. There would have probably been an hour break in the trial, maybe one day, maybe two days. Then you go into that punishment phase and you know you're in the punishment phase. You hear evidence about that person on trial. Is that a good deed or a bad deed? Anything the judge will find relevant. They will tell you anything relevant in the punishment phase of a capital murder trial.

Both of the lawyers close all of the evidence. The judge reads you the law. The attorneys

180

present final arguments and you go back into that jury room and that's when you're called upon to answer those special issues. What you have, Mr. Wiltshire, is you're signing the fate of someone who you found guilty of someone who will potentially cause the death of an individual in one of these situations. And to be a qualified juror, you have to tell us and mean it that even though you found that person guilty of capital murder, you can still answer those special issues either yes or no depending on the evidence. And if it results in a sentence of life in prison, so be it. If it results in a sentence of death, so be it.

I was in a capital murder case one time and had a fellow that was being voir dired and they asked him, what do you think would make a good juror? He said, follow the law and don't jump to conclusions. I can't say it any better than that. If you can do that, you're qualified. If you can't, now is the time to tell us. All we're asking you to do is be truthful. Is that a fair deal?

VENIREPERSON ANNAB: Yes.

VENIREPERSON WILTSHIRE: Yes.

THE COURT: All right. We're going to talk to Ms. Annab. Mr. Wiltshire if you'll step outside. I'd ask that you remain back in that chair, because we

181

never know exactly how long this is going to take.

VENIREPERSON WILTSHIRE: Okay.

(Venireperson Wiltshire exits courtroom.)

THE COURT: I want to introduce you to Ms. Andrea Handley. She is going to speak to you on behalf of the State of Texas.

AMY ANNAB, having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION FROM THE STATE

QUESTIONS BY MS. ANDREA HANDLEY:

Q. Good afternoon.

A. Good afternoon.

Q. I'm going to ask you a couple of questions. This might only take a couple of minutes, okay?

A. Okay.

Q. Do you remember filling out the questionnaire when you came down here with the big panel?

A. Yes.

Q. On that first page of that questionnaire -- I'm sorry. On the second page of that questionnaire we asked you the question, do you have any moral, religious or personal beliefs that would prevent you from returning a verdict that would result in the execution of another human being? And you put there yes. Morally it is a very difficult decision that would weigh on my

182

conscience. Was that your answer then?

A. "Yes".

Q. And is that your answer now?

A. Yes.

Q. Okay. Also, on Page 5 --

A. It says that could weigh on my conscience.

Q. Right. On Page 5 we had asked you, what would be important to you in deciding whether a person receives a death sentence rather than a life sentence in a capital murder case? And you answered, knowing without a doubt that the accused willfully took the life of another without care or regard for that individual. Was that your answer then?

A. Yes.

Q. Is that your answer now?

A. Can I reread it?

Q. Yes.

A. Yes.

Q. Okay. I noticed also that your father has been a Dallas police officer for thirty years and your younger brother works as a state trooper in Virginia?

A. That's correct.

Q. Okay. Thank you.

MS. HANDLEY: I have nothing further.

THE COURT: Anything further?

183

MS. HANDLEY: No.

THE COURT: All rise for Ms. Annab. You'll be coming back in here in a minute.

(Venireperson Annab exits courtroom.)

What says the State of Texas?

MS. HANDLEY: We will challenge Juror No. 138, Your Honor.

THE COURT: Any objection?

MR. LOLLAR: No, Your Honor.

(Venire person Annab enters courtroom.)

THE COURT: Ms. Annab, you're free to go. You don't have to serve and you do not have to return. It's been a real pleasure meeting you and I appreciate you being here. Thank you, ma'am.

VENIREPERSON ANNAB: Thank you.

(Venirepreson Annab exits courtroom.)

THE COURT: We are going to take a five-minute recess.

(Recess from 1:54 p.m. to 2:00 p.m.)

(Venireperson Wiltshire enters courtroom.)

THE COURT: Finally from me, sir, did you see in that pamphlet where Judge Snipes tells us he anticipates the trial in this case is going to commence August 10th?

VENIREPERSON WILTSHIRE: I did.

184

THE COURT: It is going to last about two weeks, Monday through Friday, 9:00 to 5:00, a break in the morning and break in the afternoon. There will be a lunch break, of course. The jury will not have to stay together overnight, unless and until you went into deliberations, and you know what that means.

VENIREPERSON WILTSHIRE: Right.

THE COURT: Let's say you went late into the night and you were unable to reach a verdict and became mentally fatigued. There is a possibility that you would be sequestered. Do you know what that means?

VENIREPERSON WILTSHIRE: Yes.

THE COURT: If that happened, I know Judge Snipes would give you plenty of advanced notice. He would say, bring your overnight bag and tell the people that are important in your life that there's a chance you would have to spend the night, because nobody knows how long the jury is going to take.

If that happened, you would all be taken as a group to a fine hotel at the county expense, individual private rooms to spend the night. You would come back the next morning to avoid any outside influence. That's during deliberations, not during the trial.

I tell you that to ask you this question:

185

As you sit here now, are you aware of anything that would be occurring in your personal or professional life that would prohibit you from sitting as a juror in this case?

VENIREPERSON WILTSHIRE: Not until August 28th. That's a Friday. I'll be out of town. We already have our plane tickets and reservations to go out of town that weekend.

THE COURT: How long would that be?

VENIREPERSON WILTSHIRE: Friday, Saturday and Sunday.

THE COURT: Okay. I'm about as confident as I can, be this case is going to start on time, but even if it didn't you would be accommodated for that Friday, okay?

VENIREPERSON WILTSHIRE: Okay.

THE COURT: Without anything further from me, Andrea Handley is going to talk to you on behalf of the State of Texas. If you need to take a break let us know. If you need water, coffee or Coke, something like that, a restroom break or whatever, just let us know.

VENIREPERSON WILTSHIRE: Okay.

MS. HANDLEY: Thank you, Your Honor.

BRADLEY WILTSHIRE, having been first duly sworn, testified as follows:

186

VOIR DIRE EXAMINATION FROM THE STATE

QUESTIONS BY MS. ANDREA HANDLEY:

Q. Good afternoon. How are you?

A. Fine. How are you?

Q. I'm just fine. It looks like you're getting married, huh?

A. Yes.

Q. Congratulations.

A. Thank you.

Q. That's fantastic. I think the judge gave you a good preview of what we have going on today, sir. The first thing that jumps out at me is maybe this will help us get through this process a little more smoothly is that you have a law degree?

A. I do.

Q. How long did you practice law?

A. Three and a half years or so.

Q. It was primarily civil?

A. It was all civil.

Q. Okay, all civil. Litigation in the courtroom or what kind of law?

A. It was litigation. I was almost never in court, personally.

Q. Okay. Why the career change? Why did you get out of law?

187

A. It wasn't for me. I didn't enjoy it at all. It was stressful. I didn't think I would every be very good at it. It didn't take.

Q. Yes. If you don't love what you do, you're probably not doing the right thing. I'm going to assume, since you spent so much time in law school and you pored over those books for so many hours, that you probably still have a pretty good appreciation for the fundamental principles of law that apply in cases throughout our legal system. I really like the way -- the Judge said it best, probably the best jurors are the ones that will follow the law and won't jump to conclusions. Would you agree with that? That's a pretty good description of a qualified juror.

A. Yes.

Q. I can tell you, you know, reading your questionnaire, I think that potentially you're a very qualified juror. But let me tell you that what we're doing here today in the individual voir dire, I might give you examples. I might say, in my experience, or, I believe, and the defense might do that also; but the fact of the matter is, what I think and what I believe and what they think and their opinions and what they believe, that and a buck and a quarter will get you a cup of coffee.

188

At this point what we think doesn't amount to anything. It's not evidence. We wouldn't bring you down here and talk to you one-on-one just to hear ourselves talk, even though we do a lot of talking. We want to hear you talk and, most importantly, we want to hear what you think about this process, about being involved in something so serious, your feelings on the law, and most importantly, are you that qualified juror. You might be qualified for one hundred different other kinds of cases, but you might not necessarily be qualified to sit on this particular case. And it could be because you just can't follow a particular law or because it would violate your moral or religious conscience to participate in the death of another human being.

And I think you appreciate that's exactly what we're doing.

A. Right.

Q. We're looking for twelve fair-minded Dallas County citizens that can sit in judgment for the defendant in this case. And if they believe we proved our case beyond a reasonable doubt, and if they believe we brought forth the evidence to show that a death sentence was appropriate versus a life sentence, that they can take pen to hand, answer those special issues,

yes, yes and no, and know that that individual, that young man seated down there, that some day he's going to be strapped to a gurney and injected with poison.

I take it you have a good appreciation with what is going on here.

A. Yes.

Q. You might have sat back after you filled out this questionnaire and gone home and maybe discussed it with your fiancé or something. Did it make you talk a little bit more about the death penalty? Did it really make you sit and absorb your ability to participate in this? Did it change your mind at all?

A. I don't think it changed my mind. I guess I understood a little bit more about what goes into it. But I can't say it changed my mind.

Q. How do you feel about this, sitting here today knowing there is a very real possibility that you could be on a jury that would ultimately participate in the death of another human being?

A. I mean, it is not ideal, because it is a pretty big responsibility, but it is part of society, I guess.

Q. Right. It is a punishment that is available in Texas at this point. I mean, if you were governor for a state and you had the option to abolish the death penalty, would you? Would you change it in any way?

A. I don't think I would ever abolish it, but I would make sure it was used where it needed to be. You know, only where it should be used and that it was carefully applied.

Q. Absolutely. As it should be. You know, and I think you probably understand also that not every intentional murder committed in Texas is a capital murder. It is actually very somewhat narrowly defined in our criminal code. It is the intentional murder, plus that aggravating factor. It is the intentional murder of a child under six years of age or of a peace officer under the official course of his duties. It is the murder of more than one individual in the same criminal episode. It is the intentional murder of somebody while in the course of committing another felony offense, robbery, burglary, sexual assault, something such as that.

And the indictment that you had an opportunity to look at or is in front of you today, alleges that type of capital murder. It is the intentional murder of an individual while in the course of committing or attempting to commitment the offense of robbery. It is actually a very narrowly defined offense where the death penalty is available. You know, if I took out a gun and just shot my co-counsel and stomped

on his body a couple of times, I'm sure you would agree that that's a pretty heinous, cold blooded murder, isn't it? It is not a capital murder.

A. No, unless he's a cop.

Q. No, he's not a cop. It would a heinous murder, but it wouldn't be a capital murder. Obviously, it doesn't mean I go home free, but now it is a first-degree murder. It carries anywhere from five years up to 99 years or life in prison.

Before we move on to talk specifically about capital murder and whether or not what happens when you get to a capital murder case, let me just brush over a couple -- or go over a couple of things with you again. This might sound very familiar to you as having a law degree and having been a practicing attorney. I don't know if you had much interest in criminal law, did you?

A. No. I think I took one class.

Q. Okay. Then stop me if you have any questions or something. Capital murder is the highest degree that we have in Texas. It is the hardest way you can commit a murder. It is the intentional murder in the course of another aggravating factor. If I don't prove in my case in chief that a capital murder occurred, it doesn't necessarily mean that everybody goes home.

You might be called upon to determine whether or not I have proved beyond a reasonable doubt a lesser included offense. Let's say that I failed to prove that there was actually a robbery. Let's say I failed to prove that the defendant in a particular case intended to cause the death of a person. If I failed to prove any one of those crucial elements of the offense, your verdict on capital murder, then, is what?

A. Not guilty.

Q. Not guilty. And you might then be called upon to determine if it is not capital, then maybe it is murder. And murder is the intentional killing of another human being. Beyond that, there's even another step down to manslaughter, where it was reckless. I didn't intend to kill the person. I didn't know it would necessarily result in their death, but I did something reckless. I should have known that it could cause that person's death. That's a second-degree felony.

Maybe I haven't even proved that. You'd still look at the evidence again and you would ask yourself, well, has the State proved that there is a criminally negligent homicide that occurred here? And, you know, we have the State jail felonies, which is somewhat relatively new, where if you're guilty of

criminal negligent homicide, it is a State jail offense. You're going to serve anywhere from six months up to two years. And it could be that situation where I'm driving through a school zone and I'm fiddling around with my radio and I'm not paying attention or I'm trying to text somebody and sure enough I hit somebody.

Now, I didn't mean to kill the person. I didn't know they were there, but I should have known. That's a State jail, so you understand there's a whole host of possibilities when it comes to murder. And you may find yourself in that position where you have to decide that.

In a capital murder case, if you find we prove to you capital murder, then you know it is only one of two things are going to happen, right?

A. Right.

Q. Life or death. If it is anything beyond that, if it's anything under that -- it might not even be murder. You might find they have no culpability whatsoever in the murder, but he did the robbery. You know, you get into that whole range of punishment then. I think you can appreciate the phrase, I'm sure you've heard it before, let the punishment fit the crime?

A. Right.

Q. Which, I think, hits the nail on the head for what we're doing in all of these legal processes, is that a verdict should also be based on the evidence in the case, right?

A. Yes.

Q. And be it a guilty verdict or be it a verdict of punishment, the punishment should fit the crime. In order to be a qualified juror, you have to be able to consider that entire range of punishment. You can't make any automatic assumptions. You can't jump to any conclusions. You have to take in the evidence and say, is this a case where the minimum sentence is appropriate, somewhere in the middle or maybe the maximum?

I think a good way to illustrate that is throughout the -- because we immediately think of things when we hear certain things. If I told you, envision if you will, a 35-year-old man who plans out and does actually carry out the intentional murder of a helpless 10-year-old boy. What do you think?

A. I'd say, a terrible crime.

Q. It sounds heinous, doesn't it?

A. Yes.

Q. It sounds heinous. The premeditated murder of a helpless 10-year-old boy. My first instinct might be, we ought to put him under the prison. He's guilty of murder. I'm looking at a range of punishment and my first instinct would be, he's going to prison for life. And then you change up the facts a little bit. That 35-year-old man is actually the father of that 10-year-old boy. And that 10-year-old boy is over at Children's Medical Hospital and he has been diagnosed with an incurable cancer. That little boy is going to die. There's no turning back. And if that wasn't bad enough, this father -- that child is suffering every single minute that boy is alive. And that dad sits at his bedside and watches him suffer. He has been a good man his whole life. He has done everything he can for his wife and kids. And out of nothing but sheer motivation of love and affection for that little boy, he goes and he gets morphine and gives him a shot because he believes that is the best way for his death. Has he committed a murder?

A. Under the law, yes.

Q. Yes. He is intentionally taking the life of someone. It seems to be a far cry from the guy that takes an AK47, goes to the playground and takes one out. It is not the same. That's why we have that wide range of punishment. I give you that example, not only to talk about the range of punishment, but just to impress upon to all of the jurors that we've talked to, that you always have to wait and hear the evidence in the case before you can truly say what you're going to do.

If you've already jumped to a conclusion, then it tells us that maybe you're not qualified, because you've already made up your mind and you're not going in with an open mind. Does that make sense to you?

A. Yes.

Q. If you were called upon to determine a lesser included offense, if we come to that situation, would you be open to the entire range of punishment?

A. Yes.

Q. If you thought the appropriate thing to do is to give five years or minimum or the maximum, is that what you would do?

A. Yes.

Q. Let me talk to you a little bit more about one more thing before we move on and that is the law of parties. I'm sure you've heard of that. The law of parties -- on TV, they always want to call it aiding and abetting. The fact of the matter is, is in Texas, I, for example, could be held liable for the murder of another human being, even though I never pulled the trigger.

A. Right.

197

Q. The way I can be found guilty or held liable for that, legally, is if I was a party to the offense. If I aided or assisted or encouraged or directed, in other words, if I participated in the commission of that murder, I'm just as guilty as if I pulled the trigger myself. Does that make sense to you, at least?

A. Yes.

Q. Okay. If my brother and I, for example, sit down and we decide both of us that we're low on funds and we need to get some cash and we're going to rob the Local 7-Eleven. We sit at the kitchen table and we talk about it. He goes and buys the gun. I buy the bullets. We both get in his car and he drives us up to this 7-Eleven and he says, this is a pretty good one. There's not a lot of traffic. I don't think there would be any witnesses. I say, got you. I understand. I pull out my gun. I load my gun. I walk in there and I say, you, my brother, sit out here and if you see anybody, you honk the horn and let me know. I go in and rob the clerk and I shoot the clerk. Am I guilty of capital murder?

A. Yes.

Q. Yes. I've intentionally killed someone. And that's assuming I intended to kill that person, maybe not just hurt them. Because I committed a capital

198

murder inside that store. Do you think my brother is guilty of capital murder?

A. I guess he could be.

Q. Do you think he aided, assisted, encouraged or participated in that offense?

A. Yes.

Q. Well, in order -- I'll go one step further. In order for you to be able to say he was a party to a capital murder and not just necessarily a robbery, you would have to find additionally that he should have anticipated that somebody was going to die.

It is not just enough that he was a party to it and he bought the bullets with me and he planned it with me, but he should have anticipated that somebody was going to die. You would make that determination as a juror, of course, based on the facts of the case and you would decide that. You know, if I take the gun and I load it in front of him and say, you know I'm not leaving any witness, that might be a piece of evidence that you would look at and help you determine whether or not he should have anticipated somebody was going to die.

Does that seem fair to you to be able to convict an individual who is a party to an offense, even though they were not the trigger man?

199

A. Yes. It is unfortunate, but you knew what you were doing.

Q. And it is interesting, Mr. Wiltshire, because when we were talking about a murder and the range of punishment, you were able to take things into account in assessing the punishment. In this situation, though, if my brother is guilty of capital murder, only one of two things can happen, right? Life in prison without parole or death.

So the other peripheral things don't maybe matter, like the father who killed his son, that fits us all. There's no discretion there. You know, let me change up the hypothetical for you a little bit here and tell you that my brother is quite mentally slow. He knows what he's doing. He knows right from wrong, but in my hypothetical, he's mentally slow. And I've pretty much raised him. And the fact of the matter is, I raised him to do my dirty work and he depends on me entirely. He looks to me for approval. And I tell him, we need some money. I'm sure you want to buy a Play Station, but we don't have the money for that, Bob. So I have a plan and if you help me, I'll get you a Play Station.

Go steal a gun from the neighbors and bring it to me. And he does it. And he gives me the gun.

200

And I say, we're going to take your car down to the 7-Eleven, okay? All right. Now, I'm going to go in there and I'm going to rob that woman and I want you to honk that horn if you see anybody coming, okay?

Okay, I'll do it.

And I pull out that gun and I tell him, you realize I'm not -- I'm going to have to hurt somebody. I'm going to have to hurt somebody.

Okay, if you say so.

And he knows I might hurt somebody, because I've done it before. And I get out of the that car and I go into that 7-Eleven and he's sitting there and he starts to think about it and bless his heart he doesn't think this sounds very good. He kind of gets a little nervous about this. Maybe I should do something? Maybe I should -- I see a phone number there. I should probably jump out and call the police. I think I will, but before he can even make a gesture in that direction, before he can do anything that he's been thinking about, he hears a shot go off.

I've committed capital murder in there, haven't I?

A. Yes.

Q. Has my brother been a party to the offense? Did he aid and assist me in committing a robbery?

201

A.   Probably.

Q.   You say probably?

A.   Well, I guess I don't know how if it is different from what you have to prove, if there's certain things you have to prove if you can't meet that.

Q.   Well, let me ask you: Do you think by him going and getting the gun that he's aided or assisted me in the robbery?

A.   Yes.

Q.   Okay. And when I tell him and when I look at him and say, understand this, Bob, and I pull out a loaded gun, I'm going to go in and hurt somebody. And I show him a gun and him I'm going to hurt somebody, do you think he should have anticipated somebody would get killed?

A.   Yes.

Q.   Would he be guilty of capital murder?

A.   Yes. But I guess the part where I get hung up on is whatever you have to prove to prove capital murder -- if his circumstances -- I mean, if there's somewhere in there that comes into play, then -- I guess I don't really know what you have to prove.

Q.   What I have to prove, technically, and I'm not talking about him getting the death sentence, I'm just about him getting capital murder, I have to prove that

202

he was a party to the offense. That he either aided, assisted or encouraged in the participation of this robbery.

A.   Just that he had to be a party to it?

Q.   Yes. First of all, he had to be a party to it. He can't sit there and not know what's going on. He had to actively participate in it. He went and got the gun. I told him what I was going to do. We drove his car up there with me in it. Is it fair to say he participated in the planned robbery?

A.   Yes.

Q.   What I have to prove to you in order for you to find him guilty of capital murder, is that he should have anticipated that somebody was going to die. When I pull out a gun that he got me and I load it in front of him and I tell him, understand, I'm not leaving any witnesses. What do you think?

A.   Probably he knows what that means.

Q.   Okay. And the standard would be, he should have anticipated it. The reason I'm putting you through this, this hypothetical, is that if I prove that beyond a reasonable doubt, then he's guilty of capital murder. And the fact of the matter is, there is no range of punishment. You can't take into consideration that he's somewhat mentally disabled. He's not mentally retarded,

203

but he's slow. He's gullible. I've used him. You don't get to take any of that into account. Your hands are tied. He's going to prison for the rest of his life, because I'm a cruddy sister, but he knew what he was doing. And that's a law where, quite frankly, you have no discretion.

A.   Right.

Q.   If I prove that, you have no discretion. And I want to know what you think about a law such as that. Is that fair?

A.   It's probably fair to some and not to others. It is harsh.

Q.   Yes. Where it is not fair to others, do you think you could participate in a process where it is not fair?

A.   Are things really fair to everybody, so, I suppose yes.

Q.   Yes. I guess what I'm getting at is, sometimes the law is the law. It is black and white.

A.   Right.

Q.   It can be black and white. And it may be harsh. For example, the hypothetical I'm giving with my brother, but the law is the law. And there are people that will tell you, and there is nothing wrong with this, because right now you haven't taken an oath to

204

follow the law.

A.   Right.

Q.   You've only taken an oath to tell me the truth. There are people who will sit here and go, you know what, I can't take part in a process such as that, where I have no discretion in what happens to that individual. I can't do that. That's not fair to me and I can't follow the law in that situation. That's an acceptable answer.

A.   Right.

Q.   Nobody gets published in the Daily Times as, you know, this guy can't follow the law, but it is a true and an honest answer. And that's what I want to know. How you feel about that?

A.   I understand how that works. You, basically, have to follow what's the law. I guess if you prove what you are supposed to prove, then that's kind of the way it goes.

Q.   Okay. You've answered a lot of questions about the death penalty and I think you put some very fair answers in here where you think it is appropriate and when it is appropriate and under what circumstances and I can't pin you down to any specific set of facts. I can't pin you down to when you definitely would do something or when you wouldn't, but let me ask you with

205

respect to the death penalty, what just shocks you? When would you go, that's a worthy case?

A. For somebody to receive the death penalty?

Q. Yes.

A. Maybe somebody who went out and killed a bunch of people, child killers, child rapists. I don't know if it applies there.

Q. I'm just asking your opinion. I'm not asking you what the law is. I just want to know your opinion. What shocks you where you go, yes, I'm comfortable with that.

A. All of those things.

Q. Okay. You wouldn't necessarily limit to the death penalty to situations of child killers, would you?

A. No. That's just one.

Q. Okay. Or to mass murderers?

A. No. You said the things that really shock me. Those are the things that stand out.

Q. Okay. Let's move on to the actual death penalty type situation. The judge did a fine job of previewing you on what's going on.

Obviously, the first part of the trial has everything to do with just guilt. Have we proved our case to you beyond a reasonable doubt, that the defendant is guilty of the offense of capital murder?

206

And you understand the presumption of innocence that he is innocent until you find him guilty, correct?

A. Yes.

Q. And can you follow that law, find him innocent until I prove otherwise?

A. Yes.

Q. Do you respect and understand that he has a right not to testify and you can't hold that against him?

A. Right.

Q. That I have an obligation to prove all of the elements, not just five out of six?

A. Right.

Q. And if I drop the ball on something as obvious as I've alleged that somebody shot somebody, but in actuality they actually stabbed somebody, do you understand your obligation is to return a verdict of not guilty? Do you understand that?

A. Right.

Q. If I prove my case to you beyond a reasonable doubt that a defendant intentionally caused the death of a person during the course of a felony offense, you find him guilty of capital murder. If that happens, that's when we move into the second phase of the trial. It is like a second trial. It's a mini trial.

207

A. Right.

Q. And that same presumption of innocence that he had in the first part of the trial, there's a presumption now in the second part of the trial. The presumption is, is that you are to presume that the proper sentence in the case is a life sentence. Life without parole. You are to carry that presumption if that is the proper thing to do, if and only until, I, as a representative of the State, prove to you beyond a reasonable doubt that it should actually be death. Does that make sense?

A. Yes.

Q. You understand they have no burden of proof, right?

A. Right.

Q. It always goes to the State. You always look to the State to prove their case. He's guilty of capital murder, so the best he's sitting on at this point is what?

A. Life without parole.

Q. Life without parole. And he's going to sit on that and that's what he's going to get until I prove to you that he should, in fact, get the death penalty. You don't go back there and go, let's think about it. Does he deserve death versus life? That has nothing to do

208

with it. It has to do with how you answer the special issues and if you answer them in a certain way, the result will be life or death.

The first special issue that you have to address that I have to prove to you is what we refer to as the future dangerous issue. Have you ever heard that before, a future danger?

A. Vaguely.

Q. Most people haven't until you come down and you're part of a capital trial, but that's that Special Issue No. 1 in that pamphlet and it is also up here. This is the first special issue that you have to consider. And you'll notice, starting right off the bat, do you find from the evidence beyond a reasonable doubt, again, that's just reminding you, who are you looking to? You're looking to the State, aren't you?

A. Right.

Q. And you're looking to me to prove everything to you beyond a reasonable doubt. That just takes you back where you're supposed to be. Do you find from the evidence beyond a reasonable doubt that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society? You will receive no definitions on these particular terms in this issue. It is for you to decide

what it is. But you'll notice that one of the first words that jumps out is probability.

A. Right.

Q. It doesn't say, do you find beyond a reasonable doubt that the defendant absolutely will or the defendant might. It says, that he probably, that there is a probability. Do you see the difference between "possibility" and "probability"?

A. Right.

Q. Anything is possible, isn't it?

A. Right.

Q. Okay. Probability, would you agree with me, that it means more likely than not?

A. Yes.

Q. Okay. So if I prove to you beyond a reasonable doubt that more likely than not the defendant will commit criminal acts of violence, it doesn't say that the defendant will commit another murder, that he will commit an assault or that he will commit a rape. They have not limited that to you. They haven't told you what criminal acts of violence are either. That's for you to decide what a criminal act of violence is.

If I ball my fist up and Mr. Hikel is sitting here minding his business and I just hit him, would you consider that a criminal act of violence?

A. Probably.

Q. Why do you say probably?

A. I mean -- well, I guess, you're hitting him.

Q. It could be considered violent, right?

A. Yes.

Q. I mean, there's no mutual combat here. Do you think he could file charges on me for assault?

A. Yes.

Q. He might not?

A. He probably wouldn't, but he could.

Q. But that could be a criminal act of violence. Maybe me just threatening him could be considered a criminal act of violence, too.

A. Right.

Q. That's for you to decide what a criminal act of violence is.

A. Right.

Q. So if I prove to you that more likely than not, the defendant is going to commit criminal acts of violence that will constitute a continuing threat to society -- when I think of society -- when you think of society, what are you thinking?

A. The public.

Q. Yes. Going to the grocery store, going to the post office, driving on the highways, which is the society in which we live in. If a defendant is found guilty of capital murder, where is he going to be the rest of his life?

A. Jail.

Q. Jail, right. And can you see how that definition of society could, in fact, encompass the prison population? You have people who are literally living there, aren't they? They are inmates and they are literally living there. And you have other people there, too, don't you, guards, teachers, doctors, administrators, wardens, you have all kinds of people in there, but it is a society itself. Do you appreciate that? Do you agree with that, that that could be considered a society?

A. Yes.

Q. I'm asking you and I'm having to prove to you that that defendant is going to be a continuing threat, a future danger to the society in which he is in. I have to prove that to you, but let me ask you, what kinds of things do you think you would need to see to make a determination as to whether or not somebody might be a continuing threat to society?

A. You mean, like, what?

Q. Yes. And I'm not pinning you down here, I'm just feeling you out here. What kinds of things would help you decide? What would you need to see or hear? What would help you decide as to whether or not you could predict if somebody was going to be a future danger?

A. Hear about their past. What other crimes they have committed or other acts they have done or what good things they have done.

Q. Right.

A. Just kind of a general background of the person to know who they are.

Q. Sure. And I'll tell you that the law says that you can actually answer this question yes or no, based strictly on what I've shown you in the first part of the trial, based strictly on the offense itself.

A. Okay.

Q. You can look at just that and decide, yes, that's enough to tell me that he's a future danger to society or you can say, no, I need more than that. I want to see more, but that's appropriate that you can make that decision based strictly on that. But what you can't do is you can't say the capital murder itself that I just found him guilty of was so heinous, I don't need to deliberate. I'm going to automatically just assume he's a future danger, because if you do that, have you jumped to a conclusion?

A. Yes.

Q. Okay. Have you gone in with an open mind?

A. No.

Q. No, you haven't. So you have to wait and you have to presume life is appropriate until it is proved otherwise. Do you think that is something you can do?

A. Yes.

Q. Is that a law you can follow?

A. Yes.

Q. Okay. If I don't prove that to you beyond a reasonable doubt, he's going to get a life sentence and we stop right there. You stop right there and he gets a life sentence. If I do prove that to you beyond a reasonable doubt, we then go to the second special issue. That hits on what we talked about earlier about the parties where I kind of gave you an out there, hypothetical about it. Basically, what you're asked to decide here now is you've already decided he was a party to capital murder because he participated in an offense and he should have anticipated somebody was going to die.

That's how you were able to find a party guilty of a capital murder. If you're looking at somebody who is a party to a capital murder in terms of whether or not they can get the death penalty, it is not enough that they should have anticipated, but you also have to find they actually did anticipate that somebody was going to die. Do you see the distinction there?

A. Right.

Q. Should have, you find him guilty of capital murder. He did anticipate, to make him eligible for the death penalty. Any questions about that?

A. No.

Q. And you're called upon and you could actually be looking at a defendant who caused the death himself.

A. Right.

Q. You could be looking at the trigger man or you might be looking at a defendant who is a party to it who is not, figuratively speaking, the trigger man, but was a party in all of the other respects.

If you also answer the second special issue yes, he is sitting square on the death penalty, okay?

A. All right.

Q. It is not over yet, though. And that's why we end up going to the last special issue, Special Issue No. 3. And it is quite a mouthful. You've already read it. We often refer to it in this business as the safety net question. It's kind of a safety net. And here's, basically, what it comes down to: If you're going to sit on a jury in a capital murder case where the stakes are so high, and they are, we're not going to tie your hands. We're going to make sure that you can take all things into consideration. And if for some reason you look at all of the evidence now in its entirety and say, you know what, there was something about this defendant or there something about the circumstances of this offense, there was something about this guy's background that I know he's a capital murderer and I know he's a future danger and I know he was a party to this, but there's that one thing that tells me we need to look this thing over and give him a life sentence instead.

What's interesting, Mr. Wiltshire, is I've been talking about burden of proof, burden of proof, well, there's no burden of proof on either side on this last issue. I don't have to prove anything to you and the defense doesn't have to prove anything for you. It is just there for you. It is there to give you that final option to turn things around. You can answer this question, of course, based on everything you have heard in the case.

I can't pin you down to say, tell me what you consider mitigating where you would turn a life sentence around. Sometimes you don't know it until you see it, but something mitigating could be anything. He could have been raised in a closet his whole life, fed dog food and had cigarettes put out on him. He's a monster, but he's a monster because of his parents. Maybe they should be the ones in prison, you know. It could be anything. It could be his height. He's a short guy or he had a hard life or his mom was an alcoholic. Anything could be mitigating. The question becomes: Is it sufficient? Is it sufficient? There's one hundred bad things about this guy's life and none of them are quite sufficient enough for me to turn this over. What's most important about the third issue, though, is you can't go in with your mind made up. You can't say, in other words -- because it sounds bad. I've got a capital murderer in here who is a future danger, knew somebody was going to die or killed him himself, I'm not even going to listen. There's nothing that you can tell me that would ever turn it around.

There might not ever be anything that could turn your opinion around, but what you have to do to be a qualified juror is say, I'll sit and review the evidence and consider the evidence again and answer this question. Does that make sense to you?

A. Yes, it does.

Q. Okay. Do you have any questions about any of these special issues?

A. No.

217

Q. Okay. Is there anything that you think as you sit here, and I know a lot is coming at you in a hurry here, is there anything that you can think of, Mr. Wiltshire, that you think we need to know? Because ultimately, even if you're qualified, it doesn't necessarily mean you're going to be on this jury.

A. Right.

Q. I haven't had an opportunity to take a good look at you and decide whether or not I really ultimately want you on this jury, as do they. And I think a lot of times we make our decisions on our gut feelings or maybe something -- we're just looking for something.

A. Right.

Q. I think, and I'm careful to speak for both sides, but ultimately we just want you to be truthful and we want a fair shake for both sides.

A. Right.

Q. And if you're predisposed to go one way or the other, I'd like to know about it now.

A. I don't think so.

Q. Okay. You're telling me that -- you're not giving the State a leg up, are you?

A. No.

Q. Okay. You're not going in -- do you have any

218

kind of empathy at this point for the defendant?

A. No. I don't know anything. I know nothing, so I have none.

Q. Absolutely right.

A. I don't really even know what he's accused of.

Q. Okay. Well, he's accused of --

A. Well, I mean --

Q. Okay. You don't know the facts of the offense.

A. Right.

Q. Okay. And let me just say this, we asked you a question about whether or not you had read or heard anything in the newspapers --

A. Um-hum.

Q. Do you have your questionnaire in front of you?

A. Yes.

Q. On Page 3 you said -- we said, do you think you've heard about this case?

And you said yes. None of the names sound familiar, but I do vaguely recall hearing names about a robbery in a music studio last year that involved a shooting.

A. Right.

Q. Let me say this, and I think it is also laid out for you pretty well there in the questionnaire, that if having heard or read something in the newspaper or on

219

TV or at the coffee shop disqualifies you to be a juror, then all we would get were jurors who never came out of their house and who never read the paper. It doesn't necessarily mean you are disqualified.

A. Right.

Q. I mean, people come in having heard things, but what you cannot do is base your verdict on anything outside of the evidence you hear in the courtroom.

A. Right.

Q. That's all you can base your verdict on. You can't go, let me tell everybody what I heard outside. Do you think you can do that?

A. Yes.

Q. Anything that you've heard, can you set that aside and base your verdict strictly on the evidence in this case?

A. Yes.

Q. Have you already formed an opinion as to whether or not this defendant is guilty or innocent, based on what you have read, heard or seen?

A. No.

Q. Mr. Wiltshire, I appreciate you answering my questions and being patient with me going through all of the facets with you. Thank you so much.

THE COURT: Thank you, Ms. Handley. I know

220

you were here before. One, do you need to take a short break?

VENIREPERSON WILTSHIRE: No, I'm fine.

THE COURT REPORTER: May I have a break?

THE COURT: Yes. How long do you need?

THE COURT REPORTER: Five minutes.

THE COURT: Okay. We'll take a five-minute break.

(Recess from 2:42 p.m. to 2:53 p.m.)

THE COURT: Mr. Brad Lollar is now going to talk to you on behalf of Mr. Broadnax.

VOIR DIRE EXAMINATION FROM THE DEFENSE
QUESTIONS BY MR. BRAD LOLLAR:

Q. How are you doing, Mr. Wiltshire?

A. I'm all right.

Q. Good. Let me introduce myself. I'm Brad Lollar, Doug Parks, Keri Mallon and James Broadnax is here on the end.

Listen, we've read your questionnaire. We've heard everything you've had to say to the State. Frankly, you're a little hard to read. I'm trying to get a good handle on where you are on these issues.

A. Okay.

Q. Let's just talk for a minute, though. You said you went to law school, graduated law school, passed the

221

bar and then you practiced here in Texas; is that right?

A. Yes.

Q. Down in Austin?

A. No, here.

Q. Here in Dallas?

A. Yes.

Q. And you just didn't like it?

A. No.

Q. Well, that happens sometimes. My wife's nephew just graduated from law school a couple of years ago and he won't even take the bar. He just doesn't like it. So he's sitting there with a law degree with nothing to do with it. But anyway, tell me what you do now.

A. I do consulting with HR. Basically, for federal contractors or affirmative action plans and their reporting and pretty much that.

Q. Okay. All right. Do you like that better?

A. I do.

Q. Well, good. Of course you know what we're down here talking about is whether or not you'll be in this group of fifty that we select this jury from. How do you feel about the proposition like we have here in Texas that if you commit a capital murder, we have the option of either a life sentence without parole or a death sentence? And tell me just what your thoughts are

222

about that. Do you favor one over the other just thinking about it?

A. No. I mean, it really just depends on what happened.

Q. Okay. It depends on what?

A. On the facts of the case.

Q. Okay.

A. On what the offense was.

Q. Well, a capital murder in Texas is if you kill a peace officer or firefighter in the line of duty, if the victim is a child under the age of six. A murder committed while the perpetrator is in the act of committing a robbery, burglary, kidnapping, aggravated sexual assault, arson, obstruction, retaliation or terroristic threat, murder for hire or being a person who hired the murderer for hire, murdered more than one person during the same transaction, a mass murder, murder more than one person pursuant to the same scheme at different times, a serial murderer or if you're in a penal institution and you commit a murder while trying to escape. Those are the different many types of capital murders we have here in Texas. Any of those are bad.

What I'm trying to get a read on from you is recognizing that all of those are bad offenses. What

223

in your mind is going to separate those who deserve the death penalty from those who deserve life without parole?

A. I guess, just the overall circumstances. You know, what actually happened during the offense.

Q. Is what happened during the offense going to be the driving consideration?

A. Part of it. I don't know if I can say if any one thing stands out. I don't know. I guess just looking at everything that's out there. Obviously, something about the defendant, too. You know, circumstances and -- are you talking about deciding between the two sentences?

Q. Yes.

A. Yes. I mean, I kind of want to know everything I can.

Q. Well, sure. I understand that.

A. I guess it is hard to say. I really don't know which way I would go.

Q. Well, we ask you on Page 4 of you questionnaire, what crimes do you think the death penalty should be available in Texas?

A. Right.

Q. And you said, child rape. Do you understand that the death penalty is not available for child rape

224

in Texas?

A. Right.

Q. You say murderers. Not all murderers, but most.

A. Right.

Q. Okay. What did you mean by that?

A. I mean, most murders are not capital murders. Well, I guess what I mean is -- I don't know. If you murder somebody, you murdered somebody.

Q. Well, right. In your mind you think it is appropriate that all murderers should receive the death penalty?

A. No.

Q. That's what I'm trying to figure out.

A. No. There's got to be something that -- I guess not everyone has done the same -- kind of at the same level of culpability. I don't know, or the level of motivation.

Q. Okay. The next question says, do you agree with the law in the State of Texas that says murder in the course of committing or attempting to commit robbery is a capital offense for which the death penalty may be imposed?

And you answered yes. Murdering someone while committing another crime, such as robbery, is a

225

serious offense showing the lack of respect for life.

A. Right.

Q. I agree with that. I don't disagree with that. But as you can see, anytime you're talking about a capital murder in the State of Texas, it is a crime that shows a lack of respect for life.

A. Right.

Q. So, again, I'm trying to figure out in my mind where your dividing line is. Who deserves death and who deserves life without parole?

A. Right. I mean, I guess I don't really have a set thing in my mind. I don't know. It is kind of, you'll know it when you see it, maybe.

Q. Okay.

A. I don't know.

Q. Okay. And then we ask you, on a scale of one to ten how strongly do you believe in it? You said, seven. Now, I certainly understand people who wrote one and I understand people who are a ten. It is where you get off in the middle that it gets hazy.

A. All right.

Q. Tell me what you meant when you said you were a seven on a scale of one to ten.

A. I suppose I'm more in support of it than not,

226

but I'm not someone who thinks that it should just be death penalty, death penalty, death penalty. I think it needs to be used and there are circumstances where it deserves to be used, but I don't feel so strongly that I think that every murderer or criminal -- I guess I just dont think it's --

Q. Do you think that most people who are guilty of capital murder should receive the death penalty, although there are exceptions or most people who are guilty of capital murder should receive life without parole with exceptions?

A. Probably the exception would be the one with parole -- without parole. I think most -- with capital murder, most would get the death penalty.

Q. Okay. And let me ask the question this way, I guess, as you've seen what we're talking about in this case, we're talking about the indictment that there's before you, I think, somewhere.

A. Yes.

Q. And you understand what the charge is. It is an intentional murder committed during the course of a robbery. Why wouldn't you give a death penalty if the State proves he did exactly what it says in the indictment?

A. Because I don't know what the circumstances are

227

that led to that.

Q. Well, it was robbery.

A. Well, I know, but I don't know -- I guess I just don't know enough.

Q. Why would it be important to know him?

A. Because that's one of the things. I mean, if there is some kind of a mitigating circumstance or something like that.

Q. Okay. Do you think that there might be something mitigating against the opposition of the death penalty?

A. There could be. I have no idea.

Q. Okay. Anything you have in mind?

A. Specifically?

Q. I'm trying to get a read on you as to what in your mind would be a mitigating factor that would be sufficient to take that individual out of a death penalty and put him into a life without parole situation, when you admittedly think that most people should get death if they commit capital murder. That's what I'm trying to get at.

MS. HANDLEY: Your Honor, I'm going to object. I think that's a commitment question. He's asking this juror to commit right now to what mitigating circumstance would make him change from a death to a

228

life sentence.

THE COURT: Overruled. We're not necessarily talking about this case. If you have anything that you can think about that might be mitigating that you can think about, I think that's what we're talking about.

VENIREPERSON WILTSHIRE: Just generally?

THE COURT: If you do or if you don't.

A. I mean, if somebody made him do it. Has he never done -- I mean, I guess, I don't really know. I mean, there's not really one thing that would stand out. I kind of have to hear the whole --

Q. (By Mr. Lollar) Okay. Well, if somebody made him do it, that's an absolute defense. You wouldn't have found him guilty if you believed or had a reasonable doubt that somebody else made him do it, okay? We wouldn't be in this situation. He wouldn't be guilty of capital murder.

A. Right.

Q. It wouldn't have gotten there.

A. Right.

Q. Can you think of anything that would mitigate against the death penalty if you found a person was guilty of capital murder and you and eleven other people had unanimously decided that they would be a person who

229

would likely continue to commit criminal acts of violence in the future, even if they're in the penitentiary? See, that's where you'd be in discussing mitigation.

A. I don't know. I don't know. I'm sure there is something, but I don't really know. I guess, I just don't know what I would do.

Q. Okay.

A. I'm not comfortable with just saying automatically, that's a death sentence. I would just want to hear -- basically, I don't think there's one thing that stands out or one thing that I could say that I think would change my mind. It would have to depend on everything. Whether you call that just kind of an overall feeling you get or what. I don't know.

Q. Let's talk about Special Issue No. 1. The context that you're viewing that question in is having already found that person guilty of intentionally causing the death of an innocent victim during the course of robbing them, okay?

A. Um-hum.

Q. Now, we come to Special Issue No. 1 and it asks, do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence in the future

230

that would constitute a continuing threat the society, right?

A. Um-hum.

Q. Now, some people say, there is no way on God's green earth that that could ever be proven to me beyond a reasonable doubt. That is asking me to look into the future. I am not God and I cannot do that. Some people say that. Other people say, okay, I have already found this guy guilty of intentionally causing the death of somebody else during a robbery, an innocent victim, and he was committing a serious felony offense at the time he committed the intentional murder. So, to me, that's always going to be a type of person who is likely to cause criminal acts of violence in the future. Do you fall into either one of those groups?

A. No. I don't think I fall into either one of those.

Q. Okay. What would be important to you to hear that would make you decide, one way or another, in regards to that question?

A. I mean, I guess, I would want to know, again, more details of the circumstances that led up to the incident and the background of a person to know -- I mean, it is kind of hard to judge somebody based on -- well, you don't know what anybody is going to do, but I

231

don't know that I would say that no one could prove otherwise. I don't really -- I don't really know what exactly.

Q. Okay. Well, the point is, is that the law is going to require the State to prove that before you can get to the death penalty. The law is going to require the State to prove that beyond a reasonable doubt that this is a person who, in probability, would commit criminal acts of violence in the future, even if he's in the penitentiary, okay?

A. Okay.

Q. And unless and until they can prove that beyond a reasonable doubt, then he doesn't get the death penalty; do you understand that?

A. Yes.

Q. If the jury is not convinced of that, you don't ever get to Special Issue No. 2 or Special Issue No. 3. You stop right there and you come in and tell us and he gets a life without parole sentence, okay? I guess, what I'm asking is, is there any one factor or major factor in your mind that would guide you one way or another in answering that question?

A. Basically, the person's past. What kind of acts they have committed before.

Q. Okay.

232

A. Um --

Q. So if they had a violent history?

MS. HANDLEY: Your Honor, if we can let the juror answer the question. I'd like to hear his full answer before he is cut off.

THE COURT: Do you have anything else that you would like to add to that?

A. That's kind of where I was going. I mean, just to know what kind of a life the person has led. I mean, maybe what's happened since the incident. Maybe what they did after. I don't know.

Q. (By Mr. Lollar) Okay. Now, in regards to Special No. 3, you understand that you never get there until you find the first two to be yes?

A. Right.

Q. And, again, that gets into this mitigation issue and it requires the jury to look at certain things. We can tell you that those are not all of the mitigating factors that a juror may consider to be mitigating. A juror is allowed to consider anything mitigating, anything they want to. And a juror is allowed to consider anything to be sufficiently mitigating to avoid the death penalty. You can impose mercy, and that alone, based on nothing you hear, if that's what you want to do, okay? If that's your

233

personal -- the law says you have to exercise your personal moral judgment as to the appropriateness of the death penalty, okay?

A. Okay.

Q. But among the things you're required to look at are the circumstances of the offense, the defendant's character, the defendant's background and the defendant's personal moral culpability, okay?

A. Okay.

Q. But that's not an exclusive list. Like I said, it can be anything. It can be nothing. It is whatever you decide. And once you made up your mind about what your personal moral judgment is about this individual, do you think it would be appropriate for other people to try to talk you out of what your personal moral judgment is?

A. Like who?

Q. The other eleven jurors.

A. I mean, I guess that's kind of part of the process is talking about --

Q. Well, deliberating doesn't mean debating.

A. I guess, you can try to talk somebody out of it. I guess, it depends how strong their moral leaning is.

Q. Okay. Do you think it would be appropriate to

234

try to talk somebody out of what their personal moral judgment is about whether or not the death penalty is appropriate?

A. I guess. I mean, you can try.

Q. Okay. Do yo think you can be talked out of what your moral judgment is by others?

A. Possibly. I don't know. I don't know.

Q. Okay. Now, we ask you in particular -- we told you what the law was in regards to involuntary intoxication. And you agree with the law that voluntary intoxication is not a defense. Now, the law says in Texas -- on Page 6 is where we're at. On the bottom of Page 5 and the top of Page 6, the law in Texas says that intoxication, even if it is voluntary, and that would mean with alcohol or by drugs, can be considered to be a mitigating factor.

A. Right.

Q. Okay. How do you feel about that? Would you agree with that?

A. You can take that as something that you can consider?

Q. Yes.

A. Okay. Sure.

Q. Do you think in your mind if you heard evidence that a person was high on a mind-altering drug at the

235

time of the occurrence of the event, that that's something you may consider?

A. Consider, yes. Does that mean it is going to change my mind? I don't know.

Q. Okay. But it might?

A. Possibly, yes.

Q. The next question down your answer was, I was drunk or I was high isn't enough. There would need to be a really good reason why the alcohol or drugs made you do it.

A. Right.

Q. Is that the way you feel?

A. Yes. I mean, I guess it is kind of one of those there. It has to be more than just the state of being drunk or high or something.

Q. Okay. Tell me what you're thinking there.

A. I mean, that by itself doesn't really excuse anything. Maybe there's some kind of situation that arose from that or that caused that or -- like I said, there might be something. What that something is, I have no idea.

Q. Okay. All right. I think I -- no I didn't ask you this, but I wanted to, do you think the death penalty is a deterrent?

A. I kind of waver on that one. Yes and no. I

236

think for some, but I think for some -- I mean, I don't think it' really -- it just doesn't even come to mind.

Q. Thank you. That's all we have.

THE COURT: We thank you, Mr. Lollar.

You'll be stepping outside and you'll be coming right back in.

(Venireperson Wiltshire exits courtroom.)

Let the record reflect Mr. Wiltshire has exited the courtroom, but we are in the presence of Mr. Broadnax. What says the State of Texas?

MS. HANDLEY: Your Honor, the State believes that Juror No. 150 is qualified.

THE COURT: And Mr. Broadnax?

MR. LOLLAR: I don't like him.

MR. PARKS: He don't like you either.

THE COURT: Ask him to return, please.

(Venireperson Wiltshire enters courtroom.)

Mr. Wiltshire, of course, you have been accepted as a qualified juror by the attorneys. Again, do you remember what that means? We're in the process of qualifying some fifty. Once that is done, half of the jury will be selected.

VENIREPERSON WILTSHIRE: Okay.

THE COURT: Late July, early August you will be notified and we're going to give you the card of

237

the court coordinator to call in case something occurs in your life that you think we need to know about that would affect your jury service.

VENIREPERSON WILTSHIRE:  Okay.

THE COURT:  Avoid all media and outside information at all costs.  It would be a shame if you were inadvertently disqualified.  Is your personal number and address on your questionnaire still correct?

VENIREPERSON WILTSHIRE:  Yes.

THE COURT:  All right.  I appreciate you.

(Proceedings adjourned.)

the court coordinator to call in case something occurs in your life that you think we need to know about that would affect your jury service.

VENIREPERSON WILTSHIRE:  Okay.

THE COURT:  Avoid all media and outside information at all costs.  It would be a shame if you were inadvertently disqualified.  Is your personal number and address on your questionnaire still correct?

VENIREPERSON WILTSHIRE:  Yes.

THE COURT:  All right.  I appreciate you.

(Proceedings adjourned.)

COUNTY OF DALLAS )

STATE OF TEXAS )

        I, Joie Ann Rivera, Deputy Official Court Reporter in and for the Criminal District Court Seven of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all excerpted portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported to me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and will be paid by DALLAS COUNTY.

WITNESS MY OFFICIAL HAND this the 12th day of April, 2010.

_____
JOIE ANN RIVERA, TEXAS CSR 8201
Expiration Date:  12-31-09
2706 Yale Drive
Rowlett, Texas  75088
469-733-5326