*AP-76207* 1

REPORTER'S RECORD
TRIAL COURT CAUSE NO. F08-24667-Y
VOLUME 11 of ___VOLUMES___

| | |
|---|---|
| THE STATE OF TEXAS | IN THE CRIMINAL DISTRICT |
| VS. | COURT NUMBER 7 |
| JAMES GARFIELD BROADNAX | DALLAS COUNTY, TEXAS |

INDIVIDUAL VOIR DIRE EXAMINATION

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 29th of May, 2009, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said court, held in Dallas, Dallas County, Texas:

Proceedings reported by oral stenography.

ORIGINAL

Debi C. Harris, CSR
(214) 653-3416

A P P E A R A N C E S


THE HONORABLE CRAIG WATKINS
Criminal District Attorney
Dallas County, Texas
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Boulevard, LB 19
Dallas, Texas   75207-4313
Telephone: 214-653-3600

BY:  MR. DAVID ALEX, SBOT No. 24003256
     MS. ANDREA HANDLEY, SBOT No. 08898800
     MS. ELAINE EVANS, SBOT No. 24032880
     MR. GORDON HIKEL, SBOT No. 00787696
     Assistant District Attorneys

     Also present: Ms. Zandra Robinson

            APPEARING FOR THE STATE OF TEXAS


     MR. BRADLEY LOLLAR, SBOT NO. 12508700
     Attorney at law
     1700 Commerce, Suite 450
     Dallas, Texas   75201
     Telephone No. 214-384-8178

     MR. DOUGLAS PARKS, SBOT No. 15520000
     Attorney at Law
     321 Calm Waters Lane
     Holly Lake Ranch, Texas   75765
     Telephone No. 903-769-3120

     DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
     133 N. Industrial Boulevard, LB 2
     Dallas, Texas   75207-4399
     Telephone No. 214-653-3550

BY;  MS. KERI MALLON, SBOT No. 24049165
     Assistant Public Defender

            APPEARING FOR THE DEFENDANT

CHRONOLOGICAL INDEX - VOLUME 11

|                                      | COURT | STATE | DEFENSE | PAGE |
|--------------------------------------|-------|-------|---------|------|
| Proceedings, May 29, 2009            |       |       |         | 5    |
| VENIREPERSON                         | COURT | STATE | DEFENSE |      |
| DOLORES McGOVERN                     | 25    |       |         |      |
| Excused by the Court                 |       |       |         | 27   |
| JOHNNY SLOVAK                        | 28    | 29    | 68      |      |
| Defendant's Challenge                |       |       |         | 101  |
| Court's Ruling                       |       |       |         | 101  |
| MATTIE VATION                        | 115   | 117   | 156     |      |
| State's Challenge                    |       |       |         | 172  |
| Court's Ruling                       |       |       |         | 174  |
| FIDEL HERRERA                        | 176   | 178   |         |      |
| Excused by Agreement                 |       |       |         | 183  |
| Court Adjourned for the Day          |       |       |         | 183  |
| Court Reporter's Certificate         |       |       |         | 184  |

ALPHABETICAL INDEX - VOLUME 11

| VENIREPERSON | COURT | STATE | DEFENSE | PAGE |
|---|---|---|---|---|
| FIDEL HERRERA | 176 | 178 | | |
| Excused by Agreement | | | | 183 |
| | | | | |
| DOLORES McGOVERN | 25 | | | |
| Excused by the Court | | | | 27 |
| | | | | |
| JOHNNY SLOVAK | 28 | 29 | 68 | |
| Defendant's Challenge | | | | 101 |
| Court's Ruling | | | | 101 |
| | | | | |
| MATTIE VATION | 115 | 117 | 156 | |
| State's Challenge | | | | 172 |
| Court's Ruling | | | | 174 |

                    P R O C E E D I N G S

                    [Defendant present.]

                    THE COURT:  Good morning, folks.  If you would, come right here, please.  Ms. McGovern, Ms. Slovak, I believe.  Please be seated.  Be seated, folks.

                    Let the record reflect we're here in open court, Friday, May the 29th.

                    Folks, I want to introduce myself to you.  My name is Webb Biard and I'm going to be with you this morning during jury selection process.  If you remember, the presiding judge of this court is Michael Snipes, who you met in that large Central Jury Room with those same 600 people there, and should you be selected as a juror, Judge Snipes will preside over the trial, whatever that's worth.  It might make more sense to you.

                    I'd ask you to do this for me, please, before we go any further.  Raise your right hand, please.

                    [Venirepersons Dolores McGovern and

                    Johnny Slovak sworn by the Court.]

                    THE COURT:  Thank you.  Let me introduce some folks to you at this time.  We have Andrea Handley.

MS. HANDLEY: Good morning.

THE COURT: David Alex.

MR. ALEX: Good morning.

THE COURT: Elaine Evans.

MS. EVANS: Good morning.

THE COURT: And Saundra Robinson.

MS. ROBINSON: Good morning.

THE COURT: And they represent Dallas County and the State of Texas.

Further on down the table is Brad Lollar.

MR. LOLLAR: Good morning.

THE COURT: Doug Parks.

MR. PARKS: Good morning.

THE COURT: Keri Mallon.

MS. MALLON: Good morning.

THE COURT: And they represent Mr. James Broadnax, Mr. Broadnax.

The way we're going to proceed, I'm going to talk to you both together for a little bit and then the attorneys will talk to you individually up to 45 minutes a side.

As the computer printout goes, Ms. McGovern, we're going to talk to you first and Mr. Slovak, then we'll talk to you next.

We never know exactly how long it's going to take, but I can tell you this. Before we leave here this morning -- it might be a little past 12: 00 -- you'll each know whether or not you've been accepted as a qualified juror in this case.

Now let me tell you what that means. We're in the process of qualifying some 50, more or less, jurors. Once that's done, the actual 12-member jury will be selected from that pool.

So you will be notified sometime in late July or early August whether or not you're actually going to be on the jury or not. When you leave here, you'll know whether or not you made the pool of qualified jurors.

I want to tell you that these are outstanding lawyers or they wouldn't be involved in this case, but they are also good folks, solid questions. Not anybody in y'all's chairs is going to be intentionally embarrassed or intimidated or talked down to. That's just not going to happen.

I also want to stress that to be a qualified juror you do not have to know the law. That doesn't have anything to do with it. This is not some legal pop quiz in which we try to find out what 12 people know the most law and they're on the jury. That

doesn't have anything to do with it.

It's our responsibility, it's the lawyers' responsibility to explain the law to you. Once you tell us, "Well, I do understand the law," the bottom line question will be, "Now that you know that's the law in the State of Texas, can you follow that law and perform your duties as a juror?"

And I don't want to sound flippant. This is no time for that. But the attorneys and I didn't get together last night or yesterday and decide what laws we were going to use.

These are your laws. They're the laws of the State of Texas. They are decades, if not centuries, old. There will be nothing really new about any of these laws that we'll be talking to you about.

Some of these you've known since the fourth grade. Right not to testify, Defendant's right not to testify, presumption of innocence, burden is on the State of Texas. You've heard about that forever.

Some other things I would imagine will be fairly new concepts to you, but it won't be anything y'all won't be able to understand.

You filled out these questionnaires. It wasn't some idle exercise. The lawyers have read them. It took some time to do it, but it's going to save you

time here this morning.

I'm sure there will be a couple of things the lawyers will want to talk to you about in your questionnaires. I have them here and you will have them when you talk to the lawyers and you'll be able to refer to them at that time.

You see that there was probably -- I was there. Judge Snipes was presiding but I was there. The room was full. I don't know how many people that was. Not all those people will be called down because they simply -- by their questionnaires the lawyers determined that they just wouldn't be a qualified juror.

So from reading your questionnaires, they think that you folks might be the kind of people that have an open mind and can sit on a case like this.

Now, from hearing Judge Snipes' remarks to filling out the questionnaire, from appearing here today, from reading the pamphlet, being here with us this morning, are you both aware that this is a capital murder case?

Do you understand that, Ms. McGovern?

VENIREPERSON McGOVERN: Yes.

THE COURT: Do you understand the State of Texas is seeking the death penalty?

VENIREPERSON McGOVERN:  Yes.

THE COURT:  Do you understand that, Mr. Slovak?

VENIREPERSON SLOVAK:  Yes.

THE COURT:  So because of that, the law in the State of Texas requires that y'all have an opportunity to talk to us individually.  Any other type case, a criminal case, 75 or so people would be in the courtroom and the lawyers would talk to you as a group.

Have you ever served on a jury before, Mr. Slovak?

VENIREPERSON SLOVAK:  Yes, I have.

THE COURT:  Criminal?

VENIREPERSON SLOVAK:  Prostitution case.

THE COURT:  Ms. McGovern?

VENIREPERSON McGOVERN:  No.

THE COURT:  Did the jury reach a verdict in that case?

VENIREPERSON SLOVAK:  Yes, we did.

THE COURT:  Did the jury set punishment?

VENIREPERSON SLOVAK:  Yes, we did.

THE COURT:  From that experience, did you realize -- do you remember that the trial was in two parts?

VENIREPERSON SLOVAK:  Yes.

THE COURT:  Guilt/innocence phase?

VENIREPERSON SLOVAK:  Right.

THE COURT:  And then the punishment phase, and you knew which part of the trial you were in; is that correct?

VENIREPERSON SLOVAK:  Yes, sir.

THE COURT:  That's the way, Ms. McGovern, all criminal jury trials are tried, in two parts, whether it be theft of a bicycle or a capital murder case.

The first part of the trial, the sole issue -- right, Mr. Slovak -- is whether or not the person is guilty or not.  If they're found not guilty, the trial is over and you go home.

If they're found guilty, then you go into that punishment phase where you can hear evidence about the person on trial.  Is that the way that proceeds?

Good deeds, bad deeds, prior record, no prior record, mental condition, physical condition, anything that the attorneys think will help you decide what's the proper punishment for this person who you found guilty of this particular offense.

Does that make sense to you?

VENIREPERSON McGOVERN:  Uh-huh.

THE COURT: Does that sound like a fair way to try a criminal case?

VENIREPERSON McGOVERN: Yes.

THE COURT: Good, okay. Now, I'm going to ask you some questions, and I'm serious when I say this. I don't expect you to know the answers to them. So why ask them? Because I want to get you to talk to me just a little bit.

Do you understand that there is a difference between murder and capital murder, Ms. McGovern?

VENIREPERSON McGOVERN: Yes.

THE COURT: What do you believe the difference to be?

VENIREPERSON McGOVERN: They have to be in another act. I believe participating in another felony act when they kill somebody.

THE COURT: That's exactly right. Did you understand that, Mr. Slovak?

VENIREPERSON SLOVAK: Yes, sir.

THE COURT: That's exactly right. One thing I want to stress to y'all, and I'll stress it again before I conclude my talk with you.

To be found guilty of murder or capital murder, the act has to be intentional or knowingly.

Some people say, "Well, you know, I could be fair in a capital murder case if I thought it was an accident."

To be found guilty of a capital murder, you have to find that the person committed, that the person on trial caused the death of an individual intentionally. Does that make sense? I want to really stress that to you.

VENIREPERSON McGOVERN: Uh-huh.

MR. SLOVAK: Yes.

THE COURT: But you're exactly right. Murder is defined by statute as intentionally or knowingly causing the death of an individual. That's murder.

Capital murder is intentionally or knowingly causing the death of an individual when certain facts fit specific situations. Murder a policeman, murder a fireman, murder someone while robbing them, kidnapping them, burglarizing their home, sexually assaulting and committing arson, murder of a child under the age of six, murder of more than one person in a single episode, murder for hire, hiring someone to murder someone.

And there are some others, but that's capital murder. So there's a difference. Are we together so far?

I want to ask you, Mr. Slovak. Let's assume -- we use examples, sir. Some of them are absurd. But we can't talk about or even come close to talking about the purported facts of this case.

VENIREPERSON SLOVAK: Right.

THE COURT: We have to stay away from that. But we use examples. Some of them are outlandish but they're used just as a tool to maybe help you understand the situation better.

Two men driving down Central Expressway. Hot afternoon. They've been working all day. They get into a road rage. They pull over. They get out. One has got a gun. Shoots the other one. Kills him. Means to kill him. Is that murder?

VENIREPERSON SLOVAK: That is murder.

THE COURT: Is it capital murder?

VENIREPERSON SLOVAK: I do not think so.

THE COURT: You're exactly right.

Did you see the distinction?

VENIREPERSON McGOVERN: Uh-huh.

THE COURT: Good, okay. I thought you did. That's one difference between murder and capital murder.

Here's another difference, the range of punishment. Murder is not less than 5 nor more than 99

years or life.  That's the range of punishment for murder.  You cannot get the death penalty for murder.

You say, "Well, Judge, that sure is a wide range of punishment," and I agree with you.  But I've been doing this a long time and I've seen things happen in a courtroom that before they started putting on evidence, you couldn't imagine that that was the way the fact scenario was going to play out.

So we leave a wide range of punishment to let people like y'all with common sense, life experiences, hard-working, know how things can go, to listen to the evidence, hear all the evidence and then decide what's the right thing to do.

If it's five years, that's the right thing to do.  If it's life or 99 years or 40 years or 10 years or 75 years, whatever the jury in their collective wisdom thinks is the proper punishment.

So that's the range of punishment for murder, 5 to 99 or life.  So I'd say you can say there's 99 possible different placements for murder.

There's only two different possible punishments if someone is found guilty of capital murder.  Do you know what they are, Mr. Slovak?

VENIREPERSON SLOVAK:  They are life without parole and death, death penalty.

THE COURT: That's exactly right. Now, Mr. Slovak said, "Life without parole," and let me tell you, life without parole means life without parole. There was a time in my career where if someone was given life in prison for capital murder, they could become eligible for parole after they served a certain amount of time.

That is no longer the law. If someone receives life in prison without parole, they will serve the rest of their life in prison. Please believe me on that. Okay?

So there's another difference between murder and capital murder. It's the range of punishment.

Here's another difference and I'm going to conclude on this. If you served on a murder case just like you did on the prostitution case and you found the person guilty of murder, you would go into that punishment phase.

You would hear evidence in all likelihood. You would go back to the jury room, just like you did. You would deliberate and you'd have a verdict form back there that reads something like, "We, the jury, having found the Defendant guilty of murder, hereby set his or her punishment at blank number of

years," like y'all did, or your deal might have been months, I don't know.

Blank number of years, and the presiding juror would write in the number of years that the jury thought was the right thing to do, anywhere between that 5 and 99 or life.

You come back out and the Judge reads it out loud. That's the way jury sets punishment in a murder case.

The capital murder is different. You have the first part of the trial and if the person on trial is found guilty of capital murder, you would go into that punishment phase, just like any other trial.

You would hear evidence about the person on trial. I would imagine you would hear everything there is to know about this person, good deeds, bad deeds, prior record, no prior record, mental condition, childhood, upbringing, family, anything that either side thinks will help you decide is it going to be life in prison without parole or death.

The attorneys would argue. You'd go back to the jury room and the jury is either going to decide life in prison without parole or death. But the jury does not write down on a blank line "life in prison without parole" or "death." It makes it unique

from any other type case.

The jury answers three special issues, answers them "yes" or "no," depending on the evidence, ad that determines the verdict.

Do you remember those special issues that were in that pamphlet?  Did you have an opportunity to read them?

VENIREPERSON McGOVERN:  Uh-huh.

VENIREPERSON SLOVAK:  Yes.

THE COURT:  All right.  Here's what I want y'all to do for me.  I want y'all to read them one more time to yourself.  Then I'm going to talk to you about it or a minute and the attorneys, I expect, will talk to you about it in some detail.

VENIREPERSONS:  [Reviewing document.]

THE COURT:  One thing I like about that pamphlet -- I didn't write it.  But it tells you what the effect of your answers, what you do after you answer.  I think that's helpful.  Sometimes that's not on there.

Everybody okay?  This is very, very important.  I can't stress this enough.  Here's the context of when and where you'd be called upon to answer those special issues and only in this situation.

You would have gone through that big

Central Jury Room. You would have come up for jury selection. You would have been selected on a capital murder jury. You would have been on the jury.

You would have heard evidence. You would have found the person on trial guilty of capital murder. That means you had found that the person intentionally caused the death of an individual in the course of one of these fact scenarios.

You would have come back into the courtroom, handed your verdict to the Judge and the Judge read out loud that, "We, the jury, find the Defendant guilty."

There would have been a break in the trial. It might be an hour; it might be a day. Then the same jury would come back and start hearing evidence on punishment, whatever either side thought would be helpful.

The evidence would be concluded. The Judge would read the law and the attorneys would present final argument and you'd be back in the jury room. The trial is over except for your deliberations.

That's when you answer those special issues, knowing that you'd found that person, that you're deciding life in prison without parole or death, that you had previously found that that person was

guilty of intentionally causing the death of an individual, That's the situation you'd be in.

If one is answered yes, you go to two. Remember that? If two then is answered yes, you go to three. If three is answered no, it's the death penalty.

If you go to one and one is answered no, you're told by the Judge to stop. You come back in the courtroom and the Judge pronounces a sentence of life in prison without parole.

If one is answered yes, you go to two. If two is answered no, you're told to come back in the courtroom and the Judge pronounces a sentence of life in prison.

if one is answered yes, two is answered yes, you still go to three. If three is answered yes, there is sufficient mitigating evidence, you come back in the courtroom and the Judge pronounces a sentence of life in prison.

Before I leave you, Ms. McGovern, do you understand the procedure?

VENIREPERSON McGOVERN: Yes.

THE COURT: Do you have any questions of me about the capital murder procedure.

VENIREPERSON McGOVERN: No.

THE COURT:  Mr. Slovak, do you understand?

VENIREPERSON SLOVAK:  Yes, sir.

THE COURT:  Anything you want to ask me?

VENIREPERSON SLOVAK:  [Nodding no.]

THE COURT:  I'd ask, Mr. Slovak, if you'll go back and take a chair, I'd tell you to come back in an hour and a half, but you never know for sure.  If you can just bear with us and then make yourself -- if you need to get some coffee or a Coke or something, feel free to do that, but at least be back in the next 20 minutes or so.  Okay?

MS. HANDLEY:  Your Honor, we need to take up one matter also outside the presence of both jurors.

THE COURT:  You can both step out for a moment.

THE BAILIFF:  All rise for the jurors, please.

MS. HANDLEY:  I think you can leave your things if you're comfortable with that.  We won't look in your purse.

[Venirepersons McGovern and Slovak left the courtroom.]

THE COURT:  All right.  Please be seated, Counsel.  Back on the record.

MR. ALEX: Judge, just real quickly, out of an abundance of caution, the potential juror in the questionnaire said she worked for a psychiatrist and she's got a history of working for psychiatrists and social workers.

The person that we're going to use as our professional is on our witness list and I wanted Counsel to make sure they are aware it's Dr. Price, in case they wanted to ask any questions as it related to if she knows him or not.

We're aware that the Judge has orders for designation of experts but that doesn't happen until June 22nd.

And if Counsel would tell us who their psychiatrists or social workers that's going to be on that list today, we wouldn't have to recall this witness to see if she knew -- I mean, the juror, if she knew any of those people that are going to be on that list.

Otherwise, we will probably reserve at least that question till after June 22nd, because we think if she works for a psychiatrist and she's also worked for social workers in that field, it's important for us to decide if she's qualified, if she knows any of their experts.

MR. PARKS:  Why don't we just ask her who she works for?

MR. ALEX:  We know who she works for. She puts it here.  But she could go to dinner with y'all's expert, and without knowing that, there's no way we can say whether she's -- and there's an order for that to be designated on the 22nd.

If y'all know this already, it would save us having to call her back on the 22nd or after the 22nd, because we would suggest to the Court there's no way for us to adamantly say whether she's qualified or not.

MR. LOLLAR:  I mean, it's really in the form of a request.  Well, the guy that she works for is not our psychiatrist.

MR. ALEX:  Well, yeah, I figured as much.  He's a medical doctor, but she has worked for Merchant, who does testify down here.

MR. LOLLAR:  He's not going to be testifying for us.

MR. ALEX:  My request is, you guys are going to have to tell us who your expert is going to be on the 22nd if they're going to testify.  If you know who they are already, we would like to know it today so we can ask this person if she knows them and if it's

going to affect whether or not she hears their testimony.

If not, that's fine.  We're just going to be requesting that after that designation is made, that we're able to call her back and ask her that question.

THE COURT:  That would be granted.

MR. PARKS:  Why don't we just ask her if -- what's wrong with just asking her about that?  Does she pal around with anybody?  Does she go to dinner with anybody?

MR. ALEX:  We're certainly going to do that, Mr. Parks, but again, I don't think that we would be doing our job properly if you give us some names of some experts without asking them if she knows them and if she hears their testimony, because she works in that field, whether or not it's going to affect whether she can be fair or not.

So I mean, that's a request from the Court and from Counsel, and it doesn't sound like just as a yes or no, I take it as a no that we're not going to get those names today; right?

MR. LOLLAR:  I think that's right.

MR. ALEX:  Okay, very good.

THE COURT:  I'll allow you to reserve

that question.

MR. ALEX:  Thank you, sir.  I mean, you can explore it all you want to but you'll still have the opportunity to have her return for that one limited area.

MR. ALEX:  I understand.

THE COURT:  All right.  Ms. McGovern.

THE BAILIFF:  All rise for the juror, please.

[Venireperson Dolores McGovern entered the courtroom.]

THE COURT:  Thank you, Ms. McGovern.

Please be seated.

Whereupon,

DOLORES McGOVERN,

having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q.  Believe it or not, one final thing, Ms. McGovern.  Here you go, there's the questionnaire.  Judge Snipes, if you noticed, in that pamphlet has told us that he expects the presentation of evidence in this case to commence August the 10th and it's going to last up to two weeks.

That's Monday through Friday, 9:00 to

5:00, break in the morning, break in the afternoon, lunch break. The jury will not have to stay together overnight during the presentation of the evidence.

However, there is a possibility should you go into -- you and the jury go into deliberations and deliberate late into the night and become mentally fatigued and still haven't reached a verdict but want to keep working on a verdict, you'd all be taken as a group to a fine hotel at county expense, individual private room, spend the night, come back the next day as a group to avoid any outside influence.

Now, should that happen, and there's no guarantee that it would, Judge Snipes, knowing Judge Snipes, he'd give you plenty of advance notice. In other words, he'd say, "Okay, there's a chance y'all are going to get the case tomorrow. Nobody knows what the jury verdict is going to be or how long it's going to take the jury to deliberate. Bring an overnight bag. Tell the people near to you that you might have to spend the night." He'd give you time to notify them.

I give you that time frame and the procedure to ask you this question. As you sit here now, are you aware of anything that will be occurring in your life during that time that would interfere with

your ability to be a juror in this case?

A.   Yes, my present job.

Q.   Tell us about it, please.

A.   I work for a psychiatrist and I'm the only person in the office.  Actually, a psychiatrist and a Ph.D.  And if I'm not there, the office cannot function.

Q.   All right.  If you're required to be on the jury during that time, do you think that would prevent or substantially impair your ability to concentrate on the evidence as it is presented?

A.   Yes.

Q.   You think that would prevent or substantially impair your ability to sit as a juror in this case?

A.   Yes.

THE COURT:  Counsel?

MS. HANDLEY:  Should we continue?

MR. LOLLAR:  We'll agree.

MS. HANDLEY:  We'll agree.

THE COURT:  All right.  You'll be excused.  I told you these were good people.  Ms. McGovern will be excused for work reasons, inability to concentrate on the evidence.  Good luck to you, ma'am.

Thank you very much.  Appreciate your being here.

Tell Mr. Slovak we're going to take about a ten-minute break.

[Recess.]

[Defendant present.]

[Venireperson Johnny Slovak entered the courtroom.]

THE COURT:  Please be seated, folks.

Whereupon,

JOHNNY SLOVAK,

having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q.    Mr. Slovak, one final thing from me, sir, I want to go over with you.  From reading that pamphlet, you see where Judge Snipes says that the presentation of evidence in this case will begin August the 10th?

A.    Yes.

Q.    And will last up to two weeks.  That's Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, lunch break.

The jury will not have to stay together overnight unless and until you were deliberating.  And this is a possibility.  This is not for sure going to happen.

Let's say you're deliberating late into

the evening, became mentally fatigued, hadn't reached a verdict but wanted to keep working on a verdict and asked to be able to rest.

The jury as a whole would be taken, could be taken to a fine hotel, county expense, individual private rooms, of course fed, come back the next morning as a group, to avoid any outside influence.

I give you that date, August 10th, two weeks, Monday through Friday, 9:00 to 5:00, the procedure, to ask you this. As you sit here now, are you aware of anything that will be occurring in your life during that time frame that would interfere with your ability to sit as a juror in this case?

A.    No.

THE COURT:  Great.  All right.  Without anything further from me, I want to re-introduce to you Andrea Handley, who will talk to you on behalf of the State of Texas.

MS. HANDLEY:  Thank you, Your Honor.

EXAMINATION

BY MS. HANDLEY:

Q.    Good morning, Mr. Slovak.  How are you?

A.    I'm fine.

Q.    Are you comfortable?  Do you need anything,

something to drink?

A.    No.  I just had coffee.

Q.    Okay.  If you'll let us --

A.    And been to the bathroom, so hopefully, I'm set.

Q.    Okay.  You let us know if you need anything.

Let me tell you a little bit about what we're doing and I'm going to try not to repeat too much what somebody else has said.

But we are bringing everybody down talking to them one on one.  We have read the questionnaires.  We've studied them thoroughly.  They are a huge help to us in determining whether or not we think somebody is potentially qualified to be a juror in the case.

By having you come down, we can talk to you more specifically now and get into your feelings about a case like this, test your credibility to see if you really are -- not your credibility, but your qualifications to see if you're an appropriate juror for this particular case.

I believe I've heard this said -- the best way I've heard this said is that a qualified juror -- and I'm going to try to paraphrase, because I heard this from a wise man and when I try to quote or

paraphrase wise men, I usually get into trouble.

But a qualified juror is a juror that will follow the law, base their verdict on the facts in the case and not jump to any conclusions. Okay? That's a qualified juror.

A person who comes in with a bias and lets that bias filter into the jury room or a person who comes in with some preconceived notions or presumptions about how things should happen and brings that into the jury room, that's not necessarily a qualified juror.

Let me talk to you a little bit -- I'll tell you. I'll just be honest with you, Mr. Slovak. I've ready your questionnaire and I get the impression personally for myself that I think that potentially you're a qualified juror for this case.

I think you have a pretty good grasp of the law and of what's required in a case like this, but I will throw this caveat out there. What I think, my personal opinions, any personal hypotheticals I give you, when I say, "I think this," what I think or what Defense Counsel may think, that and a buck and a quarter will get you a cup of Starbucks at the coffeeshop. Okay?

It doesn't amount to anything at this

point. What's important at this point is what Mr. Slovak thinks, what his opinion is and such as that. I think you can appreciate that; right?

A. Yes.

Q. Okay. There's a couple of things that I want to touch on with you from your questionnaire that will touch on your qualifications as a juror.

There are certain fundamental propositions of law that apply in every criminal case. You have sat on a jury before and I am going to make an assumption that you were selected to be on that jury because both sides considered you to be a qualified juror.

That is to say that they were confident that whatever your verdict was going to be, it would be based on the law, it would be based on the evidence and it would be fair and reasonable. And I'd like to think that's exactly what you did in that case.

A. Yes.

Q. Those propositions of law that were important in that case are also important in this case. Be it a prostitution case, be it a death penalty case, they're all the same.

The burden of proof is always with the State. You recall from your trial that it was their

obligation to bring forth the evidence in the case, that you never looked to the Defense's side to -- the Defense table to prove our case or to prove his innocence.

That's not to say necessarily that they wouldn't cross-examine witnesses or maybe call their own witnesses, but they could literally -- and I don't think this would happen. They could sit and work a crossword puzzle during the entire trial, and there's nothing wrong with that.

Their only obligation is to show up in court. That's it. That's all. I don't think they'll do that, but you understand that?

A.    Yes.

Q.    Do you agree with that?

A.    Yes.

Q.    Okay. And you would hold us to that, that it's our obligation, it's our burden of proof to prove the case to you.

MS. HANDLEY:    I'm sorry.

[State Counsel confer off the record.]

Q.    [By Ms. Handley]    As he sits here today, as any Defendant sits here today, you're to presume him innocent at this point in time, and that goes again to my burden of proof because I haven't proved a thing to

you, have I?

A. No.

Q. So that presumption of innocence is all about you need to wait. You need to continue to presume him innocent until I prove to you beyond a reasonable doubt otherwise.

Obviously, he doesn't have to testify in this case. No defendant has to, can be forced to testify. You've heard of the Fifth Amendment right not to testify.

I'm sure there's a thousand reasons why somebody would elect not to testify. And regardless of what those reasons are, you cannot hold that against him.

If for example, we concluded our case, the State rests. Here's all our evidence. If you went back into the jury room with the other jurors and said, "You know what, I don't think they quite proved their case. They're just -- they're this far from proving to me beyond a reasonable doubt. But because the Defendant didn't testify, I'm going to use that as evidence against him and I'm going to find him guilty."

You can't do that.

A. Right.

Q. And you understand that, sir, and you're

willing to follow that?

A.   I understand.

Q.   Of course, we have to prove all the elements of the crime to you.  Do you remember that from the trial that you were in?

A.   Yes.

Q.   Every element is just as important as the next one.  You know, that there was actually a robbery, that we have to prove that.  It's just as important that it happened in Tarrant County -- Dallas County, I beg your pardon.

And I'll give you a way out there example, which goes to testing your qualifications.  Okay?  Let's say I go to trial on a murder case.  You're one of the jurors on a murder case.

I have alleged that the Defendant did kill the victim by shooting them with a gun.  Turns out the Medical Examiner gets on the stand and says, "Well, the victim is dead but he didn't die from a gunshot.  He died from a stab wound."

I haven't proved to you an element of the offense, have I?

A.   Right.

Q.   And even if that Defendant had come to the stand and there was a confession maybe in the case,

you're convinced 100 percent that this person is liable, is guilty of the murder of that individual.

Do you understand that I have failed to carry my burden of proof in that case and do you understand that your obligation and your oath that you've taken would be to return a verdict of what?

A. Well, on that I'd have to say not guilty because you didn't prove your case.

Q. You're absolutely right. And after you find the Defendant not guilty, you ought to go upstairs and talk to my boss, if I miss something that -- you know.

A. Yes.

Q. Because it wouldn't be your fault; it's my fault. And that's all part of the system there.

Now, there's something else that I think you can appreciate, that I proved my case -- and I keep saying "me." I'm not necessarily the individual who might be presenting evidence in the case, but I could be.

Regardless, we prove our case by the evidence brought to you inside the courtroom. All the evidence that you hear, all the evidence you use to return your verdict comes to you from that witness stand.

May be in the form of testimony. It

could be in the form of written documents.  It could be scientific evidence.  It could be a video.  But it all comes to you from that witness stand, and you have to base your verdict only on what has come to you from inside the courtroom.

You cannot go back to the jury room and say, "That's all fine and well, but let me tell you what I learned on the internet."  Or, "Let me tell you what I saw on the television.

That would be inappropriate and it's not something you can do.  Do you agree with that, that that would be entirely unfair?

A.    I do agree with that.

Q.    I bring that point up to you because you do state in your questionnaire -- and I think you have it in front of you, sir.  On page 3 we said, "Do you think you have heard about this case?"  And you said, "Yes, I heard about the case on the radio but I don't remember any real details of the case."

A.    Right.

Q.    If every person who had something on the TV or the newspaper or the radio about a case was unqualified to serve, then I'd probably have a jury full of people who sat in the basement and, I don't know, played dominoes all day.

It doesn't mean that you're disqualified that you heard something about the case or you remember something about the case.

What would disqualify you is if you're going to bring what you heard outside of the courtroom into your assessment of the case.

A.    Right.

Q.    Would you do that?

A.    No.

Q.    Okay.  Also let me ask you, based on -- you know, you can't make any assumptions.  A qualified juror doesn't jump to conclusions.  They come in with an open mind.

Have you already formed an opinion as to the guilt or innocence?

A.    No.  I don't know the man.  And like I said, I have heard it.  I listen to KRLD.  I have heard the case that somebody was killed during a robbery, but what are the circumstances, that -- you know, they did not elaborate.

Q.    Okay.  You have not already formed an opinion as to somebody's guilt or innocence?

A.    No.

Q.    And whatever you've heard outside this courtroom, you'll leave that outside of the courtroom?

A.    Yes.

Q.    Okay.  Another way that a juror might potentially be disqualified to sit in a jury is if he comes in with a bias that he carries into the courtroom.

A.    Right.

Q.    Everybody is who they are, based on their life experiences and what we've gone through, be it the happiest moments of our lives or be it the most tragic moments of our lives.

This is who makes us up as an individual and makes us all so uniquely different.  I think it's fair to say and not in a negative sense that we all have biases or prejudices, and I don't necessarily mean against a certain race or a gender or something, but we just carry certain feelings, certain emotions.

My dad is military.  I'm going to tell you I've got a, you know, fervent bias in favor of military, military people, yet I still recognize that they're human too.  They can make mistakes.

I may respect them as a class of people but in the courtroom I wouldn't automatically believe everything they said.  Does that make sense to you?

A.    Yes.

Q.    I touch on that with you, sir, because I

noticed that, unfortunately, that your second cousin, I believe, was murdered.

A.    It was my first cousin.

Q.    Your first cousin?

A.    Yes.

Q.    And that was approximately 23 years ago, was it?

A.    Somewhere in there.

Q.    Let me -- I failed to make a notation but something tells me you said that was approximately 23 years ago.  Here on page 9, sir.  It says, "A second cousin was killed in Kaufman 30 or so years ago by being shot"?

A.    Yes.  He was murdered, yes.

Q.    Okay.  Was the person who murdered him, was he ever apprehended?

A.    I think he was.

Q.    Was he taken to trial?  Was he --

A.    Yes, I think he was.

Q.    Okay.  And that was a long time ago but I can only imagine that that's a tragedy that hit the family very powerfully and leaves a long-standing impact on a family?

A.    Yes.

Q.    A lot of people, unfortunately, have been

through situations like that and the concern is always that because you've been touched personally by violent crime, that you would now necessarily come into a courtroom or go into deliberations on a case maybe also involving a firearm and that you would come in with a bias and say, "You know what, this is what happened to my cousin.  I'm automatically giving the State a leg up in this case, or I am automatically going to be biased against the Defendant."

It wouldn't be appropriate under the law to do that.

A.    Right.

Q.    I think you can appreciate that.

A.    Yes.

Q.    That was 30 years ago.  I think it's fair to say that, you know, you don't believe the Defendant in this case  had anything to do with that, would you?

A.    No.

Q.    Would you hold what happened to you and your family and your cousin, would you hold that against the Defendant in this case?

A.    No, you can't.  People are people.  They do things, you know.  Every family has tragedies.

Q.    They do.  Unfortunately, every family does have tragedies and how everybody deals with it is a

unique experience in and of itself.

A. That's true.

Q. And we can't change that and I wouldn't change that. But the only place where we have to make -- insist on things is that if you come into a court to sit on a jury, that you do at least leave that outside to the extent that it would influence your verdict, and you're telling me that you could do that?

A. Yes.

Q. I appreciate that, sir. Your wife is clergy?

A. Yes, she is.

Q. That's really neat. I was going to tell you, I am just thrilled every time I see more and more women taking the pulpit. That's really neat. How long has she been doing that, sir?

A. She has been a priest since October. She was ordained a year ago last of January, Episcopal Church.

Q. Outstanding. How is that going for her?

A. Very well.

Q. And how is she received as a woman in the clergy?

A. Within the Episcopal Church, most churches do receive them well. There are still some Anglo Catholic churches in the Episcopal Church that do not believe in women clergy, but...

Q.    I heard it said the other day that time is on our side, that I think a lot of notions about that are kind of changing and that time is on our side.

A.    Women were head of churches after Jesus.

Q.    That's true.  That's absolutely true.  Are you also then studying to be --

A.    No.

Q.    You're just comfortable going --

A.    I'm a clergy spouse.

Q.    Okay, excellent, which is a lot of work in and of itself.

A.    Yes, it is.

Q.    I've known many ministers and preachers and their spouses.  Really, hats of to them because that's a lot of work also.

So let me ask you a little bit about that then, because we asked you, does your church take a position on the death penalty?

A.    The Episcopal Church does not have a stand on the death penalty.

Q.    Okay.  And the reason I ask that is because I see you were also raised Roman Catholic.

A.    Roman Catholic and Church of Christ.  Dad was Roman Catholic.  Mother was --

Q.    Wow.

A.    So I'm kind of Church of Catholic.  So I got both ends of the spectrum.

Q.    You sure did.  You sure did.  You had quite an education there.  Having been Roman Catholic, I think that Catholics take a personal stance on -- or take a stance against the death penalty.  Is that fair to say that, sir?

A.    Yes.

Q.    Do you still carry over any of the tenets of that particular --

A.    No.  I'm Episcopal.

Q.    Okay.  Okay.

A.    I'm kind of in the middle.

Q.    I gotcha.

A.    As has been said, it's light Catholic.

Q.    Light Catholic, Catholic light, okay.  So that doesn't cause any problems for you or anything like that?

A.    No.

Q.    I'm going to talk to you a little bit about the law.  Before I do that or while I do that, I think you see what I'm going for here, is whether or not you're qualified.

A.    Right.

Q.    And if there's something that you think that

we need to know, you're going to jump in and let me know.

A.    Okay.

Q.    I'll try to cover this somewhat quickly with you, and I know the Judge did a fantastic job already to talk with you about that.  This is a capital murder case and not every murder case is a capital murder case.  That's the highest crime we have.

The best way to describe it is it's an intentional murder plus something else.  It's the intentional murder, for example, of a peace officer who is in the line of duty, or of a child under 6 years of age, or more than one person in the same criminal episode, or what we most commonly see, at least maybe on the news, is it's the intentional murder of someone during the course of commission of another felony offense, a burglary, a robbery, such as that.

Before I get to capital murder -- and the Judge covered this also -- there can come a time when you're a juror that I may fail to carry my burden of proving to you that an actual capital murder occurred.

A.    Right.

Q.    But it doesn't necessarily mean that we all go home.  You may be called upon as a juror then to

say, "They didn't prove capital murder. They didn't prove it was as robbery or they didn't prove that the murder was intentional. Let's consider whether or not it was just a murder."

And I hate to say "just a murder," but if it's a first-degree murder, you know.

A.    Right.

Q.    There's several different levels of murder. There's capital murder. There's first-degree murder where you could still potentially get a life sentence.

There's even a lesser of murder called manslaughter, where you act recklessly, and that's a second-degree felony.

A.    Right.

Q.    And even lesser than that, it's called criminally negligent homicide. You know, I'm driving my car and I'm not paying attention when I should. I'm fiddling with my stereo or something and I hit somebody and kill them.

I didn't mean to kill them. I didn't want to kill them. I didn't even know they were there, but that's your lesser degree.

A.    Right.

Q.    If we fail to prove the capital to you, you could be called upon to determine if a defendant is

guilty of any of those lesser offenses, and the way you would do that is you would look at the evidence in the case and you would let the evidence fit the appropriate verdict in the case.

A.    Right.

Q.    As the Judge said, if a person is guilty of capital murder, only one of two things is going to happen.  They're going to get life in prison without parole or they're going to receive the death penalty.

Anything below that, the jury determines punishment.  You had that punishment phase and you know what I'm talking about there.  You look at all the evidence in the first part.  You may receive evidence in the second part.  You've heard the expression, let the punishment fit the crime?

A.    Yes.

Q.    Is that what you did in the case that you sat on?

A.    Yes.

Q.    You looked at everything.  You looked at the entire range of punishment; correct?  And based on that particular Defendant, based on what you saw in the trial, what you thought was best for the community, what you thought was maybe best for the defendant, you would set the particular punishment; is that correct?

A.    Yes.

Q.    You cannot go into a punishment phase like that with your mind already made up.  That automatic thing, it's not appropriate in a situation like this.

You can't say, "Just because I find a person guilty of murder, I'm going to automatically give them life," or, "Just because I find a person guilty of murder, I'm going to automatically give them the lower end of the punishment scale, because no two crimes are ever alike, you know.

And I'll give you an example, which I think carries through the entire kind of voir dire.  If I said to you, first-degree murder, not capital. Envision, if you will, a 35-year-old man who plans out and carries out the intentional murder of a helpless 10-year-old boy.  What's your first instinct on that? Sound mind.

A.    Well, it's not a robbery, it's not a capital murder.

Q.    No, I'm just saying in terms of having to assess punishment on an able-bodied sound mind 35-year-old man who intentionally kills a healthy 10-year-old boy.

You know, in terms of what kind of punishment a person should receive, many people say

Debi C. Harris, CSR
(214) 653-3416

their gut reaction is, "I think he needs to sit under the prison."  That sounds horrible.

See what I'm going for in terms of making an automatic assumption?

A.    It really depends on what evidence is given and what the Judge gives us as instructions.

Q.    You hit the nail on the head.  You are already leaps and bounds ahead of me, because a lot of people will go, "Put him under the prison."

When you change the factual scenario a little bit so that the punishment fits the crime, if for example, that 35-year-old man were actually the father of that 10-year-old boy, that that 10-year-old boy is currently at Children's Medical Hospital, that he's been diagnosed with terminal cancer.

He's not going to get better.  He never will get better.  He's going to die.  And if that wasn't bad enough, he's drying an excruciatingly painful death.  He writhe in pain every day.

And his father, out of nothing but sheer love and devotion and desire to see his little boy who he's raised since infancy not have to suffer a single minute again in his life, finds some morphine and he intentionally gives him a hot shot of morphine because he knows it's the least painful way he can end his

little boy's suffering.

That sounds worlds apart from the guy who takes an AK, goes out to a local school ground and just shoots a kid.  Same crime, isn't it?  Different factual scenario.

A.    Yes.

Q.    You already hit the nail on the head.  I've got to wait and hear the facts before I can say what he's guilty of or what I would do in that particular case.  That applies through all criminal cases.

So let's talk about the capital murder though.  As the Judge said to you, before you find anybody guilty of capital murder, you will have found that there was an intentional murder.  Not an accident, not an oops, not maybe a barroom brawl, an intentional murder.

A.    Right.

Q.    With an aggravating factor.  For example, in this case that it was during the commission of a robbery.

If we prove that to you beyond a reasonable doubt, then and only then do we go on to the second phase of the trial.  And as you know before, it's like a separate mini-trial, isn't it?

A.    Right.

Q.    You still consider everything you heard in the first part of the trial, but it's like you're starting all over again, you know.  And that's particularly true in a capital murder case.

Remember the presumption of innocence that applied in the first part of the trial.  You were to presume him innocent until what?

A.    Until he's proven guilty.

Q.    By who?

A.    By the State.

Q.    By me.  By me prove him guilty beyond a reasonable doubt.  You were to presume him innocent.

There's another presumption that applies equally in the second part.  As we go in now to the second part of the trial, he's guilty of capital murder.  So what's the best he's looking at?

A.    Life.

Q.    Life in prison without parole.  It's going to be life or it's going to be death.  The presumption that you need to go into the second phase with is you are to presume a life sentence is the appropriate sentence in that case, and that presumption that that's the proper thing to do does not change, will not change, only if and until I prove to you that it should change, that death is the more appropriate sentence.

A.    Right.

Q.    Is that something that you would hold me to?

A.    Yes.

Q.    Would you make any automatic assumptions that just because he's guilty of a capital murder, that he automatically should get the death sentence?

A.    No.

Q.    You would wait to hear the evidence and base your verdict on the evidence.  As the Judge said also, you don't go back there into the jury room, sit down and go, "Okay, what do you think, folks, should we give him life or should we give him the death sentence?"

It's never returned that way and you don't write down either life or death.  Instead, the way the verdict is come to is by answering a series of questions or things we call the special issues that you've had a chance to look at there.

A.    Right.

Q.    The first special issue in your pamphlet, but it's also up here, this is a special issue, sir, that we refer to as a future dangerousness issue, and it's basically saying that I have to prove to you beyond a reasonable doubt the Defendant is a future danger.  Okay?

The definitions, the words in here are

never defined for you.  We didn't write these particular questions.  They are written by the Legislature.  But a lot of these words are not defined for you.

But you notice it starts out, "Do you find from the evidence beyond a reasonable doubt." That's going again to what?  Any time you hear reasonable doubt, where are you going to go?

You're looking at me, aren't you? You're looking for me to prove something to you beyond a reasonable doubt.

"If you find the State has proved to you beyond a reasonable doubt that there is a probability --" they don't define the word "probability" to you.

They don't say that there's a possibility, that there's a chance, that maybe.  They said, "Do you find that there's a probability?"

Do you see a difference between a possibility versus a probability?

A.    [Nodding yes.]

Q.    Would you agree with me that a probability is something that's more likely than not?

A.    Yes.

Q.    Okay, because anything is possible.  Do you

find that I've proved to you beyond a reasonable doubt that it's more likely than not that the Defendant will commit criminal acts or violence?

You notice what they didn't put in there, sir? They didn't say that he would commit another murder, that he would commit an assault, that he would commit a -- make threats against other defendants, that he would commit a rape.

They didn't limit it. They didn't define it to you. They just said that he would commit criminal acts of violence, which is for you to decide what's a criminal act of violence.

Mr. Alex is sitting here minding his own business, paying attention to his business. If I turn, go like this and just smacked him in the face, do you think that would be a criminal act of violence?

A.    That's a criminal act.

Q.    Okay. So then you could potentially maybe file charges for me on it.

A.    Right.

Q.    The point is, that's for you to decide what's a criminal act of violence. If I prove to you that it's more likely than not that the Defendant will commit a criminal act of violence that will constitute a continuing threat to society, when you hear

"society," what do you think of?

A.    It's the outside world that we have now.

Q.    Yeah.  I think of going to the grocery store, driving my car, going to the dog park maybe.  That's the society.

The Defendant has been found guilty of capital murder.  So where is he going to be the rest of his life?

A.    He's probably going to be in the jail.

Q.    He's going to be in the jail or he's going to be in the prison system, isn't he?  And can you envision that that definition of society might actually include a prison society?

A.    They are a society.

Q.    They literally live there, don't they?

A.    Yes, they do.

Q.    They sleep there.  They eat there.  Maybe they work there.  They recreate there.

A.    Yeah.

Q.    They are in a society and there's other people in that society too who are not necessarily serving time.

A.    Right.

Q.    There's doctors, there's wardens, there's nurses, there's educators, there's clergy quite often

in there, there's people visiting.

I have to -- I'm asking you to basically make a prediction, sir, you know, as to whether or not, and I'm doing that by showing you certain evidence in the case.

You could make that prediction based strictly on what you saw in the first part of the trial. You could say, "You know what, I'm going to reconsider the evidence I heard in the first part. I think based solely on the circumstances of what he did, I can say beyond a reasonable doubt that he's a future danger."

You can do that, but you don't have to do that. You could also say, "That's not enough for me. I'm going to need to hear a little bit more. The State is going to have to bring me --"

A. To me, that would be part of the second phase.

Q. And you may very well hear additional evidence at that time. Again, you're going to have to hear that from me. He doesn't have to prove he's not. I have to prove he is.

What would help you, sir, in making a determination as to whether or not somebody was going to be a future danger?

A.    Well, unfortunately, it is our past that follows us, and depending on what he has done in the past, we pretty much know what he's going to do in the future.

Q.    Right.  Do you think it's ever possible that a person who doesn't necessarily have a criminal history or a violent past would be a future danger?

A.    There is a possibility.  We're human so that is a possibility.

Q.    Yeah.  I think that sometimes we hear examples like Tim McVeigh, you know.  I don't know that he had any definable criminal history that we could point to or -- I'm going to run out of examples.

A.    But as to McVeigh, the heinousness of that crime, the group he was within, it's very possible that yes, he could be a continuing threat.

Q.    It spoke to who he was and what he was capable of, didn't it, and whether or not he would continue to be a threat to society, or at least the society which he's in.

Anything else you can think of outside of whether or not the person has a history or what they've done in the past that would help you make that determination?

A.    Well, like I said, usually -- a person's past

usually will tell you their future. Their mental state. Not knowing the person, it's hard to say, but looking at evidence that's given to you, you have to make that assumption.

Q. Talk to me about mental state. You said that. What are you thinking about?

A. If a person in mental state, my definition is he does not know right from wrong.

Q. Okay. I'm going to stop you there and clear something up with you. Okay? If you truly do not know legally right from wrong, you may in fact be insane. I don't want to get too caught up in the -- but if a person does not know at the time of the offense legally right from wrong, then they may in fact be insane and not guilty by reason of insanity.

It doesn't necessarily mean that we would let them out on the street or such as that, but you can appreciate that there is a place in the law for that for people who truly don't know right from wrong.

A. Right.

Q. Okay. Do you agree with that law?

A. Yes, those are in hospitals and --

Q. Okay. Are you saying, though, that you would require some kind of element of insanity or that the person truly didn't know right from wrong, or are you

just throwing that out as maybe an example of their mental condition?

A.    Just throwing that out as an example.  That would be one way of, like I said, that you have to weigh everything.

Q.    Do you think some people are just inherently evil?  I know that's a loaded question for a man who's married to a --

A.    Well, inherently evil, no.  I think it is something you learn through life.  I don't think you're born evil.

Q.    You think it has more to do then with the choices that you make or --

A.    It's all choices.

Q.    I've heard it said that we're all free moral agents.  We all make our own choices.

A.    We do.  We do.

Q.    Okay.  Let me move on to the next issue with you.  We could have coffee and talk for hours about that.  But if after this first special issue, if I prove to you, sir, beyond a reasonable doubt that the Defendant is in fact going to be a future danger, if you answer this question "no," I haven't proved it to you, that's it.  He's going to get a life sentence without parole and you stop.

If, however, you answer that question "yes," now he's sitting closer to a death sentence in this case. But it's not done yet. You move on to the second special issue.

This is something we refer to sometimes as a parties' issue. In Texas it is quite feasible, possible that a person could be held liable for the offense of murder, could be held liable for an intentional murder, without ever having actually pulled the trigger themselves. We call it the love party.

If you aid, assist, encourage, direct, in other words, if you participate in the commission of an offense, you're just as guilty as if you did it yourself.

If my brother and I get together and decide we're low on cash and we'd rather steal than work, and we go up to the -- we sit at the kitchen table, design a plan to rob a 7-Eleven. He goes and finds a gun, I go and find the bullets.

We plan out which store we're going to. We get in his car. He drives us up there. He hands me the gun. I load it. I say, "I'm going in. You sit out here and you honk the horn if you see anybody coming."

He seems me load the bullets in there.

I'm going to get this done. I go into that 7-Eleven. I rob that clerk and I shoot that clerk five times intending to kill him. Am I guilty of capital murder?

A. Yes, you are.

Q. Do you think my brother could be held liable for capital murder?

A. I do.

Q. On what theory do you think he could?

A. He's actually a participant in the crime.

Q. Exactly. And in order to find somebody guilty of capital murder as a party, we would have to show in the first part that he should have anticipated, my brother should have anticipated that somebody would die. Do you think that would be fair to say in that particular scenario?

A. Yes.

Q. In order for that person to be eligible for the death penalty, for your consideration, we have to show that he actually did anticipate somebody would die. You'd make that determination based on the evidence.

If I held up that gun and said, "Phil, you know I'm not leaving any witnesses," you could take that into consideration in your determination as to whether or not he knew I was going to kill somebody.

If you find that the Defendant on trial was either the actual shooter, the actual trigger man if you will, or if he was a party to it working with somebody and he knew somebody was going to die and took an active role in it, you'd answer this question yes.

If you answer it no, that's it, and what happens?

A.    It's life.

Q.    A life sentence.  If you answer that question yes, though, he's sitting square on a death sentence at this point.  But there's one last question that you have to answer.

I've been talking about burdens of proof and look at me, look at me.  Interesting and ironically enough, on this last question here, there is no burden of proof.  There's no burden of proof for either side.

It's a very wordy special issue.  We often refer to it as the mitigating circumstances issue.  I think the best way to describe it is that it's kind of a safety net, that if we're going to call you to sit on the jury and to potentially assess the maximum punishment that the law provides, we want to make darn sure that we don't tie your hands.  You know?

And this right here tells you that as a juror, you've got to go into that jury room now and

litigate this -- or deliberate this issue separately from these other issues, which you have to do, and look at all the evidence in the case.

Review and look at it again, all the evidence in the case. And it could be the offense. It could be circumstances. It could be something that somebody said.

There could be some thing in that case that you might think is mitigating. You know what mitigating means. It means it lessens.

There might be something that lessens, if you will, his moral culpability, you know, and it might be such a mitigating circumstance that it's worthy of reversing what is a death penalty instead to a life in prison without parole situation.

It could be just a moral reason on your part. You don't have to agree with the other jurors on what's mitigating. What I think is mitigating, you might not, and there might be a thousand mitigating circumstances in a particular case.

But the question becomes, is it sufficiently mitigating to turn it over. You know, maybe the Defendant -- and I want to impress this upon you also because it's kind of a mental gymnastics here.

Some people say, "Look, I found the guy guilty of capital murder. I found that he was a future danger to society. I found that he either killed the person or knew the person was going to die. I don't know if there's anything that could ever change my mind."

And those people are basically saying, as they say, "There's nothing that could ever change my mind," they're saying, "I've already jumped to a conclusion there. I'm not willing to review the evidence again. I'm not willing to keep an open mind."

I can't commit you to what's mitigating. I can't commit you that you would always find something mitigating or wouldn't, but I can ask you, would you go into that final special issue, that final phase with an open mind?

A. You'd have to.

Q. Would you review all the evidence again?

A. Yes.

Q. And if you found what you considered to be not only a mitigating circumstance but that it was substantially mitigating, would you put that down and reverse that sentence from death back to life in prison?

A. Yes, I would.

Q.    Okay.  Are there any questions about this process that you have for me in particular?

A.    No, there's not.

MS. HANDLEY:  How much time do I have left, Judge?

THE COURT:  About eight minutes.

Q.    [By Ms. Handley]  Okay.  You've done me a huge favor, Mr. Slovak, by having had some prior service and I think by being very honest with your answers.

Just before I -- I'll save everybody some time here, but just finally to solidify in my mind and helping to make my decision as to whether or not I think you should ultimately be on this jury, you're telling me that you will always follow the law?

A.    Yes.  That's how I was supposed to have been raised.

Q.    Okay.  One quick thing I will cover with you is you have put in throughout your questionnaire in certain parts that it's only fair that we hear everything in the case.

A.    If you're going to ask a death penalty and take a life, I do want to know all, everything that's out there.

Q.    And here's something I want to talk to you

about because I don't want you to get tripped up on this. I appreciate that. I think that it should all be put out there, that you should have all the evidence at your disposal to make your decision.

Ultimately, the evidence that you will receive for your deliberations will be evidence that has been considered relevant, credible, you know, that certain determinations are made.

Evidence doesn't come in unless it's relevant in the first place, and there are some cases, sir, where I could try to offer a piece of evidence or the Defense could try to offer a piece of evidence where there might be an objection, a legal objection that we object to that piece of evidence coming in because maybe it just isn't relevant, you know.

A.    But that goes to the Judge then, doesn't it?

Q.    That goes to the Judge. The Judge always calls the balls and the strikes in a case. He's an impartial party up there. He's not working for the State. He's not working for the Defense.

He is there to see that justice is done. He is there to see that the rules of law are followed, and that before a piece of evidence can come in for your consideration, it is a relevant piece of evidence, that it was obtained legally, you know, that all of the

T's were crossed and all of the I's were dotted, you know, Do you agree with that?

A.    I do agree with that.

Q.    And there may in fact be some situations, Mr. Slovak, where maybe one or either side is trying to ask a question and the other party stands up and says, "I object because of whatever, whatever, whatever," and His Honor may in fact say, "Objection sustained. Jury to disregard." Do you understand why that happens?

A.    Yes, I do.

Q.    Okay. If that happened, would you be able to follow that instruction?

A.    You would have to because you're on the jury.

Q.    Okay. That's what I wanted to cover with you and that was my concern because I don't think people should hide the ball. I think this is a monumental decision for you to make and you should have all the e you need at your disposal to make that, but there usually are situations where the Judge will say, "That's not coming in. It's not relevant, or it came in but disregard."

You're telling me you will in fact disregard that. You will follow the Judge's instruction?

A.    If it's not within the case, the evidence

we're given, means you have to disregard it.

Q.   You won't make any assumptions until you hear the evidence?  You won't come in with your mind made up on something?

A.   No.

Q.   You'll judge each separate issue on itself and you'll hold us to our burden?

A.   Yes, I will.

MS. HANDLEY:   Fantastic.  Thank you for answering my questions, sir.  I appreciate it.

THE COURT:   Thank you, Ms. Handley.

I want to re-introduce to you now Doug Parks, who will speak to you on behalf of Mr. Broadnax.  Mr. Parks.

VENIREPERSON SLOVAK:   Can I make a quick run to the bathroom?

THE COURT:   Yes, you can.  Thank you for speaking up.

[Recess.]

[Defendant present.]

THE COURT:   I'm going to re-introduce to you now Doug Parks.  Mr. Parks.

MR. PARKS:   Thank you, Your Honor.

EXAMINATION

BY MR. PARKS:

Q.    Good morning, Mr. Slovak.

A.    Good morning.

Q.    Again.  I'm going to spend about 45 minutes with you.

A.    Okay.

Q.    I have a tendency, quite frankly, Mr. Slovak, to get off into these issues sometimes and my 45 minutes is gone before I even realize it.  Everybody else in the room realizes it and wishes I'd shut up, but I don't realize it.

In order to kind of save time, what I'd like to do is you spent a good deal of time with the questionnaire, and I'm going to assume just based on your conversations with the prosecutor here this morning that you filled this thing out with consideration.

You thought about your answers.  You answered it as truthfully and as honestly as you could at the time; is that fair to say?

A.    That's fair to say.

Q.    Since you filled this questionnaire out, Mr. Slovak, has there been anything that has happened, either just thinking about these issues or anything that's happened in your life that would have caused you to fill this questionnaire out any differently if you

were to do that today?

A.   The only -- probably the only thing, I did ask my wife because I had no idea what her thoughts were on capital murder, her belief and if she does believe in capital murder, that death penalty is brought in at times.

I guess the age of the Defendant would probably --

Q.   Significant for her?

A.   Yes.

Q.   I noticed in your questionnaire you had a difference with your spouse.  we ask everybody that, of course.

A.   Right.

Q.   And you indicated that you did, that it was your thought that she only -- I'm looking, trying to find the page that that's on.

A.   I think I had answered it, I think we're the same but I'm not sure.

Q.   Page 4 toward the bottom.  You said that your wife's views are only in extreme cases but that you could be wrong about that.

A.   That is true.

Q.   I take it from that, your views would differ from her in that regard, that she would limit the death

penalty to extreme cases.

A: Very extreme cases.

Q. Okay. Now, with respect to your own opinions and thoughts about these issues, can I safely assume then that they're the same as they were when you filled the questionnaire out?

A. Yes.

Q. I want to do this in about -- kind of divide it into three sections, Mr. Slovak. I want to talk to you some about your questionnaire. Then I want to talk to you about the merits phase, sometimes called the guilt/innocence phase of the trial. Then we'll talk about these punishment issues for a little while. Okay?

I do want to caution you, though, that just because we talk about punishment, we do not intend to convey the idea that we believe that this jury will have to answer these questions.

We are not conceding the guilt/innocence phase of the trial. Do you understand that?

A. Right. This is not the courtroom. This is about what you say.

Q. This is the only time we get to talk to you about these issues so we've got to talk about everything that could conceivably come up. Okay?

I noticed that you were sexton at Christ Church?

A. Yes.

Q. Would that have been Christ Church Oak Cliff or Christ Church --

A. Christ Church in Plano.

Q. Plano. Has that church left the Episcopal Church?

A. Yes, they have.

Q. Did they do that while you were sexton or it was after?

A. No, while I was there.

Q. While you were there. Did that have any influence on you and your wife going over to the --

A. My wife was already in another Episcopal church. Basically, the reason I left there, with a spouse becoming clergy, you never know where you'll wind up at.

We could have stayed here in Dallas, which she has, or we could have gone to another diocese.

Q. Was she raised in the Episcopal Church or was she raised Roman Catholic?

A. No, she was Roman Catholic. She was Roman Catholic.

Q.    All right.  We may talk about that a little bit more in a little while, but I want to make sure I cover some of the things.

On the first page of the questionnaire, Mr. Slovak, we ask all the jurors whether they're in favor of the death penalty or not.  You answered that you were and that in special cases there is a need for a life for a life.

And I'd like for you to expound on that for me a little bit, if you would.  What do you have in mind there?

A.    Well, you can actually go to the Bible and there is a life for a life at times on certain, you know, cases, even back in Biblical times.

Q.    Back in Old Testament times basically, wouldn't you say?

A.    Yes.  It was an eye for an eye, but to me, that stands in murder cases, an eye for an eye.

Q.    I guess my question is, is your belief in the death penalty biblically based?

A.    It has relevance in there but also by the laws that -- through the 200 years of this country that they have brought down.  So yes, I do believe in certain cases there is a death penalty.

Q.    It makes me kind of go back.  Do you remember

those bracelets that people used to wear, they may still wear, got to be a fad, for --

A.    What would Jesus do?

Q.    -- what would Jesus do?  Do you have a feeling what Jesus would do if he were sitting in my chair?

A.    if he were sitting in my chair, we'd have to be in heaven or that means he came back.  Jesus is a very unique individual.  He is human but he's also God.

What he would do, he forgives.  That does not say that I would not forgive, but I still believe, you know, you do what is appropriate by law.

Q.    Okay.  Do you remember --

A.    I think he would too.

Q.    Do you?  Do you remember the story in the 8th Chapter of John about the priest bringing the lady, the woman who had been taken in adultery, a capital offense, to Jesus for his judgment?

A.    Uh-huh.

Q.    Do you remember what he did?

A.    Let those without sin chunk the first stone and nobody chunked a stone, so...

Q.    Is that instructive to you at all, because that was the law of the land.

A.    That was the law of the land but that was not

part of -- yes, was it a bad offense back then?  Yes, based on for a lot of reasons back in those days.

Q.    Gathering sticks on the Sabbath was a capital offense in the Old Testament, wasn't it?

A.    But that is not murder.

Q.    I understand.  Can you reconcile John 8 to the death penalty?

A.    I can forgive somebody and hope that Jesus does when you meet him, but I believe that the law is the law and should be followed.  It was in those days too.

Q.    He didn't follow it.  Does that give you any instruction?

A.    He's God.  Who is to say what God can do and cannot do?

Q.    All right.  We've pursued that far enough.  I've got enough other things I need to talk to you about, Mr. Slovak.

Page 17, Mr. Slovak, way back at the back, we asked you about, "How do you feel about being chosen as a juror?"

Your answer was, "I'm here to serve part of my duties to this county and state."  What do you perceive your duties to the county and state to be as a juror?

A.  My duty is what they ask of us.  That is part of the freedom that we have in this country.  They do ask you to serve and I do believe that you do serve at the request of, you know, your government.

Q.  The reason I ask you that, frankly, is that we do some studies after these cases are tried.  I don't think that would probably come as a surprise to you about what people who have actually gone through the process of serving on juries and reached a verdict and what they thought.

A fairly significant number of jurors who served indicated that it was their belief that their job was to find the Defendant guilty, to assess the death penalty, that that's what they had been brought down there for, because the State was spending a good deal of money, going to a great deal of effort obviously to do that, and anything short of that would not be doing their duty.

You don't feel like that?

A.  No.  No.

Q.  All right.  Let me talk to you a little bit then about the guilt/innocence stage an we'll go back to your questionnaire from time to time, Mr. Slovak.

You understand that it is the State's burden to prove everything that they have put in their

indictment beyond a reasonable doubt?

A.    Right.

Q.    And that there is no way really for a juror to know what is going to be contested issues in the case because we're not allowed to talk to you about the facts of the case.

We all sitting here kind of know where we're headed but you as a juror do not, and that's why it's extremely important for a person not to jump to conclusions before they have heard all the evidence in a case.

And I again hearken back to those studies that have been done that indicate to us that as many as 40 percent of the jurors who serve make a decision about what they're going to do after they hear opening statements and before they heard one word of evidence.

And that's wrong because a juror does not know what the issues are really going to be.  It may be a case involving identity; you've got the wrong person.

It may be a case involving manner and means.  That was a subject that the prosecutor brought up about whether they've actually proven that the person was killed in the way that they allege that they

were killed.

So it could be it as not the same, not that they don't have the right person, but they don't have the right manner and means.  Theoretically, I guess, it could be they don't even have the right county, because that's one of the things they have to prove, that it happened in Dallas County.

And it might be that the culpable mental state is at issue.  You know that Judge told you that in order to be guilty of capital murder during the course of a rubbery, a person had to intentionally cause the death of the deceased.

And our law allows either side really to introduce evidence to the jury of the state of mind of the Defendant at the time of the offense, so that you might hear evidence, could hear evidence that would cause you to have a reasonable doubt about whether or not it was intentional, assuming that there was a murder, or whether or not it was knowing or whether it was reckless or whether it was done by criminally negligent homicide.

So a juror in ordler to fulfill the oath that we take must wait until they've heard all of the evidence to make a judgment about whether or not the State has proven their case beyond a reasonable doubt,

and they have to keep an open mind till they hear both sides say, "Rest and close," and know that all the evidence on the issue of guilt/innocence has been brought to them.

And they then begin to deliberate or consider what their decision in that case is going to be regarding the offense; you understand?

A.   Yes, sir.

Q.   It may be guilty, just exactly as charged. It may be absolutely not guilty or it may be guilty of some other offense that has been raised by the evidence because of the difference in culpable mental state.  Do you follow all of that?

A.   Yes, I do.

Q.   Do you believe, can you assure us that you won't jump to any conclusions if you serve in this case and will wait until all the evidence is in before you make a decision whether the State has proven a case?

A.   You do have to listen to the evidence. People are different but in a case as this, you do have to look at the evidence and you do have to wait.  You can't make a prejudgment.

Q.   Well, and certainly that's not just a capital murder case.  It's any case that a person serves on they ought to do that, but it's particularly important,

I think, in cases with the stakes as high as the stakes are.

A.   Yes, sir.

Q.   So we have your assurance that you'll be able to do that, would do that?

A.   Yes, sir.

Q.   Okay.  We have your assurance that you would hold the State to the burden that the law requires, that they prove everything in the indictment to you beyond a reasonable doubt.

If you have a reasonable doubt about any of those things, that you will resolve that reasonable doubt on behalf of Mr. Broadnax, not the State of Texas, because that's what the law says.

And I tell jurors, Mr. Slovak, that all any of us are entitled to as litigants here is that jurors honor the oath that they take to a true verdict render according to the law and the evidence, that we certainly have a right to that and a right to expect that.  Does that seem reasonable to you?

A.   That is very reasonable.

Q.   Now, I want for you to assume at this point, Mr. Slovak, that you have sat on the jury, and you and 11 others have heard evidence that did convince you beyond a reasonable doubt that the Defendant in this

hypothetical case was in fact guilty exactly as he was charged, that he had intentionally taken the life of another human being without legal excuse or legal justification, and did so during the course of the commission of another serious felony.  Okay?

I want to make sure we're on the right track and the same page when we talk about intentional. I know the Judge has brought this up.  I know the State brought it up.

But I want to satisfy myself that you understand clearly what we're talking about and not talking about when we're talking about someone acting intentionally.  Okay?

In legal terms, this is what you'll hear from the Judge in the Court's Charge.  A person acts intentionally when it is his conscious objective or desire to cause the result.

Now, put another way and a clearer way that we might understand better, it means that a person decided he wanted to kill somebody.  He set that as his goal and did whatever it took to accomplish his goal.

It wasn't an accident.  Okay?  It wasn't a mistake.  He wasn't acting under duress.  That's when somebody threatens another one, "If you don't go do this, I'm going to kill you," or something like that.

You know, the robber snatched the banker's wife and kids and said, "If you don't go down there and clean out the vault, I'm going to kill your wife and kids," and the banker goes down and cleans out the vault.

That's duress, you see. He didn't form the intent to do that. He only did it because he had to. It's not self-defense.

I said just a minute ago that it was the intentional taking of another person's life without a legal excuse or justification.

Legal excuse is what you talked about with the prosecutor while ago. If a person is legally insane, they are excused from criminal liability of taking another person's life because they didn't know what they were doing. Does that make sense to you?

A. Yes, it does.

Q. A legal justification is where a person certainly is sane but he has a right to take someone else's life, self defense or the defense of a third person or even the defense of property in some circumstances.

So if any of those things apply, no one would even be found guilty of capital murder. So the context in which you answer these special issues has to be that a determination has been made from the

evidence, from the 12 jurors who have taken an oath to a true verdict render, that these questions being answered about the person who is an intentional murderer, who killed another person without justification or excuse, because he wanted to, and did so during the commission of another felony.

Do you understand the context that we have there?

A.   Uh-huh.

Q.   Some jurors tell us, Mr. Slovak, that if they read that special issue and realize that they're answering that first special issue about future dangerousness, about a person that they know has already taken another human's life because they wanted to, that that is the kind and type of person who would always probably constitute a danger to society.  How do you feel about that?

A.   Well, the way it looks like it was worded to me, if any criminal offense, once you're -- if you are found guilty of capital murder, this first issue, to me, does look like any crime, any violent acts outside, which you would not be, or see or even in the prison system.

Q.   Would it be fair to say, Mr. Slovak, that you believe -- and we're all entitled to our beliefs, and I

want to make sure you understand there are no right or wrong answers here.

We're not down here to judge anybody. We're just trying to decide what they are, determine what they are.

Would I be right in saying that if you sat in a case such as this one on the jury, that you could, just as you told us that you could and would hold the State to their burden of proof in guilt/innocence, and if they failed to prove their indictment, you would find the Defendant not guilty in a New York minute; am I right about that?

A.   If they could not prove the case completely on murder and robbery --

Q.   If they didn't prove their case, you'd either find him not guilty or you'd find him guilty of some lesser offense.  Whatever they proved, that's what you'd do; right?

A.   Right.  That's the way the law states.

Q.   Exactly.  And I'm taking you at your word about that.  So if you were talking about these issues, you have to assume that you've already gone through that process and been convinced beyond a reasonable doubt.  Okay?

Now, based on what I believe that I

understand from your questionnaire and some of the things that you've told us here this morning, if you go through that process and you find a person guilty of capital murder, and you're then faced with the issue of making a determination whether or not he's going to be a future danger, am I right or wrong in believing that you would automatically answer that question yes, that an intentional murderer who committed murder during the course of a robbery, would be a continuing danger to society?

A.   No, that's not true, because that depends in the second phase of the trial.  I do believe a person's history does tell a lot about a person's priors.  You know, you have to look at all the evidence about the person himself.

Q.   Well, the reason I said that, I didn't just make that up, Mr. Slovak.  On page 4 down on the third deal it asks, "Do you think there are some crimes that call for the death penalty," not just, you know, make it available, but call for the death penalty solely because of their severe facts and circumstances, regardless of whether or not the guilty person has committed prior violent acts.

And you said, "Yes."

A.   Yes, I did.

Q.    "A crime of rage or a crime of committing or attempting a robbery to cover up that fact." And you understand that that's the very allegations that we have in this case, an intentional murder during the course of the commission of a robbery?

A.    Right.

Q.    So what I need for you to do is explain to me what you mean there and how you reconcile that.

A.    To look at it from what I've written, yes, a crime of rage, passion. A better example, even though he was found innocent, it would be like O.J. Simpson, that he was found innocent for that, but that is, as I said, a crime of passion.

A crime within a robbery, be it a bank, be it a 7-Eleven, as the prosecutor said. If you kill during a robbery, yes, I do believe there is a death penalty that you can put because it comes down to, in my mind, you do not have to kill.

Does it mean anybody would get caught down the line because you did not kill? That's a very real possibility. But it is a -- it's a choice.

Q.    And that's what I'm talking about here. I mean, if you find a person who didn't have to kill did because he wanted to, is that a person you're going to assess the death penalty for because that's the kind

and type of person that the law is designed for?

A. Very much so.

Q. Okay, fair enough. Now, I'm going to talk to you a little bit more about that in a little while, but I guess what I'm asking you here now is, is that when you come to special issue number 1, is the fact that you've found someone whose crime actually fits the very reason of having a death penalty, is that going to cause you to answer that question "yes"?

A. It probably would most of the time, but you still have to look at all the facts that are given.

Q. I understand. Let me put it another way, because what you're saying is not something that we haven't heard before. And here's what I hear and you can tell me whether I'm wrong or not.

Would it be fair to say that if you found someone guilty of capital murder and then you were presented with answering that question, that it would be your inclination to believe that that question should be answered "yes," but that you would be open to the possibility of the Defense proving to you that it was "no"?

A. Okay. It could be the prosecution does prove the case, that you can prove that it was even in a capital murder case, that he was not somehow knowingly

to kill a person, right or wrong, then that might be one I would say "no."

Q. I'm not sure I understand what you're saying. If we prove to you that he really didn't knowingly kill the person; is that what you're saying?

A. Kind of like I told the prosecutor, one that mentally he did not know right from wrong, that would be a circumstance within that.

Q. Okay. Here's what I'm going to ask you to do, Mr. Slovak, I'm going to do this so that I don't miss anything here, and I'm going to ask you, please. I'm going to play make believe here. Okay?

I don't like to use that. I'm going to ask you to assume a set of facts and I want you to assume that those facts are true, okay, and you believe them. Okay?

I want you to assume that you have heard evidence that the Defendant, the accused person, committed an intentional murder, killed someone because he wanted to.

He was over the age of 18. He was not mentally retarded. He was not insane. There was no duress, no self defense. It was not n accident. It was not a mistake.

I want you to further assume that the

victim was totally innocent, that he did not in any way provoke his death, and that he did not deserve to die.

MS. HANDLEY:  Your Honor, we're going to object to Mr. Parks committing him to a certain set of facts, the innocent victim and such as that.

THE COURT:  Overruled.

Q.  [By Mr. Parks]  Further assume that the Defendant killed the deceased because that's what he wanted to do and that you and 11 other people had believed that from the evidence and returned a verdict of guilty of capital murder.

Tell me, please, then, what are your view on the death penalty under those circumstances?

A.  I would probably give him the death penalty on that.

Q.  Would you probably find that such a person was a continuing danger to society as set out in special issue number 1?

A.  Probably would.

Q.  Let me go on a little further.  I'm trying to keep my eye on the clock.  You can see, Mr. Slovak, why I can take an hour and a half with all of this and you would be ready to shoot me and then you would be on trial down here.

You pretty much indicated that to us in

your questionnaire that those are your feelings; would that be fair to say?

A.    Very much; yes, sir.

Q.    I want to go further and -- well, let me just make sure I know where we are on special issue number 1.  I'm going to skip special issue number 2.  That will be good news for you, and then we'll go straight to special issue number 3.

Under the fact scenario that I just gave you, do you believe that you would then automatically say that such a person was a continuing danger to society and answer special issue number 1, "Yes"?

A.    Yes.

Q.    Fair enough.  Skip number 2.  We're going to go quickly to number 3.  You notice that there's a difference in number 3 because you don't find that you -- there has to be reasonable doubt provision there.

That means that nobody really has the burden of proof there.

A.    Right.

Q.    And the way the law is set up and I'm going to disagree with a couple of things that the prosecutor said.  That shouldn't be any shock to you.  She disagrees with stuff that I say.  It's not personal.

A.    Right.

Q. I don't believe, at least the way the law is set up, that there is any requirement that a juror's mind be changed because a juror who follows the law would not have made a decision about the death penalty before they answer each of those issues.

Now, the way it goes, there is a progression. If special issue number 1 is answered "yes," only then do you go to special issue number 2. And if it's answered "yes," only then do you go to number 3.

But the law contemplates that jurors go in the progression that the law contemplates, and that if special issue number 1, for instance, is answered "no," that's the end of it. And you read that in the pamphlet?

A. Right.

Q. So it's not a matter of the Defense having to change your mind theoretically, because you still have that issue to determine. Does that make sense to you?

A. Right.

Q. However, the reality of the situation is, is that by the time you get there, if you don't answer that question "yes," there will be a death penalty. There's no question about that.

But you understand that there's no

burden of proof on either side for that question; is that right?

A.    Yeah, right.

Q.    I'm going to assume, and correct me if I'm wrong about this, Mr. Slovak, but if you take into consideration the example that I gave you, the intentional murder, and you found that this person is not only an intentional murderer, but is a continuing threat to society, I'm not suggesting that you wouldn't consider special issue number 3, but that's a person that -- well, let me put it this way.

That special issue calls for you to consider the Defendant's character and background and his personal moral culpability.  Do you believe you understand what that question does?

It just gives you an opportunity to say okay, he's a murderer.  He's an intentional murderer. He murdered in the course of a robbery.  He's going to be a continuing danger to society.

But for whatever reason, I think that he ought to have life penalty and not the death penalty. That's basically --

A.    That's pretty much what it says.

Q.    And would I be right in saying that after you had been convinced of all of the other things, the way

you feel about the death penalty and its purpose in the law, that that question is pretty much going to be a "no" for you?

A.    Well, like I said, or you said, it was a lot of the background of the Defendant.  It is part of the criminal -- the second part of the phase of the trial.

And there are some, you know, there could be some mitigating circumstances.  Would I rather have him in jail for life?  There could be.

Q.    And the law really doesn't say in the State of Texas, at least, doesn't give you a list of things that are mitigating.  Some states do but we don't. Whatever is mitigating is pretty much up to an individual juror.

A.    Correct.

Q.    Sometimes -- in fact, we ask a question here in the questionnaire at the top of page 6, whether or not -- it's prefaced on the bottom of page 5.  "The law in the State of Texas says that voluntary intoxication does not constitute a defense and do you agree with that?"  And you said, "Yes."

Then we follow that with, "The law in Texas further provides that evidence of intoxication may be considered a mitigation in punishment.  Do you agree with this law?"  And you said, "No."

That's fine.  Everybody is entitled to their opinion about that.  The law doesn't say it has to be considered.  It just says that it may be considered, with that as an example.

You answered, "If you become intoxicated, you're still responsible for your actions."  And certainly, you are.  That's why it's not a defense.

But some jurors tell us that voluntary intoxication, depending upon the facts and circumstances, might be a mitigating factor for them that they could give consideration to.  Others say no.

I'm taking it from your answer that that's not something that would fall under your definition of potential mitigation; is that fair to say?

A.     That is fair to say.

Q.     So that if you heard evidence of voluntary intoxication, that would not be something you would give meaningful consideration to in mitigation?

A.     Probably not.

Q.     Fair enough.  That's not an unusual response.  And there are other things.  Age, for instance.  You indicated your wife, that would be a big deal for her perhaps.

A.    Yes, it would.

Q.    Not necessarily for you.  If the person was 18, 19, 20 years old, that would not be something that you would consider or even something that you would feel that you could or would consider?

A.    Well, then I go back to mitigating circumstances.  It depends on a lot of his upbringing, his morals.  Of course, if he's done capital murder, then it's tough for morals, but it basically comes down to what facts I hear about the person.

Q.    Absolutely.  Fair enough.  Ms. Mellon was just pointing out to me what -- I'm getting a lot of help.  Okay.

Let me touch on two things then that have been pointed out to me by my esteemed co-counsel.  Mr. Lollar points me to the fact that on page 7 you indicated that -- we asked if you believe police officers are more likely to tell the truth than the average person, and you indicated, "Yes."

A.    Yes.

Q.    And here's basically what our law says about that, that, you know, jurors are required to judge the credibility of the witnesses, whatever their walk of life.

Quite frankly, there are people who, for

whatever reason, believe that police officers are going to tell the truth when they hit the stand and if a police officer testifies, they're going to believe them, unless somebody can just prove absolutely that they're lying.

Other jurors sometimes, you know -- maybe they got a ticket for speeding when they weren't speeding -- take the attitude that they ain't going to believe a word a police officer says.

The law contemplates that all witnesses pretty much be judged in the same way, that no one come in with a preconceived intention of believing or disbelieving any classification of witnesses, and that would apply to police officers, clergy, lawyers, whatever.

Do you feel like that you'd be able to follow that law or do you think that a police officer testifying, that you would believe that officer simply because it's a police officer?

A.   I wouldn't believe him simply because he's a police officer, but they are there to uphold the law, so I would probably, depending on what he said, hopefully believe him, you know, because you're supposed to believe every witness.  They take an oath and you believe them.

Q.    You feel like you could judge their credibility as you would anybody else?

A.    Yes.

Q.    Okay, fair enough.   Over on page 8, finally. I'm going to finish this up.   Ms. Mallon reminds me of something that I had marked, frankly, to talk to you about.

We ask, say here, "Some people feel genetic circumstances, upbringing, environment should be considered when determining proper punishment.   What do you think?"   And you answered, "No, a person is still responsible for their own actions."

And you see how that ties in with special issue number 3, because special issue number 3 is asking you to consider really just those kinds of things, character, background, personal moral judgment, which might involve genetics.

Now, if a person is mentally retarded, our law says that they cannot constitutionally be executed, but there's a standard there.

A person could be substantially impaired in their mental capability and still not reach the standard that the law requires to prove that they're mentally retarded.   So that might be an issue that might be genetic in nature, or the way they were

brought up.

And I'm not saying that you wouldn't consider these things, Mr. Slovak, because I think that you would. What the law really asks jurors to do is give meaningful consideration to such things, and if they believe they are sufficient mitigation to assess a life penalty instead of a death penalty, that the juror be willing to do that.

I kind of take it back a few years ago when my wife asked me if I could consider buying a Mercedes and I said I would consider it, and I did for just about that long, because there's a difference between considering something and giving it meaningful consideration and acting upon it. You see what I'm saying?

And while I don't doubt that you would consider these things, would I be right in saying that the response that you gave us on your questionnaire would be your true feelings about the matter?

A.    A person is responsible for their own actions.

Q.    And that these would not be matters that you believe would justify the imposition of a life sentence if a person otherwise qualified for the death penalty; is that fair to say or not?

A.    Upbringing and the way you were raised, do they have a place in the way a person does things and what have you?  Yes, it is possible on morals, but a person still knows right and wrong.

I would hope that they are not mentally ill.  So no matter what you -- yes, you are still responsible for your own actions.  Everybody is.

Q.    What I'm hearing you say, and I promise this is basically the end of it.  What I'm hearing you say, to you the determination is if this person killed another one intentionally and knew what he was doing, knew what he was doing was wrong, that that is the cutoff for you, basically?

A.    If he knew what he was doing, yes.

Q.    Okay, fair enough.

MR. PARKS:  Now I'm getting notes I can't read, so I'm going to quit, Mr. Slovak.  Thank you.

THE COURT:  All right.  Let's look at special issue number 1.  Okay?  Here's what I recall your answers to some of the questions by both counsel.

You tell me.  Whatever you say is the way it's going to be.  Okay?

VENIREPERSON SLOVAK:  Okay.

THE COURT:  I believe you told Ms. Handley after going over special issue number 1 that

you would require the State to prove that beyond a reasonable doubt and that you would basically want to hear all the evidence.

VENIREPERSON SLOVAK:  Correct.

THE COURT:  And if the State failed to prove it beyond a reasonable doubt, you would answer, "no"?

VENIREPERSON SLOVAK:  That is correct.

THE COURT:  And then Mr. Parks, you and Mr. Parks were talking and initially you stated that you would not answer that question automatically "yes."

And then further after your conversation continued and Mr. Parks gave you a scenario, you said that in that case you would always answer that question "yes."

VENIREPERSON SLOVAK:  The scenario he gave me, yes.

THE COURT:  Here's what I want you to tell us and I want to hear it straight.  You understand when you're in the position of answering that question, you've either found someone intentionally killed somebody or intentionally was involved as a party in the person's death and should have known that the death was going to occur in the course of the robbery.

VENIREPERSON SLOVAK:  Okay.

THE COURT: And I'm not just talking about -- I'm not just talking about now the party part of it. I'm saying in either situation whether he intentionally killed the person himself or he was acting as a party and the person was killed in the course of a robbery.

When you go into that special issue number 1 knowing you're in that situation, knowing you've found that person guilty of that offense, are you always going to answer that question "yes"?

VENIREPERSON SLOVAK: I'd probably say yes, I would.

THE COURT: All right.

THE BAILIFF: All rise.

THE COURT: Step outside and you'll be coming right back in.

[Venireperson Slovak left the courtroom.]

THE COURT: What says the State?

MS. HANDLEY: We believe the juror is qualified.

THE COURT: What says Mr. Broadnax?

MR. PARKS: Defense will submit the juror for cause, Your Honor.

THE COURT: It will be granted. Ask him to return.

THE BAILIFF:  All rise for the juror.

[Venireperson Slovak entered the courtroom and approached the bench.]

THE COURT:  Sir, you're excused.  You're free to go.  You will not have to return.  Good luck to you.  Thank you very much.

[Luncheon recess.]

[Defendant present.]

THE BAILIFF:  All rise for the jurors.

[Venirepersons Vation and Herrera entered the courtroom and approached the bench.]

THE COURT:  Ms. Vation?

VENIREPERSON VATION:  Yes.

THE COURT:  Thank you, Ms. Vation.  If you'll have a seat right there, please.

Mr. Herrera?

VENIREPERSON HERRERA:  Uh-huh.

THE COURT:  There you go, sir.  Thank you.  Thank you very much.

Please be seated, folks.

I want to say good afternoon to you folks.  Appreciate y'all being here very much.  My name is Webb Biard and I'll be with you this afternoon during this part of the jury selection.

The actual presiding judge of this court is Michael Snipes, who you met in that big Central Jury Room. Should you be selected as juror, Judge Snipes will preside over the trial. Okay?

Also at this time I want to introduce to you Andrea Handley.

MS. HANDLEY: Good afternoon.

THE COURT: David Alex.

MR. ALEX: Good afternoon.

THE COURT: And they're with the State of Texas and Dallas County.

And further down the table is Mr. Brad Lollar.

MR. LOLLAR: Good afternoon.

THE COURT: Doug Parks.

MR. PARKS: Hi.

THE COURT: Keri Mallon.

MS. MALLON: Good afternoon.

THE COURT: And James Broadnax. Thank you, Mr. Broadnax. All right.

The way we're going to proceed, folks, is I'm going to talk to you.

Elaine Evans, she's also with Dallas County.

The way we're going to proceed, I'm

going to talk to you good people for a little bit. Then the attorneys will talk to you for up to 45 minutes each, a side. It will be an hour and a half actually, each juror individually.

Ms. Vation, the computer printout has you coming up first this afternoon and then we'll talk to Mr. Herrera. Okay?

I'm going to go over a couple of things with you before the attorneys talk to you. What I'm trying to do is just calm everything down just a little bit and give you a little maybe better understanding of what we're going to be talking about.

From filling out the questionnaire and hearing Judge Snipes and appearing here today and reading the pamphlet, as we sit here now, are you both aware that this is a capital murder case?

VENIREPERSON VATION:  Yes.

VENIREPERSON HERRERA:  Yes.

THE COURT:  Do you understand the State of Texas is seeking the death penalty?

VENIREPERSON VATION:  Yes.

VENIREPERSON HERRERA:  Yes.

THE COURT:  Everybody understand that?

VENIREPERSON VATION:  Yes.

VENIREPERSON HERRERA:  Yes.

THE COURT:  Because of that, the law in the State of Texas gives y'all the opportunity and requires you have the opportunity to talk to the lawyers one on one.

These are outstanding lawyers and outstanding people.  Without a question, anybody involved in this process sitting in y'all's chair will be intentionally embarrassed or browbeaten.  That's not a question.

Also, this is not some legal pop quiz in which we try to find out what people know the most law and then they're on the jury.  Knowledge of the law has absolutely nothing to do with it.  The attorneys will explain the law to you.

Now, have either of you good people ever sat on a criminal jury before?

VENIREPERSON VATION:  Yes, I have.

THE COURT:  All right.  When was that, Ms. Vation?

VENIREPERSON VATION:  It's been a period of about five years, I think.  I can't just remember.

THE COURT:  What kind of case was it, Ms. Vation?

VENIREPERSON VATION:  He killed or injured a policeman.

THE COURT: Did the jury reach a verdict?

VENIREPERSON VATION: No, I just made it up to the first floor. I didn't go all the way.

THE COURT: You didn't actually serve on the jury?

VENIREPERSON VATION: Well, evidently. I just -- I went in and they let me go but I know what the case was about.

THE COURT: I got you. I got you. That makes perfect sense, sure.

VENIREPERSON VATION: And then another one.

THE COURT: And so -- I'm sorry.

VENIREPERSON VATION: It was another case a little bit before then I was on and they did let him off. He got off because the majority of us felt like -- and it was a DWI charge on him.

THE COURT: Found him not guilty?

VENIREPERSON VATION: Not guilty.

THE COURT: All right. So you have an idea of kind of how a trial goes.

VENIREPERSON VATION: Yes.

THE COURT: Good. That will give you a little bit of leg up.

VENIREPERSON VATION: A little bit.

THE COURT: Mr. Herrera, have you ever sat on a jury?

VENIREPERSON HERRERA: Have not.

THE COURT: That's not going to be any big problem for you. It's just, you know, a little bit of help if you've gone through it once. You know this is a capital murder case?

VENIREPERSON HERRERA: Yes.

THE COURT: State of Texas is seeking the death penalty. Capital murder is the only crime in Texas in which the death penalty is a possible punishment.

The jury, if someone is found guilty of capital murder, the jury must fix the punishment. It can't be set by a judge.

That DWI you were in, a judge could have set the punishment if that's what everybody wanted. That's not the way it happens in a capital murder case.

If somebody is found guilty of capital murder, there's only two possible punishments. Do you know what they are, Mr. Herrera?

VENIREPERSON HERRERA: Life and -- life sentence and a vote of capital murder -- or death.

THE COURT: That's right. You're exactly right. Either life in prison without parole or the

death sentence.

VENIREPERSON HERRERA:  Right.

THE COURT:  So it's one or the other.

VENIREPERSON HERRERA:  Right.

THE COURT:  And again, that's set by the jury.  The way the jury sets punishment in a capital murder case is by answering three special issues.

Have y'all had an opportunity to read that pamphlet?

VENIREPERSON VATION:  This one here?

THE COURT:  Yes, ma'am.

VENIREPERSON VATION:  Yes, but explain it to me.

THE COURT:  I'll do the best I can.  I assure you the lawyers will be able to.

VENIREPERSON VATION:  All right.

THE COURT:  But talk to me, what do you want me to talk to you about.

VENIREPERSON VATION:  Well, you said did we read it?

THE COURT:  Yes, ma'am.

VENIREPERSON VATION:  I read it but I need to understand a little bit more.

THE COURT:  Of course.  I assure you, most people in this Courthouse don't know about it.  Do

you want me to talk to you about it?

VENIREPERSON VATION:  Yes.

THE COURT:  All right.  If you look at special issue number 1.  Have you got it, Mr. Herrera?

VENIREPERSON HERRERA:  Got it.

VENIREPERSON VATION:  Okay, special issue number 1.

THE COURT:  It says what it says.  Of course, you can read better than I can.

VENIREPERSON VATION:  Special issue number 1.

THE COURT:  Yes, ma'am.

VENIREPERSON VATION:  "Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, James Broadnax, would commit criminal acts of violence that would constitute a continuing threat to society?"

THE COURT:  Okay.  Now let me tell you when you'd be called upon to answer that.  That would be if you had been selected on the jury and you had heard all the evidence and you'd found the person on trial guilty.  That's when you have to answer that.

Some people come in here and think they're going to be asked to answer that this afternoon.  That's not the case.

VENIREPERSON VATION;  No.

THE COURT:  And you answer that "yes" or "no" based on the evidence.

That second special issue now, we call it the law of parties.

VENIREPERSON VATION:  The second one?

THE COURT:  Yes, ma'am.  In Texas someone can be found guilty of capital murder if they should have anticipated that the person was going to be killed.  All right?

VENIREPERSON VATION:  Yes.

THE COURT:  That means they didn't actually have to be the one to pull the trigger.  Have you ever heard about the get-away car, the wheel man?

VENIREPERSON VATION:  Yes.

THE COURT:  The guy that drives the car?

VENIREPERSON VATION:  Yes.

THE COURT:  To the bank and they go in and rob the bank and they come out and they get in the car and he drives off.  The guy driving the car in Texas can be found just as guilty as the person who goes in the bank.

That question calls on you to decide whether or not, one, did the Defendant actually cause the death of the person but if he didn't, did he

actually participate that his partner was going to cause the death.

Does that make sense to you, Mr. Herrera?

VENIREPERSON HERRERA:  Uh-huh.

THE COURT:  In other words, did Osama bin Laden anticipate that those people were going to be killed in that -- do you see what I'm saying?  He wasn't flying the plane.

VENIREPERSON HERRERA:  Right.

THE COURT:  But he was involved in it; right?

VENIREPERSON HERRERA:  Right.

THE COURT:  Does that make sense to you?

VENIREPERSON HERRERA:  It does.

THE COURT:  So he'd be just as guilty as the guys that were flying the planes and he could receive the death penalty just like they could.  Okay?

And then you go on down to number 3.

VENIREPERSON HERRERA:  Do you want me to read it?

THE COURT:  If you'll read it to yourself there, Mr. Herrera.

VENIREPERSONS:  [Reading.]

THE COURT:  And that's to decide whether

or not if anything that you hear during the trial is sufficient enough -- what they call mitigating -- sufficient enough where you believe the person on trial should receive life in prison rather than death.  Is there any reason why the person should receive life in prison rather than death that you think is sufficient.

VENIREPERSON VATION;  Are you asking me?

THE COURT:  No, ma'am.

VENIREPERSON VATION:  I didn't think so.

THE COURT:  Remember, that's to be --

VENIREPERSON VATION:  That's after.

THE COURT:  Yes, ma'am.

VENIREPERSON VATION:  All right.

THE COURT:  Are we all together?  Mr. Herrera, do you know when you'll be called upon to answer that?

VENIREPERSON HERRERA:  Yes.

THE COURT:  At the end of the trial.

VENIREPERSON HERRERA:  I got it.

THE COURT:  After you've heard all the evidence; right?

VENIREPERSON HERRERA:  Right.

THE COURT:  Okay.  Do you think you have an understanding of the procedure?  And to be found guilty of capital murder, you have to find that the

person on trial intentionally caused the death of the deceased or acted as a party to cause the death of the deceased.

Are you with me?  Is everybody with me?

VENIREPERSON VATION:  Sure.

THE COURT:  We're going to talk to Ms. Vation -- yes, sir, I'm sorry?  Yes, sir?

VENIREPERSON HERRERA:  This sentence here is kind of confusing to me.  I see a contradiction.

THE COURT:  Mr. Herrera, yes, sir?

VENIREPERSON HERRERA:  This right here.

THE COURT:  Right there?

VENIREPERSON HERRERA:  Yeah.  "It is not required that the prosecution prove guilt beyond --"

THE COURT:  I'm going to read to you what Mr. Herrera is pointing to.  Do you want to read it?

VENIREPERSON HERRERA:  Go ahead.

THE COURT:  The last paragraph on page 2. "It is not required that the prosecution prove guilt beyond all possible doubt.  It is required that the prosecution's proof exclude all reasonable doubt concerning the Defendant's guilt."

I don't know that I can say it a lot better than that.  It just means that the prosecution in the State of Texas has to prove that the person on

trial in every type case is guilty beyond a reasonable doubt.

VENIREPERSON HERRERA:  But it says "not required."

THE COURT:  That they prove it beyond all possible doubt.  Do you see the difference between all possible doubt and reasonable doubt?

VENIREPERSON HERRERA;  Just a little bit. Confusing.  In my opinion, it has to be beyond.  It's the life of a person that is on the line.

THE COURT:  I'm hearing you.  You're doing exactly what we want you to do and that's to tell us how you honestly feel.  All right?  They're going to give you more than enough time to explain that.

And that's a good point.  Some people feel that way.  There's nothing unusual about that. That's all right.  But the lawyers are going to talk to you about that.

Ms. Vation, did you have anything you want to ask me?

VENIREPERSON VATION:  No, not so far.

THE COURT:  We're going to talk to Ms. Vation first.  Mr. Herrera, if you'll step outside.  We never know exactly how long we're going to talk.  You can take your book with you there.  What are you

reading there, Mr. Herrera?

VENIREPERSON HERRERA:  Some certification that I'm working on.

THE COURT:  Good.

[Venireperson Herrera left the courtroom.]

THE COURT:  Please be seated.

Whereupon,

MATTIE VATION,

was examined and testified as follows:

EXAMINATION

BY THE COURT:

Q.   Ms. Vation, before we go any further, I want to go over one thing with you.  The first thing I want to stress to you, if you want to serve on this jury, that is your absolute perfect right.  I want you to know that.  I want you to feel comfortable with that.

We all respect you.  Everybody involved in this proceeding respects you.  One of the exemptions, one of the legal excuses not to serve on a jury is if you're 70 years old.  Do you want to claim that exemption?

A.   No.  I am 70 years old but I would like to serve on the jury if they choose me.  My children were laughing at me.  My children said, "Mom, you don't have

to go.  You're over age."  "I want to go.  Be quiet."

Q.  I think that's what they're telling me.  Let me tell you one other thing before I go any further.  I look forward to being with you this afternoon.  I want you to know that.

A.  Thank you.

Q.  Judge Snipes says in that pamphlet that the case is going to start August the 10th.  It's going to last up to two weeks, 9:00 to 5:00.  There will be a break in the morning, break in the afternoon, and there will be a lunch break.

The jury will not have to stay together during the trial unless and until you start deciding your verdict.  You know what that means because you already set on a DWI case.  That's when you're back in the jury room.  Okay?

That could happen but if it did, the Judge would give you advance notice.  You'll be taken to a fine hotel if you got tired during the night, spend the night, and then come back.  But you'd have to all stay together during that time.

I tell you that, at August 10th, two weeks, Monday through Friday, possibility you'd have to spend the night overnight, to ask you, as you sit here now, are you aware of anything that would be going on

in your life that would interfere with your ability to sit as a juror in this case?

A.    Only one thing.  My baby son has contracted cancer and his surgery is kind of like pending.  He's going to have to have a bone marrow transplant, but we're looking for it to be sooner than that, but we don't know exactly.  That's the only thing.

Q.    What if that happened during the trial days?

A.    To have the surgery?

Q.    Yes, ma'am.

A.    Well, I guess it would be a possibility.  I would like to be there.  I would like to be there, but I just don't think it's going to happen on that date.

Q.    Okay.  Fine.

THE COURT:  Without anything further from me, I want to reintroduce to you at this time David Alex, who will speak to you on behalf of the State of Texas.  And let me move over here, if I may.

Please proceed, sir.

MR. ALEX:  Thank you, sir.

EXAMINATION

BY MR. ALEX:

Q.    Good afternoon, Ms. Vation.  How are you?

A.    I'm good.  How about you?

Q.    My name is David Alex and I'm going to have a

bit of a conversation this afternoon. They give me about 45 minutes to talk to you and we may or may not even talk that long.

I'm going to actually be the lead prosecutor on this case too. If you're serving on the jury, I'll be the prosecutor who is putting on the evidence and responsible for the trial.

And the prosecutors have with me is Ms. Handley and Ms. Evans. They'll be assisting me as well. Okay?

A.    Okay.

THE COURT: I apologize. I did swear in the jurors? I did not? Okay.

Do this for me, please, ma'am. Raise your right hand. I have to do this to everybody. I'm sorry to interrupt.

[Venireperson sworn by the Court.]

THE COURT: Thank you.

Q.    [By Mr. Alex] What I wanted to get a good feeling for is there's no such thing as a wrong answer when we're talking today. Okay? Whatever you feel, I want you to -- I don't know how to tell you, but I want you to feel as comfortable as you can to express how you truly feel about stuff. Okay?

Sometimes people think when they get in

front of a bunch of lawyers and the Judge and folks that are carrying guns, that they've got to agree with everything, that they have to tell these folks what the correct answer is.

And what I want you to feel comfortable about is, we're here really to get to know you a little bit better, and the only way we can do that is if you tell us how you really feel about things.  Okay?

No right or wrong answers.  The only thing that you've done so far just a second ago is taken an oath to tell the truth, and when this is all over with, the Judge will tell you whether you've qualified or not.

And don't get the wrong impression. When he says you're qualified, that means that you will be in a pool of 50 people and out of that 50, 12 of them will make it on the jury.  Okay?  Are you with me so far?

A.    Uh-huh.

Q.    Okay, very good.  What I'm going to do is I'm going to talk to you a little bit about your questionnaire because that helps us out tons.

A.    Sure.

Q.    And then I'm going to talk to you a little bit about the law.  Okay?

A.    Okay.

Q.    Now, when you filled out the questionnaire -- I think the Judge has your copy over here.  It's been some time ago, but do you remember filling it out?

A.    I do.

Q.    Okay.  Very good.  And I'd be willing to bet that -- you seem very diligent about everything you do -- that when you filled it out, that you told us how you felt?

A.    Yes, I think so.

Q.    Okay.  And have you had a chance to think about the death penalty or anything that may be in the questionnaire since then where you may say, "You know, I thought about that and I don't think what I put here is what I really feel"?

A.    I still feel the same.  I tried to express it.

Q.    Okay, very good.  And so we're going to talk about that a little bit.  Okay?  And I'm going to try and start there.

In the very first page of the questionnaire, they ask you, "Are you in favor of the death penalty?"  And your answer was -- tell me what your answer is there?

A.    The only thing that concerns me now is that

lately DNA has found innocent people.

Q.    Sure.

A.    And just like they found them innocent, I believe that some have died innocent.  That's what concerns me now.  But with the DNA going, it might be wrong, because I would just hate to think that a person was innocent and couldn't prove it.

Q.    Sure.

A.    That's just like being buried alive.

Q.    Right.

A.    That bothers me.  But if they --

Q.    And as a prosecutor, I agree with you.  I don't think that I could sleep at night if that was the case.

A.    That's the only thing.  But there is such a thing as death penalty under certain circumstances.

Q.    Okay.  And do you believe that -- and again, I want you to keep in mind that when I ask you a question, you don't have to agree with everything I say.

A.    Exactly.

Q.    And sometimes it's difficult because people -- you know, you've got a beautiful smile and I would want to tend to agree with everything you say.  And you might think that what I'm saying is right but you may

not necessarily agree with me.  Okay?

And I think about sometimes when I used to talk to my mom when she was living, some of the things she would say to me.  And if I was talking to her right now, would she really tell me the truth about how she really felt or  would she feel like, "You know what, they're not going to really like the way I really feel."

And I'll tell you, one of the things she used to tell me is -- the first time when I told her I'm in a trial, the first thing she would say is, "Well, son, is it a young black man on trial?"

And I'd be like, "Well, Mom, yeah, but what difference does that make?"  But because of the era in which she grew up in, it was very difficult for her when it was a young black man on trial to really put aside the injustices that were done in her day.

And she knew there were injustices done in her day and I knew it too.  I just didn't live through it with her.  But I just don't know that if she was sitting there, if she would tell me that or if she would tell another person that, even if that's how she felt.

And I'm just going to start right off the bat with you with that kind of a question, and I

hope you'll be honest with me, because we know that just by the sheer numbers, that sometimes people are convicted when they shouldn't be.  And we would hope that the system works the way it does.

Do you think that you could take part in a trial, that if we prove our case beyond a reasonable doubt and we prove all the elements of the capital murder and we prove these special issues 1 and 2 and you say "yes" and "yes," and you say "no" to the last one, if we proved all that to you beyond a reasonable doubt -- and I want you to look at the Defendant sitting over there.

Do you really think in your heart of hearts that you could take part in a process where you know that if all that's proven to you, that the Judge will have no idea but to sign a warrant for his death, in which he's going to be strapped to a gurney and lethal injection will be pumped into his veins until he is dead?

Do you really think in your heart of hearts that you can take part in that process?

A.   Yes.

Q.   Okay, very good.  Let me go on.  And that's the very first question I needed to ask you and that's the way you feel right here?

A.    Yes.

Q.    Okay.  All right.  Now let's go to page 3 and that page has a ton of writing on that page, but it kind of breaks down.  It's basically asking you have you heard about the case.

Then it gives you some of the laws that relate to if you've heard bout the case.  The facts that we give you to try and maybe trigger your memory if you had is, it is alleged that on June 19th, 2008, Stephen Swan and Matthew Butler were shot to death outside of a Garland music studio during the course of a robbery; okay?

A.    Okay.

Q.    And you probably read that back then and when you did, you said that you'd heard about the case.  Have you heard anything else about it since you filled this out?

A.    No.

Q.    Okay.  And tell me what you think you've heard about the case, what you know about the case.

A.    It was on TV, I think.  It's just kind of vague, but they said that these guys was closing up shop and was robbed and killed, whatever.  You know, I didn't go -- I didn't remember any details and I don't even know if they told details.  I just remember hear

that.

Q. Okay. And that's what you recall seeing?

A. Yes. I don't remember seeing. I just remember it happened.

Q. Okay. And have you heard -- that's the extent of what you heard? Have you talked to anybody about it?

A. No.

Q. Sometimes when you see something on the news and you have your girlfriend and you say, "Girl, did you hear that?"

A. I might have mentioned it to my sister because we talk a lot and all, but no, I didn't have, you know, didn't think anything about it.

Q. All right. And let me ask you this. What you wrote here was that you saw it on TV and that you felt so bad for the person who had to lose his life trying to make an honest living. Tell me what you meant by that when you wrote that.

A. Well, it's just what I said. It just burdened me to think that a person were to put forth and effort to make money and somebody would come along and think that they had a right to just take it. Not only take their money, but take their life. That don't set well with me.

Q. Okay. I understand that. Sometimes that's the problem we have as lawyers when we try cases and then it starts getting broadcast in the media. It's just people do get affected sometimes.

A. Yes.

Q. And I could tell by the expressions on your face that it did kind of affect you a little bit.

A. Oh, it definitely did.

Q. Okay. And I guess as human beings, it's kind of hard not to be affected by it.

A. That's true. But could I say something?

Q. Sure.

A. I am a minister and I teach the young women how to raise the child up, not to spoil them. Don't try to give them everything that you can because when they walk out that door for the last time, they're not going to get pampered.

But if they're used to having it all, then if they can't afford -- if you give them $200 shoes and all of a sudden it's time to walk out that door, then you might have created a monster because they're the ones that go out there and take the $200 shoes.

Teach them. You know, teach them. No, you know. Don't say yes to everything because that's

where it goes to me, you know. Don't spoil them. And I tell them it's okay to love them but don't love them to death.

Q. Right. I understand.

A. Love them but don't love them to death.

Q. I understand completely.

A. When they walk through that door for the last time, the world don't revolve around him and they have to know some of this, you know. The first teaching starts at home.

Q. And do you minister at the church?

A. Anywhere.

Q. Anywhere you can?

A. I can't say I preach anywhere but I do, you know -- yeah, I exhort and everything and they call on me a lot.

Q. That's very commendable. We need more people like you in the community.

I'm going to go right back to that question now that we're talking about and the feelings that you had for the victims in this case.

A. The feelings that I had, okay.

Q. Right. What you recall hearing was that somebody got robbed?

A. Yes.

Q.   Is that right?

A.   Exactly.

Q.   If you were sitting on the jury in this case, one of the problems that we have sometimes is that the media will go out there and they will say certain things happened and people will hear it and then it will affect them.  Okay?

A.   Sure.

Q.   In order to sit on the jury you have to be able to say to the Court, "You know what, Judge, even though this may have affected me, before we start I haven't formed an opinion."  Okay?

A.   Okay.

Q.   And it wouldn't be fair, would it?  And I know you felt bad for the victims.

A.   For sure, I did.

Q.   And sometimes it's difficult to put that thing aside in a trial.  Do you think you could do that in this case?

A.   I could.

Q.   You think you could?

A.   Because I also have compassion for the one that did it.

Q.   All right.  For the person that did it?

A.   Yes.

Q.   But see, what I'm a little concerned about is that you may have already concluded that something happened.  You know what, sometimes it's difficult to disinvolve yourself and sometimes you don't even know that in the back of your mind you have already concluded that something happened.

But when we start the trial off, sometimes it's hard to unring the bell after you've heard something, especially if it touches you.  You know what I mean?

A.   Yes.

Q.   If it touches you deeply, sometimes it's difficult to go backwards in time.

A.   Yes.

Q.   One of the things you just said was that you feel compassion for the person who did it.  So would you automatically assume that something actually happened and that the person charged is somehow responsible?

A.   No.  No, I don't have him guilty already.  I don't have him guilty already.  I would hear it through and would not, have not formed an opinion before I hear everything.

Q.   Regardless of what you saw on TV, you --

A.   Because I really don't remember what I saw.

Q. Okay, very good. We're going to keep moving then. And I don't want you to think -- what I have to do is I have to make sure you can give everybody a fair trial, and it wouldn't be fair to the Defense, would it, if you've already decided he was guilty? Would it?

A. Right.

Q. We'll talk about a few other principles, you know, fundamental principals in a second, but I want to get through a few of these things on the questionnaire.

We're going to go to -- let's go to page 6. Are you okay?

A. I'm fine.

Q. Okay. Let's go to page 6. The second question there -- this page starts off talking about intoxication.

A. It says, "Please answer each and every question," at the top of it.

Q. Yeah, I think each one of them says, "Please answer each and every question," but it's going to be -- at the bottom it's going to say page 6.

A. Okay.

Q. Are we there?

A. Okay.

Q. Very good.

A. All right.

Q.    The very first question asks about intoxication and then the second question asks about drugs and alcohol.  And I read pretty much your questionnaire and I understand that you have a daughter who has addiction problems?

A.    Yes.

Q.    Tell us a little bit about that.  I'm not trying to embarrass you or anything.  I've got family members, believe me, that have some problems in that area too.

A.    Oh, no, you're not embarrassing me.

Q.    Okay.

A.    It started about 12 years ago and she's 49 now, and it's been a long haul.  So let me see.  She had this son, young son, and that's where it really showed up.  She did 32 years in the military and she blew that behind the drug addiction.

And then she got out and she was steadily losing control and this baby, I had to take the baby, the child, because she just was not in control enough to, you know, take care of a child.

And so she'd go into rehab, the best, and come out.  And every time I knew every Saturday morning where I was going.  I was either going in for classes for her or going to the stadium with her son

running track. That just took my whole life over and all.

So I had to do tough love on her. I was trying to keep her but I couldn't have anything. She would rob me and stuff. So I just got to the point I said, "You've got to go." I said, "I'm going to keep this child but you've got to go. If you choose --' you know, some things is by choice, it seemed like to me.

But things didn't get any better until I got well, because I was angry. I was hurt. I was afraid. Every siren that would go through, "That's my daughter," stuff like that. So I couldn't deal with her right.

But when it got well with me, then I was able to let her come back in the house. I could look at her like that, you see, and spend the night. "But when I leave in the morning, you've got to go."

And so I had to do tough love. And I cried, probably shed more tears than she did, but I had to do tough love, and right now we're the best of friends. We have a relationship now.

Q. And if I was to ask you how the issue of drugs, how it's touched your life, your answer would probably be "tremendous," wouldn't it?

A. Oh, God, yes.

Q.    And the reason I'm asking that is this question that we asked, the second question that we asked about, "Would a person's use of drugs or alcohol at the time of the offense automatically prevent you from assessing the death penalty if you found him guilty of capital murder?"  And you checked, "Yes."

And I think what you told me before you sat down there that what you put here is pretty much how you feel.  It sounds like that drugs has really affected you and your family's life.

I can't get into the facts of this case but what I can ask you is, your answer to this question is, "Mr. Alex, any kind of way drugs are involved in any fashion of your case, I will automatically not be able to assess the death penalty in that case."

Is that a correct statement?  And you have to be honest.  I'm not asking you to...

A.    You know, habitual.  Habitual would make me say yes to the death penalty.  Habitual.

Q.    Maybe I'm misunderstanding your answer then because this question asks that, "The use of drugs or alcohol at the time of the offense, would it automatically stop you from assessing the death penalty if you found him guilty of capital murder?"  Do you understand that question?

A.    If they were under the influence; is that what you were saying?

Q.    Right.  Would you automatically say -- you know, some people have triggers.  Some people, it might be gambling.  Some people, it might be drugs.  Some people, it might be sex.

And when they hear those things, because of the way it affected them in their life, everything else just kind of gets blurred and it's difficult to pay attention to what's going on, because you're thinking about what's happened to you in your life and your loved ones.

And that's really -- this question is saying, if this was the case, the use of drugs or alcohol at the time of the offense, would automatically that trigger prevent you from answering these questions that would give somebody the death penalty?

A.    It wouldn't.  It wouldn't because, like I say, tough love.  I have to do it, you know.  Things have to be dealt with.

Q.    Okay.  And when you checked "yes" on here, when you said yes, that it would and that if they were under the influence and it would lead them in a total direction out of their mind, tell me what you meant by that.

A.    Because it does.  It takes them there.  But just because they are habitual, don't mean that we have to leave them out here.

Q.    Now, you're assuming that we're talking about habitual stuff.  What this question is asking you, "If the use of drugs or alcohol at the time of the offense would automatically prevent you --" we're not talking about habitual use.  We're just talking about the use.  Okay?

A.    Okay.

Q.    And so your answer is still the same here?

A.    It would prevent me from committing to the death penalty?

Q.    Right.

A.    I change that.

Q.    You would change that answer?

A.    I would change that answer.

Q.    And tell me what about happened between the time you filled this out and today that would make you say that answer is changed?

A.    Well, because it just don't make sense to let people just continue to take lives even if it is ours, because whoever's life they're taking is somebody's son or daughter or whatever.  You can't just let them.

Q.    Okay, very good.  And we're going to continue

on.  Again, we're going to go through this and then we're going to talk about the law a little bit.  Okay?

A.  Sure.

Q.  And if we go a little bit further, to page 7, sometimes -- and if we look in the middle of the page, you say, "Do you believe a police officer is more likely to tell the truth than the average person?"  And you checked "yes."

And I know -- how did you raise your kids as it relates to police officers?

A.  To obey the law.  I didn't know any better once but my son took a bike.  I didn't know any better.  And I whipped him.  I beat him up pretty bad and he said that if child abuse had been as prevalent then as it is now, I never would have got out of the penitentiary because I'd tell them, I said, "I have to work hard for you guys."

I said, "To work and try to make a decent living is one thing but I'm not going to ever give my money to those people downtown.  So if you do the time, you do the crime."  So I just beat him up to keep them from having to deal with him.

Q.  Okay.

A.  Beat him up.  Obey the law.

Q.  Spare the rod.

A.    That's right.  I won't beat him now but I did then.

Q.    They might be a little too old for that.

A.    I mean my grandchild.

Q.    And specifically, what this question is asking -- read that question for me, the one in the middle of the page.

A.    Which one?

Q.    The one about police officers.  It says, "Do you believe police officers --"

A.    "Do you believe police officers are more likely to tell the truth than the average person?"

Q.    And you checked "yes."

A.    I said, "Yes."

Q.    Tell me what you mean by that.

A.    I just trust them.  You know, I just trust them.  I just know that we need them and I just trust them.  My grandson is on the force now.

Q.    You've got a grandson on the force?

A.    The one I raised.

Q.    Okay.  Well, you must have raised him really well.

A.    They said I did.

Q.    Where is he on the force at?

A.    Dallas.

Q.    How long has he been on the force?

A.    About three or four months.  He took the training.  And he did four years in the Navy and then he's on the police force.  I said, "Are you sure?"

When he first told me about, "I'm going into the Army," I said, "Boy, are you crazy with the things that are going on now?"  He said, "Well, I'm going into the Navy, Granny."  He said, "It's not that bad."

The last year or two in the Navy, "Granny, I've got to get out of here."  I said, "What's the matter?"  "They're crazy over here."

I said, "I'll tell you what."  I said, "Come on home, honey, because you're going to find out they're crazy over here too."

He must not mind the crazy stuff because he come in and get in with the police force and all, but that's just the way he is.

Q.    All right.

A.    So I believe in the police.  I trust them.

Q.    You trust them?

A.    I trust them.

Q.    And I'm going to tell you, the reason I asked you that question is it's kind of like with that media question we asked you about before.  Police officers --

and this is how the law treats all witnesses.

A police officer walks in the room, takes the stand. You've got to treat that police officer like you would any other witness. You couldn't treat -- you couldn't say to yourself, you know, "My grandson is a police officer, I grew up trusting police officers."

Some people already know in heart, you know what I mean, and it's not -- again, there's no such thing as a right or wrong answer. Some people already know in their hearts that if a police officer takes the stand, he's going to have a leg up over every other witness.

In other words, if a police officer takes the stand versus, you know, a plumber, I'm going to automatically start that police officer off just a little bit more than a plumber. Would you be doing that?

A.    Oh, no, because I also know that some of them are not, all of that, but for the most part, you know, I give them the benefit of the doubt.

Q.    Very good. We're going to move on and, hopefully, I don't wear you out here.

A.    I'm fine.

Q.    Okay, good. We're going to go to -- there's

a couple of questions on page 8 that I'm not really sure about what you meant by those and I'm going to ask you.

When we asked the question about, "What do you think makes a person dangerous," you said, "To corner him would bring out the worst." What did you mean by that?

A.   Okay.  Usually when pressure is applied, that's when you see whatever goes on inside the person, if you back them up and pen them up.

Q.   And that's what makes them dangerous?

A.   If that's their nature, it's coming out, yeah, under pressure.

Q.   Okay.  And that's the first thing that came to your mind when you read that question?

A.   Yeah.

Q.   Okay.  I just was curious.  And then we asked about at the bottom of that page, "Spouse, family members, close friends that have ever been arrested or convicted of a crime above the level of traffic ticket."

And you told us about your brother, Robert, and your nephew, and then we go to the next page and they ask about jail or prison, and you tell us about your nephew.

But you didn't mention anything about your daughter. Why is that?

A. Well, just because. Well, I felt like I had given her over and I didn't know -- but I didn't deliberately leave her out.

Q. Okay.

A. No, I didn't deliberately leave her out.

Q. I was just wondering about that because you did say something about her on the other page about her being an addict.

A. Right. Yes.

Q. But when we asked the question about those, you put the other people but you didn't put your daughter.

A. Okay. Has been arrested or convicted, yes. She's been arrested but she hasn't done the long term, but she has been arrested.

Q. Has she been to prison before?

A. Oh, no. No, she hasn't made it there. But I didn't -- it just skipped me because I wouldn't have a problem with putting her down there, because she's been guilty of all these things.

Q. Okay. And she's had a brush with the law for some time; is that right?

A. Yes.

Q. And let me see. I didn't quite understand when you said your brother, Robert, 55 years. Is that telling us how old he was or what is that?

A. How old he is.

Q. How old he is now?

A. Yes, probably, if I did that, 55 years. But this particular brother has had -- he has had a life sentence and got out and went right back in.

Q. Did drugs have anything to do with that?

A. No, uh-uh. He's out right now but he has done the best of his young life in and out of the penitentiary. He's just a habitual --

Q. What did he do life for?

A. Just habitual. He took an outfit to take his girlfriend to the prom. He was very young. And then he got out and it's just been a long haul and I was not around, but he did some more criminal, breaking and entering and stuff, just habitual. He eventually got out.

Q. Okay. And your nephew, you said that was for rape?

A. Well, I guess you would call it that. That's what the law called it but it was his own live-in wife.

Q. Okay. And how much time did he do for that?

A. I think, you know, ten years or something

like that. It wasn't a long time, but he's habitual too.

Q. All right. And do you think -- what I'm hearing from you, Ms. Vation, is it sounds like in your family that -- and we all have people in our family that go the wrong way.

Sitting on a criminal jury, do you think that these folks in your family were treated fairly?

A. Yes. Oh, yes.

Q. But you can't help but feel a certain amount of sympathy for folks that commit crimes and go to the pen?

A. Exactly.

Q. And I'm going to ask you a very serious question and I need you to be totally honest with me. Looking at this young man sitting over here right now, do you think because of his age or the way he looks or anything like that, that there's going to be some sympathy that's going to creep into your verdict if you're asked to give a fair verdict?

A. I tell you honestly, it would be compassion, but not enough to let him off from what he did. I feel compassion, yeah. But like you say, I've got too many family members and little brothers that has done time. They had to do it.

Q.    All right.  I appreciate your honesty.  We're going to go to the last few things that I have on your questionnaire here.  We're going to go to 10 and I'm going to move a little bit quicker so we can get to the legal issues over here.

You said when you sat on a jury, that you had more influence than others on the jury when it came to your verdict.  Tell me how did that happen?

A.    Well, if I can remember good, we had to go back and forth because some didn't have that compassion.  But this man was getting old and he needed his driver's license to do what little work he could do, and we just kind of went back and forwards and I kind of talked to them, you know, kind of showed them my point.  I think I had a little influence.

Q.    Okay.  During the process of deliberating and talking about things, you think that -- were there other people that were like voting for guilty and you were able to convince them that he was not guilty?

A.    Yeah, it was off balance there.

Q.    Okay.  Let's do this.  We're going to go to -- do you think that you, when you read those special issues there, you understand that we've got like two phases to the trial.

The first phase of the trial is when you

decide whether or not we've proven our case beyond a reasonable doubt, whether the Defendant committed the crime. Okay?

A. Yes.

Q. We're talking about each of the elements of the crime, and that means the capital murder, which the indictment is right there in front of you. Okay?

So when you're deciding whether he's guilty, there are some very basic fundamentals that we have to kind of talk about. Okay?

One of the things is Fifth Amendment. Some people say to me, "Mr. Alex, you know, if a person is on charge for a crime for his life and the potential to lose his life, then there ain't no reason in the world that I could think of that he wouldn't get up there and testify and tell his side of the story."

Do you understand what the Fifth Amendment is? Let's do that first. The Fifth Amendment says that a person does not have to take the stand and testify in any kind of way and incriminate themselves. Okay?

A. Right.

Q. Some people know in their heart of hearts that if they're on trial for their life, if they don't get up there and say something on their own behalf,

there's no way in heck I'm going to be able to put that aside. Tell me how you feel about that.

A.   No. It's okay if they do or if they don't.

Q.   All right. And then the other thing we need to talk about just briefly before I move on is the presumption of innocence. The presumption of innocence says that we have to prove our case beyond a reasonable doubt in order to get a guilty.

Sometimes people say, "You know, I need to hear something from the other side. They need to put somebody on to tell me something. I need two sides to the story." How do you feel about that?

A.   Okay. Somebody like -- anybody else but that person's lawyer or attorney. Somebody, just a relative or friend or something like that.

Q.   Let me be a little more specific. Okay? We have to prove our case beyond a reasonable doubt in order for you to say he's guilty of capital murder.

A.   All right.

Q.   Okay? Are you with me so far?

A.   I'm with you.

Q.   Okay. And if we don't, it's a not guilty. Some people will say that, "No, Mr. Alex, that's not enough. I need to hear some evidence from the other side. I need them to either convince me that they were

somewhere else or I need them to put something else on or else I'm going to have a hard time finding that person not guilty." Tell me how you feel about that.

A.    Well, I feel like everything has been turned over to their attorney, he or she's mouthpiece, and I would take it from whoever that person is. I don't think it matters.

Q.    All right. And the very last thing on guilt/innocence we're going to talk about is the law party. The Judge talked to you a little bit about the law party. The law party says that if the person has the intent to promote or assist in the crime, and then they go on to solicit, encourage, direct, aid or attempt to aid in that crime, then they're just as guilty as anybody else that's involved.

A.    Sure.

Q.    Okay?

A.    Uh-huh.

Q.    And when we talk about the law of parties, sometimes people don't really -- let me give an example. Let's say that we're going to commit a crime together and I going into commit a robbery. Okay?

A.    Okay.

Q.    And Ms. -- I'll change it to Ms. Evans because Ms. Evans looks like she might be more the type

to go for this. And Ms. Evans knows I'm going in with a gun. She's waiting out and looking out for me.

She doesn't have a gun but she knows I'm going in with a gun, and I'm going into the convenience store and I'm going to hit it. And I go in and not only do I hit the lick, but I also shoot the clerk and kill the clerk. Did I commit a capital murder?

A. Yes.

Q. And I intended -- and I'm going to tell you that I shot the clerk not because the clerk was running after me --

MR. ALEX: How much time do I have, Judge?

THE COURT: You've got about ten minutes.

MR. ALEX: Ten minutes, okay.

Q. [By Mr. Alex] And I'm going to tell you this for example, so this is an example. The clerk wasn't trying to run after me and I shot him so he wouldn't stop me.

I shot him because I intended to get rid of the witness. Okay? Now, obviously, I'm guilty of capital murder; right?

A. Yes.

Q. What about Ms. Evans? She's standing outside. She knows I'm going in to commit a capital

murder and if she should have known that this person could be intentionally killed, the law says that she would also be guilty of a capital murder.  How do you feel about that?

A.    I agree.

Q.    You agree with that?

A.    Of course.

Q.    Okay.  And then we're going to go right into the punishment phase of this trial.  And let's say you've found Ms. Evans guilty.  She's not the trigger person.  Now we've got to decide what we're going to do with this person.

The State is seeking the death penalty on a capital murder case.

[Telephone ringing.]

THE COURT:  Let Ms. Vation get her phone.

VENIREPERSON VATION:  I'll get it back. They can leave a message.

[Pause in proceedings.]

Q.    [By Mr. Alex]  Are you okay?

A.    I'm fine.

Q.    No emergencies going on?

A.    No.

Q.    When I turn my phone off, I'm always concerned that --

A.    That's my goddaughter.

Q.    -- that somebody is going to be trying to tell me that one of my kids is in trouble or something. So I'm always concerned about that.

A.    No trouble.

Q.    All right.  Now we're going to go into the punishment phase.  We've found the person guilty of capital murder, whether it be me as the shooter or Ms. Evans as a party.

And when we get to the very first issue that we have to prove, the State has to prove to you beyond a reasonable doubt, it's going to be the issue that you and the Judge talked about when you read the pamphlet.

You've probably read it to yourself and then out loud once.  Can you tell me what that issue, special issue number 1, just kind of tell us what that issue means to you.

A.    "If you find evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Could you break that down for me, please?

Q.    I will.  You know, we use two words that breaks it down for us and we just say "future

dangerousness." And when we talk about future dangerousness, that's kind of what we're referring to, is that special issue number 1.

We're talking about the probability that the Defendant would commit criminal acts of violence that constitute a continuing threat to society. Will they be violent in the future, criminal acts of violence in the future.

How in the world could somebody ever prove that to you?

A. That they would or wouldn't?

Q. Uh-huh, that there's a probability -- first of all, let's talk about that word "probability." What does that mean to you?

A. That they probably would or would not.

Q. More likely than not, would that sound about right?

A. They would be more than likely to do it again.

Q. More likely to do it again than not to do it again. Does that sound about right for probability?

A. Usually. Usually. I'm telling you, everybody doesn't see it like me, but some people, some things are generational. Some people have a spirit of doing a thing. Some people will just do it but some

people are habitual, because it's like they just can't help it.

                    But these people know where the help is. They know if they need to take a little medication to calm themselves.  They already know this.

Q.    Right.

A.    And if they refuse to get the help they need, then they're just going to have to suffer the consequences.

Q.    And they make that choice?

A.    They make that choice.

Q.    The question here is about acts in the future.  Are you saying to me that if a person committed, if it was me or Ms. Evans committed this capital murder, that you already know that they're going to commit criminal acts in the future?

A.    Nine times out of ten they will.

Q.    And so I guess if you heard the facts, if we're talking about a capital murder, a person intentionally took the life of another person not by accident and not in self-defense and not because they were crazy, because they intended to take another life during the course of a robbery, and so in your mind, that person would be a continuing threat to society?

A.    I think so, yes.

Q.    And you know, the thing is, sometimes we say to ourselves, "Once I see something like that, I automatically know that this person is going to commit another criminal act of violence," and that's where you're at, isn't it?

A.    That's about right.

Q.    And that's okay, and I want you to know that the answers that you give us -- I think I've told you this a million times -- is whatever you tell us is perfectly fine.

And I wouldn't doubt that the question is going to be asked you just in a different way, but your answer would still be the same, wouldn't it?

A.    Yes.

Q.    Okay.  The second special issue just talked about the parties.  That's Ms. Evans.  She's the one standing outside.  She's the one that didn't go in. She's the one that didn't have the gun.

But now what we're saying, in order for you to say "yes" to that question, you would have to not only say that she had the intent to promote or assist the crime and that she did either solicit or encourage or direct or aid in that crime, but it has to be a little bit more than she just -- this word here, the difference is going to be that she did anticipate

that a human life would be taken and not just should have anticipated.

A.    Should have, did or should have.

Q.    To find her guilty of a capital crime, you would have to say, "Okay, she should have anticipated a human life would be intentionally taken."

Now, to find this question "yes," to answer this question "yes," you have to say that, "I found that the State proved that she did anticipate a human life would be taken."  Are you with me there?

A.    Uh-huh.

Q.    And would you be able to do that if that was proven to you, even though she didn't pull the trigger?

A.    Uh-huh.

Q.    Very good.  And then finally, the special issue number 3 talks about mitigation.  And in number 3, I'm just going to -- it talks about once you answered special issue 1 "yes" and special issue number 2 "yes," then you move on to special issue number 3.

That's just basically asking you, okay, ma'am, do you find that there is sufficient mitigation from all the evidence to say instead of giving him the death sentence, we're going to give him a life sentence.  Okay?

A.    Okay.

Q.   And you understand that, that particular issue.  Let me ask you this.  You seem like a very compassionate person.  You seem like you --

A.   Don't fool yourself.

Q.   All right.  Tough love is one thing.

A.   Yes.

Q.   And I understand tough love.  I've had to give it many times.  But there's a difference between tough love and lethal injection.  You'll agree with that?

A.   Exactly.

Q.   Lethal injection is final, isn't it?

A.   Exactly.

Q.   There's no way to go back and say, "Okay, I've given you tough love.  Now let's see what you're going to do."

A.   Right.

Q.   And this is another question I want you to dig deep in your heart for and tell me.  Do you think that your compassion is at the level that you will regardless of what you hear in a case like this, looking at the Defendant, say to yourself, "You know what, I know before we even start automatically that my compassion is going to tell me that we've got to save this kid's life"?  Do you think that that's a

possibility?

A.    No, sir.

Q.    Okay.  Very good.

MR. ALEX:  That's all I have.

THE COURT:  Thank you, Mr. Alex.

Now, this is Mr. Brad Lollar.  Mr. Brad Lollar is going to talk to you.

MR. PARKS:  You're only half done.

EXAMINATION

BY MR. LOLLAR:

Q.    Let me ask you this.  Right now we can take a five-minute break if you need to return that phone call.

A.    She'll be fine.  I'll get her.

Q.    You don't need to break or anything?

A.    No.

Q.    You need water or anything, Ms. Vation?

A.    No.

Q.    Okay.  Well, good.  Again, my name is Brad Lollar and this is Doug Parks and this is Keri Mallon and this is James Broadnax.

We've listened very carefully to what you've had to say to Mr. Alex, and of course, we carefully reviewed your questionnaire that you filled out for us.

That's a lengthy questionnaire and it went into just about everything we need to find out about you.  So I'm not going to take as long as Mr. Alex did.

I want to talk to you about a couple of items.  We do not expect that jurors know about these special issues before you come down here and we tell them to you.

You see, that's how our Legislature has set up determining of those people who are guilty of the offense of capital murder, which ones get imprisoned for life without parole and which ones have to be put to death.

Now, let me tell you this, Ms. Vation.  The presumption is that the life without parole is the proper sentence.  Do you understand that?

A.    I understand.

Q.    And it's only for certain people that we go beyond that and have to put them to death.  And the dividing line is this special issue number 1.  Okay?

A.    Uh-huh.

Q.    I'm going to go over that again with you and talk about that one in particular.  That is the dividing line here in Texas between those who get put to death and those who are put in the penitentiary for

158

life. Okay?

A.    Sure.

Q.    Of course, we're not at that point unless and until you find a person guilty of the offense of capital murder.  And believe me, we're having to talk to you about punishment now, but that doesn't mean that we expect that you'll ever be in that position if you're on this jury because we don't think you'll find him guilty.

But if you do, okay, we need to talk about these because these are the special issues that apply in this type of a case.

A.    Okay.

Q.    All right.  So that first one -- and let me tell you this.  It puts the burden on the State, just like the State had the burden in the first part of the trial.

And they've got to prove that the answer to this should be "yes" beyond a reasonable doubt just like they had to prove in the first part of the trial that the person is guilty beyond a reasonable doubt. Okay?

But the presumption is that the answer is "no" just like the presumption was in the first part of the trial that the Defendant was innocent.  Okay?

It's that same type of presumption.

It's the same burden on the State and they've got to prove that to your satisfaction beyond a reasonable doubt before you can answer that question "yes."

And the answer starts out being "no"; okay, even though you found somebody guilty of capital murder.

A.   Still "no."

Q.   It's still "no."  Okay?  Now, the law requires that they bring you evidence that would show you beyond a reasonable doubt that there is a probability that the person on trial would continue to commit criminal acts of violence, that would constitute a continuing threat to society.

And that means basically whatever society he would be in and that means the penitentiary. Okay?

A.   Uh-huh.

Q.   So putting it another way, they've got to show you that even in the penitentiary this person is probably going to continue to commit criminal acts of violence.  Okay?  Does that make sense to you?

A.   It does.

Q.   Okay.  Now, and again, the presumption is the

answer to that question is "no." Okay? Which means that if that question is answered "no," the jury would stop their deliberations. That's it. It's over.

You go back and tell the Judge, "We have answered that question no," and then the Judge automatically sentences the Defendant to life without parole. Okay? That's how that works. Okay?

Now, the law says that sometimes the crime that a Defendant would commit is so horrific that you can look at that crime and that crime alone and it might give you the answer to special issue number 1.

For instance, you remember Timothy McVeigh?

A.    Yeah.

Q.    That blew up the Federal Courthouse up in Oklahoma City and killed all those babies and two hundred and some people, I think, 183 or so.

A.    Yeah.

Q.    Well, and then you find out that he's kind of a -- I don't know what you call him but he was some -- I don't even know if it's right wing or left wing, but he was trying to overthrow the government of the United States and he was with these other people trying to do the same thing and making bombs and this and that.

Well, okay. The law says that you can

look at the one act that they've been convicted of and that that sometimes may tell you the answer to special issue number 1.

The law also says, however, that sometimes that's not enough just to find that they have committed the one act that they've been convicted of. Okay?

Now, can you think of things that might indicate to you whether or not a person would probably commit criminal acts of violence in the future?

A.   Well, one thing, what happened up to this point, have they been guilty of anything.

Q.   Are you talking about besides the offense you've convicted him of?

A.   Yes.

Q.   So you want to look at maybe --

A.   A track record.

Q.   Track record; yes, ma'am.   And certainly, if they had a long  history of violent acts, that may be an indicator of what they'd do in the future.

A.   Right.

Q.   On the other hand, if they had no history of committing a violent act, do you see how that may give you information that you could use to answer that question "no"?

162

A.    Yes.

Q.    Okay.  So what we want to make sure of and what I need to ask you now, Ms. Vation, is this.  Are you saying that just because you found somebody guilty of capital murder, you would always and automatically answer special issue number 1 "yes"?

A.    That they would probably do it again?

Q.    Yes, ma'am.

A.    Just because they have not ever done anything before this point?

Q.    Well, that's what I'm trying to find out.  And my question was this, and pardon me if I got this wrong.  I thought Mr. Alex had asked you about that and you indicated that if a person has committed a capital murder and we've got him here on trial, and you found him guilty of that, that in your mind that means he's always going to be committing criminal acts of violence --

MR. ALEX:  Judge, I'm going to have to object.  That's a misstatement, characterization.

MR. LOLLAR:  Maybe I heard her answer wrong to that.  I apologize.

THE WITNESS:  I just take for granted that he would never be right again, that he would do it again if he had a chance.

Q.    [By Mr. Lollar]  Yeah, that's what I'm questioning you about.  Do you think that that's the type of person who would always be committing criminal acts of violence in the future or do you think it's a possibility that might have been out of character for him to do that that one time?

A.    Both of those, because that could be answered "yes" or "no," because sometimes they do, you know.  I guess in that you just kind of like check their criminal background and things like that, you see, because some people have committed a crime and then go back and some just habituate and just do it.

Q.    Well, and that's right and I think that's what that question requires a jury to look at.

A.    Yes.

Q.    So would it be fair to state that you would not answer that question until you heard all the evidence about that?

A.    I wouldn't.  I really wouldn't.

Q.    And you wouldn't automatically answer that question "yes" just because you found that they had committed the one offense?

A.    Right.  I really wouldn't.

Q.    All right.  Now I got you.  Any question about that?

164

A.    No.   I'm clearer now than I was.   I didn't know.   That could go both ways.

Q.    All right, very good.   Thank you, Ms. Vation.

And then special issue number 2 is not always submitted to a jury but it's a parties type case, where you've got a case where you've heard from the evidence that more than one person is involved.

Special issue number 2 asks, "Do you find from the evidence beyond a reasonable doubt that the person here on trial is the one that actually caused the death of the decedent?"   Were they the gun man?

Or if they were not the gun man, did that person intend or anticipate that the other one would commit the intentional act.   Okay?   And that's a matter of proof.   That's something that you can look at the evidence and determine.

A.    That's true.   Well, the thing about it, they surely didn't care or they wouldn't have took part in it.   It really didn't to them -- to me, they didn't care what happened.   It's okay if they kill somebody or they didn't.

Q.    Okay.   So you would be able to answer that question based upon the evidence that everybody had presented to you in the trial?

A.    Yes.

Q.    Okay.  And again, there is a presumption the answer is "no," and again, the State has got to prove that beyond a reasonable doubt.  You would be able to hold them to their burden of proof there?

MR. ALEX:  I'm going to have to object to the continued remark that the presumption to the answer to the question is "no."  There's no presumption in the answer to the special issue.

MR. LOLLAR:  Yes, there is.

THE COURT:  I think with the burden on the State, we start out presuming it's "no" unless the State proves it beyond a reasonable doubt.  That's my understanding.  If I'm incorrect, I'll certainly entertain -- now, there's no burden on 3.

Q.    [By Mr. Lollar]  On the first two special issues, the State is required to prove those beyond a reasonable doubt, and you start out with the presumption the answer is "no."  Okay?

Now, if you answer special issue number 1 "yes," you get to special issue number 2.  And you're not convinced beyond a reasonable doubt.  You answer "no" as a jury.  Stop your deliberations.  It's over.  Go back and tell the Judge.  Automatic life sentence.  Okay?

A.    Uh-huh.

Q.    All right.  Now, if you get to the point where the jury has decided the answers to 1 and 2 are both "yes," as a practical matter, we're at a death penalty, okay, instead of a life sentence.

Special issue number 3 then gives you an opportunity to back off the death penalty.  Okay?  And what it does is ask you to look at different things.  Let's read it together.

It says, "Do you find, taking into consideration all of the evidence --" and that means evidence, all of the evidence.  That's the evidence in the first part of the trial, in the punishment phase of the trial, evidence brought to you by the State, evidence brought to you by the Defendant, everything you've seen, observations that you have made.  Okay?

"-- take into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background --" so that's going to require you to look at the Defendant's character.  It's going to require you to look at the Defendant's background.  Okay?

And going on, it says, "-- and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or

circumstances to warrant a sentence of life imprisonment without parole rather than a death sentence be imposed."  Okay?

So what that says is, if you have something in your mind that you think is a mitigating circumstance, just a single mitigating circumstance, if there's something you see that you think his life is worth saving, you can give import to that.  Okay?

And the law says here that you, as a juror, make an individual decision.  Okay?  And it is your personal moral judgment about these mitigating issues.

And if you as a juror decide that there's something you see, whatever it is, that you think is a sufficient mitigating circumstance, that that can avoid the death penalty for the individual.  Okay?

A.    Uh-huh.

Q.    Now, we hear many things talked about being mitigating circumstances and in fact, the Supreme Court says that anything can be a mitigating circumstance, anything that you see in your mind as being a mitigating circumstance can be.  Okay?

We know, for instance, the age of a defendant standing alone can be a sufficient mitigating

circumstance that you might want to avoid a death penalty. Okay?

We can talk about things such as lack of prior violent history. That in and of itself, if you think that's a sufficient mitigating circumstance, that's fine.

Things such as whether or not they were under the influence of a mind-altering drug at the time they committed the offense. That's something that you may think sufficiently mitigating.

The fact that they may be shown from the evidence to be a follower, not a leader, and might have been led into this type of situation by somebody else, that's something you can consider.

The fact that if you heard from people that know a defendant best, his relatives and his friends and the people he grew up around, to say that this action was an aberration for him, that he's normally not like that, something must have happened, that in and of itself can be a mitigating factor.

Whatever you think is a mitigating factor sufficient to warrant that a life sentence should be issued instead of a death sentence, that's fine. Okay?

Do you see those things, Ms. Vation?

That's what that special issue is asking you to consider. Okay? Do you think you'd be able to look at all that evidence and make your own mind up about that?

A.   I believe so.

Q.   Okay. Now, one thing that we also need to talk about is if what if you get back in the jury room and you have decided one way. You have made your own personal moral judgment about this Defendant and you find out that the other 11 people in the room don't agree with you. Okay?

Now, personal moral judgments, I can't think of anything more personal to a person than that. That's like, you know, what religion do I hold, what beliefs do I hold, how do I want to raise my kids. Okay?

It just seems to me like it would be improper if I might have a different opinion than you do but I tell you, you must change your opinion about your religion and come to my religion, and you must change your opinion about the way you raise your kids and come to the way I raise my kids. Do you understand that?

A.   I understand.

Q.   And you don't have to do that; do you understand that?

A.    Yes.

Q.    The law gives you that right, even if you're one against eleven; do you understand?

A.    I understand.

Q.    Okay.  Ms. Vation, do you have any questions? One further thing, just one little bitty thing, congratulations on your grandson joining the force.

A.    Thank you.

Q.    And it sounds like he's a fine young man. Now, you indicated to us that you like police officers. You said you trust them?

A.    Yes.

Q.    Okay.  The law says this.  The law anticipates that a jury will listen to all of the testimony of all of the witnesses.  Okay?  And you start them all off at the same level of credibility, you listen to what they have to say, and then you decide whether or not you believe them.  Okay?

And the law says that after hearing a witness, you can believe that every word they had to say is true, you can believe that they lied from the time they first opened their mouth, or you can pick and choose and think they've told the truth on some things and they've fudged on some other things.  That's your right as a juror.  Okay.

But what the law says we can't do is this. We can't start off giving a higher level of credibility to nay witness, whether they're a priest or a police officer or Mother Teresa.

We just don't start them out -- we start them out the same, listen to what they have to say and then you give whatever degree of credibility to their testimony that you want to. Okay? Do you think you could do that?

A.    Oh, yes.

Q.    And you wouldn't automatically start a police officer out -- you wouldn't automatically believe every word a police officer has to say just because they're a police officer?

A.    No.

Q.    All right. Ms. Vation, thank you very much. We appreciate the time you've given us.

THE COURT: Ms. Vation, you'll be stepping out and you'll be coming back in, Ms. Vation. Don't forget this phone.

VENIREPERSON VATION: You said I will be coming back?

THE COURT: Yes, ma'am.

[Venireperson Vation left the courtroom.]

THE COURT: Let the record reflect Ms.

Vation has left the courtroom.

What says the State of Texas?

MR. ALEX:  The State would submit the juror for a number of reasons, if you'd like me to expound?

THE COURT:  Yes, sir.

MR. ALEX:  We believe that both sides are entitled to a juror who can be fair in the case.  This juror has vacillated on more than one issue.

First of all, in the questionnaire she said that it was correct and thee was nothing about it that she needed to correct.  And she said that in particular, that she would automatically on page 6, a question about, "Would the use of drugs or alcohol at the time of the offense automatically lead to assessing the death penalty if you found a person guilty of capital murder?"

She said, "Yes," and I think in the context of all of her answers, drugs have affected her life to the point where that's what she meant when she said it, and she told me that's what she meant when she said it.

And then she vacillated off of that point and then back onto that point and then vacillated off again when Defense Counsel was asking the

questions.

I believe under even the case law cited by the Defense, the Court does have discretion, a lot of discretion, when it comes to letting a person go for cause, and in this case, the Court doesn't know any of the facts of the case, but in my opinion, the use of drugs or alcohol could very well be the turning point in this case, and as such, we believe this juror is not qualified, because we do believe that where she checked "yes" on her questionnaire is the true and correct answer.

In addition, when she was asked about family members with criminal records, she remembered her brother and she remembered -- I'll tell you specifically what page they were.  Page 8.

And she remembered her brother and her nephew but she didn't put down her own daughter, and we know she didn't forget about her own daughter because she talked about the criminal history of her own daughter like it's on the back of her hand.

The reason that she gave was because she talked about her daughter's drug abuse.  The truth of the matter is, Judge, I know that it's difficult to say that someone that you -- one of your kids has been in trouble with the law, and that's what happened here.

She couldn't deny it when asked directly, but she didn't include it here, and she signed the back of this paper saying, "I swear under penalty of perjury all the answers are correct."

It is my belief that when she did it, she didn't mean to commit perjury or anything. She just didn't feel good about putting it down.

And for those reasons, we believe that the juror is not qualified to sit on this case.

THE COURT: Thank you, Mr. Alex.

Denied. Ask her to return.

MR. ALEX: Do you want to ask them if she's acceptable to them?

THE COURT: I already know.

MR. LOLLAR: We do accept her.

[Venireperson Vation entered the courtroom and approached the bench.]

THE COURT: You have been accepted as a qualified juror. Now, if you remember what that means, what it means is, we're qualifying some 50, and from that 50 the actual 12 will be selected.

VENIREPERSON VATION: All right.

THE COURT: So that decision hadn't been made yet, but it is going to be made the end of July, first of August, and you'll be immediately notified

when that's done.

Is your telephone number on this questionnaire still correct?

VENIREPERSON VATION:  Yes.

THE COURT:  Okay.  The sheriff is going to give you a card of the Judge's coordinator.  If anything should occur in your life that you think we need to know about affecting your service, give her a call and we'll all come up and deal with it.

VENIREPERSON VATION:  All right.

THE COURT:  And if you would, please, avoid any outside information, internet, TV, radio.  We don't want you disqualified.

It's been a pleasure meeting you.

VENIREPERSON VATION:  Thank you.

THE COURT:  You're free to go.  Thank you.

[Venireperson Vation left the courtroom.]

THE COURT:  Ten minutes.

[Recess.]

[Defendant present.]

THE BAILIFF:  All rise for the juror.

[Venireperson Herrera entered the courtroom and approached the bench.]

THE COURT:  Here you go, Mr. Herrera.

Thank you, sir.  Please be seated.

I'm going to hand you a question.  And do this for me, please.  Raise your right hand.

[Venireperson sworn by the Court.]

VENIREPERSON HERRERA:  Is this supposed to be me?  This is not me.

THE COURT:  I'm sorry.

MR. PARKS:  232, you're looking for No. 232.

THE COURT:  That was my fault.  There you go right here.  There you go, sir.  All right. Whereupon,

FIDEL HERRERA,

Venireperson No. 232, testified as follows:

EXAMINATION

BY THE COURT:

Q.   Mr. Herrera, thanks again for your patience.

Judge Snipes, who's going to be the Judge in this case, like I told you, has told us, and if you read that pamphlet, you see that the trial is going to start August the 10th.  Do you remember that?

A.   Yes, sir.

Q.   Last two weeks, Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon. Be a lunch break.  Wouldn't have to stay together

overnight unless and until you started deliberating your verdict.

Although you said you've never been on a jury before, do you know what I'm talking about when I say "deliberate a verdict"?

A.    Yes.

Q.    All right.  There's a chance you'd be taken -- if it went late into the night and you became tired, you'd all be taken to a fine hotel, your own individual private room, spend the night, come back the next morning to avoid any outside influence on your verdict.

So what I'm telling you, August the 10th up to two weeks, Monday through Friday, and wouldn't have to stay together during the week.

As you sit here now, are you aware of anything that would be going on in your life that would interfere with your ability to sit as a juror in this case?

A.    No, not as I know.

Q.    Anything that could -- anything in the back of your mind?

A.    No.

Q.    Good.  All right.  I'm going to re-introduce to you Andrea --

MS. HANDLEY:  It's Mr. Alex.

THE COURT: I'm sorry. Mr. Alex is going to talk to you on behalf of the State of Texas.

MR. ALEX: Thank you.

EXAMINATION

BY MR. ALEX:

Q. Mr. Herrera, again my name is David Alex and I'm one of the prosecutors on the case. Ms. Handley is also one of the prosecutors on the case and so is Ms. Evans. And there's another prosecutor who is not here right now that you may meet at some point.

How are you doing?

A. Good.

Q. Long day?

A. Just like any other day.

Q. Okay, very good. The book that you have with you, can you tell me what that book was one more time?

A. It's certification for a telecommunications engineer.

Q. Telecommunications engineer?

A. Uh-huh.

Q. Okay, very good.

A. I'm going for a certification.

Q. Is that a class you're taking?

A. No, it's an exam we take on certification in that field.

Q.    When do you take your exam?

A.    Maybe a couple of weeks, two to three weeks from now.

Q.    Two to three weeks from now?

A.    Uh-huh.

Q.    I'm going to start right off with a question that you asked the Judge about to make sure that we understand what is going on.  Okay?

A.    Okay.

Q.    When you read the pamphlet there in front of you -- it's the "Individual Voir Dire Juror Orientation Guide."

A.    Right.

Q.    There was a part about "beyond a reasonable doubt," and that's our burden of proof.  Okay?

A.    Okay.

Q.    And if you go to page 2, I think -- and you correct me if I'm wrong.  You were asking the Judge about what that meant.

A.    Yeah, and I still have a question.

Q.    Okay.  Let's talk about that a little bit, because I'd hate for you to go forward with --

A.    Right.  I read that booklet again and I made a little sketch.

Q.    Okay, good.  Tell me what -- and the sketch

is a part of this engineering mind that you've got?

A. Right.

Q. Very good. Talk to me about it.

A. I think the process, at least the logic behind this.

Q. Okay. Tell me what you think that is.

MR. LOLLAR: Explain that to us.

VENIREPERSON HERRERA: First of all, I'd like to get some clarification between beyond possible doubt and beyond a reasonable doubt, if I may. I have an idea what possible means but I just want to confirm it with you.

Q. [By Mr. Alex] Okay. Well, tell me what you think it means.

A. Possible can be anything, in other words. And reasonable is something within reason, human reason. So I think that is what we need to prove; is that right?

Q. Yeah. And so when it says here, "It is not required that the prosecution prove guilt beyond all possible doubt," so that's not our burden.

A. Right.

Q. Our burden is that it's required that the proof excludes all reasonable doubt. So you think you know what that means?

A.   No.   Honestly, I still believe -- and prove me if I'm wrong -- that the prosecutor needs to prove beyond reasonable doubt.   Is that right or not?

Q.   That's right.

A.   This says "exclude."   That's where I'm confused.

Q.   That our proof, the evidence that we put on, it has to exclude any reasonable doubt about the Defendant's guilt.   Does that not make sense to you?

A.   No, that doesn't make sense, because later on, going forward, before getting into issue number 1, special issue number 1, it says, "If a jury finds a Defendant guilty of a capital murder, then jurors shall answer the following issues."

And, "Do you find from the evidence beyond a reasonable doubt, which in my opinion, has already been proven before going into special issue number 1.

Q.   That it already has been proven?

A.   Right.

Q.   All right.   And that's your understanding of it; right?

A.   I should be a lawyer; is that right?

Q.   Yeah, you should be a lawyer.   And you know what, I think most of us here agree, so I think that's

pretty much all we've got to talk about.

THE COURT:  All rise, please, for Mr. Herrera.  Step out and you'll be coming right back in.  Don't forget your glasses.  Don't forget your book.  Good luck on your test.

VENIREPERSON HERRERA:  You're not going to interview me then?

THE COURT:  We're going to talk for a minute.  Then you'll be coming back in.

[Venireperson Herrera left the courtroom.]

THE COURT:  Let the record reflect we're out of the presence of the juror and in the presence of Mr. Broadnax.

What says the State of Texas?

MR. ALEX:  The State would submit the juror for cause, Judge.

THE COURT:  Because of the inability --

MR. ALEX:  Inability to appreciate the nature of the burden of proof that the State has in this case.

THE COURT:  Once he finds the Defendant guilty, he would automatically answer -- that answers special issue number 1.

MR. ALEX:  That sounds like what he said.

THE COURT:  Said on the record.

MR. LOLLAR:  We agree, Your Honor.  We agree.

THE COURT:  9:00 o'clock Monday morning.

[Whereupon, proceedings adjourned, to reconvene Monday, June 1 2009.

Reporter's Record continued in next numbered volume.]

- - - - -

THE STATE OF TEXAS        X

COUNTY OF DALLAS          X

      I, Debi Harris, Deputy Official Court Reporter for the Criminal District Court Number 7, Dallas County, Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

      I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

      WITNESS MY OFFICIAL HAND, this the _____ day of _____, 2010.

                   _____
Debi Harris, Texas CSR #1869
Expiration Date:  12/31/11
Deputy Official Court Reporter
Dallas County, Texas
Crowley Courts Building
Dallas, Texas
(214) 653-3416