ORIGINAL    1

*AP-76207*

REPORTER'S RECORD

VOLUME 13 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

THE STATE OF TEXAS          (          IN THE CRIMINAL DISTRICT

VS.                         (          COURT NUMBER SEVEN

JAMES GARFIELD BROADNAX     (          OF DALLAS COUNTY, TEXAS

* * * * * * * * * * * * * * * * * * * *

INDIVIDUAL VOIR DIRE EXAMINATION

* * * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 1st day of June, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE QUAY PARKER, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

**Anne B. Meredith**
Certified Shorthand Reporter

A P P E A R A N C E S:


HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas  75207-4313
Telephone No. 214 653-3600

BY:  MS. ANDREA HANDLEY, SBOT No. 08898800
     MS. ELAINE EVANS, SBOT No. 24032880
     MR. GORDON HIKEL, SBOT No. 00787696
     Assistant District Attorneys

     Also present:  Ms. Zandra Robinson


               APPEARING FOR THE STATE OF TEXAS


MR. BRADLEY LOLLAR, SBOT No. 12508700
Attorney at Law
1700 Commerce, Suite 450
Dallas, Texas  75201
Telephone No. 214 384-8178

MR. DOUGLAS PARKS, SBOT No. 15520000
Attorney at Law
321 Calm Waters Lane
Holly Lake Ranch, Texas  75765
Telephone No. 903 769-3120

DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
133 N. Industrial Blvd., LB 2
Dallas, Texas  75207-4399
Telephone No. 214 653-3550

BY:  MS. KERI MALLON, SBOT No. 24049165
     Assistant Public Defender

               APPEARING FOR THE DEFENDANT


**Anne B. Meredith**
Certified Shorthand Reporter

CHRONOLOGICAL INDEX - VOLUME 13

|  |  |  |  | PAGE |
|---|---|---|---|---|
| Proceedings - June 1, 2009 |  |  |  | 5 |
| VENIRE PERSON | COURT | STATE | DEFENSE | |
| MICHAEL GREEN | 5 | 9 | | |
| State's Challenge | | | | 63 |
| Court's Ruling | | | | 64 |
| ALEX JAMES FOLZ | 66 | 70 | 114 | |
| Prospective Juror Accepted | | | | 145 |
| JOYCE HERBSTER | | 152 | | |
| State's Challenge | | | | 154 |
| Court's Ruling | | | | 154 |
| BRIAN LEE ESSARY | | 155 | | |
| State's Challenge | | | | 158 |
| Court's Ruling | | | | 158 |
| DON MARTIN RILEY | | 160 | | |
| State's Challenge | | | | 162 |
| Court's Ruling | | | | 163 |
| ANGELITA RIVERA | 163,220 | 168 | 201 | |
| State's Challenge | | | | 219 |
| Juror Accepted | | | | 228 |
| CURTIS RISER | 232 | 236 | 292 | |
| Juror Accepted | | | | 326 |
| Adjournment | | | | 330 |
| Reporter's Certification | | | | 331 |

*Anne B. Meredith*
Certified Shorthand Reporter

ALPHABETICAL INDEX - VOLUME 13

|  | | | | PAGE |
|---|---|---|---|---|
| VENIRE PERSON | COURT | STATE | DEFENSE | |
| ESSARY, BRIAN LEE | | 155 | | |
| State's Challenge | | | | 158 |
| Court's Ruling | | | | 158 |
| FOLZ, ALEX JAMES | 66 | 70 | 114 | |
| Prospective Juror Accepted | | | | 145 |
| GREEN, MICHAEL | 5 | 9 | | |
| State's Challenge | | | | 63 |
| Court's Ruling | | | | 64 |
| HERBSTER, JOYCE | 152 | | | |
| State's Challenge | | | | 154 |
| Court's Ruling | | | | 154 |
| RILEY, DON MARTIN | | 160 | | |
| State's Challenge | | | | 162 |
| Court's Ruling | | | | 163 |
| RISER, CURTIS | 232 | 236 | 292 | |
| Juror Accepted | | | | 326 |
| RIVERA, ANGELITA | 163,220 | 168 | 201 | |
| State's Challenge | | | | 219 |
| Juror Accepted | | | | 228 |

***Anne B. Meredith***
Certified Shorthand Reporter

PROCEEDINGS:

(Defendant present).

THE COURT:  Go ahead and bring in Mr. Green, if you would, please.

(Prospective Juror No. 193, Michael Green, enters the courtroom).

THE COURT:  Be seated, please.

MICHAEL GREEN, having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Good morning to you, Mr. Green.  How are you this morning?

A    Very well, thank you.

Q    Good.  I'll get these out of your way.

I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney, Texas.  And Judge Snipes has asked me to assist him in the jury selection process in this capital murder case and, so, that explains to you what I'm doing here today instead of Judge Snipes.

A    Okay.

Q    And consequently, it explains why you're here today too.  You're here for your individual voir dire.

But, anyway, you probably remember -- how long ago has it been, a month ago or so when we had the general

voir dire, or something like that?  I mean, I don't have to have a specific date, but do you remember that --

A    Yes.

Q    -- Mr. Green, when everybody got together in central jury and Judge Snipes talked to you?  And at some point in the proceedings he asked everybody on the panel to stand up, raise their right hand, and he administered the oath for the prospective jurors to everyone.

Do you recall that?

A    I do.

Q    Okay.  Were you one of the panel members that stood and took the oath at that time?

A    I was.

Q    Very good.  I'll just remind you you're still under that oath.  And what you have been sworn to do are basically two things, to tell the truth, which we know you would do that, anyway, but also to be responsive to each and every question that's asked of you by the attorneys so that they can kind of find out about your qualifications as a juror in this particular case.

Now, do you understand that -- You've read the orientation guide, I assume; is that correct?

A    This guide?  Yes.

Q    Okay.  And, so, that explains to you a little bit about some of the law and the procedural aspects that are

*Anne B. Meredith*
Certified Shorthand Reporter

going to be involved in the trial of this case, and basically that's what the attorneys want to find out about.  They want to find out how you feel about the law and the procedural aspects.  What they are going to do is explain it to you first.

A    Uh-huh.

Q    And then when you understand it, then they are going to ask you questions about it.

A    Okay.

Q    So, I'm telling you this to tell you there's no right or wrong answers at all, only truthful answers.

A    Okay.

Q    And this is not a test that you've got to pass or fail or anything like that.  It's just -- And there's not going to be any embarrassing questions.  It's going to be questions concerning the law, and they want your ideas, your thoughts, your opinions concerning that.

A    Okay.

Q    Okay?  All right.  Very good.

            THE COURT:  Now, let's see, let me introduce the attorneys.

            The assistant district attorneys are Ms. Andrea Handley.

            MS. HANDLEY:  Good morning, Mr. Green.

            PROSPECTIVE JUROR GREEN:  Good morning.

THE COURT: And she will be talking to you for the State. Seated next to her is Elaine Evans.

MS. EVANS: Good morning.

THE COURT: They are both assistant district attorneys and are charged, along with three other members of the prosecution team, with prosecuting this case. A little bit later this morning we may see two more lawyers come in, Mr. Gordon Hikel and Mr. David Alex, who are also members of the prosecution team. And Zandra Robinson is also a member.

And then the defense counsel seated down here is Mr. Doug Parks.

PROSPECTIVE JUROR GREEN: Good morning.

THE COURT: And then seated next to him at the end of the table is Ms. Keri Mallon.

PROSPECTIVE JUROR GREEN: Good morning.

MS. MALLON: Good morning.

THE COURT: And seated next to her is the . defendant, Mr. James Broadnax.

PROSPECTIVE JUROR GREEN: Good morning.

THE COURT: There is also another member of the defense team, Mr. Brad Lollar, and he may be coming in at some point later this morning as well.

PROSPECTIVE JUROR GREEN: Okay.

THE COURT: Very good. I believe we are ready to begin, so Ms. Handley.

MS. HANDLEY:  Thank you, Your Honor.

Your Honor, is that Mr. Green's questionnaire?

THE COURT:  Yes, it is.  Mr. Green, there is your questionnaire, and I'm sure the attorneys will probably have you turn to certain questions and then ask you about your responses or your answers.  Okay.

MS. HANDLEY:  Thank you, your Honor.

THE COURT:  Go ahead.

EXAMINATION

BY MS. HANDLEY:

Q    Good morning again, Mr. Green.  How are you doing?

A    I'm well.

Q    How do you feel about being here?

A    I don't -- I don't mind being here.

Q    Okay, good, good.  That's your questionnaire in front of you.  I know it's been a while since you filled it out.  And I take it when you filled it out, did you have enough time to fill it out?

A    I did.

Q    Okay.  Were you -- Do you believe it's as thorough as you absolutely could have been in here?

A    As I could have been, yeah.

Q    Okay.

A    A little sleepy toward the end.

Q    Okay.  Well, I know we asked you some questions in

general about the death penalty.  We asked you, you know, when you think it's appropriate.  We also asked you some questions about, you know, what purpose it may serve, what it may not.  We asked you some, some questions about your feelings about the criminal justice system.  We asked you some -- your feelings about intoxication.

We asked you for some personal information about whether you or anybody you knew had been arrested, accused, convicted, placed on probation, deferred, for any kind of criminal offenses.  Asked you if you had been on jury duty, and then asked you some information about your employment and such as that.

Do you think that you filled everything out there?

A    I believe I did.

Q    Okay.  Anything you can think of that you might have missed out on?

A    Not that I know of.

Q    Okay.  Let's just kind of start at the beginning. I noticed on page one here you put down that you said you are in favor of the death penalty.  And you wrote down, I believe that certain crimes should be punishable by death.

And I will tell you that you are correct in that and that it is really only certain offenses.  It's not just murder.  You know, capital murder is a category that's

very unique in itself and it's actually somewhat limited. Under only certain crimes people are eligible for the death penalty. They don't automatically get it, but they are eligible.

It's always an intentional murder, though. It's never an accidental murder, a self-defense murder, a I was driving and I was not paying attention and I killed somebody kind of crime. It is a I meant to kill this person and I killed this person kind of crime. That's a first degree murder in and of itself. Capital murder is always -- you can think of it best, I think, as a murder plus something else aggravating.

I think you put in here, when we asked you for what crimes you thought it should be eligible, you said, you said just murder. But I'm telling you that it's, for example, murder, intentional murder of a child under six years of age.

A   Uh-huh.

Q   Or murder of a police officer while he's on duty.

A   Uh-huh.

Q   Or murder of two or more people in the same criminal episode at the same time, or it's murder in the course of committing another felony offense, for example, robbery or burglary or sexual assault or something like that.

Does that make sense to you?

A    Certainly.

Q    Do you -- Do you think that you would personally, just a regular intentional I meant to do it, I meant to kill you kind of murder, but not without that aggravating factor, do you think that's somebody who should at least have that as a possibility for the jury, that that should be an option for them?

A    Certainly, if they meant to do it.

Q    Okay.  Okay.  So you, if you had your druthers, you would say, I don't need that additional aggravating factor.  If you meant to do it and you killed this person, at least it ought to be an available option.

A    Sure.

Q    Okay.  The law says, though, that that is the law. It's not, it's not an available option for that.  Can you square yourself with that or do you have a problem with that particular law?

A    Oh, no, I can.  I mean, I think that even when reading through this thing, there were other mitigating circumstances like if that person had a mental issue and then they said, they said I meant to do it, but maybe they were impeded by that.

Q    Got you.  I got you.

A    But then if it's -- listen, I'm just, you know, from where -- I mean, I didn't grow up in the suburbs,

whatever. So, if somebody just says, I'm just going to kill somebody --

Q     Uh-huh.

A     -- and that's what I'm going to do --

Q     Uh-huh.

A     -- then I think it should be an option.

Q     Okay. Okay. And you mentioned like a mental issue. I'll tell you, if somebody is criminally insane, if they just flat out don't know, if they cannot appreciate and don't know the difference between what's legally right or wrong, then that person may be criminally insane.

A     Uh-huh.

Q     You know, they have a disease of the mind that prevents them from knowing right from wrong, then that person would be criminally insane. And it doesn't necessarily mean we throw them back out on the street, but maybe they would go to an institution or something.

You understand the difference there?

A     Sure.

Q     Would you agree with that, that would be insanity and that would be something different?

A     Sure.

Q     Other than that, I mean people can have -- I think maybe it's fair to say somebody in their right moral sense of mind wouldn't want to intentionally kill somebody. So,

there is really something wrong with you, right?  You may not be legally insane, but maybe you're just -- maybe you're just mean.

A    Well, yeah.

Q    Yeah.  Or sometimes I think what people, when they start talking about, were you mentally on board with that, is that maybe they were intoxicated or something, or maybe there was alcohol and drugs in their system that kind of skewed their thinking.  Are you thinking of that?

A    I wasn't when I -- When I made the statement, I was thinking more or less of being mean and this is what I'm going to do.

Q    Okay.

A    Because in some environments, like the one I grew up in --

Q    Yeah.

A    -- there were people that just thought that was a way to get out.  I'm going to do what I want to do.

Q    How do you feel about that?

A    I think that if that's that person's intention, I mean, and that's what they want to do, I don't want them out on the street.

Q    Right.

A    I mean that person gets either, you know, life or the death penalty.

Q    Right.

A    And I wouldn't have a problem.

Q    But before we really get into the particulars of the law, you said that person gets either life or death.

Just asking you right now here as we sit, what's the defining difference?  What would make the difference to you between somebody getting life and somebody getting death?

A    If the person's intention, I mean if the person -- again, I'm going with what I read here and which I'm saying is my personal feeling.

Q    That's what I want to hear is your personal feelings.

A    Personally I feel like if that person does not intend to do it, but like you were saying, they have a mental issue, okay, then life imprisonment may be better, is an option.  Why kill that person if they could be institutionalized or rehabilitated?

Q    Uh-huh.

A    But then if the person is saying, I did it and I will do it again, and if I get another chance, if it's me or them or me or anybody, that's what I'm going to do --

Q    Uh-huh.

A    -- then that -- I mean the death penalty should be an option.

Q    Do you think -- Because I saw in here where you wrote about the death penalty that you said that if it was to maybe present, pardon me, prevent somebody from future deaths or you said the death penalty is a deterrent for murder.

Are you, are you thinking in terms that the death penalty should just apply to somebody who you think is going to commit another murder necessarily?

A    More or less.  If, if, if that person's, if the intention is or the possibility is that they are going to commit it again --

Q    Uh-huh.

A    -- and you don't have any way of assessing that it's not going to happen again --

Q    Uh-huh.

A    -- you know, no mental issues, no reason or just that's just how I am, then I think it should always be an option.  But, again, I mean courts have to decide it.  I don't think it's up to me.

Q    Okay.  How do you think we would ever figure out whether or not somebody was going to commit another future -- a murder again?

A    Outside of going through a court case and interviewing that person, you don't know.

Q    Okay.

A    You can only assess what people give you.

Q    Okay.   Let's then talk a little bit about the law and stuff here.   And I will cover a couple of issues with you as we go along here.

You said that you did hear about the case on TV, though, but you said you're really not sure.   Do you remember anything about the case?

A    I wasn't certain because the young man who was sitting at the front, he didn't -- I remember hearing a case --

Q    Yeah.

A    -- like this.

Q    Yeah.

A    But he didn't look like the person that I saw, so I just said, I don't know, maybe it was him, maybe it wasn't.

Q    What did -- what did you see?

A    It was a case about a young man that had killed a guy outside of a studio or something.

Q    Okay.

A    And, but the interview, the guy was kind of -- he just looked different, so I just said, well, I don't want to put on here I know this is the case that I read --

Q    Oh, that's fine.   That's fine.

A    -- and break the oath and then the judge calls the bailiffs and stuff.

Q    What do you remember?

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT: See, I've got them close here.

PROSPECTIVE JUROR GREEN: Yeah.

Q (By Ms. Handley) What do you remember about seeing on the TV about what you saw?

A I just remember the young man was pretty callous about it. He didn't really care. Well, he didn't seemingly care about what happened, you know. So, that's what I remember. I remember it being a pretty -- a pretty cold interview with a -- with a newscaster.

Q Okay.

A And that's what I remember seeing was on YouTube or something.

Q Okay. Did you form any opinions at that time as to the guilt or innocence of that person?

A Well, I mean I felt pretty bad about it because I didn't know what all actually happened. You know, in an interview like that, shortly after everything happened, having happened.

But, again, I'm telling you, I've grown up in an environment, I don't know what the circumstances were. I hated to hear it the way he said it. But why did the young man assess that, why did he make that decision what he did? I just -- It was more sad than it was anything else, more than passing judgment.

Q Sad in what respect?

**Anne B. Meredith**
Certified Shorthand Reporter

A    In the sense that he seemed like he didn't care about life.

Q    Yeah.

A    And the question is, why didn't he?  The dude looked like he was about maybe nineteen or maybe twenty.

Q    Uh-huh.

A    You know, why all of a sudden you don't care about life?  And again I, in a sense, sympathized because in the situation we grew up in, there were people that believed like that, they thought like that.

Q    Yeah.  And you say you sympathize.  I mean, do you have sympathy for that particular person that you saw on the TV?

A    For the individual, yeah.  The guy that committed the crime, the family of the person that had to go through the things that they had to go through, yeah, I felt sympathy for them both.

Q    Okay.  And you said that you kind of empathize, you grew up in a certain area or something.

A    Uh-huh.

Q    And his youth and all of that.  I mean, how far does your empathy and your sympathy for that person extend?

A    It goes as far as it would for somebody that stole a piece of bubblegum and was going to have it on their record from now on.  I mean how far a person goes with their, you

know, with their background, you just don't know.

So I don't assess any -- you know, as far as I'm concerned, I wish, I would like to know, you know, what happened, why, what brought you to that, man? Why would you think that way? Why would you do something like that?

Q    What could you hear that would make you say, all right, I get that's heinous, but I'm not thinking that you're eligible for the death penalty?

A    I mean, I got nothing that would make me assess that. The conversations weren't that extensive.

Q    No. I'm saying, what do you think, if you heard it, would make you --

A    What would I have heard that would make me say --

Q    You can make something up here. I'm saying, given what you saw, the feelings that you had and you're like, I wonder what brought him to that point, you know, an individual like that may be eligible for the death penalty.

Do you think at that point that would be an appropriate case?

A    I'm sorry, I may be misunderstanding what you are saying.

Q    Whatever you saw on the TV.

A    Sure.

Q    Do you think that that was the kind of case that the death penalty should be an option?

A    It could have been, yeah.

Q    You said, it could have been.  What's factoring in for you, Mr. Green?

A    That would make it could have been?  Because of the fact that he was callous.

Q    Okay.

A    In the conversation he was seemingly extremely callous.  But then the part that kind of made me wonder --

Q    Uh-huh.

A    -- was typically a person as that, what we would call hard --

Q    Uh-huh.

A    -- is not that open about things that they do.

Q    Uh-huh.

A    And, so, that made me wonder, you know, somebody running off at the mouth like that, it makes you wonder, you know, does this person -- is this person really that kind of a person?  Because people that I have known that have been callous that way, they are not as talkative about it.

Q    Okay.

A    And this person was just a little -- so, it made me wonder, what brought you to think like that?

Q    Okay.  Okay.  What about the -- what about the age of the person, how does that factor in?

A    If a kid is ten or eleven and they make a decision like that, but when you get to be fifteen and sixteen, you can make a conscious decision and that's a decision that you would make again, then I think that, you know, you have to look at that person as having made cognizant --

Q    I got you.

A    -- you know, informed decisions on how they are going to handle their life.

Q    A lot of people say, well, eighteen, nineteen, that's just a youngster, that's still a boy.  Do you think -- What do you think?

A    Eighteen or nineteen doesn't, I mean, age doesn't -- that age doesn't really, doesn't really -- I don't have any --

Q    When do you think you're a man and you are responsible for your actions?

A    When you make that decision and you know that -- and based upon what I have in my hands, I would make this decision again, I don't care how old you are.

Q    Okay.

A    You know, again, if a kid is ten --

Q    Sure.

A    -- and you're kidding around, you know.  But I'm talking about if you're twelve and I'll do it again and I know I will.

Q    Uh-huh.

A    And then you put them in a scenario like that and you see that they will.

Q    Yeah.

A    You know, if you're eleven, it would be the same thing.  I mean I just --

Q    You've talked a lot, kind of what I'm hearing from you is you would want to know what was going through the person's mind, you would want to know what brought him to that point.  And we're kind of jumping all around.

But in a criminal trial, in any criminal trial, Mr. Green -- and have you ever served on jury duty before?  I think you have.

A    I was just a juror.  I've never actually --

Q    That's what I meant.  You were a juror on a DWI case, I think.

A    I never actually did a case.  I've never been picked.

Q    Okay.  You sat in the big panel before.

A    Yeah.

Q    Okay, I got you.

A    I've been picked and thrown out.

Q    Well, I'll tell you -- and thrown out.

Why do you think they didn't want to pick you?

A    I don't know.

Q    You think you're too harsh or you're too easy?

A    Well, I mean I don't -- I'm just not, I'm not going to give you any more than what you ask me.

Q    Yeah, yeah.

A    Maybe they want more, I don't know.

Q    Okay.

A    That's all you're getting.  You know, I'm not giving any more.

Q    In any criminal case, be it a DWI or be it a capital murder case, you know there's certain principles of law that apply in every case.  And cases are always generally done in two parts.

In the first part the jury decides whether or not the person's guilty of the crime that they have been charged with.  And if they are and they find them guilty, then you move on to that second phase of the trial.  And that's where you decide the punishment, what the punishment should be.

Now, capital murder is a little bit different and, so, we'll go over that.  But normally and generally speaking, it's kind of a two part trial.

And what's important at this point, Mr. Green, is -- My opinion, how I feel and how the defense feels right now, that and a buck and a quarter will get you a cup of coffee next door.  Okay.  It absolutely doesn't

matter.    What's important now is your opinion.

A    Uh-huh.

Q    And, also, right now you've only taken an oath --

MS. HANDLEY:  And has he been sworn in, your Honor?

THE COURT:  I just questioned him about his oath that he took --

MS. HANDLEY:  Okay, okay.

THE COURT:  -- back during the general voir dire.

MS. HANDLEY:  That's fine, Judge.  That's fine.

THE COURT:  He said he did take it, and I just admonished him he was still under that oath.

MS. HANDLEY:  That's fine.  Thank you, your Honor.

Q    (By Ms. Handley)  Right now the only oath you've taken is to tell us the truth.  You have not taken an oath to follow the law, okay?

A    Uh-huh.

Q    And what's important, I think a lot of people come in and they go, I want to say what's politically correct or I want to say what I think that good citizens should say, and that's really not the oath you're taking right now.

What you need to do is just be honest.

A    Sure.

Q    Just be brutally honest.  There's a lot of laws I don't like, I'm gonna tell you right now.  There's probably some cases I wouldn't be a good juror on.  I'm a lawyer and I'm gonna tell you, I wouldn't be a good juror because I don't agree with the law.

A    Uh-huh.

Q    Or I would not be able to follow the law and, so, that case isn't for me.

But there's a lot of principles of law in place, and one of those is that we have to prove our case.  Okay.  You always look to the State to prove the case.  This is really the only place that you can get evidence from is -- or require it from is from the State.  Okay?

A    Uh-huh.

Q    Now, I've got to prove my case to you what's called beyond a reasonable doubt.  I don't have any, any definition of reasonable doubt for you.  It's whatever you think it is.

Some people say, in a death penalty case, I don't think that there is room for doubt.  I don't think there can be room for any doubt.  There's too many -- There's people who have been innocent and been convicted, you know, because maybe there was that room for doubt.

How do you feel about that?

A     I think reasonable doubt is sufficient.  I mean, you asked me to be brutally honest.  I'm going to do what I'm asked to do.  That's just the way I am.

Q     Okay.

A     I mean, if you ask me my opinion, which is what you've been doing, that's what I'm going to give you.

Q     Okay.

A     If you give me parameters and you say, here is the parameters, did this happen, that's what I'm going to give you.

Q     Okay.  Okay.

A     That's just my --

Q     I got you.

A     Just whatever I'm asked to do, I'll do it.

Q     I got you.  So, do you understand, then, beyond a reasonable doubt is not all doubt whatsoever?

A     True.

Q     It's not 100 percent.

A     True.

Q     It's whatever you think it is, but it's not all doubt whatsoever.

A     Yes.

Q     And you always look to us for the burden of proof to prove our case.  You know, you're really never supposed to

look to the defensive side to hear any kind of evidence.

When we've been talking -- And I think that you're the kind of man that you like to have all the facts, don't you, before you make a decision?

A    Sure.

Q    That's what it sounds like to me.

And particularly in a criminal case or a murder case, it sounds to me like motivation and what's going through a person's mind is important to you.

A    It is.

Q    You would like to know why that person did what they did.

A    True.

Q    And in a case like that, who is the best person, do you think, that's going to tell you why they did what they did?

A    The individual, or if they have been sent by counsel to have some kind of -- somebody, you know, I guess a professional or whatever.

Q    Yeah, somebody who has interviewed them --

A    Sure.

Q    -- and maybe can give you an opinion on whether or not they are a psychopath or just a wayward kid or something like that?

A    Sure.

Q    If you don't have that kind of expert or professional opinion from a counselor or something, then you've said that the best person who could tell you is going to be the defendant.

A    True.

Q    Okay.

A    Well, no, that's not what I said.

Q    Oh, I'm sorry.  Tell me.

A    The best person that could -- well, then the only other evidence I have is what you present.

Q    Right.

A    And, so, I don't necessarily -- I can hear what the defendant is saying.  Then you have facts and you have -- the person can tell me what they think --

Q    Uh-huh.

A    -- or how they feel, but anybody can manipulate a conversation.

Q    Sure.

A    So, what facts then do I have that say there is a possibility that this is not a reasonable doubt?

Q    Right.

A    If it's there, it's there.

Q    Right.  I'll tell you this.  You've heard of a person's fifth amendment right not to testify.

A    Sure.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    It means I can't force a defendant to testify and technically you can't hold it against them.

A    Right.

Q    A lot of people -- A lot of people say, I get that. I get that law.  I understand that's the law.  But if I was on trial, I would testify.  I would get on the stand and I would explain myself.  Okay.  But I can't force a defendant to do that.

        And if you're in a criminal case such as this and you want to know motivation and it's important to you, and a defendant doesn't testify, how is that going to affect you?

A    Okay.  When I was watching the show, then it was important to me to have as much information because it was -- my personal opinion was the only thing that mattered.

Q    Uh-huh.

A    I was watching the YouTube thing.

Q    Uh-huh.

A    That's what I wanted to know before I would just, just get infuriated about it or decide one way or the other, that was important.

Q    Uh-huh.

A    So, I didn't want to make a decision then.  I'm just simply looking at stuff.

        If a person is in a case and you have

parameters, that's just what I have.

Q    Okay.

A    I mean, I don't know any other way to -- I can't --

Q    I guess what I'm saying is if I can't -- if you can't hear from a defendant, are you going to be able to make a decision still?

A    Sure.

Q    Okay.

A    I can make a decision based on what's in front of me.

Q    I got you.

A    And what I have been told is all I can decide from.

Q    I got you.  I got you.  Okay.

A    I'm not going to add to it or say, well, okay, well, they didn't tell me my -- okay, here are our parameters, this is how it works.

Q    Okay.

A    So, you can see I'm in banking.  We don't really get a whole lot of --

Q    It doesn't come across your desk much, does it?

A    We don't get a chance to add in what we think.

Q    Okay.  So, if I can't, if I can't -- If the defendant doesn't take the stand, in other words, you feel you could still render a decision in this case.

A    True.

Q    And just because a defendant doesn't take the stand, is that going to make you go one way or another?

A    No.

Q    Okay.  Just let's touch back again.  You said YouTube and you were watching parts of the case or information about the case.

Did it cause you to form an opinion as to the guilt or innocence of that particular person?

A    Legal guilt or innocence?  I would have said automatically the person was guilty.

Q    Okay.  Okay.

A    But as far as my opinion about, you know, how that person would be, you know, convicted of what this thing or another --

Q    Got you.

A    -- I wouldn't have said that.

Q    Okay.  So, based on what you've seen, you've at least already formed an opinion as to the guilt or innocence of the person, not the punishment, but the guilt or innocence of the person?

A    No.  I mean, I'm saying when I'm watching this show --

Q    Uh-huh.

A    -- I'm watching the YouTube thing --

Q    Uh-huh.

A    -- at that particular point everything on there said, I did it.

Q    Okay.

A    I mean, so there was nothing else to try to decide.

Q    Okay.

A    However, I didn't have enough facts to say.  I don't know what the extenuating circumstances were to say --

Q    Okay.

A    -- this person --

Q    All right.

A    -- actually, this is what happened, this, that or the other.

Q    I got you.  Because here's the law, Mr. Green, is that -- Everybody watches YouTube and the TV and they read the paper.

A    Sure.

Q    And they watch all this information and stuff. And that's fair, everybody does that.  But what you can't do is come into the courtroom now and listen to the evidence and take that also in to help decide your deliberations.

A    Sure.

Q    If we put on our case and we didn't put on that piece of information that you saw on YouTube, would you still be thinking about that?

A    I don't know.  I don't know.  I mean I can't say

that because, again, according to the parameters, the only thing I can go by is what you guys are saying. And, so, if then that's what I'm given --

Q    Yeah.

A    -- then that's what I'm going to do.

Q    Okay.

A    I mean I just -- To tell you, okay, well, he's not -- I'm not going to flash back to what was said in that particular event, I mean I would say no, but I don't know.

I mean, I would think that my automatic response would be, Michael -- I talk to myself, so if that makes me crazy, so be it. Michael, listen to what they are saying, that's the job.

Q    Okay. Okay.

A    So, that's just how I handle anything like that.

Q    I'm gonna tell you, sometimes I don't know is about as fair an answer as you can get, you know. And you don't know whether or not that would filter into your deliberations.

A    Yeah, I don't know.

Q    Okay. Okay. Well, like I said, we have to prove our case to you beyond a reasonable doubt. We have to prove capital murder.

In this case it's the intentional, not accidental, the intentional murder of a person during the

course of a commission -- during the course of committing robbery.

A    Uh-huh.

Q    Okay.  If I fail to prove any one of those aspects to you, Mr. Green, he would be not guilty of capital murder.

A    Uh-huh.

Q    It doesn't necessarily mean the person would walk out the door.  It might mean they were guilty of something else, what we call a lesser included offense.

A    Uh-huh.

Q    Maybe I didn't prove there was a robbery.  Instead I just proved there was an absolute 100 percent intentional murder of a person.  So, you're not looking at capital murder now, you're looking at regular murder.  And I hate to say regular because I don't think there is anything regular about a murder.

A    Sure.

Q    But in a situation like that, you would be called upon to assess the punishment of an individual then.  And you are given a wide range of punishment, anywhere from five years in prison up to life in prison, or ninety-nine years or life.

A    Uh-huh.

Q    Does that make sense to you?

A    Sure.

Q    And what you do as a juror is you look at all the circumstances of the offense, you look at the defendant, you look at whatever you need to, all the evidence in the case. You've heard the expression, let the punishment fit the crime?

A    Uh-huh.

Q    And then you decide where in that range of punishment that person should be punished.  Do they get five years, ten years, fifty years, seventy-five years, ninety-nine years, or life?

A    Uh-huh.

Q    But you're called upon to look at somebody who's committed first degree intentional murder.

If it's appropriate, you would assess the minimum of five years.  If it's appropriate, you would assess life in prison.

Do you have a problem doing anything like that?

A    As long as I have the parameters for each one to use.

Q    Very good.  Okay.

There is another way that a person could actually be guilty of capital murder and not necessarily be the triggerman, if you will.

A    Uh-huh.

Q    It's called the law of parties in Texas.

Let's say that my brother and I decide we are going to rob a 7-Eleven. We sit down at the kitchen table together, we plan it out. You know, my brother, I've taken care of him since he was a young kid and our parents abandoned him. This is a hypothetical, it's not true.

A    Sure.

Q    He's kind of slow. He's not mentally retarded, but he's just kind of slow. He's always had trouble in school, getting in and getting on, so I do everything for him, but mostly he does everything for me. I'm very good at manipulating him. He knows right from wrong. He knows what he's doing. But he does what I tell him to do because he wants to.

So I tell him, hey, Douglas, we are going to go rob this 7-Eleven. And here's what I need you to do, I need you to go steal a gun from the shed of our neighbor, and he does that.

I go and I buy the bullets. He gives me the gun. We drive up to the 7-Eleven in his car, he drives. I told him the night before to pick out a time that he thinks there's going to be slow traffic out there. He tells me 11:00 o'clock is the best time.

We pull up, we're sitting in the car, he hands me the gun, he sees me load it. And I say, Douglas,

you sit out here and you honk the horn if you see anybody come. All right? He says okay. And I says, I promise you, with whatever I get, you can buy some candy.

A    Uh-huh.

Q    Because that's what he likes, he likes candy.

So, he sits there and I hold the gun up and I say, all right, honk the horn if you see anybody. He sees me load it and he watches me go in.

He's not -- He's not without some kind of convictions, you know, Douglas, and he's sitting there and he's thinking about it. He knows me and he knows I'm a mean motor scooter and he knows that I always get in trouble and I don't like getting caught. And he sees that I went in there with a gun and he knows it's a loaded gun.

He starts to think, man, I think she's going to hurt someone. As a matter of fact, I know she is. I should probably tell somebody. And just before he's thinking of getting out of the car and going to the telephone booth to call 911, he hears shots fired.

I come running back out, I have got a bag of money, I have robbed that clerk and I have shot that clerk five times, killing him.

Am I guilty of capital murder? I went in the store, I shot that clerk five times during a robbery. Am I guilty of capital murder?

A    If that was your intention, according to this.

Q    Yeah.

A    Then, yes.

Q    Okay. Do you think my brother Douglas is guilty of capital murder?

A    Not according to what I saw in here.

Q    Okay. The law says this, that if you aid, assist, direct or participate in a criminal offense, you could be just as guilty as if you had done it yourself.

        I don't know if the law of parties is in there or not.

A    Oh, okay.

Q    That you can be just as guilty as if you had done it yourself. Do you think that's fair?

A    Personally?

Q    Uh-huh.

A    I would think that person is an accessory to the crime. But to say that they should get the same thing as the other person, I don't necessarily agree with it personally.

Q    Right.

A    But if that's what the law says, that's what my parameters are.

Q    Yeah. In order for my brother Douglas to be held guilty of capital murder, at least, the law says that not

only did he have to participate in it -- you know, and he went and stole the gun for me and he drove me up there.

A    Uh-huh.

Q    But the law says he also should have anticipated that somebody might die.

A    Okay.

Q    And a jury could make that decision based on me loading the gun in front of him and saying, Douglas, you know I'm not leaving anybody, any witnesses behind.

A    Uh-huh.

Q    Do you think, you know, that might be a fair -- You see where I'm going there?

A    You say that they should have.  That's what the law says, he should have?

Q    Should have anticipated.

A    Wow.

Q    Yeah.  Okay.  Yeah, wow, it's a lot to swallow.

So, if my simple-minded brother Douglas here participated -- and would you say it's fair to say he participated?

A    Sure.

Q    And if he should have anticipated I would kill somebody -- and do you think it's fair to say he should have anticipated?

A    If he's, if he's slow and incapable of anticipating

that, is Douglas --

Q    Could be, could not.  He's not, he's not mentally retarded.  He knows how to go steal a gun for me.  He knows how to always cover for me.  And he sees me load a gun and say, Douglas, I ain't leaving any witnesses.

A    If he can, if he is able to --

Q    Okay.

A    -- anticipate that --

Q    Okay.

A    -- and we can find that he's able to anticipate that, then the law says he's guilty.

Q    Okay.  The law says he's guilty of capital murder, then, right?

A    Uh-huh.

Q    There's only one of two things can happen to a person found guilty of capital murder.  What are those?

A    He can get either life or the death penalty.

Q    Right.  Life in prison means life in prison.

A    Uh-huh.

Q    That means you're going to die in prison, okay?

A    Uh-huh.

Q    There is no parole there.  So if I prove that, Douglas is now going to spend the rest of his life in prison.

How do you feel about that?

A    That's what the law says.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Okay.  You don't have any problem with that?

A    Huh-uh.

Q    Okay.  Okay.  And that's the law of parties.  You don't have to absolutely be the triggerperson in order to be held guilty of capital murder.

A    Right.

Q    And do you think that's something that you could follow in this particular case or does it rub you the wrong way?

A    I don't necessarily personally like it.

Q    Yeah.

A    But I'm going to do what I'm assigned to do.

Q    Okay.

A    I mean, I don't know of any other way to say that.  I'm going to do whatever it is that I'm asked to do.

Q    That's a fair thing to say.

        If, if a person is found guilty of capital murder, then the next thing that happens, Mr. Green, is now we move on to the punishment phase of the trial.

A    Uh-huh.

Q    Okay.  And the jury doesn't go back to the jury room, sit down and say, okay, should we give him the death penalty or should we give him life in prison.

A    Uh-huh.

Q    Instead, what you have to do is sit down and

answer three questions, and based on how you answer those three questions will determine whether or not somebody gets life without parole or the death penalty.

Make sense to you?

A    Sure.

Q    Okay.  At this point, what's the best this person can hope for?

A    Either the death penalty or life without parole.

Q    Yeah, they are sitting on life in prison, aren't they?

A    Yeah.

Q    Okay.  So, they are sitting on life in prison.  And what happens now is is that burden that we talked about before where I have to prove the case to you --

A    Uh-huh.

Q    -- I've got to prove to you now that death is the proper thing to do in this particular case with those parameters.

A    Sure.

Q    Okay.  It's not do I want to give him the death penalty.

A    True.

Q    It's not even does he morally deserve the death penalty.

A    Uh-huh.

Q    It's does he fit in those parameters.

A    Sure.

Q    Okay.  But right now we are presuming that life in prison is the best thing for him because I haven't proved to you that you should do otherwise, have I?

A    True.

Q    Okay.  So, we go into those questions and we start with this first -- we call them special issues, not really questions.  It was in your pamphlet and it's up here also.

We refer to this first question as the future dangerousness question.  And it's where you're called upon to determine whether or not a person is going to be a future danger.

A    Uh-huh.

Q    You're called upon to make a prediction is basically what you're, what you're doing right there.  And the law says that I have to prove to you beyond a reasonable doubt -- again, that goes to my burden, right?

A    True.

Q    -- that there is a probability the defendant will commit criminal acts of violence that will constitute a continuing threat to society.

You don't get any definitions of what any of these terms are.  We didn't write these questions.  These are questions written by lawmakers and such as that, but they

don't necessarily give you definitions.

A    Uh-huh.

Q    The first thing they say is I have to prove to you that there is a probability.

A    Uh-huh.

Q    What do you think a probability is?

A    That it's probable, it's possible.

Q    It's possible?

A    Uh-huh.

Q    Do you think there is a difference between a probability and a possibility?

A    Yeah.  Again, probability means that they probably will.  Possibility is more ambiguous.  It's, the possibility is -- could be various, whereas probable means more than likely.  At least, that's the way I see it.

Q    More than likely.

A    Yeah.

Q    It doesn't mean they absolutely will, does it?

A    No.

Q    It doesn't mean beyond a doubt they are going to, does it?

A    True.

Q    It means that more likely than not --

A    Yeah.

Q    Okay.  -- the defendant will commit criminal acts

of violence.

You notice, Mr. Green, they didn't define for you what criminal acts of violence are here. Okay?

A    True.

Q    What they didn't say is that the defendant would commit another murder.

A    Uh-huh.

Q    They didn't say that the defendant would commit a rape, that the defendant would commit a verbal threat of violence to somebody else.

A    Uh-huh.

Q    That the defendant would commit an assault of somebody.

A    Uh-huh.

Q    You notice they didn't say what criminal acts of violence are.

A    Sure.

Q    Okay. Just criminal acts of violence. What do you think is a criminal act of violence?

A    Any act of violence that breaks the law.

Q    Okay. If I balled my fist up and I smack my co-counsel right in the face, what do you think?

A    That's assault, so that would be a criminal act.

Q    Okay. You think that would be a criminal act of violence?

A    Yeah.

Q    If I, if I made a threat to her -- one of her family members, do you think that could be a criminal act of violence?

A    I don't know what the law is called for that, but --

Q    Yeah, yeah.  If I -- Well, let's see, if I, if I wrote a letter or made a phone call and I said, I'm going to get Mr. Green.  He's going to get what's coming to him.  I'm gonna get him.

A    I think there is some --

Q    What do you --

A    That is a, that is a -- there is this, I don't know what it's called.

Q    Do you think I'm threatening some kind of violence against you and your family?

A    Yeah, yeah.

Q    Okay.

A    The question is, is it criminal?  That's what I don't know.  I don't have anything to assess to it.

Q    Yeah.  Would you call the police?

A    Sure.

Q    And I think I would, too.  I think I would, too.

You'll notice that -- you know, you talked about parameters.

A    True.

Q    What it doesn't say is that the defendant will probably commit another murder.

A    True.

Q    Now, I notice in your questionnaire that you say that a lot, to prevent the person from committing another murder.  To keep them from committing another murder.

Are you looking for murder here, Mr. Green?

A    Not, not there I'm not.

Q    Okay.  And I mean personally, would you, would you insist that I show you the person will probably commit another murder in order to show that he's a future danger?

A    No.  I mean, the parameter says criminal acts of violence.

Q    Right.  So, the parameter is not that he will probably commit another murder, is it?

A    True.

Q    Okay.  That would constitute a continuing threat to society.

What do you think of when you hear society?

A    Just people at large.

Q    That's right.  I think of --

A    People around me.

Q    I think of eating out, I think of maybe going to the movies, I think of mowing my lawn, talking to my

neighbors.

A    Uh-huh.

Q    A defendant found guilty of capital murder will spend where the rest of their life?

A    Capital murder?  In prison.

Q    Prison.

A    Uh-huh.

Q    Do you think that a prison could constitute a society?

A    Yeah.

Q    Okay.  There's people in there besides the inmates, aren't there?

A    Sure.

Q    They live, eat, work, play, watch TV there, don't they, like a society?

A    True.

Q    But there's also guards, there's teachers, there's clergy that come in, there's wardens.  There's all kinds of people there, aren't there?

A    True.

Q    And there's people there serving capital murder, there may be people that are just a mean motor scooter, and there might be people there serving time for a property crime that would never hurt a person in their life, right?

So, there's a whole group of people there,

right?

A    (Nods head).

Q    So, can you see that it's asking me to show you that it's more likely than not a defendant will commit criminal acts of violence that would constitute a continuing threat to the prison society?  Does that make sense to you?

A    Sure.

Q    Okay.  If I prove that to you beyond a reasonable doubt, you answer yes to that question.

What's the kind of things that you would need to see here in order to make that -- in order to answer that question?

A    If you proved it beyond a reasonable doubt?

Q    Yeah.  What would help you decide whether or not somebody was going to be a future danger?

A    I guess the facts in the case, the history of the individual, the recent history of the individual, those things.

Q    Do you think it's possible that -- And I will tell you this.  You may answer yes or no to this question based strictly on what you just found the person guilty of.

A    Uh-huh.

Q    You can look at the crime itself that that person was just found guilty of and say, you know what, looking at that crime, that intentional murder during the course of a

robbery where it wasn't any mistake --

A    Uh-huh.

Q    -- you know, it wasn't self-defense, I think that's bad enough that anybody who could do that is absolutely going to be a future danger.  You can do that.

Okay.  Do you think that's possible to do that?

A    Just based upon, you mean having already proven --

Q    Yes.

A    -- beyond a reasonable doubt?  Well, sure.

Q    Do you think it's possible to answer that question yes or no based on just looking at what the person did that you just found him guilty of?

A    Not just -- Oh, that I just found him guilty of?

Q    Yeah, yeah.

A    Yes.

Q    Okay.

A    If I have done everything beyond a reasonable doubt --

Q    Okay.

A    -- then I could assess that more than likely the defendant would do it again.

Q    Okay.  And keeping in mind that you've found a person guilty of an intentional murder, okay?

A    Uh-huh.

Q    Not, well, there might be something that lessens

his culpability.  No, it's a first degree murder.

A    Uh-huh.

Q    Okay.  I wanted to kill that person, I meant to kill that person, I killed that person and I am glad about it.  And while I killed that person, I was also robbing that person.

A    Uh-huh.

Q    Okay.  Having looked at that, what do you think the answer to that question should be?

A    It's gonna be guilty.

Q    Well, it's actually yes or no.  Having --

A    Yes.

Q    Okay.  Do you think the answer to that question would be yes?

A    Yeah.

Q    Do you think there is ever any room for that question to be no?

A    No, not for me.

Q    Okay.  If I don't prove that to you beyond a reasonable doubt, Mr. Green, then he goes home.  He doesn't go home, but not -- you answer that question no.

A    Uh-huh.

Q    And the person spends the rest of their life in prison, okay?

A    Okay.

Q    If you answer that question yes --

A    Uh-huh.

Q    -- you know, then you move on to the second question. That has to do with that parties thing that we talked about where the law is asking you to decide, is this person the person who actually killed the person themselves?

A    Uh-huh.

Q    Or is this somebody who was a party to it? They participated in it.

A    Uh-huh.

Q    And it's not just that they should have anticipated now.

A    Uh-huh.

Q    It's that they knew it was going to happen.

A    Okay.

Q    They anticipated, they knew someone was going to die, okay?

A    Okay.

Q    So, it's either the triggerman himself or it's the guy who worked with him who knew somebody was going to die.

A    Uh-huh.

Q    So, you answer that question. If you don't think he's the actual gunman, if you don't think he knew somebody was going to die and he didn't actively participate in it, then obviously you would answer that question no.

A   Uh-huh.

Q   Keeping in mind that you've already felt that person was a future danger.

A   Sure.

Q   If you say no, then we stop there and it's life in prison, okay?

A   Uh-huh.

Q   If you say yes, then that person is sitting on a death penalty now.

A   Okay.

Q   Okay.  Then there is one last question that you have to ask yourself.  And it's interesting because, in that question, there is no burden of proof.  I don't have to prove anything to you in that question.  The defense doesn't have to prove anything to you in that question.  Okay.  It's just a -- It's a question I think we refer to as a safety net question.

A   Uh-huh.

Q   You found that person killed somebody and meant to do it.  You found that they did it during a robbery.  You found that they are a future danger, that they are more likely than not going to commit criminal acts of violence in their society.  You found they were the triggerman or the active party.

That third question says, all right, all that,

Anne B. Meredith
Certified Shorthand Reporter

even though all of that, look at everything again.  And do you think that there is something in this case that tells you that it mitigates -- and you know what mitigate means, don't you?

A    Uh-huh.

Q    Lessens --

A    Sure.

Q    -- maybe your moral culpability or lessens something about what you've done.  Do you feel that there is something mitigating about that person or that crime that would make you take that death sentence and flip it into a life sentence?

Do you think that's something that you can do?

A    To be honest with you, if I got through one and two, I don't know where I would -- I don't have -- you haven't --

You know what I'm saying?  You have a number three that has no boundaries, but boundaries have been set on the other two.  So, to be honest with you, it would be a -- it would be a nonfactor to me.  I wouldn't have a conversation with it.

Q    Okay.

A    And I probably should.  I mean, I don't know.  I'm just saying --

Q    Yeah.

A    -- based upon the parameters, I don't see the necessity of three.

Q    Okay.  Okay.

A    But I could be wrong.  That's just the way I feel.

Q    Okay.  You get up to two and you answer yes and you're like, game over.

A    Basically.

Q    There is really basically nothing that's going to change my mind.

A    Basically.  I mean, I don't have any other parameters.  I mean, I'm already locked in based upon the decisions I've already made.

Q    All right.  And I will try to explain this a little bit more to you because it's such a wordy, a wordy question.

But basically, yeah, there's no parameters there.  It says you look at everything all over again.  You look at the crime, you look at the person, you look at the victim, you look at the defendant, you know.  And looking at all of that, is there something about this guy or this offense that's mitigating, that lessens his culpablility?

It could be age, it could be where he grew up, it could be, you know, how he was raised or something.

A    Uh-huh.

Q    And there's a lot of things, I think, that can mitigate.  You know, I had a lousy childhood.  I was raised, you know, by terrible parents.  I was on dope at the time or something.  That may mitigate, but that's not enough.  It

has to be substantially mitigating.

MR. PARKS:  Judge, we are going to object to that.  There is nowhere in the law that says that it has to be substantial mitigation.  The word is sufficient.

MS. HANDLEY:  I'm sorry.  I beg your pardon, counsel.  I'll rephrase.

MR. PARKS:  Thank you.

Q    Sufficiently mitigating.  I'm sorry, maybe I'm not just quite awake yet.  Not only does it have to be mitigating, but it has to be sufficiently mitigating.

A    Okay.

Q    So, we all have our crosses to bear.

A    Okay.  So, you do have parameters, then.

Q    Well, if you want to call them parameters, yeah.  Is there something mitigating about this person, but not only is it mitigating, is it sufficiently mitigating?

A    Okay.

Q    You know, was this person raised in a closet, fed dog food, had cigarettes put out on them?  You could think it's mitigating that a person is, I don't know, wears a green hat every day to court.  I mean, whatever you think is mitigating is mitigating.  The question becomes, is it sufficiently mitagating?

A    Okay.

Q    Okay.  Is that something that you think you can do?

A     It changes how I look at it because now --

Q     Got you.

A     -- I'm made to reassess what I just saw in light of a sufficient mitigating circumstance.

Q     Okay.

A     So, in that case, yeah, I could go back and review and say, well, based upon --

Q     Got you.  Got it.  Now, what do you think is mitigating?

A     I would think having mental lapses is a possible, you know, if somewhere in the middle of all of it, this person's -- like you were saying, born in a basement and this was all that they ever saw, killing of animals or killing of individuals and this was part of their -- then maybe, you know, if it was a possibility that rehabilitation could help, that tells me that, you know, give that person that opportunity to be raised in a society, even if it's prison, where they wouldn't hurt anybody.

Q     How do you -- You said a possibility of rehabilitation.  How would you --

Don't you think that there is always a possibility anybody could be rehabilitated, right?

A     Yeah, there is a possibility.  But, again, I'm talking in light of the society that they are going in.  We are saying -- We are talking to the death penalty and life.

**Anne B. Meredith**
Certified Shorthand Reporter

Then my thing is, okay, can this person function in even a prison society without hurting anybody?

Q    Right.

A    So if you're saying, okay, you know, here's some issues where violence was huge, but you're going to have violence in prison, so I really don't know how that's going to become very mitigating, so.

Q    Yeah.  Okay.  Okay.  Let's see here.  I've run out of time.

MS. HANDLEY:  I think I've spent about 45 minutes, Judge; is that correct?

THE COURT:  Yes.

Q    Let me ask you one more question.

THE COURT:  I've got maybe a little more than that, but I'll give you a little more time.

MS. HANDLEY:  Thank you, sir, very much.

Q    (By Ms. Handley)  Let me ask you one question just to cover something.  Because you put here on page -- let's go to page, page eight, on the last question there.

A    Uh-huh.

Q    Okay.  You left that blank, right?  Have you, your spouse, any family members or close personal friends ever been accused, arrested or convicted (including probation, deferred adjudication, conditional discharge, fine, etc.) of a crime above the level of a traffic ticket?  And you put no.

A    No, that's not right.

Q    Okay.  Why is that not right?

A    My daughter -- my stepdaughter was actually convicted of a crime.

Q    Okay.  What was she --

A    She was discharged in the military.

Q    Okay.  Anything else?

A    I mean, I have had relatives that have had crimes.

Q    Okay.

A    Yeah.  I mean, yeah, that's wrong.

Q    Okay.  Let me ask you this.  Is your middle name Lynn?

A    It is.

Q    Michael Lynn Green, and were you born April 17th of 1973?

A    I was.

Q    Did you used to live at 6460 Palm Island?

A    I did.

Q    Okay.  I'm looking at some information, Mr. Green, that says that you were tried for the offense of hindering apprehension.

A    Sure.

Q    And that you were later put on probation for that.

A    Uh-huh.

Q    And you had a trial before the Court.  Okay.  But

you didn't put that down.

    A    To be honest with you because I don't know why I didn't think of it.  I was seventeen when it happened and I didn't look at it as a big conviction.  I didn't go to jail for any period of time.

    Q    Okay.

    A    And that individual, really I wasn't doing what they said, so.

    Q    Okay.

    A    My thing was that the thing was over but, sure, if it needed to be added, then add it.

    Q    I have that -- my math might be wrong.  I had that you were probably nineteen or twenty.  You were born in '73 and it happened in I think '93 so maybe you were around nineteen or twenty?

    A    It couldn't have happened in '93, there is no way.

    Q    Or '92, I'm sorry, '92.  I beg your pardon, '92.

    A    It couldn't have even --

    Q    I've got June 27th of 1992.

    A    I don't think the dates are right.  And the reason I'm saying that is because I got married, I got married when I was twenty.

    Q    Okay.

    A    Which it would have been '93 the next year.

    Q    Okay.  Well, it says that you went to court on

August 13th of 1993.

A    I was -- I would not have been put on any probation then. I was married and had children. That date is wrong.

Q    Okay. Well, this says that you received ninety days and it was probated for 24 months. About when do you think that was?

A    It would have had to have been '89, '90.

Q    Okay. But you don't take issue with that. That is you, then.

A    Yeah, yeah, yeah.

Q    Okay.

A    Yeah, it happened. I mean I remember the event, yeah.

Q    Okay. And you didn't put it on here because you just felt like you're not that person any more?

A    Honestly, no, I didn't put it on there because, frankly, I didn't think about it because it was never a big --

Q    It wasn't a big deal to you?

A    It wasn't a big deal and it was something that --

Q    Okay.

A    You know, I just, I didn't think about it, so.

Q    Okay. I got you.

A    It should have been put on here.

Q    I got you. All right. Thank you so much, Mr. Green, for answering my questions. This helps me. I

appreciate it, sir.

THE COURT: Thank you, Ms. Handley.

MR. PARKS: Could we take five?

THE COURT: You want to take a five minute break here?

Okay. Mr. Green, we're going to take a five minute break. So you can leave, go to the bathroom. My bailiffs will show you where they are.

PROSPECTIVE JUROR GREEN: Okay.

THE COURT: And we'll be back here in just about five minutes.

(After a recess, Defendant present,

Prospective Juror Green not present).

THE COURT: Okay. Let the record reflect that this hearing is being held outside of the presence of the prospective juror.

And Ms. Handley, did you have a challenge for cause or an agreement?

MS. HANDLEY: I do, your Honor.

We would, we would challenge the juror, one, for stating that he would automatically answer special issue number one if we proved our case to him beyond a reasonable doubt that the defendant was guilty of capital murder.

We would also challenge him in that, with respect to the media question, he seems to have watched quite

a bit on it and he was equivocating in his answer of whether or not he would consider that and he did ultimately state, "I don't know if I will or won't consider what was on the TV".

And, finally, Judge, we would also challenge him for withholding information. He was asked several times whether or not he had any dealings with the criminal justice system. And only until he was challenged with a specific charge that he was placed on probation for did he offer that up.

THE COURT: Okay. Mr. Parks.

MR. PARKS: We have no response, your Honor.

THE COURT: All right. Then the State's challenge for cause will be granted and Mr. Green will be excused from further jury service in this case.

And if you would just inform Mr. Green for me or do you want -- How does Webb do it?

MR. LOLLAR: He just calls them in and says they won't be needed, thank you.

THE COURT: Okay. Go ahead and bring him back in.

(Prospective Juror Green returns to the courtroom).

THE COURT: Yeah, Mr. Green, come on back in here for just a moment, if you would. Have a seat right there.

Thank you, ladies and gentlemen.  Be seated, please.

Mr. Green, I just wanted to inform you that we appreciate very much your time and effort to be with us this morning.  And your jury service, your services in this particular case aren't going to be needed.

But I wanted to thank you on behalf of myself and on behalf of Judge Snipes --

PROSPECTIVE JUROR GREEN:  Surely, thank you.

THE COURT:  -- for being here today, as well as the attorneys that are involved.

MS. HANDLEY:  It was a pleasure talking to you, Mr. Green.

THE COURT:  Thank you, Mr. Green.  We appreciate it very much.  Thank you for your answers.

PROSPECTIVE JUROR GREEN:  Okay.

(Prospective Juror Green excused from the courtroom).

THE COURT:  Are we ready for Mr. Folz?

MS. HANDLEY:  I am.

THE COURT:  Go ahead and bring him in.

(Prospective Juror No. 227, Alex James Folz, enters the courtroom).

THE COURT:  Mr. Folz, just come around me to that chair there.  You need some help?  Just pull it out and

have a seat.  Thank you, sir.  Go ahead and have a seat there.

Thank you, ladies and gentlemen.  Be seated, please.

And I would like for the record to reflect this is Prospective Juror Number 227, Alex James Folz, f-o-l-z.

ALEX JAMES FOLZ,

having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Is that correct, Mr. Folz?

A    Yes, sir.

Q    Am I saying that correctly?

A    Yes, Folz.

Q    Okay, good.  Well, I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney, Texas.  And Judge Snipes has asked me to assist him in the jury selection process, so that kind of explains to you what I'm doing here today --

A    Sure.

Q    -- presiding over this instead of Judge Snipes.  But also it explains why you're here today.  This is your individual voir dire.  And I know that you're aware of the fact that this is a capital murder case.

A    Yes, sir.

Q    And you will recall, it's probably been a month

ago or so since Judge Snipes -- since the big panel met.

A    Yes.

Q    And Judge Snipes addressed the panel, went through some qualifications, exemptions, things like that. And then at some point in the proceedings he asked everybody on the panel to stand up, raise your right hand, and he administered the oath of a prospective juror. Do you recall that?

A    Yes, I do.

Q    Were you one of the panel members that stood and took the oath at that time?

A    Yes, I did.

Q    All right. Then I will just remind you that you're still under that oath. And what you've been sworn to do are basically two things, to give truthful answers, which we know you would do that anyway, but also to respond to each and every question that's asked of you either by myself, but more likely it will be with the attorneys that are involved in the question and answer session.

A    Okay.

Q    Now, you read your little pamphlet there.

A    Yes, sir.

Q    And that kind of gives you an idea about some of the law and procedural aspects that are going to be involved in the trial of this case. And what these lawyers are going to ask you is questions about that, and they are going to

explain the law to you, and then they are going to want your ideas, your thoughts, your opinions concerning the law. Okay?

So, there's no right or wrong answers to any of these questions, nothing that's going to embarrass you. Only truthful answers, just how you feel about it, that's what they are trying to find out. Okay?

A    Sure.

Q    Now, at that time that you all met you probably recall filling out a questionnaire and there is a copy of your questionnaire, so I'm going to give that to you because the attorneys each have a copy and they will probably be referring to some of the questions and some of your responses to those questions to get you to elaborate on them or ask you questions about why you answered that way and that sort of thing. All right?

A    (Nods head).

Q    So, you feel free to use that. I know you don't remember what you put in there to start with. That's been a month ago, like I said, so I doubt if you remember how you answered most of those questions.

A    It was a pretty thorough questionnaire.

Q    Yes, it was. Yes, it was.

THE COURT: Well, let me introduce to you now the attorneys that are going to be involved in this voir dire examination. Starting right directly across from you is Ms.

Andrea Handley.

MS. HANDLEY: Good morning.

THE COURT: And she will be talking to you this morning. Seated next to her is Elaine Evans.

MS. EVANS: Good morning.

THE COURT: And they are both assistant district attorneys and charged, along with three other members of the prosecution team, with prosecuting this case.

Who is not present here but also a part of the prosecution team is David Alex and Gordon Hikel and Zandra Robinson. And some of them may walk in and out as we proceed this morning. So, I just wanted you to know that there are other lawyers that are involved in it.

And then seated on down is Mr. Brad Lollar.

MR. LOLLAR: Good morning.

PROSPECTIVE JUROR FOLZ: Good morning.

THE COURT: He's the lead counsel for the defense team.

And then seated next to him is Mr. Doug Parks.

MR. PARKS: Hi.

PROSPECTIVE JUROR FOLZ: Good morning.

THE COURT: And then on the very end down there is Ms. Keri Mallon.

PROSPECTIVE JUROR FOLZ: Good morning.

MS. MALLON: Good morning.

THE COURT: And they are all members of the defense team.

And then seated on the very end in the blue shirt down there is the Defendant, James Broadnax.

PROSPECTIVE JUROR FOLZ: Good morning.

THE COURT: All right. I believe that, Ms. Handley, we are ready for your voir dire.

MS. HANDLEY: Thank you, your Honor. Appreciate it.

EXAMINATION

BY MS. HANDLEY:

Q    Good morning again. How you doing?

A    Good, good.

Q    How do you feel being here?

A    It's a little bit --

Q    It's a little intim -- You mean you've never sat in a room before with half a dozen lawyers or more and men with guns?

A    Half a dozen attorneys, yes, actually.

THE COURT: That would make a person nervous.

A    Which is why I'm kind of a little bit, I guess.

Q    Yeah, without at least a drink in our hand.

We will try to make this as easy for you as possible.

A    Sure.

Q    You know, this questionnaire is very though.  I always kind of laugh to myself that it -- I guess it's maybe a feeling like the questions you get on E-Harmony or something. You know, they want to know everything about you except for what you weigh and the color of your eyes.

But this is why we do this, Mr. Folz.  Am I saying that correctly, Folz?

A    Yes.

Q    Is that what we are looking for is ultimately to get twelve qualified jurors.  We are looking to get a pool of qualified people from which we will ultimately determine who will sit on this jury.

Okay.  Some people are not qualified jurors because they can't follow the law or because they have maybe biases or prejudices that they would bring into their verdicts or the deliberation, or maybe they have already reached conclusions, you know, or maybe they have already snapped to judgment on what should or shouldn't happen in this case or any case.  Those people aren't qualified necessarily.

We've -- I could speak for myself.  I've read over your questionnaire and technically I think that you possibly, quite possibly are a qualified juror.  It doesn't necessarily mean you'll sit on this case.

A    Okay.

Q    But I need to test your qualifications.  I want to talk to you a little bit about what the law is, how it applies in a case like this, and kind of feel you out about how you feel on certain things.

A    Okay.

Q    I represent the State of Texas.  Okay.  And they represent the defendant in this case.  And I think it's fair to say that our opinions are probably worlds apart.  Okay.  What I think at this point, what they think at this point, that and a buck fifty will get you a cup of coffee at the snack shop, right?

It doesn't matter what I think.  What matters right now is what Mr. Folz thinks, okay?

A    Okay.

Q    I've heard it said that a qualified juror is the juror that will wait to hear the evidence, will base their verdict on the evidence in the case and not jump to any conclusions.  Does that sound fair to you?

A    Yes, it does.

Q    Now, you've actually sat on jury duty before, haven't you?

A    Yes, I have, yes.

Q    You sat on a DWI case.

A    I believe it was a DUI, DWI; I'm not sure which.

Q    Okay.  And I am thinking it was maybe a misdemeanor

case.  It was you and five other jurors?

A    Yes.

Q    So, it was a misdemeanor case and you found -- It looks like you did not assess punishment.  You found the person not guilty.

A    That's correct.

Q    So, I am assuming that you believed that the State failed to prove their case beyond a reasonable doubt.

A    That's correct.

Q    Okay.  Then if that is how you felt, you did the absolute perfect thing.  That is what makes the system run.  That is a fundamental proposition of law, and I appreciate you returning that verdict.  If we fail to prove our case, that's what you're supposed to do.

Whether it be a DWI case or it be a capital murder case, the fundamental propositions of law that played in that case that you sat on are the same ones that apply in a capital murder case.

As you recall, then, from your jury service before that it was the State who was required to prove the case.  We have the burden of proof.  We carry that burden throughout the entire trial.  You never look to the defense to prove anything.  Seems fair to you?

A    Yes.

Q    You would insist on that?

A    Yes, I would.

Q    Okay.  If I fail to prove my case to you beyond a reasonable doubt, your verdict would be not guilty of that particular charge.

A    That's correct, yes.

Q    Beyond a reasonable doubt has no definition, so to speak.  Maybe it did at the time, but it doesn't necessarily now.  Reasonable doubt is whatever you think it is, Mr. Folz.

I've heard some people say reasonable doubt is doubt based on reason and common sense.  It's not beyond all doubt.  It's not beyond a hundred percent convinced.  It's beyond a reasonable doubt, and that sounds like that's something you could grasp, then?

A    Yes.

Q    You wouldn't require me to prove my case beyond all doubt whatsoever, would you?

A    No.

Q    Do you see that there is actually room for doubt?

A    Yes.

Q    Okay.  As long as it's not reasonable doubt.

A    As long as it's not --

Q    Yeah, there is room for doubt, but if you have a reasonable doubt --

A    Right, right, yes.

Q    -- not guilty.

A    Yes, that's --

Q    Okay. In doing that, also you understand that I have to prove to you each and every element of the offense, you know, the date, the person, that it happened in Dallas County, you know, a particular victim, a particular offense. I have to prove each and every element to you.

If I fail to prove any one of those elements beyond a reasonable doubt or if I fail to prove any of those elements, what happens?

A    Not guilty.

Q    Not guilty. I'll give you a far-out example. Let's say that I have alleged in the indictment that the defendant intentionally killed the person by shooting him with a gun. Well, during the course of the trial the medical examiner comes to the stand and says, he's dead but he didn't die from a gunshot, he died from a knife wound.

Have I failed to prove to you that he died as a result of being shot with a gun?

A    Yes.

Q    Have I failed to carry my burden?

A    Yes, you have.

Q    That's a far-out example, but what would be your verdict?

A    Not guilty.

Q    Not guilty. It wouldn't be your fault, would it?

A    No.

Q    It would be my fault.

A    That's correct.

Q    Okay.  And hopefully you would go upstairs and tell my boss that I need to look at my cases a little bit better.

Okay.  Another thing that always applies in these cases is a little bit of what we talked about before, that the answer to the question of whether or not a person is guilty and the ultimate answer to what should happen to them in punishment is always based entirely on the evidence in the case.

You receive the evidence in the case from the witness stand.  It could be people testifying, it could be documents, it could be videos, it could be forensic evidence, but everything comes to you from the witness stand.

In other words, you can't go back into the jury room, have all the evidence in front of you and go, all right, everybody, let me tell you what I saw on the Internet. Because you haven't received that from the witness stand,  have you?

A    That's right.

Q    Now, that's not to say that people don't watch the TV, read the newspaper, get on the Internet.  You know, we are a technology society.  It's coming at us from all angles. Just because you may have seen something or heard something

on the TV or newspaper doesn't mean you're not qualified.

You're not qualified if what you've seen, heard and read about you bring into the jury room and factor it into your deliberations. Does that make sense to you?

A    Yes, yes.

Q    I see in your questionnaire that you probably -- I think you heard something about this case. I think it's on page three. You said, I heard about the case on TV and the Dallas Morning News. I did not remember when the event occurred until -- what is that?

A    I'm sorry. I did not remember when this event occurred until seeing it above.

Q    Seeing it above. Okay. Or any of the names of the victims.

And there may have been more media coverage of this since then. Have you heard anything additionally?

A    No, I have not.

Q    Okay. Based on -- The law states that, like I said, people have heard things, but you can't use that to form your verdict of guilty or innocent of the case. Does that make sense to you?

A    Yes, it does.

Q    Have you already formed an opinion as to the guilt or innocence of the defendant in this case?

A    No, I have not.

Q    Okay.  You'll wait until you hear the evidence and base your verdict on that?

A    Yes, I will.

Q    Okay.  Another proposition of law that comes into play on these cases is the jury, one of their main primary duties is to assess the credibility of the evidence in the case.  You know, just because everybody takes the stand, raises their right hand and swears to tell the truth, do you think they do?

A    No.

Q    Yeah, sadly they don't.  If they did, things would be a whole lot easier, I'm going to tell you right now.

Sometimes it's not necessarily that they take the stand, swear to tell the truth and out and out lie; sometimes they are just mistaken.  You see, that happens too.

A    (Nods head).

Q    The point being in the law is that for you, as a juror, you have to assess that person's credibility.  When they hit the stand, you're going to listen to them, you're going to watch them, you're going to evaluate what they say.

And then you're going to decide if you believe all, none or some of what they have to say.  Are they lying to me, are they telling me the truth, are they mistaken?  But you do that after they take the witness stand.  Does that make sense to you?

A     Yes, it does.

Q     I bring that up, Mr. Folz, because you had put on here -- We had a question about whether or not how you believed about a certain category of witnesses and those in particular being police officers.

A     Yes.

Q     It was on page seven.  Do you believe police officers are more likely to tell the truth than the average person?  You said, yes, they are subject to intense back-ground checks, rigorous training before becoming police officers.

I'm going to tell you I believe that's true. But here's the situation with respect to you, to anybody sitting on a jury.  It's okay to have a more or less skepticism for a particular group of people.  That's fine, we do that every day.

A     Correct.

Q     Everybody has their leanings or their biases or their prejudices.  But what you cannot do as a qualified juror is say, I will automatically believe a police officer every time.

A     Right.

Q     Or if a police officer takes the stand, I'm going to tell you right now I'm automatically going to believe what they say.

Are you automatically going to believe, as we sit here right now, what a police officer tells you?

A    No.

Q    You would assess their credibility.

A    Yes, I would.

Q    From the witness stand.

A    Yes, I would.

Q    From what they say, in relation to the other evidence, you would wait, in other words, to --

A    Yes.  I did that on the prior case, too.

Q    Absolutely, because I'm sure it was a police officer that testified.

A    Yes, it was.

Q    Exactly.  And police officers, their standard is probable cause.  Do they have a reasonable belief or probable cause to think that somebody's committed a crime?

A juror's standard is --

A    Beyond a reasonable doubt.

Q    -- beyond a reasonable doubt.

And then they make their arrest and they do it on probable cause and that's what we ask them to do.  But a jury decides is it beyond a reasonable doubt.  And in that case, it wasn't.  It wasn't beyond a reasonable doubt.

A    That's correct.

Q    It might have been PC, but it wasn't that.

Okay. It sounds like you've got a good appreciation for that.

And finally, Mr. Folz, as we sit here today, as any defendant sits here in a trial today, this defendant in particular, the law states that you must presume him innocent. The reason being because I haven't proved a thing to you, have I?

A     That's right.

Q     He's been indicted. That doesn't mean anything. The law states that that's absolutely no evidence of his guilt. You consider it only worth the paper that it's written on. It's just a piece of paper.

He is presumed innocent if and until I prove to you beyond a reasonable doubt he's guilty. Can you give him that presumption of innocence as we sit here now?

A     Yes, I can.

Q     Will you demand, insist that I prove it to you --

A     Yes, I will.

Q     -- beyond a reasonable doubt before that burden changes?

A     Yes, I will.

Q     That burden stays with me, right?

A     Correct.

Q     And you've heard of the fifth amendment right not to testify.

A    Yes, I have.

Q    Okay.  That's -- Basically what the fifth is talking about is that I can't force a defendant to take the stand, nobody can.  That's a decision for a defendant to make.

The reason to testify or not to testify, there is probably a hundred thousand different reasons, you know.  And you can sit here all day long and say, I would like to hear what the defendant has to say.  I think we all would.

But the law says -- It's okay if you feel that way.  The law says you can't hold that against somebody if they don't testify.

In other words, let's say I present my entire case to you.  You go back to the jury room.  You say, you know what, I think the State is about that close to proving to me beyond a reasonable doubt, just a hair close, they are just missing it by a fraction.  But because he didn't testify, I'm going to hold that against him and find him guilty.  That you can't do.  Does that make sense to you?

A    Yes, it does.

Q    Okay.  I may prove my case to you beyond a reasonable doubt.  You may go back there and say, I think he's guilty.  Had he testified, it might have changed my mind, but he didn't, so I'm still going to find him guilty.

But you're not holding it against him

necessarily. You will not hold that against a defendant.

A    Correct.

Q    And you will presume him innocent.

A    Yes, I will.

Q    Okay. Let's talk a little bit about murder and capital murder. We asked you what you think, cases you think the death penalty should be an available option. You said premeditated murder, murder on the commission of a public servant in their duty, or on the commission of another felony. I think you're pretty close right there, Mr. Folz.

In Texas, capital murder, because in capital murder the death penalty is an available option, it's not an automatic option, it's actually a very narrowly defined category of cases.

But there is one thing it is always, it is an intentional murder. Okay. It's not an accident, it's not a murder in self-defense, it's not a reckless murder, it's not a I just meant to hurt him and oh, my gosh, he died. It is an intentional I meant to kill him and he is dead.

Okay. None of those other justifications apply in the case. It is an intentional murder. That's a first degree murder in Texas. That is a murder to which somebody could get feasibly anywhere from five years in prison up to ninety-nine years or life in prison.

Capital murder is a little bit more. It's

beyond that. It's intentional murder plus something. It's murder plus an aggravating factor. For example, murder of a child under six years of age, or murder of a peace officer in the line of duty, or murder of two or more people during the same criminal episode, or murder during the course of committing another felony offense, which is basically what you put here.

You put down premeditated murder. And we don't really have a crime called premeditated murder. You know, we are not called upon to show that somebody actually laid in wait or planned something out because your intentions could be formed just in an instant. Okay?

A    Right.

Q    And is that something you would require me to prove to you, premeditated, for example?

A    Premeditated, I take it to mean just what you said, that spur of the moment, that --

Q    Okay. Okay. Very good then. So, that would be capital murder.

If you're guilty of capital murder, only one of two things can happen to you. What are those?

A    It would be death penalty or life in prison without parole.

Q    That's right. And it is life in prison without parole. You're never coming out. You're going to die in

prison. You're absolutely right.

Part of what I have to do in my case is I have to prove to you beyond a reasonable doubt capital murder. Before we get to capital, let's talk about some other things that can happen.

Let's say, for example, I fail to prove that aggravating factor. Okay. I fail -- I prove it's an intentional murder. He meant to do it. But I fail to prove it was during the course of a felony. He's not guilty of capital murder, right?

A    That would be correct.

Q    Okay. But he may -- It doesn't necessarily mean everybody goes home and he goes home. You, as a juror, might be called upon to determine is he guilty of what we call a lesser included offense. He's not guilty of capital murder, but is he guilty of murder, you know.

Murder is an intentional, an intentional killing. There's actually different categories of murder, and the punishment range goes lower according to what your mental, you know, mind state was.

If I meant to kill you, first degree murder. Let's say I, I was reckless in how I killed you. I didn't mean to hurt you or I didn't mean to kill you. I didn't even want you to die. I just wanted to scare you, you know, and did something reckless, and in the course of that you died.

That would be a reckless -- it's called manslaughter.  That would be two to twenty years in prison of category.

There is one even lower, criminally negligent homicide, which we call a state jail felony where you can get anywhere from six months in the state jail up to two years.

I'm driving down the street, I'm not paying attention.  I'm fiddling around with my cassette tapes down here, you know, my CD discs or something.  I look up, there is somebody, I hit them.  I didn't mean to kill them.  I didn't want to kill them.  Gosh, I didn't even know they were there.  But I should have known they were there, right?

A    (Nods head).

Q    Because I'm driving a car.  That's criminally negligent homicide.

I bring you through all of that just to make the point, Mr. Folz, that just because we might not prove capital to you doesn't mean that you might not be called upon to decide did we prove something else to you.

And if we prove something else to you and you find him guilty of that, then you will be called upon to decide what punishment they get.  It's not just life or death; now it's a range of punishment, you know.

First degree murder, it's anything from as little as five years up to ninety-nine years or life.  And you've heard the expression, let the punishment fit the crime?

A    Yes.

Q    That's exactly what comes into play.  You can't say, he's guilty of murder, I'm automatically going to give him life.  Would you have based your verdict on the evidence --

A    No.

Q    -- if you haven't heard anything?

You know, there's several ways a person can commit first degree murder.  If I were to say to you a thirty-five year old man, able bodied, sense of mind to him, plans out the murder of a helpless ten year old boy, plans it out, goes out and does it, what's your immediate gut reaction to that in terms of what should happen to him?

A    Probably the maximum.

Q    It sounds bad, doesn't it?

A    Yeah.

Q    It sounds bad because we just jump to a conclusion when we hear that.  Let me change the factual scenario on you there just to illustrate.  That thirty-five year old man is actually the father of that ten year old boy.

A    Okay.

Q    That thirty-five year old man has been a good father and a good husband and a good citizen and a hard worker his entire life.  That ten year old boy is currently at Children's Medical Hospital.  He's been diagnosed with a cancer that is going to kill him, there is no question about it, it's fatal.

And if that wasn't bad enough, it's a cancer that is killing him slowly and painfully.

And that father sits at that bedside and he looks at his ten year old boy, a kid that he's played ball with and soccer with and loved and mentored, took him to Boy Scouts, and he watches his little boy writhe in excruciating pain every minute that he is alive.

And that father, out of nothing but sheer love and devotion and compassion to his little man, decides he's going to put him out of his misery. And he finds some morphine in the hospital, he goes in, gives him an overdose of morphine, holds him in his arms until he dies.

Has he committed murder?

A    Yes.

Q    He has, hasn't he? He's committed first degree murder, hasn't he?

A    Yes.

Q    Yeah. It sounds a lot different than maybe the 35 year old man who takes an AK, goes out to the playground, picks out a kid, shoots him, doesn't it?

They are both first degree murders. But can you see that the facts of each case are entirely different, aren't they?

A    Correct.

Q    And you wouldn't know what punishment to give in

that case until you heard the facts, right?

A    Correct.

Q    And that's what we are talking about, you can't make automatic assumptions.  You have to say, I can't tell you what I would do.  I've got to hear the evidence first, and then I'll base my verdict on the evidence.

Is that something that you could do?

A    Yes, I could.

Q    And if that happens where we have you look at a lesser degree of offense, will you listen to the evidence and base your verdict on what the evidence is in the case?

A    Yes, I will.

Q    Will you make any automatic assumptions?

A    No.

Q    Will you make any automatic conclusions?  Just because a person's guilty of intentional first degree murder, will you automatically give him life?

A    No.

Q    Okay.  It wouldn't be proper, and you wouldn't do it is what you are telling us.

A    No.

Q    Okay.  But let's talk about capital murder. Okay.  How do you feel in general about the death penalty, Mr. Folz?

A    In general, I would say that I support it in

certain circumstances. I wouldn't say that it's something that -- Let's say that it was not in existence. I would not necessarily be one to push for it.

Q    Okay.

A    If it is the law, I would say I would support it, could support it in certain circumstances.

Q    And do you think it's something, it's a process that you could take part in?

A    Yes, I do.

Q    Okay. Because you understand that a person who is sentenced to death, if a jury determines that they fit within those parameters and that their case is worthy of the death penalty, that's it, that's all.

A    Yes.

Q    The judge is forced to sign a warrant for their execution and they will ultimately be strapped to a gurney in Huntsville, Texas and given a legal injection. That's it, that's all. You're okay with being part of a process that would kill somebody?

A    Yes, I am.

Q    You said certain cases, and I think you articulate it there. But do you have any particular case in mind that you think it's appropriate?

A    Any particular case?

Q    Yeah.

A    I guess I'm not sure as far as what you're -- like specific cases or --

Q    Yes, if you could think of a scenario where you go, that's a person who should die.

A    Timothy McVeigh.

Q    Tim McVeigh.  Do you think it requires the murder of dozens and dozens of people to be worthy of the death penalty?

A    No, I don't.

Q    Okay.  Do you think it could be an appropriate case where only one person was killed intentionally?

A    Yes, I do.

Q    Okay.  Let's talk about capital murder, then.

Okay.  If you have found a person guilty of capital murder, intentionally causing the death of an individual and doing that in the course of committing another felony offense, you would find that person guilty, guilty of capital murder.  Okay.

The two phases of trial are entirely separate.  They are almost like two minitrials in and of themselves.  Okay.  In the first part of the trial, remember you presume him innocent until I prove to you otherwise?

A    Yes.

Q    That same presumption that held in the first part of the case, there is another presumption now going into the

second part of the case.  He's been found guilty of capital murder, Mr. Folz.  That first part you found him guilty, that's done with.

So, he's been found guilty of capital murder. What's the best he could hope for at this point?

A    Life imprisonment without parole.

Q    Life in prison without parole.  Because that's automatically going to happen, isn't it?  Automatically going to happen.  So, that's the best he can hope for.

The law states that you are to presume that that's the appropriate thing to do only if and until I prove to you beyond a reasonable doubt that it should be a death penalty.  Does that make sense to you?

A    Yes, it does.

Q    Does that seem abundantly fair to you?

A    Yes.

Q    Yeah, I'm asking you to take part in a death sentence here.  I ought to prove to you it's the right thing to do, right?

A    I agree.

Q    Okay.  So, going into that second phase you presume him -- you presume what?

A    That it's going to be -- I would say I would presume that he would get life without -- life in prison without parole.

Q    Okay.

A    Unless you prove some, some additional issues.

Q    Absolutely. Okay. Okay. Here's how it works now. What you don't do is you don't all go back to the jury room and sit there and go, okay, should we give him the death sentence or should we give him life?

You don't say to yourself, hmm, does he deserve life or death? You know, it's not that. Instead, the way you come to your verdict is, and I know you read that pamphlet before, is by answering a series of questions. And depending on how you answer the questions will depend on whether or not the person will receive life in prison without parole or a sentence of death. Okay?

We also refer to them as special issues. So, the first special issue, the first thing you will be called upon to deliberate and answer is special issue number one. It's right here. It's in your pamphlet too. We also have it written out here.

The thing about these special issues, Mr. Folz, is we didn't write them in this room. They were written by legislatures. They have been around a long time. And interestingly enough, also, they don't define certain words for you in here.

But we refer to the, often, just the first special issue as to the future dangerousness issue. And

basically what I'm having to prove to you beyond a reasonable doubt is that the defendant is going to be a future danger. Okay. That's my burden in the case.

It starts out, do you find from the evidence beyond a reasonable doubt. That ought to key you in to who's got the burden of proof?

A    The prosecutor.

Q    The State does. The State does. You never look to their side, do you?

A    Right.

Q    Okay. Have I proved to you beyond a reasonable doubt that there is a probability. What do you think a probability is?

A    A probability, I would say greater than, I'll say 50-50.

Q    Okay, 50-50. Do you think it's any greater than 50-50?

A    I would say just right now, when you're asking me this right now if there was a probability, I would say probability can mean 50, 50-50 chance.

Q    Okay. Would you ever consider it to mean more likely than not?

A    Probability, yeah, I could see that, yeah.

Q    Okay. Anything is possible, right?

A    Right, right.

Q    Anything is possible. It's possible I could win Olympic swimming gold in four years. Probably not probable, though, considering I can barely swim. But anything is possible, right?

A    Right.

Q    Okay. But probability, and I don't want to put words in your mouth, but would you agree it's greater than a possibility?

A    Yes, yes.

Q    And perhaps even more likely than not?

A    Greater than 50-50 maybe, 50-50 or greater than 50-50.

Q    50-50 or greater than 50-50. Okay.

Do you find beyond a reasonable doubt that there is a probability, more likely than not or greater than 50-50 is what you're telling me.

A    Yes.

Q    Again, I don't want to put words in your mouth.

That the defendant would commit criminal acts of violence. They don't define criminal acts of violence for you. You'll notice it doesn't say that the defendant will commit another murder.

A    Right.

Q    That the defendant will commit an assault, that the defendant will make a verbal violent threat against

another person.  It doesn't articulate what that is, does it?  It doesn't narrow it for you.  It just says criminal acts of violence.  It's for you to decide what's a criminal act of violence.

If Ms. Evans is sitting here minding her business, if I just took my fist and just popped her in the face, do you think that's a criminal act of violence?

A    Yes, ma'am.

Q    Okay, okay.  It's for you to decide whether it is or isn't.

So, if I prove to you it's more likely than not the defendant will commit criminal acts of violence that will constitute a continuing threat to society, well, he's guilty of capital murder, so where is he spending the rest of his life?

A    In prison.

Q    Okay.  When I say society, what do you think of?

A    Society?

Q    Uh-huh.

A    People like outside of prison, I mean.

Q    Yeah, I think of going to the grocery store --

A    Right.

Q    -- going to school, going to work.

A    Our daily lives.

Q    Our daily lives.  Well, a defendant guilty of

capital murder, where is he going to be every day?

A    In prison.

Q    In prison.  And do you see how perhaps that definition of society could also include a penitentiary as a society?

A    Yes, ma'am, yes.

Q    People live there, don't they?

A    Yes.

Q    People work there, don't they?

A    Yes, they do.

Q    They eat there, they go to school there, they pray there.  And there is not just defendants or prisoners there, is there?

A    Correct.

Q    There's wardens, nurses, teachers, clergy, visitors.

So, does your definition of society also, would that include then also the penitentiary?

A    Yes, it would.

Q    Okay, okay.  What I'm having to prove to you beyond a reasonable doubt, Mr. Folz, is that it's more likely than not that the defendant is going to commit criminal acts of violence that will be a threat to that society in which he lives.  Okay?

A    Okay.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    What kind of things would you have to see or hear or know in order for you to decide whether or not a defendant was a future danger?

A    One thing that I would be interested in is, is this the first time, the facts of the case, is it the first time, or has it happened before?

Q    Uh-huh.

A    Is it, for lack of a better word, is it a crime of say passion versus intentional or a premeditated act?

Q    Right, right.

A    Maybe the defendant's nature.

Q    Sure.

A    It's difficult to sit here and say right here, but --

Q    Uh-huh.

A    -- that would be something I would be interested in or I would consider.

Q    Okay. Okay. And it is difficult to say. I can't pin you down right now and say, tell me what future dangerous act, if I showed it to you, you would vote for the death penalty. I just, you know --

A    Right.

Q    I mean that would be inappropriate to pin you down to any factual set of circumstances and say, what would you do in that case, you know. But you're right, you could look and see if the person, is this a first-time only issue.

You said passion. You know, I think you can intend to kill somebody passionately, I suppose, as long as it's not a, you know, sudden passion crime which might lessen -- I don't want to get too out there with that. But you're saying you would want to look at all the surrounding circumstances and maybe even the defendant himself.

A    Yes.

Q    And you realize I have to prove this to you.

A    Yes, yes.

Q    Okay. They have no burden of proof on that.

Now, I'll tell you something, Mr. Folz, you've already found him guilty of capital murder at this point, so you found that he intended to kill somebody, right?

A    Yes.

Q    And that he did it in the course of committing another felony, a robbery. Okay, that's a given. That's done. Okay. So, we've got somebody who intended to kill somebody and they did it during a robbery.

The law says that the way you answer this question, whether you think this question is yes or whether you think this question is no, that you can just look at the circumstances of that one offense and answer that question, but it doesn't mean you have to.

Okay. You can do what you're asking, what it

sounds like you would like to see, is look outside of that, too.

A    Yes.

Q    Does that make sense to you?

A    Yes.

Q    You could feasibly look at the act and say, that's enough for me to answer the question, or you could say, I want to see a little bit more in helping me answer the question.

A    Absolutely.

Q    But before you ever answer this question here, what's the presumption?

A    That the presumption is that he would not be, that he would not be a threat to commit additional or future acts of violence.

Q    That's right.  When you go in, it's like you should put -- there should be a big word no on there before you've heard any evidence, before you can go back and deliberate. As you come into the punishment phase, the answer is no, and it stays no until you hear evidence, right?

A    That's right.

Q    Okay.  Many things can help you decide whether or not that happens.  I mean, let me ask you this, Mr. Folz. We've already talked about the fact that the person's committed an intentional murder.  Okay.  They meant to do

it.  And they committed a robbery.  Is your question -- your answer going to automatically be yes?

A    To that, no, it's not automatically going to be yes.

Q    Okay.  You haven't already -- Okay.  Your answer would not automatically be yes.

A    That's correct.

Q    It could quite feasibly be that the defendant in a particular case was one mean motor scooter.  You know, he meant to kill that person, he robbed that person.  He is a bad to the core kind of person, you know.  And after he -- and every reason to believe that he is going to continue to be a bad seed the rest of his life, has always been, you know.

He goes into a 7-Eleven, robs that clerk, takes that money, shoots him fifteen times to ensure that he's dead.  And as he's hooking it out the door, running across the street to get away, he gets hit by a Dart bus. It doesn't kill him, but it paralyzes him from the neck down.

MR. PARKS:  Judge, we are going -- Your Honor, we are going to renew our objections made in a motion in limine previously heard, and I don't mean to waive my objections.

Essentially my objection is the purpose of

this kind of voir dire is to suggest to the juror that that question was intended for people who could not physically commit another offense, and it negates the entire intent of that special issue.

THE COURT: I don't know who heard the motion in limine.

MR. PARKS: Judge Biard.

MS. HANDLEY: He said we would hear -- I think he believed we would hear it as we went along. This is the first time --

THE COURT: Okay. Well, I'll overrule the objection. You can go into it.

MS. HANDLEY: Okay.

Q    It's not just a physical --

THE COURT: This is a hypothetical.

MS. HANDLEY: Oh, yes, sir, a hypothetical to illustrate the law, your Honor.

Q    (By Ms. Handley) It's not just whether or not the person would be physically unable to commit future acts. You know, that's just one, one hypothetical.

You might very well see evidence that, as you said, it was a one-time thing, that it, that the crime was motivated by something else, you know.

You remember that scenario with the father?

A    Yes.

Q    Where he put his little boy out of misery?  That was a first degree murder, wasn't it?

A    Yes, it was.

Q    Well, him needing morphine to put his son out of his misery, see, he doesn't know where to get any morphine. But he knows the hospice nurse has morphine and he knows that's where he needs to get it.  So, he goes into the hospital, he grabs her by the wrist, kind of turns her wrist a little bit, and he says, Mary, give me some morphine.  And she hands it over.

Robbery is taking something either by causing bodily injury, which is any kind of pain, or threat of injury. So that might, in fact, be a robbery of the morphine right there, wouldn't it?

A    Yeah, it could be.

Q    It could be.  And then he goes and he commits the murder.  I know that's a way out example right there, but that might be a capital murder, huh, a robbery of the morphine?

A    It might be.

Q    Technically, yeah.

A    Technically, yeah.

Q    And that's a far-out example, Mr. Folz.  But you might look at it that that could be one way you would have to ask yourself, would that particular defendant, that particular

**Anne B. Meredith**
Certified Shorthand Reporter

father, ever be a future danger to anyone else?  And I don't know what the answer is, you know.  But you don't jump to any conclusions, do you?

A     No.

Q     Okay.  If I fail to prove to you, Mr. Folz, that future dangerousness issue here, your answer to that question is no.

A     Correct.

Q     It never changed because that presumption of no stays there because I didn't shoot you off that, right?

A     Correct.

Q     If the answer is no, we stop right there and the defendant receives life in prison without parole.  Okay?

A     Okay.

Q     If I prove to you yes, that more likely than not this person is going to be a continuing threat to society, if you answer that yes, then we move on to the next issue. Okay?

         The next special issue has something to do with what we call the law of parties.  And in Texas, Mr. Folz, the law of parties states that if you aid, assist, encourage or direct in the participation of an offense, you can be found guilty just as if you had done it yourself. Okay?

A     (Nods head).

Q    Without necessarily figuratively being the triggerman.

My brother and I get together and plan out the robbery of the 7-Eleven.  We sit at the kitchen table and draw it out on a map.  He goes and buys the gun.  I go and buy the bullets.  We go case the best place in town to do it.

We drive up there in his car.  I take the gun, load it, say I'm going in, you honk if you see somebody.  You be the lookout.  And let me tell you, Bubba, I'm not leaving any witnesses and I will be out in a minute with some cash.

I go into that store.  He acts as a lookout. I go in and take the money from the clerk, shoot the clerk five times, and I come back out and we drive off.

Have I committed capital murder?

A    Yes, you have.

Q    Okay.  Has my brother committed capital murder?

A    Yes, he has.

Q    The law states that you might find yeah, he has. Did he aid, assist, encourage or participate, direct in that?  He sure did.

A    Yes.

Q    Okay.  And you could say yes or no to that.

In order to be guilty of capital murder, and not just robbery or a murder, you would have to find that

he should have anticipated when I went into that store that somebody was going to die. That's a decision you would make based on the evidence. You could maybe look at me holding the gun or saying things to him, okay? That would be enough to find me guilty of capital murder.

If we are in the punishment phase now, you're being asked, is the defendant on trial, is he the one who actually pulled the trigger, me, or is he the party to it where he actively participated in the crime and not only should have anticipated but actually did anticipate that somebody would die?

If he would be the actual triggerman on trial or a party to it, that's the question you would answer. Do you have any questions about that?

A    No.

Q    Okay.

A    At first, when I first read that, I wasn't quite sure what the distinction was.

Q    Most people say that. When they first read it they are like what? They don't see a distinction. Do you see the distinction now?

A    Yes, yes.

Q    Should have anticipated, actually did anticipate.

A    Actually did anticipate, yes.

Q    Okay. Again, your answer should be based on what?

A      All of the evidence that's presented at trial.

Q      Just because I'm a future danger and just because I should have anticipated, does that necessarily mean this answer is yes also?

A      No.

Q      Okay.  It's based on the evidence in the case, isn't it?

A      (Nods head).

Q      It's like you look at each issue independently and answer each issue independently.

If you say no, I don't think she actually caused the death, I don't think she anticipated the death, if you say no to that, that's it's, a life sentence.  Does that make sense to you?

A      Yes, it does.

Q      Okay.  If you answer yes to that question, then the defendant is sitting squarely on the death sentence now, okay?

A      Okay.

Q      You've answered each question independently. You've made no assumptions about what each one should be until you hear the evidence.

A      No.

Q      But having considered each special issue, and if you say yes to each one of these, the first and second one,

*Anne B. Meredith*
Certified Shorthand Reporter

you're looking at a death sentence.

There is one more question that you have to ask or be called upon to consider, you and the other jurors in the case, and that's that third question which is a very long run-on sentence there. We often refer to it as the mitigating circumstances question, okay?

A    (Nods head).

Q    And remember the burden of proof I talked to you about?

A    Yes.

Q    That I always have the burden of proof? There is no burden of proof on that last issue. I don't have to prove anything to you. I don't have to disprove anything to you. They don't have to prove anything to you. They don't have to disprove anything to you. Figuratively speaking, well, there is no burden of proof. Okay?

We also call it kind of a safety net issue. The lawmakers recognize, Mr. Folz, that you're being asked -- you're being called upon to, to render a judgment in the most serious of offenses in Texas. And I think you have a good appreciation for that.

A    Yes, yes.

Q    And that no one, no juror should have to be able to go into a trial, listen to all the evidence and go, yeah, he's guilty of capital murder, he's going to be a future danger,

and he was a party or the actual shooter to the offense.

There might be something, though, as you sit down there and look at all the evidence where you go, but you know what, it just doesn't seem like the right thing to do in this case. There is just something about this case, there is something about this defendant that tells me that, even though all that, he is a capital murderer, he's dangerous, he knew what he was doing, there is something about this case, though, I'm going to turn it back into a life sentence.

Does that make sense to you?

A    Yes, it does.

Q    And what you're called upon to do is, once again, you judge this independently, don't you?

A    Yes.

Q    Will you automatically assume -- do you think that there is nothing that could ever get you off of a death sentence?

A    No.

Q    And as a matter of fact, I think you've even articulated a couple of times, well, there's some circumstances or there's some -- that's what we are talking about here absolutely. Circumstance or circumstances is what we are talking about here.

You know what mitigating means, it means lessens.

A    Yes.

Q    You know, it could lessen their moral culpability. It could be just that's how you feel.  It's a moral decision on your part.

The question is not necessarily, is there just  a mitigating circumstance, because anything could be mitigating.  You know, a person's age could be mitigating, how they grew up could be mitigating.  Gosh, the color of their hair could be mitigating if you thought it was mitigating.  Okay?  There could be a million mitigating circumstances.  The question becomes, is it sufficient enough to turn that sentence into a life sentence?

I can't pin you down to what you will or will not do in this case.  But to be a qualified juror, you have to say that you will at least, that you will go into this final question, look at all the evidence in the case, and decide whether or not there is a mitigating circumstance or circumstances and if it's sufficient to turn it around.

Can you do that?

A    Yes, I can.

Q    Will you do that?

A    I will.

Q    You realize what you think is mitigating I might not think is mitigating?

A    Right, yes.

Q    We don't have to have a concensus on that in order for that to change.  Okay.

Do you have any questions for me so far, Mr. Folz?

A    No, I don't.

Q    Okay.  Do you think you have a pretty good understanding of how this -- of how this works?

A    Yeah.

Q    Okay.  Because I gained a lot from your questionnaire and I appreciate you spending all that time on it.  So, just to recap before we go on.

And you know, I've made a note here.  In terms of the question about intoxication, I think that you kind of had a pretty good grasp there.  That on page six we asked about intoxication, and you said, I see no reason why a person should not be allowed to explain why they committed their crimes.  It doesn't mean I have to agree with them, with their reasons.

That's kind of what we're talking about there. That might be mitigating if a person was intoxicated, that might be mitigating.  It might not necessarily be an excuse to you, but will you listen to it first?

A    Yes.

Q    And then will you decide whether or not it's mitigating?

A    Yes, I will.

Q    So, just to recap, Mr. Folz, two separate phases of trial. The first part of the trial, you're being called upon to determine if the person's guilty of capital murder, right?

A    Right.

Q    And if not that, maybe a lesser included offense. And regardless, you will base your verdict on the evidence in the case and nothing else.

A    Yes, I will.

Q    Including the punishment if it's a lesser.

A    Uh-huh.

Q    In the second part of the trial, you're called upon to answer these special issues here. You look at them independently, correct?

A    Yes.

Q    Will you base your verdict on the evidence in the case?

A    Yes, I will.

Q    Will you let any outside influences come into your deliberations?

A    No.

Q    Okay. And most importantly, just because you have -- understand, you have found someone guilty of an intentional murder. Meant to do it, I wanted to do it, and I committed a

robbery at the same time.

Does that mean you automatically answer this question yes?

A    No, it does not.

Q    Okay.  You will base your verdict on the evidence in the case.

A    Yes, I will.

Q    Thank you very much, Mr. Folz, for answering my questions.  And if you don't have anything for me, then I'll let you go to the other side now.  Thank you, sir.

A    Okay.

THE COURT:  All right.  Thank you, Ms. Handley.

Mr. Folz, how are you doing?  Do we need to take a five minute break for you?  Would you like to take a break?  You have been under the gun here for about 45 minutes.

PROSPECTIVE JUROR FOLZ:  I didn't know it had been that long.

THE COURT:  Time flies when you're having fun, doesn't it?  We could take a short break if you would like to.

How is everybody else doing?  Would you like to take just a five minute recess?

MR. LOLLAR:  Five minutes would be great.

(After a recess, Defendant present).

THE COURT: Are we ready for Mr. Folz?

Bring him in, please.

(Prospective Juror Folz returns to the courtroom).

THE COURT: Thank you, Mr. Folz. Come on in here, if you will, please, sir. You got something to drink?

PROSPECTIVE JUROR FOLZ: Yes, sir.

THE COURT: Go ahead and have a seat.

Thank you, ladies and gentlemen. Be seated, please.

Mr. Parks, I believe you're going to --

MR. PARKS: I am, your Honor.

THE COURT: -- talk to Mr. Folz. You may proceed at this time.

EXAMINATION

BY MR. PARKS:

Q    Good morning, Mr. Folz. How are you?

A    Good.

Q    The good news is that you'll be done with talking to lawyers by lunchtime. The bad news is it may take until noontime.

Let me warn you. I try to give somebody, all the people that I talk to a little bit of a road map. I'm going to talk to you in about three different stages. I'll talk a little bit about your questionnaire.

A      Okay.

Q      The second thing we're going to talk about is the merit stage or guilt/innocence phase of a capital murder trial, which is like any other trial for any other offense, as a practical matter.

And then the third thing I'm going to talk to you about will be the punishment phase of a capital murder trial. That's different from any other kind of offense, so I will probably -- not probably -- I will spend most of my time talking about that phase of the trial.

A      Okay.

Q      I do not intend to suggest to you in any way that we are conceding guilt/innocence in this case. That will be a contested portion of the trial. But I spend a lot of time because, as you can see, these issues are different from anything that you would normally encounter if you were called for jury service. And most people really are not at all familiar with this concept of answering special issues.

So, I think our time is more productively spent speaking about those issues, but we need to talk about some of the other things before we get there, okay?

A      Okay.

Q      I notice on page nine of your questionnaire that your brother-in-law is an attorney.

A      Yes, he is.

Q    Is that here in Dallas?

A    No, sir, he's in Illinois.

Q    In Illinois.  Okay.  So, what kind of law does he practice?

A    His is more in family law, bankruptcy, divorce. He's also an assistant city attorney, I believe.

Q    Okay.

A    For a small town in Illinois.

Q    Okay.  Anything about that relationship that you think might impact your ability to be a fair and impartial juror here?

A    No.

Q    All right.  Fair enough.

You've already talked with Ms. Handley about the issue on page three, but I want to address it a little more, that is what you heard about the case.

Can you tell us a little bit about what you have heard and what you recall?

A    All I recall is a robbery, I believe it was in Garland, of a store and two people were killed, I believe. It was in the news.  That's all I remember about it.

Q    Do you recall having seen any interviews of any of the victims' family or --

A    No, I do not.

Q    -- the defendant or anyone?

A     No, I mean I don't recall, sir.

Q     And, finally, have you done anything to try like going on the Internet?

A     No, I have not.  No, I have not.

Q     I appreciate that.  In the fall I tried a case up in Collin County.  As you can tell, I'm not the youngest guy in the room.  And it doesn't come to me naturally to suppose that people would go on the Internet to find out anything.  And now I'm beginning to learn that prospective jurors more and more, after they hear a little something about the case, go home, get on a computer and just open up a world of stuff that they shouldn't be seeing.

A     Right.

Q     Sorry.

A     I'm not the greatest fan of what's on the Internet.

Q     All right.  And if you're among those who are qualified after you finish today, I'm reasonably certain that the judge will instruct you, you know, in the future not to do anything to try to find anything out.

A     Yes.

Q     There may be even, Mr. Folz, a little bit of publicity, today, as a matter of fact.  I think there may have been some last night.  The media has gotten confused about the status of this case and are under the impression, I think, that we're going to trial tomorrow or some such

thing, which is absolutely not so.  Which is another reason why you can't always put a great deal of faith in what you see, hear or read.

But if there is something that does, you turn the TV on and it seems like they may be talking about this case, please just turn it off --

A   Yes.

Q   -- or whatever.  We don't want -- If we do get you on, we don't want to lose you on account of something like that.

A   Yes, sir.

Q   Does that make sense to you?

A   Yes, sir.

Q   There's some things that I marked here to talk to you about that has already been addressed so it saves me a little bit of time.

I know that on page four where we asked what crimes you think the death penalty should be available, you indicated that this is the kind of case, that is to say an intentional murder during the course of the commission of a robbery, that should be a potential death penalty case.

You understand that it's not automatic.

A   Yes, I do.

Q   That that's a decision yet to be made.  And you are obviously clear on that concept.

A     Yes, sir.

Q     Fair enough.   Im talking to myself a little bit.   I do that sometimes.   It shouldn't distract you.   It may.

All right.   I think that's pretty much all I want to talk to you about on the questionnaire itself as it may apply to some of the other issues that we're talking about. I'm going to say a couple of things that may sound sort of silly to you, but I promise you I'll try to focus again.

Judge Snipes will be the judge who presides over the trial of the case.   It is Judge Snipes' duty and obligation to be fair and impartial to both sides and to rule on the law.

And the way that he does that is, as you have already seen here today, each side, if they feel like something may be amiss, has an opportunity to object and call the judge into play to make a decision about that. And that's part of his job to rule on objections.   He's the judge of the law.   And in that regard, he is the person who will draft what is called the Court's Charge.

Now, the Court's Charge is a written document that is prepared, both first read to and then physically given to the jury after all of the evidence in each of the individual stages of trial.

So, after all the evidence on every stage of the trial has been put before the jury and both sides

have closed the evidence, then the judge will read you the charge and give you the charge and you'll go back in the jury room to deliberate your verdict.

You've done this before, haven't you?

A    Yes.

Q    And you're bound to follow the law that the judge gives you.  As we like to say, he'll give you all the law you need in order to render a proper verdict.  Your job is to follow the oath that you have taken as a juror to a true verdict render according to the law and the evidence, so help you God, and that's whether you agree with the law or not.

Now, if you disagree with the law to such an extent that you cannot in good conscience follow it, then that's a whole other matter.  But once you take the oath to follow the law, that's what you're bound to do.

A    Yes, sir.

Q    And, quite frankly, whatever else we may think or say about it -- and obviously we, the two sides, don't agree on all that goes on -- I think that we do finally agree that while we may not have a right to demand anything else from the jury, we do have a right to demand that they follow their oath.  Does that make sense to you?

A    Yes, it does.

Q    If they do that and do, in fact, render a proper verdict according to the law and the evidence, then nobody

has got any reason to complain about it as a practical matter.

A    Yes.

Q    Does that also make sense?

A    Yes, it does.

Q    All right.  The reason I'm saying all of that, Mr. Folz, is that, particularly in cases of this kind, is that people just by the language that we use I think are sometimes given the impression that there is this body of offenses and body of defendants that, because of what they have done and who they are, deserve the death penalty.

Okay.  And I think there is a misapprehension among prospective jurors that it's their job to determine whether or not the person on trial in that case is just such a person or not.

When, in fact, what the law expects and demands of the juror is the same thing that you would expect that they would get from the judge who tries the case, an impartial judgment of the facts, without emotion, without -- you wouldn't --

I suspect that if you were a bystander and you saw a trial where the judge was all mad at the defendant and was just overruling everything that the defense wanted to do because -- and not giving the right charge because he wanted to make it as easy as he possibly could for the State to convict somebody, you would say that's not right.  There

is nothing right about it.  The judge is letting his emotions overtake what he ought to be doing as a judge.

Now, that's not going to happen in this case. I'm not suggesting in any way that it would.  But the same is true of jurors.  If jurors get back into the jury room and are so offended by what the facts of the case are that they forget their duty and obligation to properly apply the law, then they are doing the same thing that they would be complaining about the judge doing, letting your emotions rule what it is that they ought to be doing, which is to take the facts, be judges of the facts just like the judge is judge of the law, and applying those facts in a fair and equal way to the State and to the defense, to place the burden of proof where it belongs, and make a decision based on what they have heard in a fair and equal manner.  And I will tell you how that kind of factors in in just a few minutes.

And I want to -- I do want to talk to you about the various stages of the trial first.  One of the areas I guess where I don't always just absolutely agree with the prosecution is this, that's the definition of what is or is not beyond a reasonable doubt.

Let me tell you what I anticipate Judge Snipes will tell you, which is the law that you will be expected to follow.

I think Judge Snipes will say in his charge

that the State is not bound to prove their case beyond all possible doubt, but they are required to prove their case beyond all reasonable doubt, and that's a hundred percent of reasonable doubt.

So, if you have some idea from the State's voir dire that there is some leeway in there for a jury to think, well, you know, I'm not absolutely sure based on my reasoning and common sense that they have proven the case and I remember the prosecutor told me I didn't have to be a hundred percent sure, so I can go ahead and find the person guilty, that's just not the law.

What I like to say is this. It seems to me apparent, since the law says they are not bound to proof beyond all possible doubt but they are beyond all reasonable doubt, there are two kinds of doubt, reasonable and unreasonable.

So that if a juror is willing to be unreasonable, I suppose they could say, okay, they have to prove this beyond all possible doubt because there is some -- I kind of like to use the lottery as an example. If I buy a lottery ticket, it's possible that I'll win, but it sure would be unreasonable of me to go down and buy a brand new car against the possibility I'm going to win the lottery on this ticket, even though it is possible.

You see there is a difference between

reasonableness and possible.

A    Yes, sir.

Q    Would you be able to apply the law as Judge Snipes gives it to you, assuming that that's what he tells you?

A    Yes.

Q    Thank you, sir.

Now, lesser included offenses. Let me tell you how this all plays out. And I think you may already understand it, but I want to make sure that we are on the same page.

The indictment in the case is no evidence of guilt. Judge Snipes will tell you that. It's an important piece of paper because it tells the State exactly what they have to prove in order to be entitled to a guilty verdict. Ms. Handley told you that. And the law means exactly what it says about that.

It has to -- The State has to prove every element of the offense including the manner and means which is what she was talking to you about where they had alleged shot by a gun but the medical examiner said stabbed by a knife.

Jurors never know, because we are not entitled to talk to them about the specific facts of the case on trial, they never know what elements on that indictment may be contested. Okay?

A    (Nod's head).

Q    In one case identity might be contested.  It might be that they are saying you've just got the wrong person.  On another case it may be manner and means that's contested.  It could be that what we call culpable mental state could be contested.

There are four culpable mental states in the State of Texas, intentional, knowing, reckless and criminal negligence.  And it may be that a jury would hear evidence of the state of the defendant's mind at the time the offense was committed.  It would call into question what culpable mental state that person acted with.  Okay?

A    (Nods head).

Q    So that a jury might hear evidence that would cause them to believe or have a reasonable doubt about whether it was an intentional killing or whether it was a knowing killing, or whatever.  So, that would be something that you would have to make a determination about.

Do you believe that you would be able to do that, render a verdict based upon whatever the evidence told you at the time?

A    Yes.

Q    And that's why we talk about lesser included offenses is because it might be the evidence would raise a reasonable doubt in your mind that it was intentional, and

**Anne B. Meredith**
Certified Shorthand Reporter

assuming it was a situation where you found all of the other elements.

So, you might be talking about the lesser included murder or you could be talking about a lesser included robbery, or whatever, voluntary manslaughter. These are all issues for the jury to determine. You see, and there is a reason -- there is ground for disagreement.

The fact scenario that Ms. Handley gave you of a first degree felony sounded to me like something other than what it was being sold to be. It sounds to me like we have a thirty-five year old man who is so terrified by the prospect of his son suffering with this dread disease that that is a reasonable cause for him to act -- to not be able to have the kind of thought processes that a jury would consider to be a first degree felony.

If that were so, it would still be murder. Okay. We used to call that something else, but we don't now. It's murder. But the punishment range drops from five to ninety-nine down to two to twenty and is treated as a second degree felony.

Those are factual determinations for a jury to make, whether or not a person in that same fact situation was so terrified by the prospect of his son's suffering that that was a reasonable cause for his terror and that rendered him incapable of cool reflection and he did it because of

**Anne B. Meredith**
Certified Shorthand Reporter

that.

So, that describes something totally different. The point being, not that I'm right and Ms. Handley is wrong or that Ms. Handley is right and I am wrong, but that is a determination for the jury to make based upon what they hear and how they believe it ought to come down.

Does that make sense to you?

A    Yes, it does.

Q    Okay.  So, here is the reality of it.  If for any reason the State of Texas failed totally to prove an element of the offense that did not include a lesser included offense, then the jury would be required to find the defendant not guilty.

If it happened that they failed to prove capital murder but in their proof they proved a lesser included offense, then the defendant would be entitled to a not guilty to the capital murder and guilty of the lesser included offense, and you would go into a punishment phase that would have nothing to do with these questions.  You would just make a determination of where in that range the law, the law provides for.

Does that make sense to you?

A    Yes, it does.

Q    Do you feel like you could assess a punishment based upon what you felt was right and proper depending

upon the facts and circumstances?

A    Yes.

Q    Say for murder or for aggravated robbery, all the way from five years in the penitentiary up to and including life in the penitentiary.

A    Yes, I believe I could.

Q    Okay.  And that all depends upon what the individual jurors believe is right and proper, and that's typically the point, you know, is what you believe is the right thing to do.  And you could do that?

A    Yes, I could.

Q    All right.  Now, if however the State were to have proven all that they alleged in the indictment, they proved a capital murder case, and the jury found the defendant guilty of capital murder, then and only then do we get into a situation where we are looking at these special issues.

Does that make sense to you?

A    Yes, it does.

Q    So, the context of the special issues, frankly, are these.  No one who is ever called as a juror is ever called upon to answer these special issues unless they have made a determination along with eleven other people, from the evidence, that the defendant is an intentional capital murderer that killed someone during the course of the commission of another felony.  Okay?  So, that's the context

in which these questions are always asked.  Okay?

So, in order to talk about special issue number one -- I'm not even going to talk to you about special issue number two, so don't worry about us having to go there.

Okay.  Special issue number one is always given.  Special issue number three is always given.  Special issue number two may or may not be given in an individual case.  If you sit on this jury, you may be called upon to answer that question and you may not be, so I'm not even going to bother with it today because of the time limitations.

But you see that special issue number one is always asked about a person who has been convicted of capital murder.  Okay.  You haven't done it, but we have a lot of jurors who say to us things like this.

Well, yeah, I could consider special issue number one being no if the defendant killed in self-defense, or I could consider that he wouldn't be a continuing danger to society if it were an accident.  But, you see, if it were an accident or if it were self-defense, a juror would never be called upon to answer that question at all because they would have found the defendant not guilty if they followed their oath and the law.

Murder is the intentional taking of another person's life without a legal justification or excuse.  That's the long version of the definition, and it's intended

to convey the idea that if a person has a legal excuse for intentionally killing another, he's not liable under the law.

What that refers to is insanity. If a person is legally insane, their actions are excused in the law. Those are rare birds, just to be quite frank with you. It happens from time to time that people are found not guilty by reason of insanity, but it doesn't happen often. Okay.

A person can be extremely mentally ill and not fit the definition of insanity in this state. Okay?

A     (Nods head).

Q     But that is an excuse if a person does actually fit that decision and can show that. They have the burden of proof to show that. Then that's an excuse.

Justification refers to self-defense or to defense of a third person, and sometimes even defense of property. So, you're justified in killing someone if you have to do that to protect yourself or others. You're excused if you're mentally insane. But otherwise accident and mistake come under a different thing because there is absolutely no culpable mental state if something happens during an accident.

All right. So, when you're talking about this, you're talking about somebody that you decided already killed another person because that's what they wanted to do and they did whatever it took to accomplish

their goal.  And it wasn't an accident, they weren't acting in self-defense and they weren't insane.  Okay.  It wasn't a mistake, all of the things that we've talked about.

Typically the victim is going to be blameless.

MS. HANDLEY:  I'm going to object, your Honor, to going into specific circumstances here or examples.  The victim and blameless.  I'm just objecting before we go too far, though.

THE COURT:  I'll overrule the objection at this point.

Go ahead, Mr. Parks.

Q    (By Mr. Parks)  They didn't provoke their own death.  Okay.  That's the context in which you would be looking at these special issues.  You have that in mind.  I'm telling you that for a reason, okay?

A    (Nods head).

MS. HANDLEY:  Your Honor, I will object, then, to specific circumstances about provocation or innocent victims or anything such as that.

THE COURT:  Are you headed toward a --

MR. PARKS:  I'm just trying to --

THE COURT:  -- scenario?

MR. PARKS:  I'm just trying to set the context of these questions.  That is the situation in which these cases are tried.

**Anne B. Meredith**
Certified Shorthand Reporter

MS. HANDLEY: My objection, your Honor, is to him going into the commitment of, and we are looking at unprovoked and we are looking at innocent victims. I think that that's improper to do.

THE COURT: Okay. Let me just ask you to do this, then, Mr. Parks, if you would rephrase it, then. Can you do that?

MR. PARKS: Sure.

THE COURT: Okay.

Q    (By Mr. Parks)   Set aside whether or not we have innocent victims who didn't provoke their own killing. We still have an intentional killing with no legal justification and no excuse. Does that make sense to you?

A    Yes.

Q    Okay. The purpose of going through this, Mr. Folz, is this. Aside from the fact that it would be unconstitutional, the State of Texas could just say, all right, everybody who is convicted of capital murder gets the death penalty. Well, they don't do that.

It would be unconstitutional if they did, but it doesn't matter if it wouldn't be unconstitutional, the fact of the matter is we haven't done that.

The legislature has essentially recognized that there has to be more than just a conviction for capital murder, that (a) you know, they moved murder from murder to

**Anne B. Meredith**
Certified Shorthand Reporter

capital murder by the additional requirements to make it capital murder.  Now they are adding additional requirements on top of that before a person can get the death penalty. And it is intended by the legislature that these special issues mean something.

Okay.  So, while it is true what the prosecutor said, that if the facts and circumstances of the offense answer special issue number one yes, then a jury is entitled to answer it yes, but it never says that that is -- that it's required.

It may be that the facts and circumstance of the offense say very little about whether or not a person would be a continuing danger in society in the penitentiary. It may have some small amount of relevance, it may have no relevance whatsoever, or it may have greater relevance, depending upon what those facts and circumstances are.  But it's a different question from did he do it.

You follow what I'm saying?

A     Yes, I do.

Q     And what is intended by that question, our Court of Criminal Appeals has told us, is to try to identify, in the Court's words, those few incorrigibles who cannot even be in prison without future threat of violence.

See what I'm saying?

A     (Nods head).

Q    So, the recognition is this.  That even though a person has been found guilty of capital murder, the supposition is they would not be a continuing danger to society.  We've got to have a way to identify those persons, those few incorrigibles as they call them, that we fear would be.  Make sense to you?

A    Yes, sir.

Q    This is the way we do it.  And as Ms. Handley pointed out to you, we don't really define any of these things, but we tell people, you know, what they are not, I guess, by the words that are there.

But that issue is just as important as the indictment.  The State has the same burden to prove exactly what is in that special issue as they do to prove what is in the indictment.  And jurors can't change what's in that question to suit themselves or to suit a particular outcome that they wish to have.

So that, for instance, if a jury goes back and says, you know what, that was the most awful thing I ever heard in my whole life and there's not a good thing in the world about this person.  He deserves the death penalty.  Or as Ms. Handley, the question is, there is a -- there is a person who should die, I believe was one of the questions that she asked.

Well, if the jury goes back and says, okay,

here's a person who should die or this person deserves the death penalty, now let's answer these questions in a way that will accomplish that end, you're violating your oath. Okay?

What the law contemplates is a juror being able to say, if I ever saw a person in my life that deserved the death penalty and ought to get executed, it's this fellow, but the State of Texas has not proven to me that he is going to commit acts of violence in the future that will be a continuing danger to society, just hasn't proven it. I think this is a person who can be put in the penitentiary for the rest of his life and we can forget about it.

So, there is my conflict. The State has not proven an issue that is required to be proven for the death penalty, yet I believe the death penalty is proper and appropriate. What do you do?

You do the same thing that you would have done at the indictment phase, the merits phase where they proved stabbing and they alleged shooting. Resolve that according to your oath and follow the law and the oath.

Does that make sense to you?

A    Yes, it does.

Q    Do you believe that you would be able to do that?

A    I do, yes.

Q    And in talking about that special issue, here's

what I like to say to people. You know, the law in the State of Texas is such that a person cannot be executed for what he has done, no matter how horrible or heinous it may be. He can only be executed for what the State of Texas can prove beyond a reasonable doubt he would probably do in the future.

Make sense to you?

A    Yes, it does.

Q    Okay. Well, that's what that's about.

Probability y'all have talked about. And we don't define it, but our courts pretty much are comfortable with the proposition that probability in that context means more likely than not, just as y'all talked about, that the defendant would commit criminal acts of violence.

Now, it doesn't end there. You know, sometimes we like to just stop it right there like that's the inquiry, but it's not. In the first place, criminal acts of violence is not defined for you. You get to determine what you believe a criminal act of violence is.

But you see, it says acts of violence. It doesn't just say act of violence. So I suppose, theoretically, if a person under some circumstances decided here's a person who would commit a murder in the penitentiary I believe probably beyond a reasonable doubt, the answer to that question is no because the question requires multiple acts. Make sense to you?

**Anne B. Meredith**
Certified Shorthand Reporter

A       (Nods head).

Q       That are a continuing danger to society.  So, you might find that a person would commit, probably commit acts of violence but they are such that they would not be a continuing danger to society because the context of that question really is, what criminal acts of violence would cause you, as a juror, to decide that this person needs to be executed?

Now, pushing somebody out of their chair or making a threat, you might consider, in fact, to be a criminal act of violence but would not be such that would constitute the kind of continuing threat to society that a person ought to be executed.

You see the context of that?

A       Yes, I do.

Q       Does that make sense to you?

A       Yes, it does.

Q       You know, I can see a person saying, yeah, you know, I think this particular person over the next four, five or ten years might get in some fist fights, might, you know, threaten somebody, might do something or another.  But that's not the kind of thing that I believe a person -- that I would feel comfortable giving the death penalty to because I don't believe that they rise to a level that would justify calling them continuing threats to society.

And continuing means just that, it's in there.

And you, as a juror, are entitled to take continuing, if you wish to, to mean for the whole rest of his life, that there would never be a time that would come that he would not constitute a future danger.

Does that make sense to you?

A    (Nods head).

Q    Okay. All right. Now, having said all of that, do you feel like that if you sat on the jury, you would be able to hold the State to the burden that the law requires?

A    Yes, I do.

Q    And you see that question as being different from did he do it?

A    Yes, it is a separate issue. I see that.

Q    Okay. Okay. Like I said, I'm going to skip special issue number two.

I'm going to go to special issue number three, and that one is very different from the other decisions you have to make. Jurors in these kinds of cases may make as few as one decision and as many as four. If you hear the evidence and find a person not guilty, that's the only decision you'll have to make about the case.

If you find a person guilty of capital murder, you may have to make two decisions because guilty being the first decision. If the second decision is no, then the trial is over and you don't have to make any further decisions.

If you were to answer that special issue yes and you were given special issue number two, same thing, you would have a third decision to make. If that decision was no, the trial is over. But if it's yes, then you would go to special issue number three, and there is your fourth decision that you would have to make.

Now, it's different from the other decisions because there is no burden of proof. Okay. The idea there is -- and I give people a little bit of history about this. We used to not have that question. And for whatever reasons, I won't go into it, now we do.

So that before, if a person sat on a jury and found a defendant guilty and answered the special issues yes and yes, they were going to get the death penalty. And it didn't matter if all twelve jurors thought that, under the facts and circumstance of that case, it was not the right thing to do, too bad. They had no way out of that dilemma of assessing death when they didn't believe death ought to be assessed because they had taken an oath to follow the law and they answered the questions like they were supposed to.

Okay. So, now we have this special issue that gives the jury an opportunity to reassess all of the evidence that they have heard to make an individual moral decision about whether or not they believe the death penalty is the right thing in this particular case.

Does that make sense to you?

A    Yes, it does.

Q    And we do that through the mitigation, mitigating evidence route. You know what -- You've seen what the question asks. And, again, we don't tell jurors what is or is not mitigating.

There is only one thing that is mitigating under law, that I know of, and that is mental retardation. Okay. And mental retardation is kind of out of the scene. The Supreme Court has just said it's unconstitutional to execute a person that's mentally retarded. And there's standards to be met by that, and there is no reason for us to go into that.

But everything else can be mitigating but doesn't have to be mitigating. Just like Ms. Handley told you, age may be something that a person would consider as mitigating or not.

I say that, and I don't really think that that's the truth. I think that it's more what weight a person would give to mitigating evidence that is at issue and not so much whether something is actually mitigating or not. But that's neither here nor there for right now.

With the point being this. That there might be -- That age might be something that a person would want to consider and give effect to if they thought that it was

the right and proper thing to do, whether a person was particularly young.

Under the law, a person has got to be at least eighteen years of age before they can be subjected to the death penalty. So, we are not talking about somebody being twelve, thirteen or fourteen years old. They have to be at least eighteen years of age.

There may be evidence, there may not be evidence brought to you on how age factors into a person's ability to make decisions from a physiological standpoint, and that might be something that you want to consider or not.

It's obvious that insurance companies have for a long time known about some physiological issues with young men up to the time they are twenty-five years of age because that's when your car insurance finally begins to drop. They know actuarial, the issues involved with brain development, and things of that kind.

Mental illness again. As I indicated to you earlier, a person can be pretty darn mentally ill and not be legally insane. That might be something, if you heard it, a person might consider, could consider if they wish to as mitigation.

A person could be intellectually impaired and yet not meet the standard that the law requires to be mentally retarded. Okay. So, you know, there's always got

to be a cutoff. So, a person might be fairly near to that retardation cutoff but not be able to actually get across the line, still some significant mental impairment that might be, again, something that a person would want to consider as mitigation.

Now, it could be any number of things. Okay? I can tell you it can be even mercy. If a juror says, hey, I have heard all of this. I can't put my finger on anything maybe particularly but, just as a totality, I don't believe that the death penalty is appropriate, or today I feel merciful and I have decided, I have made my own personal moral judgment that death is not appropriate and I don't wish to assess it.

That's enough, okay? We give jurors total power and responsibility in that special issue number three to make a decision so that the way it's set up, basically, an accused cannot receive the death penalty if any one individual juror says, it is my personal moral judgment that death is not appropriate. Okay?

A     (Nods head).

Q     So, it basically puts the buck on everybody. And it's an awful -- and I use that word awful in its original meaning. It's an awful responsibility. It should fill someone with awe that they have been given that kind of power over life and death as a citizen.

And you understand --

A    Yes, I do.

Q    -- the import of all of that.

A    Yes, I do.

Q    And you know, we tell jurors that since it is a personal moral judgment that a person makes, it's not subject, I think, to the kind of scrutiny that you might get from your fellow jurors if you were arguing over guilt/innocence because that's factual based, as a practical matter, or even over the answers to some of these questions.  You can discuss what the evidence showed or didn't show or whether it meets this criteria or meets that criteria.

But in special issue number three, once a juror has made their own individual personal decision about that, that's to them.  To me, it's kind of like someone choosing a religion or choosing how they wish to raise their children.  That's their own personal moral decision in the matter.  And people generally don't try to persuade others that their own personal moral judgments are wrong, you know.

And I think the same should apply.  You know, you're required to deliberate your verdict, that is, you know, to carefully consider.  But deliberation doesn't mean debate.  You may have seen Twelve Angry Men and, you know, whichever side finally beats the other one into the ground wins.  I don't think that's the way people really do things.

That obviously was a drama, but -- And you sat on a jury. Did y'all get at one another's throats back there?

A    No, we didn't.  But we deliberated for a while before we came up with our verdict, but it was based on the evidence.

Q    And were you civil to each other?

A    Yes, we were.

Q    And I think that that's what generally happens, that people are civil to one another.  That once a decision has been made, particularly something as important to an individual as whether or not a person will be executed, they have a right to have that personal moral judgment.  And if you came to your judgment, whatever it might be, you would wish that it be respected by the other jurors, I guess.

A    Yes.

Q    And would you be willing to respect that of the other jurors?

A    Yes, I would.

Q    I think I'm about out of time, okay?

A    Yes, sir.

Q    Any questions you have of me, Mr. Folz?

A    No, sir.

Q    Thank you very much for your attention, sir.

THE COURT:  All right.  Thank you very much. And I'm going to ask you to step outside for just a moment

with my bailiffs while I confer with the attorneys, and then I'll bring you back in and tell you the result.

PROSPECTIVE JUROR FOLZ: Sure.

THE COURT: Yeah, just leave everything right there will be fine. And you can take your book and your newspaper and your coffee. Thank you. We will have you back here in just a second.

PROSPECTIVE JUROR FOLZ: Thank you.

(Prospective Juror Folz exits the courtroom).

THE COURT: Thank you ladies and gentlemen. Be seated.

Ms. Handley, does the State have a challenge for cause?

MS. HANDLEY: We do not. We believe Alex Folz, Juror 227, is qualified, your Honor.

THE COURT: All right. Mr. Parks, does the defense have a challenge for cause?

MR. PARKS: We do not, your Honor.

THE COURT: All right. Then Mr. Folz has qualified as a panel member. This is ten?

THE BAILIFF: Yes.

THE COURT: Go ahead and bring Mr. Folz back in.

(Prospective Juror Folz returns to the courtroom).

THE COURT: Come on around.

Thank you, ladies and gentlemen. Be seated.

Mr. Folz, you have been qualified as prospective juror number ten. August the 10th I'm told is when the entire panel -- What we are doing, we're qualifying I think 48 --

MR. LOLLAR: Fifty.

THE COURT: Fifty?

MR. LOLLAR: Yes, sir.

THE COURT: -- individuals as a panel, at which time everyone will come in on August the 10th and then at that time then the attorneys will make their strikes. And at that time the jury will be announced. Okay?

PROSPECTIVE JUROR FOLZ: Okay.

MR. PARKS: I think, Judge, probably what we are going to do is do that before then. August 10th is the day we start the trial.

THE COURT: Oh, okay. That's the first day of evidence. This is my first day in this trial so I'm learning as you are.

MR. PARKS: I'm not sure that we will be bringing people in.

THE COURT: Okay. So, you're just going to make your strikes --

MR. PARKS: And notify them.

THE COURT: -- from the photographs. My

bailiffs are going to photograph you.  We are having a panel of fifty and then the attorneys will make their strikes from that panel.

PROSPECTIVE JUROR FOLZ:  Okay.

THE COURT:  And then those twelve jurors and I guess two alternates will be taken at that time.  And you will be notified as to whether or not you are a juror and should report on August the 10th.  But evidence will start in this case on August the 10th.  Judge Snipes will start evidence August the 10th.

So, and I anticipate two weeks -- Is that what you're looking at?  -- that the trial will take two weeks and, so, if you're notified that you are a juror or an alternate, you should schedule two weeks from August the 10th, beginning August the 10th for that trial.  Okay?

MR. PARKS:  Do you know of anything, Mr. Folz, going on in your life that would cause a problem with your serving in that period of time?

PROSPECTIVE JUROR FOLZ:  No, I do not, no.  And I'm sorry, as far as the announcement, when will it be anticipated to announce that?

MR. PARKS:  We are telling people the latter part of July first, part of August.

THE COURT:  Is that what we are looking at?  The latter part of July, first part of August, you'll be

notified, somewhere in that time frame, and it will probably be in writing, so you will probably get a letter from the Court, something like that.

MS. HANDLEY: As long as the phone numbers you gave us are all the best way to get in touch with you.

THE COURT: Contact information.

PROSPECTIVE JUROR FOLZ: Can I look at that?

THE COURT: Sure.

PROSPECTIVE JUROR FOLZ: In fact, that's correct.

MS. HANDLEY: Okay.

THE COURT: Everything is correct so we can get ahold of you. All right. One other thing, and that is any pretrial publicity or any pretrial accounts in the newspaper or on the Internet or on TV, I'm going to ask you not to -- You indicated to me you didn't know anything about this case and, so, I don't want you to. I want to keep you just exactly the way you are right now.

PROSPECTIVE JUROR FOLZ: Okay.

THE COURT: So, please don't go get on the Internet and look at any archive information concerning this case, old news accounts, newspaper articles, or anything like that.

Also, in the future if you see anything in the paper, don't read it. If you hear about something that

sounds like it might be this case on TV accounts, or what have you -- I think somebody's already mentioned today, they said that the trial was starting today, which is -- you can see how accurate that is, so that's why we tell you.

And basically what you're going to be asked to do, what Judge Snipes is going to ask you to do and what you're going to be sworn to do when he administers the oath of a juror to you, if you are selected as a juror, that you will make your decision in this case, as the attorneys have already told you, based on the law that Judge Snipes will give to you in his charge to the jury and the evidence that you'll see here and receive in the trial of this case in the courtroom.  All right?

PROSPECTIVE JUROR FOLZ:  Is that just for this case, just this case specifically that it applies to?

THE COURT:  Yes.

PROSPECTIVE JUROR FOLZ:  Okay.

THE COURT:  Yes.  If it's another case or something like that, you could, you know, do that.  But don't go looking up anything on this case.

PROSPECTIVE JUROR FOLZ:  Yes, sir.

THE COURT:  All right.

MR. PARKS:  And be careful today.

THE COURT:  Yeah.  Today apparently, for some reason, the word is out that we are starting the trial today,

**Anne B. Meredith**
Certified Shorthand Reporter

but that's not true.

Okay.  Anything else from the State or --

MR. HANDLEY:  No, sir.

THE COURT:  -- before I let Mr. Folz go, from the defense?

All right.  Thank you, Mr. Folz.

MS. HANDLEY:  Thank you, sir.

PROSPECTIVE JUROR FOLZ:  Thank you.

THE COURT:  And possibly we will see you, then, August the 10th.

(Prospective Juror Folz excused from the courtroom).

THE COURT:  Okay.  We will be in recess until 1:15.

(After the lunch recess, Defendant present).

THE COURT:  The first one I have is Joyce Herbster.  Okay.  You want to bring her in?  Joyce Herbster.

And I won't go through my usual litany with them.  I'm just going to say that the lawyers need to talk to you, and I will just go to you first.

(Prospective Juror No. 281, Joyce Herbster, enters the courtroom).

THE COURT:  Ms. Herbster, how are you doing?  Come on in, if you would, please, ma'am, just right around here.  Let me help you here.

PROSPECTIVE JUROR HERBSTER:  Okay, thank you.

THE COURT:  Right here in this chair will be good.  Thank you.

Thank you, ladies and gentlemen.  You may be seated.

I would like for the record to reflect that this is Prospective Juror number 281, Joyce Johnson Herbster.  Am I correctly pronouncing your last name Herbster?

PROSPECTIVE JUROR HERBSTER:  Yes, sir, very good.  Most people keep trying to put an E in the middle and I say it's not Herbester, it's Herbster.

THE COURT:  Okay.  Well, if it was any more complicated than that, I probably couldn't pronounce it.

PROSPECTIVE JUROR HERBSTER:  I don't really quite understand the problem.

THE COURT:  Well, Ms. Herbster, we appreciate your time and effort to be with us this afternoon.  I don't think this is going to take very long.

I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney, Texas.  And Judge Snipes has asked me to assist him in the jury selection process, and the individual voir dire is what we typically call it, in this capital murder case.  But the attorneys are going to ask you a couple of questions and then we will see where we go from there.

All right.  Ms. Handley.

MS. HANDLEY:  Thank you, your Honor.

JOYCE JOHNSON HERBSTER,

testified as follows:

EXAMINATION

BY MS. HANDLEY:

Q    Good morning, Ms. Herbster, or good afternoon I should say.  This is not going to take very long.  I'm just going to ask you a couple of questions.

You remember coming down to the big panel that morning and filling out that --

A    Oh, yeah.

Q    -- extensive questionnaire?

On that questionnaire, we asked you if you were in favor of the death penalty, and you put on there, no, it's arbitrarily unfair to poor minority defendants, it costs the State more to execute.  And then you circled on that scale five, I could never, under any circumstances, return a verdict which assessed the death penalty.

Is that your feelings?

A    Yes.

Q    Then also on page two we asked if you had any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of a human being, and you said, yes, I do not have the right to sentence another person to death.

Is that how you still feel today, ma'am?

A    I still feel that way.

Q    Thank you very much.

MS. HANDLEY:  I have nothing further, Judge.

THE COURT:  Anything?

All right.  Thank you, Ms. Herbster.  We appreciate you being here and we appreciate the time and effort you've made to be with us today.

MS. HANDLEY:  Thank you, ma'am.

THE COURT:  On behalf of myself, the attorneys, and also Judge Snipes, thank you very much.

PROSPECTIVE JUROR HERBSTER:  Okay.  I don't expect to be called, but if I --

THE COURT:  No, you won't be called.

PROSPECTIVE JUROR HERBSTER:  Won't be called.  Okay.

THE COURT:  Won't be called.  Don't have to worry about this any more.

PROSPECTIVE JUROR HERBSTER:  I was just wondering about around what time it was going to be.

THE COURT:  No, you don't have to worry about that.

PROSPECTIVE JUROR HERBSTER:  Oh, okay.

MS. HANDLEY:  Thank you, ma'am.

THE COURT:  We will take care of that for you.

Thank you.

(Prospective Juror Herbster excused from the courtroom).

THE COURT:  Thank you.  Be seated.

State have a challenge?

MS. HANDLEY:  We do, your Honor.  We challenge this juror as not qualified.

THE COURT:  Any objection from the defense?

MR. LOLLAR:  No.

THE COURT:  Thank you.  The State's challenge for cause is granted.

Are we ready for the next one?  I have Brian Essary.  Bring Mr. Essary in for me, please.

(Prospective Juror No. 244, Brian Essary, enters the courtroom).

THE COURT:  How are you this afternoon?  Come on around here.  Just have a seat right here, if you would, please, sir.  Make yourself comfortable.

Thank you, ladies and gentlemen.  Be seated, please.

This is Prospective Juror number 244, Brian Lee Essary, e-s-s-a-r-y.  Am I saying your last name correctly?

PROSPECTIVE JUROR ESSARY:  That's very good, yes.

THE COURT:  Well, thank you.  Thank you.

Mr. Essary, I am Judge Quay Parker. I'm a Senior District Judge from McKinney, Texas just north of here. And Judge Snipes has asked me to assist him in the jury selection process. We call it the individual voir dire examination. So, that explains to you what I'm doing here today and also, consequently, what you're doing here today.

PROSPECTIVE JUROR ESSARY: Uh-huh.

THE COURT: The attorneys all have a copy of your questionnaire. I think this will be relatively quick.

And, so, Ms. Handley, do you have any questions for Mr. Essary at this time?

MS. HANDLEY: I do, your Honor. Thank you.

THE COURT: Thank you.

BRIAN LEE ESSARY,

testified as follows:

EXAMINATION

BY MS. HANDLEY:

Q    Good afternoon, Mr. Essary. How are you?

A    I'm fine.

Q    I'm probably going to ask you just three questions. But you remember filling out this questionnaire in the big panel for us?

A    I do.

Q    Okay. On the first page of the questionnaire we asked you, are you in favor of the death penalty and you

answered, no, the State cannot take a life. And then you also, on that scale, you circled five, I could never, under any circumstances, return a verdict which assessed the death penalty. Is that your feeling, sir?

A    You know, I've kind of thought a lot about that since then and, you know I may have changed my mind a little bit on that, that maybe it could be within the realm of the State to take a life in certain situations.

Q    Okay. On the second page we asked you, do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of a human being, and you put on there yes. Is that still true?

A    Like I said, I've kind of -- I've kind of thought about that since then. You know, the only thing about like a religious hook on it is, honestly, if the victim in a case was a Christian, a preacher, a pastor, someone active in the Christian community, you know, I might not be able to have no bias or feel --

Q    I see.

A    -- some kind of anger --

Q    Okay.

A    -- towards the accused. And that's about as honest as I can answer you.

Q    And I appreciate that honesty. So, there could be

some bias there, depending on the circumstances?

A     Yeah.  And I mean that's just being honest.

Q     I appreciate that.  That's all we want you to do is be honest.  Are you still moving to Vegas?

A     I'm thinking about it.

Q     Okay.  Do you think you might end up in Vegas before August?

A     No, ma'am.

Q     Okay.  You also put down that being on the jury, because it might take up to two weeks --

A     Yes.

Q     -- 9:00 to 5:00 every day, that that could also hurt you a lot due to missed work.

A     Yeah, just kind of in a financial thing like I guess a lot of people are, but.

Q     Okay.

A     It would, missing work.

Q     Weigh on your mind?

A     Yeah.

Q     Okay.  Thank you very much, Mr. Essary.

MS. HANDLEY:  Can I ask one more question, your Honor?

THE COURT:  Yes, go ahead.

Q     Has anybody ever told you you look like the husband Joe on the show Medium?

**Anne B. Meredith**
Certified Shorthand Reporter

A   You know, yeah, once.

Q   Are you the husband Joe on the show?

A   No.  Actually, I have a camera crew with me.

THE COURT:  Do you now?

MS. HANDLEY:  That's all the questions I have, your Honor.

THE COURT:  Thank you, ma'am.

MS. HANDLEY:  Thank you, Mr. Essary.

THE COURT:  Do you have any questions, Mr. Lollar?

MR. LOLLAR:  We do not, Judge.

THE COURT:  None?  Okay.

Thank you very much, Mr. Essary.  I'm going to excuse you.  You are excused from jury service in this case.  Thank you so much.

PROSPECTIVE JUROR ESSARY:  Thank you.

(Prospective Juror Essary excused from the courtroom).

THE COURT:  State have a motion?

MS. HANDLEY:  We do, your Honor.  We would challenge this juror as not qualified to serve.

THE COURT:  Any objection?

MR. LOLLAR:  No, your Honor.

THE COURT:  All right.  Thank you very much.

And the State's challenge for cause will be

granted.

Okay. We ready for Don Riley?

(Prospective Juror No. 430, Don Riley, enters the courtroom).

THE COURT: Good afternoon, Mr. Riley. Come on around over to that seat right over there, if you would, please, sir.

PROSPECTIVE JUROR RILEY: Okay.

THE COURT: Just go ahead and have a seat.

Thank you, ladies and gentlemen. Be seated, please.

And I would like for the record to reflect this is Prospective Juror number 430, Don Martin Riley.

Good afternoon, Mr. Riley.

PROSPECTIVE JUROR RILEY: Good afternoon.

THE COURT: I'm Judge Quay Parker, a Senior District Judge from McKinney, Texas. And Judge Snipes has asked me to assist him in this individual voir dire or jury selection process that we are engaged in right now. So that explains to you why I'm here today --

PROSPECTIVE JUROR RILEY: Okay.

THE COURT: -- instead of Judge Snipes who is upstairs in his courtroom tending to the regular business of the Court, and also why you're here today, as a matter of fact, for the individual voir dire.

PROSPECTIVE JUROR RILEY:  All right.

THE COURT:  I think we are just going to get right into the questions by the attorneys and they have just a couple of questions for you concerning your questionnaire. I do have a copy of yours.  Would you like to have it?  I know you haven't seen it --

PROSPECTIVE JUROR RILEY:  Okay.

THE COURT:  -- since.  Let me get some of this stuff out of your way here.

All right.  Ms. Handley.

MS. HANDLEY:  Thank you, your Honor.

DON MARTIN RILEY,

testified as follows:

EXAMINATION

BY MS. HANDLEY:

Q    Good afternoon, Mr. Riley.  How are you doing?

A    Fine, thank you.

Q    Good.  Do you remember filling out this big seventeen questionnaire -- page questionnaire?

A    I do.

Q    Let me draw your attention to the first page here where we asked you specifically about the death penalty and asked, are you in favor of the death penalty, and you selected no there.

A    Uh-huh.

Q    You said, due to recent Dallas County cases where convictions were overturned due to the new DNA evidence, I feel the State should not have the authority to take a person's life.  There is too much potential for an erroneous conviction.

You still feel that way, sir?

A    Yes, I do.

Q    And you also circled number four on the scale there where you said, I believe the death penalty is appropriate in some murder cases, but I could never return a verdict which assessed the death penalty.

Is that your feeling, sir?

A    Yes, it's a bit conflicting, but yes.

Q    Sure, that's fine.

And then on page two we asked, do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being, and you said, yes, I would not feel comfortable being responsible for taking another person's life.

Is that how you feel?

A    Yes, it is.

Q    Okay.  And, finally, I notice you do have some summer plans.

A    They are not confirmed yet, but --

Q    Okay.

**Anne B. Meredith**
Certified Shorthand Reporter

A    -- I normally take a summer vacation.

Q    Okay.  And you were looking around the July/August area in there, weren't you?

A    Correct, that's when I usually do it.  It depends, late July, early August.

Q    Okay, okay.  That might run afoul of this particular case.  That might be around when we are going to start here.

That's all the questions I have for you, sir.  Thank you.

THE COURT:  Okay.  Mr. Lollar, any questions?

MR. LOLLAR:  No questions.  Thank you, Judge.

THE COURT:  All right.  Thank you very much.  You can leave your questionnaire there.  We appreciate you being here, and I am going to excuse you from any further jury service in this case.  Thank you very much, Mr. Riley, appreciate your time.

PROSPECTIVE JUROR RILEY:  Thank you.

(Prospective Juror Riley excused from the courtroom).

THE COURT:  You may be seated.

State have a challenge?

MS. HANDLEY:  We do, your Honor.  We would challenge this juror.  We do not believe he's qualified for further service in this case.

MR. PARKS:  No objection.

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT: No objection, Mr. Parks? Thank you very much.

The State's challenge for cause is granted.

You want to take a short recess? We can take a five minute recess.

(After a recess, Defendant present).

THE COURT: Okay. All right. The first one I have is Angelita Rivera. Angelita Rivera, please.

(Prospective Juror No. 208, Angelita Rivera, enters the courtroom).

THE COURT: Hi, how are you?

PROSPECTIVE JUROR RIVERA: Hi.

THE COURT: Ms. Rivera, just go ahead and have a seat there, if you would, please, ma'am.

PROSPECTIVE JUROR RIVERA: Thank you.

THE COURT: Thank you very much.

Thank you, ladies and gentlemen. Be seated, please.

And I would like for the record to reflect this is Prospective Juror number 208, Angelita Marin Rivera, r-i-v-e-r-a. Is that correct, Ms. Rivera?

PROSPECTIVE JUROR RIVERA: Correct.

ANGELITA MARIN RIVERA, having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    All right.  Ms. Rivera, I'm Judge Quay Parker.  Here's your questionnaire.  I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney, Texas.

Judge Snipes has asked me to assist him in the jury selection process, or we call it the individual voir dire, and that's what I'm doing here today instead of Judge Snipes who is upstairs in his courtroom taking care of day-to-day business of the Court.

A    Right.

Q    And it explains why you're here today as well.

A    Right.

Q    You're here for the individual voir dire.  So, anyway, we are glad to have you and thank you for your time.

Now, I handed you your questionnaire that you filled out.  You remember the general session where, oh, probably five or six hundred people --

A    Right.

Q    -- got together in central jury and Judge Snipes talked to you at that time, I believe?

A    Correct.

Q    At some point in the proceedings, not only did you fill out this questionnaire, but he also asked the panel to stand, raise their right hand, and he administered the oath of a prospective juror to each panel member.  Do you recall

that?

A    Correct.

Q    Were you one of the panel members that stood and took the oath at that time?

A    I was.

Q    All right.  Very good.  I'll just remind you that you're still under that oath and also that you have been sworn to do two things, tell the truth or give truthful answers.

A    Uh-huh.

Q    And we know you would do that, anyway.  But also to be responsive to each and every question that's asked to you by the attorneys that are involved in this voir dire examination.

A    Okay.

Q    Will you do that for us?

A    Yes.

Q    Now, a little bit about what's going to happen here today.  The lawyers are going to talk to you.  They are going to explain the law to you that's involved in the trial of this case and some of the procedural aspects that will be involved in the trial of this case.  And then once you understand that, then they are going to ask you questions about how you feel about it.

A    Right.

Q    Your ideas, your thoughts, your opinions.

A    Okay.

Q    No right or wrong answers.

A    Okay.

Q    This is not a quiz that you've got to pass or you fail if you don't, and there is not going to be anything that's going to embarrass you.

A    Okay.

Q    All right?

A    Uh-huh.

Q    All right.  So, just relax and listen to the questions and answer them as truthfully and honestly as you can.

A    Okay.

Q    Will you do that for me?

A    Yes.

Q    All right.  Now, you've read the orientation guide; is that correct?

A    Correct.

Q    Okay.  So, that kind of gives you a little introduction to what's going to happen here today and kind of basically what I've already told you, but also it kind of gives you an idea of what the law is that they are going to talk to you about.

A    Okay.

Q    So, you've kind of got a little understanding about

that.  They will explain it further for you.

THE COURT:  All right.  Let me introduce the lawyers now that are going to be participating in this.

Ms. Andrea Handley.

MS. HANDLEY:  Good afternoon.

THE COURT:  Who is seated right here to my immediate right.

And then seated next to her is Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  And also back over there is Mr. Gordon Hikel.

MR. HIKEL:  Good afternoon, ma'am.

THE COURT:  And they are all prosecutors.

PROSPECTIVE JUROR RIVERA:  Okay.

THE COURT:  And they are charged with the responsibility of prosecuting this case for the State.

Also there's two additional members of the prosecution team, David Alex and Zandra Robinson who are not here today.

Now, the defense team begins with Mr. Brad Lollar right down there.

MR. LOLLAR:  Hello.

THE COURT:  And then next to him is Mr. Doug Parks.  And then seated at the very end of the table, Ms. Mallon, Ms. Keri Mallon.  And those three attorneys comprise

the defense team.

And then seated on the very end down there also is Mr. James Broadnax who is the defendant in this case. All right?

PROSPECTIVE JUROR RIVERA:   (Nods head).

THE COURT:   Very good.

All right.   Ms. Handley.

MS. HANDLEY:   Thank you, your Honor.

EXAMINATION

BY MS. HANDLEY:

Q    Good afternoon again.   How you doing?

A    Good.

Q    How do you feel being here?

A    Excited maybe.

Q    Excited.   Okay.

And as the judge said, you know, we had everybody come down, hundreds of people that morning.

A    Yes.

Q    Everybody filled out a questionnaire.   And since then we have had time to read every questionnaire, we have all read, and we are bringing everybody down --

A    Okay.

Q    -- and talking to them individually.

A    Okay.

Q    And the reason we are doing that, Ms. Rivera, is

because it is our hope that we can, we can from all these people, all these hundreds of people, ultimately end up with twelve people --

A    Right.

Q    -- that will be qualified to sit on this particular case.

A    Uh-huh.

Q    I think you can appreciate that a death penalty case is not the case for everybody, you know.

A    (Nods head).

Q    I think on the last page of your questionnaire we asked you about jury duty and you said, well, somebody has to do it, right?

A    Right.

Q    And that's true, somebody's got to sit on the jury. But we can't necessarily make you sit on this jury.

A    Right.

Q    Okay. And that's the wonderful thing about this process is that not only, you know, in determining whether or not you're a qualified, a potentially qualified person to sit on this jury, we get to ask you and feel out how you feel about things personally.

A    Right.

Q    You know, what's your religious, you know, do you have religious stands on things, or moral or personal

convictions on things.

A    Uh-huh.

Q    And how that, you know, factors into whether or not you would be a good qualified juror for this particular case.

These cases aren't right for everybody.  Some people, it's just, they are just not comfortable with the death penalty.  Other people have had life experiences where maybe it hits a little too close to home for them.

A    Right.

Q    You know, that they have had personal dealings with not just obviously death in their family, which we all do and it's hard enough to do, but maybe they have had personal dealings with murder within their family.

A    Right.

Q    And I am sorry to hear that it looks like that's a situation that you had in your family, wasn't it?

A    Uh-huh.

Q    About how long ago was that, Ms. Rivera?

A    December 2008.

Q    That was very recent, then, wasn't it?

A    Uh-huh.

Q    Was that here in Dallas County?

A    No, it was in San Antonio.

Q    In San Antonio.  Okay.  And I'm understanding

that involved a murder/suicide, correct?

A    Correct.

Q    Your uncle killed your aunt --

A    And then killed himself.

Q    -- and he killed himself.

A    Uh-huh.

Q    Do you think you've completely dealt with that now?

A    Oh, yeah.

Q    Or are you still dealing with that?

A    Oh, no.

Q    Okay.  Okay.  So, you can see how this case might hit a little bit closer to home to you.

A    Right.

Q    You know, because you've actually dealt with murder before.

A    Yeah.

Q    Or at least --

A    Uh-huh.

Q    -- what might be the loss of one innocent life there.

A    Right.

Q    The person who was killed.

       When you sit on a jury -- Have you ever sat on a jury before?

A    Yes.

Q    What kind of case was it?

A    A civil suit.

Q    A civil suit.  Okay.  The civil courts and the criminal courts, they are kind of the same, but in a lot of ways they are very different.

A    Right.

Q    Okay.  They are very different.  And one of the things that becomes fundamental any time you sit as a juror in a case is that you agree to follow the law.

A    Right.

Q    I would imagine in your case the judge told you what the law was.

A    Right.

Q    And then you sat and you listened to the case.

A    Uh-huh.

Q    And then you applied the law and you applied the facts of the case.

A    Right.

Q    And you came up with a verdict in that case.

What kind of case was it?

A    I believe it was --

Q    Was it personal injury or --

A    It was a secretary suing a gentleman that owned  U.S. -- some fitness centers.

Q    Okay.

A    I don't remember.  It was a big name like that.

Q    Like a contract case or something like that?

A    Yeah.

Q    A money case?

A    Money.

Q    They were fighting about money.

A    Oh, yeah.

Q    Okay.  Okay.  In criminal cases we are not fighting about money.  We are usually fighting about somebody's freedom.

A    Right.

Q    You know, the judgment ultimately will be somebody locked up or, in this case, somebody put to death.

A    Right.

Q    But what becomes important in both cases is that you take -- Once you get sworn in as a juror, you take an oath to follow the law, okay?

A    Right.

Q    And once you take that oath to follow the law, there is no straying away from that.

A    Right.

Q    You know, once you take that oath you can't go, okay, I took that oath but I don't like the law and I am not going to follow the law.  Do you see what I'm saying?

A    Yeah, yeah.

Q    Okay.  So, once that hand goes in the air and you

swear to follow the law, that's it, that's all.

A    Follow the law.

Q    No turning back.  Okay.

Right now, as you sit here right now, you have not taken an oath to follow the law.  Okay.  You get what I'm saying?

A    Right.

Q    You are not bound by any laws right now.  You have taken an oath, though, to tell the truth.

A    Right.

Q    Okay.  You see the difference there?

A    Yes.

Q    Okay.  So, at this point we just need the truth from you.  So there is, there is always the oath to tell the truth and there is the oath to follow the law.  And then sometimes there is that other oath in there and it's your own personal oath.

A    Right.

Q    Your own personal convictions.

A    Right.

Q    Your own personal feelings.

And what we need to know is, do your personal oaths, your personal moral or religious convictions, do they collide and not -- do they not mix necessarily with what your legal oath might be?

A    Right, right.

Q    Because we are entitled, once you take that oath, we are entitled to, if we prove to you beyond a reasonable doubt that a person is guilty and we prove to you beyond a reasonable doubt that the special issues should be answered yes in the affirmative, then we are entitled to verdicts of guilty and special issue answers of yes, which would mean that that person, that defendant, would receive the death penalty.

A    Right.

Q    And I don't know if you're entirely familiar with how that works, but once you return those verdicts, that's it.

A    (Nods head).

Q    The judge doesn't look at it and go, well, I have a different opinion on that.

A    No.

Q    I'm gonna change it.  What's done is done.

A    Uh-huh.

Q    And that person is transferred to Huntsville, Texas.  They stay out there until the date of their execution.  On that date they are transferred to a unit down in Livingston, Texas.  They are essentially strapped to a gurney and fed lethal poisons until they die.

Okay.  You understand all that.

A    Yes.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Okay.  Just asking, just knowing that, how do you feel being a part of something like that?

A    So, I have to say the truth.  And the truth is I feel that, because of my religion or my convictions in the Lord, that the death penalty by the law is correct.  But by my conviction, I feel it's -- there is more to the situation in the individual's life than just injecting something into his vein and it's done, it's over.

Q    Sure.  And I am noticing, Ms. Rivera, it looks like you're studying for the ministry; is that correct?

A    Correct.

Q    How is that going for you?

A    Good.

Q    Good, good.  And how long have you been doing that?

A    A year and four months.

Q    A year and four months now?

A    Yes.

Q    Okay.  And is it, is it from your studies and then your personal feelings that you -- is it fair to say that you have an opposition against the death penalty?

A    I do not have an opposition against the death penalty because, again, regardless if I take the law sitting here, the oath of saying the truth and following the law, in my belief and in my conviction, I will do that regardless of being sitting here.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Right.

A    So if the law tells me, you can't speak, but my spiritual feelings feels like I need to go fast, it's not correct.

Q    Okay.

A    The law is the law, and we still need to -- I know that we still need to adhere to it.

Q    How long are your spiritual and your religious -- how strong are your religious convictions?

A    Oh, I think that only the Lord can answer because I can't answer that.

Q    Okay.

A    I  would want to say that I, me personally --

Q    Uh-huh.

A    -- that they are strong enough to believe that everybody can change if they want and desire to and have the faith to do it.

Q    Uh-huh.

A    I have seen it.  I've seen it happen.  I know it happened.  It happened to me personally and it's happening, so.

Q    Uh-huh.  You understand that if you were to return a verdict of guilty and answer the special issues yes, that that person goes to prison --

A    Correct.

Q    -- for the death penalty.

A    Right.

Q    And it doesn't matter if they then, after that verdict, they hit the prison system, if they find Jesus Christ --

A    Right.

Q    -- and accept him in his heart.

A    If it happens, it happens.

Q    It doesn't matter if they bring peace to the Middle East.  It doesn't matter if they come up with a cure for cancer and HIV.  They are going do die.

A    Right.

Q    So, when you say you're looking for -- you say there is maybe a potential for rehabilitation?  I don't want to put words in your mouth.

A    I believe that the system, I seriously believe in my heart that the system offers, but it's every individual's own decision to accept it and to have it change their life.  It's out there.

Q    Uh-huh.

A    You can't force it on nobody just like you can't force the Bible on nobody.  You can't force it in their soul.

Is the option out there for an individual to take?  Yes.  Is it going to change anybody?  I can't answer that.  Is it going to change this particular individual?  I

can't answer that.

Q     Is the -- Is the hope or the expectation that somebody could be rehabilitated, do you think that would factor in to you returning your verdict --

A     No.

Q     -- or how you came back with your verdict?

A     No, because I can't actually --

Q     Okay.  Just so I can shore this up because I've heard -- and I appreciate you saying the law is the law.  But you said also, you said, since we are speaking the truth, you said religiously --

A     Right.

Q     -- or speaking from a religious standpoint, that you -- how do you feel about the death penalty, that it would --

A     If it's -- If it's a part of the law, I still have to respect the law.

Q     Okay.

A     Even if my belief is --

Q     Okay.

A     -- hmm, in my mind --

Q     Uh-huh.

A     And this has nothing to do with my spirit.  In my mind, I've seen people change, so in my mind I think people can change.  That doesn't matter.  The law is the

law.  People have to want to.

Q    I got you.  I got you.  I think I -- I think I hear what you're saying here.

And you said here, it said, are you in favor of the death penalty, and you said no, I don't think this is the answer to all cases, but it could be the only solution with all the proper evidence and should we decide to take this action.

So, you think it's appropriate in some murder cases and you could return a verdict in a proper case, correct?

A    Right.

Q    When we asked you, pardon me, do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being, you said yes.  And you said, taking a life for a life is not what I believe is a solution to the problem, life sentence maybe.

Expand on that because I'm seeing that maybe you've got some kind of a moral, religious or personal conviction.

A    Because taking -- And, again, taking a life for a life goes back to me thinking, were all the options put out there for this individual?  Was he handed rehab?

Q    Right.

A    Whatever, whatever would help him, whatever, counsel, whatever.

Q    Was he given that before he committed the offense?

A    No.  Was he given that like before the verdict, before the trial, was this individual given all of these options?

Q    And what do you mean, given all these options? You mean that somebody went up there and offered him some personal guidance or something?

A    I, I don't think that it works that way, just go knock on your door or something.  I think that, once again, I go back to the individual has to want something fixed in their lives and doesn't want to live like this any more in order for something to come and change it.

This is not just religion.  This is counseling, this is rehab, this is teaching.

Q    Okay.  I'm trying to pin you down so I understand what you're talking about.

A    Right.

Q    Because I'm hearing you say if before the trial starts, between the time the crime was committed and before the trial starts --

A    Right.

Q    -- if the individual you said was offered --

A    Right.

Q    -- something.

A    Right.

Q    And what do you mean, offered something?

A    Well, not offered like handed to him, but it's out there. I mean, like I said, I know that the system has all of these things for them. And he did not have the doors closed --

Q    Okay.

A    -- to him for these, for these resources that are out there for them.

Q    For example, if between the time that it was committed and the time we went to trial, you're looking to see did somebody, and let's say wherever, before the trial, did somebody come to him and say, hey, here's a plan to turn your life around.

A    I'm not looking to see it, but in my personal belief, some people don't change. Some people --

Q    I get that.

A    Right.

Q    And I hate to keep cutting you off because I have such limited time, but you keep -- You've said a couple of times, between the time they committed the offense and the time they go to trial --

A    Right.

Q    -- were they offered something?

A    Were the resources out there for them?

Q    What resources do you mean?

A    Resources to change, to rehab, to do something with their life.

Q    Do you mean me physically or somebody physically --

A    No.

Q    -- coming to him and going, here's a pamphlet?

A    No.

Q    Do you mean a minister coming to them?

A    No.

Q    Okay.  What do you mean?

A    Let's say this individual is sitting in jail for the first couple of months the case opened.

Q    Okay.

A    Were the resources out there?  Was he -- Did he know of the resources?  Because they are out there.  Some of them just don't know about it.

Q    The resources in jail?

A    The resources in jail.

Q    Such as?

A    Wherever -- Or even before he went to jail.  This is just my personal --

Q    Oh, I know that.  I know that.  I'm just trying to pin you down.

A    You know, resources that would help him to change

**Anne B. Meredith**
Certified Shorthand Reporter

his life.  And, again, they are out there.  Did he know about them?

Some people don't change.  They never know about them.  They never know stuff is out there to help them.

Q    Are you envisioning a particular resource?

A    No, I can't because I've just heard like AA meetings help some people, some people they don't.  Rehab helps some people, some people they don't.

Q    Okay.

A    I mean religion doesn't help some people, some people it does.  I mean it doesn't really mean that the person has to walk around with a Bible in their hand.  It means they have to walk around with something different in their heart.

Q    Okay.  How would you know that, that they walk --

A    I don't know.  God is the only one who knows that.  I don't, you don't.

Q    But that becomes important to you in determining your verdict is whether or not -- what's going on in their heart?

A    I don't -- I don't think that it can do anything with the verdict because if I'm going to look at a verdict, I'm going to look at the law before I look at my personal feeling because I have to follow what the law says.

Q    Okay.  Okay.  But you --

A    But I'm telling you the truth.  My personal --

Q    Oh, I believe you're telling me the truth.

A    But once it comes to the law, you kind of have to put it in the back seat and say, okay, but this is what the law is and this is what the law says.

Q    Okay.  Okay.  I guess I'm still trying to get a handle on when you say that it would be important for you to know that they were offered resources and trying to figure out what you mean there.

If you meant were they physically -- Did they know that opportunities were there --

A    Right, right.

Q    -- that they could avail themselves to?  And how would you know --

A    Just to help them out, if they had the knowledge.

How would I know?  I don't know.  But in the sense it would make me feel more, okay, he had the opportunity.  He had the knowledge of everything out there to help him.  He refused it.

Q    Okay.

A    He closed every door for him and he said, I'm done with that, just trial me and this is what I want.

Q    Okay.  Okay.  Do you -- You ever run across a situation where -- and I don't want to be tacky when I say this or offensive when I say this.  But a lot of people go

to jail and they say, I found Jesus.

A    Yes.

Q    Do you think they are all sincere?

A    No.

Q    And why do you think some people would say, I found the Lord, I found Jesus?

A    Because it's an easy way out of everything and I don't get in trouble.

Q    It sounds good, doesn't it, sometimes?

A    Uh-huh.  Uh-huh.

Q    Okay.  Do you think you could be a good -- you could make a determination as to whether or not somebody was being sincere as to whether or not they found the Lord or made that kind of turnaround in their life, keeping in mind only God knows what's in our hearts?

A    Yeah.  I think at this point, I think that I have seen a lot of, a lot of different cases from abuse to child molestation to addiction to stuff that, as part of my ministry, that I can't speak of, that I just know of, and Him help in that area.  I could probably sense and feel and see the light when a sincere change and a sincere acceptance of their mistakes.

Q    Do you think you're a good judge of character of determining that?

A    I want to think I am.

Q    Okay.

A    I want to think I am.

Q    And if I prove my case to you beyond a reasonable doubt and I prove the special issues, you're telling me you would have no -- Well, it wouldn't be easy for you.

A    Right.

Q    I don't think it's easy for anybody.

A    Right.

Q    But you could participate in putting another person to death.

A    Yes.

Q    Okay.  And I do see hesitation on your part.  And what's the hesitation?

A    The hesitation is someone can participate in putting somebody to death, just kind of, those words just kind of --

Q    Sure.

A    -- you know, kind of slap you.

Q    Very harsh words.

A    But I go back to in the situation where everything is given and every option, every opportunity, and every evidence is out there beyond a reasonable doubt, sometimes you have to just know to let go.

Q    Okay.  Okay.  We had asked you, the best argument for the death penalty is, and you said, in a case where you

**Anne B. Meredith**
Certified Shorthand Reporter

have a psycho killer and this is the solution to stop him or her, then I'm all for the death penalty.

A    Uh-huh.

Q    Are you -- When you say psycho killer, what do you mean?

A    Repeated, repeated, repeated murders.  He gets out, he's sent to society, he's repeating it and he's repeating it, and no rehab and no nothing has ever helped, and at that point.

Q    So, you're looking -- you're envisioning the situation of somebody who has killed and then killed again and then killed again.

A    That would be the reason why I would just totally say, okay, done.

Q    Okay.  If you saw, if you were presented with a factual situation where the person had killed not just once but twice, I mean is that what you're talking about?

A    Just, yeah, you would have to seriously look at it, you know, because doing it once, I think, and found guilty of doing it once and trialed and sentenced and then let go and doing it again, there is a different scenario versus committing a crime once, a mistake, an argument overheated, something happened and --

Q    So are you, and this is fair to say, but if this is true, that you're looking -- in a death penalty case

you're looking for the situation of a person who has killed before and is now killing again?

A    No, I'm not looking. No, I'm not looking for that situation. If this is the case, I would probably view it differently.

Q    Okay. Do you think there is room for the death penalty on somebody who has only committed one murder?

A    I think there is room for a lot of evidence and a lot of -- a lot of evidence to look at it. Because, once again, I go back to there's been heated arguments, there's been people arguing, angry, some -- an accident happened, something different from -- and the evidence, you know, the only thing that would be able to help me answer that, only because you don't -- I don't know if it's an accident, if it was intentionally, if it was planned, if it was --

Q    Here's the thing. Capital murder is an intentional murder.

A    Right.

Q    There is nothing accidental about it. It's an intentional murder. It means it's a person who wanted to kill that person and killed that person. That's just a regular garden variety murder.

A    Uh-huh.

Q    Okay. That's not necessarily a capital murder. And for a murder, you don't necessarily -- you're not

**Anne B. Meredith**
Certified Shorthand Reporter

eligible for the death penalty.

A    Right.

Q    You know, I can hate Elaine Evans' guts, my co-counsel here, plan for months in advance how I'm going to kill her, stop her in the street, kill her, stab her 50,000 times, spit on her and laugh about it.  That's not a capital murder.

A    Right.

Q    That's just a murder.

A    Right.

Q    Okay?  Capital murder is that plus something else.

A    Right.

Q    And not necessarily something that extreme.  But it's an intentional murder.  It's not self-defense.  It's not accidental.  It's not when you're talking about passion.  It's murder plus.

A    Uh-huh.

Q    It's like murder of a police officer.

A    Right.

Q    The intentional murder of a child under six years of age.  The murder of more than one person at the same time.

A    Right.

Q    A murder during the commission of a different, another felony, like a robbery or a burglary or something.

A    Right.

Q    Do you see the distinction between those two?

A    Uh-huh.

Q    Okay.  If you're found guilty of capital murder, you know, you're looking at one of two things is going to happen to you.  You're going to get life in prison or you're going to receive the death penalty.

A    Right.

Q    The jury doesn't necessarily, you know, go back there and decide, well, let me see, does this person deserve to die?  Is this a case where I think they should die?

A    Right.

Q    This guy needs killing?  I mean it's not -- that's not how it happens.

A    Right.

Q    Instead you have to follow some very strict rules --

A    Uh-huh.

Q    -- and parameters in determining what should happen.  You might not even necessarily -- I was going to say you may not want him to die, but the law provides that he should --

A    Right.

Q    -- get the death penalty, okay?

A    Right.

Q    In a capital murder case, I mean we have to prove to you that not only did this person intentionally kill somebody and kill them in the course of a robbery, but now

we have to prove to you that they are going to be what we call a future danger, that it's more likely than not that they are going to commit some criminal, violent criminal acts in the future.

A    Uh-huh.

Q    In whatever society they may be in, be it in prison or -- A person that's guilty of capital murder is going to prison for life, right?

A    Uh-huh.

Q    So, either they are going to be in the penitentiary or, if they escape, then maybe they will be in the other society.  But we have to prove to you that they are going to be a future danger.

A    Right.

Q    Okay.  How do you think we would ever prove somebody is going to be a future danger?

A    Wow.  There's got to be some hard core evidence for that to happen, and that would be the criminal record, his history of repeated offenses, repeated violence.  That's the only thing I can think of.

Q    Do you think you could ever find that a person was a future danger if they have never been convicted of anything before in their life?

A    Oh, yes.

Q    You think so?

A    Yeah.

Q    Okay.  How do you think that's possible?

A    Once, because they were covicted once?

Q    No.  I'm saying, do you think you could predict whether or not this person would be a future danger if this was the first and only time they had ever done anything bad in their life?

A    Murder, yeah.  I don't know that you can predict it.  I don't know if you can predict it.  Again, I would just go back to looking at the history, looking at the history and looking at his whole life, looking at the actual crime that was committed before you can -- I don't know that you could predict it.  I don't know.

Q    Do you think it's possible to make a prediction?

A    I think it's possible to make a prediction, yes.

Q    Okay.  And you've already stated that you don't necessarily need to see that they committed a criminal offense before in their life to answer that question yes.

A    I think I would need to -- I think I would need to find out, like I said, the history because everything escalates.  If they started at robbing cars at eleven years old and stealing candy and --

Q    So, you're robbing people one day and the next day you're robbing them and now you're killing them.

A    Right.

Q    Okay.  And that to you would be an indication that they are going to do that?

A    An indication that nothing got better and it's just getting worse.

Q    Okay.  And then you've stated that you would like to see what's been going on from the time of the offense to the time you go to trial.

A    Right.

Q    That that would also help you decide whether or not that person --

A    I don't think it would really make a difference to decide because if the evidence is there and the evidence is there and the law is the law, regardless of that, I'm going to have to make a decision and I am going to have to follow the law.

Q    Sure.  Sure.

A    But would it help my, my way of thinking of whatever we decide?  It probably would.

Q    Okay.  Okay.  You say you don't watch a lot of TV.

A    I don't watch any TV.

Q    You don't watch any TV?

A    (Shakes head).

Q    What do you do, a lot of reading?

A    I do a lot of reading.

Q    A lot of reading.

A    Yes, ma'am.

Q    Okay.  Do you think people are inherently evil?

A    Say that again.

Q    Do you think people can be inherently evil, they were just born that way?

A    You know something?  I do believe that, yes, they can be inherently evil.

Q    If somebody's inherently evil, then that might mean that it's not their fault, then, is it?

A    Well, it may not be their fault that that evil seed was in them, but it is their responsibility.

Q    We are all free moral agents, aren't we?

A    Right.

Q    Okay.  And I haven't had a chance to cover a lot of the law with you, Ms. Rivera, and I apologize for that because I was trying to get a good handle on your answers to your earlier questions.  So, I apologize.  Maybe the next attorney can talk to you about that.

But that's basically what it comes down to is first you have to sit in the first part of the trial and you base the case on the evidence in the case, you know.

A    Uh-huh.

Q    Have we proved to you beyond a reasonable doubt this person is guilty of capital murder?  If we haven't proved that to you, then you wouldn't find him guilty of

capital murder.

He may not be guilty of capital, he may be just guilty of murder, like I talked to you about before.

A    Right.

Q    And if that happens, then obviously the punishment won't be life or death.  The punishment could be something way different.  It could be anywhere from five to ninety-nine years or life.

So I, you know, didn't commit capital murder when I killed my co-counsel, Elaine Evans.  Instead I just committed murder.  And the law calls upon you now to determine what punishment I should get, you know.  And I can get anywhere from five years in prison up to ninety-nine years or life.

A    Right.

Q    And going into it, you have to consider the entire range of punishment.  Do you think you could ever consider the lower range of punishment, the five years in prison, for the offense of that first degree murder?

A    No.

Q    No, you don't think that that's in your realm of possibility to consider that?

A    No.

Q    That lower end of the range of punishment?

A    (Shakes head).

Q    Okay.  Let me ask you about officer credibility. You had -- We had written, asked you a question about officers.  I'm sorry.  We had asked you about officers' credibility, and I believe you put in there --

MS. HANDLEY:  What page is that on, Elaine?

MR. HIKEL:  Seven.

MS. HANDLEY:  I don't want to kill her because she helps me out.

Thank you, Mr. Hikel.

Q    (By Ms. Handley)  Then do you believe officers are more likely to tell the truth than the average person?  You said yes, they should know and understand their position in or out of uniform.  And that's how you feel?

A    I do.

Q    Do you -- Do you think you would be inclined to believe police officers over any other kind of witness --

A    No.

Q    -- because of their --

A    No.

Q    Okay.  On page two here -- hold on a second.

And then you tell, where you had the moral or religious problems or convictions, where you stated you have moral, religious or personal beliefs that would prevent you from returning a verdict that would result in the execution of another human being, you wrote yes there.

And there is a part in there where you said something about there being no doubt.  Am I reading that correctly?

A    Right.

Q    That there should be no doubt?

A    Right.

Q    Okay.  The law, again, there is the law and then there is your own personal belief.  The law states that I only have to -- my burden is proof beyond a reasonable doubt.

A    Right.

Q    A lot of people tell us that this isn't theft of a bicycle case, this is a capital murder case and we are talking about the death of a human being.

A    Right.

Q    And that before they can return a verdict of a sentence that would result in the death of another person, that there can be no doubt --

A    Right.

Q    -- in their mind.

Is that how you feel?

A    Right, there can be no doubts.

Q    So, even though the law says it's only beyond a reasonable doubt, is it fair to say you would raise my burden?

A    Reasonable doubt is the right word that I'm

looking for, because no doubt in my mind would have to be pictures, videotape with blood all over you and carrying the body and saying, yeah, I'm guilty, I did it.

Q    Okay.

A    That would be no doubts.

Q    Okay, got you.  Got you.  So, you'll only hold me to reasonable doubt.

A    Right.

Q    You understand there is room for some doubt --

A    Right.

Q    -- unless you were there.

A    Right.

Q    Okay.  And I just want to make sure I understand this finally here is that you're saying in the questionnaire that you do have some personal, moral or religious convictions against the death penalty.

A    Uh-huh.

Q    Okay.  But are you -- Do you think that those personal, moral or religious convictions would prevent or at least substantially impair in how you administer your legal oath?

A    No.

Q    Okay.  And in terms of it saying one thing here and you saying another thing here --

A    Right.

Q     -- your answer is?

A     My answer is it would not impair or -- because, again, I do have my convictions, I do have my beliefs, but I do respect and know what the law is.

Q     Got you.  And I apologize, I haven't explained the entire law to you.

A     That's okay.

Q     I've kind of run out of time here, but maybe, maybe co-counsel can do that.

Do you have any questions about this process, ma'am?

A     No.

Q     Okay.  Thank you very much, Ms. Rivera.  I appreciate it.

THE COURT:  Thank you, Ms. Handley.

Why don't we take about a five minute recess, Mr. Lollar --

MR. LOLLAR:  Sure.

THE COURT:  -- before we get into your questioning of Ms. Rivera.

Ms. Rivera, if you would like to get a drink of water or a cup of coffee or restroom.

PROSPECTIVE JUROR RIVERA:  Sure.

THE COURT:  My bailiffs will show you where those are.

PROSPECTIVE JUROR RIVERA:  Okay.

THE COURT:  All right.  Thank you.

We will be in recess for five minutes.

(After a recess, Defendant and Prospective Juror Rivera present).

THE COURT:  Thank you, Ms. Rivera.  Right back around here, please, ma'am.

Thank you.  Be seated, please.

Mr. Lollar.

MR. LOLLAR:  Thank you, Judge.

THE COURT:  Yes, sir.

EXAMINATION

BY MR. LOLLAR:

Q    How are you this afternoon, Ms. Rivera?

A    I'm good.

Q    And I'm Brad Lollar.  Let me reintroduce myself, Doug Parks, Keri Mallon, and James Broadnax.

And Ms. Rivera, I just want to talk to you for a little while.  Now, we've had the benefit of reading your questionnaire and the benefit of hearing what you had to say to the State, so I'm sure I won't take all of my 45 minutes with you that I'm allotted.  Okay?

A    Okay.

Q    But let me see if I've got an accurate understanding of where I think you are in this process.

If I have understood you correctly, you're not a big fan of the death penalty, but you think you could enforce it.

A    Right.

Q    Under certain fact situations.

A    Right.

Q    If the facts and the evidence indicated that would be the thing to do.

A    Right.

Q    Okay.  Ms. Rivera, you understand that in this type of a case, just like in every other kind of case, the State has the burden of proof.

A    Uh-huh.

Q    And they have got to prove the allegations that they have made in the indictment.

A    Uh-huh.

Q    And the burden of proof that they use to do that is beyond any reasonable doubt, beyond a reasonable doubt, okay?

A    (Nods head).

Q    And I think you correctly told the prosecutor here that you understand that doesn't mean beyond all doubt.

A    Right.

Q    Because that would be pretty impossible.  If you had no doubt, you would be a witness and then you couldn't be a juror; is that right?

A    Right.

Q    But you understand that the burden that they have is beyond any reasonable doubt.

A    Uh-huh.

Q    And you would be able to hold them to that burden before you would find someone guilty of the offense of capital murder.

A    Yes.

Q    Okay.  And you understand what capital murder is. It is an intentional murder committed during the course of a robbery.  Okay?

Now, in Texas the legislature has set up the way that we decide -- Well, first of all, let me tell you this.  I'm sure you understand this by now.  There's only two possible punishments for a person who gets found guilty of capital murder.

A    (Nods head).

Q    And that is, on the one hand, life without parole.

A    Uh-huh.

Q    And on the other hand, a death sentence.

A    Uh-huh.

Q    And the legislature has set up these three special issues as the way jurors should decide between those who get death and those who get life without parole.

Now, the presumption is that the appropriate

sentence is going to be life without parole. Okay. That's the presumption, okay?

A   Okay.

Q   And we know that because the legislature has put, in these first two special issues, the burden of proof on the State again.

And you can never get to a death sentence if the State fails to convince you, as a jury, that the answer should be yes, and they convince you beyond a reasonable doubt. Okay?

A   Okay.

Q   So, if we look at special issue number one here, that's the future dangerousness issue, the presumption is that the answer to that question is no. Okay?

A   Okay.

Q   Even though you have found a person guilty of capital murder, the presumption is that they will not be a future danger.

A   Right.

Q   Okay. But it allows the State to present whatever evidence they may choose to present in that issue. And if that evidence that they present does convince you and the other eleven jurors beyond a reasonable doubt, then you answer that question yes, then go on to special issue number two.

A      Uh-huh.

Q      And, again, there is a presumption that the answer to special issue number two is no.  The law puts the burden on the State to prove that to you beyond a reasonable doubt.

And if they fail to do that, you answer no, your deliberations are over.  You come back and tell the judge, and that person receives life without parole.

A      Okay.

Q      Okay.  And let me back up because that's also what happens in special issue number one.  You never get to special issue number two if y'all have a doubt about whether or not he'll be a future danger.

A      Right.

Q      Okay.  And if you look at special issue number one and y'all decide no, the answer to that question is no, they haven't proven beyond a reasonable doubt they would be a future danger, then you stop your deliberations.  It's over, that's it.

Okay.  You come back in, you tell the judge, and the judge sentences a defendant to life without the possibility of parole.

A      Okay.

Q      Okay, is that clear?

A      Right.

Q      Very good.

Now, you indicated to us that you thought, in examining special issue number one, that things such as the following might be important to your consideration. Whether or not the person had a prior criminal record.

A    (Nods head).

Q    Whether or not they had a violent history.  Their whole life story basically in what you can observe or what can be proven about their life history relevant to that issue.

Is that kind of the way you feel?

A    Kind of, yeah.  I wouldn't -- Again, it would help me.

Q    Uh-huh.

A    It is not going to change the fact that the law is the law.

Q    Uh-huh, right.  Okay.  Now, I understand, I understand that a factor that would be of great importance to you personally is whether or not that person had taken advantage of programs that might be available to him since he's been arrested.

A    Right.

Q    And you mentioned something like, for instance, AA.

A    Yes.

Q    If you found out that there were AA groups in the jail and that was available to a defendant and he had not

taken advantage of those --

A    Yes.

Q    -- is that kind of what you're thinking?

A    Well, more of -- any issues.

Q    Any issues, right.

A    We all know that you don't wake up one morning and think, I need help.

Q    Uh-huh.

A    It escalates and you get to the point to where you know that there is something wrong.

Q    Yeah.

A    Something's not right.

Q    Right.

A    And like earlier I was asked, the question is, do I believe that there is inherited an evil seed.

Q    Uh-huh.

A    I also believe that you have also inherited a good seed.

Q    Okay.

A    The one you truly want and that's the one you're living by.

Q    Uh-huh.

A    You have to kill that seed and take that root out and go forward with life.

Q    Okay.

A    When you don't do that, there is resources out there to do it.

Q    Okay.

A    There is resources out there and that's where --

Q    All right.  That would be important for you to hear about those types of things?

A    That they were out there and if the individual declined them.

Q    Uh-huh.

A    You have the right to choose whatever you want to do.

Q    Okay.  All right.  Well, let's assume for the purposes of our discussion that the jury has answered special issue number one yes, they have answered special issue number two yes.

And, so, now we are looking at special issue number three.  That's what we call the mitigation issue.

A    Okay.

Q    All right.  Neither side has a burden in that special issue.  There is not a burden of proof on the State, there is not a burden of proof on the defendant.

Both sides are allowed to present whatever we would want to because the law says that you, as a juror, can decide that anything can be a mitigating factor sufficient to warrant that the person receive life without parole rather

than death.

A    Okay.

Q    Okay.  And it lists some things here, and we'll go through those.  But the courts have told us that the list is -- that is not a complete list.

It can be anything that is of importance to you, any mitigating factor.  And mitigating factor is something that makes it less bad, I guess.  It's the opposite of aggravating.  It's mitigating.

A    Okay.

Q    Okay?  And the issue directs a jury to look at the following things.  All of the evidence, including the circumstances of the offense, the defendant's character.

A    Uh-huh.

Q    The defendant's background.

A    Uh-huh.

Q    Okay.  And the personal moral culpability of the defendant.

Okay.  Now, again, that's not an exclusive list.  It can be anything that you feel is a mitigating factor.

Some people can, oh, look at for instance the age of an individual and feel that age alone is a sufficient mitigating factor to avoid a death penalty.  Okay.  They can. They are not required to, but they certainly can if that's

what they think.

They can look at lack of significant prior criminal history, and that in and of itself can be a sufficient mitigating factor for a juror to believe that a person should receive life without parole rather than death. Okay?

A     Uh-huh.

Q     Some jurors may believe that if the evidence shows that the defendant at the time of the commission of the offense was under the influence of some mind altering drug --

A     Uh-huh.

Q     -- that made them be really somebody that they weren't normally --

A     Right.

Q     -- that that can be a sufficient mitigating circumstance in and of itself, standing alone --

A     (Nods head).

Q     -- to warrant a life sentence rather than a death sentence be imposed.

Some people think that the life history of a defendant where you get to see what has happened to the child from the day they were born up until the day the offense took place.

A     Uh-huh.

Q     That the events that you've talked about you've had

experience with, sexual abuse.

A    Right.

Q    Physical abuse.

A    Uh-huh.

Q    Neglect.

A    Uh-huh.

Q    Extreme poverty.  All those things can come into play and it can be sufficient in a juror's mind to mitigate the imposition of the death penalty.  Okay.  All of these things can be mitigating factors.  What may be a mitigating factor to you may not be a mitigating factor to the juror sitting next to you.  But that's okay, you all don't have    to agree among yourselves that one particular thing be a mitigating factor.

A    Okay.

Q    Okay.  But the law says this.  If, in your mind, there is a mitigating factor or factors that warrant that a life sentence rather than a death sentence be imposed, you could base your decision on that.  Okay?

A    (Nods head).

Q    The law anticipates that each juror will individually decide what their personal moral judgment is about the appropriateness of the death penalty.  Okay?

A    (Nods head).

Q    And a juror may say, okay, I have looked at the

evidence in this case and it is my personal moral judgment that a life sentence is preferable than a death sentence. Okay?

A    Uh-huh.

Q    And that's it as far as, you know, that juror is concerned.

Now, that doesn't mean you can't talk to them but, you know, that would be like me trying to tell you what religion you've got to follow.

A    Right, right.

Q    That just wouldn't be appropriate for me to do that.

A    Right.

Q    And it wouldn't be appropriate for you to tell another juror --

A    Right.

Q    -- what religion they must follow.

A    Uh-huh.

Q    Or how they must raise their kids.

A    Uh-huh

Q    Or who they must marry. You know, any of those personal judgments that people make.

A    Uh-huh.

Q    If you made that personal judgment and it is your personal judgment that a life sentence rather than a death

sentence be imposed --

A    Right.

Q    -- are you the type of person that would be able to stick with that?

A    Yeah.

MS. HANDLEY:  Your Honor.  I beg your pardon, Mr. Lollar.  I suppose I need a ruling on this.

I think telling the juror that if she just feels that her personal moral judgment is it should be a life sentence versus a death sentence runs afoul of the special issue number three.

We are having to look for mitigating circumstance or circumstances with respect to the case, the defendant's character or background, the moral culpability of the defendant.  But I think the blanket statement that they just personally feel it's morally wrong would be inappropriate.

MR. LOLLAR:  Well, if I said that, I didn't mean to say that.

THE COURT:  Okay.  I'll sustain the objection. If that's what you said, I'll let you rephrase it.

MR. LOLLAR:  Sure.

Q    (By Mr. Lollar)  What the law says is that you can look at any factor you find during the trial of a case, any piece of evidence, anything you've heard about.  It may be

an observation that you make of a defendant, if he smiles at his mother when he walks into the courtroom.

A    Right.

Q    And you say, I see in that smile a sufficient mitigating circumstance to avoid a death penalty.

A    Right.

Q    And that is my personal moral judgment.

A    Right.

Q    Okay, that's fine.

A    Yes.

Q    Now, the law is not going to argue with you.  Even though smiling at his mother --

A    Right.

Q    -- is not listed --

A    Right.

Q    -- in special issue number three, you understand.

A    Uh-huh.

Q    Okay.  The law also says that you may decide to exercise mercy.  Mercy is not something that you earn. Mercy is something that is bestowed upon you when you haven't earned it, right?

A    Yes.

Q    And the law says that you can, as a juror, decide to bestow mercy, period, and that rises to the level of a sufficient mitigating circumstance and it becomes your

personal moral judgment to impose a life sentence rather than a death sentence.  Okay?

A    (Nods head).

MS. HANDLEY:  Again, your Honor.  I beg your pardon, Mr. Lollar.  But just to tell the juror that if you just want to show mercy, when I believe the correct standard is if there is a sufficient mitigating circumstance and you want to find in that favor and that happens to be showing mercy, then that's fine.

But just blanket mercy not based on the evidence of the case or the defendant and the circumstances of the offense would be inappropriate.

MR. LOLLAR:  Judge, I think we've got cases, Supreme Court cases exactly on that point where mercy is said to be a sufficient mitigating circumstance.

THE COURT:  As long as the juror thinks that it's sufficiently mitigating circumstances, they could follow the law.

Q    (By Mr. Lollar)  Okay.  Ms. Rivera, do you have any questions about anything we've talked about?

A    No, not at this time.

Q    Okay.  Ms. Rivera, I want to thank you -- oh, wait, wait, wait, wait.  One little thing we need to talk about.

A    Okay.

Q    I forgot.  Okay.  One of the things that the

**Anne B. Meredith**
Certified Shorthand Reporter

prosecutor talked with you about was a murder case, not a capital murder case.

A    Right.

Q    But you understand that in any, in any trial of a criminal case there are normally some what we call lesser included offenses that may fall out of the evidence.  Okay?

So, for instance, in this type of a case, they are saying it was a murder during the course of a robbery.

A    Right.

Q    Let's say that you see all the evidence and you have no doubt that there was a murder.

A    Right.

Q    But you do have a doubt about whether or not there was a robbery going on.

A    Right.

Q    Okay.  So you couldn't, under those circumstances, find a defendant guilty of capital murder.  So, what you do is look at the lesser included offense of murder.  Okay.  And that's what you find him guilty of --

A    Right.

Q    -- if you are convinced beyond a reasonable doubt that that's what they did.  Okay.

And the law says, in the State of Texas, the penalty range for murder is anywhere from five years up to life.

A    Uh-huh.

Q    Okay.  And an optional fine not to exceed $10,000.  Okay?

A    Uh-huh.

Q    And one of the things that the prosecutor asked you was, would you be able to keep your mind open to the entire range of punishment for murder?

A    Right.

Q    Which would include the imposition of a five year sentence for intentional murder.  Okay?

A    Uh-huh.

Q    And I believe you indicated that no, you wouldn't be able to do that.  Well, let me give you some examples, okay, just to -- I'm sure you haven't thought about these.  We don't expect that you will have thought about these.

But if we were just to say to you, if we were talking about the murder of, the intentional murder of a ten year old child, okay, that sounds awful, doesn't it?

A    Uh-huh.

Q    Until you hear the other side of the story.  I don't know if you've listened to Paul Harvey, but he always had these programs about the other side of the story.

And then you find out that the person who committed the murder, the intentional murder of the ten year old, was the person's father, the ten year old's father.

And we find out that the ten year old was suffering from some horrible disease and they are in the hospital, and the doctors have said they are not going to get -- they are not going to make it through this. They are going to die a slow, painful death.

A    Uh-huh.

Q    And they are, in fact, doing just that. They are dying a slow and painful death. And the father, in really an act of mercy, reaches over and unplugs the respirator that's keeping him alive.

A    Right.

Q    Well, he has intentionally caused the death of the ten year old boy. Okay. But that may be the type of person that you would not want to sentence to more than five years in the penitentiary --

A    Okay.

Q    -- for doing that act of mercy, okay?

A    (Nods head).

Q    So, there are a thousand million cases out there and that's why the legislature gives us that big, vast penalty range.

A    Uh-huh.

Q    Okay. Five years to life.

A    Uh-huh.

Q    Okay. So, do you now see that there may be cases

out there where you would indeed support a five year sentence for murder?

A    There may be cases.

Q    Okay.  All right.  So, you wouldn't close your mind to that.  You would wait until you heard all of the evidence.

A    Right.

Q    Right?

A    (Nods head).

Q    Okay.  All right.  Thank you, Ms. Rivera, we appreciate it.

A    Thank you.

THE COURT:  All right.  Thank you, Ms. Rivera. If you would step outside for just a moment and let me confer with the attorneys and then I'll bring you back in just a second.  Can you get through there all right?

PROSPECTIVE JUROR RIVERA:  Thank you.

(Prospective Juror Rivera exits the courtroom).

THE COURT:  Thank you.  You may be seated.

Does the State have a challenge for cause?

MS. HANDLEY:  Oh, your Honor, we would challenge this particular juror as not being qualified in that I believe she is raising the burden of proof on the State.  She is looking for things that we're not required to show in a case such as whether or not the defendant has availed himself of some resources.  Yet, within 25 minutes she couldn't ever

seem to articulate exactly what these resources were.

We would also submit her as a vacillating juror. She said very specific things on her questionnaire and then she said, of course, very different things here upon being questioned one on one.

THE COURT:  Defense have a response?

MR. LOLLAR:  Judge, we feel that Ms. Rivera is qualified under the law and that she is an acceptable juror.

THE COURT:  Okay.  Let's go off the record for just a minute.

(Discussion off the record).

THE COURT:  Okay.  Bring her back in, if you would, please, and let me see if I can kind of run through this quickly with her.

(Prospective Juror Rivera returns to the

courtroom).

THE COURT:  Yeah, Ms. Rivera, come on back in, if you would, please, ma'am.  Just go ahead and have a seat there, if you would.

FURTHER EXAMINATION

BY THE COURT:

Q    Let me see if I can't kind of clarify some things here.  The attorneys have talked to you, but I'm going to talk to you this time.

A    Okay.

Q    And you understand that in every criminal case as well as this, in a capital murder case, that the State has the burden of proving each and every element of the offense beyond a reasonable doubt.  That's the burden of proof.

Now, number one, would you hold the State to that burden of proof?

A    Yes.

Q    Would you make the State prove each and every -- each and every element of the offense beyond a reasonable doubt?

A    Yes.

Q    And if they did that, in your mind, then could you return a guilty verdict in the case?

A    Yes.

Q    Okay.  All right.  And you understand that the State's burden of proof only in the guilt or innocence phase of the trial only extends to those elements of the offense. They don't have to prove to you anything else but it was the defendant, happened on such and such a date --

A    I understand.

Q    -- on or about such and such a date.

A    Right.

Q    In Dallas County, and that the individual did cause the death of another individual.

A    Right.

Q    Whoever that might be.

A    Right.

Q    While in the commission of another felony offense.

A    I understand.

Q    In this case robbery.

A    Uh-huh.

Q    All right.  So, you could hold them to that burden of proof.

A    Yes.

Q    Now, in the punishment phase, the State's burden of proof only extends to special issue number one to prove to you beyond a reasonable doubt that there is a probability the defendant would be -- commit acts of violence in the future.

A    Right.

Q    We call it the future dangerousness issue.

A    Right.

Q    They would have the burden of proving that.

A    Right.

Q    Can you hold them to that burden of proof?

A    Yes, I can.

Q    And, again, it's proof beyond a reasonable doubt, not proof beyond all doubt or any doubt or 100 percent.

A    Right.

Q    That's Perry Mason burden of proof.

A    Right.

Q    This is real life, so this is proof beyond a reasonable doubt.

A    Uh-huh.

Q    That's what the law calls for.

Special issue number two.  If that's involved in the trial of this case -- and in some cases it is and in some cases it's not.

A    Right.

Q    Quite frankly, I don't know whether it will be involved in this case or not, but they ask you questions on it.  And if it's involved in the trial of this case and the judge submits that issue to the jury, then the State would have the burden of proof of proving that to you beyond a reasonable doubt, that they either caused the death of the deceased or actually caused the death of the deceased but intended to kill the deceased or should have anticipated that another human life would be taken.  They have to prove that to you beyond a reasonable doubt.

A    Right.

Q    If it's involved in the case.

A    Okay.

Q    And that's all that the State has to prove to you.

Special issue number three, you get that from

wherever.

A    Okay.

Q    And you just weigh all the evidence that you've heard throughout the entire course of the trial.

A    Uh-huh.

Q    Either the guilt/innocence phase or the punishment phase.

A    Uh-huh.

Q    And then you make a moral judgment as to whether or not anything that you've heard during the course of the trial would rise to the -- to be a sufficient mitigating circumstance.

And if you do, then you can answer that question yes.  And if you don't, then you answer the question no.  All right?

A    Uh-huh.

Q    Okay.  Now, you understand all that.

A    Yes.

Q    Do you have a problem with any of that?

A    No.

Q    And that would be the law and that's what Judge Snipes would tell you.

A    Uh-huh.

Q    And, so, can you follow the law?

A    Yes.

Q    Can you be true to your oath and make your decision on guilt or innocence or on special issue number one or special issue number two, if it's submitted to the jury, based solely on the evidence in this case and the law that Judge Snipes will give to you?

A    Yes.

Q    All right.  Now, you raised two or three, four times that, you know, you wanted to see something about a resource that was out there, or something like that.

You understand that the State doesn't have any burden of showing you --

A    Right.

Q    -- what was available to the defendant.

A    Right, right.

Q    And if he availed himself of it.

A    Right.

Q    Nobody does.

A    Right.

Q    There is no burden of proof on the defense at all --

A    Uh-huh.

Q    -- throughout the course of the trial.

So, you might hear something about that and, again, you might not hear anything about that.  But if you don't, that shouldn't figure into your, you know, well, I didn't hear anything about, you know, if he tried to do this,

that or the other.

A    Right.

Q    You understand that?

A    Yes, uh-huh.

Q    And that might be something you would like to hear.

A    Right.

Q    Like I believe Ms. Handley told you earlier, you know, we would like to hear both sides of the story, or maybe that was Mr. Lollar.  I don't remember which one brought that up.

A    Uh-huh.

Q    But you know, sometimes you don't --

A    Right.

Q    -- in a criminal case.

A    Uh-huh.

Q    And you understand that the State has the burden of proof.

A    Right.

Q    It never shifts to the defendant.  And you can hold the State to that burden of proof and not a higher burden of proof.

A    Okay.

Q    In other words, beyond a reasonable doubt or a doubt, any doubt based on reason and, you know, your good judgment.

A    Uh-huh.

Q    Common sense sometimes we call it.

A    Yes.

Q    Common sense.  So, can you do that?

A    Yes.

Q    Okay.  You wouldn't hold the State to a higher burden of proof?

A    Right.  No, I wouldn't.

Q    Okay.  And if Judge Snipes gives you a range of punishment in a lesser included offense, whatever it might be, if it's murder or aggravated robbery or whatever it might be, then you can keep your mind open to the full range of punishment.

A    Correct.

Q    And you can hold the State to their burden of proof on special issue number one and number two.

A    Uh-huh, definitely.

Q    If submitted to you.

A    Definitely.

Q    Okay.  All right.  Good.

THE COURT:  Any other questions?

MS. HANDLEY:  Nothing further.  Thank you, Judge.

THE COURT:  Thank you, Ms. Rivera.

(Prospective Juror Rivera exits the courtroom).

THE COURT:  Thank you.  Be seated.

Ms. Handley.

MS. HANDLEY: Your Honor, I believe this juror is qualified.

THE COURT: Okay.

MR. LOLLAR: We do, too.

MS. HANDLEY: We would be happy to take her.

THE COURT: All right. Very good. Thank you.

And if you will invite Ms. Rivera back in one more time.

THE BAILIFF: Yes, sir.

(Prospective Juror Rivera returns to the courtroom).

THE COURT: Ms. Rivera, I'm sorry to bring you back in here, but come on around here. Just go ahead and have a seat. We'll just be here a second.

PROSPECTIVE JUROR RIVERA: Okay.

THE COURT: Ms. Rivera, you have been qualified as a prospective juror in this case. And you are actually qualified as number eleven, I believe it is, isn't it?

MS. HANDLEY: Yes, sir.

THE COURT: The trial we anticipate starting August the 10th.

PROSPECTIVE JUROR RIVERA: Uh-huh.

THE COURT: Which is a Monday.

Thank you. You can be seated. I'm sorry if I

didn't say that.

Which is a Monday, and we anticipate that it will take probably two weeks.

PROSPECTIVE JUROR RIVERA:  Okay.

THE COURT:  Now, you'll be notified between now and then, probably a week to ten days, would you say, prior to trial as to whether or not you're on the jury.

PROSPECTIVE JUROR RIVERA:  Okay.

THE COURT:  But what I would like for you to do right now is to tentatively set that date, August the 10th, on your calendar.

PROSPECTIVE JUROR RIVERA:  Okay.

THE COURT:  And then you'll be notified that you're either not on the jury or that you are.  If you're not on the jury, then you don't have to report on August 10th, and it will explain that in the letter to you.

But if you are on the jury, then you have to report for jury duty on August the 10th and there will be about a two week -- it will take about two weeks to try the evidence in this case.

Now, with regard to pretrial publicity, you indicated I think when you came in here that you were not aware of any of the facts in this case or what you think the facts might be.

PROSPECTIVE JUROR RIVERA:  No.

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT: Haven't heard any radio, newspaper accounts, heard anything on TV or the radio --

PROSPECTIVE JUROR RIVERA: Huh-uh.

THE COURT: -- concerning this case that you're aware of. I want to keep you that way.

PROSPECTIVE JUROR RIVERA: Okay.

THE COURT: All right? I don't want you to know anything about this case.

PROSPECTIVE JUROR RIVERA: Okay.

THE COURT: So, don't go home and look this up on the Internet --

PROSPECTIVE JUROR RIVERA: Okay.

THE COURT: -- and try to get back in the archives and find some old news articles --

PROSPECTIVE JUROR RIVERA: Right.

THE COURT: -- or anything like that, TV newscast report.

PROSPECTIVE JUROR RIVERA: No, I'm going to start fresh.

THE COURT: Yeah, because when Judge Snipes administers the oath of a juror to you with the other jurors, then what you will be sworn to do at that time, you will be sworn to make your decision in this case based on the evidence that you'll see here and receive in the trial of the case and then the law that Judge Snipes will give to you in his

charge to the jury.

PROSPECTIVE JUROR RIVERA:  Right.

THE COURT:  All right.  Okay.  So, anything else, Ms. Handley?

MS. HANDLEY:  No, sir.  Thank you so much.

THE COURT:  From the State?  Anything, Mr. Lollar?

MR. LOLLAR:  No, thank you.

THE COURT:  Thank you so much, Ms. Rivera. And you will be notified.

PROSPECTIVE JUROR RIVERA:  Okay.

MS. HANDLEY:  Thank you.

THE COURT:  Thank you for your time today.

(Prospective Juror Rivera excused from the courtroom).

THE COURT:  Would y'all like to take a short recess here or are you ready for --

MS. HANDLEY:  At the pleasure of the Court.  I can start right now.  It doesn't matter.

THE COURT:  Okay.  Everybody okay?

MR. LOLLAR:  Sure.

THE COURT:  Okay, let's just do it.

(Prospective Juror No. 222, Curtis Riser, enters the courtroom).

THE COURT:  Mr. Riser, good afternoon.  Just

have a seat right there, if you would, please, sir.

PROSPECTIVE JUROR RISER:  Here?

THE COURT:  Yes, sir, that's a good place.

PROSPECTIVE JUROR RISER:  How is everybody?

THE COURT:  Fine, thank you.  How are you this afternoon?

PROSPECTIVE JUROR RISER:  Okay.

THE COURT:  Thank you for your time.

PROSPECTIVE JUROR RISER:  No problem.

THE COURT:  Mr. Riser, this is prospective juror number 222, Curtis Riser, r-i-s-e-r.

PROSPECTIVE JUROR RISER:  That's correct.

CURTIS RISER,

having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    And how are you this afternoon?

A    Good.

Q    Good.  Glad to have you with us this afternoon. I'm Judge Quay Parker.

A    Yes, sir.

Q    I'm a Senior District Judge from McKinney just north of here.

Q    Yes, sir.

A    And Judge Snipes has asked me to assist him in the

trial of this case during the jury selection process. And, so, that explains to you what I'm doing here today and also, consequently, why you're here today. You're here for this little exercise as well.

And of course, Judge Snipes is here. He's up in his courtroom taking care of the day-to-day matters of the Court while I'm down here getting this jury panel picked for him.

So, anyway, we are glad to have you. Thank you for your time this afternoon.

Now, did you have an opportunity to read the little pamphlet that was given to you earlier?

A    Yes, I did.

Q    And it kind of goes over -- Yes, sir, that's fine. It kind of goes over some of the law. And I will tell you kind of what's going to happen here this afternoon. The attorneys are going to do most of the talking. I'm going to hush up here in a minute and turn it over to them.

But they are going to explain a little bit about the law and some of the procedural aspects involved in the trial of this case to you. And then they are going to, once you understand that --

A    Right.

Q    -- then they are going to ask you questions regarding just wanting to get your ideas, your opinions,

your thoughts on those points of law and those procedural aspects.

Now, you'll recall, Mr. Riser, about a month ago, or maybe over a month ago now, everybody met in the central jury and Judge Snipes talked to you for a while, went over some concepts with the jury, qualifications, exemptions, and listened to all the whining and moaning of folks that didn't want to be on jury service, or what have you.

So, anyway, once he got through all that, at some point in the proceedings he had everybody stand up, raise their right hand, and then he swore in the panel members. Do you recall that?

A    Yes.

Q    Okay. Were you one of the panel members that stood and took the oath at that time?

A    Yes.

Q    All right. I'll just remind you you're still under that oath. And what you have been sworn to do are basically two things. Number one, to give truthful answers, but we know you would do that anyway. And then, secondly, to respond to each and every question --

A    Okay.

Q    -- the attorneys talk to you about or ask you.

Now, let me tell you, with regard to their

questions and your answers, there's no right or wrong answers.

A    Okay.

Q    As I told you before, they are trying to get your ideas, your thoughts, your opinions concerning the law that's involved in the trial of this case.  So, there is not going to be anything that's going to embarrass you or anything that -- it's not a quiz that you've got to pass --

A    Okay.

Q    -- or fail, you know, in other words.

THE COURT:  Okay.  Let me introduce the attorneys to you that are participating in this trial.

Ms. Andrea Handley.

MS. HANDLEY:  Good afternoon.

PROSPECTIVE JUROR RISER:  Good afternoon.

THE COURT:  She is going to be talking to you today.  I believe you are, aren't you?

MS. HANDLEY:  yes, sir.

THE COURT:  Okay.  She is going to be talking to you for the State of Texas.  And seated next to her is Elaine Evans.

MS. EVANS:  Good afternoon.

PROSPECTIVE JUROR RISER:  Nice to meet you.

THE COURT:  And then seated back over here kind of behind everybody is Mr. Gordon Hikel.

All three of these ladies and gentlemen are assistant district attorneys here charged with the responsibility of prosecuting this case.  There's also two other members of the prosecution team that aren't present here in court with us today.

Then seated right down there is Mr. Brad Lollar.  And next to him is Mr. Doug Parks.  And then on the very end down there is Ms. Keri Mallon.

MS. MALLON:  Hi.

PROSPECTIVE JUROR RISER:  Good afternoon.

THE COURT:  And they are the three members of the defense team.  And they represent Mr. James Broadnax who is the defendant on the very end down there.  All right?

PROSPECTIVE JUROR RISER:  Yes, sir.

THE COURT:  Very good.  Thank you.

Ms. Handley.

MS. HANDLEY:  Thank you, your Honor.  Appreciate it.

EXAMINATION

BY MS. HANDLEY:

Q    Good afternoon, Mr. Riser.  How are you?

A    I'm well.  How are you doing?

Q    I'm good.  How do you feel about being here?

A    It's good.

Q    Good?  All right.  Well, I'm glad to hear that.

A    It took a while, though, but.

Q    It did, and we appreciate your patience.

THE COURT:  We apologize for it.

Q    There is something you learn about the legal system if you ever get picked for this jury, it's a lot of hurry up and wait, hurry up and wait.

A    No problem.

Q    So, but we always appreciate you being patient with us.

A    Oh, yeah.

Q    And I think you can appreciate that you're here on a really big deal too, and that's why it's taking more time.  We're talking to the people one on one.  You remember that hundreds of people that showed up?

A    Yes.

Q    We're talking to every one of them.

A    I'm surprised that I got picked in it.

Q    Yeah.  Why does that surprise you?

A    Because there's so many people.

Q    So many people.  We are taking them in chronological or numerical order, numerical order and, so, you're actually pretty close of 222.

A    Yeah.

Q    But, anyway, we're talking to people one at a time and individually because we've read your questionnaire and

appreciate you being so thorough in this. I think it gives us a good appreciation or feeling about who you are and where you stand on certain issues.

And now we have this opportunity to talk to you about the law but also get to know you a little bit more, see if you understand the law, do you like the law, is it a law that you can follow or is it one that you just can't be part of, you know.

A    Right.

Q    I think that you would probably agree with me that a good qualified juror is a juror who needs to be fair to both sides.

A    Right, exactly.

Q    You don't come in with your mind made up or anything like that.

A    No, ma'am.

Q    And you are a sales rep for the Dr. Pepper and Snapple Company; is that correct?

A    Correct.

Q    Do you get in trouble if you get caught drinking a competitor's drink?

A    They can let you go. They can fire you. It's in the handbook.

Q    It's in the handbook, huh? Okay. So, better to not even try it, not get a taste for something else, huh?

A    No, ma'am.

Q    And I'll tell you what, Mr. Riser, I'm looking at your life experience, I'm looking at your education here, a little bit of your family history.  It tells me a little bit here.  And you look to me like a man who has worked hard to get where he is.  Is that a fair thing to say?

A    That's fair, yeah.

Q    Okay.  Did you always have it easy in life?

A    No.  I had good parents.  They taught me to work hard and persevere and keep moving forward.

Q    Okay.

A    I had good parents.

Q    You had -- And it looks like that you had a couple of hard working parents here.

A    Yeah.

Q    Who unfortunately passed away, and I am sure you miss them, probably miss them quite a bit.  But they raised you to work hard, and with a lot of hard work and some honesty and integrity, you can get where you want.

A    A lot of hard work and education, and it's a trial.  You know, you get up and try every day.

Q    Yeah.  It's not easy, is it?

A    It's easy if you believe in God.  I mean, my main thing is Jesus makes sure I move.  He moves me, so I'm good.

Q    And I guess it's a choice on whether or not to

listen to those things.  We're all free moral agents, aren't we?

A    Yes, we are.

Q    I mean God is everywhere.  God is in the mix of everything.

A    That's right.

Q    And we make our choices whether to listen to Him, haul our tired self out at bed at 5:00 in the morning or lay up in the bed until 12:00 o'clock, right?

A    I guess.

Q    Do you think that's a personal choice or do you think that's just --

A    It's a personal choice.

Q    Yeah.  It's not always easy, is it?

A    That's life.  Life is not easy.

Q    Life is not easy.  I think we all have our crosses to bear, don't we?

A    We do.

Q    Yeah.  And I take it, it doesn't look like you were born with a silver spoon in your mouth, you didn't have things just handed to you on a --

A    No, I'm from East Texas, Marshall, so, no.

Q    Okay.  Not everybody -- there's some folks in Marshall with --

A    If you get married to -- what's that lady that

used to be married to LBJ?  She is from down that way.

Q    Lady Bird?

A    Lady Bird.

Q    Except for Lady Bird, everybody else has hard work and getting up early, right?

A    That's it.

Q    Okay.  You've got a couple of kids, too.  I bet you're proud of them.  It sounds like they are on the right track, huh?

A    Right track, yeah.

Q    Okay.  Okay.  I appreciate you answering my questions and doing that, being that kind of person.

You are also involved in your church.  You attend The Potter's House?

A    Yes.

Q    And you are an usher?

A    Yes.

Q    Okay.  Let me talk to you a little bit, then, about, first of all, your feelings about the death penalty, Mr. Riser.  You put on the first page of your questionnaire -- Do you have it in front of you?  Good.

We asked you if you were in favor of the death penalty and you said no.  You said, there have been too many people convicted for crimes that we have later found out were innocent.  And then on the scale here you circled

number three where you said, although I do not believe the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper circumstances.

You've gone on in here again that the best argument against the death penalty might be we've killed an innocent man, we've got the wrong person, and now it's too late to turn back. And then also on the scale of how strongly you are in favor of or against the death penalty, you put a one, as a one being the least.

A    That's right.

Q    Can you expand on that a little bit for me on your feelings on the death penalty and particularly you potentially playing such a big part in a case where someone might be put to death?

A    Let me be clear. Let me be completely clear. It's a last resort because you can't bring a person back once you make that decision.

Q    Right.

A    So, that's the only thing -- that's my major issue. I mean that could be anybody. To be honest, if you kill somebody, whether it's the State or whoever, you can't bring them back. You can have remorse, you can be sorry, you can whatever, but you can't bring them back. So, if you go through the whole process, at the end of the day, that's what

it is.  Logically --

Q    Uh-huh.

A    -- and reasonably, I could do it.

Q    Okay.  Okay.

A    It just have to be through the process.

Q    I got you.

A    It can't be a shortcut.

Q    I got you.  And there should be no shortcuts --

A    No.

Q    -- in this process.

A    Not with this, no.

Q    None whatsoever.  I --

A    Not with something like this.

Q    I wouldn't want to be a part of something that would take it so callously.

A    Right.

Q    Is your reservation, then, Mr. Riser, would you say it's more towards there is no room for sloppiness and that we might convict an innocent man or is it more I don't want to be part of the death penalty?

A    No room for sloppiness.

Q    Okay.  Okay.  If we proved our case to you beyond a reasonable doubt, then you could be part of the death of another human being?

A    That's the question I asked myself this morning.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Okay.

A    Out there in the waiting room.

Q    That's how I -- That's what I want to know from you.

A    Yeah.  You asked where I stood about it.  I could do it.

Q    Okay.

A    Don't want to do it, but I could do it.

Q    Okay.  Okay.  I think, at least from my personal experience, I don't think anybody should want to do it.

A    Right.

Q    I think if someone said, I want to do it, I wouldn't want them on my jury because I think they might come in already a little too biased in favor of me and maybe not receptive to the whole circumstances.

So, your reservations, and I respect those and appreciate those, is you want to be sure.

A    I want to be sure.

Q    You want to be sure.  And you mentioned innocence here.  You have been watching the Innocence Project --

A    Oh, yeah.

Q    -- that Mr. Watkins is -- and it's fantastic, isn't it?  It's fantastic.

A    Yes.

Q    And those are a lot of cases that were prosecuted a long time ago.  We didn't have the forensic evidence that we

have now.  And a lot of good men --

A    Yeah.

Q    -- are now being exonerated.

Times have changed, I'd like to think.  Do you believe that, do you think that things are a little bit different now?

A    Oh, yeah, definitely.

Q    In terms of us prosecuting now?

A    Yes, ma'am, for sure.

Q    Okay.  Do you, because of the Innocence Project and the fact that those cases -- and you understand a lot of those come out of Dallas because we saved the evidence?

A    Yeah, that's a good deal right there.

Q    Yeah, and other, and other counties haven't saved the evidence --

A    Right.

Q    -- or it might be going on there, too.  But nevertheless, we're in Dallas and we started that program and the light is kind of on us.

Does that give you any reservations about taking part in prosecution -- I shouldn't say, you're not taking part in prosecution -- but being involved in a case in Dallas now today in 2009?

A    No.

Q    Okay.  Okay.  Are you, are you comfortable and

confident with our motivations in our office and how we are doing things?

A    I think they are more thorough.

Q    Okay.  Okay.

A    In my personal opinion.

Q    Absolutely.  Well, then let's talk a little bit -- Let me ask you a little bit more now also.  You're an usher with The Potter's House.  That is a big church.

A    Uh-huh.

Q    How many ushers does it take for one service?

A    A couple of hundred.

Q    Golly.  Yeah, that makes sense.  That makes sense.  The times I have been there, it's huge.

Does your particular church take the stand for or against the death penalty; where are they on that?

A    I don't know where he stands.  I can't speak for him.  I don't know where he stands on it.

Q    Okay.

A    I doubt it because we just -- we always believe everybody can be redeemed.

Q    Okay.

A    And we've helped to redeem some, so.

Q    Sure, sure, sure.  But does that, that everybody can be redeemed, does that, does that factor into the for or against the death penalty or --

**Anne B. Meredith**
Certified Shorthand Reporter

A    I couldn't speak for the church.  But for myself personally --

Q    Yes, sir.

A    -- it don't.

Q    Okay.  If you played a part in this case, you were on this jury, we finally proved our case, you found him guilty, he was sentenced to death, are you going to be comfortable going to your church, being an usher?

A    Uh-huh.

Q    Taking people to their seats, somebody might look at you and go, you're kidding me, right?

A    Right.

Q    You want to usher me to a seat and you just were part of killing a man?

What's going to be your response to that, Mr. Riser?

A    We live in a society and we do what the law says to do and that's what we do.  I believe in the church.  I mean I go to church, but we live in the world.  We can't pretend that we don't.  We have to be able to handle this kind of situation.

I mean personally, personally I try to make sure I'm doing the right thing because of my kids, my son.

Q    Yeah.

A    I can tell him -- You know, what can I tell him?

I want to be his example.

Q    Sure.

A    And, so.

Q    Do you think, do you think you could reconcile that with your kids, being part of a case like this?

A    Sure.  Yes, I do.

Q    Do you think if you had to -- if you found a person, a man guilty and answered the questions so that he got the death sentence, that you could reconcile that or be okay with your children with that?

A    Sure.

Q    What would you tell them?

A    If that came to that point --

Q    Yes, sir.

A    -- I would say, we went through the process. That's what the law showed us.  This is what happened in the case.  This is the decision we came to and it's the decision I made, right or wrong.  I think it's the right one that I made, guilt or innocence, either way.

Q    Uh-huh.

A    And this is what I did, A, B, C, D, E, F, G.

Q    Right.

A    I want my son to be smart enough to realize they've got to analyze things for themselves.

Q    Sure.

A    I take your opinion, his opinion, the Court's opinion. I still got to take it myself and analyze it for myself.

Q    Absolutely.

A    So, it's like I almost have to be a thinker. I don't want to just be a follower.

Q    I got you. I got you. How old is your son?

A    He's fifteen.

Q    He's fifteen. So, he's still a young man.

A    He's a young man basically. I mean I see him. I see him. I see him in this room.

Q    What do you mean, you see him in this room?

A    The lawyer right there. One of those gentlemen in the back is not a lawyer but -- oh, a bailiff. You know, my son is a black boy, and I see him in this room.

Q    Well, let me ask you this. That's the defendant right there.

A    Yeah.

Q    His name is James Broadnax. Okay. And he too is a black man.

A    Right.

Q    Is there, is there anything about that -- because you've said, I see my son in here.

A    Yeah. No, but --

Q    How does that factor into the equation?

A    It factors in because we are black people.  It's just like our district attorney is a black guy.

Q    Uh-huh.

A    First one to hit Texas, first one in Dallas.

Q    Uh-huh.

A    It's like, man, it's good because my son gets to see, besides seeing the black guys on TV all the time with the mugshots --

Q    Yeah.

A    -- he can see the lawyer, he can see the bailiff, he can see the District Attorney of Dallas.

Q    Uh-huh.

A    And if people say it don't make a difference, it do make a difference because kids, what kids see they can believe.  That's why TV is so strong.

Q    Absolutely.  It can sell you anything.  They sell you stuff you don't need all day long, yeah.

A    But you have to be smart enough to know that this' is a sales pitch.  This is not good.  So, I'm trying to teach him that and, you know, he is learning.

Q    Okay.  Let me explore that a little bit more with you because you can obviously tell me more than I can tell you.  You've said, you know, you're in a room with some very accomplished --

A    Uh-huh.

Q   -- black men, and then you're sitting in the case of a black man.

A   Right.

Q   Do you feel like you owe him any allegiance because of that?

A   No, ma'am.

Q   Okay.

A   I've also worked in personnel at this company, Dr. Pepper.

Q   Yeah, yeah.

A   And when somebody comes in with their resume, I'm going to look at it.  But he's got to have -- this is the job qualifications right here.  What are your qualifications? Do you fit this?

Q   Uh-huh.

A   If you don't -- if you don't have a commercial driver's license, you can be as black as you want to be.

Q   Okay.

A   If you don't have a commercial driver's license, you're not going to drive a truck for us.

Q   Okay.  Okay.

A   You're not going to drive a truck for us if you don't have a license.

Q   Uh-huh.

A   I can like you all you want to.  You could be my

brother, I still wouldn't hire you because you don't have a license or you don't have the salesmanship to do the job.

Q    Uh-huh.

A    You know, that goes to black people.  You could be my brother, like I say.  I have one brother.  If he come to work at Dr. Pepper, he wanted to work there, man, I can't hire you because you don't have a license --

Q    Okay.

A    -- or the skills to do the job.  So, no allegiance at all.

Q    Sure.  Okay.  So, in terms of race -- And, again, like I say, you know better than I do.  I just want your opinion.  There is not a problem for you in that somebody could potentially, or somebody could potentially say to you afterwards, how could you do that to another black man?

A    Yeah.

Q    What would be your response?

A    If I stopped laughing at them, I'd say, man, be for real.  This is how the case went.

Q    Yeah.

A    It's just like one guy told me once, you acting white.  The black guy, he said, you acting like you white.  He said, man, you trying to get an education, you trying to do this, trying to do that.

I said, man, that's being white?  That was a

black guy talking.

Q    Uh-huh.

A    I said, you tell me right now, you think being white is smart and being black is dumb because you're black? He said, come on, man, help me out, help me out.  Help me think about it.

Q    Yeah, okay.

A    So, no.

Q    Is he aware of who is president these days?

A    He wasn't president then.

Q    The man who asked you that?

A    He wasn't president then.  You know, like man, but still.

Q    Okay.

A    A lot of times -- this is my opinion.

Q    Uh-huh.

A    A lot of times our worst enemies are ourselves as far as women think and men also.  So, you know, women have the same --

Q    Oh, yeah.

A    -- the same problem as men have.  It's hard to see you in this position until they see somebody in the position. My son can see, he can see the President of the United States now.  He could dream about it at first, but now he can actually see that it came to pass.

Q    That's good.  President, DA.

A    That's how it goes.

Q    Okay.  Thank you.  Thank you for answering my questions.

A    Oh, you're welcome.

Q    That's enlightening.  I appreciate that.

A    I hope I didn't go around in circles with you.

Q    No, you're not.  That's very, that's very enlightening.  I appreciate that, Mr. Riser, I do appreciate that.

Let's talk a little bit about the law and what's going on in these cases.  Have you ever sat on a jury before, jury duty before?

A    Yes.

Q    Okay.  Did you -- What kind of case was it?

A    It was a DUI.

Q    Okay, a criminal case.  A person was charged with driving while intoxicated?

A    Right.

Q    And did you guys return a verdict in that?

A    I think we found him not guilty.

Q    Okay.  So, there wasn't a second phase, there wasn't a punishment phase where you assessd punishment --

A    No, ma'am.

Q    -- in the case?

**Anne B. Meredith**
Certified Shorthand Reporter

All right. And I think, looking back, that was quite awhile ago, wasn't it?

A    Right.

Q    Okay. Well, let me tell you this. The DWI case that you sat in, the standards of law, the fundamental principles of law that applied in that driving while intoxicated case, that misdemeanor case, are the same that apply in a death penalty case. Okay?

And generally speaking, there's two phases of trial. There's the first part of the trial where you decide one question only, is this person guilty of the charge that they have been charged with. Guilty, are they guilty or not?

And if you find them not guilty, you know, either it's not guilty and everybody goes home or there could be something else that happens that we get to.

But if you find them guilty, you move into the second phase of the trial, and that's called the punishment phase. That's where you decide they are guilty, but what are we going to do about it now?

The same principles of law that you applied in the case where you sat on for the driving while intoxicated apply in every case. You may or may not recall this. Obviously they felt you were qualified because they put you on the jury. But in any criminal case, it's the State of Texas that carries the burden of proof in a criminal

case.  I do the charging, I ought to do the proving, right?

A    Right.

Q    And does that not just seem fair to you?

A    It makes sense.

Q    Absolutely.  You shouldn't have to prove your innocence.

A    No.

Q    If I am going to bring the charge, I ought to prove it.  And from this point right now in a criminal case, in any criminal case, the defendant, you are to presume him innocent.  The reason is is because have I proved anything to you?

A    No.

Q    He doesn't come off of that presumption of innocence only if and until I prove my case to you beyond a reasonable doubt.

I don't have a definition of beyond a reasonable doubt for you.  It's really whatever you think it is.  But it's not necessarily beyond 100 percent doubt or all doubt entirely.  Does that seem fair to you?

A    Yes.

Q    And some people say that a reasonable doubt is maybe a doubt based on reason and common sense.

If you had a doubt in the case that was based on reason and common sense, then that's a pretty good doubt.

A    Okay.

Q    If you had a doubt based on some crazy theory that was not based in anything, then that's not really a doubt, a reasonable doubt.

Obviously you did in the DWI case.

A    Uh-huh.

Q    You know, police officers, their standard of proof on the street or their standard to arrest is, do I have probable cause?

A    Right.

Q    Do I have reasonable suspicion that something is going on?

It's a much higher burden once we get to the court and now the beyond a reasonable doubt.  So, perhaps that officer did what he was supposed to do for the time and circumstances on the street, assuming that that guy was drunk maybe.  But now the jury determined no, actually it didn't rise to that level.

A    Right.

Q    So, that makes sense to you.

A    Well, in that case we had a video on the guy.

Q    Okay.

A    They videotaped the guy.  They videotaped the guy, so you could see how the guy was acting.  You could see he wasn't, you know --

Q    I got you.

**Anne B. Meredith**
Certified Shorthand Reporter

A    The video, the video was there.

Q    And you can tell a lot by watching the video, can't you?

A    Oh, yeah, you can tell a lot.

Q    Some might say, well, but you can't smell alcohol on a video or you can't see the eyes on a video, or some might say, yeah, the video looks real bad, but there is another side to that story.  But that's for you to decide.

A    Right.

Q    You can look at the video and decide what you think that is.

But we've got to prove our case to you beyond a reasonable doubt.

A    Right.

Q    And until we do that, the defendant is presumed innocent.

A    I can do that.

Q    Part of that burden is -- you've heard of the fifth amendment right to remain silent.

A    Uh-huh.

Q    I can't force a defendant to testify.  And if a defendant doesn't testify, you can't hold that against him. Do you get that?

A    Yes.

Q    And you appreciate that.  Okay.

Another -- I'm sorry.  Another part of being a juror in a case is that you are to assess the credibility of all the witnesses.

A   Okay.

Q   We asked a question in the questionnaire.  Let me see if -- On page seven we asked you about officer credibility.  We said, do you believe police officers are more likely to tell the truth than the average person, and you said yes, they are trying to observe and make informed decisions.  The average person will tell the truth in whatever light they are in at a particular moment.

It's okay, Mr. Riser, to think of a certain category of persons as maybe more credible or maybe more, be more or less skeptical of a certain category of people.

But when you're sitting on a jury, you have to assess the person's credibility from what they say on the witness stand.

A   Yeah.

Q   In other words, you can't say, you tell me a police officer is going to testify, I'm going to tell you right now I'll automatically believe everything he says.

A   Right.

Q   Instead you've got to wait for him to take the stand, take the oath, be sworn, talk, and then you assess his credibility and see, is he everything you expected him

to be, or do you go, maybe he's not lying --

A    Right.

Q    -- maybe he's just mistaken.

A    Right.

Q    Or maybe he thought he, you know, he did what he had to do on the street, but it doesn't rise to the burden up here.

So, can you -- You'll wait, then. You won't automatically believe police officers just because they are police officers. Is that fair to say?

A    That's fair to say.

Q    Okay. You will assess the credibility --

A    Oh, yes, ma'am.

Q    -- from the witness stand.

A    Without a doubt.

Q    And that's something that applies to in all trials and all parts is that your verdict has to be based entirely on the evidence in the case and nothing else. Evidence comes from the witness stand.

You know, it doesn't come from what you read in the newspaper. It doesn't come from what you heard at the coffee shop. It doesn't come from what you heard at the water cooler or maybe, you know, even what your family told you or something.

A    (Nods head).

Q    We all carry this information.

A    Right.

Q    It makes us who we are, our life experiences, but you have to leave that outside and just base your verdict on the evidence in the case and evidence only.

A    Yeah.

Q    Is that something that you could do also?

A    Yes, yes.

Q    Now, capital murder, let's talk a little bit about that specifically. On our questionnaire here we -- and also you say that you do think you might have heard about the case on the TV. But you say, about Mr. Swan and Mr. Butler being shot in Garland, I never heard about an arrest or a suspect -- of a suspect -- or a suspect.

Have you heard anything else or can you tell me what you remember about it?

A    That's about it.

Q    That's about it.

A    Nothing else.

Q    Based on what you heard or you read or you saw, have you already formed a conclusion as to whether or not the defendant is guilty in this case?

A    No, ma'am.

Q    Okay. And that's basically what that goes to is we can read and hear things all day long in the newspaper,

but you can't bring what you've read or heard into the courtroom. You can't get back in the jury room and go, all right, let me tell you what I saw on the television.

A    Right.

Q    Let me tell you what I read on the Internet. You can't do that. And I take it you wouldn't do that --

A    No.

Q    -- in this particular case.

On page four we asked you, for what crimes do you think the death penalty should be available in Texas, and you put down murder.

And there is nothing automatic about the death penalty. It's just which kind of cases, you know, should it be an available option for. You put down murder. Let me tell you a little bit about murder versus capital murder.

A murder -- Capital murder is always this. It's always the intentional taking of another person's life. Not I killed him by accident or I killed him recklessly or    I killed him because I was negligent or I killed him in self-defense or I had a legal justification.

That's not what we are talking about. We are talking about a first degree intentional murder. Okay?

A    (Nods head).

Q    That's murder. That's called first degree murder

in Texas.

Capital murder is that plus something else. It's like that plus an aggravating factor. It's the intentional murder of a peace officer in the line of duty or it's the intentional murder of a child under six years of age or it's the intentional murder of more than two people during the same criminal episode or it's the intentional murder of one individual while in the course of committing another felony offense.

It's that aggravated factor that boosts it up to capital murder where now you're eligible for the death penalty. Because if you're found guilty of capital murder, one of two things is going to happen, right?

A    Right.

Q    Life in prison without parole -- and that means life without parole. It's not a wink and a nod.

A    Right.

Q    It is life without parole. -- or you may receive the death penalty. That's capital murder.

Murder is that first degree that I talked about. There is always a possibility, Mr. Riser, that when we go to trial, we've alleged capital murder, I may fail to prove that aggravating factor or I may fail to prove that it was really an intentional murder. It might have been a reckless murder. It might have been a negligent murder.

And if that happens, are they guilty of capital murder?

A    No.

Q    No.  But they don't necessarily walk out the door and go home.  Instead you would be called upon as a jury to consider, well, are they guilty of what we call a lesser included offense?

A    Okay.

Q    Okay.  Capital murder, life in prison or death penalty.  Those are your only two options.

If I failed to prove something in the capital murder, you could be called upon to look at the offense of murder.  Okay.  Did this person intentionally kill this person?

Let's say I didn't show you that.  Let's say actually there were other circumstances in it.  There is actually an even lower category of murder and it's called manslaughter.

A    Okay.

Q    Did I kill the person by some reckless actions on my part?  Was I driving my car 180 miles an hour on 635 going in and out of traffic, you know?  Was I reckless and bam, I killed somebody?  Well, I didn't want to kill them, you know, but were my actions reckless?  That's manslaughter.

And then there is even a lesser category than that and it's criminally negligent homicide.  You, know I'm

driving along in my car and, instead of paying attention, I'm digging around in my CD case looking for a CD and screwing around and not paying attention. I look up, bam, there is somebody and I kill them. I didn't even know they were there, did I? But I should have known.

So, you've got everything from capital murder down to criminally negligent homicide. You as a juror will determine which one of those that would be. And a lot of times it goes, it's -- we call it mens rea. Mens rea, it's the element, the mental element of what was going on with the defendant.

A    Right.

Q    You look at the facts and the circumstances surrounding and you decide where does this person fit in this category.

We asked you a question about intoxication. Intoxication is not a legal defense, you know. It may make you act differently, right?

A    Yeah.

Q    You might make some stupid judgments when you're intoxicated. But you can't say, well, I was intoxicated so that's my defense. Does that make sense?

A    Yes.

Q    Do you think that's fair?

A    I think it's fair, yes.

Q    You think that's fair?  Okay.

Mr. Riser, if we don't prove capital to you and we prove a lesser degree, then the option any more isn't just life or death.  It's now you're called upon to determine a range of punishment.  And you could be called upon to assess anywhere from five years in prison all the way up to ninety-nine years or life in prison for a first degree murder.

Just as you base your verdict on the evidence in the case on whether somebody is guilty or not, you base your punishment verdict in the case on the evidence in the case also.

And you can't -- At this point, do you think you could tell me what you would give somebody convicted of first degree murder?

A    The statutes are from five to ninety-nine?

Q    Yeah.

A    Five to ninety-nine, somewhere in there?

Q    Usually the answer is, well, it depends.  It depends, doesn't it?  You've heard the expression, let the punishment fit the crime?

A    Right.

Q    You know, I mean if I said to you the intentional murder of a ten year old boy, that sounds pretty bad, doesn't it?

A    Yeah.

Q    You know, and on the one hand you could have a guy who takes the AK-47, walks out to a playground, sees a kid and shoots him ten times.  And that's pretty bad, isn't it?

A    (Nods head).

Q    That's, that's -- I think that's up here on the bad, bad scale.

On the other hand, you can have the ten year old boy whose father makes the decision to go and take his son's life because he's dying of cancer in the hospital.

A    Right.

Q    And he is in excruciating pain.  You know, and his motivations are what?  Love and dignity.  And it's kind of a world of difference from the guy in the park with an AK-47, isn't it?

A    Right, yeah.  I guess you're dealing in extremes, but --

Q    Yeah.

A    -- the guy still killed the little kid.

Q    Yes, he did.

A    So, I guess maybe myself, because of that kind of stuff, because he's feeling remorseful, but he did it, he thought about it.  He thought about doing it.

Q    Uh-huh, yep.  And that's my point, Mr. Riser.  You hit the nail on the head because some people go, I don't want to find him guilty.  He is guilty.

**Anne B. Meredith**
Certified Shorthand Reporter

A     He's guilty.

Q     He's guilty.  He did it.  And I feel bad for him. And that's where you look at the range of punishment.

A     The judge will give us the ranges to follow, so.

Q     That's right.  That's right.  I only give you those two examples as two different ways you can commit a first degree murder, but he's guilty.

A     He is.

Q     And he knew he would be guilty.  But now let's let the punishment fit the crime.  Has he ever done anything else wrong in his life?  Has he been a good father and a husband and a hard worker outside of that, you know?

      So, do you think you can do that, you can assess the punishment within the range?

A     Sure.  Yes, I could.

Q     Okay.  Let's talk now about capital murder.  Let's go back to that.

      We have to prove to you, you know, all the elements of capital murder.  Okay.  And if we do that, if I prove to you beyond a reasonable doubt that the defendant intentionally killed somebody in the course of committing a robbery, if I prove that beyond a reasonable doubt, I am entitled to a verdict of guilty.

A     Yes.

Q     Okay.  He's guilty of capital murder now.  That

**Anne B. Meredith**
Certified Shorthand Reporter

phase of the trial is finished. Okay. We're to move into that second phase of the trial now, that punishment phase.

This is where a capital murder case is different than any other kind of case because you're not given a range any more. You're given one of two options, aren't you?

A    Right.

Q    A lot of people think that the jury goes back, sits at a big table like this, looks at the evidence and says, well, should we give him life or should we give him death, let's everybody put your hand up.

It actually doesn't work like that. Instead, and it's not even does he deserve to die, you know, should he be killed. You know, it's not even that. It's you answer a series of questions, and depending on how those questions are answered will determine whether or not the person receives life or the person receives death.

Does that make sense to you?

A    Yes.

Q    Okay. That burden of proof that we talked about, I've still got that burden of proof. That presumption that we talked about in the first part, you were to presume him innocent in the first part, weren't you? Well, he's not so innocent now, is he? He's been found guilty of capital murder, hasn't he?

A    Yes.

Q    What's the best thing he could hope to get right now?

A    Life in prison.

Q    Life in prison.  And, so, that presumption now is is that that's what you're going to do.  Okay.  And the presumption that a life sentence is the thing to do never changes until, if and until I prove to you that a death sentence is more appropriate.

A    Yeah.

Q    We do that not by asking you, so you think he should die?  You know, we don't do it that way.  Instead, we do it by giving you evidence and having you consider these special issues.  You've already had a chance to read those, and we've got them on the big board back here also.  So, I'm just going to turn around and go through these with you.

Have you ever seen these before today or --

A    No, ma'am.

Q    A lot of people haven't.  A lot of people haven't.  And we didn't write these for this particular case.  These have been around for a long time.  These have been written by our legislature.  These are special issues that are asked in capital murder cases.  Okay?

So, you've found this person guilty of capital murder, of intentionally causing the death of an

individual and doing it in the course of committing a robbery. Okay. They are guilty of capital murder. They are sitting on a life sentence now.

The first question you have to ask and answer is special issue number one. They don't give you any definitions to the terms in this particular question, Mr. Riser. They leave that really up to you.

But it does -- Can you see it from here?

A    I can see it, yes.

Q    But it does begin, do you find from the evidence beyond a reasonable doubt.

When you hear beyond a reasonable doubt, what do you think of?

A    I think of a reason, excuse.

Q    Who are you looking to to prove it?

A    You have to prove it to me.

Q    That's right. Any time you see do you find from the evidence beyond a reasonable doubt, it means you need to look right to me to prove it to you. So, that's another way of saying, has the State proven to you --

A    Okay.

Q    -- brought you the evidence.

That there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

**Anne B. Meredith**
Certified Shorthand Reporter

That there is a probability. What do you think a probability means?

A    If released, would he do it again.

Q    Okay.

A    Or she, he or she.

Q    Okay. If they are released, will they do it again?

A    Yes.

Q    If I were to tell you that there is a possibility of rain tomorrow and then I was to tell you there was a probability of rain tomorrow, is there a difference between the two?

A    Yes.

Q    What's the difference?

A    Possibility means maybe a 50-50 chance that it will happen.

Q    Okay.

A    You know, 50-50. Probability means, to me, it's a greater chance that it's going to happen.

Q    Okay. So, you see a possibility as maybe a 50-50 and a probability as greater than that?

A    Right.

Q    Okay. If I were to say -- I mean anything is possible, isn't it?

A    Right, anything is possible.

Q    Anything is possible. I could be the CEO of Dr.

Pepper/Snapple next week, right? Anything is possible, right?

A    That's correct.

Q    Do you think that's probable?

A    Not by a long shot.

Q    Not by a long shot. So, anything is possible.

A    Yeah.

Q    But the question becomes, is it probable?

A    Yes.

Q    Okay. So, you see a difference between the two?

A    Oh, yeah, definitely.

Q    Okay. And would you agree with me that a probability is probably more likely than not?

A    Yeah.

Q    Not just a chance but is more likely than not, or do you see something different there?

A    I see probability means probability, the chances are he will commit a crime again, do it again.

Q    Okay. Chances are pretty good that it's going to happen.

A    Chances are, yeah.

Q    Okay. Okay. And that's what I want to get to because you said they will do it again. So, let's move on.

       If I prove to you that it's more likely than not that the defendant would commit criminal acts of violence.

They have not defined for you criminal acts of violence.
They have not necessarily said, do you think it's more likely
than not the defendant will commit another murder.

A    Right.

Q    Or that the defendant will commit an assault or
the defendant will commit a rape or that the defendant
will commit or will make verbal threats against another
person.  You know, they haven't defined what that is.

A    Right.

Q    But what do you think is a criminal act of
violence?

A    To me it's, like you say, as far as speaking to
somebody in a violent way or threatening somebody.

Q    Uh-huh.

A    Threats, verbal threats.

Q    Sure.

A    Physical threats.

Q    Sure.

A    I mean violence is --

Q    If I were to ball my fist up and just hit my
co-counsel right in the face, do you think that would be a
criminal act of violence?

A    Yes.

Q    And you have also included in there it doesn't
necessarily have to be physical, does it?  It could be a

verbal threat, too.

A    Things start verbally usually.

Q    Sure.

A    It starts verbally.

Q    Sure. If I were to tell somebody that wait till -- I'm going to get Mr. Riser. He's going to get his. You know, you might consider that a verbal threat of violence.

A    I would consider it.

Q    Okay. And that's the point is they don't say would commit another murder, would commit -- It's will commit criminal acts of violence. You decide what those are.

That would constitute a continuing threat to society. He's guilty of capital murder. Where is he spending -- Where is he spending the rest of his life?

A    Prison.

Q    In prison. So, when I think of society, I think of going to the grocery store, going bowling, maybe going out to eat, spending time with my family, you know.

But can you see how prison could also be included in that definition of society?

A    I guess it's some people, I guess, in prison that's capable of hurting other prisoners.

Q    Okay. But do you see that prison can also be a society in and of itself?

A    It is a society, yeah.

Q    Yeah.  A lot of people live there, don't they?

A    Yeah.

Q    They sleep there.

A    Yeah.

Q    Eat there.

A    Carry on their life there.

Q    They carry on their life there, don't they?

And there's more people in prison besides inmates, aren't there?

A    They've got guards and wardens and people like that, so.

Q    Educators and nurses and people coming to visit.

A    Right.

Q    So, would your definition then necessarily include that prison could also be a society?

A    Yes, prison.

Q    So, what we are calling upon you to determine is whether or not I've proved to you beyond a reasonable doubt that more likely than not this defendant is going to commit criminal acts of violence that will be a threat to the people that he lives with.

A    Uh-huh.

Q    Does that make sense to you?

A    Yeah, it does.

Q    Okay.  We also call it the future dangerousness

issue. You know, we're asking you to predict whether or not he's going to be a future danger, whether or not he's going to commit criminal acts of violence.

How do you think I could prove that to you? What would you need to hear, see, know in order to say -- in order to answer a question like that?

A    My thing is that if the guy's in prison, he's being watched, he's covered by professional people, and it would be more difficult for him to hurt somebody in prison than it would be out. If he's out, he's free to do what he wants to do.

But in prison, he's under control. Somebody is watching him, there's cameras or whatever. It would be much harder for him to commit a crime or violence against somebody in prison than it would be outside.

Q    Could be, yeah.

A    So, it should be much harder, much more difficult, a lot more difficult. I mean, here we got -- I know we got, you know, mass murderers in prison now, you know, murderers in prison. But they are not killing -- I'm assuming they are not killing somebody every -- they are not killing anybody at all because of, you know, the safety factors.

Q    You keep saying killing someone, though. Is the standard killing? Would you have to believe --

A    Assaulting.

Q    -- that he's going to kill somebody?

A    No.  Assaulting somebody or --

Q    Do you think there is violence in prison?

A    Oh, of course, there is.

Q    Okay.  Because there are guards there and there are chain link fences and such as that.  Do you think they have complete control of the people in there?

A    They can't have complete control of somebody, but hopefully the person has learned their lesson and have a change of heart.  You know, you don't know what people will do.

Q    How would you know if somebody learned their lesson or had a change of heart?

A    You don't.  You don't.  People make a decision every day.  Each one of us makes a decision to do what we do.

Q    Would looking at how the person has acted since they committed the crime help you decide?

A    If they show remorse or -- remorse.  I mean you do things vaguely that, you know, you feel sorry for.

Q    Okay.

A    You know, they are human so it would be an opportunity to feel kind of sorry.  I did this but I didn't really mean to do this.

Q    Yeah.

A    You know.

Q    Yeah.  Well, keep in mind that I did this, but I didn't really mean to do it.

You've found them guilty of capital murder.

A    Exactly, yeah.

Q    Have you ever heard somebody apologize and you thought, they are not really sorry?

A    Of course, yes.

Q    Okay.  You think that happens?

A    Oh, yeah.

Q    Yeah.

A    Yeah.

Q    Have you ever heard of, for example, people going to prison and saying, I found God?

A    Exactly.

Q    Do you believe them every time?

A    There is a big argument against God -- people finding God in prison.

Q    Yeah.

A    Because, you know, it took that for the guy to find Him.  Sometime it does, so.

Q    Sometimes it does.

A    Whatever it takes.

Q    Yeah.  Sometimes maybe it's used to get special favors.  Maybe it's used to get some sympathy from other people.

A    Yeah, but people are smart like that.  But I think most people see through nonsense, so.

Q    Right.  Do you think you can see through nonsense?

A    I hope I can.  I hope I can.

Q    Okay.  Do your kids try to slide nonsense on you?

A    Of course.  I did when I was a kid, too.

Q    Exactly.  My dad used to always say, do not try to kid an old kidder.

A    That's the best -- that's the best thing, not try to do it at all, you know.

Q    Exactly.

A    It still gets past us, anyway.

Q    That's right.  So, you see where we are going here?

A    Uh-huh.

Q    I'm going to have to prove to you that more likely than not he's going to commit criminal acts of violence.

A    Right.

Q    Now, I'll tell you, Mr. Riser, that you could look at, in order to answer this issue yes or no, you could look at just the facts of the offense alone of what he did, of what you just found him guilty of.  And just looking at that you could say, I'm looking at that crime in and of itself and the surrounding circumstances of it and I am able to tell you right now, yep, I think he's a future danger.

You can actually do that.  Or you can say, I

need something a little bit more than just the circumstances of the crime itself.

Do you think that's possible to be able to make that assessment judging just strictly from what the person did and the surrounding circumstances?

A     Yes.

Q     Okay.  Do you think that just because a person has committed a capital murder, an intentional killing, not accidental --

A     Right.

Q     -- not justifiable, not I didn't mean to do it, but we are talking about a guy who wanted to kill somebody, killed them, and did it while committing a robbery, do you think that they would automatically be a future danger to society?

A     Yes.

Q     Okay.  And why do you say that?

A     Because they had an opportunity to back track.  You know, say it's a robbery, you kill a person.  Somewhere between then before you kill a second person, you have a chance to say, wait a minute, what am I doing here.  You know, you have a chance to say, wait a minute, let me just take a step back.  I made a mistake, I shouldn't have did it.

I think that, gosh, I think that you make a decision and then you proceeded with the decision.  You had a

chance to back up and back out or leave. I'm caught, you know, I'm done, let me get out of here.

Q    Yeah. Yeah.

A    And whenever you make the decision to stay and then complete the task --

Q    It doesn't seem like it maybe is not so easy to commit a capital murder.

A    You wouldn't think so.

Q    You mean to kill somebody and you have to carry out that felony offense, so it takes a lot of thought process.

A    It do because you think about it. Before you commit a crime, you think about your family being involved in it. Say this is your brother, your sister, your mom, your dad.

Q    Uh-huh.

A    Then you'll say, wait a minute. Dude, I better stop here, take my lesson what I've already done.

Q    Yeah.

A    That's what a thinking person does, what a thinking rational person would do.

Q    Sure. Sure.

A    If you're not rational about thinking --

Q    Do you think you can not be rational and not thinking? And when I hear that, I hear my dad always going, what in the world were you thinking?

A    Were you thinking. I don't know.

Q    But do you think you can not be -- obviously you're not completely rational if you're doing something like that. But do you think you can still intend and plan out and do what you're doing?

A    If the plan was already in place, you had the plan before you walked in there.

Q    Sure.

A    So, you had planned what you're going to do. Hopefully you might not get to that point, but.

Q    Uh-huh.  Okay.

A    A lot of people are put in situations that we --

Q    Got you.

A    -- are not comfortable with.

Q    I got you.  I got you.  If I prove that special issue to you, Mr. Riser, beyond a reasonable doubt, if your answer to that is yes, the State's proved to me that this defendant is a future danger, and more likely than not he's going to commit criminal acts of violence.

If I, if I fail to prove that, let me say this. If I fail to prove that, the answer is no and you stop right there.

A    Okay.

Q    And that presumption that the life sentence was the proper thing to do stays, he gets a life sentence, we all go home.  Okay?

If I prove that to you beyond a reasonable doubt and the answer is yes, then he's getting closer to a death sentence now.  Okay?

A    Right.

Q    And we move on to the second issue.  The second issue, I'll just hit briefly with you, goes to something we call the law of parties in Texas.

And basically, under Texas law, if say two people are going to commit an offense, you know, Ms. Evans and I decide we are going to rob the 7-Eleven.  We sit down at the kitchen table, we plan it out together.

She goes and buys the gun.  I go and I buy the bullets.  We case out the 7-Eleven.  We think this is the easiest to hit.  She drives us up there in her car.  She sits in the driver's seat.  She is going to act as the lookout.  She is going to honk the horn.

She hands me the gun.  Well, wait a minute, here's the bullets.  She sees me load it.  And I say, I'm going in, watch out for me, and I am not leaving any witnesses.  I go in the store, I rob the clerk of all the money in the till.  Then I shoot the clerk five times.

Am I guilty of capital murder?

A    Yes.

Q    I've robbed -- Okay.  Is Ms. Evans guilty of capital murder?

A    Yes.

Q    And why is that?

A    She was in the planning stages.  She planned it with you.

Q    Okay.  You got it exactly.  She is, she, she --

The first part is if she aided, assisted, directed, encouraged, it's like she is just as guilty --

A    Right.

Q    -- as if she had pulled the trigger herself.

In order to be guilty of capital murder, you're going to have to find first, in the first part of the trial, that she should have anticipated somebody would die.

When you get to this question you're being asked to find, is the defendant the person who actually pulled the trigger?

A    Okay.

Q    And if he is just the guy who was working actively with him and anticipated -- should have anticipated, now the question is, did he actually anticipate somebody was going to die?

A    Oh, yeah.

Q    And you look at those circumstances.  I'm not leaving any witnesses.

A    Yeah.

Q     You know, and you would answer that question.

If you answer that question yes also, then the defendant is sitting right on a death penalty now, okay? Right on a death penalty.

But it's not over with yet, okay?  There is one last special issue that we ask you to consider, and it's that third special issue.  And we also refer to it as the mitigating circumstances issue.

And all that burden of proof I have been talking about earlier, there is no burden of proof for either side on it.  I don't have to prove anything to you or disprove anything to you.  They don't have to prove or disprove anything to you.

But what it's also referred to as, Mr. Riser, is like the safety net issue.  Okay.  And what the legislature doesn't want for any juror who has to sit on a case like this is for you to go into the jury room and feel like your hands were tied, you know, that you couldn't make your decision based on everything in the case.

Because there might be situations where you've found a person guilty of capital murder, you've found that they were a future danger, no question about it.  You've found they either pulled the trigger themselves or were right up in it, you know.

But there is something about the case, there

is something about maybe the crime, maybe there is something about the defendant, there is something that is not only mitigating -- and you understand mitigating is something that lessens.

A     Yeah.

Q     There is something about it that is not only mitigating, but it's sufficiently mitigating, that you are going to flip that death sentence back over to a life sentence.

A     Okay.

Q     Okay?  I can't tell you what's necessarily a mitigating circumstance, you know.  I mean it could be that the guy was raised in a closet his whole life, fed dog food, and had cigarettes put out on him.

You know, what's mitigating to you might not be mitigating to me.  I might say, well, I think it's mitigating that the person was high at the time.  And you might say, I don't think that's any excuse whatsoever.  You know, we don't necessarily have to agree on what's mitigating.

There could also be a thousand mitigating circumstances in a case.  You know, maybe somebody had a rough life.  Maybe somebody didn't have a college education.  Maybe somebody was raised by a single parent.  These are all, you know, as we said before, crosses you have to bear.  But it isn't enough to turn it around.

**Anne B. Meredith**
Certified Shorthand Reporter

A   Right.

Q   They are mitigating, but they are not sufficiently mitigating. Does that make sense to you?

A   Yes.

Q   Okay. If you answer that question yes, if you say, not only is there a mitigating circumstance here, but I think it's sufficient to turn it around, then now he's going to get a life sentence.

If you say, there is a lot of mitigation here, but it's not sufficient enough, then he's still sitting here looking at the death sentence.

Does that make sense to you?

A   Yes.

Q   And do you think that's a fair thing to do?

A   Yes.

Q   Yeah. It always gives you room to take into account maybe a circumstance that just --

A   Right.

Q   And I can't tell you under what circumstance that would happen. I think the point of that particular special issue is that we are not going to tie your hands. I think it's fair to say that it originally came around because it had to do with people who are mentally retarded.

A   Right.

Q   We do not execute the mentally retarded, you know,

in this country.

A    Yeah.

Q    But it's not just mental retardation.

A    Right.

Q    It could be any number of things beyond that.

Any questions about those special issues, sir?

A    No, ma'am.

Q    Okay.  And I think we've covered a lot, a lot of this.  But I do want to ask you a personal question.

I know that you have a relative, a cousin who you put down was convicted of murder.

A    Yeah.

Q    And apparently that was in the eighties.

A    Yes.

Q    And is still in prison for that.

A    He's out.

Q    He's out now.  Okay.

A    It's my sister's, my sister's ex-husband.

Q    Okay.

Q    How long did he spend in prison, do you think?

A    Seven, eight, nine, ten years.

Q    Okay.

A    He was convicted on a -- I forgot what it was, but --

Q    Not murder, but maybe a lesser one?

**Anne B. Meredith**
Certified Shorthand Reporter

A    It had to be because he wasn't -- He was in Memphis and a guy broke into his house and he beat the guy. I think his brother -- I think it ended up his nephew or somebody got charged at the time because his nephew came over and did the actual murder.

Q    Okay.

A    It was actually, it was his house that got broke in, but he didn't call the police. And, anyway, he, you know, called his family over.

Q    I see. Called the family over to take care of it instead of calling the police.

A    Right. He should have. I think he served like seven or eight years, something like that.

Q    Okay. Do you think he was treated fairly?

A    Yeah, he was.

Q    You think so?

A    I mean, I didn't like the guy, so. He was kind of a knuckle head.

Q    All right. But you --

A    He was my brother-in-law, though, so.

Q    I got you. I got you. Yeah. But for what happened to him and the charges he had and the sentence he got, do you think that that was fair?

A    I think so because --

Q    Okay.

Q    -- he didn't actually kill the guy.  He didn't kill the guy.

Q    Okay.

A    If he would have killed the guy, he would have got more time so he would probably still be in prison.  You know, Tennessee.

Q    Oh, so, he was kind of like Tennessee's version to a party to the offense.

A    Yeah.

Q    He didn't actually kill him.

A    No.

Q    He played a part in it.

A    It was his house and he called his family instead of calling the police.

Q    Oh, okay.

A    He got time because of that.

Q    Okay.  Okay.  So, you think the verdict -- you think he was treated fairly?

A    I think he was treated fairly, yes.

Q    I got you.  I got you.

        Any questions you have for me, Mr. Riser, about this process?

A    No, ma'am.

Q    Okay.  Okay.  And any last chance to voice any hesitation in taking part of any of this?

**Anne B. Meredith**
Certified Shorthand Reporter

A     No, ma'am.

Q     Okay.

A     I think I can handle it.

Q     All right.  I think you can, sir.  I appreciate you answering my questions.  Thank you.

A     You're welcome.

THE COURT:  Thank you, Ms. Handley.

Mr. Riser, we are going to take a five minute recess.

PROSPECTIVE JUROR RISER:  Okay.

THE COURT:  Give you a little time to stand up and stretch your legs and go get a drink of water if you would like to get one of those, go to the bathroom.

My bailiffs will show you where all of that is. And anything you need, you let them know and they will take care of you.

PROSPECTIVE JUROR RISER:  Okay.

THE COURT:  All right.  We'll be back in five minutes.

(After a recess, Defendant and Prospective Juror Riser present).

THE COURT:  Mr. Lollar.

MR. LOLLAR:  I believe Mr. Parks is going to --

THE COURT:  Oh, excuse me.  Mr. Parks.

EXAMINATION

**Anne B. Meredith**
Certified Shorthand Reporter

BY MR. PARKS:

Q     Good afternoon, Mr. Riser.

A     How are you doing today?

Q     I'm fine.  Are you doing all right?

A     I can't complain.

Q     Okay.  Well, like I told the last juror I talked to, the good news is I'm the last lawyer you're going to have to talk to today.  The bad news is it may take until nearly 5:00 o'clock.

A     I've got the day off so that's all right.

Q     All right.  Mr. Riser, the first thing I want to ask you is this.  If you had this questionnaire to fill out again today --

A     Uh-huh.

Q     -- do you believe that you would fill it out any differently than you did before?

A     I don't think so.  I was looking at it outside. I was looking at it outside to see would I say anything different.  I didn't get halfway through it, though, so.

Q     Well, would you change anything on the first page?  Is it still your feeling that you're not in favor of the death penalty but could assess it if the facts and circumstances justified it?

A     Yes, sir.

Q     Okay, fair enough.  Well, that's basically what I

want to talk to you about today, what the law says the right and proper circumstances are --

A    Okay.

Q    -- for any juror to impose the death penalty.

And we talk about people imposing the death penalty. They do and they don't. They don't go back in the jury room as you now know -- you may not have known this when you came down here -- but you now know that the jury doesn't go back in the jury room and write death or life --

A    Right.

Q    -- on the verdict sheet. That's determined by the way the jury answers those special issues.

And there is no discretion in the judge. If you answer that first special issue number one, if you answer it yes, and the second one yes, and the third one no, the judge has to assess the death penalty. He has no choice in that matter.

A    Okay.

Q    It doesn't make any difference whether he thinks it's the right verdict or not.

Conversely, if you answer special issue number one no or if you were to answer it yes, yes, and the third one yes, any combination of answers other than yes, yes, and no, the judge must impose the life penalty. And he has no choice in that whether or not he believes that's the right verdict or

not.

And while we are on that subject, Mr. Riser, let me tell you that when we talk about the life penalty, when we talk about life without the possibility of parole in these cases, that's exactly what we mean.

A    Right.

Q    And it is life without parole.  And really the only difference between a life penalty and a death penalty -- the defendant is going to die in the penitentiary in both cases.  The only difference is with a life penalty, we don't know when or how.

A    Right.

Q    So, and I say that because that's not always been the law.  And in doing this work over the years, it's been my impression many, many of our jurors really do not believe that the life penalty, even when it was life without parole, amounted to very much, that if they didn't give the defendant the death penalty, he was likely to beat them to the elavator.  And that was absolutely never the law.

But sometimes when people get things in their heads, it's almost impossible to get it out of their heads again.

A    Right.

Q    Please trust me when I say that life without the possibility of parole means exactly that, okay?

A       (Nods head).

Q       Now, you noticed, Mr. Riser, that I started off speaking about these punishment issues and punishment in the case.    I don't want you to take that as any indication that Mr. Lollar, Ms. Mallon and myself believe that the jury will ever have to answer these special issues because they only answer the special issues in the event they find Mr. Broadnax guilty of capital murder.    And we intend to contest that finding.    We are not conceding guilt in this case in any way. I would not want you to think that we are.

The reason I say that is that there is any number of ways that a defendant can challenge the State's indictment, the allegations that are in the indictment. So, I'm going to talk to you for a few minutes about the guilt/innocence stage of the trial, what I call the merit stage.

We know that the indictment is no evidence of guilt.    Judge Snipes will tell you that in his charge, that you're not to consider that fact as any evidence of guilt. The indictment does serve a very important purpose.    It tells the State of Texas what they have to prove, and every member of the jury, beyond a reasonable doubt before they would be justified in returning a verdict of guilty of capital murder.

And there is no way for a juror to know what parts of that indictment will be at issue, okay?    Because

we're not allowed to talk to jurors about the facts of the particular case that we are talking about. We are allowed to give you hypothetical situations but not try to commit you to doing one thing or another in this particular case.

So we, as a practical matter, just stay away from the facts and circumstance of the case on trial. If we need to give hypotheticals to illustrate a point, we will generally give hypotheticals that are obviously not the real facts involved in the hypothetical.

So having said that, then, there is no way for a juror, when he or she gets sworn on the jury and swears to a true verdict render according to the law and the evidence, that they know what's contested. They have to wait and hear the evidence about that.

In one case identity may be contested. It may be that the defendant is saying, you've just got the wrong person. I'm not the person who did this.

In another case it might be the defense saying, well, the defendant did it but he had a legal excuse. A legal excuse is that he was insane at the time and did not know that his actions were against the law and did not know the difference between right and wrong.

Or it might be a defendant would say, I did it but I was justified under law. I was in fear of this defendant or this victim killing me or causing serious bodily injury to

me. I acted in self-defense. Yes, I killed him. Yes, I killed him intentionally, but I was justified under law in doing so. Or I was defending a third person.

You see what I'm saying? And the jury doesn't have any real way of knowing what is going to be before them. It might be that the defendant is challenging the culpable mental state, and we've talked about that to some extent already here.

You see, the indictment says that the defendant intentionally caused the death of the deceased. There are, as you've already been told, there are four culpable mental states in the State of Texas, intentional, knowing, reckless, and criminal negligence.

Our law allows the defense or even the prosecution to bring evidence to a jury about the state or condition of the defendant's mind at the time of the commission of the offense, if it was committed. Okay? So that it might be at issue whether or not he acted intentionally or knowingly.

It may be -- You see, a person can be insane, legally insane, and that be an excuse, a legal excuse. But that's a pretty tough standard, frankly, Mr. Riser. It's probably much more rare than most people in the general population believe that it is.

There are situations where a person might

be seriously mentally ill, yet not be at the level that the law would call legally insane, but still have substantial mental issues that could make a difference in his ability to form a requisite mental culpability. Okay. That's up to a jury to decide whether or not that factors in based upon the evidence that you hear.

So, it could be any one of those things perhaps that you would hear as a defense in a case.

So, we've sort of boiled down to a simple phrase what a good juror is. If we haven't determined much of anything else, here's what we've determined. A good juror is a juror who will base his verdict on the law and the evidence and not jump to conclusions.

Does that make some sense to you?

A    Yes.

Q    And really what that means and what the law asks you to do as a juror is to wait until you've heard all of the evidence before you make up your mind about whether or not the defendant is guilty as charged or not guilty of anything or guilty of some other offense that's included. Wait to hear everything, then make your decision.

We have got studies that tell us as many as 40 percent of jurors make up their mind after they have heard opening statement and before they have ever heard one word of evidence. We certainly want to avoid that if we can.

A    Uh-huh.

Q    Do you believe that you're the kind and type of person, as a juror, who could wait to hear all the evidence and then, only after the State and the defense have rested their case of guilt/innocence and the judge has read you the charge and you've gone back into the jury room, would you then begin to determine whether or not the State had proven their case?

A    Yes, sir, I can.

Q    Fair enough.

All right.  Now, I want you to assume for the purposes of this discussion, Mr. Riser, that on this hypothetical case you have sat as a juror in a capital murder case, you have listened to the evidence along with your fellow jurors and you have been convinced beyond a reasonable doubt that the defendant is guilty of capital murder, and you have returned that verdict into open court.

So, now you are faced with the punishment phase of a trial.  And it is then, and only then, that you would be in a position to consider the answers to the special issues.  You realize that.

A    (Nods head).

Q    All right.  Now, here's the thing that some people believe, and it's disturbing.  It's very disturbing.  A survey of jurors who have actually sat in capital murder cases, found

a defendant guilty and assessed the death penalty, almost 20 percent of those jurors believed that was what they were required to do, that upon finding the defendant guilty, the death penalty was then mandatory. And that's just not the law.

A    Right.

Q    It never has been, I suspect never will be. The default, if you will, punishment for capital murder is life without parole in the State of Texas. That is -- a default punishment is acceptable punishment. The law is always satisfied with a jury returning a verdict of life in the penitentiary. And a jury that returns that verdict has no one to apologize for because, really, that's the one that the law accepts.

And it's only in special circumstances that the jury would be allowed to return a verdict other than life without parole, and that's dependent upon the answer of these special issues. Does that make some sense to you?

A    Yes, sir, it does.

Q    The purpose of these special issues, Mr. Riser, oh, I've heard them described as they are intended to be a filter to filter out those persons who ought to receive the death penalty from those who ought not to.

I don't like to talk in terms of what people ought or ought not to get because that gets us back to jurors kind of making and having unfair discretion in

deciding whether a person deserves the death penalty or doesn't deserve the death penalty.

And if you've ever had any thoughts that that's what this process is about, I surely do need to disabuse you of that because there is nothing, I suppose, that would have kept the legislature from asking just that question if that's what they wanted the decision to be based on. But you see nowhere in those special issues does it say, based upon the facts and circumstances of this case, the defendant, does he deserve the death penalty.

And the reason for that is is because that would give unguided discretion. We would never know what in the world it was that caused one jury to give someone the death penalty and someone else not. And it would also be an invitation to play on the emotions of the jurors in helping them rush to a verdict of death based on whatever, in your own minds, caused them to think about deserving it.

Here's what I tell jurors about that. That's not what you're there to decide. If any one of your number starts talking about, well, I think he deserves the death penalty, did you ever see anything worse than that in your life, if anybody ever deserved it, it's him, someone, the foreperson of the jury or even someone who is not the foreperson needs to step up and say, that's not what we're here for. That's not the determination that the law calls

upon us to make. We need to answer these questions just like we've taken an oath to do, according to the law and the evidence.

Does that make sense to you?

A     Yes.

Q     Special issue number one is oranges to the guilt/innocence phase's apples. Okay. Let me try to explain what I mean by that. It's not the same question. You know, the first question was, did he do it?

A     Right.

Q     Okay. That's not the same as will he be a future danger in the penitentiary. Those are two different questions.

Now, the law says that if the evidence in the guilt/innocence phase of the trial in and of itself proves special issue number one, then you don't have to require the State show you anything other than the facts and circumstances of the evidence.

But if you as a juror say, listen, they are proving apples in the first phase of the trial with their evidence. Does the evidence that proves apples prove oranges? Not to me it doesn't because this is a different question.

I need to hear something more than the evidence that convinced me he was guilty. I need to hear something more about him. I need to hear -- I need to hear maybe evidence of

how has he been.    Has he ever been in the penitentiary before? If he has, did he commit acts of violence when he was in the penitentiary before or did he not?    That tells me a little something about what he is likely to do in the future.    Or if he's been in the county jail, how has he been as a prisoner there?    That may tell me a little something about how he will be in the future.

Because, you see, the one thing that is certain, Mr. Riser, is that every person about whom these questions are asked has intentionally killed someone during the course of the commission of some other offense.    They are capital murderers.

So the law, basically what we are saying here is is that if you assume that every capital murderer is going to be a future danger, then that question is meaningless.    It does nothing to try to identify what our Court of Criminal Appeals has described as those few incorrigibles who cannot even be incarcerated without fear of future acts of violence.

See what I'm saying?

A    (Nods head).

Q    What we are trying to do here, it seems to me, is to identify however many out of that larger group of capital murderers that we can't safely put in a penitentiary.    Do you see what I'm saying?

A    Right.

Q    Because that's where they are going.    That's the

reality of where we are. Jurors, in making a decision in the real world about special issue number one, are making those decisions knowing that the person about whom they are making the decision is going to be locked up in a penitentiary, behind bars, behind razor wire, and with guards and rules and regulations, and supposedly professional people who know how to run a penitentiary. Okay. You see what I'm saying?

A    Yes.

Q    Now, I'm certainly willing to concede that there may be people who cannot, even in a penitentiary context, or who would in a penitentiary context probably commit acts of violence in the future. The issue is to you, as a juror, is this one of those persons, you see.

And you can define those questions pretty much like you want to because the law has not given you a definition. And you can define a criminal act of violence as a threat against someone else without any physical violence if you wish to.

On the other hand, you have the discretion as a juror of saying, listen, in an academic discussion, I can concede that a verbal threat against someone else could be an act of criminal violence or even taking one's fist and hitting another person could be an act of criminal violence. And that's fine for an academic discussion. But when the responsibility falls on me to say whether another human

being will live or die, I have the absolute right to require more than that.

And you can place whatever emphasis you believe would be reasonable in view of the decision that you have to make or the consequences of that decision. And if you wanted to say, hey, you're going to have to prove to me that this guy would probably commit very serious bodily injury or death, or those kinds of things, that's the standard that I intend to set for me if I'm going to be the person deciding whether or not a person lives or dies, then the law gives you that discretion to put that level, to put that wherever you want to.

And you see, there is more to it than just probability that the defendant would commit criminal acts of violence. You have to go ahead and make a determination that those would constitute a continuing threat to society.

A person might commit some, some act that technically you would consider to be an act, a criminal act of violence that you might not consider would be a threat to society such that this person needs to be executed.

You see what I'm saying?

A     Right.

Q     And we can't ignore words. And that word continuing is in there and acts is in there. That's plural. That doesn't call for just one thing. So I think what it

**Anne B. Meredith**
Certified Shorthand Reporter

appears the legislature is out to do with that question, again, is to try to get jurors to identify people who, however long they are going to be, however long they live in there, they are the kind and type of person, even in the penitentiary, who are going to commit these acts of violence, or at least probably commit these acts of violence such that they cannot be safely contained in the penitentiary system, and they have no alternative but to kill them.

And I think that the purpose, the theme of these questions is, do we have a reasonable alternative? Is locking the person up for the rest of their lives a reasonable alternative except in those rare circumstances?

You see what I'm saying?

A    Yes, sir.

Q    Okay. Do you feel like that's a process that you could go through and participate in?

A    Yes, sir.

Q    And I may have misunderstood, Mr. Riser, but I thought I understood you to tell Ms. Handley that you felt that if a person was guilty of capital murder, that if they were the kind of person who would intentionally kill another human being during the course and commission of a felony, that to your way of thinking that's a person who always would be a continuing danger to society and would cause you to automatically answer question number one yes.

Did I understand that correctly or did I misunderstand you?

A    No, I don't think I said always.

Q    You said -- but you used the word automatically.

A    Automatically. I think, yeah, the death penalty has its place, but life in prison has its place also.

Q    Sure.

A    So, you would like to hope the person would be redeemed, that they would live their life peacefully in prison.

I mean, I think I also put down one as far as a scale that I had, one as far as the death penalty is concerned, one as far as that's the least thing that I want to do is kill somebody.

Q    Yeah.

A    That's how I feel. I feel it's the last thing we should do.

Q    Let me put it another way. Maybe I can make it a little clearer. You understand that the law presumes the answer to that question is no, that he would not be a continuing danger. That's what the law presumes.

A    The law presumes. To me, if he got found guilty, so you assume that he will be a threat to society.

Q    Well, that's what we need to talk about, Mr. Riser, because the law presumes he would not be. See, that's

something the State has to prove to you beyond a reasonable doubt is that he would be, just as the law presumes Mr. Broadnax to be innocent.

A    Right.

Q    If he's found guilty of capital murder, the law presumes that the answer to that question is no, he would not be a continuing danger, unless the State can prove to you that he was.

Otherwise, if that were not so, everyone convicted of capital murder would be found to be a continuing danger to society and the question would be useless.

Am I making sense to you at all?

A    You mean there are people that have been convicted of capital murder that's not considered a continuing threat?

Q    Yes, the law presumes that they are not.  That's why we have life without parole.

A    Okay.

Q    See, just because someone has done one thing doesn't necessarily mean that they are going to do it again or anything like that again.

A    Right, I understand that.

Q    And that's basically where we've got to make sure that we are all on the same page here.

Now, I'm not trying to put words in your mouth.

If you say, I don't care what the law says about that, Mr. Riser believes that anybody who has been convicted of capital murder is going to be a future danger wherever he is, even in the penitentiary, and I am going to automatically answer that question yes, then we need to know that.

A    Right.  No, that would be silly on my part.  No, I agree with you.

Q    Okay.

A    So, no, I believe the guy, or whoever, whatever the case, have the opportunity to make a choice.

Q    Sure.

A    And when they committed a crime the first time, then they can do it again.  And that's what I mean by that.

Q    Okay.

A    Because without that, I mean that was the assumption for everything, you have a chance to redeem yourself.

Q    Exactly.

A    I mean we all make mistakes and stuff.

Q    Sure.

A    So, no, I don't really -- I agree.  What you said about the guy, he's not automatically going to commit other crimes just because he did the first one, it's not automatic.

Q    Okay.  All right.  I just, I just needed to clear that up.

**Anne B. Meredith**
Certified Shorthand Reporter