A      I agree with you.

Q      We're on the same page.  All right.

Now, I'm going to skip over special issue number two, Mr. Riser.  I think we've explained to you that that is not always given.  Juries don't always have to answer special issue number two.  And we don't know yet whether it will be in this case or not, so I'm not going to talk about it.

A      Okay.

Q      We will go to special issue number three.

THE COURT:  Can you see that?

PROSPECTIVE JUROR RISER:  Yeah, I can see it.

A      It's in my pamphlet.

Q      Yeah, and I think it's in there, too.  And what I want to do is make sure that you understand that it is different from the other issues, significantly different from the other issues, because at guilt/innocence the first thing that you were told basically was, do you find from the evidence that beyond a reasonable doubt.  That means the State has the burden of proof.  Issue number one, do you find from the evidence beyond a reasonable doubt.  That means they have the burden of proof.  Same thing on special issue number two.

But special issue number three doesn't place a burden of proof on anyone.  Okay.  So, we don't have to

prove to you that there were mitigating circumstances. You may expect we will try our best and that would probably be a reasonable expectation, but we don't -- I mean there is no burden.

And the State certainly doesn't have a burden. You wouldn't expect they would try because that's not what they are trying to accomplish. They are trying to accomplish the death penalty. We are trying to keep them from doing that. So, we are not together on that issue.

A    Right.

Q    And what that does, I tell jurors -- I don't know whether it helps them or not, but I try to give them a little bit of history. We've not always had that special issue until fairly recently.

Jurors were given two special issues, one of them which does not exist any more, and it doesn't matter. But there was another special issue number one, this special issue number one and special issue number two. And special issue number two, if it was given, would be special issue number three.

We've changed it up, threw out that first one, added on that second one. Well, the bad thing about what happened in the old days was that a jury was told the same thing y'all were told. Find somebody guilty, go back and answer these questions. If you answer them yes and yes,

313

it's the death penalty.  If you answer either one of them no, it's a life penalty.

But without special issue number three, the jury did not have an opportunity to exercise their own personal moral judgment about what should happen in the case, so that they were in a place where it was possible at least for one of the jurors or all twelve of the jurors or any number of the jurors to believe that the life penalty, based upon everything that they had heard in the case, was the appropriate punishment, but that the answer to the special issues were yes and yes, so they were in the position of imposing the death penalty on someone against their own personal moral judgment about what was the right thing to do.

So this special issue has fixed that.  Okay. Now jurors are given an opportunity to review all of the evidence.  It speaks to the issue of mitigation.  It talks about the defendant's character, his background, personal moral culpability.  But it doesn't tell you, here's a list of things that are mitigating and these are the things that you have to give meaningful consideration to in answering that question.

It leaves it up to the individual juror on both what is mitigating and what weight to be given to that mitigation.  And it doesn't tell you that there must be a

certain level of mitigation in law. The level that has to be reached is that level that in your own moral personal judgment is sufficient to justify a life penalty rather than a death penalty.

And that might be different for everybody on the jury. You know, one person may have their level way up here and another one way down there. It's an individual determination to be made. Does that make sense to you?

A    Yes.

Q    There's only one thing in law in the State of Texas that is absolutely mitigating that would prevent the imposition of the death penalty and that's when a person is mentally retarded.

Now, there is a level to be reached. You see, a person could have significant intellectual impairment and not reach the level that the law describes as mental retardation. Those are things to be taken into consideration. You know, people think about a lot of different things. But what the law does require a jury to do is to at least consider the person's character and their background.

Now, there is one thing here in your questionnaire that I wanted to mention to you or visit with you about, Mr. Riser, over on page eight.

A    Okay.

Q    It's down toward the end of the -- it's not the

last question but it's the next to the last one, the one above where you spoke to us about your cousin. It asks, some people feel genetics, circumstances of birth, upbringing, and environment should be considered when determining the proper punishment of someone convicted of a crime. What do you think.

And your answer was no, because most of us have the opportunity to see beyond our circumstances. I'm not sure what that next word is.

A    We know.

Q    Okay. We know. Okay. We know good and bad, right and wrong. It's that simple.

And I am not fussing with you about your answer, Mr. Riser. I really wish it were that simple, and I am not sure that it is. Because in the first place, our law asks you in special issue number three really to look at those very things.

A    Right.

Q    Background is going to involve a person's upbringing and his circumstances of birth and environment.

Here's the way I put it. A lot of jurors say, well, you know, we each make our decisions and we know the difference between right and wrong. And if we decide to do wrong, then that's the decision we make.

And on one level, that's absolutely true. But perhaps on another level, it is not. Because if a

person, for instance, is born without the mental intelligence capability that another one is, he may make decisions that, yeah, he made them but, you know, if his mother drank while he was in utero, if his mother took -- I'm not saying that these are the facts of this case.

A    No, no.

Q    I'm giving you examples.  If his mother took drugs in utero, if he was born with some sort of birth defect, those were decisions made by someone else that effects the decisions that he then later makes.  So, it's not always --

The point I'm trying to make is that the law recognizes it's not always black and white.  It's as simple --

A    Right.

Q    -- as that.  And jurors are asked to look at those things.  And most jurors that we talk to about it, after they have thought about it a little bit, it comes to them that that might, in fact, be an appropriate thing to look at and consider.

Now, make a decision about whether or not the -- those kinds of things are not excuses.  We are not -- A lot of people think that when we talk about mitigation, we are talking about excuses.  Mitigation is not an excuse for having committed an offense.

It may be an explanation that may help answer, to some extent, questions that people might have about any

offense they heard about. Why did that person do such a thing? How could they have done that? That kind of evidence might go toward showing an explanation but not an excuse.

You understand the difference?

A    Yes.

Q    You know, it might be a situation where -- Well, let me -- I have written out a question I was going to ask you about something, and there is no right or wrong answer probably to this. But it kind of follows up on Ms. Handley's question about whether or not you could -- Mr. Broadnax being a young black man, whether or not that was going to be something that would essentially taint your ability to be fair and impartial is the gist of it.

And you indicated that would not be, that you would make your decision based on the facts and circumstances, and that is as it should be.

But do you believe that there are different cultural pressures on young people growing up in these times or not? Does that make any sense to you?

Do you think that young black men may be under different cultural pressures than perhaps young white men are?

A    Oh, there are definitely different cultural pressures. Definitely, me being a black guy, I can speak on that one.

**Anne B. Meredith**
Certified Shorthand Reporter

318

Q    Sure.

A    We were raised in a hard environment.

Q    You know, I guess the thing --

MS. HANDLEY:  Your Honor, can I hear the juror's answer without interruption?

MR. PARKS:  I'm sorry.

THE COURT:  Go ahead.

Q    (By Mr. Parks)  Go ahead, Mr. Riser.

A    I was raised in a poor section of town, hard environment.  So, you have to work harder, try harder, just to be even.

Q    Sure.

A    That's not a bad thing.

Q    I understand.  And I guess what I was more thinking about -- and maybe this is just maybe because I'm an old white guy and, you know, the record can so reflect if it didn't already.

THE COURT:  Let's don't talk about us old white guys.

Q    But, you know, it just seems to me, and maybe it is because I'm an old white guy, it just seems to me over the past ten, fifteen years, the media, what you see on television, the portrayals of urban life in black communities, the way it is, whether or not that -- is that overblown as a cultural influence, do you think, or the hip hop, whatever you

**Anne B. Meredith**
Certified Shorthand Reporter

want to call it, gangster kind of --

A    I think it's overblown because I have a fifteen year old son and basically he knows he don't live in a -- he don't live in a hood.

Q    Yeah.

A    You know, he's not a gangster.

Q    Sure.

A    But the kids kind of react to that nonsense sometimes, you know.  And I'm gonna work to make sure my son and my grandkids don't follow that.  But I would tell them to stay away.  But I've seen more and more white kids do the same thing now.

Q    Oh, yeah.

A    Dressing, acting the same, stuff like that.  All our kids will just have to grow up and get past that nonsense.

Q    Okay.  And I am glad to hear your answer that it may not be as influential as we sometimes fear --

A    No.

Q    -- that it might be.  And I am not trying to indicate to you that it has anything to do with this case.

A    Yeah.

Q    But it does bring me to where I do want to talk to you, Mr. Riser.  Based on your questionnaire, I get the impression that you had good strong parents that raised you right and taught you right.  Am I right about that?  I know

that you have very good things to say about your father.

A    Yeah, but they had issues too.

Q    Oh, I understand.

A    They taught us, hey, go to work, do the best you can, and we sometimes meet double standards but, hey, work through them. You'll be okay. Do the right thing.

Q    You're doing the same thing for your children.

A    Exactly. So, if you don't see me trying to model that for them, try to find somebody else to model that for them, you know, find them a good model.

Q    Would you agree with me that it is the responsibility of adults to raise the children and not for the children to raise themselves?

A    Yeah, I agree, of course.

Q    And you have lived long enough to know that there are differences in families. Some families have that good strong influence that teaches people. Some families are not so good at it. Some families are not whole. All different kinds and circumstances that people are raised up in.

A    Yeah, go back to my answer. You also get a chance to see what's better out there. I mean you live, and if you watch just on TV, you see what's there. You have to choose to go either way. Like, you know, if you live in a terrible neighborhood, try your best. So, we try to expose our kids to more stuff that we see is better.

Q    But you understand that not all kids are exposed to that.

A    Exactly.  Some kids have it tough.

Q    You know, there is an old saying in East Texas that may or may not have any application here.  But kind of every tub rests on its own bottom.  Everybody is different.  Every situation is not the same.

And would you agree with me that when we get down to cases of this kind, make these kinds of important decisions, that we need to do that in the context of a person's life and their life experiences and answer these questions in a way that the law indicated and not set standards for people?

You know, I've had prospective jurors come down and say, listen, I was raised in hard circumstance and I persevered.  If I did, everybody could.  That's not true.

A    Exactly.

Q    That would be just like Albert Einstein saying, listen, I know quantum physics.  It came to me just like that, so there is no reason you can't do it.

A    Right.

Q    That's just not right.

A    Yeah.

Q    And everybody needs to be judged on their own circumstances.

A    Right.

Q    Is that fair?

A    You've got to have enough sense to know that like whatever my standard is, my standard is not always right.

Q    Right.

A    And my father's too.  I understand.

Q    Well, I want to just finish up with this issue for just a minute and I will be done with you and you'll be glad of that and you can go on about your business, Mr. Riser.

You understand that when we get to that last special issue, the mitigation issue alone, that's the one that each one of us can now step back.

Heretofore you have been guided by the evidence in the fact that you have got a road map before you.  You've got the indictment as a road map.  Did the State's evidence fit that road map in such a way that you could beyond a reasonable doubt find a guilty verdict? You've got a road map with these first two special issues.

In the third special issue, you really don't have a road map other than the admonishment to consider the character and the background and look for anything that might lessen the moral culpability and, frankly, anything else that might in your own heart and mind be a mitigating factor and you weigh that.  So that the road map sort of fades out at that point and it focuses in on you as an individual juror

and your own personal moral judgments about certain matters.

You see how that fits?

A    Yes.

Q    What the law basically says is this, is that every juror must make up his own mind, his or her own mind about that, okay, whether or not there is a sufficient mitigating factor in the case.

You don't have to be able to articulate. You can if you want to.

A    Yes.

Q    But you have -- there is no obligation in the law that you have to be able to articulate what you believe is mitigating or why you believe it is sufficiently mitigating. That's your own personal judgment in the matter.

You don't have to explain that to the Court. You don't have to explain it to the lawyers. You don't have to explain it to your fellow jurors any more than they would have to explain their own personal judgments to you.

It's the same way you've talked about raising your children. You've made a moral judgment about how your children ought to be raised.

A    Right.

Q    And it wouldn't be appropriate for someone to come and tell you that you're doing it wrong and that you need to do it their way any more than it would be appropriate for you

to tell them the same thing, or about religion or any of the other important decisions that you make, so that that carries through to the juror.

And once each of you have made your own personal moral judgment about what you think is appropriate in the case, can you see how that's -- the job's done?

A    (Nods head).

Q    And then the case is basically over.  And if all twelve of you have reached a verdict or ten of you can reach a verdict -- I'm not going to go into this ten twelve business.

But the bottom line is this.  No one in the State of Texas can be executed unless all twelve jurors have reached the same moral judgment that he deserves death.  If one juror says, my personal moral judgment is this is a life penalty case, then that's what it is.

Does that make sense to you?

A    Yeah, it does.

Q    Again, the law never presumes death.

A    Right.

Q    The law presumes life.

A    Right.

Q    Are there anything, any of these issues that I have tried to explain as best I could, anything you don't understand?

**Anne B. Meredith**
Certified Shorthand Reporter

Any reason that you feel like you could not be a fair and impartial juror in this case?

A    No, sir.

Q    All right.  Just so that we are abundantly clear, we've got special issue number one cleared up that you would not automatically answer that question yes, didn't we?

A    Yes.

Q    You would listen to the evidence.  And then if the State proved it yes, answer it yes.  If they didn't prove it yes, answer it no.  Fair enough?

A    Fair enough.

Q    Mr. Riser, I appreciate your patience with me. Thank you.

A    No problem.

THE COURT:  Thank you, Mr. Parks.

Mr. Riser, I'm going to ask you to step out with my bailiff for just a moment while I confer with the attorneys, and then I'll bring you back and give you the result.  You can just leave it right there.  Thank you very much.

PROSPECTIVE JUROR RISER:  Okay.

(Prospective Juror Riser exits the courtroom).

THE COURT:  Thank you.  You can be seated.

Ms. Handley, does the State have a challenge for cause?

**Anne B. Meredith**
Certified Shorthand Reporter

MS. HANDLEY: We do not, your Honor. We believe Mr. Curtis Riser, Juror number 222, is qualified.

THE COURT: Okay. Mr. Parks.

MR. PARKS: As does the defense.

THE COURT: All right. Thank you.

Bring Mr. Riser back in, if you would, please.

(Prospective Juror Riser returns to the courtroom).

THE COURT: Mr. Riser, come on back in for just a moment.

Thank you. Be seated, please.

Mr. Riser, you have been selected as prospective juror number twelve --

PROSPECTIVE JUROR RISER: Okay.

THE COURT: -- on the panel. That doesn't necessarily mean that you will be on the jury, but you will be in the group to be considered --

PROSPECTIVE JUROR RISER: Okay.

THE COURT: -- to be on the jury. You will find out for sure probably the latter part of July to the first of August, somewhere in that neighborhood.

We anticipate evidence in this case, if you're on the jury, evidence in the case will start August the 10th.

PROSPECTIVE JUROR RISER: Okay.

THE COURT: A Monday. And I would like for

you to kind of pencil in the next two weeks from August the 10th on your calendar. I'll keep that. I'll keep that, if you don't mind.

PROSPECTIVE JUROR RISER: Okay.

THE COURT: And also you had indicated to us that you didn't recall if you knew anything about this case, whatever you knew about this was very limited and you weren't even sure it was this case.

PROSPECTIVE JUROR RISER: Right. Yes, sir.

THE COURT: Well, I want to keep you just exactly like that.

PROSPECTIVE JUROR RISER: Okay.

THE COURT: I don't want you finding out anything about this case by going back and --

PROSPECTIVE JUROR RISER: Researching.

THE COURT: -- going on the Internet and researching it, getting into the old archives of the newspaper articles or the TV accounts or anything like that.

PROSPECTIVE JUROR RISER: No.

THE COURT: Also, any future pretrial publicity that this case might receive in the newspaper or on TV, I'll ask you to refrain from reading those articles, also from listening to any news clips that might be on the TV news or the radio.

PROSPECTIVE JUROR RISER: Yes, sir.

THE COURT: Okay. Will you do that for me, in other words? And of course, if you are selected as a juror in this case and you report for jury service on August the 10th, then the first thing that Judge Snipes will do is to administer the oath of a juror to you or to the entire jury.

And what you will be sworn to do at that time under the oath that he will administer, you will be sworn to make your decision in this case based solely upon two things, and that is the evidence that you will see here and receive in the trial of this case and then the law that Judge Snipes will give to you in his charge to the jury.

PROSPECTIVE JUROR RISER: Okay.

THE COURT: Okay. So, no pretrial publicity and refrain from reading any of those articles or going back and looking up any old articles, and kind of pencil in there the two weeks following August, the week of August the 10th as well as the following week which I guess would be the 17th and that following Monday, so through about the 21st. I guess we are looking at from the 10th through the 21st.

MS. HANDLEY: Yes, sir.

THE COURT: Something like that. Okay. All right. Very good. Thank you, Mr. Riser, for your time. Appreciate it very much.

PROSPECTIVE JUROR RISER: No problem.

THE COURT: You have a good evening.

PROSPECTIVE JUROR RISER: Yes, you too. So, everything stays?

THE COURT: Yes.

PROSPECTIVE JUROR RISER: I keep taking everything with me.

HANDLEY: Some good reading.

PROSPECTIVE JUROR RISER: Thank y'all. Appreciate it.

(Prospective Juror Riser excused from the courtroom).

THE COURT: And ladies and gentlemen, thank you all very much. Have a good evening and we will see you tomorrow morning. And we start at 9:00, right?

MS. HANDLEY: Yes, sir.

MR. LOLLAR: Yes.

THE COURT: Very good.

(Court adjourned for the day).

**Anne B. Meredith**
Certified Shorthand Reporter

THE STATE OF TEXAS   (

COUNTY OF DALLAS      (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 1st day of June, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volumes 13, 14, 15 & 16) is $7,300.00 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 29th day of November, 2009.

Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter