ORIGINAL

AP-76207

REPORTER'S RECORD

VOLUME 14 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| THE STATE OF TEXAS | ( | IN THE CRIMINAL DISTRICT |
| VS. | ( | COURT NUMBER SEVEN |
| JAMES GARFIELD BROADNAX | ( | OF DALLAS COUNTY, TEXAS |

* * * * * * * * * * * * * * * * * * *

INDIVIDUAL VOIR DIRE EXAMINATION

* * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

SFP 16 2010

Louise Pearson, Clerk

On the 2nd day of June, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE QUAY PARKER, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

*Anne B. Meredith*
Certified Shorthand Reporter

A P P E A R A N C E S:


HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas  75207-4313
Telephone No. 214 653-3600

BY:   MS. ANDREA HANDLEY, SBOT No. 08898800
      MS. ELAINE EVANS, SBOT No. 24032880
      MR. GORDON HIKEL, SBOT No. 00787696
      Assistant District Attorneys


           APPEARING FOR THE STATE OF TEXAS



      MR. BRADLEY LOLLAR, SBOT No. 12508700
      Attorney at Law
      1700 Commerce, Suite 450
      Dallas, Texas  75201
      Telephone No. 214 384-8178

      MR. DOUGLAS PARKS, SBOT No. 15520000
      Attorney at Law
      321 Calm Waters Lane
      Holly Lake Ranch, Texas  75765
      Telephone No. 903 769-3120

      DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
      133 N. Industrial Blvd., LB 2
      Dallas, Texas  75207-4399
      Telephone No. 214 653-3550

BY:   MS. KERI MALLON, SBOT No. 24049165
      Assistant Public Defender

           APPEARING FOR THE DEFENDANT


*Anne B. Meredith*
Certified Shorthand Reporter

CHRONOLOGICAL INDEX - VOLUME 14

| | | | | PAGE |
|---|---|---|---|---|
| Proceedings - June 2, 2009 | | | | 5 |
| VENIRE PERSON | COURT | STATE | DEFENSE | |
| JOHNNY WILLIAM SANFORD | 6,77 | 9 | 53 | 75,85 |
| State's Challenge | | | | |
| Court's Ruling | | | | 85 |
| VICKI SUE WOOD | 90 | 93 | 145 | |
| Prospective Juror Accepted | | | | 175 |
| NICHOLAS ANTHONY TUEFEL | 180 | 184 | | |
| State's Challenge | | | | 186 |
| Court's Ruling | | | | 186 |
| CHALENDIA HARRISON | 188 | | | |
| State's Challenge | | | | 190 |
| Court's Ruling | | | | 190 |
| JAIME GAMEZ | 191 | | | |
| State's Challenge | | | | 194 |
| Court's Ruling | | | | 194 |
| KELLY McDONALD | 195,273 | 199 | | 246 |
| Juror Accepted | | | | 274 |
| LINDA SUE COLEMAN | 279 | 282 | | |
| State's Challenge | | | | 298 |
| Court's Ruling | | | | 298 |
| Adjournment | | | | 298 |
| Reporter's Certification | | | | 298 |

*Anne B. Meredith*
Certified Shorthand Reporter

ALPHABETICAL INDEX - VOLUME 14

PAGE

5

| VENIRE PERSON | COURT | STATE | DEFENSE | |
|---|---|---|---|---|
| COLEMAN, LINDA SUE | 279 | 282 | | |
| State's Challenge | | | | 298 |
| Court's Ruling | | | | 298 |
| GAMEZ, JAIME | | 191 | | |
| State's Challenge | | | | 194 |
| Court's Ruling | | | | 194 |
| HARRISON, CHALENDIA | 188 | | | |
| State's Challenge | | | | 190 |
| Court's Ruling | | | | 190 |
| McDONALD, KELLY | 195,273 | 199 | 246 | |
| Juror Accepted | | | | 274 |
| SANFORD, JOHNNY WILLIAM | 6,77 | 9 | 53 | 75,85 |
| State's Challenge | | | | |
| Court's Ruling | | | | 85 |
| TUEFEL, NICHOLAS ANTHONY | 180 | 184 | | |
| State's Challenge | | | | 186 |
| Court's Ruling | | | | 186 |
| WOOD, VICKI SUE | 90 | 93 | 145 | |
| Prospective Juror Accepted | | | | 175 |

***Anne B. Meredith***
Certified Shorthand Reporter

PROCEEDINGS:

(Defendant present).

THE COURT: Bring in Mr. Sanford, please, sir.

(Prospective Juror No. 265, Johnny William Sanford, enters the courtroom).

THE COURT: Good morning, Mr. Sanford. How are you, sir? Just go ahead and have a seat right there, if you would, please, sir.

Thank you, ladies and gentlemen. Be seated, please.

I would like for the record to reflect this is Prospective Juror number 265, Johnny William Sanford, s-a-n-f-o-r-d.

JOHNNY WILLIAM SANFORD,

having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Good morning to you, Mr. Sanford.

A    Good morning.

Q    I'm Judge Quay Parker. I'm a Senior District Judge from McKinney, Texas just north of Dallas here.

A    I know where that's at.

Q    You know where McKinney is.

Judge Snipes, who is the Presiding Judge

over this case, has asked me to assist him in the jury selection process.  So, that explains to you what I'm doing here today and also consequently why you're here today --

A    Yes, sir.

Q    -- for the individual voir dire.  Of course, Judge Snipes is in his courtroom taking care of the day-to-day matters of the Court while we're picking this jury downstairs here.

A    Okay.

Q    So, anyway, we are glad to have you here this morning, appreciate the time and effort you've made to be with us.

You'll recall that probably it's been a month ago or better than a month ago that everyone got together --

A    Yes, sir.

Q    -- in the central jury room and Judge Snipes went over some qualifications, exemptions, and he talked to some of the jurors.  And at some point in the proceedings he asked everybody on the panel to stand up, raise their right hand, and he administered the oath of a prospective juror.

Do you recall that happening?

A    Yes, I do.

Q    Okay.  Were you one of the panel members that stood and took the oath at that time?

A    Yes, sir, I was.

Q    Very good.  I'll just remind you you're still under your oath.  And basically what you have been sworn to do is two things.  Number one is to give truthful answers, but we know you would do that anyway.  And, secondly, to be responsive to each and every question that the attorneys ask you during this voir dire examination.  All right?

Now, a little bit about their questions and your answers.  There's no right or wrong answers.  This is not a quiz that you've got to pass or you fail, you know, or you're being graded on.

What they are going to do is they are going to explain to you a little bit about the law and some of the procedural aspects that are going to be involved in the trial of this case, and then they are going to ask you questions to get your ideas, your thoughts, your opinions concerning the law and these procedural aspects.

Once you understand them -- They are going to explain them so you can understand them and then they will ask you questions.  All right?

A    Okay.

Q    Okay.  So, that's kind of the procedure.  Now, you've read your little instruction guide --

A    Yes, sir.

Q    -- or juror's guide there, and that explained to you quite a bit about what they are going to be talking to

you about this morning, the special issues and some of the law concerning capital murder cases.

Okay.  Well, let me go ahead and let them get started, then, and we will get started with you.

THE COURT:  Let me introduce the attorneys that are seated around the table here.

Ms. Andrea Handley.

MS. HANDLEY:  Good morning.

PROSPECTIVE JUROR SANFORD:  Good morning.

THE COURT:  She will be talking to you for the State of Texas.

Seated next to her is Elaine Evans.

MS. EVANS:  Good morning.

THE COURT:  And then seated next to Elaine is Mr. Gordon Hikel.

MR. HIKEL:  Good morning, sir.

PROSPECTIVE JUROR SANFORD:  Good morning.

THE COURT:  They are three assistant district attorneys and charged with the responsibility of prosecuting this case.

Then the defense team is over here.  Mr. Brad Lollar.

PROSPECTIVE JUROR SANFORD:  Good morning.

THE COURT:  Mr. Doug Parks.  And on the very end down there Ms. Keri Mallon.

MS. MALLON:  Good morning.

THE COURT:  And then seated next to Ms. Mallon down there is the defendant, James Broadnax.

PROSPECTIVE JUROR SANFORD:  Good morning.

THE COURT:  Ms. Handley.

MS. HANDLEY:  Thank you, your Honor.

THE COURT:  You may proceed with your voir dire.

MS. HANDLEY:  Thank you.

EXAMINATION

BY MS. HANDLEY:

Q    Good morning, Mr. Sanford.

A    Good morning.

Q    How are you doing today?

A    I'm doing pretty good.

Q    Okay.  I think we just missed the rain getting in here, huh, could you hear the thunder?

A    Probably, yes.  It was looking pretty bad.

Q    I'm sorry I left my sprinklers on today.  I think I could hear it as we were going along there.

You remember filling out this questionnaire, right?

A    Yes, ma'am.

Q    How long do you think it took you to fill this out?

A    Probably about an hour and a half.

Q    An hour and a half?

A    Somewhere in there.

Q    Yeah.

A    I'd say around two, but I don't really remember.

Q    Okay.  Then I'm going to --

A    After the first hour, it was kind of numbing.

Q    It does get kind of numbing, doesn't it?  I think some people think, well, I filled out enough here for an eHarmony application or something, you know.  But I don't think you need that.  You're not in the business of that.

But I am going to assume, you tell me if I'm wrong, that the answers that you gave in here were thoughtful answers.

A    Yes, ma'am.

Q    Okay.  And that the feelings that you put in here about the death penalty, and such as that, that those are truthful answers for you.

A    Yes, ma'am.

Q    And that that's how you feel.

A    Yes, ma'am.

Q    Okay.  A lot of what we do, Mr. Sanford, in individual voir dire, we are bringing down everybody who showed up to fill out a questionnaire.  We are talking to them one at a time individually because the fact of the matter is we call hundreds and hundreds of people because

there are a lot of people who this kind of case is just not the case for them.

They might be a perfect juror for a burglary case or they might be a perfect juror for a theft case or they might even be the kind of juror who could sit on a, you know, on a case involving a child or something. But this is an entirely different situation than what you see the majority of the time.

And I think from reading your questionnaire that you have a pretty good appreciation for that. We are talking about a death penalty case here.

A     Yes, ma'am.

Q     We are talking about getting twelve people to sit in judgment of an individual, and if I prove my case to them beyond a reasonable doubt and if I prove the evidence in a way that causes them to answer the special issues in a certain way, then I am entitled to the death penalty. You understand that.

A     Right.

Q     And even having said that, I mean that's the law. And there is always, you know, the legal law and there is man's law, but then there is also, you know, God's law and there is also your own personal moral and religious convictions and your feelings on something.

And quite frankly, I can't -- nobody can make

you come down here and have those two collide.  You know, I can't make you come down here and violate your personal feelings or your personal oath.  I can't make you violate your religious oaths.  I can't make you violate your moral oaths.  Does that make sense to you, sir?

A     Yes.

Q     And do you not think that that's essentially fair?

A     Yes.

Q     Okay.  And ultimately what it comes down to is if sitting on a jury that's causing you to take part in the death of another human being would violate your personal, religious or moral oath, then you're not a qualified juror for this case, and that's fine.  There is nothing wrong with that.  There are hundreds and hundreds of people who feel that way, and there is nothing wrong with that.

You know, we don't -- we don't put something in the newspaper saying you're a bad citizen or you're a bad juror.  I think you see that that's ridiculous, right?  That we ought to respect a person's feelings and convictions and we ought not to make somebody do something that they don't think that they should do.

Does that make sense to you, sir?

A     Yes.

Q     I see that you put on your questionnaire that you do not favor the death penalty; is that correct?

A    Yes.

Q    And you had also put on your questionnaire, and it's kind of peppered I believe throughout your questionnaire, your feelings about it where on page four you had even said that we should not take another life for any reason.

A    Yes.

Q    And on page one even when we asked you, are you in favor of the death penalty, you said no.  And you said, I don't believe that another life should be taken under any circumstances.  And is that how you feel, sir?

A    Yes, ma'am.

Q    Okay.  And let me ask you a little bit also -- You do attend church.

A    Yes, ma'am.

Q    I see from your questionnaire here.  And it's your belief or at least you think that your church is opposed to the death penalty.

A    Yes.  I'm not completely sure, but I believe they are.

Q    Okay.  Okay.  And let's talk a little bit about that.  You are a man who attends church.  I'm sure you've studied your Bible.

A    Yes, ma'am.

Q    And you are familiar with the ten commandments.

A    (Nods heads).

Q    And one of those commandments is thou shall not kill.

A    Right.

Q    Is that correct?  And a violation of any one of the commandments, is that a sin?

A    Yes.

Q    If you were to take part in being a jury on a capital murder case and the evidence led a jury to believe that the proper thing in that case was to give the death penalty, do you believe that you are, in fact, taking part in the death of another human being?

A    No.

Q    Why not?

A    Well, because murder is something that is allowed to be dealt with.

Q    In what way?

A    Even in the Bible.

Q    Okay.

A    Well, in the Old Testament it was frequently an eye for an eye, a tooth for a tooth, so.

Q    Okay.

A    But I believe the Bible does and the church does allow for following the laws of the State.

Q    Okay.

A    And what we are doing complies with the laws of

the State.

Q    Okay.

A    So, it's something that would not be actually committing as opposed to --

Q    Okay.  Do you believe, though, that you are taking part personally in the murder of another individual?

A    No.

Q    You understand, and let me explore that with you, that obviously you base your verdict on the evidence in the case.

A    Right.

Q    And if the evidence convinces you that that's the thing that has to be done in this case, then you are signing a verdict, you know, to that effect.  And once you do that you've essentially, and I am speaking figuratively here, but you've essentially signed somebody's death warrant. You are one of twelve people who is taking part in the death of another human being.

A    Yes.

Q    So having said that, though, you don't believe that you're taking part in the death of another human being if you were called upon to do that?

A    No, I believe that would be passing judgment on the actions of another person.

Q    Okay.

*Anne B. Meredith*
Certified Shorthand Reporter

A    So, that is something that is vastly different than actually taking a life.

Q    Okay, okay, okay.  You believe you're just passing judgment.

A    Yes, ma'am.

Q    But you don't think that you've actually taken a part, played -- your hand has been involved in any -- in the ultimate death of that person?

A    No.  I mean, that's just, like I said, following the laws of the State, and they do allow for that.

Q    Yeah.  I've heard people say, when they prioritize their convictions of their oaths that, you know, some people say it's family first and then my job, and I hear a lot of people say it's God first.  God first, then family, then --
       What's your priority?

A    It's God first.

Q    God first and then what?

A    My family.

Q    Okay.  Okay.  God first and then your family.
       You have said in your questionnaire that I don't believe that another life should be taken under any circumstances.  What do you mean by that?

A    That's just my belief that life is sacred so it's not something to take lightly.

Q    Okay.  It's not something to take lightly.  But

you say under any circumstance. What do you mean by that?

A    Well, I'm in agreement that murder is definitely wrong. I mean, that's clearly one of the ten commandments, so.

Q    Yeah. But when you say under any circumstances, is not a circumstance that the defendant may be put to death, is that a circumstance also of murder?

A    That's a circumstance, but I believe that we all have to answer for our actions, so sometimes the consequences are not exactly what we would like them to be, but we all do have to answer for them.

Q    How much do you think your personal feelings against the death penalty will factor into your deliberation of the evidence?

A    I don't think it would, but I've never been involved in one so I can't say for certain but, you know, I feel like that it wouldn't, but.

Q    But you can't say for sure?

A    No. Again, I mean it's easy to say with certainty something, but it's another thing when you come down to the reality of it sometimes, you know

Q    Yeah. Well, because the law states that, you know, and it's always easy to say the law says this, the law says that. But we are talking about what, you know, a person really, really does feel.

A    Right.

Q    So, the law states that a verdict has to be based strictly on the evidence in the case.  And you are saying that you can't say right now whether or not your religious convictions or personal or moral convictions against the death penalty would factor into that.

Is that what I'm hearing?

A    I don't think that they would.

Q    But you can't tell me.

A    But I can't say that for a hundred percent certainty, no, ma'am.

Q    Okay.  Okay.  You had also put in your questionnaire, and I think it's towards the, towards the last page there, that we asked you basically how, on page 17, how would you feel about being chosen as a juror in this case, and you said you're undecided.

A    Yes, ma'am.

Q    Expand on that for me.  Why did you put that down?

A    Well, because it's an area of my life that I've never had to be involved in something like that, so, you know, because of that I think it just, it tends to leave feelings of uncertainty about -- like I said, you can't ever be 100 percent sure of anything regarding what you think will happen in a circumstance.

Q    Yeah.

A    So --

Q    So, as we sit here today, you can't, you can't tell us a hundred percent -- Let me see if I can't word this appropriately.

You can't tell us a hundred percent that you would give all your personal time and commitment to this case and decide the case strictly on the evidence.  You just don't know as we sit here today.

A    No, ma'am.  I would do that if I was chosen.  I would give my 100 percent --

Q    Okay.

A    -- undivided attention to that matter.

Q    Okay.  But you can't tell us whether or not your moral opposition to the death penalty would influence how you, how you looked at the evidence.

A    I don't think it would.  I would try to decide it strictly on the evidence.

Q    Okay.  Okay.  Let's see here.  You also -- How do you feel about sitting here today and being called upon to play part in this?

A    Well, strange, but I am doing my civic duty to come down and sit in this if need be.

Q    Yeah.  Do you think that your civic duty should always trump your personal feelings or personal motivation?

A    It's a fine line.  Yes, because basically we are

talking about following the law, and I believe that we are called on to follow the law regardless of our beliefs because sometimes our beliefs can be misguided.

Q    Do you think your beliefs are misguided?

A    No, ma'am.

Q    Okay.  You think that there is -- Okay.  You don't believe your beliefs are misguided.

A    No, ma'am.

Q    Okay.  Okay.  Have you ever sat on jury duty before?

A    No, ma'am.

Q    It's a heck of a case to start with, isn't it?

A    Yeah.

Q    For those people who say that they don't think that they are the right juror for this particular case, that they just -- they are not comfortable with it or they don't think that they can extract their religious or moral convictions against the death penalty out of the equation, do you think they are bad people?

A    No.

Q    Okay.  Do you think that's an acceptable view to have?

A    Certainly it's an acceptable one.  It's a personal belief and that's just, you know, that's unfortunately the way we all -- we are human and we do have our beliefs.

Q    Right.  Right.  Do you want to be on this jury?

A    Not necessarily but, you know, if I was picked, I would serve on it, yes, ma'am.

Q    Okay.  Okay.  Let me see if you, if you fit into this, into this equation.

Have you ever seen the -- Have you ever seen the people who clean the big windows on the skyscrapers downtown?

A    Yes.

Q    And they get about eighty floors up off of the ground out there.  And some jurors tell us that they kind of fit into this scenario here, at least how they feel about sitting in a case where they may be called upon to assess the death of another human being.

And I don't know how much you know about the death penalty, Mr. Sanford.  But, you know, if we prove our case beyond a reasonable doubt that the defendant committed an intentional murder in the course of committing a robbery, and if we prove that the special issues should be answered yes -- And that's not necessarily that you go back there and go, am I for or against the death penalty, you know.  But if we prove that, then we are entitled to a verdict of capital murder.

And what ought to weigh upon you and what really ought to impress upon you is the gravity of what's

going on and the ultimate result and finality of it.

If that happens, then you and the other jurors would sign a verdict with those answers, and the judge at that time -- And I believe that will be Judge Snipes who will oversee the case. -- he will have no choice in the matter other than to sign basically a warrant for the execution and the death of the defendant in this case.

He'll be taken to Huntsville until the date of his execution. And on that date he's taken into a smaller prison, if you will, in Livingston, Texas. They strap him to a gurney and continuously feed poison into his veins until he succumbs and he dies by lethal injection.

Now, I don't tell you that to be morbid but I just tell you that to impress upon you the reality of what we're doing here, that this isn't an academic exercise, that this isn't I'll think about it now and make up my mind later.

You know, I mean we're here. This is now. We are talking about a reality and a true possibility of you taking part in that. And we are not talking about some ambiguous character, or something, or some person out there.

I need you to look down at the end of the table. You see that young man in the blue shirt and the blue tie?

A    Yes, ma'am.

Q    All right.  His name is James Broadnax and he is the defendant in this case.  And if I prove my case beyond a reasonable doubt, I have a right to have that verdict of death and to have that young man killed.  Okay?

A    (Nods head).

MR. PARKS:  Judge, that's a misstatement of the law.

Q    (By Ms. Handley)  Have that death penalty --

THE COURT:  Sustained.

Q    -- assessed against him, and he will essentially be killed by lethal injection if I prove my case.  Okay?

A    Okay.

Q    As I said, I don't say that to be morbid, just to impress upon you the reality that we're talking about the death of that young man down there.

As you look at him now, do you have any feelings about him?

A    Sure.

Q    What are your feelings?

A    Well, I feel empathy for him, but.

Q    And why do you feel empathy for him?

A    Because I believe that life is sacred, so.

Q    Okay.

A    If I was -- If I'm human, then I think that that would be an appropriate feeling.

Q    Sure, sure.  And do you think -- well, okay.  Okay.
You feel, you feel empathy for him at this point.

How much will that factor into your -- into
the way that you view the evidence?

A    Well, like I said, I think I would base it on the
evidence.  And if that is -- If it was proved, if you proved
your case, then I would make it based off of that.

Q    Okay.  Okay.  That window washer example, this may
or may not be how you feel.  You tell me.  But you know,
you've got those people who go up onto the eighty floors on
top of those skyscrapers to clean windows.

Academically, I will tell you that if you ask
me about how I feel about cleaning windows on the top of tall
buildings, I'll tell you I'm 110 percent for it.  Okay.  I'll
tell you that it's a job that has to be done.

A    Yes.

Q    And that somebody has to do it, right?

A    Right.

Q    Would you agree with me?  However, if you told me,
okay, Ms. Handley, since you say that it has to be done,
that there is a place for it in our society, that it's a
necessity and that there is a reason for it, then here's a
bucket of sudsy water and here's a squeegy and I need you to
get up on that scaffold and I am about to put you eighty
feet in the air -- eighty stories in the air.

Now, I'll tell you, yeah, I can't do that. I don't want to be a part of that. Now, I can tell you that, well, I can tell you I can do it. I'll tell you right now that I think I can do it. I think I can do it. And I will bravely get on that scaffold and tell them, I'll try my best. And they will put me up eighty floors.

But to be perfectly honest with you, I'm not going to be thinking a hundred percent about cleaning those windows. I'm going to be thinking about, am I going to fall off of this thing? I'm going to be thinking about how scared I am, or I'm going to be thinking about other things.

Okay. I will not give it a hundred percent of my dedication and a hundred percent of my effort. I believe the windows should be cleaned, but I'm not the right person for it.

And sometimes jurors come in here and they say, you know, I feel that way. I believe there is a place in the law and in society for the death penalty. I agree with that. I agree it's a law and it's man's law. But if you ask me to participate in it personally, I'm going to tell you that my reservations about it or my religious or moral or personal convictions, I'm not the right person. I'm probably not the person who can fairly sit on this and give both sides a fair shake in the case.

How do you feel, Mr. Sanford?

A     I believe that I would probably do the window washing.  I probably would be a little apprehensive about it, but I believe that I would give it my best shot.

Whether it would a hundred percent, I don't know, because certainly it would be something that I'm not used to.

Q     Okay.  And, again, you can't say that you can give it a hundred percent of --

Well, let me put it this way.  That you can't say that you're -- You can't say is basically what I'm hearing from you.  You can't give us an answer.

A     Well, I don't know that anybody can say with certainty until they are actually faced with the situation.

Q     I think some people can.  I think some people can say --

A     They may be able to, but --

Q     But can you?

A     No.

Q     No.

A     I don't think, no.

Q     Okay.  And I hope you don't think that I think that there is something wrong with that, Mr. Sanford.  I don't.

A     No, I don't think that.

Q     I don't because I am looking at your statements that, you know, you don't believe that a life should be

taken under any circumstances and that you aren't in favor of the death penalty. And I think your convictions are strong in that sense, and I think that it's hard, if not maybe impossible, to tell somebody to completely put their personal convictions aside.

A    Sure.

Q    Do you agree with that? Okay.

I notice also that you heard some stuff about this case. Is that true? On page three.

A    Yes, ma'am, I believe briefly I probably heard something about it on the news.

Q    Okay. What did you hear?

A    I just heard that a store clerk was killed, I believe.

Q    Okay.

A    In a robbery.

Q    Okay.

A    And I think that's really all I heard.

Q    What did you think when you heard that?

A    I don't really remember because, unfortunately, we hear a lot of things like that on the news. Sometimes we can become desensitized to it.

Q    Uh-huh.

A    But I certainly knew that, you know, someone's family had suffered a loss.

Q    Sure, sure.  And that's interesting.  You say that we become desensitized.

You had put in your questionnaire on page four, we asked you, do you feel the death penalty is used too often or too seldom?  Please explain.

And you said, too often, because I believe that we shouldn't take another life for any reason.

Do you think that, is it that we seek the death penalty too much, or why do you think it's too often?

A    I don't think it's the courts necessarily.  I think that people themselves are seeking revenge for their loss.  And I think that, in my opinion, that's the wrong attitude because that skews their thinking.  I'm talking about the victims.

Q    Uh-huh.

A    The family of the victims.  I hear too many times about, you know, people wanting to get up there in the front row and watch the execution.  And that, to me, is really morbid.

Q    Uh-huh.

A    Because I just don't think that, even though the law allows for it, that it's something that should be celebrated, especially, you know, with an attitude like that.

Now, if they are actually just seeking justice and they deal with it, you know, it's difficult to, I think,

reach a point where you can forgive somebody until you get past that.

Q    Uh-huh.  It's a very personal choice, isn't it?

A    Yes.

Q    Okay.  Do you think that, by the State seeking the death penalty, that we are enacting, exacting some revenge?

A    No, I don't think it's the State.  I think it's the people who suffer the loss, the victims of the family.

Q    Do you think that they, that they call the -- I mean who then decides whether or not we should seek the death penalty?  How do you think that works?

A    I believe the State decides that, and that's appropriate.

Q    Okay.  Do you think that if a family member is seeking revenge, that that should factor into the equation?

A    No, it shouldn't but, unfortunately, it's part of the process and that happens.

Q    Sure.

A    And I think too many times they get caught up in that and they -- it just impedes their getting over their loss.

Q    Okay.  If a family member were to testify in court and say -- you know, would you -- and be angry and such as that, would you be sceptical of that person?

A    No.

Q    No?

A    But I would certainly be aware that it's probably an issue that they haven't dealt with and they think that that is a way to deal with it.

Q    Yeah.

A    But I don't really think that that is a way to deal with it.

Q    Have you ever -- And this is such a personal question, but have you ever lost a loved one to murder?

A    No, ma'am.

Q    Okay.  Okay.  So, I guess you've heard the expression, mayby they tell you to walk a mile in my shoes and then see how you feel.  But that's a personal opinion.

A    Yes, ma'am.

Q    There's certainly nothing wrong with that.  I wouldn't disagree with you there, sir.

With what you saw on the TV, did you, did you form an opinion about the case at that point?

A    No, ma'am.

Q    Okay.  Have you seen anything on the Internet or talked to anybody about this before coming to court?

A    No, ma'am.

Q    Okay.

A    I don't have a home computer and I am not too fond of getting on the Internet, period, so.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Okay.  Okay.  You've never been on jury duty before, so I'll try to hit the high points with you on how these things work.

In any criminal case, you know, there's fundamental principles of law that come into place.

The defendant has been indicted at this point which means that, you know, he's -- it's gone through several checks and balances at this point.  The case has been -- I think it's fair to say that maybe an arrest warrant was issued, that the case was -- that that was signed by a judge or a legal authority, that it's been to a grand jury, that they have looked at it, they they true billed it, found that there was evidence there to hold it over.  That we looked at it and we drew up an indictment and presented it to them.  It's been though a lot of points at this point.

Does that mean anything to you, Mr. Sanford?

A    It's just means that the State has decided that they have sufficient evidence to proceed with trying the case.

Q    Okay.  Okay.  Do you think that's any evidence of his guilt?

A    No.

Q    Okay, you're right.  It's not.  It's just clearly an indictment that's brought up against him.  And now what happens is we go to court and the State is called upon to

present our case beyond a reasonable doubt.  We have to prove it beyond a reasonable doubt to the jurors that he is, in fact, guilty of each and every element of the offense as charged.

There is no definition for reasonable doubt.  You know, we only have to prove to you beyond a reasonable doubt --

A    Right.

Q    -- that the defendant is guilty.

What do you think that means?

A    That means that if you have a certain doubt that you think is reasonable, then that's what it means.

Q    Okay.  Can you expand on what is reasonable?

A    I guess -- It's difficult, but if there was some element that -- in the case that didn't seem to hold true with the facts and the evidence presented, then that would be reasonable.

Q    Okay.  Okay.  How, how convinced do you need to be before you can return a verdict?

A    I really don't know because it's a, it's a difficult question to answer.  But I would say, if you're going to put a value on it, it would probably be 75 percent or greater.

Q    Okay.  Okay.  Do you think there is room for doubt when we are talking about imposing the death penalty

on somebody?

A    No, there shouldn't be but, unfortunately, there is usually a little doubt, so.

Q    Okay. Okay. Well, you know, we have to prove the case to you beyond a reasonable doubt, and we do that by bringing evidence to you in the form of maybe testimony or documents and such as that.

Figurative -- Well, literally speaking, the defense has absolutely no burden whatsoever.

A    Right.

Q    You know, they can sit at the table and they can work a crossword puzzle if they wanted to. Their only obligation is to show up, and they have done that. They have shown up. They are here. Outside of that, they don't have to do a darn thing. Okay?

Let's say we are sitting there in trial. I'm putting on my evidence and they literally do that, they work a crossword puzzle. They don't do a single thing. What would you think about that?

A    I might think it a little strange, but I do believe that the law states that the burden of proof is on the prosecution, so.

Q    Uh-huh. What if I'm sitting there just, pardon my language, just kicking their butt because they are not asking any questions, they are not offering any evidence,

they are not doing a thing; how do you feel for the defendant now?

A    I don't believe it would matter.  I would still try to decide the case on the facts.

Q    Even though he wasn't getting any representation?

A    I don't think that would have any effect on me.

Q    You don't think that you might sit there and go, man, if he had better lawyers, he might be getting a better shake?

A    I don't think I would, but there again.

Q    You don't know?

A    Yeah.  That's something that --

Q    Yeah.

A    -- I don't think a lot of us would know until we were actually faced with the situation.

Q    Sure, sure.  Well, you know, and I don't know whether they would do that or not.  I've actually seen that before in some cases, but I don't think that would happen in this court, in this case.

        But once -- You know, along with that is you've heard of the fifth amendment right of a person not to testify?

A    Yes.

Q    Do you have kids?  You have a lot -- You have a lot of kids, don't you?

A    Yeah.

Q    Okay.  You remember when they were little ones?  How many do you have?

A    Well, I raised three of my own --

Q    Okay.

Q    -- when they were little.

Q    Okay.  Okay.  You ever came home and something is broken or there's some kind of mess or something like that and there's three little ones running around?

A    Probably.

Q    Yeah.  What would be the first thing you would do?

A    I would probably ask who did it.

Q    You would get them all in the room and go, who did this, right?  And they all sit there.  And what if they, what if they said, well, daddy, I know you would like to know who did it and I know you would like to hear from us, but we are going to invoke our fifth amendment right to remain silent; what would happen then in the Sanford household?

A    Probably nothing drastic, but I'm sure that it would have some, some form of consequence.  But I don't, I don't believe that I would punish all of them, not with the typical type of punishment, anyway.

Q    Do you think you could figure out what actually happened in the house and who was actually to blame without their discussing it with you?

A    Possibly but, you know, sometimes that's difficult to do.

Q    Sure.  You would let them just remain silent?

A    Probably.

Q    I wish I was raised in your house.  In my house, there was no fifth amendment in our house.  You were going to talk.  You were going to talk as long as it took to figure out what was going on.

But in a court, you know, you've heard that a defendant has a right not to testify.  He has a right to remain silent.  Would you like to hear from the defendant?

A    Possibly, but I don't know that it would be necessary.

Q    Okay.  And if a defendant didn't testify, then you wouldn't hold that against him?

A    No, ma'am.

Q    Okay.  What if, what if I put on the evidence in my case and I was just a hair, just a fraction from proving to you beyond a reasonable doubt my case, but the defendant didn't testify, how would that factor in?

A    I don't think it would.  I don't think it would, but.

Q    Okay.  One of the things also that I'd have to prove, Mr. Sanford, is not -- is all of the elements of the indictment.  And that means I have to prove who did it, that

they did it in Dallas County, on or about a certain date, how they did it, you know, that they committed a robbery, and that they intended to cause somebody's death, the whole elements of the offense.

A    Right.

Q    And the law provides that I have to prove all of the elements, not just five out of six, but all of the elements, and that there is a certain burden of proof, you know, to all of those. And certain things are sometimes at issue in a case. You know, maybe the issue in the case could be who did it, or maybe it's not who did it but did he do it intentionally, you know.

So, we can't -- I can't really say what the, what the issue may or may not be in this case because I don't know. They don't have to tell me anything. Okay. But I do have to prove all the elements to you beyond a reasonable doubt, and each one is of equal importance.

And let's say, you know, for example you're sitting on a murder case. Okay. And I have alleged in the indictment that a defendant did cause the death of another person, that he did it by shooting him with a handgun. Okay. So, that's what I have to prove to you.

And in that case the medical examiner takes the stand and says, well, no question this man was killed, but he didn't die from a gunshot wound. First he was

stabbed in the heart and that's what killed him.  And then later on he was shot, but that's not what killed him.

The defendant has taken the stand and confessed, I killed that man.  I sure did, and I would do it again.  But have I, have I proved to you that he died as a result of a gunshot wound?

A    It doesn't sound like it.

Q    No.  So, how do you -- What would your verdict be in that case?  I mean, some people say that's a technicality.

A    It would probably have to be not guilty.

Q    Okay.  Could you honestly do that?

A    I believe so.

Q    You would let a -- You would let a confessed murderer ride that elevator down to walk on the streets with you?

A    If that's the way it played out, I might be forced to.

Q    Okay.  All right.  Then I think you understand the elements there in proving a case.

You know, not all cases -- not all murder cases are capital murder cases.

A    Right.

Q    I think we asked you about that.  We said on page four, for what crimes do you believe the death penalty should be available in Texas, and you said murder.

*Anne B. Meredith*
Certified Shorthand Reporter

Okay.  So, if I pulled out a gun out of my briefcase down here, and you see Ms. Evans is sitting here minding her business, and I took that gun and I just started shooting her and I shot her about ten times and I laughed about it and I spit on her body and I danced around and I said, I am glad she is dead.

Is that a -- Is that a case that you think the death penalty should be a potential punishment for?

A     According to the law, I don't think it is.

Q     Why?  What do you know about the law?

A     Well, I know that capital murder, the death penalty has to be with extenuating circumstances of it, with something other than --

Q     Exactly.

A     It's during the commission of another crime.

Q     There you go.  It's the --

A     And they kill someone as a result of that crime.

Q     It's the intentional murder of somebody, not the accidental --

A     Right.

Q     -- not the reckless murder, not the negligent, but it's the intentional murder of a person plus some aggravating factor.

A     Yes.

Q     You know, it's murder during the course of the

commission of another felony or it's murder of a child under six years of age or it's murder of a police officer.

If you were governor for a day, Mr. Sanford, would you, would you widen the category of death penalty cases or would you narrow it?

A    I would probably leave it like it is because I think those are fairly reasonable.

Q    Okay.  Well, we have to prove that aggravating factor to you.  If I failed to prove that aggravating factor to you, what would you do?

A    Then I would not vote on the death penalty.

Q    Right.  You may be called upon to vote on something that we call a lesser included offense.

A    Right.

Q    And that would be murder.  And in that the option isn't just life in prison or the death penalty.  It actually becomes a wide range of punishment.

So, you might find yourself looking at a case where a person intended to cause the other person's death, and that means they wanted to do it.  Okay.  They wanted to do it and they did whatever was necessary in order to take that -- to carry that murder out.

The law would then ask you to assess the person's punishment, let the punishment fit the crime, and it could be anywhere from five years in prison up to

ninety-nine years or life.

Some people say that they could never give the minimum sentence to anybody who committed an intentional murder, regardless of the circumstances. Some say they could never put somebody in prison for the rest of their life because they believe in second chances.

How do you feel?

A    I believe that there are cases where life imprisonment is reasonable.

Q    Okay. And what about where five years is reasonable, are there cases where that applies, too?

A    I don't know that I would say five years was reasonable, but it would have to be established in the course of the trial.

Q    Sure. It has to be based on the evidence. You might actually see a case where you thought it was appropriate and then you would do that is what you are telling us.

A    Yes, ma'am. Yes, ma'am.

Q    Okay. Okay. If you find that person guilty of capital murder, if I prove all my elements to you, I'm entitled obviously to a verdict of guilty.

A    Yes, ma'am.

Q    And you have no problem with that?

A    No, ma'am.

Q    Okay.  That's when we move on to the punishment phase of the trial.  And as I said, you don't go back into the jury room and sit there with the other jurors and say, okay, should we give him life in prison or should we give him the death penalty?  It doesn't actually work that way.

Instead, you come to your verdict by answering certain questions.  Okay.  We also call those special issues.  And that first special issue, it's in your pamphlet there, and I think we also --

A    Yes, ma'am.

Q    -- we have it on the chart behind me right there, too.  We refer to that special issue sometimes as the future dangerousness issue.

And basically what I'm having to prove to you beyond a reasonable doubt is that this defendant will be a future danger.  I'm asking you to make a prediction into the future.  Do you think that's possible?

A    Yes, ma'am.

Q    Okay.  You believe you can predict the future?

A    Not completely accurately but, yes, ma'am.

Q    Sure.  Okay.

A    There's a reasonable idea that --

Q    Yeah --

A    -- something could happen.

Q    Got you.  On this first special issue -- We didn't

write these, us lawyers and this judge, we didn't write these. These were actually written by our lawmakers. They have been around a long time. And when they wrote these, what they didn't do, Mr. Sanford, is they didn't define the particular terms up there. Okay. They've left that up for, I guess for you to decide.

But it does start out, do you find from the evidence beyond a reasonable doubt. And that reasonable doubt, you think it's 75 percent is what you put in your verbiage. But do you find at least 75 percent or higher for you that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society?

What is probability?

A    That means most likely.

Q    Okay. Is it different from a possibility?

A    No.

Q    Okay. So, you don't see a difference necessarily between a possibility and a probability?

A    No.

Q    Okay. So you're saying, do you find from the evidence by at least 75 percent that there is a possibility that the defendant would commit criminal acts of violence?

They don't define criminal acts of violence either. What do you think those are?

A    I think those would be the ones that are the more serious offenses. I'm not really sure what, but certainly anything involving a weapon of any kind.

Q    Okay. Would you, would you limit your definition of acts of -- criminal acts of violence to those acts that involve a weapon?

A    Not necessarily, because there's -- I mean you can commit violence on a person without a weapon.

Q    So, would your definition of criminal acts of violence include, then, acts that don't involve a weapon?

A    Sure.

Q    Okay. If I balled up my fist and I hit somebody in the face, would that be a criminal act of violence?

A    It could be.

Q    Okay. When could it not be?

A    Well, if it was done in I guess a normal course of a disagreement or something, but people do tend to sometimes lose control, but --

Q    Does losing control mean it's not an act of violence?

A    It doesn't mean it's an act of -- not an act of violence, but I'm not sure that that would be considered in the same venue as what we are talking about.

Q    Okay. It doesn't say, Mr. Sanford, that the defendant would commit another murder.

A    Right.

Q    Or that the defendant would commit -- or the defendant would shoot somebody or that the defendant would smack somebody in the face.  I mean, it doesn't say --

A    Right.

Q    -- you know, what the criminal act of violence is, just a criminal act of violence that would constitute a continuing threat to society.

What do you think society means?

A    That means the general public.

Q    Okay.  Would your definition of society, then, just -- would it expand beyond that or is society just the general public to you?

A    Oh, it could be police officers, anyone that's involved with the public, yeah.

Q    Okay.  So, when you think of society, you think of a free world society, as we might call it, where you go to work every day --

A    Yes, ma'am.

Q    -- and you go to the restaurant and you talk to people at the post office and such as that.

Do you think that the defendant, that a person living in the prison, do you think he's part of a society?

A    He's part of a society, but he's in a different

type society.

Q    In a different type of society.  People live there, right?

A    Absolutely.

Q    And they work there and they play there and they might watch TV there.

A    Yes.

Q    And they might lift weights there and they might visit their loved ones there, right?

A    Right.

Q    So, they live there.  And there's other people that also work or live maybe in that society, wardens and nurses, educators and clergy and visitors and such as that.

You agree with me there?

A    Yes.

Q    Okay.  So, in order for you to determine, to decide that issue, Mr. Sanford, as to whether or not the defendant will be a future danger, what kind of evidence would you need to see or hear?

A    Well, I guess it would have to be something that was based on personal feelings.

Q    Whose personal feelings?

A    Mine.

Q    Okay.  So, you're going to base your verdict on what your personal feelings are?

A    From the evidence and the --

Q    That's what I'm asking you.

A    -- things that transpired in the trial, yes, ma'am.

Q    Okay.  Okay.  Well, what kind of things would you need to know or see or hear that would help you determine whether or not somebody was a future danger?

A    I guess remorse, regret, some type of acknowledgment that they were aware that what they did was wrong.

Q    Well, you know, I can't force them to take the stand and acknowledge anything.

A    I know you can't, yes, ma'am.  I know.

Q    So, if you don't have that, how are you going to make a determination?

A    You would have to base that on what you see from the defendant in the course of the trial.

Q    But, again, what you see from the defendant in the course of a trial, are you talking about him taking the stand?

A    No.

Q    Okay.

A    I'm talking about the way he would present himself, I guess.

Q    From, from the witness stand or from the defensive table?

A    From the defense table.

Q    Okay.  Well, you understand evidence only comes to you from the witness stand.

A    Yes, I know.

Q    But would you be watching the defendant at counsel table and you would take that --

A    I would not be necessarily watching him, no.

Q    But how are you --

A    But there are cases where you might, depending on the questions asked.

Q    I want to get a feel for what you're saying there because, you know, evidence comes to you from the witness stand.  But you said it's kind of -- it's important to you to know how he feels and what's going on in the trial.  So, are you watching him or what are you doing?

How are you making that determination, then, if he doesn't take the stand?

A    I'm not sure how you would make that determination.

Q    Okay.

A    But I understand the special issue.

Q    Uh-huh.

A    And it would have to be decided at the time it got to that, so.

Q    But, so, you would or you wouldn't be looking now to something from the defendant?

A    I'm not -- I'm not looking, no, ma'am.

Q    Okay.  How are you --

A    I would hope that I would hear something in the course of the trial that would give me guidelines to use that --

Q    Okay.  Okay.  Understand that by the time we get to the first special issue, Mr. Sanford, you've found this person guilty of capital murder.  Okay.  And we've talked about what that means.

That means it's an intentional murder.  It means it wasn't an accident.  It wasn't a, I didn't mean to kill him.  It wasn't a self-defense.  There was no legal justification for that murder.  It wasn't even a reckless act or a negligent act.  It was an intentional murder.

In other words, it was a, I want to kill this person, I'm going to kill this person, and they have done everything that they need to do to ensure that they have killed this person.

You understand where I'm coming from there?  No legal justification for what they have done, you know, no he might have something wrong with his mental abilities, you know, where we couldn't appreciate his actions.  I'm talking about he intended to do it.

Do you get what I'm saying there?

A    Yes, ma'am.

Q    And I am also talking about an individual who, when

they meant to kill this person and set out to do it and did it, was also in the process of committing or attempting to commit robbery.  Okay?

A    Right.

Q    And that's obviously the taking of somebody's property and taking it by force.

A    Right.

Q    Okay.  So, you found that person guilty of that. Okay.  So, what kind of person are you looking at at that point?

A    I'm not really sure because we are basing it on that one act.

Q    What do you think of that act?

A    Well, it's certainly something that I would not agree with.

Q    Sure.  I don't think a lot of people would agree with it.  But what do you think of the character of somebody who would do something like that?

A    Well, I believe there is a fine line, and under certain circumstances things can happen like that.  But there again, it would -- It's a difficult thing to answer really, but.

Q    It's a difficult thing for you to say what you think of a person who would intentionally kill somebody while robbing them; is that what you're saying?

**Anne B. Meredith**
Certified Shorthand Reporter

A    No.  I would definitely say that he was in the wrong.  As far as condemning him for whatever was left, no, I wouldn't have a problem with forgiving for it.  But --

Q    Let me explore that with you.  You've thrown in there that you wouldn't have a problem forgiving him for it.  What do you mean by that?

A    I believe that's what the Bible teaches us to do is to forgive.

Q    Okay.  And from what I'm hearing from as you talk is that that does play a large part in how you think in your actions; does it not?

A    Yes, ma'am.

Q    Okay.  Okay.  That what you think is your religious convictions play a part into how you see things and do things.

A    Yes, ma'am.

Q    Okay.  Okay.  And would that continue to play a part throughout your deliberations or how you saw the evidence?

A    I don't believe it would cause it to go one way or the other.  I would still try to do it based on my feelings about what transpired in the course of the trial.

Q    Do you think you could ever find somebody was a future danger --

A    Sure.

Q     -- without them taking the stand?

A     Yes.

Q     Okay.

Mr. Lollar, did you have --

THE COURT:  Thank you, Ms. Handley.

MS. HANDLEY:  Then I'm finished.  Thank you, Mr. Sanford.

THE COURT:  All right.  Thank you.  Five minute break?

MR. LOLLAR:  Sure.

THE COURT:  Give Mr. Sanford kind of an opportunity to regroup and stand up and stretch your legs, get a drink of water, bathroom if you need to.

We will be in recess for five minutes.

(After a recess, Defendant present).

THE COURT:  Are we ready?  Okay.  Bring the juror in.

(Prospective Juror Sanford returns to the courtroom).

THE COURT:  Thank you.  Just go ahead and have a seat again, Mr. Sanford.

All right.  Ms. Mallon.

MS. MALLON:  Thank you, Judge.

THE COURT:  We're ready for your voir dire examination.

EXAMINATION

BY MS. MALLON:

Q    Good morning again, Mr. Sanford.

A    Good morning.

Q    Again, my name is Keri Mallon.  Doug Parks and Brad Lollar and I, we all represent James here.

I know these are difficult questions to answer.  It's usually a subject not most people think about, much less have to discuss with seven lawyers in a room, so I appreciate that.

One thing I do want to tell you is that being opposed to the death penalty does not disqualify you as a juror as long as you can follow the law.  Okay?

A    (Nods head).

Q    There is nothing wrong with that as long as you can follow the law.

And based on your questionnaire -- And before I even say this, you know, what I think or what the prosecution thinks doesn't matter.  Okay.  What matters is what you think and how you feel.

But based on your questionnaire, you seem qualified to sit on this panel.  Okay?

A    Okay.

Q    But I do want to cover a few more things for you -- with you.  I'm sorry.

This is a capital murder case, okay?

A    (Nods head).

Q    So, if you were to sit on a jury and find a defendant guilty of capital murder, there are only two punishments, life without parole and the death penalty, okay?

A    (Nods head).

Q    And when I say life without parole, that is life without parole.  Okay.  That individual will die in the penitentiary.  We just don't know at what point or how, okay?

A    (Nods head).

Q    So, I want to make sure you understand that.

Now, we've talked a little bit about this today.  The burden of proof is always and only with the prosecution.  Okay.  And there's two phases of the trial, and I don't know if we actually talked about that yet.

There is the guilt/innocence phase, right?

A    Right.

Q    Where the prosecution has to prove to you beyond a reasonable doubt that the person committed the crime they are charging him with.  And then we get to the penalty phase, okay?

In the guilt/innocence phase the burden is with the prosecution, and you touched on that a little bit. The burden is proof beyond a reasonable doubt.  And that definition is nowhere in Texas law.  Okay.  That definition

is what you believe beyond a reasonable doubt is.

The only thing I can tell you is that it's not a hundred percent sure.

A    Right.

Q    Okay.  Does that make sense?

A    Yes.

Q    Because if you were a hundred percent sure of what happened in a case, where would you be in a trial?  You would probably be a witness, right?

A    Probably.

Q    Because that would mean you saw what happened.  Does that make sense?

A    Yes.

Q    Would you agree with me that the only way to know a hundred percent sure is if you actually witnessed an event?

A    Yes.

Q    Okay.  So, the burden is beyond a reasonable doubt and you decide for you what reasonable doubt is.  Okay.

Now, I want to make sure you're not going to hold the prosecution to a higher burden than reasonable doubt.

A    No.

Q    Okay.  Because the law says that's what it is, and you are telling me you can do that; is that right?

A     Yes, ma'am.

Q     You're not going to hold them to a higher burden than beyond a reasonable doubt.

A     (Shakes head).

Q     Is that correct?

A     Yes.

Q     Okay, good.  It seemed like you said a lot during your answers to Ms. Handley, you know, I can't say with a hundred percent certainty what I would do.  And I don't think anybody can.  You don't know what you're going to do.

But the thing you are required to do in order to sit on a jury is follow the law, and that's what I have to make sure you can do.  And it sounds to me like you can, but I just need to make sure, okay?

A     Yes, ma'am.

Q     And we've already discussed the guilt/innocence.  You will hold them to beyond a reasonable doubt and nothing more; is that right?

A     Right.

Q     Okay.  So, what I would like to do is move on a little bit to the penalty phase.  Now, when you get to the penalty phase, you have already decided that someone is guilty of capital murder.

A     Yes.

Q     They intended to kill someone, they wanted to, it

was the desire, they did it, okay?

A     (Nods head).

Q     There are no defenses.  It wasn't self-defense.  It wasn't defense of another.  It was their desire to kill and they did it.  There was no justification.  They weren't insane.  They weren't mentally retarded.  They wanted to kill someone and they did kill someone.  And in this case it would be in the course of a robbery.  Okay?

A     Okay.

Q     Pretty bad facts, right?

A     Right.

Q     So, when you consider these special issues, you have already made that determination.  Okay?

A     Okay.

Q     Now, when you get to the special issues -- Let me back up a little bit.

When you are in the guilt/innocence phase of a trial, you understand the presumption of innocence, right?

A     Yes.

Q     That even though Mr. Broadnax has been indicted, as he sits here right now today, he is presumed innocent.

A     Yes, ma'am.

Q     Can you do that?

A     Yes.

Q     Okay.  That's the presumption in the guilt/

innocence phase.

When we get to the punishment phase, there is a presumption that the appropriate sentence is a life sentence. Okay. And I'll tell you why. Because the prosecution, these guys over here, have the burden to prove to you special issue number one and special issue number two beyond a reasonable doubt. Okay?

A    (Nods head).

Q    And if not all twelve jurors agree that they have proven these special issues number one and special issue number two beyond a reasonable doubt, then the sentence is life. Okay. Does that make sense?

A    Yes.

Q    So, what that means is when you get to these special issues after you've already found a person guilty of capital murder, the presumption is life, and it stays at life until they prove otherwise.

Does that make sense to you?

A    Yes.

Q    Okay. After you have convicted somebody of capital murder, when you get to special issue number one, can you presume life until they prove otherwise?

A    Yes.

Q    Okay. And you talked a little bit about this future dangerousness issue, and I don't know if it was

really clear.

Again, beyond a reasonable doubt is their burden.  Okay.  They have to prove it to you.  And you don't have to worry about what could or could not prove it to you because you don't have to decide, they do.  Okay?

A      (Nods head).

Q      The burden rests squarely with them.  So, you don't have to make that determination right now, what would prove to you, what would prove to you that someone would be a future danger.  Okay?

A      Okay.

Q      Does that make sense?

A      Yes.

Q      Okay.  Because it says they have to prove to you beyond a reasonable doubt and, again, that's your definition.  The only thing we know for sure is that it's not a hundred percent.

That there is a probability that a defendant would commit criminal acts -- acts, more than one -- of violence that would constitute a continuing threat to society.

Okay.  I want to break that down a little bit.  Because when you were talking to the prosecutor, you indicated that probability and possibility were the same to you.

A      Yes.

Q    I want to talk to you a little bit about that, okay?  Would you agree with me that anything is possible?

A    Yes.

Q    All right.  I mean I could, I could run a marathon tomorrow.  It's possible.  It's not probable because I can't even run a mile.  Does that make sense?

A    Yeah.

Q    Anything is possible, wouldn't you agree with me?

A    Yes.

Q    Would you also agree with me that probable is a higher standard than possible, or a lower standard?  What would you say?  I guess it depends on how you look at it.

A    I would say it's probably very close.

Q    Okay.  Well, some people say probable to them sounds like more likely than not.  Would that be fair to say?

A    Probably, yeah.

Q    Okay.  And let's put that in this definition or in the special issue.  If you find from the evidence beyond a reasonable doubt that it is more likely than not that the defendant would commit criminal acts of violence.

Does that make sense to you?

A    Uh-huh.

Q    Okay.  And can you hold them to that burden and that burden alone?

A    Yes.

Q    Okay.  So, you could hold them to proving probability and not possibility?

A    Yes.

Q    Okay, good.  And when we were talking about criminal acts of violence, again, that is not defined.  That is up for you to decide.  Okay.  And it's their burden so you don't have to worry about that now, okay?

A    Okay.

Q    And I think you were talking about where -- I think we were talking about the scenario of punching someone in the face, whether or not you thought that was a criminal act of violence.

And correct me if I'm wrong because I don't want to put words into your mouth.  But I think the situation you were talking about when you were saying a disagreement, were you thinking about punching someone in self-defense; is that what your thought process was?

A    Well, someone would obviously be defending themselves.

Q    Okay.

A    The person that throws the first punch would be the one that started the altercation.

Q    Right.

A    Or at least the physical part of the altercation.

Q    Okay.  I just want to make sure that you will keep an open mind and you will listen to whatever they want to present to you in trying to prove that a defendant would be a future danger.  Can you do that?

A    Yes, ma'am.

Q    Okay.  Knowing that it is your definition, but you have to listen to their evidence and you have to consider it, can you do that for me?

A    Yes, ma'am.

Q    Okay.  And I do want to touch a little bit on society.  We talked about there's two punishments in a capital murder case.  Can you tell me what they are?

A    I believe they were life without parole and death.

Q    Right.  So, if a person has been convicted of capital murder, their society is going to be the penitentiary, right?

A    Right.

Q    Okay.  And you do agree that that can be a society.

A    Yes.

Q    Okay.  So, what the prosecution has to prove to you is that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society in the penitentiary.  Okay?

A    (Nods head).

Q    And can you consider that for me?

A    Sure.

Q    And what, what special issue number one and, frankly, special issue number two does is it's -- you know, and this is language given to us by the legislature -- it's to reserve the death penalty for the worst of the worst. Okay. I think there is actually case law that says it's the ultimate penalty reserved for those few incorrigibles that pose such a great threat to society that they cannot even be incarcerated.

Okay. Would you agree with that?

A    Yes.

Q    Okay. So, the death penalty is reserved for the worst of the worst, and that's why we have these special issues so if they prove to you that the death penalty is the only option in the case, okay?

A    Okay.

Q    And you again will listen to whatever they bring you and consider that, right?

A    Yes, ma'am.

Q    Okay. And I think when the prosecutor was asking you about what things you would want to see in order to determine whether or not someone is a future danger, you know, it's hard to know right now, and you don't have to worry about it. Like I said, it's their burden.

But let me ask you this. If someone had a

*Anne B. Meredith*
Certified Shorthand Reporter

prior criminal history, is that something you might look at in order to determine whether or not they might be a future danger?

A    I guess it would depend on if it was allowed in the case.

Q    Okay.

A    I don't know.

Q    Okay.  If that came in as evidence, if they presented that to you, could you consider that?

A    I guess you could, but.

Q    Okay.  And I guess on the flip side, no significant criminal history, you could also consider that, right?

A    Yes, ma'am.

Q    Okay.  And, frankly, the facts in the case, I think that's what you were trying to get at -- and I don't want to put words into your mouth -- when you were saying you would have to see from the defendant the facts of the case, the capital murder.

A    Yes, ma'am.

Q    Is that what you were saying, that could give you an idea of whether or not this person might be a future danger?

A    Yes.

Q    Okay.  But I want you to remember that the

presumption is still life until they prove otherwise. Can you do that for me?

A    Yes.

Q    Okay. And you talked a lot about forgiveness, and there is, there is nothing wrong with being forgiving. I think that is a great trait. I wish I was better at it. But I just want to make sure. You are a forgiving man.

A    Yes, ma'am.

Q    You mentioned that over and over. But you can be forgiving and still follow the law, right?

A    Yes.

Q    Those two things don't necessarily have anything to do with each other, do they?

A    Not necessarily.

Q    Okay. I want to talk to you, Mr. Sanford, about a couple of things in your questionnaire. I think we've already established that any media you may have read or seen on this case, it has not caused you to form an opinion on the guilt or innocence?

A    No, ma'am.

Q    Okay. Or on what the appropriate punishment is?

A    No.

Q    Okay. Actually, let's talk about special issue number three, and this will tie into the questions I have about your questionnaire.

Special issue number one and special issue number two, the burden of proof rests, rests solely with these guys. Okay. They have to prove them to you beyond a reasonable doubt.

I'm not really going to talk about special issue number two because we don't know for sure if that's going to even be a part of this case.

Okay. But I would like to talk to you about special issue number three. And if you will take a minute, Mr. Sanford, and just read through that to yourself for me, please, or you feel like you know it pretty well already?

A    I'll read it again.

Q    Okay.

A    Okay.

Q    Okay. This is what we typically call the mitigation issue. Okay. The difference between special issue number three and special issue number one and two is that there is no burden of proof on special issue number three. There is no burden with them and there is no burden with us. Okay?

A    Okay.

Q    And if you read that with me.

Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal

moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a life sentence is appropriate?

Okay. So, what that means is if you find evidence related to any of those things listed there, the offense, the defendant's character, background, moral culpability, that even if you had answered yes, yes to special issue number one and special issue number two, okay, if you answered yes to both of those, you're looking pretty seriously at the death penalty, unless you can find some mitigation that makes you think that a life without parole is the appropriate penalty.

MS. HANDLEY: Your Honor, I'm going to object. That's a misstatement of the law. Some mitigation.

MS. MALLON: Sufficient. My apology.

THE COURT: Okay. I'll sustain it. I didn't hear the some.

Q    (By Ms. Mallon) It's stated right there. I don't mean to misstate the law. I know you can see it for yourself. Sufficient mitigation. Okay.

But, again, that is not defined anywhere in the law. That is up to you. It can be a hundred things, it can be one thing. It can be anything that you find sufficiently mitigating that you believe -- that makes you believe that a life without parole sentence is more

appropriate than a death sentence.  Okay?

A    Okay.

Q    Some things jurors take into consideration are -- and these are just, just, you know, not necessarily related to this case, but just things other jurors have talked about, things other attorneys have presented.

The age of the defendant, do you think that might be mitigating to you?

A    I guess it could be.

Q    Why don't you -- Why don't I ask it this way. What things, if any, would you might consider mitigation in a case?  I know you talked a lot about remorse and regret.

A    Well, it's difficult to answer.

Q    Sure.

A    But I mean it has to do with, I guess, one's beliefs, so.

Q    The defendant's beliefs?

A    Well, my beliefs.

Q    Okay.

A    But, unfortunately, everybody has their own beliefs, so.

Q    Okay.  And I think on your questionnaire on page six, the question says, the law in Texas further provides that evidence of intoxication may be considered in mitigation of punishment.  And it said, do you agree with the law, and

you said no.

Now, you know, being under the influence of drugs or alcohol in Texas is not an excuse or justification for a crime. Okay. And that's not what this question is asking.

What it's asking is, if you heard evidence that a defendant was under the influence of a mind altering drug or alcohol, could you consider that in mitigation?

A    Possibly, but I'm not sure that I would consider it mitigating because the choice was made to be under the influence of whatever they were under.

Q    Sure.

A    Okay?

Q    Sure. And all the law really requires is that you consider the evidence presented in mitigation. Okay. Can you do that for me?

A    Yes, ma'am.

Q    Okay. And then there is another question I think that talked about mitigation. On page eight of your questionnaire, the question says, some people feel genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime. What do you think?

And you said you could consider all of them but ultimately it's how they deal with current situations.

Can you explain that to me a little bit?

A    Well, it's basically the unknown.  That's why you can't be 100 percent sure on how you will deal with a situation until you're actually faced with the situation, so.

Q    Okay.  Such as a -- Now, are you talking about like a crime, like a capital murder, is that what you're talking about?

A    That would be included, yes, ma'am.

Q    Okay.  If there was evidence of how a defendant was raised, perhaps he was raised, you know, by six different relatives or was in and out of foster care or was abused as a child, those are potential mitigation issues.

A    Yes, ma'am.

Q    Would you agree with me on that?

A    Yes, they can be.

Q    Okay.  And I just need to make sure that you will consider mitigation.

A    Yes, I could consider it.

Q    Okay.  Careful consideration?

A    Yes.

Q    Okay.  And let me talk to you a little more about special issue number three.  What the law says is that, when you get to special issue number three, it is your personal moral judgment that decides for you whether or not life without parole or the death penalty is appropriate.  Okay?

A       (Nods head).

MS. HANDLEY:  Your Honor, I think that's also a misstatement of the law.  Actually the juror has to take into consideration the evidence in the case and find if, from the evidence in the case, there is a substantial mitigating issue.

THE COURT:  I'll sustain the objection.  Just rephrase the question.

MS. MALLON:  But it's not substantial, Judge, it's sufficient.

THE COURT:  Sufficient is the correct word.

Q       (By Ms. Mallon)  In a case, okay, after you consider all the evidence, it's within your personal moral judgment to decide whether or not life or death is the appropriate penalty.  Okay?

A       (Nods head).

Q       That's your personal moral judgment.

A       (Nods head).

Q       And it can be, like I said earlier, it can be a hundred things, it can be one thing.  It's up to you.  Okay.  And it could be anything.  Okay.  And it doesn't -- You don't have to agree with the eleven other jurors.  Okay.  This decision is all yours and yours alone.

On special issue number one and special issue number two, it has to be unanimous.  Okay.  And, frankly, on

special issue number three, it takes all twelve of you to decide that there is no mitigation.

If and unless all twelve of you decide there is no mitigation, then it's life without parole. Okay. Just one, just one person who decides, in their personal moral judgment, that life without parole is the appropriate sentence, then that's what the sentence is going to be. Okay?

A    (Nods head).

Q    I guess what I want to ask you is if in your personal moral judgment you decide that life without parole is the appropriate sentence, can you withstand eleven other jurors yelling at you that you're making the wrong decision?

A    Yes, ma'am.

Q    Okay. And the law says that you do not have to debate that. You can, you certainly can.

MS. HANDLEY:  Your Honor, I'm going to also object.  That's a misstatement of the law and the juror's oath.  They actually do have to deliberate on special issue number three.  And to say that they don't have to talk about it or deliberate would be an unfair statement of the law and the procedures.

MR. LOLLAR:  Your Honor, the word deliberate does not mean debate.  It means think about.

MS. HANDLEY:  I think to suggest that there doesn't have to be any conversation about it just tends to

mean the same thing.

MR. LOLLAR:  The jurors think.

THE COURT:  I'll just instruct the prospective juror that the jurors do have to deliberate special issue number three to determine if there is sufficient mitigating circumstances.

Q    (By Ms. Mallon)  And that is correct, but you do not have to debate it, okay?

A    Okay.

Q    You do not have to debate it.  That is your personal moral judgment and you can make that determination for you, okay?  And you don't have to discuss it with anybody else if you don't want to.

MS. HANDLEY:  Again, your Honor, you don't have to discuss?

THE COURT:  Sustained.

Q    When you have made your decision, you have made your decision, okay?

A    Okay.

Q    Okay.  And, you know, personal moral judgment, that's something very personal to you such as religion, okay, or how you raise your kids.  You're not going to debate with someone else whether or not you're raising your kids correctly, right?

A    Probably not.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Okay.  And it's the same type of decision, it's very personal to you.  Okay?

And let me tell you this, too, Mr. Sanford. You have very strong, very strong personal beliefs and convictions.  That's obvious through your questionnaire and the answers that you've given us today.

You don't have to check those at the door. Okay.  You can bring those into the jury room.  You just have to make sure you follow the law as well.

A    Right.

Q    Okay.  Does that make sense to you?

A    Yes.

Q    Is that something you think you can do?

A    Yes.

Q    Okay.  That's all I have.  Thank you, Mr. Sanford. I appreciate it.

THE COURT:  Thank you, Mr. Mallon.

All right.  Mr. Sanford, if you would step outside, let me confer with the attorneys, and I will bring you back in in just a moment with the results.  Thank you very much.

(Prospective Juror Sanford exits the

courtroom).

THE COURT:  Thank you.  Be seated.

Ms. Handley, does the State have a challenge

for cause?

MS. HANDLEY:  We do, your Honor.  We would challenge this juror for cause in several different areas.

We believe that he does have a bias against the law.  His opposition to the death penalty in his questionnaire certainly is rife with that opposition wherein he states he not only doesn't believe in the death penalty but he believes that another life should never be taken, and he has also stated again that a life should never be taken for any reason.  I think any reason would encompass even the law in this case.

We believe that that would prevent or at least substantially impair his performance of his duties in accordance with his oath.

He has stated through questioning that he would, in fact, factor that opposition into how he views the evidence in this case.  He has expressed, your Honor, an inability to be -- basically to be fair and impartial to the State and certainly a bias against that law.

I believe he's also an equivocating juror in that he has consistently maintained that he is unsure about his oath and unsure about his ability to follow the oath.  He cannot say that he can follow the law or that he can even base his verdict strictly on the evidence in the case.

He's also been vacilating in that he's

clearly bounced back and forth between both sides of this case as well as his questionnaire.

I think that he would also unfairly place the burden on the defendant in this case in that he is looking for evidence from the defendant in answering special issue number one. He said he would be looking to the defendant even if he doesn't take the stand. He's going to be looking for -- looking at him. And he's basically saying that he's going to be using evidence in his decision that does not come from the witness stand.

He's looking for, as he stated, in considering the future dangerousness issue, an acknowledgement from the defendant that what he did was wrong, and he is looking to the defendant whether he takes the stand or not.

By his comments and his questionnaire, your Honor, I think he's indicating he is unable to answer the special issues based on the law and the evidence, but instead he has stated that he's answering that special issue on his ability to forgive anyone.

We think for those reasons, as well as other reasons that the Court may have seen itself from this particular juror, that he's not a qualified juror for this particular case.

THE COURT: Okay. Defense wish to be heard?

MR. LOLLAR: Yes, your Honor.

We think that the responses given by the juror show that he does have feelings against the imposition of the death penalty, but he's told us clearly he can set those aside and render a verdict based solely on the evidence which would require the imposition of the death penalty. I think he said that repeatedly during his voir dire in response to questions both by the State and by the defendant.

THE COURT: Does either side wish me to ask the prospective juror any questions?

MR. LOLLAR: If you feel that you would need to, Judge, sure.

MS. HANDLEY: If you feel you need to, your Honor. I think that it would just demonstrate even more of the vacilation of this particular juror that he's just going to bounce back and forth.

THE COURT: Okay. Well, bring him back in.

(Prospective Juror Sanford returns to the courtroom).

THE COURT: Mr. Sanford, just go ahead and have a seat there again, if you would, please, sir. Thank you very much.

Thank you, ladies and gentlemen. Be seated, please.

FURTHER EXAMINATION

BY THE COURT:

Q    Mr. Sanford, I had a couple of questions I wanted to ask you concerning your jury service.

You've made it quite clear your position on the death penalty. I just need to ask you, you understand that the death penalty in the State of Texas is the law.

A    Yes, sir.

Q    Regardless of your personal views, would you be able to set those aside and follow the law? And if Judge Snipes gives you the law, would you be able to follow it?

And let me explain that to you, what I'm asking you here. The first thing that Judge Snipes, if you're on this jury, the first thing that Judge Snipes would do when all twelve jurors are assembled is to administer the oath of a juror to you.

And that oath is principally you're sworn to do two things, that you will decide this case or render a verdict in this case based solely upon the evidence that you'll see here and receive in the trial of the case and the law that Judge Snipes gives to you.

Now, some of the law, well, quite a bit of the law has been explained to you by both sides. And one of them is that you understand that if you answer these special issues as yes, yes and no, then that's going to end up with the death penalty. It's going to be binding on Judge Snipes.

A    Right.

Q    He's not going to have a choice.  He's going to have to issue a death warrant then in that case if that's the jury's verdict, if that's the jury's decision.  Of course, it has to be a unanimous decision.

My question to you is, knowing that, can you still follow the law based on the evidence and render a true verdict according to the law and the evidence?

A    Yes, sir, I believe I can.

Q    And set your personal views, values aside --

A    Yes, sir.

Q    -- and do that?  Okay.  Even though you know that, you know, that your answers based on the evidence could lead to the execution of a human being?

A    Yes, sir.

Q    Okay.  You could participate in something like that?

A    Yes, sir.

Q    Okay.  Also, with regard to the special issues -- and you understand that the State has the burden of proof throughout the trial.

A    Yes, sir.

Q    And that they have to prove, first of all, to you during the guilt/innocence phase of the trial the elements of the offense.

A    Yes, sir.

Q    And if the jury unanimously finds that a capital murder was committed, the offense, that the State has proved each and every element of the offense to each and every member of the jury beyond a reasonable doubt, then it would be the jury's duty under their oath to return a guilty verdict.

A    Yes, sir.

Q    You understand that?

A    (Nods head).

Q    And by the same token, if the State failed to prove any of the elements to the jury beyond a reasonable doubt, then it would be the obligation and duty of the jury under their oath to return a not guilty verdict.

A    Yes, sir.

Q    You understand that?

A    Yes.

Q    Assuming that the jury -- And, of course, if the jury returns a not guilty verdict, that's the end of the trial, everybody goes home.  Mr. Broadnax goes home.

If the jury returns a guilty verdict, then we proceed to the second phase of the trial which we have called the punishment phase of the trial, and that's when you would address the three issues that are behind me over here that we've talked about.

A    Yes, sir.

Q    And during the punishment phase of the trial you

may hear additional evidence.  You may not, but you may.
And you understand that the State has the burden of proof
throughout the entire trial.  The burden of proof never
shifts to the defendant in any phase of the trial.

A    (Nods head).

Q    You can't look to the defendant to provide anything
for you.  I'm not saying that they won't; I'm just saying that
you can't look to them.  And if they don't, if the defendant
doesn't testify, I think you're clear to that that you can't
hold that as a condition against him or any evidence of guilt.

A    Correct.

Q    Can you do that?

A    Yes, sir.

Q    And that you can give him the presumption of
innocence --

A    Yes, sir.

Q    -- that our law provides.  And that the only time
that that presumption of innocence is going to disappear is
when you and the eleven other jurors are convinced beyond a
reasonable doubt of his guilt.

A    Yes, sir.

Q    And that's when it -- that's when it disappears.
Can you do that?

A    Yes, sir.

Q    Can you reserve your decision in making -- or

reserve that decision until that time?

A    Yes, sir.

Q    In other words, wait, hear all the evidence, and then make your decision --

A    Yes, sir.

Q    -- based upon that and follow the law?

A    Yes, sir.

Q    Okay.  The State also has the burden of proving the first and possibly the second issue if it's involved in the trial of the case.

The first issue has to be proved to you beyond a reasonable doubt in the punishment phase of the trial.  Do you understand that?

A    Yes, sir.

Q    Okay.  The second question, if it's a part of the trial, concerns the issue of parties.  I don't think anybody went into the second issue.  And it may not be germane to this particular trial because I don't know any of the fact issues in this case, and we couldn't discuss them with you, anyway.

A    Right.

Q    But if that is involved in the trial of the case, then the State would also have the burden of proof of proving that to you, that that question should be answered yes beyond a reasonable doubt.  Same burden of proof throughout the

trial.  You understand that?

A    Yes. sir.

Q    Third issue.  If you answer that one yes, first one yes, second one yes, then you go to the third issue. If you answer either one of those no, then the trial stops wherever you answer no, and a life sentence without the possibility of parole is invoked, and that's what Judge Snipes would sentence the defendant to.

You understand how that works?

A    Yes, sir.

Q    So, you've worked from one to two, if it's involved, if Judge Snipes submits that to the jury.  And then you will go to number three, which doesn't have a burden of proof, and this is the mitigating circumstance issue that we talked about.

A    (Nods head).

Q    The State doesn't have to prove it to you.  The defense doesn't have to prove it to you.  It might be something you hear during the course of the trial in the guilt/innocence or it might be something you hear additional evidence in the punishment phase of the trial, or maybe you don't hear any at all.

If you don't hear anything that is sufficiently mitigating, which is what the law says, what the issue says, sufficiently mitigating, not substantially,

not some mitigating, but sufficiently mitigating circumstances, then you would be bound by your oath, and that's a judgment call for you and all of the other jurors as well.

A    Yes, sir.

Q    Okay.  Can you do that?

A    Yes, sir.

Q    Okay.  And if you don't find any sufficiently mitigating circumstances -- You might think that's mitigating but it's not sufficiently mitigating, something you hear, and then again you may not hear anything or you might hear a lot. I don't know.  But can you make that judgment call?

A    Yes, sir.

Q    Okay.  And if anybody makes that call, can you respect their position as well?

A    Yes, sir.

Q    All right.  And you can deliberate that issue?

A    Yes, sir.

THE COURT:  Any other questions from the State?

MS. HANDLEY:  No, sir.

THE COURT:  From the defense?

MR. LOLLAR:  No, your Honor.

THE COURT:  All right.  Thank you very much, Mr. Sanford.  Step outside and I will get back with you here

in just a second.

(Prospective Juror Sanford exits the courtroom).

THE COURT: Okay. State wish to renew its challenge for cause?

MS. HANDLEY: We do, your Honor. I think when he's talked to and he is only required to say yes or no, I think he's going to say whatever it is that he thinks he should say. But what is most telling about this juror is when he starts to talk and he initiates.

And he has stated, and I think it's been pretty, pretty clear throughout his testimony here today, that with respect to future dangerousness issue he's looking for -- he's basing it on forgiveness in this particular case.

I think he's also, when he's able to talk, he cannot see or have an appreciable understanding of the difference, for example, between a probability and a possibility.

I don't think that he understands the law in this case and that he would limit certain things to specific instances, the criminal acts of violence, for example, or that the death penalty is only a tool of revenge.

THE COURT: Okay.

MS. HANDLEY: We would submit him.

THE COURT: Okay. All right. The State's

challenge for cause is denied.

Does the defense have a challenge for cause?

MR. LOLLAR:  No, your Honor.  We accept the juror.

THE COURT:  All right.  Bring Mr. Sanford back in.  He will be number 13.

(Prospective Juror Sanford returns to the courtroom).

THE COURT:  Mr. Sanford, go ahead and have a seat there just briefly.

You are going to be Prospective Juror number 13 of 47 or 48, so we are kind of in the early going on this.

Thank you.  Be seated, please.  I'm sorry. Go ahead and sit down if I forget to tell you to.

And you stated that you didn't have any prior pretrial knowledge of this case?

PROSPECTIVE JUROR SANFORD:  Yes, sir.

THE COURT:  You do have?

PROSPECTIVE JUROR SANFORD:  I just saw it on the news briefly, and that's all.

THE COURT:  Okay.  But you don't remember what you saw?

PROSPECTIVE JUROR SANFORD:  No.

THE COURT:  Or what the facts were or what you thought the facts were?

PROSPECTIVE JUROR SANFORD:  No, sir.

THE COURT:  Or what the report was about or what they said?

PROSPECTIVE JUROR SANFORD:  No.

THE COURT:  So, I want to keep you that way. I don't want you knowing anything about it.  So, I don't want you going back in the archives on the computer and looking up old newspaper articles, if there are any, or any old TV reports or anything like that.

And also, in the future, if it does receive some pretrial publicity, I don't want you listening or reading those articles.

PROSPECTIVE JUROR SANFORD:  Okay.

THE COURT:  I want you to stay just the way you are because, as I explained to you earlier, your decision in this case, if you are on this jury, would have to come from the evidence that's presented during the course of the trial and then the law that Judge Snipes will give to you, to the jury, in his charge to the jury.

All right?  Okay.  And those are the only two things that you can make your decision in, okay?

PROSPECTIVE JUROR SANFORD:  (Nods head).

THE COURT:  Now, we anticipate that the evidence in this case is going to start August the 10th and, so, I would like for you to look at your calendar when you

leave here and to kind of pencil in those next two weeks. I'm thinking that probably toward the end of July you'll be notified as to whether or not you're on this jury.

PROSPECTIVE JUROR SANFORD:  Okay.

THE COURT:  If you're not on the jury, then you don't have to report for jury duty on the 10th.  But if you are, it will also tell you that you need to report for jury duty on the 10th or, if the date changes, then it would be in that letter to you.

PROSPECTIVE JUROR SANFORD:  Okay.

THE COURT:  Okay.  I think that's basically it.  We anticipate, I think I told you, two weeks.

PROSPECTIVE JUROR SANFORD:  Yes.

THE COURT:  So from August the 10th, the next two weeks there, the week of the 10th and the week of -- I guess that would be the 17th of August, those are the two weeks.

Anything that you know of that's coming up during that time that would prevent you from --

PROSPECTIVE JUROR SANFORD:  No.

THE COURT:  -- being able to attend or give your 100 percent attention to this case?

PROSPECTIVE JUROR SANFORD:  No, sir.

THE COURT:  If you're selected for jury service?

All right.  Anything further from the State?

MS. HANDLEY:  No, sir.

THE COURT:  From the defense?

All right.  Thank you very much, Mr. Sanford.
You're free to go at this time.

(Prospective Juror Sanford excused from the
courtroom).

THE COURT:  You want to take a short break?

(After a recess, Defendant present).

THE COURT:  And the next one I have is Ms.
Wood, Vicki Wood.

MS. HANDLEY:  Yes, sir.

THE COURT:  Okay.  Go ahead and bring Ms.
Wood in.

(Prospective Juror No. 277, Vicki Wood,
enters the courtroom).

THE COURT:  Here she is.  Hi, Ms. Wood.  Just
go ahead and have a seat right there, if you would, please,
ma'am.  Thank you.  Here, I'll get this out of your way.

Thank you, ladies and gentlemen.  Be seated,
please.

And I would like for the record to reflect
this is Prospective Juror number 277, Vicki Sue Wood, w-o-o-d.

VICKI SUE WOOD,
having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    And good morning to you, Ms. Wood.

A    Good morning.

Q    I'm Judge Quay Parker, a Senior District Judge from McKinney.  And Judge Snipes has asked me to assist him in the jury selection process.  And, so, that explains to you what I'm doing here today instead of Judge Snipes.  He's upstairs in his courtroom taking care of the everyday matters of the Court while I'm down here assisting him in the jury selection process in this death penalty case.

I've got a copy of your questionnaire.  I'm going to give that to you so you can refer to it because I know it's been about probably a month or better than that --

A    Right.

Q    -- since you filled that out.  And you'll probably recall when everybody got together in the grand jury room, or not the grand jury room, but general --

MR. LOLLAR:  Central jury.

Q    -- central jury.  I'm sorry, I had a lapse.  I had a senior moment there.  In the central jury room, and there was probably what, 500 of you?

A    A whole lot.

Q    A big bunch of people, anyway.  Judge Snipes talked to you.  He went over some qualifications, exemptions,

and at one point in the proceedings asked everybody to stand up, raise your right hand, he administered the oath of a prospective juror to everyone.

Do you recall that?

A    Yes.

Q    Okay.  Were you one of the panel members that stood and raised your hand and took the oath at that time?

A    Yes.

Q    Very good.  I'll just explain to you you're still under that oath.

A    Okay.

Q    And what you have been sworn to do are basically two things, tell the truth, or give truthful answers sometimes we say, which we know you would do that anyway, but also to be responsive to each and every question that the attorneys ask you because they are the ones who are going to conduct the voir dire examination.

Anyway, you've read over your little juror guide.

A    Uh-huh.

Q    And it's explained to you, and let me just tell you what's going to happen here today.  They are going to ask you questions, but it's going to be concerning the law. What they are going to do, they are going to explain the law to you first, and then they are going to ask you questions

about your feelings, your thoughts and your ideas concerning the law. Okay?

A    (Nods head).

Q    And some of the procedural aspects that are involved in the trial of this case. So, there is not going to be anything that's going to embarrass you in any way.

There's no right or wrong answers, only truthful answers, as I said earlier. And it's not a test that you have to pass or fail. It's simply just trying to get your ideas, your thoughts, your considerations, your opinions concerning the law as it applies to this particular case. All right?

A    (Nods head).

THE COURT: Okay. Now, then, let me introduce the attorneys that are going to be talking to you today and that are on the different sides of the table here.

Ms. Andrea Handley --

MS. HANDLEY: Good morning.

THE COURT:  -- is going to be talking to you this morning. Seated next to her is Ms. Elaine Evans.

MS. EVANS: Good morning.

PROSPECTIVE JUROR WOOD: Good morning.

THE COURT: And seated next to her is Mr. Gordon Hikel.

MR. HIKEL: Good morning, ma'am.

THE COURT: They are three assistant district attorneys and they are the ones charged with the responsibility of prosecuting this case.

Then seated on this side of the table down a little further is Mr. Brad Lollar and Mr. Doug Parks, and on the very end down there Ms. Keri Mallon.

PROSPECTIVE JUROR WOOD: Good morning.

MS. MALLON: Good morning.

THE COURT: And then seated next to Ms. Mallon is the defendant, James Broadnax, their client.

PROSPECTIVE JUROR WOOD: Good morning.

THE COURT: They represent -- they are the defense team. This is the prosecution team. All right.

All right. Ms. Handley.

MS. HANDLEY: Thank you, your Honor, appreciate it.

EXAMINATION

BY MS. HANDLEY:

Q    Good morning again, Ms. Wood. How are you?

A    Fine, how are you?

Q    I'm fine, thank you. How do you feel being here?

A    I'm okay with it.

Q    Good, good. Let me tell you what we're doing here briefly. You know, we brought hundreds of people down to fill out these questionnaires, and we are actually going to

talk to every one of those people just in order of how they have come along, talk to everybody.

And we have had an opportunity to read the questionnaire. Sometimes we read the questionnaire and at least I can look at something and go, I don't think this is a proper juror for this particular case.

Other times I might look at a questionnaire and go, based on the answers in this, I think this person might be qualified. But I want to talk to them more in depth. I want to tell them about the law, see how they feel about it, and see if they are truly qualified for this particular case.

I think to be a qualified juror means that you are a juror that will listen to the evidence, base your verdict on the evidence, and not jump to any conclusions.

Do you think that you're the kind of person that could do that in a criminal case?

A    I think I am.

Q    Okay. You don't think that you'll come in already with your mind made up on what should happen?

A    No.

Q    You think you could listen to the evidence fairly and impartially, you think you could give both sides a fair shake?

A    Uh-huh.

Q    Be it the State or be it the defendant?

A    (Nods head).

Q    Okay.  You have to say yes or no.

A    I do.  I'm sorry.

Q    That's all right.  That's all right.  She doesn't have a key for uh-huh, so we have to have you say yes or no.

A    Oh, well, you need one.

Q    That's what I think.  That's what I think.

A    I'm sure you get it a lot.

Q    Yeah, that and she likes for me to slow down.  I tend to talk too fast.  If I am talking too fast, if I say something you don't understand, let me know.  Because at this point, Ms. Wood, what I think about this case and what I think about the death penalty is probably entirely polar opposites to what they think about it.  Okay?

My feelings on it and their feelings on it, that and a buck and a quarter will get you a cup of Starbucks at the snack bar.  Okay.  It doesn't matter.  What matters right now is what you think.

And you haven't taken an oath at this point to follow the law.  You've only taken an oath to tell the truth.  Okay?  And it's based on your answers that we will ultimately make that determination as to whether or not you're qualified.

Now, you've never been on a jury before.

A    Yes, I have.

Q    You have?  Was it a criminal case?

A    Uhh, yes.

Q    About how long ago was it?

A    Let me see.

Q    Let's see, I bet you wrote that down.

A    I don't remember dates, though.  Maybe a year ago.

Q    You did.

A    And then the year before that.

Q    I looked right past it.  It says 2007 a car wreck, not guilty, and 2005 malpractice, not guilty.  Were those civil cases or cases here in this courthouse?

A    I think they were civil.

Q    Okay.  They were suing for damages.

A    Right.

Q    For money.

A    Right.

Q    Okay.  I'll tell you that there is civil law and then there is criminal law.

A    Did you ask me criminal?

Q    I might have but that's all right.  Don't worry about that.

          There is civil law and there is criminal law. And in a way, they are kind of entirely separate.  You know, people sue for money over there, for damages over there.

*Anne B. Meredith*
Certified Shorthand Reporter

Over here in criminal law we are talking about whether or not somebody is guilty of a crime and will they go to prison for it, or, ultimately in this case, will they receive the ultimate punishment, the death penalty.

And in all criminal cases, be it talking about a theft of a bicycle or talking about a death penalty case, there's always certain fundamental principles of law that come into place.

Some people listen to the law and they say, I can't follow that law.  Those people are not qualified to sit on a particular jury because they can't follow the law. You don't have to like the law; you just have to agree to follow the law and, in fact, do it.

A    Uh-huh.

Q    Some people are not qualified because they say, oh, I'll listen to the evidence, but I'm also going to take into account what I saw on the Internet or what my neighbor told me over coffee, or something like that.  Those people aren't qualified because they are taking information into their deliberation that comes from outside the courtroom.

And finally there's some people who are not qualified because maybe their personal life experiences are so strong and they carry them with them so hard and heavy still that they can't honestly say, I will leave that outside the courtroom and I will base this case strictly on the

*Anne B. Meredith*
Certified Shorthand Reporter

evidence in this case. They say, I can't do that. I'm going to be thinking about what happened to me before or I'm going to be thinking about how this might impact my relative who has a case pending, or something like that.

And before we start talking to you about the law, I do want to ask you very personal questions then about your son, okay?

A    Okay.

Q    And I don't say this to embarrass you or anything, but I just feel that it would help me understand where you're coming from.

A    Okay.

Q    I get from the questionnaire that your son has had some problems with drugs.

A    Yes.

Q    What kind of drugs was he having a problem with?

A    I couldn't tell you.

Q    Okay. You don't know if it was cocaine or --

A    I don't have any idea.

Q    Okay. About when did this start?

A    After he left my home.

Q    About how old was he, a teenager then?

A    Yeah, eighteen, seventeen.

Q    Okay.

A    Eighteen.

Q    And apparently it eventually landed him in prison; is that correct?

A    It did.

Q    Okay.  For a sentence of ten years, was that what I saw?

A    Yes.

Q    Did he serve all of his time?

A    He's still there.

Q    He's still there.

A    Yes.

Q    How long has he been there?

A    Almost ten years.

Q    Almost ten years now.  Okay.  Was he -- Then obviously he received -- it was a felony conviction.

A    Right.

Q    You know.

A    There was some robbery involved in it.

Q    And there was some robbery involved in that. Okay.  Is it your understanding, was he robbing to get money for drugs or --

A    He robbed our home.

Q    Oh, oh, okay.  Okay.  So he came to your home, stole some things from your home.

A    Uh-huh.

Q    And did you then have to press charges against

him?

A    I turned him in, yes.

Q    Okay.  Okay.  And was that in the hope or the belief that until you exhibit some tough love, this isn't going to stop?

A    It's -- Yeah.

Q    Okay.

A    It was -- He robbed us, didn't know what he was doing to anybody else.

Q    Uh-huh.

A    But it was wrong.

Q    Okay.

A    And I turned him in.

Q    Okay.

A    It was hard.

Q    I bet it broke your heart to do that.

A    Yeah.

Q    Sure.  Did you -- Do you need a moment?  I'm sorry.  Gosh, I'm so sorry.

            THE COURT:  Do you want take just a minute here, Ms. Wood?  Why don't we --

            PROSPECTIVE JUROR WOOD:  No, I'm good.

            THE COURT:  Are you okay?  You need some tissues?  She is going to get you some tissues here.

            MS. HANDLEY:  Bless your heart.

THE COURT: We can take a minute if you want to. Wait just a minute.

MS. MALLON: I got you a whole box just in case.

PROSPECTIVE JUROR WOOD: I don't think it's going to be that bad.

THE COURT: Well, I might use them.

PROSPECTIVE JUROR WOOD: Well, I'll share.

A    It's hard for a mother to do that.

THE COURT: Sure it is.

A    But I didn't know what else he would do, and he was wrong, and he had to --

Q    Sure.

A    -- he had to be accountable for that.

Q    Okay. You said that he burglarized your home, he robbed your home.

A    Uh-huh.

Q    And I believe you said you don't know what else he had done.

A    I don't.

Q    Okay.

A    I don't even know that there was a trial. I don't think there was. I think he just may have pled out and --

Q    Okay.

A    You know, I had gotten him out of jail once.

Q    Uh-huh.

A    And that's the only time I would do it.

Q    Okay.

A    Got him out of jail, he went back to whatever.

Q    You got him out of jail and he promised it was over?

A    (Nods head).

Q    He promised he wouldn't go back to the drugs?

A    Right.  The only other time he went to jail, he stayed there.

Q    Okay.  And after you bailed him out, he went right back to the drugs.

A    Uh-huh.

Q    Okay.  Okay.  Do you talk to him while he's in the penitentiary?

A    I do, we write.

Q    Okay.  Okay.  And how is he doing?

A    He says he's okay.

Q    Okay.

A    You know, I don't, I don't ask questions, a lot of questions about that.  And I am sure on that, his part, he doesn't tell me a lot.

Q    Sure.  Sure.  Do you know if he's getting any help or treatment for those drugs?

A    I know that he had sent me certificates where he's

been in school --

Q    Outstanding.

A    -- and done some achievements there, so --

Q    Okay.  Okay.

A    -- maybe.

Q    Okay.  But you don't know what kind of drugs.

A    I am sure that it was more than --

Q    More than marijuana or something.

A    -- marijuana.

Q    Something fairly addictive?

A    Right, he had lost a lot of weight.

Q    Okay.  Okay.

A    So, I'm sure it was something heavy probably.

Q    Okay.  There are some narcotics out there now that -- this is a lot different than the sixties when people used to just smoke marijuana.  We've got stuff out there now that's pretty bad.

And let me just ask your feelings about that.  You say he was wrong.

A    Uh-huh.

Q    You know, but, but what part did the drugs play in what he did?  I mean what about accountable versus I couldn't help myself because I was high on drugs?

A    Are you asking me as a mother?

Q    I'm asking you as a mother.

A    Or just period?

Q    And I'm asking you period, either way.

A    I don't know what part it played in it.  It could have played a big part.  However, he shouldn't have been doing the drugs, though.

Q    Okay.

A    I mean he knew that was wrong, you know, so.

Q    Sure.  If a person were to say, look, you know, I voluntarily ingested the drugs and I, as a result of that, I did something pretty bad, you know, but --

A    Uh-huh.

Q    -- it's really not my fault, it was the drugs, it wasn't me, what do you say to something like that?

A    My thought on that is that if it's to the point where you're committing a crime because of that, any kind of a crime, that isn't the person taking the drug.  And even if it faltered into a larger drug or a more -- you know that it alters you in some way.

Q    Uh-huh.

A    So.

Q    You know before you ever take the drug that it's going to affect you in some way.

A    Right.

Q    And, so, in terms of accountability or responsibility, I'm hearing you say that they knew, they knew

something was going to happen, yet they made that choice to take it anyway.

A    Right.

Q    Well, they made that choice.  You know, yeah, I did it, I took the drugs.  I knew it would change me, but, gosh, I didn't, I didn't think I would go off the deep end that much and do something so bad.  You know, it isn't me. I'm not that kind of person.  It was the drugs that did it.

What would you feel about an argument like that?

A    I don't know.

Q    Okay.

A    I don't know how I would feel about that.  I mean I --

Q    You think I'm trying to use it as an excuse for bad behavior?

A    I think that you knew the drugs would alter you.

Q    Okay.

A    So, whatever, however it changes your behavior, your lifestyle, whatever it does.

Q    Like what came first, my decision to do it or my actions?

A    You have the choice.

Q    You have the choice.  And you should pay the consequences for it.

Okay. It's a sad situation to get yourself caught up in that, but -- and I don't want to put words in your mouth. But in this day and age we should all have a pretty good appreciation for what drugs are going to do to you.

A    Right.

Q    It's all over the TV, it's in the magazine, it's on the news. But people still make that choice to do it.

Okay. There was a question in the questionnaire about intoxication. And the law states in Texas that voluntary intoxication is not a defense to a crime. Would you agree to that?

A    (Nods head).

Q    That it's not a defense, that I can't say, okay, I robbed your house but I wasn't in my right mind because I had smoked crack. The law says you can't use it as a defense.

How do you feel about that?

A    I don't think it's a defense either.

Q    Okay. So, you would agree with that law, then.

A    Right.

Q    But the law does state that there are certain circumstances where you can take that into account. And really where that plays into a part is that maybe, maybe that should be taken into consideration in assessing a punishment or something, you know, that the person might

have been intoxicated at the time, or maybe you can take that into consideration in determining whether or not they really were in their right mind, you know, what was their level of culpabability.

Have you ever seen your son under the influence of drugs before?

A    I don't think so.

Q    Okay.  Okay.

A    It may have been.  I may have when he would come like -- he wasn't living in my home.

Q    Uh-huh.

A    So, you know, he would come for food or money, or --

Q    Okay.

A    -- whatever, and he could have been.

Q    Okay.

A    I've never seen him where he wasn't in control of it.

Q    Okay.  You've never heard of or seen him hurt anybody because of that?

A    No.

Q    Okay.  He was addicted to drugs but, as far as you know, he was just stealing property and things in order to support that habit?

A    (Nods head).

Q    No indication otherwise?

A    No.

Q    Okay.  Well, let me ask you this, Ms. Wood, because obviously this is a -- this really hits close to home with you.  I mean this is a very recent thing with your son and he is in the penitentiary right now.

And like I said before, sometimes some cases aren't right for certain people because of the issues that may arise.

A    Uh-huh.

Q    And if you were confronted with a situation in this case or any case involving the use of drugs by a young person and how it affected them or what they did as a result on the drugs, do you think that you could look at it fairly and impartially?

A    I think it's a whole different thing from my relationship with my son.

Q    Okay.

A    As a mother, I didn't want to see that happen to my son.

Q    Got you.

A    But in another circumstance, it's not going to be that thing.  I'm not somebody else's mother.

Q    Okay.

A    You know, I can look at that a little bit differently than what you look at with your own child.

Q    Uh-huh.

A    I'm not saying that anything he did was right, but he's still my son.

Q    Sure.  Sure.

A    So, that is an emotion there that isn't going to be in anything else.

Q    You won't bring that into the courtroom, then.

A    Absolutely not.

Q    Okay.  Let's talk -- Let's talk about the law. And I apologize if I move quickly with you.

A    That's okay.

Q    But there is kind of a lot to talk about.

In a criminal case, this basically happens in two parts.  In the first part of the trial you're called upon to determine one thing only and that is, is the person guilty of the charge?

You know, if you find him not guilty, then you either go home or maybe something else happens.  But the first part of the trial is about innocence or guilt.  Okay?

A    (Nods head).

Q    If you find the person guilty, then you move on to the second part of the trial.  Okay.

And in the first part there's fundamental principles of law that apply in every case that you sit on, be it theft of a bicycle, a drug case, or a capital murder

case.

The State of Texas, we bring the charges in these criminal cases. And since we bring the charges, the law demands and insists that we have to prove the case. And we have to prove it to you, a juror, beyond a reasonable doubt. Does that make sense to you?

A    Uh-huh.

Q    Does that sound fair to you?

A    Absolutely.

Q    In other words, we carry the burden of proof. You never look to the defense to do it. He ought not to have to prove his innocence. We ought to have to prove him guilty.

Is that something you would hold us to?

A    Yes.

Q    And when we say prove to you beyond a reasonable doubt, there is no definition of reasonable doubt really. It's whatever you think it is. You know, it's not beyond all doubt whatsoever. It's not 100 percent, you know. But it's whatever you think it is.

And there is that room for doubt because anything is possible, isn't it? And you can have doubts, but the question is, are your doubts reasonable or are you just making up reasons at this point on things that are not rational, you know.

A    Uh-huh.

Q    So, if I say to you beyond a reasonable doubt, what do you think that means?

How sure would you have to be of your decision if it was beyond a reasonable doubt?

A    I would have to be pretty sure of it.

Q    Pretty sure is fair enough.  Pretty sure.

A    Pretty sure beyond a reason.

Q    Beyond a reasonable doubt.

A    You're going to have to show me.  I've got to be shown.

Q    Exactly.  And that's just it is you always look to me.

Also what becomes important is that you base your verdict on the evidence in the case and the evidence alone, nothing else.  And as I touched on that a little bit with you, you know, that you can't go back to the jury room, gather around with the jurors, take in the evidence and go, this is all fine and good, but let me tell you about my son.

A    Oh, no.

Q    Because the law says that that's evidence outside the courtroom.  You receive it only from the witness stand.  That's what you base your verdict on.  Do you believe that you're capable of doing that?

A    Yes.

Q    Do you think you can set aside those other

**Anne B. Meredith**
Certified Shorthand Reporter

things, leave those outside and base the case strictly on the evidence?

A    Absolutely.

Q    Okay.  Or your verdict, that is to say.

As we sit here today, Ms. Wood, you're to assume the defendant innocent.  There is a presumption of innocence and basically that's because I haven't proved anything to you yet, have I?

A    No.

Q    And only if and until I prove my case to you beyond a reasonable doubt can you return a verdict of guilty.  If I fail to prove it, the verdict is what?

A    Not guilty.

Q    Not guilty.  So right now, as he sits here right now, as any defendant in this stage of a trial sits here right now, he's presumed innocent.  It may not be that he is innocent, but he's certainly presumed innocent, isn't he?

A    Yes.

Q    And that doesn't change until I prove it to you otherwise beyond a reasonable doubt.

A    Right.

Q    Will you hold me to that burden?

A    Absolutely.

Q    Will you presume him innocent right now?

A    Absolutely.

Q    Just because he's been indicted doesn't mean he's guilty of anything, does it?

A    No, it does not.

Q    That's just a piece of paper is all that is.

Okay.  I have to prove all the elements of the case to you.  You know, he did it on or about a certain date, in Dallas County, how he did it, that, you know, he intended to kill somebody.  I mean I have to prove all the elements.  I don't get points for five out of six.  You know, all of the elements.

And each element is just as important as the other one.  I have to prove them all to you.  I give you a far-out example, okay, that goes to testing your qualifications as a juror.  But you tell me your honest answer, okay?

A    Okay.

Q    Let's say that I've called upon you to sit on an intentional murder case where I have alleged that an individual intended to cause the murder of a person by shooting them with a gun.  Okay.

And I put on my evidence and, sure enough, there's a -- the guy is dead and the defendant in the case even testifies and says, I killed him, I would kill him again.  Okay.  He's confessed.

But the medical examiner takes the stand

and says, well, he didn't die as a result of a gunshot wound, he died as a result of being stabbed in the heart. Okay. Well, what have I alleged?

A    You said he shot him.

Q    Right. But what has been proved?

A    That he didn't die from the gunshot wound.

A    So, what is your verdict?

A    Well, he's not guilty.

Q    Right. Right. I mean some people would say that's a technicality, I would find him guilty anyway. I mean it goes to your qualifications. And it's kind of an extreme example.

A    You didn't put that he stabbed him, so.

Q    I didn't prove a stab -- well, I didn't allege it in the indictment. And that's what becomes important, you know, is that that's not what's in the indictment.

That's the worth of that piece of paper is it tells me absolutely what I have to prove, and I didn't put that on that piece of paper. I screwed up, didn't I?

A    Right.

Q    You ought to be mad at me, right? You ought to go tell my boss I should learn how to charge a case better, right?

A    Well, you didn't prove that one, so.

Q    I sure didn't prove that one, and your verdict

would be not guilty because I failed to carry that burden of proof.

A    (Nods head).

Q    The defendant doesn't have to testify in this case and I can't make him testify either.  Everybody has the right to remain silent and not take the stand if they so choose, and you could think of a million reasons why somebody might not want to.  I think we would all like to hear from both sides, wouldn't we?

You've got kids, right?

A    Right.

Q    Wouldn't you always want to hear both sides of what happened when you came home and --

A    Yeah.

Q    -- there is a mess in here, right?

A    (Nods head).

Q    Well, that's fine on the outside world.  But in the courtroom, you could still want to hear what he says, but if he doesn't testify, you can't hold it against him.

Does that make sense to you?

A    Yes, it does.

Q    Would you hold it -- Would you follow that law, then?

A    Yes.

Q    Okay.  Let's talk specifically about capital

murder and in particular murder. Okay. Capital murder is -- it's the highest offense that we have in the State of Texas. It carries the ultimate punishment in the State of Texas and that carries the potential that the person could be put to death by lethal injection. Okay.

And it's actually a very narrowly defined category of what cases where there is a potential that the person be subjected to the death penalty.

If I pulled a gun out of my briefcase right now and turned to my co-counsel and shot her five times, laughed about it, said I'm glad she's dead, that's a pretty bad murder, isn't it?

A    Yes.

Q    It's not a capital murder, though. The most I could get for something like that is life in prison. It's not a capital murder because, although it's an intentional murder, it's missing that additional factor that makes it a capital murder.

Capital murder is always intentional murder plus something else. Okay?

A    (Nods head).

Q    Plus an aggravating factor. For example, intentional murder of a child under six years of age is capital. Intentional murder of a peace officer while he's on duty is capital murder. Intentional murder of

*Anne B. Meredith*
Certified Shorthand Reporter

two or more people at the same time is capital murder. Intentional murder of somebody while in the course of committing another felony such as a robbery is a capital murder.

So, you see, it's intentional murder plus something else. You understand that?

A    Uh-huh.

Q    Do you think that's fair?

A    I do.

Q    Do you think all murders, though, should be subject to the death penalty?

A    I would have to know the --

Q    Uh-huh.

A    I would have to know the circumstances of it before I could say that.

Q    Sure. No, I don't mean that you would. I'm just saying, do you think that every intentional murder -- because just because it's an intentional murder doesn't mean it's an available option.

A    No, I would say it doesn't.

Q    Okay. Okay. All right. That's a capital murder, and that's what I have to prove to you, that intentional plus that aggravating factor.

So let's back up a little bit before we get into capital and talk about what happens if I don't prove

one of my elements to you in a capital murder.

Let's say that I have failed to prove that a robbery occurred during the course of this intentional murder. Not guilty of capital murder, right?

A    (Nods head).

Q    What are they guilty of?  Not guilty of capital murder.

A    Murder, murder.

Q    They are guilty of murder, and we also refer to that as a lesser included offense.  Here's capital and you step down and here's murder.

There's several different ways a person can actually commit murder in Texas and there's several different levels of culpability, if you will, and a lot of it depends on what was going through your head at the time that you did it.  Okay?

We know capital, we know what that is. Murder, intentional murder, I meant to kill the person.

You could step down from that and actually have a situation where a person causes somebody's death but they didn't mean to do it.  They didn't intend to do it but they were acting reckless.  I didn't want to kill him, I didn't mean to kill him, but I was acting reckless and now he's dead.  That's called manslaughter and that's a less -- that's a second degree felony.

You can even go a step further down to something called criminally negligent homicide. You know, I didn't mean to kill him, I didn't want to kill him. I didn't even know they were there, but I did something negligent and now they are dead.

I'm driving in my car, I'm fiddling around with my CDs, I'm not paying attention. I'm just being grossly negligent. And I look up and there is somebody and I hit them. You know, I'm culpable for that person's death. But did I mean to kill him, did I want to kill him, do you think?

A    I don't know.

Q    No, I was just really negligent, wasn't I? It's called a state jail felony.

So, you've got everything from that all the way up to capital murder. If I fail to prove capital to you, you might be called upon to determine, well, did I prove an intentional murder. And then the option is not, are they going to get the death penalty or life in prison, but the option then becomes, what's the range of punishment. You know, you've heard the expression, let the punishment fit the crime.

A    Absolutely, I know I've heard that.

Q    I think that's true throughout -- it's true throughout the entire process of a criminal proceeding is

let the punishment fit the crime.  Let the evidence dictate what you will do in a case.  Okay?

A    (Nods head).

Q    In a first degree murder you can assess anywhere from five years in prison all the way up to ninety-nine years or life in prison.  And you make that decision based on the facts of the case.

You know, there are a million different ways somebody could commit a first degree murder, and I'll submit to you they are not all the same.  I could take an AK-47, walk out on the playground, pick out a ten year old kid and just shoot him.  That's pretty cold-blooded, isn't it?

A    It is.

Q    It's pretty cold-blooded.  Probably I should be put under the prison, let alone life in prison, right?

A    (Nods head).

Q    But you could change the same circumstances. This is just a hypothetical to illustrate the law.

That that ten year old boy that I've decided to kill is not actually a kid out on the playground that I'm going to shoot, but he's my son who is in Children's Medical Hospital diagnosed with incurable cancer who is suffering every single minute of his life.

And I sit by his bedside every day and I cry a million tears and probably not as many as he has from the

pain he's in.  And I finally decide enough is enough, I'm going to put him out of his suffering.

And I go get some morphine and I come in and I give him a shot of that because I know it's the least painful way I can end his suffering.  Have I killed him?

A    You killed him.

Q    And he died.  Did I mean to kill him?

A    You meant to kill him.

Q    I did.  I committed murder, didn't I?

A    Yes.

Q    But it's a far cry from somebody taking an AK and picking off a kid in the park, isn't it?

A    (Nods head).

Q    So you see that you look -- you know, let the punishment fit the crime, don't you?  Can you do that in a case?

A    Yes.

Q    Okay.  And one of the things that you said also in your questionnaire, and I think it hits on that, on those lesser included things, is you said on page two, when we said, the best argument against the death penalty is, and you said self-defense, mental problems that make them unaware of right or wrong.  Okay?

A    (Nods head).

Q    I'll tell you that if a person kills somebody in

self-defense, truly justified self-defense, they are not going to jail and they are not being convicted of anything. They had a legal justification for doing it.  And I believe in the self-defense law.  I'm glad we have it.

You know, so if it's something truly in self-defense, they are going home.  Are you okay with that?

A    Uh-huh.

Q    Can you appreciate that law of self-defense?  Some people would go, well, I would give him a lesser sentence if it was self-defense.  It doesn't work that way.  If it's a justified homicide, you know, and a jury believes it was, or a judge, they are not guilty.  Do you understand that?

A    Yes.

Q    Okay.  You've put on here, or mental problems that make them unaware of right from wrong.  And that's what I'm talking about.  Maybe there is something about the person going through their head that you might say, a person couldn't form the intent or a person didn't know what they were doing.

You know, I think anybody can say, well, I was high or I was drunk, I didn't know what I was doing.  The question whether or not you believe that or not is entirely for you to determine.  Okay?

And a person may very well have been intoxicated or high.  As you said, they knew what they were doing when they took it.  And, still, do you think a person

can be high and still know what they are doing?

A    I've never been high so I don't know.

Q    Okay.

A    But I think that -- I think that it may impair them in some ways of thinking, but I don't know.

Q    Uh-huh.  Do you think people can be in their right mind and just exercise extremely poor judgment?

A    I'm sure there's times that that could happen.

Q    Do you think that -- Let me ask you this. Sometimes people go, that guy must have been crazy or he must have been high or something.

          The people who took that airplane into the Twin Towers, you think they were in their right mind?

A    I think they were evil.

Q    Yeah.  They knew what they were doing, didn't they?

A    Yeah.

Q    And kind of there is a hard distinction to make between was he in his right mind, you know, or did he know what he was doing.  Some people know what they are doing. There is nothing wrong with them mentally.  They may be high on power.  They may be high on drugs.  Doesn't mean they didn't know what they were doing and maybe they made an evil choice.

          You know, if somebody were mentally retarded

or if somebody were mentally deficient or defective, maybe that would play a part into it. But is that something you're open and receptive to seeing? You understand that could always be a possibility.

A    Right.

Q    It could or couldn't be. Just because someone says it's so doesn't necessarily make it so.

Let's -- I want to continue on with you, though, here. Let's talk about capital murder, then, okay?

A    Okay.

Q    And understand this, Ms. Wood, that in order for you to find somebody guilty of capital murder, you must have first found that they intended to cause that murder. It wasn't an accident, it wasn't justified. They meant to do it.

You must also find that, in the course of committing that intentional murder, that they were also committing or trying to commit robbery. Okay. Do you understand that, where I'm going there?

A    Right.

Q    Okay. If you found them guilty of capital murder, you found that that's true. There is no mental deficiency there, there was no excuse going on there. Regardless of what their circumstances were, they meant to kill this person. High or sober, they meant to kill them, and they

did it, and they were robbing the person at the same time.

That's the first part of the trial. If I prove that to you beyond a reasonable doubt, you return a verdict of guilty, correct?

A    Right.

Q    If I don't, you don't return a verdict of guilty of capital murder. But assuming you have now, okay, at this point this defendant now is not looking at that range of punishment. He's looking at one of two things that's going to happen. He's going to get life in prison, all right, or he's going to receive the death penalty. Those are his only two choices.

And life in prison means that, Ms. Wood. It means life in prison. You're going to die there. You're spending the rest of your life there.

A jury does not go back to the jury room and sit down and go, okay, what do you think, should we give him life or should we give him the death penalty. You don't do it that way. It's not just kind of an open debate like that.

Instead, you come to that determination by answering questions, and the judge had you look at those questions earlier.

A    Uh-huh.

Q    We call them special issues. And based on how you answer those special issues will be the determination

as to whether or not somebody receives life or the death penalty. Okay?

Now, remember I talked about that in the first part of the trial you were to presume the person innocent, and that was because I hadn't proved anything to you yet, right?

A    Right.

Q    That same presumption now carries over into that second part of the trial. It's like it's a whole separate new trial. Okay. And that presumption carries over now also.

But it's not the presumption of innocence. Instead, you are to assume or to presume that the life sentence is the most appropriate thing in the case. And that's because I have to prove to you that the death penalty is actually the more appropriate thing in this case. And if and until I do that, you are to presume that life is the proper thing to do.

A    Uh-huh.

Q    That doesn't change until I prove it to you, right?

A    Right.

Q    And some, some jurors come in here and they go, well, look, you've proved to me that he's a capital murderer. He meant to kill this person. It wasn't any accident. It wasn't any excuse here. He meant to kill this person and he was robbing him, or trying to, at the same. You tell me

that, I think he needs to die, without me hearing any evidence whatsoever.

Do you feel that way?

A    No.

Q    Okay.  Do you think that's even appropriate?

A    You would have to show me why he shouldn't live.

Q    Why he shouldn't, exactly.  And that's the --

A    You would have to show me why.

Q    That is the essence of jury duty in a case like that, Ms. Wood, is you can't jump to any conclusions.  You can't say, just because he's guilty of capital murder, I will answer the questions in a way that will ensure he dies, or just because he's a capital murderer, I'll answer the questions automatically and ensure a way he doesn't die. Because you're not basing your verdict on the evidence, are you?

A    No.

Q    So, will you wait to hear the evidence?

A    Yes.

Q    Will you base those answers on the evidence in the case?

A    I would have to have the evidence.

Q    Exactly.  I think you have a good appreciation for that.

So, you're going in with the presumption that

the life is the appropriate thing to do. And you are called upon to answer those questions. And the first one, we call it special issue number one. You've got it in front of you, but it's also over here on this big board here.

And it says, do you find from the evidence beyond a reasonable doubt there is a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society?

We did not write that question. That was written by our lawmakers. Okay?

A    (Nods head).

Q    And when they wrote that, they didn't give you any definitions of what those terms mean up there.

We've already talked a little bit about reasonable doubt. And any time you hear that, it ought to cue you in to, proof beyond a reasonable doubt, who are you looking to? Who is proving something to you?

A    You're proving.

Q    It means you're looking to the State again, right?

A    Right.

Q    They never have a burden of proof. They could sit on their hands and work a crossword and that would be fine, okay, because you always look to the State.

We also call that issue number one the future dangerousness issue. Basically what the State is called

upon is to prove to you beyond a reasonable doubt that the defendant will be a future danger. We're kind of asking you to predict the future. Okay.

And you can look at the evidence in the first part of the case to make that determination and you could also look at evidence offered to you in the second part of the case to make that determination.

But notice it starts out, do you find beyond a reasonable doubt if I prove to you that there is a probability. Okay. Do you see a difference between a probability and a possibility?

I mean, is anything possible?

A    Anything is possible.

Q    I could win Olympic -- It's possible I could win Olympic gold in swimming and beat Michael Phelps in a couple of years, right?

A    You sure could.

Q    You think that's possible? All five foot four of me and I can hardly swim. It's possible, right?

A    It's possible.

Q    You think it's probable?

A    Probably not.

Q    No, no. Again, they don't define probability for you, but do you see a difference between a possibility and a probability?

A    I do.

Q    Okay.  And some people have said that probability means to them more likely than not.  Would you agree with that?  Say yes or no.

A    I would, yes.

Q    Okay.  Do you have a different definition?

A    No.

Q    Okay.  If I proved to you that it's more likely than not the defendant will commit criminal acts of violence.

Notice what it doesn't say, Ms. Wood.  It doesn't say that the defendant will commit another murder or that the defendant will commit an assault or that the defendant will threaten other inmates or that the defendant will punch somebody in the face.

It doesn't say what criminal acts of violence are.  There is no definition for it.  It's really for you to decide what a criminal act of violence is.

If I, my poor co-counsel here, I just whacked her right in the face, would you consider that a criminal act of violence?

A    I would.  Yeah, I would.

Q    Okay.  Okay.  I think she would, too, and I think I would be in a lot of trouble.

Some people say that it doesn't -- you don't even necessarily have to physically do something, that

threatening a person could be a criminal act of violence. If I threatened to do you or your family harm, would you consider that a violent act?

A     I would.

Q     Okay.  And probably something you would get on the horn and call the police about.  But, again, that's for you to decide what a criminal act of violence is.  Okay.

If I prove to you more likely than not that this defendant will commit criminal acts of violence that would constitute a continuing threat to society.

Normally when people hear society, they think of what?  What do you think of when you hear society?

A     Us.

Q     Us.  I think of -- I think of people on the highway, I think of people in restaurants, I think of going to the post office.  I mean, I think of us interacting and integrating as human beings all in the same place, right?

A     Uh-huh.

Q     Now, this defendant, when you get to this issue, has been found guilty of capital murder, right?

A     Uh-huh.

Q     So, where is he going to be the rest of his life?

A     Well, he's going to be in prison.

Q     Right.  Right.  And can you see that that definition of society might also include a prison society?

A    That's what it would include.

Q    Sure.

A    That's where he would be.

Q    Yeah, unless he escapes, right?

A    Right.

Q    Then it would be a prison society.  Your son is living in a society right now, isn't he?

A    He is.

Q    He lives there.  He sleeps there.  He apparently goes to counseling there.  You know, he's trying to get over this.  He, you know, he eats there, he reads there.  He lives in that society, doesn't he?

A    He does.

Q    And I would imagine maybe you would agree that he has to live amongst other inmates in that society, doesn't he?

A    He does.

Q    He has to co-mingle and he has to deal with other people all day long.  There's other people in that society other than the inmates.  There's guards, nurses and teachers and therapists and even moms that come and visit sometimes, you know.

So, your definition would include that society, then.

A    Yes, it would.

Q    Okay.  I'm having to prove to you, ma'am, that the defendant is going to commit, more likely than not, not that he -- you know, more likely than not that he will commit criminal acts of violence that would be a continuing threat to that prison society.  Okay.

I can do that -- You can answer that question based strictly on the criminal offense itself that you just found him guilty of.  You could look at it and go, based just on what he did, I am making a decision that I believe beyond a reasonable doubt that he's a future danger.

You don't have to do that, though.  You can also say, I would like to see a little bit more.  Now, I can't -- You can't say right now what you -- Have you heard any evidence in this case?

A    No, none.

Q    No.  So, do you really think, whether I ask you or anybody asks you, look, you found him guilty of capital murder, so aren't you going to honestly, obviously automatically say that he's a future danger, can you do that right now?

A    No, I would have to know more about --

Q    Okay.  Okay.  I have to prove it to you.  But you can look at the evidence of the offense.  And let me cut to that there.  Your son is doing time in prison for narcotics.

A    Uh-huh.

Q    Do you think he's paying a debt to society?

A    I think -- yeah, I think he is.

Q    Okay.  Okay.  He's trying to better himself also. Does he have a right, or do you think he has a reasonable expectation, to be able to do that and be safe while he's there?

A    I do.  I think anybody there should be safe.

Q    Okay.  And do you think that maybe it just comes with the territory that he ought to be able to get his butt kicked every day or somebody could hurt him; is that fair?

A    Do I think -- Ask me that again.

Q    He's in prison.  And I used some language I probably shouldn't.  He's in prison, so is it fair to say, well, that's prison, and you're probably going to get hurt and you're probably going to get assaulted?

A    Okay.

Q    Does that make it okay?

A    No, it doesn't.

Q    Okay.  There are a lot of people in prison for a lot of different crimes.  Some are there for murder, some are there for narcotics, some are there for a combination of both.  And their only debt that they owe us is a debt to spend time in that prison, right?

A    (Nods head).

Q    Does it necessarily mean that they don't deserve

a right to safety?

A    No.

Q    Okay.  That's what we are talking about.  Is this defendant, is this defendant going to be a continuing threat to that prison society?  Is he more likely than not going to commit acts of violence, maybe against an inmate or maybe against a guard?

You can make that determination, I think, based on, you know, looking at the person or seeing -- maybe sometimes you can tell a lot about a person by how they act, you know.

But let me ask you this.  In order for you to make that determination, what kind of things do you think you would have to see or know to answer that question, that somebody was going to be a future danger?  What would help you decide that?

A    Everything that led up to what he's here for.

Q    Okay.

A    What happened in that -- in that crime.

Q    Sure.  Sure.  What happened in the circumstances of the crime.

A    Right.

Q    You could also -- you could also -- Well, exactly that, you could look at everything that led up to the crime, the circumstances of the crime, maybe what happened after

the crime, or maybe even how a person has acted since the crime. Have they shown a lot of remorse? Have they, you know, fallen to their knees and begged forgiveness? I mean, all these things might help you assess whether or not that person's really truly going to be a future danger.

Do you think you're capable of making that determination?

A    Yes.

Q    Will you automatically answer that special issue number one yes just because they have intentionally killed somebody during the course of a robbery?

A    No.

Q    You'll reserve and you'll wait until you hear the evidence?

A    (Nods head).

Q    Okay. And I see you nodding your head yes.

A    Oh, yes.

Q    That's all right.

A    I'm sorry.

Q    If I fail to prove that to you beyond a reasonable doubt, then your answer must be no.

A    Right.

Q    And if that's what happens, then the defendant gets life in prison, that's it, that's all, we all go home.

Okay. If I have proved that to you beyond

a reasonable doubt, we move on to the next special issue. And we haven't really touched on this much. I'll hit it briefly. But it's also what we refer to at times as the law of party -- the law of parties.

And in Texas, if a person aids, assists, encourages or directs another person, participates with another person to commit a crime, they can be held equally liable for committing a crime.

If Ms. Evans and I get together tomorrow and decide that we are going to rob a 7-Eleven, and we sit at the kitchen table and think about it and plan it out and scope it out on the Mapquest there. And she goes and buys the gun and I buy the bullets. And we drive her car down there and she sits in the driver's seat and says, I'm going to be the eyes and ears for you. If I see somebody, I'll honk.

And I say, all right. And she hands me the gun, I load it. She says, don't leave any witnesses, now. I won't. I go in, she watches. She hears a shot. I come out with the money, and I have killed the clerk.

Am I guilty of capital murder?

A    You are.

Q    Okay. Do you think she should be guilty of capital murder?

A    She should.

Q    The law in Texas says she quite possibly could be if you found that she participated in the crime and, most importantly, should she have anticipated somebody would die.

A    She should have.

Q    Okay.  When you get to that issue, you're being asked not only -- you're being asked, is this the defendant who actually caused the death, was he the, quote, triggerman, or was he somebody who actively participated in the offense and not only should have anticipated somebody would die but did anticipate somebody would die.  Okay?

Does that make sense to you?

A    Uh-huh.

Q    Okay.  If you don't think they were a party to it, if you don't think he actually anticipated it, you know, then you would answer that question no, you stop right there, and that's a life sentence, okay, and we move on.

But if you do believe that answer is yes, we proved it to you beyond a reasonable doubt, then the defendant is now sitting squarely on top of the death sentence.  Okay.  Guilty of capital murder, he's a future danger, and he was actively participating in this criminal offense, he's sitting on a death sentence right now.

But it's not over.  You have one more question that you need to answer, special issue number three.  We also call it the mitigating circumstances

question.

And it's very wordy, you know. But it says, do you find, taking into consideration all of the evidence. So, we are asking you once again, look at everything. Look at everything again.

All of the evidence, including the circumstances of the offense. We talked about that before. You want to know what happened. The defendant's character and background, and the personal moral culpability of the defendant. You're looking at all of that.

If you find, after looking at all of that, that there is a sufficient mitigating circumstance or circumstances to warrant that a life imprisonment sentence is actually more appropriate than a death sentence.

We also refer to it as a safety net question. And the theory is is that I'm calling upon you to assess the ultimate punishment that anybody ever could. And it's a task that should be given a lot of seriousness and you need to look at everything before you assess that verdict, correct?

A    I would look at the evidence.

Q    And they don't -- We don't want you to get back in the jury room and go, look, I get it. You know, that's a capital murder and a future danger. He was a participant in it. But there is something about this case where it doesn't rub me right. I think that actually the right thing

to do, based on the evidence in the case, is to give him a life sentence.

Okay. We call it a mitigating circumstance. It can't -- It doesn't say just a mitigating circumstance, but it has to be -- I want to make sure that verbiage is correct -- sufficient mitigating circumstance.

Maybe you look at the defendant and you see he was raised in a closet, fed dog food, had cigarettes put out on him his whole life. Well, guess what, he turned into the monster that his parents turned him in to be.

You know, some might say, tough luck, I had it worse. I don't think that's mitigating. And others might say, you know what, I think it is. And not only is it mitigating, I think it's sufficient. I think it's enough that it ought to turn the verdict around. And that's fine. And if you think that, then you need to do it.

Does that make sense to you?

A    It does.

Q    Do you think that's fair?

A    I think it is fair.

Q    Okay. And, of course, it's based on the evidence in the case, you know. And you do, you do deliberate on that issue also. But -- And I can't pin you down as to what you think is mitigating sufficiently enough to overturn a verdict right now. I can't do that. That would be inappropriate to

put you on the spot like that or to get you to tell me what you're going to do in this case or under what circumstances you would do it.  Okay?

It could be mitigating -- Age could be mitigating.  It could be mitigating, the circumstances of the offense.  Maybe he was -- Maybe he was the participant in a crime who stayed behind and tried to save the victim's life.  You know, maybe he turned everybody else in, you know, and that's enough to turn it around.

But the point being because it requires some mental gymnastics sometimes.  A lot of times people want to go, how could you ever do that?  Do you think you could really ever do that?  He's a capital murderer.  He meant to kill someone.  He's a future danger, for crying out loud.  And you are telling me, Ms. Wood, that you would ever find a reason to overturn that verdict?

The question is, will you go into that special issue, review all the evidence again, and if there is a sufficient mitigating circumstance, will you answer that question yes?  That's the question.

A     I would.

Q     Okay.  Any questions for me before I turn you over to the other side?

A     I don't think so.

Q     Okay.  Any reservations or reasons that you think

you can't be completely fair in this case to either side?

A    I don't think so.

Q    Okay.

A    You know, I know my son's there.

Q    Uh-huh.  Is that going to cause you any worry? Are you going to think, oh, no, I'm convicting, maybe assessing a death sentence on somebody, and my son is somewhere in the penitentiary system and --

A    No.  My son's been there ten years.  You know, I'm still a mom.  I still love my son.

Q    Got you.  Okay.

A    But he's there.

Q    Okay.  And that's not going to --

A    And that hasn't affected my life for the last ten years.  I go on with my daily business and I do what I have to do, and it certainly wouldn't affect this.

Q    Okay. You're very tough.

A    I mean, it is what it is, you know, and I hope he's well.  I hope he -- You know, I hope he's learning something.  I hope he's getting help.

Q    Uh-huh.

A    And if he isn't, then --

Q    Okay.

A    -- it's out of my hands.  It's out of my control.

Q    Okay.

A    But that doesn't --

Q    Do you worry -- I guess I'll just ask you out and out. Would you at all be concerned -- and, again, I'm getting you out -- we are not talking about who your son is. I don't want to know who he is or any of that.

A    Okay.

Q    -- that somebody's going to try to exact some revenge on him, or something, because you were involved in a case where the guy was given the death penalty?

A    I don't really think about that. I don't think about any of that, period, because as a mother you can't. Number one, you can't.

Q    Okay, fair enough.

A    You know, because there is emotion in being a mom. I'm sure there's enough going on there that me, as a person, I'm not going to cause any kind of anything in the system.

Q    Okay.

A    Do you know what I'm saying?

Q    Oh, I got you. I got you.

A    So, this has nothing to do with that.

Q    All right. Okay.

A    It was ten years ago. Am I still emotional about it? Sure, you know.

Q    Sure.

A    I raised two children. I raised one that didn't

get in trouble and one that did, so.

Q    And one final thing.  Everybody has got a mother, you know.  And the defendant -- A defendant in a criminal case might have a mother that gets on the stand and --

A    Absolutely.

Q    -- boo-hoos.  And are you going to be swayed by that?

A    I can't be swayed by that.  I couldn't be swayed by being his mother.

Q    Okay.

A    So I couldn't be swayed by the defendant's mother.

Q    Okay.  Thank you for being so honest with me.  I appreciate it.

A    You're welcome.

Q    It helps me make our decisions.

THE COURT:  Thank you, Ms. Handley.

Let's take about a five minute recess here and let Ms. Wood kind of regroup and walk around and stretch a little bit.

PROSPECTIVE JUROR WOOD:  You think I'm gonna gnaw around?

THE COURT:  No, no.

PROSPECTIVE JUROR WOOD:  You caught me off guard there.

THE COURT:  That's all right.  That's all

right. You're not the first. So, yeah, just leave that here, and you'll be back in just a minute and we will conclude your voir dire. Kind of give you a short break here.

PROSPECTIVE JUROR WOOD: Okay.

(After a recess, Defendant and Prospective Juror Wood present in open court.

THE COURT: Thank you, Ms. Wood. Just go ahead and have a seat there, if you would, please, ma'am.

Thank you. Be seated please, ladies and gentlemen.

Mr. Lollar, you may inquire of the witness.

MR. LOLLAR: Thank you, Judge.

THE COURT: Yes, sir.

EXAMINATION

BY MR. LOLLAR:

Q    Ms. Wood, how are you?

A    I'm fine.

Q    Well, I'm glad to see that you're out there with the rest of us sinners, Andrea and me and --

A    Well, I told you I didn't have any habits.

Q    Well, they are going to exile us one of these days.

A    They are getting close to doing it now.

Q    Yes, they certainly are.

Well, we just want to chat for a little while. Now, I've had the advantage of hearing what you've had to say to the State. Of course, I've read your questionnaire. I'm just going to talk about some things.

Let me get this out of the way about your son. I'm sorry that all that's happened to your son, that you've had to deal with that.

I see that you say that he's at the Clemens Unit now.

A    Uh-huh.

Q    And have you had a chance to visit him out there?

A    No, I have not gone there.

Q    Yeah, that's tough to do, isn't it?

A    It is.

Q    Yeah.

A    It's hard to go. It's very emotional to go there, so I don't go.

Q    I'm sure that's right. It says you have visited him, though. Is that --

A    Before.

Q    Before he got sent to the penitentiary?

A    Before, yes.

Q    Okay. All right. But you keep in contact, you write each other.

A    We do.

Q    He tells you what's going on.

A    He does not.

Q    He tells you what he wants to tell you.

A    He says, I'm staying out of trouble.

Q    Yeah.

A    And I think he gives me the bare of what he needs to give me, and I give him the news of what's going on.

Q    Okay.

A    And that's how we go about it.

Q    Okay.  Let me ask this question.  Now, you've indicated to us that you thought he was there because of a drug case; is that right?  Or is that a drug case and a robbery?

A    Drug case and a robbery.

Q    And then obviously the burglary of your house.

A    I don't know -- Well, no, he robbed my home.

Q    Uh-huh.

A    And I called the police and turned him in.

Q    Right.

A    And when they caught him, he had the drugs.  And I really don't know.  I didn't go to any of that.

Q    Okay.  Let me ask you this question.  Do you think, Ms. Wood, that your son got into that activity because of the drugs that he may have been addicted to?

A    I would like to think that he did, but I don't

know.  I don't know.

Q    Okay.

A    He was not living in my home.  He was of age not to live in my home.

Q    Sure.

A    So I don't know.

Q    How old was he when he was sent to the penitentiary?

A    I want to say maybe 19, 20.  I don't know.

Q    Okay.

A    He's been there ten years.  He'll be 34 in December, I think, so.

Q    Maybe he was like 24 or 25 when he went, something like that?

A    (Nods head).

Q    Okay.  I see you nodding --

A    Like I said, he was in and out, in and out of jail, so.

Q    Okay.

A    And it was always something to do with the drugs.

Q    Okay.  Do you see how --

Well, let me ask you if it is your opinion that drugs can impair somebody?

A    I believe that can impair people, yes.

Q    And lead them to commit criminal activity that,

weren't the drugs there, they might not have done it?

A    Maybe.

Q    Okay.  Ms. Wood, let me go through your questionnaire with you.

A    Okay.

Q    Just a couple of things.  Now, I noticed that you had an interest in a criminal case on a person by the name of Casey Anthony.  Who is Casey Anthony?

A    Oh, that's the case in Florida with the little girl, the little --

Q    Was it a --

A    The little three year old girl.

Q    Was that the name of the little girl was Casey Anthony?

A    No, that's her mother.

Q    Oh, okay.  And that's the one who is accused of killing her.

A    Right.

Q    Okay.  Now, have they gone to trial yet?

A    No.

Q    Yeah, I think -- I don't know why they haven't.  That's been going on for a long time.

A    I don't know when it's going to trial, but no.

Q    Okay.  All right.  I see that you have a number of relatives, your father, your brother-in-law, brother,

nephew, niece, who are all police officers.

A    They are.

Q    So, you come from a pretty law enforcement background.

A    But not in the State -- they are not in the State of Texas.

Q    That's my next question.  Where are they?

A    Tennessee and Virginia.

Q    Tennessee and Virginia.  Okay.  So, none of these people here are officers of the Dallas police force or --

A    No.

Q    I think our question, I was going to see -- The case that we have here on trial is from the Garland Police Department.

A    No, they are all Tennessee and Virginia.

Q    Okay.  All right.  Now, is there anything about that that I need to worry about, that you have so many relatives who are police officers?

A    No.

Q    Okay.  Do you talk to them about the cases that they have going on or anything like that?

A    No, no, we don't talk about stuff like that.

Q    Okay, very good.

A    We fight and cuss like regular brothers and sisters.  We have other things to fight about.

Q    All right.  Now, there are a couple of other things.  Now, where did it go?  Down at the bottom of page nine -- no, that's not it.

The bottom of page five, we say -- we tell you what the law is in the State of Texas.  Voluntary intoxication, and that means by alcohol or drugs, is not a defense to the commission of crime.  And you indicated you agree with that.

Okay.  Now, at the top of the next page, though, we tell you further what the law in the State of Texas is, that evidence of intoxication either by drugs or alcohol can be considered in mitigation of punishment.  And I notice that you did not -- we asked you, do you agree with this law, and you did not mark either yes or no.

A    Oh, I don't know why I didn't.

Q    Okay.  Well, what do you think about that?

A    I think I could probably consider that.

Q    Okay.  The reason I say that is -- and I am going to read to you the law from our criminal codes book here.  It says, in all prosecutions for murder, the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of

the accused at the time of the offense.  Okay?

A    Uh-huh.

Q    So, it allows us to present evidence as to what the condition of the mind of the defendant was at the time he committed the offense.  Okay.  Do you think that's important information for you to hear?

A    Yeah, I think it would be important.

Q    Okay.  Because it's one thing if a person, if you hear testimony that a person was of a clear mind, was of a -- I don't even know how to say it.  But you see what I'm saying?

A    I do.

Q    As opposed to a person who committed an act while he was stone cold drunk or under the influence of some mind altering drug.  You see, that might, that might make a difference to you.

A    (Nods head).

Q    And where it would make a difference to you is in talking about what we call the culpable mental states of a criminal offense.

And just very briefly, let me tell you there are four of them under Texas law.  There is one called intentional, there is knowing, there is reckless, and there is with criminal negligence.

Okay.  Now, intentional means that you

intended to cause the result.

And somewhere up there before you is an indictment.  Do you see the indictment in the case?  We have got an indictment around here some place.

THE COURT:  You know, I haven't seen it since I've got here.  I've got one in the file.  Do you want me to show her that?

MS. HANDLEY:  There is one in a binder.

THE COURT:  There should be one in a binder?

MR. LOLLAR:  That's it.

Q    (By Mr. Lollar)  So, that's the indictment in this case.  Just take a moment to look at that.

(Prospective Juror complies).

Q    Okay.  So, what they are saying there, and it's an element of the offense that they have got to prove, is that this murder was committed intentionally.  Okay?

A    (Nods head).

Q    And that's one of the things that makes it a capital murder.  You've got to have an intentional killing before you have a capital murder.  Okay?

And what we in Texas mean by the word intentional is that they had it in their mind to achieve the result, the result being death, okay, and they had in their mind to achieve that result of death, and that's what they did.  They did whatever they needed to do to cause the

death.

Okay. So, it's not a situation where -- It's not sufficient if the State proves that a defendant in a capital murder case tried to wing him, you know, tried to harm him and injure him, that's not enough. They must prove that, in his mind, at that time, he wanted to cause the death of the victim. Okay?

A    Okay.

Q    And that that happened during the course of a robbery. Okay. So, the person was engaged in a robbery and caused the death intentionally. Those are the two things that the State would have to prove to make a capital murder case. Okay?

Now, let's say that they are not able to show that a murder was committed intentionally. Okay. And let me just give you an example. If I go in and rob a 7-Eleven store and I have got my gun and, you know, I'm threatening the cashier and I say, give me the money, and they do.

Okay. And then I say to them, I'm fixing to leave. Don't follow me out of here because I'm going to get away. And if you follow me out of here, then you'll see which way I go, and I won't get away. And, so, if you come around that counter, I'm going to shoot you in the leg.

Okay. And that's what you believe from the testimony. Okay? Well, so, they didn't have the intent to

kill. All right. But unbeknownst to them or unintended by them, it hits the femoral artery and they bleed to death before the ambulance gets there, the police get there. Okay?

So, clearly, that's a person who has committed a murder during the course of a robbery, but it's not an intentional murder. You see how that would not be an intentional murder?

A    (Nods head).

Q    And, so, in that case, in that hypothetical instance, a jury would not be entitled to find the person guilty of capital murder. Instead, you would find them guilty either of aggravated robbery or of murder, okay, which are lesser included offenses from this type of capital murder.

Does that all make sense to you?

A    Yes.

Q    Okay. Now, there are situations where a jury can hear evidence and decide that it's not an intentional murder or a knowing murder.

That last instance we talked about would be a knowing murder. I knew when I shot the person that a death could result, but it was not my intention to cause death. Okay? Those are the differences there.

You may have an instance where you hear about a recklessly committed murder. And I will just give

you an example.  On New Year's Eve sometimes you can go outside at the stroke of midnight and hear people firing their guns off in the air.

I don't know where that came from, where that tradition came from, but I know it's out there.  And if you go out to my neighborhood, I live in North Oak Cliff and, Lord, if you go out there at the stroke of midnight on New Year's Eve, it sounds like Beirut, I can tell you that.  And people don't realize, I think, that when they fire those guns off in the air, the bullet goes up in the air and sometimes it comes down.

A    And it comes down.

Q    And it can come down and actually kill somebody.

Well, all right, recklessly is when a person knows that there is a substantial risk in doing what they are doing, but they decide to ignore the risk.  Okay.  And that's an example.

Now, you know, I suppose that if you shoot a gun off into the air, it might come down and hurt somebody or kill somebody, but you ignore the risk and you do it anyway.  Okay.  So, you can cause a death that way, but that's not a knowing murder and that's not an intentional murder.  It would be a recklessly caused murder.  Okay? That's an example of that.

Then even lower than that is what we call an

act committed with criminal negligence. Okay. That's when you aren't aware of the risk, but you should be. Okay.

Let me -- If you're driving down the road and you are not paying attention and perhaps you're reaching over looking for a CD to put in your CD player in the car. And you are not paying attending and, bang, you run into the car in front of you and end up killing somebody. Well, that's an act of criminal negligence. Okay. And that's also prosecutable. They can put you in jail for that for up to two years. Okay?

So, all of these different things can fall out of an indictment. And that's where this whole business about paying attention to the condition of the mind of a defendant at the time of the commission of the offense is important. It goes to these culpable mental states. Okay.

And I want you to understand that, in the event you're selected as a juror, we get in trial and you start hearing evidence about the condition of the mind of the defendant, well, that's because the law allows us to and it's important for your determination of this element that the State's got to prove beyond a reasonable doubt.

You can only find a person guilty of capital murder if you find that they did that intentional murder, if they intended to cause the death of the victim. Okay.

And if you have a doubt about that, then you

resolve that doubt by not finding him guilty of capital murder but finding him guilty of one of these lessers that you've determined is the appropriate mental state. Okay?

A    Okay.

Q    All right. But now let's go ahead -- I think I'll just go ahead and talk about these special issues. And please believe me when I say that, by talking about the special issues, that doesn't mean that I think a jury is going to find Mr. Broadnax guilty of capital murder. Okay?

A    (Nods head).

Q    But this is the only time when we can talk to jurors about their feelings about the death penalty, that I've got to do this now. And in starting to talk to you about your feelings about the death penalty, I just want to go through some things with you.

A    Okay.

Q    Now, we ask you on the front page there, are you in favor of the death penalty, and you said yes, I believe some cases warrant the death penalty. Okay. And then down below we ask you, which of the following statements best represent your feelings, and you circled number two.

A    Where are you at?

Q    On the front page.

A    Oh, the front page.

Q    The very front page.

A    Uh-huh.

Q    See down there, you circled number two, I believe the death penalty is appropriate in some murder cases and I could return a verdict in the proper case which assessed the death penalty.

And I want to -- Take a look at answer number one, okay?  I believe the death penalty is appropriate in all murder cases.  Why didn't you circle that number?

A    Because you could commit a murder and it not be -- If someone was doing something to me and I was trying to defend myself and I murdered them, I shot them and killed them --

Q    Right.

A    -- that's still murder.  I still killed them.

Q    Oh, all right, I get you.

A    And I just don't think -- you know, there may be circumstances that caused, caused the murder.

Q    Okay.

A    And then there's some things are just evil and mean and for no reason.

Q    Okay.  Okay.  Let me jump to page number two.

And we asked you, the best argument for the death penalty, and you said, intentionally taking one's life while committing another crime, taking the life of a child.

And that, in your mind, is a capital offense

which would require the death penalty would be taking the life of a child under the age of six?

A    Right.

Q    Okay.  And up at the top we asked you, do you agree in some cases that a life sentence rather than the death penalty would be appropriate, and you said yes.

What kind of cases were you thinking about there where, in your mind, a life sentence would be appropriate rather than a death sentence if someone were guilty of murder?

A    Maybe in an instance where a person's never done anything wrong, been in trouble or -- and they just, something happened and they murdered somebody.

It's going to -- Any of these answers is going to depend on what you're answering to.

Q    Uh-huh.

A    So it's, you know, it's hard to give a specific, specific exactly what I feel.

Q    Uh-huh.

A    Unless I have something to --

Q    Sure.

A    -- to be ruling that on.

Q    Sure, something to base that on, I understand.

Now, let me jump you over to page number four and we ask at the top, what crimes do you think the death

penalty should be available in Texas, and your answer was violent crimes on children and the elderly.

Okay. And those are a couple of other examples, in your mind, that would justify a death penalty?

A    I think they definitely do.

Q    Okay. And then we ask you down below there, about halfway down, how strong you feel for the death penalty on a scale of one to ten, and you indicated you were a ten.

Is that how you feel?

A    If it -- I think if it's a crime that warrants the death penalty, then you have to be all for that.

Q    Okay.

A    Do -- I mean if you had proved to me --

Q    Uh-huh.

A    -- that this person needs to be put to death --

Q    Uh-huh.

A    -- then I think you have to believe in that totally.

Q    All right. And how do -- What would you look at to determine if the State has proved to you a person needs to be put to death?

A    They are going to have to show me all the evidence and absolutely convince me that he did it and knew what he was doing.

Q    Uh-huh.

A    He intended to do it. I would just have to have

the evidence.

Q    Okay.  Now, let me -- let me tell you the law on a couple of things, okay?

A    Uh-huh.

Q    Now, the law says that if you are actually defending yourself from somebody else's use of force, then that's not a criminal offense at all.  You would not be punished, period.  If I'm acting in self-defense, it's not that I'm going to get life as opposed to death, it's that I'm going to be found not guilty.  Okay?

A    Uh-huh.

Q    So, you understand that.  Okay?

A    Okay.

Q    Now, I want to go with you and talk to you about a situation, we will talk about a hypothetical capital murder case.  Okay.  And we are talking about a person who is charged with the intentional murder of a victim during the course of a robbery.  Okay.  And let's say that you have been selected as a jury -- a juror, in that type of a case.

         The State has presented their testimony to you.  The evidence, whatever it is, has convinced you beyond any reasonable doubt that the person is guilty of that.  Okay.  Intentionally killing the victim during the course of a robbery.  Okay.

Now, put yourself at that point. And now you know from being down here, you know at that point only two things can happen to the defendant on trial.

A     Uh-huh.

Q     Number one, he's going to get a death sentence or, number two, he's going to be put in the penitentiary for life without parole.

And I assure you, Ms. Wood, that it means exactly that, he will be there until the day he dies. Okay. He's going to die in the penitentiary. It's just going to be a time of God's choosing and not of a judge's choosing. Okay?

A     Uh-huh.

Q     And that's the only difference between the two, now, is death and life without parole.

What I need to find out and understand in my mind, if a person is proven to you to be an intentional capital murderer, okay, would there be any -- anything which would cause you not to give him the death penalty, or do you think that you would be leaning towards giving him a death penalty if you find that they are an intentional capital murderer?

A     I think it would have to be that he would be violent after that, I mean.

Q     Okay.

**Anne B. Meredith**
Certified Shorthand Reporter

A    There would have to be circumstances for me that would show that he did not need to be here.

Q    Did not need to?

A    Be alive. That he was going to do something else and be violent and hurt somebody else or --

Q    All right. So, let me understand now. Are you saying that your default is going to be for a life without parole, and the State would have to show you something that he's going to -- they are going to have to prove to you that he would be violent even in the penitentiary before you --

A    I'm saying that I would have to be -- this is an emotional thing.

Q    Sure.

A    You're not just going to go into this thinking you're going to do whatever.

Q    Okay.

A    So until I know everything that there is to know about that, I wouldn't be able to make a judgment on that.

Q    Okay.

A    I would have to know everything and, yes, they would have to prove to me that there are circumstances that maybe he's been violent all along. I don't know.

Q    Well, and that's an important thing to consider, sure.

A    So, I would want to know those things --

Q    Sure.

A    -- before I decided to do something.

Q    Okay.

A    To make that judgment.

Q    Okay.  Are you telling me that your preference or your default -- I keep getting back to that word -- is that, yes, I found him guilty of capital murder, but I'm not going to impose the death penalty unless the State shows me he'll be violent in the future?

A    They are going to have to prove to me that there are other circumstances that he needs the death penalty for.

Q    Okay.  All right.  And that's exactly what this special issue number one requires a jury to do.  You see that?

A    I do.

Q    And do you understand that there is a presumption that the answer to that question is no, that he's not going to be a future danger?

A    Right.

Q    Okay.  Recognizing yes, he's done this capital murder, but the presumption is that the answer to that question is no, and it is required that the State prove to you that the answer should be changed from no to yes.

A    Right.

Q    And they have got to prove that beyond a reasonable

doubt. It's that same high level of proof that is required of them to prove the case in the first part of the trial. Okay, you understand that?

A     Uh-huh.

Q     All right. And what must be proved to a jury beyond a reasonable doubt is that there is a probability that the defendant would commit criminal acts of violence in the future that's going to make him a continuing threat to society, understanding that that society now is going to be the penitentiary. Okay?

A     (Nods head).

Q     So, really what the legislature has done here is say to us and say to jurors, we are going to reserve the death penalty only for those few people, those few incorrigible people who are going to continue to commit criminal acts of violence in the future.

Okay. We are not going to give them the death penalty for what they have done.

A     Uh-huh.

Q     We give them the death penalty for what they are likely to do in the future. Do you see that? That's exactly what special issue number one says. Okay. It's for those people who cannot safely be in prison. Okay?

A     Okay.

Q     Now, what the law says is that the State can

present evidence to that. The defendant can present evidence as to that issue. You can certainly consider the evidence you heard in the first part of of the trial.

But you've already mentioned one of the things that might be important to you in your consideration is what type of a history this person has. If this person has been a violent person all their lives, okay, certainly that's something that you could look at and maybe answer that first issue question.

On the other hand, if you look at their life history and they have no prior violent acts, okay, certainly that's something you could look at to determine it. Do you agree with that?

A    I agree with that.

Q    Okay. They can present a criminal record. If he's got a criminal record, they can certainly present that. If they don't, then we can certainly point out to a jury that they haven't presented any evidence of a criminal record. Okay?

A    (Nods head).

Q    But, anyway, what the law says is the jury has to be convinced beyond a reasonable doubt that the person would probably continue to commit criminal acts of violence in the future that's going to make him that threat to society, okay?

A    Okay.

Q    And if they don't persuade you as a jury unanimously, okay, then you don't even get to special issues number two and three.  You stop right there, it's over.  Okay.  You come back and tell the judge, we have answered special issue number one no, and it's over.  Okay.  At that point the judge sentences the defendant to life without parole.  Okay?

A    (Nods head).

Q    And let me ask you this because I think I forgot to ask you this.  Do you think that a sentence of life without parole is an appropriate sentence for capital murderers?

A    There again, I guess it would depend on the circumstances of the crime, what happened.

Q    Right.  The reason I ask that is we have had some jurors come down and say, well, to me, if they don't get the death penalty, then I have let down the families of these victims.  Okay.  Because people have it in their minds that unless they get the absolute, you know, worst punishment, that I have somehow let down the families of these victims.

Do you feel that way?

A    No.

Q    Okay.  Okay.  In fact, Ms. Wood, I know it would be for me a worse punishment to be locked up for life than it would simply to be put to death.

So, we can talk about what's the worst punishment, I suppose. But some people have it in their idea -- have the idea in their mind that, if I don't give the death penalty, then I have failed these victims' families, I have failed these victims.

You do not feel that way?

A    No, I don't.

Q    Okay. So, you think that in some cases a life sentence would be the appropriate punishment for a person convicted of capital murder?

A    I think that in some cases it would.

Q    Okay, very good.

Now, special issue number two talks about the law of parties. And real quickly let me tell you about that. The law of parties is that if two people or three people are all acting together in the commission of an offense.

Okay. One person is, you know, being the lookout for the bank robber who goes in to rob the bank. Okay. And his job is to stand out there and, you know, make noise if somebody is approaching. Okay. And then you've got another person who is the getaway driver. Okay. And they all know what's going on and they are all helping each other to commit this aggravated robbery of this bank.

Well, they are all guilty. Okay. If acting

*Anne B. Meredith*
Certified Shorthand Reporter

with the intent to promote or assist the commission of the offense, a person directs, solicits, aids, attempts to aid the other person to commit the offense, then they are all guilty. Okay?

And what special issue number two goes to is it asks you, if you have a party situation, if there is more than one person involved in the robbery, the jury has to make a determination that the person on trial is either the shooter between the two that caused the death or, if they are not the shooter, they were the other party that intended that the death result. Okay. And that's what that question asks you. Okay.

So, again, the presumption to that answer is no. It's something that there is a burden on the State to prove beyond a reasonable doubt that the answer should be yes. Okay. And this issue is only given to a jury if, in fact, there is a parties -- there are parties to the commission of the offense. If there is not, if all the evidence shows there is just one person that did the entire act, then you don't get that question. Okay?

A    Okay.

Q    But, again, if a jury looks at the evidence and decides the State has not proven that beyond a reasonable doubt, then you say no, it's over. You go back and tell the judge, and that person gets sentenced to life without

parole.  Okay?

A    (Nods head).

Q    Any question about special issue number two?

A    No.

Q    Special issue number three is totally different.  Okay.  There is no burden of proof either for the State or for the defense in deciding special issue number three.  Understand now that special issue number three, by the time you get there, you have already determined that the person on trial is an intentional capital murderer who intentionally killed the victim during the course of a robbery.  You have decided unanimously that he is the type of person who is a future danger and is likely to commit criminal acts of violence even in the penitentiary.

Okay.  Number three, special issue number three allows you to back off of the death penalty if you want to at that point.  Okay.  And it says -- and let's read it together.  It says, do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

Okay.  So, it allows a jury -- see, you've

found guilty, yes, yes.  You're at a death penalty.

A       Uh-huh.

Q       And special issue number three allows a jury to back off of that for whatever reason that they want to, whatever each individual juror, looking at the sum body of evidence you heard, feels might be a mitigating circumstance sufficient to back off the death penalty and assess life instead.  Okay?

A       (Nods head).

Q       Now, this is something I need to ask you.  We have had a lot of jurors that say, honestly, I'm a strong proponent of the death penalty.  If the State has shown me beyond a reasonable doubt the person is guilty and they have shown me beyond a reasonable doubt that they are a future danger, there are no -- there aren't going to be any mitigating circumstances sufficient to back me off of the death penalty.

Okay.  There just aren't going to be any.  I don't care about his background.  I don't care about anything you -- I don't care about his age.  I don't care about whether or not he was under the influence of drugs.  If it was shown me he's a capital murderer and you have shown me he's a future danger, that's what I think the death penalty is for.

Okay.  How do you feel about that?

**Anne B. Meredith**
Certified Shorthand Reporter

A     I would have to know everything.

Q     Okay.

A     I couldn't just do it because I would want to know everything, all the circumstances of everything.

Q     Okay.

A     And until I have that, I wouldn't be able to make a decision on that.

Q     Okay.  Is your feeling that, in your mind, there might be sufficient mitigating circumstances even for a person who is a convicted capital murderer who is going to be a future danger?

A     I think there could be.

Q     Okay.

A     I don't know.

Q     Okay.

A     I've never --

Q     Well, and let me tell you, now, our special issue number three requires a juror to look at the defendant's character and background.  Okay.  It requires them to.  It's what it says right there.  So, we are allowed to present testimony about his character and background; so is the State.  Okay.

        Do you feel that there might be some mitigating circumstance -- and you don't even have to articulate what it is -- that might cause you to want to

sentence him to life instead of to death?

A    Well, like I said, if I knew -- I wouldn't be able to make that even on just that.  I don't have enough information to make that decision on anything like that.

Q    Okay.

A    I would have to know --

Q    Are you saying there might be something out there?

A    There could be and there might not be.  But I don't have --

Q    No, we are not asking you to answer that question.

A    I mean I can't -- There might be something that, in somebody's past or whatever, that might make a difference, but I don't know.

Q    And specifically, Ms. Wood, let me talk to you about this.  Now, we have talked about if you hear evidence, again going back to this issue of the mind, the condition of the mind of the defendant at the time of the offense, and if you hear perhaps that a defendant, in our hypothetical case, was under the influence of alcohol or drugs to the point where you believe that altered his way of thinking, okay, might that be a mitigation circumstance sufficient in your mind to cause you to get away from a death sentence and impose a life sentence instead?

A    It could be.

Q    Okay.  I don't think there is anything else I need

to talk about.  Do you have any other questions?

A    I don't have any.

Q    Do you have any questions?

A    (Shakes head).

Q    Okay.  Thank you.

THE COURT:  All right.  Thank you, Mr. Lollar.

Ms. Wood, if you would step out for just a moment with my bailiff, I'll confer with the attorneys and have a result for you here in just a second.  Thank you very much.

(Prospective Juror Wood exits the courtroom).

THE COURT:  You may be seated.

All right.  Ms. Handley, does the State have a challenge for cause?

MS. HANDLEY:  We do not.  We believe she is qualified.

THE COURT:  Okay.  And Mr. Lollar, does the defense have a challenge for cause?

MR. LOLLAR:  We believe she is qualified also, Judge.

THE COURT:  All right.  Thank you.

Bring Ms. Wood back in.

(Prospective Juror Wood returns to the courtroom).

THE COURT: Yes, ma'am. Ms. Wood, just come on in and have a seat here, if you would, please, ma'am.

And thank you, ladies and gentlemen. Be seated, please.

And after conferring with the attorneys, you are Prospective Juror number 14. And we anticipate that the trial -- now, that doesn't necessarily mean that you will be a juror. You will be in contention to be a juror.

PROSPECTIVE JUROR WOOD: Okay.

THE COURT: But you will be notified, I anticipate, toward the end of July whether or not you're on the jury.

PROSPECTIVE JUROR WOOD: Okay.

THE COURT: If Judge Snipes sends you a letter and says you're on the jury, then you'll report, and it will be in the letter, but we anticipate you would report for jury service August the 10th and that you would be available for trial in this case for the next two weeks.

PROSPECTIVE JUROR WOOD: Okay.

THE COURT: So, I would like for you to kind of mark that on your calendar, pencil that in on your calendar --

PROSPECTIVE JUROR WOOD: Okay.

THE COURT: -- if you would, that there is

a potential for the week of August the 10th and August the 17th that you would be involved in this capital murder trial. Okay?

PROSPECTIVE JUROR WOOD:  (Nods head).

THE COURT:  Now, you had indicated, I believe, that you didn't know anything about this case.

PROSPECTIVE JUROR WOOD:  No, I don't.

THE COURT:  Coming in here, had no knowledge or hadn't received any --

PROSPECTIVE JUROR WOOD:  I'm sorry, I do not watch the local news, and I did not read it in the paper, so.

THE COURT:  That is a good thing, and let me tell you, I want to keep you just that way.

PROSPECTIVE JUROR WOOD:  Okay.

THE COURT:  So, I don't want you going back, now that you understand that you have the potential of being a juror in this case, I do not want you going to the Internet and looking up on the -- in the archives of the newspaper any articles that might be associated with this case or go back and look at any old TV reports.

I don't want you to, if at some point in the future from this day forward, if the newspaper is writing articles concerning this case or even during the trial, and I am sure Judge Snipes during the trial will continue to admonish the jury not to read any newspaper accounts of the

trial or, you know, watch any TV reports, but I'm telling you that right now, even if there is something pretrial, you know, about it.

PROSPECTIVE JUROR WOOD:  You don't have to worry about me reading the newspaper.  I'm not going to read it.

THE COURT:  Okay.  I just want you to -- I just want you -- because in this case the first thing that Judge Snipes will do, if you're on this jury, he'll swear the jury in, and the oath that he's going to administer to the jury is that each juror will swear that their decision in this case will be based solely upon two things, the law that Judge Snipes will give to the jury in his charge to the jury and, secondly, the evidence that you'll see, hear and receive in the trial of the case in the courtroom, and those are the only two things.  So, any pretrial publicity, any pretrial knowledge you might have or articles that you might have read, you just have to put those out of your mind, just makes it more difficult for you to do that.  Okay?

PROSPECTIVE JUROR WOOD:  Okay.

THE COURT:  All right.  So, I think that's it.

Ms. Handley, anything further from the State?

MS. HANDLEY:  Nothing further, Judge.

THE COURT:  Okay.  Mr. Lollar.

MR. LOLLAR:  Nothing further.

THE COURT: Thank you very much. Ms. Wood, we appreciate your time, and you will be notified.

PROSPECTIVE JUROR WOOD: All right.

THE COURT: Thank you, ma'am.

(Prospective Juror Wood excused from the courtroom).

THE COURT: And thank you, ladies and gentlemen. We'll be in recess for the lunch hour. Why don't we take until about 1:30.

(After the lunch recess, Defendant present).

THE COURT: Are we ready? What I've got here is Mr. Nicholas Tuefel, Chalendia Harrison and Jaime Gamez. So let's take Tuefel.

(Prospective Juror No. 310, Nicholas Tuefel, enters the courtroom).

THE COURT: Thank you. How are you this afternoon, Mr. Tuefel?

PROSPECTIVE JUROR TUEFEL: I'm doing well.

THE COURT: Nice to meet you. Please have a seat right there, sir, if you would.

Thank you, ladies and gentlemen. Be seated, please.

I would like for the record to reflect this is Prospective Juror number 310, Nicholas Anthony Tuefel.

PROSPECTIVE JUROR TUEFEL: Yes, Tuefel.

THE COURT:  T-u-e-f-u-l.

PROSPECTIVE JUROR TUEFEL:  F-e-l.

THE COURT:  F-e-l.  Excuse me.  I'm sorry. I'm looking at it and you spelled it correctly, didn't you?

PROSPECTIVE JUROR TUEFEL:  It's my name.

THE COURT:  Yeah, your name.

NICHOLAS ANTHONY TUEFEL, having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    I'm Judge Quay Parker, a Senior District Judge from McKinney.  And Judge Snipes has asked me to assist him in the jury selection process in this death penalty case.

A    Uh-huh.

Q    And, so, that explains to you what I'm doing down here today instead of Judge Snipes.  He's upstairs in his courtroom taking care of the daily matters in his court while I'm assisting him in this jury selection process. And also it explains why you're here today, consequently.

Now, you will recall probably a month ago, or better than a month ago it's been, you filled out a questionnaire and Judge Snipes addressed the -- remember when everybody came in to central jury?

A    Yes.

Q    And everybody -- Judge Snipes went over some

things with you and at some point in the proceedings he had everybody stand up, raise their right hand, he administered the oath of a prospective juror to each member of the panel.

A    Uh-huh.

Q    Do you recall that?

A    Yes.

Q    Were you one of the panel members that took the oath at that time?

A    Yes, I was.

Q    Okay.  Then I'll just remind you you're still under your oath.

A    Okay.

Q    And there's two things that you have been sworn to do.  Number one is to give truthful answers, and we know you would do that anyway.

A    Yes.

Q    But also to be responsive to each and every question that is asked to you either by me or under my direction which means by the attorneys that will be involved in this voir dire examination.  All right?

A    Okay.

Q    Okay.  Now, then, you've read your little guide?

A    Uh-huh.

Q    And, so, that sets out kind of what's going to happen here today.  That kind of gives you a preview of the

law and some of the procedural aspects that are going to be involved in the trial of this case.

Now, the attorneys, when they talk to you, they are going to explain the law to you. And then once you understand that, then they are going to ask you questions getting your ideas, your thoughts, your opinions concerning the law and some of the procedural aspects tht you've already read about and that they are going to explain to you.

A     Okay.

Q     Now, there's no right or wrong answers. This is not a quiz that you've got to pass or don't pass.

A     Okay.

Q     It is nothing that's going to be embarrassing to you in any way.

A     Okay.

Q     So, I know you're going to be responsive, I know you're going to be truthful with them.

Okay. Now, then, with that I think I'm ready to introduce the attorneys to you.

MS. HANDLEY:  May it please the Court.  Mr. Hikel will have just a few questions for the juror.

THE COURT:  Okay.  Mr. Hikel, you're going to take this one?

MR. HIKEL:  Yes, sir.

THE COURT:  Well, let me start down here.

This is Elaine Evans.

MS. EVANS: Good afternoon.

THE COURT: And then seated next to her is Andrea Handley.

MS. HANDLEY: Hi.

THE COURT: And then next to her is Mr. Gordon Hikel, and I've already mentioned his name. And he is going to be the one that's going to be talking to you today.

All three of these ladies and gentlemen are assistant district attorneys and they are charged with -- they are the prosecution team and charged with the responsibility of prosecuting this case.

Now, seated on my side of the table down here is Mr. Brad Lollar.

MR. LOLLAR: Hi.

THE COURT: And Mr. Doug Parks --

MR. PARKS: Good afternoon.

THE COURT: -- sitting next to him. And then we have one, the third member of the defense team that just stepped out for just a moment, Ms. Keri Mallon. And she will probably come in here in just a moment.

And then on the very end down there is their client, Mr. James Broadnax.

PROSPECTIVE JUROR TUEFEL: Okay.

THE COURT: All right? Okay. Mr. Hikel.

MR. HIKEL: Thank you, Judge.

THE COURT: Yes, sir.

EXAMINATION

BY MR. HIKEL:

Q    Am I correct, is it Mr. Tuefel?

A    Yes, Tuefel.

Q    Mr. Tuefel, just very briefly. About a month ago you remember filling out the questionnaire that's in front of you there?

A    Yes.

Q    And on the front page of your questionnaire, in regards to the question, are you in favor of the death penalty, you wrote -- Do you see your answer there?

A    Yes.

Q    Okay. That your beliefs do not allow you to put someone to death?

A    Uh-huh.

Q    And then you circled, of those five choices, number five. It says, I could never, under any circumstances, return a verdict which assesses the death penalty. Is that -- Did I read that correctly?

A    Yeah, that's the one I circled.

Q    Okay. Is that still your beliefs today as we speak?

**Anne B. Meredith**
Certified Shorthand Reporter

185

A    My belief is yes, I do not agree with putting someone to death.

Q    Okay.

A    But now that I'm reading that answer that I circled --

Q    Uh-huh.

A    -- a verdict that puts someone to death, no, but a verdict that would put someone away for life, you know, I'm in favor of doing that, yes.

Q    Okay.  But you understand in this case we are seeking the death penalty; you understand that, right?

A    Yes.

Q    Okay.  So, you're saying that because of your religious beliefs, you will not be able to partake in the process where the State is ultimately seeking the death penalty?

A    That's correct.

Q    Okay.  And that's still your position today.

A    Yes.

MR. HIKEL:  Okay.  I have no further questions, your Honor.

THE COURT:  All right.  Any questions from the defense?

MR. LOLLAR:  No, sir.

THE COURT:  All right.  Mr. Tuefel, thank you

**Anne B. Meredith**
Certified Shorthand Reporter

very much for being here today.  We appreciate your time and your service, but I'm going to relieve you from any further jury service in this case.  Just you can leave that right there will be fine.  Yes, sir, and your questionnaire as well.

Thank you so much.  You can leave your puzzle book here too, if you want.

PROSPECTIVE JUROR TUEFEL:  That's just in case it took a while.

THE COURT:  Took a while, huh?  Thank you so much for being here.

PROSPECTIVE JUROR TUEFEL:  Thank you.

THE COURT:  We appreciate your time and effort.  Thank you.

(Prospective Juror Tuefel excused from the courtroom).

THE COURT:  Thank you.  Be seated.

MR. LOLLAR:  Judge, the next two will be just like that.

THE COURT:  Let me just get on the record here.  Do you have a challenge for cause?

MR. HIKEL:  Judge, we submit Juror number 310, Mr. Tuefel, for cause based upon his answers.

THE COURT:  Okay.  Any objection?

MR. LOLLAR:  No, your Honor.

THE COURT:  All right.  Mr. Tuefel, the State's

challenge for cause will be granted, and Mr. Nicholas Anthony Tuefel will be excused from further jury service in this case.

MS. HANDLEY:  The next two that we are going to do, Judge, Chalendia Harrison and Jaime Gamez, it's going to be the same situation, Judge.  If you just want to jump to Mr. Hikel, or if you want to do the introductions, that's fine too, but --

THE COURT:  Yeah, I'll just, I'll just go right to you, Gordon, if that's okay.

MR. HIKEL:  Yes, sir.

THE COURT:  And eliminate all that.

Ms. Harrison.

(Prospective Juror No. 417, Chalendia Harrison, enters the courtroom).

THE COURT:  Good afternoon, ma'am.  How are you today?  Just go ahead and have a seat right there if you would, please, ma'am.  Thank you.

Be seated, please, ladies and gentlemen.

And I would like for the record to reflect this is Prospective Juror number 417 -- Chalendria?

PROSPECTIVE JUROR HARRISON:  Chalendia.

THE COURT:  Chalendia.

PROSPECTIVE JUROR HARRISON:  Uh-huh.

THE COURT:  Chalendia.

PROSPECTIVE JUROR HARRISON:  Chalendia.

THE COURT: Chalendia. Excuse me, I'm being too harsh there, aren't I? Chalendia Harrison, h-a-r-r-i-s-o-n.

PROSPECTIVE JUROR HARRISON: Uh-huh.

THE COURT: All right. Ms. Harrison, thank you for being here today. We are glad to have you with us. And I'm Judge Quay Parker from McKinney, Texas. And the attorneys want to speak to you for just a moment.

And Mr. Hikel, would you like to engage the prospective juror at this time?

MR. HIKEL: Thank you. Thank you, Your Honor.

THE COURT: Yes, sir.

CHALENDIA HARRISON,

testified as follows:

EXAMINATION

BY MR. HIKEL:

Q    Ms. Harrison, good afternoon, ma'am.

A    Good afternoon.

Q    Do you have the questionnaire in front of you?

THE COURT: She does. Here, I'm sorry. I have it in front of me. There is your questionnaire. All right.

Q    Do you remember filling that out about a month ago?

A    I do.

Q    Okay.  On the cover page you were asked the question about, are you in favor of the death penalty.

You see that question there?

A    Uh-huh.

Q    You circled no and you said that is against God's will.

A    I did.

Q    Okay.  And then bottom of the same first page you're given five choices there that ask about your feelings on the death penalty.  You circled number five which says, I could never, under any circumstances, return a verdict which assessed the death penalty.

A    Uh-huh.

Q    Is that still your feelings and your beliefs today?

A    Yes.

MR. HIKEL:  Okay.  All right.  No further questions, Judge.

THE COURT:  Any questions?

MR. LOLLAR:  Thank you, ma'am.

THE COURT:  All right.  Thank you so much for being here.  We appreciate your service very much.  You can just take your stuff.

PROSPECTIVE JUROR HARRISON:  Thank you.

THE COURT:  Thank you.  Have a good day.

PROSPECTIVE JUROR HARRISON:  You too.

(Prospctive Juror Harrison excused from the courtroom).

THE COURT:  Thank you.  Be seated.

Mr. Hikel, does the State have a challenge for cause?

MR. HIKEL:  Judge, we will submit Juror number 417 for cause based upon her answers.

MR. LOLLAR:  No objection.

THE COURT:  Okay.  Thank you.  State's challenge for cause will be granted.  Number 417, Ms. Harrison, will be excused from further jury service.

Okay.  Mr. Gamez, Jaime Gamez.  Mr. Gamez, please.

(Prospective Juror No. 424, Jaime Gamez, enters the courtroom).

THE COURT:  Hi, Mr. Gamez, how are you this afternoon?  Just go ahead and have a seat right there, if you would, please, sir.

Good afternoon to you.  Thank you for being here.  We appreciate your time and your service.  The attorneys will be talking to you briefly about your position concerning the death penalty case.  So, I'll just let them get started with that at this time.

Mr. Hikel.

MR. HIKEL:  Thank you, your Honor.

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT: Yes, sir.

JAIME GAMEZ,

testified as follows:

EXAMINATION

BY MR. HIKEL:

Q    Mr. Gamez, good afternoon, sir.

A    Good afternoon.

Q    Do you have your questionnaire in front of you?

A    Yes, sir.

Q    Okay. Do you remember filling that out about a month ago when you came to this building?

A    Yes, sir.

Q    Okay. On the cover page, the very first page, you were asked the question here in the middle of the questionnaire whether or not you are in favor of the death penalty, and you put no. Do you see that there?

A    Yes, sir.

Q    And you gave us a stated reason where you said that it's like we are murdering someone. And basically you are against the death penalty; is that correct?

A    Yes, sir.

Q    Now, you were asked at the bottom of the first page again, you're given five choices, and you were asked which one best represents your feelings. And I believe you said -- you circled there, while you believe it's appropriate in

some cases, that you as a juror could never return a verdict which assessed the death penalty. Is that still your feelings today?

A    I'm trying to figure out --

Q    I'm sorry?

A    I'm trying to figure out if that's the answer to this question.

Q    Well, no. Basically all we're asking you is, you circled number four; is that correct?

A    Yes, sir.

Q    And number four specifies that, I believe the death penalty is appropriate in some murder cases, but I could never return a verdict which assessed the death penalty. Was that the choice you circled?

A    That's what I circled, yeah.

Q    Okay. Is that still how you feel today?

A    I didn't really understand the question at that time.

Q    Okay. What was the misunder -- What do you understand different now about the question?

A    About what, you mean return a verdict to the death penalty?

Q    Well, okay. You understand this is a case where the State is, in fact, seeking the death penalty.

A    Yes, sir.

Q    Okay.  And if you are qualified as a juror to serve in this case, that one of the possible verdicts that you could return, based upon the evidence and the law and facts in this case, is, depending on how you answer certain special issues over here, you could return a verdict where you answer those questions yes, yes and no that could result in this man being put to death.

You understand that's a process you are being asked to partake in?

A    Yeah, I would.

Q    I'm sorry?

A    I feel I would return a verdict.

Q    When you say you would return a verdict --

All right.  Thank you, Mr. Gamez.  Thank you so much.

THE COURT:  All right.  Thank you, very much, Mr. Gamez, for being here.  I appreciate your time.

PROSPECTIVE JUROR GAMEZ:  Thank you, sir.

THE COURT:  Thank you, sir.

(Prospective Juror Gamez excused from the courtroom).

THE COURT:  Thank you.  Be seated, please.

Would you like for me to bring him back in here and just ask him about any language problems?

MR. LOLLAR:  No.

**Anne B. Meredith**
Certified Shorthand Reporter

MS. HANDLEY: No, we've agreed. We're just trying to --

MR. HIKEL: Judge, we would move to challenge for cause Juror number 424.

Judge, just for the record, I just want the record to reflect that while Mr. Gamez, Juror numnber 424, circled and wrote certain answers, upon asking him to review and read his own answers, he appeared to be confused as to what he was answering and what the question asked of him.

And, so, based upon his responses here today and his answers to the questionnaire, we would challenge him for cause, your Honor.

THE COURT: Okay. Any objection?

MR. LOLLAR: No objection.

THE COURT: Thank you. Prospective Juror number 424, Jaime Gamez, will be -- the State's challenge for cause will be granted, and he will be excused from further jury service in this case.

MR. PARKS: Off the record.

THE COURT: Yes, sir.

(Discussion off the record).

THE COURT: Okay. Are we ready for Ms. McDonald? All right. Let's bring Ms. McDonald in.

MR. HANDLEY: Ms. Evans will be talking to

her, Judge.

(Prospective Juror No. 272, Kelly McDonald, enters the courtroom).

THE COURT:  Hi, how are you doing this afternoon?  Ms. McDonald, just go ahead and have a seat there.  How are you today?

PROSPECTIVE JUROR McDONALD:  Great.

THE COURT:  Thank you, ladies and gentlemen.  Be seated, please.

KELLY McDONALD,

having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    And good afternoon to you, Ms. McDonald.  I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney, Texas, right up the road here.

A    Okay.

Q    And Judge Snipes has asked me to assist him in this jury selection process while we do the individual -- for me to preside over the individual voir dire examination.

So, that explains to you what I'm doing here today and also why you're here today.  Judge Snipes is also here.  He's up in his courtroom taking care of the daily matters of the Court while we do this down here.

So, anyway, we do appreciate your time and

effort to be with us today.  I see that you have your little juror guide --

A    I do.

Q    -- or orientation guide, and I assume that you've had an opportunity to read that.

A    I have.

Q    And that kind of explains to you what we are about here today.  It kind of gives you a preview of the law and some of the procedural aspects that will be involved in the trial of this case, some of the special issues that the jury will be -- that Judge Snipes will pose to the jury at the conclusion of the evidence.  And I know you've read that.

And what's going to happen here today, Ms. McDonald, is that the attorneys are going to talk to you. First of all, they are going to explain to you the law maybe in more detail than what you've read here.  And then, once you understand that, then they are going to ask you questions about it.

And they just want your ideas, your thoughts, your opinions, if you will, concerning the law and some of the procedural aspects involved in the trial of a capital murder case.  All right?

A    Uh-huh.

Q    Now, there's no right or wrong answers.  There is nothing that's going to embarrass you in any way.

And at some point in time, do you recall -- it's probably been over a month ago -- that Judge Snipes, that you all got together -- it was probably what, four or five hundred of you?

A    Uh-huh.

Q    -- in central jury here and Judge Snipes addressed the group, and at some point in the proceedings he asked the panel members to stand, raise their right hand, and he administered an oath to the jury?

A    Yes.

Q    Or to the jury panel, I should say.  Were you one of the panel members that stood and took the oath?

A    Yes, I was.

Q    All right.  I'll just remind you that you're still under that oath.  And what you have been sworn to do are two things, to give truthful answers, which we know you'll do that anyway, but also to be responsive to each and every question that's asked to you by the attorneys.  All right?

A    All right.

Q    Okay.  Now then, also, Ms. McDonald, you filled out a questionnaire at this time and, so, let me give that to you.

THE COURT:  And if I haven't already got it on the record, this is Prospective Juror number 272, Kelly Lynn McDonald.

Okay.  Ms. McDonald, there is your questionnaire.  And let me introduce to you now the attorneys that are going to participate in this, in the voir dire or actually in the trial of this case including the voir dire examination.

Ms. Elaine Evans is seated directly across from me.  She will be talking to you today on behalf of the State of Texas.  Seated next to her is Andrea Handley.

MS. HANDLEY:  Hi.

PROSPECTIVE JUROR McDONALD:  How are you?

THE COURT:  And then next to her is Gordon Hikel.

MR. HIKEL:  Hello, ma'am.

THE COURT:  And these three ladies and gentleman are assistant district attorneys and charged with the prosecution -- with the responsibility of prosecuting this case.

Seated on this side of the table right down from me here is Mr. Brad Lollar, and next to him Mr. Doug Parks, and then on the very end down there Ms. Keri Mallon.

MS. MALLON:  Hi.

THE COURT:  And they are the defense team, the three attorneys that comprise the defense team.

The gentleman seated on the very end down there in the blue shirt is their client and the defendant

*Anne B. Meredith*
Certified Shorthand Reporter

in this case, Mr. James Broadnax.  Okay.

All right.  We are ready, Ms. Evans.  You may proceed.

MS. EVANS:  Thank you, Your Honor.

THE COURT:  Yes, ma'am.

EXAMINATION

BY MS. EVANS:

Q    Ms. McDonald, I've taken a look at your questionnaire and I have read through it and I can definitely tell you that after reading it, I wanted to go up to my boss and ask him for a leave of absence so I could follow in your footsteps for a while.  You have a very interesting job.

A    It sounds more interesting than it actually is.

Q    Well, on paper it sounds good to me.  But in all honesty, after reading your questionnaire, it looks like you have, you know, a really good grasp of everything we are looking for.

I can't tell you what a relief it is, and I think we can all agree, to be able to talk to one of our peers, a fellow lawyer, about some of these issues because you certainly understand them.  So, a lot of it we can just breeze over and we don't really have to focus on it so much as it is explaining the process to the other jurors because clearly, by your answers, you realize that it's very important to have a fair process.

I think somewhere in your questionnaire you talked about, you know, from the arrest forward it's important for the process to be fair to protect the integrity of the criminal justice system; is that correct?

A    Yes.

Q    Okay.  And honestly, that's what we are looking for.  Both the State and the defense just want a fair trial, somebody that's going to follow the law and the evidence in the case.

And if the law and the evidence leads them to a verdict of guilty of capital murder, then the State is entitled to a verdict of guilty.  And if the law and the evidence lead the jurors to answer the special issues yes, yes and no, then the State is then entitled to a verdict that would render the death sentence in this case.

And that's what we are looking for, to be fair and to just wait until you hear the evidence in the case to make that decision.  And it certainly looks like you could do that; is that correct?

A    Yes.

Q    Okay.  I do want to talk to you a little bit about some things in your questionnaire.

A    Sure.

Q    I realize you work for the Department of Justice.  And correct me if I'm wrong, it looks like you probably

represent -- you say you represent the employees of the DOJ, which I guess would be what, guards, staff, wardens?

A    Sorry.  I didn't mean to --

Q    Yeah, go ahead.  Tell me what it means.

A    I mean currently -- I mean I've actually had two jobs with the Bureau of Prisons.  My first job was actually at the Federal Correctional Institution at Cumberland, Maryland.  And I worked there to defend the staff when inmates sued them.

Q    Okay.

A    For torte claims, those kind of actions, of a staff member from officers all the way up to management.

Currently I do employment law for the past eight years.  And in employment law I represent -- I do defense of management.  Generally my clients are regional directors, the director, wardens, associate wardens and department heads.

Generally very seldom that I would have to represent -- I really don't deal much with the everyday lower level employees because, quite frankly, they are the ones filing the suits.

Q    Absolutely.

A    So, management for the most part.  And I represent management in union issues as well.  When charges are filed against management, I represent management.

*Anne B. Meredith*
Certified Shorthand Reporter

Q    Okay.  Thank you for that.

Let me ask you, given the fact that you have worked in a position there at the DOJ where you represented individual staff of the DOJ and the prisons themselves whenever inmates bring claims --

A    Uh-huh.

Q    -- do you have any bias against criminal defendants or inmates, or would you be able to judge this inmate realizing that he has, since you worked in Maryland, obviously never brought any claim against DOJ?

A    I wouldn't say I have a bias.  There is obviously a distinction between an inmate and a defendant.  Since he's obviously a defendant, he hasn't been convicted yet.

Q    Perfect.

A    So, you know, the people I dealt with were inmates who, quite frankly, you know, all two thousand of them told me they were innocent on a daily basis, but at that juncture I wasn't really inclined to believe them.  So, yeah, I do have that particular bias.

But when somebody who is in a federal prison comes and tells me he's innocent, I'm pretty much, yeah, whatever, you know, as the next person because I've heard it fifty times before.

But, again, it's an actual defendant and the process hasn't been completed yet.

**Anne B. Meredith**
Certified Shorthand Reporter

Q      Okay.   And when you say the process hasn't been completed yet, you would be able to give this defendant his presumption of innocence, correct?

A      Correct.

Q      And you understand that the indictment in no way, shape or form means that he is guilty of the charged offense of capital murder, or any offense, for that matter, correct?

A      I do.

Q      And while you've heard it, and I think you say in the questionnaire time and time again, people don't want to accept responsibility for what they have done in prison, but you realize that those people have been through a process, correct?

A      Yes.

Q      And is that your distinction?

A      Yes.

Q      And you would be able to give this defendant a fair trial; is that correct?

A      Yes.

Q      And none of that previous service or interaction with inmates and kind of your belief that, yeah, in fact, they have been found guilty and they are in prison, that would not affect you in your deliberations in this case, would it?

A      No.   I mean, in fact, I've done defense work as

well, so.

Q    I saw that, and I am going to get to that actually.

That was your -- You worked for a criminal defense attorney in Missouri.

A    Yes.

Q    Is that correct?

And that was actually working on what, habeas death penalties?

A    Yeah.  22.54 death penalty cases.

A    Okay.  And tell us a little bit about that work.  And exactly what was your role in working for that defense attorney?

A    My role was generally researching with the client, ferreting out the issues that we would be raising in terms of the Court and drafting the pleadings, for the most part.

Q    Okay.

A    If it was an argument, he generally did the argument, those kinds of things.

Q    Okay.  But you spent a lot of time with those that have been condemned to death, correct?

A    Yes.

Q    And in your dealing with those defendants, did you form any close relationship with those or was it just literally looking at the law and what maybe you could assert?

A    The latter of the two.  I mean they are clients.  I look at the law, see what arguments I can make and make them.

Q    Okay.

A    It's not personal to me.

Q    In your dealings with these inmates, was there ever an inmate that stands out in your mind that maybe you had a little empathy or sympathy for?

A    Not really.  I mean, I mean did I feel that -- Did I raise arguments that I thought, you know, warranted being raised?  Did I feel maybe perhaps their attorney should have raised an issue that they didn't raise?  Did I think, yeah, they might have, you know, maybe things would have been different?  I mean that was my job.

So, did I personally feel, you know, sorry for somebody who was on death row that had been through the process?  Not necessarily.

Q    Okay.  And I understand and I appreciate that distinction that you said.

Certainly we want all legal arguments to be made, whether it be by counsel at trial or later through an appellate process, so that their rights are protected.  Fair to say?

A    Yes.

Q    But at the same time I just wanted to make sure, check to see if any inmate particularly stood out in your

mind as having an impact or an effect on you since you've dealt with those that were condemned to die.

A    No.

Q    Okay.  In your -- I guess during law school you had a professor.

A    Actually it was undergraduate.

Q    Undergraduate.

A    If that's where you're going.

Q    Scott Decker?

A    Yes.

Q    Okay.  Tell me a little bit -- what was he a professor in?

A    My major was criminal justice, treatment of the offender, and he was over that particular department, and he was actually my advisor.

A    Okay.

A    And he did research on the death penalty.

Q    Okay.

A    And he was actually generally an advocate against the death penalty and was often an expert witness in trials regarding that issue.

Q    Okay.  Do you still keep in touch with him today?

A    No.

Q    Did you -- In addition to him being your advisor, did you have classes where he was the professor?

A    Of course, yes.

Q    Okay.  What sort of classes did he actually teach?

A    I've got to be honest.

Q    You don't remember.

A    That was like twenty years ago.  I've had so many classes between then and here.

Q    I know.

A    You know, criminal justice classes.

Q    I know.

A    I mean probation, parole.  We had -- You know, there were just so many statistics classes on, you know, criminal statistics, I mean, just so much, I really --

Q    Certainly.

A    Without getting out my transcript, I couldn't tell you, honestly.

Q    We don't even need you to do that.

Basically what I'm wondering is, it sounds like probably you're the type of person like I was.  I took any class and every class that had to do with criminal law.  Would that be fair to say or no?

A    Actually, originally, yeah.  I mean -- Well, I mean, quite frankly, as you know, when you're an attorney or planning on being an attorney, you know, you can major in anything.  And you know, I kind of stink at math and so I went with the one that required little math and --

Q    Sure.

A    And so -- And I actually at some point had thought I wanted to be a prosecutor in the State of Missouri.  But then, you know, when I first started it was like, you know, that was done.

Q    Okay.

A    You know, it happened.  So, I just took whatever classes with regards to the major.  Like I said, the major was kind of like whichever -- I hate to say it, but --

Q    I understand.  You originally had an idea that you wanted to go into criminal law, so you were gearing your --

A    It seemed like the most interesting, so I did tend to take more classes in that area, but then, you know, it veered off in a different direction.

Q    And did Professor Decker, did he -- did you take any of his classes on the death penalty?

A    I honestly don't remember.

Q    Okay.

A    I don't think he had a class that was just the death penalty.  I mean I remember being in classes where he discussed the death penalty and the deterrent value or lack therefore, in his opinion, and his studies.

Q    Okay.

A    But I just -- I don't know if that was the class.

I mean they didn't have a class called the death penalty.

Q    Sure.

A    It may have been a class that was about an introduction to criminal justice or something where he discussed those issues.

So I mean, was I in a class where he discussed that issue?  Absolutely.  Was that the main focus of the class?  No, not that I recall.

Q    And it sounds like, you know, if he is an advocate against the death penalty, a lot of those professors take that opportunity to use it as a sounding board.  Would you agree with that?

A    Yes.

Q    Did you agree with the positions that he took on the death penalty?

A    You know, I've thought about that and I really -- I don't recall.  I mean I really -- I know it's unusual to say, but I don't really have an opinion on it one way or the other.

Q    No, that's fine.

A    I mean I understand his arguments and I understand his position.

Q    Uh-huh.

A    Also, working in an environment where I know the cost of incarceration and that, and I have also been involved

in, you know, the habeas side of it where I know how much, you know, I was charging an hour, and so, fine, I know how much things cost. I know that.

You know, then that was also before I had exposure to the other side of being in a law enforcement environment so, you know.

Q    Right.

A    That also tends to focus my views as well.

So, I'm not somebody who has a strong opinion one way or the other. So I used his arguments, and whether they were right or wrong, they were his arguments and his opinions, so.

Q    And that obviously didn't influence you enough to where you're standing outside of a death chamber holding up a sign saying no more death penalty, right?

A    Clearly not.

Q    Did you ever participate in anything like that?

A    No.

Q    Okay. And it looks like, from your questionnaire, that you are very much well balanced, well rounded in your understanding of the death penalty. And it's okay to understand the views on both sides. In fact, its probably an advantage to understand the pros and the cons of it. But really what we are just looking for is somebody that can listen to the evidence and follow the law after they have

heard the evidence and the facts of this case.

So, that sounds like you, to be quite honest. You know, we've talked to jurors that are so for it that they just, you know, say death penalty on every single person that's committed a murder. And we hear from others who could never do it under any circumstances. And we want somebody right there in the middle. You say right here on the questionnaire that you don't have strong feelings one way or the other, and we appreciate that.

In addition, you talk about that you read books on the death penalty. Was that while in college law school or a little of both or --

A    Yeah.

Q    Okay. Do you still read or are you still interested in that topic today?

A    No.

Q    No?

A    I mean when I was doing obviously death penalty work, when I was doing criminal justice work, obviously I had to read topics on that issue. Do I read books on the death penalty now? No.

Have I read murder mysteries and other books of fiction that deal with it? I mean the reality is that I spend twelve to fifteen hours a day reading the law and reading about various issues. So when I get home, I really

don't want to read anything too hard, and so --

Q    You pick up an Us magazine?

A    Pretty much.

Q    Absolutely, I'm with you.  So, it sounds like that the books that you read were for your work so that you could better understand what you were doing and that sort of thing. Is that fair to say?

A    That's correct.

Q    And not as a pasttime or as a hobby or because that was your passion or driving force.

A    Yeah.

Q    Would that be fair to say?

A    Yes.

Q    Okay.  And on page five of your questionnaire we ask you how all of that -- and you have more exposure than the average person just because of your work and because of your career path and your education.  But we've asked how the shows, movies, books, articles influence your opinion about the death penalty.

A    Uh-huh.

Q    And you left that blank.  Do you have an opinion about how it is that stuff influenced your opinions?

A    You mean I went through an 18 page questionnaire and I actually left one blank?

Q    That's okay.  We are not giving you a grade.

*Anne B. Meredith*
Certified Shorthand Reporter

A    I didn't actually think it was possible there was a question that I missed.

Yeah, TV shows, movies, books and articles don't influence me, so I would say that --

Q    None of that.

A    I mean other than when I was -- obviously when I was using it for my work or I was doing it for my studies, obviously it would affect how I presented it in that forum. But with respect to my personal opinion, you know, some TV show or article is not going to influence me to form an opinion, so.

Q    Got you. And looking at the questionnaire, you had -- there was a son of an ex-boyfriend that was in prison for drugs.

A    Yes.

Q    How long ago was that that you were --

A    I think he's still in one of our prisons.

Q    Okay. And were you close to that individual or no, the son?

A    The son, no. I mean I knew him and I had met him and spent a little time with him but, you know.

Q    And based on the information you knew about the facts of his case and why he was in prison, do you believe he was treated fairly?

A    I actually don't know any of the circumstances.

Quite frankly, it violates the rules of our code of conduct for me to associate with anybody who is convicted or who is a former inmate of ours for two years.

Once I was advised that his son had been incarcerated in one of our prisons, I advised the warden of that prison of that fact and I ceased communications with him.

Q    Okay, perfect.  So you didn't know, prior to that, anything about the facts of that case?

A    No.  I mean it was an ex-boyfriend that called to catch up and said, hey, by the way, my son's in prison.

Q    Got you.

A    Good to talk to you, too.

Q    Well, we appreciate you including that.  But I understand that that's not going to have any impact or effect on you in your deliberations here, correct?

A    Correct.

Q    Okay.  And also I see that your criminal justice degree, you had an emphasis on treatment of offenders.

A    Correct.

Q    Do you have or did you have an opinion going into it why that was your emphasis or you just chose it and then do you have a different one now or --

A    The reason I chose it, actually, it was the course -- the course under it.  It was more a psychology course.

It was more probation, parole, institutionalized, and that was an area that I found more interesting.

Q    Okay.

A    So, quite frankly, the other areas were less exciting, less interesting, so.

Q    Do you have a view or an opinion about treatment or rehabilitation of inmates in prison?

A    It's hard to say because, you know, I'm sure that my employer would have me -- you know, has their opinions on it

Q    And I am not asking for your professional, just your personal.

A    I really don't believe in rehabilitation.

Q    Okay.

A    I don't know that it's possible.  And that's just from my daily interaction with inmates.

You have to understand when I was in a prison dealing with them, they weren't accepting responsibility. And you know, listening to them one on one, you know, really, yeah, I'll see you next week when you get back in, because I really didn't believe that they would stay out.

Q    I understand.  So based on, you know, your work, I understand that you would be skeptical of inmates' motivations and that sort of thing once they get there, correct?

A    Correct.

Q    But you know that -- We are going to talk about the law a little bit in a minute.  You know ultimately you answer special issues that result in a death sentence here in Texas, correct?

A    Yes.

Q    And one of the special issues is a mitigation question.  Do you find anything, based on the defendant's background or their character, after looking at all the evidence again, that would -- that you would find sufficiently mitigating to overturn a sentence of death?

And basically, not hearing any of the facts in this case and not knowing this individual down here, the defendant, James Broadnax, would you be able to keep an open mind to and listen to the facts in this case, and if you thought something was sufficiently mitigating, despite your skepticism of those that are already currently there that have been through the process, would you be able to keep an open mind and listen to all the facts and evidence, and if you saw something to be sufficiently mitigating in this case, would you be able to answer that special issue yes?

A    Yes.

Q    Okay.  And we will talk more about the special issue in a minute, but since it came up, I just wanted to make sure --

A    Certainly.

Q    -- that your beliefs and from your work would not again enter into your deliberations here in this case.

And I also saw where -- I'm almost done with your questionnaire. It's a long one. But I just -- I was interested in who you put as -- and usually I skip right over this and don't even look at it.

A    I know exactly where you're going.

Q    On who you most respect. Why would you say, as a male, that you respect the Director of the Bureau of Prisons? What about him?

A    Well, first of all, I found the question incredibly difficult to answer, and I thought it was incredibly imposing because if you ask me -- I was going to put "not applicable" because, quite frankly, I don't admire public people in general.

I may admire something they do. But for all I know, he's -- you know, who knows what he does in his personal life or what people do in their private life. But I don't really know him personally. So I don't admire somebody, you know, as a public figure.

Harley Lappin is public. I mean everyone may not know him, but he's the director of my agency and I know him very well. I've defended him in lawsuits and we've spoken a number of times and I respect him. I respect the decisions

he makes.  And, so, that was where I went with that.

Q    I understand.

A    It was like I really had nobody else to put, so that's what you got.

Q    And you probably wouldn't work there if you didn't respect the man that you represent and defend in lawsuits, correct?

A    It would be more difficult, yes.

Q    Okay.  That makes perfect sense.

We are going to kind of skate right through a defendant's rights because I feel like you've probably known those since undergrad or law school and still here today.

But you've already said that you would give this defendant the presumption of innocence, correct?

A    Yes.

Q    And you know that the burden of proof is on the State and always rests with the State throughout both the guilt/innocence phase as well as when you answer each and every one of those special issues.

A    Correct.

Q    It never shifts to the defense at any time.  If we do the accusing, we got to do the proving, correct?

A    Correct.

Q    And you will hold us to that burden, correct?

A    Yes.

Q    And if we don't prove an element in our indictment, would you return a verdict of not guilty?

A    I'm sorry.  If you don''t prove an element?

Q    If we do not prove an element in our indictment. Say, for example, we say that this defendant caused the death of another in the course of a robbery by stabbing him, and we actually prove on the stand that it was a shooting.

A    Uh-huh.

Q    So, we haven't proved an element in our indictment. Would you return a verdict of not guilty?

A    Yes.  Not guilty, yes.

Q    Okay.  You would hold the State to their burden, correct?

A    Yes.

Q    Okay.  And you realize from law school that a defendant does not have to testify.  The State can't force him to testify, his own lawyer can't.  Through the advice of counsel, he can decide to testify on his own.

But if a criminal defendant does not testify, if Mr. Broadnax doesn't testify in his own behalf, would you consider that or hold it against him in any way, shape or form?

A    No.

Q    Moving right along.  I'm sure you very much know the difference between capital murder versus murder.  And

**Anne B. Meredith**
Certified Shorthand Reporter

basically, you know, capital murder, it's an intentional killing plus something else, some sort of aggravating factor that makes it capital murder. And those are the ones that are eligible for the death penalty, not all murders.

Which I think you say in there you don't believe that all murders should get the death penalty, correct?

A    Correct.

Q    Okay. And, so, basically if we -- The indictment here reads that it's murder in the course of a robbery. That's the aggravating factor here.

If we were to bring you evidence, facts in the case that showed you that a murder was committed, however you didn't believe that a robbery was committed, what would you find the defendant guilty of?

A    I'm sorry, say that again.

Q    We charged this defendant with capital murder. If you believed that we proved the elements of murder, that he caused the death of the individual, that it was done intentionally, would you -- but we didn't prove the robbery, the aggravating factor, what would you then have to find this defendant guilty of?

A    Murder.

Q    Murder.

A    As opposed to capital murder.

Q    Absolutely.  And, so, basically what we are talking about is there could be lesser included offenses offered to the jury to look into.  And it could have to do with, you know, the defendant's mental state.

Say, for example, you know, we proved to you, instead of it being a murder, an intentional -- intentionally causing the death, or somebody knew or should have known that they could cause the death by doing the act they did, say it's reckless.  They consciously disregarded a substantial or unjustifiable risk.

Say, for example, individuals that shoot guns up in the air.  What goes up must come down, right?  They should have been aware of that and consciously disregarded it.  They shoot the weapon anyway in a crowd of people and somebody ends up being struck by it.  That might be manslaughter, for example, correct?

A    Correct.

Q    Based on the mental state of the individual.

You can also have criminally negligent homicide.  Say, for example, I'm driving my car and I'm down messing with the radio and I plow into somebody and kill them.  You know, I should have been aware that that could happen, and my actions have resulted in the death of somebody.

So you may be, based on your mental state,

guilty of a lesser offense than capital murder based on what we've proved and the facts before you, correct?

A    Correct.

Q    And would you and could you return a verdict on any of those lesser included offenses if those are offered to you at trial?

A    Yes, if they are offered.

Q    And understanding if the defendant is convicted of capital murder, what are the two choices of punishment?

A    Life without the possibility of parole or the death sentence.

Q    Okay, absolutely.

Now, if the defendant is convicted of a lesser included offense, there will be a range of punishment.  There won't be just the two options then.  Say, for example, there is murder.  It could be anywhere from five years in prison all the way up to life.

Could you consider and assess the minimum all the way to the maximum of life, given the right set of facts and circumstances in a case?  You don't have to think of a set of facts now.

A    Certainly.

Q    Okay.  And moving on from there.  After a defendant is convicted of capital murder, and only if a defendant is convicted of capital murder do you then look at the special

issues in the punishment phase of the trial.

And it could be, for example, whenever you move into the punishment phase of this trial, as we talked about before, the burden of proof still rests on the State for the first two special issues. There is no burden on the third by the State or the defense.

But for the first two special issues, it rests solely on the State. The presumption is a life sentence. Unless and until the State proves to you otherwise, the answer is yes to each of the special issues number one and number two.

Could you not automatically return a verdict of yes, yes and no, but could you wait until you hear the evidence in the punishment phase before you answer those special issues?

A    Yes.

Q    So, in other words, just because you convicted a defendant of capital murder, you wouldn't automatically answer those special issues in a certain way to then give the defendant a death sentence.

Could you wait until you hear -- I'm sorry. I asked that very confusingly.

Just because a defendant has been found guilty of capital murder --

A    Correct.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    -- would you ever automatically, because a person has been convicted of capital murder, answer those special issues in a certain way?

A    No.  But reading, and I obviously haven't got into it yet, but when I read the brochure, special issue two almost seems to be answered by the elements of the offense of capital murder.

Q    Okay.  And I understand why you might think that because they could be intertwined.

A    Yes.  Obviously I -- and there may be something I'm missing.  But when I look at how you define capital murder --

Q    Absolutely.

A    -- and then I look at special two, it's -- I don't know how you could not answer yes to special two.

Q    Okay.  Let's talk about that.  There is a difference, but you're right, it's very subtle.  You might skip over it if not understanding it first.

Capital murder.  Let's say, for example, myself and Andrea, we go and we plan that we are going to rob a 7-Eleven.

A    Uh-huh.

Q    And say, you know, I'm the one, I tell her, I'll go in there, I'm going to take the money, but whenever I come out, you better be there and you better have that car running, you better be ready to gun it.  She says, yes, I'll be there.

**Anne B. Meredith**
Certified Shorthand Reporter

Here's the gun.  It's fully loaded.  I bought the bullets for you today.  You better just not leave any witnesses.  She tells me that.  Okay?

A    Okay.

Q    So I actually go in the 7-Eleven, I do the robbery, I kill the clerk and I take the till, take all the money out of there, walk outside, she is there waiting for me as promised and we drive away together.

Am I guilty of capital murder?

A    Yes.

Q    Okay.  Is Andrea guilty of capital murder?

A    I would say yes.

Q    Okay.  And we are talking about just a non-death penalty setting right now.  We are just talking about capital murder, guilty of the offense.  And you would say yes why?

A    Because the definition, this person commits the offense if he or, in this case, I guess she intentionally or knowingly causes the death of the individual.

Obviously when Andrea drives you to this building, Andrea told you to make sure you don't leave any witnesses.  And I don't quite know how she got you to do that unless you kill them.

Q    Okay.

A    So I would have to say that she did.  I mean I didn't say it kind of like --

Q    Okay.  And let me explain it to you.  In Texas we have what is called the law of parties and, so, basically that's what special issue number two is and that's kind of what we are talking about right now is the 7-Eleven outside of a death penalty context.

A    Uh-huh.

Q    So, I as the triggerperson am certainly guilty of capital murder.  And Andrea, because of what you just said, you're right, she said, don't leave any witnesses, so she is aiding or assisting in the participation of that murder as well as -- I don't know if you remember some of the additional facts.  She supplied the gun for me and had it loaded for me and was kind of the driver in the offense.

So, can you understand how she would be aiding or assisting in the commission of that offense?

A    Yes.

Q    Okay.  So, she is guilty as a party.

Now, under capital murder you have to, in addition to aiding or assisting, you also have to be found that you should have known, should have anticipated that a human life would be taken in the course of that criminal offense.  And I think that you've already kind of hit the nail on the head, she should have anticipated, right?

A    She told you to leave no witnesses or to not leave people.  I don't remember the actual phrasing.  And

**Anne B. Meredith**
Certified Shorthand Reporter

she gave you the equipment to do it, so presumably you would have used it.

Q    Absolutely.  You walk into a 7-Eleven with a loaded gun, what did she think I was going to do with it? And she gave me instructions, correct?

A    Yes.

Q    So, guilty of capital murder because of that, because she should have anticipated that a life would be taken, and she aided or assisted.

Special issue number two, if you will read.

THE COURT:  Can you see it?  I'll get out of the way.

Q    Do you find from the evidence beyond a reasonable doubt that the person actually caused the death of the deceased?  So that would be me, the trigger person.  And you know, under the facts of the specific case you would contemplate are they the trigger man, did they actually cause the death, or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

So rather than they should have known, you know, say for example she didn't say, don't leave any witnesses, but she handed me a gun to go in there or she saw that I had a gun.  Could you still find that they should have anticipated that a human life would be taken?

**Anne B. Meredith**
Certified Shorthand Reporter

A    I think I could.

Q    Okay.  But the distinction in special issue number two is did they actually anticipate.  So, in order to receive the death penalty and to answer special issue number two, you have to find that they actually did cause the death of the individual or, acting as a party, they actually did anticipate that a life would have been taken.  Not just that they should have anticipated but they actually did anticipate.  Do you understand that distinction?

A    I do.

Q    Okay.  And would you be able to listen to and evaluate the evidence now understanding the distinction between the two?

A    Yes.

Q    Okay.  And I am glad you brought that to our attention because you're right and I imagine it goes over a lot of jurors' heads, and so you're very smart to notice that they seem very similar, so what's the difference there.  Are we okay there now?

A    Uh-huh.

Q    Okay.  I'm going to back it up just a bit to special issue number one.  And understand that after having found a defendant guilty of capital murder, you first turn to special issue number one.

And as you said before, you're not going to

give any automatic answers or responses just because a defendant has been convicted of capital murder, correct?

A    Correct.

Q    You're going to wait and listen to and hear the evidence. In fact, I think you said at one part in your questionnaire that that's what you're looking for. You want to know is the person going to be a future danger.

And you were kind of hitting the nail right on the head as to what you've got to answer in special issue number one before you make that ultimate decision of is this a case where the death penalty is appropriate, correct?

A    Correct.

Q    In special issue number one you'll see that it reads, do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Do you understand the difference between probability versus a possibility?

A    Yes.

Q    And what's the definition of probability in your mind?

A    To me, if it's a probability, then it's more likely than not.

Q    Okay. And, so, your definition of probability

would be more likely than not.

A    Yes.

Q    And understanding that you did say that there is a difference to you between probability and possibility, correct?

A    Yeah, I mean aliens could come land down on a spaceship today.  I mean that's a possibility.  I mean is it going to happen?  No, it's not a probability in my opinion, so.

Q    Exactly.  You got it.

A    Will a spaceship from the United States land back again?  Yes, that's a probability, so.

Q    Exactly.  And what special issue number one is doing, it's contemplating predicting the future.  You know, can we say whether or not a person is going to commit criminal acts of violence in the future?  And, so, it's a probability, more likely than not, as you suggested.

Criminal acts of violence, there is no definition there.  It doesn't say that it means commit another murder.  It doesn't say violent criminal acts or anything of the likes, but I see again in your questionnaire you contemplate what can go on.

If a person has been convicted of capital murder, what's the best case scenario of a sentence they are going to receive?

Anne B. Meredith
Certified Shorthand Reporter

A    What do you mean by the best case scenario?

Q    Well, you said earlier there's two possible punishments.  What --

A    They might receive life in prison.

Q    Absolutely.  And, so, if they are serving a sentence of life in prison, what types of acts in your mind would be criminal acts of violence or what could constitute?

A    You have to understand I work for a prison so I see it a lot.  I mean it's possible that a person who is convicted of, you know, an offense that's punishable by life in prison will do his time, his or her time, and do it without any incidents.  We have that all the time.

But if they are involved in an assault on another inmate, if they are involved in assault on the staff, that kind of thing, so assault.  I mean, you know, I don't necessarily --

An institution, once you're inside an institution, you know, well, they do have an amazing ability to get weapons at their disposal.  Just because something didn't particularly, you know, didn't result in death or didn't result in a significant injury doesn't mean that it's not necessarily a criminal act -- I mean, to me, it would be a criminal act of violence that would constitute --

Q    Okay.

A    You know, is the criminal act of violence -- Is the fact that he might get into an altercation over, you know, a bet with another inmate, they might get into a fist fight, is that enough to put him to death?  Probably not.  If there is a possibility he's going to kill a correctional officer --

Q    Back it up.  Probability.

A    Probability.  If there is a probability that he's going to kill an inmate or an officer, then, you know, absolutely.

Q    Okay.  And, so, you could contemplate, though, that criminal acts of violence, whenever you're determining what your answer should be to special issue number one, you would consider assaulting other imates, other guards, as being criminal acts of violence?

A    Most certainly.

Q    Okay.  And what about the threat of violence to those individuals, could that also be a criminal act of violence?

A    That's kind of vague.  The threat of violence to me is -- You're getting away from the probability if you're just saying a threat.  I mean anybody has --

Are you saying he's threatening violence to these individuals --

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Uh-huh.

A    -- or are you saying that the fact that he's been convicted of a particular offense makes him a threat to commit these acts?

Q    No, no, no.  Because you do -- you have to answer this separate and apart.  You can consider all the facts and everything you heard in the original guilt/innocence phase of the trial.

In fact, the law says that, based solely on the facts of the case for which you have found the defendant guilty of, you could consider that in determining whether an individual is going to be a future danger and answer that special issue yes.

Could you contemplate that --

A    Yes.

Q    -- based solely on the facts of which you've found a person guilty?

A    Yes, yes.

Q    Okay.  You could determine and find from that that there is a probability that they are going to commit criminal acts of violence --

A    Yes.

Q    -- in the future.

So, from that, is the threat alone -- not necessarily talking about the offense they have been

**Anne B. Meredith**
Certified Shorthand Reporter

convicted of, but of course you can consider that whenever you're deliberatating and looking at what your answer to that would be.

But the threat of violence alone or would the threat of violence be a criminal act of violence in your mind?

A    That's still really kind of vague for me.

Q    I understand.

A    I mean is the fact that if you -- if you present evidence that he is likely to pose a threat to other inmates or --

Q    Let me give you an example because I don't know if I'm making myself very clear.

Let's say that the inmate is in the penitentiary and he is so mad at his cellmate, he's sick of him. The cellmate knows everything about him, knows what type of person this individual is, and the inmate tells his cellmate, you better sleep with one eye open, dude.

A    Uh-huh.

Q    And he says it, he means it. You believe and you find from the evidence that he meant it when he said it and he could, in fact, act upon that.

Now, again, this is going to be you judging from the evidence that you've heard, and we have got to

prove it beyond a reasonable doubt.

A    Yeah.

Q    Do you in that situation believe that that could constitute a continuing threat of violence or a criminal act of violence?

A    I don't know that I can find a threat or the possibility --

Q    And it's okay if you --

A    -- is necessarily an act of violence.

Q    Okay.

A    It's a threat of an act of violence, but I don't think that -- it may or may not come to fruition, so.

Q    And, again, that would be for you to decide and you to say, and I am not trying to pin you down. I just wondered if it's in your realm of contemplation.

A    I mean if I could put him in a special housing unit and keep him away from the other guy, absolutely I would keep him apart from him because there is a possibility he could do it.

Q    Okay.

A    Well, in my realm we deal with possibilities because I'm going to get sued at the other end.

Q    Certainly.

A    But, yeah, I mean I don't know any better way to answer that.

Q    That's okay.  And would you make sure that if you were deliberating, if you were a juror in this case -- and I understand what you're saying, possibilities in your line of work -- but would you hold the State to the burden of probability?

A    Yes.

Q    Okay.  Continuing threat to society.  I think you've already hit the nail on the head, both talking to us here today and in your questionnaire, that you could foresee or you could see that society would be anywhere this defendant finds himself, whether it be in the penitentiary or out here in the society as we think about in the free world, correct?

A    Yes.

Q    And that's because of the individuals that work, such as even yourself, that work in these prisons, correct?

A    Yes.

Q    Okay.  And, so, you would consider and contemplate society as the prison world as well.

A    Yes.

Q    Okay.  And if you answer special issue number one, if you determine that based on the evidence that you have seen or in looking back at the facts of the original offense that this defendant does not constitute a future danger after you've looked at that special issue, you would answer that special issue no.

**Anne B. Meredith**
Certified Shorthand Reporter

A    Yes.

Q    Correct?

A    Yes, you're correct.

Q    And if you would stop there, that would result in a life sentence.

A    Yes.

Q    But if you do find that there is a probability that the defendant would commit future acts of violence, criminal acts of violence, and be a continuing threat to society, you would answer that special issue yes if we prove it to you beyond a reasonable doubt, correct?

A    Yes.

Q    And at that point you would move to special issue number two which we've already talked about.  Do you have any questions about special issue number two and what the difference is between should have anticipated and actually anticipated?

A    No, I mean I understand the difference.

Q    Okay.  And, again, it would be based on the facts and the evidence that you hear in that specific case and for you to make that call, okay, if we've proven it to you beyond a reasonable doubt that they actually anticipated, or if they are the trigger man, then it's an easier call, correct?

A    Yes, correct.

Q    Okay.  If you answer special issue number two yes,

then you move on to special issue number three, the mitigation question that we've already touched upon a bit.

You may hear a thousand pieces of evidence that seems or sounds like it would be mitigating to you or that you might consider mitigating. I think you mentioned in your questionnaire that actions may be affected by a person being intoxicated, and upbringing, and those sort of things could be potentially considered by you in a given case, depending on the facts, correct?

A    Correct.

Q    Okay.

A    I mean I don't think that they are an excuse necessarily, but they may be mitigating.

Q    Okay. And all that special issue number three contemplates or asks you to do is just give all the evidence that you've heard throughout the duration of the trial, give it consideration. Just determine for you what box it fits in, and if it rises to a level of being sufficiently mitigating in your mind, then would you answer that special issue yes?

A    Yes.

Q    And if you answer special issue number three yes, it results in a sentence of life in prison without parole.

A    Correct.

Q    Okay. And, so, all we are asking is that,

**Anne B. Meredith**
Certified Shorthand Reporter

regardless of how many pieces of mitigating evidence that you hear, and while some people may think that intoxication may even be aggravating, they may not even find it mitigating, so listen to the evidence and determine if you find it mitigating or not. But even if you find something mitigating, then determine does it rise to the level of being sufficiently mitigating to then overturn a sentence of death and give a life sentence without parole, okay?

You're giving me a weird look.

A    Well, because I wasn't sure if there was a question in there.

Q    Yeah, you're probably right.

A    And you did say overturn a verdict of death as opposed to finding --

Q    Well, essentially what you're doing is, you know, I told you you've got to wait --

A    Because there is a presumption of life --

Q    Right.

A    -- not a presumption of death, so that's why --

Q    After you reach special issue number two --

A    Correct.

Q    -- this defendant is sitting squarely on a death sentence.

A    Okay.

Q    Fair to say?

A    Yes.

Q    Special issue number three is kind of the safety net. It's just do you find anything to be sufficiently mitigating so that this defendant should receive a sentence of life without parole rather than death.

So, at that time there is no burden on either side. We've met our burden. And if you answer special issue number one and number two yes, mitigation is just like, after taking everything under consideration, should I then revert back.

A    Okay.

Q    Does that make sense?

A    Yes.

Q    Okay. And could you, in fact, do that if you found something to rise to the level of being sufficiently mitigating?

A    Yes.

Q    Do you have any questions for me?

A    I don't believe so.

Q    Okay. And you know, you talk about in your questionnaire at one point something about that you would wait and evaluate and assess the witnesses as they come, any witness. And I think that you answered the police officer credibility question perfectly clear. You're going to wait until you hear what they have to say.

Anne B. Meredith
Certified Shorthand Reporter

Same goes for a priest, prostitute, a prison official, you know, a person of authority that works for the penitentiary, or I think you had some comments about psychologists and social workers as well. They all start out on an even playing field.

Now, you can -- you can have your opinions. You can respect law enforcement. You can respect those that work in the prison system. But when they come in to testify, they have to all start out on an equal playing field. You understand that, correct?

A    I do.

Q    Would you wait until you hear what they have to say and not give them a leg up or a leg down based on just who they are by virtue of their profession?

A    Yes.

Q    Okay. And that's all that we ask that you do, and that's all that the law provides for you to do to be qualified.

So, just because you work for the Bureau of Prisons, you're not going to give somebody a leg up if somebody from the penitentiary comes to testify about life in prison.

A    No.

Q    Okay. And are you at any point in time going to add any information to the individual jurors? Say, for

**Anne B. Meredith**
Certified Shorthand Reporter

example, you've got juror X over there contemplating, well, I don't know, I mean maybe a life sentence is actually going to be more harsh on this individual, and they are wondering what goes on in prison, how it can make it more harsh.

Say they didn't hear from a person from the penitentiary and they didn't hear any of that evidence. Are you going to then supply that information to them?

A    No. And first I wouldn't do it because it's inappropriate. Secondly I wouldn't do it because the state and federal systems are very different, different animals. The way we handle our prisoners is very different from the way the state does.

Q    Okay. And absolutely, you're correct, it would be inappropriate. And I just wanted to make sure that you would not give any of that outside information that doesn't come from the witness stand to the jurors back there as they are deliberating.

Finally, you mention in your questionnaire about scheduling conflicts at times given your job. And I understand you travel quite a bit; is that fair to say?

A    I do.

Q    This trial is scheduled for August the 10th and it should -- we have budgeted about two weeks for it, so up through August 21st, the 10th through the 21st.

Do you know now at this time what your

**Anne B. Meredith**
Certified Shorthand Reporter

schedule is?

A    May I look at my --

Q    Sure.

A    I'm actually scheduled to prep a witness on the 21st because I have a hearing with the administrational director the next week in Oklahoma.

Q    Okay.  I think it's our belief that we will be done by the 21st.  With that being said, is there -- would you be able to say, for example, if you wanted to schedule a vacation or if you're coming down here to vacate with us for two weeks, would you be able to schedule that so that they wouldn't schedule any hearings or any appointments for you?

A    I have to say I don't -- I don't know what would happen.  I mean I'm currently scheduled for an EEO hearing on the 25th, and I am traveling the 23rd and prepping the 24th and 21st, and obviously I have to do my own personal prepping.

Q    Sure.

A    It's a case in which the regional director is involved.  He's the second highest ranking individual for the Bureau.  So I don't know, since the hearing has already been rescheduled once and I don't know if the judge will do it again or not.  She's a Dallas EEO judge and they tend to think they run the world.

Q    We anticipate --

A    You know how judges are.

Well, so my main concern would be I don't know if they would have to give it to another attorney.

Q    Sure.

A    But obviously, as an attorney, we always think that we are going to do the best job.

Q    Well, Ms. McDonald, I can tell you from first-hand experience that the judge, Judge Snipes presiding over this trial will make sure that things go efficiently, and he runs a very tight ship from 8:00 to 5:00 and gets witnesses on and off. So I do anticipate, I think that we will be done by this trial whenever you have all of your hearings and interviews scheduled.

A    And my main concern is if you think it's going to go through the 21st, I mean that's really not going to give me any time to prepare for the hearing, so I would have to do it during my personal time at night, so that would be a distraction for me unless I can get it moved, and I just don't know without talking to the judge.

Q    Okay. And when you say that that will be a distraction for you, do you think that it's going to be such a distraction that you wouldn't be able to give your full attention to the facts and the evidence in this case that both the State and the defense deserve?

A    I would do what is required of me.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Uh-huh.

A    I mean if I have to work on my personal time to handle the case, I'm going to do it because I'm going to do my job if they can't give it to another attorney.

Obviously I want to handle the case myself since I've already started it.

I can't say what they are going to do, so.

Q    But in terms of what you're going to do if you were to serve as a juror in this case.

A    I'm going to do the job that you require of me to do.

Q    Okay.

A    So, I mean I'll come to the hearing -- I mean I'll come to the trial and I will listen to the evidence because that's what I'm here to do, so.

Q    Okay.  And you would be able to give it a hundred percent of your attention as a juror, even though you've got the outside work stuff going on?

A    Yes.

Q    Okay.  Thank you.  I appreciate that, Ms. McDonald.

A    Sure.

THE COURT:  All right.  Thank you, Ms. Evans.

You want to take about a five minute recess, Brad?

MR. LOLLAR:  Whatever the Court wants to do.

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT:  How are you doing?

PROSPECTIVE JUROR McDONALD:  I would rather move on.

THE COURT:  You would rather move on, okay.

MR. PARKS:  It's my turn, Ms. McDonald.

THE COURT:  Yes, Mr. Parks.

PROSPECTIVE JUROR McDONALD:  All right.

MR. PARKS:  Are you ready?

PROSPECTIVE JUROR McDONALD:  Yes, sir.

EXAMINATION

BY MR. PARKS:

Q    All right.  Let me tell you that first it is both -- well, you're the third lawyer we have had to talk to in five -- We have been at this five days and you are the third lawyer, so we are averaging more than half a lawyer a day.

A    You know, there are a lot of us out there, unfortunately.

Q    And it's both harder and easier to do this when you're talking to a lawyer.  It's easier because you've got someone who understands the basic concepts and you don't have to go back through little piece by little piece and make sure they understand the things that we learned in first semester of law school.

The hard part is that we are used to talking to people who do not understand the concepts and I am afraid

**Anne B. Meredith**
Certified Shorthand Reporter

it sounds like we are talking down to a lawyer sometimes because we are used to doing things in a certain way.

If I say anything to you that makes you think to yourself, does he think I'm stupid --

A     Uh-huh.

Q     -- it's not intentional, okay?  I promise you it's not.

Now, let me pick up where we left off.  There is not any way for any of us to say that this trial is or is not going to be over by the 21st.  We've told all the jurors up to you that they need to set aside those first two weeks.  That includes the 21st.

And I know that you have a concern about these issues because you told us that in plain English on page 12 of your questionnaire.  And I don't doubt you when you say that if you are selected on this jury and given the job -- hold on just a second.

I've got two or three different little areas here and I have a one track mind and I can't get on with these things.  I can't even decide whether to look at you with my glasses on or not.

A     I don't know how I feel about that.

Q     Well, I have had lasic surgery and my eyes won't decide whether I need these glasses or not.  I see a little more clearly.

**Anne B. Meredith**
Certified Shorthand Reporter

A    I was worried that you didn't really want to see me that good.

Q    I want to see you.  In fact, I'm going to put my glasses on so I can see you very clearly.  Here we are.

I don't doubt that you're the kind of person who, if you're selected to sit on a jury, you're going to give that the best attention that you possibly can.  I don't doubt that for a second.

I also know from my own practice of having conflicting issues where I need to be in about two or three different places at the same time how that can, no matter how hard you try not to let that influence the job that you're doing right then, I know how difficult that is.

And you know, we have a lot of people that we have talked to now, and we are going to take you, you know, at your word, knowing and understanding that you cannot assume that we will be through on the 21st or the 20th.  With a jury, we have no way.

We can estimate how long we think it's going to take to put the evidence on.  That's an estimate only. I think you probably have been in this business long enough to know that we are sometimes reasonably accurate with that and sometimes we are a mile off.  We don't know.

We don't know whether we are going to have witness issues that may delay us as we get into the trial.

**Anne B. Meredith**
Certified Shorthand Reporter

We can expect in trials of this kind, it's not uncommon for experts to testify, and it's not uncommon for experts to need to be here and there at the same time. Somebody has got to do it. And things like that happen.

And what we really cannot control is how long it will take a jury to deliberate. A jury might come back right away. A jury might be out for hours, even days. We don't know.

So, knowing all of that, first tell me what your preference would be. Knowing that we've scheduled this trial right when you've got a hearing at the tail end of it, would it be your preference not to be on this jury?

A    Wow, I've never had anybody ask me that particular question before. Do I want to do it? No. I'm sure lots of jurors don't want to do it. I mean they are all busy. They all have things to do they consider more important.

But by the same token, I understand that somebody's life is at stake and that obviously people need to focus on that. So, do I want to do it? No. Will I do it if I'm required to? Yes.

And then I will either -- you know, the other guy in my office will hate you because he is going to be defending a case and, you know --

THE COURT: Well, he can hate me or Judge Snipes either one, preferably Judge Snipes.

Q    Fair enough.  My name is --

A    I've got about seventy cases and he's got about seventy, so you know.

Q    If he hates me and you tell him I'm, in fact, the one who caused that, just remember my name is Brad Lollar.

THE COURT:  Spell that for her if you would, Doug.

Q    Let's get -- we'll get back to this.  You did habeas work.  It's been what, fifteen years ago, something like that?

A    Probably '91 to '93.

Q    '91 to '93, so sixteen years, seventeen, eighteen?

A    Correct.

Q    Do you recall about how many cases you've worked on on this matter?

A    I didn't have a lot of them, probably somewhere between five and eight maybe.

Q    How did you like that work?

A    God, I don't really recall.  It was a job, you know, I mean.

Q    Okay.  Well, if this gives you any clue how I feel about federal habeas work in death penalty cases, I have given my wife permission to shoot me if I ever take another one.  To me, they are the most frustrating, but that's just personality.

Anything about that habeas work that you think would have any major influence on your ability to be a fair and impartial juror for us --

A    No, I mean --

Q    -- in this case?

A    -- I go with whoever is paying my paycheck at the time.

Q    Sure.

A    So, neither one of you is paying my paycheck. So at the time, you know, I was getting paid to do habeas so that's whose side I was on. When I was working for a judge, I was neutral. When I work for the defense, I'm on their side, so.

Q    Absolutely. And as a juror you know that your job essentially is to be a judge and to be neutral again.

Is that something that you feel like you will be able to do?

A    I would do it.

Q    All right. I think so.

Let me visit with you just a minute about guilt/innocence or the merits phase of the trial and here is where I'm falling into the possibility of being too simplistic, but I do want to make sure that I cover all the ground.

A    Certainly.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    And you know that it's the prosecutor's job to prove all the elements of the offense.  And we are not in a position of being able to tell jurors what the facts of the case that we are trying are so that a juror never really knows what may be contested and what may not be contested.

You know, in one case it may be identity.  In another case it may be manner and means.  In another case it may be the culpable mental state.  You just have to wait and hear all of the evidence.

And I think we've finally come to a consensus about what makes a good juror; a person who will follow the law, listen to the evidence, and not jump to conclusions.

Does that make some sense to you?

A    Yes.

Q    And I particularly caution all prospective jurors not to make up their mind about anything until they have heard all of the evidence in that particular phase of the trial that you're in.  And once you've heard all the evidence, then it's time to begin to carefully consider what your verdict is.

Does that makes sense to you?

A    Yes.

Q    Is that something you would be able to do?

A    Yes.

Q    Now, obviously if the jury returns a verdict of

not guilty, we all go home. If the jury returns a verdict of guilty of some lesser included offense, then we go into a punishment phase that determines where in the range of punishment that the punishment falls.

And you understand in the State of Texas we do not have sentencing guidelines in state court, only in federal court.

A    I don't know how you sentence in the State of Texas. I believe you guys will tell me that at the end of the jury case.

Q    Let me tell you, if it's a first degree felony -- Murder is a first degree felony. So is aggravated robbery, aggravated kidnapping, aggravated sexual assault, cases of that type, first degree felonies.

There is a punishment range of not less than five years nor more than life, ninety-nine years or life in the penitentiary. And the jury has complete and total discretion about where within that range of punishment they wish to assess. Okay.

So that if you go into a punishment phase in a noncapital case, then the State can, in addition to the facts and circumstances of the offense, the State can bring whatever evidence is relevant to punishment, prior criminal record, bad acts, unadjudicated offenses, anything that might influence the -- excuse me -- influence the jury to assess

**Anne B. Meredith**
Certified Shorthand Reporter

a higher punishment. The defense can bring lack of any criminal record, eligibility for probation if it's a probation type case, things that might lessen or mitigate whatever punishment.

And then the jury just goes back and decides life, 99, 5, 16, 24, whatever they think. The only thing we tell them they really can't do is everybody decide on a number, add it up, divide it by twelve and get an average. That's not acceptable. So, that's out of it.

You see how that differs so much from the federal system where --

A    I do understand.

Q    You would be able to do that, I assume, if you were called upon to do that.

A    Correct.

Q    And you would return whatever verdict you felt was appropriate in that range that was provided for the particular offense.

A    Yeah.

Q    Then, of course, the alternative to that would be if you heard a case, a capital murder case, you felt like the State had in fact proven the case beyond a reasonable doubt, then the jury would return a verdict of guilty of capital murder. Then and only then would you be confronted with the special issues, right?

A    I understand that, yes.

Q    Okay. All right. Now, here is where I want to talk to you about the special issues. You told us on the front page of your questionnaire, Ms. McDonald, that you really -- I guess you didn't say ambivalent, but you say you have no strong feelings one way or the other about the death penalty, and that's fine, that what you do believe in is that the law is to be followed.

A    Correct.

Q    And the way Texas has chosen to set up their death penalty procedure is to basically not define anything for jurors and let jurors pretty much decide for themselves what they believe these words, phrases and these special issues mean, and to present them with these special issues and let them decide from the evidence either the answer is yes or no, and that whatever happens flows from that.

Some -- All states do it differently. I think Oregon and Texas are the only states that actually do it exactly like this, or pretty much like this, with special issues.

At any rate, what the law contemplates, of course, is that some method they determine that, for a better way of putting it, we weed the sheep from the goats because obviously everyone about whom this question is asked is a capital murderer. If that were not so, the jurors would

have said so by their verdict, either not guilty or guilty of some other offense, right?

A    Correct.

Q    So, obviously the law is not that all murderers get the death penalty.

A    Right.

Q    So, there has got to be a way to determine which of those get the death penalty and which of those do not. This is the method that we use. And it's a determination basically of future dangerousness, at least in that first special issue.

A    Okay. And in doing this work, Ms. McDonald, it's my feeling that people have a tendency to see that special issue differently and sometimes may even have a tendency to rewrite it and in some way translate that thing into, after I've heard and considered all the evidence, do I believe the defendant deserves the death penalty, and then answer those questions in such a way that it will result in the desired outcome. And that obviously is not what the law intends by that.

The legislature hasn't asked us to determine whether or not an individual deserves the death penalty or not. The first question inquires whether the State, beyond a reasonable doubt, proved that he would probably commit acts of violence in the future that would constitute a

continuing threat to society. And that's exactly what that question asks, and every word has a meaning.

Now, it may not mean exactly the same thing to every juror, but we have to assume that every word has a meaning. Does that make sense to you also?

A    Yes.

Q    Okay. And you touched on what I consider, at least, to be a very important issue on that question when you talked about the kind of act, criminal act of violence, and what it would or would not be because each juror really is left with the decision to determine what level of criminal violence you think, if any, the individual defendant might be capable of, I guess, and whether or not that's something that would justify executing him.

So that one juror might say, yeah, if I thought there was a probability that a guy would ever say to his cellmate, you better not close your eyes tonight, I would execute him.

And another juror might say, you're out of your mind. Now, if they prove to me that this is a guy who is going to commit serious bodily injury or even death on a fellow inmate or a corrections officer, or someone else in the penitentiary, that's another matter. But it's got to be to some level of seriousness if you're talking about an execution.

**Anne B. Meredith**
Certified Shorthand Reporter

Does that make sense to you?

A    Yes.

Q    That each juror can put that level where they believe it's appropriate, considering the serious nature of what's being asked.

Do you believe that you would be able to do that and make your own decision about it?

A    Yes.

Q    We know that there are only two possible punishments for a person convicted of capital murder, life without the possibility of parole or death.

And let me just tell you, I don't think I need to but I will because we tell everybody this. Life without the possibility of parole in the State of Texas means exactly that. That the only real difference between life without parole and the death penalty is that we don't know when or how a person might die in the penitentiary if not given the death penalty, but they will die in the penitentiary.

Does that make sense to you? Do you believe that?

A    That the only difference between somebody sentenced to life and death is when they will die in the penitentiary?

Q    Well, the point is, the point I'm trying to make is

**Anne B. Meredith**
Certified Shorthand Reporter

259

is that life without parole means exactly that.  A person given a life penalty rather than the death penalty is going to die in the penitentiary.

A    Correct.

Q    Okay.

A    I understand that.

Q    So that either, either of the two verdicts is going to result in the defendant dying in the penitentiary.

A    Ultimately, yes.

Q    Ultimately.

A    They have different routes to get there, but.

Q    In the one we just don't know really when or how that would be.  It could be sooner, it could be later than he otherwise would.  But that's what the result of it is.

A    I understand that, yes.

Q    Some jurors have it in their mind, prospective jurors, that we don't really mean what we say.  That if they don't give the defendant the death penalty, they get to go home, and we want to disabuse everybody of that. And I know that's not what you think, but.

A    No, I understand.

Q    Remember when I warned you we were going to say some things that makes you think, they think I'm stupid. That's one of them.  There will be some more.

A    Okay.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Okay?  The point of that sort of is this.  We know where the defendant will be.  So, we know what society means for that particular defendant.  It's going to be wherever he is, and he will be in the penitentiary, so that's the society in which -- about which we are concerned in answering special issue number one.

As our Court of Criminal Appeals has sort of stated, is this one of those few incorrigibles who cannot even safely be incarcerated in the penitentiary?  You see what I'm saying?

A    I understand.

Q    And that's kind of how we do -- I saw you smile awhile ago when I said weed the sheep from the goats, but that's how, at least at the first step, we identify those persons convicted of capital murder and whittle them out of the process of death.

Because if the answer to that question was no, the State cannot prove beyond a reasonable doubt that this is a person who will probably -- and I won't restate the whole thing -- but he is a future danger, if that determination is made, then the jury has done its job.  It has separated that person out into that group of other capital murderers who do not pose a future danger, and their job is done.  Return the no to the Court and the trial is over, okay?

It's only if this is a person identified as one of those few incorrigibles that you go forward with the process. Does that make sense to you?

A    I understand.

Q    And would you be able -- I know the answer to this question, but I'm going to ask it. Will you be able to force the State to meet the burden that the law places on them, presume the answer is no, and not answer it yes until and unless the State proves it to your satisfaction beyond a reasonable doubt that it should be answered yes by the evidence?

A    Yes.

Q    Here's where your experience, Ms. McDonald, is far different from any other prospective juror that we have had, including the other two lawyers, because the other two lawyers did not work for the Department of Justice or any other system that had anything at all really to do with the penitentiary.

Now, I understand that the Bureau of Prisons is not the Texas Department of Criminal Justice. I understand that they have different policies and procedures. But are you at all familiar with the policies and procedures of the Texas Department of Criminal Justice?

A    No, I'm not.

Q    The classification policies or anything of that

Anne B. Meredith
Certified Shorthand Reporter

kind?

A    No.

Q    Are you reasonably familiar with the federal prisons classification policies and how they treat different levels of prisoners?

A    I'm very familiar with that.

Q    Would it be fair to say that the Bureau of Prisons has in place procedures and policies intended to protect other inmates and prison personnel from those prisoners who are violent or who have a tendency to be violent?

A    Yes.

Q    I know that you mentioned awhile ago special housing.  I know in the Texas Department of Criminal Justice they have what's called administration -- administrative segregation.  I would guess that the Bureau of Prisons has something like that where violent prisoners can be segregated and controlled.

A    I mean it's hard to -- I mean the classification of federal prisoners is very complicated.  It starts from -- there are so many dynamics and so many various areas of classification of inmates.  It starts when they bring the prisoner in, the inmate.

You know, I'm not -- Basically this is kind of what's confusing me is y'all keep referring to the penitentiary.  But the Federal Bureau of Prisons has a, you

**Anne B. Meredith**
Certified Shorthand Reporter

know, five different levels of prisons, that being the second to the highest level, incarceration in the administrative, maximum, of course, being the maximum.

So, if there's somebody that -- It's hard to say. I mean, yeah, we have ways of, you know, putting -- we are going to put them in a prison where they are going to do -- where, you know, they are not with other gangs, they are not with other people who they, you know, you know, are supposed to be separated from, who have committed like similar offenses, received similar sentences.

We keep them like that and they are going to be in the general population unless and until they do something that warrants them being put in the administrative setting or in special housing. And then we deal with that from there.

So, as a general matter, I mean murderers are walking around free as far as just like inside the institution just like any other inmate.

Q    Sure.

A    Because they are already at a higher security institution than the rest of the inmates.

Q    And I guess what I'm sort of thinking about is that you do have a mix of prisoners. And you might have a prisoner charged with a nonviolent offense, possession perhaps or a property crime of some kind, or whatever, who

might commit criminal acts of violence in the penitentiary though they have no history of that on the outside.

You may have murderers incarcerated who do not engage in that kind of activity. It's not really possible to predict, based solely upon what a person is convicted of, what kind of prisoner they are going to be.

A    The convic -- the sentence -- I mean the actual conviction or the crime for which they have been convicted, no. That's not -- That certainly is a part of it and it certainly is a big part of it. But is it the sole issue? No.

Like you said, there are, you know, other things, his criminal past, his affiliation with gangs, security threat risk, those kind of things, the length of the sentence. All those things go into consideration.

But, no, the very fact that he committed murder doesn't necessarily -- like I said earlier, I agreed when -- I forgot her name -- was questioning me.

Q    Ms. Evans.

A    You know, I have lots of people who have committed rape and murder who are walking around and haven't committed an offense inside the institutional walls.

Q    Sure. And I would suggest that our legislatives sort of understood that -- Well, let me put it this way.

If a person is classified in some way that they are put in the general population, regardless of what they are convicted of, what the length of their sentence is, they have been classified and assigned to a prison and they have been put in general population.

If they behave themselves, if they cause no problem, then if they are changed in classification at all, it's going to be into a better situation than the one that they have got rather than a more restrictive one.

A     Correct.

Q     So that prisoners are given an opportunity, I suppose you could say, to do the right thing. And as long as they do the right thing, they are left to go about their daily business without more restrictive confinement, right?

A     Correct.

Q     But once they do something that is a violation of the rules and regulations, whether it might be committing a violent act on another prisoner or a jail guard or someone, there are policies and procedures in place to deal with that, right?

A     Yes, I mean if they commit --

Q     They can be put in a more restrictive environment as it takes to control the prisoner.

A     Well, if they commit a violent act, they will actually be prosecuted.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Sure.

A    And we will put them in a more secure institution or put them in 23 hour lock down probably.

Q    And the significance of that, Ms. McDonald, is the way that the legislature has chosen to write this particular special issue because it speaks to commit criminal acts of violence rather than just the one thing. It requires that those criminal acts of violence constitute a continuing threat to society.

So it appears to me, at least, that the purpose of that question is to identify those persons who cannot, even in the penitentiary setting, be controlled by the policies and procedures in place at the penitentiary and, despite the policies and procedures, would continue to violate and be a continuing threat.

Does that make sense to you in the way that that's worded?

A    I understand what you're saying.  Actually, I'm not sure I understand what you're saying because the way you phrased the question, the discussion leading up to the question almost sounded like it would be okay if they committed a violent act because we have a way of controlling them if they do that and they are not going to keep doing it.

Q    Well, I didn't say that it would be okay.  But I don't think that if the State proved just -- if you thought

that a person was going to commit one violent act, then the State would have failed to have proven that question to you because it speaks to acts, not act.

A    If there is a probability that a convicted inmate were going to commit an act of violence, i.e., you know, kill an officer or kill another inmate, obviously that would lead to a conviction for that crime.

But I would have to say they do look like they would constitute a continuing threat to society at that juncture if they did it once, they locked you up, and you did it again.  So, to me, they have, you know.

Q    So, if the State shows you that he would commit even one criminal act of violence for the rest of his life in the penitentiary, that would answer special issue number one for you?

A    It would depend on what you would show as a criminal act of violence or what they would show as a criminal act of violence.

Q    Well, see, that's a prediction that --

A    I understand that.  I understand, but I also understand that his background, his history, the facts of the case, et cetera, will demonstrate the probability or lack thereof that he will commit a future act of violence.

And, so, to me, if based on all those facts they present it looks like he is likely to kill an officer

or kill an inmate, I have to say that I would find him to be -- the probability that he would have a continuing threat to society.

Q    Okay.  And if the State failed to prove that to you, could you answer that question no, even though you're answering it about a convicted capital murderer?

A    Yeah.

Q    Okay, fair enough.

I'm going to move on to question number three real quickly.  That's the mitigation issue and this is one that in the context of the way that question is asked --

A    Uh-huh.

Q    -- you will have to assume that you've already heard evidence that causes you to believe that the defendant is, in fact, a capital murderer, that he intentionally took the life of another person without any excuse or justification during the course of the commission of another felony, that you have found him guilty of that offense, you and eleven others, that you have proceeded into the punishment phase of the trial, heard evidence about special issue number one.  Whatever that evidence was, it convinced you beyond a reasonable doubt, and the other eleven jurors, that there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing danger

**Anne B. Meredith**
Certified Shorthand Reporter

to society, and you answered that question yes.  It's a long statement.

A    I get that actually.

Q    That is the only way you get to special issue number three.  So when you're answering that question, that's the context of it.  You're answering it about a person who is not only a convicted capital murderer but you believe he's also a continuing threat to society.

Now, some jurors tell us that once they get to that, their feelings are so strong that while they could consider any mitigation that they heard in the course of the trial, that there would be no way that they would ever find that the mitigation was sufficient to return a verdict that would result in a life penalty rather than a death penalty for a convicted murderer who is a continuing danger.

And other jurors tell us no, they would look at that, they could determine that question on its own.  If they feel like it ought to be answered yes, they could answer it yes and essentially turn that death penalty into a life penalty.

How do you feel about that special issue personally?

A    I can consider the mitigating consensus but it -- how do I phrase this?  They would have to be pretty darn mitigating if I really thought that he presented a danger of

killing other people. You know, that may -- that may excuse or justify what he did -- not justify, I mean mitigate to some degree what he did.

But if it was of such a nature that whatever burden that they have put on obviously, or whatever proof they have put on to special issue number two, if I believe they are a threat to society, and again I consider society being inside the institution as well obviously, then it would have to be pretty darn mitigating at that juncture to me, but I would certainly consider it.

Q    Well, you understand that every juror gets to set their own level of what would be mitigating evidence for them.

A    Okay.

Q    What might be for one juror might not be for another. Two jurors might agree on what's mitigating; one would believe it's sufficient and another not. That's all based on each individual juror's personal own judgment about the facts because that's what it really comes down to in that particular special issue.

All the jurors consider the evidence that they have heard in the case, make their own individual determination or moral judgment about whether or not the mitigating evidence is sufficient to answer that question yes. And if they do, then they answer it yes. If they

don't, obviously they don't.

And you believe that you will be able to do that?

A    Yes.

Q    And fairly consider mitigation evidence and be able to give it meaningful effect if you believed that was the proper thing to do?

A    Yes.

Q    You understand, Ms. McDonald, that whatever your own individual personal judgment might be in the matter, that that is yours, and that that applies to all of the other jurors in the jury room.  That if they have an individual personal moral judgment about the right and proper thing to do, they are as entitled to that judgment if it's different from yours as you are from theirs, right?

A    Correct, I understand.

Q    Do you believe that it would be proper to try to dissuade someone from their own personal moral judgment in the matter?

A    No.

Q    Any more than it would be proper for them to try to dissuade you, right?

A    They couldn't, but they can try if they want.

Q    All right.  You understand that -- and I go over this because so many of our jurors believe, prospective

jurors believe that their job down here is to assess the death penalty because we are going to a great deal of trouble, we are obviously spending a good deal of money, and they don't want to waste that effort and money by not giving the defendant the death penalty. Otherwise, they feel like they were just throwing it all away.

You understand that the law never requires the death penalty and, in fact, presumes the life penalty to be the proper penalty; do you understand that?

A    I understand that.

Q    Would you believe that studies have shown that as many as 20 percent of the jurors who have sat in these kind of cases, after the case is over and they were polled, felt like that the death penalty was mandatory, that they had to do it, despite all that we talked to them about? So you see our concerns about that.

But you understand that that's not so, that the law never demands that, never requires it. The law is perfectly satisfied with a life sentence.

A    I understand that.

Q    All right. Thank you, ma'am. I appreciate it.

THE COURT:  Okay. Thank you, Mr. Parks.

MS. EVANS:  Your Honor, could the State have one just additional question to clarify something?

THE COURT:  Sure.

**Anne B. Meredith**
Certified Shorthand Reporter

FURTHER EXAMINATION

BY MS. EVANS:

Q   You just mentioned on special issue number one several times that in committing criminal acts of violence, if somebody committed another murder, you would find that they were a future danger, and you mentioned that several times that you felt like after the evidence was presented to you that they were at risk to commit another murder, whether it be a prison guard or another inmate.

Are you limiting your answer on special issue number one, would you only be able to answer yes to that special issue if you found that we proved beyond a reasonable doubt that it would be a murder for a criminal act of violence, or are you able to consider other criminal acts of violence?

A   No.  I mean what I was referring to would be to the mitigating circumstances, that if I believed that the particular act of violence is going to be a murder, that it would really have to be a heck of a mitigating circumstance for me to consider not imposing the death penalty at that juncture.

Q   Okay, I understand.

A   Would I consider other things?  Assault, you know, if he's going to be assaulting other inmates, yeah, I mean that's serious.

**Anne B. Meredith**
Certified Shorthand Reporter

274

Q    So, if we were able to prove to you beyond a reasonable doubt, beyond a reasonable doubt that there is a probability of those other criminal acts of violence that you consider a criminal act of violence aside from murder, you would still be able to answer yes to that question?

A    Yes.

Q    If it were proven?  Okay.  I understand.  Thank you.

THE COURT:  Thank you.  Anything further?

MR. PARKS:  No, your Honor.

THE COURT:  All right.  Ms. McDonald, I'm going to ask you to step outside with my bailiff for just a moment while I confer with the attorneys.  Then I'll bring you back and give you a result.

All right.  Thank you so much for your time.

(Prospective Juror McDonald exits the courtroom).

THE COURT:  Thank you.  Be seated, please.

Does the State have a challenge for cause, Ms. Evans?

MS. EVANS:  No, your Honor.  The State believes this juror is qualified.

THE COURT:  Okay.  Mr. Parks.

MR. PARKS:  We believe she is qualified, your Honor.

**Anne B. Meredith**
Certified Shorthand Reporter

275

THE COURT: Very good. Bring Ms. McDonald back in, please. She will be number 15. Good job, kids.

(Prospective Juror McDonald returns to the courtroom).

THE COURT: Ms. McDonald, you're going to be Prospective Juror number 15. That doesn't mean you'll be on the jury. It just means that you have the possibility of being on the jury.

So, I'm going to ask you to do a couple of things for me. First of all, I'm going to ask you to look at your calendar. You already know that we are beginning or evidence will begin in this case on August the 10th running through the next two weeks, so the week of August the 10th, the week of August the 17th, which will be through the 21st, Friday the 21st. So, if you'll pencil that in on your calendar.

Toward the end of July I anticipate that you will receive a letter from either Judge Snipes or his coordinator advising you as to whether or not you're on the jury. Of course, if you are not on the jury, you don't have to report for jury service.

If you are on the jury, then you would have to report for jury service, and they will tell you if it's August the 10th. I don't know if it can be moved back or adjusted in some way. It won't be moved forward, I can

**Anne B. Meredith**
Certified Shorthand Reporter

assure you.  But you know, I don't know, if we run into some delays in the jury selection process, whether or not the possibility it could be moved back.  I doubt it.

PROSPECTIVE JUROR McDONALD:  So I won't know until July?

THE COURT:  You won't know until probably the end of July, that's correct.

PROSPECTIVE JUROR McDONALD:  I mean if you are going to change it, I mean, I'm just -- You know how judges are.  And it's really, I mean --

THE COURT:  Well, Judge Snipes is pretty much a stickler for staying on schedule and getting things done.

MR. LOLLAR:  Judge, I think we put it out far enough so that we all anticipate we will get our group of fifty.

THE COURT:  Yeah, yeah.  We will have our panel.  What we are doing is qualifying a panel.

PROSPECTIVE JUROR McDONALD:  Uh-huh.

THE COURT:  And then the attorneys will make their strikes once we get the panel.  And then once we have the jurors, then notices will be sent out to everybody whether or not they are -- whether or not they are a juror, advising them, you're either a juror or you're not a juror.

So, we don't think that that's going to

**Anne B. Meredith**
Certified Shorthand Reporter

happen until probably toward the end of August -- I mean the end of July. Excuse me.

MS. HANDLEY: Yes, sir.

THE COURT: Is that kind of everybody's idea?

MS. HANDLEY: Uh-huh.

MR. LOLLAR: We hope it goes fast.

THE COURT: Yeah, we hope it goes fast. You might get advance notice, but --

PROSPECTIVE JUROR McDONALD: I'm just trying to figure out, you know, if I try to reschedule this hearing again with the judge and, you know, my regional director is very hard to, you know, given his rating, it's hard to reschedule things, so I don't want to --

THE COURT: Well, if we can help you, we will be glad to do that. I'm sure Judge Snipes will be glad to help you.

PROSPECTIVE JUROR McDONALD: Are you going to talk to the judge and the regional director and see if I can change my schedule?

THE COURT: You know, what do they think they are, a federal judge, you know?

All right. And also concerning pretrial publicity, the second thing I wanted to visit with you about. You don't know anything about this case. Of course, as you well know, I want to keep you that way because you'll be --

**Anne B. Meredith**
Certified Shorthand Reporter

if you're on this jury, you're going to be asked to make your decision based strictly on the evidence and the law that you'll receive from Judge Snipes.

And, so, we don't want you going back in the archives on the Internet, review any old newspaper articles or anything like that. I know you know better than that, but I have to tell everybody that, anyway.

PROSPECTIVE JUROR McDONALD: Okay.

THE COURT: Okay. And any other news articles or TV accounts of this case, I'm going to ask you not to read or not to listen to or watch just simply because, again, you're going to have to set that aside, as you well know, and make your decision based on the evidence and the law.

PROSPECTIVE JUROR McDONALD: I don't actually watch Dallas news.

THE COURT: Okay, good enough. Suits the heck out of me. Thank you very much, Ms. McDonald. Appreciate your time and effort.

PROSPECTIVE JUROR McDONALD: Do I give this back?

THE COURT: Yes, just leave that with me. Is all the contact information on here correct?

PROSPECTIVE JUROR McDONALD: Yes, it is.

THE COURT: Thank you, ma'am.

**Anne B. Meredith**
Certified Shorthand Reporter

(Prospective Juror McDonald excused from the courtroom).

THE COURT:  Let's take a short recess.

(After a recess, Defendant present).

THE COURT:  Why don't you go ahead and bring in Ms. Coleman for me, please.

(Prospective Juror No. 306, Linda Coleman, enters the courtroom).

THE COURT:  Thank you.  Ms. Coleman, right here, if you would, please, ma'am.  Just go ahead and have a seat right there, if you would, please.  Thank you.

Thank you, ladies and gentlemen.  Be seated please.

I would like for the record to reflect this is Prospective Juror number 306, Linda Sue Coleman.

LINDA SUE COLEMAN,

having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Good afternoon, Ms. Coleman.

A    Good afternoon.

Q    I apologize for your having to wait so long, but we have been busy in here.  As you can tell, we haven't been just sitting around with our feet propped up on the table drinking coffee.

**Anne B. Meredith**
Certified Shorthand Reporter

Anyway, I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney, Texas.  And Judge Snipes, the Presiding Judge over this case, has asked me to assist him in the jury selection process.  So, that explains to you what I'm doing here today and also why you're here today.

You'll recall over a month ago, a month ago or over a month ago, you all met in the central jury.  Judge Snipes talked to you at that time.  At some point in the proceedings he asked the entire panel to stand, raise their right hand, and he administered the oath of a prospective juror.  Do you recall that?

A    Uh-huh.

Q    Were you one of the panel members that stood and took the oath at that time?

A    Yes.

Q    Very good.  I'll just remind you that you're still under that oath.  And what you have been sworn to do are two things, you are to give truthful answers, which we know you would do anyway, but also to be responsive to each question that's asked to you by the attorneys or under my direction which will be by the lawyers.

Now, let me just tell you, you've read the jury handbook or little introductory pamphlet, I guess I should say.

A    Yes.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Jury guide.  And it explains briefly some of the law and procedural aspects that are going to be involved and the special issues that will be involved in the trial of this case as any other capital case.

And the attorneys, what you're here for today, they are going to explain that law to you probably in a little more detail than what you've already read.  But once you understand it, then they are going to ask you questions regarding your ideas, your opinions, your thoughts concerning the law and the procedural aspects involved in the trial.  Okay?

A    All right.

Q    So, there's not going to be anything embarrassing that's going to be asked to you.  Also, there's no right or wrong answers to any of the questions, just simply how you feel about it.

Okay.  Now, then, you also at that time filled out a questionnaire, and I know it's been over a month since you've seen your questionnaire so I'm going to give it to you, and feel free to refer to it.  In fact, the attorneys that are going to be talking to you are going to ask you to turn to certain questions so that they can ask you a little more information about probably some of the responses and the answers that you've given to those questions.

**Anne B. Meredith**
Certified Shorthand Reporter

282

A    Okay.

Q    Anyway, let me introduce the attorneys because we are running a little bit behind and we want to get you out of here and ourselves out of here as well.

THE COURT:  So, this is Ms. Andrea Handley. She will be talking to you in just a moment.  Ms. Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  And then next to her is Mr. Gordon Hikel.  They are all three assistant district attorneys and they are the prosecution team that's charged with the responsiblity of prosecuting this case.

Seated on this side of the table right down from me here is Mr. Brad Lollar and then Mr. Doug Parks next to him, on the very end Ms. Keri Mallon.

MS. MALLON:  Hello.

THE COURT:  And they are the defense team, and they represent Mr. James Broadnax who is the defendant in this case.

All right.  Ms. Handley.

MS. HANDLEY:  Thank you, your Honor.

THE COURT:  Yes, ma'am.

EXAMINATION

BY MS. HANDLEY:

Q    Once again, Ms. Coleman, I appreciate you being

here. I appreciate your patience in sitting out there. You don't seem to me like a woman who has got a lot of time to waste, you know.

A    Why do you think I brought a book?

Q    You should have brought a book or a puzzle because I think, if you get involved in this jury, you'll find out that oftentimes the theme of a trial is hurry up and wait, hurry up and wait, you know.

So having said that, I appreciate you being here on time and I appreciate you hanging around. Okay. I'm going to try to just get to it with you and talk to you about this.

You've never sat on a jury before; is that true?

A    No.

Q    You don't have to have been on a jury before in order to be qualified for jury duty and, by all means, you don't have to be a lawyer either. But there are certain rules, if you will, there's certain laws, if you will, that you have to agree to follow. You don't have to like them, but you have to agree to follow them.

You see the difference there?

A    Uh-huh.

Q    And in order to be a qualified juror, you have to be able to be a person who will listen to the evidence in

**Anne B. Meredith**
Certified Shorthand Reporter

the case, who will base their verdict on the evidence in the case, who will follow the law and who won't jump to any conclusions.

Does that sound reasonble to you?

A    It does.

Q    We're going to test you out a little bit and see if you're one of those people, okay?

A    That will be interesting.

Q    Okay.  It could be interesting.  Because there is a world of difference, Ms. Coleman, between really what the law says and following the law versus how you just personally feel about something, you know.  Sometimes they collide and sometimes they actually mesh quite nicely, you know.

One thing I'll tell you I agree with you right off the top is on the first page of your questionnare, we asked you, are you in favor of the death penalty, and you said yes.  You said, some people do not deserve to continue to live.

I'm going to tell you something, Ms. Coleman, I agree with you 110 percent.  Personally, you know, sitting there having a cup of coffee or watching the TV or reading a case that's come across my desk, my personal feeling is, this person doesn't deserve to live and they don't deserve to breathe the same air that I do.  Okay.  That's my personal Andrea Handley feeling, but that's not

the legal standard.  Okay.

The legal standard in a death penalty case is not necessarily do they deserve to die, but do the facts of the case dictate that they should be found guilty of capital murder.  Furthermore, do the facts of the case dictate that the death penalty is the most appropriate sentence in the case versus a life sentence in the case.

See where I'm going with that?

A    (Nods head).

Q    Jurors don't find somebody guilty of capital murder and then go back and make a cup of coffee and go, all right, should we, should we assess the death penalty or should we give them life in prison without parole, and just have an open discussion about it and go with their gut.  You really don't do that.

Instead, you're actually given some pretty definitive parameters in which to follow.  You know, if this, then that, and if this, then that.  And by answering those questions and following those rules of laws, you will ultimately come to your verdict, and that will be whether a person gets the death penalty or whether the person gets life in prison.

Does that make sense to you?

A    Yes.

Q    I think you can appreciate that there actually

is some guidance in this, you know, that we don't just throw it at you and go, go figure it out. You know, we are actually going to give you some guidance in this and particularly in a case this big.

I take from your questionnaire that -- sometimes I look at the questionnaires and I go, I think this person is kind of pro State, I think this person will, you know, be on my side.

Sometimes I look at questionnaires and I go, ooh, I think they are kind of pro defense, you know. And I don't know if I can ever really say that from reading a questionnaire, you know.

I don't think, honestly, Ms. Coleman, I could really know how you feel until I got to know you after several days. You know, but I'm going to try my best to kind of get a feeling for where you are in this. Because if you are ultimately at least qualified, then I still have an option to decide whether or not I want you on the jury. They also have an option still to decide whether or not they want you on the jury.

If you're not qualified, then you're not qualified and you are gone, and that's it, that's all. But if you are qualified, we still get to decide whether or not we think you're the right juror for this particular case.

I'm never going to receive a jury full of

**Anne B. Meredith**
Certified Shorthand Reporter

fire breathers who say, kill them all and let God sort them out. I wouldn't want that, to be honest. It may surprise you to hear that from a prosecutor, but I don't necessarily want that. I don't need that kind of leg up, and I've been doing this long enough that I know that's not fair. That's not fair.

But on the other hand, I don't want twelve people who are nervous Nellies and wringing their hands and suspicious of authority and could never return a death verdict either. I don't think that's fair either.

What do you think? We are looking for somebody right in the middle. Does that sound fair to you?

A    Yeah.

Q    I think sometimes you can look at it in terms of if the tables were turned, you know. If you had a loved one on trial, you know, looking at a potential sentence of life in prison versus death, you know. And you knew they did -- you knew they did wrong and you knew they were guilty of it, but the ultimate question was what should happen to them, I think that maybe -- maybe I shouldn't say family or friend, because you might want a jury that's biased in favor of your family, and that would be perfectly natural.

But if the tables were turned and it was your son or your husband or somebody you loved dearly who was the victim and somebody was on trial now for that

person's death and they were looking at the possibility of the death penalty, that person who took your loved one's life might be that person that you think doesn't deserve to continue to live.

And you would want, at the very least, a jury that would look at the evidence and base their verdict on the evidence. Is that fair to say?

A    Yes.

Q    So, that's what it's all about here is just giving both sides a fair shake. It deosn't mean you don't have your opinions and it doesn't mean that you have to necessarily leave them at the courthouse door. But you do have to base your verdict on the evidence in the case.

And let's talk a little bit about that. There are certain fundamental principles of law that apply in every criminal case, be it theft of a loaf of bread from the Kroger or a capital murder where somebody's looking at the possibility of the death penalty. These fundamental principles of law apply every time.

You've probably heard of them already from TV or just reading a book or just having a conversation with your friends that, you know, just because a person's indicted doesn't mean they are guilty of anything, does it?

A    No:

Q    And a defendant doesn't have to come to court and

prove he's innocent, does he?

A    No.

Q    It's the State who carries the burden of proof, isn't it?

A    (Nods head).

Q    We do the charging, we do the proving. It's always the State that you look to to prove the case. And if and until I can prove to you otherwise that a person is guilty of the crime I've charged them with, you are to presume them not guilty. You are to presume them innocent.

Can you do that? As we sit here today, knowing that that man has at least been indicted, can you still give him the presumption of innocence?

A    Yes.

Q    And will you hold us to our burden to prove to you beyond a reasonable doubt that he's guilty?

A    (Nods head).

Q    If I fail to do that, Ms. Coleman, will you return a verdict of not guilty?

A    Yes.

Q    Okay. In other words, you'll follow the law in the case.

A    Yes.

Q    Okay. And if the defendant does not -- if he elects to invoke his fifth amendment right to remain silent,

**Anne B. Meredith**
Certified Shorthand Reporter

will you hold that against him?

A    No.

Q    Okay.  You won't give me an extra leg up because he doesn't testify?

A    No.

Q    Okay.  In other words, you'll follow the law in that respect, won't you?

A    (Nods head).

Q    Okay.  I will submit to you that all of those laws that are in place for a reason and that there's good sound principles for them.  Okay.  If you can't follow the law, then that's fine.

And that's why I want to specifically address one law with you, though, okay, one principle of law, because you brought it up in your questionnaire here.

And you write very emphatically, by the way, I noticed that.  You're like, that's my opinion, there you go.

A    Yeah, I have opinions.

Q    Okay.  It kind of looks like, okay, I take it, there you go.  Let me see what page that's on.  Something that jumped out at me here, and I apologize for not being right on top of that.

We asked you about a situation where the jury should follow the law or if they should -- Here we go.

291

Turn to page eleven with me.

All right. Here it says in the middle of the page, do you agree with the following statement, regardless of what a judge says the law is, jurors should do what they believe is the right thing, and you said yes. You said, it would be impossible not to consider irrefutable evidence that was thrown out for whatever legal reason.

First of all, before we talk about the law, are you thinking of a particular situation or case?

A    Oh, no. I just, you know, I see a lot of TV shows and read a lot of books and, you know, you have all these things that you -- you know, that's what I would base that answer on.

Q    Yeah. I'll tell you this. I have been doing this about twenty years, and nobody loves the legal shows more than I do. Love them, can't get enough of them. Okay. Law and Order, Crime Victims, CSI, I love it.

And you know why I love those shows? Because I love fiction, I love make believe, I love drama. I love just impossible to where you have to suspend disbelief in order to get, you know, through the show because they are just that, they are absolute fiction.

But I have a good feeling for what you're talking about there. Is it not true that he confessed to you?

A    Right.

Q    Objection, your Honor.  Sustained.  Instruct the jury to disregard.

A    Absolutely.

Q    And then he goes, the jury is instructed to disregard that the defendant confessed to the cop in the back of the car.  You're thinking, oh, right, that's like saying, ignore the elephant in the room, right?

Okay.  And keep in mind that is TV, you know, and that's done for a purpose.  But the fact of the matter is, Ms. Coleman, that there are rules of evidence that cases are tried by and they are grounded in good common sense.  They are grounded in what is fair and what is just, you know, and they are there for a reason.

And there does come a time sometimes in cases where one or either side could ask a witness, for example, a question, and the other side might stand up and say, your Honor, I object.  You know, I object, that evidence is irrelevant or that's hearsay or that's -- whatever reason, obtained unconstitutionally, for whatever reason.  And the judge might say, sustained, disregard what you just heard.

Now, I'll submit to you there is a reason for that.  It's not because the judge is working for the State.  It's not because he's working for the defense.  I mean, by

the judge's very nature and occupation, he is meant to call the balls and the strikes. He is a completely objective party up there. He's not there helping out either side.

And I think you'll agree with me, that's how it should be, right?

A    (Nods head).

Q    So, there are times that he is called upon to call the balls and the strikes in the case. He's the one that actually keeps the order in the courtroom and makes sure that things go according to the law and according to how they are supposed to go.

I think that you'll agree that there is probably at times some things that one or both sides, one or the other side might want to get in that a judge will have determined is completely irrelevant, completely irrelevant. And that decision is based on the law for the judge, it's based on what's fair, you know, what is the right and the rational thing to do and that his decision is based on those reasons and those reasons alone. Okay. You understand how that can happen?

A    Yes.

Q    Okay. Do you understand the necessity for that?

A    Yes.

Q    I could give you a bunch of examples but I'm not going to. I'm just going to tell you, Ms. Coleman, that the

**Anne B. Meredith**
Certified Shorthand Reporter

law states that a juror has to base their verdict strictly on the evidence in the case and nothing else.

And the evidence comes to you from the witness stand, either from what somebody says to you, maybe it comes to you in the form of a document or a statement. Maybe it's a videotape. Maybe it's an actual piece of evidence you can hold on to. But it comes to you from the witness stand.

And the law says that's the only place you can get your evidence. In other words, you can't come back to the jury room, get the evidence around you and go, this is all fine and great, folks. Let me tell you what I heard on the Internet. You can't do that, right?

A    I would never do that, no.

Q    Okay, good. You're not going to, let me tell you what my neighbor told me over coffee out there. That's not appropriate. I think you can appreciate why, because it hasn't been ruled on as reliable evidence that's necessary for you to make your determination. Well, that also factors into it.

A    I watch CSI too.

Q    There you go.

A    So I know that's good.

Q    If we swab this chair, I think we can solve 25 murders right now, right? According to CSI.

The same thing holds true for when a judge

**Anne B. Meredith**
Certified Shorthand Reporter

makes a ruling on that is that he's made a determination that the evidence is either not reasonable, it's not reliable, it's just not coming in.

Is that something that you can respect that that happens?

A    I think so, yeah.

Q    Okay.  If that were to happen, if the judge were to say, sustained, objection sustained, disregard the evidence, will you disregard that evidence and base your verdict on everything else that you've got there?

A    I'm not sure that -- It would depend on what it was.  You know, I don't think anybody is going to be able to say, well, yeah, I can pretend I never heard that, if it was something, you know, that was major.  I don't know that --

Q    Sure.  Well, you definitely can't pretend -- I don't know if you could pretend you didn't hear something.

A    Right.

Q    I don't think that you can.  It's kind of like pretending that you aren't married and don't have kids and don't have life experiences.

I mean everybody has experiences and everybody carries around certain things that make them who they are, you know.  And I can't give you a shot in the head and go, okay, you know, forget all your past and everything like that.

The question becomes, once you get back in

the jury room, you might remember that that happened. You can't cut it out of your brain and leave it back in there. The question becomes, are you going to use that as evidence against the defendant?

A    Again, it would depend on what it was, you know.

Q    Okay.

A    I don't know how else to answer that.

Q    Yeah, yeah.

A    I don't think that I could ever vote to convict someone of anything unless there was, you know, evidence there.

Q    Absolutely.

A    I don't -- I don't believe that it would be an opinion that I would use or something like that, you know.

Q    Yeah.

A    There would have to be evidence.

Q    Okay. I'm not going to sit here and try to change your mind because I think you're telling me the truth, quite frankly.

A    Yeah, I am.

Q    And I'll tell you, and I don't mean to offend you, I don't think you're qualified.

A    That's all right with me.

Q    Because you can go home and play with those dogs. Do you have dogs?

**Anne B. Meredith**
Certified Shorthand Reporter

A    Yeah, I do.

Q    I just want to know that and then I'm going to, I'm going to pass you. What kind of dogs do you have?

A    I have Wolf Terriers.

Q    Fantastic. I have mutts that showed up and needed a home and sixty pounds of nothing but the original welfare recipients is what I like to call them right there.

Thank you for your honesty, Ms. Coleman. I appreciate it. Thank you very much.

A    You're welcome.

Q    I have no further questions for you. They might, I don't know.

THE COURT: Thank you, Ms. Handley.

MR. LOLLAR: We have no questions. Thank you.

THE COURT: All right. Thank you very much, Ms. Coleman, for being here.

PROSPECTIVE JUROR COLEMAN: Thank you.

THE COURT: We appreciate your being with us this afternoon.

PROSPECTIVE JUROR COLEMAN: Do I get to keep this?

THE COURT: No, I get to keep that. You get to take what you brought with you today. Thank you very much.

PROSPECTIVE JUROR COLEMAN: Take my book back.

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT: Yes.

PROSPECTIVE JUROR COLEMAN: Thank you.

Ms. HANDLEY: Thank you.

THE COURT: Thank you very much.

(Prospective Juror Coleman excused from the courtroom).

THE COURT: Thank you. Be seated.

Ms. Handley, does the State have a challenge for cause?

MS. HANDLEY: We would challenge this juror, your Honor.

THE COURT: Any objection, Mr. Lollar?

MR. LOLLAR: No, your Honor.

THE COURT: The State's challenge for cause is granted.

(Court adjourned for the day).

**Anne B. Meredith**
Certified Shorthand Reporter

THE STATE OF TEXAS   (

COUNTY OF DALLAS   (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 2nd day of June, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volumes 13, 14, 15 & 16) is $7,300.00 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 29th day of November, 2009.

Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter