ORIGINAL

*AP-76207*

REPORTER'S RECORD

VOLUME 15 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | ( | IN THE CRIMINAL DISTRICT |
| VS. | ( | COURT NUMBER SEVEN |
| JAMES GARFIELD BROADNAX | ( | OF DALLAS COUNTY, TEXAS |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

INDIVIDUAL VOIR DIRE EXAMINATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 3rd day of June, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE QUAY PARKER, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

**Anne B. Meredith**
Certified Shorthand Reporter

A P P E A R A N C E S:


HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas   75207-4313
Telephone No. 214 653-3600

BY:   MS. ANDREA HANDLEY, SBOT No. 08898800
      MS. ELAINE EVANS, SBOT No. 24032880
      MR. GORDON HIKEL, SBOT No. 00787696
      Assistant District Attorneys


            APPEARING FOR THE STATE OF TEXAS



      MR. BRADLEY LOLLAR, SBOT No. 12508700
      Attorney at Law
      1700 Commerce, Suite 450
      Dallas, Texas   75201
      Telephone No. 214 384-8178

      MR. DOUGLAS PARKS, SBOT No. 15520000
      Attorney at Law
      321 Calm Waters Lane
      Holly Lake Ranch, Texas   75765
      Telephone No. 903 769-3120

      DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
      133 N. Industrial Blvd., LB 2
      Dallas, Texas   75207-4399
      Telephone No. 214 653-3550

BY:   MS. KERI MALLON, SBOT No. 24049165
      Assistant Public Defender

            APPEARING FOR THE DEFENDANT


**Anne B. Meredith**
Certified Shorthand Reporter

CHRONOLOGICAL INDEX - VOLUME 15

PAGE

Proceedings - June 3, 2009                                                          5

| VENIRE PERSON | COURT | STATE | DEFENSE | |
|---|---|---|---|---|
| DEREK LYNN DAVIS | 5 | 9 | | |
| Excused by Agreement | | | | 12 |
| | | | | |
| HELEN NOBLE | 13 | 18 | 68 | |
| Defense Challenge | | | | 102 |
| Court's Ruling | | | | 103 |
| Defense Objection | | | | 109 |
| | | | | |
| BEMSHA ODAN | | 113 | | |
| State's Challenge | | | | 114 |
| Court's Ruling | | | | 115 |
| | | | | |
| JOSE ANTONIO PARRA | | 116 | | |
| State's Challenge | | | | 117 |
| Court's Ruling | | | | 117 |
| | | | | |
| ANISE HALL | | 118 | | |
| State's Challenge | | | | 119 |
| Court's Ruling | | | | 119 |
| | | | | |
| BILLY EUGENE HENRY | 120,203 | 123 | 168 | |
| Defense Challenge | | | | 194,206 |
| Defense Challenge Taken Under Advisement | | | | 214 |

Adjournment                                                                        219

Reporter's Certification                                                           220

**Anne B. Meredith**
Certified Shorthand Reporter

ALPHABETICAL WITNESS INDEX - VOLUME 15

|                                              |        | PAGE |        |           |
| VENIRE PERSON                                | COURT  | STATE | DEFENSE |          |
| DAVIS, DEREK LYNN                            | 5      | 9     |         |          |
| Excused by Agreement                         |        |       |         | 12       |
| HALL, ANISE                                  |        | 118   |         |          |
| State's Challenge                            |        |       |         | 119      |
| Court's Ruling                               |        |       |         | 119      |
| HENRY, BILLY EUGENE                          | 120,203 | 123  | 168     |          |
| Defense Challenge                            |        |       |         | 194,206  |
| Defense Challenge Taken Under Advisement     |        |       |         | 214      |
| NOBLE, HELEN                                 | 13     | 18    | 68      |          |
| Defense Challenge                            |        |       |         | 102      |
| Court's Ruling                               |        |       |         | 103      |
| Defense Objection                            |        |       |         | 109      |
| ODAN, BEMSHA                                 |        | 113   |         |          |
| State's Challenge                            |        |       |         | 114      |
| Court's Ruling                               |        |       |         | 115      |
| PARRA, JOSE ANTONIO                          |        | 116   |         |          |
| State's Challenge                            |        |       |         | 117      |
| Court's Ruling                               |        |       |         | 117      |

P R O C E E D I N G S:

(Defendant present).

THE COURT: Okay. Are we ready for Mr. Derek Davis? Bring in Mr. Davis, please.

(Prospective Juror No. 267, Derek Davis, enters the courtroom).

THE COURT: Good to see you, sir. Just go ahead and have a seat right there. Thank you.

Thank you. Be seated, please, ladies and gentlemen.

And good morning, Mr. Davis.

PROSPECTIVE JUROR DAVIS: Good morning.

THE COURT: How are you this morning?

PROSPECTIVE JUROR DAVIS: Good.

THE COURT: I would like for the record to reflect this is Prospective Juror number 267, Derek Lynn Davis, d-a-v-i-s.

DEREK LYNN DAVIS,

having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    And Mr. Davis, I'm Judge Quay Parker.

A    Okay.

Q    I'm a Senior District Judge from McKinney, Texas just right up the road here. And Judge Snipes has asked me

to assist him in this jury selection process in this capital murder case. And Judge Snipes is upstairs in his courtroom taking care of the day-to-day business of the Court while I'm down here assisting him in this case by picking the jury.

A   Okay.

Q   So, anyway, that's what I'm doing here today and that's why you're here today, as a matter of fact.

You'll probably recall, it's been over a month ago or so, when everybody got together in central jury and y'all filled out that questionnaire.

A   Yes, sir.

Q   I know you haven't seen it since then so I'm going to give your copy to you because the attorneys are going to be talking to you and asking you questions about it and some of your answers and responses.

A   Okay.

Q   Do you recall that Judge Snipes addressed the group on that particular day and at some point in the proceedings he asked everybody to stand up, raise their right hand, and he administered the oath of a prospective juror?

A   Yes, sir.

Q   Do you recall that happening?

Were you one of the panel members that stood and took the oath at that time?

A    Yes, sir.

Q    Very good.  I'll just remind you you're still under your oath that Judge Snipes administered to you at that time.

And basically what you have been sworn to do are actually two things.  One to is to give truthful answers, which we know you would do, anyway, and, secondly, to be responsive to each and every question that's asked to you by the attorneys.

Now, let me tell you a little bit about that.  How that's going to work is they are going to explain a little bit to you about the law.  You've already read some --

Did you have an opportunity to read your pamphlet before you came in?

A    Yes, sir.

Q    Okay.  Well, anyway, that's kind of an introduction to what they are going to talk to you about.  And they are going to explain the law and some of the procedural aspects that are going to be involved in the trial of this case, and then they are going to ask you questions about that.  They are just wanting to get your ideas, your thoughts, your opinions.

There's no right or wrong answers to any of their questions.  There's nothing that's going to embarrass you or anything like that.

A    Yes, sir.

Q    All righty?  You kind of got an idea of what's happening, huh?

A    Yes, sir.

Q    Good.  All right.  And just relax.  There is no reason to be nervous.  And let me introduce to you the attorneys that are going to be participating in this jury selection process and in the trial of the case.

THE COURT:  Mr. Gordon Hikel --

MR. HIKEL:  Good morning, Mr. Davis.

THE COURT:  -- is seated directly in front of me, and he will be talking to you this morning.

PROSPECTIVE JUROR DAVIS:  Hi.

THE COURT:  And seated next to him is Ms. Andrea Handley.

MS. HANDLEY:  Good morning.  How are you?

THE COURT:  And then on down from her is Ms. Elaine Evans.

PROSPECTIVE JUROR DAVIS:  Good morning.

THE COURT:  They are all three assistant district attorneys here in Dallas County.

PROSPECTIVE JUROR DAVIS:  Okay.

THE COURT:  And they are the prosecution team charged with the responsibility of prosecuting this case.

Then seated next to me on this side of the table is Mr. Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  And Mr. Doug Parks next to him. And then on the very end down there Ms. Keri Mallon.

MS. MALLON:  Good morning.

THE COURT:  And they are the three lawyers that comprise the defense team.  And they represent Mr. James Broadnax who is the defendant seated on the end down there.  All right?

PROSPECTIVE JUROR DAVIS:  All right.

THE COURT:  All right.  Very good.

All right.  Mr. Hikel.

MR. HIKEL:  Thank you, your Honor.

THE COURT:  Yes, sir.

MR. HIKEL:  May it please the Court. Mr. Davis.

THE COURT:  Yes, sir.

EXAMINATION

BY MR. HIKEL:

Q     Back in April when you filled out this questionnaire, you told us that you had a wedding to go to.

A     I do have a wedding.

Q     August 15th through the 22nd?

A     Yes, sir.

Q     Is that still the case?

A     That is still the case.

Q    Are you the one getting married?

A    No, sir, I'm already married.

THE COURT:  Don't need two of them.

PROSPECTIVE JUROR DAVIS:  No, no.  I like half my stuff.

THE COURT:  You like half of your stuff.

Q    (By Mr. Hikel)  So, you have tickets and everything to go to this wedding?

A    Yes.

Q    Okay.

THE COURT:  That's going to be when, did you say?

MR. HIKEL:  August 15th through the 22nd, Judge.

A    The wedding is the 15th and then we have a Disney World trip.

Q    All right.  This trial starts August the 10th.

THE COURT:  It's gonna be right in the middle of it, sure will, yeah.

Q    Well, Mr. Davis --

A    Yes, sir.

Q    -- we are not going to ask you to change your plans and because you already have tickets -- nonrefundable tickets?

A    I would have to talk to my wife.

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT: I hate to let a good man like that go. Anything?

MR. LOLLAR: No, Judge.

We want to ask you, you were born in Knob Noster, Missouri?

PROSPECTIVE JUROR DAVIS: Yes, sir.

MR. LOLLAR: Where is Knob Noster?

PROSPECTIVE JUROR DAVIS: It's -- Apparently there is an air force base there.

MR. LOLLAR: Really?

PROSPECTIVE JUROR DAVIS: So, yeah.

MR. LOLLAR: I'll be darn.

PROSPECTIVE JUROR DAVIS: Never gone back.

THE COURT: You were an air force brat, were you?

PROSPECTIVE JUROR DAVIS: No, my parents got divorced when I was young, so, no.

THE COURT: Oh, okay. So, you didn't have to move around a bunch.

PROSPECTIVE JUROR DAVIS: Grew up in Kansas, so.

THE COURT: Okay. Good enough. All right. Well, thank you so much. Just leave it right there.

PROSPECTIVE JUROR DAVIS: Thank you, guys.

THE COURT: Thank you, sir, appreciate it

very much.  Good luck to you.

(Prospective Juror Davis excused from the courtroom).

THE COURT:  You want to put anything on the record with regard to Mr. Davis, Gordon?  Okay.  Go ahead.

MR. HIKEL:  Juror number 267 filled out his questionnaire and answered that on August 15th through the 22nd of August that he has a wedding in Orlando, Florida.

And when asked this morning as part of the voir dire, the juror repeated that, yes, he still has plans to attend the wedding on the 15th through the 22nd.  And as we stated, this trial is scheduled to start August 10th and we believe it may go two weeks.

Given the schedule, we agreed to allow Mr. Davis, Juror number 267 to be excused.

THE COURT:  All right.  Thank you.

Mr. Lollar?

MR. LOLLAR:  We agree.

THE COURT:  Thank you, Mr. Lollar.

Juror number 267, Derek Davis, will be excused by agreement.

Okay.  Next is Ms. Noble.

MS. HANDLEY:  Yes, sir.

THE COURT:  Bring in Ms. Noble.

(Prospective Juror No. 337, Helen Noble,

**Anne B. Meredith**
Certified Shorthand Reporter

enters the courtroom).

THE COURT:  Good morning, Ms. Noble.

PROSPECTIVE JUROR NOBLE:  Good morning.

THE COURT:  Come on in, if you would, please, ma'am.  Just have a seat right there.  Make yourself comfortable.

Thank you, ladies and gentlemen.  Be seated, please.

HELEN NOBLE,

having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Good morning again, Ms. Noble.  I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney just right up the road here from us.

A    Uh-huh.

Q    And Judge Snipes has asked me to assist him in the trial of this case by presiding over the jury selection process.  So, that explains to you why I'm here today instead of Judge Snipes.  He's upstairs in his courtroom taking care of the day-to-day matters of the Court while I'm helping him by picking this jury.  Okay?

A    Okay.

Q    So, that explains why I'm here today and why you're here today, too, by the way.

A      Thank y'all.

Q      And we are glad to have you.  Thank you for your time and effort to be with us this morning.

Now, I notice you've got your little juror guide there.

A      Yes.

Q      And have you had an opportunity to kind of look over that and familiarize yourself with it somewhat?

A      Yes.

Q      Okay.  That's what the attorneys are going to talk to you about, the law and some of those special issues that you read about in there.

A      Uh-huh.

Q      They are going to -- they are going to expound on that and they are going to explain the law to you and then they are going to ask you questions about it.  And they just want your ideas, your thoughts, your opinions on it.

A      Okay.

Q      There's no right or wrong answers to any of the questions.  This is not something that you have to pass or fail.  It's not a quiz, in other words.  It's just they are trying to get your ideas and thoughts on how you feel about some of the law and procedural aspects that will be involved in the trial of this case.  All righty?

A      Uh-huh.

Q    Now, you'll recall it's been about a month ago or better --

A    Uh-huh.

Q    -- now that everybody met in central jury.  Judge Snipes addressed the group at that time.

A    Uh-huh.

Q    And at some point in the proceedings he asked everybody to stand up, raise their right hand, and he administered the oath of a prospective juror to each panel member; is that correct?

A    Yes.

Q    Okay.  You remember that, then, don't you?

A    Yes, I do.

Q    And were you one of the panel members that stood up and took the oath at that time?

A    Yes, I did.

Q    All right.  I'll just remind you that you're still under your oath.

And what you have been sworn to do and what your responsibility is now today with us is just to tell the truth, in other words, give truthful answers, which we know you would do anyway, but also to be responsive to each and every question that is asked to you by the attorneys.

A    Okay.

Q    That's all you've got to do today.

A    Okay.

Q    We know you'll do that for us.

Okay.  Now, also during that time that you all got together, you got to fill out a questionnaire.

A    Uh-huh.

Q    Quite an extensive questionnaire, by the way.

A    Yes, it was.

Q    So, I know you haven't seen it since then so I'm going to give it to you.  And the attorneys have copies of it and they are going to ask you questions about it and some of your answers and responses, I'm sure.  That's kind of --

They have all been through it and, so, if they have got any questions about it, well, you've got your copy there that you can look at --

A    Okay, cool.

Q    -- and refer to.

All right.  Let me introduce you to the attorneys that are going to be participating in this trial.

THE COURT:  Ms. Andrea Handley --

MS. HANDLEY:  Good morning.

THE COURT:  -- seated right across from me.

PROSPECTIVE JUROR NOBLE:  Hi.

THE COURT:  And she is going to be talking to you today.

And then next to her is Elaine Evans, Ms.

**Anne B. Meredith**
Certified Shorthand Reporter

Elaine Evans.

PROSPECTIVE JUROR NOBLE:  Hi.

THE COURT:  And next to her is Mr. Gordon Hikel.

MR. HIKEL:  Good morning, ma'am.

PROSPECTIVE JUROR NOBLE:  Good morning.

THE COURT:  And they are all three assistant district attorneys here in Dallas County, and they are the ones that are charged with the responsibility of prosecuting this case.

And then seated next to me on down the road here or line here is Mr. Brad Lollar.

MR. LOLLAR:  Good morning.

PROSPECTIVE JUROR NOBLE:  Good morning.

THE COURT:  And next to him is Mr. Doug Parks.

MR. PARKS:  Hi.

PROSPECTIVE JUROR NOBLE:  Good morning.

THE COURT:  And on the very end down there is Ms. Keri Mallon.

PROSPECTIVE JUROR NOBLE:  Hi.

MS. MALLON:  Hi.

THE COURT:  And they comprise the lawyers, the three lawyers that comprise the defense team.  And they represent Mr. James Broadnax who is the defendant seated on the very end down there.

PROSPECTIVE JUROR NOBLE:  Okay.

THE COURT:  All right.  Very good.

Ms. Handley, I believe we are ready for your voir dire.

MS. HANDLEY:  Thank you, your Honor.  I appreciate it so much.

EXAMINATION

BY MS. HANDLEY:

Q   How are you doing today, Ms. Noble?

A   Pretty good.

Q   Okay.  Okay.  How do you feel about being here for this kind of case?

A   I've never done this before.  I would have to say anxiety, a little high.

Q   Okay.  I'm going to tell you what, most people haven't been put in this position before, you know.  And I think it's perfectly nervous to have some apprehension and some nervousness about it.

I think that anybody who came down here and said, yeah, I want to get on this jury and take part in something like this, I would be a little apprehensive of that person, even as a prosecutor, I'll tell you that, because I think that maybe they are coming in with an agenda, and that's not the person we are looking for.

We -- All of those hundreds of people you

came down with, you all filled out that questionnaire, eighteen pages of personal information about the law and also your personal feelings. I kind of feel like, you know, we've got enough information here we could put you on eHarmony or something.

A    Yeah, yeah.

Q    We know everything about you. Well, we don't know everything about you. You know, we get a good appreciation from reading your questionnaire if you have a good grasp on what the law requires in a case like this.

A    Uh-huh.

Q    And then we also just ask you some personal information because we are trying to feel people out, you know, and see where they are coming from and see where they are going. Do they have anything that might stand in their way of being a fair and unbiased and objective juror in a case like this?

Because ultimately, Ms. Noble, what we are looking for is, is -- is a pool. What we are getting is a pool of qualified jurors. We are going to get fifty people that are qualified, and then we will go in and determine and pick out who we think is appropriate for this particular jury.

A    Okay.

Q    A qualified juror is a person who will follow the

law.  You don't have to like the law.  But a person who will follow the law, a person who will come into the courtroom, listen to the evidence, and base their verdict strictly on the evidence in the case and not something they have heard outside of the courtroom or on the television, not something they have heard from their neighbor talking over the fence, but base their verdict on the evidence in the case.

And also a qualified juror is somebody who doesn't jump to any conclusions.  Somebody who comes in and says, I'm going to listen to the evidence first.  I will wait before I render my verdict or answer those special issues until I've heard the evidence.  I'll sit in the jury room, I'll review the evidence with the other jurors, I'll deliberate, and then I'll come to my conclusion.

Does that sound fair to you?

A     Yes.

Q     Okay.  And I will tell you, going through this, I have about forty minutes to talk to you, and I am kind of conflicted because I see one of your hobbies or what you got from your mom is you learned how to fix things, right?

A     Is that what I wrote?  I -- it's --

Q     You put on something --

A     I would have to look and see what I actually wrote.

Q     Well, you put something on there about your mom, you admire her and she helps you how to fix things.

*Anne B. Meredith*
Certified Shorthand Reporter

A    Oh, yeah.

Q    Because I can either talk to you about the law or I can talk to you about the situation I've got going with my shower head.

A    I can help you with that.

Q    You know what, I might give you a call. I'll have to get out my Home Depot 1-2-3 book.

But let's talk instead, let's talk about this and what we are doing here today. You have sat before on a jury, I understand.

A    Yes.

Q    You put in there. And from what I'm gathering, I think it was a civil lawsuit is what it was.

A    It was civil, yes.

Q    Okay. I'll tell you that the civil courts and the civil trials and the criminal courts and the criminal trials, while it's all legal --

A    I've done criminal as well.

Q    What kind of criminal case did you do?

A    You're asking an old brain. A gentleman had -- it was something with drugs, arrested, and he tried to escape.

Q    Okay.

A    And it was just -- I think it was two days, three days maybe.

Q    Okay. Were there six people on the jury or twelve

people on the jury?

A    Six.

Q    Okay.  So, that was a misdemeanor offense.  That's what that tells me.

A    Oh, okay.

Q    And did you return a verdict in that case?

A    Yes.

Q    Were you also called upon to assess punishment in the case?

A    No.

Q    Okay.  Because sometimes a judge will do that, sometimes a jury will do that, or a jury will find him not guilty and neither of which happens.

What was your situation?

A    We said guilty.

Q    You said guilty and he had the judge assess punishment?

A    Yes.

Q    Okay.  I'm going to assume -- I'm going to jump to a conclusion -- which whether that's good or not we will find out -- that you were selected to be on that jury because they felt you were qualified to sit on a criminal jury, which means when they had you in voir dire and they asked you some questions, they said, I believe Ms. Noble can follow the law, I believe she will base her verdict on

23

the facts in the case and nothing else, and I think she will keep an open mind until she hears everything.

And that's what I'm looking for also here. The same principles of law that applied in that -- it sounds like it was probably an escape case or something like that where he tried to escape maybe or --

A     Yeah.

Q     The same principles of law that applied there apply in this case also.  Whether I am -- you are sitting on a trial on theft of a loaf of bread from Kroger or a capital murder case, these apply across the board, and you've probably heard of a lot of these laws before.

A     Uh-huh.

Q     As a defendant sits in the courtroom today, this defendant in particular, as he sits here today, you are to presume him innocent.

A     Uh-huh.

Q     Okay.  And the reason is is because I have not proved a thing to you right now.  He's been indicted but that doesn't mean anything.  All that is is a piece of paper that tells him what he's been charged with.  It's absolutely no evidence of guilt.  You can't consider it evidence of any kind of guilt.

You wouldn't do that, would you?

A     No.

Q    Okay. He's presumed innocent because I haven't carried my burden, I haven't carried my burden of proof. As a representative of the State, I bring the charges, I ought to bring the proof. And you always look to the State to bring you the proof in the case.

I carry the burden of proof. A defendant doesn't carry the burden of proof. You ought not to have to come to court and prove that you're not guilty, that you're innocent. You know, you ought to look to the State to do it. Is that a law you can appreciate and follow?

A    Yes.

Q    And you should. It's a good law, I'll tell you that right now.

He's to be presumed innocent if and only until I prove to you beyond a reasonable doubt that he is guilty of the charge.

A    Uh-huh.

Q    There is no definition of reasonable doubt. It is whatever you think it is, Ms. Noble. It's not beyond all doubt whatsoever, you know.

A    Yes.

Q    It's not beyond a shadow of a doubt. I mean there's -- A reasonable doubt, if you have a doubt and it was a reasonable doubt, it would be, I would submit to you, because your doubt was based on reason and common sense.

A    Uh-huh.

Q    Versus something you just manufactured or you're looking for a reason to say that maybe aliens came out of the sky and actually did it. You know, is that possible? Maybe. But is that reasonable? Probably not, you know.

A    Yeah.

Q    So, what do you think reasonable doubt is?

A    Well, that's -- you mean if I had to --

Q    If I proved something to you beyond a reasonable doubt, how sure would you be?

A    Very sure.

Q    Very sure, fair enough.

A    Yeah, I see what you mean, yeah.

Q    Yeah, very sure, and that's a perfectly reasonable answer.

A    I would have no doubts.

Q    Okay. Okay. And you say you would have no doubts.

A    Uh-huh.

Q    Really the standard is you would have no reasonable doubts.

A    No reasonable doubts. Okay.

Q    And I don't want to change your mind. I want to hear what you have to say. Because some people say, look, in a case like this, in a case of this magnitude, I know you're telling me you only have to prove it to me beyond a

reasonable doubt, but I'm telling you I can have no doubt whatsoever.

You know, those people are asking us to carry a burden that maybe we really can't do.  But that's fair, that's their opinion.

So, when you say you would have no doubts, what are you -- what are you saying?

A    Well, I would, in my mind, feel that what I decided on was right and I felt good about it.

Q    Okay.

A    And that's what I would go with.

Q    I got you.  Excellent, excellent.  I think that's a very fair answer and I appreciate that.  I think you're certainly on the right track with that.  You want to be darn sure, as some people say.

A    Yeah, yeah.

Q    Okay, that's fair enough.  You should be.

A    Uh-huh.

Q    I have to prove this case to you.  There are certain things I have to prove.  We call them elements of the offense. I have to prove to you who did it, when they did it, where they did it, in Dallas County, who they allegedly murdered, and how they murdered that person.

And every one of those elements is just as important as the other one.  I don't get points for just

proving five out of six.  You know, I have to prove them all.  Okay?

A    Uh-huh.

Q    And every one of those is just as important as the next.  For example, I'm going to give you a far-out example.  Okay.  And sometimes we come up with very wild hypotheticals just to illustrate a person's ability as to whether or not they are qualified.  Okay?

Let's say you're sitting on a case, a murder case, and it's alleged that a person has -- I have alleged in that indictment, which means everything in that indictment I have to prove.  I'm stuck with that, okay?  And I have alleged that that person killed this other person by shooting him with a gun.  Okay.

Now, we go to trial.  I put on my case.  You even hear a confession from the defendant that says, yeah, I killed the guy and I'm glad I did it.  Okay.  But the medical examiner comes into the court and the medical examiner, she testifies that, yeah, your victim is dead, you know.  But he didn't die from a gunshot wound like you've alleged in the indictment, he died from being stabbed.

Have I carried my burden of proof?  Have I proved my case?

A    No.

Q    I haven't, have I?  What would be your verdict?

A    Not guilty.

Q    Not guilty, that's right. And it wouldn't be your fault, Ms. Noble. It would be my fault. And after you return that verdict of not guilty, I'm going to suggest to you, you go straight upstairs and talk to my boss and tell him I've got a little problem figuring out how to charge cases, right?

A    Uh-huh.

Q    Because your obligation as a juror would be to return a verdict of not guilty.

A    Yes.

Q    You could do that, you understand that?

A    Yes.

Q    You know, in my hypothetical I mentioned that, you know, the defendant made a confession. I'm sure you've heard of the fifth amendment right of a person not to testify.

A    Uh-huh.

Q    Basically what that says is I can't force anybody to testify. I can't force any defendant to testify. That's their decision --

A    Yeah.

Q    -- and their decision only. And it's well grounded and justified in the law, and there is probably a million reasons why somebody might not want to testify. We might all want to hear both sides of the story, but you might not

get that side of the story --

Q    Uh-huh.

Q    -- from a defendant in a case.  The law says, if that happens, you can't hold that against him.

In other words, let's say I finish my case. You go back to deliberate and you say, the district attorney has not quite proved to me beyond a reasonable doubt that the defendant did it; but because he didn't testify, I'm going to find him guilty.  You can't do that.

A    Oh, yeah, yeah.

Q    You see how that would be using it against him?

If you go back there and you say, she's proved her case to me beyond a reasonable doubt.  Now, had he testified, it might have made a difference, but he didn't. That's fine and that's okay because I proved my case.

A    Uh-huh.

Q    Will you hold it against a defendant if he doesn't testify?

A    No.

Q    Okay.  That burden stays with me throughout the case.  It never changes.  It never shifts.  Okay.  You always look to me.  You always look to me.

A    Uh-huh.

Q    Their only obligation is to show up, and they have already fulfilled that obligation.  Okay?

Now, before we talk about capital murder, I want to talk to you about some other things, okay, some other things that may or may not happen in a criminal case.

A capital murder, and we asked you, you know, what kind of cases that you felt -- it should be in here -- what kind of cases that you felt the death penalty should be available in Texas, on page four in the top question, and you said murder and harming children. Okay.

I'll tell you a capital murder case is this and is always this. It's always the intentional taking of another person's life, okay, not the accidental taking of a life, not that I recklessly caused somebody's death, not that I --

A    Uh-huh.

Q    I intentionally caused this person's death. I meant to do it and I did what I had to do to accomplish it. That's an intentional murder. Okay?

A capital murder is an intentional murder plus something else, something we often call an aggravating factor. Okay. The intentional murder, for example, a capital murder plus that it was a peace officer in the line of duty, or it was the intentional murder of a child under six years of age, or it was the intentional murder of two or more people at the same time, the same criminal episode, or it was the intentional murder of somebody while in the

course of committing another felony like burglary or robbery or sexual assault.

Does that make sense to you?

A    Uh-huh, uh-huh.

Q    So, not all intentional murders are capital murder cases and, therefore, eligible for the death penalty.

A    Okay.

Q    Okay.  You got that?

A    Yeah.

Q    I could pull a gun out of my briefcase.  Ms. Evans is minding her business here.  And I could just shoot her ten times, you know, a heinous act, wasn't it?  And clearly I've intended to kill her, haven't I?  I shot her ten times.

A    Uh-huh.

Q    Not a capital murder, though, because there is not that additional aggravating factor.

A    Okay.

Q    In a capital murder case, I have to prove to you that there was that additional aggravating factor.  Okay.  I also have to prove to you that it was an intentional murder. If I fail to prove one of those two things to you, your obligation is what?

A    Not guilty.

Q    Not guilty of capital murder because I didn't prove that intent or I didn't prove that other factor.

A    Okay.  If that's what the charge is.

Q    Exactly.

A    Okay.

Q    So, not guilty of capital murder.  That might not necessarily mean that everybody goes home and you take the elevator downstairs with the defendant.

A    Uh-huh.

Q    Because you might be called upon now as a juror to consider, well, they are not guilty of capital murder, but they may be guilty of something else.  Okay.  It's not capital murder, but maybe they are just guilty of murder because she didn't prove the robbery.

See what I'm saying?

A    Okay.

Q    So, we call them lesser included offenses because capital murder is the highest you can go.

A    Okay.

Q    You know, and everything else under that might be a lesser included offense.  I didn't prove there was a robbery or I didn't prove it was intentional, he's not guilty of capital murder.  Well, maybe he's just guilty of a regular murder.  And I hate to say regular because there might not be anything regular about a murder.

But now what you look at, there's several different ways a person could commit murder.  We call them

mental states, mental culpability.  What was going through my mind, what was motivating me to commit that murder?

A     Uh-huh.

Q     And that determines how serious the offense is.

In a first degree murder, not a capital murder, I can still intend to cause the person's death like I did Ms. Evans here.

A     Uh-huh.

Q     And that's a first degree murder.

There is another way you can commit murder called manslaughter, and it's not considered as serious an offense because the punishment range is less.  And that would mean that I caused somebody's death, but I did it recklessly.

Okay.  Let's say, for example, I don't mean to kill Ms. Evans.  You know, I don't even really want to hurt her, but I'm clowning around with my new Glock gun and I just kind of want to scare her and, so, I'm shooting around her.  Well, I miss.  I'm a terrible shot with my new Glock, and I actualy hit her in the leg and she bleeds to death. Have I caused her death?

A     Yes.

Q     Did I mean to cause her death?

A     No.

Q     No, no.  So, it might be a manslaughter.  Does

that make sense to you?

A   Yeah.

Q   You can even go lower to something called a negligent homicide which means I caused somebody's death because I was negligent.

I'm driving on the highway.  Instead of paying attention like I should be, I'm messing around with my new CDs down here.  I'm looking for my, you know, Stevie Wonder CD.  I'm not paying attention.  I look up, oops, there is somebody.  I hit them and I cause their death.

Did I mean to kill them?

A   (Shakes head).

Q   Did I even want to kill them?

A   (Shakes head).

A   Did I even know they were there?

A   No.

Q   Am I still responsible for their death?

A   Yes.

Q   Yeah.  So, do you see what I'm saying, Ms. Noble?

A   Yeah.

Q   That sometimes -- And it all has to do with what was going through my head at the time.  You know, we call it mens rea, you know.  But you would look at that and make the determination, if they are not guilty of capital, maybe they are guilty of something else.

Does that make sense to you?

A    Uh-huh.

Q    If that happens, for example, if I don't prove that intentional or I don't prove that robbery but I do show it's an intentional, the punishment -- a jury would be called upon to assess the punishment. And the punishment now could be anywhere between five years in prison up to ninety-nine years or life in prison.

You've heard the expression, let the punishment fit the crime?

A    Uh-huh.

Q    That is what our justice system is all about and that's what you're called upon to do in a punishment phase. Look at the offense, look at the surrounding circumstances, look at the evidence, and let the punishment fit the crime.

Does that sound fair to you?

A    Yes.

Q    Does it make sense to you?

A    (Nods head).

Q    It's kind of like in your verdict, let the evidence fit the verdict. You know, if it's a manslaughter, it's a manslaughter. If it's a capital, it's a capital. But it's determined by the evidence. The punishment is also determined by the evidence.

You go into that punishment phase now and

you would decide, well, am I going to give this person who committed a first degree murder, an intentional murder, am I going to give him as low as five years in prison or as much as ninety-nine years in prison or maybe ten years or thirty-five or fifty?

You know, and you've got to look at what in order to make that determination?  What do you have to look at?  What's going to help you decide what's appropriate?

A    Well, what went on in the evidence.

Q    Yeah, yeah.

A    And the deliberations.

Q    Can you tell me right now what you would do in every first degree murder?

A    Oh, no.

Q    No.  And just to give you a hypothetical to illustrate why we have this wide range of punishment.  If I told you to envision a 35 year old man of sound mind who planned out the intentional murder of a helpless ten year old boy and went and did it, what's your first reaction to that?

A    Well, bad.

Q    It's heinous.  I think a lot of people would say he ought to be put, not only life in prison, but maybe under the prison.  That sounds horrible, doesn't it?

A    Yeah.

Q    But if I change that hypothetical a little bit to you and I tell you that that 35 year old man, he's actually the father of that ten year old boy.  And he is -- That 35 year old man has been a good man his entire life.  He's been a good father.  He's been a good husband.  He's been a good citizen, a hard worker.

But that ten year old boy is dying of cancer. He's in Children's Medical Hospital diagnosed with terminal cancer.  He will die.  There will be no cure for this boy. His death is inevitable.

But if that wasn't bad enough, it's a slow and painful death.  And he sits by his bedside every day, cries more tears if not than his son does.  And he watches his son suffer and writhe in pain every minute that he's alive.

And that father says, I can't watch this any more.  I have nothing but sheer devotion and love for his boy, for his little Cub Scout, his little man.

A    Uh-huh.

Q    He goes and gets some morphine out of a doctor's cabinet and he comes in and he gives him a hot shot of morphine to kill him because he believes it's the kindest, most humane way to put his little boy out of suffering.

Did he cause his death?

A    Yes.

Q    Sure did, didn't he?  It's a first degree murder, isn't it?  He intentionally caused his death.

A    Uh-huh.

Q    Maybe there is a world of difference between that guy and the guy who takes an AK-47, goes to the park, picks out a boy, shoots him in the head.

A    Uh-huh.

Q    And that's meant to illustrate to you that the facts -- the punishment has to fit the crime.

A    Uh-huh.

Q    Do you think you are capable of doing that, of assessing punishment anywhere within that range?

A    Yes.

Q    Based on the facts of the offense?

A    Yes.

Q    Okay.  Those are what we call our lesser included offenses.  But I want to talk to you about capital murder now.  Okay.  Let's direct our attention more towards that area there.

A    Uh-huh.

Q    And as I said, you always base your verdict on the evidence in the case and you don't jump to any conclusions.  But if I prove to you beyond a reasonable doubt that there was an intentional murder and that it was committed in the course of the defendant committing or trying to commit a

robbery, if I prove that to you beyond a reasonable doubt, then I am entitled to a verdict of guilty.

A    Right.

Q    Okay?

A    Yes.

Q    All right.  And will you do that?

A    Yes.

Q    Okay.  Now, that's the first part of the trial. There's two parts to every trial, and that's the first part of the trial.  And you have done that before and you returned your verdict --

A    Uh-huh.

Q    -- at that point from the judge.

We now move on to the second phase of the trial, and it's almost like it's an entirely separate trial. Okay.  You're going to look at the evidence all over again. You're going to come in with an open mind and you are not going to jump to any conclusions.  Okay.  You've found the person guilty.  Now we move into the second phase.

This person is guilty of capital murder now. Okay.  You've found that.  All right?

A    Uh-huh.

Q    Only one of two things can happen to a defendant if they are found guilty of capital murder.  What is that?

A    Life in prison or the death penalty.

Q    Or the death penalty.  That's right.  The best that they can ever hope for is that they will at least spend the rest of their life in prison.  Okay?

A    Uh-huh.

Q    Remember that presumption of innocence in the first part of the trial where you were to presume him innocent until I proved to you beyond a reasonable doubt he was guilty of the charge?

A    Uh-huh.

Q    Remember that presumption?  There is a presumption in the second part now, too.  Okay.  And the presumption is is that the right thing to do in this case is to give him a life sentence.  And the reason you are to presume that a life sentence is the right thing to do is because I haven't proved to you beyond a reasonable doubt that a death sentence is the appropriate thing.

Does that make sense?  Are you following with me there?

A    Not exactly.

Q    Let me, let me just step back a little bit.

What a jury doesn't do is a jury doesn't now go back into the jury room and go, all right, let's sit around, let's all have a cup of coffee and talk about does he deserve to live or does he deserve to die.  Should we give him life or should we give him the death penalty?  It

doesn't work that way.

Okay.  Instead, the way you arrive at your ultimate verdict of if they get life or they get the death penalty is by answering three questions, those special issues.

A    Oh, okay.

Q    And based on how you answer those questions will ultimately determine what will happen in the case.

A    I see.

Q    I think you -- kind of a bulb went on, you get it now.

A    Yeah, uh-huh.

Q    Okay.  Well, the presumption -- the burden of proof, who are you looking to again?

A    You.

Q    You're looking to me.  And I am asking you to do something, I'm asking you to engage in something very serious, am I not?

A    Yes.

Q    We're talking about assessing the death penalty, aren't we?

A    Yes.

Q    We are talking about me asking you to essentially figuratively sign a death warrant for somebody, right?

A    Uh-huh.

Q    Well, ought not I have to prove -- ought not I should have to prove to you that that's the proper thing to do before you do it?

A    Yes.

Q    Sounds fair, doesn't it?

A    Yes.

Q    Okay.  That presumption of innocence over there, now it's a presumption that the life sentence is the proper thing to do.  Because have I proved anything to you yet?

A    No.

Q    I haven't proved to you why he should get the death penalty, have I?

A    No.

Q    Okay.  You go in presuming a life sentence is the right thing to do.  Will you do that?  Will you go in presuming a life sentence is the right thing --

A    Oh, okay.

Q    Will you do that?  Will you follow that law?

A    That's the first step.  Yes.

Q    You've already found him guilty of capital murder.

A    All right.

Q    Okay.  You've already found him guilty of capital murder.  You're going into the punishment phase now.

A    Okay.

Q    Where you're going to decide if it's a life

sentence or death penalty.  Okay?

A    Okay.

Q    But as you go into that phase of punishment, you're to presume the right thing to do is give him a life sentence.  Okay?

A    Why are you to presume that?

Q    Because I haven't proved to you that he deserves the death penalty.

A    Okay.

Q    Does that make sense?

A    Yeah.

Q    Okay.

A    I mean that's just the first step.

Q    Yeah.  I'm just telling you before --

A    Okay.

Q    -- we answer any questions.

A    Okay.

Q    Before we answer any questions or start anything or hear even a shred of evidence, you're to presume that life is the right thing to do.

A    Oh, okay.  I see what you mean.

Q    You get it now?

A    All right.

Q    Okay.  And you are going to presume that the life sentence is the proper thing to do until I prove to you

beyond a reasonable doubt otherwise.

A    Okay.

Q    Okay.  I think you --

A    All right.

Q    You get what I'm saying?

A    Yeah.  I was at the end and you were at the beginning.

Q    And I'm at the beginning, exactly.  I'm at the very beginning talking about --

A    Yeah, okay.

Q    -- before you ever heard anything.

Because what you can't do, Ms. Noble, is you can't say, look, I found the guy guilty of capital murder. He's clearly intentionally killed somebody.  It wasn't an accident, it wasn't self-defense, it wasn't manslaughter. He meant to do it and he did it.

A    Uh-huh.

Q    You know, and he did it in the course of committing a robbery, or trying to.

A    Uh-huh.

Q    And what you can't say is, look, I found him guilty of capital murder.  I'm automatically going to answer these questions in a way that will assure the death penalty.

You would be unqualified if you had that attitude.

A    Yeah.  Okay.

Q    You see what I'm saying there?

A    Yes, yes.

Q    Because you haven't heard anything yet, have you?

A    Yes.

Q    You haven't answered those questions yet, have you?

A    No.

Q    So, you've got to go in blank again.

A    Okay.

Q    All right.  So, we go into the first part.  You're going to answer some questions.  Okay.  And again you're looking to me to prove everything.  They are called special issues.  And I think you've had an opportunity to read them.

A    Yes.

Q    I'll tell you this, we didn't write those special issues.  They were written by our lawmakers, you know.  Sometimes they are a little confusing and, so, I want to walk you through those.  Okay?

A    Okay.

Q    And maybe talk to you in ways that we can both understand it because you don't have to be a lawyer to do this.

A    Okay.

Q    That's what's most important.

A    Yeah.

Q    The first question you're asked to answer is what we call up there special issue number one. It's hidden a little bit behind that other one, but you've also got it --

THE COURT: Let me space that out.

MS. HANDLEY: Judge, thank you so much. Thank you.

Q    We also refer to this, Ms. Noble, as the future dangerousness issue. And essentially what's going on here is I'm having to prove to you beyond a reasonable doubt that the defendant is a future danger. Okay?

A    Okay.

Q    I'm asking you to make a prediction, and I am having to prove to you that he's going to be a future danger. Okay?

A    Okay.

Q    Now, the issue reads, do you find from a reasonable -- Do you find from the evidence beyond a reasonable doubt that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society?

You won't get any definitions of what those terms mean, just like you didn't get a definition of reasonable doubt. It's whatever you think it is. Okay?

A    Uh-huh.

Q    But I think it's fair to say that when it starts

out, do you find from the evident beyond a reasonable doubt, they are talking about you're looking to me to prove it again, right?

A    Uh-huh.

Q    Any time you hear beyond a reasonable doubt, that means did the State prove it to you, okay?

A    Okay.

Q    Are you with me on that?

Did the State prove it to me beyond a reasonable doubt?  Did they prove to me that there is a probability, okay?

A    Uh-huh.

Q    What do you think a probability means?

A    Whether yes or no, you're not sure.

Q    Okay.

A    Is it possible, is it possible?

Q    Is it possible?  Well, let me ask you this.  Do you see a difference between something being a possibility and a probability?

A    Yes.

Q    Okay.  Anything is possible, isn't it?

A    Yeah.

Q    It's possible I could win Olympic gold in the swimming and beat Michael Phelps in the next four years.  It's probably not probable, though, is it?

**Anne B. Meredith**
Certified Shorthand Reporter

A    No.

Q    Because I don't even swim.  Okay.  But anything is possible.

A    Yes.

Q    They are not asking, is it possible.  They are saying, is it probable.

Okay.  Some people tell us that probability means it's more likely than not.  Would that be a fair --

A    Uh-huh.

Q    Yes?  Okay.  If I prove to you beyond a reasonable doubt that it's more likely than not that this defendant will commit criminal acts of violence.  Again, that's not defined for you, okay, criminal acts of violence.

But what it doesn't say, Ms. Noble, is it doesn't say if I prove to you it's more likely than not he'll commit another murder or that he will commit an assault or that he will commit -- make threats against other people.  It doesn't say what criminal acts of violence are.

A    Uh-huh.

Q    It's for you to decide --

A    Yeah.

Q    -- what's a criminal act of violence.  Okay.  It doesn't limit you.  It doesn't say I have to prove to you that he will kill somebody again.  Okay?

A    Uh-huh.

Q    If I were to ball my fist up and just punch Ms. Evans in the face, you think that would be a criminal act of violence?

A    Yes.

Q    If I were to make threats against her and her family, do you think that's an act of violence?

A    Yes.

Q    Okay.  And that's for you to decide --

A    Uh-huh.

Q    -- what's a criminal act of violence.  Do you see what I'm saying there?

A    Uh-huh.

Q    So, is it more likely than not this defendant will commit criminal acts of violence, not just one, but at least two -- it's a plural.

A    Uh-huh.

Q    -- that would constitute a continuing threat to society?

Okay.  Now, let's keep in mind he's been found guilty of capital murder, right?

A    Okay.

Q    And what's the presumption that you should do at this point?  What's the presumption of the sentence at this point?

A    You mean like guilty, not guilty?

Q    No.  Remember we talked about he's guilty.  And you go in now presuming that a life sentence is the appropriate thing to do.

A    Okay.

Q    Right?  Because if you're guilty of capital murder, only one of two things can happen, right?

A    Okay.  All right.

Q    Right?  Either death or what?

A    Death or life in prison.

Q    Life in prison without parole.

A    Uh-huh.

Q    So, if he gets life in prison without parole -- because you're to presume that, right?

A    Okay.

Q    Until I prove to you otherwise that he deserves otherwise.  -- where is he going to be the rest of his life?

A    In prison.

Q    In the prison.  Now, it says that will constitute a continuing threat to society.

When you hear the word society, what do you think of?

A    Well, everyone, I mean as people.

Q    Yeah.

A    No matter where they are.

Q    Yeah.  Maybe going to the grocery store, maybe going to the movies.

A    Uh-huh.

Q    Maybe talking to people at work.  We all live and act in a society of people, don't we?

A    Uh-huh.

Q    Well, the defendant will be spending the rest of his life in prison.  Okay.  And in prison, there's people other than inmates, aren't there?

A    Yeah.

Q    There's guards, there's educators, there's people who come to visit.

A    Uh-huh.

Q    You know, there's nurses.  There's just all kinds of people who live there, or who work there, I'm sorry.  But there's people who also live there, inmates.

A    Uh-huh.

Q    They sleep there, they eat there, they recreate there, they watch TV there, they lift weights there, they do whatever it is that they do there, right?

A    Uh-huh.

Q    Can you see that that definition of society might also include a prison as a society?

A    Oh, yes.

Q    Yeah, because that's where he's going to be the

*Anne B. Meredith*
Certified Shorthand Reporter

rest of his life.  Unless he escapes, he's going to be in that society, isn't he?

A     Uh-huh.

Q     So, this question is asking, Ms. Noble, am I able to prove to you beyond a reasonable doubt that it's more likely than not this defendant will commit criminal acts of violence that will be a threat, a continuing threat to the people in the society he lives in, to the people inside the prison walls?

A     Uh-huh.

Q     Okay.  Do you think there is ever any violence in prison?

A     Oh, yes.

Q     There probably is.  I think that that might be a reasonable assumption.

A     Uh-huh.

Q     And the question asks you to make a prediction as to whether or not this defendant will engage in any criminal acts of violence and, if he does, will he be a threat to the people around him.

Does that make sense to you?

A     Yes.

Q     I have to prove that to you, that more likely than not that's going to happen.

What kind of things do you think you would

have to hear or know in order for you to decide if somebody was going to be a future danger in the prison?

A     That there is more, more acts, that a person has done other things, that this was a pattern or this was -- this is something that's happened before or other similar things --

Q     Uh-huh.

A     -- have happened before, and that this is more likely that something will happen again.

Q     Sure, sure.  You know, sometimes people say, I think maybe one of the best predictors of how a person will act in the future is what they have done in the past.

A     Uh-huh.

Q     You know, or how they act.  How did they act before this crime?  How did they act after this crime?

Do you think that's information that would help you decide whether or not somebody was going to be a future danger?

A     Yes.

Q     You, you look at all that evidence, and that's how you answer that question yes or no.

A     Uh-huh.

Q     Okay.  And you don't go into it and make any automatic assumptions.  You have to look at the evidence and then answer that question.  Is that what you'll do?

A    Yes.

Q    Now, some people might say, Ms. Noble, look, I found this person guilty of capital murder.  He intentionally killed somebody and did it in committing a robbery.  I don't need to see anything else and I don't even need to debate the issue.  I'm going to find him a future danger automatically.  Is that person following their oath?

A    No.

Q    Okay.  Why not?

A    They aren't listening to what's going on, what happened, what people say, paying attention.

Q    Right.  They have already made up their mind, haven't they?

A    Uh-huh.

Q    They have already jumped to that and it's not based necessarily on what's gone on.  That's not to say you can't go back again, look at the crime itself, and you might look at the crime and go, in my opinion, looking at it again, I think it's bad enough that I can tell you right now, I think he's a future danger just based on what he did.

You can do that.  Or you can do like you're saying, I want to see a little bit more than just the crime.  I want to see some other things outside of the crime.

Does that make sense to you?

A    Yes.

Q    And I am hearing you would like to see maybe --

A    Yeah.

Q    -- some additional evidence.

A    Uh-huh.

Q    But, regardless, you won't jump to any conclusions there?

A    No.

Q    Okay.  If you answer that question no, he's not a future danger, he will get that life sentence.  Okay.  And that's it, that's all, you go home.

A    Uh-huh.

Q    Okay.  Go back to fixing things at the house. All right.  That's it.

A    Yeah.

Q    And the defendant will go to prison for the rest of his life.  Okay?

A    Uh-huh.

Q    Because I didn't prove it to you, so that presumption of life is appropriate.

If you say, though, you know, Ms. Handley, you and your colleagues have proved to me beyond a reasonable doubt he's a future danger, then you answer that question yes.

A    Uh-huh.

Q    Okay.  Then you move on to the next special issue.

And that's, that's worded so, so crazy, I think a lot of people come in, they go, I don't get this special issue. What in the world is that? So, I'm going to try to explain it to you as easy as I can.

In Texas we have something called the law of parties. Okay. And basically it means that, that two people involved in committing one crime can equally be held liable for it. Okay?

A    Yes.

Q    If Ms. Evans and I go home tonight, sit at my kitchen table and plan out the robbery of my local 7-Eleven, and she goes and gets the gun and I go and buy the bullets, and we decide the best time to go to the 7-Elevan because we know the clerk will be alone. We drive up there in her car. She hands me the gun. I load it and say, I'm going in, you keep a lookout for me and you blow the horn if you see anybody coming.

A    Uh-huh.

Q    And I got a loaded gun and I am going to do what I gotta do to get this done. I go in the store. I not only take all the money out of the till, I rob the woman, the clerk, but I also shoot her five times. I intend to kill her and I do.

Am I guilty of capital murder?

A    Yes.

Q    Okay.  Do you think Ms. Evans could be guilty of capital murder?

A    Yes.

Q    Okay.  The law in Texas says if she aided, assisted, encouraged, if she participated in that offense -- she doesn't have to be the triggerman, so to speak -- she can be held just as guilty as I am.

Now, there is a little something different, though.  In order for her to be guilty of capital murder, okay, the law says that she should have anticipated somebody was going to die.  You would have to find that she should have anticipated.

Do you think when I said, I got my gun, I got it loaded, I'm going to do what I'm going to do, you think she should have anticipated that somebody would die?

A    Uh-huh.

Q    Maybe it could be reasonable?

A    Uh-huh.

Q    When you get to this question, they are asking you, look, is this particular defendant the actual triggerman or is he the guy that actively participated in the offense, okay?

A    Okay.

Q    Not only should have anticipated that somebody was going to die, but actually did anticipate somebody was going to die.  Does that make sense to you?

A    Okay.

Q    Do you see a difference between --

A    Uh-huh.

Q    -- in the first part to find him guilty of capital, he should have anticipated; in order to be eligible for the death penalty, he did anticipate it?

Does that make sense to you?

A    Yeah.

Q    Do you see the distinction there?

A    Yeah.

Q    Okay.  If you don't think he anticipated that somebody was going to die, if you don't think Elaine Evans ever anticipated I would actually kill somebody, then what do you do?  How do you answer that question?

A    Then she is not guilty.

Q    You would answer that question no.

A    Yeah.

Q    Yeah, you would answer that question no.

A    Yes.

Q    Okay.  If you answer that question no, he gets a life sentence.

A    Uh-huh.

Q    You go home.  That's it, that's all.  Okay?

A    (Nods head).

Q    If you say, yeah, she was a party to it and she

knew somebody was going to die, she anticipated somebody was going to die, then at that point, Ms. Noble, that defendant is now sitting straight on a death penalty sentence. Okay?

A    Okay.

Q    He's been found guilty of capital murder. You found that he's a future danger. Now he's a party to the offense. He's got a death sentence right there in front of him. Okay?

But it's not over yet. You have to answer one more question.

A    Uh-huh.

Q    Okay. Now, I've been talking a lot about look to me, I have the burden of proof, I have the burden of proof. What's interesting about this last question is nobody has the burden of proof on it. I don't have to prove anything to you. They don't have to prove anything to you. It's just a question out there. It's the last question for you to answer. We also call it a safety net question.

And basically what it says is this -- I'm going to paraphrase -- is that, you know, we want the evidence to fit. We want the verdict to fit the evidence, right?

A    Uh-huh.

Q    And we want the punishment to fit the crime,

right?

A    (Nods head).

Q    Well, there might be cases out there where you look at all the evidence and you say, you know what, he's guilty of capital murder.  There is no question about it.  He's a future danger.  There is no question about it.  And he was a party to this.  But there was something in this case that tells me, even all that, death sentence isn't the right thing to do in this case.  Okay.

We call it the mitigating circumstances question.  Mitigating means it lessens.  You know, does it lessen his moral culpability in it?

A    Okay.

Q    Okay.  And it's a wordy issue.  You can see it up there.

A    Uh-huh.

Q    Special issue number three.  Let me carry you through that.  Do you find, taking into consideration all of the evidence.  So it's asking you again, let's look at all the evidence again and answer this special issue number three.

Let's look at all the evidence again.  Do you find from all the evidence, including the circumstances of the offense, including the defendant's character, including his background, his personal moral culpability, do you find,

looking at all of that, Ms. Noble, that maybe there is a sufficient mitigating circumstance that would cause you to change your mind to give him life versus death, okay?

A     Uh-huh.

Q     It's another way of saying, before we, before we sentence somebody --

A     Uh-huh.

Q     -- to death, we are going to make -- we're not going to tie your hands. We are going to let you make your decision based on everything in the case.

And you are required to go back in there and look at everything again. And you are required to ask yourself, is there a mitigating circumstance here, and not only is it mitigating, but is it sufficient enough that I'm going to change that verdict?

A     Yeah.

Q     Does that make sense?

A     Yeah.

Q     I can't tell you what a mitigating circumstance is. Okay. That's for you to decide. You know, some people -- You might look at it because it says, look at the circumstances of the offense. He's guilty of capital murder. He meant to kill the person. He was a party to it.

You  might look at the circumstances of the offense and say, you know what, this defendant, he actually

stayed behind and tried to save the victim's life, and then later on he turned in the other people, and he's been on his knees begging for forgiveness every day.

Now, I think, I think if he's around his buddies, he might be a future danger and all that.  But you know what, based on what he did, based on maybe his character there, I think it's sufficient enough to give him life versus death.

Does that make sense?

A    Yes.

Q    You might look at his background.  He might be a defendant who was raised in a closet, fed dog food every day, and had his parents put cigarettes out on him.  And you may say, you know what, he's a monster, but his parents are worse.  And all he is is he grew up to be what his parents raised him to be.  And while he's dangerous, he doesn't deserve to die.  That's a mitigating circumstance.

There might be a hundred mitigating circumstances.  It might be -- Some people say the person's age.  Some people will say -- and I want to make sure and touch on this with you -- that, well, the person was intoxicated at the time, you know.  And maybe if he wasn't intoxicated, he wouldn't have acted that way.  You know, he hasn't done anything since then.  It might be mitigating, but it might not be enough.

A    Okay.

Q    You might think it's mitigating and you might think it's sufficiently mitigating to turn the verdict to life. I might say, that's nonsense, I don't think it's sufficiently mitigating. It doesn't matter.

We don't have to agree on it. Okay?

A    Okay.

Q    It's enough that you think that.

Now, you put some stuff in your questionnaire. We asked you some questions about a person's upbringing. We asked you some questions about, you know, when a person is intoxicated and how that might factor into a case.

I'll tell you, legally speaking, intoxication, voluntary intoxication -- I took the stuff myself. Voluntary intoxication, it's not a defense. I can't go, okay, sure I killed that guy, you know, but I was drunk.

You know, you can't --

A    Uh-huh.

Q    You can't use it as a defense.

A    No.

Q    It might come into play in that you could say, my mind was so altered that maybe I couldn't form the requisite intent to intentionally kill him. Maybe I just, you know, recklessly did it.

I mean, it does factor in and it is something

you have to consider.  Okay.  You don't have to give it any credibility after you've listened to it.  You decide whether or not to give it credibility.

Does that make sense?

A    Yes.

Q    So, it's not a legal excuse.  But if you saw evidence that somebody was intoxicated by drugs or by alcohol or something at the time of the offense, you might have to still look at it in special issue number three and ask yourself, do I think that's mitigating?  And you might go, that ain't mitigating.  Under no circumstances is that mitigating.

But now you've made your decision if it's mitigating or not, right?

A    Uh-huh.

Q    You decide whether or not it's mitigating.

So, on the upbringing, I think you put in there that, look, something to the effect that we all have our crosses to bear.  I don't think any -- You know, very few people were raised with a silver spoon in their mouth.

A    Uh-huh.

Q    So, it's really no excuse.  But it might be an excuse for some people.  It might have been so bad that you go, by the grace of God go I.  It's mitigating.  And then you decide, well, is it enough or is it just woe is me?

A    Yeah.

Q    Do you see what I'm saying there?

A    Yeah.

Q    But you do have to at least consider it.

A    Uh-huh.

Q    But you decide how much weight you want to give it.  Okay?

A    (Nods head).

Q    Do you have any questions about that?

A    No.

Q    Okay.  Because the defense is also going to have an opportunity to talk to you.  And I think that you're very -- you're very methodical in how you're following me here.  I think that when we explain things to you, I get --

A    Uh-huh.

Q    -- a good appreciation that you understand what's going on, and I think you've got a good sense of  fairness to you.  But if you don't understand something, stop, I don't get that, okay?

A    Uh-huh.

Q    I don't want to put words in your mouth.  I don't want anybody to put words in your mouth.

But just to summarize with you before we move on.  You will always base your verdict on the evidence in the case; is that correct?

A    That is correct.

Q    Okay.  If I don't prove my case to you, what's your verdict?

A    Not guilty.

Q    If I don't prove to you that a death sentence is the appropriate thing to do, what's your verdict?

A    Life in prison.

Q    Life, that's right.  No, you're absolutely right.  You're absolutely right.

And will you wait to render your verdict until after you've heard the evidence?

A    Yes.

Q    Will you jump to any conclusions?

A    No.

Q    Are you always going to say he's a future danger just because he's been convicted of capital murder?

A    No, ma'am, I won't do that.

Q    Okay.  You'll wait and decide that question --

A    Uh-huh.

Q    -- ultimately on the evidence in the case.

A    Yeah.

Q    Okay.  Okay.  Thank you so much --

A    Oh, you're welcome.

Q    -- for answering my questions.  It has been a pleasure talking to you, I'll tell you that.  Thank you,

Ms. Noble.

THE COURT: All right. Thank you, Ms. Handley.

Mr. Parks, you want to take a five minute recess?

MR. PARKS: Yes, sir, I do.

THE COURT: Okay. Let's take a five minute break and you can get you something to drink if you want to or go to the restroom or just walk around and stretch your legs a little bit.

PROSPECTIVE JUROR NOBLE: Okay.

THE COURT: All right. Relax a little bit. We'll be back.

PROSPECTIVE JUROR NOBLE: All right. Thank you.

THE COURT: All right. We'll be in recess for five minutes.

(After a recess, Defendant and Prospective Juror Noble present).

THE COURT: Go ahead and have a seat there, Ms. Noble.

Thank you, ladies and gentlemen. Be seated, please.

Mr. Parks.

MR. PARKS: Thank you, your Honor.

THE COURT: Yes, ma'am -- yes, sir. I'm sorry, counsel.

MR. PARKS: That's all right.

THE COURT: I was looking at Keri when I said yes, ma'am.

EXAMINATION

BY MR. PARKS:

Q   Ms. Noble, I'm Doug Parks, and with Mr. Lollar and Ms. Mallon, we represent Mr. Broadnax down at the end of the table.

A   Uh-huh.

Q   I'm going to have some questions for you obviously, just like Ms. Handley said that I would. We both get an opportunity to spend the same amount of time with the prospective jurors.

A   Okay.

Q   Sometimes we do take our whole time and sometimes we do not. But I expect that we will go, if not the whole way, we will go pretty far into the 45 minutes that I have, and that's one reason I wanted to go ahead and have a break.

A   Okay.

Q   If at any time, during the time I'm talking to you, you feel like you need another break or anything, just let us know that.

A   Okay.

Q    I also have a tendency to let my voice drop and I am a little further distance from you than Ms. Handley.  So if you get to where you're having trouble hearing me, let me know that also.  You won't hurt my feelings.

A    All right.

Q    I like to give jurors kind of a road map.  I'm going to talk to you basically in three basic areas, Ms. Noble.

I'm going to talk to you some about your questionnaire, I'm going to talk to you about the merits or guilt/innocence phase of a trial, and then I'm going to spend probably the better part of my time talking to you about these special issues in the punishment phase of a capital murder trial.  Okay?

A    Okay.

Q    Now, just because I spend a good deal of time on this punishment phase, it should not be taken by you as any indication that the defense team believes that this jury is going to find Mr. Broadnax guilty of capital murder.  That's going to be a contested portion of the trial.  We are not conceding anything.  Okay?

A    (Nods head).

Q    But I sometimes have concerns that jurors think, you know, in the back of their mind somehow, well, you know, those defense lawyers spend all their time talking about

punishment, they must be giving up on the first part of the trial.

A    No, sir.

Q    That's not so.  Okay?

A    Uh-huh.

Q    And I am going to talk to you, Ms. Noble, because it sort of bears on some of your answers in the questionnaire, I'm going to talk to you about some studies that have been done regarding jurors who have actually sat in these kinds of cases and what we've learned from that.  I do it sort of as a teaching prop to try to make a point about some issues in some areas of the law.  Okay?

A    Uh-huh.

Q    Now, you did come down and fill the questionnaire out the same day we had that whole crowd of people down there.

A    Uh-huh.

Q    And we had another crowd just like it in the afternoon, so a lot of questionnaires filled out that day. We do that because, you know, we don't want to be stretched for potential jurors in a case of this kind.  It's to everyone's benefit, the State's as well as the defendant's, to finally settle on twelve jurors who can be fair and impartial to both sides in the case.

It wouldn't be fair to the State if we were

to select a jury all of whom were against the death penalty and they told us that it would be a rare, rare, rare case indeed that they would ever impose the death penalty.

The same would be true, it wouldn't be fair to Mr. Broadnax or any other person --

A     Uh-huh.

Q     -- charged with a crime if we had twelve jurors on the jury that said, oh, you know, I really think the death penalty is the proper thing in almost every case and I would do it in almost every case.

We need twelve people who haven't really made up their minds about such things --

A     Uh-huh.

Q     -- and can wait and listen to the testimony. Okay?  Does that make sense to you?

A     Yes.

Q     Ms. Noble, let me start with your questionnaire since that's the place I generally like to start.  And we will start at the starting place on page one.  We asked all potential jurors whether or not they are in favor of the death penalty.  Frankly, most people marked that yes box just as you have.

And we ask, you know, to explain your answer. And you have put here that if a person is convicted of a crime and the punishment is the death penalty, it should be

done.  Then there is no possibility of this person harming anyone else.

If you could, Ms. Noble, could you expand on that just a little bit?  What were you thinking?  What are your thoughts in regard to that?

A    Well, not having a whole lot of information, I've already learned today a little bit more about what it means.  That was just my -- and having never done that, I just said that if a person was convicted of the crime.  And I didn't know about the choosing of the punishment levels and things like that, so it was kind of a statement that I didn't have any other information on except that's what I felt at the time.

Q    Okay.  And let me just ask you, Ms. Noble -- and I do this to almost all of the jurors I talk to.  When you filled this questionnaire out, did you do the best that you could at the time?

A    Uh-huh, yes.

Q    And the sentiments that you expressed and the answers that you gave us at that time, were they true reflections of the way you felt about these issues?

A    Yes.

Q    Okay.  So I'm assuming that whatever you've put here in the questionnaire is what you meant.

A    Yeah.

Q    And those were your feelings, and I am guessing probably feelings that you have had for a long time.  Is that fair to say?

A    Yes.

Q    Here's what I want to talk to you about this first page a little bit, and that's this.  Remember when I told you that we had done some studies about --

A    Uh-huh.

Q    -- jurors who had sat in these kinds of cases?  Almost 20 percent of the people who have served on capital murder juries believed, even after they finished their jury service, that the imposition of the death penalty was mandatory or required by law once they found a person guilty of capital murder.

Now, do you believe that?

A    I think I did believe that.  I didn't know there was other, other choices that were -- that there was a choice and a choice and a choice.  It was like it was either death penalty or in prison, that was the only two choices.

Q    Those are the only two choices.

A    But then it's like you can -- but the way you get to those two choices, there is this process.

Q    Okay.

A    That I didn't know that there was more of a process.  So, there really isn't a cut and dried answer for

one or the other.

Q   Was it your belief at the time that if a person was convicted of capital murder for which the State was seeking death, that death was required?

A   Yes.

Q   It was mandatory?

Do you believe that that's the way it ought to be?

A   I guess I have to say yes.  You know, I hesitate but yeah.

Q   Sure.  And there is something else that we tell people, Ms. Noble, and we haven't told you, I don't think, is that there are no right or wrong answers to these questions.

A   Uh-huh.

Q   The only thing really we are entitled to are your true feelings about these issues.  Does that make sense to you?

A   Yes.

Q   Okay.  Let me just -- Oh, yeah, I knew there was something I wanted to talk to you about.  On page three of your questionnaire, you've indicated down at the bottom that you have heard about the case, that you heard it on TV, radio or newspaper.

A   Uh-huh.

Q    And that, in fact, you live near there.

Can you tell us what you remember of having seen or heard about the case?

A    Just on the news, on television.

Q    Uh-huh.

Q    That it happened and where it happened.  And I was surprised.  And that was, I mean not across the street from me, but I'm a little close to the area.

Q    Sure.

A    And it was just like that what had happened, and then later that someone had been arrested.  I remember watching pretty much whatever happened.  I listened to the live speaker on the TV.  And we talked about it at work because there's a lot of people that live closer.

Q    Sure.

A    And just it was -- other things were happening in the neighborhood as well during that time, so it was kind of like everybody had a heightened awareness of criminal activities that were happening and, so, there was a lot of -- a lot of talk about it.

Q    Okay.  About how far from this location did you live?

A    I'm like northeast Richardson.

Q    Okay.

A    And just right close to Jupiter.

Q    Okay.  Ms. Noble, based on any of the information that you may have heard or read, or any of the information that may have been given to you by others that you were talking to, do you believe that you've formed an opinion as to whether or not Mr. Broadnax is guilty or innocent of the offense?

A    I didn't form an opinion.  I mean I don't know.

Q    Based upon anything, whatever you've heard, read, or from whatever source, have you formed an opinion as to the proper punishment for whoever is guilty in this case?

A    No.

Q    You can keep an open mind as to any of that?

A    Yeah.

Q    You're not going to bring any of that into the courtroom with you?

A    No.  No, sir.

Q    Okay, fair enough.

Over on page seven, Ms. Noble, we ask toward the middle of the page, do you believe police officers are more likely to tell the truth than the average person?  You indicated that you believe that is so and that they can be trusted.

Fill that out for us a little bit.  What causes you to come to that conclusion?

A    I've just known some in my lifetime, and the ones

I've known are good. And I always was told, if I needed any help, I could always go find a policeman.

Q  Sure.

A  And I still, I still believe that. And I think for the -- I know some may not be as good as others, but I think it's always safer to do that.

Q  Okay.

A  I feel that they really are good people. They protect you, and that's what they are for.

Q  You know, my brother-in-law was a long-time Garland police officer for over thirty years, and my niece is a police officer now. I understand what you're saying.

Let me, let me tell you what the law says about, not just police officers, but all witnesses. The law says that no class of persons are entitled to belief just because of who they are.

Now, the law says that. That doesn't mean that people have to go by that, you understand.

A  Uh-huh.

Q  So, basically what it says is is that whether it's a priest, a police officer, an accused citizen, a lawyer, or whoever it may be, a doctor, that just because they are who they are or what they are, they are not necessarily entitled to belief.

Some people don't think that that's right.

They have so much respect for say police officers that if a police officer takes the stand and testifies, they are going to believe what they have got to say.

And I suppose there are some citizens who, for whatever reason, wouldn't believe anything that a police officer says.

A    Uh-huh.

Q    How do you stand on that?

A    I have to go back to the jury I was on.  There was a police officer and it turned out we did not -- I did not believe him.

Q    Okay.

A    And that was the reason that the person on that case was not guilty because I didn't think he said the truth. And it was kind of hard to say, but I just, after all the things that were said and then what he said, I -- so I didn't trust that particular policeman.

Q    Police officers are human just like --

A    Yeah, it could be anybody.

Q    Tell me again, was that a DWI case?

A    A DWI, yes.

Q    Okay, fair enough.

Also on that same page, down at the bottom, we've got a series of boxes to be checked.  And on that very last one, it says, criminal laws treat criminal defendants

too harshly, and you marked that you strongly disagree with that statement.

Can you expound on that for us a little bit? Why do you come to that conclusion?

A    Well, let me -- I'll have to read this again.

Q    Sure.

A    I think I was just thinking at the time that there are some times that the punishment does not fit the crime. Someone is given too much, you know, ten years for a minor --

Q    Thing?

A    -- something that happened.

Q    Sure.

A    And there again, I think, you know, the circumstances, I think sometimes that that happens.  In fact, I think it happens a lot.

Q    Fair enough.  All right.

Now, I want to then go to page four, and that's probably going to lead me in to some of the issues that I want to talk to you about in guilt/innocence or the merits phase of the trial.

You've indicated to us here that, on a scale of one to ten, in asking you how strongly you believe in using the death penalty, and you put that you're a ten.

Is there any reason why you would have gone to the extreme of ten?  Can you enlighten us a little bit

about your feelings about the death penalty in that regard, the purpose that it serves?

A    Well, it was like if that's what the penalty was going to be or that was -- and that fit the case, then that's the answer.  It's ten or it's one.  It's like either a yes or a no.  There is no -- I didn't feel there was really any middle ground.

Q    Okay.  I see what you're saying.  Now, again you use the term, if that's what the penalty is going to be.

A    Yeah.

Q    We are on the same page, are we not, that the death penalty is never mandatory, or not?  Do you believe that it is mandatory?

A    Oh, no, not mandatory.

Q    Okay.  If I --

A    Yeah.

Q    If I'm with you where we are so far --

A    Yeah.

Q    -- you understand that it's not mandatory, but you think that it probably ought to be.  Is that what you told me earlier?

A    I think that's what I -- yeah, and I am learning a lot more that I didn't know.

Q    Sure.

A    So I didn't, you know --

Q    And that's why we set aside this amount of time to talk to people.

A    Yeah.  Yeah.

Q    There's not one in a hundred --

A    There is a better way to come to that decision, and maybe that's not always the decision.  I used to think it was, that was the decision.  Now I know different.

Q    On the same page we asked you, do you think the death penalty is ever misused?  And there is a purpose in me going through this, Ms. Noble.  And you indicate no, that after sentencing, a person has a chance for appeal and there is a waiting period.  I think they are careful.

And that sort of ties into another question that we asked you.  It is a philosophical question that can be found on page eleven and it's about a third of the way down the page.

And we asked, do you agree with the following statement?  It is better that ten guilty people go free than one innocent man be convicted.  You indicated you did not agree with that statement, that it seems that the innocent will be saved, sometimes it just takes a while.

And frankly, here is my concern, Ms. Noble, with both of those particular answers, and that is this. The State has got a burden of proving what it is they have to prove.  They have to prove guilt beyond a reasonable

doubt.

A    Uh-huh.

Q    They have to prove the answers to the special issues one and two to be yes.  And any accused citizen is entitled to have a juror who can do that without any consideration of anything other than did the State of Texas prove it to me beyond a reasonable doubt.

And my concern, frankly, is this.  Is with a juror who would say, well, you know, I think that probably the defendant is guilty just exactly as he's charged and I think that the State's evidence has indicated to me that he probably is guilty.  They may not have gotten quite to that beyond a reasonable doubt level that the law requires.

But if I'm wrong, the appeal process is going to save him.  It may not be right away, but before this is over, if he really is innocent, then that will come out and I wouldn't have really done very much harm at all.  And, so, I'm going to go ahead and vote guilty because I would hate like the dickens to know that I had found a person not guilty who actually had done the crime.

You see what I'm saying?

A    Yes.

Q    Do you feel like that you would feel that way at all if you sat as a juror in the case?

A    Umm, I, I -- this was a long thing to figure out.

Q    Oh, sure, I understand it was.

A    I think that I wouldn't have any trouble with saying one way or the other.  I think that -- I actually think I had the process reversed.  And as I said, I'm learning a lot that I might have written something different maybe.

Q    So, can I take it from that that you would put the State to their burden of proof without consideration of the appellate process or any lessening their burden on you at all because of that?

A    I'm not -- I'm not understanding.  Give me a -- I'm a little confused.

Q    You don't concentrate necessarily on the question itself, Ms. Noble.  It's the principle of it.  It's the issue that I'm mostly concerned with.

A    Okay.

Q    Because you're aware that there is an appellate process.

A    Yes.

Q    That is obvious from your answers.

A    Yeah.

Q    And the indication, at least to me, is that there may be some reliance on the appellate process in your thinking that -- I guess what it's saying to me is, it would be okay to convict an innocent person if you could get ten

**Anne B. Meredith**
Certified Shorthand Reporter

guilty ones because the appellate process is probably going to catch that innocent one, or not.

My concern is not with the way you answered the question so much as how or whether the appellate process would weigh on the decision making you would do in the case if you were a juror.

A    No, no, no.  It's just that -- No, it would not weigh.  I would not think about that.  I mean it's like, in my mind, I would make the decision and that would be my decision.  If I was happened to be, later on, I was found to be wrong, I would have still made that same decision.

Q    Okay.

A    But if the jury made the wrong decision unbeknownst to them, then the person that was said to be guilty has a chance then to find out or get that changed, then that's --

Q    I understand what you're saying.  You're not going to be sitting there thinking, hey, he may or may not be guilty.

A    No, no.  I see what -- okay.

Q    You see what I'm saying?

A    Yeah.

Q    All right.  Fair enough.  I understand.

Now, same page and then I'm pretty much going to get off of this and into the actual trial issues.  Up

towards the top we asked you if you agree with the law in the State of Texas that says murder, intentionally taking a life without a legal justification in the course of committing a robbery is something for which the death penalty may be imposed.

You answered yes. I'm not concerned with that. But your answer was, if a person meant to kill another person, it was not an accident. And the reason I come to that is because, gosh, maybe as many as 50 percent, certainly a high percentage of our prospective jurors, Ms. Noble, really come into the room with a misguided concept about what an intentional murder really is.

A    Uh-huh.

Q    Because so very, very often we hear people say, yes, I could consider the full range of punishment for murder or I could consider assessing the death penalty for capital murder unless it was an accident. Or sometimes people will say or unless it was in self-defense. And sometimes people say unless the person didn't know the difference between right and wrong.

A    Uh-huh.

Q    And I understand from a layperson's viewpoint why they would think that. But it's incumbent upon us to make sure that jurors understand that they would not ever be called upon to assess a punishment, whether it be the death

penalty or any other punishment, in those circumstances because if one person actually kills another person by accident, it's no offense at all.

A    Oh, okay, I see.

Q    You see what I'm saying?

A    Uh-huh.

Q    Or if a person intentionally kills another person defending themselves under circumstances --

A    Uh-huh.

Q    -- that gives them a right to self-defense or defense of another person, or even sometimes defense of property, they have committed no offense so they wouldn't be guilty of anything.

A    Okay.

Q    That's what's called a legal justification.

A    Uh-huh.

Q    A person is justified in taking another person's life under certain circumstances.  The same with insanity. If a person does not know the difference between right and wrong because of mental illness or mental defect, then that person is excused from the law.  And that doesn't mean they get to go out and roam up and down the streets.  There are other provisions to be made for them.

A    Uh-huh.

Q    But they don't go to the penitentiary because our

law -- that is in our law a legal excuse.

A    Uh-huh.

Q    So that the full definition of murder is the intentional taking of another person's life without legal excuse or legal justification.

A    Uh-huh.

Q    They were not insane. They were not acting in self-defense. It was not an accident. Okay?

A    (Nods head).

Q    Nor would it have even been any of those other homicides that Ms. Handley talked to you about. It's sort of a cliche to say that all murders and all capital murders are homicides, but not all homicides are murders or capital murders. And she described some of the ways in which a person might take another person's life less than intentionally.

A    Uh-huh.

Q    Some other culpable mental state, reckless or knowing or even criminally negligence -- criminal negligence, you see. And that might make it a manslaughter case which is a homicide. It might make it a criminally negligent homicide, exactly what it's called. So, but it's not murder. Okay?

Whatever else we can say about what a juror is faced with when they finally come face-to-face with these

special issues is that they would have heard evidence in the courtroom that convinced them and eleven other people that, whatever else the facts and circumstances were, the person on trial had intentionally taken another person's life without legal excuse or justification and during the course of the commission of another felony offense.  That has to be so or you would never reach these special issues.

A    Uh-huh.

Q    Because if the jury came to any other conclusion, if they found the person was not guilty, they would never face these questions.  If they found that they were guilty of some lesser included offense than a capital murder situation, it may be murder or it might be aggravated robbery or it might be manslaughter, any of the things that we've talked about before, they would never see these questions.

Just like Ms. Handley told you, if they were found guilty of one of the lesser included offenses, then the jury would go back in the jury room and determine where in the range the law provided the punishment ought to be, but it would be a matter of numbers rather than answers to a question.

A    I see.

Q    If you found a person guilty of murder, you would go back and decide between five and ninety-nine or life. It might be life, it might be five, it might be anything

in between.  Okay.  See what I'm saying?

A    Uh-huh.

Q    But you wouldn't answer these questions.

A    Okay.

Q    The only time you answer these questions is when you're answering about an intentional murderer.  Okay?

A    Okay.

Q    Now, I want to make sure you understand, excuse me, what we mean when we say intentional.  Here is the legal description, the legal definition, and then I'm going to give you a common sense sort of definition of it, I guess.

Our law says a person acts with intent when it is their conscious objective or desire to cause the result.  That's the legal way of putting it.

The plain way of putting it is a person acts intentionally when they have set the act of taking another human's life as their goal.  It is what they want to do and they do whatever it takes to accomplish that end.  Okay?

A    Okay.

Q    So, are you with me?

A    Yes.

Q    All right.  Well, it is in that context that special issue number one is asked.

A    Okay.

Q    And of course, the State of Texas has the burden

of proving that the answer to that question should be yes before a jury would be justified in answering it yes.

Are you with me?

A    Uh-huh.

Q    The presumption is the answer to that question is no.

All right.  Now, just as Ms. Handley told you, the law allows a juror to look at the facts and circumstances of the offense alone without considering anything else about the defendant, his background, whether he's been in trouble or hasn't been in trouble, whether he's been a good citizen or a bad citizen, whether he's killed before or hasn't killed before.

The law says a juror does not have to have that information.  They can make the decision to answer that question yes based solely on the fact that they are answering it about an intentional murderer.

See what I'm saying?

A    Uh-huh.

Q    And for some prospective jurors, Ms. Noble, quite obviously they feel that once they have found someone guilty and they know that this is a person who has killed another human because they wanted to, and for no other reason, that that information alone would be sufficient for them to answer that question yes always.

How do you feel about it?

A    I think it would be yes.

Q    And it's kind of a, you know, I'm answering -- I'm called upon to answer that question about the kind and type of person who would make a decision to kill someone else, and not just that, but during the commission of another felony. And the question doesn't ask me will he absolutely commit criminal acts of violence in the future. It asks me whether he probably will.

A    Yeah.

Q    And this is just the type and kind -- I mean, anybody that would do what this defendant has done would probably commit acts of violence in the future. That's a locked yes.

A    Uh-huh.

Q    Is that the way you feel about it?

A    Yes I do, yes.

Q    And I thought probably it was, Ms. Noble, based on the answers that you've given us in your questionnaire. You feel pretty strongly about people who kill other people. Would that be fair to say?

A    Yes.

Q    Okay. Let me -- And do you feel like you understand what the question is?

A    Yes.

Q    And what the purpose of it is?

A    Uh-huh.

Q    You understand that one of the things about this country that's absolutely great is that people can make up their own minds about how they feel about the law.

A    Uh-huh.

Q    And they are perfectly entitled to how they feel about it.  And that's the way you feel about that issue; is that fair?

A    Yes.

Q    I want to jump ahead a little bit.  I'm going to skip over special issue number two, okay, and to go special issue number three.  Now, it's different, and you will probably recall that Ms. Handley told you there is no burden of proof on anybody.

A    Yes.

Q    At that point in time, once you're there, that's just an opportunity that a juror would have to reassess all of the evidence that they have heard to determine whether or not they have heard mitigating evidence.

A    Uh-huh.

Q    And if they have heard mitigating evidence, to decide what weight, if any, they wish to give that mitigating evidence.  Just as Ms. Handley told you, the law doesn't say what is or is not mitigating.  Jurors are allowed to make up

their own minds about that.

A    Uh-huh.

Q    Okay.  And not only are they allowed to make up their own minds about what is mitigating, they are allowed to make up their own minds about what effect to give to the mitigating evidence.

A person might sit on a jury and say, I haven't heard anything that I consider to be mitigating so the answer to that question is no.  Or they may say, I've heard evidence that I consider is mitigating, but I don't believe it's sufficiently mitigating to answer it yes so I'm going to answer it no.  And if you answer it no, that's the death penalty.

A    Uh-huh.

Q    If you answer it yes, that's the life penalty.

Or a juror might say, I've heard mitigating evidence and I have weighed that and I believe it's sufficient in my mind to justify a yes answer and I am going to answer it yes so that the defendant gets the life penalty.

Any one of those things can happen.  And it's pretty much, you know, structured in the sense that we don't tell you what is mitigation, but we are given an instruction about some of the things that the jurors should look at, and those are in the questions.  For instance, it

says, considering the defendant's character and background.

A    Uh-huh.

Q    What does background in the context of that question mean to you, Ms. Noble?

A    Their -- What they have done in their previous up to this point, whether they have committed other crimes before, whether this was the first crime they ever committed, they were a model student, they were, you know, what was their -- you know, I think that all kind of goes in together to help figure out why or what happened and helps you make a decision.

Q    Sure.  Some jurors tell us that those traits that you just mentioned probably go more to the defendant's character than their background, what kind of a person they are.  Background goes more to how they were raised, what their circumstances were.  Were they raised in a single family, were they in poverty, were they well to do?  Were they mistreated, were they not mistreated?  That kind of background which they --

Does any of that make sense to you?

A    Yes.

Q    Do any of those things, do you believe, by the time you got to that special issue would make any difference to you?

A    Basically, no.  I mean, I don't think it makes a

difference whether it's a single family or wherever they grew up. That's not really going to have a whole lot of bearing on -- A person is who they are, no matter what their background was.

Q    Some jurors tell us that if a person knows the difference between right and wrong and can make choices for themselves, if they choose wrong, it doesn't make any difference whether they were raised in poverty or raised with a silver spoon in their mouth.

Is that kind of how you feel?

A    Yeah, uh-huh.

Q    Or even if they were subjected to abuse as a child, would that make any difference to you?

A    That would make a difference, yes.

Q    Okay, fair enough. What about age? Do you think whether a person is young or old would have any bearing?

A    Some bearing, yes, depending on, you know, child, adult, you know.

Q    I'll tell you that the law in the State of Texas is that no person can be subjected to the death penalty unless they are at least eighteen years old. So, we are not talking about, you know, fourteen, fifteen, sixteen.

A    Okay.

Q    It would be eighteen or older. Do you believe that if a person was at the lower range of that, you know,

eighteen, nineteen, twenty, something like that, that would be something that you would consider in answering special issue number three?

A    Not age, no.

Q    I know you and Ms. Handley talked about intoxication, voluntary intoxication.

A    Uh-huh.

Q    And certainly that's not an excuse or a defense to anything, just like she told you.  It might, in some circumstances be an explanation as to why a person did what they did.

A    Uh-huh.

Q·    And jurors, of course, have different feelings about that.  Do you believe that evidence of some mind altering substance, whether it be drugs or alcohol, voluntarily ingested, is that something that you believe you could consider in answering special issue number three, or do you think that would be irrelevant to that question?

A    It might have some bearing, not a lot.  That's like if -- Well, if they were, you know, intoxicated, they are not using their normal brain, so --

Q    Sure.

A    -- their decision making skills are not good and, so, that was the reason for that, not that they made -- they thought about that.

Q    Let me -- I'm going to finish up here with you, Ms. Noble, in just two or three minutes. But I want to make sure that you understand the context also in which number three would be answered. Okay? So, I'm going to take you back to the guilt/innocence stage of the trial. It's easier for me to do that, not because I don't think you understand what I'm talking about.

A    Okay.

Q    But obviously if a juror finds a defendant not guilty or guilty of some lesser offense, then that decision would take away from them the answering of these questions. We talked about that. And you understand --

A    Right.

Q    -- that it's only if a person is a capital murderer.

A    Uh-huh.

Q    And I'm not sure we've explained this to you. But once you get into the punishment phase of a trial, these special issues are presented, in the charging instrument of the Court's charge that you will get, in order.

A    Uh-huh.

Q    So that when you face special issue number one, if it is the decision of the jury to answer that question no, that ends the trial.

A    .Uh-huh.

Q    You don't go on to those other issues. Did you

understand that?

A    Yes, I did.

Q    Okay.  It's only if you answer yes, he would be a future danger --

A    Uh-huh.

Q    -- that you would ever get to special issue number three.

A    Yeah.

Q    Okay.  So that when you're answering special issue number three, you've not only determined from the evidence that this is an intentional murderer, but you've also determined beyond a reasonable doubt that he will be a future danger in whatever society he finds himself in.

A    Yes.

Q    Knowing those two things, Ms. Noble, do you believe that there would ever be any evidence that would cause you to answer special issue number one yes, that an intentional, dangerous murderer should receive the life penalty rather than the death penalty?  I mean number three.

A    I'm going to ask you to repeat that again.

Q    Okay.  Yeah, that's a long question.

See, here's where you are.  You've found that this person is an intentional murderer.

A    Okay.

Q    You've found him guilty of capital murder.

A    Okay.

Q    Listened to the evidence and you found that he's a person who is going to probably commit criminal acts of violence that would be a continuing danger to society.

A    Okay.

Q    Okay.  And now you're asked to look at his character, his background, his personal moral culpability, those things.

A    Okay.

Q    To decide whether or not to give him the life penalty instead of the death penalty, even though he's an intentional murderer and would be a future danger.

A    Okay.

Q    Some jurors say to us, I can do that.  I can look at the way a person was raised.  I can look at those kinds of things --

A    Uh-huh.

Q    -- even if he is a future danger.

A    Uh-huh.

Q    And I will put him back into whatever society he's going to be in, believing that he's probably going to be a future danger, if I think that that's the right thing to do.

Other jurors basically say to us, sure, I can look at the character and background.  But I'm answering

this question about a murderer I believe is going to be -- probably commit acts against others, in whatever society, commit criminal acts of violence. I'm not about to put him back into the society where he can do that. That wouldn't be right. So, I'm going to always answer that question no if I get there.

So, two different philosophies about that.

A    Okay.

Q    Where do you feel like you fall?

A    I think I could answer that. Depending on what was there, I could say yes.

Q    Okay. Fair enough. Fair enough.

A    I could do that.

Q    Do you have any questions of me, Ms. Noble?

A    No.

Q    You feel like we've pretty thoroughly wrung this subject out?

A    Yeah. For someone who has no knowledge, you have been very, very helpful about repeating and asking and saying it so that I could understand it.

Q    And you feel like the answers you've given us are your --

A    Yes.

Q    -- true answers?

Thank you, Ms. Noble. I appreciate that.

THE COURT:  Thank you, Mr. Parks.

And Ms. Noble, I'm going to ask you to step out with my bailiff for just a second --

PROSPECTIVE JUROR NOBLE:  Okay.

THE COURT:  -- while I confer with the attorneys, and then I'll bring you back in here and give you a result.  All right?

PROSPECTIVE JUROR NOBLE:  Okay.

THE COURT:  Thank you very much.

PROSPECTIVE JUROR NOBLE:  Thank you.

(Prospective Juror Noble exits the courtroom).

THE COURT:  All right.  Thank you, ladies and gentlemen.  Be seated, please.

Ms. Handley, does the State have a challenge for cause?

MS. HANDLEY:  We do not, your Honor.

We believe Ms. Noble is qualified.  While she has articulated certain of her opinions on certain things, she has consistently held that she would follow the law in this case and that she would consider all the evidence in this case and base her verdict on that.

We believe she is qualified, Judge.

THE COURT:  All right.  Thank you, Ms. Handley.

Mr. Parks, does the defense have a challenge

for cause?

MR. PARKS:  We do have a challenge for cause, your Honor.

I think that Ms. Noble plainly told us in plain and uncontroverted English that, with respect to special issue number one, that if she found that a person was guilty of capital murder, that she would automatically answer that question yes.  I think that confirms what she told us in her questionnaire.

It was straightforwardly put to her.  I gave her every opportunity to change her mind about that if she wished to, but she said that that would be a yes for her if she found someone guilty of capital murder.

We believe that she has a bias against the law that we are entitled to rely upon and is disqualified.

THE COURT:  All right.  Thank you, Mr. Parks.

Ms. Handley, State's response.

MS. HANDLEY:  Thank you, your Honor.

I was listening with a very close ear to this.  With all due respect to Mr. Parks, I don't think it was straightforward.

There was an explanation to her that some jurors had found that they may be able to answer special issue number one based strictly on the facts of the offense alone.  And that question being posed, do you think you

would be able to answer that question based on the offense alone, her answer is yes, and there is nothing wrong with that, Judge.

But she has consistently held, and has even come back in spite of Mr. Parks' compound questions and such, that I will answer these questions depending on what is there.

I don't think she is disqualified, and there is nothing on there about her making any automatic assumptions.

THE COURT: All right. Thank you, Ms. Handley.

The defendant's challenge for cause is denied. And, so, Ms. Noble then would be juror, Prospective Juror number 16 is the number I get.

MR. HIKEL: That's correct.

THE COURT: All right. Would you bring Ms. Noble back in, please, sir.

THE BAILIFF: Yes, sir.

(Prospective Juror Noble returns to the courtroom).

THE COURT: Ms. Noble, just have a seat back there again, if you would, please, ma'am.

Ms. Noble, you are going to be Prospective Juror number 16.

PROSPECTIVE JUROR NOBLE: Okay.

THE COURT: Now, that doesn't necessarily mean that you're on the jury. What we are doing is qualifying a panel right now for the attorneys to make their strikes from. So there might be, through another process of elimination, you may be eliminated from the jury. And then again, you know, you're one step closer to being on this jury, however, as well.

PROSPECTIVE JUROR NOBLE: Okay.

THE COURT: So, we anticipate that evidence in this case, that Judge Snipes will begin evidence in this case on August the 10th, that there will probably be a two week period that it will take to try this case. So, the week of August the 10th. August 10th is a Monday. So those five days, and then the next Monday through Friday, which I think takes us through the 21st of August, if I recall correctly, that Friday the 21st. So, I would like for you to pencil that in on your calendar.

You will be notified as to whether or not you're on this jury I'm anticipating somewhere toward the end of July. So, and once you get that letter in the mail or get that notification, if they call you or whatever, one thing, look at that contact information. Is that still good information?

PROSPECTIVE JUROR NOBLE: Yes.

THE COURT: Okay. All right. And of course,

we will keep that and then they will notice you, you know, and tell you whether -- advise you whether or not you're on the jury or you're not on the jury.

PROSPECTIVE JUROR NOBLE:  Okay.

THE COURT:  If you're on the jury then, of course, you report for jury service August, excuse me, August the 10th.  This will be in the letter to you as well.

PROSPECTIVE JUROR NOBLE:  Okay.

THE COURT:  But anyway, I want you to go ahead and pencil that in and not make plans just yet until you find out that you're not on the jury.  Okay?

PROSPECTIVE JUROR NOBLE:  Yeah.  I already have plans, but.

THE COURT:  Oh, you did?

PROSPECTIVE JUROR NOBLE:  Well, yeah.

THE COURT:  Is it something that you can --

PROSPECTIVE JUROR NOBLE:  A high school reunion.

THE COURT:  Oh, your high school reunion.

MS. HANDLEY:  Is that in July?

PROSPECTIVE JUROR NOBLE:  July -- August, August 15th.

THE COURT:  August the 15th.

PROSPECTIVE JUROR NOBLE:  Yeah, but that's okay.  That's okay.  It was a mini reunion.

THE COURT:  It was a mini reunion.

PROSPECTIVE JUROR NOBLE:  That will be okay, yeah.

THE COURT:  Well, that would be I guess that Friday, wouldn't it?

PROSPECTIVE JUROR NOBLE:  Yeah.

THE COURT:  It would be Friday.

PROSPECTIVE JUROR NOBLE:  It's just that weekend.

THE COURT:  That weekend?  Well, now, you'll be able to go that weekend.

PROSPECTIVE JUROR NOBLE:  Well, it's out of state.

THE COURT:  Oh, okay.  All right.

PROSPECTIVE JUROR NOBLE:  But that's okay.

THE COURT:  Well, you'll work Monday through Friday, so if it's like a Saturday or Sunday --

PROSPECTIVE JUROR NOBLE:  I could go.

THE COURT:  -- you could still go.  You're not going to be sequestered over the weekend or anything, or even sequestered during the trial.

PROSPECTIVE JUROR NOBLE:  No, I could get there and back.

THE COURT:  Yeah.  Okay.  All right.  Now, one other thing I wanted to touch base with you on, and that

**Anne B. Meredith**
Certified Shorthand Reporter

is that you've already let us know that you think you had heard something about this case either from TV or the newspapers.

PROSPECTIVE JUROR NOBLE:  Yes.

THE COURT:  Or somehow.

PROSPECTIVE JUROR NOBLE:  Yes.

THE COURT:  I don't recall if you recalled any specific facts or what you thought were facts about the case, but I'm going to ask you to put that out of your mind or just, you know --

PROSPECTIVE JUROR NOBLE:  Okay.

THE COURT:  -- forget about that.  What I don't want you to do is to go back and say, now, what was it I heard, and you get on the Internet and you look up in the archives any old newspaper articles or the TV newscast, you know, concerning this case.

PROSPECTIVE JUROR NOBLE:  Okay.

THE COURT:  I don't want you to do that.

Also, any future reports of this case, whether in the newspaper, TV, radio, whatever it might be, I don't want you to read those articles, I don't want you to watch those TV newscasts or radio broadcasts.  Okay?

PROSPECTIVE JUROR NOBLE:  Okay.

THE COURT:  All right.  We want to keep you just like you are now.  Okay?

PROSPECTIVE JUROR NOBLE:  All right.

THE COURT:  That you don't know anything about this case.  Because the reason for that is obviously that when, if you are on this jury, then the first thing that Judge Snipes is going to do August the 10th, he's going to swear in the jury.

PROSPECTIVE JUROR NOBLE:  Uh-huh.

THE COURT:  And the oath that he's going to administer to the jury and to you, if you're on the jury, would be that you will make your decision in this case based solely upon two things, the evidence that you'll see here --

PROSPECTIVE JUROR NOBLE:  Uh-huh.

THE COURT:  -- and receive in the trial of the case, and then the law that Judge Snipes will give to you in his charge to the jury.

PROSPECTIVE JUROR NOBLE:  Uh-huh.

THE COURT:  Okay.  And, so, whatever you've heard before, we don't want you going into court with any preconceived ideas about the case.

PROSPECTIVE JUROR NOBLE:  Okay.

THE COURT:  Okay?  All right.

Anything further then from the State?

MS. HANDLEY:  Nothing further.

THE COURT:  Mr. Lollar?

MR. LOLLAR:  No, your Honor.

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT:  Thanks very much, Ms. Noble, for all your time.

PROSPECTIVE JUROR NOBLE:  Thank you.

THE COURT:  And you will be noticed.  Thank you very much.

PROSPECTIVE JUROR NOBLE:  Thank you.

THE COURT:  Yes, ma'am.

PROSPECTIVE JUROR NOBLE:  Thanks for your time.

THE COURT:  Thank you for your time.

(Prospective Juror Noble excused from the courtroom).

MR. PARKS:  We are not off the record.

THE COURT:  Yes.  Mr. Parks.

MR. PARKS:  Judge, I would like for the record to reflect that --

THE COURT:  Are you wanting to make a bill on that?

MR. PARKS:  I just want to make sure the record is clear about my objection.

THE COURT:  Yes, sir.  Okay.  Go ahead.

MR. PARKS:  I've done a submission.  I have been denied.

THE COURT:  Right.

MR. PARKS:  We object to the Court's ruling --

THE COURT:  Okay.

MR. PARKS: -- in that we believe the Court is in error, that the Court's ruling deprives Mr. Broadnax of his due process rights under the fifth amendment of the United States Constitution, it deprives him of an impartial juror or jury under the provisions of the sixth amendment of the Constitution. It subjects him to cruel and unusual punishment under the eighth amendment and all of those equal protections of the law provided to him under the fourteenth amendment of the Constitution of the United States.

Furthermore, it deprives him of an impartial jury under the provisions of article 1, section 10 of the Texas Constitution. It deprives him of -- or it subjects him to cruel and unusual punishment under the provisions of article 1, section 13 of the Texas Constitution. It deprives him of due course of law under the provisions of article 1, section 19 of the Texas Constitution.

Further, your Honor, while we believe that this juror was clearly disqualified, even if there is some argument or some room for argument whether or not she was technically qualified, certainly the answers that she gave in her questionnaire, the answers that she gave me regarding special issue number one are such that her ability to serve as a fair and impartial juror in this case is called into question.

I understand that the Court has not previously

been a part of the pretrial hearings in this case.  The defense has filed a motion attaching the concurring opinion of the Court of Criminal Appeals in Treadgill versus State which refers to Jones versus State.

Jones is the case in which the Court of Criminal Appeals made it almost impossible for the defense to show reversible error in jury selection in a capital murder case where the issue did not involve a person's death use, a juror's death use.

In consideration of taking that away from the defense, the Court in Jones admonished the trial courts to make close calls in favor of the defense indicating that there was no use in putting jurors on the jury where it was a close issue whether or not they could be fair and impartial, that there were plenty of jurors from which to choose.  And sort of in exchange for taking away our ability to reverse the Court, it admonishes trial courts to be liberal in granting a defense challenges for cause.  That admonition went totally unremarked by the bench in the State of Texas.

So that when Treadgill came along, four of the jurors joined in a concurring opinion and basically said, we told y'all in Jones that you needed to be liberal in your granting of challenges for cause from the defense. So, there's four judges sitting on that Court looking at these.

I filed a motion. I respectfully ask the Court to read that concurring opinion in Treadgill because I believe that this is the kind of juror about which the Court of Criminal Appeals was speaking.

And further, defense says not.

THE COURT: Further the defense says not.

Okay. Thank you, Mr. Parks. And my ruling remains the same.

MR. PARKS: Yes, sir.

(Discussion off the record).

MR. PARKS: I would just like for the record to reflect that the Juror Helen Noble is not an acceptable juror to the defense.

(After the lunch recess, Defendant present).

THE COURT: We might as well bring in Ms. Odan.

(Prospective Juror No. 247, Bemsha Odan, enters the courtroom).

THE COURT: Ms. Odan. Yes, ma'am. Thank you. Come right in and just have a seat right there, if you would, please, ma'am.

PROSPECTIVE JUROR ODAN: Yes.

THE COURT: Okay. Just make yourself comfortable.

And I would like for the record to reflect

that this is Prospective Juror number 247, Bemsha,

b-e-m-s-h-a.

PROSPECTIVE JUROR ODAN:  Yes.

THE COURT:  Bemsha, is that correct?

PROSPECTIVE JUROR ODAN:  Yes.

THE COURT:  Odan, o-d-a-n.  Is that correct?

PROSPECTIVE JUROR ODAN:  Yes.

THE COURT:  All right.  Well, Ms. Odan, thank you for being here today.  I don't think this will take very long.

Ms. Evans, would you like to inquire of Ms. Odan?

MS. EVANS:  Thank you, your Honor.

THE COURT:  Yes, ma'am.

BEMSHA ODAN,

testified as follows:

EXAMINATION

BY MS. EVANS:

Q   Ms. Odan, I would first like to say that I really like your middle name.  My name is Elaine Evans, so it's very nice to meet another Elaine.  There's very few of us.

I note from your questionnaire that your son is in prison for the offense of murder.

A   Yes, he is.

Q   And this being a capital murder trial, I can see

from your questionnaire that you have some concerns about serving as a juror in this type of case; is that correct?

A    Even more so after I came and I saw the young man here.

Q    Yes, ma'am.  And, so, you are thinking about your son's experience and what you've dealt with with that; is that correct?

A    Yeah.  And it's real -- it is -- well, it's been hard.

Q    I understand.  Well, we appreciate you coming down today, Ms. Odan.

MS. HANDLEY:  Thank you.

THE COURT:  Any questions, Mr. Lollar?

MR. LOLLAR:  No, ma'am.  Thank you.

THE COURT:  Thank you, Ms. Odan.  I'm going to excuse you from further service in this case, but we do appreciate your time and effort to be with us today.

You can just leave that here on the table there.  Thank you, ma'am.  Have a good afternoon.

(Prospective Juror Odan excused from the courtroom).

THE COURT:  All right.  Ms. Evans, State have a challenge for cause?

Thank you.  Be seated.

MS. EVANS:  Yes, your Honor.  State would

challenge juror number 247, Ms. Odan, based on her statements here today that this is difficult, especially after seeing the defendant here today, as well as in the questionnaire, and how she would feel if chosen as a juror. She said it would bring back memories of her son.

MR. LOLLAR:  We have no objection.

THE COURT:  No objection.  Thank you.

State's challenge for cause for Prospective Juror number 247, Bemsha Odan, is granted.

Okay.  And let's see, who is the next one on our list here?

MS. HANDLEY:  I've highlighted it for you.

THE COURT:  Parra, Jose Parra.

(Prospective Juror No. 326, Jose Parra, enters the courtroom).

THE COURT:  Thank you, Mr. Parra.  Just go ahead and have a seat.

Thank you, ladies and gentlemen.  Be seated, please.

And I would like for the record to reflect this is Prospective Juror number 326, Jose Parra.  Is that -- Am I pronouncing your last name correctly?

PROSPECTIVE JUROR PARRA:  Jose Parra, Jose Antonio Parra.

THE COURT:  Jose Antonio Parra.

PROSPECTIVE JUROR PARRA:  Yes.

THE COURT:  Okay.  Mr. Parra, thank you for being here this afternoon.  Ms. Evans, one of the assistant district attorneys, is going to talk to you.

You may proceed, Ms. Evans.

MS. EVANS:  Thank you, your Honor.

JOSE ANTONIO PARRA,

testified as follows:

EXAMINATION

BY MS. EVANS:

Q    Mr. Parra, do you recall filling out the questionnaire when you came down on the big panel?

A    Yes.

Q    And when you filled out the questionnaire, it asked, with regard to the death penalty, which statement best represents your feelings regarding the death penalty. And do you recall you circled number one, I believe that the death penalty is appropriate in all murder cases?

A    Yes.

Q    And is that still how you feel today, sir?

A    Yes.

Q    Okay.  Thank you.

THE COURT:  Any questions?

MR. LOLLAR:  We have no questions.  Thank you.

THE COURT: Okay. Thank you, Mr. Parra, for being here today. We appreciate your time and effort. I'm going to excuse you at this time. Thank you.

PROSPECTIVE JUROR PARRA: Thank you, sir.

(Prospective Juror Parra excused from the courtroom).

MS. EVANS: Your Honor, the State would submit Juror number 326, Jose Parra, for cause.

MR. LOLLAR: Defense has no objection.

THE COURT: All right. Jose Parra, Prospective Juror number 326 is -- the State's challenge for cause is granted.

All right. And then the last one we've got is Hall, Anise Hall.

(Prospective Juror No. 461, Anise Hall, enters the courtroom).

THE COURT: Yes, ma'am. Ms. Hall, come in and have a seat right there, if you would, please, ma'am. Just make yourself comfortable.

Thank you. Be seated, please, ladies and gentlemen.

I would like for the record to reflect this is Prospective Juror number 461. Anise?

PROSPECTIVE JUROR HALL: Yes.

THE COURT: Hall. And how are you this

afternoon, Ms. Hall?

PROSPECTIVE JUROR HALL:  All right.

THE COURT:  Thank you for being here.

And Ms. Evans is going to talk to you for the State of Texas.

Ms. Evans.

MS. EVANS:  Thank you, your Honor.

ANISE HALL,

testified as follows:

EXAMINATION

BY MS. EVANS:

Q    Ms. Hall, do you recall filling out a questionnaire whenever you came down for service in the big panel?

A    Yes.

Q    Okay.  And in that questionnaire I note, regarding the death penalty, that you have strong religious views that prevent you from giving a sentence of death; is that correct?

A    Yes, that is correct.

Q    Okay.  And is that still how you feel today?

A    Yes.

MS. EVANS:  Okay.  Pass the witness.

THE COURT:  Okay.  Any --

MR. LOLLAR:  We have no questions.  Thank you, ma'am.

THE COURT:  All right.  Thank you, Ms. Hall,

**Anne B. Meredith**
Certified Shorthand Reporter

for being here.  And I am going to excuse you from further jury service in this case.  Thank you very much.  You're free to go.

(Prospective Juror Hall excused from the courtroom.

THE COURT:  Thank you.  You may be seated.

MS. EVANS:  Your Honor, the State would submit Juror 461, Anise Hall --

MR. LOLLAR:  No objection.

MS. EVANS:  -- for cause.

THE COURT:  All right.  Thank you.

State's challenge for cause on Prospective Juror number 461, Anise Hall, is granted.

(Discussion off the record).

THE COURT:  Okay.  Let's bring in Henry, Billy Henry.

(Prospective Juror No. 301, Billy Henry, enters the courtroom).

THE COURT:  Hi, Mr. Henry.  How are you doing today?  Judge Parker, Quay Parker is my name.

And thank you, ladies and gentlemen.  Be seated, please.  This is Prospective Juror number 301, Billy Eugene Henry.

BILLY EUGENE HENRY, having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Mr. Henry, thank you for being here today.  And I am, as I told you, I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney, Texas.

And Judge Snipes, who is the Presiding Judge over this case, has asked me to assist him in the jury selection process and, so, that's what I'm doing here today. And Judge Snipes is upstairs in his courtroom taking care of the regular business of the Court while I'm down here helping him get this jury picked.  So, and consequently, that's why you're here today, as you already know.

All right.  You've read your little juror guide, shall we say, or pamphlet here?

A    Uh-huh.

Q    And, so, that kind of explains a little bit about what the questions are going to be about this afternoon.  It kind of gives you some idea of what the law and some of the special issues that are involved in the trial of this case are about.

And what the attorneys are going to do, they are going to explain the law or the procedural aspects of the case, and then they are going to ask you questions about it.  So, there's no right or wrong answers to any of their questions.  It's not a quiz that you've got to pass or

anything like this.  And there is nothing that's going to be embarrassing to you.

Do you recall, it's been over a month ago, when Judge Snipes -- when everybody got together in central jury, and there was probably what, four or five hundred of you, something like that?

A    Right.

Q    Something like that all together at one time, and Judge Snipes went over some stuff with the panel.  At some point in the proceedings he asked the panel members to stand up, raise their right hand.  He administered the oath of a prospective juror to everyone on the panel.

Do you recall that?

A    Yes, sir.

Q    Were you one of the panel members that stood --

A    Yes, I was.

Q    -- and took the oath?  Did you take the oath at that time?

A    Yes.

Q    Very good.  I'll just remind you you're still under that oath.  And basically what you've been sworn to do are two things, to give truthful answers, which we know you would do, anyway, but also to be responsive to each and every question that's asked to you.  Okay?

THE COURT:  All right.  And let me introduce

to you the attorneys now that are going to be involved in the trial of this case.

Ms. Andrea Handley.

MS. HANDLEY:  Hi, Mr. Henry.

PROSPECTIVE JUROR HENRY:  Hello.

THE COURT:  And seated right directly across from me, next to her, is Ms. Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  And then on next to her is Mr. Gordon Hikel.

They are three assistant district attorneys that work here in Dallas County in the DA's office, and they are the ones charged with the responsibility of prosecuting this case.  So, they are the prosecution team.

And then seated next to me down here and on down the line is Mr. Brad Lollar.  And next to him is Mr. Doug Parks.  And then on the very end down there, Ms. Keri Mallon.

MS. MALLON:  Hi.

THE COURT:  And they are the defense team. And then seated next to Ms. Mallon there is the defendant, James Broadnax.  And he is the defendant and their client in this case.

PROSPECTIVE JUROR HENRY:  Okay.

THE COURT:  All right.  Very good.

Ms. Handley.

MS. HANDLEY:  Thank you, your Honor. Appreciate it.

EXAMINATION

BY MS. HANDLEY:

Q    Hi, Mr. Henry.  How are you doing this afternoon?

A    Very well.

Q    Good.  I appreciate you showing up on time and being patient.

I think you noticed that people were coming in and going right back out.  I don't think that's going to happen to you.  I think you're going to be here a while.

THE COURT:  You were hopeful, I know.

Q    We always save the best for last, and I will tell you why, Mr. Henry.

You remember being down in that big, that big jury room.  There were hundreds of people down there that day.  Hundreds of people filled out this questionnaire. And we have, believe it or not, actually read all those questionnaires, and we talk to every single one of those people.

And the hope is, the goal in this entire process is to get ultimately fifty people that we believe are qualified to serve as a juror in a case like this. After we get fifty people qualified, we will then come

through and actually pick the twelve people who will actually sit on this case.

But it's not that -- Well, I don't want to say it's not that easy to get qualified. I think what becomes really apparent to us is that some people are just flat out not qualified, and spending some extra time with them and talking to them isn't going to help. We know it's not going to happen.

We reserve a lot of time and our extra time to talk to people such as yourself. We've read your questionnaire, and we don't know entirely how you feel, but we have a pretty good -- or I should say I have a pretty good appreciation that I think you're a well-read man, I think you're a smart man, and I think you have a good grasp on the law on what's expected on a case like this. And then, most importantly, I don't think you are biased into one direction or the other at this point.

Okay. And, so, we're going to explain the law to you and how this things works. And we also want to feel you out and talk to you about some very personal things that you may have put in your questionnaire. Okay.

Have you ever served on jury duty before?

A    No.

Q    Okay. So, you don't have to have been on a jury before to do this. You don't have to be a lawyer to

understand this.  Thank goodness, you know, it's not that way.

But I'm going to address something with you right off the bat.  In the questionnaire, I have in twenty years of doing this, I've never seen people just show up and go, I would like to serve on a jury today.  You got anything for me?

Nobody wants to do jury duty.  Okay.  And a lot of people such as yourself will say, look, I'm probably going to miss some work because of this, and I would rather not miss work.

That's not really an exemption from jury service that you might miss work.

A    Right.

Q    It just -- Jury duty is sometimes one of those things that you're called upon to do and you might have to do it.  Okay?

I can make this representation to you, that we're not going to waste your time if you ultimately get on this jury.  The judge who will preside over the case is Judge Michael Snipes, former military.  He is on time, let's go, no messing around.  He's not going to waste your time and we are not either.  Okay?

We believe the case will start on August 10th. I will tell you, giving ourselves an incredible amount of

leeway to make sure it's done, I'll tell you two weeks, but it could be done quicker than that.

The only thing I can't tell you is how long it takes a jury to deliberate. Okay. We keep regular hours. If you need to do breaks and such as that, then you can do that.

So, that's the representation I can make to you. Okay. How do you feel about that?

A    Okay.

Q    All right. All right. Good, good.

Let me -- Let me just start off by telling you, I've told you we've read your questionnaire. We are here to talk ultimately about capital murder, but I want to talk to you about a few other principles of law that apply in any criminal case, not just a death penalty case, but any case.

And what it comes down do, Mr. Henry, is a qualified juror is a juror who says, I will -- I'll base my verdict on the evidence in the case, and nothing else. And if called upon to assess punishment, I will let the punishment fit the crime. And I won't bring into the courtroom stuff that I heard at the coffee shop, you know, or I won't bring things outside of the courtroom into the courtroom to decide this case for me. I won't bring in any kind of preconceived notions on what should happen. I won't make any snap -- I

won't make any automatic decisions without looking at the evidence first. I'll wait, sit there, I'll listen to it, I'll absorb it, I'll deliberate it with my fellow jurors, and then I'll render my decision in the case.

If you've already made up your mind on what you're going to do today in any death penalty case, then I tell you you're not qualified to serve. I take it, from reading your questionnaire, that it doesn't look like you're that type of person.

A    That's correct.

Q    Okay. A lot of the principles of law that come into play in any criminal case, be it theft of a loaf of bread from Kroger or be it a capital murder case, are the same across the board. And most people are actually very familiar with these because you watch TV and you hear it and you read about them and you see these terms.

As we sit here today, as we sit here today now, the defendant in this case is to be presumed innocent. Okay. There is that presumption of innocence. And what that goes to is that you are to presume him innocent because I haven't proved anything to you yet, have I?

A    Right.

Q    He may have been charged. He may have been indicted. That's only worth the piece of paper that it's on. All that does is tell me what I have to prove and it

tells him what he's been charged with, but it's not to be considered any evidence of guilt.

There is no where there is smoke there is fire, he must have done something. You can think that at the coffee shop, but in a courtroom you can't use it as a piece of evidence against the man. Do you understand that?

A    Yes.

Q    Is that something you can follow? Is that a rule of law you can follow?

A    Right.

Q    You presume him innocent only if and until I, as a representative of the State -- and I say I. It could be me. There is also another attorney, Mr. David Alex, who will probably be offering most of the testimony at trial.

You presume him innocent only if and until I prove to you beyond a reasonable doubt that he's guilty. There is a burden of proof in these cases, and it's always the State's burden of proof.

I've done the charging, I ought to do the proving, then, right?

A    Right.

Q    You ought not to charge a man and then make him come to court and prove his innocence. It's unconstitutional and, outside of that, it's just fundamentally unfair. You know, we live in America.

So, you always look to the State. I have the burden of proof, and I have to prove the case. They only have one obligation in this case and that's to show up, and they have fulfilled their obligation. Okay. Always look to us.

My proof, though, is to prove the case to you beyond a reasonable doubt, not beyond all doubt whatsoever, not 100 percent. It's beyond a reasonable doubt. I'll submit to you that if you have a reasonable doubt, you have a doubt based on reason and common sense and not on some manufactured thing that you're making up that anything is possible. That's not a reasonable doubt. It's a doubt but not reasonable.

Do you have any -- If I prove something to you beyond a reasonable doubt, what does that mean to you in your terminology?

A    That means it's most reasonable that that's what happened.

Q    Right.

A    I don't have any doubts that what you say is actually what occurred.

Q    Okay. Okay. I've heard some people say that if you prove something to me beyond a reasonable doubt, then I'm pretty darn sure or I'm comfortable with that.

A    Right.

Q    You know, there is no definition for it.  But it's never, you have to prove it to me beyond all doubt whatsoever.

Would you, would you raise my burden to proving it to you beyond all doubt whatsoever?

A    No, it's what I believe happened.

Q    Okay.  Okay.  Part of that, of me carrying that burden of always looking to me, means that any defendant in a criminal case -- I have this right.  You have this right.  It's the right to, to, to elect not to testify against -- testify I have been charged.  I have a fifth amendment right to remain silent, if you will.

There's probably a hundred thousand reasons why somebody might elect not to testify in a criminal case.  You could go, if I was charged, I would testify.  Well, you don't know until you're there, you know.

But the fact of the matter is, if a defendant doesn't testify, you can't use it as evidence against him.  You could always wonder what would happen.

But what you can't do is, at the close of the case, you know, I say that's my case, I close the evidence, you can't go back to the jury room, look at it and say, you know what, the State came this close to proving it to me beyond a reasonable doubt.  They didn't quite get there.  But because they didn't quite get there, because he didn't

testify, I'm going to find him guilty.  That you can't do.

A    Right.

Q    You understand that?

A    Uh-huh.

Q    That's a rule that you could also follow, then?

A    Uh-huh.

Q    Okay.  Okay.  You agree with that law?

A    Uh-huh.

Q    Okay.  Even if you may like to hear both sides, you're only going to -- you might not necessarily, and you can't hold it against him.

A    Right.

Q    Do you have kids?

A    Yes.

Q    A lot of times people with kids, they have a hard time relating to that.  Because you come home, the house is a mess, something is broken.  Something like that, what's the first thing you do?  You haul everybody into the living room.  You go, start talking, don't you?  There is no fifth amendment right to remain silent because you want to hear from everybody, right?

A    Okay.

Q    Right.  Maybe you have really good kids.  You're not like I was.

A    Just one.

Q    Just one. Okay. Okay.

Something else that comes into play in all criminal trials is that one of the primary duties of a juror, and this is why we have people sit on juries and we don't just spit facts into a computer and look for a verdict, is because we need people to assess the credibility of the evidence in the case and we need people to assess the credibility of witnesses in a case.

Your verdict has to be based strictly on the evidence. As I said, nothing coming from outside the courtroom, nothing you've read on the Internet or you've heard on the television. You have to base it on the evidence in the case.

As a piece of evidence comes to you, you test its credibility. Do I believe this? As a person testifies you decide, do I believe all, some or none of what this person says?

If I told you everybody that took the stand and swore to the tell the truth actually tells the truth, I would be lying to you.

A    Uh-huh.

Q    Some people don't just lie, some people are mistaken. Okay.

I notice in your questionnaire that on page seven, we asked you about police officers and their

propensity to -- are they more likely to tell the truth than the average citizen, and you said yes, they are usually honest  and just want to do their job.

I'll tell you that I agree with you, you know.  But what the law says is that you can't automatically believe a certain category or group of individuals.  You can't say that, if you tell me a police officer is going to testify, I'm going to tell you I'm automatically going to believe them before he even takes the stand and utters a single word.

A     I think that's true.

Q     Okay.  So, that's also something that you can follow?  You'll wait to assess the credibility of an officer who testifies before he even hits the stand?

A     Yes.

Q     Very good.  Very good.  The prevailing theme throughout these cases, and in any criminal case, Mr. Henry, is follow the law.  If you can agree to follow the law and you follow the law, that's fine.

The prevailing theme is also, and the insistence is, because once you take your oath, if you're sworn in as a juror, is that you've got to base your verdict on the evidence in the case also.  Okay.  You've got to let the verdict fit the evidence.  You've got to let the punishment fit the crime.

Let's talk specifically now, I want to talk to you about the crime of capital murder and a little bit about murder. A lot of people think that it's kind of cut and dry, there is only one kind of murder, and there is not. And I don't want to talk down to you if you already know a lot of this. If I am, you tell me and we will kick it in high gear.

But in Texas capital murder is this, and it is always at least this, it involves an intentional murder. Okay. And when I say intentional, I'm talking about it's a murder that was committed, the person meant to do it. They meant to do it. They had the goal in mind, the desire in mind to see that that person died, and they did whatever they had to do to carry out that goal.

Okay. It's not an accidental death. It's not a, gee, I just meant to hurt him but he accidentally died death. It's nothing like that. It's not a justified homicide.

Some people will say, well, I guess I could give probation or I guess I wouldn't give the death penalty if it wasn't intentional or if it was in self-defense.

Well, it wouldn't even be coming into play if it was in self-defense or if it was justifiable homicide or if it was an accident. That wouldn't be capital murder. Okay. You understand that?

**Anne B. Meredith**
Certified Shorthand Reporter

A    Uh-huh.

Q    That wouldn't be capital murder.  Capital murder is, at the very least, always includes intentional murder.  Okay?

A    (Nods head).

Q    It's not just intentional murder, it's intentional murder plus something else.  It's the highest degree of offense that we have in Texas and it carries the most severe penalties.  And it's actually an exclusive, if you will, category of crimes to which the death penalty is an option.  Because the death penalty is never mandatory, it's never automatic, but it may be an option, depending on the evidence.

So, capital murder cases, cases where the death penalty may be an option would be, for example, the intentional murder of a police officer while he's in the line of duty, or the intentional murder of a child under six years of age, or the intentional murder of two or more people during the same criminal episode or, as in this case, the intentional murder of an individual while in the course of committing or attempting to commit another felony offense such as robbery, such as burglary, something such as that.

You know, we usually hear the classic example of the guy who robs a 7-Eleven and kills the clerk.  That would be a capital murder.

If I pulled a gun out of my briefcase and I

shot my co-counsel five times just for the heck of it, that's not a capital murder. It's a vicious first degree murder, but it's not a capital murder because it doesn't fall in one of those categories. You see what I'm saying there?

A    Right.

Q    Okay. So, we are always talking about an intentional murder.

And, now, this becomes a pretty important issue in a lot of these cases, Mr. Henry, is that there's many different ways to commit a murder and there's many different categories of murder in Texas. We've got capital murder. You know what that is.

We've got first degree murder. That's intentionally or knowingly causing the death of a person. And then you even could get up to a life sentence still in that, but not the death penalty.

And you can even step down a category to something we call manslaughter, which is a second degree felony, only carries up to twenty years in prison. And that's where a person took someone's life by acting recklessly.

They didn't intent to kill them. They didn't -- They didn't really know that their actions would result in the person's death. But they were acting in a reckless manner in such a way that it caused a person's death.

I got a new Glock.  I think it's great.  I want to shoot it and I want to show it off, so I decide I'm just going to start shooting around you, Mr. Henry, just to show you how my gun works, you know.

Well, I like you.  I don't want to hurt you.  I don't want to kill you.  I don't even want to shoot you.  But I'm a terrible shot and I actually shoot you in the leg and you bleed out and die.

Did I mean to kill you?  Did I want to kill you?  I should say that.

A     No.

Q     Was I acting recklessly in what I did?

A     Yes.

Q     And not to mention stupid, too, wasn't I?

A     Right.

Q     Okay.  Well, that's called a manslaughter, and it's a lesser because I didn't intend to kill you.  I didn't even -- I didn't even know it would kill you, but it did.  Okay.  I'm still held liable for it, but on a lower degree.

You can go even farther lower than that, something called criminally negligent homicide.  And that's where I take somebody's life by acting negligently.

I'm in my car.  I'm on 635.  I'm driving along.  I decide I want to listen to a particular CD.  I start digging around in my glove box on the floor.  I am not

watching the road. It is -- it is traffic out there. And finally I look up and it's too late. There is somebody, I hit them and I kill them.

Okay. I didn't intend to kill them. I didn't even know they were there. But I should have known they were there, didn't I?

A    Yes.

Q    I was negligent, wasn't I?

A    Yes.

Q    Not to mention, in layman's terms again, just stupid, huh?

A    Right.

Q    I mean, I have -- I have taken somebody's life. But the mental culpability, if you will, is a lot less than intentional, isn't it?

A    Uh-huh.

Q    Okay. Do you understand the distinctions there, how that could come into play?

A    Yes.

Q    If I fail to prove to you that this is actually a capital murder -- because I have to prove that to you, the intentional and the additional aggravating factor. Let's say that I, I failed to prove to you that there was actually a robbery in this case. Maybe all I've proved to you is an intentional murder.

A    All right.

Q    All right.  That means you would find him not guilty of capital murder, but you wouldn't necessarily go home.  You would be called upon to decide, well, is he guilty of murder?

A    Right.

Q    Got it?

A    Uh-huh.

Q    And if that happens, it's an entirely different kind of punishment scheme.  We are not talking about the death penalty now.  And instead we are talking about you looking at a range of punishment available to you, you looking at the evidence in the case, the circumstances of the offense, and deciding where in that range of punishment, anywhere from five years up to life in prison, that you think my case falls into.

You've heard the expression, let the punishment fit the crime?

A    Right.

Q    That's what we are talking about.  And I will submit to you, Mr. Mc -- I keep saying McHenry.  Why am I saying that?

A    I don't know.

Q    If I call you Mr. McHenry, I'm sorry, McHenry.  And now I lost my thought.

You would be asked -- You would be called upon to determine, let the punishment fit the crime anywhere within that range. Okay?

A   (Nods head).

Q   You have to base that verdict on the evidence in the case. Having heard nothing on any case right now, can you tell me what punishment you would assess if you found this defendant guilty of the lesser murder?

A   Of the lesser murder?

Q   Yeah.

A   No.

Q   You don't have any facts, do you?

A   Right.

Q   And that's just the point right there. Nothing is automatic. You can't make any automatic assumptions because you haven't based your verdict on the evidence in the case.

There is a wide range of punishment, I'll submit to you, because no two cases are alike. I've been doing this twenty years. I deal in strictly homicide. I've never seen two defendants or two circumstances alike.

If I said to you, envision, if you will, a 42 year old man that plans out the intentional murder of a helpless ten year old boy and carries it out and does it, and now you've got to assess his punishment, what's the first thing you think of?

A     That he's guilty.

Q     I think he needs to be put under the prison, quite frankly.  If you just threw that at me, I think I would make the snap decision.

A     Uh-huh.

Q     Now let me change the facts and say to you -- And this is to illustrate that wide range of punishment and how the facts should always fit the verdict or the punishment.

That same 42 year old man is actually the father of that ten year old boy.  And he's been a great father, an outstanding husband.  He's provided for that family.  He's a good community man.  He's done everything for that kid.  The sun and the moon rise around that little boy of his.

But that boy's been diagnosed with terminal cancer.  He's in Children's Medical.  He's not going to get better.  He's going to die.  And if that wasn't bad enough and cruel enough, it's killing him slowly.  And dad watches that boy writhe in pain every minute and second of his life and decides, nothing but sheer love and devotion, I'm going to end this.

He goes and he gets some morphine, gives him an overdose of morphine, because he believes that's the least painful and most humane way of ending his little man's suffering.

Has he intentionally killed that boy?

A    Yes.

Q    He sure has.  He's committed first degree murder, hasn't he?

A    Uh-huh.

Q    But he's a world different maybe than the guy who took an AK, picked out a ten year old in the park and just shot him, right?

A    Right.

Q    Same offense, different facts.

A    Uh-huh.

Q    And that's what these things are about is you've got to wait, don't you, before you can say what you're going to do?

A    Right.

Q    You can't make any snap decisions.

Whether or not somebody is guilty of something less, whether it was an intentional act or maybe just a reckless act, can depend often on the circumstances of the offense and depend on what was going through their mind at the time.  That's something that you may be called upon to do.

I'm going to jump forward and I'm going to ask you something kind of out of order here because you've written quite a bit in here about intoxication and people using drugs.  Okay.  You were very candid with us in saying

that I think you've had relatives?

A    I had a friend that was killed in high school by a drunk driver.

Q    Okay.  Okay.  And did -- And I've read so many of these questionnaires here, but I believe I read that you might have known some people or had some family that have used drugs, but you personally have never done that.

A    I have never done that.

Q    Okay.

A    I have a stepbrother who was in prison for a bank robbery who is now out and turned his life around.  I've had other relatives that constantly go to jail for DWIs.

Q    Okay.  Okay.  We had asked you about, about, you know, intoxication and told you that it doesn't necessarily constitute a defense, and you agreed with that.  That's the law.

A    Right.

Q    That it's not necessarily a -- it's not a defense to the commission of a crime.  However, I will tell you that it's still something you can consider in determining what should happen in a case.  Because then we went on to say here, Texas law provides that evidence of intoxication may be considered in mitigation of punishment.  Do you agree?  And you said yes.  Without intoxication, would they have committed the crime?  Sometimes something I would ask myself.

This could possibly reduce the punishment.

Well, maybe not, you know.

A    (Nods head).

Q    And I think you really hit the nail on the head with respect to that, Mr. Henry, is that, is that it's something that you can consider, but will it have any merit with you?  Will it affect your decision?  It may, it may not.  Apparently it depends --

A    Right.

Q    -- on what you hear.  But you haven't, at least I'm reading -- Don't let me put words in your mouth.  You haven't made any automatic assumptions about, if a person is intoxicated and they commit a crime, what that does or doesn't do.

A    Right.

Q    But outside of that, though, how do you feel about that?  Somebody gets voluntarily intoxicated, does something, commits a crime and then goes, look, I was high or drunk.  What are your feelings about that?

A    It's a lot different than planning out a murder, going in and getting drunk and then killing somebody versus having no plan, you're drunk and you murder somebody.

Q    Right.  Do you think you're incapable of carrying out a plan if you are intoxicated?

A    No, it depends.

Q    It depends, doesn't it?

A    Yeah.

Q    Again, it depends, yeah. I think that's the point in all of this. If there were evidence in any criminal case that you sat on of intoxication, would you listen to that evidence and would you give it the amount of credibility that you thought it deserved?

A    Uh-huh.

Q    You won't make any automatic assumptions about that?

A    No.

Q    Okay. Let's talk specifically about capital murder now. Okay. In a capital murder case, as I said to you before, I have to prove to you beyond a reasonable doubt there was an intentional murder, not an accident, not an oops, I didn't mean to kill them. There was an intentional murder and it was done during the course of a robbery.

Okay. If I prove that to you beyond a reasonable doubt, I am entitled to a verdict of guilty in the case. Okay. That's all you're called upon to do in the first part of the trial is are they guilty.

If I fail to prove it to you, the verdict is?

A    Not guilty.

Q    Not guilty, or maybe something else. You'll take that up.

But once I prove that to you, if and when I do, and you find that defendant guilty, now we get into the second phase of the trial.

Trials are -- We have this bifurcated trial system in Texas where it's in two parts. The first part, you determine if the person's guilty. In the second part, if they are guilty, now you decide what you're going to do about it. Kind of like the dad who killed his son or the guy who killed the kid in the park. They are guilty, but what are we going to do about it? Let me look at the facts of the case and let the punishment fit the crime.

Capital murder, it's a lot like that, but it's also a lot different than that. A lot of people think that if you're guilty of capital murder, then it means you automatically get the death penalty. There is nothing automatic about the death penalty.

Okay. A lot of people think that if you find a person guilty of capital murder, the jury goes back, you get a cup of coffee and you kind of debate, well, should we give him life in prison or should we give him the death penalty. It doesn't work that way either.

You might have a good appreciation for that now after having read the packet with the special issues. Did you have a chance to read that?

A      Yes. I like the order of the questions. I think

it makes it easier.

Q    And it's -- I think it's designed that way, you know, that it's supposed to be a very methodical process, and that's exactly what it is.

You don't go back and say yes or no on the death penalty.  Instead you arrive at your verdict by answering each question.

A    Uh-huh.

Q    And based on how you answer the questions will determine what happens in a particular case.

Only one of two things can happen for a man or a woman who has been convicted of capital murder, and that's what?  Only one of two things can happen.

A    Repeat the first part of that question.

Q    Only one of two things is going to happen, can happen for a person convicted of capital murder.  What is that?

A    It's either the death penalty or life in prison.

Q    Life in prison.  It's life in prison without parole.  Okay?

A    Uh-huh.

Q    So, after you're found guilty of capital murder, you're sitting on a life sentence, aren't you?

A    Uh-huh.

Q    That's the best you could ever hope for.

A    Right.

Q    That does not change to a death penalty only if and until I prove to you that it should be a death penalty. Okay?

A    Okay.

Q    Remember we talked about the presumption of innocence in the first part. You presumed him innocent because I haven't proved anything to you yet, right?

A    Right.

Q    There's a presumption in the second part also. And now you are to presume that a life sentence is the appropriate thing to do. He's sitting on a life sentence right now. You are to presume it's the right thing to do. The reason being, have I proved to you that it's not? Have I?

A    No.

Q    I haven't shown you any evidence now, have I?

A    No.

Q    It's really a separate, it's a separate almost mini trial in and of itself. Okay. We are going to start all over again is what we are going to do.

The point being you can't say, look, I found this guy guilty of capital murder which means he intended to kill somebody and he did it while robbing them, so case closed. I'm going to automatically answer those questions

in a way that gives him the death penalty.

If you do that, then you haven't considered the evidence in the punishment phase, have you?

A    Right.

Q    So, again, there is nothing automatic.  You presume at this point that the right thing to do is a life sentence because I haven't proved to you otherwise.  Make sense?

A    Right.

Q    You can follow that?

A    Yes.

Q    Do you already have any inclinations that, Ms. Handley, if you prove to me he did capital murder, I'm gonna tell you right now you can't change my mind off of the death penalty?

A    No, not based on the first question.

Q    Okay.  All right.  And exactly, that first question is a really important question.  I want to go through that specifically with you.

We are going into the second phase of the trial now.  You can consider all the evidence you heard in the first part of the trial, okay, in making your decision on this first issue, this first question.

You might also hear additional evidence now.  Now is the proper venue for you to hear maybe other things

about a person's background.  Have they committed other crimes?  You know, have they been a choirboy their entire life?  Now you're gonna hear these other things about the person and their background.

But the first question that you're called upon to answer is our special issue number one.  We also refer to it as the future dangerousness question.  In other words, I have to prove to you that the defendant is a future danger, basically asking you to predict the future.

A    Right.

Q    Okay.  We didn't write that question, us attorneys here in this room.  That's written by our lawmakers.  Okay.  And when they wrote that first special issue for you, they also didn't define any of the terms in it for you.  Okay.  So, we will walk through this together here.

The question reads, do you find from the evidence beyond a reasonable doubt.  I'll tell you, Mr. Henry, any time you see that phrase, do you find from the evidence beyond a reasonable doubt, it ought to key you in to one thing.  Has the State proved its case to you?

A    Uh-huh.

Q    Okay.  And has the State proved to you that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

So, if I prove to you that there is a probability, do you see a difference -- What do you think a probability is?

A    Probability can be any percentage.

Q    It could be any percentage.  Do you see a difference between a possibility, a possibility versus a probability?

A    Yeah.  Anything is possible.

Q    Anything is possible, isn't it?  I could win Olympic gold, you know, against Michael Phelps in four years.

A    That's right.

Q    It's really probably not probable, though, you know, but it's possible.

A    There's still time.

Q    Well, I think I might actually have a shot, then.

Anything is possible but it's not probable.

A    Right.

Q    And, so, that's what we're talking about here.  Some people tell us that a probability is more likely than not.  Would you agree with that?

A    Right.

Q    So, if I proved it to you, if I proved beyond a reasonable doubt that it's more likely than not the defendant will commit criminal acts of violence.  It's not defined for

you again what that means.

Okay.  But what it doesn't say is that I'll prove to you that the defendant will commit another murder or that the defendant will commit an assault or that the defendant will threaten people while -- you know, make threats of criminal violence against people.  It doesn't define that for you.  It's whatever you think it is.

Okay.  What do you think is a criminal act of violence?

A    Well, I'll just use the word probability.  There is a probablility that I believe he would do that again, he or she would commit another crime.

Q    Will commit another crime.  If I were to ball my fist up and Ms. Evans is minding her business over here and I smack her in the face, do you think that's a criminal act of violence?

A    No, she may deserve it.

Q    Wow.

THE COURT:  Let me assure you she doesn't.

Q    She doesn't.  Hard working.  All joking aside, assuming she didn't deserve it, do you think that's a criminal act of violence for me to hit her in the face?

A    Maybe not a criminal act, but it's --

Q    What kind of act do you think it is?

A    Act of violence.

Q    Okay.  It's an act of violence.  Why do you think it's not criminal?

A    I don't know what's the reason behind it.

Q    I'll tell you she is sitting here minding her business.  She's done nothing to me.  She's done nothing to me to provoke this whatsoever, and I hit her.

A    Uh-huh.

Q    Let me make it more personal.  What if I stood up and smacked you in the face right now.  Have you done anything to deserve it?

A    Probably not.

Q    Probably not.  You know, probably not.  I don't want to beat this like a dead horse or something.  But it doesn't necessarily define what is a criminal act of violence, okay?

A    No, it doesn't say whether there is a gun or whether it's physical, whether it could be mental, or it could be --

Q    It could be verbal.

A    It could be locking somebody up against their will, lots of things.

Q    Okay.  The point is it's for you to decide --

A    Right.

Q    -- what you think is a criminal act of violence.

Okay.  It's more likely than not the

defendant will commit criminal acts of violence, at least more than one, that would constitute a continuing threat to society.

He's sitting on a life sentence right now. So, where is he going to spend the rest of his life presumably?

A    In prison.

Q    In prison.  Unless he escapes, he's going to be in prison, right?

Do you see how a prison could also be defined as a society?

A    Yes.

Q    Okay.  You and I walking around in town, grocery shopping, going to the post office, talking to each other, we are operating in a society of people right now, aren't we?

A    Yes.

Q    In the penitentiary, there's people there besides inmates, aren't there?

A    Yes.

Q    There's hundreds of inmates, but there's also wardens and teachers and doctors and educators and people who come and visit, too, you know.  But these inmates, they live there, they sleep there, they might work there, they recreate there, they eat there.  It's their own little society, isn't it?

A    (Nods head).

Q    So, the question is really, it's asking you, do you think it's more likely than not he's going to commit criminal acts of violence, will be a threat to the society in which he lives at the time, wherever he may find himself, okay?

A    Uh-huh.

Q    Does that make sense to you?

A    Yes.

Q    What kind of things do you think you would have to hear or see or know in order for you to make that prediction as to whether or not somebody might be a future threat?

A    The past.

Q    Okay.

A    Whatever was going on.

Q    Okay.    Sometimes a man can know a lot about a man by the way he's acted in the past, right?

A    Yes, it's a good indicator of the future.

Q    Okay.    Okay.    I'll tell you this also, that in answering this question -- and you understand you answer each one of these questions separately.

A    (Nods head).

Q    You start from the beginning on each one of these questions and you don't make any assumptions.    Okay.

         I'll tell you that, in determining whether

that question should be yes or no, you can look at the facts of the offense, okay, of everything that you heard in the first part of the trial. And you might feasibly be able to answer that question yes or no based strictly on looking at what this person did that one time. Okay. You don't have to.

A    Uh-huh.

Q    But some people might be able to. And some people say, that's good but I would like to see more. That's fine, too. But it allows you that option also.

Does that make sense to you --

A    Uh-huh.

Q    -- that you might get everything you need to know from that particular crime in order to answer that question yes or no?

And I will ask you the sixty-four thousand dollar question now, Mr. Henry. By the time you ever get to special issue number one, there is one thing that you can take to the bank. Okay. The person you're being called to look at now, the defendant in this case, is absolutely guilty of capital murder, right?

A    Uh-huh.

Q    No question about it, you know, that he has killed somebody intentionally. He has meant to do it. Okay. He did what he had to do and he did it, and he killed this person and he did it while in the course of committing

a robbery or trying to commit a robbery. So, you know that about him, right?

A    Uh-huh.

Q    You do know that about him. Are you automatically, before you even go into the second phase of the trial, are you automatically going to answer that question yes or no just because he's been convicted of capital murder?

A    No.

Q    Okay. Really you can't do it because you're not reconsidering the evidence, are you?

A    Right.

Q    And you wouldn't do it just because he's guilty of capital murder?

A    Right.

Q    Some people would say, well, you know, isn't that the kind of person that you would be inclined to give the death penalty to? I think being inclined or having feelings that that's a pretty bad, mean motor scooter is a lot different from saying, well, let me look at the evidence in the case and base my decision on the evidence in the case.

Is that what you would do?

A    Uh-huh.

Q    If I fail to prove to you that the defendant is a future danger, then you stop right there. And remember the presumption that the life sentence was the proper thing

to do?

A    Right.

Q    Well, apparently it is the proper thing to do because he's not a future danger, and we stop right there. The defendant receives life in prison without parole, and you go home.  Okay.

If you answer that question yes, I believe he is a future danger, you've proved that to me, now you move on to the special issue number two.  It's a very confusing issue.  Did you completely understand it when you read it?

A    Number two?

Q    Yeah.

A    Let me read it.

THE COURT:  Can you see?  I'm sorry.  I'll get out of your way here.

A    Yes, it is a very confusing sentence.

Q    I was going to say, if you say you absolutely understand that by just reading it, then you win the prize because nobody seems to.

A    No, I don't.

Q    Let me explain to you that in Texas we have something called the law of parties.  And it basically says that if two or more people are acting together in the commission of a crime, if they are all actively participating

in carrying out that crime, that each one of those people could be held liable for that crime.

I'll give you a quick example. If Ms. Evans and I go home tonight after work, we go to my house. We sit at my kitchen table and we decide that we are going to rob my local 7-Eleven. And we sit together, we plan it out.

We pick the right 7-Eleven, the one that we think is going to be the least crowded tonight. We plan to do it at 11:00 o'clock. She goes and gets a gun. I go and I buy some bullets. We come back to the house, get together, get our little ski masks on, we get in her car.

She drives down to the 7-Eleven. She parks on the side. She hands me the gun. I take the gun, I load it, and I say, you sit here and be a lookout. If you see anybody coming, you honk the horn and let me know.

She says, I'll do it. And I say, you know we can't afford to leave any witnesses. And she says, I understand, go do what you gotta do.

I go into the 7-Eleven by myself. I hold that clerk up at gunpoint. I take all that money out of the register and then I shoot that clerk five times and kill him. I get back in the car and we take off.

Am I guilty of capital murder?

A     Yes.

Q     I am. That's murder in the commission of a

robbery, isn't it?

A    Yes.

Q    You think Ms. Evans could be guilty of capital murder?

A    Sounds like it, based on the law.

Q    Based on the law, if a person aids, assists, encourages, directs, if they participate in the commission of an offense, fair to say that she probably has, I mean she can also be held liable for that offense.

In order for her to be held liable or found guilty of capital murder, you have to first find that she should have anticipated somebody was going to die. Okay?

A    (Nods head).

Q    Do you think that's fair to say that she should have anticipated somebody was going to die?

A    Based on those comments.

Q    Yeah. And I am giving you a very fact specific situation here.

When you get to the special issue number two in the penalty phase of the trial, what they are asking you is this. Do you believe or do you find that the defendant is the person that actually caused the death, that he's the actual, figuratively speaking, the triggerman, or is he the other guy who, not only should have anticipated somebody was going to die and actively participated in the crime, but

that he actually did anticipate somebody was going to die?

A    Uh-huh.

Q    Does that make sense?

A    Uh-huh.

Q    Okay.  Do you think she anticipated somebody was going to die?

A    Yes.

Q    You may or may not find that from the evidence.

A    Uh-huh.

Q    That's for you to decide.  Okay?

You answer that issue yes and you answer this issue yes, then the defendant is sitting squarely on the death sentence right now.  If you answer either one of those no, it's a life sentence.  That's it, that's all.

But if you answer those both yes, he's now sitting on a death sentence.  But you're not quite finished yet.  Okay.  We have that third special issue we call the mitigating circumstances question.  We also call it or refer to it as a safety net issue.

And basically, Mr. Henry, it says this.  Our lawmakers recognize that we are calling upon you to sit in the most important of all cases with the ultimate punishment and that being death.  And that before you're going to render that, that they are not going to tie your hands.  They are going to let you do what you think is the right thing to do

*Anne B. Meredith*
Certified Shorthand Reporter

in this case as long as it's based on the evidence. Okay.

And that question speaks to that. It says, go back in the jury room, look at all the evidence one more time. And if you think that there is something mitigating about this defendant or this offense, and you think it substantially mitigates, you can turn that --

MR. PARKS: Objection again.

Q    I misspoke. That it's sufficiently mitigating, that you can turn that death sentence to a life sentence. Okay. But it involves you going back and looking at all the evidence again.

Read with me. Do you find -- And let me say this before we take off on this. Remember that burden of proof I talked about before where I always carry that burden? There is no burden of proof on this. I don't have to prove anything to you and neither do they. It's there for your benefit. Okay. There is no burden of proof in this. So, there is no do you find beyond a reasonable doubt.

But it says, do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character, his background, personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances that would warrant a sentence of life in prison without parole rather than the death sentence?

**Anne B. Meredith**
Certified Shorthand Reporter

The circumstances of the offense. Again I give you a hypothetical just to illustrate the law. Could be that he's the person who stayed behind and tried to save the life of the victim. Maybe he turned in, you know, his co-defendants. Maybe he's just been truly remorseful, you know, ever since this and has tried to do better.

He may still be a future danger as long as he can be around his friends and have contact, but there is just something about that, about the circumstances of the offense, that not only mitigate but they may be sufficient enough to turn it around.

The defendant's character or background. You might find that he was raised in a closet his whole life, fed dog food, and his parents put cigarettes out on him. He's a monster, but he's a monster because they raised him to be one, you know.

His moral culpability. I mean anything can be mitigating. I can't tell you what's mitigating. I can't pin you down to it. What I think is mitigating and what you think is mitigating can be entirely separate, too.

You know, you don't have to agree with any juror on what you think is mitigating. But you're looking at everything in the case and decide it. There could be a hundred mitigating factors.

Gee, that's a shame he had a bad childhood,

and that's a shame he got kicked out of high school, and that's sad that such and such. You know, it could be mitigating that he's got blue eyes. I mean whatever, you know. But the question becomes, is it sufficiently mitigating to turn over the death sentence?

Do you see, Mr. Henry, that there is always a possibility maybe that there might be some kind of mitigating evidence?

A    Uh-huh.

Q    Okay. Will you go into that with an open mind?

A    Yes. From the question, it appears that it's my choice.

Q    Yeah, it is. It is your choice. That's exactly it is that you're looking at the evidence, though.

A    Right.

Q    You're not just picking something out of a hat with no rhyme or reason, but you're looking at the evidence. And if you think there is something there that mitigates against the death penalty, and it's sufficient, then that's what you do. Okay.

And the point being, I guess the question that you could ask is, you found him guilty of capital murder, he meant to kill someone, you think he's a future danger, he was an active participant in it, so is there anything you could ever really see that would make you

**Anne B. Meredith**
Certified Shorthand Reporter

change your mind?

A    Who knows?

Q    Who knows?  And I guess that's the point, you would wait to make that determination after you saw the evidence.

Do you have any questions about this process or anything here so far?

A    No.

Q    Okay.  That intoxication that we talked about before, and you kind of hit the nail on the head there. You said maybe it matters, maybe it doesn't.  That might be something that mitigates, you know.  Maybe it mitigates or maybe it would be like no, it doesn't.

But you could properly consider in that context also?

A    Yes.

Q    All right.  I am going to allow I think the defense -- Oh, one more thing, too.  Just let me hit briefly on this.

Your mother was involved in the prison ministry.

A    For a little while.

Q    Is that true?  For a little while.  When was that?

A    When was it?  Probably five to three years ago, so it was about two years.

Q    Did she go to the prisons or the jails or what?

A    She went to the prisons.

Q    To the prisons.  Which ones?

A    I'm not sure which ones, you know.  She lives in Texarkana.

Q    Okay.

A    So, it would be not too far from there.

Q    Okay.  Did she go with a group or just on her own initiative?

A    There may have been a few others that she went with at one time.  She may have just gone with her husband.

Q    Okay.  There is a group and I'm probably going to get this name wrong.  I think they are called the HIOSK (ph) or something.  It's kind of a -- She wasn't part of a bigger --

A    I don't believe so.

Q    -- network that did that?

Is her husband a minister, or what was his motivation?

A    No, their son or his son was in prison.

Q    Okay.

A    So in visiting him, they kind of got into the ministry a little bit.

Q    Okay.  They went to talk to him and maybe give him some counseling.  And did she also talk to other inmates,

then?

A    When she did some of the visiting, they would go to I think other prisons and minister.

Q    Okay.  Okay.  How do you think she would feel about you being involved in a case where you might be called upon to assess the death penalty?

A    I don't think she would care.

Q    Okay.  Okay.  It's not one of those things where I respect my mother and I don't want to do anything to offend her?  And, so, you know, it wouldn't be one of those situations, or do you think she could even sit on a death penalty case?

A    I think she could.

Q    Okay.  If she, if she thought it was the proper thing to do for the particular case, she could do it?

A    Right.

Q    Okay.  Okay.  So, there is nothing about that, then, that would necessarily sway you one way or the other?

A    No.

Q    Okay.  All right.  Thank you very much, Mr. Henry. I appreciate you indulging me talking to you about the law here.  I hope that helped you a little bit.

                THE COURT:  Thank you, Ms. Handley.

Mr. Henry, why don't we take about a five minute recess, give you a couple of minutes here to just kind of breathe a little bit and walk around, get you a drink of water if you would like to, bathroom, whatever. My bailiffs will assist you with anything you need.

PROSPECTIVE JUROR HENRY:  All right.

THE COURT:  All right.  Thank you.

We will have a five minute recess.

(After a recess, Defendant and Prospective Juror Henry present).

THE COURT:  Thank you, ladies and gentlemen. Be seated, please.

THE COURT:  All right.  Mr. Lollar.

MR. LOLLAR:  Thank you, Judge.

EXAMINATION

BY MR. LOLLAR:

Q    How are you, Mr. Henry?

A    Fine.

Q    Good.  I want to talk to you about a number of things, but I want to give you an out right here at the very get-go.  Okay.  Back on page seventeen we asked you, how would you feel about being chosen as a juror in this case? You said, not excited, I have work to do.

A    Yes.

Q    Okay.  Now, we told you, we told everybody, and

we expect -- we expect the case to take two weeks to try. Okay. Some people tell us that their employers pay them while they are down here. Others tell us that they don't pay them while they are down there and it would be a financial hardship to them. They just couldn't do it.

A    Yeah.

Q    Others say, I get paid while I'm down here but, really, the work that I do is important to me and I have got things to do. And my mind really would not be on the trial, it would be on the work I'm missing, and that type of thing.

A    Yeah.

Q    Tell me about how you feel.

A    It's not really an excuse to miss it.

Q    Okay. So, you think you could serve as a juror in a case that takes two weeks and pay attention to the testimony and not be thinking about your work?

A    Yes.

Q    Okay. All righty. Get that out of the way.

Now, do you have your questionnaire there in front of you?

A    Yes.

Q    Okay. Here's what I think. I have been at this long enough to know. I think that people tell us the truth about the way they feel on these questionnaires when they

first come down.  Okay.

And when someone comes down to a follow-up session on a call back like you are over here today, if I see them saying things that don't jive with what they said on their questionnaire, I get worried, I get suspicious and I get cynical about a potential juror.  Okay.

And, so, with that in mind, take a look at page number four.  Right up at the very tiptop it says, for what crimes do you think the death penalty should be available in Texas, and you said murder.

A    Yes.

Q    Go back to page one.  And on your feelings about the death penalty, down at the bottom we asked you to circle one that you felt best represented your feelings.  And I want you to tell me why you didn't circle number one.

A    Sometimes there are circumstances that could make it where it's not a death penalty.

Q    Tell me what those circumstances are in your mind.

A    There was a good example earlier where it's a murder, but there may have been -- they may have not meant to actually commit the murder.  They may have just been wanting to get away.  They maybe just want to hinder somebody. They could have -- it just turned out to be a murder but it wasn't their intent.

Q    Okay.  Well, now that you have been through this

process and you understand that what we are talking about in a capital murder requires the element of intentional, the intentional killing.  Okay.  And then I look at page number two of your questionnaire and you say, the best argument for the death penalty is intentionally taking the life of someone else.

A  Yes.

Q  Okay.  So I'm starting to think in my mind, okay, here is a juror who thinks that the death penalty is the appropriate sentence in a case where someone has intentionally taken the life of the victim.  Is that not the way you feel?

A  That's pretty much it.

Q  Okay.  And that's what I -- that's what I want to talk to you about.  Let us talk about this word intentionally first.  Okay.

When we say in Texas law -- we've got our lawbooks to tell us what the definition is.  A person acts with intent when it is his conscious objective or desire to cause the result.  That's the legal definition.

Now, in plain speaking, what that means is that you have got to be convinced that the person meant to cause the death of the victim when they did what they did.

A  Right.

Q  Okay.  And if they meant to cause the result, the result being death, that is what we are talking about when

we say intentionally. Okay.

So, if I understand what you just told me, you think that the death penalty would be appropriate if you found that somebody intentionally caused the death of the victim.

A    Yes.

Q    Okay. Now, and this is the bottom line of what we are going to spend the next forty-five minutes talking about, Mr. Henry. Do you think you could ever give somebody less than the death penalty if you found that they intentionally caused the death of a victim during a robbery?

A    Yes.

Q    Tell me why.

A    By you answering those three questions.

Q    Okay. Your next answer on page number two was, the best argument against the death penalty is murder was not intentional.

Okay. So, here I am reading death penalty if they intentionally took the life, no death penalty if they didn't intentionally take the life.

Is that the way you feel?

A    Yes.

Q    Okay. And let me see, over on page four we asked, on a scale of one to ten, how strongly you hold your belief in favor of the death penalty. You said you were an eight.

We asked you if you thought the death penalty was a deterrent to other criminals.  You said yes.

You felt -- You think the death penalty in Texas is used too often or too seldom?  Your answer was too seldom.  It feels like it's not being used enough.  Okay.

We asked you if you think it's ever misused, and you said yes, but I would rather have the death penalty than not, even if it means it's misused.

A    Yes.

Q    Okay.  We asked you about a life sentence without possibility of parole, what do you think about that?  And you said you were strongly in favor of that, but you added, I think we let people out too soon.

A    In many cases, yes.

Q    Okay.  We asked you what purposes, if any, do you believe life without the possibility of parole serves, and you said, an act that caused death but may not have been planned.

By that, again, not intentional, is that what you meant?

A    Premeditated.

Q    Okay.  All right.  We asked you to rank the objectives of punishment, and you put down as number one, punish those convicted.  And we asked you to explain.  You said, punishment is by far the most important.

Rehabilitation doesn't work for most criminals.

Is that the way you feel?

A    Yes.

Q    Okay.  And then we get over to page eleven.  And we asked you, do you agree with the following statement?  It's better that ten people go free than one innocent man be convicted.  And you said no, and we asked you to explain.  And you said, reverse that statement.

A    Yes.

Q    Okay.  So, you feel it is better that ten innocent people be convicted than one guilty person be acquitted?

A    No, that's not the reverse that I was intending.

Q    Okay.  Reverse it for me.

A    It is better that one innocent person be found guilty than ten guilty people go free.

Q    All right.  Now, say that again for me.  It's better that one --

A    -- innocent person be found guilty than ten guilty people become free.

Q    Okay.

A    As opposed to ten guilty people going free.

Q    Okay.  All right.  Now, having gone through your questionnaire and with you agreeing with the things that you had to say in your questionnaire, let me again get to the bottom line.  I get the impression that you are a person

who strongly believes in the death penalty.

A    (Nods head).

Q    Thinks people get out too early.

A    I would say -- I would say this.  Don't get out too early necessarily on the death penalty or death causes, but just in general.

Q    Okay.  Don't believe in rehabilitation.

A    I don't believe it works in a lot of cases.

Q    Okay.

A    So if you ask me, does rehabilitation work, it may work in some cases, in many cases it does not.

Q    Okay.  But your belief is generally it doesn't.

A    Generally, probably not, but I don't have numbers to support either way.

Q    Okay.  And you think the death penalty is used too seldom.

A    But I have no facts to base that on.  It's just my opinion.

Q    But that's your feeling.

A    That's my opinion, yes.

Q    Okay.  See, that's -- that's the other thing I wanted to impress upon you here.  You haven't taken an oath to follow any law yet.

A    Right.

Q    Okay.  The only thing you've taken an oath to do

is to tell the truth.  Okay?

A    (Nods head).

Q    So, what we are trying to figure out is if you're a person who really can follow the law in these cases and do what the law says you've got to do to be a fair juror in this type of a case.  Okay.

And so, for example, let me, let me ask you about one issue here.  You told us -- what page is that on? Do you believe police officers are more likely to tell the truth than the average person?  You said yes.

Do you believe that?

A    I believe they are more honest than most.

Q    Okay.

A    It doesn't mean that they always are.

Q    Okay.  But just the general question.  Do you believe police officers are more likely to tell the truth than the average person?

A    More than likely, yes.

Q    Okay.  So, let me give you a little test.  We have a case where the State says the defendant confessed in writing.  Okay?

A    (Nods head).

Q    And let's take a hypothetical example where you have a written confession by a defendant.  Okay.  And you get to trial and the police officer, the detective who took

the statement from the defendant is going to be testifying. Okay. And the defendant is going to be testifying. Okay.

And the issue is not whether the defendant made this confession. Okay. That's really not the issue. The issue is whether or not the detective read him his Miranda rights because, under our law, unless the detective read him his Miranda rights, that statement is not admissible and the jury can't consider it. Okay?

A    (Nods head).

Q    And that can become a jury issue, okay, as to whether or not the Miranda rights were read. Okay. And the police officer testifies, yes, I read him his Miranda rights. The defendant testifies, no, he didn't read me my Miranda rights. Now, I did make the confession and everything in the confession is true, but he did not read me my Miranda rights. Okay?

A    (Nods head).

Q    Mr. Henry, some people, some jurors tell us, well, in that event I'm always going to believe the police officer as opposed to the defendant in the case as to whether or not the Miranda rights were read because he's a police officer and he's a defendant.

How do you feel?

A    I feel if that's all I had to go on, then I would believe the police officer more than I would the defendant,

but that doesn't necessarily make either one of them right.

Q    Well, that's our situation, that's our hypothetical.

A    Based on the evidence, I would have to lean towards the police officer.

Q    In 100 percent of the cases?

A    It depends if there is some more evidence to support the police officer.

Q    That's all there is.

A    If that's all there is, then I would have to take that.

Q    Okay.  So, in 100 percent of the cases you're going to go with the police officer over the defendant.

A    In what you just described.

Q    I'm sorry?

A    In what you just described.

Q    Okay.  Now, let's talk about that, those Miranda rights a little bit more.  And you have heard the Miranda rights read on television shows a million times.  You know, you've got a right to remain silent.  Anything you say may be used against you at your trial.  You know, there's five of them.  Okay.  You have a right to stop the interview at any time.  You have a right to a lawyer to advise you during and -- prior to and during the questioning.

So, let's say that in this particular

situation there is a videotape of the interview between the detective and the defendant.  Okay?

A    (Nods head).

Q    And there is no question about it.  The officer is reading him his Miranda rights, but he forgets to read one of them, one of the five.  Okay.  And the defendant waives his rights to remain silent, writes out a confession saying, I'm guilty of this murder.  This is why I did it. Here's where you can find the gun.

Okay.  Well, you know, in other words, there is no question that the officer has failed to read one of the Miranda rights.  Okay?

A    (Nods head).

Q    But there is also no question that the defendant is guilty.  And you are a juror in that trial.

A    Uh-huh.

Q    Now, some jurors tell us, well, look, I understand that the law says that you've got to read them all five. But in this case, to me, that's a technicality.  I'm going to consider the confession and find the defendant guilty.

Other jurors say, no, the law says you have to read all five.  Even though I know this person is a murderer, I'm going to let him go and walk down the elevator with me.

How would you feel about that?

**Anne B. Meredith**
Certified Shorthand Reporter

A    Well, based on the law.

Q    You would follow the law there and let the murderer go free?

A    In that case, yes.

Q    Okay.  Now, Ms. Handley has explained to you how sometimes a prosecutor may not be able to prove every element of an indictment but they prove nine out of ten.

Okay.  Let's say that they allege that this offense occurred in Dallas County, Texas, and it turns out it's just an inch over the line in Tarrant County.  Okay.  But they proved everything else.  They proved intentional murder in the course of a robbery, caused the death, no question about that.

Some jurors say, look, I know he's guilty, no question about it, so I'm going to find him guilty even if it appears that the offense took place in Tarrant County.

How would you feel about a situation like that?

A    Explain to me what the law is on Tarrant County versus Dallas County.

Q    Well, their indictment says the offense occurred here in Dallas County.  That's something they would have to prove.

A    Uh-huh.

Q    Some jurors say, look, I couldn't do that.  I

couldn't find somebody not guilty under those circumstances.

How do you feel?

A    Well, they should have drawn it out and retried it in the right court.

Q    Which is possible under certain circumstances. But how about you being on that jury that heard that case?

A    Well, would I have instructions on whether that is grounds to find them guilty or not guilty?

Q    Well, what you would have is the judge would give the jury a charge and it would say, if you find beyond a reasonable doubt that so and so, so and so, so and so, so and so, depending on the indictment in that particular case. And like I say, one of those elements is that it happened in Dallas County.

A    If he said that was on the indictment and I had a reasonable doubt that it was in Dallas County, then I would have to say reasonable doubt, that he's not guilty on that.

Q    Would you be able to do that?

A    Yes.

Q    Okay.  Ms. Handley has explained to you that sometimes you might be looking at a murder case instead of a capital murder case.  And in that event, there is a penalty range of anywhere from five years up to life.

Ms. Handley may have explained, I don't remember, that you might be looking at a lower punishment

range.  That would be for voluntary manslaughter.  Okay.  And the penalty range there is two years to twenty years.

Okay.  And if it is proven to you that a defendant has never before been convicted of a felony offense, then that defendant would be eligible for probation.

Okay.  Now, do you think that you would ever be able to assess a probated sentence if you found that a person recklessly caused the death of another person?

A    It depends on the circumstances.

Q    Okay.  And there is even a lower category of homicide called criminally negligent homicide where the penalty range is anywhere from six months up to two years in a state jail.  And, again, probation could be something that a jury would consider in that type of a case for a defendant who is eligible for probation.

Do you think you could ever give somebody as little as six months if you found them guilty of criminally negligent homicide?

A    Yeah, depending on the case.

Q    Okay.  And probation also?

A    Yes.

Q    All right.  Now, how long do you think a person in Texas spends in the penitentiary if they are given life without parole?

A    Life without parole, it's seventy years or seventy years until death.

Q    I'm sorry?

A    Until death or seventy years.

Q    Seventy?

A    I don't know the actual time.

Q    Okay.  Well, would you believe me if I told you that they spend the rest of their life there?  They are going to die in the penitentiary.

A    Yes.

Q    Okay.  Now, I want to talk to you about these special issues and make sure that you understand what the law in Texas requires a juror to do.

The law is that you cannot find a person guilty of the offense of capital murder unless and until the State has proven the elements of the indictment beyond a reasonable doubt.  And obviously we are talking about an intentional murder committed during the course of a robbery.

Okay.  So, they have got to prove there is a robbery going on first, and then they have to prove that there was an intentional murder of the victim.  Okay.

Again, that means they did whatever they needed to do to cause their death, not to wing them, not to wound them, not to shoot them in the kneecap to keep them from following them, nothing like that.  They meant to kill

them and they did that.

Okay. And, so, if the State proves that beyond a reasonable doubt, the jury, following its oath, would have to find the defendant guilty of that. Okay.

Now, I believe that you've already told me that you would be inclined, or I believe you told Ms. Handley that you would be inclined to give that person a death penalty at that point; is that correct?

MS. HANDLEY: I believe that's --

A    No.

MS. HANDLEY:  -- actually in his statement, your Honor, but.

A    I believe I would go through the questions.

THE COURT:  Overrule the objection.  Go ahead.

Q    (By Mr. Lollar)  Now, special issue number one is what we call the future dangerousness issue.  Okay?

A    Uh-huh.

Q    And I know that you've read it but let's read it again.

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

See, the law presumes that the answer to that

question is no, even though the jury has found a person guilty of an intentional murder committed during a robbery. Okay?

A    (Nod head).

Q    Would you be able to presume that the answer to that question is no, even if you found that the person on trial is an intentional capital murderer?

A    I believe I could start with no.

Q    Okay.  Some people tell us, Mr. Henry, in looking at that question, now, wait a minute, you're asking me to predict the future and you are asking me to predict whether or not a person here is a person who would likely commit criminal offenses, pardon me, criminal acts of violence that would constitute a continuing threat to society, and you are asking me to believe that beyond a reasonable doubt.

Okay.  And some jurors tell us that's impossible.  I am not God.  I cannot predict the future. And there is no way that the State would ever be able to show me anything which would indicate to me beyond a reasonable doubt that this person would probably commit criminal acts of violence in the future.

Okay.  Other jurors tell us no, by virtue of the fact that the State has already convinced me and my other fellow jurors beyond a reasonable doubt that the person on trial is the type of person who would, number one, voluntarily

engage in a robbery, number two, bring a gun to that robbery, number three, intentionally kill the victim during that robbery, okay, that is the type of person who, to me, is always going to be a person who is likely to commit criminal acts of violence.

Do you fit in either one of those two camps?

A    No.

Q    Okay.  Tell me why.

A    The second one is I would look at the next evidence of you have to prove to me that this person will probably be a -- commit violence to society.

Q    Okay.  And what type of society would you be thinking about?

A    As it was stated earlier, it could be in a prison society.  If he could be a threat to people there, then that counts as well.

Q    Okay.  Do you think that the prisons are set up to deal with violent people?

A    They are.  It doesn't stop them from doing it, though.

Q    Okay.  Do you think that there are measures they can take in the prisons to control violent people?

A    Yes.

Q    Okay.  In that event, then, do you think that there would ever be a way that a person, if they know he's

going to be violent, do you think that they could control him to a degree where he would not be violent?

A    Towards others, yes.  Towards the actual people who have to watch over him, probably not.  There is still some danger there.

Q    Okay.  Okay.  Now, special issue number two deals with the issue of parties again.  And I think Ms. Handley explained to you what parties are in the State of Texas.

A    Yes.

Q    And it basically asks, is the person on trial the gunman, and if he wasn't the gunman, did he anticipate or intend that the gunman kill the victim intentionally?

Okay.  And that's what that question asks.  And it seems to me that's something capable of proof one way or another, so I don't want to spend a whole lot of time on that issue.

But I do want to talk to you about special issue number three.  And understand that that is different from the other two in this respect.  The State has the burden of proof in special issue number one and special issue number two.  There is a presumption that the answer to special issue number one is no.  There is a presumption that the answer to special issue number two is no.  And the State's got to present evidence to persuade you otherwise before you can even get to special issue number three, and they have got to

persuade you beyond a reasonable doubt.

Okay. But now let's assume we are there at that point. You as a jury have done what you're supposed to do and you start out the examination of special issue number one.

Okay. And I don't know if I mentioned this to you, but if you -- you don't even get to two and three if you are at one and you all decide that the State hasn't proven that there is a probability he would be a future danger.

A    Uh-huh.

Q    Okay. You stop right there, you sign the verdict form, you go back and tell the judge. The judge assesses an automatic life sentence on the defendant. Okay.

The same thing with number two. If you get past number one and you get to number two and you decide, as a jury, that they haven't proven that beyond a reasonable doubt, well, then you stop right there. You sign your verdict, go back and tell the judge. He sentences him to life without parole.

Okay. But, now, let's say that you're past those two special issues. Okay. So, where you are now is you have found a defendant guilty of capital murder and you have found that he's going to be a future danger. Okay.

And many jurors tell us, well, Mr. Lollar, I

see special issue number three but, frankly and honestly, if I found that a person is an intentional murderer, an intentional capital murderer, and the evidence has shown me beyond any reasonable doubt that this person is going to continue to commit criminal acts of violence in the future, even if he's in the penitentiary, then really there are no mitigating circumstances that I would ever find sufficient to avoid a death penalty for that person because I am responsible for the future acts of violence that this killer is going to commit.  okay?

A    (Nods head).

Q    How do you feel about that?

A    Well, question number three, I think, is just something to cover the unknown and can I say absolutely that there is nothing that would make me say on special item number three that I would not then say no, he doesn't deserve the death penalty.  I don't know, there could be something out of all the possibilities out there that would feel that way out there.

Q    Can you give me an example of something that you might be thinking about?

A    No, I cannot.  I just -- I think it's there as a what if, as a last possibility.

Q    Okay.

A    So, no, I can't think of anything.  It doesn't mean

that there is not something there.

Q    Okay.  Let me see.  Kind of ran some of those by you here on page eight.  We asked you the question, some people feel genetic circumstances of birth, upbringing, environment should be considered when determining the proper punishment of someone convicted of a crime.  What do you think?  You said, no, I don't agree.  They chose their path of crime.

Do you think that in this type of a situation, in answering special issue number three, that genetic circumstances of birth, upbringing or environment would ever be sufficient mitigating circumstances for you to ever avoid the imposition of the death penalty for a future danger capital murderer?

A    Not if I made it to that question, probably not.

Q    Okay.  And we asked you on page six, could you ever give any consideration to those issues in answering special issue number three?

A    Probably not.

Q    Okay.  How about drug usage?  If you hear that a person might have voluntarily ingested drugs, some people would say that might be a sufficient mitigation circumstance.

A    No, I don't believe that drug use would fall into that area.

Q    You're saying you would not even consider that --

A    No.

Q    -- as a mitigating circumstance?

A    No.

Q    And Ms. Handley asked you, I think the example was, you know, if they were locked in a closet and fed dog food and abused all their life as a child, would that type of thing ever be a mitigating circumstance to you?

A    It's possible.

Q    Okay.  So that might be.

A    It's possible.

Q    Okay.  How about sexual abuse as a child?

A    No.

Q    Okay.  How about age?

A    No.

Q    No.  So, age would never be something that you could consider as a mitigating factor.

A    Not if it made it all the way this far.

Q    Well, I think the law in the State of Texas is that they have got to be over eighteen, eighteen or older in order to receive the death penalty.

A    Right.  So, in this case it would be up there.

Q    Right.  Okay.  So that's not something you would even consider or look at.

A    (Shakes head).

Q    Okay.  How about whether or not the individual

was the follower or the leader in this situation that got them to commit the capital murder?

A    No.

Q    It doesn't matter?

A    No.

Q    You wouldn't ever look at that?

A    I wouldn't think so.

Q    How about, for the intentional capital murderer that you believe is going to be a future danger, the fact that they didn't have a previous violent history?

A    Well, they already proved number one in the case.

Q    Okay.

A    I can't say that I wouldn't ever consider it, but probably not, but it is a possibility.

Q    Okay.  So you might consider that.

A    I might.

Q    Okay.  So if I'm hearing you correctly, factors such as drug usage, age, circumstances of their environment when they were being raised would not be things that you would even consider to be mitigating circumstances.

A    I wouldn't think so.  I do reserve the right to change my mind on that depending on the circumstances, but probably not.

Q    Okay.  And sexual abuse as a child wouldn't be a mitigating circumstance for you?

**Anne B. Meredith**
Certified Shorthand Reporter

A    I wouldn't think so.

Q    Okay.  All right.  Okay.  Hold on just a second.

Thank you, Mr. Henry.  Appreciate it.

THE COURT:  All right.  Thank you, Mr. Lollar.

Mr. Henry, if you will just step outside with my bailiff, I'll confer with the attorneys and then I'll have an answer for you.  Thank you very much.

(Prospective Juror Henry exits the courtroom).

THE COURT:  Thank you.  Be seated, please.

State have a challenge for cause?

MS. HANDLEY:  We do not, your Honor.  We believe Mr. Henry is a qualified juror.  He has maintained throughout questioning from both sides that he would follow the law in this case.

And my concern is to the last questioning by Mr. Lollar.  And I don't want to speak for him, but in anticipation that he might lodge a challenge that he's saying he wouldn't even consider anything, all that started out by asking him with respect to the very specific question about upbringing and circumstances and how he felt about that and then taking it through some things.

And I think what Mr. Henry is telling us here is ultimately no, I don't think it would matter.  But what demonstrates -- should demonstrate to the Court that he is considering these things is that he says, I do reserve the

right to change my mind depending on the circumstances.

But if you pin him right down now and go, what do you think about drug use, it's his opinion to say, I don't think it's mitigating. But what he's saying is it depends on the circumstances.

And I am afraid that we probably played a little too -- we kind of play around with, you know, can you even consider, when he's looking at in the context of what are you asking my opinion today.

I think it's pretty clear that he's been throughout this whole thing, yeah, I'll wait. The answers depend on the special issues, and I will look at the evidence in the case.

So, I think he's been very clear about his qualifications.

We have no challenges.

THE COURT: Okay. Mr. Lollar.

MR. LOLLAR: Judge, we do have a challenge for cause for Mr. Henry.

THE COURT: Okay.

MR. LOLLAR: First, we would suggest that the juror is unqualified to be a juror because he has stated to us, in the example where I gave him where a police officer testified one way and a defendant testified exactly the opposite, he said he would go with the police officer's

testimony 100 percent of the time.

He said that unequivocally.  He didn't back off of that.  That's what he said.  So he is going to automatically believe the testimony of a police officer over that of a defendant.

He is not a qualified juror under the laws of the State of Texas.

Secondly, he has told us quite clearly that circumstances such as drug usage, the life of a defendant, the environment he grew up in, sexual abuse of a child, age, whether he was a follower or a leader in the circumstances of the offense, he would not consider as a mitigating issue.

Now, we have rights under Eddings versus Oklahoma, which I'm sure the Court is aware of, and also under Standifer versus State, to float the facts of our mitigation in this case to a juror to see if they would even consider them.  And he has said no, those are factors which he would not consider.

And I tell the Court now, and I will put it on the record now, that those are the mitigating factors which we intend to show in this case if we get to the point of having to show that to a jury.

So, under Standifer, under Eddings, under --

MR. PARKS:  Penry.

MR. LOLLAR -- Penry, Penry, he is not a

qualified juror. He will not even consider those mitigating factors which we intend to show in this case.

THE COURT: Thank you, Mr. Lollar.

MS. HANDLEY: Judge.

THE COURT: Yes, ma'am.

MS. HANDLEY: With respect to the circumstances on the officers opinion, I will remind the Court, and I am sure you remember this, that Mr. Lollar took him through a very specific fact situation of you've got two people who testified. There is this, there is that. You know, and the juror said, if that's all I have to go on, then I think I would believe the police officer.

That's not the standard, Judge. I mean the standard is, are you always going to automatically believe a police officer before you've heard anything? Well, he's taken him through a whole what would you do in this case thing. So, I don't think that reaches the proper standard in there.

Again, if you are inclined to grant this challenge to defense on this manipulation that they took him through on the special issue number three, I think that he should at least be talked to and given the proper law and not, you know, let me run you through a scenario and how do you feel about that.

He should have the law explained to him that

the law says, Mr. Henry, that you have to go in to special issue number three, consider everything, and whether you consider it mitigating or not is entirely up to you.

The weight that he gives it is entirely up to him. He doesn't have to give it any weight whatsoever after hearing it. I think he was very clear that, yeah, I get that. I have to go in, listen to everything again. If I don't think there is anything to it, I don't have to give it any credibility.

And that's what I'm hearing him explain to the attorneys and explain to the Court, not that he's going to go in closeminded and not take anything into consideration. He so much as said here, oh, that's a possibility, sure that's a possibility, to certain things. But certain things don't jibe with him and that's just his opinion. But he hasn't presented himself as a man who will go back there, put his hands over his ears and say, I'm not even going to look at anything in this case.

MR. LOLLAR: Well, then I, you know, I point out two things. Ms. Handley had the opportunity to explain the law to him, did explain the law to him in regard to mitigation issues. And then I get him and he says, no, I will not even consider A, B, C, D, E or F. You know, he's told us he will not consider them.

MS. HANDLEY: I think we're playing fast and

loose with dual words and how you --

THE COURT: Okay. Let me do this. Let me bring Mr. Henry back in and let me just briefly explain the law on the witnesses and see if he can follow that and explain once again what his obligation would be with issue number three and see if he can or if he's closeminded to any mitigating circumstances or not or if he could be openminded, keep an open mind to mitigating circumstances.

MS. HANDLEY: Well, and specifically, Judge, I think what he needs to be asked is, you know, will you go in and listen to everything?

THE COURT: Yeah.

MS. HANDLEY: And then will you make up your mind as to whether or not --

MR. LOLLAR: The law does not say listen. The law says listen and give consideration.

THE COURT: That's what I'll ask him.

MR. LOLLAR: Meaningful consideration.

MS. HANDLEY: But not that we have to get an answer from him today as to whether or not he thinks --

THE COURT: I'm not going to ask him about that.

MS. HANDLEY: But I think he needs to understand that because I think that's what he's saying. If you ask me right now, I don't think it's an excuse.

THE COURT:  I'm going to ask him what I understand the law to be --

MS. HANDLEY:  And I think that you should --

THE COURT:  -- and can he follow the law.

MS. HANDLEY:  I think you should explain --

THE COURT:  Which would mean --

MR. LOLLAR:  Meaning consideration.

THE COURT:  -- meaningful consideration to mitigating circumstances.

MS. HANDLEY:  And if you find that there is nothing to it, then you're free to do that after you consider it.

THE COURT:  After you consider it, but you've got to give it meaningful consideration.

MR. PARKS:  The problem with it is --

THE COURT:  I'm not going to tell him that.

MR. PARKS:  No.  I'm saying I know what he's going to say if you ask him whether or not he can give meaningful consideration to mitigating evidence.  He's going to say yes.  The fact of the matter is --

THE COURT:  Maybe he won't.  I don't know.

MR. PARKS:  -- he will because that's not the issue.  He's told us in plain English that the things that special issue number three require of him he won't do.

THE COURT:  Okay.  All right.  Well, let me

ask him and then --

MR. PARKS:  We will go from there.

THE COURT:  -- we will go from there, yeah.

MR. PARKS:  All right.

THE COURT:  Bring Mr. Henry back.

(Prospective Juror Henry returns to the courtroom).

THE COURT:  Mr. Henry, just go ahead and have a seat there again, if you would, please.

FURTHER EXAMINATION

BY THE COURT:

Q    I was kind of unclear on a couple of your answers.

First of all, I want to take up the situation of witness testimony.  Now, you understand that the law requires that each juror or you, as a juror, to start all the witnesses out at the same place.

A    (Nods head).

Q    Regardless of whether police officers, preachers, priests, streetwalkers, whoever it might be, you have to start everybody out on the same line.

A    Okay.

Q    Listen to what they have to say, and then you are the trier of fact and you judge the credibility of the witnesses and you determine what weight is going to be given to their testimony.

A    Okay.

Q    So, it's kind of like a foot race. Everybody starts from the same line, from the starting line, the same place. But that doesn't mean that everybody finishes at the same place.

A    Right.

Q    That's up to you. You use your good judgment and common sense in judging their credibility.

And you understand that police officers are like everybody else. They make mistakes or in some cases we've all heard about police officers that were, you know, weren't credible.

A    Right.

Q    The same way with other persons. But the point being is that the law requires that you listen to them before you make a judgment call as to how credible that particular witness is and what weight would be given to their testimony.

There might be something you would believe from every witness, and there might be something you wouldn't believe from any witness, and there might be some things that you believe from one witness and you would disbelieve other things from that same witness.

A    Right.

Q    So, that's your judgment call. Can you do that?

A    Yeah.

Q    That's what you would be required to do under the law.  And just because a person is a police officer, just because a person is clergy, or just because a person is maybe from the dark side of life doesn't mean that you're going to believe everything that you expected a person that would be -- you would expect to be truthful would say.  You would still weigh their testimony.

A    Yes.

Q    And you wouldn't disbelieve everything a person that you -- of disreputable character.

A    Yes.

Q    Okay.  Can you do that?

A    Yes.

Q    All right.  And then the second thing I wanted to talk with you about is special issue number three here.  And that is that you understand that after you've found -- you only get to special issue number three if this is the very last, last thing.  In fact, I've heard some people refer to it as a safety net.

A    Right.

Q    And first of all, you understand that to get to number three, you've already found the defendant guilty of a capital murder offense.

A    (Nods head).

Q    A bad, heinous act.

A    Right.

Q    Secondly, you've already found that the defendant is guilty or, excuse me, not guilty, but you've already found special issue number one to be true and answered that yes.

A    Yes.

Q    Okay.  If special issue number two is submitted by the Court, by Judge Snipes, then you've also answered that one yes.  Okay?

A    Okay.

Q    And now you come to the safety net or special issue number three.  Now, the State has the burden of proving one and two to you.

A    Right.

Q    And the burden of proof is beyond a reasonable doubt, the same burden of proof as in the guilt/innocence phase of proving the offense.

A    Right.

Q    Beyond a reasonable doubt.  Okay?

But there is no burden of proof here on anybody's part.  The defendant never has the burden of proof and it never shifts to the defendant at any point during the trial.

So, what special issue number three would require you to do -- and this is my question to you.  Can

you do this?  It would require you to review -- each juror to review in your mind all of the evidence that's been presented in the entire course of the trial, the guilt/innocence phase, punishment phase, and to look at that evidence and to make a determination in your mind if there is any mitigating circumstances that are sufficient for you to change this death penalty, that you have already got the defendant sitting on by the answers to your questions and by your verdicts concerning guilt/innocence and the first two special issues, to a life sentence.

You understand how number three works?

A    Yes.

Q    And nobody has a burden of proof.  This is something that you just review in your mind, you look at it.  You might see something there.  You might see several factors there that in and of themselves individually don't rise to the occasion of being sufficiently mitigating.  But you put the two or three together and you think, well, you know, this happened, this happened, this happened.  I think that does rise to sufficiently mitigating.  I'm going to change that --

A    Uh-huh.

Q    -- to a life sentence.

Or you might look at everything and there might be a jillion out there.  But you've got to keep your

**Anne B. Meredith**
Certified Shorthand Reporter

mind open and you have got to make your decision based on the evidence and not some preconceived idea that you arrived at just because you've already found him guilty, you've already said yes to one and yes to two, that you're just going to close your mind to any mitigating circumstances and ignore number three.

A    Right.

Q    So, you tell me what you would do.

A    I think I would be open to number three.

Q    Okay.

A    There could be something there.

Q    Could be.  And you know, you don't have to think of a sets of facts or circumstances that you think might be mitigating.  But I think you've already articulated some of those things that you would consider and could consider. But you can consider everything?

A    Yeah.

Q    Some you might say is not mitigating and they might be to other jurors and not to you.  There might be some things that you would think would be mitigating that other jurors wouldn't agree with.

A    That's true.

Q    And it doesn't -- you don't have to agree on -- Every juror doesn't have to agree on any one thing being mitigating.

A    Uh-huh.

Q    You know, it's just if one juror thinks that there is sufficiently mitigating circumstances, and that juror could be you --

A    Uh-huh.

Q    -- will you keep your mind open?  Will you follow the law?

A    Yes.

Q    And will you give good consideration, true consideration -- What's the word I'm looking for?

MR. HIKEL:  Meaningful.

THE COURT:  Meaningful.  Thank you.

Q    (By the Court)  -- meaningful consideration to mitigating circumstances?

A    Yes.

Q    Before you answer that question?

A    Uh-huh.

THE COURT:  Okay.  All right.  Then thank you very much. Mr. Henry, I'm going to ask you to step out once again and I will bring you right back.  Okay.  And then we'll be through, I promise you.

(Prospective Juror Henry exits the courtroom).

THE COURT:  All right.  You want to reurge your motion?

MR. LOLLAR:  Yes, sir, I do.

THE COURT: Okay. Yes.

MR. LOLLAR: And let me point out --

THE COURT: Okay.

MR. LOLLAR: -- even in the Court's voir dire of Mr. Henry in regard to the credibility issue of police officers, the record will reflect the statement still stands made by Mr. Henry that in 100 percent of the cases he would believe the word of a police officer over the word of a defendant.

And the Court, I appreciate the Court using the language, that's what you would be required to do is to make them all even, but his statement still stands in the record.

THE COURT: Okay.

MR. LOLLAR: In 100 percent of the cases I'm going to believe the police officer over the defendant.

And Mr. Parks wants to address the second issue.

THE COURT: Yes, sir.

MR. PARKS: I'll wait until after the Court rules.

THE COURT: Oh, okay.

MR. PARKS: Well, I'll make my speech now.

THE COURT: Okay. All right.

MR. PARKS: Of course, I don't know who --

In the event this case has to be appealed, I don't know who is going to do it, Judge.

THE COURT: Yeah.

MR. PARKS: And in order to effectively represent Mr. Broadnax, I think myself and Mr. Lollar need to give a road map so far as we can to the --

THE COURT: Sure.

MR. PARKS: -- as yet to be revealed person.

THE COURT: Okay.

MR. PARKS: And our position here in the case --

THE COURT: Are you talking about the appellate lawyer?

MR. PARKS: Yeah, the appellate lawyer, whoever that might be.

THE COURT: Right.

MR. PARKS: And frankly, Judge, these I think are subtle issues that are probably -- well, not that subtle, but they are issues that are lost on the Court of Criminal Appeals. They have told us that time and time again by decisions that they have made.

We are relying on the Constitution of the United States and the clear statements of the Supreme Court of the United States on the issue of mitigation and constitutional rights that any defendant has to a fair and

impartial jury.

And we start basically with Morgan versus Illinois. And what Morgan tells us is that a defendant must be allowed to voir dire a jury to determine whether each juror is able to consider and give effect to his mitigating evidence.

In fact, that must be good law because Justice Scalia almost had an aneurysm and correctly identified the issue in his dissent by saying that now, because of today's decision, any juror who thinks a bad childhood is never mitigating must be excluded. And he is exactly right. That's what Morgan versus Illinois says. But it doesn't stop with Morgan.

THE COURT: But the majority opinion -- Let me ask you a question about that case --

MR. PARKS: Yes, sir.

THE COURT: -- Mr. Parks, because I don't have the -- I don't have the brief in front of me. But the majority opinion was that the juror did not have to.

MR. PARKS: No, the majority was that the juror did. That the defendant was entitled to have a jury that would consider his mitigation. And that's what upset Scalia is because Scalia is saying --

THE COURT: Yeah, but I'm talking -- I'm talking about -- You're quoting Scalia's dissenting

opinion.

MR. PARKS:  Yes, sir.

THE COURT:  And in his dissenting opinion, he says -- That's not the majority opinion, it's the dissenting opinion.  But the dissenting opinion is that he thinks or he writes that every juror should.

MR. PARKS:  Well, what he writes is -- In mocking the majority opinion, he writes, now I guess we are going to have to kick off all the jurors that doesn't believe that a bad childhood can be mitigating.  And he is right.  That's what the majority opinion held and that's why he was scornful of it.  But him being scornful of it didn't change the fact that the majority held that a defendant was entitled to a juror who could consider his mitigation, not just mitigation generally.

And where the Court of Criminal Appeals has gone wrong is by saying, since the State of Texas does not specifically identify what mitigation is or is not, then we don't have to pay any attention to what the Supreme Court says because we don't define mitigation for our jurors.

THE COURT:  Well, some states do define mitigating circumstances.

MR. PARKS:  That's right.

THE COURT:  And was this from a state that did have a laundry list of mitigating circumstances or --

MR. PARKS:  It doesn't make any difference.

TEH COURT:  It doesn't make any difference?

MR. PARKS:  It doesn't make any difference.

THE COURT:  All right.

MR. PARKS:  Because the Court goes on and in Penry 1 the Court said that under the eighth and fourteenth amendments, the jury must not be concluded from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

Well, as Mr. Lollar has already said, we intend to proffer as a mitigating circumstance the business about drug usage, which this juror has said he absolutely will not consider.  And that's in plain violation of what Penry tells us.

Eddings versus Oklahoma goes on to essentially say the same thing, saying just as the State may not preclude by statute considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.

Lockett versus Ohio again says the eighth amendment requires the consideration of the defendant's background and upbringing.

Our special issue number three requires a juror to consider his background and character.  Background

is obviously upbringing. This particular juror says, as to that, he cannot.

So, where we are falling off, I guess you would say, is that if we use this great big umbrella and say, can you consider mitigating factors, yes, I can, but not the mitigating factors that this particular defendant intends to proffer, that's a useless thing for him.

And I believe, under all of these Supreme Court cases and under the eighth and fourteenth amendments, this particular juror is disqualified.

MR. LOLLAR: And that's the bottom line, Judge. We shouldn't have to use a strike on this man. He is not qualified to be on this capital murder case.

He has told us he will not consider certain factors which we intend to show this jury. He's not even going to give them meaningful consideration. He's not going to look at them. They are not going to ever be sufficient mitigating factors to avoid a death penalty, and he has told us that.

MR. PARKS: Judge, he said so right here in his questionnaire in plain English. And he said, I agree with -- Brad asked him, you know, you said no, I do not agree that genetic circumstances of birth, upbringing, environment should ever be considered. And he said, yes, I agree with that. I affirm that here today.

MR. LOLLAR: And let me add this. We are talking about a guy who put in his questionnaire, when we asked, do you agree with the following statement, it's better that ten guilty people go free than one innocent man be convicted, he says, reverse that statement. You know, that's who we are arguing about, a guy who feels it's better that ten innocent people be convicted than one guilty guy go free.

This guy's not on the planet of reasonable people in regard to capital murder trials.

MS. HANDLEY: I don't believe that that's what the juror said, your Honor, when he was explaining himself.

I think when you try to pin down a layman and in the context of compound questions and talking real fast and throwing a bunch of your opinions and some people say and other people say, in which category, and you try to squeeze the word consider in there, in the context in which this gentleman was talking to us, he's hearing, are you asking my personal opinion right now?

You know, and that's not the standard, Judge. And when the standard, when the law is explained to him, he's very honest. As through four pages of notes I have where Mr. Lollar is trying to get him to say he'll make automatic assumptions or he won't consider, he's been very consistent

about that.  What he's telling you is, yeah, I'm going to follow the law.  And even offers that up, well, I can't get there, Mr. Lollar, because I haven't -- I go through the questions here.  I don't make assumptions.

If you want to throw this all on whether or not we use the word consider, I think when you listen to him, you take everything into context, he absolutely will consider everything.

But whether or not he thinks something is mitigating right now is not the standard.  That's his personal opinion, and that's fully within his discretion.

MR. PARKS:  How can we assume that he's going to consider something --

MR. LOLLAR:  When he tells us he won't.

MR. PARKS:  -- when he tells us that he won't?

MS. HANDLEY:  Oh, because I think the judge has a good head on his shoulders and can watch this gentleman and listen to you two -- and let me finish, sir.

THE COURT:  Wait, wait.

MS. HANDLEY:  -- and make a determination as to what he can or can't do.

MR. PARKS:  I'm going to say this just one time.  Be careful what you ask for.

THE COURT:  All right.  Let's do this.  I'm going to take your challenge for cause under advisement this

evening since this is our last one to do today.  And I'm going to bring him back in here and I am going to admonish him, you know, and then turn him loose because we are not picking him as a juror, anyway.

MR. LOLLAR:  Sure.

THE COURT:  So, let me bring him back in and I will just tell him, you know, not to refer to any newspaper articles or anything like that.

MR. LOLLAR:  Sure.

THE COURT:  And then I'll give you a ruling tomorrow.  Let me kind of think on this.

MR. LOLLAR:  Sure.

THE COURT:  And then I'll rule on your objection or your challenge for cause tomorrow.  Okay?

MR. LOLLAR:  Yes, sir.

THE COURT:  Okay.  Let's go ahead and bring Mr. Henry back.

(Prospective Juror Henry returns to the courtroom).

THE COURT:  Just go ahead and have a seat there, Mr. Henry.

Thank you, ladies and gentlemen.  Be seated, please.

Mr. Henry, let me just advise you, I don't know whether you're going to be a juror in this case or not;

nobody does.  We are simply qualifying a panel at this point, and then the attorneys will make their strikes at some point in the future.

PROSPECTIVE JUROR HENRY:  Okay.

THE COURT:  Now, let me just tell you this. As far as I know, Judge Snipes will send out notices to those folks that are on the jury, more than likely the last of July, isn't it?

MR. LOLLAR:  Yes.

THE COURT:  That's what we have been telling everybody, the last of July.  And you'll be notified either by phone or in writing.

Would you look at your -- Is that contact information correct for you still?  I know you filled that out over a month ago.

PROSPECTIVE JUROR HENRY:  Yes, it is.

THE COURT:  Same thing.  All right.  And they will be in contact with you and they will notify you whether or not you're on the jury.

PROSPECTIVE JUROR HENRY:  Okay.

THE COURT:  Or if you don't hear anything that you are on the jury, you're not.

PROSPECTIVE JUROR HENRY:  Okay.

THE COURT:  Okay.  All right.  Also, I'll ask you not to go and review anything.  I can't remember if you

told us in the beginning that you knew anything about this case or you heard anything about this case or thought you knew something about it or heard something about it.

PROSPECTIVE JUROR HENRY:  I wasn't asked today. It was asked a month ago.

THE COURT:  A month ago when you filled your questionnaire out.  And did you write something down in your questionnaire about that issue?

PROSPECTIVE JUROR HENRY:  I don't remember. I hadn't heard anything before or since about this case.

THE COURT:  Okay.  So you haven't heard anything up to this point?

PROSPECTIVE JUROR HENRY:  No.

THE COURT:  Haven't heard anything that you would remember, anyway?

PROSPECTIVE JUROR HENRY:  No.

THE COURT:  You don't remember it.

PROSPECTIVE JUROR HENRY:  I haven't researched anything.

THE COURT:  Okay.  And you haven't researched anything, and that's exactly the way I want to keep you.  I don't want you to research and go back in the archives, look up any old newspaper articles or TV reports.

PROSPECTIVE JUROR HENRY:  Okay.

THE COURT:  Or anything like that.  And from

**Anne B. Meredith**
Certified Shorthand Reporter

this day forward, if there is anything that appears in the newspaper about this case or on TV, I don't want you listening to that news account, I don't want you to read that newspaper article.

PROSPECTIVE JUROR HENRY:  All right.

THE COURT:  Okay?

PROSPECTIVE JUROR HENRY:  Uh-huh.

THE COURT:  Because I want to keep you just the way you are today.

PROSPECTIVE JUROR HENRY:  Okay.

THE COURT:  Because if you're on this jury, then Judge Snipes will administer the oath of a juror to you as well as the other members of the jury.  And in that oath you will be sworn to make your decision in these -- decision or decisions in this case based solely upon the evidence that you'll see, hear and receive in the trial of the case and the law that Judge Snipes would give to you in his charges to the jury.  Okay?

PROSPECTIVE JUROR HENRY:  All right.

THE COURT:  Okay, very good.  Well, have a good evening, what there is left of it.

PROSPECTIVE JUROR HENRY:  Okay.

THE COURT:  And maybe we'll talk to you later.  Okay.

PROSPECTIVE JUROR HENRY:  Nice to meet y'all.

**Anne B. Meredith**
Certified Shorthand Reporter

MS. HANDLEY:  Thank you, sir.  Appreciate it.

THE COURT:  Nice to meet you, Mr. Henry. Thank you for your time.

(Prospective Juror Henry excused from the courtroom).

THE COURT:  Okay.  Ladies and gentlemen, have a good evening.  Tomorrow 9:00 A.M.

(Court adjourned for the day).

**Anne B. Meredith**
Certified Shorthand Reporter

THE STATE OF TEXAS    (

COUNTY OF DALLAS       (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 3rd day of June, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volumes 13, 14, 15 & 16) is $7,300 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 29th day of November, 2009.

Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter