1

REPORTER'S RECORD   *AP·76207*

VOLUME 16 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

THE STATE OF TEXAS                  (        IN THE CRIMINAL DISTRICT

VS.                                 (        COURT NUMBER SEVEN

JAMES GARFIELD BROADNAX             (        OF DALLAS COUNTY, TEXAS

* * * * * * * * * * * * * * * * * * *

INDIVIDUAL VOIR DIRE EXAMINATION

* * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

SEP 1 6 2010

Louise Pearson, Clerk

On the 4th day of June, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE QUAY PARKER, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

**Anne B. Meredith**
Certified Shorthand Reporter

APPEARANCES:

HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas  75207-4313
Telephone No. 214 653-3600

BY:  MS. ANDREA HANDLEY, SBOT No. 08898800
     MS. ELAINE EVANS, SBOT No. 24032880
     MR. GORDON HIKEL, SBOT No. 00787696
     Assistant District Attorneys

          APPEARING FOR THE STATE OF TEXAS

     MR. BRADLEY LOLLAR, SBOT No. 12508700
     Attorney at Law
     1700 Commerce, Suite 450
     Dallas, Texas  75201
     Telephone No. 214 384-8178

     MR. DOUGLAS PARKS, SBOT No. 15520000
     Attorney at Law
     321 Calm Waters Lane
     Holly Lake Ranch, Texas  75765
     Telephone No. 903 769-3120

     DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
     133 N. Industrial Blvd., LB 2
     Dallas, Texas  75207-4399
     Telephone No. 214 653-3550

BY:  MS. KERI MALLON, SBOT No. 24049165
     Assistant Public Defender

          APPEARING FOR THE DEFENDANT

**Anne B. Meredith**
Certified Shorthand Reporter

CHRONOLOGICAL INDEX - VOLUME 16

|  |  |  |  | PAGE |
|---|---|---|---|---|
| Proceedings - June 4, 2009 |  |  |  | 5 |
| VENIRE PERSON | COURT | STATE | DEFENSE | |
| BILLY HENRY | | | | |
| Court's Ruling on Defendant's Challenge | | | | 5 |
| ANTHONY RYAN GALLARDO | 6 | 11 | 57 | |
| Defendant's Challenge | | | | 82 |
| Court's Ruling | | | | 82 |
| MARIO ALBERTO MARTINEZ | 83 | 87 | 133 | |
| State's Challenge | | | | 137 |
| Court's Ruling | | | | 138 |
| GEORGIA MARGARET BUKIN | 139 | 140 | | |
| State's Challenge | | | | 141 |
| Court's Ruling | | | | 141 |
| PAMELA DENISE MUNSON | | 143 | | |
| State's Challenge | | | | 145 |
| Court's Ruling | | | | 145 |
| HEATHER EGER | 146 | 150 | 204 | |
| Prospective Juror Accepted | | | | 255 |
| JERRY WAYNE JACKSON | | | | |
| Excused by Agreement | | | | 262 |
| Adjournment | | | | 262 |
| Reporter's Certification | | | | 263 |

**Anne B. Meredith**
Certified Shorthand Reporter

ALPHABETICAL INDEX - VOLUME 16

| VENIRE PERSON | COURT | STATE | DEFENSE | PAGE |
|---|---|---|---|---|
| BUKIN, GEORGIA MARGARET | 139 | 140 | | |
| State's Challenge | | | | 141 |
| Court's Ruling | | | | 141 |
| EGER, HEATHER | 146 | 150 | 204 | |
| Prospective Juror Accepted | | | | 255 |
| GALLARDO, ANTHONY RYAN | 6 | 11 | 57 | |
| Defendant's Challenge | | | | 82 |
| Court's Ruling | | | | 82 |
| HENRY, BILLY | | | | |
| Court's Ruling on Defendant's Challenge | | | | 5 |
| JACKSON, JERRY WAYNE | | | | |
| Excused by Agreement | | | | 262 |
| MARTINEZ, MARIO ALBERTO | 83 | 87 | 133 | |
| State's Challenge | | | | 137 |
| Court's Ruling | | | | 138 |
| MUNSON, PAMELA DENISE | | 143 | | |
| State's Challenge | | | | 145 |
| Court's Ruling | | | | 145 |

*Anne B. Meredith*
Certified Shorthand Reporter

P R O C E E D I N G S:

(Defendant present).

THE COURT:  Let's get on the record and let me go ahead and rule on Mr. Henry.

The defendant's challenge for cause will be denied.  Do you want to put anything else on the record?

MR. LOLLAR:  We would ask the record to reflect that Mr. Henry is an unacceptable juror to the State, or pardon me, to the defense.  We feel that he's clearly disqualified under the holdings of the Supreme Court of the United States under Lockett versus Ohio, Morgan versus Illinois, and Eddings versus Oklahoma, which all cite the sixth, eighth and fourteenth amendments to the United States Constitution.

I have brought copies of those opinions in case anyone wants to review those so we all know what the law is.

MS. HANDLEY:  Is that my copy?

MR. LOLLAR:  Well, I brought a copy.

(Discussion off the record).

MR. PARKS:  We would like the record to reflect that this is not an acceptable juror to the defense and we respectfully request an additional peremptory challenge due to the Court's error in ruling.

THE COURT:  Okay.  I'll take your request

*Anne B. Meredith*
Certified Shorthand Reporter

for an additional peremptory challenge under advisement.

Anything else?

MR. PARKS:  That's it.

THE COURT:  That's it.  Okay.  All right. Then that will be number 17.  Mr. Henry will be number 17 by my count.  Is that correct?

MR. HIKEL:  Yes, your Honor.

THE COURT:  All right.  Moving right along. Okay.  So Mr. Gallardo, please.

(Prospective Juror No. 349, Anthony Gallardo, enters the courtroom).

THE COURT:  Good morning, Mr. Gallardo.  Have a seat right there, if you would, please, sir.

Thank you, ladies and gentlemen.  Be seated, please.

And I would like for the record to reflect this is Prospective Juror number 349, Anthony Ryan Gallardo, g-a-l-l-a-r-d-o.  Correct, Mr. Gallardo?

PROSPECTIVE JUROR GALLARDO:  Yes, sir.

ANTHONY RYAN GALLARDO, having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Am I pronouncing your last name correctly?

A    That's the easy way to say it, yes.

Q    What's the hard way?

A    Gallardo.

Q    Gallardo.  Okay.  And is that the way you prefer to have it pronounced?

A    The first way.

Q    Gallardo?

A    Yeah.

Q    Okay.  It's easier for me.

I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney, Texas just right up the road here.  And Judge Snipes has asked me to assist him in this jury selection process while he's upstairs in his courtroom taking care of the day-to-day matters of the Court, and I'm assisting him by picking this jury.  Okay?

A    (Nods head).

Q    So, that explains to you what I'm doing here today instead of Judge Snipes, and why you're here today, as a matter of fact.

Now, you'll recall about a month ago everybody met in central jury, probably four or five hundred folks at one time.

A    Uh-huh.

Q    And Judge Snipes addressed the group, went over some qualifications, exemptions, that sort of thing.  And then at some point in the proceedings he had everybody stand

up, raise their right hand, and he administered the oath of a prospective juror to each member of the panel.

Do you recall that?

A    Yes, sir.

Q    Okay.  Were you one of the panel members that stood and took the oath at that time?

A    Yes, sir.

Q    Very good.  I just remind you you're still under that oath.  And what you have been sworn to do, just by way of quick reminder, you're of course sworn to tell the truth, which we know you would do that, anyway.  But also you're sworn to give -- to be responsive to each and every question that's asked to you by the attorneys.  All right?

A    Okay.

Q    Now, let me tell you a little bit about the question/answer deal.  Now, you've had an opportunity to look at your juror guide there, have you?

A    Yes, sir.

Q    Okay.  That explains to you very briefly about some of the law and procedural aspects and the special issues that are going to be involved in the trial of this case.

And what the attorneys are going to do then, they are going to explain the law a little bit further to you and make sure you understand it, and then they are going

to ask you questions concerning your ideas, trying to get your ideas, your thoughts, your opinions concerning the law and the procedural aspects involved in the trial.

So, there's no right or wrong answers. I guess what I'm telling you is no right or wrong answers to any of the questions. This is not a quiz that you have to pass or anything like that, not at all.

A    All right.

Q    And there is not going to be anything that they are going to inquire about that's going to be embarrassing to you in any way. All right?

A    Okay.

Q    All right. So, just kind of relax there. And you'll recall back over a month ago when everybody showed up for jury service, you filled out a questionnaire at that time; did you not?

A    Yes, sir.

Q    And there it is right there, that's yours. I know you haven't seen it in over a month and, so, I know you don't remember all the answers that you put down. But the attorneys have been through your questionnaire, both sides have, and they have -- I'm sure they have questions that they want to ask you concerning some of your answers and responses to those questions. All right?

A    Okay.

Q    All right.  Very good.  Now I'm going to -- I'm going to shut up and let the attorneys take over and I want to introduce them to you at this time.

THE COURT:  Seated right across from me is Ms. Elaine Evans.  She is going to talk to you for the State of Texas here in just a moment.  And then seated next to her is Ms. Andrea Handley.  And then on down from her Mr. Gordon Hikel.

MR. HIKEL:  Good morning, sir.

PROSPECTIVE JUROR GALLARDO:  Good morning.

THE COURT:  They are all three assistant district attorneys here in Dallas County, and they are the prosecution team charged with the responsibility of prosecuting this case.

Then seated next to me down here, down the table, is Mr. Brad Lollar.  And then next to him Mr. Doug Parks.  On the very end Ms. Keri Mallon.

MS. MALLON:  Good morning.

PROSPECTIVE JUROR GALLARDO:  Good morning.

THE COURT:  Next to Ms. Mallon is the defendant and their client, Mr. James Broadnax.

All right.  Very good.

You may proceed, Ms. Evans.

MS. EVANS:  Thank you, your Honor.

THE COURT:  Yes, ma'am.

EXAMINATION

BY MS. EVANS:

Q    Good morning, Mr. Gallardo.

A    Good morning.

Q    How are you this morning?

A    A little tired.

Q    A little tired.  And I saw by your questionnaire with regards to being here, for the reason you're here for prospective jury service, that maybe you had a little nerves involved with that.  You haven't ever done that before.

A    No.

Q    You still feel that way?

A    I'm okay.

Q    Okay.  And I wanted to let you know that most of the individuals that we have seen so far -- you remember how large that room was, all the people in it?

A    Yes.

Q    And you were the morning panel, but we talked to a whole other group in the afternoon with the room just as crowded as that one.

A    Oh, wow.

Q    Most of the people that we have talked to have never done jury service before.  So the first time out, you know, you're here on a very serious, important case.

A    (Nods head).

Q    Nothing wrong about that, nothing different about it because the same principles of law apply whether it's a DWI down in misdemeanor court as it does here in a capital murder case.

The law just is different based on the type of case you're hearing, but the same principles of law, fundamental principles apply, and the same procedures and process in general apply regardless of the type of case. Okay.  So, you're going to be okay with that?

A    Yes.

Q    Okay.  Basically, as the judge said, the oath that you took before was just to tell the truth, just talk to us about how you feel.  That's basically all we are asking you to do today.  Okay?

If you are qualified and if you actually serve as a juror in this case, you will be asked by the judge to take an additional oath.  And that oath will then be to render a verdict based on the law and the evidence.

And, so, that's why we have this process, why we talk to you individually, because we want to make sure first that you agree with the law and that you can follow that law as given to you by the judge.  Okay.

Because obviously we don't have -- I mean, sure, we live in this great country, but not everybody agrees with every single law that we've got out there.

Okay.   Does that make sense?

A    Uh-huh.

Q    Some people, I know, that were born many years ago may not agree with the laws that we have about buckling children into car seats.   Because like my parents, for example, say, heck, you just road all over the car, wherever it is you could find a seat.   You may have a seat belt on or you may not.

But that's kind of the era that they grew up in.   Now, are they going to follow that law with my daughter?  Absolutely.   But that's all we want to know that you can do.  Do you agree with the law and are you able to follow that law as it's given to you by the judge, okay?

A    Okay.

Q    And with respect to that, I'm going to turn quickly, if you want to take a look in your questionnaire, page eleven.   And I think you may have just kind of misunderstood what was being asked of you and I want to explain it a bit.

Do you agree with the following statement, regardless of what a judge says the law is, jurors should do what they believe is the right thing?   And you said, yes, that you believe jurors should do what they believe is the right thing, that one person's opinion should not be your influence in decision making.

Let me first explain to you, the judge is not going to have an opinion. The law does not allow him to influence you or have an opinion one way or another as to the facts of the case. You, if you're a juror in this case, you're the exclusive judge of the facts and the evidence that you hear from that witness stand. Okay. He's going to have no influence over you on that.

It's just he's bound to give you the law in the case. And then that law, as it comes from the judge, is what you are then, in turn, bound to follow based on the facts that you hear.

A    Okay.

Q    Are you going to, understanding that the judge isn't going to influence your decision regarding the facts, are you going to be able to follow the law as given to you by the judge?

A    I think they should follow the law. I think you're right, I did misunderstand the question.

Q    That's what I thought.

A    What I was misunderstanding about, I was thinking when I read it that the juries were considering the judge's -- judge as an opinion.

Q    Kind of as an advisory --

A    Yes.

Q    -- type opinion? Okay.

And understanding now that literally their job is to sit up there and call balls and strikes, in other words, they kind of act as the referee. If the State is getting into something or trying to introduce a piece of evidence they shouldn't be, or the defense is trying to do the same, the judge will basically say, well, wait a minute, time out, that ain't coming in, or, whoa, wait a minute, yes, that is acceptable, that is relevant, that is coming in.

But they don't influence or advise you as to what your verdict should be, whether it should be guilty, whether it should be not guilty, or whether or not the death penalty should apply in this case.

In fact, your verdict, if you return a verdict of guilty and if you answer the special issues yes, yes and no, the judge has no choice, no discretion but to sign a death warrant for this defendant sitting down here, and he will be sentenced to die. Okay?

A    (Nods head).

Q    So, you've probably heard that before where some things are maybe discretionary or the judge gives an advisory opinion or something like you were saying, that's not the case here. It will be your verdict. All right. You just have to follow the law as given to you by the judge.

Do you think you could do that?

A    Yes.

Q    Okay.  I want to talk to you a little bit more about some of the stuff in your questionnaire and your feelings about the death penalty first before we start going over the law.  Okay?

And I see here that you are in favor of the death penalty; is that correct?

A    Yes.

Q    And you believe that it applies or is appropriate in some murder cases, fair to say?

A    Yes.

Q    Okay.  And you say, no person should take a life intentionally over any reason other than self-defense; is that correct?

A    Yes.

Q    And basically you're absolutely right, a person has a right to defend themselves.  It is a legal justification.  So, as a matter of fact, if the issue of self-defense arose, you would not be called upon to assess punishment in any way, shape or form, nor would the death penalty apply because, if the person is acting in self-defense, they are what?

A    They are protecting themselves.

Q    Right.  And they are not guilty of that offense, right?  Not guilty of murder.  If you are legal --
self-defense is a legal justification.  You're allowed to

defend yourself under the law so long as you're abiding by what the law says self-defense is.

A    Right.

Q    All right.  So, you would be not guilty and it wouldn't even apply.

A    Right.

Q    Does that make sense?

A    Yes.

Q    And it wouldn't apply punishment-wise.  Okay?

And I see on page two where you talk about what are the various arguments for and against the death penalty.  And I know you're just giving your kind of a philosophical, you know, approaches if you are trying to advocate for it versus against it.

But in your best argument against the death penalty you say, killing a person that took a life should not be punished by death but spend the rest of his life thinking on what they have done.

What do you think about that argument?

A    Well, depending on the circumstances of why they killed the person, it's not our place to tell a person if they should live or die.  It's up to that person who took the responsibility to commit what they did and think upon that.

Q    Okay.  Now, when you say it's not our responsibility

to say whether they should live or die, what do you mean?

A    Well, I mean I understand by law that we are supposed to decide that.  But in my personal opinion, I don't think that we should make that decision.

Q    Okay.  So, do you have a moral, personal or religious --

A    No.

Q    -- reason why you don't feel that people should be making the decision whether death should be imposed?

A    No.

Q    Okay.  Explain to me, then, what you mean by you don't think we should be making that decision.

A    Well, if we had no laws, that's how I would feel, that the person should be able to make for themselves if they should live or die.  But since we have laws, we are obligated to make that decision for them.

Q    Okay.  So I saw, I believe you believe in eye for an eye.

A    Yes.

Q    Is that correct?  So, you mean the person or persons that that individual has wronged should be able to make that decision or call, or who should make that call if we weren't doing it under the laws, or how should the individual be punished if we didn't have laws that we were following?

A    I honestly couldn't tell you.

Q    Okay.  But you understand that the law here in the State of Texas is, if you are guilty of capital murder, you are eligible for the death penalty; is that a fair statement?

A    Yes.

Q    We are going to talk about what capital murder is. And if you were to serve as a juror in this case, would you have any problem rendering a verdict that resulted in a sentence of death?

A    No.

Q    Okay.  And I see that you have not heard anything about the facts of this case, or you hadn't back when you filled out the questionnaire.

A    No.

Q    Is that still the case as you sit here today?

A    Yes.

Q    Okay.  And on a scale of one to ten, how strongly do you feel about the death penalty, you say that your belief is it's a ten.  You're ten in favor of the death penalty.  Where did you arrive at that number?

A    Umm, it's just how I -- I feel that, depending on the circumstances of what has occurred, some things I believe deserve the death penalty.

Q    Okay.  And when you say that some things deserve the death penalty, I see too from your questionnaire that

you say that your family doesn't hold the same beliefs as you do with regards to the death penalty.

How do your beliefs differ?

A    I honestly don't know.  I've never talked to them about stuff like that.

Q    Okay.  Do you feel that they would be in favor of it or against it?

A    I believe they would just, you know, follow the law and, given the evidence, decide from that.

Q    Okay.  Because the reason I ask that is we just want to make sure that there is not going to be any outside influences or pressures that are going to weigh on you or come into deliberations whenever you're looking at the facts of this case.

Because it's okay to have your views and opinions, and it's okay obviously for your family members to.  But if it's going to be to a degree that, you know, weighs on you so heavily that you are entering those opinions into your deliberations and your verdict, then we just want to know about that, okay?

A    Right.

Q    Because there's no right or wrong answers here, and that's why I asked you about your family.  I know probably as you sit there you're thinking, why does it matter what my family thinks?  They are not prospective

jurors.  Was that kind of going through your mind?

A    No.

Q    Okay.  So, that's why we ask that question.

Okay.  And there are, as I told you, certain fundamental rights that are afforded to every criminal defendant, whether it's a traffic ticket, a misdemeanor DWI, shoplifting case or capital murder, and they all apply in this case just as they would in those.  Okay?

This defendant, as he sits here, is presumed to be innocent.  He has not been proven guilty of anything. The State hasn't brought you any evidence so that that presumption will be overturned.

He's just been indicted -- and here is the indictment in front of you -- for the offense of capital murder, but the indictment alone is no evidence of guilt. All the indictment does is let the State know what we have to prove to you and it puts the defense on notice of what they are being charged with, what the defendant is being charged with.  Okay?

A    (Nods head).

Q    But, you know, some people say, where there is smoke, there is fire.  Well, you know, maybe that's okay to talk about, you know, out amongst friends having pizza and beer, but not in a courtroom.  Okay?

A    (Nods head).

Q    Because he is presumed innocent, and that's very important, because we wouldn't want people to have to come in here and prove that they were innocent, would we?

A    No.

Q    It should be the other way around, correct?

A    (Nods head).

Q    I mean, if the State is doing the accusing, we better do the proving; fair to say?

A    Right.

Q    And do you agree with that?

A    Yes.

Q    Okay.  And would you be able to give this defendant down here the presumption of innocence?

A    Yes.

Q    And as he sits here now, unless and until the State proves each and every one of the elements in this indictment, you would not presume him anything but innocent; fair to say?

A    Yes.

Q    Okay.  And the burden of proof.  Whenever I talk about, you know, the State has the burden, we have the burden at all times in this case.  It never shifts to the defense.  They could sit there and do crossword puzzles. All they have to do is show up, and they have done that.

Okay.  I don't think these individuals will

just work crossword puzzles over there, but it doesn't matter. The burden always rests with the State.

And we have the burden of proving each and every thing in that indictment beyond a reasonable doubt. What does beyond a reasonable doubt mean to you?

A    There is no other reason why you could say otherwise.

Q    Okay.  No other reason why you could say that what happened happened or --

A    Yes.

Q    Is that what you mean?

A    Sorry.

Q    No, don't tell me you're sorry.  There's no wrong answers here.  And, in fact, the law doesn't define beyond a reasonable doubt.  That's why I asked you what it means to you.  Because each individual juror gets to determine what reasonable doubt is to them and what beyond a reasonable doubt, you know, means.  Okay?

A    Okay.

Q    We just want to make sure that nobody is holding us to a burden that we can't attain because obviously we can't prove something to anybody 100 percent or without any doubt.  Pretty much you would have to be there and see it for yourself if you believe something 100 percent or beyond all doubt, correct?

24

A    Right.

Q    So, really, some people tell us that a doubt based on reason, you know, they would use their common sense in determining whether or not we proved it to them.  Okay?

And it sounds like you would be able to do that, hold us to just beyond a reasonable doubt.  Is that fair to say?

A    Yes.

Q    Okay.  And you are never going to shift that burden over to the defense and require them to prove or bring you anything, correct?

A    Correct.

Q    Okay.  And the defendant, you've probably seen -- Do you ever watch any of the law shows?

A    A long time ago.

Q    A long time ago.  Okay.  You've heard of a defendant's fifth amendment right, right to remain silent?

A    Yes.

Q    Okay.  That right still applies.  You typically hear it, you know, when the police officer is talking to a suspect, you know, giving Miranda warnings, that sort of thing.

Q    (Nods head).

Q    That they have a right to remain silent and not say anything.  That right still holds true in the courtroom.

They do not have to take the witness stand and testify.

The State can't say, I now call Mr. Broadnax to the stand, let's hear what you have to say. And his own lawyer can't force him to take the stand. He can, through advice of his counsel, choose to testify, but that's his right, and his right alone, if he chooses to testify.

Okay. And if a defendant chooses not to testify, you cannot hold that fact against them for any reason. Okay. For example, let's say, you know, we've got to prove this capital murder to you. Let's say I came this close to proving each and every element of that indictment, but I wasn't quite there. You didn't believe that it had been proven to you beyond a reasonable doubt.

However, the defendant didn't testify in this case. You can't -- That would be holding it against him if you then said, well, because the defendant testified -- the State didn't really prove it, but, you know, since he didn't testify, I'm going to hold that against him and I'm going to go ahead and give the State a leg up and say guilty.

You understand why you can't do that?

A    Yes.

Q    And you wouldn't do that, would you?

A    No.

Q    Okay. So, you just cannot at any time consider that fact for any reason because there could be hundreds of

reasons why somebody chooses not to testify. You know, they could be nervous, not think they are a good speaker, lots of different reasons. Okay. Just be sure that you're not holding that against them. It's of no consequence because who always has the burden?

A    The State.

Q    The State, absolutely.

You know, I've talked about certain elements of the indictment. And basically when I say elements, it's just like a check list. The State has to prove to you that an offense happened say in Dallas County and it was this individual that did it and he intentionally caused the death of an individual and it was in the course of committing a robbery, for example.

And, so, you just kind of go through, did they prove Dallas County and did they prove that it was this person's life that was taken and did they prove that it was in the course of a robbery, those things in determining.

Now, if we fail to prove to you any of those things that we've alleged in the indictment, then the verdict is what?

A    I'm sorry, say that again.

Q    What is the verdict if we fail to prove to you any of the elements of capital murder in the indictment?

A    Not guilty.

Q    Not guilty, absolutely.  And it doesn't matter if, you know, let's say for example we say that the death occurs by shooting an individual with a firearm.  And say that the medical examiner comes in and says, absolutely Joe Smith is dead, but Joe Smith died of stab wounds.  But I've alleged in my indictment by shooting with a firearm.

What would that verdict have to be?

A    Not guilty.

Q    Okay.  And would you hold the State to their burden, and if we do not prove to you the elements that we are required to prove, will you find the defendant not guilty?

A    Yes.

Q    Okay.  Let's talk a little bit about capital murder.  The death penalty is only available for the offense of capital murder.  And I believe on page four you say that, regarding what crimes the death penalty should be available, you say for intentional murder, rape or abuse.

Okay.  Understanding that the law is that it's only available in capital murder cases -- and by capital murder I mean it's got to be something more than just plain vanilla murder.  And I know no murder is just plain vanilla.

But say, for example, I turn to my co-counsel, Ms. Handley here, and I shoot her ten times, and I sit here

and laugh my head off, I am so glad that she is dead. And I planned it. I went out and bought the gun last night, and I tell you, I have been waiting to do this for the last 48 hours, she made me so mad.

Is that case eligible for the death penalty?

A No.

Q No. Because capital murder in Texas has to be murder plus some sort of aggravating factor. It's got to be something like murder in the course of a robbery, or murder where you kill a child under the age of six, or murder of a police officer when he's in his official duty.

Does that make sense to you?

A Yes.

Q Murder plus something else, not just all murders.

Do you agree with the law regarding that?

A Yes.

Q Okay. And whenever you say that capital -- that the death penalty should be available for intentional murders, you're dead on. Because a capital murder, there is something that it will always be, and it will always be intentional. It has to be an intentional act, not an accident.

Okay. And whenever I say that it has to be intentional, there are some things that could come up in a given capital murder case. Okay. I'm not saying that they

will come up here, but just I want to go ahead and go over the law here so that you understand that, should it come up, because we never know what to anticipate until it actually happens.  Right?

A    Right.

Q    So, I told you we have to prove the elements of capital murder, so murder plus.  Murder that happens in the course of a robbery.  But let's say, for example, that I don't prove to you that a robbery happened.  You don't believe that an individual was trying to rob anybody whenever he caused the death.

What would that person then be guilty of if he still took a life?

A    Just murder.

Q    Just murder, right?  Just kind of like the situation I told you with Ms. Handley, just regular murder, because I wasn't trying to rob her here, right?

A    Right.

Q    So, that would just be murder.  And let's say, for example, I didn't intend, taking it a step further, say I didn't intend to cause the death of the individual that I was shooting, and there is no robbery involved here now.  We are just talking about a death of someone that happened.

Let's say that I'm out and I am shooting a gun off in the air and there's tons of people around me,

and I just decide to fire that gun off in the air.  And, so, I'm kind of reckless about my actions, right?

These are -- I'm all amongst friends.  I'm just showing them how big and bad I am and that I can fire this gun.  It's a new gun that I just bought.  I don't intend to kill anybody.  But would you say that it's kind of obvious what comes up must come down?

A    Uh-huh.

Q    And if I'm reckless about my actions when firing off that gun, then I may be guilty of something else, and that something else would be manslaughter.  Okay?

A    Uh-huh.

Q    And that carries a different punishment range than capital murder and that does murder and does manslaughter.  It has to do with my state of mind.  I don't intend to cause the death of anybody, and I don't necessarily -- you know, but I do, right, cause the death of somebody?  So, that would be manslaughter.

There is another type of crime for which if you kill an individual and you have a different mental state called criminally negligent homicide.

Let's say I'm driving down the road and I'm texting somebody and I'm there on Central and I'm just shooting off a text, you know, what I think is really quick.  But I kind of get into it and I write a little longer and,

bam, run into the person in front of me.

Do I intend to cause the death of anybody as I'm just driving down the road texting?

A    No.

Q    And you know, I don't even know that somebody is in front of me that I'm piling in to, but should I have known that?

A    Yes.

Q    Absolutely.  So, then I would be guilty of criminal negligent homicide.  And I tell you --

A    Why isn't it the same as manslaughter?

Q    Manslaughter?  Well, you know, and that would be something for the individual jurors to decide based on the facts of an individual's case, but it has to do with the mindset.  It has to do with your level of culpability, okay?

If I knew, for example, that there --

A    Is it because it's more of an accident than an actual with the gun thing?

Q    Kind of.  With the gun thing, I know people are around me, okay?

A    Right.

Q    But I just consciously disregard, you know, that fact and say, I'm going to fire off this weapon, anyway.  And you know, it's obviously reckless.

A    Right.

Q    I'm just disregarding that people are all around me. Here with the text message, let's say, you know, that I think that it's clear, there is nobody really in front of me at that time. It's not rush hour or anything like that. And, so, I just start texting.

I mean, by driving, you're kind of accepting responsibility, right? You're saying you're going to follow the rules of the road, and I should know there are other people on the road, but at that point in time there hadn't been.

So, I would be -- I should have known that I could cause the death of somebody by my actions, reckless actions of just texting, but I -- negligent actions of texting.

A    So, it's whatever the mindset is of the person?

Q    Exactly, the mindset of the person. And that dictates, you know, what we may prove in a given case. Okay?

A    Okay.

Q    But first we would start at capital murder and you would determine if we proved all the elements of that; and if so, you don't go any farther.

I'm not saying that this is going to come up in this case. The reason I ask you is because that the different offenses have different punishment ranges.

For capital murder the available punishment

is either life in prison without parole or the death sentence. Okay. For murder it could be a range of five years in prison all the way up to life in prison. And for those other offenses they vary, two to twenty, state jail.

And I just tell you that because if any of those other less -- they are called lesser included offenses. And the law would be given to you by the judge. You don't have to remember this right now or digest it or even know what may come into play, okay, because it will be there for you in the jury's charge.

But I ask you because I want to make sure that, if given to you, you would be able to listen to the facts of what you've heard. And it sounds like, from what you are saying and already digesting now, that you would be able to do that.

A    Yes.

Q    And determine, based on those facts, what the individual is guilty of, first of all. Could you do that?

A    Yes.

Q    And then, second of all, if you were given a range of punishment -- which you would be if this defendant is found guilty of anything but capital murder, you would have a range of punishment -- would you be able to consider and assess the minimum as it's given to you by the judge?

Which could be five years, it could be two

years, you know, could be some other minimum of a state jail punishment depending on what the person is convicted of. Would you be able to consider and assess the minimum based on the facts of the case?

A    Yes.

Q    Okay.  And would you be able to consider and assess the maximum, up to life in prison, if the facts dictated that?

A    Yes.

Q    Okay.  And the reason I ask that is because, you know, as you sit here, you don't know what the facts are, and we're not allowed to talk to you about the facts of our case.

But let's say, for example, by illustration, that I told you a thirty-five year old man intentionally planned out the murder of a ten year old boy, what would you think as you sat there?

A    Did he actually do it?

Q    Did he actually do it?  Yeah.

A    You said he planned it.  You didn't say he actually did it.

Q    I'm sorry.  He planned it and he carried out the --

A    Okay.

Q    -- murder or the intentional killing of a ten year old boy.  What would you think as you sit here?  That's good

that you said, did he actually do it. You're presuming him innocent, absolutely.

What would you think, though, his punishment should be if you believed beyond a reasonable doubt that that happened, just as you sit here?

A    I would have to hear the evidence first.

Q    Absolutely, and that's exactly why I said that. You would have to hear the evidence first. Because what if I gave you additional facts that told you that that ten year old boy was actually his son, and his son had been suffering from cancer for years and he was in pain day in and day out, excruciating pain that he had to watch his son suffer in.

And it kind of was a mercy killing. He went and got him a high dosage of morphine and fed it to him until he just drifted away in his sleep. Still a murder, right?

A    Yes.

Q    And he still would be guilty of murder. But that may be a different set of facts than if you heard about an individual who just went out on the playground and started shooting away at young children, correct?

A    Yes.

Q    And you were dead on, you know, I would have to hear the facts. I would have to hear some more facts. That's what we just want to make sure, you will just judge

the case based on the facts and let the punishment fit the crime.  Can you do that?

A    Yes.

Q    Okay.  I want to talk to you about another area of law in Texas.  We have the law of parties.  And what that means is that an individual can be held responsible, criminally responsible for a crime, even if they are not the actual triggerman, so long as they aided and assisted in the commission of the offense.

Does that make sense to you?

A    Yes.

Q    Do you think that's a fair law?

A    Yes.

Q    Okay.  Let me give you an example.  Let's say that Ms. Handley and I, we planned last night around my dinner table to go out and rob a 7-Eleven.  And she said, hey, I got this new weapon.  Why don't you bring that with you.  And I said, okay, yeah, I like that gun.  I'll take that gun.

And I go and I get bullets for it and put the bullets in.  Ms. Handley drives me over to the 7-Eleven that we have chosen to rob.  And I say, okay, I'm going to go in there and I am going to get all the money and all the cigarettes that I can find.  And then you sit out here and you have the car running and you be ready to hightail it out

of here.

And Ms. Handley says to me, okay, that sounds good. And I turn to her and I say, I'm not leaving any witnesses. And she says, I know, I don't think we should.

So I go in, I actually rob the 7-Eleven and I kill the clerk that's right there. What am I guilty of?

A    Murder.

Q    What kind of murder?

A    Capital murder. I'm sorry.

Q    Absolutely. That's okay. Capital murder because it's murder plus in the course of a robbery.

Okay. What is Ms. Handley guilty of?

A    The aiding part.

Q    Okay. And by her aiding and assisting, what is she also guilty of?

A    Capital murder?

Q    Absolutely. And you say that with a question mark. How do you feel about that?

A    Well, I didn't know that she would be considered for that because she didn't actually do it herself.

Q    Okay. How do you -- how do you feel about that? Because she is not the triggerperson.

A    Well, I still think she should have a punishment, but I don't think it should be capital murder.

Q    Okay. You do not think it should be capital murder?

The law in Texas again is that if you aid or assist someone in committing a crime, that you are guilty of that offense.

Now, for capital murder it's a bit different. To be guilty of capital murder, for the non trigger person to be guilty of capital murder, they should have anticipated that a human life would be taken.

Do you think, based on the facts as I gave you, that Ms. Handley should have anticipated that a human life would be taken?

A    Yes.

Q    And why is that?

A    I'm trying to think of everything you said.

Q    I know, it was kind of fast.

A    Well, which one of you said that --

Q    We planned it together.  She knew that a gun was going to be involved, correct?

A    Yes.

Q    And I'm the one that made the comment about I'm not going to leave any witnesses.  And she said, sure, I don't think we should.  Do you think any of that plays a part?

A    Yes.

Q    Okay.  And why is that?

A    Because she agreed with it.

Q    Agreed with it.  And should have anticipated somebody could die, right?

A    Well, I'm sure she already anticipated it before y'all even got out there, so.

Q    Okay.  And why is that?

A    Well, because y'all were going in with the intent and already had the -- already had it planned out and were already thinking about it.

Q    Okay.  And even if I had not said the part about I wasn't leaving any witnesses, sometimes people say that a person, a party, you know, the non trigger person, should have anticipated by virtue of the fact that we are carrying a loaded weapon in to commit a robbery.  Some jurors or some people tell us that that's another way that they are able to say that a party should have anticipated.

But how do you feel about that?  Because again, you know, right here as you sit here today, we are just asking your feelings on things, just to tell us the truth about how you feel.  What do you think?

A    About what?

Q    Again about whether or not Ms. Handley should be guilty of capital murder, the non trigger person.

A    If the State proves that she anticipated it.

Q    Should have anticipated it, right?

A    It's only should have or should --

Q    Well, we are going to get, we are going to get into -- Probably you're saying that because you've read the pamphlet, right, very carefully?

A    Not very carefully, but.

Q    Okay.  We are going to get to that.  Basically to be guilty of capital murder, she just should have anticipated it.

A    Okay.

Q    Now, to be able to get the death penalty, she has to actually anticipate it.  And that's special issue number two, okay?

A    Okay.

Q    So guilty of capital murder, just aided or assisted in the crime, okay, and should have anticipated that a human life would be taken.

But to receive the death penalty or to be eligible to receive the death penalty or for you to answer special issue number two, you have to believe beyond a reasonable doubt that she actually anticipated that a death would occur.

A    Okay.

Q    Okay.  Or that they were the trigger person themself.  Make sense?

A    Yeah.

Q    Okay.  Could you follow the law with regard to

that or do you still have some reservations?  And it's okay if you have reservations as you sit here now.

A    I could follow the law.

Q    You could follow the law?

A    Yes.

Q    Okay.  We are going to move on to the second phase of the trial.  Let's go ahead and say, you know, this trial -- and I know you've never sat as a juror, but basically all trials come in two phases.  You've got the guilt/innocence phase and then you've got the punishment phase.  Same goes for a capital murder.

If you find a defendant guilty of capital murder, everything that we proved in the indictment as we've alleged, okay, then you would move to the second phase, and that would be where you answer special issues.

The jurors don't go back there and say, after everything that I've heard, I believe this person deserves to die, or after everything I've heard, I believe that this person just deserves a life sentence without parole.

It comes by way of answering special issues. And when you get into that second phase, the burden is still on who?

A    The State.

Q    Absolutely, as it goes to the first two special issues.  We still have to prove to you beyond a reasonable

doubt that, number one, the person will be a future danger, just to sum up because that's a lot of words on special issue number one.

But we have to prove, number one, they would be a future danger. Number two, that they themselves were the trigger person or they were acting as a party. And then special issue number three, nobody has the burden. But the State does still have the burden of proof in that second phase of the trial as it goes to the first two special issues.

Now, the presumption is, as we talked about before, you presume the defendant innocent in the first phase of the trial. In the second phase you presume a life sentence without parole unless and until the State proves to you the answers to those special issues so that a death sentence is the answer. Okay, make sense to you?

A    Yes.

Q    And can you hold the State to that burden and can you presume a life sentence even after you have found somebody guilty of the offense of capital murder?

A    If I found them guilty, then no.

Q    If found guilty, let me tell you --

A    I could not presume him a life sentence.

Q    You could not presume a life sentence if you find somebody guilty of capital murder?

A    Correct.

Q    Okay.  Because the law, the law as it's going to be given to you, again, is that the burden is on the State and that you are to presume a life sentence without parole after finding a defendant guilty of capital murder.

Because it's not until we prove to you the special issues that that presumption then or the -- you know, you would then answer those special issues in such a way that would render a verdict of death.  Okay?

A    Okay.

Q    Nothing is automatic.  Nothing is automatic in the first phase.  As you told me that you would listen to the facts and the evidence before making your decision, you have to be able to listen to the facts and the evidence as presented to you again in the second phase.

Now, I saw where you said -- and this may be where, you know, you're coming from, and you are absolutely right in what I think you're getting at.  On page four of your questionnaire you say you think there are some crimes which call for the death penalty solely because of their severe facts and circumstances, regardless of whether or not the guilty person has commited prior violent acts.  And you said, one's judgment should not be based on how many crimes but on the magnitude of the crime committed.

Is that how you feel?

A    Yes.

Q    And is that why you're saying that if found guilty of capital murder, you would not be able to presume life?

A    Yes.

Q    Okay.  Let me explain to you.  The law says that you can, you can take into consideration everything you heard from that guilt/innocence phase of the trial in answering special issue number one.  You can revert back to everything you heard.

You may hear additional facts or you may not.  But you can base your verdict or your answer to special issue number one on the future danger, dangerousness of an individual based solely on the magnitude of the crime committed, just as you said.  Okay?

But you have to wait until you get to special issue number one and you have to wait until you consider everything again, whether it's reconsidering the facts as you heard them in the guilt/innocence phase or whether it's considering the additional evidence, if you hear it, in the punishment phase.  Okay?

A    Right.

Q    You have to wait until you hear it.  You can't --
There is nothing automatic.  You don't just say, well, we found him guilty of capital murder.  We all go home now.
He's getting the death sentence.

There is no automatic sentence of death in

*Anne B. Meredith*
Certified Shorthand Reporter

Texas.   Make sense?

A     Right.

Q     You've got to answer the special issues.  So will you wait until you've reconsidered what you heard in the guilt/innocence phase or you listen to the evidence that you hear in the punishment phase of the trial in answering special issue number one, or are you automatically going to say, if found guilty of capital murder, I'm answering that special issue number one yes?

A     I thought when you first asked me that that I had heard everything on stuff like that.

Q     Exactly, you're right, and you had heard some stuff, some stuff that you can't -- you know, you can consider all that again.  Okay.  So, I asked it kind of tricky, huh?

A     (Nods head).

Q     Is that a yes for the record?

A     Yes.

Q     So, are you able to wait until you get to special issue number one --

A     Yes.

Q     -- and consider everything that you've heard at that point in making a determination whether or not the answer to special issue number one should be yes?  Or if we haven't proven to you beyond a reasonable doubt the question

in special issue number one, then it's what?

A    Not guilty.

Q    Then it's no.

A    I mean no.

Q    You're right, no.  And if the answer to that is no, then the defendant receives a life sentence without parole, and you stop and you don't go on to special issue two and three.  Okay?

Let me talk to you about special issue number one.  It says a probability that the defendant would commit criminal acts of violence in the future.

What does a probability mean to you?

A    It means that if released or found not guilty that he has a high chance of doing that again or something like that.

Q    Okay.  A high chance.

Some people tell us it means more likely than not.  Probability means more likely than not he'll do it again.  Is that fair to say?

A    Yes, because if it wasn't more likely, then they wouldn't have the word possibility in there.

Q    You're right.  And they don't say possibility.  And there is a difference between a possibility and a probability, isn't there?

Say for example I tell you that I'm going to

go and I am going to run the New York marathon and I am going to win the thing.  It's possible, but I don't run and I haven't run in years.  So, do you think it's -- You know, of course it's possible, but do you think it's probable that I'm going to win that New York marathon?

A    No.

Q    No.  And, so, do you see the distinction between a probability and a possibility?

A    Yes.

Q    Okay.  And, so, the State's burden of proof to you would be that there is a probability, maybe more likely than not, it's probable that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

What would be a criminal act of violence to you?

A    Stealing, shooting, abuse.

Q    And by abuse, could it be even just me turn around and smacking my co-counsel in the face?  She is sitting there minding her own business.

A    No.

Q    That wouldn't be a criminal act of violence to you?

A    No.

Q    Why not?

A    Well, it depends on what your intentions were.

Q    Okay. My intentions are, you know, I'm just sick of looking at her, so I'm just going to turn around and clock her. Criminal act of violence?

I'm not trying to change your mind. It's whatever you believe criminal acts of violence to be. Because they -- What I want to get across to you is they don't define it. They don't --

A    It would depend on the severeness of how much damage you did to her.

Q    Okay. And that is certainly something that you could consider in determining -- because what special issue number one is asking you to do is predict the future, to try to determine if it's probable that this defendant is going to commit more acts of violence.

That's why I just ask you, what would be an act of violence to you, because it certainly doesn't say that we have to prove to you that the defendant is going to commit more murders or that he's going to go out and shoot more people. Fair to say?

A    Right.

Q    It just says criminal acts of violence.

And, so, some people say that can even be a threat of violence. Would that be enough for you?

A    Unless you have like a doctor or something for the

state of mind and possibly the state of mind of what he will be later on, then, no, you can't decide that.

Q    Okay.  You wouldn't be able to decide that based on a threat.

A    Correct.

Q    Is that fair to say?

Okay.  Society.  Society, you know, some people say, well, that's where I live every day, that's where I go to the grocery store, you know, where I go to work, people around me.

If a defendant is found guilty of capital murder and is not sentenced to death, where is he going to find himself?

A    In prison.

Q    Okay.  And, so, could you see where prison would then become that person's, that defendant's society?  And as part of that prison society, there are doctors, nurses, other inmates that live there, work there day in and day out.  Do you see that?

A    Yes.

Q    And there are visitors to prison, you know, people like you and I going to visit their loved ones.

So, would that then be a part of society that deserves protection as well?

A    Yes.

Q    Okay.  If you believe beyond a reasonable doubt that we've proven to you special issue number one -- And, again, you can take into consideration the facts alone of the offense.  The law allows you to do that, okay, in determining your answer to special issue number one.

But if you find that a defendant is a future danger and you answer yes to that question, you move on to special issue number two.  And we've already kind of talked about that, and that's the law of parties where you would have to determine that the individual was the trigger person or that they actually anticipated a life to be taken when they participated and assisted in that crime.  Okay?

A    Okay.

Q    And if you answer yes, then you move on to special issue number three.  But I want to back up and ask you, what would, what would be some evidence that you would like to see in determining whether a person would be a future danger?

A    Well, possibly like DNA evidence on a gun.

Q    Okay.  Now, back up.  You've already found somebody guilty of capital murder.

A    Oh, okay.

Q    So, now special issue number one is just, you've got the crystal ball and you are trying to determine, is there a probability, is it more likely than not that somebody is going to commit other acts --

A    Was he the only one there?

Q    -- of criminal violence?

What else?

A    Was he the only one there when the act was committed?

Q    Well, I'm sorry.  Let me take it out of kind of like the hypothetical.  We are not talking about any one --

A    Okay.

Q    -- any one situation.  We are just talking about a defendant that you have found guilty of capital murder and now you're answering those special issues.

And those special issues are what, you know, dictate whether or not a defendant is going to get life without parole or whether they are going to get a death sentence.  Okay?

A    Okay.

Q    And, so, you are just looking to the future based on the evidence that you hear or based on the facts of the original offense that you found somebody guilty of.  Okay?

A    Yeah.

Q    Because I think, as you said, you know, the magnitude of the crime committed could determine whether or not somebody is going to be a future danger.  Okay.  Is that fair to say?  Did you say that?

A    Yes.

Q    Okay.  What types of evidence or what types of things other than the magnitude of the crime would you look to in determining whether or not somebody's a future danger, whether or not they are going to commit other acts other than what they are on trial for?

A    State of mind.

Q    Okay.  State of mind.  Okay.  And you would look only to the State to prove that to you, right?

A    Yes.

Q    Because, again, in the punishment phase the defense, they don't have to do anything.  They don't have to present anything.  The defendant may or may not take the stand.  But if he doesn't, you can't hold that against him in the punishment phase either.  And you wouldn't do that, correct?

A    Right.

Q    Okay.  Let's move on to special issue number three.  And with regard to special issue number three, it's kind of a safety net provision.  Nobody has a burden of proof there.

It's just if you hear it, you hear it, and if it rises to the level of being sufficiently mitigating such that you decide, okay, I've heard it and it's sufficiently mitigating and I do not believe this person now deserves a sentence of death.  Because if you answer special issue number one yes and special number two, issue

number two yes, then that defendant is sitting squarely on the death sentence. Okay?

But when you get -- You have to consider again all the evidence that you've heard, look at it and determine, is there anything mitigating. Is there anything that lessens in my mind the culpability of this defendant and anything that lessens it sufficiently enough so that I think that he now deserves a life sentence without parole rather than the death sentence that he's sitting on.

Does that make sense?

A     Yes.

Q     So, it's kind of a safety net. And you may hear a thousand pieces of the mitigating evidence. But then you have to determine, does it rise to the level of being sufficiently mitigating? All right?

A     Okay.

Q     And it's your, it's your decision as to what is mitigating and what is not. Because some jurors tell us that age may be mitigating, if the person is particularly young, or if they were high or under the influence of some type of other drug or alcohol at the time an offense was committed. Some people tell us that they may consider a person's upbringing to be mitigating.

Now, some people say, no, age is just a number, I don't care. Some people say, if you're under the

influence of something, I don't consider that to be mitigating or lessen your culpability. I think that's aggravating. You know, I think that that makes it worse. You know, you went and took a drug and then you go out and do a crime.

And that is completely okay. It is for you to decide what is mitigating and what is not mitigating to you. All right. But it's just you have to consider everything that you've heard and determine what category does it fit in.

And if it's mitigating to you, then you have to look at it and say, is it sufficient enough mitigation to now say that this person does not deserve to die but that he deserves a life sentence?

Will you do that?

A    Yes.

Q    And if you hear something that is sufficiently mitigating to you, will you then answer that special issue number three yes?

A    Yes.

Q    And if you answer special issue number three yes, then this defendant receives a life sentence without parole. Okay?

A    Okay.

Q    And that's after you, you know, you deliberate with the other fellow jurors. Okay. But it's your

individual determination of what's mitigating and what's not and if it's sufficiently mitigating to you.  All right?

A    All right.

Q    A couple of other questions for you, and that is on page seven.

THE COURT:  We are just about out of time, Ms. Evans.

MS. EVANS:  I'm sorry.  I will wrap it up, your Honor.

THE COURT:  That's fine.  Thank you.

MS. EVANS:  Thank you, Judge.

Q    (By Ms. Evans)  You said, with regards to the police officer credibility question, that all officers are people just like you and me.  And, so, just because a police officer takes the stand, will you wait to hear what they have to say before you begin to judge their credibility?

A    Yes.

Q    You're not automatically going to say, just because they have a badge and wearing a uniform, that they are presumed to be credible, right?

A    Right.

Q    They are people just like you and me.

But with regard to that, I do have a question. You say that police officers are enforcing the laws in a professional and fair way.  You say you disagree that they

are enforcing the laws in a professional and fair way here in your city.  Why do you say that?

A    Well, because I mean not everything -- not everybody does everything truthful.

Q    Some police officers, is that what you are referring to?

A    Yes.

Q    Okay.  I understand that.  Do you have a bias at all against police officers, or is it just what you say, that they are just people like you and me and you will wait until you hear from them to determine if you believe a particular police officer on the stand?

A    They are people just like you and me.

Q    Absolutely.  Okay.  Thank you.

A    You're welcome.

THE COURT:  All right.  Let's take about a five minute recess here.  And Mr. Gallardo, you can get up and walk around, go to the bathroom and get a drink, whatever you need to do.  My bailiffs will help you in that and show you where you need to go.

Five minutes.

(After a recess, Defendant and Prospective Juror Gallardo present in open court).

THE COURT:  Go ahead and have a seat there, Mr. Gallardo, if you would, please, sir.

All right.  Mr. Parks.

MR. PARKS:  Please the Court.

THE COURT:  Yes, sir.

EXAMINATION

BY MR. PARKS:

Q    Mr. Gallardo, my name is Doug Parks.  Mr. Lollar, who is not right now present, and Ms. Mallon and I represent Mr. Broadnax down here at the end of the table.

I want to tell you before I start that there are no right or wrong answers to any of these questions.  I have been doing this long enough, Mr. Gallardo, to tell you -- Do you prefer Gallardo to Gallardo?

A    It doesn't matter.

Q    It doesn't make any difference.  All right.

I have been doing this long enough to know that I'm not good enough at this work to change somebody's long-held opinions about these issues.  Okay?

A    Okay.

Q    So, I'm not going to try to change your mind about the way you feel.  What I would like to do, however, is for you to tell me, as honestly as you possibly can, what your true feelings about these issues are because that's really what's important here, not trying to see whether or not we can shoehorn you into a little cubbyhole that you will fit into even if that's not some place you're

comfortable being.  Okay?

A    Okay.

Q    All right.  I'm going to talk to you kind of in three different areas.  I'm going to talk to you about some of the things that you told us in your questionnaire so that I can be sure that I understand where you're coming from.

A    Okay.

Q    I'm going to talk to you a little bit about the guilt/innocence phase of the trial.  I probably won't spend a great deal of time doing that.  And then I'll move into the capital murder punishment phase of the trial.

I do that, Mr. Gallardo, because most of the time, at least, almost always people are not familiar with the process in capital murder punishment trials.  It's not something that you see on television.  It's not something that -- you know, people don't read these questions in their daily newspaper.  Most of the time people have never even heard of these questions before they come down here to do this service.  So, I think our time is more valuable to have spent in that area.

But I don't want you to think that just because I'm talking to you about punishment that we are conceding that this jury is going to find Mr. Broadnax guilty of capital murder.  You shouldn't do that.

A    Right.

Q    Fair enough?

A    Yes.

Q    Okay.  All right.  You have told us, Mr. Gallardo, that you are, in fact, in favor of the death penalty.

A    Yes.

Q    Why do you think that is?

A    Like I said earlier, it depends on the magnitude of the crime committed.

Q    Well, I understand, and we'll talk about that in a little bit.  But why do we have the death penalty?  What purpose do you really think a death penalty serves that a life in the penitentiary would not serve?

A    Because in some cases I believe an eye for an eye.

Q    Sure.  And that's not an uncommon response that we get, and that's a perfectly valid position for you to have.  I'm not going to try to change your mind about it. I told you that earlier on.

        I don't think -- Do you think I could change your mind in forty-five minutes about that if I wanted to try?  Probably not.

A    It depends on the evidence.

Q    I wish I could.  If I had those powers, I would probably be preaching on television and making a gajillion dollars or something like that.

        And there is nothing wrong.  I mean we get

people down here, Mr. Gallardo, who have all sorts of opinions. Okay. We get people who are absolutely against the death penalty, would never impose it regardless of the facts and circumstances. They just wouldn't do it.

And we get people at the other extreme who believe in the death penalty and believe it ought to be used and probably ought to be used more often than it is presently. In fact, I think you fall into that category. Am I right about that?

A    Yes.

Q    You tell us, I think over here on page four, that you believe that the death penalty is used too seldom. Why do you believe that it is, Mr. Gallardo?

A    Because, in my personal opinion, some crimes I believe deserve it.

Q    What sort of crimes do you have in mind?

A    Things like rape and abuse and --

Q    And you told us that. You told us on that same page, intentional murder, rape and abuse all, you believe, ought to be subjected -- the people who do those kinds of things ought to be subjected to the death penalty.

A    Yes.

Q    Okay. Do you think that in most cases they ought to be assessed the death penalty for those offenses?

A    What do you mean?

Q    Well, I mean if you convicted someone of rape and you were convinced that that's what they did, that they were guilty of that offense, do I understand that that's the kind of offense that you believe the death penalty is an appropriate punishment?

A    Yes.

Q    And the same would be for abuse.  And I guess I need to flesh that out a little bit.  What sort of abuse do you have in mind, sexual abuse or physical abuse, any particular persons or classes of persons?

A    Like, you know, beating your child, beating your wife, or just beating someone for no reason.

Q    Okay.  And of course, you also put here intentional murder as one of those things.

Now, you probably know, based on what you have been told here today already, that the law in the State of Texas is not such that a person, no matter how horrible the rape might be or how aggravated it would be or, for that matter, how horrible the abuse might be, that's not something that a person, standing alone, that's not something that a person could be subjected to the death penalty for.

Nothing wrong with believing that the law ought to be changed to include those things, but the way the law is right now, it can't be done.  You understand that.

A    Yes.

Q    Intentional murder is in a little bit different category, though.  We do provide the death penalty for intentional murder when it is coupled with something else, as you have been told.

An intentional murder during the course of the commission of a robbery like it's indicted in this case.  And that's what Mr. Broadnax is charged with; you understand that.

A    Yes.

Q    Okay.  Or some other felonies, or it could be a knowing or intentional killing of a certain class of people, a child under the age of six, police officers, firemen on duty, things like that.  No reason to get into this stuff.

But the common thing there essentially is the intentional murder.  Okay?

A    (Nods head).

Q    So, at least the -- well, it covers that.  If I understand what you're saying to me, though, that for you personally, it shouldn't have to be coupled with something else.  That if one person intentionally takes the life of another human being, that and that alone should be sufficient to subject that person to the death penalty.  Is that fair?

A    If it was proven.

Q    I'm sorry?

A    If it was proven.

Q    Sure, if it was proven.  Do you believe that, assuming that the evidence is clear beyond a reasonable doubt that a person is guilty of intentional murder, do you think that that's a person who always ought to receive the death penalty?

A    Always?

Q    Once it's proven.

A    What do you mean?

Q    Well, I mean, I guess just that, just you personally.  I'm not telling you that's what the law says.  I'm just saying you personally, do you believe that all intentional murderers ought to be put to death?

A    It would depend on what they were intentionally killing that person for.

Q    Well, let's go back to intentionally.  And I will tell you that, generally speaking -- well, not generally speaking -- the State is not required to prove motive.

Now, very often they do.  Very often the evidence will say why a person killed another person, but they don't have to because there may be some situations, there are some situations where it might not ever be known why a person killed another person.

So, what the law does is concentrate on the state of mind of the defendant at the time of the killing.

Okay?

A    Uh-huh.

Q    And when I say that a person acts intentionally, what we mean is that they had the conscious objective or desire to cause the result.  That's just a fancy legal way of saying that they had made up their mind that, for whatever reason, they wanted to kill another person and they set that as their goal and they did whatever it took to accomplish the goal.

We are not talking about a situation where it was an accident.  If it was an accident, it wouldn't be murder.  We are not talking about self-defense.  If a person was acting in self-defense, they would be justified in taking another person's life.

We are not even talking about a situation where a person doesn't, because of mental illness or mental defect, doesn't know the difference between right and wrong. They don't know that taking another person's life is the wrong thing to do because they are crazy.  Okay.  I'm not talking about that situation because that's a legal excuse.

The full definition of murder is intentionally taking the life of another person without any legal excuse or justification.  Okay.  So you take out the excuses, you take out the justifications, and what's left is just that person's desire to end another person's life.  And it may be

for an obvious reason, it may not be for an obvious reason. But why doesn't really matter in the law why a person does it.

A    Okay.

Q    You know, they may do it for greed.  They may do it to get that person's money.  They may do it because they are simply mad at them.  They may do it because they don't like the way they look.

You know, why is really not important to the law.  What's important to the law is their state of mind. Did they really want to do that?  Is that what they wanted to accomplish, that person's death?  Does that make sense to you?

A    Yes.

Q    So, that's what we are talking about when we talk about an intentional killing.

A    Okay.

Q    Okay.  And it's not one of these lesser included things that the prosecutor talked to you about.  It's not driving down the road and fiddling with your cell phone, or whatever, and running over somebody you didn't see.

It's not even getting drunk as a skunk and running through a red light, T-boning a car full of people and killing all of them.  That's not murder because that's not something that the person intended to do.

Now, if a person chased somebody up on the

sidewalk and ran them down in their car where it was obvious that that's what they intended to do, that's different. Excuse me. It's different from fiddling with a telephone or getting drunk and just not being able to see the red light, appreciate what a red light was. Do you understand the difference?

A    Yes.

Q    So, we are not talking about any of those lesser included homicides. Murder is the intentional taking of a life.

A    Okay.

Q    Are you with me?

A    Yes.

Q    Okay. Now, are those the kind of things that you believe a person ought to be subjected to the death penalty for?

A    Yes.

Q    If you were king for the day, you would make that -- those folks eligible for the death penalty, right?

A    Yes.

Q    Okay, fair enough.

Now, if you were king for the day, would you require the death penalty for the intentional murderers? Would that be the proper punishment as far as Mr. Gallardo is concerned?

I'm going to get it one way or the other. I'm going to say it one way or the other before this is over, Mr. Gallardo. Okay.

Is that something you believe that ought to be done, automatic death penalty for intentional murderers?

A    Automatically, no.

Q    No.  What would -- Under what circumstance do you feel like it might not be justified for an intentional murder?

A    You said we can include state of mind?

Q    Yeah, but it's -- but the state of mind has to be intentional.

A    Okay.  I honestly don't know.

Q    And that's fine.  One of the things that, Mr. Gallardo, we are entitled to ask you to think of situations, but you're not required by law to ever be able to come up with one, okay?  So, don't worry about that.  Just do the best you can if we ask you those kinds of questions, but don't feel any pressure that you have to come up with any scenario for it.

A lot of times people come back to me when I ask them that question and say, oh, well, if it was an accident or, oh, well, if it was self-defense.  And the reason -- that's one reason that I ask the question is because I want to make sure that the juror understands that if it were any of those things, we wouldn't be talking about

capital murder because a person wouldn't be guilty at all. Does that make sense to you?

A    Yes.

Q    Okay.  And the reason I'm asking this, and we are going to hopefully tie it in in a little while when we talk about these special issues, because it's very, very important that you understand the context in which these special issues are asked.  And we will talk about that in a little while, okay?

I'm getting the impression that you don't approve of murder.  Would that be fair?

A    Yes.

Q    We have never had anybody sit in your chair who said that they did approve of murder.  Nobody approves of murder.

You understand that murder, what we sometimes refer to as regular murder, just to distinguish it from capital murder, still is the intentional taking of another person's life.  It's just not done in the context of one of these other aggravators like robbery or police officers or that sort of thing.  You understand that.

A    Yes.

Q    Okay.  And as the prosecutor has indicated to you -- I don't mean this to be a trick question.  What's the range of punishment for regular murder?

A    Range of punishment?

Q    Uh-huh.  You don't have to answer that.  I didn't think -- I'm not sure you have been told.  But if you were told, I was reasonably sure you wouldn't remember it.  I wouldn't if I had been sitting where you are.

The range of punishment for murder is from five years in the penitentiary all the way up to life or ninety-nine years in the penitentiary.

So that if a juror finds someone guilty of the lesser included offense of murder, they would not be called upon to answer these special issues.  They would be called upon to set a punishment somewhere within that range.  Okay?

A    Okay.

Q    And I want to make sure that we are clear on this concept.  Regardless of whether or not there is a robbery or a burglary or a police officer, you would be making a determination about a person who intentionally had taken the life of another human being.  Okay.

And, so, in order to be a qualified juror, a person has got to have an open mind to the full range of punishment.  And basically what that means is is that they have got to be able to say and mean that they could find a person guilty of intentionally taking another human being's life with no excuse or justification in the law and still

give a sentence as little as five years in the penitentiary if they thought that was the right thing to do.

Some people are able to do that. Some people know themselves well enough to know that if they ever heard evidence that convinced them beyond a reasonable doubt that the defendant was a murderer, that there are no facts and circumstances that would ever justify a sentence as little as five years in the penitentiary.

How do you feel about that?

A    I don't agree with that little of a sentence, but that's my personal opinion.

Q    And you are entitled to your personal opinion. That's something that I think we don't do maybe a good enough job of explaining to people before they sit down in that chair.

One of the good things about this country is we are entitled to our opinions. Okay? And we can voice those opinions without fear of being thrown in jail or some things that sometimes happen to people in other countries when they express their opinion. We don't have to worry about that. You're entitled to your opinions. Whatever they are, they are yours and they are legitimate. You have a right to them. Fair enough?

A    Yes, sir.

Q    Okay. Now, if I'm understanding you correctly --

and correct me if I'm wrong because I don't want to put words in your mouth. What I'm hearing you say is that, if you sat on a jury and you heard evidence that convinced you beyond a reasonable doubt that the defendant had intentionally taken the life of another human being without any legal excuse or justification, that you could never return a sentence as little as five years in the penitentiary.

A     Correct.

Q     Because there are no facts and circumstances to your mind that would justify a sentence that low for murder; is that right?

A     Yes.

Q     Fair enough.

Now, let's talk a little bit, Mr. Gallardo, about these special issues. I want to jump from the guilt/innocence phase -- and before I do that, do you feel like you've understood all of the other concepts involved in the guilt/innocence phase? That the burden of proof is on the State of Texas. It never shifts to the defense. That Mr. Broadnax is presumed to be innocent where he sits here today. You understand all of those concepts?

A     Yes.

Q     Are you able to follow those laws? Do you, in fact, presume Mr. Broadnax to be innocent?

A     Yes.

Q    And you know that we don't have to prove to you that he's innocent.  They would have to prove to you what they have put in that indictment, right?

A    Right.

Q    Okay.  And you can force them to do that; is that right?

A    Yes.

Q    All right.  Okay.  Now, then, we will go on to this other stage of the trial.

I omitted to do some things that I was going to do, Mr. Gallardo, so hold on just a second.  I was going to talk to you about a couple of things in your questionnaire.  Let me do that before we get into these special issues.  Okay?

A    All right.

Q    I notice on page two where we asked you what your best argument for the death penalty is, and you indicate that -- I'm not going to read the whole thing.  But the tail end of what you say here is it should only be fair to take the life of one who took the life in the first place.

Is that what -- Do I understand that correctly?

A    Yes.

Q    Do you still feel that way?

A    Yes.

Q    We talked about page four.  On page seven, at the top of the page, we ask what your thoughts and feelings in

general are about the criminal justice system. And you indicate, and this is not an unusual response for us to see, that there are too many loopholes that cheat the system.

And I am just curious as to what you have in mind. Anything in particular you have in mind about that? What were you thinking about when you answered that question, if you remember?

A    Well, that there's a lot of laws that you have to work against in order to either prove someone guilty or not guilty. And sometimes people get a not guilty because of certain evidence that was needed in order to prove that they weren't able to get, or state of mind wasn't -- like they pleaded that they were crazy or something only when they did that act or something, but they could be completely fine now.

Q    Let me, let me ask you this while we are talking about that. Our law says that the defense is entitled, either side really is entitled to offer evidence in a murder case, in a capital murder case, of the condition of the defendant's mind at the time the offense was committed. Okay. And that's basically exactly what the statute says. So, condition of mind I guess would be whatever situation that that person was in.

It might be that he was insane, legally insane. We could offer that as a defense actually, what our

law says.  But it could be a situation where a person was, for instance, mentally ill, and pretty seriously mentally ill perhaps, but did not rise to the level of being criminally insane as the law defines it.

The law defines insanity as not being able to know the difference between right and wrong.  A person might be able to on some level appreciate the difference between right and wrong, but the condition of the mind from mental illness or defect might be such that it affected the way they perceived some things and, in that way, affected the way they were -- whether or not they were able to actually form the specific intent or act with one of the particular culpable mental states that you've been told about.

It may be a condition brought on by the voluntary ingestion of alcohol or some mind altering drug.  And I will tell you that our law says that voluntary intoxication in and of itself is not a defense to an act.  But that's different from being intoxicated or high on drugs to the extent that it altered a person's ability to form the requisite culpable mental state.

Now, that's kind of complicated, Mr. Gallardo.  I'll tell you that.  It's a complicated law and I know a whole bunch of lawyers that don't understand it.  Okay?  But that's what the law is.

Now, some jurors tell us that, as long as a person knows the difference between right and wrong, if they are not insane, legally insane, the fact that they may be under the influence of alcohol or the influence of a mind altering drug or have some mental defect or mental disease that affects their ability to form a culpable mental state, some jurors say that would be important to them. Some jurors say, no, as long as they know the difference between right and wrong, it's a not a defense, and I can't take that kind of evidence into consideration.

How do you feel about that, if you have any feelings about it?

A    I think they were responsible enough to know, when they took that mind altering substance, that they understood what it would do to them.

Q    Okay. Now, again, don't let me put words in your mouth. But if I understand what you're saying, that the condition of the defendant's mind at the time the offense was committed would not be something that you would consider unless it rose to the level of insanity. Is that a fair way to put it?

A    I would have to say what their state of mind, if it was altered by anything, unless if it was already like that before they committed that, then --

Q    That might make a difference?

A    Yes.

Q    Okay.  So, if it were a mental disease or mental defect that they had no control over, that's something that you could consider?

A    Yes.

Q    But if it were something that they had ingested, alcohol, a drug, as long as they had done that voluntarily, regardless of the state of mind that it took them to, that would not be something that you would consider?

A    Right.

Q    Okay, fair enough.  All right.  We will go on to page seven.  And listen, I don't know what this means and I have a thick skin and so does Mr. Lollar and I believe so does Ms. Mallon.

On page seven we asked you what you think about police officers, prosecutors and defense lawyers. You say that you feel sorry for defense lawyers, and that's fine.  I'll take all the sympathy I can get.  What did you have in mind when you wrote that, Mr. Gallardo?

A    Well, depending on how much evidence they have, I believe, and from what I've seen, that it's really hard to prove somebody innocent.

Q    See, and that's sort of what I kind of took that to be is that, again, not trying to put words in your mouth, but it sounds to me like someone said, boy, I feel sorry for

a guy that's got to have the job he's got to represent guilty clients.

A    Right.

Q    Is that kind of what you mean?

A    Yes.

Q    All right.  Now, the reason I bring that up is that that kind of clashes with the law that says that jurors should presume an accused to be innocent.  Now, and again, your feelings are your feelings and I am not going to be able to alter them.

Can you presume Mr. Broadnax to be innocent regardless of what you put here about that?

A    Yeah.  But the biggest reason why I said that, too, is even though if the State can't prove that person guilty, if you are the defendant's attorney and you know that he really is guilty --

Q    Uh-huh.

A    -- I couldn't do that.  I mean I couldn't be a defense attorney.

Q    Sure, and a lot of people tell us that.  And if we had about an hour, I might could convince you differently, but I'm not going to try, so we're not gonna worry.  I might not could either.

And it doesn't real matter, just so long as you tell us that in this case you can presume Mr. Broadnax

to be innocent and not make us prove that he's innocent.
See, that's something that you said that is also kind of a
concern to me because it sort of switches the burden of
proof to the defense, and that's not where the burden of
proof ought to be.  The burden of proof ought to be with
the State.

A    Right.

Q    Are your feelings such that you would expect us
to prove Mr. Broadnax to be innocent before you could find
him not guilty?

A    No.

Q    Okay, fair enough.  I just wanted to make sure we
were on the same page about that.  Okay?

A    Okay.

Q    All right.  Let's move along here.  We have
already talked about page eleven so I'm not going to deal
with that.

Okay.  What I want to do at this point, then,
is to move into the punishment phase of a capital murder
trial.  And we told you it's different from all others and
it's governed by these special issues.

Okay.  I want you to assume that you are on
a capital murder jury.  You have heard the evidence that
the State has presented to you.  If the defense presented
any evidence, you've heard that.  Both sides have rested

and closed.  The judge has read you the law.

And you and the other eleven people have gone back into the jury room to determine what the right and proper verdict is at the guilt/innocence stage of the trial. And you are all in agreement that the State of Texas has proven to you beyond a reasonable doubt everything that is in that indictment and that the accused is, in fact, a capital murderer just like that indictment accuses him of being, that he intentionally took the life of the person named as the complainant in the indictment.  He did it because he wanted to, without any reason or justification in the law. And he did it during the course of the commission of a robbery.  Okay.  You believe that --

A    Yes.

Q    -- beyond a reasonable doubt, all twelve of you, and you come back and you say guilty.  And then and only then would you go into the punishment phase of a capital murder trial.  Do you understand where I am with that?

A    Yes.

Q    So, I'm going to ask you a question, and you may think it's dumb.  But what would you know about the defendant at that point in time?  When you come back in to sit and listen to the State's evidence in punishment, what do you know about the defendant?

A    That the State proved him guilty.

Q    Right, that he's an intentional murderer, right?

A    Yes.

Q    Whatever else -- You may know a lot of other things in this hypothetical case we are talking about. We are not talking about this; we are talking about a hypothetical case.

You may know a lot of things from the evidence, but for sure you would know he's an intentional murderer who killed in the course of another felony, right?

A    Right.

Q    Okay.  So, it's in that context that you're asked these special issues.  Special issue number one asks you, from the evidence, beyond a reasonable doubt, if you find there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

I don't think that was ever totally stated. It's just been referred to as the future dangerousness issue.  But that's what the issue asks you to do, is to determine beyond a reasonable doubt whether there is a probability that the person that you already just found guilty of being an intentional murderer would commit acts of criminal violence in the future constituting a continuing threat to society.

You understand what that asks you to do?

A    Yes.

Q    Now, you've indicated to us and the State indicated through Ms. Evans that you would not presume that answer to be no.  Is that fair to say?

A    Yes.

Q    And do you still feel that way?

A    Yes.

Q    Now, I want to make sure that you understand, Mr. Gallardo, that the State of Texas has the burden of proving that question is yes.  Okay?  And it sounds -- Again, I don't want to put words in your mouth.

But it sounds to me like you're saying what is not an unusual thing for us to hear, which is this. That since that question does not ask whether a person would absolutely commit acts of violence in the future but only would probably commit acts of violence in the future, or be a future danger -- I'll use the shorthand for it -- that anybody who would intentionally kill another person during the course of another felony is the kind and type of person who would probably commit acts of violence in the future, would be a future danger.

Is that the way you feel about it?

A    Yes.

Q    And is that why you would not answer and not presume that question to be no, that you would presume it to

be yes, because this is a guy who is a killer?  Is that how you feel about it?

A    Yes.

Q    Some jurors, Mr. Gallardo --

Okay.  Thank you.

THE COURT:  All right.  Thank you, Mr. Gallardo.

MR. PARKS:  I appreciate it.

THE COURT:  Well, that was short and sweet.

All right.  Thank you, Mr. Gallardo.  We appreciate you being here and appreciate your time and effort very much.  I'm going to excuse you.  Yeah, just leave that there.  I'll take care of that for you.  Thank you, sir.

(Prospective Juror Gallardo excused from the courtroom).

THE COURT:  State have a challenge for cause?

MR. PARKS:  The defense would submit the juror for cause, your Honor.

THE COURT:  The defendant's challenge for cause is granted.

(After a recess, defendant present).

THE COURT:  All right.  Are we ready to go with Mr. Martinez?

(Prospective Juror No. 352, Mario Martinez,

**Anne B. Meredith**
Certified Shorthand Reporter

enters the courtroom).

THE COURT:  Mr. Martinez, come in if you would, please, sir.  Just go ahead and have a seat right there if you would.

Thank you, ladies and gentlemen.  Be seated, please.

This is Prospective Juror number 352, Mario Alberto Martinez.  Is that correct?

PROSPECTIVE JUROR MARTINEZ:  Yes.

MARIO ALBERTO MARTINEZ, having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Mr. Martinez, thank you for being here this morning.  We are glad to have you.

I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney, Texas.

A    Good morning.

Q    Just right up the road here.  And Judge Snipes, who is the presiding judge over this case --

A    Uh-huh.

Q    -- has asked me to assist him in the jury selection process and preside over that for him while he's upstairs in his courtroom taking care of the everyday matters of the Court.  Okay?

A    (Nods head).

Q    So, I guess you're getting a double bang for your buck this week.

Anyway, you'll recall about a month ago, or better than a month ago now, that everybody got together in the central jury room.  There was probably four or five hundred of you at one time.  And Judge Snipes talked to you.

At that time you filled out your questionnaires, and I am going to give this to you in just a moment for you to refer to.  And also at some point in the proceeding Judge Snipes asked everybody to stand up, raise their right hand, and he administered an oath --

A    Yes.

Q    -- to the prospective jurors.  You recall that?

A    Yes.

Q    Okay.  Were you one of the panel members that stood and took the oath at that time?

A    What do you mean, when people stood up?

Q    Yeah, when everybody else stood up.

A    Yes.

Q    Did you stand up along with them?

A    Yes.

Q    Raise your right hand and take the oath that Judge Snipes administered to everybody at that time?

A    Yes.

Q    All right.  Then I'll just remind you you're still under that oath.

A    Okay.

Q    And what you have been sworn to do is to give us truthful answers, which we know you would do that, anyway.

A    Yes.

Q    But also to be responsive to each and every question that's asked to you by the attorneys or by me.  All right?

A    Uh-huh.

Q    Okay.  Now then, you've looked over your little jury pamphlet here or guide, and in it, it explains some of the law and some of the procedural aspects and some of the special issues that are involved in the trial of this case.

A    Uh-huh.

Q    And, so, it kind of gives you an introduction to that.  And what's going to happen here this morning is the attorneys are going to go over the law with you and then they are going to ask you questions to figure out -- All they want is your ideas, your thoughts, your opinions concerning the law and some of the procedural aspects.

A    Uh-huh.

Q    So, there's not any right or wrong answers.  This is not a test or a quiz that you have to pass or anything like that.  And there's not going to be anything that's asked to you that might be embarrassing to you in any way.

A    Yes, sir.

Q    Okay?

A    Uh-huh.

Q    All right.  So, let me give you your questionnaire because they all have a copy of it.  They have all read it and they will probably have some questions they want to ask you about certain answers or responses that you've given to some of the questions contained in the questionnaire.  All right?

A    Uh-huh.

Q    All right.  Now, then, let me introduce you to the attorneys that are going to participate in this.

THE COURT:  And seated directly across from me and next to you is Mr. Gordon Hikel.

MR. HIKEL:  Good morning.

THE COURT:  And then next to him is Ms. Andrea Handley.

MS. HANDLEY:  Hello.

THE COURT:  And next to her is Ms. Elaine Evans.  And all three of these ladies and gentlemen are assistant district attorneys, and they are the prosecution team and they are charged with the responsibility of prosecuting this case.

PROSPECTIVE JUROR MARTINEZ:  All right.

THE COURT:  Now, seated next to me down the

table here is Mr. Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  And next to him is Mr. Doug Parks. And then on the very end down there is Ms. Keri Mallon.

MS. MALLON:  Good morning.

THE COURT:  And next to Ms. Mallon is their client.  They are the defense team.  And next to Ms. Mallon is their client, Mr. James Broadnax, and he is the defendant in this case.  All right?

PROSPECTIVE JUROR MARTINEZ:  Uh-huh.

THE COURT:  All right.  Mr. Hikel.

MR. HIKEL:  Thank you, your Honor.

May it please the Court.

THE COURT:  Yes, sir.

EXAMINATION

BY MR. HIKEL:

Q    Mr. Martinez, hi.

A    Hello.

Q    I'm going to talk to you for about, I think, like forty-five minutes.  And as the judge said, all we are doing is trying to get from you what your feelings, your ideas, your opinions are about the law.

A    Uh-huh.

Q    Okay.  Obviously before we can ask you that, you would think that we have a responsibility to tell you what

the law is first.

A    Uh-huh.

Q    And then ask you how you feel about the law.  And I am going to endeavor to do that.

During this time I'm going to ask you some questions about your questionnaire.

A    Uh-huh.

Q    There are some interesting things in there, that you have served as a juror before.

A    Yes.

Q    Is that correct?

A    Yes.

Q    And you mention there on page ten of your questionnaire, it says it was in 2001, the person was found guilty.

A    Uh-huh.

Q    What kind of case was that?

A    It was a possession case.  He had, I guess it was like a bag of black tar heroin in his automobile.

Q    All right.  And it says that punishment was assessed by the judge?

A    Yes.

Q    Okay.  So, you found the person -- you guys found the person guilty.

A    Uh-huh.

Q    About how many jurors, was it six or twelve jurors?

A    Twelve.

Q    Twelve.  Okay.  All right.  Let me also ask you to do us a favor during the time when we are talking.  When I'm done, these lawyers will talk to you also and ask you perhaps some of the same things that I'm going to ask you.

This lady over here is going to take down everything you're saying.  So, if we ask you a question and the answer is yes or no or there is an explanation, if you can say yes or no rather than nodding your head, because she doesn't have a key for nodding the head.  Okay?

A    Yes.

Q    All right.  Let me tell you what our goal here is is to get twelve jurors.  Because you've served as a juror before, you understand that this is not a regular courtroom.  We are just picking a jury down here.  The case is going to be tried upstairs in a regular courtroom.  It's just that we didn't have room to pick the jury so we are using this room here.  Okay?

A    Yes.

Q    And we are trying to get twelve fair and impartial jurors that will hear the case and the evidence we present in this case and determine whether or not this man sitting over there with the tie is guilty of the offense as charged, that being capital murder.  There is another prosecutor here

named David Alex who will be presenting the evidence, but he's not here. He's upstairs doing something else.

Now, on page three of the questionnaire you mentioned that you heard something about this case. And all I'm going to ask you is that the law requires that whatever you've heard about this case outside of the courtroom, when the trial starts --

A    Okay.

Q    -- that you cannot allow whatever you may have heard or read about to influence your decision in the courtroom. Do you understand that?

A    Yes, I do.

Q    Okay. All right. And, so, we understand, as jurors, we can't expect you to come in here and -- you know, stuff is broadcast in the news, there is newspapers. We understand that there are times when you may have read or heard something.

All we ask that the law requires is this. If you have, just you cannot bring it into the courtroom and say, let me tell you what I heard on the news. Okay? Unless, of course, you know, we present that specific evidence in the courtroom. You understand me?

A    Yes, I do.

Q    Okay. All right. Now, as you sit here today and whatever you've heard about this case in the news and you see

the defendant sitting there, have you formed any opinion about the defendant's guilt or innocence at this stage here?

A    At this stage, no.

Q    Okay.  All right.  So, as he sits here and as you sit here today, you will presume the defendant, Mr. Broadnax, innocent of the charges, correct?

A    Yes.

Q    Okay.  All right.  Now, in your questionnaire you told us on the very first page, when we asked you, with reference to the death penalty, we asked you to circle a choice of where you are.  And the answer you circled said you believe the death penalty is appropriate in some murder cases.

I just wanted you to know that that is actually what the law is in Texas.  For example, not every murder case a person commits a murder is eligible for the death penalty.

So, for example, if I were to turn to my colleague here.  You know, she's been here for a long time and I want the position she has in the DA's office.  I'm a little jealous of her.  And I just kill her and I stomp on her and I laugh about it.  Okay.

And I say I have been planning to do it for a long time.  I intentionally kill her.  The State would not be able to charge me with capital murder because, while it's

an intentional murder, I intentionally killed her, I laughed about it, I wanted her position so badly, it would not be a death penalty case because, before you can charge someone with capital murder in the State of Texas, it has to be murder plus something else, plus an aggravating factor. And we will talk about what the aggravating factor is in this particular case.

In addition to that, though, we have situations where in Texas another law, a person can be charged with capital murder if he kills an officer in the line of duty, if he or she kills a child under the age of six years, if he or she kills multiple people, in other words, two or more, in the same criminal episode, or if he kills multiple people in a different -- in the same plan or scheme. For example, you heard of Timothy McVeigh, for example?

A     Yes.

Q     The Oklahoma City bomber. Okay. Killed 160 people. And, so, we have all those different situations.

You can also be charged with capital murder if you intentionally kill someone during the course of a robbery, an aggravated sexual assault, or we call it rape, a burglary of a house, or he kills someone for money.

So, it's the murder, intentional murder plus something else. Okay. So if I kill my colleague, Ms.

*Anne B. Meredith*
Certified Shorthand Reporter

Handley, just because I don't like her, not capital murder, even though it's an intentional murder.

Do you see the difference there?

A    Yes.

Q    Okay.  All right.  Now, I'll tell you further, Mr. Martinez, what our goal is in this case.  Our goal in this case is to see some day this defendant here be executed for the crime he committed.  That's our goal.  Our goal is to get twelve fair and impartial jurors that can hear the evidence in this case.

Okay.  I want you to look at the defendant right there and understand that's our objective.  But let me tell you this, though.  Because you put in your questionnaire on page four, you said on page four, taking a life should never be considered lightly.  You turn to page four.

A    Uh-huh.

Q    And you say that there.  And I tell you what, we agree with you entirely.  Because if you came in here and you told us on your questionnaire, you said, oh, I'm ready, I'm ready to kill someone, I'm ready to find this guy guilty and kill him, we wouldn't want you as a juror.  Okay?

What we want are twelve people who would sit in the courtroom, hear the evidence that we will present and then -- you know, it's a two part play, so to speak.  In the

first part of the trial the only question is this.

Would you take a look at this document? It's called the indictment. And that indictment has what we call elements of the crime, you know, where it begins with the defendant's name.

What we have to prove to you is this. On or about June 19th of 2008, in Dallas County, State of Texas, that defendant sitting there, James Broadnax, intentionally caused the death of Stephen Swan, okay, by shooting him with a firearm, a deadly weapon, a gun, while in the course of committing or attempting to commit robbery of Stephen Swan.

Okay. That's all we have to prove. And those are the things we call -- you will hear us referring to them during this trial are called the elements of the offense.

Now, think of this trial now as a play, so to speak, only in the sense for analogy and not in the sense of anything to be taken lightly. But you have two parts of a play. You have act one and you have act two.

In act one the only question you have to answer as a juror, did the State prove to me beyond a reasonable doubt the things we alleged in that document they call an indictment? That is that the defendant killed Stephen Swan in the course of a robbery in Dallas County, State of Texas, on a certain date. Okay? All right.

*Anne B. Meredith*
Certified Shorthand Reporter

That's what we have to do.

Now, knowing all of this, you know, what our goal is, what our objective is, is there anything that you know about yourself you can tell us right now? Say, Mr. Hikel, you know, I don't know if I can partake in a process like that. I have a moral or religious or philosophical beliefs that would make it difficult for me to partake in a process like that.

A    Oh, I feel bad. I don't have any -- anything that comes to mind. It's really hard to say.

Q    Okay. In other words, at this point --

A    Yeah, at this point I --

Q    At this point you have an open mind.

A    Yes.

Q    Okay. You will wait to hear the evidence and determine whether or not we have proven the case to you.

A    Uh-huh.

Q    Okay. Now, let me say this to you now. In the first part of the trial called act one or the guilt and innocence stage, because you have guilt and innocence in the trial, if you find a person guilty, you move to the second stage called the punishment.

That case you sat on as a juror in 2001 is no different from this case in the sense that there are certain principles that applied back then that apply here.

For example, as the defendant sits here, you are to presume him innocent. We have the burden of proving that he's guilty. That burden never shifts to them. We do the accusing, as that indictment indicates, we've got to do the proving, okay? So, that's the first principle I'm going to ask you to accept as a matter of law in Texas. He doesn't have to prove anything.

Number two, that piece of paper in front of you is called an indictment. It's not proof of anything. It doesn't mean he's done anything. All that that paper says is, State, here is what you accused the citizen of, now prove it. Okay?

It's just a road map to tell us what we've got to prove to you, as a juror, if you become one of the twelve in this panel. All right?

A    Okay.

Q    Now, I mentioned a few seconds ago the word or the term beyond a reasonable doubt. You may recall that in 2001, when you served as a juror, you would have heard the term also.

A    Uh-huh.

Q    What does that mean to you?

A    It means that without a doubt. I can't say, you know, what. If I find anything that I think maybe -- maybe he didn't do it because of this.

Q    Right.

A    Then that would give me a reason to doubt it, I mean, so.

Q    Okay. All right. Now, I mean, and you are right. Under Texas law there is no definition for the terms beyond a reasonable doubt. But here is what it does not mean. It doesn't mean where there is no doubt at all. We can't prove anything to you a hundred percent.

A    I understand.

Q    Now, for example, for me to prove something to you 100 percent, that would require what?

A    Pretty much an undoctored video camera of them committing the crime.

Q    All right. Or you would have seen it yourself. You are a witness to the crime yourself, correct?

A    Right.

Q    And if that's the case, you would be what? A witness, not a --

A    Not a juror.

Q    Not a juror. Okay. So, what it says is this, though. It says that if you have a doubt when we've closed act one, so to speak. And you are asked the question, did the State prove to you beyond a reasonable doubt that James Broadnax, that defendant sitting there, is guilty of the offense of capital murder, in that on June 19, 2008 he

intentionally caused the death of Stephen Swan by shooting him with a gun or a firearm, a deadly weapon, while in the course of committing the offense of robbery. And if you have a doubt, it has to be a doubt based upon reason.

A      Uh-huh.

Q      For example, you know, some jurors just say, well, I don't know. I mean anything is possible. It could be somebody from space came down and killed Stephen Swan. It could be anything. And, so, because I didn't see it myself, where there isn't a videotape of it, I have some doubts.

Well, if a person reasons like that, saying it could have been an alien, it could have been this, could have been that, that's not a doubt based upon reason, is it?

A      No.

Q      Okay. So, if there is a doubt, it has to be a doubt based on some reason. Okay, do you agree with me on that?

A      Yes.

Q      Okay. That's why it's called beyond a reasonable doubt, not just beyond any doubt. Okay. Are you with me so far?

A      Yes.

Q      Okay. Now, so we've talked about the indictment being no evidence of anything against the defendant. Number

two, you must presume him innocent. Number three, we've talked about this principle called beyond a reasonable doubt.

I also want to talk to you about credibility of witnesses. In this case, as you may -- A variety of witnesses come to court and testify including police officers.

Here's what the law provides. You cannot, as a juror, give a class of witnesses a leg up or a leg down simply because of their status. So, for example, if I'm a police officer and I come to court, you can't say, oh, Gordon's a police officer. Before he even speaks a word, I believe everything he's going to tell me. Not fair to the defendant, is it?

A    No, it's not.

Q    Okay. So, you have to then wait now until the witnesses testify, you heard what she has to say, and then you assess the person's credibility as a witness, correct?

Was that what you did in the trial you had in 2001?

A    That was so far back, it's difficult for me to try to remember.

Q    Uh-huh.

A    We did hear the evidence. We sat and deliberated. We just didn't find any doubt, any reasonable doubt.

Q    Okay. And that's fine. But in that case did you have police officers testifying?

A    Yes, we did.

Q    Okay.  The moment they walked through the door, though, before they even said a word on the stand, did you make a decision that, whatever he tells me, I'm going to believe him, or did you wait until he or she testified and then assess his or her credibility?

A    I waited.

Q    Okay.  The same thing in this case.  Okay.  We are going to ask you -- And I believe on page seven of your questionnaire, when asked about police officers, you said, do you believe -- I'll wait until you get there.

Do you believe police officers are more likely to tell the truth than the average person, you said yes.  But you said, it is expected of them.  And while I know it's not always the case, I believe the majority do.

A    Uh-huh.

Q    Now, I'm going to say this to you.  Myself and these lawyers here, we are not trying to change your mind or your opinions about anything.  We will explain to you what the law is, though.

Now, this opinion you have expressed, there is nothing wrong with it.  But I want to make sure, though, what you're not saying is this.  You do understand that you cannot simply conclude that a police office, when he comes into court, he's speaking the truth right away before you've

heard anything.  You do agree with me on that, right?

A    Yes, I do.

Q    Okay.  So, you are promising us and the Court, I mean, when you take that oath as a juror, you will wait to hear any witness's testimony before you assess his or her credibility; is that correct?

A    Yes.

Q    All right.  Okay.  Now, finally, I want to talk to you about this principle you've heard on TV a lot called the fifth amendment.

A    Uh-huh.

Q    You know, you've seen it where, you know, a police officer arrests someone and they read to you the statements from the Miranda.  You have the right to remain silent and not say anything against you.  You've heard that before on TV, right?

A    Yes.

Q    Okay.  In a courtroom, a citizen who is accused of a crime, any citizen, even if you are Mr. Martinez, you have the right under the fifth amendment to our constitution to not testify.  Okay?

A    Okay.

Q    What it means is this.  All you have to do when you're charged with a crime is to show up.  Mr. Broadnax has done that.  Now, if in the trial now when we are upstairs

now, and here is act one, the State puts on their evidence and the defendant does not testify, for whatever reason. It could be because he's scared, it could be because he has a speech impediment, it could be because his lawyers advise him not to, it could be because he chose not to, a myriad of reasons why a person accused of a crime may not testify.

Given all those various reasons why a person may or may not testify, the law says this. If a person accused of a crime does not testify, the judge will instruct you, and the prosecutors, we will join the Court in asking you, don't even consider it or talk about it for any reason at all because it is against the law.

If the defendant does not testify, could you promise us that you will not consider that for any reason at all, period?

A    Yes, I can promise that.

Q    Okay. For example -- Let me test you now. Let's say, for example, here it is now act one, we put on the evidence now. Okay. You go back there to deliberate. You've got a court's charge. Remember you go back there and you begin to deliberate.

And you say, the State is not quite there yet. Something is missing here. But you know what, though, if Mr. Broadnax had testified, if he had only testified, it would have made a difference to me. But since he didn't

testify and the State is so close, I'm going to give the State a nudge over the line and say, you know what, I think he's guilty.

You can't do something like that. Do you agree with me?

A    Yes, I agree.

Q    Okay. And that's again because if he doesn't testify, you can't consider it or even talk about it for any purpose. And the reason is simply this, and it's only fair. We do the accusing, we must do the proving, regardless of what he does or doesn't do. Does that seem fair to you?

A    Yes.

Q    Okay. Now, let me tell you how this is going to play out, this trial. Again, in Texas, we have -- all trials are going to be in two parts. We call it bifurcated, or I call it, for this example, act one and act two.

The first part is the guilt/innocence. We only ask one question. What is that question you are asked to decide in the first stage?

A    Is he guilty.

Q    Right. And how do you answer that question? By saying to us, by saying, did the State prove to me, Mr. Martinez, beyond a reasonable doubt those things alleged in the indictment there. Nothing more, nothing less. Okay?

Now, for example, let me show you how this works now. You're a juror now. Okay. We've alleged a gun. Do you see that in there? Do you see the gun, a shooting?

A    By shooting with a deadly weapon.

Q    Okay. All right. And the M.E. comes, the medical examiner comes to court now to testify. She gets on the stand and says, yeah, Stephen Swan is dead. But when I performed the autopsy, I found no gunshot. In fact, what I found were stab wounds. But he's still dead.

State, you have alleged gunshot. But what did the evidence prove from the medical examiner? He died from what? What did I just say?

A    Stab wounds.

Q    Knife. What is your verdict?

A    Well, they didn't prove, the State didn't prove that, what they were accusing him of, that he used a deadly weapon by shooting him.

Q    Okay.

A    So, it would have to be innocent.

Q    It would be not guilty.

A    Uh-huh.

Q    Exactly. Now, he would be not guilty because, again, now, we did the accusing, we've got to do the proving. And if we allege a gunshot and the evidence shows it was a stab wound, all we ask you to do is follow your oath as a

juror.  And your oath would require you to say not guilty.

Now, what would happen now is I'll be out of a job because then, you know, my boss would want to know, why are you so stupid?  Why are you alleging a gun when the evidence shows a knife?

You know, but you shouldn't feel bad about that because all you do as a juror is what?  Follow your oath.  Okay.  That's all we are going to ask you to do if you are on the trial is just follow your oath.  Okay?

A    Okay.

Q    All right.  Now, so, to be a fair and impartial juror, that's all we ask you to do.  Now, if you become one of the twelve jurors, you will take another oath.  Judge Snipes will give you another oath.  And that's the oath where you say, Judge, when you give me the law, I promise you I'm going to abide by the law.

So, as we are talking to you here today, if there comes a point where you are saying, ahh, I don't think I can follow the law, I don't think I like that law, I don't think I can agree with it, tell us.

Now, it's okay to not like it if you can tell us, you know, I don't like it.  I can still follow the law if the judge instructs me that that's the law.  See the difference there?

A    Uh-huh.

Q     Is that a yes?

A     Yes, I see the difference.

Q     All right.  Now, so here it is, now we put on our evidence.  And as I mentioned to you before, now, if I get mad and kill my colleague here because I want that job, okay, and I kill her, that's not capital murder.  That's only murder.

Now, in the State of Texas, before a person can be found guilty and assess the death penalty for capital murder, you not only have to find the person guilty as charged, but you've got to answer what we call special issues.  And you have there on the board special issue one, two and three.

Okay.  Now I'll tell you -- I'll have you read them in a second.  Now, let me show you the difference now where, if I kill my colleague, I'm charged with murder because I intentionally killed her.  I stomped on her.  I laughed about it.  In fact, I broke out the champagne and I laughed about it.  If I'm found guilty of that murder, these special issues here are not even relevant to my trial.  And why is that?

A     Because it wasn't capital murder.  You just did a plain murder.

Q     Exactly.  Now, I'm glad you used the term because sometimes we lawyers use the term plain murder.  And you

know, we hope not to be insensitive to the jurors. Nothing about murder should be plain. But I know what you mean. Plain murder until the State has shown capital murder. And you're right. Those three issues only become relevant if I'm convicted of, or the person is convicted of capital murder, not just regular murder, regular murder, so to speak.

Now, if it were a regular murder, then you go still into the second phase, or act two, called the punishment phase, where there is a range of punishment from five years all the way up to ninety-nine years or life for regular murder.

Okay. Now, I'll tell you something now. As a juror now, before you can be qualified as a juror, here is what the law says. Before act two begins, or the punishment phase, you know, you know nothing else about me except that you found me guilty of murder. Okay. You can't say, I'll tell you right now, if I find him guilty of intentionally killing his colleague, he's gone for life.

Because here is why. I mean, give you an example. If I were to tell you, sir, about a man who takes a knife and puts it in a woman's chest and cuts her open and takes her money from her, what comes to mind? What kind of person that comes to mind?

Takes a knife and intenionally, he's been planning for weeks, and puts a knife in her chest, cuts her

open and takes her money from her, and that's all you hear in act one, what comes to mind?  Good guy, bad guy?

A    Bad guy.

Q    Yeah.  And if I say to you, that's all you hear in act one.  I say, okay, what punishment would you want to give that kind of person?  A lot of time, do you think, a little time?

A    I guess I would have to hear everything and see maybe why he did it or --

Q    Exactly.  Because what if I tell you in act two now, the punishment phase, that that person put the knife in the person's chest and cut the person open is a doctor and what he did was he performed surgery, because if you perform surgery, you know, you what, you cut a person open.  And surgery is not free.  You've got to pay for the surgery, right?

A    Uh-huh.

Q    Okay.  So, if I were to tell you simply in act one, that's all you hear were those facts, and you said, oh, he's gone, I'm done.  He's gone for life.  It's not fair because you don't have an open mind as to considering all the evidence before you reach a verdict.  Okay?

A    Uh-huh.

Q    So, that's why it's important also to wait and hear all the evidence before you can say, I know exactly

what I'm going to do.  Okay?

Now, I'll give you another example.  You have a 45 year old man who, you know, he gets tired and he just goes and he kills a six year old child, kills a six old child, intentionally kills a six year old child.  And that person is then charged with murder.  Okay?

And I say to you, Mr. Martinez, here you have a forty-five -- I'm forty-six -- a forty-six year old man kills a six year old child.  Let's make it a seven year old child.  What punishment do you think I ought to have for that?      .

I mean I just intentionally kill that child. And that's all you hear in act one.

A    It's really hard for me to assess until I hear more evidence, details, I mean.

Q    It's hard to assess.

A    Yeah.

Q    Exactly.  What if I tell you my seven year old child that I kill had terminal cancer.  He was in Baylor Hospital, and I snuck in there at night.  I had some morphine.  And I was sick and tired of seeing my child suffer for two or three years with no hope.  I'm tired of hearing my child cry and scream and, so, I just give him the morphine and kill him.

Now, that's still an intentional act; is it

not?

A    Yes.

Q    Where I kill the child?

A    Yes.

Q    Right.  But once you hear that, you know how much I suffered and everything, you may decide, well, okay, I can give him the low end of the scale rather than giving him the maximum which, you know, would you want to be able to make that determination until you hear all the evidence, right?

A    Yes.

Q    Okay.  Now, before we get to the special issues, you read the pamphlet that you were given outside?

A    Yes.

Q    Okay.  If you were to find someone guilty of capital murder, what is the very best punishment that that person can hope for?

A    Best as in for the defense or the --

Q    Yeah.

A    -- the prosecution?

Q    Oh, the person who is found guilty, what is the best case scenario for him if you find him guilty of capital murder?

A    I guess life imprisonment.

Q    Exactly, right.  At this point, because remember under Texas law, now, the person is charged with capital

murder, intentionally murdering somebody plus something else, in this case a robbery. And you find the person guilty of capital murder. There is only one of two sentences a person would get, life without the possibility of parole or death. Okay?

So, act one is over. You find the person guilty of capital murder. At this point the very best he can get is life without parole. Under Texas law, it means life without parole. He's going to die in jail. Okay?

Now, before we go to act two, and that is called the punishment phase, we've got to prove to you those three special -- well, we have to prove to you one and two beyond a reasonable doubt, as you notice it says right there. And the third one, there is no burden; no side has a burden. We are talking about number three.

Here is how it works. Number one says, what -- You read number one to yourself, please.

A    Yeah.

THE COURT: I'll scoot over here. Mr. Martinez, can you see over there? You can move over here.

A    Yes, I read that. I read that, that there is no hope for him, I guess, that he will continue being a threat.

Q    Well, we have to prove that because notice what it says. Notice what it says. Do you find from the evidence, which means now that -- because, for example,

think about this.  If, after the person is found guilty of capital murder, he automatically gets the death sentence, there would be no reason for these three special issues, correct?

A    Yeah.

Q    And there would be no need for the second part of the play or the act called the punishment.

A    Uh-huh.

Q    But under Texas law, before you can determine whether the person gets the death sentence, the State has to prove one and two to you beyond a reasonable doubt, because you notice in there it says again, in one, beyond a reasonable doubt.

A    Uh-huh.

Q    And in two, beyond a reasonable doubt.

Now, let's talk about one.  It says now in the second part of the play, we put on our evidence now, and now it's the close of the trial now, okay, punishment. Guilt/innocence is over.  You found the person guilty.  You move into act two.  We put on evidence, and you then have to answer these questions now.

The first one says this.  Do you find from the evidence beyond a reasonable doubt -- same legal standard again as the guilt/innocence -- that there is a probability. Now, when you hear the word probability, what comes to mind

by the word probability?

A    That being able to.

Q    Well, let me ask you this.  In your mind, is there a difference between the word probability and the word possibility?  Would you agree with me that anything is possible?

A    Yes, anything is possible.

Q    Okay.  Anything is possible.  I mean, you know, a space ship from Mars, aliens could land on earth tomorrow. It's possible.

A    It's possible.

Q    You know, I can go and run the -- I'm six foot three, old, I have a bad back.  I can't run two miles.  But it's possible that I can run the Boston marathon and win it if I'm the only one who shows up, right?

A    Yes.

Q    But is it probable that if I go there with all the other competitors I'm going to win; is that probable? Probably not, right?

A    Yeah, probably not.  It depends on who the other runners are.

Q    Right.  So, what jurors have told us is the word probability means more likely than not.  Now, it doesn't say that we have to prove that there is a certainty that the defendant will commit criminal acts of violence.  It just

says that we have to prove beyond a reasonable doubt that there is a probability.

Now, I know you're sitting there thinking, well -- because we are asking you basically to look into the future.

A    Uh-huh.

Q    And ask yourself this question, if the State proves to me beyond a reasonable doubt that this man I found guilty of capital murder is a future danger. You think, well, how am I going to do that?

The law says there are several ways you can do it. One is you can look at the mere facts of the crime. For example, you've heard of Timothy McVeigh?

A    Yes.

Q    Okay. He was charged with killing -- well, he killed 160 people. He was a decorated war veteran, served in the Gulf war, no prior criminal history. But he was convicted in federal court of killing eight agents and given the death penalty.

Now, I'm going to transpose you now and come to state court. Imagine he is now charged with killing the other 160 people. You as a juror may conclude, after hearing the evidence in the punishment phase, the facts alone helps me to answer that question.

Now, here's the difference now, and it's a

big difference, Mr. Martinez, understand this. The moment you find him guilty of capital murder, you cannot conclude, oh, this is easy, I found him guilty of capital murder, number one is definitely yes.

You understand the difference there?

A    Yes.

Q    In other words, you can't prejudge it, right?

A    I would have to wait until I hear more evidence.

Q    Correct. The same way you couldn't prejudge, when you hear a forty-six year old man killed his seven year old, he deserved life in prison, because then you heard it was me who killed my son because he had cancer. And once you hear that other part, the same facts, you then conclude, yeah, okay, I'll give him something lighter than life in prison because he killed his own son who was suffering.

Same thing in this case. The mere fact that you said guilty of capital murder, you can't say, bam, I already know I'm going to answer special issue number one yes. Okay?

A    Yeah.

Q    You've got to wait to hear the evidence. You with me?

A    Yes.

Q    Okay. Now, look at the second terms. It says probability. Then it says would commit criminal acts of

violence.

Let me tell you this again.  Our law doesn't tell you what those are.  We have to bring evidence to you to show that there is a probability that that man you found guilty of capital murder would commit criminal acts of violence.

It could be -- Give me some ideas that come to mind when you hear the term criminal acts of violence. What comes to mind?

A    Hurting someone.

Q    Okay.  Burning property, could that be a criminal act of violence?  I burn your house down, is that an act of violence, you think, arson?

A    Arson violent?

Q    Uh-huh.

A    No, I don't think arson would be violent.

Q    It wouldn't be?

A    But it would be a criminal act.

Q    Okay.  All right.  If I take my fist, I'm a big guy, and I just clock Ms. Handley in the face.  No reason, she is just sitting here minding her business, taking notes, and I just hit her.  Criminal act of violence?

A    I don't know.  I think I would think yes.

Q    Well, tell me what else you think it could be if not a criminal act of violence.  I mean, it is violence, is

it not?  She is sitting there minding her business.  I just clock her.

A    But it depends on the force that you used.

Q    Uh-huh.

A    Sometimes, you know, people are just kind of play fooling around, right?

Q    Well, I ain't playing around.  All of a sudden I clocked her in the face.  I don't like her.  I don't like orange and brown or black.  I just clocked her.  I'm not fooling around.  I clocked her.  Act of violence, you think?

A    If she had to receive stitches and hurt.

Q    Uh-huh.

A    I would think so, yes.

Q    All right.  Now, look over there now.  Notice it does not say that I have to prove, give you a probability that he will commit another murder or an aggravated robbery or a sex assault.  It didn't say what kind of crime or what kind of criminal acts of violence that I have to prove.

All it says is that I have to prove that there's a probability he will commit criminal acts of violence.  You, the juror, has a right to determine whether something is or isn't a criminal act of violence.  Do you understand that?

A    Yes.

Q    Now, there is the next word in there that says that

would constitute a continuing threat to society.  When you hear the word society, what comes to mind, when you hear the word society, just in general?

A    People.

Q    Right.  People like me and you going to church, the grocery store, mechanic shop, come to court, we are all part of a society, right?

A    Yes.

Q    Now, but if you were to find the defendant guilty of capital murder as charged, what would constitute his society?  Where is his society?

A    I guess if he's found guilty, he would be in prison.

Q    Right.  Because what is the best -- If you give him capital murder, what is the best sentence he could hope for?

A    Life.

Q    Without parole, okay?

A    Yeah.

Q    So, and the legislators have said -- And by the way, these three issues are not drafted by us.  They are drafted by the legislators of Texas.  That's the law that they give us to follow.

And they say would constitute a continuing threat to society.  If he's found guilty of capital murder, they are obviously saying to you, a juror, that his society is prison, right?

A    Yes.

Q    And who, who are the categories of people you expect to be in prison? Are there people who commit crimes?

A    Yes.

Q    Prison guards?

A    Yes.

Q    Doctors, nurses, medical providers?

A    (Nods head).

Q    Perhaps clergy?

A    Yes.

Q    Perhaps teachers?

A    Yes.

Q    Okay. So, you see that even in the confines of prison there are a lot of people that go there. More is in prison that would constitute a society, correct?

A    Yes.

Q    Okay. So, then we would have to prove to you, a juror, beyond a reasonable doubt that, if you find Mr. Broadnax guilty of capital murder as charged in the indictment, we would have to prove issue number one to you beyond a reasonable doubt.

Again, no definition of the term reasonable doubt beyond, no definition of probability. And examples of criminal acts of violence is whatever you think it is. And society could be prison where he is. All right?

A    Uh-huh.

Q    Now, if you answer special issue yes -- And by the way, you remember the last jury you did in 2001, all twelve of you were in one room when you deliberated?

A    Yes.

Q    Okay.  Now, knowing now we didn't put the twelve of you in twelve separate rooms and ask you to come up with a verdict, did they?  Did they?

A    No.

Q    They put you all in one room and asked you to do what?

A    Discuss.

Q    Deliberate.  Okay?  All right.  Deliberate, discuss.

A    Okay.

Q    Now, the twelve of you deliberate and discuss issue number one.  And if we prove it to you beyond a reasonable doubt, your answer would be yes.  If we don't prove it, your answer is what?

A    No.

Q    And if you guys say no, you stop, you press the button and tell the judge, the answer to number one is no, and you never get to number two or number three.  Okay?  Because you take them in order, one, two, three.

If you say yes to number one, you go on to number two.  If you say no to number one, you stop.  The

button is pressed, the judge comes out and sentences him to life in prison without parole.  Okay?

A    Okay.

Q    But if we prove number one to you beyond a reasonable doubt, you go on to number two.  Basically number two says this.  You read it with me.  Do you find from the evidence, again beyond a reasonable doubt, that the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another, or anticipated that a human life would be taken?

Now, a whole lot of words in there.  Let me tell you basically what it means, Mr. Martinez.  Me and my colleague here, Ms. Handley, government employees don't make a lot of money.  We need some extra cash, okay?  Times are tough.

All right.  We sit down at my kitchen table and we say, check this out.  Let's plan, let's plan to hit a lick at this store.  We need some money.  I know around midnight there is only one clerk in there.  He's all by himself.  Since you're a girl, a woman, you drive the car.  I'm going in with the gun.  Okay.  And we talk about it.  She says, yeah, let's go at midnight.  You know, you stick him up, you take the money, you come back out.

As I'm walking in, I say, oh, I forgot to put

on the mask. He'll see my face. He's going to rat me out. And she says, kill him, don't leave any witnesses. I go in there with a gun, get the money, and I pop the guy in the head and I kill him. Okay. Take away the money.

What am I guilty of, the triggerman?

A    Actually committing a murder.

Q    Okay. And I stole money from the store. So, now, what is capital murder in Texas? Murder plus something. Okay?

A    Uh-huh.

Q    In this scenario where I walk into the store, take the money and kill the clerk, what am I guilty of?

A    Capital murder.

Q    Because there is a murder --

A    And --

Q    And money or property, any property, as long as it's property, right?

A    (Nods head).

Q    Ms. Handley never went into the store. All she did was we talked about it the night before, we planned it. And I said to her, the guy can see my face. And she said, take care of the witnesses. But she never came into the store. What is she guilty of?

A    An accomplice.

Q    All right. But what can she be charged with also?

What can she be charged with, what crime?

A    I guess just robbery.

Q    Why?  Tell me why you think just robbery.

A    She took part in it.

Q    Uh-huh.  All right.  Let's look back at number two.  Does it say there -- Now, she didn't actually cause the death.  I did, right?  I shot the guy.

But it then says, or did not actually cause the death but intended to kill the deceased.  Now, when she said to me, and I said, look, the guy can see my face, you know, she says, take care of it, kill him, did she intend that I kill the deceased by her words?

A    Yes.

Q    Correct.  So, what could she be charged with also?

A    I guess murder.

Q    Just murder?  Now, what did I do?  Tell me, what did I do?  I'm the gunman.  What did I do?  I walked into the store and what did I do?

A    You robbed and pulled the trigger.

Q    I killed someone and I took property, so what charge is that?

A    That's capital murder.

Q    Capital murder.  Now, Ms. Handley didn't come in the store, but she -- and she didn't kill the guy.  But when she said to me, yeah, take care of him, did she intend, did

she intend the deceased, that I kill the person?

A    Yes.

Q    Right.

A    She told you.

Q    Right.  So, she is just like me.  In other words, the fact that there is just one gun, the law doesn't require that both of us use the one gun and pop the person in the head.  I mean, if she is agreeing with me to go in and take care of the guy, why should she get a break because I'm the one who pulled the trigger, right?

A    Yes.

Q    If she assisted, you know, she assisted me, she encouraged me, we talked about it and all this stuff, she is just as guilty as I am, right?

A    Yes.

Q    But let's say, let's say that we go to the store and she knows I have a loaded gun, okay?

A    Okay.

Q    And she knows I'm a hothead because she's been dealing with me for five years and knows I'm a hothead.  And she says, look, go in there and rob the store.  And she says, oh, by the way, do you have the gun?  I say, yeah, I got it.

          And she is like, just go in and rob the store and come back with the money, as much as you can.  Okay?

And she knows there is a clerk in there by himself.  I've got a gun, I'm hotheaded.  The only thing she agrees with me to do is to rob the store.

I come back out and I am laughing.  She can see the smoke from the gun.  But I'm laughing, the money in my hand, the bag of money in my hand.

Later on you find that I killed the clerk, right?  And I took the money.  So, what am I guilty of again?

A     Capital murder.

Q     Ms. Handley, what could she be charged with?

A     Just assisting as an accomplice.

Q     Okay.  But what crime could she be charged with?

A     Robbery.

Q     Why not capital murder?

A     She had no knowledge --

Q     Uh-huh.

A     -- of the crime, capital murder.

Q     All right.  Good answer.

Look at the very last sentence, though, look at the last words at the bottom of special issue number two.  What does it say?  Or anticipated that a human life would be taken.

Now, here's what the law in Texas says for a party.  Two people conspire to commit a crime.  The crime they conspired to commit was what?  Robbery, right?

A    Uh-huh.

Q    We get together, we need some money.  She knows I have a gun.  The law says this.  Should she have anticipated that in carrying out one crime, robbery, should she have anticipated that another crime would have been -- could have been committed, another felony?

Now, here's my question to you.  You have to make this determination as a juror.  Is it unreasonable that if I have a gun, and she knows I have a gun, and I am going in the store to rob someone of their property, is it unreasonable that she should have anticipated that the store clerk would put up some resistance?  Is that unreasonable?

A    No, that's not unreasonable.

Q    Okay.  And if I have a gun and she knows I'm hotheaded, is it unreasonable for her to anticipate that, you know what, knowing Gordon is such a damn hothead, if that clerk puts up a resistance, he may shoot that clerk.  Is that unreasonable for her to anticipate those kind of things?

A    No, it's not unreasonable.

Q    Right.  But again, now, you as a juror would have to make that determination, though.  You have to get the facts before you can even make that determination.

What I would say to you is the law in Texas says this.  The nonshooter, not the shooter, but the

nonshooter could be charged with the same crime as me, depending on the facts and the circumstances.

Okay. The mere fact that you sat in there and you watched me go in there, you're not doing anything, you're a bystander, we can't charge you with anything because you didn't do anything. But if you participated, you assisted me, you helped me, you encouraged me, you discussed it with me, all of those make you, the word you use, an accomplice to it. Okay?

All right. Now, let's now get to -- So, if you answer yes to number two, okay, yes to number one, yes to number two, you get to number three. Number three is a safety net.

Now, number three doesn't have any burden. You notice that, right? All it says is, do you find, taking into consideration all of the evidence. Now, what is the next phrase up there after the word evidence?

A    Including the circumstances of the offense.

Q    All right. So, notice now you look at the offense again. Okay. You look at the defendant's character and background. Remember, now, no side, State nor defense, has any burden to prove it to you. One and two, we have the burden, beyond a reasonable doubt.

Number three is simply this. Think of a window that's wide open like this. If you answer -- When

the window is slammed shut, the defendant gets the death penalty. But here you find him guilty so he's sitting here on life without parole. Okay? You answer special issue number one yes, the window is closed a little. You answer special issue number two, the window is closed some more, but it's still open. It's not fully closed just yet.

And why is that? The law says that you, as a juror, may then hear evidence about the defendant, you know, that you may consider mitigating. You may hear a thousand things that are mitigating. He was beaten as a child. He was raised on dog food. His father died when he was one week old and he never knew who his mother was and he never went to high -- he never got a chance to go to school. You may hear all these different things about a defendant's background that you may think is mitigating.

Okay. Now, remember now here's the window. Yes to one, close. Two, and you're hearing all these things now. Now, look at me for the word on the board that says mitigating.

A    One, two.

Q    You see the word mitigating up their?

A    Yes.

Q    Right before the word mitigating, what is the word that comes before mitigating?

A    Sufficient.

Q    Good.   Now, there is a difference now.   The law didn't say that you have to find something mitigating.   It says sufficiently mitigating.   Meaning what?   You may hear a thousand things about the defendant.   And you, as a juror, then have to decide, with all the things I've heard about him, raised on dog food, bad parents, this and that, is that sufficient to lessen his moral culpability for the crime he committed?

In other words, the fact that he's young, the fact that he didn't know who his daddy is, the fact that he may not know who his momma is, she burned him when he was a child, she did all those bad things to him, do all those things that I hear rise to a level where in my mind as a juror it's sufficiently mitigating to leave the window like this and give him what sentence?   If the window is left like this, what sentence does he get?

A    Life.

Q    Without parole.

A    Yes.

Q    Okay.   If you say, you know what, Gordon, yeah, I think I've heard enough bad about this kid to say I don't want the window closed, I will answer the issue yes.   And if you say yes, he get's life without parole.

If you say no and the window is closed shut, what sentence does he get?

A    Death.

Q    Death.  Now, so you see now where as a juror you don't say, you don't answer the question yes or no, does he deserve to live or not.  All you do is you answer the special issues.  If you answer yes to one, yes to two and no to three, he gets the death sentence.

But as you promised us, you don't know what you will do until what, until you hear what?

A    All the evidence.

Q    All the evidence.  Mr. Martinez, thank you for your time, sir.

A    Oh, before, after I had gone to the -- I got home and everything.

Q    Uh-huh.

A    On the questionnaire it asked if I knew people being in the prison --

Q    Right.

A    -- and stuff.  One thing that had escaped me because maybe I was kind of -- because I do have cousins who were in the same situation that he is.

Q    Right.

A    I didn't find out what had happened until maybe years later because I had kind of stopped talking to them.

Q    Uh-huh.

A    But they were accused and convicted of murdering

during a robbery.

Q    Uh-huh.

A    And I, I just wanted to bring that up because I wasn't sure if that would decide or not.

Q    Okay.

A    It's just that I totally forgot to put it on here because I don't talk to them.

Q    Right.

A    Or I don't --

Q    Okay.

A    And I just hear that, but my answer earlier, if it helps.

Q    Right.  Well, the only thing we will ask you about that, how long ago was that?

A    See, that's the thing.  I don't know when they committed it.  I'm guessing it was like the late nineties.

Q    Okay.  And this office prosecuted them, the Dallas office?

A    I don't know where the crime was committed.  I don't know what office.

Q    Here's my final question, then.  Anything about that situation involving your family members that you believe would affect you in being a fair and impartial juror either for the State or the defense?

A    That's what I keep thinking about.  I can't say

yes or no because I keep thinking about it now that I'm actually in this situation.  What would I have done in that situation?  I can't decide.

Q    All right.  The last thing.  Are you from Dallas?

A    Yes.

Q    Let's say you go to New York.  Do you have family in New York anywhere?

A    No.

Q    Okay.  Let's say you go fly to New York for a vacation, and you are walking up the ramp to board the plane.  You stop and talk to the pilot.  And he says to you -- You ask him, hey, Captain John, how you doing?  Oh, I'm going good.  And you say, hey, do you think you can fly this plane?  He says, I don't know but I'll give it my best shot.  I'm going to try and fly this plane to New York but I don't know if I can do it.  Do you get in that plane?

A    No.

Q    Why?  You want to be certain, right?

A    Yes, I want to be certain.

Q    Let's pretend that you are the passenger and I'm the pilot.  I reverse the question and I'm asking you, do you believe the situation involving your family members could affect you being fair and impartial?  And, yes, it will affect me.  No, Mr. Hikel, I can separate that.  It has nothing to do with me.  I can put it aside and just listen

to the facts in this case and judge based on the evidence in this case.  What would your answer be?

A    I would say yes, I can put it aside.  As I said, I haven't talked to them.  I don't know.  Like to me, they are just --

Q    Okay.  It's a whole separate situation.

A    Yes, uh-huh.

Q    Okay.  All right.

THE COURT:  All right.  Thank you.

Mr. Lollar, you want to take about five minutes here or do y'all want to go ahead?

MR. LOLLAR:  Let me ask one little question and then --

THE COURT:  Sure.  Okay.

MR. LOLLAR:  -- depending on that.

EXAMINATION

BY MR. LOLLAR:

Q    Mr. Martinez, how are you doing?

A    I'm doing okay.

Q    Okay.  We have 800 jurors to choose from.  We've talked to about maybe 60 or so.  So, we've got lots of jurors to go through.  Okay?

A    Uh-huh.

Q    And I know that you have given thought to this issue that you just brought up.  You've got cousins who were

actually convicted of capital murder?

A    Yes.

Q    And did they receive the death penalty?

A    No, they received life.

Q    They received life.  Okay.  And you brought the issue up so I just want to talk to you about that.

A    Uh-huh.

Q    You said that that's something that's in your mind, right?

A    Uh-huh.

Q    Let me, let me put it this way.  Can you guarantee us 100 percent that that event that happened to your cousins would not influence your verdict, either in guilt innocence or in punishment, either for the State or for the defendant?

I don't want to make you -- and believe me, like I say, we've got 800 jurors to choose from.

A    Yeah.

Q    So, I don't want to do anything that is going to put you in an uncomfortable position.

A    I want to say, I want to say yes and guarantee. I mean, those are cousins that kind of drifted away.  And that's from my paternal side.  And my grandma, the last time she counted, she had like seventy-something grandchildren, so they are kind of distant.

Q    So, you've got lots of cousins to choose from.

A     Like I say, I want to say yes, but it's very difficult for me to guarantee.

Q     Okay.

MR. LOLLAR:  We can take a break, right?

THE COURT:  Take a short break.  If you need to run to the bathroom or get a drink or anything, my bailiffs will assist you in that.  All right?  Yeah, just leave that right there.

(Prospective Juror Martinez excused from the courtroom).

THE COURT:  What do y'all think?  Do y'all submit him?

MR. LOLLAR:  He can't guarantee us that that wouldn't influence him.

THE COURT:  Y'all want to talk?

MR. LOLLAR:  I don't know whether that would influence him against the State or against the defendant.

MS. HANDLEY:  That's what I don't know.

THE COURT:  Yeah.

MR. LOLLAR:  But the bottom line is he can't guarantee us that it won't influence him.

THE COURT:  Well, can y'all agree to just excuse him or --

MS. HANDLEY:  Sure, sure.

THE COURT:  Can y'all agree to that?

(Discussion off the record).

THE COURT: Okay. Well, why don't we -- why don't we go ahead and bring Mr. Martinez back and just excuse him, then.

MR. HIKEL: Sure.

MR. LOLLAR: Sure.

THE COURT: And get that on the record and then we'll get out of here for lunch. How does that sound?

MS. HANDLEY: That sounds great, Judge.

THE COURT: Go ahead and bring Mr. Martinez --

THE BAILIFF: He's taking a break.

THE COURT: All right. As soon as he comes out, bring him in for me, if you would, please, sir.

(Mr. Martinez returns to the courtroom).

THE COURT: Go ahead and have a seat, if you would, right there, sir. And Mr. Martinez, thank you so much for being with us this morning. We think, in light of what you've told us --

PROSPECTIVE JUROR MARTINEZ: Yes.

THE COURT: -- about your family, that you might be conflicted in this case.

PROSPECTIVE JUROR MARTINEZ: Okay.

THE COURT: And this might not be the best case for you.

PROSPECTIVE JUROR MARTINEZ: I understand.

THE COURT:  So, after conferring with the attorneys, I'm going to excuse you from any further jury service in this case.

PROSPECTIVE JUROR MARTINEZ:  Okay.  Thank you.

THE COURT:  But we do appreciate your time very much.

PROSPECTIVE JUROR MARTINEZ:  All right.

THE COURT:  You're free to go.  Thank you.

(Prospective Juror Martinez excused from the courtroom).

THE COURT:  Gordon, do you want to go ahead and put this on the record?  Hang on just a minute.  Let's get this on the record and then we can get out of here.

MR. HIKEL:  Judge, we move to excuse for cause Juror number 352, Mr. Martinez, in light of the fact that he mentioned at the end of my voir dire that he has one or more family members that were charged and convicted of capital murder and that he could not promise or guarantee us that, if he were to be a juror, that he would be able to separate their situations from his duty and responsibility here as a juror, either to the State or to the defendant. So, we ask that he be excused for cause.

THE COURT:  Any objection?

MR. LOLLAR:  No objection.

THE COURT:  Thank you.  Prospective juror

number 352, Mario Martinez, is -- the State's challenge for cause is granted and he is excused from further jury service in this case.

All right.  Have a good lunch.  See you at 1:15.

(After the lunch recess, defendant present).

THE COURT:  Bring in Ms. Bukin.

(Prospective Juror No. 434, Georgia Bukin, enters the courtroom).

THE COURT:  Yes, ma'am, come on in.  Thank you, ma'am.  Go ahead and have a seat there.

Thank you, ladies and gentlemen.  Be seated, please.

How are you this afternoon?

PROSPECTIVE JUROR BUKIN:  I'm well.

THE COURT:  Is your last name Bukin?

PROSPECTIVE JUROR BUKIN:  It is.

THE COURT:  Okay.  Am I pronouncing that right?

PROSPECTIVE JUROR BUKIN:  Yes.

THE COURT:  Great, good, good.  This is -- Anne, I would like for the record to reflect this is Prospective Juror number 434, Georgia Margaret Bukin, b-u-k-i-n.

GEORGIA MARGARET BUKIN, having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    And how are you this afternoon, Ms. Bukin?

A    I'm good.

Q    Good. We are glad to have you here. Thank you for your time in being with us this afternoon.

I'm Judge Quay Parker, a Senior District Judge from McKinney. And Judge Snipes, the Presiding Judge in this case, has asked me to assist him in the jury selection process. So, that explains to you what I'm doing here today instead of Judge Snipes and why you're here, by the way.

A    Okay.

Q    You were called, it's been probably over a month ago now that all four or five hundred jurors got together at one time in the central jury downstairs and that Judge Snipes talked to you down there.

A    Uh-huh.

Q    And at some point in the proceedings asked everybody to stand up, raise their right hand, and he administered the oath of a prospective juror to each panel member. Do you recall that?

A    Oh, yes.

Q    Okay. Were you one of the panel members that stood and took the oath at that time?

A    Yes, I was.

Q    Okay, very good.  I'll just remind you you're still under your oath.  And what you have been sworn to do is to give truthful answers, but we know you would do that, anyway.

A    Right.

Q    But also to be responsive to each and every question that the attorneys are going to ask you.  I really don't think this is going to take very long and, so, without me going into any more detail about it, I'm just going to let the lawyers talk to you.

A    Okay.

THE COURT:  And, so, Ms. Evans, are you going to talk with Ms. Bukin today --

MS. EVANS:  Yes, your Honor.

THE COURT:  -- for the State?

All right.  You may proceed then.

MS. EVANS:  Thank you.

EXAMINATION

BY MS. EVANS:

Q    Ms. Bukin, do you remember filling out this questionnaire when you came down for the big panel?

A    Yes, I do.

Q    And I believe in here in the question, are you in favor of the death penalty, you say there is a limit to whatever a person can or cannot do.

**Anne B. Meredith**
Certified Shorthand Reporter

And then with regards to the death penalty, in circling what best states your view, you circled number four, I believe that the death penalty is appropriate in some murder cases, but I could never return a verdict which assessed the death penalty.

A      Right.

Q      Is that still how you feel today?

A      It is.

MS. EVANS:  Okay.  Thank you.

MR. LOLLAR:  Thank you, ma'am.  We have no questions.

THE COURT:  All right.  Thank you, Ms. Bukin. We appreciate you being here very much and we appreciate your time, but I'm going to excuse you.  You're free to go.

PROSPECTIVE JUROR BUKIN:  Okay.

THE COURT:  All right.  Thank you very much.

(Prospective Juror Bukin excused from the courtroom).

THE COURT:  Thank you.  You can be seated.

All right.  Ms. Evans, does the State have a challenge for cause?

MS. EVANS:  State has a challenge for cause, Juror number 434, Ms. Bukin.

MR. LOLLAR:  No objection.

THE COURT:  State's challenge for cause on

Prospective Juror number 434, Georgia Bukin, is granted.  The juror is excused from further jury service in this case.

Okay.  Now, let's see, the next one I have is Munson, correct?  Ms. Munson.

(Prospective Juror No. 463, Pamela Munson, enters the courtroom).

THE COURT:  How are you today, Ms. Munson?

PROSPECTIVE JUROR MUNSON:  I'm fine.  How are you?

THE COURT:  Good.  Come on in, if you would, please, ma'am.  Just go ahead have a seat there.  It looks like you had an accident there.

PROSPECTIVE JUROR MUNSON:  Yes, the vacuum cleaner won.

MS. HANDLEY:  That's why you shouldn't do housework.

THE COURT:  That's right, that's a good reason.

PROSPECTIVE JUROR MUNSON:  I didn't get a chance to do it.

THE COURT:  That's a good reason for not --
Thank you.  Be seated.  That's an excellent reason for not doing housework.

PROSPECTIVE JUROR MUNSON:  I know.

THE COURT:  I can't think of a better one.

**Anne B. Meredith**
Certified Shorthand Reporter

Ms. Munson, thank you for being here with us this afternoon.

PROSPECTIVE JUROR MUNSON:  You're welcome.

THE COURT:  I'm Judge Quay Parker and I am presiding over the jury selection process for Judge Snipes.

And, Anne, and I would like for the record to reflect that this is Prospective Juror number 463, Pamela Denise Munson, m-u-n-s-o-n.

And Ms. Munson, I think the attorneys just have a couple of questions to ask you, so we will just get right to that.

PROSPECTIVE JUROR MUNSON:  Okay.

THE COURT:  And Ms. Ellyce -- Ellyce.  Elaine Evans.  There is another prosecutor, Ellyce Lindberg, that I've been with last week and I get them confused.  I'm sorry.  I'm sorry, Elaine.

But Ms. Evans has a couple of questions for you.

PROSPECTIVE JUROR MUNSON:  Okay.

MS. EVANS:  Thank you, Judge.

THE COURT:  You may proceed.  Sorry.

PAMELA DENISE MUNSON,

testified as follows:

EXAMINATION

BY MS. EVANS:

Q    Ms. Munson, do you remember filling out this questionnaire --

A    I do.

Q    -- whenever you were here with the big panel?

A    I do.

Q    And I believe you state in here that, with regards to the death penalty, you circled number five, I could never under any circumstances return a verdict which assessed the death penalty.

A    Never.

Q    Okay. And that is still your opinion here today?

A    That is still my opinion here today.

Q    Thank you.

A    You're welcome.

THE COURT: Thank you, ma'am. We appreciate you being here very much, Ms. Munson.

PROSPECTIVE JUROR MUNSON: You're welcome.

THE COURT: And I'm going to excuse you. You're free to go.

PROSPECTIVE JUROR MUNSON: Why, thank you.

THE COURT: You're welcome. And next time watch out for that vacuum cleaner.

PROSPECTIVE JUROR MUNSON: Oh, my husband took it out so fast.

THE COURT: I don't want to know what happened

to that thing.  Thank you very much.

(Prospective Juror Munson excused from the courtroom).

THE COURT:  Be seated.

Okay.  Ms. Evans, does the State have a challenge for cause?

MS. EVANS:  State would submit Juror number 463 for cause.

THE COURT:  Any objection?

MR. LOLLAR:  No objection.

THE COURT:  All right.  Prospective Juror number 463, Pamela Munson, State's challenge for cause is granted and the juror is excused.

Okay.  Well, you want to go ahead and take Ms. Eger?

MR. LOLLAR:  Sure.

MS. HANDLEY:  Sure.

THE COURT:  Ms. Eger.

(Prospective Juror No. 284, Heather Eger, enters the courtroom).

THE COURT:  Hi, Ms. Eger.

PROSPECTIVE JUROR EGER:  Hi.

THE COURT:  Is it Eger or Eger?

PROSPECTIVE JUROR EGER:  Eger.

THE COURT:  Eger.  Go ahead and have a seat

there, if you would, please, ma'am.  Thank you very much.

Thank you, ladies and gentlemen.  Be seated, please.

Anne, let the record reflect that this is Prospective Juror number 284, Heather Eger, e-g-e-r, correct?

PROSPECTIVE JUROR EGER:  Uh-huh, yes.

HEATHER EGER,

having been previously sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Thank you for being here with us this afternoon, Ms. Eger.  And my name is Judge Quay Parker.  I'm a Senior District Judge from McKinney, Texas.  And Judge Snipes, who is the Presiding Judge in this case, has asked me to assist him in the jury selection process.

So, that explains to you what I'm doing here today and consequently why you're here today as well.

A    Okay.

Q    Do you recall about a month ago that probably four or five hundred panel members met down in the central jury?

A    (Nods head).

Q    And Judge Snipes addressed the group at that time.  At some point in the proceedings he asked everybody on the panel to stand up, raise their right hand, he administered

the oath of a prospective juror to each one of the panel members. Do you recall that?

A    Yes.

Q    Were you one of the panel members that stood and took the oath at that time?

A    Yes.

Q    Very good. I'll just remind you you're still under that oath. And what you have been sworn to do is to give us truthful answers, but we know you would do that, anyway, but also to be responsive to each and every question that's asked to you either by me or by the attorneys involved in the case. Okay?

A    Okay.

Q    Now, then, at that time you also filled out a questionnaire.

A    Uh-huh.

Q    And I know you haven't seen that. This is your questionnaire right here, and I want to give that to you because the attorneys each have a copy. They have gone through it and they will have questions concerning some of your answers and responses to some of the inquiries in that questionnaire.

So, anyway, I'm giving it to you, and they will tell you where to turn and look and maybe want you to expound or explain or something like that.

*Anne B. Meredith*
Certified Shorthand Reporter

You've also had an opportunity to read your juror guide, I guess, haven't you?

A    Uh-huh.

Q    All right.  It's a thumbnail sketch of some of the law, procedural aspects, special issues that are going to be involved in this case.  And when I talked about the questions and answers that the attorneys are going to ask you just a moment ago, do you recall that?

A    Uh-huh.

Q    Let me let you know there's no right or wrong answers to any of their questions.

A    Okay.

Q    Because what they are going to do, this is what's going to happen.  They are going to explain to you the law that you've already kind of got an introductory lesson to by reading the guide.  But they are going to explain it more fully to you, probably give you some examples or some scenarios that don't have anything to do with this case because they can't go into the facts of this case.

But they are going to -- they are going to give you some examples, and then they are going to ask you questions, getting your ideas, your thoughts, your opinions concerning the law, procedural aspects, special issues that will be involved in the trial of this case.  So it's not a test.

*Anne B. Meredith*
Certified Shorthand Reporter

A    Okay.

Q    Nothing you have to pass or you fail and, you know, anything like that.  Nothing embarrassing is going to be asked to you.  All right?

A    Okay.

Q    Okay.  Now, let me introduce you to the attorneys that are involved in the trial of this case.

THE COURT:  This is Ms. Andrea Handley.

MS. HANDLEY:  Hi.

PROSPECTIVE JUROR EGER:  Hi.

THE COURT:  And she will be talking to you today on behalf of the State of Texas.  Seated next to her is Ms. Elaine Evans.  And then on further down here is Mr. Gordon Hikel.

MR. HIKEL:  Hello, ma'am.

THE COURT:  All three of these ladies and gentlemen are assistant district attorneys here in Dallas County and they are the prosecution team.  They are charged with the responsibility of prosecuting this case.

On the defensive side seated right next to me down here is Mr. Brad Lollar.

MR. LOLLAR:  Good afternoon.

PROSPECTIVE JUROR EGER:  Hi.

THE COURT:  Next to him Mr. Doug Parks.  On the very end down there is Ms. Keri Mallon.

MS. MALLON:  Hi.

PROSPECTIVE JUROR EGER:  Hi.

THE COURT:  And they are the defense team, and they represent Mr. James Broadnax who is the defendant seated down there on the end.  All right?

PROSPECTIVE JUROR EGER:  Okay.

THE COURT:  Very good.  Thank you.

Ms. Handley.

MS. HANDLEY:  Thank you, your Honor.  I appreciate it.

THE COURT:  Yes, ma'am.

EXAMINATION

BY MS. HANDLEY:

Q    Hi again, Ms. Eger.  How are you doing?

A    Good.

Q    Good.  I saw your name, Heather Eger, and I went oh, newscaster.  Does anybody ever do that, they get you confused with Heather Hays and Steve Eger, don't they?

A    No, no one ever has.

Q    No?

A    But I've heard about them before quite a bit.

Q    Okay.

A    Uh-huh.

Q    I looked at that and at first I thought, I thought -- I confused you with Steve Eger.  And I don't

suppose that's your brother, is it?

A     No, I'm not from Texas originally.

Q     Okay.  Where are you from?

A     I grew up in Indiana but moved from upstate New York to Texas.

Q     What part of upstate New York?

A     Up on the east side near -- in Lake George, Lake Placid area.

Q     Some people -- I've been up there before and some people say it's kind of like being in Texas when you're really upstate New York.

A     It kind of is.

Q     Yeah.

A     My friend calls it hill country on steroids because it's got mountains, it's beautiful.

Q     There you go.  It is beautiful up there.

When I saw, I saw Eger, at first I thought the newscaster person.  I realized that wasn't right.  And then I went to your occupation and I see that you are a charge nurse in the ER on the rapid assessment team.

A     In ICU, yes.

Q     ICU, I'm sorry.

A     That's okay.

Q     And then I realized, oh, no, that is the coolest job, at Parkland, too.

A    It's pretty interesting.

Q    I bet you've seen some fascinating things.

A    Some weird stuff, yeah.

Q    And sometimes it's like -- I bet it's like a four alarm fire drill down there sometimes.

A    It is sometimes, yes.  It's kind of crazy, yes.

Q    Yeah, amazing.  I know a lot of nurses.  I have friends that work at Parkland.

A    Oh, cool.

Q    And they always have the best stories to tell.

A    Yeah.

Q    My name is Andrea Handley.  I'm an assistant district attorney, and I'm one of the attorneys in charge of helping to select the jury for this particular case. There are other attorneys involved in this case that might be involved actually in the courtroom helping to present the evidence.  One of those gentlemen is David Alex.  He's not here right now.

         But our mission here, what we are doing is, you know, we brought down hundreds of you that day; you remember that?

A    Uh-huh.

Q    And we had you fill out this big questionnaire. And later, if you like, we can submit it to eHarmony, you know, because --

A    Oh, thanks.

Q    -- there's everything you need to know.  I always think this is so much information maybe that that was the true -- no.

But we are bringing literally everybody down here to talk to them.  Okay.  And we go through each questionnaire and we read it and we take each answer thoughtfully and into consideration.  And even though we bring everybody down, there's some people who come in pretty quick and they leave pretty quick.  I think that you've seen that.

A    Yeah.

Q    Because already today, because there are some people who are just not going to be the right jurors for this particular case.  Okay.  And I am sure you can appreciate that this is a pretty big deal here.  This is a death penalty case.

A    Uh-huh.

Q    So, on the one hand, I do not want, and I will tell you this even as a prosecutor, I'm not looking for people who come in and say, look, Ms. Handley, you tell me where to sign and I'll sign a death warrant.  I don't need that person on my jury because they are biased and they are not going to be fair.

And quite frankly, this is so serious a thing

that I'm involved in here that it needs to be taken seriously. And I don't need that kind of person who is going to make those automatic assumptions and not base their verdict on the evidence.

There are other people who say, I can't, I can't do it. Religious or moral reasons or whatnot, I just can't take part in something like that and it would skew the way I look at the evidence. And, so, they are also not qualified to be jurors on cases.

A qualified juror, if you're qualified today, it doesn't necessarily mean you're automatically going to be on the jury. It just means that you'll be in a pool of people that are considered qualified, and later we'll determine exactly who is going to be on that actual jury.

The case should start on August 10th of this year. Is that -- Are you going anywhere? Are you going to Europe or anything like that or getting married or any plans that prevent you from taking part in this?

A     Not around that time. I'm traveling a couple of times between now and then, the end of June and early July.

Q     Okay. Okay.

A     But not in August.

Q     Okay, excellent. A qualified juror, Ms. Eger, is somebody who can follow the law as given to them by the judge, will base their verdict on only the evidence in the case.

A    Uh-huh.

Q    And will find the individual guilty of what they are actually guilty of, be it capital murder, or maybe they are not guilty of that, they are guilty of something else. A juror that will let the evidence fit the crime, and a qualified juror is a person who will let the punishment fit the crime.  Okay?

A    (Nods head).

Q    A person is not qualified to sit on a jury if they are going to make automatic assumptions, if they have already formed a conclusion as to what should happen, or if they cannot go into a case with an open mind, listen to the evidence, reserve their judgment until after they hear the evidence.  That person is not qualified.  Okay?

A    Okay.

Q    Do you think that's a person that you are at this point, somebody who will sit, listen to the evidence, base your verdict on the evidence, and the evidence only, and do what is the right thing for this particular case?

A    I think that I could, uh-huh.

Q    Okay.  And this is a death penalty case.  We are seeking the death penalty in this case.  And if I prove to you beyond a reasonable doubt that James Broadnax is guilty of capital murder, and if I prove to you beyond a reasonable doubt that the special issues should be answered yes, yes and

no, then I'm entitled not only to a verdict of guilty but to have you answer those questions in that way, and the judge will then be called upon to sign basically a warrant for his execution.

Okay.  Is that something that you believe you can take part in?

A    I think so, yes.

Q    Okay.  And you look a little hesitant.  Okay.  And I'll tell you what, I'm glad.  I'm glad.

A    Okay.

Q    Because you should be a little nervous about taking part in something like this.  If you were sitting there going, yeah, tell me where to sign, I would probably say, could we have a time out, and I would ask you to leave.

A    Okay.

Q    Because I don't need that.  I don't need that kind of person on my jury.  I need somebody to take it seriously.  Okay?

A    (Nods head).

Q    I get the impression, and I could be totally wrong, and I would like to cover that with you, about whether or not you're a qualified juror.  I have an opinion on that right now.  But I'm going to tell you this, my opinion in this process and the opinion of the defense attorneys in this process are probably worlds apart.  I

think that's safe to say, wouldn't you think?

A    Probably.

Q    What I think should happen and what they think should happen are totally different.  My opinion, their opinion, that and a buck sixty will get you a cup of Starbucks next door.  Okay?  It doesn't amount to a hill of beans.  What's important in this process is your opinion.

What we are feeling out here is we're trying to explain the law to you because it can be all over the place, and we are trying to feel how you feel about it to determine if you can follow the law and can you be a qualified juror for this case.  So it's important you just be honest.  Okay?

There's no right or wrong answers.  You're free to have an opinion on something.  But it ultimately comes down to, will you follow the law, will you base your verdict on the law?  But we still want to know how you feel because, even though you're qualified, we've still got to go back afterwards and go, is this the right person for the case or not, okay?

A    Okay.

Q    So, I'm reading through your questionnaire and I am getting a good appreciation that I think you have a pretty good grasp on what the law calls for and how the proceedings work.  Do you have any legal background or anything?

A    Huh-uh, no.

Q    Do you hang out with a lot of lawyers or something?

A    Nurses only.

Q    That's probably good.  That is good.

A    It's interesting.

Q    Yeah, I bet it is.  But you've already touched upon, for example, when we asked how you feel about jury duty, you said, it's a big responsibility.  And you're absolutely right, it is.  If you don't take this seriously, then you have no business being here.

And you did say that on page four, I believe.  On the last question, we are asking about your feelings and maybe your family's feelings.  And you said, we feel that only in that it ought to be humane and it ought to also be taken very seriously.

And I couldn't agree with you more.  Okay.  It needs to be taken seriously, and I think that you have a good appreciation for that.

You have also shown what is fundamentally important in all of these cases.  On page eleven we asked you, you know, what if -- about in the middle of the page there we asked you about the statement, regardless of what the judge says the law is, jurors should do what they believe is the right thing, and you said, no, you need to follow the law even if you don't agree with it.  It's there for a reason.

**Anne B. Meredith**
Certified Shorthand Reporter

You are spot on correct on that, and that's the essence of all jury trials in our whole criminal process, okay, is you've got to follow the law.  So, you're right on on that one.

And importantly then on page one we asked you if you're in favor of the death penalty, and you said yes. You said, there are certain crimes in which the death penalty is appropriate, a life for a life.  I think it depends on each case, though, and each case must be evaluated on an individual basis depending on the intention of the criminal.

You once again have hit the nail on the head when you say, I think it depends on each case and each case has to be evaluated on an individual base.  That is absolutely correct.  Okay?

A    (Nods head).

Q    You can't paint every case with the same cloth. You can't do it.  Every case is different.  I've been doing this twenty years.  I've never seen two cases alike, two defendants alike.  It doesn't happen.

Each case I have to look at independently. In each case I can't make a decision on what to do or how to do it until I've evaluated the evidence in the case or until I've evaluated the defendant in the particular case. And then I make my decision on what should happen or how I should proceed.

Criminal trials are supposed to be exactly the same way. It seems you have a very good appreciation for that, so I think we are already off to a good start in that sense. Okay?

As I talk to you here, though, if there is something you don't understand, then by all means please interrupt me. I think if you had to explain to me what a rapid assessment team does and how they do it in forty-five minutes, I would be staring at you like a pig looking at a wrist watch. I would be going what, what are you talking about, you know.

But the law, for all the words and the verbiage and the stuff that we use, really I'll tell you this, that a lot of it's based on common sense and a lot of it's just based on a fundamental fairness proposition, okay, that everyone deserves a fair trial.

If I'm charged with something, I deserve a fair trial. I have a right to it and so do you. We all enjoy the same equal rights. Okay? And it's all really about fairness and it's all really about do the right thing for the particular case and do the thing that the evidence indicates you should do.

Okay. Having said that, have you ever served on jury duty before?

A    Huh-uh.

Q    Okay.  In Texas, criminal trials are usually, they are done in two parts.  We call it a bifurcated trial system.  There's two parts to it.

In the first part the jury is called upon to do one thing, and one thing only, and that is decide whether or not the defendant is guilty of the charge that he's had filed against him.  Not what am I going to do about it, but is he guilty of the charge.

If you find the person not guilty, then under those circumstances you go home, that's it, that's all.  If you do find the person guilty, then you move into the second phase of a trial which is like a separate mini trial all in itself again.

And now you ask yourself, okay, he's guilty, no question about it, that's done.  What are we going to do about it?  And now you look at the punishment aspect.  And that's how our criminal cases work.

And keep in mind that in both phases of the trial nothing is automatic.  Just because somebody's guilty of something doesn't mean there is an automatic punishment that applies.  Okay?

A    (Nods head).

Q    It's always, it's always still open for the jury or a judge, whatever the case may be, to determine what's appropriate for the case.

**Anne B. Meredith**
Certified Shorthand Reporter

But in all criminal cases, be it theft of a loaf of bread from the Kroger or a capital murder case, there are fundamental principles of law that apply across the board. You've probably seen them, read them, heard about them before. They are very popular and they make sense if you think about it.

A    Okay.

Q    As we sit here today, you are to presume the defendant innocent. Okay? Not necessarily presume him not guilty, but presume him innocent. And I will tell you why. Because at this point, I haven't proved a thing to you, have I?

A    Huh-uh.

Q    No, I can only tell you that he's been indicted for an offense. Okay. The law states that an indictment is absolutely no evidence of guilt. It's literally a piece of paper. Okay. It tells him what he's been charged with. It tells me what I have to prove in order to find him guilty.

You can't go into it going, well, he's been indicted. Where there is smoke, there is fire. He must be guilty of something.

The law states this is not evidence of guilt. Do you agree with that?

A    Uh-huh.

Q    Okay. You would follow that law?

A    Yeah.

Q    Okay.  So, as we sit here today, he's presumed innocent because I haven't proved to you anything otherwise. And he stays with that presumption of innocence only if and until I prove to you beyond a reasonable doubt otherwise.

That goes to burden of proof.  The State, the charging institution, the person who brings the charges is always the person who has to bring the proof.  And I think you'll agree with me that that's just fair.

A    It makes sense.

Q    Yeah.  If I charge you with aggravated robbery from one week ago, shouldn't I have to prove it's true instead of you having to prove it's not true?

A    Uh-huh.

Q    It's just fundamentally fair.  That's the law. That's how it is.  I'll submit to you that's how it should always be.

Okay.  It stays that way until I bring that proof to you.  And it's not enough that I just bring some proof to you.  I have to prove it to you beyond a reasonable doubt.

Okay.  There is no definition of reasonable doubt.  I think that, if you had a reasonable doubt about something, that it would be a doubt based on reason and good common sense.  Okay?

A    Uh-huh.

Q    To me that makes sense that that's what reasonable doubt is.  Some people say, if you prove something to me beyond a reasonable doubt, it means I'm pretty darn sure. Some people say, yeah, I think he did it.

You know, what it isn't is that I prove it to you beyond all doubt whatsoever because I think you would have to be standing there watching it in order for that to happen.  Then you would be a witness, and you wouldn't be sitting there, you would be sitting on a witness stand.

So, can you hold me to that burden?

A    Sure.

Q    Will you hold me to that burden?

A    Uh-huh.

Q    Will you ever look to the defense to prove his innocence?

A    Huh-uh.

Q    Okay.  You can do that.  The burden never shifts.

A    Okay.

Q    And they literally could sit there and work a crossword puzzle if they want to.  They are a fine group of attorneys and they are talented and committed, and I don't think they would do that.  But literally they don't have to do anything other than show up, and they have already fulfilled that obligation.  Okay?

If the defendant elects not to testify in his trial, you can't hold that against him either. That fifth amendment right to remain silent that you always hear on the cop shows --

A    Yeah.

Q    -- I think just about probably 75 percent of the population could probably rattle that off. But what it comes down to in a courtroom is this. If a person asserts their right not to testify, because I can't make anybody -- I can't make the defendant testify, and nobody can make him testify. It's his own personal decision. He might listen to his attorneys about it, but you can't force him to.

And if a defendant elects not to testify, to exercise that constitutional right that I have and you have, you can't hold it against him.

So if I put my case on, the State rests, you go back to the jury room, you look at everything that I presented and you say, you know what, Ms. Handley didn't prove that to me beyond a reasonable doubt. She just didn't quite get there. She is about this close, about this close. So, because he didn't testify, I'm going to hold that against him. I'm going to find him guilty. You can't do that.

A    Okay.

Q    Okay. If I prove my case to you and he didn't testify and you think, well, it might have made a difference,

well, that's okay.  But it doesn't matter because I proved it, right?

A    Okay.

Q    Will you respect that right?  Will you follow that particular piece of law there?

A    Yes.

Q    Okay.  When you come into a courtroom, if you are chosen to serve as a juror in a criminal case, your obligation as a juror is to assess the credibility of the evidence in the case.  Okay.  And you assess the credibility of the witnesses in the case.

The judge decides what the law is.  Okay.  He's up there to call the balls and the strikes and to make sure that everything is going in accordance to the law.  But he doesn't work for me and he doesn't work for them.  He's completely objective in this.  He doesn't have an opinion on the facts and the evidence in the case.  He's there for the law.  How credible a piece of evidence is is for you to decide.  Okay?

A    Uh-huh.

Q    And you assess the credibility of evidence by taking it and by looking at it.  You know, people testifying are offering evidence in the court.

The only place you can get evidence in a case is from the witness stand.  You can't, you can't go back to

the jury room and go, this is all fine and great, but let me tell you what my girlfriend told me on break at the ER the other day about this.

That's not evidence in the case, is it?

A    No.

Q    And you can't talk about what you saw on the Internet or you can't go home and tell you what I heard in the newspaper. That's not evidence in the case at hand. Okay?

A    Uh-huh.

Q    Evidence comes strictly to you from the witness stand. You judge the credibility of that evidence. That goes towards the witnesses in the case, too.

We asked you a question about -- We had asked all the jurors a question about officer credibility. What page is that on? Page seven, I believe.

MR. HIKEL:    Seven.

MS. HANDLEY:    Thanks, Gordon.

Q    Where we say, do you believe police officers are more likely to tell the truth than the average person? I think you said yes. My page is kind of cut off here. And you said, you said, I would hope so. They are serving. People need to be honest with them. They are held to a higher standard.

Did I get that right? I was missing some

words there.

A     Yeah, uh-huh.

Q     I'll tell you this.  The law says that you have to judge the credibility of every witness from what comes to you from the witness stand.  Okay?

A     (Nods head).

Q     You have to reserve your assessment of their credibility until they take the stand.  There is nothing wrong with saying, as a group of people, I respect police officers and I tend to believe that they are honest people or, like you said, I would like to certainly hope so.  There is nothing wrong with that.

What you can't do is say, if you tell me a police officer is going to testify, I will tell you I will automatically believe everything he says.

Do you think that would be fair in any way?

A     Uh-huh.

Q     You think so?  Okay.  I think -- I don't know.  I want to make sure what you said.  Do you think that would be fair for you to say, I will automatically believe everything a police officer says?

A     Yes.

Q     Okay.  You will automatically believe everything a police officer says?

A     If he's up there on the stand and he is sworn to

oath, I would think he is telling the truth and I would believe what he says.

Q    If he's telling -- How do you know if he's telling the truth?

A    If he's under oath, he should be telling the truth.

Q    He should be, but --

A    I guess you would have to take everything that everyone kind of says altogether and look at the big picture and not just the one, but look at the big picture and see if it all fits and if it matches, or if what he says doesn't match anything else everyone else says, or does it all kind of fit together and make sense, the whole story together.

Q    I think what you just described to us is you would have to assess the credibility of his testimony, right?

A    True.

Q    You have to wait until the person takes the stand and they get sworn in and then they testify and you go, well, does that make sense?  He said this, but that doesn't wash with what I'm seeing in the physical evidence, or that doesn't really wash with what that witness said over there and, quite frankly, they were in a better vantage point. You assess their credibility.

        Do you think officers ever make mistakes?

A    Sure, they are human.

Q    They are human.  I'll tell you I've been working

with them my entire career, and they are just like you and I in a great sense.  They have got kids who need orthodontry and mortgages that need to be paid, and they make mistakes, you know.

And if I told you that everybody who took the witness stand and swore to tell the truth told the truth, I would be lying to you.  Okay?

A    (Nods head).

Q    Some people get on the witness stand and they lie.  That's a fact.  Some people get on the witness stand and they don't mean to lie, but they are not right.  They are mistaken.  Okay.

The same might hold true with a police officer.  Do you think it's possible they could be mistaken about something?

A    Sure, uh-huh.

Q    Have you ever seen in the TV or the news where some law officers have just flat out lied?

A    I'm sure.  I don't remember exactly, but I'm sure there has been, yeah.

Q    Yeah, yeah.  I can tell you there have been cases.  I can tell you I have sadly had to prosecute police officers before.

A    It happens.

Q    Yeah, it happens.

**Anne B. Meredith**
Certified Shorthand Reporter

A    Uh-huh.

Q    And, so, let me make sure I flesh this out with you because you have essentially described to me assessing the credibility of something.  The law says you can't automatically assume that --

Let me make sure I say this right.  The law says you can't say, if a police officer is going to take the stand, I will always believe that person automatically before hearing what they have to say.

A    I think you would have to hear what -- you have to take it in the whole context.  You can't automatically say, yes, I believe them a hundred percent.

Q    Okay.

A    Because you may not.

Q    Okay.  You'll wait until the person testifies.

A    Uh-huh.

Q    And then you'll assess their credibility.

A    Yes.

Q    Okay.  But if I say today a cop is going to take the stand and the defendant is going to take the stand and they are both going to testify, you don't have any idea what they've just testified to, do you?

A    No.

Q    I haven't told you anything, have I?

A    No.

Q    You know, and I don't know if it would really be fair to say, you know, well, will you automatically believe the cop or will you automatically believe the defendant, because are you able to really assess what's happened here? Have I given you any facts?

A    Huh-uh, you just have the defendant and the police officer, nothing else really.

Q    Yeah.

A    Yeah.

Q    Yeah.  So, you'll wait to assess the credibility of the witnesses before they take the stand.

A    Uh-huh.

Q    Okay.  And you will take all that in in assessing the credibility, all that, the evidence and what other people say and such as that --

A    Yes.

Q    -- before you make that decision.  Okay.  Very good.

All right.  Those are, those are some fundamental principles of law.  I'll hit on a couple more before we move on.

There are certain things that I have to prove to you as a prosecutor in this case, and we call them elements.  They are elements of the crime.  You know, that it happened on a certain date, it happened in Dallas, that

this is the person who did it, that this is the person who was killed and this is how it happened.  They are called elements of the offense.

Every element is just as important as the other.  I have to prove every one of them to you.  I don't get points for proving five out of six.  I've got to prove them all.

A    Okay.

Q    And I have to prove them all to you with that same burden of proof, beyond a reasonable doubt.  Okay.  If I fail to prove any one of those elements to you, the law says that you must return a verdict of not guilty.

A    Okay.

Q    Okay.  Can you do that?

A    Sure.

Q    I'll give you a far-out example, okay, just to illustrate my point here.  I've alleged in the indictment that -- And let's say you're sitting in a murder case and I have alleged that a defendant killed another man by shooting him with a gun.

And the defendant even takes the stand in the case and says, yeah, I killed him and I'm glad I killed him.  Okay.  But then the medical examiner, you know, the M.E. --

A    Sure.

Q    -- gets on the stand and she says, I've done the

autopsy and this man is dead, but he didn't die from a gunshot wound, he died from being stabbed.

Now, I have to prove he died from being shot, don't I?

A    Uh-huh.

Q    Did I prove it?

A    No.

Q    I sure didn't.  What are you going to do?

A    Say not guilty.

Q    Absolutely, that's what you've got to do.  And then you should go upstairs and tell my boss that I need to learn how to read an indictment a little bit closer.  But it's an illustration to show you that you have to follow the law.  No matter how crazy that sounds, you've got to follow the law in each and every case.

And I get a pretty good idea here that you are willing to follow the law and you can follow the law. Is that true?

A    Yes.

Q    Any problems with that whatsoever?

A    No.

Q    Any questions about that at all?

A    I don't think so.

Q    Okay.  Because I'm running through it kind of rapidly, so you'll tell me if I need to back up a little bit

for you.

Let's talk specifically now about the death penalty or, I'm sorry, about capital murder and when that applies. There are actually several different -- there are obviously several different ways you can take an individual's life. Okay?

A    (Nods head).

Q    It's countless, and you have probably seen many things in the hospital there at Parkland. But there's also several different degrees or culpability of murder, several different types of murder, if you will.

The highest one is capital murder and it carries the highest ultimate punishment, a possibility of death. It's not automatic.

A    Uh-huh.

Q    There is a possibility. Under capital murder is first degree murder, intentional murder. It carries a range of punishment anywhere from five to ninety-nine years or life in prison. And that's for the intentional taking of a life.

There is a lesser degree of that, something called manslaughter where I may take a person's life but I didn't mean to kill him, I didn't want to kill him, but I was acting recklessly.

A    Okay.

Q    Okay. And I should have known that what I was

doing might result in their death and now they are dead.

And then there is even a lesser degree and it's called criminally negligent homicide. I didn't mean to kill them, I didn't want to kill them, I didn't even know, you know, that what was going on to the circumstances, but I should have known, you know, and now, as a result, they are dead.

And the different levels carry different degrees of punishment because I think you can appreciate they carry different states of mind, don't they?

A    Uh-huh.

Q    We have gone from, I meant to do it and I did everything I needed to do to kill this person, all the way down to, I didn't even see the guy, I was just being stupid and negligent and now he's dead. Big difference, isn't there?

A    Yeah.

Capital murder. And we asked you about for what crimes you think capital murder should be available, and you put on page four -- you hit the nail again right on the head, and that's why I wondered if you already knew something about capital murder. You said murder, and you put in parenthesis intentional.

A    Oh.

Q    Okay. There is one thing that capital murder is always. Okay. It always involves an intentional murder.

And you need to appreciate the difference between an intentional murder versus anything else. An intentional murder is not a murder in self-defense. It's not an accident.

A    Okay.

Q    It's not an oops, I just meant to hurt him but I accidentally killed him. It's not a, well, I was acting negligent and I killed. An intentional murder means I meant to kill the person and I did whatever was necessary to carry it out. Okay?

A    Okay.

Q    In a capital murder you always have to have intentional murder. But that's not enough. If I pulled a gun out and I looked at Elaine over here and I just shot her fifteen times and I laughed about it, you know, it would be a pretty bad murder, wouldn't it?

A    Yeah.

Q    Fair to say it's an intentional murder, I shot her fifteen times, right?

A    Uh-huh.

Q    It's not a capital murder, though. Okay. And the reason is is because capital murder is actually a very closely defined category of offenses. It's not all murders and it's not all intentional murders.

But it is an intentional murder plus something else. Okay. It is the intentional murder, for

example, of a peace officer while he's in the line of duty. It is the intentional murder of a child under six years of age, or the intentional murder of two or more people during the same criminal episode at the same time, or if I intentionally kill somebody while in the course of committing or even trying to commit another felony offense. I intentionally kill a person while breaking into their house, a burglary, or I kill somebody while trying to rob them, or I kill somebody while trying to sexually assault them. That's capital murder. It's that murder plus something else. Okay?

A    Uh-huh.

Q    And that's what I have to prove to you in capital murder is an intentional murder plus something else. Okay?

A    Okay.

Q    If I don't prove that it was intentional, if I don't prove that plus something else, not guilty of capital murder, right?

A    Uh-huh.

Q    Okay. It doesn't mean we all go home, though. It means you might be called upon to consider, if not capital murder, then what else. Okay?

A    Okay.

Q    We call those lesser included offenses and I hit briefly with you on that. In capital murder, and we will

get back to that, if you find a person guilty of capital murder, only one of two things is going to happen to that person, right?  What are those two things?  He's guilty of capital murder.  One of two things can happen to him now.

A    As far as penalty or --

Q    Uh-huh.

A    From what I understand, either the death penalty or life in prison.

Q    Life in prison without parole.

A    Yeah.

Q    That means the rest of your life.  Okay.  That's capital murder.

If I fail to prove capital murder to you, if I fail to prove there was a robbery or fail to prove it was intentional, you might still be called upon to determine if he's guilty of just murder.  Okay?

A    Okay.

Q    And if a person is guilty of murder and you are a juror on the case, instead of deciding life or death, now instead you decide what punishment to assess in a range of options, what's called a range of punishment.

And you can give that defendant who is guilty of intentional murder anywhere from five years in prison all the way up to ninety-nine years in prison or more -- or life.  Okay?

A    Okay.

Q    And as you said in your questionnaire here, you know, you said that it depends on each case and each case should be evaluated on an individual basis.  That's true for every criminal case.  All right.  You can't make any automatic assumptions.  The law says -- the law doesn't provide that if you find somebody guilty of first degree intentional murder they will automatically get fifty years in prison.  That doesn't happen.  That doesn't exist.

A    Okay.

Q    It says that you now need to assess the punishment, and you have to assess the punishment based on the evidence in the case.  Does that make sense to you?

A    Uh-huh, yeah.

Q    You can't make any snap judgments on what should happen.  I'll give you an example to illustrate for range of punishment.

If I were to say to you, I've got a case where a thirty-five year old man, sane mind, able-bodied thirty-five year old man, knew what he was doing, he planned out and even carried out the intentional murder of a helpless eight year old boy, and he went and did it.  Okay.  He killed him.  Guilty of first degree murder.

What do you think should happen to that guy?

A    He probably should -- the sentence of, you know,

anywhere from five to ninety-nine years, I would think.

Q    Uh-huh.  What's your initial gut reaction, though, without hearing any of the facts?  A man killed a helpless eight year old boy.

A    It's terrible.

Q    It's terrible.

A    Yeah.

Q    I think my gut reaction would be he ought to be put under the prison.

A    Probably.

Q    You know, because that's my gut reaction.  But have you heard any of the details of the offense?

A    Huh-uh.

Q    You haven't.  Could you really assess the punishment properly then in accordance to the law?

A    Not until you heard everything and how it happened and all the evidence.

Q    Exactly.  Because let me change that for you a little bit now.  Okay.  That thirty-five year old man is actually the father of that eight year old boy.  All right?

A    Uh-huh.

Q    And he has been a loving father, a loving husband, a good provider.  He's taken that boy to Cub Scouts and is his best friend.  He loves him dearly and wholeheartedly.  His world moves around him.  That little boy is currently in

Children's Medical Hospital.  He's been diagnosed with terminal cancer.  He is going to die.  There is nothing we can do for the little guy.  He's going to die.

And if that wasn't cruel enough, he's dying slowly and he is dying painfully and it's excruciating.  There is only so much they can do for him.  And that man sits at that bedside every single day, cries more tears than his son could ever be capable of, and watches him writhe in pain and suffer.

And he finally says, I can't let my little guy go through this any more, it's just cruel.  He goes to the nurses' cabinets there.  He knows where they keep the morphine, gets a big bottle of it, comes back and injects the whole bottle into his IV and kills his son.  He holds him in his arms and he cries until he finally dies.

Did he intend to kill that boy?

A    Yes, he did.

Q    Yeah.  Did he kill that boy?

A    Uh-huh.

Q    Did he do everything that was necessary to carry out that intentional murder?

A    Uh-huh.

Q    He did, didn't he?

A    Yeah.

Q    He is guilty of first degree murder.  He wanted to

kill him.  It may have broke his heart, but he did everything that he had to do to purposefully carry out that goal.  His goal in mind at that time was to kill his son.

Does that seem like the thirty-five year old man who takes the AK-47 and goes out to the park and picks someone off?

A    Huh-uh.

Q    That would be the intentional murder of an eight year old boy, too, wouldn't it?

A    Yeah.

Q    See how they might be considered different cases?

A    Yeah.

Q    You would be called upon to look at the facts of the case and then decide where in that range of punishment that man should fall.  Okay?

A    Okay.

Q    I can't tell you where he should; that's your opinion.  But that's just to illustrate --

A    Okay.

Q    -- you know, why we have a wide range of punishment.  And it's also to illustrate to you that you can't tell me what you would do right now without knowing the facts first.

A    Uh-huh.

Q    It depends, just like you put in your questionnaire,

well, it depends.  It does depend.  It depends on the facts in the case.  You've got to wait until you hear the facts.

That's a murder case.  Let's talk about capital murder now.

A    Okay.

Q    Because as I said, if I can't prove capital, you might be called upon to do something else.  But I'm going to talk to you about capital.

I have to prove to you beyond a reasonable doubt that there was an intentional murder.  Once again, not an accident, not an oops, I didn't mean to kill him but now he's dead.  That there was an intentional murder and that it happened in the course of committing or at least trying to commit a robbery.  Okay.

If I prove that to you beyond a reasonable doubt, then I'm entitled to a verdict of guilty.  Okay?

A    Okay.

Q    And if I prove that to you, will you return that verdict?

A    Yes.

Q    Okay.  Once I do that, Ms. Eger, that defendant is now guilty of capital murder.  That first stage of the trial is over.

A    Okay.

Q    Because your obligation to prove him guilty or not

guilty is done.  You have found him guilty.  Okay?  Now we move on to the punishment phase.  And this is where a capital murder case is different than all the other criminal cases because it's not really a range of punishment any more.

And I think a lot of people come in to death penalty cases and they have this idea that once you find him guilty of capital murder, you go back to the jury room and you just decide, well, does he deserve the death penalty or does he deserve life?

And it really doesn't work that way.  You don't sit down and talk about, you know, what should we give him.  You arrive at the verdict instead by answering a series of questions.  And you've seen those questions.

A    Yes, right there.

Q    We call them special issues or questions, whatever you want to call them.  You understand these special issues, they would be, they would be completely irrelevant unless we actually get to a capital murder case.  Okay?

A    Okay.

Q    To the punishment phase.  You've found the person guilty of capital murder.  Remember that presumption of innocence in the first part of the trial?

A    Uh-huh.

Q    There is a presumption that carries now over into the second part of the trial.

A    Uh-huh.

Q    Because he's guilty of capital murder, right?

A    Yeah.

Q    So, what's the best thing he can hope happens to him?

A    Life in prison without parole.

Q    Right.  And what automatically is he going to get now that he's guilty of capital murder?

A    Well, at least that.

Q    At least that.

A    Uh-huh.

Q    There is only one thing that's automatic in this case, okay, and that's he's definitely got life in prison without parole.  There is no question about it.  Okay?

A    Okay.

Q    And when you go into that second phase of the trial, that presumption of innocence is now a different presumption.  You are to presume that that life sentence without parole is the proper thing to do for this case.  Okay.  That's the presumption that you need to have.

The law says you can't go in presuming that the death penalty is the proper thing to do, okay, because as you stated here in your questionnaire, whether or not you get the death penalty depends, doesn't it?

A    Uh-huh.

Q    And should be based on a case by case basis, doesn't it?

A    (Nods head).

Q    And, so, there is nothing automatic about it. You are to presume that life is the appropriate thing to do. And the reason you have to presume that is because I'm asking for a pretty big thing, aren't I?

A    Uh-huh.

Q    I'm asking for the ultimate punishment.

A    Uh-huh.

Q    So, don't you think it's fair, Ms. Eger, that first I ought to prove to you that it's appropriate?

A    Uh-huh, I think so.

Q    Yeah, yeah. And do you think that -- Let me ask you this. Do you think that just because somebody has been found guilty of the intentional, not accidental, not self-defense -- self-defense is a justification for homicide, okay, so we are not talking about that.

A    Okay.

Q    Do you think that just because somebody has been found guilty of the intentional murder of somebody while in the course of committing or trying to commit robbery that they should automatically receive the death penalty?

A    I think it really depends on what all the evidence says and everything like that.

Q    You're absolutely right.

A    The whole circumstances of the offense.

Q    You're absolutely right.  I think sometimes people say, well, you know, you found him guilty of capital murder and aren't you inclined to say that's the kind of person that should die?

Well, that's not the standard.  You know, that's not the standard by which we do these things.  It's not are you inclined to do this or whatnot.

It's does he get the death penalty because of the answering of the certain questions.  Will you base your answers to the questions based on the evidence in the case is what we get to.

A    Okay.

Q    So, coming into it, you're to presume that the proper thing to do is to give him a life sentence.  And you just sit on that presumption that it's the right thing to do until what?

A    Until you prove otherwise.

Q    Until I prove otherwise.  And again, you always look to me.

A    Uh-huh.

Q    And you never come off of that.  And let me tell you right now, I don't need you to give me any favors.  Okay.  I don't need you to go, I'm going to help her out and

lean towards the death penalty. And I don't need any favors. Okay?

A    Okay.

Q    I wouldn't be in this business if I did.

So, here's how this works now. In order for a defendant to be found -- in order for a defendant to receive a death penalty in the State of Texas, I have to first prove to you beyond a reasonable doubt that he is a future danger. Okay. And I'm just kind of paraphrasing right now.

A    Okay.

Q    I have to prove to you that he's a future danger, that he was actively involved in the offense, which you've pretty much already seen that, and I have to -- and then you have to find on your own that the death penalty is the right thing to do.

But you start with that first question. Okay. We call it a special issue. It's up here on the board also. All right. You're going into the second phase of the trial. Have you made any assumptions about what we should do right now?

A    Not yet.

Q    Okay. He is certainly the type of person who would intentionally kill somebody during the course of a robbery, right?

A    Uh-huh.

Q    Okay.  But what is the one thing we can definitely say about him right now?  It's kind of a trick question, but.

A    I'm not sure.

Q    We can definitely say this.  Can we definitely say he deserves the death penalty?

A    Possibly.

Q    Okay.  Possibly.

A    Yeah.

Q    Okay.  But can we definitely say that before looking at any of the evidence?

A    No, I wouldn't say so because I think you still need to look at all the evidence and see before --

Q    Right, right.  We can definitely say this, though. Having intentionally killed somebody in the course of a robbery, he's certainly eligible for the death penalty, isn't he?

A    Uh-huh.

Q    Okay.  But can we say he definitely should get it at this point before we've heard anything?

A    Not yet.

Q    Or before we've looked at the separate issue?

A    Huh-uh.

Q    Okay.  Look at this first issue with me.  We call it the future dangerousness issue.  And it says that I have

to prove --

THE COURT:  Can you see that all right?

Q    Do you see it?

A    Yeah.

Q    It says -- Basically it asks you, but what it's telling you, too, is that I have to prove to you beyond a reasonable doubt.  Again, red flag, what is that telling you?  Who are you looking to for the proof?

A    You are.

Q    You're looking to me, aren't you?

Have I proved to you beyond a reasonable doubt that there is a probability this defendant will commit criminal acts of violence that will constitute a continuing threat to society?

You don't get any definitions of the terms in there.  Okay?

A    (Nods head).

Q    You don't get a definition of reasonable doubt, but we talked about that, and it means you're looking to me to prove it first, right?

A    Uh-huh.

Q    That there is a probability.  Do you see a difference between a possibility and a probability?

A    Yeah, anything is possible.  Probability is more likely to happen.

Q    You are -- I couldn't agree with you more. Possibility and probability --

A    Yeah.

Q    Anything is possible.  Probability, would you agree, is more likely than not?

A    Uh-huh.

Q    If I prove to you it's more likely than not that this defendant will commit criminal acts of violence.  There is no definition of criminal acts of violence.

But you notice what it doesn't say.  It doesn't say that it's more likely than not he'll commit another murder or he'll commit another robbery or he'll commit an assault, that he'll threaten somebody.  It doesn't define what that is.  It's for you to determine what that is.  Okay?

If I were to ball up my fist and punch my co-counsel in the face, and she is just sitting there minding her business, do you think that would be a criminal act of violence?

A    It could, yeah.

Q    It could be, yeah.

A    If she didn't do anything, uh-huh.

Q    Yeah, that's for you to decide.  You know, if I made threats against her family, do you think that might be a criminal act of violence?

A    Uh-huh.

Q    Could be.  That's for you to decide.

So, if I prove to you that it's more likely than not this defendant will commit criminal acts of violence that will constitute a continuing threat to society.

He's got life in prison without parole right now, right?

A    Yeah.

Q    So, where is he going to be the rest of his life?

A    In prison.

Q    In prison.

A    Yeah.

Q    So, when you see society, what do you think of?

A    Well, before I think of that, I automatically thought of everyone else.  But where he's going to be is going to be inside the prison and everything.  He's not going to be out and amongst people --

Q    Correct.

A    -- or out in the world.

Q    Absolutely.  So, do you see how our definition of society, of us being out and amongst everybody, that it could also include prison as a society?

A    Uh-huh.

Q    They live there, they might work there, they go to school there, they eat there, they watch TV there, they

recreate there. It's a society, right?

A    Uh-huh.

Q    So, I have to prove to you it's more likely than not he's going to be a future danger and a continuing threat to the people within that society. Okay?

A    Okay.

Q    Does that make sense to you?

A    Uh-huh.

Q    Okay. It's not enough maybe that he did the capital murder, but I also have to prove to you that he's going to do something in the future.

A    Okay.

Q    Okay. How do you think I would prove that to you?

A    Maybe past history and kind of, you know, maybe even what type of people he hangs out with or like their habits and characteristics.

Q    Sure, sure. Yeah. I'll tell you this. Your answer to that question needs to be based on the evidence in the case. Okay?

A    Okay.

Q    And I will tell you this. You can answer that question by looking at the evidence you heard in the first part of the case. All right?

A    Okay.

Q    And I think we even asked you a question about

that, about if somebody could be eligible -- right here on page four.  Do you think there are crimes which call for the death penalty solely because of the severe facts and circumstances regardless of whether or not the guilty person has committed prior violent acts?

You said yes.  First you said no, then you said yes.  Even though the circumstances are severe or odd or harsh, the person still committed the crime.  Every action has a consequence, good or bad.  We have to accept responsibility for our actions.

I'll tell you this, Ms. Eger, is that in order for you to answer that question, you can actually look to what you just convicted the person of.  You can look to the surrounding circumstances of the criminal offense, the capital murder that he committed.

And it might be, as you say, it might be severe enough or harsh enough that you say, looking back now, reconsidering that evidence, I can say that I think he's going to be a future danger.  Okay?

It's also acceptable for you to say, I can appreciate that and I will reconsider that evidence, but I need a little bit more.

A    Okay.

Q    See what I'm saying?

A    Uh-huh.

Q    So, you could make your decision based on that, but you don't have to make your decision based on that.  But the $64,000 question is, just because you found him guilty of capital murder, intentionally killing somebody -- he meant to do it, all right?

A    Uh-huh.

Q    -- and robbing them, are you automatically going to say he's a future danger?

A    No, I think you would have to look at the evidence, both of them, to be for sure.

Q    That's right.

A    I don't think you can automatically say it, no.

Q    You can't automatically say it, because if you automatically say that before you consider the evidence, are you following the law?

A    Not really, no.

Q    So, will you consider the evidence again before you answer this question?

A    Yes.

Q    Okay.  And now you can sit here and go, do you think he's the kind of guy who you would be inclined to give the death penalty to?  Well, that's not the question the law is asking you.

The law is asking you, will you base this question -- your answer to this question on the evidence in

the case. It doesn't matter what you think right now other than that you tell us that you'll follow the law.

A    (Nods head).

Q    And you'll base that answer on the evidence in the case and you won't make any automatic conclusions. Are you going to do that?

A    Yes.

Q    Or are you the kind of person who is going to say, you prove to me he did something like that, I'm going to tell you he's always going to be a future danger?

A    I think it has to be based on the evidence.

Q    Okay.

A    Yeah.

Q    You know that example I gave you of the dad with the son? That's an out there hypothetical, and my hypotheticals usually are, just to illustrate a point. Okay?

A    Sure.

Q    That man was guilty of intentional murder, wasn't he?

A    Uh-huh.

Q    Well, let's bump up the facts a little bit more and let's say he doesn't know where to get morphine. He doesn't have a key to the nurse's station there. And, so, he goes to the charge nurse and he's known her for years through all the suffering of his son.

And he goes to her and he grabs her by the wrist and he twists her wrist. And he said, you know, Mary, you're going to give me that morphine. She says, I don't know if that's a good idea to give you the morphine. And he twists her wrist, and she says, all right, and she gives him the morphine.

Now, I'll tell you robbery is the taking of something by either force or threat. Okay. So it might be fair to say, has he committed a robbery?

A    Uh-huh, yeah.

Q    And then he goes and he intentionally kills his son, doesn't he?

A    Uh-huh.

Q    Might he be guilty of capital murder?

A    Yeah.

Q    Yeah. A pretty harsh scenario, isn't it? But it's to illustrate. Can we say he will automatically be a future danger?

A    No, I don't think you could.

Q    Yeah.

A    Huh-uh.

Q    But he might be.

A    Could be, yeah.

Q    Could be, too. You could have a guy who commits a robbery from a 7-Eleven, is running out the door to get

away with it and gets hit by a DART bus, okay, and can't move from the neck down.  Maybe physically he would never be a future danger.  But you wouldn't know that until you saw the facts, right?

MR. PARKS:  Your Honor, we renew our motion in limine on that issue.

THE COURT:  Refresh my memory here, Mr. Parks, on your motion in limine.

MR. PARKS:  The motion in limine asks that they be prohibited from using as an example a person for whom it would be impossible to --

THE COURT:  Oh.

MR. PARKS:  -- because it nullifies special issue number one.

THE COURT:  Well, I'll overrule the objection.

Go ahead, Ms. Handley.

Q    (By Ms. Handley)  You might find that he's like Hannibal Lecter and he can still bite through a mask or something.

It's just to illustrate that, you know, you can't automatically say whether or not somebody is a future danger just because, right?  You couldn't for that dad and you couldn't for Hannibal Lecter.  You've got to see first and you've got to wait.

THE COURT:  And we are running out of time,

too.

Q    If you answer that special issue number one yes, that means he's a future danger, and I'll tell you you're close -- you're sitting close to a death penalty now, a death sentence now, because I proved that to you.

You've got to answer a second question, though. And basically what that's asking you, Ms. Eger, is do you find, from looking at the evidence again, that he was either the triggerman, the person who actually killed the person, or that he was a party to the offense and he anticipated somebody was going to die?

A friend and I go to the 7-Eleven to rob it. We drive up there in her car. She gives me the gun. I provide the bullets. She says she is going to sit out there and wait in the car and honk if anybody comes.

I get ready to go in and rob and I say, man, I forgot my mask. And she says, don't worry about it, just shoot the witnesses. I go in, I rob the clerk and I kill the witnesses.

Am I guilty of capital murder?

A    Uh-huh.

Q    Is she guilty too?

A    Yeah, because she --

Q    The law in Texas says she is. If she aided, assisted, participated, you know, in that offense, and she

anticipated that somebody was going to die, then she too is eligible for the death penalty, provided she is a future danger also.

If you answer that question yes, she is sitting on a death sentence now. Okay?

A    Okay.

Q    It's not over yet, though. Now you go to that last special issue. We call it the mitigating -- We call it the mitigating circumstances issue. There is no burden of proof on either side on this issue right here.

A    Okay.

Q    And basically what this is is this is an option for you, this is an option for Heather Eger, okay, that it tells you, go back now and look at all the evidence again in the case, review it all over again. Okay. Look at the circumstances of the offense, look at the defendant, look at his background, where he's come from, what he's done, look at his personal moral culpability.

And when you look at all that, Ms. Eger, if there is something in there that you think lessens his moral culpability, and you think it lessens it sufficiently that really he ought to get a life sentence versus death, then you do that.

A    Okay.

Q    I can't ask you to tell me what's mitigating. I

can ask you your opinion on it, if you think age is mitigating or -- but the point being here is you have to go into it with an open mind.

You can't go into that going, I'm not even going to consider whether or not somebody's age is mitigating. Well, you've got to consider it. You don't have to find it's mitigating. But at least will you consider everything in the case?

A    (Nods head).

Q    And then will you determine whether or not it's mitigating or not?

A    Okay.

Q    And even then will you make the determination as to whether or not it's sufficiently mitigating to turn that sentence over?

A    Okay.

Q    Is that something you think you can do? Even though they are guilty of capital murder, even though they are a future danger, they were a party to it, will you keep an open mind, review all the evidence again, and if you find something sufficiently mitigating to turn that sentence back over to a life sentence, will you do that?

A    Yes.

Q    Can you do that?

A    I think so, uh-huh.

Q     Okay, okay.  And you said, I think so.  I think the question is not, you know, will you turn it over now. The question is, will you look at all the evidence, Ms. Eger?

A     Uh-huh, yes.

Q     Will you give it meaningful consideration?

A     Uh-huh.

Q     Will you make any automatic assumptions right now and say, there isn't a thing you could ever show me to change my mind?

A     No.

Q     Okay.  Because if you did, then you are not following the law.

MR. PARKS:  We are not obligated to change her mind.  It puts the burden of proof on the State. Object that it's a misstatement of the law.

MS. HANDLEY:  I certainly wasn't implying they have a burden to do anything.

MR. LOLLAR:  Judge, we're well over fifty minutes.

Q     (By Ms. Handley)  Is there anything I could do to -- Well, you've answered the question.  Thank you very much. I think they eagerly want to speak to you.

THE COURT:  Okay.  Thank you, Ms. Handley.

Do you want to take a short break?

MR. LOLLAR: Yes.

THE COURT: How are you doing, Ms. Eger? Why don't we just take about a five minute recess, let you relax just a minute.

PROSPECTIVE JUROR EGER: Sure.

(After a recess, defendant and Prospective Juror present in open court).

THE COURT: Just go ahead and have a seat there again, if you would, please, Ms. Eger.

PROSPECTIVE JUROR EGER: Uh-huh.

THE COURT: Thank you. Be seated, ladies and gentlemen.

Mr. Lollar.

MR. LOLLAR: Thank you, Judge.

THE COURT: Yes, sir.

EXAMINATION

BY MR. LOLLAR:

Q    How are you, Ms. Eger?

A    Good.

Q    Good. I'm Brad Lollar again. This is Doug Parks, Keri Mallon, and James Broadnax down here.

I want to talk to you about what we are doing and go over some of the things in your questionnaire with you.

I see that you work as an RN --

A    Uh-huh.

Q    -- at Parkland.  And are you -- if I come in with a heart attack, do I go to you?

A    Almost, yes.  I work in the cardiac unit so, yes, you probably would see me most likely.

Q    Probably would.  Okay.

A    Uh-huh.

Q    Pretty quick, I hope.

A    Yes.

Q    All right.  Very good.  Now, I see that -- where was it?  Okay.  I see that you have a diploma from Word of Life Bible Institute.

A    Uh-huh.

Q    And I see that you belong to a Irving Bible Church in Irving, Texas.

A    Yep.

Q    Now, if you told me you were a Catholic, I kind of know what that means.  If you told me that you were a Methodist, I kind of know what that means.  But tell me about this, the Bible Church and the Word of Life Bible Institute.

A    It's just a Christian based organization.  It's not necessarily associated with any specific religious affiliation.

Q    Okay.

A    It's kind of nondenominational, I guess you would

call it.  Just a Bible based Christian organization.  The Bible Institute I went to for two years.  It's one year just pure Bible study.  We would just like study the Bible.  We would have different lecturers coming from different colleges and stuff that would preach a book of the Bible for a week or so.

And the second year was an optional second year that I did.  It seemed like it focused on missions and like discipleship and that kind of stuff.

Q    Okay.  And where is that located?

A    It's in upstate New York where my parents live.

Q    Oh, okay.  Is that in --

A    It's in Pottersville.

Q    Pottersville.

A    Yeah.

Q    Yes, I saw the book.  And your parents --

A    Uh-huh.

Q    -- live there.  Now, do they work for that institution?

A    Uh-huh, my mom -- There's a couple of different parts of it.  My dad works for the Bible Institute itself.  He's a AV department manager.  He does like all of the audio/ visual stuff and things like that.  My mom's one of the secretaries there.

Q    Okay.  All right.  Great.  Now, does your church

have a position on the death penalty?

A    Not one that's published that I know of, no.

Q    Okay.  All right.  So, whatever you believe about the death penalty doesn't come to you from your church.

A    No, huh-uh.

Q    Okay.  All righty.  And what else?  A couple of little things.  Well, that's the big thing.  I'll get back to that later.

A    Okay.

Q    Okay?

A    Certainly.

Q    Let's see.  Well, yes, let me go to that last page. Read over that statement again.  You marked no and you might have just got confused there

A    Oh, yeah.  No, I've never been convicted of any felony.

Q    Okay.  And you are not under indictment --

A    No.

Q    -- or legal accusation for theft?

A    Yeah.

Q    Okay.

A    Sorry, but then I didn't read the little question.

Q    That's what I figured.

A    Sorry.

Q    Because, frankly, some people have answered that

no, and it's true that they have got a theft case in their background or something.

A    Oh, okay.

Q    And that disqualifies them from sitting as a juror in any case --

A    Okay.

Q    -- in Texas.

A    Yeah.

Q    So we have to ask that.

Go to page four, if you would, please.

A    Uh-huh.

Q    About two-thirds of the way down we ask, do you think the death penalty is ever misued, and you said, yes, it has the potential to scare a person.  What did you mean there?

A    I guess I never had an understanding like exactly how the death -- like I learned more like today, like with the three questions and stuff like that.

Q    Uh-huh.

A    I think, and maybe just from like TV and stuff, watching, you could say that, you know, that they could scare the person to, you know, admitting guilt or something because they might have a possibility of a death penalty. I think that's more, you know --

But I think if you look at all the -- like

after today, I would say probably not, no, as much not misused.

Q    Okay.  And then down at the bottom there, let's see.

A    Uh-huh.

Q    That very last phrase, in that at times the media doesn't seem to, what did you mean there?

A    Sometimes, just from watching the media and things like that, they don't seem to take things with great seriousness.  Just because I feel like a lot of times it's biased and I think, oh, I can't believe they would say that.

Sometimes I think that things that seem to be a lot more serious, they don't seem to portray it with the seriousness that it needs to have.

Q    Okay.

A    Does that kind of make sense?

Q    All right.  Okay.  Well, go over to the next page, page five.  And about halfway down we asked you to explain your response that you are moderately in favor of a sentence of life without parole.  And you said, it's a good alternative, although men and women have it good in prison.

Have you ever visited a Texas prison?

A    Not in Texas, huh-uh.

Q    Anywhere?

A    Huh-uh.

Q    Okay.

A    Well, no, that's not true.  I did in nursing school.  We had to do some like clinicals in nursing.

Q    Okay.

A    So, you know, a couple of hours I guess in a -- it was a state or --

Q    Okay.

A    I don't remember if it was county or state, I'm not sure.

Q    And when you say that you think that men and women have it good in Texas, what do you mean by that?

A    Have it good in prison?  I think that as far as everything is supplied for them as far as they have like opportunities for education to better themselves and they have, you know, they always have food and shelter.

And I guess what I found as far as working at Parkland and things like that, I see a lot of people that are homeless and come in, things like that.  And sometimes, not always, but sometimes those people, the ones that commit crimes, and if they end up in prison, a lot of times they end up with -- they have more in prison than they would on the streets homeless.

Q    Well, that's true, they do get fed and they do get housed.  That's certainly correct.

A    And that's kind of what my perspective was on that one.

Q    Okay.  Just let me tell you, do you like air conditioning in Texas?

A    That's kind of nice.

Q    None of the housing units are air conditioned.

A    Uh-huh.

Q    They have big fans that pull in the outside air. Now, if that air happens to be 110 degrees, that's what you get.

A    It's hot, huh?

Q    But there is no air conditioning in the housing units in any prison in Texas of the 120 different prison units we have.

A    Oh, okay.

Q    So, you know, just so you know that.

A    Okay.

Q    It's not always as good as the people might think it is.

Go to the next answer.  What purpose, if any, do you believe the death penalty serves, and you said, life for a life, the consequences of your actions.

So, I guess what I need to ask is, do you think if a person takes a life that it's only just that their life be taken?

A    I think it really depends on the circumstances, once again, like the circumstances surrounding what the

situation was.

Q    Okay.

A    I think sometimes yes, other times I think no, not always.

Q    Okay.

A    I think there is always --

Q    So, not in all cases.

A    Yeah, uh-huh.

Q    All right.  Down at the bottom we ask you, voluntary intoxication does not constitute a defense.  You agree and you said yes.

Now, at the top of the next page, though, the law in Texas is that voluntary intoxication, either with the use of drugs or alcohol, can be considered as a mitigating factor under Texas law.  Would you agree with that?

A    Yes, I think because it's your choice, though. Like you can choose to drink and you can choose to drink a lot or not drink or drink a lot, you know.  And you know, people get drunk because they choose to drink more and more and more, you know, that kind of thing.

So, I think ultimately it's still your choice and you still have to accept the consequences for what your choice was, whether, you know, good or bad.

Q    Well, and understand that it is not a defense, but the law says that you can look at whether or not a person was

in a state of intoxication, either through voluntary ingestion of drugs or alcohol, and you may decide that that person may not have been in the right mind that they would have been as a sober person.

A    Okay.

Q    And that's something you can take into consideration as mitigation of punishment.

A    Okay.

Q    Do you think that that's something you might agree with or not?  You don't have to.

A    Yeah.

Q    Like I say, there's --

A    I'm not sure.  I guess it would kind of -- I think it is a factor, but at the same time I guess I would still look and see like what, you know, what were they doing beforehand.

Like if they, you know, if they had this all planned out and did they plan to like get drunk as part of it to make --

Q    Uh-huh.

A    -- you know, kind of that whole thing.  Like whether it was part of their intention of that or it was just kind of a, you know -- Because I drink myself, but I am always very careful to know exactly what I am doing, and I will not get drunk.  It's one of my things, you know, and stuff like

that.

And, so, I think it's always -- you know, it can be part of your state of mind. But you still, even though you're drunk yourself, accept those consequences of what you've done.

Q    Yes, you do have to do that. You've got to accept the consequences.

A    Whether it's part of mitigation, I don't know. I think it would kind of depend on what the -- what the evidence all shows.

Q    Well, think on that and we may get back to that in a minute.

A    Okay.

Q    I suppose it would also depend on, for instance, you indicated you drink. I drink on occasion, very rarely.

THE COURT:    Who are you trying to convince, me? I don't care. I drink on occasion, too.

MR. PARKS:    Almost any occasion.

THE COURT:    Almost any occasion. July the 5th, you know.

Q    (By Mr. Lollar) Way back in Palestine, Texas, I remember the first time I drank. Okay.

THE COURT:    They had alcohol then, Brad? I'm sorry.

Q    I suppose you have to look at a person's useage of

alcohol or drugs. And if it's the first time they got drunk, you know, they may not have anticipated the consequences of their actions.

A    Yes, that -- Yeah, I would say that. Kind of depending on what their --

Q    Uh-huh.

A    -- I guess kind of the whole history of whether it's the first time or were they, you know, they always get drunk every weekend or like every once -- or what happens sometimes when they get drunk. Like the history of getting drunk and their friends go, well, every time they get drunk, you know, they always, you know, go driving and are reckless. I tell them not to do it and I take the keys away.

Q    Sure. If it's a repeat type thing --

A    Yeah.

Q    -- then they ought to know what might happen to them if they get drunk.

A    Yeah, their history.

Q    If it's not, then that may be something you could take into consideration?

A    I think so, yeah.

Q    All right. And let me talk to you about the issue of police officers testifying. Now, we asked you on page seven -- and I know Ms. Handley has inquired of you of this.

A    Uh-huh.

Q    Do you believe police officers are more likely to tell the truth than the average person?  Yours is kind of cut off, so I think you answered yes to that; is that right?

A    Yes, uh-huh.

Q    Okay.  And you say, I hope so.  They are serving people.  They need to be honest with them.  They are held to a higher standard.

Okay, and that's fine.  That's a reasonable thing to understand.  Now, you do understand that sometimes police officers don't tell the truth.

A    Uh-huh.

Q    They are humans and sometimes they make mistakes.

A    Sure.

Q    And, so, they may say something which is, in fact, false unintentionally.  And then there are police officers, of course, who have intentionally told falsehoods while under oath.  You understand that that possibility exists?

A    Yes, uh-huh.

Q    Okay.  The problem that we have is if a juror says to us, well, I'm going to believe a police officer if he takes the stand and testifies and I am going to believe everything they have to say.

Are you the type of person that feels that way?

A    I think it's one of those you kind of have to look

at the whole perspective and see if what he says matches everything else that everyone else has kind of said, or whether his story or what he says like is totally opposite of the other witnesses or anything. I think you have to have the whole picture and look at it.

Q    Okay. Let me give you a little test to see how you fall on this. Let's say that you have a situation where you have a police officer who is a detective. Okay. And part of their job is to interview defendants after they have been arrested to see if they will give them a statement, a confession maybe.

Okay. And, of course, you heard about the Miranda rights that a police officer has got to read to a --read and explain to an arrested person before they are able to get a statement from them. You've heard about those.

A    Uh-huh.

Q    Let's say we have a situation where this interview is not recorded in any way. There is no audio recording, no video recording. And the issue is this, whether or not the police officer read the Miranda warnings to a defendant who has been arrested, an arrested person. Okay?

A    Uh-huh.

Q    And the police officer testifies, yes, I did read every one of those Miranda warnings and he voluntarily waived his rights and gave me this statement. It's his confession.

Okay. But then you hear from a defendant, and the defendant in the case says, well, I gave him that confession all right, but I didn't know I had a right not to give him a statement. He never read me these Miranda warnings. Okay?

A       Uh-huh.

Q       And there is nobody else, there is no other evidence on that issue. You've got the police officer saying, yes, I did. You've got a defendant saying, no, he didn't.

Some people tell us, well, in 100 percent of the cases I would side with a police officer on that issue because he's a police officer. How do you feel about that?

A       I guess it would kind of -- I would kind of talk to both of them and see like if they remember the situation, like even possibly like a -- I know it sounds kind of cheesy -- but like a time sequence of like how it happened, kind of chronological order of how it happened.

Something could have gotten missed or someone wasn't paying attention or, you know, I think you should talk to both of them. Like you shouldn't talk to just one or just believe one without talking to the other person, just talk to both of them individually.

Q       So, you're saying it would depend on what you heard from each of them.

A    Yeah.

Q    Okay.  So, you wouldn't automatically believe the police officer.

A    No, not necessarily.

Q    Okay.  All right.  Go with me to page one because I want to talk to you about your feelings about the death penalty.

We asked you, are you in favor of the death penalty, and you said, yes, there are certain crimes in which the death penalty is appropriate, a life for a life.  I think it depends on each case.  Each case must be evaluated on an individual basis depending on the intention of the criminal.  Okay.

A    Uh-huh.

Q    So, I think in your -- This is unkind, but let's say that we will call this the uneducated version of when you came down here and filled out the questionnaire, and now you've been educated about it.

A    Okay.

Q    And you see that when we are talking about capital murder in Texas, all of them have to be intentional murders.

A    Uh-huh.

Q    Okay.  So knowing that, some people say, well, you know, my feeling really is that if it's shown to me that a person intentionally caused the death of another person,

intentionally killed the victim, shot the victim with the intent to cause death and not to wing them, not to wound them, not to harm them, but to cause death -- And that's what we mean when we say intentional, okay?

A    Uh-huh.

Q    -- to me, that is a person who should always receive the death penalty.  How do you feel about that?

A    I think it still depends on the evidence in the case because I think sometimes you could -- you know, a life sentence without parole is more appropriate than the death penalty.

I don't know that there is one specific idea.  It just depends on how everything comes -- how the evidence looks and, you know, how the whole thing comes together.

Q    All right.  So, you're not of a belief that a person who intentionally causes death should automatically receive the death penalty.

A    Not automatically, no.

Q    Okay.  All right.  And turn to page two.  We asked the best argument that you can think of for the death penalty, is when a person intentionally, on purpose, takes the life of another individual.  The purpose of the said person was to harm the other individual.

Well, again, that goes back to the same point.  Now you know that all capital murders have to be intentional

murders.

A    Uh-huh, yeah.

Q    Yet the law in Texas says that not all capital murderers should be put to death.

A    (Nods head).

Q    You understand that?

A    Yes, uh-huh.

Q    Okay.  Is that something you agree with?

A    Uh-huh, yeah.

Q    Okay.  And then, if you would, please turn over to page four again.  We asked you, on a scale of one to ten, how strongly do you believe in the death penalty, and you said a seven.

Okay.  Now, I know in my mind what a ten is and I know in my mind what a one is, but I don't know for sure what a seven is.  Tell me in your own words, why did you choose the number seven?

A    I think ten would be like something you would say like a hundred percent of the time you always have to, you know, you would feel like you always have to put them to death.  One is, you know, like never do.  Five is kind of in between.  I guess seven is a little stronger towards more often than less often.

Q    Okay.

A    Does that kind of make sense?

Q    Yeah.

A    But at the same time, I think like you still have to kind of look and see everything that surrounds the case and like the situation and everything.

Q    Okay.

A    But I feel like there is always a responsibility. Like the consequences for actions like good or bad, you always have to accept responsibility for those. And I think that's where kind of like I feel it needs to be a little bit or maybe it should be more towards the death penalty, still depending. Just because we, you know, we do things, and especially if we are doing it intentionally, you have to accept the consequences of the choice that you made to take someone's life or intentionally do something.

Q    Sure. Now, you said you've got to accept the consequences.

A    Uh-huh.

Q    But, you see, in Texas the consequence is one of two.

A    Uh-huh.

Q    It's either death or life without parole.

A    Yeah.

Q    Both of which are pretty bad things.

A    Uh-huh.

Q    So, yes, we are talking about accepting a severe

consequence, but really we are talking about two horrible things.

A     Yeah, definitely.

Q     Okay.

A     The lesser of two evils, yeah.

Q     Okay. Now, there is something I want to talk with you about because I've mentioned it to most of the jurors that I've spoken to.

Sometimes a juror feels that, if they are selected on a capital murder case, that the victim's families would be slighted if the juror did not return a death penalty.

You see what I'm saying?

A     Yeah, I think so.

Q     That in their concept of justice, if the juror does anything less than return a death verdict, that they will have shown disrespect to the victims and to their families.

A     Uh-huh.

Q     How do you feel about that?

A     I think it's something that -- like it would be very difficult for the families, I'm sure. But at the same time, the family, I think knowing that the person who was indicted, you know, went through the fair trial and through all of the -- everything that he has rights to as far as

**Anne B. Meredith**
Certified Shorthand Reporter

the law is concerned, that they kind of -- I guess it sounds a little jaded, but they kind of have to accept what the law has given. You know what I mean?

And I think as long as, you know -- and obviously everything would be followed along the line of, you know, they kind of have to understand that that's as much as they can do. You know, and the jury -- They have to, kind of have to accept it because they are obviously going to be a little bit more emotionally attached obviously if they are family members.

Q    Sure.

A    You know, sometimes it's harder to be objective when you're, you know, that closely attached.

Q    Okay.

A    So I think, yeah.

Q    So, would I be correct in saying that you would not feel that you have let a family down if you were to sit on a case like this and return a verdict of life without parole?

A    No, I don't think so. I wouldn't feel like that. As long as, you know, we, as a jury, really felt like we did our best for, you know, at the end, you know, the person who was indicted.

Q    All right. Okay. Well, and let me make sure there's a couple of things that you understand. The law in

Texas never requires that a death penalty be returned.

A     Okay.

Q     Never, ever, not for any type of offense.  Not for a mass murder, a serial murder, murder of a police officer, murder of more than one person, murder during the course of a robbery, a burglary, a sexual assault, or anything.  There is no offense that requires the return of a death sentence.

A     Okay.

Q     Okay?  And I think a lot of people don't know that. A lot of people think that if you get convicted of X offense, then the penalty has to be death.  There is no offense in Texas law that requires the death penalty.

A     Okay.

Q     Okay?  And let me make sure that you understand one other thing about the sentence of life without parole.

How long do you think a person really has to spend in the penitentiary if they are given life without parole?

A     I would assume the rest of their life, I mean.

Q     That is correct.

A     Yeah.

Q     Until the day they die.

A     Yeah, I would assume so.

Q     Okay.  And some people come down and tell us, well, I think twenty years or I think, you know, twenty-five, forty

years, whatever. But they think that if they are assessed a sentence of life without parole, that if they do good works in the penitentiary, if they say stay out of trouble, not get into trouble, you know, that at some point they amass enough good time credits or brownie points, or something, that they are released. That is not true.

A Yeah.

Q A person sentenced to life without parole will die in the penitentiary.

A Okay.

Q Even if they win the Nobel Prize, okay?

A Okay.

Q They won't get to go to Oslo to pick that up if they are going to be stuck in the Texas penitentiary system.

A Okay.

Q I want you to understand that.

A Okay.

Q They are there until the day they die.

A (Nods head).

Q Okay. So, in either event, it is accurate to say that if a jury finds a defendant guilty of capital murder, then they are going to die, following that verdict --

A Uh-huh.

Q -- in the penitentiary system --

Q Yeah.

Q    -- through lethal injection at a time appointed by a judge, or from whatever cause, at whatever time, at a time appointed by God.  You understand that?

A    Sure, yeah.

Q    Okay.  All right.  Now, the way Texas law determines for a person convicted of capital murder whether they get life without parole or death are these three special issues about which we've talked before.  Okay?

A    Uh-huh.

Q    The first special issue really is a biggie.  Okay?

THE COURT:  Let me move back here.

Q    And let's read that again.  It says --

Now, understand, before we start talking about these special issues, where you are as a juror.  Okay?

A    Okay.

Q    You have been selected as a juror in this capital murder case.  You have heard evidence.  You've heard all the evidence that both sides are going to present to you on the issue of guilt or innocence, and both sides have argued the case to you as a jury.  You've gone back to deliberate and all twelve of you have unanimously decided that a defendant is guilty.

A    Okay.

Q    Okay.  Now, obviously if you've got a doubt about it, then you find him not guilty, or you find him guilty of

some lesser included offense, perhaps of murder if the State hasn't proved that the murder took place during the course of a robbery.  Okay?

A    Uh-huh.

Q    Or if you're not sure that the defendant's actions caused the death of the individual but they were doing a robbery, okay, you could find them guilty of aggravated robbery instead of murder.  Okay?

A    Okay.

Q    Or vice versa, you could have a situation where you find that they committed the murder, but you're not sure it was during the course of a robbery.  So, there are lesser included things, lesser included offenses that fall out of a capital murder indictment.

A    Okay.

Q    And in terms of the homicide part of that, you can have murder, you can have voluntary manslaughter, you can have criminally negligent homicide, okay, depending upon what the mental state of the defendant on trial had at the time of the commission of the offense.

The law specifically allows either side to introduce evidence during the first part of the trial about what the mental state was of the defendant at the time he committed the offense.  Okay?

A    Okay.

Q    And whatever -- We've got four mental states in Texas. It's called intentionally, knowingly, recklessly, or with criminal negligence.

Okay. And the examples that I think you've already heard, first of all, for it to be capital murder, you have to find that they did the act intentionally. Okay?

A    Uh-huh.

Q    Again, in doing what they did, they intended to cause the death of the victim. Okay. If you doubt that, you can look at whether or not they did the act knowingly, and that's whether a defendant knew in what he was doing that death may occur, not necessarily would occur, but may occur. Okay. That's knowingly.

Recklessly is when a defendant is aware of a substantial and justifiable risk but consciously disregards that risk and does what they are going to do. For instance, on New Year's Eve it is a tradition among some people to go out on the front porch at midnight and shoot their gun up in the air. Okay?

A    (Nods head).

Q    And they know that there is a risk involved with that, but they consciously disregard it and go out and shoot the gun off in the air. Well, sometimes those bullets go up and come back down and hurt somebody, may even kill somebody.

Well, that is a criminal offense. That's

manslaughter.  Okay?  They didn't intend to cause the death, not even knowingly caused the death, but they were aware of the risk and they consciously disregarded the risk and it resulted in a homicide, resulted in a death.  Okay?

And then we have the situation where a person may not be aware of what they are doing basically, not to the point where it's insanity, not to the point where they didn't know the difference between right and wrong.

But, for instance, if I'm driving down the road, not paying any real attention, and I am looking over trying to get a CD to put into my player there in the car and I run over somebody and kill them, well, I didn't intend to.

A    Uh-huh.

Q    But that's something I should have been aware of, but I was not, and that resulted in a person's death.  That's called criminal negligence.

A    Okay.

Q    Okay?

A    Uh-huh.

Q    All right.  So, those are the different mental states that can lead to a jury finding a person guilty of an offense lesser than capital murder.  Okay.  But if you do that, if you do go into one of the lesser included offenses, understand that these special issues don't apply.

Okay?

A    Okay.

Q    Life without parole doesn't apply, and death certainly is off the table --

A    Uh-huh.

Q    -- as a possible punishment.

Okay.  If you find them guilty of a lesser included, then the judge will tell you what the penalty range is for an offense.  Like for murder, it's five years up to ninety-nine years or life.  For manslaughter, it's two to twenty.  Okay.  For criminally negligent homicide, it's anywhere from six months up to two years.  Okay?

A    Uh-huh.

Q    So, you would be given that range of punishment and then you would get to choose, as a jury, where in there you want the defendant's punishment to be.

Okay.  Does that all make sense to you?

A    Uh-huh.

Q    Okay.  That's something you could do if faced with those situations?

A    Okay.

Q    That's a question.  Is that something --

A    Oh, yes.

Q    And, for instance, in a murder case, the penalty range again is anywhere from five years up to life.  Okay.

Some people tell us, well, if I found somebody guilty of knowingly causing a death, there is no way I could give as little as five years.

How would you feel about that?

A    It seems like -- it seems like five years is a little bit short for something as much as, you know, taking someone's life.

I don't -- I think, once again, I have to look at all the evidence and see the surrounding circumstances and what was going on and everything.

Q    So, you wouldn't close your mind to it.

A    No, I don't think so, huh-uh.

Q    Okay.  It just depends on what kind of facts you hear.

A    Yeah, it kind of depends on the whole situation around it and what's going on.

Q    Okay.  All right.  Okay.  Now let's talk about, though, if you find a person guilty of capital murder. Okay?

A    Okay.

Q    Then we are looking at these special issues.  We have a punishment phase.  The State puts on whatever they want to put on.  We put on whatever we want to put on.  We don't have to put on anything.

But, now, understand that after you hear

evidence in the second part of the trial, again you go back and you don't sit around a table and say, okay, we know our choices are death or life without parole, how many vote for death, how many vote for life without parole.  You don't do that under our law.

A    Okay.

Q    What you do is answer these three special issues.  Okay?

A    Uh-huh.

Q    And determining or depending on how you answer these special issues tells the judge what the judge must do.  Okay?

A    Right.

Q    The judge has no discretion.  Okay?  The judge cannot disagree with your verdict.

A    Okay.

Q    Okay.  For instance, if you decide, if the jury decides to answer these special issues in a way that calls for death, that's what the judge has to do.

A    Okay.

Q    He can't change it to life without parole.  And, conversely, if you, as a jury, decide these three special issues in such a way that it comes out life without parole, the judge cannot change that to a death sentence.

A    Okay.

Q    Okay.  It's whatever the jury decides, the judge must do.

A    Okay.

Q    Okay?  All right.  So, the point I want to make with you now, by the time you get back and are considering these three special issues, one thing we know for sure, you twelve members of the jury have unanimously decided that the State presented evidence that convinced you all twelve beyond a reasonable doubt that the person on trial is an intentional murderer who killed his victim during the course of robbing that victim.  Okay?

A    Okay.

Q    Now, we've had jurors tell us, well, if the State has convinced me of that, then I'm leaning towards a death penalty or will definitely answer these questions in such a way as to result in a death penalty.  Okay?

A    Uh-huh.

Q    And other jurors say, no, even though I have found the person guilty and I know that they are an intentional murderer who took their victim's life during the course of a robbery, I am not leaning towards a death penalty and I am not going to answer them in ways so the person will get a death penalty.  Okay?

A    Okay.

Q    How do you feel about that?

A    I think it -- I think it still comes back to the evidence and what the, you know, kind of maybe even the person's history, the person inside their history.

Like if this is like a one time thing or, you know, if it looks like there is more of a repetition and things like that.

Q    Okay.  So, a person's perhaps criminal record --

A    Uh-huh.

Q    -- would be important to you in deciding special issue number one?

A    I think so, yeah.

Q    Okay.  And even if they don't have a record, if you hear about whether or not they have committed criminal acts of violence in the past.

A    Uh-huh.

Q    Or not.

A    Yeah, either way.

Q    Either way.  Okay.  So, that's something you would look at?

A    Yeah, uh-huh.

Q    Okay.  All right.  That's very reasonable.

Let me tell you about special issue number one, that the law presumes that the answer to that is no.

A    Okay.

Q    Okay?

A    Uh-huh.

Q    The law presumes the answer is no, and it puts a burden on the State to prove that that no answer should be changed to a yes answer.

A    Okay.

Q    Even though the person has been convicted of capital murder.  And let me inform you of that.

A    Okay.

Q    That is the law.  And we know that because of the way the question is written by our legislature.  Do you find from the evidence beyond a reasonable doubt.  Okay.  So, again, that's the same burden of proof that the State had in the first part of the trial.

A    Uh-huh.

Q    To prove a defendant guilty beyond a reasonable doubt.  So, there is a presumption that the answer to that question is no.  It is a duty of the State to persuade the jury unanimously that this person will be a future danger. Okay?

A    Okay.

Q    Would you be able to hold the State to that burden of proof?

A    Yes, because I think, from what the law says, they should have to prove it.

Q    I'm sorry?

A    The law says they should have to prove it, I think, so.

Q    That's right.  The law does say that.

Okay.  Now, let's read it together.  Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?  So, necessarily that question asks a jury to look into the future.

A    Uh-huh.

Q    Okay.  So, you can look at it this way.  That the dividing line between those that get life without parole and those that get death is not what the person has been convicted of but what they are likely to do in the future.

A    Okay.

Q    Would you agree with that?

A    Uh-huh.

Q    Because that's what that question counts on you to do.

A    Yeah.

Q    And, so, if you look at whatever evidence there is, the life history of a defendant, their prior criminal record, a lack of prior criminal record, a lack of history of criminal violent acts, you look at all that type of evidence and you decide, as a jury, whether or not that

evidence proves beyond a reasonable doubt that this is a type of person who is going to continue to commit criminal acts of violence no matter where he is.

And you know he'll be, as a practical matter, in the penitentiary. Okay?

A    Uh-huh, yes.

Q    Is that something you think you could do?

A    Yes, I think so.

Q    Okay. And you would hold the State to their burden of proof.

A    Uh-huh.

Q    Okay. Some people tell us, well, now, wait a minute, you're asking me to look at something and decide beyond a reasonable doubt that a person is going to commit criminal acts of violence in the future. I can't do that. I cannot -- I'm not a mind reader. I'm not a seer. I am not God. I cannot tell what a person is going to do in the future.

A    Uh-huh.

Q    Okay. Do you feel that way?

A    I can see why people would say that. I think if the State really does a good job and, you know, beyond a reasonable doubt, I think there would be evidence or like you could create a -- I'm not sure what the word is -- like a characteristic kind of thing that would show that there

is, you know, a high probability the defendant would continue to do, you know, criminal acts of violence.

Q    Okay.  Now, that's something you would hold the State to do?

A    Uh-huh, yes.

Q    Okay.  Well, let me tell you this.  Other people tell us, well, now, if you show me a person who is an intentional murderer and you have proven to me beyond any reasonable doubt that that's the person also who chose to do a robbery with a gun, that that is always going to be the type of person who, in my mind, is the type of person who is likely to commit criminal acts of violence in the future.

How do you feel about that?

A    I think a person can always change.  I think that, you know, sometimes someone does an act of violence like that or a crime like that and, you know, sometimes they may change and other times they may not.

But, you know, something may happen in a person's life that they realize, you know, what they have done.  You know, that's not for me, I want to change.

And the opposite can certainly be true, too.  Someone may commit a crime like that and say, you know, I really, not that it was fun, but you know, it was a -- they got a high from this and they will continue.

But I think it depends on the person, really.

*Anne B. Meredith*
Certified Shorthand Reporter

Q    Okay.

A    I think a person has the ability to change.

Q    All right.  So, you'll wait and see the evidence.

A    Uh-huh.

Q    And you will make your decision after you see the evidence.

A    Yes.

Q    And you will hold the State to the burden of proof that they have.

A    Yes.

Q    Which you recognize is a high burden of proof.

A    Uh-huh, yeah.

Q    Okay.  Now, and it's meant to be.  See, these special issues were meant to be barriers to the imposition of the death penalty.

A    Uh-huh.

Q    Okay.  They are not meant to be speed bumps on the way to the death penalty.  They are barriers to the imposition of the death penalty and they are put there by the legislature.

A    Uh-huh.

Q    Okay.  Let me tell you that if the jury gets to special issue number one and you all discuss that and you decide that the State has not shown beyond a reasonable doubt that the defendant is going to be the type of person

to continue to commit criminal acts of violence, okay, then that's it. That's the end of your deliberations. You sign the verdict sheet and say no.

It's a yes or no deal. You sign no, you sign names on it, you come back and give that to the judge. And at that point the judge would immediately sentence the defendant to life without parole. Okay?

A    Okay.

Q    And you have done your job. You never even get to two or three because you've done your job in determining the answer to special issue number one. Okay?

A    (Nods head).

Q    That's it. If you unanimously agree, though, that the answer to special issue number one is yes, then you go on to special issue number two. Okay. And that has to do with the parties issue. I know Ms. Handley talked to you about parties. That's where, you know, two or more people agree to do an offense.

A    Uh-huh.

Q    And as a result of that offense, it has to be shown to you that the person on trial, the defendant on trial either was the one that caused the death, in other words, was the gunman, or, if they weren't the gunman, they intended that the person with the gun caused the death or anticipated that the person would cause the death. Okay.

So, that's again an issue that the law puts the burden on the State to prove beyond a reasonable doubt. There is a presumption that the answer to that special issue is no. Okay. And, again, that's something you're going to look at the evidence to determine.

A    Uh-huh.

Q    And if you have a doubt that the person on trial was the gunman or if you have a doubt that they didn't intend the death to occur or didn't anticipate that the death would occur, then you answer that question no. Okay?

A    (Nods head).

Q    And that's it. You don't have to go any further. You have done your job. You write no on the verdict form, go back and give it to the judge, life without parole. Okay?

A    Okay.

Q    See how that goes? Okay.

Now, let's assume that you and the other eleven jurors have unanimously decided that the answer to that question is yes. Okay. So, you've got guilty of capital murder, yes, yes. Now you're sitting on a death penalty. Okay. You are at a death penalty.

Special issue number three allows you to back off of that, for whatever reason. Okay?

A    Okay.

Q    And instead assess a life sentence without

parole.  Okay?

A    (Nods head).

Q    And let's read that together.  Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?  Okay.

A    Uh-huh.

Q    That's what we call the mitigation issue.

A    Okay.

Q    Okay.  Mitigation is something that lessens the penalty as opposed to aggravation which makes the penalty worse, okay, for lack of a better explanation.

A    Okay.

Q    Mitigating circumstances, the law tells us, can be anything that each individual juror wants them to be.  Okay?

A    (Nods head).

Q    Let us turn in your questionnaire again over to page -- where is it?

            MR. PARKS:  Eight.

Q    -- eight.  Yeah, page eight in your questionnaire,

about, oh, three fourths of the way down.  Some people feel genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime.  What do you think?

Only a little consideration.  You know, killing someone is wrong.  No matter how you grew up, you still choose.

And that may be true in 99 percent of the cases out there.  But you see, that's exactly the type of thing that special issue number three directs you to look at.

A    Okay.

Q    Okay?

A    Uh-huh.

Q    You look at this as taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background.  Okay?

A    (Nods head).

Q    So, all of these things would necessarily be part of a defendant's background.

A    Uh-huh.

Q    Okay.  Do you think you would be, you would be able to look at those type of things and apply them to special issue number three?

A    I think so, yeah.

Q    You see why the law would allow you --

A    Yeah.

Q    -- or even direct you to do that?

A    Yeah, uh-huh.

Q    And Ms. Eger, you know, we could spend days debating, I suppose, whether certain people have a free will in certain circumstances, in certain situations.

A    Uh-huh.

Q    And certainly if a -- You know, I can take a dog and make them a bad dog.

A    Uh-huh.

Q    I can make them a dog that bites.  Okay?

A    Uh-huh.

Q    And people are like that, too.

A    Uh-huh.

Q    You know.

A    I thought I said yes, uh-huh.

Q    So, what that special issue allows is for a jury to look at the background of a defendant to see whether or not they have been made the person that they are today, the person that they were the day of the offense.

A    Okay.

Q    Okay?

A    Uh-huh.

Q    And getting back to an issue, on page six, I think it is, again back to that issue at the top of that,

intoxication. Okay. Now, we've already told you a person's voluntary intoxication is not a defense. Okay. But in any law -- in any case the law says that a jury can consider intoxication in mitigation of punishment.

Well, and again getting back to these special issues, number three, the law says that if a jury hears evidence that a person was intoxicated, under the influence of alcohol or drugs, at the time of the commission of the offense, that that is something that a jury can use and say that it is a sufficient mitigating circumstance to get them off the death penalty --

A    Uh-huh.

Q    -- and on to a life sentence. Is that something you believe?

A    I think it could be. I'm not sure. I guess it's one of those things that it just kind of depends on all the rest of the circumstances surrounding it.

Q    Sure.

A    Like what, you know, what caused him, if he was intoxicated, what caused him to get intoxicated.

Q    Uh-huh.

A    It's just kind of the whole situation, I think. I feel like you would kind of have to look at the whole big picture, not just like the one little part.

Q    Right.

A    But I think it could very possibly be considered a mitigating circumstance.

Q    Okay.  Now, we've had jurors who absolutely say that.  Some jurors say, well, if I believe that the person was not in their right mind because of the alcohol or drugs at the time of the commission of the offense, that that's something that I would always find is a mitigating circumstance.  We have jurors that say, I may hear that, but that to me would never be a mitigating circumstance.  And then we have jurors that are in between, in the middle part.

Where would you fall in that spectrum?

A    I think I would kind of be in the middle because I think it kind of, it kind of depends on what's going on with the person.

Q    Okay.  All right.  Some people think that certainly lack of a prior violent history or lack of a prior criminal record is a mitigating circumstance in and of itself.

Can you see how that might be?

A    Uh-huh, yeah.  I think I would agree just because if it was just a one time thing, you know, I think you need to look at that and consider that in the spectrum of, you know --

Q    Okay.  Some people think that if they hear evidence that in this situation that led to the murder, if the person on trial was a follower and not the leader in that enterprise

of people that committed those offenses, that that might be something that would cause them to back off of the death penalty.

A    Yeah.

Q    It could be a mitigating circumstance.

A    I think that could definitely be a mitigating circumstance, uh-huh.

Q    Okay.  And, again, this issue about their life history of the person on trial.  If you find that things have happened to them, for instance, sexual abuse as a child.  People have told us that that can be a mitigating circumstance in and of itself.

A    I think it could be.  I think you have to look and see kind of like whether they have dealt with that as far as, you know, whether they were abused as a child, or whatever it is, if they have dealt with it and tried to work through it or if it's something that, you know, just came up recently and they kind of realized they were dealing with it, quote, unquote.

Q    Sure.

A    I think it's kind of -- but I think it could be.

Q    Okay.  And we have had people tell us that if they hear evidence from friends and relatives of the person on trial that know him best, been with him all his life, and that if they hear evidence from them that this act was an

aberration for them, that they are normally not like that, they are normally not violent, that that is something they could look at as being a mitigating circumstance.

A   I think that could be because that could kind of tell you, you know, whether it's just a one time, like not absolute but, you know, just a one time thing or whether it's, you know, a character thing that, you know, could happen sequentially, you know, happen again kind of.

Q   Okay.  What the law says, Ms. Eger, is this.  That when the jurors go back there to deliberate special issue number three, okay, each juror has to make their own personal determination on that, on that question.  Okay.  It's not a situation where you take a majority vote.  Okay?

A   Okay.

Q   It is not a situation like that.  Each juror has to make their own personal moral judgment in consideration of special issue number three.  Okay?

A   Okay.

Q   Now, it may be that you look at all of the evidence and you have determined in your mind that there is a sufficient mitigating circumstance.

A   (Nods head).

Q   And your personal moral judgment is that the person should not die.  Okay?

A   Okay.

Q    Now, because that is a personal moral judgment, in that event, would you think it would be appropriate that somebody else on the jury try to talk you out of your own personal moral judgment?

A    If it's supposed to be something that's like each individual juror, then I don't think so, no.  I think it should be your thing, and it doesn't matter what everyone else says, it needs to be your opinion.

Q    That's exactly right.  And nor would it be appropriate for you to try to talk somebody else out of their own personal moral judgment.

A    Exactly.

Q    Would you agree with that?

A    Yes, uh-huh.

Q    Okay.  Let me tell you one other thing.  The law says that a juror can decide to exercise mercy in answering that question not based on any sufficient mitigating circumstance.  Regardless of the mitigation, that you can decide to be merciful, and for that reason, and that reason alone, answer that question yes.

MS. HANDLEY:  Your Honor, I'm going to object as a misstatement of the law.

MR. LOLLAR:  No.

MS. HANDLEY:  Mr. Lollar is saying that the juror can find there is no mitigating circumstance --

MR. LOLLAR:  That's exactly right.

MS. HANDLEY:  -- yet overturn the verdict.

MR. LOLLAR:  yes.

MS. HANDLEY:  I think that's also a misstatement to imply that the juror doesn't have to deliberate with the other jurors about the evidence in the case.

THE COURT:  Ms. Eger can read the special issue number three.  It speaks for itself.  It has to be --

MR. LOLLAR:  Gregg versus Georgia, your Honor, 428 --

THE COURT:  -- a mitigating circumstance or circumstances.

MR. LOLLAR:  Also Morgan versus Illinois and Rogers v. State.  Mercy alone irregardless of the mitigating circumstances.

MS. HANDLEY:  Again, your Honor, I take issue with that.  I think that their verdict has to be based, of course, on the evidence, and there has to be a finding of a sufficient mitigating circumstance.

MR. LOLLAR:  That is just flat smooth wrong.

MS. HANDLEY:  I think --

THE COURT:  Well, let's not get into an argument about this.  Special issue number three speaks for itself.  Ms. Eger can read it.  Both of you have explained

it to her, you know, and that's within her perview and her judgment as to what is sufficiently mitigating circumstance or circumstances.

MR. LOLLAR: See, the Supreme Court --

MR. PARKS: Has the Court overruled or sustained the objection?

THE COURT: I sustain the objection.

Q    (By Mr. Lollar) The Supreme Court of the United States has said, and the Texas Court of Criminal Appeals has said, that although there are certain things listed there in special issue number three as things that might be mitigating circumstances, that is not an exclusive list, and anything that a juror wants to consider as a sufficient mitigating circumstance can be a sufficient mitigating circumstance for the juror. Okay?

A    Uh-huh.

Q    Now, let me talk to you about one more thing and I think I'm through unless you have questions.

A    Not so far, huh-uh.

Q    Okay. All right. Now, when in a normal case, in any type of criminal case other than a death penalty, other than a capital murder case, okay, where the State is seeking death, if a jury goes back into the jury room and is unable to reach a verdict, okay --

A    Okay.

Q -- then that trial is not resolved. Okay. You've got to start over with another jury. I mean that's up to the State whether to do it again, but that's basically true. If the jury is unable to reach a unanimous decision, then it's not resolved.

That is not true in a case where the State is seeking the death penalty in a capital murder case. Okay. And, again, going back to special issue number three, the law anticipates that each juror will exercise their personal moral judgment. Okay?

A Uh-huh.

Q And only in the event that all twelve jurors unanimously agree that there are no mitigating factors sufficient to avoid the death penalty does the person get the death penalty.

A Okay.

Q But if one juror disagrees with that and thinks that there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life without parole, that's what's going to happen.

A Okay.

Q It is a resolution, even though the jurors do not agree.

A Okay.

Q Okay?

A    That makes sense.

Q    All right.  Now, you are a very educated juror.  Okay?

A    I think so.

Q    And I suppose if we had you do your questionnaire over again, you would have different answers.

A    Probably a little bit, yeah.

Q    All right.  Do you have any questions, ma'am?

A    I don't think so.  No, I can't think of anything.

Q    Okay.  Can you be a juror in this type of case?

A    Yeah, I think so.

Q    Hold the State to their burdens of proof?

A    Uh-huh.

Q    And do what these special issues require a jury to do?

A    Uh-huh, yes.

Q    Thank you, Ms. Eger.

THE COURT:  All right.  Thank you, Mr. Lollar.

Ms. Eger, I'm going to ask you to step outside with my bailiff for just a moment and let me confer with the attorneys, and I will bring you back in and give you a result here in just a moment.

(Prospective Juror Eger exits the courtroom).

THE COURT:  Okay.  Thank you.  You can be seated.

**Anne B. Meredith**
Certified Shorthand Reporter

Does the State have a challenge for cause?

MS. HANDLEY: We do not. We believe she is qualified.

THE COURT: Mr. Lollar, does the State have a challenge for -- or the defense have a challenge for cause? I'm sorry.

MR. LOLLAR: You know, we do not have a challenge. But I really need to get this clear, that bit about mercy is the law. And you will find it right here in Gregg versus Georgia.

THE COURT: Okay. Well, let's go ahead and -- that doesn't have anything to do with it.

MR. LOLLAR: Well, it doesn't. But when the State unknowing -- well, they either don't know the law or they are misstating the law. Okay. So, that's what my point is. If it's because they don't know, well, then here's a copy --

THE COURT: Why don't you give her a copy, give everybody a copy, give me a copy --

MR. LOLLAR: Well, I'll be glad to.

THE COURT: -- of the opinion that you're referring to. Let us look at it and then we can discuss it. Give us over the weekend. We are through for the day and, so, and for the week, so we'll look over it, and then Monday morning we can all hit it a lick. How does that sound?

MR. LOLLAR:  Very good.

MS. HANDLEY:  And this is the Illinois -- which case are you relying on?

MR. LOLLAR:  Gregg versus Georgia.

MS. HANDLEY:  You're relying on Illinois versus Georgia.

MR. LOLLAR:  No, Gregg, g-r-e-g-g, 428 U.S. 153.

THE COURT:  Get us all copies of the opinion, if you don't mind.

MR. LOLLAR:  I will.

THE COURT:  And then we can discuss this Monday.

MR. LOLLAR:  Gregg versus Georgia.  Okay?

MS. HANDLEY:  Yes, sir.

MR. PARKS:  774 SW 2d 247 at 269.

THE COURT:  Then Ms. Eger is number 18; is that right?

MR. PARKS:  Yes.

MS. HANDLEY:  Yes.

THE COURT:  Okay.  She is qualified number 18.

Bring Ms. Eger back in, please, sir.  And then we will take up Mr. Jackson.

(Prospective Juror Eger returns to the courtroom).

THE COURT: Thank you. Just go ahead and have a seat there, Ms. Eger.

Thank you ladies, and gentlemen. Be seated, please.

Ms. Eger, you are prospective juror number 18. That means you're going to be on the panel. Now, that doesn't mean that you're on the jury.

PROSPECTIVE JUROR EGER: Uh-huh.

THE COURT: But there is now the possibility that you would be on the jury or could be on the jury.

PROSPECTIVE JUROR EGER: Okay.

THE COURT: Okay? So, what I'm going to ask you to do, we anticipate that Judge Snipes will begin evidence in this case starting August the 10th.

PROSPECTIVE JUROR EGER: Okay.

THE COURT: That's a Monday. We also anticipate it will take two weeks to try the case to the jury. And, so, I would like for you to pencil in on your calendar the week of August the 10th and then that following week as well.

PROSPECTIVE JUROR EGER: Okay.

THE COURT: That takes you through the 21st.

PROSPECTIVE JUROR EGER: Okay.

THE COURT: So, it would be Monday through Friday and then the next Monday through Friday, which I

**Anne B. Meredith**
Certified Shorthand Reporter

think that Friday, the last Friday is the 21st.

PROSPECTIVE JUROR EGER:  Okay.

THE COURT:  Okay?  Now, toward the end of July you should be notified whether or not you're on the jury.

PROSPECTIVE JUROR EGER:  Okay.

THE COURT:  If you're on the jury, you report for jury service August the 10th.  If you're not on the jury, then thank you very much for your time.

PROSPECTIVE JUROR EGER:  Okay.

THE COURT:  Okay?  Also, now that you know you have the potential of being on the jury, when you came in here today, you told me that you didn't know anything about this case, didn't think you remembered hearing anything about it from reading the newspaper or on TV news or anything like that.

PROSPECTIVE JUROR EGER:  Uh-huh.

THE COURT:  I want to keep you just that way.

PROSPECTIVE JUROR EGER:  Okay.

THE COURT:  I don't want you to go back on the Google and Google this case and try to find out any old newspaper articles or any old TV accounts about the offense or this case specifically.

Also, if there is anything that comes up in the future like future newspaper articles, future TV accounts

of the trial or, you know, of the jury selection, or whatever it might be, I don't want you to read those articles, don't want you to listen to those TV reports or radio reports. All right?

PROSPECTIVE JUROR EGER:  Okay.

THE COURT:  Because I want to keep you just the way you are right now, not knowing anything about the case.

PROSPECTIVE JUROR EGER:  Okay.

THE COURT:  Because if you're on this jury, then Judge Snipes, the first thing he'll do August the 10th is swear the jury in.  And if you're on the jury, then the oath you would have to take is that you will make this decision or your decisions in this case based solely upon the evidence that you'll see here and receive in the trial and the law that Judge Snipes will give to you in his written charges to the jury.  Okay?

PROSPECTIVE JUROR EGER:  Uh-huh, okay.

THE COURT:  All right.  Very good.  Anything further from the State?

MS. HANDLEY:  No, sir.

THE COURT:  Mr. Lollar, from the defense?

MR. LOLLAR:  No, your Honor.

THE COURT:  Thank you very much.  Have a good weekend.  Thank you for your time.

**Anne B. Meredith**
Certified Shorthand Reporter

PROSPECTIVE JUROR EGER:  Thank you.

(Prospective Juror Eger excused from the courtroom).

THE COURT:  Okay.  Now, then, let's address Mr. Jackson.

Anne, this is Prospective Juror number 183, Jerry Wayne Jackson.

Mr. Jackson, I would like for the record to reflect, was a no-show this afternoon.  He was noticed to be here.  He has summarily elected not to be here.  And when he was contacted by my bailiff, he informed my bailiff that he was not coming in, that his --

What did you say, the place had flooded?

THE BAILIFF:  His place had flooded, yes, sir.

THE COURT:  The place flooded.

THE BAILIFF:  Yes, sir.

THE COURT:  And that he was not -- wasn't coming in.

THE BAILIFF:  He said he wouldn't be able to come in.

THE COURT:  Wouldn't be able to come in.

Now, I think that, in doing a background check, that the State found that Mr. Jackson was less than honest in his upping a particular criminal conviction; is that right?

Okay.  Why don't you go ahead and put that on

the record.

MS. EVANS:  Yes, your Honor.

On Mr. Jackson's questionnaire, he did not disclose on the question if he, himself, close friends or family members had ever been arrested, charged or convicted of a criminal offense.  He left that portion blank.

Mr. Jerry Wayne Jackson, date of birth 10-30 of 1963, black male, was convicted --

THE COURT:  Which fits the information he filled out on his questionnaire --

MS. EVANS:  Yes, sir.

THE COURT:  -- by the way.

MS. EVANS:  -- was convicted of the offense of driving while intoxicated on November the 9th, 2001 following a trial before the Court, and he was placed on probation for a period of two years.

THE COURT:  So, he has a class B misdemeanor conviction for driving while intoxicated.  Is that what you're telling me?

MS. EVANS:  Yes, your Honor.

THE COURT:  Okay.  And he neglected to put that on his questionnaire.  When asked that question, he just left it blank, ignored it.

MS. EVANS:  That's correct.

THE COURT:  Okay.  All right.  Mr. Lollar,

you have anything you would like to add?

MR. LOLLAR:  Well, Judge, I would agree to excuse him based on the fact --

THE COURT:  Okay.

MR. LOLLAR:  -- that he's had a flood at his business or home, just couldn't be here today, so.

THE COURT:  State agree to have him excused or --

MS. EVANS:  Yes, your Honor.

THE COURT:  Okay.  All right.  Then Prospective Juror number 183, by agreement of the parties, will be excused.

(Court adjourned for the day).

THE STATE OF TEXAS    (

COUNTY OF DALLAS      (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 4th day of June, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volumes 13, 14, 15 and 16) is $7,300 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 29th day of November, 2009.

Anne B Meredith
_____
Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter