*AP-76207*

APPELLATE NO. AP-76,207
TRIAL CAUSE NO. F08-24667-Y

THE STATE OF TEXAS          *     IN THE CRIMINAL DISTRICT

vs.                        *     COURT NO. 7 OF

JAMES GARFIELD BROADNAX     *     DALLAS COUNTY, TEXAS

**************************************************************

REPORTER'S RECORD OF PROCEEDINGS

(Individual Voir Dire Examination)

Volume 21 of _____

***********************************************************FILED IN
COURT OF CRIMINAL APPEALS

SEP 1 6 2009

Louise Pearson, Clerk

On the 15th day of June 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Quaid Parker, Senior Judge sitting for the Honorable Michael Snipes, Judge of Criminal District Court 7 of Dallas, County, Texas, at which time the following proceedings were held:

ORIGINAL

(Proceedings generated by computer-aided transcription.)

VICKI L. TUCK, OFFICIAL REPORTER
COUNTY CRIMINAL COURT NO. 1
TEL. FAX 214-653-5606

**APPEARANCES**

MS. ANDREA HANDLEY
SBOT:  08898800
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,

MS. ELAINE EVANS
SBOT:  24032880
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,

MR. GORDON HIKEL
SBOT:  12508700
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,


MR. DOUGLAS PARKS
SBOT:  15520000
ATTORNEY AT LAW
321 Calm Waters Lane
Holly Lake Ranch, Texas  75765
                    APPEARING FOR THE DEFENDANT,

MR. BRADLEY LOLLAR
SBOT:  12508700
ATTORNEY AT LAW
1700 Commerce, Suite 450
Dallas, Texas  75201
                    APPEARING FOR THE DEFENDANT,

MS. KERI MALLIN
SBOT:  24049165
ASSISTANT PUBLIC DEFENDER
Dallas County Public Defender's Office
133 N. Industrial Blvd., LB2
Dallas, Texas  75207-4399
                    APPEARING FOR THE DEFENDANT.

VICKI L. TUCK, OFFICIAL REPORTER
COUNTY CRIMINAL COURT NO. 1
TEL. FAX 214-653-5606

CHRONOLOGICAL INDEX - VOLUME 21

(June 15, 2009)

| PROSPECTIVE JUROR | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **KELLY WATSON** | 5 | 8 | - | - | 21 |

Court's Ruling ............................ 16

| **TERESA RANDLEAS** | 17 | 25 | 60 | - | 21 |
|---|---|---|---|---|---|

Challenge for Cause (Defense) ............ 92
State's Response ......................... 93
Court's Ruling (Juror Qualified) ......... 94
Defense's Response ....................... 94

| **JONATHAN HORNE** (Absent) 98 | | - | - | - | 21 |
|---|---|---|---|---|---|

State's Response ......................... 99
Excused by Agreement of Parties .......... 100

| **THANK THAO-THI HUYNH** | 101 | 102 | - | - | 21 |
|---|---|---|---|---|---|

Challenge for Cause (State) .............. 103

| **LOU DEAN DIXON** | 104 | 104 | - | - | 21 |
|---|---|---|---|---|---|

Challenge for Cause (State) .............. 106
Court's Ruling ........................... 106

| **LEONARD D. PHLATTS** | 107 | 111 | - | - | 21 |
|---|---|---|---|---|---|

Challenge for Cause (State) .............. 126
Court's Ruling ........................... 127

Court Adjourned .......................... 127

Reporter's Certificate ................... 128

**ALPHABETICAL INDEX - VOLUME 21**

| PROSPECTIVE JUROR | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **LOU DEAN DIXON** | 104 | 104 | – | – | 21 |
| Challenge for Cause (State) .............. | | | | 106 | |
| Court's Ruling ........................... | | | | 106 | |
| **JONATHAN HORNE** (Absent) 98 | | – | – | – | 21 |
| State's Response ......................... | | | | 99 | |
| Excused by Agreement of Parties .......... | | | | 99 | |
| **THANK THAO-THI HUYNH** | 101 | 102 | – | – | 21 |
| Challenge for Cause (State) .............. | | | | 103 | |
| **LEONARD D. PHLATTS** | 107 | 111 | – | – | 21 |
| Challenge for Cause (State) .............. | | | | 126 | |
| Court's Ruling ........................... | | | | 127 | |
| **TERESA RANDLEAS** | 17 | 25 | 60 | – | 21 |
| Challenge for Cause (Defense) ............ | | | | 92 | |
| State's Response ......................... | | | | 93 | |
| Court's Ruling (Juror Qualified) ......... | | | | 94 | |
| Defense's Response ....................... | | | | 94 | |
| **KELLY WATSON** | 5 | 8 | – | – | 21 |
| Court's Ruling ........................... | | | | 16 | |
| Court Adjourned .......................... | | | | 127 | |
| Reporter's Certificate ................... | | | | 128 | |

VICKI L. TUCK, OFFICIAL REPORTER
COUNTY CRIMINAL COURT NO. 1
TEL. FAX 214-653-5606

Q. Good. Good. I'm glad to hear that . As the Judge said my name is Andrea Handley. I'm an Assistant District Attorney. And let me tell you what we're doing here. You remember you came down that morning with hundreds of people and filled out questionnaires.

A. Uh-hum.

Q. Well, we had -- that afternoon we had even more people come up here and fill out questionnaires, also. So we've literally got hundreds of people who appeared for this particular case only.

We've read those questionnaires and we're talking to everybody, you know, in order as they come up. And the reason we had so many people come up here -- the reason we're talking to hundreds of people is because this is a death penalty case. And the fact of the matter is that this is not the kind of case that's right for everybody. And I think you can appreciate that.

It looks like you've never even been on jury duty before, huh.

A. No.

Q. Okay. This will be a heck of a way to start for you. It would be like trying to bake a wedding cake before you've even baked a bunt cake, huh. It's quite a leap there.

There are a lot of people that we talk to who say that they are not right for this kind of a case. And what I don't -- as the Judge said, you've taken an oath now just to tell the truth. There's no right or wrong answers here. It's just to tell the truth and to be perfectly honest with us about how you feel. Your duty at this point is only to do that. You have not taken a legal duty to return a verdict or anything like that. Your duty is just to tell the truth right now.

A lot of times I think that people believe that it's their duty when called down here as a potential juror, to try to tell us what we want to hear or to try to say it's my civic duty to suck it up and get on this jury. It's my civic duty to tell the Defense Attorney or the prosecuting attorney what they want to hear, and that's not your duty right now. Okay. Your duty is just to tell us how you feel about something because I think you can appreciate that this is not the proper case for everybody, and it wouldn't be fair to the defendant to have somebody who says all you've got to show me is the murderer and I'll give them the death penalty. And it wouldn't be fair to the State who represents the victims and their families for somebody to say, in my heart of hearts I'm not right for this and I can't do it, and my view on the death penalty will impair the way I look at the evidence. Pick me for a

different case, but don't pick me for this one. And I see you nodding your head yes, yes. They will all tell you that you have to say "yes," or "no" for the record. She doesn't --

A. Yes. Sorry.

Q. -- she doesn't have a button for that, yet. She should probably get one, but she doesn't have one.

I've read your questionnaire thoroughly and digested it, you know, and we talked to you about exactly that, Mrs. Watson, is your feelings on the death penalty. And we do that in order to make a determination as to whether or not you would be a good juror for this particular case. Okay. You have stated on the first page where we ask you, are you in favor of the death penalty. And you said, no.

A. Correct.

Q. And is that still your feelings today?

A. Yes.

Q. Some people say that when they came down here it was the last thing they thought they were going to do was come down here and fill out an eighteen-page questionnaire about their feelings on the death penalty.

Have you given it any more thought since then?

A. Not too much.

Q. Okay. Did you go home and talk with your husband about it or your girlfriends or anything like that?

A. My husband.

Q. Okay. Okay. And, kind of, what did you talk to him about?

A. Well, I have a few reservations. My husband works in Manhattan, my house is on the market, and I have two young children.

Q. Okay. Well, let me explore that with you first, okay, because some people are not qualified because they say I just can't. I can't do it. I can't be a part of this. And some people might be disqualified in that they might move out of the State or they might move out of the County.

Do you have plans to move? Is that what we're talking about?

A. If my house sells. My house has been on the market since September.

Q. I gotcha. And as soon as it sells you're out of here?

A. Probably, yes.

Q. Okay. And definitely out of Dallas County.

A. We'll be going back to New York.

Q. Okay. This trial is suppose to start on August 10th.

13

A.  Correct.

Q.  And we believe that it will take approximately two weeks to put the evidence on in this case.  We cannot tell you how long it would take for a jury to deliberate.  I've seen them deliberate an hour, I've seen them deliberate a week.

A.  Right.

Q.  If you go into deliberations there's a very good chance that you might be sequestered, which means you would be separated from your family.  No phone, no T.V.  Away from them.  So we're looking at that time block there in August.  And you're telling us as it stands today if you sold your house today and signed on it you're out of here.

A.  Well, it would probably take sixty days, realistically.

Q.  Okay.  All right.  You also have two little ones, don't you?

A.  Yes, I have a six-year old and a four-year old.

Q.  Okay.  And I would like to ask moms about that because sometimes it is an exemption that you can take if you've got children under ten years of age and you cannot get adequate supervision for them, then it's an exception, an exemption that you can take.  Sometimes

14

one day is fine, two days is fine, but maybe three weeks and overnights might pose a different problem.

Does that pose a problem for you?

A.  That potentially could, yes.

Q.  Okay.  Because I guess you could say, well, my husband could take them, but he works, too.

A.  Yes, he works in Manhattan.  He works in New York City.

Q.  Okay.  So now you're talking about having to have somebody come into your house.

A.  Yes.

Q.  Okay.  Are they school age?

A.  My son will be in second grade and my daughter will be in Pre-k.

Q.  Okay.  Do you pick them up and drop them off and that kind of thing?

A.  I do.  Yes.

Q.  Okay.  Do you think that that poses a problem for you, ma'am, that you cannot be certain about having adequate supervision for your kids?

A.  It might be expensive.

Q.  Yeah, it could be.  It could be.  I mean, the question becomes if you can assure that you can have adequate supervision for them, then that becomes possibly an exemption that you could talk to the Judge

15

about that you could maybe claim.

A.  Yes, I don't have family here.  My family is in Connecticut and Michigan, so I don't have grandparents that can take care of my children.

Q.  Okay.

THE COURT:  Well, do you wish to claim the exemption?

PROSPECTIVE JUROR:  I think that would be -- if I could --

THE COURT:  Okay.

PROSPECTIVE JUROR:  -- please.

THE COURT:  Did Judge Snipes go over that with you?

PROSPECTIVE JUROR:  He didn't bring that up.  Well, not that I remember bringing it up about the children.

THE COURT:  Not the exemption.  You don't recall?

PROSPECTIVE JUROR:  It was, you know, the English was an issue, if you were taking care of an elderly person.

THE COURT:  Right.  Yeah, okay.  But it sounds like to me -- now, you don't work outside of the home.  Right?

PROSPECTIVE JUROR:  No, I do not.  I do

16

not work.

THE COURT:  So you're a full-time mom staying at home with your kids.  And, of course, this is summertime so they are not even in school, even your son who would be a second grader is not in school right now.  He's out for the summer vacation.

PROSPECTIVE JUROR:  Correct.

THE COURT:  And, of course, your youngest one isn't even in school, yet, but is not attending Pre-k --

PROSPECTIVE JUROR:  Not until the Fall.

THE COURT:  -- until school starts, yeah.  Okay.  All right.  Well, I'll go ahead and grant your exemption.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Especially in light of the fact that you might not even be here in the not too distant future.  I know you hope it's sooner than not.  So I'll excuse you, then.

PROSPECTIVE JUROR:  Thank you.

MRS. HANDLEY:  Thank you, Mrs. Watson, for your time today.  We appreciate it.

PROSPECTIVE JUROR:  Thank you.  Don't I leave this with you all?

MRS. HANDLEY:  Yes.

**17**

PROSPECTIVE JUROR: Thank you.

THE COURT: Okay. Now, do we have --

MS. EVANS: Are you ready for the other juror, Judge?

THE COURT: Yes.

MRS. HANDLEY: Okay. Right before she comes in --

THE COURT: Okay. Yes.

MRS. HANDLEY: Okay. This next juror coming in is --

THE COURT: Teresa Randleas?

MRS. HANDLEY: Yes. She's also Teresa Buckner, Your Honor, B-u-c-k-n-e-r, with a date of birth of 2-2-1960. And we ran a criminal history and we shared this with Defense Counsel that she was placed on deferred adjudication for --

THE COURT: Y'all can be seated.

MRS. HANDLEY: -- for the felony offense of insurance claim fraud. It appears she lived out that probation and we have nothing to indicate that there was any final conviction on there. She received on -- let me see here -- on March 2nd of 2005, twelve months probated deferred adjudication and there was never -- at least there was never an adjudication on that. If you want to make those assurances with her you can do that,

**18**

Your Honor, or I can handle it. I don't know what's the best way to do that. We shared the information with Defense.

Do you guys have any questions about that?

MR. PARKS: I'm not sure how we can be sure of that. We weren't sure of that other one.

MRS. HANDLEY: She's going to print out the dismissal screen.

THE COURT: I could do it, Andrea.

MRS. HANDLEY: I'm satisfied that she's qualified, but that's why we're sharing it with them just to see if everybody is satisfied, Judge. If they are not, then maybe you can follow up.

MR. PARKS: We were satisfied that that woman the other day was qualified.

THE COURT: Well, I wasn't because I didn't have anything. I didn't know whether it was a conviction or not.

MRS. HANDLEY: And this is Dallas County, Judge, so it's a little easier to confirm.

THE COURT: That was Florida or something like that, another state.

Are we waiting on Elaine to give us a printout on the disposition?

**19**

MRS. HANDLEY: Yes, sir.

THE COURT: Looks like she's got -- did she have three names? Buckner, Anderson and --

MR. LOLLAR: She's been married five times.

THE COURT: She's been married five times? Well, that's why then.

MS. EVANS: It shows the day she pled and then the day it was dismissed.

THE COURT: Okay. So it was dismissed and she got a deferred and it was dismissed. Is that right?

MS. EVANS: Yes, Your Honor.

THE COURT: So no conviction. Is everybody satisfied, no conviction?

MR. LOLLAR: Well, we've seen the paperwork. Yes, sir.

THE COURT: Okay. Do you want to challenge her or not?

MR. LOLLAR: No, sir.

THE COURT: No? Okay. All right. Then if you want me to just to verify that she did have that and that it was dismissed and that she was placed on a deferred.

MS. EVANS: Yes, sir.

**20**

THE COURT: All right. Go ahead and bring in Miss Randleas.

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 601, Teresa Randleas, enters the courtroom.)

THE COURT: Miss Randleas, come on in if you would, please, ma'am. Just go ahead and have a seat right there.

How are you today?

PROSPECTIVE JUROR: I'm doing well. Thank you. And you?

THE COURT: Good. Thank you, ladies and gentlemen. Be seated, please. And, let's see. This is Prospective Juror Number 601. Teresa Randlea, R-a-n-d-l-e-a.

Am I saying that correctly?

PROSPECTIVE JUROR: Randleas.

THE COURT: Randleas. And, Miss Randleas, I did have some information here, before we get started in the questioning, that it looks like I have some information that you were placed on community supervision or deferred adjudication; is that correct?

PROSPECTIVE JUROR: That's correct.

THE COURT: And that was for -- let me see. Was that a theft case?

PROSPECTIVE JUROR: It was a felony insurance fraud, but it was reduced down to a misdemeanor.

THE COURT: Felony fraud. And then you got a deferred on misdemeanor, is that what it was?

PROSPECTIVE JUROR: Yes, correct.

THE COURT: And were on probation or community supervision for about twelve months. And then was that case dismissed?

PROSPECTIVE JUROR: Yes.

THE COURT: That was the final disposition of the case. It was dismissed after you lived down the twelve-month probation; is that correct?

PROSPECTIVE JUROR: That is correct.

THE COURT: Any other cases that went along with that or grew out of that before that or since then?

PROSPECTIVE JUROR: No.

THE COURT: All right. And you're not presently under any sort of indictment information or anything like that --

PROSPECTIVE JUROR: No.

THE COURT: -- for a criminal offense of any kind. Okay.

Then -- let's see. You recall it's been

21

over a month ago, I guess, when Judge Snipes talked to the whole group. Y'all got together about four or five hundred of you and met down at Central Jury and Judge Snipes addressed the group at that time. You filled out your questionnaires. And you should have a copy.

Where is her copy of her questionnaire? Bring those to me, would you?

THE BAILIFF: Yes, sir.

THE COURT: Just bring the whole stack, if you would, please. Thanks. Let's see here.

UNIDENTIFIED SPEAKER: Judge, it's probably in tomorrow's stack.

THE COURT: I found her. Okay. 601. Did I give you that, Vicki? Teresa Randleas. Okay.

All right. Ms. Randleas, there's your questionnaire that you filled out a month ago so I know you haven't had an opportunity to see it, and the attorneys are going to be asking you questions about some of your responses and so forth.

Do you recall over a month ago that at some point in the proceedings Judge Snipes had everybody stand up, raise their right hand, and he administered the oath of a prospective juror to everyone. Do you recall that?

PROSPECTIVE JUROR: Yes.

22

THE COURT: Were you one of the panel members that stood and took the oath at that time?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. I'll just remind you you're still under your oath. And what you've been sworn to do is give truthful answers, but we know you do that anyway, but also be responsive to each and every question that's asked to you either by myself or the attorneys that are involved in this voir dire examination.

PROSPECTIVE JUROR: Okay.

THE COURT: Okay. So anyway -- and they may have some questions about your responses and answers to some of the questions in your questionnaire and so I gave that to you because I know you don't recall that.

Did you have an opportunity to read the kind of little information guide, the juror guide?

PROSPECTIVE JUROR: I did.

THE COURT: Okay. That just kind of gives you an introduction to some of the law and procedural aspects that are involved in the trial of a capital murder case.

Now, what the attorneys are going to do they are going to explain the law in more detail than what you had in your little information guide and then

23

once you understand that, then they are going to ask you questions about it.

PROSPECTIVE JUROR: Okay.

THE COURT: Now, there's no right or wrong answers. There's nothing embarrasing here or anything like that, just how you feel. They want to know how you feel about the law and about some of the procedural aspects that would be involved in a capital murder case.

All right. So with that, let me go ahead and introduce the attorneys to you. Seated at the table right directly in front of you is Miss Andrea Handley and Miss Elaine Evans, and then behind them is Mr. Gordon Hikel. These three, ladies and gentleman, are Assistant District Attorneys here in Dallas County and they are charged with the responsibility of prosecuting this case.

And then seated at the counsel table directly in front of me here is Mr. Brad Lollar and Mr. Doug Parks, and then down here on the end Miss Keri Mallin. And they are the Defense team and they represent the defendant, Mr. James Broadnax.

Okay. Miss Handley.

MRS. HANDLEY: Thank you, Your Honor. Appreciate it.

24

TERESA RANDLEAS, having been duly sworn, testified as follows:

EXAMINATION

BY MRS. HANDLEY:

Q. Good morning, again. How are you?

A. I'm doing well. Thank you.

Q. Good. Good. With respect to the Judge quizzing you about what happened with your circumstances there, we saw that in your questionnaire and I appreciate you putting it in your questionnaire because we follow up on that. Not because that gives me an opinion about you or I don't like you because it doesn't offend me whatsoever. What we're insuring is that you don't have a conviction that would automatically disqualify you because in the event that happened, you are not qualified and you got on the jury, that could cause a lot of problems in the future. But it sounds to me like you received a deferred, you lived that out, that's been dismissed now and so you don't have any of those disqualifications standing in your way.

A. That is correct.

Q. You can serve on jury duty, you can vote, you handle it in an appropriate way best for you. Unless, of course, you wanted a reason to get off jury duty, so we appreciate your being honest about that. That helps

---

us in this process because what we're doing -- is it Randleas?

A. Randleas.

Q. Randleas. What we're doing, Mrs. Randleas, is we brought hundreds of people down that morning with you to fill out questionnaires and we brought even more that afternoon to fill out questionnaires. All of those people were brought just for this particular case because out of all of those people, we are hoping to find a pool of people that are qualified to sit on this particular case. And after we qualify a pool of people, then we'll determine who will actually sit on the jury. But we bring so many because some people are just not qualified. Some people it's not the right case for them, they just can't be on a death penalty case. Some people may be a little too overzealous and they say, show me a murder and I'll give them the death penalty regardless of what the facts are. That person is not qualified. They have already told us that it doesn't matter what the evidence shows, they are going to do this and they are going to do it every time. Those individuals aren't qualified. Some people just have disqualifications, or they are taking care of somebody and they can't make jury duty, but we need to test everybody out here.

---

I've read your questionnaire and I've absorbed all of your answers and I like to keep in mind that when people answer these questions you haven't studied death penalty law. Have you?

A. No.

Q. You're just giving us your honest feelings at that point and a lot of times your gut reaction and you're doing it with a clipboard and two people sitting next to you, so you're doing the best you can.

Your obligation right now is only that you tell us the truth. You have not taken a legal oath, you know, to give a verdict in this case. You haven't been selected. You're just here to tell us how you feel. Okay. And in the process I would like to tell you about the law and see if you can follow the law, see if it's the right case for you. Okay.

A. Okay.

Q. A qualified juror is a person who will say and does say I will follow the law. I will base my verdict in the case on the law and the facts in the case and nothing else. I will wait to hear the evidence in the case before I render my verdict and I won't jump to any conclusions. I will always base my verdict on the evidence and I will always base my answers to the special issues on the evidence in the case.

---

Okay. So I would like to talk to you about that and see where we're going with that. You did say in your questionnaire on the first page there -- do you have a copy it?

A. Yes, I do.

Q. We asked you about the death penalty. You said you were in favor of it. You said if somebody intentionally murders another person, then they should pay for the life that they took with their own life.

And then on the second page on the very top of Page 2, though, we asked you that if you are in favor of the death penalty in some cases, which you said you are, do you agree that a life sentence rather than a death sentence would be appropriate under proper circumstances in some cases? And, again, you said, yes. So that tells me -- you correct me if I'm wrong. But that tells me that perhaps you recognize that even though somebody might be eligible to receive the death penalty that there are situations, though, where maybe a life sentence is more appropriate.

Do you feel that way?

A. Possibly.

Q. And when you say "possibly," is it because like you put in here, "It depends on the facts"?

A. Uh-hum.

29

Q. And I'll tell you that's pretty much what this is all about is it really always depends on the facts.

A. Yes.

Q. If you've already decided what you're going to do in this case, if you've already decided, well, if you show me they committed capital murder, I'll automatically answer those questions yes, yes and no, then you've already made up your mind, haven't you?

Have you heard anything about this case?

A. Very little. I do recall hearing a little bit about it on the news when it happened. I don't quite know all of the details and the facts, but I did hear a little bit about it on the news after it happened.

Q. I think if you had heard all of the details and the facts of the case, then that might cause a problem. Just because somebody hears something on the T.V. or reads it in the newspaper doesn't necessarily mean they are disqualified from jury duty on that particular case. The law provides that you cannot use what you got on the outside of the courtroom to render your verdict on the inside of the courtroom.

A. Sure.

Q. You've got to base your verdict strickly on the evidence in the case. Based on what you've heard so far, can you do that? Can you set what you may have

31

In Texas, we have what is called a "bifurcated" trial system. It's a two-part trial system where the jurors in the first part of the trial are called upon to determine one issue only and that is, is the defendant guilty of the charge. If you find that he is, in fact, guilty of the charge, then you move on to the second phase of the trial and that's where the jury determines the punishment in the case.

Have you heard the expression, "Let the punishment fit the crime"?

A. Yes.

Q. That's basically what we're talking about. In the second phase of the trial you will revisit all of the facts that you heard in the first part. You may hear additional evidence at that time, and that's when you make your decision on what should happen to the defendant, what the punishment would be in the case. So it's two separate parts really.

In any criminal case, though, be it a capital murder case like we're sitting on here today, or even be it theft of a loaf of bread from the Kroger, there are principles of law that apply in every criminal case. Okay. You've probably heard of all of these before if you read the papers or you listened to the television or radio. As we sit here today in this courtroom, the

30

read or heard in the T.V. or newspaper aside and base your verdict just on the evidence in this case?

A. Yes, because I really don't recall much at all.

Q. Okay. And you put --

A. I feel like I could do that anyway.

Q. Okay. You put in there, though, when we asked you about cases that you were following, I think you're following the case, the Anthony case, and such as that.

A. Uh-huh.

Q. Do you watch that on Nancy Grace and Jane Valez? Issues with Jane Valez, do you watch it on that?

A. (Shakes head).

Q. There's a lot of coverage on that if you're looking for it. But you put in there that you had kind of formed an opinion on those particular cases and so you wouldn't be qualified maybe to serve as a juror on those cases if you had already made up your mind. But you haven't done that here, is that what you're telling us?

A. Right.

Q. Okay. Have you ever been on jury duty before?

A. No.

Q. Let me tell you a little bit about the criminal justice system in cases such as this.

32

defendant is presumed innocent. Okay. And the reason he's presumed innocent is because I haven't proved anything so far, have I?

A. No.

Q. I haven't brought a shred of evidence against this defendant. Now, he's been indicted, but the law will tell you that you are not to consider the indictment as evidence against him. And I'll tell you an indictment is merely a piece of paper that tells him what he's being charged with and tells me, as a prosecutor, what I have to prove to a jury beyond a reasonable doubt before he can be found guilty. Okay.

A. Okay.

Q. You, as a juror -- and always in a criminal justice system -- it's important that you understand that I carry the burden of proof in every criminal case. I have brought the charges, therefore, I should have to bring the proof. It's just fundamentally fair, if you will. You don't have to come into court and prove your innocence. This State has brought the charges. They have to prove that there's sufficient evidence to find a person guilty of the offense. That proof must be beyond a reasonable doubt.

Reasonable doubt, ma'am, is whatever you think it is. There's really no definition for it. It's not all

doubt one hundred percent. Some people say if I thought somebody was guilty beyond all reasonable doubt, then I think I would be pretty darn sure, or I would know it. I mean, it's whatever you think it is. Okay. But regardless, you're always looking to me to bring that evidence.

And along with that is the defendant as do I, as do you, as to everybody in here, we all enjoy the same constitutional rights and we all have that right to elect not to testify in a criminal trial, that Fifth Amendment right. If a defendant in a criminal case elects not to testify, the law states that you cannot use that against him as evidence of guilt. So, for example, you went back to deliberate. I finished with my evidence. You get back there in the jury room and say, "The State didn't quite prove to me beyond a reasonable doubt. They were this close. But since the defendant didn't testify, I'm going use that as evidence of guilt and find him guilty." You can't do that. And I see you shaking your head, yes, so it sounds to me like you understand that.

Any questions about any of those laws?

A. No.

Q. Okay. The indictment tells me what I have to prove against the defendant and they are called elements

34

of the indictment that the defendant did it on a particular date and in a particular county and by a certain manner and means. These are elements that I have to prove. I have to prove all of them beyond a reasonable doubt. I don't get points for proving five out of six. All of them. And if I fail to carry my burden on any one of those elements, then your verdict must be --

A. Not guilty.

Q. -- not guilty. And I'll give you a far-out example just to illustrate the point.

If I indicted a person for murder and I alleged in my indictment that he murdered this individual by shooting him with a gun, then I'm obligated to prove that he shot him with a gun. If that defendant got on the stand and said, "You know what, I did it. I killed the guy and I'm glad I did it." But then the Medical Examiner gets on the stand and says, "The person is dead, but they didn't die by being shot with a gun, they did it by being stabbed with a knife."

Have I proved my case?

A. Yes.

Q. Have I proved that he shot him with a gun?

A. Yes.

Q. The Medical Examiner said he died by being

stabbed with a knife.

A. True.

Q. If the evidence showed you that the person actually died from being stabbed with a knife, have I proved to you he was shot with a gun?

A. I guess not because he didn't say that he found a bullet, did he?

Q. No. No. He says I killed him, but I stabbed him. The State alleges that I shot him.

Have I carried my burden?

A. Okay. No.

Q. I haven't. And that's a far-out example. Your obligation is that "You didn't prove it. He's not guilty. You didn't carry your burden." So you need to find him guilty and you need to go upstairs and tell Mr. Watkins that I have a problem figuring out how the people die and I ought to allege it better in the indictment. It wouldn't be your fault. It would be mine. So if I failed to carry my burden on any of those elements, will you follow the law and find him not guilty?

A. Yes.

Q. Okay. Let's talk about capital murder versus murder.

A lot of people don't know that there's really a

36

distinction there. They think that murder is murder. In Texas, you know, we have capital murder and then we have murder, and then there's actually a whole bunch of different ways that you could commit a homicide. A manslaughter, negligence, the kind of thing you see in car wrecks. Things like that.

A capital murder is always this, ma'am. It always starts with the intentional taking of another person's life. It's never, I took this person's life by accident. It's not, I took this person's life and I had a legal justification like self-defense or duress. It's always going to be, I meant to take this person's life and I took this person's life. Okay. That's murder. That's a first-degree murder. Okay.

If I pulled out a gun right now and just started shooting my co-counsel ten times and laughed about it, I'm sure you would agree that's pretty darn bad. Isn't it?

A. Yeah, that's pretty coldblooded.

Q. Yes, it's coldblooded, and I intended to kill her and I did. Well, guess what? I'm not eligible for the death penalty because that's just a murder. I could get life in prison, but it's not a death penalty case.

Okay. Make sense to you?

A. I understand.

Q.  Capital murder cases are where people are eligible for the death penalty.  There's nothing automatic about it.  And a capital murder will always be an intentional murder, but will have an additional aggravating factor which will make it a capital murder.

For example,  if it's the intentional murder of a child under six years of age, or if it's the intentional murder of a peace officer while he's in the line of duty, or if it's the intentional murder of two or more people at the same time, or if it's the intentional murder of somebody while you're committing or trying to commit another felony offense like burglary, or robbery.  That's what makes it a capital murder, that aggravating factor.

Does that at that make sense to you?

A.  Yes.

Q.  Are you okay with that law?  Would you broaden it to include all murders, or if you could change it, would you?

A.  No.

Q.  You wouldn't?  Okay.

You've put in your questionnaire when we asked you about the death penalty and you said that if someone intentionally murders another person, they should pay for the life that they took with their own life. Well,

case. If they are not in the facts of the case, if they are not in the evidence in the case, then the death penalty is not an option.

Do you think that's fair?

A.  I do, but on one hand when someone commits a murder intentionally and it's coldblooded and it's -- they have thought about it, and they knew that they were going to do it before they did it. I have a little problem with why do they not get the death penalty.

Q.  Okay. Because I'll tell you the technical reason is because -- what they might automatically get -- they're guilty of capital murder. What they will automatically get is life in prison without parole. Okay. They will definitely get that. Okay.

A.  Okay. But what is the purpose of that?

Q.  They will definitely get that, but the law provides that there's got to be something more there in order for you to get the death penalty. And whether or not there's that something else could, a lot of times, be answered by what they did, you know, but it's nothing automatic. I think what it is, ma'am, is that the law always appreciates that there's no two defendants alike. That there's never two factual scenarios alike. And that what the law gives you is that wide range of discretion so that if this is that case where it's not

38

40

you certainly have it right on intentional. You hit the nail on the head there that it has to be intentional. It's not a murder with legal justification. Okay. A lot of people say, well, I wouldn't give them the death penalty if he killed him in self-defense. Well, you're not even eligible for the death penalty if you killed somebody in self-defense. Quite frankly, you're not guilty of anything if it's in self-defense. So it is always an intentional murder.

There's nothing automatic about the death penalty. Okay. You did put throughout your questionnaire that -- you put a couple of times in there about an eye for an eye, that you believe in the premise of an eye for an eye. If you take a life, you should give your life. You know, I will tell you that Texas law does not believe in an eye for an eye. Okay. It's okay to think that in a personal sense. I think a lot of people may think that way. But Texas law does not believe for an eye for an eye. Just because you killed somebody doesn't mean we can kill you. Okay. Instead, Texas law provides that there's nothing automatic about it, that in order for us to give the death penalty certain things must be followed. Certain circumstances must be present in order for a person to receive the death penalty and those circumstances must be found in the facts of the

appropriate based on the facts, it gives you that ability to say it's not appropriate. It's not appropriate. I could give you a thousand different, you know, examples on how a capital murder could be committed. I mean, we know it's the intentional taking of a life. Right?

A.  Right.

Q.  And we know that there's a special aggravating factor, you know. The intentional taking of the life of a child under six years of age is capital murder, automatic life in prison without parole. Whether or not you get the death penalty depends and other things.

If a man goes out to a park, pulls out a gun, sees a five-year old playing on the merry-go-round and shoots him. That's capital murder. Okay. But let's say you got a man, a 35-year old man, sound mind, and I tell you that he intentionally takes the life of a helpless five-year old boy. What is your immediate gut feeling about that person and that individual of what they deserve?

A.  The death penalty.

Q.  Right. What if I were to tell you now that that same man, that 35-year old man of sound mind and body, that that five-year old boy that he intentionally kills is actually his son. And that five-year old boy

is actually in Children's Medical Hospital and he's been diagnosed with terminal cancer. He's dying. He will never get better. There's no chance he's going to get better. And if it wasn't cruel enough that the little guy will never get better, he suffers every minute of his life and the 35-year old man spends every day and every hour that he can at his bedside crying more tears than his little boy ever could. He's his little guy. He's been a great husband, he's been a great father, and he's watching this kid suffer now and he can't watch his boy suffer anymore. And so he goes and he does whatever he has to do and he comes back and he intentionally takes his boy's life either by an overdose of morphine, be it by pulling out the plug, be it by maybe putting a pillow over his and shooting him, and then he holds him in his arms until he dies.

Q. Did he intend to kill that boy?

A. He did.

Q. Was that boy under six years of age?

A. Yes.

Q. Is that capital murder?

A. Yes.

Q. I can see by the change of your face that you're going, well, wait a minute. That's different.

A. Yeah, but the law is the law.

Q. The law is the law. It is capital murder, isn't it? So the question becomes does he get the death penalty? And that question --

MR. PARKS: Can she answer the question, Judge?

MRS. HANDLEY: I'll get to it.

THE COURT: Were you wanting the response?

MRS. HANDLEY: No. No --

MR. PARKS: She was trying to.

THE COURT: I think she's just laying out the scenario, so...

Did you have a response?

MRS. HANDLEY: I'm sorry if I cut you off.

No? Okay.

PROSPECTIVE JUROR: That's okay.

THE COURT: Okay. Let's move on.

Q. (By Mrs. Handley) I guess my point is -- and that's an "out there" factual situation, isn't it? But my point is, is that it's capital murder. It was the intentional taking of a child under six years of age. It's definitely capital murder. So the question becomes is it a case in which the individual receives the death penalty. And that answer is not based necessarily on

your gut reaction right here now, that answer is based on the answer to the special issues. Okay. It always depends on the facts of the case.

If I proved to you beyond a reasonable doubt that the person intentionally took a life and intentionally did it during the course of a robbery, or trying to commit a robbery, or if it was -- "I deserve. I should get" -- or prove it to you beyond a reasonable doubt a verdict of guilty on capital murder, can do you that?

A. Yes.

Q. And having done that, ma'am, now you would move into the punishment phase of the trial and now you would answer these special issues. You don't go back there and go with the jury, well, how many of you think he should get life, and how many of you think he should get death? Instead, the way you do it is by answering questions.

Okay. You've had an opportunity to read the special issues?

A. Yes.

Q. The first special issue is what we refer to -- often call it the "Future Dangerousness Issue." And basically what it's telling you is this. Is that the death penalty is reserved for those individuals who will continue to be a threat to society. Okay. I think

you're reading it over once again there. I see you doing that. It's reserved for those individuals that will continue to be a threat to society that more likely than not will continue to commit criminal acts of violence in the future. That's who receives the death penalty are those individuals. Okay. And I have to prove to you that the person on trial is one of those individuals. Okay.

There are -- a person may be a future danger. You may believe they are a future danger based on what they have done and based on their criminal history or lack of criminal history that you may think this person, I believe, could be a future danger. There may be circumstances where you look at an individual and say, this person could never be a future danger, you know. Two days before you actually go to trial the defendant falls down the stairs, breaks every bone in his body --

MR. PARKS: Judge, we're going to renew our Motion in Limine on this very issue. Is it clear to the Court what we're talking about?

THE COURT: Yes, and my ruling would be the same.

MR. PARKS: Overruled?

THE COURT: Overruled. Go ahead.

Q. (By Mrs. Handley) -- breaks every bone in his

body, is paralyzed from the neck down, can't move a muscle. Has to suck out of a straw, you know. Is he a future danger to anybody? That would be a question for you to decide. The question asks you this because, understand, he's guilty of capital murder. Right?

A. Uh-hum.

Q. Before you ever get to this you've found this person guilty, haven't you? If you haven't found him guilty of capital murder there's no need to answer these special issues. Okay.

A. Right.

Q. Okay. You found him guilty of capital murder, but nothing is automatic. The only thing you can assume right now is that he will get life in prison without parole. That's the only assumption you can make right now. So we ask you to answer this question.

Do you believe from the evidence, if you find from the evidence beyond a reasonable doubt -- again, that tells you look to me to prove it. Reasonable doubt always tells you look to the State to prove it. Have I proved to you that there is a probability he will commit criminal acts of violence that will be a continuing threat to society?

"Probably" isn't defined for you, ma'am. It's whatever you think it is. It's certainly more than a

46

possibility. Some people would tell us it means more likely than not.

Are you satisfied with that?

A. Uh-hum.

Q. Okay. Is it more likely than not that the defendant will commit criminal acts of violence? Again, that's not defined for you. It doesn't say that he will commit another murder, or another assault, or a rape. It just says criminal acts of violence. That's something for you to decide what is and is not a criminal act of violence.

You know, slugging my co-counsel in the face. You know, if you think that's a criminal act of violence, then it is. If you don't think it is, then it's not. Okay.

A. Okay.

Q. And it says, "That would constitute a continuing threat to society." Well, understand the place he is right now and will be for the rest of his life until the day he dies is the penitentiary, isn't it?

A. Yes.

Q. So the society in which he may be might well be a prison society. And can you see how the definition of society could also include a prison society.

47

A. Yes.

Q. There's guards there. There's people there other than inmates. There's nurses and doctors and clergy and educators. It's a society in and of itself. So the question becomes have I proved to you now -- I proved to you he's guilty. We know that. But have I proved to you now in the punishment phase that he will be a future danger.

Okay. You can look at the circumstances of what he did in the first part of the trial and you may use that in making your determination now whether or not he's a future danger, or you can even say, I need to see something more. I need to see some prior history, or I need to see something about him in order to make that decision. You know, whether somebody is or isn't going to be a future danger can depend on a lot of things. You know, the guy is a paraplegic now. Maybe he is a future danger. Maybe you still see that, or maybe you don't and go, you know what? He's not. The evidence just doesn't fare it out.

What kind of things do you think that you would have to see, or hear, or know in order to help you decide that question that somebody is going to be a future danger and make that prediction? What would help you?

48

A. I would have to hear some pretty hard evidence as far as why you proved that he would be a further danger to society and continue to do violent acts.

Q. Do you see how there could be circumstances where somebody has committed a heinous capital murder, but they might not actually be a future danger? Do you think that is an impossibility, or do you think that's actually possible that there's room for that?

A. From what you just told me there's a possibility that they would not be a further danger to society. Being a paraplegic, it would be kind of hard to be a future danger to society.

Q. And I just threw that out as an example. And I'll tell you that I don't want to commit you to any set of circumstances, the point being -- because I just threw facts at you, didn't I?

A. Uh-hum.

Q. Okay. And the point being, have you heard any facts in this case yet?

A. No.

Q. And if you're going to base your verdict on the facts, can you tell me whether or not somebody is or won't be a future danger?

A. If I base it on facts.

Q. If you base it on facts. Have you heard any

facts --

A. No.

Q. -- in this particular case?

A. No.

Q. So can you base your answer to that question? Can you definitely say what it will or won't be?

A. No.

Q. Okay. You would have to wait and hear the evidence and then you would answer that question.

A. Correct.

Q. Okay. Because that becomes the issue, ma'am. Some people say, look, if you prove to me he intentionally killed somebody and he did it in the course of a robbery, then I'll automatically answer that, yes, regardless. You've proved to me he killed somebody. He meant to do it. It wasn't a mistake. He did it during a robbery. I don't have to hear any evidence, I'm just going to automatically answer it, yes. I'm not going to base my verdict on the evidence, or I'm not going to wait, in other words, until we get to that special issue. I'm just going to tell you it's automatically yes every time. Is that you?

A. I can't do that.

Q. Okay. You can't do that, and you won't do that. You're going to wait?

directing in the participation of the offense.

If Miss Evans and I get together tonight and decide to rob the local 7-Eleven, she goes and buy the gun, I go buy the bullets. We take her car up to the 7-Eleven. She's going to act as the "good eye," as the lookout. She hands me the gun. I'm going to go in and rob it and I tell her, "I forgot my mask." She says, "Don't worry about it. Just don't leave any witnesses."

I go in there. I take the money from the clerk. I kill the clerk; shoot her five times, and I come out with the money.

Have I committed capital murder? I see you nodding your head.

A. Yeah.

Q. Yes. The law states that Miss Evans could also be held guilty for capital murder if she participated in the offense by giving me a gun, by driving me out there. What this question asks you is: Do you find that the person was either the triggerman -- and if he wasn't the triggerman, was he somebody that actively participated in the case and anticipated that somebody would die?

A. Okay.

Q. Okay. If you think that answer is no, you answer it no. If you think that answer is yes, then you

50

A. Right.

Q. Okay. And that's fair enough. That's fair if you answer that special issue, no, if I don't prove it to you. And if I don't prove it to you answer it, no. That's the law. I don't need your help. Don't give me any leg up there. If I don't answer it, yes -- prove that to you, answer it no. If you do that the defendant will automatically get that life sentence and he will spend life in prison without parole. Okay. He will die there. A lot of people that's a wink and a nod and he will get out. He will die there. Okay. If I do prove that to you that you believe he's a future danger, you answer that "yes" and you move on to the second question.

The second question -- I'll just go over this briefly. It may or may not be given that in the jury case. But it has to do with something we call the "Law of Parties." Often times crimes are committed not just by one person, but by two or more people working together. And it speaks to that particular scenario where if two or more people are working together to commit an offense under certain circumstances, they can all be held liable for that offense. And they could all be potentially subject to the same punishment provided that they were aiding, assisting, encountering or

52

move on to the final issue.

An answer to the first two special issues of yes means that the person is sitting on a death penalty case now. Okay. In Texas, and kind of like how you've been saying in your questionnaire and through here, is whether or not somebody receives a sentence of death is, of course, again, always based on the evidence in the case. And I'll submit to you that a lot of what the lawmakers had in mind with the punishment ranges and the punishment phases in the State of Texas is that the punishment should always fit the crime, and that you are not going to be called upon to -- you're not going to come down here, render a verdict, and walk out and go you know what, I don't feel right about that because I think that we should have been able to consider such-and-such. Because in my own personal moral beliefs, I believe that there was something going on in this case that mitigates against the defendant, mitigates in his favor, lessens his moral culpability in this and in my heart of hearts, in my personal moral feelings, I think that the death penalty was inappropriate. I agree he was guilty of capital murder. I agree he's a future danger. But there was something about this particular case that I think should have turned it into a life without parole case versus a death

sentence. You do have that option now in the event that that happens.

Does that make sense to you?

A. Yes.

Q. Now, this last special issue I've been talking about burdens of proof. There's no burden of proof for either party on this special issue. Okay. It's there for your benefit. It's there for your benefit. We call it also the "Safety Net" issue.

Basically, what it's telling you is go back there and look at everything again. Look at all of the evidence again. Look at the circumstances of the offense. Look at the defendant's character. Look at his background. Look at his personal moral culpability. Look at all of that one more time and if there's something in there that says to you, you know what? I think it's mitigating. I think it lessens his culpability. I want to show mercy and I think it's sufficiently mitigating. Then it allows you, as an individual, to show that mercy based on the evidence and turn it into a life sentence.

The question for you now is not what do you think is mitigating. When will you do it? Mitigation is often something, ma'am, that you're like, well, I'll know it when I see it. I'll know it when I see it. And

53

that's why it's there for you because God forbid you know it, you see it, you think it's the right thing to do and you not have that option.

Okay. Do you think that sounds fair?

A. I do.

Q. Is that an exercise that you could engage in?

A. Yes.

Q. It kind of sounds like mental gymnastics, you know, that we're like, wait a minute. I found him guilty of capital murder which means the intentional murder of somebody. I believe he's going to be a future danger. You know, I think he was an active participant in this offense, but what in the world would ever make me change my mind? And that's not necessarily the question. The question is: Will you go into Special Issue Number 3 with an open mind and see if there's something that will change your mind. And I see you nodding your head "yes." And if there is something that changes your mind, will you do that?

A. Yes.

Q. We asked you about intoxication in your questionnaire. We asked you about upbringing in your questionnaire and how you feel about it today and your immediate reactions about it today are your reactions. But we'd like to feel you out about that because it

54

could potentially become an issue. You might not want to give whether or not somebody was intoxicated a lick of weight. And that's fine. But the question -- what you need to do is, well, let me look at it. Look at it in this context and then decide if it carries any weight or not.

We talked to you about genetics here. And I think it was you that gave a great example about Woody Harrelson's dad. Yeah. You know, he killed a Judge. Woody Harrelson didn't go on to start killing federal judges, you know, but it speaks to a defendant's character and background, and there might be circumstances where a person maybe just had it so bad, you know.

Again, I'll give you crazy. Maybe he's the guy who maybe he was just whipped everyday of his life. You know, and his dad was a monster and he put cigarettes out on him. And guess what, he turned into the monster that they raised him to be, and he's a bad guy and he's a dangerous guy. Probably it's his parents that should be on death row and not him. That might just be how you feel, you know. That doesn't mean we don't have personal culpability or responsibility. It doesn't mean that he goes home. He's going to be in prison for life, but it might be a circumstance that you think is

55

sufficiently mitigating to turn that verdict over.

Make sense to you?

A. Could be. Uh-hum. It makes sense.

Q. Okay. Will you wait and will you look at all of the evidence in that context and then make your decision based on the evidence in the case?

A. Yes.

Q. Okay. Just to -- one more thing I didn't cover with you in terms of the fundamental principles of law that always apply, the presumption of innocence, and the burden of proof and such as that.

If you're selected as a juror, your primary duty as a juror is to judge the credibility of the evidence in the case and the witnesses of the case. Okay. That's why we have people on juries and not just machines that we stick things into. And the law provides that's entirely up to you to determine what weight a piece of evidence gets or what amount of credibility an individual gets. But just like how you have to wait to answer the questions based on the evidence in the case, you have to wait for the person to take the stand before you assess their credibility. You had put in here, we asked you about peace officers and I think you have some law enforcement in your family.

A. Yes.

56

57

Q. Okay. And we put on Page 7, "Do you believe they are more likely to tell the truth than the average person?" And you said, "Yes."

You said, "They are naturally made up to hold up the law and protect the citizens. I realize there are bad in all aspects of life, but I respect the law and I hold a high opinion for those who serve to protect us."

I agree with you. I agree with you. And there's nothing wrong with having feelings about a certain group of people such as that. I see that you also do hold your reservations and do acknowledge that there are some that are not so good sometimes. One bad apple often times does stink up the whole crew, doesn't it?

A. Yes, it does sometimes.

Q. And it's horrific when it happens. It is. But what you can't do is -- as a juror, you have to assess a person's credibility from the stand. You've got to wait to hear them testify. And you can't say, look, I will always believe a certain category of witnesses before I even hear what they have to say. I will always believe a preacher if he takes the stand. I don't even have to wait to hear what he says. I will always believe a police officer. I don't even have to wait to hear what he says. The law says, no, you've got to wait to hear what he says and then you assess his

58

credibility. And if it's everything you thought it would be, fantastic. If it doesn't pan out, then it doesn't.

Is that something that you think you can do? Are you capable of that?

A. Yes.

Q. That's a law that you can follow then?

A. Yes.

Q. So just to summarize with you. Understand that capital murder it's always the intentional taking of a life, it's not taken by accident.

Do you understand that?

A. I do. I understand.

Q. And it's the intentional taking of a life plus an aggravating factor.

A. Yes.

Q. And just because somebody is guilty of capital murder, does that mean that they automatically receive the death penalty.

A. No.

Q. Instead, whether or not somebody gets the death penalty depends on what?

A. On if they are a future threat to society.

Q. Okay. Depends on how, the answering of the special issues?

59

A. Well, yes.

Q. Okay. And will you base your answer to the special issues on the evidence in the case?

A. Yes, I will.

Q. Are you going to wait until I prove it to you?

A. Yes.

Q. Are you going to make me prove 1 and 2 to you?

A. Yes.

Q. Beyond a reasonable doubt?

A. Yes.

Q. Are you ready to answer those questions right now?

A. No.

Q. Okay. Why not?

A. I don't have any facts or burden of proof from you yet.

Q. Exactly. Do you have any questions for me as a representative of the State in this process?

A. No, ma'am, I don't.

Q. Anything not clear for you?

A. No.

MRS. HANDLEY: Okay. Okay. Thank you for answering my questions. I appreciate it.

PROSPECTIVE JUROR: You're welcome.

THE COURT: Thank you, Miss Handley.

60

How are you doing, Ms. Randleas? Do you need to take a short break?

PROSPECTIVE JUROR: I'm fine.

THE COURT: You're okay?

PROSPECTIVE JUROR: Uh-huh. Thank you.

THE COURT: You need any time out, Doug?

MR. PARKS: Yes.

THE COURT: All right. Let's take about a five-minute recess then. If you need a drink of water or the restroom, my bailiff will direct you. All right. Thank you.

(Brief recess taken at 10:49 a.m.)

(Proceedings resumed at 11:03 a.m.)

THE COURT: All right. We're ready.

THE BAILIFF: All rise for the juror.

THE COURT: Thank you, ladies and gentlemen. Be seated, please.

Mr. Parks.

MR. PARKS: Thank you, Your Honor.

THE COURT: Yes, sir.

EXAMINATION

BY MR. PARKS:

Q. Miss Randleas, let me note the time here. I'll try not to run over. Sometimes I lose my way if I don't make a notation. And I apologize for the delay,

I'm the one that called time out. I'm trying to coordinate with my wife who is coming a hundred miles to a funeral this afternoon and I needed to check on that progress. So I apologize for wasting that time.

A.  Not a problem.

Q.  We'll try to move through this as quickly as we can.

I don't know whether this is on. We don't really need it, but if you get to a point where you're having trouble hearing me --

THE COURT:  I can turn it on.

MR. PARKS:  That's all right, Judge.

THE COURT:  Are you having difficulty hearing her?

MR. PARKS:  No.

THE COURT:  No? Okay.

MR. PARKS:  Sometimes my voice drops.

THE COURT:  I've got it turned off, but you know, if you need it on, I'll be glad to turn it on for you.

MR. PARKS:  I think it will be all right for right now, Judge.

Q.  If I do drop, let me know. Okay.

A.  The same here.

Q.  All right.

---

62

A.  Thank you.

Q.  We've been doing this down in a little room on the second floor where we're all around a table and there are advantages to doing that and there are some disadvantages. I'm telling you more about this process than you want to know.

Here's the way I like to go about these things, Miss Randleas. I like to talk to you kind of in three stages to give you a little road map of where we're headed. I'll talk to you a little while about your questionnaire, I'll talk to you about the guilt-innocence phase of a capital murder trial, and I'll talk to you about the punishment phase of a capital murder trial. Okay.

A.  Okay.

Q.  Now, just because I spend a good deal of time on these special issues when we get there does not mean that the Defense team is conceding in any way that this jury will find Mr. Broadnax guilty of capital murder.

You understand that?

A.  I understand.

Q.  Okay. We just have to use our time on the issues that we need to talk about. Fair enough?

I'm a little bit confused about the questionnaire, I guess, Miss Randleas. When you filled the

---

questionnaire out, did you take your time to do that and did you take that endeavor seriously?

A.  Yes.

Q.  I thought you did. The answers that you put in the questionnaire were your answers and not anyone else's. Am I right?

A.  Yes.

Q.  And those were answers based upon your opinions and feelings that you have developed over the years.

Is that fair to say?

A.  That's fair.

Q.  Okay. Can I, in the space of the next thirty or forty minutes, talk you out of your long-held beliefs and opinions?

A.  Yes.

Q.  I can?

A.  Yes.

Q.  Are you sure about that? I'm not that good, Miss Randleas. I promise you.

The point is these are your answers that you gave us and they were serious answers when you gave them to us.

Is that fair to say?

A.  That's correct.

---

64

Q.  And like most of the jurors that we call down you indicate to us that you are in favor of the death penalty and you give us your reasons why as other jurors do, and I want to talk to you about some of those.

I had sort of interrupted myself in my head thinking back to what the prosecutor indicated to you about jurors and cases of this kind, and I can assure you that the Defense here wants a fair trial and I think that we are entitled to that and I expect you agree with that.

Is that fair to say?

A.  Yes, uh-hum.

Q.  And so our purpose down here really is to make a determination whether people can, in all honesty, follow the legal principles that are involved here. Some jurors tell us that they can do that and some jurors tell us that they cannot do that, and both positions are perfectly fine. Okay. That's one of the great things about this country. We have the right to make up our own mind about matters and we have a right to agree or disagree with the laws. We have an obligation to follow them, but we don't have to agree with them.

You understand what I'm saying?

A.  Yes.

Q. I generally tell jurors that the only thing that they can do that would not be right would be to indicate something with their mouth, I guess you would say, that they do not feel in their heart and in some way either give a false impression whether they intend to do that or not to the State, or a false impression to the Defense. Because this system works. I know that there are a lot of people who question whether or not the criminal justice system in the United States works. And I think that it works way better than most people believe that it does, but it requires four things to work. It requires prosecution who prosecute fully and fairly; and it requires a defense team dedicated to the defense of their client; and it requires a Judge who is willing to and can apply the rules. That's the Judge's job. The State needs to prosecute according to the rules, the Defense needs to defend according to the rules, and the Judge needs to fairly and evenhandedly apply the rules.

Does that make sense?

A. Uh-hum.

Q. The fourth thing are jurors who are truly not on one side or the other and can judge the facts in a fair, impartial, and unbiased way. And if all of those four things come together, this system is almost

you correctly -- and correct me if I'm wrong -- it would be your position if where a person had intentionally taken the life of another person that, generally speaking, that person's life should also be forfeited, but you hold out the possibility that there could be extenuating circumstances to prevent that.

A. Yes.

Q. Would that be a fair synopsis of how you feel about this issue?

A. Yes.

Q. Fair enough. You tell us over on the next page when we ask about the best argument against the death penalty you indicate a mental disorder, not intentionally killing another person. And the reason I bring it back up to you at this point, Miss Randleas, is that I want you to make sure and understand that when we're talking about a capital murder, we are talking about an intentional murder. Okay.

A. Okay.

Q. What our law says -- and sometimes you will get definitions of words or phrases and sometimes you will not. You do get a definition of intentional.

The legal definition is where a person -- it was his conscious objective or desire to cause the result. That's a legal way of saying a person in their right

66

68

perfect. Not quite because humans are involved and where humans are involved, there is always a chance that something might be awry. Most of the time when you hear or read about cases that have messed up in some way or another, you can generally point to one of those areas that somebody didn't do their job.

Does that make sense to you?

A. Yes.

Q. So we're down here to make sure everybody does their job. All right. Having said all of that, you've indicated to us in your questionnaire that you're in favor of the death penalty. That's fine. Nothing wrong with that. We ask you to explain that answer and you answer "If someone intentionally murders another person, then they should pay for the life that they took with their own life."

And I'm assuming that, that's what you meant when you wrote it down there.

A. That's what I meant when I wrote it down there.

Q. And do you still believe that?

A. I still believe that, but I also know that there can be some extenuating facts that could change that statement there.

Q. I understand. Okay. So if I'm understanding

mind made up, or set as a goal, to the taking of another person's life and did whatever it took to accomplish that goal. They killed another person because they wanted to, okay, and for not any other reason. There may be other reasons, motives or whatever, but with respect to determining if it was intentional that's all it takes.

The State doesn't have to prove motive. They don't have to prove pre-meditation. All they have to prove is that this person decided to kill another person without legal excuse or legal justification and did it. And when I say a "legal excuse" or "legal justification" that's another way of saying he was not insane, he was not acting in self-defense, he was not acting in defense of another person, it was not an accident, it was not a mistake, it was not negligent, it was not reckless. Okay. He did it because he wanted to. Okay. So that's what we're talking about when we talk about intentional. And I say that because you mentioned mental disorder. I want to make sure that you understand that a person who is criminally insane has a legal excuse and cannot be convicted -- should not be convicted of murder or capital murder.

You understand that concept?

A. Yes.

Q. We'll come back to that in just a minute.

Over on Page 9 you indicate to us that your husband, your ex-husband, your brother-in-law, and your nephew are all now or have been police officers. Is that correct?

A. Yes.

Q. Is there anything about that, Miss Randleas, that would cause you any difficulty in being a fair and impartial juror in a case of this kind?

A. No.

Q. It wouldn't make you judge the testimony of police officers any differently than you would anyone else?

A. No.

Q. Okay. Here is something that has not been touched on, but it concerns me and I need to visit with you about it. I hate to get personal like this, but sometimes we have to.

You indicate that your stepfather his home was broken into and he was shot and murdered there in his home.

A. Uh-hum.

Q. About how long ago was that?

A. It was a real long time ago. Let me think. Probably about twenty years ago.

cases, generally, but I couldn't tell for sure whether you were talking about this case, or the other cases.

Have you been on the internet at all about this case and tried to find out what any of the facts or circumstances were?

A. No, because I thought I recall being asked not to.

Q. You did. Listen. Don't take this personally.

A. Oh, I'm not.

Q. We've had people do it anyway. Can you believe that?

A. Yeah, I can, out of curiosity.

Q. Not so much in this case as the one that I tried not too long ago in Collin County. For some reason those Collin County jurors love the internet and they went straight to it. But you don't recall having done any searches or anything about this case?

A. No.

Q. Do you recall any of the details of this case?

A. All I -- and I'm not even sure that they're correct. It's been a long time ago. And what I recalled was there were two people and, I think, it was after hours they approached the two men. And I really don't recall anything. I just remember it was like for, what, $5, $10 something like that was how much they got.

70

72

Q. Okay. Did they catch the person who did that?

A. No.

Q. Never did?

A. Huh-uh.

Q. Is there anything about that, that you feel like you might would bring into the jury box with you and influence you in one way or the other?

A. No, I really don't even think about it unless it's brought up somehow.

Q. Okay. Well, I couldn't tell from the questionnaire whether it was a recent thing or not a recent thing. And, obviously, if it was something that had happened last year, or there was a person on trial for it or something, that would be a good deal more of a greater concern to us then something back then.

A. I understand.

Q. All right. I wanted to make sure that we talked about those issues before we got away from your questionnaire, and I want to make sure that I understand correctly on Page 10 and Page 3.

We ask you on Page 3 if you had heard anything about the case and you indicated that you had, but you did not recall the details. Then on Page 10 we asked you if you formed a basis of an opinion. And I know that that question comes right after the question about

Q. Okay. Do you recall seeing any interviews of the victim's family or anyone about that?

A. No.

Q. When you heard that on the television had you formed an opinion, or did you form an opinion at the time about whether the defendant was guilty or innocent or what punishment he ought to receive?

A. Not really. I just remember thinking that that was, you know, a shame and a waste, and how could someone do that, you know. I mean, robbing someone, but then killing them. You know, that's two different things, so...

Q. And you recall two people having been killed; is that correct?

A. That's what I recall. And I just remember it was like maybe for $5 or $10, something like that. So it didn't seem like it was really for the money, seemed like it was more for the kill.

Q. And how did that make you feel at the time?

A. Sad.

Q. Okay. And is there -- and you're telling us that you haven't formed an opinion about Mr. Broadnax regarding that, or have you?

A. No, I can't say that I have.

Q. Okay. All right. We may talk about that a

73

little bit more, or not, as we go along.

Miss Randleas, let me -- yeah, here is a question that I was curious about. And I'm referring on Page 4 right -- not the very first thing, but the second question about whether you agree with the law in the State of Texas. It says, "Murder in the course of committing a robbery is something for which the death penalty could be imposed." Your answer is: "When one plans to commit robbery and carries a gun, they have already maliciously become a murderer and planned on killing. "

Can you expand on that a little bit? What is your feeling about that? Taking a gun to a robbery is premeditated. Is that what I'm understanding?

A. Pretty much. I mean, why would you take a gun unless you were planning on using it?

Q. Okay. Sure. And in the question just above you indicate that the death penalty should be available for premeditated murder or intentional murder without legal justification. And I'm assuming that that still is your feeling about that?

A. Oh, yes.

Q. Sure. Okay. All right. Well, I want to talk to you a little bit about some of these issues. That pretty much takes care of that first thing that we were

74

going to talk about in your questionnaire. We may come back to something if it applies, but basically I'm through with that.

Now, I want to talk to you about the guilt-innocence phase of the trial. A capital murder is really not too different from any other case that you would hear as a juror at the merit phase or the guilt-innocence phase of the trial. Jurors are called upon to listen to the testimony, apply the evidence to the law that the Judge gives them, and return a verdict of guilty, not guilty, or guilty of some lesser offense if that has been an option given to them. Okay. And that's true whether it's a DWI case, or a capital murder case, or anything in-between. All of the principles pretty much apply; that is to say, the defendant is presumed to be innocent regardless of what he's charged with, that the State of Texas has the burden of proving everything that they have put in the indictment, all of the elements of the indictment whatever the offense is. And a failure to do so would require that a jury find the defendant not guilty of the charge contained in the indictment. Maybe not guilty of everything, maybe guilty of something else if they have been given the option.

You understand all of that?

75

A. I do.

Q. I go through that because occasionally I have people who indicate to me that they don't really believe in any of that stuff, or not all of it. I can remember a time when a prospective juror said that my client, she was convinced was guilty from the way he looked. So I give you that example not because to make light of that lady's opinion, but to recognize the fact that we don't all believe in presumption of innocence. We understand that's the law, but we don't all believe in it. We don't all believe in burden of proof. There's some of us who believe that the defendant ought to have to prove they're innocent. Everybody has a right to their own opinion. Okay.

I want to touch a little bit on the issue of manner and means. You remember the example that the prosecutor gave you about a hypothetical indictment where a juror was in a murder case and the State had alleged that the person was killed by shooting and then the evidence turned out that they were stabbed?

A. Uh-hum.

Q. Well, I want to make sure that we're clear about that because this is an issue that some jurors have a great deal of difficulty with and I need to make sure that you're straightforward with us and we know

76

where you're coming from.

I want you to assume that same fact scenario, that a defendant is being charged with intentionally taking the life of another person by shooting him with a gun, a regular murder case. We're not going to complicate it with capital murder. It's just what we call a plain murder. And you hear testimony that convinces you, including the confession from the defendant, "Yeah, I killed him. I killed him because I wanted to. Given a chance I'd do it again. And I stabbed him ten times."

And there you are sitting, believing with every bone in your body that this is a murder case, that the defendant did it, he's remorseful about it, he confessed to it, and there's no question in your mind that he intentionally took that person's life without legal justification or excuse. The only problem is the State said he shot him and the Medical Examiner said he stabbed him, and he said he stabbed him. And that's the evidence that you have. You have two choices. You can render a verdict of not guilty, which the law would expect that you would do to be real honest with you and let a murderer, coldblooded, walk right out of the back door.

Now, some jurors tell us that faced with that proposition they would do it. Wouldn't like to do it,

79

but could. Other jurors tell us that they understand the law. They understand what would be legally, I guess, required of them, but that morally that that was not something that they would ever -- could ever do and wouldn't do it.

How do you feel about it?

A. Well, that's a big question. I would have to stick to the law. I mean, we have to do what the law says.

Q. Hold your nose and find him not guilty?

A. Yeah. Not that I would want to do that, but that's what we would have to do.

Q. Okay. And that's fair enough. It's just you had some hesitation earlier and I just wanted to explore that just a little bit more. But you understand that that would be your obligation. You've got to hold the State -- and the key is not that, that's going to happen to you. The point that we're trying to make to you, Miss Randleas, is that you've got to hold the State to the burden that the law requires of them and very often it's not going to be issues as stark as that. It might be a situation where you go back to the jury room and say, well, you know what? I heard the evidence about the condition of the mind of the defendant and it causes me to wonder whether he really had the mental capacity

verdict in a case before you've ever heard the evidence. The law doesn't provide for that. So you have to wait. Okay. It's not a matter of choice. You've got to wait before you return a verdict in a case until the proper time in the case. The question gets to be whether or not you've prejudged the issue in any way before you hear the evidence or before you hear all of the evidence, and those are the things that we need to talk to you about. So if you were ever as a juror called upon to answer any of these special issues you would have had to have heard evidence that convinced you beyond a reasonable doubt along with eleven other people, all twelve of you convinced beyond a reasonable doubt, that the defendant is an intentional murderer, that he killed someone because he wanted to during the course of the commission of another serious felony. That's the type and kind of person that you would be answering these special issues about.

Are you with me?

A. Yes.

Q. So that when you're told that you don't have any evidence to answer these things before you hear the facts of the case, that's not exactly right because whatever else the evidence might be, you would have had to have heard evidence that convinced you that you're

78

at the time to form the kind of specific intent that the law requires. He's not insane. He's not retarded, but he was high on something. And I'm not sure the State has proven to me beyond a reasonable doubt that he had the specific intent to kill. And that's an issue that they have got to prove to me and I can't be helping them out. Just because it's a darn shame that people were killed and it's an awful situation, but I can't say beyond a reasonable doubt that he had the requisite mental -- cupable mental state. You don't give them a break because of the other issues. You hold them to their burden and say not guilty of capital murder if that's the kind of case that we're talking about and then if you've got other options, as you probably would have, then you go to whatever option you believe fit.

Can you do that?

A. Yes.

Q. All right. I want to talk to you then about the punishment phase of a capital murder trial. I want to set the context for it. And let me tell you, Miss Randleas, that we cannot talk about the specific facts of a particular case and ask you what you would and wouldn't do under those circumstances. That's why you sometimes receive hypothetical situations. But I can tell you that one, you or no other juror can return a

80

answering these questions about a capital murder.

Are you with me?

A. (Nods head.)

Q. Are you sure?

A. Yeah. You're just talking hypothetically. Right?

Q. I mean, it's -- because the only way a jury ever gets to these questions -- you see, if you heard evidence at the guilt-innocence stage and you weren't convinced beyond a reasonable doubt that the defendant was -- that it was an intentional murder, for instance, you find him either not guilty in which case the trial is over and everybody goes home, or you find him guilty of some lesser offense and you're not given these questions. You're sent back into the jury room to decide what punishment he would get within the range that the law provides for whatever he was found guilty on. Okay.

A. I understand that Special Issue 1 would be yes, or no, and then you go to the next. Correct? If it's a "yes," then you go to the next special issue.

Q. That's right. But the point I'm trying to make to you, Miss Randleas, is that if there was any verdict other than guilty of capital murder, you would never answer these questions.

81

A. Correct.

Q. Are we together on that?

A. Yes.

Q. Okay. So you see why they would always be asked about a capital murder.

A. Yes.

Q. Okay. So whatever else you'd know about a person you would know that he's capital murderer. Right?

A. Right.

Q. Okay. So then we come to these special issues. And the law presumes that this answer to Special Issue Number 1 there is no.

A. Uh-hum.

Q. Now, here's the question that I have for you frankly, Miss Randleas, based upon what you told me earlier. Where it's your personal belief -- that you're entitled to -- that intentional murderers should receive the death penalty, but there could be an exception contrary to what the law would ask you to do with respect to Special Issue Number 1, which is to presume that it is no; that is to say, that to presume that a capital murderer would not be a future danger so that he could receive the death penalty, unless it was proved that he was.

82

Do you see the difference in those two positions?

A. I do.

Q. Do you believe, in all honesty, Miss Randleas, that you could presume that an intentional murderer would not be a future danger? And I'm not talking about -- see, this is serious business down here, Miss Randleas. And to try to qualify somebody as a juror in a death penalty case based upon whether or not the defendant is a paraplegic kind of blinks at the reality of the situation. The reality is, is that Mr. Broadnax is entitled to twelve fair and impartial jurors. And he's not a paraplegic, and this case has got nothing whatsoever to do about some man who's five-year old child is dying some dread disease over at Children's Medical Center. This is a case where the State has alleged my client killed a person intentionally during the course of a robbery. He hadn't been run over by a trolley or anything like that to render him impossible to be a future danger. That blinks at what that question is asking and it's a straightforward question that everyone who is charged with capital murder is entitled to have a jury give an honest consideration to.

Does that make sense to you?

A. Yes, it does.

Q. And not to say, well, yeah, I could answer

83

that question no if the defendant killed his dying five-year old child, or I could answer that question no if the defendant is quadraplegic. You know, I guess the legislature could have put those things in there if that's what they wanted the standard to be, but that's not the standard.

Now, my bottom line question for you with respect to that question, Miss Randleas, is in all honesty if the State proved to you beyond a reasonable doubt that a defendant formed a goal to kill another person without legal excuse and justification and did it because that's what he wanted to do and did it during the course of the commission of another serious felony, would the facts of that case alone, just based on what convinced you that this person is guilty of capital murder, would that answer Special Issue Number 1 for you every time?

A. Yes.

Q. And I thought that that's the way you felt about it and that's what you've basically have been trying to tell us for some little while.

A. Uh-hum.

Q. All right. So essentially that's what the State is going to have to prove to you that the defendant is a capital murderer who intentionally took another person's life. And that fits basically with

84

your philosophy. I think what you told us is perfectly plain that I believe we must stand firm on an eye for an eye.

Is that kind of what you meant by that?

A. Yes.

Q. Okay. Fair enough.

I want to go a little bit further, Miss Randleas, and talk to you -- I'm not going to talk to you about Special Issue Number 2. The reason is, is that that issue is not always given. Special Issue Number 1 always is. Number 3 always is. But Number 2, the Judge will decide after he's heard all of the evidence whether or not that even applies, so this jury may not ever see that issue so I won't spend a lot of time with it. Okay.

A. Okay.

Q. Special Issue Number 3 is a good deal different from what we have been talking about.

Firstly, it's different because there is no burden of proof. In the guilt-innocence stage it's the State's responsibility to prove beyond a reasonable doubt, and so it is with Special Issue 1 and Special Issue 2, but not Special Issue Number 3. Special Issue Number 3 is peculiar in that it allows jurors to consider everything that they have heard during the course of the trial from

85

whatever source that it may have come through, and they get a little bit specific, but it's not limited to just this. It calls on the juror to consider the circumstances of the offense, the defendant's character and background, personal moral culpability, and it's not limited to that, that's just things that are enumerated there to determine if there is a sufficient mitigating circumstance, circumstances to warrant that life without the possibility of parole is the appropriate punishment and not the death penalty.

You made a statement earlier that I wanted to follow-up on and just get your thoughts about it because you said it and that was the end of it. It was in the form of a rhetorical question. You said, what good is life without parole, or something to that effect.

Do you remember making that statement?

A. I do remember making that statement.

Q. Tell us what you mean by that, what your concerns, your thoughts are in that regard.

A. Well, this is, again, my feelings and my opinion --

Q. Sure.

A. -- but when someone is in prison for life, what kind of life is that? So, yeah, they are still alive, but they are caged. They can't ever leave.

86

Q. Right.

A. And I just -- that's something that I have, you know, questions about as far as --

Q. You see no real purpose in it. Would that be fair to say?

A. Yeah, the purpose of it.

Q. Okay. Fair enough. What I want to make sure that you understand is whatever else the mitigating or circumstances might be, Special Issue Number 3 is being asked about a person that you've not only found is a guilty intentional murderer, a capital murderer, but is a person that you believe is going to be a continuing danger to society. So that's the context, again, of that question.

Now, it talks about some things that, again, refer back a little to your questionnaire and I want to visit with you about this issue that Ms. Handley talked to you about because maybe I interpreted it a little differently than she did. The answer that you gave about Woody Harrelson.

Do you remember that?

A. Yes.

Q. The way I interpreted that -- and I believe that's on Page 8. It is. The way I interpreted that is that here was Woody Harrelson who had himself overcome

87

his background and circumstances and was extremely successful. And I kind of took that to mean that if that's a person who can do that, then anybody can.

Is that sort of what you intended to convey there?

A. That's, you know, that's the whole -- I mean, I feel like it's possible that people can come from hard backgrounds. They didn't have good parents, but yet they can still make a life for themselves and be, you know --

Q. Be productive?

A. -- in society.

Q. Sure. Well, that question kind of calls for a yes or no, and you didn't answer it yes or no so I had to interpret it. It asked whether you feel circumstances of birth, genetics, upbringing, environment should be considered when you determine a proper punishment.

Do I interpret correctly that the yes-or-no answer for you is no? If I'm wrong, tell me.

A. Well, I'm just kind of open to it. It just depends on what I hear and the facts that are produced. And I think everything should be heard before making a decision.

Q. Okay. Let me run some things by you. Let me just tell you that we do not define in the State of

88

Texas what a mitigating circumstance is or is not. We leave that up to the individual juror to make a determination about. Here are some things that jurors have indicated to us could be considered or might not be considered depending upon their feelings about it.

Youth. Now, let me tell you that a person has got to be at least 18 years of age before they can be tried for capital murder and the State can seek death. So when talking about age, we're talking about at least 18 years of age. Some jurors indicate to us that if a person was in the lower end of that, 18, 19, the low 20's, 20, 21 that that would be something that they would -- or could consider in answering Special Issue Number 3.

How do you feel about that?

A. I don't think the age makes any difference to me between 18 and 21.

Q. As long as you're 18 years of age or older --

A. Uh-hum.

Q. -- that would not be a consideration for you. Is that what I'm hearing?

A. It wouldn't be.

Q. Okay. Fair enough.

We talk about voluntary intoxication in here. We tell you first that voluntary intoxication is not a

89

defense, and that's true.

A. Uh-hum.

Q. And then over on Page 6 we ask at the top, we say that the law in Texas provide that evidence of intoxication may be considered -- it doesn't say it has to be -- may be considered in mitigation of punishment. Do you agree?

Your answer was "Whether it was self-induced or in knowingly administered by way of another person." And I understand that. What I want to talk to you about is the situation where it's not, where it's voluntary whether through alcohol or drugs or any mind-altering substance, a person voluntarily took those substances.

Is that something that you believe that you could consider in answering Special Issue Number 3? Would that make any difference to you at all?

A. It's possible. It just depends on what I hear as facts and circumstances.

Q. Fair enough.

Now, let me ask you this last question, basically, and you just tell me how you feel about it because as I said before, you get to that special issue you would have already decided from the evidence --

A. I see.

Q. -- that the defendant is guilty.

90

So I want you to assume an intentional murderer where the accused was over the age of 18. He was not mentally retarded. There was no duress, self-defense, accident, mistake, insanity, those things that we've talked about. That the victim was totally innocent, did not provoke the accused and did not deserve to die.

What would be your feelings about answering Special Issue Number 3 at that point in time?

MRS. HANDLEY: Your Honor, I'm going to object to the commitment to a particular fact situation such as that.

THE COURT: Well, I'll overrule the objection. She can answer the question.

Do you need it repeated?

PROSPECTIVE JUROR: Yes, please.

THE COURT: Repeat the question.

Q. (By Mr. Parks) Okay. All right. Assume that when you're answering that question you have already found by the evidence beyond a reasonable doubt that the defendant is an intentional murderer. He was over the age of 18. He was not mentally retarded. There was no duress, self-defense, accident, mistake, insanity. Assume that the victim was totally innocent, did not provoke the accused, that he did not deserve to die, that the defendant killed him because that's what he

91

wanted to do.

What would be your feelings about the death penalty at that point?

A. I would probably find him guilty and sentence him to death.

Q. In all honesty, Miss Randleas, if you heard and were convinced of facts such as I have just described to you, do you believe that there would, or could ever be, any mitigating circumstance or circumstances that would cause you to change that belief that he ought to have the death penalty to a life sentence?

A. There always that possibility.

MR. PARKS: Okay. Fair enough. Thank you, ma'am. That's all we have, Judge.

THE COURT: All right. Thank you, Mr. Parks.

All right. Miss Randleas, I'll ask you to step out with my bailiff for just a moment and I'll confer with the attorneys and I'll bring you back in and give you a result. All right.

PROSPECTIVE JUROR: All right. Thank you.

THE BAILIFF: All rise for the juror.

(Prospective Juror, Teresa Randleas,

92

exits the courtroom.)

THE COURT: Thank you. Be seated, please.

Miss Handley, does the State have a challenge for cause?

MRS. HANDLEY: We do not, Your Honor.

THE COURT: And, Mr. Parks, does the Defense have a challenge for cause?

MR. PARKS: We do, Your Honor. We would first challenge the juror for the reason that she has a bias or prejudice against a portion of the law that the Defense is entitled to rely upon in that we are entitled to have a person sit -- all persons sit on the jury who would not -- or who could consider the answer to Special Issue Number 1 is no. And this juror has clearly stated that if she finds a person guilty of capital murder she will, in all cases, answer Special Issue Number 1 yes. So we believe that she is disqualified because of that.

Further, we believe that she is disqualified under the Eighth, Sixth and Fourteenth Amendments of the United State's Constitution and under the teaching of Lockett versus Ohio, Morgan versus Illinois and Eddings versus Oklahoma for the reason that she would not consider -- could not consider the defendant's use in answering Special Issue Number 3.

And we are entitled to have a jury made up of persons who would not refuse to consider relevant mitigating evidence on behalf of the defendant, which she would do.

THE COURT: Okay. Miss Handley, do you have a response?

MRS. HANDLEY: I do, Your Honor. I've been listening carefully to this particular juror and she has been very -- she has stated consistently her ability to not only -- to follow the instructions and the law in this case. Even if she didn't like it she stated, well, that's the law and I would stick with the law.

With respect to the answer of Special Issue Number 1, I believe that His Honor did hear that in asking her about that she did want to clarify and she said, "Are we talking about hypotheticals here?" Because even after that she has consistently stated in answer to questions, "I'm open to that. Everything should be heard before making a decision. The answers to this depends on the facts and circumstances." Even consistently through her anything is possible, it's always possible. So I think when the Court takes into context everything that she has said, I believe that she does have a good understanding that everything always does depend on the issues and does depend on the facts

and circumstances of the issues. She has brought that up several times, Your Honor. And for those reasons I believe that she is qualified.

THE COURT: All right. Thank you. The Defendant's challenge for cause is denied. And let's see. She will Number 24, is it?

THE BAILIFF: Yes, sir.

MR. LOLLAR: May the record reflect, Your Honor, that this is a juror that is unacceptable to the Defense.

THE COURT: Yes, sir. So noted.

And, of course, we're not picking jurors, but we're just qualifying panel members for the jury to be selected from.

Okay. Would you bring the juror back in for me, please?

(Prospective Juror, Teresa Randleas, enters the courtroom.)

THE COURT: Miss Randleas, come on in and just have a seat there, if you would, please, ma'am. Thank you, ladies and gentlemen. Be seated, please.

Miss Randleas, you are going to be Prospective Juror Number 24. Now, that doesn't mean that you're on the jury. What we're doing right now is we're qualifying forty-eight to fifty people as

prospective jurors to be a panel. And then from that panel then each side will have fifteen preemptory strikes or challenges, we call them sometimes, where they can strike fifteen of those panel members. And the first twelve that aren't struck by either side, then become the jury.

PROSPECTIVE JUROR: Okay.

THE COURT: Okay. Now, you're probably not going to know whether you're on this jury until about the end of July, but we anticipate that the evidence in this case will start August the 10th, which is a Monday, and we anticipate that the trial will take approximately two weeks. So what I would like for you to do for me now is to mark on your calendar the week of August the 10th and then that following week which, I guess, would be August the 17th, those ten days Monday through Friday for this trial in the event that you're on the jury.

Now, if you get a notice in July that you're not on the jury, well, then of course you don't have to report for jury service. But if you are, indeed, one of the jurors, then you would report for jury service to commence evidence in this case on August the 10th. Okay.

PROSPECTIVE JUROR: Okay.

THE COURT: All right. Now, with regard to pretrial publicity. You said, during your interview here today that you had heard something about it, wasn't real sure, couldn't remember exactly what it was that you had heard. But you did indicate to me that you had not formed an opinion. Is that correct?

PROSPECTIVE JUROR: That is correct.

THE COURT: And so, therefore, you don't have any opinion as to guilt or innocence of this defendant at this point in time. And, of course, you know what Judge Snipes will do if you're on this jury is to administer the oath of a juror to each of the twelve of you and at that time, then you would be sworn to make your decision in this case based solely upon the two things. The law that you will receive from Judge Snipes during the trial, and then the evidence that you will hear and see during the trial. Okay. And those will be the only things. In other words, you can't go into it with an opinion. And if you read something or hear something about the trial even between now and then, or during the course of the trial, you wouldn't be able to take that into consideration as well.

Do you understand that?

PROSPECTIVE JUROR: Yes.

THE COURT: So what I'm going to ask you

97

to do is to stay just like you are and that is not know anything about this case.

PROSPECTIVE JUROR: Okay.

THE COURT: And so don't come back in the archives or on the internet and try to find out what happened or anything like that. Or if there are stories that come out during the jury selection process, or even during the course of the trial -- and I'm sure Judge Snipes will continue to admonish the jury if there is publicity about the case, you know, not to read the newspaper accounts or watch the T.V. accounts or whatever it is that might be in the news.

So anyway, I want to ask you to do that between now and then as well.

PROSPECTIVE JUROR: Yes.

THE COURT: All right. Very good. Anything further from the State?

MRS. HANDLEY: Nothing from the State.

THE COURT: Mr. Parks?

MR. PARKS: No.

THE COURT: Thank you so much for being here and you will be noticed.

PROSPECTIVE JUROR: You're welcome.

THE COURT: Thank you, ma'am. Appreciate your time very much.

98

Okay. I guess that takes care of our morning, doesn't it? So we will reconvene about 1:15.

(Lunch recess.)

(At 1:23 p.m., the following proceedings were held.)

THE COURT: Okay. I believe we've got everybody, except Mr. Horne. Right?

MR. PARKS: Mr. Horne was never notified, apparently.

THE COURT: Well, it says his number is no good so he won't be here is what it says on my little list.

MR. PARKS: It's a great loss.

MRS. HANDLEY: A terrific loss.

MR. PARKS: Yeah.

THE COURT: So do you want to just agree to let him go?

MRS. HANDLEY: Yes, sure.

THE COURT: Okay. Well, let's get this on the record.

Okay. Let's go ahead and get Mr. Horne on here. This is Prospective Juror Number 968, Jonathan Horne, H-o-r-n-e. And my list indicates that the phone number for Mr. Horne -- the phone numbers -- on his sheet are no good and that he's not going to be here

99

because no one has been able to contact him.

So does the State have anything they would like to put on the record with regard to Mr. Horne excusing him?

MRS. HANDLEY: We do, Your Honor.

In addition to the fact that we just simply cannot locate Mr. Horne, he's also stated on his jury questionnaire that he believes the death penalty is appropriate in all murder cases. Based on that, and some other things he's put in here about some health concern with his leg or something, that we don't believe he would be a qualified juror for this particular case.

MR. LOLLAR: No objection.

THE COURT: All right. Thank you, Mr. Lollar.

Page 7, Andrea, where he talks about the police officers -- it looks like his questionnaire, to me, when he filled it out to me it was very minimal.

MRS. HANDLEY: Yes, sir.

THE COURT: There's really not much information given.

MRS. HANDLEY: It's very minimal. Really no explanations to the things he answered. His answers don't make sense in a lot of respects, Your Honor. It appears he's 23 years old, and I just don't think that

100

he would really even get through understanding the process here on what we're doing. But having even said that, he does have a bias, I think, in favor of the death penalty too far in favor with his answer of Number 1 that he thinks it's appropriate in all murder cases.

THE COURT: Anything further, Mr. Lollar?

MR. LOLLAR: No, Your Honor.

THE COURT: All right. Thank you.

Then by agreement can I just put on the record that Mr. Horne is being excused by agreement of parties for those reasons?

MR. LOLLAR: Yes.

MRS. HANDLEY: Yes.

THE COURT: All right. Let the record reflect that Prospective Juror Number 968, Jonathan Horne, is being excused by agreement of the attorneys for the purposes and reasons mentioned on the record. So I'll put Mr. Horne down as excused.

All right. Now, then, I guess Leonard Phlatts.

MR. LOLLAR: Judge, we've got two others that we can get rid of pretty quick.

THE COURT: Oh, you want to do those first? Okay. Sure.

MR. LOLLAR: Five and --

THE COURT: Okay. Let's see. Dixon and Huynh. Is that how you pronounce that? Let's do -- what is Huynh?

MRS. HANDLEY: He's a Buddhist, Your Honor.

THE COURT: Okay. Bring in Mr. Huynh.

MR. LOLLAR: That's a woman.

THE COURT: Yes, I see now. Female. That would indicate that she's a woman. Thanks for pointing that out to me.

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 129, Thank Huynh enters the courtroom.)

THE COURT: Have a seat right there, if you would, please, ma'am. Thank you. Just go ahead and have a seat.

Thank you, ladies and gentlemen, be seated, please. And good afternoon, Miss Huynh. Am I pronouncing your last name correctly?

PROSPECTIVE JUROR: It's Miss Huynh. Yes.

THE COURT: Good. And if you could speak up. You have a real soft voice and the attorneys out here need to hear your answers. So could you do that for me?

---

prevent you, or at least inhibit you, from participating in a process such as this. Is that correct?

A. Yes, ma'am.

Q. Okay. So that's still your feelings today?

A. Yes, ma'am.

MRS. HANDLEY: Thank you very much, ma'am. I appreciate it.

THE COURT: Any questions, Mr. Lollar.

MR. LOLLAR: No, Your Honor. Thank you, Ms. Huynh.

MRS. HANDLEY: That's all we have.

THE COURT: All right. Thank you, Ms. Huynh. I will excuse you then. Thank you very much for being here.

(Prospective Juror, Thank Huynh, exits the courtroom.)

THE COURT: Does the State have a challenge for cause?

MRS. HANDLEY: We do, Your Honor. We have a challenge to this juror as having a bias against the law.

MR. LOLLAR: No objection.

THE COURT: The State's challenge for cause on Prospective Juror Number 597 -- I don't know how you pronounce her name. Thank Thao Thi Huynh.

---

102

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you, ma'am. Let's see. Miss Handley.

MRS. HANDLEY: Thank you, Your Honor.

THANK THAO-THI HUYNH,
having been duly sworn, testified as follows:

EXAMINATION

BY MRS. HANDLEY:

Q. Good afternoon, ma'am. We appreciate you coming down here. I just have a couple of questions to ask you, okay, because we're trying to determine whether or not certain people are good for this particular case, and this is a death penalty case. You understand that.

A. Yes, ma'am.

Q. In your questionnaire we asked you if you were in favor of the death penalty and you stated on there, no, that you're not in favor of the death penalty.

A. Yes.

Q. Is that still how you feel today --

A. Yes.

Q. -- not in favor of it? You also stated that when we asked you if you had any moral or religious beliefs that would prevent you from either standing in judgment of another person or in returning a verdict of death you stated that your Buddhist religion would

---

104

MRS. HANDLEY: Do you need us to spell that for you?

THE COURT: And you can do so much better, Doug.

MR. PARKS: I didn't say anything.

THE COURT: Now, let's bring in Lou Dixon.

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 969, Lou Jean Dixon, enters the courtroom.)

THE COURT: Ms. Dixon, come on in. Yes, ma'am. Just go ahead and have a seat right there, if you would, please, ma'am. Thank you very much.

Be seated, please, ladies and gentlemen. Vicki, I would like for the record to reflect this is Prospective Juror Number 969, Lou Jean Dixon.

And, Miss Dixon, good afternoon to you. Thank you for coming and being with us this afternoon.

Ms. Handley.

MRS. HANDLEY: Thank you, Your Honor.

LOU JEAN DIXON,
having been duly sworn, testified as follows:

EXAMINATION

BY MRS. HANDLEY:

Q. Good afternoon, Mrs. Dixon. How are you?

105

A. Fine.

Q. I appreciate you being here. We need to talk to every juror to ensure whether or not they are qualified for this particular case so I just have a couple of questions for you and then we'll go to your qualifications.

When we asked you about how you felt if you were in favor of the death penalty you stated that you were not. Is that still how you feel today?

A. Yes, ma'am.

Q. And you also stated that you could never, under any circumstances, return a verdict which would assess the death penalty.

Is that also still your feelings today?

A. Yes, ma'am.

Q. You also articulated for us that currently you are suffering from a few health problems that might impair your ability to participate in this trial.

A. At the time, yeah. I'm doing better. I'm recovering quite well.

Q. I'm glad to hear that. And does this still cause you stress to drive into downtown?

A. Yeah.

Q. Yeah, it does a lot of people. It does a lot of people. That's really all the questions I have for

106

you.

Thank you, ma'am.

MR. LOLLAR: We have no questions. Thank you.

THE COURT: All right. Thank you. Appreciate your being here, Ms. Dixon. You are excused.

(Prospective Juror Lou Jean Dixon exits courtroom.)

THE COURT: Thank you. Be seated.

Mrs. Handley, does the State have a challenge for cause?

MRS. HANDLEY: We do, Your Honor. We would challenge this juror on having a bias against the law, not able to return a verdict under any circumstances.

MR. LOLLAR: No objection.

THE COURT: The State's challenge for cause, Prospective Juror Number 969, Lou Jean Dixon is granted.

Okay. Now, I think we're down to the talker. Right?

MRS. HANDLEY: Elaine will be talking to Mr. Phlatts.

THE COURT: Okay. All right. So we're ready for Phlatts?

107

MRS. HANDLEY: I believe so.

THE COURT: Mr. Phlatts. Yes, come in, Mr. Phlatts.

(Prospective Juror No. 446, Leonard Phlatts, enters the courtroom.)

THE BAILIFF: All rise for the juror.

THE COURT: Good afternoon, Mr. Phlatts. Just go ahead and have a seat right there, if you would, please, sir. Thank you.

Am I saying your last name correctly? And, thank you ladies and gentlemen, be seated, please.

PROSPECTIVE JUROR: Yes, sir. Phlatts.

THE COURT: Phlatts. Very good. Thank you, Mr. Phlatts. It's good to have you here this afternoon. Thank you for coming down and being with us this afternoon.

I'm Judge Quaid Parker. I'm a Senior District Judge from McKinney, Texas, just right up the road here from Dallas, and Judge Michael Snipes is the presiding Judge in this case. And Judge Snipes asked me if I would assist him in the trial of this case by presiding over the jury selection process.

PROSPECTIVE JUROR: Okay.

THE COURT: We call it the Individual Voir Dire Examination. So that explains to you what I'm

108

doing here today instead of Judge Snipes and also, incidently, while you're here today.

PROSPECTIVE JUROR: Right.

THE COURT: Now, Mr. Phlatts, I know that -- oh, and, Vicki, I would like for the record to reflect that this is Prospective Juror Number 446, Leonard Douglas Phlatts, P-h-l-a-t-t-s. Right?

PROSPECTIVE JUROR: Correct.

THE COURT: Mr. Phlatts, I'm going to hand you your questionnaire you filled out over a month ago. I know it's been over a month since you've seen that or since you filled it out and probably the last time you saw it.

Now, you do recall over a month ago when Judge Snipes got everybody together down in Central Jury. There were probably four or five hundred of you on the panel, and at some point in the proceedings not only did you fill out this questionnaire, but also Judge Snipes had everybody stand up, raise their right hand, and he administered the oath of a prospective juror to every panel member.

Do you recall that?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Were you one of the panel members that stood and took the oath at that time?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Very good. I'll just remind you, you're still under your oath and what you've been sworn to do are two things. First of all to give truthful answers, but we know that you do that anyway, but also to be responsive to each and every question. In other words, answer each question as best you can that the attorneys ask you.

Now, first of all, let me tell you there's not going to be anything that's going to embarrass you in any way and there's no right or wrong answers. What's going to happen is they are going to go over the law with you.

Did you have an opportunity to read the little juror introduction there?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Okay. What do they call that, the juror guide or something like that? That little pamphlet that my bailiff handed you when you got here and that gives you kind of an introduction to what the attorneys are going to be talking to you about, but they are going to expand on the law, explain it in more detail to you. Once you understand it, then they are going to ask you questions to get your ideas, your thoughts, and your opinions, if you will, concerning the law and some of the procedural aspects that are involved in a capital murder trial. Okay.

PROSPECTIVE JUROR: Okay, sir.

THE COURT: So like I said, there's no right or wrong answers. This is not a test or a quiz that you have to pass or don't pass. They are just trying to get an idea of how you really feel about the law and whether you can follow the law. Okay.

PROSPECTIVE JUROR: Okay, sir.

THE COURT: Very good. Now, let me introduce you to the attorneys that are going to take part in this voir dire examination.

Elaine Evans is seated right here directly in front of you, and next to her is Ms. Andrea Handley.

MRS. HANDLEY: Good afternoon, sir.

THE COURT: And behind these ladies is Mr. Gordon Hikel. These ladies and gentleman are all three Assistant District Attorneys here in Dallas County and they are three members of the prosecution team.

And then at the table right in front of me, at counsel table in front of me, is Mr. Brad Lollar, Mr. Doug Parks, and then on the very end down here, the better looking of those three, is Miss Keri Mallin. And these three attorneys comprise the Defense team and they represent Mr. Broadnax, Mr. James Broadnax, who is the defendant in this case. All right.

PROSPECTIVE JUROR: Okay.

THE COURT: Very good. Thank you. Miss Evans.

MS. EVANS: Thank you, Your Honor.

LEONARD DOUGLAS PHLATTS, having been duly sworn, testified as follows:

EXAMINATION

BY MS. EVANS:

Q. Mr. Phlatts, how are you this afternoon?

A. I'm fine, ma'am.

Q. Great. I'm going to first turn to a scheduling-type issue.

On Page 17 of the questionnaire you said that you have some plans in August?

A. Yes, I did say that.

Q. Okay. And do you still have those plans?

A. I haven't materialized anything yet. I just had it in plans. Nothing in --

Q. Because this trial, if you're selected as a juror in this case, is going to be from August 10th until maybe about August 21st. We've scheduled about two weeks.

A. Yes, I read it here.

Q. Okay. Does that interfere or since you hadn't already developed your plans, would that interfere with your plans to travel?

A. No, it would not because as I said before, I haven't materialized anything. I just had it in plans.

Q. Okay.

A. But I haven't done anything.

Q. Okay. Perfect. So you would be here and available in Dallas County to serve as a juror in this case for those days?

A. Exactly.

Q. Okay. Thank you.

A. You're welcome.

Q. After getting that out of the way, I want to talk to you a little bit about why you're here today.

As the Judge told you there are no right or wrong answers here as we sit and talk now. And really it's the only time the lawyers have on either sides to talk to you about what your feelings are. Okay. And right now you've just taken an oath to tell the truth and so we just really want to know what your thoughts are, what your feelings are about the laws that may come up in a case of this type. Okay.

A. Okay.

Q. And it's okay to disagree with the law. As

113

you sit there right now you don't have to agree with everything. You may think that some things should be changed about the law and that's perfectly fine as you sit there now. Okay.

A.    All right.

Q.    Whenever you take -- if you are selected as a juror in this case you would be taking an additional oath and that oath would then be to render a true verdict based on the law and the evidence. So if you were to serve as a juror in this case you would then have to follow the law as given to you by the Judge. And so it's okay to still have thoughts and feelings about various laws as long as you can set those aside and follow the law as the Judge gives you, okay --

A.    Okay.

Q.    -- and render a verdict based upon that. Does that make sense?

A.    Yes, it does.

Q.    And so basically the type of case you're here on today is capital murder. All right. And in capital murder in Texas there are two possible punishments. That's life in prison without parole, or the death sentence.

Did you read about that in the pamphlet?

A.    Yes, I did.

115

Q.    Okay. And the reason I bring that up is because if somebody has a legal justification or defense like self-defense, they were justified under the law in committing that act, they would be not guilty. Okay. And if it turns out the State doesn't prove their case, then they are also not guilty and you would be obligated to return a verdict as such. Okay.

A.    Okay.

Q.    And if you find, based on the evidence, that we have the wrong person, that this individual didn't commit any crime, much less the one we charged them of then they are not guilty and you would be obligated to return your verdict of not guilty.

Does that make sense?

A.    Yes, ma'am.

Q.    And so I bring that up because if you find somebody not guilty of capital murder or of any offense charged, you would not be called upon to assess punishment. Okay.

A.    Okay.

Q.    And so the death penalty wouldn't be available if you find somebody not guilty of capital murder, you would stop right there and everyone would go home. Okay.

A.    Okay.

114

Q.    Okay. And not in every single capital murder case does the State decide to seek the death penalty that, you know, the determination or the decision is made whether or not it would be sought in a particular capital murder. Okay.

In this case the State is seeking the death penalty. And so that gives you the possibility of either of those two punishments life without parole, or the death sentence if you find the defendant guilty of capital murder. Okay.

A.    Okay.

Q.    And so the reason I say if you find the defendant guilty of capital murder is because I notice in your questionnaire you talk about maybe a reason not to do the death penalty would be if somebody didn't commit the crime.

If you want to turn to Page 2 you talk about maybe a reason against the death penalty is if the individual didn't actually do the crime, didn't commit a crime they shouldn't get the death penalty. All right. And then somewhere else in your questionnaire I think you talked about a reason to do the death penalty versus a life sentence would be if they were acting in self-defense.

Do you kind of recall something about that?

A.    Correct. Yeah.

116

Q.    It's only if you find someone guilty of capital murder do you then go about determining the answers to these special issues, and we're going to get into those a bit later. Okay.

A.    Okay.

Q.    Now, I also read from your questionnaire that you are in favor of the death penalty; is that correct?

A.    Correct.

Q.    Okay. And you say if an individual commits a crime, any type of crime, he or she should get the death penalty. If that person commits a bank robbery, they should get the death penalty.

Do you recall answering it that way?

A.    Yes, I do.

Q.    Okay. And what do you mean by you think somebody should get the death penalty for committing any type of crime?

A.    I'm saying if someone commits a crime and there's proof and evidence they should be sentenced to death. If you take away somebody's life, your life will be taken away, also.

Q.    Okay.

A.    Legally.

Q.    Literally?

A.    Legally.

Q. Legally. Okay. By the State of Texas, you mean. Right? Somebody should do it in accordance with with the laws, right, not just an eye for an eye sort of killing. Okay.

A. No.

Q. And I saw you don't believe in an eye for an eye. Correct?

A. Correct.

Q. Is that "no?"

A. No, ma'am.

Q. Let me explain to you. I said that the law in Texas is that capital murder has two possible punishments life without parole, or a death sentence, but I didn't talk about what types of crime constitute a capital murder.

In Texas, capital murder is murder with some sort of special circumstance. For example, if you murder a police officer who is the line of duty. If you murder a child under the age of six, or if you killed two or more people during the same criminal episode during the same crime, those are all capital murders. There also is what we've alleged here in this indictment which is murder plus a robbery. It has to be something additional, some sort of aggravating factor, another felony that was committed in the course of that murder.

---

A. Okay.

Q. What is it about bank robbery that gives you, I guess, the feeling that that type of person, or that type of crime is deserving of the death penalty?

A. Because I think if a person is going to rob either a bank or another person, a lot of times it involves death because the person that is being robbed tried to defend themselves. The thief is going to kill that person, is going to murder that person, just to get the money.

Q. So that's why you believe that it should be eligible or available in crimes such as that. Is that fair to say?

A. Yes, ma'am.

Q. And, again, like I told you before there are no right or wrong answers. You're entitled to your feelings as you sit there. You just have to be able, though, if you were to sit as a juror to base your verdict on the law and the evidence in the particular case. Okay.

A. Okay.

Q. And so if somebody goes in and commits a bank robbery -- and they may have it thought out in their head. You know, I've got my gun right here, and if that teller makes a move towards me or is not letting me take

---

118

All right.

A. Right.

Q. So, for example, if I just turn to my co-counsel here and I start firing away and I fired ten shots into her body and I sit back and laugh about it and I tell you, I'm glad she's dead. That offense is not a capital murder. Do you understand why?

A. No.

Q. Okay. That would just be a plain -- I mean, it might be an evil heinous crime, but I've just taken her life just one person and it didn't have any sort of aggravating factor. You know, she's not a child under the age of six, she's not a police officer, and I did take or steal any money from her so it's not murder plus something else. To be available to get the death penalty here in Texas it has to be one of those circumstances. Okay. It's not just killing her because I want to. No matter how evil and heinous it is, okay, those crimes are not available to receive the death penalty.

How do you feel about that?

A. It sounds reasonable.

Q. It sounds reasonable that it would have to be -- require something more to be eligible for the death penalty.

---

120

money, then I'm just going to shoot them and kill them. They can go in there with that thought, but let's say they go into that bank, rob it, but the teller is more than willing. Here, take it all. Take it all. And they leave and nobody is hurt, nobody is killed. That case isn't eligible for the death penalty. You understand that?

A. Okay.

Q. Are you okay with that law?

A. Okay.

Q. You are? It's got to be murder plus something else.

A. Right.

Q. And I believe you've served as a juror before, is that correct --

A. Yes, I did.

Q. -- back in 2004?

A. Yes, I did.

Q. And that was a murder case.

A. Yes, it was.

Q. Okay. Do you recall how the Judge gave you will the Court's Charge and it contained all of the law in it?

A. Right.

Q. Correct?

121

A. Correct.

Q. And you were okay with reading and understanding and following the law as it was given to you when you sat as a juror previously. Right?

A. Yes.

Q. So just because this is kind of a special-type murder, a capital murder, it's no different here. The Judge will give you the law as it applies. And you kind of have a puzzled look. You don't have to remember what we are talking about here today. Okay.

A. No problem.

Q. I don't want you to feel like you have to remember, you know, way in August what we're talking about because you will get the law again just as you did in your previous jury service. Okay.

Now, on Page 11 of your questionnaire you talk about that you believe regardless of what the Judge says the law is jurors should do what we believe is the right thing. And you say, yes, the jurors have the right to express themselves. You see where you put that? It's about the middle of Page 11.

A. Okay.

Q. So, again, I want you to kind of think about your prior jury service and what you did there. Jurors will deliberate and talk amongst yourselves about, did

122

the State prove their case beyond a reasonable doubt. And you're entitled to your opinion whether or not we've proved it and why we did and why we didn't, and you would discuss that in deliberations, okay. So you're right. Jurors to do have a right to express themselves and the verdict is your verdict and, you know, the jury that comes to a consensus -- it's y'all's verdict and yours alone and no Judge is going to try to change your mind as it applies to the facts and the evidence you heard. Okay.

A. Right.

Q. But what the Judge gives you is the law and it is the law which you are bound to follow. Okay.

A. All right.

Q. And so if the Judge gives you the law, will you follow that law and then apply it to the facts that you hear in the trial?

A. Yes, I will.

Q. You would do that?

A. Yes.

Q. Okay. Moving along.

Since you had prior jury service you will probably remember such things as principles of law that apply in every single type of criminal case. It doesn't matter if it's a speeding ticket or a DWI, all the way up here

123

to capital murder where the State is seeking death. Every defendant is entitled to certain rights.

Do you remember something about that?

A. Yeah.

Q. Okay. For example, the presumption of innocence. As the defendant sits here, he's just being charged with the offense of capital murder. Okay. The indictment is no evidence of guilt, it just let's the State know what we have to prove to you and it puts the defendant on notice of what he's being charged with.

Does that make sense?

A. Yes, it does.

Q. And so would you be able to give this defendant his presumption of innocence?

A. Sure, I will.

Q. Okay. And as I mentioned the burden of proof is always on the State. Okay. We have to prove a person guilty beyond a reasonable doubt. And what beyond a reasonable doubt or what a reasonable doubt is is up to the juror to determine. Okay.

A. Okay.

Q. But will you hold us to our burden of beyond a reasonable doubt? Would you be able to hold the State to its burden --

A. Yes.

124

Q. -- and require us to prove it? Okay. And when I say that we have certain things -- and I think you probably looked at the indictment in this case what we are required to prove such things as the county, where this occurred, who did it, how that person died, like the manner and means by shooting someone, and that it happened in the course of a robbery. All of those things are called elements. Okay.

A. Okay.

Q. So let's just take it out of the context of this case and let's say, for example, that you are here on a plain murder like you sat on before. And let's say the indictment read that the defendant caused the death of the deceased by shooting that person with a firearm. All right.

A. Okay.

Q. And then you're sitting here as a juror on trial and you hear evidence that sure enough that person is dead that we talked about in our indictment, and sure enough you believe that this defendant is the one that did the killing that caused the death of the deceased, okay, but then the Medical Examiner comes and testifies and says that that individual died from stab wounds from being stabbed to death not by a gunshot. What would your verdict be in that case?

A. Being stabbed by the same person?

Q. Right. But the State said we were going to prove to you gunshot, that the person died as a result of being shot with a firearm. And we're required to prove what we tell you we're going to prove, okay, beyond a reasonable doubt.

Would you hold the State to their burden?

A. It's kind of hard to say.

Q. Because the Judge is going to give you the law and tell you we've got to prove those elements, those things in the indictment beyond a reasonable doubt. Okay. And so if we don't prove to you that the person died as a result of being shot, but we proved to you that they are stabbed, are you able to find the defendant guilty?

A. It should be because the person is dead.

Q. But we've got to prove to you how they died by gunshot, but then remember you had a witness come say he was stabbed. So what would your -- if you were following the law and the oath that you take, what would your verdict have to be?

A. I would say guilty.

Q. Okay. You would still say guilty?

A. Yes, because he committed the murder.

Q. All right.

126

A. He did commit the murder.

MS. EVANS: All right. Thank you, Mr. Phlatts. I believe that's all that we'll have for you today. Okay.

PROSPECTIVE JUROR: Okay.

THE COURT: All right. Thank you. Mr. Lollar, do you have anything?

MR. LOLLAR: We don't have any questions.

THE COURT: Thank you, Mr. Phlatts, for coming in. We appreciate it. You can just leave everything right there, except your glasses, of course, take those with you. Thank you for coming down this afternoon, sir.

PROSPECTIVE JUROR: Okay. Thank you.

THE COURT: We appreciate your time. Thank you very much.

PROSPECTIVE JUROR: You're welcome.

MS. EVANS: Thank you, sir.

(Prospective Juror, Leonard Phlatts, exits the courtroom.)

THE COURT: This is Prospective Juror Number 446, Leonard Douglas Phlatts, P-h-l-a-t-t-s.

Does the State have a challenge for cause?

MS. EVANS: Yes, Your Honor. The State

would challenge Juror Number 446, Mr. Phlatts, in that he would not require the State to prove each and every element beyond a reasonable doubt, would not hold the State to the burden of beyond a reasonable doubt and, in fact, Mr. Phlatts appeared to be a bit confused in not understanding the law as it would apply in this case.

MR. LOLLAR: We have no objection.

THE COURT: Thank you, Mr. Lollar.

Then the State's challenge for cause will be granted.

Well, so much for this afternoon.

(Proceedings adjourned at 1:57 p.m.)

-oOo-

**COUNTY OF DALLAS** )
)
**STATE OF TEXAS** )

I, VICKI L. TUCK, Official Court Reporter in and for County Criminal Court No. 1 of Dallas County, State of Texas, do hereby certify that the above and foregoing contains all exhibits referenced in proceedings directed by counsel to be included in the Reporter's Record in the styled and numbered cause, all of which occurred in open court, or in chambers, and were reported by me.

I further certify that this Reporter's Record of Proceedings truly and correctly reflect the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ 853.00 and was paid by Dallas County.

WITNESS MY OFFICIAL SIGNATURE on this 26th day of February, 2010.

_____
VICKI L. TUCK, CSR #1250
OFFICIAL COURT REPORTER
County Criminal Court No. 1
133 N. Industrial Blvd., 3rd Floor
Dallas, Texas 75207
Tel./Fax 214-653-5606

Certification Expires: 12-31-10.