*AP-76207*

APPELLATE NO. AP-76,207
TRIAL CAUSE NO. F08-24667-Y

THE STATE OF TEXAS          *   IN THE CRIMINAL DISTRICT

vs.                         *   COURT NO. 7 OF

JAMES GARFIELD BROADNAX     *   DALLAS COUNTY, TEXAS


*********************************************************

REPORTER'S RECORD OF PROCEEDINGS

(Individual Voir Dire Examination)

Volume 22 of _____

*********************************************

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 16th day of June 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Quaid Parker, Senior Judge sitting for the Honorable Michael Snipes, Judge of Criminal District Court 7 of Dallas, County, Texas, at which time the following proceedings were held:

ORIGINAL

(Proceedings generated by computer-aided transcription.)

VICKI L. TUCK, OFFICIAL REPORTER
COUNTY CRIMINAL COURT NO. 1
TEL. FAX 214-653-5606

**APPEARANCES**

MS. ANDREA HANDLEY
SBOT:  08898800
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,


MS. ELAINE EVANS
SBOT:  24032880
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,


MR. GORDON HIKEL
SBOT:  12508700
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,



MR. DOUGLAS PARKS
SBOT:  15520000
ATTORNEY AT LAW
321 Calm Waters Lane
Holly Lake Ranch, Texas  75765
                    APPEARING FOR THE DEFENDANT,

MR. BRADLEY LOLLAR
SBOT:  12508700
ATTORNEY AT LAW
1700 Commerce, Suite 450
Dallas, Texas  75201
                    APPEARING FOR THE DEFENDANT,

MS. KERI MALLIN
SBOT:  24049165
ASSISTANT PUBLIC DEFENDER
Dallas County Public Defender's Office
133 N. Industrial Blvd., LB2
Dallas, Texas  75207-4399
                    APPEARING FOR THE DEFENDANT.

## CHRONOLOGICAL INDEX - VOLUME 22

(June 16, 2009)

| PROSPECTIVE JUROR | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **Kylar Hamilton** | 5 | 8 | 42 | – | 22 |

Challenge for Cause (State) ................. 60
Challenge for Cause (Defense) ............... 61
Court's Ruling ............................. 61

| **James Henvey** | 61 | 65 | – | – | 22 |

Challenge for Cause (State) ............... 80
Court's Ruling ........................... 81

| **Baird Whitten** | 81 | 84 | 124 | – | 22 |

Challenge for Cause (Defense) .............. 143
State's Response .......................... 144
Court's Ruling ............................ 146

| **Kimberly Morris** | 147 | 150 | 191 | – | 22 |

Challenge for Cause (Defense) ............. 231
Court's Ruling (Juror Qualified) ........... 231


Court Adjourned ........................... 235

Reporter's Certificate .................... 236

### ALPHABETICAL INDEX - VOLUME 22

(June 16, 2009)

| PROSPECTIVE JUROR | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **Kylar Hamilton** | 5 | 8 | 42 | – | 22 |

Challenge for Cause (State) ................. 60
Challenge for Cause (Defense) .............. 61
Court's Ruling ............................. 61

| | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **James Henvey** | 61 | 65 | – | – | 22 |

Challenge for Cause (State) .............. 80
Court's Ruling ........................... 81

| | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **Kimberly Morris** | 147 | 150 | 191 | – | 22 |

Challenge for Cause (Defense) ............. 231
Court's Ruling (Juror Qualified) .......... 231

| | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **Baird Whitten** | 81 | 84 | 124 | – | 22 |

Challenge for Cause (Defense) ............. 143
State's Response ......................... 144
Court's Ruling ........................... 146

Court Adjourned ........................... 235

Reporter's Certificate .................... 236

PROCEEDINGS

(June 16, 2009; 9:10 a.m.)

THE COURT: All right. Are we ready to talk to Mr. Hamilton, Kylar? Okay. Bring Mr. Hamilton in.

THE BAILIFF: All rise.

(Prospective Juror No. 709, Kylar Hamilton, enters the courtroom.)

THE COURT: Come in, Mr. Hamilton. Just have a seat right there. Good morning to you. Thank you, ladies and gentlemen. Be seated, please.

Vicki, I would like the record to reflect this is Prospective Juror Number 709, Kylar, K-y-l-a-r, Hamilton, H-a-m-i-l-t-o-n.

Good morning, Mr. Hamilton. How are you this morning?

PROSPECTIVE JUROR: Good.

THE COURT: I'm Judge Quaid Parker. I'm a Senior District Judge from McKinney, Texas, just up the road here in Dallas and the Presiding Judge over this case is Judge Michael Snipes and Judge Snipes was the one who talked to you. It's been over a month ago now since everybody got together in the Central Jury and Judge Snipes talked to the group. And at some point in the proceedings he asked everybody to stand up, raise their right hand, and he administered the oath of a prospective juror.

Do you recall that?

PROSPECTIVE JUROR: Yes.

THE COURT: Were you one of the panel members that stood and took the oath at that time?

PROSPECTIVE JUROR: Yes.

THE COURT: Very good. I'll just remind you, you are still under that oath. And what you've been sworn to do here this morning is to give us truthful answers -- but we know you'll do that anyway -- but also to be responsive to each and every question that is asked to you by the attorneys.

Now, let me tell you just a little bit. Have you had an opportunity to read the --

PROSPECTIVE JUROR: Just the first page.

THE COURT: Just the first page. Okay. So what's going to happen -- that's kind of a little introductory guide to the law and some of the procedural aspects that are involved in the trial of a capital murder case. And the attorneys will be talking to you about that. They are going to explain the law to you and go over it with you. When you understand the concept, well, then they are going to ask you questions about how you feel about it, your opinions, that sort of thing. So there's really not any right or wrong answers to any of their questions. This isn't a quiz that you have to pass or fail or something like that. They are just trying to get your ideas about how you feel about the law and some of the procedural aspects that would be involved in the trial.

Anyway, now, at that same time over a month ago you filled out a questionnaire and I've got your questionnaire right here. I know you haven't seen it, but the attorneys all have copies of it, they have all read it, and so they will probably have questions that they want to ask you about some of your responses and answers to some of those questions.

All right. Anyway, let me introduce you to the attorneys. This is Mrs. Andrea Handley seated at the counsel table right directly in front of you.

MRS. HANDLEY: Good morning.

THE COURT: And the young lady that just left is Miss Elaine Evans, and then seated behind them over there is Mr. Gordon Hikel. All three of them are Assistant District Attorneys here in Dallas County. They are part of the prosecution team in this case.

And then directly in front of me at counsel table here is Mr. Brad Lollar.

MR. LOLLAR: Good morning.

THE COURT: And then next to him is Mr. Doug Parks, and on the very end down here is Miss Keri Mallin. These three attorneys are the Defense team and they represent Mr. James Broadnax who the gentleman right here in the middle.

All right. Very good. Thank you. Mrs. Handley.

MRS. HANDLEY: Thank you, Your Honor. I appreciate that.

KYLAR HAMILTON,
having been duly sworn, testified as follows:

EXAMINATION

BY MRS. HANDLEY:

Q. Good morning, again, Mr. Hamilton. How are you today?

A. Good, and you.

Q. I'm just fine. Thank you for asking.

I appreciate you being here. I appreciate you coming down that first day and filling out the questionnaire, making time for us today. This process doesn't work only until we have people such as yourself who are willing to come down here and take part of it.

I know you didn't have a lot of time to absorb that information in front of you so we'll kind of take it

slow. If there's something you don't understand, then by all means interrupt and ask us some particular questions because for a lot of people this is the first time they have ever had to think about the death penalty or even how one of these cases works. I think that there's popular misconceptions how these things work, that if a person is found guilty of capital murder they automatically get the death penalty, or that a juror will go back and go, should we give them the death penalty or should we give them a life sentence. And it really doesn't work that way. There's actually procedures and protocols that are place and things that have to be followed in cases like this.

What we're doing is we had hundreds of people come down in the morning, fill out questionnaires, and even more people come down that afternoon and fill out questionnaires. And the reason we had so many people is because this is a different kind of case, you know, and I think you can appreciate that. This is the most serious offense that we have with the most serious potential punishment that we have in the State of Texas and we need to get jurors that are qualified to sit on this case. Some people just flat out aren't qualified. Some people just can't do it and there's nothing wrong with that. And some people may be a little too

overzealous and they are willing to just come in and make assumptions and just "Tell me where to sign." And I don't want those people either. What we are looking for are people that can follow the law, listen to the evidence in the case, apply the facts and the evidence in the case to the law and return their verdict, and assess a punishment based on how they answer the questions so that the punishment fits the crime. We're not looking for anything automatic.

I'll tell you that I believe a qualified juror is an individual that will follow the law. You don't necessarily have to like it, but that you will follow the law. A qualified juror is an individual that will come into court and listen to the evidence with an open mind. That, that person, that individual, then apply the evidence in the case in order to answer the questions in the case in order to return their verdict, and that they will always have an open mind and won't make any snap decisions or come in with their mind already made up. Some people can and some people can't. And so I just want to talk to you about the law and we also want to feel you out. I mean, just because you may potentially be qualified today does not necessarily mean that you will definitely be on the jury. We're looking for a pool of individuals that are qualified that we can

then take that particular juror out of. Okay. So you will know today if you're qualified, but you won't know if you will actually be on the jury.

Does that make sense to you?

A. It does.

Q. I believe you sat on a civil case before. Is that true?

A. It's been a long time.

Q. A long time ago? Okay. I'll tell you that civil cases and criminal cases are a lot different, a lot different. In Texas, we have what is called the "Bifurcated Trial System," a two-part trial system. In the first part of the trial the jury is called upon to determine one issue only and that is, is the defendant guilty of the charge that he's been indicted for. If he's not guilty you find him not guilty, and that should be it. If you do find him guilty, then and only then do you move on to the second phase of the trial. And that's where that expression "Let the punishment fit the crime" comes into play. That you, again, look at the evidence in the case and that will dictate what the verdict will be in the case. And in a death penalty case by listening to the evidence in the case, you will answer what we call special issues, or questions.

Did you have an opportunity to read those yet?

A. No.

Q. Okay. We'll get to those then. But a jury doesn't go back and say how many vote for life, how many vote for death? Instead they go back, they reassess all of the evidence, and they answer questions and based on how you answer those questions will determine whether or not the sentence will be a life without parole sentence, or a sentence of the death penalty. Okay.

A. Okay.

Q. So let's talk a little bit about -- and I'll tell you that in your questionnaire -- your questionnaire is only for us to get your personal feelings. It's not a law test. It's not a quiz. You know, we didn't expect that you knew the law when you answered this. It's a lot of times just to get your gut reaction to things. And when you state that -- I believe that you put in here that you do believe in an eye for an eye. And do you have the questionnaire in front of you?

A. Uh-hum.

Q. Okay. Great. On Page -- gosh. Where is that? I believe that's Page 5 we asked you "Do you believe in an eye for an eye?" And you said "Yes." And I think a lot of people feel that way.

I'll tell you that the law does not necessarily

13

provide in an eye for an eye. Okay. It's's kind of a personal feeling I think for people, but that's not the Texas law. It's not if you kill somebody, you will be killed. That's not actually how it works in Texas. Instead, it's's based on procedures and protocols and following the rule of the law.

I'll talk to you a little bit about the laws that always play into every criminal case, be it a case where somebody is looking at the death penalty potentially -- and, again, I say "potentially" because nothing is ever automatic in a case like that, or be it theft of a bicycle. There's certain principles of law that apply every single time. Okay.

Let me touch on one of those things with you right at the beginning. And one of those principles of law is that a jury basis its verdict only on the evidence that it receives in the trial. The evidence comes from the witness stand right where you're sitting right now. It comes from people talking, it comes from documents sometimes. It might be in the form of a physical piece of evidence you can hold, but evidence comes only from the witness stand. It does not come from what you heard from the newspaper, or what you heard on T.V., or what you talked about at work around a cup of coffee. And we had asked you because we need to know if you had heard

14

anything about the case. On Page 3, we said, "Do you think you heard about the case?" And you said, "Yes." And you put down "word of mouth." Okay.

Is that just you talking to your neighbor or friends or something or one of those, did you hear what happened on the T.V., that kind of situation?

A. Well, I live in Garland so I have a paper route part time downtown, so I kind of knew what had happened.

Q. Okay. Okay. I think it did generate a lot of interest out there. If people who heard something on the T.V. or radio or talked about it were not qualified to sit as a juror, then we'd just have a bunch of people who sat in their basement with the lights off, you know. What is important is that if you have heard something, that you leave that outside of the courtroom and that you only base your verdict on what you hear inside of the courtroom.

Do you feel you're capable of doing that?

A. Yes.

Q. Okay. Have you already formed an opinion as to whether or not this defendant is guilty and what should happen?

A. No.

Q. All right. Then fair enough. That is one of

15

those fundamental principles of law that we're talking about.

Another one is, sir, that as we sit here today -- and this applies in any criminal case. As we sit here today you, as a juror, everybody in this courtroom, is to presume the defendant innocent at this point in time and the reason is, is because I haven't proved anything to you. I haven't offered up a single piece of evidence. And until, only if and until I can prove my case to you beyond a reasonable doubt, he gets a presumption of innocence and that stays with him.

Does that sound fair to you?

A. Uh-hum.

Q. And it is fair. It's just a fundamentally fair proposition. I bring the charges, I ought to have to bring the proof. Don't you think?

A. Yes.

Q. Can you give him that presumption of innocence as we sit here today?

A. Yes.

Q. Now, he's been indicted. And the law will tell you that the indictment is not evidence of his guilt either. All that is, is that it tells him what he's been charged with, and it tells me what I have to prove in order for a juror to find him guilty. Okay.

16

And keep in mind I keep saying that I have to prove and I'm talking about me as a representative of the State. The burden of proof always rests with the State of Texas. Always. I'm the one who has to bring the evidence in the case. You, as a juror, never look to the Defense side for any piece of evidence. Okay. That doesn't mean that they can't bring evidence, but you can't say, well, he needs to prove he's innocent.

Do you understand that?

A. Yes.

Q. And is that something that you think you can also follow there?

A. Yes.

Q. I have to prove my case to you beyond a reasonable doubt. I think everybody has heard that before. But I'll tell you what, there's really no definition of what that means. What that means is what you think it means. I'll submit to you it doesn't mean that I have to prove it to you beyond all doubt whatsoever. Some people have explained a reasonable doubt saying if I have a reasonable doubt, then I have a doubt that's based on reason and common sense. It's not I'm just looking for any possibility whatsoever, but it's a doubt based on reason and common sense.

Does that also make sense to you?

17

A. Yes, it does.

Q. Okay. What do you think reasonable doubt is?

A. Kind of what you said. You have to be able to prove it, but you don't have to prove all aspects of it.

Q. Right. Right. Okay. And one of the things the things that I do have to prove to you -- there are certain things I don't have to prove to you. I don't have to prove to you motive. I can if I want, but I don't have to. But the things that I must prove to you, Mr. Hamilton, are things called elements of the offense and that's what is set out in that indictment. That indictment tells me you have to prove every element of this offense or else the defendant is not guilty. And every element of the offense is just as important as the other. I don't get points for proving five out of six. I have to prove them all. I have to prove to you who did it, that he did it in Dallas County, that he did it on a particular date, how he did it, who he did it to. They're all set out in the indictment. If I failed to carry my burden on any one of those elements, then your verdict must be not guilty. Okay. And I'll give you just an "out there" example just to illustrate to you the importance of that law and how we're not kidding around about that.

Okay. Let's say you're called to sit on a murder

18

case. And in that indictment that tells me what I have to prove it is put in that indictment I have alleged that the defendant killed another person by shooting him with a firearm. Okay. So I have to prove shooting him with a firearm. Well, the defendant testifies and he says, "I killed that guy. I'm glad I killed him." Okay. But the Medical Examiner comes to the stand and says, "This person didn't die of a gunshot wound, this person was stabbed." The crime scene person says, "I didn't find a gun at the scene, I found a knife." Have I carried my burden of proving to you that he killed him by shooting him with a gun?

A. No.

Q. No. What would your verdict be?

A. Not guilty.

Q. Not guilty. And I know you would probably hate it and you should probably tell my boss I need to learn how to prosecute better, but it wouldn't be your fault. And that's just to illustrate to you that there's no cutting corners in that respect.

I take it that you will hold me to my burden in this case then.

A. Yes.

Q. Excellent. Also, with respect to, you know, we talked about you get your evidence from the witness

19

stand. And a lot of times, Mr. Hamilton, that comes in the form of people taking the stand and testifying. Your obligation -- one of your most important duties as a juror is to assess the credibility of the witnesses. You listen to him, you watch him, you know, and you assess their credibility. Is this person telling me the truth? Is this person lying to me? Is this person just maybe mistaken? Okay. But what the law says is you have to wait for the person to take the stand first before you assess their credibility. You can't automatically give somebody credibility. You can't automatically say, I will always believe this kind of person, this group of individuals, if you put them on the stand.

We had asked you on -- I believe it is Page 7 about police officers. And a lot of times police officers do testify in criminal cases. It's in the middle of the page. And we said, "Do you believe police officers are more likely to tell the truth than the average person?" And you said "Yes. We hold them to a higher power of the law." Well, I'll agree with you. I believe they are held to a higher standard. They are all about law and order and it's a reasonable assumption or expectation that they would be more truthful. There's nothing wrong with that. But what you can't do is say,

20

before I ever hear what the police officer has to say I'm going to tell you right now I'll always believe him.

Do you feel that way, Mr. Hamilton?

A. No.

Q. Will you wait until that individual, be it a police officer, a doctor, a convicted felon, you will wait?

A. Right.

Q. Okay. Let's talk -- do you have any questions about any of that?

A. No, not so far.

Q. Okay. Let's talk then a little bit about murder and let's talk about capital murder because I'll tell you will that the two are actually different. They are similar in many respects, but they are actually also different. We had asked you for what crimes do you think the death penalty should be available in Texas and you said, capital murder. And I'll tell you you're absolutely right. That is the only crime where an individual could potentially receive the death penalty. Again, nothing automatic. It is different, though, from murder.

In Texas, a person commits first-degree murder, okay, if he intentionally causes the death of another individual. It's important to understand what

"intentionally" means. It doesn't mean that he accidentally killed somebody, it doesn't mean that he killed someone in self-defense, it doesn't mean that he was just negligent or reckless like a car wreck or I just meant to hurt him, but he died. It is I meant to kill the person. I did what I had to do to kill the person. That is intentional murder. If I pulled a gun out of my briefcase right now and I just started shooting my co-counsel and I shot her ten times, I think you would agree with me that's particularly heinous, isn't it?

A.   Uh-huh.

Q.   I cannot potentially receive the death penalty for that, though, because it's not a capital murder. Capital murder is actually a very exclusive -- for lack of a better word -- group of crimes to which the death penalty is available. It is this, though. It always involves an intentional murder. Okay. But it's an intentional murder, plus something else. An intentional murder, plus an aggravating factor. For example, the intentional murder of a child younger than six years of age. That's an aggravating factor, or an intentional murder of a police officer while he's in the line of duty, or the intentional murder of a person while you are in the course of committing another serious felony

22

offense, such as burglary, sexual assault, robbery. So it's always that intentional murder, plus that something else.

Does that make sense to you, sir?

A.   Yes.

Q.   Do you agree with that law? Would you change that law?

A.   I agree with it.

Q.   You agree with that? Would you broaden it to include all murders that that be potentially available?

A.   No.

Q.   Okay. As a matter of fact, you hit the nail on the head there. On Page 2 where we said, the best argument for death penalty. You said, "capital murder." The best argument against it is murder because if I can't prove capital is the person eligible for the death penalty? They are not. It's an impossibility and it cannot and should not happen, so that is a capital murder.

As I said before, Mr. Hamilton, just because an individual is found guilty of capital murder does not necessarily mean that they automatically receive the death penalty. In all criminal cases, be it a death penalty case or be it a theft case, or a burglary case, what happens in the punishment phase will always depend

on the circumstances of the offense. It will always depend on the defendant in the case. It will always depend on the particular circumstances of that particular case. I think you might have even said that in your questionnaire. Again, I think you hit the nail on the head.

On Page 5 we asked you -- it's's kind of towards the third question from the bottom. We said, "What would be important to you in deciding whether a person received a death sentence rather than a life sentence in a capital murder case?" And you said, "The circumstance." And I don't think I could have said it better. That's exactly it. It's the circumstances of this particular case whether or not it's appropriate. Not whether or not he deserves it, but does it fit the particular law.

You had also put on Page 8 where we asked you about some people feel genetics in circumstances of birth, upbringing and environment should be considered when determining the proper punishment of somebody convicted of a crime. We said, what do you think? You said, "Every crime is different and we should look at it on a case-by-case basis." And, again, I submit to you, sir, I think you're absolutely right. You're not telling us that you can tell us what you will do in every case, can

24

you?

A.   No.

Q.   Do you know right now what you will do in every case in terms of punishment if an individual is found guilty of capital murder?

A.   No.

Q.   Can you tell me right now if I proved to you beyond a reasonable doubt that this defendant intentionally caused the death of somebody in the course of committing or trying to commit a robbery, can you tell me right now if you can give them the death penalty or not?

A.   No.

Q.   Why not?

A.   Because you haven't weighed all of the evidence.

Q.   Right. You haven't reached that punishment phase. You haven't heard any additional evidence, have you?

A.   No.

Q.   Do you know anything about -- and you don't know anything about this because I haven't told you anything about this, have I?

A.   Right.

Q.   All right. You know there's about a million

different ways somebody can commit a capital murder, Mr. Hamilton. I think it's just countless, countless ways because no two cases are alike as you've recognized. I can say a capital murder is the intentional murder of a person in the course of committing robbery, you know, and you could envision in your mind the guy who goes into a 7-Eleven, steals the money out of the cashier's draw, and shoots him in the head. That's a capital murder. Or you can envision a guy who goes up to his -- goes up to a -- a guy who lives down the street from him, knocks on the door, the guy opens the door, he shoots him in the head, he walks in and takes his bag of money. They are both intentional murders, aren't they? And they are both robberies, aren't they? And that's all you've heard. But a lot of times you have to look at the surrounding circumstances because no two cases are alike. Maybe one of these guys has just been a n'er do well his entire life and really not a credit to his community. Maybe the guy who went to that neighbor and shot him and stole his money, maybe he shot the local drug dealer who has been poisoning people his entire life, and maybe he took that sack of money and walked down to Goodwill and dropped it in the box for donations.

He meant to kill him, didn't he? He sure did. He

26

meant to kill him and he robbed him, didn't he? And that's a capital murder, you know, but you've got to look at all of the surrounding circumstances. Who is the defendant? What was going on? Maybe one of them has had a terrible record, maybe one of them has been a stellar citizen his entire life. Maybe one of them has had a horrible upbringing. Maybe both of them have, but one took one way and the other took another. It depends. So let's talk about when we get to the capital murder punishment phase of a trial and what happens. Okay.

You will never get to the second phase of the trial if you don't find the person guilty of capital murder. Okay. So understand where you are at that point. At that point you have found that this person meant to kill somebody and did it. Okay. And you have found that they were either committing or trying to commit a robbery when they did it. Okay. So we're past that. That's the person that you're looking at, at this point.

Okay. You go in now to the second phase of the trial. And, Mr. Hamilton, it's like you're starting all over again. Okay. You're not making any assumptions about what should happen, you haven't already made up your mind as to what should happen. It's almost like it's a brand new trial. Okay.

Now, remember how I told you in the first phase of the trial that the defendant enjoyed a presumption of innocence?

A. Uh-hum.

Q. And that was because why?

A. Because the State hadn't proven anything at that point.

Q. Exactly. I hadn't proved anything so he enjoyed a presumption of innocence. Well, he's not innocent anymore now, is he, because you found him guilty. But there's another presumption that the law says you must have now going into this punishment phase and the presumption is this. That you are to presume that the proper sentence in the case is life in prison without parole. Okay. And understand, life in prison without parole is just that. You're not coming out. Okay. You are to presume that that is the proper thing to do because only one of two things can happen after a guilty of capital murder. You're going to get life without parole, or you're going to receive the death penalty. Okay. You're to presume that's the right thing to do and the reason you're going to presume that's the right thing to do is just like in the first phase I had to prove to you he was guilty. In this phase you're to presume that's the right thing to do

28

until I prove to you it's not. Okay. That burden of proof is right back on me again. And before I can ask you to sign a verdict that will sentence somebody to death, I ought to have to prove to you that the circumstances fit that, that it is the appropriate thing to do.

Does that sound fair to you?

A. Yes.

Q. Okay. What I basically have to prove to you, Mr. Hamilton, is not necessarily just that he committed a capital murder, but we're talking about a person now who I'm going to have to prove to you that in all likelihood, more likely than not, he will continue to be a danger. We often call that the "Future Dangerousness Issue." And it's one of the three questions that you're called upon to answer, okay, because you're going to answer questions in that punishment phase.

Look at this first special issue here. Go ahead and take a second to read that. I don't know if you've had an opportunity to do that yet.

You got it?

A. Uh-hum.

Q. Okay. That's the first question that you're called upon to answer. And, again, I have to provide you the proof in order for you to answer that because

29

can you answer that right now?

A. No.

Q. You don't have anything in front of you, do you?

A. No.

Q. Okay. The question reads -- it's asking you basically is he going to be a future danger. Notice it starts out, do you find from the evidence beyond a reasonable doubt. That ought to tell you one thing right there when you see "reasonable doubt," have I proved it to you. Okay. Have I proved to you beyond a reasonable doubt that there is a probability.

Now, the word "probability" is not defined for you by the lawmakers. They wrote these questions for you, but they did not tell you what these terms mean.

And I apologize of this phone going off. That's completely unacceptable. I'm so sorry, Your Honor.

THE COURT: That's okay.

MRS. HANDLEY: Sorry, Mr. Hamilton.

Q. These terms are not defined for you. Some people say that they think of probability as more likely than not. Would you agree with that?

A. Yes.

Q. It's definitely not. It's more than a possibility, isn't it? Anything is possible.

31

could be the act of making threats against people could be considered a criminal act of violence, you know, but I have to show to you that more likely than not he's going to commit criminal acts of violence be it actually hitting somebody, or threatening somebody, or whatever, and I have to show you that it will constitute a continuing threat to society. Now, understand you presumed life in prison is the proper thing to do because that's the best he can get at this point. Right?

A. Correct.

Q. So where is he going to be the rest of his life?

A. In prison.

Q. So when it says "society," do you see how perhaps a prison could also include -- that definition of society could also include a prison?

A. Yes.

Q. There's more people in prison than inmates, aren't there? There's guards, and teachers, and clergy, and visitors, you know. So I'm having to prove to you not only is he a capital murderer, but more likely than not he's going to be violent in the future.

What would you have to hear, or see, or know, Mr. Hamilton, in order to help you answer that question

30

Have I proved to you that it's more likely than not that the defendant will commit criminal acts of violence? It doesn't tell you what criminal acts of violence are either, but notice this. It doesn't say have I proved to you that it's more likely than not that the defendant will commit another murder, or that the defendant will commit an assault, or that the defendant will threaten people. It doesn't say that, does it?

A. Right.

Q. It just says criminal acts of violence. That's for you to decide what that means. If, for example, if I were to -- Miss Evans is helping me out right now by turning off that cell-phone for me. And if I were to just turn and pop her in the face, do you think that would be a criminal act of violence?

A. It would be an act of violence.

Q. Okay. Do you think it would be a crime?

A. No.

Q. If I walked up and punched you in the face, do you think that would be a crime?

A. Oh, I'm sorry. Yes, it would be.

Q. And that's fine. If you don't think it is, then you don't think it is. That's the point, Mr. Hamilton. It's entirely up to you to decide. It could be, you know, physically hitting somebody. It

32

yes, or no?

A. The evidence and, I guess, a history.

Q. Okay. Okay. I'll tell you this. That in answering that question you can look at the crime that he committed. Okay. Some people are able to say I can just look at the crime itself and based just on that I can tell you that I believe, more likely than not, he's going to be a continuing threat to society. Other people say I need a little bit more, and that's fine, too. Okay. And you're telling me you would like to look at the crime and you would look to see if there's some kind of a history.

Do you think it's possible that a person could continue to be violent in the future if they have only done one bad thing in their life?

A. Yes.

Q. Okay. And, again, while you can look at that evidence of the crime just because he's guilty of capital murder he meant to kill somebody and he did it, are you going to automatically say that, that's yes?

A. No.

Q. Okay. You're going to reassess that evidence and maybe hear more now before you answer that question. If you answer that question, no, Mr. Hamilton, then you stop right there and you go home and the defendant gets

life in prison without parole, okay, because I've got that burden to carry and I have to carry that burden. If you answer that question, yes, then you move on to that second special issue.

In Texas, we have something called the law of parties. And I think, as you could probably imagine, sometimes crimes are committed by more than one person; sometimes two or more people acting together. And if a jury finds that those individuals acted as a party, that they either aided, encouraged, assisted, or directed in the commission of that crime, then they can also be held liable for that crime as if they had done it themselves by themselves. In a capital murder case you would have to find not only that they were a party to a crime, but also that they anticipated somebody was actually going to die.

If Miss Evans and I plan to rob the 7-Eleven tonight in my neighborhood, we'd sit at her kitchen table and plan it out. She goes and buys a gun, I go and buy the bullets, we take her car, she drives us up there. She says, "I'm going to sit out here and act as a lookout for you and I'll blow the horn if somebody comes." I'm going to go in and rob the clerk. And I forgot my mask. Somebody is going to see me. And she says, "Don't worry about it. Just don't leave any

witnesses. Here is the gun." I go in and rob the clerk and I kill the clerk.

Am I guilty of capital murder?

A. Yes.

Q. Do you think she could be held guilty for capital murder?

A. Yes, she could.

Q. Yes. She assisted me and she anticipated somebody was going to die. But if you're posed with that question you would answer that and you would answer that based on the evidence. Was the person actually the triggerman, so to speak, or are they somebody who acted as an active party and knew somebody was going to die. Okay. If you don't think that that is true, that they weren't the actual triggerman or an active party, then you would answer that question no. Okay. We would go home, and the defendant would get life in prison without parole because I haven't carried my burden. Right?

A. Right.

Q. Okay. Are you with me so far? Does that make sense to you?

A. It does.

Q. Okay. If you answer Special Issue Number 1 and 2, yes, then I'll tell you, Mr. Hamilton, the defendant is now sitting on a death sentence. Okay.

He's sitting on a death sentence because I've carried that burden and I've proved those special issues to you.

Okay. Special issue Number 3 is another question. It's the last question you will ever have to answer in a case like this. And I've been talking about burdens of proof this whole time, but I'll tell you now there's no burden of proof on this last question. Okay. I don't have to prove anything to you, they don't have to prove anything to you. The special issue is for you. Okay. And I'll submit to you that our lawmakers recognize what's going on here, Mr. Hamilton, and that's that we're talking about something really serious here and we're talking about somebody receiving the death penalty. And before that happens you're going to be able to walk out of this courtroom and say, I had all of the options available to me. I had all of the evidence -- looking at all of the evidence, I was able to do what I think should have been done in that case.

That last issue we also refer to -- we call it a safety net issue. And it's that last chance for you to re-evaluate all of the evidence and ask yourself, is there something about this particular defendant, is there something about this case where, even though he's sitting on a death sentence now, I think it should a life sentence. Okay. We call it the mitigating issue.

The mitigating circumstances. And it reads as follows. You can go with me here.

"Do you think taking into consideration all of the evidence" -- and again, Mr. Hamilton, it's asking you to sit down and look at everything all over again -- "including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, looking at all of those things, do you think that there's something sufficiently mitigating to warrant giving him a life sentence versus a death sentence?"

What's mitigating to one person may not be mitigating to another person. And I could ask your opinion on whether or not you think certain things are mitigating now. That's entirely your opinion. But understand -- I mean, evidence, you might be able to look at it this way. You go back, you look at all of the evidence again and put it in a category. Is it mitigating? Does it lessen his culpability? Is it aggravating? Does it make it worse, or is it just neither? And if there's anything mitigating, then you're asked to go back and look at that and ask yourself, it's mitigating, but is it sufficiently mitigating to turn that sentence over again. There may be -- I can't pin you down to, you know, what it would

37

take to make something mitigating, but it says look at the circumstances of the offense. Maybe it's that parties' case. Maybe he stayed behind and tried to save the victim, you know. Maybe he turned in his codefendants, you know. It says, look at the character and background of the defendant. Maybe he had a really bad childhood, you know. Maybe his parents turned him into the monster that he is. Maybe they ought to be the ones sitting in that chair over there, you know? It's kind of a mental gymnastics, Mr. Hamilton, because you already said this guy is a capital murderer, and you've already said he's a future danger and now we're asking you -- all that aside though -- are you willing to look at the evidence, reassess the evidence, and find that there's a mitigating circumstance.

Do you think you're capable of doing that?

A.   Yes.

Q.   Sometimes the question is posed, well, this is a really bad guy. He's a future danger. Can you honestly say, Mr. Hamilton, that you would ever answer that question yes?

A.   No.

Q.   What are your feelings about that?

A.   Like you said, you just have to re-evaluate to get the whole case.

38

Q.   You've got to look at the whole case. Do you have any questions about the special issues?

A.   No.

Q.   Okay. Let's talk a little bit about the death penalty. And I notice you keep looking over to this side of the courtroom and there's nothing wrong with that. I want you to do that.

How do you feel about sitting there right now knowing that my goal, Mr. Hamilton, is to get a verdict of guilty and get answers to those special issues that will ultimately result in the execution of that individual seated at the end of the table over there and I am asking you to take a part in that. How do you feel about that?

A.   You just got to do the right thing.

Q.   What do you think is the right thing?

A.   To weigh out the evidence first and come back with the correct verdict.

Q.   How do you feel, though, about taking part in a process that will result -- may very well result in the execution of another person. How do you feel about that?

A.   That's kind of a part of our judicial system and that's why we have jurors and courts, and so it's a part of the law-making process.

39

Q.   Do you have any kind of religious, or moral, or personal feelings about it that just really, I mean, make you cringe or make you go one way or another?

A.   No.

Q.   Okay. Okay. All right. Do you come into this process already biased in favor of one side or the other?

A.   No.

Q.   Okay. I notice that you have a brother that's been in trouble. And I see you nodding your head yes. I say "yes" because she doesn't have a key for nodding.

His name is James, is that right?

A.   James. Correct.

Q.   And you put him down, actually, as one of the persons you least respect.

A.   Right.

Q.   Is that because of his situation, or what's going on there?

A.   Well, kind of that and the way he's treated the family all along. And, so, it's just a lot wrapped into that.

Q.   I gotcha. I gotcha. You know, one of the things that you are asked to look at and that you can possibly look at in terms of answering all of these questions -- because you said you want to look at

40

everything, and how much weight you give it is entirely yours. But you may be given evidence, for example, drug use, or intoxication, or a poor upbringing, or you know. And in given what's happened to your brother and all of that, are you still willing to still listen to an argument about maybe somebody did what they did because they were intoxicated?

A.   Yes.

Q.   Okay. You don't automatically have a bias going that's a bunch of nonsense and I'm not going to even listen to it?

A.   No.

Q.   You might think it is afterwards, but you're going to -- at least going to listen to it. Okay. Okay. Do you have any questions for me about any of this?

A.   Not yet.

Q.   Okay. Okay. We've hit you with a whole lot here in a hurry. Well, then, I'll tell you what -- oh, let me just check something with you for the record, Mr. Hamilton.

On Page 9, turn to that with me right there in the middle of the questionnaire. It says, "Have you ever used the services of this or any other DA's office? Hot checks, child support, protective orders, et cetera."

41

You said, "Yes. Returned check about five years ago."

What was that? Was that a check that you wrote and got returned for insufficient funds, or what happened?

A. Well, yeah. It was maybe even a little longer. I had first moved here and closed an account. And then it was returned and I couldn't follow up on it because the credit union is from out of town. And the next thing I got notified it was from down here so I had to come down, pick it up, and pay for it.

Q. The reason I'm asking, Mr. Hamilton, is because one of the things that may disqualify somebody from jury service is if, for example, they had an insufficient check or a hot check and they were convicted of that, you know, because that would be considered a theft conviction. Pretty minor, quite frankly, but it would automatically disqualify you.

So were you convicted of anything? Did you just -- and I think we might have that information. Let me double-check that with you.

Okay. I'm understanding -- because we check these things out. When you're honest enough to tell us, we have to check them out for purposes of the record. It looks like you paid all of those.

A. Right.

Q. You came and paid them off, so it's a

42

restitution dismissal is what we call it. So you were never convicted of anything there.

A. Right.

Q. I gotcha. And now it's because you were changing accounts. I think that happens to a lot of people. Okay.

All right. Mr. Hamilton, thanks for answering my questions. I appreciate it, sir.

THE COURT: All right. Thank you, Mrs. Handley.

How are you doing, Mr. Hamilton?

PROSPECTIVE JUROR: I'm good.

THE COURT: Do you need to take a short break, get a drink of water or anything?

PROSPECTIVE JUROR: No, I'm fine.

THE COURT: No? Good to go? Okay. Mr. Lollar.

MR. LOLLAR: Thank you, Judge.

EXAMINATION

BY MR. LOLLAR:

Q. Good morning, Mr. Hamilton. How are you doing?

A. Good. And you?

Q. Why do you think Defense lawyers are soft?

A. I guess I watched one too many 48 Hours.

43

Q. Well, okay. I was going ask you about that. You put that down there. I see that you work for Methodist Health System as a Worker's Compensation Adjuster. Tell me exactly what that is. I don't know what that is.

A. Basically, when someone gets hurt on the job, I -- from the time that person is injured, I follow the claim from ER until we've gotten Texas Mutual or whatever insurance company to pay it. Whether we have to do an appeal, whether the insurance company is fighting it for whatever reason. It kind of depends on what's going on, but it's kind of like when you have a car wreck you have an adjuster, well, this is only on a person following it from beginning to end.

Q. You know, I've been in that situation before. They come out and they take pictures of the car, that type of thing. Is that what you do?

A. Right. Well, if we have any suspicion about the person we may put them under investigation, or it could be something as simple as a slip and fall; whereas, you broke your leg, you know, you got healed, you went back in a certain amount time. The case is paid, wrapped and closed. If it's a continual case or the person is a habitual, we follow or monitor it. It kind of depends. It's kind of a case-by-case basis,

44

kind of what's going on with it.

Q. Kind of an investigator.

A. Right. And it also depends on the dollar amount.

Q. All right. I gotcha. And I see that your whole professional life, that's the same type of thing that you've done in all of your occupations, all of your employments.

A. Correct.

Q. Okay. And then let's see. Now, I know that you live in Garland.

A. Correct.

Q. And you mentioned that you've got kind of a second job where you deliver newspapers; is that correct?

A. Correct.

Q. Is that The Morning News?

A. Correct.

Q. And you do that in downtown Garland?

A. Well, yeah. Downtown Garland to the north side of Garland; thirty-one mile route.

Q. Now, I do want to question you a little bit here on Page 3.

You said you have heard about this case and you heard about it through word of mouth. Tell me what you

heard.
A. Well, basically what we heard is the guy that throws downtown Garland, he -- I guess for whatever reason, he couldn't get through that part of the route that morning and we had no clue what was going on, and then later on we found out it was a shooting. That's why he couldn't get, you know, to that part of the route. I mean, we didn't know who got shot or what it was and later on we found out it was some kind of record company or Record Exec, or whatever.
Q. Okay. Now, did you follow it in the newspapers or on T.V.?
A. No, it was just kind of chitchat over the table.
Q. Okay. All right. Do you use the internet a lot?
A. I do for work and home, and school, and kids, but that's about it.
Q. Have you looked up anything on the internet about the case?
A. No.
Q. Okay. All right. Is there anything about what you've heard which would influence you in how you would sit as a juror in this case if you were selected to be on the jury?



A. No.
Q. Okay. Very good. Now, what I'm going to do, Mr. Hamilton, in my time with you is talk about your questionnaire a bit and things you told us about your questionnaire, and then we're going to talk about the law.
A. Okay.
Q. And then in talking about the law, we're going to talk about the first phase of the trial which is the guilt-innocence phase, and there the jury's focus is on that indictment that's there in front of you and whether or not the State has proven that indictment beyond a reasonable doubt. Okay.
A. Okay.
Q. So that's the evidence in the first part of the trial. That guilt or innocence phase is limited to either proven or disproven the allegations in that indictment. Okay.
Then, I'm also going to talk to you about the punishment phase of the capital murder trial. Even though we don't think we're ever going to get there, this is the only time we can talk to you about that, so we've got to now.
A. Okay.
Q. And these three special issues are only found



in this type of a case, a capital murder case, where the State is seeking death. Okay. In any other type of case if the jury sitting in a criminal case they find the defendant guilty, the Judge then tells them what the penalty range is and they go back and just pick a number somewhere within the penalty range. Okay. It's different in this type of a case, obviously, because we've got these three special issues. None of us expected you, as a layperson, to know what these special issues were before you came down here today. And so that's why we want to spend some time talking to you about that so to make sure that you understand and you understand what the law's intent is.
A. Okay.
Q. Now, first, let me talk to you about your questionnaire. And, again, there aren't any right or wrong answers to what we're doing here.
A. Okay.
Q. You are fully entitled to your opinion just as much as the prosecutors are entitled to their opinion, we are entitled to our opinion. And I'm not here to try to change your opinion about anything. That's not my purpose. I've got no more right to change your opinion than tell you who to vote for president. Okay. But it is important to us to know what your opinion is because,



of course, our job is to represent this man who is on trial for his literal life, okay, in a courtroom such as this upon the seventh floor. Okay. So what we've got to ensure is that we get jurors who understand what the law is and can follow the law. And I say that right from the get-go.
On the first page we ask you if you're in favor of the death penalty, okay, and you answered yes. And we asked you to explain your answer and you said, "If they deserve it." Okay. Nowhere in this whole process is a juror ever asked if the defendant deserves the death penalty. Okay. And that's important for jurors in this type of a case to understand. In fact, whether they deserve it or not is irrelevant. The only thing that counts is how these three special issues are answered. And nowhere in those three special issues is it asked of a jury, do they deserve the death penalty. Okay.
A. Okay.
Q. A lot of jurors think that if a defendant commits a certain crime that the death penalty is automatically assessed. Okay. And that's never the case in Texas. Okay. There is no offense that if a defendant commits it they automatically get a death sentence, period. There just isn't any. In fact, what the legislature has said is that the preferred penalty

**49**

for the commission of capital murder is life without parole. Okay. And only for those incorrigible few people that meet these three things here is the death penalty reserved for. These are meant to be barriers to the imposition of a death sentence. Okay. And they mean them to be barriers, so that is the law. Okay.

Now, I say all of that because if you look over on Page 4 of your questionnaire and Page 5 -- and I'm going to talk to you about some of the things you told us. Again, you're fully entitled to your opinion. We asked you, "Do you feel the death penalty in Texas is used too often or too seldom?" And your answer was, you thought it was used too seldom. Can you expound on that? Tell me why you think that.

A. I guess the reason I think that is because you look at some of the cases where the parents or whatever killed their kids, or whatever, and it seems like sometimes we let them off a little bit more than we should, or we don't hold them accountable for what we should, so maybe that was my reason for answering that way.

Q. And we've got one of those situations going on now. I don't know if that's the case you're referring to, but looks like the parents killed the baby.

A. Right.

**50**

Q. Threw him in Lake Lewisville. Well, that's a terrible thing and I'm sure they are going to pay the price for that.

But now here is the bottom line. Just taking that case as an example, do you feel that life without parole for those two individuals is sufficient, or do you think that for those people -- for that particular couple -- the only just sentence is the death penalty?

A. Well, life for parole could be sufficient because it's a mental thing, so it can reek havoc that way as well.

Q. Okay. So even in that type of extreme situation you're the type of person that does not think that death is necessary.

A. No, it's not necessary.

Q. Okay. Very good. Now, turn over to the next page, Page 5. And this is where we try to get people's true feelings about the death penalty. We asked you do you believe in an eye for an eye. And you said, yes. Tell me what you mean by that. We've had different responses.

A. Okay. I would say kind of like with kids when somebody pinches you, you pinch them back. That's kind of the way the kids operate. And then in the Bible it says, an eye for an eye and there's another passage. I

**51**

can't remember what it is at this time, but, basically, do unto others as you would have them do unto you. That's kind of where I was going with that. It doesn't literally mean you have to pull that person's eye out because they did something to yours, but it's kind of along those lines.

Q. Okay. The next question is, "Do you think spending a lot of time in prison is equivalent to the death penalty?" And you say, "No." Right?

A. Right.

Q. Okay. Tell me about that.

A. Well, again, it depends on the circumstances and what the crime was and what was did and how it kind of plays out. You have to look at the evidence, look at what was done, kind of weigh the issues there. It could be a situation where death is warranted. It could be a situation where life is warranted in prison, so it could go either way.

Q. And in your mind, what is the deciding factor? What are you going to be looking at to determine whether or not death is appropriate?

A. Well, you're going to be looking at did the State prove it in all the evidence that you have there.

Q. Okay.

A. You know, telling you did this person do this

**52**

and, you know, was it his intent to harm, or could it have been self-defense, or a lot of different issues can play into that.

Q. Okay. Well, let's talk about that for just a second because I want to make sure that you understand something.

A. Okay.

Q. If a person acts in self-defense, that's not an offense at all under the laws of the State of Texas. If Miss Evans is attacking me, I can use reasonable force to stop her from attacking me. If she's using deadly force to attack me, then I can use deadly force to repel that attack.

A. Correct.

Q. And if she's trying to kill me, I can kill her, okay, and I have not committed a criminal offense at all.

A. Right.

Q. Okay. And you understand that.

A. Correct.

Q. Okay. Now, the second thing that I want you to understand is that in all capital murders -- and, again, capital murder is an intentional murder committed during the course of another serious type of offense like a burglary, a sexual assault, a robbery, arson.

Okay. Something serious. You've got the combination of the two. Serious offense, plus an intentional killing during the course of that. Okay. And it has to be an intentional murder. And what we mean by that -- there's a legal definition. Basically, what we mean by that is that the person formed in their mind the intention to cause death. Okay. Not to wing him, not to harm him, not to wound him, but to cause their death and did whatever it took to accomplish that goal. Okay. And see, that's what we mean when we say an intentional murder in the State of Texas. And that's a requirement on the State, and it's listed in your indictment there. You see that indictment there? It says that the defendant did intentionally cause the death of Stephen Swan. Okay. And that's something that they have got to prove.

A.  Right.

Q.  Now, if they failed to prove that he intended to cause death -- and let me just give you a simple example.

If a person goes in to rob a 7-Eleven store and they have got the gun pointed at the cashier and says, "Give me your money," and they do. Okay. And then he tells the cashier, "Well, I'm fixin to leave out of here. Don't follow me around the counter because then

---

54

you will see where I go, or what car I get into." Okay. And he starts out the door, but sure enough the cashier goes around the counter. And so to prevent him/her, whatever, from following them out, shoots him in the kneecap. Okay. And so his intention was not to cause death, but to stop them from following them outside to see where he went.

Okay. You see how that's different from the person that goes in with the intent to cause their death? Bang, right off the bat. Shoots them. But in our example, okay, the person was in the course committing robbery and they did an act. They knowingly shot the person in the kneecap. Okay. But let's say the bullet hits the femoral artery and the person bleeds to death. So there you have a situation where you've got a knowing murder, not an intentional murder, but a knowing murder committed during the course of a robbery. No question about any that. Okay. But that's not capital murder. And that person could not get the death penalty and could not get life without parole. That person would get somewhere in the range of punishment for murder which is five years up to life. Okay.

A.  Okay.

Q.  You see that distinction that we made there? And it goes back to the culpable mental state of the

---

defendant at the time they committed the act. The law says that either side may introduce evidence as to the state of mind of the defendant at the time of the commission of the offense. And it's important because, again, in this type of a case there's a requirement on the State to prove beyond a reasonable doubt that the offense was committed intentionally. And if they failed to do that, then we're not talking about a capital murder. Okay. That all make sense?

A.  Yes.

Q.  Let me talk about some more things you've told us about on Page 5. We asked you "What purpose, if any, do you believe life without the possibility of parole serves?" And your answer was, none. You don't think that that sentence serves a purpose.

What did you mean by that?

A.  Well, again, it's a mental state of mind, you know. Some people are just callous and they can go in and, you know, stay there for life with no chance of parole of getting out. It means nothing to them. And someone on the other hand, it mentally destroys them, so it can kind of go either way there.

Q.  Okay. Let me ask this question because I think I need to know the answer to this.

A.  Okay.

---

56

Q.  Is it your opinion that you don't think there should be an alternative to the death penalty for a person who has been found guilty of knowingly and intentionally causing the death of an innocent victim during the commission a robbery?

A.  There shouldn't be be an alternative.

Q.  I'm sorry?

A.  There should not be an alternative to it.

Q.  There should not be an alternative?

A.  No.

Q.  So you think that everyone who intentionally commits the murder of an innocent victim and who is doing that during the course of robbery should receive the death penalty?

A.  Correct.

Q.  Okay. That's kind of what I was gleaning from your questionnaire and the answers. So let me do the follow-up question.

If you're in a position to decide -- you're on the jury -- would it be your decision that if you found a person guilty beyond any reasonable doubt of the exact thing which is charged in this indictment -- and that is the intentional murder during the course of a robbery, okay, with the use of a deadly weapon. Okay. That you would, if that's proven to you beyond a reasonable

doubt. There's no doubt left in your mind about that's a reasonable doubt -- that you would feel that that person should be sentenced to death?

A. Yes.

Q. Okay. Is there any way that you would not answer the questions in such a way to avoid the death penalty?

A. No.

Q. Okay. And that's what I was gleaning from your questionnaire. I mean, if you are on this type of a jury, you see what the allegations in the indictment are, and if the State proves that to you beyond a reasonable doubt --

A. Right.

Q. -- you're telling me that you are going to answer these questions in such a way so that your verdict is for death?

A. Right.

Q. Okay. And the follow-up question there. "What purposes, if any, do you believe the death penalty serves?" And you answered "Closure." And that's something we hear a lot and that's closure for the family of the deceased. And many people tell us if I'm on this type of a jury and it's my choice whether life without parole or the death penalty, and I can answer

the questions in such a way to achieve both results, that I would be failing the family if I did not return a death sentence.

Is that the way that you feel?

A. No. I think the family just kind of wants justice done and at the same time you can get closure with either one.

Q. Okay. All right. Now, following upon that prior thing that we are talking about, Mr. Hamilton. Now, you understand these three special issues are only asked to a jury after that second phase of the trial.

A. Right.

Q. Okay. The first phase is whether or not the State has proven the indictment beyond a reasonable doubt. Okay.

A. Okay.

Q. So you have the evidence presented by both sides in the first phase of the trial, and then you go back as a jury and deliberate whether or not the State has proven the allegations beyond a reasonable doubt. If you find they have not, you find the defendant not guilty. Okay. If you find they have, you return your verdict of guilty and then we go into the second phase of the trial which is the punishment phase, okay, and then both sides can present more evidence whatever they

want to present that's relevant to punishment, and then the jury goes back and are given these three special issues.

Okay. Now, again, the law says -- well, understand now where we are. Okay. You have already found the defendant to be guilty beyond a reasonable doubt --

A. Correct.

Q. -- of intentionally causing a murder during the course of a robbery. Okay.

A. Uh-hum.

Q. And then you look at that first special issue and that says, well, do you find that the person on trial is going to be a future danger, basically is what that's asking you. Many jurors have told us, well, if you've already proven to me beyond a reasonable doubt that the person here is the type of person who took a loaded gun, went out and committed a robbery of an individual and intentionally killed that individual during the course of that robbery, then that is to me always going to be the type of person who might be a future danger, who probably would be a future danger. See, that's what that question is asking.

Is that the way that you feel?

A. Yes.

Q. Now, of course, Miss Handley has told you that

the law says that a jury is suppose to presume the answer to that question as none. But frankly, we've got to have a lot of people tell us if they've shown me he's the type of person that could do this type of an offense and did it, then that to me is always going to be a person who is likely to be a future danger. And is that what you're telling me?

A. Correct.

Q. That's what you believe?

A. Yes.

Q. All right, sir. Now, let's jump --

MRS. HANDLEY: Brad, that's enough.

MR. LOLLAR: Mr. Hamilton. Thank you. We appreciate your honesty. What we're trying to do is get a fair juror for both sides. Okay. Thank you, Mr. Hamilton.

THE COURT: Thank you, Mr. Hamilton, for being here. We appreciate your time. I'm going to excuse you at this time. Thank you, sir. You can go ahead and leave that right there. Thank you.

(Prospective Juror, Kylar Hamilton, exits the courtroom.)

THE COURT: Mrs. Handley, does the State have a challenge for cause?

MRS. HANDLEY: Yes, Your Honor.

61

MR. LOLLAR:  We have no objection.

MRS. HANDLEY:  Can I take a quick break before we start our next person?

THE COURT:  Yeah, well, do you want to go ahead and put this challenge for cause on the record?

MRS. HANDLEY:  I'm sorry. I thought we just did.

MR. LOLLAR:  Your Honor, the defendant will submit the juror for cause for inability to presume Special Issue Number 1 to be answered in the negative. And also because he says he would always answer Special Issue Number 1, yes, if he found the defendant guilty.

THE COURT:  The Defense challenge for cause is granted. So that takes care of Mr. Hamilton. Let's take a break and we'll have Mr. Henvey, it looks like, next up.

(Brief recess taken at 10:18 a.m.)

(Proceedings reconvened at 10:29 a.m.)

THE BAILIFF:  All rise for the juror.

(Prospective Juror No. 661, James Henvey, enters the courtroom.)

THE COURT:  Good morning, sir. Go ahead and have a seat there, if you would, please, sir. Thank you, ladies and gentlemen. Be seated.

All right. Let the record reflect this

62

is Juror Number 661, James Robert Henvey. Mr. Henvey, H-e-n-v-e-y. Right?

PROSPECTIVE JUROR:  That's correct.

THE COURT:  Good morning to you, Mr. Henvey. And we're glad to have you here. Thank you for your time and effort to be with us this morning. I'm Judge Quaid Parker. I'm a Senior District Judge from McKinney just north of Dallas here and Judge Michael Snipes is the Presiding Judge in this capital murder case. Judge Snipes has asked me to assist him in this case by presiding over the jury selection process. So that explains to you why I'm here today instead of Judge Snipes and also, of course, why you're here this morning as well.

Now, you will recall it's probably been other a month ago now that four or five hundred of you got together in Central Jury downstairs. Judge Snipes talked to the group. At some point in the proceedings he had everybody stand up, raise their right hand, and he administered the oath of a prospective juror to everyone on the panel.

Do you recall that?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay. Were you one of the panel members that stood and took the oath at that time?

63

PROSPECTIVE JUROR:  Yes.

THE COURT:  Very good. I'll just remind you, you are still under that oath. And what you've been sworn to do, what Judge Snipes swore you to do is to give truthful answers, but we know that you would do that anyway during your questioning here today. And then the second part of that oath is to be responsive to each and every question that is asked to you by the attorneys. So let me kind of tell you, have you had an opportunity to read over the little guide there, the juror guide?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Good. That kind of gives you a brief introduction to some of the law and procedural aspects that are involved in a capital murder trial.

Now, what's going to happen here today the attorneys are going to talk to you. First of all, they are going to explain the law probably in more detail than what you've read in the juror guide, and then they are going to ask you questions. Once you understand the law, then they are going to ask you questions about how you feel, getting your ideas, your thoughts, your opinions concerning the law and some of the procedural aspects that would be involved in this trial. Okay. Now, I've said all of that to say this.

64

There's no right or wrong answers to any questions that are asked of you. Nothing is going to be embarrassing or anything like that. They just want to make sure that you understand what the law is and whether or not you can follow the law. That's basically what we're about here today.

All right. So with that, then let me introduce you to the attorneys. This is Mrs. Andrea Handley --

MRS. HANDLEY:  Good morning, sir.

THE COURT:  -- seated right in front of you. Next to her is Miss Elaine Evans, and then the gentleman in the white shirt right behind the two ladies there is Mr. Gordon Hikel. These three attorneys are Assistant District Attorneys here in Dallas County and they are part the prosecution team. They will be talking to you this morning.

Then seated at the Defense table over here right directly in front me is Mr. Brad Lollar, and seated next to him is Mr. Doug Parks, and on the very end down here is Miss Keri Mallin. And these three attorneys comprise the Defense team that represent Mr. James Broadnax who is the defendant right there. Okay.

All right. Ms. Handley.

**65**

MRS. HANDLEY:  Thank you, Your Honor.

JAMES ROBERT HENVEY,

having been duly sworn, testified as follows:

EXAMINATION

BY MRS. HANDLEY:

Q.  Good morning again, sir.  How are you today?

A.  I'm fine.

Q.  I appreciate you being here.

THE COURT:  Hold on just a minute, Ms. Handley.  Let me get Mr. Henvey his questionnaire.  I know you haven't seen that in a month so you probably don't remember what your answers were so -- pardon me.  Go ahead.

Q.  (By Mrs. Handley) We'll probably ask you some questions from your questionnaire so we want you to have it up there.  I appreciate you being here today and I appreciate you showing up that day on the big panel.  We have brought hundreds of people down for this case to have them fill out questionnaires in the hopes that we can, from those hundreds of people, get a jury of individuals who will be qualified to sit on this particular case.  I think that you can appreciate, sir, that this is a serious case.  That the highest stakes -- the highest penalty is at stake here.  We're talking about the potential death penalty here.  We're talking

**66**

about potentially putting an individual to death.  And in order to do that, we're going to have to have a jury of twelve individuals that are willing and capable of coming down here, of following the law, of listening to the evidence in the case and basing their verdict on the evidence in the case and nothing else, and giving both sides a fair trial, of giving the State a fair trial and giving the defendant a fair trial.

Can you hear me fine?

A.  Yes.

Q.  Okay.  Let me know if you can't.

I know that you have sat before on a civil case.  I believe you did jury duty on that, sir.

A.  That's correct.

Q.  And this, of course, is a criminal case and in many aspects the two are entirely separate and I would like to talk to you a little bit about that.  So I'll talk to you a little bit about the law, some things that you put in your questionnaire and particularly your feelings about the laws and the death penalty, and also take you through the process of a death penalty case because it's very different in a lot of respects from a different criminal case.  Okay.

I will say this, Mr. Henvey, that what we're looking for in getting qualified jurors for this case

**67**

are just what I said to you earlier, people that understand the law and people that are willing to follow the law.  Okay.  We talk to you individually because there are some people who will give us their very honest answers and say maybe on the one hand I could never under any circumstances whatsoever sit on a case like this because it involves the death penalty and that person is not qualified.  They are not right for this case.  On the other hand we get individuals who say, look, if you show me that somebody has committed a capital murder, I'll do whatever I have to do to ensure that they get the death penalty regardless of the evidence, and that's not appropriate either.  There are protocols in place.  There are laws in place that have to be followed to the letter of the law by the jurors in the case and the State has to be held to its burden of proof before that should happen.  But even having said that, everybody has got their opinions and that's all we're looking for right now, sir, is your honest answers.  Okay.  Because what I say as a representative of the State and what I think as a representative of the State, and what the Defense thinks are probably entirely different.  We have entirely different opinions at this point.  But what we think and our opinion on the law that and a buck sixty will get you a cup of coffee.

**68**

What is important today, sir, is your opinions and how you feel.

All right.  Let me start off by telling you that -- or let me just go ahead and ask it at the beginning.  We asked your personal feelings on the death penalty and you said that you are, in fact, in favor of it.  Correct, sir?

A.  That's correct.

Q.  Do you think it's appropriate in all murder cases?

A.  I don't know.  I feel like it would depend upon the laws of the State or government.

Q.  I'll tell you, sir, that I'll submit to you you're exactly right on that.  That not all murder cases are appropriate for the death penalty, it always depends on the particular crime, it always depends on the particular defendant and the circumstances surrounding that.  So I'll submit to you, you hit the nail on the head there.  And I will tell you that not all capital murders, not all people found guilty of capital murder are appropriate for the death penalty because their particular cases do not fit within the standards and the protocols that will call for the death sentence.  So I think that already you're going in the right direction and we'll talk a little bit more about that.

I do want to ask you -- could you turn to Page 2, please, of your questionnaire? We asked you second to the last question there we said -- we asked you, "The best argument against the death penalty is..." And could you read me your answer there?

A. Where you said "against?"

Q. Yeah.

A. "If the wrong person is charged, in other words, death of an innocent person."

Q. Okay. I think we were all wondering what "iow" means. Now, I know what that means. In other words, death of an innocent person. And, again, that's just one part of any criminal case is to ensure that you don't have the wrong person convicted, you know. A second part of the death penalty case is to ensure that even though you have the right person, even though you have the person who has committed a capital murder, you still are called upon to answer that question. Is this particular person the appropriate person, the right person? Do his circumstances and his crime dictate that a death sentence is more appropriate than a life sentence? Because it's never automatic, Mr. Henvey. It's never automatic. It always depends on the evidence in the case.

You had put at the top of Page 2 where we asked you

"Even if you're in favor of the death penalty, do you agree that a life sentence, rather than a death sentence, would be appropriate under the proper circumstances in some cases?" And you did put, yes.

Is that still your feelings today, sir?

A. Yes.

Q. And is that you recognizing that even though an individual is found guilty of capital murder where the death sentence is a possibility, that there are some circumstances where it's not appropriate?

A. Can you restate that?

Q. Are you basically telling us there that even though you believe in the death penalty that there are some cases where an individual, even though having been found guilty of capital murder, where a life sentence is actually more appropriate than a death sentence?

A. Yes.

Q. You believe that?

A. I do.

Q. Okay. You had even on Page 4, if you could turn there with me now, where we had asked you at the very first question, we asked you for what crimes do you think the death penalty should be available in Texas? And you said, "Kidnapping and murder, rape and murder, robbery and murder, arson and murder, child

endangerment, cruelty and murder." I'll tell you that I think that you're on the right track there in recognizing what is capital murder.

Capital murder is always a murder. It always involves a murder. It always involves an intentional murder. Okay. Not a murder through self-defense, not an accidental murder, not a murder where I was being negligent or reckless. I didn't mean to kill the person, but they died anyway. That's not the murder we're talking about. In a capital murder, we're always talking about an intentional murder. Did the person intend to cause the other person's death. But a capital murder it is that and something more. And you, again, I believe hit the nail on the head here. Capital murder is intentional murder plus something else. For example, the intentional murder of a person while in the course of committing another felony or trying to commit a felony, such as you put here kidnapping, or rape, or robbery, or arson. That is capital murder, or it's the intentional murder of a police officer, or the intentional murder of a child under six years of age. So it's always that murder plus something else and I don't know if you knew that coming into this.

Did you already know that, sir?

A. I think so. Yes.

Q. Okay. Okay. And that's just it. A person can be found guilty of intentional murder and they would be subject to being held to a punishment, but it might not necessarily be a capital murder. They might not necessarily be eligible for the death sentence because there's not that additional aggravating factor, so it's not a capital murder. So, again, I think you've kind of hit the nail on the head there.

You had also put in your questionnaire when we asked you if you believed in an eye for an eye. And I believe that was on Page 5. We said, "Do you believe in an eye for an eye?" And you said, no, you don't. Tell me you're feelings about that.

A. Well, my feelings is that we quote a lot of things. A lot of people say an eye for an eye, but where they get that phrase from, it doesn't really say that we have the ability to do that. I think it's found in scripture in the Bible. It says, "An eye for an eye, saith the Lord," which would indicate to me that there's someone else that would be able to -- a higher authority that would have that type of recompense or satisfaction. So I wouldn't believe that that would be something that I would be able to make amends for an eye for an eye type judgment.

Q. And I'll tell you that Texas law does not

73

provide for an eye for an eye. You know, in the law the law does not say, if you are found guilty of intentional murder, or if you are found guilty of capital murder you, therefore, must die yourself. There's no such thing in Texas law. It does not state eye for an eye. It, instead, states that you may be eligible for that, but you still must go through the procedures and you must go through the protocols.

I see, sir, that you're also a Pastor?

A. That's correct.

Q. Let me ask you about that then. Do you think, then, that there is a place for man, for people, to be involved in a death penalty where we are saying whether or not somebody should live or die. Is that our place? Is there a place for that?

A. Yes.

Q. How do you square that with the Bible and such as that? Because a lot of people would say it's not our place to say who should live or die that's only for God to say. What is your opinion on that?

A. A lot people say, what?

Q. A lot of people say it's not our place to decide who should live or die such as a death penalty case that's only for the Lord to say. What are your feelings on that?

74

A. My feelings are that, that's why we have government and that's why we have officers of the court, police, that type of people to uphold the laws of the land, and the land that I currently live in is the United States. And I feel comfortable with the government system that we have governing the states, plus the State Government that we have here governing this state and the county and on down to where I live. So I'm in favor of upholding those laws, whatever they are. And if we need to change the law, there's a way of doing it outside of taking an eye for an eye.

Q. Okay. If you were governor for a day, let's say, and you can change the laws, would you change the death penalty law?

A. I would have to know what the death penalty law is completely to find the finder part of it. I'm sure it's a little lengthier than saying it's the death penalty law.

Q. It is. It actually can be quite complex sometimes, but I'll tell you this. I think that fundamentally, Mr. Henvey, it's grounded in fairness, and it's grounded in letting the punishment fit the crime, you know, but we'll talk a little bit more specifically about that.

And let me talk to you now about some principles of

75

law that apply in any criminal case. If you were sitting on a case right now where you're looking at theft of a bicycle, or if you're sitting on a capital murder case where a defendant is potentially looking at the death penalty, there's certain fundamental principles of law that always apply, never change. And I'll submit to you that they are grounded in good common sense and that they also come to us out of fairness in order to ensure that the proper man is convicted of the crime and in order to ensure that a person gets a fair trial.

As the defendant sits here today in this criminal courtroom you, as is everybody, is to presume him innocent at this point. And the reason he has the presumption of innocence is because I haven't proved that he's guilty. The law states that I, as a representative of the State, have to prove my case to you. I have to carry the burden of proof. I'm the individual or I'm the party that has brought the charges, and so I must be the individual that should have to prove the charges. You see where I'm going there? And only if and until I can prove to you that the defendant is guilty beyond a reasonable doubt, then he has that presumption of innocence.

Do you understand that, sir?

76

A. I do.

Q. Okay. Do you think that's fair?

A. Yes.

Q. Can you presume him innocent until I prove him guilty otherwise?

A. Yes.

Q. Okay. And will you hold me to that burden, that burden being that it's the State that always has the burden of proof, it's the State that has the obligation to bring the evidence to have the defendant found guilty. The Defense has no burden of proof. Their only obligation is to show up and they have already fulfilled that obligation. I have to carry that burden of proof throughout the entire trial. You always look to the State to prove that case. And I have to not only carry that burden of proof, but I have to prove it to you beyond a reasonable doubt. There's no definition of what beyond a reasonable doubt means, Mr. Henvey, it's whatever you think it is. Some people say if you prove something to me beyond a reasonable doubt, then I can tell you I'm pretty sure, or I'm confident. You know, it's whatever you think it is. It's never beyond all doubt whatsoever because I believe that would be impossible unless you were there watching the crime and then you would be a witness, but it's whatever you think

it is.

Does that make sense to you, sir?

A. Well, you've asked -- I think you asked about three questions all there together.

Q. I did. I'm moving in a hurry and I apologize for that.

A. The one thing that I don't know that I would be able to do is to hold you to whatever it is you're supposed to do. I don't know that I have the ability to make you do your job. You started out saying that one of the things that I was supposed to do is to hold you --

Q. Yes.

A. -- to that. I don't know that I would -- I would only be able to do that within the limits of whatever a juror could hold.

Q. Let me see if I can explain that better. I might have been very confusing. I apologize.

The law states that I have to prove the case to you, okay, before you can find an individual guilty of a criminal offense. I have to prove it to you. In other words, I, as the State, as the person bringing the charges, I am under the obligation to bring you the evidence that you would need in order to find that personal guilty. It's my obligation. I carry the

78

burden of proof. The defendant has no burden of proof. In other words, he does not have to come in and prove that he is innocent. Instead, I have to come in and prove that he is guilty. And so my question to you is, will you always look to me to prove the case?

A. Yes.

Q. Okay. Will you ever look to the defendant to prove his innocence?

A. No.

Q. Okay. And that's basically what I'm saying. Will you always look to the State to prove the case to you beyond a reasonable doubt. If I failed to prove the case to you, sir, then your verdict should be not guilty. Okay. And that's just a fundamentally fair proposition of law.

Do you agree with that, sir?

A. I do.

Q. Okay. A defendant doesn't have to testify in a criminal case. If he doesn't testify, if he elects to exercise his constitutional right to remain silent, the law states you cannot hold that against him. You can't use that as evidence against him. Why a person would not want to testify is entirely their choice, but regardless if a defendant doesn't testify, you can't use that as evidence against him.

Does that make sense to you?

A. It does.

Q. Do you think that's fair?

A. I do.

Q. Will you presume him innocent until I prove him guilty otherwise?

A. Yes.

Q. Will you hold it against him if he doesn't testify?

A. No.

Q. I have to prove to you, Mr. Henvey, all of the elements of capital murder. I have to prove to you not only that this particular defendant did it, but that he did it in Dallas County, that he did it on a particular date. I have to prove to you how he did it, who he did it to, and that it was committed in the course of a robbery. Those are what are referred to as the elements of the offense. I have to prove each one of those elements to you beyond a reasonable doubt. I don't get points for only proving five out of six, I have to prove them all to you. Okay. If I fail to prove any one of those elements to you beyond a reasonable doubt, then your verdict must be not guilty.

Does that make sense to you?

A. Are you asking me that does it make sense to

80

me that there's numerous parts that you have to -- like you named about six things there.

Q. Does it make sense to you that I should have to prove all of the elements versus just five out of six?

A. I'm not sure that does make sense to me.

Q. Why not?

A. I don't know.

MRS. HANDLEY: Okay. Okay. All right. Mr. Henvey, I appreciate you coming down here, sir, and I appreciate you answering my questions. I think that's all I need from you today. Thank you, sir.

THE COURT: Any questions, Mr. Parks?

MR. PARKS: No, Your Honor.

THE COURT: All right. Thank you, Mr. Henvey, very much. You can just leave that right there. Appreciate the time and effort that you've made to be with us today. Thank you so much.

MRS. HANDLEY: Thank you, sir.

THE COURT: You're free to go. Thank you.

(Prospective Juror, James Henvey, exits the courtroom.)

MRS. HANDLEY: Your Honor, we would challenge Juror Number 661. I don't know if it's clear

81

from the record, but I think he had an incredible difficult time understanding the questions and articulating responses.

THE COURT: I detected that myself.

MR. PARKS: We have no objection.

THE COURT: Any objection, Mr. Parks?

MR. PARKS: No.

THE COURT: All right. The State's challenge for cause will be granted.

We're through for this morning, so see ya'll about 1:15 or so.

(Lunch recess taken at 1:15 p.m.)

(Proceedings resumed at 1:27 p.m.)

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 506, Baird Whitten, enters the courtroom.)

THE COURT: Good afternoon, Mr. Whitten. Just have a seat right there. Thank you.

Thank you, ladies and gentlemen. Be seated, please. And, Vicki, I would like the record to reflect this is Prospective Juror Number 506, Baird, B-a-i-r-d, Whitten, W-h-i-t-t-e-n.

And, Mr. Whitten, we're glad to have you here this afternoon. I'm Judge Quaid Parker. I'm a Senior District Judge from McKinney, Texas, just right

82

up the road here from Dallas. And Judge Michael Snipes is the Presiding Judge over this case and he's the one that talked to the group more than a month, I guess it has been now, that you all met in Central Jury and you filled out your questionnaires. And I have yours right here. Let me give that to you right now because the attorneys are going to be asking you questions about that.

Anyway, Judge Snipes asked me if I would assist him in the trial of this case by presiding over the jury selection process. So that's the reason I'm here today and, consequently, that's why you're here, too. So anyway, we're glad to have you here today and what's going to happen -- did you have an opportunity to read your orientation guide there?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. That's just kind of a thumbnail sketch of the law as it pertains to a capital murder case. It just gives you kind of a little bit of the law and the procedural aspects involved in a capital murder case. What the attorneys are going to do, what's going to happen this afternoon with you, are the attorneys are going to explain in more detail the law and the special issues and some of the procedures that will be involved in the trial. And then once you

83

understand that -- because I know this is the first time that you've ever had this type of an education, so to speak, or been exposed to capital murder law and some things that go along with it -- they are going to explain it to you and make sure you understand it, and then they are going to ask you questions about how you feel about it. You know your ideas, your thoughts, your opinions. And there's no right or wrong answers to any of their questions.

At some point in the proceedings a month ago or better than that, Judge Snipes had everybody stand up on the panel, stand up and raise their right hand. He administered an oath to everyone.

Do you recall that?

PROSPECTIVE JUROR: Yes.

THE COURT: Were you one are the panel members that stood and took the oath at that time?

PROSPECTIVE JUROR: I believe I was.

THE COURT: Good. Well, I'll just remind you, you are still under that oath. And what you've been sworn to do is give us truthful answers, which we know you will do, and also to be responsive to each and every question. All right. So with that let me introduce the attorneys to you that are participating in this trial.

84

Seated first is Mr. Gordon Hikel right in front you there. And then next to him is Miss Elaine Evans, and then behind her is Mrs. Andrea Handley. These three are Assistant District Attorneys here in Dallas County and they are part of the prosecution team and so they will be talking to you. I think Mr. Hikel is going to talk to you today.

MR. HIKEL: Yes, sir.

THE COURT: And then over here directly in front of me at Defense counsel table is Mr. Brad Lollar and Mr. Doug Parks, and then on the very end down here is Miss Keri Mallin. And these three are the Defense team and they represent the defendant who is seated right there, Mr. James Broadnax.

Okay. Mr. Hikel.

MR. HIKEL: Thank you, Your Honor. May it please the Court.

BAIRD WHITTEN, having been duly sworn, testified as follows:

EXAMINATION

BY MR. HIKEL:

Q. Mr. Whitten, good afternoon, again, sir.

A. Good afternoon.

Q. Mr. Whitten, if at any time I talk too fast, you don't hear me, just let me know. I'll slow down and

85

try to keep my voice up. Okay.

I noticed yesterday you had an issue with the water heater. Did you get that fixed?

A. Yes. Works good now.

Q. It's good now?

A. A new one.

Q. All right. Do you have your questionnaire in front you? Okay. All right. I noticed that on the first page of the questionnaire that you left the age blank, but given your date of birth we figured it out. You just had a birthday about, what, two weeks ago?

A. Yes.

Q. You turned 75?

A. June 2nd, 44.

Q. Sixty-five.

A. June 2nd, 44, was the birthday.

Q. So that makes you a young man now 65 years old.

A. That is correct.

Q. All right. Mr. Whitten, what we're doing here is trying to find twelve jurors, twelve citizens that can come into the courtroom here and hear the evidence and not have a made-up mind what the State wants them to do or the Defense wants them to do, but twelve folks that are willing to wait until they hear all of the

---

86

evidence before they can come to a decision, come to a verdict.

Now, we have reviewed the questionnaire you filled out which comprises about eighteen pages. And based on the answers you give there, which seems to be very thoughtful, you seem to be the kind of person who will wait until you hear all the evidence before you make up your mind. Is that a correct assumption about you?

A. That is correct.

Q. Okay. What I'm going to do is we'll talk to you about some principles of law and then ask you how you feel about those areas of law. Let's just say this that there are no right or wrong answers. The only thing we ask for at this juncture are truthful answers. So however you feel about the law just tell us. We won't argue with you, we will not try to change your mind. Just be honest and tell us how you feel about the law once it has been explained to you. Okay.

I'll begin by telling you that on the first page of the questionnaire you said that -- where you circle choice Number 2 -- that you believe that the death penalty is appropriate in some murder cases in that you could return a verdict in a proper case, which is assess a death penalty.

Now, from doing this we've understood that some

---

87

jurors believe that what they do, what they are asked to do is if the State -- that's this table right here. If we have proven in the first part of the trial -- because you know there are two parts to every trial, the guilt innocence and then the punishment. Some jurors believe that if they find the defendant guilty in the first phase of the trial of capital murder -- I'll talk about what that means -- then they go back into the jury room and they are asked, hey, who thinks he ought to get life, who thinks he ought to get death. Let me tell you that that is not the way it works in Texas. How it works essentially is if you were to find the defendant, as a juror guilty of capital murder, we go into the second stage of the trial called the punishment where you are then asked, based upon the evidence these three special issues here in these chairs one, two, and three. You're then asked to consider in order as they are written Special Issue Number 1, Special Issue Number 2 and Number 3. Depending on what your answers are to the first one -- for example, if you were to answer no to the first one, then the trial stops. If you answer yes, then you move on to Number 2. If you answered no to Number 2, the trial stops. If you answer yes to Number 2 then, and only then, you go to Issue Number 3. And depending on whether you answer that yes or no is as to

---

88

what the defendant's sentence will be. But before we get into all of that let's go back to the beginning now.

Have you been a juror before, Mr. Whitten?

A. Yes. It's been quite a while, but I have.

Q. Was that a criminal case?

A. I don't believe it was.

Q. Okay. Would you turn to Page 11 in your questionnaire? You know where we're talking about jury service. Let me make sure I understand. You said you've never been a juror before, but then you're asked in the -- about the fourth or fifth question there in the middle of the page. "Regardless of what the Judge says the law is jurors should do what they believe is the right thing." You put, yes. And you said that jurors should do what they believe is the right thing.

Now, I just want to make sure, Mr. Whitten, that we understand what you meant by that statement. You understand that as a juror, if you're picked as a juror, you will take another oath. At this point the only oath you've taken is to tell the truth. If you end up being one of the twelve jurors that sit in these soft burgundy chairs you will take another oath and that second oath you will take you will promise the Judge that when he gives you the law, that you will abide by the law. You will follow the law as he gives it to you.

89

Now, do you understand that as a juror you may have a disagreement with the law, but if you end up as a juror, then you must follow the law as the Judge gives it to you?

A. Right.

Q. Do you an issue with that at all?

A. No.

Q. So you can do that?

A. Yes.

Q. All right. Now, on Page 2 of your questionnaire, page 2. You mention that you are -- on the very top -- that you're in favor of the death penalty --

A. That is correct.

Q. -- but that do you agree that a life sentence rather than a death penalty would be appropriate under certain circumstances.

Let me explain to you in Texas not every murder is a death penalty case. For example, Texas has certain very specific acts, specific crimes, where a person can be charged for a capital murder case. A person is only eligible for the death penalty if he or she commits a capital murder, a capital felony and by that we mean this. For example, If someone intentionally or knowingly kills a police officer in the line of duty --

90

now, we'll go back and talk about those two words intentionally and knowingly. Let me just tell you intentionally simply means that it was a person's conscious objective or desire to cause the result. It wasn't a mistake, it wasn't an accident. You intentionally killed the person. I wanted him dead and you killed him. Okay. Knowingly is that the actor is aware that the conduct he is engaging in is reasonably certain to cause the result. So, for example, I take a gun, you point a gun, you pull the trigger. That conduct of pulling a gun and pointing it at someone and pull the trigger, a juror may conclude that I knowingly -- and if the person dies -- that I knowingly caused the person's death because the conduct of pointing a gun to a person and pulling the trigger is reasonably certain to cause the result, the death of someone. That's what you would have to decide as a juror. So if I intentionally and knowingly kill a police officer in the line of duty, I can be charged with capital murder. If I intentionally and knowingly kill a fireman, a correction officer in the line of duty, I can be charged with capital murder or capital felony. If you intentionally kill a child under the age of six, or more than one person in the same criminal episode, those are the kinds of crimes where you can be

91

charged with capital murder where you may be looking at the death penalty.

We also have a different category of crimes in Texas where if you commit certain kinds of felony offenses and someone is killed in the process you can be charged with capital murder if in the course of a robbery, burglary of a habitation, retaliation, aggravated sexual assault. If in the course of committing one those kinds of felony you intentionally kill someone, intentionally kill someone; that is, you had the specific intent to kill the person while robbing them or attempting to rob them; you had the specific intent to commit aggravated sexual assault -- we call it rape -- and you kill someone in the process intentionally, you can be charged with a capital felony or you're looking at the death penalty. Now, I said all of that to say this. Therefore, under the Texas law, we don't believe in the principle of an eye for eye. If by that you mean if you kill someone you get the death penalty.

Do you understand that, Mr. Whitten?

A. Uh-hum. Yes.

Q. Now I know on your questionnaire you put there on Page 5 that when you were asked a question for what purpose do you believe the death penalty is served and

92

you put there an eye for an eye. Okay. Now, as I just said before -- did you find it there, Mr. Whitten?

A. Yes.

Q. Okay. As I just said before if by an eye for an eye you mean if there's a death, then Texas law would automatically charge someone with a capital murder because he or she has killed someone, that's not the law in Texas. So, for example, right in front of you right now if I were to kill my colleague here, I stab her and I laugh about it, and I stomped on her and she dies, and I think it's the greatest thing I've done in my life and you watched all of that, the State would not be able to charge me with capital murder or capital felony because while I intentionally killed her and I laughed about it, there wasn't that underlining aggravating factor of another felony, i.e., a robbery, an aggravated sexual assault, a burglary of a habitation, or retaliation, those kind of things. So before it's a capital murder it has to be an intentional killing plus one of those felony offenses.

Do you understand me so far?

A. If that's the law, yes, I understand what you're saying.

Q. All right. Can you follow that law?

A. Yes.

93

Q. Now tell me because you had somewhat of a hesitation and I know that we're talking about this principle that you have here called an eye for an eye on Page 5. Do you some hesitation or reservations about my explanations of the law and whether or not you can follow that law as it pertains to the death penalty case or capital murder case?

A. I believe I could.

Q. You believe you can follow the law?

A. Yes.

Q. Okay. Now, Mr. Whitten, there are certain fundamental principles or rights that every person that's accused of a crime has whether it be in this case that defendant or, God forbid you're charged with a crime. There are certain rights that you have as a citizen of this country. One of those is this. In a felony case in Texas before a person can be prosecuted, a grand jury has to return a piece of paper called an indictment. I believe you have a copy in front of you. All that indictment is, is a simple piece of paper. It tells the citizen what he or she is accused of and it tells the State of Texas what the State has to prove to a jury beyond a reasonable doubt before the jury can answer the very simple question, is the person guilty or not guilty of the offense as alleged in the indictment.

94

So the indictment is no evidence of anything, except notice the defendant of what he or she is charged with. Okay.

Number 2 is, because I have not -- and by I, I mean the State of Texas. I have not presented any evidence as to the defendant's guilt. As he sits here today, the law says you must presume him to be innocent. Until such time as the State of Texas brings forth enough evidence to prove to you, as one of twelve jurors, beyond a reasonable doubt that he's now guilty of the offense as charged in the indictment, then and only then does the presumption of innocence go away.

Do you understand that?

A. Yes, sir.

Q. Okay. Number 3. Witnesses. As you would imagine where you are sitting right there is called the witness stand. Evidence comes into a courtroom in the form of witnesses, or documents, or other kinds of evidence you can touch. My point being, though, that witnesses whether it be officers, priests, anyone, you cannot simply say as a juror, I'm going to believe everything or nothing at all that a category of witnesses are. For example, police officers. You cannot say that, hey, "police officer." The mere fact that he's a police officer, I'm going to believe

95

everything he says, or nothing at all that he says now before he's testified. What you have to do as a juror is wait until the witness, whom ever he or she be, testifies from the stand where you're sitting right now and then you, as a juror, weigh the person's testimony. Do I believe everything he said, some, or nothing?

Do you understand that?

A. Right.

Q. All right. I know that you've heard on television a lot this concept called the Fifth Amendment which basically in this context provides that every person accused of a crime, every person, has a right not to testify in the trial in which he or she has been prosecuted. You understand that?

A. Right.

Q. Let me give you an extreme example now to make sure you can follow that law.

Let's assume in a case where the State of Texas has accused someone of committing a crime. Okay. We alleged that a defendant caused the death of someone by shooting him with a firearm. Okay. That's what the indictment says and that's what we are proceeding on is the indictment. Remember now, what an indictment is. What is the purpose an indictment? A little pop quiz.

A. (No audible response.)

96

Q. It's, again, just to make sure that we, the State of Texas, we have to prove those things that are alleged in the indictment.

A. Right.

Q. And it gives the defendant notice as to what he's charged with, what he's accused. Okay.

So let's assume now in the indictment we say a defendant killed another person by shooting him with a gun, with a firearm, a deadly weapon. Okay. You're now a juror and the Medical Examiner who does autopsies comes to court and testifies and says, "Yep, it's true that the person is dead, but he wasn't killed by gunshot, he was killed by stab wounds." Now, I alleged gunshot, evidence shows stab wounds. And you're a juror in that case. What must be your verdict guilty, or not guilty?

A. I'm afraid it would have to be not guilty.

Q. Exactly. Because, again, I allege as the State gunshot, the evidence shows stab. And as a juror who takes an oath to follow the law that wouldn't be your fault if that's what happens, that would be my fault as the prosecutor of the State. Your job is not to help the State out or help the defendant, your job is simply to follow your oath which says you would render a true verdict based upon the evidence and the law as

given to you. Okay.

Now, in that same scenario where I mention just now where we allege gunshot, the evidence shows stab wounds. Even if the defendant takes the stand -- or let's say he doesn't take the stand. But you're sitting there at the back of the room, you're talking as a juror. You say, "You know what? Man, if he had only taken the stand. The State hasn't quite gotten there. They are missing this little thing. But if only the defendant had taken the stand, it would have made a difference to me." If he doesn't take the stand you can't even consider that for any reason at all. Don't even think about it. Don't even bring it up in your thoughts, or your deliberation, you just can't consider it for anything at all.

Do you understand that, Mr. Whitten?

A. Right.

Q. And you would agree that it's fair, is it not, that if the government, if the State accuses a citizen, we shouldn't rely upon the citizen to prove his innocence. Correct? Do you agree with me?

A. Absolutely.

Q. Okay. Because, again now, as he sits there he has this constitutional presumption that he's innocent of anything that he's accused of until we prove beyond a

---

reasonable doubt that he's guilty. Okay. And if he doesn't take the stand, don't use it against him, don't consider it for any purpose at all.

Do you agree with that?

A. Yes.

Q. I've mentioned several times this term and this concept called beyond a reasonable doubt. Let me tell you there was a time under the Texas law where there was a definition given, but then the big shot lawyers in Austin realized that you guys are smart, you jurors are smart people. And rather than giving you a definition, they said that it's up to a potential juror what the term means to him or her.

I can tell you, Mr. Whitten, what it does not mean. It does not mean proof beyond all possible doubt, otherwise, if I can prove something to you beyond all possible doubt that would require, what, for you to be a witness. You saw it for yourself so you have no doubt. And if you're a witness, you can't be both a witness and a juror in the same criminal case. You understand that. Do you understand that, that you can't be both a witness and a juror in same case?

A. Right.

Q. And so beyond a reasonable doubt whatever it means does not mean beyond all possible doubt. You

---

know, some T.V. shows out of California they use a term beyond all doubts based, I think, upon moral certainty or something like that, all of that fancy jazz. In this State of Texas beyond a reasonable doubt simply means do you have any doubts based upon reason and common sense. Okay. Reason and common sense. That's why it's called beyond a reasonable doubt.

What do you think that means to you, Mr. Whitten, the concept beyond a reasonable doubt?

A. Let's see. Are we going back to the difference between the stabbing and the shooting?

Q. For example, okay. If you want to use that you can.

A. According to what we talked about last?

Q. Yes, sir.

A. That you couldn't consider that because of the stabbing.

Q. Right.

A. But he was shot.

Q. Right.

A. You could.

Q. So in that example I had failed -- meaning the State of Texas, failed to prove to you, a juror, beyond a reasonable doubt that the defendant is guilty as we allege in the indictment. Correct?

---

A. That is correct.

Q. Exactly, because we will alleged one thing and the evidence showed something else which meant that there was a doubt based upon reason. We alleged one thing and proved another so you had a doubt based on reason. Verdict not guilty.

A. That's right.

Q. All right. Now, you said on Page 2 of the questionnaire that -- give me the appropriate circumstances you have in mind where you believe that a death penalty -- I'm sorry. That a life without the possibility of parole is appropriate more than a death penalty. What were your thoughts on that?

A. On 2?

Q. On Page 2 the very first question. Yes, sir.

A. I'm not quite sure what I put it that way for.

Q. Okay. Well, Mr. Whitten, let me say this, though, but you're absolutely correct. And let me tell you why you're correct. If under Texas law someone automatically gets the death penalty if the State proved that he's committed a felony -- remember what I told you the felony is robbery, burglary a habitation. If it was an automatic process guilty, therefore, he gets the death penalty there would be no need for those special issues 1, 2, and 3, so you're absolutely right. What

101

the legislator said is this. If a person is found guilty of a capital felony where one of the possible punishments is the death penalty or life without parole, whichever one he gets. Now, if he's found guilty of capital murder, he automatically gets life without parole. Before it can be elevated now to a death penalty sentence, the circumstances has to be considered. And how we do that under Texas law is by looking at these three special issues here. And so you're right that you have to look at the circumstances. If I were to ask you right now sitting there as a potential juror, Mr. Whitten, whether or not this young man should get life versus death, your answer would have be to be what? I don't know. Because why? You haven't heard any evidence. Correct?

A. Right.

Q. Okay. So you're right. It depends on the circumstances.

Now, you're not a prosecutor and a lawyer. I need your help. On Page 2 when you're asked what is the best argument against the death penalty, there's a big word there that I think it's dow? Doe? (Phonetic.) What is that?

A. If you find a doubt in something.

Q. Oh, a doubt. Okay.

102

A. You understand what I'm saying?

Q. Yes, sir. So you meant, in other words, if there's some doubt --

A. If I have a doubt that that's not the case whatever comes out.

Q. Okay. Now, let's go back now to -- remember now we're talking about a trial having two stages, stage one, a Part 1 and Part 2. Part 1 is where you're asked as a juror one question and one question only. Did the State of Texas prove to me, a juror, beyond a reasonable doubt that the defendant is guilty of the offense as charged. In this case, you know, it's a capital felony, meaning that we have alleged that that defendant caused the death someone in the course of committing a robbery or attempted to commit a robbery in that he shot the person with a firearm, a deadly weapon. Now, if some doubt after both sides rest and close and everything and you go back there as a juror and you're deliberating. If you have some doubt as to whether he's guilty or not, based upon reason and common sense, after considering all of the evidence it means that your verdict has to be what if there's doubt?

A. Not guilty.

Q. Not guilty. Right. You get to these issues if and only if you say, as a juror collectively, we find

103

the defendant guilty of capital murder because the State has proven to me beyond a reasonable doubt what they said he did in that indictment. Okay.

So let's assume now, let's go forward in time. You find him guilty of capital murder. You then move on to the second stage of the trial called the punishment. You then have to consider these three special issues. Now -- and you to take them in order as they are given and their named 1, 2 and 3 for a specific purpose in that they are to be considered in that order.

Number 1 says, "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts violence that would constitute a continuing threat to society?" Now, remember I said earlier now, if the jury finds the defendant guilty of capital murder he automatically gets one sentence if he's found guilty?

A. Death penalty.

Q. Is it the death penalty, or is it life without parole? Which one does he get automatically? Because remember now you said in your questionnaire whether he gets life or death depends on the circumstances. Right?

A. Yes.

Q. Page 2? Right. So as I said before if he's found guilty of capital murder, the only thing he gets

104

automatic is life without parole. That's the law.

Now -- and the legislature wants you to presume that life without the possibility parole, which means just that: Is the appropriate, is the correct, is the right sentence in a death penalty case. That's the presumption you have to go with. Remember now, in the saying when the trial begins or right now you've got to presume that he's innocent of any charges. Correct?

A. That's correct.

Q. The same thing. If you find him guilty of capital murder, the presumption of innocence goes away, but then there's a next presumption that comes into play in Part 2 and that is the presumption that life without the possibility of parole is the correct appropriate right sentence for this defendant. Unless and until the State of Texas then proves to you Issue Number 1.

Now, look at Issue Number 1. It says, "Do you find from the" -- what? What is that word right there?

A. Reasonable doubt.

Q. No, the sixth word in the first sentence. "Do you find from the" --

A. Evidence.

Q. Evidence. Okay. Which means, what? We've got to bring evidence in the second stage of the trial of the punishment to help you decide that question. Let

me say this to you. The law in Texas provides that a among the evidence you can consider before you answer that question on Issue Number 1 could be the facts of the crime itself. You may conclude after deliberating, after deliberating, that the facts alone are sufficient for you to answer that question. Now here's the difference, Mr. Whitten. You cannot, as a juror, automatically assume that if you find the person guilty of capital murder, then you cannot assume that automatically the answer to Number 1 is yes, because if the legislature intended you to do that, then they wouldn't give you the special issue for you to consider.

Do you understand that?

A.    Right.

Q.    Okay. Now, you're right when you read the term that says beyond a reasonable doubt because in the first part of the trial is he guilty or not, that's the legal burden that we to sustain, the State of Texas, beyond a reasonable doubt. When you come to the second stage of the trial now the punishment, you're right again. We have to prove to you, a juror, beyond a reasonable doubt, that there's a probability that the defendant would commit criminal acts of violence that would constitute a continual threat to society.

Now, there's a word up there called probability

which is to be distinguished from the word possibility. Now, would you agree with me, Mr. Whitten, that anything is possible?

A.    That is correct.

Q.    Would you also agree with me then that there's a difference, though, between the word probability and the word possibility?

A.    That's true.

Q.    Okay. How would you distinguish between the words probability and the word possibility? And there's no legal definition. It's entirely up to you, Mr. Whitten, as a juror.

A.    That's a good question.

Q.    Well, some jurors have told us that, look, I'm six foot three, two hundred and forth pounds. It is possible that I can run the Cow-town Marathon and I can win it, if no one else shows up. I could possibly finish it in five, or six, or eight hours, and I could possibly win it. The chances are I'm not going to be the only runner who shows up for it and, you know, the possibility me winning it are very, very, very, very slim to none. Probability though, some jurors have told us means more likely than not. "More likely than not." You look at the weather and the weatherman says, you know what? It's a probability since it's summertime in

Texas it's going to be hot because it's summer in Texas, you know. Knowing that it's summertime in Texas and it's a hot state, it's probably a good probability that he's right, he or she, when he says it's going to be hot in Texas today because it's the summertime. Okay.

A.    That's right.

Q.    So all the word probability means is there a greater -- there is a more likely than not that something would happen. In essence, Mr. Whitten, what we're asking you to do as a juror is this. We're asking you to peer into the future and ask yourself this question as a juror. After considering all of the evidence do you believe, or do you find from considering the evidence beyond a reasonable doubt, that it's a probability more likely than not that the defendant would commit criminal acts violence in the future that would constitute a continuing threat to society? Now, we're not asking you to guess or to speculate or do magic or anything because we're asking you to make that determination based on the evidence again, which means you've got to wait. Correct? Is that correct, sir?

A.    That's true.

Q.    Now, Criminal Acts of Violence. Would you agree with me, Mr. Whitten, that if I were to take my hands right now and go over there and punch the bailiff

in the face because I don't like him. You know, I just don't like him and I punch him in the face. Do you agree with me that that act of punching someone is an act violence?

A.    Sure.

Q.    Okay. Do you agree with me that it would be a criminal act of violence?

A.    Maybe, not necessarily.

Q.    Well, if I were to punch him in his face, I just walk up to him right in front of you and just socker-punch him, is that an assault?

A.    That would be an assault.

Q.    Do you believe an assault is a crime, is a criminal act?

A.    Yeah, I would believe that.

Q.    Now, whether or not I have a justification or whether or not you provoke me or anything like that, it's something that's to be considered if I'm prosecuted for it. But given my question is, my simple question is if I were to punch him in the fact, is that act itself a criminal act of violence? And you agree with me the answer is yes, because it's an assault. Correct? Is that "yes" for the record?

A.    Yes.

Q.    And just to let you know this lady is taking

109

down everything you say and that's the reason why we need you to say yes, or no. Okay.

Now, Mr. Whitten, let's go back now. Here's my question now and see if you listen to me. I already said to you before that whether or not a defendant who is found guilty of capital murder gets the death penalty or not depends on how those three issues are answered. Correct?

A. Correct.

Q. Which means that it's not an automatic process. Correct?

A. Yes.

Q. Okay. But as I said to you before if a defendant is found guilty of a capital felony -- in this case capital murder -- what is the automatic sentence that he gets? What is the best sentence that he can hope for?

A. Life without parole.

Q. Good. So you're listening to me. Okay. Life without parole. Now, if a defendant who is guilty of capital murder gets life without the possibility of parole, where do you expect that he or she will spend the rest of his or her life?

A. In the penitentiary.

Q. Good, in prison. Okay. Now, look at the very

110

last word in Special Issue Number 1. See the word there "society?"

A. Right.

Q. Now, the fact that the legislature has asked you as a juror before you can answer the question whether a defendant gets the death penalty or not you've got to answer those three issues. And if a defendant automatically gets a life without the possibility of parole, if he's found guilty of capital murder and you know he's going to spend the rest of his life in prison, the legislature, therefore, is asking you to consider his society as what? Who would be his society, the defendant's society?

A. Prison.

Q. Okay. Now, when you think of the word society you think of me and you whether we go to church, or the supermarket, or the courthouse, those are the kind of things that you think about when you hear the word society. Correct?

A. That's right.

Q. But would you agree with me that in prison there are other people in prison simply besides individuals who have been convicted of criminal acts. Would you agree with me?

A. Yes.

111

Q. There's clergy, medical providers, teachers, other family members who are visiting their family members in prison. So do you see now how that pool of society members have now been increased to all the people besides all the criminal defendants? Do you agree with me there?

A. Right.

Q. Okay. Now, so the legislature is asking you now, based upon the evidence presented by the State which could include the facts of the crime itself, you're then asked to consider Issue Number 1, "Do you find from the evidence beyond a reasonable doubt that there's a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?"

Now, Mr. Whitten, if you're a juror, what are some of the things that you would want to hear in the form of evidence that you believe would best help you to answer that question Issue Number 1? There's no right or wrong answer?

A. I'm not quite sure.

Q. Okay. Now, if the person is found guilty and now you're asked to consider these three special issues, which depending on how you answer them could result in someone either getting the death penalty, or that

112

automatic sentence that he gets if he's found guilty of capital murder which is life without parole. What are some of the things, as a juror as you're sitting in that box, you're hoping to hear from the State -- because it's our burden -- that would help you answer that question? What would you want to know?

A. I'm not quite sure.

Q. All right. Now, whatever it is, Mr. Whitten, that the State presents in that second stage of the trial called the punishment, it's up to you as a juror to determine, look, the State has presented to me this evidence. Maybe the facts of the crime, the defendant's background, all of those kinds of things you hear in the form of evidence. You then decide, as a juror, did I hear enough evidence in the second stage of the trial that helps me as a juror answer Special Issue Number 1 which is, did the State prove it to me beyond a reasonable doubt that the defendant is a future danger to society. Either yes, or no. If you answer no, the trial stops. You sign the paper that, you know, I don't believe the State has proved to me that he's a future danger; therefore, he gets the automatic sentence of life without parole and you don't consider Issue 2 or 3. He gets an automatic sentence.

Now, but if you answer Issue Number 1 yes, you and

113

all the jurors, then and only then do you will go onto Issue Number 2. Okay. And it's a whole lot of words there, Mr. Whitten, on Special Issue Number 2, but I just want to call your attention to a couple of important words up there. One is, as it says, again, "the evidence" in the first line. The second line again it mentions the terms "beyond a reasonable doubt." Now, all that language in there basically is what we call law of the parties in Texas. And all it means basically, Mr. Whitten, is this. My colleague and I plan to commit a crime. Okay. We want to hit a lick at a 7-Eleven or some grocery store, or a bank, because we're broke. We're govenment employees, we don't make enough money, okay, so we need some quick cash. We sit at my dining table and we make this plan. I'm bigger and I'm badder so I tell my colleague "I'll go into the grocery store. All right. You just drive the get-away car in case the clerk push the button and alert the cops, we've got to make a quick get-away." She says, "Not a problem."

We drive up to the store. I take my gun. She says to me, "Hey, don't leave any witnesses." I said, "Ahh, don't worry about it. I've got it covered." She never comes in the store. Okay. She sits outside in the car waiting for me to come back out.

I go in the store, get the money, and she hears

114

three shots fired. It turns out that I've killed the clerk. Okay. I robbed the clerk and killed the clerk. I did that.

Q. What crime can I be charged with?

A. Murder.

Q. Say again?

A. Murder and robbery.

Q. Okay. Now, murder and robbery if I intentionally shot the clerk in the head. Murder and robbery equals what in the Texas law?

A. Death penalty.

Q. Capital felony. Right? Capital murder. Correct? Is that correct?

A. Right.

Q. Because remember now I can be charged with capital murder where I'm eligible perhaps for the death penalty, but it's not automatic because again it depends on what? How you answer those three special issues correct. Is that yes?

A. Yes.

Q. Okay. Now, so, because I intentionally killed the clerk and took the money I can be charged with capital murder. My colleague who never went into the store can also be charged with the very same crime under Texas law. If the State can prove that she either

115

solicited me to commit the crime, encouraged me, directed me, aided or attempt to aid me in the commission the crime, she can be charged with the same thing as me. Okay. Because the law says she shouldn't get a break if she did those things simply because there's only one gun. All right. So if -- and I don't know what the evidence will be, whether or not we will have the law of the parties or not, but if you do have the law of the parties, look at Issue Number 2. And if you say yes to Number 2, here is what will happen then, Mr. Whitten, because remember now, before you got to Number 2 you've already done, what, you've already found the defendant guilty of capital murder. He gets an automatic sentence of life without parole, unless the State proves to you beyond a reasonable doubt that the answer to Number 1 is yes, the answer to Number 2 is also yes. Then and only then you will go into Issue Number 3.

Now, Issue Number 3 is what's called a safety value. It's like the last best hope. It's like the -- it's the last chance for the jurors to consider all of the evidence. Now look with me if you would. It says, "Do you find taken into consideration -- and here's that word again -- "all the evidence including the circumstances of the offense, the defendant's character

116

and background, and the personal moral culpability of the defendant." When you consider all of that stuff. You know, is he from a single parent home, was he on drugs when he committed the offense, was he fed dog food when he was a child, was he abused either physically or sexually. All of those things you have the right to listen to them and consider them. Okay. In doing that the question then becomes when you take all of that into consideration, do you find that there's something about all the evidence you have now heard that -- and look with me carefully, Mr. Whitten. It says, "That there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life in prison without parole rather than a death sentence be imposed." So here is what it means basically. The law says this. When you get to Issue Number 3, you to be able to consider all of the evidence.

Now, I want to make sure that you hear this word carefully, Mr. Whitten. You don't have to agree that something is or isn't mitigating or lessens the defendant's moral culpability, but here's what the law says. The same way you have to assume certain presumptions, like the presumption of innocence that he has, the same way you have to say if he doesn't testify, I can't hold that against him because you won't be

117

qualified. At this stage the law says also you have to have an open mind to hearing the evidence. You don't have the right to decide now once you've heard the evidence is it mitigating, or is it aggravating? For example, his age. Whether he was on drugs, what kind of family did he grow up in. You will hear all of those things. Now, you may find that because of his age it's mitigating, because he's from a single mom it could be mitigating or maybe he had a rough childhood. He was on drugs at a time, maybe it's mitigating. But you notice in that Issue Number 3, the legislator didn't say if there is a mitigating circumstance. What do they say? If there is a what? Right before "mitigating" what is the word?

A.  Sufficient.

Q.  Sufficient. So while you may hear a lot bad stuff about his background, but you may consider, yeah, you should have a little notch for that or mercy or sympathy or it's mitigating, the question isn't is it mitigating or not, the question is it sufficient mitigating circumstance.

Now, I can tell you under Texas law the only thing the law says that you must accept as mitigating is if the defendant is mentally retarded. Because in Texas, in this country, we don't execute people who are legally

118

deemed to be mentally retarded. We don't do that. But anything less that you hear about a person's background you must have an open mind to considering it. You don't have to agree with it. Do you see the difference, Mr. Whitten?

A.  Right.

Q.  Now, on Page 6 are your questionnaire. The very, very top. You said in regards to the question as to whether or not intoxication could be considered -- may be considered mitigation you said, yes, you agree with the law, but then you said being intoxicated is no excuse.

Now, Mr. Whitten let me say this to you. You're absolutely right. That under Texas law being intoxicated is not an excuse for committing a crime. In other words, I can't get drunk and go kill my neighbor and say, hey, I can't be prosecuted because I was intoxicated. As you correctly noted on Page 5 at the very bottom of Page 5 where you say I agree with the law -- the bottom of Page 5. Now, what is the difference there? The bottom of Page 5 asks or tells you that voluntary intoxication does not constitute a defense to the commission of a crime. You said, yes, you agree with that because intoxication is no excuse. Now, you're right. That is the law.

119

Now, top of Page 6 now it's a different question that we ask you there. It is not an excuse for the commission of the crime, but you as a juror have to an open mind to hearing the evidence as to whether or not the fact that he is intoxicated was that something that mitigates or lessens the punishment. In other words, Issue Number 3 right here again as I told you before you have to keep an open mind to hearing all of the evidence. Okay.

Now, you notice they say they may be considered. Intoxication may be considered. Now, it's up to you if you find it to be mitigating or not. That's entirely in your province. But the law is at this point you can't have a closed mind to say I already didn't tell you right now. If he's intoxicated I'm going to tell you right, Mr. Hikel, I not going to even consider it for anything because you don't have an open mind.

Do you understand me there, Mr. Whitten?

A.  You're asking me a question?

Q.  Yes. Do you agree with me that intoxication while you're correct on Page 5 of the questionnaire that is not a defense, which is Texas law, that when you get to Page 6 now at the top, that it may be one of those many, many, things that you hear as evidence that you may conclude as sufficiently mitigating. I can't tell

120

you right now that you have to agree that it is, it's entirely up to you.

Do you agree with me?

A.  I do agree.

Q.  I'm sorry?

A.  I do agree.

Q.  Okay. All right. Let me ask you -- Page 3 of the questionnaire we ask you on Page 3, the third question on Page 3. We ask you there what one hears in the news media is a better source of information and testimony one hears in the courtroom. You say, agree. Third question on Page 3.

A.  I'm sorry. I should -- I don't think I agree with what I put down.

Q.  Okay. In other words, the answer should be, no. Right? Is that what you meant to say?

A.  Yes.

Q.  Because you understand, Mr. Whitten, that in considering this case whether or not that defendant is guilty or not, how you answer those three special issues we use the word in each of those special issues the evidence, the evidence, the evidence. Correct?

A.  That is correct.

Q.  And you understand that the evidence comes in the form of when witnesses take that stand and testify,

121

or there's some other form of evidence that you can touch or forms of paper evidence, but it comes in this courtroom. You understand that?

A. Right.

Q. Okay. Mr. Whitten, do you any questions of me at all about anything?

A. No, I do not.

Q. One last thing. You're correct that you say that what makes a person dangerous may be a bad upbringing. Again, you mention that in Page 8 of the questionnaire. You may consider that a person's upbringing as either a mitigating factor or as an aggravating factor. It's entirely up to you, Mr. Whitten, how you want to consider it. Okay.

A. As far as answering the question?

Q. Yes. You're asked what you think makes a person dangerous and I think you said a bad upbringing. And all I'm saying is we're not going to argue you with you about that. That may be the case. But if you find from the evidence that the defendant had a bad upbringing, you may consider that either as an aggravating factor, or a mitigating factor. It's entirely up to you. Okay.

A. Right.

Q. But my last thing to you before I pass it to

122

the defense lawyers who will ask you questions. Here is my last question for you, Mr. Whitten. You understand that nothing is automatic in this case, except the only thing that happens automatically is if you find the defendant guilty as charged in the indictment of capital murder he automatically gets a life without a possibility of parole sentence. That's the only thing that happens automatically. You understand that? Was that yes, or no?

A. Yes.

Q. Okay. Whether he gets the death penalty now depends on those three special issues and how you answer them. If you say yes to 1, yes to 2, no to 3, he gets the death penalty. Because, yes, he's a future danger. Yes, he was a party or committed the crime. No, I find nothing sufficiently mitigating, that's a death penalty.

Here's my question to you now. Are you telling me, Mr. Whitten, that if you find somebody guilty of capital murder. All right. He intentionally killed sombody in the course of taking a person's property. All right. No legal justification or excuse for it. I intend to kill this person, I killed them and took the property. Are you telling me that you have the ability as a juror to wait and hear all of the evidence before you decide whether or not the person is guilty or innocent? You

123

can do that?

A. Sure.

Q. Secondly, are you telling me that if you find the person guilty that your mind is not made up that he automatically gets a death sentence, but that you will wait to hear the evidence and answer those three special issues before you decide whether or not -- well, how to answer those questions, you will wait for the evidence?

A. Absolutely.

Q. And you can do that as a juror?

A. Yes, I can.

Q. Any questions me, sir?

A. No, sir.

MR. HIKEL: Mr. Whitten, thank you so much for your time and attention, sir.

Judge, I pass the witness.

THE COURT: Thank you, Mr. Hikel. How are you doing, Mr. Whitten? Do you need to take a short break, get a drink water or anything?

PROSPECTIVE JUROR: I'm fine. Thank you.

THE COURT: Stretch your legs or anything?.

Mr. Parks.

MR. PARKS: Yes, sir. I'm prepared to go forward.

124

THE COURT: Okay.

EXAMINATION

BY MR. PARKS:

Q. Mr. Whitten, how are you doing?

A. Fine.

Q. The Judge just asked you that. Let me ask you, Mr. Whitten, do you feel like you've got a get good grasp of all of this concept. You've understood everything that's been going on?

A. Pretty much.

Q. Pretty much? Okay. Well, I'm going to talk to you about it some more. I want to make sure that we're all on the same page here. I don't do this to bore you or waste your time, but I want to make sure that we're all together. Makes sense to you?

A. (Nods head).

Q. Okay. Before I get into the case itself and the special issues, Mr. Whitten, I want to talk to you a little bit about some of the things you said in your questionnaire just so that I can understand where you're coming from.

Okay. First over on Page 6. Well, no, before we get over there. On Page 4, let's start there. We ask you up at the top of the page what crimes you believe the death penalty should be available for. You, like

125

most other people who answered this questionnaire, tell us murder. And you understand that while certainly you you are entitled to believe that the death penalty ought to be available for what we call "plain murder" -- although, I'm a little uncomfortable using that term -- the law in the State of Texas doesn't allow for the death penalty for murder. It has to be murder plus something else in order to make it a capital murder and Mr. Hikel explained that to you. So you understand where we're coming from there?

A. Right.

Q. The next question we ask you there is if you agree with the law in the State of Texas that murder in the course of committing a robbery, which is capital murder, is something for which the death penalty may be imposed and you indicate, yes, that your answer is taking a life without any justification. And I took that to mean, Mr. Whitten, if I'm wrong please correct me. That it's your feeling that if a person takes another person's life without any justification, intentionally, then the death penalty would be an appropriate punishment in that case.

A. Right.

Q. Okay. There in the middle of the page you indicate where we ask you if the death penalty is used

126

too often or too seldom you told us, too seldom. I would like for you to expand on that just a little bit. Why do you feel that it's used too seldom here in the State of Texas?

A. I don't know exactly why I put that down that day, but...

Q. Well, you're not the only one who's put that so don't worry about that. And you have a perfect right to believe that, Mr. Whitten. I'm certainly not challenging your opinion in that regard.

A. No, I understand, but I do I believe it's probably too seldom.

Q. Okay. What purpose do you think in society -- why should we have a death penalty? What purpose does it serve in your mind that a life without parole would not serve?

A. The reason I would put it like that is because if you didn't have a death penalty for that, then I don't know how many more people would probably be killed by somebody.

Q. Okay. Do you feel that it --

A. Even, you know, in a robbery or something like that or going into the store and robbing it and shooting people. I think if the death penalty was used more often it would probably deter a little bit more.

127

Q. As a deterrence then?

A. That's my feeling.

Q. Sure.

A. Yes.

Q. Okay. Fair enough. I guess taken to a logical conclusion if we did execute those people who go into stores or stop people on the street or hijacked their car or whatever it is, there's many ways a person can be robbed and under many conditions. Home invasions; any number of things. If we executed those people who were guilty of that offense, I guess there's some hope that that would be a message to others --

A. It would be a good deterrent, I think.

Q. -- not to do it. Okay. All right.

Now, over on the very next page, Page 5, we ask you about the life without parole and whether or not you're in favor of that. That's kind of toward the middle of the page and you said you're strongly opposed to life without parole and that you're more in favor of the death penalty. Is that because you believe it's a greater deterrent, or what do you have in mind there?

A. I think that it's connected to what was said on the other page. If you had more deterrence, then people would not kill people.

Q. Sure.

128

A. I mean, you can rob somebody and take their money, but if you go in and intentionally shoot them, that's -- that's not helpful.

Q. Just not acceptable behavior, is it?

A. No, it's not acceptable behavoir. Absolutely.

Q. Right. Then down a little bit -- in fact, you indicate that you don't believe that life without the possibility of parole serves any purpose really. You put "none."

A. Right.

Q. Okay. And then finally, "What purpose do you believe the death penalty serves?" And you said, "An eye for an eye."

And we get that a lot, Mr. Whitten. And different people mean different things when they say an eye for an eye. Nobody really, I think, means it as literally as is used in the Bible, but a lot people do take that to mean a life for a life. That if a person who has intentionally killed another person without any good excuse or justification, then the taking of their life is the right thing to do.

Is that how you mean it, or do you mean it in another way?

A. That is how I mean it.

Q. Okay. Fair enough.

129

Page -- that may be -- well, we'll go back. I want to talk to you about a couple of things on Page 8, but it makes more sense to do that when I'm talking about these special issues so I'm going to wait to do that --

A.   Okay.

Q.   -- right now. All right. Here is what I want to do, Mr. Whitten. I want to talk to you just a few minutes about the merit stage or the guilt-innocence stage of a trial. Capital murder cases are not really any different than any other kind of case in that regard, it's only punishment that's a difference.

A.   All right.

Q.   It doesn't make any difference what a person is charged with, they have a right to the presumption of innocence whether it's a Class B or Class C misdemeanor all the way up to a capital murder case. It doesn't make any difference what a person is charged with, it's the State's burden to prove their guilt beyond a reasonable doubt and they must do that by proving all of the elements of the charging instrument, whether that's an indictment in a felony case, or an information in a misdemeanor case. So, you know, that really is not any different from any other kind of case.

Do you feel like you have understood pretty much what the issues are there that we don't have to prove

130

Mr. Broadnax is innocent, that he should be presumed to be innocent where he sits here today?

A.   That's true.

Q.   Okay. And then can you afford him that presumption?

A.   Yes.

Q.   All right. And can you place the burden of proof on the State of Texas and require them to prove to you beyond a reasonable doubt what they've charged?

A.   Absolutely.

Q.   Okay. Now, sometimes, Mr. Whitten, it's easy for us to talk about these issues and make them kind of black and white for you, but sometimes it's a little bit harder in the doing than it is in the explanation of it. Let me give you an example and I do that because of what you tell us over on Page 11 that Mr. Hikel has already talked about where we ask you, do you agree with the following statement.

"Regardless of what a Judge says the law is jurors should do what they believe is the right thing." And you put, "Yes, that jurors should do what they believe is right."

And I'm assuming you believe that at the time?

A.   Yes.

Q.   And probably still believe it today. Is that

131

fair to say?

A.   Yes.

Q.   Okay. Well, let me give you a scenario and this is just by way of example.

Mr. Hikel explained to you that if a juror is placed on a jury they will take an oath to a true verdict render according to the law and the evidence. Now, we expect jurors to be able to follow their oaths if they are on the jury. However, our law provides that if there is something that there is a disagreement that a juror has with the law, such that following it would do violence to his or her conscious, then they are not required to take the oath.

Okay. Now, let me give you an example of what could happen. And, again, this is just -- I'm not talking about this case at all, but it's an example of what could happen and the position a juror could be put in. Let's say that you're on a murder case and you've heard the testimony and unbeknownst to you the defendant has given a confession and he told the police that he killed the deceased. That he wanted to do that, did it because he wanted to, and given the opportunity he would do it again, and certainly was not sorry for having done so.

Now, he said all of that, they put it in writing or

132

they recorded it, video or audio, but you don't know that because in this scenario the police officer forgot, or just because he didn't want to, didn't give the Miranda warnings. You've heard of the Miranda warnings.

A.   Yes.

Q.   And what our law says is, is that if the police do not give the Miranda warnings, whatever the defendant says to them whether it's true or it's not true, or whether they mistreated him or didn't mistreat him, none of that matters. It's not admissible in front of the jury. Okay.

A.   All right.

Q.   The jury can't hear about it. So you're on this jury, it's a bad murder, awful facts, a person shot fourteen times or some some such. No justification, but there really weren't any witnesses to it. You know, maybe somebody said, well, I saw somebody run away, but I can't identify them in court. I didn't get a good enough look at them. It could have been the defendant, but I can't say for sure. And then the police officer is testifying and he says, well, yeah. We arrested the defendant a day or two later and I took him to the police station. And now the Judge had already told him that the concession is not admissible. Okay. But all of a sudden he just blurts out and he confessed, told me

133

he did it. And the Defense lawyer jumps up and says, I object to that, Your Honor. It's inadmissible and the Judge says, "Sustained." And then he turns to the jury and says, "Ladies and Gentlemen of the Jury, I instruct you to disregard what you just heard."

So now you've heard the only real evidence that's convinced you that the defendant is guilty, but the Judge has told you to ignore it. And if you ignore it you're going to find the defendant not guilty and he's going to walk right out the door even though you believe absolutely that he's a murderer.

See, we can put jurors in hard positions down here. Now, do you believe that your belief that you ought to do the right thing regardless of what the Judge says would prevent you from following his instructions in disregarding that evidence and finding that defendant not guilty, or do you believe that you would have to find him guilty because you believed that he was guilty from what you heard?

A.   If the law says that, then you would have to believe that he's not guilty.

Q.   Okay. So you could follow the Judge's instruction in that regard.

A.   I could do that.

Q.   You see how hard it can get sometime?

135

about guilt or innocence when they heard opening statements before they ever heard any evidence. And, of course, that's not right thing to do. What we want people to do is to wait and hear the evidence. You pretty much have to wait, but we can't make you hear the evidence. You've got to want to do that, you see. But we're not supposed to make up our minds early on, but we do expect jurors to render a proper verdict, which means this in the context a capital murder trial. No jury will ever be called upon to answer these special issues unless they have first found, along with eleven other people beyond a reasonable doubt, that the person about whom they are answering these special issues is an intentional murderer who took another person's life because he wanted to in order to take his money. Okay. So whatever else you may or may not know about a defendant, you would have to know that and believe that beyond a reasonable doubt before you are ever asked these questions.

So that's the context in which we ask these questions. Okay. You are being asked not about just this citizen, or that citizen, or some other citizen, they are only asked about capital murderers.

Are you with me?

A.   Okay.

134

A.   Yeah.

Q.   Okay. Fair enough.

What I want to do at this point then, Mr. Whitten, is explain to you what the law requires and intends with respect to these special issues in the guilt phase of the trial -- the punishment phase of a capital murder trial, but -- excuse me. It's not like I had enchiladas for lunch. I had chicken and dumplings. They shouldn't do that.

I want to make sure that you understand the context of these questions, Mr. Whitten. Okay. Because a lot times, quite frankly, jurors -- maybe it's because we go through it too fast, maybe it's because these are concepts that are not commonly known and understood and it's just a whole lot to take in, in a short period of time. And we find some very disturbing things when we've talked to jurors after they already served on a death penalty case. And we want two things that are very disturbing to us.

One, is that about twenty percent of people who serve believe that it was required that they assess the death penalty, that it was mandatory, okay, and that's not right.

The second thing was that as many as forty percent of them made up their mind what they were going to do

136

Q.   So that's the context of it. Now, with that -- and let me ask you at this point in time to assume that you have sat on a jury, that you have heard evidence in open court, that you have been convinced by the evidence, that you presumed the defendant innocent just like you're supposed to. You've placed the burden of proof on the State just like you're supposed to. You've listened to the evidence, you've waited until you've heard all of the evidence, and you and all of the other members of the jury have said unanimously, we are convinced beyond a reasonable doubt this defendant did exactly what he's charged with having done. He's a capital murderer. He killed a person, wanted to kill him, and did it to get his money. We know that about him and we're returning a verdict of guilty.

You with me?

A.   Yes.

Q.   Okay. Having assumed those facts, can you tell me what your personal feelings about the death penalty in that situation would be?

A.   Like I put on Page 5 up there, I strongly oppose.

Q.   We know you're strongly opposed to the life without parole.

A.   Yeah, and more in favor of the death penalty.

137

Q. And you see at that point there are only two things that can happen. He's either got to have life without parole, which you see no purpose in and you're opposed to it, or the death penalty. There are no other choices. So I guess what I'm asking you in all honesty, Mr. Whitten, is if you came to that place and you had that decision to make, your feelings would be the death penalty would be appropriate.

Did I misread you or not?

A. No, you did not.

Q. Okay. Now, here is what we've got to talk about, Mr. Whitten, and that's this. Jurors don't go back in the jury room and just decide, hey, I think this person ought to get the life penalty so I'm going to answer these questions so that he does, or I believe this defendant ought to get the death penalty so I'm going to answer these questions so that he does. That's not the way we do it. We have to go through these special issues one at a time. But my experience has been in doing this work that people generally who feel the way that you do about it feel that any person who is capable of making up their mind to kill another person just to get their money is the type and kind of person who would probably continues to commit acts violence in the future and would be a future danger.

139

the evidence beyond a reasonable doubt that he is guilty. But once they've shown you the facts, the evidence, that makes you believe without doubt based on reason and common sense that he is guilty, that this is an intentional murderer, that this is the person who killed another to get their money, that this is the person about whom you're always going to say would constitute a continuing danger to society and would answer Special Issue Number 1, yes, for you. Yes.

A. Yes, that's true.

Q. Okay. Thank you, sir.

Now, I'm going to skip Special Issue Number 2. Okay. It may be that if you sit on this jury you would have to answer that question, it may be that you wouldn't. The Judge decides that after he's heard all of the evidence. Number 1 and Number 3 are always asked, but Number 2 is not. Sometimes it is and sometimes it's not. We talk about it because we don't know until after the trial and all of the evidence is in. But I generally don't talk about it.

Special Issue Number 3 just goes one step further. What that does is ask jurors to take into consideration all of the evidence that they heard to determine whether they believe it's the right thing to do to change a death sentence for a person who is an intentional

138

Is that the way you feel about it?

A. That is.

Q. And you see that's what that first special issue asks you. And it doesn't ask you whether for sure that person would commit acts of violence in the future, but it does ask you if you probably would. And based upon what you're saying to me, Mr. Whitten, it sounds to me like if you're faced with answering Special Issue Number 1 about an intentional murderer, you're going to answer that question, yes, that he would probably commit acts of violence in the future because he is an intentional murderer to capital murder.

Is that fair to say?

A. That is fair to say.

Q. Okay. Am I putting words in your mouth in any way?

A. No, not at all.

Q. Okay. So what I'm hearing you say is -- and I think this is what I'm hearing and correct me if I'm wrong, that you're able to sit in the guilt-innocence phase of the trial and you're able to consider the defendant to be innocent, put the burden on the State, make them prove that he's guilty. If they don't prove it to you, you're going to say not guilty. You're not going to put guilty on someone unless you believe from

140

murderer and killed to take somebody's money and is further going to be a future danger, to change that from a death to a life. It gives an opportunity to the jury to do that. They don't have to do it. Just like Mr. Hikel said, there's a term in there "sufficient mitigating circumstance or circumstances" and a juror can decide for himself or herself what is sufficient for them to change a death sentence to a life sentence for an intentional dangerous murderer.

Do you see what I'm saying?

A. Yes, sir.

Q. And some jurors, frankly, tell us that they can consider a person's background in whether he is raised in poverty, or whether he was raised in the life of luxury, or whether he's been abused, or never been abused in one way or another. You know, anything that a juror might conceivably consider to be potentially mitigating. And some jurors say that they can change that death to a life. Other jurors tell us that they will consider that kind of evidence because the law says that they should, but that since they are given an opportunity in law to determine what is sufficiently mitigating for themselves, that they know themselves well enough to know that if they found someone guilty of capital murder and if they decided that they are going

141

to be a continuing danger to society, whatever mitigation might be brought to them is never going to be sufficient to change the death penalty to the life penalty for a dangerous intentional murderer.

Is that the way you feel or not? How do you feel about that issue?

A. Yes, exactly.

Q. And, again, that goes back to your feeling that really with the life without parole serves no purpose.

Would that be a fair way to say it?

A. Yes, sir.

Q. Okay. So it may be that we could bring you evidence of his background, but that's not really going to make any difference to you.

Is that fair to say?

A. That's fair to say.

Q. Okay. Age. Here is what the law says. If a person is 18 years of age or older when the offense is committed, the death penalty can be applied to them. It use to be 17. The Supreme Court raised it to 18.

Is whether a person is 18, 19, 20, 21, would that make any difference to you?

A. No.

Q. Okay. Sometimes -- and we address this issue

142

here in the questionnaire where we talk about voluntary intoxication is not a defense. And Mr. Hikel talked to you about this. The law says that you may -- it doesn't say you have to, but that you may consider voluntary intoxication whether it's an alcohol or drug or any mind-altering substance, that you may consider that as a mitigating circumstance, but the law doesn't require that you do so, or at least we don't consider it a defense. Listen. I'm not altogether sure that I agree with that statement on the questionnaire, but that's what the statement says. Okay.

Do you think that voluntary intoxication would be something that you would consider in mitigation at the punishment phase of the trial to maybe lessen a person's punishment?

A. Because they are intoxicated when it happen?

Q. Yes, sir.

A. It's a possibility.

Q. Okay. Sometimes -- well, if there is more than one person involved in the commission of an offense sometimes one is more of the leader than the other, and one more a follower than the other. But if they were both involved in the commission of the offense, would it make any difference to you in considering Special Issue Number 3 who was the leader and who was the follower?

143

A. I don't think it would make any difference which one.

Q. The bottom line I guess from what I heard you say, Mr. Whitten, is while you might consider some of these issues and might consider them as even being mitigating, if you found that the person was guilty and was an intentional dangerous murderer, it's not going to change your position on the death penalty.

A. That's true.

MR. PARKS: Thank you, Mr. Whitten. I appreciate your time.

THE COURT: All right. Thank you, Mr. Whitten. If you would step down, and just step out with my bailiff and then I'll bring you back in in just a moment. Okay.

(Prospective Juror, Baird Whitten, exits the courtroom.)

THE COURT: Do we have an agreement? No? State have a challenge for cause?

MR. HIKEL: No, Your Honor.

THE COURT: Mr. Parks, does the Defense have a challenge for cause?

MR. PARKS: We do, Your Honor. We would challenge the prospective juror for cause for at least three reasons.

144

We would challenge him that he has a bias or prejudice against the law upon which this defendant is entitled to rely, which is to say, that if he found him guilty of the offense of capital murder, he would always and automatically answer Special Issue Number 1 yes. He's made that perfectly clear. And that if he got to Special Issue Number 3 while he might consider individual things as mitigation, that there would never be sufficient mitigating circumstances for him to answer that question, yes, and change a death penalty to a life penalty. He says that is because both in his questionnaire and his answers to me, that he sees no use in life without a parole sentence, that he much favors the death penalty, that the life without parole serves no purpose, and I think he made it perfectly clear what his position is.

And finally, we would also submit him for his inability to consider youth in answering Special Issue Number 3 in violation of the Eight, Sixth and Fourteenth Amendments of the constitution. Lockett v. Ohio, Morgan v. Illinois, and Eddings v. Oklahoma.

THE COURT: Okay. Response.

MR. HIKEL: Judge, in response to the question that Mr. Parks asked the juror, he asked him, what would be your personal feelings in the death

penalty if you find the defendant guilty of capital murder. And the juror looked back at Page 5 and says he's more in favor of the death penalty. That question and answer that the juror gave is not a disqualifying one because it's no different from any of the questions he asked the juror on the first page of the questionnaire about the personal feelings. He wasn't asked the follow-up question, but it is can you set aside your personal feelings and follow the law which says that before you can vote for the death penalty or not you've got to consider these special issues. He does say that if I find someone not guilty of capital murder who intentionally killed somebody and took their property, yes, I'm in favor of the death penalty. Well, that's the law and that's his personal feelings, and he made it pretty clear he's in favor of the death penalty. But when I questioned him -- and Mr. Parks didn't ask him this. Can you set aside your personal feelings, however, whatever they may be and follow the law, that then requires you to answer these issues yes, yes, and no before you can then have the death penalty assessed. He wasn't asked that question.

On the issue of this mitigation, Judge, obviously, the only thing as a matter of law that he must consider is mental retardation. Everything is in

his discretion. And he said follow the leader doesn't make a difference. Voluntary intoxication -- the only time he was still with the law is, which is involuntary intoxication, you may consider it, but you don't have to. He says, yes, I'll follow the law and I'll consider it. "Possibility" is the word he used. I'll consider it. Age 18 to 21 will not make a difference. Well, that's in his discretion as a juror. He doesn't have to consider it. He said, no, it would not make a difference.

Given the fact that those issues he was asked about all of which is in his discretion as a juror, Judge -- and he says, it may not make a difference to me. It's a possibility involuntary intoxication. He's not been asked any question and given any answer to cause him to be disqualified as a matter of law. He has a strong feeling as to the death penalty, but he doesn't disqualify himself by the way he answered the questions, Judge.

THE COURT: I'm going to grant the challenge for cause. Okay. Bring Mr. Whitten back in and I'll thank him and excuse him and then we'll take a break.

THE BAILIFF: All rise for the juror.

(Prospective Juror, Baird Whitten, enters

the courtroom.)

THE COURT: Come in, Mr. Whitten, if you would please, sir. Just go ahead and have a seat there, if you would, please. Thank you, ladies and gentlemen. Be seated, please.

Mr. Whitten, thank you very much for being with us this afternoon. I'm going to excuse you from further service in this case, but we do appreciate the time and effort that you've made to be with us today. Thank you very much. You're free to go.

And we'll take about a ten-minute recess.

(Brief recess taken at 2:58 p.m.)

(Proceedings reconvened at 3:12 p.m.)

THE COURT: Okay. I guess we're ready for Miss Morris.

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 626, Kimberly Morris, enters the courtroom.)

THE COURT: Hi, Miss Morris. Come on in and have a seat right there, if you would, please, ma'am. How are you this afternoon?

PROSPECTIVE JUROR: I'm doing fine.

THE COURT: Thank you, ladies and gentlemen. You may be seated.

Vicki, I would like for the record to

reflect this is Prospective Juror Number 626, Kimberly Morris, M-o-r-r-i-s.

And, Miss Morris, my name is Quaid Parker. I'm a Senior District Judge from McKinney, Texas. The Presiding Judge in this case is Judge Michael Snipes and Judge Snipes has asked me to assist him in the trial of this case by presiding over the jury selection process.

PROSPECTIVE JUROR: Okay.

THE COURT: So he's upstairs in his courtroom. I'm here in this auxiliary courtroom presiding over the jury selection process while he's taking care of the day-to-day matters of the court, so that explains to you what I'm doing here instead of Judge Snipes.

Now, you will recall about a month ago when you all did get together probably, what, four or five hundred of you there in the Central Jury, Judge Snipes talked to you at that time and at some point in the proceedings had everybody stand up, raise your right hand, and he administered the oath of a prospective juror to the panel.

Do you recall that?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Were you one of the

panel members that stood and took the oath at that time?

PROSPECTIVE JUROR: Yes.

THE COURT: Very good. I'll just remind you that you are still under your oath. And what you're sworn to do is first of all give us truthful answers, which we know you'll do that, and also to be responsive to each and every question that's asked to you by either the attorneys or by myself. All right.

All right. Now, then, also on that date over a month ago you filled out a questionnaire and I know you haven't seen it since then, but the attorneys are going to be asking you questions concerning some of your answers and responses in the questionnaire. Now, let me kind of tell you what's going to happen today.

Now, did you have time to read over the orientation guide?

PROSPECTIVE JUROR: Yes, I did.

THE COURT: Okay. That's just kind of a thumbnail sketch of what the law and some of the procedural aspects that will be involved in a capital murder in this trial. What the attorneys are going to do is they are going to explain in more detail than what you have in your little orientation guide there. They are going to explain the law to you and then they are going to ask you questions concerning your ideas, your

---

150

thoughts, and your opinions. And so there's no right or wrong answers to any of their questions, and it's not a quiz that you to pass, an exam that you to pass. Nothing like that. Okay.

Now, then let me introduce you to the attorneys that are going to be involved in the trial of this case. Miss Elaine Evans who is seated at the counsel table directly in front of you, and then seated next to her is Mr. Gordon Hikel, and then behind them is Mrs. Andrea Handley. And these three are Assistant District Attorneys here in Dallas, County, and they are part of the prosecution team.

And then over at the Defense table over here Mr. Brad Lollar, Mr. Doug Parks, and then on the very end down here Miss Keri Mallin. And these three attorneys are the Defense team and represent Mr. James Broadnax who is right there in the middle.

All right. Thank you very much.

Miss Evans?

MS. EVANS: Thank you, Your Honor.

KIMBERLY MORRIS,

having been duly sworn, testifies as follows:

EXAMINATION

BY MS. EVANS:

Q. Good afternoon, Miss Morris. I think we can

---

151

all appreciate you here that you don't know your way around the criminal courthouse. And we're glad you don't. We're glad you're not a frequent visitor. So, glad you made it, though, and located us.

During this process here nobody is going to try to change your mind, or try to convince you to change your beliefs or the way you feel about things. Your feelings are yours and yours alone, and we're just asking that you tell the truth about those feelings here today. But of most importance is if you're asked to serve as a juror in this case, you will then be required to take an additional oath and that oath would be to render a true verdict based on the law and the evidence. So it's during this process that we're going to talk about potential issues or potential laws that could come up that you're going to be asked to follow because if your feelings are so strongly, one way or another, that they are going to impact the way you -- or guide you in the way you follow the law, or with respect to that, then that could be an issue. But you're not supposed to check your feelings at the door or personal beliefs at the door or anything like that. You're just going to be required to follow the law if you are to serve as a juror in this case. Okay.

A. Okay.

---

152

Q. But here today you're just here to tell the truth and what your true feelings really are on things. Okay.

I can tell by your questionnaire -- I looked through that, that you filled out some time ago -- that you take this process very seriously.

A. Yes.

Q. And I could tell that by the way you answered that last question on the back about how you feel about being chosen as a juror. You say that you would be nervous because the case is dealing with someone's life and making absolutely sure he is innocent or guilty. That is a huge responsibility. And I couldn't agree with you more, Miss Morris. That is a huge responsibility especially given the type of case you're called upon to sit as a juror on potentially here. You know, it's very important regardless if it's a misdemeanor or all the way up to any sort of felony because a person's liberty or freedom is potentially at stake. And I see that you recognize that as well as on Page 5 you say, regarding books and articles and movies that you've seen, the way that it influenced you is on the fact that we -- and you have that underlined -- make sure that these people are guilty. And, again, I agree with you. But I would submit to you that not only do we

153

have to make sure that these people are guilty and that the jurors in this case give a fair trial to both the State as well as the Defense, we've got to make absolutely sure that if a verdict of guilty is rendered on capital murder, that this is the type of person and the type of case and the evidence has proven beyond a reasonable doubt, that the person should receive the death penalty. Okay.

A.   Okay.

Q.   And so it's important not only in guilt-innocence, but it's important in the punishment phase to ensure that a fair trial is given to both the State and the Defense. Okay. And so it's kind of a waiting game, kind of wait until you hear the evidence. And as you sit here right now, you have no clue what the evidence would be in this case. Correct?

A.   Right.

Q.   And so would you be able to say right now today if this defendant is guilty of capital murder?

A.   No.

Q.   Would you be able to say right now today how you would answer the special issues?

A.   No.

Q.   No. And the same goes for during that second phase of the trial where you're trying to decide has the

154

State proven to me beyond a reasonable doubt each and every one of the elements in the indictment -- and you have the indictment before you there -- where he's charged with capital murder.

In guilt-innocence you would say, you know, did they prove it to me? Did this happen, you know, what they said happened, happen? And was it this defendant that did it? At that point in time if you say guilty of that you still wouldn't be able to say if he is deserving of a life sentence or a death sentence at that point. Correct?

A.   Correct.

Q.   Because you would have to wait, until when?

A.   Until after he was proven guilty or innocent and you heard all the extra -- the stuff that were in the back, the --

Q.   The punishment stuff. Fair to say?

A.   Thank you.

Q.   So after you find somebody guilty of capital murder you don't automatically say, you know, x marks the spot he's getting life, or he's getting death. That's not the way we do it here in Texas. You then would go back and consider, give meaningful consideration, to each of the three questions that are posed to you. So they are phrased in the forms of

155

questions and we call them special issues. But it's not until you find somebody guilty of capital murder that you would even be called upon to answer those. And, again, like I said nothing is automatic. There is no automatic death penalty in Texas. The law presumes life, life without parole if you're convicted of capital murder. So you would definitely have to follow along each of those three and answer those in such a way that would render a death sentence if it were proven to you the questions in each of the special issues. And we'll get more into that a bit later. The main thing is I just want you to realize that there are separate and distinct phases. And right here this phase is just to tell the truth, then you've got the guilt-innocence, and then you have the punishment phase. Okay.

A.   Okay.

Q.   When in looking at your questionnaire, I know that you gave a lot consideration to your answers, but I also know that when you filled it out you probably didn't have a Black's Law Dictionary there with you, or any pocket guide to law school in what sorts of crimes were eligible for the death penalty and how all of that works, did you?

A.   No.

Q.   I can certainly tell, though, that you thought

156

it out. And, for example, on Page 1, you are in favor of the death penalty and you say, "The death penalty should be used when a person intentionally takes the life of another."

And then on Page 2 you say, "The best argument for the death penalty is if the person being tried has intentionally killed another person."

And then on Page 5 I believe you say, "Death sentence rather than life" you say, "if that person intentionally took the life of another person." And you hit the nail on the head because you're absolutely right. It has to be an intentional murder before the death penalty is even an option. But the reason I kind of laughed jokingly, you know, is you didn't have a dictionary there with you and you didn't know all about the law. We don't expect jurors to. But a capital murder here in Texas is not only an intentional murder, an intentional killing, but it's got some sort of aggravating circumstance with it. It's either, say, the intentional murder of like a police officer in the line of duty, or it's a child under the age of six years old that you killed, or it can be two or more people that are killed in the course of the same criminal episode, same transaction, or it could be an intentional murder plus something, plus some other felony.

157

For example, here as we've alleged in this indictment an intentional murder plus a robbery. Okay. So it's not just straight out murder that makes somebody eligible for the death penalty, it has to be something more. Because as you might imagine Texas is a huge state. We've got lots of murders unfortunately happening, but the law recognizes that there's appropriate punishment for the offense of murder which is actually five to ninety-nine years, or life, here in Texas. But capital murder -- that murder plus something else, something aggravating -- is kind of special. And there's two possible punishments for that and that's life without parole, or a death sentence.

Does that make sense?

A. Absolutely.

Q. But you were dead-on whenever you said that it's an intentional murder because that will always be the case in the type of capital murder that we're talking about here today. Okay. Murder plus an aggravating factor such as robbery. It has to be intentional. They have to mean to do it, set out to do it. It wasn't an accident, it wasn't a mistake. They meant to do what they did.

A. Okay.

Q. But just because it's a capital murder, I said

158

that that makes it eligible for two possible punishments. Correct?

A. Uh-hum.

Q. And so just because somebody has been found guilty of capital murder, again, doesn't mean that you automatically get the death sentence because nothing is automatic. It's either going to be life without parole, or the death sentence, based on how you answer those special issues.

A. Okay.

Q. Okay. For example, if I were to shoot my co-counsel here ten times and I sat back and laughed about it and I was happy I did it and you thought, wow, that was a heinous crime. But that would just be a what?

A. Well, it wouldn't be -- you wouldn't have committed a robbery and a murder.

Q. Absolutely. So that would be just a plain murder for lack of a better word or better term, just a regular murder. Okay.

A. Okay.

Q. And so that is not a case -- and you do see that, that that's not a case that would be eligible for the death penalty. And just because something is eligible doesn't mean or make it automatic. Okay.

159

A. Right.

Q. I see, too, from your questionnaire that you agree that a life sentence in some cases is appropriate rather than a death penalty, is that correct --

A. (Nods head.)

Q. And you're going to have to answer up.

A. I'm sorry. Yes.

Q. There's not a key for nodding. Thank you.

-- as well as I see that the best argument against the death penalty is the defendant accidently killed someone and had extenuating circumstances for doing it. I see your answer to that. And, actually, extenuating circumstances that, in my mind -- and we'll talk about it more -- you're kind of talking about Special Issue Number 3, anything mitigating or extenuating circumstances about it that you're going to hear about from the evidence.

Is that fair to say?

A. Yes.

Q. And so you would take that into consideration right, Miss Morris, in determining whether or not a death sentence may be more appropriate or whether or not a life sentence may be more appropriate. Correct? The important thing here is that your mind is not foreclosed to any possible punishment, that you're open to

160

either/or.

A. Yes.

Q. Okay. When you did say that the defendant accidentally killed someone, I did want to make it clear to you that if it were determined by the jurors in the guilt-innocence phase that this was just an accident, or maybe somebody was acting in self-defense, then that person is not guilty and you would not be called upon to assess any punishment.

Does that make sense to you?

A. Yes.

Q. Because it has to be, like you said, an intentional murder, an intentional act before you're going to be guilty of the offense. Okay.

A. Okay.

Q. All right. I also see where you are not in favor of, or you do not agree with the proposition of an eye for an eye.

A. No.

Q. And why is that?

A. Well, I'm a Christian. And based on my beliefs of Christianity just because someone comes in and hits me in the arm doesn't mean it gives me the right to hit them back, or if someone might steal something from me, that doesn't necessarily mean I have

161

the right to go back and steal it from them.

Q. You're absolutely right. And in the State of Texas in giving us these special issues doesn't believe in an eye for an eye. It doesn't say, you know, the State believes that if you kill someone you shall be killed. No. It gives us special issues and allows the jurors to decide and determine is that person that's been convicted of capital murder, are they going to be a future danger, and is there any sort of mitigating circumstance such that we shouldn't give this person a death sentence. It gives you all sorts of options before doing that. So the State of Texas doesn't even believe in an eye for an eye or there would be no need for you to be back there answering those. Fair to say?

A. Fair.

Q. Okay. I want to go over -- have you ever served as a juror before?

A. No.

Q. That's okay because you don't, like I said, have to be a legal scholar, you don't have to remember anything that we talked about here today because all of the law will be given to you by the Judge in a Court's Charge at the conclusion and so you can go through it then and that way you are able to do what I told you.

To be qualified you would have to render a true

162

verdict based on the law and the evidence and you would have the evidence in your head because you had just seen it at trial and then the law would be given to you. Okay. Certain principles of law, for example, are the presumption of innocence. As the defendant sits here today just as any criminal defendant in any type of case whether it's a DWI or here today in this capital murder, all criminal defendants are presumed to be innocent. This defendant is presumed to be innocent and just because there's an indictment against him for capital murder, that indictment is by no means or any way, shape or form, to be construed as any evidence of guilt. It's just a sheet of paper that let's the State know what we have to prove in order for a jury to find somebody guilty, and it's a sheet of paper that let's the defendant know what he's been charged with and nothing more.

Would you be able to afford this defendant his presumption of innocence?

A. Yes.

Q. And whenever I talk about, you know, that sheet of paper there, the indictment, there are certain things on there. We call them elements. Basically, it's the defendant did intentionally cause the death of another on or about a certain day in Dallas County,

163

Texas, and in the course of doing so was committing a robbery. We're required to prove those to you beyond a reasonable doubt and the State is the one that has that burden. The defendant and his attorneys they could sit over there and work crossword puzzles or Sudoku all day long and that would be perfectly fine because they've shown up. That's all they are required to do. The State does the accusing, we better do the proving.

Do you think that's fair, Miss Morris?

A. Absolutely.

Q. And could you only look to this table, or to the State's table, at our representatives to prove to you the elements in that indictment?

A. Yes.

Q. You're not going to require the Defense to do anything.

A. No.

Q. Okay. And with regard to that -- I keep using the phrase "beyond a reasonable doubt." You may have heard that term on T.V., but T.V. sometimes gives other meanings to things that may not be quite so right. Sometimes you hear them say, beyond a shadow of a doubt or that sort of thing. And I can tell you beyond a reasonable doubt certainly it's not beyond all possible doubt, or one hundred percent because the State probably

164

would never be able to prove to you something one hundred percent, I would submit to you, unless you were actually a witness and saw it. Fair to say?

A. Yes.

Q. What does beyond a reasonable doubt mean to you?

A. Well, after reading this it made it sound like if I have any doubts in my mind, then the person is not guilty.

Q. You're absolutely right. Any doubt. And, you know, some people say it's a doubt based on their reason and common sense because as I told you before, you're not supposed to necessarily check your feelings at the door, and you don't have to check your common sense at the door either. So you're right. If you have any doubt, then you are to find the defendant not guilty. Okay.

A. Okay.

Q. Can you follow that as well?

A. Yes.

Q. And you've probably heard about a defendant's Fifth Amendment Rights. He does not have to testify. The State can't say, I will now call James Broadnax to the stand. And his attorneys can't say, you get on the stand. You're going to testify. It's his decision and

165

his decision alone through consultation with his attorneys. And if a defendant does not chose to testify, you cannot take that into consideration for any reason. You can't use it as evidence of his guilt, or you can't say, you know what, the State almost proved their case to me, but I had a little doubt about there. But, hey, since the defendant didn't testify, I'm going to go ahead and say he's guilty. You can't do that.

Would you be able to give this defendant his Fifth Amendment Rights?

A. Yes.

Q. And you would not hold it against him if he did not choose to testify.

A. No.

Q. Thank you, Miss Morris.

Again, you hit the nail on the head on another presumption or another kind of basic legal aspect and that's credibility of witnesses. On Page 7 of your questionnaire with regard to police officers you say your first reaction if they are going to tell the truth or not more than the average person is, no, because we're all human. You're absolutely right. Whether it be a police officer, a priest, a prostitute, whoever they are, just by virtue of their profession, you're not to hold them to a higher standard just as soon as they

166

walk through this door and take the witness stand. After you hear what they have to say, then you can start giving them a little more credibility or a leg up saying, hey, I think I know what they are talking about. But you don't judge them until it comes out of their mouth and you hear what they have to say. And it looks like you would be able to do that. And would you be able to wait and keep all witnesses on the same equal playing field until you hear what they have to say?

A. Yes.

Q. Okay. We've talked about capital murder and what it takes to be a capital murderer here in Texas and I think you understand that. And so now I want to talk about the possible punishments.

I mentioned before that, for example, say that we've got this defendant charged with capital murder, which we do. Say we didn't prove the robbery element in there. Say, you know, you believe -- well, yeah, they caused the death and they proved it by shooting just like they said they would. And, yes, I believe it was this person, but I don't think it was in the course of a robbery. Then the defendant would just be guilty of what?

A. Murder.

Q. Absolutely. And so at that point in time you

167

would be called upon to assess his punishment. And now instead of the two choices like it is in capital murder, you would have a range of punishment, five to 99 years or life. ^And based on a particular set of facts that you've heard, and the jurors can take into consideration everything they hear in the guilt-innocence phase, again, when you move into that next phase it's just that nothing is automatic. You can't say, well, I've just convicted a murderer, I'm going to go ahead and say it's worth life because you don't know. You've got to wait until the punishment phase because you don't know what else you may hear. You may hear things that let's you know that the defendant has a criminal history or lack of a criminal history, or you may hear things about his background or character that would help you in assessing that punishment, but there's a range. So we would just ask that you let the punishment fit the crime.

Could you do that, Miss Morris?

A. Yes.

Q. And let me give you an example to kind of illustrate what I mean by let the punishment fit the crime. Let's say that on trial you heard a case -- and we're just talking in hypotheticals, nothing about this case -- that a thirty-five year old man carefully planned out and actually carried out the intentional

168

killing of a five-year old child.

What would you think about that?

A. Well, it would be horrific.

Q. Absolutely.

A. And by what you said earlier he could still get the death penalty.

Q. Uh-hum, because he's a child under the age of six. Right? So before you say you find this person guilty of capital murder and you got before you whether or not it's going to be life without parole or a death sentence, you couldn't really say right now --

A. No.

Q. -- which it would be even though you said it's horrific. Correct, Miss Morris?

A. Well -- and he intentionally planned it out and did it, but still there's so many facts missing.

Q. You're right. And so what if I were to give you additional facts in the punishment phase when we move into that next phase and I tell you that the thirty-five year old man is actually the father of that five-year old, and this five-year old has been suffering for over a year now with terminal cancer. And you hear other evidence that that father he's a pillar of the community, he's been a very attentive father, he's a loving husband, he's been by that child's bedside day in

169

and day out, he only leaves to go to the restroom and he cannot stand his little man suffering any longer. And so he goes and he gets a lethal dose of morphine and gives it to his son to put him out of his misery.

A.   Well, then, I would have to say he's not guilty.

Q.   Okay. And I understand what you mean, but then you have to say, he's not guilty, but under the law --

A.   Well, he's guilty of committing the murder, but it wouldn't be worthy of a death penalty or life in prison or something like that.

Q.   I understand what you're saying. That is a very far out there example, but you do understand? Because I think you just said it. He would be guilty of the capital murder actually because it's a child under the age of six. Fair to say?

A.   Yes.

Q.   And as I said, it's kind of a far out there example, but you said, but he wouldn't be worthy of a death sentence or life, but those may be your only two choices in that scenario. But I just wanted to illustrate the point that you don't know until you hear it, right --

A.   Until you see the whole picture --

170

Q.   -- in the punishment phase. And that's why you have to wait. And that's why the legislator says, you've got to wait. You've got to consider these special issues because you don't know what you might hear.

A.   Okay.

Q.   So can you do that, Miss Morris --

A.   Yes.

Q.   -- wait until you hear it?

So in answering the special issues -- so say, for example, you found -- and kind of forget about that far out there example for now. Say you found any defendant, a defendant guilty of capital murder and then you move into the special issues. Again, there's no automatic answers. At this point in time the burden of proof is still on the State of Texas to prove to you that the answers to Special Issue 1 and Special Issue Number 2 would be, yes. That would be our job to prove that to you. But the presumption going into that phase would be that the answers to those special issues are, no, because we have the burden to prove to you. Just like he's presumed to be innocent in the first phase of the trial and as he sits here now, the presumption to those special issues, unless and until we're able to prove to you beyond a reasonable doubt that the answers

to those special issues in Number 1 and Number 2 are, yes, then the presumption is that he faces a life sentence without parole and that those answers are no.

A.   Okay.

Q.   Okay. And as I said the State of Texas has that burden. You don't look to that table again for anything in that second phase of the trial either. And as you said, I think with the child example that would be horrific. You may hear about the most heinous, horrific, crime. You know, your jaws drop wide open after hearing everything in the guilt-innocence phase after you've found somebody guilty of capital murder. And you may say in nine out of ten of the capital murder cases you hear, you may think that that person is absolutely deserving. And the type of person that deserves a death sentence and the type of person that's going to be a future danger as Special Issue Number 1 calls upon you to answer, you know, nine times out of ten you may say, hey, that is the type of person that I wouldn't want to meet on a dark alley, and you betcha he's going to be a future danger. You may think that in your head, but what the law is telling you, again, is you've got to wait. You've got to play mental gymnastics a little bit because you don't know, you really don't know truly what you're going to hear until

172

after you consider everything again in that second phase.

Okay. And so with regard to Special Issue Number 1, you will see it says, "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?" And the word "probability" is used there, not the word possibility because virtually anything is possible. Right?

What does probability mean to you?

A.   Well, that there is evidence that there might be -- not the possibility, but that he could, or the person could do some more heinous acts.

Q.   Absolutely. And you hit the nail on the head again whenever you said "evidence." There's evidence there because that's what you are to look to. You've got to look to the evidence to help you to determine whether or not the evidence suggests that there is a probability that the person could commit other acts of violence in the future. And, you know, some jurors tell us that to them it means more likely than not.

Do you think that would be a fair way to assess it?

A.   Yes.

Q.   It doesn't say with absolute certainty he's

173

going to do this because there's no way to know that. Right?

A. Right.

Q. But a probability that the defendant would commit criminal acts of violence. And it doesn't say, you know, that he's going to go out and commit another robbery, or that he's going to go out and commit another murder, does it, Miss Morris?

A. No.

Q. Just criminal acts of violence. What would be an example of a criminal act of violence to you?

A. Well, in this case I would assume that they would be in life for prison, so something in the prison. Maybe he could hurt someone there, or -- I don't know. Steal something there or do something there that could be a crime in the jail.

Q. And, again, when you said "I don't know," you know, you've got to wait to hear it. Right?

A. Right.

Q. And I just wanted to know some examples. Let's say, for example, that I turned and I just clocked my co-counsel here just straight in the jaw. Would that be a criminal act violence to you, or could it be considered --

A. It could be considered, yes.

175

Q. Okay. And, again, it's the State that has to prove it to you beyond a reasonable doubt.

The law also allows you to consider the facts of the case and decide that somebody could be a future danger, that you believe that there's a probability that they would commit criminal acts of violence in the future based on the facts of the offense alone that it is so heinous or so bad that you say, well, yeah, he's going to. But, again, you can't make that snap decision after the guilty verdict, you've got to reconsider it. That's what the Special Issue Number 1 is asking you to do. But the law does allow you to say, just based on the facts alone, yeah, I think he's going to be a future danger.

Okay. Miss Morris, what types of things do you think would be important in your mind in determining whether or not a person is going to be a future danger?

A. Well, like you said, I think it might be the act alone from the crime, or the person's history of other crimes that they've committed.

Q. So a person's criminal history, if you hear it, or the act alone. And I think you said on Page 4 of your questionnaire something that was just kind of dead-on, but it's like you knew about these special issues beforehand. You say, "If a crime is severe

174

Q. Right. And you were right in saying, you know, I guess here he's looking at maybe prison because that would then be his society. Fair to say?

A. So that would be different than if they were outside in the world.

Q. Right. And certain types of offenses that happen out in the free world could still happen there in prison. Fair to say?

A. Yes.

Q. And so that's why Special Issue Number 1 contemplates are they going to be a continuing threat to society wherever that society may put this defendant.

A. Okay.

Q. Do you agree with that?

A. Yes.

Q. All right. And do you agree that, you know, people that are in prison, for say, their third DWI, they deserve to be protected just as much as somebody that's murdered somebody else?

A. Yes.

Q. And could you wait and answer Special Issue Number 1 after you have heard all of the evidence and consider it in determining whether or not this individual was actually going to be a future danger?

A. Yes.

176

enough why let this person have the opportunity to commit more violent acts." And that's basically -- it sounds like what you were contemplating is the severity of the crime may lead you to answer Special Issue Number 1, yes. But, again, you've got to wait until the evidence leads you there in the punishment phase, not after a guilty verdict in capital murder.

Okay. Miss Morris, let me give you an example, again, as to how important it is to wait until you hear everything because you just don't know. Let's say I go into the 7-Eleven, or let's say you hear evidence that a person goes into a 7-Eleven and robs the 7-Eleven of all of its money and cigarettes and puts the clerk in the bathroom, locks the clerk in the bathroom, ties him up. And before they leave they say, you know what, I think that clerk has got a look at my face. So they go into the bathroom and put a bullet into the clerk's head and then leaves.

Guilty of capital murder?

A. By the facts you just gave me, yes.

Q. Okay. But do you know yet what punishment is appropriate?

A. No.

Q. No, because then you hear in the punishment phase of the trial that actually after that defendant

177

put the bullet in the clerk's head he walked out of the door and took a swig of the Bourbon that he got off the shelf and got plowed into by a big eighteen wheeler leaving him to be a paraplegic. And, you know, some jurors tell us, no, that person isn't going to be a future danger in any society anymore; and other people say, well, know he still could be.

Do you understand?

A. Yeah, I do.

Q. So I'm not going to ask you how you would answer that now because you don't know, you haven't heard all the surrounding facts. But do you understand why it is important to wait until you hear everything?

A. Yes.

Q. And, again, kind of like you illustrated before about the father and the child. That's a situation where, obviously, if you had waited to hear the evidence, you might change your mind on what punishment to assess. Fair to say?

A. Yes.

Q. If you answer Special Issue Number 1, no, then everything stops, you don't move on to Special Issue Number 2 because the defendant gets a life sentence without parole if you answer that no. But if you answer Special Issue No. 1, yes, that he is going to be a

178

future danger, then you move on to Special Issue Number 2, and Special Issue Number 2 doesn't always come into play in every trial. You're not always called upon to answer this, "If you find a defendant guilty of capital murder." But in case it comes into play, we just want to make sure you understand what it is. And, basically, it's the law of parties. So let's take that 7-Eleven example again, but instead let's say that I'm the trigger person and my co-counsel here, he and I plan out to go rob that 7-Eleven and we're wanting to take the cigarettes and the money. So we get there at the 7-Eleven. He's ^trying, and I've got the gun cocked and ready to go. And we pull up at the 7-Eleven and I say, "Oh, I forgot my mask." And he's like, "Who cares. Don't leave any witnesses."

So he sits out in the car behind the wheel and he's getting ready to drive away as soon as I walk out with the money and the cigarettes. And I come outside and I say , "I didn't see any witnesses. I killed the clerk. Here's the money and the cigarettes."

What offense could I be found guilty?

A. The death penalty because you committed two crimes. You murdered and you stole.

Q. Okay. What's the offense, though? Not the punishment. Not the possible punishment, but the

179

capital murder. Right?

A. Capital murder. Sorry. Yes.

Q. That's okay. So I could be found guilty of capital murder?

A. Yes.

Q. What do you think that the driver -- the person that sat in the car and never went inside, what could he also be convicted of?

A. I think just -- I don't know what you would call it, but he didn't murder anyone and he didn't steal, but he was still part of the crime.

Q. You're absolutely right. And that's what the law contemplates, law of parties, in Special Issue Number 2. Of course, the trigger person, me, that put the bullet in the clerk's head could be found guilty of capital murder, but the law says that if you aid, assist, another person in the commission of a criminal offense then you, too, can be found guilty of that same crime regardless of if you're the trigger person, the person who actually did it or not.

A. Okay.

Q. And to be eligible for the death penalty in the capital murder case you would have to have actually anticipated that a death could occur to be guilty as a party to capital murder and be eligible for the death

180

penalty. Okay. And that's what you're called upon to answer in Special Issue Number 2 is did you find that that person is actually the triggerman, or did you find that they aided or assisted in that crime and they anticipated that a death would occur. And do you think that the driver could have anticipated or did actually anticipate a death would occur?

A. Well, yeah, because he told him to do it.

Q. Absolutely, he told him to do it. Don't leave any witnesses. And so if you answered Special Issue Number 2, yes, then you move on to Special Issue Number 3. But, again, with regards to Special Issue Number 2, it's the State's burden. We have to prove that to you beyond a reasonable doubt and if we don't, the answer to that is no, and, again, everything stops and it's a life sentence without the possibility of parole. Okay. And then you would move on to Special Issue Number 3, though, if you find the answer to Special Issue Number 1, yes, and Special Issue Number 2, yes, moving on to Special Issue Number 3.

No one has the burden regarding that. The State doesn't have the burden, the defendant doesn't have the burden. Nobody has to bring you anything it's just taking into consideration everything that you've already heard during the course of the trial. And in the

181

punishment phase is there anything, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed. You can imagine a situation where a jury maybe has found somebody guilty of capital murder and then they found that, yes, they are going to be a future danger; and, yes, they are the triggerman or they acted as a party. But then they hear something, some piece of evidence in that trial that, to them, is tugging at their hearts saying, wow, I don't want to give this guy a death sentence. I don't want to do it. So that's the reason why we have Special Issue Number 3. It's called the safety net. You know, you may hear a thousand pieces of mitigating evidence, or what is mitigating to you and we don't tell you and the law doesn't tell you what is mitigating. That's for you to decide. It could be that a defendant who's dyed his head red and you think that's the greatest thing ever, or that his mom is sitting back in the courtroom or, you know, took the stand and cried for him. You know, whatever is mitigating to you. Some people say age, some people say if they were on drugs or alcohol or a

182

person's upbringing if they didn't have a good one may be considered as mitigating to them. But those things that I just mentioned to you that may be mitigating, some people it see them as aggravating.

We have jurors all the time in cases, not even capital murder, but in other cases that would say you know what, I think if somebody intoxicated themselves, voluntary intoxication, and then goes out and does a crime that makes me madder. I think they are more culpable. To them it's more aggravating than mitigating. So we're not going to tell you what category to put something in, but if you hear evidence that is mitigating to you and you put it in that mitigating category, then you have to go back and look at those pieces of mitigating evidence and say, okay, all of that was mitigating, but is it sufficiently mitigating? Sufficiently mitigating such that I'm going to overturn this death sentence and give the defendant now a sentence of life without the possibility of parole.

Does that make sense, Miss Morris?

A. Yes, it does.

Q. So basically after you've answered Special Issue Number 1, yes, and Special Issue Number 2, yes, the defendant is sitting on a death sentence because

183

we've met our burden. We've proven to you what we had to prove to you beyond a reasonable doubt so that the defendant will now receive a death sentence --

A. Okay.

Q. -- unless you find that there is something sufficiently mitigating to answer Special Issue Number 3, yes.

A. Okay.

Q. And as you sit here today, it's just like the other phases of the trial, you don't know because you haven't heard everything.

Fair to say, Miss Morris?

A. Yes.

Q. And there may be things -- and I'm not going to pop quiz you and ask you what you think is mitigating or not mitigating or what you would consider, or what you wouldn't consider because it may be taken entirely out of context as I just ask it to you, you know, blanket right now throwing out the topics and terms. It may be something you've never considered before.

Let's take, for example, you have a day-care situation. And say a twenty-five year old man walks into the day-care and you hear that he shoots and kills two of the workers there. Another horrific, horrible set of facts. Right?

184

A. Yes.

Q. But, again, you don't know at this point in time what would be the appropriate punishment. Correct, Miss Morris?

A. Correct.

Q. Let's say that you then heard additional evidence in that punishment phase that the two individuals that were shot and killed actually were that twenty-five year old man's two aunts and those two aunts raised him from birth. In fact, they raised him in a closet. They put out cigarettes on him, they fed him dog food, they kept him locked in that closet 23 of the 24 hours of the day and just never gave him any love or any type of teaching of right or wrong, and he now sees that they are taking care of children and working in a day-care, so he goes in and takes those two aunts out.

Do you understand how some people may say, well, first of all, I would maybe answer Special Issue Number 1, no, because he killed the two people he maybe has a beef with. Like, maybe he wouldn't be a danger to anyone else but those two who treated him so horribly. Or, if jurors thought, no, I don't know. Based on that, that's pretty bad and he could have killed other children, so maybe he is a future danger. And so then you get down to Special Issue Number 3 you could at that

point in time take into consideration that upbringing, what those people did to him.

Q. Do you understand that?

A. Yes.

Q. And that's just kind of to illustrate, again, you just don't know until you hear it. You're not going to be pinned down to say what it is or is not right now, just you know when you hear it.

Fair to say, Miss Morris?

A. Yes.

Q. Could you do that?

A. Yes.

Q. All right. I want you to then look basically on Page 5 and 6 and this is with regard to Special Issue Number 3. I think I told you that it looked like you were already kind of thinking of Special Issue Number 3 when you talked about extenuating circumstances.

Is that kind of what you mean by extenuating circumstances, or what do you mean?

A. Yes. The whole picture of the background. Like you said, maybe how they were raised. If they had a criminal history.

Q. Okay. So you would be able to take certain things like that into consideration. Fair to say?

A. Yes.

186

Q. All right. And right now as you sit here you would not say there's never something that I would just never consider to be mitigating or sufficiently mitigating. Could you keep an open mind?

A. Yes.

Q. On Page 5 and 6 when we talk about voluntary intoxication, I've already kind of touched on this, but the law says voluntary intoxication does not constitute a defense. So you can't go out and get drunk and then say, well, I was drunk so I'm not guilty of the offense. You say that here. You say, "You choose to become intoxicated. This does not give you an excuse for your actions." And that again when asked if it would automatically prevent you from assessing the death penalty you say, "This is not an excuse." And you're absolutely right. That is the law. But with regard to mitigating which is the first question on Page 6 the law does provide that evidence of intoxication may be considered in mitigation of punishment. Do you agree with that law? And you say, yes. And you said that it kind of speaks for the state of mind of the person.

So would you agree that, again, that that is something under Special Issue Number 3 that may be something that could be considered in any given case?

A. Yes.

187

Q. Okay. And I think you already said that you would consider a person's upbringing, and on Page 8 you're kind of asked about that. And you say that everyone has the opportunity to choose a path. Some people have a harder time seeing the path, but they choose to keep the cycle of their circumstances going or to change it so as long as you understand that that might be the type of evidence that you could potentially hear. And certainly you may decide after you've heard it, no, I don't think it's mitigating at all; or, yeah, a little bit mitigating, but it doesn't rise to the level of being sufficiently mitigating; or maybe you find absolutely and, yes, that it's sufficiently mitigating and, no, we shouldn't give this person the death penalty. But would you be able consider all of that?

A. Yeah, I think it goes back to the fact that you have to hear all of the facts to be able to --

Q. You don't know it until you hear it. Right?

A. Exactly.

Q. Okay. I believe you also stated from your questionnaire that you hadn't heard anything about this case.

A. No.

Q. Is that still the way you are today?

188

A. Absolutely.

Q. Okay, because I did see that you had been sort of following the case in Coppell.

A. Yes.

Q. In that case it looked like you had kind of formed an opinion in your mind maybe on that case, and that's fine because it's not the case we're talking about here today.

A. Well -- and that's just based on the fact that, unfortunately, my daughter went to school with the daughter of the lady that got murdered.

Q. So it kind of hits close to home.

A. Yes.

Q. So you could see where, you know, obviously if we were asking you to serve as a juror on that case, it's probably not the appropriate case for you. Fair to say?

A. Yes.

Q. And literally that's all both the State and the Defense are looking for here today is a juror that can give a fair trial to both the State and the Defense. And based on your questionnaire and based on what you're telling us here today, I think that you would be able to do that, Miss Morris.

I do see that you have a nephew with a drug

189

problem.

A. Yes.

Q. Is he, what, brother or sister's child?

A. My sister's. It's really my sister's half -- my sister's husband's son, but she raised him.

Q. Gotcha. Do you know what type of drugs he used?

A. You know what, I think heroin, marijuana. Pretty much everything.

Q. Okay. And I saw where he tried to get help for that.

A. He did. And he did go through a rehab program through something that the court set him up with.

Q. Great. And I think I saw where you were in favor of rehab. Fair to say?

A. Absolutely.

Q. And I couldn't agree with you more. If we can get some of these drug users help so that they don't go on to commit other crimes or that sort of thing, then it's what should be done. You're right, Miss Morris. So let me go ahead and ask you. Can you -- again, I think you said as you sit here today, you can't say if the defendant is guilty, fair to say --

A. Yes.

Q. -- of capital murder. And after you find a

190

person guilty of capital murder you can't automatically answer those special issues just because you found somebody guilty. Fair to say?

A. Correct. Yes.

Q. You will wait and hear additional evidence and consider it again.

A. Right.

MS. EVANS: Thank you, Miss Morris. Do you have any questions for me?

PROSPECTIVE JUROR: No, I don't.

THE COURT: All right. Thank you, Miss Evans.

Miss Morris, how are you doing?

PROSPECTIVE JUROR: I'm fine.

THE COURT: Do you want to take a break?

PROSPECTIVE JUROR: No, I'm fine.

THE COURT: You're good?

PROSPECTIVE JUROR: I'd rather just move on.

THE COURT: Get it over with.

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. All right. Mr. Lollar.

MR. LOLLAR: Thank you, Judge.

191

THE COURT: Yes, sir.

EXAMINATION

BY MR. LOLLAR:

Q. How are you, Miss Morris?

A. I'm fine.

Q. Again, my name is Brad Lollar. This is Doug Parks. This is Keri Mallin down here on the end, and we represent James Broadnax seated right here with us.

You've been called down to kind of be interviewed about being a juror in this case and I want to talk to you a little bit. Let me, again, state to you that we're not down here to try to change your opinion about anything. I don't have anymore right to tell you what you should think about an issue than I have the right to who you should vote for, for president. That's not what I'm about. We're not down here to change your opinions, but I think we are entitled to know what your opinions are about the criminal justice issues and the death penalty because we have a job and that's to protect Mr. Broadnax down here. And what we're looking for, obviously, are twelve jurors who can be fair and who can be fair in this type of a case. We do not expect that you would have been familiar with procedures in a capital murder case. We don't expect that you would be familiar with these three special issues or even have

192

heard of those three special issues before today. Really, did you know those existed?

A. Absolutely not.

Q. Well, nobody else does either. Half of the lawyers in this courtroom -- well, not in this courtroom, but in this court's building don't know that they do either.

But now you've heard a little bit about them and I want to talk to you about those issues. First, I want to talk to you about some things in your questionnaire.

A. Okay.

Q. And I do that because I think when you filled out the questionnaire a month ago you told us what your true feelings were about these issues. Right?

A. Okay. Yes.

Q. Having thought about it, would you have changed any of the questions or any of the answers that you gave here on your questionnaire? If we asked you to fill that out today would it be about the same?

A. It would be about the same.

Q. Okay. Fair enough. And then we're going to talk about the first part of the trial, the guilt or innocence phase of the trial, and then we're going to talk about the penalty phase in a capital murder case. Please understand that just because we're going to talk

193

about that doesn't mean that we expect that we're ever going to get there in this trial, but this is the only opportunity we have to talk to you about that and we need to because it's a capital murder trial. Okay. Fair enough?

A. Fair enough.

Q. I see that you are a teacher in a preschool.

A. Yes.

Q. And I see that you teach a couple of days a week. Are you going to be teaching in the Fall again?

A. Yes.

Q. Do you know when your school starts back up?

A. August the 24th.

Q. August the --

A. Oh, I'm sorry. August the 26th.

Q. August the 26th. Okay. And we ask that because our trial is going to start on August the 10th we have asked jurors to set aside a couple of weeks, okay, so I think that we anticipate that the evidence in the case would be wrapped up by the 21st of August. So from what you're saying I don't think that would be a conflict with your work.

A. No.

Q. Were you planning on taking any vacation before you went back to work?

194

A. Yes, but that's at the end of July.

Q. End of July. Okay. So you're good to go for those two weeks in August if you're called upon to be a juror.

A. Yes.

Q. Okay. Fair enough.

Now, I did want to ask you now -- obviously, it's been mentioned here and you put in your questionnaire that you had an interest in a case that was going on a month ago about a lady who had disappeared there in Coppell.

A. Yes.

Q. Tell me about that case. What happened in that case?

A. It was her and this man went and had coffee at a grocery store in Coppell and they got on tape some roughhousing out in the parking lot, and they got in the truck and left together. And, apparently, the family knew the man, but she never showed back up and they haven't found her yet.

Q. So the supposition is that she has been kidnapped and murdered?

A. Yes.

Q. And they have not found the body yet?

A. They have not found the body.

195

Q. Have they identified the person who kidnapped her?

A. Yes. I believe they arrested him, but maybe they let him go again. I'm not sure.

Q. Is that -- see part of Coppell are in Dallas County and parts are in, I think, Denton County.

A. This would be in -- gosh, it is. It's on the other side of 121, so it might be Denton County.

Q. Yeah. That's what I was thinking. It might be. And if that's the case, then it's probably a case that's prosecuted up in Denton County.

A. Probably so.

Q. Well, that was on your mind when you filled out the questionnaire and I wanted to ask you about that.

And I see that you have a couple of children.

A. Two.

Q. And a boy and a girl. Is that right?

A. Yes.

Q. And your husband works as a consultant for a chemical company?

A. Yes.

Q. Okay. Very good.

Now, Miss Morris, I want to talk to you, like I said, about this type of a case. Since you've not been

196

a juror before let me tell you this. The only time when we lawyers get to talk to a juror individually is in this type of a case, in a capital murder case, where the State is seeking death, the death sentence. Okay.

A. Okay.

Q. Normally, you would be sitting out on a big panel of sixty or seventy people. You would all be out here and we would get up and talk to you for an hour aside, maybe forty-five minutes aside, maybe. But in this kind of a case it's different.

Now, in a normal case, any other kind of a criminal case but this, once the jury is selected you go into testimony. The State has the burden of proof in any criminal case so they put on their evidence first.

A. Okay.

Q. Then they rest, and then the defendant has the opportunity to put on evidence. But since they don't have the burden of proof, they don't have to. Okay.

A. Okay.

Q. The jury hears all of the evidence put on by both sides, they make arguments, the prosecutors argue and the Defense argues, then the jury goes back to deliberate their verdict. Okay. And if the State has proven the allegations in the charging instrument -- the indictment against the defendant -- then the jury is

197

supposed to find the defendant guilty. And if the jury feels the State has not proven the elements of the indictment, then they are supposed to find the defendant not guilty. It's just that simple. Okay.

A. Okay.

Q. Now, in any other case but this then if a jury finds the defendant guilty of something, then you go into what's called the punishment phase. And, again, the State has the opportunity to present any type of testimony they want to that's relevant to punishment. The Defense has the same right. And you do that and then the jury goes out to deliberate again after arguments. And in a regular case, any other type of case but this, the Judge will give you a range of penalty that's attached by the legislature to the type of offense you're dealing with. Okay. And the jury goes out and decides where the defendant fits in that range of penalty, either at the low end or the high end or in the middle. Okay. And that's basically the way it is and the trial is over with then.

A. Okay.

Q. This type of case is a little bit different. In this type of case you have right there before you the indictment in the case. Do you see that? It says, "In the Name and By The" -- I think that's it right there.

198

A. Yes.

Q. If you would take just a moment to look at that you will see some printed parts and then the typed-in parts are the allegations in this particular case. Okay. You see what the State is charging --

A. Uh-hum.

Q. -- is that there was an action committed here in Dallas County back on June the 19th of last year and that they are saying Mr. Broadnax here intentionally caused the death of Stephen Swan and did that during the course or the commission of aggravated robbery.

A. Okay.

Q. Okay. And caused -- intentionally caused Mr. Swan's death by shooting him with a firearm, a deadly weapon. Okay. Now, that's what the State has alleged and that's what they have to prove.

A. Okay.

Q. They have got to prove each and every element of that indictment beyond a reasonable doubt. Okay. One of the things I want to make sure you understand is the phrase that is used there when they say that the defendant intentionally caused the death of the decedent. Okay.

A. Okay.

Q. That phrase has meaning in Texas law. The

199

legislature has given us a definition of what it means to say that somebody did something intentionally. And the legislature tells us that what that word means is that it was the person's conscious objective or desire to cause a result, the result being death.

A. Okay.

Q. Okay. So let's take it out of the context of this particular case and let's just talk about a hypothetical case where the State has charged the same type of thing. Okay. An intentional murder committed during the course of a robbery --

A. Okay.

Q. -- of a person. Okay. Now, understand that what the State is saying in that type of an indictment is that the defendant on trial was engaged in the act of robbery with a gun. And that during the course of that robbery, they intentionally wanted the -- they wanted the victim to be dead and they did whatever was necessary to cause their death.

A. Okay.

Q. Okay. So they consciously formed the objective to cause the result which is death. Okay. Now, let me contrast that by showing you this example. Let's say that a person goes into a 7-Eleven to rob the 7-Eleven. Okay. And they go up to the cashier with

200

a gun and they point it at the cashier and say, "Give me your money" and the cashier does. Okay.

And then the robber tells the cashier, "I'm fixin to leave. You're not going to get hurt unless you come around that counter and follow me out. I don't want you following me out because then you will see where I go or what car I get into."

Okay. And sure enough he starts out the door just as he said he was going to do, but sure enough the cashier decides to come around the counter and follows him out to see where he went. Okay. And at that point he looks back at the cashier and says, "I told you not to do that." And at that point shoots him in the kneecap, okay, so that he'll fall to the ground and won't follow them out to see where they go.

A. Right.

Q. Okay. Now, in that hypothetical the person did an act which was clearly dangerous to human life. They fired a gun hitting the person in the kneecap, but they didn't do that with the intent to cause death.

A. Right.

Q. Do you see that's the difference between what is alleged in our hypothetical that we're talking about and what is alleged in this indictment.

A. Okay.

201

Q. Now, unfortunately in our hypothetical we're talking about there the bullet hits the femoral artery and the person dies. Okay. So what you have is a murder that was committed during the course of a robbery, but it's not a capital murder because of this lack of what we call the culpable mental state. That person did not commit the murder intentionally, they did it knowingly. In other words, they knew that by firing a gun at somebody that could result in death --

A. Right.

Q. -- but that was not their specific intention.

A. Okay.

Q. Okay. And that's a difference. And that is a difference that would make, in our hypothetical here, that not to be a capital murder. The jury could then consider the lesser-included offenses of murder and aggravated robbery and find the defendant guilty of either one of those. They are the same level of offense, they're first-degree felonies, and set a punishment anywhere between five year's confinement and life.

A. Okay.

Q. Okay. But it would not be life without parole and there would not be the availability of a death sentence because it's not capital murder.

202

A. Right.

Q. Now, having said all of that I want to talk to you about some of the things you put in your questionnaire.

A. Okay.

Q. Okay. So now you are clear on what must be proved in this type of a case to be talking about a capital murder.

A. Right.

Q. It is a murder committed during a robbery where the death of the victim was caused intentionally. So we got a person who gets a gun, makes sure the gun is loaded, intends to go out and commit a robbery of somebody, did that with a gun, and then decides to intentionally cause the death of the victim. Okay.

A. Okay.

Q. So that's what we're talking about. And that's the context that I want to talk to you about, these three special issues.

A. Okay.

Q. Now, if you were chosen as a juror in a capital murder case, and it's that type of a case, an intentional murder committed during the course of a robbery, okay, where it has been proven to you beyond any reasonable doubt that the person on trial is guilty

203

of that offense --

A. Okay.

Q. Okay. We're there. We're at that point.

A. Okay.

Q. Okay. So then you're faced with answering these three special issues after you hear the punishment phase. Okay. But now frankly, Miss Morris, and like I say, I'm not entitled to change your opinion. I am entitled to know what your opinion is.

A. Okay.

Q. Fair enough?

A. Fair enough.

Q. Okay. You tell us here on the first page we ask, "Are you in favor of the death penalty?" And you said, "yes." And will you please explain your answer? And you say, "The death penalty should be used when a person intentionally takes the life of another person."

A. Okay.

Q. Okay. Page 2. We ask you the best argument for the death penalty. "If the person being tried has intentionally killed another person."

A. Okay.

Q. Okay. Page 5. "What purposes, if any, do you believe the death penalty serves?"

"A person who commits the murder intentionally."

204

That's about two-thirds of the way down.

A. Oh, okay. I see.

Q. Do you see what your answer was there?

A. Uh-hum.

Q. "What purposes do you believe the death penalty serves?"

"A person who commits murder intentionally."

And the next question. "What would be important to you in deciding whether a person received the death sentence rather than a life sentence in a capital murder case?"

And your answer was, "If that person intentionally took the life of another person."

A. Okay.

Q. Okay. So it seems obvious to me that to you the dividing line between who gets death and who gets life without parole is that issue of whether or not they committed the murder intentionally, intentionally causing the death of the victim.

Would that be a fair statement?

A. That would be a fair statement, but I didn't know about these special issues.

Q. Well, that's what I want to talk to you about.

A. Yes.

Q. Because now you see that the legislature has

205

set up a procedure. And, frankly, what the legislature has told us is that for anybody convicted of the offense of capital murder under the myriad of types of cases, that we can do capital murder in Texas. We can kill a policeman, we can kill a fireman, we can kill during the commission of arson, burglary, sexual assault, robbery, and some other offenses, retaliation and so forth. Or we can commit serial murder, or we can commit mass murder, or we can kill a warden or a jail guard while we're escaping from a penitentiary. And I still don't think I've listed all of them. I've got them listed in here if you want to hear more.

You see what we're talking about here? For anybody who has done that thing and has been shown beyond a reasonable doubt that they have done that thing, okay, the preferred sentence is life without parole and not the death sentence.

A.   Okay.

Q.   And they have told us that by giving us those special issues. Those special issues are erected as barriers to the imposition of a death sentence. Okay.

A.   Okay.

Q.   And they meant them to be. They did not mean them to be speed bumps on the way to an execution. They put them up there and they say, well, look at Special

206

Issue Number 1. And, let's read it together.

"Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?"

Okay. So what they are saying there is, you know, we're going to divide those who get life from those who get death depending not on what they have done, but what they are likely to do in the future.

A.   Okay.

Q.   Do you see that? That's exactly what that question is asking. That's why we call it the future dangerousness issue. Okay. And the legislature tells us that there's a presumption that the answer to that question is no, okay, just like there's a presumption of innocence in the first part of the trial. The legislature has told us that there's a presumption that the answer to Special Issue Number 1 is no. And it's a duty upon the State, again, just like they had a duty in the first part of the trial to prove the defendant guilty beyond a reasonable doubt, they have a duty to prove that he's going to be a future danger. Okay.

A.   Yes.

Q.   And you understand now where are we talking about the defendant being? In the penitentiary.

207

A.   Correct.

Q.   Okay. So really we're not talking about, you know, being in downtown Dallas and committing these acts of violence, we're talking about whether or not he's going to be committing criminal acts of violence in the penitentiary. And, you know, we've got 153,000 people locked up in penitentiary in the State of Texas. And, obviously, there are guards, there are wardens, there are teachers, there are nurses, there's lots of people down there. But the point is that, that's what that special issue is set up to do is to divide those who -- well, the courts have told us -- are the incorrigible few who would continue to be committing criminal acts of violence even if they are in the penitentiary from those who the State can't show that they would be violent in the penitentiary. Okay.

A.   Okay.

Q.   Now, some jurors tell us, okay, I see that, but that's asking me to predict the future on somebody. And that is what question Number 1 does. It asks you to determine and to what degree you've got to determine beyond a reasonable doubt. See that's that first thing. "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that's going to

208

continue -- that's going to be a continuing threat to society." And some jurors say that is not possible for me to do. First of all, you're asking me to guess whether there's a probability, whether he's more likely than not going to commit criminal acts of violence. And then you tell me that, that's got to be proven beyond a reasonable doubt, okay, and that's an impossible burden. Nobody can ever prove to me beyond a reasonable doubt that there's a probability that the person is going to be violent even in the penitentiary. Some jurors tell us that.

Other jurors tell us, no, I could do that based on what I've seen in the offense, based on what I've been shown about the person's history whether they have been violent before, whether they have a whole series of violent acts in their history, and I can make the determination based on what I've shown to you. And if the State shows me a history of violence that's something I will consider. If the Defense shows me that he doesn't have a history of violence, that's something I'll consider. Okay.

How do you feel about that?

A.   Well, I feel like what you said at the end that I think that if one or the other shows you evidence of no violence, yes violence, and take all of those

209

facts into account, that you could beyond a reasonable doubt.

Q. All right. Now, here's, Miss Morris, here is what I need to know from you. Okay. I read your questionnaire. You told me the dividing lines whether or not there was intentional. Okay. You can see that that's not what the program is.

A. Correct.

Q. It doesn't matter whether it's intentional. Before you would be considering these special issues for anybody, the State would have had to have shown you that the murder was intentional.

A. Correct.

Q. So can I trust you when you tell me that just because you have found that somebody committed an intentional murder during the course of a robbery, you're not going to automatically answer that question Number 1, yes.

A. Well, no, I'm not going to automatically because I need to know -- if there's no history and this was a first time or if there's other extenuating circumstances --

Q. Okay.

A. -- you may say, yes. You may say, no.

Q. Okay. So are you telling me you would hold

210

the State to their burden of proof on that issue?

A. Absolutely.

Q. And if they failed to show that to you, even though you found somebody intentionally caused the death during a robbery, are you telling me that you would answer that question no?

A. If they could prove --

Q. If they failed to prove --

A. If they failed to prove it, then, yes, I would answer it no.

Q. Any compunction about doing that? Any hesitation?

A. No.

Q. Can I trust you on that?

A. I'm under oath, aren't I?

Q. Yeah.

THE COURT: She's sworn to tell the truth here.

MR. LOLLAR: Yeah.

Q. Well, you see what I'm saying, Miss Morris. You've got to convince me now because you told me time and time, and time again.

A. I understand that. But I also believe that every situation is different and every set of facts are different, and I had to give an answer, but that was my

211

answer because I don't know the facts. And so based on never being in a court, never being on a jury not knowing this, that's how I felt.

Q. Okay. So now that you know this -- see, I just worry that -- okay. You've never seen these questions before, you come down here on June the -- what is today, the 16th? We tell you these questions for the first time and tell you if you're a juror, you're not going to see these questions unless we're in the punishment phase and you've heard all of the testimony in the trial. And now you're back in the jury room, you got the judge's charge with you and there are those three questions.

A. Absolutely.

Q. Are you going to remember what you told me here today?

A. Yes.

Q. You will? You're under oath.

A. Yes. I will remember what I said to you and to her.

Q. Well, that's fine. Okay. So we're clear on that and that's exactly what that issue is saying. It's saying you can't give somebody the death penalty for what they did. You give them the death penalty for what they are likely to do in the future.

212

A. Very clear.

Q. Very good. Okay. Now, here is another thing. We've had many jurors -- well, a guy here this morning or maybe it was this afternoon, or I forgot. We've heard it from more than one juror. And they say that, you know, what's going to determine if they assess the death penalty or a life sentence is whether or not they feel the defendant deserves to die. And, again, whether the defendant deserves to die is not one of those three special issues.

A. No, that's a personal opinion.

Q. That's a personal opinion. And you really have to, to be a qualified juror in this type of a case, you have to set aside your personal opinions and you've got to look at these three special issues and let the law and the evidence guide you in answering these three special issues.

Can do you that?

A. Yes.

Q. Okay. So if you're on a jury and somebody gets back there in the jury room and says, well, I think we ought to answer these questions this way because I think he deserves to die. What are you going to tell them?

A. That's your opinion. That may not be the

213

opinion of everyone else. Then you start with Special Issue 1 and you say, how do we answer.

Q. Thank you. Very good.

I think that's all I need to talk to you about Special Issue Number 1. Obviously, you've got to look at something in answering that question. You've got to remember that the presumption is the answer to that question is no, and you've got to wait for evidence to be presented to you that convinces you to change that no to a yes.

Now, if that evidence is not there, okay, and you all talk about it as jurors and you decide, no, the State has not proven this to us, then your deliberations are over. You sign that to the verdict sheet, you knock on the door, you give it to the bailiff.

A. Okay.

Q. You come back into court, the bailiff gives it to the Judge, and the Judge sentences the defendant to life without parole. Boom. Just like that and it's over because that is how important that special issue is.

A. Okay.

Q. Now, let's say that you have found the answer to be, yes. Then you go on to Special Issue Number 2.

214

That's only given to you in a case where the evidence has shown that more than one persons are involved in the commission of the offense. Okay. So you may get that, you may not. If you do get that, then it's a pretty simple question. Again, there's a presumption the answer is no. Again, it requires the State to prove the answer to be, yes, beyond a reasonable doubt before you can answer it yes. But it's pretty simple. It says, "Do you find from the evidence beyond a reasonable doubt that the defendant actually caused the death of the deceased?" In other words, was he the gunman, okay, or if he's not the gunman, did not actually cause the death of the deceased, but intended to kill the deceased or anticipated that a human life would be taken.

A. Okay.

Q. Okay. And that's pretty simple. You look at the evidence. Has that been proven beyond a reasonable doubt. If you have a doubt about it, you've got to answer it no and if you do that, the trial is over. You write that on the verdict sheet --

A. Okay.

Q. -- you come out, the Judge sentences the defendant to life without parole.

And while I'm on that issue before I forget it because I don't think anybody else has said this to you.

215

How long do you think a person stays in the penitentiary on a sentence of life without parole?

A. Forever until they die.

Q. That's exactly right. People have this weird idea that if they get down there and they do well, you know, that they can get out. No, they can't. They are going to be there until the day that they die. So either way, Miss Morris, you can see, you know, if we're talking about a death sentence, if we're talking about a life without parole, the defendant is going to die in state custody.

A. Okay.

Q. Now, it can be tomorrow, it can be 60 years from now, but he's going to stay there until the day he dies. Okay. Are we clear on that?

A. Yes.

Q. Now, let's talk about Special Issue Number 3. In the context of talking about it means that you've answered 1 and 2, yes. Okay. You don't even get to talking about Special Issue Number 3 until you've found the answer of 1 to be yes, and 2 to be yes.

A. Okay.

Q. So now we are talking about a person that you believe and the other eleven jurors believe beyond a reasonable doubt is an intentional capital murderer who

216

has been shown to you beyond a reasonable doubt to be a future danger.

A. Okay.

Q. And we're talking about that type of a person. And, frankly, Miss Morris, some people tell us, okay, if we're down here now to Special Issue Number 3, I know that by answering that question yes, that means that he will get a life sentence without parole. If I answer that question no, he will get a death sentence.

A. Okay.

Q. And that's exactly what that means.

A. Okay.

Q. Okay. But some people tell us if it has been shown to me beyond a reasonable doubt that the person on trial is a capital murderer who intentionally caused the death of a victim during a robbery, and it has been proved to me beyond a reasonable doubt that he is going to commit criminal acts of violence in the future. Okay.

A. Okay.

Q. That there is nothing that can mitigate to the degree that I would avoid issuing a death verdict because then I would be responsible for the future acts of violence that I believe he's going to commit.

A. And you want to know if I agree with that.

Q. Yes.

A. I don't agree with that because I think in any case there could be a mitigating circumstance that might change whether you do life in prison or the death sentence.

Q. Okay. Okay. You pass that test.

A. I'm not trying to pass a test.

Q. Okay. Let me talk to you about a couple of things here and I'm going to run some things by you.

Down on the bottom of Page 5 we told you what the law is. Voluntary intoxication -- and that means by either alcohol or drugs --

A. Okay.

Q. -- okay, does not constitute a defense. Well, of course, it doesn't. It's simple. You can't go out and do an offense and say, I was high, therefore, you can't prosecute me. Of course, that's nonsense. Okay. But at the top of Page 6 we tell you what the law is in the State of Texas. That evidence of intoxication, voluntary intoxication, can be considered in mitigation of punishment. Okay. That is the law in the State of Texas.

A. Okay. So you're saying "voluntary?" Because it doesn't say voluntary on here.

Q. Right. But let me tell you that's true the

218

evidence of intoxication. Now, obviously if we're talking about a person to whom a micky has been slipped into their drink at a bar and then they go off and do something, you know, that person is not guilty.

A. Okay.

Q. We're not talking about that. We're talking about a person who takes drugs or drinks alcohol, okay, and then goes out and commits an offense.

Now, the jury can look at that and you can hear evidence about that from whoever you want to hear from. If, for instance, the friends and relatives of the defendant -- the people that know him best -- tells you he is not normally like this. Okay. But when he starts to drinking, or when he starts taking drugs he gets violent, that's something that you can consider if you want to.

A. Okay.

Q. You don't have to, okay, but the law says you can, and you can consider that to be a mitigating circumstance.

A. Okay.

Q. And then whether or not it's a mitigating circumstance that's sufficient to move a death sentence to a life without parole sentence is up to you. Okay.

Now, let me tell you about these mitigating

circumstances and what's sufficient. We can present a thousand things to you and you can find 999 of them not to be sufficiently mitigating, but if you find one that is sufficiently mitigating, you make a personal moral judgment on whether or not that is sufficiently mitigating to you.

A. Okay.

Q. Okay. Now, what the law says is, is that the jurors don't have to agree among themselves what's mitigating circumstance or what's not mitigating. The law says they don't have to agree among themselves that evidence of "A" is sufficiently mitigating to avoid a death sentence. Okay. You may have a different opinion about that than the juror seated right next to you.

A. Okay.

Q. But that's okay. The law says you can do that. The juror over here may think that something is sufficiently mitigating where you don't. You may think something is sufficiently mitigating that nobody else in the room agrees with is, but that's okay.

A. Okay.

Q. Let me throw some things by you to see what you think about them. Some people tell us that the age of a defendant standing alone in and of itself could be a mitigating factor sufficient to avoid a death

sentence. Let me tell you that they have to be over 18, 18 or older --

A. Okay.

Q. -- in order to receive a death sentence. Okay. But whether they are 18, 19, 20, 21, if they are in that far end down there of the scale, that that in and of itself can be a sufficiently mitigating factor in and of itself.

A. For me I don't know that that would be a mitigation.

Q. Okay. Are you open to hearing testimony about that?

A. Sure.

Q. Are you open to considering that?

A. Yes.

Q. Okay. Again, lack of significant prior criminal history or violent history. A person can look at that and say, yes, I know you committed this offense, but I haven't seen a history with that. And to me that is sufficiently mitigating --

A. Yes, I agree with you there.

Q. -- okay, about whether or not they are the follower in the situation and not the leader in the situation. In other words, whether they are acting under the domination of another person.

221

A. I think you would have to hear all of the facts on that one because --

Q. Sure.

A. -- yes, it could be, but they still have --

Q. Sure.

A. -- a choice of whether or not to follow. But there are circumstances where --

Q. Right. Well, I agree with that. This is your choice and free will. We can talk about that for days and days, but are you open to listening to testimony about that, and could you consider that as a sufficiently mitigating circumstance if you thought it was?

A. Yes.

Q. Okay. Now, how about the defendant being under the influence of a mind-altering drug?

A. There again, I go back to the fact that if -- I would need to hear the facts of the whole situation.

Q. Sure.

A. And, yes, I could take that into consideration.

Q. But if you came to believe that were it not for the mind-altering drug, that the defendant would not have committed the offense. See, that's something that is presented to you, and you believe that.

223

is telling you to look at his background. "And the personal moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life without parole rather than a death sentence be imposed."

Okay. So it's giving you the ability even for a person that you found guilty and who you believe would be a future danger to avoid a death sentence if you find that there is sufficient mitigating circumstances.

A. Yes.

Q. Could you do that if you hear sufficient mitigating circumstances?

A. Yes, I could.

Q. Would you do that?

A. Yes.

Q. Let me tell you a few other things here now. The law expects that you would exercise your personal moral judgment on this mitigation issue.

A. Okay.

Q. Okay. As one juror here told us the other day, "I would look to my personal moral compass to decide whether the person should get death or life without parole." Okay.

A. Well, I think you have to look at the facts.

Q. Sure, you do. You have to look at the facts,

222

A. Yes.

Q. Could you find that to be a sufficiently mitigating circumstance?

A. Yes.

Q. Okay. The life history of a defendant and what brought him to this point?

A. Absolutely.

Q. Okay. That is something that would make a difference to you or could make --

A. Could make. Yes.

Q. And whether or not friends and relatives who know him best say this is aberrant behavior for him, that this is not what he normally is like.

A. Yes.

Q. Okay. Whether the person has been sexually assaulted or physically abused as a child.

A. That would be a consideration.

Q. Is that something that you would consider?

A. Yes.

Q. Okay. And in doing all of those things we just talked about you see how you're doing what the law requires you to do in Special Issue Number 3. It says, "Do you find taken into consideration all of the evidence including the circumstances of the offense, the defendant's character and background." Okay. The law

224

but the law expects you to make your personal moral judgment about whether something is mitigating sufficiently enough to avoid a death sentence. Okay. And let me say this. If you don't take a vote back in the jury room how many think there's, you know, sufficient mitigating circumstance. I mean, if it's seven to five then -- it's not majority rule.

A. Okay.

Q. Every juror is expected to make their own personal moral judgment.

MS. EVANS: Well, Your Honor, I would object to that. It's after deliberations.

MR. LOLLAR: Well, yeah. After deliberations, during deliberations, whatever.

THE COURT: I'll overrule the objection. Go ahead.

Q. (By Mr. Lollar) The bottom line is that, again, a person cannot get the death penalty unless all twelve jurors agree that there are no sufficient mitigating circumstances.

A. Okay.

Q. Do you understand what I'm telling you?

A. Yes.

Q. Okay.

A. So if one juror thinks there's mitigating

233

already qualified.

PROSPECTIVE JUROR: Okay.

THE COURT: Anyway, we anticipate -- and here's what I would like for you to do, a couple of things for me, if you would. We anticipate that the evidence in this case, Judge Snipes, will start the evidence in this case on August the 10th. So what I would like for you to do for me right now is to pencil in the next two weeks. We anticipate that it will take two weeks, so the week of August the 10th as well as the following week, which I think is August the 17th through the 21st.

PROSPECTIVE JUROR: Okay.

THE COURT: So the 10th through the 21st. Now, at the end of August -- excuse me. I'm sorry. At the end of July, you will be notified as to whether or not you are on the jury. Of course if you're not on the jury you don't have to worry about that, you can make whatever plans you want to from that point, but wait to make plans for those two weeks until you know whether or not you're on the jury. Of course if you are on the jury, well, then, you would report for jury service, and the letter will tell you this.

PROSPECTIVE JUROR: It will come by letter?

234

THE COURT: Yeah, it will be a letter or the coordinator will call you. You will be contacted some way. Maybe both ways, I don't know. But anyway, don't make any plans for those two weeks until after you find out whether or not you're on the jury, if you would for me, and that should be some time toward the end of July.

And then you had indicated that you didn't know anything about this case, or didn't recall hearing anything about this case and I want to keep you that way.

PROSPECTIVE JUROR: Okay.

THE COURT: I don't want you going back on the internet, or in the archives, or the newspapers or anything like that looking for old newspaper articles or looking for old T.V. accounts, you know, anything like that.

PROSPECTIVE JUROR: Okay.

THE COURT: Also, let me just caution you. Now that you know that you have the possibility of being on this jury, then I would ask you not to read any future articles. If you do see an article in the newspaper or you do hear about something on T.V. about this case, just don't read the article, don't listen to the T.V. account, or radio account, whatever it might

235

be. Just avoid any kind of media publicity about this case. I'm sure Judge Snipes will tell you. And, of course, the first thing he'll do if you're on this jury, the first thing he's going to do when all twelve jurors are assembled in the jury box, he's going to administer the oath of a juror to you. And from that point forward you would be required by your oath to make your decisions in this case based solely upon the law that Judge Snipes will give to you in his charges to the jury, and also the evidence that's presented during the course of the trial.

PROSPECTIVE JUROR: Okay.

THE COURT: So it won't make any difference what some newspaper article said or some reporter or what have you about that. Okay.

PROSPECTIVE JUROR: All right.

THE COURT: All right. Very good. Well, thank you so much. We appreciate your time this afternoon.

PROSPECTIVE JUROR: Thank you.

THE COURT: Sorry it took so long, but we do appreciate it very much. Okay. And we'll be in recess until 9 o'clock tomorrow morning.

(Proceedings adjourned at 4:56 p.m.)

-oOo-

**COUNTY OF DALLAS** )
)
**STATE OF TEXAS** )

I, VICKI L. TUCK, Official Court Reporter in and for County Criminal Court No. 1 of Dallas County, State of Texas, do hereby certify that the above and foregoing contains all exhibits referenced in proceedings directed by counsel to be included in the Reporter's Record in the styled and numbered cause, all of which occurred in open court, or in chambers, and were reported by me.

I further certify that this Reporter's Record of Proceedings truly and correctly reflect the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ *1,555.00* and was paid by Dallas County.

WITNESS MY OFFICIAL SIGNATURE on this 26th day of February, 2010.

VICKI L. TUCK, CSR #1250
OFFICIAL COURT REPORTER
County Criminal Court No. 1
133 N. Industrial Blvd., 3rd Floor
Dallas, Texas 75207
Tel./Fax 214-653-5606

Certification Expires: 12-31-10.

VICKI L. TUCK, OFFICIAL REPORTER
COUNTY CRIMINAL COURT NO. 1
TEL. FAX 214-653-5606