*AP-76207*

APPELLATE NO. AP-76,207
TRIAL CAUSE NO. F08-24667-Y

THE STATE OF TEXAS          *    IN THE CRIMINAL DISTRICT

vs.                        *    COURT NO. 7 OF

JAMES GARFIELD BROADNAX     *    DALLAS COUNTY, TEXAS

*************************************************************

REPORTER'S RECORD OF PROCEEDINGS

(Individual Voir Dire Examination)

Volume 23 of _____

*************************************************** FILED IN *****

COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 17th day of June 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Quaid Parker, Senior Judge sitting for the Honorable Michael Snipes, Judge of Criminal District Court 7 of Dallas, County, Texas, at which time the following proceedings were held:

ORIGINAL

(Proceedings generated by computer-aided transcription.)

VICKI L. TUCK, OFFICIAL REPORTER
COUNTY CRIMINAL COURT NO. 1
TEL. FAX 214-653-5606

**APPEARANCES**

MS. ANDREA HANDLEY
SBOT:  08898800
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,

MS. ELAINE EVANS
SBOT:  24032880
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,

MR. GORDON HIKEL
SBOT:  12508700
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,


MR. DOUGLAS PARKS
SBOT:  15520000
ATTORNEY AT LAW
321 Calm Waters Lane
Holly Lake Ranch, Texas  75765
                    APPEARING FOR THE DEFENDANT,

MR. BRADLEY LOLLAR
SBOT:  12508700
ATTORNEY AT LAW
1700 Commerce, Suite 450
Dallas, Texas  75201
                    APPEARING FOR THE DEFENDANT,

MS. KERI MALLIN
SBOT:  24049165
ASSISTANT PUBLIC DEFENDER
Dallas County Public Defender's Office
133 N. Industrial Blvd., LB2
Dallas, Texas  75207-4399
                    APPEARING FOR THE DEFENDANT.

VICKI L. TUCK, OFFICIAL REPORTER
COUNTY CRIMINAL COURT NO. 1
TEL. FAX 214-653-5606

CHRONOLOGICAL INDEX - VOLUME 23

(June 17, 2009)

| PROSPECTIVE JUROR | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **KELLY WATSON** | 5 | 8 | - | - | 21 |
| Court's Ruling ............................ | | | | 16 | |
| **TERESA RANDLEAS** | 17 | 24 | 60 | - | 21 |
| Challenge for Cause (Defense) ............. | | | | 91 | |
| State's Response .......................... | | | | 92 | |
| Court's Ruling (Juror Qualified) ......... | | | | 93 | |
| Defense's Objection ....................... | | | | 93 | |
| **JONATHAN HORNE** (Absent) | 97 | - | - | - | 21 |
| Excused by Agreement of Parties ........... | | | | 99 | |
| **THANK THAO-THI HUYNH** | 99 | 101 | - | - | 21 |
| Challenge for Cause (State) .............. | | | | 102 | |
| Court's Ruling ........................... | | | | 102 | |
| **LOU DEAN DIXON** | 103 | 103 | - | - | 21 |
| Challenge for Cause (State) .............. | | | | 105 | |
| Court's Ruling ........................... | | | | 105 | |
| **LEONARD D. PHLATTS** | 106 | 110 | - | - | 21 |
| Challenge for Cause (State) .............. | | | | 125 | |
| Court's Ruling ........................... | | | | 126 | |
| Court Adjourned .......................... | | | | 126 | |
| Reporter's Certificate ................... | | | | 127 | |

**ALPHABETICAL INDEX - VOLUME 23**

(June 17, 2009)

| PROSPECTIVE JUROR | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **LOU DEAN DIXON** | 103 | 103 | – | – | 21 |
| Challenge for Cause (State) .............. | | | | 105 | |
| Court's Ruling .......................... | | | | 105 | |
| **JONATHAN HORNE** (Absent) 97 | | – | – | – | 21 |
| Excused by Agreement of Parties .......... | | | | 99 | |
| **THANK THAO-THI HUYNH** | 99 | 101 | – | – | 21 |
| Challenge for Cause (State) ............. | | | | 102 | |
| Court's Ruling .......................... | | | | 102 | |
| **LEONARD D. PHLATTS** | 106 | 110 | – | – | 21 |
| Challenge for Cause (State) ............. | | | | 125 | |
| Court's Ruling .......................... | | | | 126 | |
| **TERESA RANDLEAS** | 17 | 24 | 60 | – | 21 |
| Challenge for Cause (Defense) ........... | | | | 91 | |
| State's Response ........................ | | | | 92 | |
| Court's Ruling (Juror Qualified) ........ | | | | 93 | |
| Defense's Objection ..................... | | | | 93 | |
| **KELLY WATSON** | 5 | 8 | – | – | 21 |
| Court's Ruling .......................... | | | | 16 | |

Court Adjourned .......................... 126

Reporter's Certificate ................... 127

PROCEEDINGS

(June 17, 2009; 9:15 a.m.)

THE BAILIFF:  All rise for the juror. (Prospective Juror No. 473, Luther Anderson, enters the courtroom.)

THE COURT:  Come on in, Mr. Anderson. Good morning, sir. How are you? Just go ahead and have a seat there, if you would, please, sir. And thank you, ladies and gentlemen. Be seated, please. And I would like for the record to reflect this is Prospective Juror Number 473, Luther Anderson, Junior.

And good morning, again, Mr. Anderson. How are you this morning? I'm Judge Quaid Parker. I'm a Senior District Judge from McKinney, Texas, just right up the road here from Dallas. And Judge Michael Snipes is the Presiding Judge in this case, and Judge Snipes has asked me to assist him by presiding over the jury selection process. That explains to you what I'm doing here this morning instead of Judge Snipes; and consequently, why you're here today as well. Anyway, we're glad to have you. We appreciate the time and effort that you have made to be with us this morning.

Now, what we're going to do this morning, Mr. Anderson, you probably recall -- oh, it's been a

month ago or better than a month ago probably now since all of you got together in the Central Jury Room downstairs and Judge Snipes talked to the panel at that time. And at some point in the proceedings he had everybody stand up, raise their right hand, and he administered the oath of a prospective juror to everyone on the panel.

Do you recall that?

PROSPECTIVE JUROR:  Yes, I recall.

THE COURT:  Okay. Were you one of the panel members that stood and took the oath at that time?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Very good. I'll just remind you, you are still under your oath that Judge Snipes gave to you back on that day. And what you've been sworn to do, Mr. Anderson, are actually two things. To give us truthful answers, and we know you'll do that anyway; but also, to be responsive to each and every question that is asked to you by the attorneys. All right.

Did you have time to read your orientation guide?

PROSPECTIVE JUROR:  Yes, I did.

THE COURT:  Good. Now, that just kind of gives you a thumbnail sketch of some of the law and

procedural aspects that are involved in a capital murder trial. What the attorneys are going to do today, they are going to go over that in more detail. They are going to explain the law to you in more detail than what you've got in your little orientation guide there that you've read, and then once you understand it, then they are going to ask you questions to get your ideas, your thoughts, your opinions, if you will, concerning the law and some of the procedural aspects involved in a capital murder trial. Okay.

PROSPECTIVE JUROR:  Okay.

THE COURT:  All right. Let me just tell you, Mr. Anderson, there's no right or wrong answers to any of their questions. This is not a quiz that you have to pass, you know, in order to be qualified for jury service. Not at all. Okay.

Now, let me introduce the attorneys to you and then we'll get started with the voir dire examination. Seated at the table, at the counsel table directly in front of you, is Mrs. Andrea Handley, and next to her is Miss Elaine Evans, and then the gentleman seated right behind them is Mr. Gordon Hikel. These three ladies and gentleman are Assistant District Attorneys and they work for the District Attorney, the elected District Attorney here in Dallas County, and

they are charged with the responsibility of prosecuting this case.

And then seated at the counsel table directly in front of me here is Mr. Brad Lollar, and seated next to him Mr. Doug Parks, and then on the very end down here Miss Keri Mallin. And these three attorneys comprise the Defense team and they represent their client seated in the middle there the defendant, James Broadnax.

All right. Very good. Mrs. Handley, we're ready for your voir dire.

MRS. HANDLEY:  Thank you, Your Honor. Appreciate it.

LUTHER ANDERSON, having been duly sworn, testified as follows:

EXAMINATION

BY MRS. HANDLEY:

Q.  Good morning, sir. How are you today?

A.  All right.

Q.  All right. Good. Good.

THE COURT:  Excuse me, just a minute, Mrs. Handley. That's your questionnaire, Mr. Anderson. She's going to be referring to that so I want you to have a copy of it. Excuse me for the interruption.

MRS. HANDLEY:  That's fine, Your Honor.

I appreciate it.

Q.   Mr. Anderson, have you ever served on jury duty before?

A.   No, I haven't.

Q.   Okay. I'll tell you a little bit about what we're doing here. You know, we brought hundreds of people down that day along with you and had everybody fill out a questionnaire. We brought even more people down that afternoon to fill out questionnaires and we did that just for this case. We don't do that in all criminal cases. You know, usually we just bring in a group of people and talk to them and see if they are qualified to serve on a case.

The death penalty case is a little bit different because I think you can appreciate that the stakes are very high, that we're talking about the potential execution of another human being if the facts provide for that. So, we get so many people down here and we have so many people fill out questionnaires so we can fill them out and see if they are the proper juror for this kind of case. Okay.

And I like that your questionnaire is in front of you because I've had an opportunity to read it. I've read it a couple of times and really digested it to try to get a feel for, you know, who Mr. Luther Anderson is,

to see if you're actually the proper person for this kind of case. You know, you might be a good juror for a burglary case or a possession of a controlled substance case. You might be a good juror for this case or you might not because this kind of case is really not right for everybody.

Can you appreciate that?

A.   Yeah.

Q.   Okay. You haven't had an opportunity to review your questionnaire since then, but let's go through a couple of things in it because I would like to hear you kind of expand on some of the things you told us. All right.

I think you understand that in a death penalty case we're talking about that a person can either receive life in prison or they will be sentenced to death. That is what will happen to the person who is found guilty of capital murder.

Okay. All right. And on the first page of the questionnaire we ask you are you in favor of the death penalty and you said, yes. And you said, "A person who will kill somebody in cold blood, yes."

That was your answer then?

A.   Yeah.

Q.   Can you expand on that? What do you consider

in cold blood?

A.   Killing someone with ah -- ah, just doing it to try to get away with what they are trying to do. Just, you know, to get them out of the way or something.

Q.   Somebody who -- did they kill them to try to get away with what they are doing?

A.   Yeah.

Q.   I think you said they could run away. Was that what you said?

A.   No, to get away with the crime or whatever they're trying to do. No witnesses.

Q.   Okay. They killed the person or people in order to get away with the crime in order to not leave any witnesses. You would consider that a coldblooded murder?

A.   Yeah.

Q.   Okay. Okay. Any other examples that you can think of that you consider coldblooded?

A.   No, just killing someone for no reason.

Q.   Right. For no reason or for the reason to leave no witnesses, perhaps. That would be a coldblooded murder, in your opinion? I'm sorry to put you on the spot. You probably didn't think you were going to come down here today and be quizzed again.

Have you given anymore thought to your answers

since we had you come down here in how you feel about the death penalty?

A.   No.

Q.   Not really? I notice that on the last page or almost the last page of your questionnaire we asked you how you would feel about being called to jury duty. It was on Page 17. Let me put my glasses on. You depend on your glasses like I do?

A.   Oh, yeah.

Q.   It says, "How would you feel about being chosen as a juror in this case?" And you said, "No, I would not like to be chosen." Tell me why not, sir.

A.   Well, I just don't like to be in front of the public too much. I've always been like that. I just don't want to be put on the spot like that.

Q.   You don't want to be put on the spot?

A.   Yeah.

Q.   You mean, like you don't want to have to be put on the spot to make a decision or --

A.   That, too.

Q.   -- or you don't want to be put on the spot that you're going to be seated there and a lot of people are going to be watching you. I mean, what exactly is it about it?

A.   Well, the whole thing. Just to me it's a big

13

trial, you know. And I just haven't been out too much in public like doing stuff like this --

Q. Yeah, but does it make you -- I'm sorry. I cut you off.

A. I'm not outspoken too much.

Q. Okay. Well, I can appreciate that. How do you feel being seated in that seat with everybody staring at you asking you questions?

A. I hope it will be over pretty quick.

Q. Yeah, like a bandaid. You hope it will come off real quick, huh. Well, it's not a comfortable seat to be in and I'll tell you it's not a comfortable case to be on either. It is a big deal. And that's one of the reasons why I'm asking you about it, Mr. Anderson, is that some people are just so uncomfortable with the process or maybe so uncomfortable being called to serve as a juror that they tell us that they can't give the case their complete concentration because of their discomfort.

Does that make sense to you?

A. Yeah.

Q. Do you feel that way?

A. Yeah.

Q. Do you feel like because of your discomfort with the case, or your discomfort being out in public,

15

person.

What are your feelings on it?

A. Well, I feel I'm not that person.

Q. Okay. Okay. You think you couldn't concentrate on this case?

A. No.

Q. And you do look a little uncomfortable now, too, I'll say that. Okay. Okay.

(Discussions held off the record.)

MR. LOLLAR: Okay.

MRS. HANDLEY: Thank you very much for your time, Mr. Anderson. We appreciate you coming down here.

THE COURT: Thank you, Mr. Anderson. We appreciate your time and effort very much. I'm going to excuse you now. You can just leave everything right there. Just be sure and get your cap.

PROSPECTIVE JUROR: Oh, yeah.

THE COURT: Don't forget that. And watch your step. Thank you for being here, Mr. Anderson. We appreciate it.

MRS. HANDLEY: Thank you, sir.

THE COURT: All right. Mrs. Handley, does the State have a challenge for cause?

MRS. HANDLEY: We do, Your Honor. We

14

or your discomfort with having to sit over there for a couple of weeks and listen to the case that it would interfere with how you heard the evidence, or interfere with your concentration on hearing the evidence and reaching a verdict?

A. Yeah. Yeah.

Q. Okay, because that's one of the things and there's nothing wrong with that, Mr. Anderson. The only oath you've taken right now is to tell the truth. And if you are chosen as a juror, you know, then your oath is different. You know, your oath is to sit and listen to the evidence and return a verdict, but at this stage the only oath you've taken is to tell the truth. Okay. You haven't taken an oath to -- you know, I can't make you come down here and take an oath to make yourself uncomfortable, or to the point that, you know, you just can't sit and concentrate on the case. You know, and that's why I need to feel you out now to see if you're a gentleman like that because I need people who -- it's not an easy case. Nobody is entirely comfortable, but I do need people who can tell me and who can tell the defendant I can tell you with certainly that I can be here and I can give it a hundred percent of my time and a hundred percent of my concentration. And so we need to know if you're that person or if you're not that

16

would challenge this juror as not qualified for this case. He has articulated to the best that he can that is his inability to sit on a case like this and to give his full concentration and attention to it.

THE COURT: Mr. Lollar.

MR. LOLLAR: We have no objection.

THE COURT: All right. Thank you. Then the State's challenge for cause will be granted, and Mr. Luther Anderson, Junior, will be excused for the jury service in this case.

MR. PARKS: Judge, can we take five minutes? A real five minutes?

THE COURT: Okay.

(Brief recess.)

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 573, Guy Ferreira, enters the courtroom.)

THE COURT: Good morning, Mr. Ferreira. Go ahead and have a seat right there, if you would please, sir.

Thank you, ladies and gentlemen. Be seated, please. And, Vicki, I would like the record to reflect this is Prospective Juror Number 573, Guy Gant, G-a-n-t; is that correct?

PROSPECTIVE JUROR: Yes.

**17**

THE COURT: Ferreira. Am I pronouncing your last name correctly?

PROSPECTIVE JUROR: Yes, you are.

THE COURT: Great. Well, we're glad to have you here this morning. Thank you for your time and effort to be with us. I'm Judge Quaid Parker. I'm a Senior District Judge from McKinney, Texas, and Judge Michael Snipes is the Presiding Juror over this capital murder case. And Judge Snipes has asked me if I would assist him in the jury selection process while he's upstairs in his courtroom taking care of the day-to-day matters of the court. They have got me here presiding over the individual voir dire is what we call it in the capital murder case.

So anyway, that explains to you what I'm doing here today instead of Judge Snipes, and also why you're here today as a matter of fact. You will probably recall, Mr. Ferreira, oh, it's been over a month ago, I guess, Judge Snipes had everybody assembled in the Central Jury Room downstairs and went over some things with the jurors. At some point in the proceedings he had everybody stand up and raise their right hand and he administered the oath of a prospective juror to each panel member.

Do you recall that?

**18**

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Were you one of the panel members that stood and took the oath at that time?

PROSPECTIVE JUROR: Yes.

THE COURT: Very good. I'll just remind you, you are still under oath. And what you've been sworn to do is give us truthful answers, which we know you will anyway, but also to be responsive to each and every question asked that's asked to you by the attorneys.

PROSPECTIVE JUROR: Okay.

THE COURT: Now, have you had an opportunity to read through the little juror guide?

PROSPECTIVE JUROR: This?

THE COURT: Yes.

PROSPECTIVE JUROR: Yes, I have.

THE COURT: Okay. That's just kind of a thumbnail sketch of the law and some of the procedural aspects that are involved in a capital murder trial. And what's going to happen this morning is that the attorneys that talk to you are going to explain more about the law and give it to you in more detail. And then once you understand it, then they are going to ask you questions to get your ideas, your thoughts, your opinions, if you will, concerning the law and some of

**19**

the procedural aspects involved in a capital murder case because they differ from any other criminal case that we have in the State of Texas. So you're going to understand all of that, and we know that nobody comes down here with any prior knowledge of capital murder cases and what's involved in them and so that's the whole purpose of this is to inform you and then get your opinions. So I guess I'm telling you that to tell you there's no right or wrong answers to any of the questions that are asked of you and it's not a quiz or an exam that you've got to pass in order to be on the jury or anything like that. So anyway, we just kind of want you to relax as much as you can and it will probably take about an hour, an hour and a half and we'll be through. Okay.

Okay. All right. Very good. Now, let me introduce you to the attorneys that are going to participate in the voir dire examination. Seated at the counsel table directly in front of you is Miss Elaine Evans, and then seated next to her is Mrs. Andrea Handley, and then behind the two ladies there is Mr. Gordon Hikel. And these three ladies and gentleman are Assistant District Attorneys here in Dallas County and work for the elected District Attorney, and they are the ones charged with the responsibility of prosecuting

**20**

this case.

And then at counsel table directly in front of me is Mr. Brad Lollar and Mr. Doug Parks, and on the very end down here Miss Keri Mallin. And these three attorneys are the Defense team and they represent their client, Mr. James Broadnax, who is seated right there in the middle.

All right. We're ready, Ms. Evans, for your voir doir.

MS. EVANS: Thank you, Your Honor.

GUY GANT FERREIRA, having been duly sworn, testified as follows:

EXAMINATION

BY MS. EVANS:

Q. Good morning, again, Mr. Ferreira. Did I pronounce that correctly?

A. Yes, uh-huh.

Q. As the Judge told you there are no right or wrong answers right now during this process and it's the only time that the lawyers from each side get to talk to you about what your feelings are.

A. Right.

Q. It's very important that you just be honest with us in answering them as I know you will be because really what we're trying to do here is just make sure

that, first of all, that you understand what the law is as it may apply in this case, and then that you would be able to follow that law to where you could sit as a juror. And that's important because as you sit here now, like I said, you have just taken an oath to tell the truth. But you can understand how for some people that they are not qualified a serve as a juror in this type of case for whatever reason. They might be a bit uncomfortable if asked then to take an additional oath to render a true verdict based on the law and the evidence if they have such strong feelings. For example, that they can't follow those laws. So that's why we talk about them here and now.

From looking at your questionnaire it looks like you have a very good appreciation for the type of case that you've been called upon as a potential juror. I don't know where you get -- because I see that you've never served as a juror. Right?

A. No.

Q. But your answers were very spot-on. You talk about beyond a reasonable doubt in there at one point in time and, you know, you're very dead-on about the type of cases that are eligible for the death penalty. And I think that, you know, you can appreciate that not every murder case is even eligible for the death penalty, and

even though that a case may be eligible doesn't mean that that's the proper punishment for every case.

Am I correct in saying that?

A. Yes.

Q. Okay. And in looking at your questionnaire I see on Page 5 -- and if you want to flip with me you're welcome to because I know it's been a while. I see where you read the books and articles and the movies, and it shows that you've seen as it relates to the death penalty, you say that they influenced you in that they're stories about a guilty case and later they are proven innocent. And then you go on to say, "You must get it right."

A. Yeah.

Q. And, basically, I want to let you know that the State of Texas, we absolutely agree with you. We want to get it right. Not only in guilt-innocence, whenever we say, you know, did this person do the act that we say that they did and that we've charged them with committing, as well as making sure that it is that person who is on trial for it, but we also want to make sure in the punishment phase, the third phase of the trial. You know, we call this the jury selection, the first phase. The second phase would be the guilt-innocence where you're called upon to decide

whether or not they did it and is this the person. And then the third phase, the punishment phase, we want to make sure we get it right and that the punishment fits the crime.

Can you appreciate that also, Mr. Ferreira?

A. Yes.

Q. And so I can tell that you understand that this is a serious type of case and, basically, this is a capital murder; meaning, that it has to be murder plus, murder plus some type of aggravating factor. I see that you understand that as well. On Page 2, you say the best argument for the death penalty is that you purposely kill someone without just reason i.e., self-defense, plus there's aggravation.

A. Yes.

Q. And you're absolutely right. And that's the type of case we have here. We have a capital murder alleging that there's been a murder plus a robbery, that being the aggravating factor, an additional felony that makes it capital murder and that's eligible for the death penalty.

There are other types of capital murders that I'm sure you're aware of, too. If you murder a child under the age of six, or if you murder a police officer or a fireman in their line of duty, if you murder two or more

people in the same course of action, that's also other types of capital murders. So, for example, if I were to turn and shoot my co-counsel ten times and then I sit back and laugh about it and say, "Good, I am glad that she is done." Horrible heinous. Right?

A. Uh-huh.

Q. But is that a capital murder?

A. Ah, I don't know. Would it?

Q. Well, I intend to shoot her and kill her, but I don't have any of those aggravating factors. Right? I don't rob her, I don't take her pen or her money or anything like that, so it must be murder plus something up to equal capital murder. And that's the type of case that we're talking about here today.

A. That's the plus something else. There was a plus something else, but it was a different plus something else.

Q. Oh, it was me being --

A. Yeah. Right.

Q. Okay. How do you feel about that?

A. Ah, I -- well, that's not against the law. So that's not -- it doesn't pertain to law, in my opinion, that's the most important thing, but...

Q. What's the most important thing?

A. That you're following the law.

Q. Absolutely.

A. The fact that that person enjoyed doing it, in my opinion, morally is not a very good thing. But like you said, it's not the law, so...

Q. Absolutely. And it might affect, for example -- say if that's the type of murder if it were just a murder like it would be that we're talking about, it might affect the punishment, what you think that person deserves if you hear that's how they reacted, but it doesn't qualify under the law as a capital murder.

A. Right, the special issues in the back or whatever.

Q. Absolutely. And I can appreciate that you're very concerned with following the law because on Page 1 you start off right away that you're in favor of the death penalty. And when asked to explain it you say, "You kill someone per the law, your punishment should be death" and that you agree with that. And so basically in saying that, are you saying if it qualifies, you know, under the law, then you're in favor of that?

A. Right.

Q. Okay. And we'll talk more about that in a bit because, again, there's a difference in something being eligible for the death penalty and you, as a juror, actually assessing it. Because when I talk about the

---

phases of the trial right now we're just talking about your feelings. Then whenever you go into the guilt-innocence phase of the capital murder, if you find somebody guilty of capital murder that murder plus -- here that being murder plus a robbery and you say, yes, guilty of capital murder, then you go on to answer special issues here in Texas.

A. Right.

Q. In that punishment phase of a regular trial you could be called upon to assess a punishment within a range, but here you go back there and answer questions. And your answers to the questions that we call special issues determine whether or not the person receives a death sentence, or whether it would be life without parole.

Does that make sense?

A. Yes.

Q. Okay. So in other words, you don't go back there -- some people think that have never sat on this type of jury, and even lawyers that have never dealt with it, don't understand that the jury doesn't go back there after finding somebody guilty of capital murder and say, well, I think that I vote that he should die, and I vote that he should live. You know, it doesn't work like that. You just answer questions.

---

A. Right.

Q. And it all revolves around the State of Texas proving beyond a reasonable doubt A) whether or not the person did it what we said that they have done. And then if they are guilty of capital murder, we also have to prove to you beyond a reasonable doubt each of the special issues before you are able to answer those questions in such a way that would render a death sentence. Make sense?

A. Yes.

Q. Okay. And, once again, I can tell by your questionnaire that you will hold us to that and that you will be able to follow the law. And in looking at your questionnaire again, I can see that you realize that the death penalty should be available in Texas for capital murder. And, again, whenever asked about murder plus a robbery and if you agree with that, that that should be eligible for the death penalty, you say, I agree with the law. I'm not sure what else to say. I understand what you're saying there, you know. If it's the law, it's the law. Is that right, Mr. Ferreira?

A. Yeah, that's how I feel.

Q. Okay. And in addition to that I see on Page 5, though, that you appreciate where asked about the life without possibility of parole, you say you're

---

strongly in favor of that. And I believe life is appropriate punishment in certain murder cases per the law.

A. Yeah.

Q. Is that also how you feel?

A. Uh-hum.

Q. Okay. And that's the type of juror that we're looking for. Somebody that can give a fair trial to both the State and the Defense because both sides are equally entitled to a fair trial under the law. And based on the evidence that you hear, then you render a verdict based on that and only that.

Would you be able to do that, Mr. Ferreira?

A. Yeah, I think I would.

Q. Okay. I want to talk a little bit more about your questionnaire and then we are going to go more in depth into the special issues. Okay.

A. Okay.

Q. Because that's where, you know, things are a little bit different in this type of case.

You say on -- again, you're mentioning the law again. And so I can appreciate that you're grounded in the law and you're not going to be swayed --

A. Yeah, I am.

Q. -- and bring your own personal feelings into

the deliberations. You certainly don't have to check them at the door, but they are not involved in deliberations. It's based on the law and the evidence.

On Page 4 you say how strongly you believe in the death penalty. You say ten, but you add "per the law" behind that. What did you mean by that?

A. Well, again, I kind of go back to what I said before. I mean, I'm not sure what else to say. I believe in the law. I don't know the law, the details of the law, but the overall spirit of the law, our law in Texas I agree with and so the details are just what they are. So I am one hundred percent behind our laws in Texas. I don't know all of the details of the laws, but I have no problems following the details to make sure.

Q. I understand what you're saying. And we've had some jurors, you know, come in and say, well, I mean, either you're for it or you're against it. In favor of the law involving capital punishment, or the death penalty, or you're not. So there's really no in-between there. Is that what you're kind of saying why you're a ten on that scale?

A. Yes. And the details are just, you know, following the details. You know, the intricacies or whatever of the law to make sure that you get it right.

30

Q. Absolutely. And, you know, whenever you say you don't know all of the details of the law, we didn't expect you to know details. I'm amazed at how much you did know and I appreciate that from your questionnaire. And you're not required to remember anything that either of us say to you here today because the law will be given to you when and if you are to serve as a juror in this case.

You know, during the guilt-innocence phase you will have a Court's Charge to go by that contains the law that applies during that phase. You will additionally have a Court's Charge during the punishment phase if it applies that will give you the law there, and so you will have those details and that road map to kind of guide you from the Judge.

And I see from your answer that given the law that you definitely believe that it's your job as a juror to follow that law.

A. Right.

Q. Page -- on two parts of the questionnaire you mention about a person being evil. I think the first time is on Page 5 regarding whether a person should receive a death sentence instead of a life sentence. You say -- in the life sentence you say, "If the person was evil in his act." And then as well on Page 8

regarding what makes a person dangerous you say, "If they were evil."

Can you define "evil" for me or what types of a situation that would be to you?

A. I would say the situation that you gave where the person laughed about killing somebody that's somebody being evil, but as you pointed out that's not a reason for the death penalty. Right? Is that what you said?

Q. Right, but may be something that you consider on down the line in how you answer special issues.

A. Right. Exactly.

Q. And you would certainly be able to take that into consideration. So right now, like I said, there's no right or wrong. I'm just wondering what was going on through your mind whenever you use the term evil.

A. That's basically what's going on through my mind.

Q. Okay. Basically somebody that shows no remorse --

A. Right.

Q. -- or lack of regard for life.

A. Right.

Q. Okay. Perfect. Do you think that people are inherently evil or --

32

A. No.

Q. No? How do you think that comes about?

A. Well, I guess -- maybe I take that back. I guess you could be -- I don't know if people are born evil, but I think maybe some people just, you know, no matter how much you do for them they are just the way they are.

Q. Gotcha. So you just kind of know it when you see it. Fair to say?

A. Yeah --

Q. Okay.

A. -- I think so.

Q. Since you have not served on a jury before, I want to go through some of the basic presumptions of law and I feel quite certain that you've probably heard about some of these in that you knew a lot about law and legal terms in general.

For example, in every criminal trial whether it be, you know, a misdemeanor DWI case all the way up to this capital murder trial, a defendant has a presumption of innocence and as he sits here today he is to be presumed innocent. And, you know, you have an indictment in front of you whereby we have charged him with capital murder and that indictment in front of you is just a piece of paper. That piece of paper let's me, as the

33

State know, what we have to prove and it let's the defendant know what he's been charged with. Okay. But it's nothing more than that. It's no evidence of guilt.

Could you afford this defendant his presumption of innocence?

A. Yeah.

Q. And, you know, I say that that indictment is something that the State has to prove to you each and every one of those elements in that indictment beyond a reasonable doubt. And I saw where you used the term beyond a reasonable doubt at one point. I think it was in the question regarding ten guilty people going free and one innocent person remaining or something.

What does beyond a reasonable doubt mean to you?

A. It doesn't mean all possible doubt. It means within reason, you know, that -- you know there's no doubt within reason because there's never one hundred percent sure about everything, so...

Q. I may just turn this over to you and just let you talk to us because you're absolutely right. That's what I would have spat back to you if you didn't know what it was. But it's really what each individual juror thinks it is or believes it is, but we hear a lot of people say that it's a doubt based on reason, or based on common sense. It's not any or all doubt or one

34

hundred percent, so you hit that dead-on. But that is the State's burden to prove it to you each and every one of those elements beyond a reasonable doubt, and if we do prove those to you, then we are entitled to a verdict of guilty. However, if we miss an element that we fall short on you're bound, by your oath, to follow the law and the evidence to return a verdict of what?

A. Crime.

Q. What kind of verdict if we do not prove to you beyond a reasonable doubt the elements?

A. Innocent.

Q. Absolutely, not guilty.

A. Right. Not guilty.

Q. So would you be able to do that in a case like this?

A. Yes.

Q. Okay. And a defendant has what's called a Fifth Amendment Right. I'm sure you know all about that as well. It's just that a person does not have to testify. I can't, as the State of Texas, say, you know, "Defendant get on the stand and testify. We want to hear your story." His own attorney can't even do that. It's his decision and his decision alone with, of course, the advice of his attorneys. But if a defendant chooses not to testify you cannot, for any reason, hold

35

that against him.

Could you afford this defendant his Fifth Amendment Right and not hold it against him if he chose not to testify?

A. Yes.

Q. And that applies in the guilt-innocence phase as well as later should the punishment phase apply it applies in that phase as well. You cannot consider that for whatever reason. So say, for example, that we came this close to proving our case, but we were a little bit shy of proving it. And you say, well, I don't think they proved it, but the defendant didn't testify so, hey, I'll go ahead and give it to him. Can you do that?

A. No.

Q. No. The verdict would still be not guilty. Correct?

A. Right.

Q. All right. With regard to witnesses that may testify, you know, you may hear from civilians that can be anywhere from a priest to a prostitute. You may hear from police officer witnesses. And all witnesses the law says are to start out on an equal playing field. You don't give one a leg up just simply by virtue of what their occupation is or before you hear anything they have to say. They start off equal until they take

36

the stand and begin to testify and then you can judge their credibility based on what they are saying.

Does that make sense to you?

A. Yeah, it does.

Q. I see from your questionnaire on Page 7 when we ask about police officers and if you believe they are more likely to tell the truth than the average person you say, "There's more of an obligation on their part, but they are people, too."

A. Yeah.

Q. So do you realize in saying that they are people, too, that you can't start them off automatically believing what they have to say you have to judge their credibility just like anyone else?

A. Right.

Q. And would you be able to do that?

A. Yes.

Q. Okay. Now, moving more into a capital murder in the process that occurs here. As I said before there are two possible punishments. And what are those for a capital murder?

A. Parole and death sentence. Right?

Q. Life.

A. I mean, life.

Q. Life without the possibility of parole. And

37

that means exactly what it sounds like. They don't get out of jail or out of prison at any point in time. And, the death sentence. You're absolutely right. So it's those two punishments.

And, basically, let me give you an illustration. In the punishment phase, it's just very important that, you know, like guilt-innocence before we prove to you beyond a reasonable doubt what it is that we have to prove to you, then we have not met our burden and you can't return a guilty verdict unless and until we do.

Punishment phase. The same thing. The burden is on us to prove to you the first two special issues, and then on that last special issue neither side has the burden. But, again, whenever you move into that punishment phase, it's very important to keep an open mind and you have to, you know, reassess everything. You may go back and reassess what you heard in the guilt-innocence phase again, but it's just that. You do have to undergo and undertake that mental exercise reconsidering everything in the punishment phase.

Would you be able to do that?

A.   Yes.

Q.   And so basically in an illustration to you let's say, for example, a 35-year old man kills a five-year old. He intentionally plans out and kills

---

39

longer. So then he goes and gets a legal dose of morphine and applies it to his child.

Can you understand where that punishment may be very different than if I were to give you a situation where a 35-year old man goes to a park and just picks off a five-year old child?

A.   Sure. Absolutely.

Q.   So that's the point here is just to understand that you really do have to keep an open mind because you don't know what you're going to hear until you hear it.

A.   Right.

Q.   And the law wants you to do that. Would you be able to do that?

A.   Yes.

Q.   Okay. And I see where on Page 5 of your questionnaire you say you're in favor of an eye for an eye. A lot of people, we hear a lot of jurors say that in theory, yeah, they are in favor of an eye for an eye, but then I do want to tell you that Texas law really doesn't contemplate in favor of an eye for an eye because, obviously, in the situation where I talked about where I shot my co-counsel, I wouldn't even be eligible for the death penalty for that type of murder. So just because I kill someone doesn't mean that the State of Texas is going to kill that individual. It's

---

38

that five-year old child.

Q.   What do you think about that for punishment?

A.   Well, that's not capital murder, is it?

Q.   Well, it's a child under the age of six.

A.   Oh, right.

Q.   So, in fact, it would qualify as a capital murder.

A.   Oh, yeah. Right. Yeah.

Q.   That's all the facts you know right now.

A.   Well, it's not enough for the death sentence.

Q.   Okay. Because you would want to hear more. Is that fair to say?

A.   Right.

Q.   I mean, you can't really know as you sit here now if that's all I've told you.

A.   Right.

Q.   But what if I then added some additional facts and told you that that 35-year old man is actually the father of that five-year old kid. And you hear that the five-year old was actually suffering from terminal cancer and he had been in the hospital now for a long period of time and that father had sat by his bedside. And for 23 to 24 hours of the day he'd been an excellent husband, an excellent father, a pillar of the community and he could not stand to see his child suffer any

---

40

up to the jurors in answering the questions or the special issues to return a verdict as such.

Do you understand that?

A.   Yes.

Q.   And if the State condones sort of an eye for an eye, there would be no need to have the special issues. Fair to say?

A.   Yes.

Q.   And so there's nothing about the death penalty that is automatic. That's what I just want you to understand that you've got to keep an open mind in answering the special issues and not jump to any conclusion until you hear it.

Would you be able to do that?

A.   Yes.

Q.   All right. Moving into that punishment phase in a capital murder case. It's separate and apart from the guilt-innocence phase so it's kind of like a clean slate. Like I said, you can consider things from the guilt-innocence phase, but you've got to start over with now instead of a presumption of innocence, you know, like you have in the first phase, there's a presumption of life without parole.

The law says that unless and until the State of Texas proves beyond a reasonable doubt, that the answers

to those special issues should be "yes" and the answer to the Special Issue Number 3 would be "no," then there is no death sentence. The presumption is life without parole. Okay. And in Special Issue Number 1 and Special Issue Number 2, the presumption is that the answer to those are "no" and you don't answer those "yes" unless and until the State proves to you those beyond a reasonable doubt.

A.  Right.

Q.  So once again the State has the burden. You know, that side of the table they can sit and work crossword puzzels all day or Sudoku and they have met their burden, they have have done what they have to do which is just to show up. They have no burden to prove to the jurors anything. So can you always just look to the State of Texas to prove to you what needs to be proven? Can you do that?

A.  Yes.

Q.  And if we don't do it, then the answer to the special issues would be what?

A.  It would be no.

Q.  Absolutely. And then a life sentence without parole would result.

And, basically, it's just important to remember there's no automatic answer. So say you found somebody

---

42

guilty of capital murder. You may, you know, think as you sit here now we're not going to ask you what set of facts, you know, do you think would be good for a life sentence, or what set of facts would be good for a death sentence because you don't know until you've heard it. We can't get into the facts of this case so I wouldn't ask you that. But if you sat there and thought in your mind the most horrific, horrible, heinous capital murder that you could possibly think of, you know, nine times out of ten you may think to yourself, well, that's the type of person and the kind of case that I think maybe is deserving of the death penalty. But there can be no automatics. Right, Mr. Ferreira?

A.  Uh-hum.

Q.  So given that you may think just because you found somebody guilty of capital murder, nine times out of ten that might be the type and kind of case that may warrant a death sentence, you've got to go through the process of answering these questions because you don't know until you've heard everything, or until you've reconsidered everything in light of these special issues.

And so, looking at Special Issue Number 1, do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit

---

criminal acts of violence that would constitute a continuing threat to society?

Now, the law doesn't define for you probability, but I would submit to you that it's not a possibility because anything would be possible. Some jurors tell us that a probability means more likely than not. Can you see that?

A.  Yes.

Q.  And it doesn't say, you know, that they are definitely going to commit, but just is it probable, more likely than not.

With regard to criminal acts of violence, you will see there that it doesn't say would commit another murder or that they would commit another robbery. It doesn't specify --

A.  You're talking about Issue Number 2?

Q.  Issue Number 1.

A.  Still Issue Number 1? Okay.

Q.  I'm sorry. It doesn't talk about what type of acts of criminal violence we're talking about. Basically, Special Issue Number 1 they refer to this as the "future dangerousness issue." Okay. Are they going to be a danger to society in the future in answering this question is what you're being called upon to do. What types of things do you think would constitute a

---

44

criminal act of violence in your mind?

A.  Where somebody gets injured, hurt.

Q.  Okay. So somebody is injuring somebody or hurting them. And here you see that it talks about the word "society." If the law presumes a sentence of life without parole, where is the best possible scenario that this defendant would end up if you've already found him guilty of capital murder?

A.  Say that again? I'm sorry.

Q.  If you found somebody guilty of capital murder, where is the best scenario of where that defendant's society would be?

A.  It would probably be -- it will only have to be within the prison itself, wouldn't it?

Q.  You're absolutely right. And can you see and understand that prison would also be a society?

A.  Yeah.

Q.  And, you know, there's people that work there. There's prison guards, there's chaplains, there's nurses, there's visitors that come. There's a person that may be there for a drug possession charge all the way up to some murderers. Do they, too, deserve a right to be protected from continual threats of violence?

A.  Yes.

Q.  Okay. That's why the legislature contemplates

that in having have you answer Special Issue Number 1 that regardless of where the defendant may find himself is he going to be a future danger. And if the State proves to you beyond a reasonable doubt that, yes, they are going to be a future danger, a continuing threat to society, then you would answer that special issue, yes --

A. Right.

Q. -- and then move on to Special Issue Number 2. If we do not prove to you Special Issue Number 1 you would answer it, no, and then the trial stops, and the answer is life without parole. Okay.

What types of things in your mind would you be looking for to determine whether or not he was going to be a future danger?

A. I would think, you know, some understandings of the background and patterns in the person's behavior. The situation that you explained before where this person, you know, enjoyed killing someone.

Q. Okay. So some of the surrounding facts underlying the original offense or background pattern.

A. No remorse.

Q. Okay. Absolutely. Those would be things that you, as a juror, could consider in determining whether someone was going to be a future danger.

46

And I saw on Page 4 of your questionnaire that you could look solely to the facts of the offense that the person was on trial for in determining whether or not a person was going to be a danger in the future because I think you said that there's a first for everything.

Is that fair to say?

A. Yes.

Q. And the law allows you to do that. The law allows you to answer Special Issue Number 1, yes, based on the facts of the offense the person is on trial for. However, you can't automatically -- remember, there's no automatics. Just because somebody is guilty of capital murder, you can't say, yeah, x marks the spot --

A. Right.

Q. -- that my answer is automatically going to be, yes, for Special Issue Number 1. You would then have to reconsider the evidence you heard in the first phase and answer that. But the law does allow you to say solely because of the facts of it.

A. Okay.

Q. And so if you answer -- let me give you another example of whenever I talk about whether or not somebody is going to be a future danger and the importance of waiting to hear.

Let's say that you hear about an individual that

goes into a 7-Eleven and they rob. They take all of the money out of the cash draw, they take the cigarettes, and then he goes and he locks and ties up the cashier in the bathroom. Well, before leaving with all of the goods he says, "You know what? I shouldn't be leaving any witnesses," and goes and puts a bullet in the clerk's head before walking out of there. You think that might be somebody that, if those were the facts you heard, would be guilty of capital murder? Just guilty of capital murder, first.

A. Yes. Okay, because it's a murder plus. Right?

Q. It's a murder, plus he robs them. But then you hear additional evidence in that punishment phase after finding him guilty of capital murder. And you're not to jump to any conclusions because you don't know, you've got to wait to hear, but you hear additional evidence in the punishment phase that that individual, after putting the bullet in the head of the clerk walks out the door, takes a swig of Bourbon that he stole from the store, and gets plowed into by an eighteen wheeler.

MR. PARKS: Your Honor, we're going to renew our objection to our Motion in Liminie that it trivializes this entire process.

THE COURT: So noted. The same ruling.

48

MR. PARKS: It deprives this defendant of a fair trial under the Fourth, Sixth and Eighth Amendments.

THE COURT: Yes, sir. Thank you, Mr. Parks. So noted. You may continue.

MS. EVANS: Thank you, Your Honor.

Q. So after you hear that he's plowed into by the eighteen wheeler you then learn that he becomes a paraplegic. And so, in answering Special Issue Number 1 some people tell us that maybe they can see how that individual is really no longer going to be a continuing threat to society in their mind; however, some jurors tell us, well, no, maybe he still could be. So it's up to you in answering Special Issue Number 1 how you would answer it, and how you see the evidence. But you understand why it would be important to wait because you don't know all of the situations, all of the facts, just from the guilt-innocence phase of the trial.

A. Yes.

Q. And so could do you that, Mr. Ferreira, wait --

A. Yes. Yes.

Q. -- to hear before you answer Special Issue Number 1?

A. Yes.

49

Q.   And if you answer Special Issue Number 1 "yes," then you would move to Special Issue Number 2, and Special Issue Number 2 is basically just the law of parties.  And it doesn't come up in every trial, but at this stage we just want to make sure that you understand what it is in case it comes up in this case.  Basically, it's that the law says that even if you're not the triggerman, if you aid, assist, in the commission of a criminal offense, then you can be just as guilty as the triggerman, just as guilty as the person of the person that actually did the act.

Does that make sense to you?

A.   Yes.

Q.   By way of illustration let's go back to the 7-Eleven robbery.  And say that really it was myself that planned it out with my co-counsel here, and we planned it out in on her kitchen table and we go and I take the gun and she's driving.  And she says, "I'll be out here waiting for you whenever you get out.  And we'll take all of the goods and we'll go spend the money how we want to.  We'll go shopping or something."  And I say, "okay."

Well, we pull up outside of 7-Eleven that we planned and we picked out to do this robbery and I say, "Geez, I forgot my mask."  And she turns to me and says,

50

"Hey, don't worry about it.  Just don't leave any witnesses."

So I go in and I shoot the clerk and come out with the money and cigarettes and all of the goods.  What can I be found guilty of?

A.   Murder.

Q.   Capital murder because it's murder plus a robbery.  Right?

A.   Yeah, capital murder.

Q.   Now, my co-counsel here she never went inside.  What can she also be found guilty of?

A.   Capital murder.

Q.   Absolutely.  And that's what Special Issue Number 2 is talking about.  While she can be, you know, charged with and found guilty of capital murder, to be eligible for the death penalty the person would have to either be the triggerman -- they are actually the one that caused the death of the individual in the course of the robbery; or if they are not the one that was actually the triggerman that went in and did it, they would have to actually anticipate that a human life would be taken.  And can you see how her words to me "don't leave any witnesses" would anticipate that a life be taken?

A.   Yes.

51

Q.   Okay.  So that's what Special Issue Number 2 is.  Again, the burden is on the State and we have to prove that to you beyond a reasonable doubt.  Okay.  And if you answer that Special Issue Number 2 you don't think we've proved it, the trial stops and it's a life sentence without the possibility of parole because the law always presumes that.

If you answer Special Issue Number 2, yes, then we move on to Special Issue Number 3.  And with Special Issue Number 3, neither side has a burden of proof.  Okay.  It's what we call kind of the safety net provision where if you answer "yes" and "yes" to Special Issue Number 1 and Special Issue Number 2 after you found somebody guilty of capital murder, then the defendant is sitting squarely on a death sentence.  Okay.  Because we have met our burden, we are now entitled to a death sentence.

But the legislature has comtemplated that, hey, the jurors in going through this process could have heard some type of evidence that they find in their mind is mitigating and they find it not only as mitigating, but it's sufficiently mitigating toward overturning a sentence of death and, thereby, giving a life sentence by something that the individual jurors have heard.  And so basically, you know, you have to -- what Special

52

Issue Number 3 is asking you to do, again, is kind of mental gymnastics again.  Take everything into consideration that you've heard.  The law requires you to do that.  Everything that you have heard just consider it, and you've got to give meaningful consideration to everything that you've heard, all pieces of evidence.  And if you find something to be mitigating, then you look to those items that you thought maybe were mitigating and then you decide, well, are they sufficiently mitigating so that it would warrant a sentence of life in prison without parole rather than the sentence of death that this defendant would receive.  Okay.  And if you answer, yes, that there is something sufficiently mitigating, then the defendant receives a sentence of life without the possibility of parole.  However, if you don't find anything that rises to the level of being sufficiently mitigating, then the answer is no and the defendant receives a death sentence.  Okay.

You know, you may hear a thousand pieces of mitigating evidence in one trial, you know, things that could be mitigating in your mind.  Some people have said maybe age, upbringing, whether or not a person was intoxicated by way of drugs, or alcohol, or some type of abuse.  Those things in their mind may be mitigating and

53

so you're required by Special Issue Number 3 to consider those things. You're not required to say that those things are mitigating. Just decide in your mind are they mitigating or not? And some people may say that some of those items are actually aggravating, make the person more culpable if they drink to the level of intoxication and go out and do a crime. We hear that a lot in other types of cases even. But if you put something in the category of being mitigating, then you look at it and determine does it rise to the level of being sufficient.

Okay. Does that make sense?

A.   Yes.

Q.   Just to give you an example of what I mean by this. Let's say you hear about an individual, a 25-year old man goes into a day-care and shoots two of the workers. Sound pretty bad?

MR. PARKS:   Judge, the Special Issue Number 3 needs no hypothetical question to explain that and that's the only purpose of hypotheticals. Not to put in a potential juror's mind that there are certain circumstances under which, and only under which, a person can find mitigating circumstances.

THE COURT:   I'll overrule the objection. You can go ahead, Ms. Evans.

55

times, more times than not, those are excuses. But there can be exceptions. And that's where I just want to illustrate to you that there can be exceptions to everything and it's very important to keep an open mind. So by way of an example of that, let's say a 25-year old guy goes into a day-care and shoots two of the workers.

Does that sound like the type of -- whenever I say "two," you remember capital murder can be two or more --

A.   Uh-hum.

Q.   -- in the same course of conduct would be capital murder.

A.   Yeah.

Q.   So, thereby, may be eligible -- would be eligible for the death penalty. However, let's say that you then heard additional facts that the two day-care workers that the individual went in and killed --

MR. PARKS:   Judge, we object. This is illustrative of nothing. She's not explaining the law with this.

THE COURT:   I've already overruled the objection.

Go ahead, Ms. Evans.

MS. EVANS:   Thank you, Your Honor.

Q.   You then hear evidence after you've heard just the initial facts, you know, of what they did because

54

Q.   (By Ms. Evans) The purpose of my hypothetical is just to illustrate the law what we're talking about and how important it truly is to just wait until you've heard everything. And I can tell by your questionnaire before I give you the example that you would be willing to do that.

For example, with regard to voluntary intoxication, I note that you said that you can see why we have that law. And that if somebody intoxicates themselves to the point -- or voluntarily becomes intoxicated that it's not going to be an excuse. You know, you don't get to say, well, I was drunk so, thereby, I'm not guilty. The law doesn't allow that. But I do see that you appreciate and respect why we would have that law that maybe it could serve as mitigation; is that correct?

A.   (Nods head.)

Q.   I'm sorry. You've got to answer out for the court reporter.

A.   Yes. Sorry.

Q.   I see there where you say, "Intoxication can cloud one's judgment so I understand why we have this law."

A.   Yes.

Q.   And with regard to upbringing as I mentioned before, I believe you say that you think most of the

56

that's all you hear in guilt-innocence. And then you've got to wait until you get to the punishment phase. And in the punishment phase you hear that the two people that actually were killed happened to be the defendant's aunts and they were two aunts that raised him since birth. And you hear that he was raised by them in a closet. They put their cigarettes out on him, they fed him dog food, they gave him no love, no attention, never allowed him outside of that house.

A.   Yeah.

Q.   And then he comes and sees that now they are running a day-care where children are and he becomes so inflammed that he picks them off. So can you understand the importance of waiting until you hear because some people may say, hey, I don't think I would even answer Special Issue Number 1, yes, because he may not be a future danger to anybody else, except for those two that he had a beef with.

Can you understand that?

A.   Yes.

Q.   Or, you know, they could say, well, it's still a pretty bad act because he could have hurt a child. Some jurors may answer, yeah, he may be a future danger to Special Issue Number 1. However, what Special Issue Number 3 contemplates is that you take everything as a

57

whole back and digest it and give meaningful consideration to everything and then decide, you know, whether or not, yeah, that's mitigating; but is it sufficiently mitigating to warrant overturning this death sentence. Because remember after you answer Special Issue Number 2, yes, then the defendant is sitting squarely on a death sentence.

A. Right. Yes, uh-hum.

Q. But Special Issue Number 3, again, is the safety net for you to consider. And could you give consideration to everything you've heard in the trial, the case-in-chief as well as the punishment phase, in answering Special Issue Number 3?

A. Yes.

Q. Okay. Let me ask you about one other thing in your questionnaire.

You talk about hearing mental health experts, the testimony of them, the psychiatrist or psychologist that maybe would come and testify. And you say that you would like to hear from two or more than one. Can you explain what you meant by that?

A. Uh, I'm saying that I would like to hear from two because I think a lot of what they give is kind of opinions; some. It's kind of like a second doctor's opinion.

58

Q. Okay. I understand what you're saying. If, for example, they don't hear from two, can you remember what I said about credibility of witnesses? And would you, just by virtue of what their profession is, wait and hear what they have to say before you decide whether or not you want to take that into consideration or believe what they have to tell you?

A. Yeah, I don't think it has anything to do with credibility. It's just kind of more to do with opinion was my thinking there.

Q. I understand. Weighing what they have to say and if their sides gel.

A. Yeah.

Q. Okay. I understand what you're saying.

A. I mean, one psychologist could say the kid has ADD and has a problem, and another one would say, you know, he's just a boy, so...

Q. Absolutely, and I can appreciate why you would like to hear from more than one. I just noted that you had put that and wanted to ask you about it.

Let's say, for example, again just another proposition under the law that you're in the middle of trial and the State hasn't proved their case to you, but you hear a police officer take the stand and he blurts out at some point during questioning -- though he's been

59

advised at a previous hearing not to. You don't know all of that part during trial. But he basically blurts out and says, "Well, the defendant confessed to the whole crime to me. He said he did it."

Well, you know, Defense stands up and objects because it was improper. It was a confession that was not supposed to come in, that you were not supposed to have heard about because it was not taken properly under the law. And so the Judge then instructs the jury, "Jury, you must disregard the evidence that you just heard." And so the Judge has just given you the law regarding that, that you could not consider that for any way, shape, or purpose. Could you do that?

A. Yes.

Q. Okay. You would disregard that if you heard it?

A. Yes.

Q. All right. And that's all the law I'd ask you to do is just be fair and impartial and render a true verdict based on the law and the evidence. And I believe, Mr. Ferreira, from everything you've said and from your questionnaire that you would be able to do that.

Now, let me ask you before I pass you. Can you say today whether or not this defendant is guilty of capital

60

murder?

A. No.

Q. Because you hadn't heard the evidence. Fair to say?

A. Right. Yes.

Q. Can you say today how you would answer those special issues?

A. No.

Q. And, Mr. Ferreira, even after returning a verdict of guilty of capital murder, if you did, would you be able to automatically say what sentence was deserving of this defendant or how to answer those special issues after returning a verdict of guilty?

A. No.

MS. EVANS: Okay. Thank you.

THE COURT: All right. Thank you, Ms. Evans.

Mr. Parks? Okay. Thank you, Mr. Parks. How are you doing, Mr. Ferreira?

PROSPECTIVE JUROR: I'm doing fine.

THE COURT: Would you like to take a short break?

PROSPECTIVE JUROR: No, I'm okay.

THE COURT: Get a drink of water?

PROSPECTIVE JUROR: I think I'm all

right.

THE COURT: All right. How about you, Mr. Parks?

MR. PARKS: I'm fine, Your Honor.

THE COURT: All right. Go ahead then.

MR. PARKS: I'm just putting my time down so I don't run over.

THE COURT: I won't let you.

EXAMINATION

BY MR. PARKS:

Q. As the Judge says, my name is Doug Parks. Mr. Lollar, Miss Mallin and I represent Mr. Broadnax. And let me explain a couple of things.

I hope, Mr. Ferreira, that if you became upset with me because I was making objections, you go ahead and tell me. You think I'm a jack-ass after this is over, if you do, fine, but certainly don't hold it against Mr. Broadnax. This is our job.

A. Right.

Q. And, obviously, we don't always agree on the purpose, I guess, of what we're doing down here. And I'll tell you that it is my position almost to -- almost to never try to ingratiate myself with a prospective juror because this isn't about who likes who, it's about what the State's obligations are and whether they can

62

meet them. Okay. And I'm going to violate that a little bit by telling you that almost the first thing out of your mouth, whenever Miss Evans was talking to you, was something that I was impressed with and made up my mind that I would start my portion of the voir dire with it. And what you said was "Following the law is the most important thing."

A. Yeah, I strongly feel that way.

Q. And I thought that you did, Mr. Ferreira, and I judge you to be a person who basically says, you show me the rules and I'll follow them.

A. Yes, exactly.

Q. Okay. Well, I can promise you, Mr. Ferreira, that, that on behalf of the Defense team is really all we want among the twelve people on this jury and all that we're really entitled to, but we are entitled to that and I appreciate your having said that, and I judge that, that's where you were.

Now, it's my job to explain the law to you; that is, to give you the rules so that you will know what rules you are to follow.

Now, I will not try -- I think the State fears that I'm going to, but I will not try to find some way to figure out how you're not qualified to serve. That's not what I'm about. Okay. Now, if -- however, be

honest with me. If I explain the law to you that you would be required to follow, and that for whatever reason you know in your own heart that you're not going to be able with good conscious to follow that law, then you need to tell us that. I don't think that's going to happen and I'm certainly not going to try and get you to do that.

A. Yeah.

Q. I'm going to rely on you to tell me. If I explain something to you and you say "I can't go there," then let me know. But I'm not going to try to lead you down that path. Okay.

A. Okay.

Q. All right. So here is where we are in this deal. I want to make sure, based on what you tell us on the front page of your questionnaire and a little bit later in the questionnaire, that we're on the same page here.

You say that you are in favor of the death penalty. And that quote, "You kill someone per the law, punishment should be death." I agree with that. Let me make sure that you understand that. There is no automatic death penalty in the State of Texas. The law does not prescribe the death penalty, ever. The law allows for the death penalty in what it interprets to be

64

limited situations. In fact, what the law does do is set life without parole as a punishment for capital murder.

A. Right.

Q. And only in those exceptional cases does it allow for the imposition of the death penalty. And in order to determine which of those cases are the exceptional case we set up this system so that there can be a systematic determination of which capital murder should receive the death penalty as opposed to those that the law assumes should not.

Does that make sense to you?

A. Yes, it does.

Q. And that's really all this is about. It's not about jurors making a determination whether or not they think, based on the facts and circumstances of the case, that the defendant deserves the death penalty and then answering questions in order to reach the results that they have determined. There's nowhere in the law does a person, a juror -- is he or she ever called upon to determine what the defendant deserves. That's a very subjective determination and what would be deserving of one person's standard would not be anothers. You speak to evil. That's sort of the same thing. What is evil to one is not evil to another. So the purpose of this

system is for the law to try to guide a jury to a certain determination based not only on subjective determinations, but objective proof brought by the State.

Does that make sense to you?

A. Yes, it does.

Q. And it really -- particularly with respect to these first two special issues it's no difference from the guilt-innocence phase of the trial. There is a contextural situation that we want to talk about when we get there, but basically just as a defendant is presumed to be innocent in law at the guilt-innocence stage of the trial, the law presumes that the answers to Special Issues Number 1 and Number 2 are no. And they serve -- the special issues serve exactly the same purpose as the indictment does in the first phase of the trial.

What this indictment does is tell the State of Texas what it is they have to prove to all members of the jury beyond a reasonable doubt before they would be entitled to a guilty verdict. And if they miss even one of those elements, then the jury is required to find the defendant not guilty. It's not a matter really of innocence or not. You know, I prefer -- I wish we had "not proven" as a verdict because that's really kind of what it is. Either they prove their indictment, or they

66

do not. A person is either guilty, or it's not proven. See what I'm saying?

A. Yes.

Q. We sometimes use an example of what we call the manner and means. Have you read the indictment in this case?

A. Yes, I have.

Q. You will notice in that indictment they put a manner. That is death was caused by shooting with a firearm. Okay. The law says that anytime they indict someone for murder or capital murder, they have to say how it happened. They just can say so-and-so killed John Doe. They have got to say whether or not he was shot, or stabbed, was poisoned, strangled, whatever. Now, if they don't know, then they say that by manner and means unknown to the grand jurors. They can do that. But there has to be a manner and means in the indictment. So we sometimes use an example of the situation where a juror hears evidence that a person has been stabbed to death, but the indictment says that they were killed by shooting with a firearm. And even though they know from the evidence that the defendant killed the deceased and did so because he wanted to, had no legal excuse for justification, the State got the manner and means wrong. They said he was shot, the Medical

Examiner said he died by stabbing. In that situation a juror would be required under their oath to return a verdict of not guilty as distasteful as it may be, but that's the way our system works. Okay.

A. Okay.

Q. And I'm assuming from what you've told me you would be able to do that because those are the rules.

A. Yeah.

Q. And, you know, you may want to go up and complain to the District Attorney about the prosecutor that missed that, but your obligation as a juror would be to follow your oath.

A. Right.

Q. And that oath is to a true verdict render according to the law and the evidence.

A. Right.

Q. Well, these special issues are the same. They are written down just the same as the indictment is written down. They are written down for a purpose, and they were written to be interpreted and acted upon exactly as they are written so that if a juror goes back in the jury room and says, "Well, you know, I think that this guy deserves the death penalty. He may not be a continuing danger to society, but the facts and circumstances are just so horrible in this case, I'm

68

going to answer these questions to get the result that I wish." He's violating his oath. Right?

A. Yes.

Q. So he can't do that. So let's talk just a few minutes about the guilt-innocence stage of the trial. Just like manner and means, the State has got to prove beyond a reasonable doubt to all members of the jury what we call the culpable mental state.

You will notice in that indictment it says that Mr. Broadnax intentionally took the life of the deceased. That would be the same in any capital murder, an indictment alleging the death during the course of a robbery. The intentionally is the culpable mental state. There are four culpable mental states in the Texas. Intentionally, knowingly, recklessly, and with criminal negligence. Okay. So whatever the law requires that the State prove, they have to put in that indictment. The law in the Texas requires an intentional state of mind in a capital murder case where there is a robbery involved. Okay. That is, it could not have been a mistake, not an accident, not a self-defense, the defendant was not mentally insane.

"Intentionally" in our law is defined as a conscious objective or desire to cause the result. That's just a fancy way of saying that the defendant

decided to kill the deceased and did that because that was the goal that he set by whatever means was at-hand. okay.

A. Okay.

Q. The way we can distinguish that very quickly from the knowingly state of mind because this is kind of confusing sometimes to jurors is that -- well, let me give you a quick example.

Let's say a person -- a hypothetical situation -- they go in to rob the 7-Eleven store. They have a loaded gun. They've loaded the gun and they go in and they point the gun at the clerk and say, "Give me the money." And the clerk hands the money over. And he says, "Now, I want you to stay behind this counter. Don't you follow me out because I don't want you to see what car I get in and I don't want you to see which way I go, so stay behind the counter."

And he starts to leave and gets to the door and sure enough here comes the clerk around the corner doing just exactly what he told the clerk not to do. So in order to disable the clerk and keep him from following him out he takes the gun and shoots the fellow in the leg. Okay. Unfortunately, the bullet hits the femur artery and the clerk dies. You can see where now he intentionally did an act that was clearly dangerous to

human life, but it was not with the intent to cause the result that ultimately happened.

A. Right.

Q. You see? And it's kind of maybe a fine line in a juror's mind, but the difference between that and the walking up to the clerk, getting the money and shooting them dead because they want them dead so that they wouldn't be a witness against them, or for whatever reason, is a different thing.

A. Yes.

Q. So what the law says is that certainly that person would be guilty of both aggravated robbery and murder for which he could get life in the penitentiary.

A. Yeah.

Q. But he would not be guilty of capital murder. Are with me?

A. Yes.

Q. Now, the law allows either side in a case of this kind to offer evidence to the jury about the condition of the mind of the defendant at the time the offense was committed, if an offense was committed, so that the jury can make a determination whether or not the State has proven the required state of mind.

Are you with me?

A. Yes.

Q. And so, you know, that could be a determination depending upon the facts of the case the same as manner and means, the same as identity. Any number of things could be in issue.

A. Uh-huh.

Q. And a juror never really knows what will be in issue because we can't talk about the specific facts of the case. All a juror can do is assure us that if they sit on a jury that they are going to wait until they have heard all of the evidence, not jump to a conclusion just because they have heard opening statements from the lawyers. What lawyers say is not evidence. You have to wait and hear it all. Don't make up your mind after you've heard two, or three, or four of the State's witnesses. Wait until you've heard everybody.

A. Right.

Q. Then you go back, make a determination from that evidence whether the defendant is guilty or not guilty, or perhaps guilty of some other offense if that was raised by the evidence. Fair enough?

A. Yes.

Q. Now, one of three things is going to happen, of course. The jury is going to find the defendant not guilty, guilty of a lesser included offense if it was available, or guilty of capital murder. Only if the

jury finds the defendant guilty of capital murder will they ever see these special issues. Okay. In every other situation these special issues will not be given. Obviously, if a person is found not guilty, they go home. Okay.

A. Yeah.

Q. If they are found guilty of some lesser included offense like murder, or aggravated robbery, then the jury goes back and determines within the range of punishment. And for those two offenses they are both first-degree felonies. The range of punishment would be five to 99 years or life. And they would decide, based upon the evidence, where in that range of punishment it ought to fall; five years, life, somewhere in-between. It's up to them, but they wouldn't answer these special issues.

The context of these special issues are only where the jury has already determined from the evidence beyond a reasonable doubt that the defendant is an intentional murderer and he killed during the course of committing another serious felony. Okay.

A. Right.

Q. So that's the pool of people about whom these questions are asked. So it's obvious, I think, that the law recognizes -- it doesn't say if you find someone

73

guilty of capital murder they get the death penalty. So that, obviously, recognizes that there are some who should and some who should not under the law. What our Court of Criminal Appeals has said is that the death penalty is reserved for those few incorrigibles who cannot even be confined without fear of further violent acts. So that's what Special Issue Number 1 is designed to determine. Is this capital murderer one of those persons -- one of those few incorrigibles -- that we cannot even safely, even imprison. Okay.

A.   Yeah.

Q.   Now, that requires the State to prove the Special Issue Number 1 the same as they were required to prove guilt-innocence -- the guilty verdict. And it requires them to prove exactly what's up there. Here's what I say sometimes, Mr. Ferreira.

Speculation is the mortal enemy of the law. Okay. Where the State is required to prove something it is not up to a juror to help them along.

A.   To help them what?

Q.   To help them along with it.

A.   Okay.

Q.   To speculate what might be. See. What I'm trying to get to is, is that it's the juror's obligation to make the State prove that this particular defendant

74

would be a future danger, not just speculate that he would be because he's a capital murderer.

A.   Sure.

Q.   And just because there are guards, and doctors, and nurses, and other people in the penitentiary, a juror is not -- should not speculate that just because they are there that this is a person who would have the opportunity to do them harm --

A.   Yeah.

Q.   -- or the inclination to do them harm. That's something that the State is required to prove to you. If they believe that the accused is that kind of person, then they need to prove that.

A.   Yeah.

Q.   Are you with me with that?

A.   Yes, I am. There needs to be a reason for that.

Q.   Exactly. You know, it's like if I'm a juror I'm saying, all right. You show me with the evidence why this particular person cannot even be controlled in the penitentiary.

A.   Right.

Q.   Why those folks can't contain him --

A.   Uh-hum.

Q.   -- that he's that bad. And if they can, then

75

it's my obligation to answer that question, yes. If they can't, it's my obligation to answer it, no, regardless of what I think --

A.   Yep.

Q.   -- ought to happen. Are you with me?

A.   Yes, I am.

Q.   And could you do that --

A.   Yes.

Q.   -- put them on their proof? And if they proved it, fine; if they don't, fine.

A.   Yes.

Q.   Because I can tell you, Mr. Ferreira, the law is satisfied with a life penalty. In fact, the law presumes a life penalty. Okay. So I don't want you -- as many as twenty percent of the people who serve on these kinds of jurys we learn go through the entire thing and believe that they were required to assess the death penalty.

A.   Right.

Q.   No, no, no. They are required to assess the life penalty unless the State can meet its burden. That's what the law really requires.

Does a make sense to you?

A.   Yes.

Q.   Okay. All right. I told you I was going to

76

try to explain the rules as best I can.

So you see that from Special Issue Number 1 what they have to prove, obviously, is not that a person could possibly commit acts of violence in the future. Anything is possible. They have got to prove that it's a probability. It's more likely than not --

A.   Okay.

Q.   -- that a defendant would commit criminal acts. And it's plural. It's not just -- a juror couldn't go back and say, well, you know, I think that he is more likely than not that at some point he's going to commit violence against someone. It's got to be acts of violence that would constitute a continuing threat to society. They put "continuing" in there for a reason. That they are trying to identify, again, those few incorrigibles who cannot be incarcerated that the system cannot even control. And so they don't want to limit it to just is this a person who, you know, who could get in a fight, or is this a person who might do something down the way. That's not what they are there to prove. And it's not there to weed the paraplegics and the quadriplegics out, Mr. Ferreira. That's a trivialization of this. You know, it doesn't say do you find from the evidence that this is a person about whom it would be impossible to commit acts of violence in the

77

future. That example of paraplegics turns that first special issue right on its head, which is why I hollar about it. You understand what I'm saying? So please don't go back into the jury room, if you sit on this jury, and interpret that question to mean it is intended to be a barrier to the execution of people who couldn't possibly be a future danger. That's not what it says.

Are you with me?

A. Uh-hum. Yeah.

Q. And, you know, Mr. Broadnax is not a paraplegic. I don't think there's any question from reading the indictment in this case that the State is ever going to suggest that Mr. Broadnax intentionally killed his five-year old son who was dying of cancer. It's -- you know, these are examples, at least in my mind, that are used to suggest to you as a juror that the death penalty is appropriate and the life sentence appropriate only in these extraordinary circumstances like are portrayed in these hypothetical examples. And that's just plain not true. In fact, the absolute opposite is true from that.

Are you with me?

A. No, not really.

Q. Not really? All right. The example that Miss Evans gave you about the boy in the hospital dying of

78

cancer. What do you think that was used to illustrate to?

A. To me that is just more -- that's more evidence and information that you would think through to think, you know, would this person have more likely than not caused danger to somebody else in prison.

Q. And the point I'm trying to make, Mr. Ferreira, is that, you know, while the law allows us to give hypotheticals to try to illustrate a point of the law, you're not to take those as any indication that they are a standard from which you should judge an individual case.

Are you with me on that?

A. To me, I took it just as an example to better understand kind of the thought, the process.

Q. Well -- and the thing that bothers me about that particular example is that at the point and time that it's asked of you is before you hear about these special issues. And it kind of indicates maybe that you ought to make up your mind whether a person deserves the death penalty or not based upon the facts of the case rather than on answering the special issues. As long as you understand that's not the way the system works.

A. No, I understand that.

Q. Okay. Fair enough. I want to make sure that

79

there wasn't any mistake about that.

A. Right. That alone is probably not enough information to --

Q. Sure. I mean, we could all sit here and think of individual scenarios that either would tug at a person's heartstrings or make their hair stand upon end, but those things really have no place when it comes time for a jury to decide whether the State has met its burden of proof.

Are you with me about that?

A. Yes.

Q. All right. So let us assume that you have sat on a jury and found the defendant guilty of capital murder.

A. Uh-hum.

Q. Now, you go to Special Issue Number 1. And I want to make sure we word this a little bit differently, but it's kind of going to the same place.

The State tells you that the law allows you to answer Special Issue Number 1 "yes" based solely upon the facts of the case. Okay. The way I put it is this. The law does not preclude you from answering question Number 1 "yes" based upon the facts of the case alone, but the facts of the case must prove Special Issue Number 1, and it's a different question from did he do

80

it.

A. Right.

Q. Okay. So what the law says is this, is that as a juror you are absolutely within your rights to say, I don't believe whether or not a person did a capital murder is ever going to be sufficient for me to determine that the answer to Special Issue Number 1 is yes. I insist upon having more evidence that goes to that issue rather than just did he do it. And you're perfectly entitled to do that. That's the kind of power that the jury has. And my point to you is this. Certainly you can consider the facts of the case itself, but to me that's kind of the apples' determination. Once you get over to Special Issue Number 1, that's oranges and it may be the evidence that proved apples would prove oranges, but it certainly may not necessarily do so. That's why a different question is asked.

A. Right.

Q. I like to tell people that the way that our law is set up in the State of Texas is that we do not execute anyone for what they have done. No matter how horrible, no matter how heinous it may be. We only execute people for what the State can prove beyond a reasonable doubt they will probably do in the future.

And those are two different determinations. You understand that?

A.    They will probably do violence.

Q.    All right. Well, let us assume then that if you, as a juror, you answer Special Issue Number 1 no, they have not proven to my satisfaction beyond a reasonable doubt that he'd be a future danger in the penitentiary. You answer that no and the trial is over.

A.    Right.

Q.    You return that into open court, the Judge assesses life without a parole penalty and we're done.

A.    Uh-hum.

Q.    If you answer it yes and Special Issue Number 2 is given to you, then answer that. And if it's no, the same thing. The trial is over.

A.    Okay.

Q.    If you answer that one yes so you've got a guilty "yes" and "yes," then you go to Special Issue Number 3.

We have not always had that issue, Mr. Ferreira. It use to be under our system that if the jury answered special issues "yes" and "yes," then the defendant got the death penalty and it didn't make any difference whether the jurors collectively or individually felt that under the facts and circumstances of that case the

82

death penalty was not appropriate. They did not have a method, whereby, they could exercise their own individual moral judgment about whether this was, all things taken into consideration, appropriate for the death penalty.

Our Supreme Court a few years ago said that jurors needed to be given an opportunity to take potential mitigation into consideration and have an opportunity to exercise that personal moral judgment, and if they felt it was not appropriate have a vehicle where they can say that rather than go and live their life having made a decision to execute a person against their own moral personal belief in the matter.

Have I made it too complicated for you?

A.    No, I think I know what you're saying.

Q.    You see what I'm saying?

A.    Yeah.

Q.    So really what that does -- and as the prosecutor told you there's no burden of proof on that special issue. It's different than any other decision that you've made.

A.    Yeah.

Q.    At this point you're called upon by the law to determine if you have heard anything that you consider to be mitigating; that is, that would lessen a person's

moral culpability, or cause you to think for whatever reason that the death penalty -- that the life penalty would be more appropriate under the circumstances than the death penalty.

What is a mitigating circumstance is up to each individual juror. What weight to be given to mitigating evidence is up to the individual juror. No one on the jury, as opposed to these other things where you've got to agree -- if the case has been proven guilt, you've got to all agree to that. Here you don't. What you might think is mitigating, the juror next to you might think is not. What you may think is sufficient, another juror may think is not. And vice-versa, that juror may think something is sufficiently mitigating and you don't. The law says that's fine. Theoretically, all twelve of you could say, I believe there is sufficient mitigating evidence in this case to answer this question yes, and all twelve of you have a different reason for that. It doesn't matter.

A.    Okay.

Q.    And it doesn't have to be all twelve of you because at this point each of you are called upon to render your own individual moral judgment about that matter and return that individual moral judgment into open court. Okay. The laws ask you to look at a

84

person's character, background, personal moral culpability -- you know, that may be a place where if you do hear evidence of intoxication, voluntary intoxication, and if you hear evidence maybe from friends, or family, or whatever along the lines, well, this is not the kind of thing that we expect the defendant to do. It's out of character for him. It must have been the alcohol or the drugs or the combination that caused him to act this way. You might think that that is sufficient to -- that, that goes to his personal moral culpability. You might not. I'm just saying that these are the kinds of judgment that a juror can make. Okay.

A.    Uh-hum.

Q.    Do you believe that you would be able to do -- some jurors tell us that they just foreclose that because by the time they reach Special Issue Number 3 they have already decided that the defendant is an intentional murderer and that he would be a future danger. Some jurors tell us, you know, I can go to Special Issue Number 1 and give you a real fair shake there. And if the State doesn't prove it to me, I'm going to answer it no because if they prove it to me and I get over to Number 3 knowing that I'm answering that about the person who is an intentional murderer and who

85

I believe is going to be a future danger, while I can listen to the evidence, consider the evidence, I might even find some of the evidence mitigating, I'm never going to find it to be sufficiently mitigating to change a death penalty to a life penalty for an intentional dangerous murderer. Other jurors say, no, I can do what the law requires of me. And, you know, it's not like we're sending the person home. Really the only difference between a life penalty and a death penalty is they both require the defendant to die in the penitentiary. Life penalty we just don't know when or how that's going to take place. It could be tomorrow, it could be sixty years from now, but it amounts to the same thing in that the defendant will serve the rest of their life in the penitentiary.

Knowing that some people say that, that's fine. I can see that, stand alone, I can answer that question, yes, even about an intentional murderer I believe would be a future danger. Another juror tells us in all honesty when they get there, they just couldn't change that death penalty to a life penalty.

How do you feel about that?

A. I think I could follow the process. Yeah. I mean, I strongly feel that, you know, the process is there for a reason.

86

Q. Sure.

A. And so you have to follow the process and the rules, so ...

Q. Let me visit with you about one other thing, Mr. Ferreira. I think I'm getting -- I'm trying to be careful of my time here.

A. Uh-hum.

Q. When you're called upon -- you're called upon by law to deliberate your verdict.

A. Uh-hum.

Q. And I'm not trying to discourage you from deliberations. And the law doesn't say what deliberation is it just says that the jury will deliberate. I looked in the dictionary and to deliberate means to carefully consider. Okay. And I would hope that every juror would carefully consider, particularly when they get to Special Issue Number 3, what their own personal moral judgment is. I think that sometimes maybe because of television -- watched the Twelve Angry Men -- that the idea is is that the jury is required to go back into the jury room, defend their position, justify their position, debate their position, argue their position. And I suggest to you that that is not true.

A. Right.

Q. You can explain your position if you wish to, but you're not required to.

A. Okay.

Q. You know, if you have decided that your personal moral judgment has been arrived at by careful consideration, you may wish to justify that to others and you may wish not to. Once you have reached that place, do you believe it would be appropriate for other jurors to try to convince you that your own personal moral judgment was the wrong one?

A. No.

Q. Do you believe it would be appropriate for you to do that for them?

A. I don't think it's something you're trying to convince somebody of. You know, you're explaining your position and they make up their own mind.

Q. Well, you know, sometimes we likened it to people deciding what religion they are, or how they want to raise their children. They make personal moral judgments about how they want to do that. And, ultimately, it's not my place to try to convince you to be an Episcopalian like I am. You know, I could tell you the benefits of being or whatever, but it's up to you to ultimately decide about that.

A. Right. Yes.

88

Q. And I think that's the same way it is back there. I think if a juror wishes to justify and explain the position, they have an absolute right to. If a juror wishes to say listen, I heard the evidence, I listened to the evidence, I carefully considered the evidence, and I have reached my own personal moral judgment, and I'm done.

A. Yep.

Q. You see where I am?

A. Yes, I do.

Q. All right. So we're together here.

I'm going to wrap it up. The State has to prove to you the person is guilty beyond a reasonable doubt. You're going to force them to do that if they can. If they do we get to the special issues. Special Issue Number 1 is presumed to be no, it must be answered no, unless they prove it to you beyond a reasonable doubt. Same as Special Issue Number 2. Special Issue Number 3 requires you to go back through the evidence, make your own personal moral determination that can be based on specific evidence that you're able to identify, and you can articulate your position, justify your position. But it may be that you don't want to do that and you're not required to do it. And I'll tell you, Mr. Ferreira, that the law allows -- and this is how much power we

give to the jurors in these cases. The law allows you to decide, after you've heard all of the evidence, that today I wish to exercise mercy. I have it in my power. Mercy is something that's not earned, it's a gift. And today I feel like giving the gift of mercy, and that is my personal moral judgment in the matter. And you're entitled to do that. The only way in the State of Texas that a person can be executed is if all twelve jurors say so.

Are you with me?

A. Yes.

Q. Okay. So that's how much power. It's a great responsibility, but that responsibility is leavened with the power to say at the end of the day, my judgment is the life penalty as appropriate. I know that the law is satisfied with that. I know I don't have to justify that to anyone. That's what I can live with and that's what I'm going to do. And the law says, fine.

Are you with me?

A. Yes, I'm with what you're saying.

Q. Because it gives every member of the jury that same power. Do you think that's a good thing?

A. Yes. Yeah, I have no problem following that rule. I don't think it's something that from one day you say, you know today I feel like being this way and

90

tomorrow may be different. I think, you know, you need to follow what it says is the safety net, I think, with what was said. Yeah.

Q. Sure. And the point of that is that you're not restricted.

A. Right. Exactly.

Q. That the law doesn't say you have to find a particular thing --

A. You get to look at all of the evidence. Where here you're Issue 1 and 2, you're guided. You have to follow it. Three, it's kind of your opportunity to consider all of the evidence.

Q. Right.

A. And, you know...

Q. Do what you believe is appropriate under the circumstances --

A. Right. Yep.

Q. -- knowing that the only choice is life without parole and the death penalty.

A. Right.

MR. PARKS: Thank you, Mr. Ferreira. You've been very patient with me. I appreciate it.

THE COURT: All right. Thank you, Mr. Ferreira.

Mr. Ferreira, I'm going to ask you to

step out for just a moment with my bailiff. Let me confer with the attorneys very briefly and then I'll have you come back in and give you the result. You can just leave everything right there.

PROSPECTIVE JUROR: Even what I was given, all of that stays here?

THE COURT: Yeah, leave that. You can take your stuff with you.

PROSPECTIVE JUROR: All right.

THE COURT: Your cup. I guess that's your cup there. We'll have you back here in just a second. Thank you.

(Prospective Juror, Guy Ferreira, exits the courtroom.)

THE COURT: Thank you, ladies and gentlemen. You can be seated.

And, Miss Evans, does the State have a challenge for cause?

MS. EVANS: We do not, Your Honor.

THE COURT: Mr. Parks, does the Defense have a challenge for cause?

MR. PARKS: We do not.

THE COURT: Thank you. All right. Mr. Ferreira, then will be Prospective Juror Number 26.

All right. Would you bring Mr. Ferreira

92

back in?

THE BAILIFF: All rise for the juror.

(Prospective Juror, Guy Ferreira, enters the courtroom.)

THE COURT: Thank you, Mr. Ferreira, come back in and just go ahead and have a seat there, briefly. Thank you, ladies and gentlemen, be seated.

Mr. Ferreira --

PROSPECTIVE JUROR: Yes.

THE COURT: -- after conferring with the attorneys, what we're doing at this point we're qualifying approximately 47, 48 to 50 prospective jurors. Okay. You've been qualified as Prospective Juror Number 26.

PROSPECTIVE JUROR: Okay.

THE COURT: Now, what that means is, is that at some point in time after we've got the panel, if you will, together or those 47, 48 to 50 people, each side has fifteen strikes or preemptory challenges, sometimes we call them, or preemptory strikes. And each side can strike fifteen. The first twelve that qualify are not struck. In other words, are the jury. So the jury is kind of made up of leftovers in not really picking those twelve.

PROSPECTIVE JUROR: Right. I understand.

93

THE COURT: So -- and the attorneys once we get the panel together, then they will make their strikes and then you will be notified as to whether or not you're one of the jurors.

Now, knowing that you do have the potential of becoming one of the jurors in this particular case, I've got a couple of things I want to go over with you before you leave here today.

Number one, I would like for you to pencil in on your calendar the two weeks of August the 10th and that following week which would be August the 17th. So we're looking at the 10th through the 21st, I believe it is. It would be that Monday the 10th through a week from that following Friday which, I believe, is the 21st of August.

PROSPECTIVE JUROR: You said the 10th, and the 17th, and then the 10th through the 21st?

THE COURT: Yes. The 10th through the 21st that two-week period there. There's ten working days. The week of the 10th which is a Monday. Right?

Okay. Judge Snipes will begin evidence in this case on Monday the 10th, August the 10th. And then we anticipate the trial will take approximately two weeks. Hopefully, maybe not that long, but we're allowing a two-week period there to make sure, you know,

94

that everybody has time. So I would like for you to pencil that in.

Now, let me just tell you at the end of July, you will be notified by Judge Snipes' office either by a letter, or by a phone call. And I would like for you to check your questionnaire just to make sure all of that contact information is still correct on there.

PROSPECTIVE JUROR: Okay.

THE COURT: But anyway, you will be contacted at the end of July as to whether or not you are on the jury. Of course, if you are told you're not on the jury, then you go your way and don't worry about it. If you are told that you are on the jury, then it will also tell you -- the contact information will also tell you that evidence will begin August the 10th and you are to report for jury service on that date.

PROSPECTIVE JUROR: The trial will last you're saying --

THE COURT: About two weeks.

PROSPECTIVE JUROR: From the 10th to the 21st.

THE COURT: Right. That's right. Very good.

And now when you came in here you

95

indicated you didn't know anything about this case, hadn't heard anything about it in the news media or anything like that and that's exactly the way I want to keep you. So I'm going to ask you not to go on the internet and try to find out old newspaper articles or any archives to try to find out some information about this. Because what's going to happen, Mr. Ferreira, is if you are on this jury the first thing on August the 10th that Judge Snipes is going to do is to have those twelve jurors stand up and he's going to administer the oath as a juror to you to each one of you. And what that means and what you're going to be sworn to do at that time is that you're going to make your decision in this case based on solely on two things. The evidence that you will see here and receive in the trial of the case in the courtroom during the trial, and then the law that Judge Snipes will give to you which will include the special issues and all the other instructions that we've talked about here today.

PROSPECTIVE JUROR: Okay.

THE COURT: Okay. And those are the only two things that you will be allowed to make your decision on so it's better if you just don't have any information. And that's not always a reliable source anyway, is it?

96

PROSPECTIVE JUROR: Right.

THE COURT: So anyway, no publicity. And so if there's anything that comes up between now and August the 10th, if there's any newspaper articles or if there's any T.V -- any blurbs on T.V. about the trial or what's going on here in the trial, then I'll just ask you to not read those articles or not to listen to that T.V. or radio account. All right?

PROSPECTIVE JUROR: All right.

THE COURT: Okay. All right. Again, thank you, Mr. Ferreira. Again, we appreciate the time and effort that you made to be with us today. Thank you so much.

PROSPECTIVE JUROR: And I'll be told at the end of the July whether I will be or not. Right?

THE COURT: Yes, towards the end of July you will be notified as to whether or not you are on the jury. And then, of course, you will be told if you are then when to report for jury service.

Thank you so much. Appreciate your time. Thank you, ladies and gentlemen. Thank you all. And we'll say 1:15.

(Lunch recess taken at 11:15 a.m.)

(Proceedings reconvened at 1:28 p.m.)

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 564, Brent Hardy, enters the courtroom.)

THE COURT:  Good afternoon, Mr. Hardy. Come on in. Just have a seat right there, please, sir. How are you this afternoon?

PROSPECTIVE JUROR:  Fine. How are you?

THE COURT:  Fine.

Thank you, ladies and gentlemen. Be seated. And, Vicki, I would like for the record to reflect this is Prospective Juror Number 564, Brent Wade Hardy, H-a-r-d-y.

And good afternoon, again, Mr. Hardy. Glad to have you here this afternoon. I'm Judge Quaid Parker. I'm a Senior District Judge from McKinney, Texas, and Judge Michael Snipes is the Presiding Judge in this case, and he has asked me to assist him in this capital murder case by presiding over the jury selection process. So that explains to you what I'm doing here today instead of Judge Snipes, and also why you're here today as a matter of fact.

Anyway, I want to thank you for being here. You will probably recall it's been probably over a month ago.

PROSPECTIVE JUROR:  Two months ago.

THE COURT:  Almost two months ago.

afternoon with you is that the attorneys are going to go into more detail explaining the law to you. Once they know you understand it, then they are going to ask you questions about how you feel about it, your thoughts, your ideas, your opinions, if you will, concerning the legal issues and some of the procedural aspects that will be involved in this trial.

So I guess what I'm trying to tell you is there's no right or wrong answers to any of the questions. Really just how you feel about it. And also it's not a test, and there's nothing embarrassing that's going to happen that, you know, you have to worry about.

So anyway, with that then -- and I've got your questionnaire here. Okay. I've just handed you your questionnaire. And I know you haven't seen it in almost two months now when you filled it out, but the attorneys also will have questions concerning I'm sure some of your answers and your responses to some of the questions in the questionnaire.

So with that, let me introduce you to the attorneys that are involved in this case. Seated directly at counsel table directly across from you and in front of you is Ms. Andrea Handley and also next to her is Ms. Elaine Evans, and then right behind the two ladies there the gentleman is Gordon Hikel. And these

PROSPECTIVE JUROR:  April 24th.

THE COURT:  Is that when it was, April 24th, when everybody got together in Central Jury and Judge Snipes did address the group at that time. And at some point in the proceedings he had everybody on the panel stand up and raise their right hand and administered the oath for prospective juror.

Do you recall that?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Good. Were you one of the panel members that took the oath at that time?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Very good. I'll just remind you, you are still under your oath then in which you've been sworn to do basically two things. Number one, to give truthful answers, which we know you will do that anyway, but also to be responsive to each and every question that's asked to you by the attorneys. That's basically it.

Now, have you had a chance to read your information guide there?

PROSPECTIVE JUROR:  Yes, I have.

THE COURT:  Now, that's kind of a thumbnail view of the law as it applies to capital murder cases. What's going to happen here this

three ladies and gentleman are Assistant District Attorneys here in Dallas County, and they are the three members of the prosecution team that are charged with the responsibility of prosecuting this case.

And then at counsel table directly in front of me here is Mr. Brad Lollar, and next to him Mr. Doug Parks, and then on the very end -- the better looking member of that team -- is Miss Keri Mallin. And these three attorneys are the Defense team and they represent Mr. James Broadnax who is the defendant in this case. All right. Very good.

Miss Handley.

MRS. HANDLEY:  Thank you, Your Honor.

THE COURT:  Yes, ma'am.

BRENT WADE HARDY, having been duly sworn, testified as follows:

EXAMINATION

BY MRS. HANDLEY:

Q.  Good afternoon, again, Mr. Hardy. How do you feel today?

A.  Pretty good. A little nervous.

Q.  You're a little nervous?

A.  I've never been up on this side before.

Q.  It's a tough seat to be in. I've been doing this twenty years. And a couple of times I've had to

take the witness stand and it almost becomes surreal. It's a very weird place to be sometimes, but we'll take this slow here. We don't need you to be uneasy or nervous because we do need to talk to you.

Let me tell you what's going on today, Mr. Hardy. We've brought hundreds of people down that day along with you to fill out questionnaires and we bought even more people down that afternoon to do the same. All of those people were brought just for this case. We brought literally hundreds of people in the hopes that out of those hundreds of people we could glean twelve people that would be appropriate for this particular case. And the reason we do it is because this is a death penalty case. The stakes don't get any higher and we need to be extra careful and extra cautious that the twelve people that are selected are the twelve people that they are the right people for this job. Okay. And I think that you have a good appreciation for how high the stakes are just by reading your questionnaire. You occur to me to be very thoughtful and kind of, you know -- even writing down on paper that maybe there's a mental struggle you were having with some of the issues, and I appreciate that. Some people put one-word answers. We don't get a thing from that. It doesn't help us one bit. So thank you from the get-go right

there.

Not only is that -- obviously, it's important to us to make sure we have somebody who is good for this particular case and ensure that they are qualified for this particular case. That's one of the things we look at. But we also look at other issues in terms of a person's work situation or, you know, are they going to live in Dallas County. And those are some of the things that jumped out at us is just a preliminary matter that I want to cover with you.

You had put in your questionnaire that you had plans to move to Fort Worth.

A. Eventually, yes. Probably nothing that's going to happen within the next couple of months.

Q. Okay. So you don't have a definite E.T.A. on that. If your house sold -- are you selling your house and hoping to move?

A. I haven't even got it on the market yet. It's a long story, but my mom is back in the nursing home and stuff, so things have changed a little bit since then.

Q. I gotcha. Here's what we're looking at. We're looking at starting this case on August 10th, and I'll tell you that our best guess is that it will take two weeks to actually put on the evidence in this case. We generally start 9 o'clock till 5 o'clock. It's kind of like banker's hours every day. That would be two weeks just to do the evidence. What I can't tell you as a definitive time frame is how long it would take a jury to deliberate. That could be anywhere from a day to a week if need be. So we're talking about anything potentially from two weeks to three weeks. After you deliberate if you haven't been able to reach a decision you're mentally fatigued. The Judge will, generally speaking, have to sequester you, which means send you to a hotel. You don't go home. You don't talk to your family, there's no internet, phone, T.V., and the purpose is to keep you from outside influences.

We asked you about your work situation. And you have your questionnaire in front of you, correct, sir?

A. Uh-hum.

Q. Turn to Page 12 with me, if you would, please. And at the very top we said, "Do you have projects in progress at your job which might affect your ability to concentrate if you were to serve as a juror in this case for a week or more?" Well, you know, we're looking at, at the very least two weeks, possibly more.

Now, I had a little trouble reading your handwriting. And that's not a criticism because I can tell you nobody can read my handwriting. I could be a spy and nobody could ever read my handwriting. But what is it that you put there, sir?

A. It says, I'm facilitating a db new hire class and plan to travel to another location -- well, I'll cut to the chase. The class is over now so that one doesn't matter anymore.

We are planning to deliver a Train the Trainer which is where we go to teach people how to deliver a class. And that potentially could be in August, but it's probably going to be much later than that now. We've delayed our hiring as you're probably familiar with the economic situation and all of that. We aren't hiring people right now so the probability of that is very slim.

Q. So --

A. And somebody else would have to do it, obviously, if I got picked.

Q. And that's the sixty-four thousand dollar question, Mr. Hardy, is if you were selected to sit on this jury, are you going to have this taken care of with your work situation?

A. (Nods head.)

Q. Okay. And you won't be distracted then. You can tell us that you can give us a hundred percent of your full concentration and time and dedicate it to this particular case here.

A.    Absolutely.

Q.    Okay. That takes care of that. We know that you're not going to be living in Fort Worth when this case comes on is what you're telling us.

A.    Yeah.

Q.    Okay. That's another situation then. Then let's talk a little bit about -- you know, those are preliminary matters. Let me talk to you just about the heart of what I think we're doing here in terms of people who are qualified, and that is in terms of whether or not this is the right case for you. Okay.

As I said before, there's a reason we call literally hundreds of people down here because there are literally hundreds of people who this is not the right case for them. They are a great juror for a burglary case, they are a great juror for maybe even a sexual assault case, but they are not a great juror for a death penalty case because it involves the execution of a human being. If I can prove to a juror beyond a reasonable doubt that this defendant is guilty of capital murder, and if I can prove to you beyond a reasonable doubt that the special issue should be answered yes, yes, and no, then the Judge will have no choice other than to essentially sign a death warrant that will lead to this individual sitting at the end of

106

the table over here taken to Huntsville and eventually Livingstone, Texas, strapped to a gurney and given a lethal injection until he dies. Okay. And I am talking about asking twelve citizens of Dallas County, Texas, to take part in that process. Okay. It's not an academic thing right now. It's nothing that we're just talking about in theory right now around the water cooler. I mean, now is the time to talk and really get your personal and truthful feelings on how you feel about it and whether or not you can really participate in it.

I think a lot of people are under the impression that it is their duty as a citizen to come down here and say, you know, I can suck it up and I'll do it because it's my civic duty to participate. And it's really not true. It's not true. And there's nothing wrong with somebody saying, it's just not for me. That's why we call hundreds of people down here. So I'm always a little wary and I think we are, both sides, that when people tell us things that they think we want to hear versus what the truth is. Your only obligation is to tell the truth. Later on, if you're selected, your obligation is to render a verdict according to the evidence. You know, I mean, you can say right now to a friend of yours, "Yeah, I think I can make your anniversary party. Sure, put me on the schedule. I'll

do the best I can. I think I can do it. I'll try." And you have up to the last second to back out of that if you really can't. But you don't on this. If you're picked, you're picked, and you can't get back there and go, "I probably should have been more honest. I can't do this." And the reason I go into that with you is because you did, in my opinion, give very thoughtful consideration as to your ability whether or not you could participate in a case like this.

Let's go to Page 2 there. And we asked you -- and, I'm sorry. I keep coughing. I beg your pardon.

We asked you -- about the second question down -- "Do you have any moral, religious, or personal beliefs that would prevent you from sitting in judgment of another human being?" And you say, yes. You said, "This is a difficult question to answer. It's one thing to be in a situation where you would need to protect yourself in self-defense taking someone's life. It's quite another to sentence someone to death for a crime."

Is that what I'm reading right there?

A.    Yep.

Q.    Okay. And then we asked you on the second question, "Do you have any moral, religious, or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human

108

being?" And, again, you said, "Yes. I cannot say with any certainty that I could definitely convict somebody and be responsible for them being put to death."

Flush that out a little bit for me. What do you really feel?

A.    It's a difficult question to answer. It's kind of what you said at the beginning. In other words, it's one thing to talk about it and say you could do it, it's quite another thing to actually have to do it. So, you know, it's one of those difficult questions to answer that honestly I'm not sure I could give you a definitive answer on one way or the other. I think I could do it, but, you know, it's a tough question to answer.

Q.    Yeah. Sometimes I use a really simple analogy to maybe kind of illustrate the point. And I don't mean to belittle the process or the gravity of what we're doing here, but have you ever flown on a plane before? I'm sure you have in your business many times before. Well, let's say you're getting on a flight. You're going to go do Train the Trainer or whatnot, and you walk up the ramp way. And often times the captain is standing there to greet everybody as they get on the plane. So say you walk up to him and you say, "Good morning, captain. Sir, can you fly this plane?" And if

he says to you, "Well, I've given it some thought. I think I can. I'm not entirely sure, but I think I can." What would you do?

A. I would be pretty concerned about flying on that plane, I mean, obviously. I would probably want them to, you know, kind of find out what he really meant by that.

Q. If he said, all I can tell you is I think I can. I'm not sure.

A. Yeah. And I can see where you're going with the analogy, but it's also a little different because I could say, have you done it before? And he could say, yeah, I've flown the plane before. Okay.

Q. Have you sat on a case like this before?

A. No. See that's the problem. So it's that definite ability to answer that question to say, well, I've done it before. I can do it again.

Q. Yeah. Yeah.

A. So, yeah, I see where you're going with the analogy.

Q. I'll tell you that, you know, we need to know and we need to have a certainty from you, from a juror, that we would put on a case; that is to say, that says, look, I can tell you, you know I'm certain about my abilities to be able to sit on this particular kind of

---

110

case. It's only fair to the State, and it would only be fair to the defendant that we have somebody who says I can absolutely assure you that I'm the right juror for this case. If you can't assure us that you're the right juror for the case, then I think you can appreciate that, that's a problem for us. And that's why I'm flushing that out with you. And you seem to maybe have some reservations about that. You haven't been able to completely come to terms with it yet.

A. I would say that's probably true. Yeah.

Q. And I notice that you even have a son and a daughter who also are not in favor of the death penalty. And I don't want to put words in your mouth, that's what I flushed out from that questionnaire.

A. I think it was more just my son, I think. But I did talk to them about it to see how they felt about it.

Q. And he's not in favor of the death penalty?

A. No.

Q. I don't have a son, but I would imagine as a father that, that certainly puts you in an awkward position that -- you know, family should always come first.

A. Sure.

Q. And particularly the considerations and

---

111

feelings of your family. I mean, sometimes you do what you have to do, but I think it would put you in an awkward position.

Do you somewhat feel like that, also?

A. Yeah. I mean, I talked to him about it and kind of asked him what he would think if that would happen. He didn't say, oh, I'm never going to talk to you again if you do it or anything.

Q. Sure.

A. I think he just has reservations about it.

Q. Well, I appreciate you being honest about that and I'm probably not going to take up too much of your time, but I do want to ask you this. You work for Fidelity Investments?

A. Uh-huh.

Q. I give them money on a regular monthly basis. I'm hoping that you make me very rich some day. Are we headed in the right direction?

A. That's a hard question to answer there. In the long run we're headed in the right direction, I hope.

Q. I'm hoping my ten bucks a month might make me a millionaire some day.

A. It might take a little more than ten bucks a month or a very long period of time.

---

112

Q. Yeah, maybe if I lived to be 800.

MRS. HANDLEY: Well, thank you, Mr. Hardy. I appreciate your coming down today. Thank you very much. You've helped us out here. Appreciate it.

THE COURT: All right. Thank you, Mr. Hardy. We appreciate your time and effort today. I'm going to excuse you at this time. Thank you so much for being here.

Just leave your questionnaire and the guide, but you can take everything else.

PROSPECTIVE JUROR: All right. Thank you.

THE COURT: Thank you.

(Prospective Juror, Brent Hardy, exits the courtroom.)

THE COURT: All right. Does the State have a challenge for cause?

MRS. HANDLEY: We do, Your Honor. We challenge this juror. We think he's not qualified to serve on this case and has so much as articulated so in his questionnaire that he does have either a moral, religious, or personal belief that would prevent him from sitting in judgment of another individual as well as returning a verdict that would result in the

execution of an individual.

THE COURT: No objection, Mr. Lollar -- Mr. Parks?

MR. PARKS: Judge, that's basically true, but I do want to flush this out a little bit for anybody that might be reading this later on.

THE COURT: Sure.

MR. PARKS: We judged Mr. Hardy to be a person who was extremely hard to read based upon his questionnaire and had issues that would be of some concern to both sides. And I just want to say that while he says that he has religious, moral, personal beliefs -- and the things are already in the record -- he goes on to indicate that he's an eight on a scale of one to ten. He does indicate here that he is strongly opposed to life without parole in prison and sees no purpose in that penitentiary setups.

He has a friend who was killed during the course of a robbery in times past. He believes that defense lawyers are crooks. There are things about this that would indicate to us that we're not opposed.

MRS. HANDLEY: I definitely agree with Mr. Parks on this particular juror. I think as a matter of fact he so much as said that if we prove an intentional killing, we have automatically proved future

---

114

dangerousness, so he's just all over the place, Your Honor.

THE COURT: Then the State's challenge for cause is granted.

Okay. Do y'all want to take a short break here before we talk to Miss Woodward or are y'all ready?

MRS. HANDLEY: I'm fine.

MR. LOLLAR: We're ready.

THE COURT: Bring Miss Woodward in then, please.

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 586, Rindy Woodward, enters the courtroom.)

THE COURT: Good afternoon, Miss Woodward. How are you? Just go ahead and have a seat there if you would, please, ma'am. Thank you, ladies and gentlemen. Be seated, please.

Vicki, I would like for the record to reflect this is Prospective Juror Number 596, Rindy, R-i-n-d-y. Is that correct?

PROSPECTIVE JUROR: Yes.

THE COURT: Kay Woodward, W-o-o-d-w-a-r-d.

Miss Woodward, I'm Judge Quaid Parker.

---

I'm a Senior District Judge from up the road here in McKinney and Judge Snipes, Michael Snipes, is the Presiding Judge over this case.

Judge Snipes has asked me to assist him in the jury selection process to preside over that while he takes care of the day-to-day matters of the court. And so that explains to you why I'm here today instead of Judge Snipes, but also that's why you're here today.

Now, you've had an opportunity, I hope, to read the little jury guide and that kind of gives you a thumbnail sketch of the law and some of the procedural aspects that are involved in a capital murder trial. That's what you're going to be asked about today. Not that this is a quiz. This is not a quiz. There's not any right or wrong answers to any of the questions. What's going to happen is that the attorneys are going to talk to you and they are going to flush out the law, if you will. Tell you more about it, more in detail about it, maybe give you some examples to illustrate it. And then once you understand it, then they are going to ask you questions about how you feel about it. You know, to get your ideas, your thoughts, your opinions, if you will, concerning the law and procedural aspects involved in a capital murder trial which would be the trial of this case. So anyway that's why I tell you

---

116

there aren't any right or wrong answers because this is not a quiz or anything like that.

Now, you will recall probably almost two months ago maybe now it's been since you all met, everybody met in Central Jury.

PROSPECTIVE JUROR: Right.

THE COURT: Judge Snipes talked to you at that time. You filled out your questionnaire and I want to give you yours in just a moment because the attorneys are going to be asking you questions I'm sure about some of your responses and some of your answers to those questions.

Anyway, at some point in the proceedings Judge Snipes, I'm sure, had everyone stand, everybody on the panel stand up, and raise their right hand. He administered the oath of a prospective juror to each of the panel members.

Do you recall that?

PROSPECTIVE JUROR: Yes, I do.

THE COURT: Very good. Were you one of the panel members that stood and took the oath at that time?

PROSPECTIVE JUROR: Yes, I was.

THE COURT: Very good. All right. Well, I'll just remind you, you are still under that oath.

And, basically, what you've been sworn to do just by way of reminder, is to give truthful answers, but we know you will do that, and to be responsive to each and every question that is asked of you by the attorneys.

Okay. Now then, let me go off the record for just a minute here.

(Off the record.)

THE COURT: All right. Now that you have received your questionnaire, I know you haven't seen that in almost two months now, but they will tell you what page to turn to and what question that they want to inquire about.

Okay. Let me introduce you to the attorneys that are going to be involved in this trial and talking to you today. Miss Elaine Evans is seated at counsel table. Directly in front of you seated next to her is Mrs. Andrea Handley, and then the gentleman seated right behind the two ladies there is Mr. Gordon Hikel. And these three ladies and gentleman are three Assistant District Attorneys here in Dallas County and part of the prosecution team charged with the responsibility of prosecuting this case.

Seated at the counsel table directly in for front of me is Mr. Brad Lollar. And next to him is Mr. Doug Parks. And then down here on the very end,

---

would be asked to take that additional oath which would to be render a verdict based on the law and the evidence and that alone. And so I can appreciate that you will be able to do that because I can tell by all of your answers that you are extremely fair-minded and take this process very seriously.

So with that, Miss Woodward, I would like to talk to you a little bit about some of the things in your questionnaire first, and then we'll go on and talk about the process for this specific type of case. Though, as you know in the phase where we talk to you individually we won't get into the facts of the case that will be on trial, we'll just talk in hypotheticals and the types of laws that may come up for a capital murder.

Okay. I do want to ask you -- I see that you served on a previous jury.

A.    Uh-hum.

Q.    And that was back in 1998?

A.    Around about 1998.

Q.    Can you tell us a little bit about that.

A.    It was involving a lady at a club who had got rowdy in the club and an off-duty officer was working in the club and they had to mace her to try to calm her down. They ended up having to -- she bit the officer and they had to handcuff her to the outside rail just to

---

118

Miss Keri Mallin. And these three attorneys comprise the Defense team that represent the defendant in this case Mr. James Broadnax.

All right. Miss Evans, we're ready for your voir dire.

MS. EVANS:    Thank you, Your Honor.

RINDY KAY WOODWARD,

having been duly sworn, testified as follows:

EXAMINATION

BY MS. EVANS:

Q.    Good afternoon, Miss Woodward.

A.    Hi.

Q.    Hi. I'll tell you right off the bat I noticed something from your questionnaire and that is that you are probably one of the few jurors that realize that shows and movies are just shows and movies, and that the law is the law.

A.    Right.

Q.    Today in the age of CSI and all of the crime shows we can certainly really appreciate that, that you are able to separate the fact from fiction. And that is ultimately what you will be asked to do if you sit as a juror in this case. Here today you've taken an oath to tell us the truth about what your feelings really are. But if you were to serve as a juror in this case, you

---

120

get away from her, so it was --

Q.    Gotcha. Was she charged with assault of a public servant?

A.    She was.

Q.    Okay. And so you were seated on like a twelve-person jury?

A.    I believe so.

Q.    All right. And I see that you rendered a verdict of not guilty in that case.

A.    Right.

Q.    And I saw that you had some concerns after the trial was over because many times -- did the Prosecutors and the Defense come and talk to you after the trial?

A.    Right. What it was was the DA had taken pictures of the bite before, but it was like a year before they went to trial. And then when they looked, they couldn't find the pictures so they tried to reprint them and they weren't as bright and vivid as they were the first time, so they decided not to use them. So we didn't see the pictures until it was all over with.

Q.    Okay. I understand. Would those pictures have made a difference to you in your verdict?

A.    Yes.

Q.    Okay. I understand what you're talking about there. Sometimes prosecutors make a decision based on

121

their isolated view of the case because they have been staring at the case for maybe a couple of weeks or a month maybe even, and they have their own prospective. And maybe, like you said, they thought, you know, maybe they're bright, maybe it didn't show up in their mind and so they thought it would minimize it to you guys or something and if you saw it y'all would think, huh, what's there? I don't see anything. And so maybe they thought it would be doing harm or detriment to it. But I can certainly appreciate that afterwards you thought, God, you know, maybe if I'd just been given that, that would have made the difference. And I understand that completely what you're talking about.

Do you think that would affect you in sitting as a juror? Again, knowing that sometimes prosecutors do make judgment calls in terms of what they believe may or may not be admissible, or what they believe may or may not be relevant to prospective jurors. And you're only allowed to consider, during the trial, that evidence that comes from the witness stand or that's admitted here in court.

A.   I guess you would just have to go on what you've seen and what's been shown to you --

Q.   Absolutely.

A.   -- as evidence.

122

Q.   And would you be able to do that?

A.   Uh-hum.

Q.   I'm sorry. You have to answer out for the court reporter.

A.   Yes.

Q.   And I understand it's very frustrating to not know something and then you're told later and you're like, "man."

A.   Yes.

Q.   But you did what both the State and the Defense would be asking for you to do in this trial or any other trial and that is to look at the evidence and evaluate it in light of the law that the Judge gives you. And, obviously, you found that the prosecutor -- based on what you saw there in that courtroom -- had not proven it beyond a reasonable doubt and so you followed your oath in rendering a verdict of not guilty.

Would you agree with that?

A.   I agree. It was just one person's word against another.

Q.   Absolutely. And sometimes that's all you have. And, you know, if you don't get there, if that does not prove it beyond a reasonable doubt, then you have a duty taken by your oath that you will return a verdict of not guilty. The State would not hold that

123

against you for doing that. You would be following your oath. Okay.

A.   Right.

Q.   So don't feel bad about the prior jury service. You do think you can leave that outside, though, and not be speculating or wondering what may be --

A.   Right.

Q.   -- what you're maybe not being allowed to see either because the Judge keeps it out because it's not admissible or what they decided or chosen may not be relevant.

A.   Right.

Q.   Okay. Thank you, Miss Woodward.

Also, I notice on the last page of your questionnaire that when you talk about how you would feel about being chosen as a juror in this case you say, "I've always found being a juror is interesting and have no problems sitting on this jury no matter the outcome."

Once again, that speaks volumns to me in terms of what type of person you are and what we're looking for in somebody being fair and open-minded because as you sit here now you don't know what the outcome is going to be. Correct?

A.   Right.

124

Q.   We're just talking about your thoughts and feelings. You don't know the facts of the case and you couldn't tell me right now if this defendant is guilty of capital murder, could you?

A.   No, I couldn't.

Q.   And you couldn't tell me right now whether or not this capital murder should render a verdict of life without parole, or whether it's going to render a verdict of the death sentence, could you?

A.   No, I couldn't.

Q.   And that's what this process just asks you to do is just keep a fair and open mind throughout. As you sit here now, please be honest with us, tell us your feelings and thoughts because we do need to know that in terms of if you do understand and if you could follow the law if you were to sit as a juror. But then if you take that additional oath in the guilt-innocence phase of the trial, keep an open mind, look and see did the State prove each and every one of those elements beyond a reasonable doubt that they said they would and if not, the verdict is not guilty. And then again, if found guilty there's an additional phase in a capital murder trial and that would be answering these questions over here and we call those questions "special issues." And your answers to those questions determine whether or not

125

the defendant receives a sentence of life in prison without parole or the death sentence. Okay. We'll get more into that a bit later. I just want you to realize that you hit the nail on the head when you said "regardless of the outcome" because you shouldn't be concerned about steering the outcome a certain way just let the evidence lead you. And if the State proves it, then we're entitled to a verdict of guilty of capital murder. If the State proves to you the special issues in 1 and Special Issue Number 2, then we're entitled to answers of, yes, that would then result in a death sentence, unless you answer Special Issue Number 3 with a yes. And like I said, we'll get into that more later, but I just appreciate that you can keep an open mind throughout each phase in the entire process because they really do kind of stand alone. Okay. Having sat as a juror before I'm sure you understand that perfectly. In fact, I know you do because I saw you kind of reciting that you're not suppose to take into account of a person what they have done in the past in determing if they did this crime.

A.    Right.

Q.    You're absolutely right, and that's why that sort of thing is inadmissible in a guilt-innocence phase. So I can appreciate you do understand this

126

process and it is kind of a mental gymnastic of sorts sometimes, but you are to consider what is before you.

A.    Right.

Q.    Okay. I also see when we're talking about this type of a case, capital murder, we're talking about a murder plus something else. And I see that you can appreciate that because on Page 1 you're saying you believe in the death penalty. You say, "I believe that there are some crimes that should be punishable by death." And then on Page 2 here again you say, "Some crimes should be punishable by death. The laws are there for a reason. And people, no matter how they were raised, know the difference between right and wrong. And wrong is wrong." And then your argument against the death penalty you say, "The punishment should fit the crime." So I can appreciate that you understand that there are two possible choices. Nothing is automatic here. Just because somebody is found guilty of capital murder doesn't mean that there's an automatic death sentence. Correct?

A.    Right.

Q.    Some crimes may warrant it, if those special issues are proven, and others maybe it's more of a life without parole. And we're just asking that you be able to keep an open mind to that and not have made up your

127

mind now. And I don't think from the questionnaire that you have at this point.

Is that fair to say?

A.    Yes, it is.

Q.    Okay. Looking at Page 3, you talk about you had heard of this case just by word of mouth. Based on what you heard just word of mouth it says that you didn't even realize that there were two people that had been shot. Correct?

A.    Right.

Q.    All right. From what you heard, were you able to, or did you form an opinion as to the guilt or innocence of this individual charged?

A.    No. What I had heard -- I was at work and I work in Plano and a lot of people that work with me live in Garland. And they had said that there had been a shooting, and that's basically all I know because I work and I try to go to school in the evening, so I don't watch the news. I very rarely catch the news.

Q.    Perfect. Well, there is nothing wrong with that. Just because you heard about the case or know that it's out there and it existed, you haven't formed an opinion as to it. There's nothing wrong with that because, obviously, we wouldn't want jurors that stay home in their basement and play chess all day or

128

something. We expect jurors will get out and speak to other people and, perhaps, even watch the news. Just so long as you have not formed an opinion, then you are qualified as a juror with that regard to that.

A.    Yeah, I was not ever aware that they had even arrested anyone for it.

Q.    Okay. Perfect. I do also notice that in terms of how strongly you believe in the death penalty you ranked a number ten, and you say if a person commits a crime, they must be willing to take the punishment of that crime.

How did you arrive at ten in terms of your range of how strongly you feel about the death penalty?

A.    Just that if a person does that crime, then they know that the punishment can be severe, you know, so they should be willing to take, you know, what that punishment is. I don't know if I've answered your question.

Q.    No, you have. I think I understand what you're saying. Like, we've had some jurors come in here and they for either personal, moral, or religious reasons, or they just do not agree with the law and the death penalty, they will come in and say, no, I'm a one. I could never do it and I'm not doing it. I don't agree with it. And then those jurors that believe in the

death penalty and believe kind of like you do that the law is the law and if that's the law, then I'm planning on following that if that's to serve as a juror, then they will rank it as a ten because they don't see any in-between.

Is that what kind of what you're saying?

A. Uh-huh.

Q. Okay. And also with regard to that I see that you say on Page 5, do you believe in an eye for an eye. And you say, "No, not completely."

Can you elaborate on what you mean by the "not completely?"

A. Just basically the law, the way some laws read, that you can get the death penalty for the same crime as you can get, you know, life in prison. So it wouldn't be an eye for an eye such as a death for a death, but it would be some kind of punishment that the law sees as equal to the death penalty or the same punishment as the death penalty.

Q. Okay. Whatever the law provides for, and you would be able to consider that if it warranted?

A. Right.

Q. I completely understand what you're talking about. In fact, the State of Texas clearly, as you've already pointed out, doesn't believe in an eye for eye

---

principles of law. And you're going to remember a lot of these I'm quite sure from your previous jury service and that is that the defendant here, as he sits here now, is presumed to be innocent. And the same holds true whether it was a defendant in a DWI trial down in misdemeanor court, or this capital murder here today. Just because he's been indicted for or charged with the offense of capital murder by no way, shape, or form, means that he is guilty of that offense. That indictment you have in front of you is just a piece of paper and it's nothing more than that. It just let's the State know what we have to prove to you as a juror and it let's the Defense know what he's been charged with.

Does that make sense?

A. Right.

Q. And could you give this defendant his presumption of innocence?

A. Yes.

Q. Okay. And the State -- it's the State's job, and our job alone, to present to you the case. You know, the State does the accusing, we better do the proving. Right?

A. Right.

Q. So those elements, everything that that

---

130

for the offense of capital murder that, you know, is eligible to receive a sentence of death if the jurors answer the special issues a certain way. Also, there's a punishment available of life in prison without the possibility of parole. And, for example, if it were just straight murder, for lack of a better term rather than a capital murder, there's a whole range of punishment that you would consider all the way from five to 99 years, or life in prison, that the jury would then be called upon to assess. So certainly the State of Texas doesn't say you kill somebody, then we're taking your life. Absolutely not. That's why we have those special issues that you would answer in the forms of questions. The State doesn't even have you go back and say, okay, I think now the person is guilty of capital murder. They deserve to die, or I think now I'm going to check the box that, no, they should get life in prison without parole. You answer the questions that then determine the sentence. You understand that?

So you're absolutely right and hit it right on the head when you say that you don't completely agree with an eye for an eye because that's what also the law contemplates. And I think that is about all that I wanted to talk to you about in your questionnaire.

I want to talk to you now about some basic

---

132

indictment says in terms of the "who" and the "where" and the "what" and the how this offense was committed has to be proven to you by the State of Texas. You don't ever look to that table for proof of anything. Just by showing up they've filled their duty. They don't need to do anything else over there. You always look to the State and I know you were able to do that in your previous jury service. And if State of Texas does not prove to you this case beyond a reasonable doubt, then the verdict is what?

A. If they don't prove it --

Q. If we don't prove it --

A. -- not guilty.

Q. Absolutely. And say, for example, we've alleged a murder that happened and said that it happened in the indictment by shooting. That, you know, somebody shot an individual with a firearm and that's how the death was caused. But say at trial you're sitting here as a juror and you heard evidence from the Medical Examiner that, well, sure, the person is dead and it is that person that we alleged, and you believe that it's this defendant that did it. In fact, the defendant testified and said, "Yeah, I killed him. I'd do it again." But you hear testimony from the Medical Examiner that says, "Yeah, he did it, but not by a

gunshot wound. He did not die from a gunshot wound to the chest, it's a stab." So we didn't prove the manner and means, in other words, what it was that caused the death, even though the defendant did it.

What would your verdict have to be in that situation?

A. Not guilty.

Q. Absolutely. So it sounds to me like you can follow the law with regard to that and if we don't prove our case, you certainly would do the right thing and hold us to that. Never feel bad about it because you shouldn't give us a leg up. We have to do the proving. Okay.

A. Right.

Q. The defendant also is afforded his Fifth Amendment Rights and that means that at no point in time in this trial, whether it be the guilt-innocence phase or the punishment phase should we get there, is the defendant required to testify. I, as the State, can't call him to the stand and say, all right. Tell us what you know. His own attorneys can't force him to the stand. It's his decision and his decision alone. Certainly his counsel can advise him, but that's his decision to make. And if for whatever reason -- because there could be a whole host of reasons why somebody

134

chooses not to testify. You cannot hold that fact against them for any reason.

Does that make sense to you?

A. Yes.

Q. And would you promise that you would not hold that against the defendant if he chose not to testify?

A. I could do that. That's what we did on the other case. She did not testify.

Q. Okay. And you didn't consider it for any reason. Because let me give you an example, actually, from that case. Say that you were almost there, you just -- I think you said though it was, you know, one word against another. But just say that you thought that they had almost proven it to you. I mean, you were thinking, well, I wish I had seen evidence of that bite mark or, you know, they should have probably taken pictures of it. But, you know, I believe that it probably did happen. And then if you took into consideration the fact that she did not testify and, say, well, she didn't testify so I'm going to go ahead and put him over the edge there and find the defendant guilty.

Do you understand why that would not be following the law with regard to the defendant's Fifth Amendment Rights?

A. Yes. Right.

Q. Thank you. And in terms of credibility of the witnesses again, I think, too, based on the type of case you testified on before because you said it was one word against another word and by the very nature of the case that would have been a police officer or a victim. Correct?

A. Correct.

Q. And so I know in the previous case you had to listen to the testimony of police officers and determine the officers' credibility in whether or not you believed that the State had proven their case beyond a reasonable doubt. And I see from your questionnaire on Page 7 that you recognize that police are just human.

A. Right.

Q. And so you don't find them anymore likely to tell the truth than the average citizen and that's exactly what the law says. And you probably remember that as well from the previous trial. Whether it be a priest, or prostitute, or a police officer, the law says you can't take that into account in determining whether or not you're going to believe them or not. Automatically, after a person takes the stand and you hear about their training and experience and all of that, then you can start to judge their credibility in

135

determining whether or not you believe what they have to say, but not until they have taken the stand and they begin to testify can you judge their credibility. You can't just by virtue of their occupation or undesirable living can you then judge them. Everybody starts off equal.

Can you do that, start every witness off on an equal playing field?

A. Yes.

Q. Thank you.

All right. When I talk about beyond a reasonable doubt, what does that term mean to you?

A. Basically with no doubt at all. You've pretty much proven it to a fact.

Q. Okay. When you say no doubt at all, that you've pretty much proven it to a fact, I have to tell you I get a little bit nervous, but I think I know what you mean. Because a lot of jurors say it and it's whatever each individual sees beyond a reasonable doubt to mean, and that's why I ask you what it means to you. But you understand that the State of Texas would never -- our burden is not to prove it beyond all possible doubt or with one hundred percent certainty because we could never probably achieve that unless you were actually a witness to the crime.

136

Do you understand what I'm saying by that? But I think I know what you mean. You said, to a fact, or beyond --

A. Right. I have to walk out of here knowing that what verdict I gave, that I could live with from a year from now.

Q. Absolutely. And so as long as you base your verdict on reason, common sense, and you find that you held the State to their burden and required us to prove it beyond a reasonable doubt. Do you think that's something you could do --

A. Yes.

Q. -- is hold us to that burden? And that's all that we would ask you to do.

I see on Page 11 of your questionnaire as well that you recognize the seriousness as serving -- you know, serving as a juror as well as the seriousness of this case when you say, "I think being a juror is very serious and should be treated as such. It should be proven that they did the crime first." You're absolutely right. The State has to prove it. And I would submit to you not only is it important and a serious job as a juror that we prove that the person did the crime in the guilt-innocence phase, it's just as important -- should we reach the punishment phase --

doesn't mean that there's an automatic death sentence. The legislature has carefully thought out that, no, the jurors must answer these questions before that determination is made. And it's based on how those answers come out that will determine the sentence, and so we just ask that you be able to do that.

And so, for example, you know capital murder is one thing, it's always an intentional murder. Okay. And so it's not an accident, somebody was not acting in self-defense. You know, they weren't otherwise justified from how it wasn't a mistake. They set out to do it and they meant to do it. It was an intentional murder for this type of -- for the murder plus a robbery. Okay. So it's got to be on purpose, intentional. And then you've got to have the factor -- the aggravating factor of robbery. We've got to prove both of those to you for it to be a capital murder.

Now, let me give you an example. Say I just turn to my co-counsel and I shoot her ten times and I sit back in my chair and I laugh and I say, "Good. I've been wanting to do this since day one. She's dead."

Is that capital murder?

A. Yes, because you were intending to do it.

Q. Okay. I probably just confused you because we just talked about intentional. You're right. I

that you require the State and hold us to our burden of proving it beyond a reasonable doubt in Special Issue Number 1 and Special Issue Number 2 because there are no automatic answers as you will recall.

A. Right.

Q. Okay. So, again, it appears to me that you're very fair-minded and that you can do that. So those are the basic principles of law. And so for this type of case I want to talk about some of the special deals that go along with capital murder. And when I say "capital murder," I saw what some of the crimes were that you talked about that you thought should be eligible. Let me tell you what the law in Texas basically says are some types of capital murders. And that is murder of a child under the age of six would be a type of capital murder. Murder of a police officer in the line of duty would also be capital murder. Murder of two or more people in the course of one criminal episode would be capital murder, as well as murder plus some sort of aggravating factor. And that's what we have today before you is capital murder plus a robbery. And so all of those crimes that I'm kind of terming as "capital murder" and there are others. Those are just some examples. Those are eligible for the death penalty. But just as I said before just because you're eligible

intended to do it and I wanted to take her life, but does she fit any of those special circumstances, or did I take anything --

A. The robbery.

Q. -- from her that should then qualify it for a capital murder?

A. No.

Q. And so that's the difference. I just want to illustrate to you that there's a difference because some people think that just because a murder is intentional that that makes it a capital murder. But in Texas, you've got to have some type of other circumstance either by virtue the type of person, police officer, child under the age of six or because you're doing it in the course of another felony.

Then for a capital murder you would be looking at those two possible punishments that we've talked about. And there no automatics. And so I want to talk a little about if you were to find a defendant guilty of capital murder, and only if you find the defendant guilty of capital murder, would you then look to these special issues in determining what the appropriate sentence -- or really what your answers are to these questions that would then lead to that sentence. All right.

Let me give you an example again of how important

it is just to keep your mind open because you don't know what you're going to hear. And as I told you each phase is kind of isolated on its your own. And right now we just want to know your thoughts and feelings. In the guilt-innocence phase you're going to hear the facts of the case. The question is: Did he do it? And, is this the right person on trial for it. Okay. Did we prove our case beyond a reasonable doubt.

Then after you've heard that you go into the punishment phase. If you find the defendant guilty of capital murder. And like I said, they are kind of separate and isolated. Of course, you can consider what you heard in the guilt-innocence phase whenever you go into the punishment phase, and you may hear additional evidence in the punishment phase. You know, you may hear about a person's character, background, criminal history or lack thereof. You may hear all sorts of things in the punishment phase in addition to what you heard in the first phase. But the important thing to remember is the law says that you can't just because of the facts of the case, just because you found somebody guilty of capital murder, you can't then say, all right, well, now I'm going to answer these questions, yes, yes, no. There are no automatics. You have to then isolate each of these special issues and take into consideration

---

142

what it's asking you to do and then answer the special issues. Okay. And so when you go into -- and I told you I was going to give you an example and I lost track and I didn't.

Let's say you have a 35-year old man that plans out and intentionally kills a five-year old child. What is the first thing that comes to mind there?

A.   That, that's capital murder.

Q.   Right.

A.   Under six.

Q.   And do you know what punishment would be appropriate based on what I just told you?

A.   It would be one of those two.

Q.   Okay. You're absolutely right. It would be one of those two. But as you sit here right now you don't know what the outcome would be. Right?

A.   Huh-uh.

Q.   And just because maybe you found someone guilty of capital murder because it fits under the law, and if you believe that this person really did kill a child under the age of six, then it would be capital murder. But what if you find him guilty of capital murder and then you hear additional evidence. If I were to tell you that that 35-year man is actually the father to that five-year old child and, in fact, that five-year

---

old child had been suffering from terminal cancer for over a year now and was just progressively getting worse, and worse, and worse, and that the father stays by his bedside 23 or 24 hours as day crying with him, weeping with him, suffering in pain almost as much pain, if not more than his son, watching what he's going through and you hear evidence that that man is the pillar of the community, he's been a wonderful father, husband. And that's the type of evidence you have before you.

Can you see how that sort of capital murder, that scenario, would be much different from the scenario where you have a 35-year old man that goes and picks off a five-year old in the playground?

A.   Right.

MR. PARKS:   Judge, we're going to object. That is an invitation to the juror for jury notification, I suppose.

THE COURT:   Overruled.

Q.   (By Ms. Evans) I'm just trying to illustrate to you the importance of keeping an open mind and looking at each of the special issues in isolation from each other. And certainly just because you find somebody guilty of capital murder, like you said that the 35-year old killing a five-year old would be, and

---

144

you have those two possible punishments, you don't know what the situation is. You don't know what the facts are. And that's why the law says you have to consider everything. And you know you can consider what you heard in guilt-innocence, but also you have to give meaningful consideration to the things you hear in that punishment phase. Okay.

A.   Right.

Q.   So could do you that?

A.   Yes.

Q.   All right. With regard to going into that punishment phase, we talked before about the defendant has a presumption of innocence. That's in the guilt-innocence phase. Well, if you're looking at these special issues, then you've already found the defendant guilty of capital murder. Correct?

A.   Right.

Q.   So the presumption of innocence is gone, but now there's a new presumption. And that's a presumption of life. The law says that you will presume a life sentence without the possibility of a parole, unless and until the State proves to you Special Issue Number 1 and Special Issue Number 2. And there is no burden in Special Issue Number 3. There's nothing for us to prove, but we'll get to that. So unless and until we

145

prove to you beyond a reasonable doubt the answers to those questions are yes, then the presumption is life without the possibility of parole, and the presumption to those -- the presumption is that the answer to those questions, Special Issue 1 and 2, are no, again, unless and until we prove to you that the answers should be yes.

Could you hold us to our burden on that?

A. Yes.

Q. And remember that there are no automatics. Just because you found somebody guilty you have to look at that.

A. Right.

Q. And so the presumption is life without the possibility of parole. The burden is still on the State. The Defense still has no burden, they never have a burden whether it's guilt-innocence or the punishment phase, and there's no automatic answer. So that's the most important thing to remember in looking at these special issues.

Now, you may find that, you know, when you're sitting there thinking in your mind about capital murder -- and as I've already illustrated to you with that example, there could be a wide variety and range in-between types of capital murders. But you may be

146

thinking about horrible, horrific sort of capital murders. And you may find nine times out of ten that a capital murder that you're thinking of is the type or kind of case that you think may be deserving of the death sentence, or maybe the type of crime that would cause you to believe somebody may be a future danger, but recall that the law says, that you can't automatically say just because they're guilty of capital murder means I answer that they are, in fact, a future danger. Correct?

A. Right.

Q. You've got to wait and look at Special Issue Number 1, see what it's asking you. And it's asking you, "Do you find from the evidence beyond a reasonable doubt that there's a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?" So, again, our burden is beyond a reasonable doubt. And where it says "probability," I can tell you that that's not a possibility because anything is possible, you know. So that's not what the law contemplates. But it also doesn't say that with absolute certainty, you know, the defendant would be a future danger to our society because, again, that would be something unattainable most likely for us to reach.

147

So some jurors tell us that probability to them means more likely than not. Could you see that?

A. Yes.

Q. Does that sound about right in your mind what it could mean?

A. Yes.

Q. And it's that the defendant would commit criminal acts of violence. It doesn't say that would commit other robberies, would commit another murder, it just says criminal acts of violence. So it's for you, as a juror, to determine what that means to you.

What would you consider a criminal act of violence?

A. Violence is any kind of abuse, rape, physical abuse.

Q. Okay. Rape. Physical abuse. It could run a whole course of things. Right?

A. Right.

Q. If I turned to my co-counsel and punched her smacked dab in the face right now, could that be considered a criminal act of violence?

A. Yes.

Q. Absolutely. And, you know, that's for you to decide what is and what is not. And if you are answering these special issues, remember you have found the defendant guilty of capital murder and so you're

148

looking at one of those two punishments.

Where do you think is the best scenario for him that he's going to end up at that point in time if he's been found guilty of capital murder?

A. If he's found guilty? It's hard to say with not knowing any facts.

Q. You're right. But if he's already been found guilty, then either he's going to be on death row awaiting his death sentence, or he's going to be serving life in prison. Correct?

A. Correct.

Q. So either way we're kind of contemplating that his society may be prison, correct --

A. Right.

Q. -- wherever the defendant may find himself. Could you contemplate that prison could, in fact, be a society?

A. Sorry. If prison could be a society where he could inflict more violence?

Q. Right. The question is asking you, basically, would you find this defendant to be a future danger, or would he constitute a continuing threat to society. And so I just want to make sure that you could include prison as being part of society.

When I say that when I think of society, I think of

me going to the grocery store everyday, or going by Starbucks and getting a coffee, or coming down here to work. But prison society it includes jailers, it includes medical doctors, nurses, visitors that are coming to visit the inmates, and it includes other inmates themselves. So could you also see that there are people there that are also in need of protection?

A. Right.

Q. And that's what that question is kind of asking. You know, to kind of look at whatever the evidence is and make that determination, do you believe that there's a probability they would commit criminal acts of violence in the future that would constitute a continuing threat to society, whatever society that may place them in.

What types of things do you think you would be looking for in determining whether somebody would be a future danger?

A. If they still had violent outbreaks. You know, if they posed a threat.

Q. Okay. And those would be things that would be important to you in looking at that. And, again, you know, you just look to the evidence. And if the evidence leads you to answer that question yes, that we have proven it beyond a reasonable doubt, then you

150

answer it yes. If you do not find that the State has proven it to you beyond a reasonable doubt, then your answer is no and the trial stops and the defendant receives a sentence of life in prison without the possibility of parole and you don't even look at the other special issues. Okay.

The law does also state that you could look to -- in making your determination or in deciding what the answer to Special Issue Number 1 should be, you can look for the facts of the offense that the defendant is on trial for. It's just that you can't automatically jump to that yes, you have to reconsider the evidence that you heard in that first phase and then determine if based on those facts you believe then that he's going to be a continuing threat in the future. Does that make sense? So the law does allow you to base that solely on the facts, but some jurors tell us kind of like you did, you wanted to know if there was any type of continuing outbreaks or anything like that. They might like to hear something a little bit more than just the facts of the offense in that punishment phase. And that's perfectly fine, too. Okay.

Let me give you an example about future danger and how important it is to just wait until you've heard everything. For example, let's say you hear evidence in

the first phase of the trial, in the guilt-innocence, that somebody goes in and they rob a 7-Eleven. They plan the robbery, they go in, take the money out of the cash register, load up all of the cigarettes, and then they put the clerk in the bathroom, tie the clerk up. And then as they are walking out of the door they turn around say, "You know what. I don't need to leave any witnesses in this deal." And so they go and they put a bullet in the clerk's head.

MR. LOLLAR: Judge, I'm going to object in advance.

THE COURT: Okay.

MR. LOLLAR: Same grounds.

THE COURT: Yes, sir. The same ruling. Overruled.

Go ahead, Ms. Evans.

Q. (By Ms. Evans) And so that's the evidence then that you hear in guilt-innocence. Guilty of capital murder?

A. Yes.

Q. Okay. Then further, you know, you don't make any automatic assumptions there. You don't know. That's all you've heard. You can't say how you would answer those special issues at that point in time. Correct?

152

A. Correct.

Q. And so then you hear evidence in the punishment phase that while awaiting trial, that the defendant had some type of horrible, terrible, spill and fall and it's left him to be a paraplegic as he sits here in trial at this point in time. At that point in time some jurors sometimes are able to say, you know what? I don't think that I would be able to find it now, being a paraplegic, that they are a continuing threat to society. But other jurors tell us, well, I don't know. There still could be some things that they could do, you know, criminal acts of violence that would cause pause or cause me concern based on that original offense. It's totally up to you in how you answer that question in determining whether or not we proved it to you beyond a reasonable doubt. But can you see how important it is to wait until you've heard everything --

A. Right.

Q. -- and the importance of considering everything before you reach your answer to that question?

A. Right.

Q. Okay. If you answer Special Issue Number 1 yes, then you move into Special Issue Number 2. And Special Issue Number 2 is basically the law of parties.

153

What that says is you can be just as accountable or just as responsible as the triggerman if you somehow aid or assist in the commission of the offense. Okay. And so let me give you an example of that.

Say that myself and my co-counsel, we plan this 7-Eleven robbery. We pick out the one we want to go to. And I've got my gun, it's loaded, ready to go. She's going to be the driver. And so we get outside to the 7-Eleven and I say, "Ah, man. You know what, I'm not ready to go. I forgot my mask." And she turns to me and says, "Hey, I've got the car juiced up and ready to go. You get in there and do your business and just don't leave any witnesses."

And so I go in, I shoot the clerk. She never leaves the car, she just has it raring to go whenever I come out with the money and all of the cigarettes after having shot the clerk.

And so what offense can I be found guilty of?

A.   Capital murder.

Q.   Absolutely. And what about her, my co-counsel?

A.   She took a part in it. I would think that she could be held the same.

Q.   Absolutely for capital murder. And the law says that, you know, a person if they are actually the

154

participant, if they are the actual shooter that carries out the act, of course, they are then eligible for the death penalty and then you could answer these special issues. But, her, even though that she -- my co-counsel, even though she did not go inside and she wasn't the actual shooter, if she aided or assisted and you find that she's a party to the offense in that she actually anticipated that a human life would be taken then she, too, is eligible for the death penalty and then you would go and answer these special issues for her. So that's what Special Issue Number 2 contemplates. If they are the shooter or if they are not actually the shooter, did they anticipate that a human life would be taken in their actions. Okay.

A.   Okay.

Q.   And so if the State proves to you beyond a reasonable doubt Special Issue Number 2 the answer is yes, then you go on to Special Issue Number 3. However, if we do not prove to you Special Issue Number 2 either that they are the shooter or maybe you don't believe that they acted as party or they didn't anticipate, then you answer that no and the defendant receives a sentence of life without parole. Okay. Each special issue is taken in isolation. Then you move on to Special Issue Number 3 if you answer Special Issue Number 2, yes. So

155

at this point in time when you get to Special Issue Number 3, what has happen is you have found the defendant guilty of capital murder. You have found that an individual intentionally took the life of somebody in the course of a robbery. Okay. At that point in time you have then moved on to Special Issue Number 1 and you have answered, yes, you believe that they are going to be a future danger. And then you've moved on to Special Issue Number 2 and found that, yes, they were actually the shooter or they participated, aided, or assisted and that they actually anticipated that a life would be taken. And so at that point in time the State of Texas has met their burden. You found them guilty of capital murder and you've answered Special Issue Number 1 and Number 2, yes, if you do.

We've met our burden and so the defendant is sitting squarely on a death sentence at that point in time. But what the legislature contemplates is that, hey, you know, jurors may have heard throughout the course of this trial all sorts of different types of evidence. And given the importance in the severity of this type of case, they found it important to include a Special Issue Number 3. And what Special Issue Number 3 is -- like I said before, the State doesn't have a burden of proof there. The Defense never has a burden

156

of proof so they certainly don't there. But it's just taking into consideration all of the evidence you've heard, you know, be it from the guilt-innocence phase of the trial, be it during the course of the punishment phase taking into consideration everything that you've heard, do you find that there is sufficient mitigating circumstances to warrant now -- because I told you that, that's it. The defendant is sitting squarely on a death sentence. Do you find sufficient mitigating circumstances to then overturn that and give the defendant a life sentence?

All right. A lot of times we call Special Issue Number 3 kind of the safety net. And it's for those things that as you sit here right now you may not have comtemplated, thought about, and we're not going to ask you to sit here and make us a grocery list or a laundry list of things that you may think are mitigating, and whether or not if that's going to rise to the level of being sufficiently mitigating because as you told us on your questionnaire, you know, regardless of the outcome, you feel like you could do this.

Do you still feel that will way?

A.   Yes.

Q.   Okay. And so when I say, you know, "mitigating circumstances," things that may lessen the

159

defendant's moral culpability. Okay. And you just have to give meaningful consideration to the things you've heard and that doesn't mean that you have to find something that, you know, other jurors think may be mitigating. Maybe you don't think it's mitigating at all.

You know, I've picked other juries and sometimes I talk about voluntary intoxication. And, obviously, as you reflected here in your questionnaire, you know that voluntary intoxication does not give you a legal defense to commit a crime. But some jurors find, you know, if they are under the influence, then, hey, maybe they really didn't know or they couldn't really appreciate what they were doing. So, yeah, I might find that to be mitigating. Other jurors on the other hand I have heard have had some pretty strong feelings. No, if they go out and intoxicate themselves to the point that they are out doing a crime, I think that's even worse. So can you see how -- you know, many jurors may think different things about things they've heard throughout the course of the trial. That's the reason for Special Issue Number 3. So you can then decide is anything that I've heard mitigating or, hey, is it aggravating to me or is it nothing at all, it's just something I heard. But if you do have things kind of in that category of

walks into a day-care and blows away two of the workers. And so, again, you might recall that, that's one situation that could be considered a capital murder because it's killing two or more people in the course of one episode. Okay. From that, that's all you've heard in the guilt-innocence phase. Right?
   A.   Right.
   Q.   You can't know how to answer those at this point in time. Right?
   A.   Right.
   Q.   There are no automatics. And so then when you get to the punishment phase you hear that, in fact, those two people, those two workers that this defendant went in and killed, were his two aunts. And these were two aunts that had raised this individual since birth --
        MR. PARKS:   Your Honor, we object. May we know what portion of the law this is supposed to be illustrating, please, other than just trying to convince the jury that 3 doesn't apply?
        MS. EVANS:   Your Honor, it goes to mitigation. It goes to future dangerousness.
        THE COURT:   I understand. And you will have the opportunity -- or Mr. Lollar. Mr. Parks will have the opportunity to question the juror on Special Issue 3, so I'm going to -- well, I don't guess you made

158

mitigating, then you have look back to those items and say, all right, that was mitigating. That was mitigating. But then you have to ask yourself, is it sufficiently mitigating to warrant overturning this death sentence and making it then a life sentence without the possibility of parole.
   Does that make sense?
   A.   Uh-hum.
   Q.   Because you may hear thousands of pieces of mitigating evidence, but none of those may rise to the level of being sufficiently mitigating to you, or you may hear that one in a million thing, or that one in a thousand thing, or 999 things out of a thousand that you think, yeah, all of that is sufficiently mitigating. But the question is -- you know, what the law is asking you to do is just wait and give meaningful consideration and if you see it, you see it. And would you answer Special Issue Number 3, yes, if you did find something to be sufficiently mitigating.
   A.   Yes.
   Q.   Okay. Let me give you another example by means of illustrating what I mean by just waiting until you've heard everything to make determinations with regard to these special issues.
   Let's say you hear about a 25-year old male, and he

160

an objection, you just asked me a question about the law. So go ahead, Ms. Evans.
        MS. EVANS:   Thank you, Your Honor.
   Q.   So it's there in that punishment phase that you then hear -- whenever you're able to hear additional evidence, you know, about circumstances and surroundings -- everything that Special Issue Number 3 is asking you to consider. You then hear that this 25-year old male that went in and killed these two individuals, that they were his aunts, and that they had actually raised him in a closet since birth. He was not allowed to go outside, he was fed dog food, they put their cigarettes out on him. They showed him no love, care, or concern whatsoever. And then he comes and sees that they are now running a day-care and he loses it and takes them out.
   Is that capital murder?
   A.   Yes.
   Q.   Yeah. And so can you see, though, where there might be a type of situation that you're just not contemplating right now? And, you know, some jurors tell us that, hey, you know what, I think with regard to Special Issue Number 1 that individual probably isn't a future danger to anyone else, except for the two individuals that treated him wrongly.

A.  Right.

Q.  The same scenario with the father who I gave you the example of.  He may not be a future danger to anyone, I would submit to you, but other jurors --

MR. PARKS:  Judge, we're going to object to that hypothetical because it is a distortion of the lawful course of voir dire, and violates this appellate's right to due course of law and to due process of law and effective representation of counsel.

THE COURT:  Okay.  Thank you, Mr. Parks.  The objection is overruled.

Ms. Evans, we do need to wind this down.

MS. EVANS:  Yes, Your Honor.

Q.  So you see the importance of -- because, you know, some jurors may answer Special Issue Number 1 a certain way given on what they hear, but the importance is just waiting to hear what you hear.  Okay.

I just have -- Your Honor, do I have time for a couple of more questions?

THE COURT:  Briefly.

MS. EVANS:  Okay.  Thank you, Your Honor.

Q.  I notice that you had an adopted sister that suffered from some abandonment issues.

A.  Yes.

Q.  Could you briefly describe what that was

---

162

about?

A.  She recently has talked to her birth mother and she had a lot of questions that were not answered correctly.  You know, the birth mother remembers things a little different.  So the mother tried to smooth it over and I don't think she really got the answers that she really needed of why she was abandoned, so --

Q.  And how old was she at that time?

A.  She was -- she went into foster care at two weeks old.  Well, she was premature.  From the time she left the hospital I'm not real sure of the age then, but two weeks later she went into foster care and from then to eight months old, she was with one foster family and then at eight months old she came to our house, and then we had her until she was two and a half.  And the mother just came in and terminated her rights within about two weeks of actually getting her back and just decided to move to Hot Springs.  So we had had her that long, so we adopted her.

Q.  So your sister was cared for by a family member, your mother.  Is that fair to say?

A.  Yes, she was in our home that whole time.

Q.  She received counselling, though, for those issues.  Fair to say?

A.  Yes.

---

Q.  And then you have a sister that has a pending DWI right now.

A.  That's the same sister.

Q.  Okay.  Is that here in Dallas County?

A.  Yes.

Q.  All right.  And anything about that process right now that you don't believe that she's been treated fairly regarding?

A.  No.  I try to stay out of that and let her handle that.  That's her business.

Q.  I completely understand.  And when you say that your mother was a foster mom, was it just to that sister, or did she have other foster children?

A.  No, we were in foster care when I was young probably from four years old to maybe ten, and then we got back into it when I was in fifth grade, sixth grade, and until '91.

Q.  Okay.  That's an excellent service that your mother has provided.  I'm sure much needed.

A.  So we've had quite a few.

Q.  Where were the children placed from mostly?

A.  From Dallas County.

Q.  Okay.  Last question then I'm going to pass you on.

I see that you're in school right now.

---

164

A.  Right.

Q.  Will serving as a juror in this case -- we anticipate the trial will go from August 10th to roughly about August 21st.  Of course, we don't know how long the jury will deliberate.  But would that interfere at all with your school that you're in now?

A.  Well, I tried to call earlier because we had been told that it would be July.  But as far as I can tell the first day of school would be the 24th of August.

Q.  Okay.  So you should be okay if asked to serve as a juror in this case?

A.  Yes.

MS. EVANS:  All right.  Thank you.  We appreciate talking with you.

THE COURT:  Thank you, Ms. Evans.

How are you doing, Miss Woodward?

PROSPECTIVE JUROR:  Fine.

THE COURT:  Do you need to take a short break, take a drink of water, anything like that?

PROSPECTIVE JUROR:  No, I'm fine.

MR. LOLLAR:  Could we take a short break, Your Honor?

THE COURT:  Yeah, let's take a short recess.  My bailiff will show you where the bathrooms

165

are so you can get you a drink of water if you would like to have one.

PROSPECTIVE JUROR: Okay. Thank you.

(Brief recess taken at 2:44 p.m.)

(Proceedings resumed at 2:55 p.m.)

THE COURT: Okay. Be seated.

Bring Miss Woodward back, please.

THE BAILIFF: All rise for the juror.

(Prospective Juror Rindy Woodward enters the courtroom.)

THE COURT: Thank you. Just go ahead and have a seat there. Thank you again, ladies and gentlemen. Be seated.

All right. Mr. Lollar.

MR. LOLLAR: Thank you, Judge.

EXAMINATION

BY MR. LOLLAR:

Q. How are you, Miss Woodward?

A. I'm fine. How are you?

Q. Oh, I'm good. My name is a Brad Lollar and this is Doug Parks and Keri Mallin, and we represent James Broadnax. And what we want to do with you in our time is to talk to you. And what both sides are trying to do, Miss Woodward, is find twelve jurors out of that group of 800 jurors that we had down here that day in

167

in this for a long time. Okay. We, for instance, do not expect that you have ever seen these three special issues before today. Is that true?

A. That's correct.

Q. And now you see that it's these three special issues that determine whether a person who has been found guilty of capital murder get the death sentence or get a life without parole sentence. Okay. And that's something new to you. So we feel like you were like ninety-nine point nine percent of the people out there that don't know anything about these three special issues. Okay. And how they are, in fact, the determining factors in whether a person whose guilty of a criminal offense of capital murder get a death sentence or get a life sentence.

Okay. So what I want to do -- and I still haven't quite got you figured out, frankly, because I think that you believe like most jurors believe that if a person commits X offense they get the death penalty. Okay.

A. Right.

Q. And I think you believed that before you came down here today and so now you know that's not the case. There is no offense in the State of Texas for which the death penalty is automatic.

A. Right.

166

the morning and afternoon sessions -- we had another group just like yours in the afternoon. So 800 people we asked to fill out this questionnaire and just we're just trying to find twelve that can be fair to both sides. You wouldn't think that would be a hard thing to do, but believe me it is in these type of cases. People have all sort of crazy ideas about the laws in the State of Texas. And, you know, death penalties, it's a very emotional issue for some jurors. Some jurors have religious feelings about the death penalty, moral feelings. Anyway, we've seen things all over the waterfront.

We had a guy down here yesterday that told us that anybody who violates any criminal law should receive the death penalty. Okay. We didn't talk to him for near as long as we're talking to you. He put that on his questionnaire. He fell off even before we got to talk to him about that issue. He put very clearly in his questionnaire twice that anybody who commits any criminal violation should receive the death penalty. Okay. Then, also, we have people who can't do the death penalty at all. Then we have a group of people in the middle that say that they can.

Now, what we don't expect you to know is the law. Okay. You're a layperson. We're lawyers that have been

168

Q. And you know that now. You didn't know that before now, so that kind of changes, I think, how you might have answered your questionnaire.

A. Right.

Q. Okay. But now that you know that I want to talk to you about some things in your questionnaire and then we're going to talk about the guilt-innocence phase of the trial like you've been in before. It's going to be exactly the same and you've seen how it goes. The State puts on their evidence first, the Defense puts on their evidence second if they want to, and then the jury receives the Court's Charge. You hear the arguments of counsel, and then you go back to deliberate.

A. Right.

Q. And then y'all decide whether the State has proven the case beyond a reasonable doubt or not. And that's just like the case you were on before.

Okay. And then we're going to talk about the penalty phase of the capital murder trial. And let me tell you this right up front. Just because we're talking about the penalty phase, don't take that to mean that we believe we're ever going to get there in this trial, but this is our only time to talk to you and, obviously, it's something new to you.

A. Right.

169

Q. And, you know, we have to know that you understand what the law is to be a juror in this case. Okay. So that's what we're going to do.

Miss Woodward, first of all -- and I see that you were going to start radiology school --

A. Yes.

Q. -- or a radiology program. Is that out of El Centro?

A. Yes.

Q. Have you actually started that, ma'am?

A. No. I've applied and I'm waiting to hear. I'll hear in the middle of July.

Q. Is that the classes you would be going into on August the 24th?

A. Yes.

Q. Okay. Well, good luck on that.

A. Thank you.

Q. And I see that in addition to your school work that you're doing that you assemble night vision scopes for the military. Is that right?

A. Yes.

Q. And is that a full-time occupation eight hours a day?

A. That's full time.

Q. Well, good. You're a busy woman then going to

---

170

that and then going to school at nighttime down here at El Centro. Very good.

Now, this previous trial that you were on that was an assault on a public servant, is that right, where the defendant was accused of biting the police officer?

A. Right.

Q. Okay, and you had your trial. And based on the evidence that you heard from both sides, you found the defendant not guilty because you didn't feel the State had proven the case beyond a reasonable doubt.

A. Right.

Q. Okay. And am I to understand that after that was over somebody came back to you, either the lawyers for the State or the lawyers for the Defense -- somebody came back to you --

A. Both sides.

Q. Both sides?

A. Yes.

Q. -- and showed you a photograph. Is that right?

A. Right.

Q. That they had not introduced during the trial.

A. Right.

Q. And had they introduced that during the trial you would have found him guilty.

---

171

A. Right.

Q. Was that the feeling of the rest of your jurors?

A. Pretty much, yes.

Q. Okay. Well, things like that happen. I just want to make sure that, that's not going to hold over if you're a juror in another criminal case.

A. Right.

Q. And you're thinking when you get back to the jury room that you haven't seen all of the evidence, or you haven't heard all of the testimony. You may not have, but it may be because the Judge rules it's inadmissible --

A. You've just got to use what you've heard.

Q. I'm sorry?

A. You've just got to use what you've heard.

Q. Right. You have to base your verdict on what you hear in the courtroom here. And is that something that we can trust that you will do?

A. Yes.

Q. Okay. Now, I want to ask you about your answer there on Page 11 about that incident. Okay. After trial you said, okay. "The DA did not use certain evidence that should have been used." That's the photograph. Right?

---

172

A. Right.

Q. "After trial that was shared and it was disturbing to me that people's lives were changed because of this crime. And she walked."

What did you mean by that?

A. Basically, the officer had to go through aids testing on a regular basis, so he was still -- even though the trial was over, he was still having to deal with the aids test and, you know, protecting his family.

Q. Did he actually contract aids?

A. Not as of the trial, but he had only had, I think, one or two tests at the end and I think he had to go through one more to rule it out.

Q. Okay. Well, that explains that answer to me. Thank you.

Now, let's talk for just a moment about your feelings, about the death penalty, in general and, obviously, the procedures you now know since you've been down here today. But just, in general, I want to talk to you about what you told us about your feelings about the death penalty.

And we asked you on Page 1, "Are you in favor of the death penalty?" You said, "Yes."

I said, "There are some crimes that should be punishable by death." And after that you said, "Murder.

173

Any crime against a child or anyone who is not capable of defending themselves."

Do you think the death penalty should apply to all murder cases?

A. No.

Q. Okay. Tell me why not. What do you think?

A. Because some murders are to protect yourself.

Q. If you view that, that's not a crime at all, that's self-defense.

A. Right.

Q. If the prosecutor here is using force against me, I have a right to use force against her.

A. Right.

Q. Okay. And if she's using deadly force against me, then I have a right to use deadly force against her. Okay.

A. Right.

Q. And if she's attacking me with deadly force, I respond with deadly force and cause her death, I'm not guilty of anything. Okay. So aside from the offense of -- aside from the issue of self-defense if it's shown to you that it's not a case of self-defense, do you think that everyone who has committed murder should receive the death penalty with that exception?

A. No.

174

Q. Okay. Tell me why.

A. Well, like she stated there are certain circumstances of why a person would commit murder.

Q. Okay. Let me tell you what murder is in the State of Texas. Murder is the knowing or intentional causing of another person's death without legal justification or excuse. Okay.

A. Okay.

Q. So when we're talking about murder that's what we're talking about.

A. Okay.

Q. Okay. On Page 2 you tell us: "The best argument for the death penalty is some crimes should be punishable by death. The laws are there for a reason and people, no matter how they were raised, know the difference between right and wrong. Wrong is wrong."

And then we ask you the best argument against the death penalty and you tell us: "The punishment should fit the crime. If the person in question poses an ongoing future or threat to society, you must always remember that someone's life is in your hands and use that, and that is serious business."

Tell us what you mean by "ongoing threat to society."

A. If it's proven that they could go on and help

175

someone else.

Q. If they what?

A. If it's proven that they could -- they have the possibility of going on and hurting somebody else. That it just continues even though, you know, they get out of one punishment and they go on to hurt someone else, that would be an ongoing threat.

Q. The death penalty should apply to that person?

A. Yes.

Q. Okay. All right. Tell me what purpose you think the death penalty serves that a life without -- a life sentence without parole would not serve?

A. I think the death penalty would protect everyone that that person would come into contact with. Life without parole they would still be around people that they could possibly hurt.

Q. Okay. Possibly hurt. Now, see Special Issue Number 1 you're talking about kind of in the language of Special Issue Number 1, but they don't use the word "possibility," they use the word "probability." But if you could kind of think of it in those terms, is that what you're talking about?

A. Right.

Q. Okay. Now, do you think that a person is adequately punished for the offense of capital murder if

176

they are not going to be a future danger by giving them a life without parole sentence?

A. If they are not a future danger, then I could give them life without parole.

Q. Would you be satisfied if you sat in a case of capital murder and if you were convinced or if you had a doubt that the person would not be a future danger, would you be satisfied with having sentenced that person to life without parole?

A. Yes, if they were not a future danger.

Q. Okay. Now your voice kind of trails off.

A. Yes, if they were not a danger.

Q. Okay. All right. Now, some people have told us that if they are a juror in a capital murder case, that they do not think that they would be able to assess life without parole instead of the death sentence because the families of the victims would be disappointed in their actions. How do you feel about that?

A. I think that the punishment -- I mean, I as a family member if I was the family member, I would probably want the death penalty more than life without parole because, you know, it hit home. But hearing it and hearing, you know, the circumstances and, you know, hearing all through the penalty phase, you know, there

177

may be something that I would not feel comfortable putting that person to death because of those circumstances.

Q. Even if that verdict disappoints the family.

A. Right.

Q. And is that something you would be able to do even though that verdict disappoints the family?

A. Right.

Q. Okay. Thank you.

I want to ask you about Page 4 of your questionnaire. We ask you about the second question down -- third question, I guess. "Do you think there are crimes which call for the death penalty solely because of the severe facts and circumstances?"

You answer, "Each crime should carry its own weight. A prior is a prior, although sometimes it may be used to show the character of a person even though it doesn't mean that they are guilty of this crime just because they have committed some other one."

Now, kind of explain that answer to me. What did you mean there?

A. I know sometimes they will use if the person has a prior and they have been convicted of that, they will bring it up in court. And I look at it as two separate crimes.

178

Q. Uh-huh.

A. So I don't know if I answered your question.

Q. Well, I guess it does. Yes, ma'am.

We ask you on a scale of one to ten how strongly do you believe in the death penalty and you told us you were a ten.

A. Right.

Q. And then you say, "If a person does a crime, they must be willing to take the punishment of that crime."

A. Uh-huh.

Q. And kind of explain that to me. What is your thinking there?

A. Well, I rated it a ten because I believe that if the person does the crime and they know that the death penalty is a possibility, then they need to realize that if they do that crime that that could be the outcome.

Q. Okay. So if they're, number one, in the right thinking state of mind; and two, have thought about the death penalty; and three, go ahead and do the offense, then that's what they should expect basically is what you're saying.

A. Right.

Q. They shouldn't be surprised if that happened.

179

A. Right.

Q. All right. And then I know the prosecutor asked you about this. Miss Evans asked you, "Do you believe in an eye for an eye?"

"No, not completely." Tell me what your answer to that was again.

A. It's hard to remember what I told her. But an eye for an eye, I believe that some people think that if you take a life that your life should be taken, too.

Q. Uh-huh.

A. And the way the law reads that's not the case. You know, like in this there's two options.

Q. Uh-huh. Okay.

A. So...

Q. Okay. So you think something ought to happen to them, but not necessarily the death penalty.

A. Right.

Q. Okay. Is that the way you feel?

A. Right.

Q. Okay. Good enough. Now, at least two times here in your questionnaire you use the phrase "future danger to society." And that's important to you.

A. Right.

Q. And that is remarkably on point with Special Issue Number 1. And for you not to have ever heard of

180

Special Issue Number 1 before and, yet, that is the very phrase that the legislature tells us is the dividing line between those who get death and those who get life, that's pretty remarkable to me. But is that how you feel about these things?

A. Right. I know being around foster kids so many times they tend to act out when you first get them. They are just lashing out at anybody that they can get ahold of.

Q. Sure.

A. So once they realize, you know, they are in a stable home and know what is acceptable and that they feel comfortable, they are not as apt to just lash out at anybody.

Q. Okay.

A. So...

Q. So if I'm hearing what you're saying, your family would take in foster children from the State, is that right?

A. Right.

Q. And then they would be with you for varying periods of time.

A. Right. We may have one for a couple of weeks, we may have one for a couple of years.

Q. How many foster children did you have -- if

181

you can give us an estimate -- when you were being raised?

A.   More than fifty.

Q.   More than fifty?

A.   (Nods head).

Q.   Good.  Well -- and what you've told me is very interesting.  You're saying if they get in a house with structure and somebody tells them what the bounds are -- the boundaries, then they start adapting themselves to that --

A.   Right.

Q.   -- environment.

A.   Well, they have been taken away.  Even though the parents may not have been the best, they are the only parents they have only known.  And you can take a child that the parent beat them every day and they still cry for that mother.  So, you know, there's something there about the mother-child bond.  So -- I mean, they will beg to go home even though they know what they are going to get when they go home.  So they realize once they are there what normal life looks like --

Q.   Uh-huh.

A.   -- that a mother doesn't, you know, lock you in the closet and not feed you, but you sit down at the table with everybody else and you eat a meal.

182

We've had a child in our home that when you sat them down to a meal -- this child was five and he ate more than my father did.  He would eat to the point where he gagged because he never knew when he was going to get another meal.

Q.   Okay.  That is very interesting.  I want to talk to you about the sister, the adopted sister.  You told us about that who has received counselling for abandonment issues.  And before we get into that, have you had foster kids in your household who have been bounced around from relative to relative, to relative, to relative, and then come to you?

A.   We might have a few that went to one relative and then they usually weren't bounced around a lot.  We usually got younger aged-children.  We stayed with the younger age because we were young.  My mom didn't want to put us with older children with us being small.  So most of ours were very young.

Q.   And --

A.   I think our oldest was ten.

Q.   Okay.  And do these children that come to live with y'all have abandonment issues being away from their parents?

A.   I don't know if it was considered abandonment issues, but they kind of withdrew for awhile.  I think

with us being close to the same age and we could play with them, we could probably pull that out more than if we weren't the same age and if we were older.

Q.   Okay.

A.   So...

Q.   Okay.  All right.  Your adopted sister who is receiving counselling for abandonment issues you told us about that a little bit.  Is the counselling helping her?

A.   Yes.

Q.   Okay.  So she is a person who has had abandonment issues; is having trouble because of that in her life; is receiving counselling and the benefit of counselling, and is doing better.

A.   Right.

Q.   So that's something that you understand --

A.   Right.

Q.   -- is abandonment issues and how that can affect somebody, is that right?

A.   Yes.

Q.   And are you glad that she's getting counselling for that?

A.   Yes, very glad.  Makes life a little easier on us, too.

Q.   Well, sure.  And if she hadn't received

184

counselling --

A.   She might have gotten there eventually, you know, just by maturing.

Q.   Maybe not.

A.   Yeah, maybe not.

Q.   All right.  Okay.  Let's jump right into this talking about the trial itself.

A capital murder trial, like I said, is just like any other criminal case.  In the first part of the trial the State's job is to prove the indictment beyond a reasonable doubt and every bit of the indictment beyond a reasonable doubt.  You have a copy of that indictment right there in front of you.

Have you had a chance to look at that?

A.   Yes, I have.

Q.   Okay.  You told us in your questionnaire that you might have heard about this a little bit.  Can you recall what you've heard?

A.   It was just at work.  They said that, you know, they live in Garland and I guess live around that area.  And they said that there was a shooting, you know --

Q.   Okay.

A.   -- at that the location.

Q.   And you haven't seen anything on T.V., or any

follow-up of that?

A. No.

Q. Okay. Very good.

A. I never heard anything after that day about it.

Q. And certainly you have not heard enough to, in your mind, determine before you ever got to trial whether or not Mr. Broadnax is guilty or not guilty --

A. No, I haven't.

Q. -- or anything like that.

A. No.

Q. Okay. Very good.

You will see that one of the things that the State has to prove in a capital murder case is that the murder was committed intentionally. Okay. And you will see that word used there in the indictment. Okay. Let me tell you what we mean by that because that has specific legal meaning in the State of Texas. And that is that a person formed a conscious objective or desire to cause the result. Okay. That's what the law means, and that's what the Judge will tell you the law means in defining intentionally. Okay. So one of the things the State has to show is in this type of a case -- and let's not use this case anymore. Let's talk about a hypothetical case like this -- is that the defendant

186

formed in his mind the intention to cause the victim's death and did whatever it took to accomplish that goal. Okay. And they have to show also that that took place during the course of a robbery. Okay. So first you've got a robbery going on, and then the State would have to show that the defendant formed the intent in his mind to cause the death of the victim and kill the victim, shot him, with that intent to cause his death. Not to wing him, not to wound him, not to harm him, but to cause his death. Okay.

Now, let me give you an example to contrast that type of scenario with. Let's say you have a person that goes into a 7-Eleven store, robs the store, has a gun, goes up to the cashier and says, "Give me your money." The cashier does. Okay. And then the robber says, "Okay. I'm fixin to leave out of here. Don't follow me out because then you will see what car I get into, which direction I go." Okay.

A. Okay.

Q. "So don't come around that counter or I'll shoot on you." Okay.

A. Okay.

Q. But sure enough, you know, he's going out the door, he looks back around and sure enough the cashier has come around the counter and is following him out to

187

see where he goes. So at that point he shoots him in the kneecap. Okay. And that's to disable him so they can't follow him out. Okay.

A. Okay.

Q. Now, in that particular instance we have a defendant who has done an act clearly dangerous to human life in shooting the person in the kneecap. Right?

A. Right.

Q. But he didn't do it with the intent to cause their death. He did it with the intent to hobble them or to maim them so that they couldn't follow him outside. Okay.

Now, the bullet hits the femoral artery and the cashier dies before the ambulance gets there, before the police gets there. Clearly, we have a murder that was committed during a robbery, but it's not a capital murder.

A. Right.

Q. Do you see why?

A. Right.

Q. Because that element -- that's what we call the culpable mental state -- of the defendant was not intentional, but it was, in fact, knowing. He knew that if he did the act that could result in a death, but he did not intend the death. Okay. And in that case, that

188

situation, that hypothetical, that is not a capital murder, that's murder and an aggravated robbery both of which carry a penalty range of up to life in prison. Okay. So a jury faced with that type of fact scenario would find the defendant not guilty of capital murder because the State failed to prove that element that is required in the indictment and they go on to find the defendant guilty of the lesser included offenses of murder and aggravated robbery. Okay.

A. Right.

Q. Sometimes jurors are called upon to determine what the state of mind of the defendant was at the time of the commission of the offense. In fact, Texas law specifically allows either side to introduce evidence as to the state of mind of the defendant at the time of the commission of the offense. Okay.

A. Okay.

Q. And it's because it goes to that culpable mental state of whether a defendant is acting intentionally, or knowingly, or recklessly; or there's a fourth category of culpable mental state. It's called acting with criminal negligence. Okay.

Now, acting knowingly. We have an example of shooting somebody in the kneecap is clearly dangerous to human life and that can cause death. That can get you

189

convicted of murder.

If a person is acting recklessly, here is an example. If you go out on New Year's Eve right at midnight you might hear shots being fired up into the air and that's while people are celebrating New Year's Eve. Sometimes those shots go up, they come down, they hurt somebody and may even kill somebody. Well, they didn't intend to cause their death, they didn't knowingly do that act, but they recklessly did that act. And under our law when we talk about reckless they are aware of the consequence. They disregard the risk and cause the result. Okay. They are aware of it, consciously aware of the risk, disregard that and cause the result. Okay.

Then the fourth category is a person acting with criminal negligence. And that's where the law says they are not aware of the risk, but they should have been. Okay. An example. I'm driving down the street, not paying any attention. I'm looking for a CD to put into the CD player in the car and somebody walks out and because of my inattention, I run over them and cause their death. Well, I haven't done that intentionally, knowingly, or recklessly, I've done that with crminal negligence.

Okay. So that just tells you the four kinds of

190

cupable mental states we have here in Texas, and a jury can -- a trial, a whole trial, can revolve around whether the defendant is acting intentionally, knowingly, recklessly, or with criminal negligence.

Do you see how that could be?

A. Right.

Q. Is that something you would be able to listen to and give mind to in your deliberations?

A. Yes.

Q. Very good. All right. Let's talk about a hypothetical case now where you've been selected on a capital murder jury, you have heard the testimony in the first part of the trial, the evidence has convinced you beyond a reasonable doubt the defendant is guilty, okay, exactly as charged. Okay. Then, what happens is you come back into court, both sides again get to present testimony in anything relevant to these three special issues. Okay. And then the jury again hears argument, goes back and starts deliberating and starts with Special Issue Number 1. And the way it's suppose to go is you answer Special Issue Number 1 first, then you go to Special Issue Number 2, then you go to Special Issue Number 3.

Now, whatever else we know about the defendant by the time you get to answering these special issues we

191

know this. It is a person who has intentionally caused someone's death during the robbery. Okay. And using that definition of intentionally, they meant to cause their death. They did it. They did it during the robbery, they did it with a deadly weapon. Okay. So whatever else we know about him, we know that much about him. Okay.

Then the jury is called upon to answer Special Issue Number 1. "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?" Okay. And that's what we call the future dangerousness issue. And you can see that -- well, let me just tell you this. The legislature of the State of Texas gave us this law. Okay. They gave us these three special issues and they erected them as barriers to the imposition of a death sentence. Okay. They are meant to be barriers to the imposition of a death sentence. And what they have told us is, is the default punishment for a person convicted of capital murder is life without parole. Okay. That the preferred answer is life with without parole. And what the courts have told us, our highest criminal court in the state has told us, is that the death penalty is supposed to be reserved for the few incorrigibles who

192

cannot safely be imprisoned. Okay. And that is something that I think jurors in a case like this have to understand and have to -- you know, your personal beliefs kind of have to be set aside, whatever your personal beliefs are. That's the divding line in the State of Texas. Okay.

The law tells us that there is a presumption that the answer to Special Issue Number 1 is, no, this is not a person that's going to be a future danger. Okay. And it puts the burden of proof on the State to prove that that answer, that no answer, should be changed to a yes answer before the person can be executed. Okay. And we know that because it says right there it's putting the burden on the State to prove the answer beyond a reasonable doubt. And I wrote down what you told us your definition of beyond a reasonable doubt was and you said "Proven to a fact. No doubt at all." Okay. And I think at the time you were being asked about that you were thinking about it in terms of the first part of the trial, but you understand that's the same burden in that question.

Okay. So would your feeling about that definition apply to the special issue just the same as it did to the burden on the State to prove the defendant guilty beyond a reasonable doubt?

A. Yes.

Q. And we can trust you. We can rely on you for that. Right?

A. Right.

Q. Okay. That's what the legislature wants us to do. That's what the legislature wants you to do as a juror on a capital murder case. The default answer is no. And the death penalty is reserved for those few people, those few incorrigibles that even if you put them in the penitentiary, they are going to continue with criminal acts of violence against the people around them. You know, there's other prisoners. There's jailers, wardens, nurses, teachers, visitors, all of those types of things. And it's the people that's going to keep attacking those type of people and causing them, you know, physical harm --

A. Right.

Q. -- that the legislature says should not be allowed to live even though they are in the prison society. Okay. Are we clear on that?

A. Yes.

Q. And I'll just say this. We laugh -- well, we use to get real mad and now we just laugh when the State uses this example of a person who has come out of the 7-Eleven after robbing it, steps off the curb and gets

hits by a bus and is now a paraplegic. Now, we don't think that's what the legislature had in mind there. I mean, that's a person who is physically incapable because of their condition of being a paraplegic of not being able to harm anyone physically. That's not what that special issue is asking. It's much more serious than that. You see that?

A. Right.

Q. Okay. Special Issue Number 2 is only given to a jury in the event that there's more than one person involved in the commission of the offense. And it's basically asking, do you find from the evidence beyond a reasonable doubt, again, and if the presumption of the answer is no again. But it says, if you find from the evidence beyond a reasonable doubt that the defendant actually caused the death of the deceased, or if he wasn't the one that caused the death of the deceased, did he actually anticipate or intend that the victim was going to die. Okay. And that's something again the State has got to prove beyond a reasonable doubt. Okay.

A. Okay.

Q. Any questions about Special Issue Number 2?

A. No.

Q. I'm not going to spend much time on that because that's pretty self-explanatory. Now, Special

Issue Number 3 is a whole different animal here. First of all let me tell you that there's no burden on either side to show a mitigating factor sufficient to avoid the death sentence. Okay. Specifically, the legislature does not say that the defendant has to prove that there is a sufficient mitigating circumstance beyond a reasonable doubt. We don't have to do that. Okay. We don't have to do it by any burden of proof. Okay. It says, "There's no burden of proof on either side in the presentation of the evidence relevant to Special Issue Number 3."

Okay. Let's look at it again. And this special issue is only given to you after you've answered Special Issue Number 1, yes, and Number 2, yes. So whatever else we know about the person on trial we know he's a capital murderer who caused the death intentionally during a robbery, who you have now been convinced beyond a reasonable doubt is going to be a future danger even if he's in the penitentiary. Okay. And the legislature says that's not enough yet for a person to get a death penalty. Okay. They say you've got to look at Special Issue Number 3. "Do you find taken into consideration all of the evidence, including the circumstances of the offense the defendant's character and background and the personal moral culpability of the defendant, that there

is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life of imprisonment without parole rather than a death sentence be imposed?" Okay. So what this does is a couple of things.

Number one, it allows a jury to take the death sentence that the defendant is sitting on if he answered one and two yes, and change that back to a life sentence. Okay. Now, the other thing it does it directs the jury to look at the background of the defendant. Okay. That's not defined so whenever we're talking about background, we're talking about background. And I know over here in your questionnaire, Page 8, we say, "Some people feel genetic circumstances of birth, upbringing and environment should be considered when determining the proper punishment of a crime. What do you think?"

"I think it influences who they are, but I've also seen people raised in certain circumstances come up and be great people."

Okay. Wouldn't disagree with that. Some people are able to rise above their circumstances and others are not able to. Would you agree with that?

A. Right.

Q. But that is directly what Special Issue Number 3 is asking the juror -- telling the jury to do is to

look at the background of the defendant.

A.   Right.

Q.   Okay. Anything can be considered by a juror to be a mitigating circumstance. Anything. Okay. What is not mitigating to the juror next to you may be mitigating to you. Okay.

A.   Right.

Q.   What the law says is, is the jury doesn't have to agree among themselves that there is a particular thing that is mitigating sufficient to avoid a death sentence, that could be something different for each of the twelve jurors. You may all agree that something is sufficiently mitigating, but you don't have to agree on any one thing. Okay. Nor is it a majority vote back there. What the legislature intends, and courts have told us is that in answering this question, each individual juror is suppose to use their personal moral judgment about the appropriateness of a death sentence. Okay. They are suppose to come to their own personal moral judgments about that. Okay.

Do you think you would be able to do that?

A.   Yes.

Q.   Okay. Now, let me ask you if you're the type of person that can do this. Let's say that your personal moral judgment is that the defendant should be

197

Is that something that you think that you could consider and give consideration to?

A.   As far as like what?

Q.   Well, I'm not asking you to commit right now, okay, that you would consider that to be a mitigating circumstance sufficient to avoid the death penalty, what I'm saying is is that something that you could look at and if you heard testimony about the age of the defendant, is that something that you could give consideration to and at least think about it?

A.   Yes.

Q.   How about lack of significant prior criminal history or violent history?

A.   I mean, there is also a first offense for anybody who, you know, is on that kind of path.

Q.   Right.

A.   So it could be the first offense, it could be, you know, five down the road or --

Q.   Well, let me talk about that. If you find out that a person has a long history of violent acts, okay, that's something that certainly would be relevant, it would seem to me to your answer to Special Issue Number 1. Right? If they are going to be a future danger -- well, if they have been a violent person all of their life, then there's something relevant to that. But now

199

spared the death penalty. Okay. But there's eleven other jurors who think that he shouldn't be. Are you the type of person that would be able to stand up to the pressure of eleven other people --

A.   Yes.

Q.   -- if you felt that there was a sufficient mitigating circumstance?

A.   Yes.

Q.   Okay. Well, I think that's entirely appropriate because, you know, me trying to tell you what your personal moral judgment should be is like me telling you what your religion should be, or what you should believe, or who you live with, or how you raise your kids.

A.   I can't let somebody else choose what I have to carry the rest of my life.

Q.   That's exactly right. Nor is it appropriate for you to tell somebody else what their personal moral judgment should be. Right?

A.   Right.

Q.   Okay. Let me run some things by you that we have been told by other jurors may be mitigating circumstances such things as, well, how old the defendant was at the time of the commission of the offense, the age.

198

if you find out that the person on trial has not got a violent history, okay, it would seem to me that that would be relevant to your answer to Special Issue Number 1.

A.   Right.

Q.   But it might also be a mitigating circumstance sufficient to avoid a death penalty in answering Special Issue Number 3.

A.   Right.

Q.   Would you agree with that?

A.   Yes.

Q.   Okay. How about if you find out during the testimony that the person was a follower and not a leader in that group and that they were acting under the domination of another person.

Is that something that you might be willing to look at and consider as a mitigating factor?

A.   Yes.

Q.   How about if a defendant was under the influence of mind-altering drugs at the time of the commission of the offense, is that something that you might want to look at and consider?

A.   Right. I think it would be one of the factors.

Q.   Yes, and that would also be relevant, I guess,

200

201

to your determination of whether or not the defendant acted intentionally because it goes to that culpable mental state back in the first part of the trial.

A. Right.

Q. Do you think so?

A. Yes.

Q. Would you want to hear a defendant's life history that has brought him to the point where they would be committing a capital murder?

A. Yes.

Q. And whether, for instance, that person has been the victim of sexual assault as a child or physical abuse as a child, would that be something that might be relevant to you?

A. I think so.

Q. What if you heard from friends and relatives of the defendant, the people who know him best, to say that this behavior exhibited on the date in question was aberrant for him, was not the way he normally is and that's out of character for him. Would that be something important for you?

A. Yes.

Q. Well, Miss Woodward, I think we think along the same lines and I appreciate that you would be willing to consider those things.

202

Let me tell you also that this special issue allows a jury to recommend mercy for the defendant even though the defendant is not worthy of mercy. Mercy is something that you give and it's not earned.

Would you agree with that?

A. Yes.

Q. Well, I think that's about all I've got to talk to you about, Miss Woodward.

Do you have any questions of us?

A. I can't think of any. No.

Q. Now, Miss Woodward, you are a very educated juror about these things. Okay. So when you're walking down the street and you hear about a capital murder trial going on you will know what the issues are.

A. Right.

Q. And ninety-nine percent of the people around you won't know what the issues are, but now you do.

Do you think you could be fair to both sides in this case?

A. Yes.

MR. LOLLAR: Thank you, Miss Woodward.

THE COURT: All right. Thank you, Mr. Lollar.

Miss Woodward, I'm going to ask you to step out of the courtroom for just a second with my

203

bailiff and let me confer with the attorneys here for just a second and then I'll bring you back and make an announcement to you. All right.

(Prospective Juror Rindy Woodward exits the courtroom.)

THE COURT: You can be seated.

Miss Evans, does the State have a challenge for cause?

MS. EVANS: The State does not, Your Honor.

THE COURT: Mr. Lollar, does the Defense have a challenge for cause?

MR. LOLLAR: No.

THE COURT: All right. Then bring Miss Woodward back and she will Number 26. Correct?

MS. EVANS: Number 27.

MR. LOLLAR: Twenty-seven.

THE COURT: Oh, 27. I like that better.

THE BAILIFF: All rise for the juror.

(Prospective Juror Rindy Woodward enters the courtroom.)

THE COURT: Yes, Miss Woodward, come on back and have a seat right there, if you would, again. And thank you, ladies and gentlemen. Be seated, please.

Miss Woodward, conferring with the

204

attorneys you have been selected as Prospective Juror Number 27. Now, let me just kind of explain what we're doing here. We are qualifying a panel of 48 to 50 people as prospective jurors. What's going to happen is after we get our 48 to 50 folks qualified, then both sides have 15 preemptory strikes that they can make, in other words. And the way a jury is made up, actually a jury is not picked. We use that term, but it's a misnomer. A jury is really made up of leftovers. In other words, after both sides have made their strikes, then the first twelve that qualify that's the jury. Okay.

Now, we're not going to know until after we get the panel and after the attorneys or both sides make their strikes who is going to be on the jury. And we anticipate that that will happen somewhere toward the end of the month of July next month. Okay. So you will be notified as to whether or not you are on the jury. But the reason I'm going through all of this to tell you this is we anticipate that evidence will start in this case August the 10th.

PROSPECTIVE JUROR: Okay.

THE COURT: It will go for the next two weeks so we're looking at the week of August 10th. August the 10th, incidently, is a Monday and that would

205

be the first day of your jury service, if you're on the jury, so sometime prior to that you will be notified whether you're on the jury. So if you're not on the jury you can forget August the 10th and go on about your business; but if you are notified that you are on the jury, then you also will be instructed in that confirmation letter that you are to report for jury service August the 10th, okay, and we anticipate the next two weeks we'll be involved in the trial.

PROSPECTIVE JUROR: Okay.

THE COURT: So I would like for you to pencil those two weekends right now, those two weeks, on your calendar, if you would --

PROSPECTIVE JUROR: Okay.

THE COURT: -- and not make any plans for those two weeks until you find out for sure in July that you're not going to be on the jury -- whether you are or not. Okay.

PROSPECTIVE JUROR: Okay.

THE COURT: All right. Now, then, the second thing. You had indicated earlier in your questioning that you had talked with, I think, some fellow workers or somebody had mentioned something that you thought might be about this case --

PROSPECTIVE JUROR: Right.

206

THE COURT: -- but you couldn't recall details, it was just folks talking at work so you really didn't read a newspaper account or anything. Really don't have an opinion about it. Really don't know anything about it if that was, in fact, the case that was being discussed. So I want to keep you that way, okay, because if you're on this jury, then the first thing August the 10th that Judge Snipes is going to do is have those twelve members of the jury stand, raise their right hand, and he's going to administer the oath of a juror to each one of you. And in that oath from then from that point forward, you will be bound by your oath to make your decisions in this case based solely upon the evidence and the law that you will receive from Judge Snipes. So I don't want you going back and trying to find out something. Now that you know that you're a potential juror in this case, I don't want you going back and looking in the archives or going on the internet or anything like that.

PROSPECTIVE JUROR: My computer is down, so...

THE COURT: Well, don't get it fixed for the next couple of months.

PROSPECTIVE JUROR: I don't know how to fix it so it may take a while.

207

THE COURT: All right. That's safe then. And in the future from this point forward between now and August the 10th, I'm going to ask you to reframe from -- if there are any newspaper articles or if there are any reports on the T.V. news or radio news, then I'm going to ask you to not either listen to those broadcasts, you know, to those accounts or read the article in the newspaper, whatever it might be. In other words, I don't want you getting some preconceived ideas in your head about what you've read in the newspaper or what you've heard about this case on T.V. --

PROSPECTIVE JUROR: Okay.

THE COURT: -- because those aren't very accurate sources of information anyway as we all know. Anything else then from the State, Ms. Evans?

MS. EVANS: Nothing from the State.

THE COURT: Mr. Lollar?

MR. LOLLAR: No, Your Honor.

THE COURT: All right. Well, thank you so very much and you will be notified. Thank you, Miss Woodward. Appreciate your time this afternoon.

(Prospective Juror Rindy Woodward exits the courtroom.)

208

THE COURT: All right. Very good. Thank you all very much. It's was a long day, but it was a productive day.

(Proceedings adjourned at 3:48 p.m.)

-oOo-

**COUNTY OF DALLAS** )
)
**STATE OF TEXAS** )

I, VICKI L. TUCK, Official Court Reporter in and for County Criminal Court No. 1 of Dallas County, State of Texas, do hereby certify that the above and foregoing contains all exhibits referenced in proceedings directed by counsel to be included in the Reporter's Record in the styled and numbered cause, all of which occurred in open court, or in chambers, and were reported by me.

I further certify that this Reporter's Record of Proceedings truly and correctly reflect the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ 1,379.50 and was paid by Dallas County.

WITNESS MY OFFICIAL SIGNATURE on this 26th day of February, 2010.

VICKI L. TUCK, CSR/#1250
OFFICIAL COURT REPORTER
County Criminal Court No. 1
133 N. Industrial Blvd., 3rd Floor
Dallas, Texas  75207
Tel./Fax 214-653-5606

Certification Expires:  12-31-10.