AP-76207

APPELLATE NO. AP-76,207
TRIAL CAUSE NO. F08-24667-Y

THE STATE OF TEXAS          *     IN THE CRIMINAL DISTRICT

vs.                        *     COURT NO. 7 OF

JAMES GARFIELD BROADNAX     *     DALLAS COUNTY, TEXAS

*************************************************************

REPORTER'S RECORD OF PROCEEDINGS

(Individual Voir Dire Examination)

Volume 24 of _____

*************************************************

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 18th day of June 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Quaid Parker, Senior Judge sitting for the Honorable Michael Snipes, Judge of Criminal District Court 7 of Dallas, County, Texas, at which time the following proceedings were held:

ORIGINAL

(Proceedings generated by computer-aided transcription.)

VICKI L. TUCK, OFFICIAL REPORTER
COUNTY CRIMINAL COURT NO. 1
TEL. FAX 214-653-5606

**APPEARANCES**

MS. ANDREA HANDLEY
SBOT:  08898800
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,

MS. ELAINE EVANS
SBOT:  24032880
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,

MR. GORDON HIKEL
SBOT:  12508700
ASSISTANT DISTRICT ATTORNEY
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas  75207
                    APPEARING FOR THE STATE,


MR. DOUGLAS PARKS
SBOT:  15520000
ATTORNEY AT LAW
321 Calm Waters Lane
Holly Lake Ranch, Texas  75765
                    APPEARING FOR THE DEFENDANT,

MR. BRADLEY LOLLAR
SBOT:  12508700
ATTORNEY AT LAW
1700 Commerce, Suite 450
Dallas, Texas  75201
                    APPEARING FOR THE DEFENDANT,

MS. KERI MALLIN
SBOT:  24049165
ASSISTANT PUBLIC DEFENDER
Dallas County Public Defender's Office
133 N. Industrial Blvd., LB2
Dallas, Texas  75207-4399
                    APPEARING FOR THE DEFENDANT.

## CHRONOLOGICAL INDEX - VOLUME 24

(June 18, 2009)

| PROSPECTIVE JUROR | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **MARDI JOHNSON** | 5 | 7 | – | – | 24 |
| Challenge for Cause (State) ................ | | | | 9 | |
| Court's Ruling ........................... | | | | 10 | |
| **JOHN CANTWELL** | 10 | 13 | 55 | – | 24 |
| Challenge for Cause (Defense) ............ | | | | 92 | |
| Court's Ruling (Juror Qualified) .......... | | | | 93 | |
| **ABRAHAM LOPEZ** | 97 | 101 | – | – | 24 |
| Court's Ruling (Excused by Agreement) ..... | | | | 107 | |
| Challenge for Cause (State) .............. | | | | 109 | |
| **DANNY W. YOUNG** | 109 | 114 | – | – | 24 |
| Challenge for Cause (State) .............. | | | | 119 | |
| Court's Ruling ........................... | | | | 119 | |
| **JOHN MOTA** | 119 | 124 | – | – | 24 |
| Challenge for Cause (State) ............. | | | | 132 | |
| Court's Ruling ........................... | | | | 132 | |
| Court Adjourned .......................... | | | | 132 | |
| Reporter's Certificate ................... | | | | 133 | |

VICKI L. TUCK, OFFICIAL REPORTER
COUNTY CRIMINAL COURT NO. 1
TEL. FAX 214-653-5606

**ALPHABETICAL INDEX - VOLUME 24**

(June 18, 2009)

| PROSPECTIVE JUROR | COURT | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|---|
| **JOHN CANTWELL** | 10 | 13 | 55 | - | 24 |

Challenge for Cause (Defense) ............    92
Court's Ruling (Juror Qualified) ..........    93

| | | | | | |
|---|---|---|---|---|---|
| **MARDI JOHNSON** | 5 | 7 | - | - | 24 |

Challenge for Cause (State) ...............    9
Court's Ruling ............................    10

| | | | | | |
|---|---|---|---|---|---|
| **ABRAHAM LOPEZ** | 97 | 101 | - | - | 24 |

Court's Ruling (Excused by Agreement) .....    107
Challenge for Cause (State) ..............    109

| | | | | | |
|---|---|---|---|---|---|
| **JOHN MOTA** | 119 | 124 | - | - | 24 |

Challenge for Cause (State) ..............    132
Court's Ruling ............................    132

| | | | | | |
|---|---|---|---|---|---|
| **DANNY W. YOUNG** | 109 | 114 | - | - | 24 |

Challenge for Cause (State) ..............    119
Court's Ruling ............................    119

Court Adjourned .........................    132

Reporter's Certificate ..................    133

VICKI L. TUCK, OFFICIAL REPORTER
COUNTY CRIMINAL COURT NO. 1
TEL. FAX 214-653-5606

PROCEEDINGS

(June 18, 2009; 9:44 a.m.)

THE COURT: Mardi Johnson. Bring Miss Johnson in, please.

Come on in, Miss Johnson.

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 650, Mardi Johnson, enters the courtroom.)

THE COURT: Good morning, Miss Johnson. Right here on the witness stand. Thank you, ma'am. Just go ahead and have a seat there, if you would, please. Thank you, ladies and gentlemen. You may be seated.

Vicki, I would like for the record to reflect this is Prospective Juror Number 650, Mardi Johnson. That's correct, is it not, Miss Johnson?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Good morning to you. Glad to have you here this morning. Thank you for your time.

I'm Judge Quaid Parker. I'm a Senior District Judge from McKinney and Judge Michael Snipes is the Presiding Judge over this capital murder case. He was the one that addressed the group probably almost two

6

months ago now, and I'm sure you were there with the other four or five hundred people, however many were assembled there in Central Jury. And at some point in the proceedings, well, he had everybody on the panel stand and raise their right hand and he administered the oath. You're nodding your head like you remember and know what I'm talking about. And I'm sure you were one of the panel members that stood and took the oath at that time; is that correct?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: I'll just remind you you're still under your oath and what you've been sworn to do is, of course, to give us truthful answers, and we know you'll do that anyway, but also to be responsive to each and every question that's asked to you by the attorneys.

What I'm going to do -- I've got your questionnaire that you filled out that same day and I know you haven't seen it since then, but I'm sure the attorneys will probably have some questions about some of your responses and some things that you put down in your questionnaire.

So with that I'm going to turn you over to the attorneys to ask any questions they might have. And talking to you this morning will be Ms. Andrea Handley and then Mr. Gordon Hikel who is seated right

7

behind her. They are both Assistant District Attorneys and two of the -- I think there's about four or five members of the prosecution team that are assigned to this case. And then over here is Mr. Brad Lollar and Mr. Doug Parks next to him. And on the very end down here Miss Keri Mallin and they are the three Defense lawyers that will represent Mr. James Broadnax who is defendant in this case.

All right. Miss Handley.

MRS. HANDLEY: Thank you, Your Honor.

MARDI JOHNSON, having been duly sworn, testified as follows:

EXAMINATION

BY MRS. HANDLEY:

Q. Good morning, Miss Johnson. First of all, I appreciate you being here and I think I speak on behalf of everybody involved in this case in being very thorough in filling our your questionnaire. I'm going to tell you that I'm probably not going to keep you very long.

A. Okay.

Q. Because one of the paramount requirements for a juror for this particular case is that they come in kind of with a blank slate and not really know a lot about the case. And I've seen on Page 3 here that you

8

are a resident of Garland.

A. Yes, ma'am.

Q. And it sounds like you have followed that case very closely --

A. Yes, ma'am.

Q. -- and know a lot about the details of the case already.

A. Yes.

Q. And would it be fair to say, ma'am, that you've already formed an opinion in this case?

A. You know after going through a lot of thought from the first meeting we had in the jury room, yes, unfortunately, I guess, in this instance I do remember quite a bit about of things that were said, I guess, on the news programs and things. Yes.

Q. On the television and then the newspaper and it hit so close to home. And I would expect that when something happens and hits you so close to home that you do take a personal interest in it, as you should.

A. Yes.

Q. But I think because of those reasons it sounds like you know a little bit too much about this case.

A. I felt the same way.

Q. Okay, and you feel the same way.

MRS. HANDLEY: Then I'm not going to take

up anymore of your time today. And thank you, though. Thank you very much for coming down here.

PROSPECTIVE JUROR: Sure. Sure.

THE COURT: Thank you. And, Mr. Lollar, do you have anything for Miss Johnson?

MR. LOLLAR: We do not. Thank you.

THE COURT: Thank you so much, Miss Johnson. Appreciate your time and effort. You can just leave that right there will be fine. Thank you so much for being here. We appreciate it.

PROSPECTIVE JUROR: Thank you.

THE COURT: Okay. Do you want to go ahead and put it on the record then, Ms. Handley?

MRS. HANDLEY: Sure. Your Honor, we would challenge Juror Number 650, Mardi Johnson. It appears she already has a bias in this case and has formed an opinion as to the defendant's guilt. She lives in Garland and according to her questionnaire has followed the case very closely and knows too many details about this. And, she, herself has said that she doesn't believe that she can be fair.

MR. LOLLAR: And, Your Honor, let me add for the record that this juror also tells us in her questionnaire that she has two cousins who are on the Garland Police Department. And since we have a list of

---

witnesses, it looks like the entire Garland Police Department is on it, so we would suggest she's probably bias to that respect as well.

THE COURT: All right. Very good. Thank you. And the State's challenge for cause will be granted and Miss Johnson will be excused from further jury service in this case.

All right. Do y'all want to --

MRS. HANDLEY: We're ready to forge ahead if you are.

THE COURT: Okay. Mr. Cantwell, then.

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 474, John Cantwell, enters the courtroom.)

THE COURT: Come on in, Mr. Cantwell, if you would please, sir. Just have a seat right there. Thank you very much. Thank you, ladies and gentlemen. You may be seated.

And good morning, Mr. Cantwell. How are you this morning?

PROSPECTIVE JUROR: Fine. Thank you.

THE COURT: Good. We're glad to have you here this morning. Thank you for your time and effort to be down here with us.

I'm Judge Quaid Parker. I'm a Senior

---

District Judge from McKinney and Judge Michael Snipes is the Presiding Judge on this case. And Judge Snipes has asked me to assist him in the jury selection process and so that explains to you what I'm doing here today instead of Judge Snipes. He's up in his courtroom taking care of the day-to-day matters of the court while I'm down here presiding over the jury selection process in this case. So anyway -- and that is also why you're here today, by the way. I know you know that.

And, Mr. Cantwell, you probably recall almost two months ago, I guess it has been now, that everybody together down in Central Jury and Judge Snipes did address the group at that time and went over some things with the jurors at some point in the proceedings. He had everybody stand up, raise their right hand, and he administered the oath of a prospective juror of each panel member. Do you recall that?

PROSPECTIVE JUROR: Yes, I do.

THE COURT: Very good. Were you one of the panel members that a stood and took the oath at that time?

PROSPECTIVE JUROR: Yes, I was.

THE COURT: Very good. I'll still remind you, you are still under your oath and what you've been sworn to do is number one, to give truthful answers.

---

And we know you'll do that anyway, but also to be responsive to each and every question that is asked of you by the attorneys.

Now, let me kind of tell you what's going to happen here today. Have you had an opportunity to read over your orientation guide?

PROSPECTIVE JUROR: Yes, I have.

THE COURT: Very good. Well, that gives you kind of a thumbnail sketch of the law as it pertains to capital murder cases. And what's going to happen here today the attorneys are going to explain in more detail the law, probably give you some examples to illustrate some of their points, and then they are going to ask you questions about how you feel to get your ideas, your thoughts, your opinions, if you will, concerning the law and some of the procedural aspects that govern this case or that would be involved in the trial of this case. And so there's no right or wrong answers. This is not a quiz that you've got to pass or anything like that. Just how you feel about it. So that's what they are wanting to find out from you.

Now, let me go ahead and introduce the attorneys to you that are going to be participating in this. Ms. Andrea Handley.

MRS. HANDLEY: Good morning, sir.

13

THE COURT: And next to her is Mr. Gordon Hikel.

MR. HIKEL: Good morning, sir.

THE COURT: And they are two Assistant District Attorneys here in Dallas County. There's also a third member of the prosecution. Well, actually, there are two more members, but one that you will probably see today that could come in, Miss Elaine Evans. She's also a member of the prosecution team and Assistant District Attorney here in Dallas County.

Now, seated at counsel table right in front of me is Mr. Brad Lollar, and seated next to him Mr. Doug Parks, and on the very end down here Miss Keri Mallin. And these three attorneys are the Defense team and they represent Mr. James Broadnax who is the defendant in this case.

All right. Okay. Ms. Handley.

MRS. HANDLEY: Thank you, Your Honor.

JOHN CANTWELL,
having been duly sworn, testified as follows:

EXAMINATION

BY MRS. HANDLEY:

Q. Good morning, again, Mr. Cantwell. How are you, sir?

A. Very well. Thank you.

14

THE COURT: Excuse me. Just a minute, Ms. Handley. Let me get -- I forgot to give Mr. Cantwell his questionnaire.

MRS. HANDLEY: Thank you, Judge.

THE COURT: Thank you, ma'am.

MRS. HANDLEY: I do want you to have this available, sir, because we'll probably refer to it in the course of talking to you.

Q. I appreciate you being here. I think I speak on behalf of everybody here. Your coming down, first of all, for the big panel and filling out that questionnaire and being thorough in your answers -- that helps us tremendously -- and then coming here again today and giving us your time and being on time. That's what makes this process work.

Let me tell you what we're doing, Mr. Cantwell. This is a death penalty case as I'm sure you're well aware now. And it is a special kind of case. It is different than a regular criminal case and that is why we call down literally hundreds of people to sit and fill out a questionnaire, and we actually read every questionnaire and we actually start bringing them up one at a time because there are some people who just, quite frankly, are not the right juror for this particular case. There are some people who, quite frankly, cannot

15

follow the law. And then there are some people who maybe even know too much about the case and they have already formed an opinion. So it's necessary for us to bring everybody in one at a time. And to not only tell you the law and see if you can follow the law, but then to also fill you out, you know, and kind of get a sense of who Mr. Cantwell is and how does he really feel about things because even if you are deemed qualified today, it doesn't necessarily mean that you will ultimately end up on the jury. After we qualify a pool of individuals we then both have the opportunity, both sides the State and the Defense, to then decide who will actually sit on the case.

Does that makes sense to you?

A. Yes, it does.

Q. Okay. Obviously, your obligation today, sir, is only to tell us the truth, which I'm sure you've already done in your questionnaire. We recognize that when you filled out the questionnaire you didn't have the pocket law guide with you and you probably never heard of the special issues before, and a lot of people tell us that I had no idea that's how a death penalty case worked. Nine out of ten attorneys in this courthouse right now have know idea how a death penalty case works because it's a very peculiar animal and it's

16

a very specific kind of case. So your answers, I'll take it were your answers just based on what you knew at the time. But now we'll ask you some questions about that and tell you about the law and see how you feel.

Just a couple of preliminary matters to cover with you first, though. This case we anticipate will take two weeks to try, and that is literally the calling of the witnesses, the putting on the evidence, the offering of the evidence. We believe it should take two weeks to try. I cannot tell you how long it will take the jury to deliberate. Some deliberate an hour, some deliberate for days. Okay. But we are talking about an obligation of your personal time.

I appreciate and have seen in here already in your questionnaire where we asked you how do you feel about jury service and you said, "Well, it would be personally disruptive, but it is my civic duty." And for the almost twenty years I've been doing this I have yet to have a citizen come and knock on the courthouse door and say, hey, I would like to sign up for jury duty. I mean, it is a personal imposition. And we all get that. But I appreciate that you also recognize it. It is a part of an individual's civic duty.

The system can't work without persons such as yourself saying I'll make the time. But that does beg

the question, Mr. Cantwell, because you put in your questionnaire here that you do travel a bit and that you are sometimes called to go out of town. We believe this case will start on August 10th.

Now, given that, is that going to cause such a problem for you that you think that you couldn't situate your work schedule and come here and give us your time and your attention to this particular case?

A. No, I think I could. I would be be able to work it out.

Q. Okay. Very good then. I appreciate that, sir. I appreciate that very much as I told you, you know, kind of what we're doing here. So what I would like to take my time in talking to you about is I would like to tell you about the criminal process, in general, and how it works. I would like to talk to you about capital murder cases and what actually constitutes a capital murder versus just a murder. And I would like to talk to you, specifically, about how a jury would arrive at a verdict of a death sentence versus a sentence of life without parole. Okay.

I see, sir, that you've actually served on a jury before. It appears in the nineties you told us that you served on a jury; is that correct?

A. Well, I was in the military --

You are former military?

A. Yes.

Q. Air Force?

A. Yes, I am.

Q. My father was a military man. He was career Air Force, also. He flew fighter jets, actually. And so I'm going to do what jurors can't do. I'm going to make just an assumption right now without really even talking to you that I think you have a good appreciation based on your military experience and service that there are certain rules of law in place and that they are there for a reason.

A. I agree.

Q. Yeah. And that there are certain protocols and practices that need to be followed before you can, you know, figuratively speaking, pull the trigger. So I'm going to assume that you're already on-board with that, but I will still talk to you about that just to give you a primer.

When you sat in your cases as a juror there in the military I would believe -- I firmly believe that there were certain principles of law that were in place then; the same principles of law are in place now. Whether you are called down here to sit on a theft of a bicycle case or in a capital murder case they never change. And

18

Q. Yes.

A. -- and I served on a jury in the military.

Q. Okay. Okay. I saw that it was a court martial that you served on?

A. Yes.

Q. And let me see where I got -- and I got here it said, on Page 10, you had put down late nineties, child abuse. And that was in the military that you served?

A. Yes.

Q. And then also -- so did that result in his military court martial, or was that a separate matter that you also sat on?

A. Well, I honestly can't remember if that was a pure court martial or a discharge board.

Q. Okay. Okay.

A. But it was a very similar process.

Q. All right. I'll tell you that different states, and the federal system, and the military system, in a lot of ways they differ. But I'll tell you that the rules of law and the laws that you are bound by in sitting as a juror really don't change because they are based on our constitution and they are set in stone and they are there for a reason, as I'm sure you can completely appreciate.

20

those principles, as I said, are based on the constitution and really out of a since of fairness and protocol, if you will. And the first and foremost being, Mr. Cantwell, that today as we sit here the defendant is to be presumed innocent. By everyone, he is to be presumed innocent. And the reason for that is because I, as a representative of the State, have not proved his guilt. And only if and until I can bring forth the type and quality of evidence that will prove to twelve jurors that he is guilty beyond a reasonable doubt, only until I can do that, you are to continue to presume that he is innocent.

Okay. I, of course, carry the burden of proof in any criminal case. I have brought the charges in this case, therefore, it is my obligation to bring the proof, the evidence to prove it. The defendant has one obligation only and that is to show up, and he's already fulfilled that obligation.

A juror always must look to the State to bring the proof and to bring the evidence in the case. And I see you shaking your head, yes. I think you have a good appreciation for that, also.

I have to prove my case to you beyond a reasonable doubt. There's really no definition, Mr. Cantwell, of beyond a reasonable doubt. It's whatever you think it

21

is. Okay. I'll submit to you it's not beyond all doubt whatsoever, it's not a hundred percent doubt, but it's reasonable doubt. And I believe I've heard it best described as somebody saying that if I have a reasonable doubt, then my doubt is based on reason and common sense.

Does that make sense to you?

A.  It does.

Q.  Okay. Okay. Along with my obligation as a representative of the State and as the party bringing the charges in this case, you know I have to prove him guilty and I have to prove him guilty of exactly what I have charged him with.

Now, a defendant has been indicted, but that is not to be considered as any evidence of guilt whatsoever, it's merely a procedure to get us to this place, and a juror is instructed that you cannot consider that as evidence of guilt. All the indictment is, is it tells the defendant what he's been charged with and it tells me specifically what I have to prove. Very specifically what I have to prove in order to carry my burden. We call them elements of the offense. I have to prove to you who did it, that he did it, on or about a particular date in Dallas County. I have to prove to you how he did it, who he did it to. You know, these are all

22

elements of the offense. And the law states that if I fail to carry my burden on any of those elements, then your verdict must be "not guilty" because I've failed to carry my burden in the case. And just to illustrate the importance of it, for example, sir, if I had called you down here to sit on a murder case, just a murder case, where I had alleged in the indictment that the defendant caused the death of the person by shooting him with a firearm, then my obligation is to prove to you that he killed him by shooting him with a firearm.

Let's say in that case the defendant actually took the stand, got on the stand and said, "I killed the guy. I meant to kill him and I'm glad I did it and if I had the opportunity, I'd do it again." But the Medical Examiner takes the stand and says, "This guy is dead, but he didn't die by being shot with a firearm. He died from being stabbed." The CSI people take the stand and says, "There is no gun at the scene, but there was a bloody knife."

Have I fulfilled my obligation? Have I carried my burden to prove to you beyond a reasonable doubt that he killed him by shooting him with a firearm?

A.  No.

Q.  I haven't. And what would your verdict be in that case?

23

A.  Not guilty.

Q.  As distasteful as it is, I mean, that's the law and it's there for a reason. You know, in my example I said if the defendant took the stand. Well, the fact of the matter is you have this right, I have this right, the defendant has the right not to be forced to testify in a criminal case. That's his choice and his choice only. And the law states that if a defendant elects to exercise that constitutional right and not testify that you, as a juror, may not use it as evidence against him.

Do you agree with that, sir?

A.  Yes, I do.

Q.  Okay. Do you think that's a fair law?

A.  I do.

Q.  And one that you could definitely follow, then?

A.  Yes.

Q.  Okay. Those are just some fundamental principles of law that are carried out throughout any criminal case.

I'll tell you that in order to be a juror on any criminal case you have to be qualified to be a juror, which means, in my opinion, I think a qualified juror is an individual that says, I will base my verdict on the

24

evidence in the case and just the evidence in the case. I will give the evidence fair consideration. I will not come in with any biases or any assumptions, and I'll wait to hear the evidence before I return my verdict. In other words, I haven't come in with my mind made up. I won't make any snap decisions about what should already happen in a criminal case. I'll wait to hear the evidence and I'll base my verdict on the evidence in the case and nothing else. And that's what we're talking about. And I think you can imagine some people don't do that. Some people -- is it the Marines that say, kill them all and let God sort them out? That's not our system. That's not our system and it ought not to be.

Let me talk to you a little bit about capital murder. And I'm just going to assume that you don't know a lot of these things so I apologize if I'm telling you something that you already know. But in Texas we do have a crime that is called capital murder. Now, there are actually several different degrees, if you will, of how you can commit a murder in Texas. Capital murder is the highest degree because it carries the highest punishment. It carries the potential, the possibility that if convicted of capital murder you might receive the death sentence because nothing is automatic in a

criminal system like that.

Below capital murder is what we call first-degree murder. And I hate to say just plain murder, but it is just murder. That's a first-degree felony where you could still be looking at the possibility of life in prison.

Below that we have other kinds of murders. We have manslaughter where you might have taken the life of a person because you were being reckless in your act.

Below that even we have criminally negligent homicide where you may have taken the life of another because you were negligent. You were driving your car not paying attention. You look up, there's somebody, you hit them, and you kill them. You are liable for that. You are guilty of a murder for that, but it's not a capital murder and you wouldn't be eligible for the death sentence.

All these different degrees of murder depend on what was your intent. What was going through your head, what was your mental state at that time. Did you mean to kill the person or were you just being reckless, or were you just being negligent. And that's one of the things that a juror decides in a criminal case.

But let me talk to you about capital murder. Capital murder is this. It always involves this, sir,

always that you intentionally took a life, plus there is an aggravating factor.

For example, a capital murder could be the intentional taking of the life of a child under six years of age, or it is the murder of a police officer while he's in the line of duty, or it is the murder of two or more people at the same time, or it is the intentional murder of an individual while in the course of committing or trying to commit another serious felony offense such as burglary, such as sexual assault, such as robbery. So it's always that murder plus something else. And if you are found guilty of capital murder, those "intentional plus that," that's where we talk about that you are now eligible for the death penalty.

Does that make sense to you, sir?

A.   Yes, it does.

Q.   And I think that we had asked you before telling you really what the law was on -- let me see here. On Page 4 on the very first question, sir, we say for which crimes do you think the death penalty should be available? And, again, it's "available," it's not that they would absolutely happen. You said, "Premeditated murder or killing somebody while committing a crime." Well, you really kind of hit the nail on the head there. It's again, it's not just

26

and that is the intentional taking of another person's life. And "intentional" is something that I have to prove in the indictment, that a defendant in a capital murder case intended to take that person's life. Not that there was self-defense involved, or not -- you're not guilty if you kill somebody in self-defense. If I come after you with deadly force, you have a legal right to defend yourself with equal force, and maybe perhaps deadly force if you felt it was reasonable and necessary. And if you did that in defending yourself and you took somebody's life, you're not guilty of anything because you have a legal justification. So when I say you're guilty of intentionally taking another person's life, I'm not talking about you accidentally did it, I'm not talking about, well, I just meant to hurt the person, but they died as a result of it. It is I absolutely intended to take this person's life and I did whatever I needed to do in order to ensure that.

Does that make sense to you, sir?

A.   Yes.

Q.   That is a first-degree murder, a first-degree murder. A capital murder is that plus something else. Capital murder is actually a very exclusive category of crimes to which the death penalty becomes an option, but it's actually a very exclusive category of crimes. It's

28

killing somebody, but it's intending to kill them and doing it while you're in the course of committing another crime. We really don't have a pre-meditation in Texas. I think that sometimes there's maybe a fine line between premeditated and intentional, but it is absolutely that the intentional taking of a life while in the course of committing another criminal offense. And if you are convicted of that you are now an individual where the death penalty becomes an option. It's never anything automatic. The death penalty is never automatic.

As a matter of fact, sir, going through your questionnaire if you turn to Page 5 with me. We asked your opinion on life without parole, and when do you think that serves a possibility, and for what circumstances would a death sentence versus a life sentence be appropriate. And let me tell you why we're asking you that.

In a capital murder a person convicted of capital murder never is automatically assessed the death sentence. That never happens. There's nothing automatic about it. The only thing automatic about it, Mr. Cantwell, is if you're convicted of capital murder, you will receive life without parole. Okay. That's the only automatic thing that happens because the law deems

that, that's appropriate for that type of offense. If you find a man guilty of capital murder, if you find him guilty of intentionally taking a life while in the course of committing, for example, a robbery. If you think he's guilty of that beyond a reasonable doubt, then he has automatically earned himself life in prison without parole. Okay. No way around that. All right. The law believes that at that point, that is what's the appropriate thing to do. That's the appropriate thing to do. That is the law in Texas. And you're always to presume that, that's the appropriate sentence. And I will submit to you, I don't know if you know this. A lot of people think, well, parole, a wink and a nod they'll get out. Life without parole really means that. It means you will die in the penitentiary. Okay.

In order for an individual to receive a sentence of death versus that life without parole, we have to prove more to you. We have to prove to you, in other words, that it's the appropriate thing to do in this case. And as you've recognized in your questionnaire there are actually very strict laws and procedures in place to ensure that it is the right thing to do in this particular case. There's nothing automatic about it. And a jury must go through the evidence, a jury must go through an exercise, if you will, to ensure that that is

30

the right thing to do because I'll tell you that just because an individual is found guilty of capital murder, it doesn't necessarily mean that a death sentence is appropriate in the case. We have many capital murders committed in Texas; many, unfortunately, committed in Dallas County, but they are not always cases where we would seek the death penalty because perhaps we don't feel it's appropriate.

Now, what I feel at this point doesn't matter. If I say "I," my opinion at this point and the opinion of the Defense party, that and a buck sixty will get you a cup of coffee. Okay. What's important is your opinion, but I'm just helping to illustrate a fact here. So if you're guilty of capital murder, the law deems that the appropriate sentence is life in prison without parole and there's no turning back on that. That's it. But before and only if and until a death sentence is imposed, certain obligations must be met and those obligations must be met by the State.

I have sought the death penalty in this case. Therefore, it is my obligation to prove to you that it is the appropriate thing to do in this case. And I think you would agree with me that, that's just fair.

A. I agree.

Q. Yeah. You will determine -- you will make

that determination as to whether or not it's a life without parole sentence, which he's already got. You will make that determination if we're going to go that step further based on the evidence in the case. That's what will be the defining determination in this case is does the evidence dictate that that's the proper thing to do.

Now, keep in mind, Mr. Cantwell, that if a person found guilty of capital murder receives life without parole, where are they going to serve the rest of their life? Where is he going to be for the rest of his life?

A. Prison.

Q. Prison, yeah. He will be in prison. And I will submit to you that's a pretty harsh punishment. The law recognizes that. Life without parole, you're going to get that, you're going to live in prison for the rest of your life. So what the lawmakers have told us as representatives of the State is that you must prove to these jurors beyond a reasonable doubt that that individual that will now serve life in prison without parole, that even when he's in prison he's going to be a future danger, he's going to be a threat to the people that he lives with. You must prove that. And only if and until you can prove to these twelve jurors that in all likelihood, more likely than not, that he

32

will commit criminal acts of violence and be a continuing threat to the people that he lives with, if you prove that, then you're getting a step closer to the death penalty. But if he's the kind of guy who is going to go to prison for the rest of his life, he's going to act right whatever right maybe in prison, he's not going to be a threat to the other inmates, he's not going to be a threat to the guards or the people that are there, he's not going to be a continuing threat to that society. If you can't prove that, then he needs to just serve his sentence of life without parole. The death penalty protects, or maybe is designed, as looking at the protection of the people that he will now come into contact with in the future.

Does that make sense?

A. Yes, it does.

Q. And I think that you can envision, if you will, that, you know, his society is a lot different from our society. My society is going to the grocery store and the library and maybe concerts and going home and talking to you. That's my society, and the people that I come into contact with are the people on the streets. A defendant's society serving life in prison without parole is the people that he is with everyday. And he will live there, he will eat there, he will sleep

33

there, he will work there, maybe he will play there. And there are other people in that society with him who are not just inmates. There are guards, there are wardens, there are doctors, there are nurses, there are teachers, there are clergy. There are people who are family members to other inmates who will come and visit them there. So we're talking about a society not just of the inmates, but also of the people who may come in from the outside, if you will. So that's a society that we're talking about. And I think that the lawmakers recognize that the people who are serving time in prison and the people who also come into that prison also deserve a right to protection. That inside our penitentiary, Mr. Cantwell, there are individuals serving time for many, many different types and kinds of offenses. Some are violent offenses, some are property offenses. There are people in there serving time for felony DWI with a drinking problem who are trying to maybe get some help. There are people in that prison serving time for theft crimes or property crimes, you know, and they are there and they are serving their time and they anticipate that perhaps they will get out some day. So there's a lot of different people in there.

You can tell me if you agree with me or not, but the other inmates that are in there doing their time, do

35

that future dangerousness before they could go further in getting the death penalty?

A. Yes.

Q. Okay. That's one of the questions that you have to answer and we call them special issues. Okay. And I won't spend a lot of time on the guilt-innocence phase of the trial because we have in Texas what's called the "bifurcated trial system." It's always in two parts.

The first part of a trial you as a juror are called upon to answer one question and that is this. Has the State proven to me beyond a reasonable doubt that the defendant is guilty of the charges set out in the indictment. And if you feel like I have not carried that burden, then your obligation is to find him not guilty. Okay. If you believe I have proved that to you beyond a reasonable doubt, then I am entitled to a verdict of guilty. And if I've proven that to you beyond a reasonable doubt that he is guilty of capital murder, what's the best he's looking at now, Mr. Cantwell?

A. I'm sorry. Say that again?

Q. If he's proved guilty of capital murder only one of two things can happen now. And what is that? He's guilty of capital murder. What's he definitely

34

they have a right to have an expectation of safety?

A. Absolutely.

Q. Do you think they deserve it?

A. Yes.

Q. Okay. And so what we're looking at now is this guy that's been convicted of capital murder, is he more likely than not going to be a danger to those other people. If I can prove that to you, then he's closer to a death sentence. If I cannot prove to you that he's going to be a future danger to any of those people, then I haven't proved it to you and the law says that the proper thing to do then is have him serve life in prison without parole.

Does that make sense to you?

A. Yes, it does.

Q. Does it sound fair to you?

A. It sounds fair to me.

Q. Okay. Does it sound fair that I should have to go an additional step after proving somebody guilty of a capital murder in order to ensure the death penalty?

A. Yes.

Q. Okay. You wouldn't change -- if you had your druthers, if you were governor for a day, would you still have that obligation that the State have to prove

36

going to get?

A. Prison.

Q. Life in prison.

A. Life in prison without parole.

Q. What might he possibly get?

A. The death penalty.

Q. The death penalty. And it depends, of course, on what?

A. Special circumstances.

Q. The special circumstances, the special issues and the special issues how they are answered by you will always depend on the evidence that I bring you. So I'm just going to step ahead to the punishment phase. Okay. We have found him guilty of intentional murder. And keeping in mind once again, sir, understand the context in which we are right now. I am talking about a person who intended to kill somebody. I am talking about a person who did it while in the course of committing robbery or attempting to commit robbery. Okay. Not an accident. That's it. That's all.

You put in your questionnaire there on Page 5, we asked you to kind of fill you out about this and around the middle there we said, "Which of the following accurately states your general belief regarding a sentence of life without the possibility of parole?"

37

You had said or you were moderately in favor. You said, "It could be some special circumstances. Age, health, complete life transformation. Rare" -- I think you said "rare" there --

A. Yeah.

Q. -- "that could warrant parole."
Then we asked you "What purposes, if any, do you believe life without the possibility of parole serves?" And you said, "It locks up criminals so they can no longer hurt members of society."
I'm going to say that I think at that point when you said "society" you were talking about us, the society on the outside.

A. Yes.

Q. Do you realize, do you understand now that after explaining to you about a prison society, that what we're looking at in a death penalty case is the possibility of that society perhaps being in danger?

A. Yes, I'm aware of that now.

Q. Now you are.

A. I am.

Q. And you didn't know that then?

A. I didn't.

Q. But where you state up here that you said there could be some special circumstances, I'm going to

39

specific offense that was committed, you will look to the specific defendant in the case in order to answer your decisions in the case.
There's nothing automatic. Some people have said, look, if you prove to me that a person intentionally took somebody's life in the course of a robbery, I will tell you that I will automatically -- without even considering the evidence, I will automatically say that they will always be a future danger. Well, they have made an assumption, haven't they?

A. Yes.

Q. They have speculated, haven't they, without looking at the facts of the particular case. Haven't they?

A. They have.

Q. And, in fact, I heard a lawyer say one time that speculation is the mortal enemy of the law, you know, because you're not basing your decision at this point on the evidence in the case, you're just merely speculating without the facts. There are about a hundred million different ways somebody can commit a capital murder of this sort. And if I give you an illustration -- I am not talking about this case, but it's only to illustrate to you the different ways that an individual could commit a capital murder. I think

38

tell you, Mr. Cantwell, that that's absolutely true. Whether or not somebody receives that life sentence or we step it up to that sentence of death will depend on the surrounding circumstances.

MR. PARKS: Judge, I'm going to have to object. I think what he meant about special circumstances were that there could be a possibility of parole even in a case where there was life without the possibility of parole. I think he's being misinterpreted.

Q. (By Mrs. Handley) Well, I believe -- Mr. Cantwell, you understand now there's no possibility of parole.

A. Yes.

Q. You understand that now, sir?

A. I do.

Q. Certainly. And when you filled this out you didn't know that. And I'm only pointing to your writing here of special circumstances to illustrate to you that whether or not somebody receives that life versus receives that death sentence will always depend on the evidence in the case.

A. Yes.

Q. And that no two cases are alike. And no two defendants are alike. And you will always look to the

40

when we hear intentional murder in the course of a robbery, a lot of us think of that classic example of the guy who goes into the 7-Eleven with a gun, robs the clerk of all of the money in the till, and then shoots him to ensure that there's no witnesses and runs off with the money. You know, and that person you could find would be guilty of capital murder. Had they intended to cause that person's death? Yeah. Did they rob that person? You believe they robbed that person?

A. Yes.

Q. Yeah. Guilty of capital murder. And that would be a capital murder in the course of committing a robbery. And I think you would perhaps say that, that's pretty bad.

A. Yes.

Q. That's a pretty bad guy. And that's all you know at this point, but I've given you specific facts about it.
Another example of how a capital murder like that could be done. I could be sitting in my house and decide that I am going to walk five houses down. I'm going to take my loaded gun with me, I'm going to knock on the door of the guy who lives in the house Number 212 and when he opens the door, I'm going to shoot him five times to kill him. And after he falls to the ground,

I'm going to grab his money because I know he keeps money in that house.

Does it sounds like I'm intending to commit a capital murder?

A. Yes.

Q. Sounds pretty coldblooded, doesn't it?

A. Yes, it does.

Q. And then that's all you know at this point, don't you?

A. Yes.

Q. And you might be inclined to say, well, sounds to me like anybody who would do that would be a future danger. But then you hear maybe more evidence that may or may not change your mind. Well, it turns out the guy who lives five houses down from me is a dope dealer. And he's been slinging dope and he's been poisoning teenagers and people in my community far too long. And I've seen people suffer, I've seen lives fall apart, I've seen people die of addiction, and I'm sick and tired of him being a cancer that is invading my community. And I make the decision that I'm going to go down there and I'm going to put it to an end. And I'm taking justice in my own hands and that's not right. There's no excuse for what I'm doing, but that's my motivations. And when he opens the door, I do kill him

---

42

and my motivation is to stop this cancer that's going through my community. And that money that I took, by the way, were his dope proceeds. And I took it down to the local children's hospital and I dumped it into the charity box.

Now, you know, I'm guilty of capital murder, Mr. Cantwell, aren't I?

A. Yes.

Q. I intended to kill that guy, didn't I?

A. Yes.

Q. And I took his money, didn't I?

A. Yes.

Q. And, again, it's just an example. And I will serve life in prison without parole. No question about it. Okay. The question becomes for the jurors in my case now in order to determine whether or not I should get just life or death is am I going to be a future danger to the other people in that prison. And the jury may very well look at me and say, the only person she ever meant to kill and ever would kill, or would ever harm was that guy right there. And it's done. What's done is done. I think she will read books, maybe write books and be a model prisoner, or the jury could say you know what, she's in a prison with a whole lot of dope slingers, isn't she, and she's got a real hostility

---

towards people who sling dope. And, quite frankly, I don't think her deal is done and I think she's going to hurt them.

Do you see what I'm saying?

A. Yes.

Q. But you don't know that, do you, until you hear the circumstances of the offense.

A. Right.

Q. Look at Special Issue Number 1. That's basically what we've been talking about. And this is the question that you have to answer based on the evidence. Do you find from the evidence beyond a reasonable doubt -- which tells you again, alerts you to the fact that I have to prove it -- that there's a probability. There's no definition of probability, Mr. Cantwell. A lot of people say it means more likely than not.

Would you agree with that? Is it more than a possibility?

A. Yes.

Q. Anything is possible. So I have to prove to you that more likely than not that I would commit criminal acts of violence. That's not defined for you. But what it doesn't say is that the defendant would commit another murder, or do you believe more likely

---

44

than not he will commit another robbery, or you believe more likely than not he will hit another defendant. It just says criminal acts of violence. That's for you to decide what that means, what is and is not violence. Some people say it doesn't even have to be physical, it could be a verbal threat to somebody. It could be a criminal act of violence -- but that's for you to decide -- that would constitute a continuing threat to society. And, again, what society are we talking about?

A. The prison society.

Q. We're talking about prison.

You are called upon to answer that question yes, or no. And you can't answer that question yes or no until you hear the evidence in the case and until I prove it to you beyond a reasonable doubt. Only until I prove that to you beyond a reasonable doubt can you answer that yes. Okay. Because the presumption is, is that life is the thing to do and we're not going to go for the death sentence unless you're a danger to the other people in your society. If I can't prove that to you, Mr. Cantwell, then what is your answer to that question?

A. Life in prison without parole.

Q. Yeah, the answer is no, which means life in prison without parole. I've got my life sentence and that's it, that's all. If I'm able to prove that to

you, though, more likely than not the defendant is going to be a continuing threat to his society, then the answer to that he question is, yes. Okay. But it doesn't stop there. There are still more strict rules. There still more things in place. So your obligation, your duty as a juror, is not done. You would now go to the second special issue.

You had a chance to read that back there, I think, in your jury guide. And even then it kind of -- it gives people some pause. Let me just try to explain what that is before we go through it specifically.

In Texas, we have what is referred to as the law of parties. Basically, I think as you can imagine, sir, that often times crimes are committed by more than just one person. Sometimes it's two or more people acting in concert acting together to ensure that a criminal offense is done. And the law of parties takes that circumstance into issue. And the law of parties says this, that if I'm involved in some kind of criminal activity with my co-counsel here, Mr. Gordon Hikel, if I aid, assist, encourage, direct or participate in the commission of a criminal offense with Mr. Hikel, then I am just as guilty as he is.

Okay. If Mr. Hikel and I go to his house tonight, sit at his kitchen table and hatch a plan to rob the

would you have to find that maybe the person actively participated in the offense, but also that they did anticipate somebody would die. Okay. And that's a question that you would answer based on the evidence in the case. So it's saying, have I proved to you beyond a reasonable doubt that the defendant, in the particular case, is the actual triggerman like I was, or if not the actual triggerman, then it was the person who actively participated and anticipated somebody would die.

Does that make sense to you, sir?

A. Yes, it does.

Q. If I can't prove that to you, they weren't an active party, they weren't the actual triggerman, your answer to that question is no.

A. Right. Okay. I agree.

Q. And that life sentence that is presumed to be the right thing, we are at a life sentence. That's it. That's all.

A. Okay.

Q. Okay. That's it, that's all. We go home, going to prison for the rest of my life. I'm getting that sentence that the law says I deserve at that point. If, however, you believe that answer is yes, you were an active participant or you were the triggerman in the case, then now the defendant in the criminal case is

46

local 7-Eleven store, we sit at his kitchen, he tells me the best one in town. I go, I buy a gun. He goes, he buys the bullets. We come back, meet back up at his house, get our gun together, he loads the gun, I grab the masks, put them in the trunk.

We get in his car, we drive up to the 7-Eleven together. He sits in the driver's seat and says, "I'm going to sit here and I'm going to act as a lookout, and if somebody comes, I'm going to blow that horn. You go in there and take care of business."

He hands me that loaded gun, I start to get out of the car, I don't have my mask. Let me get to the trunk. He says, "Don't worry about it. Just don't leave any witnesses." Hands me the gun, I go inside that store, I rob that clerk of her money and shoot her intending to kill her and leave no witnesses. Am I guilty of capital murder?

A. Yes.

Q. Very well could be. Do you think Mr. Hikel could be guilty of capital murder?

A. Yes.

Q. Okay. You may find that he actively participated in the commission of this crime. What this special issue says to you is. Not only -- if this is a case where two or more people were involved, not only

48

sitting square on a death sentence. Okay. Because I've proved to you that he is a future danger in his society and I've proved to you he was an active participant. And now the law says, okay, now he's sitting on a death sentence. All right. He's maybe earned, you could say by what he's done, by his actions, by the evidence in the case. But that's not it. That's not the end of the show. Okay. All he's doing now is he's sitting on a death sentence. And you have one final question that you have to answer back there before we know how this case will really end. Because, again, nothing is automatic. And it's that last special issue there. And, again, it's very wordy.

We refer to that, Mr. Cantwell, as the "Mitigating Circumstances Issue." We also call that sometimes in layman's terms "The Safety Net Issue." Okay. And what it's calling upon for the jurors in a criminal case is the lawmakers are saying, look, we understand that you found this person guilty of capital murder, and we understand based on the particular circumstances of that case you believe he's going to be a future danger, and we understand you think he was an active participant or the triggerman. We understand that at this point he's got his death sentence. But they do this not only for the defendant, but I'll submit to you they do this for

49

the jurors, also, this last issue here. They say we're going to give you this opportunity. We recognize that no two situations are ever alike and that there is always room for possibilities. There's always room for recognizing that there are, as you said, special circumstances that may apply. Okay. And that in a capital murder case even in the case of a person who may be a future danger, there may be something about that case. There may be something about that particular defendant that tells you, tells you, Mr. Cantwell, that you believe actually all that's being said; a life sentence is actually the more appropriate thing to do in this case. You are not going to walk out of this courthouse at the end of this case and say, I felt like my hands were tied. You know, I know it is the one in the million situation, or I know I never thought I'd get to that point, but there was something about this guy; or I'm going to tell you, quite frankly, in my heart of hearts what I thought was the right thing to do. I don't think he should have got the death sentence. I get all that. But I think he should have got life, not death. That, I, Mr. Cantwell, felt that mercy was appropriate in that case. That special issue gives you that option. Okay. And it reads: Do you find taking into consideration all of the evidence -- again, you're

50

looking at everything -- including the circumstances of the offense, the defendant's character and background, the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant turning that death sentence that he's sitting on now, instead, to a life sentence.

And I think you can see it. I think it kind of makes sense. It's kind of a long sentence there, but it's telling you to do, what, look at everything all over again, isn't it? Sit back down and let me look at this issue separately and let me piece this thing apart. Let me look at how the offense was committed, let me look at this particular guy. And what you think is mitigating, Mr. Cantwell, is entirely up to you. You know, you go back there and you can look at the evidence and you can even categorize it. You can say, I'm looking at a circumstance of the offense and I think it's mitigating, or you can say the opposite. You can say, I think it's aggravating, quite frankly; or you can say, I don't think it's anything. But if you look at everything and you say, I think there's some mitigating evidence here you go one step further and you ask yourself, is it sufficiently mitigating, though. Is it sufficiently mitigating to turn that sentence over to a life sentence versus a death sentence.

51

I can't obligate you right now to tell me what you think is mitigating and when will you find somebody -- you know, when will you do that and under what circumstances because quite frankly, Mr. Cantwell, have you heard a shred of evidence in this case?

A.  No.

Q.  You have't heard a thing, have you?

A.  No.

Q.  So I can't commit you now. I think that -- do you understand the special issue?

A.  Yes, I do.

Q.  Does it make sense to you?

A.  It makes a lot of sense to me.

Q.  Do you think it's fair?

A.  Yes, I do.

Q.  And it's kind of like you're doing some mental gymnastics. I mean, some people will go, well, you found him guilty of capital murder and he's a future danger, and he's a participant, he's got horns and, you know, whatever. And how could you ever find something that would mitigate that? And that's not really a good question right now, Mr. Cantwell. The question is, and it's for you to decide, and it's based on your own personal moral judgment what is and is not sufficient and whether or not you think it's appropriate to turn it

52

over. So the question becomes, Mr. Cantwell, if after having done all of that if you saw a piece of evidence, a circumstance, and you personally thought it was mitigating and if you saw something and you personally thought it was sufficiently mitigating, and if you personally felt that it was the right thing to do because it was sufficiently mitigating enough to turn that sentence over, if you personally thought it was the right thing to do, would you do it?

A.  Yes.

Q.  Okay. And if you don't think there's anything mitigating there, if you think there's a hundred pieces of mitigating evidence, but I don't think they are sufficient enough. You know, I don't think I should turn it over, then would you do that, too? I turned that totally around on you, didn't I?

If you think there is sufficient mitigating circumstances to turn it over to a life sentence, would you do that?

A.  Yes.

Q.  And if you don't think there is, would you not?

A.  Right, I would not.

Q.  Okay. And that question I submit to you should be answered on the circumstances and the facts of

the case. I don't know what's mitigating to you or what isn't, you know. It says the circumstances of the offense. Well, maybe it was a case where the guy was a party to the crime, and maybe Mr. Gordon Hikel is also on trial for this. And maybe, quite frankly, he might always be a future danger as long as I'm alive telling him what to do. But maybe Mr. Gordon Hikel was actually about to pull out his cell-phone and call the cops and he was too late and he stayed behind and he tried to save that clerk, and he called the police and he turned me in and he turned himself in, and he's dropped to his knees from the moment this happened and shown nothing but sincere remorse.

He's still going to serve life in prison without parole, isn't he?

A.  Yes, he is.

Q.  Maybe he's warranted that life sentence versus that death sentence, that's entirely up to you. Some people look at age and some people go, well, the guy is kind of young. I think that's sufficient. I think it's mitigating. Other people look at age and go, look, there are guys younger than him fighting the war right now overseas. There are guys younger than him raising kids and working two jobs. That isn't mitigating for me. But if somebody else finds it sufficiently

mitigating that's their decision, isn't it?

A.  Yes.

Q.  That's their decision. And you can talk about it, if they are so inclined, but it's their decision.

THE COURT:  I think we're about out of time.

MRS. HANDLEY:  Thank you, Your Honor. I hope that I kind of brought you up to speed on this process, Mr. Cantwell. I appreciate your answering my questions for me. Now, you're going to have another lawyer ask you some questions, too. Thank you, sir.

PROSPECTIVE JUROR:  You're welcome.

THE COURT:  Thank you, Ms. Handley. How are you doing, Mr. Cantwell? Do you need to take short recess, get a drink of water, or go to the bathroom or anything?

PROSPECTIVE JUROR:  I think so.

THE COURT:  Okay. All right. Let's take just a short recess here. My bailiff will assist you, show you where the bathrooms are, get you a drink if that's what you need. Whatever you need just let him know.

Okay. Let's take about a five or ten minute recess.

(Brief recess.)

THE BAILIFF:  All rise for the juror.

(Prospective Juror, John Cantwell, enters the courtroom.)

THE COURT:  Come on in again, Mr. Cantwell. Just go ahead and have a seat.

Thank you, ladies and gentlemen. You may be seated. And, Mr. Lollar, I believe we're ready for your voir dire.

MR. LOLLAR:  Thank you, Judge.

EXAMINATION

BY MR. LOLLAR:

Q.  How are you, Mr. Cantwell?

A.  Fine, thank you.

MR. LOLLAR:  I'm going to take a minute out of my voir dire just to do one thing and that is to congratulate the State of Texas after four weeks for coming up with a new example.

MS. HANDLEY:  Let's see if Defense can do the same.

THE COURT:  Now, you're on notice, Brad.

Q.  (By Mr. Lollar) Mr. Cantwell, how are you today?

A.  I'm fine. Thanks.

Q.  Good. Well, we've been looking over your questionnaire, obviously, and heard everything you had to say to the State. I see that you're the Regional Deputy Director of the N-I-S-H, the National Institute --

A.  Well, at one time it was the National Institute of the Severly Handicap, except the word handicap is politically incorrect. So now we're just called NISH.

Q.  Okay. So just NISH?

A.  Right.

THE COURT:  And that makes it politically correct, I guess.

PROSPECTIVE JUROR:  Yes.

Q.  (By Mr. Lollar) For the severly handicapped is what it used to be called?

A.  Yes.

Q.  And what exactly does that organization do?

A.  Well, we work with nonprofit agencies, for example, different Easter Seals' organizations, Goodwill, other nonprofit agencies. And we work with the federal government to act as a liaison between them so that the federal government will award contracts to those nonprofit agencies who employ people with severe disabilities.

Q.  Okay. So it's basically to provide employment

57

for persons severe handicap?

A. Yes.

Q. Okay. So this would not be in the area of say getting them wheelchairs, or bedding, or something like that?

A. No.

Q. Okay. Great.

And is that why you travel all the time is because of your employment with them?

A. Yes. We're responsible for Texas and several states around Texas, so I travel in that area and sometimes to Washington.

Q. And what other states do you cover besides Texas?

A. Louisiana, Arkansas, New Mexico, Colorado, Kansas, Missouri.

Q. Quite a big chunk of the country then.

A. Yes.

Q. Okay. Well, great. And then I see that you have lived in several different cities, by my count. I think ten different states, plus Turkey for a couple of years. Is that right?

A. Yes.

Q. And is that because your family was in the military?

58

A. No, because I was in the military.

Q. Because you were in the military.

A. Right.

Q. And you were in the Air Force?

A. Yes, I was.

Q. What was your position in the Air Force?

A. Well, I spent the first four or five years in nuclear weapon operations, missile operations. And I spent the last twenty-five in contract management for the Air Force. And that's basically what I do for NISH is contract management.

Q. I see. And then I see there for fifteen months you were in the county purchaser's office for Dallas County.

A. Yes, I was.

Q. What year was that, or what years?

A. That was 2000 to 2001.

Q. Oh, okay. And who was the lead purchaser at that time, if you recall?

A. I was.

Q. You were. Okay. And was that with Shannon Brown? Do you know Shannon Brown?

A. No, I don't, but that was the job I had.

Q. Okay. I think she's the county's chief purchaser now.

59

A. Right.

Q. And that was the same position you held back then?

A. Right.

Q. Okay. All right. Mr. Cantwell, I want to talk to you about some matters. Obviously, you've heard what this is about. You know it's a serious matter. And since so many people have different ideas about capital murder and the death penalty and that type of thing, you can see that many people have the idea that if you're convicted of a particular offense, then death is the punishment that you get. And that's not the case here in Texas.

A. Right.

Q. I mean, I'm sure that is in some places throughout the world, but not in the United States anymore, anyway. There's no offense in the State of Texas that if you're convicted of it the result is death. Okay. Instead, if you are convicted of the offense of capital murder here in the State of Texas, then the jury has to answer these three questions over here. And we did not expect that you would have ever seen these questions before you got down here today, and so this is kind of a learning experience for you. And by the time you leave here today, you will know more

60

than 99% of the people you run across on the street out there about this process in the State of Texas.

So we appreciate that you didn't know these things, and now you're faced with them for the first time and it's at a time like this when we would like you to refill out your questionnaire to see how your answers would be now that you know we have these three special issues.

So I want to go through some of the things that you told us here in your questionnaire and now, in light of these three special issues, what your answer would be. Okay.

We ask you first if you're in favor of the death penalty. And you said, yes.

A. Where are we now?

Q. On the very front page. What is that first word?

A. "In accordance with."

Q. Oh, in accordance with.

A. I'm sorry.

MR. LOLLAR: Okay. What did that guy tell us the other day?

MR. PARKS: I-O-W.

MR. LOLLAR: We didn't know what that meant either. That was "in other words."

61

Q. Okay. "In accordance with state law judicially apply to very strict rules." That's fine.

Now, you know what the State law is. Right? Okay. Would your answers still be the same down below? We gave you five choices.

A. I think my answer is the same.

Q. Okay. Very good. The prosecutor told you what some of the capital murder offenses were in the State of Texas and I will read the list of them to you just to kind of start talking about this.

Capital murder under Texas law is an intentional murder of another person and that means not done accidentally or not done in self-defense, plus one of the following aggravating factors: If the victim is a peace officer, or a fireman -- firefighter acting in the line of duty. If the victim is a child under the age of six. Now, why the legislature chose six as opposed to seven or ten, or five, I don't know, but they did.

A murder while the perpetrator is in the act of committing or attempting to commit an act of robbery, burglary, kidnapping, sexual assault, arson, obstruction, retaliation or terroristic threat.

A murder for hire, or being the person who hired the murderer, murdered more than one person during the same transaction. In other words, a mass murderer.

62

Murder of more than one person pursuant to the same scheme. And there's a serial murderer.

If the perpetrator is a prisoner in a penal institution, a murder committed while escaping from the penal institution, or a murder of an employee of the penal institution, or a murder committed with the intent to establish, maintain, or participate in a combination or in the profits of a combination, or if the prisoner is serving time for murder, is serving a term of life for ninety-nine years for any offense murders of another person in the penitentiary.

Okay. So there's a whole laundry list of offenses that our legislature has made into capital murder. And I think the point I want to make by saying that is they are all bad. Would you agree with that?

A. Yes.

Q. And they are all different from, oh, what we would call, I guess, the run-of-the-mill murder, the plain murder. You know, two guys get mad at each other in a bar and end up whacking over the head with a pool cue or something. Each one of these is an especially -- a heinous-type of offense.

Okay. And the other thing I want to point out to you -- and you've got a copy of the indictment in this case just as an example up there. And I don't know if

63

you've had a chance to look over that.

A. I have not.

Q. Take a look at that right there just for a minute.

Okay. So you can see that in this case the State is alleging one of those types of murders where they say that the defendant intentionally caused a death of an individual during the course and commission of a robbery and did that by the use of a firearm or a deadly weapon. Okay.

One of the things that the State has to prove is what we call the culpable mental state of the defendant at the time of the commission of the offense.

A. I'm sorry. What was that?

Q. Well, we call them culpable mental states. Okay. And in Texas law there are four culpable mental states that a person must have to make it a criminal offense. And the most serious one is intentionally. Okay. The next one down is what we call knowingly. The next one is recklessly, and then the fourth one is if a person does an offense with criminal negligence. Okay. And Miss Handley gave you some examples of those.

When we talk about a person acting intentionally, the legislature has told us that the definition of that, that the Judge would give you as a juror that you must

64

be bound by, is that the perpetrator formed in their mind the intent to cause the result. Okay. So one of the things in a case like this that the State has got to prove, and it's an element of the offense that they have to prove, and if they don't prove this then the defendant is not guilty of capital murder is that he acted intentionally, intentionally to cause the death of the victim. Okay. And that is something the State has got to prove.

Now, to make it perfectly clear when we say that a defendant commits a murder intentionally, what we're saying is that they formed in their mind the conscious objective or desire to cause the death of the victim, okay, and they did whatever it took to accomplish that goal. But it is a goal that they have got to form in their mind and then do what it takes to accomplish that goal. And that is what we mean in a courtroom down here of the phrase "intentionally." Okay.

Let me give you an example to kind of separate or to illustrate the difference between an intentional murder, and the next one down which would be called a knowing murder.

Okay. If a person has gone into a 7-Eleven store with the intent of robbing the store. Okay. And he has his gun, he goes up to the cashier and says, "Give me

65

all of your money," and they do. Okay. And then he tells the cashier, "Okay. I'm leaving out of here. Don't try to follow me. Don't come around the counter because then you will see which way I go," or what car I get into. Okay. And he starts out the door just as he said he would, but sure enough here comes the cashier around the counter. And so at that point the perpetrator turns back towards the cashier and shoots him in the kneecap to disable them, okay, so that they would not be able to follow them out to see which way he went. Okay. Well, in that instance that person has knowingly committed an act that's clearly dangerous to human life. Okay. And in our example we're using we tell jurors that, unfortunately, when being shot in the knee the bullet hit the femoral artery and the person bled to death before the police or ambulance could get there. Okay.

Now, that is clearly -- what we have there is what we call a murder and an aggravated robbery. No question about that. Both of which could be punished by up to life in prison. Okay. And that's obviously a serious matter as well. Okay. But that's not a capital murder.

Do you see the difference there?

A. Oh, yes, I do.

Q. Okay. Because in the one instance if -- we

66

have this case where they go in and they shoot him in the kneecap, but they did not do that with the intention of causing death. Okay. Now, as opposed to the person who goes in, gets the money from the cashier and shoots him in the head for just -- you know. And that's to illustrate the difference between a capital murder and what we would call a regular murder. In that instance you would have a murder committed during the course of a robbery, but it's not a capital murder and it's because of that culpable mental state of the defendant at the time of the commission of the offense. The law says that both sides can introduce evidence to you, as a juror in the case, about what the state of mind, the condition of the mind is of the defendant at the time of the commission of the offense. And it's to show what level of mental state the defendant had, so that would allow the jury to decide what level of offense the defendant committed. Okay.

We can talk about a reckless homicide and use this example. If on New Year's Eve right at midnight you might step outside and hear people shooting guns off into the air. Some people do that. I don't know why, but that's to celebrate the New Year. Well, the bullet goes up. It's got to come down. And sometimes that can hit a person and, in fact, kill them. Well, obviously,

67

the person didn't intend to kill anybody there, and they didn't even knowingly kill anybody there, but they did recklessly kill someone there. And that's the third level of culpable mental state that we have. Okay.

A fourth level is as Mrs. Handley said. If a person is driving down the road fiddling around trying to find a CD to put into their CD player and run over somebody. Well, that's what we would call an act done with criminal negligence, and certainly a person can be prosecuted for that as well.

So there you have examples of four different situations where the culpable mental state of the defendant is going to direct the jury as to what offense to find him guilty of. Okay.

Any question about that? Any problems with that?

A. No.

Q. Okay. And, obviously, the State has got to prove the rest of the elements of the offense. They have to show that it happened in Dallas County on or about a particular date. They have to show the culpable mental state that a gun was used as opposed to a knife or a baseball bat or whatever. They have to show everything and they have got to prove everything in that indictment beyond a reasonable doubt.

Now, that phrase is not defined under Texas law.

68

What does beyond a reasonable doubt mean to you?

A. Well, to me it means that as I've looked at all of the evidence and digested it and thought about it that there's -- in my opinion, there's no doubt what has happened.

Q. No doubt. Okay. Well -- and like I say the phrase is not defined under Texas law and it can mean to each individual juror whatever you want it to mean.

Now, the State would tell you that it may not necessarily mean one hundred percent because if it was one hundred percent that means that you are a witness and not a juror, and if you are a witness you can't be a juror. Okay. But that's fine. If in your mind it means elimination of any reasonable doubt --

A. Right.

Q. -- elimination of any question that you have regarding the evidence or what you see, that's fine. Okay.

Now, let me tell you that that burden of proof having to prove something beyond a reasonable doubt is the same burden of proof that the State has when we get over to Special Issues Number 1 and 2. And you will see that there, the first lines. "Do you find from the evidence beyond a reasonable doubt that" so on and so forth. Okay. And you have that in both of those two

special issues. Okay.

Now, I think that's all we need to talk about in terms of the guilt or innocence phase of this type of a case because this guilt or innocence phase is just like any other criminal trial in Texas. If you steal a bicycle and you're charged with that the first phase of the trial is going to go essentially like it would go here. The State calls whatever witnesses they want to call, prove that you stole the bicycle. The defendant gets to call any witnesses that we wish to call. Obviously, the defendant himself does not have to testify and the law gives him the right not to testify. It also gives him the right to testify if he should chose to do that. Okay. What the law says, though, is if the defendant chooses not to testify, that a jury cannot hold it against him, that he has exercised that right. And I think you're familiar with that concept having served on these previous jurys --

A. Yes, I am.

Q. -- and the military boards that you sat on while you were in the Air Force; is that correct?

A. Yes.

Q. Is that something that we can trust that you would do and be able to follow that?

A. Absolutely.

Q. Great. And what we expect is in any event, whether the defendant testifies or not, what the jury does is look at the body of evidence presented by both sides, take that back to the jury room with you, you've got the Judge's Charge telling you what the State must do and what the jury must do and cannot do. You follow the law and you arrive at a verdict that's unanimous among the twelve jurors. Okay.

Now, in any type of case just about there might be what we call lesser-included offenses. Like, for example, if we were trying that case where the person walked into the 7-Eleven and told the cashier not to come around the -- you know, the counter. If that's the case we had on trial, well, then that evidence having been presented to the jury, the Judge would include in the charge what is called a lesser-included offense of the murder. And the Judge might also include in the charge what we call a lesser-included offense of aggravated robbery. Okay. So in that hypothetical trial the jury would have a choice of finding the defendant guilty of capital murder, or murder, or aggravated robbery. See? So you might have that come up in any kind of a case and certainly in a capital murder where there's so many different elements, and we're actually talking about the top of the pyramid.

Okay.

Any question about that?

A. No.

Q. Okay. Now, in any other kind of a case, except this type of case, then if a jury finds the defendant guilty of an offense then in the second phase of the trial, what we call the punishment phase -- again each side gets to present evidence. The State can if they want to. They don't have to. The defendant can if he wants to, but we don't have to. At any rate once you have all of that body of evidence before you the jury goes back. And in any other kind of case, then the Judge will tell you what the penalty range is for an offense. Whether it's two to twenty or five to life, whatever. And then the jury decides what's the appropriate punishment within that range of penalty. Okay. And, you know, if it's first-degree, then it's five to life. And a jury can agree on five years, you can agree on life, you can agree on twenty, or forty, or sixty, or whatever in-between.

Now, not in this type of case. Okay. In this type of case when a jury finds a defendant guilty of capital murder, what they have done is assess a life sentence in the penitentiary without parole and people are confused. Some jurors are confused and think that somehow a person

sentenced to life without parole can get out of the penitentiary at some time if on good behavior or whatever. Let me assure you that is not the case.

A. Okay.

Q. A person could win the Nobel Prize in literature from their penitentiary cell, but they won't be going to Oslo. Okay. So if you had any thoughts about that, get them out of your mind because in Texas, it is life without parole which means they are going to die in the penitentiary.

A. I undestand.

Q. And that may be tomorrow, that may be six years from now. Okay.

Okay. In talking about these special issues -- and let me say right from the get-go, and you may remember this. Back in 1969 the Supreme Court of the United States overthrew every death penalty in the United States that had been issued up until that time. Okay. And they did that because they felt the State laws were capricious and arbitrary. And they said, okay, we're not saying you can't have death penalty, but you've got to set up rules and regulations so that there's a delineation among those persons who are guilty of capital murder as to which ones get sentenced to death and which ones do not. Okay.

73

And so Texas legislature came up with these special issues. These haven't always been the same special issues, but this is what we have now. And each one of these special issues means something and it means something important. And I want to talk with you about each of the special issues so that you would understand as a juror in a case like this what is expected of a juror.

Okay. First of all, remember what I said. If a person has been found guilty of capital murder, they have earned a sentence of life without parole. Okay. And these special issues determine if that's not enough. Okay. And going further, should that person be put to death rather than be allowed to live in the penitentiary for life, for the rest of their natural life? Okay.

And let me tell you this, also. These special issues were put in there to be barriers to the imposition of a death sentence. Okay. And they are not speed bumps on the way to a death sentence, they are barriers to the imposition of a death sentence. And the first one is first for a good reason. And it tells you, if we look at it together, "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing

74

threat to society." Okay. And now I think we're all agreed that the society we're talking about now is prison society.

Now, we've got 153,000 inmates in the penitentiary here in the State of Texas. We've got 150 prisons around all over Texas. Of course there are wardens, there are guards, there are nurses and doctors. There are visitors that come to see people in the penitentiary so there is a society of people that they would live among. Okay. And that is the society we're talking about now. Okay.

Now, obviously, we're talking about a penal system where you have trained people running it. Okay. I would not be a good prison guard. I don't know about you, but I wouldn't be a good one, I don't think. For one thing I haven't been taught how to be a prison guard, but you've got to assume that the people down there have been taught how to be prison guards and they know how to control the place.

Is that a fair statement?

A. Yes.

Q. Okay. Very good. Back to Special Issue Number 1. You see what it's asking there is for the jury to determine if the person on trial, based on the evidence that you've heard, convinces you beyond a

75

reasonable doubt that this person is the type of person who's going to keep on committing criminal acts of violence that will constitute a threat, a continuing threat, to prison society. So people who are attacking guards, people who are attacking nurses, people who are attacking other inmates, you know, that's the type of person that the legislature has singled out for execution, okay, and only that type of person. And how serious do they think that issue is? They put a burden on the State to prove that issue beyond a reasonable doubt. And they tell the jury that the presumption to that answer is no. Okay. The presumption is that they will not be a future danger and they put a burden on the State to prove that issue beyond a reasonable doubt that same burden of proof that they put on the State in the first part of the trial to prove the defendant is guilty beyond a reasonable doubt. Okay. It's that important. And, again, your definition of beyond a reasonable doubt, "no doubt." Right? I mean, that's what you told us here a little while ago.

A. Yes.

Q. So you see you used the same burden of proof in answering that special issue that you used in the first part of the trial in the guilt-innocence phase. Okay.

76

What we like to tell people -- and it's the absolute truth under Texas law. For a person who is on trial for capital murder, it's not what they have done that's going to determine whether they get death, it's what they are likely to do in the future. Okay. You see how that's exactly true under Special Issue Number 1?

A. Yes.

Q. Very good. And just to say it again. The word they put in there is "probability," not possibility. Okay. I suppose anything is possible, but what they are talking about is a probability that the defendant would commit criminal acts of violence that's going to constitute a continuing threat to prison society. Okay.

Any question about that in your mind?

A. No.

Q. Okay. Now, I want to ask you this. Some people tell us, well, wait a minute now. You've shown to me beyond a reasonable doubt that the person in our hypothetical case charged with a murder during the commission of a robbery, charged with an intentional murder, okay, you've proven that to me beyond a reasonable doubt that the person on trial intentionally got a weapon, intentionally loaded it, intentionally

77

went and committed a robbery, and intentionally caused the death of the victim. Okay. Well, to me that's the type of person who is always going to be a future danger. Okay. And other people tell us, no, that's not what I think. What do you think?

A. What do I think?

Q. Yes.

A. Well, I would agree with that.

Q. You would agree with what?

A. I would agree that if someone took all of those steps that you mentioned that resulted in the killing of another person, that there's a probability that person will do it again or exhibit other violent crimes.

Q. Fair enough. So are you telling me then that if you find a person guilty beyond a reasonable doubt of that type of a capital murder, that you will always answer that in Special Issue Number 1 because you think that is the type of person who would probably commit criminal acts of violence in the future?

A. If you could repeat that question.

Q. Sure. Are you telling me that --

A. I'm sorry. Are we just looking at the special issues, not --

Q. Yes, Special Issue Number 1. Okay. And so

79

yes.

Q. That's what we're trying to determine. That's what the law would presume.

A. Okay.

Q. Because there's a presumption that the answer to Special Issue Number 1 is no for anybody convicted of capital murder under any of those different circumstances we talked to, those thirteen or fourteen different circumstances. But that's what I'm trying to find out is if that is a law that you, yourself, can follow.

A. Yes.

Q. Okay. So you would not presume that that person would automatically be a future danger?

A. I would not.

Q. Okay. Very good. I want to make it clear about that because you about fell off the wagon there, Mr. Cantwell. The law would say that a person who can't presume that the answer is no is not a qualified juror in this type of a case. Okay.

So that I'm clear you're telling me that just because you found a person guilty does not, in your mind, mean that they are necessarily going to be a future danger.

A. Right.

78

that I understand what you just told me. Are you telling me if the State has proven to you beyond a reasonable doubt in the first part of the trial --

A. Okay.

Q. -- that the defendant on trial is a person who committed an aggravated robbery and during the course of that aggravated robbery used their deadly weapon to intentionally cause the death of the victim -- okay, and, obviously, that's the type of trial we have going here. Okay. Are you telling me that if you find that person guilty of the offense of doing that type of an act that, to you, that is the same type of person who is always going to be a future danger?

A. I would disagree with that.

Q. You would tend to agree with that?

A. I would disagree with that.

Q. You would disagree with that. Okay. Then I didn't understand what you told me. So --

A. You know, I guess what I think, based on everything I've heard today --

Q. Sure.

A. -- just because someone is found guilty in the first phase --

Q. Uh-huh.

A. -- does not necessarily mean that 1 or 2 are

80

Q. Okay. And you I think that's a reasonable thing to believe. You might find that what that person did was an aberration for them, that they might have been under the influence of some kind of alcohol or drugs or something that led them to do the offense when they might otherwise not have. You might have found that there might have been something particular going on in their life, whatever. But if you're with us still on Special Issue Number 1 --

A. I am.

Q. -- okay, the law says that you must presume the answer to that issue to be no.

A. Right.

Q. And wait until the State produces, if they can produce, evidence to convince you that the person on trial -- despite what they have done in the past on that incident -- would be a continuing threat. Okay.

What types of things would you look for in terms of evidence to help you determine whether the answer to Special Issue Number 1 is yes, or no?

A. I think it's kind of hard for me to say. It would be, you know, how heinous the crime would be.

Q. Okay.

A. You know, the thought process of the crime. I think all the steps prior to the crime and during the

81

crime. I was just thinking you would have to take all of that into consideration.

Q. Okay. Sure. And people have told us that. They have used the example of a Timothy McVey, for instance, you know, the one instance that he did. I don't think he had a prior criminal record at all, but certainly killing 300 people including a bunch of kids was something to show you that they are the type of person that are a future danger. All right.

A. I would agree with that.

Q. Very good. Some people tell us that in answering that question they would look for whether or not the State has shown whether the person on trial has a history of committing criminal violent acts, criminal or violent acts; and particularly, the violent acts in a person that has shown a history of committing violent act, after violent act, after violent act. And then you've got the capital murderer that that is the type of person who is probably going to commit criminal violence acts in the future.

Is that something that you would agree with?

A. I would.

Q. And, conversely, if the Defense points out to you that the person on trial does not have a history of committing violent acts, is that something which would

83

guilty of this offense, he's an intentional murderer, and they have proven to me beyond any reasonable doubt that he's a future danger, that really there aren't any mitigating circumstances that would ever rise to the level of being sufficiently mitigating that I would want to avoid the death penalty for that person. Because if they have proven to me he's going to be a future danger then the criminal acts of violence that I think he's going to commit in the penitentiary are on my head, on my conscious.

How do you feel about that?

A. I think that argument seems logical. You know, but I think that -- and I wouldn't have any examples that despite that, there could be some mitigating circumstances --

Q. Okay.

A. -- that you would not want the death penalty.

Q. Okay. And I want to talk with you about a couple of those. And particularly -- if I could find it again. Page 8 of your questionnaire, about three-fourths of the way down we ask you this question. "Some people feel genetics, circumstances of birth, upbringing and environment should be considered when determining proper punishment of someone convicted of a crime. What do you think?" You say, "no." Okay.

82

be relevant to your consideration to Special Issue Number 1?

A. Yes, as well as all the other factors.

Q. Okay. Very good. Special Issue Number 2 is pretty straight-running and it's only given to you by the Judge in the event that the evidence shows there was more than one person involved in the commission of the offense. But the question is, is the person on trial the shooter, or if they are not the shooter, did they intend that the death of the victim occur, or did they anticipate that the death of the victim occur. Okay. That's pretty straight-running. You may or may not get that depending on the facts in the case.

Let's go to Special Issue Number 3. And let me tell you where you are now by the time we get to Special Issue Number 3 as a juror.

You have found that the defendant on trial is a capital murderer, is an intentional murderer, and you have found beyond a reasonable doubt that he is likely to be a future danger to the prison society. Okay. So if you've answered Special Issue Number 1, yes, you've answered Special Issue Number 2, yes, now you're coming to Special Issue Number 3. And frankly, Mr. Cantwell, people tell us -- we've had people tell us, look, if they have shown me beyond a reasonable doubt that he's

84

Now, I want you to take a look at Special Issue Number 3, again, over here with me. And it says, "Do you find taken into consideration all of the evidence including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life without parole rather than a death sentence be imposed?"

You see how that special issue and our legislature and the Supreme Court of the United States is telling you to look at the background of the defendant?

A. (Nods head).

Q. Do you see that?

A. Yes.

Q. Okay. And the reason being just as you said that there might be a mitigating circumstance despite the fact that the person has been found guilty and might be a future danger -- would be a future danger. Okay. That would allow you to avoid a death sentence for that person. Okay.

And is that something you think you could do?

A. Yes.

Q. Okay. Let me run some things by you what other jurors have suggested to us might be a mitigation

85

issue, a mitigating circumstance that would be sufficient to them to avoid a death sentence. Number one, the age of the defendant at the time of the commission of the offense.

Now, the law says that a person cannot be executed for an event that occurred when they were 17 years of age or below. Okay. But 18, 19, 20, 21, you know, somewhere in there if they show us that the defendant was of that age. And by saying that they are saying they are not mature, their brains hadn't fully developed. All of those things you heard about that that might be something that they would give consideration to. How about you?

A.    I think that that would be a consideration. I'm not sure of the weight of that.

Q.    Sure. Just as long as you would be able to look at something like that and give it consideration, meaningful consideration.

Is that something you could do?

A.    Yes, as well as all the other factors.

Q.    Sure. Some people tell us that, again, a lack of significant prior criminal history or violent history would be a sufficiently mitigating circumstance for them. How do you think? See, because that could be relevant to both Special Issue Number 1 and to Special

87

can't prosecute me. That doesn't work that way. But what Texas law says is this. That evidence of voluntary intoxication may be considered as a mitigating circumstance in punishment.

Okay. How do you feel about that? Is that something that you feel you would be able to give consideration to?

A.    I think I would have a pretty hard giving that consideration. But, again, I guess I would try to give everything consideration.

Q.    Okay. Some people feel that the life history of a defendant, how they got to the point where they were committing a capital murder is something that they would look at and consider. How about yourself?

A.    No.

Q.    No? So whether he is born with a silver spoon in his mouth or whether he was fed dog food by his parents locked up in a closet, that type of thing, you wouldn't look at?

A.    I wouldn't. I can't conceive of that being a special circumstance.

Q.    Okay. All right. Some people feel that if a defendant has shown to have been the victim of physical, or sexual, or mental abuse as a child growing up that's something that could rise to the level of sufficient

86

Issue Number 3.

A.    Right. I guess -- I guess I don't see how you can get all the way to 3, but...

Q.    Well, you might have that Timothy McVey situation. Didn't do anything before, but did that. Okay. But then you're over here at Special Issue Number 3. I don't know. Is that something you think you might ever look at and consider meaningfully whether --

A.    I think so.

Q.    Okay. All right.

A.    I think it's important to look at all of those factors.

Q.    Okay. Now --

A.    I mean, I guess I just think that it's very important to go through the whole process and in every phase and every special issue to look at everything.

Q.    The next one I want to talk to you about is a person who committed the action, the capital murder, while they were under the influence of drugs or alcohol.

Okay. And we talk about that in a couple of places in the questionnaire down at the bottom of Page 5. We tell you what the law is in Texas. Voluntary intoxication does not constitute a defense to the offense. You can't go out and commit an offense and say, well, I was drunk, or I was high, therefore, you

88

mitigating circumstance. How about with you?

A.    I would say no.

Q.    Okay.

A.    Assuming it's -- I mean, it has nothing to do with this instance. Right.

Q.    Okay. All right. Some people say that if they hear from friends and relatives of the defendant, the people that know him best, to say that the action that he did on the day in question was totally aberrant for him; that, that's not the way he normally is and that he's not normally violent, that type of thing; that, that would be something that they would look at and be able to avoid a death sentence.

How do you think about that?

A.    Like I said, I would consider that.

Q.    I'm sorry?

A.    I would consider that.

Q.    You would?

A.    (Nods head).

Q.    Okay. And, finally, some people who have told us that whether or not the person on trial, if we're talking about the offense being committed by more than one person, that they were not the leader of that group. They were not the one that thought it up and got it together and that type of thing, but instead were a

89

follower. That they were, in fact, acting under the domination of a stronger personality in doing what they did might be a sufficient mitigating circumstance for them.

How do you feel about that?

A. Well, you said under the domination of another person.

Q. Uh-hum.

A. I mean, it almost seems like you're talking about other than free will.

Q. Free will has a lot to do with it.

A. You know, I guess there could be circumstances where someone -- a follower. That could be a mitigating factor.

Q. Okay. All right. Let me say just a few final words about these mitigating circumstances. Okay.

The law does not say that all the twelve jurors have to agree among themselves what a mitigating circumstance is or is not. Okay. You could find something to be a mitigating circumstance sufficient to warrant a life sentence; whereas, the juror sitting next to you would not think that it was, okay, or they might think something is where you don't think it is. You know, you might have twelve different jurors seeing the evidence and each one of them has a thought of something

90

different that is a mitigating circumstance sufficient to get a life sentence instead of a death sentence. Okay. The law says that fine. Y'all don't have to agree on those type of things.

So you understand that?

A. Yes.

Q. And finally, the law says that it is expected that each individual juror in answering Special Issue Number 3 come to their own personal moral judgment about the appropriateness of the death sentence for this defendant in this trial. Okay. Their own personal moral judgment. Okay.

And I would just ask you if you came, in your personal moral judgment, to the opinion that the defendant should receive a life sentence instead of a death sentence, that the other eleven jurors in there don't think so, are you the type of person that could stick to your guns?

A. Yes.

Q. Likewise, you know, telling somebody what their own personal judgment should be is like telling somebody what their religon should be or, you know, who they live with, or how to raise their kids. It's their personal moral judgment. To me, nobody can tell me what my personal judgment is and I don't have a right to tell

91

anybody else what their personal moral judgment should be.

Do you agree with that?

A. Yes.

Q. Mr. Cantwell, do you have any questions of us?

A. No -- well, I guess I would just like to know what the next steps are.

Q. Well, the next step is for us to talk about you behind your back. And then what we're doing, Mr. Cantwell, we're qualifying a panel of 50 people out of that group of 800. We're trying to find 50 people who can make it to the second round. Okay. And you will know here by the time you leave whether or not you've made it to the second round. And then when we have a group of 50 qualified -- and you would be number 28 of that 50, so we're over halfway there -- then the lawyers get together, the State gets to strike some they don't want. We get to strike some we don't want, and the first twelve left over are the jurors. So you will know here in just a minute whether or not you've made it through to that second round. Okay.

Any other questions?

A. No, sir.

MR. LOLLAR: Thank you, Mr. Cantwell.

THE COURT: All right. Thank you.

92

Mr. Lollar.

Mr. Cantwell, I'm just going to ask you to step outside briefly with my bailiff while I confer with the attorneys, and then I'll bring you back in and explain some stuff, things to you.

(Prospective Juror, John Cantwell, exits courtroom.)

THE COURT: All right. Miss Handley, does the State have challenge for cause?

MRS. HANDLEY: We do not.

THE COURT: And, Mr. Lollar, does the Defense have a challenge for cause?

MR. LOLLAR: We do have a challenge for cause, Your Honor, based on his response and with regard to Special Issue Number 3, the juror said he would not be able to view as mitigating circumstance evidence that a defendant was acting under the influence of alcohol or drugs. He would not be able to look at a defendant's life history a possible abuse as a child. Physical abuse, sexual abuse, mental abuse, those type of things. He would not consider that.

So there were three issues there where he said that he would not pay consideration to them and would find them to be irrelevant. He would give them no weight at all, which is contrary to the holdings of the

93

United States Supreme Court in Lockett versus Ohio, Morgan versus Illinois, and Eddings versus Oklahoma.

So we feel the juror is not qualified insomuch as we've told the Court, many times before, that those are some of the mitigating circumstances in which we intend to show in this case should we get to that portion of the trial.

THE COURT:  All right.  Thank you, Mr. Lollar.  Mrs. Handley.

MRS. HANDLEY:  I think this juror -- Your Honor, I think he's demonstrated with respect to his conversations with Mr. Lollar on Special Issue Number 3 statements such as, it is important to look at all of the information and all of the factors.  I could consider particular things being mitigating.  And he's even stated in there that he may consider, for example, age mitigation, but he's really not sure right now what weight he would give that, but he has certainly demonstrated an ability and a willingness to look at everything and take it into consideration.

THE COURT:  Okay.  The defendant's challenge for cause is denied and Mr. Cantrell will be Number 28, qualified as Number 28.  So if you will bring in Mr. Cantrell -- Cantwell.  I keep mispronouncing his name.

94

MR. LOLLAR:  Excuse me, just a minute. Judge, would the record reflect this is a juror that is not acceptable to the Defense?

THE COURT:  So noted.  Okay.

THE BAILIFF:  All rise for the juror.

(Prospective Juror, John Cantwell, enters the courtroom.)

THE COURT:  Come on back in, Mr. Cantwell.  Just go ahead and have a seat there. Thank you, ladies and gentlemen.  Be seated, please.

Mr. Cantwell, you've been qualified as Prospective Juror Number 28.  And as Mr. Lollar has already pointed out to you kind of the procedure now is that I anticipate toward the end of July, you will be noticed.  By that time we should have our 48 to 50 persons that were qualifying for this panel; as Mr. Lollar said, make it to the second level.

Well, you've made it to the second level, but it still doesn't mean that you're a juror because each side has fifteen preemptory strikes or challenges and they can strike fifteen people from that panel.  And the first twelve that don't get struck by either side then would be the jury.  And you very well could be one of them and then again, you may not be so -- but you will find out.  You will be notified toward the end of

95

July as to whether or not you are on the jury.

Now, I would like for you to do a couple of things for me right now.  We anticipate the evidence will start in this case on August the 10th.  That's the trial date that Judge Snipes has set to start evidence in this case.  And we're kind of ahead of our schedule here and so we should be ready in plenty of time to begin the trial at that time.  We anticipate it will take about two weeks.  So what I would like for you to do now that you know that you are a potential juror is to go home and log that on your calendar, pencil in those two weeks on your calendar.

Now, should you be notified in July that you're not on the jury then, of course, you can do whatever you want to during that time.  But in the event that you would be notified that you are one of the jurors, then you would have to report for jury service on August the 10th.

PROSPECTIVE JUROR:  Okay.

THE COURT:  And we anticipate, as I said, that the next two weeks would be involved in the trial.

Okay.  Now, also with regard to any pretrial publicity, I think you've already indicated you don't know anything about this case.  If you do, if you heard anything about it you don't remember it, so that's

96

exactly the way I want to keep you.  Of course, if you are on the jury, then the first thing that Judge Snipes would do is to administer the oath of a juror to each of the jurors.  And what you would be sworn to do at that time is make your decision or decisions in this case based solely on the evidence that's presented in court and then the law that Judge Snipes would give to you with regard to guilt-innocence, and then even possibly into the punishment phase if the trial proceeds into the punishment phase.  So we don't want you coming back to court, if you're on this jury, with my preconceived ideas after having read newspaper articles or what have you.  So I'm going to ask you not to go back in the archives or go back on the internet to try to find old newspaper articles or T.V. reports.  And if you see anything that might come up between now and August the 10th, if you will just reframe from reading those articles or listening to those T.V. or radio reports. All right.

Very good.  Thank you very much, Mr. Cantwell.  We appreciate your time today and you will be notified toward the end of July.

PROSPECTIVE JUROR:  Okay.

THE COURT:  Thank you, sir.  Let's give Vicki just about a short recess here before we get to

97

our last one this morning.

MR. LOLLAR: Judge, what we were thinking, maybe the State would do their voir dire and then we could go to lunch and come back and we could finish up because I think we've got problems with people with afternoon.

MRS. HANDLEY: We can do what the -- probably we should do what the juror wants to do.

THE COURT: Yeah. I could ask if they want to break for lunch, but I'd kind of like to go ahead just because we do have -- of course, we do have -- I anticipate we're going to have some extra time this afternoon. They've been waiting here all morning so I'd kind of like to go ahead and get it done. Let's take a short -- let's just take a short recess right now. Let Vicki relax for just a minute and then we'll start with Mr. Lopez.

(Brief recess.)

THE COURT: Let's go ahead and bring Mr. Lopez in, please.

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 682, Abraham Lopez, enters the courtroom.)

THE COURT: Come in, Mr. Lopez. How are you this morning? Actually, this afternoon -- well, no,

98

it's still morning. Go ahead and have a seat, if you would, please, sir. And good morning to you. Thank you, ladies and gentlemen. You may be seated.

And, Vicki, I would like for the record to reflect this is Prospective Juror Number 682, Abraham Lopez. And, Mr. Lopez, I'm going to give you your questionnaire that you filled out about two months ago, Mr. Lopez, and I know you haven't seen it since then. But I'm sure you've had ample opportunity since you've been waiting out there practically all morning long to kind of read over the -- kind of the jury guide, the questionnaire -- not the questionnaire, but the jury guide, the orientation guide.

PROSPECTIVE JUROR: Yes, Your Honor.

THE COURT: Okay. Good. Well, let me just tell you, Mr. Lopez, that that orientation guide is just kind of a thumbnail view, if you will, of the law as it pertains to capital murder cases. And what you're here for today is that the attorneys are going to ask you questions to get your ideas, your thoughts, your opinions, if you will, about the law and about some of the procedural aspects that will be involved in the trial of this case, the capital murder case.

Do you understand that?

PROSPECTIVE JUROR: Yes, Your Honor.

99

THE COURT: Okay. Very good. Now, then, Mr. Lopez, do you recall it's probably been almost two months ago that I guess it was five -- four or five hundred of you that met together down in the Central Jury Room downstairs here in this building and Judge Snipes, the Presiding Judge over this case, talked to the group. And at some point in the proceedings he had everybody stand up, everybody on the panel stand up, raise their right hand and he administered an oath to those panel members.

Do you recall that?

PROSPECTIVE JUROR: I do you recall, Your Honor.

THE COURT: Okay. Were you one of the panel members that took the oath that Judge Snipes gave at that time?

PROSPECTIVE JUROR: I was one of the panel members.

THE COURT: Very good. I'll just remind you that you are still under your oath. And I know you don't remember what you were sworn to do having been almost two months ago now, but the oath entails that you will tell the truth, or give truthful answers. And we know that you're going to do that anyway. But also that you be responsive to each and every question that the

100

attorneys ask you during this voir dire examination.

Will you do that for me please, sir?

PROSPECTIVE JUROR: Yes, Your Honor.

THE COURT: Very good. Thank you. Okay. Now then, I guess we'll just get right into it. And, again, we thank you for being so patient and waiting on us. And at this time I'm going to introduce the attorneys to you that are going to talk to you and that are involved in the trial of this case.

Seated at the counsel table directly in front of you here, Mr. Lopez, is Ms. Andrea Handley.

MRS. HANDLEY: Good morning.

THE COURT: And seated next to her is Mr. Gordon Hikel.

MR. HIKEL: Good morning, sir.

THE COURT: And then behind them the young lady back there is Miss Elaine Evans. And these three, ladies and gentleman, are Assistant District Attorneys here in Dallas County and they are a part of the prosecution team that has the responsibility of prosecuting this case.

And then seated at the counsel table directly in front of me here is Mr. Brad Lollar, and then next to him Mr. Doug Parks, and then on the very end down here Miss Keri Mallin. And these three

attorneys comprise the Defense team and they represent Mr. James Broadnax who is the individual sitting in the middle there and is the defendant in the case. All right.

Okay. Ms. Handley, are you going to do the --

MRS. HANDLEY: Yes, sir.

THE COURT: Okay. You may proceed.

MRS. HANDLEY: Thank you, Your Honor.

ABRAHAM LOPEZ, having been duly sworn, testified as follows:

EXAMINATION

BY MRS. HANDLEY:

Q. Good morning, again, Mr. Lopez. How are you doing?

A. Good, ma'am.

Q. I'm glad to hear that. I appreciate you being here, first of all. Let me say that on behalf of everybody, we appreciate you coming down that day, filling out this questionnaire, being as thorough as you were. That helps us in talking to you and in determining whether or not you would be a qualified juror for this particular case.

I see that you already have an interest in the legal system.

---

case.

Not everybody is qualified for this kind of case. There are some people who just don't have the internal fortitude to be involved in a death penalty case. Some people have already made their mind up on what should always happen to a defendant who is convicted of capital murder, and those people are not also qualified because they haven't come in with an open mind. But most importantly, not only do we want to see if you're technically qualified, but we need to fill you out and know a little bit more about you personally and your background and where you're coming from. And I'll tell you I think the thing that we all really want to hear about first and foremost is your involvement, apparently, right now in a death penalty appeal.

Am I understanding that correctly?

A. Yes, ma'am.

Q. Could you tell us exactly what's going on? Who do you work for? What is the case? What are you doing with that?

A. Is that --

Q. Without violating any client privileges. I don't want you to do that. But what is your hesitation?

A. Attorney/client privilege.

Q. I don't want you to tell me about your client.

---

102

A. Yes, ma'am.

Q. That you've taken some criminal law courses.

A. Yes, ma'am.

Q. And are currently working as a paralegal.

A. Yes, ma'am.

Q. So if you were to be asked a question, do you believe that the criminal justice system is a fair system, but at times can be a slow system based on today, would your answer maybe be yes?

A. A slow system --

Q. You had to wait a long time this morning is the reason I'm saying it.

A. Oh, yeah. Due process, yeah.

Q. And we appreciate that. We don't take that lightly, but we've had to talk to people individually and sometimes it goes a little bit long, so we appreciate that.

What we're doing, Mr. Lopez, as you know, we brought hundreds of people down to jury service that day and we had hundreds of people fill out questionnaires. Everybody was there that day as a prospective juror for this particular case. And the reason we have them fill out questionnaires is so that each side we can read those, digest those, and then make a determination as to whether or not you're a good juror for this particular

---

104

I don't want you to tell me -- you know, give away any kind of attorney work product.

THE COURT: You can give us the style of the case, could you not, and the attorneys that you work for?

PROSPECTIVE JUROR: I'm not sure if I can.

Q. (By Mrs. Handley) Who do you work for?

A. I work for Carrington Coleman, and we have a death penalty appeal case and it's a pro bono case. There's probably, I think, about four or five attorneys working on it, and I think they are ACLU.

THE COURT: Are you directly involved in that yourself?

PROSPECTIVE JUROR: Yes. I'm way at the bottom, but I'm still just doing whatever they tell me to do.

THE COURT: Could you tell me who is the defendant? I don't think that would be a violation of any attorney/client privilege. I mean, it's public record, so...

PROSPECTIVE JUROR: Jose Angel Valez.

THE COURT: Is it a Dallas County case?

PROSPECTIVE JUROR: No, Your Honor. It's in Beaumont, around in that area. And let's see --

105

we're not the only ones involved in it. There's a Colorado firm and us, and then there's the ACLU and someone else --

MRS. HANDLEY: Okay.

PROSPECTIVE JUROR: -- and we're just -- what all we're doing we're -- I think we're writing up the appeal for it. And right now we've got -- we took all of the documents that they have and we're just trying to start from the beginning in disseminating everything, putting it into a database, the repository. We just barely started and it's taken a while because of different language barriers and trying to gather logs from the jail, and who is talking to him and talking to the attorneys and his local counsel in what's going on. And it's just starting, just beginning with the Colorado firm. And since it is pro bono it's just taken a little while.

Q. (By Mrs. Handley) Let me tell you why I want to know. Okay. And why we're interested in it. And, first of all, I really respect you hesitating for a minute there and going, let me check myself and make sure I'm not violating any attorney/client privileges because that is paramount and that is important, and nobody wants you to do that.

The reason we'd like to know the circumstances and

106

what's going on in your level of involvement is because you are here as a potential juror in a death penalty case. And what's important for any juror coming into a case is that they come in with an open mind, you know. That they don't already have an idea of what should happen in the case, that they will strickly base their verdict on the evidence in the case. And we're interested in knowing how involved you are in a death penalty appeal because we don't know if the issues that you're dealing with in that case might be issues that you would be dealing with in this case. You see what I'm saying? And if they are, you know, you might have very well have done a lot of research on certain special issues that apply to that particular case. You might have already formed an opinion on those special issues, or you might then bring it into this case in how you deliberate on this case or -- see, what I'm getting at there? So we need to -- we're looking for that, you know, to see how at all how this would affect you.

And without violating any privileges, are you specifically answering certain issues brought up on appeal?

A. The attorneys are doing that. I'm just organizing all of the documents from the lower level. I'm just -- just the repository that we're all working

107

on, I do see the issues. I research what they tell me. I don't conclude my own -- make my own judgments on the issues.

Q. I gotcha.

A. The attorneys do all of that.

THE COURT: Mr. Lopez, you are involved in the research --

PROSPECTIVE JUROR: Yes.

THE COURT: -- in the case yourself?

PROSPECTIVE JUROR: Yes, Your Honor.

THE COURT: So they might give you an assignment to go look up this or find this for me and you do that, and then tender it to your attorney; is that correct?

PROSPECTIVE JUROR: Yes, Your Honor, but it's --

THE COURT: Let me just see counsel at the bench here right quick.

(Bench conference held off the record.)

THE COURT: Okay. All right. Well, listen, Mr. Lopez, thank you so much. After conferring with the attorneys we don't want to put you in a position that you would feel uncomfortable in, either by virtue of working on this case that you're working on now in your employment and/or, you know, trying to

108

separate that from a case that you might be a potential juror on.

So we're going to unburden you with that and I'm going to excuse you by agreement of the parties. They have agreed to -- because of your circumstances and your employment and, specifically, the case that you're working on right now, that we've agreed to excuse you.

PROSPECTIVE JUROR: Thank you, Your Honor.

THE COURT: Thank you so much.

MRS. HANDLEY: Thank you.

THE COURT: We appreciate your time very much. You can just leave that right there would be fine. And thank you so much, Mr. Lopez. We appreciate your time and your patience.

(Prospective Juror Abraham Lopez, exits the courtroom.)

THE COURT: All right. Well, now see there? We did get out in time for lunch, didn't we? Okay. So 1:15 or thereabouts? Okay. We'll see y'all this afternoon.

Do y'all want to put anything on the record with regard to Mr. Lopez --

MRS. HANDLEY: Yeah, I guess we should.

THE COURT: Yes, Ms. Handley.

109

MRS. HANDLEY: Your Honor, with respect to Abraham Lopez, Juror 682, we would challenge this particular juror, I think, at this point in time. He's not an appropriate juror for this case. He's involved in a death penalty appeal and he can't really, without in his mind, violate attorney/client privilege; let us know about that situation to make a decision as to whether or not he could be appropriate on this case.

THE COURT: Okay. Mr. Lollar.

MR. LOLLAR: Well, and based on the answers to his questionnaire, we agree.

THE COURT: Okay. All right. Good. Then the State's challenge for cause is granted. Okay. Thank you for doing that.

(At 11:45 a.m., lunch recess taken.)

(Proceedings reconvened at 1:15 p.m.)

THE BAILIFF: All rise for the juror.

(Prospective Juror No. 493, Danny Young, enters the courtroom.)

THE COURT: Come in, Mr. Young. How are you, sir? Just come in and have a seat right there if you would, please. Thank you. Thank you, ladies and gentlemen, be seated, please.

Good afternoon, Mr. Young. Are you how?

PROSPECTIVE JUROR: I'm fine, sir.

110

THE COURT: Good. Good to have you here. Thank you for your time and effort to be with us this afternoon.

Vicki, I would like for the record to reflect this is Prospective Juror Number 493, Danny Wayne Young, Y-o-u-n-g.

Mr. Young, I am Judge Quaid Parker. I'm a Senior District Judge from McKinney, Texas, just right up the road here from Dallas. And Judge Michael Snipes is the Presiding Judge over this case, this capital murder case. And Judge Snipes asked me some time ago if I would help him, or assist him, in the trial of this case by presiding over the jury selection process. So that explains to you what I'm doing here this afternoon instead of Judge Snipes and, consequently, why you're here today, too.

PROSPECTIVE JUROR: I understand, sir.

THE COURT: Now, do you recall, Mr. Young -- well, it may almost be two months ago now that everybody got together down in Central Jury. And there was probably four or five hundred of you at that time and Judge Snipes then addressed the group. And at some point in the proceedings down there he asked everybody on the panel to stand up, raise their hand, and he administered the oath of a prospective juror to

111

each panel member.

Do you recall that?

PROSPECTIVE JUROR: Yes, sir, I do.

THE COURT: Were you one of the panel members that stood and took the oath at that time?

PROSPECTIVE JUROR: Yes.

THE COURT: Very good. I'll just remind you, you are still under your oath. And what you've been sworn to do since it's been almost two months, you might not remember. I wouldn't. But you, of course, are sworn to give us truthful answers, but also to be responsive to each and every question that the attorneys ask you. All right?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: All right. Now, did you have an opportunity -- I know you were the first one we got in here. Did you have an opportunity to read over that orientation guide?

PROSPECTIVE JUROR: Yes, sir, the bailiff gave it to us.

THE COURT: And so you had an opportunity to read that, did you?

PROSPECTIVE JUROR: I sure did.

THE COURT: Okay. Good. That's just kind of a -- Mr. Young, that's kind of a thumbnail

112

sketch of the law that's involved in a capital murder case.

PROSPECTIVE JUROR: I understand.

THE COURT: And, so, what the attorneys are going to do when they talk to you about your -- they want your ideas. They are going to explain the law to you in more detail.

PROSPECTIVE JUROR: Okay.

THE COURT: And then they are going to ask you questions about how you feel about the law and the procedural aspects that are involved in a capital murder trial.

PROSPECTIVE JUROR: I understand.

THE COURT: And there's no right or wrong answers.

PROSPECTIVE JUROR: Okay.

THE COURT: You can't -- it's not a quiz that you've got to pass or anything like that. Okay.

PROSPECTIVE JUROR: All right.

THE COURT: What they are trying to do is just to find out how you really feel, get your opinions, your ideas about the law and some of the procedures that will be involved in this trial. Okay.

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Now, then. Let me go ahead

and introduce you to the attorneys that are participating in this trial. And seated directly in front of you at the counsel table over here is Mr. Gordon Hikel.

MR. HIKEL:   Good afternoon, sir.

THE COURT:   And Miss Elaine Evans.

MS. EVANS:   Good afternoon.

THE COURT:   And then seated behind them is Ms. Andrea Handley.

MRS. HANDLEY:   Good afternoon.

THE COURT:   And these three, ladies and gentleman, are Assistant District Attorneys here in Dallas County and they are assigned the responsibility of prosecuting this case.

And then seated at the counsel table directly in front of me here is Mr. Brad Lollar.

MR. LOLLAR:   Howdy.

THE COURT:   And then seated next to him is Mr. Doug Parks, and down here on the very end is Miss Keri Mallin.

MS. MALLIN:   Hi.

THE COURT:   And these three attorneys are the Defense team and they represent Mr. James Broadnax who is the defendant seated in the middle. All right. Very good.

---

MS. EVANS:   No problem, Judge.

THE COURT:   Okay. Thank you, ma'am. You may proceed.

Q.   (By Ms. Evans) The purpose of this was really just so we could kind of get to know you a little bit better so that whenever it comes to this stage -- we're talking to everybody that came down there unless they were already disqualified -- we could have an idea kind of what Mr. Young is about and what his thoughts are, okay, as well as the rest of the jurors. And I noticed whenever you filled this out that you said your mother had been a victim of robbery.

A.   Yes, ma'am.

Q.   How long ago was that?

A.   That would be right around Thanksgiving Eve of 2004 or five, I want to say.

Q.   Okay. And what stands out in your mind about that?

A.   Well, how the guy -- well, she was coming from Simon David on Inwood Road and University Boulevard. She was getting in her car, she had opened up her car door and was getting ready to put her groceries in and this guy came from nowhere and pulled her purse. She had it around her shoulder, but he dragged her trying to get the purse away from her and stuff. And I was at

---

114

Miss Evans.

MS. EVANS:   Yes, Your Honor.

DANNY YOUNG,
having been duly sworn, testified as follows:

EXAMINATION

BY MS. EVANS:

Q.   Good afternoon, Mr. Young. How are you?

A.   I'm fine.

Q.   Good.

A.   A little nervous.

Q.   What's that?

A.   I'm a little nervous.

Q.   That's okay. You can calm down a bit. We're just going to talk here with you. That's all this process is, is both sides getting a chance to talk to you.

A.   I understand.

Q.   You recall whenever you came in with all of the many people that were down at the Central Jury Room you filled out this questionnaire.

THE COURT:   Miss Evans, hang on just a minute. I forgot, again, to give Mr. Young his questionnaire. You're going to need this, Mr. Young, because they're going to ask you questions about that. Sorry.

---

116

work. Then my sister called me and told me this incident had happened. She didn't go to the hospital or nothing, but she did have a bad bruise on her. So that was the main thing right there.

Q.   So she had a bruise from it. Was she scared to go places after that?

A.   Not my mother.

Q.   Okay. The reason I asked you about that is because this case, capital murder, involves a murder plus a robbery. That's what this defendant has been indicted for.

A.   Okay.

Q.   And so I ask you that to see if the fact that your mother had been a victim of robbery --

A.   Yes, ma'am.

Q.   -- was going to have any influence or impact upon you in your deliberations on this case.

What do you think about that?

A.   Well, when it happened I was angry. Okay. And I must admit that me and my brother -- she couldn't give them a full description, but we being born and raised in that neighborhood we tried to figure out who it could have been. I don't want to say what crackhead it would have been.

Q.   Sure.

A.   I'm sorry. So we went riding around the neighborhood. She couldn't give no full description of the person, but we know some people who would do that kind of thing that's up on this corner that hung out. But we rode around looking to see if we could find that person, but to no avail. It just went away.

Q.   So that person was never caught, never brought to justice?

A.   No, ma'am. But they did use her credit card -- one of her Shell cards, I believe it was, up on Walton Walker Freeway and stuff. But that's as far as it got. Before she had a chance to cancel out all of her credit cards and stuff, they did get a chance to use that, but outside of that...

Q.   I'm sorry that your mother had to deal with that and go through that. It's never good to be a victim of any type of crime. But given that this case does by the indictment -- I can't get into the facts of this particular case and what happened. But understanding that you will hear evidence of a robbery -- or that's what the State has to prove you beyond a reasonable doubt that a robbery did occur as part of a murder; both of those two things. And then by your mention that you tried to figure out, for lack of a better term, which crackhead might have done it, we

---

**118**

don't know what all evidence may or may not come out in trial right now. And I'm not really talking about the facts of this case but, hypothetically, if you hear evidence of a robbery similar to your mother's situation or evidence that a person on trial maybe used drugs to the point of intoxication and then goes out and commits a crime, do you think that is going to hit a little bit too close to home in your life experiences that you've had with this?

A.   It probably would. It more than likely would.

Q.   That's what I was kind of gathering from what you said about trying to figure out, you know, which crackhead. Honestly, we really just need fair and impartial jurors. And you may be a perfect juror on a DWI case or situation that doesn't hit too close to home, but when we saw that we kind of thought maybe you might have some strong feelings towards that. Okay.

A.   I probably would. Yes, ma'am.

MS. EVANS:   We appreciate you coming down today, Mr. Young.

PROSPECTIVE JUROR:   Thank you.

THE COURT:   All right. Thank you very much, Mr. Young. We appreciate the time and effort you made to be with us. You can just leave that right there that would be fine. Thank you, sir.

---

PROSPECTIVE JUROR:   Y'all have a good day.

THE COURT:   You have a good afternoon. Thank you, sir.

(Prospective Juror, Danny Young, exits the courtroom.)

THE COURT:   Does the State have a challenge for cause?

MS. EVANS:   Your Honor, the State would challenge Juror Number 493, Danny Young, because of his life experiences and his mother being a victim of robbery that he couldn't keep a fair and open mind to the evidence in this case, especially, if it involved drug usage.

MR. LOLLAR:   We have no objection.

THE COURT:   All right. Thank you. The State's challenge for cause will be granted.

All right. Do y'all want to go ahead with Mr. Mota, M-o-t-a? Are we ready?

THE BAILIFF:   All rise for the jury.

(Prospective Juror No. 686, John Mota, enters the courtroom.)

THE COURT:   Come in, Mr. Mota. If you would, please, sir. Just go ahead and have a seat there. Thank you, sir. Thank you, ladies and

---

**120**

gentlemen, be seated, please.

Good afternoon, Mr. Mota. How are you this afternoon?

PROSPECTIVE JUROR:   Just fine. Thank you.

THE COURT:   Good.

Vicki, I would like for the record to reflect this is Prospective Juror Number 686, John Mota, M-o-t-a.

And am I pronouncing your name correctly?

PROSPECTIVE JUROR:   Yes, sir.

THE COURT:   Good. Well, Mr. Mota, again, thank you for being here. We appreciate the time and effort that you've made to be with us this afternoon. I'm Judge Quaid Parker. I'm a Senior District Judge from McKinney just up the road here from Dallas, and the Presiding Judge in this case is Judge Michael Snipes. And Judge Snipes asked me sometime ago if I would assist him in presiding over the jury selection process of this capital murder case. And so that explains to you why I'm here this afternoon instead of Judge Snipes. He's upstairs in his court taking care of the everyday matters of the court while I'm down here assisting and picking this jury. Anyway -- also, that explains why you're here today, consequently, for your individual

121

voir dire.

Now, Mr. Mota, you'll probably remember it's been almost two months ago, I guess now, that probably four or five hundred of you got together down in the big Central Jury Room downstairs and Judge Snipes did talk to the group at that time. And at some point in those proceedings he asked everybody on the panel to stand up and raise their right hand and he administered the oath of a prospective juror to each panel member.

Do you recall that?

PROSPECTIVE JUROR: Yes, Your Honor, I do.

THE COURT: Good. And were you one of the panel members that stood and took the oath at that time?

PROSPECTIVE JUROR: Yes, I was.

THE COURT: Very good. I'll just remind you that you're still under that oath. And what you've been sworn to do are actually two things. One, to give us truthful answers, but we know you'll do that anyway. But also to be responsive to each and every question that the attorneys might ask you during this little Individual -- we call it Individual Voir Dire session.

All right. Now then, did you have an opportunity or enough time, Mr. Mota, to kind of read

122

over that Juror's Guide or the little introductory information that I had my bailiff give you when you first got here?

PROSPECTIVE JUROR: Yes, Your Honor, I did.

THE COURT: Good. That's kind of a thumbnail sketch of the law and some of the procedural aspects that are involved in a capital murder trial. And what's going to happen here this afternoon is that the attorneys are going to explain, in more detail, that law. And then once you understand it, then they are going to ask you questions about it to get your ideas, your thoughts, your opinions, if you will, on the law in some of the those procedural aspects. Okay. So what I'm telling you is there's no right or wrong answers at all to any of their questions. It's just honestly how you feel about it. And it's not a quiz that you've got to pass or -- you know, if you don't pass you don't get to be on the jury or anything like that, so it's not an exam of any kind. All right.

PROSPECTIVE JUROR: I understand.

THE COURT: All right. Now then, I believe with that I'll introduce you to the attorneys that are involved in this case, and then I'll turn it over to them and let them ask you questions.

123

Seated at the counsel table directly in front of you, Mr. Mota, is Mr. Gordon Hikel. And seated next to him is Miss Elaine Evans, and behind them is Ms. Andrea Handley. And these three, ladies and gentleman, are Assistant District Attorneys and they are part of the prosecution team that's charged with the responsibility of prosecuting this case. And then at the counsel table directly in front of me here, Mr. Mota, is Mr. Brad Lollar and seated next to him is Mr. Doug Parks, and on the very end, Miss Keri Mallin. And these three attorneys are the Defense team and represent Mr. James Broadnax who is the defendant in this case and seated there in the middle.

Very good. Miss Evans.

MS. EVANS: Thank you, Your Honor.

THE COURT: I had almost figured that out, Gordon, from the last go around. Excuse me. Go ahead.

Oh, wait a minute. Mr. Mota, I want to give you your -- that's your questionnaire that you filled out back during that session. And I'm sure they will have some questions for you and some of your responses so I want you to have that to refer to. All right.

Thank you, Ms. Evans. Please

124

proceed.

MS. EVANS: Thank you, Your Honor.

JOHN MOTA, having been duly sworn, testified as follows:

EXAMINATION

BY MS. EVANS:

Q. Thank you, Mr. Mota, for being down here with us today.

I would first like to tell you that, obviously, as you were told from the big panel this defendant is charged with capital murder. That's murder plus something else. In this case it's a robbery. And so the State has to prove to you each and every one of those elements in the indictment. It's the State's burden to do that. Okay.

Do you recall filling out the questionnaire?

A. Yes, I do.

Q. If you would take a look back on Page 17 of your questionnaire, I see where you answered the question about how you would feel about being chosen as a juror in this case. And I believe you say there, I would feel that I would like to give the person and Defense Attorneys a chance to prove innocence. So in other words, the defendant and the Defense Attorneys a chance to prove that he's innocent of the charges.

A. Well, to prove both sides of the story, to give -- basically, to hear all of the facts of the story.

Q. All right. And understanding that the law says that it's the State's burden, it's our to job to prove it beyond a reasonable doubt, you're not the only one that feels that way. So I don't want you to feel isolated or singled out or anything like that, but basically the Defense, they don't have to do anything. They merely have to show up. So you may not hear from them. You may not hear from their side at all; but nonetheless, would you want to hear from them or would you require that you hear their side of the story before being able to render a verdict?

A. No. I mean, if it's -- if it will help to give us more information to what the decision would be on a case then, yes.

Q. Okay. And understanding that the law says that, you know, it's the State's burden. We have to prove it beyond a reasonable doubt. In fact, the defendant has a Fifth Amendment right to not testify. Okay. It's his decision and his decision alone. The State of Texas can't call him to testify, his own attorneys can't force him to. It's his decision to make.

bound, under your oath, to return a verdict based on the law and evidence a verdict of not guilty.

Do you think, you know, if we came this close, you know, and you really believed that we were almost there, but you still had a bit of a doubt -- but the defendant failed to testify. What verdict do you think you would render?

A. Not guilty.

Q. Okay. You would be able to do that?

A. Uh-huh.

Q. All right. Talking a little bit more about your questionnaire if you would take a look on Page 4 regarding whether or not you believe that the death penalty is used too often or too seldom. And you say, "Too seldom there are people that have done worse that are sitting on death row that should not have a chance to live their life out."

What do you mean by that statement?

A. I feel that there have been people that have done more heinous crimes and they are still sitting on death row. And it's like, well, why are they still sitting there? There are other people who have done lesser things and they have been, you know, probably executed before them.

Q. Okay. What type of person are you thinking of

---

126

Do you think if a defendant did not testify that you would use that information maybe in some way to think or feel that the defendant may be guilty or has something to hide?

A. No.

Q. You would not?

A. No.

Q. Okay. Let's say, for example, that the State proved to you almost every one of those elements in the indictment, but you still weren't sure. We're about this close to proving capital murder beyond a reasonable doubt. All right. But still you were not convinced beyond a reasonable doubt, but the defendant didn't testify in that case.

How would you use that circumstance, or what do you think about that?

A. I think I would just go by the evidence that I have heard.

Q. Okay. And what would you do at that point in time regarding a verdict?

A. I'm not sure.

Q. You're not sure?

A. No.

Q. If the State does not prove to you one of the elements in the indictment you would be required and

---

128

when you say "far worse things. They are still sitting there?"

A. It could be like murder of a whole family or -- I don't know.

Q. Sorry to put you on the spot to think of examples. But by your answer I take it that you mean that they should already have been put to death, that they should have already been executed.

A. Yes.

Q. And you understand that there's a process, there's an appellate process that maybe some of those cases are going through. And the same for here. There's kind of a process. There's a road to the verdict. There's no automatic answers, no automatic decisions, no automatic death penalty here in Texas just because you commit a crime. But there are many people, by the same token, that kind of feel like you do. Why are we wasting taxpayer dollars on people sitting there on death row that should have already been executed. And why are we wasting taxpayers money on maybe even not having a trial on some of these people because of what they did is so obvious that they committed the act. And why are we requiring the State to prove it, they should just be hung on the courthouse lawn or something. And, quite frankly, there may be those cases out there.

How do you feel about that, Mr. Mota?

A.    Well, if -- I can't think. I'm kind of nervous.

Q.    That's okay. There's no right or wrong answers. We just want to know how you feel at this point.

A.    Well, I feel if they have had their chance in court and that have been proven guilty and they are sitting on death row or so forth, then they should be already -- you know, I understand there's a process, but they should have already been executed or so forth as opposed to having them sit there.

So I think that if there was without a reasonable doubt that this man was guilty -- I understand there are times that a lot of evidence do come up like years later and so forth and they might be innocent. I mean, I can understand that, but still if they are still sitting there what's the purpose, you know? It's like taxpayer's money like you said. So that's what I feel.

Q.    Okay. I understand. We're just -- there's no right or wrong answers, we just want to know your feelings. So I have to ask you with regard to that, this case here is a capital murder and so it's one of those eligible for the death penalty. It's an intentional murder so the person meant to do it. And I

130

think as you say on your questionnaire "a murder on purpose without any reason." So it would be one of those, an intentional murder.

In capital murder it can't just be a murder on purpose, it has to be plus something else an aggravating factor. Here that aggravating factor is a robbery. So you have a murder plus a robbery to make this a capital murder.

Do you think after hearing the facts of the capital murder and if you believe that the State proved that to you beyond a reasonable doubt that the person was guilty of capital murder as we've charged them, do you think that you would automatically feel like the death penalty is appropriate just based on the fact that we have proven our case beyond a reasonable doubt?

A.    No, not necessarily.

Q.    Okay. Because you've read the pamphlet. Right? You understand that there's a process. There's a punishment phase that you have to go through with the special issues. Fair to say?

A.    Yes.

Q.    Okay. Some people tell us, though, that they would be inclined just because, you know, kind of by what you read in the indictment. Even that, that's kind of the type of crime that's so heinous that they are

sorry there wouldn't be any way to determine if somebody is a future danger because they'd automatically feel if they have convicted somebody of capital murder that, yeah, that person is going to be a future danger and I would always use Special Issue Number 1 after having found somebody guilty of capital murder.

So that's what I'm asking, Mr. Mota. Do you think that someone is always going to be a future danger if you convicted them of capital murder?

A.    I would think so.

Q.    You would. So do you think that you would be kind of predispositioned to answer Special Issue Number 1, yes, after having found somebody guilty of capital murder?

A.    Yes.

MS. EVANS:    Okay. Thank you, Mr. Mota.

MR. LOLLAR:    Thank you, Mr. Mota. We have no questions. We appreciate you coming down today.

THE COURT:    All right. Thank you, Mr. Mota. I do appreciate you being here and your time, and you're free to go now. Thank you very much. You can just leave it right there. It will be fine.

Thank you, sir. Have a good afternoon.

PROSPECTIVE JUROR:    Thank you. You, too.

(Prospective Juror, John Mota, exists the

132

courtroom.)

THE COURT:    Okay. Miss Evans, do you have challenge for cause?

MS. EVANS:    Yes, Your Honor. The State would challenge Juror Number 686, John Mota, in that he would not be able to give proper consideration to the special issues in that he would automatically answer "yes" if the verdict is guilty.

THE COURT:    Mr. Lollar --

MR. LOLLAR:    Your Honor --

THE COURT:    -- anything else?

MR. LOLLAR:    Yes, that and some other things that he indicated to us in his questionnaire. We would agree.

THE COURT:    Okay. All right. Then the State's challenge for cause on Mr. Mota will be granted.

And, ladies and gentlemen, that concludes this afternoon and this week and end my little tenure with you. I've enjoyed being with all of you. Thank you very much.

(Proceedings adjourned.)

COUNTY OF DALLAS      )
                      )
STATE OF TEXAS        )

I, VICKI L. TUCK, Official Court Reporter in and for County Criminal Court No. 1 of Dallas County, State of Texas, do hereby certify that the above and foregoing contains all exhibits referenced in proceedings directed by counsel to be included in the Reporter's Record in the styled and numbered cause, all of which occurred in open court, or in chambers, and were reported by me.

I further certify that this Reporter's Record of Proceedings truly and correctly reflect the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $ _885.50_____ and was paid by Dallas County.

WITNESS MY OFFICIAL SIGNATURE on this 26th day of February, 2010.

VICKI L. TUCK, CSR #1250
OFFICIAL COURT REPORTER
County Criminal Court No. 1
133 N. Industrial Blvd., 3rd Floor
Dallas, Texas 75207
Tel./Fax 214-653-5606

Certification Expires:  12-31-10.