*AP-76207*

1

REPORTER'S RECORD
TRIAL COURT CAUSE NO. F08-24667-Y
VOLUME 25 of ____VOLUMES_____

| | |
|---|---|
| THE STATE OF TEXAS | IN THE CRIMINAL DISTRICT |
| VS. | COURT NUMBER 7 |
| JAMES GARFIELD BROADNAX | DALLAS COUNTY, TEXAS |

_____

INDIVIDUAL VOIR DIRE EXAMINATION

_____

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 22nd of June, 2009, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said court, held in Dallas, Dallas County, Texas:

Proceedings reported by oral stenography.

ORIGINAL

Debi C. Harris, CSR
(214) 653-3416

```
                    A P P E A R A N C E S


         THE HONORABLE CRAIG WATKINS
         Criminal District Attorney
         Dallas County, Texas
         Frank Crowley Courts Building, 10th Floor
         133 N. Industrial Boulevard, LB 19
         Dallas, Texas  75207-4313
         Telephone: 214-653-3600

     BY:  MR. DAVID ALEX, SBOT No. 24003256
          MS. ANDREA HANDLEY, SBOT No. 08898800
          MS. ELAINE EVANS, SBOT No. 24032880
          MR. GORDON HIKEL, SBOT No. 00787696
          Assistant District Attorneys

          Also present: Ms. Zandra Robinson


              APPEARING FOR THE STATE OF TEXAS


          MR. BRADLEY LOLLAR, SBOT NO. 12508700
          Attorney at law
          1700 Commerce, Suite 450
          Dallas, Texas  75201
          Telephone No. 214-384-8178

          MR. DOUGLAS PARKS, SBOT No. 15520000
          Attorney at Law
          321 Calm Waters Lane
          Holly Lake Ranch, Texas  75765
          Telephone No. 903-769-3120

          DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
          133 N. Industrial Boulevard, LB 2
          Dallas, Texas  75207-4399
          Telephone No. 214-653-3550

     BY;  MS. KERI MALLON, SBOT No. 24049165
          Assistant Public Defender

              APPEARING FOR THE DEFENDANT
```

CHRONOLOGICAL INDEX - VOLUME 25

|                                          | COURT | STATE | DEFENSE | PAGE |
|------------------------------------------|-------|-------|---------|------|
| Proceedings, June 22, 2009               |       |       |         | 5    |
| **VENIREPERSON**                         |       |       |         |      |
| ALEXANDER KONKLE, No. 660                | 6     | 10    | 49      |      |
| Defendant's Challenge                    |       |       |         | 76   |
| Ruling by the Court - Accepted           |       |       |         | 77   |
| TERRY O'STEEN, No. 566                    |       |       |         |      |
| Excused                                  |       |       |         | 78   |
| EMELDA PACLIBON, NO. 647                  | 81    |       |         |      |
| Excused                                  |       |       |         | 84   |
| LOY KNOWLES, No. 561                      | 87    | 90    |         |      |
| Challenge                                |       |       |         | 100  |
| Excused                                  |       |       |         | 100  |
| TANA MARYOVICH, No. 688                   | 102   | 106   | 146     |      |
| Challenge                                |       |       |         | 164  |
| Excused                                  |       |       |         | 165  |
| Court Adjourned for the Day              |       |       |         | 165  |
| Court Reporter's Certificate             |       |       |         | 166  |

ALPHABETICAL INDEX - VOLUME 25

| VENIREPERSON | COURT | STATE | DEFENSE | PAGE |
|---|---|---|---|---|
| KNOWLES, LOY, No. 561 | 87 | 90 | | |
| Challenge | | | | 100 |
| Excused | | | | 100 |
| | | | | |
| KONKLE, ALEXANDER, No. 660 | 6 | 10 | 49 | |
| Defendant's Challenge | | | | 76 |
| Ruling by the Court - Accepted | | | | 77 |
| | | | | |
| MARYOVICH, TANA, No. 688 | 102 | 106 | 146 | |
| Challenge | | | | 164 |
| Excused | | | | 165 |
| | | | | |
| O'STEEN, TERRY, No. 566 | | | | |
| Excused | | | | 78 |
| | | | | |
| PACLIBON, EMELDA, NO. 647 | 81 | | | |
| Excused | | | | 84 |

PROCEEDINGS

[Defendant present.]

THE COURT: Good morning. Please be seated, folks. I like to pronounce everybody's name correctly, if I can. I have a hard time doing it sometimes.

Alexander Konkle?

VENIREPERSON KONKLE: Yes, sir.

THE COURT: Okay. I'm going to hand your questionnaire to you, sir. Sir, I'm going to ask you to do this for me before we go any further. Raise your right hand.

[Venireperson Konkle sworn by the Court.]

THE COURT: Sir, on behalf of everybody here, we want to express our appreciation to you for being here and being on time. That's a big help to us.

My name is Webb Biard and I will be with you this morning during this part of the jury selection process.

The actual presiding judge of this court is Michael Snipes. Should you be selected as a juror in this case, Judge Snipes will actually be the presiding judge. For whatever that's worth, that might make a little more sense to you.

Also at this time I want to introduce

some folks to you.   Andrea Handley.

MS. HANDLEY:   Good morning.

THE COURT:   Gordon Hikel.

MR. HIKEL:   Good morning, sir.

THE COURT:   They represent Dallas County and the State of Texas.   Now, there are some other attorneys who may or may not be here with us this morning, David Alex, Elaine Evans and Zandra Robinson.

And then to my right is Brad Lollar.

MR. LOLLAR:   Hi.

THE COURT:   Doug Parks.

MR. PARKS:   Good morning.

THE COURT:   Keri Mallon.

MS. MALLON:   Good morning.

THE COURT:   And they represent Mr. James Broadnax.   Mr. Broadnax.   Thank you, sir.

Whereupon,

ALEXANDER KONKLE, #660

having been first duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q.   I think it helps a little bit, Mr. Konkle, to have some idea of what's in front of you here.   I'd like to stress this, sir.   These are outstanding lawyer or they wouldn't be involved in this case.

Also, they're fine attorneys and good folks. It's out of the question anybody is going to be embarrassed or mistreated in this process, especially a prospective juror.

All we're going to ask you to be doing is tell us how you honestly feel about these legal concepts and your thoughts on any question that they might ask you. The only right answer would be a true answer. In other words, it's not what's 2 plus 2 type of test.

I told you the presiding judge of this court is Michael Snipes. Judge Snipes has told us and we have every reason to believe that this trial will start August the 10th and it will last up to two weeks, Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, lunch break.

The jury will not have to stay together overnight unless and until you are deliberating and if for some reason you went late into the night and not reached a verdict, whatever that verdict might be, there's a possibility you would all be taken to a fine hotel at county expense and spend the night together in individual private rooms and then come back in the morning to avoid any outside influence.

I tell you that to ask you this. As you

sit here now, are you aware of any reason why you can't sit as a juror in this case?

A.    I can't think of any reason.

Q.    All right.  Also I want to tell you that what we're doing, we're in the process of qualifying at this time, qualifying some give or take 50 prospective jurors and then once that's done, which we anticipate will be done in the next three or four weeks, the actual trial jury will be then selected.

So what you will know and what I will tell you when you leave here this morning is whether or not you are a qualified juror.  Then should you actually be selected on the jury, you'll be personally notified by the Judge's coordinator.

Also, each side has been allotted 45 minutes per side to talk to you, so this process should last about an hour and a half and then you'll be free to go and know whether or not you're a qualified juror.

Have you had an opportunity to read that pamphlet?

A.    Yes, sir.

Q.    Did it make any sense to you?

A.    Yes.

Q.    Do you think it helps you understand this process a little bit?

A.    Yes, sir.

Q.    From Judge Snipes' remarks and filling out that questionnaire, which you have there by the way, and it will be a help to you.  It took time to fill it out but it's going to save you more time than that this morning.  The attorneys might ask you to refer to a page, one of the answers, and you'll have it there to look at.

From filling out that questionnaire and appearing here this morning and reading that pamphlet, as you sit here now, are you aware that this is a capital murder case?

A.    Yes, sir.

Q.    The State of Texas is seeking the death penalty; you understand that?

A.    Yes, sir.

Q.    In Texas, in a capital murder case in which the State seeks the death penalty, there's only two possible punishments should the jury find the person on trial to be guilty of capital murder, and that's life in prison or death.  All right?

And I want to one last thing stress to you, and I'm as sincere as I can be about this and I want you to believe it.  The law in Texas at this time is if someone receives life in prison, that means life

in prison.  No parole.

There was a time in my career where there was such a thing as parole, eligible for parole, if someone was found guilty of capital murder and you gave him life in prison, but that is no longer the law.

Life in prison means life in prison. Can you accept that from me, sir?

A.    Yes, sir.

Q.    Okay, fine.

THE COURT:  Without anything further from me, I want to re-introduce to you at this time Andrea Handley, who will speak to you on behalf of Dallas County.

MS. HANDLEY:  Thank you, Your Honor.

EXAMINATION

BY MS. HANDLEY:

Q.    Good morning again, Mr. Konkle.  How are you?

A.    I'm tired, to be honest.

Q.    I am too.  I spent the whole week doing yard work.  What's your excuse?

A.    I'm just a workaholic, to be honest.

Q.    Okay.  Well, I can appreciate that.  I can empathize with that.  Appreciate your being here though and being on time.

Let me tell you what we're doing and why

we brought you down here individually. We have brought literally hundreds of people down to fill out these questionnaires for this specific case.

And the reason we're doing that, Mr. Konkle, and I think you can appreciate, is because this is a pretty important matter. We're talking about a capital murder case. We're talking about somebody being potentially receiving the death penalty in this case.

And in the hopes of -- what we're doing is bringing everybody down one at a time and talking to them because this case is not right for everybody, and I think you can appreciate that.

Some people just simply cannot take part in a death penalty case, and some people are just simply too maybe aggressive or eager to be on this case, and neither one of us are looking for somebody like that.

But the reason we bring you down here also is because a lot of people just don't know how a capital murder case works, and that's fair enough. There are a lot of attorneys in this building who don't know how a capital murder case works and have never even seen these special issues before.

So what we do is, is I want to talk to

you about the law and I want to talk to you about a capital murder case versus a regular case, if you will, and I want to test you out here and tell you what the law is and see if you can follow the law, because if you cannot follow the law, then you are not a qualified juror.  It pretty much just comes down to that.

You've never sat on jury duty before, I believe, and you don't have to have for purposes of sitting on a case like this, and in reading your questionnaire, we didn't give you a pocket law book. We didn't tell you about the special issues.

We didn't prime you on the law.  We just had you fill this out just to get your gut reactions and your gut feelings on matters such as this.

So you're not necessarily pinned down to anything you said in this, and you might have changed your answers or qualified your answers, I think, had you known what the exact law was in a particular case, because as the -- I will tell you this from the beginning.

In a capital murder case the person found guilty of capital murder will receive one of two punishments.  They will either get -- if they're found guilty of capital murder, they automatically receive life in prison without parole.

Whether or not that individual receives the death sentence is not automatic. It is a very structured particular process that we have to have jurors go through in order to determine if they get that extra up of the death penalty versus the automatic life and parole [sic] that they already have.

For example, reading your questionnaire, and we asked you about the death penalty and such as that, and you made some comments such as, "Every action has an equal reaction."

I believe you stated that you believed in an eye for an eye. You had also stated that the same should happen to the murderer.

And in all fairness, I believe that that's just your feelings at that point. I'll tell you, though, that that's not necessarily the law. We don't have -- Texas law is not an eye for an eye.

It is not if you are found guilty of murdering somebody, you will automatically receive the death penalty. But nevertheless, I think that's just fairly how you felt at the time. Is that true?

A.   Yes, that's true. In that it wasn't just -- that was just as you said, a gut reaction, a gut feeling. It wasn't exactly like what should -- or what happens, happens, but it's pretty much saying that

everything has a consequence or a reaction to what you do pretty much.

Q.    Precisely.  Every action does have a reaction.

A.    Exactly, and not meaning that, you know, if you go out and hurt somebody or somebody gets hurt, it should happen to you, but yeah.

Q.    Right.  And specifically, in capital murder, it definitely does not apply.  Just because you've been found guilty of capital murder does not mean that you automatically receive the death penalty.

It does mean that you automatically receive life without parole, but it doesn't mean that there's anything automatic.  It is always, always based on the evidence in the case, always based on the evidence in the case.

And again, I noticed throughout your questionnaire that you made some statements where you felt that the death penalty was appropriate in some murder cases, where it shows me you're already thinking it's not appropriate in all cases but maybe some cases.

You had also said a life sentence in a capital murder case would be appropriate under the proper circumstances, and I'll tell you that's the whole basis of the law, is it the proper thing to do in

this particular case.

You had also said, and most importantly, on page number 5 we had asked you what would be important in your determination -- it's the third question from the bottom.

It said, "What would be important to you in deciding whether the person received a death sentence rather than a life sentence in a capital murder case?" And you said, "The evidence in the case."

And I'll tell you, you hit the nail right on the head, because that's what it all comes down to is the evidence in the case. Does the evidence support that a death sentence is more appropriate than the automatic life sentence without the parole that the person will receive?

Let me talk to you a little bit first about the law in general. These are fundamental principles of law, Mr. Konkle, that apply in every criminal case, be it theft of a loaf of bread or a capital murder. They apply across the board.

As we sit here today, you are to presume the Defendant innocent, as we sit here right now. And the reason you are to presume him innocent is because I haven't brought you a shred of evidence yet. Does that

make sense to you?

A.    Yes, it does.

Q.    You know, I bring the charges.  The law says that I have to bring the proof., And I think you'll see that's just fundamentally fair.  That goes hand in hand.

He's presumed innocent because I, as the representative of the State, I have the burden of proof.  You always look to the State to bring the evidence in the case.

You never look to the defendant to prove his innocence.  I have to do that.  Eyes always come over here.  Expectations always come to this side of the table.

Not only do I have to prove my case to you and carry that burden of proof, but I have to prove my case to you beyond a reasonable doubt.  I think everybody has heard that expression, but I'll tell you, there's really no definition of it.

Beyond a reasonable doubt is whatever you think it is.  Okay?  If you say somebody has proved something to me beyond a reasonable doubt and that means I'm really sure or I'm confident or I think I know he did it, that's your definition of beyond a reasonable doubt.  It's not beyond all doubt

whatsoever, you know, but it's whatever you think it is. Okay?

Now, the defendant has been indicted at this point and the law states that you are not to consider the indictment as any evidence of guilt. There's no such thing in this courtroom as where there's smoke, there's fire, he must have done something.

All an indictment is, is it's a charging document. It tells the defendant what he's been charged with and it puts me on notice also of what I have to prove to you beyond a reasonable doubt in order for you to find him guilty.

It sets out elements of the crime. Okay? I have to prove to you who did it. I have to prove to you where they did it, when they did it, how they did it, who they did it to.

These are elements of the offense that I have to prove to you. and the law states that all elements are equally important. I don't get points for proving just five out of six. I have to prove each and every element beyond a reasonable doubt.

The law states that if I fail to carry my burden on any one of those elements, you must return a verdict of not guilty. Does that make sense to you?

A.   Yes, it does.

Q.   Okay.   And I'll give you a far-out example there just to tell you how the law isn't kidding around here.   I mean, the law is the law.

Let's say you're called to sit in a murder case and let's say that the indictment states in there that I have alleged that the defendant caused the death of another person by shooting him with a firearm.

That means I have to prove that he killed him by shooting him with a firearm.   Okay?   Well, let's say as you sit in the courtroom and listen to the evidence, the defendant states, "I killed the guy.   I meant to do it and I'm glad I did it."   Okay?

But the medical examiner takes the stand and says, "This guy is dead but he didn't die by being shot with a firearm.   He died from being stabbed."

And the crime scene guy takes the stand and says, "There was no gun there.   There was a bloody knife."

Have I proved that he killed him by shooting him with a firearm?   I have not, have I?   And your obligation would be to return a verdict of what?

A.   Not guilty.

Q.   Not guilty.   Absolutely not guilty because I haven't carried my burden, and that's just how it is.

As distasteful as it is, you would have to return a verdict of not guilty.

A defendant doesn't have to testify in his trial. We've all heard of a person's Fifth Amendment right. You enjoy that right. I enjoy that right. Any defendant does.

And what the law states is that if a defendant elects to exercise that constitutional right, you can't use it as evidence against him. Okay? In other words, if I put on my entire case and you go back to the jury room and you look at all the evidence that I brought you and you say, "I'm not confident that she proved her case beyond a reasonable doubt. She's about this close, but since the defendant didn't testify, I'm going to hold it against him and find him guilty."

You can't do that. Does that make sense to you?

A.   Yes.

Q.   And would you hold it against the Defendant if he did not testify in this case?

A.   I'm sorry?

Q.   Would you hold it against him? Would you use it as evidence against the defendant?

A.   No.

Q.   No, okay. As a juror, one of your most

important duties in a case is to assess the credibility of the evidence. That's why we have people who hear cases and not machines because you use your life experience and you determine what is credible and what is not credible. That's one of your primary issues as a juror.

I will tell you that all the evidence you get in a case comes to you from the place you're sitting right now, the witness stand. It doesn't come from what you heard at work.

It doesn't come from what you may have seen on the TV or read in the paper. It doesn't come from some other case that you've been reading about.

It comes from the witness stand and the witness stand only. Does that make sense to you also?

A.    Yes, it does.

Q.    And in assessing the credibility of the evidence, the law states that as people take the stand and are sworn in and start to give testimony, you have to judge their credibility. Okay?

In other words, you cannot already decide you're going to give somebody credibility before they even take the stand.

It's one thing to say, I respect or I appreciate or I regard a certain category of people,

for example, police officers. There's nothing wrong with that.

But what you can't say is, "Before I've heard a single piece of testimony, before this person even takes the stand, I'm going to believe everything he says." Does that make sense to you?

A. Yes.

Q. Some people lie, some people tell the truth and some people are just mistaken. Okay? And I noticed in here that we asked you a question about officer credibility and you said that you were more inclined to believe that they would always tell the truth.

Can you see that sometimes officers may be mistaken?

A. As the question says, I consider they can be mistaken, but for the most part they're always correct,

Q. The law states that there's nothing wrong with you thinking that, but that you can't say, "Well, if you're telling me an officer is coming in to St, I'm going to tell you right now I'll automatically believe everything he says."

You have to wait for him to take the stand, tell you about his credentials maybe, tell you about what he saw, evaluate that in terms of all the

other evidence, and then assess his credibility.  Does that make sense?

A.   That does make sense.

Q.   Will you wait to do that?  Will you wait before the witnesses take the stand to do that?

A.   Yes.

Q.   Be it a preacher, a police officer, a prostitute, you have to wait first for them to take the stand.

Those are just principles of law that are grounded in our Constitution and they're based on an abundance of fairness, is what they are.  And they apply throughout the entire criminal process.

Now, in every criminal case, it's in two parts really.  The first part, you come in as a juror. You receive evidence and you're called upon to make one determination and on determination only, and that is, has the State proved the defendant guilty beyond a reasonable doubt.

If we haven't, then you find him not guilty.  If we have carried our burden of proof, then you'll go on to the punishment phase.  Okay?

So let me just first shore up a little bit in the first part of the phase where we're just talking about whether a person is guilty or not.  Okay?

And let me tell you a little bit of a difference between a murder versus a capital murder. All right? And I hate to say just a plain murder, because I don't think there's really anything plain about it, but there's a difference between a murder and a capital murder.

If I were to pull a gun out of my briefcase right now, turn to my co-counsel who's minding his business and just load him full of five bullets, dance around his body and laugh about it, I think you'll admit that that's a pretty heinous crime, isn't it?

A. Yes.

Q. Okay. But I tell you what. That's not capital murder. I intended to cause his death. You might find I intended to by how many times I shot him and laughed about it.

That's an intentional murder. That is a first-degree murder that I could potentially receive life in prison for. It depends on the facts. But it's not a capital murder.

A capital murder is this, Mr. Konkle. It's always an intentional murder. Okay? It's never a, "I killed him in self-defense." It's never a, "I just meant to hurt him but he died anyway." It's

never, "It was an accident."

It's always, "I meant to kill him. I did what I had to do to kill him and I did it." So it's always an intentional murder. Okay?

But it's that plus something else. In order to be a capital, it has to have an additional aggravating factor, if you will. There's a category of cases that fall into that.

So for example, it would be the intentional murder of a child younger than 6 years of age, or the intentional murder of a police officer while he's in the line of duty, or the intentional murder of two or more people at the same time, or the intentional murder of somebody while in the course of committing or trying to commit another serious felony offense, such as burglary or robbery or sexual assault. Does that make sense to you?

A.    Yes.

Q.    So not all murder cases are capital murder cases. Okay?  in order for it to be capital, you're going to have to find first the person meant to kill them.  Okay?  That's just where you've got to be, is they meant to kill them, and there is an additional aggravating factor.  Okay?

That's a capital murder case. If I

don't prove that aggravating factor, if I don't prove that the defendant was intentional, that he meant to kill the person, then it's not capital murder. It's something else and you'll be called upon to look at that something else. Okay?

Any questions about what is and is not a capital murder then?

A.   No.   I understand.

Q.   Let's talk about the punishment phase then. Okay? You've found a person guilty of intentionally causing the death of another individual while in the course of committing, for example, another felony offense. Okay? That's capital murder.

As the Judge stated, only one of two things can happen to that defendant. He will either receive life in prison without parole or he will receive a sentence of death.

If you are found guilty of capital murder, there's one thing that you can bank on. There's one thing that is absolutely automatic. That person will receive life in prison without parole. Okay?

That's a done deal. He is sitting on a life sentence without parole. And our Legislature, I believe, went ahead and said that capital murder is

serious enough that that's a fitting punishment for it and at the very least, that is definitely what you're going to get.    Okay?

But in Texas they've decided this.    You know, you've got life in prison.    Now, you've got also a potential to receive the death sentence, but certain things must be met.    We need to see certain things. We need to see certain evidence before you can make that step up to a death sentence.

Now, a person who is receiving life in prison without parole is obviously spending the rest of their life where?

A.    In prison.

Q.    In prison.    So what they're looking at is this individual who will now spend the rest of their life in prison, what we want to know before we can ever give that person a sentence of death is whether or not that person is going to be a future danger, a threat to the people that he is currently living with.    Okay?

I think you can imagine that prison in and of itself, it's kind of a society in itself, isn't it?    Not only are inmates there but you've also got guards and wardens, nurses, doctors, educators, people who come visit.

But there are people there, inmates who

live, eat, sleep, work, play, whatever, in there. It's their own world. It's their own society. And inside our prison walls, you have people in there doing time for a number of different crimes.

You've got people in there doing life sentences for murder. You've got people in there doing some time for stealing a car. You've got people in there doing time for property crimes, forgery maybe or fraud or something.

You've got all kinds of people in there doing all kinds of time, some people because they've been caught with drugs, possession.

And let me ask you this, Mr. Konkle. The people, the other inmates who are living there in prison doing their time, do you think they have a right to have an expectation to be safe?

A.    Yes.

Q.    Okay. I don't think prison is any walk in the park and I think we all hear stories about it, but the fact of the matter is, they're there doing their time that they've been sentenced to do by a judge, and they haven't been sentenced to go in there and get kicked around every day, have they?

A.    No.

Q.    Okay. And that's what we're looking at, is

the safety of the other people who are in there.  And the law says that this defendant who has been found guilty of capital murder now, if I can show you beyond a reasonable doubt that more likely than not that defendant is going to be a future threat to those other inmates or whoever else is in there, then he's getting a little closer to the death penalty.

He might be a guy who can go in there, do his time, mind his business, read his books, write the great American novel, whatever it is, and never hurt anybody else.  Okay?

And if that defendant is that guy, then he does not get the death penalty.  Does that make sense to you?  It's based on his future actions at that point.

And so the first thing that you're called upon to do when you go into the punishment phase is answer that question.  Is that defendant that I just found guilty of capital murder, is he going to be a future danger to the other people in his society?  Are you with me so far?

A.    Yes.

Q.    Whether or not he is a future danger is for me to prove to you.  Okay?  Some people might say, "Well, any person who intentionally kills another

person and does it in the course of committing another felony offense such as robbery, well, he's automatically going to be a future danger."

Well, if a person is saying that, then they're speculating or they're jumping to a conclusion before sitting there and listening to the evidence, aren't they?

A.    Yes.

Q.    I'll give you an analogy just to illustrate a point. Okay? Capital murder is obviously an intentional murder of an individual while in the course of committing robbery.

A lot of times we think of the guy who goes into the 7-Eleven, takes a shotgun, steals the money from the clerk and then takes the clerk in the back room and then shoots him to kill him.

That's a capital murder. That was an intentional murder in the course of a robbery, and that sounds like a pretty bad guy, doesn't it?

A.    Yes.

Q.    Okay. Let's envision a different guy now, who lives on a street and he's got a hatred, a burning hatred for a guy who lives five houses down.

And he knows that guy sits over there and he's kind of living on fat city. He knows he's got

a lot of money. He's got nice cars and things and he hates im and he hates im with a burning passion.

And he sits there and he plans out how he's going to kill this guy. And he goes to the Bass Pro Shop and he gets the biggest gun he can and he gets as many bullets as he can and he fills that thing full of bullets.

And then he plans his right time. He walks down the street to that five houses down, knocks on the door. That guy opens the door. He puts that gun to him and says, "Give me your money."

The guy says, "I ain't giving you my money." He shoots him ten times. He steps in, grabs his bag of money, grabs his wallet.

Does that sound like a capital murder to you? "Give me your money." Took his money. Is that a robbery?

A.    Yes.

Q.    Did the person intend to kill him?

A.    Yes.

Q.    Okay. Well, let's change the facts a little bit because that sounds bad, doesn't it? Let's say that guy who lives five houses down is actually a father and a husband and he's been a good man his entire life.

He's been a great husband, a great father, a great citizen, a hard worker. All right? And that guy who lives five houses down that he killed is a dope dealer. He slings dope and he sells it to kids and he sells it to teenagers and he's spreading cancer throughout that community like hot water through snow.

And he sold dope to his kids and his kids are hurt now and he just sits there every day and watches that guy make money on the backs of a lot of helpless people and ruin lives.

And he decides, "I'm going to do something about it." And he goes down there and he kills that dope dealer. And that bag of money that he took, he walked down to the local charity and he dropped it in the box.

And then he went to the police station and he said, "I'm here to turn myself in. I killed the guy, committed capital murder. I know I'll spend the rest of my life in prison, but I'm fine with that."

It's capital murder, isn't it?

A.    Uh-huh.

Q.    Yeah. And I only make the illustration to show you that even though they're both guilty of the same offense, when you look at the surrounding

circumstances, you might have a different determination on who they were and why they did it and maybe whether or not they'll be a future danger. Okay?

Now, going into the trial, you know, you have to ask yourself, is the 7-Eleven guy going to be a future danger, is the dad who killed the guy going to be a future danger, and you look to me to prove it to you. Okay?

And that's where you come to that first special issue, because right now they've automatically got life in prison, don't they?

A.   Uh-huh.

Q.   We're going to decide whether or not they get the death sentence. Let's look at the first special issue number 1. It's a little bit of what I've already talked to you about with the prison society thing.

It says, "Do you find from the evidence beyond a reasonable doubt," which should always tell you that you need to look to me to prove it to you. Have I proved to you beyond a reasonable doubt that there is a probability -- there's no definition of probability but it's certainly more than a possibility; would you agree with me?

A.   Yes.

Q.   Some people say they think that means more

likely than not; would you agree with that?

A.   Yes.

Q.   If I proved to you that more likely than not that the defendant will commit criminal acts of violence -- that's not defined for you either.  It doesn't say that the defendant will commit another murder, do you find he will commit another robbery.

It just says, "Do you find that he will commit criminal acts of violence?  That could be anything from a punch in the face.  It could be a verbal threat of violence.  That's for you to decide what is a criminal act of violence.

Have I proved to you more likely than not he will commit criminal acts of violence that will constitute a continuing threat to society?  We already talked about what that society is; right?  It's the society he finds himself in.

So I have to prove to you that more likely than not, he will be a future danger.  Okay?  I can do that by bringing you more testimony, more evidence.

You can also look at the surrounding circumstances of the offense.  You might find the dad who went down the street and killed the dope dealer who was killing all the kids, that that was the one person

that he hated in this world.

That was his one mission in life was to kill him and he's not going to hurt a fly after that. He's going to sit in his cell and he's going to write letters to his wife.

Or you might find that, well, he didn't like one dope dealer.  Now who is he living with?

A.    A whole bunch of them.

Q.    A whole bunch of dope dealers.  And you might look at the circumstances.  You might look at that defendant and go, "Yeah, I think he's going to hurt one.  I think any opportunity he gets he's going to hurt a dope dealer."

So do you see though that you're making your decision based on the evidence in the case and not necessarily just because he's guilty of capital murder? Does that make sense to you?

A.    Yes, it does.

Q.    And is that an exercise that you think you could do, go in with an open mind, not having already made your mind up, and look to me to prove to you whether or not he's a future danger?

A.    Yes.

Q.    In other words, just because you've found somebody guilty of intentionally taking the life of a

person and doing it in the course of another felony, are you going to automatically answer that question "yes"?

A.    I'm sorry, that was a lot of information.

Q.    I'm sorry.  I guess what it comes down to is this.  And understand, because at this point the person is guilty.

A.    Okay.

Q.    At this point the person is guilty.  Okay? And they are getting that life sentence without parole. That is where you are now when you answer that first question.  They are automatically getting that life sentence.

They are guilty.  They did intend to do it.  Be it the 7-Eleven guy or the dad, you know, they intended to kill this person and did it in a robbery.

So they are guilty.  The law states that you can't say, "Well, because they're guilty of capital murder, I will automatically say yes to that question."

A.    So automatically going into it.

Q.    No.  You would wait and --

A.    Wait for the evidence.

Q.    Wait for the evidence and make your decision at that point.  You would make no automatic assumptions.

A.    Correct.

Q.    If I fail to prove to you the person is a future danger, can you answer that question no?

A.    Yes.

Q.    Because the presumption is already that you should answer that question no.  Only if and until I can prove it to you.

A.    Yes.

Q.    Just like he was presumed innocent in the first part, you presume a life sentence is the appropriate thing to do until I prove it to your otherwise.

I see you nodding your head yes.  I think you're with me there.

A.    Yes.

Q.    If I can't prove it, then you stop right there and he'll get that life sentence without parole.  And make no mistake about it.  As the Judge said, he's getting that.  It's not like he's going unpunished.

If I do prove to that answer to you is yes, we're not finished yet.  There's still more obstacles that you have to overcome in order for him to receive a death sentence.

In Texas we have something called the law of parties, which means that -- I think you can

imagine that oftentimes more than one person commits an offense, that two or more people may be working together to commit an offense together.

And the law says that if I can prove to you that they were both active participants in that crime, then they can both be held liable for that crime, as if they had done it by themselves.  Okay?

If the person aided or assisted or directed, encouraged the commission of the offense, they can be guilty too.

So for example, let's say my co-counsel and I, Mr. Hikel, we meet tonight at his kitchen table and we talk about that we really need some more money.  You know, we don't make a lot of money.  We work for the Government.

And I tell him, "Well, I know a 7-Eleven that we can rob and I know a good time to rob it, around 1:00 o'clock.  They'll have a lot of cash and there's not a lot of foot traffic there."

He says, "That sounds like a good idea.  Let me get a map and see where it is," you know.  He goes and he gets a gun out of his closet.  I go to my car and I get a magazine of bullets.  We plan out how we're going to do this.

We get in Mr. Hikel's car.  He drives us

down there and parks in front of the 7-Eleven.  He hands me the gun.  I put the magazine in the gun, make sure the gun is working.

He says, "I'm going to sit here and act as a lookout.  If anybody comes, I'm going to honk this horn."  I say, "Great, I'm going to go in and rob."

As I get out of the car, I say, "I forgot my mask."  And he says to me, "Don't worry about it.  Don't leave any witnesses."

I go in.  I rob the clerk.  I shoot the clerk.  I come back out.  We leave and split the money.  Am I guilty of capital murder?

A.    Yes.

Q.    Do you think Mr. Hikel could be guilty of capital murder?

A.    Yes.

Q.    He aided, assisted and participated, didn't he?

A.    Uh-huh.

Q.    Now, in order for him to be also guilty of capital murder, the law states that you must find beyond a reasonable doubt that he actually anticipated somebody would die.

You might be able to glean that from the fact that he said, "Don't leave any witnesses," and saw

me load a gun. That would be up for you to decide.

But that's what that second special issue is about there. It's asking you, have I proved to you beyond a reasonable doubt that if there were more than one person involved in this offense, that the person on trial is either the one who actually pulled the trigger, was the trigger man, or was the person who was actively participating in the offense and anticipated somebody was going to die. Does that make sense to you?

A.    Yes.

Q.    So that's the second question that you answer. If I fail to prove that to you, that I wasn't a party to it, I wasn't the trigger man, I didn't know anybody was going to die, then you answer that question no. Okay?

And that person now gets a life sentence. You always resort back to that. However, Mr. Konkle, if you do believe that beyond a reasonable doubt, then I will tell you that defendant is now sitting on a death sentence. Okay?

Because I've proved to you not only did he commit capital murder, but that more likely than not, he's going to be a future danger and he was an active participant in the case, he's sitting squarely

on a death penalty sentence now.  Okay?

But that's not the end of the story. Your obligation is not finished now.  There's still one more thing that you have to do.  Okay?

Up to this point, you've always looked to me for the evidence, haven't you?  I've always been the person who's had to prove to you that not only was the person guilty, but that the person was a future danger.  You've always looked to me for that.

If you find yourself at that point now, then it means I've fulfilled my obligation.  Okay?  But there's still one more thing that you have to do, and there's a last special issue, and let me tell you about that.

In the State of Texas our law makers, in terms of a death penalty case, they appreciate what we're doing here and they appreciate that a sentence of death is the ultimate punishment.  Okay?

And they appreciate that before somebody receives a sentence of death, everything needs to be looked at, and they also appreciate that a sentence of death must be the proper thing to do in this particular case.  Okay?

Not only does the evidence support it, but you as an individual, Mr. Konkle, believe, that you

would believe, that it's the right thing to do, Okay?

I'm sure you've heard the expression, let the punishment fit the crime. That's what it's all about. And what we're talking about here is that you will not leave the Courthouse that day, after having returned either a verdict of penalty of death or a verdict of life in prison without parole, you will not leave going, "You know what, there was something about the case that I thought was important to me, that I thought made a difference in what should happen, but the law said I couldn't look at it and take it into account."

That's not going to happen. Okay? And that's what that last special issue is all about. We call it a safety net issue. Okay? And what it basically says is you've come to this point.

You wouldn't be at special issue number 3 if you didn't believe he was guilty, you know, if you didn't think he was a future danger and you didn't think he was a party to it. You're not at that issue, you know, until you get to that point.

But we want you to look at everything all over again. Okay? And we want you to ask yourself, is there something about this case, is there something about this defendant, something about the

surrounding circumstances that tells me that even though all this, I think a life sentence is actually the appropriate thing to do for this particular case.

It gives, obviously, the defendant that option but it gives you that option.  You think that's fair?

A.    Uh-huh.

Q.    Okay.  Does it make sense to you --

A.    Yes.

Q.    -- that you would receive that option, that you would receive the ability to do that?

A.    Yes.

Q.    And so it asks you to look at everything.  So let's look at special issue number 3.  It says, "Do you find, taking into consideration all of the evidence --" so you're back there again and you're looking at everything all over again, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant, looking at all of that, "Do you find that there is a sufficient mitigating circumstance or circumstances that would warrant you giving a sentence of life versus death?"

Now, I can't tell you what you -- you can't necessarily tell me what you believe is a

mitigating circumstance, what would or wouldn't be in this case, because have you heard any evidence in this case? You haven't heard a thing, have you?

A.    No.

Q.    And I think a lot of people go, "Well, wait a minute, you know. I've found a guy guilty of capital murder. He's a future danger. He's got horns and a tail. How could I ever find a mitigating circumstance?"

And that's really not the question. The question is, if you've got to that point and you personally, you, believe that there was a sufficient mitigating circumstance to turn it into life versus death, the question is, will you do what you think is the right thing to do?

A.    Yes.

Q.    Okay. The circumstances of the offense, the defendant's character and background. I mean, I can give you analogies or I can have you hearken back to some of our earlier examples.

Maybe after I shoot and kill and that clerk, maybe Mr. Hikel, who was sitting in the car, was actually having second feelings about this. Maybe he was getting ready to call the police and then he heard the gunfire.

Maybe he ran in and tried to save the clerk's life, you know. Maybe he went straight to the police department and turned himself in. Maybe he turned me in also.

Maybe he spent every moment since that time on his knees praying for forgiveness from God and the family. I don't know if that would make a difference to you, Mr. Konkle, but it would be something for you to look at in determining whether or not -- I get he's bad.

I get he'll be a future danger as long as I'm around telling him what to do. But maybe I need to not give death penalty and he should just get life. You know, he's a follower here. He did everything I told him to do.

And some people say, "Well, maybe the age of the defendant would make a difference." You know, maybe the person is really old and they feel sorry for them because they're really old and maybe other people say, "That doesn't make a difference to me. He should know better."

Or maybe he's really young. Well, he's just a kid. And other people might say, "There's kids younger than him fighting a war overseas," you know.

The point about special issue number 3

is, I'm not proving anything to you. It's entirely up to you to look at and it's entirely up to you to decide whether or not there's a single mitigating thing in this case.

And even if something is mitigating, it has to be sufficiently mitigating. There could be a hundred mitigating things about a person.

They had a bad childhood, you know, or they were raised by a single mother or they were a dope smoker or something. I get it. It's mitigating, but it's not enough to turn it around.

And also, it's up for you to decide that. Okay? You don't have to be in agreement with anybody in the jury room about whether or not you feel something is mitigating or not. Does that make sense?

It's based on your own personal moral decision whether or not something is mitigating. Do you think that's an exercise that you could do?

A.    Yes.

Q.    Okay. Let me just make sure we've hit some stuff on your questionnaire here. You know, we asked you a little bit about things that were kind of going towards that mitigating.

We asked you, you know, for example, on page 8 kind of the last two questions up there where we

said, "What do you think makes a person dangerous?"

You said, "The environment that someone places themselves in.  If you live in a poverty or drug area, you're more prone to commit a crime, where a normal setting, no crime, no drugs, the outcome is usually different."

I'll submit to you that that might be something that you would look at in the mitigation question.  Where did this person grow up?  Did he ever have a chance?  You know, was he raised by people who turned him into the monster that he is today?

We asked you, "Some people feel genetics, circumstances of birth, upbringing, environment, et cetera."  You said, "No, because people can change the environment that they live in and I believe that genetics has nothing to do with how a person turns out."

And that's your personal opinion and that's something where, you know, you look at it.  Is there something wrong with him, something about his upbringing?  You know, you look at that and you decide for this defendant does that make sense to you.  It's up for you to decide that.

So in summary, and I've been doing most of the talking here because I had a lot to cover.  Do

you have any questions for me?

A.    No, I do not.

Q.    I'll tell you in summary, Mr. Konkle, you know, as the Judge stated, just because you might be deemed qualified today because you can follow the law doesn't necessarily mean you'll be on this jury.

You know, we're going to get a pool of qualified people and from that we'll take our jurors. But a qualified juror is a juror who states that -- and does, not only just says it, but will follow the law. Okay?

And a qualified juror in a capital murder case is a person who will wait until the State proves to them beyond a reasonable doubt that the defendant is guilty of the charge before they return that verdict.

A qualified juror will return a verdict of not guilty if I fail to prove my case. If I fail to carry my burden on any element, a qualified juror would say, "Not guilty." Okay?

And a qualified juror in terms of a capital murder case in the punishment phase would be an individual who says, "I will wait to hear the evidence in the case. I will wait to make my answers to the special issues. I will make my answers to the special

issues on the evidence in the case and not just what I speculate should happen in every case, that I understand that no two cases are alike, no two defendants are alike and I'll wait to answer those questions. And if the State proves to me the person is a future danger, then I'll answer that question yes. If they don't, I won't, and so be it. And if they prove to me he's a future danger and he was an active participant in it, even though he's all those bad things, I will still go into special issue number 3 with an open mind. And if I think it's the right thing to do for me to turn it into a life sentence versus a death sentence, that's what I'll do."

Do you feel like you're that person, Mr. Konkle, or have I misstated anything at that point?

A.    I feel like I'm that person.

Q.    Okay. I appreciate you listening to me talk for 45 minutes. Maybe we'll get to hear you talk now. Thank you so much.

MS. HANDLEY:  I'm fine, Judge.

THE COURT:  Thank you, Ms. Handley. All right.

At this time I want to re-introduce to you Douglas Parks, who will talk to you on behalf of Mr. Broadnax.

EXAMINATION

BY MR. PARKS:

Q.    Are you doing all right, Mr. Konkle?

A.    I'm doing great, thank you.

Q.    Well, I'm going to spend about 45 minutes with you also, just like the prosecutor did.  If you feel the need to ask any questions or ask for an explanation about anything that I'm talking about, feel free to jump right in.

A.    All right.

Q.    This is a reasonably informal process that we have down here for jury selection.  It's the only part of the trial where we get to talk back and forth to each other and explore the law and the ramifications of the law and like that.

I'm going to talk to you a good deal probably about these special issues, Mr. Konkle, along with some things on your questionnaire and along with the merits phase or guilt/innocence phase of the trial.

I want you to understand though from the get-go that just because I talk about the punishment phase of a capital murder trial, we, the defense team here, are not conceding that this jury is ever going to be required to answer these questions, because they are only answered in the event a jury finds a defendant

guilty of capital murder.

We're not conceding that that's going to happen in this case. Do you understand that?

A.    Yes.

Q.    Another thing, Mr. Konkle, and this is kind of my philosophy, I guess, maybe more than anything else, but it's my thought that our job and our purpose here in voir dire is more to -- certainly we need to make sure that jurors understand the law, and we need to determine whether or not they can follow the law.

But in doing that, I believe that it is appropriate -- if I had a prospective juror who wanted to be on the capital murder case in which the State is seeking the death penalty and all they needed to know was whatever it was they had to say to get on it, I'd be very nervous about that.

Or if I had someone on the panel who for whatever purpose or reason, their lives were busy, they had other things they wanted to do, they just didn't want to be tied up for two weeks in the summertime, and all they wanted to know was what it was they had to say not to have to serve, then we'd just be down here telling people what they had to say.

And I don't think that's our purpose. I think our purpose really if we're going to actually try

to set a fair and impartial jury is to encourage people to tell us how they really feel about these issues, not what they have to say to either get on or get off.

A.   I understand.

Q.   I've heard a lot of instructions to you today about what you needed to say in order to be on this jury.

MS. HANDLEY:   I'm going to object, Your Honor.  I'm informing the juror what the law is in the particular case.

THE COURT:   Sustain the objection.

Q.   [By Mr. Parks]  What I want to do is get your true feelings about these issues, whatever they are.  It really doesn't matter as long as they're your true feelings.  Does that make sense to you?

A.   Yes.

Q.   Okay.  Now, let's first talk about the guilt/innocence stage of the trial, Mr. Konkle.  And here's what our law basically says that the starting point is.

I will tell you that it's fairly obvious that Mr. Broadnax is sitting here in court today having been charged, arrested, indicted and brought to trial.  That's obvious.  Okay?

Now, our law says that despite those

things, he is entitled to have jurors presume that he's innocent. I know from experience that sometimes jurors are able to do that and sometimes jurors are not.

How do you feel about it?

A. Being able to or not being able to?

Q. Whether or not you presume that he's innocent.

A. Well, as it was said before, as the law states, it's presumed innocent until proved guilty, and that's how I feel. It's just with the evidence and everything that's brought forward, then you have to pretty much go from there and make up -- or not make up, but do what's correct.

Q. Okay. I think what I'm hearing you say there is that you do presume Mr. Broadnax to be innocent?

A. Yes.

Q. Can afford him that presumption?

A. Yes.

Q. Fair enough. And that presumption alone is enough to entitle him to an acquittal unless the State can prove what they have alleged in their indictment to every member of the jury beyond a reasonable doubt. You understand that?

A. Yes.

Q. Now, beyond a reasonable doubt is not defined

in our law.  I think the prosecutor told you that, but it's not just really whatever you want it to be.  There are some guidelines that you will be given.  Okay?

I can tell you what it's not.  It's not a preponderance of the evidence.  That's what we use in civil court when people are fighting over money, and whoever has the most evidence, if it's 51 percent to 49 percent, the 51 percent wins.  Well, that's not the standard in a criminal case.

In some courts, in some situations, we have another standard that people generally don't know about.  It's called by clear and convincing evidence, and that's the standard that's used if, for instance, the State is trying to remove the parental rights of a parent and take their child away.

The theory behind that is that you shouldn't take anybody's children just by preponderance of the evidence, the same as you'd use for money.  There should be a greater requirement on the State than that, and so the law says that the State has got to show by clear and convincing evidence that that's in the best interest of the child.

But whatever else beyond a reasonable doubt is, it is greater than that standard.  Our courts have told us that.  Okay?

Now, what I anticipate Judge Snipes will tell you in the Court's Charge is that the State is bound to prove -- is not bound to prove their case beyond all possible doubt, but they are bound to prove their case beyond all, that's a hundred percent, all reasonable doubt.

Does that sound like something that you -- a law that you could follow and apply to the case?

A.   Yes, sir.

Q.   All right, fair enough.  Now, capital murder cases in which the State seeks the death penalty is -- there are a lot of things that are unique, I guess, but the one that is probably the most unique is that typically we can say with real confidence to a prospective juror, I can say to you, Mr. Konkle, it really doesn't matter what your personal opinions and thoughts and beliefs are, because you're down here on a fact-finding mission.

If we tell you what the law is and then show you the facts, then you can make a decision, objective decision based upon the evidence that you've heard and the law that's been given you by the Court, and it really doesn't much matter what your personal beliefs are, and that's true in most cases.

It's absolutely true in the

guilt/innocence phase of a capital murder trial, but it's not in the punishment phase, and I'm going to explain that to you in just a little while, and you may know where I'm going with that.

But it is very often true that a person's opinions, beliefs, ideals, whatever you want to call them are critically important in the punishment phase of a death penalty case and can very well make a difference literally between life and death for an accused citizen.

And that's why we talk to you about your personal beliefs and feelings because our law in capital murder cases in which the State is seeking death allows for a great deal of latitude from the juror to exercise just those very things without structure, without guidance.

So we need to know what they are. Does that make sense to you?

A.   Yes, it does.

Q.   There's really no difference in a capital murder case's guilt/innocence phase and, really, a DWI case or a theft case or any number of -- anything else I could name, because the standard is the same, burden of proof is the same, and it's just a question of whether or not the State has proven what they've

alleged.

Obviously, the difference though between a capital murder case and a theft case or a possession of marijuana case is that the allegations are obviously much more serious and the consequences to the accused citizen are much more serious.

But other than that, the procedure is the same. Does that make sense to you?

A.    Yes.

Q.    Okay.  Do you feel like you've understood everything that we've told you about the guilt/innocence phase as far as --

A.    Yes.

Q.    Fair enough.  Well, I'm going to move on, Mr. Konkle, to the punishment phase of a capital murder trial, and, you know, again, you remember my admonition, don't take anything from that.

One thing is basically the same, and I want to talk to you first about these first two special issues because they can be lumped together and we can talk about them pretty much in the same way.

Then the third special issue is different.  We need to talk to you about that as a single issue.

The process on the first two special

issues really is the exact same as the process that you went through as a juror in the guilt/innocence phase of the trial.

If you just substitute these questions for the indictment, then you've got a real good handle on where you were at the first phase of the trial, because just like an accused citizen is presumed to be innocent, these first two special issues are presumed to be no.

And just like the defendant must be found not guilty [sic] if the State proves exactly what they have put in the indictment, then a defendant is entitled to have these special issues answered no unless the State proves beyond a reasonable doubt exactly what our Legislature has put in these special issues.

Do you see how the parallel works there?

A.    Yes.

Q.    So that just the same as you are not allowed as a juror to change the indictment, you're not allowed to change the special issues.

You remember Ms. Handley talked to you about the different manner and means portion of that indictment?  If they alleged killed by shooting a firearm and they proved that the person was killed by

stabbing with a knife, then the proper verdict is not guilty, just as she said.

Well, the same is true. They've got that same burden of proof on these special issues, and you can't help them out by changing what the special issues say, and certainly you can't help them out by making a determination what you think the right and proper verdict ought to be and then answering the questions in order to get to that result. Does that make sense to you?

A. Yes.

Q. The process is intended to say to a juror, you may believe with every fiber of your being that a defendant deserves the death penalty based on what he has done, and that the family deserves closure and that justice demands, but those are not the issues that you are called upon to decide, because what might be justice for one juror would not be for another.

What one defendant might deserve in the eyes of one juror might not in another. So that if we made our decisions based just on those concepts, you can see how there would be almost no guidance for a jury to make a determination.

And our Supreme Court has said that there has to be some guidance on the part of the law to

a jury in order for this process to be constitutional.

They have said, for instance, if the State passes a law that says if you are found guilty of capital murder, you get the death penalty automatically, that is unconstitutional. Okay?

There must be some system provided that gives reasoned guidance to a jury. And this is the way Texas has decided to do it. Most other states use different systems from this. It really doesn't matter.

I think Texas and perhaps one other state uses these special issues. But the idea is that they are to be barriers to the imposition of the death penalty.

And if a juror does not see them as barriers, then they're not giving an accused citizen the benefit of what our Supreme Court and now our Legislature has said they are entitled to.

Does that make sense to you?

A.    Yes, it does.

Q.    All right. Now, I've heard it said, Mr. Konkle, that if a juror were to actually put the State to the test of proving, literally proving what that first issue says, that that's practically impossible to be done because it calls for a juror to predict the future or at least predict a probability in the future

beyond a reasonable doubt.

And I submit to you that it was intended to be a difficult thing for the State to do, because our Court of Criminal Appeals has told us that the purpose of special issue number 1 is to identify those few incorrigibles who cannot even be incarcerated without fear of further violent acts.  Okay?

So the law recognizes that just because a person is a capital murderer, that there should be some standard to identify those who should not receive the death penalty from those that the law would say should.  Does that make sense to you?

A.    Yes.

Q.    Okay.  Now, the context, Mr. Konkle, of that first special issue, however, is this, and here's where I want to first -- I want to get your own personal honest-to-God opinion about this, whatever it may be.

The context of special issue number 1 is that as a juror, the only way you would ever be called upon to answer that question is if you had been convinced, along with 11 others, that the defendant was an intentional murderer who killed another person because that's what he wanted to do.

As the prosecutor told you, all capital murder cases where robbery is alleged requires an

intentional culpable mental state.

Our law defines that as it being the conscious objective or desire on the part of a defendant to cause the result. That's a fancy say of saying that a person decided to end another person's life and did whatever it took to accomplish that goal.

It was not an accident. It wasn't acting in self-defense. He wasn't under duress being forced to do it by someone else. He wasn't just doing an act clearly dangerous to human life that caused death even though he didn't particularly want death to ensue.

No, no. He wasn't insane. Okay? Knew what he was doing, knew the difference between right and wrong. He just wanted to kill somebody and did, and not only that, did it in order to obtain possession of that person's property. Okay?

So whatever else you might know about the defendant, you would have to know that before you ever come to that particular question.

Some jurors tell us in all honesty, Mr. Konkle, that if they're answering special issue number 1 about just such a person, that that is the kind and type of person who in their opinion would always probably commit acts of violence in the future and

would constitute a continuing danger to society.

Other jurors tell us no, that just because a person is an intentional murdering robber, he would not necessarily -- in fact, could even presume he would not be the kind of person who would commit acts of violence.

How do you feel about that, about that issue? Do you believe if you found someone from the evidence beyond a reasonable doubt was an intentional murderer, that you would answer that question yes in all circumstances or not?

A.    With all circumstances?

Q.    Every time. Do you think that that's just something that you would do or can you presume that question to be no?

A.    I can presume that question to be no.

Q.    Can you think of anything that you might want to know in addition to the fact that a person is an intentional murderer that would help you answer that questions

A.    I'll say nothing comes to mind at the moment. Honestly, it would just be the evidence about the person.

Q.    Our law says that a juror can answer that question yes based only upon the facts and

circumstances of the offense itself.

A.    Okay.

Q.    So what jurors are allowed to do in our law is to say, Okay, now I have found this person guilty of capital murder.  It's up to me to decide whether or not special issue number 1 should be answered yes.  Well, what do I know?  Well, I know that the defendant -- I'm going to look at the facts and circumstances of the case.  I know the defendant intended to kill this guy, did it with no legal excuse or justification, and did it in order to get his property.

Now, is that enough for me to answer that question yes, or do I need more than that in order to answer that question?

A.    I don't think I need more than that.

Q.    You would need more than that?

A.    I wouldn't.

Q.    You would not need more than that?

A.    Would not.

Q.    So that whenever you looked back and said, okay, I'm reviewing the evidence, the evidence shows me that this person is an intentional murderer.  He killed another person just to get their money.

Then that, since the law allows me to answer that question yes based solely on the facts,

those are the facts, and I'm going to answer it yes. Is that what I'm hearing you say?

A.    Yes.

Q.    Okay, fair enough.  If you answer special issue number 1 yes, you go to special issue number 2. I'm not going to spend a lot of time on special issue number 2, Mr. Konkle.

That's a different issue 2.  I don't know whether you've been told.  We always, the jury always gets special issue 1 and special issue 3.  They don't always get special issue 2.

The Judge makes a determination whether to give that after all the evidence is in and depending upon the evidence.  So I generally frankly don't spend a great deal of time on that.

You may see that if you sit on this jury, you may not if you sit on this jury, and only if Mr. Broadnax is found guilty.

Special issue number 3 is different though, and I want to talk to you about that and kind of refer back to your questionnaire.

Remember when I told you early on when we started that a person's own feelings, opinions were important?

A.    Uh-huh.

Q.    This is where that comes in, because with special issue number 3 there no longer is a burden of proof on anyone, just as the prosecutor told you.  Once you get to special issue number 3, the defendant is sitting on the death penalty because 12 jurors have found, (a), that he is an intentional robbing murderer and that he will be a future danger.

So that's the context in which special issue number 3 is asked, and it is open, I guess is one way of putting it, to a juror's own determination without a great deal of boundary there, just as Ms. Handley told you.

What is or is not a mitigating circumstance is strictly up to the individual juror. One juror might find something is mitigating.  Another juror might find that the same thing is not.

Another juror might find something different to be that no one else on the jury thinks is. It's up to each individual juror as to what they believe is a mitigating circumstance.

And not only that, it's up to each individual juror to determine what weight they would give to any individual mitigating piece of evidence or mitigation as a whole.

And again, what one person might feel

was sufficiently mitigating to justify a life penalty rather than a death penalty, another juror might say, "I believe it is mitigating same as you do, but I don't believe that it's sufficiently mitigating." Everybody makes up their own mind.

So with that rather fluid contextual situation, it becomes extremely important what a person's core beliefs, feelings, opinions and thoughts are, and that's why we have to delve into these things. Does that make sense to you?

A. Yes, sir.

Q. And you've told us, Mr. Konkle, on the first page of your questionnaire right out front that you believe in the death penalty. Well, that's what -- most people do, and no harm in that.

But down at the bottom there, if someone has brought harm to someone else, the same should be brought to them. And I know that you talked with Ms. Handley a little bit about that, but I'd like to get you to -- do you still believe that's so or have you changed your mind about that?

A. I think the wording was incorrect, but what I meant to say was it shouldn't be harm brought to them. It should be brought to justice is the way it should be read. It's not actual physical harm.

Q.    It would be kind of like an eye for an eye. It's not literally what --

A.    Yeah, exactly.  It's not literally harm somebody.  It's bring them to justice pretty much.

Q.    And I guess my question to you is that if a person did in fact intentionally take the life of another person, just as a capital murderer would have done, do you believe that that person should receive the death penalty in all cases?

A.    Not in all cases, but as you said, with the evidence and everything else, that's where you'd make your final decision.

Q.    Sure.  In looking at special issue number 3, Mr. Konkle, we ask that you consider the circumstances of the offense and, of course, that would be whatever it was that caused you to find that a person did in fact commit the offense of capital murder as we've been describing it, the defendant's character and background and personal moral culpability of the defendant.

We asked a question and you've spoken to it already a little bit on page 8 over here about genetic circumstances of birth, upbringing and environment and whether they should be considered in determining proper punishment, and it was your feeling that they should not.

And was that your feeling there at the time that you answered that question?

A.    Yes, sir.

Q.    And does that continue to be your feeling?

A.    About the genetics portion or just the whole question?

Q.    Well, the whole thing.  I'm not trying to hide the ball on you, Mr. Konkle.  You can see how that question speaks really pretty directly to special issue number 3.

And what we're trying to find out here is just how important, if they are important at all, to the individual juror, because frankly, we do have jurors who come and say, yes, I believe that the way a person is raised, if they're raised in poverty or if they've been abused, if they've been mistreated growing up, if that's the kind of background from which they have come, if they're addicted to alcohol or substances, drugs of one kind or another, those are things that I think should be considered.

Some jurors say, I think they're important things to consider.  Other jurors -- and there's no right or wrong about this.  This is just how people feel.  Other jurors say, well, I understand that we're all raised in different circumstances and

different backgrounds.

And some jurors say, you know, I came from a tough background. My parents whupped on me and we were poor and I rose above that. I know people who were raised in terrible situations. They rose above that, people who know the difference between right and wrong, which is kind of what you say here in yours, because people can change their environment.

And to them, the really important issue here is did he commit the offense, is he going to be a future danger.

And if those two issue are yes he did and yes, he will be, then this other just really doesn't matter. That's a person who has earned the death penalty and while they may take some of these things into consideration, it's never going to change the death penalty to a life penalty for a dangerous capital murderer. How do you feel about that?

A.    Explain it one more time. I'm sorry, I'm still not grasping it.

Q.    All right. Here's the thing. The special issue says taking into consideration the defendant's background. Some jurors say, sure, I can do that. And if his background was such that I believe that whatever those circumstances are, I believe that it ought to

change the death penalty to a life penalty.

Other jurors say, sure, you know, I can look at his background. I don't care what it was. If he knew the difference between right and wrong and did it anyway, it's meaningless for me.

Or -- and I'm not sure where genetics fit in this. You're pretty positive about genetics.

A.    Yeah.

Q.    But genetics could have things to do with a person's -- maybe their intellectual ability, maybe a predisposition for illness, I don't know.

And I'm just trying to get from you whether or not we have any chance with you. If you find Mr. Broadnax guilty of capital murder, and you find that he is going to be a future danger, is there anything about background or genetics or any of those things the special issue speaks to that gives him a chance of not having a death penalty?

A.    Well, in that being said, special issue 3, it does feel like you'll actually have to sit there and from everything that you've heard and whatnot, sit there and figure out in between his background and whether or not that he'd pose a problem or if it should be a life imprisonment instead of the death penalty.

That's how I perceive it, going through

everything presented, yes.

Q. Okay. And here's the thing. Anyone in Mr. Broadnax's position is entitled at least to people on the jury who can give consideration and can give meaningful consideration to any of the things that they might be proposing as potential mitigating evidence.

And the law doesn't say, you know, that -- a requirement that the defendant rush in and try to save the victim or that he pray over the victim. Those are pretty outrageous sorts of examples and I think they're meant to be just in order to give an idea to a juror.

But if it was stuck with those kinds of things, it would probably render that issue meaningless. So what we're really looking for is just someone who can honestly say, I can keep an open mind to those issues. I can give meaningful consideration to anything that is proposed.

Some of the things that we've heard jurors say in the past that could be potentially mitigating would be the age of an accused. Our law says that anyone 18 or over, that the State can seek death against them.

To some jurors, if a person is in the lower range of that, still youthful, 18, 19, 20, 21,

that would be something that they could give consideration to in answering that question.

Other jurors feel like if they're 18, that's not something that would be for them potentially mitigating or something to consider. How do you feel about that?

A. About the age issue?

Q. Yeah, whether or not that would be a consideration. If they were at least 18 years old, would that be something that you believe you would consider in answering special issue number 3?

A. Honestly, that would be something that would be considered.

Q. Would be?

A. Would be, yes.

Q. Okay. Another thing that we sometimes talk about is voluntary intoxication. You see on the questionnaire on page 5, down at the bottom it tells you that voluntary intoxication does not constitute a defense.

That is, you can't say, listen, I'm not guilty because I was out of my gourd with drugs or alcohol. The law says that's not a defense.

At the top of the next page you'll see it says that our law says that a juror may consider

voluntary intoxication in mitigation, That means to lessen punishment.

And you agreed with that.  I wasn't sure if you understood what we were asking you because you put, "Intoxication is a person's own fault."  How do you feel about that?

As it says, you may consider that.  Some jurors say they would consider voluntary or could consider voluntary intoxication in answering special issue number 3.

Others feel if it was voluntary, that that would not be something that they could give any consideration.  How do you feel?

A.    Well, if it was voluntary, it wouldn't be considered.

Q.    Would not be?

A.    Yes, sir.

Q.    Fair enough.  Sometimes people take -- if there's more than one person involved, for instance, whether or not the Defendant was the leader or the planner or whether hew as just a follower, a go-along guy, even though he may have been the one that did the killing, that would be something that they can consider in special issue 3.  How do you feel about that?

A.    That would be something I would consider.

Q.    Let me just take a quick look here, Mr. Konkle.  I think that I've got a little bit of time left.  Well, I keep different time on a different clock, but I'm still okay.

I want to just sort of summarize here, I guess.  Let me look at the questionnaire for one more second.  I think I've covered everything on here that I wanted to visit with you about.

We talked about police testimony. You're willing to concede that a police officer might take the stand and not tell you the truth?

A.    Well, yeah.

Q.    But you'll wait and judge credibility?

A.    Yes.

Q.    Okay.  You work at the Sports Authority?

A.    Yes, sir.

Q.    I believe, Mr. Konkle, that that's everything in the questionnaire.  So let me just kind of summarize and be done with this.

What you're telling us is that if you're selected on this jury, you can presume Mr. Broadnax to be innocent, that you'll force the State of Texas to prove everything that's in that indictment beyond a reasonable doubt?

A.    Yes, sir.

Q.   If they fail to do that, you'll find him not guilty?

A.   Yes.

Q.   If they do that, you will find him guilty and move on to these special issues; is that what I'm hearing so far?

A.   Yes.

Q.   That when you get to these special issues, with respect to special issue number 1, in reviewing the evidence that you have heard, if you have been convinced from the evidence beyond reasonable doubt that the defendant is an intentional murderer who killed to get another person's property, then that evidence is going to convince you that he will be a future danger, that you'll answer special issue number 1 yes?

A.   Yes.

Q.   And that if you get special issue number 2, you'll consider the evidence and answer that yes or no, depending upon the evidence that you hear, and that if you get to special issue number 3, that you can reconsider all the evidence that you've heard to determine whether or not you have heard any evidence of mitigating circumstances, that if there are mitigating circumstances, it is possible that it will rise to the

level of being sufficient for you to change the death penalty to the life penalty, and that you could answer that question yes.

A.   Yes, sir.

Q.   Is that a fair summary of what you've told us?

A.   Yes, it is fair.

MR. PARKS:  Thank you, Mr. Konkle.  I appreciate it.  Pass the witness.

THE COURT:  All rise for Mr. Konkle. You're going to step outside and be coming right back in, sir.

[Venireperson Konkle left the courtroom.]

THE COURT:  Mr. Konkle has left the courtroom.  What says the State of Texas?

MS. HANDLEY:  We believe the juror is qualified.

THE COURT:  All right.  Mr. Broadnax?

MR. PARKS:  Your Honor, we would submit Mr. Konkle for two reasons.  First, we would submit that he has pretty clearly advised us that he's an automatic yes on special issue number 1, and we'd also submit him for the reason that he could not give meaningful consideration to voluntary intoxication in

answering special issue number 3; and that will be, no question about it, it we reach this stage of the trial, that will be evidence that we will submit as mitigating evidence in this case, and having a juror that would not give meaningful consideration would violate the Sixth, Eighth and Fourteenth Amendments of the Constitution and the teachings of logic of the *Morgan v. Illinois* and *Eddings v. Oklahoma* .

THE COURT:  Be denied.  What says the State -- well, I'm sorry.

MS. HANDLEY:  I believe the juror is qualified, Your Honor.

THE COURT:  Ask him to return, please.

[Venireperson Konkle entered the courtroom and approached the bench.]

THE COURT:  Please be seated, sir.

Mr. Konkle, you've been certainly accepted as a qualified juror by these attorneys and I think that's exactly right and I'm sure Judge Snipes will look forward to working with you, should you be on this jury.

Now, that decision will be made, I think, in about three weeks.  You'll get a phone call telling you whether or not you are or are not on the jury.

In that interim, this case might receive some media attention. I will ask that you avoid it at all costs. It would be a shame if somebody like you were inadvertently disqualified.

If anybody asks you, the simplest thing to do is say, "The Judge told me I can't talk about it." That stops it right there.

The sheriff is going to give you the telephone number of the court coordinator, who will -- should anything occur in your life that you think might affect your service, give her a call and we'll deal with it. All right, sir?

It's been a pleasure meeting you and good luck to you, sir. All rise.

[Venireperson Konkle left the courtroom.]

MR. PARKS: Judge, we'd just like the record to reflect that this is a juror that would not be acceptable to the Defense.

THE COURT: The record shall so reflect.

[Off the record.]

THE COURT: Back on the record in front of Mr. Broadnax, the Court, after reviewing the questionnaire of prospective juror O'Steen, on its own motion will excuse Mr. O'Steen from jury service.

Any objection?

MS. HANDLEY: No objections.

MR. LOLLAR: No objection.

THE COURT: All right. Sheriff, tell him he's free to go. See everybody at what time? Y'all coming back at 1:30, 1:15?

MR. LOLLAR: We've been coming back at 1:15.

[Luncheon recess.]

[Defendant present.]

THE COURT: let the record reflect we're in open court in the presence of Mr. Broadnax.

Please state your name for the record, sir.

MR. UTSEY: Matthew Utsey.

THE COURT: Will you spell that for me, please?

MR. UTSEY: M-A-T-T-H-E-W, U-T-S-E-Y.

THE COURT: Raise your right hand for me.

[Matthew Utsey sworn by the Court.]

THE COURT: You've been sworn in. Is there any return date?

MR. ALEX: We've got an August 10th start date and I'm going to keep him on the stand about -- I want him to come in August 10th and when we get closer in time to then, we'll give him.

THE COURT:  Is there any reason you know why you can't be here August 10th?

MR. UTSEY:  I'll probably be in South Carolina.  I won't be here.

MR. ALEX:  We've got him covered, Judge.

THE COURT:  No need to admonish him about failure to appear.

MR. ALEX:  I think I can take care of that.

THE COURT:  Okay.  You know the consequences should you --

MR. UTSEY;  Yes, sir.  I've seen the subpoena.

MR. ALEX:  Thank you, Judge.

[Pause in proceedings.]

[Venireperson Paclibon entered the courtroom and approached the bench.]

THE COURT:  Good afternoon, ma'am.  Please be seated, folks.  Please be seated, ma'am.

We met earlier this afternoon?

VENIREPERSON PACLIBON:  Yes, sir.

THE COURT:  Are you doing all right?

VENIREPERSON PACLIBON:  I'm very nervous.

THE COURT:  I understand.  I introduced myself to you.  I'm Webb Biard and we've talked

earlier. And how do you pronounce your name, please?

VENIREPERSON PACLIBON: Emelda Paclibon.

THE COURT: Thank you. Raise your right hand for me, please.

[Venireperson Emelda Paclibon sworn by the Court.]

Whereupon,

EMELDA PACLIBON, NO. 647

having been first duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q. Did you have an opportunity to read the pamphlet that you had out in the hall, that document?

A. Yes, sir.

Q. Did that help you understand the procedure a little better?

A. A little, only there's too many words.

Q. All right. Do you understand that this is a capital murder case?

A. That's what was told the last time when we filled out this application.

Q. Right. And you understand that now?

A. Yes, sir.

Q. The State of Texas is seeking the death penalty?

A.    Yes, sir.

Q.    All right.  That's the reason we talk to jurors like this.  And I want you to relax as much as possible.  I know this can be sometimes intimidating to some people and I don't want it to be.  I told you that earlier this afternoon.

Also, I want to introduce some other folks to you.  we have Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  And Andrea Handley.

MS. HANDLEY:  Good afternoon.

THE COURT:  They represent Dallas County and the State of Texas.

Further to my right, Brad Lollar.

MR. LOLLAR:  Hello.

THE COURT:  Doug Parks.

MR. PARKS:  Good afternoon.

THE COURT:  Keri Mallon.

MS. MALLON:  Hi.

THE COURT:  And they represent Mr. Broadnax.  Mr. Broadnax.  Thank you, sir.

Q.    [By the Court]  If someone is found guilty of capital murder, then there's only two possible punishments.  That's either life in prison or death.  And we're going to be talking to you about this

procedure.

Now, did you see in that pamphlet, and I believe it says this, that Judge Snipes has told us the trial is going to start August the 10th.

THE COURT:  Is that in the pamphlet, Counsel?  It is, isn't it?

MS. MALLON:  Yes.

Q.  [By the Court]  And it's to last up to two weeks.  As you sit here now, are you aware of any reasons why you couldn't sit as a juror in this case?

A.  I work in Outpatient Dialysis Clinic and during this time we have a lot of people on vacation, so I pitch in as the charge nurse if, you know, we have no staff that we can find to work.

Q.  Let's assume that you were on the jury during that time for two weeks and weren't able to attend to your job with the dialysis clinic.

Do you think that would prohibit or substantially impair your ability to listen to the evidence as it is presented during the trial?

A.  I have to notify my supervisor.  They already knew today that I'm going to have an interview to be a potential juror for this capital murder case.

Q.  Okay.  Do you have any idea of what he's going to say as far as whether or not --

A.    I don't know, sir, because like yesterday, there were two people that called in sick in my clinic, so they have to find one person.

And I'm supposed to be the one covering but I told them that I have this thing that I have to do here in the court.

Q.    Right.  Have you talked to your supervisor about what would happen if you were on the jury?

A.    No.

Q.    Do you have any idea what he would say?

A.    Well, probably, if it's needed, he'll probably say there's no way I can hold you to the job. We have to find somebody to replace you.  For two weeks, you're saying?

Q.    Yes, ma'am, up to two weeks.

MR. LOLLAR:  Judge.

THE COURT:  All right.  Since you have such an important job, we're going to excuse you from service.  You're free to go and won't have to return.

VENIREPERSON PACLIBON:  Thank you.

THE COURT:  You bet.

THE BAILIFF:  All rise for the juror, please.

[Venireperson Paclibon left the courtroom.]

[Off the record.]

THE COURT:  Back on the record in the presence of Mr. Broadnax.

MS. EVANS:  Your Honor, Juror No. 647, Emelda Paclibon, in addition to her concerns about missing work and the effect it could have on her future employment there, the State does not believe, based on some of her answers in her questionnaire, as well as her answering questions for you this morning, Judge, that she would be a juror that would understand the laws fully and be able to participate in this process due to language barriers.

MR. PARKS:  I had written in my notebook, "This woman has a look of pure panic on her face."

THE COURT:  Although -- let the record reflect she appeared early for service.  I happened to be in the courtroom and I had a brief conversation with her and she appeared to be very overwhelmed.  Although she has a very important job, she had a hard time understanding me.

At this time for cause will be granted by the Court.

Now, Mr. Loy appeared also early, Loy Knowles, and he's set for tomorrow; is that correct?

MS. HANDLEY:  Yes, sir.

MR. PARKS:  Our schedule has him --

MR. LOLLAR:  tomorrow at 1:00 o'clock.

MR. PARKS:  -- tomorrow at 1:00.

MR. LOLLAR:  All right.  And there's another lady that's supposed to be here this afternoon at 1:00, who is not here, and now it's 1:24, and we're wondering whether for some reason the court coordinator switched Mr. Knowles from tomorrow to today and Ms. Maryovich from today to tomorrow.

MS. MALLON:  Do you want me to go check on that, Judge?

THE COURT:  Yes.  Ask Counsel to approach the bench, please.

[Off-the-record conference at the bench among Court and Counsel.]

THE BAILIFF:  All rise for the juror.

[Venireperson Knowles entered the courtroom and approached the bench.]

THE COURT:  Please be seated, Mr. Knowles.  Be seated, folks.

I'll say good afternoon to you again, r Knowles.

VENIREPERSON KNOWLES:  Thank you.

THE COURT:  Raise your right hand for me, please.

[Venireperson Loy Knowles sworn by the Court.]

Whereupon,

LOY KNOWLES, NO. 561

having been first duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q.    We appreciate you being here.  You got sent a day early but that will be fine.  We'll be able to work that right in.

I'd like to introduce myself to you.  My name is Webb Biard and I will be with you today during the jury selection process.

The presiding judge of this court is Mike Snipes and should you be selected as a juror, Judge Snipes will preside over the trial.  This will be the only opportunity we have to be together.

Also I want to introduce Andrea Handley to you.

MS. HANDLEY:  Good afternoon.

THE COURT:  And Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  They represent Dallas County and the State of Texas.

Further to my right is Brad Lollar and

Doug Parks, and they represent Mr. Broadnax.  Mr. Broadnax.  Thank you.

Q.    [By the Court]  Before we go any further, I want to just bring this up to you.  We appreciate you filling out that questionnaire.  Do you have that up there with you?  There you go.

And there's Keri Mallon also with Mr. Broadnax.

We appreciate you filling that out.  It wasn't some idle exercise.  It's going to save you time here today.  The attorneys have read it in detail.

There's one thing I want to address with you before we go any further.  I see your mention of Tyrone Fuller.

A.    Yes.

Q.    And that was your cousin's daughter?

A.    Yes.  Be my mom's first cousin, so be my second cousin.

Q.    All right.  For what it's worth, I represented Mr. Fuller.  Will that affect your ability to answer these questions and talk to us this afternoon?

A.    Truthfully, yes.

Q.    Do you think that might affect you?

A.    Yes.

Q.    Sir?

A.    Yes, it would.

Q.    Did you recognize my name?

A.    No.

Q.    Well, I wanted you to know that.

A.    I pulled it up on the internet but that didn't register with me.

Q.    And how do you think that might affect you?

A.    Me and her were real close growing up.  We rode bicycles and stuff together and I hunt on her mom's property every duck season.

Q.    You still see Ms. Duke?

A.    Yes.  Martha Duke, yes.

Q.    Martha, Ms. Duke.  Roxton community there?

A.    Outside of -- right, Roxton, yeah.

Q.    And just for the record, you say it will affect you knowing that I represented Fuller?

A.    No, that has nothing to do with it.  It's just the way I feel about certain things, the death penalty and --

Q.    Do you think the fact that Lee Duke was murdered would affect your ability to sit as a juror in this case?

A.    I can't answer that right now.  I don't think I could.  Maybe it would.  I can't answer that.  I've

never been on a jury to determine somebody else's life. I don't know.

THE COURT: All right. Well, I'm going to let the State of Texas talk to you first for up to maybe 45 minutes, and then the Defense will talk to you.

MS. HANDLEY: Thank you, Your Honor.

EXAMINATION

BY MS. HANDLEY:

Q. Good afternoon, Mr. Knowles. I appreciate you being here today. Let me tell you what's going on.

In a death penalty case, we bring jurors down one at a time and we talk to them individually, because of the nature of the case, because of, quite frankly, what's at stake here.

A. Right.

Q. You know, if a person is found guilty of capital murder, are they going to serve that automatic life in prison without parole or are they going to be sentenced to death.

And things might have changed. I think the law might have changed since you went through your situation where an individual found guilty of capital murder now, if they're sentenced to life in prison, it means life in prison without parole. There is no

possibility of parole.

But we bring folks down one at a time because not only is it important for us to explain the law to them and see if they understand the law and can they follow the law, but to also feel them out personally and see where they're coming from and to determine if they have any bias that they might bring into the court that's going to affect the way that they look at the evidence, or it's going to affect the way that they arrive at their verdict.

Everybody has personal baggage, and I am so sorry you had to go through a situation like that with somebody. so close to you.

Did you sit in the trial every day or did you just get kind of a report of what was going on?

A.    No.  No, I did not go through any of the trial or nothing.

Q.    Okay.  And that individual was found guilty of capital murder and he has since been executed, has he not?

A.    Yes.

Q.    And that really becomes the $64,000 question, sir.  Is because of what you've been through in the past and because o the taste, you know, that this has left in your mouth, can you truthfully say that you can

come into court, you can listen to the evidence in this case and just base your verdict on the evidence in this case?

Are you still going to be holding on to maybe what happened, the situation with your family member?

A. I don't think it would affect me. The only thing that I can truthfully say that bothered me about the whole thing is her mother, Martha. I've known her since, you know, I was a baby. Good Christian woman.

Her and her son went down to watch Tyrone or Evil Fuller. They watched the execution. That bothered me.

Q. Why did that bother you?

A. That she went down there and watched him executed.

Q. What about that situation bothered you?

A. I can't believe she did that. Being a Christian woman, she went down and watched the execution. That really bothered me.

So there's certain things that I guess when you take somebody's life -- I can't answer that. It just bothered me. Me and my brothers talked about it.

We can't believe Martha went down there

and watched the execution.  I mean, we're just like, "She did?"

Q.  Was it that she needed to have some closure or she needed to actually see him put to death or was she feeling sorry for him or something?

A.  Well, put yourself in her place.  What if somebody killed your daughter?

Q.  God forbid.

A.  Right.

Q.  You know, I don't know.  I don't think we can ever say that until we're actually in the shoes of those individuals.

A.  I mean, we've all thought about it.  I have no kids but my twin brother, his kids are the apple of my eyes.  What if somebody did that to them.  I could watch him die.

Q.  You could or couldn't?

A.  I could.

Q.  You could?

A.  I could, yes.

Q.  Okay.  Well, I read your questionnaire and you tell me if I'm reading it incorrectly or if I'm taking something away that's not appropriate, because we had you fill this out before we really told you how the laws actually work, and we're doing that to get

your gut reactions and to get a feel for how you feel about the criminal justice in particular and how things work.

It occurs to me that I think -- tell me if I'm wrong, but I think you're the kind of man that you just don't have a whole lot of tolerance for criminal activity and maybe not even a whole lot of wanting to give some leniency or some mercy or some understanding to people who do actively or do purposefully break laws.

You know, you've got some things in here, for example, where you state that you -- on page 6. Have you got that in front of you here? For example, on page 6, you know, we asked you some questions about intoxication and how should -- would you consider that in determining what should happen in a case, and you made the statement here, "Get tough on the S.O.B.s."

A.    Right.

Q.    And then we talk to you about drugs or alcohol and would that prevent you from returning a death sentence, and you said, "That's a copout. Guns and drugs don't mix. Alcohol and guns and cars don't mix. You play, you pay. Get touch, Texas." Okay.

And the whole thing about a death

penalty case, Mr. Knowles, is that there really isn't anything automatic about it. You know, just because a person is found guilty of capital murder doesn't mean that they automatically get the death penalty.

There's actually a presumption that if you're found guilty of capital murder, you will spend life in prison without parole. The Texas laws say that that's the presumption, that that's the right thing to do.

And only if and until I, as a representative of the State, can prove things t you, things that are necessary, only then can you take that extra step to see that they get the death penalty.

A.    Right.

Q.    Okay. So there are rules in place and there are laws in place and they have to be these questions that you answer. I think you had a chance to look at the special issues. Have you had a chance to look at that?

A.    Yes.

Q.    When you answer those questions, that's what determines whether or not somebody gets a death sentence or they serve life in prison without parole. That's how it comes about.

It's not that you go back and say, do

you think he should die, or, how many for life and how many for death. Instead, you answer those questions.

And if you answer those questions yes, he's a future danger and yes, he was a party to it and no, I don't see any reason, any mitigating circumstances to turn that sentence into life, then he gets the death penalty.

But your answers to those questions have to be based entirely on the evidence in this case.

A.  I understand that.

Q.  Okay. That not all people guilty of capital murder will get the death penalty, and that's just the law and the law states you got to do it on the fact.

A.  Right.

Q.  Now, obviously, you know, a person's personal feelings and such as that, I think that that might weigh into how they see certain pieces of evidence, but what you can't do is say anybody who is guilty of capital murder, I think they're automatically going to be a future danger and I think they should get the death penalty. So regardless of what you tell me, I'm going to go ahead and answer these questions in a way to ensure that they get the death penalty.

Does that make sense to you?

A.  Somewhat, yeah.

Q.   You've got some hesitation.   Do you have a problem with the way it works, or you tell me?

A.   I was raised in a Christian environment. Certain things that you just cannot do.   I could never see me taking a human life.

When y'all called me, I didn't sleep for two nights when I got the call thinking, wow, could I actually give this guy the verdict?   I would have trouble with that.

Q.   You would have trouble returning a verdict of death?

A.   Of death, yes.

Q.   Okay.

A.   I have guns all around my house to defend myself but could I actually kill somebody?   Yes, I think I could to defend myself.   But to pass down a sentence to send James to his death?   I don't think I have that right.

Q.   Okay.  is that based on a Christian belief?

A.   Yeah, my Christian belief; right.

Q.   And what --

A.   I'd have to stand before my maker one day and answer that.

Q.   And there are a lot of people who say that, you know, that just because we have the death penalty

in Texas and just because it's an available option, people under, well, that's the law, I get that, but it's not for me. There's a lot of cases that I could appropriate sit on. I could sit on a burglary case. I could sit on a theft case. I could even sit on a child assault case.

But I can't, because of my personal, moral or religious convictions sit on a case where I might be called upon to return a sentence of death to another person. It's simply just not right for me.

And because of my personal, moral or Christian beliefs, the way I see the evidence, it's going to impair, you know, the way I return my verdict. It's going to prevent or substantially impair me from returning a verdict that I know is going to result in somebody's death, because it sounds to me, and you've lost two nights sleep, that you have a really good appreciation that this isn't a game and we're not talking about this academically.

We're not sitting around, you know, the coffeetable having coffee, going, oh, they ought to kill that guy. Well, a lot of people say that until they go, all right, do it. Well, it's really not for me. It's not for me.

Is that what I'm hearing from you, Mr.

Knowles?

A.   Right.  Don't expect me to pull the plug.  I can't do that.  I couldn't do that.  I could probably hand down the verdict but I can't pull the plug.

Q.   You could return a verdict of guilty but you couldn't go the step further and return a verdict of the death seniority

A.   It just depends on the case and what happened.  I know nothing about this case.  I heard a little bit through the grapevine on what happened.

Q.   What did you hear?

A.   Well my mom goes to the beauty shop next door and when it happened, my mom mentioned something about a double murder over in Garland or something.  A few people talked about it, but I don't watch the local news that much.

Q.   Okay.  Have you heard enough about the case that you've already made up your mind as to whether or not the person is guilty or not guilty?

A.   I know nothing about it, nothing about it at all.

Q.   All right.  All right.  Well, I'll tell you what, Mr. Knowles.  I appreciate you coming down here today.  That's all the questions I have for you at this time, but I thank you for your time, sir.

A.    Sure.

Q.    Thank you, sir.

A.    You're welcome.

THE BAILIFF:  All rise for the juror, please.

THE COURT:  You'll be coming right back in, sir.

[Venireperson Knowles left the courtroom.]

THE COURT:  let the record reflect we're outside the presence of the juror but in the presence of Mr. Broadnax.

What says the State of Texas?

MS. HANDLEY:  We would challenge Mr. Knowles.

THE COURT:  What says the Defense?

MR. PARKS:  No objection.

MR. LOLLAR:  Judge, we'll agree to excuse him.

THE COURT:  It will be granted.  Ask him to return, please.

[Venireperson Knowles entered the courtroom and approached the bench.]

THE COURT:  You're free to go, sir.  You do not have to return.  Thank you very much.

THE COURT:  Off the record.

[Off the record.]

THE COURT:  Back on the record.

MS. HANDLEY:  So the record is clear, Juror No. 561, Loy Knowles, it's interesting that as you read his questionnaire, this man is the most pro-death jurors I've ever seen.  He would return a verdict of death in a DWI case and an insurance claim case.

And then he gets on the stand and, quite frankly, has now told us that he can't be the person who would sit in a death penalty case.  I think this is the classic equivocating and vacillating juror, Your Honor.

I think he's also got a bias with his involvement in that death penalty case involving his cousin that he cannot overcome.

MR. LOLLAR:  We agreed to excuse the juror because he's a nut.

THE COURT:  All right.  That will be granted.

[Off the record.]

THE BAILIFF:  All rise for the juror, please.  Have a seat, Ms. Maryovich.

[Venireperson Maryovich entered the courtroom and approached the bench.]

THE COURT: Thank you very much. Please be seated. Please be seated, Counsel.

I want to say good afternoon to you. My name is Webb Biard and I'll be with you this afternoon during the jury selection process, this part of the jury selection process.

The presiding judge in this court is Michael Snipes. You met Judge Snipes at the big panel.

VENIREPERSON MARYOVICH: Right.

THE COURT: Should you be selected as a juror in this case, Judge Snipes will actually preside over the trial.

I'd ask you to do this for me, please. Raise your right hand.

[Venireperson Tana Maryovich, sworn by the Court.]

Whereupon,

TANA MARYOVICH, NO. 688,

having been first duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q. What's the correct pronunciation of your last name, please?

A. Maryovich.

Q. Maryovich. Ms. Maryovich, I think it helps

to have some idea of what's ahead of you.  We're in the process now of selecting some give-or-take 50 prospective jurors, qualified jurors, and we anticipate that will be done in the next three weeks or so.  When that's done, then the actual jury then will be selected from the pool of qualified jurors.

Since this is a capital murder case -- and you understand that the State is seeking the death penalty -- Texas law requires that you and other jurors have an opportunity to talk to us on a one-on-one situation.

In that regard, I'm going to introduce to you at this time Andrea Handley.

MS. HANDLEY:  Good Afternoon.

THE COURT:  And Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  They represent Dallas County and State of Texas.

And further to my right is Brad Lollar, Doug Parks and Keri Mallon, and they represent Mr. Broadnax.  Thank you.

Q.  [By the Court]  One of the attorneys for each of the -- one for the State and one for Mr. Broadnax will speak to you, talk to you up to 45 minutes.  So in approximately an hour and a half I will tell you here

in open court whether or not you've been selected as a qualified juror.

Then when the actual jury is selected, you'll be notified by Judge Snipes' court reporter -- court coordinator, I'm sorry. And that's the way the process is going to work.

Now, Judge Snipes has told us and I have no reason not to expect this to be true -- in fact, I'm sure it is -- that the actual presentation of evidence will commence August 10th and last up to two weeks, Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon and lunch break.

The jury will not have to stay together overnight unless and until the possibility of you went into deliberations, went late into the night, unable to reach a verdict and became weary.

You'd all be taken to a fine hotel -- could. This could happen. Individual private room, spend the night, come back and continue deliberations to avoid any outside influence.

I give you that information to ask you a couple of questions. As you sit here now, are you aware of any reason why you can't sit as a juror in this case?

A.    No, sir.

Q.    Do you have any reason to believe you couldn't be a fair and impartial juror in this case?

A.    No, sir.

Q.    Now, a couple of things for me and then the attorneys are going to talk to you.  You know from filling out the questionnaire, from hearing Judge Snipes' remarks, from reading that pamphlet and from just sitting there in the chair that you're in that this is a capital murder case.

The State of Texas is seeking the death penalty.  In Texas, if someone is found guilty of capital murder, there's only two possible punishments.  That's either life in prison or death.

And I want to stress this fact to you and I want you to believe me.  If anything I ever said is true, this is true.

Under the current law in Texas, which this case will be tried under, if someone is found guilty of capital murder and given a sentence of life in prison, that means life in prison.  No parole.

There was a time a while back where if someone was found guilty of capital murder and given life in prison as a sentence, they would become eligible at some date in the future after the sentencing.

That is no longer the case. Life in prison means life in prison. Can you accept that law?

A. Yes, sir.

Q. Okay.

THE COURT: Without anything further from me, I'm going to re-introduce to you now Andrea Handley, who's going to talk to you on behalf of the State of Texas.

Ms. Handley.

MS. HANDLEY: Thank you, Your Honor.

EXAMINATION

BY MS. HANDLEY:

Q. Good afternoon, Ms. Maryovich, how are you?

A. Good.

Q. Good, I'm glad to hear that. Appreciate you coming down here and giving us some of your time.

Let me tell you what's going on. We brought hundreds of people to court the same day that you came, some in the morning and even more in the afternoon, and we brought them all here for this particular case.

We had everybody fill out a questionnaire, and since then we've read the questionnaires and we've been bringing everybody down one at a time.

We brought about 800, maybe a thousand, people down here in the hopes that from that we can find 12 people who are qualified to sit on this particular case.

And the way we do that is we bring you down here. We tell you what the law is. We see if you are a person who is capable of following the law and we also feel you out to see if you are, as the Judge said, somebody who can be fair and unbiased, fair and impartial at this point of the case.

Are you somebody who is going to come in, listen to the evidence, base your verdict on the evidence in the case, or are you somebody who has come in with their mind already made up or maybe some kind of a bias either in favor of the State or in favor of the Defendant, because if you have that, then you're not appropriate for this particular case.

You know, a qualified juror is somebody who will listen to the evidence, base their verdict on the evidence and nothing else, and who will do what they believe is the right thing to do and the right thing to do according to the law and the evidence.

So as we talk to you and tell you about the law, that's also what we're getting at. Okay? So I'm going to hist squarely the first thing that jumps

out at me that I think somebody might say there's no way you could be fair and unbiased because you work for a police department.

Now, you are a dispatcher for the Mesquite Police Department; correct?

A.    That's correct.

Q.    Been doing that about ten years now.  Are you a police officer?

A.    No, ma'am.

Q.    Okay.  And do you do any kind of investigations or go to crime scenes or anything like that?

A.    No, ma'am.

Q.    Are you a jailer?

A.    No, ma'am.

Q.    Okay.  So you don't necessarily have any interaction with the prisoners or their comings and goings?

A.    That's correct.

Q.    You just strictly work the dispatch, take the 911 calls, get the officers routed where they need to go, kind of a real juggling --

A.    Correct.

Q.    -- thing.  You can do six things at one time, can't you?

A.    Right.

Q.    And then sometimes there's a lot of down time, so you've got to be ready to go.  So if somebody were to say, well, you work at Mesquite Police Department, therefore, you're law enforcement -- how would you describe your job, ma'am?

A.    We don't enforce the law, the dispatchers don't.  We take the calls from the citizens.  We try to get them help and get somebody out there to help them with the law to determine right and wrong.

Q.    I got you.

A.    We have to be biased.  We can't determine if it's right or wrong just by what they say over the phone, because what they say to us on the phone is a lot different story once the officer gets out there.

Q.    I think that's a pretty good analogy, that a lot of times you just hear some very topical things and it may sound bad or it may sound like it's not much, but then once you get the whole story --

A.    Right.

Q.    -- now you're fully informed as to what's going on.  Okay.  And maybe it's kind of like saying just because I might work at the information desk at a hospital doesn't necessarily mean I'm a surgeon.  You know, I'm not a doctor, but I work there.

A.    Right.

Q.    So you wouldn't really classify yourself as law enforcement then?

A.    No, ma'am.

Q.    Because that becomes one of the important things in any criminal case, is that as a juror sits in a case and listens to the evidence, they're supposed to come in unbiased.

Now, after they take in the evidence, after they listen to the witnesses, then you make your judgment calls and your credibility calls on who you're going to believe or some, all or none of what they say, and such as that. But you come in unbiased and you wait for the evidence to come.

We had asked you about police officer credibility. Do you have your questionnaire in front of you there? Let us go to page -- oh, gosh, where is that?

Turn to page 7 with me, please. We asked you, "Do you believe police officers are more likely to tell the truth than the average person," and you said, "Yes." You said, "Knowledge of the law and trained to find facts."

I'll tell you that there's nothing wrong with people having already a respect or making an

assumption about the credibility of a group of persons. There's nothing wrong with that.

But what the law says is kind of what it old you before, that if you're a juror in a case, you have to start everybody else out on the same level playing field, and that you have to assess their credibility once they take the witness stand, and only then can you say I believe this person or I don't believe this person.

You can't say just because somebody is a police officer, I'm going to automatically believe everything he says.  You know, you've worked with them before.  You might know some in your personal life. You know they're human too, aren't they?

A.    Yes.

Q.    And sometimes they make mistakes?

A.    Yes.

Q.    Is that something that you think you're capable of doing is waiting until a police officer would take the stand in order to determine his credibility or are you going to automatically believe everything any police officer tells you?

A.    I'll wait till he takes the stand.

Q.    Okay.  And I don't mean to keep picking at this but I think it's the one thing that I think

somebody might take issues with, is, you know, whether or not you're going to side with the police or whether or not you're going to side in this particular case with any one party.

Maybe you know this, maybe you don't, but you -- I think you stated it before that you take a call and you really don't know. It's not your job to determine who's telling the truth or not.

But there's a big difference between an officer establishing a reasonable suspicion to arrest somebody or maybe probable cause on the street versus finding somebody guilty beyond a reasonable doubt in the court. You understand that, ma'am?

A. Yes.

Q. And can you truthfully tell us as you sit here today, because all we want are your honest answers, that you are not coming in here giving the State a leg up because you happen to work as a dispatcher?

A. No, ma'am.

Q. All right, very good then. Well, let's talk then about the process of a case like this, and if I'm repeating some things that you already know, bear with me. And if some things don't make sense to you, then by all means you stop me and I'll try to clear it up

with you, because I'll probably do a lot of talking here, but I don't mean to flood you out like that.

We had you fill out this questionnaire and you might think that now we could submit this to e-harmony for you or something because everything we need to know about you is on here.

But we read these to -- basically, it gives us a feeling about maybe like I said, your gut reactions to things or just your feelings at that point about it.

But when you filled this out, what we didn't do was give you a pocket law guide and we didn't tell you about death penalty cases and how they work and the difference between a death penalty case versus a -- a murder versus a capital case.

And I think it's fair to say when you went into that, did you -- you didn't know all those things, did you?

A.    No.

Q.    These answers here were just how you were feeling at the time with what you knew about the system; correct?

A.    Right.

Q.    Let me start off by telling you that -- talk to you a little bit about criminal cases. Have you

ever sat on a jury in a case?

A.   No.

Q.   Have you ever been called to testify?

A.   No, ma'am.

Q.   In the State of Texas, as is all throughout the United States, we have certain fundamental propositions of law that apply throughout.  Whether it is theft of a bicycle case or whether it is a capital murder case, these things are law.

They come from our Constitution. They're based in fairness.  These are our laws.  They apply.  Okay?

As we sit here today, ma'am, you are to presume that the defendant in this case is innocent. Okay?  And the law states you must presume him innocent as he sits here today.

And the reason for that is because I haven't proved to you otherwise.  The law states that as a representative of Texas, I have brought the charges in this case, and therefore it is my burden to prove to you, a juror, beyond a reasonable doubt that he is in fact guilty of what he's charged with.

It's my burden of proof.  A defendant never has to prove his innocence.  You would always look to the State to bring the proof.  I bring the

charge in.  I ought to bring the proof in.

And that's why you presume him innocent right now because have you heard a single fact in this case?  You've heard nothing in this case, have you?

A.  No.

Q.  No evidence whatsoever.  So as we sit here today, he is presumed innocent.  Can you give him that presumption as he sits here now?

A.  Yes.

Q.  And does that make sense to you?  Do you think that's fair that that should be my burden of proof to have to prove it?

A.  Yes.

Q.  Okay.  I have to prove my case to you beyond a reasonable doubt.  I'll tell you there's really no definition of reasonable doubt.  It's whatever you think it is.  Okay?

It's not any possibility.  It's a very high standard, I'll tell you that.  Some people have said if I find somebody guilty beyond a reasonable doubt, it means I'm convinced.

It means I'm absolutely sure.  I mean, it's whatever you think it is.  Okay?  But I must prove my case beyond a reasonable doubt.

Now, there are things that I have to

prove to you, you know.  Just as the defendant is presumed innocent right now, there's no evidence against him.

He's been indicted and that is why he is in the courtroom today.  But the law states that you may not consider the indictment as any evidence against him.  There's no where there's smoke there's fire kind of thing.  That doesn't apply in a court of law.

All an indictment is, is it's a piece of paper that tells him what he's been charged with and it tells me what I have to prove to you beyond a reasonable doubt before you can find him guilty.  It's just a piece of paper.

And in that piece of paper, in that indictment is the charge that he's been charged with.  There are certain elements of that charge, if you will.  I have to prove to you the element of when it happened, where it happened, that it was the defendant, how he did it, who he did it to.

These are elements of the offense and the law states I have to prove all those elements of the offense, all of them.  I don't get points for proving five out of six.  I've got to prove them all.  And if I fail to carry my burden on any one of those elements, then your verdict must be not guilty.

Just to illustrate to you how important that proposition of law is, that there's no kidding around here, let me give you an example.

Let's say that you've been called upon to sit as a juror in a murder case, and in the indictment I have alleged that the defendant caused the death of another individual by shooting him with a firearm.

That's called the manner and means. That's what's in the indictment. That's what I have to prove beyond a reasonable doubt, by shooting with a firearm.

But say during that trial you hear the defendant state, "Yeah, I killed the guy. I meant to kill him and I'm glad I did it and I'd do it all over again if I got a second chance."

But now the medical examiner takes the stand and says, "That person is dead but they didn't die by being shot with a gun. They died because they were stabbed."

And then the crime scene person gets on the stand and says, "There was no gun at the scene but there was a bloody knife."

Have I carried my burden of proof? Have I proved to you beyond a reasonable doubt that that

person died by being shot with a firearm?

A. No.

Q. No. I haven't, have I? So what would be your verdict in that case?

A. Not guilty.

Q. Not guilty. And as distasteful as that is, it goes to demonstrate that that is an obligation of law and there's no way around it. That's your obligation. You have to do it.

Do you have a problem with any one of those laws, that you think you couldn't follow that?

A. No problems at all.

Q. Do you understand a defendant has a right to not testify at his trial? It's a right that I have. It's a right you have, any defendant has. The law states that if he elects to exercise that constitutional right, you can't use that as evidence against him. Do you have a problem with that?

A. No, no problem.

Q. let's talk about capital murder specifically and about the offense also of murder. There's actually two differences there and as you may or may not know, there's various different degrees of how a homicide can be committed.

You've got your capital murder, your

first-degree murder, manslaughter, criminally negligent homicide. They kind of stairstep up or down, if you will.

In a capital murder case the one thing that you will always have in a capital murder case is that a defendant intentionally caused the death of another individual. Okay?

They intentionally caused the death. Not I just meant to hurt him and he died anyway, not it was an accident, not I killed him in self-defense, not I killed him because I was under duress.

There's no legal justification for it. It is I killed him, I meant to kill him and I did what I had to do to kill him. That is an intentional murder, and that is the one thing you will always have in a capital murder case, part of it.

If I pulled a gun out of my briefcase right now, turned to my co-counsel who is minding her business and shot her five times, laughed about it and danced around her body, I think you'd admit that's pretty bad; isn't it?

A.    Right.

Q.    And would you say I intended to cause her death?

A.    Yeah.

Q.    That's an intentional murder, but guess what, that's not a capital murder.  It's not a capital murder, because a capital murder is always an intentional murder, I did it and I meant to do it, plus something else.  Okay?

We like to say it's that plus an aggravating factor, and there's a defined set of cases, you know, that qualify as capital murder.

For example, the intentional murder of a child under six years of age is capital murder.  The intentional murder of a police officer during the course of their official duties is capital murder.

The intentional murder of two or more persons during the same criminal episode is a capital murder, or the intentional murder of a person while I am committing or attempting to commit another felony offense is also a capital murder.

For example, burglary, robbery, sexual assault.  So it's always that intentional murder plus something else.  Does that make sense to you also?

A.    Yes.

Q.    Now, I noticed that, and I wanted to hit this with you, throughout your questionnaire -- for example, on page 1 you had said, "If a person knowingly kills someone with no regard, I have no problem with them

receiving the death penalty."

I'll tell you that there is a difference between somebody intentionally or knowingly causing the death of another human being. It must be intentional in order to be a capital murder.

If I go into the 7-Eleven to rob it, I don't want to kill the clerk, you know, so I tell the clerk, "Give me the money and don't you follow me," you know, and I start to go out the door. And sure enough, the clerk starts to follow me.

Well, I don't want the clerk to follow me, so I shoot her in the kneecap. I don't want to kill her. I just want to maim her. Well, I het the femoral artery and she ends up dying from blood loss.

I'm clearly guilty of murder but my intent was not to kill her, but I did knowingly kill her because I should have known. Do you see the difference there?

A.    Right.

Q.    So the intent is, I meant to kill them, there's no question about it. Knowing is something else. And you always have to have that intentional killing in order for it to be a capital murder case. Do you see the difference there?

A.    Right.

Q.    If it's anything less, it's not capital, and you deal with it on another level entirely.

A person found guilty of capital murder, one of two things is going to happen to them.  There's only two possible punishments that that person can receive.

If you are found guilty of capital murder, you will automatically receive life in prison without parole, no question about it.  If you're guilty of capital murder, life I prison without parole.

You do not automatically receive the death sentence, though.  That's an entirely different hurdle.  That's a whole different set of circumstances that we have to look at.

But there's one thing you can always say about somebody being convicted of capital murder, and that is that they will definitely spend the rest of their life in the penitentiary.  Okay?

I'm not really going to talk any more about the third -- trials are in two parts, you know. The first part of the trial you're called upon to answer one question, are they guilty of the offense.

If you find them guilty of capital murder, now you move into the second phase of the trial, and that's the punishment phase of the trial.

Okay? So I'm going to talk to you about that now and how that works.

Keeping in mind capital murder is the intentional murder; right?

A.    Right.

Q.    During the course of committing or attempting to commit a robbery, for example. That is a capital murder. If I am found guilty of capital murder I will automatically receive life in prison.

Our law makers have deemed it a serious enough offense that if I'm found guilty of it, that's a fit punishment for it. Okay? They have felt that's the appropriate punishment. It's automatic. That's what's going to happen. All right?

In order for somebody to get the death penalty, there's got to be something more. Okay? There's got to be something more. A person who is going to spend the rest of their life in prison is obviously going to spend it in prison; right? They're going to spend it in prison.

And I think you can understand. I believe you even have -- and I don't want to misspeak here. I think it's -- is it your son? Your brother? Your brother has done some time actually for forgery?

A.    Right.

Q. I think is what you said. Well, the person convicted of capital murder will spend the rest of their time in the penitentiary. In the penitentiary, I think you can imagine that there's a lot of people in the penitentiary, aren't there?

There are a lot of people there serving time for a whole bunch of different crimes, aren't there?

A. Right.

Q. Everything from murder and involving violence all the way down to people serving time for felony DWI or maybe multiple forgeries or theft cases, but there's all kinds of different people serving time there.

And in addition to the inmates there, there's also other people there. You've got a warden. You've got guards, nurses, administration. You've got people who come and visit.

So you've got a whole society of people there; right?

A. Right.

Q. Well, our law makers have looked at that situation and they have said, we understand that this person found guilty of capital murder is now in that society and he's going to be there for the rest of his life. That's his punishment he gets automatically.

But in order for you to make the determination that he should receive the death penalty, you're going to have to show us one more thing, something else. You're going to have to show us that that defendant serving that life sentence is the kind of guy who is going to be a threat to everybody else in that penitentiary, in that society. Okay?

Because as I said, there's people there serving just a couple of years for property crimes, aren't they?

A.    Right.

Q.    And then you've got people who are there for the rest of their life for murder. So I'll ask you, the person who's there doing time for forgery or for burglary, do you think it's reasonable that they should have an expectation of safety?

A.    Yes.

Q.    Do you think they have a right to safety?

A.    Yes.

Q.    Okay. I mean, people say prison isn't any picnic and I guess I'd have to agree with it, but when a judge sentences a man or a woman to their time, he's sentencing them to their time and not that you go now and get kicked around every day; right?

A.    Right.

Q.    Well, our lawmakers recognize that, that there are people there to do their time and to do it peacefully.  And if the defendant convicted of capital murder is the kind of individual who cannot do his time peacefully and will be a danger to the other people in that penitentiary, in that society, then if that is proven, then he's the kind of guy who's right for the death penalty.

He may be the kind of guy who isn't a threat to anybody, you know, but that's the question that you have to ask yourself first and foremost.  Is this guy going to be a danger to anybody or is he just going to be a guy who just sits and does his time?  All right.

You know, keeping in mind, he's been found guilty of this.  We know this about him.  We know he intended to kill somebody; right?

A.    Uh-huh.

Q.    He meant to do it.

A.    Yes.

Q.    And we know he did it in the course of committing robbery; right?  And that's all you know about him now going into that that first phase of the trial.  Okay?

Whether or not he will or won't be a

future danger, that question has to be answered on the facts in the case. It's not a question that you could say, I will always say somebody who has done that will always be a future danger.

If you've already made your mind up just because he's guilty of capital murder he will be a future danger, then I'll submit to you, you're not listening to the facts in the case or basing your decision on the facts in the case. Does that make sense?

A. Yes.

Q. So you've found him guilty of capital murder and now you've got to answer this future dangerousness question. Look at special issue number 1. I think you had a chance to read it before.

That's basically what we're talking about there. Just like he was presumed innocent in the first phase of the trial, you now have to presume that a life in prison without parole is the proper sentence, only if and until I can prove to you it's not. Okay?

So when it says, "Do you find from the evidence beyond a reasonable doubt," that tells you to look to me to prove it to you, that there is a probability, not a possibility, but a probability, which some people tell us they think that means more

likely than not. Would you agree with that?

A. Yes.

Q. Have I proved to you that it's more likely than not that the defendant will commit criminal acts of violence. That term is not defined for you by the lawmakers. It's whatever you think it is.

They don't say do you find him more likely than not will commit another murder or he will commit an assault on an inmate or he will verbally threaten somebody. They don't tell you what it is. They just say "criminal acts of violence," and that's for you to decide, "that will constitute a continuing threat to society."

Well, we know what his society is right now; right? We're talking about the place where he's going to live the rest of his life, unless he escapes I guess.

A. Right.

Q. Okay. That's that question. I have to prove to you that he would be a future danger, because when you first go into it, the assumption is that he's not, because I haven't proved anything to you. You can't say just because he's committed capital murder, he's automatically a future danger.

I'll give you an analogy here. When we

hear capital murder, sometimes we think in the course of robbery, of that guy who goes into the 7-Eleven. He's got a shotgun. He takes the money from the clerk, takes him back to the storage room, ties him up and shoots him so there's no witnesses. That's intentional murder; right?

A.    Uh-huh.

Q.    And that's in the course of committing a robbery, isn't it?  It sounds like a pretty bad guy, doesn't it?

A.    Right.

Q.    Okay.  Well, let me give you another example of how you could commit a capital murder, an intentional murder in the course of a robbery.

Let's say that there's a guy who lives on a street and there's a man who lives five houses down from him and he doesn't like that man who lives five houses down from him.  As a matter of fact, he has a burning hatred for him.

And he also knows that that man has a lot of money, carries a lot of money on him, has nice cars, has nice things, always seems to have a lot of cash on him.

That man sits in his house.  His anger becomes greater and greater and he decides, I'm going

to go kill that guy and I'm going to take all his money.

He goes to the Bass Pro Shop.  He buys the biggest gun he can.  He buys as many bullets as it will hold.  He goes home.  He loads that gun.  He waits for the time to be right.  He knows when that guy is home.

He walks down that street five houses down, knocks on that door, and when that guy opens the door, he puts a gun to his face and he says, "Give me all your money."

The guy says, "I ain't giving you anything."  He shoots him five times, kills him, steps in, grabs his bag of money, takes the wallet from his pocket and then he leaves.

Did he intend to kill him?

A.    Yes.

Q.    Did he rob him?

A.    Yes.

Q.    Yeah.  That's capital murder, isn't it?  Sounds pretty bad, doesn't it?

A.    Uh-huh.

Q.    Okay.  Well, let's say that guy who did the shooting, the guy who did the murdering, he's actually a husband and he's a father and he's a good guy.  He's

never been in trouble before in his life.

He's been a good husband, a good father, a good citizen, a Scout leader. I mean, just a terrific guy. Okay? But he's got two teenage kids and his two teenage kids are hooked on drugs and they're pretty bad of now.

And they're hooked on drugs because the guy five houses down is a dope dealer and he's been selling dope to his kids and other kids and all kinds of people, and he's been spreading cancer throughout this community and that neighborhood like hot water through snow. He's ruining lives.

And that dad is sick and tired of it, and he decided right or wrong he's going to take justice into his own hands. He's going to put an end to this guy who is spreading poison.

And he walks down there and he kills him. He kills him for the sake of his kids and everybody else he's hurt.

And that bag of money that he took from him, he walked down to the charity and he dumped it in the charity box. Then he went to the police department and said, "I'm here to turn myself in. Here's what I did. I meant to do it. I'm not crazy. I knew the consequences. I'm guilty of capital murder. So be

it."  Okay?

It's just two different examples of the way you can commit capital murder during the course of a robbery.  Whether or not the 7-Eleven guy or whether or not the dad with the kids on drugs, whether or not they'll be a future danger is for you to decide based on the surrounding circumstances and the evidence you would hear in the trial.  Okay?

Because going into it, you might find from the evidence that, for example, the dad, he's not going to be a future danger to anybody.  There was one guy he hated, the guy who lived five streets down, you know.

That's the guy he hated.  That was his main objective in life was to kill him.  He did it and he'll probably sit in his cell and write love letters to his wife and kids for the rest of his life.

Or you might look at the evidence and go, well, he hated that drug dealer.  Now who is he spending time with?  A lot of drug dealers in prison, aren't there?

A.    Right.

Q.    And you might look at that guy and you might look at that evidence and go, actually, I think he is a future danger.  I think he's going to go out to get

every drug dealer in that prison.

But you wouldn't know that until you looked at the facts of the case; right? So can you see that it's not necessarily an automatic, is it?

A. No.

Q. Just because you're found guilty of capital murder doesn't necessarily mean you're automatically a future danger. And do you see also that I have to prove that to you?

A. Right.

Q. That there's no assumptions. There's no automatic assumptions or speculations. I have to prove it to you.

If I don't prove it to you, then your answer to that question is no, and the life in prison sentence that is automatic, that's what stays and that's what will happen. Okay? Does that make sense to you?

A. Right.

Q. We don't move on at that point. That's it. However, if I do prove to you that a particular defendant is a future danger, then you have another question to answer, another obstacle to overcome before we reach the actual death penalty. Okay?

In Texas we have what's called the law

of parties, which basically states if two or more people are committing a crime together, they can both be held equally liable for it.

For example, if Ms. Evans and I tonight sit at her kitchen table, plan out the robbery of the 7-Eleven. She goes and gets the gun. I go and get the bullets. She drives us down there. She hands me the gun. I load it. I make sure it's working.

She says, "I'm going to sit here and act as a lookout and honk the horn if anybody comes." I say, "I'll go in and rob the clerk." Then I say, "I forgot my mask." And she says, "Don't worry about it. Don't leave any witnesses."

I go in the store, rob the clerk and kill the clerk. Am I guilty of capital murder?

A.   Yes.

Q.   Sure sounds like it. Do you think Ms. Evans could be guilty of capital murder?

A.   Yes.

Q.   Yeah. The law states if she aided, assisted, encouraged or directed in the participation of that criminal offense, she could be just as guilty as I am. In order for her to be guilty of capital murder, though, you must also find that she actually anticipated somebody would die.

So that's a question that you would decide from the evidence and that's what special issue number 2 is all about. It's asking you to look at the evidence and have I proved to you beyond a reasonable doubt that the defendant is either the actual triggerman, like I was, or the person who actively participated in the offense and anticipated somebody would die. Does that make sense?

A.    Yes.

Q.    If I prove the question -- if I don't prove that to you, then the answer is no. The defendant receives that automatic life in prison without parole sentence and you go home. Okay?

If, however, the answer to that question is yes, if I have proved that to you beyond a reasonable doubt, then I will submit to you now the defendant is sitting square on a death sentence, okay, because you've already found him guilty of capital murder and we know what that means.

He intentionally killed somebody and took their money, be it the 7-Eleven guy or the dad. He's guilty of capital murder. I've proved to you he's a future danger. I've proved to you he was a party to that offense. So he's sitting on a death sentence now. Okay?

Now up to this point it's all about looking to me to prove a case to you. Okay? I have always carried the burden of proof in this case.

There's one more step that you have to take as a juror in a death penalty case. The way I like to explain this, ma'am, is this, is that I believe our lawmakers recognize and appreciate that we are calling upon you to -- we're talking about the ultimate sentence here, aren't we?

We're talking about giving somebody the death penalty. in order for that to happen, we need to make darn sure it's the right thing to do. And you need to make sure that it is the proper sentence for this particular case and this particular defendant. Okay?

And what will not happen is you will not walk out of this courthouse when it's all said and done either having returned a verdict of death or having returned a verdict of life in prison without parole, you will not walk out of here going, you know, I felt my hands were tied. There was something about that case. There was something about that defendant that -- I guess he's guilty of capital murder and I get he's a future danger, but I don't think death sentence is appropriate. I think actually the appropriate thing to

do is a life sentence.

There's that option there for you. It's an option for the defendant but it's really also an option for the juror. And that's that special issue number 3. That's where we say, okay, now go back and do this one last thing.

Look at everything all over again. Look at the facts of the case. Look at the defendant. Look at everything, and when you look at everything in its entirety, do you -- and it's a personal question for you.

Do you, Ms. Maryovich, do you see something in this case that tells you, I think the appropriate thing to do in this case is make this a life sentence versus a death sentence.

If you think it's the right thing to do, that option is there for you. We call it the mitigating circumstances issue. It's special issue number 3. Okay?

"Do you find, taking into consideration all of the evidence --" so once again, you're looking at everything all over again with fresh eyes, including the circumstances of the offense, the defendant's character and background, the personal moral culpability of the defendant, looking at all of that,

do you find that there is a sufficient mitigating

circumstance or circumstances to warrant that that

sentence, that death sentence should actually be a life

sentence.   Does that make sense to you?

A.    Yes.

Q.    Do you think that's fair?

A.    Yes.

Q.    Do you think that's possible that -- you've found a person guilty of capital murder, so understand the context in which we are.  Guilty of capital murder, you know, be it whoever.  He's guilty of capital murder.  He intentionally took somebody's life and he did it in a robbery, and you know even the circumstances surrounding that can be very different.

You've found that he's a future danger. Maybe that person was the only person he wanted to kill or maybe he wants to kill all drug dealers.  So he may be -- he's a future danger.

You've found he was an active participant in it.  So the question some people say, you know, well, I could never find anything that would change my mind.

Well, as we sit here today, the question is not, Ms. Maryovich, tell me what would change your mind.  That's not the question.  I mean, I can't tell

you, tell me what's a mitigating circumstance and will will you and will won't you.

The question is for you, will you look at all the evidence in the case again, and even having found all that, will you look at it again and if there is something that you believe is sufficiently mitigating to turn the sentence around, will you do it?

A.    Yes.

Q.    Okay.  You think that's an exercise that you can engage in then?

A.    Yes.

Q.    It makes sense to you?

A.    Yes.  Any questions about this process so far?

A.    No.

Q.    Okay.  Let me look at a couple of things here, going through your questionnaire with you.  And I'll tell you that I think that, you know, for example, if you turn to page 2 with me on your questionnaire there.  And  you know, I read your questionnaires kind of with keeping the law in mind as I read them.  So I see them kind of differently sometimes.

But on page 2 we asked you, "The best argument for the death penalty is?"  And you said, "If a person knowingly commits a malicious crime and has no

regrets and there is a risk of the person committing the crime again, I believe they should get the death penalty."

When I looked at that, I thought, well, I think she's kind of hit all the factors there. You know, if you substitute the word "knowingly" for "intentionally," if a person intentionally commits a malicious crime -- well, intentionally commits a murder in the course of a robbery, and he's got no regrets, which might go to what, his moral culpability and how he felt about it and how he acted afterwards, and there's a risk of him committing crimes again, which we know is special issue number 1, then I think he should get the death penalty.

And it kind of tells me that I think that you kind of appreciate what the actual scenario is here, you know, that it's a lot of ifs.

A.    Uh-huh.

Q.    You know, it's a lot of ifs. Well, if the facts support that he's guilty, then I'll find him guilty. And if the facts support that he's a future danger, then I'll say yes to that.

And if the facts support that he does need some mercy, well, I'll do that. And if it's not there, I won't do that.

You know, mitigating circumstances, there could be a million different things that somebody considers mitigating. The question is, is it sufficiently mitigating.

You know, some people look at a person's age, you know, maybe they're really old or something. Well, he's really old. He's come to the end of his time, you know. Other people might say, well, he knows better.

Some people may say, well, he was intoxicated when he committed the crime, and therefore I think under normal circumstances he might not have done something had he not been intoxicated.

And other people may say, it's voluntary. As long as you're voluntarily intoxicated, you brought it on yourself.

But you see where I'm coming from? You can see both sides of the equation.

A.   Right.

Q.   And I can't pin you down today as to how you would feel about that, but the question becomes, if there's evidence of all that, will you look at it and then make your decision in the case?

A.   Uh-huh.

Q.   Okay. I do want to hit something else with

you that's on your questionnaire. As I stated to you earlier -- I think I did when I was talking about how cases work and such as that.

You know, we have our fundamental principles of law that apply in every case, and one of those is that you always receive the evidence in the case from the witness stand, the place that you're sitting right now.

And it can come to you in the form of witnesses, people testifying, documents. It might be something physical you can actually hold. But all evidence comes to you from the witness stand and that's the only evidence that you can use in forming your verdicts of guilt and your answers to the special issues.

On page 3 you had indicated -- we asked you, "Have you heard about this case?" And you said, "TV. Two people shot at a music studio in Garland," which is pretty much kind of what we told you out also out there in our short recitation of a little bit of the facts there.

Just because somebody has heard something on the TV or read it in the newspaper doesn't necessarily mean they're not qualified to sit as a juror in the case.

If that meant you were unqualified, then we would get all our jurors who sit in the basement interest he dark and don't do anything.

The question becomes that if you have heard something, are you able to put that aside and base your verdict on what you hear in here versus what you  might have heard on the TV?

A.    Yes.

Q.    You believe you can do that.  Is there anything about you or your situation with employment or anything in your personal life that we should know that you would say, you know what, in all fairness I can't start everybody out even here?  I can't give the defendant -- I can't be impartial to the defendant at this point and I can't be impartial to the State.  I've already made up my mind one way or another.

A.    No.

Q.    Are you coming in with any kind of bias in favor of one side or the other?

A.    No.

Q.    Okay.  All right, ma'am.  Then just to summarize, you know, we always have the burden of proof in the case.  You always look to us.  We have to prove our case to you beyond a reasonable doubt.

I have to prove every element of the

offense, all of them, to you a hundred percent.  If I fail to carry my burden in the first part of the trial, your verdict would be what?

A.    Not guilty.

Q.    Not guilty.  And as you go into the second phase of a capital murder trial, there is a presumption at that point and the presumption is that the proper sentence is life in prison without parole.

And that presumption does not go away.  It does not change, only if and until I prove to you beyond a reasonable doubt that it should be otherwise.  The way I do that is by offering more evidence to you and you answering these special issues here.

And you go into special issue number 1.  Just because you've found somebody guilty of capital murder, are you automatically going to find that they're a future danger?

A.    No.

Q.    Okay.  And are you automatically going to find that they're an active party to the offense?

A.    No.

Q.    Are you going to base that on the verdict -- or the evidence in the case?

A.    The evidence.

Q.    And if you find the answers to special issues

number 1 and 2 are yes, you believe he's a future danger, you believe he was an active party, are you still going to go into special issue number 3 with an open mind, reconsider all the evidence and see if there is anything sufficiently mitigating to turn that verdict back into a life sentence?

A.    Yes.

Q.    Any questions for me?

A.    No.

Q.    I've done a lot of talking here.  I appreciate you for listening so hard.  Thank you so much.

MS. HANDLEY:  That's it.

THE COURT:  Thank you, Ms. Handley.

MS. MALLON:  It's going to be me, Judge.

THE COURT:  All right.  Ms. Mallon is going to talk to you on behalf of Mr. Broadnax.  All right.

Let me ask before we do that, do you need a short break?

VENIREPERSON MARYOVICH:  No.

THE COURT:  Debi?

THE COURT REPORTER:  No, sir.

THE COURT:  All right.

MS. MALLON:  Thank you, Judge.

EXAMINATION

BY MS. MALLON:

Q.    How are you doing, Ms. Maryovich?

A.    Good.

Q.    Okay.  I'm Keri Mallon.  Mr. Lollar, Mr. Parks and I represent James Broadnax here.

I want to ask you some questions about your questionnaire and then I'm probably just going to jump into these special issues.  Okay?

Let me ask you this.  Where were you employed prior to Mesquite?

A.    I was working for the Medical Center of Mesquite back then in home health.

Q.    All right.  So you did a big change?

A.    Right.

Q.    What brought you to the police department?

A.    At that time Social Security and Medicare was changing, so I needed to get out of home health, and my sister and mother had worked as prison guards in Hutchins, and my dad was security.  So kind of -- I don't know.

I always liked to watch 911 on TV and I kind of wanted to get into something like that.  So I was interested when I found out there was an opening. Just jumped right into it.

Q.    Okay.  Your mother and your sister, are they both still prison guards?

A.    No.

Q.    How long ago was that?

A.    Before I started with the police department, so it's well over ten years ago.

Q.    Okay.  During your workday, I would assume you have annual leave to of interaction with police officers, or no?

A.    Yeah.

Q.    Okay.  Because of your work, have you gotten close with police officers?  Are they close friends?  Do you socialize with them?

A.    Only one of the officers because my best friend works in dispatch too and she's fixing to get married to a police officer.  So yes, I do hang out with them.  As far as any other officers, no.  We've been kind of divided there.

Q.    Okay.  Okay.  And you know, I'm just going to be honest with you.  The prosecutors are seeking a guilty verdict in this case.  They want a guilty verdict of capital murder and their goal is to get a death sentence for Mr. Broadnax.

So this young man's life is literally in our hands.  I'm asking you to, please, just speak

honest with me because that's the only way we're really truly going to get a fair jury. For both sides, but obviously my concern is for Mr. Broadnax.

A.   Right.

Q.   And so it's hard for me to really truly believe that you're not going to give them a leg up because of your ties with the police department. You know, you socialize with them and you deal with them on a daily basis.

Just for an example, say you are seated on this jury and you come back with a life without parole verdict. Are you concerned at all about what your fellow officers will think or how they'll treat you or anything along those lines?

A.   Not really, because it's my decision and they couldn't have any say over my decision or anything like that. If they really didn't like it, you know, it was my decision.

Q.   Okay. And you can tell me honestly, when a police officer takes the stand, you're not going to automatically believe him?

A.   No.

Q.   Or her?

A.   No. It has to be proven that what he's saying is right. The evidence has to back up what he

says.

Q.    Okay, fair enough.    And working in the Mesquite Police Department, tell me how much you know about this case, if any.

A.    Just what the media said.    In working with the department, I know the media doesn't have all the truth, all the facts.    So I really don't put a hundred percent into what the media says.

Q.    Okay.    What have you seen on TV that you can recall?

A.    I just -- whatever -- it's just been a while since it's been on TV and all that.    basically, like I said, it was from a music studio.    And two guys got shot there.    That's not too much.

        Like I said, I don't really listen too much to what the media says because working in the police department, I know a lot of it's not true.

Q.    Do you recall seeing any interviews or anything like that?

A.    No.

Q.    Okay.    A couple of other things I want to talk to you about in your questionnaire.    On page 2, it asks you the best argument against the death penalty, and you left that blank.    I don't know if you just missed it or you didn't have a good response or what

was that about?

A. I didn't have a good response on that.

Q. Okay. Does that mean that you don't think there is a good argument against the death penalty?

A. I think there is a good argument.

Q. What would that be?

A. It kind of falls into what I said after that, the best argument for the death penalty. I mean, it's hard for me.

Q. I understand this is probably something you have never thought about before.

A. Right.

Q. But you can understand why that question would be important to me?

A. I understand. I understand. Based on, I guess, what the prosecutor was kind of saying there, is you go in and you rob a place and it wasn't -- not intentionally going and killing somebody. You're not going there with your mind thinking I want to go in and kill him and I'm going to take the money.

it's I want to go in, take the money. I'm walking out the door, turn around and just something happens and the gun goes off.

Q. Okay. That's the type of scenario where you think life without parole would be more appropriate

than death?

A.    Than the death penalty; right.

Q.    I want to give you a hypothetical.  Okay?  I want you to assume you're sitting on a capital murder jury and let's just say since it's this type of case, it's a murder in the commission of a robbery.  Okay?

And the person intentionally kills another human being.  Okay?  That means that they wanted this person to die.  It wasn't self-defense.  It wasn't an accident.  It wasn't a mistake.  The shooter was not insane.  He wasn't mentally retarded.  He wasn't under duress.  He wasn't forced to do it.

Basically, he wanted to kill someone.  He went in and killed someone and he took their money.  Okay?  That's the type of scenario that I want you to imagine yourself being a juror on.

How do you feel about the death penalty in that case?

A.    I would think he would get it if the evidence backs it up, yes.

Q.    Well, that's the evidence you have.  Okay?  The evidence has convinced you and 11 other people beyond a reasonable doubt that this individual killed someone because he wanted to.

There was no defenses, no justification.

That was his goal and that's what he did and then he robbed him. In that situation, can you ever see yourself giving life without parole.

A. No, because he intentionally, knowingly, no regrets did it.

Q. Okay. And if that is the situation, that situation I just gave you, is that the type of case and the type of person that you would always say is going to be a future danger, as in special issue number 1?

A. Yes.

Q. Okay. So let's take this a step further. Okay? So a person who intentionally killed another person, wanted to, set it out as his goal, no justification, no defenses. He wasn't under duress. The victim didn't deserve it. Flat cold-blooded murder, and then he robbed him. Okay?

On top of that, you and the other jurors find that he will be a future danger, that the prosecution has proved to you beyond a reasonable doubt that he will be a future danger, even in the penitentiary. Okay?

And I'm going to skip over number 2 because that may or may not be an issue in this case. That's going to be up to the Judge to decide. Okay?

And so intentional murderer, future

danger.  Now then, we ask you, is there really, truly anything that you would ever consider to be mitigation in that situation so you would give a life without parole sentence?

A.    It could be what made him lead up to wanting to go kill that one person, why with no regret, you know, what circumstances that led him up to that.  Does that make sense?

Q.    I'm not sure.

A.    He knowingly and intentionally went to kill somebody, no regrets and all that, but what made him want to go kill that person.

Q.    Okay.  Let's back up again.  I just want to be clear on this scenario I'm setting for you and then you can tell me, you know, how you feel.  It is again a person who set out as his goal to kill another person, period.  All right?

It was his goal to or his desire to.  He did it because he wanted to, no justification, no defenses, no duress.  He's wasn't a target.  He wasn't insane.  He set out as his goal to kill someone.

He did it and then he robbed him.  That's where you're at.

A.    Okay.

Q.    And you and 11 others have found beyond a

reasonable doubt that situation, guilty of capital murder. Then you also find beyond a reasonable doubt that he is going to be a future danger. He's going to continue to commit criminal acts of violence that would constitute a continuing threat to society. You have decided that beyond a reasonable doubt.

Can you truly consider anything in mitigation to turn that sentence from a death penalty to a life without parole?

A.    [Nods no.]

Q.    No?

MS. MALLON:  Thank you. That's all I have, Ms. Maryovich.

THE COURT:  All right. Let me just ask you a couple of questions to make sure I understand.

As I heard you talking to the lawyers, I heard understandably some contradictory answers. Remember when we first started talking, I said all I want you to do is tell the truth. That's all I want you to do.

You understand if someone has been found guilty of capital murder, you and the other 11 members of the jury would have found that that person intentionally caused the death of an individual while in the course of a robbery?

VENIREPERSON MARYOVICH: Right.

THE COURT: So then you go into that punishment phase and you hear evidence and then the jury goes back to decide their verdict and that is rendered by answering special issues either yes or no.

VENIREPERSON MARYOVICH: Uh-huh.

THE COURT: Are you with me? Do you have any questions or any confusion about how the punishment phase proceeds?

VENIREPERSON MARYOVICH: No.

THE COURT: Those questions are answered at the end of all the evidence that's been presented. So what you have is a person who's been found guilty of capital murder.

The first special issue you answer is special issue number 1. I want you to look at it with me, if you would. All right. You'll answer that yes or no.

I believe I heard you tell Ms. Handley that you could answer it yes or no, but then I think you also have told Ms. Mallon that if you had found that person intentionally caused the death of an individual in the course of a robbery, you would always answer that special issue number 1 yes.

Trust me. You have a perfect right to

feel any way you want.  What is your true heartfelt answer?

VENIREPERSON MARYOVICH:  If they proved to me beyond a reasonable doubt, the prosecution without a reasonable doubt that that person is going to be a threat to society --

THE COURT:  No.  No.  They've proven beyond a reasonable doubt that the person intentionally caused the death of an individual.

VENIREPERSON MARYOVICH:  Right.

THE COURT:  And then you got to special issue number 1.  I understand if you believe that they proved it beyond a reasonable doubt, you're going to answer it yes.

I heard you tell Ms. Mallon that if you had found someone intentionally caused the death of an individual in the course of a robbery, you're always going to find that that person --

VENIREPERSON MARYOVICH:  No, I thought she was talking about special issue number 3, because she had already skipped number 2.  She said we've already proved that he's a threat to society.

Would there be any in special number 3, would there be anything that I would --

THE COURT:  Find that would be --

Debi C. Harris, CSR
(214) 653-3416

VENIREPERSON MARYOVICH:  -- find mitigating.

THE COURT:  -- mitigating.

VENIREPERSON MARYOVICH:  Right.

THE COURT:  Sufficiently mitigating to give him life, and you said no.  Is that your correct answer?

VENIREPERSON MARYOVICH:  If he intentionally did a murder, robbed them, we found he was a threat to society.

THE COURT:  All right.  Then you go to 3.

VENIREPERSON MARYOVICH:  Go to 3.  I mean, if he intentionally -- I don't know how I want to say this.  If there was no mitigating situations why he did it, if he just went out and did it.

THE COURT:  That's what that special issue asks.

VENIREPERSON MARYOVICH:  Right.  Right. If he went out and just killed somebody, grabs a gun and goes up there and kills them and he robs them, no regrets or anything like that.

And we've already proven everything along there and we get to there, and I review everything over the case, go over the evidence again and found it, if I feel like he intentionally went out

and killed the person and robbed them, then no, I'm not going to change my mind. He's getting the death penalty.

THE COURT: You kind of qualified it by saying "regret."

VENIREPERSON MARYOVICH: Uh-huh.

THE COURT: What I want you to do with me, if you found someone intentionally caused the death of an individual, then you find beyond a reasonable doubt that they're going to be a continuing theat to society, then you go to 3, and 3 says what it says.

VENIREPERSON MARYOVICH: Right.

THE COURT: I'm not going to put words in your mouth. I'm not going to do that. I want you to look at 3 and tell me would you always answer that special issue where they would receive the death penalty or could you answer it yes or no depending on the evidence?

VENIREPERSON MARYOVICH: I won't answer it no all the time but you have to review everything again. I will not say just because we proved him guilty without a reasonable doubt, we get to that, I wouldn't say give him the death penalty all the time.

I would take the circumstances into consideration.

THE COURT: I'm going to let Ms. Mallon talk to you some more, but let's go back to special issue number 1.

VENIREPERSON MARYOVICH: Okay.

THE COURT: Again, when you're answering that, you have found that the person beyond a reasonable doubt intentionally caused the death of an individual. Before you answer special issue number 1, the State has to prove that to you beyond a reasonable doubt.

VENIREPERSON MARYOVICH: Right.

THE COURT: Would you make the State do that or do you think the fact that the person is guilty of intentionally causing the death of an individual?

VENIREPERSON MARYOVICH: I'd make them prove.

THE COURT: I'm going to let Ms. Mallon talk to you some more.

MS. MALLON: Thank you, Judge.

Q.   [By Ms. Mallon] Ms. Maryovich, let me ask you this. What kind of situation can you foresee where you think a life without parole sentence would be appropriate?

A.   If -- let me think here.

Q.   Pardon me?

A.    I'm having to think real quick.  Y'all excuse me.  I got off at 2:00 o'clock this morning.  I've been up since 8:00 o'clock and I have to be back at work at 10:00.  So my thinking process is a little slow right now.

Q.    let me say this and then give you some time to think.  I think it's hard to say no, I can't follow the law.  I mean, I think it's easier to -- because what the Judge is saying and what the prosecution is saying is making sense.

But I really need to know how you honestly feel and it seems to me you're having some trouble contemplating a situation where there was an intentional murder, they did it because they wanted to, that you would ever even consider life without parole.

A.    I can -- I can do that.  I can sit there and take the evidence, you know, convict im of capital murder in the scenario that she gave with the father, his kids were on drugs, went down there, knowingly and intentionally killed the drug dealer and so, you know, you convict of capital murder.

He could be a threat to society because he went after one drug dealer.  What's going to keep him from going after other ones.  So we do find that he will be a threat to society.

So now we're down to number 3. And I would take in the circumstances, you know. We did find him a threat to society but is he -- I could probably give him life in prison on that more so than the death penalty.

Q. Okay. Can you foresee that happening? Can you foresee yourself giving a life without parole sentence in any situation other than the one the prosecutor gave you, because in all honesty, if that was the situation, they probably wouldn't be seeking the death penalty?

A. Yeah, I can see. It's what the evidence shows. What has led up to the point that made this person break where they're just going to, you know, they're just sitting there going okay, I'm just going to go out and kill somebody. I just feel like doing it. I'm going to go out and kill somebody.

Something had to trigger for them to do that, just sit there and go I'm going to go out and kill somebody. So I would take that into consideration when we get to special number 3.

Q. Okay. Well, let me ask you this. What if you don't know the trigger? Okay? What if all you know is that the person intentionally killed another human being because they wanted to and after they

killed him, they robbed him?

That's the evidence you have and that evidence convinces you beyond a reasonable doubt that that person is guilty of capital murder.  How do you feel about the death penalty in that situation?

A.    I would have to give them the death penalty.

Q.    You would have to give them the death penalty?  That situation I just gave you, an intentional murder, kill someone because they wanted to, and then they robbed them.

Can you ever foresee a situation where you would not think that that person would be a future danger?  Is that person always going to be a future danger to you?

A.    I mean, not necessarily be a future danger because you never know if they're going to do it again.

Q.    Okay.  You just told me you would want to give them the death penalty.

A.    Right.

Q.    So tell me about that.

A.    To me, if you go out and you commit knowingly and intentionally going out and killing somebody, taking somebody's life, then to me, it's an eye for an eye.  That's my opinion.  That's my honest opinion.

Q.    And I appreciate that very much.  I really,

really do.  So that means that your belief -- and I would assume these are beliefs you've had for a long time?

A.    Right.

Q.    Okay.  With those long-held beliefs, if you are on a jury and you convict someone of capital murder, intentionally killing another human being because they wanted to.  Then they robbed them.  Is it fair to say you're going to answer these questions so that they get the death penalty?

A.    I can be fair.  I mean, I see where you're coming from and where I'm coming from, but I'm one of those people that will sit there and I don't presume everybody guilty.

I take the facts and I'll sit there and listen to both sides of the story and then form an opinion from there.

If you give me hard evidence that he is not guilty, you know, or she can't prove that he did it or he knowingly and intently, you know, I can go either way.  I'm one of those people, I sit there and make my judgments by what you give me.  Does that make sense?

Q.    It does, but I'm a little concerned because you told me just a minute ago that if you found someone guilty of capital murder, it would be the death

penalty?

A.    Right.    If you prove to me or she proves to me that he's guilty of knowingly and intently going in and I feel like it's believable, my opinion is he should get the death penalty.

THE COURT:    Okay.    Could I see, Counsel. All rise, please.

[Venireperson Maryovich left the courtroom.]

THE COURT:    What says the State?

MS. HANDLEY:    Your Honor, I believe this juror is abundantly qualified.    Even after picking and picking and trying to get her to change her mind, she has consistently stated, I'll make up my own mind, I'll look at the evidence, I'll make them prove it to me.    I think this woman is qualified, Your Honor.

MR. LOLLAR:    In successive answers right there, she said, I'll give him the death penalty if I find him guilty of this type of capital murder.

MS. HANDLEY:    That's not --

MR. LOLLAR:    She said it repeatedly.    She said, if we show hard evidence that he's not guilty. Well, that's shifting the burden to us.    She says --

THE COURT:    All right.    I'm going to grant the challenge.    I'm going to be more strict on

you got to ask the challenge questions more specific from now on. You've got to talk about that, making the State prove beyond a reasonable doubt. It's very important to the Court as to whether or not someone is qualified or not in the future. Be granted.

[Venireperson Maryovich entered the courtroom and approached the bench.]

THE COURT: You'll not have to serve. You're free to go. Thank you very much.

[Whereupon, proceedings adjourned, to reconvene Tuesday, June 23 2009. Reporter's Record continued in next numbered volume.]

- - - - -

THE STATE OF TEXAS         X

COUNTY OF DALLAS           X

       I, Debi Harris, Deputy Official Court Reporter for the Criminal District Court Number 7, Dallas County, Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

       I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

       WITNESS MY OFFICIAL HAND, this the

_____ day of February, 2010.

Debi Harris, Texas CSR #1869
Expiration Date: 12/31/11
Deputy Official Court Reporter
Dallas County, Texas
Crowley Courts Building
Dallas, Texas
(214) 653-3416

Debi C. Harris, CSR
(214) 653-3416