7620 7

1                    REPORTER'S RECORD

2              VOLUME 51 OF _____ VOLUMES

3           TRIAL COURT CAUSE NO. F08-24667-Y

4    THE STATE OF TEXAS          )   IN THE CRIMINAL DISTRICT
                                 )
5                                )
                                 )
6                                )
     VS.                         )  COURT NO. 7
7                                )
                                 )
8                                )
     JAMES GARFIELD BROADNAX     )  OF DALLAS COUNTY, TEXAS
9

10

11                        *ORIGINAL*

12   ====================================================

13                                      FILED IN
                                  COURT OF CRIMINAL APPEALS
14             PUNISHMENT PHASE

15                                      SEP 1 6 2010

16   ===================================== Louise Pearson, Clerk =

17

18

19            On the 18TH day of AUGUST, 2009, the

20   following proceedings came on to be heard in the

21   above-entitled and -numbered cause to be heard before

22   the Honorable MICHAEL SNIPES, Judge presiding, held in

23   Dallas, Dallas County, Texas;

24            Proceedings reported by machine shorthand;

25   computer-aided transcription.

                SHARON HAZLEWOOD, CSR          972-739-3906
            CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

```
 1                      A P P E A R A N C E S

 2
       FOR THE STATE OF TEXAS:
 3

 4        HONORABLE DAVID M. ALEX
          SBOT NO. 24003256
 5        HONORABLE LISA SMITH
          SBOT NO. 00787131
 6        HONORABLE GORDON HIKEL
          SBOT NO. 00787696
 7        HONORABLE ANDREA HANDLEY
          SBOT NO. 08898800
 8        HONORABLE ELAINE EVANS
          SBOT NO. 24032880
 9        133 N. INDUSTRIAL BLVD.
          FRANK CROWLEY COURTHOUSE
10        DALLAS, TEXAS 75207
          TEL. 214-653-3600
11

12     FOR THE DEFENDANT:

13        HONORABLE BRAD LOLLAR
          SBOT NO. 12508700
14        1700 COMMERCE ST, STE. 404
          DALLAS, TEXAS 75201
15        TEL. 214-384-8178

16        HONORABLE DOUGLAS H. PARKS
          SBOT NO. 15520000
17        321 CALM WATER LANE
          HOLLY LAKE RANCH, TEXAS 75765
18        TEL. 903-769-3120

19        HONORABLE KERI MALLON
          SBOT NO. 24049165
20        DALLAS COUNTY PUBLIC DEFENDERS OFFICE
          133 N. INDUSTRIAL BLVD., LB 2
21        FRANK CROWLEY COURT BLDG.
          DALLAS, TEXAS  75207
22        TEL. 214-653-3550

23

24

25
```

# VOLUME 51

## PUNISHMENT PHASE

AUGUST 18TH, 2009                                    PAGE   VOL.

PROCEEDINGS.................................     3     51

CASE CALLED BY THE COURT...................     3     51

HEARING....................................     3     51
JURY PRESENT...............................    27     51


| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| KELLY, AUDREY | 28 | | 64 | 51 |
| | 64 | 93 | | 51 |
| | 133 | 137 | | 51 |

|  |  |  | PAGE | VOL. |
|---|---|---|---|---|
| HEARING.................................... | | | 140 | 51 |
| JURY PRESENT.............................. | | | 149 | 51 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| PFAFF, NICOLE | 152 | 154 | | 51 |
| WYNN, DARNELL | 156 | 165 | | 51 |
| | 181 | 187 | | 51 |
| BIGGS, VICKI | 187 | 192 | | 51 |
| | 197 | | | 51 |

|  |  |  | PAGE | VOL. |
|---|---|---|---|---|
| HEARING.................................... | | | 198 | 51 |
| JURY PRESENT.............................. | | | 202 | 51 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| AARON, GARY | 203 | 220 | | 51 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| EASON, KEVON | 225 | 247 | | 51 |
| | 254 | | | 51 |
| AARON, JACKIE | 256 | 275 | | 51 |
| MILLER, TRE'VAUN | 278 | 288 | | 51 |
| | 297 | | | 51 |

| | PAGE | VOL. |
|---|---|---|
| HEARING................................. | 301 | 51 |
| ADJOURNMENT................................. | 305 | 51 |
| REPORTER'S CERTIFICATE................... | 306 | 51 |

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| KELLY, AUDREY | 28 | | 64 | 51 |
| | 64 | 93 | | 51 |
| | 133 | 137 | | 51 |
| PFAFF, NICOLE | 152 | 154 | | 51 |
| WYNN, DARNELL | 156 | 165 | | 51 |
| | 181 | 187 | | 51 |
| BIGGS, VICKI | 187 | 192 | | 51 |
| | 197 | | | 51 |
| AARON, GARY | 203 | 220 | | 51 |
| EASON, KEVON | 225 | 247 | | 51 |
| | 254 | | | 51 |
| AARON, JACKIE | 256 | 275 | | 51 |
| MILLER, TRE'VAUN | 278 | 288 | | 51 |
| | 297 | | | 51 |

```
 1              ALPHABETICAL INDEX OF WITNESSES

 2    WITNESS                    DIR.    CROSS   V.D.   VOL

 3    AARON, GARY                 203     220            51

 4
      AARON, JACKIE               256     275            51
 5

 6    BIGGS, VICKI                187     192            51
                                  197                   51
 7
      EASON, KEVON                225     247            51
 8                                254                   51

 9    KELLY, AUDREY                28            64      51
                                   64      93           51
10                                133     137           51

11    MILLER, TRE'VAUN            278     288            51
                                  297                   51
12
      PFAFF, NICOLE               152     154            51
13
      WYNN, DARNELL               156     165            51
14                                181     187           51

15

16

17

18

19

20

21

22

23

24

25
```

| 1 | | | **STATE'S EXHIBITS** | | | |
|---|---|---|---|---|---|---|

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 549 | APRIL 1ST, 2009 CALL TO<br>LAKARRAME COLE | 104 | 105 | 51 |
| 552 | CALL FROM JAIL<br>NOVEMBER 14TH, 2008 | 106 | 107 | 51 |
| 558 | CALL FROM JAIL<br>JANUARY 21st, 2009 | 294 | 294 | 51 |
| 559 | DEMONSTRATIVE OF STATE'S<br>EX. 549 | 104 | 105 | 51 |
| 563 | DEMONSTRATIVE OF STATE'S<br>EX. 558 | 294 | 294 | 51 |
| 569 | DEMONSTRATIVE OF STATE'S<br>EX. 552 | 106 | 107 | 51 |
| 585 | BOOK - 48 LAWS OF POWER | 113<br>147<br>149 | <br>147<br>147<br>150 | 51<br>51<br>51<br>51 |
| 586 | BOOK - ART OF SEDUCTION | 113<br>147<br>149 | <br>147<br>147<br>150 | 51<br>51<br>51<br>51 |
| 587 | BOOK TICKETS | 172 | 172 | 51 |

(Line numbers 1–25 run along the left margin.)

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 41 | MONEYGRAM DOCUMENTS | 83 | 83 | 51 |
| 42 | GREYHOUND RECORDS | 87 | 87 | 51 |
| 43 | PEOPLE SEARCH FOR JAMES BROADNAX | 178 | 178 | 51 |
| 44 | DEPOSITION OF JUANITA MAYES | 202 | 202 | 51 |
| 45 | DEPOSITION OF FRANCINE MAZONE | 202 | 202 | 51 |
| 46 | RAP LYRICS | 218 | 218 | 51 |

**DEFENSE EXHIBITS**

```
 1                    REPORTER'S RECORD

 2              VOLUME 51 OF _____ VOLUMES

 3           TRIAL COURT CAUSE NO. F08-24667-Y

 4   THE STATE OF TEXAS      )  IN THE CRIMINAL DISTRICT

 5                           )

 6   VS.                     )  COURT NO. 7

 7                           )

 8   JAMES GARFIELD BROADNAX )  OF DALLAS COUNTY, TEXAS

 9

10

11

12   ===================================================

13

14                    PUNISHMENT PHASE

15

16   ===================================================

17

18

19           On the 18TH day of AUGUST, 2009, the

20   following proceedings came on to be heard in the

21   above-entitled and -numbered cause to be heard before

22   the Honorable MICHAEL SNIPES, Judge presiding, held in

23   Dallas, Dallas County, Texas;

24               Proceedings reported by machine shorthand;

25   computer-aided transcription.
```

*SHARON HAZLEWOOD, CSR        972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

## A P P E A R A N C E S

FOR THE STATE OF TEXAS:

HONORABLE DAVID M. ALEX
SBOT NO. 24003256
HONORABLE LISA SMITH
SBOT NO. 00787131
HONORABLE GORDON HIKEL
SBOT NO. 00787696
HONORABLE ANDREA HANDLEY
SBOT NO. 08898800
HONORABLE ELAINE EVANS
SBOT NO. 24032880
133 N. INDUSTRIAL BLVD.
FRANK CROWLEY COURTHOUSE
DALLAS, TEXAS 75207
TEL. 214-653-3600

FOR THE DEFENDANT:

HONORABLE BRAD LOLLAR
SBOT NO. 12508700
1700 COMMERCE ST, STE. 404
DALLAS, TEXAS 75201
TEL. 214-384-8178

HONORABLE DOUGLAS H. PARKS
SBOT NO. 15520000
321 CALM WATER LANE
HOLLY LAKE RANCH, TEXAS 75765
TEL. 903-769-3120

HONORABLE KERI MALLON
SBOT NO. 24049165
DALLAS COUNTY PUBLIC DEFENDERS OFFICE
133 N. INDUSTRIAL BLVD., LB 2
FRANK CROWLEY COURT BLDG.
DALLAS, TEXAS 75207
TEL. 214-653-3550

*SHARON HAZLEWOOD, CSR        972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

## PUNISHMENT PHASE

AUGUST 18TH, 2009                         PAGE   VOL.

PROCEEDINGS..............................    3     51

CASE CALLED BY THE COURT.................    3     51

HEARING..................................    3     51
JURY PRESENT.............................   27     51

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| KELLY, AUDREY | 28 |  | 64 | 51 |
|  | 64 | 93 |  | 51 |
|  | 133 | 137 |  | 51 |

                                          PAGE  VOL.

HEARING..................................  140    51
JURY PRESENT.............................  149    51

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| PFAFF, NICOLE | 152 | 154 |  | 51 |
| WYNN, DARNELL | 156 | 165 |  | 51 |
|  | 181 | 187 |  | 51 |
| BIGGS, VICKI | 187 | 192 |  | 51 |
|  | 197 |  |  | 51 |

                                          PAGE  VOL.

HEARING..................................  198    51
JURY PRESENT.............................  202    51

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| AARON, GARY | 203 | 220 |  | 51 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| EASON, KEVON | 225 | 247 |  | 51 |
|  | 254 |  |  | 51 |
| AARON, JACKIE | 256 | 275 |  | 51 |
| MILLER, TRE'VAUN | 278 | 288 |  | 51 |
|  | 297 |  |  | 51 |

                                          PAGE  VOL.

HEARING..................................  301    51

ADJOURNMENT..............................  305    51

REPORTER'S CERTIFICATE...................  306    51

### CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| KELLY, AUDREY | 28 |  | 64 | 51 |
|  | 64 | 93 |  | 51 |
|  | 133 | 137 |  | 51 |
| PFAFF, NICOLE | 152 | 154 |  | 51 |
| WYNN, DARNELL | 156 | 165 |  | 51 |
|  | 181 | 187 |  | 51 |
| BIGGS, VICKI | 187 | 192 |  | 51 |
|  | 197 |  |  | 51 |
| AARON, GARY | 203 | 220 |  | 51 |
| EASON, KEVON | 225 | 247 |  | 51 |
|  | 254 |  |  | 51 |
| AARON, JACKIE | 256 | 275 |  | 51 |
| MILLER, TRE'VAUN | 278 | 288 |  | 51 |
|  | 297 |  |  | 51 |

*SHARON HAZLEWOOD, CSR        972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL. |
|---|---|---|---|---|
| AARON, GARY | 203 | 220 | | 51 |
| AARON, JACKIE | 256 | 275 | | 51 |
| BIGGS, VICKI | 187 | 192 | | 51 |
| | 197 | | | 51 |
| EASON, KEVON | 225 | 247 | | 51 |
| | 254 | | | 51 |
| KELLY, AUDREY | 28 | | 64 | 51 |
| | 64 | 93 | | 51 |
| | 133 | 137 | | 51 |
| MILLER, TRE'VAUN | 278 | 288 | | 51 |
| | 297 | | | 51 |
| PFAFF, NICOLE | 152 | 154 | | 51 |
| WYNN, DARNELL | 156 | 165 | | 51 |
| | 181 | 187 | | 51 |

## DEFENSE EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 41 | MONEYGRAM DOCUMENTS | 83 | 83 | 51 |
| 42 | GREYHOUND RECORDS | 87 | 87 | 51 |
| 43 | PEOPLE SEARCH FOR JAMES BROADNAX | 178 | 178 | 51 |
| 44 | DEPOSITION OF JUANITA MAYES | 202 | 202 | 51 |
| 45 | DEPOSITION OF FRANCINE MAZONE | 202 | 202 | 51 |
| 46 | RAP LYRICS | 218 | 218 | 51 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 549 | APRIL 1ST, 2009 CALL TO LAKARRAME COLE | 104 | 105 | 51 |
| 552 | CALL FROM JAIL NOVEMBER 14TH, 2008 | 106 | 107 | 51 |
| 558 | CALL FROM JAIL JANUARY 21st, 2009 | 294 | 294 | 51 |
| 559 | DEMONSTRATIVE OF STATE'S EX. 549 | 104 | 105 | 51 |
| 563 | DEMONSTRATIVE OF STATE'S EX. 558 | 294 | 294 | 51 |
| 569 | DEMONSTRATIVE OF STATE'S EX. 552 | 106 | 107 | 51 |
| 585 | BOOK - 48 LAWS OF POWER | 113 | | 51 |
| | | 147 | 147 | 51 |
| | | 149 | 147 | 51 |
| | | | 150 | 51 |
| 586 | BOOK - ART OF SEDUCTION | 113 | | 51 |
| | | 147 | 147 | 51 |
| | | 149 | 147 | 51 |
| | | | 150 | 51 |
| 587 | BOOK TICKETS | 172 | 172 | 51 |

## P R O C E E D I N G S

(Court convened; defendant and jury not present.)

THE COURT:  Turning first to -- this is the State of Texas versus James Broadnax.

The jury is not present.

As I understand, Mr. Lollar, for the purpose of addressing the objections to the deposition, you're waiving the appearance of your client; is that correct?

MR. LOLLAR:  Yes, sir.

THE COURT:  All right.  Turning first to the deposition testimony of Juanita Mayes, and does the State have any objection to any portions of the deposition?

MS. EVANS:  Yes, Your Honor, we do.

THE COURT:  Okay.  Go -- start with the first one and then we'll go from there.

MS. EVANS:  Okay.

THE COURT:  Go by page number on the deposition.

MS. EVANS:  The first one is Page 7.

THE COURT:  Okay.  Lines 23 through 24.

MS. EVANS:  There you go.

THE COURT:  All right.  And what is the objection?

6

1    MS. EVANS: It's hearsay, Your Honor, and

2  it's speculation. Mainly hearsay, because it's based

3  on what she's heard.

4        THE COURT: Right.

5        And what is the response?

6        MR. LOLLAR: She says on Page 8, Line 2,

7  that she told her she tried drugs.

8        THE COURT: Which is hearsay.

9        MR. LOLLAR: Judge, it's our

10  understanding, it's our belief that we have a right to

11  show that the mother of the defendant was under the

12  influence of drugs and appeared to be so to several of

13  these witnesses we are about to come.

14        THE COURT: You absolutely do, and you can

15  get that through her.

16        MR. LOLLAR: Okay.

17        THE COURT: This is hearsay.

18        MR. LOLLAR: The statement you're talking

19  about on top of Page 8.

20        THE COURT: Yeah.

21        MS. EVANS: Bottom of Page 7, going into

22  Page 8.

23        THE COURT: Yeah. And then, -- I mean,

24  Line 24, for example, is textbook hearsay.

25        You're going to get it through her, and

SHARON HAZLEWOOD, CSR    972-739-3906

CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

6

1  Page 8. But her answer on Page 9 is entirely

2  speculation. She just has a feeling that something

3  happened to Audrey, but she doesn't have any personal

4  knowledge of that.

5        THE COURT: Okay. I had that also.

6        Mr. Lollar, do you have any response to

7  that? What would happen is Line 25 on Page 8 would

8  come out, and then Lines 1 through 13, keeping in mind

9  also that I fully anticipate that Ms. Kelly would

10  testify about that, and certainly I'll allow all of

11  that. It's just that we need to hear it from her, not

12  from someone guessing about why, in my judgment.

13        But what's your response?

14        MR. LOLLAR: I believe Line 7, where she

15  starts, But she's been married like, I mean, four to

16  five times. Every time she leaves one, she has to get

17  another. I think that's a -- that's -- nothing wrong

18  with that.

19        THE COURT: Okay. I'll allow that. I

20  agree.

21        Starting with the word "Because" on Line 6

22  through, Has to get another one on Line 9, I'll allow

23  that to come in.

24        Anything else on that, Mr. Lollar?

25        MR. LOLLAR: Yes. Starting on Line 11,

SHARON HAZLEWOOD, CSR    972-739-3906

CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

5

1  I'm going to allow that.

2        MR. LOLLAR: Okay.

3        THE COURT: Okay. The objection is

4  sustained and the deposition tape will be muted as to

5  Lines 21 through 25 on Page 7.

6        MS. EVANS: Your Honor, we do have a

7  proposal as it relates to that. Just because we think

8  there's going to be a large number of this same or

9  similar type of objection, and just to protect the

10  record, we would like to play the deposition tape so

11  that they can see it and see her demeanor and

12  everything, but mute the volume on the recording and

13  actually offer and redact on the transcript rather than

14  sit here and mute back and forth, back and forth, and

15  possibly err in doing so.

16        THE COURT: Okay. You got any objection

17  to that, Mr. Lollar?

18        MR. LOLLAR: No, sir.

19        THE COURT: All right. So again, Lines 21

20  through 25 will be muted, whatever. And -- or

21  redacted, or however you want to do it, all the way

22  through Line 5 on Page 8, okay?

23        All right. What's next, Ms. Evans?

24        MS. EVANS: Page 9, her entire answer to,

25  Do you know why Audrey moved around. That started on

SHARON HAZLEWOOD, CSR    972-739-3906

CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

7

1  Because when Audrey was a little kid coming up, Audrey

2  wasn't so different, but when she became an adult, she

3  really changed a lot.

4        THE COURT: And I'll allow that too.

5        You have that, Ms. Evans?

6        MS. EVANS: I do.

7        THE COURT: Okay. Next?

8        MS. EVANS: Page 9, Line 22, the question,

9  basically, is improper as it elicits statements of the

10  defendant. I think James has said he moved around

11  about 18 times in his life.

12        THE COURT: Response?

13        MR. LOLLAR: Well, I think that ties back

14  into what she was talking about. Her observation was

15  that he was moved around a lot by his mother.

16        MR. HIKEL: It's hearsay.

17        THE COURT: It's -- it's hearsay. It

18  comes out. You're -- you're going to get it through

19  Ms. Kelly, for the record. There's no harm there.

20        MS. EVANS: The answer as well to that?

21        THE COURT: Yeah.

22        MS. EVANS: Okay.

23        THE COURT: Lines 22 through 24.

24        Next?

25        MS. EVANS: Page 11, Line 12 through

SHARON HAZLEWOOD, CSR    972-739-3906

CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1  Line 15. Again, speculation. She doesn't have any
2  personal knowledge. It's based on suspicion.
3          THE COURT: Response?
4          MR. LOLLAR: Well, she says she has her
5  suspicions, and that was based on his reactions through
6  certain people he would be around, and she goes on --
7  she goes on to explain on Page 12, He would clam up;
8  felt like he had to do whatever that person wanted.
9          THE COURT: Okay.
10         MR. LOLLAR: Acted real afraid.
11         THE COURT: I'm going to allow all of
12  that, but I'm not going to allow Lines 12 through 15.
13         MR. LOLLAR: 12 through 15.
14         THE COURT: Next, Miss Evans?
15         MS. EVANS: And Page 14.
16         THE COURT: Okay.
17         MS. EVANS: And that's starting Line 21.
18         THE COURT: Okay.
19         MS. EVANS: Through 25.
20         MR. LOLLAR: I think that's admissible.
21  It's her perception that Audrey was unstable. She
22  always thought something was wrong with her.
23         MS. EVANS: Again, that's speculation.
24  It's based on her previous answer, she just had a
25  feeling. No personal knowledge.

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

9

1          MR. LOLLAR: It's based on her --
2          THE COURT: I'm going to allow it.
3          MS. EVANS: Okay.
4          THE COURT: It is speculative, but not so
5  much that I'm not going to allow it. I'm going to
6  allow it.
7          MS. EVANS: Now, Page 20, Line 25.
8          THE COURT: Okay. I got that.
9          MS. EVANS: Once again, there's a lack of
10  personal knowledge there.
11         THE COURT: So it's Line 25 on Page 20,
12  and then 1 through 2 --
13         MS. EVANS: Yes, Your Honor.
14         THE COURT: -- on Page 21.
15  Response?
16         MR. LOLLAR: I'll give you that one.
17         THE COURT: Yeah. It's pretty clear.
18  Okay. That comes out.
19         MS. HANDLEY: Why don't you just say for
20  the record what it is, also.
21         MS. EVANS: Okay. And for the record,
22  this is, And Aaron is the one you have suspicion of
23  abusing James, and she says Yes. Yes.
24         THE COURT: And by the way, I again want
25  to compliment both -- both sides' lawyers on getting

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

1  these depositions done. It's a good job. Thank you.
2          MS. HANDLEY: What was his ruling on that?
3  I missed it.
4          MS. EVANS: Yeah, that's coming out.
5          MS. HANDLEY: Thank you.
6          MS. EVANS: And then Page 25, starting
7  with Line 18 and her entire answer to that, it's an
8  improper question. It invades the province of the jury
9  and it also encompasses some hearsay within that. The
10  one that goes all the way -- starts on Page 25,
11  Line 18, and the answer goes all the way through
12  Page 26.
13         MS. HANDLEY: For the record, what's the
14  subject matter?
15         MS. EVANS: And for the record, the
16  subject matter is that the jury has found him guilty of
17  capital murder, and what does she believe the
18  appropriate punishment is.
19         MS. MALLON: That's not the question.
20         MS. EVANS: (As read:) Has convicted
21  James of capital murder, and they're going to decide
22  whether the appropriate punishment is life without
23  parole or death sentence. Is there anything you'd like
24  to tell the jury with respect to that?
25         That specifically invades the province of

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

11

1  the jury. It contains matters of hearsay, and it's a
2  narrative response at that.
3          THE COURT: Response?
4          MR. LOLLAR: Well, I disagree, I think
5  Ms. Mallon was asking the witness with respect to James
6  what she would like to tell the jury, and she responds.
7  She talks about his childhood; how he never had
8  anything in his life. It was her reaction.
9          THE COURT: Ms. Evans, how is this
10  different than any other case where mommas come in here
11  all the time, defense lawyers ask mom, What -- What do
12  you want to tell the jury about whether or not this
13  defendant should get probation.
14         You've let that in a million times in
15  front of me. How is this any different?
16         MS. EVANS: Well, Your Honor, -- well,
17  first of all, that's -- this isn't.
18    A.   Witnesses, I think, should be treated
19  differently than -- obviously, the reason the State
20  let's it in when it's momma testifies sometimes, is
21  because we don't want to beat up on mama and object to
22  that in the middle of it -- coming out in the middle of
23  the courtroom, but it's entirely improper.
24         It's irrelevant as to what these witnesses
25  feel like the jury should do. And especially, these

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**12**

1 are witnesses that haven't seen him.
2 THE COURT: Okay. Hold on. Hold on.
3 Okay. You're not starting off with the
4 deposition testimony, are you, Mr. -- Mr. Lollar?
5 MR. LOLLAR: No, sir.
6 THE COURT: Okay. I'm going to reserve
7 ruling on 18 through 25 on Page 25, and then the entire
8 answer down to 21 on 26 until I've looked at the law on
9 that.
10 I don't think you're right, Ms. Evans, but
11 I'll check.
12 MS. EVANS: Page 40 --
13 THE COURT: Let me write that down. Okay.
14 MS. EVANS: Page 48, Line 19, and her
15 answer to that. Once again, it's based on hearsay.
16 She doesn't have any direct knowledge.
17 MR. LOLLAR: Which line?
18 MS. EVANS: Starting Line 19, like my
19 question, and then her answer to that.
20 THE COURT: Line --
21 MS. EVANS: And it ends on Page 49,
22 Line 2.
23 MR. LOLLAR: Judge, I think that goes to
24 her perception of Audrey and how she interacts with
25 James.

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**13**

1 MS. EVANS: It says, (As read:) I mean,
2 my daughter had called and said she was offered to come
3 to Dallas and everything would be taken care of for her
4 to come to Dallas just to be with James, and she didn't
5 go.
6 MR. LOLLAR: Yeah.
7 MR. ALEX: That's hearsay.
8 THE COURT: How is it not hearsay,
9 Mr. Lollar?
10 MR. LOLLAR: Well, I think she has facts
11 within her knowledge that Audrey had the opportunity to
12 come to see James and she didn't take advantage of that
13 opportunity.
14 THE COURT: Right. And she can say that,
15 but this is the daughter telling the aunt, or whatever
16 this lady is, so it's hearsay.
17 Okay. So Lines 19 through 25 on Page 48
18 come out. And 1 and 2 on 49.
19 Anything else on Mayes' deposition?
20 MS. EVANS: I feel like there is one more
21 portion regarding Aaron that I didn't mention, and so
22 I'm looking for that now.
23 THE COURT: Are you talking about her
24 suspicions about him?
25 MS. EVANS: Exactly. There's a longer

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**14**

1 portion --
2 THE COURT: Mr. Lollar, do you mind if I
3 point that out to her where that is?
4 MR. LOLLAR: No.
5 THE COURT: Okay. It's Page 44, Lines 5
6 through 13.
7 MR. LOLLAR: Line 13?
8 THE COURT: 5 through 13, Page 44.
9 MS. EVANS: The State would also object to
10 that, the same objection, that there's a lack of
11 personal knowledge and it's just sheer speculation.
12 THE COURT: Response, Mr. Lollar?
13 MR. LOLLAR: I think starting with Line 14
14 is okay.
15 THE COURT: It's Lines 5 through 13.
16 MR. LOLLAR: 5 through 13, okay. All
17 right.
18 THE COURT: Okay. Is that it on the Mayes
19 one?
20 MS. EVANS: That's it on the Mayes.
21 THE COURT: All right. All right. The
22 next deposition?
23 MS. EVANS: The first one starts on
24 Page 10, Line 10. (As read:) The cousin she said he
25 was on crack and that's --

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**15**

1 THE COURT: Let me get there. Let me get
2 there.
3 MS. EVANS: -- that's just what I heard.
4 THE COURT: Oh, Lines 9 through 13,
5 Page 10?
6 ReaMS. EVANS: Yes, Your Honor.
7 THE COURT: Response? Appears to be
8 hearsay.
9 MR. LOLLAR: I would agree at this point.
10 THE COURT: All right. And again,
11 Ms. Kelly, I'm sure, will be testifying exactly the
12 same way.
13 MR. LOLLAR: Well, I'm not so sure she'll
14 admit to the crack usage.
15 THE COURT: Okay.
16 MR. LOLLAR: And I think if we go down to
17 9, 10 and 11, that's one issue, but I think starting
18 with (As read:) And I'm going to tell you something,
19 during that time, almost the whole neighborhood was on
20 crack, was crack infested, I think that's admissible,
21 that the neighborhood they were living in was crack
22 infested.
23 THE COURT: Where are you talking about?
24 MR. LOLLAR: Starting on Line 11, Page 10.
25 Or actually, I guess we could start on Line 12, at

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

18

1   (As read:)  During the time of --
2          THE COURT:  Just the one sentence?
3          MR. LOLLAR:  Yes, sir.
4          THE COURT:  I'll let that come in.
5          (As read:)  During that time of era, --
6   whatever that means -- almost the whole neighborhood
7   was on -- it was just crack infested.
8          That gets to come in.
9          Next, Ms. Evans?
10         MS. EVANS:  Page 11, Line 22 through
11  Line 1 of Page 12.
12         MR. LOLLAR:  If I could back up to just
13  that last one, I think hearsay can be the basis of an
14  opinion, though, and if she's hearing from the cousins
15  that the mother was doing crack, I think that is
16  admissible.
17         THE COURT:  Yeah, I don't agree with that.
18         I'm going to let in the sentence, During
19  that era.
20         MS. EVANS:  Page 11, starting with
21  Line 22, ending with Line 1 of Page 12, again that's
22  hearsay.  It's statements by the defendant and trying
23  to be offered by the defense.
24         MR. LOLLAR:  Well, Judge, she observed
25  the -- the bruises on him.  She asked him about it.  He

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

1          THE COURT:  Okay.  And that's sustained as
2   to that.
3          MS. EVANS:  And then also on Page 12,
4   Line 15 through 17, the question that is asked is
5   assuming that hearsay response that you've just agreed
6   to remove.
7          THE COURT:  Okay.
8          Response to that, Mr. Lollar?  The same
9   response?
10         MR. LOLLAR:  The same response.
11         THE COURT:  Okay.  15 through 17 are --
12  the objection to those lines are sustained.
13         MS. EVANS:  Page 14.
14         THE COURT:  Okay.
15         MS. EVANS:  Line 15, where I object to
16  nonresponsive, I believe that entire answer, with the
17  exception to whenever she says I would hope so, would
18  be nonresponsive to the question asked and it's a
19  narrative.
20         THE COURT:  Are you talking about Lines 3
21  through 14?
22         MS. EVANS:  Starting Line -- right.  3
23  through 14.
24         MR. LOLLAR:  I think -- 
25         MS. EVANS:  And then it continues on, I

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

17

1   was six years old at the time.  I don't think that
2   there's any indication that he was lying or
3   manufacturing that.
4          He explains to her that Richard knocked
5   him down the stairs and he knocked his mother down the
6   stairs, which he observed.
7          MS. EVANS:  Your Honor, we don't object to
8   what she observed, the bruise on his head; just his
9   response to how it happened.
10         MR. LOLLAR:  Well, and also --
11         THE COURT:  It's hearsay, obviously, so
12  how do you get around that?
13         MR. LOLLAR:  I think it's not offered for
14  the truth of the matter asserted.  It's not hearsay.
15         THE COURT:  No sarcastic chuckling over
16  there, members of the State.
17         MS. HANDLEY:  It kind of was a laugh,
18  chuckle.  I'm sorry.  I beg your pardon, Your Honor.
19         THE COURT:  Okay.  On Line 22 through 25,
20  starting with And he, the objection's sustained as to
21  all those.
22         And now on Page 12, what's your objection
23  over there?
24         MS. EVANS:  Just that -- Her down the
25  stairs to, Line 1.  It's a continuation of that.

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

19

1   guess, to the top of Page 15.
2          MR. LOLLAR:  I think the answer is
3   responsive to the question asked.  The question was,
4   (As read:)  Do you think that if you had been able to
5   take James in, he would be different than he is today?
6   And she's explaining her answer.
7          THE COURT:  Okay.  I think Ms. Evans is
8   probably technically correct, but I'm going to let it
9   in anyway.
10         MS. EVANS:  The entire --
11         THE COURT:  Yeah.
12         MS. EVANS:  -- narrative response?
13         THE COURT:  Yeah.
14         MS. EVANS:  The next is Page 15, Line 13
15  through 18, what he said, that he wanted to come stay
16  and live with her, all that is hearsay.
17         MR. LOLLAR:  Judge, she has already in
18  this deposition said that she wanted to take him in,
19  and this is also showing that he wanted to be with her.
20  I don't know how else to say that.  I don't feel
21  there's anything inappropriate about this.  He was a
22  six year-old boy at the time.
23         THE COURT:  Yeah, but the objection is
24  hearsay, not whether it's relevant.  I agree it's
25  relevant.  The objection is hearsay.

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

20

22

1    MR. LOLLAR: Well, I think it's evidence
2    of an existing mental state, which is an exception.
3    THE COURT: Okay. The objection to
4    Lines 13 through 18 on Page 15 is sustained.
5    MS. EVANS: Okay. In addition to that,
6    same page, Page 15, Line 21 through 24, (As read:) One
7    time did you ask Audrey if she could keep James and she
8    said no, that's hearsay.
9    THE COURT: All right.
10    MR. LOLLAR: Well, Judge, this shows her
11    efforts to try to get James when he was a small child
12    and the mother refusing to let her have him.
13    THE COURT: I understand that, but how is
14    it not hearsay? Don't get mad, just be logical and
15    explain to me how it's not hearsay.
16    MR. LOLLAR: Well, we'll say it's present
17    impression, then existing mental, emotional, or
18    physical condition.
19    MS. EVANS: And again, Ms. Kelly is going
20    to be on the stand and can be asked these questions as
21    well.
22    MR. LOLLAR: And if she denies it?
23    THE COURT: Well, if she denies it and
24    gets hostile on you, you can cross-examine her as a
25    hostile witness and I'll allow that.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1    Nothing, Ms. Mazone. I said, Well, listen, be good.
2    Don't get in any trouble. Where you living? He said,
3    Oh, just here and there.
4    The defendant's statements there are
5    hearsay.
6    THE COURT: Response?
7    MR. LOLLAR: Um, I would agree.
8    Well, let me say this. Again, I don't
9    think it's offered for the truth of the matter
10    asserted, but just to show that she had a conversation
11    with him there. She saw him. He was indicating that
12    he said he was just living here and there.
13    THE COURT: I agree. I mean, it doesn't
14    hurt anybody. I'm going to let it in.
15    MS. EVANS: Next is Page 17, starting at
16    Line 15, going all the way down through Page 18,
17    Line 13. It's the same objection we had earlier. It's
18    got --
19    THE COURT: Okay. I'm not going to rule
20    on that yet. That's 15 through 25 on Page 17, and then
21    through Line 12 on Page 18; is that right, Ms. Evans?
22    MS. EVANS: Yes, Your Honor.
23    THE COURT: Okay. I'll reserve judgment
24    on that.
25    Okay. Is that it?

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

21

23

1    The objection to Lines 21 through 24 are
2    sustained on Page 15.
3    MS. EVANS: 21 through 24, Your Honor?
4    THE COURT: Yeah.
5    MS. EVANS: Okay. Page 16 --
6    THE COURT: And I mean what I just said
7    there, so pay attention to that if she starts doing
8    that, okay?
9    MS. EVANS: Page 16, beginning at the very
10    end of Line 6 through 9, (As read:) I got in touch
11    with his cousin and she said, Well, Audrey just moved
12    up in Arkansas somewhere. We don't know where she is.
13    She's disappeared too.
14    That's all hearsay.
15    THE COURT: Response?
16    MR. LOLLAR: Well, and again, that's not
17    offered for truth of the matter asserted; just to show
18    that she said it, and that explained why she went away
19    or she couldn't find James.
20    THE COURT: Yeah, I agree with that.
21    The objection's overruled as to those.
22    MS. EVANS: Bottom of Page 16, starting
23    Line 24, when she says, (As read:) What are you doing
24    over here? And he said, Well, I'm over here seeing my
25    friend. And I said, What are you guys into? He said,

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1    MS. EVANS: There's a little portion in
2    the redirect which is -- one of them is on Page 32,
3    Line 23. Once again, I think you've just overruled
4    that objection before, whenever he said he was living
5    here and there.
6    THE COURT: I'm going to overrule it
7    again.
8    MS. EVANS: Okay. And then that she was
9    on drugs herself comment.
10    THE COURT: Where is that?
11    MS. EVANS: I'm looking. Again, that's
12    speculation, if I can figure out where it was.
13    Gregg, did Barney go get the jury?
14    THE BAILIFF: Sir?
15    THE COURT: Did Barney go get the jury?
16    THE BAILIFF: Not yet, sir.
17    THE COURT: Is the jury up here?
18    THE BAILIFF: Yes, sir.
19    MS. EVANS: Okay. Page 31, Lines 10 and
20    11. Wait. Lines 10 through 12, Page 31.
21    THE COURT: What's your objection there?
22    MS. EVANS: Speculation, Your Honor. She
23    doesn't have any personal knowledge.
24    I think earlier she said that that was
25    based on hearsay through something she heard from the

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

26

1  cousins.

2       MR. LOLLAR:  That was the other lady.

3       MR. HIKEL:  And, Judge, remember --

4       MS. EVANS:  She never saw it --

5       MR. HIKEL:  -- you maybe allowed this only

6  because the whole neighborhood might have been on crack

7  is what you allowed earlier, but not the fact that she

8  learned through some cousin that she may have been on

9  crack.

10      MR. LOLLAR:  That was the other witness.

11      MS. HANDLEY:  Forget about the cousin.

12 She never saw it.  She never --

13      MS. EVANS:  Again, Page 10, Lines 10 and

14 11 is what you've already sustained.  The cousin said

15 that she was on crack and that she said that's just

16 what I heard, and so Page 31, Lines 10 through 12, just

17 go to what she heard.  It would be hearsay.

18      THE COURT:  I agree with that.  That's

19 sustained.

20      Is that it?

21      MS. EVANS:  That's it.

22      MS. HANDLEY:  What lines?

23      MS. EVANS:  10 through 12.

24      THE COURT:  10 through 12, Page 31.

25      MS. EVANS:  That's all, Your Honor.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1       MS. EVANS:  Okay.

2       THE COURT:  All right.  Any objection to

3  that, Mr. Lollar?

4       MR. LOLLAR:  So we don't want to try to

5  redact the portions during the playing of the tape and

6  just mute it for those portions?

7       THE COURT:  Well, she's suggesting that we

8  not do that because of the technical difficulties of

9  doing that, but if you insist on it, I'm going to give

10 it to you.

11      Off the record.

12      (Off-the-record discussion was had.)

13      THE COURT:  Back on the record.

14      MR. LOLLAR:  I guess we can agree to that,

15 Judge.

16      THE COURT:  All right.  Thank you.

17      So, you will be showing them long enough

18 to introduce themselves, then we'll read it, okay?

19      MS. EVANS:  Yes, sir.

20      THE COURT:  And that's for each witness.

21      MR. LOLLAR:  Well, they're our -- they're

22 our witnesses.  I guess we'll be showing them.

23      THE COURT:  Right.  That's what I mean.

24      MR. LOLLAR:  Okay.

25      THE COURT:  Okay.  I'm sorry.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

25

1       MR. LOLLAR:  Now, tell me how we're going

2  to do this again?

3       MS. EVANS:  I would propose to play the

4  deposition and just mute it so they can see the

5  witness's demeanor, but then we are going to go copy

6  and then redact out those portions that you just

7  sustained.

8       THE COURT:  So they're going to watch an

9  hour of silent --

10      MS. EVANS:  They're going to read it

11 while -- like we did with the other deposition, we can

12 read it while they're watching it.

13      THE COURT:  How are you going to know

14 where to read it?

15      MS. HANDLEY:  It's just for the -- it's

16 just for the purpose of them seeing the witnesses.

17      MS. EVANS:  Right.

18      MS. HANDLEY:  If we finish reading it

19 before then, --

20      THE COURT:  Why can't we just put them up

21 for a little bit so you can see them, and then read the

22 depositions?

23      MS. EVANS:  Right, Your Honor.  That would

24 be fine.

25      THE COURT:  Not the whole thing.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

27

1       MR. HIKEL:  So -- so that I'm -- so you

2  guys will hit the button whenever it needs to be --

3       MS. HANDLEY:  No, Gordon.

4       MR. HIKEL:  Or just going to play it --

5  okay.  Introduce it, and then just mute the whole

6  thing.

7       MS. EVANS:  Why don't we just turn it off.

8       THE COURT:  No, no, no.  Pay attention.

9  They're going to put on both of the witnesses long

10 enough for the jury to know what they look like, what

11 they sound like, et cetera, okay?

12      Then after that, someone from the defense

13 team, probably Ms. Mallon, will read the -- the

14 portions of the deposition that have not been objected

15 to.

16      So we will not be going through an hour,

17 45 minutes, or whatever, of muted videotape.

18      Okay?  Have you got your witness here?

19 Miss Kelly?

20      MR. LOLLAR:  Yes, sir.

21      THE COURT:  All right.  Bring her in.

22      Call the jury.

23      THE BAILIFF:  All rise.

24      (Jury present.)

25      THE COURT:  Be seated, please.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

30

1    Good morning, ladies and gentlemen.

2    We continue now with the trial of the

3    State of Texas versus James Broadnax.

4    Mr. Lollar, it is your witness, sir.

5    MR. LOLLAR:  Thank you, Your Honor.

6    THE COURT:  Yes, sir.

7    **AUDREY KELLY**

8    was re-called as a witness and testified as follows:

9    **DIRECT EXAMINATION - CONTINUING**

10   BY MR. LOLLAR:

11   Q.  Would you tell us your name again, please.

12   A.  **Audrey Kelly.**

13   Q.  And, Ms. Kelly, you are the same witness who

14   was testifying yesterday when we broke for the day; is

15   that correct?

16   A.  **Yes, sir.**

17   Q.  Ms. Kelly, --

18   MR. LOLLAR:  May I approach the witness,

19   Your Honor?

20   THE COURT:  Yes, sir.

21   Q.  (BY MR. LOLLAR:)  -- I had just shown you what

22   I believe is Defendant's Exhibit Number 40, and let me

23   ask you, is this the medical records of the event that

24   you were describing to the jury about when James

25   Broadnax, III, had run you off the road, making your

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

31

1    with Mr. Broadnax in an apartment in Irving; is that

2    correct?

3    A.  **Yes.**

4    Q.  And following the event with your vehicle that

5    wasn't capable of driving anymore, what did you decide

6    to do?

7    A.  **Well, I went back to the apartment, I called a**

8    **friend of mine.  She came and picked us up.  And I went**

9    **back to the apartment and I stayed there until I could**

10   **get money together to get to Hope.**

11   Q.  Now, Mr. Broadnax, was he arrested for this

12   offense?

13   A.  **Yes.**

14   Q.  Do you know whatever happened with that case

15   or what he was charged with or anything?

16   A.  **I don't know for sure.**

17   Q.  Okay.  Now, do you know whether or not he was

18   able to post bond and come back to the apartment?

19   A.  **He posted bond, but he didn't come back to my**

20   **apartment.**

21   Q.  All right.  I want to direct your attention to

22   a couple of weeks later.  Did Mr. Broadnax show up

23   there at the apartment?

24   A.  **Yes.**

25   Q.  And what happened when he showed up there at

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

29

1    car flip over?

2    A.  **Yes.**

3    Q.  All right.

4    MR. LOLLAR:  And I believe this has been

5    offered and introduced.

6    May I publish, Your Honor?

7    THE COURT:  Yes, sir.

8    Q.  (BY MR. LOLLAR:)  And, Ms. Kelly, what kind of

9    a vehicle was that?

10   A.  **My vehicle?**

11   Q.  Yes.

12   A.  **It was a red Sprint.**

13   Q.  A red what?

14   A.  **Sprint.**

15   Q.  Sprint?

16   A.  **Sprint.**

17   Q.  Okay.  And after the car flipped over three

18   times, you said it landed on its wheels?

19   A.  **Yes.**

20   Q.  Was the car capable of driving after that?

21   A.  **No.**

22   Q.  So where had this physically taken place?

23   Here in the Dallas area?

24   A.  **It was in the Dallas area, yes.**

25   Q.  And if I recall correctly, you had been living

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

31

1    the apartment?

2    A.  **He came in, said he wanted to talk and wanted**

3    **to get things back together.  And he came in and he**

4    **walked through the house and went in and picked up my**

5    **son, Michael, and started out the door.**

6    **And we started arguing and fighting because I**

7    **wasn't going to let him take my child.**

8    Q.  How old was Michael at that time?

9    A.  **He was a few months old.  Close to a year,**

10   **maybe.  I'm not exactly sure --**

11   Q.  So --

12   A.  **-- of the date.**

13   Q.  -- he physically picked up Michael?

14   A.  **Yes.**

15   Q.  And left out of the apartment with him?

16   A.  **Yes.**

17   Q.  And what did you do?

18   A.  **I called the police and tried to file a**

19   **complaint, but they said I couldn't file a complaint**

20   **because he was his biological father and he had all**

21   **rights to him.  And then, of course, I tried to get an**

22   **attorney, you know, and everything, but I couldn't**

23   **afford one, so ...**

24   Q.  Okay.  And do you know where James Broadnax,

25   III, moved to after that or left?

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

34

1   A.  As far as I know, he was in Oklahoma.  He went
2  to Tulsa.
3   Q.  Okay.  And did he take Michael with him?
4   A.  Yes.
5   Q.  Have you seen James Broadnax, III, since that
6  time?
7   A.  No.
8   Q.  Have you seen Michael since that time?
9   A.  Briefly.  I saw Michael when he was two, and I
10  haven't seen him since.
11   Q.  Okay.  Explain how you came to see him when
12  Michael was two.
13   A.  James' sister, Michael's aunt, called me and
14  told me where she was and I went down.  Well, she was
15  here in the Dallas area.  And I came down and I saw
16  him.  That's why.
17   Q.  Just a brief visit?
18   A.  Yes.
19   Q.  And is that the last time you've seen Michael?
20   A.  Yes.
21   Q.  And has James ever seen Michael?
22   A.  No.
23   Q.  Growing up or anything?
24   A.  No.
25   Q.  All right.  Were you able to stay here in the

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1   Q.  And what did you do?
2   A.  I worked at Tyson Foods for awhile.
3       I worked for Meyers Bakery briefly.
4       And there was a hatchery there.  That was also
5  part of Tyson, so --
6   Q.  Okay.  So you were working at jobs as you
7  could find them?
8   A.  Uh-huh.
9   Q.  And did you have occasion in 1991 to join the
10  Army reserve?
11   A.  Yes.
12       THE COURT:  Hold on a second.
13       Could you say yes or no as opposed to
14  uh-huh?  You've done that quite a bit, okay?
15       THE WITNESS:  Yes, sir.
16       THE COURT:  The question was, Did you join
17  the reserves in '91.
18   A.  Yes.
19   Q.  (BY MR. LOLLAR:)  And as part of the Army
20  reserve, will you explain how that process works to the
21  members of the jury?  Is it full-time occupation or
22  part-time?
23   A.  No, sir, it's part-time.  You serve one
24  weekend a month.  You go to different places to drill.
25       At that particular time, I was drilling at Red

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

33

1  Dallas area for a little while longer until you had
2  money to move back to Arkansas?
3   A.  Yes.  I -- when I -- I was here, I guess,
4  probably about a month-and-a-half, maybe two months,
5  and my sister ended up helping me get back down to
6  Arkansas.
7   Q.  And where did you move back to?
8   A.  To my mother's house.
9   Q.  In Hope?
10   A.  Yes.
11   Q.  And did James come with you?
12   A.  Yes.
13   Q.  Who all was with you there at that time?
14   A.  It was Aaron, James, NiQuia and Kerrin.
15   Q.  And how old was James at that time when you
16  moved back to Hope?
17   A.  Oh, James was closer to two, maybe three.
18   Q.  All right.  Now, let me ask you, ma'am, if in
19  1991, would that be about the year we're talking about
20  when you moved back to Hope?
21   A.  Early.  Early part.
22   Q.  Early part of '91?
23   A.  Uh-huh.
24   Q.  Did you find employment in some manner?
25   A.  Yes.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

35

1  River Army Depot in Texarkana.
2       Two weeks a year we would go maybe to
3  different parts of the country.  We would go to maybe
4  California, or Texas, or wherever we were assigned to
5  go at that particular time.
6   Q.  And how long did you remain in the Army
7  reserves?
8   A.  Off and on, about ten.  Ten, eleven years.
9   Q.  All right.  All right.  Let me ask you, ma'am,
10  if in 1993 you met a man by the name of Darryl Maxwell?
11   A.  Yes.
12   Q.  And how did you meet Mr. Maxwell?
13   A.  We were co-workers.
14   Q.  At what location?
15   A.  At the hatchery.
16   Q.  The hatchery?
17   A.  The Tyson hatchery in Hope.
18   Q.  Okay.  And did you subsequently marry
19  Mr. Maxwell?
20   A.  Yes.
21   Q.  And where did you-all live at that time?
22   A.  We lived in Hope.
23   Q.  Where was James?
24   A.  He was there.
25   Q.  With you-all?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

36

38

1    A. With -- yes. Briefly.
2    Q. Was there a time when he was left with your
3 mother, --
4    A. Yes.
5    Q. -- Betty Eason?
6    A. Yes.
7    Q. And then he joined you all together?
8    A. Yes.
9    Q. And had y'all moved at that point out of Hope?
10    A. Yes, we moved to Arkadelphia, Arkansas.
11    Q. And Arkadelphia is one of the locations that
12 we circled on the map there --
13    A. Yes.
14    Q. -- towards Little Rock?
15    A. Yes.
16    Q. And when you moved to Arkadelphia, did James
17 then come and joined you from his -- from his grand --
18 well, from your mother, Betty Eason?
19    A. Yes.
20    Q. So she had had him for a period of time before
21 he joint you all there in Arkadelphia.
22    A. Yeah.
23    Q. Now, can you describe how long you were
24 together with Mr. Maxwell?
25    A. Roughly, three years.

SHARON HAZLEWOOD, CSR       972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1    Q. Okay. Let me back up just for one second.
2 When you moved to Arkadelphia with Mr. Maxwell, where
3 were you-all living?
4    A. We lived in a -- a house right off the
5 highway, right off the freeway.
6    Q. Okay. And how many of your children moved
7 with you there or came to live with you and
8 Mr. Maxwell?
9    A. Two.
10    Q. And who would that be?
11    A. That was Aaron and James.
12    Q. And where were NiQuia and Kerrin at that time?
13    A. They were in Michigan.
14    Q. With their father?
15    A. With their father, yes.
16    Q. Okay. Let me ask you, Miss Kelly, did there
17 come a point in time when there -- something happened
18 that caused Nikki and Kerrin to go back to Michigan
19 with their father?
20    A. Yes.
21    Q. Would you describe to the members of the jury
22 whether or not you believe that you had alcohol
23 problems at that time?
24    A. I did.
25    Q. Can you describe the extent or the level of

SHARON HAZLEWOOD, CSR       972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

37

39

1    Q. And how was that relationship?
2    A. It was good in the beginning. We started
3 having some problems and we separated, and then
4 eventually we divorced.
5    Q. And when you separated, where did you go to?
6    A. I went back to Hope.
7    Q. Remember what year you separated from
8 Mr. Maxwell?
9    A. That was in '96. '95. End of '95, beginning
10 of '96.
11    Q. So you were together with him with James
12 living with you --
13    A. Yes.
14    Q. -- in Arkadelphia.
15    A. Yes.
16    Q. For about what, two or three years?
17    A. Yes.
18    Q. Now, were there any instances of violence
19 there in the household at that time?
20    A. No.
21    Q. None at all?
22    A. Not in that one, no.
23    Q. Okay. When you went back to Hope, how long
24 did you stay there?
25    A. I stayed there till the early part of '98.

SHARON HAZLEWOOD, CSR       972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1 the alcohol problems that you had?
2    A. My drinking was all the time. I just -- the
3 things I was going through, I just had -- felt like I
4 had needed the alcohol to deal with certain situations
5 in my life at that time.
6    Q. And would that be before you met Mr. Maxwell?
7    A. Yes.
8    Q. Okay. So I kind of got that out of order, but
9 let's -- let's talk about that. When you were having
10 these -- these alcohol problems, would that have been
11 about 1991 to '92?
12    A. Yes.
13    Q. And where were you living at that point?
14    A. I was living in Hope.
15    Q. And were you living with your mother or with
16 Clara?
17    A. I was kind of like in between, but I was
18 mostly with Clara --
19    Q. Okay.
20    A. -- at that time.
21    Q. And do you remember what happened in regard --
22 did something happen in regard to your daughter NiQuia?
23    A. I had told her to do something and she was
24 being -- not wanting to do what I told her to do and I
25 spanked her. And when I hit her, I didn't realize how

SHARON HAZLEWOOD, CSR       972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

40

1  hard I hit her, and I ended up hitting her on her arm,
2  and her arm got broken.
3      Q.  And how old was NiQuia at that time?
4      A.  Oh, gosh.  Um, she was about six, seven years
5  old.
6      Q.  And did the Arkansas version of CPS get
7  involved?
8      A.  Yes.
9      Q.  And were you actually filed upon -- was a
10  criminal case filed upon you?
11      A.  Yes.
12      Q.  Do you remember what the charge was?
13      A.  I'm not sure exactly how it was worded, but I
14  know it was assault to a minor child or something like
15  that.
16      Q.  And did you have to go to court over that?
17      A.  Yes.
18      Q.  And what happened?
19      A.  Um, they gave me probation, and I was on
20  probation for a couple of years.
21          And then because I was doing everything that I
22  was supposed to do regarding my probation, I end up
23  getting off of probation for that.
24      Q.  And was that there in Hope?
25      A.  Yes.
          SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

41

1      Q.  Did you continue drinking?
2      A.  Somewhat.  Sometimes.
3      Q.  Now, Ms. Kelly, were there periods of -- of
4  times in your life when there were drugs involved?
5      A.  Sometimes.
6      Q.  And when would that be?
7      A.  Um, I don't remember dates or whatever, but I
8  experimented every now and then.
9      Q.  What type of drugs were you experimenting
10  with?
11      A.  Marijuana.  I tried crack once, and that was
12  it.  I didn't do that anymore.
13      Q.  Okay.  Now, where were you living -- well, let
14  me back up.
15          You were -- you were in Hope when this
16  incident with NiQuia occurred.
17      A.  Yes.
18      Q.  And I understand that that was at Clara's
19  house.  You were actually at Clara's when that event
20  happened.
21      A.  Yes.
22      Q.  And following your arrest and going to court
23  and everything, where did you -- where did you live
24  while you were on probation?
25      A.  With my mother.
          SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

42

1      Q.  At Miss Eason's house?
2      A.  Yes.
3      Q.  And where was James?
4      A.  He was there with my mom -- at my mom's.
5      Q.  Okay.  And how old was he at that time?
6      A.  I don't know.  Three or four.  That was ...
7      Q.  Three or four?
8      A.  Maybe three or four, five.  Somewhere.  I
9  don't know.
10      Q.  And where was -- where was Aaron?
11      A.  He was there.
12      Q.  How long did you stay there in Hope before you
13  moved again?
14      A.  About a year and-a-half.
15      Q.  And where did you move to?
16      A.  Texarkana.
17      Q.  And what did you do once you moved to
18  Texarkana?
19      A.  I went to work for a temp agency with Kelly
20  Services and worked for different companies through
21  them.  And then I eventually got a job at JC Penny.
22      Q.  Let me ask you, when the CPS had gotten
23  involved, or the Arkansas version of CPS had gotten
24  involved, they did their investigation, a criminal case
25  was filed, and it's my understanding that NiQuia and
          SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

43

1  Kerrin's father came from Michigan and got them?
2      A.  Yes.
3      Q.  And they went back up to live with him in
4  Michigan.
5      A.  Yes.
6      Q.  Now, did you have an occasion to meet a man by
7  the name of Richard Wimbley?
8      A.  Yes.
9      Q.  When did you meet Mr. Wimbley, approximately?
10      A.  Somewhere around '98, 99.  Somewhere around in
11  there.
12      Q.  Around where were -- how did you meet him?
13  What did he do?
14      A.  He was a truck driver.  I met him through
15  his -- his sister and I were friends, and I met him
16  through his sister.
17      Q.  All right.  And did you subsequently become
18  involved in a relationship with Mr. Wimbley?
19      A.  Yes.
20      Q.  Were y'all ever formally married.
21      A.  No.
22      Q.  How long were you together with Mr. Wimbley?
23      A.  Approximately six years.
24      Q.  Now, where were y'all living when you got with
25  Mr. Wimbley?
          SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

44

46

1    A.    In Texarkana.
2    Q.    Let me ask if you were still living there in
3  Texarkana with Mr. Wimbley in 2001?
4    A.    Yes.
5    Q.    And did you have some further problems with
6  the law around that period of time?
7    A.    Yes.
8    Q.    Were there issues with some bad checks?
9    A.    Yes, I had written some checks previously, and
10  I was paying them off and I ended up being on probation
11  for that.  And some kind of way I ended up missing a
12  couple of payments and I was arrested and I ended up
13  going to prison.
14    Q.    And when did you go to prison?
15    A.    In February of 2001.
16    Q.    And where were you imprisoned at?
17    A.    Newport, Arkansas.
18    Q.    How long were you actually in the -- in the
19  penitentiary there?
20    A.    Six months.
21    Q.    How old was James at this time?
22    A.    James was 12, 13.
23    Q.    Now, you had been living with Mr. Wimbley --
24  is that correct? -- when all of these hot checks and
25  everything came out?

1  ex-husband Russell.
2    Q.    Well, he's coming up.  We haven't gotten to
3  him yet.
4    A.    Right.
5    Q.    How about James Broadnax, III?
6    A.    James, yes.
7    Q.    Okay.  So is this something that unfortunately
8  happened to you many times during your relationships
9  with men --
10    A.    Yes.
11    Q.    -- as James was growing up?
12    A.    Yes.
13    Q.    And he would be witness to this?
14    A.    Sometimes.
15    Q.    Now, you were indicating with Mr. Wimbley that
16  James would try to intercede.  Of course, he was 12
17  years old at that time, 13?
18    A.    Yes.
19    Q.    And you tried to tell him not to intercede so
20  he wouldn't --
21    A.    Yes, I would take him and we would leave, or
22  I'd send him somewhere and then I'd leave later.
23    Q.    Now, did there come -- well, you've told us
24  about how in 2001, while you were in this relationship
25  with Mr. Wimbley, you were sent to the penitentiary for

45

1    A.    No, I had written the checks before I met him.
2    Q.    Okay.
3    A.    But when the issue came up with me being on
4  probation, yes, I was with him.
5    Q.    And how was Mr. Wimbley as a partner?
6    A.    He was okay for awhile, and then he became
7  abusive and -- verbally and physically.
8    Q.    To you?
9    A.    Yes.
10    Q.    And would this be in the presence of James?
11    A.    Sometimes.
12    Q.    And how bad did that get?
13    A.    It had gotten so bad, gotten to a point that
14  James would try to intervene, and I wouldn't let him do
15  whatever because I didn't want him to get hurt.
16    Q.    So there were -- did this happen on one
17  occasion or more than once?
18    A.    More than one.
19    Q.    How many times, do you think?
20    A.    I don't know.  Three, four, maybe.
21    Q.    Now, is this the first man in your life that
22  had been physically abusive to you?
23    A.    No.
24    Q.    Who before this had been?
25    A.    James Martin, my first husband.  And then my

47

1  a six-month period of time?
2    A.    Yes.
3    Q.    Where was James while you were in the
4  penitentiary?
5    A.    He was with my mother.
6    Q.    Back in Hope?
7    A.    Yes.
8    Q.    With Betty.
9    A.    Yes.
10    Q.    And once you got out of the penitentiary,
11  where did you go?
12    A.    I went back to Hope.
13    Q.    Where was Mr. Wimbley?
14    A.    As far as I knew, he was in Texarkana.  I
15  don't know for sure.
16    Q.    Okay.  When you got out of the penitentiary,
17  you said that James was about 12 or 13 when you went
18  into the penitentiary.  When you got out of the
19  penitentiary, did you notice any changes in James?
20    A.    Just -- yeah, some.  He was not as happy as he
21  was, you know, because he was always happy-go-lucky
22  because of -- you know, the changes, I think, were
23  just -- were because of the things that were going on,
24  and with me being gone, you know, and everything.
25    Q.    What other things were going on with him that

48

50

1  you were aware of while you leave were at the penitentiary?

2      A.   He had to leave my mother's house to go stay

3  with my sister Teresa for a little while because of the

4  situations with my mother.  She wouldn't --

5      Q.   Explain that to us.

6      A.   -- treat him like everybody else because

7  basically, I guess, he was different, so-to-speak, you

8  know, so ...

9      Q.   Because he was half white?

10     A.   Yes.

11     Q.   And did your mother have a problem with that?

12     A.   Yes.

13     Q.   And how would she express that?

14     A.   Just in her attitude toward him, toward me

15  and, I mean, just different -- in different ways.  She

16  would say she didn't like that because everybody should

17  be, you know, with their own, and this and that, and,

18  you know, just the way that people were.

19     Q.   Was that something that you've heard her

20  express on one occasion or more than one occasion?

21     A.   More than one.

22     Q.   Would she tell James that?

23     A.   Sometimes.

24     Q.   On one occasion or more than once?

25     A.   More than once.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1      Q.   Okay.  When you got -- when you got out of the

2  penitentiary, you said that James was not as carefree,

3  I guess?  Or how would you -- how would you describe

4  the difference once you got out from when you went in?

5      A.   James was always -- just always happy.  I

6  mean, he was happy when I got home and everything.  I

7  guess maybe it was just because of me -- him seeing me.

8  But I noticed a lot of times he would, you know, just

9  get off to himself and he would just sit there, you

10  know.

11          And I'd ask him, Well, baby, what's on your

12  mind, you know.  And he'd say, Well, mama, just, you

13  know, just too much is going on and I don't like the

14  way people treat us and, you know, stuff like that.

15          So I guess it was just things like that that

16  would always bother him.

17     Q.   You had indicated that when you left to go to

18  the penitentiary, James was with Betty Eason.

19     A.   Yes.

20     Q.   And at some point while you were in the

21  penitentiary, he had gone to live with Teresa, your

22  sister.

23     A.   Yes.

24     Q.   When you got out of the penitentiary, did you

25  get back with James?

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

49

1      Q.   So did she make it pretty plain that she

2  didn't like James being around?

3      A.   Not the fact that she didn't like him being

4  around, she just didn't like the way he was, basically.

5      Q.   Did she ever say in particular anything about

6  his green eyes?

7          MR. ALEX:  Judge, we're going to object to

8  any particular statements as being hearsay.

9          THE COURT:  Response?

10         MR. LOLLAR:  I'll go on.

11         THE COURT:  All right.  Sustained.

12     Q.   (BY MR. LOLLAR:)  Now, at the period of time

13  when you were in the penitentiary, did James ever come

14  see you?

15     A.   No.

16     Q.   Did he write you, or did anybody in the family

17  write you there in the penitentiary?

18     A.   My mother did.

19     Q.   And did you write them?

20     A.   Yes.

21     Q.   And did you ask that James be brought to see

22  you?

23     A.   Yes.

24     Q.   And they never did that.

25     A.   No.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

51

1      A.   Yes.

2      Q.   And where did you go to?

3      A.   We went back to Texarkana.

4      Q.   And was Mr. Wimbley still in the picture at

5  that time?

6      A.   No.

7      Q.   Let me ask you what had occurred with regard

8  to Mr. Wimbley and how he got out of the picture?

9      A.   While I was in the county --

10     Q.   County jail?

11     A.   Yes.  In the county jail in Hempstead County

12  down in Hope waiting to be sent to Newport, he -- there

13  was an incident.  He attempted to molest my daughter.

14     Q.   Which daughter?

15     A.   NiQuia.

16     Q.   Had she come back from Michigan?

17     A.   Yes.

18     Q.   And how did it occur that she came back from

19  Michigan?

20     A.   Um, she wanted to come live with me.  Um, so

21  she came down to Texarkana.

22     Q.   And moved into the apartment where y'all were

23  living at that time?

24     A.   Yes.

25     Q.   And was Mr. Wimbley subsequently prosecuted

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

52

54

1   for sexual assault of NiQuia?
2       A.   Yes.
3       Q.   Was he actually sent to the penitentiary?
4       A.   Yes.
5       Q.   And what year would this be?
6       A.   This was in 2001.
7       Q.   And is he still in the penitentiary?
8       A.   No.
9       Q.   When did he get out?
10      A.   I'm not sure, but it was sometime within the
11  last couple of months.
12      Q.   Within the last couple of months?
13      A.   Of this year, yes.
14      Q.   So that was roughly for nine years?  Seven
15  years, I'm sorry?
16      A.   To my knowledge.  I mean, because -- yeah.
17      Q.   All right.  So that took him out of the
18  picture after he had molested NiQuia; is that correct?
19      A.   He didn't actually molest her.  He was ...
20      Q.   Tried to?
21      A.   Yes.
22      Q.   Okay.  To the degree where he got sent off to
23  the penitentiary for at least a seven-year sentence.
24      A.   Yes.
25      Q.   And when you got out of the penitentiary

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1       A.   That was in '90.
2       Q.   Could it have been in 2003?
3       A.   End of 2002, beginning of 2000 -- I'm not
4   sure.
5       Q.   But after you left Pinehurst Village there in
6   Texarkana, you moved to Dallas.
7       A.   Yes.
8       Q.   And what was the purpose of you moving to
9   Dallas?
10      A.   To start over.  Make a new start.
11      Q.   And did you come alone?
12      A.   No, James came with me.
13      Q.   And where did y'all move to once you got here
14  in Dallas?
15      A.   Went to -- I have a sister.  I went to live
16  with her until I found --
17      Q.   And what is her name?
18      A.   Raleshia Cummings.
19      Q.   Rolesha?
20      A.   Yes.
21      Q.   R-O-L-E-S-H-I-A?
22      A.   R-E -- R-A-L-E-S-H-I-A.
23      Q.   Now, is she the mother of Demarius Cummings?
24      A.   Yes.
25      Q.   And where was she living when y'all came to

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

53

55

1   yourself, you've indicated you moved back to Texarkana?
2       A.   Yes.
3       Q.   And where did you live at that point?
4       A.   In Pinehurst Village.
5       Q.   And what is Pinehurst Village?
6       A.   It's a housing complex in Texarkana.
7       Q.   A housing project?
8       A.   Yes.
9       Q.   And who was living there with you?
10      A.   James.
11      Q.   Anybody else?
12      A.   No.
13      Q.   Okay.  So you got James back from Teresa at
14  that point; is that correct?
15      A.   Yes.
16      Q.   Now, how long did y'all live there in the
17  projects in Texarkana?
18      A.   A few months.  Pretty close to a year.
19      Q.   And this was when James was still, what, 13,
20  somewhere along that age?
21      A.   Somewhere around there.
22      Q.   Did there come a point in time when you moved
23  again?
24      A.   Moved to Dallas.
25      Q.   And when did you move to Dallas?

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1   live with her?
2       A.   She was living in some apartments off of Harry
3   Hines.
4       Q.   Off of Harry Hines?
5       A.   Yes.
6       Q.   Here in the City of Dallas?
7       A.   Yes.
8       Q.   How long did you stay with Raleshia?
9       A.   Probably about six months, give or take.
10      Q.   All right.  Were you able to find employment
11  here in Dallas?
12      A.   Yes.
13      Q.   And where did you work?
14      A.   I worked through a temp agency with a company
15  called Selectron.
16      Q.   And how did that pan out?
17      A.   They ended up shutting down, the company did.
18  Selectron.
19      Q.   The company shut down?
20      A.   Yes.
21      Q.   Now, when that happened, did you decide to
22  move again?
23      A.   Yes.
24      Q.   And where did you move to this time?
25      A.   San Antonio.

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

56

1    Q.   And what was the purpose of going to San
2    Antonio?
3    A.   I had met someone and I went up there to stay
4    there briefly.
5    Q.   And did James go with you?
6    A.   Yes.
7    Q.   And how old is James now in the year 2003?
8    A.   15. 14, 15.
9    Q.   Okay. And how long did you end up staying in
10   San Antonio?
11   A.   Only a couple of months.
12   Q.   And where did you move after that?
13   A.   I moved back to Texarkana.
14   Q.   Now, so that the -- so that the jury
15   understands, when you're moving around all these
16   places, you're taking James with you; is that correct?
17   A.   Yes.
18   Q.   And did that impact his schoolwork?
19   A.   Yes.
20   Q.   Would it be fair to say that you frequently
21   moved him in the middle of a semester?
22   A.   Sometimes.
23   Q.   And I know we haven't gotten to it yet. We're
24   going to get to Mount Vernon. And I see you moved him
25   out of Mount Vernon in April of a year, right before

58

1    A.   That was in June of -- June of '04, I believe
2    it was.
3    Q.   And did James come with you?
4    A.   Yes.
5    Q.   And James is what now, about 15, 16 at this
6    point?
7    A.   Yes.
8    Q.   Now, you said that Russell Kelly was a truck
9    driver. What, would that be a long-distance truck
10   driver?
11   A.   Yes.
12   Q.   And you remember when you got married to
13   Mr. Kelly?
14   A.   We married in June of '04.
15   Q.   And would you go with him on his trucking
16   runs?
17   A.   Sometimes.
18   Q.   And while you were gone, where would James be?
19   A.   He was with my sister.
20   Q.   Which sister?
21   A.   Raleshia.
22   Q.   Okay. Were y'all actually living with them or
23   did y'all have a separate place from them?
24   A.   At first we were, and then we ended up getting
25   our own place.

57

1    the school term ended, so he wouldn't have been able to
2    complete his schoolwork for those terms. Is that
3    something that you understand kind of disrupted his
4    ability to -- to -- well, to do a lot of things: To
5    get to know his teachers, to get to know his
6    classmates, to get to -- to excel in school?
7    A.   Yes.
8    Q.   Now, you indicated to us that you moved back
9    to Texarkana from San Antonio.
10   A.   Yes.
11   Q.   After having been down there a couple of
12   months.
13   A.   Yes.
14   Q.   And how long did you stay there in Texarkana?
15   A.   Not very long. Probably about a few months,
16   because I left in '04.
17   Q.   And where did you move to in '04?
18   A.   Back to Dallas.
19   Q.   And what was your purpose in coming to Dallas?
20   A.   Um, I got married. Um, after I got to Dallas,
21   um, and my husband, Russell Kelly, he was a truck
22   driver, and he was driving over the road and we came
23   here to find a -- find a place and everything.
24   Q.   And do you recall when you moved back to
25   Dallas?

59

1    Q.   And where was Raleshia living at that time?
2    A.   She was living in Garland.
3    Q.   Pardon me?
4    A.   In Garland.
5    Q.   And where at in Garland?
6    A.   I'm not sure of the address where she was.
7    Q.   Was it an apartment complex?
8    A.   It was a house.
9    Q.   A house?
10   A.   Yes.
11   Q.   Okay. And did you also at that point in time
12   learn how to drive a truck yourself?
13   A.   About a year later, I did.
14   Q.   Okay. So how long was it that y'all were
15   staying in Garland when you would be with Mr. Kelly and
16   occasionally on the road with him?
17   A.   About three or four months we were there.
18   Q.   Okay. And James was how old at this point?
19   A.   15, 16.
20   Q.   Now, I want to ask you, how is your
21   relationship with Mr. Kelly?
22   A.   It's not. We're no longer together. He was
23   violent. Verbally abusive.
24   Q.   Was he physically abusive?
25   A.   Yes.

60

1   Q.  To you?
2   A.  Yes.
3   Q.  On one occasion or more than one occasion?
4   A.  On more than one.
5   Q.  Did James see this?
6   A.  Yes.
7   Q.  And what would James, who is now about 16?
8   A.  Yes.
9   Q.  What would James do when he would see and
10  observe Mr. Kelly being physically abusive to you?
11      A.  At that time, he didn't actually see the
12  abuse, but -- other than -- other than the bruises that
13  I had, and he would cry and say, Mama, why don't you
14  just leave him and, you know, just don't be with him
15  because you don't need him.  You don't need that, you
16  know.  He just didn't like to see me like that going
17  through those things.
18      Q.  So how was the relationship with Russell Kelly
19  and James?
20      A.  It wasn't good after that.
21      Q.  Okay.  So these bruises that would be left on
22  you that James would see, how many times did he see
23  those bruises?
24      A.  Several.  Several times.  I'm not sure how
25  many, but, you know, it was several.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

61

1   Q.  So as a result of that, James didn't like
2   Russell.
3   A.  Right.
4   Q.  And wanted you to get away from him.
5   A.  Yes.
6   Q.  Now, but y'all would still, together, go off
7   on the road; is that correct?
8   A.  Yes.  That was off and on.  We would separate
9   for awhile and eventually get back together and try to
10  make it work, make the relationship work.  And it just
11  wasn't working.
12  Q.  And was James living there in that environment
13  during that period of time?
14  A.  Yes.
15  Q.  Now, when you met Mr. Kelly, did you come to
16  learn that he had had a drug problem?
17  A.  Yes.
18  Q.  And what else did you learn about Mr. Kelly's
19  past history?
20  A.  Um, he had been incarcerated.  He did federal
21  time for some drug trafficking in Tennessee.
22  Q.  Did he have children of his own?
    A.  Yes, four.
    Q.  How many children did he have prior to the
25  time y'all got married?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

62

1   A.  Four.
2   Q.  And did you come to learn that at one point,
3   his daughter murdered his son?
4       MR. ALEX:  Judge, I'm sorry.  I'm going to
5   have to object to relevance and hearsay, unless she's
6   got personal knowledge of this.
7       THE COURT:  Response?
8   Q.  (BY MR. LOLLAR:)  Well, was that a factor
9   which -- which came to play --
10      MR. ALEX:  Judge, I think you're asking
11  for a response to the Court, not another question.
12      THE COURT:  Right.  Response to the
13  objection?
14      MR. LOLLAR:  I'll withdraw that, Judge.
15      THE COURT:  Thank you.
16      Sustained.
17  Q.  (BY MR. LOLLAR:)  Was that a situation that
18  James became aware of?  Did they talk about it?
19      MR. ALEX:  Judge, again, it's based on
20  hearsay and it's the same objection you just sustained.
21      THE COURT:  Sustained.
22      MR. LOLLAR:  Well, if we could approach?
23      THE COURT:  All right.
24      (Off-the-record discussion was had.)
25      THE COURT:  The following testimony is not

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

63

1   for the truth of the matter asserted.  That means it's
2   not to say that these things actually happened or did
3   not happen.  It's simply to -- it is the defense's
4   position that this explains certain behavior that the
5   defendant engaged in; is that correct, Mr. Lollar?
6       MR. LOLLAR:  Yes, Your Honor.
7       THE COURT:  All right.
8       MR. ALEX:  Judge, may I take the witness
9   on voir dire just briefly?
10      THE COURT:  You may.
11      Well, I'll tell you what, though.  I need
12  a break.
13      All rise for the jury.
14      We're in recess.
15      (Recess taken.)
16      (Court reconvened; Jury present.)
17      THE COURT:  Be seated, please.
18      Mr. Alex, you were taking the witness on
19  voir dire.
20      MR. ALEX:  Yes, sir.
21
22
23
24
25

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**66**

1    A.  Yes.

2    Q.  And as a result of him going back to using

3  drugs, -- and what was his drug of choice?

4    A.  **Crack cocaine.**

5    Q.  Okay.  Did you-all separate?

6    A.  Yes.

7    Q.  And where did you go to when you separated

8  from Mr. Kelly at that point?

9    A.  **At that particular time, I went to Mount**

10 **Vernon, Texas, and I believe he went back to Memphis.**

11   Q.  Mr. Kelly went back to Memphis.

12   A.  Yes.

13   Q.  Did James go with you to Mt. Vernon?

14   A.  Yes.

15   Q.  Would this have been in about August of 2004?

16   A.  Yes.

17   Q.  And how old would James be at that time?

18   A.  **James was right about 16.**

19   Q.  Okay.  Now, Miss Kelly, when you would move to

20 these various locations, would James be enrolled in

21 schools there?

22   A.  Yes.

23   Q.  And is it accurate to say that he would not

24 always be at his grade level because of all the time

25 he'd missed previously in the different schools he'd

---

**66** (top right original)

**AUDREY KELLY**

1

2  was re-called as a witness and testified as follows:

3        **VOIR DIRE EXAMINATION**

4  BY MR. ALEX:

      Q.  Ms. Kelly, there was a question asked of you

6  about Mr. Kelly and the defendant having conversations.

7  You recall that?

8        I think the last question that Mr. Lollar

9  asked you had to do with a conversation between

10 Mr. Kelly and the defendant, the defendant being your

11 son, about Mr. Kelly's troubles as far as some -- a

12 murder, was it?

13   A.  **(No response.)**

14   Q.  Was that it?  Was it murder?  Regarding some

15 murder?

16       Do you recall that question?

17   A.  Yes.

18   Q.  Okay.  Was this a conversation that took place

19 in front of you or something that the defendant told

20 you about?

21   A.  **It was in front of me.**

22       MR. ALEX:  Okay.  That's all I've got,

23 Judge.

24       THE COURT:  You may proceed, sir.

25

---

**65**

**DIRECT EXAMINATION - CONTINUING**

2  BY MR. LOLLAR:

3    Q.  Ms. Kelly, let me back up for just a second.

4  I wanted to ask you, you told us about Richard Wimbley

5  and the relationship between you and him, and James was

6  there and observed this relationship.

7        Was there a particular time when Mr. Wimbley

8  threw you down some stairs?

9    A.  **Threw you down some stairs?**

10   Q.  Yes, ma'am.

11   A.  **No.  He attempted to, but he didn't.**

12   Q.  Did he throw James down some stairs?

13   A.  **No.**

14   Q.  Okay.  All right.  Let me get back to where we

15 were.

16       You had indicated that Mr. Kelly and you were

17 together and James was with you, and you had indicated

18 to us how Mr. Russell had, to your knowledge,

19 previously been involved in drugs.  Did he go back to

20 using drugs?

21   A.  Yes.

22   Q.  And about when did that happen?

23   A.  **Right about a couple of months after we were**

24 **married, and this was in '04.**

25   Q.  And was James with you at that point?

---

**67**

1  gone to?

2    A.  Yes.

3    Q.  So he would be older than the classmates he

4  would be with?

5    A.  Yes.

6    Q.  And did he have to repeat certain years

7  because he had missed out on so much time in a

8  particular school district?

9    A.  **He could have repeated the years, or he could**

10 **have gone to summer school to make up --**

11   Q.  Okay.

12   A.  -- the credits.

13   Q.  When you moved to Mt. Vernon, do you remember

14 what class or what year he should have been in?

15   A.  **At that particular time, he should have**

16 **been -- what was it?  Junior, I believe it was.**

17 **Eleventh grade.**

18   Q.  And what class did he actually go into?

19   A.  **He was -- I think they had him on the ninth**

20 **grade level, I think.**

21   Q.  When you moved to Mount Vernon, did you move

22 there to somebody, to move with somebody?

23   A.  **When we first went, James and I was with my**

24 **sister Teresa.**

25   Q.  And how long had she been living there in

68

Mt. Vernon?

2   A.   Right about two years.

3   Q.   All right.

4   A.   Maybe.

5   Q.   How long did you stay with Teresa?

6   A.   Um, just a couple of months. Once I got a job, --

8   Q.   Uh-huh.

9   A.   -- I ended up getting an apartment.

10  Q.   And you did find employment there?

11  A.   Yes.

12  Q.   And did you get your own apartment after that?

13  A.   Yes.

14  Q.   And did James live with you in the apartment?

15  A.   Yes.

16  Q.   Anybody else?

17  A.   Um, it was just me and James at first, and then Russell came back.

19  Q.   Okay. And did Russell again live with you-all there in Mt. Vernon for awhile?

21  A.   Yes.

22  Q.   How long did y'all stay there in Mt. Vernon?

23  A.   Probably about seven months. Give or take.

24  Q.   And did you have occasion to move again?

25  A.   Yes.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

69

1   Q.   And where did you move to?

2   A.   Fort Worth.

3   Q.   And what was your purpose in going to Fort Worth?

5   A.   Russell had gotten a job with another company. He was still driving over the road, long distance, and we moved to Fort Worth to be closer to where his job was.

9   Q.   And did James come with you to Fort Worth?

10  A.   Yes.

11  Q.   Where did y'all live in Fort Worth?

12  A.   Oh, I don't remember that address. It was close to downtown.

14  Q.   All right. How long did y'all stay in Fort Worth?

16  A.   A few months.

17  Q.   And what happened there?

18  A.   Russell and I ended up separating again. And we -- James and I moved.

20  Q.   And where did you move to?

21  A.   We moved to Texarkana.

22  Q.   Okay. You and James?

A.   James, yes.

Q.   All right. And did James subsequently go to live with your mother again?

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

70

1   A.   Briefly.

2   Q.   And how long was he with Betty?

3   A.   I believe he was there a few months, and then he ended up moving out on his own.

5   Q.   Okay. There in Hope?

6   A.   Yes.

7   Q.   And where did you move? Did you move back to Hope from Texarkana?

9   A.   Let's see, I went from Fort Worth back to Texarkana. I stayed in Texarkana for awhile, and I believe at that time I came back to Dallas briefly. And then I ended up going to truck driving school, and that's when I went and got my CDL.

14  Q.   And where did you get your truck driving degree?

16  A.   From Swift in Memphis.

17  Q.   In Memphis?

18  A.   Yes.

19  Q.   And what year would that have been?

20  A.   That was in '06.

21  Q.   '06?

22  A.   Yes.

23  Q.   And when you had moved to Nashville, did you get back with Russell?

25  A.   Yes.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

71

1   Q.   And how long did you stay there in Nashville with Russell?

3   A.   With him, we stayed there about a couple of months.

5   Q.   Okay. Now, this was an on-again, off-again relationship with Mr. Kelly?

7   A.   Yes.

8   Q.   Did he continue to be abusive to you?

9   A.   Yes.

10  Q.   And then you would separate again?

11  A.   Yes.

12  Q.   And was James aware of this?

13  A.   Yes.

14  Q.   Where was James when you were in Nashville?

15  A.   When I went to Nashville, James was in Dallas.

16  Q.   The whole time?

17  A.   No.

18  Q.   How did he get back to Dallas?

19  A.   He -- I believe he caught a bus.

20  Q.   Okay. And who did he stay with in Dallas?

21  A.   My aunt.

22  Q.   Which aunt?

23  A.   Alice.

24  Q.   Alice who?

25  A.   Gatewood.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

74

1    Q.  Would that be Alice Gatewood?

2    A.  Yes.

3    Q.  And where did Alice live?

4    A.  She lived in some apartments over in South

Dallas.

6    Q.  Was that the Junction --

7    A.  Yes.

8    Q.  -- Apartments?  Does that sound right?

9    A.  Yes.

10    Q.  And is that basically a housing project in

11   South Dallas?

12    A.  It's not a housing project, it's just

13   apartments.

14    Q.  An apartment complex?

15    A.  Yes.

16    Q.  Okay.  And how long did he stay in Dallas at

17   that point?

18    A.  Me?

19    Q.  He.

20    A.  It wasn't very -- when he got to Dallas, let's

21   see.  Couple of months, I guess.  I don't know.

22    Q.  And then where did he move to?

23    A.  He went to --

24        MR. ALEX:  Judge, again, I'm going to

25   object unless there's some predicate laid, that this is

SHARON HAZLEWOOD, CSR        972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

73

1    based on personal knowledge and not by statements of

2    the defendant.  There's no predicate been laid to that.

3    Q.  (BY MR. LOLLAR:)  Well, would you see him at

4    the place that he would move to?

5    A.  Say again?

6    Q.  Yes.  Would you -- you know he didn't stay in

7    Dallas, that he moved at some point.

8    A.  Yes.

9    Q.  And would you see him at the location that he

10   moved to?

11    A.  Where he moved to?

12    Q.  Right.

13    A.  No.

14    Q.  Okay.  Where is the next time that you knew

15   that he was living, where was he living?

16    A.  He went to -- I know he was in Georgia for

17   awhile, but that was before he came to Dallas.

18    Q.  Okay.  Why did he go to Georgia?

19    A.  Because I was in Georgia.

20    Q.  Okay.  How did you come to be in Georgia?

21    A.  I was driving for J.B. Hunt at the time, and I

22   had some issues with the company, and when I got to

23   Georgia, that's where I turned my truck in, and so I

24   stayed there.

25        My daughter NiQuia and Kerrin, both, they were

SHARON HAZLEWOOD, CSR        972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

75

1    living in Georgia at the time.

2    Q.  Where were they living in Georgia?

3    A.  In Marietta.

4    Q.  And that's circled on the map up there on

5    Georgia; is that correct?

6    A.  Yes.

7    Q.  And did you stay with them for awhile?

8    A.  Yes.

9    Q.  And did James come to join you there in

10   Georgia?

11    A.  Yes.

12    Q.  How would you -- how would he get there?

13    A.  He came on the bus.

14    Q.  And how would he have the money to buy a

15   ticket for the bus?

16    A.  I sent him money.

17    Q.  You would wire him money?

18    A.  Yes.

19    Q.  How would you do that?

20    A.  Through MoneyGram.

21    Q.  MoneyGram?

22    A.  Yes.

23    Q.  And do you remember when that was that James

24   came to stay with you in Marietta, Georgia?

25    A.  Let's see, this was some in -- somewhere

SHARON HAZLEWOOD, CSR        972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

75

1    around '08.

2    Q.  And how long did you stay there in Georgia?

3    A.  I stayed there about five or six months.  I

4    worked at a convenience store there, and that's where I

5    was until I went back over the road.

6    Q.  So you went back to truck driving from

7    Georgia.

8    A.  Yes.

9    Q.  And how long during that period of time was

10   James with you there in Georgia?

11    A.  He was there with me up until I left, and when

12   I left, he was still there.

13    Q.  Okay.  How many months was he there of the six

14   months that you were there?

15    A.  Probably about four.

16    Q.  Now, did NiQuia or Kerrin have children?

17    A.  They both.  Kerrin has two; NiQuia has one.

18    Q.  And what was the relationship there.  Were you

19   living with all of them together?

20    A.  No.  NiQuia and her husband and her son, we

21   were with them.

22    Q.  Okay.

23    A.  And Kerrin and her husband had their own

24   apartment.

25    Q.  Okay.  Now, when you left to go back out on

SHARON HAZLEWOOD, CSR        972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1  the road, did you leave James there in Marietta,
2  Georgia?
3     **A.  Yes.**
4     Q.  And what was he doing while he was there?
5     **A.  When I left, as far as I know, he was there.**
6  **You know, my daughters worked --**
7         MR. ALEX:  Again, Judge, I'm sorry.  I'm
8  going to object.  There is no -- there's a lack of
9  personal knowledge here.  She just said she was not
10  there.  It would all be based on hearsay.
11     Q.  (BY MR. LOLLAR:)  When she -- when you left,
12  what was he doing when you left?
13         THE COURT:  Overruled at this point.
14         MR. ALEX:  Okay.
15         THE COURT:  If you know.  If you don't
16  know, say you don't know.
17     **A.  When -- before I left?**
18     Q.  (BY MR. LOLLAR:)  Right.
19     **A.  Before I left, he would stay at home with**
20  **the -- the children.  He would babysit sometimes for my**
21  **daughters.**
22     Q.  Okay.  Do you know if there was an issue with
23  him finding a job because he didn't have any type of a
24  birth certificate from the State of California?
25     **A.  Yes, there was.**

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

77

1     Q.  And tell the jury about what that -- what that
2  issue was.
3     **A.  Being that he didn't have his birth**
4  **certificate, he couldn't get a state ID, because the**
5  **only ID that he had, he still had his school ID from**
6  **the school where he last attended.  And, um, in order**
7  **for them to hire him, he would have to have an ID or**
8  **something showing how old he was and stuff like that.**
9     Q.  And what was the difficulty in getting a -- an
10  original birth certificate, do you know?
11     **A.  There was an issue, something, different**
12  **paperwork that we had to do because he was born on a**
13  **military base.**
14     Q.  Okay.  All right, ma'am.
15         Now, when you left out of Marietta, Georgia,
16  about when was that?
17     **A.  I left Marietta in, oh, somewhere around -- I**
18  **believe it was maybe September or October.**
19     Q.  Of 2007?
20     **A.  Was that '07?  Somewhere around in there.**
21     Q.  Okay.  And when you went back on the road,
22  were you reunited with Russell?
23     **A.  Yes.**
24     Q.  Okay.  And y'all were back together for
25  awhile.

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

78

1     **A.  Briefly, yes.**
2     Q.  Okay.  Did there come a point in time when
3  James left Georgia?
4     **A.  Yes.  He left to go to Michigan to take**
5  **NiQuia's son to his father who was in Muskegon at the**
6  **time.**
7     Q.  All right.  Let me make sure I understand
8  that.  Had NiQuia and her husband split up?
9     **A.  Yes, they were separated.**
10     Q.  And he had moved back to Muskegon.
11     **A.  Yes.**
12     Q.  And did there come a point in time when
13  NiQuia -- well, I guess when he wanted NiQuia to come
14  live with him, -- no, not NiQuia.  What was the child's
15  name?
16     **A.  He wanted Treybeon.**
17     Q.  And how old was Treybeon?
18     **A.  Treybeon at the time was three, I believe.**
19     Q.  Okay.  And you indicated that James left
20  Marietta to take Treybeon to Treybeon's who was living
21  in Muskegon.
22     **A.  Yes.**
23     Q.  And what's the father's name?
24     **A.  Darnell Wynn.**
25     Q.  Okay.  Do you know approximately when that

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

79

1  was?
2     **A.  I'm not sure of the exact time, no.**
3     Q.  Okay.  Would it be accurate to say that James
4  was up in Michigan starting about the middle of January
5  2008, somewhere along that period of time?
6     **A.  Yes.**
7     Q.  And do you know how he got to Michigan with
8  Treybeon?
9     **A.  On a bus.**
10     Q.  Greyhound?
11     **A.  Yes.**
12     Q.  And you were aware of all that going on.
13     **A.  Yes.**
14     Q.  When he got to Michigan, do you know where he
15  was staying or what he was doing up there?
16         MR. ALEX:  Judge, again, I'll have to
17  object to hearsay.  The witness has already established
18  she was not there.
19     Q.  (BY MR. LOLLAR:)  If you know.
20         MR. ALEX:  She was not there and there's
21  been no predicate laid that she had personal knowledge
22  of it, and I do believe this will be offered for the
23  truth of the matter.
24         THE COURT:  Sustained.
25     Q.  (BY MR. LOLLAR:)  Did you go to visit him

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

80

1  there in Michigan?

2  A.  No.

3  Q.  Okay.  You were still out on the road with --

4  with Russell.

5  A.  At that time, I was driving solo.

6  Q.  Okay.  Did you ever talk to James on the phone

7  when he was there in Michigan?

8  A.  Yes.

9  Q.  On how many occasions?

10  A.  On several occasions.

11  Q.  And where would he be calling from physically?

12  Where was he?

13  A.  I don't know where he would call from.  He

14  would use different people's cell phones or house

15  phones to call me.

16  Q.  But he kept in contact with you.

17  A.  Yes.

18  Q.  Okay.  Now, did there come a point in time

19  when you came back to Dallas?

20  A.  Yes.

21  Q.  And when did you come to Dallas in 2008?

22  A.  That was -- I believe it was in April.

23  Q.  April of 2008?

24  A.  Of '08, yes.

25  Q.  And what was your purpose of coming to Dallas?

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

81

1  A.  Um, starting over again.  My husband Russell

2  and I had separated again.  I went there to find a job

3  and to get another place.

4  Q.  And who did you stay with when you moved back

5  to Dallas?

6  A.  My Aunt Alice.

7  Q.  And was that again in those Junction

8  Apartments?

9  A.  Yes.

10  Q.  And who all physically was living at those

11  apartments when you came down?

12  A.  When I first got there, it was my aunt, her

13  daughter, and her two sons.

14  Q.  Okay.  Did there come a point in time when you

15  wanted James to join you here in Dallas?

16  A.  Yes.

17  Q.  And where was he --

18  A.  He was still in Michigan.

19  Q.  Now, between the time he had first gone to

20  Michigan in January and the time that we're fixing to

21  talk about, had he ever left Muskegon, to your

22  knowledge?

23  A.  No.

24  Q.  And do you remember about when it was when --

25  well, did you want him to come join you in Dallas?

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

82

1  A.  When I first got to Dallas, um, I didn't send

2  for him right then because I didn't have my own place

3  and I had just started working, and I was trying to

4  save some money so I could get a place so he could

5  come.  So it was roughly about roughly about a month

6  and-a-half, maybe two months before he got there.

7  Q.  Okay.  So you wanted him to come join you.

8  A.  Yes.

9  Q.  And did he agree to do that?

10  A.  Yes.

11  Q.  And how was he going to get here?

12  A.  By bus.

13  Q.  Greyhound?

14  A.  Greyhound.

15  Q.  And how was he going to pay for it?

16  A.  I was going to send him the money.

17  Q.  And how did you send him the money?

18  A.  I sent it MoneyGram.

19       MR. LOLLAR:  May I approach the witness,

20  Your Honor?

21       THE COURT:  Yes.

22  Q.  (BY MR. LOLLAR:)  Okay.  And do you recall if

23  you sent him money by MoneyGram again?

24  A.  Yes.

25       THE COURT:  It should be 41.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

83

1       MR. LOLLAR:  Yes, sir.

2  Q.  (BY MR. LOLLAR:)  Ms. Kelly, let me show you

3  what I've marked here as Defendant's Exhibit 41 and 42,

4  and ask if you recognize what 41 is?

5  A.  Yes.  It's, I guess, a MoneyGram report.

6  Q.  Do these appear to be business records of

7  MoneyGram showing different moneygrams sent by you to

8  James Broadnax?

9  A.  Yes.

10  Q.  Okay.  And also refecting money sent by Kerrin

11  Martin.  Now, that's James's sister.

12  A.  Yes.

13  Q.  In Georgia; is that correct?

14  A.  Yes.

15       MR. LOLLAR:  We would offer Defendant's

16  41?

17       THE COURT:  Any objection?

18       MR. ALEX:  I have no objections,

19  Your Honor.

20       THE COURT:  For 41?

21       MR. ALEX:  For 41.

22       THE COURT:  Defense Exhibit 41 is

23  admitted.

24  Q.  (BY MR. LOLLAR:)  Miss Kelly, let me show you

25  and go through with you Defendant's Exhibit 41.  Do

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

84

1  these appear to be documents from MoneyGram
2  International?  Is that correct?
3      A.  Yes.
4      Q.  And we'll talk about the top line.  This is
actually a continuum that goes all the way across
through several pages.  Does this appear to be in
7  reference to the date of January the 25th of '08; is
8  that correct?
9      A.  Yes.
10      Q.  And does this reflect a sender by the name of
11  Kerrin Martin?
12      A.  Yes.
13      Q.  Is that correct?
14          And who is Kerrin Martin?
15      A.  She's my daughter.
16      Q.  And does that show her address as 735 Cobb
17  Parkway in Marietta, Georgia?
18      A.  Yes.
19      Q.  And does that show an amount sent of $61.46?
20  The top line there?
21      A.  Yes.  That was the total paid.
22      Q.  Okay.  And it was shown from a Wal-Mart
23  location.
24          MR. ALEX:  Judge, may I approach?
25      A.  Yes.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

86

1  for James on January the 25th of 2008, --
2      A.  Yes.
3      Q.  -- to Muskegon, Michigan; is that correct?
4      A.  Yes.
5      Q.  Now, do these records also show that on March
6  the 9th of 2008, that a person by the name of Audrey
7  Kelly, showing that same address in Marietta -- it says
8  Marietta, Texas -- sent a total of $86.46?
9      A.  Yes.
10      Q.  From a Wal-Mart in Midland, Texas?
11      A.  Yes.
12      Q.  Do you recall doing that?
13      A.  Yes.
14      Q.  And it shows a receive date of March the 10th
15  of 2008, to be received by James Broadnax, at a receive
16  location of a Wal-Mart in, Muskegon, Michigan; --
17      A.  Yes.
18      Q.  -- is that correct?
19      A.  Yes.
20      Q.  Now, how did it come to be that you were in
21  Midland?
22      A.  I was over the road at that time.
23      Q.  Okay.
24      A.  And I -- that's where I had to stop.  I always
25  find the nearest place where I could stop to send him

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

85

1          THE COURT:  The witness?
2          MR. ALEX:  I'd just like to see -- yeah --
3  what they're talking about.
4          THE COURT:  Yes, sir.
5      Q.  (BY MR. LOLLAR:)  And the same location state
6  was in Georgia?
7      A.  Yes.
8      Q.  And does that show that that shipment, that
9  MoneyGram was received on January the 25th of 2008?
10      A.  Yes.
11      Q.  At a particular time, 16:18:55?
12      A.  Yes.
13      Q.  Does that show the receiver being James
14  Broadnax.
15      A.  Yes.
16      Q.  At a Wal-Mart location.
17      A.  Yes.
18      Q.  In Muskegon, Michigan?
19      A.  Yes.
20      Q.  Okay.  And the test question for that was, Who
21  is Audrey.
22      A.  Yes.
23      Q.  Does that appear to be correct?
24      A.  Yes.
25      Q.  So it looks like Kerrin had sent some money up

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

87

1  money --
2      Q.  Okay.
3      A.  -- whenever I could.
4      Q.  And so that shows that that MoneyGram that you
5  sent was received on March the 10th of 2008.
6      A.  Yes.
7      Q.  All right.
8          MR. LOLLAR:  May I publish, Your Honor?
9          THE COURT:  Yes.
10      Q.  (BY MR. LOLLAR:)  Let me show you, ma'am,
11  what's been marked as Defendant's Exhibit 42, and do
12  these appear to be records of Greyhound?
13      A.  Yes.
14      Q.  And do these show various tickets and
15  assignment -- well, tickets in regard to James
16  Broadnax?  Let me see if I can find it here.  Yeah.
17      A.  Yes.
18      Q.  Okay.
19          MR. LOLLAR:  We would offer Defendant's
20  42.
21          THE COURT:  Any objection?
22          MR. ALEX:  We have no objections, Judge.
23          THE COURT:  42 is admitted.
24      Q.  (BY MR. LOLLAR:)  And let me show you, ma'am,
25  what has been introduced here as Defendant's 42.  Do

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

88

1  these appear to be business records of the Greyhound
2  Corporation?
3      A.  Yes.
4      Q.  And does it show a copy of a ticket issued for
James Broadnax?
6      A.  Yes.
7      Q.  On January the 17th of 2008.
8      A.  Yes.
9      Q.  From Marietta, Georgia.
10     A.  Yes.
11     Q.  To Louisville, Kentucky.  Does that appear to
12 be?
13     A.  Yes.
14     Q.  And the ticket origin is going to be Marietta,
15 Georgia.
16     A.  Yes.
17     Q.  And the ticket destination was Muskegon,
18 Michigan.
19     A.  Yes.
20     Q.  All right.  Now, would that be consistent with
21 the time you told the jury about the defendant
22 going with Treybeon to take him up to his father's
23 there in Muskegon, Michigan?
24     A.  Yes.
25     Q.  So it looks like the first, I guess, leg of

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

89

1  that journey would be from Marietta to Louisville.
2      A.  Yes.
3      Q.  Going on to Michigan.
4          And then let me show you again, here is
5  further continuation of that trip on January the 17th
6  of '08, again showing a ticket origin in Marietta,
7  going to Muskegon, Michigan.
8      A.  Yes.
9      Q.  Okay.  And here is the last leg, I think, from
10 Detroit to Muskegon on January the 18th of '08.
11     A.  Yes.
12     Q.  Correct?
13         Now, let me show you this.  Does this appear
14 to be a ticket on May the 1st of 2008 from Muskegon,
15 Michigan, to Grand Rapids, Michigan?
16     A.  Yes.
17     Q.  Okay.  And I'm showing you the next page.
18 Does that appear to be for a James Broadnax?
19     A.  Yes.
20     Q.  On May the 1st of 2008.
21     A.  Yes.
22     Q.  Origin, Muskegon, Michigan; destination,
Dallas, Texas?
24     A.  Yes.
25     Q.  So that was the trip where he took the bus

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

90

1  from Muskegon to Dallas.
2      A.  Yes.
3      Q.  Okay.  And do you recall that being
4  approximately correct?  I mean, those -- the dates are
5  right.  January the 17th going into the 18th is when he
6  left Marietta to go there?
7      A.  Yes.
8      Q.  To Michigan?  And then took the bus from
9  Michigan to Dallas on May the 1st.
10     A.  Yes.
11         MR. LOLLAR:  May we publish?
12         THE COURT:  Yes.
13     Q.  (BY MR. LOLLAR:)  Now, when James arrived with
14 you here in Dallas, you indicated to us that you were
15 living with your -- your aunt, Alice Gatewood.
16     A.  Yes.
17     Q.  And did James come to stay with you there?
18     A.  Yes.
19     Q.  Were you working, or did you go back out on
20 the road, or what was the situation then?
21     A.  At that time, I was working at Pilgrim's
22 Pride.
23     Q.  Okay.  How long did you work there at
24 Pilgrim's Pride?
25     A.  Only a couple of months.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

91

1      Q.  And then what did you do?
2      A.  I went back over the road.
3      Q.  Now, do you recall when you went back on the
4  road?
5      A.  That was in June.  June 16th.
6      Q.  June of 2008?
7      A.  Yes.
8      Q.  What date in particular?
9      A.  The 16th.
10     Q.  And how do you remember that it was June the
11 16th?
12     A.  I remember that because that's my oldest
13 daughter's birthday.
14     Q.  Okay.  So you just know that that's the day
15 that you went back out on the road.
16     A.  Yes.
17     Q.  And when you left Dallas, was James still
18 living with you there at Alice Gatewood's apartment at
19 the Junction Apartments?
20     A.  Yes.
21     Q.  Okay.  Now, let me ask you this, Audrey:  Have
22 you ever known James to be violent?
23     A.  No.
24     Q.  And tell me about that.  And during these
25 instances when your mother, Betty, would be the way she

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

92

1 was with James, did he ever get violent in response to
2 that?
3     A.   No.
4     Q.   Did he ever get violent in response to the
5 times you were living with Richard Wimbley and
6 Mr. Wimbley would physically abuse you?
7     A.   No.
8     Q.   Did he ever get violent when Russell Kelly
9 would abuse you?
10    A.   No.
11    Q.   Have you ever seen him do any kind of violent
12 act?
13    A.   No.
14    Q.   Okay.  What type of person did you think
15 Demarius Cummings was?
16    A.   Demarius, he was a -- he was a good person in
17 his own, you know, in his own right, but when he was
18 younger, he stayed in and out of trouble.
19          I wasn't around him a lot, but my sister and I
20 would always communicate, and every now and then he was
21 always into something whenever she would call me, and
22 we would talk about things like that.
23    Q.   Now, Ms. Kelly, this jury has got a decision
24 to make, you know.  You understand why you're here.
25    A.   Yes.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

93

1     Q.   I brought you to explain James' history, and
2 to do that, the jury has to understand your history.
3     A.   Yes.
4     Q.   Now, did you ever think that James would be
5 sitting in a courtroom like this?
6     A.   No.
7     Q.   Is there anything you'd like to tell the jury
8 about James that would be helpful for their
9 consideration?
10    A.   It's just that he's -- he's just -- he's
11 always been a good kid.  And it's not his fault that
12 he's gone through stuff that he's gone through in life.
13 But he's a good person, he really is.  And I'm not just
14 saying that because he's my son, but he is.
15          He's always one to make people laugh and he's
16 just always been a happy child, no matter what.
17    Q.   Ms. Kelly, thank you.
18          MR. LOLLAR:  I think I'll pass the
19 witness.
20          THE COURT:  Cross-examination?
21          MR. ALEX:  Yes, sir.
22                CROSS-EXAMINATION
23 BY MR. ALEX:
24    Q.   Ms. Kelly, my name is David Alex.  I have a
25 few questions for you.  If I'm not making any sense to

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

94

1 you or if you don't understand my questions, you let me
2 know.
3     A.   Yes.
4     Q.   Okay.  You okay?  You need a minute?
5     A.   I'm okay.
6     Q.   I think what you just told the jury was that
7 your son was a good kid, always wanted to make people
8 laugh and happy.  And that's the James Broadnax that
9 you knew; is that right?
10    A.   Yes.
11    Q.   And you gave him all the love and support you
12 could.
13    A.   Yes.
14    Q.   You taught him the difference between right
15 and wrong.
16    A.   Yes.
17    Q.   And he knows the difference between right and
18 wrong.
19    A.   Yes.
20    Q.   Okay.  There's no -- there's no reason for
21 this jury to believe that Mr. Broadnax is any kind of
22 way mentally retarded or anything like that, right?
23    A.   No.
24    Q.   Okay.  And he knows that if he does something
25 wrong, there are consequences; is that right?

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

95

1     A.   Yes.
2     Q.   Okay.  And -- and then throughout your life,
3 that's something that you instilled in him; is that
4 right?
5     A.   Yes.
6     Q.   Okay.  And I think what the jury heard on
7 direct examination was that you moved around quite a
8 bit, but in all that, did you always see to it that
9 James was well fed?
10    A.   Yes.
11    Q.   Did you see to it that he was well clothed?
12    A.   Yes.
13    Q.   And did you see to it that the people that you
14 left him with were people that you trusted?
15    A.   Yes.
16    Q.   All right.  Even if your trust at sometimes
17 may have been violated, you did the best you could; is
18 that right?
19    A.   Yes, I did.
20    Q.   All right.  And you would agree with me that
21 everybody is responsible for their own actions, right?
22    A.   Yes.
23    Q.   Okay.  And just like you will be held
24 accountable for your actions, and you have been, James
25 must be held accountable for his actions; is that

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

96

1  right?
2      A.  Yes.
3      Q.  Okay.  Now, let's talk a little bit about the
4  specifics.
5          Well, before we do that, have you yourself
6  ever abused James Broadnax, your son?
7      A.  No.
8      Q.  Have you ever beat him?
9      A.  No.
10     Q.  And, of course -- and let me just make a
11  distinction there.  There's old-fashioned whoopings
12  that parents will give the kids when they're out of
13  line.  Have you ever done that?
14     A.  No.
15     Q.  You've never even given an old-fashioned
16  whooping?
17     A.  I've disciplined him, yes.
18     Q.  Okay.  And would that include an old-fashioned
19  whooping?
20     A.  Well, if that's what you call old-fashioned
21  whooping, yeah.
22     Q.  Okay.  All right.  So he didn't go without
23  that kind of discipline, did he?
24     A.  No.
25     Q.  All right.  But did you ever beat him with
        SHARON HAZLEWOOD, CSR       972-739-3906
        CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

98

1  with Fanny?
2      A.  I didn't really have a relationship with her.
3  I knew her through my cousin.
4      Q.  Okay.  And how well would you say Fanny knew
5  the defendant, James Broadnax, your son?
6      A.  She doesn't.
7      Q.  She does not.
8      A.  No.
9      Q.  Okay.  Did you ever ask her if James could
10  come and live with her?
11     A.  No.
12     Q.  Okay.  And you've testified before that you've
13  tried crack cocaine once, but have you ever been what's
14  commonly referred to -- have you ever been addicted to
15  crack?
16     A.  No.
17     Q.  And in contrast, Russell, you would -- you
18  would say, is a crack addict, wouldn't you?
19     A.  Yes.
20     Q.  And -- and while I'm asking you about that,
21  well, we -- we talked a little bit about -- and if I
22  called her Aunt Betty, would that be somebody that
23  maybe James looked up to as a grandmother?
24     A.  Yes.
25     Q.  Okay.  And she would have passed in what year?
        SHARON HAZLEWOOD, CSR       972-739-3906
        CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

97

1  your fists?
2      A.  No.
3      Q.  Did you ever leave marks on his back like he
4  was some kind of slave or something like that?
5      A.  No.
6      Q.  Okay.  And did you ever see or know of -- I
7  guess it would be your Aunt Betty, beating him like he
8  was a man?
9      A.  No.
10     Q.  All right.  And -- or whooping him to -- and
11  leaving marks on his back or anything like that?
12     A.  No.
13     Q.  Never happened.
14     A.  No.
15     Q.  Okay.  And in particular, you know a person by
16  the name of Fanny Mazone.
17     A.  Yes.
18     Q.  How long -- how long had you known Fanny
19  Mazone?  Let's say starting with today and going back
20  in time, how long have you known her?
21     A.  I've only known Fanny for, I don't know, maybe
22  seven, eight years.
23     Q.  Okay.
24     A.  If that.
25     Q.  And what kind of relationship did you have
        SHARON HAZLEWOOD, CSR       972-739-3906
        CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

99

1      A.  This year.  April.
2      Q.  April of this year.
3      A.  Yes.
4      Q.  And you went to the funeral; is that right?
5      A.  Yes.
6      Q.  And there was a lot of people there.
7      A.  Yes.
8      Q.  All right.  And during that time, you were
9  talking to the defendant.  He would call you from jail;
10  is that correct?
11     A.  Yes.
12     Q.  And the relationship, so that the jury
13  understands between Aunt Betty and the defendant, and
14  Aunt Betty's husband name was what?
15     A.  Glen.
16     Q.  And he and the defendant had a pretty good
17  relationship, didn't they?
18     A.  James didn't know him.
19     Q.  Okay.
20     A.  He passed away a month after James was born.
21     Q.  Okay.  And so his -- his relationship with
22  Aunt Betty would have been sort of as the matriarch of
23  the family, she was -- she took care of you; is that
24  right?  For a bit?
25     A.  Yes.
        SHARON HAZLEWOOD, CSR       972-739-3906
        CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1    Q. And she also took care of your son for a bit.

2    A. Yes.

3    Q. All right. And would you say that James loved

4 Aunt Betty?

5    A. Yes.

6    Q. And would you say that she loved James?

7    A. Yes.

8    Q. All right. She had this thing about -- and

9 you know what? It's a cultural -- people that grew up

10 in a time when race was not what it is today, she had a

11 thing against white people; is that right?

12    A. Not against them.

13    Q. Okay.

14    A. But she just felt like, I don't know, maybe

15 like a lot of people, you know, you should be with,

16 like if you're black, you should be with a black, you

17 know.

18    Q. She didn't believe in mixing of the races.

19    A. Right.

20    Q. Gotcha. And -- and because of that, she would

21 voice that to you about James being of a mixed -- mixed

22 race; is that right?

23    A. Yes.

24    Q. But did she treat James -- well, let me ask

25 you this:

101

1    Did you ever get the impression that she

2 didn't love James?

3    A. No.

4    Q. All right. Did you ever get the impression

5 that James didn't love her?

6    A. No.

7    Q. And that that was -- that love was expressed

8 between the two of them, even though she felt like he

9 was a product of something she didn't believe in?

10    A. Yes.

11    Q. Okay. And, in fact, in one of those

12 conversations in the -- from the jail when you were

13 talking to James, he was telling you that he was going

14 to tattoo her name and date of birth on him, didn't he?

15    A. Yes.

16    Q. Okay. And that -- that would sort of give the

17 jury some idea of about how he felt about Aunt Betty;

18 is that right?

19    A. Yes.

20    Q. Okay. And I want to go back a little bit

21 about the -- you said you've never known James to be

22 violent; is that right?

23    A. Right.

24    Q. Okay. Were you aware that since he's been in

25 the Dallas County jail, that he's been in fights; is

1 that right?

2    A. No, I didn't know about that.

3    Q. Okay. And -- and you know it may have been

4 awhile, but do you recall talking to him on the phone

5 when he would tell you that he was going to be put on

6 restriction because he got in a fight?

7    A. Well, I remember that conversation, but it

8 wasn't -- he didn't tell me about the fight, per --

9 that they actually fought. It was more or less they

10 had passed words.

11    Q. Okay. All right. And in particular, he

12 didn't like Russell; is that right?

13    A. Right.

14    Q. And did you -- when you say that he's not a

15 violent person and that he wouldn't hurt anybody, would

16 it -- would it surprise you if he's expressed a desire

17 to kill Russell? Would that surprise you?

18    A. Actually, yes.

19    Q. Okay. All right. I'm going to play a tape

20 for you. Now, you understand that when the -- when

21 people talk from the jail, that those calls are

22 recorded; is that right?

23    A. Yes.

24    Q. And in fact, they come on and they say you're

25 now Dallas county jail, North Tower, and this call is

103

1 recorded for further use; is that right?

2    A. Yes.

3    Q. Okay. And you wouldn't be privy to any

4 conversations -- do you know who Lakarrame Cole is?

5    A. Yes.

6    Q. Who is that?

7    A. She's my niece.

8    Q. Okay. Is that Demarius Cummings's sister?

9    A. Yes.

10    Q. And you're aware that your son was talking to

11 her on the phone from the Dallas County jail. He told

12 you that a few times; is that right?

13    A. Yes.

14    Q. And, in fact, you counseled him not to talk to

15 her, didn't you?

16    A. Yes.

17    Q. Okay. In a second I'm going to play a call

18 for you, and I want you to tell me if you recognize the

19 voice as being that of your son, James Broadnax, and

20 the person that he's talking to is going to be

21 Lakarrame Cole.

22    THE COURT: If you could, identify this

23 for the record.

24    MR. ALEX: I will, Judge.

25    THE COURT: All right.

104

1    MR. ALEX: Judge, for the record, 546 has
2 been introduced already for all purposes. It's a call
3 from January 9th of '09.
4    And then 567 would be the demonstrative
evidence of that call.
6    THE COURT: Has that been admitted, 567?
7    MR. ALEX: Yes, sir. We've played
8 January 9th, '09. That's the lengthy call that we
9 played to Ms. Cole.
10    THE COURT: Right. That's correct.
11    And the objection is the same; is that
12 right, Mr. Lollar?
13    MR. LOLLAR: Same objection.
14    THE COURT: And that's overruled.
15    MR. ALEX: And the second call that we're
16 going to play, Your Honor, is going to be 547, State's
17 Exhibit 547, a call from January 26th of '09, with the
18 subtitles for demo, demonstrative purposes, is 561.
19    THE COURT: Same objection to that?
20    MR. LOLLAR: Yes, sir.
21    THE COURT: Overruled.
22    MR. ALEX: Well, I stand corrected.
23    And, Judge, I apologize. The -- a little
24 bit of mix up on what's on the tape.
25    The tape I'm actually going to play at

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

106

1 it?
2    A. Actually, it does.
3    Q. Okay. And, ma'am, as it relates to your
4 conversations with the defendant since he's been in
5 jail, has there been a number of times when you talked
6 to him on the phone that he wanted your advice about
7 using the crazy defense?
8    A. Wanted my advice about it?
9    Q. Yeah. He just said, Mama, what do you think
10 about the crazy house, or what do you think about the
11 crazy defense? Do you recall those calls?
12    A. Yes.
13    Q. And do you recall -- do you recall there were
14 times when he was talking to you about being violent in
15 jail when you tried to counsel him to -- to not be
16 violent, and there were times when you even told him
17 you're praying for him so that he wouldn't be violent.
18 Do you recall those kind of calls?
19    A. Yes.
20    Q. Okay. Do you recall the time when he was --
21 in fact, you know what? I know it has been awhile.
22    MR. ALEX: And, Judge, the exhibit that
23 we're going to play at this time is going to be a call
24 from November 14th of '08 for all purposes, we're going
25 to offer State's Exhibit 552; for demonstrative

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

105

1 this time is only going to be State's Exhibit 549,
2 which was an April 1st, 2009 call to Ms. Lakarrame
3 Cole, and the demonstrative is 559. And I believe
4 those are both in for all purposes and demonstrative
5 purposes.
6    THE COURT: What were the numbers?
7    MR. ALEX: 549 for all purposes, and 559
8 for demonstrative purposes.
9    THE COURT: Okay.
10    And the objection's the same?
11    MR. LOLLAR: Same objection.
12    THE COURT: Overruled.
13    If I didn't admit those previously,
14 they're admitted now. I think I did, but just in case.
15    (Tape played.)
16    Q. (BY MR. ALEX:) And you recognize that -- the
17 voice is being that of your son?
18    A. Yes.
19    Q. Okay. And you didn't hear the voice on the
20 other side of that, and we can play a little more of
21 that call there, but you did hear your voice -- the
22 voice of your son, talking about putting a slug in that
23 N-I-G-G-A though, did you hear that?
24    A. Yes.
25    Q. All right. That would surprise you, wouldn't

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

107

1 purposes, State's Exhibit 569. Call from the jail from
2 November the 14th of 2008.
3    THE COURT: Any objection?
4    MR. LOLLAR: Same objections, Your Honor.
5    THE COURT: All right. Objection's
6 overruled.
7    552 and 569 are admitted.
8    MR. ALEX: Permission to publish?
9    THE COURT: You may.
10    (Tape played.)
11    Q. (BY MR. ALEX:) And is that an example of
12 times when your son is in the Dallas County jail for
13 double homicide, knowing he's going to trial for his
14 life, and you're hoping and praying that he's not going
15 to make trouble; is that right?
16    A. Yes.
17    Q. You're hoping and praying that when he gets to
18 this day in court, that you don't have to look at a
19 jury and explain to them why your son is still talking
20 about snatching up people who are just trying to clean
21 the floor, right?
22    And you -- you said a lot of prayers for him
23 while he was in jail, didn't you?
24    A. Yes.
25    Q. In hopes that he would control his -- his

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

110

1  aggression.
2     A.  Yes.
3     Q.  Okay.
4        MR. ALEX:  May I approach, Your Honor?
5        THE COURT:  Yes, sir.
6     Q.  (BY MR. ALEX:)  And, ma'am, I just want to ask
7  you about a couple of things about the defendant here,
8  your son, James Broadnax.
9        Did you -- I want you to take a look for me,
10  if you will.  I think I asked you to look at this
11  earlier.
12        There was a letter written to him while he was
13  in jail -- you know, before I do that, let me ask you
14  this:
15        You know who some of his friends were?
16  State's Exhibit 131-H, do you recognize anybody in
17  there?
18        Your son is the person in the middle; is that
19  correct?
20     A.  Yes.
21     Q.  And then Demarius Cummings is the person all
22  the way to the left?
23     A.  That's Demarius, yes.
24     Q.  Do you recognize any of these other people?
25     A.  That's my cousin Buffy, and that's my niece,

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

109

1  well, a cousin.  I call her my niece.
2     Q.  Okay.  Let's do this, if you will.  I think
3  I've got a bigger photo of that.
4        Okay.  So the person all the way to the left,
5  I guess to the jury's left, is Demarius Cummings; is
6  that right?
7     A.  Yes.
8     Q.  And the person in the center of the photograph
9  is your son.  He's the tallest person there; is that
10  right?
11     A.  Yes.
12     Q.  He looked like he'd been kind of pumping
13  weights here.  Is he -- does he look pretty big there?
14     A.  Yes.
15        THE COURT:  What exhibit is this?
16        MR. ALEX:  This is State's Exhibit 182.
17     Q.  (BY MR. ALEX:)  And then the person in the
18  pink, is that Buffy?
19     A.  Buffy.
20     Q.  Is that the one who was living with you over
21  on Junction?
22     A.  No.
23     Q.  She wasn't living with you on Junction?
24     A.  No.
25     Q.  Okay.  And then the person all the way to the

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1  jury's right, what's that person's name?
2     A.  Oh, Jesus.  TK.
3     Q.  TK?
4     A.  TK.
5     Q.  All right.  And do you know who the other
6  person is with Mr. Cummings?
7     A.  That's his girlfriend, I believe.  I don't
8  know her name.
9     Q.  Okay.  All right.  Any of those people live
10  over at the Junction with you-all, besides the
11  defendant and Demarius?
12     A.  No.
13     Q.  All right.  State's Exhibit 477 is a letter
14  apparently written to your son talking about the
15  temporary insanity tip.  And you and your son had a few
16  conversations about that as being a defense; is that
17  right?
18     A.  Yes.
19     Q.  Okay.  And do you know the person in this
20  letter?  Apparently it's somebody that knows your son
21  who is giving him some advice.  And I think he refers
22  to himself as Nate, but he signs it, it looks like with
23  a nickname.  Do you know who that person is?
24     A.  No.
25     Q.  You don't recognize any of that writing?

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

111

1     A.  No.
2     Q.  All right.  And when your son was in jail, he
3  asked you to send him a couple of books; is that right?
4     A.  Yes.
5     Q.  Okay.  One of them would have been The Art of
6  War; is that right?
7     A.  I didn't never know what they were.  I was
8  always -- tell him to write me and tell me what it was,
9  but he never did.
10     Q.  Okay.  And I know it's been awhile, but if we
11  have a call from the jail where he's giving you the
12  names of the books, you wouldn't dispute that, would
13  you?
14     A.  No.
15     Q.  Okay.  The Art of War here, that would have
16  been something that you set up to send him?  State's
17  Exhibit 467?
18     A.  That I set up?
19     Q.  Right.  He was asking you, or your sister, or
20  somebody in your family to send him a couple of books.
21  Not your sister, but your daughter?
22     A.  Yes.  But I was going to say, because I
23  didn't.  And I didn't send him any.
24     Q.  Okay.  But -- but he was asking for these
25  books; is that right?

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**112**    **114**

1    A.  (No response.)
2    Q.  Maybe I can refresh your memory just a little
3    bit.
4            MR. ALEX:  And, Judge, what we're going to
5    play right now is State's Exhibit 554 for all purposes
6    has been previously admitted; and for demonstrative
7    purposes, State's Exhibit 565, which is a jail call
8    from January 12th of '09.
9            THE COURT:  Same objection?
10           MR. LOLLAR:  Yes, Your Honor.
11           THE COURT:  Overruled.
12           It was previously admitted.
13           (Tape played.)
14    Q.  (BY MR. ALEX:)  And did you hear your voice
15    there at the very beginning?
16    A.  Yes.
17    Q.  Okay.  All right.  And The Art of War is
18    State's Exhibit 467, and it's a book that was in his
19    cell.  That would be one of the books he was asking you
20    for; is that right?
21    A.  Like I said, I never remembered the name of
22    the book, so yes, I --
23    Q.  But the -- what you just heard on the -- on
24    the exhibit there, that that was the three books that
25    he was requesting; is that right?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1            MR. ALEX:  These books?  These books came
2    from the bookstore, but the books he was asking for, he
3    received one of them, and the other two, he did not
4    have in his cell.  But the contents of the books is
5    what he's asking for.
6            If he's asking for the Bible, that goes to
7    his state of mind.  He's asking for -- and I could make
8    a proffer to the Court of how they go to future
9    dangerousness.
10           THE COURT:  I'm going to hold that ruling
11    on that in abeyance for now.  I'm going to -- I'm going
12    to have to look at that, so they're not admitted at
13    this time, although I'm not sustaining the objection
14    either.
15           MR. ALEX:  Okay.  Well, can I proffer them
16    to the Court --
17           THE COURT:  Sure.
18           MR. ALEX:  -- at this time?
19           THE COURT:  Sure.
20           MR. ALEX:  And primarily, Judge, what I
21    would be offering them for, --
22           MR. PARKS:  Judge, can he make his proffer
23    outside the presence of the jury, please?
24           THE COURT:  Yes, sir.  Yes, sir.
25           MR. ALEX:  I'll move on, Judge.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**113**    **115**

1    A.  Yes.
2    Q.  All right.  State's Exhibit 585 and 586, The
3    Art of War -- The Art of Seduction, 48 Laws of Power
4    all by Robert Greene; is that correct?
5    A.  Yes.
6    Q.  All right.
7            MR. ALEX:  We're going to offer, Judge, at
8    this time, State's Exhibit 585 and 586.
9            THE COURT:  Any objection?
10           MR. LOLLAR:  Well, yes.  I don't think
11    there's been any establishment that Mr. Broadnax ever
12    got those books or read the books.  He requested the
13    books.
14           So as to the -- as to the books and as to
15    the contents of any of the books, that there's no
16    evidence he ever got or read, I don't see how they're
17    relevant.
18           THE COURT:  Response?
19           MR. ALEX:  Yes, sir.  It goes to his state
20    of mind.  He's asking for to read in jail, the
21    type of books they are go to his state of mind and it
22    goes directly to the future danger aspect, and I can
23    give --
24           THE COURT:  Where did those books come
25    from?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1            THE COURT:  Okay.
2    Q.  (BY MR. ALEX:)  And, Ms. Kelly, you stated to
3    the jury that your son was not a violent person, has
4    never been a violent person.
5            Have you ever looked at the videos where your
6    son talks about what he did in this case?  Have you
7    ever seen those?
8    A.  No.
9    Q.  Okay.  And you probably don't want to see
10    them; is that right?
11    A.  No, I don't.
12    Q.  The -- the reality of it is, is there's
13    sometimes our -- and I'm not going to say kids.  James
14    Broadnax is a grown man; is that right?
15    A.  Yes.
16    Q.  All right.  Sometimes our grown children will
17    do things that we would never expect; is that right?
18    A.  Yes.
19    Q.  All right.  And after he's committed these
20    crimes, he's in jail, do you have any idea of what The
21    Art of War was about, the book -- one of the books he
22    was asking you for?
23    A.  No, I don't.
24    Q.  All right.  But the -- you -- would you --
25    would you disagree with me that it would have something

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

116

118

1  to do with war?

2     A.  No.

3     Q.  All right.  And war is about -- it's about a

4  lot of things, but typically in war, people's lives are

5  taken.

6        MR. PARKS:  Judge, we're going to object.

7  The book itself speaks for itself.  We don't need a

8  book review.

9        THE COURT:  It's cross-examination.  I'll

10  allow it.

11        Overruled.

12     Q.  (BY MR. ALEX:)  As it relates to your son

13  being a future danger and being a violent person,

14  ma'am, would you expect that after committing these two

15  heinous crimes, he'd still be asking for books about

16  how to strategically take people's lives?  Would you

17  expect that?

18        MR. LOLLAR:  Judge, she has said she has

19  not read the book; she doesn't know what the book's

20  about, and that's -- that's just -- that's argument, is

21  all that is.  We object to it.

22        THE COURT:  All right.  I sustain the

23  objection at this point.

24     Q.  (BY MR. ALEX:)  And your son, he fancied

25  himself as a rapper; is that correct?

        SHARON HAZLEWOOD, CSR      972-739-3906
    CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1  that's killing folks and robbing folks?

2     A.  No, not the ones that I've read.

3     Q.  Not the ones you read.

4     A.  No.

5     Q.  Okay.  And again, I think that every parent in

6  this room would know that kids sometimes will only act

7  a certain way around their parents.  You'd agree with

8  that.

9     A.  Yes.

10     Q.  All right.  Would you -- State's Exhibit

11  475 -- well, you wouldn't -- you wouldn't -- you

12  wouldn't disagree that -- have you ever seen these two

13  notebooks here that your son would have carried with

14  him in his -- 131-J and 131-I -- in his travels?

15     A.  No.

16     Q.  Never seen these before?

17     A.  No.

18     Q.  Okay.  The suitcase that we see over here, I

19  think it's probably 133, is this a suitcase that your

20  son would commonly travel with?

21     A.  Yes.

22     Q.  Okay.  And you ever -- well, in -- in helping

23  him unpack or packing in all of y'all's travels, did

24  you ever kind of go through his stuff at all?

25     A.  Yes.

        SHARON HAZLEWOOD, CSR      972-739-3906
    CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

117

119

1     A.  Yes.

2     Q.  All right.  And he -- and he wrote a lot of

3  lyrics and -- a lot of original lyrics; would you agree

4  with that?

5     A.  Yes.

6     Q.  And a lot of his -- and we'll call it music,

7  because there's a music genre for, let's say, gangster

8  rap.  You're aware of that, right?

9     A.  Yes.

10     Q.  Okay.  Are you okay?

11     A.  Yes.

12     Q.  If you're not, then I'm sure the Judge will be

13  fine with taking a break.  Are you okay?

14     A.  Yes.

15     Q.  And -- and in the gangster rap sort of genre

16  music, you would agree with me there's a lot of stuff

17  that's -- the lyrics are not always the kind of stuff

18  you'd hear on the radio; is that right?

19     A.  Yes.

20     Q.  Okay.  Have you ever read any of your son's

21  lyrics?

22     A.  Yes.

23     Q.  All right.  And would you agree with me that

24  many of his lyrics, probably a large majority of them,

25  are talking about just what he did in this case, and

        SHARON HAZLEWOOD, CSR      972-739-3906
    CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1     Q.  All right.  Did you ever recall seeing those

2  notebooks there?

3     A.  No.

4     Q.  All right.  But some of the documents that

5  would have been in that -- in that suitcase, I think

6  you've already sort of identified his Social Security

7  card; is that right?

8     A.  Yes.

9     Q.  All right.  And -- and I think what you're

10  telling the jury was this wasn't enough for him to get

11  a job with, the Social Security card?

12     A.  Right.  He had to have a birth certificate and

13  an ID, a state ID.

14     Q.  Was this for some particular kind of job he

15  was trying to get?

16     A.  No.  I think it's -- I guess different states

17  do different things, so --

18     Q.  Okay.  So to work at McDonald's, you think

19  he'd have to have a birth certificate, and just a

20  Social Security card wouldn't work?

21     A.  No, because when he worked in Hope, he didn't

22  have to have it, so --

23     Q.  It just depends on where you're at.

24     A.  Yes.

25     Q.  Okay.  All right.  And then the -- the birth

        SHARON HAZLEWOOD, CSR      972-739-3906
    CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

120
122

1  certificate that he did have with him, appears to be a
2  little -- a little old, doesn't it?  131-A?
3      A.  Yes.
4      Q.  Okay.  And this wouldn't -- this wouldn't have
5  been something that he just received in '07 or '08,
6  would it?
7      A.  No.
8      Q.  So this would have been something that y'all
9  would have had for awhile.
10      A.  Yes.
11      Q.  So help me understand, if he already had the
12  birth certificate, what is the -- what is the holdback
13  in getting employment?
14      A.  I don't know, because I didn't know he had
15  that one.
16      Q.  Okay.  And again, sometimes kids will -- or
17  adult children will tell us things that aren't always
18  the truth; is that right?
19      A.  Yes.
20      Q.  Okay.  The -- and -- and I'm not going to go
21  through a whole lot of this because I -- I think the
22  reality of it is, if there was another side of your
23  son, you never saw it; is that right?
24      A.  Yes.
25      Q.  Okay.  Did you -- did you ever -- did he ever

1      Q.  All right.  If we looked at those bus tickets
2  that counsel provided for the jury to see, would you be
3  surprised that there's ticket there going to Chicago?
4      Q.  Would that surprise you?
5      A.  To Chicago?
6      Q.  To or from, or in any way to Chicago.  Would
7  that surprise you?  Would that surprise you at all?
8      A.  Would it surprise me?
9      Q.  That he had been on the bus --
10      A.  Well, he had to go through there to get to
11  Michigan, wouldn't he?
12      Q.  I'm sorry?
13      A.  Wouldn't he have to go through there to get to
14  Michigan?  That's the only other time I knew of.  I
15  don't know of any other time that he actually was,
16  because he never stayed there.
17      Q.  Okay.  That you know of.
18      A.  That I -- right.
19      Q.  Okay.  Very good.  All right.  And then -- and
20  so you wouldn't know anything about him -- were -- were
21  you -- when Russell was talking to him on that one call
22  and he asked you to ask Russell about 0G and 74, and
23  what it I'm going to tell you is, that's -- the code
24  we're talking about is the Original Gangster for the
25  Gangster Disciples, which is a gang out of Chicago,

121

1  talk about, you know how kids sometimes will use codes
2  and talk, you know?  I guess what my kids will do is
3  they'll talk about rap songs and that kind of thing,
4  and I don't know what they're talking about.
5      Sometimes I'd have to go on the internet just
6  to understand the lingo they're talking.
7      Did you ever hear him talk about like 74, or
8  GD, or Gangster Disciple, or anything like that?
9      A.  No.
10      Q.  All right.  But you do remember the one call
11  where Russell was with you and he says to you, Hey,
12  mama, ask Russell if he was really an 0G, a 74, and
13  then you give Russell a call, because I think we hear
14  you laughing, sort of, in the background?
15      A.  Yes, I remember that.
16      Q.  Did you have any idea what they were talking
17  about?
18      A.  No.
19      Q.  Okay.  Have you ever heard the words Gangster
20  Disciple used as far as a criminal street gang out of
21  Chicago?
22      A.  No.
23      Q.  All right.  Are you aware that your son -- has
24  your son been to Chicago?
25      A.  No.

123

1  okay?
2      And when he's talking to Russell, were you
3  there in the truck or wherever y'all were at when he
4  was talking to Russell?
5      A.  Yeah, I was in the truck.
6      Q.  Okay.
7      A.  Yes.
8      Q.  And you heard Russell tell him then that he
9  really wasn't a part of that; he was just telling him
10  that so he could relate to him, but he really would try
11  and steer them away from that kind of stuff.  I think
12  the jury's already heard that call.
13      A.  Yes, I remember him saying that.
14      Q.  You remember him saying all of that?
15      A.  Yes.
16      Q.  Okay.  All right.  Had you ever -- your son,
17  he's pretty -- he's pretty good at sketching things
18  with a pencil, are you aware of that?
19      A.  Yes.
20      Q.  All right.  And have you ever looked at his
21  sketches such as -- this is one of the sketches that he
22  made while he was in the Dallas County jail.
23  Presumably, it's in his cell.  State's Exhibit
24  Number 6.
25      Have you ever seen him drawing things like the

1  pitchforks like you see here?
2  A. Un-uh. No.
3  Q. Never seen that on any of his drawings?
4  A. No.
5  Q. What about like the six-star -- the six-point
6  star here?
7  A. No.
8  Q. Okay. And I know sometimes it's difficult
9  when we're looking at sketches, but if we looked at
10 something like State's Exhibit Number 8, have you ever
11 seen him sketching things like that?
12 A. Yes.
13 Q. Okay. And sometimes you -- it's hard to see,
14 but in these kind of things, there's references to
15 pitchforks and six-point stars and all of that. As a
16 mother, you wouldn't be looking for those kind of
17 things, would you?
18 A. No.
19 Q. Okay. And as it related to him being in -- in
20 Michigan, in Muskegon, do you know if he made very many
21 friends while he was in Michigan?
22 A. He made a few.
23 Q. Okay. And refresh my memory, if you will,
24 while he was in Michigan, he had -- who was the
25 relatives he had there in -- in Muskegon?

1  A. Yes.
2  Q. Okay. And when you would talk to him on the
3  phone, y'all would regularly talk about scripture; is
4  that right?
5  A. Yes.
6  Q. And you would read to him from the Bible and
7  he would read to you from the Bible; is that right?
8  A. Yes.
9  Q. And that was pretty consistent from the time
10 he got in jail all the way up until probably about
11 April of this year; is that right?
12 A. Yes.
13 Q. Okay. And even while he was in jail, you were
14 still trying to teach him and -- and witness to him
15 about the better way of doing things; is that -- would
16 that be correct?
17 A. Yes.
18 Q. All right. Do you think that he was sincere
19 when he would talk to you -- well, let me -- let me ask
20 it to you this way:
21     Could you think of any calls that you talked
22 to the defendant from jail that didn't somehow wind up
23 being about Can you put some money on my books?
24     Can you think of any calls where you talked to
25 him where he didn't ask for money on his books?

1  A. Actually, there were no relatives there. The
2  only person that I knew when he went there was Trina.
3  I don't know her last name.
4      Um, and Darnell, my grandson's father.
5  Q. Okay. And your grandson, which grandson?
6  A. Treybeon.
7  Q. Okay. And that would be which one of your
8  daughters?
9  A. NiQuia's.
10 Q. NiQuia's?
11 A. Son.
12 Q. Son. And then -- so he would have went to
13 Michigan for that; is that correct?
14 A. Yes.
15 Q. All right. Any -- any connection with Flint,
16 Michigan, that you know of?
17 A. No.
18 Q. Any of his friends that live in Flint, that
19 you know of?
20 A. No.
21 Q. All right. So if he's got a letter in his
22 cell -- well, we'll skip that.
23     You -- you don't know of any of his friends
24 that he would have potentially in Flint, Michigan; is
25 that right?

1  A. No.
2  Q. Okay. And almost all calls, at some point,
3  came back to putting some money on the phones so that
4  he could make the calls.
5  A. Yes.
6  Q. Okay. And when y'all talked about the Bible
7  and -- and such, you would have thought that he was
8  sincere about what he'd be talking about when he read
9  from the Bible; is that right?
10 A. Yes.
11 Q. All right. Would it shock you to know that he
12 would -- he kept pornographic pictures inside the
13 Bible?
14     Would that shock you?
15 A. Yes.
16 Q. Okay. And let me just ask you about a few of
17 his plans. Would you say that you -- you -- even
18 though you moved around quite a bit, you wouldn't say
19 that your son was -- well, let's see, I'm not going to
20 say uneducated, but he -- he did a pretty good job of
21 communicating with folks, didn't he?
22 A. Yes.
23 Q. And, in fact, he had a flare for sort of
24 making people like him, didn't he?
25 A. Yes.

128

130

1    Q.   And if he walked up to you and started having

2    a conversation with you about anything, the Bible,

3    Christian music, any of that, you probably would not be

4    able to tell if he had something else on his mind,

5    would you?

6         He's -- he's a pretty personable guy, isn't

7    he?

8    A.   Yes.

9    Q.   Okay.  And would -- did you have any idea of

10   what -- maybe -- some of the things he thought about

11   when it comes to his future plans as far as legitimate

12   work versus illegitimate work?

13        Did he ever share those things with you?

14   A.   Yes.

15   Q.   Okay.  Did he talk about perhaps in -- I'm

16   just going to ask you, State's Exhibit 131, you said

17   you've never seen these, but if you'll look for me, if

18   you will, there is home delivery, home and nightly

19   drivers, and there seems to be a website here to follow

20   up on.

21   A.   Yes.

22   Q.   Did he ever talk to you about anything like

23   that?

24   A.   No.

25   Q.   Okay.  United States postal positions,

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

1    A.   Yes.

2    Q.   Okay.  As it relates to his relationship with

3    Demarius -- well, his relationships in general, would

4    you say that he has -- he would be a passive person?

5         In other words, if he's in a room with a bunch

6    of people, is he going to be the person that's passive

7    in the room, or is he going to make his presence known,

8    is he going to voice his opinions?

9    A.   He's not going to stand out, no.

10   Q.   Okay.  And would he be a person that would

11   voice his opinions, though?

12   A.   If he were asked, yes.

13   Q.   Okay.  And -- his relationship with Demarius

14   Cummings, did you ever see the two of them together?

15   A.   Yes.

16   Q.   And what was their relationship like?

17   A.   You know, they were just always -- just -- I

18   don't know.  Whenever they saw each other, just happy

19   to see each other, I mean, --

20   Q.   They hung out like cousins?

21   A.   Yes.

22   Q.   Would you say that the defendant, or Demarius

23   Cummings, in that relationship, that either one of them

24   would have dominated the other, or were they just kind

25   of cousins who liked to hang out?

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

129

1    starting $21 an hour, with a phone number.  You see

2    that there?

3         He ever talk to you about that as a possible

4    job?

5    A.   He mentioned the post office a couple of

6    times.

7    Q.   And I guess the point that I'm trying to make

8    is, the defendant knew that he had choices in life,

9    didn't he?  He knew that there were -- I mean, if you

10   had to -- if you had to characterize his outlook on

11   life, would you say that he felt like there was

12   anything that he couldn't do if he applied himself?

13   A.   No, because I always told him that --

14   Q.   Okay.

15   A.   -- he could do whatever he set his mind to.

16   Q.   And did you get the impression that he

17   believed that?

18   A.   Yes.

19   Q.   Okay.  All right.  So it would be not true

20   to -- to insinuate that he didn't know what his choices

21   were in life; is that correct?

22   A.   Say again?

23   Q.   It would be untrue to insinuate that he would

24   not know that he had choices in life to choose from,

25   from good or not good.

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

131

1    A.   More or less just like to hang out.

2    Q.   Okay.  Fine.

3         And, Ms. Kelly, as it relates to your

4    relationship with the defendant, I think that -- I

5    think that there may be in your part, some feelings

6    like you have -- you have some feelings that you're

7    somehow -- have some -- have some blame as to why your

8    defendant is here.  Would that be -- would that sum up

9    kind of what you feel in your heart?

10   A.   Sometimes.

11   Q.   Okay.  All right.  But the bottom line was,

12   you've -- you've always worked, haven't you?

13   A.   Yes.

14   Q.   I mean, for instance, when you were working at

15   Pilgrim's Pride, as an eviscerater, what's an

16   eviscerater?

17   A.   Sorting out the intestines from the chickens

18   and stuff, putting the hearts, livers, and all

19   different things.

20   Q.   And I imagine you would do that in pretty --

21   pretty cold temperatures.

22   A.   It was actually hot in that area of the plant.

23   Q.   Okay.  But you're -- so you're -- you're

24   basically taking the innards out of chickens and

25   separating them out; is that correct?

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

132

1   A.  Yes.
2   Q.  And that wasn't below you, was it?
3       You did what you had to do to make the money;
4   is that right?
5   A.  Yes.
6   Q.  And part of what you did with that money was
7   what you -- you gave it to the defendant, didn't you?
8   A.  Yes.
9   Q.  And -- and whenever he needed something, you
10  provided it to him, didn't you?
11  A.  Yes.
12  Q.  And tell the jury how many jobs he's held in
13  his whole lifetime.
14  A.  He's had one.
15  Q.  One.  Okay.
16      MR. ALEX:  May I have a second, Judge?
17      THE COURT:  Yes.
18      MR. ALEX:  I'm about to wrap it up.
19  Q.  (BY MR. ALEX:)  And -- and I guess, finally,
20  Ms. Kelly, you're not in any way insinuating to this
21  jury that your son has any kind of physical abnormality
22  from the car wreck that happened back when your car was
23  rolled.  You're not suggesting that to the jury, are
24  you?
25  A.  No.

SHARON HAZLEWOOD, CSR       972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

134

1   Q.  No?
2   A.  No.
3   Q.  She never took James to church?
4   A.  No.
5   Q.  And did she ever ask you to let her take him
6   into her home?
7   A.  No.
8   Q.  Never.
9   A.  No.
10  Q.  Okay.  And you said that you had no
11  relationship with her at all?
12  A.  No.  I knew her through my cousin.  She was a
13  friend of my cousin's, Juanita Mayes.
14  Q.  And you had no relationship with her at all.
15  A.  No.
16  Q.  Now, if we look at the Mount Vernon school
17  records that are in evidence up here, you put her down
18  as a reference.
19  A.  No, I didn't put her down as a reference.
20      MR. LOLLAR:  Well, I'll look for that in a
21  minute.
22      May I approach anyway, Judge?
23      THE COURT:  Yes, sir.
24      How much longer do you have?
25      MR. LOLLAR:  Just a couple of minutes.

SHARON HAZLEWOOD, CSR       972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

133

1   Q.  Okay.  Thank you.
2       MR. ALEX:  That's all I have, Judge.  I'll
3   pass the witness.
4       THE COURT:  Redirect?
5       MR. LOLLAR:  Thank you, Your Honor.
6       **REDIRECT EXAMINATION**
7   BY MR. LOLLAR:
8   Q.  Couple of questions, Ms. Kelly.
9       Now, one of the persons that Mr. Alex
10  mentioned to you was a lady by the name of Fanny
11  Mazone?
12  A.  Yes.
13  Q.  And you know who Fanny Mazone is.
14  A.  Yes.
15  Q.  Is she an evangelist, along with her husband,
16  there in Texarkana?
17  A.  Yes.
18  Q.  And was that a person you knew for periods of
19  time when you lived in Texarkana?
20  A.  Yes.
21  Q.  Or at least some of them?
22  A.  Yes.
23  Q.  And is it true that she would take James to
24  church?
25  A.  No.

SHARON HAZLEWOOD, CSR       972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

135

1       THE COURT:  All right.
2   Q.  (BY MR. LOLLAR:)  Now, Mr. Alex has asked you
3   about some areas in regard to the photo ID.  Did James
4   ever have a driver's license or anything like that?
5   A.  No.
6   Q.  And, you know, to work, to get a state-issued
7   ID, are those, I guess, rules different from state to
8   state?
9   A.  Yes.  In some states I think you have to have
10  a birth certificate and another form of ID, but then in
11  some states you have to have your birth certificate ID,
12  and some -- I don't know, some certified paper or
13  something.  I don't know.
14  Q.  Okay.  And was that apparently an issue with
15  James trying to get a state-issued ID?
16  A.  Yes.
17  Q.  And Mr. Alex has shown you what has been
18  marked here as State's Exhibit 131-A.  Now, if you were
19  a government agency, would you accept that in the
20  condition that it's in?  It's obviously a xeroxed copy
21  of a copy, and it's obviously of some age to it, and
22  it's not an original, is it?
23  A.  No.
24  Q.  Okay.  And then what has been introduced here
25  as State's Exhibit 131-C, which were among the papers

SHARON HAZLEWOOD, CSR       972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

138

1  A. That's my cousin.

2  Q. Your cousin. And did you live with Juanita

3  Mayes for any period of time?

4  A. No.

5  Q. All right. And how well -- let me just ask

6  you this:

7       Have you talked to Juanita lately, say, in the

8  last two or three months?

9  A. It has been a couple of months.

10  Q. All right. And did you see her down here, --

11  I'm sorry, not down here, but where does she live?

12  A. She lives in Texarkana.

13  Q. All right. Would she know more about the

14  relationship between James and Betty than you would?

15  A. No.

16  Q. Okay. And if there was an assertion that you

17  beat James and split his back open by Ms. Juanita

18  Mayes, how would you respond to that?

19       MR. LOLLAR: That's comparison of

20  testimony, Judge, and the jury hasn't heard that yet.

21  A. First of all, that never happened.

22       THE COURT: Hold on. Hold on.

23       Sustained.

24       But ask another question.

25  Q. (BY MR. ALEX:) Well, is there any bad blood

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

136

1  found, I believe, in the notebook, and do you see what

2  this is?

3  A. That's an application for a birth certificate.

4  Q. Application for a certified copy of a birth

5  certificate.

6  A. Yes.

7  Q. And this has apparently been filled out for

8  James Broadnax; is that correct.

9  A. Yes.

10  Q. Monterey, California?

11  A. Yes.

12  Q. So it looks like he was attempting to try to

13  get a certified copy of his birth certificate; is that

14  correct?

15  A. Yes.

16  Q. Now, Mr. Alex asked you if James ever

17  expressed to you what his plans for the future were at

18  any time in his life.

19  A. Yes.

20  Q. Remember Mr. Alex asking you that?

21  A. Yes.

22  Q. Did James ever tell you what he would like to

23  do in the future?

24  A. He said he would like to be an architect.

25  Q. An architect.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

139

1  between you and Juanita Mayes?

2  A. No.

3  Q. All right. And you're telling this jury that

4  you never beat James and split his back open, and beat

5  him with your fists or anything like that; is that

6  right?

7  A. That's correct. I've never done that.

8  Q. Okay. And do you know -- when is the last

9  time you saw Ms. Mayes?

10  A. The last time I actually saw her was in April.

11  Q. Okay. Of this year?

12  A. Yes, sir.

13  Q. And does she routinely go out into the

14  neighborhoods and -- and do evangelist-type work?

15  A. I don't know.

16  Q. You don't know that?

17  A. No.

18  Q. All right. Does she drive?

19  A. Sometimes.

20  Q. Okay. And does she get around pretty good?

21  A. Yes.

22  Q. Do you know -- well, strike that.

23       MR. ALEX: That's all I've got.

24       THE COURT: May the witness be permanently

25  excused?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

137

1  A. Yes.

2  Q. And we've seen that he has some artistic

3  talent. Was he always drawing?

4  A. Yes.

5  Q. And on these jail calls, I remember one time

6  him saying to you that if he gets sent to the

7  penitentiary, he would like to take drafting

8  classes, --

9  A. Yes.

10  Q. -- remember that?

11  A. Yes.

12  Q. Okay.

13       MR. LOLLAR: I believe that's all the

14  questions we have, Judge.

15       THE COURT: Recross?

16       MR. ALEX: Just briefly, Judge.

17            RECROSS-EXAMINATION

18  BY MR. ALEX:

19  Q. And, Ms. Kelly, it's going to sound silly,

20  but surely you're not telling this jury that he needs a

21  birth certificate to go out and mow lawns, or to just

22  work like every other person works.

23  A. No.

24  Q. All right. And tell me, do you know a person

25  by the name of Juanita Mayes?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**140**

1    MR. ALEX: Actually, Judge, I want to keep
2  the witness on standby. I'm assuming she will be here
3  for the rest of the trial. There's maybe one other
4  issue on another matter that I think the Court is aware
5  of that I've not gone into with the witness.
6         THE COURT: Okay. Will you allow the
7  witness to stay in the courtroom?
8         MR. ALEX: Yes. Yes, sir, I'll allow the
9  witness to stay in the courtroom, but I'll give the
10 Court a heads up if I think it's going into that area.
11        THE COURT: I understand. I understand.
12 You may step down.
13        MR. LOLLAR: Judge, can we approach you?
14        THE COURT: Yes.
15        (Off-the-record discussion was had.)
16        THE COURT: You may step down, ma'am.
17 You're excused for the time being, but you will remain
18 under the jurisdiction of the Court.
19        All right. We're going take a recess
20 until 11:30 a.m.
21        I need the lawyers to stay in the
22 courtroom.
23        All rise for the jury.
24        (Jury not present.)
25        THE COURT: The jury is not present.

**141**

1         At 11:25 a.m. by that clock, I'll hear
2  arguments about whether I should allow the testimony of
3  the two witnesses about what they want the jury to do,
4  and whether the books should be admissible. At
5  11:25 a.m.
6         (Recess taken.)
7         (Court reconvened; Jury not present.)
8         THE COURT: If I could have order in the
9  courtroom.
10        This is the State of Texas versus James
11 Broadnax.
12        Turning first to the deposition testimony,
13 and what is the State's objection to the testimony
14 from, I guess it's Ms. Mayes and Ms. Mazone with regard
15 to what they wanted the jury to do, visa vie, the
16 defendant?
17        MR. ALEX: Well, we've got a couple of
18 cases that -- that my appellate section is bringing
19 down, Judge, but the general -- the general objection
20 is -- is going to be relevance, and that is what the
21 witness wants the jury to do from the perspective of
22 family members of the defendant is not relevant to any
23 phase of the punishment, and I think that's what those
24 cases directly speak to.
25        Is it Fuller versus State --

**142**

1         THE COURT: Yes. I've seen no case that
2  say that, and I've researched it.
3         MR. ALEX: I can -- I can provide you with
4  two of them that say that.
5         MR. HIKEL: Miss Smith is bringing them
6  down, Lisa Smith.
7         THE COURT: Well, I asked for it to happen
8  at 11:25.
9         MR. ALEX: Judge, I'm sorry. We're not as
10 fast researchers you are, but I can --
11        THE COURT: The cases say that they're not
12 allowed to have testimony that -- that the defendant
13 should receive the death penalty, but not the converse.
14        MR. ALEX: I'm sorry? That -- that
15 they -- that my family can't get up and say that he
16 should get the death penalty, --
17        THE COURT: Right.
18        MR. ALEX: But his can get up and say that
19 he shouldn't get the death penalty.
20        THE COURT: I have seen no case that
21 addresses that one way for other. The cases do say
22 that your family can't say that he gets the death
23 penalty.
24        MR. ALEX: Well, I can -- if you give me
25 just enough time, Judge, to go through a whole case and

**143**

1  read it and analyze it, I can guarantee you I can give
2  you something on that issue. I just -- four minutes is
3  just not enough time for me to give you a case on that
4  issue. I'm sorry.
5         THE COURT: Well, it's not four minutes,
6  though. We had those depositions on Saturday. We knew
7  that was in there.
8         MR. ALEX: Right. And the objections we
9  made this morning was to relevance, and you just asked
10 us for cases on it just awhile ago.
11        THE COURT: Mr. Lollar, why do you think
12 it should be admitted?
13        MR. LOLLAR: Just a recommendation of
14 punishment. To the jury for punishment.
15        MR. PARKS: And the authority for that
16 position is set out in a motion that --
17        MR. LOLLAR: That's been filed previously
18 with the Court.
19        MR. PARKS: Which is entitled --
20        THE COURT: Let me have that.
21        MR. PARKS: Let you have it?
22        THE COURT: Yeah.
23        MR. ALEX: And, Judge, I believe that in
24 the pretrial hearing we addressed those things as well,
25 and co-counsel who was with appellate, gave the Court

144

1  cases on that very issue.  I'll find that here.

2          I believe the pretrial motion was just

3  that, Judge, for the family to be allowed, and the

4  defendant to be allowed to give this type of testimony.

5          Co-counsel for the State brought up the

6  cases and -- do you have the pretrial motion --

7          THE COURT:  Okay.  I'm not going to decide

8  on this right now.

9          For the time being, you're not allowed to

10  go into that testimony.  I may allow it later.

11          You understand that, Mr. Lollar?

12          MR. LOLLAR:  Yes, sir.

13          THE COURT:  Okay.  I'm not going to rule

14  on it right now.

15          It looks to me like it's my call, and

16  there's no mandatory requirement either way, so I want

17  to think about it.

18          MR. ALEX:  That's what I recall from the

19  pretrial hearing, Judge, was that counsel said that the

20  law basically said it was discretionary to the Court,

21  is what -- is what I recall her saying.

22          THE COURT:  So I want to think about it.

23  I'm not going to -- if you think you've got some law

24  that says something to the contrary, but the cases that

25  were just handed to me, which includes Fuller, --

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

145

1          MR. ALEX:  The ones that you have?

2          THE COURT:  Yeah.  Which includes Fuller,

3  the one you just cited, essentially, bottom line, say

4  it's my call.

5          MR. ALEX:  I -- I think that's probably

6  the -- what I recall from that previous hearing as

7  well.

8          THE COURT:  All right.  Now as to those

9  books, which are State's Exhibits what?

10          MR. ALEX:  I think it's 585 and 586.  And

11  for the record, Judge, I think in retrospect, I would

12  withdraw the offer of the full book and only offer the

13  front and back pages of the book, and we would be

14  offering for the purpose of showing that the defendant

15  is requesting certain reading materials in jail, and it

16  goes to his character.

17          THE COURT:  All right.  I understood that.

18          MR. ALEX:  Okay.  All right.

19          THE COURT:  Okay.  So the -- the posture

20  of this evidence is that -- and the Court recalls

21  this -- that he did specifically ask for those books in

22  a telephone call.  There's no question about that.

23          On the other hand, there's no evidence to

24  suggest that he ever got the books; is that right,

25  Mr. Alex?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

146

1          MR. ALEX:  That's correct, the two in

2  question here.  He did receive one --

3          THE COURT:  And you're offering those as

4  to future dangerousness.

5          MR. ALEX:  That includes -- I'm offering

6  them show his state of mind in jail, incarcerated, as

7  he would be if he's given a life without parole

8  sentence.

9          THE COURT:  And I -- I have reviewed those

10  books and they do -- they are about controlling people,

11  essentially.

12          Mr. Lollar?

13          MR. LOLLAR:  Well, I think it begs the

14  question, Judge, he may be requesting the books, but

15  there's no evidence to show that he ever got the books

16  or ever read the books.

17          THE COURT:  That's true, but why would he

18  request them if he didn't know about them?

19          MR. LOLLAR:  Well, he apparently heard

20  about them from somebody, I would guess, but I think

21  the bottom line is, now the State wants to open those

22  books up and start reading quotes out of them is what

23  they want to do, so that -- as they have already done

24  here in this courtroom before this jury.  They want to

25  start quoting from a book that he's never read.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

147

1          MR. ALEX:  Judge, we're not going to offer

2  the whole book, we're only going to offer the front

3  page and the back page, and it will only show, if you

4  were going to a bookstore and you picked up a book and

5  you picked it up and you read it, I mean, he obviously

6  hasn't gotten the book.

7          THE COURT:  I don't need to hear any

8  speeches on it.

9          I'm going to admit those.

10          Your objection's overruled.

11          What numbers are those?

12          MR. ALEX:  They're 585 and 586.

13          MR. LOLLAR:  And, Judge, so our objection

14  is clear, it's under Rule 401, 402, and 403.

15          THE COURT:  Yes, sir.  Yes, sir.

16          And I have made the balancing test under

17  403.

18          And it is only as to the covers, Mr. Alex.

19          MR. ALEX:  Yes, sir.

20          THE COURT:  All right.  So those are

21  admitted.

22          Now, I will tell you this.  I -- as I have

23  it, are you considering offering testimony from the

24  victim's family that they want him to get the death

25  penalty?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

148

1    MR. ALEX:  No, Judge, I'm not --
2    THE COURT:  Because I don't think the law
3  allows that.
4    MR. ALEX:  I have not -- no.  I don't
5  think that I've read anything that that was proper, and
6  I don't plan on asking them.
7    And if I have not, I plan to before I put
8  them on in rebuttal to make sure that they're aware
9  that that's not proper.
10    THE COURT:  All right.  And they're in the
11  courtroom, so I'm sure they heard that.
12    And I have not ruled yet on that last bit
13  of testimony as to what those ladies want the jury to
14  do.  I'm going to take that under advisement, all
15  right?
16    Can we call the jury?
17    What are you going to do now?
18    MR. LOLLAR:  Well, we're fixing to call
19  some quick witnesses if we can find the exhibits,
20  State's Exhibits 41 and 42.
21    MS. MALLON:  The MoneyGram.  Do y'all have
22  them over there, by any chance?
23    COURT REPORTER:  They're probably in the
24  evidence cabinet.
25    MR. ALEX:  Didn't he just offer those

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

149

1  through Ms. Kelly?
2    MS. MALLON:  Yeah.
3    MR. ALEX:  Okay.
4    MS. MALLON:  Yeah.
5    THE COURT:  They're Defense Exhibits 41
6  and 42.
7    COURT REPORTER:  Yes.
8    THE COURT:  You have them?
9    COURT REPORTER:  Yes, sir.
10    THE COURT:  You ready to go?
11    MS. MALLON:  Yes, sir.
12    THE COURT:  Call the jury.
13    THE BAILIFF:  All rise.
14    (Jury present.)
15    THE COURT:  Be seated, please.
16    What further says the defense?
17    MS. MALLON:  Your Honor, the defense would
18  call Nicole Pfaff.
19    THE COURT:  Spell that.
20    MS. MALLON:  P-F-A-F-F.
21    THE COURT:  Nicole Pfaff.
22    MR. ALEX:  Judge, prior to that, can I
23  publish the two exhibits?  Re-offer them and publish
24  them?
25    THE COURT:  Yes.

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

150

1    MR. ALEX:  Okay.  We'd re-offer State's
2  Exhibit 585 and 586.
3    THE COURT:  What do you mean by "publish"?
4    MR. ALEX:  Tell them what it is.
5    THE COURT:  Very brief.  I don't want you
6  reading the whole thing.
7    MR. ALEX:  Okay.
8    THE COURT:  All right?  Because it takes
9  too long.
10    MR. ALEX:  Are they admitted?
11    THE COURT:  Yes.
12    MR. LOLLAR:  Same objections.
13    THE COURT:  Overruled.
14    MR. ALEX:  The 48 Laws of Power by Robert
15  Greene, State's Exhibit 585, which the defendant was
16  asking for in jail, if we looked at the back cover, it
17  describes it:
18    The best-selling book of those who want
19  power, watch power, or want to arm themselves against
20  power.  Amoral, cunning, ruthless, and instructive,
21  this piercing work distills three thousand years of the
22  history of power in 48 well-explicated laws.  As
23  attention-grabbing in its design as it is in its
24  content, this bold volume outlines the laws of power in
25  their unvarnished essence, synthesizing the

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

151

1  philosophies of Machiavelli, Sun-tzu, Carl von
2  Clausewitz, and other great thinkers.  Some laws
3  require prudence.  Law 1, never outshine the master, of
4  some stealth; conceal your intentions; some, the total
5  absence of mercy.
6    Law 15, crush your enemy, but like it or
7  not, all have applications in real-life situations.
8    That's the 48 Laws of Power that he's
9  asking for.
10    The brief description of The Art of
11  seduction:
12    Seduction is the most subtle, elusive and
13  effective form of power.  It's evident in John F.
14  Kennedy's hold over masses, as is Cleopatra's hold over
15  Anthony.
16    Now we go to the best-selling 48 Laws of
17  Power, where it began, for synthesizing the classic
18  literature of seduction from Freud to cunning
19  strategies illustrated by the success and failures of
20  characters throughout history.
21    And once again, Robert Greene identifies
22  the rules to be timeless, amoral game, and explores how
23  to cast a spell, break down resistance, and ultimately,
24  compel a target to surrender.
25    THE COURT:  All right.  Call your next

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

154

1  witness.
2          MS. MALLON: Miss Pfaff.
3          THE COURT: Miss Pfaff, if you'll come all
4  the way to the front of the courtroom, all the way to
5  the door. Go as far as you can. When you've reached
6  the door, turn and face me and raise your right hand.
7  All the way to the front.
8          Raise your right hand.
9                    **NICOLE PFAFF**
10 was called as a witness and testified as follows:
11         THE COURT: You may lower your hand. Take
12 your seat in the witness stand.
13         You will be responding to questions from
14 Mr. Mallon.
15         Ms. Mallon, whenever you're ready.
16         MS. MALLON: Thank you, Judge.
17              **DIRECT EXAMINATION**
18 BY MS. MALLON:
19    Q. Ms. Pfaff, will you state your full name for
20 the record, please?
21    A. **Nicole Elizabeth Pfaff.**
22    Q. And can you spell your last name?
23    A. **It's P-F-A-F-F.**
24    Q. And where are you employed?
25    A. **MoneyGram International.**

1     Q. Is that part of your policy when someone wants
2  to pick up a -- receive a MoneyGram, they have to know
3  the answer to a test question?
4     A. **If the MoneyGram is less than $900, they do
5  have the option to provide a test question and
6  answer, --**
7     Q. Okay.
8     A. **-- and then that would be sufficient in lieu
9  of an ID being presented.**
10    Q. Okay.
11    A. **If there is no test question and answer, then
12 ID would need to be presented, but not recorded to pick
13 up the MoneyGram.**
14    Q. Okay. So that's my next question. On the
15 March 10th transaction, there is no test question, so
16 your policy would be again?
17    A. **To present the ID, but the agent location is
18 not required to record it.**
19         MS. MALLON: That's all I have, Judge.
20         THE COURT: Cross-examination?
21              **CROSS-EXAMINATION**
22 BY MR. ALEX:
23    Q. Just briefly, ma'am. And -- and so the person
24 getting the money would not have to show an ID as long
25 as they know the answer to the test question.

153

1          MS. MALLON: May I approach, Your Honor?
2          THE COURT: Yes, ma'am, and as necessary.
3     Q. (BY MS. MALLON:) Ms. Pfaff, I'm going to show
4  you what's been previously marked as Defendant's
5  Exhibit 41. Do you recognize that?
6     A. **Yes.**
7     Q. Okay. And what is that?
8     A. **That is the records of the transactions that
9  were subpoenaed regarding James Broadnax.**
10    Q. Okay. And I'd like to direct your attention
11 to the back page. Now, this is the page that shows the
12 receiving location; is that right?
13    A. **Uh-huh.**
14    Q. And the receiving city.
15    A. **Yes.**
16    Q. And I guess that's the state.
17    A. **Yes.**
18    Q. And the zip code.
19         Now, this last section here, it says test
20 question; is that right?
21    A. **Yes.**
22    Q. Okay. On the first transaction in January, it
23 looks like there was a test question, and that test
24 question is who is Audrey?
25    A. **Yes.**

155

1     A. **Correct.**
2     Q. Okay. Very good.
3          MR. ALEX: That's all I've got, Judge.
4          THE COURT: Redirect?
5          MS. MALLON: No, Your Honor.
6          THE COURT: May the witness be permanently
7  excused?
8          MS. MALLON: Yes, sir.
9          THE COURT: All right. You're permanently
10 excused, ma'am. Thank you for your testimony.
11         What further says the defense?
12         MS. MALLON: The defense will call Darnell
13 Wynn.
14         THE COURT: Darnell Wynn.
15         Mr. Wynn, if you'll please come all the
16 way to the front of the courtroom, all the way up by
17 the door. Go as far as you can. When you've reached
18 the door, turn and face me and raise your right hand.
19 All the way to the front, sir. Keep going.
20         Turn and face me and raise your right
21 hand.
22              **DARNELL WYNN**
23 was called as a witness and testified as follows:
24         THE COURT: Lower your hand. Take your
25 seat in the witness stand.

1    You will be responding to questions from
2  Ms. Mallon.
3    Whenever you're ready, ma'am.
4    MS. MALLON:  Thank you, Your Honor.
**DIRECT EXAMINATION**
6  BY MS. MALLON:
7    Q.  Mr. Wynn, would you please state your full
8  name for the record?
9    **A.  Darnell Wynn, Jr.**
10    Q.  And would you spell your last name?
11    **A.  W-Y-N-N.**
12    Q.  Okay.  Mr. Wynn, where do you currently live?
13    **A.  Muskegon, Michigan.**
14    Q.  Okay.  And when did you get to Dallas?
15    **A.  Sunday.**
16    Q.  Okay.  Do you know Mr. Broadnax --
17    **A.  Yes.**
18    Q.  -- sitting next to me here?
19    **A.  I do.  Yes.**
20    Q.  And how do you know Mr. Broadnax?
21    **A.  He's my brother-in-law.**
22    Q.  Okay.  And you were married?
23    **A.  I'm going through a divorce right now.**
24    Q.  Okay.  And you're married to who?
25    **A.  NiQuia Marie Wynn.**

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

157

1    Q.  Okay.  So Mr. Broadnax's sister.
2    **A.  Yes.**
3    Q.  Okay.  Do you recall Mr. Broadnax coming to
4  Michigan in 2008?
5    **A.  Yes.**
6    Q.  Okay.  Do you remember when he came to
7  Michigan in 2008?
8    **A.  The end of January.**
9    Q.  Okay.  And is that Muskegon, Michigan?
10    **A.  Yes.**
11    Q.  Okay.  That's where you currently live as
12  well, right?
13    **A.  Yes.**
14    Q.  Okay.  And how do you know -- how do you
15  remember it was January of 2008?
16    **A.  Because that's when I got my son back.**
17    Q.  Okay.  So --
18    **A.  My son came to live with me in January.**
19    Q.  Okay.  Mr. Broadnax brought --
20    **A.  He brought him to me.  Yes.**
21    Q.  What's your son's name?
22    **A.  Treybeon.**
    Q.  Okay.  And how did they get to Michigan?
    **A.  They took the bus.**
25    Q.  Okay.  And did you go to the bus station to

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

1  pick them up?
2    **A.  Yes, I did.**
3    Q.  Okay.  And did you pick them up?
4    **A.  No.**
5    Q.  Why not?
6    **A.  I missed them at the bus station.**
7    Q.  Okay.  Did you see -- did you see Mr. Broadnax
8  soon after?
9    **A.  Yes.**
10    Q.  Okay.  Do you remember the first time you saw
11  him?
12    **A.  Yes.**
13    Q.  Can you tell us when that was?
14    **A.  Um, you mean the very first time I ever saw**
15  **him in life or --**
16    Q.  No, in Muskegon.
17    **A.  -- when I saw him is Muskegon?**
18    Q.  In Muskegon.
19    **A.  It was the same day he dropped off my son.  It**
20  **was just -- about -- I'd say about a half hour later**
21  **because they ended up dropping my son off with my aunt**
22  **and I had to go get his luggage because they had forgot**
23  **to take it off the car.**
24    Q.  Okay.  And did Mr. Broadnax stay in Muskegon?
25    **A.  Yes.**

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

159

1    Q.  Do you know for how long?
2    **A.  Oh, I know he was still there at the end of**
3  **April.**
4    Q.  And how do you know that?
5    **A.  Because my birthday's at the end of April, and**
6  **I was with him on my birthday.**
7    Q.  And what day is that?
8    **A.  April 28th.**
9    Q.  The time that Mr. Broadnax was in Muskegon,
10  what's the longest period of time you went without
11  seeing him?
12    **A.  I would have to say from March 12th to the --**
13  **maybe the 4th of April.**
14    Q.  Okay.  And why did you not see Mr. Broadnax
15  during that time?
16    **A.  Between March 12th and the 4th of April, I was**
17  **in Georgia.**
18    Q.  Okay.
19    **A.  I had to go and take care of some law trouble**
20  **I had.**
21    Q.  Okay.  And when did you leave Muskegon?
22    **A.  I left on the 12th.**
23    Q.  And how do you remember that?
24    **A.  Well, I was going to turn myself in, and it**
25  **was also a friend of mine's birthday.  Her birthday is**

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

162

1   the 12th, and I seen her the day before I left.

2       Q.   Okay.

3       A.   So I called her on the 12th from the bus to

4   let her know I was leaving town and let her know I

    would see her when I got back.

6       Q.   Okay.  And did you take a bus to Georgia?

7       A.   Yes.

8       Q.   Okay.  And did you see Mr. Broadnax on

9   March 12th when you left Muskegon?

10      A.   Yes, I did.  I seen him that morning.

11      Q.   Pardon me?

12      A.   I seen him that morning.  He came over while I

13  was drinking coffee.

14      Q.   Okay.  And did you actually have a

15  conversation with him?

16      A.   Yes.  I told him to go check on my son while I

17  was out of town because he was the most familiar face

18  that he was -- he knew.

19      Q.   Okay.  And when you got back from Georgia, did

20  you say that was early April?

21      A.   Yes.

22      Q.   Okay.  Okay.  And did you see Mr. Broadnax

23  when you returned?

24      A.   Yes.

25      Q.   Okay.  How often would you see him?

           SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

161

1       A.   I seen James almost every day.  I would say

2   every day, but I'm not for certain if I seen him every

3   day, but I would say nine out of ten times, I seen him.

4       Q.   Okay.  Did he stay with you sometimes?

5       A.   Yes.

6       Q.   Okay.  When he wasn't staying with you, do you

7   know where he was staying?

8       A.   At one point in time, he stayed with a friend

9   of ours named Trina.

10      Q.   Okay.

11      A.   That was his girlfriend during the time period

12  that he was in Muskegon, or part of the time period he

13  was in Muskegon.

14           He stayed a couple of nights with us and he

15  stayed with my cousin right before he left.

16      Q.   Okay.  Anyplace else you knew that he stayed?

17      A.   Oh, not for certain, no.

18      Q.   Okay.  All right.

19      A.   Oh, the mission.  He stated at the mission

20  also.

21      Q.   The homeless shelter?

22      A.   Yes.

        Q.   Okay.  How long have you known Mr. Broadnax?

24      A.   I met James in '07.

25      Q.   Okay.  And how did you meet James?

           SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

162

1       A.   We went to pick him up from Hope, Arkansas.

2       Q.   And when you say "We," who does that mean?

3       A.   Me and my wife at the time.

4       Q.   Okay.  So you and NiQuia.

5       A.   Yes.  Me and NiQuia, and her sister Kerrin,

6   and her husband all went down there because their

7   grandmother was sick, so we all went down there so we

8   could to see their grandmother, and we brought James

9   back with us.

10      Q.   Okay.  And that was in 2007, is that what

11  you --

12      A.   Yes.

13      Q.   Okay.  And you brought him back to Georgia.

14      A.   Yes.

15      Q.   Did he live with you and NiQuia at that time?

16      A.   Yes.

17      Q.   Okay.

18      A.   Part of our arrangement was that if he stayed

19  with us, he watched our son while we were at work.

20           THE COURT:  Let me interrupt you there.

21  You said you brought him back to Georgia.  I think you

22  meant to say Michigan?

23           THE WITNESS:  No.  Georgia.

24           MS. MALLON:  No, sir.  Georgia.

25           THE COURT:  Okay.

           SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

163

1            MS. MALLON:  This is back in 2007.

2            THE COURT:  All right.

3       Q.   (BY MS. MALLON:)  Okay.

4       A.   I left Georgia December 13th.  Around the

5   13th.  My brother passed --

6            MR. ALEX:  Objection.  There's no question

7   in front of the witness.

8            THE COURT:  Overruled.

9            Ask another question.

10           MS. MALLON:  Okay.

11      Q.   (BY MS. MALLON:)  Mr. Wynn, let's clear that

12  up.  When did you leave Goergia or Muskegon?

13      A.   I left Georgia around the 13th of December of

14  2007 --

15      Q.   Okay.

16      A.   -- because my brother passed.

17      Q.   Okay.  Now, let's go back to when you brought

18  James back to Georgia with you.  What were you saying,

19  you had an arrangement?

20      A.   We had an arrangement.  He watched my son for

21  me and NiQuia while we worked.

22      Q.   Okay.  And did you trust him with your son?

23      A.   Yes.

24      Q.   Did he do a good job of taking care of your

25  son?

           SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

164

166

**A.**  Yes.

**Q.**  Did you and James ever write rap music together?

**A.**  Yes, we did.

**Q.**  Okay.  Did you write gangster rap together?

**A.**  Define "gangster rap."

**Q.**  You tell me what you think "gangster rap" is.

**A.**  They would say gangster rap is rap that has violence and drugs involved in it, and I would say that people that rap about violence and drugs, rap about things they see on a daily basis.

**Q.**  Okay.  And you and James have that in common?

**A.**  Yeah.

**Q.**  Okay.  Did you ever know James to be violent?

**A.**  No.

**Q.**  Okay.  Did you ever see him act violent?

**A.**  No.

**Q.**  Did you ever know him to have a gun?

**A.**  No.  I have never seen him with a weapon at all.

**Q.**  Okay.  Did you ever know him to be in a gang?

**A.**  No.

MS. MALLON:  That's all I have, Your Honor.  I'll pass the witness.

THE COURT:  Cross-examination?

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

**A.**  Yeah, you hear about that also.

**Q.**  Okay.  And just because a person writes about it doesn't mean they're going to go out and do it, correct?

**A.**  Correct.

**Q.**  I mean, you never murdered anybody, right?

**A.**  Correct.

**Q.**  And you never robbed anybody, right?

**A.**  Right.

**Q.**  And, in fact, the kind of business -- what kind of work were you doing when the defendant was watching your -- your son?

**A.**  I worked for Tug Technologies.  I was a painter.

**Q.**  Painter?  All right.

And -- and how old a man are you?

**A.**  I didn't hear you.

**Q.**  How old are you?

**A.**  How old am I?

**Q.**  Yes, sir.

**A.**  I'm 27.

**Q.**  And so back then you were working as a painter.

**A.**  Yes.

**Q.**  Hard work?

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

165

MR. ALEX:  Yes, sir.

**CROSS-EXAMINATION**

BY MR. ALEX:

**Q.**  Sir, tell me your name again?

**A.**  Darnell Wynn, Jr.

**Q.**  Darnell.  Last name is what again?

**A.**  Wynn, W-Y-N-N.

**Q.**  W-Y-N-N, okay.

Now, Mr. Wynn, my name is David Alex and I have a few questions for you.  If I don't -- if I don't make any sense to you, you let me know, okay?

**A.**  Okay.

**Q.**  Let's start off with where you left off, and that is this gangster rap business, okay?  Is it common in gangster rap music to talk about a murder?

**A.**  Um, you hear about murder in a gangster rap, yes.

**Q.**  All right.  And you understand what I mean by common, right?  It's something you hear on a regular basis in gangster rap, is murdering other folks?

**A.**  In -- I would say in probably about 60 percent of gangster rap.

**Q.**  And -- and robbing and murdering other folks?

**A.**  You hear about that kind of stuff also.

**Q.**  And selling dope and making money?

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

167

**A.**  At times.

**Q.**  Okay.  But gratifying?

**A.**  I would say it did what it was supposed to do.  It helped me pay the bills.

**Q.**  Right.  You didn't resort to what you -- what you -- did you write that kind of gangster rap?

Let me just --

MR. ALEX:  May I approach, Judge?

THE COURT:  Yes, sir.

**Q.**  (BY MR. ALEX:)  So the jury understands what we're talking about, have you ever seen State's Exhibits 131-J?  This appears to be a notebook by James Broadnax.  Have you ever seen this before while he was living with y'all?

**A.**  I don't know if I seen it because we had probably about 30 notebooks between the both of us, so I don't know if I seen those notebooks exactly.

**Q.**  Okay.  All right.  Very good.

And -- and so on the first page of this, it appears to be a letter to his brother who is in the federal -- what he calls the federal penitentiary.

Do you know Aaron Eason?

**A.**  I know who he is, I don't actually know him.  I have never met Aaron.

**Q.**  Okay.  All right.  And when it comes to

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**170**

1  specific gangster rap, let's just take a sampling of --
2  or even better still, let's do this.
3      Let me look at that while I ask you just a few
4  other questions, all right?
5      A.  Uh-huh.
6      Q.  When we start talking about you knowing
7  specifically where the defendant is at any given time
8  between, is it January of '08 and April of '08?  Or you
9  would have said -- you left on March the 12th --
10     A.  Uh-huh.
11     Q.  -- of '08 to turn yourself in; is that right?
12     A.  Yes.
13     Q.  And turn yourself in for what?
14     A.  Marijuana possession.
15     Q.  Okay.  Possession of marijuana.
16     A.  Yes.
17     Q.  All right.  Okay.  And where were you turning
18  yourself in at?
19     A.  Marietta, Georgia.
20     Q.  Okay.  Marietta, Georgia?
21     A.  Yes.
22     Q.  All right.  And did you have to spend some
23  time in jail?
24     A.  Yes.
25     Q.  And that's the timeframe you just told us

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**169**

1  about; is that right?
2      A.  Yes.
3      Q.  Now, from January to April, do you know if the
4  defendant left that area of Muskegon, Michigan, and
5  went to other cities and other places?
6      A.  I can say that during the time period of
7  April, um, -- sorry about that.  January till
8  March 13th he did not leave.
9      Q.  He did not leave.
10     A.  No.
11     Q.  So if the records that counsel has put in
12  showed that -- and you're pretty certain about that,
13  right?
14     A.  Yes, I'm pretty certain.
15     Q.  You saw him on a regular basis.
16     A.  Yes.
17     Q.  And he didn't go in to other cities and other
18  states.
19     A.  Not that I know of.
20     Q.  January 17th, Marietta, Georgia to Louisville,
21  Kentucky, that would have been when he arrived in
22  Muskegon; is that right?
23     A.  That would be the time period.
24     Q.  Okay.  And then on February the 22nd, if there
25  is a bus ticket in his name from Memphis, Tennessee, to

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**170**

1  Detroit, and then to Nashville, that would just be some
2  other James Broadnax.
3      A.  I would have to say so, because I --
4          MR. ALEX:  Where are those records at?
5  You have them there?
6          MS. EVANS:  No.
7          THE COURT:  What are you looking for,
8  Defense Exhibit 42?
9          MR. ALEX:  Yes, sir.
10         THE COURT:  Okay.
11     Q.  (BY MR. ALEX:)  So you'd agree with me,
12  February 22nd would be a date during the time you would
13  say the defendant would definitely not be leaving
14  Michigan, right?
15     A.  Yes.
16     Q.  Because you would have been seeing him.
17     A.  Yeah.
18     Q.  All right.  And you're aware that you don't
19  really have to show an ID before you get on the bus,
20  right?
21     A.  Right.
22     Q.  Okay.
23     A.  But to get a ticket, you must have an ID or a
24  password.
25     Q.  Okay.  All right.  And you've done that before

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**171**

1  with a password?
2      A.  Yes.
3          MR. ALEX:  How about that.  Those aren't
4  in there.
5          Would you prepare those for me, Miss --
6  the other ones aren't in here?
7          MR. LOLLAR:  Other what?
8          MR. ALEX:  The package you gave us.
9          MR. PARKS:  They're two exhibits.
10         MR. LOLLAR:  They're two exhibits.  That's
11  41 and 42.
12         MR. ALEX:  That's okay, I'll -- I'll ...
13  okay.
14         And, Judge, I believe that there is in the
15  file the complete record of this.  I'm going to offer
16  them --
17         THE COURT:  Record of what?
18         MR. ALEX:  These are the bus tickets that
19  were filed as business records.  If I could.  I don't
20  think they're going to object, but I'll just take this,
21  just in case.
22         MS. MALLON:  Are you sure that's not the
23  full record up there?
24         MR. ALEX:  I'm looking at it.  I don't see
25  it.  I'm looking for the February 18th, and 19th, and

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

172                                                                        174

1  the 27th, I guess.
2         (Sotto voce discussion.)
3         THE COURT: Folks, I'd take a lunch break
4  while they sort this out, but this witness has to go
5  get on a plane or something, so we have to wait for
6  this, I'm sorry.
7         MR. ALEX: All right. And at this time,
8  Judge, we're going to offer State's Exhibit 587
9  pertaining to the same packet that's been filed by the
10 defense for the other dates not included in Defense
11 Exhibit 42.
12        THE COURT: Any objections?
13        MR. LOLLAR: No.
14        THE COURT: State's Exhibit 587 is
15 admitted.
16     Q.  (BY MR. ALEX:) Now, sir, the -- the document
17 that I'm showing you is a document that completes this
18 whole packet here, and if you see here on February 18th
19 at 10:30 p.m. a ticket by -- they said was by James
20 Broadnax, was scheduled from Detroit to Nashville. You
21 see that?
22     A.  Uh-huh.
23     Q.  And that would be during the time period you
24 say Mr. Broadnax not leaving Michigan, right?
25     A.  Right.

             SHARON HAZLEWOOD, CSR       972-739-3906
        CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1      A.  Right.
2      Q.  Okay.
3         THE COURT: You have to answer out loud,
4  sir.
5      A.  Right.
6      Q.  (BY MR. ALEX:) Okay. And then, I guess this
7  would be the front part of that ticket where it says
8  James Broadnax. This is a re-board pass, so I'm
9  assuming that this is a travel in between one place or
10 the other.
11        But in any -- in any regards, it shows that on
12 the 19th, we're going from Nashville to Memphis; is
13 that right?
14     A.  That's what it shows on the ticket.
15     Q.  Okay. So Detroit to Nashville, and then from
16 Nashville to Memphis, so that could all be one travel
17 on the 18th and the 19th, right?
18     A.  I would say so, yes.
19     Q.  Okay. All right. But again, this couldn't
20 have been the defendant, because you're saying that he
21 didn't leave Muskegon, right?
22     A.  To my understanding, he did not leave.
23     Q.  All right. And then again on the 22nd of '08
24 at 1:40, we've got a James Broadnax going from Memphis
25 to Nashville. Do you see that?

             SHARON HAZLEWOOD, CSR       972-739-3906
        CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

173                                                                        175

1      Q.  Okay. And it doesn't say from Muskegon,
2  Michigan to Nashville, it says from Detroit to
3  Nashville, right?
4      A.  Right.
5      Q.  So that would assume that if Mr. Broadnax, the
6  same person who would be included in all of these
7  records, was -- somehow he had to get to Detroit,
8  right?
9      A.  Yes.
10     Q.  If that was him going from Detroit to
11 Nashville --
12     A.  Uh-huh.
13     Q.  -- during February.
14     A.  Uh-huh.
15     Q.  All right. And then, let's see, that was
16 February 18th, looks like from Cincinnati to Nashville.
17        There appears to be another departure date on
18 February 19th of '08. Do you see that?
19     A.  Uh-huh.
20     Q.  Okay. That would be kind of tough to do,
21 wouldn't it?
22     A.  Yeah.
23     Q.  To go from Detroit to Nashville on the 18th,
24 and then go from Cincinnati to Nashville on the 19th,
25 right?

             SHARON HAZLEWOOD, CSR       972-739-3906
        CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1      A.  Uh-huh.
2      Q.  And then on March the 8th, we've got a ticket
3  of a man by the name of James Broadnax going from
4  Nashville to St. Louis. Do you see that?
5      A.  Uh-huh.
6      Q.  Okay. And we could go into these records and
7  see how they all purport to be to the same person, but
8  you -- let me ask you this: You were -- you were flown
9  in here to testify in this trial, and -- and basically
10 you were going to give the defendant an alibi for a
11 particular time; is that right?
12     A.  Yes.
13     Q.  Okay. And you've talked about -- you've
14 talked to the lawyers about the alibi for a particular
15 time; is that right?
16        MS. MALLON: Judge, can we please
17 approach?
18        MR. LOLLAR: I object to the
19 characterization. He's been flown in here to testify
20 to the truth.
21        THE COURT: Hold on.
22        MR. ALEX: Judge, I'm going to object to
23 the sidebar.
24        THE COURT: Stop it. Both sides. Come up
25 here.

             SHARON HAZLEWOOD, CSR       972-739-3906
        CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**176**

1    (Off-the-record discussion was had.)

2        THE COURT:  Both sides are warned to stop

3    this contentiousness.  Both sides.

4        Q.   (BY MR. ALEX:)  Mr. Wynn, so the bottom line

is, if all of those records up there are correct, the

6    defendant's moving all around from state to state, and

7    you have no knowledge of it, if those records are

8    correct; is that right?

9        MR. PARKS:  Well, Judge, we object to that

10   because it's a mischaracterization.  That would be true

11   if there were only one James Broadnax in all the world.

12       THE COURT:  The objection's overruled.

13   I'll allow him to answer that.

14       A.   Can you repeat the question?

15       Q.   (BY MR. ALEX:)  Yeah.  If the records up there

16   are true, which are records that were filed in this

17   case from the witness -- well, were filed in this case

18   for James Broadnax, during the same time period you're

19   testifying to, if they're correct, then that James

20   Broadnax would be traveling all around from city to

21   city and state to state and you would not know it,

22   right?

23       A.   That would be correct if I didn't see him

24   during those time periods, but I know I seen him during

25   those time periods.

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**177**

1        Q.   Okay.  And how much -- how much --

2        MR. ALEX:  That's all I've got, Judge.

3        THE COURT:  Redirect?

4        MS. MALLON:  Yes, Your Honor.

5        Do you have the Court file back?

6        Judge, I would like to ask you to take

7    judicial notice of the subpoena duces tecum in here to

8    Greyhound Bus Lines that request any and all records

9    related to James Broadnax.

10       THE COURT:  Where is it?  I tried not to

11   waste time.

12       MS. MALLON:  May I approach the witness,

13   Your Honor?

14       THE COURT:  Yes, ma'am.

15       **REDIRECT EXAMINATION**

16   BY MS. MALLON:

17       Q.   Mr. Wynn, before I do that, -- Mr. Wynn, I'm

18   going to show you what has been marked as Defendant's

19   Exhibit 43.  Will you take a look at that for me,

20   please?

21       A.   Um, it's a -- looks like a people search.

22       Q.   Okay.

23       THE COURT:  You have to answer out loud,

24   sir.

25       THE WITNESS:  It looks like a people

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**178**

1    search.

2        Q.   (BY MS. MALLON:)  And it's a search for what

3    name?

4        A.   Broadnax.

5        Q.   First name?

6        A.   James.

7        Q.   And how many results do we have there?

8        A.   38.

9        MS. MALLON:  I'd like to offer Defendant's

10   Exhibit 43, please?

11       THE COURT:  Any objection?

12       MR. ALEX:  No, sir.

13       THE COURT:  Defense Exhibit 43 is

14   admitted.

15       MS. MALLON:  Thank you, Your Honor.

16       Q.   (BY MS. MALLON:)  So this is a people search

17   on the internet for James Broadnax and we have 38

18   results, right?

19       A.   Yes, ma'am.

20       Q.   Okay.  And can you look through here and see

21   that they're in all different states?  We have Georgia,

22   Illinois, Tennessee, Texas, and it goes on, correct?

23       A.   Yes, ma'am.

24       Q.   Thank you.

25       MS. MALLON:  Permission to publish,

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**179**

1    Your Honor.

2        THE COURT:  You may.

3        Q.   (BY MS. MALLON:)  Mr. Wynn, you do

4    specifically recall seeing James Broadnax during that

5    timeframe.

6        A.   Yes, ma'am.

7        Q.   And how do you remember that?

8        A.   I get up every morning about 7:00 o'clock and

9    drink coffee.

10       Q.   Okay.

11       A.   And about 9:00, James would be coming over and

12   he usually asked for a cigarette in the morning, and I

13   smoke a cigarette with him.  And then, you know, we go

14   on about our day, so that's why I can remember seeing

15   him almost every day, because he came over to get a

16   cigarette.

17       Q.   Did he take care of Treybeon during that time?

18       A.   During the time when I was gone to jail, or

19   what time are you talking about?

20       Q.   Either or both.

21       A.   A few times he came and got him.  I would say

22   maybe about eight times he came and got him.

23       Q.   Prior to March 12th?

24       A.   Yes.

25       Q.   Okay.  And then did he help take care of

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

**180**

1  Treybeon after?
2      A.  When did I got back?
3      Q.  Yes.
4      A.  Yes, he came and visited Trey all the time
when I got back.
5      Q.  While you were gone?
6      A.  While I was gone, they stayed, he did come by
and stop by.
9      Q.  Okay.  And I think you testified earlier that
10 Mr. Broadnax spent some time in a homeless shelter.
11     A.  Yes.
12     Q.  Is it fair to say he didn't have a lot of
13 money?
14     A.  Yes.
15     Q.  And when he came to Muskegon, he came by bus;
16 is that right?
17     A.  Correct.
18     Q.  And did Mr. Broadnax have a car?
19     A.  No.
20     Q.  So his only transportation would be the bus?
21     A.  Walking.
22     Q.  Walking.  Okay.
23              MS. MALLON:  Pass the witness, Your Honor.
24              THE COURT:  Recross?
25

**181**

1              MR. ALEX:  Yes, sir.
2              RECROSS-EXAMINATION
3  BY MR. ALEX:
4      Q.  Mr. Wynn, to your knowledge, there was nothing
5  wrong with the defendant physically?  He could have
6  went out and -- and -- and made a dollar if he wanted
7  to honestly working, mowing lawns or whatever; is that
8  right?
9      A.  Correct.
10     Q.  He didn't have any broke legs, or broke arms,
11 or anything, did he?
12     A.  No.
13     Q.  All right.  Young man?
14     A.  Yes.
15     Q.  Okay.  And we talked a little bit about the
16 rap, the -- the gangster rap.  Tell the jury what the
17 term MOB means.
18     A.  Money over bitches.
19     Q.  Money over bitches.  And that whole mentality
20 of money over bitches, what's that all about?
21     A.  It basically means that, get money now; worry
22 about females later.
23     Q.  All right.  And in some people's mind, the
24 whole world could be the bitches, couldn't it?  Get the
25 money and --

**182**

1      A.  If that's how they feel about it, yeah.
2      Q.  I mean, you've -- you've seen -- you've seen
3  the rap and you know from the gangster rap mentality
4  that you get the money any way you can.  The world is a
5  bitch.  You never heard -- never heard of that?
6      A.  The world is a bitch?
7      Q.  Yeah.
8      A.  Yes, I have.
9      Q.  Okay.  And you've seen the defendant's forearm
10 where he's got tattooed MOB right there, didn't you?
11     A.  Yes.
12     Q.  All right.  Do you think that that is -- you
13 and the defendant would have smoked marijuana together;
14 is that right?
15     A.  Yes.
16     Q.  Okay.  And you felt comfortable with him
17 watching your kids even if he was high, didn't you?
18     A.  He was never high with my son.
19     Q.  How would you know if you weren't there?
20     A.  Because I was the one who gave him the money
21 when he kept my son.  It wasn't like he just kept him
22 to, you know, just for a place to stay.  You know, I
23 still would give him money for, you know, his own so
24 that he had his own.
25          I couldn't just be like keep my son just so

**183**

1  you can live here and that's all it is to it.  No.  I
2  mean, I had to give him money also, you know.
3          I mean, any man is going to want money in his
4  life, and I'm stopping -- by him keeping my son, I'm
5  keeping him from being able to go do something else
6  constructive, so --
7      Q.  Sure.  But -- but there would be no way for
8  you to stop him from going and buying some weed and
9  smoking it while he's with your son, would there?
10     A.  Then that would mean he would have to leave
11 with my son.
12     Q.  Okay.  Let me ask you this, and -- and where
13 you lived in Michigan, if you're familiar with the
14 gang -- with the gangster rap, the root word of
15 gangster -- gangster rap is gangster.  Well, one of the
16 words is gangster.  You've seen the pitchforks and the
17 Gangster Disciples.
18          Do you know who the Gangster Disciples are?
19     A.  Yes.
20     Q.  All right.  And you know that they go by -- GD
21 is their -- is their call sign, right?
22     A.  Yes.
23     Q.  G being the seventh letter in the alphabet,
24 and 4 being the --
25          THE COURT:  D being the fourth.

**Page 184**

1    MR. ALEX: Thank you, Judge.

2    Q. (BY MR. ALEX:) Do you know that?

3    A. Yes.

4    Q. All right. And you know that their call sign

is pitchfork?

6    A. Yes.

7    Q. You see that all over Michigan and places

8    around --

9    A. Not really, not where I'm at, no.

10    Q. Okay. So where do you know them from?

11    A. Oh, where do I know of the gang mentality?

12    What's the name? I watch TV.

13    Q. Specifically, Gangster Disciples.

14    A. I watch TV.

15    Q. You've seen it on TV.

16    A. I've seen it on many TVs.

17        Where I'm from, I'm from a small city. We

18    don't really have any gangs.

19    Q. In -- in Michigan, you don't have any gangs.

20    A. Well, where I'm from, Muskegon, we don't have

21    any gangs.

22    Q. So you've seen the pitchforks and all of that

23    on TV.

24    A. Yes.

25    Q. Okay. And you've never seen them in any of

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**Page 185**

1    the defendant's raps or any of his notebooks?

2    A. Well, usually, you know, I don't too much read

3    his raps because I don't want to take any of his words

4    and put them in my raps.

5    Q. I understand. I understand completely.

6        MR. ALEX: That's all I've got, Judge.

7        Oh, I'm sorry.

8    Q. (BY MR. ALEX:) Sir, your -- your conviction

9    for that marijuana was actually not until March 27th of

10    '08; is that correct?

11    A. No. I was already in jail.

12    Q. I'm sorry?

13    A. I was already in jail. Around March 27th, I

14    was getting out of jail. As a matter of fact, that is

15    the day I got out of jail.

16    Q. That's the day you got out of jail?

17    A. Yeah, that's my -- when I seen the Judge for

18    the first time that day, --

19    Q. Okay.

20    A. -- that's when I got out. I was already

21    locked up, incarcerated.

22    Q. You turned yourself in, you went in front of

the Judge, you plead guilty?

24    A. No. I turned myself in and I went and got

25    locked up.

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**Page 186**

1    Q. Okay.

2    A. And then I came back and seen the Judge.

3    Q. And that was the same day he let you out of

4    jail.

5    A. Yes. When I seen -- when I finally seen the

6    Judge, I was getting out of jail.

7    Q. And how many days were you in jail?

8    A. I'm not exactly correct. I just know I was in

9    there from the 13th until like the 27th, somewhere in

10    there.

11        MR. ALEX: That's all I have, Judge.

12        THE COURT: Anything else?

13        MS. MALLON: No, Your Honor.

14        THE COURT: May the witness be permanently

15    excused?

16        MS. MALLON: Yes, sir.

17        THE COURT: From the State also?

18    Permanently excused? Mr. Alex?

19        MR. ALEX: Can we approach?

20        (Off-the-record discussion was had.)

21        THE COURT: Is that a yes?

22        MR. ALEX: That's fine.

23        THE COURT: You're permanently excused,

24    sir. You may step down.

25        THE WITNESS: Thank you.

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**Page 187**

1        THE COURT: Do you have any other of these

2    witnesses that have to get on now, Ms. Mallon?

3        MS. MALLON: One more, Your Honor.

4        THE COURT: All right.

5        Sorry, folks.

6        MS. MALLON: Vicki Biggs, Your Honor.

7        THE COURT: Ma'am, if you'll please come

8    all the way to the front of the courtroom, all the way

9    to the very front, up by the door. When you've reached

10    the door, turn and face me and raise your right hand.

11    Go as far as you can. Raise your right hand.

12            **VICKI BIGGS**

13    was called as a witness and testified as follows:

14        THE COURT: You may lower your hand. Take

15    your seat in the witness stand.

16        You will be responding to questions from

17    Ms. Mallon.

18        Whenever you're ready.

19            **DIRECT EXAMINATION**

20    BY MS. MALLON:

21    Q. Miss Biggs, could you please state your full

22    name?

23    A. Vicki Biggs.

24    Q. You're going to have to speak up in that

25    microphone.

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

190

1    A.   Vicki Biggs.

2    Q.   And spell your last name, please.

3    A.   B-I-G-G-S.

4    Q.   Okay.  And do you know James Broadnax?

5    A.   Yes.

6    Q.   And how do you know James Broadnax?

7    A.   He brought my great nephew to Michigan last

8    year.

9    Q.   Okay.  Let's explain that to the jury.  Are

10   you related to Mr. Wynn that we just saw?

11   A.   Yes, I'm his aunt.

12   Q.   Okay.  So Treybeon would be your --

13   A.   Great nephew.

14   Q.   Okay.  And do you remember when James brought

15   Treybeon -- oh, let me back up -- where do you live?

16   A.   Muskegon Heights, Michigan.

17   Q.   Okay.  And do you recall when James brought

18   Treybeon to Michigan?

19   A.   Yes.  I don't remember the exact date, but it

20   was in January.

21   Q.   Okay.  And how do you remember that?

22   A.   Because he came over to my baby sister house

23   with the baby.

24   Q.   Okay.  And do you know how long James stayed

25   in Michigan?

189

1    A.   For a few months.

2    Q.   Okay.  Do you know specifically?

3    A.   I don't know exactly how many months.

4    Q.   Okay.  When James was in Michigan, how often

5    would you see him?

6    A.   Basically every day.

7    Q.   Okay.  And tell us about that.

8    A.   I gets up pretty early in the morning, and

9    when I open my door, he the first person that I see

10   when I open my door at 7:00 o'clock in the morning.

11   Q.   Okay.  Do you know where James was staying

12   while he was in Michigan?

13   A.   He stayed a couple nights at my house.  He was

14   with Trina.  And then I heard he was staying at the

15   rescue mission.

16   Q.   Okay.  Tell us about when -- do you remember

17   when Mr. Wynn went to Georgia to turn himself in?

18   A.   I do believe it was in March.

19   Q.   Okay.  Do you remember the day?

20   A.   No.

21   Q.   Okay.  Do you remember anything that happened

22   after he left to go turn himself in in Georgia?

23   A.   As far as what?

24   Q.   Well, do you remember a specific date -- do

25   you remember times or specific dates when you would see

1    James?

2    A.   Yeah.  I seen him on the -- on the 13th

3    because I called my brother, but that was the wrong

4    day.  I thought that was his birthday, but his birthday

5    was on the 14th of March.

6    Q.   Okay.

7    A.   And then we had a barbecue on the 14th.

8    Q.   Okay.  And was James there?

9    A.   Yes, he was.

10   Q.   Okay.  Had you seen him prior to that, prior

11   to the 14th?

12   A.   Yes.

13   Q.   Okay.  And you said you saw him just about

14   every day.

15   A.   Basically every day.

16   Q.   Did you feed him?

17   A.   Yes.

18   Q.   Okay.  How often would he come by your house

19   during the day?

20   A.   He would come by, he'd leave and come back.

21   Q.   Okay.  And I think you testified you're not

22   exactly sure when he left.

23   A.   No, I'm not.

24   Q.   Do you remember the time of year it was?

25   A.   The snow was gone.

191

1    Q.   Okay.  And in Michigan, that could be --

2    A.   It's definitely not in March.

3    Q.   Okay.  Do you know how James got to Michigan?

4    A.   I think he came in on the Greyhound.

5    Q.   Okay.  And you don't -- do you remember -- did

6    you ever go more than a couple of days without seeing

7    James?

8    A.   Maybe one day, at the most.

9    Q.   Okay.  Was James -- how was James when he was

10   around you?

11   A.   He was all right.  He came in one day,

12   britches hanging a little low.  I told him he had to

13   pull his britches up in my house cuz don't nobody wear

14   their pants hanging off them in my house.

15   Q.   And did he do that?

16   A.   Yes.

17   Q.   Was he respectful to you?

18   A.   Yes.  I had no problem out of him.

19   Q.   Okay.  Was he -- did you ever see him

20   exhibit -- show any signs of violence?

21   A.   No.

22   Q.   Okay.

23        MS. MALLON:  That's all I have,

24   Your Honor.

25        We'll pass the witness.

192

1  THE COURT: Cross-examination?

2  MR. ALEX: Yes, sir.

3  **CROSS-EXAMINATION**

4  BY MR. ALEX:

5  Q.  Ma'am, my name is David Alex. I've got a few

6  questions for you. If I'm not making sense to you,

7  which sometimes I don't, you'll let me know?

8  A.  **Pardon me?**

9  Q.  If I don't -- if you don't understand my

10  questions, will you let me know?

11  A.  **Yes.**

12  Q.  All right. March 13th is the day you

13  specifically remember seeing the defendant; is that

14  right?

15  A.  **Yes.**

16  Q.  And you say that's because you thought it was

17  his birthday; is that right?

18  A.  **No, I thought it was my brother birthday.**

19  Q.  Your brother's birthday.

20  A.  **Yes.**

21  Q.  Okay. And so how does that tie into

22  remembering talking and seeing the defendant?

23  A.  **Because he was around. I called my brother on**

24  **that day, but it wasn't his birthday. And the next day**

25  **is when we had the barbecue, which was March the 14th,**

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

194

1  A.  **No, not really, because I seen him basically**

2  **every day.**

3  Q.  Okay. And I -- and I understand what you're

4  saying, but let's say, for instance, if I asked you

5  what you did on March 1st of 2008, could you tell me?

6  A.  **It all depends on what day of the week it was.**

7  **I probably was drunk.**

8  Q.  Okay. And you -- but in order to do that,

9  you'd have to go in through your mind and you'd have to

10  search back and say, Okay. What was I doing on this

11  day and what was I doing on that day, right?

12  A.  **Yes.**

13  Q.  Okay. So surely this isn't the first time you

14  thought about March 13th was today. Did -- did the

15  lawyers or somebody call you and ask you whether or not

16  James was there on the 13th?

17  A.  **Oh, yes, they did.**

18  Q.  Okay. How long ago was that?

19  A.  **Maybe a month ago.**

20  Q.  Okay. And were you able to tell them right

21  off that James was there or the 13th, --

22  A.  **Yes, I was.**

23  Q.  -- or did you have to think about it?

24  A.  **No, I didn't have to think about it.**

25  Q.  All right. Because -- because that was not

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

193

1  on a Friday, when we had it for his birthday.

2  Q.  For your brother's birthday.

3  A.  **Yes.**

4  Q.  And your brother's birthday is what?

5  A.  **March the 14th.**

6  Q.  Okay. And what year was he born in?

7  A.  **I don't know. He's my oldest brother.**

8  **There's 16 kids. I can't keep up with all them**

9  **birthdays.**

10  Q.  But you remember that day specifically,

11  though, the 13th, which was not your brother's

12  birthday.

13  A.  **Yes.**

14  Q.  And so that would have been the 13th.

15  Would -- and you remember that day -- when was

16  the first time you had to think back and say, Oh, I

17  remember that day. James was at my house, the 13th?

18  A.  **What do you mean, I had to remember that day?**

19  Q.  Well, when is the first time somebody asked

20  you about that date, March 13th, was James at your

21  house?

22  A.  **Today.**

23  Q.  Today. So since March 13th, today is the

24  first time you've had to think about whether or not you

25  saw him on that specific date?

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

195

1  the day of your brother's birthday, but it was the

2  following day.

3  A.  **Yes.**

4  Q.  And you were able to remember the 13th because

5  of that.

6  A.  **Yes.**

7  Q.  All right. Okay. So do you know what you had

8  for breakfast that day?

9  A.  **I don't eat breakfast.**

10  Q.  Okay. Do you know what you had for dinner

11  that day?

12  A.  **Probably not.**

13  Q.  Okay. All right. Can you tell us where the

14  defendant was on February 22nd of 2008?

15  A.  **No, I cannot.**

16  Q.  Okay. Could he have been going from Memphis

17  to Tennessee?

18  A.  **He could have.**

19  Q.  I'm sorry. Memphis is in Tennessee. Memphis

20  to Nashville?

21  A.  **He could have.**

22  Q.  Okay. And Detroit to Nashville?

23  A.  **Probably.**

24  Q.  Is that possible?

25  A.  **Yeah it's possible.**

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

196

1    Q.  All right.  And so February the 19th from
2    Nashville to Memphis?
3        A.  Probably.
4        Q.  Okay.  And March 8th from Nashville to
5    St. Louis.
6        A.  Could have.
7        Q.  Okay.  But on March 13th, for sure, he was at
8    your house.
9        A.  Yes, because I had him turning over the meat
10   on the barbecue pit.
11       Q.  Well, that would be --
12       A.  That was the 14th.
13       Q.  That would have been the 14th, ma'am, right.
14       A.  Yes.
15       Q.  I'm not talking about the 14th right now, I'm
16   talking about the 13th, right?
17       A.  Yes.
18       Q.  Okay.  And what's your brother's name?
19       A.  Rex.
20       Q.  Rex what?
21       A.  Diggs.
22       Q.  And, I guess one of the answers you gave me
23   was that you were probably drunk.  I didn't really ask
24   you that, but do you drink quite a bit?  Is that it?
25       A.  If I don't have to work, yes, I will.

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

197

1        Q.  Do you that might affect your memory at all?
2        A.  Nope.  I remember better that way.
3        Q.  You remember better.
4        A.  Yes.
5        Q.  Okay.
6            MR. ALEX:  That's all I have, Judge.
7            THE COURT:  Redirect?
8            MS. MALLON:  Just briefly, Your Honor.
9               **REDIRECT EXAMINATION**
10   BY MS. MALLON:
11       Q.   Ms. Diggs, I think you testified earlier that
12   you never went more than a couple of days without
13   seeing James.
14       A.  I haven't.  I mean, I don't know the exact
15   dates.  The reason I remember the 13th is because I
16   called my brother, and he was like, It's not my
17   birthday.  That's how I remember that day.
18       Q.  Okay.  Did you ever go weeks at a time without
19   seeing James?
20       A.  I mean, after I found out he was gone, yes.
21       Q.  Okay.  But that was after --
22       A.  But while he was in Michigan, no.
23       Q.  Okay.  That was after the snow had melted.
24       A.  Yes.
25       Q.  Okay.

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

198

1            MS. MALLON:  That's all I have,
2    Your Honor.
3            MR. ALEX:  Nothing further, Judge.
4            THE COURT:  May the witness be permanently
5    excused?
6            MS. MALLON:  Yes, Your Honor.
7            MR. ALEX:  Yes, Your Honor.
8            THE COURT:  You're permanently excused,
9    ma'am.  Thank you for your testimony.
10           THE WITNESS:  You're welcome.
11           THE COURT:  Anything else before lunch?
12           MS. MALLON:  No, Your Honor.
13           THE COURT:  Okay.  We're going to take a
14   recess for the jury until 1:30.  It's 12:22 right now.
15           Thank you for your patience, ladies and
16   gentlemen.  But we will be recessing today, for
17   everybody's knowledge, at 3:30.  I have something I
18   have to do.
19           All rise for the jury.
20           (Jury not present.)
21           THE COURT:  I still haven't decided, but
22   it's Jackson versus D-R-E, T as in Tango, K kilo, E
23   echo, at 450 F3d 614, which is a habeas case from a
24   death penalty sentence, but it was in federal court.
25           As I see it, it basically says I can't go

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

199

1    wrong either way on that testimony, so that's what I
2    think.  And I still haven't decided, though.
3            We're in recess.
4            (Recess taken.)
5            THE COURT:  This is the State of Texas
6    versus James Broadnax.  The jury is not present.  The
7    lawyers are here, and the defendant's here.
8            Additional objection to the deposition
9    testimony of Ms. Juanita Mayes as to Lines 12 through
10   16 on Page 12, in that the witness said she suspected
11   an older brother of abusing the defendant, and the
12   objection is that it's speculation or guesswork; is
13   that right, Mr. Hikel?
14           MR. HIKEL:  Yes, sir.
15           THE COURT:  Response from you, Mr. Lollar?
16           MR. LOLLAR:  Judge, that was her
17   perception.
18           THE COURT:  All right.  The objection is
19   sustained.
20           Lines 12 through 16 will not be admitted.
21           The Court has found the following case
22   that is on all fours on the issue of whether or not the
23   defense's witnesses can testify about whether they want
24   the jury to spare the life of the defendant.
25           The case is Fuller versus State of Texas.

*SHARON HAZLEWOOD, CSR       972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

200

1  It's at 827 S.W.2d.  It's a 1992 case, Court of
2  Criminal Appeals.  In that case, Page 935 through 936,
3  the defense attempted to elicit the exact same
4  testimony that they attempt to elicit here.
5  Specifically, the defense attempted to elicit the
6  question about their feelings as to whether the
7  defendant should receive a life sentence or a death
8  sentence.
9        The defendant/appellant in that case
10  argued that the testimony was admissible as mitigating
11  evidence, citing the exact same cases that Mr. Parks
12  has cited, including the Lockett case, and the Court
13  notes that the Court of Criminal Appeals in that case,
14  the case I'm talking about, Fuller, said, (As read:)
15  We're unable to discern any such support for his claim
16  in those opinions.
17        So although I would agree that I could let
18  it in, that's the closest I have to anything on point,
19  and I decline to allow that testimony.
20        So the objection as to Page 25, Lines 18
21  through 25 on the Mayes deposition, and Lines 1 through
22  22 on Page 26 of the Mayes deposition, the objection as
23  to that testimony is sustained.
24        And on the Mazone deposition, Page 17,
25  Lines 15 through 25, and Page 18 Lines 1 through 12,

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

201

1  that objection is sustained.
2        MR. LOLLAR:  Your Honor, in regard to
3  that, are we -- you have duplicate originals of the two
4  depositions; is that correct?
5        THE COURT:  I believe so; yes, sir.
6        MR. LOLLAR:  And are those part of the
7  record?  If they're not, I'd like to ask those be made
8  part of the record.
9        THE COURT:  They are.  And you can mark
10  them however you want to mark them.
11        MR. LOLLAR:  All right.  Let's get those
12  marked.
13        MS. HANDLEY:  Judge, I apologize, could
14  you say it one more time?  I apologize.  I thought
15  somebody was behind me taking notes.
16        THE COURT:  On the Mayes deposition,
17  Page 25, Lines 18 through 25; Page 26, Lines 1 through
18  22.
19        On the Mazone deposition, Page 17,
20  Lines 15 through 25; Page 18, Lines 1 through 12.
21        MS. HANDLEY:  Thank you, Judge.
22        MR. LOLLAR:  And, Your Honor, we now have
23  marked --
24        MS. EVANS:  Judge, --
25        THE COURT:  No talking all at the same

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

202

1  time.
2        MR. LOLLAR:  We have now marked the
3  depositions, the original depositions as Defendant's
4  Exhibits 44 and 45.
5        THE COURT:  Yes, sir.
6        MR. LOLLAR:  And we'd ask that this be
7  made a part of the record.
8        THE COURT:  They are a part of the record.
9  My previous objections remain the same.  I
10  mean, my previous rulings on the objections remains the
11  same.
12        Ms. Evans, did you want to be heard?
13        MS. EVANS:  No, Judge, I got it.
14        THE COURT:  All right.  Are we ready for
15  the jury?
16        MR. LOLLAR:  Yes, sir.
17        MR. ALEX:  Yes, sir.
18        THE BAILIFF:  All rise.
19        (Jury present.)
20        THE COURT:  Be seated, please.
21        Call your next witness.
22        MR. LOLLAR:  Call Gary Aaron.
23        THE COURT:  Gary Aaron?
24        If you'll come to the front of the
25  courtroom, sir, where the door is shutting right there,

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

203

1  all the way to the front.  Keep going.  All the way to
2  the front.  Keep going.
3        When you've reached the door, turn and
4  face me and raise your right hand.
5        **GARY AARON**
6  was called as a witness and testified as follows:
7        THE COURT:  You may lower your hand.  Take
8  your seat in the witness stand.
9        You will be responding to questions from
10  Mr. Lollar.
11        Whenever you're ready, sir.
12        MR. LOLLAR:  Thank you, Your Honor.
13        THE COURT:  Yes, sir.
14        **DIRECT EXAMINATION**
15  BY MR. LOLLAR:
16  Q.  Would you tell us your name, please?
17  A.  Gary Aaron.
18  Q.  And how do you spell your last name, Gary?
19  A.  A-A-R-O-N.
20  Q.  And, Mr. Aaron, where -- first of all, how old
21  are you?
22  A.  17.
23  Q.  And where do you live?
24  A.  Eldorado, Arkansas.
25  Q.  And who do you live with there in Eldorado?

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

206

1    A.  My mother.
2    Q.  And what is your mother's name?
3    A.  Jackie Aaron.
4    Q.  And do you live with anybody else there?
5    A.  I live with my cousin.
6    Q.  And what is your cousin's name?
7    A.  Kevon Eason.
8    Q.  Kevon is your cousin as well?
9    A.  Uh-huh.
10   Q.  And you two live there with your mother.
11   A.  Right.
12   Q.  And are you related to the defendant here,
13   James Broadnax?
14   A.  He is also my cousin.
15   Q.  He's also your cousin.
16   A.  Yes.
17   Q.  Is that on your father's side or your mother's
18   side?
19   A.  My mother's side.
20   Q.  Very good.  And do you see James sitting two
21   doors [sic] down from me?
22   A.  Yeah, I see him.
23   Q.  All right.
24        MR. LOLLAR:  May the record reflect the
25   witness identified the defendant in open court?

1    of high school?  What would you like to do?
2    A.  I plan to go to college.
3    Q.  And where are you thinking about going to
4    college at?
5    A.  Either Jonesboro, Arkansas State or Grambling.
6    Q.  What is Jonesboro, is that Jonesboro State
7    school -- State College there in Arkansas?
8    A.  That's Arkansas State.
9    Q.  Pardon me?
10   A.  That's Arkansas State.
11   Q.  Arkansas State?
12   A.  Yes, sir.
13   Q.  Okay.  And that's located in Jonesboro,
14   Arkansas?
15   A.  Right.  Right.
16   Q.  Or you want to go to Grambling.
17   A.  Right.
18   Q.  And what do you want to study when you go off
19   to college?
20   A.  Journalism.
21   Q.  What would you like to be?
22   A.  A writer.
23   Q.  Very good.  Now, Mr. Aaron, let me ask you
24   how -- how close do you consider yourself to
25   Mr. Broadnax here?

205

1        THE COURT:  Any objection?
2        MR. ALEX:  No, sir.
3        THE COURT:  The record will so reflect.
4    Q.  (BY MR. LOLLAR:)  And, Mr. Aaron, let me ask
5    you, where were you born?
6    A.  I was born in Eldorado.
7    Q.  And have you lived there all your life?  So
8    all of your 17 years.
9    A.  All my 17 years.
10   Q.  And are you currently going to school?
11   A.  I'm still enrolled in high school.
12   Q.  You're -- which high school is that?
13   A.  Eldorado High School.
14   Q.  Okay.  Now, you may want to pull the
15   microphone toward you a little bit and speak right into
16   that so that all the jurors can hear you.
17        You are currently going to be a senior --
18   A.  Right.
19   Q.  -- at Eldorado High School when school starts?
20   A.  Yeah.
21   Q.  And when does school start?
22   A.  Tomorrow.
23   Q.  Tomorrow.  So we want to try to get you on and
24   off here today if we could.
25        What are your future plans after you get out

207

1    A.  I say me and James are pretty close.
2    Q.  All right, sir.  Do you know how old you were
3    when you first met James?
4    A.  We've been around -- I've been around James
5    since I probably was like real young, like since I
6    could remember.  That young.
7    Q.  I'm sorry.  Now, you're going to have to speak
8    up just a little bit.
9    A.  Probably since I could remember.  Probably
10   four or five.  I was young when I — probably around
11   even before then, even though I can't remember.
12   Q.  All right.
13   A.  But I know I been around James for awhile.
14   Q.  You've known him as long as you can remember.
15   A.  Right.
16   Q.  Okay.  And how would you come to see him?
17   A.  Well, either we come visit in Hope or
18   Texarkana, where they were staying, because he be
19   living with my Big Mamma.
20   Q.  Okay.  Who is Big Mamma?
21   A.  Betty Eason.
22   Q.  Would that be in Hope, Arkansas?
23   A.  Right.
24   Q.  And would you see him there living with Big
25   Mamma in Hope from time to time?

208

1   A.   Right.
2   Q.   You also talked about seeing him in Texarkana
3  when he and his mom were living in Texarkana?
4   A.   I believe so.  I can't remember who he was
5  living with, but I remember James living in Texarkana.
6   Q.   Okay.  Have you seen him -- have you visited
7  with him when he's been living anywhere else?
8   A.   I can't tell you.  I believe Mt. Vernon,
9  but --
10   Q.   In Mt. Vernon, Texas?
11   A.   Right.
12   Q.   You might have gone to visit there once or
13  twice?
14   A.   Once or twice.
15   Q.   All right.  So were you around each other a
16  lot, even though you didn't live together?
17   A.   Yeah, we were around each other enough, like
18  we visit like a few times a month.
19   Q.   All right, sir.  Now, how would you say that
20  you perceive James?  Did you like James?
21   A.   Oh, yeah.  James is a well-likable person.
22  Yeah, I like James.  That my cousin.  I like him.
23   Q.   Would you -- would you look up to him?
24   A.   Yeah, I would say in my younger years I looked
25  up to James.

209

1   Q.   And why would that be?
2   A.   Because James, he was a well-liked person.  He
3  always had people laughing.  Cool to be around.  He had
4  all the females.  I looked up to James back then.
5   Q.   All right.  Now, did you -- were you aware of
6  whether James had any dreams or aspirations that he
7  wanted to do?
8   A.   Yeah.  I remember he used to talk, he wanted
9  to be an architect.
10   Q.   Wanted to be an architect?
11   A.   Yes.
12   Q.   Had he expressed that to you?
13   A.   He expressed that to us a lot of times, I
14  remember him saying it.
15   Q.   What else did he say about his future plans?
16          MR. ALEX:  Judge, I'm sorry.  That's --
17  that's rank hearsay and there's no exception to that
18  with this witness.
19          THE COURT:  Response?
20          MR. LOLLAR:  Oh, I'll go on to something
21  else, Judge.
22          THE COURT:  Sustained.
23   Q.   (BY MR. LOLLAR:)  Now, did you know James's
24  mother?
25   A.   Yeah, I know Audrey.

210

1   Q.   You know Audrey?
2   A.   Uh-huh.
3   Q.   And what did you think about Audrey?
4   A.   I like Audrey too.  She's sweet.
5   Q.   How about the -- the various -- would you --
6  would you ever see her with different men in her life
7  at different times of her life?
8   A.   Like -- like I told you, like, um, the main
9  person I remember her being with was Russell.
10   Q.   Russell Kelly?
11   A.   Yes.
12   Q.   And what did you think about Russell?
13   A.   Not -- I didn't hold Russell in too high
14  regard, I'm just going to put it like that.
15   Q.   You didn't hold him in very high regard?
16   A.   No. No.
17   Q.   Why?
18   A.   Because Russell had a history of putting his
19  hands on my auntie.
20   Q.   On Audrey?
21   A.   Exactly.
22   Q.   So he was --
23   A.   Abusive, yes.
24   Q.   He was physically abusive to her?
25   A.   Yes.

211

1   Q.   And y'all were aware of that.
2   A.   (Nods head.)
3   Q.   So you didn't hold him in very high esteem for
4  that.
5   A.   No.
6   Q.   How about James's relationship with Russell?
7  How did -- how did they get along?
8   A.   I couldn't -- I couldn't speak on it for you.
9  I'm not sure the relationship ...
10   Q.   Okay.  Now, let me ask you, there in Hope,
11  Arkansas, is there any type of gang activity there?
12   A.   I don't live in Hope to tell you that.
13   Q.   Oh, I'm sorry.  How about in Eldorado?
14   A.   There's plenty of that activity in Eldorado.
15   Q.   I'm sorry?
16   A.   There's plenty of gang activity in Eldorado.
17   Q.   Okay.  And were you aware of whether or not
18  James was involved in any gang activity?
19   A.   Like I remember him saying something about 74
20  G's at one point, okay.
21   Q.   Okay.  What did he say about that?
22          THE COURT:  Hold on.  Hold on.  I didn't
23  understand that.
24          You said something about 74 G's; is that
25  what you said?

212

```
1    THE WITNESS:  Yes, sir.
2         THE COURT:  All right.  Make sure that
3  Mr. McCreary over there can hear you.
4         THE WITNESS:  All right.
5         MR. ALEX:  We'll object to any further
6  hearsay from this witness, Judge.  I didn't -- it was
7  not responsive as to what he said, but any further --
8  may we instruct the witness -- the question wasn't
9  asked what he said; it was whether he was aware of.
10  I'm going to object to any further hearsay of what the
11  defendant may have told the witness.
12         THE COURT:  That's sustained.
13    Q.  (BY MR. LOLLAR:)  All right.  You've indicated
14  before, Mr. Aaron, that the way you observed things,
15  that James was always in a good mood; is that right?
16    A.   For the most part.  You know, everybody have
17  bad days, but mostly James was good -- in a good mood.
18    Q.   Did you ever see him or know him to be violent
19  in any way?
20    A.   Not -- no more violent than anybody else.
21    Q.   Are you aware of any instances where James was
22  violent?
23    A.   None -- none that I've seen.  I can only tell
24  you what I've seen.
25    Q.   All right, sir.
```

214

```
1  school and get good grades, and I think that's
2  mitigating evidence.
3         THE COURT:  It's not for truth of the
4  matter either, is it?
5         MR. LOLLAR:  No.
6         THE COURT:  Overruled.
7    Q.  (BY MR. LOLLAR:)  Mr. Aaron, you can answer
8  the question.
9         Did James ever counsel you as to whether or
10  not you should stay in school?
11    A.   He always did tell me I should stay in school.
12    Q.   Why?
13    A.   He said there ain't no future on the streets.
14    Q.   Okay.  So he would counsel you to keep going
15  on your studies.
16    A.   Exactly.
17    Q.   All right.  Now, how much potential, in your
18  opinion, did James have?
19    A.   A lot.  It's a lot of potential, because I've
20  seen some of the stuff he drew.  You know, he really
21  could have been a good architect, you know what I'm
22  saying?  He knew how to scale it or map it.  It could
23  be done.
24         THE COURT:  What was that last testimony?
25  He could sale it or map it?
```

213

```
1         And how was James generally as a person?  How
2  was his personality?
3    A.   Like I said, James a lay-back person, always
4  joking.  Just pretty much that.
5    Q.   Now, are you familiar with James at one point
6  dropping out of high school?
7    A.   I was going to say I heard he did, but I
8  wasn't there to see it or nothing, so --
9    Q.   I'm sorry.  I couldn't hear you.
10    A.   I was aware of it because I heard he did,
11  that's all.
12    Q.   All right.  Did he ever counsel you about what
13  you should do in regard to school?
14    A.   Yeah.  James --
15         MR. ALEX:  Judge, and counsel is asking
16  for a hearsay response.
17         THE COURT:  Response?
18    A.   You want me to answer that?
19         THE COURT:  No.
20         MR. LOLLAR:  Hold on for just a second.
21         Judge, I think that --
22         THE COURT:  The objection is hearsay.
23         MR. LOLLAR:  The objection is hearsay.
24  This is both before and after he was arrested,
25  counseling him as to whether or not he should stay in
```

215

```
1         THE WITNESS:  You know, like an architect.
2         THE COURT:  Okay.
3         THE WITNESS:  You know how they do.
4         THE COURT:  I'm not fussing at you.
5    Q.  (BY MR. LOLLAR:)  Do you see that guy over
6  there with his hand on his face there?
7    A.   Yeah.
8    Q.   He's got to be able to understand what you're
9  saying, okay?
10    A.   All right.
11    Q.   Okay.  So just speak up real loud.
12         You were talking about his ability as an
13  artist.
14    A.   Right.
15    Q.   And drafting ability, that type of thing.
16    A.   Yes.
17    Q.   And putting things in scale and dimension,
18  those types of things, is that what you're talking
19  about?
20    A.   Yes, sir, it is.
21    Q.   And you thought he had potential in the area
22  that he wanted to go into, which was architecture.
23    A.   Right.
24    Q.   All right.  Now, you are aware that James also
25  writes rap.
```

216

1    A.   I'm aware of that.

2    Q.   Lyrics, or music, whatever you want to call

3 it. That's not of my generation, forgive me for that,

4 but you are of the generation.

5         Do you sometimes listen to rap music yourself?

6    A.   All the time.

7    Q.   All the time. And are you familiar with his

8 rap music that he wrote?

9    A.   I heard some of his free-style songs before.

10   Q.   Okay. Now, is that something that is unique

11 just to James, or is that something that a lot of kids

12 do?

13   A.   I know a lot of people that free-styles.

14        THE COURT: A lot of people that what,

15 sir?

16        THE WITNESS: Free-style. Write rap.

17   Q.   (BY MR. LOLLAR:) Free-style? Okay.

18        And are you familiar with the type of rap that

19 is popular in the culture?

20   A.   Yes, I am.

21   Q.   All right. Have you heard of Lil Wayne?

22   A.   Yes, I have.

23   Q.   Have you heard of Ja Rule?

24   A.   Yes, I heard of Ja Rule.

25   Q.   I'm sorry?

*SHARON HAZLEWOOD, CSR     972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

218

1    A.   It's typical.

2    Q.   All right.

3        MR. LOLLAR: We'll offer Defendant's 46.

4        THE COURT: Any objection?

5        MR. ALEX: I have no objections, Judge.

6        THE COURT: Defense Exhibit 46 is

7 admitted.

8    Q.   (BY MR. LOLLAR:) Now, Mr. Aaron, I'm going to

9 read these, but just so the jury understands, if the

10 suggestion is made that what James was rapping was in

11 any way unique, or displays a mindset towards violence

12 or anything like that, it's just like the rest of this

13 stuff --

14   A.   Right.

15   Q.   -- by these rappers; is that right?

16   A.   Exactly. It's just music.

17        MR. LOLLAR: May I publish, Your Honor?

18        THE COURT: Yes, sir.

19   Q.   (BY MR. LOLLAR:) Now, have you gotten any

20 letters from James since he's been jailed here in

21 Dallas?

22   A.   Yes, I have.

23   Q.   How many letters have you got from him?

24   A.   I believe around two or three, maybe four.

25   Q.   And do you have those letters?

*SHARON HAZLEWOOD, CSR     972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

217

1    A.   I've heard of him.

2    Q.   Okay. How about 50 Cent?

3    A.   Yeah, I heard of him.

4    Q.   Three 6 Mafia?

5    A.   You can go down the list all day, and I heard

6 them.

7    Q.   You've heard them all.

8    A.   Yes.

9    Q.   Okay.

10        MR. LOLLAR: May I approach the witness,

11 Your Honor?

12        THE COURT: Yes, sir.

13   Q.   (BY MR. LOLLAR:) Mr. Aaron, let me show you

14 what has been marked as Defendant's Exhibit Number 46,

15 and do you recognize what these are?

16   A.   Yeah, I recognize them.

17   Q.   Go through there, because I just stapled them

18 altogether.

19        Are these all typical rap lyrics by noted

20 rappers, I guess?

21   A.   Yeah, that -- that's true.

22   Q.   That's true?

23   A.   That is true.

24   Q.   And is this type of rap that we're looking at

25 here kind of typical of the genre?

*SHARON HAZLEWOOD, CSR     972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

219

1    A.   Not on my person, but I have them.

2    Q.   Okay. In general, can you give us some idea

3 of what he's telling you to do, or what you should do?

4        MR. ALEX: Judge, I'm going to object to

5 hearsay.

6        THE COURT: It's not for the truth of the

7 matter asserted; for the effect on the witness.

8        Overruled.

9    Q.   (BY MR. LOLLAR:) What has he advised you to

10 do?

11   A.   Like I said, he wrote me and he told me I

12 should stay in school; that -- to go on to college and

13 get a degree or something. Just don't be out on the

14 streets. Don't make the same mistakes that he did, and

15 that -- do something positive with my life, pretty

16 much.

17   Q.   Has he done -- has he mentioned anything about

18 getting involved with drugs?

19   A.   Never mentioned anything about that.

20   Q.   How about gangs?

21   A.   He told me to stay away from gangs.

22   Q.   He told you to stay away from gangs, and stay

23 in school and get your education.

24   A.   Exactly.

25   Q.   Thank you, Mr. Aaron.

*SHARON HAZLEWOOD, CSR     972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**220**

1  MR. LOLLAR: We'll pass the witness.
2  THE COURT: Cross-examination.
3  MR. ALEX: Yes, Your Honor.
4  **CROSS-EXAMINATION**
   BY MR. ALEX:
6  Q. Mr. Aaron, my name is David Alex. I have a
7  few questions for you, okay?
8  **A. All right. That's cool.**
9  Q. Tell me how old you are again?
10 **A. 17.**
11 Q. 17? And at 17, would you say that you're
12 pretty mature person?
13 **A. I'm a pretty mature person.**
14 Q. All right. And you're here -- is your mom
15 Jackie?
16 **A. Yes, sir.**
17 Q. All right. And is that -- her last name is
18 Aaron as well?
19 **A. That's correct.**
20 Q. Okay. I want to just talk to you a little bit
21 about what you just finished telling the jury about,
22 and that's these gangster raps, okay?
23 **A. All right.**
24 Q. And I think you used the word free-styling,
25 didn't you?

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**221**

1  **A. Yes.**
2  Q. And you've seen the --
3  MR. ALEX: May I approach, Judge?
4  THE COURT: Yes, sir.
5  Q. (BY MR. ALEX:) And you've seen the defendant
6  do a little free-styling before, haven't you?
7  **A. Exactly.**
8  Q. All right. Have you -- have you ever seen the
9  interviews that the defendant gave to the media in this
10 case?
11 **A. I have.**
12 Q. Okay. And you -- you're familiar with the
13 gangster rap; is that right?
14 **A. That's correct.**
15 Q. Many of it is talking about robbing and
16 killing folks, right?
17 **A. Some of it.**
18 Q. Some of it? Would you say a lot of it or just
19 a little of it?
20 **A. I'd say the majority.**
21 Q. Majority of it? Okay.
22 And when it comes to rap about it, they don't
23 then go out and do it, do they?
24 **A. No.**
25 Q. So there's a little something different about

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**222**

1  what your cousin was writing about and then what he
2  went out and did. He actually went out and did what he
3  was writing lyrics about, didn't he?
4  **A. If they convicted him of it, I guess.**
5  Q. I'm sorry?
6  **A. If they convicted him of it, I guess.**
7  Q. Well, do you think he -- he didn't go out and
8  execute these two young men over here?
9  **A. No part of my heart can let me believe that.**
10 Q. I understand completely. Now, --
11 THE COURT: What was that last thing you
12 said? Part of your heart does not believe it?
13 MS. HANDLEY: No part of my heart.
14 THE WITNESS: No part.
15 Q. (BY MR. ALEX:) I would be willing to bet as
16 well that State's Exhibit 474, what's that called up
17 here at the top?
18 **A. Right here?**
19 Q. Yeah.
20 **A. Free-style.**
21 Q. Free-style writing?
22 **A. Uh-huh.**
23 Q. And I'll bet you you'd be shocked if -- if he
24 knew that the defendant, even after he executed these
25 people, was in his cell free-styling about it. That

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**223**

1  would shock you, wouldn't it?
2  **A. I ain't got an answer to that.**
3  Q. All right. Let me -- let me read this to you.
4  It's called free-style writing, and you just finished
5  telling the jury free-styling is a part of what rap is
6  all about, right?
7  **A. Right.**
8  Q. And your cousin here, who you say is not
9  dangerous, after he murders these two people, he writes
10 a free-style about why he's in jail, okay? And he
11 says, *****check with lyrics*** Say, look. Fade 'em,
12 Fade 'em. Tape 'em up. I hit 'em later. I'm so high
13 up and cloud proof, like a skyscraper. Hogtie 'em and
14 body bag 'em. Send them to the mayor. Then I bombed
15 the whole country. Send the press. The paper.
16 All right? And then he stops and he says,
17 Hold up. Stop and rewind that shit. I'm about to tell
18 you a little story why I'm in this bitch.
19 You see that?
20 **A. I see it.**
21 Q. He's free-styling, ain't he?
22 **A. Uh-huh.**
23 Q. Okay.
24 Yeah, I hit the lick, but the reason I got
25 caught, cuz the nigga' snitchin. Shoot, now this bitch

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**224**

1  leaked.  I got two counts of murder.
2         He's talking about this case, isn't he?
3     A.    (Nods head.)
4           THE COURT:  Answer out loud, sir.
5     A.    Yes.
6     Q.    (BY MR. ALEX:)  In jail.  Have you even seen
7  the photographs of what he did to those people?
8     A.    No, I haven't.
9     Q.    So even after he's done that, he's in there
10  free-styling about a murder.  I might go to trial and
11  tell the Judge, I'm going to merck him.  Cuz I'm J.B.
12  Do you know who you fuckin' with?  Get money out the
13  ass.  Now that's some expensive shit.
14         And you're telling me that this situation,
15  after he's talked about killing and robbing folks in
16  his lyrics and actually doing it, and then after he
17  does it, he free-styles about it, you're telling me
18  that's no different than Lil Wayne or anybody else.  Is
19  that what you're saying?
20     A.    It's still no difference; yes, sir.
21     Q.    No difference.
22     A.    It's just music.
23           MR. ALEX:  That's all I have, Judge.  I'll
24  pass the witness.
25           THE COURT:  Redirect?

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**225**

1           MR. LOLLAR:  That's all the questions we
2  have, Your Honor.  May he be excused?
3           THE COURT:  Yes, sir.  You're permanently
4  excused, sir.  You may step down.
5           MR. LOLLAR:  Call Kevon Eason.
6           THE COURT:  Kevon Eason.
7           Mr. Alex, I need to see that last exhibit,
8  please.
9           Mr. Eason, will you please come all the
10  way to the front of the courtroom up here by the door.
11  Go all the way to the front of the courtroom.  Go as
12  far as you can.  Keep going.  All the way to the front.
13  When you've reached the door, turn and face me; raise
14  your right hand.
15              **KEVON EASON**
16  was called as a witness and testified as follows:
17           THE COURT:  You may lower your hand.  Take
18  your seat in the witness stand.
19           You'll be responding to questions from
20  Mr. Lollar.  All right.
21           **DIRECT EXAMINATION**
22  BY MR. LOLLAR:
23     Q.    Would you tell us your name and spell your
24  first name and your last name for the court reporter?
25     A.    My name is Kevon Eason.  And that's K-E-V-O-N,

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

1  E-A-S-O-N.
2     Q.    And, Mr. Eason, how old are you?
3     A.    19.
4     Q.    And where do you live?
5     A.    Eldorado, Arkansas.
6     Q.    And who do you live with?
7     A.    Jackie Aaron.
8     Q.    And is that the mother of Gary Aaron, who was
9  the last witness we heard from here?
10     A.    Yes, sir.
11     Q.    And how long have you been living there with
12  Jackie and Gary in Eldorado?
13     A.    Going on three years.
14     Q.    And where did you live prior to the time you
15  came to live with them?
16     A.    Hope, Arkansas.
17     Q.    And who did you live with there in Hope?
18     A.    My mother and my grandmother, Betty Eason.
19     Q.    And your grandmother is Betty Eason?
20     A.    Yes, sir.
21     Q.    Let me ask you if you know James Broadnax?
22     A.    Yes, sir.
23     Q.    Do you see him here in the courtroom?
24     A.    Yes, sir.
25     Q.    And is this him seated right down here to my

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**227**

1  right?
2     A.    Yes, sir.
3     Q.    And how are you -- are you related to James?
4     A.    Yes, sir.
5     Q.    How are you related to him?
6     A.    First cousins.
7     Q.    All right.  Have you kept close with James
8  over the years as y'all have grown up?
9     A.    Yes, sir.
10     Q.    He's just a little bit older than you are; is
11  that right?
12     A.    Yes, sir.
13     Q.    How old were you when you first met him, if
14  you recall?
15     A.    Probably like three or four.
16     Q.    Three or four?
17     A.    Yes, sir.
18     Q.    So certainly you've had him in your memory
19  since the day you were three or four years old.
20     A.    Yes, sir.
21     Q.    All right.  Are you currently in school?
22     A.    Yes, sir.
23     Q.    Where are you going to school at?
24     A.    Arkansas State University.
25     Q.    And where is that located?

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

228

230

1    A.   Jonesboro, Arkansas.

2    Q.   And what are you studying there?

3    A.   Mechanical engineering.

4    Q.   And how do you like mechanical engineering?

5    A.   It's all right. It's good.

6    Q.   Are you planning on changing major in the

7    future?

8    A.   Yes, sir.

9    Q.   What are you going to change to?

10   A.   Criminal justice, I'm leaning towards.

11   Q.   And why do you want to change to criminal

12   justice and get a degree in criminal justice?

13   A.   I want to work for the FBI one day.

14   Q.   All right, sir. That's what your plans are?

15   A.   Yes, sir.

16   Q.   And I want you to tell me, based on your

17   personal experience with James, how is he? How is

18   James?

19   A.   He's a normal kid. Playing sports, video

20   games. Average teenager, basically.

21   Q.   All right, sir. Have you ever known him to be

22   violent?

23   A.   No, sir.

24   Q.   Okay. How about James' living situation as he

25   was growing up, can you describe that for the jury?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1    and then moved to Arkadelphia. Do you remember them

2    moving to Arkadelphia?

3    A.   They always lived in Arkadelphia, as far as I

4    can remember, so --

5    Q.   Okay. Very good.

6         Now, what seemed to be stable about the time

7    when James was living with Darryl Maxwell?

8    A.   I mean, he was going to school, did his work

9    and all of that. Had chores. I mean, just basic

10   structure of how a home was supposed to be.

11   Q.   All right. And that was how, in your opinion,

12   a home should be.

13   A.   Yes, sir, for the most part.

14   Q.   All right, sir.

15        And you said that Mr. Maxwell was financially

16   stable and that was able to help out the family there?

17   A.   It seemed that way; yes, sir.

18   Q.   Okay. Very good.

19        Now, were you aware that Audrey broke up with

20   Mr. Maxwell at some point?

21   A.   Yes.

22   Q.   And how was James's stability after that

23   point?

24   A.   He probably wasn't too stable. I really don't

25   recall. But I think they might have -- he might have

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

229

1    A.   James, he never really has had a stable home.

2    Always moved around a lot pretty much his whole life,

3    up until now.

4    Q.   Do you remember at any time in his life when

5    he had a degree of stability?

6    A.   Probably a couple of months here and there at

7    a time, but not just years, not long.

8    Q.   And when was that? Where was he living when

9    you thought he had a degree of stability?

10   A.   Probably in Texarkana for a little bit. And

11   maybe in Hope for a little bit too.

12   Q.   All right. Do you know his mom, Audrey?

13   A.   Yes, sir.

14   Q.   Do you know a guy by the name of Darryl that

15   she was married to for a short while?

16   A.   Yeah, I remember him.

17   Q.   And how did you think about that home being a

18   stable place?

19   A.   It seemed -- it seemed pretty stable. It

20   seemed like they were financially stable. It looks

21   like they had a good home.

22   Q.   That would be when she was married to Darryl

23   Maxwell?

24   A.   Yes, sir.

25   Q.   And I understand they started out in Texarkana

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

231

1    moved to Texarkana or Hope, Arkansas, with us.

2    Q.   Did there come a point in time when James

3    moved into your house with you?

4    A.   Yes, sir.

5    Q.   And did that happen on just one occasion or

6    more than one occasion?

7    A.   It was a few occasions.

8    Q.   All right. The first time, when -- when was

9    that? Or how old were y'all?

10   A.   I was probably like nine, he may have been ten

11   or eleven.

12   Q.   All right. And did y'all share a room?

13   A.   Yes, sir.

14   Q.   And so y'all got to be pretty close.

15   A.   Yes, sir.

16   Q.   Now, how was James at that point in his life?

17   A.   He might have been the same. He was the same

18   way, pretty much.

19   Q.   Ever any problem to y'all?

20   A.   No, sir, not at all.

21   Q.   Okay. Did he seem to enjoy being with y'all?

22   A.   Yes, sir.

23   Q.   Okay. Now after that initial period of time,

24   how long did he live with you there initially?

25   A.   In Hope?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1    Q.   In hope.

2    A.   Probably like two -- two or three years, two

3    and-a-half years, something -- something along that

4    line.

     Q.   At that point in time, were y'all living with

6    Betty Eason?

7    A.   No.  No, sir.

8    Q.   Okay.  So this was separate and apart from

9    Betty.

10   A.   Uh-huh.

11   Q.   Okay.  After that initial time that he lived

12   with y'all, did his mom have an occasion to take him

13   and move to Texarkana?

14   A.   Yes, sir.

15   Q.   And how long did they live there in Texarkana,

16   if you know?

17   A.   Probably about the same amount of time.  About

18   two or three years.

19   Q.   All right.  And would you ever go and visit

20   them there in Texarkana?

21   A.   Yes, sir.

22   Q.   And can you describe the neighborhood that

23   they were living in when you went to visit Texarkana?

24   A.   It was project housing, Grambling Courts, and

25   it was a pretty rough neighborhood for the time.

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

233

.-.   Q.   Is that different than what you were used to?

2    A.   Yes, sir.

3    Q.   Okay.  You described that as a rough

4    neighborhood?

5    A.   Yes, sir.

6    Q.   Okay.  After they lived there for that period

7    time, did they move back in with y'all?

8    A.   Yes, sir.

9    Q.   And how old is -- how old would you have been

10   and how old would James have been about then, the

11   second time they came to live with you-all?

12   A.   I was probably about 11.  He might have been

13   12 or 13.

14   Q.   And again, did y'all share a room?

15   A.   Yes, sir.

16   Q.   So you were still close to him and --

17   A.   Yes, sir.

18   Q.   -- got along fine?

19        Was he ever any problems to y'all when

20   y'all -- when he lived with y'all the second time?

21   A.   No, sir.

22   Q.   Okay.  Now, I want to ask you about that

23   period of time.  Did you get a feeling of how James

24   felt about himself?

25   A.   Yes, sir.

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

234

1    Q.   Can you describe that to the jury?

2    A.   Sometimes at night he would sit up and talk to

3    me and my sister about how he felt misplaced and

4    unwanted at times.

5         MR. ALEX:  Judge, I'm going to have to

6    object to hearsay.  If counsel wants his testimony, --

7         THE COURT:  Hold on.  On that, I sustain.

8    Q.   (BY MR. LOLLAR:)  Well, specifically, did a --

9    tell us what kind of mood he would be in when he was

10   telling you these things.

11   A.   Sad, lonely.  That would describe it.  And a

12   little upset.

13   Q.   And when he would say he was upset, how did he

14   express that?

15   A.   He would cry.

16   Q.   Okay.  And what was he talking about?

17   A.   Not being wanted by --

18   Q.   Not being wanted.

19   A.   Not really feeling loved by anyone.

20   Q.   And from your perception, why would he be

21   having that feeling about not being wanted?

22        MR. ALEX:  Judge, I'm going to have to

23   object.

24        THE COURT:  Sustain the objection.  I've

25   previously sustained it.

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

235

1         MR. LOLLAR:  Okay.

2    Q.   (BY MR. LOLLAR:)  What was y'all's response to

3    him?

4    A.   Um, we were young and basically we just tried

5    to let him know that, you know, me and her, we still

6    loved him, or whatever, and we would always love him.

7    Q.   So you tried to encourage him?

8    A.   Yes, sir.

9    Q.   And did there come a point in time when again

10   they -- they moved away from y'all and back to Hope?

11   A.   Yes, sir.

12   Q.   And where did they move to in Hope?

13   A.   I think he moved to Hope with us.

14   Q.   With who?

15   A.   With us.

16   Q.   With y'all?

17   A.   Yes, sir.

18   Q.   Okay.  Now, did he ever go to stay with Betty

19   Eason?

20   A.   Yes, sir.

21   Q.   And when would that have been?

22   A.   When he was younger, probably.  He stayed with

23   her a few times, a few occasions.

24   Q.   And you would -- you would be over there also?

25   A.   Yes, sir, I would come to visit and sometimes

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

236

1  I would stay with her too.
2      Q.  And y'all know -- y'all refer to her as Big
3  Mamma?
4      A.  Yes, sir.
5      Q.  And how is James's relationship with Big
6  Mamma?
7      A.  They didn't have a good relationship.
8      Q.  And you saw that firsthand.
9      A.  Yes, sir.
10     Q.  Can you describe the relationship and how Big
11 Mamma would treat James?
12     A.  Basically, she would belittle him all the time
13 and talk down to him and just treat everyone better
14 than the way she treated him.
15     Q.  What are the types of things she would say to
16 James?
17             MR. ALEX:  Judge, that's hearsay.
18             THE COURT:  Overruled.  I'll allow it.
19     A.  She would call him half baked, or half --
20     Q.  (BY MR. LOLLAR:)  Half baked?
21     A.  Yeah.  A dirty white boy.  Tell him that his
22 mother didn't want him.  Things along that line.
23     Q.  I'm sorry, but you're losing your voice there.
24 You need to speak up a little bit.
25         So she called him half baked, called him a

237

1  dirty white boy, and she would tell him that his mother
2  didn't want him?
3      A.  Yes, sir.
4      Q.  And would she -- did she indicate to him
5  whether anybody wanted him?
6      A.  No, sir.
7      Q.  Do you remember her specifically saying that?
8      A.  Yes, sir.
9      Q.  Okay.  That there ain't nobody that wants you?
10     A.  Yes, sir.
11     Q.  You heard her say that to him?
12     A.  Yes, sir.
13     Q.  On one occasion?
14     A.  It was a lot of times she said it.  Every time
15 they would argue, basically.
16     Q.  Okay.  Now, how about -- how did she treat him
17 in other ways besides talking like this to him?
18     A.  Sometimes, she would kick him out the house
19 for a little bit at a time.  She wouldn't let him get
20 nothing to drink or eat sometimes.
21     Q.  I'm sorry.  Now you're losing your voice
22 again.  Keep that up.
23     A.  She wouldn't let him eat sometimes.  She
24 wouldn't let him get nothing to drink.  He would have
25 to tell his brother to go sneak him something to drink

238

1  and eat at times.
2      Q.  Okay.  So she wouldn't let him eat and
3  wouldn't let him drink, even a drink of water?
4      A.  Yes, sir.
5      Q.  And she literally put him outside of the
6  house?
7      A.  Yes, sir.
8      Q.  And wouldn't let -- wouldn't let him come in.
9      A.  Yes, sir.
10     Q.  Would she let y'all take any food or water out
11 to him?
12     A.  Not if she seen it.
13     A.  Not if she seen it.
14     A.  No, sir.
15     Q.  Okay.  Now, how long, that you're aware of,
16 did James live there with Big Mamma?
17     A.  On which occasion?
18     Q.  I don't know.  How many are there?
19     A.  Probably have to be about three or four times.
20     Q.  And how long would -- would she -- would --
21 would he stay there with her on those occasions?
22     A.  On the averages, had to be about six or seven
23 months at that time, maybe.
24     Q.  Okay.  Did there come a point in time when you
25 moved with your mother to Mt. Vernon?

239

1      A.  Yes, sir.
2      Q.  And you remember what year that would have
3  been in?
4      A.  Probably like 2003, maybe.
5      Q.  And how long did you and your mom live there
6  in Mt. Vernon?
7      A.  About a year and-a-half, two years.
8      Q.  Was there a point in time when Audrey and
9  James came to live with y'all in Mt. Vernon?
10     A.  Yes, sir.
11     Q.  And do you remember how long they were there
12 with y'all?
13     A.  Probably about a year.
14     Q.  Okay.
15     A.  Nine months to a year.
16     Q.  Did they live that whole time with you or did
17 they go out and get their own apartment after awhile?
18     A.  They went and got their own apartment after
19 awhile.
20     Q.  And did James get enrolled in school there at
21 Mt. Vernon?
22     A.  Yes, sir.
23     Q.  Was he in an age-appropriate class for him or
24 was he at a lower class level than he should have been
25 in?

240

1    A.   Um, at that time he had a few classes that
2    were under his age -- grade level.
3    Q.   Okay.  Do you know why that was?
4    A.   No, sir.
5    Q.   Okay.  Now, do you know where Audrey and James
6    moved to after they left Mt. Vernon?
7    A.   I think they moved to Dallas.
8    Q.   And do you know why they moved to Dallas?
9    A.   No, sir.
10   Q.   How long did they stay in Dallas?
11   A.   Probably about four or five months.
12   Q.   And then what happened?
13   A.   They moved -- moved back to Hope, I think.  He
14   did, anyways.
15   Q.   And who did he have to go back and live with?
16   A.   He stayed with us.
17   Q.   With y'all?
18   A.   Yes, sir.
19   Q.   Did he ever have to go back to Big Mamma's at
20   that point?
21   A.   Yes, sir.
22   Q.   Okay.  Do you know how long he had to stay
23   back there?
24   A.   He stayed there at times for about a year,
25   maybe.

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

241

1    Q.   Okay.  And where did y'all move to?
2    A.   We moved to Hope also.
3    Q.   To Hope also?  And how long did y'all stay
4    there?
5    A.   About a year.
6    Q.   And then where did you move?
7    A.   Eldorado.
8    Q.   Okay.  And did James come and stay with y'all
9    there in Eldorado?
10   A.   No, sir.
11   Q.   All right.  Are you familiar with the time
12   when James dropped out of school?
13   A.   Yes, sir.
14   Q.   Tell me about that.  What do you know about
15   him dropping out of school?
16   A.   I know he had started going at the beginning
17   of the year, and then on towards the end of the
18   semester, he had sort of like stopped going, and he was
19   saying that he was going to get his GED.  And he had
20   started doing -- working on that.  And he was walking
21   back and forth every morning doing that.  And I think
22   he probably got tired of that and I think he stopped
23   doing it.
24   Q.   And why did he get tired of going to those GED
25   classes?

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

242

1    MR. ALEX:  I'm going to object.  There's
2    no foundation for this.
3    Q.   (BY MR. LOLLAR:)  If you know.
4    MR. ALEX:  Why he got tired of doing
5    anything is --
6    THE COURT:  Sustained.
7    Q.   (BY MR. LOLLAR:)  How far away were the GED
8    classes from where they were living?
9    A.   About four to five miles.
10   Q.   Okay.
11   A.   Approximately.
12   Q.   And he didn't have any transportation?
13   A.   No, sir.
14   Q.   So he'd have to walk to those GED classes.
15   A.   Yes, sir.
16   Q.   Okay.  Now, in -- his decision -- well,
17   in -- in dropping out of regular school, how were his
18   credits situation with where he was supposed to be, if
19   you know?
20   A.   I think most of his classes were under what
21   they were supposed to be at the time.
22   Q.   But he wanted to get his GED and tried to get
23   his GED?
24   A.   Yes, sir.
25   Q.   Did he have any plans at this time as to what

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

243

1    he wanted to do with his future?
2    A.   At this time.
3    Q.   Yes, sir.
4    A.   I think he wanted to be an architect.
5    Q.   Had he expressed that to you?
6    A.   Yes, sir.
7    Q.   Do you know whether or not he had any talent
8    that would support that?
9    A.   Yes, sir.  He've [sic] always been able to
10   draw real well.
11   Q.   Okay.  Now, before he would -- wanted to be an
12   architect, did he have any shorter range plans that he
13   ever talked about doing?
14   A.   Not that I recall.
15   Q.   Did he ever mention going to the Job Corps?
16   A.   Oh, yeah.
17   Q.   Okay.  Tell us about that.
18   A.   Yeah, he wanted to go to Job Corps about the
19   time we had moved back to Hope the last time, and he
20   was trying to get his birth certificate, Social
21   Security card to get enrolled in Job Corps, but he
22   couldn't get it because I don't think he could get in
23   contact with his mom, and he wanted for her to send it
24   to him.
25   Q.   Okay.  There was some difficulty in getting

SHARON HAZLEWOOD, CSR     972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

244                                                                                                          246

1  the birth certificate?
2       A.  Yes, sir.
3       Q.  And that was preventing him from going into
4  the Job Corps?
5       A.  Yes, sir.
6       Q.  But he tried to.
7       A.  Yes, sir.
8       Q.  Now, were you familiar with the time when he
9  went to Georgia?
10      A.  Yes, sir.
11      Q.  And tell me about that.  Why did he go to
12  Georgia?
13           MR. ALEX:  Judge, again, I'm going to
14  object --
15           THE COURT:  Sustained.
16      Q.  (BY MR. LOLLAR:)  If you know.
17           MR. ALEX:  There's no foundation for
18  personal knowledge if the question is asked.
19           Can I take him on voir dire?
20           THE COURT:  No.
21           MR. ALEX:  Okay.
22           THE COURT:  The objection's sustained.
23           MR. ALEX:  Thank you, sir.
24      Q.  (BY MR. LOLLAR:)  Okay.  Well did he go to
25  Georgia?

        SHARON HAZLEWOOD, CSR     972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1       Q.  Now, did you ever see any guidance that he had
2  in his life at any point, really?
3       A.  No, sir.  Except for probably those first few
4  years in Arkadelphia.
5       Q.  Okay.  With Darryl Maxwell?
6       A.  Yes, sir.
7       Q.  Okay.  Now, I want to talk about this for just
8  a second.  His older brother, Aaron, what was Big
9  Mamma's relationship with Aaron as opposed to Big
10  Mamma's relationship with James?
11      A.  She always treated Aaron better than James.
12      Q.  I believe you described it as he was the
13  golden boy?
14      A.  Yeah, the golden boy.
15      Q.  Couldn't do anything wrong?
16      A.  No, sir.
17      Q.  And he is not half white; is that correct?
18      A.  No, sir.
19      Q.  Okay.  And would Big Mamma favor him over
20  James?
21      A.  Yes, sir.
22      Q.  Treat him good as opposed to you told us how
23  she treated James?
24      A.  Yes, sir.
25      Q.  Mr. Eason, do you know what James has been

        SHARON HAZLEWOOD, CSR     972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

245

1       A.  Yes, sir.
2       Q.  And are you familiar with where he went after
3  Georgia?
4       A.  I think Michigan.
5       Q.  All right.  All right.  At -- when he was in
6  Michigan, did he have any contact with you?
7       A.  Yes, he called me a couple of times.
8       Q.  Do you know, did he tell you where he was
9  staying up here?
10      A.  He told me -- he told me that he was at a
11  shelter.
12      Q.  Okay.  Do you know where he went to after he
13  left Michigan?
14      A.  Dallas.
15      Q.  And was that last year sometime?
16      A.  Yes, sir.
17      Q.  Now, did you ever know James to be involved in
18  a gang of any type?
19      A.  No, sir.
20      Q.  Okay.  Was James ever -- in your whole
21  experience with him, you actually lived with him in the
22  same room for years, off and on, --
23      A.  Yes, sir.
24      Q.  -- did you ever know him to be violent?
25      A.  No, sir.

        SHARON HAZLEWOOD, CSR     972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

247

1  convicted of doing here, in this courtroom?
2       A.  Yes, sir.
3       Q.  Is that something that you could -- would ever
4  have foreseen from him, knowing him like you do?
5       A.  No, sir.
6       Q.  When do you start back to school?
7       A.  The 26th.
8       Q.  The 26th of August?
9       A.  Yes, sir.
10      Q.  All right, sir.  All right.  Thank you, Kevon.
11           MR. LOLLAR:  We'll pass the witness.
12           THE COURT:  Cross-examination.
13           MR. ALEX:  Yes, sir.
14           CROSS-EXAMINATION
15  BY MR. ALEX:
16      Q.  Mr. Eason, my name is David Alex.  I have a
17  few questions for you.  If you don't hear me or if I'm
18  not making sense, will you let me know?
19      A.  Okay.
20      Q.  All right?
21      A.  Yes, sir.
22      Q.  Okay.  And how old of a man are you?
23      A.  I'm 19.
24      Q.  You're 19?
25           And you appear to be a pretty responsible

        SHARON HAZLEWOOD, CSR     972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

250

1  young man, would that be correct?
2    **A.  Yes, sir.**
3    **Q.**  All right.  And you are going to school where?
4    **A.  Arkansas State University.**
5    **Q.**  Okay.  And your last name is Eason, but you're
6  living with Jackie Aaron?
7    **A.  Yes, sir.**
8    **Q.**  Okay.  And who are your parents?
9    **A.  My mother is Teresa Thompson.**
10   **Q.**  And your dad is?
11   **A.  Jeffery.**
12   **Q.**  Jeffery Thompson?
13   **A.  No.  Jeffery -- Jeffery Read.**
14   **Q.**  Jeffery Read?
15   **A.  Yes, sir.**
16   **Q.**  And where are they at?
17   **A.  My mother is on her way back to Eldorado, and**
18  **I don't know where Jeff -- Jeffery is.**
19   **Q.**  You don't know where your father is.
20   **A.  No, sir.**
21   **Q.**  And that's -- that's -- for lack of a better
22  term, you know, in our country, for some -- for some
23  reason, that's kind of common, isn't it?  Where the
24  dads kind of -- the dads are not always there, are
25  they?

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

249

1    **A.  I guess you could say that.**
2    **Q.**  You turned out all right, didn't you?
3    **A.  I'm trying to.**
4    **Q.**  You're doing a good job, too.  Have you
5  worked -- have you worked your life -- during your
6  life?
7    **A.  Yes, sir.**
8    **Q.**  How many jobs have you worked?
9    **A.  Three.**
10   **Q.**  Okay.  Where did you work at?
11   **A.  My first job was Pizza Hut, then my second job**
12  **was Lion Oil, and my third job was J Christy**
13  **Construction.**
14   **Q.**  You think those things helped make you who you
15  are today, the fact that you went out and worked?
16   **A.  No, sir.**
17   **Q.**  You don't think they contribute at all to the
18  person you are today?  Well, let me ask it this way:
19        If you sat up on the couch playing video games
20  and eating pizza all day every day instead of going out
21  and working, do you think you'd have the drive to be in
22  college right now?
23   **A.  No, sir, I do not.**
24   **Q.**  All right.  And let me -- let me ask you this:
25        When you -- when did you-all get here to

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

1  Dallas?
2    **A.  Saturday.**
3    **Q.**  Okay.  Today is Tuesday?
4    **A.  Yes, sir.**
5    **Q.**  All right.  And who all did you come down
6  with?
7    **A.  I rode in the car with?**
8    **Q.**  Yes.
9    **A.  Jackie Aaron and Gary Aaron.**
10   **Q.**  Gary Aaron is the young man who just -- Gary
11  just testified?
12        THE COURT:  Yes.
13   **Q.**  (BY MR. ALEX:)  Gary Aaron is the young man
14  who just testified, right?
15   **A.  Yes, sir.**
16   **Q.**  And Jackie is going to testify as well?
17   **A.  Yes, sir.**
18   **Q.**  All right.  And counsel asked you a lot of
19  questions, and to be honest, you -- you wasn't with the
20  defendant when he was moving from place to place, were
21  you?
22   **A.  Was I with him?**
23   **Q.**  Yeah.
24   **A.  Most of the time they moved to where we were**
25  **to stay with us.**

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

251

1    **Q.**  Okay.
2    **A.  But, no, I wasn't with them.**
3    **Q.**  Okay.  And how long they lived somewhere and
4  all that kind of stuff, that would just be information
5  that somebody told you; is that right?
6    **A.  It's information I know.**
7    **Q.**  Okay.  But it wouldn't be because you were
8  with them and you knew that because you were with them,
9  right?  It would be from what somebody told you; is
10  that right?
11   **A.  I kept in contact with them a lot, so --**
12   **Q.**  Did y'all talk about the case and what was
13  going to be said in here in court on the way here
14  from -- was it from Arkansas y'all came from?
15   **A.  Yes, sir.**
16   **Q.**  Did y'all talk about that?
17   **A.  No, sir.**
18   **Q.**  Nobody talked about what you were coming here
19  for and what was going to be said?
20   **A.  Oh, yeah, we knew what we were coming here**
21  **for.**
22   **Q.**  Okay.  And when y'all got here, did y'all have
23  an interview in which y'all all sat together and talked
24  about what was going to be said?
25   **A.  About?**

*SHARON HAZLEWOOD, CSR    972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

252

1  Q.  About the testimony today in trial.  You were
2  prepared for trial, right?
3  A.  Yes, sir.
4  Q.  Okay.  And when you were prepared for trial,
you would have been in the same room with Jackie and
6  with the other guy, right?
7  A.  No, sir.
8  Q.  No?  I mean, they separated y'all and talked
9  to y'all about what you were going to say?
10  A.  No, sir, they didn't tell us what to say.
11  Q.  No, I'm not -- I'm not saying that.  I'm not
12  even suggesting that.  Let me -- let me just ask you
13  this, though:
14      You said that -- that the defendant was trying
15  to get his birth certificate to go to Job Corps; is
16  that right?
17  A.  Yes, sir.
18  Q.  And it wasn't that he was trying to get a job
19  and he couldn't get a job because he didn't have a
20  birth certificate?
21  A.  Yes, sir, that's true.
22  Q.  Which one?
23  A.  He couldn't get a job because he didn't have
24  his birth certificate.
25  Q.  And he couldn't go to Job Corps because he

SHARON HAZLEWOOD, CSR        972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

253

1  didn't have his birth certificate.
2  A.  Yes, sir.
3  Q.  All right.  And how do you know that?  Is that
4  what he told you?
5  A.  No.  I was there.
6  Q.  You were there?
7  A.  Yes, sir.
8  Q.  When he was trying to get the birth
9  certificate?
10  A.  Yes, sir.
11  Q.  Okay.  And where was that at?
12  A.  At my Big Mamma's house.
13  Q.  Okay.  That wasn't when he was in the east
14  somewhere, Michigan, or something like that?
15  A.  No, sir.
16  Q.  Okay.  All right.  And when -- when we talk
17  about gangs in Arkansas, are you familiar with the
18  Gangster Disciples?
19  A.  Somewhat.
20  Q.  You've heard the name before?
21  A.  Yes, sir.
22  Q.  Have you ever seen any of their tags on the
walls or anything like that?
24  A.  No, sir.
25  Q.  Okay.  But you've heard of -- you've heard of

SHARON HAZLEWOOD, CSR        972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

254

1  the Gangster Disciples.
2  A.  Yes, sir.
3  Q.  And they are in -- they do have them in
4  Arkansas.
5  A.  Yes, sir, I believe so.
6  Q.  Okay.
7      MR. ALEX:  That's all I have, Judge.  I'll
8  pass the witness.
9      THE COURT:  Redirect?
10      MR. LOLLAR:  Just one question.
11      **REDIRECT EXAMINATION**
12  BY MR. LOLLAR:
13  Q.  Mr. Alex was asking you how it was that we
14  talked to you.  We separated y'all and talked to y'all
15  independently of each other; is that correct?
16  A.  Yes, sir.
17  Q.  So you couldn't hear what somebody else was
18  saying to one of the other lawyers.
19  A.  No, sir.
20  Q.  Okay.  All right.  Thank you, Kevon.
21      MR. LOLLAR:  May he be excused,
22  Your Honor?
23      THE COURT:  Will there be any recross?
24      MR. ALEX:  No.  No, Judge.
25      THE COURT:  May the witness be permanently

SHARON HAZLEWOOD, CSR        972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

255

1  excused?
2      MR. LOLLAR:  Yes.
3      MR. ALEX:  I have no objection,
4  Your Honor.
5      THE COURT:  You're permanently excused,
6  sir.  You can go.  That mechanical engineering's not
7  bad, though.  You might not want to give up on that
8  quite yet.
9      What further says the defense?
10      MS. MALLON:  Jackie Aaron, Your Honor.
11      THE COURT:  Jackie Aaron.
12      Is that Miss Aaron there?
13      MS. MALLON:  Yes.
14      THE COURT:  Miss Aaron, if you'll please
15  come all the way to the front of the courtroom, all the
16  way to the very front.  Up by the door.  When you've
17  reached the door, turn and face me and raise your right
18  hand.  Raise your right hand.
19      **JACKIE AARON**
20  was called as a witness and testified as follows:
21      THE COURT:  You may lower your hand.  Take
22  your seat in the witness stand.
23      You'll be responding to questions from
24  Mr. Lollar.
25      Whenever you're ready, sir.

SHARON HAZLEWOOD, CSR        972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

258

1       MS. MALLON:  It will be me, Judge.
2       THE COURT:  Or Miss Mallon.
3       Go ahead.
4       MS. MALLON:  Thank you, Your Honor.
        **DIRECT EXAMINATION**
6   BY MS. MALLON:
7       Q.   Ms. Aaron, would you please state your full
8   name?
9       **A.   Jackie Ann Aaron.**
10      Q.   Okay.  And where do you currently reside?
11      **A.   Eldorado, Arkansas.**
12      Q.   Okay.  And what's your educational background?
13      **A.   I have an MBA.**
14      Q.   From where?
15      **A.   University of Arkansas at Little Rock.**
16      Q.   Okay.  When did you get your MBA?
17      **A.   May of 2005.**
18      Q.   And what are you doing professionally right
19  now?
20      **A.   I'm the administrative manager at Union Power
21  Station in Eldorado, Arkansas, and I'm currently going
22  back to school for a doctorate.**
23      Q.   Okay.  What's your relationship to James
24  Broadnax?
25      **A.   He's my nephew.**

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

257

1       Q.   Okay.  Do you see Mr. Broadnax here today?
2       **A.   Yes, I do.**
3       Q.   Where is he seated?
4       **A.   Right there.**
5       Q.   Next to me?
6       **A.   Yes, he is.**
7       Q.   Okay.  Thank you, ma'am.
8           Is Audrey Kelly -- she -- she's your sister;
9   is that right?
10      **A.   That is correct.**
11      Q.   Okay.  And explain to the jury how -- how --
12  how Audrey, I guess, came to be your sister.
13      **A.   We were all raised by my aunt and uncle as
14  sisters.  My baby sister Teresa, which is my biological
15  sister, Teresa Thompson, and then Audrey is our cousin,
16  but we were all raised as sisters.**
17      Q.   Okay.  And you were raised by whom?
18      **A.   Betty Eason and Glen Eason.**
19      Q.   Okay.  Is that also who we referred to as Big
20  Mamma?
21      **A.   That's correct.**
22      Q.   And do you still have a relationship with
23  Audrey today?
24      **A.   Yes.**
25      Q.   Would you say you're close?

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

1       **A.   Yes.**
2       Q.   Okay.  Do you recall the first time when you
3   met James?
4       **A.   Yes.**
5       Q.   Tell us about that.
6       **A.   Um, I was in Hope visiting Mamma Betty, and
7  Audrey had come home with James.**
8       Q.   Okay.  Do you remember when that was, what
9   year, approximately?
10      **A.   I believe it was around '91 or '92.**
11      Q.   Okay.  And you came home from where?
12      **A.   From college at SAU in Magnolia, Arkansas.**
13      Q.   Okay.  And you said Audrey was visiting --
14      **A.   Yes.**
15      Q.   -- Ms. Betty with James?
16      **A.   Yes.**
17      Q.   Did she have her other children with her?
18      **A.   No.  No one but James.  Aaron lived with Mamma
19  Betty at the time.  That's her oldest son.**
20      Q.   Okay.  And that was the first time you met
21  James.
22      **A.   Yes.**
23      Q.   Have you seen James from that point on
24  throughout your life?
25      **A.   Yes.**

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

259

1       Q.   Okay.  How often would you see James, on
2   average?
3       **A.   Maybe once a month, or once every other month
4  when I would go to Hope.**
5       Q.   Okay.  Were there times when you'd see him
6   more often than others?
7       **A.   Yes.**
8       Q.   Okay.  Did you ever spend a significant amount
9   of time with him?
10      **A.   I mean, not a lot of time.**
11      Q.   Okay.
12      **A.   My visits were -- he was there at the home
13  when I was visiting, but as far as just spending time,
14  we didn't do a lot of that.**
15      Q.   Okay.  Did he ever live with you?
16      **A.   No.**
17      Q.   Did he and his mother ever live with you?
18      **A.   His mother, yes; him, no.**
19      Q.   Okay.  Do you remember when that was?
20      **A.   Audrey lived with me recently.**
21      Q.   Okay.  Okay.
22      **A.   So that was this year.**
23      Q.   How would you describe Audrey as a mother?
24      **A.   She tries.  She -- she has a good heart.  Her
25  intentions are good.**

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

260

1    Q.   Okay.

2    A.   But, you know, she falls short sometimes, I

3    believe.

4    Q.   How does she fall short?

5    A.   Well, you know, James being moved around a

6    lot. He didn't have a lot of stability in his life.

7    His mom wasn't the mother figure there for him. It was

8    always someone else --

9    Q.   Okay.

10   A.   -- a lot of times.

11   Q.   So are you saying that she would drop him off

12   and go somewhere else?

13   A.   May I speak in my opinion?

14   Q.   Sure.

15   A.   In my opinion, yeah, I believe she should have

16   been there more for him. She dropped him off too much.

17   Q.   Okay.

18   A.   I have a son, and I wouldn't drop him off like

19   that.

20   Q.   Okay. So she dropped him off with different

21   relatives?

22   A.   Yes.

23   Q.   And did that -- was that his entire life as

24   you knew him?

25   A.   As I knew, yes.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

261

1    Q.   Okay. Would you say that she abandoned him?

2    A.   Yeah, sometimes she would.

3    Q.   Okay. Could you see, from the time that you

4    spent with James, could you see how that affected him,

5    his mother leaving him all the time?

6    A.   He was somber a lot.

7    Q.   Okay.

8    A.   Kind of quiet and reserved a lot, you know.

9    His brother gave him joy. I know he enjoyed being with

10   Aaron, his older brother, but, you know, it's nothing

11   like being with your mother.

12   Q.   Okay. Did you ever see Audrey abuse James?

13   A.   I've never seen her physically abuse him.

14   Q.   Have you seen her verbally abuse him?

15   A.   I've heard verbal abuse, yes.

16   Q.   You've seen her verbally abuse him.

17   A.   Yes.

18   Q.   Okay. Did that happen often?

19   A.   Not often. Of my knowledge, it wasn't very

20   often, because I wasn't there to see their

21   interaction --

22   Q.   Okay.

23   A.   -- that often.

24   Q.   But you actually saw it yourself.

25   A.   Yes.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

262

1    Q.   Okay. And what did she say?

2    A.   Just, whomever, like, one -- one instance that

3    I remember, she was taking up for this gentleman she

4    was with, and apparently James had done something or

5    didn't do something he was not happy with, and so she

6    was defending the gentleman instead of James and saying

7    that he needs to be more obedient, and he doesn't

8    listen, and hardheaded, and all of these kinds of

9    things.

10   Q.   Did you ever hear her call him names?

11   A.   Yes.

12   Q.   Okay. What was James's reaction?

13   A.   He never said anything. He was kind of well

14   up within himself, but he never said anything back to

15   her.

16   Q.   Did he get upset?

17   A.   Yes, he was upset, but he didn't act out.

18   Q.   Okay. And the times you saw this, do you

19   remember how old James was?

20   A.   When he -- when -- when they had come to Hope,

21   he was about seven years old.

22   Q.   Okay.

23   A.   And I didn't even know he was in the world

24   until then, really. But as he got older, he was back

25   and forth in Hope a lot with the grandmother, and so,

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

263

1    yes, I saw more of him.

2    Q.   Okay. Did you know -- did you see Audrey, or

3    did you know Audrey had been abused by the men in her

4    life?

5    A.   Yes.

6    Q.   Okay. And how did you know that?

7    A.   She's told us, and I've seen the bruises.

8    Q.   Okay. And Audrey's had a lot of men in her

9    life, hasn't she?

10   A.   Yes.

11   Q.   Okay. Did you ever see any of those men abuse

12   James?

13   A.   No.

14   Q.   Did you ever see any effects of abuse on him?

15   A.   No.

16   Q.   Okay. And were you aware that Audrey abused

17   NiQuia?

18   A.   Yes.

19   Q.   Okay. And how are you aware of that?

20   A.   I was going to my aunt's house the night the

21   incident happened, and so by the time I got there,

22   police officers were there taking her away and taking

23   the kids to the hospital.

24   Q.   Okay. When you say Taking her away, you're

25   referring to Audrey?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

266

1    Q.    Yes.

2    Q.    So the police had arrested her.

3    A.    Correct.

4    Q.    Okay.  And the police took both of the girls
away?

6    A.    Yes.  When I got there, NiQuia was in an
7  ambulance, and Kerrin was getting into a --a police
8  car.

9    Q.    Okay.  Was James there?

10   A.    No.

11   Q.    Okay.  And did they end up charging Audrey
12 with a crime, do you know?

13   A.    Yes.

14   Q.    Do you know what she was charged with?

15   A.    No, I'm not sure what she was charged with.

16   Q.    Okay.  As a result of that, do you know if the
17 girls were taken away from her?

18   A.    Yes.

19   Q.    Okay.  And where did they go?

20   A.    To Michigan to live with their father, Steve.

21   Q.    Okay.  Did you ever know Audrey to abuse
22 drugs?

23   A.    Yes.

24   Q.    What kind of drugs?

25   A.    Pills, marijuana, alcohol, to my knowledge.

---

1    Q.    Okay.  Tell me what kinds of physical abuse
2  you actually saw.

3    A.    Hitting.

4    Q.    Okay.

5    A.    Hitting him with her hand a lot, wherever she
6  could hit him.

7    Q.    Okay.

8    A.    Yeah.

9    Q.    What else?  Did she throw things at him?

10   A.    Yeah.  Whatever she could pick up.

11   Q.    Such as?  What do you recall?

12   A.    An ashtray.

13   Q.    Okay.  Like a --

14   A.    Just a smoking ashtray, a glass ashtray.

15   Q.    Okay.  So it was glass.

16   A.    Yes.

17   Q.    What else would she throw at him, that you
18 recall?

19   A.    That's what I recall.

20   Q.    Okay.  And you said you saw her hitting him.

21   A.    Yes.

22   Q.    On more than one occasion?

23   A.    Yes.

24   Q.    Okay.  With an open hand, a closed fist, or
25 both?

---

265

1    Q.    Okay.  Anything else?

2    A.    To my knowledge, she said she had
3  experimented --

4        MR. ALEX:  Excuse me, Judge.

5    A.    -- with crack cocaine.

6        THE COURT:  Sustained.

7        MR. ALEX:  I'm going to object to hearsay.

8        THE COURT:  Sustained.

9        You're not allowed to talk about what she
10 told you, ma'am.

11       THE WITNESS:  Yes.

12   Q.    (By Ms. Mallon:)  But you have known her to
13 abuse drugs and alcohol.

14   A.    Yes.

15   Q.    Now, I want to talk a little bit about
16 Ms. Betty, Big Mamma.

17   A.    Uh-huh.

18   Q.    Did you -- did you actually see the
19 relationship between Big Mamma and James?

20   A.    Yes.

21   Q.    Okay.  Tell us about that relationship.  Was
22 it abusive?

23   A.    Yes.

24   Q.    How?

25   A.    Physically and verbally.

---

267

1    A.    Both.

2    Q.    Okay.  And I think you said wherever she could
3  get him.

4    A.    Yes.

5    Q.    Anything else she used to do to him?

6    A.    Verbally abusive to him.  Neglect.  Sitting
7  him -- locking him outside of the house in
8  hundred-degree temperature denying him access inside
9  the house to get a cold drink of water.

10   Q.    How old was James when you recall that
11 happening?

12   A.    He was young.  He was maybe -- I'm not quite
13 sure of his age, but he wasn't an older teen.  He was
14 younger.  13, 14.

15   Q.    Okay.  And she would physically lock him out
16 of the house?

17   A.    Yes.

18   Q.    Okay.  And did you say it was hot outside?

19   A.    Yes.

20   Q.    Okay.  She wouldn't let him in for a drink of
21 water.

22   A.    No.

23   Q.    Anything else you recall her doing to him?

24   A.    He was not allowed to freely go to the
25 refrigerator to eat.

270

1   Q.   Okay.  And when you said that Ms. Betty would
2   hit James, --
3   A.   Yes.
4   Q.   -- did he ever once retaliate?
5   A.   No.
6   Q.   Did he ever hit her or push her?
7   A.   No, he did not.
8   Q.   Whenever Ms. Betty would hit him, what would
9   he do?
10   A.   He would just cry, or if he didn't cry, he'd
11   just kind of swell up within himself and he'd go
12   outside or -- or go into another room.
13   Q.   Okay.  And the physical abuse, do you know --
14   do you recall the first time you saw Ms. Betty
15   physically abuse James?  You remember how old he was?
16   A.   Yes.
17   Q.   And how old was he?
18   A.   He was nine.  We had gone to Hope to visit,
19   and it was wintertime, and James was there.  And I'm
20   not sure of what had happened to bring it about, but
21   she said something to him, and subsequently, she
22   slapped him.
23   Q.   Where did she slap him?
24   A.   On his face.
25   Q.   Okay.  Did Audrey ever see the way Ms. Betty

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

1   Q.   Were the other kids allowed to go to the
2   refrigerator and eat?
3   A.   Yes.
4   Q.   James was the only one.
5   A.   Yes.
6   Q.   Okay.  Did -- you said she verbally abused
7   him.
8   A.   Yes.
9   Q.   What would she say?
10   A.   She would call him a half breed and say that
11   he was nasty.  His kind was nasty.  And that he was
12   trifling; that his mother was a disgrace for having
13   him.  She would -- she would just say mean things to
14   him.
15   Q.   Okay.  And when you -- how old was James when
16   you first remember her saying those kinds of things?
17   A.   From the time he got there, when he was seven.
18   She had no love -- no like for him.  I don't know.  I
19   can't speak whether she loved him or not, but she
20   expressed that she did not care for him.
21   Q.   And did those names, those -- did she continue
22   to call him those kinds of things throughout his life?
23   A.   Yes.
24   Q.   And how would James react?
25   A.   He was hurt.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

271

1   treated James?
2   A.   I'm not sure.
3   Q.   Okay.  Would Audrey -- and only if you know --
4   would Audrey drop -- would Audrey leave James with
5   Betty on more than one occasion?
6   A.   Yes.
7   Q.   Okay.  But you're not certain if she knew
8   about the abuse.
9   A.   I'm not certain.
10   Q.   Okay.  Did she ever leave any marks on him?
11   A.   Handprint, yeah.  She hit him pretty hard so,
12   yeah, she'd leave her handprint or, you know, fist,
13   whatever it was she hit him with.
14   Q.   Okay.  And despite this treatment by
15   Ms. Betty, did you know -- how did James treat her?
16   A.   He still loved his Big Mamma.  He did.  He
17   respected her.  In spite of everything, he respected
18   her.
19   Q.   Okay.  Let's talk a little bit more about
20   James.
21        Did you, or were you aware -- were there times
22   when he was left completely alone?
23   A.   One occasion that I am aware of.
24   Q.   And do you know how old he was at that time?
25   A.   No, I'm not sure of his age.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

269

1   Q.   Did he cry?
2   A.   Sometimes.
3   Q.   Okay.  Um, is it fair to say that Mamma Betty,
4   as you call her, she didn't like white people?
5   A.   She didn't like white people, Mexicans.  When
6   we were young, we were not allowed to play with people
7   of opposite race.  We were told to stay to ourselves,
8   and especially white people because they meant us no
9   good.
10   Q.   Okay.  And that was her problem with James?
11   A.   Yes.
12   Q.   Did -- did she treat the other kids as poorly
13   as she treated him?
14   A.   No.
15   Q.   Okay.  Tell us about Ms. Betty's relationship
16   with Aaron, James' oldest brother.
17   A.   She loved Aaron very much and she doted on
18   Aaron.  Her love and her affection.  Her money and her
19   time, Aaron got that.
20   Q.   Okay.  Very different than her relationship
21   with James.
22   A.   Yes.
23   Q.   And did James -- was James able to witness the
24   relationship between Ms. Betty and Aaron?
25   A.   Yes.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

274

1    Q.  Okay.  Can you give us -- was he under ten or
2    over ten, can you tell us that?
3    A.  Over ten.
4    Q.  Okay.  Um, would you think --
5        THE COURT:  Let me stop you there,
6    Ms. Mallon.
7        We'll take our last recess of the day.
8        All rise for the jury.
9        We're in recess till 2:50.
10       (Recess taken.)
11       (Court reconvened; Jury present.)
12       THE COURT:  Whenever you're ready,
13   Miss Mallon.
14       MS. MALLON:  Thank you, Your Honor.
15                **JACKIE AARON**
16   was re-called as a witness and testified as follows:
17        **DIRECT EXAMINATION - CONTINUING**
18   BY MS. MALLON:
19       Q.  Miss Aaron, will you state your name again,
20   please?
21       A.  Jackie Ann Aaron.
22       Q.  And you were testifying prior to the break,
23   right?
24       A.  Yes.
25       Q.  Okay.  And I think when we left off, we were

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

1    Q.  Okay.  When you learned of this incident, were
2    you surprised?
3    A.  Very much.
4    Q.  Okay.  Did you ever expect to see James in
5    this position?
6    A.  (Shakes head.)
7    Q.  No?
8    A.  No.
9    Q.  Okay.  We've heard from a lot of -- a lot of
10   your family, Ms. Aaron.  It sounds like James had a lot
11   of people who loved and cared about him.  I mean, do
12   you -- do you see a way his life might have turned out
13   differently?
14   A.  Yes.
15   Q.  Tell us about that.  James wrote me a letter
16   to apologize for letting me down, and the reality is --
17       MR. ALEX:  And, Judge, I'm going to object
18   to any further --
19       THE COURT:  Sustained.
20   Q.  (BY MS. MALLON:)  Don't tell me what James
21   said, just tell me what you want to say.
22   A.  I let him down.  His family let him down.  Not
23   just his mother, but his aunt.  He reached out to us
24   and we didn't pull him in.  We didn't.  And I'm sorry.
25       MS. MALLON:  That's all I have, Judge.

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

273

1    talking about James.  Do you recall the last time you
2    saw James?
3    A.  The last time I saw James was in Hope.
4    Q.  Okay.
5    A.  And that was about two years ago.
6    Q.  Okay.  And how was he?
7    A.  He was doing good.
8    Q.  Okay.
9    A.  He -- he had something on his mind.  He said
10   he would talk to me at one time about it, but we never
11   got to talk.
12   Q.  Okay.  Have you ever known James to be
13   violent?
14   A.  No.
15   Q.  Have you ever seen him fight?
16   A.  No.
17   Q.  Have you ever seen him get in a fight?
18   A.  No, ma'am.
19   Q.  Okay.  How has he treated you?
20   A.  Always decent, respectful.
21   Q.  Have you ever seen him act in any other way?
22   A.  No.
23   Q.  Okay.  Um, have you ever known him to be
24   involved in any gang activity?
25   A.  No, I did not.

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

275

1        THE COURT:  Cross-examination?
2             **CROSS-EXAMINATION**
3    BY MR. ALEX:
4    Q.  You okay, ma'am?
5    A.  Yes, sir.
6    Q.  You've been up there for awhile.  You need any
7    water or anything?  I've got bottled water over here.
8    A.  No, sir.  Thank you.
9    Q.  You sure?
10   A.  Yes, sir.
11   Q.  Miss Eas -- I'm sorry.  Ms. Aaron, that's your
12   last name, right?
13   A.  Yes, sir.
14   Q.  Okay.  My named is David Alex.  I -- I really
15   only have a few questions for you.
16       I want to congratulate you on your success
17   and -- and wish you much future success in your working
18   on your master's?
19       THE COURT:  Ph.D.
20   Q.  (BY MR. ALEX:)  Ph.D.  You have a master's; is
21   that correct?
22   A.  Yes, sir.
23   Q.  Okay.  Very good.  And did you grow -- tell
24   the jury where did you grew up at?
25   A.  Hope, Arkansas.

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**278**

1    Q.   Okay.  And -- and who raised you?

2    A.   Betty Eason and Glen Eason.

3    Q.   And would you agree with me, generally

4  speaking, that young people, when they're growing up,

5  they tend to have two sides to them?  The side that's

6  respectful to their elders, and then the side that they

7  portray when they go out when they're not around their

8  elders.  Would you agree with that?

9    A.   Yes.

10   Q.   Okay.  And were you aware at all about when

11  James went to jail and -- and spent some time in jail

12  for a possession charge?

13   A.   No.

14   Q.   You weren't aware of that?

15   A.   No.

16   Q.   Okay.  And if -- if that had happened, that

17  would just be an incident in his life that you would

18  not have been aware of; is that right?

19   A.   Yes.

20   Q.   Okay.  And as it relates to the --

21       MR. ALEX:  That's all I've got, Judge.

22  I'll pass the witness.

23       THE COURT:  Redirect?

24       MS. MALLON:  No, Your Honor.

25       THE COURT:  May the witness be permanently

*SHARON HAZLEWOOD, CSR     972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

**277**

1  excused?

2       MS. MALLON:  Yes, Your Honor.

3       MR. ALEX:  I have no objections,

4  Your Honor.

5       THE COURT:  You're permanently excused,

6  ma'am.  Thank you for your testimony.

7       What further says the defense?

8       MR. LOLLAR:  Tre'Vaun Miller.

9       THE COURT:  Tre'Vaun Miller.

10       You may step down, ma'am.  Thank you.

11       Somebody needs to go get Tre'Vaun Miller.

12       MS. MALLON:  He's here, Judge.

13       THE COURT:  Okay.

14       Mr. Miller, please step forward.  All the

15  way to the front of the courtroom.  Mr. McGaughey will

16  escort you.  All the way to the door.  When you've

17  reached the door, turn and face me and raise your right

18  hand.  Raise your right hand.

19              **TRE'VAUN MILLER**

20  was called as a witness and testified as follows:

21       THE COURT:  Lower your hand take.  Take

22  your seat in the witness stand.  You'll be responding

23  to questions from Mr. Lollar, I guess?

24       MR. LOLLAR:  Yes, sir.

25       THE COURT:  All right, sir.

*SHARON HAZLEWOOD, CSR     972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

**DIRECT EXAMINATION**

1

2  BY MR. LOLLAR:

3    Q.   Would you tell us your name, please?

4    A.   Tre'Vaun Miller.

5    Q.   Mr. Miller, you might want to point that

6  microphone right towards you there and kind of lift up

7  on the end of it so you'll talk right into that.  And

8  remember to speak up loud enough so that the last juror

9  down here can hear you, okay?

10   A.   Yes, sir.

11   Q.   Would you spell your first name for the court

12  reporter?

13   A.   Tre'Vaun Miller.

14   Q.   How do you spell that?

15   A.   T-R-E apostrophe V-A-U-N, Miller.

16   Q.   And, Mr. Miller, how old are you?

17   A.   20.

18   Q.   And, Mr. Miller, I see that you are dressed in

19  the outfit of a Dallas County jail inmate.  Are you

20  currently an inmate here in the Dallas County jail?

21   A.   Yes, sir.

22   Q.   Mr. Miller, I understand that earlier this

23  year, you were actually sentenced to penitentiary time;

24  is that correct?

25   A.   Yes, sir.

*SHARON HAZLEWOOD, CSR     972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

---

**279**

1    Q.   And were you sentenced to a 20-year sentence?

2    A.   Yes, sir.

3    Q.   And I understand that you were on probation

4  for burglary of a habitation; is that correct?

5    A.   Yes, sir.

6    Q.   And then got arrested for, I believe, three

7  aggravated robberies and two robberies; is that

8  correct?

9    A.   Yes, sir.

10   Q.   And you were sentenced to 20 years'

11  confinement in each of those cases earlier this year;

12  is that right?

13   A.   Yes, sir.

14   Q.   Do you remember what month and what day you

15  went to court?

16   A.   I think -- I think it was January the 23rd, I

17  think, or the 26th.

18   Q.   January the 23rd?

19   A.   Yes, sir.

20   Q.   Of this year?

21   A.   Yes, sir.

22   Q.   And were you actually sent to the

23  penitentiary?

24   A.   Yes, sir.

25   Q.   Which penitentiary were you sent to?

*SHARON HAZLEWOOD, CSR     972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

282

1    A.   My unit is Wallace.

2    Q.   Wallace Unit?

3    A.   Yes. Yes, sir.

4    Q.   And where is that located?

5    A.   In Colorado City.

6    Q.   Colorado City, okay.

7         Mr. Miller, I caused you to be brought back up

8   here to Dallas County, and then I came and interviewed

9   you, I believe, on July the 28th of this year; is that

10  correct?  Does that sound about right?

11   A.   Yes, sir.

12   Q.   And did we talk about an incident that

13  occurred last January the 21st of this year?

14   A.   Yes, sir.

15   Q.   And do you know an individual by the name of

16  James Broadnax?

17   A.   Yes, sir.

18   Q.   And do you see him here in court?

19   A.   Yes, sir.

20   Q.   Where is he sitting?

21   A.   He's sitting right there, sir.

22   Q.   He's sitting right here, the second one to my

23  right?

24   A.   Yes, sir.

25   Q.   Let me ask you, Mr. Miller, did you-all get

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

1    Q.   How many fights did you get into there?

2    A.   I think like four or five, and then I

3   threatened an officer.

4    Q.   Four or five, and then you threatened an

5   officer?

6    A.   Yes, sir.

7    Q.   And got moved to a single cell.

8    A.   Yes, sir.

9    Q.   Is that right?

10        Now, how long were you in a single cell up

11  until the time you were sent off to the penitentiary?

12   A.   I think three -- three months.

13   Q.   Three months or so?

14   A.   Yes, sir.

15   Q.   And when did you actually, if you recall, --

16  what month was it when you got into the single cell?

17   A.   November.

18   Q.   November of 2008?

19   A.   Yes, sir.

20   Q.   All right, sir.

21        And then you told us you were sentenced on

22  January the 23rd of this year; is that right?

23   A.   Yes, sir.

24   Q.   And so for that period of time, you were in

25  the single cell there in the North Tower.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

281

1   into it at one point?

2    A.   Yes, sir.

3    Q.   And would that be in a recreation area there

4   in the west gym area of the North Tower of the Dallas

5   County jail?

6    A.   Yes, sir.

7    Q.   Do you remember about what time of day that

8   was?

9    A.   I couldn't recall.

10   Q.   All right. Mr. Miller, let me ask you this:

11        Now, you were -- you were in jail.  Were you

12  in general population or were you assigned to a single

13  cell?

14   A.   A single cell.

15   Q.   And had you been in a single cell the whole

16  time or had you started off in general population?

17   A.   I started off in general population.

18   Q.   And you were moved to a single cell from

19  general population; is that correct?

20   A.   Yes, sir.

21   Q.   And why were you moved to a single cell?

22   A.   Too many jail violations and too many history

23  of aggravated assaults.

24   Q.   Too many fights you've been into?

25   A.   Yes, sir.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

283

1    A.   Yes, sir.

2    Q.   Now, Mr. Miller, is it true that when you're

3   in a single cell, you do get to get out one hour a day

4   and taken to recreation; is that right?

5    A.   Yes, sir.

6    Q.   And did you have occasion to be at recreation

7   with other people?

8    A.   Yes, sir.

9    Q.   So they would let the people in the single

10  cells out, take them to a recreation area.  And I've

11  seen those.  They're kind of like a half basketball

12  court; is that right?

13   A.   Yes, sir.

14   Q.   And it's kind of open air.  Of course, there's

15  netting, screens there.  You can't get out or anything,

16  but they let y'all run around and play basketball and

17  that type of thing.

18   A.   Yes, sir.

19   Q.   And is that where you had first come to know

20  Mr. Broadnax was at the recreation?  Or did you know

21  him before that?

22   A.   No, I -- I knew him before that.

23   Q.   How did you know him?

24   A.   Because it was all over the news.

25   Q.   So you had seen his case on the news.

SHARON HAZLEWOOD, CSR      972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

284

1   A.   Yes, sir.

2   Q.   Okay.  And when did you first personally meet

3 him?

4   A.   When I went to -- when I was walking down the

hallway go to my cell when I first went to

administrative custody.

7   Q.   Okay.  How was your relationship with James?

8   A.   I ain't never really talked to him.  It

9 just -- the time I only talked to him was when he --

10 when he gave me that encouragement and that time we had

11 a fight.

12   Q.   Okay.  And I know what you're talking about,

13 but the jury doesn't.  You said he gave you some words

14 of encouragement.

15   A.   Yes, sir.

16   Q.   How did y'all come to be talking to each other

17 where he gave you these words of encouragement?

18   A.   Because I was yelling in my cell cussing

19 everybody out, and then he told -- he yelled down there

20 to me and he told me, Just give it to God and let go.

21 And I'm already mad at the situation because when --

22 when I'm mad, I don't like for nobody to tell me no

23 positive advice, period.

24        So I was already thinking in my mind to

25 assault somebody, so when he said that, I said I'm just

          SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

285

1 going to assault him.  And when we went to the gym, I

2 assaulted him and he defended himself.

3   Q.   Okay.  That was kind of quick.  I want to go

4 back through that one more -- one more little time,

5 okay?

6        So you were mad.

7   A.   Yes, sir.

8   Q.   Mad at the world, I guess?

9   A.   Yes, sir.

10   Q.   And you were yelling?

11   A.   Yes, sir.

12   Q.   And cussing everybody out and that type of

13 thing?

14   A.   Yes, sir.

15   Q.   And he told you to chill out and give it to

16 God?

17   A.   Yes, sir.

18   Q.   And that, in your state of mind, was not what

19 you wanted to hear at that particular point in time; is

20 that a fair statement?

21   A.   No, sir.

22   Q.   So you formed the intent in your mind at that

time that the next time you saw him, that you were

going to go up and get into a fight with him.

25   A.   Yes, sir.

          SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

286

1   Q.   Is that a fair statement?

2   A.   Yes, sir.

3   Q.   And the next time you saw him happened to be

4 this date of January the 21st, 2009; is that right?

5   A.   Yes, sir.

6   Q.   And again, were y'all at -- had you been taken

7 to the recreation area there in the west gym area?

8   A.   Yes, sir.

9   Q.   And did he get brought to that same recreation

10 area?

11   A.   Yes, sir.

12   Q.   Tell the jury exactly what happened.

13   A.   When -- when me and him -- when we up in the

14 gym together, once the guards walked away from the

15 door, once they totally walked away from the door,

16 because I wanted to -- I didn't want there to be a

17 quick fight because I wanted to actually fight him, so

18 once I seen the guards was nowhere in sight, then

19 that's when I walked up to the offender over there,

20 walked to him and I started assaulting him and he

21 defended himself.

22   Q.   And what did you do, exactly, when you walked

23 up to him?

24   A.   I started assaulting him.

25   Q.   You started hitting him?

          SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

287

1   A.   Yes, sir.

2   Q.   With your fists?

3   A.   Yes, sir.

4   Q.   Now, he's -- he's probably a good deal taller

5 than you are.

6   A.   Yes, sir.

7   Q.   Did that stop you?

8   A.   No, sir, but it's -- it's just the point that

9 I just wanted to release some anger.

10   Q.   Okay.  So he was defending himself from your

11 attack upon him.

12   A.   Yes, sir.

13   Q.   And did that attack -- this fight, then,

14 attract the attention of the guards?

15   A.   Yes, sir, because they came.

16   Q.   And did they come in and break y'all up?

17   A.   Yes, sir.

18   Q.   And again, the cause of this, because he was

19 telling you to chill and give it up to God.

20   A.   Yes, sir.

21   Q.   Is that about all there is to this?

22   A.   Yes, sir.

23   Q.   Thank you, Mr. Miller.

24        MR. LOLLAR:  We'll pass the witness.

25        THE COURT:  Cross-examination?

          SHARON HAZLEWOOD, CSR      972-739-3906
     CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

290

1    MR. ALEX: Yes, sir.
2    **CROSS-EXAMINATION**
3    BY MR. ALEX:
4    Q.   Mr. Miller, my name is David Alex and I've got
5    a few questions for you.  If you don't understand me or
6    if I'm not making sense, you let me know, okay?
7    A.   **Yes, sir.**
8    Q.   All right.  We met for the first time today.
9    I talked to you while you were in the holdover; is that
10   right?
11   A.   **Yes, sir.**
12   Q.   And have you ever spoken to anybody -- let me
13   ask you this:
14        After the fight happened, did they give
15   you-all an opportunity to make a statement about what
16   happened?
17   A.   **Yes, sir.**
18   Q.   You didn't give any statement back then, did
19   you?
20   A.   **No, sir.**
21   Q.   All right.  And then the first time you really
22   talked about this would have been with the defense
23   counsel, Mr. Lollar when?  Did he come over and see you
24   at the jail?
25   A.   **Yes, sir.**

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

289

1    Q.   And that would have been back on -- do you
2    remember how long ago that was that he came and talked
3    to you?
4    A.   **No, sir.**
5    Q.   All right.  Would it have been within the last
6    couple of months?
7    A.   **When his attorney came to see me?**
8    Q.   Yes, sir.
9    A.   **No, it was like -- it was this month.  I**
10   **wasn't even here --**
11   Q.   Okay.
12   A.   **-- no longer than a week.**
13   Q.   All right.  So it would have been close to a
14   week ago he came and talked to you, right?
15   A.   **Somewhere -- yeah, somewhere in there.**
16   Q.   And at that point you had already been down to
17   the penitentiary; is that right?
18   A.   **Yes, sir.**
19   Q.   And when you got to the penitentiary, which
20   penitentiary did you go to?
21   A.   **I went to the Wallace Unit.  Well, but before**
22   **I went to the Wallace, I passed through three of them.**
23   Q.   Okay.  And you had to go through what they
24   call classification; is that right?
25   A.   **Yes, sir.**

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

1    Q.   And did you wind up in the general population
2    there at the penitentiary?
3    A.   **Yes, sir.  Then I went to medium custody.**
4    Q.   Medium custody?  And why is that?
5    A.   **Assault -- assault by a threat on a guard --**
6    **an officer.**
7    Q.   Okay.  While you were there at the
8    penitentiary?
9    A.   **Yes, sir.**
10   Q.   Since you left here, right?
11   A.   **Yes, sir.**
12   Q.   And that seems to be kind of -- kind of your
13   MO; is that right?  You like to fight?
14   A.   **Yes, sir.**
15   Q.   And when you were in the tank, were you trying
16   to -- were you trying to start your own little gang
17   down in the tank?
18   A.   **Where, in --**
19   Q.   Here in Dallas.
20   A.   **Oh, no.**
21   Q.   No?  That's -- you know about gangs in the
22   penitentiary, though?
23   A.   **Oh, yeah.**
24   Q.   And are you aware that the defendant is a
25   Gangster Disciple?

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

291

1    A.   **No, I didn't know that.**
2    Q.   You didn't know that?
3    A.   **No.  I don't get in people business.**
4    Q.   I'm sorry?
5    A.   **I don't get into people business.**
6    Q.   You don't get in people's business?
7    A.   **No, sir.**
8    Q.   Okay.  But when you go down to the
9    penitentiary, the gangs, you're aware of, they kind of
10   control things, don't they?
11   A.   **Yes, sir.**
12   Q.   All right.  And you are aware that at some
13   point the defendant is going to be down there at the
14   penitentiary too in some form or fashion, right?
15   A.   **Yes, sir.**
16   Q.   And have you ever heard the defendant's
17   version of what happened and how this fight started?
18   A.   **No, sir.**
19   Q.   Okay.  Let's -- let's hear that.  And -- and
20   before I play that, let me ask you this:
21        When -- when you got in the fight with the
22   defendant, do you -- well, if I said that you -- that
23   the -- that the defendant didn't see it coming, I mean,
24   from what you're telling the jury, the only thing that
25   the defendant told you was, was to let God handle it,

*SHARON HAZLEWOOD, CSR      972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

**292**

1  right? Or something to that nature?
2  　A.　Yes, sir.
3  　Q.　All right. And so he would have never seen
4  you coming. I guess you got a pretty good lick on him,
5  didn't you?
6  　A.　Yes, sir, but I didn't -- I didn't -- what --
7  I didn't really hit him that hard. My first lick, I
8  didn't really hit him that hard.
9  　Q.　Okay. But you would have -- you would have
10  had the opportunity to get the first shot at him,
11  wouldn't you?
12  　A.　Yes, sir.
13  　Q.　All right.
14  　　　MR. ALEX: State's Exhibit -- I'm sorry,
15  Judge. May I approach the witness?
16  　　　THE COURT: Yes, sir.
17  　Q.　(BY MR. ALEX:) State's Exhibit 574 and 576,
18  they took you-all to nurse afterwards, right?
19  　A.　Yes, sir.
20  　Q.　And that's the way he looked and that's the
21  way you looked, right?
22  　A.　Yes, sir.
23  　Q.　Okay. And you're a pretty good fighter,
24  right?
25  　　　MR. LOLLAR: Oh, I'm sorry. Are those in

**293**

1  evidence, Your Honor?
2  　A.　No, I never said that.
3  　　　MS. HANDLEY: Uh-huh.
4  　　　MR. LOLLAR: They are? I'm just asking.
5  　　　THE COURT: What exhibits are they?
6  　　　MR. ALEX: 574 and 576, Judge. We offered
7  them with the --
8  　　　THE COURT: Yeah, they're in evidence.
9  　Q.　(BY MR. ALEX:) So you never said you were a
10  good fighter. You just said you like to fight.
11  　A.　Yes, sir.
12  　Q.　Clearly, the defendant got the better of you,
13  even though you had the -- the surprise on your side.
14  He didn't see it coming, right?
15  　A.　Yes, sir.
16  　Q.　Okay.
17  　　　MR. ALEX: Let me identify what we're
18  going to play for the record. Let me identify it.
19  　　　MS. HANDLEY: Oh. Oh, identify it. I'm
20  sorry.
21  　Q.　(BY MR. ALEX:) The call that I'm going to
22  play for you, sir, would have been January 20 -- oh,
23  we'll play the 21st.
24  　　　MR. ALEX: He talked about this fight on
25  two different occasions: On the 21st, Judge, is

**294**

1  State's Exhibit 558 for all purposes, and 563 for
2  demonstrative purposes, and I'm going to play that at
3  this time.
4  　　　This would have been, oh, let's see, yeah,
5  looks like the --
6  　　　THE COURT: 558 and what?
7  　　　MR. ALEX: I'm sorry?
8  　　　MS. HANDLEY: 558.
9  　　　THE COURT: 558.
10  　　　MR. ALEX: 558 for all purposes; 563 for
11  demonstrative purposes.
12  　　　THE COURT: Okay. Those are not in
13  evidence yet. Is there any objection?
14  　　　MR. LOLLAR: Same objection as we
15  previously offered.
16  　　　THE COURT: The objection is overruled.
17  　　　558 and 563 are admitted.
18  　　　MR. ALEX: Thank you, Judge.
19  　　　(Videotape played.)
20  　Q.　(BY MR. ALEX:) All right. And you recognize
21  that voice? Did you ever have any real conversations
22  with the defendant while y'all were there in the single
23  cells?
24  　A.　No, sir.
25  　Q.　Okay. And when he's talking about -- you were

**295**

1  in -- in 54 at the time?
2  　A.　Yes, sir.
3  　Q.　And he would have been in, I guess, right
4  around down the hall from you, is that it?
5  　A.　Yes, sir.
6  　Q.　Okay. And you would have walked by him; is
7  that right?
8  　A.　Yes, sir.
9  　Q.　Okay. And you knew, when you walked by
10  him, -- when -- when did you realize that this was the
11  man who had committed this double homicide during a
12  robbery that was all over the TV? At what point did
13  you realize that?
14  　A.　Can you repeat that again?
15  　Q.　Yeah. Counsel asked you if you knew who the
16  defendant was, and I think your response was, Yeah, of
17  course I knew who he was. He was all over TV.
18  　A.　Yeah.
19  　Q.　All right? So at what point did you realize
20  that the man in 66 was the man who had robbed and
21  murdered these folks?
22  　A.　Because when you -- when you be down there,
23  you hear everybody talking, you going to know everybody
24  voice.
25  　Q.　Okay.

296

1    A.  You're going to know everybody voice.  So the
2  person that told me that, which was -- which was J.B.
3  I told him, you know what I'm saying?  I -- I -- I know
4  for a fact that was his voice because we hear everybody
   over there talking.
6    Q.  I gotcha.  So you recognized his voice.
7    A.  Yes, sir.
8    Q.  And you went -- you went down 20 years for
9  robbery.  Three robberies?
10   A.  Yes, sir.
11   Q.  All right.  Aggravated robberies?
12   A.  Two was ag -- no, two was aggravated, I think,
13 though.
14   Q.  With a gun?
15   A.  Yes, sir.  It's five robberies altogether.
16   Q.  With a gun?
17   A.  Yes, sir.
18   Q.  Did you kill anybody?
19   A.  No, sir.
20   Q.  All right.  Did you pull a gun on anybody?
21   A.  Yes, sir.
22   Q.  Did you get their property?
23   A.  Yes, sir.
24   Q.  Did you shoot them?
25   A.  No, sir.

298

1  a lot of people out, you know what I'm saying?  But all
2  I remember him telling me, Just give it to God and let
3  it go.  That's all I remember.
4    Q.  That's what James told you?
5    A.  Yeah, that's what he told me.
6         MR. LOLLAR:  That's all the questions we
7  have.
8         THE COURT:  Recross?
9         MR. ALEX:  Nothing further, Judge.
10        THE COURT:  May the witness be permanently
11 excused?
12        MR. LOLLAR:  Yes, Your Honor.
13        MR. ALEX:  Yes, sir.
14        THE COURT:  You're permanently excused,
15 sir.  You may step down.
16        What further says the defense?
17        MR. LOLLAR:  May we approach?
18        (Off-the-record discussion was had.)
19        THE COURT:  Let me explain this to you,
20 folks.
21        The law permits the parties, in some
22 circumstances, to take what are called depositions, and
23 those can be videotaped, and that's what we've done
24 here.  We're going to start playing one of the
25 videotapes, just to give you some familiarization with

297

1    Q.  You didn't kill them.
2    A.  No, sir.
3    Q.  Why not?
4    A.  They gave me the money.
5    Q.  They gave you the money.
6    A.  Yes, sir.
7    Q.  You gave them an opportunity for them to give
8  you the money?
9    A.  They gave me the money.
10   Q.  All right.  So you gave them that opportunity.
11 You didn't shoot them first.
12   A.  I didn't shoot nobody.
13   Q.  All right.  And because you got what you was
14 looking for, you didn't kill them, right?
15   A.  That wasn't even on my mind.  I had the money.
16   Q.  Gotcha.
17        MR. ALEX:  That's all I've got, Judge.
18        THE COURT:  Redirect?
19        **REDIRECT EXAMINATION**
20 BY MR. LOLLAR:
21   Q.  Mr. Miller, you heard what Mr. Broadnax
22 apparently said here on this jail call.  Did any of
   that happen that he was talking about?
24   A.  Like I said, I was cussing everybody out.
25 Because I was going through some things, I was cussing

299

1  who this witness is, and then if we have time, then
2  we're going to start reading the transcript from that
3  point forward.
4         We're not going to play the entire tape
5  for you, because if you'll recall, I told you from time
6  to time I had to take up objections to certain things,
7  and I did in this case.  And some portions of the
8  deposition I ruled would not be admissible.  Those
9  portions have been redacted, that is, taken away from
10 the transcripts.  So those will be read to you so that
11 you don't get confused.
12        But we'll start off with who -- who is
13 this witness going to be, Mr. Lollar?
14        MR. LOLLAR:  I think of the two, Fanny
15 Mazone would be the shortest.
16        THE COURT:  All right.
17        MR. LOLLAR:  So maybe we can go ahead and
18 start with Miss Mazone's.
19        THE COURT:  Okay.  And Fanny Mazone is --
20 is this going to be Defense Exhibit 44 or 45?  This, to
21 the transcript of her --
22        MS. MALLON:  45.
23        THE COURT:  45.  And then the tape will be
24 45-A.
25        Is that all right, Mr. Lollar?

300

1      MR. LOLLAR: That's fine, Judge.
2      THE COURT: All right.
3      (Sotto voce discussion.)
4      MR. LOLLAR: And, Your Honor, --
5      THE COURT: Yes, sir.
6      MR. LOLLAR: -- if we can explain to the
7   jury of how the interview of Ms. Mazone was conducted
8   this last Saturday in Texarkana, for reasons which are
9   gone into in the body of the interview, the interview
10  was conducted by Ms. Mallon for the defense, and --
11     THE COURT: Ms. Evans for the State.
12     MR. LOLLAR: Yes. And so --
13     THE COURT: The bottom line on this is
14  these witnesses were too frail, ill, whatever, to come
15  down there, that's why we did this by depositions.
16     MR. LOLLAR: So may it please the Court,
17  then, if Ms. Evans will represent herself, and I'll be
18  Ms. Mallon, and Ms. Mallon can be the witness.
19     THE COURT: Well, aren't we going to play
20  a little bit of the tape first?
21     MR. LOLLAR: Yes.
22     THE COURT: Okay. Go ahead and do that.
23     (Videotape played.)
24     THE COURT: I was going to let it go all
25  the way to Page 10 in the transcript.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

302

1      MR. LOLLAR: Just two.
2      THE COURT: Are they long?
3      MR. LOLLAR: Not long long. I would say
4   maybe 45 minutes at the outside.
5      THE COURT: You think we'll be able to
6   argue tomorrow afternoon, unless the State puts on a
7   rebuttal case?
8      MR. LOLLAR: Well, that's what I would
9   like to find out, is if they're going to, because if
10  they're going to, I have to have a separate witness
11  drive up.
12     MS. HANDLEY: Are these just family --
13  more family you're calling to call up, the two live
14  witnesses?
15     MR. LOLLAR: Yes.
16     THE COURT: Do you know, Mr. Alex?
17     MR. ALEX: I know I have at least two
18  rebuttal witnesses, Judge, that are not very long, and
19  potentially one that -- that may be long, but I
20  think -- I'm sorry?
21     THE COURT: Are you at liberty to tell me
22  whether these are witnesses pertaining to the
23  allegations of the robbery in 2008?
24     MR. ALEX: No, Judge. At this point, I
25  don't anticipate that.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

301

1      (Videotape played.)
2      THE COURT: Stop it there, Mr. Hikel.
3      Okay. It's 3:28, and we're not going to
4   go into reading the transcript. We'll start the case
5   back up again tomorrow morning at 8:45.
6      I appreciate y'all's patience, I
7   appreciate you paying attention to the case. We're
8   going as expeditiously as we can, consistent with the
9   ends of justice, as I'm sure -- I hope you-all
10  understand how important this case is.
11     So, I hope you have a good evening.
12  Please don't discuss the case or look at any of the
13  media.
14     All rise for the jury.
15     (Jury not present.)
16     THE COURT: Be seated, please.
17     Where are we in your case, sir?
18     MR. LOLLAR: Judge, we have -- I don't
19  have my list out.
20     1, 2, I think that's all the live
21  witnesses. Isn't that correct? Two live witnesses.
22  We have to complete this that we're doing now.
23     Of course, we have Ms. Mayes also, and I
24  think that will bring us --
25     THE COURT: Are they long live witnesses?

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

303

1      I haven't -- obviously, we heard the same
2   testimony the Court has, and at this point, I don't
3   have any intention at this point of putting on the ag
4   robbery victims.
5      Of course, Counsel and I really haven't
6   had a chance to really discuss the ins and outs of the
7   credibility of the two wit -- the only two witnesses to
8   vouch for them during the time of the offense.
9      THE COURT: Is your witness on that?
10     MR. LOLLAR: Yes, sir. The expert
11  witness.
12     THE COURT: If you put that on, -- don't
13  bring him.
14     If you put it on, I'm going to stop the
15  case so we'll have time to get him here, so I'm telling
16  you that.
17     MR. LOLLAR: Well, the point being, if
18  he -- he is an expert and I would like him to listen to
19  their testimony if they're going to put them on. I
20  think they would be entitled to do that. So, you know,
21  I think it's kind of declare if we're going to --
22     THE COURT: I will have to stop the case
23  before you put that on, until such time as he's here.
24     MR. LOLLAR: Okay.
25     THE COURT: If I have to do it. I will.

SHARON HAZLEWOOD, CSR    972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1  I don't want to, lawyers.

2  MR. ALEX:  Mr. Lollar, is that one of the

3  live witnesses you're talking about?  You have two live

4  witnesses?

     THE COURT:  No.

     MR. LOLLAR:  No.

7  THE COURT:  No.

8  MR. ALEX:  Okay.

9  MR. LOLLAR:  It's Dr. Weaver from Baylor,

10  my witness expert.

11  MR. ALEX:  I just didn't understand what

12  you were saying.

13  MR. LOLLAR:  Uh-huh.  I know it.  There's

14  no other reason to call him.

15  THE COURT:  Watch the contentiousness on

16  both sides.

17  MR. LOLLAR:  Nope.  I'm not being

18  contentious.  I'm just saying I have no reason to call

19  him unless they put on the extraneous.

20  THE COURT:  All right.  All right.  Okay.

21  Where is he?  Down in Waco?

22  MR. LOLLAR:  Waco.

23  THE COURT:  All right.  Okay.  Well, what

24  I hope is that we get the case to the jury tomorrow

25  afternoon, that's what I hope.

            SHARON HAZLEWOOD, CSR      972-739-3906
       CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

305

     MR. ALEX:  I'd like to do that too, I

2  really would.

3  THE COURT:  I think we've been in here

4  lawyering around long enough.

5  All right.  We're in recess until

6  8:45 a.m.

7  (Court adjourned.)

            SHARON HAZLEWOOD, CSR      972-739-3906
       CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

THE STATE OF TEXAS )

COUNTY OF DALLAS   )

     I, SHARON HAZLEWOOD, Official Court Reporter in
and for Criminal District Court No. 7 of Dallas County,
State of Texas, do HEREBY CERTIFY that the above and
foregoing contains a true and correct transcription of
all portions of evidence and other proceedings
requested in writing by counsel for the parties to be
included in this volume of the Reporter's Record, in
the above-styled and -numbered cause, all of which
occurred in open court or in chambers and were reported
by me.

     I further certify that this Reporter's Record of
the proceedings truly and correctly reflects the
exhibits, if any, offered by the respective parties.

     Witness my hand this the 15th day of
_April___, 2010.

            Sharon Hazlewood

            SHARON HAZLEWOOD, CSR
            Certified Shorthand Reporter
            Official Court Reporter
            Criminal District Court No. 7
            972-739-3906
            Texas CSR No. 628
            Expiration Date:  12/31/10

            SHARON HAZLEWOOD, CSR      972-739-3906
       CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS