76207

REPORTER'S RECORD

VOLUME 52 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| THE STATE OF TEXAS | ) IN THE CRIMINAL DISTRICT |
|---|---|
| | ) |
| VS. | ) COURT NO. 7 |
| | ) |
| JAMES GARFIELD BROADNAX | ) Of DALLAS COUNTY, TEXAS |

ORIGINAL

=================================================================

PUNISHMENT PHASE

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

=================================================================

On the 19TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

1

A P P E A R A N C E S

FOR THE STATE OF TEXAS:

  HONORABLE DAVID M. ALEX
  SBOT NO. 24003256
  HONORABLE LISA SMITH
  SBOT NO. 00787131
  HONORABLE GORDON HIKEL
  SBOT NO. 00787696
  HONORABLE ANDREA HANDLEY
  SBOT NO. 08898800
  HONORABLE ELAINE EVANS
  SBOT NO. 24032880
  133 N. INDUSTRIAL BLVD.
  FRANK CROWLEY COURTHOUSE
  DALLAS, TEXAS 75207
  TEL. 214-653-3600

FOR THE DEFENDANT:

  HONORABLE BRAD LOLLAR
  SBOT NO. 12508700
  1700 COMMERCE ST, STE. 404
  DALLAS, TEXAS 75201
  TEL. 214-384-8178

  HONORABLE DOUGLAS H. PARKS
  SBOT NO. 15520000
  321 CALM WATER LANE
  HOLLY LAKE RANCH, TEXAS 75765
  TEL. 903-769-3120

  HONORABLE KERI MALLON
  SBOT NO. 24049165
  DALLAS COUNTY PUBLIC DEFENDERS OFFICE
  133 N. INDUSTRIAL BLVD., LB 2
  FRANK CROWLEY COURT BLDG.
  DALLAS, TEXAS  75207
  TEL. 214-653-3550

VOLUME 52

PUNISHMENT PHASE

AUGUST 19TH, 2009                                    PAGE    VOL.

PROCEEDINGS................................    3      52
CASE CALLED BY THE COURT...................    3      52

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| MAZONE, FRANCINE | 4 | 11 | | 52 |
|  | 24 | 27 | | 52 |
| MAYES, JUANITA | 32 | 51 | | 52 |
|  | 73 | 76 | | 52 |

| | | | PAGE | VOL. |
|---|---|---|---|---|
| HEARING..................................... | | | 78 | 52 |
| JURY PRESENT............................... | | | 82 | 52 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| WYNN, NIQUIA | 95 | 108 | | 52 |
| MAXWELL, DARRYL | 141 | 168 | | 52 |
|  | 179 | 182 | | 52 |
|  | 183 | | | 52 |

| | | | PAGE | VOL. |
|---|---|---|---|---|
| DEFENSE RESTS............................. | | | 184 | 52 |
| HEARING.................................... | | | 184 | 52 |
| JURY PRESENT............................... | | | 190 | 52 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARGER, DAVID | 194 | | | 52 |

|  | PAGE | VOL. |
|---|---|---|
| HEARING........................................... | 196 | 52 |
| JURY PRESENT.................................. | 200 | 52 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARGER, DAVID | 201 | 203 |  | 52 |
|  | 206 |  |  | 52 |

|  | PAGE | VOL. |
|---|---|---|
| HEARING........................................ | 208 | 52 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| PRICE, JACK | 211 | 217 |  | 52 |
| (HEARING) | 221 |  |  | 52 |

|  | PAGE | VOL. |
|---|---|---|
| JURY PRESENT.................................. | 266 | 52 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| LUTTON, ELIZABETH | 227 | 232 |  | 52 |
| PRICE, JACK | 234 |  | 242 | 52 |
|  | 243 | 254 |  | 52 |
|  | 259 |  |  | 52 |
| SWAN, MICHAEL | 261 |  |  | 52 |
| SWAN, DEBORAH | 268 |  |  | 52 |

|  | PAGE | VOL. |
|---|---|---|
| HEARING........................................ | 281 | 52 |
| JURY PRESENT.................................. | 285 | 52 |
| STATE CLOSES................................. | 285 | 52 |
| DEFENSE CLOSES............................... | 285 | 52 |
| HEARING........................................ | 286 | 52 |

|  | PAGE | VOL. |
|---|---|---|
| ADJOURNMENT.......................... | 290 | 52 |
| REPORTER'S CERTIFICATE.................. | 291 | 52 |

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| MAZONE, FRANCINE | 4 | 11 | | 52 |
| | 24 | 27 | | 52 |
| MAYES, JUANITA | 32 | 51 | | 52 |
| | 73 | 76 | | 52 |
| WYNN, NIQUIA | 95 | 108 | | 52 |
| MAXWELL, DARRYL | 141 | 168 | | 52 |
| | 179 | 182 | | 52 |
| | 183 | | | 52 |
| BARGER, DAVID | 194 | | | 52 |
| | 201 | 203 | | 52 |
| | 206 | | | 52 |
| PRICE, JACK | 211 | 217 | | 52 |
| (HEARING) | 221 | | | 52 |
| LUTTON, ELIZABETH | 227 | 232 | | 52 |
| PRICE, JACK | 234 | | 242 | 52 |
| | 243 | 254 | | 52 |
| | 259 | | | 52 |
| SWAN, MICHAEL | 261 | | | 52 |
| SWAN, DEBORAH | 268 | | | 52 |

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARGER, DAVID | 194 | | | 52 |
| | 201 | 203 | | 52 |
| | 206 | | | 52 |
| LUTTON, ELIZABETH | 227 | 232 | | 52 |
| MAXWELL, DARRYL | 141 | 168 | | 52 |
| | 179 | 182 | | 52 |
| | 183 | | | 52 |
| MAYES, JUANITA | 32 | 51 | | 52 |
| | 73 | 76 | | 52 |
| MAZONE, FRANCINE | 4 | 11 | | 52 |
| | 24 | 27 | | 52 |
| PRICE, JACK (HEARING) | 211 | 217 | | 52 |
| | 221 | | | 52 |
| PRICE, JACK (IN PRESENCE OF JURY) | 234 | | 242 | 52 |
| | 243 | 254 | | 52 |
| | 259 | | | 52 |
| SWAN, DEBORAH | 268 | | | 52 |
| SWAN, MICHAEL | 261 | | | 52 |
| WYNN, NIQUIA | 95 | 108 | | 52 |

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| | **STATE'S EXHIBITS** | | | |
| 454A | JUDGMENT AND SENTENCE (COMPLETION TO DEFENSE EX. 47) | 91 | 91 | 52 |
| 552 | CALL FROM JAIL - 11/14/08 | 190 | 191 | 52 |
| 555 | CALL FROM JAIL - 11/22/08 | 191 | 192 | 52 |
| 556 | CALL FROM JAIL - 1/15/09 | 192 | 192 | 52 |
| 564 | CALL FROM JAIL - 1/15/09 (DEMONSTRATIVE PURPOSES) | 192 | 192 | 52 |
| 568 | CALL FROM JAIL - 11/22/08 (DEMONSTRATIVE PURPOSES) | 191 | 192 | 52 |
| 569 | CALL FROM JAIL - 11/14/08 (DEMONSTRATIVE PURPOSES) | 190 | 191 | 52 |
| 588 | XEROX PHOTOS OF FIGHT | 92 | 92 | 52 |
| 590 | CD OF CALLS FROM 6/7/09 - 8/18/09 | 196 201 | 197 201 | 52 52 |
| 591 | CALL LOG FROM 6/7/09 - 8/18/09 | 196 200 | 197 | 52 52 |
| 592 | CD OF CALLS | 201 | 201 | 52 |
| 594 | CURRICULUM VITAE OF DR. PRICE | 212 237 | 212 237 | 52 52 |
| 595 | CHARACTERISTICS OF A PSYCHOPATHIC PERSONALITY | 237 | 238 | 52 |
| 596 | COMMISSARY LOG | 228 | 228 | 52 |
| 597 | POWER POINT PRESENTATION | 243 | 243 | 52 |

## DEFENSE EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 47 | JAIL CARD | 83 | 83 | 52 |
| 48 | POLICE REPORT OF HOPE POLICE DEPARTMENT | 83 | 83 | 52 |

January 14, 1980

0

REPORTER'S RECORD

VOLUME 52 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

THE STATE OF TEXAS ) IN THE CRIMINAL DISTRICT
)
)
)
VS. ) COURT NO. 7
)
)
JAMES GARFIELD BROADNAX ) Of DALLAS COUNTY, TEXAS

===========================================================

PUNISHMENT PHASE

===========================================================

On the 19TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

---

2

VOLUME 52

PUNISHMENT PHASE

AUGUST 19TH, 2009

|  | PAGE | VOL. |
|---|---|---|
| PROCEEDINGS | 3 | 52 |
| CASE CALLED BY THE COURT | 3 | 52 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| MAZONE, FRANCINE | 4 | 11 |  | 52 |
|  | 24 | 27 |  | 52 |
| MAYES, JUANITA | 32 | 51 |  | 52 |
|  | 73 | 76 |  | 52 |

|  | PAGE | VOL. |
|---|---|---|
| HEARING | 78 | 52 |
| JURY PRESENT | 82 | 52 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| WYNN, NIQUIA | 95 | 108 |  | 52 |
| MAXWELL, DARRYL | 141 | 168 |  | 52 |
|  | 179 | 182 |  | 52 |
|  | 183 |  |  | 52 |

|  | PAGE | VOL. |
|---|---|---|
| DEFENSE RESTS | 184 | 52 |
| HEARING | 184 | 52 |
| JURY PRESENT | 190 | 52 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARGER, DAVID | 194 |  |  | 52 |

---

3

| PAGE | VOL. |
|---|---|
| HEARING | 196 | 52 |
| JURY PRESENT | 200 | 52 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARGER, DAVID | 201 | 203 |  | 52 |
|  | 206 |  |  | 52 |

| PAGE | VOL. |
|---|---|
| HEARING | 208 | 52 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| PRICE, JACK | 211 | 217 |  | 52 |
| (HEARING) | 221 |  |  | 52 |

| PAGE | VOL. |
|---|---|
| JURY PRESENT | 266 | 52 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| LUTTON, ELIZABETH | 227 | 232 |  | 52 |
| PRICE, JACK | 234 |  | 242 | 52 |
|  | 243 | 254 |  | 52 |
|  | 259 |  |  | 52 |
| SWAN, MICHAEL | 261 |  |  | 52 |
| SWAN, DEBORAH | 268 |  |  | 52 |

| PAGE | VOL. |
|---|---|
| HEARING | 281 | 52 |
| JURY PRESENT | 285 | 52 |
| STATE CLOSES | 285 | 52 |
| DEFENSE CLOSES | 285 | 52 |
| HEARING | 286 | 52 |

---

1

APPEARANCES

FOR THE STATE OF TEXAS:

HONORABLE DAVID M. ALEX
SBOT NO. 24003256
HONORABLE LISA SMITH
SBOT NO. 00787131
HONORABLE GORDON HIKEL
SBOT NO. 00787696
HONORABLE ANDREA HANDLEY
SBOT NO. 08898800
HONORABLE ELAINE EVANS
SBOT NO. 24032880
133 N. INDUSTRIAL BLVD.
FRANK CROWLEY COURTHOUSE
DALLAS, TEXAS 75207
TEL. 214-653-3600

FOR THE DEFENDANT:

HONORABLE BRAD LOLLAR
SBOT NO. 12508700
1700 COMMERCE ST, STE. 404
DALLAS, TEXAS 75201
TEL. 214-384-8178

HONORABLE DOUGLAS H. PARKS
SBOT NO. 15520000
321 CALM WATER LANE
HOLLY LAKE RANCH, TEXAS 75765
TEL. 903-769-3120

HONORABLE KERI MALLON
SBOT NO. 24049165
DALLAS COUNTY PUBLIC DEFENDERS OFFICE
133 N. INDUSTRIAL BLVD., LB 2
FRANK CROWLEY COURT BLDG.
DALLAS, TEXAS 75207
TEL. 214-653-3550

**PAGE VOL.**

| | PAGE | VOL. |
|---|---|---|
| ADJOURNMENT | 290 | 52 |
| REPORTER'S CERTIFICATE | 291 | 52 |

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL. |
|---|---|---|---|---|
| MAZONE, FRANCINE | 4 | 11 | | 52 |
| | 24 | 27 | | 52 |
| MAYES, JUANITA | 32 | 51 | | 52 |
| | 73 | 76 | | 52 |
| WYNN, NIQUIA | 95 | 108 | | 52 |
| MAXWELL, DARRYL | 141 | 168 | | 52 |
| | 179 | 182 | | 52 |
| | 183 | | | 52 |
| BARGER, DAVID | 194 | | | 52 |
| | 201 | 203 | | 52 |
| | 206 | | | 52 |
| PRICE, JACK (HEARING) | 211 | 217 | | 52 |
| | 221 | | | 52 |
| LUTTON, ELIZABETH | 227 | 232 | | 52 |
| PRICE, JACK | 234 | | 242 | 52 |
| | 243 | 254 | | 52 |
| | 259 | | | 52 |
| SWAN, MICHAEL | 261 | | | 52 |
| SWAN, DEBORAH | 268 | | | 52 |

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL. |
|---|---|---|---|---|
| BARGER, DAVID | 194 | | | 52 |
| | 201 | 203 | | 52 |
| | 206 | | | 52 |
| LUTTON, ELIZABETH | 227 | 232 | | 52 |
| MAXWELL, DARRYL | 141 | 168 | | 52 |
| | 179 | 182 | | 52 |
| | 183 | | | 52 |
| MAYES, JUANITA | 32 | 51 | | 52 |
| | 73 | 76 | | 52 |
| MAZONE, FRANCINE | 4 | 11 | | 52 |
| | 24 | 27 | | 52 |
| PRICE, JACK (HEARING) | 211 | 217 | | 52 |
| | 221 | | | 52 |
| PRICE, JACK (IN PRESENCE OF JURY) | 234 | | 242 | 52 |
| | 243 | 254 | | 52 |
| | 259 | | | 52 |
| SWAN, DEBORAH | 268 | | | 52 |
| SWAN, MICHAEL | 261 | | | 52 |
| WYNN, NIQUIA | 95 | 108 | | 52 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 454A | JUDGMENT AND SENTENCE (COMPLETION TO DEFENSE EX. 47) | 91 | 91 | 52 |
| 552 | CALL FROM JAIL - 11/14/08 | 190 | 191 | 52 |
| 555 | CALL FROM JAIL - 11/22/08 | 191 | 192 | 52 |
| 556 | CALL FROM JAIL - 1/15/09 | 192 | 192 | 52 |
| 564 | CALL FROM JAIL - 1/15/09 (DEMONSTRATIVE PURPOSES) | 192 | 192 | 52 |
| 568 | CALL FROM JAIL - 11/22/08 (DEMONSTRATIVE PURPOSES) | 191 | 192 | 52 |
| 569 | CALL FROM JAIL - 11/14/08 (DEMONSTRATIVE PURPOSES) | 190 | 191 | 52 |
| 588 | XEROX PHOTOS OF FIGHT | 92 | 92 | 52 |
| 590 | CD OF CALLS FROM 6/7/09 - 8/18/09 | 196 | 197 | 52 |
| | | 201 | 201 | 52 |
| 591 | CALL LOG FROM 6/7/09 - 8/18/09 | 196 | 197 | 52 |
| | | 200 | | 52 |
| 592 | CD OF CALLS | 201 | 201 | 52 |
| 594 | CURRICULUM VITAE OF DR. PRICE | 212 | 212 | 52 |
| | | 237 | 237 | 52 |
| 595 | CHARACTERISTICS OF A PSYCHOPATHIC PERSONALITY | 237 | 238 | 52 |
| 596 | COMMISSARY LOG | 228 | 228 | 52 |
| 597 | POWER POINT PRESENTATION | 243 | 243 | 52 |

## DEFENSE EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 47 | JAIL CARD | 83 | 83 | 52 |
| 48 | POLICE REPORT OF HOPE POLICE DEPARTMENT | 83 | 83 | 52 |

**8**

PROCEEDINGS

(Court convened; jury present.)

THE COURT: Be seated, please.

Good morning, ladies and gentlemen. Thank you once again for being here on time.

If you'll recall, when we stopped yesterday, we'd watched the live videotaped deposition testimony from Ms. Mazone, and we're now going to continue from the transcript.

And, Ms. Mallon, will you please come forward and be sworn in?

She will be acting the part of Ms. Mazone up there.

**KERI MALLON**

was called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the witness stand.

Mr. Lollar, whenever you're ready.

MR. LOLLAR: Thank you, Your Honor.

THE COURT: Yes, sir.

MR. LOLLAR: And again, I'm playing the part of Ms. Mallon who is doing the questioning of Miss Mazone.

Starting at the top of Page 10.

(Deposition of Francine Mazone:)

**9**

**DIRECT EXAMINATION**

BY MR. LOLLAR:

(As read into the record:)

Q. Yes, ma'am.

A. And there's just a difference. So you know. If you don't drink, you know a man that's drinking.

Q. Okay. Did you ever see her use drugs?

A. Never saw her use them.

Q. Okay. Did you see her, what you thought was, under the influence of drugs?

A. Have saw her under the influence of drugs.

Q. During that time of --

MR. LOLLAR: Oh, I'm sorry.

A. During -- during that time of -- era, almost the whole neighborhood was on -- it was just crack infested.

Q. Okay. And that's --

A. So that's just the way it was.

Q. Is that the neighborhood James was living in?

A. Yes.

Q. Okay. And did Audrey take very good care of James, that you could tell?

A. I -- I can't -- I can't say that. The only thing that I'll tell you is we always fed him because he was hungry. He -- he was just a kid, you know. He

**10**

just -- he didn't have new shoes and new jeans or anything like that, but he did have clothes on, you know. He was decent, but he was just hungry. He'd always say, I'm hungry.

And I said, Now, you've got to wait till after church. You know, he -- when I'd pick him up, he'd want to eat. And I said, No, you've got to go to Sunday School and be good in Sunday School, and then if you're good in Sunday School, you know, I'll -- sometime I'd have candy or something to give him, but that was just the duration of that.

Q. So he was always hungry?

A. Just about. But he didn't talk very much. That was the only thing he really would say. You know, we'd try to get him to talk in Sunday School, but he wouldn't talk in Sunday School. He always had his head down.

Q. Okay.

A. And I was worried about that because he always kept his head down. I said, Look up. You're such a good-looking boy. Look up and smile, but he never would.

Q. Did you ever see him smile?

A. Never. Never.

Q. Did you ever see any signs of abuse on James?

**11**

A. One time. One time we picked him up, he had a little knot on his head and a bruise. You know, he's real light-complected, and everybody said, What happened to you, baby? Because I thought maybe he was out playing.

I -- and so I was kind of furious about it, so I kind of said something about it, I think, to -- I -- when I took him home, I knocked on the door and she was in there, like she was asleep or something, and I kind of asked about it, but she said he was gone. Richard was gone. So, you know, I thought maybe they might have had a brawl or something. I didn't ask too much because it's good not to get too much in people's business. Especially when you try to take them to Christ, you don't want to get in too far in their business, so I didn't -- I didn't ask her a lot of ques -- a lot about it. But after that, about a month later, they were gone, --

Q. Okay.

A. -- so I don't know what happened.

Q. And he had a bump on his head?

A. Well, yeah, he had a -- he had a bruise and a knot. Yeah, I seen that.

Q. Okay. Did you see any injuries on Audrey?

A. I didn't. I wasn't interested. To be honest

12

with you, I was interested in this baby, you know, because he was like six or seven, and I don't know. Apparently I got some different words about that situation, but that was just too -- you know, I didn't see it. But like I said, I was interested in -- in James at the time, because --

Q. Did you ever see any in -- interaction between Audrey and James?

A. No. No.

Q. Okay. Did there come a time when you wanted to take James in?

A. I did.

Q. Okay.

A. I -- in fact, I asked her one time, I said, Let -- come let James live with me, and she said, Oh, I don't know. I'll think about it, you know. But I don't -- I just don't know what happened to -- to him then. I don't know, because the next time I saw him, which was about a couple of years ago, he was just staying here and there.

Q. Okay. During that timeframe when you took James to church and to Sunday School, about what -- what length of a time period was that? Was it a month, two months, six months?

A. Oh, no, it was longer than that.

13

Q. Do you remember?

A. Probably about three, four months, somewhere -- about four months somewhere in there.

Q. Okay. And did you see him every Sunday?

A. Pretty much.

Q. Okay.

A. Every Sunday.

Q. Do you think if you had been able to take James in, he -- he would be different than he is today?

A. I would hope so, because for one thing, I do know he didn't have any kind of foundation. You know, he didn't have any -- didn't have a home life. He was just kind of loose on his own, you know what I'm saying? Just kind of wherever he wanted to go, he gets going, and whenever -- whenever he come back, he'd come back. And no -- no structure. He just didn't have it. And he was a troub -- he seemed troubled. Ever seen anybody always keep their head down, look sad, don't never smile, don't never talk? And I often wonder was it because he lived in this housing project because --

THE COURT: Go ahead now with You can continue.

(As read:)

Q. You can continue.

A. Oh. Because he lived in this housing project

14

and this neighborhood that they lived in. Was that the reason, or he was just unhappy? But he just -- he wasn't talking. That -- you know, you got a seven year-old boy and you got toys, and I got -- I -- my son is 25, and he was at home, so he had toys, he had games and things like that, and a room, his own room with music and stuff. And James just didn't hardly, you know, interact too much, and I wondered how did he do in school.

Q. Did you ever ask him why he always kept his head down and kept to himself?

A. Didn't talk.

Q. He just wouldn't talk?

A. Uh-huh [sic].

Q. Okay.

A. Didn't talk.

Q. Okay. Did you ever see James with any toys or any --

A. No, nothing.

Q. Okay. Okay. So --

A. I don't know whether I did. And --

Q. And then they left?

A. Uh-huh, then they left.

Q. Did she say goodbye before she left or --

A. No.

15

Q. You didn't have any warning that they were leaving.

A. Un-uh. I just went over there to get him as usual, and no one answered the door, and then so I asked his -- I got in touch with his cousin and she said, Well, Audrey just moved up in Arkansas somewhere. We don't know where she is. She's disappeared, too, so --

Q. Do you know how Audrey supported them?

A. I guess Welfare, because she wasn't working. That I do know. She wasn't working.

Q. Okay. Did you ever see James act out or be violent in any way?

A. Nothing. Nothing.

Q. And I think you said a minute ago that you saw him a couple of years ago.

A. Yes. He was on a bicycle in Hope, Arkansas, and I was -- I had taken somebody home from church, or I was trying to pick somebody up, one of the two, but I passed by this group of boys on bicycles. I always notice this group of boys in the neighborhood, you know, and I noticed James was in it because his hair was real long and flying everywhere.

And I backed my car up. I says, What are you doing over here? He said, Well, I'm over here seeing

16

my friend. And I said, What are you guys into? And he said, Nothing, Ms. Mazone. I said, Well, listen, be good. Don't get in no trouble. Where are you living? He said, Oh, just here and there.

Q. Was that about two years ago, you think?

A. About two years ago.

Q. Okay.

A. About two.

Q. And that was in Arkansas?

A. Well, I've been here two years, so it must have been three years. About three years ago.

Q. In Arkansas.

A. Uh-huh.

Q. Okay.

A. Over in Hope.

Q. Okay. Thank you, Ms. Mazone. Now Ms. Evans is going to talk to you and then I may have a few questions for you after that as well.

**CROSS-EXAMINATION**

BY MS. EVANS:

Q. Okay. Miss Mazone, you and I had an opportunity to talk a little bit before we started this process, right?

A. Right.

Q. Okay. I appreciate you having us here in your

17

home today, and especially knowing that you don't feel well and nor does your husband, okay?

I want to talk a little bit more about that relationship that you had with James, okay?

A. Okay.

Q. It sounds to me that it was for approximately three to four months; is that right?

A. Approximately three to four months, right. Maybe a little longer. I -- I won't say, but maybe a little longer.

Q. Okay.

A. It would be no more than five months at the most.

Q. So no more than five months at the most --

A. Uh-huh.

Q. -- when he was around six or seven.

A. Right.

Q. You provided a positive influence in his life, right?

A. I tried to do the best I could, yes.

Q. Okay. And so would you see him other days of the week besides Sunday or was it just for Sunday church?

A. Just Sunday.

Q. Okay.

18

A. Just Sunday for church.

Q. And did you take him to church every Sunday?

A. Every Sunday that -- it's -- it was a few times that I went by to get him and nobody would answer the door, but mainly on a regular basis he would be ready to go and I wouldn't even have to go to the door. I just pulled up in front of the place and blow and he'd come out.

Q. Okay. And when he came out and went to church with you, you-all went to Sunday School and church, --

A. Yes.

Q. -- right?

A. Yes.

Q. And then you would bring him here to your house, --

A. Yes, I'd bring him --

Q. -- right?

A. Not to this house.

Q. Well, not to this house.

A. It was to the house where I was living, yes.

Q. Okay. And you'd feed him lunch.

A. Feed him -- well, yeah, you'd call it lunch. It was more like an early dinner because we wouldn't get home until like 1:00, 2:00 o'clock.

Q. Okay. And about how long would you spend with

19

him there in your house?

A. Like I said, I had a son that was a little older than him, and we'd maybe take him home about 5:00 or 6:00 o'clock, you know, in the evening, because Sunday, he'd have to get ready to go to -- to school the next day. So he was six, you know, and so about 6:00 or -- 6:00 o'clock, 5:00 or 6:00 o'clock in evening.

Q. Okay. You said you wondered how he did in school.

A. Yes, I wondered, you know, what -- what --

Q. If he was six or seven at the time, would he have been in kindergarten?

A. No, he would have been in the first or second grade.

Q. First or second grade.

A. Uh-huh.

Q. And so have you ever known how he went on to do in school?

A. No.

Q. Don't know.

A. I don't know anything about it.

Q. And I know you talked about the last time you saw him was a year ago in Hope; is that right?

A. It was -- well, it was -- I've been here two

20

years. Three -- three years ago.

Q. Three.

A. It would have been three years ago.

Q. Three years ago is when you saw him in Hope.

A. Uh-huh.

Q. And when you saw him at that time and then the time whenever he was six and seven years old, did you see him at any time in between --

A. No.

Q. -- when he -- when was six and seven and then three years ago --

A. No.

Q. -- in Hope?

A. No, I don't know where he was or what he was doing. Sure don't.

Q. Okay. But when you would take him to church, you say that he was always hungry, right?

A. Yeah, he would always be hungry and ask could he --

Q. It's fair to say children that age, they're growing. They need food and nourishment.

A. Yeah -- right.

Q. And you were giving him that, right?

A. Right. We'd feed him every Sunday.

Q. On Sundays.

21

A. Uh-huh.

Q. And you said that he -- he didn't have new clothes, but he always dressed nice and looked nice.

A. Yeah, he was always okay, you know, just regular.

Q. Okay.

A. I can't think of anything wrong with the way he was dressed.

Q. And when you saw him three years ago in Hope, that would have been, I guess, roughly 2006, maybe?

A. Yeah, 2006.

Q. You told him what?

A. Was don't get into any trouble. And what -- I wanted to know what he was doing over there because he was just out, you know, and he's still on the bicycle and he was over there visiting his friend. I said, Well, where do you live?

He said, Well, just here and there, you know.

Q. Did he remember you?

A. Yes, he remembered me. Uh-huh.

Q. So even though it had been quite a few years since he had that interaction with you, you taking him to church, he remembered you.

A. He remembered me right off.

Q. If James had asked you back three years ago if

22

you could get him a hot meal or if he could stay with you for a little while, would you have been willing to do that?

A. I'd have brought him right in here, right into the house where I was living.

Q. But he didn't ask that, did he?

A. No, he didn't ask.

Q. Okay. You said that that whole neighborhood where he was living during the time you knew him was crack infested, right?

A. Oh, yeah. And it's somewhat still that way.

Q. And that neighborhood is there in?

A. Arkansas.

Q. But where? What city is this in?

A. Texarkana.

Q. Here in Texarkana?

A. In Texarkana, uh-huh.

Q. Okay. Because we've talked -- we've made some mentions of Hope --

A. Yeah. I --

Q. -- and so I just wanted to clarify.

A. It's Texarkana, Arkansas.

Q. And so in that neighborhood in Texarkana, did you take other children to church or just James?

A. I had a couple other children I would pick up

23

sometime and some mad dogs I'd pick up sometime, but not on a regular basis. James was the only person I would -- at that time he would -- we would take on a regular basis. You know, we witnessed other people. Sometime people go one time to church and don't go anymore, but his mother would, you know, let him go on a regular basis so --

Q. And, in fact, did his mother ever attend with you-all?

A. Yes, she did.

Q. And --

A. Three or four times she went.

Q. Ms. Kelly, his mother, seems pretty versed in the Bible. Would that be fair to stay?

A. Pretty much, because she's been in and out of church quite a bit.

Q. And did you know that she tries to give him teachings from the Bible and tell him to read his Bible?

A. I don't know anything about that.

Q. Okay. But she did attend with you-all some.

A. Yes, she did.

Q. Okay. And you haven't had any contact with her for the last -- how long would you say?

A. Let's see how many years it's been. Maybe

24

three years, right before we moved here, I saw her in Mount Vernon, Texas.

Q. Okay.

A. She was there and had gotten involved in one of our church situations and met some of the church people there, and she was going to church, and she came to my house a couple times. I don't know where James was, but -- because he wasn't with her, but she came to my house and visit and told me she was trying to change her life again, trying to get things straightened up. She was homeless, but she was trying to get -- you know, get herself back on track.

Q. And how long ago was that?

A. That was about three -- three years ago.

Q. Three years ago as well?

A. Three and-a-half. Between three and-a-half -- three and-a-half and three years ago.

Q. So did you know that she's been working pretty hard as a truck driver -- driver?

A. She -- she had been working as a truck driver then.

Q. Okay.

A. I don't know what happened, but that she told me she had married some guy and he was a truck driver.

Q. And did you -- and did you know that she's

25

been supportive of James and sending him money, like moneygrams?

A. I don't know anything about that.

Q. Because you hadn't had any contact here in the last three years --

A. Uh-huh [sic].

Q. -- with James --

A. Or her.

Q. -- or Ms. Kelly, right?

A. No.

Q. Okay. The other children that you would take, even though it wasn't on a regular basis, have you had a chance to interact or know what they have done later in life?

A. Yes. I have had one. I got one little boy that calls me. He lives in maybe Eldorado, --

Q. Okay.

A. -- Arkansas. Eldorado maybe is the way you pronounce it. But he -- he called me about two months ago. He calls me quite a bit. His name is TJ. I used to take him quite a bit. I've got a young lady that still comes to see -- well, she comes to see me about -- she comes to see about me, runs errands for me right here, that I took to church. She used to come -- we pray every night at 9:00 o'clock at my house, and

26

she was one of the little young girls that would come and pray at 9:00 o'clock at my house. And she's went to nursing school. She's an LVN now.

Q. Wow.

A. So, yeah. I've -- I've had an influence on a few, but -- and this one has come back and been able to help me, praise the Lord. I think she's a great help to my husband and I. But I've had quite a bit, and some I've lost contact with.

Q. Okay.

A. And at one time I had 13 people living in my house --

Q. Whoa.

A. -- off the street.

Q. And so you're willing to take people in, whatever they do.

A. I have taken a lot of people in, a lot of people.

Q. That -- there's something to be said for that, Ms. Mazone. So TJ and the nurse, the LVN that you --

A. Rachel.

Q. -- just spoke of, --

A. Uh-huh.

Q. -- did they come from that same neighborhood that James came from?

27

A. Well, TJ kind of, and there's a story about that and I don't want to get into that, but he came out of a -- it was okay. But Rachel, she came out of a real bad situation, because her mother passed way when she was little girl.

Q. Okay.

A. And her dad was sick and he was trying to raise her, so I kind of stepped in, you know, and took her to church. And her dad is still sick. I'm trying to get him to go to church now. But anyway, I could tell you a story about a lot of people --

Q. I understand. You've touched --

A. -- on drugs and things.

Q. I'm sure you've touched a lot of people's lives in your history.

A. I've tried. I've tried to give -- I've tried to give back. Because someone had mercy on me and gave me an opportunity to come off the streets of Oak Cliff in Dallas. I was into everything and they -- a lady gave me an opportunity, took me off the street and took me to a ministry in Hope, Arkansas. And I've got to say -- and my heart -- my heart, my desire is to give back because I was confused and mixed up. I came out of -- my dad was an alcoholic. He abused my mom all my life. And every -- and I'm the -- I'm just the first

28

child. Everybody said I was going to be an alcoholic, you know. And I grew up angry, so I know the signs of an angry child, because all throughout I fought and I cut up so bad. So I know some of the signs of an angry child who's angry about their home.

A lot of people are not angry. A lot of children blend in, but a lot of children rebel and they don't know how to rebel, and I was one of those children, so -- and I was withdrawn. I had no activity with anybody, so I know some of the signs.

Q. And Ms. Mazone, that's what you tried to do for James, right?

A. Tried to do that.

Q. To give him an opportunity?

A. I tried to give him an opportunity; yes, ma'am.

Q. And whenever you would share those meals with James here in your home for those five months, did you try to teach him about the Lord?

A. I did. I -- I tried to tell him. My thing was -- to him was to try to do good, treat people the way you want to be treated. But he didn't -- he didn't talk very much. He just -- he was ...

Q. But just because James didn't talk, didn't mean that you weren't still trying to --

29

A. No, no.

Q. -- minister to him.

A. Uh-huh.

Q. Fair to say?

A. Uh-huh.

Q. Okay. And James hasn't tried to reach out to you or have any contact with you, other than you seeing him there in Hope three years ago; fair to say?

A. No, he haven't.

Q. Okay.

MS. EVANS: Thank you, Ms. Mazone.

THE COURT: Mr. Lollar?

**REDIRECT EXAMINATION**

BY MR. LOLLAR:

(As read:)

Q. Ms. Mazone, I just have a couple of follow-up questions for you.

A. Okay.

Q. Ms. Evans asked you about him, James being hungry all the time. Was that because his mother didn't feed him?

A. I won't say that --

Q. Okay.

A. -- because I don't know.

Q. Okay.

30

A. He -- he would just always would be hungry. Come and just, I'm hungry, you know, and I -- and I -- I'm a good cook too, so ...

Q. Was it a normal six-year-old hunger or did he seem to be more hungry than a normal kid? And if you don't know, that's okay.

A. I just don't want to say.

Q. Okay.

A. You know, I -- I don't want to paint his mother as a bad person. Maybe she just done -- did the best she could at that time with what she had.

Q. Okay. But doing the best she could at that time still may not have been very good; --

A. Yeah.

Q. -- is that right? Is that fair?

A. Because she had him there with her, you know. I -- I don't want to say she did the best, but I don't want to take anything from her either, because she had a problem, and if you can't -- you've got a problem, you can't very much help anybody else too much, you know.

Q. And, Ms. Mazone, you know firsthand what it's like growing up with an addicted parent, --

A. Yes, I do.

Q. -- right?

31

A. I do.

Q. And you know how that can affect you?

A. I do, very much so.

Q. And is it fair to say -- I think you said it -- it makes a child angry?

A. Yeah. Some children -- some children are withdrawn, some are angry and, you know, they just do different things, you know. And I was an angry child. I was quiet, but I was a quiet storm. If you stepped on my toe, I was subject to just rare into you, you know, even through school. I don't know what his school's activities was, but I do know he was with -- he was really with -- he was with -- withdrawn as a child, he was.

Q. James?

A. Yes.

Q. Okay.

A. He was very withdrawn.

Q. Okay. The first time you went to pick James -- pick up James for church and they were gone, they had moved away? You never saw them again until much later?

A. Never saw them again.

Q. So James' mother Audrey took him away?

A. Just -- they just up and left, and I don't

32

know why, you know. They just up and left.

Q. And when you saw James in Hope approximately three years ago, was he homeless, did you know?

A. He said he was living here and there.

Q. Okay. Okay. And at that point did you exchange numbers or addresses?

A. No.

Q. Okay.

A. No. It was -- he was in -- riding bicycles, like four other guys on bicycles, --

Q. Okay.

A. -- so ...

Q. So he wouldn't know how to contact you.

A. No, he wouldn't know how to contact me.

Q. Okay. That's all I have.

**RECROSS-EXAMINATION**

BY MS. EVANS:

Q. Ms. Mazone, you said his mom was always there with him when he was six or seven, right?

A. Yes.

Q. Living -- they were living together?

A. Well, sometime he would come out the door. I won't say she was there or not, but I would just assume she was there. You know, blow -- he was just -- when I would drive up, I'd blow and he'd just run right out

33

the door and run up to the car. Most of the -- sometimes, you know, I know she was there because I got out and went to the door to talk to her.

Q. Right.

A. But I would just assume she was there.

Q. But they had a home together.

A. Yes.

Q. They had built a home together there.

A. Uh-huh.

Q. Because you know there are some moms that just totally abandon their children --

A. Yeah.

Q. -- or leave them with other individuals; fair to say?

A. Right.

Q. But she didn't do that to James, did she?

A. No. She was -- he was -- they lived in a housing project, but he was there at home with her.

Q. Okay. And did you ever have an opportunity to talk to a lady by the name of Ms. Ross?

A. No.

Q. No? So as far as talking about this case, when is the first time that you talked to anybody about what was going on with James?

A. A lady by the name of Brendan called me on the

34

phone.

Q. Okay. Ms. Brendan?

A. And another lady. I can't think of her name, but they both came here and asked me, you know, would I be willing to come to Dallas. And at that time, you know, I didn't even think about myself. I was going to try to get me a driver and go, because although I don't know him for a long -- long time, there's something about him; he's on my heart. For one reason, he's 19 years old. He's -- he's just a young boy, hasn't even had a life yet.

Q. And, Ms. Mazone, that's part of what you do.

A. Right.

Q. You minister to people, right?

A. Yeah.

Q. So you want to help and --

A. Yeah, that's it.

Q. -- reach out to those you can.

How long were you on the phone with the lady that called you to talk about it?

A. I don't know. She might have been on the phone 20 minutes.

Q. And then when they came to your home, how long did they visit with you?

A. Oh, they were here, I'd say, 45 minutes at

35

least.

Q. Okay. And did they kind of tell you what James' situation was and the crime he had committed?

A. Yes, they did.

Q. Okay. Now, you haven't seen any of the interview tapes where James is confessing and kind of bragging about the killings, have you?

A. No, I haven't saw anything.

Q. Okay.

A. And somebody said one of them was on television, but I -- I never saw that.

Q. And do you feel like that's something you would ever want to see?

A. I -- I wouldn't want to see it, because that's just not him. I don't -- you know, I -- that's just not his personality. I don't know what --

Q. But Ms. --

A. -- has happened to him.

Q. But, Ms. Mazone, you haven't seen him since he was six or seven years old.

A. Well, I haven't.

Q. Is that fair to say?

A. Of what I saw him, you know --

Q. Right.

A. Of -- of -- and he -- I didn't talk to him

36

like now.

Q. But you hadn't had a relationship with him.

A. No.

Q. Okay.

A. And I didn't talk to him long enough to see what -- I just hate to believe it, I think. I don't want to believe it.

Q. I understand.

A. I just don't.

Q. Thank you, Ms. Mazone.

THE COURT: All right. And that was Defense Exhibit 45; is that correct, Mr. Lollar?

MR. LOLLAR: Yes, sir.

THE COURT: All right. And so now, if you'll begin the tape on Defense Exhibit 44, which will be the deposition testimony of Ms. Mayes.

And after we've gone through the introduction, then we'll proceed with that in the same manner. So if you can, queue that up.

And, Mr. Hikel, I want you to stop on this on Line 3, Page 7.

MS. HIKEL: Okay, Your Honor.

MS. MALLON: Judge, would you like me to stay on the witness stand?

THE COURT: Yes. Thank you.

37

(Videotape played.)

THE COURT: Okay. Stop it there. All right.

### DIRECT EXAMINATION

(Deposition of Juanita Mayes as read:)

A. Who passed away in April?

Q. And that would be Betty Eason?

A. Uh-huh.

Q. Okay. Where is Aaron right now?

A. Oh, God. I don't know. He's somewhere in Texas. He's locked up somewhere in Texas.

Q. He's in the penitentiary somewhere?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. We just need you to answer --

A. Yes. I'm sorry.

Q. -- out loud, okay?

A. Yes.

Q. So the court reporter can take down what you're saying.

A. I hear what you're saying.

Q. Okay. What -- do you know what her relationship with James was like?

A. I don't think they had a relationship. I -- I

38

really don't. I don't think, because he's from pillar to pole, and he -- I don't -- I don't think she really had a relationship with her son --

Q. Okay.

A. -- a bond. You know how you bond with your children? I don't think she ever really bonded with James. And I want to say the best -- I think the best time that James had with Audrey is when she was married to Darryl Maxwell.

Q. Okay. You said pillar to pole?

A. Yeah. And I mean, you know, from -- you know, when kids are not stable, they're from house to house or even the mom. She was nev -- Audrey was -- never been stable.

Q. Okay. So Audrey moved around --

A. Uh-huh.

Q. -- a lot?

A. A lot, yes.

Q. Do you know why?

A. Because Audrey is -- I'm 54 and I don't know if Audrey's 50 yet or not, but she's been married, like, I mean, for four or five times, and I think every time she leaves one, she has to get another one. Because when Audrey was a little kid coming up, Audrey wasn't so different, but when she became an adult, she

39

really changed a lot.

Q. Okay. So she moved around a lot?

A. Yes. And then when she moved around, that means James moved around, you know, because he had to follow her.

Q. Okay. So James would follow her.

A. Now, he had to. He was a little boy. He had no other choice.

Q. Okay.

A. Do you know what I'm saying?

Q. Okay. Was there ever a time when Audrey would leave James with different relatives and not take care of him?

A. Whoever would -- whoever would take him in, yes.

Q. Okay. Did that happen often?

A. Quite often, yes.

Q. Okay. So she would just leave James with the relatives.

A. In Dallas, yes.

Q. Do you know how long that would take -- or how long she would leave him with someone else?

A. I -- you know, I don't know. I know she -- she had left one time, left Hope and left him with Teresa for awhile and she --

40

Q. And who's Teresa?

A. That's my daughter, Teresa.

Q. Your daughter.

A. Uh-huh.

Q. Okay.

A. And she went off driving trucks or somewhere, she did. Well, she came back through Hope or somewhere, apparently, --

Q. Okay.

A. -- and she picked James up and she came to Dallas and just dropped him off.

Q. Just dropped him off?

A. Uh-huh.

Q. Do you know of any other relatives Audrey has left James with?

A. No, other than Teresa and then, like I -- like I said, my Aunt Betty, and then she left him with some of her -- on her mamma's side.

Q. Okay.

A. You know, he spent time with them. I don't know what that was like.

Q. Okay. Is it fair to say that James never had a stable living environment?

A. Never.

Q. Okay. What are your suspicions?

41

A. I felt like things happened in his childhood as -- as to the way he acted and things. I -- I don't know. I guess, you know, to -- to have children, you got -- you know, you have to pay close attention and you have to watch that. But I could tell from things in James as to the way he act and when he's around certain people, just the way he acted, and I felt like some things had went on, but I couldn't say for sure. You know what I'm saying?

Q. Okay. What -- can you explain that a little more? How would he act?

A. Uh-huh. I mean, I felt -- okay. Like James could be around certain people and it was just like he would just clam up and he felt like he had to do whatever that person wanted or -- you know what I'm saying? And he acted real afraid of that person. You know what I'm saying? And I used to always look at that and wonder why he was like that.

Q. Any person in particular you're thinking of?

A. Yes. His brother Aaron.

Q. His older brother Aaron.

A. Yes, uh-huh.

Q. Okay. Anybody else?

A. I don't -- I -- I can't say.

Q. Did Audrey ever abuse him physically that you

42

know of?

A. As far as whupping him?

Q. Yes?

A. Yeah, he took some licks.

Q. Okay.

A. I mean, not whupping. You know what I'm saying, the way you would whup a child, and I don't think she knew how to do that --

Q. Well, what --

A. -- and was always beating him.

Q. So what are you -- and I don't want to put words in your mouth. Are you saying it was more than just standard discipline?

A. Oh, I can remember the time that she beat him so -- one time that she beat him, and when she finished with that baby, his back looked like he was a slave. She laid his skin, just laid it open. She whupped the baby's skin.

Q. James?

A. James.

Q. And do you know how old he was at that time?

A. James? Oh, he was -- I don't know if he -- oh, my God. He lived in Arkadelphia. So James have to be -- oh, he wasn't that old. Six or seven. He was a young -- he was a kid. He was little; he was young.

43

Q. And that's the time that you knew of that she beat him until his back split open.

A. Yes.

Q. Do you know any occasions where that occurred?

A. No, but I know he always got whuppings and he always had bruises, but then my thing is, not only did she do this, she allow mens in her life to abuse him.

Q. So Audrey allowed her --

A. Boyfriends or whoever pay for her. She say they were her husband. Whoever she said they were, they even whupped him, you know, so ...

Q. Okay. When you say "whupped," you're not talking about regular discipline, are you?

A. Un-uh. Un-uh.

Q. Okay.

A. I mean, you know, like pushed down stairs, and just -- he -- he was just being like a -- you know, like he were a norm -- a child. You know what I mean? I don't think -- James was kind of like as to where -- you know, I don't think some people would do to their animals. That's the way some people -- some -- some folks in Audrey's life or Audrey had allowed to happen to James, you know. And I don't know if you understand what I'm saying, but I'm, like, saying James was not just regular whupped or anything like that. He was

44

always abused. You know what I'm saying? And that's just the way it were.

Q. Okay.

A. But I always thought -- I mean, I always thought that she was unstable. I always thought something was wrong with her.

Q. Okay.

A. I always thought she had something wrong with her.

Q. Is -- would it be fair to say that -- say that James was abused most of his life?

A. All of his -- all his young life, yes.

Q. Yes?

A. Yes.

Q. Okay. Tell me about your Aunt Betty, Betty Eason. There was a time when James stayed with her, right?

A. Yes.

Q. Okay. Do you know how long James lived with her?

A. Off and on. I would say just about -- just about most of his life because -- well, she was in and out of my aunt's house all the time after her marriage failed with James Broadnax. That's James. That's how James got his name, James Broadnax. And I was -- asked

45

the question, why would he take one child and not the other one? The way it happened, though, that Audrey had stepped around her husband, James Broadnax, and got James, and she named him James Broadnax. But once her husband found out, then he sent Audrey and James this way. That's how Audrey end up with the little Michael, because he took him from her and sent Audrey and James on their way.

Q. Okay.

A. So I --

Q. Let me stop you there. So when James was living with Betty, his mom was -- his mom Audrey was also living there?

A. Yes.

Q. Okay.

A. She's in and out, you know, --

Q. Okay.

A. -- mostly. Mostly James was there and Audrey was in and out, wherever she wanted to be.

Q. Okay.

A. Yes.

Q. And now, with respect to James Broadnax, so James Broadnax, Sr., --

A. Uh-huh. Yes.

Q. Is not really James Broadnax's --

46

A. No, that's not his father. That's not his father.

Q. My client's father.

A. No.

Q. Okay.

A. No.

Q. Okay. Did Audrey tell James --

A. I don't -- really don't know. All I know is she had him.

Q. -- who his real father was?

A. I don't -- I don't -- I don't think she knew, --

Q. Okay.

A. -- to be honest. I mean, just to be honest, I don't think she knew.

Q. Okay. So how was -- how did Betty, Betty Eason treat James?

A. Oh, God rest her soul, my aunt's gone on. She was mean. My aunt was real mean to him. That girl, her -- and her brother was there also, because my daughter was in and out of there too, but --

Q. Okay. When you say "that girl," who are you talking about? Who are you referring to?

A. I'm talking about my granddaughter --

Q. Okay.

47

A. -- was there, and they would go in the kitchen to eat. They could eat, but James couldn't. They would have to sneak food out the back door so James could eat. She would just slap him, I mean, just -- just for GP, just haul off and slap the baby. I mean, she just beat him like, you know, like -- she was cruel. My aunt was cruel to him, but not only to him; she was cruel to his mamma.

Q. Okay.

A. That's the way she was. That's just the way she was.

Q. So for whatever reason, Betty Eason was mean to Audrey and James.

A. And James.

Q. Okay. Did you know -- and if you don't, that's fine -- the years and age that James spent with Betty, like seven or eight, or six to nine, or do you -- do you know?

A. James came, I think Audrey and James came back. James was still a baby. James had to be about two years old when they came back --

Q. Came back where?

A. -- from -- Audrey was in service.

Q. Okay?

A. And so I guess when she got out of the

48

service, she came back with little James. So I'm thinking that -- I don't know why I can't get it straight. He had to be two years old, two or three years old when they came back to Hope, Arkansas.

Q. Okay.

A. So from then on, that's where she were, in and out of Hope, you know.

Q. Okay.

A. That's where she were. And so then most of the time, Audrey never would stay, would -- never had a place of her own. The only place I could -- Audrey lived that was stable, the years that she was married to Darryl Maxwell.

Q. Okay.

A. That's when she was really -- had a stable place with James to be.

Q. Do you know how old James was during the time she was married -- or she was with Darryl Maxwell?

A. I'm thinking that had to be around the second or third grade. James wasn't that old.

Q. Okay.

A. He wasn't that old.

Q. Okay. Now, let's go back to when James was living with Betty Eason. You said that -- you told us a little bit about that. Tell -- tell me some more

49

about that. Do you know why Betty Eason didn't like James or Audrey?

A. I don't know why she abused Audrey. I don't know why she abused Audrey. I don't -- I haven't the slightest idea. I mean, she could just see Audrey coming and get mad. I don't know why. But she raised her. I mean, she -- and she even adopted Audrey, you know.

Q. Okay.

A. But I don't know why my aunt was so mean to Audrey, why she did Audrey like she did. I think that had a lot to do with Audrey when she got older, and -- but James, I don't know why she mistreated James. She didn't like him.

Q. Okay.

A. And she always made the statement, you know, saying he's half white, you know. She always made the statement. But that's what -- she did him bad. She did him bad.

Q. Okay. Did you ever hear her use the term half-breed when referring to James?

A. I always heard her say half white. I don't know about half-breed.

Q. Okay.

A. She always called him half white.

50

Q. Okay. So you said she would slap him across the face?

A. Yeah, and leave her handprint on his face.

Q. Not feed him?

A. She would have -- no, they would have to sneak. I mean, literally. I mean, sneak food out the back door to feed that child.

Q. Okay.

A. Or either when Teresa would come home, then she'd say, You can't go in there and eat through all that stuff. That's Aaron's -- that's the oldest boy -- that's his stuff. But again, like Teresa would say, Go in there and eat. You know, when Teresa would come home, he could go ahead and eat. But other than that, she wouldn't let him come in the house, get no water. She did him like that.

Q. She would lock him out of the house with no water?

A. Yeah. He couldn't come in. He couldn't come in the house. They could go in the house to get cool, but he couldn't. My granddaughter -- my granddaughter and my grandson, but he couldn't. Un-uh.

Q. And Aaron was living there also.

A. Uh-huh.

Q. Okay. And during this time, where was Audrey?

51

In and out?

A. In and out.

Q. Do you -- did Audrey know that -- how Betty treated --

A. She knew how Betty was treating him. She knew how Betty treated him, but she -- I didn't -- I don't think she really cared. She just wanted to do what she wanted to do, and that's what she did.

Q. Okay. She never tried to stop Betty from harming James?

A. Uh-huh. And most of the time when she did it, Audrey wasn't around. Audrey wasn't around.

Q. So most of the times when Betty was abusing James, Audrey --

A. Audrey wasn't around.

Q. -- wasn't there. Okay. But she --

A. But she --

MR. LOLLAR: Okay.

A. -- when she was there, he would talk. She would talk back to him. She said nothing. But she would talk, you know, and use abusive words to him, and Audrey sat there and didn't say anything. She allowed it to happen.

Q. So Betty would talk abusively to James --

A. Yes.

52

Q. -- and Audrey wouldn't say anything.

A. No, un-uh.

Q. So do you think -- it sounds like from your testimony -- and if I'm wrong, tell me -- that Betty had issues with James being half white.

A. Yes.

Q. Okay.

A. I -- I think she did. I think that was one of the problems.

Q. That was part of the reason she was so mean to him?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Okay. Did everybody in the family see this interaction between Betty and James?

A. Uh-huh. Yeah, everybody that was around. Yeah.

Q. Okay. So Betty Eason didn't try -- even try to hide it.

A. No, un-uh. She wasn't going to hide nothin'. That was her. That was just her way.

Q. Okay. Is there anything else you can tell me about Audrey and this ...

A. I really don't know as much, except, you know,

53

James -- I know James -- James didn't have a good childhood. James' childhood rough; he had a rough time. Rough time.

But I know when Audrey left, she was driving trucks. She came through Hope when she got James, and she dropped James off in Dallas, and she dropped James off with people she don't even -- she didn't know herself. Audrey wasn't even raised with the kind of -- she didn't know those people. She don't know nothin' about them, but she dropped him off there -- dropped him off down there. But her thing were to go back through Dallas and pick him up, but the guy that she was married to, didn't want to go back through and get him, so she didn't go back and get her son.

Q. So is it fair to say that the men in Audrey's life --

A. Yes. Ruled her life.

Q. Okay.

A. You know -- you know, I'm going to tell you, she wasn't even going to come to Dallas. Her thing was she -- she didn't know if she was going to come.

Q. To testify for James?

A. For her son. But the guy that she's supposed to be married now said, I didn't know you're going to go to Dallas and see about your son, you know. Well, I

54

guess I'm going. She's like that. She's mental.

Q. She's mental? Is that what you said?

A. Yes, I believe she is. I really, really do. I believe that. So I don't know --

Q. You believe she's mentally ill?

A. I don't -- I believe that with all my heart. And I'm sitting here and I'm telling -- I'm telling you everything I know of the truth within my soul and, Lord knows, I had a heart attack and I don't want to have none of this. And I just believe this is -- this is where the heart attack come. I believe -- I just know she has a problem.

Q. Did you ever see her show love towards James?

A. No.

Q. Did you ever see anybody show love towards James?

A. Well, family members. That was all he had, you know, family members. But nine times out of ten, most -- by the time he got close, she took him up and ran off with him. You know, he even had people that wanted to take him in. You know, the Mazones had him for a while, wanted to take him in. She took him from -- she took him from them, you know, just -- I don't know why.

Q. How did Audrey support James?

55

A. I -- you know what? Audrey would work, but he quit school because he had nothing to wear to school. He was ashamed to go to schools. She wouldn't buy him clothes. She wouldn't buy him school clothes. That's why he quit school.

Q. Do you know when that was? About eighth, ninth grade?

A. Uh-huh [sic]. James had to be about tenth grade, I believe.

Q. Okay.

A. Somewhere around the tenth, I think.

Q. Okay.

A. It had to be around the tenth grade.

Q. So that's why James quit school?

A. Said he didn't have nothin' to wear to school, so he wasn't going.

Q. Okay. Did you ever know James -- and you've known James his entire life, right?

A. Uh-huh.

Q. Did you ever know James to be violent or did you ever see him --

A. No, never -- never, no.

Q. -- be violent?

A. Oh, God, no. I never know James -- you couldn't even strike up an argument with James. I

56

never knew James being in an argument with anybody.

Q. Okay.

A. Never.

THE COURT: It's you, Ms. Mallon.

A. Not a thing.

Q. Have you ever seen any of the videotaped interviews that James did? Do you know what I'm talking about?

A. When he -- when he was -- when he was confessing?

Q. Yes.

A. No.

Q. You've never seen them?

A. No.

Q. Okay. Anything else you'd like to add, Ms. Mayes?

A. That's it.

Q. Okay. Ms. Evans is going to talk to you for a little bit, and I may have a couple of questions more after that. Okay?

**CROSS-EXAMINATION**

BY MS. EVANS:

(As read:)

Q. Okay. Ms. Mayes?

A. Yes, ma'am.

57

Q. You and I just introduced ourselves to each other --

A. Yes.

Q. -- earlier. We didn't really get a chance to talk, right?

A. Yes.

Q. Can you tell us, when is the last time that you saw James?

A. Oh, God. It had to be about -- about three years ago in Hope -- in Hope, Arkansas, I saw him. He had -- was living down by Fair Park with some young lady. That's the last time I saw James.

Q. Okay. And do you recall her name that he was living with?

A. I don't remember. She was a young -- she was a young white lady, but I don't remember her name.

Q. Okay. And that was about three years ago.

A. The last time I saw him.

Q. And since the last time you saw James, have you talked to him?

A. No, I haven't.

Q. No? Okay. So the last communication would have been three years ago in Hope?

A. Yes.

Q. All right. How long has his mother been a

58

truck driver?

A. I think Audrey been on the road -- oh, God. I don't even want to sit here and say, but I think Audrey been driving about three years or so, I think. I don't want -- I don't want to say this for any definite, but I think around two or three years, --

Q. Okay.

A. -- something like that, she's really been on the road.

Q. And has her employment been pretty steady? I mean, maybe not necessarily with the same company, but has she been working as a truck driver pretty much the whole two to three years?

A. Yes.

Q. Okay. And when is the last time you saw Audrey?

A. We buried my aunt in April.

Q. And would that have been James' grandmother or --

A. That's James' aunt.

Q. Aunt? Okay. And you buried her in April, and that's when you last saw her.

A. Yes.

Q. And she was working as a truck driver during that time, right?

59

A. She had exit -- she quit. When she came -- when she moved to Eldorado, she quit driving trucks.

Q. Okay.

A. That's when my aunt was in her last stage, and so she moved home. I think Audrey came back -- my aunt died in April. Audrey had to come home like in March, the last of March.

Q. Okay. And she came home to take care of your aunt, or what -- what was her --

A. She came to see about her, but she had quit driving trucks, yes.

Q. Okay. And you haven't seen her since April; is that right?

A. Right.

Q. Have you talked to her since April?

A. Yes, I've talked to her.

Q. Okay. And I think just to go through some of the things that you just said, you said you can't say for sure that Audrey was addicted to drugs, right?

A. No. She -- but she said once that she tried it, and she told me that she tried crack. As far as her being addicted, I can't say that she really got addicted to drugs.

Q. Okay.

A. But she told me she tried it. She was with

60

this young man, Richard, and she said that she tried it with him. She told me that.

Q. And did you ever see her under the influence of anything?

A. No, I didn't.

Q. Okay. And when you -- you mentioned the Mazones.

A. Uh-huh. Yes.

Q. Are you a friend of Ms. Fanny Mazone?

A. Yes, I am. Uh-huh.

Q. How long have you known her?

A. I've known her about 17 or 18 years.

Q. Okay. And what's your relationship like with Ms. Mazone?

A. Me?

Q. Uh-huh.

A. She's a friend of mine.

Q. Okay. You-all attend the same church?

A. Yes.

Q. And you know her to be a really good minister --

A. I do.

Q. -- out there?

A. I do, yes. She's one of the best there is.

Q. Okay. She's out there trying to get people to

61

know the Lord and take them to church, and she'd -- she'd do anything for somebody, right?

A. Yes, she would.

Q. Okay. And, Ms. Mayes, based on your friendship with her and the, I guess -- I assume going to the same church, you follow those same teachings.

A. Yes, we're on the same. Yes.

Q. And would you also try to help out anybody that needed help?

A. Yes, I would help. Yes.

Q. And particularly, what if they were blood, related to you?

A. I have. I have raised two grandkids. I've already had a heart attack, bypass surgery, raised grandkids, and fixin' to raise the grand -- my great grandkids.

Q. And would James have known that if he needed any help, --

A. Yes, he could have -- he could have stayed.

Q. -- or needed a place to stay, he could go where?

A. He could have come and stayed, because all the kids stay at my house. I've raised nephews, nieces. I've raised a lot of kids.

Q. And that would not have been a problem, right?

62

A. No, the grandkids know.

Q. But James never came to you, did he?

A. He stayed -- they stayed with me a few -- you know, a little while. Audrey stayed. You know, she would be in and out, so they -- they stayed in and out of my house for a little while.

Q. Okay.

A. But Audrey was never stable anywhere, so she always, like, was in -- always in somebody else's house living.

Q. Okay. And so as far as the moving around, though, he always knew he could have a stable home with you; fair to say?

A. Well, I -- yeah, I guess. I mean, if he wanted somewhere to stay, but he never -- James always followed his mom. He always -- you know, wherever Audrey went, he went, you know? I mean, I don't -- I don't care where he -- where she went, that's just where he were. If he could go, he would go.

Q. And some people say it's always good for a kid to be with their mamma, right? And so --

A. It ain't always the best, but ...

Q. Well, but he -- he knew her, and he lived with her, and she took care of him, right?

A. If that's what you call it, yes.

63

Q. Okay. The best she could; fair to say?

A. Well, I think she could have done better. I'm just going to say --

Q. Okay.

A. -- it like that. She could have done better with James.

Q. Okay. How do you think a mother shows love to their child?

A. Oh, God. Well, you -- you love, you -- you -- I had -- I'm going to tell you, okay? I want to say, I have my -- my kids, and I mean, I'll do anything for mine. I will.

Q. Uh-huh.

A. But everybody tell me I'll never have anything, I'll never have any -- you know, I always be broke because I always give them. I have a son that's 33 and he's just had a stroke, and I bend over backwards for my kids. I mean, that's just me. But -- and things have happened in my life, too. Things have happened. But still, the Lord blessed and turned things around where I could have an opportunity, and I thank God for that opportunity. But I -- I wouldn't trade anything for my kids. I mean, you give and it -- and not only give. It ain't always giving. You understand what I'm saying?

64

Kids, a lot of times you can't give kids everything they want. That's not always love. And every time what you give them, that's not always love. But if you take -- take a child in and you nurture them and you -- you train them up or you teach a child the way, and so when they out in this world they know what -- know what it's like and what they're going to face, I think that's -- that's really a mother's job is to really teach their children to love them or something, but you don't give them everything they want.

Q. Okay.

A. But just to show them love and let them know I'm here for you, yeah.

Q. Okay. And so did you know that Audrey sends James, or has sent James money, moneygrams?

A. I don't know what -- I don't know. I can't tell you. I don't know.

Q. Even -- even prior to this offense happening, she supported him monetarily, didn't she?

A. I don't know. I can't say.

Q. You can't say?

A. No.

Q. And you said that you didn't really think that they had a relationship, but is part of a relationship

65

talking to each other?

A. Yeah, talk -- yeah, talking. But, see, okay. Talking, there's a difference in talking and screaming and hollering. I don't feel like Audrey ever -- okay. My thing is I don't think she ever was just bonded to James.

Q. Okay.

A. I don't think they really had like a father -- I mean, like a son and mother relationship --

Q. Okay.

A. -- because she was too busy with other things. I -- I'm -- that's the way I see it.

Q. And so you would stick up for your child and do anything, right?

A. Yeah, my child.

Q. And so would it surprise you to know that Audrey has done that during this time in his life?

A. Yeah. Well, Audrey -- I don't -- I don't know, because I feel like she unstable or she -- I don't know.

Q. So you don't really know what she has done to stick by her son during this time; fair to say?

A. I don't know what I -- I know what I've seen in my time with Audrey. I don't know what she's done away from me, but I know what's been -- what I've seen

66

around her, what's been in my presence with James. Now, her and James away from me, I can't say.

Q. But a mother would encourage their child, right?

A. Ah -- yeah, a mother would.

Q. Give them advice?

A. A mother? Yes.

Q. Would they even talk to them about the Bible and turning to God?

A. If a mother's in that way.

Q. Okay. And have you known Audrey to attend church at times?

A. Audrey used to be at church once, uh-huh.

Q. And she's well-versed in the Bible, isn't she?

A. Well, I -- yes, from what I've heard.

Q. Okay. And she can be a hard worker when she's employed as a truck driver.

A. I -- well, I never seen her. I just knew she drove trucks as far as like that. She's always away driving trucks, you know.

Q. Okay. And so during some of the times that she would be away, James would stay with relatives, right?

A. Yeah, but most of the time when she was driving, James was going with this girl, and that's

67

where he stayed at, that young lady in Hope.

Q. Okay. And did he seem to like the young lady there in Hope?

A. I don't know nothing about their relationship.

Q. Okay.

A. I just --

Q. But he was -- he was okay staying there.

A. I've never been there. I just saw him with her.

Q. All right. And did you ever -- so were you there whenever your Aunt Betty would do these things to James?

A. I mean, not all the time, but when I was there, I saw. I mean, -- I mean, when I was there, I saw what -- I saw when I was there, but I wasn't always around my Aunt Betty.

Q. And you saw your Aunt Betty slapping him in the face.

A. Yeah, she slapped him and she left her handprint on his face. Yes.

Q. And how old was he when that happened?

A. She did that once, and I think James had to be around the eighth or ninth grade. Once she did that --

Q. Okay.

A. -- it was one day after school.

68

Q. And was that in reaction or response to anything he had done or said?

A. Because he had went into the kitchen to get some -- get him something to eat.

Q. Okay. And you saw that.

A. Yes.

Q. All right. You said that one of the most stable times in James' life was when Audrey was with Darryl Maxwell?

A. Yes.

Q. And that was a stable place to live?

A. Yes.

Q. And you said that was about the second or third grade, right?

A. He had to be. He -- he was young. I -- I don't know exactly what age, but James was still young.

Q. And so would that be the same time period that the Mazones were taking him to church on Sunday mornings --

A. No.

Q. -- and feeding him?

A. No.

Q. No?

A. No.

Q. Different time period.

69

A. Yes. That's -- that's when she -- when she was married to Darryl. Darryl took care of -- of James.

Q. Okay.

A. Audrey didn't need that -- at that time, Audrey was at Arkadelphia. She was up in Arkadelphia.

Q. Okay. When was she [sic] was with Darryl?

A. Yes.

Q. And did you know -- and were you around both James and the Mazones when they were taking him to church on Sunday mornings?

A. Yes. They lived in Hope.

Q. Okay. They lived in Hope?

A. In Hope. And then when they moved to Mount Vernon, they still took him to church.

Q. And that provided some stability for James as well, taking him to church, right?

A. I -- I -- I guess. I -- I -- I -- I can't really say what he was -- what -- what he was like, you know, in Hope. I can't really say because I -- I wasn't in Hope when she was taking him back and forth to church, but I know she did.

Q. Okay.

A. And I know -- and then when she lived in Texarkana, I also knew she took him to church. She

70

went to -- they lived in Brian Court, and she used to pick him up and take him to church, too.

Q. Okay. And when you say you can't really say what James was like, how often would you say in a given year that you would see James?

A. Before -- in the last -- okay. Before the last three years, I want to say I saw him -- that's the last time I saw him, be about three years ago, the last time I saw James. But I always see James, but maybe -- let me see. Oh, maybe I will see James about -- maybe twice a month, some -- somewhere like that.

Q. Twice a month?

A. Yeah, I mean, like -- or if I see him, I just -- being around me. Once I got -- okay. I want to explain this to you [sic]. Once I've -- once I've got sick -- and, I mean, I've had heart attacks, heart surgeries, stuff like that, I wasn't really, like, around the family after all of that began to happen in my life. You know what I'm saying? That -- that set me down at lot of doing and hanging out and stuff like once I had begun to -- because I've had, like, two bypass surgeries, so -- my sickness have really just scared me. I don't really just hang out, so ...

Q. And when did that start?

A. I got sick in -- I had a heart attack in 1995?

71

'95. I had a heart attack in '96.

Q. '96?

A. I know at that time James and Audrey was living in Hope then. '96. They lived in Hope then.

Q. And so about -- he would have been about six?

A. Somewhere. I think it was six or seven, but I don't know.

Q. Or seven?

A. Or thereabout. Excuse me. And as a matter of fact, I had the heart attack right after she had left -- her and Darryl divorced. I mean, well, they had separated. That's when I had the heart attack.

Q. Okay. And since your heart attack in 1996 when James would have been about six or seven, is it fair to say that your dealings with James, or your seeing James has actually gone down since that time?

A. Oh, yeah. Over time, yeah.

Q. Okay. And so on average, since that time, how often in a given year do you see -- did you see James after your heart attack?

A. They came around. I mean, like she would come -- Audrey would come visit, or when she came through town to check on me and I would see James. But when James got a little bit older -- I want to say that he got a little bit older as a teenager, that was kind

72

Q. And that's what teenagers do, right?

A. Yeah, he went his separate way.

Q. Okay. And when you say he went his separate ways, is it fair to say you -- you really didn't know what James was doing when he wasn't with you, right?

A. With me? No.

Q. Or with you-all.

A. No.

Q. Okay. Ms. Betty Eason that he was around quite a bit when his mother would leave, she's passed away, right?

A. She's passed on.

Q. Okay. And you talked about his brother Aaron, right?

A. Yes.

Q. I think you -- I think earlier you said that his mother only had one child to raise, and so she only had one child. How -- how often were Aaron and James in that same home together?

A. Because Aaron was raised by my aunt.

Q. Okay. And so when -- or what age would they have been around each other?

A. Well, like I say, James came back. They came

73

back to the Arkansas area when James had to be about two or three years old, so Audrey was always, like, I've got -- I'm going to say the only time that Audrey was really away and had really -- away from my aunt is when she was really married to Darryl. And then after she got married to Darryl, she got Aaron and moved Aaron to Arkadelphia with them.

Q. Okay. And how old would James have been about that time?

A. Let's see, he had to be about -- James had to be about four or five. James had to be about somewhere like that. Four or five. Three or four. He wasn't very old.

Q. Okay. And what -- you said that you just had a suspicion and had a feeling. Did you ever see Aaron do anything inappropriate with James?

A. No, nothing.

Q. Did you ever -- how -- how -- what's the difference in age between Aaron and James?

A. I don't know how old Aaron is. Let's see. Let me think. Let me think for a moment. Aaron's got to be -- I know I had Corey in sev -- I had Corey in -- I had Corey in '79 and -- oh, God. And he's 29. So Aaron's got to be somewhere about 26 or somewhere like that. He's got to be somewhere like that or older.

74

Q. So six or seven years' age difference.

A. I -- I -- I don't know, I can't tell you.

Q. Okay.

A. I couldn't tell you, but I know --

Q. But quite a bit older, not just a year or two.

A. Not -- not a year or two.

Q. Okay. And how long did Aaron live there in the home with his mother and James?

A. In Arkadelphia?

Q. Uh-huh.

A. Until her and James -- her and Darryl broke up, and I think they broke up like in -- I remember, I think it was like -- I remember the year because that's when we had that tornado that came through here, and that was in '96 and I had the heart attack.

Q. Okay.

A. I think that's when they ended up leaving Arkadelphia.

Q. And when they left Arkadelphia, did Aaron go with she and James?

A. I don't know where Audrey moved to. I think she got a -- Audrey moved in with Teresa, I think, and James -- Aaron went back to my aunt's. But --

Q. But then you went on to say that his mother beat him?

75

A. Yeah, his mother beat him.

Q. Okay. And did you see her do that?

A. Yeah, quite often. She didn't whup him like a normal person would whup him. She would take her fist or something and she whupped him like she was fighting a man or something.

Q. And how old was he whenever you would see this?

A. James was young. James had to be four or five, six. Like I said, when I had the heart attack, James had to be about six or seven when I had the heart attack. So it was before I was at -- it was before that. It was before he got even teenager, you know.

Q. And they were there in the same home as Darryl Maxwell?

A. Yes.

Q. Okay. And that was the time period when he had the most stable home life, right?

A. With -- with Darryl. I mean, he was like -- I mean, yes. As far as being somewhere, you know, stable and not having to move around, yes.

Q. Okay. And do you know James to be an intelligent young man?

A. I don't know. I mean, if you -- help me understand what you mean when you say "intelligent."

76

Q. Well, you said he went to school through about ninth or tenth grade, right?

A. Yes. Uh-huh.

Q. And do you know that he did well in school or if he did well in school?

A. No, I -- but I -- I -- if -- I would just say he made bad grades. I -- I would be silly to tell you, but I understand that he did, that he just wasn't a good student. That's all I'm -- I can't say, because I've never seen a report card as to what James --

Q. You understand what?

A. That he made bad grades; that he was just -- you know, he just -- James just went to school.

Q. Okay. Because there's some people that just go to school because they've got to go and they don't necessarily apply themselves; fair to say?

A. Yes.

Q. Or do what they're to do at school, but that doesn't mean they're not intelligent, right?

A. No, that doesn't mean -- are you saying know -- to even know how to do or should do? You know, what they should or shouldn't do? I mean, what are you asking me?

Q. Okay.

A. Is that -- is that -- is that what you're

77

asking me? If he know -- I mean, if being intelligent means you have a lot of people saying, Well, you're intelligent; well, you know better or you know what you can, what you should and shouldn't do. Is that what you're asking me?

Q. Well, if his mother had made the statement before that he could be something like Barack Obama right now, do you think he has that sort of potential or he ever had that sort of potential?

A. I think -- all right. I -- I think -- I think a child coming up and started here has a chance to be anything they want to be in life. I -- I believe that. I mean, I stress that my -- you could be anything you want to be in life. I believe that.

Q. Because a mother --

A. I didn't -- I didn't apply myself, but I feel like it could be done.

Q. Because a mother that loves her child would give their child that encouragement, right?

A. Yes.

Q. And that support.

A. Because she loves them, yes.

Q. Okay. And you based on your knowledge of James -- and I know you haven't seen him for the last three years -- but did -- did he appear to you to be

78

somebody that if he had applied himself, he could do good?

A. I guess if he had applied himself, yeah, he would. I mean, if -- if he had applied himself, he could be anything he wanted to be if he applied himself.

Q. Okay.

### REDIRECT EXAMINATION

(As read:)

Q. Okay, Ms. Mayes. I have a few more questions based on Ms. Evans' questions.

When -- when you said -- when you testified earlier that Audrey had whupped James so badly on the back that it split his back open, do you remember how old he was at that time?

A. James had -- okay. This happened before we left Arkadelphia, so James had to be -- he was younger then. He was about three or four. He was -- James was young, a baby. He was young, real -- he was real young.

Q. Okay. And when we're asking you a lot of dates and ages and, you know, I don't ex -- I don't think either of us expect you to know exactly. We just want you to try and recall the best that you can, okay?

A. Okay.

79

Q. Why do you think James kept following his mother?

A. I don't think he had a choice.

Q. So she just forced him to go.

A. Yeah, to go. Yeah.

Q. But James -- do you know what kind of relationship they have right now?

A. Un-uh. No, I don't.

Q. Would you be surprised to know that Audrey hasn't even spoken to him since April?

A. Un-uh. I wouldn't be surprised.

Q. Just to go visit James in jail?

A. Yeah, just to visit him in jail.

Q. Okay. Do you think that James was nurtured as a child by Audrey? Did she nurture him growing up?

A. No, not like a mother should.

Q. Okay. Do you feel like Audrey, when James was young, in the times that James lived with her, did she encourage him?

A. I -- I -- you know what? I don't know. I -- I -- I can't even say --

Q. Okay.

A. -- as to what -- you know, what she did. I -- you know, I just know from what I saw. But I don't know. I don't know.

80

Q. Okay. That's fair. That's fair. You weren't around him all time.

And did you say earlier that you believe that Audrey has only been a truck driver the last two or three years?

**A. I -- I don't know how long Audrey's been driving trucks. As far as I recall, it only seemed like a few years she's been driving trucks. But, you know, she -- I don't know. I think Audrey -- no, she wasn't driving. Her friend was driving. But I don't know how long Audrey been driving trucks, but it's been a few years, I know.**

Q. Okay. So prior to the time she was driving a truck, she would just dump James off because she wanted to go do something else; is that fair to say?

**A. Yeah, because just -- she always had a different -- she always had her own life. I would say she always -- she always had her -- her own life in her life, and most of the time her -- her guys didn't include James.**

Q. Okay. And you just told Ms. Evans about an incident where James was in the eighth or ninth grade and Ms. Betty slapped him across the face.

**A. Yes.**

Q. Did James do anything --

81

**A. No.**

Q. -- back to Ms. Betty?

**A. Ran out the house.**

Q. Okay. So he didn't hit her back --

**A. No, no.**

Q. -- or push her or anything?

**A. No, no. Nothing.**

Q. He just turned around and ran away.

**A. He ran out the back door, yes.**

Q. Okay. Thank you, Ms. Mayes.

**RECROSS-EXAMINATION**

BY MS. EVANS:

(As read:)

Q. Just a couple more questions, Ms. Mayes. In regards to the way that you say you saw James being treated by both Aunt Betty and his mamma, and you said that, I think, some of the men were allowed to discipline James as well; fair to say?

**A. Her friends, yes.**

Q. Based on that, did you ever call -- I think in Arkansas it's called DHS, right?

**A. Yes.**

Q. And what is DHS?

**A. Department of Human Service.**

Q. Is that kind of like Child Protective

82

Services? They take care of the children when the parents aren't taking care of them?

**A. Yes, when they ...**

Q. Okay. Did you ever make any attempt to call DHS --

**A. Un-uh.**

Q. -- based on what you saw?

**A. No.**

Q. No, you never did?

**A. No.**

Q. Okay. And prior to today, had you had conversations with the lady, Ms. Ross?

**A. Ms. Brendan?**

Q. Yes.

**A. Yes, I talked to her.**

Q. Ms. Brendan Ross?

**A. Uh-huh.**

Q. And when was -- or how long -- did you talk to her on the phone or in person?

**A. She came, oh, God, I guess it's been about a month ago I talked to her in person.**

Q. And about how long did you talk to her?

**A. I guess about -- me and my aunt talked to her, I guess about 15, 20 minutes we talked to her.**

Q. Okay.

83

**A. It could have been longer.**

Q. You talked to her about 15 to 20 minutes.

**A. It might have been longer. Yeah, me and my -- talked to me and my aunt both. She asked me and my aunt both questions.**

Q. Okay. And you told her as well as you've told us today everything that you can recollect or really know about James, right?

**A. A sweet child, yeah.**

Q. Okay.

**A. I'm sure. I'm sure. Until now.**

Q. Okay. Thank you.

THE COURT: Okay. Ladies and gentlemen, that's the end of the deposition testimony. We'll take a ten-minute recess before we continue with live testimony.

All rise for the jury.

(Jury not present.)

THE COURT: We are in recess till 10:10 a.m.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT: On the record in the case of State of Texas versus James Broadnax.

The jury's not here.

84

Mr. Lollar, it's my understanding you have two more witnesses?

MR. LOLLAR: Ah, --

THE COURT: That's what you said yesterday.

MR. LOLLAR: We've got some exhibits and then we have one -- two more witnesses; yes, sir.

THE COURT: Okay. And then it's my understanding the State's planning on putting on a rebuttal case; is that right, Mr. Alex?

MR. ALEX: Yes, sir.

THE COURT: All right. Who are you going to start with?

MR. ALEX: I'm probably going to start with -- a lot of it's going to depend on these next two witnesses, but it will probably be two of the victim's family members.

THE COURT: Okay. So -- so in other words, not your -- not Dr. Price.

MR. ALEX: No. My understanding is we probably need to do a short 702 hearing before I put him on.

THE COURT: Okay.

MR. ALEX: And we could probably either do that right -- well, that's -- that's totally up to the

85

Court. I've got him --

THE COURT: Well, his doctor can be here for that.

MR. PARKS: She is here, Judge. She just came in.

THE COURT: Really. I thought you said she wouldn't be here till noon?

MR. LOLLAR: No, that's a different doctor.

THE COURT: Okay. And then are you planning on putting on a surrebuttal case?

MR. LOLLAR: Yes.

THE COURT: Okay.

MR. LOLLAR: Well, --

THE COURT: So we're not --

MR. LOLLAR: -- depending on what Dr. Price says.

THE COURT: -- we're not going to be arguing today.

Probably for planning purposes then, after you finish your case we'll take a lunch break, but when I say a "lunch break," that's not for us. We'll have our 702 hearing, for your planning purposes. All right?

MR. ALEX: Judge, I'll -- I'll give

86

Dr. Price a call again, but I know he had an 11:30 that he had to do, and he said he could be here for 1:30. And I asked Mr. Lollar, and he seemed to think it was going to take the rest of the morning for his case.

MR. LOLLAR: Close to it.

THE COURT: The earliest he can get here is 1:30?

MR. ALEX: He's got an 11:30 that he's doing right now. I guess whatever --

MR. LOLLAR: Are you going to put in Rebecca Lopez's?

MR. ALEX: I'm sorry?

MR. LOLLAR: Are you going to put in Rebecca Lopez's?

MS. HANDLEY: Yeah, let's talk about how that's going to happen.

MR. LOLLAR: You can do that before.

MR. ALEX: Okay.

THE COURT: I just don't want to waste the jury's time.

MR. ALEX: I understand, Your Honor.

THE COURT: Okay? I mean, you're talking -- that -- that could be like a two-hour lunch break, and I don't want to do that. This jury's been here for a long time.

87

Call the jury.

MR. PARKS: Since -- Judge, can we -- since we have no guidance as to when Dr. Price might be here, I've got Dr. Kessner sitting back here, which I really don't --

THE COURT: We do have guidance. 1:30.

MR. PARKS: 1:30, okay.

THE BAILIFF: All rise.

(Jury present.)

THE COURT: Be seated, please.

Ladies and gentlemen of the jury, just to give you kind of an update of where we are, I hope we get through with all the testimony today. I can't guarantee it. But then the instructions and final arguments for you will probably be tomorrow.

For your planning purposes, tomorrow we're probably not going to allow you to separate, that is, go home, so you'll be sequestered Thursday night.

That would not apply to you, assuming the jury remains intact over here, so you'll need to bring some clothes in tomorrow. And the bailiffs can answer any questions that you have about that. We're not there yet. I just want y'all to be thinking ahead. So that's where we are.

Mr. Lollar, whenever you're ready.

88

MR. LOLLAR:  Thank you, Your Honor.

At this time, Your Honor, the defense would offer what has been marked as Defense Exhibits 47 and 48.

THE COURT:  Any objection?

MR. ALEX:  Let me just look, Judge.

I have no objections, Your Honor.

THE COURT:  Defense Exhibits 47 and 48 are admitted.

MR. LOLLAR:  May I publish, Your Honor?

THE COURT:  Yes, sir.

MR. LOLLAR:  Ladies and gentlemen, Defense Exhibits 47 and 48 are offered to clear up any misunderstanding that you might supplement what you have heard from Mr. Alex yesterday in reference to a -- an arrest of Mr. Broadnax in Hope, Arkansas, back on the date of May the 23rd of 2007.

The top page here is an affidavit from the Hope Police Department.

The second is what's called a tracking card information regarding the arrest of the defendant.

The third page is the fingerprint page.

And the fourth page are just -- appears to be a continuation of the third page.

Now, this is the possession of controlled

89

substance that Mr. Alex referred to with the witness yesterday.

Defendant's Exhibit 48 is the police report of the Hope Police Department, and these deal with all of the involvements that James Broadnax has had with the Hope, Arkansas, police department.

MR. ALEX:  Judge, I'm sorry.  I'm going to have to object to counsel characterizing the evidence other than just what it says.

THE COURT:  No speaking -- well, all right.  No sidebars.

MR. LOLLAR:  Defendant's Exhibit 48 --

THE COURT:  Sustained.

MR. LOLLAR:  -- is what they call a Master Name History Rap Sheet from the Hope Police Department in regard to James Broadnax.  Black male, age 20.

The list here indicates that there was a failure to comply on December the 20th, 2007.  That there was an allegation of domestic battery third, and that's repeated all on the date of 6/28 of 2007. That's entered four times in the system.  It refers to the same incident.

There is an incident referred to as possession of a controlled substance for the date 5/23 of '07, and that's the date mentioned here in regard to

90

possession of controlled substance.  The same listing all the way down.  There are multiple listings of two incidences.

Now, the second page is the disposition of the possession of a controlled substance.

Now, you will see that the battery in the third-degree, there was no action taken on that, okay? There was no criminal case filed as a result of that.

The third page is the start of the incident report in regard to the possession of a controlled substance.

And I'm going to go down through this with you.  The location was 603 Third Street West.  Date, 5/23 of '07.  And Off. Dusty Townsend and an Off. Sandra Sundberg were involved in this incident.

The offense is possession of a controlled substance:  Marijuana.

The type of locations of the offense was a driveway.  The victim was the State of Arkansas.

Continuing.  Lists offenders.  These are the people who would have been arrested:  Holly Lamb, a white female, age 23; Christopher Dwayne Johnson, a black male, the age of 17.

The next page shows property.  Note. Evidence.  One small plastic baggie containing a green

91

leafy substance believed to be marijuana.

Arrest:  James Broadnax, on the date of 5/23 of 2007.  Age at that time, 18.  Possession of a controlled substance:  Marijuana.

Arrest:  Holly Lamb, white female, age 23. Charge:  Possession of a controlled substance, marijuana.

Arrest:  Christopher Dwayne Johnson, black male, age 17.  Charge:  Possession of a controlled substance, marijuana.

And then there's a narrative.  It states as follows:

(As read:)  On 23 May, 2007, at approximately 4:55, Off. Townsend and Sgt. Sundberg received a call from the police dispatcher regarding police activity located at 603 West Third in Hope, Hempstead County, Arkansas.  Upon arrival, Off. Townsend made contact with a black male, later -- black-male subject, later identified as James Broadnax, Jr.  While speaking with Off. -- while speaking with Broadnax, Off. Townsend could smell an odor that, through training, Off. Townsend associated with burnt marijuana.  Off. Townsend asked Broadnax if he had been smoking marijuana.  Broadnax advised that he had smoked yesterday.

92

Off. Townsend then asked Broadnax if he had anything illegal on his person that he needed to know about. Broadnax stated he had a bag of marijuana in his pants pocket and removed the bag. Off. Townsend then took possession of the small plastic baggie containing a green leafy substance and placed Broadnax under arrest for possession of a controlled substance and placed Broadnax in Off. Townsend's patrol unit.

Contact was then made with another black male subject who was identified as Christopher Johnson. Johnson advised that he did not have anything illegal on his person. Johnson was asked whose vehicle he was sitting on and advised it was his girl's car.

Sgt. Sundberg and Capt. Holly observed that there were pairs of scissors and a cigar laying on the front seat which, through training and experience, officers associate with hollowing out the tobacco and replacing with the marijuana and residue, which appeared to be from marijuana, on the rear seat and front seat of the vehicle.

A search was performed on the vehicle and a small plastic baggie containing a green leafy substance was found in the ashtray.

At that time, Holly Lamb arrived and stated that the car belonged to her. Off. Townsend

93

then placed Lamb under arrest for possession of a controlled substance, and placed Lamb in Off. Louderbach's patrol car. Off. Townsend re-established contact with Johnson who, at that time, advised the car belonged to him.

Off. Townsend then placed Johnson under arrest for possession of a controlled substance, and placed Johnson in Sgt. Sundberg's patrol car.

Officer then transported Lamb and Broadnax to the HCDF where they were charged with possession of a controlled substance and given a Court date of July 3rd, 2007.

Off. Johnson made contact with juvenile intake Off. Powers about Johnson. Off. Powers advised to release Johnson to his grandmother and would make contact with her. Johnson was transported to 912 East First Street and released to his grandmother, who was informed that Off. Powers would make contact with her about the incident.

The two plastic baggies containing the green leafy substance believed to be marijuana, were labeled as EV-1 and EV-2 and placed in a temporary evidence locker at TED for safekeeping. Nothing further at this time.

Now, the second incident report is dated

94

6/25, 2007. Location address, 903 Spring Hill Road South. Time is 1:44.

Description: Battery, misdemeanor.

Reportee: James Broadnax. Black male, age 18.

Off. Lauderbach and Matthew Miller were dispatched. The offense, domestic battery in the third degree.

Type of location: Residence, home. Victim: James Broadnax, black male, 18.

Injuries: Minor injury.

Relationship of victim to offender: Boyfriend/girlfriend.

Name: Casey Norman. White female, 19.

Victim: Casey Norman.

Address: 117 Greening Street, Hope, Arkansas.

Relationship of victim to offender: Boyfriend and girlfriend.

Arrest: Casey Norman.

Charge: Domestic battery in the third-degree.

Arrest: James Broadnax.

Charge: Domestic battery in the third-degree.

95

Narrative. (As read:) On June the 28th, 2007, at approximately 1:01 a.m., reporting Off. Lauderbach and Cpl. Miller received a call from the police dispatcher regarding a disturbance located at 903 Spring Hill Drive in Hope, Hempstead, Arkansas, Texas [sic]. Hempstead County, Arkansas.

Upon arrival, contact was made with James Broadnax and Casey Norman. Norman told Off. Lauderbach that her and Broadnax had gotten into an argument, and when Broadnax threatened to leave the residence, the argument turned physical.

Norman said she hit Broadnax several times and Broadnax hit her back. Both Norman and Broadnax had several welts and scratches on their shoulders, arms, and backs. Off. Lauderbach also observed that just above Norman's left eye was a knot.

Norman said that her and Broadnax had been living together in this residence for approximately three months. Both Broadnax and Norman were arrested for domestic battery third. Both were transported to HCDF where they were booked and issued citations for the above charge, with a court date 7/31/07 at 9:00 a.m.

Both were left in the care of the on-duty HCDF staff awaiting a first court appearance.

96

And then there are photographs of Mr. Broadnax. It says, Photos were taken of the injuries observed and are attached to this report. No further information at this time.

And a photograph of Broadnax. Photograph of Casey Norman, Casey Norman, and Casey Norman.

THE COURT: What further says the defense?

MR. LOLLAR: We'll call NiQuia Martin.

MR. ALEX: Judge, before we do that, I would like to offer the rest of the documents related to this under the rule of optional completeness. That would be the judgment and sentence that wasn't offered just then, and photographs --

THE COURT: What will that be, State's Exhibit what?

MR. ALEX: That would be State's Exhibit 454-A.

THE COURT: Any objection?

MR. LOLLAR: No, sir.

MR. ALEX: And -- give me a mark on that.

I believe the photographs offered by the defense are very poor quality. I've got a much better quality of those photographs showing that.

THE COURT: 454-A is admitted.

MR. ALEX: 488. State's Exhibit 488,

97

Your Honor, would be -- I'm assuming the purpose for these photographs is to show the marks on the victims that you can't see in counsel's copy. It's probably just a poor copy I gave them.

THE COURT: Are you offering 488?

MR. ALEX: Yes, sir.

5 -- 588 for all purposes.

THE COURT: 588. All right. Is there any objection?

MR. LOLLAR: 464 and 588?

THE COURT: 454-A and 588.

MR. LOLLAR: No objection.

THE COURT: 588's admitted.

MR. ALEX: Permission to publish?

THE COURT: You may publish.

MR. ALEX: Folks, what I just admitted was State's Exhibit 588. It shows the -- Broadnax scratches on his back.

The Norman's -- that would be the girl -- bruises on her arm. And you'll notice there's -- no welts or -- you'll -- you'll see the scratch there and you'll see the bruises on the young lady's arm. I don't think we'll be able to see it very well in the other photographs. So there's a scratch on his back.

The second page will show that he has a

98

scratch on his chest and on his arm. And they're labeled as such.

And then finally, the third page says, Norman, knot above the left eye, which I think is consistent with what Mr. Lollar just read to you, that the defendant would have punched her in the eye. This young lady here.

And finally, State's Exhibit 454-A is the completion to Defense Exhibit 47.

Defense Exhibit 47 is just a jail card on a person that goes to jail. The actual conviction and sentence is going to be here at State's Exhibit 454-A, and you can see that the defendant did plead guilty to those charges. It will tell you the date. It will tell you the arraignment date. And the fine. And the fact that the sentence was suspended for six months to pay the fine. And it will have the complete sentence -- sentencing information and conviction information. That's 454-A.

And that's all we have under that.

MR. LOLLAR: Your Honor, if I can comment also on State's Exhibit 454-A, he pled guilty to the possession of marijuana; did not plead guilty to the battery.

THE COURT: Call your next witness.

99

MS. MALLON: It's actually NiQuia Wynn, Your Honor.

THE COURT: Miss Wynn.

Is she not in the courtroom?

MS. MALLON: She was. She was just right outside.

THE COURT: Miss Wynn, if you'll please come all the way to the front of the courtroom up by the door. All the way to the door, ma'am. When you've reached the door, turn and face me and raise your right hand. Raise your right hand.

**NIQUIA WYNN**

was called as a witness and testified as follows:

MS. MALLON: You may lower your hand.

Keep your voice up, ma'am.

Take your seat in the witness stand right there in front of you. Keep your voice up. Everybody's got to be able to hear you, especially Mr. McCreary down there at the end of the jury.

Is this your witness, Ms. Mallon?

MS. MALLON: Yes, Your Honor.

THE COURT: Whenever you're ready.

MS. MALLON: Thank you, Your Honor.

100

**DIRECT EXAMINATION**

BY MS. MALLON:

Q.  NiQuia, why don't you pull that microphone closer to you so you can talk into it so you can make sure everybody can hear you, okay?

A.  **Uh-huh.**

Q.  State your full name, please.

A.  **NiQuia Marie Wynn.**

Q.  Okay.  You're going to have to speak up.

A.  **NiQuia Marie Wynn.**

Q.  Okay.  And, NiQuia, how old are you?

A.  **24.**

Q.  And where do you live?

A.  **Kennesaw, Georgia.**

COURT REPORTER:  Spell that?

THE WITNESS:  K-E-N-N-E-S-A-W.

Q.  (BY MS. MALLON:)  And do you have any children?

A.  **Yes, I do.  I have one.**

Q.  And who's that?

A.  **Tre'vaun Wynn.**

Q.  You've got to speak up.

A.  **Tre'vaun Wynn.**

Q.  And how old is Tre-vaun?

A.  **He's five.**

101

Q.  Okay.  Where does Tre-vaun currently live?

A.  **In Kennesaw, Georgia, with me.**

Q.  Okay.  And are you pregnant?

A.  **I am.**

Q.  How far along?

A.  **Three and-a-half months.**

Q.  Okay.  What's your relationship to James Broadnax?

A.  **That's my brother.**

Q.  Okay.  Would you go through with us and tell us how many siblings you have?

A.  **I have --**

Q.  And the order.

A.  **-- total -- well, Aaron is my older brother. Then there's me.  Kerrin Martin.  And then it's James Broadnax.  Michael.  I think his last name is Maxwell. And I have another brother, but I'm not sure of his name.  That's my father's side.**

Q.  Okay.  And was there ever a time when you actually lived with James?

A.  **Um, yes.  We lived on and off on different occasions with each other.**

Q.  Okay.  So on and off your entire life?

A.  **Yes.**

Q.  Okay.  And that was with Audrey; is that

102

right?

A.  **Um, when we were younger, yes, it was with Audrey.**

Q.  Okay.

A.  **Uh-huh.**

Q.  Did you -- did you-all move around a lot?

A.  **Yes, we did.**

Q.  Okay.  When I say you-all, who would that include?

A.  **My mother, myself, my sister, and James.**

Q.  Okay.  And do you remember when you went to live with your dad?

A.  **Um, yes.**

Q.  Okay.

A.  **I'm not sure of the year or anything, but I remember it.**

Q.  Do you remember how old you were?

A.  **Maybe five or six.**

Q.  Okay.  And why did you go live with your dad?

A.  **Um, at the time, -- I'm not sure.  All I know is they showed up with the police.  They came and got me and my sister.**

Q.  What had happened prior to that?

A.  **Prior to that, me and my sister, we were abused.  We moved with my grandmother.  We call her Big**

103

**Mamma, and we weren't treated very well there, and I guess that may have gotten to my father and he went -- he took further action and he came and got me and my sister.**

Q.  Okay.  You're saying you weren't treated well by --

A.  **By my grandmother.**

Q.  Okay.  And that's Betty Eason?

A.  **Yes.**

Q.  Okay.  Prior to that, tell us what happened with your mother.

A.  **Um, we moved around a lot with her, me and my sister.  James was small, so he didn't really get a lot of it, but we were -- me and my sister were abused.  We were beaten.**

**My grandmother had x-rays of where my arm was broken.  And we were just abused up until we moved in with my grandmother, Betty Eason.**

Q.  Okay.  And you were abused by your mother?

A.  **Yes.**

Q.  Okay.  Do you remember your mom breaking your arm?

A.  **Yes.**

Q.  And what did she do to break your arm?

A.  **I remember she grabbed me by my throat and she**

104

threw me against the wall.

Q. Okay. Do you remember how old you were at that time?

A. Um, I'm not sure. Maybe -- I'm not sure. I know James, he was really young. He was still wearing diapers, so it was a long time ago.

Q. Okay. Was James living with you guys at that time?

A. Yes.

Q. Okay. Was there a lot of abuse by Audrey?

A. Yes.

Q. Okay. And is that the reason you went to live with your father?

A. Yes.

Q. Okay. And where did your father live?

A. At the time, I think he was stationed by the military in Michigan.

Q. Okay. The first time you moved to live with your father; was that in Michigan?

A. Yes.

Q. Okay. After you moved with your father to Michigan, did you ever live with your mother at a different time?

A. A little after that when I was in high school, I moved to -- I believe it was Texarkana with her, for

105

a little while.

Q. Okay. How long did you stay with her at that time?

A. Not very long. It was a few weeks, months. Maybe three months.

Q. Okay. Was she abusive at that time?

A. No.

Q. Okay. Was James with her at that time?

A. Yes.

Q. Now, did you move back and forth between Georgia and Michigan?

A. Yes.

Q. And why did that happen?

A. Um, well, we -- when we were in Michigan -- because my grandmother there, Lula Brown, she raised me and my grand -- and my sister pretty much. And after she passed, we moved to Georgia with my dad.

And after I got older, I moved back to Michigan with my son's father prior to -- well, at that time he wasn't my son's father, but I moved up there. And then after living there for a little while, we moved back to Georgia.

Q. Okay. So you moved to Georgia after your grandmother in Michigan passed away; is that right?

A. Yes.

106

Q. And that's because your dad was there?

A. Yes.

Q. Okay. And then once you got a little older, you moved back to Michigan to be with Darnell?

A. Yes.

Q. Okay. And is that when you had Tre'vaun, was in Michigan?

A. Yes.

Q. Okay. And then did you move back to Georgia?

A. Yes.

Q. Okay. Now, did James come stay with you in Georgia?

A. Yes, he did.

Q. Okay. Tell us about the first time he came to stay with you in Georgia. Do you remember when that was?

A. Um, oh, I think my son was about three, so I think it was in maybe 2007. And my mom called me and told me that, um, he had a girlfriend there and his -- her parents didn't approve of him and he couldn't live there, and there was nowhere else he could go.

So I was already going down there to visit Betty Eason because she was sick, so after visiting her, I picked him up and took him back to Georgia with me.

107

Q. Okay. How long did James stay with you at that time?

A. I believe he -- well, at that point, he stayed, um, maybe a few months because the girlfriend talked him into moving back to Texas, or whichever state that was. I think it was Texas.

Q. Texarkana?

A. I think so.

Q. Okay. And the girlfriend, do you remember her name?

A. Her name was Casey.

Q. Okay. And you said she talked him into moving back?

A. Uh-huh.

Q. And did James actually move back?

A. Yes, he did.

Q. Okay. And was -- did he come live with you another time in Georgia?

A. Yes.

Q. How -- when was that?

A. Um, it wasn't that long after he moved back to live with Casey. They had a disagreement and he couldn't live there anymore again, and he -- um, he came back to live with me. He stayed there maybe a little over -- um, I'm not sure. I think it was maybe

108

until January or February of 2008.

Q. That's how long he stayed with you?

A. Yes, I believe so.

Q. In Georgia.

A. Yes.

Q. Okay. And while he was living with you in Georgia, did he take care of Tre'vaun?

A. Yes, he did.

Q. Okay. And so he was responsible for the childcare for Tre'vaun

A. Yes.

Q. Okay. Did he do a good job with him?

A. Yes, he did.

Q. Did he take good care of him?

A. Yes, he did.

Q. Okay. And then you said James stayed with you until January or February of 2008. Do you know where he went at that time?

A. He went to Michigan.

Q. Okay. And who did he go to Michigan with?

A. With a friend of mine, Trina Byrd, and also my son, Tre'vaun went.

Q. And that was January or February of 2008?

A. Yes.

Q. Do you know why he went to Michigan?

109

A. Um, he was just moving up there to -- I'm -- I'm not sure exactly why he moved there but, um, since he was going, he was taking my son to Michigan to his father for me.

Q. Okay. Do you know how they got to Michigan?

A. They took the bus, through the Greyhound.

Q. Okay. How was James when he lived with you?

A. Um, he -- you know, I mean, I'm not -- okay. I'm not sure about what you mean about how was he.

Q. Okay. Did he help you?

A. Yes, he helped me.

Q. He was helpful to you?

A. Uh-huh.

Q. Okay. Was he respectful to you?

A. Yeah.

Q. Was he getting into any trouble?

A. Um, there was one occasion where -- it wasn't really he got in trouble, but they were at -- visiting some people at an apartment complex, and the police were kind of harassing them because I guess there's a lot of stuff that goes on over there, so they told them to leave because they couldn't be over there or something, but other than that, no.

Q. Was it a bad part of town?

A. Sort of.

110

Q. Okay. Did you ever know James to be involved in any gang activity?

A. He had said -- I heard him talk about the gangs and stuff before, but his actions in certain things that he did doesn't -- doesn't say to me that he was actually in the gang.

Q. Would you describe him as a "wannabe"?

A. Yes.

Q. Okay. Do you know if Aaron was in a gang, his older brother?

A. Yes, he was.

Q. Okay. Do you know what gang he was in?

A. I think they call it GD.

Q. Gangster Disciples; is that right?

A. I think so, yes.

Q. Okay. And in your opinion, did James want to be like Aaron?

MR. ALEX: Judge, I'm going to object that that would be complete speculation at this point. She can't testify for the --

MS. MALLON: If she --

THE COURT: Sustained.

Q. (BY MS. MALLON:) And you said -- tell me again what you said about him not -- tell me again what you said about being in a gang. He talked about it,

111

but what did you say?

A. There were certain things that he did that would -- people in gangs don't do.

Q. Okay. Such as?

A. Hang with rivalry gang members. And like certain things you should know about the gangs and things like that, he didn't know.

Q. Okay. How do you know about gangs?

A. Because of my older brother.

Q. Aaron?

A. Uh-huh.

Q. And you say he used to hang with the rival gang members. Is there anyone in particular?

A. There was a guy who used to come visit him at my house a lot. His name was Mario.

Q. Okay. And how do you know that -- he was in a rival gang?

A. Yeah. Well, he claimed to be. I -- I think -- I will call him a wannabe also, but he claimed to be.

Q. And the gang that he was in was supposedly a rival gang of the Gangster Disciples?

A. Right.

Q. But Mario and James would spend a lot of time together?

112

A. Yes.

Q. Okay. Did you ever see James violent?

A. No.

Q. Did you ever see him fight?

A. No.

Q. Did you ever hear him refer to his girlfriend or women at all as bitches?

A. Prior to this, no.

Q. Hoes?

A. No.

Q. Okay. Never heard him use any language like that.

A. No.

Q. Okay. Did you ever know him to use drugs?

A. On occasion, yes.

Q. And what drugs?

A. He smoked weed.

Q. Okay. Did you say that James is easily influenced by others?

A. Yes.

Q. Okay. When Casey wanted him to move back to Texas, did he go?

A. Yes, he did.

Q. Okay. And did Trina Byrd, your friend, is she from Michigan?

113

A. Yes.

Q. Okay. Did she want him to go to Michigan?

A. Yes.

Q. Okay. Is there anything else you'd like to tell us about James?

MR. ALEX: Judge, I'll object. It calls for a narrative response.

THE COURT: Sustained.

Q. (BY MS. MALLON:) Is there anything else you want to say?

MR. ALEX: Judge, that's the same question.

THE COURT: Sustained.

MS. MALLON: Pass the witness, Your Honor.

THE COURT: Thank you, Judge.

**CROSS-EXAMINATION**

BY MR. ALEX:

Q. Miss Wynn, my name is David Alex. I have a few questions for you. If you don't hear me or understand me, would you let me know?

A. Yes, I will.

Q. All right. And we've heard talk through this trial about a young lady by the name of NiQuia or Niki Martin. You'd be that same young lady; is that right?

A. Yes.

114

Q. All right. And you are the defendant's sister.

A. Yes.

Q. And when -- before today, when was the last time you saw the defendant?

A. Um, when he went to Michigan. Before he went to Michigan.

Q. All right. And prior to today, -- when did you get in town?

A. Saturday, I believe.

Q. And did you go see him in jail --

A. Yes, I did.

Q. -- when you got here?

A. Yes.

Q. Okay. So you did see him on August 17th, 2009, which would have been the Monday before the defense started putting on their witnesses; is that right?

A. Yes.

Q. All right. And you know when you see somebody in jail they keep a record of it, right?

A. Yes.

Q. Okay. And at that same time, the day before the defense started putting on the witnesses, Gary Aaron, Audrey Kelly, Kevon Eason, Jackie Aaron and

115

Parnell Wynn, y'all all saw him at the same time at 7:00 p.m. that night before; is that right?

A. Yes.

Q. Okay. So that would have been the last time you saw him, right?

A. Yes.

Q. And you -- and you talked to him about the predicament he was in?

A. A little.

Q. Okay. All right. Now, have you ever made any statements, wrote any statements down -- well, let me ask, have you ever wrote any statements down about what you know about this case or the defendant?

A. Um, I believe so. I think I have. I can't recall the letters, but I think I did.

Q. Okay? And those were letters -- would have been sent to who?

A. To James Broadnax.

Q. Okay. And have you ever prepared any statements for the defense lawyers or anything like that?

A. I'm not sure what you mean.

Q. Well, did you ever talk to them and they have you make out a statement and you sign it, or review it, or anything like that?

116

A.  No.

Q.  All right.  And then when you spoke to the defense attorney, is that right, did they take down what you said and then ask you what all you knew about this case?

A.  They didn't ask me what I knew about the case, but they asked me questions and wrote what I said down.

Q.  And they wrote what you said down?

A.  Uh-huh.

Q.  All right.  So there's a document somewhere about what you previously said; is that right?

A.  Yes.

Q.  All right.

MR. ALEX:  Judge, we would like to see that at this time.

MR. LOLLAR:  Judge, it's not a statement made by her.  It's our notes of what she said, which is not the same thing.

THE COURT:  I'm going to deny that.

Q.  (BY MR. ALEX:)  Okay.  Ms. Martin, -- I'm sorry.  Ms. Wynn, let's talk a little bit about your brother, James Broadnax.  You -- you told the jury that he is -- he's a follower; is that it?

A.  At times.

Q.  Okay.  But he's -- he's pretty good when it

117

comes to being quick with his wit.  Would you agree with that?

A.  Yes.

Q.  Okay.  And if we were sitting down having a conversation with him, he's not just going to stay out of the conversation, is he?  He's going to put input into that conversation.

A.  Yes.

Q.  All right.  And he appears to know a lot about a lot of different subjects, doesn't he?

A.  Depending on what you're talking about, yeah.

Q.  Okay.  And he's a likeable guy.

A.  Yes.

Q.  Pretty -- pretty entertaining.  Would you say he's entertaining?

A.  Yes.

Q.  Okay.  And he -- he's talked about with you -- he's expressed a desire to be an architect; is that right?

A.  Yes.

Q.  Okay.  Even since he's been in jail; is that right?

A.  Yes.

Q.  All right.  And as far as his relationships with women, he doesn't have any problem getting

118

girlfriends or getting women to like him, does he?

A.  No.

Q.  All right.  And you've never seen the other side of him that's been expressed in this trial.  And what I mean by that, you're aware that not only was he found guilty, but he confessed to brutally killing two people.  You've never seen that side of him; is that right?

A.  No.

Q.  Okay.  Did you ever see the videos in this case?

A.  No.

Q.  All right.  And as far as you know, he's only worked one job his whole life; is that right?

A.  As far as I know, yes.

Q.  And -- and what job was that?

A.  I'm not sure where it was.

Q.  Did he ever work at a Sonic?

A.  I believe it was Sonic.

Q.  You believe it was Sonic?

A.  I think so.

Q.  Okay.  And other than that, he would have relied on you, your mother, and other family members for support; is that right?

A.  Um, I'm not sure what you mean by really rely

119

on us, but we took care of him.

Q.  Okay.  Y'all took care of him financially, and if he needed somewhere to stay, and that kind of thing.

A.  Yes.

Q.  All right.

MR. ALEX:  May I approach, Judge?

THE COURT:  Yes.

Q.  (BY MR. ALEX:)  And as it relates to your brother Aaron, you said that he was Gangster Disciple; is that correct?

A.  Uh-huh.

Q.  And he would talk about being a Gangster Disciple; is that right?

A.  Yes.

Q.  And when people that are part of that gang talk, they call each other folk; is that right?

A.  Yes.

Q.  It would be like, What's up, folk?  That kind of thing?

A.  Yep.

Q.  I may say to the jury, You know, folks, I got something to tell you.  That would be different than if two people that were a part of this Gangster Disciple were saying, Folk, it would be an endearing way of showing respect to the gang; is that right?

120

A. Right.

Q. And when they write "Folk," they would write it -- State's Exhibit 131-J, like in all caps; is that right?

A. Um, James didn't always write it that way.

Q. Okay. Now, so you've seen the way he wrote Folk in the past then.

A. Right.

Q. Okay. And I'm going to suggest to you, if I can, have you ever seen the suitcase that he traveled with?

A. No.

Q. So this suitcase that's here, when he was at your house and he was traveling back and forth, he never was in this suitcase?

A. I don't recall that suitcase at all.

Q. Okay. What would he use when he was traveling?

A. When he came with me, he had a duffel bag.

Q. Okay. So you have -- you don't think you've ever seen this before?

A. I don't think so, no.

Q. Okay. All right. You would recognize some of his writing; is that right?

A. Uh-huh.

121

Q. Does this appear to be his writing in State's Exhibit 131-J?

A. It looks familiar, yeah.

Q. Okay. And second page, he's got some things there about job potentials; is that right?

A. Uh-huh.

Q. Does that look like his writing?

A. Uh-huh.

Q. Okay.

THE COURT: You have to say yes or no, ma'am.

A. Yes.

Q. (BY MR. ALEX:) And this letter here, I'm -- I'm going to read it to you. I want you to tell me whether or not you think this is a letter that he had written to his brother Aaron while he was in jail, but just perhaps never tore it out and sent it, okay?

A. Okay.

MS. MALLON: Judge, I'm going to object. That calls for speculation.

THE COURT: Overruled. I'll allow it.

Q. (BY MR. ALEX:) All right. And you recognize the writing here; is that right?

A. Yes.

Q. Okay. And it -- it says What? When you see

122

an arrow up, that just means like What up, folk; is that right?

A. Yeah.

Q. Folks is in all caps.

Let me start by saying I miss you OG.

Now, OG is a term we refer to a -- a Gangster who has been around for awhile; is that right?

A. Right.

Q. And that's consistent with what you told the jury about your older brother Aaron; is that right?

A. Right.

Q. Okay. (As read:) I ain't got to use no codes or nothin' because I know they own that shit with day' bitch ass.

Now, here what -- he's talking about codes. Gang members will write in codes from time to time so people don't know what talking about, right?

A. Right.

Q. Okay. What's been up wicha' bro?

And when he says bro here, there's a reference there, appears to be from James to his older brother; is that right?

A. He called a lot of people bro.

Q. Okay. (As read:) I heard the State low on everything. My nigga' keep your head up behind them

123

bars and keep your marriage going. Yeah, I know, congrats, nigga'. You already know I know everything. Well, I think I do.

Now, your brother was in jail; is that right?

A. Right.

Q. Your oldest brother?

A. Yes.

Q. And he was behind bars.

A. Yes.

Q. And when he's talking about here, Keep your marriage going, do you have any idea what he's talking about there?

A. No. As far as I know, Aaron is not married.

Q. Okay. When you're in -- when you're in a gang -- well, we'll -- we'll come back to that.

(As read:) But that's a part of learning, and reputation is the father of learning. Member dat? Can't say I ain't never put you on nothin'.

And when you start talking about putting somebody on some knowledge, that's typical gang talk to where in every gang hierarchy, there's things that you got to learn about the gang; is that right?

A. Right.

Q. And when you put somebody on some knowledge, that's where you're telling them either some history or

124

Q. something about the gang; is that right?

A. I believe so, yes.

Q. Okay. So he says, (As read:) I can't say I ain't never put you up on nothing. Ha-ha. Now G, your little bro made it, man. I finally fuckin' made it.

And he's -- he's saying now G, that's referring to a Gangster, right?

A. Right.

Q. (As read:) Your little bro made it, man. I finally fuckin' made it.

Do you have any idea what he's talking about?

A. No, I don't.

Q. Okay. (As read:) I'm out of that shit hole called hopeless. Know what I'm saying? I'm still halfway struggling, but I'm doing good for myself, folk.

And -- and big -- in all caps.

(As read:) I got a new bitch and all dat shit. I'm just trying to brighten my horizon and fly with the birds on cloud nine. You feel me?

And at the time that he was -- your brother was with you, James, the young lady that he was dealing with, what was her name?

A. When he lived with me, he spoke with -- he used to talk with Trina Byrd.

125

Q. Trina Byrd.

A. Uh-huh.

Q. And that would be the young lady he followed to Michigan; is that right?

A. Yes.

Q. Okay. (As read:) But NE way G, how dem MF'ers treating you there? Everything copacetic. Have you talked to the fam lately? Big M and everybody.

Big M would be a reference to Big Mamma?

A. I never heard him call her Big M.

Q. Okay. (As read:) He wrote Big M with a period; is that right?

A. Correct.

Q. Okay. (As read:) I talked to moms the other day and shit and got the address. When I first heard, I'm like Dam. They got my nigga' doin' fed time.

Now, was there some concern that your oldest brother was doing fed time?

A. Yes.

Q. Okay. And you're still not confident this is a letter from Mr. Broadnax that he was writing to your older brother.

A. There's no -- I mean, he called a lot of people bro, so I'm not sure.

Q. All right. (As read:) How long is your time?

126

Q. I wish I could come see you, bro, but I'm in Michigan. Yeah, Michigan. It's a long-ass story I'll have to tell you another time.

Now, at the timeframe you're just talking about with the jury, you're saying that your little brother, James here, went to Michigan to stay. You're not sure why, but he took your son to go to see his dad, to stay with his dad; is that right?

A. Right.

Q. Okay. And the person who's writing this letter to whoever it is that's doing fed time, is talking about he's in Michigan, right?

A. Right.

Q. Okay. (As read:) It's -- it's a long-ass story I'll have to tell you another time, but I'm good though. Man, I got so much shit to tell you when you get out that hole. And everything go right -- and if everything go right, which it is already, I got you. You already know what I'm talking about. You know me too well.

And so, if this is the defendant's notebook, and if he's writing to his brother, he's telling his brother he's got it going on, isn't he?

And that when he gets out of jail, he's going to be able to take care of him, isn't he?

127

A. That's what it sounds like.

Q. Okay. (As read:) You know me too well.

And then he says, (As read:) Just think about it. I got you when you touch down for sho',G.

And if we look through this notebook, this all appears to be your brother's writing; is that right? He's a pretty good artist, or he sketches with a pencil?

A. Yes.

Q. All right. And in State's Exhibit 131, we see a sketch by JB. He's got his initials in it. And it appears to be a -- would you say that appears to be maybe a self portrait? It's got a JB on the hat and all that?

A. Maybe. Could be.

Q. Okay. But this looks like some of your brother's sketching; is that right?

A. Yes.

Q. Okay. Have you ever seen this notebook while he was with you?

A. No.

Q. You ever see what he wrote his raps in and the kind of things he -- he sketched in?

A. I bought him something before, but that wasn't it.

128

Q. Do you remember what color it was?

A. It --

Q. Was it red?

A. No.

Q. Okay. But was it a notebook like this?

A. No.

Q. Okay. And in the -- in the gang lifestyle -- and I think you've told the jury that you know a bit about the gang lifestyle, -- the -- the other guy who was a wannabe, what gang was he claiming to be a part of?

A. I believe he claimed to be a Blood.

Q. A Blood?

A. Uh-huh.

Q. And -- and your understanding is Bloods and Gangster Disciples don't mix, right?

A. Right.

Q. But you -- you are aware of the fact that when it comes to making money by either selling dope or -- or robbing, that gang members have planned together sometimes for monetary purposes. You're aware of that, right?

A. No.

Q. Never heard of that?

A. No.

129

Q. Okay. When we see what your brother's plans is, I mean, you're really not going to deny that this is all -- not all your brother's writing, are you?

A. That there doesn't look like his writing.

Q. That doesn't look like his writing?

A. No.

Q. These all look like his sketches?

A. The previous paper, that looks like his writing.

Q. Okay. The plans doesn't look like his writing?

A. It looks a little sloppy for James.

Q. Okay. And the plans that we have in this notebook, you would agree with me when we start talking about the gang lifestyle, gangs would support their -- their lifestyle through selling drugs; is that right?

A. Some of them, yes.

Q. Okay. And here, whose ever plans this is, did your brother ever talk about going to the Job Corps?

A. Yes, he talked about that before.

Q. Did he ever talk about going into the Army?

A. No.

Q. What about an escort service?

A. No.

Q. Okay. But you see here where it says Job

130

Corps under Plans?

A. Yes.

Q. Okay. That would just be a coincidence if this wasn't his, right?

A. Maybe.

Q. Okay.

A. Yes.

Q. And did he ever talk about going to Vegas?

A. No.

Q. What about a limo service and -- or that kind of thing?

A. No.

Q. Okay. And when we get down to the six pounds of dro, of Spanish, six zips, -- hydroponic -- hydroponic marijuana they call dro; is that right?

A. Yes.

Q. Okay. And when we talk about six pounds of dro and then six of chronic, chronic is another name for marijuana; is that right?

A. That I'm aware, yes.

Q. Okay. And then we see a bunch of additions and subtractions that -- and -- and if you've been around Gangsters, you know that -- what dope notes look like, right?

A. No.

131

Q. Okay.

A. I've never seen them.

Q. All right. Have you ever -- when you go shopping and you make out your shopping list, you write down what things cost, and when you get them, you scratch them out, and you do that kind of thing?

A. Uh-huh.

Q. Okay. And that -- we see here where there's numbers written down and struck out, under Chronic, we've got zips. Zips would be commonly referred to with -- for -- for drug dealers would be like Zip-Lock bags, right?

A. I've never heard them referred to them like that.

Q. You've never heard of Zip-Lock bags?

A. I've heard of Zip-Lock bags, but not being referred to as zips.

Q. Okay. And then we've got 24,000 for six pounds of dro. Does that sound to be about the right price?

A. I'm not sure. I know a little bit about the stuff, but I'm not sure of prices --

Q. Okay.

A. -- or sizes.

Q. Very good. And then at the bottom we see Weed

132

and we see Coke; is that right?

A. Yes.

Q. Okay. And you never -- when -- when he was hanging out with this guy who was a Blood, what kind of things would they do?

A. **They just, most of the time, sat around the house.**

Q. Sat around the house.

A. **Uh-huh.**

Q. They talk about their gangster stuff or no?

A. **No.**

Q. Okay. And so how would you know that this other gentleman, -- what was his name?

A. **Mario.**

Q. Mario. How would you know that he was a wannabe Blood?

A. **I heard him say something about being one before, but they didn't ever go into details. And then James wouldn't talk about it around my son.**

Q. Okay. All right. He was respectful around you and your son.

A. **Yes.**

Q. Very good. And was it -- basically, I think what you're telling this jury is you've never seen any side of him outside of that respect and -- and good

133

guy, right?

A. **I -- I know my brother --**

Q. Okay.

A. **-- and I know -- I mean, he's -- is like me.**

Q. Okay.

A. **If he needs to defend himself if someone is messing with him or something, then he defends himself, but what they're portraying him to be as a monster, that's not him.**

Q. Okay. All right. And -- but you're not aware of any of the facts of this case, though, right?

A. **No.**

Q. Okay. And when it comes to knowledge in gang -- I want you to look at State's Exhibit 131-I for me, if you will, and does -- does he call himself JB?

A. **Yes.**

Q. All right. And this appeared to be one of JB's lyrics for maybe one of his raps; is that right?

A. **I would have to read it. I'm not sure what it is.**

Q. Okay. It says, JB. Think milligrams on up to two kilograms. Every five minutes -- and I'm going to stop using this word. It's just the N word -- thinking, trying to flip a gram.

And you're aware that that's talking about

134

selling dope and flipping small amounts to larger amounts, right?

A. **Yes.**

Q. Okay. And have you ever listened to him when he was free-styling or rapping?

A. **Yes.**

Q. Okay. He's pretty good at that, isn't he?

A. **Yes.**

Q. And did he -- a lot of his raps talked about killing and robbing and that kind of thing.

A. **No, he never rapped about killing anybody.**

Q. Okay. Not that you were aware of.

A. **No.**

Q. All right. And these are all in the same notebook. He's talking about ya' pistol can't kill like my cash; cannot hedge steel. All JB need is Epsom salt and gas. Blow up the world F'n S-H-I-T.

You'd agree with me that people sometimes will have another side to them that they don't show their families, right?

A. **Yes.**

Q. Okay. And when we -- when we come to gang knowledge, knowledge in a gang comes from being pretty intricate in a gang. You would -- you would agree with me, right?

135

A. **Right.**

Q. Okay. And this page here on State's Exhibit 131-I, there's a world there that's being held by two fingers. We've got Boss. We've got the pitchforks. We've got the GD 74. We've got the six point star. We've got the winged heart with the 74 GD 6.

We've got a lot of code on this side. We've got the buildings behind it. We've even got a diner from 10 to 4 on this -- what does that appear to be, the south side.

Would you agree with me that this shows some pretty good knowledge in -- in the gang culture, this drawing here?

A. **I know a lot of people who aren't in that gang that know that stuff.**

Q. Okay. And the reality of it is, he could have just gotten all of this gang stuff from your older brother, right?

A. **Right.**

Q. Okay. And you're aware that the Gangster Disciples are a pretty ruthless criminal street gang.

A. **Yes.**

Q. Ms. Martin, -- I'm sorry. Ms. Wynn, your brother was -- I mean, he wasn't really hurting for --

136

when you -- at least when he was there with you in Michigan and when he came back, for clothes and things to wear of that nature, was he? He was pretty well dressed.

A. Sometimes, yes.

Q. Okay. Have you ever seen some of the clothes that he travelled with?

A. I saw what he wore when he was around me.

Q. Okay. Did he -- did he -- did he dress raggedy like a homeless person might?

A. Sometimes he looked kind of bum, yes.

Q. Okay. State's Exhibit -- State's Exhibit 133 contains some clothes. You ever see him wearing that?

A. No.

Q. That look familiar?

A. No.

Q. It's not your every-day ordinary pair of just Lee jeans, though, is it?

A. No.

Q. It's pretty expensive stuff?

A. That -- I'm not even sure what brand that is.

Q. Okay. You don't have clothes like that, do you?

A. No.

Q. That brand?

137

A. No.

Q. Okay. You ever see him wearing these?

A. No.

Q. Do you recognize like the label inside of that?

A. No.

Q. Okay. And I believe, Ms. Wynn, if you were to look through some of the items in here, you'd agree with me that your brother was -- he was styling pretty good, wasn't he? Would you agree with that?

A. I guess so, yes.

Q. I mean, if you saw him wearing these jeans that are -- and I don't -- I'm not up on this style -- but it's E -- E-N-Y-C-E. I mean, that wasn't -- he wouldn't be looking like a homeless person, would he?

A. Enyce isn't an expensive brand, so I'm not --

Q. It is?

A. No.

Q. And COOGI, C-O-O-G-I, that's pretty expensive. I think I've seen my little brother wearing that kind of stuff.

A. Yes.

Q. That's, what, about a hundred-dollar pair of shorts?

A. Maybe, depending on wherever you go.

138

Q. And you're telling this jury that the only job that you've ever known him to have was at Sonic; is that right?

A. (No response.)

MS. HANDLEY: Outside pocket. Look on the outside pocket. No, of the -- of the suitcase.

MR. ALEX: It's on the outside?

MS. HANDLEY: I believe so.

MR. ALEX: Do you want to give me a hand here?

(Sotto voce discussion.)

Q. (BY MR. ALEX:) Now, that doesn't even appear to be the same size as these in here. That's a size 34, but those appear to be pretty expensive jeans, doesn't it?

A. Yes.

MS. MALLON: Well, Judge, if they're not the same size of the suitcase we know to be Mr. Broadnax, then we can't -- he shouldn't ask the witness about those.

THE COURT: Response?

MR. ALEX: Judge, these are things found in the victim's car that the defendant's driving at the time. He's got care, custody, and control of them. He's been painted as a person of --

139

THE COURT: Okay. Overruled.

Q. (BY MR. ALEX:) And these appear to be $138 Ed Hardy men's denim jeans with the tag still on them; is that right?

A. Yes.

Q. And the duffel bag that you would see him with, was it similar to this one right here?

A. It's -- a little bit. I think it's a different color.

Q. Looks like the one he might have had when he was with you?

A. I believe the one he had was black.

Q. Do you recognize any of his shoes? Does he wear these kind of shoes?

A. I think those look familiar.

Q. Those look familiar. And Fila's a pretty expensive brand; is that right?

A. No, nobody really wear Fila's anymore.

Q. Okay. All right. Kind of out of style.

A. Yeah.

Q. Reebok too?

A. Yeah.

Q. All right. But they're not like -- the ones you might see on my feet, the no brands, they are -- we're talking about brand -- name-brand tennis shoes

140

Q. for somebody who doesn't have -- at the time he was living with you, his employment was watching kids; is that right?

A. He had name-brand things, though, but yes, that was his employment.

Q. And how much money did you pay him for watching the kids?

A. I didn't pay him. I bought him things that he needed.

Q. All right. Did you buy him any of this stuff?

A. No, but I bought clothes for him.

Q. Okay. And you're probably a little more prudent with your money. What kind of work were you doing at the time?

A. I worked for Office Depot.

Q. All right. You work eight hours a day?

A. Most of the time, yes.

Q. To provide for your family.

A. Yes.

Q. And you don't even wear this stuff, do you?

A. Some of it.

Q. Okay. You ever see him with a Scream mask, 131-G?

A. No.

Q. No?

141

A. That doesn't look familiar.

Q. And when he was in the Dallas County jail, he still wasn't hurting for much since he's been there; is that right?

Your mom's constantly putting money on his books; is that right?

A. That I'm aware of, yes.

Q. That you're aware of. Have you put any money on his books?

A. I sent her money to put there, yes.

Q. Okay. So you're aware that she kept money on his books when she can, right?

A. Yes, when she could.

Q. And at some point, did she get sick and -- when she was there in Hope and have to have some medical treatment this year?

A. Yes.

Q. All right. Did she have to have like a blood transfusion and all that?

A. Yes.

Q. And this would have been about the time that she lost contact with James; is that right?

A. Yes.

Q. Okay. And the woman that you said abused all of y'all, she kept not only money on his books so he

142

could buy commissaries and all the woo-woos and zoo-zoos that we see in that little bag there, but she also kept money on the phone so he could all her whenever he wanted to; is that right?

A. She abused us, but she still made sure we had everything we needed and yes, she did.

Q. All right. And when James was in Michigan, was he receiving any kind of assistance by way of food stamps or anything like that?

A. Um, I think my cousin got food stamps. I'm not -- I remember my mother saying something about him trying to get it, but I'm not sure if he ever did.

Q. When he was living with you, did he get any kind of assistance?

A. No.

Q. What about when he was here in Texas?

A. Not that I'm aware of.

Q. Not that you're aware of?

Now, you're aware that since he's been in the jail, he's picked up some pen pals; is that right?

A. No.

Q. You're not aware of that?

A. I'm not aware of that.

Q. You have not met a young lady here in this trial that's his pen pal?

143

A. No.

Q. You haven't talked to anybody about that.

A. No.

Q. Not even your brother.

MS. MALLON: Judge, she said no four times.

Q. (BY MR. ALEX:) Does the name Megan Finley sound familiar to you?

A. My mother said something about that girl to me, yes, but I'm not aware of her being a pen pal.

Q. All right. You're aware that she's putting money on his books now?

A. Yes.

Q. Okay. And this is a -- a woman that he would not have known prior to going to the county jail; is that right?

A. I'm not sure who he knew before he went in.

Q. Okay. And a woman by the name of Kyanna -- Kyanna Anderson? Does that name sound familiar?

A. No.

Q. Okay.

COURT REPORTER: Do you want to spell the first name?

MR. ALEX: I think it's K-Y-A-N-N-A.

Q. (BY MR. ALEX:) Ms. Martin, the young lady

144

sitting right here over in court, have you ever had a conversation with her?

A. Not that I'm aware of.

Q. The young lady sitting right in the first, second, third row, have you ever had any conversation with her?

A. Not that I'm aware of.

Q. Okay. Not since you've been here.

A. No. I don't know her.

Q. Okay. All right.

MR. ALEX: May I have one second, Judge?

THE COURT: Yes, sir.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Redirect?

MS. MALLON: No, sir.

THE COURT: May the witness be permanently excused?

MS. MALLON: Yes.

MR. ALEX: If the witness is not leaving town or anything like that, Judge. We'd like to leave her on standby. I don't think we've got that much more of the trial left.

THE COURT: Okay. Can she be excused from the Rule?

145

MR. ALEX: I -- I don't have any problem with that, Your Honor.

THE COURT: From the defense?

MS. MALLON: Well, Judge, I have to -- I don't know what time her flight is. I have to find out. But she does have a flight out today.

THE COURT: I just wanted to give her the opportunity to stay in the courtroom if she wanted to, that's all I'm doing.

MR. ALEX: Fine.

THE COURT: You may step down, ma'am. You can stay in the courtroom if you wish. Thank you for your testimony.

What further says the defense?

MR. LOLLAR: We'll call Darryl Maxwell.

THE COURT: Darryl Maxwell.

And this will be our last witness; is that right, Mr. Lollar?

MR. LOLLAR: Yes, sir.

THE COURT: Mr. Maxwell, please come all the way to the front of the courtroom, all the way to the door. Go as far as you can. Go all the way to the door. When you've reached the door, turn and face me and raise your right hand. Raise your right hand.

**DARRYL MAXWELL**

146

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Lollar.

MR. LOLLAR: Yes, sir.

THE COURT: Whenever you're ready, sir.

**DIRECT EXAMINATION**

BY MR. LOLLAR:

Q. Would you tell us your name, please.

A. Darryl Maxwell.

Q. And, Mr. Maxwell, could you spell your first name?

A. D-A-R-R-Y-L.

Q. And last name?

A. Maxwell. M-A-X-W-E-L-L.

Q. Mr. Maxwell, how old a man are you?

A. 43.

Q. And where do you live?

A. I reside in Sparkman, Arkansas.

Q. Could you spell that?

A. S-P-A-R-K-M-A-N.

Q. Sparkman?

A. Yes.

Q. All right, sir. And are you married?

147

A. Yes, sir.

Q. And who are you married to?

A. Vanessa Maxwell.

Q. How long have you and Vanessa been married?

A. Eight years.

Q. Very good. Mr. Maxwell, what occupation do you have?

A. I'm a supervisor at Petite Jean Poultry.

Q. And Petite Jean is P-E-T-I-T-E, --

A. Yes, sir.

Q. -- J-E-A-N?

A. Uh-huh.

Q. And how long have you been a supervisor there at Petite Jean's?

A. 16 years.

Q. All right, sir. In addition to your regular employment, do you have another occupation?

A. I'm also an assistant pastor at a church.

Q. And what church is that?

A. Williams Temple Church of God and Christ in Sparkman, Arkansas.

Q. All right. Sir. Now, how long have you been assistant pastor there at the church?

A. Um, I'd say about seven or eight years.

Q. Seven or eight years.

148

A. Yes, sir.

Q. All right. Well, very good.

Mr. Maxwell, let me ask you if you, first of all, know the man seated here to my right?

A. Yes, sir.

Q. And who is that?

A. That's -- I call him Little James, but his name is James.

Q. All right, sir. And do you know his mother?

A. Yes, sir.

Q. And what was his mother's name?

A. Audrey.

Q. And, Mr. Maxwell, how did you know Audrey?

A. Um, I was married to her.

Q. When did you first meet Audrey?

A. We worked together. Well, I knew her because she was older than I was.

Q. Uh-huh.

A. She go back then. I know her when she was in school, but I didn't know her. I didn't start really just knowing her until we worked together on a particular job.

Q. Did y'all go to high school together?

A. We went to high school. She was older than I was, though. Yes, sir.

149

Q. How many years older was Audrey than you were?

A. I think it's -- I'm not mis -- it's either one year or two years.

Q. Okay.

A. I'm not for sure.

Q. So y'all would grow up together and she would always be ahead of you.

A. Yes, sir.

Q. And where was that high school?

A. Hope High in Hope, Arkansas.

Q. Hope High School. And then you said that you-all started working together in the same place?

A. Yes, sir.

Q. And where was that?

A. It was a place called Egg City, or either Cal-Mine. Egg City. It was a egg plant.

THE COURT: How do you spell Cal-Mine?

THE WITNESS: It was C-A-L-M-I-N-E.

Q. (BY MR. LOLLAR:) Okay. And that was an egg factory?

A. Yes.

Q. All right. So where was that located?

A. That was on the outskirts of Hope. You're talking way back. I can't remember. It was on the outskirts of Hope, though.

150

Q. All right. And is this the place where y'all both were working at one time?

A. Yes, sir.

Q. And how old were you when you started working there? Would that have been after high school?

A. Oh, yeah, it was after high school.

Q. Okay. How many years out of high school were you when you were working there?

A. I was -- I don't know. I'm going to say around five or six years, probably. I don't know.

Q. Very good.

A. Excuse me.

Q. Okay. Well, that's fine.

Once y'all started working in the same place, did you start to -- start to date, or did that come later?

A. Yeah, we started talking, but we both still seen different people. Uh-huh.

Q. All right. You started talking, but y'all were still with different people at the time?

A. Yes, sir.

Q. Did there come a point in time when Audrey, to your knowledge, got arrested for hot checks there?

A. Well, that's what brought us closer together. She did get in some trouble, if I'm not mistaken, it

151

was -- I believe it was hot checks or something, --

Q. Uh-huh.

A. -- and I helped -- helped her get out, you know. I was just a part of helping her get out. And when I helped her get out, it seemed like, I guess, we started talking even closer.

Q. All right. Did you help her get out of jail? You mean you posted her bond?

A. Yeah, her -- I helped. With somebody else, we helped.

Q. Okay. You put up part of her bond?

A. Yes, sir.

Q. And then after that, y'all got a little bit closer.

A. Yes, sir.

Q. And you were both still seeing different people?

A. Yes.

Q. But started getting closer?

A. Getting closer.

Q. All right. Now, how did that sit with the rest of your family, with your mother, in particular?

A. Well, my mother didn't too much like her. She didn't like her.

Q. She didn't like Audrey?

152

**A.** No. No, sir.

**Q.** Okay. Where was Audrey living at that time, if you know?

**A.** I really -- she was staying with -- at two locations. She was staying with her sister, and also -- she got another friend. That's why I say, she -- it was a guy in the military. I don't -- I can't remember his name. She was staying at both houses at the time.

**Q.** Okay. Now, her sister, would that be Teresa?

**A.** Teresa, yes.

**Q.** And where were they living, what town?

**A.** It was in Hope.

**Q.** In Hope, okay. And then with another guy there?

**A.** She dated at the same time she dated me.

**Q.** Okay. And you don't remember what his name is.

**A.** No.

**Q.** Okay. Now, did y'all start getting even closer together?

**A.** Yeah, we got close where we got married.

**Q.** All right. That's getting pretty close.

**A.** Yeah.

**Q.** Okay. When did y'all get married?

153

**A.** Now, I can't remember exactly when we got married. It was in '90 something, early '90s.

**Q.** All right. And where did you live when you first got married to Audrey?

**A.** We was still staying in Hope. Hope, Arkansas.

**Q.** All right. Now, was James there at the time?

**A.** Yes.

**Q.** Was he staying --

**A.** He was staying with Ms. Betty.

**Q.** He was staying with Betty?

**A.** Uh-huh.

**Q.** And you know that to be Betty Eason?

**A.** Yes, ma'am -- yes, sir.

**Q.** All right. And so he was not living with Audrey at that time.

**A.** No, no, no. I didn't -- personally, I didn't even know that was her son at that time.

**Q.** Okay.

**A.** Uh-huh.

**Q.** So y'all got married, but you still didn't -- even though you were married, you didn't know that James was her son.

**A.** No, no, no.

**Q.** She didn't talk about him?

**A.** No. No, I just knew about one of her sons,

154

that's the oldest one.

**Q.** Aaron?

**A.** Yes, sir.

**Q.** But you didn't even know about James.

**A.** Un-uh.

**Q.** And how long did y'all live there in Hope together?

**A.** Maybe, I would say, roughly -- probably two years.

**Q.** Did you know about the other kids that she had? Did you know about --

**A.** Eventually, I started to know all of them, all of them but the real baby. I never knew him.

**Q.** Michael?

**A.** Michael, uh-huh. But I started to know -- in that process, I started to know Niki and Kerrin, and then Little James.

**Q.** Okay. And how was it that you started to know them? I mean, --

**A.** They would come and visit with us. They would come and visit with us and I'd -- you know, we'd sit there and watch TV or something, you know.

**Q.** Okay. Well, would it be a fair statement to say that at the time you got married, you didn't know she had five kids?

155

**A.** No. When we got married, I did know she had --

**Q.** Okay.

**A.** -- five kids. Uh-huh.

**Q.** All right. Very good.

Now, how long did y'all stay there in Hope before you moved someplace?

**A.** It was during that two-year period because I was working out of town, and eventually I moved to Arkadelphia, got closer to my job.

**Q.** Okay.

**A.** So that's when we moved to Arkadelphia.

**Q.** And what company did you start working with in Arkadelphia?

**A.** The plant that I'm working at now, Petite Jean.

**Q.** So you've been working with them since the early '90s?

**A.** Yeah. 16 years, uh-huh.

**Q.** All right, sir. Now, did -- after you moved up there, did you get a house and get things set up?

**A.** We bought a trailer. I -- first I stayed with my sister and brother, then I bought a trailer.

**Q.** You bought a trailer.

**A.** Uh-huh.

156

Q. All right. And you got things set up there in Arkadelphia, and did Audrey come with you up there?

A. Yes.

Q. When you first went up.

A. Yes.

Q. Okay. And did they leave James back at Aunt Betty's?

A. Yes. It was just me and Audrey at the time in Arkadelphia.

Q. Okay. And let me ask you this:

Once you married Audrey, did you get to see a different side of Audrey than you had known prior to the time you married her?

A. Well, technically, yes, because even before we got to Arkadelphia, I was seeing another side of her.

Q. And what type side did you begin to discover about Audrey that you really hadn't known before?

A. Well, it was -- pers -- I personally, at that time, I felt like she had three different personalities.

Q. Tell me about that.

A. Well, the -- while we was in -- still -- if I go back to when we was in Hope, I started to get a good glimpse of the personalities. It was where she would -- she was very jealous, and so she didn't want

157

me talking to nobody. So there was, on a couple of occasions, she put -- put marks on me, I'll put it like that.

Q. Put marks on you?

A. Yes, sir.

Q. What do you mean?

A. Well, I got a mark on the back of my neck right here.

MR. LOLLAR: Could I ask the witness to step down, please, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) Mr. Maxwell, come on, step right down here and show the jury what you're talking about there.

(The witness came down from the stand.)

A. Yes.

Q. Are you talking about these marks right here? These scars on your neck?

A. No, just this one right here.

Q. This one right here.

A. Yeah.

Q. It's about an inch long, about a quarter-inch wide.

A. Uh-huh.

Q. Come on down this way a little bit and let the

158

jurors down here see that scar.

A. (Witness complied.)

Q. Okay. Thank you, Mr. Maxwell.

(The witness returned to the stand.)

Q. How did she put that mark on you?

A. Well, that mark came from -- I was with my -- one of my brothers was in the Navy and he had just got out, and so me, him, and my baby brother, we had kind of just went into fellowship and kicked it with each other. And I came home that night and I was just laying -- laying on the bed asleep, and that morning, as I was asleep, I felt a jar hit the back side of my head.

And I didn't know I was bleeding, but my baby brother did. And I felt when it -- I got up and I said, Girl, what you doing?

She had hit me. And she said, Well, you -- you didn't have no business out all, you know, all night and stuff.

I said I was nowhere. I was with my brothers, you know, like that. And by that time, my baby brother, he was staying with us and he came in and he seen me bleeding, and he said, Boy, you bleed, you know.

And I didn't hit her. I don't hit girls. So

159

about that time, she was getting ready to go anyway, so she left. And so we -- me and him just stayed at the house, and that's when that mark came.

Q. And what had she hit you with?

A. It was a Kool-Aid -- it was a jar with Kool-Aid in it.

Q. A Kool-Aid jar.

A. Yeah.

Q. All right. Was that the only time that there was any violence between her and you?

A. No.

Q. Could you describe the next event?

A. One time we was in Hope, still. We was still in Hope. I was over Miss Betty's, and I -- and I don't know what happened on that day, but she bit me on my chest.

Q. She bit you on the chest?

A. Yeah, and I don't know how that came about that day.

Q. Leave marks on your chest?

A. I haven't seen that mark; no, sir. I have never seen it.

Q. How about the next time?

A. Well, we was in Arkadelphia. She did good while we was in Arkadelphia for a point.

160

I got a mark here. I'm sorry y'all, but I got a mark here where she -- she bit me when I was with my sister. We had went to the club. I wasn't preaching then. I went to the club. We was at the club, and me and my sister was dancing and we got off the dance floor and we sat down, and she grabbed my hand and she, you know, she was just kissing it, and the next thing I know, she bit me. Uh-huh.

Q. Bit you so hard, it leaves a mark to this day?

A. Yeah. That mark's still there.

Q. Okay. Any other occasions where she --

A. As far as violence, she did good for a long period of time. She did. And by that time she had asked could Little James come stay with us.

Q. All right.

A. Uh-huh.

Q. So how long were y'all in Arkadelphia before she asked for James -- Little James to come stay with you?

A. I'd say for a few years. We had been there -- we had been residing there for a few years, I know.

Q. And so all that time he had been back at Miss Betty's.

A. Yeah.

Q. Okay.

161

A. It was during a year -- I'd say a year and-a-half to two years, we had already been there.

Q. Okay. Now, did James, in fact, come? Did they bring James up or did y'all go get him?

A. No. Well, -- well, she did. What happened, I was at work. Her and one of our friends, she had called the job and asked could James come and stay with us. And I said, Sure, no problem.

And she went and got him. And when I got home that day, that's when me and Little James really met each other, you know. We had been, you know -- but I really got close to him.

Q. All right. Now, when he came from Miss Betty's, and there is now James for the first time that you were really getting to know him, even see him, how old was James then?

A. He had to be around four. Four. I'd say four or five. I'm not for sure. He was a young boy.

Q. And what was his physical condition when you saw him?

A. When I first seen James when he came and stayed with us, he was a mess. He had probably hadn't took -- taken a bath in maybe months. That was my personal opinion. But he was real dirty. You know, he

162

was a light complexion. He was dirty. We gave him a bath.

Q. Did you help give the bath?

A. Yes.

Q. All right.

A. And I remember giving him the bath, and the water was so dirty. And it -- it was touching to me because, you know, -- at that time. And so -- and I kept looking in his ear at that time and I was won -- I said, Man, what's wrong with this boy ear, you know, like that?

And so when we got -- got him out of the tub, we started cleaning his ear out, and the next thing that came out of his ear was a full grown roach was in that boy's ear. And I -- that didn't -- oh, that's -- I just dropped. A full grown -- and it seemed like that had been in his ear so long, wax and everything was around it. And I took that out of -- and that's what I can pretty much remember at that point during that time.

Q. Okay. And so when he came to see you, -- did I hear you correctly? -- he had a dead roach in his ear?

A. Yes, sir.

Q. Look like he hadn't taken a bath in months.

163

A. Yeah. To me, now, because he was dirty.

Q. And when they sent him up, did they send any clothes with him?

A. He had a trash bag. It was just a trash bag with clothes in it.

Q. Any toys or anything?

A. No, no toys. No toys.

Q. Now, over the course of time, did James become attached to you?

A. Yes. I became attached to him; he became attached to me. He started calling me daddy. And never -- I didn't. I never had no problems with him. I mean, everywhere I went, he went.

When I went to the church, he was there with me at the church. He would just -- he was good. I mean, at that -- he was a good little boy to me, you know. And like I say, he went everywhere I went. If I went fishing, he went fishing.

The only time he wasn't with me is when I went to work.

Q. So he became very attached to you.

A. Yeah.

Q. Called you daddy.

A. Yes.

Q. And did that last as long as y'all were in

164

that situation?

A. Yes.

Q. Was there -- did there ever come a point in time when the older boy, Aaron, joined you?

A. Yes.

Q. About how long after James had got there did Aaron join you?

A. Aaron moved -- he came -- because he was in high school, and he moved with us. I think he was in either ninth or tenth grade. I can't remember.

Q. Okay.

A. He -- he came and he stayed with us. It was a few -- it was in that same year period and he came and moved with us.

But James had been with us for awhile, --

Q. Uh-huh.

A. -- so he was comfortable. And then by that time, Aaron came.

Q. Okay. Now, to kind of jump ahead in the story, how long were you together with Audrey there in Arkadelphia?

A. I'd say about three or four years.

Q. Okay. And when James first came, he was -- he was how old?

A. He was about four.

165

Q. So from four till roughly seven or so, --

A. Yes, sir.

Q. -- he was with you?

A. Uh-huh.

Q. You had a paying job; things were stable. He called you daddy, went fishing with you, went to church with you; is that right?

A. Yes, sir.

Q. Now, how about your relationship with -- with Audrey during this period of time? How was that going?

A. Well, it started getting on shaky ground, because at the time, I was the type of person that, since I was in the church and I believe honestly that if you're going to be in the church, you be in the church, live for God, and that's how I believe. If I was going to be in the world, I'm going to be in the world.

And I started getting a very close relationship with God, and the more it seemed like he got closer, we would come home. She was in the church and she would be up there in the choir and everything singing, and when we would get home, the other personality would come up, and she would probably start throwing stuff and just -- she would just go crazy. Throwing stuff.

166

There was a couple of occasions -- my mother was living at that time, and there was a couple of occasions where I went into the bathroom, just locked myself up in it and constantly -- and say, Lord, what -- what's going on?

And there was times where I would just leave with -- I'd get in my car and just leave and go to a service station and call my mother on the pay phone and just cry. I mean, literally cry, you know. Like I said, Mamma, I don't know how I got in a situation like this here. I mean, because she would just throw stuff.

We had a church mother. She's dead. She would come and knock on the door --

THE COURT: Let me interrupt you for a second.

Ask another question.

MR. LOLLAR: Yes, sir.

Q. (BY MR. LOLLAR:) You were about to tell us about a church mother, and the church mother is the most elder lady in the church; is that correct?

A. Yes, sir.

Q. And tell us about the time the church mother came.

A. She came and knocked on the door, and she made Audrey sit down, because she was just throwing stuff

167

and she had tore -- basically tore my house up. And so she made her sit down. Told me to go in the other bedroom.

She basically kind of counseled us; tried to tell us to, you know, work it out, and try to stick it -- stick it out, but it never really worked.

Q. Okay. What kind of language would Audrey use?

A. She would cuss.

Q. Was she -- would she be cussing and things?

A. Yes.

Q. Now, how did she do in disciplining the children?

A. It was -- you know, discipline, it was -- she would basically, you know, whup them like they was supposed to.

Now there was one occasion there was no whupping involved, and that's when we really went our separate ways.

Q. I'm going to get to that.

A. Okay.

Q. What type of things would James do to get himself into trouble?

A. Well, James, during that time, he didn't really get in trouble. It was Aaron who always got in trouble. And he was the one getting in trouble, and so

168

we would have to always discipline him.

Q. How was James? How was James?

A. No, I didn't -- I didn't have no problem with him. At that time, Audrey never did whup him, you know.

Now Aaron, we -- we constantly stayed on Aaron because he was older, and I guess he was just getting off into a lot of stuff.

Q. Okay. You were about to tell us about the one time, and you said that that kind of caused y'all to split.

A. Yes, sir.

Q. Tell the members of the jury about that.

A. I can't remember how it came about, but it was one night we was -- we was at the house and -- and Little James had -- I don't know what he did to this day. When she came in the house and --

Q. I'm sorry to interrupt. You say Little James. How old was he we're talking about?

A. I don't know. He was probably six. I'd say six. And she came in the house, and I don't know what he had did. And I was sitting on the couch. And she went in the bedroom. She come back, went into they bedroom, and she started whupping them. And I was fine with the discipline. You know, he was just in there

169

crying like a little boy. Just crying. And I was sitting up watching TV. By that time she come back through and he was still in there crying.

By that time, Aaron, the oldest one, he came in, he whispered at me. He said, Daddy, -- he started calling me Daddy. He said, Dad, come here. I want to show you something.

So I went in there. He raised the shirt up and I could see where she had just beat him. Marks were all down his back. It was like blood was really almost coming out the boy's back. And that's when I snapped. I -- I left. I pulled his shirt down and I went in. I said, Audrey, you got to go. I said, I'm tired. I said, I can't take this no more. I said, you got to get out of my house, I said, Because this is unacceptable.

I said, I don't mind you disciplining them, but you beat this boy. She had beat him.

And she said, Where I'm going to go?

I said, I don't know where you're going to go, to -- I said, But you got to get out of my house. I said, Because his -- school was in. I said, He can't go to school like this here.

And so she went over our friend's house. And I would just -- by that time, when she left, Aaron and

170

James came. We came in the living room. I didn't take him to the hospital or nothing. I tried to doctor them myself. And Aaron, he was just still crying. I was, you know -- finally he -- he calmed down.

And Aaron started telling me history, which I didn't know about a lot of the stuff that had happened in the past. I never really asked. And he started telling me a lot of stuff was going on. By that time I started hearing more other stuff that was going on with Audrey's life, and so that's where that ends up at, right there.

Q. So when you went into the bedroom to see what Aaron was wanting you to see, you said Aaron lifted up his -- James' shirt?

A. Yes, sir.

Q. And what did it look like?

A. To me, it looked like slavery times, because it was just marks going down -- down his back. And to this day, I don't even know what that girl whupped him with, but it was marks going down his back.

Q. And James was crying?

A. Yeah.

Q. And you -- I guess you thought about taking him to the hospital, but --

A. Right. I didn't.

171

Q. -- doctored him yourself?

A. No. Yes, sir.

Q. Okay. How long was it after that that Audrey left your life for good, or was that the day she left?

A. It was -- I believe that was in '97. Or '96 when we went our separate ways.

Q. Okay. And what happened to James?

A. I didn't see him no more. He -- she -- she took James, Aaron, and everything I had in my house that day and just left, so I never seen them no more. This is the first time I'm seeing him right now.

Q. And so she took James and Aaron, and what else did you say she took?

A. She took everything except two couches and a waterbed.

Q. And today is the very first time you've seen James?

A. Well, besides the video.

Q. Right.

A. I seen him on the video, but physically, it's the first time.

Q. Okay. Have you seen Audrey since then?

A. About right af -- this was the first time I seen her.

Q. Okay. Now, Mr. Maxwell, it's been -- it's

172

been said to this jury that that period of time when James lived with you is the only time of stability in his whole life. Would you agree with that, as far as you know?

**A.  Yes.  You know, I -- I felt like I was a good parent at the time so, you know, everything was -- it was good to me.  You know, I believe I was good to him.**

Q.  Now, when you saw that Audrey had beaten him like she did, did you have thoughts of taking him or trying to get him?

**A.  That day there, -- well, that night, -- um, I don't know if he remember or Aaron remembered this, that -- that was the first thing that came to my mind. I said, I wish I could go on and adopt both of them at that time.  I wanted to adopt them, but I really didn't know how to go about the procedure at that time, and so I never -- never took action.**

Q.  You wanted to, though.

**A.  Yes, sir.**

Q.  And then she took off with him --

**A.  Uh-huh.**

Q.  -- and you didn't know where she went?

**A.  No.**

Q.  Didn't know where they were?

Had things changed, if you had been able to

173

keep him, do you think we'd be here today?

MR. ALEX:  Judge, I'm sorry.

THE COURT:  Sustained.

Don't answer that.

MR. LOLLAR:  We'll pass the witness.

THE COURT:  Cross-examination.

MR. ALEX:  Yes, sir.

**CROSS-EXAMINATION**

BY MR. ALEX:

Q.  Mr. Maxwell, my name is David Alex.  I've got a few questions for you.  If -- if I'm not making any sense or if you don't hear me, would you let me know?

**A.  Yes, sir.**

Q.  All right.  Let me ask you, just as a preliminary matter, you've told the jury a whole lot today.  Is all of that just straight from memory from, let's see, if he was six, the last time you saw him, we'd be talking -- he's 20 years old now; is that right?

**A.  I don't know how old he is.**

Q.  Okay.  We'd be talking 14 years ago.  Is everything you told the jury today just straight from your memory?

**A.  Yeah, that I can remember.  Yes, sir.**

Q.  Okay.  Have you ever written anything down

174

about the events you just finished --

**A.  No.**

Q.  -- about?

**A.  No, sir.  No, sir.**

Q.  Have you ever made any statements and signed those statements --

**A.  No, sir.**

Q.  -- with the lawyers or the police or anybody else?

**A.  No, sir.**

Q.  All right.  And as far as you know, there's nothing documented anywhere about what you just told the jury.

**A.  Not that I know of.**

Q.  Okay.  And when was the first time you were contacted to testify in this case?

**A.  It was a few weeks ago.**

Q.  A few weeks ago?

**A.  About two -- two or three weeks ago.**

Q.  So up until that point, you had no reason to really -- well, strike that.

Let me ask you this.  You said you saw the videos; is that right?

**A.  Yes, sir.**

Q.  Okay.  And did you see the videos at the time

175

they were happening, or did somebody have to call you and say, Hey, James is on TV.  You need to see this?

Did you --

**A.  No.  As I had heard about it, and then -- and I -- I went on the internet.**

Q.  Okay.

**A.  And that's when I seen him.**

Q.  All right.  And -- and so you know what James did in this case, right?

**A.  Yes.  Uh-huh.**

Q.  Okay.  And you know those two young men over there were -- do you have any idea how many times he shot them?

**A.  No, sir, I don't.**

Q.  Okay.  Would you be surprised if he put six bullets -- five to six bullets in these two young men? Pointed to their head, and in their heart, and throughout their body?  Would that -- that would surprise you, wouldn't you?

**A.  Would it surprise me?**

Q.  That would surprise you.

**A.  Yes.**

Q.  Okay.  And you've never seen the photographs of these young men as they lay on the ground --

**A.  No, sir.**

176

Q. -- with their blood trickling into the street.

A. No, sir.

Q. You've never seen any of the -- the carnage that Mr. Broadnax left behind when he was convicted -- when he committed these crimes. You've never seen any of that, right?

A. No, sir.

Q. Okay. Do you -- are you a man that believes that people should be held accountable for their actions?

A. Yes.

Q. Okay. And --

A. Could I respond also?

Q. Well, you'll -- you'll get a chance to --

A. Okay.

Q. -- to clarify that.

A. Okay.

Q. I think I know what you're going to say, though, is there's an accountability to God, right?

A. Uh-huh.

Q. And then you believe there's accountability here on earth as well, don't you?

A. Yes, sir.

Q. Okay. All right. And accountability here on earth has to do with why we're here right now, right?

177

A. Yes, sir.

Q. Okay. And you're really not telling the jury that what they viewed in this case, those pictures and all that carnage, is your fault. You're not telling them that, are you?

A. No, that's --

Q. Okay. All right. That's James' doing, right?

A. Yes.

Q. Okay. And you're really not telling this jury that Ms. Audrey Kelly is the person on trial here today, are you?

A. No.

Q. Okay. All right. Because I've heard you talk probably for the last hour about Audrey Kelly like she was on trial. You realize she's not on trial here, right?

A. Yes, sir.

Q. Okay. All right. And Audrey Kelly's a human being; --

A. Uh-huh.

Q. -- is that right?

A. Yes, sir.

Q. And in your line of work, you know that human beings are fallible, right?

A. Yes, sir.

178

Q. But Audrey Kelly, to your knowledge, has never killed anybody, has she?

A. Not that I know of.

Q. All right. And Audrey Kelly has never killed anybody and then turned around and bragged about it, has she?

A. Not that I know of.

Q. Okay. And when you first met Audrey Kelly, you were bonding her out of jail; is that right?

A. Yes, sir.

Q. So you knew at some point when you first met her, that this was a troubled woman.

A. Yeah.

Q. When you first met her, right?

A. Yeah.

Q. And for the last hour, you've sat here and did nothing but call her everything but the devil; is that right?

A. No, I didn't call no --

Q. Okay.

A. I didn't call her devil.

Q. All right. But you're telling us that James Broadnax over here sitting today, has got marks on his back like he was a slave back in the slavery times from her; is that right?

179

A. During that time; yes, sir.

Q. Okay. And I guess those marks over time fade away and they just disappear, right?

A. Yes, sir.

Q. All right. If I showed you some photographs of his back as an adult where he got into an assault, there's no marks there, would that surprise you?

A. No, I guess if -- if I was looking at the video, no, it ain't going to surprise me.

Q. But you still have a mark on your hand that's there 14 years later, right?

A. Yes, sir.

Q. Okay. And you said -- you made a comment that was kind of interesting. You said that you never hit Audrey; is that right?

A. No, never.

Q. And a man that hits a woman, there's something wrong with that man, isn't there?

A. Yeah. I've -- I grabbed her, but never hit her. Never.

Q. My question is, a man that hits a woman, there's something wrong with that man, isn't there?

A. Well, my personal opinion?

Q. Your personal opinion.

A. Yeah, my personal opinion, because I seen my

180

mother, when I was a little boy, get hit. And I always promised myself that I would never --

Q. Hit a woman.

A. -- hit a woman.

Q. And there's just something not right about that, is there?

A. Yeah, it's not -- to me, it ain't.

Q. Okay. And punching a woman in the eye because she scratched you, that just would be against everything you believe in, isn't it?

A. I mean, I would -- if a person hit -- if a guy would hit a woman, I wouldn't know their situation. I mean, I ain't going to say I wouldn't forgive him.

Q. Mr. Maxwell, that's not my question.

A. Okay.

Q. My question is, a man that would ball his fist up and hit a woman in the eye, that just -- that goes against everything you believe in, isn't it?

A. Yeah.

Q. Okay. Now, Audrey Kelly, amongst a lot of things, she was a hard-working woman, wasn't she?

A. Yeah, she -- when I was with her, she worked several jobs.

Q. And she worked hard and she provided the best she could; is that right?

181

A. Yeah.

Q. All right. And when Aaron came to live with you guys, where were y'all living?

A. We was still in Arkadelphia.

Q. Arkadelphia?

A. Uh-huh.

Q. And in Arkadelphia, you -- you made a comment to this jury about two different phases of your life: One when you were in the world, and one when you were with God; --

A. Yes.

Q. -- is that right?

A. Yes, sir.

Q. And when you were in the world, that would have been a time when, you know, doing things that weren't right --

A. Uh-huh.

Q. -- with God was just kind of who you were then, right?

A. Yes, sir.

Q. Okay. And in Arkadelphia, there's gangs there, right?

A. No. During that time, gangs wasn't in Arkansas, no. The only place you probably would have seen gangs in Arkansas during that time was Little

182

Rock.

Q. In Little Rock.

A. Uh-huh.

Q. Have you ever heard of the Gangster Disciples?

A. I've heard of them.

Q. And they're in Arkansas.

A. Yeah.

Q. Okay. And were you aware that James here claims to be a member of the Gangster Disciples?

A. No, I didn't.

Q. But you are aware that criminal street gangs are pretty ruthless and dangerous organizations.

A. Yes, sir.

Q. You try and counsel folks not to get into that kind of thing, right?

A. Yes, sir.

Q. Let me ask you this, Mr. Maxwell: When the defendant came and lived with you-all, and at that time you were not in the world, you were -- you were preaching; is that right?

A. When he came and stayed with us, I was -- yeah, I had got out of the world. Yes, sir.

Q. Okay. And if somebody in your congregation was abusing a child, would you not report that?

A. Yeah, I would report it.

183

Q. Okay. And if somebody was really being, that you thought, abused to the point -- well, you're -- you're telling this jury you found a dead roach in his ear; is that right?

A. Yes, sir.

Q. Did you ever report that to the authorities in any way?

A. No, because I --

Q. I didn't --

A. -- I thought his mother was at that time, --

Q. Okay.

A. -- so I didn't.

Q. All right. And did the police ever get called out to your house for Audrey when she was -- when she was --

A. No.

Q. Okay. And when -- when you say that the defendant's back was bleeding like he was a slave, you never called any kind of protective services.

A. No, sir.

Q. You never called the police.

A. No, sir.

Q. And you never took him to the hospital.

A. No, sir.

Q. And this was a time when you were not in the

184

world, right?

A. No, I was. I was in still -- I was in the church then.

Q. Okay.

MR. ALEX: That's all I've got, Judge.

THE COURT: Redirect?

**REDIRECT EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Maxwell, I -- was there a time when you called the police on Audrey?

A. Yes. When we was in Hope, Arkansas.

Q. That was in Hope?

A. Yes, sir.

Q. Tell the jury about that.

A. Okay. We was in Hope. We was staying at a house together. We wasn't -- we were married. No. I'm trying remember, were we married? Well, we was -- but we were staying together. And I had got off of work and when I came home from work that day, sit down, watching TV, she came in the room. She had fixed me some dinner and she came dressed nice, you know, in her negligee, and she want to, you know, do something. But I was tired. And she got angry and she got vio -- you know, that's the day -- that was the first time I really encountered her throwing stuff.

185

And so I went into the kitchen where we had a phone, and our people that we was renting from, they was -- they happened -- they would come and visit us. And they was over. And everybody would go out on the front porch, and she was in there and she was throwing stuff.

And so I went out there to tell them, you know, Hold on, you know. Because they was asking, What's going on in there, you know, like that.

So when I went back into the house, I said, Audrey, calm down. People -- you know, I can't think of their name now. The people we was renting from, I said, They outside.

And so I went toward -- she'd get -- it seemed like she got worse, and so that's when I went to the kitchen. And I remember picking the phone up, calling the cops. They came over. It was one of them. And as I went outside to meet him, and I was telling him, I said, You know, could you go in there and calm her down? You know, like that. And by that time, he asked me, you know, he says, Darryl, would you sit in the backseat of the car.

By the time I got ready to sit in the backseat of the car, Audrey came outside, and she was still dressed the way she was dressed for me, and she came

186

out. So he locked the door, got backup. They got her to leave the house that day, you know. My name was on the lease and everything, so they got her to leave.

Q. Was she pretty excited when she came out of the house?

A. Sir?

Q. Was she pretty excited when she came out of the house?

A. She was at a violent stage at the time, you know, where it got him scared, so he locked the doors and he had called backup. And so they --

Q. He locked the doors and called backup?

A. Yes, sir.

Q. Okay. Mr. Maxwell, just one more thing. Mr. Alex had asked you if you believed in punishment.

A. Do I believe in punishment?

Q. Yes, sir. And you were about to explain or expound on your answer. Go ahead and do that.

A. And -- and this is my per -- you know, I believe that everybody, even -- I -- if I wasn't in this situation, I believe everybody deserve -- you know, is forgivable.

And I know that he did something wrong. He -- he made a mistake. It -- it was a serious mistake he deserve to be punished for. I believe that he's --

187

also is able to be forgiven for what he's done. He -- he -- he did -- I mean, like I said, from the video I seen, it was bad, you know. I knew that wasn't him of the James I knew.

But I believe that God is a person that gives people -- he's a forgiving God. He's a loving God. And that's -- that's the way I look at things, you know, that I can count on people that makes mistakes.

MR. ALEX: Judge, I'm going to object to the narrative.

THE COURT: Sustained.

Ask another question.

Q. (BY MR. LOLLAR:) Mr. Maxwell, thank you very much.

MR. LOLLAR: I'll pass the witness.

THE COURT: Recross, briefly?

MR. ALEX: Just briefly, Judge.

**RECROSS-EXAMINATION**

BY MR. ALEX:

Q. Mr. Maxwell, the -- the incident you just told the jury about, about calling the police on Audrey, are you offering that to this jury in any way to say -- I mean, what does that have to do with anything that we're here for?

A. I just answered the question. I was answering

188

**the question.**

**Q.** But you're not saying to the jury that that somehow lessens what the defendant has done, are you?

**A. No. I'm just answering the question he was asking me.**

**Q.** And you're not suggesting that to the jury either, are you?

**A. No, I just --**

**Q.** Okay.

MR. ALEX: That's all I have, Judge.

**FURTHER REDIRECT EXAMINATION**

BY MR. LOLLAR:

**Q.** Mr. Maxwell, do you have any reason to believe that after Audrey left you and took James with her that she quit being violent, she quit being crazy, quit being abusive?

**A. I don't know --**

MR. ALEX: Judge, I'm going to object to the form of the question. After she left him, there would be no personal knowledge of that.

MS. MALLON: He already said I don't know, so there you go anyway.

THE COURT: May the witness step down and be permanently excused?

MR. ALEX: I have no objection,

189

Your Honor.

THE COURT: All right. You're permanently excused, sir. Thank you for your testimony.

What further says the defense?

MR. LOLLAR: May it please the Court, members of the jury, we'll rest.

THE COURT: All right. The defense has rested its case. There's going to be rebuttal evidence and probably surrebuttal.

We will take a lunch break until 1:00 p.m.

All rise for the jury.

Lawyers, stay in here.

(Jury not present.)

THE COURT: Be seated, please.

Mr. Alex, your expert can't be here till 1:30. Do you have other witnesses you can call at 1:00 o'clock?

MR. ALEX: I do, Judge.

THE COURT: All right.

MR. ALEX: And I can -- I'll call him at the lunch break. I'm sure he's taking -- he's going to take time to eat and just find out if his schedule went faster than he thought.

But told me he started at 11:30 and he'd be done -- I asked him as soon as he could get here,

190

and that's what he told me.

THE COURT: All right.

MR. PARKS: Well, of course, Judge, I've sent my person away till 1:30, because that's what we were told.

THE COURT: Well, 1:30 is when it will be. So we'll be having a 702 hearing at 1:30.

Is that what you envision, Mr. Alex?

MR. ALEX: Yes, sir.

THE COURT: Mr. Parks, you'll be ready for that?

MR. PARKS: Yes.

THE COURT: All right. Now, I know this is an extremely important case. It's as important as it gets, but whatever we can do to streamline this 702 hearing, I'm sure the jury would appreciate. They've been here a week and-a-half now, and so we'll go as far as we can. We'll go all the way to 5:00 o'clock today and see if we get through this testimony.

MR. ALEX: Judge, and I can give you a proffer of what I intend, and that may help defense counsel and it may help the Court in scheduling.

What I had planned to ask Mr. Price and what he planned to offer. I mean, that -- since it's going to be 1:30 before we start, that may help speed

191

things along, and I don't mind doing that.

THE COURT: Go ahead.

MR. ALEX: I don't plan on asking Mr. -- I mean, Dr. Price any opinions as it relates to the mental health of the defendant. I think he will testify, if asked, without interviewing the defendant that he cannot give a professional opinion.

What I am going to ask Mr. Price to do is to educate the jury on the subject of -- of psychopathy, and he is going to do basically what Ms. Silver did, and that is educate the jury upon what a psychopathy is and what a psychopath is, and what the traits of a psychopath is.

I'm not going to ask him if he's done tests on the defendant, because I know he has not.

THE COURT: That's for purposes of the jury's evaluation of future dangerousness?

MR. ALEX: Yes, sir.

MS. HANDLEY: Uh-huh.

MR. ALEX: And so from that degree, I think we would -- we would need a hearing to establish that he's qualified to testify to that. But I don't believe I'm going to be asking him any professional opinion that we'll need to ask a bunch of questions about what was the underlying data of your opinion and

192

all that.

THE COURT: All right.

MR. ALEX: He will have the articles that he relied on in educating the jury about psychopathy, and he has provided me yesterday evening, which I have not looked at a Power Point presentation that I'm going to look at through the lunch hour, and whether or not I present that or not will just all depend on what I see.

THE COURT: All right.

MR. ALEX: But I don't anticipate his testimony will take very long or the hearing will take very long.

MR. PARKS: All right. Well, question. Will he be giving an opinion that Mr. Broadnax has an antisocial personality disorder?

MR. ALEX: He's not going to give an opinion on that because he wasn't -- he didn't -- he didn't interview the defendant and I don't think his ethics will allow him to do that.

MR. PARKS: So he's just going to explain what?

MR. ALEX: He's going to educate the jury on psychopathy and what a psychopath is.

MR. PARKS: Well, Judge, I don't see what the relevance of that could possibly be if he's not

193

going to opine that it applies in this case.

THE COURT: Did Dr. Silver examine the defendant?

MR. PARKS: No. I --

THE COURT: No, is the answer to that, I think.

MR. PARKS: She didn't -- she didn't test him.

MR. LOLLAR: She wasn't diagnosing him with any type of a particular illness. She was talking about any 19-year old. And this doctor was talking about specific --

THE COURT: I'll hear the testimony and we'll decide then.

Now, I assume that y'all then are going to want to put an expert on in surrebuttal now; is that correct or not?

MR. PARKS: Well, perhaps not.

THE COURT: The reason I'm asking you that is whether we're going to need to have yet another 702 hearing --

MR. PARKS: Well, --

THE COURT: -- about your expert.

MR. PARKS: -- let me -- let me just say this in the spirit of candor. If -- if he testifies

194

that this is what -- here I am educating you about psychopathy, and that's as far as it goes, --

THE COURT: Uh-huh.

MR. PARKS: -- then the only purpose that I would have probably in calling Dr. Kessner would be in the area of, so what does that tell the jury? Is there any correlation between psychopathy and violence.

THE COURT: So you are going to call her.

MR. PARKS: So I would probably call her.

THE COURT: So will you want a 702 hearing on that?

MR. ALEX: If he -- I mean, he probably won't know until after Dr. Price testifies, but if he just gives me a proper proffer of what that opinion is, I doubt that I'll need a hearing on that, Judge.

MR. PARKS: The opinion would be that there is no statistical correlation between sociopathy and violence.

MR. ALEX: Okay. I wouldn't need a hearing on that, Judge.

THE COURT: All right. Good. So it's conceivable we will get through with the testimony today then.

MR. ALEX: I would like to.

THE COURT: And then we'll have Charge of

195

the Court in the morning, argue in the morning, then put the jury up in the finest hotel in town.

We're in recess until 1:00 o'clock. We're in recess until 1:00 o'clock.

(Recess taken.)

(Court reconvened; Jury present.)

THE BAILIFF: All rise.

THE COURT: Be seated, please.

Ladies and gentlemen, the State of Texas -- excuse me -- the defense has rested its case in the punishment phase.

What says the State by way of rebuttal?

MR. ALEX: By way of rebuttal, Judge, the State would first offer State's Exhibits -- I've got the date of the call, Judge. Just give me one second.

We're going to offer -- November 14th, I'm sorry. I've got that page here that shows all the exhibit numbers.

MS. HANDLEY: November 14th is 552.

MR. ALEX: State's Exhibit 552 for all purposes. It's going to be a phone call between the defendant and another person on November the 14th of 2008 and -- for all purposes.

And for demonstrative purposes, Judge, it would be State's Exhibit 569.

196

THE COURT: So 569 is the demonstrative, and 552?

MR. ALEX: Yes, sir.

THE COURT: Any objection?

MR. LOLLAR: The same objection as we've offered in pretrial in regard to this issue, Your Honor.

THE COURT: The 4.03 objection, and then also the -- do you have a Fourth Amendment objection on this? I'm trying to remember.

No. No. It's not on this.

MR. LOLLAR: No, sir.

THE COURT: Okay. 4.03, it's overruled. State's Exhibits 552 is admitted for all purposes; 569 for demonstrative purposes.

And you may publish whenever you're ready.

MR. ALEX: Thank you, Judge.

(CD played.)

MR. ALEX: And there will be a few clips, Judge, from that day.

(CD played.)

MR. ALEX: And then we will offer, Judge, State's Exhibit 555, which is a jail conversation from November 22nd of '08 for all purposes, and 568 for demonstrative purposes.

197

THE COURT: Same objection?

MR. LOLLAR: Yes, Your Honor.

THE COURT: Objection's overruled. 558 [sic] is admitted for all purposes, and 568 demonstrative.

(CD played.)

MR. ALEX: All right. And, Judge, finally, -- or next to the last, Judge, State's Exhibit 556, phone call of January the 15th, 2009, for all purposes; and 564 for demonstrative purposes.

THE COURT: Same objection?

MR. LOLLAR: Yes, sir.

THE COURT: Overruled. 556 admitted for all purposes; 564 for demonstrative.

(CD played.)

MR. ALEX: And finally, Judge, 549 has been already admitted -- admitted for all purposes. There's one other call that I'm going to publish to the jury at this time from State's Exhibit 549.

THE COURT: Is there a demonstrative counterpart to it?

MR. ALEX: There is a demonstrative counterpart, --

THE COURT: Which is?

198

MR. ALEX: -- and that would be --

MS. HANDLEY: 559.

MR. ALEX: -- 559.

THE COURT: Same objection?

MR. LOLLAR: Yes, sir.

THE COURT: It's overruled.

It's admitted, 549; and 559 for demonstrative purposes.

(CD played.)

MR. ALEX: All right. That's all I've got on those, Judge.

MR. LOLLAR: Can I cross-examine on those, Judge?

THE COURT: Yes, sir.

MR. LOLLAR: Now, in regard to State's Exhibit 552 where there's the phrase about squeezing people, if the jury listens to that tape, they'll hear he's -- he's talking about the guards squeezing them and taking their stuff, not him squeezing them, that's the first thing.

The 564, where he's talking about boys being molested, he's telling his mother that he read in the Dallas Morning News about the -- the teacher out here at the juvenile center who was molesting boys, and that was in that context.

199

And thirdly, in regard to that last one, -- what was the last one?

THE COURT: 549.

MR. LOLLAR: If the jury listens to that tape, what they wrote is not what he said. He does not say it ain't nothing. He doesn't say that.

Play it again if you want to.

THE COURT: No. That's enough of that.

Call your next witness.

MR. ALEX: The State would call David Barger, Your Honor.

THE COURT: Mr. Barger, you've been previously sworn. I'm going to swear you again. Raise your right hand.

**DAVID BARGER**

was re-called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the witness stand. You will be responding to questions from Mr. Alex.

Mr. Alex, whenever you're ready.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your name -- full name for the jury, please.

A. David Barger.

200

Q. And, Mr. Barger, you're the same David Barger who testified earlier in this case; is that correct?

A. Yes.

Q. And did I ask you to -- during the trial, to monitor the phone calls from the same inmate ID number that you testified to before?

A. Yes.

Q. And on August the 12th, 2009, after this jury has found the defendant guilty, were there other phone calls made from that same ID number?

A. Yes.

Q. All right. May I approach, Judge?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) I'm going to start off with State's Exhibit 590 and 591. Is that the continuation from the previous log of calls at -- 591 is the log of all the calls from June 7th of '09 through August 18th of '09 at 4:32; is that right?

A. That's right.

Q. Okay. And State's Exhibit 590 is a CD or all of those calls on the same proprietary software that you've previously testified to; is that correct?

A. Yes.

Q. Were they downloaded in the same way?

A. Yes.

201

Q. And was there anything done to affect the legitimacy of those calls?

A. No.

Q. All right.

MR. ALEX: And we would offer, Judge, the call log at this time for all purposes, and State's Exhibit 590, which is all of those calls, just for record purposes at this time.

THE COURT: What's the call log number?

MR. ALEX: It's 591.

MR. LOLLAR: For record purposes, the call log?

MR. ALEX: 591 for all purposes, and 590 just for record purposes.

THE COURT: Any objection?

MR. LOLLAR: Well, Judge, I will state to the Court that these were first given to us this morning after we got to court here. We have not had a chance to listen to them at all. I don't know what the context is. I don't know if they plan on taking, you know, a quote out of a 15-minute conversation or what, so we do object.

THE COURT: All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

202

What is it you're intending to play for the jury, Mr. Alex?

MR. ALEX: I'm intending to play the call two hours after the defendant was found guilty.

THE COURT: Okay. Which exhibit number is that?

MR. ALEX: It's actually going to be the next exhibit I'm going to offer.

The first exhibit I'm offering shows the call logs from the last one offered till today. It just shows all the calls --

THE COURT: Right.

MR. ALEX: -- that were made by him.

THE COURT: So your objection is not to the call log, it's to the --

MR. LOLLAR: No, sir.

THE COURT: All right. So there's no objection to 591.

MR. LOLLAR: Correct.

THE COURT: Okay. 591 is admitted.

And how about any objection to 590 for record purposes?

MR. LOLLAR: No, not for record purposes.

THE COURT: So 590 is admitted for record purposes.

203

Now, which one are you planning on calling?

MR. ALEX: And the one that I plan to offer, Judge, is going to be State's Exhibit 592, which is on August 12th of '09, the same day the defendant was found guilty. And that was 592.

THE COURT: All right. I'll hear it.

MR. ALEX: And, Judge, the -- and, Judge, there's -- there's actually nine calls made from the time he leaves this courtroom until the time they take the phone from him.

I had only intended on playing a portion of it that I think is going to fit in line with the doctor's definition of a psychopath, and that -- if you want to listen to all nine of them, that's fine, but I didn't plan on --

THE COURT: No. What I want to listen to is what you're planning on offering in front of the jury.

MR. ALEX: Okay. And I'm going to --

THE COURT: Keep your voice down, Ms. Mallon.

MS. MALLON: Yes, sir.

(CD played.)

MR. ALEX: And, Judge, I had planned to

204

fast forward it after we establish that it is the same voice.

Pause it.

THE COURT: So far, there hasn't been one thing that the jury could possibly understand anything that he's saying. Not one thing.

MR. ALEX: All right. And the -- the part that we just heard, was that part of -- the part we were just going to play? What was the starting point on it?

MR. EVANS: The start is the beginning of the tape all the way up to one, say, or two minutes.

MR. ALEX: Okay. 142. Start it at 140 and let the Court hear that part, because that's the part we're going to ...

(CD played.)

MR. ALEX: And then the next part is.

(CD played.)

MR. ALEX: All right. And -- and, Judge, that's about as far as I plan on playing. I was going to offer the day's calls because I -- I believe it fits right in line with the traits of a psychopath. And the traits of a psychopath will be talked about by Dr. Price, and the jury certainly can take that two hours after he's -- two hours after he's been found

205

guilty, he couldn't give a care in the world, and that is a direct trait of a psychopath.

THE COURT: Is there objection?

MR. LOLLAR: Well, I had difficulty hearing what was being said. To the point that Mr. Alex, interpreting for the jury, I think, is just inherently unfair, and I object to that because I can't understand it. The Court's heard it. I ask the Court if you understand what they were saying?

THE COURT: Are you planning on making -- or editorializing like that to the jury? I wouldn't think so.

MR. ALEX: No, sir.

THE COURT: Right. It goes to the weight, not the admissibility.

Basically, what I got out of it was, he thought it was funny that it was only -- that he only thought it was 30 minutes. So to that extent, I'm -- I think it is relevant.

Your objection's overruled.

Call the jury.

(Jury present.)

THE COURT: Be seated, please.

The State offered State's Exhibits 591, to which there was no objection; is that right,

206

Mr. Lollar?

MR. LOLLAR: Yes, sir.

THE COURT: And 590 for record purposes, to which there was no objection for record purposes, correct, Mr. Lollar?

MR. LOLLAR: That's correct, Your Honor.

THE COURT: And 592, I believe you're objecting on relevance grounds and also 4.03 grounds?

MR. LOLLAR: Yes, sir.

THE COURT: Okay. And I have made the balancing test under Rule 4.03. In my judgment, the exhibit is more probative than prejudicial. And 592 is admitted.

The objection is overruled.

You may publish.

MR. ALEX: Thank you, Your Honor.

**DAVID BARGER**

was re-called as a witness and testified as follows:

**DIRECT EXAMINATION - CONTINUING**

BY MR. ALEX:

Q. And before I do that, Mr. Barger, the -- the date of this -- and the time of this call, this is August the 12th. You have the log up there or not?

A. I don't have the log.

Q. Did I take it back from you?

207

A. You did.

Q. I think I just stuck it right here.

August 12th, 2009, which would have been just this past Wednesday; is that correct?

A. Yes.

Q. And the call that we're offering is going to be -- I'm sorry -- the first call of that day, and that's at what time?

A. 4:35 p.m.

Q. And for the record, I think the verdict of guilty came back at right about 2:00 o'clock. Does that sound about right to you?

A. Yes, sir.

Q. Somewhere around there?

A. Yes.

Q. And it's not an impossibility that if he was -- the defendant was found guilty at 2:00 o'clock, that he could be using the phone again at 4:30; is that right?

A. That's possible.

Q. He could make it back up to his cell and still use it; is that right?

A. That's correct.

Q. All right.

(CD played.)

208

Q. (BY MR. ALEX:) Mr. Barger, we're going to stop it there and we're going to fast forward it through a lot of -- of the small talk and we're going to go forward.

MR. ALEX: We'll pass the witness, Judge.

THE COURT: Cross-examination.

## CROSS-EXAMINATION

BY MR. LOLLAR:

Q. Mr. Barger, when did y'all get these calls?

A. What do you mean, when did we get them?

Q. Well, this disk that you gave me this morning after I got here to court, when did y'all get it?

A. We had he -- there's a disk for 8/12 that we burned over lunch, but those calls had also been pulled earlier.

Q. The last call -- this -- this log that you gave -- that y'all gave me hearing this morning --

A. Yes.

Q. -- that includes these calls starting on August the 12th, --

A. Okay.

Q. Okay. -- when did you get those calls?

A. Can I see the log?

MR. LOLLAR: Sure. I'm showing you 591, State's Exhibit.

209

A. Okay. He -- this log was run on 8/18.

Q. Okay. When did you become aware of the phone calls that are reflected in that log that was run on 8/18?

A. Oh, you mean the contents of the calls?

Q. Yes.

A. Off and on, probably over the past week, because we haven't had time to sit down and listen --

Q. Okay.

A. -- to the complete calls.

Q. Okay. So y'all have been in possession of these for the last week; is that right?

A. Well, the calls are available on the -- on the system.

Q. They're not available to me until y'all give them to me.

A. True.

Q. Okay. So is there any reason why you would wait and give me ten and-a-half hours worth of phone calls on the morning of punishment after we get to court?

Any reason why y'all haven't given me to these -- given these to me before now so I can listen to any of them?

A. Well, we haven't listened to them either until

210

recently.

Q. Well, when did you start listening to them?

A. Well, last night and this morning.

Q. Is that the very first time you listened to them is last night?

A. It's the first time I've heard some of the calls, yes.

Q. How many of your people have been listening to these calls?

A. Probably two or three.

Q. And since when?

A. Whenever we could get the staff to do it. When they had the time to do it.

Q. You've had them for a week and your staff has been listening to them for the week.

A. Well, we've had the -- some of these disks were burned yesterday, as I recall.

Q. But some of them weren't.

A. Well, some of them you could listen to on real time on the system if you have the time.

Q. But I can't.

A. Right. Well, we didn't have time either.

Q. Okay. So you've been aware of these calls since what, April the 12th? The one you played, for instance.

211

THE COURT: You mean August 12th?

MR. LOLLAR: August 12th.

A. I think I was made aware of that yesterday, of the contents of that call.

Q. (BY MR. LOLLAR:) Okay. But your people have known about it since before then.

A. I don't know.

Q. You don't know?

A. I don't know.

Q. But you've had people listening to these calls and they're certainly aware of the calls. And the first time we hear about it is after we get here to court today and haven't had a chance to listen to any of it.

A. I just heard it -- I just heard it yesterday.

MR. LOLLAR: I have no further questions.

THE COURT: Redirect?

MR. ALEX: Yes, sir.

## REDIRECT EXAMINATION

BY MR. ALEX:

Q. Mr. Barger, who is the person on those calls?

A. One of the persons is James Broadnax.

Q. James Broadnax, right? Who's the best source of who's on those calls?

A. James Broadnax.

212

Q. Okay. Is there any surprise to anybody who represents James Broadnax of what he's talking about on the phone?

A. I would think not.

Q. And as a matter of course, do we turn over phone calls like we do everything else, as our open policy; is that right?

A. Yes, we do.

Q. And when it comes to rebuttal, if he goes out of here and makes the call tonight, are you going to stay up all night and listen to it?

A. No, I'm not.

MR. ALEX: That's all I've got.

MR. LOLLAR: Nothing further.

THE COURT: You may step down, sir.

Y'all want to do that 702 hearing now or have you got another witness?

MR. ALEX: We can, Judge. I think Dr. Price is here.

THE COURT: All right. This is probably going to be about 30 minutes, folks, if y'all want to walk around or whatever. I'm sorry, but it's necessary though.

All rise for the jury.

(Jury not present.)

213

THE COURT: Call your witness, Mr. Alex.

MR. ALEX: Yes, sir. And Judge, you know, before I do that, so that we don't get accused of hiding anything, I have a commissary account here on a business record exception. And for the record, this is rebuttal.

There's been a whole lot of direct examination by the defense on how Ms. Audrey treated her son. I've got the witness here that will sponsor those. But again, this is rebuttal, and I think the commissary --

THE COURT: Is this commissary that was added by his mother?

MR. ALEX: Added by whoever put the commissary on there.

THE COURT: Yeah, I'm -- I'm going to allow that.

MR. LOLLAR: By whoever put it on there?

MR. ALEX: Yeah. It's going to be his whole commissary account from beginning to end.

MR. LOLLAR: So is there any inclination of whether Audrey put it on there or his cousin?

MR. ALEX: Yeah. It shows exactly who put it there. It shows Megan, it shows Audrey, it shows whoever put it there.

214

THE COURT: All right. Call your witness up.

MR. ALEX: Dr. Price? Is he in here?

Judge, I'm sorry. I know he's here, Judge.

MR. HIKEL: We're calling to see if he went to the restroom or --

MR. ALEX: I know he's here, Judge. They told me that he was here.

THE COURT: Well, Mr. Hikel, I told y'all we were going at 1:30 on this.

MR. HIKEL: He probably went to the restroom, Judge.

MR. ALEX: Judge, I'm sorry. I thought he was in the building. They say he's actually in the parking garage, but I can put on --

THE COURT: Well, see, I let the jury go based on what you told me. He was supposed to have been here at 1:30.

MR. ALEX: Is Dr. Weaver the eye witness person?

UNIDENTIFIED SPEAKER: Uh-huh.

MR. ALEX: No, I think I told you we weren't putting on the extraneous.

MR. LOLLAR: I'm sorry?

215

MR. ALEX: I told you that we didn't have any intentions on putting on the extraneous unless something came up that was different.

MR. LOLLAR: Judge, can I take about a ten-minute break?

THE COURT: Yeah. You going to smoke a cigarette?

MR. LOLLAR: I think I need to.

THE COURT: Go smoke a cigarette, Mr. Lollar.

MR. LOLLAR: If you're telling me that, I'm going to let my expert go.

THE COURT: He is. He just said it.

MR. LOLLAR: Okay.

THE COURT: Mr. Barger, let me know the moment your -- your expert gets here.

MR. BARGER: Yes, sir.

THE COURT: He's going on the stand as soon as he gets here.

**JACK RANDALL PRICE, M.D.** was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Alex.

216

Whenever you're ready, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. Good afternoon, Doctor.

A. Good afternoon.

Q. Have you had a chance to catch your breath?

A. I'm ready.

Q. State your full name for the Court.

A. My full name is Jack Randall Price.

Q. And, Dr. Price, tell the jury what you do for a living.

A. I'm a clinical and forensic psychologist.

Q. And you know why you're here; is that right?

A. I do.

Q. Okay. Tell the jury -- I'm sorry. Tell the Judge -- I asked you to come in here and educate the jury on the topic -- the topic of psychopathy; is that correct?

A. That's correct.

Q. What qualifies you to discuss and educate the jury on the topic of psychopathy?

A. Well, as a forensic psychologist, topics about the -- the -- the kind of people that are frequently found in criminal cases, and in my past of examining probably hundreds of criminal defendants, and in the

217

study of forensic psychology. The topic of the psychopathic personality is a common one.

Q. Okay. And you provided me with your curriculum vitae; is that right?

A. I did.

Q. Can I have it -- is it up there right now?

A. I have one here.

MR. ALEX: May I approach the witness, Judge?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) All right. State's Exhibit 594, is that a copy of your curriculum vitae?

A. Yes.

Q. All right.

MR. ALEX: And we would offer that for the record, for the purposes of the hearing only at this time, Judge.

MR. PARKS: No objection.

THE COURT: It's admitted.

Q. (BY MR. ALEX:) And would you just kind of go through and give us the high points that would satisfy the Court that you are an expert in this area that you're about to -- if the Judge so sees fit -- educate the jury on?

A. Okay. I have Bachelor's, a Masters, and a

218

Ph.D. in psychology from the University of North Texas, with a postdoctoral fellowship at the Baylor Institute for Rehabilitation, and a postdoctoral fellowship at the University of Kentucky.

I am licensed to practice psychology in the State of Texas, and have been so since 1983.

I'm also licensed to practice in the State of Oklahoma, and I am board certified in forensic psychology.

I have been teaching psychology for 38 years and been practicing psychology -- had a practice of psychology for 26 years.

Q. And the -- the study of psychology, in the specific area that we're going to talk about to the Judge at this point of psychopathy, is that a well-known area of psychiatry?

A. Of psychology, yes?

Q. Of psychology, I'm sorry. Yes, sir. And there's -- there's lots of literature out there on psychopaths; is that right?

A. Right. There are hundreds of articles about this personality construct, going back to the 1950's, at least.

Q. Okay. And State's Exhibit -- did I ask you to put together or to provide a list of the

219

characteristics of a psychopathic personality?

A. Yes, you did.

Q. All right. And you told me you could give me one; is that right?

A. I don't remember how it proceeded, but I did provide you with one.

Q. State's Exhibit 595, is that the characteristics of a psychopathic personality?

A. Yes, it is.

Q. All right.

MR. ALEX: And for the purpose of the hearing, I'll tender to counsel a copy of this, for the purposes of the hearing.

MR. PARKS: No objection for the record.

THE COURT: It's admitted for record purposes.

Q. (BY MR. ALEX:) Do you have a copy of it over there?

A. I do.

Q. All right.

MR. ALEX: I'll provide this one to the Judge.

Q. (BY MR. ALEX:) We'll just talk a little bit about, first, Doctor, I'm not -- I haven't asked you to give this jury an opinion on whether the defendant is a

220

psychopath, have I?

A. No.

Q. All right. And you don't have any intentions of going in front of this jury and saying to them that James Broadnax is a psychopath, do you?

A. I do not.

Q. What I asked you to do, and I guess that's by way of an opinion, probably more factually, is to educate the jury on these characteristics of a psychopathic personality; is that correct?

A. Yes, that's correct.

Q. But, there is -- there is -- there is 20 characteristics here that you've listed as being characteristics of a psychopathic personality; is that right?

A. Yes.

Q. And we could go through them all right now, but I think the Judge has the copy of them up there and defense has a copy of them, and if we went through these, I could ask you, you've -- you've received a lot of information in this case from the State as far as police reports, medical records, jail phone calls, you name it, you received volumes and volumes and volumes of information, have you not.

A. I have.

221

Q. And you could go through each one of those pieces of information and say from your professional opinion that they're consistent or not consistent with these characteristics; is that correct?

A. I could.

Q. You could -- you could do that.

I haven't asked you to do that, have I?

A. No.

Q. All right. And in front of this jury, primarily, your purpose will be to educate them on these characteristics and they can apply the facts just as well as you could; is that correct?

A. That's my understanding.

Q. All right. Now, and I may have -- may have downplayed that a little bit. To say that they could apply them as well as you, you have applied these before in many cases; is that correct?

A. I have.

Q. All right. And that's after talking to a defendant and using a certain instrument; is that correct?

A. Yes.

Q. And that's the Psychopathy Checklist Revised; is that correct?

A. That's correct.

222

Q. The PCLR.

A. Yes.

Q. Very good. And these characteristics are all part of that checklist; is that correct?

A. That's correct.

Q. All right. Very good.

MR. ALEX: That's all I got, Judge.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. PARKS:

Q. Dr. Price, you and I know each other, do we not.

A. Yes, we do.

Q. We'll be sending probably a good part of the day next Wednesday together down in federal court.

A. Or more than that.

Q. I was afraid of that.

So if I understand correctly, Doctor, you're not going to give the jury an opinion about whether or not Mr. Broadnax fits the criteria of antisocial personality disorder, or would be a psychopa -- a sociopath.

A. That's correct.

Q. Okay. You're here to educate them about sociopathy because it's a topic that is a common one.

223

Did I -- did I under -- did I understand you correctly?

A. I may have said "common." It's frequent in the field of forensic psychology and it's relevant to many types of criminal cases.

Q. Okay. Are you going to give an opinion to the -- to the jury as to whether or not you believe Mr. Broadnax would be a future danger?

A. No.

Q. Are you going to suggest to the jury that anyone who is a psychopath or sociopath would be a future danger?

A. No.

Q. Do -- do you know why you're testifying? I mean, to -- to what -- to what end?

What do you intend to suggest to the jury would be their appropriate response if Mr. Broadnax has some of these traits?

A. That would be up to them. I wouldn't suggest anything other than, as I understand the plan here, I would just be educating them as to these traits.

Q. Okay. So, if I -- and I'm not fussing with you, Doctor. I'm trying to understand myself.

You would be telling the jury generally about sociopathy.

A. Or psychopathy, --

224

Q. Or psychopathy.

A. -- as we call it today.

Q. Telling them that these are some of the traits, and then just letting them apply that however they would with no further direction.

A. That's my understanding.

Q. And you've done this work enough to know that by application here, of course, we're talking about answering the special issues.

A. Yes.

Q. Do you believe that this general information is relevant to the answering of these special issues for a jury?

MR. ALEX: Judge, I'm going to object to the form of the question. That's up to the Court to decide.

THE COURT: The jury's not here. I want to hear the answer to this.

A. I would say that it's relevant to the jury in that the traits of a psychopath would be aggravating instead of mitigating. They're to consider any factor that would be a factor that would mitigate their -- the facts or the punishment in this case, and these traits would speak to that.

Q. And -- and -- and why do you feel they would

225

be aggravating? Are you going to tell them that?

A. No. You asked me --

Q. I understand.

A. No.

Q. You don't intend to -- well, let me go off a little bit.

Wouldn't the studies show us with respect to whether or not a person who fits these criterias are more or less likely to commit acts of violence in the future?

A. Well, I haven't been asked to testify to that, but I can certainly speak to that if you'd like.

Q. Well, I mean, do -- do they exist?

A. Yes.

Q. Okay. But you're not intending to -- to testify about that.

A. No. If you ask me, I'll be glad to do so.

Q. Oh, I won't -- I'm not going to ask you. I promise you, I'm not. That's why I ask these questions out here. But you haven't been asked to opine about that.

A. I haven't been asked to testify about that today.

Q. Okay. So I'm just trying to get a clear picture, Dr. Price.

226

Basically, what you're saying is this is an educational process from which a jury could speculate that these factors would be relevant to answering those special issues without really knowing why.

A. Well, I'm not -- I don't know that I have a professional opinion about how the jury might use these -- this bit of information about the psychopathic personality.

Q. Okay. Okay. That's -- that's fine.

MR. PARKS: That's all I have, Judge.

MR. ALEX: Judge, I do have a few more things.

**REDIRECT EXAMINATION**

BY MR. ALEX:

Q. And, Doctor, we talked about what your opinions were going to be, we talked about what the facts that you're going to give the jury, the facts basically being the characteristics, but I did ask you, and I do plan to ask you as a -- as a fact, not as an opinion, is there any -- is there any way to cure a person who is a psychopath?

A. No. There is no effective treatment that is a treatment for these -- these behaviors, these typical behaviors, feelings, thoughts, interactions with others. There's no effective treatment.

227

Q. Okay. And that's probably the only thing that I hadn't asked you here on this hearing, but that's just what you consider the facts, based on what you know about psychopathy; is that correct?

A. Yes, that opinion that I just gave about there not being an effective treatment is based on my training and experience and the research literature.

Q. Okay. Very good. So that would be an opinion, and that would be based on your training, experience, and the literature that you've -- you've read; is that correct?

A. Yes.

Q. All right. Very good.

MR. ALEX: And that would be primarily the -- I guess the bottom line opinion, Judge.

THE COURT: Recross?

MR. PARKS: No, Your Honor.

THE COURT: You may step down, sir.

Is there objection to the doctor testifying.

MR. PARKS: Yes, Your Honor. We have no objection to Dr. Price's expertise in the area. Our objection is that -- basically 401, 403, 702.

I just don't think that this is an area --
here's the way I perceive it. It is the State

228

introducing something that's not in the case in order to raise an issue about it so that they can call an expert to testify generally about something that he's not going to testify applies to this defendant.

It -- it just -- I -- I really don't know the difference between this and having a doctor get up and testify about the traits of a schizophrenic, or the traits of a person with bipolar disorder, or the traits of a person with whatever else they wanted to come up with and let a jury just speculate as to what the meaning of that can possibly be and what use they ought to make of it.

It -- it just seems to me to be fraught with the danger of this jury speculating about things that are not actually so.

MR. LOLLAR:  It confuses the issue.

MR. PARKS:  It confuses what they're about.  It confuses the issues in the -- in the punishment stage.

THE COURT:  How is it helpful to the jury, Mr. Alex?  Because that's one of the requirements under the Kelly test.  You're supposed to be able to tie the facts of the case to the opinion.

MR. ALEX:  Well, Judge, I think it answers all of the questions in this case.  You had doctors

229

who've talked to the defendant who diagnosed him with certain things.  You've even had Dr. Lane talk about a psychopath when he talked about antisocial personality disorder.  And if we look at the characteristics of a psychopath and we go through them by each one, the defendant hits on all fours.

And it explains, quite frankly, some of the arguments the defense is going to make to the jury about why the defendant does certain things that he does, and it's helpful to the jury because the -- the term has been used by Dr. Lane, for one; and for two, I'm going to be using it in my closing argument.  And I think the fact of the matter is that if the jury can be educated on what psychopathy is and what a psychopath is, then it will be extremely helpful to them in understanding the facts of this case.

THE COURT:  Okay.  I've got you.

MR. PARKS:  It will be extremely helpful to Mr. Alex to argue what he can't present in evidence here, which is that Mr. Broadnax is a psychopath. That's why he wants to.  He can't prove it.  No one has ever diagnosed him as such, but he wants to throw that camel's nose under the tent so that he can -- well, never mind.

THE COURT:  That's a phrase I'm not

230

familiar with.

MR. PARKS:  Throwing a camel?  Well, I mix my metaphors a lot.

THE COURT:  Okay.  I've got you.  I've heard enough.  It is rebuttal evidence and that's -- that's why I'm going to allow it, because it rebuts certain testimony that was provided by Dr. Lane, which the Court did not recall until the State brought it out.  He did testify about that.

So to explain what a psychopath is, I think might conceivably be helpful to the jury. Although, of course, I'll allow liberal cross-examination.

So I have performed the gatekeeping function required under Kelly versus State, 824 S.W.2d 568, and find the testimony is sufficiently reliable and relevant, could -- could conceivably assist the trier of fact -- that remains to be seen -- in understanding the evidence or in determining a fact in issue, and if the expert has made an effort to sufficiently tie the pertinent facts of the case to meet the requirement, it would be helpful to the jury. The probative value is not substantially outweighed by prejudicial effect.

So that's my ruling.

231

All right.  Ready for your next witness, Mr. Alex?

MR. ALEX:  We are, Judge.  And I think I'll probably put on Ms. Lutton with the Sheriff's Department briefly so she doesn't have to sit through --

THE COURT:  Is this the commissary lady?

MR. ALEX:  Yes, sir.

THE COURT:  All right.  Call the jury.

THE BAILIFF:  All rise.

(Jury present.)

THE COURT:  Be seated, please.

Thank you for your patience, ladies and gentlemen.

Call your next witness, Mr. Alex.

MR. ALEX:  The State will call Elizabeth Lutton.

THE COURT:  Elizabeth Lutton.

Miss Lutton, if you'll go all the way to the front of the courtroom up by the door.  When you've reached the door, turn and face me and raise your right hand.

**ELIZABETH LUTTON**

was called as a witness and testified as follows:

232

THE COURT: You may lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, ma'am.

A. Elizabeth Ann Lutton.

Q. And, Ms. Lutton, what do you do for a living?

A. I'm the legal adviser for the Dallas sheriff.

Q. All right. And are you an attorney?

A. Yes, I am.

Q. How long have you been an attorney?

A. Since 1986.

Q. All right. And you know why you're here; is that correct?

A. Yes.

Q. All right.

MR. ALEX: May I approach the witness, Judge?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) State's Exhibit 596, is this

233

an affidavit and a commissary account for one James Broadnax?

A. Yes, sir, it is.

Q. And it relates to Monday, August 17th at 12:56. That would be as of that date; is that correct?

A. That is correct.

Q. And there is -- the BNO, is that a book-in number?

A. Yes, it would be.

Q. All right. And that would correspond to a young man by the name of James Broadnax.

A. Correct.

MR. ALEX: And we're going to offer 596 at this time, Your Honor.

THE COURT: Any objection?

MR. LOLLAR: No objection.

THE COURT: For what?

MR. ALEX: I was just going to say for the record. It's been previously tendered to defense counsel.

THE COURT: Okay. Any objection to 596 for all purposes?

MR. LOLLAR: No, Your Honor.

THE COURT: 596 is admitted.

Q. (BY MR. ALEX:) And, Ms. Lutton, the

234

commissary account, can you kind of briefly explain to the jury what a commissary account is?

A. Yes. The inmates can place money into the system so that they will have money available when they're in jail to purchase small items like cokes and various other items, snacks and things like that. So people can deposit money for them and then they can withdraw when the little cart comes around and purchase some of those items.

We don't provide extra items free in the jail. They have to purchase them and people have to deposit money for them to make those purchases.

Q. And you can make those deposits over the internet, in person, all kinds of ways?

A. Yes. There's many different ways to make the deposit. You can do it online, you can do it to the kiosk here in the jail. There's just a lot of different ways that -- usually it's done by family members or people who know the inmates.

Q. Okay. And State's Exhibit 596, we see here the initial entry of June 21st of '08; is that correct?

A. Yes.

Q. And the very first deposit is from an Audrey Kelly; is that correct?

A. That's correct.

235

Q. For $20?

A. That's correct.

Q. And if we follow Audrey Kelly putting money on the defendant's books, we see again here an A. Kelly on 7/18 for $25; is that correct.

A. Yes, we do.

Q. And then we see again on 8/11 for $25.

A. Yes.

Q. And then on 8/18 for $30.

A. That's correct.

Q. And all of those are highlighted in yellow; is that right?

A. Yes, they are.

Q. We also see a Megan Burn and a Megan Finley on those same -- on this same page; is that correct?

A. Yes. That's what the records show.

Q. Primarily, it's Audrey Kelly putting money on those -- on that -- on this particular page between June of '08 and September of '08; is that correct?

A. Yes.

Q. And if we go to Page 2 and we look at -- I think I've highlighted in yellow where all the places where Audrey Kelly made deposits; is that correct?

A. Yes. It says from Audrey.

Q. And from September 4th of '08 all the way to

236

January 5th of '09, is Audrey Kelly the only one putting money on the defendant's books?

**A. It looks like there's one dated on the first and seventh.**

Q. Okay. And that would be --

**A. From Jackie?**

Q. From Jackie. And that was January 7th.

**A. Yes.**

Q. But this whole page, if we go $30, $50, $30, $30, $30, $30, $40, $40, $40, 58, 45 and 40, all of those are from Ms. Audrey Kelly; is that right?

**A. From Audrey, yes.**

Q. All right. And then if we go to Page 1, this is sort of in -- in order of most recent to the day of book-in, 6/21; is that right?

**A. Correct.**

Q. Okay. And then if we go to Page 1, which would be the most recent, we see Audrey Kelly making deposits as late as February 27th, and then on March 1st; is that correct?

**A. Yes. That's what the records show.**

Q. And then on May 7th, there's another deposit of $40; is that correct?

**A. That is correct.**

Q. And then on -- I'm sorry. That was April 7th.

237

**A. April 7th, 2009.**

Q. And then on April 24th of 2009.

**A. That's correct.**

Q. And then that's the last place we see Audrey Kelly putting money on his books; is that correct?

**A. Yes, it is.**

Q. All right. But we see a Brendan; is that correct? 98 bucks?

**A. Yes. That is on -- it looks like it's May the 14th of 2009.**

Q. And then we see Megan here at least 1, 2, 3, 4, 5, 6. The primary source of his money at that point is a -- is a Megan.

**A. Is a Megan. That's what the records show; yes, sir.**

Q. And we -- when the jury looks at this, if they so care to, they -- it shows a balance before and after he spends it; is that correct?

**A. Yes. It reconciles itself.**

Q. All right.

MR. ALEX: That's all I've got for this witness, Judge.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

238

Q. What's his current balance?

**A. I would have to look at the records.**

MR. LOLLAR: May I re-approach?

THE COURT: Yes, sir.

**A. As of the April 14th, it looks like it's 14 cents.**

MR. LOLLAR: That's all the questions we have.

THE COURT: May the witness be permanently excused?

MR. ALEX: I have no objection, Judge.

MR. LOLLAR: Yes, sir.

THE COURT: You're permanently excused, Miss Lutton. Thank you for your testimony.

What further says the State?

MR. ALEX: The State would call Dr. Price, Your Honor.

THE COURT: Dr. Price.

Would you come all the way to the front of the courtroom, sir. Turn and face me. Raise your right hand.

**JACK RANDALL PRICE**

was re-called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the witness stand.

239

You will be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. Would you state your full name, sir.

**A. Yes. My full name is Jack Randall Price.**

Q. Tell the jury what you do for a living.

**A. I'm a clinical and forensic psychologist.**

Q. And tell the jury what a clinical and forensic psychologist does.

**A. Well, you think of a clinical psychologist as being the most typical kind of psychologist who, in some setting, is involved in the diagnosis and/or the treatment of mental and personality disorders.**

Q. Okay. And how long have you been doing that?

**A. For about 26 years, and that's the clinical part.**

**And the forensic part, a little less than that, which is the application of clinical psychology to some question of the law.**

Q. All right. So if we were talking about the law and clinical psychology, we would get to forensic psychology at some point.

240

A.  Yes, that's correct.

Q.  All right.  And you know why you're here today; is that correct?

A.  I do.

Q.  I called you -- well, first, tell the jury what qualifies you to talk to them about clinical or forensic psychology.  Give them your -- your qualifications.

A.  I have a bachelor's, a masters, and a Ph.D. in psychology from the University of North Texas, with a postdoctoral fellowship at the University of Kentucky, and a postdoctoral clinical internship at the Baylor Institute for Rehabilitation here in Dallas.

I have been licensed as a psychologist in the State of Texas since '84.  I'm also licensed as a psychologist in the State of Oklahoma.

I am board certified in forensic psychology.

I've been practicing forensic psychology for approximately 25 years, and I've been a professor in teaching psychology for 38 years.

Q.  All right.  And obviously, I'm calling you to the stand to testify, and you know why I'm calling you to the stand today.

A.  I do.

Q.  And -- and what's the purpose of you being

241

here today?

A.  To describe for the jury the traits of what is known as a psychopathic personality, which is roughly the equivalent of what you've heard about, the antisocial personality.

Q.  Okay.  And they would have heard that from Dr. Lane when he was testifying; is that correct?

A.  That's correct.

Q.  And he mentioned the -- the idea of a -- of a psychopathic or -- or a psychopathic personality or psychopathy; is that correct?

A.  Yes.

Q.  All right.  And first all -- first of all, let me ask you this, Doctor:

Your curriculum vitae, did you bring that --

MR. ALEX:  May I approach the witness, Judge?

THE COURT:  Yes, sir.

Q.  (BY MR. ALEX:)  Would you describe for the jury -- is it here?

You described for the jury your training, experience, and education.  State's Exhibit 594, does that basically outline what -- what all that is?

A.  Yes.  That's what is referred to as a curriculum vitae.  It's kind of like a resume, except

242

you're not looking for a job.  And it outlines my training, experience, presentations I've given.  Publications.  All that.

Q.  All right.

MR. ALEX:  We'd offer State's Exhibit 594.

THE COURT:  Any objection?

MR. PARKS:  No objection.

THE COURT:  State's Exhibit 594 is admitted.

Q.  (BY MR. ALEX:)  And did you prepare a list, if you will, -- I think the last time I saw it, it was on the bench.

MR. ALEX:  Thank you, Judge.

Q.  (BY MR. ALEX:)  Did you prepare a list of character -- characteristics of a psychopathic personality?

A.  I did.

Q.  And is that what we have here in State's Exhibit 595?

A.  It is.

Q.  All right.

MR. ALEX:  And we'd offer State's Exhibit 595, Judge.

THE COURT:  Any objection?

MR. PARKS:  No.

243

THE COURT:  State's Exhibit 595 is admitted.

Q.  (BY MR. ALEX:)  And if we met -- did you also -- do you also have a Power Point presentation that goes through those characteristics?

A.  I do.

Q.  All right.  Before we do that, let me ask you a couple of just general questions about -- the jury may have seen you throughout this trial sitting in the courtroom.  As part of what you do, do you advise the State on matters of psychiatry?

A.  Well, I answer questions that whatever attorney has retained me, answer questions about topics that come up.  I don't consider it advising you, --

Q.  Okay.

A.  -- but when you or whoever it is that retains me has questions about concepts and diagnoses that come up, that I'm here to answer, as well as to listen to the other experts.

Q.  All right.  And -- and -- and so your expertise in, let's say, antisocial personality disorder, your expertise in drug-induced psychosis, all of that, you would sit in the courtroom and if I have questions about those things, obviously I'm -- I'm -- I'm not a psychiatrist.  I could find out answers from

244

you; is that correct?

A. That's correct.

Q. And I provided you with just about everything there was in this case: Crime scene photos, police reports and all that; is that correct?

A. That's correct.

Q. And one of the things that we're not going to do for this jury today is, you're not going to say to them, ladies and gentlemen of the jury, this man sitting over here is a psychopath. You're not going to do that today, are you?

A. No, I'm not.

Q. All right. What I asked you to do was to educate them and they can apply the facts as they see them; is that correct?

A. That's correct.

Q. All right. And you're also not going to give them an opinion as to whether the defendant was in a -- in any state of mind at the time of this offense, are you?

A. No.

Q. Okay. And as it relates to a drug-induced psychosis, I think you sat through all that testimony; is that right?

A. Yes.

245

Q. Okay. And you've got all the information, but at this time you can't give them an opinion one way or another; is that correct?

A. That's correct.

Q. All right. And I guess there is a distinction between whether or not you can give them one or whether you -- or whether or not you -- you were asked to give them one. You weren't asked to give them one; is that correct?

A. That's correct.

Q. All right. And part of what a -- what a clinical psychiatrist does, is they sit down and they interview folks and they get a -- a plan for treatment. Is that the -- primarily what a clinician would do?

A. Yes, that's correct.

Q. All right. And you've never sat down with the defendant; is that correct?

A. That's correct.

Q. All right. So let's -- let's talk about the traits of a psychopathic personality, all right? And we're going to use the Power Point presentation that follows along with State's Exhibit -- you tell me the number of that.

THE COURT: 595.

MR. ALEX: 595. Thank you, sir.

246

THE COURT: Is this exactly the same thing?

MS. HANDLEY: Uh-huh.

MR. ALEX: I think it is, Judge.

THE COURT: Is it?

MR. LOLLAR: It's not exactly the same thing.

THE COURT: All right. Is there any objection to this? This needs to be a new exhibit then, if it's not exactly the same thing.

(Sotto voce discussion.)

MR. ALEX: I'm sorry.

Q. (BY MR. ALEX:) There's -- there's two more slides on here than that's -- what's here; is that correct?

I'm sorry. What's -- what's here is there's 20 characteristics of a psychopathic personality; is that right?

A. Yes, that's correct. It's -- it's an outline kind of talking points that come from the document that's in evidence, State's Exhibit 595.

THE COURT: Okay. I want you to mark this as a new exhibit, 597, and offer it.

MR. ALEX: Okay.

THE COURT: Is there any objection to 597?

247

MR. PARKS: Well, of course, I haven't seen what's different. Can I take the witness on voir dire --

THE COURT: Yes, sir.

MR. PARKS: -- briefly?

**VOIR DIRE EXAMINATION**

BY MR. PARKS:

Q. Dr. Price, what is different about your Power Point presentation and -- and the document?

A. The Power Point is an outline. It's briefer. It's bullet points.

Q. Would -- would -- would you say that it -- it adds -- is there anything on your Power Point that is on contained in one form or another here in this document?

I mean, does it introduce new topics?

A. There is a title slide and there's a slide after it that is a general description of the concept of psychopathy, and I would need to make sure that the Power Point here stops after the 20 traits, and that's what I would use.

Q. Okay. And if you do that, -- and you and I know each other, do we not, Dr. Price?

A. Yes, sir.

Q. Okay. Are you -- are you saying to me -- and

**248**

I'll trust what you say -- that if you stop the Power Point where you intend to stop it, that in all essential respects, your Power Point is the same as the document that's already been admitted?

A. I will. It's just briefer.

Q. All right.

MR. PARKS: Judge, I have no objection.

THE COURT: There's no objection.

MR. PARKS: No objection.

THE COURT: Offer it as 597, please. It's offered?

MR. ALEX: Yes, sir.

THE COURT: Okay. No objection. That's admitted. 597's admitted. Power Point presentation, for the record, is 597.

**DIRECT EXAMINATION - CONTINUING**

BY MR. ALEX:

Q. All right. Doctor, this first slide we're talking about is psychopathy. Can you explain that to the jury?

A. Well, it's -- it's a -- a construct. It's a personality construct. It's a label, if you will. It's roughly the same thing as what we talked about or what you heard about, the antisocial personality disorder.

**249**

It's clusters of traits that some of which are -- describe the person's behavior that's a psychopath. Some of them describe their emotions, and some of them describe how they would interact with others.

So it's a long-standing concept in forensic psychology to describe and to research people that have this that frequently come up, and different kinds of criminal cases in the system.

Q. All right. And if you had to give the jury a general definition of what a psychopath is, what would that be?

A. It's a person whose traits, both the behavioral, emotional, interpersonal, are against society. They have these traits. They're long-standing personality traits; constitutes what we call a personality disorder, not a mental illness, but rather the kind of person they are.

They used to refer to personality disorders as character disorders.

Q. All right. And we're going to talk about those characteristics; is that correct?

A. Yes, that's correct.

Q. All right. One of the first characteristics we're talking about here, would you describe that to

**250**

the jury?

A. It's referred to as glibness and superficial charm. This trait is -- is that the person is what they refer to as verbally facile. They're fast talker -- they're good talkers. They can chat somebody up. They're -- they can be amusing, and entertaining, and engaging, and tell really convincing stories even though they're not likely -- but they also have this ability to be likable, especially at first. They make a good first impression.

They frequently, at first, are quite likeable, but people then typically start to think of them as being too slick, too smooth to be believable.

Sometimes they have a lot of superficial knowledge in any area. They can speak to any topic for a few minutes. So they're good talkers and good at interacting with others at that superficial level.

Q. Okay. Let's go to the next characteristic.

A. This trait talks about grandiosity or grandiose sense of self-worth. They're very impressed with themselves. They're a braggart. They have an inflated sense of themselves, an ego. And they typically think of themselves as being pretty remarkable people in spite of given the facts of their life at times.

**251**

They oftentimes appear quite insensitive to their current legal problems, and they find themselves involved in a criminal lifestyle partly because regular jobs are kind of beneath them.

Q. Okay. Let's talk about the next trait, the need for stimulation.

A. Um, they are stimulus seekers. They have this need for excitement, to live in the fast lane, on the edge, where the action is.

Like I said, having a regular 9:00 to 5:00 job, or whatever, is not something of interest to them. They get bored easily. And part of this stimulus seeking oftentimes is alcohol and drug abuse.

So this excitement, stimulation seeking is a trait of theirs.

Q. All right. Let's go to the fourth trait.

A. This is pathological lying. Lying and being deceitful is characteristic of their -- how they would get along with others. They will lie sometimes when the truth would be better for them. But they lie frequently. If they're caught, they come up with some other lie. They're not embarrassed.

This is not only to lie to get something, but it's just -- that's their personality.

Q. Okay. And then the fifth trait. The conning

252

and the manipulative.

A.   It's a similar trait to lying, but they will do something to get people to do what they want them to do. They have -- and frequently employ schemes and scams for their own gain. This can be criminal. Sometimes it's just to get somebody to give them something. As one person that was high in these traits of a psychopath told me, that he's good at fast talking slow-thinking people into doing what he wants them to do. The combination of the glibness, and the charm, and the manipulativeness.

Q.   Okay.  Let's go to the sixth trait.  And out of all of these traits we're going to talk to the jury about, there is 20 in total; is that right?

A.   That's correct.

Q.   Let's go to the sixth trait.  A lack of remorse or guilt.

A.   They don't have concerns for what their behavior has done to others. They don't feel guilty about it. They don't feel a sense of remorse. They are completely forthright about what they've done. They may say they're sorry, but their behavior doesn't back that up.

Often, they blame the system. They blame the system. They blame other people for getting caught,

253

and the system for being unfair to them.

Q.   Okay.  The next characteristic we're going to talk about is the shallow affect.

A.   This is about their feelings, which they have little of, except for anger. They usually have the impression of being cold and unemotional people. They have trouble describing their feelings. They are devoid of many feelings except for anger.

Q.   Okay.  And the next characteristic we're going to talk about is callous; lack of empathy?

A.   And you will see some similarities here, but they are mainly and always concerned with themself; that they are selfish. And from that, then they may find themself or say that they are a loner by choice. They want what they want for them without concern for others.

Q.   All right.  Number nine, an uncharacteristic scale, a parasitic lifestyle.

A.   Financial dependence on others is a way of life. Again, they don't -- are not attracted to regular jobs and steady employment. And their job is to find somebody that they can live off of and to take care of them and their financial aspects, of needs.

They use this with the other trait of being a manipulator to get others to give them things and take

254

care of them.

Q.   Okay.  Number ten, poor behavioral controls.

A.   They have a bad temper. They are angered easily. They become aggressive over small things; described as being a hothead. Envies having -- anyone with a bad temper, oftentimes that -- that trait of theirs is disinhibited by drugs and alcohol.

Q.   Okay.  Promiscuous sexual behavior, Number 11.

A.   Again, it is related to the lack of regard for other people; that they see sex as something that is impersonal, that's casual, that's trivial. Frequently have what is referred to as a one-night stand. A lot of different sexual partners. And sex is for sex. It's not part of the relationship to them.

Q.   Okay.  Number 12, early behavior problems.

A.   They -- as far as their criminal lifestyle, it -- it frequently gets started early, whether caught or not, whether incarcerated or not. The serious problems they have usually start at an early age. For this trait, they talk about 12 in the DSM, the Diagnostics Statistical Manual. When they talk about antisocial personality disorder, they talk about 15 as the age. They're early starters in their career as a criminal.

Q.   Okay.  And Number 13, lack of realistic

255

long-term goals.

A.   I think it's -- the best way to describe this is that they live day-to-day. They don't think much about the long-term future. Don't plan. Seldom upset about not having achieved goals in the past. And they want things quick. Not -- not for the long term.

Q.   Okay.  And impulsivity, Number 14.

A.   Their behavior is generally impulsive. They act without thinking. They don't think through things, the consequences of things. They don't reflect on what might happen to others or to themselves even at the time they're engaging in that behavior. Oftentimes, just do things on the spur of the moment. They might break off a friendship, a relationship, walk off a job. Get in the car and leave and -- without a plan.

Q.   Okay.  Number 15 is irresponsibility.

A.   This is not only true in their finances, but it's true in terms of their commitment to others, their friends and family. If -- they just have a little sense of duty or loyalty to family and friends because it is, it's about them.

Q.   Okay.  Number 16, failure to accept responsibility for their own actions.

A.   They're either not able to, or unwilling to accept full responsibility for their criminal or their

256

noncriminal behavior or for the consequences. They give excuses, rationalizations. They didn't have a choice. That someone disrespected them and that's -- you have to do that. It's their fault, not theirs.

They again sometimes may say the words that they accept the responsibility, but their behavior doesn't back that up.

Q. Okay. Number 17 would be many short-term marital relationships.

A. This is -- again, it's getting at the lifestyle about the commitment to others. This is just another way to look at it, another indication of the lack of commitment to others, a lack of loyalty to others, and that's -- it's a measurement item.

Q. Okay. Number 18?

A. Not only do they have those early problems that may be things in school, behaviors like that, truancy, et cetera, prior to the age of 12 or 15, but they frequently also are charged with or convicted of crimes in the juvenile justice system prior to age 17.

Q. Okay. And Number 19. Revocation of conditional release.

A. And these traits again, you don't -- it's rare that you find all of them in one person, and it would depend on their age, but if they're an adult and if

257

they have been caught before and been on probation or parole, they often have difficulty with those kind of rules, that kind of supervision. Having to report. Having to pay probation fees.

They frequently are taken off of probation or parole. It's revoked. They refer to it as having to live their life in a goldfish bowl with everybody looking at everything you do, and they don't like those kind of rules.

Q. Okay. And then the last one that we have here as a characteristic is criminal versatility.

A. They -- as an adult, and the older they are, the more you see of this -- have a history of being in trouble with the law with repeated charges and convictions that oftentimes escalate from less violent or less severe to more sincere -- to more serious.

Q. Okay. And I think you've said to the jury that those were the 20 characteristics that would describe a person with psychopathic personality; is that correct?

A. That's correct.

Q. And I think you told them that in order for a person to be a psychopath, that all of these characteristics do not have to be present.

A. That's -- that's actually correct. This is a

258

part of a way to assess this, and we would look at each of those and rate the person on each of these on a scale of 0 to 2. And they might not have some of those, but others might really be present and show this or indicate this kind of psychopathic personality.

Q. Okay. And as it relates to treatment, if a person is a psychopath, can we give them a pill and cure it, or can we give them some -- can you sit down and write a treatment plan to -- for them to no longer be a psychopath in the future?

A. No. It's a very persistent condition; that the research, in our experience, is that there is no effective treatment. Under certain conditions, their behavior can be managed, but talk of a cure is infrequent in the literature at this time, and talk of any kind of effective treatment is just not present.

Q. Okay. And -- and finally, Doctor, true or false:

A psychopath is a person who preys ruthlessly on others using charm, deceit, violence or whatever to allow them to get what they want.

A. That's true.

Q. And I did say finally, but I'm notorious for that.

Any -- any of the studies show what percent of

259

the population -- does one percent sound about right of the population are psychopaths?

A. Yes, it's an infrequent -- especially a full-blown psychopath is relatively infrequent in society in general.

Q. Okay. And I guess -- well, that's all I've got.

MR. ALEX: I'll pass the witness, Judge.

THE COURT: Cross-examination.

MR. PARKS: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. PARKS:

Q. Dr. Price, just a few things. These characteristics that you listed, you get those from the DSM-IV?

A. No. There is some mention in the DSM-IV, but I did not get these characteristics from the DSM-IV.

Q. Does the DSM-IV even have a -- a diagnosis of psychopath in it?

A. No. The most similar is antisocial personality disorder.

Q. Okay. So what we're talking about here is something that cannot even really be found in essentially the Bible of mental illness and -- I guess is what you'd call it. The DSM-IV, that's -- that's

260

what everybody goes to.

A. To make an official diagnosis of a mental or personality disorder, the most frequently used manual in the United States is the DSM-IV.

Q. It's -- it's approved by the American Psychiatric Association.

A. Yes, and published by them.

Q. And published by them.

But -- but we don't find a diagnosis of psychopath in this --

A. No.

Q. Is that -- okay.

Now, you're not saying, are you, Doctor, that anyone who has any one of these traits is a psychopathic personality.

A. That's correct. I'm not saying that.

Q. Because a lot of them, I -- I see this first one, glibness. Superficial charm. Kind of -- sort of describes a hale fellow well met. Be pretty good for a salesman and a politician and other kinds of things to -- to have that trait.

A. And attorneys.

Q. And attorneys. I was -- I was getting to that because I knew you were.

So, I mean, the kind of personality that

261

you're describing here would be fairly common, I guess, in jails and -- and penitentiaries?

A. Well, um, in jails and penitentiaries, there's a lot of people with an antisocial personality disorder, because it goes more on their past behavior and things that are very much documented, even though there's overlap. About 85 percent of people in prison, 80 to 85 percent of people in prison would qualify for having an antisocial personality disorder, again against society, and probably only 15 to 25 percent of people in prison would meet the characteristics of the traits of a psychopath.

Q. All right. Would I be right or wrong in saying that even the use of the term Psychopath is kind of dated? I mean, --

A. Well, no. I don't think that's correct. It does go back to and it predates antisocial personality disorder to say psychopath. And then at one point we changed the term to sociopath.

And then in the DSM-III, that's the edition before this, they really tried to tighten up the diagnostic criteria, and so they made them so that it was more of a checklist of things that were more easily documented. And so they went to antisocial personality disorder that has a lot of these traits, but not all of

262

those.

It talks about lack of remorse in antisocial personality disorder. It talks about having problems with the law. It talks about a lack of empathy for others. But the concept of psychopathy is a current one, and the concept of a psychopath is a current one. It's not an official diagnosis, but it's used to describe these kind of people.

Q. And on that subject, Dr. Price, you testify pretty much -- you used to testify pretty evenly for the defense and the State. Am I right about that?

A. It's about -- at this time it's about 60 percent at the request of the State, and 40 percent at the request of the defense.

Q. Would I be right or wrong in saying that some of the issues that we have here, that some of the characteristics that are described here could be explained by just pure immaturity rather than sociopathic tendencies?

A. Well, I would say this: That there are people that are immature that would show some of these traits. I wouldn't say that every psychopath is immature or that every immature person is a psychopath. But there -- I can see some of the -- of the similarity in terms of kind of a self-centeredness, impulsivity and

263

that sort of thing.

Q. Well, I -- you know, I'm look -- yeah, impulsivity and lack of realistic long-term goals. I guess we all wanted to be something fairly unrealistic at one point in their life or another. I myself wanted to be a Marine worse than anything. When I got out of high school at the weight of 107, I determined that that probably was not a realistic goal. It's -- you know, people can do and have some of these, is the only point I'm trying to make. It doesn't necessarily mean that they are, in fact, a psychopathic personality and can outgrow some of these kinds of things.

A. That's true. You may have seen some of these traits in someone that you know. These are clusters of traits. When you put all of these together or a good part of them together, and they are serious and persistent, then that's when we would apply the label of a psychopath.

Q. Okay. Thank you, doctor.

MR. PARKS: I believe that's all I have.

THE COURT: Any very brief redirect?

MR. ALEX: Yes, sir.

264

**REDIRECT EXAMINATION**

BY MR. ALEX:

Q. And so a lack of remorse or guilt would not necessarily just be from being immature, would it?

A. No.

Q. Not necessarily.

A. No.

Q. And if you combine that with a lack of empathy, be unable to experience a normal range of emotion, those three in particular, the pathological lying, and the conning, and the manipulation, if you combined all of those together, that just wouldn't necessarily be imma -- you wouldn't just say that's just an immature person, would you?

A. No. That would be -- this is a continuum. It's a set of traits. You may see some of these in yourself or others, but when you have a cluster of these, and when they are persistent and severe, this is a person that would fit this construct of a psychopath, and a person we would often find in criminal -- in criminal cases.

Q. Okay. And -- and this would be someone who, regardless of their age now or their age in the future, that you are not going to be able to cure, --

A. Correct.

265

Q. -- according to the literature.

A. That's correct.

MR. ALEX: That's all I've got, Judge.

THE COURT: Recross?

MR. PARKS: Nothing further.

THE COURT: May the witness be permanently excused?

MR. PARKS: No objection.

MR. ALEX: I have no objection, Judge.

THE COURT: You may step down.

What further says the State?

MR. ALEX: The State will call Michael Swan, Judge.

THE COURT: Mr. Swan, will you come to the front of the courtroom, all the way up by the door. When you've reached the door, turn and face me and raise your right hand.

**MICHAEL SWAN**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

266

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name for the jury, sir.

A. Michael Lewis Swan.

Q. And, Mr. Swan, how are you related to Stephen Swan?

A. He was my brother.

Q. Okay. And did you know Matthew Butler?

A. Yes.

Q. All right. And is your -- your family is here sitting over to the left. I think maybe Debbie Swan and her boyfriend, and your mom's back there; is that correct?

A. Yes.

Q. And I'm sure your dad is back there somewhere as well; is that right?

A. Yes.

Q. And there's people here supporting you and your family; is that right?

A. Yes.

Q. And I -- I told you that at this phase of the trial, that you'd be able to give the jury some idea how this has impacted you and -- and your life; is that correct?

A. Yes.

267

Q. You've heard a whole lot about the defendant for the last few days. Could you just kind of remind the jury, if you will, who was your brother?

A. He was my best friend. He was my brother, my counselor, and everything I had. He was a wonderful musician, programmer, scholar, gentleman, and I -- I could go on and on.

Q. And, Michael, where did he fit in your family? Are you older or younger?

A. I'm younger.

Q. And how old are you?

A. I'm 24 right now.

Q. And -- and Stephen was how old -- how old would Stephen be right now, if he was still living?

A. He would have just turned 28.

Q. And was he somebody that you looked up to?

A. Yes.

Q. What were the living arrangements at the time of his death?

A. He was living with me and my sister in a rent house.

Q. And your sister's name is?

A. Deborah Swan.

Q. How old is she?

A. She will be 26.

268

Q. So Stephen would have been the oldest.

A. Yes.

Q. What was that -- what was life like living with Stephen in that house?

A. It was easy. It was natural. There was just a set hierarchy that we never discussed. We never had to argue over who did what. It was --

Q. Now, Michael, I'm sure these jurors have children and siblings. You're -- you're not telling me that the three of y'all got along like just no fights or nothing.

A. That's what I'm telling you. It was that easy.

Q. It was that easy.

A. Yes.

Q. Sort of a rare situation.

A. Yes.

Q. And how was Stephen as an older brother in that household? Was he like a father figure to you-all or was he just -- did y'all have to take care of him or what?

A. He was, but he was also -- he was also just down to earth with us. He would not take the authoritative position unless we all deemed it necessary.

269

Q. Okay.

A. He was always there for advice, but he would never impose himself.

Q. So he treated y'all like equals, but if you needed a little guidance, a little hard-handed guidance, you'd get it from him; is that right?

A. Yes.

Q. And what has it meant to you now that he's no longer here, and your living arrangements and how that's affected you?

A. It's made it a lot harder. I can't say me and my sister argued much, it's just quite a load we all have to pick up now. We've had to work things out that we weren't planning on taking care of, and kind of pick up the whole administrative side of living on our own.

Q. Did you guys come to rely on Stephen to be there all the time?

A. Yes.

Q. And now that he's not there, what's -- how is it now?

A. It can be chaotic without a logical anchor to hold -- to guide us. We -- we were never irresponsible, but it was -- it was to where Steve would always be the one of reason. Hey, look. This is overflowing. Take it out. Or, you know, we -- we got

270

to do something about, you know, the -- the -- at one point, the plumbing in the back of the -- in the backyard got knocked over and it was just spilling everywhere, and he was -- he was the one that plugged it and let the landlords know, and it's -- it's just gotten to where it's not like we don't care, it's just -- it's a lot harder to organize things.

Q. I understand. When was the last time you saw Steve alive?

A. Wednesday morning. June 18th.

Q. Wednesday morning?

A. Yes.

Q. And were y'all there at the home together before he left and you left?

A. Yeah. We usually left the same time for work.

Q. And were you able to say goodbye to him?

A. Not in the way I'd want to.

Q. Is there a bit of a difference between being able to -- somebody who is sick and leaves this earth, or somebody who is suddenly taken away from you?

A. Yes, there's a huge difference.

Q. Explain that to the jury. How?

A. Up until that day, I was just living life normally, taking for granted he had been there since before I was born. And I had no reason to believe he

271

was leaving. So when he was gone, it was just -- he's gone. I never got to talk to him again. The last time I saw him, it was just, Hey, later.

Q. Tell the jury a little bit about y'all's relationship in -- with music, you and -- you and Stephen's.

A. Yes. Steve started playing guitar at a very early age, and I never had any musical talent, so I started playing drums. And I just kind of naturally became his backup. And I can't even re -- I can't even say how many years we played just casually in jamming and with my dad on another guitar, and that was -- that was -- part of life was to come home and hear him playing guitar, or hear him start playing guitar at 11:00 o'clock at night, you know. He was just -- he was very passionate about music.

Q. And is the music the same for you now that he's gone?

A. No.

Q. Tell the jury about why.

A. I can't -- I can't sit down and be on the drum set anymore without thinking how it would be if he was still there.

Q. Is music a big part of y'all's lives?

A. Yes.

272

Q. Michael, some people have described their brothers as, you know, as best friends, and some people describe them as their best enemy. You've described your brother as your best friend; is that right?

A. Yes.

Q. And can you give the jury some sense of -- are you the same person now that he's gone?

A. No. Um, I -- I -- even just looking at pictures of me with Steve when we were goofing around or at a birthday party or something, I don't recognize myself.

Q. What do you mean by that?

A. My face changed. I can't smile the same. I don't carry myself the same.

Q. If there was anything you could say to -- to Stephen right now, what would it be?

A. I miss him. I want him back.

MR. ALEX: We'll pass the witness.

THE COURT: Cross-examination.

MR. LOLLAR: We have no questions.

THE COURT: You may step down, sir. Thank you. Sorry for your loss.

What further says the State?

MR. ALEX: The State will call Debbie Swan, Your Honor.

273

THE COURT: Miss Swan, if you'll come to the front of the courtroom up by the door, turn and face me and raise your right hand.

**DEBORAH SWAN**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, ma'am.

A. Deborah Jean Swan.

Q. And, Ms. Swan, tell the jury, -- I think they've probably heard from your brother, though -- who was Stephen to you?

A. My big brother and my best friend.

Q. And is this --

MR. ALEX: May I approach, Judge?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) It's probably been awhile since the jury has seen the photograph of your brother,

274

your best friend. Is this State's Exhibit 20, is that your brother?

A. Yes.

Q. All right. And in the photograph, he's playing a guitar; is that right?

A. Uh-huh.

Q. What did music mean to Stephen?

A. Music was one of the easiest ways he could communicate to anyone -- to everyone on a large scale. It's something we grew up with. It's something that brought us close together as a family.

When we were very young, my dad started teaching my -- Steve and I guitar, and it was just one of those things that always bonded us, held us together. And Steve loved it.

He loved singing. He loved playing guitar. He loved playing any instrument he could get his hands on.

Q. So was he pretty good?

A. Yes. He was very good.

Q. And as a family, you-all enjoy music together; is that right?

A. Yes.

Q. And now that he's gone, what has -- how has that affected you and your love for music?

275

A. I have a hard time picking up a guitar and playing it anymore. It's -- it's painful.

I -- I still enjoy listening to music, most of all, his music, because it's one chance to get to hear his voice again.

Q. And when Steve passed, when was the last time you saw him before he passed?

A. Tuesday night, the 17th. He came to see me at work.

Q. And where were you working?

A. I was working at a -- I was bartending and cocktailing at a place in Addison, a little bar and grill.

Q. And was that the kind of work you liked to do?

A. It paid the bills.

Q. Paid the bills. And so after you saw him on that night, when was the next time -- how were you made aware that Steve was no longer with you?

A. I was awakened about 5:17 the morning of the 19th. I was asleep. My dog was barking and howling and making a lot of noise, and I heard banging on my window; Garland detectives that somehow knew my name and wanted me to come to the door so they could speak to me.

Q. What were you thinking?

276

A. I knew something was wrong. I knew something was wrong.

Q. You didn't have any warrants out or anything?

A. Excuse me?

Q. You didn't have any warrants out or anything like that?

A. No.

Q. I mean, were you shocked?

A. Yes.

Q. Were you surprised?

A. Yes. I couldn't think of any plausible reason why there would be detectives banging on my window in the middle of the night.

Q. So what happened?

A. Well, I answered the door. I was wary at first because I didn't know why they were or for sure who they were. I'd only heard voices and my dog was upset.

I opened the door and they said that they wanted to come in and speak to me and they wanted me to sit down. And I wouldn't really wait to do that. I kept asking them, you know, what -- why. You need to tell me why, and they said -- they said it's about Stephen. And all I could do was try to think up some excuse why something I -- something -- some part of me

277

knew that he was gone.

All I could do is think of, well is it this? Is he okay? And they said, No, he's not okay. I said, Well, is he alive? And he said no, and I just started screaming.

Q. And was your brother home at the time?

A. Mike was, yes.

Q. What about your parents? Where were they at at this time?

A. Asleep at their house.

Q. So who -- who -- did you try to notify them?

A. I had to figure out what happened and, you know, clear my head. And I asked them if they had told my parents. And they said, No. We don't know how to get in touch with your parents. We just -- Matt's wife had informed them where -- where we lived because she had been to our house before with Matthew.

So she told them where we lived so that they could get ahold of us. No one had told my parents. So I -- I tried to call them and they weren't picking up their phones. Finally, my mom picked up her -- her phone, and her voice on the end of the line was so cheerful. She was like, Oh, hi. What's up?

And I couldn't tell her. I had to hand the phone to the detective because I couldn't burst her

278

bubble. The voice -- her voice on the other end of the line was just that -- I was already going through sensing a tragedy and I didn't want to see that end in her, the way it had just moments before with me. I couldn't even speak.

Q. And so I think your brother has told the jury that Stephen was -- was the one in y'all's family that took care of a whole lot of stuff.

A. Yes.

Q. Now someone had to take care of -- of funeral arrangements for him?

A. Yes.

Q. Did you have to do that or did somebody else do that?

A. Jamie, Matt Butler's wife and I put our heads together and we all sat down, both families sat down and -- and discussed it, but we put together most of the actual funeral.

I wrote the -- the eulogy and the -- and the -- and the publication for my brother and we held a dual memorial service for the two of them because there was so many of us that had to say goodbye to both of them.

Q. And the -- how did that affect your grieving process, having to do so much of the funeral

279

arrangements?

A. I kind of had to put everything off, part of the grieving off, because there were a lot of people I had to notify also that day, and part of it was just trying to people myself conscious, trying to keep myself going, talking to people.

Then as soon as the funeral was over, I think I just crashed for a few days. I couldn't do anything.

Q. Had Stephen been sick?

A. He had in the past.

Q. And what kind of illnesses was he suffering from?

A. Well, starting -- he had respiratory illnesses when he was younger. He had severe asthma that landed him in the hospital numerous times to the point where the doctors didn't seem to know what to do for him anymore, so my mom, over the years, nursed him back to health.

He -- he grew stronger, and as he got older, he -- he had wanted to join the military since he was a kid. I believe it was 2006, Fall 2006, he was speaking to recruiters about -- his health was improving, you know. He was getting better. He wanted to see if he could get in the Army now, and during that time he was then diagnosed with cancer. He was diagnosed with

280

Hodgkin's lymphoma. He went through chemotherapy, radiation, fought to take good care of himself and come out on top. And shortly before his death, he had been declared in remission. We were all just breathing a sigh of relief.

Q. So his death was -- was pretty sudden after a -- a successful bout with cancer.

A. Yes.

Q. It's been, I guess, a little over a year now since he's gone. Has the -- has the pain subsided at all?

A. No. I think it gets worse.

Q. What do you mean by that?

A. Well, when he was alive, ever since I was born, I never went a month without seeing him. I think once I might have gone an entire month without seeing him; certainly not without talking to him. We spoke all the time on the phone.

He -- when I lived an hour away, he'd visit me once at least every week or two. He'd drive an hour just to come hang out with me. And the more time goes by, the more I realize how much I just miss him.

Q. So time doesn't quite heal.

A. No.

Q. Ms. Swan, did you have any role in Stephen and

281

Matthew coming together and working together?

A. Yes. They met through me. Matthew and I had a -- we took general psychology together at the community college, and Matthew walked up to me one day to tell me that he liked my shirt. It was for a local Christian radio station that had only been around for about a year at the time, and it was just his way of breaking the ice, I guess.

We became friends, and probably about a year later, I had introduced him to my brother when the three of us were all attending classes at the same campus.

Q. And did they become lifelong friends?

A. Yes.

Q. What -- what was their relationship like?

A. Well, they were best friends. They worked together at the studio. Steve was the godfather of Matthew's two children. Their -- I watched their friendship grow over the years and, you know, they spent more and more time together. Steve was always somebody that Matt could call, and vice versa.

Q. And the -- the two -- Matt's -- Matthew Butler, that would be the young man in the State's exhibit there in the middle with your brother Stephen; is that correct?

282

A. Yes.

Q. And the young man who is holding up the peace sign in front of the piano; is that right?

A. Yes.

Q. What's his two children's names?

A. Matthew Garrett Butler, Jr., and Michaela Grace Butler.

Q. How old are they?

A. Two and-a-half and three and-a-half, I believe. Matthew's three and-a-half; Michaela's about two and-a-half.

Q. All right. And Stephen's loss and Matthew's loss would be -- would be pretty grave to them as well.

A. Yes.

Q. Do you know these children very well?

A. I know them. Not -- not exceptionally well.

Q. Okay. As it -- as it relates to the -- the kids, was there -- was there any time that you can think of where Matthew expressed his -- his desire for the kids and that kind of thing, --

A. Yes.

Q. -- that you can recall?

A. There was one evening, less than a month, probably only about two weeks before -- before the boys died that I had a staff meeting late at night. For

283

some reason, my boss decided to have a staff meeting after we closed at 2:00 o'clock in the morning. And I didn't want to fall asleep, because if I'm not working, I'm not going to want to stay up till 2:00 a.m.

And Stephen informed me that him and Matt had gone to see a live show which wasn't far away from there, and so I said, Well, I'll come up and meet you guys, you know. Where are you?

Well, I called them on my way out and he said, Well, I guess -- whatever band they had gone to see had left or something, or their friends had gone home. I don't remember exactly. But I -- I showed up right as they were leaving, and I told them -- I explained my situation. And Matt said, Well, Hey, Steve. Hey, bro, let's go hang out with your sister for awhile so she doesn't have to wait by herself till 2:00 o'clock in the morning.

Steve said, Okay, you know, let's -- let's go. So they followed me over and we were walking in from the parking lot, and my brother always had a sense of purpose when he walked. He walked in a straight line from here to there. Erect, you know. Okay. I'm going to go to the door. I'm going to go inside. And Matt's personality was a little different. He was a little more laid back, swing his arms, not necessarily walk in

284

a straight line, just because it wasn't his nature.

And he walked -- he kind of was walking across the parking lot, looking a little glum, swinging his arms back and forth, and I said, well, you know. We kind of looked at him, and we're like, What's the matter, dude? And he goes, I miss my kids. I said, Well, when did you see them last? Oh, earlier this evening. He didn't like to go more than a few hours without seeing his kids. He missed them already. Matt loved his kids.

Q. And -- and finally, Ms. Swan, your -- your brother and -- and Mr. Butler, working out there at this studio, if two strangers had approached him and want to talk to them, would it be in their nature to just give them a talk?

A. Oh, yeah. Definitely.

Q. And was -- was that Christian music, was that their -- their life?

A. Yes.

Q. And if two strangers was to walk up to them and just start chopping it up with them and talking to them, they'd probably be witnessing to them, wouldn't they?

A. Most likely.

Q. Telling them about God or Jesus or something.

285

A. Yes.

Q. Wouldn't necessarily be on guard for anything that potentially would come ill to their way, would they?

A. Not necessarily. And I would imagine being there at that time of night after closing and stuff, that they were probably in a pretty good mood just getting carried away with the music.

Q. And the -- the last music that y'all are aware of that they were working on would have been that song, I think, that somebody mentioned earlier in the trial, and that is We All Die Before Our Time.

A. Yes. Steve had just finished recording a sixth album. He completed six albums and had hundreds more songs that he has demos of that he had written and not fully worked on, and he, I think, probably within that last week, had told my younger brother that he'd finished the album, except it was ready for the drums to be recorded, and he had -- of course, he would have had Matt listen to it. So from our understanding of -- the last file that they accessed on the computer was that song.

Q. And -- and when they would have walked out there and locked the door, anybody they had ran into, they would have been talking to about their Lord and

286

savior as their --

MR. LOLLAR: Judge, I'll object to speculation.

THE COURT: I'm going to sustain that.

MR. ALEX: Okay.

Q. (BY MR. ALEX:) They were Christians through and through; is that right?

A. Yes.

MR. ALEX: That's all I got, Judge.

MR. LOLLAR: We have no questions. Thank you.

THE COURT: You may step down, ma'am. Thank you for your testimony. Sorry for your loss.

What further says the State?

MR. ALEX: Judge, I believe that's all we -- we've got. I'd like a minute to go through our exhibit list and make sure there's not anything we need to offer before we completely close the case, if that's okay with the Court.

THE COURT: We'll take a brief recess for the jury.

All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

Mr. Lollar, are you going to have any

287

surrebuttal?

MR. LOLLAR: No.

MS. EVANS: Your Honor, I don't have the defense exhibit numbers in front of me, but the deposition CD's, as well as the deposition transcripts, I'd just like to make sure that those are in for record purposes only and not for all purposes.

THE COURT: They are.

MS. EVANS: Okay.

MR. ALEX: Judge, what do you have for State's Exhibit 454?

MR. LOLLAR: That's the records of the arrest.

MR. ALEX: I think the defense put in the jail card. I don't think I offered that.

MS. HANDLEY: I don't think you did.

MR. LOLLAR: You never offered the jail card.

MR. ALEX: I think you offered A.

THE COURT: 454-A is in.

MR. ALEX: And I think the -- my 454 would be the equivalent of Defense Exhibit 47. Okay. Very good.

We're ready to close, Judge.

THE COURT: Be seated, please.

288

Mr. Lollar, have you explained to your client that he has the absolute right to testify in his own behalf?

MR. LOLLAR: Yes, sir, but not recently.

THE COURT: Okay.

MR. LOLLAR: Should we take a moment and let me do that?

THE COURT: Well, you have the absolute right to testify in your own behalf if you wish to do so, sir. If you choose not to testify in your own behalf, I'll instruct the jury they can't take that as a circumstance against you. Do you understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Have you talked to your lawyers about that?

THE DEFENDANT: No, sir.

THE COURT: You have not talked to them.

THE DEFENDANT: Not recently.

THE COURT: Okay.

Send them back.

MR. LOLLAR: If we could just take 30 seconds.

(Off-the-record discussion was had.)

MS. MALLON: We're ready.

289

THE COURT: Okay. Back on the record.

Having spoken to your lawyers, what is your decision, sir? Do you wish to testify in your own behalf or do you choose to give up that right?

THE DEFENDANT: Give up the right.

THE COURT: All right.

We really are ready this time.

THE BAILIFF: Two of them just left, so ...

THE COURT: How long do you want for argument, Mr. Alex?

MR. ALEX: I think Ms. Handley and I both are going to argue.

THE COURT: All right.

MR. ALEX: Judge, we would request an hour to be split between me and counsel.

THE COURT: All right. I'll give you that. 30/30?

MR. ALEX: We'll -- we'll have to talk about that.

MS. HANDLEY: Yeah, we'll talk about that. Whatever I don't use, I'd ask you give back to him.

THE COURT: Mr. Lollar, are you going to do all of yours?

MR. LOLLAR: No, sir. We're going to

290

split it up. 30 minutes -- an hour will be fine.

THE COURT: All right. Mr. Parks will be going first or --

MS. MALLON: I will.

THE COURT: You will. Okay.

THE BAILIFF: All rise.

(Jury present.)

THE COURT: Be seated, please.

What further says the State?

MR. ALEX: At this time, Judge, ladies and gentlemen of the jury, the State would close its case.

THE COURT: Okay. And you will have no surrebuttal?

MR. LOLLAR: No, Your Honor.

May it please the Court, members of the jury, we close.

THE COURT: Okay. Both sides have rested and closed. All right. Here's where we are.

You have all of the evidence that you're going to have in the case, both in the case-in-chief and the punishment phase. You do not yet have the arguments of counsel or my instructions, which are similar to the procedure we had before. We're going to have that in the morning.

I'm going to ask you to be back here at

291

8:45 in the morning. I'll give you my instructions at about 9:00. It will probably be over by about 9:15 at the latest, and then I am allowing the parties to argue for such a period of time, as you'll probably have the case to begin your deliberations about 11:15, 11:30 tomorrow morning.

Mr. McGaughey is going to take you back in a moment and he's going do give you detailed instructions on how the -- the sequestration process in this case works. Remember my instructions. It's late in the game now to be causing any problems with that. Don't discuss the case with each other. No media.

Thank you very much for your attention in this case. We'll see you tomorrow morning at 8:45.

All rise for the jury.

Lawyers, stay in the courtroom.

(Jury not present.)

THE COURT: Be seated, please.

Has the State had the opportunity to inspect the Court's proposed Charge in punishment?

MR. ALEX: I'm -- I'm quite sure we have, Judge. I don't -- we have no objections.

THE COURT: All right. You previously told me you didn't. I'm just doing it again.

MR. ALEX: Yes, sir.

292

THE COURT: All right. So no objections from the State.

Will there be objection from the defense?

MR. PARKS: Yes, Your Honor.

THE COURT: All right, sir.

Just basic objections, and some of these objections I know were in the motion that I had referred the Court to, I believe, yesterday, and those motions have not found their way back to me, so I can't remember exactly what it was. But I know that we were objecting to the failure of the Court to define various words and terms found in the special issues.

And I don't know whether the Court has ruled on that motion or not, so we would just go ahead and object to the Court's --

THE COURT: Which words are you talking about?

MR. PARKS: I'm sorry?

THE COURT: Which words and terms are we talking about?

MR. PARKS: We are talking -- let me get over here to them -- failure to define the term "criminal acts of violence," failure to define the term "society." Failure to define the word "probability." Failure to define "continuing threats" in Special Issue

293

Number 1.

We also object to the definition of "mitigating evidence" as contained in the Court's Charge for the reason that it is entirely too restrictive, as it allows the jury to consider only that evidence that they believe would lessen the defendant's moral culpability.

And we do not believe that mitigation, as that has been discussed under the cases interpreting the United States Constitution is that restrictive, and we feel that it is unconstitutional, and for that reason deprives Mr. Broadnax of due process, equal protection of the law, and all the other protections under the Fourth, Fifth, Eighth and Fourteenth Amendments.

Additionally, we object to the statutory instruction allowing the jury to consider evidence that both militates for and mitigates against the imposition of the death penalty in determining the answer to Special Issue Number 1, as I believe that instruction is in plain contravention of the Special Issue itself and would lead only to confusion of the issues and is therefore unconstitutional. Deprives Mr. Broadnax of due course of law under Article 1, Section 9 of the Texas Constitution, and the constitutional protections

294

afforded him under the Fourth, Fifth, Eighth and Fourteenth Amendment of the United States Constitution.

And I believe that's it, but let me -- and plus, -- and we would not waive any of the additional concerns and objections that we had in motions that had previously been filed.

THE COURT: The motions with regard to the instructions?

MR. PARKS: Yes, sir.

THE COURT: Okay. Where do you think those are?

MR. LOLLAR: Those are in my -- my bound volume.

THE COURT: Yeah, I'll need those tonight, then.

MR. PARKS: You have mine.

MS. MALLON: We gave it to you yesterday.

MR. PARKS: And you gave it to the briefing attorneys and I haven't seen it since.

MR. ALEX: Can we go off the record for one second?

THE COURT: All right. Are you done?

MR. PARKS: Yes, sir.

THE COURT: Okay. Now we're off the record.

295

(Off-the-record discussion was had.)

THE COURT: Okay. Anything else?

MR. PARKS: No.

THE COURT: Those are all denied.

MR. PARKS: Yes, sir.

THE COURT: Anything else before tomorrow morning?

MR. LOLLAR: No.

MR. ALEX: That's all we have, Judge.

MR. LOLLAR: 8:45, Your Honor?

THE COURT: Yes, sir.

MR. LOLLAR: Very good.

THE COURT: Thank you.

Thank you, ladies and gentlemen. We're in recess until 8:45.

(Court adjourned.)

296

THE STATE OF TEXAS )

COUNTY OF DALLAS   )


    I, SHARON HAZLEWOOD, Official Court Reporter in and for Criminal District Court No. 7 of Dallas County, State of Texas, do HEREBY CERTIFY that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

    Witness my hand this the 15th day of _____April_____, 2010.

_____Sharon Hazlewood_____
SHARON HAZLEWOOD, CSR
Certified Shorthand Reporter
Official Court Reporter
Criminal District Court No. 7
972-739-3906
Texas CSR No. 628
Expiration Date:  12/31/10