*76207*

REPORTER'S RECORD

VOLUME 53 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE CRIMINAL DISTRICT |
| | ) | |
| | ) | |
| | ) | |
| VS. | ) | COURT NO. 7 |
| | ) | |
| | ) | |
| JAMES GARFIELD BROADNAX | ) | Of DALLAS COUNTY, TEXAS |

ORIGINAL ORIGINAL ORIGINAL ORIGINAL

FILED IN
COURT OF CRIMINAL APPEALS
SEP 16 2010
Louise Pearson, Clerk

PUNISHMENT PHASE

=================================================================

On the 20TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

A P P E A R A N C E S


FOR THE STATE OF TEXAS:


  HONORABLE DAVID M. ALEX
  SBOT NO. 24003256
  HONORABLE LISA SMITH
  SBOT NO. 00787131
  HONORABLE GORDON HIKEL
  SBOT NO. 00787696
  HONORABLE ANDREA HANDLEY
  SBOT NO. 08898800
  HONORABLE ELAINE EVANS
  SBOT NO. 24032880
  133 N. INDUSTRIAL BLVD.
  FRANK CROWLEY COURTHOUSE
  DALLAS, TEXAS 75207
  TEL. 214-653-3600


FOR THE DEFENDANT:

  HONORABLE BRAD LOLLAR
  SBOT NO. 12508700
  1700 COMMERCE ST, STE. 404
  DALLAS, TEXAS 75201
  TEL. 214-384-8178

  HONORABLE DOUGLAS H. PARKS
  SBOT NO. 15520000
  321 CALM WATER LANE
  HOLLY LAKE RANCH, TEXAS 75765
  TEL. 903-769-3120

  HONORABLE KERI MALLON
  SBOT NO. 24049165
  DALLAS COUNTY PUBLIC DEFENDERS OFFICE
  133 N. INDUSTRIAL BLVD., LB 2
  FRANK CROWLEY COURT BLDG.
  DALLAS, TEXAS  75207
  TEL. 214-653-3550

VOLUME 53

PUNISHMENT PHASE

AUGUST 20TH, 2009                                    PAGE     VOL.

PROCEEDINGS...................................     3       53

CASE CALLED BY THE COURT...................     3       53


HEARING....................................     3       53
JURY PRESENT...............................     3       53

JURY CHARGE................................     4       53

CLOSING ARGUMENTS BY MS. HANDLEY...........    10       53
CLOSING ARGUMENTS BY MS. MALLON............    31       53
CLOSING ARGUMENTS BY MR. PARKS.............    35       53
CLOSING ARGUMENTS BY MR. LOLLAR............    46       53
CLOSING ARGUMENTS BY MR. ALEX..............    65       53


JURY RETIRES TO DELIBERATE.................    81       53

ALTERNATE JURORS DISMISSED.................    82       53

JURY NOTE..................................    83       53

ADJOURNMENT................................    91       53

REPORTER'S CERTIFICATE.....................    92       53

P R O C E E D I N G S

(Court convened; jury not present.)

THE COURT:  I need order, please, for just a second.

The Court reviewed the objections that were posed by Mr. Parks to the Court's Charge last night, and those objections are overruled.  The Charge is as I have previously stated.

As soon as the jury gets situated, we'll go ahead and go.

Have you got something?

MR. LOLLAR:  Would that include the motions we had filed pretrial in regard to the Charge, Your Honor?

THE COURT:  Yes.

Are both sides ready?

MR. ALEX:  Yes, sir.

MR. LOLLAR:  I am.

THE COURT:  All right.

THE BAILIFF:  All rise.

(Jury present.)

THE COURT:  Be seated, please.

Good morning, ladies and gentlemen.

As I mentioned to you yesterday, you have all the evidence that you're going to have in the case.

You do not yet have the Court's Charge; the instructions in the case.

As I told you before, you will have a copy of these back with you during your deliberations. It is very important that you listen carefully to these instructions, however. And after I've read these, then you'll have the arguments of counsel.

I'll take a break about an hour into the arguments.

And the instructions in this case read as follows:

(As read:) In a prior proceeding, James Garfield Broadnax, the defendant, was found guilty of the offense of capital murder, alleged to have been committed on or about June 19th, 2008, in Dallas County, Texas.

It is now your duty to determine from all the evidence in the case answers to certain questions called Special Issues.

You are instructed that the punishment for the offense of capital murder is either death or confinement in the Institutional Division of the Texas Department of Criminal Justice for life without parole.

Two Special Issues Numbered 1 and 2 are included in this Charge. You are instructed to answer

these Special Issues either yes or no in accordance with the instructions given in this Charge.

Special Issue Number 1. Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Special Issue Number 2. Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole, rather than a death sentence, be imposed?

Instructions regarding Special Issue Number 1. In deliberating your answer to Special Issue Number 1, you are instructed that the State has the burden of proving beyond a reasonable doubt that the answer to the issue is yes.

If you do not so find and believe from the evidence beyond a reasonable doubt that the answer to Special Issue Number 1 should be yes, or if you have a reasonable doubt, then you shall answer the Special Issue no.

You may not answer Special Issue Number 1 yes unless the jury agrees unanimously, and you may not answer Special Issue Number 1 no unless ten or more members of the jury agree. The members of the jury need not agree on what particular evidence supports a no answer to the issue.

If you have answered no to Special Issue Number 1, then you shall cease your deliberations.

If you have answered yes to Special Issue Number 1, then you shall next consider Special Issue Number 2.

In deliberating on Special Issue Number 1, you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

Instructions regarding Special Issue Number 2. In deliberating on your answer to Special Issue Number 2, you are instructed that you may not answer Special Issue Number 2 no unless the jury agrees unanimously. And you may not answer Special Issue Number 2 yes unless ten or more members of the jury agree.

The members of the jury need not agree on

what particular evidence supports a yes answer to Special Issue Number 2.

In arriving at your verdict, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

If the jury answers under Special [sic] Number 2 that a circumstance or circumstances warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed, the Court will sentence the defendant to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life without parole.

Under the law applicable in this case, a defendant sentenced to confinement for life without parole is ineligible for release on parole.

General instructions. You are instructed that if the jury answers yes to Special Issue Number 1 and answers no to Special Issue Number 2, the Court shall sentence the defendant to death.

If the jury answers no to Special Issue Number 1 or answers yes to Special Issue Number 2, then the Court shall sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life without parole.

If the jury's answers to the Special Issues are unanimous, then the presiding juror may sign each Special Issue for the entire jury.  If any answer or answers are not unanimous but agreed to by at least ten members of the jury as set out above in these instructions, then the ten or more jurors who agree shall individually sign the Special Issue.

During your deliberations upon the Special Issues, you must not consider, discuss, nor relate any matters not in evidence before you.  You shall not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by evidence.

In arriving at the answers to the Special Issues, it will not be proper for you to fix the same by chance, and not by any other method of chance other than by a full, fair and free exchange of the opinion of each individual juror.

You are not to be swayed by mere sentiment, conjecture, sympathy, passions, prejudices, public opinion or public feeling in considering all of the evidence before you and in answering the Special Issues.

In determining your answers to the Special

Issues, you shall consider all the evidence admitted in this whole trial.

You are further instructed that if there is any evidence before you in this case regarding the defendant having committed an offense or offenses other than the offense alleged against him in the Indictment, you cannot consider this evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the answers to the Special Issues.

You are further instructed that the law allows the defendant to testify in his own behalf at this phase of the trial, but a choice on his part not to do so is not a circumstance against him, and no presumption can be indulged in by the jury for a choice on his part not to do so. During your consideration of this case, you are instructed not to consider, discuss, or even refer to the choice of the defendant not to testify.

After the reading of this Charge, you shall not talk with anyone not of your jury. After the argument of counsel, you will retire to consider your answers to the Special Issues submitted to you.

It is the duty of your presiding juror to preside in the jury room and vote with you on the answers to the Special Issues submitted.

You are the exclusive judges of the facts proved, of the credibility of the witnesses, and of the weight to be given to the testimony, but you are bound to receive the law from the Court which has been given to you in these instructions and to be governed by these instructions.

And the jury instructions were signed by me, the presiding judge of Criminal District Court No. 7.

The Court will recognize Miss Andrea Handley --

MS. HANDLEY:  Thank you --

THE COURT:  -- for the State of Texas.

MS. HANDLEY:  Thank you, Your Honor.  May it please the Court?

THE COURT:  Yes, ma'am.

MS. HANDLEY:  Counsel, co-counsel.

Good morning, ladies and gentlemen.

It seems it was about 50 years ago, I think, that we first got the opportunity to talk in voir dire, so I'd like to take this time to be able to -- to go over some of those issues that we discussed

in voir dire.

And also, first, I'd like to talk to you a little bit about the Charge that the Judge just read to you. You will take that back into the jury room with you.

But understand this. At this point, the defendant has already earned life in prison without parole. If we closed up shop right now and went home, he will still get life in prison without parole. That's where we are.

The first part of the trial you found him guilty of capital murder, and that was the one thing that was automatic about this, and we discussed that. Now we go into the second phase of trial, and this is where you consider those Special Issues.

You'll recall from voir dire that we talked to you about another special issue, a parties issue, and you'll see that that's not presented to you in this case. It wasn't presented to you in the first part of the trial, and it's not now, and that's because the defendant is on his own merit, on his own, individually responsible for the robbery and the murder of Stephen Swan. He is the triggerman that we talked about in voir dire, so you do not need to concern yourself with the issue we talked about before, and

that being whether or not he was a party to the offense.

Understand this also. To put it in as simple terms as possible, in order for the defendant to receive a sentence of death, your verdict must be unanimous. You must unanimously find that he is, in fact, a future danger. That is, that you must unanimously all agree that the answer to Special Issue Number 1 is yes, and then you must all unanimously agree that the answer to Special Issue Number 2 with respect to mitigation, is no.

Any other answers, any other numbers result in the sentence that he has already earned, the sentence that he already has, and that is life without parole. So your decisions must be unanimous as to 1 and as to 2.

As the Judge stated to you and as we talked to you about before, in considering these Special Issues, you consider all of the evidence in the case: Everything you heard in the first part of the trial and everything you heard in the second part of this trial. You begin with the very first witness, that being Matt Johnson, a man who was riding his bike home in the early morning hours after working an eight-hour shift. You start with him. You go all the

way up to Debbie Swan, Stephen Swan's little sister, who came up here to tell you about one of the victims in this offense and to put a person, a face and name to what is now a State's exhibit, and you consider everything that you heard in between. The circumstances of the offense. The way it was committed. The number of times he shot these men, how he did it, why he did it, what he did it for.

You consider how he pawned their property afterwards and filled their car with his junk to flee to Texarkana, to flee justice. You consider how he acted afterwards when he got on the TV and boasted with pride about what he did. And, yes, you even consider the testimony of his mother. What we've heard about his mother. And that while she may not be able to boast mother of the year, she was a woman who had her own crosses to bear, who had her own fallacies, who was not perfect but did the best she could. Always worked. Did the best she could.

You consider all of that, ladies and gentlemen, when you consider the Special Issues in this case.

And one of the most important things you also do as a juror, and that's in your Charge, is you have the burden, the duty, to judge the credibility of

the evidence and the credibility of the witnesses. And that's where your life experience and your street smarts and what you know becomes important because you have to ask yourselves when considering the testimony of the witnesses, what were their motivations for testifying the way they did.

You look at their motivations, and it ought not to surprise you that many people took the stand on behalf of James Broadnax. People who, in spite of not having seen him since he was six or seven years old, people who have not seen him in the past three years, people who only knew him in passing, it ought not to surprise you that they would come up here and try to paint him in the light most favorably as they could; that they would try to shift the blame on somebody other than James Broadnax. It doesn't surprise you.

And I don't begrudge these people for doing it. I'm glad they did because when it's all said and done, and when James Broadnax is sitting on death row, they can at least say that they came and they did something and there won't be anymore finger pointing or blame shifting. So you consider that also when you consider the testimony of everybody.

And I would be remiss if I did not point

out to you, ladies and gentlemen, that the defendant has been found guilty of the capital murder for the robbery and the murder of Stephen Swan.  But remember this, when we talked about what capital murder is. He's committed two capital murders.  The murder of more than two -- of two or more persons during the same criminal episode is also a capital murder, and you may also consider that.

So let's talk about the Special Issues. Special Issue Number 1, we referred to it in voir dire as the future dangerousness issue.  And we went through it specifically and we talked about the different terms that were in it.  And what I would like you to recall from the voir dire is that the law recognizes that you may consider Special Issue Number 1 and you may answer Special Issue Number 1 yes based strictly on the facts of the offense without looking at history, without looking at what he's done while he's been awaiting trial.

You may look just at the crime and have enough before you to say that yes, he is a future danger.

The law recognizes that there are some crimes that are so heinous, that are so cold-blooded, that are so calculating and without remorse, and a

complete disregard for life, that they speak in and of themselves to this issue right here. I'll submit to you that you have that case before you today; that everything you need to know about this defendant, his proclivity towards violence, his ambitions and his desire to engage in violence, speaks to you from just what he did on that night when he executed these two men.

But you do have more. We did bring you more. And let's talk about -- break it down as we did in voir dire. You do not get definitions to certain terms within Special Issue Number 1. The Judge does not define for you what these things mean. It is up to you to decide what these things mean. And we start, of course, with whether or not there is a probability that the defendant will be a future danger.

This is no longer an exercise in making a future prediction as to somebody's behavior. We don't have to look into the future and guess or predict, because the fact of the matter is, whether or not James Broadnax will continue to be violent, is already a reality. It is already a reality. It has already materialized.

A lot of people say in determining this, well, I'd like to know, how has he acted since he

committed this crime.  Is he the guy who's on his knees in tears begging for forgiveness, showing remorse at any chance he can?  Is he that guy?

MR. PARKS:  Your Honor, we're going to object to the prosecutor's indirect and direct comment on the defendant's demeanor during the course of this trial.  It is a comment on his failure to testify.

THE COURT:  The objection is overruled.  The jury will take the law from me and remember the evidence for themselves.

MS. HANDLEY:  The fact of the matter is, if there were ever a time in James Broadnax's life that he should act right, it was while he was awaiting trial.  He is literally on trial for his life.  He's in a cell by himself with all his commissary, his books, his notebooks, his phone calls.  He doesn't have to interact with anybody.  He can mind himself.  He can mind his own business, not get in any trouble and keep his mouth shut, but he doesn't.

And he knows we're listening and he knows the world is watching.  And if ever there were a time to act right, he can't do it.  He either won't do it or he's incapable of doing it.  So it's not a probability anymore, folks.  It's a reality.  He's shown to you that he is violent and he will continue to be violent.

Will he engage in acts of -- criminal acts of violence? That's for you to decide, what's a criminal act of violence. Is -- is busting a person's lip open on the basketball court an act of violence? Is taunting, and bullying, and threatening, and laying in wait for -- for Utsey an act of violence?

Is waiting until he got that opportunity when that guard was distracted and actually assaulting Utsey, is that an act of violence?

And remember this about that assault, folks. If Utsey hadn't moved, if he hadn't gotten out of the way, what did the guards say to you? If he had landed that punch, he would have knocked him out. It isn't a body check in a hallway. He would have knocked him out.

Is secreting a razor blade inside your cell an act of violence? Of what utility does James Broadnax have for a razor blade in his cell, folks? And don't kid yourself. It's not so he can cut his hair. He gets his hair cut at the barber shop. It is an older razor blade. It is something that Warden Nelson told you is one of the most dangerous objects that they find in the penitentiary.

Ask yourself, what is James Broadnax doing with a razor blade, and does that not speak of a

criminal act of violence or potentially one?

Is bowing up to guards a criminal act of violence?

Is shifting around and getting so antsy that they have to preventively take him to the ground before he puts an elbow in DSL Kirvin's face, is that an act of violence?

Is getting on the phone and saying you're going to put a bullet in this person's head, and you can't wait to get your hands on the guy who's mopping the floor and accidentally unplugged your phone to bust his face, are those acts of violence?

What can he get his hands on?  Or does he even need to get his hands on?  He's pretty good with his hands.

He's already shown you that he's engaged in criminal acts of violence.

Will he be a continuing threat?  A continuing threat.  Where does that continuum start exactly?

At what point do we start?  Did it start when he put that final bullet in Matthew Butler's head? Did it start when he got on the television and bragged to the world and paid homage -- homage to his Gangster Disciples for having killed somebody?  Is that where

the continuum started?

Did it start with the fight on the basketball court? Did it start with the thing with Utsey? Did it start with the razor blade? Where does that continuum of violence start? Does it start today? Do we start today?

And if we start today, ask yourself this: What have you heard, what have you seen that would tell you that it's not going to continue. He's already told you, send me to prison for life. I will kill someone.

There is no magical dust that's thrown on you when you walk inside the penitentiary. You don't suddenly change your personality or become a peaceful person.

He had no regard for life on the outside world. Why would he have a regard for human life inside the penitentiary?

Finally, you do look at that society that we spoke of during voir dire, and we know at this point that presumably, he'll spend the rest of his life in prison, and that's presumably, unless he escapes, and -- and why wouldn't he plot every day his escape? He's got nothing to lose. But presumably and hopefully he will spend that inside the penitentiary. And we know now that each one of our prisons is full of

thousands of inmates.  And we know it's not just inmates in the penitentiary, but it's guards.  It's educators.  It's visitors.

It's all kinds of people are within that society, and you also know now that there's not a separate prison for the James Broadnaxes of the criminal world.  That within these penitentiaries you have thousands of inmates serving hundreds of different types of crimes.

You have capital murderers serving time and interacting with and among people who are there for lesser crimes.  People who maybe are serving ten years for possession of drugs.  A nonviolent crime.  He's not in his own separate penitentiary.  He's in amongst everybody.

And you also know that he will not automatically go to some administrative segregation.  That's not going to happen.  He will automatically be classified as a G-III, a general population classification.  He will have access, folks.  He will -- he will have --

MR. PARKS:  Judge, that is not the testimony of their very own witness.

THE COURT:  The jury will remember the evidence for themselves.

MS. HANDLEY:  He will go through classification.  They will look at his offense and they will look at what he has done.  And, no, he hasn't already stabbed a guard yet, and in all likelihood, no, he doesn't go straight into administrative segregation.  He goes in to the population with the rest of the inmates.

What James Broadnax desires is opportunity.  He is an individual that is chomping at the bit to engage in violence, and all that separates him from his violence is opportunity.  He got it with Utsey in the hallway, didn't he?  And he got it with Miller on the basketball court.  And now he's got his opportunity.  He's got his access.  He's in the dining hall.  He's in the hallways.  He's in the dayroom.  He's at work.  He has access to the church.  And why wouldn't he pick victims in church?  That's how he picked his last two victims.

He has access to people.  And we have this special issue because we recognize that; that he's not in there by himself.

And you have to ask yourselves this:  Shall the other inmates, the other people who work in that prison, are they supposed to be fodder for James Broadnax?

Do we have -- carry a hope, maybe a hope that he'll change?  That maybe he'll mature and he'll change?  Is that a hope that should be carried on the backs of the other people that have to live with him?  It shouldn't.  And it doesn't.  Remember that.  A hope should not be carried on the backs of other people who have to be around him.

Prison is a violent place.  The warden came up here and -- and as best they do, as -- as much as they try to keep it a tight ship and -- and -- and run safely, the fact of the matter is, prison is a violent place.

And just as she told you, for a person who has a pension for violence, a person that likes to engage in violence, prison gives you those opportunities.  It gives you those opportunities.

You have in prison anything and everything at your disposal to make weapons to engage in violence when maybe, perhaps, your fists aren't enough.  It's a violent place.  It's a place that James Broadnax, quite frankly, will be very comfortable in.

I want you to remember something about Tre'Vaun Miller.  And this ought to give you a real glimpse into the reality of prison.  And I hope you can appreciate what you really saw that day when he took

the stand for James Broadnax. Recognize this. Understand this in context with what goes on in prison. You saw Tre'Vaun Miller get up here, and what did he say? And he said it really quickly because he wanted to say it. He didn't want to forget it. He wanted to get it out. I was in my cell. I was angry. I was saying things. He told me to just leave it to God, but I was still angry, so I saw him. I was aggressive. So I went to assault him and he defended himself.

That's it. He got it out in a hurry, didn't he? He didn't -- he didn't tell you, he wouldn't agree that, no, the fight when they were pulled apart, Broadnax was still going after him because he didn't know that guard was going to be on the stand. And when he told you, No, I started this. He had nothing to do with it, Tre'Vaun Miller didn't know we had the phone call where this defendant is on the phone call talking about how it really happened; that he heard this guy mouthing. And let me tell you something, buddy. When those cell doors open, consider that the bell is on. He's chomping at the bit to engage in violence.

Tre'Vaun Miller didn't tell you that. Why didn't Tre'Vaun Miller tell you that? Did he look scared to you? Did he look nervous to you? Because he

should be.  Because Tre'Vaun Miller knows this:  He's been sentenced to 20 years in the penitentiary, okay?

Tre'Vaun Miller knows that James Broadnax is a member of the Gangster Disciples.  A violent gang.  A gang that is legendary for its cold violence, for its willingness to kill perfectly innocent people.  He knows that.

It's like Utsey knew that.  Remember Utsey told you they're up there talking all the time?  He talks loud and he talks proud about who he is and who he's a brother to.  Tre'Vaun Miller knows that, folks.  Tre'Vaun Miller is not a gang member.  Tre'Vaun Miller is going into prison --

MR. LOLLAR:  Judge, that's outside the record.

MS. HANDLEY:  Tre'Vaun Miller testified he is not a member of a gang, Your Honor.

THE COURT:  The objection's overruled.

MS. HANDLEY:  Tre'Vaun Miller is not a member of a gang.  He does not go into prison with fortification or affiliation and protection from his brothers.

He also knows he's going in to serve 20 years, and unless James Broadnax receives a sentence of death and therefore goes to death row at the Polunsky

Unit, for all he knows, he might end up in the same prison with him. And regardless, he may very well end up in a prison with other Gangster Disciples.

What Tre'Vaun Miller has shown to you folks is not that he hit him in self-defense. What that is, what we call that in the business, is self-preservation. That's survival. He's scared. He's scared. And, quite frankly, he should be. He did what he had to do to protect himself.

That's what prison life is. And that's the power of James Broadnax.

Keep this in mind also when you consider these issues that the defendant is serving life without parole, it is a relatively new type of sentence. We're only now seeing the influx of these people into our penitentiaries who will never parole out. And remember what was told to you from the stand. The biggest and greatest incentive that inmates have for acting right is what? The possibility of parole. He doesn't have that incentive. He is a new breed, a new brand of inmate. He has nothing to lose.

What is the worst we're going to do to James Broadnax when he busts somebody's face open? What is the worst we could possibly do to James Broadnax when he bows up to a guard and breaks his arm

or his leg, give him another life sentence? Or put him in administrative segregation for 75 days? He's already in administrative segregation. There's nothing we can do to James Broadnax than what he already has.

He has nothing to lose. And what's most frightening about him, folks, is he doesn't care. He doesn't care. He doesn't care. And while life without parole may give us on the outside a sense of comfort and safety, I will submit to you from the prison system, it created a monster. And how big that monster will get has yet to be seen. He's got nothing to lose.

There's nothing to prevent him from doing it. There's no motivation not to.

Special Issue Number 2, folks, is what we have referred to in voir dire as the mitigation issue, and we had discussed that once you find -- it says three, but it's actually two in the case -- once you find that the defendant is in fact a future danger, and I'll submit to you that's already been proved to you. There's no guesswork involved. Then you move on to the next issue, the mitigation issue.

And I want you to keep this in mind. What's very important about this is, we call it the mitigation issue, but it's more than just mitigation. You're not looking just for mitigating evidence in this

case, you're looking at everything, including the circumstances of the offense, the defendant's character, his personal moral culpability. You're taking a good hard look at the individual, not just what he did. Not just how he did it. But you are looking at him and who he is and what he's capable and what -- what he's about. And you're looking at his moral culpability.

You're asking yourself what kind of a guy is he? Is he the kind of guy who, when asked do you have anything to say to the widow and the children of the men you executed, he's not the guy who, I am so sorry. I can't believe I did what I did. Is he that guy? Or is he -- and pardon me -- in his words, or is he the kind of guy that says, Fuck 'em. Fuck them. Fuck their families. You look at his moral culpability.

And you don't only just look at the defendant in a case like this, folks, you do have to look at the victims. The victims are a part of this case, all right?

You look at the victims. If you ask James Broadnax who are the victims in this case, he will tell you what he's already told you. He's already told you folks that their mother -- and that they are bitch ass

who needed to be killed.  I mean, we -- we know how he refers to the victims in this case.

THE COURT:  You have five minutes remaining.

MS. HANDLEY:  Thank you.

You also know the victims in this case. You know Stephen Swan not only is the oldest son of the Swan family, the pride and joy of the Swan family.  The engineer, the programmer, the -- the self-taught musician, the big brother, best friend and hero to his little brother and sister, the man who wanted to join the military finally because he beat cancer.  You know that Stephen Swan.

And Matthew Butler, the husband, the father.  The husband to Jamie, the red-headed smart girl he prayed to God to bring him.  The father to two little children, Matt, Jr., and Michaela, kids he couldn't stand to be away from for more than a couple hours.  Matt Butler, a man whose passion was his business in Christian music.  Matt Butler, a man who would come by his mother's house, give her a hug, encourage her on her hard work, and then make sure he put stakes in the garden so her tomato plants wouldn't die.  That's who we're talking about.

And here's what's important.  First

impressions are formed within the first 30 seconds of meeting somebody. They're lasting impressions. Anybody whoever met those two men told you it didn't take you but a couple of seconds to know who they were and what they were about. Their sincerity, their Christianity, their goodness, their kindness. He knew them. He didn't just pass by them. He knew them. He stopped them. He engaged them. He talked to them. He had if not that 30 seconds and even more to know these men, and even after knowing these men like this, he still was able to walk up, look them dead in the eye and put a bullet in their head.

You have to consider, when you consider this defendant, what that took to do what he did to Matt Butler. Matt Butler didn't die instantly. He was shot in the arm, he was shot in the chest, he was shot in the back. He was crawling. He was literally crawling. Where he was going and what he hoped to do, we don't know. He's not here to tell us. Do you think he was thinking about his wife? Do you think he was crawling to his wife and his life?

Do you think he was crawling to his wife and his kids?

I can tell you this. He probably had a look of desperation on his face that no one can

imagine. Desperately thinking about his wife, desperately thinking about his kids, and when this walked up to him and put a gun to his face, don't you know he had to look into the face of that desperation. And he shot him in the head. And that tells you a lot about James Broadnax. It tells you about who he is and what he's capable of.

Consider that, ladies and gentlemen, when you consider if there's anything in this case about him, about his mother, to undo that. Thank you.

THE COURT: Thank you, Ms. Handley.

The Court will recognize Ms. Keri Mallon for the defendant.

MS. MALLON: Thank you, Your Honor.

May it please the Court. Counsel. Co-counsel.

She hated him. She abandoned him. Half breed. She dumped him. You should be ashamed of yourself for having given birth to him. She beat him until his back was split open.

He was filthy. He had a dead cockroach in his ear. He had a knot and a bump on his head. She slapped him so hard she left her handprint on the side of his face.

This is what you have learned about the

life of James Broadnax.  A life he described as hell. Capital H, capital E-L-L, hell.  A life that caused him to tell the world, I should never have been born.

Yet, still, despite that life that he had, he still loves his mother and he still loved his Big Mamma.  That life James Broadnax was given by people who were supposed to love him, teach him, take care of him.  His family.  That life he was given led him down a path to make very, very bad choices.  And choices that he made, choices that he created a different kind of hell.  A hell he currently lives in.  A hell in which he knows he's responsible for the death of two innocent men.  A hell in which he will forever be known as the animal who went on television and bragged about the horrible thing that he did.  And a hell in which, because of his choices, he will die in the penitentiary.

He will die in the penitentiary either at some unknown date in the future, or he will die in the penitentiary strapped down to a gurney with the State of Texas pumping poison into his veins.

James has made some horrible, horrible choices that have hurt many people.  He has hurt the Swan family.  He has hurt the Butler family.  And he has hurt his own family.

James has caused a lot of pain to a lot of people, and he knows that.

This whole case, this whole scenario is just -- is a series of regrets. Regrets for what could have been done, regrets for what should have be done, and certainly, certainly, regrets for what has been done. And James does regret what he has done, and he expressed that to the family in letters.

MR. ALEX: Judge, I'm sorry. I'm going to have to object to that. That's completely outside the record, whether he expressed any regret in a letter to anybody.

THE COURT: I don't recall that either. Sustained.

MS. MALLON: Judge, he's -- Mr. Lollar provided the family the letters.

MR. ALEX: We would ask the Court to ins -- to instruct counsel not to continue on that line, because it's not in the record, Judge.

THE COURT: Well, I'm not going to do that, but the objection's sustained.

Move along.

MS. MALLON: I'm moving on.

THE COURT: All right.

MS. MALLON: Thank you.

And now, you, the jury, are called upon to decide what the punishment will be for what he has done, and I hope that you see that as a very important decision, and I hope you see that as a difficult decision.

The State has done the very best that they can to paint James Broadnax as a monster. And frankly, James has done a pretty good job of making himself out to be a monster.

But I hope at this point that you can see that that is not the complete picture of James Broadnax, and I hope that you can also see a very different picture, a picture of that discarded, abandoned and abused child who just gave up on life.

Now, you may think and you may feel that James Broadnax deserves to die for what he did and what he has done since Mr. Butler and Mr. Swan were killed, but that is not the issue. And we talked about this during jury selection and you all promised that you would not discuss what James deserves; that you would not even consider what James deserves, because whether or not James Broadnax deserves to die is not the question you are called upon to answer. And I am pleading with you to see through that cold appearance, see through the bragging and the bravado and see that

that child, that abandoned and abused and discarded child is still there, and that child does not need to be executed.

And we're asking you to please spare his life.

Ghandii said, Where there is love there is life. James has not had a life because he has not ever had any love. And we're asking you, the jury, to give that child a second chance at life. We're asking you, the jury, to show that child mercy and give him life.

Thank you.

THE COURT: Thank you, Ms. Mallon.

We will take a ten-minute recess before the rest of the arguments.

You are reminded again not to discuss the case. It's not time yet.

All rise for the jury.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

The Court will recognize Mr. Doug Parks for the defense.

MR. PARKS: May it please the Court.

THE COURT: Yes, sir.

MR. PARKS: Ladies and gentlemen of the

jury, I want to take a few minutes to talk to you about some realities that we are dealing with here in this trial.

Mr. Lollar will finish our arguments and will probably speak to you with more specificity with respect to the actual evidence than I will.

But what I want to remind you of is the reality of what we are doing here today. And the reality is that each one of you gave us your word in voir dire that you could follow the oath that the Judge would give you if you were selected as a juror in this case. And we believed you then; we believe you now.

The reality is that the Judge did give you an oath, and each one of you raised your right hand and said that I will a true verdict render according to the law and the evidence so help me God. We believed you when you took that oath and we believe you now.

Now the reality is that you must sit as judges in this case. We're the advocates. The State advocates for their position; we advocate for our position; and you judge. But that is your oath in reality: To follow the oath that you -- that you gave us when you were selected as jurors.

Now hyperbole is not evidence. It is your job to look at the evidence and make a determination

what the right and true answer to these Special Issues are.

Let me just visit with you a minute about some of the early testimony that you've heard in the punishment phase of this trial for the State, and some of the late evidence that you heard from the State in the punishment phase. And they sort of fit together as -- as a piece that we need to talk about. That's the evidence given to you by Warden Nelson and the evidence given to you yesterday by Dr. Randall Price.

And the upshot of that testimony, and to a very large degree, Ms. Handley's argument here this morning is to try to put you in a place where you substitute your judgment for the judgment of the professionals who work in this area, in this field.

Dr. Price was put on the stand yesterday to go through a list of things that, for the most part, the State has absolutely failed to prove or show that they apply to James Broadnax in any way.

They have failed to show you what real meaning that would have, if they had, and their own professional witness said, I can't make that diagnosis. They're asking you to. They're asking you to suppose what their own witness couldn't say. And they're asking you to give that an effect, which they've never

explained.

They are asking you to return some verdict not based on evidence, not based on knowledge, but based on some -- where you would get it, I don't know -- supposition that that evidence means something.

And I'll tell you, ladies and gentlemen, that tells me a good deal about their case. And it should tell you a good deal about their case when you're reaching for that sort of evidence to finish the case.

And how does that tie in with Melody Nelson? Well, it ties in with Melody Nelson because it is the same argument. Do not take the judgment of the professionals. They're asking you, once again, to substitute your judgment for the professionals who do this work.

And Melody Nelson told us a lot of things. She brought some little weapons that have been gathered up over the years at TDC. She told you that violence occurs from time to time and probably on a daily basis on some degree or another at the penitentiary. That comes as no surprise to anybody.

The penitentiary is full of 150 thousand felons. It comes as no surprise. But she did tell us something that was very, very important. She said that

we can handle it.  We can take care of those prisoners.  We are set up to do that.  We know how and we have the tools.

It goes directly to that first Special Issue.  I asked her the question:  If people are in your penitentiary and they commit criminal acts of violence, and -- such that it would constitute a continuing danger to society, can you handle that?  Yes, we can.  We have the means.  We have the way to do that.  We can do it.  That was the important part.

Now what we have this morning is the State's argument that if you don't give him a dose, what will happen.  They have the burden of proof beyond a reasonable doubt, not just stand up here and try to frighten you into a verdict.  If you don't execute him, who knows what will happen, you know.

The reality is, most of the things that they rely on to suggest the answer -- the answer to that question is yes, it might take place.  The reality is that James Broadnax has an 18-year-old big mouth.  The evidence is clear.  He's a poser.  He brags.  He's fairly typical in that regard, I would suggest to you, to many 18-year olds who like to portray themselves as smart or tough, whatever it is they portray themselves as.

Most of the things that Dr. Price told you about, many of them, at least, could be explained by pure immaturity, if they even apply to him.

You know, he says he's going to assault the maintenance man, but he didn't.

She says that the possession of a razor blade is a precursor to a criminal act of violence. There's no evidence of that. That's just pure supposition. Where did he get it? They gave it to him. Did he assault anybody with it? If he had, I guarantee you we'd have heard about it.

Two facts. Y'all can judge Mr. Utsey for yourself, whether or not he's lying. I-would-never-do-a-thing-to-cause-anybody-to-be-upset-with-me sort of a fellow. Or you can say, Okay. If people attack you, you don't have a right to defend yourself. That was the reality of it.

I don't care how the State wants to spin Mr. Miller. You have a right to determine for yourself whether or not you believe Mr. Miller. Mr. Miller was way in the penitentiary, safely tucked away. He didn't have to take the stand. There is absolutely no evidence of any invisible Gangster Disciple hand coming down on the head of Mr. Miller. That is the absolute fabrication of the State. There is absolutely no

evidence that he is in fear of anybody, and the only suggestion that he wasn't telling you the truth comes from the State, because they don't want you to believe that it happened that way.  But the evidence is pretty clear that it did.  And they say all he's waiting for is an opportunity.

You send him down to that penitentiary. These professionals don't know how to classify it. They only do it for a living and have been doing it for years.  They'll go in as a G-III.  You heard what she said.  We'll take all of that into consideration. That's where it starts.  But if we believe that he is a person who needs to be put in ad seg, we'll put him there.  And ad seg is no picnic.

When the State says, Well, we can't do a thing to him that hasn't already been done, flies right in the face of what their own witness told you.  We will lock him up in a cage and not let him out but one hour a day, and we'll keep him there forever if we need to.  And if he acts up, we'll strip his clothes off, we'll put him in a paper gown, we'll put all of his food in a blender, blend it together and bake it and shove it in to him.

These cases all -- they don't have -- you know, our legislature passes a law that says that

people convicted of capital murder now serve life in the penitentiary without the possibility of parole, and the State wants you to kill him because of it.  Because our legislature passed the law, they ask you to -- stand right here and ask you to kill James Broadnax because of that.  Their argument being, well, now we have no control over him whatsoever.  We have to kill these folks because they have no incentive to do good at the penitentiary.

How bizarre is that?  It's indicative of what you're being asked.  You're being asked to execute James Broadnax because he's got an 18-year-old mouth.  Hadn't got the good sense to keep it shut and doesn't act on anything that he claims to have done.  Sure, he bragged about busting the guy's lip.  Kill him for it.  That's what they're asking you to do.

Got in a fight with Utsey.  Kill him for it.  That's what they're asking you to do.  Because they bring you no evidence that he has ever been in any violent situation prior to this, with the exception of defending himself when his girlfriend attacked him, and he was never charged with that.

He's been convicted of one thing in his life:  Possession.  Misdemeanor possession of a small amount of marijuana.

So they're asking you to kill him on what he says but doesn't do.

Now, I'm not ignoring the fact that James Broadnax committed an awful, awful crime. The families probably wouldn't believe me when I -- if I told them that our hearts go out to both of those families. And I wish there was something we could do to bring those two young men back, but we cannot. But James Broadnax is going to be punished for it. He will live the last day of his life behind those double razor wire fences, being told to go here, told to go there, and better do it. It's no picnic down there.

I suggest to you, ladies and gentlemen, contrary to what the State tells you, James Broadnax is more likely to be a victim in the penitentiary than he is a predator in the penitentiary because just like Ms. Handley told you, it's full of people with all kinds of offenses. Not just the not violent ones, but the violent ones.

She blames us for bringing you evidence of his background. But the reality is, you are called upon to make a decision about that. We would not have been doing our jobs if we had not brought you all the evidence that we felt you were entitled to have in order to make the decisions that you've taken an oath

to make, and now we're blamed for it. We're not trying to shift the blame; we are trying to give you some understanding of how we got to be in this courtroom to begin with.

But you see, James Broadnax is not the only person who's ever committed an awful crime. He won't be the last person who has committed an awful crime. And the State's arguments that you heard this morning can be made, with the changing of a few words, in a capital murder case that's ever tried down here, because the reality is, is that always there are victims. Always, it is tragic. Always, there is sorrow, and always there is responsibility to be assigned. That doesn't change.

What we're here to do today is to determine among other folks who commit this offense, and not just capital murder, but murder, what we called in voir dire the regular murders of the world.

THE COURT: You have used 15 minutes, sir.

MR. PARKS: Thank you.

THE COURT: Yes, sir.

MR. PARKS: Are victims. It doesn't have to be capital murder for there to be sorrow and tragedy. Families torn up. That happens in almost every murder case. Every capital murder case.

Our decision here today is whether or not in this case, James Broadnax is one of those few incorrigibles that the Melody Nelsons of this world cannot control, despite what she says, without further acts of violence.

I'll respectfully suggest to you, ladies and gentlemen, that the State has not proven that beyond a reasonable doubt as is their duty to do.

Now, I may have stepped on Mr. Lollar's toes some in speaking to you about Special Issue Number 1. I hope not. My purpose mostly is to bring us back to the reality of the courtroom, back to the reality of the law, back to the reality of your oaths.

And I'm confident as I was when we started this trial that each of you can return that verdict which the law would require you to do based on your oath and the evidence.

I suggest to you, ladies and gentlemen, that it's a verdict which will spare James Broadnax's life. Not because I say so, but because I believe that in a full consideration of all the evidence and the law, that that's the proper one. Personal moral judgment to be made by each of you, and I ask you to do that. Thank you.

THE COURT: Thank you, Mr. Parks.

I'll recognize Mr. Brad Lollar to close for the defendant.

MR. LOLLAR:  Thank you, Your Honor.  May it please the Court.

THE COURT:  Yes, sir.

MR. LOLLAR:  Co-counsel, and all the members of the prosecution, and ladies and gentlemen of the jury.

First of all, I want to thank each and every one of you.  You didn't have a choice about being called down for -- for jury service.  You didn't have a choice about whether or not you ended up on this jury and, you know, having the responsibility of choosing whether or not another human being dies is perhaps a task that -- that maybe -- maybe none of us should have the -- the right, the responsibility or duty to do.  But you assumed that responsibility.

Which person among you would not have fought to protect the lives of Stephen Swan and Matthew Butler.  Which person among you does not believe that human life is sacred?  James Broadnax and if -- we're going to talk about this quite a bit because this is what the State says about James.  That he's an animal.  That he's a psycho killer.  Pure evil.  That's what they're -- that's what they say.  And yet, I

suggest to you that you have seen that that's not the case.

Certainly, as the evidence clearly shows you, he did a horrendous act.  No question about that.  But, you know, when we talk here in this courtroom, we're talking under the authority of the laws of the State of Texas, and you-all were carefully talked to about the law and about whether or not you could follow the law.

You told us what you would require of the prosecution before you would return a death sentence, after we explained to you that the law does not ask whether a person deserves the death penalty.  Who knows what that means?  We don't know.  And really, the -- the answer to that question is irrelevant.  You said you would not look at that issue; that you would follow the law as it was given to you by the State of Texas.  We are sworn to uphold those laws and you have taken an oath to follow that law.

Now, we told you that the penalty for the commission of capital murder in the State of Texas was life without parole.  That if a person is convicted of the offense of capital murder, they will die in the penitentiary, whether that's a week from now, whether that's 30 years from now, or whether that's 70 years

from now, they will get a death sentence. But it will be a time of God's choosing and not of man's choosing, and that's really the only difference we're talking about here between a life without parole sentence and a death sentence.

You-all told us that you understood Special Issue Number 1 to be a barrier to the imposition of a death sentence. And it's -- it's shorthand to call it a future dangerousness issue. What it asks is, do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

Now, to that -- to that question, you told us, Well, what I'd want to see is his prior history. What prior criminal acts has he committed. What prior acts of violence. So I would know, as a juror, that this act that he's on trial for was not an aberration. You would want to see a history of violence before you could answer that question. That's what you-all told us.

Well, to that end, we have brought you, and we presented James Broadnax's entire criminal history. We have shown you that, yes, at 17 he was arrested for the offense of possession of marijuana.

And that he received a $600 fine to that.

We showed you in response, really, to Mr. Alex's suggestion that he made with one of the witnesses when James was living with that girl there in Hope for three or four months, remember Mr. Alex saying to one of the witnesses, Well, and you remember the police being called out there repeatedly for domestic violence? No. They were called out one time by James. The reportee was James.

Where the evidence shows you that the police, when they got there, made contact with James Broadnax and Casey Norman, Norman told them that her and Broadnax had gotten into an argument, and when Broadnax threatened to leave the residence, the argument turned physical. Norman said she hit Broadnax several times and Broadnax hit her back.

Okay. Well, the police come out. They take them both in. No criminal case was ever filed, and that was the end of that. Now, that is the extent of any allegation of violent behavior on James' part before June the 19th of last year. That's it. That's all.

This is significant also when we get down to talking about Dr. Price's testimony, and Dr. Mirmesdagh's testimony, and Dr. Lane's testimony.

I'll get back to that in a minute.

Now, how about since he's been locked up here in jail?  Well, you know, the State has brought you evidence that he's gotten involved in two fights.  You know, were these serious fights?  Were these fights that caused serious injury?  Were they fights that constituted a threat to that society?

You know, are these the type of activities, you know, getting in a fight on a basketball court, is that what you believe to be the type of criminal act that would constitute a continuing threat to society.  Is that the level of item that you believe the legislature was looking for there in order to separate out from that group of people who have been sentenced to life without parole and given a death sentence?  Really, is that the type of thing they're talking about?

You know, I guess -- what are we supposed to do?  If I had gone to talk to Tre'Vaun Miller and Tre'Vaun Miller says, I started that fight.  He didn't do anything.  I'm the one that started hitting on him.  Am I not supposed to present that?  Am I not supposed to bring that when the State has clearly implied that James was the aggressor?

And, you know, we present for you the very

person who got in the fight and he says -- and you saw his history there.  He was in a single cell because of fighting.  He was in a single cell because of assaulting a guard.  He was there -- he was raising heck, and James told him, basically, to calm down and give it up to God.  And that's not what Tre'Vaun wanted to hear.

So, you know, Tre'Vaun swore to you under oath that he was the one that went up and started the fight with James.  So you know, am I not supposed to -- am I not supposed to put that on when the State has suggested to you that this is a reason why you should impose a death sentence?

Now Matthew Utsey is the other one, and you heard a little bit about Matthew Utsey.  Now, this is the guy that called himself the killing machine; that was there for threatening his girlfriend and her daughter; that had violated the protective order, that got out --

MR. ALEX:  Judge, I'm going to object.  Counsel's going outside the record.  The Court sustained --

MR. LOLLAR:  That's in the record.

MR. ALEX:  The Court sustained the objection to going behind any of those convictions and

going to the facts of those cases, and counsel is now arguing those same facts you sustained.

THE COURT:  The jury will remember the evidence for themselves.

MR. LOLLAR:  He was in there for assault family violence, retaliation, violation of a protective order and injury to a child.

So, you know, and, you know, Utsey denies everything, but I will suggest to you, Utsey was the troublemaker out there, and that he has -- he was the one that was constantly taunting and picking on the people around him who were charged with capital murder. So when they're both being brought back from court, and you heard that Utsey spit on him, and that's when James turns around and hits him one time in the --

MR. ALEX:  Judge, I'll have to object. There's absolutely no evidence -- these questions that are answered in the negative, and counsel is proposing that as evidence.  There's absolutely no evidence that anybody spit on his client.

THE COURT:  The jury will remember the evidence for themselves.

MR. LOLLAR:  Now, that's it in terms of acts of violence that James has committed in jail.

Now, as Mr. Parks has pointed out to

you, -- and, you know, with James, the question you ought to ask yourselves, is how much is real and how much is just talk. How much is talk and how much is real. And when James tells something on the phone, you know, does he follow through with that? Is it a -- is it a true reflection or reality? And you've heard that -- him tell his cousin on the phone, Well, boy, when that lawyer came up to see me, I let him have it. I cussed him out, chewed him out and called him names. Un-uh. That didn't happen.

When he tells his mother on the phone, you know, yes, I got into a fight with this Tre'Vaun Miller and he had been disrespecting me. Well, now, you've heard the truth about that. Tre'Vaun told you the truth about that.

So when -- as Mr. Parks points out to you, the State tries to present evidence to you that he is a constant threat, that he's a continuing threat to that society, the evidence just doesn't bear that out. Now, it's true they found that little part of a razor blade there in his cell. Well, did he do anything with it? Had he cut anybody with it? Had he threatened anybody with it? A fellow inmate? You know, he's brought out one hour a day to go to that basketball court.

A jail guard, anything like that? No, he

hasn't.  He says, Oh, boy, I'm going to -- and that was back in January.  He says, I'm going to get that maintenance man.  I'm going to get him.  He disconnected my phone cord.  But he didn't.

You know, there's all these things that the State points to and saying, Well, this is evidence that he's violent.  Well, no.  He -- he -- he didn't act on those.

Now, the requirement that the law places on a jury to do in answering Special Issue Number 1 is hold the State to their burden of proof as to whether or not he is the type of person that will commit criminal acts of violence that would constitute a continuing threat to society.

And I suggest to you that the answer to that question is no, they have not proven that beyond a reasonable doubt that he's that type of a person.  And that's the guideline, the legislature has told us, between those who get death and those who get life without parole.  And I think you'll agree with that.

And when you do cease your deliberations, come back and tell us that's what the law says; that's what the Judge of the Court -- the Charge says.  That's it.

But I need to go ahead and talk to you

about Special Issue Number 3 as well.  Special Issue Number 3.

THE COURT:  Well, it's actually Special Issue Number 2 in this case.

MR. LOLLAR:  That's true.  In our Court's Charge, it's Special Issue Number 2, because we don't have Special Issue Number 2 submitted, so this becomes the second Special Issue that you must consider.

And remember, we told you in voir dire, if you get to Special Issue Number 3, we're talking about a capital murderer who you believe is a future danger.  And yet, the law allows, based on this issue, sparing the life of the person you convicted and believe is going to be a future danger.  It says to take into consideration certainly the circumstances of the offense, but also the defendant's character and background, and the defendant's personal moral culpability for what he has done.

Now, what does that mean?  If we look at the life of James Broadnax, we are talking about mitigation in spades because this clearly shows you that he did not have what everybody talks about as free will throughout his life.  He didn't have these choices.  Certainly, he did not choose to be born into a situation where he is, from his birth, castigated

because he's half white. That was not his choice, okay? He was not -- he didn't have the choice about whether he was born. And the man's name on his birth certificate is not his father.

He didn't have that choice to be born into a situation where the man's name who's on his birth certificate soon abandons the family and tries to run them off the road.

He didn't have the choice of being born to Audrey. Now, I told you that to understand James' life, you had to understand Audrey's life, okay? And he loves his mother and his mother loves him. I believe that to be true. But you have to understand the chaos that Audrey lived, and the chaos that James lived being brought up in that family. The constant moving. 18 times by the time he's 17-years old.

By the time of -- by the -- by her testimony, if you count all the different places they go, yanked around here, moved here and she moved there, and, you know, it was certainly disrupting any ability that he had to form a bond of any type with teachers, boy scout leaders, church leaders, anybody. You know, what does that do to a child in and of itself?

She would pull him out, regardless of what time of the school year it was, and yank him off to

some other school district, some other town, some other state. And it wasn't just her doing that by -- by herself now. See, she'd go from one bad guy to another bad guy, to another bad guy, to another bad guy, and what -- what is pretty consistent about the guys she was with? That they would beat her. And he would see that. You grow up with that.

You know, and then we hear that she was abusing drugs herself. We hear that from her sister. We hear that from Fanny Mazone. We hear, by her own admission, that she drank to excess. We hear, from her own admission, that she broke her daughter's arm when the little girl was six by grabbing her and whopping her. Niki told you she grabbed her by her throat and threw her up against the wall. Broke her arm.

We told you, or she told you that this abuse was ongoing in their lives, not only by the boyfriends or the husbands that Audrey would choose to have at the time, but also from Audrey herself.

You've heard from Darryl Maxwell, the good man, the Pentecostal minister, that had him in his life for two or three years when James was five to seven. And you've heard his description of life with Audrey. Violent rages, yelling, cussing, put scars on him he bears to this day. And how a child growing up in that

environment sees all of this. It's just incredible to me.

And then we hear -- we haven't even got to Big Mamma yet. Talk about Big Mamma. Now, Big Mamma, you know, is where James gets dropped off with when Audrey is off with one of these men and is not taking care of him. And Lord, we've heard about Big Mamma.

Now, I cannot -- I cannot put myself in that type of a situation where I am half white and being forced to live in a household of a woman that calls me to my name [sic], dirty white boy; that calls me to my name, half-breed; that calls me and tells me, You should never have been born. You are a disgrace to your mother.

What does that do to the psyche of a child, or a teenager, or a young man growing up? What does that do to them? It's not just the physical abuse she gave to him where she slaps him, locks him out of the house, won't let him get food, won't let him get water, but it's the -- it's the psychological impact, the absolute torture that he was put through.

Now, he does the best he can. As you know, he tried to get work. Found that hard to do because of the situation of his birth. Couldn't get a certified birth certificate. Without that, you can't

get a state ID, and tell me what employer is going to hire you if you don't have a state ID.

Yet, we know he had dreams. He always has drawn. And we sat there for four months now watching him doodle, and I can tell you that he's got that artistic ability. You've seen it displayed.

And what he wanted to be was an architect. He wanted to be an architect. Well, that dream was beaten out of him. He didn't have the opportunity to get that dream accomplished.

And then he gets down here and he gets with Demarius, and that's not a good situation. And then we end up in Garland on June the 19th.

Now, I want you to consider also that he did what he did under the influence of PCP. And why is that significant? Because you've heard from the experts, you've heard from Dr. Roache, the chief of addiction studies at UT Health Science Center in San Antonio. You've heard from him. He tells you that PCP makes you violent.

MR. ALEX: Judge, I'm sorry. I'll have to object to that. That's a direct contradiction of what Mr. Roache said, that -- that PCP does not make you violent. That's his exact testimony.

THE COURT: The testimony was that

sometimes it does and sometimes it doesn't, and the jury will remember that.

MR. LOLLAR: He testified that PCP can make you violent, okay? Well, why is that significant? Okay. If we're talking about a person that has a history of violence, then the PCP isn't of relevance. But if we're talking about a person that every one of these people who we brought in told you was not violent, did not have a history of violence, was not getting into violent acts by the time that he was born up until the time right before the mom left out on June the 16th. Right before Audrey left out. He didn't have a history of violence. So it is significant, I would suggest to you.

I would suggest to you that evidence is present before you, not only what he told the people at the jail when he first got here, but also by Dr. Lane's testimony, he tells you that he was suffering, later, as he explained how that can happen, from substance abuse induced psychosis, which he treated over the course of -- of this last year.

Now, the law says -- and you remember the Judge telling you in the first part of this trial that voluntary intoxication is not a defense to a crime. We don't excuse a crime because a person chooses to ingest

a substance which made them intoxicated, either alcohol or drugs.

But what we also told you was that evidence of voluntary intoxication or intoxication by any means -- by any means, can be a mitigating factor in punishment. So we have that situation. We've got a person who everybody says is not violent, that becomes violent. And I ask you to take that into consideration.

THE COURT: You've got about five minutes remaining, Mr. Lollar.

MR. LOLLAR: Special Issue Number 3, again, requires you look at all of these factors that you've heard. And I would ask you to consider the youth of the defendant, 19 at the time of the commission of the offense.

And why is that important? We brought you Dr. Silver to testify about that. A 19-year old is not mature. They haven't finished brain development. So I ask you to consider that.

I ask you to consider everything you've heard about his prior history, his prior life.

You know, when we brought you Fanny Mazone by way of the -- the video here, and we brought you Darryl Maxwell, and both of those people told you, I

wanted to take James in. They wanted to, and Audrey wouldn't let them. And I ask you, now, both of those were stable situations, stable lives that he could have been left in, and would not things have been different had he been allowed to go? They reached out, and he was cut off from enjoying that bit of stability that could have led to a productive life.

You know, one of the best witnesses for us was Warden Nelson, presented by the State, and she is a professional and she's representative of the professional people we higher to run the prison system. And that's right. There's 150 thousand felons down there. And sure, they have trouble with some of them from time to time. You can't tell me that you didn't get a sense from Major Nelson that she -- that she and they know how to control that down there. They know how to take care of that situation.

And she tells you about the various carrots and sticks they have and the -- the different levels of imprisonment that they have. If a person going in who's a -- who's a gang member is going to go in as a G-4. Could never get lower than a G-3.

Now, I want to spend a minute here because this is what the State's going to do, okay? Mr. Alex is going to get up here in a minute, and despite the

fact that we have heard three witnesses to this proposition, whether or not the defendant's antisocial, has antisocial personality disorder, -- first of all, you remember Dr. Mirmesdagh, who said being that and being a psychopath are two different things, okay?

A psychopath is like an antisocial personality disorder a hundred times over, okay?

She said she could not make a diagnosis of him based upon the requirements of the American Psychiatric Association. And I read her this definition. What is antisocial personality disorder? A pervasive pattern and disregard for, and violation of the rights of others that begins in childhood or early adolescence and continues into adulthood. The individual must be 18 or over, as well as have a documented history of a conduct disorder before the age of 15.

All right. That's why she could not and would not say that James is antisocial. That is exactly why Dr. Lane explained to you, I can't say that. He doesn't have that history. And even their own doctor, Dr. Price, you know, in going through his checklist, which is not the American Psychiatric Association checklist, by the way, he told you that. This is one he made up, okay? He said, Yes, if these

traits are serious and persistent, then the person can be diagnosed. But despite that, despite their own expert saying he doesn't meet the criteria for that, there is no evidence of persistent disregard for the rights of others, starting as a child. Starting in childhood. There is no evidence of disorder prior to the age of 15. Period. He doesn't meet the criteria.

But despite all of that, what Mr. Alex is going to do now, is take this kind of Ann Landers' test that Dr. Price came up with, and have you go through it and say, Aha. There is an instance where he committed a criminal act. There is an instance where he was friendly to somebody, and that means he's glib, okay?

So Mr. Alex here is fixing to get in front of you and become Dr. Alex, and he's going to ask you to become Dr. Jurors and go where the psychiatrists and the trained psychologists refused to go, and he's going to ask you, based on his determination here, that the defendant is a psychopath; to kill him.

You know, that's what this trial boils down to. They're going to say that James is a psychopathic killer and he's pure evil. And the evidence doesn't support that.

He did a purely awful, terrible act, but he is not the psycho killer that the State makes him

out to be.  This was out of character for him.  He did it under the influence of PCP.  He was 19 at the time.  And has no significant prior criminal history.

This is not a person that the death penalty was made for.  The punishment for this person is to die in the penitentiary at whatever time God calls him, but he's not the type of person that meets the criteria under the law that you swore to uphold.

I want to thank y'all very much.

THE COURT:  Thank you, Mr. Lollar.

The Court will recognize Mr. David Alex to close for the State of Texas.

MR. ALEX:  Judge, I'm going to need a second just to set up a couple of items.

THE COURT:  Take -- take your time.

Can you see that, Mr. McCreary?

JUROR McCREARY:  Yes, sir.

THE COURT:  Okay.

MR. ALEX:  May it please the Court, Counsel.  Ladies and gentlemen of the jury.

A person who preys upon others ruthlessly, by charm, by deceit, and by violence, with total disregard for human life.  One percent of the population.  And that one percent of the population is represented by the man sitting right here, James

Broadnax.

And I understand why counsel is afraid of that label, psychopath, because it has some very serious meanings.

And his argument to you-all is, I guess, that before the science was developed to determine who was a psychopath, that there were no psychopaths, because there was no science to tell you there was.

I guess before they developed a test to tell you that somebody was drunk, you couldn't tell they were drunk. It's ridiculous.

A person who preys ruthlessly on another by charm, by deceit, and with violence to take the other person's things without any regard for human life is who the defendant is. And you can call it whatever you want. You can call it a psychopath. You can call it a sociopath. You can call it whatever you want. But you-all know that's who he is.

And I'll tell you, Dr. Price didn't make this checklist up. And, you know, here -- let's talk -- let's talk about that just a minute. He gave you a -- a list of characteristics. He told you that there was a -- an instrument that they use in psychology, checklist for violence that he would use if he sat down with somebody and tried to determine

whether they were a psychopath, and that these are all the characteristics that are there, okay?

He told you he never sat down with the defendant. He was not able to do that, okay?

Now, think about this. Counsel for the defense told you that we're asking you to substitute a professional judgment that he's not willing to make. He's not willing to go beyond his ethics and sit here and say this man's a psychopath because he's never talked to him.

You guys have seen this trial. You guys have seen all the evidence, and you can decide for yourself. And I don't know why they're objecting to that. What did Dr. Silver do? The very first expert they put on the stand. She talked to you in some abstract theory of the imaging of a juvenile's brain, of knowing every image displayed, and, no, I never sat down and talked to him, and no, I can't tell you anything about him, but I'm just educating you guys. What for? Well, I don't know. I don't -- I don't know how the defense is going to use that.

Now, why would they object to Dr. Price educating you on a psychopath when they're doing the same thing? Because they are deathly afraid of that term. They're deathly afraid of those characteristics,

because those characteristics describe everything about this case. They answer every question you may have in your mind about this case.

And understanding that is very important. It's very important, folks, because think about this. I'll tell you what. Let's -- let's look at one of the video clips, and as we look at the video clips, I'm going to leave this checklist here in front of you, and I want you to see for yourself whether or not the defendant has the characteristics.

(Video clip played.)

MR. ALEX: Pause it for me.

Folks, who's in control of this? Here's an inmate behind bars, and who is commanding who to do what needs to be done? Who's in charge here? Look at your checklist.

(Video clip played.)

MR. ALEX: He's able to manipulate the guards to open the chute.

(Video clip played.)

MR. ALEX: Folks, that's a display, and we could go through every one of these qualities, but I think -- I'm not even going to spend much time with this because you could look at that video alone and not even look at the volumes of other evidence you got to

show you that the man sitting over there is part of that one percent of the folks that live amongst us who, with their charm and their wit, they see coming. That's the very first checkmark. Charm and wit.

You know, you -- you could look at that tape and you could say, My God, so cold, so calculated. Such total disregard for human life. There must be something wrong with him. He must be on something. Oh, you could say that. But the fact of the matter is, there is something wrong with him, and he's a psychopath and that's not going to ever change.

And when you look at stuff like his Federline rap, where he's saying, well, he's looking at her in her eye and he's trying to -- he's trying to charm her, folks. When he walks in, he says, Oh, she looks good. And then he looks her in her eye, and he's trying to be -- he's trying to charm her with the rap about Britney Spears. And you may look at that and you may go, oh, this guy's crazy. Where'd that come from?

Here's where it came from, right here, folks. That's where it comes from. That's how he gets his victims off guard. His charm. Grandiose sense of self-worth. Well, the whole page is full of it. And you may go back and you may -- when you first look at this tape, you may say, Hey, there's something terribly

wrong here. Terribly wrong. That guy got something -- he must be on something.

Well, he's been in jail for two days. He ain't on nothing. And if you have any questions about that, you know seven months later he's still talking about the same thing. Seven months later. After he's been in jail in January.

But this grandiose sense of self-worth? The whole deal. He wants the whole world to know what he's done and what he's proud of. Need for stimulation. Prone to boredom. Well, counsel told you that he's always doing. Counsel told you that he cannot sit still. His own counsel told you that.

He can't imagine working the same job for any length of time. And I don't want you to think, well, he didn't work because he didn't have a birth certificate. Well, you saw the birth certificate, folks. It might have been a little tattered, but I guarantee you if he wanted to go out and cut somebody's yard, -- pathological liar. It doesn't take a whole lot for us to even go through the pathological liar. I mean, it's throughout. Throughout this whole case.

The conning and the manipulative. You know, these two things kind of go together, and I'm going to go outside the tape for a little bit, because

I want y'all to think about that one phone call you heard where he was bragging to his mom about how he could manipulate the guards, how to get out of his cell and walk around so he could go to the nurse's station and see what's going on.

Lack of remorse or guilt. You know, I don't think that there's -- that you could have ever seen more lack of remorse or guilt than you did in that video you just saw. And if you start to think, you know what? There's something wrong with this guy. You know what it is? It is exactly this word right here, the word that counsel is so afraid of, the -- the one that he says, well, y'all can't make that determination.

Well, if y'all had -- could tell whether he was drunk or not when he was up on that video, y'all could do that. Y'all wouldn't need some expert to sit here and tell you he was drunk.

Hey, look. The shallow affect. Cold and unemotional. I mean, we could go through all of these. The callous, lack of empathy, the parasitic lifestyle.

He lives off of everybody. He doesn't work. His mom supports him, his sister supports him. The poor behavioral control. Short-tempered, hot-headed.

You know, what's interesting is, he told you that they didn't plan to really go and kill nobody. You know what happened? He and Demarius planned to go hit a lick. He had the gun and he decided at that moment he was fixing to kill these guys for no other reason but because he wanted to do it.

And -- and -- and the whole deal about the maintenance man, you know what? The behavioral control, the short-tempered, easily and aggressively over trivial -- how trivial it was -- that the maintenance man just so happened to roll over his phone cord, and what's he saying to mamma? I'm going to snatch him up next time he comes by.

Now, promiscuous sexual behavior. Well, you know, he refers to every woman you've ever heard him talk about on any of those videos or any of his writings as B-I-T-C-H.

Impersonal, casual and trivial. Those behavioral problems -- now, here's an interesting one. He says to you and the whole world he's been to juvie for six months. Now, we didn't bring you any records of that. Counsel is totally right. But you did hear that they -- they destroyed and purged those records after awhile.

MR. PARKS: You know, Judge, he is

suggesting something that's totally outside of the record. He knows that very well --

MR. ALEX: Judge, I would like there to be an objection and not a speaking objection.

THE COURT: The jury will remember the evidence for themselves and take the law from me.

Go ahead, Mr. Alex.

MR. ALEX: He told you he went to juvie. Now, whether it is because of earlier behavioral problems or because of this grandiose sense of self-worth, I can't tell you, but why wouldn't you believe? He's the one that told it to you.

I guess you cannot believe him because he's got this grandiose sense of self-worth and maybe by telling the world he's been to juvie, that somehow makes him a bigger man.

Lack of realistic long-term goals. Well, he wants to make it Easy Street interesting and get rich quick schemes. You can look through his plans there in his notebook and you will see the get rich quick schemes that he's for himself.

Impulsivity. Irresponsibility. Failure to accept responsibility. Short-term marital relationships. Well, he's never been married, but they do talk about live-in relationships.

Juvenile delinquency.  At 17 is when he got his possession charge.  Revocation, conditional release.  Well, we don't -- he's never been on probation and he's only got the one charge there, and that's the -- the possession of controlled substance.

But what did he tell you, at least in one of the videos, and even in this video?  I shot him.  Boy, I ain't got no problems at gun play.

Folks, they're deathly afraid of this checklist.  You know why?  Because you don't have to be a clinical psychologist to tell a psychopath.  You know how you can tell it?  Did you see the look in Ellen Goldberg's face?  Did you see the look in her face?  She knew it.  She knew she was looking at somebody who would just as soon shoot you, kill you, and go get a burger and not think about it again for the rest of his life.  She knew it.  And y'all know it too.

A person like Mr. Broadnax, folks, he's the kind of person -- I'll tell you.  My son and I, we like to watch Animal Planet, and we like to watch the animals, you know, and -- and -- and it's just something we like to do.  And one of the things that -- that you'll see is that when a predator whose normal prey is not a human being preys on a human being, the villagers, they go out and they find them and they kill

them, because they know that once he's tasted the human blood, he ain't going to be able to stop.

That predator -- it's not normal for him to go out and kill humans. That's what he's going to do now. And, folks, James Broadnax is a predator. James Broadnax is the worst kind of predator. And he's not going to stop. There is no stopping. You heard what Dr. Price said, that once a psychopath, always a psychopath. There's no cure for it. There's no pill you can give them. There's no counseling you can give them.

And I know that y'all are sitting there thinking, my God, this is a 20-year old man. Can't he be rehabilitated? Can't we save him? When he's 40, when he's 50, when he's 60, how do we know he's still going to be a continuing threat? That's why counsel is so afraid of this word, because when Dr. Price told you it can't be cured, did you hear one question, one question on cross-examination about it? Well, Dr. Price, you know that's not true. A psychopath can be cured.

No. It was the studies. It was the fact. And that's the fact, folks. He will never change. He will always be a cold-blooded person with no remorse. And if you want -- and you may say, okay. Well,

Mr. Alex, what does that have to do with anything? What does that have to do with any of the Special Issues that we have to decide here? Well, think about this. We do have to prove that it has to be a continuing threat to society, and I think that it's crystal clear to you that he has -- it's not a probability, but he has shown you that he will commit criminal acts of violence, and all this business about Utsey and -- and Mr. Miller, and all that and not being criminal acts of violence, folks, let's face it. The man is on trial for his life. On trial for his life.

And he's in a single cell, locked up in what Warden Nelson told you would be the equivalent of ad seg, and he's still finding ways to assault people. If that's not a criminal act of violence that shows his propensity, I don't know what is at a time when he has everything to lose.

And counsel's just, Well, the State wants you to kill him because the legislature passed a law saying that there's life without parole. Well, you know what? Sometimes we pass laws and there's unintended effects. And that's exactly one of the unattended effects is, you know what? Inmates that are in prison, they have an incentive to behave. You know why? Because they could get good time and they could

get out.  The inmate who has no possibility of having good time and getting out, there is absolutely no incentive for them to behave at all.

Now, contrast that to what he's done while he's been in the county jail.  It's not a probability.  It's certainty.  And because he's a psychopath and because he'll never change, it is a continuing threat to society that will not ever change.

Now, folks, I'm going to talk to you briefly about Special Issue Number 2.  I know that my time is going to run short.

Judge, how much time do I have?

THE COURT:  You've used 30 minutes, but she didn't use 30, so go ahead.

MR. ALEX:  Okay.  I'm going to talk to you a little bit about Special Issue Number 2, because you know what?  I think -- I think that y'all want to just find Audrey Kelly or Big Mamma guilty of this capital murder, because that's what we heard for the last two days, is that these people are responsible for this carnage.  Big Mamma and Audrey Kelly must have been the ones responsible for this carnage.  That's what -- I guess that's what the defense is putting on to you-all.  That they're responsible for his actions, or they're responsible for what he did to -- you know, it's

ridiculous, folks.

How many people do you know -- how many people are in this community that comes from bad homes? It's ridiculous to say that when you consider the circumstances of this offense, -- and you know what happens when we talk about the circumstances of the offense in this sterile environment that we're in, when everybody's dressed up and talking nice? We forget about the carnage.

And I'm not embarrassed to show you those photographs. That's what he did. Those are the circumstances of this offense. That's what he did. He's the one who pumped those bullets into those young men until they could no longer move. And when you think about the circumstances of this offense and you compare that with poor James, it's ridiculous. Poor James. He was abused.

Well, you know what, folks? Perhaps Audrey Kelly should have been the one who committed this crime. She was the one that was abused. She was the one that they was beating. She was the one that was the alcoholic. She was the one who was the battered wife. She didn't go out and kill folks. You know what she did? She went out and worked. She pulled the guts out of chickens so she could put money

on his books.  But poor James.  He's the victim here. Poor James.  He's the victim.

Folks, when it comes to mitigation, I want you guys to think about -- I want you to think about it real hard -- the circumstances of the offense.  And when you think about the defendant's character and his background and the moral blameworthiness, remember who he is.  He's a Gangster Disciple.

He told you what he was going to do in his writings before he even did it.  He talked about the murder and the robbery of people.  And you know what? Maybe if he never got out and did it, maybe he'd just be another gangster rapper.  But then he went out and did it.  Counsel says we want you to kill him because of what he says he's going to do, but you've got evidence right here that told you what he was going to do, and then he went out and did it.

That's what you need to consider, folks. And then after he does it and he's in jail, he's free-styling now.  Hold up.  Stop and rewind.  A little story while I'm in this bitch.  Yeah, I hit the lick. I got two murder charges on me.  I might just go to the Judge and tell him I'm going to merck him, because I'm J.B.

This is after he's in jail in his cell.

If that's not a sign of a psychopathic killer, I don't know what it is, folks.

And when you think about his character, who he is, and his moral blameworthiness in this case and everything you heard, if you go back there and you say, Poor James. We need to spare his life, then we just -- you know what? We just wasted everybody's time.

Because counsel told you that your oath was to follow the law and the facts. You decide what the facts are and you decide whether there is mitigating circumstances sufficient, after looking at the character of the defendant, his background, and the circumstances of the offense, and I would say to you, Poor James doesn't get it, because if poor James gets it, then we should see two bodies laying on the ground every day of -- of the week, because you know that poor James is out there everywhere.

Everybody has a sad story. That's life, folks. The only thing that explains why we're here today is that James Broadnax is a psychopathic killer, and y'all know it. And he will kill again. And if you don't stop him, then you think about what you're going to have to live with because you didn't follow your oath. When he lives up to his promise and he goes to

prison and he kills again, you think about that. Because you should follow your oath and you should take your oath seriously and you should do exactly what the law tells you to do.

There's no reason not to believe him, folks. He told you he killed them. And the only answer to the Special Issues is yes, he is a future danger; and no, there is no sufficient circumstance in looking at the facts of this case, the circumstances, his character and background, sufficient enough to say life versus death. Thank you.

THE COURT: Thank you Mr. Alex.

In just a moment, you will retire to consider your verdict in this case.

Mr. Patterson, you will continue to be the foreman of the jury.

Mr. Fittick and Mr. McCreary, you will remain behind.

The rules are the same. No deliberation unless you're all assembled together back in my jury deliberation room. I wish you good luck in reaching your verdict in this case.

All rise for the jury.

(Jury retired to deliberate.)

(Jury not present.)

THE COURT: Be seated, please.

Mr. McCreary and Mr. Fittick, if you have items that still remain in the jury room, if you'll let Mr. McGaughey know what those are, he will get those for you. You are not allowed to go back into the jury room anymore.

I want to thank you for your service in this case. I know it's hard to have to sit here for almost ten days now and then not be able to participate in the deliberation process, but I hope you understand, if one of the other jurors had not been able to continue and I did not have alternate jurors in the case, we would have a mistrial, so we don't want to have that.

I do want to thank you for your service in this case. You're now free from all of your obligations in the case. That means you can talk about the case to anybody in the world if you want to, or no one. That is your right.

Thank you again for your service. If you'll let Mr. McGaughey know what you have, we'll take care of that.

And we're in recess pending the jury's verdict.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT:  All right.  This is the State of Texas versus James Broadnax.  The jury's not here. The jury is deliberating.

I have received the following note, which is nothing auspicious, so the parties can alleviate their concerns about that.

However, because of the complex nature of the evidence in the case, I did feel it was necessary to discuss it with the lawyers.  This is a note from the jury foreman, Mr. Patterson.  It reads as follows.

I'm going to quote first, and then we'll go into the substance of it.

(As read:)  Need:  School records; journals from car and jail; trancript [sic], spelled T-R-A-N-C-R-I-P-T, which obviously is a transcript of a 4:30 phone call on August the 12th, which would be the phone call that the defendant made after the verdict was returned; video of Channel 5 interview; photos from crime -- crime scene [sic], spelled S-E-E-N.  It should be S-C-E-N-E -- shown today by prosecution.

So I intend to give them all that, but as far as the school records, if the parties will look at that, I think it's like 184 or something along those lines.  I'll have it in a second.

MR. ALEX:  It's about four exhibits, Judge.  I believe.

THE COURT:  I have it, I believe.  No, I don't.

MR. ALEX:  They're all in one folder.

THE COURT:  Yeah, I know.

Anybody have the numbers on that?

Off the record.

(Off-the-record discussion was had.)

THE COURT:  Yeah, I have it.  It's 489 through 492.

Any objection to me giving that to them from you, Mr. Lollar?

MR. LOLLAR:  No, sir.

THE COURT:  All right.  That will go to them.

Journals from car and jail.  Well, from the car, that's going to be 131 --

MR. ALEX:  I and J?

THE COURT:  Yeah.  Now, were there separate ones from the jail?

MR. LOLLAR:  No.

MR. ALEX:  Just the writings from -- just his writings from jail.

THE COURT:  Well, I'll be honest with you,

I don't think that journals equal letters, so I don't intend to give them that, unless you insist on it, Mr. Lollar.

MR. LOLLAR: Well, no, sir. I'm trying to recall what letters. There was a letter to the defendant.

There's a letter to the defendant that they seized from jail, but that's not what they're asking for.

THE COURT: No. They're asking for some things that are very, frankly, aggravating towards your client, so I wouldn't think you'd want them to have it. They haven't specifically asked for it.

MR. LOLLAR: No. I don't want them to.

THE COURT: Okay. All right. So it's those -- that red notebook and that black notebook. Those go back.

And then the transcript of the 4:30 phone call on August 12th, I know we have that. I just don't know the number.

MR. LOLLAR: There was not a transcript. That was the one they didn't have time to do the demonstrative tape on.

MR. ALEX: There's no transcript of any of the jail call, Judge. There's just the jail call.

They're probably thinking about when we entered the demonstrative stuff, but even if they asked for that, they wouldn't get those either.  They would get the regular call.

THE COURT:  All right.  Okay.  So I'm not going to give them that.

I do intend, though, because I'm always in favor of candor with a jury, to say there is no journal from the jail and to say that there is no transcript of a 4:30 phone call on August the 12th, unless the defense objects to that.

MR. LOLLAR:  No, I don't think we would object to that.

THE COURT:  It's neutral.  I mean, I'm just telling them so they won't sit back there wondering about it.

MR. LOLLAR:  Yes.

THE COURT:  Okay.  Now, photos from the crime scene shown today by the prosecution.  And I -- I didn't -- yeah, I wasn't down there, so I don't know what you showed them.

MR. ALEX:  Well, it's going to be these four right here.

THE COURT:  Okay.  Is there any objection to them seeing that?  They've asked for it.

MR. LOLLAR: No, sir.

THE COURT: All right. So they get it. And what are those numbers, for the record?

MR. ALEX: 30, 31, 45 and 46.

THE COURT: All right. So they'll have that.

Now, as to -- and I'm going to have to have Mr. McGaughey weigh in on this -- video of the Channel 5 interview, do they have a way -- Mr. McGaughey, I need you, sir.

Do they have a way of playing that back there or are we going to have to bring them back out here --

THE BAILIFF: There's going to be a laptop back there plugged .into that --

THE COURT: So we can have them listen to that.

MR. LOLLAR: Yeah.

THE BAILIFF: Yes, sir.

THE COURT: All right.

MR. LOLLAR: I mean, they could play it on this one right here, except it's got all that other stuff on there.

THE COURT: Well, I just want them to be able to do it back there, so Mr. McGaughey will fix

that.  He knows how to do it.

Okay.  So we're going to give them that video and take care of it as soon as Mr. McGaughey can do that.

I'm going to answer that there is no transcript of the 4:30 phone call.

I'm going to answer that there is no journal from the jail.

And otherwise, I'm going to provide them with the exhibits.

Any objection from the State?

MR. ALEX:  I have no objections.  I just -- the only request that I have would be why not just give them all the evidence?

THE COURT:  Because they haven't asked for it.

Any objection from the defense?

MR. LOLLAR:  No, Your Honor.

THE COURT:  We're in recess.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT:  On the record on State of Texas versus James Broadnax.

The State of Texas has brought to my attention that they believe that there is a page that

was inadvertently omitted from the notebook that was taken from the victim's car being driven by the defendant, and the State of Texas has asked that I include that in response to my following -- I mean, to my previous -- to the note the jury previously sent to me.

You want to see that?

MR. LOLLAR:  Yes, sir.

Where was this, David?

MR. ALEX:  That was in the notebook.

MR. LOLLAR:  In the notebook?

MR. ALEX:  It was in the notebook.  That's why I had the notebook initially in a Zip-Lock bag, so that it would stay with the notebook.

THE COURT:  Is there any objection?

MR. LOLLAR:  No, Your Honor.

The COURT:  It will be included.

(Recess taken.)

(Court reconvened; Jury not present.) .

THE COURT:  This is the State of Texas versus James Broadnax.  The jury is deliberating.  It is 3:40 p.m. on Wednesday, August -- excuse me -- August 20th.

The jury has advised the Court that they will not have a verdict today.  They're going to

deliberate until 5:00 p.m., at which time they will be sequestered and they will continue their deliberations tomorrow at 8:45. It goes without saying, they will not be deliberating while they're sequestered.

That's my intention. Does the State have any objection to that practice?

MR. ALEX: No, sir.

THE COURT: The defense?

MR. LOLLAR: No, Your Honor.

THE COURT: And that's what we will do.

I'll need the lawyers to stay here until 5:00 o'clock in case there are questions, but those of you who are waiting for a verdict, there will be no verdict today.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT: On the record. This is the State of Texas versus James Broadnax.

The jury is deliberating and has asked for the photograph entitled Free-Styling found in the jail. If I could have that, please, what you believe to be that, Ms. Handley?

MR. PARKS: This is the photo of the free-styling that Mr. Alex was reading during his closing. It's State's 474.

THE COURT:  And it says Free-Styling at the top.  It clearly seems to be in response to this question.

Any objection from the State?

MR. ALEX:  No objection.

THE COURT:  Any objection from the defense?

MR. LOLLAR:  No, Your Honor.

THE COURT:  State's Exhibit 474 will be provided to the jury.

(Court adjourned.)

THE STATE OF TEXAS )

COUNTY OF DALLAS    )


        I, SHARON HAZLEWOOD, Official Court Reporter in and for Criminal District Court No. 7 of Dallas County, State of Texas, do HEREBY CERTIFY that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

        I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

        Witness my hand this the _____ day of

_____, 2010.




        _____
        SHARON HAZLEWOOD, CSR
        Certified Shorthand Reporter
        Official Court Reporter
        Criminal District Court No. 7
        972-739-3906
        Texas CSR No. 628
        Expiration Date:  12/31/10