*AP-76207* 1

REPORTER'S RECORD
TRIAL COURT CAUSE NO. F08-24667-Y
VOLUME 26 of ___VOLUMES_____

THE STATE OF TEXAS            |    IN THE CRIMINAL DISTRICT

VS.                          |    COURT NUMBER 7

JAMES GARFIELD BROADNAX       |    DALLAS COUNTY, TEXAS

_____

**FILED IN**
**COURT OF CRIMINAL APPEALS**

**SEP 1 6 2010**

INDIVIDUAL VOIR DIRE EXAMINATION

**Louise Pearson, Clerk**

_____

**FILED IN**
**COURT OF CRIMINAL APPEALS**

**SEP 1 6 2010**

**Louise Pearson, Clerk**

On the 23rd of June, 2009, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said court, held in Dallas, Dallas County, Texas:

Proceedings reported by oral stenography.

ORIGINAL

Debi C. Harris, CSR
(214) 653-3416

```
                    A P P E A R A N C E S


        THE HONORABLE CRAIG WATKINS
        Criminal District Attorney
        Dallas County, Texas
        Frank Crowley Courts Building, 10th Floor
        133 N. Industrial Boulevard, LB 19
        Dallas, Texas  75207-4313
        Telephone: 214-653-3600

   BY:  MR. DAVID ALEX, SBOT No. 24003256
        MS. ANDREA HANDLEY, SBOT No. 08898800
        MS. ELAINE EVANS, SBOT No. 24032880
        MR. GORDON HIKEL, SBOT No. 00787696
        Assistant District Attorneys

        Also present: Ms. Zandra Robinson


                APPEARING FOR THE STATE OF TEXAS


        MR. BRADLEY LOLLAR, SBOT NO. 12508700
        Attorney at law
        1700 Commerce, Suite 450
        Dallas, Texas  75201
        Telephone No. 214-384-8178

        MR. DOUGLAS PARKS, SBOT No. 15520000
        Attorney at Law
        321 Calm Waters Lane
        Holly Lake Ranch, Texas  75765
        Telephone No. 903-769-3120

        DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
        133 N. Industrial Boulevard, LB 2
        Dallas, Texas  75207-4399
        Telephone No. 214-653-3550

   BY;  MS. KERI MALLON, SBOT No. 24049165
        Assistant Public Defender

                APPEARING FOR THE DEFENDANT
```

CHRONOLOGICAL INDEX - VOLUME 26

|  |  |  |  | PAGE |
|---|---|---|---|---|
| Proceedings, June 23, 2009 |  |  |  | 5 |

| VENIREPERSON | COURT | STATE | DEFENSE | |
|---|---|---|---|---|
| WESLEY MARSHALL, No.  551 | 6 | 11 | 49 | |
| Accepted - Juror No. 30 |  |  |  | 71 |
| SERGIO MORENO, No. 604 | 74 | 79 |  | |
| State's Challenge |  |  |  | 100 |
| Excused |  |  |  | 101 |
| LANCE BEDFORD, No. 468 | 103 | 110 | 154 | |
| Accepted - Juror No. 31 |  |  |  | 179 |
| Court Adjourned for the Day |  |  |  | 180 |
| Court Reporter's Certificate |  |  |  | 181 |

```
                    ALPHABETICAL INDEX - VOLUME 26

VENIREPERSON                      COURT STATE DEFENSE      PAGE

LANCE BEDFORD, No. 468             103   110    154
Accepted - Juror No. 31                                   179


WESLEY MARSHALL, No.  551           6    11     49
Accepted - Juror No. 30                                    71


SERGIO MORENO, No. 604             74    79
State's Challenge                                         100
Excused                                                   101
```

                    P R O C E E D I N G S

                    [Defendant present.]

THE COURT:  We're ready.

THE BAILIFF:  All rise for the juror.

[Venireperson Marshall entered the courtroom and approached the bench.]

THE COURT:  Thank you.  Mr. Marshall, please be seated, sir.  I want to say good morning to you, Mr. Marshall.  My name is Webb Biard and I'll be with you this morning during the jury selection process.

The presiding judge of this court is Michael Snipes, if you remember Judge Snipes at the general session.  Should you be selected as a juror, Judge Snipes will actually preside at the trial, for whatever that's worth.

I also want to introduce to you at this time Gordon Hikel.

MR. HIKEL:  Good morning, sir.

THE COURT:  Andrea Handley.

MS. HANDLEY:  Good morning.

THE COURT:  They represent Dallas County and the State of Texas.  Further to my right is Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  Doug Parks,

MR. PARKS:  Good morning, sir.

THE COURT:  And Keri Mallon, and they represent Mr. James Broadnax.

Do this for me, please, before we go any further.  Raise your right hand.

[Venireperson Wesley Marshall sworn by the Court.]

Whereupon,

WESLEY MARSHALL, NO. 551, having been first duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q.  At this time I'm going to ask the court reporter to hand you your questionnaire.  We appreciate you filling that out.  I know it took some time but it will save you more time here today.

The attorneys have read it and it wasn't some idle exercise and I'm sure there might be some of your answers they'll want you to expound on.  I don't know what they are.  That's just the way this procedure works.

And you'll have it there.  They'll give you the page and the paragraph number and we all know at the time you filled that out, you weren't familiar

with any of the laws that apply to this case.  It was mainly just getting to how you feel, those kind of feeler questions.

In that regard, did you have an opportunity to read that pamphlet?

A.    Yes, I did.

Q.    Did that help you a little bit understand this process?

A.    Yes.

Q.    Good.  And they're going to be talking to you about that pamphlet.  They're going to be talking to you about these special issues and what they mean, and ask you to give your opinion on whether or not you can follow the law in answering these issues.

Now, are you aware that ths is a capital murder case?

A.    Yes, I am.

Q.    You understand the State of Texas is seeking the death penalty?

A.    Yes, sir.

Q.    Because of that, the law in Texas allows you to have an opportunity to talk to the attorneys one on one and in that regard, one of the attorneys from the State and one of the attorneys from the Defense will talk to you each for up to 45 minutes a piece.

So we're talking about an hour and a half. At the end of that hour and a half, you will know. I'll tell you here in open court whether or not you've been selected as a qualified juror or not.

Now, what that means is, we're in the process of selecting, give or take, some 50 qualified jurors. We anticipate that will be done mid-July, maybe a little later July.

When that's done, the actual 12 jurors who are going to hear this case will be selected from that pool. Does that make sense to you?

A.   Yes, sir.

Q.   You will be told at that time whether or not you're on the jury when that decision is made. Now, from reading the pamphlet, did you see that Judge Snipes will start this trial, the presentation of evidence August the 12th.

A.   I'm sorry, I thought it said the 10th.

Q.   I'm sorry. August the 10th, that's exactly right. At least that means you read it. And it will last up to two weeks. That will be Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, be a lunch break.

The jury will not have to stay together overnight unless and until you were deliberating and

should you be deliberating late into the night and had not yet reached a unanimous verdict, there is the possibility -- and I just want to tell you about it -- that the jury as a whole, all members, would be taken together as a group to a fine hotel at county expense, individual private rooms, spend the night and come back, to avoid any outside influence.

I tell you that and give you that information to ask you this. As you sit here now, are you aware of any reason why you wouldn't be able to sit as a juror in this case?

A.   No, sir.

Q.   All right.   Now, a couple of final things. If someone is found guilty of capital murder, there's only two possible punishments.   One of them is life in prison; the other one is death.

And I want to stress this to you.   The law in Texas now is that if you are found guilty of capital murder and you're sentenced to life in prison, you will serve the rest of your life in prison.   You will die in prison.

Now, there was a time when someone, if they were given life in prison, would be eligible at a later date, and those years have changed through the years, but at a later date would be eligible for

parole. That is no longer the situation. Life in prison means life in prison.

All right. Now, the special issues, the attorneys will spend some time on those because we assume very few people knew they existed or ever heard about them before. I assume that's your situation?

A.   Yes.

Q.   Okay. Nothing magic about this. It's just common sense. And the last thing I want to tell you -- and I might go back over this with you again after the attorneys talk to you.

All I want you to do, the only thing I'm entitled to, but I am entitled to this, that you tell us how you honestly feel. If you can follow the law, you'll be a qualified juror. If you cannot, you will not be a qualified juror.

And one way or the other is no reflection on you. You've done all you're required to do by appearing here today and agreeing to talk to us. Fair deal?

A.   Fair deal.

Q.   All right.

THE COURT: At this time I want to re-introduce to you Mr. Gordon Hikel, who will speak to you on behalf of the State of Texas.

MR. HIKEL: Thank you, Your Honor. May it please the Court?

THE COURT: You may.

EXAMINATION

BY MR. HIKEL:

Q. Mr. Marshall, good morning, sir.

A. Good morning.

Q. How are you doing this morning?

A. I'm doing fine. How are you?

Q. I'm doing good. The Judge mentioned to you a few minutes that, as you are now aware, this is a capital murder case, where if the Defendant, Mr. Broadnax, is found guilty as charged by the indictment, that there are only one of two possible sentences.

One is the automatic life in prison without the possibility of parole and the other is, depending on how these three special issues are answered, may result in Mr. Broadnax getting the death penalty, being sentenced to death.

Upon hearing that or upon learning that there are only one of two possible choices and what they are, what were your thoughts or feelings?

A. Well, it would lead to take this a little more seriously, I think. It really hits home and this is really --

Q.   Do you have friends or colleagues where you guys have actually sat around and talked about or discussed the death penalty as an academic exercise, or intellectual exercise?

A.   Not any time recently.  I can tell you in college that it came up.  I took a writing course where the subject came up in the course and we discussed it at some length, but it was a while back.

Q.   What was the writing -- what was the class in the writing course?

A.   Well, it was a debate course, I believe, and we were learning to write critical arguments, and the question was posed, is the death penalty moral, should humans execute one another for any reason at all.  That was the subject at hand.

Q.   How long ago was that, this class that you're talking about?

A.   Probably five or six years ago.

Q.   What position did you take in the debate?

A.   The position I took is that I think there are some cases where it is warranted, but it needs to be an extreme case.

Q.   Okay.  And in the paper or even now as you feel, give us some examples of what would be an extreme case where you either took that position in the paper

or your position today that if I hear this extreme case, that's where I believe the death penalty is warranted.

A.    I believe that in order to be executed someone would need to show complete disregard for others.  They need to lack empathy and show aggression, violence towards those people.

Q.    Okay.  And was that the position you took in the paper you wrote several years ago?

A.    I believe so, yes.

Q.    All right.  Those who took the position against the death penalty, what do you recall as being some of their arguments that you found to be persuasive?

A.    Well, I think the most persuasive argument would be if evidence were to provide following a guilty verdict that proved the innocence of the defendant. You know, that is the most compelling argument against it.

Q.    Say there were some post-proceedings that evidence comes forward that the person was in fact innocent, you found those to be the most compelling reasons against the death penalty?

A.    Yes.  I believe there were some statistics given and it was somewhat surprising how often it

happens. You wouldn't think that it would be a common thing, but it was more common than I expected it to be.

Q. Okay. In light of that, you've become aware of that information and the position you took that you believe in the death penalty in the most egregious of situations, did that situation cause you to reform, change or modify your position and your belief for the necessity of the death penalty in the most egregious of cases?

A. I wouldn't say that it changed my opinion. However, it did make me aware that more caution should be exercised when making the decision on an issue like this.

Q. Okay. You mentioned in your questionnaire the movie, The Green Mile ," and you said that it had the most impact upon you because both it showed the necessity or the need for the death penalty and both the misuse of the death penalty. How so?

A. Well, it kind of gives you cases on both ends of the spectrum. On the one hand, there's an insane man who is, you know, very obviously not of good mental health, who shows no regard for others, who wants to just go crazy, and he looks like once he got out, he would return straight back to the way that he was before.

On the other hand is a man who is innocent, who came in and is calm, is generally caring about other people, shows compassion, shows empathy, and doesn't deserve where his situation is.

Q.    So the movie, *The Green Mile*, for you, would that reaffirm the position in the paper you took where it's warranted in the most egregious of situations, but in the same way where you had colleagues that said they argued against it because a person could be innocent, that movie certainly drove home the point of both ends of the spectrum for you?

A.    Yes.

Q.    Okay.  Now, you mentioned something interesting when you said that it showed someone who had no good mental health.  Let me just tell you this, that the law in Texas is this, that we -- well, all across the nation, that people who are deemed to be mentally retarded cannot be executed.

That's the law.  The United States has mandated that be the law several years ago, and so you can take that as a given.  Okay?

I noticed in your questionnaire you've never been a juror before; correct?

A.    Correct.

Q.    But here it is now you're at -- it doesn't

get any bigger than this.  I mean, the death penalty or a capital felony is the highest degree crime we have here in the State of Texas, perhaps most of the states in the Union also.

Now, having never been a juror, let me explain to you the process, how it works, and then I'll begin asking you some more questions.

First of all, as the Judge said, there are no right or wrong answers here in this process. There are only true and untrue answers.  All we ask both this table and this table over here, that table, is that in answering the questions, just be honest with us and tell us exactly how you feel.  Okay?

A.    Yes.

Q.    As Mr. Broadnax sits over there, the Defendant, he has a right that all of us have as citizens if we're accused of a crime, and that is a presumption of innocence, because this table represents the State of Texas.

We have the burden of proving what we have alleged he has done.  And because we have not bring forth any evidence as yet for you as a juror, the law says you must presume that he's innocent of any charges.  Okay?

Number two, I believe you may have read

the indictment, which is in a folder there. An indictment is simply a piece of paper that tells the defendant what he is accused of committing and tells the State of Texas the elements of the offense that we must prove before you, a juror, can then be asked the solitary question, which is, did the State of Texas prove to you as a juror beyond a reasonable doubt that the defendant, Mr. Broadnax, is guilty as we have alleged in the indictment. Okay?

And by that, let me give you by way of illustration how serious it is, that if we have alleged it in the indictment, we must prove it, or you must find him not guilty if we don't prove it.

So for example, I believe in the indictment that you read, we allege that Mr. Broadnax -- I'll tell you what. Let me just give you a hypothetical situation.

The State of Texas alleged that someone has committed the crime of capital murder in the context that he intentionally killed someone while robbing the person. Okay?

We have alleged that the person -- the cause of death was gunshot, firearm, a deadly weapon. Okay? The medical examiner comes to court because by law we now have to prove to you, juror, that that in

fact happened.

The medical examiner comes to court and says, yes, the person is in fact dead, but when I performed the autopsy, I found no evidence of gunshot. In fact, what I found was evidence of stab wounds. This person was stabbed to death with a knife.

The evidence came forward that there was no gun found at the crime scene or anything, just a knife and some stab wounds. We have alleged in the indictment the cause of death was gunshot, but the evidence in the trial showed that it was stab wound.

We have failed to prove the allegations in the indictment. What is your verdict in that situation?

A.    The verdict would be not guilty.

Q.    Okay.  And why is that?

A.    Well, if the allegation was that there was a gunshot, then I would presume that the evidence would show --

Q.    Gunshot.

A.    -- that the defendant was in possession of a gun or was believed to be in the possession of a gun. If there was no gun involved in the death of the victim, then it's obviously --

Q.    We got it wrong.

A.   Yeah.   Obviously, it's a not guilty.

Q.   As bad as that situation is that I gave you in the hypothetical situation where someone is killed in the course of a robbery, we alleged a gunshot but the person was stabbed, your obligation as a juror would be to find that person not guilty.

It wouldn't be your fault.   It would be our fault.   And as a juror, your responsibility is not to help the State of Texas out or to help the defendant out.

It's just to evaluate the evidence and the law as the Judge gives it to you and then make a determination as to whether or not we have proven to you beyond a reasonable doubt that he's guilty or not guilty.   Okay?

A.   Yes, sir.

Q.   All right.   In the process of doing that, right where you're sitting, you're hear from witnesses. Witnesses will come in, whether they be police officers, medical persons, ordinary civilians who are fact witnesses, they will come into the courtroom, raise their hand, take an oath as you have to tell the truth and then they'll take that stand and give forth their testimony.

The law says this.   Before a witness

takes the stand, you as a juror cannot either give him a leg up or a leg down simply by virtue of his or her classification.

So for example, you cannot say because that's a police officer I'm going to believe, before he even testifies, everything that he says or nothing that he says, because of his job.

You start out every witness on the same level. And then once he or she testifies, you then evaluate whether or not you believe all, some or none of what he or she has said. Okay?

All right. I've used the term several times and you see it here in issue number 1 and number 2 called "beyond a reasonable doubt." Some jurors tell us that means that -- it just means that I've got to be certain. Okay?

The law does not give a legal definition for the term, "beyond a reasonable doubt," because the law recognizes you jurors are smart enough to figure it out for yourself.

What I can tell you it does not mean is this. It doesn't mean proof beyond all doubts. It says beyond a reasonable doubt, which means that after the State has presented its evidence and you are asked in the first part of the trial the one question, did

the State prove to you beyond a reasonable doubt the defendant is guilty.

If you have a doubt about it, it must be a doubt based upon reason. You can't say, well, I don't know. They didn't prove to me that somebody from Mars or Jupiter didn't come down and kill this person, you know, and so I have some doubt.

It has to be a doubt that's based upon reason and common sense. Okay?

A.   I understand.

Q.   The final principle I want to talk to you about is this. It's called the Fifth Amendment. I'm sure you've heard about it.

It means every citizens, including Mr. Broadnax, has the right to not be called as a witness in a trial against himself. In other words, he doesn't have to prove anything. Okay? We do the accusing. We've got to do the proving.

So that if Mr. Broadnax decides, and it's his constitutional right, that he does not want to testify or his lawyers advise him not to, whatever the case may be, you cannot consider that for any reason at all. Okay?

That's because there could be a myriad of reasons why he doesn't testify, and so you cannot

consider that for any purpose.  Okay?

Now, I've mentioned that this trial, as well as any other criminal trial, is what's called in the State of Texas a bifurcated trial, meaning they have two parts.

In the first part of a trial you're only asked one question.  The indictment.  If we prove to you beyond a reasonable doubt that he's guilty of the offense of capital murder.

In your questionnaire on page 4, at the very top of page 4, you're asked a question about what crimes do you think it's appropriate for the death penalty, and you put "aggravated sexual assault" and "assault of a child."

Tell me why assault of a child.  What is it about that crime that you believe warrants the death penalty?

A.    Well, I think that would have mental effect on a child that would be greater than the effect on an adult, something that would effectively ruin that child's life.

Q.    Okay.  And so then you would look -- in other words, because of the consequences of that crime, i.e., lifelong, perhaps lifelong effects on the child, you believe that warrants a death penalty?

A.   Yes.

Q.   And why aggravated sexual assault -- oh, it's aggravated sexual assault of a child?

A.   Yes.  Yes, sir.

Q.   Okay.  And then you have, "Perhaps of an adult in extreme cases."  Like, for example, what?

A.   I suppose if someone was assaulted repeatedly and brutally beaten or there was a lot of physical violence, they were taken within an inch of their life and this occurred over the course of a very long period of time, I feel that it might be warranted.

Q.   Okay.  The death penalty?

A.   Yes.

Q.   All right.  And then you have "murder."  And by the way, when you filled this questionnaire, we did not expect you as a potential juror to know necessarily the law in this state as to what crimes make a person eligible for the death penalty.

But let me just tell you that in the State of Texas the crime of murder -- and I hate to say simple murder or only murder -- is not a death penalty or capital felony.

So for example, if I were to take a gun or a knife right now and I were to kill someone in this courtroom, repeatedly stabbed this person or shot this

person ten, fifteen times, laugh about it, dance on the person's body after he or she is dead.

For that crime in and of itself, if that's all I did, which is a murder, I would not be charged with a capital felony whereby I can be eligible for the death penalty.

In Texas, when there's a murder, it depends on who was killed and what the person's state of mind is before the person can be charged with a capital felony.

So for example, if a police officer is killed in the line of duty, if a child under the age of six is killed, if multiple persons, two or more, are killed in the same transaction, multiple persons are killed in a common scheme, if those people are killed intentionally or knowingly.

So for example, if it is my conscious objective, conscious desire to kill a police officer, walk up to him and I put a gun and I shoot him, put it to his head and I pull the trigger, there's no question that my intent there, my desire, is to see him dead, or her dead.

I can also commit a crime against -- kill a police officer knowingly or a child under the age of six knowingly or multiple people knowingly by

this.

It may not have been my conscious desire to kill the person, but based upon my conduct, it was reasonably certain that their death could result from my actions. Okay? Reasonably certain based upon my conduct.

Now, in this crime, this kind of crime where there's an underlying felony and a death occurred, there's a different thing we have to prove.

We've got to prove that in the course of committing a robbery, the defendant intentionally killed someone. In other words, either in the course of committing the robbery or attempting to commit robbery, it was his conscious desire to kill the person. Okay?

So in an aggravated sexual assault, if someone is killed intentionally, that's a capital felony where the person can get the death penalty.

If it's a burglary of a habitation, retaliation, those kinds of crimes, those kinds of felonies, if someone is intentionally killed in the course of those felonies, the person can be charged under Texas law with a capital felony. Okay?

Now, on page 1 of your questionnaire you mention that you believe that it's warranted in the

most egregious of cases, but you said, "It must be justified not only by the crime but by the character of the guilty party as well."

And the word you used there, the "character," we'll talk about it when we get to issue number 3, because you'll see it mentioned in there.

But what I want to ask you, though, is looking at your answer on page 1 as to why you would support a death penalty, then flip to page 4. When asked if you believe in using the death penalty, you were asked to rate on a scale of 1 to 10, you put a "3." Tell me how do you come up with the number 3?

A.   Well, again, I think it's an issue of exercising caution. When I say "the most egregious," I mean the most egregious, and I think it should be used with some hesitation on the part of whoever is issuing that sentence.

Q.   All right. Now, when you use the term again, "most egregious of cases" on page 1 and again at page 4, in the very second question there on page 4 you were asked that long, long question there.

And your response was, "Murder during a robbery may be a sign of a lack of regard for the life of another person," and you give that answer to reflect, I believe, your agreement with the law in the

State of Texas that the person should be charged with a capital felony if he commits that kind of crime.

Now, is that an example which you had in mind when you used the expression, "the most egregious of cases"?

A.   Well, when I said "may be a sign," I think it's not black and white either way.  I think, you know, it depends on the circumstances of the robbery and, you know, the behavior or the situation that is at hand that would help you determine how extreme the behavior is.

Q.   Okay.  All right.  Now, remember I said to you that a criminal trial, we have two parts, the guilt/innocence part, which is part one, and then if the person is found guilty as charged in the indictment, only then do you then go on to consider these special issues.

So when I said to you earlier that a capital murder or a capital felony trial is identical to any other crime, whether it's stealing a bicycle, a loaf of bread, that is correct as to the first part of the trial, which is you must assume those five principles I told you about, the presumption of innocence, the indictment is not evidence of guilt, the witnesses all on the same level, beyond a reasonable

doubt -- it means a doubt based upon reason, not all doubts -- and the Fifth Amendment. All those are the same in the first part of the trial.

The difference now where there's a line of demarcation with capital murder is when you come to the second part of the trial called the punishment.

Mr. Marshall, you're absolutely correct that nothing is automatic when it comes to a capital felony case or death penalty case. The mere fact that you found someone guilty of capital murder doesn't mean that he automatically gets the death penalty.

Now, let me test you now. The Judge did tell you that there are two possible penalties in a capital felony. What were they again?

A.     Death penalty.

Q.     Right.

A.     And life in prison without parole.

Q.     Okay. If, as the indictment reads there in front of you, if the defendant is found guilty as charged, meaning that you believe as a juror that the State has proven to you beyond a reasonable doubt that he intentionally killed someone who is named in the indictment while in the course of committing or attempting to commit a robbery, and we prove that to you beyond a reasonable doubt.

And you and your other 11 colleagues discuss, deliberate and agree that we've proven that to you, and you come back into the courtroom and you say, "guilty."

We then take a break and we come back to the second part, act two, part two of the trial called the punishment.  In that stage we then have to prove to you these special issues here.  They're labeled 1, 2 and 3 because the law requires you to consider them in that order.

Now, you mention that, on page 2 of your questionnaire, almost the middle part there, when you were asked to give your best argument in favor of the death penalty, you mentioned that some individuals pose too great a threat to others, even while incarcerated, to justify imprisonment instead of death.

Now, you are absolutely correct in the thought process as to why we have these special issues here, because special issue number 1 asks you precisely what you stated on page number 2 of your questionnaire.

This is what it does.  It says, "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?"

Now, in light of the fact that if a defendant is found guilty of capital murder, he spends the rest of his life in prison, where would you expect his society to be?

A.   Well, primarily there in prison among fellow prison mates.

Q.   Okay.  Well, entirely in prison; right?

A.   Yes.

Q.   Now, who are some of the people you would expect to be in prison that constitute a prison society or constitute a society, some categories of people?

A.   Well, thieves, robbers, violent individuals.

Q.   Do you believe that those people you've mentioned deserve the right to have their safety protected against -- from other inmates?

A.   I believe they have rights, yes, as an individual to be protected from others who are violent. Yes.

Q.   Do you believe that in that society there are other people besides prisoners, like guards for example?  Do you believe there are guards that work in prisons?  You've got to say "yes" or "no" for the record.

A.   Yes.

Q.   Okay.  That there are perhaps medical

personnel, be they doctors or nurses?

A.   Yes.

Q.   Do you believe that there are clergy there?

A.   Yes.

Q.   Do you believe that there are other family members who go there for the purpose of visiting their family who may be incarcerated?

A.   Yes.

Q.   Do you believe that all of those categories of people deserve the right to be protected while there?

A.   Yes.

Q.   All right.  So you see there where the word "society," by using the word "society" -- and these issues were drafted by the Texas Legislature.  They're the ones who want you as a juror before you can elevate the life without parole sentence that a defendant automatically gets if he's found guilty of capital murder, before it can be elevated to the death penalty, they want you to consider those three special issues.

The very first one, they recognize that even in prison, in that society, the person can be a continuing threat.  What they ask you is this.  We have to prove it to you, the State of Texas, beyond a reasonable doubt that it is a probability.

What does the word "probability" mean to you? What comes to mind when you hear the word "probability"?

A. I guess something that is likely to occur in the future.

Q. Good. That's what most jurors tell us. To them it means more likely than not. It's not that it's a possibility, which means anything is possible. It's a probability. Okay?

Now, probability that what, that what would happen?

A. A probability that a violent act would be committed by the defendant toward someone in their immediate surroundings.

Q. In prison, okay. Now, notice that it didn't say another murder. It didn't say what kind or what category of violent crime or violent acts. It just says would commit criminal acts of violence.

Would you agree with me that if I were to take my hands, my colleague is sitting here writing notes, and just punch her in the face, because I'm just like that. I'm just that bad.

Do you believe that that act of me punching my colleague in the face would be an act of criminal violence?

A.   Yes.

Q.   All right.   Now, so what we have to prove to you with the evidence in part two of the trial is the same legal standard as we did in part one, beyond a reasonable doubt that there is a probability, more likely than not, that the defendant, if put in prison for life, he would commit criminal acts of violence that would constitute a continuing threat to society. Okay?

I believe you said that on page 5 of your questionnaire, if you could turn there please. When you were asked -- it's the fourth question from the bottom that asks, "What purposes, if any, do you believe the death penalty serves?"

And you said, "It provides the worst threats to society the most effective emotional means of quick punishment and removes their ability to harm others."

What do you mean by "emotional means and quick punishment"?  What does that term mean, "emotional means and quick punishment"?

A.   By emotional, when someone is sentenced for the crime, there's not only a physical sentence of being isolated into a cell in a prison.  There's also the idea that a person must reflect during that time on

the crime that they've served.

I believe when someone is sentenced to death, that time is limited and I believe that causes the emotions to be stronger, if only because there's less time to reflect on them, which is why I say it's a more effective emotional means of punishing them.

Q.   So by emotional, you mean from the person who has been sentenced?  It's from his perspective?

A.   Yes.

Q.   Okay.  Well, given that a life imprisonment without the possibility of parole means just that, he'll die in prison, why would you then be a proponent or be in support of the death penalty in some cases then?

In other words, if it's important that he has the time to reflect on what he has done, why not say, I believe in every case where there's a capital felony, the only punishment that I believe in is life without possibility of parole?  Why not just say that instead?

A.   Well, when someone is sentenced to death, as I said, it limits that time.  Some people may go to prison and feel that, you know, well, I've still got my life.  I've still got time, years and years, whereas even though the death penalty perhaps may take years

before the actual execution, but I think it gives them a sense of finality in the near future or nearer than a natural death in prison, which I think provokes them to reflect more strongly upon their actions during life when they know that there is a set date for execution.

Q. So in other words, you think it's important that a person who is found guilty of capital murder, a capital felony, that he or she needs time to reflect on the crime he has committed?

A. Yes.

Q. Okay. Well, wouldn't the life in prison give him the most opportune time to reflect upon the crime because he has all the rest of his life to reflect upon it?

A. It does, but I think that some people might not take that opportunity to reflect if they're just thrown into a cell and told that you're going to live here now.

If you're told you're going to be put to death, this will be the time that you die, it can give you just a shock, I think, just the realization that this is the definite end and this is when it is set, that might provoke someone to reflect on behaviors that they may otherwise not have reflected upon.

Q. All right. On the same page, page 5, right

above that question, the one where you said, "I believe an eye for an eye to be metaphorical." What we are questioning there is the very last sentence where you said, "While life in prison and execution are very different, neither is appropriate for all cases."

Tell me in your mind when is it appropriate for life without parole versus when it is appropriate for the death penalty or for execution.

A.    Okay. As I said before, I think that execution is necessitated when there is a very egregious case of a person who can't be trusted to function within any mode of society, you know, normally and without acting violently and displaying bad moral character.

Q.    Okay. So that again, you understand there's a process whereby even when you find someone guilty of capital murder, automatically he gets life in prison without parole, that before you can elevate that sentence to a death penalty, you have to consider or ask yourself, is this one of those most egregious of crimes that I talked about as a juror. Right? Answer "yes" or "no" for the record.

A.    Yes.

Q.    But even then, even if it is, you understand it is not automatic, that you must go through these

three special issues; correct?

A. Yes.

Q. All right. Let's say you answer issue number 1 yes, because if you answer it no, if you say, well, look, yeah, I know we've found him guilty of capital murder, but the State has not proven to me beyond a reasonable doubt that he's a future danger, so I think the answer is no.

If the answer is no, then the punishment phase of the trial stops. You come back into the courtroom, the 12 of you and you hand your answers to the Judge, and the Judge has to sentence the defendant to life in prison without the possibility of parole, because you have decided he's not a future danger.

Now, what kind of evidence would you expect to hear or expect the State to present to you as a juror to help you answer the question, is this person a future danger?

A. Well, I think it would be a matter of establishing the character of the defendant, establishing that they had a history of violence or lack of regard for the rights of others, and showing that person has behaved in a way prior to the crime that would lead you to believe that they would continue to behave that way.

Q.    Okay.  So criminal history, if there is one.
The person's character.  Okay.  What else?  What comes
to mind?

A.    The general behavior of the character and
basically the person.

Q.    Okay.  Have you ever heard of Timothy
McVeigh?

A.    Yes.

Q.    What did he -- what in your memory did he do?

A.    I believe he was tried for bombing of a
building in Oklahoma City.

Q.    Do you know he was a decorated war veteran?

A.    I did not know that.

Q.    Right.  Decorated, Gulf War.  No criminal
history.  And so -- and he was charged and sentenced to
death for killing eight federal agents or employees.
He killed 168 total persons.  So he did not have a
criminal history.

          The law says in Texas that in answering
question number 1, while you may look for criminal
history and those kind of things, as you mentioned, the
defendant's character, that you can consider the facts
of the crime alone, and as you said in your
questionnaire, do the facts of this crime alone help me
as a juror to answer the question affirmatively that

yes, based on the facts alone, I believe that the State has proven to me beyond a reasonable doubt there's a probability that the defendant would commit acts of violence that would constitute a continuing threat to society.

MR. PARKS: Your Honor, we're going to interject at this point. No reflection on Mr. Hikel but I have come to believe that that law is in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and we would object to them instructing jurors in that regard.

THE COURT: Overruled.

Q. [By Mr. Hikel] So Mr. Wesley, in light of what I've just said about Texas law and just the facts, tell me what are your thoughts as a juror, what are your beliefs and your opinions if the person does not have a criminal history? What do you look for in trying to answer issue number 1?

A. Well, I would consider testimony that details interactions with family members, interaction with friends or with, you know, acquaintances, interaction with coworkers, and namely, any other incidents that may have led someone to believe that this person would be more likely to commit violent acts in the future.

Q. Okay. So you want to hear from friends and

associates of the person?

A.   Yes.

Q.   All right.   Issue number 2, I'm going to just mention it very briefly because whether or not you have to consider it depends on the Judge, Judge Snipes at the trial, but all this talks about is what they call in Texas law of parties, which says that two or more people conspire, aid, assist, direct each other in the commission of a crime.

For example, my colleague and I go home tonight and because we work for the Government, we don't make a lot of money.   So we decide it's a good time to go rob a bank or a check-cashing place.

We realize the best time to do it is late at night.   Only one employee there.   So we plan this together.   And we go to the store.   We're going to rob the store.

I'm the big bad guy so I'm going to go in.   My colleague here is a very fast driver, loves the movies, fast and furious.   So she is good like that. She decides, I'll wait out here and I'll rev the engine.   If anybody comes, I'll toot the horn two times to mean you got to go.

I go in there.   She hands me my gun and says, "Hey, don't forget your gun.   You need this."   I

say. "Oh, thanks." I'm walking through the door. I realize I got no mask. I say, "Andrea, I don't have my mask." She says, "Don't worry about it, take care of the witnesses."

I go in there. There's one clerk. Take the money, put a gun to her head and pull the trigger. Kill her. What crime can I be charged with?

A.   You can be charged with capital murder.

Q.   And why is that? Robbery with intentional killing; right?

A.   Yes.

Q.   My colleague now who sits outside in the car waiting, never comes into the store, what can she be charged with?

A.   I'm not sure.

Q.   The law says she can be charged with the same thing, if you as a juror finds that she either solicited, encouraged, directed, aid or attempt to aid me in the commission of the crime.

Now, you may conclude from these facts when she and I planned the crime together, she saw me take my gun in there, she said to me when I said, "I forgot my mask," she said, "Take care of the witnesses," you may conclude as a jury that all of those factors rises to the level of her either

soliciting, encouraging, directing, aiding or attempt to aid me.

So like me, the trigger man, she can be found guilty of capital murder, if you believe that she should have anticipated human life would be taken or she was a party to the crime. Do you agree with that law?

A.   Yes.

Q.   Okay. You kind of paused. Tell me why.

A.   Well, it's not something that I just had a gun reaction towards. I wanted to take a moment to reflect on it.

Q.   Okay. So that's issue number 2. Now, issue number 3 now -- in regard t issue number 1 and number 2, the very second sentence of both of those issues is a legal term that says "beyond a reasonable doubt." You notice that; right?

A.   Yes.

Q.   And that is because you only look to this table to prove issues 1 and 2. Issue number 3 does not have that term, "beyond a reasonable doubt."

That is because there's no burden of proof on either the State's part or the Defense part. It's just your chance as a juror now to consider everything that we've talked about.

Is this case one of those most egregious of cases that I talk about in my questionnaire. What is the person's background? What is the circumstances of the offense, his personal moral culpability, all of those things?

And by that, Mr. Wesley, you may hear stuff that he is a leader versus a follower. Is that relevant to you in determining whether or not it should be a mitigating factor? Is it, in other words --

A. Well, yes, I believe that is a factor.

Q. All right. Now, it says, do you find, taking into consideration all of the evidence, including circumstances of the offense, defendant's character and background, the moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Here's what the Legislatures contemplate. If you answer issue number 1 yes and issue number 2 yes, it means at that point the defendant is sitting squarely on the death sentence, because you have found he has intentionally killed someone in the course of a robbery and you have found him guilty.

Then you go to these issues and you have found that he's a future danger.  Two, you have found that he was either a party and did one of those things I mentioned, but that he anticipated a human life would have been taken.

So you have then said yes.  So that means now he gets the death sentence unless you then in considering issue number 3 find that there are sufficient -- there's something that mitigates against the death sentence.

Now, look with me, if you will, under special issue number 3, and notice right before the word "mitigating," there's a word right before "mitigating."  What is that word?

A.   "Sufficient."

Q.   Why do you think it's there?  What do you think it means to you?

A.   I think it means that if issues number 1 and 2 are met, that the sentence will be death unless the jury believes that there is -- there are factors that have not yet been considered which are reason enough to exclude death as a sentence.

Q.   Like what?  What are some of the things that as a juror now -- you've answered yes to 1, yes to 2.  You are now considering 3.  You know if you answer

number 3 no, the Judge has no choice but to give him the death penalty.

If you answer number 3 yes, he gets life in prison without parole. What are some of the things that you would consider as a juror in answering issue number 3? What's relevant to you? What do you want to hear?

A. Well, I want to hear about, again, their dealings with friends and associates. I want to hear, you know, about individual behaviors, how -- you know, is this a person who keeps to himself? Is this a person who acts as though they may be modeling something and that they may be suffering greatly and not letting anyone know about it?

Is this a person who looks or acts primed to just let out whatever feelings are inside and commit something terrible.

Q. All right. Turn to page 8 of your questionnaire, please.

A. All right.

Q. Tell me about the emotional trauma there you mention on page 8, where you mention what makes a person dangerous. You said, "emotional trauma." What do you mean by that?

A. Well, I think, you know, especially as a

child, very impressionable throughout your life but especially as a child, when someone is violent towards you or if someone has taken something very valuable away from you --

Q.    Like what?

A.    Like someone, a sibling, for instance, is kidnapped or murdered or a family member or a family friend that's very close to you, or if there's maybe even a possession or several possessions of value, great sentimental value to you, are taken and destroyed or made unusable, that that could lead to a great deal of stress and emotional trauma throughout one's life.

Q.    So in other words then, so in trying to answer number 3, issue number 3, and you talk here about emotional trauma, does it mean everyone that has a bad childhood has a green card to commit violent crimes?

A.    No.  No.

Q.    So how would you distinguish then if you hear person number A had a bad childhood, emotional trauma, and commits these most egregious of crimes?  Person number B, bad trauma childhood but didn't commit those crimes.  How do you then distinguish between those two situations

A.    Well, it's a matter of how one deals with it,

whether treatment was sought, whether the person sought comfort from others, whether they tried, they made an effort to overcome the feelings that were brought about because of the trauma, and whether or not they've allowed that situation to alter their behavior, if they've allowed it to let them become someone that's violent or not law-abiding.

Q.   You mentioned on page 8 again genetics and circumstances of bringing all those things.  You said those are relevant to you, not in determining punishment but in determining rehabilitation.

You understand in a death penalty case there are only two sentences, life without parole or a death penalty, depending on how these are answered.

A.   Yes.

Q.   In light of those two choices, tell me the relevance of the genetics, circumstances of birth, those things in the context of rehabilitation?  How did that play out for you?

A.   Well, when answering these questions, to be honest, I was looking more along the lines of upbringing, environment more so than genetic, that we as a society have a moral obligation to help rehabilitate those who even are incarcerated for the rest of their lives so that they may improve their life

and improve their self.

I was raised in a Christian home and I do believe in the after-life. I do believe that we have a responsibility to help aid others as best we can to make amends for what they've done wrong.

Q. One last question, Mr. Wesley. Your girlfriend, I believe she is involved in what kind of work?

A. She's a case manager. In the past she's done work with juvenile delinquents.

Q. Young people, okay. How would she feel if she finds out that you're a juror in this case and you were to answer special issue number 1 yes, special issue number 2 yes and special issue number 3 no, that results in this young person over here getting the death penalty?

A. I think that she would support whatever decision I made. She understands that I'm not taking this lightly and that I will heavily consider all the evidence that's presented, and I believe that she'll back whatever decision that I make.

Q. And you can do that?

A. Yes.

MR. HIKEL: All right.

THE COURT: Thank you, Mr. Hikel.

MR. HIKEL: Thank you, Judge.

THE COURT: At this time I want to re-introduce to you Keri Mallon, who will speak to you on behalf of Mr. Broadnax.

MR. M.: Thank you, Judge.

EXAMINATION

BY MS. MALLON:

Q.  How are you doing, Mr. Marshall?

A.  I'm doing well. How are you?

Q.  Good. Do you need a break or anything?

A.  I'm fine, thank you.

Q.  Okay. I'm Keri Mallon. Mr. Lollar, Mr. Parks and I, we represent James Broadnax here.

Let me start by saying I really appreciate your caution and hesitation in making these decisions. I really, really do. None of us in this room want a jury full of killers. That's not what any of us want.

We want everybody to consider the law, evaluate the evidence and make decisions that are appropriate under the law and appropriate for them. Okay? So I appreciate that. I think everyone in this room does.

And in the State of Texas, the State of Texas gives jurors a lot of power, okay, a whole lot of

power to make these difficult decisions.  So I want to just assure you of that.  Okay?

Looking through your questionnaire, you can tell you've at least thought about the death penalty, even if that was back in college, because a lot of your answers almost follow some of the decisions you're going to have to make in this case.

A couple of things I do want to talk to you about though.  I'm going to talk a little bit about your questionnaire, just briefly about the guilt/innocence phase of the trial, and then finally I want to focus on the penalty phase.  Okay?

A.   All right.

Q.   In your questionnaire -- let's see.  And actually, I may want to talk about your questionnaire once we get to the penalty phase.

I guess one thing I did want to talk to you a little bit more about, though, is the work your girlfriend does.  Do you guys talk about that a lot?

A.   She likes to talk about it a lot, yes.

Q.   She is a woman.  And is she still working with juveniles?

A.   Actually, she's -- as of this week, she's currently unemployed.

Q.   I'm sorry to hear that.  How long did she

work with juveniles?

A.    I would say anywhere from a year to two years.  She did work with some of that before we met, so I'm not exactly sure how long it was, but it was between on and two years, I think.

Q.    Okay.  Is that work she enjoyed?

A.    Yes, very much.

Q.    Okay.  I just thought that was very interesting.  Anything about the work she does or did, do you think that would affect you in any way being a juror on this case?

A.    If anything, you know, it's helped me to see that people, even when incarcerated, they still connect with others and they -- you know, it's testimony of how people are people and they relate to one another in all situations.

Q.    Right.  I see also that you have a cousin who is a state trooper, so you have a little bit of both influences in your life; right?

A.    Right.

Q.    Okay.  Well, let's talk a little bit about the guilt phase of the trial.  That's the first part of the trial.  That's where the only question is whether or not the prosecution can prove to you beyond a reasonable doubt that Mr. Broadnax is guilty of capital

murder.  Okay?

That's the only question.  And the guilt/innocence phase of the trial is really fact-based thinking.  You know, whether or not they have proven the facts to you that show you beyond a reasonable doubt that the person committed this crime.

Now, once you get to the penalty phase of the trial, it's completely different.  Okay?  It's a more personal decision for you.  Okay?

And let me -- I don't mean to simplify this too much, but I just kind of want to give you an idea of what will happen, since you've never sat on a jury before.

There's the guilt/innocence phase where the evidence is only about whether or not he committed this crime.  Then the jury goes back to deliberate.  They make a decision.

If they make a decision that yes, they've proved every element of that indictment beyond a reasonable doubt, that he is guilty, then you return that verdict.

Then you come out and you will hear evidence in the penalty phase.  Okay?  It's a lot different in the penalty phase because you have the prosecution trying to prove to you beyond a reasonable

doubt that special issue number 1, which we tend to simplify and call future danger issue. Okay. They have to prove to you that beyond a reasonable doubt.

Now, special issue 2, sometimes that will come into play. Sometimes it won't. That's a decision that will be made by the judge at the time of trial. So I'm not going to talk to much about that one. Okay?

A. Okay.

Q. And then on special issue number 3, primarily it's an opportunity for the Defense to put on anything and everything we can to try to convince the jury that life without parole is the appropriate sentence. Okay?

So you get a lot of information, a lot of information in the penalty phase, and then you go back and deliberate on what you think the appropriate sentence is. Okay? Does that make sense?

A. Yes.

Q. Okay. Now, beyond the burden of proof, beyond a reasonable doubt, the prosecutor told you that is not defined for you. That is what it is to you. Okay?

Now, he did say that it is not proof beyond all doubt, which I agree with, but I want to kind of give you an illustration of other things it's

not.  Okay?

You know, we have civil courts; right?

A.    Right.

Q.    And in civil cases the burden of proof is a preponderance of the evidence.  Okay?  That's just 51 percent.  It could be millions of dollars but that's the burden of proof.

You might even be familiar with this. In juvenile courts or family court, when the State is trying to intervene or remove a child the home, the burden of proof there is clear and convincing.  Okay? So that's even a little step higher.

Then a criminal cases we have beyond a reasonable doubt, which is the highest burden we have. Okay?  So even though I can't tell you what it is, it's a really high burden, and I just wanted to illustrate that by showing you what it is in civil cases and when the State is trying to remove a child from the home. Okay?  Does that make sense to you?

A.    Yes.

Q.    Do you think you can hold them to their burden?

A.    Yes, ma'am.

Q.    Okay.  And there are -- the law is set up where there are really barriers to the death penalty.

Okay? Even in the guilt/innocence phase, you have the opportunity to hold them to their burden of proof on whether or not the Defendant committed a murder intentionally. Okay?

Let me give you an example. Let's say someone went in to rob a 7-Eleven. They go in and they have a gun and they say, "Give me all your money." The clerk gives them all the money.

And the person committing the robbery says, "Look, you know, I'm going to leave. I don't want you to follow me because I don't want you to see where I'm going." Okay?

And so the person leaves the store but the clerk follows him. So the person who is committing the robbery turns around and shoots the clerk in the knee, just trying to keep him from following them, and leaves.

Well, later on, the clerk ends up dying because the shooter hit an artery, okay, and bled to death. So can you see how in that situation the shooter was not intentionally trying to kill the clerk? Does that make sense to you?

A.   Yes.

Q.   Okay. So that's another barrier to the death penalty, because only if you find beyond a reasonable

doubt that a person accused of capital murder intended to kill can you return a verdict of death.  Okay?

A.  I understand.

Q.  Okay, good.  Now let's talk a little bit about the penalty phase.  Issue number 1, like I said, we tend to simplify that and call that the future dangers issue.

But the thing I really want to stress to you with that, it's still their burden of proof.  Okay?  They have to prove that beyond a reasonable doubt.  And again, that's a definition for you to decide what it is.  Okay?

That there's a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.  You notice it says "acts," so it's more than one.  Okay?  It's not a single act.

And if you'll look at that with me, do you see that "probability" is in there for a reason?  Do you agree with that?

A.  Yes.

Q.  Okay.  It's not "might," or, "I'm afraid that he will."  "Probability" is, you know, in there for a reason.

And I would tell you that the

Legislature again intended for these special issues to be a barrier to the death penalty, because just as you have to presume Mr. Broadnax innocent in the first phase of the trial, since they have the burden of proof on special issue number 1, you have to presume that the answer to that question is no, he will not be a future danger.  Does that make sense to you?

A.    Yes.

Q.    Is that something you can do?

A.    Yes, ma'am.

Q.    Okay.  So even keeping in mind you found him guilty of capital murder, intending to kill another human being and robbing him or her at the same time, you could still presume the answer to that question no?

A.    Yes, ma'am.

Q.    Okay.  Until they prove it or if they prove it to you beyond a reasonable doubt?

A.    Yes.

Q.    Because the State of Texas is always satisfied with a life sentence.  Okay?  Always.  It's only if they meet their burden that it's actually escalated up to the death penalty.  Okay?

Do you think that that's a difficult thing for the prosecution to prove, because actually they're asking you to make a prediction; do you see

that?

A. Yes. It does seem that it would be somewhat difficult to prove, yes.

Q. Okay. And I think that's what the Legislature intended because the presumption is that the life without parole is the appropriate sentence. Okay?

And I just want to make sure that you can hold them to that burden.

A. Yes, I can.

Q. Okay. And the prosecutor talked about prison. Do you think that prison is just a free-for-all, that prisoners can roam around wherever they want and there's no safeguards and they're just entitled to do whatever they want to do whenever they want to do it?

A. No, I don't think it's like that at all.

Q. Okay. You think they run the system efficiently so that people are protected within the prison system?

A. I think it's a pretty tight ship, from what I hear.

Q. Okay, good. And again, I just want to stress to you it's, you know, acts of violence, so it's not just one incident. They have to prove to you that this

is going to be ongoing, that this person is going to be an ongoing threat to society, even in the penitentiary. Okay?

A.   Okay.

Q.   Can you tell from reading special issue number 1 that the death penalty is really reserved for the worst of the worst? The Texas Court of Criminal Appeals says the most egregious of defendants who could not even maintain themselves in the penitentiary. Do you agree with that?

A.   Yes, I do.

Q.   Okay, good. And let me tell you this too. The law requires that when you're back in the jury room, you have to deliberate this issue. Okay? Deliberation means give careful consideration to.

But you are not required to agree with the other jurors. Okay? That's your decision and your decision alone to make, whether or not they prove it to you beyond a reasonable doubt. Okay?

A.   I understand.

Q.   Good. Now, let's say that -- let's just say, you know, for discussion purposes -- and let me tell you this too.

This is our only chance to talk with you right now, so even though we're talking about the

penalty phase of the trial, I don't want you to take that to mean that we in any way, shape or form think that we're going to get there. Okay?

It's just this is our only time to talk to you so we have to address these issues. Okay? Does that make sense?

A.   Yes.

Q.   All right. So all 12 of the jurors determine that a person is guilty of capital murder and will be a future danger, and I'm going to skip over special issue number 2.

Then you go on to special issue number 3. Special issue number 3 is an animal in and of itself because there is no burden of proof from either side.

I think sometimes jurors want us to prove to you that, you know, a life sentence is the appropriate sentence, but there is no burden of proof. Again, it's up to you to decide.

I disagree, and I'm sure it's no surprise, with the prosecutor. I don't think, I don't see at that point even finding, you know, answering yes to 1 and yes to 2 if it's available, I don't think, I don't see it as still sitting on the death penalty, because it takes 12 jurors to say there is no

sufficient mitigation for the death penalty to be imposed. Okay?

A. Okay.

Q. And that's because it takes all -- it's an individual decision. It's a decision you make based on, the law says, your own personal moral judgment. Okay?

A. Okay.

Q. And if you look at special issue number 3 with me, you can tell that it's meant for you to take into consideration pretty much everything, the facts of the case, any background of the defendant, his character, you know. I think you said his relationship with friends and family.

It's your personal moral judgment. So you make that decision for you. Okay?

A. Okay.

Q. And let me take a step back to special issue number 1 because there's something that's kind of related to this.

When you go back in the jury room, if you found someone guilty of capital murder, when you go back in the jury room, the decision is not who thinks he deserves life without parole, who thinks he deserves death. Do you understand that?

A.   Yes.

Q.   You can see how that would be an improper discussion; right?

A.   Yes, ma'am.

Q.   Because this is how you decide what the appropriate penalty is.  Are you with me on that?

A.   Yes.

Q.   And if another juror started to make and have that discussion, would you step up and say, "That's not the discussion we're supposed to have"?

A.   I would try to, yes.

Q.   Okay.  So let's go back to special issue number 3.  You already talked about -- and I think this is where I wanted to bring out on your questionnaire a little bit.

On page 2 when you say the best argument against the death penalty is, "Even in the fairest, most unbiased trials, a wrongful conviction is still slightly possible."

And I appreciate that and I appreciate your concern for that.  But I guess I want to make sure that that's not the only situation where you think the death penalty is not appropriate.  Does that make sense?

A.   Yes, that makes sense.

Q.    Okay.

A.    I think that's the strongest argument against it is that no one should be put in that situation if they're innocent.  But there are other situations where I believe it would be appropriate, yes.

Q.    Okay, thank you.  On the bottom of page 5 it talks about voluntary intoxication and it asks -- you know, tells you that, "It's not a defense for commission of a crime.  Do you agree with this?"  And you say, "Yes, that's what makes sense to me."

You can't say, you know, I was drunk so I committed this crime; therefore I'm not guilty.  You can't do that in Texas.

But on the top of page 6 it says, "The law in Texas further provides that evidence of intoxication may be considered in mitigation of punishment.  So you agree with this law?"  And you said, "Yes, only to a slight degree."

Can you tell me more about your feelings on that subject?

A.    Well, I think it's something that should be considered when considering someone's character.  Is this a person who is going to go out and get drunk every night and just allow that to take over their personality and allow that to cause them to behave in a

way that they wouldn't normally behave?

Or is it something where if someone was very emotionally distressed. They went out and had a few drinks to lighten their mood and then that overcame any restraint that they had against doing something wrong.

I think it's two very different situations that you could have. There again, it's not black and white, and it should be considered what the circumstances are, you know, regardless of whether there's intoxication involved. Just every situation is different.

Q. Okay. I understand completely. Let me ask you, how do you feel about intoxication with respect to special issue number 3? Is that something you could consider in mitigation, that at the time they committed the offense they were under the -- voluntarily under the influence of drugs or alcohol?

Now, that's not to say that it's a defense or even an excuse, but just something that you would consider in determining an appropriate sentence.

A. I think it's a factor that can be considered. I don't think that that alone is sufficient.

Q. Sure.

A. But I do believe that that can contribute to

sufficient mitigating circumstances.

Q.    Okay, and that's fair.  Let me tell you this, is that the law says, you know, you decide what is sufficient for you.  It can be one thing.  It can be a hundred things.  Okay?

It's up to you.  It's your personal moral judgment.  And what you find sufficient may be different from the person sitting next to you.  It may be different from the other persons too.  Does that make sense?

A.    Yes, ma'am.

Q.    Okay.  And you know, you may have a situation where you find one thing that you think is sufficient mitigation that says to you life without parole is the appropriate punishment.

And there may be 11 others in the room who say, absolutely not, no way, you know, death penalty is the only appropriate sentence in this case.  What would you do in that situation?

A.    I would state my case and I would, you know, present what I believe to be the factors at hand and explain the circumstances from my point of view, and I'd also have an open ear, you know, to hear.

If 11 others are convinced of something, I think it's worth listening to what they have to say,

even if it doesn't change my mind.

Q.   Okay.  Let me tell you this.  The law requires that you deliberate, and again, that's give careful consideration to.  Okay?  But you do not have to defend, you do not have to debate.

Now, you certainly can if you want to.  Okay?  That's your decision.  You can tell from special issue number 3, this is a very personal decision that each individual juror has to make, and it makes sense.  It's the ultimate penalty; right?

So you do not have to defend your position.  You do not have to debate it.  Okay?  Like I said, you certainly can.  You don't even have to be able to articulate why you believe life without parole is the appropriate sentence.  Okay?

You can decide mercy alone.  You can say, you know, I was raised in a Christian home.  Today I feel like exercising mercy.  And for that, I'm going to give life without parole.  Does that make sense to you?

A.   Yes, ma'am.

Q.   Okay.  So what I want to know is if you have 11 other people hammering you, saying you are wrong, you are wrong, can you stick to your guns?

A.    I have no reservation about holding my

ground.  If I truly believe that something isn't warranted, then I'm not going to switch over just because 11 people tell me to.

Q.  Okay.  And in the same token, would you give respect to another juror who felt differently than you did?

A.  Of course I'd show respect, and again, I will listen to what they have to say and I will try to, you know, convey as best I can circumstances that are affecting my decision, but I won't be bullied and I won't allow someone to change my mind for me.

Q.  Okay, good, because like I told you earlier, it takes 12 people.  Okay?  It takes 12 people to say there is no sufficient mitigation in order for a death sentence to be imposed.  Okay?

If one person says life without parole, it's life without parole.  Okay?  Does that make sense to you?

A.  Yes.

Q.  Okay.  Now let me talk to you about a few things that jurors -- that we've seen in other cases that jurors have talked about in mitigation.  We've already talked about intoxication.

And this is where I want to talk to you about page 8.  The prosecutor talked to you a little

bit about this but I want to talk to you a little bit more.

We're talking about genetic circumstances of birth and that sort of thing. Can you see how -- really, what's listed in that question is very similar to special issue number 3. That's really what special issue number 3 is talking about. Can you see that?

A.    I can see that, yes.

Q.    And that's things that you would consider in special issue number 3. Let's just -- let me break it down a little bit.

A person's background, how they were raised, would that matter to you?

A.    Yes, I think it matters in helping me to understand someone's character and how they will behave in the future. I think there are good indicators from the background.

Q.    Okay. And maybe how they got to where they are now, you know, being found guilty of capital murder?

A.    Yes.

Q.    Okay. What about if -- and I think this is exactly what you're talking about, where family and friends come in and testify that, you know, the

behavior in this incident was completely out of character for him, something he's never done. Would that matter to you? Is that something you could consider?

A. Yes, I would consider that.

Q. Okay. How about abuse, whether it be physical or sexual? Is that something you would consider?

A. Yes, I think that's a strong determining factor in someone's behavior as an adult.

Q. Okay. Let me just make sure I've covered everything. This is one thing I want to cover to you that I don't think any of us have talked about.

Sometimes we have -- we hear jurors say after the fact that they felt like if they did not assess the death penalty in a capital murder case, that they would be letting the family down, the family of the victim. How do you feel about that?

A. I disagree. I think we should follow the law. I don't feel an obligation to decide what's right for the family. I think the law does that for us, and it's my obligation to uphold the law.

Q. Okay. And I guess, just to sum up a little bit, you're going to hold them to their burden; right?

A. Uh-huh.

Q. And you can presume Mr. Broadnax innocent at this point and all the way up until they prove beyond a reasonable doubt that he committed a crime?

A. Yes.

Q. Okay. And when you get to special issue number 1, you're going to hold them to their burden of proof?

A. Yes.

Q. And you're going to force them to prove every part of that question; right?

A. Yes.

Q. And then once you get to special issue number 3, you're going to rely on your personal moral judgment to determine whether or not there's sufficient mitigation to impose a life sentence?

A. Yes, ma'am, I will.

Q. All right. Thank you very much.

A. Thank you.

THE COURT: All rise, please. Mr. Marshall, step out, sir. You'll be coming right back in,

[Venireperson Marshall left the courtroom.]

THE COURT: In the presence of Mr. Broadnax, what says the State of Texas?

MR. HIKEL: State believes he's a qualified juror, Judge.

MR. LOLLAR: We believe he's qualified as well.

THE BAILIFF: All rise for the juror.

[Venireperson Marshall entered the courtroom and approached the bench.]

THE COURT: Please be seated, sir. Of course, the attorneys have accepted you as a qualified juror. Again, I've told you the probable trial date and when the decision will be made on the actual jury.

You'll be notified on that date. Are the telephone numbers on your questionnaire still correct?

VENIREPERSON MARSHALL: Yes.

THE COURT: All right. It's been a real pleasure meeting you. I want you to do this. Try to avoid any outside influence or do avoid any outside influence, any media information.

Tell anybody that's close to you, "I was up there and the Judge told me I couldn't talk about it." That stops everything. It would be a shame if somebody like you were inadvertently disqualified.

The sheriff now is going to give you the business card of the court coordinator. Should

anything occur in your personal life between now and then that you might think could affect your jury service, give her a call and we'll deal with it.

VENIREPERSON MARSHALL:  Yes, sir.

THE COURT:  Glad to meet you.

All rise.

[Venireperson Marshall left the courtroom.]

THE COURT:  Court's in recess.  Ten minutes.

[Recess.]

[Defendant present.]

[Venireperson Moreno entered the courtroom and approached the bench.]

THE COURT:  Thank you.  Mr. Moreno, have a seat, please.  Appreciate you being here, sir.  I know you were here early this morning and apologize that we've got this late in the morning, but that's just the way it works and I'm sure you'll understand that.

VENIREPERSON MORENO:  Yes, sir.

THE COURT:  My name is Webb Biard and I'll be with you this morning during the jury selection process.  The presiding judge of this court is Michael Snipes, who you met at that large panel, and should you

be selected as a juror, Judge Snipes will actually preside over the presentation of evidence, for whatever that's worth, if that makes much sense to you.

In that regard I want to tell you, we're in the process now of qualifying jurors, prospective jurors. There's going to be about, give or take, we're going to qualify about 50 prospective jurors.

Once that's done, the actual 12-member jury will be selected. We anticipate that will be done in about three weeks. When that's done, you will be notified if you're on the jury.

I want you to do this for me before we go any further, please.

[Venireperson Sergio Moreno sworn by the Court.]

THE COURT: I've introduced myself to you. I also want to introduce Elaine Evans.

MS. EVANS: Good morning.

THE COURT: Andrea Handley.

MS. HANDLEY: Good morning.

THE COURT: They represent Dallas County and the State of Texas. Further to my right is Brad Lollar.

MR. LOLLAR: Morning.

THE COURT: Doug Parks, Keri Mallon. And

they represent Mr. James Broadnax.

Whereupon,

SERGIO MORENO, NO. 604,

having been first duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q.    Did you have an opportunity to read the pamphlet?

A.    Yes, sir.

Q.    Did you see the trial date of August the 10th?

A.    Yes, sir.

Q.    And it's going to last up to two weeks maximum, Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, be a lunch break. The jury will not have to stay together overnight unless and until you were deliberating.

There's a possibility if you were deliberating late into the evening and hadn't reached a verdict and became mentally fatigued, the entire jury would be taken to a fine hotel at county expense, individual private rooms, spend the night, come back, to avoid any outside influence.

That could happen like one or two nights maximum.  If it did, the Judge would give you ample

notice to prepare and bring an overnight bag.

I give you those dates, and you've read them, to ask you this question. As you sit here now, are you aware of any reason why you can't sit as a juror in this case?

A. Possibility of marriage, honeymoon.

Q. Well, tell us about it.

A. I'm going on a honeymoon cruise for an anniversary the end of August.

Q. When?

A. At the end of August.

Q. I'm sorry?

A. End of August.

Q. End of August?

A. Yes, sir. It's not set for sure but that's tentative the dates.

Q. Well, let's see. This is going to approximately the 21st. So what if you, starting August the 10th, you were here for two weeks, what would that do to your trip?

A. Well, it's sort of free. It's a free package that I'm getting and we're trying to take advantage of it, but I haven't got the date set for sure. So I don't want to say for sure that we are going to go those dates yet because it hasn't been set in stone

yet.  That's a possibility.

Q.    All right.  Well, you know, we need to address this now.  Of course, anything is a possibility.

A.    Right.

Q.    And you understand the importance of this case?

A.    Right.

Q.    If you're on this jury, would you stay here and be able to concentrate and consider the evidence?

A.    Yes, I would be.

Q.    Okay.  It wouldn't keep you from rendering a fair judgment?

A.    No.

Q.    Good.  Now, you understand this is a capital murder case?

A.    Yes, sir.

Q.    The State of Texas is seeking the death penalty.  If someone is found guilty of capital murder, there's only two possible punishments.  That's either life in prison without parole or death.

And when I say "life in prison without parole," I mean life I prison without parole.  There was a time that if somebody was convicted of capital murder and given a sentence of life in prison, there was a

possibility of parole.

That is no longer the law. If someone is found guilty of capital murder and given a life sentence, they will spend the rest of their life in prison. All right?

Now, you filled out your questionnaire and I'm going to hand it to you at this time. That's the court reporter.

We really appreciate you taking the time to fill out the questionnaire. The attorneys have read it. It's to some idle exercise. It took you time but it will save more time today because they have read it.

I'm sure there will be a question or two they'll want you to talk about a little bit more. I don't know which ones they are but that's just the way it works. They'll give you the page and the paragraph number to refer to when they ask them.

Now, finally from me. All we're asking you to do is tell us how you honestly feel.

A.    Yes, sir.

Q.    You're not expected to feel any certain way one way or the other. The bottom line question is going to be is once the attorneys explain the law to you, you will be asked whether or not you can follow the law or not.

You can have strong beliefs one way or that way. That's not the bottom line question. It's will you be able to follow the law.

Now, did you read that pamphlet?

A. Yes, sir.

Q. Did that help you a little bit to understand it?

A. Yes, sir.

Q. Did you see those special issues in that pamphlet?

A. Yes.

Q. All right. If someone is found guilty of capital murder, then you go into what's called the punishment phase. The jury then hears evidence and then they consider the evidence they heard in the first part of the trial and then they set punishment by the way they answer those special issues.

You answer them "yes" or "no" depending on the evidence. And depending on how you answer them determines life in prison without parole or death.

If you can do that, you're a qualified juror, but if you've already got your mind made up and say, "Well, here's what I'm going to do in any case, once I find somebody guilty," you wouldn't be a qualified juror.

And if that's the way you feel, you have a right to feel that way, but there wouldn't be any need to have a punishment phase if you decide, "If I find somebody guilty, I know what I'm going to do one way or the other." Does that make sense to you?

A.    Yes, sir.

Q.    All right.  So all I'm asking you to do is just give me how you honestly feel.  Is that a fair deal?

A.    Yes, sir.

THE COURT:  All right.  I want to re-introduce to you now Elaine Evans, who will speak to you on behalf of the State of Texas.

MS. EVANS:  Thank you, Your Honor.

EXAMINATION

BY MS. EVANS:

Q.    Good morning, Mr. Moreno.

A.    Good morning.

Q.    You can just relax there because we're just going to talk about your feelings, okay, how you really feel about issues that may come up in a case like a capital murder.  All right?

Wherever I give you examples, I'm in no way, shape or form talking about the facts in this case because the lawyers aren't allowed to talk to you about

the facts of the case on trial.  Okay?

Just giving you examples of things that could come up because, as the Judge told you, it's important that if you serve as a juror in this case, because you're going to take an additional oath if you're seated as a juror, and that oath will be to render a true verdict based on the law and the evidence.

So it's important here that first you understand the law and then that you would agree to follow it, if you were to serve as a juror.  Okay?  So that's all we're talking about right now.

I doubt you sit around the coffeetable at home and talk about capital murder law and how you feel about such; right?  It's kind of new for you?

A.    Right.

Q.    Okay.  I will say that it's the State's job as well as the Defense's job here today to get fair and impartial jurors.  All right?  We've talked to well over a hundred people now one on one, just like I'm doing here with you.

And we have some people that come in and say, you know what, if the State of Texas proves to me that somebody committed a murder, whether it's capital murder or not, I don't care.  If they proved that

somebody killed somebody, then I think they deserve the death penalty.

You know, they truly believe an eye for an eye, and I know from your questionnaire that you don't believe in that or you don't feel that way, that truly eye for an eye like that.

And we've talked to some jurors that say, I could never, never render a verdict of death under any circumstances because I don't believe in it.

So you can see that's a wide spectrum. You've got people that are always going to do it and you've got people that are never going to do it.

Well, those aren't qualified jurors. All right? But we need somebody in the middle that can be fair and impartial and just look at the evidence as it's presented.

And if the State of Texas proves to you beyond a reasonable doubt that the Defendant committed the offense of capital murder, we're then entitled to a verdict of guilty of capital murder.

And then you would move into the special issues, as the Judge told you about, and then special issue number 1 and number 2.

Again, the State has the burden of proving those to you beyond a reasonable doubt. And if

we prove those to you, then we're entitled to a verdict of "yes" and "yes" to the special issues.

And with regard to special issue number 3, there's no burden. Nobody has a burden. That's just for you to consider. And we'll talk more about those later. All right?

I just want to make sure you understand kind of how the process will go and what it takes to be qualified, is that you just wait and listen to the evidence, okay, and base your verdict on the evidence that you've heard in deciding whether or not the State has proved it to you beyond a reasonable doubt.

Could you do that, Mr. Moreno?

A.    Yes, ma'am.

Q.    Okay. And I can tell by your questionnaire that it looks like you are one of those jurors that are potentially qualified. Okay? You're not so extreme that you're always going to do it and you're certainly not saying that you're never going to do it.

I see by your questionnaire that you do believe in the death penalty; is that correct?

A.    That's correct.

Q.    And I see from page 1 you say you believe in some cases it's warranted. And that's what's important to us. You know, in every case the State of Texas

doesn't -- in every capital murder, because that is the only type of offense that the death penalty is available in Texas, is for capital murder -- we'll talk more about what capital murder is in a bit.

But the State of Texas doesn't even seek the death penalty in every capital murder because we realize what you're saying. Sometimes it's warranted and sometimes it's not.

And sometimes the State of Texas can prove to you the special issues, the answers are "yes," and sometimes we don't get there. And if we don't, then your answers to those would be "no," and it would result in the life sentence without the possibility of parole because, as the Judge told you, there's two available sentences in a capital murder case. All right?

And so we appreciate that you say that some cases warrant it. And I see on page 2 you do agree that a life sentence, rather than death, is appropriate in some circumstances.

And so as we go through this, if you would just keep an open mind because we're not going to -- you know, as you sit here right now today we're not going to ask you in what situation would you give the death penalty, or in what situation would you answer

those questions "yes," "yes," and "no."

We would never do that.  All right?  Because that would be committing you to something that you don't know.  You haven't heard the facts, and as you sit there, you're not required to come up with a fact scenario with what you would do.  All right?

I do want to talk a little bit about capital murder, because that's the type of case we're on here today and the types of crimes that qualify as capital murder here in Texas are, for example, if you kill a child under the age of six or if you murder a police officer or a fireman in the line of duty, when they're in the line of duty, if you kill two or more people in the same criminal episode.

And then a capital murder would also be what we're talking about here, that this Defendant has been indicted for, and that's a murder plus something else, murder plus a robbery.  Okay?

Murder plus another felony, whether it be a robbery or some other felony, is also a capital murder.  All right?

Those are the only types of offenses that qualify for the death penalty, that makes a person eligible.  But again, just as I told you, just because somebody is eligible doesn't mean that they receive it.

Nothing is automatic in this process. All right?

And I know I can see that you're a former Marine; correct?

A. Yes, ma'am.

Q. And you ever served our country in Iraq?

A. Yes.

Q. I appreciate your service over there, sir. But you can probably respect that there's certain protocols and certain rules and processes that you follow, and you probably did that in your military service; fair to say?

A. Correct.

Q. Same holds true, okay, in the last and in sitting as a juror in a capital murder case. It's just a step-by-step process where you let the law guide you and the facts and the evidence that you hear in the case in determining what your answers are. All right?

So when I say that you're only eligible for the death penalty in a capital murder case -- let's say I turn here to my co-counsel and I shoot her ten times. And I sit back and I say, you know, I've been planning to do this for two weeks now. I feel good that I finally did that, and I laugh about it and I'm happy that I did it.

That's not a capital murder, is it?

A.    If the person planned it, if they planned it -- no.  No.

Q.    Right, because it has to be murder plus one of those aggravating factors or, you know, one of the additional things I said, police officer, child under the age of six.  Okay?

So that's just what we call like a plain murder, and so in that situation it's just a range of punishment.  Okay?  It's not death penalty or life without the possibility of parole.  You'd be given a range and you'd just let the punishment fit the crime.  Okay?

The death penalty is not available for just plain murder.  And on your questionnaire, it's not truly fair because we're asking you things before you know what the law is or before you even know what cases in Texas qualify for the death penalty.

But I saw, I guess, when you were talking about what's important to you in deciding whether or not a person receives a death sentence rather than a life sentence in a capital murder case, you say, "If you murder someone."

Do you understand and see now how if it's just murder, that you're to even eligible?  Do you understand that, sir?

A.    Correct.

Q.    So you're not saying, in answering this, that just because somebody commits another murder, without hearing any other of the facts or surrounding circumstances, and certainly you understand now that the law is it must be murder plus, you wouldn't automatically return a sentence of death; correct, Mr. Moreno?

A.    Based on if it's just murder, based on the law, no.  Based on my belief, I'd have to hear all the evidence, hear if they're mentally unstable or if there was a reason why.  But based on the law, no.  Based on my personal belief, most likely.

Q.    Okay.  I understand.  And you obviously feel strongly that a person should not take another person's life; correct?

A.    Correct.

Q.    But I think as you just said, even based on your personal beliefs, you'd have to hear all the circumstances; correct?

A.    Correct.

Q.    And that's all that the law contemplates and asks you to do, just listen to that, okay, and follow the law.

A.    Correct.

Q.    Because as I said, there is nothing automatic.  I want to talk to you a little bit more about the process, and that is -- right now we're just talking about your thoughts and feelings and making sure you can follow the law if you were to sit as a juror.

From there, if you are selected as a juror, then you move into the guilt/innocence phase of the trial where you just determine whether or not the State of Texas has proved to you beyond a reasonable doubt each and every one of the elements of the offense of capital murder, and those elements are there in the indictment, you know, what he's charged with.

And so it's just a checklist.  Did we prove those things to you?  Did this defendant do it?  Is this the person who did it and did he do what they said he did.  All right?

And then if you find somebody guilty of capital murder, and only if you find somebody guilty of capital murder, do you see those special issues.

A.    Right.

Q.    That then help you decide -- you know, you answer those questions and then from your answers to those questions, it will then result in a sentence of life in prison without the possibility of parole, or

death.  Make sense to you?

A.    Yes, ma'am.

Q.    In talking about the various processes, I want to go back a bit to the guilt/innocence phase of the trial when you determine whether or not somebody did what it is we've charged them with.  Okay?

I see in your answers as well, I think, on page 2 when you talk about your argument against the death penalty, you talk about a situation where it involves self-defense or protecting others of your family or loved ones; correct?

A.    Correct.

Q.    All right.  Just so you understand, when we are talking about a capital murder, I told you we're talking about a murder plus something else.  Here, murder plus robbery.

It is always going to be an intentional murder, an intentional act.  Okay?  The person meant to do it.  That is what they set out to do.  All right?  It wasn't an accident.

They were not justified under some theory of self-defense where they are protecting themself or another individual, which the law does allow for.  Okay?

But if a person were to be acting in

self-defense, in that guilt/innocence phase of the trial, you would be bound by your verdict -- your oath to return a verdict of not guilty; correct?

A.    Return not guilty?

Q.    Right, if a person were acting under self-defense, because that is a legal defense.  You have a right to protect yourself.  Okay?

A.    Right.

Q.    Even a right to protect yourself with deadly force, should it be necessary under the circumstances.  All right?  And so I just want you to understand that not only would the death penalty or life without parole not be available in a situation where self-defense or defending another person, those wouldn't apply, and a range of punishment would not even apply because the person should be found not guilty.  All right?

A.    Correct.

Q.    So for capital murder, we are talking about an intentional act.  Somebody meant to do it.  Okay?  That is what they set out to do.  Intentional act plus a robbery.  All right?

Let's talk about defendants' rights.  Whether it be a misdemeanor DWI or this capital murder that we're talking about here today, defendants have certain rights.  Okay?

For example, as the Defendant sits here, he is presumed to be innocent. All right. That indictment is no evidence of guilt. It's just a sheet of paper and all that sheet of paper does is it tells the State of Texas what we have to prove to the jurors, and it tells the Defense what he's been charged with. All right? But it is in no way, shape or form any evidence of guilt.

Would you be able to give this Defendant his presumption of innocence?

A.    If proven innocent, yes.

Q.    Okay.  Now, when you say "if proven innocent," it's the State's burden.  All right?  The burden is always on the State of Texas to prove that a person is guilty.  All right?

There is no where there's smoke there's fire presumption.  Just because somebody has been charged doesn't make them guilty.  Okay?  It's the State's job to prove beyond a reasonable doubt that hey did what we said they did.

We do the accusing.  We'd better do the proving.  All right?  And if we don't, then the verdict is not guilty.  All right?  We haven't done our job.  The evidence wasn't there.  The facts weren't there to support it.

Then the verdict is not guilty, and the burden always, always rests on the State of Texas. Never does it shift to the Defense.

The Defense has done their job by just showing up. You know, they can sit and work crossword puzzles or sudoku all day long and that would be fine. And I know these are fine lawyers and they wouldn't do that, but they have no burden. They never have a burden. Okay?

And so would you be able to, as he sits here -- as I said, you know, you haven't heard any evidence today, have you?

A.    No.

Q.    All right. So you wouldn't be able to say, as he sits here right now, whether this Defendant was guilty or innocent; correct -- or not guilty?

A.    No, ma'am. Correct.

Q.    So would you be able to give this Defendant his presumption of innocence?

A.    Right.

Q.    You could?

A.    Correct.

Q.    And can you hold the State to the burden of proof, never shift that burden to he Defense, because it only lies on the State of Texas? Could you hold the

State to their burden?

A.    Can you explain that a little bit?

Q.    Well, we have to prove it to you, prove that it happened in Dallas County, and the Defendant intentionally caused the death of that involuntary by shooting him with a firearm, okay, in the course of committing a robbery.

Those are things we have to prove to you with evidence that comes from the witness stand. Would you require the State and only the State to do that?

A.    Correct.

Q.    You would never look to the Defense for any reason to prove to you anything?

A.    Well --

Q.    The law says that you can't. Would you be able to follow that?

A.    Well, correct. Correct.

Q.    When I say we have to prove it to you beyond a reasonable doubt, what does beyond a reasonable doubt mean to you?

A.    Where there's no -- it's not 50-50. it's a hundred percent. It's been proven a hundred percent where you can't -- you know, there's no other evidence to show that he's not -- that the person would not be guilty.

Q. Okay. And I think I understand what you're saying. I'll tell you that the law in Texas doesn't give you, as a juror, a definition of beyond a reasonable doubt. It's whatever it means to you. Okay?

And you're right in saying it's not 50-50, because that wouldn't be our burden. Our burden is certainly higher than 50-50. Okay? Beyond a reasonable doubt.

I would tell you, though, or submit to you that it's not 100 percent certainty, because to be 100 percent sure of anything, to have absolutely no doubt, 100 percent sure, you would pretty much have to see it with your own eyes. Would that be fair to say?

A. Correct.

Q. So I would submit to you it's not 100 percent, but it's whatever you believe it to be, and you're correct in saying it's a high burden. Okay?

And that burden rests on the State of Texas. All right? Would you hold us to the burden of beyond a reasonable doubt?

A. Yes.

Q. Okay. Defendant has a Fifth Amendment right. At no point in time can the State of Texas say, you know, "Mr. Defendant, I want you to take the stand now

and tell us everything about what you did."

His own lawyers can't force him to the stand. Okay? It's his decision and his decision alone whether or not to testify.

And you know, you could probably sit here and think of a whole lot of reasons why somebody may not want to testify.

They may not be a good speaker. You know, they may get nervous and feel like that's going to indicate that they're maybe guilty when in fact they're not.

There could be tons of reasons. Their counsel may be advising them not to, or maybe the State hasn't proven their case, so there's no reason for a defendant to testify.

So you know, given all those reasons, the law says you cannot for any reason hold it against the Defendant if he chooses not to St on his own behalf. Could you follow the law regarding that and not hold it against the Defendant if he chose not to testify?

A.    Yes.

Q.    You could do that?

A.    Correct.

Q.    Okay. And when I say you can't hold it

against, you know, the defendant for any reason, let's say that the State came this close. We almost proved to you but you still have a little doubt, you know.

You're not there yet. You don't believe that the State has proven it beyond a reasonable doubt. But then you go back there and say, "Well, but the defendant didn't testify, so I'm going to go ahead and give him a guilty." Do you see why you can't do that?

A.  Right.

Q.  Okay. And you wouldn't do that; right, Mr. Moreno?

A.  Correct.

Q.  All right. When we talk about those elements and the things that the State has to prove to you, those things in that indictment that's up there, okay, for capital murder, let's say for example -- you know, I told you that it says that we have to prove to you that the defendant caused the death of somebody by shooting them with a firearm.

Let's say we've proved everything to you except for you heard testimony that the defendant [sic] didn't die from a gunshot wound. You heard that it was from a stab.

And the crime scene people out there didn't find any bullets or a gun at the scene. They

found a knife, bloody knife.  Okay?

So now the evidence has suggested that the person died from stabbing, not from being shot.  Okay?  Has the case proven their case to you beyond a reasonable doubt?

A.  No.

Q.  What would you be required to do under that circumstance?

A.  Well, I guess start trying to get evidence that a person did it with a knife.

Q.  Well, that might be the State's job and we probably -- it's a little too late now if we've proven the wrong thing.  Okay?

But your job as a juror, because your oath is to render a verdict based on the law and the evidence -- right?

A.  Uh-huh.

Q.  The evidence has now come out at trial that the cause of death wasn't due to a gunshot.  Okay?  Cause of death is now stabbing.

So you would have to find the defendant what?

A.  I would have to hear all the evidence before I can make a complete --

Q.  You're absolutely right.

A.    Before I can say, well, was the person there, any witnesses., was the other person there.  So --

Q.    But if we don't prove to you those things in that indictment, that it was from a gunshot, you would have to return a verdict of not guilty; right?

A.    It would be very difficult.  Like I said, I'd have to hear everything.  I can't just make a judgment based on the person being -- if the person was there, then obviously there must be some form of guilt if he did it, if it was proven that he did do something.

Q.    Okay.  You understand, you know, if we say -- we're required to prove how something happened.  the manner in which it happened.  All right?  Let's just talk about plain vanilla murder.  Let's take it out of the capital murder context.

We say that the defendant intentionally caused the death of the victim by shooting them with a firearm, okay, with a gun.  All right.  That's what we have said.

And the State of Texas -- I mean, like I said, we're the ones that do the accusing, so we can put in that indictment anything that we want to put, you know, based on the evidence as we know it to be.  Okay?

So it's our job to get it right, and you

shouldn't feel bad or guilty in any way, shape or form, because the State does the accusing and then we come into the courtroom and we bring you the evidence and the proof. All right?

So I don't want to confuse you. But basically what I'm saying is in the scenario, we have said we're going to prove that the person, this defendant caused the death by shooting them with a gun, with a firearm.

But then it comes time for trial and I have a witness who -- just say for example, obviously, I didn't do my job. I never talked to the doctor, the medical examiner that examined that body.

And I just popped him up on the stand and the medical examiner tells the jury, "That person didn't die from a gunshot wound to the chest. They died from a stab wound to the heart." All right?

So you know, at this point in time I want to crawl underneath the table because I should have indicted it as the defendant caused the death by stabbing that victim with a knife, but I didn't.

So do you understand what I'm talking about there?

A. I think I'm understanding versus a person is trying to prove a person guilty by the actual act he

committed with a gun versus the actual act, period.

Q. Uh-huh, by what he really did. So what I have proven to you is not what really happened or what really occurred, and I have to prove to you beyond a reasonable doubt that what I have said happened is the way that it happened. Okay?

A. But the bottom line is he did it though.

Q. He did cause the death.

MS. EVANS: Thank you, Mr. Moreno. We appreciate you for being here.

THE COURT: Thank you, Mr. Moreno. Appreciate it. All rise for Mr. Moreno.

[Venireperson Moreno left the courtroom.]

THE COURT: In the presence of Mr. Broadnax, what says the State?

MS. EVANS: Your Honor, the State would challenge this juror for cause in that he was having difficulty understanding the law and the State doesn't believe he would then be able to, for one, give the Defendant his presumption of innocence in reality, nor would he be able to hold the State to the burden of beyond a reasonable doubt and requiring us to prove our case. He tends to have a bias in favor of the State.

MR. LOLLAR: Your Honor, we agree with that, particularly in light of his response in the

questionnaire where we asked him, "Regardless of what a Judge says the law is, jurors do what they believe is the right thing," and he says, "Overall, you have to obey the laws of the land, except when it goes against God's law, God's word for me." Not sure what that would be. "Example, unless I were here feeling what I feel, for example, gay rights goes against God's word."

So we're afraid that he might jimmy the works.

THE COURT: That will be granted. Court's in recess until 1:15.

[Luncheon recess.]

[Defendant present.]

[Venireperson Bedford entered the courtroom and approached the bench.]

THE COURT: Thank you. Please be seated, Counsel. Is it Mr. Bedford; is that correct?

VENIREPERSON BEDFORD: Yes, sir.

THE COURT: I want to say good afternoon to you, sir. Appreciate you being here on behalf of everybody.

My name is Webb Biard and I'll be with you this afternoon during this part of the jury selection process.

The presiding judge of this court, if

you remember, is Judge Michael Snipes.  That's who you met in that large panel.

VENIREPERSON BEDFORD:  Right.

THE COURT:  And should you be selected as a juror in this case, Judge Snipes will preside over the actual trial.

In that regard, what we're in the process of doing is selecting some, give or take, 50 qualified jurors.

When that's done, the actual 12-member jury will be selected from that pool.  So that will give you an idea of what were doing this afternoon.

One of the attorneys from the State and the Defendant will talk to you for up to 45 minutes each.  So this process will take about half an hour.

At that time, I will tell you, before you leave here -- I'll tell you here in open court whether or not you've been selected as a qualified juror or not.  All right, sir?

VENIREPERSON BEDFORD:  Yes.

THE COURT:  Do this for me, please. Raise your right hand.

[Venireperson Lance Bedford sworn by the Court.]

THE COURT:  We've met and you pronounce

it Bedford; is that correct?

VENIREPERSON BEDFORD:  Yes.

THE COURT:  At this time I also would like to introduce to you Andrea Handley.

MS. HANDLEY:  Good afternoon, sir.

THE COURT:  And Elaine Evans.

MS. EVANS:  Good afternoon.

THE COURT:  They represent Dallas County and the State of Texas.  Further to my right as we go, Brad Lollar, Doug Parks and Keri Malloy, and they --

MS. MALLON:  Mallon.

THE COURT:  Mallon.  I've got it written down in phonetics up here and I tried to do it on my own and I can't.  I just can't.

And they represent Mr. Bradford -- Mr. Broadnax.

Whereupon,

LANCE BEDFORD, NO. 468,

having been first duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q.    Here we go.  I'm going to talk to you for just a minute and then, like I say, the attorneys will talk to you.

Did you read the pamphlet?

A.    Yes, sir.

Q.    Did that help you understand the process just a little better?

A.    I think so.

Q.    Good.  I'm sure there are some things in there you weren't aware of, like those special issues, but the attorneys have the unique ability to explain those to you.

And then the bottom line question is going to be, once you understand what the law is, you're going to be asked, can you follow the law of Texas and the United States in performing your duties as a juror.

They might want to know whether you agree with the law.  They might want to know if you knew the law, and they're certainly going to want to know how you feel.

All that is fine.  But the bottom line question is can you set aside whatever strong feelings you may have and just follow the law.

If you can, basically you're a qualified juror.  If for some reason you can't, there's nothing wrong with that, as long as you tell us and mean it.  Then you wouldn't be a qualified juror.

And all we're going to ask you to do is

tell us how you honestly feel.  Is that a fair deal to you?

A.   Yes, sir, sounds good.

Q.   If there's anything -- we get to talking about something, knowing that we're going to talk about some things you haven't sat around and talked about, and you say, "Wait a minute, explain that to me further," we'll certainly do our best to do that.

It's obvious these are outstanding lawyers or they wouldn't be involved in this case, in a case of this import.  But they're also good people and it's out of the question anybody would be intentionally embarrassed or intimidated.

I can tell right off the bat you're not that kind of person anyway, but some people are when they come in.  You know, you've got a judge in a black robe and lawyers asking you questions.

Now, in front of you there you have your questionnaire.  We appreciate you filling it out.  I know it took you a long time to fill out that questionnaire, but it wasn't some hollow exercise.

The attorneys have read it.  They've spent time reading it, and it's going to save you time here today.

I'm sure there's a couple of your

answers that they'll want you to expound on. I don't know what they are but that's just what it is. But they'll give you the page and the -- the numbered page and paragraph to look to, and you'll have it there and you can more easily answer their questions.

Now, we know that when you filled out that questionnaire, you didn't know many of these laws we're going to be talking about. Some you've known since the fourth grade, but a lot of these will be a new concept to you.

We know that. But the questionnaire has a purpose and that's just to see your initial reaction to things. All right, sir?

Now, you understand this is a capital murder case?

A. Yes, sir.

Q. You understand that the State of Texas is seeking the death penalty?

A. Yes, sir.

Q. Do you also know if someone is found guilty of capital murder, which is intentionally causing the death of an individual in certain specific fact situations -- in other words, it's not self-defense. It's not a car wreck.

It's not a hunting accident. It's

intentionally causing the death of an individual in certain fact-specific situations such as murder of a child, policeman, fireman, in the course of a robbery, which is alleged in the indictment.

That's capital murder. Intentionally causing death of an individual while in one of these fact scenario categories. All right, sir?

That is capital murder. And if someone is found guilty of that offense, there is only two possible punishments. One of them is death and the other is life in prison without parole.

Mr. Bedford, when I tell you life in prison without parole, I mean no ifs, ands, buts about it, life in prison without parole. Please take my word on that, man to man.

A.    Okay.

Q.    Now, in that regard, you might have heard that there is parole and there was at one time, when I first started. Then it changed as the years changed, but now for the last so many years in Texas if someone is found guilty of life in prison without parole, they will serve the rest of their life in prison. Are you with me on that?

A.    Yes, sir.

Q.    I want you to understand that when you're

dealing with these special issues.  They're going to explain these special issues to you and then the answers to these special issues, depending on the evidence, if you're qualified, is either "yes" or "no," and depending on how those answers shake out determines the punishment.

And by the way, I want to tell you, the jury verdict decides the punishment.  The jury verdict is not advisory to the Judge.  If those special issues are answered a certain way, it's a death sentence.

The Judge can't look at it and say, "Well, I wonder how Mr. Bedford thought about that, but here's what I'm going to do."  If they're answered another way, it's sentenced to life in prison.  Okay?

A.   Okay.

Q.   All right.  Now, you read the pamphlet?

A.   Yes, sir.

Q.   Do you see where Judge Snipes says the trial is going to start August the 10th?

A.   Yes, sir.

Q.   And will last up to two weeks.  That's Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, lunch break.

The jury will not have to stay together overnight unless and until you were deliberating the

verdict.   Have you ever served on a jury before?

A.   I've served on a civil jury.

Q.   Okay.   There's some similarities but a lot of differences.   But you know what deliberations means?

A.   Yes, sir.

Q.   If your deliberating your verdict and went late into the night and became fatigued, there's a possibility you would all be taken to a fine hotel at county expense, individual private rooms, spend the night, come back together as a group to avoid any outside influence.

I give you that information to ask you, as you sit here now, knowing that time frame and type case it is, do you know of any reason why  you can't sit as a juror in this case?

A.   No, sir.

Q.   Great, okay.   Again, if you need to take a break, let me know.   We'll be going for about an hour and a half.   I drink water.   You certainly have a right to do that or anything else you want to drink up there. Okay?

A.   All right.

Q.   I want you to be relaxed as much as possible and I want to have just one agreement with you.   All I want to know is how you honestly feel.   I want to know

if honestly can follow the law and perform your duties as a juror.  Is that a fair deal?

A.    Sounds good.

Q.    Good deal.  I want to re-introduce to you at this time Andrea Handley, who will speak to you on behalf of the State of Texas.

MS. HANDLEY:  Thank you, Your Honor.

EXAMINATION

BY MS. HANDLEY:

Q.    Good afternoon again, Mr. Bedford.  How are you feeling?

A.    Feel fine.

Q.    Good, I'm glad to hear that.  We have brought all those jurors you met with in the court downstairs that day, and y'all filled out questionnaires.  We're been bringing you up one at a time to speak to you individually.

And our purpose in doing that, as the Judge stated, is to get a pool of qualified jurors. Once we do that, we'll then make our specific election as to who is exactly going to sit on that jury.

One of our main motivations here in bringing you up here is to tell you what the law is, to walk you through that and to see if you can follow the law.

It's exactly as His Honor said, because the bottom line to being a qualified juror is whether or not you're a person that understands the law and can follow the law. Okay? That's primarily what's important here.

But we also like to talk to you and we read your questionnaire because it's also very important to figure out how you feel. You know, who is Mr. Bedford, what is he all about and does he come in with any biases or is he going to give either side a leg up or how have the things in his life affected how he thinks.

I mean, I think to really get to know you, I probably would have to know you for a long time, but we try to do our best in this hour and a half, because it helps us make that ultimate decision on whether or not you will finally sit on this jury, because I could eliminate you from that pool or the Defense could eliminate you from that pool.

A lot of what goes into that is just kind of feeling you out and seeing how you feel. If you can't follow the law, then you'll never be in that pool and that won't become a question.

So it is important that we tell you the law and it's important that you really tell us how you

feel, and I believe you can do that, sir.  It sounds like you don't have any problem with that.

Unfortunately, as much as I want to really get to know you, and I do get a lot from your questionnaire.  I think I have a pretty good picture of who you are.

I'm going to end up doing a lot of the talking here, because there is a lot of law to cover, to tell you what it is and just to see if you understand it and if you can follow it.

But if there's any questions or any kind of ah-ha moments or something like that, by all means, feel free to interrupt me.  You're not going to hurt my feelings one bit.  Okay?

And also, you're a gentleman of 64 years of age, I believe that says.  I don't have my glasses on.

A.   Actually, that changed since then.

Q.   It sure did.  It sure did.  Happy belated birthday there.  I'm going to take it you've got a lot of life experience.  I think you've seen a lot, you've heard a lot, and some of this probably might be repetitious to you.

So I don't mean to offend you if there's anything that you already understand, but I'm going to

go ahead and go through it anyway, and you'll stop me if you need more clarification.

As His Honor stated, so we're calling jurors down today and every day.  We have been for weeks, because this is a capital murder case, and it's a different kind of animal from a lot of other cases.

In many respects it's very different from a burglary case, you know, or a theft of a bicycle case or something like that.

There's a lot of fundamental principles of law that will apply in every criminal case, but a capital murder case is just kind of special, and I think you can appreciate that because it's the only offense we have in Texas to which the death penalty is actually an option.

One of the important things to understand is that the death penalty is always merely an option for the jury.  It's never automatic.

I think a lot of people believe that if a person is found guilty of capital murder, it means they automatically get the death penalty, and it does not work that way.

Some people believe that if they find a person guilty of capital murder, they go back to the jury room and how many people think he deserves life

and how many people think he deserves death.  It doesn't work that way either.

There's actually a very structured methodical process that a jury has to go through to arrive at that verdict of life or death.  And it's not based just entirely on your feelings but it is based on the evidence in the case.

And primarily, does the evidence in the case, do the circumstances surrounding the offense, does the defendant, is everything about that dictate that he should get a death sentence versus life without parole.

I've seen throughout your questionnaire you have said several times in answers to these questions things such as, "It depends on the facts, it depends on the circumstances."

We had asked you things about, you know, even intoxication, and I think you put in there that, "Well, it's something to be considered."

And I'll submit to you that I think you've really hit the nail on the head.  That's what all criminal cases are about when it comes to assessing punishment, is consideration of all the facts and circumstances of the particular offense.  Okay?

So I think you're already going there

with that and that you haven't made up your mind that all capital murder cases are worthy of the death sentence, because you haven't heard a thing about this case, have you?

A.   No.

Q.   And as you sit here today, I don't think you could really truthfully tell us whether or not this particular Defendant's sentence should be life without parole or it should be a death sentence.

I will explain a little to you about capital murder.  Capital murder is the only crime in which the death penalty is an option.  Okay?

It's not an option for any other crime.  Capital murder is the only crime where it's an available option.  It's never automatic.

If I were to take a gun out of my handbag over here, pull it out and just shoot my co-counsel ten times while she's sitting there minding her business and then laugh about it and say, "Ha-ha, I'm proud I did it," I think you'd agree that that's a pretty heinous crime, wouldn't it be?

A.   Pretty serious.

Q.   Sure, pretty serious.  I intentionally caused that woman's death and she didn't deserve any of that.  But I'll tell you what, Mr. Bedford, for that offense

there, I'm guilty of murder, but the death penalty is not an available option for a jury to give me, and the reason being is that's not a capital murder.

A capital murder, I think the easiest way to understand it is it's always a murder. Okay? It always involves a murder, but it's a murder plus something else.

It is a murder plus some aggravating factor. That's what makes it a capital murder. For example, if it is the murder of a child under six years of age, that's capital murder.

Or the murder of a police officer or fireman while they're in the official course of their duties. That's a capital murder. That's that additional factor.

If it's the murder of two or more people during the same criminal episode, that's the aggravating factor. That's capital murder.

Or if it's the intentional murder of a person while you are in the course of committing or trying to commit another serious felony offense, that's a capital murder, another felony offense such as burglary, such as robbery or aggravated sexual assault.

So it's always that murder plus it's something else. Does that make sense to you?

A.    Yes, ma'am.

Q.    Do you think that's a fair law, that we limit it to those murders plus that aggravating factor?

A.    Yes, ma'am, I do.

Q.    Okay.  And that's something that our lawmakers have put in place, you know, that before that ought to ever become an available option to you, we need to see the most egregious of crimes.

We need to see that murder, plus we need to see that aggravating factor.  And if we do, then that person may be guilty of capital murder, but they're still only eligible for the death penalty.  It doesn't necessarily mean that they automatically get it.

Something that's also important to understand about capital murder and particularly in this case -- and keep in mind, I'm not talking about the facts of this case.  That would be inappropriate. I just might use some analogies to help illustrate the law.

But what becomes important in the case of a capital murder involving the murder of an involuntary while committing robbery or trying to commit robbery goes to the mindset of the defendant.

The law demands that in order for you to

find him guilty of capital murder, you must also find that in committing that murder, it was done with intent. It was intentionally done.

In other words, they intended to kill that person. They did whatever was necessary to bring about that person's death. Or in other words, it wasn't an accident, you know.

It wasn't a situation of I just meant to hurt him but he died anyway, or I killed him in self-defense, or sure, I killed him but I was under duress.

It's none of those things. It will always be an intentional murder without any legal justification and it will always be an intentional murder. Does that make sense to you, sir?

A. Yes.

Q. You know, if I just shot you in the knee to keep you from calling the police or something but I accidentally hit an artery in your leg and you bled out and died, I'm guilty of murder. Make no question about it.

But it might not necessarily be intentional murder because my intent was merely to harm you. Does that make sense?

A. Yes, ma'am.

Q. I don't walk away. I'm still guilty of

something and I'll pay the price, but it's not intentional murder.

So capital murder is always that. It's going to be that intentional murder and it's going to have that additional aggravating factor to it.

Any questions about that?

A. No, ma'am.

Q. Okay. And that's what we're talking about in this case. Specifically, we're talking about intentional murder of somebody while in the course of committing or trying to commit a robbery. That's the indictment that stands before us today.

You have served as a grand juror before. I believe you put from 2004 to 2005.

A. That's kind of a wild guess. I'm not real sure about the dates.

Q. Okay. Do you think it's fair to say, though, that you were not on the grand jury that heard this case and returned the indictment?

A. No, ma'am, I wasn't.

Q. I think you understand, as having served on a grand jury, that the cases come in there really fast. A lot of times you just have a police officer might read the case in.

There's no judge in there calling the

balls and the strikes.  It's merely you're there to decide whether or not there's enough evidence to hold it over for trial.

A.    Right.

Q.    There are a lot of fundamental principles of law that apply in any criminal case, be it a misdemeanor theft or be it a capital murder, that apply across the board.

They are those laws that we're talking about, that in order for you to be a qualified juror, you must be able to -- you must be willing to follow those laws.

And as we sit here today, Mr. Bedford, I will tell you that the law states that you are presume the defendant innocent at this point in time, and the reason you are to presume him innocent is because I, as a representative of the State, have the burden, have the duty of proving to you beyond a reasonable doubt that he's guilty.

If and until I can do that, you are to continue to presume him innocent.  Does that make sense to you?

A.    Yes, ma'am.

Q.    That's the burden of proof always goes to the State.  I bring the charges.  I ought to have to bring

the proof.  That's what the law states, that you will always look to the State to prove its case.  You will never look to a defendant to prove his innocence.  Does that make sense to you?

A.    Yes, ma'am.

Q.    Is that a law that you think you can follow?

A.    Yes, ma'am, I can.

Q.    I have to prove my case obviously to you beyond a reasonable doubt, is what the law states.  We don't necessarily have a definition of reasonable doubt, Mr. Bedford.  It's really whatever you think it is.  Okay?

I'll submit to you that it is a high standard of proof.  It's not 50 percent or 51 percent. It's a very high standard of proof, as it should be, given what's at stake in any criminal case, a person's freedom, a person's liberty.

But it's whatever you think it is.  Some people say if I'm convinced beyond a reasonable doubt, then I'm certain, or I'm pretty darn sure, or there's no doubt in my mind that anybody else did it.

You know, it's whatever you think it is. It's not beyond all doubt whatsoever, because the only way I could convince you of that, I think, is if you were standing there watching the crime yourself, and

then you'd be a witness in the case obviously, and not a juror.  Do you understand that concept also?

A.    Yes, ma'am, I do.

Q.    Okay.  Will you hold me to that burden of proof of beyond a reasonable doubt?

A.    I'll do that.

Q.    Okay.  As you know, you ought to know this better than anybody else, the indictment in this case is merely an indictment.  It's just a piece of paper, and what that piece of paper does is it tells the defendant what he's been charged with and it tells me what I have to prove beyond a reasonable doubt in order for a verdict of guilty to be returned.

The law states that at this point, at no point, you cannot use the fact that a defendant has been indicted as evidence against him.  It's merely a charging instrument.  Do you understand that concept also?

A.    Yes, ma'am.

Q.    And is that a law that you could also follow?

A.    Yes, ma'am.

Q.    Contained within the indictment are the elements of the offense.  It is exactly what we have charged the defendant with doing.  And those elements, that indictment puts me on notice that this is exactly

what I have to prove.

I don't get points for proving five out of six. I got to prove six out of six. I got to prove to you who did it, when they did it, how they did it, where they did it. Every element is just as important as the next one.

And if I fail to carry my burden of proof beyond a reasonable doubt on any element, then your verdict must be not guilty. That is the law and you understand that too, I believe.

A.   Yes, ma'am.

Q.   Far out example there just to illustrate how important a rule of law that is and that there is no wiggle room, let's say that you have been called as a juror to sit on a murder case and the indictment has alleged that the defendant did cause the death of another individual by shooting him with a firearm.

That is one of the elements that's the manner and means that I am obligated to prove beyond a reasonable doubt; would you agree?

A.   Yes, ma'am.

Q.   Let's say we go to trial. There's a statement from the defendant where he says, "I killed the guy, I'm glad I killed him, and I'd do it again if I had a chance."

But the medical examiner takes the stand and says, "This guy is dead, sure enough, but he didn't die by being shot with a firearm.  He died from being stabbed with a knife."

The crime scene guy takes the stand and says, "There's no gun at this scene.  There's no bullets but there sure is a bloody knife."

Well, the evidence has shown that this individual died as a result of being stabbed with a knife.  The indictment says that I have to prove beyond a reasonable doubt that he killed him by shooting him with a firearm.  Have I carried my burden of proof in that case?

A.    No, ma'am, you haven't.

Q.    And what would be your verdict?

A.    It would be not guilty.

Q.    Not guilty.  As distasteful as it might be, that illustrates the law to you, that there's no wiggle room there.  That's it.  That's all.  I failed to carry my burden of proof.

And as I'm sure you also know, everybody, you, me, the Defendant, we all enjoy a constitutional right, the Fifth Amendment right to refuse to incriminate ourselves, that if any one of us is indicted, whether or not I choose to testify is my

choice and my choice alone.

And the law states that if a defendant elects to exercise that constitutional right to not testify, that you cannot use that as evidence against him. Do you agree with that law, sit?

A. Yes, ma'am, I do.

Q. If I put on my entire case and you go back there and you look at it and you say, "You know what, she came this close to proving this to me beyond a reasonable doubt, but because the defendant didn't testify, I'm going to find him guilty anyway."

That would be using that against him and that would be wholly improper. Do you understand that also?

A. Yes, ma'am.

Q. Okay. Any questions about those fundamental principles of law there?

A. No, ma'am.

Q. I think that we hear them, we see them and we read about them every single day and I will submit to you that they are based in fairness and good common sense and they are what keeps our system going and keeps our system fair.

They apply throughout the entire criminal case. They never stop. It's always

fundamental that we adhere to those laws.

In Texas, we have what's called a bifurcated trial system, which means we try criminal cases actually in two parts. And our first part of any criminal case, we call it the guilt/innocence phase, and a jury is called upon to do one thing and one thing only, and that is to make the determination as to whether or not the State has proved to them beyond a reasonable doubt that the defendant is guilty of the charge as set out in the indictment. That's all you're called upon to do in that phase of the trial.

If you believe that I have not proved my case to you beyond a reasonable doubt, then what would be your verdict at that point?

A.    Not guilty.

Q.    Not guilty and we'd go home. Okay? If you believe I have, then we move into the second phase of the trial.

But with respect to the first phase of the trial, and this would apply through all phases of the trial also, as a juror in a case, it is your duty -- this is why we have people listening to cases and not necessarily spit facts into a machine and look for an answer.

It's your duty to assess the credibility

of the witnesses in the case and to assess the credibility of the evidence in the case. That's why we have you with life experiences and intellect go back there and do that.

The law states that in order to return your verdict, your verdict has to be based on the evidence that is offered to you in the case and nothing else. Evidence comes to you from the witness stand. That's it. That's all.

In other words, the law states you cannot use what you saw on TV as evidence against the defendant, what you talked about with your neighbor over coffee, "Let me tell you what I heard about the case." That would be completely inappropriate also.

In your question there on page 3 we had asked you if you had in fact heard about this case, and you stated no. You said, "I vaguely recall the shooting as a music store in Garland, but that's all I can recall." Is that still basically all you --

A.   Right.   That's all I know about it.

Q.   Then you understand, sir, that what you may or may not recall, you may not use as evidence in this case, that you have to leave that outside the courtroom, and is that something that you can do?

A.   Yes, ma'am.

Q.    Also in assessing the credibility of the evidence and looking at the testimony, you're called upon to assess the credibility of the witnesses.

I would like to tell you, Mr. Bedford, that everybody that takes the stand and swears to tell the truth and the whole truth does exactly that, but they don't.

Some people do tell the truth. I've seen some people just flat-out lie. And I have seen some people who are just truly mistaken. You know, there's no mal-intent or anything. They're just mistaken and what they say just doesn't shore up with the evidence.

That's your job as a juror, to determine that. Do I believe all, some or none of what this person is saying? Does it make sense?

The law states that when you assess a person's credibility, you assess that person's credibility from the witness stand, that you wait till they take the stand. You wait to look at them, to listen to them, to hear what they say, and then you determine what, if any, credibility you're going to give them.

In other words, the law states you can't say I will always believe a certain group of people and

if you tell me you're going to put these people on the stand, I'm going to tell you before I ever hear a word they say, that I will automatically believe everything they say.

Now, we asked you a question about police officer testimony and whether or not you were inclined to believe that they would always tell the truth, and you were very candid and honest in saying, no, I think that they're pretty much like anybody else, you know, that I'm not going to always believe a police officer.

And I would assume that you recognize that they're human too, that you cannot wash all police officers with the same brush, you know, that they're individual persons and that you have to listen to them as they take the stand and then see if what they say pans out. Does it jibe with the facts in the case?

It sounds to me like that's something that you can and will do also, sir?

A.    Yes, ma'am.

Q.    Now, I bring that up because I see here that from 1965 to 1972 you did serve as a police officer?

A.    Yes, ma'am.

Q.    Was that for Dallas?

A.    Yes, ma'am.

Q.    Were you patrol or what were your duties?

A.    I was patrol division.

Q.    Patrol division the entire seven years there?

A.    Yes, ma'am.

Q.    What caused you to leave the force?

A.    Bad career decision.  My daddy was in the restaurant business at that time and he had been after me for years to go to work for him and he finally talked me into it.

Q.    I got you.  Any regrets?

A.    Well, the main thing is, I could be retired now making the same money I'm making right now, so that's kind of a regret.

Q.    Okay.  One of the things that becomes important in our assessing whether or not you're a qualified juror in the case is whether or not you come into this case with any kind of bias.  You know, a bias in favor of the State or even a bias in favor of the Defendant.

That was a long time ago.  In 1972 I was seven years old and gosh, I'm well into my forties now.  So I know that was a long time ago.

But still, I would be remiss if I did not ask you, Mr. Bedford, because you served as an officer so many years ago, over -- gosh, how many years

has that been?

A.   Thirty -- thirty-five or so.

Q.   Thirty-five years or so ago.  Because you served as a police officer then, do you think that's going to create a bias for you?  Are you going to come in and automatically be pro-State or be pro for the law enforcement, give them a leg up because over 30 years ago you served as a peace officer?

A.   No, ma'am.

Q.   Okay.  And I don't want to pick-pick or beat a dead horse at this, but that's one of those things that we have to honestly absolutely know your gut feelings on that.

I think it's fair to say a lot of citizens, whether they're law enforcement or not, are law-and-order-minded people, you know, but that's what we really do need to know from you, searching yourself, because of your prior experience, are you going to give me a leg up in this case, yes or no?

A.   No.

Q.   You've said, "No," and it doesn't sound like you're going to change your mind.  I'm going to trust you're telling me the truth on that, sir, and I appreciate it.

I want to talk to you about specifically

-- let's talk about death penalty cases then. Okay?

And that's not to give short shrift to the

guilt/innocence phase because it's important, just as

important as the second part of the trial.

But I want to talk to you more now about

the punishment phase of the trial. Keeping in mind,

Mr. Bedford, that if you have found an individual

guilty of capital murder, it means this. It means that

individual intentionally caused the death of another

human being, and that they did it while they were

committing or trying to commit robbery. Okay?

That's where we are. We are past any

was it justified, was it a mistake, was it an accident.

We're past that.

You have found that person intentionally

took somebody's life and they did it in the course of

committing or trying to commit a robbery. That's the

point that we're at. Okay?

Now, in Texas law, as His Honor stated

to you, anybody found guilty of capital murder is

looking at one of two punishments. They will receive

life imprisonment without parole or there's also that

option of the death penalty.

So you can always say this about

somebody convicted of capital murder, is that they will

get life in prison without parole.  Okay?  There's no wiggle room there.  That's automatic.

And I'll submit to you that our lawmakers felt that capital murder was a serious enough offense that an automatic life in prison sentence was appropriate.  Okay?  That's just a given there.

So they are being punished.  I don't know if you've ever been to a penitentiary.  Have you?

A.    No, ma'am.

Q.    Okay.  There's punishment there.  I haven't had the pleasure or displeasure of serving any time in jail but I've been in many of them, and it's not a great place to be.

So there is a punishment there to life in prison without parole.  It is safe to say that that person will die there.  Okay?

However, the death penalty is still an option for you as a juror.  Going in, you know what he's got.  He's already got life without parole.

Our lawmakers looked at this.  They said we understand that this person has committed capital murder.  We believe that's an egregious enough offense to give them life in prison without parole.

However, before you can have the death penalty assessed, you, the State, are going to have to

show us something more.  You're going to have to show us another additional aggravating factor.

Now, keep in mind this person is spending the rest of their life in prison; right?

A.    Yes, ma'am.

Q.    So their new society is not the society you and I move around in, is it?  Their new society is a prison society, isn't it?

And I think you can imagine that within a prison you've got hundreds and hundreds of inmates serving time in that prison, don't you?

A.    Yes, ma'am.

Q.    I mean, they live there, they eat there, they sleep there.  Maybe they go to school there.  They recreate there.  You've got people living, working, breathing, sleeping within that society inside prison.

And not only do you just have inmates in that prison, but you've also got a warden, you've got guards, you've got secretaries, you have clergy, you have people that come to counsel, you have people that come to visit, you know, family and friends.  You have educators.  You've got all kinds of people within that prison system.

And our lawmakers recognize that within all those hundreds of thousands of men and women that

are within that prison system, there are people in there serving all different kinds of sentences for all different kinds of offenses.

We don't have a separate prison just for burglars and a separate prison just for check-writers, bad check-writers, or a separate prison for car thieves.

There are people in there mixing and walking amongst each other who are serving various different sentences and various different kinds of time. Okay?

So you might very well have a person in there guilty of capital murder for the rest of their life walking around with a guy who is in there serving time for forgeries or a guy who is in there serving time because he has an addiction to drugs. Okay?

And what the lawmakers are asking us to look at is we need you to determine -- or the State has to prove to you. We need you to determine this guy that's now serving this life sentence, is that guy going to be a danger to all those other people in that prison society, or is he going to be the kind of guy who maybe will go to prison for the rest of his life, mind his business, read his books, do what he's supposed to do, follow the rules, be respectful.

I'll submit to you there are people there who do that. Or is he going to be the kind of guy who's always going to be a continuing threat to the other people within that system there, because if he's that kind of guy that will be a continuing threat, if he is that kind of guy who more likely than to will commit criminal acts of violence against people within that society, then that's something we need to deal with and that's the guy that we're looking at for possibly giving the death sentence. Does that make sense to you there?

A. Yes, ma'am.

Q. And I'll just ask you, you know, I said there's all kinds of people in that prison. The guy who's been sent, for example, to prison for, say, burglary, the judge has sentenced him to ten years I prison for breaking into a person's house.

He's sentenced to serve ten years in prison now and he's in there with all these people. Do you think that he has a right to have an expectation of safety while he's serving his ten years?

A. Yes, ma'am.

Q. Do you think that it is unreasonable that this man who's serving ten years in prison -- well, do you believe and it's also reasonable that he would

expect that -- he got ten years in prison for burglary but along with that sentence didn't come ten years of a beat down or ten years of being threatened or ten years of being insulted. Fair enough?

A. Yes, ma'am.

Q. Prison is not a pretty place but I have never seen a judge sentence somebody to time and say, "Oh, and by the way, this means you also get a butt kicking." Would you agree with that, that they also deserve a right to safety?

A. Yes, ma'am,

Q. Okay. And I think that that's what our Legislature is looking at, is the safety, not only of the other inmates, but maybe the guards and the educators and the nurses, and is that guy the kind of guy that will just do his time, or is he the kind of guy who more likely than not is going to commit a criminal act of violence or violent acts. Okay?

So when you go into the punishment phase of the TRIAL, MR. Bedford, that's the first question that you're called upon to answer, because you know one thing right now, that the presumption now is -- you know he's going to serve life in prison. Okay?

And just like you presumed him innocent in the first phase of the trial, going into the second

phase of the trial you have to presume that a life sentence without parole is the proper thing to do.

And you have to continue to presume that that's the proper thing to do, only if and until I, as a representative of the State, prove to you beyond a reasonable doubt that it's not.  Okay?

The first question we look at is whether or not that defendant you just found guilty is going to be a future danger.  That's that first special issue that you're hit with there.

We can go through this together.  It says, "Do you find from the evidence beyond a reasonable doubt --" I will tell you that that line right there is a key flag to you saying look to the State., The State has to prove this to you.  Okay?

"-- that there is a probability --" probability is not defined for you, Mr. Bedford, by anyone, but I will submit to you it's more than a possibility.

Some people say a probability means more likely than not.  Would you take issue with that?

A.    No, m.

Q.    Okay.  Have I proved to you beyond a reasonable doubt that more likely than not that defendant will commit criminal acts of violence.

Once again, that term is not defined for you by the Legislature. It's whatever you think it means. But notice what it doesn't say. It doesn't say that the defendant will commit another murder or do you find that the defendant will commit another robbery or that he will commit an assault.

It leaves it wide open for you for you to decide what is and what is to a criminal act of violence. It could vary from anything from another murder to a punch in the face or maybe even just a verbal threat, you know, that I'm going to get you or I'm going to get your family.

That's up for you to decide. If my -- again, my poor co-counsel is sitting here minding her business. If I just hauled off and popped her in the face, would you consider that a criminal act of violence?

A.    Yes, ma'am.

Q.    What if it was in the context of a prison society? If she's sitting there in her cell minding her business and I just haul off and hit her in the face?

A.    Same thing.

Q.    Same thing. That's for you to decide what is and is not an act of violence. "That will constitute a

continuing threat to society."

Well, we know the society that he's living in at that point. Unless he escapes, he's going to be within a prison society for the rest of his life.

So that's the first question that you're called upon to answer. And keep in mind, right now the answer to that is no, because I haven't proved anything to you, because it's my obligation to prove to you that the defendant will in fact be a future danger.

Now, the law states that in order to make that determination, you know, you look at all the evidence in the case, and that you may, rightfully so, look at the circumstances of the offense that you just found him guilty of, and that may help you decide whether or not that person is or is not going to be a future danger.

We're essentially asking you to make a prediction here, you know. So let me ask you, Mr. Bedford, what are the kinds of things that you think you'd like to see or know maybe that would help you make a determination as to whether or not somebody was going to be a future danger?

A.    Probably past experience, what their past has been like.

Q.    Okay. What do you mean like his past, what's

it been like?

A.   Well, if we're talking about being violent, has he been violent in the past?  Was he a fighter?  You know, just whatever.

Q.   Sure.  What's his past been like?  How has he acted around other people, you know, his temper and such as that.

I think we asked you a question -- let me look here -- about whether or not -- turn to page 4 for me there.  We asked you, third question down from the bottom, "Do you think there's some crimes which call for the death penalty solely because of their severe facts and circumstances, regardless of whether or not the guilty person has committed a prior violent act?"

You said, "Yes.  Generally, I believe each crime stands on its own merit.  However, past events could influence sentencing."

And it sounds to me, Mr. Bedford, that maybe you're kind of talking about that, that that's something that you're going to look at to make a determination about this particular person and what they're capable of in the future.

Do you think that if a person has never committed a violent act before in their life but then

commits a capital murder where they intentionally kill somebody while robbing them, that that means -- what does that mean to you?  Would it mean anything?

A.    Well, I think it would definitely mean life in prison.  I don't know.  I think the circumstances would have to determine -- I'd have to know more than just that information, I guess.

Q.    You're absolutely right.  You're absolutely right.  And I put you on the spot like that just to kind of feel you out and see what you were going to say.

But I think your answer is entirely appropriate because you're telling me, "Well, it depends a lot on the facts and circumstances.  You really haven't told me anything."

And I will tell you, I'll submit to you that I think that that's really what our law has in mind.  You know, I've been doing this almost 20 years now and I can tell you that I have yet to see two cases that are exactly alike.

Never two crimes exactly alike, never two defendants exactly alike, never even two victims exactly alike.  Every case is different and I assess the merits of the case each separately.

I decide what I'm going to do on each

case separately and independent of any other case, and I look at the facts and circumstances of that particular case.

You know, just because somebody is guilty of capital murder does not necessarily mean they'll automatically be a future danger to the society that they're in.

It's going to depend largely on what, what they did, why they did it maybe, how they did it, how had they acted before that. How have they acted after that might become important.

So I think what I'm hearing from you, Mr. Bedford, is that just because you've found somebody guilty of capital murder, intentionally killing somebody, no question about that, in the course of a robbery, what I'm hearing from you is that you're not going to automatically say yes to that question.

Instead, you're going to wait to hear some facts. You're going to wait for me to prove it to you, that he's a future danger. Is that correct, sir?

A.    Yes, ma'am.

Q.    I don't want to put words in your mouth so you tell me if that's not right.

A.    That's correct.

Q.    Okay. That's what you do. You look to me.

You look to me to prove to you he's going to be a future danger. Okay? And you look at the context of the offense and you look at the defendant in doing that.

If you find, Mr. Bedford, that I have not proved to you that he's going to be a future danger, if I have failed to carry that burden to show you that in all likelihood, more likely than not, he's going to commit criminal acts of violence, that he will be a continuing threat to the other people in that prison, if I can't carry that burden, then your answer to that question is no. Okay?

And if your answer to that question is no, then I'll tell you, you stop right there. You tell the Judge, "The answer to that issue is no. We agree that's no." And the defendant will get that life sentence without parole that the Texas law has deemed is appropriate for his circumstances. Okay?

If, however, you find that yes, you proved it to me, I believe more likely than not he's going to be violent. He's going to commit criminal acts. If I have proved that to you, then you answer that question yes.

Now, it's no the end of the show. There's still more obstacles that you have to overcome

before we would ever reach a death penalty.

In Texas we have what is called the law of parties, and basically what it states is that -- it recognizes that oftentimes two or more people may be involved in committing a crime together, and that if both persons in that offense, if they aid, assist, direct or encourage each other to do that offense, then they can each be held liable for it.  Okay?

In other words, if my co-counsel and I meet up at her house tonight, decide that we need some extra money and I say, "Hey, I know there's a 7-Eleven on the corner.  There's a clerk that works alone at 1:00 a.m.  I know they've got a lot of cash.  It's just before the cash drop.  We ought to rob that place."

And she says, "Sounds like a great idea to me.  As a matter of fact, I'll go get the gun, I'll go get the bullets and I'll go get the mask."

We meet back up at her house.  We get in her car.  She drives us up to the 7-Eleven.  She hands me the gun.  I take the bullets.  I load it, put as may bullets in it as it will hold, and she says to me, "I'm going to sit out here in the car.  I'm going to act as the good eye, the lookout.  If anybody comes, I'm going to start blowing this horn."

And I say, "Sounds good to me."  I take

the gun from her, start to walk towards the store, and I say, 'Man, I forgot my mask." She says, "Don't worry about it. Just don't leave any witnesses."

I go in that store. She sits in the car. I hold that clerk at gunpoint. I take that money out of the till and then I shoot that clerk so there are no witnesses. Fair to say I'm guilty of capital murder?

A. Yes, ma'am.

Q. I have intentionally killed somebody and I've done it in the course of committing a robbery. What do you think Ms. Evans might be guilty of?

A. I would say she's guilty of the same thing.

Q. She may too be guilty of capital murder, yeah. If she aided, assisted, encouraged or directed in the participation of the offense, she's just as guilty as I am.

In order to be guilty of capital murder, you would have to also find that she actually anticipated somebody was going to die. And you can make that determination based on the surrounding facts.

That's what that special issue number 2 there is. Whether that becomes an issue in the trial, we will see. But if you are encountered with that, you have to look at the evidence and have I proved to you

that the defendant in the particular case was the actual trigger man, or was he a person who actively participated in it and anticipated somebody would die.

if I fail to prove that to you, your answer to that special issue is no, and once again, that life sentence that's presumed the proper thing to do, that's what applies there.

He gets life in prison without parole. You got home. That's it. Okay? I have failed to carry my burden for you.

If, however, I have proved that to you beyond a reasonable doubt just as I did the first special issue, then I'll tell you that he's sitting really close now to a sentence of death. Okay? He's sitting very close to a special ed of death.

But you have one more question that you have to answer. Now, up to this point I have been talking about burdens of proof and look to me, look to me, to prove things to you.

I'll tell you, in this special issue number 3, there is no burden of proof. I don't have to prove a single thing to you, and nor does the defendant. There's no burden of proof on either side. Okay?

It is a special issue for the benefit of

the defendant, but I also like to believe that it's a special issue for the benefit of the jurors, because our lawmakers recognize that we're calling upon you to sit on a case with the highest stakes possible. We're talking about the death sentence.

And our law has always consistently recognized too that the punishment should always fit the crime. And the law recognizes that not only your verdicts, be it in the first phase of the trial or be it in the second phase of the trial, must always be based on the evidence in the case. Your verdict should be appropriate for this particular case. They recognize that.

And I will submit to you that with special issue number 3, you will not, when this is all said and done, walk out of this Courthouse, be it a sentence of death or be it a sentence of life, you'll not walk out of this Courthouse and say, "You know what, I felt like my hands were tied. There was something about this case. There was something about the circumstances about it. There was something -- or the defendant, you know. There was something about this case. Well, you know what, I get it. He's guilty of capital murder and he's a future danger, but there was something here that in my own personal moral

judgment, I believe it should have been a life sentence, even though."

Special issue number 3 gives you that option. We call it the mitigating circumstances option. And basically what it tells you is, go back now and look at all the evidence all over again.

Look at everything and ask yourself, is there something, in all this evidence is there something that I find mitigating? And I think you understand mitigating means lessening, you know.

Is there something here that's mitigating about this defendant, about this crime? And even if it is mitigating, because I'll submit there could be a million mitigating things, even if it is mitigating, is it sufficiently mitigating, is it sufficient enough that that death sentence that he's looking at right now, that I'm going to turn it into a life sentence.

Do you understand what you're called upon to do there? Does that make sense to you?

A.    Yes, ma'am, it does.

Q.    Do you think that's a fair thing to do?

A.    Yes, ma'am.

Q.    Even though a person is a future danger, if though they're guilty of capital murder, you think

that's a fair thing to do, is still have special issue number 3 and that final option?

A.    Yes, I do.

Q.    Why do you think we have that option?

A.    Because there might be mitigating circumstances.

Q.    Right.

A.    It's hard to sit here and give you a specific instance or something like that. I could see how listening to different people and hearing different ideas, that you may be a little uncertain about something that someone said or some of the evidence or something.

Q.    Yeah. And maybe not uncertain about his guilt, because if you found him guilty, you're not uncertain about that. But -- and I think you hit the nail on the head again, Mr. Bedford, is I can't sit here and say to you, all right, tell me right now, what would you find sufficiently mitigating to turn a life sentence into -- you know, a death sentence into a life sentence?

It's really somewhat unfair because, well, first of all, you can't tell me what you're going to do in this case, can you?

A.    No.

Q.    Can you tell me whether or not you will or won't find any mitigating circumstances in this case?

A.    No, ma'am.

Q.    Because you haven't seen a darn thing, have you?

A.    Not a clue.

Q.    Exactly.  So I think maybe the more appropriate question becomes this, Mr. Bedford. Instead of trying to tie you down to when will you do it and when will you not, or instead of trying to tie you down to will you consider this to be mitigating, I think maybe the proper question to you is this.

Will you, first of all, go into special issue number 3 with an open mind?  Will you do that?

A.    Yes, ma'am.

Q.    Will you reconsider all the evidence in the case?

A.    Yes, ma'am.

Q.    And if you, Mr. Bedford, you personally feel that there is a circumstance and that it is sufficiently mitigating to turn that death sentence into a life sentence, will you do that?

A.    Yes, ma'am.

Q.    Okay.  And you'll see it says, "Do you find, taking into consideration all of the evidence,

including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the Defendant."

I think that that's kind of a broad brush, really, you know. And it doesn't say specifically, taking into consideration whether or not the defendant was high, or taking into consideration whether or not the defendant was raised by a single parent. I mean, it's not specific, but I think it lends itself to all those circumstances.

We have, for example, asked you about intoxication. What page is that? Starting on page 5, I think you recognize that it's not a defense. You can't say, "Well, I'm not guilty because I was drunk or I was high." It's not a defense.

But then on page 6, the first question at the top where it says, "The law provides that evidence of intoxication may be considered in mitigation of punishment," not has to be, but may b e considered.

And we asked you if you agreed and you said, yeah, "Yes, all actions are part of an offense and they need to be considered."

And again, I think you hit the nail on the head there, that some people might say I think it's

mitigating, you know, I think it alters how you are, maybe who you really are.

And other people might say, you know what, you did it yourself though, you voluntarily drank. It wasn't involuntarily. It's no excuse whatsoever.

So the important thing to remember from this final issue here is that there doesn't necessarily have to be -- what's mitigating to you might not be mitigating to me, or vice versa. Okay?

And if it's sufficiently mitigating to you, then that's fine. All right? That's all it takes. Okay?

But the point being, is it sufficiently mitigating, you know, and I could pick your brain about that for a while, but I don't know that I will, because I think that you've been pretty clear to us here that you can't tell us what is or what is not?

I appreciate you listening to me. I think you have a good grasp on the law. Boy, 45 minutes go fast for me. I hope it went fast for you.

A.    It wasn't too bad.

MS. HANDLEY:  Thank you, Mr. Bedford. I appreciate it.

THE COURT:  We thank you, Ms. Handley.

Mr. Lollar?

MR. LOLLAR:  Thank you, Judge.

THE COURT:  Brad Lollar will speak to you now on behalf of Mr. Broadnax.

EXAMINATION

BY MR. LOLLAR:

Q.   Do you need to take a break or anything?

A.   I'm fine.

Q.   You okay?  All right, let's carry right on then.  I'm going to start mine so I don't go over. I've got my little clock over here.

How are you doing?

A.   I'm doing well.

Q.   How was Arica?

A.   It was great.

Q.   Was that a vacation?

A.   Actually, I go on a mission trip every year with my church and it was part of the mission trip.

Q.   And I saw you went to Senegal; is that right?

A.   Yes, sir.

Q.   What did y'all do while you were there?

A.   Well, we do several projects.  We did some medical things.  We've done eyeglass things. Currently, we've been working on a water well for some people there.

Q.    Very good.  I wanted to talk to you about the Lake Pointe Church.  Is that the church that you went with on the mission?

A.    Yes, sir, it is.

Q.    And I see that you are a regular attendee there at the Lake Point Church and you attend weekly, as a matter of fact?

A.    Yes, sir.

Q.    And I know on page 3 of your questionnaire that you said you vaguely recall something about the church -- I'm sorry -- about the incident in question here, the shooting at the music store in Garland?

A.    Right.

Q.    But that's all that you can recall.  Now, the reason I'm asking you about this in particular is, we've been told that the widow of one of these victims preached at the Lake Pointe Church about that.  Do you know anything about that?

A.    If it's true, I'm not aware of it, but it's quite possible.

Q.    Okay.  But you didn't happen to be there that particular Sunday?

A.    No.  In fact, I can't remember a woman preaching there, to be honest with you.

Q.    Maybe she was part of the service or

something.  I understand that they played a --

A.    Right.  I'm not -- if it's -- I can't say yay or nay to that.

Q.    All right.  If it happened, you don't know about it.  Okay, very good.

And then I see that you have worked for the Post Office for 30 years?

A.    Right.

Q.    Very good.  And you're out at the Bulk Mail Center?

A.    Yes, sir.

Q.    Very good.  But you were a Dallas police officer from '65 to '72?

A.    Yes, sir.

Q.    And you were a patrol officer?

A.    Yes, sir.

Q.    And what part of town did you patrol?

A.    Well, I started out in the downtown area and then ended up out in South Dallas.  When I left, I was in South Dallas.

Q.    All right.  I believe that you, if I understood, you went off to work with your father in the restaurant business?

A.    Yes, sir.

Q.    And what type of restaurant was it?

A. It was a steakhouse.

Q. Steakhouse, okay. And then following that, is that when you started with the Post Office?

A. Actually, I left him and I managed a Pizza Inn for a short time and then went to the Post Office.

Q. Very good. Well, Mr. Bedford, as you can see, what we're doing is trying to figure out if people can be qualified jurors. What we're doing is qualifying a panel of 50, and I think we have 30 qualified as of today. So we're over halfway there.

What we're trying to do is get a group of 50 people who understand what the law is and say they can follow the law, and we're trying to figure out if they really can follow the law in a case like this.

Now, I've heard obviously what you have to say. I've seen your questionnaire. There are a couple of things I want to ask you about in your questionnaire.

I see here on page 2 we asked you the best argument against the death penalty, and you say, "I cannot think of a reason to be against the death penalty when justly administered." Is that the way you feel?

A. Yes, sir.

Q. Okay. And then over here on page 4 we ask

you, "for what crimes do you think the death penalty should be available in Texas," and your answer was, "Murder."  Is that the way you feel?

A.    Yes, sir.

Q.    On a scale of one to ten, we asked you how strong you are for the death penalty?  And you answered that you were a nine, so pretty far up there on the scale.

A.    Right.

Q.    You do believe it's a deterrent; is that right?

A.    Yes, sir.

Q.    Okay.  Let me ask you this question.  Things have certainly changed since you were a police officer that maybe you've kept up with and maybe you haven't.

A.    Actually, I've already learned a lot of new stuff I didn't know.

Q.    Well, and there's a lot of things we don't expect jurors to know when they come down here.  I don't expect you've ever seen these special issues before.

A.    No, I haven't.

Q.    And that's what we need to spend some time talking about.  One of the things that has changed since you were in law enforcement is this business

about life without parole.  Okay?

A.    Right.

Q.    And as the Judge says to you, starting here, I think, about three or four years ago, the Legislature instituted life without parole, and they mean life without parole.

A.    To be honest with you, this is new to me today.  I did not realize that.

Q.    Well, we've seen that it -- we've talked to over a hundred people now individually like this and we've seen that with a lot of our jurors who have come down.

They have in their mind that if a person gets a life sentence, that they'll serve, oh, 10, 20 years and then they'll be out.

Well, that's the way it used to be.  Not any more.  It is life without parole.  And as the Judge has told you, if a person is sentenced to life without parole, they're going to be in the penitentiary till the day they die, whether that's tomorrow or 60 years from now.  Okay?

So when we're talking about punishment in a capital murder case, we're talking about one of two things, either of which are horrible punishments. And I think you'd agree with that.  I think any

thinking person would agree with that.

A.    Right.

Q.    To be executed is bad.  To be locked up until the day you die is bad.  So in our system of justice now, the Legislature has said those are the two things that can happen to you if you commit the offense of capital murder.

Now, I don't have to spend a lot of time with you, frankly, talking to you about what capital murder is.  You know what capital murder is.

I don't have to talk about a trial.  I'm sure you testified in trials before, didn't you?

A.    Yes, sir.

Q.    Did you testify pretty frequently?

A.    No, not really.

Q.    But sometimes?

A.    Yeah.

Q.    So you're familiar with the process.  You know the State has got the burden of proof.  You know the burden of proof is beyond a reasonable doubt.

And I think that you have said that you could presume the Defendant to be innocent and not find him guilty unless the State has proven their case beyond a reasonable doubt.

They've got to prove everything they've

got in the indictment.  If they don't, then it's your duty to find him not guilty.

You understand what lesser included offenses are?

A.   Yes, sir.

Q.   And how those can frequently come up in a capital murder case, because you've got capital murder being a combination of really two offenses.  You've got an intentional murder and then you've got a robbery. They've got to prove that the robbery was going on when the intentional murder took place.

You're familiar with he different mental states that we have here in Texas of a defendant? We've got intentional, we've got knowing, we've got reckless and we have a person acting with criminal negligence.

A.   Okay.  I'm familiar with the terms, but I --

Q.   You might have forgotten those things but you're familiar with them.  And basically, you know, a person acting with criminal negligence can commit a homicide.

If I'm driving down the street not paying attention and somebody walks out in front of me and I run them over and kill them, well, I can be charged with criminally negligent homicide, and that's

basically when I should have been aware of a risk but I wasn't. Okay?

Now, the next one up is what we call recklessly, and that's when a person is aware of a risk and consciously disregards the risk and causes a death. For instance, on New Year's Eve in South Dallas and West Dallas, where I live anyway, certainly, you can go out at midnight and hear people firing the guns off up in the air.

Well, if that bullet comes down and kills somebody, it certainly was not the intent of the person firing the gun, but that was a reckless act that they did.

They should have been aware of potential consequences and they disregarded those consequences and caused a death, and that's reckless.

The next one up is knowingly, and that's when you know the action that you take can result in serious bodily injury or death.

If I shoot you in the kneecap, that's certainly an act where I know that something bad can happen there, including serious bodily injury or death.

And sure enough, if the bullet hits the femoral artery and you bleed to death, well, then I am guilty of murder, even if I'm not guilty of capital

murder.

Now, capital murder, understand, is the intentional taking of another human being's life. In other words, they meant to do it. They did not shoot them with the intent to wound them, to harm them, to cause them injury or pain, but they shot them with the intent to cause death. Okay?

And it is that type of mindset that is alleged in this indictment, which is right there before you. I don't know if you saw the indictment or not, but it's right up there.

A.    Yes, I did see it.

Q.    Take a look at that if you haven't seen it. Since you've been on a grand jury, you'll know the language there.

A.    [Reviews document.]

Q.    Okay?

A.    Yes, sir.

Q.    So the mindset of the defendant at the time he committed the action is something the State has to prove. And if they fail to prove that he acted intentionally, then we may be looking at murder or we may be looking at recklessly causing a death or causing a death with criminal negligence, but we're not looking at capital murder.

For capital murder, the State has to show the death was caused intentionally.  Okay?

A.   Yes, sir.

Q.   And specifically, the law in the State of Texas tells us that either side, the State or the Defendant, can offer evidence as to the state of mind of the Defendant at the time of commission of the offense, and it's for that particular purpose.

It's to determine what his mental, the culpable mental state was so he can figure out what type of offense was committed.

A.   Right.

Q.   Fair enough?

A.   Yes, sir.

Q.   Do you understand all that?  Okay.

I'm not going to talk about guilt/innocence any more.  We're going to talk about these three special issues, again which we have not expected you to have ever seen.

But now you see, that's just another way a case in which the State is seeking the death penalty is different from any other kind of case.  Okay?

One way, obviously, is that in this type of a case and really only in this type of a case we are entitled to talk to jurors individually.

In any other type of case we have down here at this Courthouse, we would talk to you as a group; right?

The seconds way that this type of a case is different than any other type of a criminal case that we deal with is because in any other type of case, if you find a defendant guilty, then the Judge tells you what the penalty range of the offense is, whether it's five to life or two to twenty or two to ten, and the jury goes back and basically picks a number within that range that everybody can agree on, and that's it.

Well, not in this type of case. As you can see, you do not go back there and pick a number, obviously. You do not go back there and take a vote and say how many are in favor of death, how many are in favor of life without parole. Okay?

You don't do that at all. What you are required to do is answer these special issues. Okay? And as Ms. Handley explained to you, the first one you come to, of course, is special issue number 1. Okay?

I want you to understand this very clearly. If the answer to special issue number 1 is no, your job is done. If they cannot prove to you that the defendant on trial will be a future danger in that prison society and there's a probability that he would

be and there's a probability that he would continue to commit criminal acts of violence, and they have proven that beyond any reasonable doubt, and that's the same burden of proof, of course, that we had in the first part of the trial.

But if they fail to prove that, if by the presentation of all the evidence in the first part of the trial and the second part of the trial brought to you by the State and the Defendant, and if that evidence does not prove to you beyond a reasonable doubt that this is the type of person that no matter where we put him in the penitentiary, he's going to be committing criminal acts of violence that will make him a continuing threat to that society, okay, then you answer that question no.

You come back into court. You don't even get to special issue number 2, the jury.

A.   Right.

Q.   Okay?  You answer that one and the Judge immediately sentences the Defendant to life without parole. And your job is done and the law is satisfied. Okay?

We have some jurors that come down and say -- hopefully, by the time they leave here, they understand what the deal is, but they come down here

and have it in their mind that somewhere along the line they are going to get to figure out whether the defendant deserves the death penalty.

Well, it doesn't matter whether he deserves the death penalty or not. It matters whether or not the State has proven beyond a reasonable doubt that he's going to be a future danger in prison society. Okay?

You were on the police force back in 1969 when *Furman v. Georgia* came down, and that's the Supreme Court case that threw out the death penalty in the United States. Do you remember that happening when you were on the police force?

A.    No, not really.

Q.    Okay. Well, it did, 1969. And basically, that was a nine-zero opinion. All nine justices on the Supreme Court agreed, and it's the only time in the history of this country where each justice wrote their own opinion.

So you had nine separate opinions about what was wrong with the infliction of the death penalty in the United States back at the time in 1969.

And they basically said that it was arbitrary and capricious. The states had not set up any type of a mechanism where you figure out where a

person who was guilty of capital murder, which ones should get death and which ones should not get death. Okay?

And Texas came back in 1973 in the 63rd session, which I worked at as a legislative aide when I was at UT, and that was the year that they brought back in the death penalty.

So I had the benefit of hearing all the debate about that and what needed to be done. And the Legislature gave us special issue number 1, and they said, this is the way we're going to separate out those who are guilty of capital murder but who should not receive the death penalty. Okay?

And that's it. They came back and said special issue number 1, it's the ones who we cannot safely imprison. Okay? Does that all make sense?

A. Yes, it does.

Q. Very good. Do you think that's something that you would -- well, first of all, you understand what the special issue is?

A. Yes, sir. I -- go ahead.

Q. No. Go ahead, please.

A. I was going to say, I don't think I'll have any problem going by what the law is.

Q. Okay. Well, let me test you just a little

bit on this.

MS. HANDLEY: I'd like to hear the juror's answer, Your Honor.

VENIREPERSON BEDFORD: Well, my conscience would be bound to that.

Q. [By Mr. Lollar] Okay, good. And is that -- you say your conscience would be bound by it, by special issue number 1; is that what you're saying?

A. I'm saying that it's laid out what I'm supposed to do and as a juror, I'm taking an oath to do what I'm told to do, what the law says.

Q. Okay.

A. I would feel obligated to do that.

Q. Okay, very good. All right. Well, let me ask you this kind of test question to see where we are. Understand that when we're talking about these special issues, we are only talking in the context of a jury having found a defendant guilty of intentionally causing the death of an innocent victim, and doing that during the course of a robbery, and doing that with the use of a deadly weapon, a firearm. Okay?

So we are being asked to answer these questions about that person, about that type of person who would do that. Okay?

And some jurors tell us, well, if you

have shown me, if the evidence has shown me beyond any reasonable doubt that the person here on trial is the type of person who would get a loaded gun, go out and commit a robbery, and during the course of that robbery, form the intent to cause the death of the victim and do that, then that is the type of person who I believe would always be the type of person who would be likely to cause future acts of violence, even in prison. How do you feel about that?

A. Well, I don't think you could make a blanket statement like that about everyone. I think you'd have to know the person and know the --

Q. What other types of things would you look at? Obviously, you'd look at the offense, but what other types of things might you want to look at?

A. You know, probably their past history, probably even the situation, whatever was part of what took place in the offense could affect that. I don't know, it's hard to sit here and just think of --

Q. Let me throw some things at you. If a person has a long history of violent acts, is that something that --

A. I think that would be something to consider; yes, sir.

Q. -- would be relevant to you?

A.    Yes, sir.

Q.    And if, on the other hand, he has no history of committing violent acts besides this event?

A.    I think that would also be relevant; yes, sir.

Q.    Okay.  That's reasonable and that would lead you to look at how you would maybe want to answer special issue number 1.

Let me point this out to you, there's a presumption under law that the answer to special issue number 1 is no.  Okay?

And we know that because the Legislature put the burden on the State to prove that issue, and they've got to prove that to you beyond a reasonable doubt, the same burden that they have in the first part of the trial.  Okay?

So it's just that important.  That's how big a deal this special issue number 1 was for the Legislature.

And again, I think you understand that now.  Do we need to talk about that any more?

A.    No, I think I'm clear.

Q.    Okay.  Special issue number 2 is in the parties situation.  That's only given to you if there is a party situation, and it asks, again puts the

burden of proof on the State to prove it beyond a reasonable doubt that if we have a party situation, if there's more than one person involved in the commission of the offense, they've either got to prove that the person on trial was the shooter or they've got to prove if he wasn't the shooter, that he actually intended that the victim die or actually had anticipated that the victim would die. Okay?

And really, that's all I think we need to talk about special issue number 2. That's a matter of proof. The State is going to have to prove to you, and if they fail to prove that, then again, your deliberations are over with.

You come back and tell the Judge no on special issue number 2, and at that point he sentences the defendant to life without parole. Have you got any question about that?

A.    No, sir.

Q.    Then we get to special issue number 3. Special issue number 3 is a different animal. This is another way that this type of case is different from any other type of case, because special issue number 3 requires a jury to look at the history of the defendant, to look at the background of the defendant.

And in no other case is the jury ever

told to do that. Now, obviously, you can if you want to, but they are never told to, to specifically consider the character and the background of the defendant. So that sets this type of case apart.

What this is saying, again, "Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant the sentence of life in prison without parole rather than death be imposed?" Okay?

So that gives the jury a mechanism, a vehicle in which to express that yes, the defendant is guilty of capital murder, yes, we think he's going to be a future danger, but no, we do not think he should be executed. Okay?

The law anticipates that each juror should come to their own personal moral judgment on that question, and only in the event that all 12 jurors unanimously agree that there are no mitigating circumstance does the jury return a verdict of no on that answer, which results in a death sentence. Okay?

So all 12 jurors have to agree that there aren't any sufficient mitigating circumstances.

If one juror things otherwise, then we don't have a death sentence.  Okay?  Do you understand that?

A.    Yes, sir.

Q.    Now, what are we talking about in terms of mitigating circumstances?  Mitigating is the opposite of aggravating.  So you know, an aggravating circumstance makes something worse; a mitigating circumstance makes something a little bit less worse.  Okay?

For instance, some people think that the age of the person on trial in and of itself can be a sufficient mitigating circumstance to avoid a death penalty.

Now, you may not know this.  The Supreme Court here in the past couple of years said that nobody can be executed for an offense they committed when they were 17 years of age.  They have to be at least 18.  Okay?  So we've got that cut-off date.

But some people have told us, well, if a person is in the younger range, if they're 18, 19, 20, 21, something like that, that that is something in and of itself that to them would be mitigating, because they anticipate that a person of such a young age may not have been mature enough at that age to really be held responsible to the level of a death sentence for

what they did when they were that age.

How do you feel about age being a mitigating circumstance?

A.    I can see that would be a possibility.

Q.    Okay.  Some people have told us that again the lack of a significant prior criminal history or a lack of violent history, in addition to be important to them in special issue number 1 is also important to them in special issue number 3.

If we have what is basically an act that was out of character for them to have committed, that that may be something in and of itself that could be sufficiently mitigating.  How do you think about that?

A.    That would be possible.

Q.    Some people have told us that if the evidence shows that the defendant was under the domination, mental domination or whatever, of another person, if they were the leader and not the follower of the group that committed the robbery for instance, that that might be something that they would look at, that they would consider anyway.

THE COURT:  Which way?

MR. LOLLAR:  I'm sorry?

THE COURT:  Which way?

MS. MALLON:  You said "leader."

MR. LOLLAR:  I'm sorry.

Q.    [By Mr. Lollar]  If they were not the leader, they were the follower.  I'm sorry if I screwed that up.  To some people that makes a difference; to some people it doesn't.

A.    I'm not sure about that.  You know, all of this is really subjective, to be honest with you.

Q.    Sure.  It is.  It is, and it's meant to be subjective, and we'll talk about that here in just a second.

Some people tell us that the life history of the defendant that brought them to the point where they'd be out doing this type of thing is something that would be of significance to them.

Whether they were born with a silver spoon in their mouth or lived in abject poverty, whether they were raised by a single mother, whether they were abandoned by their father, whether they were tossed around from relative to relative, whether they were beaten as a child, starved as a child, abused as a child, sexually abused as a child, those type of things would make a difference to them.

Standing by itself, knowing that the person is a convicted capital murderer who is going to be a future danger, how do you think?

A.   There again, I'd say it would be possible.

Q.   And lastly, the issue of intoxication.  Now, when we talk about voluntary intoxication, we're talking about alcohol or drugs.

Some people have told us that in accordance with Texas law -- Texas law says the fact that you're voluntarily intoxicated is not a defense you can raise, but it is something the jury can consider in the mitigation of punishment.

Well, and here we are talking about voluntary intoxication as a mitigating factor in punishment.  How do you feel about that?

A.   There again I would say it would be possible, but I'm not sure.  To be honest, I'm not real sure on any of these.

Q.   Well, and let's talk about that, because it's exactly true.  The law says the 12 jurors don't have to agree with each other about what a mitigating factor is and what is sufficiently mitigating.

You could be sitting here and you think something is sufficiently mitigating and the juror right next to you think no, that's not, or vice versa.

A.   Right.

Q.   There is no -- it's not a majority vote on this type thing.  It is again what each individual

juror feels in their own heart is a sufficiently mitigating circumstance to avoid a death penalty. That's what we're talking about.

It's expected that each juror will make their own mind up about that and that each juror will make their own personal moral decision about it. Is that something you think you can do?

A.    Yes, sir.

Q.    Okay.  And last, Mr. Bedford, do you think you can be fair to the defendant in this case?

A.    Yes, sir.

MR. LOLLAR:  Thank you very much. Appreciate it.

THE COURT:  Thank you, Mr. Lollar.

All rise for Mr. Bedford.  You'll be stepping out and you'll be coming right back in, sir.

[Venireperson Bedford left the courtroom.]

THE COURT:  In the presence of Mr. Broadnax, what says the State of Texas?

MS. HANDLEY:  We have no challenges.

THE COURT:  Mr. Broadnax?

MR. LOLLAR:  We have no challenge, Your Honor.

THE COURT:  Sheriff, ask him to return,

please.  All rise for the juror.

[Venireperson Bedford entered the courtroom and approached the bench.]

THE COURT:  Please be seated, Mr. Bedford.  Be seated, Counsel.

Mr. Bedford, of course, the attorneys have agreed that you're a qualified juror, and for whatever it's worth, I whole-heartedly also agree.

It's been a real pleasure meeting you, sir.  I want you to do this for me.  Avoid any outside information about this case from any source.  It would be a shame if somebody like you were inadvertently disqualified because of anything that you might hear that would influence your vote, if you're on the jury, basically from what you hear in the courtroom.

Now, this sheriff is going to give you the card of the court coordinator.  That's who called you to appear today.

VENIREPERSON BEDFORD:  Okay.

THE COURT:  Should anything occur in your personal life between now and August 10th, give her a call and we'll come back up here and deal with it.

Now, is the information you have on your questionnaire as far as telephone number still correct?

VENIREPERSON BEDFORD:  Yes.  Well, yes.

She called me, however, on my cell number and left a message, and it's better to use my home phone number rather than my cell.

THE COURT:  All right.  I'll convey that.

VENIREPERSON BEDFORD:  But both the numbers are good.

THE COURT:  All right.  I'll convey that.

VENIREPERSON BEDFORD:  I'm not a big cell person.

THE COURT:  I'm with you a hundred percent.  All right.  Good luck to you, sir.  Thank you very much.

Court's in recess till 9:00 o'clock.]

[Whereupon, proceedings adjourned, to reconvene Wednesday, June 24 2009.

Reporter's Record continued in next numbered volume.]

- - - - -

THE STATE OF TEXAS        X

COUNTY OF DALLAS          X


        I, Debi Harris, Deputy Official Court

Reporter for the Criminal District Court Number 7,

Dallas County, Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of all portions of evidence and other proceedings

requested in writing by counsel for the parties to be

included in this volume of the Reporter's Record in the

above styled and numbered cause, all of which occurred

in open court or in chambers and were reported by me.

        I further certify that this Reporter's

Record of the proceedings truly and correctly reflects

the exhibits, if any, offered by the respective

parties.

        WITNESS MY OFFICIAL HAND, this the

_____ day of February, 2010.


Debi Harris, Texas CSR #1869
Expiration Date:  12/31/11
Deputy Official Court Reporter
Dallas County, Texas
Crowley Courts Building
Dallas, Texas
(214) 653-3416


Debi C. Harris, CSR
(214) 653-3416