

REPORTER'S RECORD
TRIAL COURT CAUSE NO. F08-24667-Y
VOLUME 27 of ___VOLUMES_____

| | |
|---|---|
| THE STATE OF TEXAS | IN THE CRIMINAL DISTRICT |
| VS. | COURT NUMBER 7 |
| JAMES GARFIELD BROADNAX | DALLAS COUNTY, TEXAS |

INDIVIDUAL VOIR DIRE EXAMINATION

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 24th of June, 2009, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said court, held in Dallas, Dallas County, Texas:

Proceedings reported by oral stenography.

ORIGINAL

Debi C. Harris, CSR
(214) 653-3416

A P P E A R A N C E S


THE HONORABLE CRAIG WATKINS
Criminal District Attorney
Dallas County, Texas
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Boulevard, LB 19
Dallas, Texas   75207-4313
Telephone: 214-653-3600

BY:   MR. DAVID ALEX, SBOT No. 24003256
      MS. ANDREA HANDLEY, SBOT No. 08898800
      MS. ELAINE EVANS, SBOT No. 24032880
      MR. GORDON HIKEL, SBOT No. 00787696
      Assistant District Attorneys

      Also present: Ms. Zandra Robinson


              APPEARING FOR THE STATE OF TEXAS


      MR. BRADLEY LOLLAR, SBOT NO. 12508700
      Attorney at law
      1700 Commerce, Suite 450
      Dallas, Texas   75201
      Telephone No. 214-384-8178

      MR. DOUGLAS PARKS, SBOT No. 15520000
      Attorney at Law
      321 Calm Waters Lane
      Holly Lake Ranch, Texas   75765
      Telephone No. 903-769-3120

      DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
      133 N. Industrial Boulevard, LB 2
      Dallas, Texas   75207-4399
      Telephone No. 214-653-3550

BY;   MS. KERI MALLON, SBOT No. 24049165
      Assistant Public Defender

              APPEARING FOR THE DEFENDANT

CHRONOLOGICAL INDEX - VOLUME 27

|  | | | | PAGE |
|---|---|---|---|---|
| Proceedings, June 24, 2009 | | | | 5 |
| <u>VENIREPERSON</u> | COURT | STATE | DEFENSE | |
| STEVEN ZAIDEL, NO. 412 | 9 | 19 | 65 | |
| Accepted - Juror No. 32 | | | | 94 |
| WILLIAM STINSON, NO. 684 | | 106 | 143 | |
| Accepted - Juror No. 33 | | | | 173 |
| Court Adjourned for the Day | | | | 175 |
| Court Reporter's Certificate | | | | 176 |

Debi C. Harris, CSR
(214) 653-3416

ALPHABETICAL INDEX - VOLUME 27

| VENIREPERSON | COURT | STATE | DEFENSE | PAGE |
|---|---|---|---|---|
| WILLIAM STINSON, NO. 684 | | 106 | 143 | |
| Accepted - Juror No. 33 | | | | 173 |
| STEVEN ZAIDEL, NO. 412 | 9 | 19 | 65 | |
| Accepted - Juror No. 32 | | | | 94 |

P R O C E E D I N G S

[Defendant present.]

THE COURT:   Let the record reflect it's Wednesday morning, June the 24th.  Mr. Broadnax is present.

What says the State of Texas?

MS. EVANS:   Your Honor, the State believes Juror No. 788, Loy Hurd, would not be qualified to serve as a juror in this case in that her questionnaire reflects that she is not in favor of the death penalty.  She says, "I don't believe in a life for a life."

And then she goes on on page 2 to say that she does have moral, religious or personal beliefs that would prevent her from returning a verdict which would result in the execution of another human being, because again she says, "I don't believe in a life for a life."

Clearly, she makes the distinction that she can sit in judgment of another human being, but she just cannot sit for this type of case.

And so given that, we believe she has personal or moral scruples that would prevent her from serving in a death penalty case, as well as she has a bias, we believe, because her daughter was shot eight

times and lived.

But given the fact that somebody so close to her was a victim of a gun crime, we think that she would not be qualified and would have a bias, given the type of case that this involves, as well as her son has a pending first-degree drug case right now.

She did disclose her son's problems and issues, but given that her son has a case pending in this office, and she left how she feels about prosecutors blank and she answered how she felt about all the rest of the respective individuals.

But we believe that this juror, through her questionnaire, has indicated a bias regarding those issues, as well as that she would not ever be able to return a verdict of death in this case.

MR. LOLLAR:  Judge, we do not object to what the State has just said, and we would also like to point out we've got a guy coming in this afternoon, David Russell Holmes, who is Juror No. 801, who has extensive knowledge about the case, which he reflects in his questionnaire on page 3 and has made conclusions, which he tells us about on page 2, as to the guilt of this Defendant in this case.

So in light of both of these jurors here, Ms. Hurd and Mr. Holmes, we would suggest to the

Court we would just agree to excuse both of them.

MS. EVANS: The State would also agree with what the Defense said about Juror 801, David Holmes, as well as he indicates that he's very skeptical of police and the D.A.'s Office and would not put it past the police or the D.A. to manipulate the truth.

And so in that, we believe he also has a bias against the State, as well as Defense, yes.

THE COURT: That will be approved by the Court.

As I understand it, we're going to attempt to have Mr. Stinson appear this morning.

MS. HANDLEY: Apparently he's on his way, Your Honor.

THE COURT: Fantastic. Are we ready for Mr. Zaidel?

MS. HANDLEY: We are, sir.

THE COURT: All right. All rise for the juror.

[Venireperson Zaidel entered the courtroom and approached the bench.]

THE COURT: Please be seated, sir. Please be seated, Counsel.

I want to say good morning to you, sir.

VENIREPERSON ZAIDEL:  Good morning.

THE COURT:  Appreciate your being here. Appreciate your being here on time.  My name is Webb Biard and I will be with you this morning during this part of the jury selection process.

The actual presiding judge in this court is Mike Snipes.  That's who you met at that large panel.  Should you be selected as a juror in this case, Judge Snipes will preside over the presentation of evidence.  For what that's worth, I just wanted to tell you that.

Also at this time I want to introduce to you Andrea Handley.

MS. HANDLEY:  Good morning, sir.

THE COURT:  Elaine Evans?

MS. EVANS:  Good morning.

THE COURT:  They represent Dallas County and the State of Texas.  Further to my right is Brad Lollar.

MR. LOLLAR:  Morning.

THE COURT:  Doug Parks.

MR. PARKS:  Good morning, sir.

THE COURT:  Keri Mallon?

MS. MALLON:  Good morning.

THE COURT:  And they represent Mr. James

Broadnax.  Mr. Broadnax.

Before we go any further, do this for me, please.  Raise your right hand.

[Venireperson Zaidel sworn by the Court.]

Whereupon,

STEVEN ZAIDEL, NO. 412,

having been first duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q.   And is it --

A.   Zaidel.

Q.   -- Zaidel?  Thank you very much, sir. Appreciate that.

Let me give you a little idea of what we're doing and how the morning will proceed.  I think that it helps, whether it be work or at home or any situation.

We're in the process of qualifying some give or take 50 prospective jurors.  We're at 31 now and we anticipate it will take about another three weeks to do that.

When that's done, the actual 12 will be selected from that panel.  Like I said, that will probation be done in about two or three weeks.  Then those 12 will be notified by the Court.

I will tell you this morning whether or not you are a qualified juror, so when you leave here, you'll know whether there's a possibility you'll be in that pool. That doesn't necessarily mean you'll be selected on the jury. All you'll know is you will not be in the pool.

Did you have an opportunity to read that pamphlet?

A.    Yes.

Q.    Did that help you a little bit understand this procedure?

A.    Yes.

Q.    We appreciate you filling out your questionnaire and I'm going to hand it to you at this time, sir.

I'll tell you, I know it took time to fill that out, but it wasn't some idle exercise. The attorneys have read it in detail, and actually, it's going to save you more time today than it took you to fill it out.

We also know when you answered that questionnaire, you probably weren't familiar with a lot of these laws we're going to be talking to you about. We understand that.

That doesn't have anything to do with

it. Believe it or not, that serves a purpose of kind of getting some of your first impression feelings about some of these concepts.

The bottom line question when we determine whether or not is qualified or not is not whether they knew that was the law, not whether they agreed with the law, but whether or not once the law was explained to you by these extremely competent attorneys -- and that's their responsibility and my responsibility, not your responsibility.

Once the law is explained to the jurors, you'll be asked the bottom-line question and that is, now that you know that's the law and now that you know that's the procedure that's set up by the Texas Legislature and U.S. Constitution, U.S. Supreme Court, would you be able to follow that in performing your duties as a juror.

And I don't want to sound flippant, because this is no time for that, but the attorneys and I didn't get together over the weekend and say, "Well, how are we going to proceed Wednesday morning?"

What we're doing, we're proceeding strictly in accordance with the laws of Texas and the United States, and I'm sure you understand that.

A.    Uh-huh.

Q.   The only thing I'm going to ask of you, and I think you'll discover it's a fair deal, just to tell us what your honest answers are.

This isn't like some legal pop quiz and it's not like what's two plus two and the right answer would be four.  The right answer is how you feel in your heart.  Is that a fair deal?

A.   Yes.

Q.   And ever how you feel is perfect and exactly right, as long as you tell us.

Now, did you have an opportunity to read that pamphlet?

A.   Yes.

Q.   You told me you did.  Did you see the date of the trial?

A.   Yes.

Q.   August the 10th.  Judge Snipes will start the trial on that date and it will last up to two weeks. That's Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, lunch break.

The jury will not have to stay together overnight unless and until there's a possibility that you were deliberating, went late into the night, became fatigued and the jury as a whole agreed to take a break.

You'd all be taken to a fine hotel, individual private rooms at county expense and returned in the morning to avoid any outside influence. That could happen.

It might not happen. If it did happen, the Judge would give you plenty of advance notice, like, "Tell the people important to you and bring an overnight bag because you might have to spend the night."

I tell you that to ask you this. Now that you know that that is the time frame and the way that the trial proceeds, as you sit here now, do you know of any reason why you can't sit as a juror in this case?

A.    Other than business reasons, no.

Q.    Okay. Do you want to tell me about them?

A.    Well, I have a job that I might have to travel. It's unknown what my August time frame is right now. So other than that, there would be no reason.

Q.    Okay. Well, if you're selected on this jury, you'll have to be here.

A.    Right.

Q.    All right. And if you were called to serve and weren't able to tend to your profession, would you

still be able to concentrate on the evidence as it is presented to you?

A.    Absolutely.

Q.    Fantastic.  Great.  Now let me tell you, you saw how many people were there that day.  There was a morning session and an afternoon session.  The vast majority of those people haven't even been called up here.

So these attorneys, and I tell you right off before we get started, think that you very well wold be a qualified juror, and you just tell us whether you think that you are or not.

And again, we know that when you filled out that questionnaire, you didn't know -- some of these laws you've known since fourth grade, but I guarantee you, you didn't know about these special issues, did you?

A.    No.

Q.    Okay.  Do you now understand that that's the way that you decide punishment in a capital murder case?

A.    Yes.

Q.    All right.  Have you ever served on a jury before?

A.    Yes.

Q.   Criminal jury?

A.   Yes.

Q.   Did the jury reach a verdict?

A.   Yes.

Q.   Did the jury set punishment?

A.   Yes.

Q.   You're ahead of most jurors.  You understand from that experience that criminal jury trials are in two parts, guilt/innocence phase; remember?  You found the person guilty so you went to punishment, and then you get into punishment, and you know which part of the trial you're in; correct?  Isn't that right?

A.   Correct.

Q.   All right.  One of the things they're going to be asking you is -- and I'll tell you this.  This is a capital murder case and you know that.

And the State of Texas is seeking the death penalty.  You know that by now, I'm sure, from the questionnaire and sitting here.

Do you know if someone is found guilty of capital murder, there's only two possible punishments?

A.   Yes.

Q.   One of them is death and the other is life in prison without parole.  And let me tell you, sir, and I

want you to please accept my word on this.

Now the law in Texas is if someone is found guilty of capital murder and receives the life sentence without parole, that's the verdict, they will serve life in prison. No parole.

There was a time -- you probably don't know this -- when I first started out as a lawyer, there was a certain number of years that a person who received life in prison in a capital murder case would become eligible for parole. That is no longer the case.

So we're talking about if someone is found guilty in a capital murder case, they are either going to stay in prison till they die or they're going to receive the death penalty.

And I think you'd agree with me, both sentences are serious punishment. So we're not talking about five years. We're talking about life in prison without parole or death.

And do you now understand that the way the jury sets punishment is by answering those special issues? You answer them yes or no.

And from reading those special issues and you're going to have ample opportunity to read them again -- and I've read them a thousand times and I

can't quote them to you and I don't expect you to quote them.

Each issue is separate from the others. Each issue has nothing to do with whether or not the person on trial is guilty or not. That's already been decided.

When you're answering these special issues, guilt is no longer an issue. So to be a qualified juror, you're going to have to say that even though if you should find someone guilty of capital murder, you can still answer those special issues yes or no, depending on the evidence.

And if you can do that, you're basically going to be a qualified juror. Do you think you can do that?

A.    Yes.

Q.    And if you answer them a certain way, it will result in death. If you answer them another way, it will result in life in prison without parole.

And I assure you, sir, and I promise you, your answers would to be advisory to the Judge. In other words, the Judge can't say, "Well, I wondered how the jury felt about this case, but I heard the same evidence. I don't care how they answer them. Here's what I'm going to do."

A yes, yes, no, yes to 1, yes to 2, no to 3 is a death sentence. Any other combination of answers is a sentence of life in prison without parole, and it's not advisory to the Judge.

Is there anything you want to ask me about the process before the attorneys start talking to you?

A. No.

Q. One attorney from the State and one from the Defense will talk to you for up to 45 minutes, so this process is going to take about an hour and a half.

If at any time during this you need to take a break, you need water, coffee, Coke, let me know. I drink water. You're certainly entitled to be as comfortable up there as you can be.

All right, sir?

A. Okay.

Q. Fair deal?

A. Yes.

Q. Okay.

THE COURT: I want to re-introduce to you Andrea Handley now, who will speak to you on behalf of the State of Texas.

MS. HANDLEY: Thank you, Your Honor.

EXAMINATION

BY MS. HANDLEY:

Q. Good morning, Mr. Zaidel. Is that how you say it

A. Zaidel.

Q. Zaidel. Okay, Mr. Zaidel. Appreciate you being here on time. Appreciate you giving us your time and attention in this matter.

Let me tell you basically, you know, what we're doing, is we had hundreds of people come down that morning. We had even more people come down that afternoon for this case specifically.

And we had everybody fill out a questionnaire. And since then, we've actually read all these questionnaires and we've brought people down one at a time.

We bring so many people on a case like this because it's our hopes of getting a pool of qualified people that we can ultimately pick our jury from.

We bring so many people because there's just a lot of people who this is not the right case for them. Maybe they just can't sit on a case involving the death penalty.

On the other end of the spectrum, there are some people who are just a little too egregious and

aggressive, quite frankly, who will say, "If you show me a murderer, I'll give them death penalty."

And that's not a qualified juror. That's somebody who's already made up their mind without hearing a shred of evidence.

So we cull through all these people in the hopes of finding somebody who, as the Judge said, can follow the law, because the bottom line for a qualified juror is somebody who can follow the law and who will base their verdict, be it the guilty or not guilty verdict or be it the verdict of life in prison without parole or death sentence, who will base that verdict on the evidence in the case and nothing else.

And a qualified juror is also an individual who is willing to really look at that evidence and absorb that evidence and base their verdict on the evidence and most appropriately, let their verdict fit the evidence and let the punishment fit the evidence.

I'll tell you, I sat down and I read your questionnaire and did a lot of highlighting on it. And granted, you didn't know the law when you first filled out the questionnaire, and we understand that for all these jurors.

But what we do get a lot of time from

these questionnaires is whether somebody is maybe already on the same page with us in terms of coming in with an open mind and willing to listen to everything and ultimately basing their verdicts on the evidence in the case.

And I'll tell you, and you'll tell me if I'm wrong, because I'm not here to put words in your mouth, but as I've gone through your questionnaire, I see a lot of that, you know, because as the Judge said, the death penalty, it's not automatic.

It's something that only happens if the facts fit it. And throughout your questionnaire, on page 1 and 2 for example, you have already recognized where you say that, "The death penalty is an option for certain capital crimes."

And you're absolutely right. It's always merely an option, never an absolute. On page 2 you had put on there that it's an option and it's only justified in certain circumstances. And again, sir, I say to you, you're absolutely right.

You've put in there in answer to one of the questions you've noticed that the case should always be judged by the facts.

Also throughout your questionnaire, I see where you've put on page 4, "The punishment should

fit the crime." And also you have put, "A life without parole sentence could be or can be justified under certain circumstances."

You're absolutely right, sir. It always, always depends on the evidence in the case. And particularly in a death penalty case, you know, it's not enough that the person has just been convicted of capital murder.

We're going to have to prove certain things to you. You had an opportunity to look at those special issues. Those are the additional obstacles that we, as representatives of the State, have to overcome, things that we have to prove to you before you can say that it's an appropriate sentence in the case.

And one of those things that you do in the punishment phase is you do take a good hard look at all the surrounding circumstances of the case. You look at the circumstances surrounding the Defendant, his character, his upbringing, his environment, and ultimately that's how you answer those questions.

Again, to me, it shows that you have demonstrated a willingness to at least consider certain things in arriving at your verdict.

For example, on page 6, we had asked you

about intoxication, you know, and we had told you on the previous page there intoxication is never a defense. You can't say, "I'm not guilty because I was high or drunk."

However, at the top of page 6 we did tell you that the law provides that evidence of intoxication may be considered in mitigation of punishment.

And you stated to that that you do agree with that, that it can in fact lead to poor judgment, so it should be considered in mitigation of punishment.

And that's the key. You always want to consider something, but ultimately, Mr. Zaidel, whether or not you want to give that any credibility or how much weight you want to give that piece of evidence is always entirely up to you.

I will talk to you about the law just so I can tell you what the law is and you'll tell us if you don't understand it or if you don't agree with it, because -- we do that, but quite frankly, we also like to kind of pick your brain a little bit and just see what Mr. Zaidel is all about.

You know, see if there's something that either one of us, it's going to help us make our ultimate decision as to whether or not we believe that

you're the right juror for this particular case.

You are already, as the Judge correctly stated, ahead of the game, in my opinion, because you've already sat on a criminal case before, and not only did you sit in the guilt/innocence phase and found the defendant guilty, but you were also the body that assessed punishment in the case.

Now, you stated in your questionnaire that you thought I might have been one of the prosecutors on that. Do I look familiar?

A.    You were.

Q.    I was. Was I the lead prosecutor or did I just help pick the jury and sit with another counsel?

A.    That I can't remember.

Q.    Okay. I'm almost embarrassed to admit that I've tried so many cases, I was going when did I get 13 years concurrent on a case. What kind of case was it?

A.    It was a bodily injury, illegal immigrant. I just don't remember exactly but I remember it was a concurrent sentence with deportation after.

Q.    Okay. He was tried on several different charges and you heard all of those and then ultimately gave him 13 years on each sentence?

A.    On each and it was run concurrent and then he was issued a deportation.

Q.    I see.  I see.

A.    Those are the things I remember.

Q.    Okay.  Would you say that was a good experience for you as a juror?

A.    Yes.

Q.    Well, I'm glad to hear that.  Glad to hear that.  Obviously, and I'm going to make an assumption here that just because I was the prosecutor on a previous case that you sat on, that you recognize that that case that you sat on before was an entirely different case, and that just because I presented evidence in that case and you believed our evidence beyond a reasonable doubt, you're not going to necessarily say, well, anything Andrea Handley believes is obviously -- you're not going to do that, are you?

A.    No.

Q.    Okay.  And I didn't think you would but I thought I'd go ahead and mention it.  Let me just for the record then run through some of those fundamental principles of law that applied in that case just like they will apply in this case.

And I'll submit to you, you wouldn't have been qualified then if you couldn't follow the law, and I believe that you probably proved to us that you could.

You know, as we sit here today, you understand the Defendant is presumed innocent at this point, and that being because I haven't presented a single piece of evidence to you.

As a representative of the State, I have brought the charges in this case, and therefore it is my legal obligation to bring the proof in this case.

And only if and until I can prove to you and the other jurors beyond a reasonable doubt that the Defendant is guilty of the charge as set out in the indictment, you are to continue to presume him innocent.

And I believe that you understand that law and that's a law that you could follow?

A.   Yes.

Q.   And you will hold me to that burden of proof?

A.   Yes.

Q.   And you will make me prove my case to you beyond a reasonable doubt?

A.   Correct.

Q.   And as you may -- I believe was the law in 2007, there's not necessarily a definition of reasonable doubt, Mr. Zaidel.  It's whatever you think it is.

I will submit to you, it is a high

burden of proof.  It's not just more than 50 percent, but it's not beyond all doubt whatsoever.

It's generally if you have a reasonable doubt, I'll submit it's a doubt based on reason and common sense.  A lot of people say if you prove something to be beyond a reasonable doubt, then I'll tell you I was convinced. you know.  So it's whatever you think it is, but it is definitely a high burden of proof.

You understand that a defendant, you have this right, I have this right, the Fifth Amendment right not to testify, and that if the Defendant elects to exercise that constitutional right, that you may not use that as evidence against him.

And I don't know if the Defendant testified in the case that you sat on previously?

A.    No, did not.

Q.    Okay.  And I would take it and I would hope that when you went back into your deliberations, nobody said, well, because the guy didn't testify, he must be guilty, and I'm going to use that against him.

A.    Correct.

Q.    That you did not do that, you know.  And the indictment, Mr. Zaidel, as you recall from your previous service, an indictment is just merely -- it's

a piece of paper. The law states that it's not to be used as any evidence against the defendant.

You know, we can say where there's smoke, there's fire, you know, at home and talk about that, but in a court of law that's inappropriate.

It merely tells the defendant what he's been charged with and it tells me what I have to prove to you beyond a reasonable doubt.

As you may already know, that indictment sets out certain elements. You know, I have to prove to you this defendant did it on this date in this county, who he did it to, how he did it. You know, those are the elements of the offense.

And I don't get points for proving five out of six. I have to prove every element to you beyond a reasonable doubt.

I may come close on one indictment but not actually -- on one element, but not actually make it. Well, you can't give me a leg up. If I fail to prove any element of the indictment, your verdict must always be not guilty.

And just a quick example just to illustrate that there's no kidding around here on that fundamental principal of law, let's say, for example, you were called to sit in a murder case, and I have

alleged in the indictment that the defendant caused the death of another individual by shooting him with a firearm.

That's what's referred to as the manner and means. It's in the indictment and that means that I must prove that manner and means beyond a reasonable doubt.

Let's say the defendant in that case took the stand and said, "Yeah, I killed that guy. I'm glad I killed him and I'd do it again if I had a chance." Okay?

But the medical examiner takes the stand and says, "This guy didn't die from a gunshot wound. He died from being stabbed." The CSI guy takes the stand and says, "There's no gun at the scene. There's no bullets or casings, but there was a bloody knife."

Have I proved to you beyond a reasonable doubt that he killed him by shooting him with a firearm?

A.    No.

Q.    And what would be your verdict in that case?

A.    Not guilty.

Q.    Not guilty. Absolutely. And so those are the fundamental principles of law that apply.

Also, you probably also recognize from

your prior service that one of the most important things you do as a juror is to judge the credibility of the evidence in the case.

And all evidence comes to you from the witness stand. It doesn't come from the coffeeshop or what you heard on TV. It comes to you from the witness stand in the form of either people testifying to you, maybe documentary evidence, maybe something you can actually hold and look at, but it comes to you from the stand.

And just because somebody takes the stand and swears to tell the truth and nothing but the truth, I'd be kidding you if I said they always do, wouldn't I? Some people don't tell the truth, and it's up to you to decide as a juror if that person is credible and how much credibility you give them.

Now, the law states that when you assess an individual's credibility, you have to do it from them being on the witness stand. In other words, you can't say, "I will always believe a certain group of individuals, and before they even take the stand, I'll tell you right now that if you put one of those category of people on the stand, I'm always going to believe what he says," because you wouldn't have followed the law.

You wouldn't have made that assessment of credibility from his testimony from the stand.  Does that make sense to you, sir?

A.   Yes.

Q.   And I bring that up because we did ask you about police officers on page 7 where we asked you -- it's about the middle of the page there.  "Do you believe police officers are more likely to tell the truth than the average person?"

And you said, "Yes.  As someone with a sworn duty to uphold the law and provide safety to our communities, their motives should be more ethical than the average person."

I'll tell you, I agree with you.  You know, I think that they should be held to a high standard.  What I may be hearing here from you -- you correct me if I'm wrong -- is that what you're looking for is you have an expectation that they're certainly going to be truthful on the stand based on their profession and such as that.

And there's nothing wrong with having an expectation, but what the law states is that you can't say, "If you tell me a police officer is going to take the stand, I'll automatically believe everything he says."

Is that the position that you take where you automatically believe what they say before they actually take the stand?

A.    Oh, no, no, no.  No, I won't.

Q.    Okay.  And again, nothing wrong with your answer there.  I just wanted to clear up with you what the actual law was.

Let's talk a little bit about then capital murder versus -- and I hate to say regular murder because I don't think there's anything regular about murder.

But capital murder is the only offense to which the death penalty is an option in Texas.  It's not an option for any other crime, and it's not an option even for a regular murder, if you will.  There's actually a distinction between the two.

If I were to, for example, take a gun out of my briefcase right now, turn to my co-counsel, Elaine Evans, who is just minding her business and has done nothing wrong to me, and shoot her five times, laugh about it, stomp on her body and say, "I'm glad she's dead," I'm sure you would agree with me that that's a pretty heinous murder, isn't it?

A.    Uh-huh.

Q.    And I'm sure you would agree with me that I

certainly intended to cause her death by shooting her five times; wouldn't you agree with me?

A.   Yes.

Q.   But I'll tell you what.  As a defendant, if I was charged with that murder of Ms. Evans, the death penalty is not an option for the jury, because it is merely considered a first-degree murder.

Now, I could get anywhere from 5 years up to 99 years or life in prison, but the death penalty is not even an option because it is not a capital murder.

A capital murder is actually a very -- and I say narrowly defined because we do have a lot of laws in Texas, but it's a defined category of cases.

And I will tell you this, Mr. Zaidel, capital murder is always this, particularly for this case.  It involves an intentional murder, first and foremost.

It's not a murder where it was an accident or I was merely being reckless and somebody died or even a murder situation where I didn't mean to kill the person but I wanted to maybe shoot im in the kneecap so they couldn't chase me so I could get away with a crime.  You know, I didn't intend to kill that person.  I intended to harm them, but as a result of me

shooting them, they died.

Well, that's a murder and that's still a first-degree murder, but I didn't intend to kill them. I merely intended to harm them. Does that make sense to you?

A.    Yes.

Q.    And therefore that is not a capital murder. In the capital murder particularly, in a case such as this, you must always find before you can return a verdict of guilty that the defendant intended to cause the person's death.

Whether or not they intended to do that, that's something that you can glean from the evidence in the case. You know, what exactly happened, how did it happen, and you then make that determination as to whether or not his actions were in fact intentional versus something else. Okay?

So capital murder is always intentional murder, but it's something else in addition to it. It's that murder plus an aggravating factor.

For example, a capital murder would be the murder of a child under six years of age. That's that aggravating factor. Or it would be the murder of a police officer or firefighter while they're in the line of duty. That's that additional aggravating

factor.

Or it would be the murder of two or more individuals during the same criminal episode. That's capital. Or as this case would be, it is the intentional murder of an individual while in the course of committing or trying to commit another serious felony offense, such as burglary, such as rape, such as robbery.

And in this case I will tell you, because I'm not talking about the facts of this case, but we have alleged capital murder by intentionally taking the life of an individual while in the course of committing or trying to commit the felony offense of robbery.

Does that make sense to you, the difference between murder and capital murder?

A.    Yes.

Q.    And do you think that's fair, that the law would limit the option of a death sentence to just categories such as that, to a defined category, or do you think it should be wide open for all murder cases?

A.    No, I think it should be, because of the finality of it, that it should be limited.

Q.    Absolutely. And I'll tell you this, and this is something that everybody needs to remember in the

context of looking at these cases, is that just because you don't receive a death penalty does not mean you go unpunished.

As His Honor said, if you are found guilty of capital murder, only one of two things is going to happen. You're going to get life in prison without parole or you could possibly get the death penalty.

So our Legislators have looked at the offense of capital murder and they have stated, "We believe it is befitting that the punishment should at the very least be life in prison without parole. That's it. That's all."

So that's a given for you. If you in fact find somebody guilty of that, they will automatically get life in prison without parole because our Legislators have deemed that at the very least that is what is appropriate for this particular offense. So you understand that then?

A.   Yes.

Q.   If I prove to you, Mr. Zaidel, beyond a reasonable doubt that the Defendant did intentionally cause the death of somebody and he did it in the course of committing or trying to commit a robbery, then I am entitled to a verdict of guilty. Okay?

If I fail to carry that burden, then obviously we know what your verdict is going to be on a capital murder. It's going to be not guilty. Okay?

Let's go ahead then and talk about the punishment phase, and I don't mean to give short shrift to the first part of the trial because they're both very important stages.

But let's put ourselves in the context of where we are now going into this second phase, the punishment phase of the trial. The defendant has been found guilty.

We're not talking about self-defense, any legal justifications or it was an accident or he didn't mean to. We know who this person is. This is a person who intentionally caused the death while in the course of committing a robbery. Okay?

Now we can go into the second phase of the trial, the punishment phase. As you know, as we already talked about, what's he going to serve automatically right now without question?

A.   Life without parole.

Q.   Life without parole because that has always been deemed the appropriate sentence at that point, and that's very important. It is you are to consider that at that point the appropriate sentence at that point.

Here's what comes into context when we look at the second phase of the trial and considering those special issues.

He's serving life in prison without parole. So where's the going to be the rest of his life?

A.    In prison.

Q.    He's going to be in prison. And I don't know if you've ever had the opportunity to visit a penitentiary. Have you?

A.    No.

Q.    Then I'll tell you that there are thousands and thousands of people serving time in penitentiaries throughout the State of Texas, and there are people serving time in prison for various different criminal offenses.

We have men and women in prisons serving time for murder. We have people also serving time in prison for property crimes, you know, burglary or a theft, forgeries. We have people serving time in prison because they're addicted to drugs, you know, drug offenses.

We have people there for violent crimes, in other words, and we have people there for property crimes. Make no mistake about it, they're probably

where they should be.  They've received a sentence. They're in that penitentiary now and they're serving time.

But they're all there together.  We don't have a prison just for people who stole a car. We don't have a prison just for people who burglarized, just for people who committed rape.

They're all in there together.  Can you see that?

A.    Yes.

Q.    And in that penitentiary, obviously there are people there that that's where they live.  They sleep there.  They eat there.  Maybe they work there if they choose to do so.  Maybe they go to school there.  You know, that's what they do.

They are in and amongst each other. They are a society in and amongst themselves.  And not only do we have inmates in a prison, but there's also a lot of civilians, if you will, aren't there?

A.    Yes.

Q.    You've got a warden.  You've got guards. You've got administrative clerks, secretaries.  You've got doctors and nurses, dentists.  You've got educators.  You've got clergy.  You've even got people coming from the outside to visit their families while

they're there.

So it's a whole kind of society in and of itself. And the Legislature recognizes this in terms of the death penalty case.

We are going to reserve a sentence of death only for those individuals that, (a), have been convicted of capital murder, and (b), are the type of people that even in that society are still a threat to people. Okay?

That's what we need to see. If that individual who has been convicted of capital murder is the kind of person who will go, serve their sentence, will abide by the rules, will not threaten or harm other people, will basically follow the rules and the laws, will do their time peacefully in accordance with the laws, then that's fine.

They're right where they need to be, and they deserve and should get that life sentence and that's it.

However, if that person who's been found guilty of capital murder is the type of person who in all likelihood, more likely than not, is going to continue to commit criminal acts of violence that will constitute a threat to either the other inmates or the people within that penitentiary system, then that's the

kind of person that we're looking at now that would receive the death sentence. Does that make sense to you, sir?

A. Yes.

Q. That's the distinction right there. I will submit to you that there are a lot of people in prison doing their time and doing it in accordance with the law and doing it peacefully, and there are probably people in prison who are bad, all right, and not doing it peacefully and are violent in the penitentiary system.

For the guy -- I'll ask you this. For the guy who has been sentenced by a judge to serve ten years I the penitentiary for theft, he's sentenced him to ten years in the penitentiary to do his time for his particular crime.

Should he or does he deserve an expectation of safety while he's doing his time, Mr. Zaidel?

A. Yes.

Q. Okay. And that's really the basis of what we're talking about here. He's sentenced to ten years in prison. He wasn't -- no judge says I'm going to give you ten years in prison and, oh, by the way, you get to get kicked around while you're there by a couple

of bad guys.

That's not part of it and that's what the sentence of death is always looking for. We're looking for that individual who might be a continuing threat or harm to that guy or the guards or anybody else. Make sense to you?

A. Yes.

Q. Okay. That's one of the first things that I have to prove to you. You know, that burden of proof. I'm still carrying that burden of proof because the presumption is that life is the appropriate thing to do only if and until I can prove to you beyond a reasonable doubt that we need to go a step higher.

And the first thing I have to prove to you beyond a reasonable doubt is that that defendant that you just found guilty is not going to be that peaceful guy, but he in fact is going to be that guy who's going to be a future threat to his society.

I do that by bringing you evidence. I do that by having you look at all the evidence, but it's my burden to bring it to you in order to prove it to you. Okay? Make sense to you? With me there?

A. I need to ask one question.

Q. Yes.

A. That was the part I did not understand

originally, was that this is a threat within the prison system because the individual has life without parole.

Q.    That's correct.

A.    That's not clear in that statement.   It says "the society."

Q.    That's correct.

A.    So I was looking at the interpretation of that as being if the person was in society, whether they would be a threat, but that's not the interpretation.   The interpretation is within being confined to the prison system.

Q.    Sure.   And I think that's what it becomes, is does your definition of society, would it also include a prison as a society, because yeah, the presumption is that's where he's going to be the rest of his life unless he escapes, you know.

That's where he's going to be is he's going to be in prison.   So when they say "society," that's actually what they are envisioning there, is he a threat to that society.

So does that make sense to you now?

A.    Yes.

Q.    So that's the first question that you have to answer and that's the first thing that I have to prove to you beyond a reasonable doubt.   That's special issue

number 1.

You've read it before. We also have it on this first chart up here. We'll read through it together. "Do you find from the evidence beyond a reasonable doubt --" keeping in mind again, Mr. Zaidel, any time you see "from the evidence beyond a reasonable doubt," that is a red flag to you that I have to prove it to you. Okay?

"-- that there is a probability --" notice it doesn't say a possibility. It says that there's a probability, and I see you nodding your head yes. I think you see a clear distinction between a possibility and a probability.

Some people have told us that means to them more likely than not. Would you agree with that?

A.    Right.

Q.    Have I proved to you that it's more likely than not that the defendant will commit criminal acts of violence? They do not define for you what that means. What is a criminal act of violence is entirely up to you to decide.

You notice it doesn't say that the defendant more likely than not will commit another murder or that he will commit another robbery or that he will commit an assault on another inmate or that he

will threaten a guard.

It's not specific. It leaves it wide open. You know, some people have said, I don't think there actually has to be physical contact in order for there to be a criminal act of violence, that a verbal threat to get somebody could constitute a criminal act of violence, in my opinion.

So it's entirely up for you to decide what is and what is not a criminal act of violence. If again, my poor co-counsel is minding her business, if I just looked at her and just smacked her in the face, do you think that would be a criminal act of violence?

A. Yes.

Q. Okay. That's for you to decide. If I prove to you more likely than not the defendant will commit criminal acts of violence that will constitute a continuing threat to society, and we've talked about what that society means.

So that's where we are. Am I able to prove to you that when he goes to the penitentiary for the rest of his life, is he more likely than not going to commit some criminal acts of violence and it's going to be a threat to the people in that society, and as you said, maybe even the other society outside of the penitentiary. I have to prove that to you.

Now, the way you make that determination, Mr. Zaidel, is by looking at the evidence, you know. You've got to look at the evidence and make that determination.

The law states that you may look at the offense that he has committed in making that determination as to whether or not he would be a future danger.

You know, I'm looking at what he did. I'm looking at how he did it. It tells me a lot about him. It tells me a lot about his potential for violence in the future. You can look at that in consideration of answering that question.

And then I may or may not bring you -- you know, I can bring you additional evidence now about the defendant and other things that would also help you make that decision.

Some people say well, you're predicting the future. Well, fair enough. Maybe that's exactly what we're doing.

But let me ask you, what would you like to see or hear or know that would help you answer that question yes or no?

A.    Well, it depends upon how far you go beyond the crime. If you're doing their life situation, the

reason -- if you have that kind of knowledge or you present that burden, that would be more so because you're trying to say again the continuation beyond was this a one-time event or is there a pattern of this violence that would continue in prison.

Q.    Right.

A.    I mean, that's what I'm looking at beyond the fact that it's guilty and you said you're going into the next step.

Q.    Yeah, because you're beyond guilty now.  This is an entirely separate issue that you're looking at in and of itself, you know.

In other words, you know, you go into that special issue again with an open mind.  You know, the law states you got to go in with an open mind and you can't already have your mind made up.

In other words, you can't say, "Just because I found him guilty of capital murder, I will automatically say he's a future danger," because you've made an assumption there without considering the evidence and you're not making me prove it to you.  I have to prove it to you.

But I do hear people say that.  They say, "I want to look and know is this a one-time thing, just an anomaly about this guy, and everything else I

see about him, I don't think he's going to hurt a fly. I think he's going to be a guy who does his time peacefully, you know."

Or they look at that and some additional evidence and go, "I see a pattern here. I think he is. I believe he is beyond a reasonable doubt."

You know, was it a one-time thing? Does he have a history? How does he act? You know, all those things you might consider in coming up with that answer of yes or no, because the presumption at this point, Mr. Zaidel, is the answer is no, because I haven't proved anything to you, and you must make me prove it to you beyond a reasonable doubt.

And I see you're nodding your head yes. I think you've got a good appreciation for that particular issue.

So that's what we're looking for. We're looking for that individual who can't do their time peacefully, who is going to be a continuing threat.

If I fail to prove that to you, if I have not brought you sufficient evidence to prove that answer should be yes, then you need to answer the question no. You must answer it no.

And if you do that, that life sentence that he's already got stays. He's going to serve life

in prison without parole.  Okay?  And your obligation is over with.

However, if you answer that question yes, I believe he is a future danger and I've made that determination based on the facts and the evidence in the case.  They've proved it to me beyond a reasonable doubt.  Then you answer that question yes, but your obligation does not end there.

We move on to another question that you have to answer.  Now, I'll tell you in the State of Texas we have a law that's referred to as the law of parties, and it takes into account that oftentimes there may be more than one person involves in the actual commission of a crime.

And the law states that with respect to both of those people, two or more people that did this offense, if the other person aided, assisted, encouraged or directed, in other words, participated in the commission of that crime, then they can be held legally obligated for that crime just as the other guy.  They can all be held liable for it.  Does that make sense to you?

A.    Uh-huh.

Q.    If Ms. Evans and I go home tonight, go to her house, sit at her kitchen table and decide that we're

going to rob the local 7-eleven tonight to get some extra cash, and we sit down and plot out a plan and we get on MapQuest and find the most isolated 7-Eleven, and then she goes and she gets a gun and I go and I get the bullets and we get in her car.

She drives us up to that 7-Eleven. She puts it in park. She says, "I'm going to sit here. I'm going to be the lookout. I'm going to honk the horn if anybody comes."

She hands me that gun. She loads it full of bullets, hands it to me, and says, "Go rob that place." I say, "All right, I'm up for it."

I start to get out of the car and I said, "I don't have a mask. They're going to know who I am." And she says, "Well, don't worry about it. Just take care of the witnesses."

I go into that 7-Eleven alone. I hold that clerk up at gunpoint. I take the money from that clerk and then I kill that clerk to ensure there are no witnesses. Do you believe I could be held guilty of capital murder?

A.    Yes.

Q.    Okay. Do you believe Ms. Evans could be held guilty of capital murder?

A.    Yes.

Q.    She's actively participated in that offense, hasn't she?

A.    Yes.

Q.    Well, the law states that in order for you to -- in a capital murder case, in order for her to also be eligible for the death penalty, not only must she be a future danger to that society, but she must have also actually anticipated somebody was going to die.

And when she hands me the gun and says, "Don't leave any witnesses," that may be a piece of evidence that you could use to make that determination.

So special issue number 2 is really asking you to decide have I proved to you beyond a reasonable doubt in the case that the defendant is either the actual trigger man, if you will, or if he's not the actual trigger man, was he an active participant in this offense?  He intended somebody would die and he anticipated somebody would die.

Does that make sense to you, sir?

A.    Yes, but to me, that should have already been proved in the fact that it's under the capital murder.

Q.    It actually is and I kind of --

A.    It all seems redundant to me.  That's the part I don't understand about this one a little bit.

Q.    Once again, you're absolutely right and I

Debi C. Harris, CSR
(214) 653-3416

kind of jumped ahead a little bit there because I will tell you, in the first part of the trial, if Ms. Evans was on trial, you would have to find she aided or assisted or encouraged or directed, that she participated in the crime. I'm talking about the first part of the trial.

And in the first part of the trial before you could ever find her guilty of capital murder, you would have to find that she should have anticipated somebody would die. Okay?

If you found she was an active participant and she should have anticipated somebody would die, then you would find her guilty of capital murder.

But in order for her to be eligible for the death penalty now, it's not just she should have, but she actually did anticipate somebody would die. Do you see a distinction there?

A. Yeah.

Q. Okay. If it's Ms. Evans we're trying and we actually get to this stage of the trial, then you believed beyond a reasonable doubt that she should have anticipated somebody would die.

But the question still is there now, did she actually anticipate it. It's kind of a difference

before you should have known better versus you did know better. That's the distinction between just being found guilty of capital murder versus the death penalty now being an option.

A. But 1902 says, "Intentionally or knowingly."

Q. Yes.

A. So isn't that the same? "Intentionally or knowingly," I guess I still don't understand the interpretation of how that's any different than what 1902 says.

Q. I'm trying to think of the best way to describe this to you. I don't know how else to better describe it to you other than to say, you know, in order for you to find her guilty as a party to capital murder, you'd have to find she actively participated in the offense. Okay?

That she -- the things that she did were purposeful, were intentional, that she did assist, that she knew what was going on. But in order to find her guilty of that capital murder, you know -- let's say, for example, maybe this will help you, that we planned on robbing the 7-Eleven. Okay?

And she says, "We're going to go down there. I want you to rob the 7-Eleven." She goes, "But don't hurt anybody. It's an old woman and I don't

want you to hurt anybody." And I go, "Yeah, yeah, okay."

And she says, "Look, I know you got to scare her, so I'm giving you an empty gun. It's unloaded. Okay?" And I'm like, "Yeah, yeah, yeah, okay. I ain't going to hurt anybody, Elaine. Don't worry about it."

So she goes, "All right. I'll honk the horn if somebody shows up." At this point, what is she thinking I'm going to do? I'm just going to rob the place; right?

A. Yes.

Q. And that a gun is unloaded or not loaded doesn't mean it's not still an aggravated robbery. So she sees me go in. She's handed me an unloaded gun.

Well, I step behind and I start putting bullets in it. Okay? And she doesn't know I'm doing that. And she's sitting in the car waiting and she hears bang, bang, bang. She goes, "Oh, my God, what happened?"

Am I guilty of capital murder?

A. Yes.

Q. Yeah, I robbed the woman and I killed her, didn't I? The question becomes as to whether or not Ms. Evans is guilty of capital murder is did she

anticipate?  Should she have anticipated somebody would die?

You could rightfully find from that evidence that she anticipated an aggravated robbery and she's guilty of the aggravated robbery, no question about it.  I don't think she anticipated somebody was going to die.

Does that make sense to you?  She's still held liable for an aggravated robbery, but ultimately, I'm guilty of capital murder.

A.   Right, because the statement that murder -- it doesn't even say.  It says intentionally or knowingly.  That's murder.  That's not even capital murder.

Q.   That's right.  We're talking --

A.   This statement, intentionally or knowingly, which is the same statement you're making here is, actually caused the death or did not actually caused but intended.  So it's the same thing as what we --

Q.   Yeah, sure.

A.   -- would have found again, so that's the part I don't --

Q.   Because that's our other one.  If we're sitting in the car, you know, I'm the one who actually shot the clerk; right?

A.    Uh-huh.

Q.    But when she hands me a gun and goes, "Here's a loaded gun, don't leave any witnesses," do you think she intends for somebody to die?

A.    Right.

Q.    Right.  That's what it's talking about when it says "intended" there.

A.    But they were already convicted under the definition of that.

Q.    The difference being that she should have anticipated somebody would die.  Now you have to decide did she actually anticipate somebody would die.  Maybe she should have anticipated somebody would die when she handed me an unloaded gun, and she knows me better than anybody in the world and she knows I always carry bullets, and she probably should have known somebody was going to die.

A.    Okay, I get it now.

Q.    You get it now?  Okay.  Okay.  Whether or not that becomes an issue we won't even know until we're actually in the trial.  Okay?  But the point being if it does become an issue, if I prove that to you beyond a reasonable doubt, then the answer is yes.

If I don't, then the answer is no.  The defendant receives life in prison without parole and

that's the end of the story.  Okay?

Now, I have had a burden of proof in these special issues.  I have had to prove to you they're a future danger.  I have had to prove to you they were an active party that anticipated somebody would die or that they were the actual trigger man.  Okay?

If I have done that, my obligation in carrying a burden of proof is over with.  Okay?  I've proved my case to you.  I'll submit to you the defendant is sitting really close on top of the death penalty at this point.  Okay?

But your obligation as a juror is not over yet with respect to a death penalty case.  Okay?  Now, you have put throughout your questionnaire that you believe before somebody receives a death sentence, we should always look at the surrounding circumstances.

We should always look at things that maybe mitigating against it.  We need to look at everything.  Our lawmakers recognize that, Mr. Zaidel.

They say, "Look, we are not going to put you in a position of rendering a verdict of a death sentence and tie your hands.

We're going to let you look at everything and we're going to let you ultimately do

what you believe is the right thing to do for this particular case.

In other words, you will not walk out of the Courthouse that day having either returned a verdict of death or having returned a verdict of life without parole, you will not walk out going, "You know what, I felt my hands were tied. There was something about that case. There was something about the circumstances of it, the way it went down. There was something about his motivations. There was something about him where I get he committed capital murder. I agree. And I get he'll probably be a future danger, you know, but I think based on whatever that was, you know, actually a life sentence in his case is the most appropriate thing to do."

Does that make sense to you? It's an option. It's obviously for the benefit of the defendant that that law is there, but I submit to you it's also for your benefit. Okay?

That you're not going to go out going, "I don't think that was fair. I don't think that was fair. I think I should have been able to take that into consideration, and I think that that piece of evidence was sufficient enough to make what was a death sentence actually should have been a life sentence."

We call it the mitigating circumstances issue. It's the last question that you have to answer. And basically, what the law provides, once again, is that you have to go back there and in the jury room look at the issue and look at all the evidence again. Okay?

Look at all the evidence again. Look at the crime. Look at the circumstances of it. Look at the defendant and everything about him and decide for yourself, is there anything in this case or about this defendant that I consider mitigating?

And I think you know what "mitigating" means. It means lessens. Is there anything mitigating about this? And then not only is it mitigating, do I feel that it's sufficiently mitigating, that it warrants me turning that verdict of a death penalty actually to a life sentence. Okay?

We cannot today say, "Tell me, Mr. Zaidel, what you will always find mitigating to turn that sentence over." Well, first of all, because we're not talking about this case and we're not talking about the facts of this case.

I think the real question becomes not what is and what isn't mitigating, because you certainly have your opinions right now just on a

general, you know, feelings about stuff, but the real question becomes if you as a juror find yourself now at special issue number 3 and you as a juror, Mr. Zaidel as an independent person, find that there's something that's not only mitigating but it's sufficiently mitigating and you believe it's the right thing to do to turn the sentence into a life sentence, will you do it?

A.    Yes.

Q.    Okay.  Do you think that's fair?

A.    Yes.

Q.    Absolutely.  Do you find taking into consideration all of the evidence.  You look at everything again.  Including the circumstances of the offense, the defendant's character and background, the personal moral culpability of it, you know.

Maybe, you know -- what is and isn't mitigating is entirely up to you.  Circumstances of the offense.  Well, maybe the defendant actually was a party to it, you know, that special issue number 2, and he knew somebody was going to die.  He anticipated it, but he stayed afterwards and actually tried to save the victim.

And he turned himself in and he turned in his co-defendants, and he is truly and sincerely

remorseful. That may not matter a hill of beans to some jurors but it may matter to you, and it's your own independent decision as to whether or not it matters, how much weight you give it.

It may be mitigating. There may be a lot of mitigating things about somebody. Maybe they didn't have a great childhood, you know. Maybe they're not that smart.

Maybe there's -- but the question becomes is that enough. Is that enough or is that just it's too bad but it's not enough to turn it around. Does that make sense to you there?

A.   Yes.

Q.   Okay. Any questions for me about anything that I've been talking about here with you? Any --

A.   The only question that I have is that you get to special issue number 3. You have one juror that says no. At that point, because to me you're in a personal -- you may not be arguing necessarily. It's your interpretation of the mitigating circumstances.

That's not as much about the facts, so to me it only takes one person.

Q.   I'll tell you that. It does only take one person. You must reach a consensus that there are no sufficiently mitigating circumstances.

But if there is one juror who states, "I believe that's a mitigating circumstance, I believe it's sufficient," that's it. That's it.

A. Okay.

Q. Now, you know, it's not your obligation to browbeat anybody back there. I do think that you have an obligation to deliberate.

I've heard people say, you know, "I'll always be receptive and open to listening to people's opinions. I think that we should talk about things," you know, but it's not necessarily your obligation to browbeat anybody.

And I will submit to you that I think that decision needs to be made on the evidence in the case, you know. I'll submit to you that's the law. You've got to make it on the evidence in the case.

But you're right, it is a very personal thing. It's a very personal thing, because what's mitigating to you might not be to somebody else. Do you get that? Does that answer that for you?

A. That's my whole point, is when you get to that stage and then you're having deliberations, if a person, like you said, has this opinion and that, when you get to -- to me, this is at special issue 3 only.

And you're not going to spend days and

weeks trying to convince somebody else because, again, it's their interpretation of a mitigating circumstance.

Granted, it's supposed to be based on the facts, but again it's how you may interpret things like character, background, things like that.

Q. Could be, yeah. And I don't think -- I mean, I'm not back there with you in the room, but the fundamental -- you know, what we always hear about juries is that they deliberate, which doesn't necessarily mean that they sock each other in the eye or browbeat each other, but I'd like to think that there's an open discussion.

It's a serious case and if everybody goes back there and goes, "Well, I'm just really not going to talk about it and I have my mind made up," then I don't know that that's fair to anybody, is it?

But how you handle things in the jury room I think is entirely up to you, as long as you do it in accordance with the law and decency and respect.

But yeah, I believe you are free to talk about it, you know, but I think others would tell you that, you know, you can't talk somebody out of anything. It's not my place, for example, to tell you how to raise your kids. Well, it doesn't mean we can't talk about it.

You know, it doesn't mean we can't talk about it, but that's what mitigation is all about there. All right?

A. Okay.

Q. I appreciate your answering my questions. I'm going to let the Defense -- I'm sure they've got some questions for you too and they might feel you out a little bit more on mitigation and how you feel about it and such as that.

MS. HANDLEY: Thank you.

THE COURT: Thank you, Ms. Handley.

You've been going since early this morning, I know. Do you want to take about a five-minute break?

VENIREPERSON ZAIDEL: That's fine, restroom.

THE COURT: You want to do that?

VENIREPERSON ZAIDEL: Yes.

THE COURT: All right. Let's take a five-minute break. All rise, please.

[Recess.]

]Defendant present.]

THE COURT: Please be seated, sir. Thanks a lot. Please be seated, Counsel.

Again I want to re-introduce to you Doug

Parks, who is going to talk to you on behalf of Mr. Broadnax.

EXAMINATION

BY MR. PARKS:

Q.   Good morning, Mr. Zaidel.  How are you?

A.   Good.

MR. PARKS:  Thank you, Your Honor.

Q.   [By Mr. Parks]  Mr. Zaidel, as the Judge told you earlier, I'm going to take about 45 minutes, about the same amount of time Ms. Handley did, to talk to you about all of these concepts and you're probably sitting there wondering, "All right, I've read that brochure. I've listened to 45 minutes of voir dire already.  What in the world could he talk about for 45 minutes?"

Well, the answer to that question is pretty much the same thing that you've already heard but maybe from a little bit different perspective, almost certainly from a little bit different perspective.

And let me tell you, Mr. Zaidel, I don't make it a practice to tell prospective jurors what a great understanding they seem to have and all of those things.  There's nothing wrong with that.  That's just not something I typically do.

But I will say that it's been something

of a pleasure to hear the voir dire because you appear to come to these concepts a good deal more quickly and with a good deal more understanding than we commonly hear down here, and that's going to make my job, I think, somewhat easier.

Let me start by telling you that -- you've already been told by Ms. Handley and I agree with her wholeheartedly. What we're looking for here is a jury who can follow the law, base their decision on the evidence just as their oath will require them to do.

I will tell you that if we get 12 people in this jury box who can in fact follow the law and will follow the law and base their verdict solely upon the evidence in this case, I would be a happy man. Okay?

Because I want 12 people who can and do presume that my client is innocent as he sits here in the courtroom this morning, and will require the State of Texas to prove everything that the law requires the State of Texas to prove, and not give them any help, not give them any head start, but actually place the burden where it belongs and to the quality of evidence as the law requires.

And I think that you're a person who can

do that.  So I break my rule and tell you those things.

I want to talk to you for just a little bit about the guilt/innocence stage of a capital murder trial and then I'm going to move into the special issues.

I want to caution you, Mr. Zaidel, that in doing that, spending most of my time on the special issues, I don't in any way want to signal you that we believe that the jury who sits in this case will find Mr. Broadnax guilty of capital murder.

There is no concession of that first phase of the trial simply because I'm spending a good deal of time talking about the punishment phase.  You understand that?

A.    Yes.

Q.    You've served on a jury before, and even people who have not understand, I think, pretty well the concepts involved in the guilt/innocence stage of any kind of a trial.

They understand presumption of innocence, burden of proof and things of that kind. You've indicated that you understand them and I'm not going to spend a great deal of time, almost no time, talking about those things.

But there are two areas I want to touch

on before I move into the questionnaire and into these issues, and one is this. It is true that the law does not define beyond a reasonable doubt.

I disagree somewhat with the State when the State says that it can be whatever you want it to be, because that's not really so, and I think what the intent of the prosecutor is to say to you, that ultimately each individual juror has got to determine for himself or herself whether or not the proof that they have heard rises to the level that will satisfy them, that is beyond a reasonable doubt.

But they can't just arbitrarily say something that is not intended by the law. For instance -- and when we try civil cases, we define what the burden of proof is on the plaintiff or the person seeking monetary damages.

They must prove their case by a preponderance of the evidence, which is essentially no more than 51 percent, 49 percent. And whatever else beyond a reasonable doubt is, jurors must be willing to give it greater significance than preponderance of the evidence.

Our laws also said that is a greater burden on the State than the standard that we have in a few cases, most notably when the State of Texas decides

they need to take a person's parental rights away from them, take their children away.

The standard in a case like that is by clear and convincing evidence. It's greater than that preponderance of the evidence, because we're talking about their children now, not just their money.

So whatever else beyond a reasonable doubt means to a juror, they must hold the State to a standard in law greater than by a preponderance of the evidence and greater than the standard of by clear and convincing evidence.

I expect that what Judge Snipes will tell you in his charge is that the State is not bound to prove their case beyond all possible doubt, but they must prove I beyond all reasonable doubt.

So I think that in logic that means that the law recognizes that there are two kinds of doubt a juror could have, reasonable and unreasonable, and it is something that is not -- it is a doubt that is not anchored in the evidence or the lack of evidence.

It is somebody saying, you know, what if the defendant was a shift changer, like I've seen on television and he really doesn't look the way he did. Wouldn't the eyewitness be wrong?

Well, you know, everybody would probably

go "Eeeeey." So you understand the concept. Ultimately, you as a juror must decide for yourself whether or not the State has proven their case beyond a reasonable doubt in your own mind and to your own level of satisfaction. Does that make sense to you?

A. Yes.

Q. And that applies not only in the guilt/innocence stage. It also applies in the punishment stage of the trial, because these first two special issues do place a burden of beyond a reasonable doubt on the State of Texas. Do you understand that?

A. Yes.

Q. All right. The second thing is that we cannot talk, as Ms. Handley told you, about the facts of this particular case. So that a juror -- and that's not just for this case. It's for any case that's being tried.

A juror really doesn't have any way of knowing, as they sit in the panel, what will or will not be contested when the case actually starts.

You know, in one case it might be identity that was in question, the defendant saying it just plain was not me. It might be an issue of an affirmative defense.

It might be a defendant saying, "Well, I

did what you say I did but I did it in self-defense or I did it in defense of a third person or it was an accident. I didn't intend the consequences of my acts. Or I was insane; therefore I have an excuse under law.

A jury really doesn't know until the evidence comes to pass, and what the State is bound to do is to prove to each member of the jury beyond a reasonable doubt every element that's in that indictment.

And Ms. Handley gave you a very good example when she talked to you about manner and means where they have alleged a murder in which the person was killed by shooting with a gun and the evidence turns out that it was by stabbing with a knife.

You recognized that they had not met the burden that the law places on them, that you would have to render a verdict of not guilty in that case, even if everything else was proven. Well, that was to illustrate how serious the law is about the burdens of proof that they put on the State.

And we got into a discussion while ago, you and Ms. Handley over -- and you were speaking to intentionally and knowingly. What might be contested in a particular case is what we call culpable mental state.

There are four culpable mental states in the State of Texas, intentional, knowing, reckless and with criminal negligence. Okay? And the difference in a nutshell is that if a person acts intentionally, that means that they have a conscious objective or desire to cause the result.

So if they intentionally killed someone, that means that they formed as their goal the taking of that person's life and did whatever it was they needed to do to accomplish the goal.

Whereas a person can act knowingly and take another person's life and be guilty of murder without intending the result. If they do an act that's clearly dangerous to human life that results in that person's death, even if they didn't intend this, then they have acted knowingly and they could be guilty of murder.

They cannot be guilty of capital murder where it is alleged you killed another person during the course of another felony unless you've acted intentionally and knowingly killing during the course of a robbery is not capital murder. It's murder.

It may be aggravated robbery. Those are called lesser included offenses. The example we typically give, and I'll kind of go through this in a

hurry, and you may have already heard it.  I can't remember.  These things kind of run together after five weeks we've been doing this.

But if the person goes into the store with the intent of robbing them, but they don't intend to kill the clerk and they tell the clerk, "I got your money.  Don't you come around the counter and follow me out so you can see which way I go.  Don't do that."

And as the robber is leaving, despite what he was told, the clerk comes around to follow him out.  So he shoots him in the leg to keep him from following him.  He didn't shoot him to kill him.  When he shot him, the intent that he had was to keep him from following him out.

And the bullet hits the femoral artery and he bleeds to death before anybody can get there.  That's a knowing killing in an act clearly dangerous to human life.  Shot him with a firearm, a deadly weapon that caused the death.

But he didn't intend to do that and the law makes that distinction, the culpable mental distinction between wanting to cause somebody's death and doing what it takes and doing something that causes a death even without the specific intent.  Does that make sense to you?

A.    Yes.

Q.    A reckless act would be where a person recognizes that there is a danger but does an act anyway.  We kind of use the example of New Year's, firing a gun up into the air to celebrate New Year's.

We know if a bullet goes up, a bullet is going to come down and that there's a risk that it could come down and harm or even kill someone.  Yet if the person ignores that risk that they recognize and does it anyway, that's a reckless act.

It's a homicide if they kill somebody, but it's not murder.  It certainly is punishable by law but not as a murder.

If a person does something that causes another person's death where they did not recognize the risk but should have, that's criminal negligence and can be done criminally negligent homicide, again homicide, not murder.

And it might be that the culpable mental state of the defendant at the time would be what was at issue.  The law allows either side to offer evidence to the jury that would show the condition of the defendant's mind at the time the offense was committed so that a jury could make a determination whether or not they acted intentionally, knowingly, recklessly.

Do yo9u see how that would be?

A.    Yes.

Q.    So you've just got to hold back as a juror, wait until you hear all the evidence.  Don't jump to conclusions.  Don't make up your mind after you've heard opening statements.  Don't make up your mind after the State has rested.

Wait until you've heard all the evidence.  Then make a decision whether or not the State has proven what the law would require.  Does that make sense to you?

A.    Yes.

Q.    And would be something you would be able to do?

A.    Yes.

Q.    Now, obviously, if after the jury heard all the evidence and rendered a verdict, if they found the defendant not guilty, the case is over.

If they find him guilty of some lesser offense, for instance, if you find that he killed in the course of a robbery, was not an intentional killing, was a knowing killing, then you would find him guilty of murder and then assess a punishment in the range that the law provides for murder, 5 to 99 years or life, whatever you thought was appropriate.  And we

never see these special issues; right?

A.    [Nodding yes.]

Q.    Only if you find the defendant guilty of capital murder in a case where the State is seeking a death penalty will you ever be confronted with these special issues, and I think we've made that abundantly clear to you so far, have we not?

A.    Yes.

Q.    So the context, just as Ms. Handley told you, the context in special issue number 1 is that it is always asked about capital murder.

So why have that special issue?  Well, our Court of Criminal Appeals has said to us that the issue with special issue number 1 there is to determine, if you will, those few incorrigibles who cannot even be incarcerated without fear of further violent outbursts toward others.

That's the interpretation of our Court of Criminal Appeals on special issue number 1.  So it's obvious that if a person was automatically sentenced to the death penalty because they were guilty of capital murder, we wouldn't need that special issue; right?

A.    Right.

Q.    So the idea about it is that it acts as a barrier to the imposition of the death penalty.  Now,

of course, there are no quotas. The law doesn't say, well, one out of every ten capital murders should get the death penalty or one out of a hundred should get the death penalty.

All it says it that it is intended to identify those incorrigibles who couldn't even be incarcerated without parole. So this is the way they drafted the question, the issue.

And what I caution jurors about is this, and why I went into that detail, Mr. Zaidel, about the State's burden of proof, just like you would not be entitled to change what's in that indictment to suit your desired verdict, you know,

You may have heard evidence that convinced you at the guilt/innocence stage of the trial of this hypothetical case that the defendant absolutely is guilty of murder. He just didn't do it with a gun like they said in the indictment. He did I with a knife. You're not entitled to give the State that help.

The same applies to this special issue. You're not, if you follow the law, entitled to change what that special issue says.

It would be wrong for a juror to say, "Well, I've heard this evidence of this offense. It's

a terrible offense.  I believe the defendant deserves the death penalty.  So I'm going to go back and answer these questions in such a way that he gets the death penalty."

You know, we talk about things like justice and mercy when we're talking about this and those are common terms that jurors use.  I believe in the death penalty because it brings justice.

We're guilty, frankly, in this questionnaire of asking some questions that suggest that perhaps the jury does just that.  They go back in the jury room and decide whether or not the person deserves the death penalty.

But nowhere are you asked does the defendant deserve the death penalty, because that's a subjective decision.  What might be just desserts for one juror would not be to another.  What might be justice to one juror would not be to another.

Just like the first phase of the trial, you're making an objective decision.  Did the State prove to me beyond reasonable doubt that the defendant did exactly what they said he did.

The same is true with special issue number 1 and special issue number 2.  Those are objective decisions to be made from the evidence you've

heard.

Now, special issue number 3, you very precociously, I might say, recognize that that is a subjective sort of decision that each individual juror is required to make.

But not true of the guilt/innocence phase, not true of special issues 1 and 2. Those are objective decisions that should be answered only if the State has proven them beyond reasonable doubt, and only if they've proven exactly what the question requires to prove. Okay?

Now, let's talk about that because I will suggest to you that there is evidence that a jury could find relevant to answering special issue number 1, aside from what happened.

Now, don't misunderstand me. A jury can take into consideration the facts and circumstances of the offense itself. The law says that.

But so long as a juror recognizes that you're being asked two different things. The first phase of a trial you're being asked did he do it, and the second phase of the trial you're being asked a different question, so that while the way it happened, the offense and the facts of the offense itself might have some relevance to special issue number 1, it might

not speak at all to whether or not this person is going to be a continuing danger in the penitentiary.

That's for the individual juror to decide. I like to tell prospective jurors that the way the law is set up in the State of Texas, we do not execute anyone for what they have done, regardless of how awful or how heinous, how hair-raising it may have been.

We only execute people for what the State of Texas can prove beyond a reasonable doubt they will probably do in the future, because that's the entire purpose of special issue number 1, and those are two different questions. Does that make sense to you?

A. Yes.

Q. Do you believe you'll be able to place the burden of proof on the State of Texas and make them prove that to you beyond a reasonable doubt?

A. Yes.

Q. And you understand that the law presumes that the answer to that question is no? The law presumes that a life without parole sentence is an adequate punishment for capital murder and never, ever requires the death penalty unless the State of Texas can prove exactly what the law requires of them?

A. Correct.

Q.    I guess another way of saying it is this.  We have jurors who studies have shown us believe that if they go through this entire process, Mr. Zaidel, that they have some sort of duty and obligation to the State of Texas and that they are somehow letting the system down if they do not vote for the death penalty.

And I'm just telling you that the law is satisfied with a life penalty.  That's the default penalty for capital murder and no jury would ever have to explain themselves to anyone if they said, "I chose the life penalty rather than the death penalty."  Does that make sense to you?

A.    Yes.

Q.    Now, what kind of evidence can you hear?  Well, I agree with Ms. Handley that the State of Texas does not have -- we've got a lot of penitentiaries in this state, but we don't have penitentiaries set aside for particular offenses.

Like she said, we don't have a penitentiary for forgers.  We don't have a penitentiary for drug possessors or drug dealers.  We don't have a penitentiary for murderers.

That does not, however, necessarily mean that people are just sent down to the penitentiary willy-nilly and thrown in, devil take the hindmost.

You can hear, as a juror, from people at the penitentiary to tell you about the classification system that they have, to tell you how they distribute the prisoners through the system, what pains they take to keep violent or potentially violent prisoners away from those prisoners like Ms. Handley was talking about that has, you know, a ten-year sentence.

Now, no one is going to come and tell you that this system is perfect, because it's run by human beings. At the same time, you would be wrong in speculating that prisoners run the penitentiary and that it's just, you know, a mash of people with no supervision, or nothing like that.

As a juror, you are not only able, I suggest to you that you are entitled to be able to hear just how the penitentiary works so that you can make a decision.

I've often said that speculation is the mortal enemy of the justice system. We used to have a prosecutor down here. It's been kind of a long time. I liked him personally but you could always know whenever he intended to ask a jury to speculate about something he hadn't proven because he would start the sentence by saying, "Don't you know." And he'd say, "Don't you know this or that or the other thing," that

had no basis in the evidence.

Well, it's kind of the same thing in a way. We can't expect a juror to make a reasoned objective decision about special issue number 1 without giving that juror as much information as we possibly can that's relevant to that issue.

It's not enough just to say, "Don't you know that if he's a murderer, he's going to be a future danger," because if that were true, we wouldn't need that special issue. Do you see where I'm coming from?

A. Yes.

Q. Do you believe that with respect to special issue number 1 you could again do the same thing that you did in the guilt/innocence phase of the trial, not leap to conclusions, that you could -- just as you presumed the defendant to be innocent, you could presume special issue number 1 to be no and wait to hear all of the evidence and then make an objective decision not based upon what you think the defendant observes or what you think might be justice to the family of the deceased or anyone else, but based solely on has the State of Texas proven to me what special issue number 1 requires?

And you see it requires that they prove a probability, not just a possibility, and it requires

that they prove that the defendant would, not just could, would commit criminal acts of violence.

Now, a criminal act of violence, not reaching over and hitting somebody one time, but criminal acts of violence, plural, and that's modified by the statement that would constitute a continuing threat to society, because you as a juror might find, well, you know, over the course of his lifetime here's a person who might commit two or three acts of violence that if it were in the context of defending himself from perceived threats or in the context of however you think it might happen, you might decide, well, there are acts of violence that can be committed that do not constitute a continuing threat to society.  Up to you.

The point I'm trying to make to you, Mr. Zaidel, is that there was a reason why the Legislature put every word in that question, and it's intended that the jury hold the State to their burden of exactly what that says.

A person can say, I've heard the evidence in this case.  It's just awful.  I've never heard anything worse, talking about a hypothetical case of course, never heard anything worse.  If I ever saw anybody that deserves the death penalty, it's this guy.

But I don't believe the State has proved

to me that he's going to be a threat in the penitentiary, so I've got to answer that question no. Don't do it based on what I think ought to happen, but whether or not they met their burden.

I've beat that horse to death. Are you with me on that?

A.   Yes.

Q.   And you believe that you can hold the State to that burden?

A.   Yes.

Q.   And it doesn't say, you know, do you find that the defendant is going to do his time peaceably. I don't know what that means. There are a lot of rules in the penitentiary. You may hear about that if you sit on this jury.

There are a lot of rules in the penitentiary a person can break without being a continuing threat to society. So I don't know what doing his time peacefully means and that's why it's not in there. Okay?

You've got to hold the State to the burden that the law does. Okay? All right.

Now then, let us say that after hearing that evidence it comes to you that the answer is no and the other 11 people agree with you on the jury it's no,

and you answer it no.  That's the end of the trial. The Judge brings everybody in, sentences the defendant to life without parole and we're done.

Only if you answer special issue number 1 "yes" do you go to special issue number 2.  Special issue number 2 is not that complicated but the law is a little bit tricky in that area, and I think one of the problems that may be caused -- and like the prosecutor told you, you may not ever see that question because the Judge makes the decision whether to include that after he's heard the evidence.

But there's two ways a person can be a party in the State of Texas and we've kind of mixed those two things up in talking about special issue number 2, I think.

A person can be a party to an offense if acting with the intent to promote or assist the commission of the offense, and that is important.  He aids, directs, solicits, encourages or attempts to aid the other person to do the offense, the offense in that context is capital murder, not robbery.  Okay?

So if he does in fact do any of those things, it doesn't make any difference at the guilt/innocence stage of the trial if he should have anticipated anything because he's guilty as a party

because he aided in the commission of capital murder.

Now, there's another way that person can be a party to a capital murder and that's if he enters into a conspiracy with other persons to commit a felony, robbery, and during the course of that felony another offense is committed, capital murder, or murder, and he should have anticipated that that second offense would be committed.

So it may make a little more sense if you see that they are separated out like that at the guilt/innocence stage of the trial.

Now, some jurors tell us that if they find that a person did in fact conspire with someone to commit one felony, robbery, and during the course of the commission of that felony, a murder was committed, that the mere fact that they conspired with the other person to commit the robbery would always mean they should have anticipated the murder would be committed, and they would automatically find the person guilty of capital murder in that fact situation. How do you feel about that?

A.    Well, I can't necessarily say that if they went into a robbery and didn't have a weapon, so I don't know how they could have anticipated that there would be a murder.

Q.   Sure.   So I think what I'm hearing you say, it depends on the facts and the circumstances that y'all hear.

A.   It's always about the facts.

Q.   Sure.   But you understand what that question is about?

A.   Yeah, uh-huh.

Q.   Now, again, if that question is given and if the jury answers it no, the trial is over and we come back into the jury room, life without parole.   Only if special issue and special issue 2 are answered yes, do you ever receive or get to answering special issue number 3.

So again, the context in which that is answered is always whatever else you may know about the defendant at that point in time.   You know that you're answering that question about an intentional murderer who killed another person because he wanted to in order to take his property and you believe he will probably commit acts of violence in the future.

Some jurors say to us that once they get to there, they can be just as fair as fair can be in guilt/innocence, 1, 2, but once they get there, knowing what kind and type of person they're answering that question about, that it doesn't make any difference

whether there's mitigating evidence.

It doesn't matter how strong or weak that mitigating evidence is, they would never answer that question in such a way to change that death penalty to a life penalty for a person they believed was going to be a future danger. How do you feel about that?

A.   Well, again, that's just someone else's opinion. To me, the reason I see number 3 being there is that once you get to that point, then you're at the mitigating -- you're at the last step. So then at that point you make that decision.

Q.   And here's what the law contemplates -- and we haven't always had that special issue, Mr. Zaidel. It's relatively new. The Supreme Court of the United States forced that question basically on the State of Texas and any other state that did not give jurors the opportunity to fully consider mitigating evidence that was offered to them.

It is unconstitutional for a jury to impose the death penalty based solely on the facts and circumstances in the case. They have to be able to consider the defendant, his background, his character and anything that is offered to the jury that would potentially mitigate against the imposition of the

death penalty.

They have to have a vehicle through which they can give effect to that evidence if they believe that it is sufficient enough to give effect to. Does that make sense to you?

A.    Yes.

Q.    That's why we have that special issue. Just as you said, the law contemplates that the answer to that question be a reasoned moral response to the evidence that has been heard, and that each individual juror is expected to make their own personal moral judgment about whether the evidence mitigation is sufficient to justify the life penalty rather than the death penalty.

So again, it's very different from the objective decisions that you're called upon to make. Now this is a subjective decision for each individual juror to make.

Just as Ms. Handley told you, no juror is required to agree on what is mitigating. No juror is required to agree on what weight to be given mitigation.

It is the duty and obligation of every individual juror to determine for himself or herself what his own personal moral judgment in the case is,

and it can be something that that person can't articulate, but they don't have to.

It is something that they may be willing or able to defend, but they don't have to. It may be something that they are willing and able to debate about, but they don't have to. It may be something that they can justify articulately, but they don't have to.

Now, I looked in my dictionary and it said that the definition of deliberation is to give careful consideration. It doesn't say anything about debating, justifying, articulating, any of those things.

Now, I agree with Ms. Handley that if a juror wants to discuss how they feel about a particular issue, if they do want to articulate their position, they're certainly free to do that. If they want to enter into a debate with someone, they're free to do that.

But I will tell you, they are just as free and have just as much right to walk into that jury room and say, "I took my oath, I listened to the evidence, I carefully considered the evidence and I have made up my mind." Nothing wrong with that.

There's no requirement that people that

people wear other people down, that the majority wear down the minority. You indicated to us in your questionnaire that you perhaps had more influence than the other jurors in the trial that you had before. Why do you think that was? Do you have an idea?

A.    Well, it was because we were discussing what reasonable doubt means, and I think again, but we weren't -- I don't think this was a fatality case. This was coming up with guilty or not guilty.

So like I said, now that I've heard both of you explain this, I totally understand you now, whereas when I just read it, I didn't understand it.

Q.    And this is just my thought. I was on a jury one time. Probably won't ever be again. It's real rare for a defense lawyer to be put on a jury to begin with, but you know, when you're talking about objective things like guilt/innocence, like have they proven future dangerousness, the things that you take the facts and apply the law, certainly discussion helps.

But it seems to me that once you get to special issue number 3, everybody is making a subjective personal moral decision, and whatever that decision is should be respected, and you should expect other jurors to respect that and not try to talk you out of that any more than they'd try to talk you out of

which church you go to.

And the with them. If you give your fellow jurors the respect of having the good sense to make their own mind up, then it would seem to me that that's not something that would require a great deal of [inaudible] about that. Does that make sense to you?

A. Uh-huh.

Q. And it is just as Ms. Handley said. In that phase of the trial no person in the State of Texas can be executed unless 12 citizens unanimously say yes, yes, no.

Any other combination of decisions means life without parole penalty. Does that make sense to you?

A. Yes.

Q. Okay. I've spent a lot of time going through all of this, probably more than you wish that I would, but I'm nearly done.

Is there anything about any of this that you feel like you don't understand, Mr. Zaidel, or need any more discussion?

A. I think between the two of you, you've explained the special issues.

Q. We've been doing this a while. Well, I appreciate your consideration of both of our voir

dires, and thank you very much.

THE COURT:  Thank you, Mr. Parks.

I'm going to ask you to step outside for just a minute, and I'm talking about a minute, and then you'll be coming right back in.  All rise, please.

[Venireperson Zaidel left the courtroom.]

THE COURT:  Let the record reflect we're in the presence of Mr. Broadnax.  What says the State of Texas?

MS. HANDLEY:  We believe this juror is qualified.

THE COURT:  And what says Mr. Broadnax?

MR. PARKS:  As do we, Judge.

THE COURT:  All right.  Ask him to return.

THE BAILIFF:  All rise for the juror.

[Venireperson Zaidel entered the courtroom and approached the bench.]

THE COURT:  Please be seated, sir.  Well, of course, you've been accepted as a qualified juror. It's been a real pleasure being with you this morning. I'm going to -- the sheriff is going to give you the car with the Judge's coordinator.  That's the person who got in touch with you to be here.

Should anything occur in your personal

life between now and the time the actual 12 are selected, give us a call and come up and we'll deal with it, that you think might affect your jury service, of course.

I'd ask you to avoid all outside information. It would be a shame if somebody like you were inadvertently disqualified because of evidence off of somebody's opinion or the news media that's not heard right here in this courtroom.

And I know you won't, but the easiest thing to do in case somebody says, "Well, what was it like," the easiest thing right now is say, "The Judge told me I can't talk about it." That stops it right there.

Yeah, you can tell people in your home that you were here, of course, and what the situation is going to be.

Now, on the questionnaire you list your telephone numbers. Are those still the same as they were when we contacted you?

VENIREPERSON ZAIDEL:  Yes.

THE COURT:  Good.  Okay.  Thanks a lot again.  Good day to you, sir.

[Venireperson Zaidel left the courtroom.]

THE COURT:  Court's in recess.

Debi C. Harris, CSR
(214) 653-3416

[Recess.]

[Defendant present.]

THE BAILIFF:  All rise for the juror.

[Venireperson Stinson entered the courtroom and approached the bench.]

THE COURT:  Please be seated, Counsel.

Good morning, sir.  We really appreciate you being here.  Appreciate your coming up early too. Have a seat, please.

I'll say good morning to you, Mr. Stinson.  My name is Webb Biard and I'll be with you this morning and through the noon hour, hopefully.  I'm helping the Judge during this part of voir dire.

The presiding judge of this court is Michael Snipes.  That's who you met at that large panel.  He spoke to the entire panel.

Should you be selected as a juror, Judge Snipes will actually preside over the trial, for whatever that's worth.  This will be our only opportunity to be together.

Also at this time I want to introduce to you Andrea Handley.

MS. HANDLEY:  Good morning, sir.

THE COURT:  Gordon Hikel.

MR. HIKEL:  Good afternoon -- good

morning, sir.

THE COURT:  These folks represent Dallas County and the State of Texas.  Further to my right is Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  Doug Parks.,

MR. PARKS:  Hi.

THE COURT:  Keri Mallon.

MS. MALLON:  Hi.

THE COURT:  And they represent Mr. James Broadnax.  Mr. Broadnax.

I'm going to talk to you for a minute and then see how that goes and then the attorneys are going to talk to you for up to 45 minutes a side.  One of the attorneys for each the State and the Defense talk to you.  So we're talking about an hour and a half.

What that's going to do is take us up around 1:00.  What that also means is we're not going to break and come back and then we here till like 2:30 or later.

But I'm leaving it all up to you.  If you have some kind of dietary need or something you need to do right now, we'll stop for you, but otherwise, what prefer to do if it's all right with

you, and knowing you're a busy man, I'd assume that you want to just proceed on; is that right?

VENIREPERSON STINSON:  Yes, sir, Your Honor.

THE COURT:  Do you need to take any kind of a break before we do that, knowing we're going to be here for another hour and a half?

VENIREPERSON STINSON:  No, sir.

THE COURT:  All right.  Something I want to address up front.  It's been pointed out to me by the attorneys, and by the way, I have your questionnaire here and I'm going to hand it to you in a minute.

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  We appreciate you filling it out very much.  I know it took time, but I promise you, it wasn't a waste of time because the attorneys have read it in detail.  It's going to save you more time here today than you actually took filling it out.

Like I say, they've read it and they asked me to go over one of your responses with you at this time.

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  And here's what I want you to do.  You don't know me but I'm telling you, all I want

you to do is just tell me like it is.  Fair enough?

VENIREPERSON STINSON:  Fair enough.

THE COURT:  All right.  On page 12, "Do you have any projects or requirements at your job which might affect your ability to concentrate if you were to serve as a juror on this case for a week or more?"  You marked, "Yes.  I am responsible for approving changeorders on a construction project."

And they pointed out to me that it's the DART line; is that right?

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  "If a case were longer than one to two weeks, I would worry about the backlog, but I would handle it, if necessary."  All right.

Did you have an opportunity to read that pamphlet while you've been sitting out there?

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  Did you see when the trial is going to start?

VENIREPERSON STINSON:  Yes, sir, August 10th, I believe.

THE COURT:  Yes, sir.  It's going to last two weeks.  That's Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon.  There will be a lunch break.

The jury will not have to stay together overnight unless and until you were deliberating your verdict.

Have you ever sat on a jury before?

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  Did the jury deliberate?

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  So you know what I'm talking about?

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  Let's say you went late into the night and became fatigued.  Since this is such an important case, there's a possibility you would all be taken to a fine hotel together at county expense, individual private room, spend the night and then come back together to avoid any outside influence.

I give you that date.  You had already read the date.  I assure you that's the date, and the trial is going to last up to two weeks, Monday through Friday, 9:00 to 5:00.

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  Here's what I'm going to ask you, and whatever you tell me, I'll accept.  If you were selected as a juror in this case and if it lasts, like it's anticipated, up to two weeks, with your job

responsibilities and not being able to be at work, would that affect your ability to sit as a juror in this case?

VENIREPERSON STINSON:  No, sir.

THE COURT:  In other words, you can sit and concentrate on the evidence as it is presented?

VENIREPERSON STINSON:  I would let my boss know that she should anticipate that I'm totally gone for an extended period and turn my duties over to someone else.

THE COURT:  All right.  Let me in that case hand you your questionnaire.

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  Let me talk to you just a little further.

VENIREPERSON STINSON;  Yes, sir.

THE COURT:  Did you have an opportunity to read that pamphlet?

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  From hearing the Judge's remarks there back when the group was together, from filling out the questionnaire, from coming here and reading that pamphlet, do you understand this is a capital murder case?

VENIREPERSON STINSON:  Yes.

THE COURT:  Do you understand that the State of Texas is seeking the death penalty?

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  All right.  In a capital murder case in Texas, if someone is found guilty of capital murder, there's only two possible punishments.  It's either life in prison without parole or death.

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  And the jury is the body, should someone be found guilty, the jury is the body that must set punishment.  It cannot be set by a judge.

One thing I want to guarantee you and assure you, it is from a Judge to a juror, and that is the law in Texas now is, if someone is found guilty of capital murder and sentenced to life in prison without parole, they will serve life in prison without parole.

There was a time when if someone was given a life sentence, after a number of years they would become eligible for parole.  That wouldn't mean they would receive parole but they would be eligible for it after a certain number of years.

That is no longer the law.  About three or four years ago Texas changed the law to life in prison without parole means life in prison without parole.  Okay?

VENIREPERSON STINSON:  Understood.

THE COURT:  Okay.  So if someone is found guilty of capital murder, they're either going to serve life in prison without parole or death.

And I believe you agree with me that either one is serious?

VENIREPERSON STINSON:  Very.  It doesn't get any seriouser.

THE COURT:  That's right.  That's the reason why the law allows you to come in here and talk to us individually.

Now, I know for some people, not necessarily you, but this process can be a little bit intimidating.

VENIREPERSON STINSON:  I'm a little intimidated right now.

THE COURT:  Sir?

VENIREPERSON STINSON:  I'm a little intimidated by my surroundings.  I'm calming down though.

THE COURT:  We understand that.  All right?  And don't want it to be.  Here's something I want to -- I want to guarantee you this.  These are some of the finest lawyers in Texas or they wouldn't be involved in this case, but they're also fine people.

It's out of the question that you will be intentionally embarrassed or intimidated by anybody involved in this process.  That would be ridiculous.  It's not going to happen.

Now, you're liable to be asked some pointed questions but they won't be for any other reason than to find out how you honestly feel.

Now, here's something I also want to stress to you, sir.  You're not expected to know the law.  You're not expected to agree with the law.

This is not going to be some legal pop quiz in which we'll be asking questions and you'll either have right or wrong answers.  That doesn't have anything to do with this process.

It's their duty, their responsibility and mine to explain the law to you.  You're not expected to know the law.  You'll be explained the law and then you'll be asked, now that you know that's the law, can you follow the law and perform your duty.  Some people can and some people can't.

And also, they'll tell you how the procedure works and some of the ideas you have to accept to proceed into the trial.

And once they explain that to you, they'll ask you whether you can do it or whether you

can't, and whatever you say is correct.

If they determine you're a qualified juror, you're a qualified juror,  If for some reason you're not, that doesn't have any reflection on the kind of person you are.

You've pretty well proven just from reading your question what kind of man you are and what you've accomplished.  You've done all you're required to do by being here and showing up to talk to us.

So if you need to take a break, if you need water, coffee, Coke, you just let us know and we'll do that.  All right?

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  So I really appreciate your willingness to serve, and without anything further from me, I'm going to re-introduce to you Gordon Hikel, who will now speak to you on behalf of --

Thank you, Debi.  Just a second.  Here's something I didn't do and I should have.  If you'll raise your right hand.

[Venireperson Stinson sworn by the Court.]

THE COURT:  Okay, thank you, sir.  You remember Judge Snipes gave you that same oath?

VENIREPERSON STINSON:  Yes, sir.

THE COURT:  And the pamphlet tells you, you remain under that oath, and I just like to remind jurors of it.  Thanks a lot.  You can be seated.

Mr. Hikel.

MR. HIKEL:  May it please the Court.

Whereupon,

WILLIAM STINSON,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HIKEL:

Q.   Mr. Stinson, good morning again, sir.

A.   Good morning, sir.

Q.   Let me first of all express on behalf of all of us here that we are very sensitive to the fact that you are the manager for this big project, this big DART project, and that jury duty, albeit a civic responsibility, can be an imposition on one's time, because there are other things that you do as part of your life rather than being here as a juror.

Let me say this, though, in the 15 years I've been a lawyer doing this, we've never had jurors who come to this Courthouse and just say, "Hey, I'm excited, I want to be a juror," because it is an imposition.  We understand that.

But as you mentioned a few minutes ago

to the Judge, it doesn't get any bigger than this, capital murder, and so in the course of these kind of offenses, we want jurors who have ties to the community, who have responsibilities, who are, you know, people like yourself who can be fair and impartial.

And while I understand with all these lawyers here, you said to the Court that you feel somewhat intimidated. Tell us why. Why is that? Why do you feel intimidated?

A.    The seriousness, the magnitude and the officialness of it, people I don't know, very honorable and respectable people I don't know. It's just a lot of gravity to the situation.

Q.    Well, essentially, you are correct with those tings you've said. Let me perhaps tell you this and hopefully it will help you to somewhat relax a bit more.

As a juror, you will not be asked to determine do you think the defendant deserves to live or die. You will not be asked that question.

Instead, this trial, like every other criminal case, has two parts, and I believe you know some of this because you were a juror before. And so if I tell you something that you already know, just

bear with me for a few moments because I'll explain to you the similarities between a capital murder trial and every other criminal case, and then I'll explain to you where they are dissimilar, a capital murder case and any other criminal case.

From having been a juror, you understand that a criminal case has two parts. in part one, the jurors are asked one and one question only, and that is to decide has the State of Texas proven to me, a juror, beyond a reasonable doubt that the citizens accused of the crime is guilty in fact of the crime.

You may have read the indictment in this case to learn that this is in fact a capital murder case where the State is alleging that that Defendant, Mr. Broadnax, on or about a certain date, which was June 19th of 2008, in Dallas County, Texas, intentionally caused the death of someone, Stephen Swan, while in the course of committing robbery or intent to commit robbery.

And so from that indictment you get a sense of what the State is accusing the citizen of and what is it that we have to prove.

In the first part of the trial, the only question that you have to answer when you're given the

Court's Charge is did we prove the allegations in the indictment beyond a reasonable doubt.

In answering that question, there's certain fundamental principles of law that the law says you must keep in mind.

For example, the fact that Mr. Broadnax sits over there this morning, he is to be presumed to be innocent of any charges.

Obviously you know from being a juror, the reason that presumption is there is because every person accused of a crime is to be presumed to be innocent until the State has proven to a juror beyond a reasonable doubt that he is guilty.

And if the State can prove that he is guilty, then the presumption of innocence goes away, but until such time he is to be presumed to be innocent.  Do you understand that?

A.    Absolutely.

Q.    Okay.  Secondly, I mentioned a word called an indictment, which I believe is sitting in front of you, and all an indictment is is a piece of paper.  It simply tells the citizen what he is accused of, he or she, and what the State has to prove.

Let me tell you that it is to be considered as absolutely no evidence of anything

against the defendant. Okay? It's merely for purpose of notice, to put the defendant on notice and put the State on notice what the State has to prove. Okay?

A.    Understood.

Q.    You would expect as a juror and having been a juror before that the way the State goes about this process of proving the defendant guilty is to bring forth evidence, and that evidence will come to you in the form of witnesses, documents, demonstrative aids, those kind of things.

But when the witnesses come into the courtroom, they'll take the stand that you're sitting there. He or she will raise his or her hand and then proceed to tell you, the juror, what he or she knows about the case.

We notice that on page 7 of your questionnaire, in regards to a category of witnesses, i.e., police officers, when you were asked the question, "Do you believe that they are more likely to tell the truth," you gave an answer.

You said, "Yes," and you explained why. You said because you believe that, "They generally hold themselves to a high level of ethical conduct," which there's nothing wrong with that answer.

Now, let me just tell you that during

this entire process, Mr. Stinson, there's no right or wrong answers. There are only truthful and untruthful answers.

So any answer you give us will not necessarily be a wrong answer. We just want you to be truthful with us.

Now, this answer you have here on page 7 about the police officers, nothing is wrong with it. Here's what the law says though.

When witnesses come into the courtroom to take the stand to testify, before he or she does that, you cannot as a juror presume that because of his or her profession, police officer, medical examiner, doctor, civilian witness, that because of the classification of that person, I am telling you right now, I am going to believe everything he or she has to say or nothing he or she has to say prior to the person testifying.

But certainly, as a juror, because as a juror you are on a fact-finding mission, you're to determine the facts, what happened, after the person has testified, you then make that assessment. Do I believe everything he said, some of what he said or nothing at all.

And so the fact that you believe police

officers and you stated why, it's fine as long as you don't say, hey, if an officer comes in here, everything he tells me before he testifies, I'm going to believe. Do you understand that?

A.   Yes, sir.

Q.   Okay.  I've been using a term, been mentioning a term and you'll see here when we get to these special issues, particularly 1 and 2, called beyond a reasonable doubt.

Now, having been a juror, I'm sure you may have recalled that the Judge had instructed you back then that those terms are not defined by law, beyond a reasonable doubt.

There was a time years ago when we had a definition, but the court in Austin realized that you juror are smart enough to figure it out.

And while we don't know what it means legally, let me tell you what it does not mean.  It does not mean proof beyond all doubts.  it does not mean proof beyond a shadow of a doubt, because you would agree with me, Mr. Stinson, that as a prosecutor, as the State, I would only be able to prove something to you beyond all possible doubts if you, yourself, witnessed the events in question; correct?  Do you agree with me?

A.    Yes.

Q.    Okay.  And if that were to happen, then you wouldn't be a juror.  You would be what instead?

A.    I'm sorry?

Q.    If you witnessed something for yourself, do you think you can also be a juror in that same context or you would be what instead?

A.    It would be a conflict of interest.

Q.    Right, because you would be a witness instead rather than a juror; correct?  And so the law recognizes that I can't prove anything to a juror beyond all possible doubts, beyond a shadow of a doubt, but only beyond a reasonable doubt.

And as you know, the word "reasonable" is there for a purpose.  It has to be a doubt that's based upon reason and common sense.  Do you agree with me?

A.    Yes.

Q.    Okay.  Now, keeping in mind those four principles, that the defendant is presumed to be innocent; an indictment is only a piece of paper to give him some notice of what he's accused of and what I must prove; three, all witnesses are started off on the same level; four, I must prove it to you beyond a reasonable doubt.

At the close of the first part of the trial, you are to look -- keeping in mind those four principles, you are to ask yourself this question. "Did the State of Texas prove to me, Mr. Stinson, beyond a reasonable doubt the allegations against the defendant?"

Now, in the process of answering that question, you know of something called the Fifth Amendment, which among other things that it says is a person accused of a crime cannot be called or made to testify against himself in that criminal trial.

In other words, he has the right to not testify. Okay? It is not a right that Mr. Broadnax alone has. It's a right that all of us has a people if we're accused of a crime. Do you understand that?

A.   Yes.

Q.   Now, in answering the first part of the question, whether or not we have proven to you beyond a reasonable doubt that he's guilty of the offense, you cannot consider for any purposes whether or not the defendant -- if he doesn't testify, you cannot consider that for any purpose at all whatsoever.

A.   I understand.

Q.   On the flip side, if he were to testify, and I don't know if he will or not, then he is to be

treated like any other witnesses, whereby you assess his credibility based on what he tells you and everything that you do as a juror.

A.    Understood.

Q.    All right.  Now, let's say that we are in stage one or part one of the trial and you answer that question, and you and the other 11 jurors -- and you remember that when you served as a juror the last time that you guys were in -- how many rooms were you in as a juror when you were deliberating?

A.    One.

Q.    One room; right?  Okay.  And why do you think that's the case, Mr. Stinson?

A.    So we can talk to each other and be near each other and deliberate.

Q.    Exactly.  Now, each of you as a juror have to be convinced yourself beyond a reasonable doubt, but the reason we have you in on jury room as opposed to 12 separate rooms is because we want you to do just that, deliberate what the evidence was to answer the question, did the State prove to me beyond a reasonable doubt what they said this citizen did.  Okay?

Now, let's assume, Mr. Stinson, that you get to part one of the trial.  You're handed the case with the law.  You go back with your colleagues.  You

deliberate.

And you come back into the courtroom and you say that, "We, the jury, find the defendant guilty of the offense of capital murder."

Now, you are one of the very few jurors we've talked to thus far that they are smart enough to put there on page 4, the very top of your questionnaire. We asked you, "For what crimes do you think the death penalty should be available in Texas," and you are the only juror that said so far, "Those cited by the Judge," which suggests to me that you actually were listening to Judge Snipes when he was talking to you guys.

You listened to him and you put down there, yes, you agree with what the Judge said.

A.    That's usually a good idea to listen to the Judge.

Q.    Certainly it is, yes.  And then you give an exception there where you said that for children, though, it should be raised to the age of 18, which is fine, as long as you understand that the law in Texas is that for a capital murder, the Legislature believed that that crime is so serious enough, that that is the only kind of crime where a person who is found guilty of committing that crime can be sentenced to death.

Now, capital murder in Texas, we have various categories, but essentially they are if a police officer is murdered in the line of duty, a fireman murdered in the line of duty, if someone is killed in the course of -- intentionally murdered in the course of a retaliation, burglary of a habitation, your house, in the course of a robbery, in the course of a sexual assault, if more than one person is killed in the same criminal transaction, more than one person is murdered in separate transaction but it's a common scheme.

These are the categories, some of the categories of crimes that our Legislature said is serious enough that if one commits that kind of crime, he or she is eligible for the death penalty.

Let me say this to you, Mr. Stinson, that it is not an automatic process.  In other words, we in Texas don't believe in what's called an eye for an eye, meaning that if someone has committed a capital murder, we don't say automatically, "Oops, he gets the death penalty."

Whether or not that happens, it depends on the jurors.  As the Judge said, and you recognize, it is an enormous responsibility, and we ask jurors, the Legislature asks jurors to not make that decision

haphazardly or automatically.

But if you find someone guilty of capital murder, stage one, act one of the trial, you come back into the courtroom and we proceed to the second stage of the trial called the punishment.

That is where the similarities between a capital murder and any other criminal case ends. We have stage one, guilt/innocence, same thing as any other criminal case where we prove it to you beyond a reasonable doubt what we accuse the citizen of doing.

The difference is here now these special issues, and you will not see these three -- it could be three, sometimes it could be two, but you will not see these special issues anywhere from in a capital murder case where a person who is found guilty of that particular crime, the jury is going to have to answer these questions here.

It is from your answers to these questions that determines if the defendant gets the automatic sentence of life without the possibility of parole or the death penalty.

Now, as the Judge said to you earlier, if someone is found guilty of capital murder, there are only two possible sentences he or she could get. Pop quiz, Mr. Stinson. What are they?

A.    Life in prison without parole and the death penalty.

Q.    Okay.  Very good.  Now, you said to us on page 5 of your questionnaire, if you will turn there, and it's perhaps middle way there where you were asked the question about which one of these choices generally reflect your belief about life without parole, and you give an answer there that says, "It seems that there could be better ways to protect society other than warehouse someone for life.  That seems not to be any good for the prisoner or society," which is fine to have that opinion.

Let me just explain to you what the law is because remember now again this process of the jury selection is not to disagree with your opinion.  It's not to ask you if you agree with the law, but it's to ask you, once you know what the law is, can you promise the court and us that you can follow the law.

A.    I can.

Q.    Now, the law says if you find someone guilty of capital murder, he gets one sentence automatically. What is that automatic sentence that he gets?

A.    Life in prison.

Q.    Life I prison without the possibility of parole, which means he's going to die in prison.  Now,

our legislators recognize, though, that while the sentence of life in prison without parole is automatic, whether or not that sentence becomes elevated or not to a death penalty is not automatic at all.

In fact, when you come back into the courtroom for part two of the trial, you begin now with trying to answer these three questions.

Now, if you look at special issue number 1 for me, and Mr. Stinson, they are labeled 1, 2 and 3, because you as a juror are to consider them in the order they're given to you, 1, 2 and 3.

And here's why. If you were to answer special issue number 1 no, then the trial stops. You come back into the courtroom with your other colleagues and the Judge would then sentence the defendant to that automatic sentence that he got when you found him guilty, which is life without parole.

But in the second part of the trial you are asked to consider the evidence again. Now let me say this, Mr. Stinson. If you look at issue 1 and 2, the second line, you see those terms "beyond a reasonable doubt."

The reason why they're there is because when you see those words 'beyond a reasonable doubt," the law says to you, the juror, look to the State to

prove it.

The same way in the part one of the trial where we've got to prove him guilty beyond a reasonable doubt, issue 1 and 2 asks you as a juror to ask yourself this. Did the State prove to me beyond a reasonable doubt, based on the evidence, question number 1?

Did the State prove to me, do you find from the evidence beyond a reasonable doubt that there is the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Now, the reason they have the word "evidence" there, Mr. Stinson, is this. You mention in page 3 of your questionnaire that you may have heard something on the TV or the news about this case.

Now, we don't expect jurors to come here with blank minds. We expect you to come here because, you know, it's part of your normal life. You carry on your business. We ask you to come here as a juror and whatever you know, you know.

Here's what the law says though. Whatever you have heard about this case beyond the courtroom, you cannot allow it to influence you in any way at all as to the issues of the guilt/innocence of

the defendant or anything dealing with the trial.

A.    Understood.

Q.    Whatever you heard, you heard, but you come in here and you have to consider the evidence in the courtroom.  That's the reason why we have there in issue 1 and 2 and even in 3 the word "evidence," because as I said before, that comes to you in the courtroom in the form of testimony or documents or those kind of things like that.  Okay?

A.    Yes, sir.

Q.    Now, let's look at issue number 1 because there are some words in there that we need to talk about.  Number 1 says, do you find from the evidence.  Now let me say this, Mr. Stinson, the facts that you heard or the evidence that was presented in part one of the trial that allowed you as a juror to answer the question yes, we find the defendant guilty, you can consider in the second stage of the trial, called the punishment, those same facts as part of the question you're seeking to answer, do you find from the evidence.

Now, some jurors have told us that -- and let me tell you this.  A life sentence with possibility of parole, the law presumes that is the proper correct sentence for someone who is found guilty

of capital murder.

The same way in the very first part of the trial I said to you, you are to presume him innocent until I, the State, prove that he is guilty, in part two of the trial called the punishment you are to presume that the proper sentence for any defendant found guilty of capital murder is life without the possibility of parole.

But it doesn't end there, because remember now the only thing automatic about this process is the sentence of life that he gets if he's found guilty of capital murder.

Whether we move from life without parole to the death sentence now, you have to then look at these issues here. And number 1 says, do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

Now, Mr. Stinson, I know you're an engineer, a BSE from Louisiana, University of Louisiana. What does the word "probability" mean to you?

A.    Likelihood of an event taking place.

Q.    I couldn't have said it better myself. To be

distinguished from the word "possibility," which means anything is possible. The Legislature didn't put the word "possible" there. It put the word "probability," and all it means, the jurors have told us in the past, is more likely than not.

However you want to quantify it, it's up to you as a juror. But all it says is the word "probability," not the word "possibility." Okay?

Secondly, let's talk about the terms "criminal acts of violence." Again, when you get the Court's Charge, I can tell you this, those words will not be defined for you as a juror, because like the words "beyond a reasonable doubt," like the word "probability," same thing with the words "criminal acts of violence."

The Legislature wants you as a juror to determine from the evidence is there a probability the defendant will commit criminal acts of violence.

For example, if I were to -- as we're sitting here right here right now, you're looking at me and out of the blue I just punch my colleague in the face. I just felt like doing that.

In your mind as a juror, would that act that I just did constitute a criminal act of violence?

A.    I would think so.

Q.   Yes, because certainly it's violent; right?

A.   Can I say something?

Q.   Yes, sir, absolutely.

A.   Did I understand you correctly to say that the criminal act of violence is not defined?

Q.   Correct.

A.   But I thought to be a crime it had to be codified in the law.

Q.   Very good question.  That's the thing you will have tod et based on evidence that we bring forth to you.  Is there some probability the defendant would commit whatever -- whether it be a verbal threat, whether it be a property crime.

I mean, if you find that there's a probability that I could commit property crimes in the future that tear up property, hit people, punch people, threaten people with criminal violence, all of those things you are to consider as a juror in trying to answer the question, is that a criminal act of violence that the State has proven to me that there is a probability the defendant will commit those, and that he will constitute a continuing threat to society.  Okay?

You determine for yourself whether or not the acts that we present as part of the evidence

would constitute a criminal act of violence.

Now, as I said to you before, Mr. Stinson, the law allows you, the juror, in answering that question to look just to the facts alone. Have you heard of someone named Timothy McVeigh?

A.    Yes, sir.

Q.    That he killed over 160 people in Oklahoma, a decorated war veteran, sentenced to death for killing eight federal agents.

For example, let's transport that here into the civil arena -- State arena. You determine as a juror, is there a probability that a guy like that, given the facts alone of the crime, do I as a juror believe beyond a reasonable doubt that given the facts of the crime and whatever the State presents to me, that that defendant is a future danger to the society where he finds himself in.

Now here's my question to you now. Let me see if you listened to me, Mr. Stinson. If he's found guilty of capital murder, where will he spend the rest of his life?

A.    In prison.

Q.    All right. Now, given the fact he's going to be in prison, why would you think the word there "a threat to society" be placed there by the Legislature?

Why the word "society" there then?

A.   Prisons are part of society.  A person could commit violent acts in prison.

Q.   Very good, because in prison you would expect to find a range and category of people who have been sentenced to crimes; correct?

A.   Right.

Q.   Whether it be the petty thief, the arsonist, the murderer, the rapist, they're all in prison; correct?

A.   There could be security guards.  They could break out, get at large.

Q.   There you go.  There are security guards there.  There are medical personnel there.  There are clergy members there.  There are teachers there.  There may be family members who are there to visit their other loved ones who are in prison for other kinds of crimes; correct?

A.   Yes, sir.

Q.   Now, in Texas we have hundreds of thousands of prisoners, but we don't have a prison that says here's a prison for just capital murder defendants.  Here is one for rapists or arsonists or those kind of things.  We don't have that.  You understand that?

A.   Yes, sir.

Q.    There are different security levels where they're classified and placed in there, but you as a juror have to then determine issue number 1, do I find from the evidence beyond a reasonable doubt that there's a probability that the defendant that I found guilty of capital murder would commit criminal acts of violence that would constitute a continuing threat to society.

Mr. Stinson, if you answer the question yes because we've proven it to you, then you go on to issue number 2.  If you answer it no, trial stops and he gets life without the possibility of parole.

Number 2 issue has a whole lot of words, but let me tell you basically what it means.  We call it the law of parties in Texas and annual leave it says is this.

You would imagine that there are times when two or more persons would get together and conspire to commit crimes.  For example, if I want to rob a 7-Eleven or a store or something, and I get -- I'm the big bad guy and I get some other friend of mine, younger than me, smaller than me, and I tell him, "Hey, we need to hit this 7-Eleven tonight.  We need to hit it a lick.  I need some money."  All right?

And we sit down and we plan it out, and I

tell them, you know, around a certain time of the night only one person there, the clerk alone.  Best time to do it, you know, because when I'm planning a crime, I want to do it at the most opportune time; correct?

A.    Yes, sir.

Q.    Makes sense, doesn't it?

A.    Yes.

Q.    We get there to the 7-Eleven that we're going to rob and I decide to go in there.  I take the gun. My colleague and I, you know, he sees me with a gun.  I walk into the 7-Eleven and I turn to him and say, "Dude, John, guess what.  I forgot the mask on the dining room table.  They're going to see my face.  What do you think I should do?"

He says, "Don't worry about it.  Just take care of the witnesses.  Leave no one standing, no witnesses."  I say, "Not a problem."

I go in there, rob the clerk, shoot her in the head and kill her.  John is outside waiting interest he car, revving the engine, waiting for me to come.

He didn't see what I did in the store. He just said to me, "Take care of the witnesses, shoot them with the gun."  I go in there and I shoot the clerk, come back outside, we get away with the money.

The clerk is dead. What crime can I be charged with as the shooter?

A. Murder, capital murder.

Q. Capital murder because remember now, for capital murder, particularly where there is an underlying felony, as I mentioned to you, robbery, burglary of a house, sexual assault, retaliation. It has to be that felony, plus the intentional murder, intentional killing of someone in the course of that felony.

In that example I gave you, because I killed the clerk in the course of the robbery, I can be charged with capital murder. I did the shooting.

The question now, what about my friend John, who was sitting in the car, who never came into the store? All he said to me was -- we planned the crime together. He saw me with the gun.

I told him I forgot my mask. He said, "Don't worry about it. Take care of the witnesses." He's sitting there waiting for me to come back out. What crime can he be charged with?

A. Capital murder.

Q. Why?

A. Because he knew about it and he helped cause the event.

Q.    You're right.  Texas law says this.  If someone acting with the intent to commit a crime, in this case here the crime was -- what was the crime that happened?  Capital murder; right?

A.    And robbery.

Q.    And robbery.  Well, it's capital murder because there's a robbery plus the intentional killing.  Okay?  Aids, directs, solicits, encourage or attempt to aid me, the shooter, in the commission of that crime, that person that lent me that aid or directed me or assisted me can be charged with the same crime just as me, the shooter.

There is another situation where the non-shooter can also be charged with capital murder.  Given the same set of facts I gave you, but here's the thing.  My friend John was sitting in the car.  He knows me to be a hothead.  He knows I like to -- if I get ticked off, I'll pull out my gun and I'll use it.

I have a gun on me.  John and I are going to rob the 7-Eleven.  So John says, "Hey, man, just go in there and get the money quickly and come back out."

I say, "John, you know I'm carrying my gun."  He says, "Oh, that's fine.  Just carry the gun but don't do anything though.  Just go in there, get

the money, hurry up and come back out."

I go in there and I'm robbing the clerk and she's taking too long to give me the money, taking way too long. And I say, "Whoa, you're taking too long," and I pump some bullets into her and I kill her. Okay?

Now, John and I agree to commit robbery but I go in there and I kill the clerk. The law says this. In answering issue number 2, for example, you need to ask yourself this question.

If John, the non-shooter, is in trial, here's what you're going to ask yourself. Do you find from the evidence beyond a reasonable doubt that the defendant, my friend John who never went into the store, actually caused the death of the deceased? It would be no, because he didn't cause the death. I did.

Or did not actually cause the death of the deceased, but intended to kill the deceased? Maybe not, or another. But here's the last part. Or anticipated that a human life would be taken?

Here's what the law says. Two people conspire to commit a particular crime and they should have anticipated that this other crime could be committed. They conspire to commit robbery and murder occurs.

The question is, should he have anticipated that murder could have occurred in the course of a robbery. Now, you as a juror have to answer that question, but certainly if I am going to rob the store at night. John knows I'm a hothead. John knows I have my gun on me.

You've got to determine as a juror, given all those facts, should John have anticipated that a human life would have been taken. If you answer the question yes, then and only then we proceed to issue number 3.

If you answer the question no, the trial stops. You come back into the courtroom and the Judge sentences the defendant to what sentence? What's the sentence he gets if you answer number 2 no?

A.    Life in prison without the possibility of parole.

Q.    Correct, because remember, the Judge said to you now, in order to elevate it from a life without parole to death, the only combination of answers that you must give is yes, yes and no. Any other combination besides yes, yes and no results in a life without parole.

But again, you mention in your questionnaire about -- you use a lot of words about

circumstances. Will you turn to page 6 of your questionnaire, please. Page 6 of the questionnaire at the very top.

You are asked the question about voluntary intoxication and whether or not that may be considered mitigation, and you said there, "Punishment should be gauged on intent and all punishment should have flexibility due to the circumstances."

Now, let me tell you this, Mr. Stinson. You're absolutely correct. The circumstances are very relevant in a death penalty case. That's the reason why, as you sit there right now, if I were to ask you, Mr. Stinson, look at the defendant and tell me right now as you sit there what sentence would you give im in this case, the answer would be what?

A. I haven't heard any evidence.

Q. Exactly. You haven't heard a thing. And as you're told in issue number 1, number 2 and number 3, your decision has to be based on the evidence.

So you mention there about the circumstances, and you're right. Voluntary intoxication may be considered as a mitigating circumstance.

So for example, now you answer yes to 1, yes to 2. What has happened there now is this. At

this point in the trial you have determined three things.

You have determined, one, defendant is guilty of capital murder. Number two, you have determined that yes, he is a future danger as the question is reflected in issue number 1.

You have said that yes, I believe he'll commit criminal acts of violence that will constitute a continuing threat to the prison society. The State has proven that to me beyond a reasonable doubt.

And number 3, if it's given to you, you have answered issue number 2 yes. You have found that either he caused the death, intended to kill someone, or he anticipated someone would have been killed. You've answered yes to those.

It still isn't finished though, because the law says, do you find, taking into consideration all of the evidence -- now, Mr. Stinson, you are absolutely correct because there they use, the Legislature used the words, "including the circumstances of the offense," and just as you pointed out on your questionnaire on page number 6 at the top, "Punishment should have flexibility due to the circumstances."

You're hitting some of these terms

correctly because you are asked as a juror to look at the circumstances of the offense, the defendant's character, the defendant's background.

In other words, there's this big huge hodgepodge where all these things are thrown in now, and you look at everything.

Here is what I could promise you, you can be promised as a juror. If you are picked as a juror, you will not leave this courtroom saying to yourself, "You know what, I did not get a chance to consider whether or not there was something about the defendant that would have warranted a life without parole versus the death," because as a juror you are asked to take into consideration all of the evidence.

Whether or not he was voluntarily intoxicated from drugs or alcohol, you may consider that if you think it's mitigating.

His age. Now, in Texas we cannot -- well, in the United States we cannot execute people for crimes they committed when they're younger than 18 years. Okay?

But in this case, as you look at the defendant, you can tell he's somewhat youthful. If you think his age is something that's mitigating, you may consider it.

Some jurors tell us that voluntary intoxication, rather than being mitigating, may have been aggravating something to me. That's up to you as a juror.

Some tell us, you know, with the hypothetical I gave you of me and my friend John, whether I'm the leader and John is the follower or vice versa, you may consider that also.

Whether I'm from a bad childhood, I'm from a single parent, I never knew my daddy. Mom fed me dog food all my life. I was abused as a child, physically or sexually or emotionally. All of those things you take into consideration.

But I want you to look with me on the board here, Mr. Stinson. The first, second, third, fourth, fifth, sixth line in special issue number 3, what is the last word on your right-hand side as you see it here on the sixth line?

A.    "Sufficient."

Q.    "Sufficient." Now, that word, Mr. Stinson, is there for a purpose, and here's why. When you look at the circumstances of the crime, here's a person who intentionally committed murder in the course of robbery. I've already found him guilty.

I've already said he's a future danger

in issue number 1. I've already said that he's a party and he either caused the death or anticipated -- should have anticipated the death.

I'm now at issue number 3 and I take all those things I've heard, background, age, how he was raised, genetics, all of those things, and then the law says to you this, Mr. Stinson, do you find that those things I mentioned, not are they mitigating to lessen his moral culpability, but are they sufficient mitigating circumstance or circumstances.

Let me say this to you now. As a juror, you may conclude for yourself that, "Oh, yeah, I heard some thing about his age or something that lessens his moral culpability and I'm sticking to that."

Here's what the law says. The same way you did as a jury before where you all got together and you deliberate to discuss, that's what you're asked to do as part of your oath, deliberate and discuss.

But you have to find as an individual juror that whatever you hear about his background and all this stuff, I think as a juror, I, Mr. Stinson, find that it's sufficiently mitigating to change that death sentence back to a life without parole. Okay?

Here's my question to you, Mr. Stinson, before I pass you. First of all, do you have any

questions to me about anything at all?

A.    No.

Q.    All right.  Do you understand that as a juror, to be qualified, you can't come in here with your mind made up about anything; correct?

A.    Correct.

Q.    And you've already said to us several times you don't know anything until you hear the evidence; correct?

A.    Correct.

Q.    So can you as a juror, if you find someone guilty of capital murder, you answer yes to 1, yes to 2, will you as a juror still have an open mind to the possibility of hearing some thing or things that convinces you that that defendant, that there exists something about the defendant's background or something I heard that tells me it is sufficiently mitigating circumstance that he now goes back to a life without parole versus a death penalty?

Will you have an open mind, Mr. Stinson, to the possibility of hearing some evidence that may allow you to do that?

A.    Yes, sir.

Q.    Okay.  You have no questions to me at all, Mr. Stinson?

A.    No.

Q.    Okay.  Mr. Stinson, I believe that's all that I have for you, sir, and I want to thank you for your time.

A.    Thank you.

MR. HIKEL:  Oh, one last thing, Judge.

THE COURT:  Sure.

Q.    [By Mr. Hikel]  Your prior jury service, I forgot to ask you about that.  Do you see -- would you turn to that for me, please, on page 11.

At the very top there, you put a lot of information there about that prior jury service, involving a prostitute, you said, and some Mexican nationals.  What was that all about?

A.    It was a defendant charged with kidnapping and rape.

Q.    Right.

A.    And I don't know.  You want me to elucidate on what I did earlier

Q.    No.  I think you put there that -- you said, "All of the circumstances were not made clear during the trial.  The victim was actually a prostitute who had sex with the defendant several times before.  I believe this was a case where a couple of Mexican nationals got run over by a bunch of rednecks."

Very strong opinion there.  But let me tell you this, what do you mean by that?  What happened?

A.   This young lady was allegedly raped and -- kidnapped and raped by a couple of guys.  You know, I was selected for the jury.  We heard the evidence.  We weighed the evidence presented and brought back a verdict of guilty.

Once the trial was over, it was made public -- I mean, actually the defense attorney was chatting with some of the jury people and said that she was actually a prostitute that had sex with these people on prior occasions.

Once I heard that, it cast a considerable amount of doubt as to what actually might have transpired.  I mean, it changed the perspective, not because she was a prostitute.  I don't mean to condemn her for that.

Q.   Right.

A.   It just -- it introduced reasonable doubt as to the believability of the officer that alleged that she got drug into the bushes, which was the basis of the kidnapping charge, and it lent reasonable doubt to the allegation of rape when it could have been simply a transaction gone bad.

Q.   Okay.

A.   I think it, from a reasonable point of view, I can appreciate that, you know, her course of profession shouldn't be taken.  What she does as a profession shouldn't be looked down upon in the courtroom venue, but the fact that she was of that profession and had relations on this person certainly would have introduced a considerable amount of reasonable doubt.

Q.   In your mind as a juror?

A.   Absolutely.

Q.   Okay.  Any carryover to this case, you think, that whole issue?

A.   No.

Q.   You understand you will separate that from this?

A.   Oh, absolutely.

Q.   And consider in this case, all the evidence that the State brings to you as part of your service as a juror, if you're picked in this case?

A.   I understand.

Q.   Okay.  And remember now, you don't look to them for anything.  You look to us for all the evidence, because they have no burden; correct?

A.   I understand.

Q.    Okay.  All right, Mr. Stinson, thank you so much for your time and attention, sir.

THE COURT:  At this time Brad Lollar is going to talk to you on behalf of Mr. Broadnax, which again is going to take about 45 minutes.

Do you need to take a five-minute break?

VENIREPERSON STINSON:  I could use a drink of water.

THE COURT:  You can get it.  We'll take a five-minute break.  Court will be in recess five minutes.

[Recess.]

[Defendant present.]

THE BAILIFF:  All rise for the juror.

[Venireperson Stinson entered the

courtroom and approached the bench.]

THE COURT:  Thank you, sir.  Appreciate it.  Please be seated.  Be seated, Counsel.

Now I think Mr. Brad Lollar -- is that correct, Mr. Lollar?

MR. LOLLAR:  Yes, sir.

THE COURT:  Is going to talk to you on behalf of Mr. Broadnax.  Mr. Lollar.

EXAMINATION

BY MR. LOLLAR:

Q.    Mr. Stinson, how are you doing?

A.    Well, sir, how are you?

Q.    Well, I'm doing fine.  Now tell me about our green line here.  You're the project manager for it?

A.    Yes, sir.

Q.    Twenty-six miles; is that correct?

A.    I'm sorry?

Q.    Is it 26 miles?

A.    Right at 26 miles for the entire green line from Buckner Boulevard to Frankfurt Road in Carrollton. I'm the manager over the piece from roughly Mockingbird Lane by Love Field Airport out to Frankfurt Road.  It's 13 1/2 miles, $500 million.

Q.    Great.  And I seem to recall that's supposed to open in August, isn't it?

A.    The segment that goes from the Central Business District out to --

Q.    South?

A.    -- MLK station, which is going to serve Fair Park Station when the State Fair opens, it opens about the same time the State Fair starts in September.

Q.    Well, good.  Okay.  And the Judge asked you about this.  Obviously, that's a big job and lots of stuff going on right now in the green line expansion.

A.    Yes.

Q.   But you're good with that?

A.   Well, one of our coworkers came back a couple of days ago, which takes some of the pressure off.  I'm sorry I didn't mention that earlier.

Q.   Say that again?  I'm sorry.

A.   I have a coworker that just came back to work from being off for a while that will take some of the burden if need be.

Q.   Okay.

A.   Takes some of the weight off.

Q.   So if you're selected as a juror in this case, you can tell the State and us that you'll pay attention to this trial and a week or two would be okay?

A.   Yes, sir.

Q.   It would be a problem, we understand, but it would be something you could do?

A.   It would be manageable.

Q.   All right, very good.  Now I want to talk to you about this criminal service that you had before as a juror.  You said it was a kidnapping and rape case, and I take it you all did not find out during the presentation of the evidence that the victim was a prostitute?

A.   Correct.

Q.    And then you found that out after the trial?

A.    Correct.

Q.    And is that something, if I read you right, that had you known during the trial, you might have come up with a different verdict?

A.    Possibly.  A lot of the evidence was less than concrete.

Q.    All right.  Well, and then you say in talking about it, "All the circumstances weren't made clear," and I understand that part of your answer.  Then you say, "I believe this was a case where a couple of Mexican nationals got run over by a bunch of rednecks."

Who were the rednecks?

A.    Well, I guess I would have been culpable in that.

Q.    You're talking about the jury in that?

A.    I'm talking about, I mean, the whole system, the prosecutors, the defense attorney, the judge, the jury, myself, the whole Las Vegas society.  I think, you know, it was unfortunate and I'm ashamed I took part in it.

Q.    Okay.  And obviously, that's something that you've thought about since then?

A.    Yes, sir.  I think about it a lot.

Q.    Now, I appreciate what you've told us about

that. I appreciate that you told us about that. How is that -- you haven't served as a juror in a criminal case since then?

A. No, sir.

Q. And let me tell you that the laws are pretty funny about what -- in a sexual assault case, the laws are pretty funny about what they will allow about the person's prior sexual history, the victim's prior sexual history.

A. Yes, sir.

Q. And I suppose that's what guided the judge's decision in that case not to allow -- did you say that was in Las Vegas?

A. It was in Las Vegas.

Q. That was in Las Vegas. Okay. And maybe they've got laws like we do.

A. That's a good point.

Q. That's the only explanation I can have for that, because certainly if the defendant's attorneys knew that the lady was a prostitute, they would have been trying to point that out during the trial and obviously it would have to have been a ruling from the judge under the law of the State of Nevada that that wasn't admissible for some reason or another. So I don't know.

But the problem we have is trying to figure out how that might affect you if you're called here as a juror in our case. Of course, what we hear is that in hearing the testimony, you'll be thinking you're not getting the full story about something?

A. No, not really.

Q. And you might be worried about that.

A. No. I think the fact that I'm older now makes me a little more open-minded and skeptical about things, but not that particular event. That was just me being honest in trying to answer the question.

Q. Sure. And about how old were you back when you sat as a juror in that case?

A. Thirty.

Q. Okay, very good. Well, you did what you were supposed to do. You based your verdict on the evidence that you heard in the courtroom, and that's what we would expect a juror to do in this case, base their verdict on what they hear in the courtroom.

They have to take the law from the Judge. The Judge will tell you what the law is in Texas, and then it's the jurors' job to apply the law and the facts that you hear. And that's it.

A. Yes, sir.

Q. You can do that?

A.    Yes, sir.

Q.    Okay, very good.  We're going to talk about some things you put in your questionnaire here and then we're going to talk briefly about the guilt/innocence phase and then we're spending some more time on these special issues.

And Mr. Stinson, we do not expect that you would have ever seen these three special issues before today, frankly.  Each state, the states that do have a death penalty, do it differently.

This is the way that Texas does it and we don't expect you as a lay person to know these things, and probably half the lawyers running around this building don't know these three special issues either.

It's pretty specialized and, like I say, we don't expect you to have ever heard of those before.  But now you see that these are the ways that the Texas Legislature has determined what the proper outcome should be for a person convicted of capital murder.

A.    Understood.

Q.    Okay.  And we'll talk about that here in just a minute.  First we're going to talk about the offense of capital murder and as Mr. Hikel has explained to you, in this case they have alleged that the Defendant

intentionally caused the death of the victim during the course of the commission of a robbery.

And that's one of the 17 or 18 different ways under Texas law that a person can commit capital murder.

The thing that we need to stress about the proof in the case, and of course, you look at the State's table to bring you proof, to convince you beyond a reasonable doubt of the defendant's guilt, and if they fail to do that, obviously your verdict is not guilty.

Now, in any type of a capital murder case, a jury may not feel that the defendant has committed the capital murder but instead there are what we call lesser included offenses that fall out of a capital murder case.

In this type of a case you've got a murder and a robbery. Okay? So a jury can find a defendant not guilty of capital murder but believe he's guilty of murder, or aggravated robbery, and those might be what we call lesser included offenses.

If that's the case, then you find the defendant not guilty of the capital murder, find him guilty of one of the lesser includeds, and then the Judge is going to tell you what the penalty range is

for that offense, and like in the previous trial you've been on, you go back and you pick a number within that range and that's what you're supposed to do.

Any questions about that at all?

A. No, sir.

Q. Okay. When we're talking about capital murder, they have to show you that there was a robbery going on and that the defendant during the course of that robbery made up his mind to take the life of the victim.

That's what the law means and I think you've been shown the indictment here in the case.

A. Yes, sir.

Q. Have you had a chance to read that there? And it says, "Intentionally caused the death." That word "intentionally" is defined under Texas law and it's basically that a person forms in his mind the intention to cause the result, the result being death, and that is an element of the offense that the State has to prove.

That's what's called the culpable mental state of the defendant, and the law in Texas allows both sides to present evidence as to the state of mind, the condition of the mind of the defendant at the time of the commission of the offense.

A.    I understand.

Q.    And it's to go to that issue of what their culpable mental state was.  We have three other culpable mental states.

One is called knowingly, one is called recklessly and one is called acting with criminal negligence.  Okay?

And let me give you some examples of those just so you understand them and know how important it is that that element be proven.

Let's say that I decide to go rob a 7-Eleven store.  I go into the store.  I confront the clerk with the gun and say, "Give me your money," and they do.

Then I decide to leave.  I'm ready to leave now and I tell the clerk, "I'm fixing to leave.  You're not going to get hurt.  Don't come around the counter though because I don't want you to see which way I'm going to go."  Okay?

But nevertheless, despite that warning, here comes the clerk around the counter.  So I'm at the door.  I look back and I see him following me and I shoot him in the kneecap.  Okay?  And that's to prevent them from chasing me out the door.

Well, I do not have the intention to

cause their death. I meant to disable them. But unfortunately, the bullet hits the femoral artery and they bleed to death before anybody gets there.

Now, I have committed murder. I have committed an aggravated robbery. But I have not committed capital murder, because I did not intend that the person die when I did my act, which was clearly dangerous in that it resulted in the death of the individual. Okay?

So that's just an example of how things can come up in these type of trials. The requirement is that the State has to prove everything in that indictment beyond a reasonable doubt, and if the jury has a doubt about even the culpable mental state of the defendant at the time of the commission of the offense, they can't find him guilty of capital murder. Okay?

A.   I understand.

Q.   Reckless is the next level down. You've got knowingly, intentionally and then recklessly, and that's like if I'm going out on my front porch at midnight on New Year's Eve and shoot a gun up into the air. Okay?

I'm aware that there is a risk that the bullet can come down but I consciously disregard that risk, and under the law what I have done is reckless,

if that bullet goes up and comes down and hits somebody.

I didn't intend to.  I didn't know that I was going to actually hit anybody, but I was reckless in that I disregarded the risk and went ahead and did it.  Okay?

And then when we talk about somebody acting with criminal negligence, that's when they're not aware of a risk but they should be.

You know, as an example, if you have a mother that's running to the store -- we see this happening a lot here recently.  They leave the baby in the car and that's where you have that argument.

Were they aware of the risk and consciously disregard the risk or is it something they just didn't think about.  They were not aware of the risk.  So that's where you have that type of discussion going on in that type of a case.

So acting with criminal negligence, I could be driving down the road not paying any attention, fumbling for a CD to put into my CD player, and run over somebody.  So that's acting with criminal negligence.

So it's very important in any criminal case but it's even more so important in this type of a

case, because as you can see, the culpable mental state of the defendant at the time of the commission of the offense is going to determine what level of offense he is convicted of.  Okay?

And only in the event that the State is able to prove that he intentionally caused the death of the victim are we talking about a capital murder where the punishment range is one of two horrible punishments, which is either death by lethal injection or confinement till the day he dies in a prison.  Okay?

A.   I understand.

Q.   So are you with me on all that?

A.   Yes, sir.

Q.   Very good.  Any questions about the first part of the trial?

A.   No, sir.

Q.   Okay, good enough.  We'll go on to these. And like I say, we do not expect that you've ever seen these before.  Jurors come down here and they've got -- well, we've heard about all -- you're about the hundred and sixth juror, I think, we've talked to individually. One-oh-five.

And we've heard it all as to how they thought before they got here a jury is supposed to decide in this type of a case whether a person gets the

death sentence or not.

Some people, obviously, are totally opposed to the imposition of the death penalty, period, across the board. The law is that that type of a juror cannot sit in this type of a case. You have to be able to -- even if you don't like the law, you have to be able to enforce the law.

So we're talking basically to the people who we think can be reasonable about this and follow the law, despite what their personal opinions may be.

You see, that first choice you had on your questionnaire down at the bottom there was, "I believe the death penalty is appropriate in all murder cases."

Well, we don't even spend our time trying to talk to those people because that's not the law, obviously.

In fact, the death penalty is not even available in a murder case. It has to be a capital murder case. So who we talk to are the 2s and the 3s, the people who say I think it's appropriate in some cases. Even if I don't like it, I could do it. So that's who we talk to. You are one of those people and that's why you're here.

But let's talk about this because now

you know, now that you -- you're going to leave here today and you're going to be very educated, more than 99 percent of the people you'll run into on the street out there. You'll know something about these special issues and those are the things that we are supposed to look at in determining of that group of 100 percent of the people who committed capital murder, what percentage get death and what percentage get sentenced to life without parole. Okay?

And as the Judge told you, if you're sentenced to life without parole in the State of Texas, you're going to be in the penitentiary until the day you die.

We've had a lot of people come down here and think, well, a life without parole means he may serve 20 years or so and then you get out. Uh-uh. You are going to be there until the day you die. Okay?

The legislature set up these issues and special issue number 1 and special issue number 2 are supposed to be barriers to the imposition of the death penalty.

The highest criminal court in Texas is the Court of Criminal Appeals in Austin and they have told us that the death penalty is reserved for those few incorrigibles who cannot safely be in prison

without fear of them committing acts of violence to the people around them in prison, that would constitute a continuing threat to that society.  Okay?

And that's the dividing line, if you want to look at it that way.  That's why it's special issue number 1.  It's the ones who are so violent that they cannot be in prison without fear they're going to be attacking fellow prisoners, staff, wardens, guards, nurses, visitors.  Okay?

So if we look at special issue number 1, the question It asks is, do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?  Okay?

And that's the issue that the jury is first required to answer.  You can see there that by the way they wrote that question the Legislature put the burden of proof on that issue upon the State.

By saying it the way they did, there's a presumption that the answer to the question is no, just like there was a presumption that the defendant was not guilty.  And they put the burden of proof on the State to change that no to a yes.  Okay?

Now, Mr. Stinson, let me see where we

are with you on this issue. Some people say, "Mr. Lollar, you've shown me that the person on trial intentionally took a victim's life and he did that during the course of a robbery and he had a loaded gun that he took to the robbery in order to commit the robbery, and to me, that is the type of person, just knowing that about them, that is always going to be a future danger."

Some people have told us that. How do you feel about that?

A.   I don't know that that in and of itself indicates future possibilities. I wouldn't agree that based on that, I would say that that person is necessarily a threat in the future.

Q.   Okay. And I think that you hit it right on the head on page 2 of your questionnaire when you were telling us the best argument against the death penalty. "It doesn't deter crime, it is inhumane and punishes a person for life based on one moment of poor judgment."

So you recognize that a person can have a moment of poor judgment that he's got to pay for with the rest of his life; right?

A.   Yes, sir.

Q.   And I think that fits perfectly well with special issue number 1. You recognize that that's a

possibility.

What would be of help to you in answering that question, besides the facts of the case?

A.    I guess the person's character.

Q.    Their character, uh-huh.

A.    And how they've conducted their life, kind of track record they've set, because people tend to follow their -- someone I used to know said the spots on a leopard don't change a lot.

So whatever track record they set forth could be a big indication, a predictor of the future.

Q.    Some people have told us, well, if the State is able to show me that the person here on trial has a history of committing violent acts, that that is something which would be instructive to me about whether or not he's going to be violent in the future, if he's got a history of violent actions against other people.

Now, on the other hand, we've had people that said, well, if I hear nothing from the State about a violent history and if that's pointed out to me by the Defense -- I mean, we can't prove a negative, but if there is no history of violent acts, that that would be instructive to me also as to how I should answer

special issue number 1.  Do you see what I'm saying there?

A.   Absolutely.

Q.   And do you agree with that?

A.   Yes, sir.  If a person doesn't have a track record of being violent, I would need something to show that there's something to base a judgment of future possibility.

Q.   Well, it's a matter, Mr. Stinson, that is capable of proof.  It's kind of an objective look at it.  If you bring people -- if the State brings people that have known the defendant all his life and they say he's violent, he's mean, what you see in this instance that's on trial is exactly like he is 364 days out of the year.  Okay?  Certainly, that's instructive to you.

If on the other hand, you hear from friends and relatives of the defendant that know him best and say that what he did on this day in question is totally out of character for the person that I know, that I've known all his life, and he's not violent, then certainly that also is instructive to you, don't you think?

A.   Yes, sir.

Q.   Okay.  But in any event, Mr. Stinson, would you be able to do what the law says a juror should do

in that case, and that is to presume that the answer to special issue number 1 is no, and that you as a juror would have to wait until the State was able to prove, if they could prove, beyond a reasonable doubt that the answer should be yes before you change it to yes?

A.  Yes, sir.

Q.  Okay, very good.  Do we need to talk any more about that?  Are we pretty clear on that?

A.  Yes, sir.

Q.  And again, the Legislature set these special issues up.  That's the one that's special issue number 1 for a reason.  It's to separate the people that were committing the capital murder who shouldn't be put to death because they're not going to be a future danger if they're in a controlled society like a prison.

A.  Yes, sir.

Q.  Okay?

A.  Understood.

Q.  All right.  Special issue number 2 is only given to a jury if the evidence shows that more than one person was involved in the commission of the murder.  Okay?

If it is shown by the evidence that more than one person was involved in the robbery or the murder, then that issue is submitted and that question

basically asks, Do you find from the evidence beyond a reasonable doubt again that the defendant was the one who was the trigger man, whether the defendant actually caused the death of the deceased, or if he was not the trigger man but he was a party to the commission of the offense, did he actually intend to kill?

Did he have the intent that the murder take place or did he anticipate that the murder would take place? Okay.

So that's the special issue number 2 that is only submitted to the jury if it's a party type situation. Again, that's a pretty objective look at the evidence in the case.

If the State is able to prove it, and again they've got a burden to prove it beyond a reasonable doubt, then you answer that special issue number 2 yes, and then you go to special issue number 3.

Let me back up and say -- I think it's already been pointed out to you. In looking at special issue number 1, if the answer that y'all as a jury arrive at is no, the State hasn't proven he's going to be a future danger, that's the end of the deliberations.

You write that on the verdict form, let

us know, you come back into court and the judge receives that verdict and immediately sentences the defendant to life without parole. Okay?

And the same thing for number 2. If you've gone through special issue number 1, you've been presented with special issue number 2, and the State has failed to prove that the answer should be yes, then that's the end of your deliberations.

You write that on the verdict form, come back in, life without parole. Okay? You see how that works?

A. Yes, sir.

Q. Okay. If, however, you get to special issue number 3, that means that you have found the defendant guilty of an intentional murder committed during the course of a robbery, you have found that he is going to be a future danger no matter where he is. He's going to be a future danger in the prison society.

Some people tell us, well, if I have found those things, then there really is never going to be anything that I could ever find mitigating enough to spare his life. How do you feel about that?

A. I still think number 3 is appropriate. I think you have to take in the mitigating circumstances.

Q. Okay. So you think that that is a good thing

to have there even for a person who is going to be a future danger, who has committed capital murder?

A.   Yes, sir.

Q.   Okay, very good.  Well, let's read that together.  it says, "Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character, the defendant's background and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant the defendant's life in prison without parole rather than death sentence be imposed?"  Okay?

This is the only type of case in Texas law where a jury is told to look at the background of the defendant.  Now, it's allowed in other cases, I'm sure, but this is the only case in Texas law where a jury is actually instructed to look at it and to consider it in terms of whether or not there is something you could hear about their life, about their background that could reduce the defendant's personal moral culpability.  That's what that question is about.  Okay?

Do you think it's a good idea to have that type of a question there?

A.   I think so.  I mean, the Legislature thought

it was and I think it makes sense.  I mean, we're talking about putting a person to death.

Q.   Well, and let me tell you this.  The Legislature -- well, the law has also told us that the jurors don't have to agree all amongst themselves that a particular thing is mitigating.

You might have an idea that one thing you hear about is mitigating and sufficiently mitigating to make you want to vote against the death penalty.

The juror sitting right next to you may not feel that that particular thing is a mitigating factor but they might have one of their own that they think is a mitigating factor.

And so all the way around the room, you can have 12 different points of view about what's mitigating and what's not mitigating.  There is no requirement that there be unanimity on any one thing.

I'll tell you this also, that this is not supposed to be a majority vote type of deal.  The law says that each juror should come to their own personal moral judgment.  Each juror should come to their own personal moral judgment.

That is something that's kind of different from special issue number 1 and special issue

number 2. Those are kind of objective questions. You look at the objective facts.

But when you get to special issue number 3, that's more subjective and it's what's important to you. It might be important to you because you may have had personal experience with it.

For instance, if you find out that a person on trial's father committed suicide, and that may ring a bell with you, as opposed to some juror that has not had that experience with that. Okay?

So that's what it's there for. And again, the law says that each juror comes to their own personal moral judgment about these mitigating circumstances. Okay?

A.   Yes, sir.

Q.   Now I'm going to run some things by you. We've had these suggested to us by jurors as being mitigating factors that would be of importance to them.

Some people tell us that the age of the person on trial might be mitigating to them. Now, we know, and I think Mr. Hikel told you, that the Supreme Court of the United States has told us we cannot execute a person who was 17 or younger at the time of the commission of the offense. They are just not mature enough to.

But they've left it open for anybody who is 18 or over. We've had some jurors tell us that, well, if I see that a defendant is 18, 19, 20, 21, something like that, still young, that that might be a sufficiently mitigating circumstance for them.

How do you feel about age as a possible mitigating factor?

A. I think it's reasonable. I mean, people at 18 aren't the same people they are at 38.

Q. And would that be something that you'd be able to give consideration to?

A. Absolutely. I think that would be reasonable. I don't -- never mind.

Q. Another thing that people have told us that was, of course, obviously important to them in answering special issue number 1 that is also looked at as a mitigating factor by them is if a defendant has a lack of significant prior criminal history or violent history.

A. That seems reasonable.

Q. Is that something you'd be able to --

A. That's reasonable.

Q. Okay, very good. Some people have told us that if they hear the evidence in the case and believe that this was a parties type situation, more than one

person, more than the defendant was involved in the commission of the offense and that they find and believe from the evidence that the defendant was a follower and not a leader in that type of a situation, that that might be something that they would look at as a mitigating factor.

A.   I think that's reasonable.  It --

Q.   Sir?

A.   It kind of goes towards intent and -- the word escapes me.  I'm sorry.

Q.   Okay.

A.   Culpability.

Q.   Culpability, all right.  Very good.  Now, some people tell us that if they hear evidence that the defendant was under the influence of drugs or alcohol to the point where they were not thinking clearly, I suppose, that that would be something that they could consider to be a mitigating circumstance.

We kind of touch on that in the questionnaire and we tell you on the bottom of page 5 that voluntary intoxication is not a defense.  You see that very last question at the bottom of page 5.

That is the law in the State of Texas, voluntary intoxication is not a defense.  You can't say, "Well, you know, I was drunk and therefore you

can't find me guilty." Well, that's nonsense. Of course, we can.

At the top of page 6, though, we tell you what the law also says about voluntary intoxication, and that is that evidence of intoxication may be considered in mitigation of punishment. Does that seem reasonable to you, or how do you feel about that?

A. Well, I have a little problem with it but I think it's probably reasonable. I mean, a person needs to be responsible for their actions.

Q. Yes, they are responsible. We're not avoiding responsibility. What we're saying is it may be a reason that you might want to give them life without parole instead of death sentence. That's what mitigation is.

A. I think that's reasonable.

Q. People have told us that something that might be important to them might be the life history of the defendant. You know, how was he raised, what was he taught, what conditions did he grow up under?

Was he raised with a silver spoon in his mouth or was he raised in abject poverty? Was he living in a stable home with two parents or was he not? Was he moved around a lot?

Was he able to stay in one school for more than six months or was he moved from school to school and town to town throughout his whole life? Was he fostered off on different relatives here and there or was he able to have a loving family caring for him throughout his whole life?

Those type of things are important to them. How do you feel about stuff like that?

A.   I think that would be very reasonable. I mean, some people are unfortunate.

Q.   And people have told us, well, if I hear evidence that as the defendant was raised, he was subjected to physical or sexual abuse, that that might be important to me.

A.   I think those are all mitigating circumstances.

Q.   And then I think we've touched on this before in talking about special issue number 1, but people have told us that it would be important for them to hear from the relatives and the friends of the defendant that know him best to see whether or not this type of behavior exhibited on a particular day in their life was an aberrant form of behavior for them.

So like we talked about in special issue number 1, that --

Debi C. Harris, CSR
(214) 653-3416

A.    Kind of like a representation of their character.

Q.    Yeah, talking about their character, whether, you know -- and again, we talked about that before. This is perfectly in keeping with the character that I know him as.  They come in and tell you evidence of bad character, or they could come in and tell you evidence of good character.

A.    That seems reasonable.

Q.    Okay, very good.  Mr. Stinson, I think you've got it.  I think you are now a very educated juror about what we're supposed to be doing here in Texas under the law.

A.    Appreciate it.

Q.    Do you have any questions about anything?

A.    No, sir, I'm good.

Q.    All right.  Do you think you could be a fair juror to the State of Texas and a fair juror to the Defendant in the case?

A.    Yes, sir, I do.  I think I can listen carefully and be given a set of criteria and make a judgment to that.

Q.    Very good.  All right.  Thank you, Mr. Stinson.

THE COURT:  All right.  All rise.  You'll

be stepping outside for about a minute.  Watch that first step and then you'll be coming right back in to us.  The sheriff will be with you.

VENIREPERSON STINSON:  Your Honor, would you like this back?

THE COURT:  The sheriff will take it.  Thank you.

[Venireperson Stinson left the courtroom.]

THE COURT:  In the presence of Mr. Broadnax, what says the State of Texas?

MR. HIKEL:  The State believes that Juror No. 684 is a qualified juror.

MR. LOLLAR:  And we do also.

THE COURT:  All right, 33.  Ask him to return, please.

THE BAILIFF:  All rise for the juror.

[Venireperson Stinson entered the courtroom and approached the bench.]

THE COURT:  Thank you.  Please be seated, Counsel.

Well, of course, you're accepted as a qualified juror by the attorneys, obviously.  It's been a real pleasure to meet you.  Appreciate your willingness to serve.

The sheriff is going to give you the telephone number of the Judge's coordinator. Should anything occur in your life that you think might affect your jury service between now and the trial date, give her a call.

I'm going to ask you to avoid any outside influence, friends talking to you about this case, the media. It would be a shame if somebody like you were inadvertently disqualified.

Also, are the telephone numbers on your questionnaire still correct?

VENIREPERSON STINSON: They should be. They haven't changed.

THE COURT: I just want you to doublecheck, because she's going to call you one way or the other.

Remember, just because you're qualified here today, still the decision has to be made who the actual 12 are going to be. All right?

Would you doublecheck for me?

VENIREPERSON STINSON: They're correct.

THE COURT: Thanks for coming up this morning. See you, sir.

VENIREPERSON STINSON: Thank you, Your Honor.

[Venireperson Stinson left the courtroom.]

THE COURT:   Court's in recess till 9:00 o'clock.

[Whereupon, proceedings adjourned, to reconvene Thursday, June 25 2009. Reporter's Record continued in next numbered volume.]

- - - - -

THE STATE OF TEXAS        X

COUNTY OF DALLAS          X


            I, Debi Harris, Deputy Official Court

Reporter for the Criminal District Court Number 7,

Dallas County, Texas, do hereby certify that the above

and foregoing contains a true and correct transcription

of all portions of evidence and other proceedings

requested in writing by counsel for the parties to be

included in this volume of the Reporter's Record in the

above styled and numbered cause, all of which occurred

in open court or in chambers and were reported by me.

            I further certify that this Reporter's

Record of the proceedings truly and correctly reflects

the exhibits, if any, offered by the respective

parties.

            WITNESS MY OFFICIAL HAND, this the

_____ day of February, 2010.

Debi Harris, Texas CSR #1869
Expiration Date: 12/31/11
Deputy Official Court Reporter
Dallas County, Texas
Crowley Courts Building
Dallas, Texas
(214) 653-3416