ORIGINAL

REPORTER'S RECORD   *AP-76207*

VOLUME 29 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

THE STATE OF TEXAS              (        IN THE CRIMINAL DISTRICT

VS.                            (        COURT NUMBER SEVEN

JAMES GARFIELD BROADNAX        (        OF DALLAS COUNTY, TEXAS

ORIGINAL

* * * * * * * * * * * * * * * * * * * *

INDIVIDUAL VOIR DIRE EXAMINATION

* * * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 29th day of June, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

**Anne B. Meredith**
Certified Shorthand Reporter

A P P E A R A N C E S:


HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas   75207-4313
Telephone No. 214 653-3600

BY:  MS. ANDREA HANDLEY, SBOT No. 08898800
     MS. ELAINE EVANS, SBOT No. 24032880
     MR. GORDON HIKEL, SBOT No. 00787696
     Assistant District Attorneys


                APPEARING FOR THE STATE OF TEXAS



     MR. BRADLEY LOLLAR, SBOT No. 12508700
     Attorney at Law
     1700 Commerce, Suite 450
     Dallas, Texas   75201
     Telephone No. 214 384-8178

     MR. DOUGLAS PARKS, SBOT No. 15520000
     Attorney at Law
     321 Calm Waters Lane
     Holly Lake Ranch, Texas   75765
     Telephone No. 903 769-3120

     DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
     133 N. Industrial Blvd., LB 2
     Dallas, Texas   75207-4399
     Telephone No. 214 653-3550

BY:  MS. KERI MALLON, SBOT No. 24049165
     Assistant Public Defender

                APPEARING FOR THE DEFENDANT




*Anne B. Meredith*
Certified Shorthand Reporter

CHRONOLOGICAL INDEX - VOLUME 29

|                                            | COURT | STATE | DEFENSE | PAGE |
|--------------------------------------------|-------|-------|---------|------|
| Proceedings - June 29, 2009                |       |       |         | 5    |
| VENIRE PERSON                              |       |       |         |      |
| LYLE LIVINGSTON                            | 6     | 12    | 58      |      |
| Defendant's Challenge                      |       |       |         | 86   |
| Court's Ruling                             |       |       |         | 87   |
| LESLIE ALLAN                               | 91    | 95    |         |      |
| State's Challence                         |       |       |         | 104  |
| Court's Ruling                             |       |       |         | 104  |
| JENNIFER STOCKTON                          | 106   | 112   | 154     |      |
| Defendant's Challence                     |       |       |         | 183  |
| Court's Ruling                             |       |       |         | 185  |
| PETER FERRIS                               | 188   |       |         |      |
| Excused by the Court                       |       |       |         | 198  |

*Anne B. Meredith*
Certified Shorthand Reporter

ALPHABETICAL INDEX - VOLUME 29

| VENIRE PERSON | COURT | STATE | DEFENSE | PAGE |
|---|---|---|---|---|
| ALLAN, LESLIE | 91 | 95 | | |
| State's Challenge | | | | 104 |
| Court's Ruling | | | | 104 |
| | | | | |
| FERRIS, PETER | 188 | | | |
| Excused by the Court | | | | 198 |
| | | | | |
| LIVINGSTON, LYLE | 6 | 12 | 58 | |
| Defendant's Challenge | | | | 86 |
| Court's Ruling | | | | 87 |
| | | | | |
| STOCKTON, JENNIFER | 106 | 112 | 154 | |
| Defendant's Challenge | | | | 183 |
| Court's Ruling | | | | 185 |

*Anne B. Meredith*
Certified Shorthand Reporter

P R O C E E D I N G S:

(Defendant present).

THE COURT:  What says the State of Texas?

MS. EVANS:  State's ready, your Honor.

THE COURT:  And Mr. Broadnax, Mr. Lollar?

MR. LOLLAR:  We are ready, yes, sir.

THE COURT:  Lyle Livingston.

(Prospective Juror No. 797, Lyle Livingston, enters the courtroom).

THE COURT:  Good morning, sir.  Thank you very much.  Please be seated.

PROSPECTIVE JUROR LIVINGSTON:  Good morning. Thank you.

THE COURT:  Be seated, counsel.

I want to say good morning to you again, Mr. Livingston.  Appreciate you being here, being on time. Apologize for the delay.  No one, none of these attorneys had anything to do with our short delay.  But we do respect your time.

My name is Webb Biard and I will be with you this morning during the jury selection process.  The Presiding Judge of this Court is Michael Snipes.  That's who you met at that large jury panel.  And should you be selected as a juror on this case, Judge Snipes will actually preside over the trial, for what that's worth.

Before we go any further, do this for me, please, sir.

(Prospective Juror Livingston sworn).

LYLE LIVINGSTON,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Thank you, Mr. Livingston.  Mr. Livingston, in regard to the jury selection, what we are in the process of doing is we are qualifying some, give or take, fifty prospective jurors.  We anticipate that being done within the next two or three weeks.  When that's done, then the actual twelve man/woman jury will be selected from that pool.

So, that will give you an idea of what we are doing this morning.  And I will tell you before you leave here this morning, here in open court, whether or not you are a qualified juror.

A    Okay.

Q    The way we are going to proceed, I'm going to talk to you for just a minute, and then one of the attorneys for the State and then one of the attorneys for Mr. Broadnax will speak to you for up to forty-five minutes.  So, it's going to take up to an hour and a half, maybe not that long.

During that time, if you need to take a break, if you need some water, you need a Coke, coffee, you just let

me know and I guarantee you we will accommodate you.

A    Okay.

THE COURT:  Also, I want to introduce to you at this time Elaine Evans.

MS. EVANS:  Good morning.

PROSPECTIVE JUROR LIVINGSTON:  Good morning.

THE COURT:  Andrea Handley.

MS. HANDLEY:  Good morning, sir.

THE COURT:  They represent Dallas County and the State of Texas.

Further to my right is Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  Doug Parks.

MR. PARKS:  Hi.

THE COURT:  Keri Mallon.

MS. MALLON:  Good morning.

PROSPECTIVE JUROR LIVINGSTON:  Good morning.

THE COURT:  And they represent Mr. Broadnax, Mr. James Broadnax.

Q    (By the Court)  Did you have an opportunity to read that pamphlet?

A    Yes, I did.

Q    Did that help you a little bit to understand this process?

A    Yes, it did.

Q    As you can see from just that pamphlet, we are going to be talking about some things that I bet you've known and understood since grade school.  But then we are also going to be talking about some law that probably you were unaware of like those special issues.  Have you ever seen those special issues before?

A    No, I haven't.

Q    I would have been very surprised.  I tell you, probably 90 percent of the lawyers in this building aren't familiar with those special issues.  Don't let that worry you.  These attorneys have the ability to explain the law to you.  And then once you think that you understand it, then you'll be asked, now that you know the law, can you follow the law in performing your duties as a juror?

And we will spend whatever time it takes for you to have a grasp of these laws.  And in that regard, sir, this isn't like some legal pop quiz in which we are trying to find out what twelve jurors know the most law and then they are going to be on the jury.  It doesn't have anything to do with it.  We don't assume that you know any of these laws.  That's our job, not your job.

A    Okay.

Q    And I want you, as much as possible, to be just as at ease as you can be.  Trust me, nobody involved in this process would ever intentionally embarrass or intimidate or

browbeat the prospective jurors.  It's not going to happen.

They are going to ask you some pointed questions because of the import of this case, but you'll understand that when we do.

Now, I'm going to hand to you at this time your questionnaire.  All right, sir.  We appreciate you filling out that questionnaire.  The attorneys have spent a lot of time reading it.  I know it took you time filling it out, but I promise you it will save you more time today than it did to fill it out.

We are not going to go back over it in detail, but I'm sure, some of your responses, they will want you to explain a little further.  And that's -- So, that's just the way, not you, it's just the way we've done it with every juror.

And one thing I want to stress, and I don't know how I could stress it any more but simply tell you, all I expect, all I have a right to expect, all the attorneys expect is you tell us how you honestly feel.  I mean that's the bottom line.

From hearing Judge Snipes' remarks, from filling out the questionnaire, from reading that pamphlet, from sitting here as you are now, are you aware that this is a capital murder case?

A    Yes, I am.

Q    The State of Texas is seeking the death penalty.

A    Yes.

Q    You understand that?

A    Yes, I do.

Q    And I will tell you, sir, if someone is found guilty of capital murder, then there's only two possible punishments.  One is life in prison without parole and the other one is the death penalty.

And I want you to believe me on my word when I tell you, under the current law in Texas now is, if someone is found guilty of capital murder and they are sentenced to life in prison without parole, they will serve the rest of their life in prison.  In other words, life in prison without parole means life in prison without parole.

There was a time, sir, in my earlier career, when someone could possibly, after a certain number of years, become eligible for parole on a capital murder case, but that's no longer the situation.  That's not the law.  Life in prison means life in prison.

Now, did you see from reading that pamphlet where Judge Snipes says that we are going to start this trial August the 10th?

A    Yes, sir.

Q    It's going to last up to two weeks.  Let me tell you how that will go.  It will go -- I think it says it in

that pamphlet.  It will go Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, lunch break.

The jury will not have to stay together overnight unless and until the possibility of, during deliberations --

Have you ever served on a jury before?

A    I have, sir.

Q    Okay.  But you know what deliberations mean.

A    Yes, sir.

Q    In other words, deliberating your verdict.  And let's say you worked late into the night, became fatigued, you and the other eleven members of the jury, there is a possibility you would all be taken together to a fine hotel, county expense, individual private rooms, spend the night, and then come back in the morning as a group, to avoid any outside influence on your decision.  That's a possibility.

If that happened, Judge Snipes would give you plenty of advance notice.  About two days ahead he might say, bring an overnight bag tomorrow, or something.

I tell you all that, give you those dates and the way the trial will proceed to ask you, as you sit here now, are you aware of any reason why you can't sit as a juror in this case?

A    No, sir.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Great.  Okay.  All right, sir.  You remember what I told you, if you need to take a break, let me know.

A    Thank you.

Q    Because I know you've been going since early this morning.

THE COURT:  And I want to reintroduce to you at this time Elaine Evans now who is going to speak to you on behalf of Dallas County.  Thank you.

MS. EVANS:  Thank you, your Honor.

THE COURT:  Yes, ma'am.

EXAMINATION

BY MS. EVANS:

Q    Good morning again, Mr. Livingston.  I want to talk to you a little bit about how we are going to proceed this morning, and then we will just get into it.  How is that?

A    Okay.

Q    Right now, you know, as the judge told you, it's just important to let us know how you feel because right now your only oath has just been to tell us the truth.  And really it's the only opportunity that the lawyers from both sides get to find out how you really feel about certain things.  Okay?

And the reason that's important is, if you are selected as a juror in this case, you're going to take that

additional oath, and that is to render a true verdict based on only two things, and that is the law and the evidence in the case. Okay. And, so, that's why we do this is just to make sure that you can follow the law as it's going to be given to you by the judge if you were to serve as a juror in this type of case. Okay?

A    Uh-huh.

Q    Because I'll tell you, of all the people that we've talked to, and we've talked to over a hundred now individually just like you, not everyone can sit as a juror in this type of case because they have strong feelings either against the death penalty or very strong feelings for the death penalty. You know, they are very pro death penalty.

And there is nothing wrong with being in support of the death penalty and there is nothing wrong with being against the death penalty. It's just whenever you cannot follow the law as it's given to you, it would make you unqualified. Okay?

A    (Nods head).

Q    And, so, that's why we talk about the law up front and make sure that you can follow that, Mr. Livingston.

In proceeding here today, we are going to talk about a couple of things in your questionnaire that I noticed, and then we are going to talk about principles of

law that come up in every single type of criminal case, be it a speeding ticket all the way up to capital murder here today.

And then we are going to talk more specifically about capital murder and how a person goes about, you know, being eligible for the death penalty and then, by the way the special issues are answered, determines whether or not a person actually receives a death sentence. Okay. So, that's how we are going to go today.

In looking at your questionnaire, I noticed that you are in a very unique position that we have not seen another juror like yourself in, and that is that you actually know an individual that's on death row.

A     Yes, I do.

Q     Is that correct?

A     Yes.

Q     And how long has this individual, your friend, been on death row?

A     Since the seventies.

Q     The seventies?

A     Uh-huh.

Q     Okay. And was this a publicized case out there in California?

A     Yes, it was.

Q     Okay. I was born in '76, so bear with me. I

missed that one though I, you know, I frequently watch the news as it relates to crime everywhere.

But have you kept in touch with him since he's been on death row at all?

A     No, I haven't.

Q     You have not.

A     No.

Q     Has he tried to reach out to you, write you letters, things of that nature?

A     No.

Q     No.  All right.  Did you follow his trial?

A     Yes, I did.

Q     You did.  And that's understandable, you know, a friend of yours, and I am sure you wanted to know the outcome and maybe the ins and outs of what happened; fair to say?

A     Yes.

Q     Okay.  Based on what you saw in that case, the trial of your friend and the fact that he's on death row now, will that in any way affect your service in a capital murder case where the defendant is facing the death penalty?

A     No.

Q     Okay.  Appreciate that, Mr. Livingston.

Additionally, I saw that you are aware of this case to some degree.

A    Yes, I am.

Q    And what I want to say about that is, you know, we have talked to a lot of jurors. Some have not heard a thing about the case and others, you know, saw what they saw on the TV.

So long as you haven't already formed an opinion based on what you saw, then you're still qualified, because we don't expect jurors to walk around with their eyes and ears closed and not pay attention to any of their surroundings. In fact, I submit to you that wouldn't be a very good juror if we had people that closed off.

A    Right.

Q    Tell me, Mr. Livingston, what you remember hearing about this case.

A    I remember that there was a robbery at a -- I think it was a photography studio.

Q    Uh-huh.

A    And that I think two people were killed and it was a robbery.

Q    Okay.

A    And that's basically what I remember about it.

Q    And did you just see what the, I guess, reporters reported on it?

A    Yes.

Q    Or did you see any actual interviews from it or

anything like that?

A     No, I saw the -- it was on the news.

Q     Okay.

A     And because I lived in Garland, you know, it was of interest because it was in my city.

Q     Absolutely.  And since hearing that news report, have you learned anything else about this case?

A     No.

Q     All right.

A     I had forgotten about it until I got called for this.  But you know, crimes happen a lot, so you look at it and you kind of think about it, and then you kind of move on unless it involves you personally.

Q     And move on and hear about the next crime, unfortunately; right, Mr. Livingston?

A     Yes, ma'am.

Q     Okay.  I want to move and talk now a little bit about some of the principles of law that come up in every type of trial.

And I see that you have prior military service to our country.

A     Yes, ma'am.

Q     And that's in the Navy, correct?

A     Yes, ma'am.

Q     You can appreciate that, you know, there is a

process in the way the law works and that it's very important that the jurors in this case can be able to follow that law as given to them. And it, you know, sometimes can be like mental gymnastics sometimes, but it's very much required. And I see that you respect the system that we have in our country, sir.

A    Yes, ma'am, I do.

Q    Okay. When I talk about basic rights, I mean such as that the defendant is presumed innocent. As he sits here today, there has been no evidence presented and, so, you would have to presume him to be innocent of all charges against him.

He's been merely just indicted for the offense of capital murder. And that indictment that's in front of you is just a sheet of paper. It's absolutely no evidence of guilt. It just lets the State know what it is that we have to prove to the jurors beyond a reasonable doubt, and it lets the defense know -- puts them on notice for what he's been charged with. Okay? But merely that.

You know, there is no proposition here in this courtroom of where there is smoke there is fire, none of that. The State does the accusing, we better do the proving. And I see that you appreciate that in your questionnaire, sir, as well.

A    Yes, I do.

Q    Would you be able to afford this defendant his presumption of innocence?

A    Yes, I can.

Q    Okay.  And when I say that it's the State's job and the State's burden to prove the case to you, it's our burden and our burden alone.  It never shifts over to the defense where they need to produce even a shred of evidence, always rests with the State.

You always look to the State to prove to you beyond a reasonable doubt the elements in the offense as well as when we, if the State reaches the punishment phase, you will again look to the State to prove to you what is required before rendering a verdict in the guilt/innocence or the punishment phase.  Okay?

A    Okay.

Q    And if the State doesn't prove their case beyond a reasonable doubt, what is your verdict?

A    Not guilty.

Q    Absolutely.  And if the State does not prove to you these issues in the special issues that we will get to a little bit later, then there is an automatic presumption of life in prison without the possibility of parole.  Okay.  So, there is nothing automatic.  And, again, I can see that you respect that in your questionnaire.

When I say the State's burden is beyond a

reasonable doubt, what does that mean to you?

A    That there's no circumstances or no things that would say, well, maybe he did it, but maybe there is this little thing that says maybe he didn't --

Q    Okay.

A    -- with totally a hundred percent proof that he committed the crime.

Q    Okay.  So, maybe -- Some people tell us that they have no doubts in their mind.  But if you'll notice that it's beyond a reasonable doubt.

A    Right.

Q    Right.  Because the State, I submit to you, could never prove something to you beyond all certainty or 100 percent sure unless you saw it with your own eyes.

A    Right.

Q    Fair to say?

A    Fair to say.

Q    So, can you hold the State to the burden of beyond a reasonable doubt?

A    Yes, I can.

Q    Okay.  Another one of the rights that we talk about is the defendant's fifth amendment right not to testify.  You know, the State of Texas can't say, you know, now I call the defendant in this case.  Let's hear what you have to say.  And his own attorneys can't force him to take

the stand.

It's his decision, and his decision alone. Of course, he can have the advice of his counsel, but it's his decision to make. Okay?

A    Uh-huh.

Q    And if the defendant chooses not to testify for whatever reason -- because there can be a whole host of reasons why somebody chooses not to testify. For one, I would submit to you, maybe the State hasn't proven their case. And, so, why would he subject himself to that, you know?

A    Uh-huh.

Q    So, for whatever reason, if a defendant decides not to testify, would you afford the defendant his fifth amendment right and not hold it against him for any reason?

A    Yes, I would.

Q    Okay. In other words, if we get this close to proving to you the elements of the offense but we are not quite there, you can't go back in the jury room and then say, well, but the defendant didn't testify, and then thereby give the State a leg up and say, well, they didn't prove it but, hey, the defendant didn't testify so I'm going to go ahead and convict.

A    Right.

Q    That's what the law is telling you you cannot do.

And you wouldn't do that, right, Mr. Livingston?

A    No, I wouldn't.

Q    Okay.  When I talk about the elements of the offense, those are the items listed there in the indictment. And I tell you, it's kind of like a check list.

A    Yes, ma'am.

Q    You know, did the State prove the county where they say that this occurred?  Did they prove the manner and means, the way they said this happened?  Okay.  Did they cause -- Did this defendant, is he the one that actually did it, and did he cause the death of the individual they said that he caused the death of?  That sort of thing, okay?

A    Okay.

Q    Let's say -- And I'm never talking about this case when I give you hypotheticals.  Okay?

A    Okay.

Q    Let's say you have a murder case and the State says that the defendant caused the death of an individual by the name of Joe Smith by shooting that individual with a firearm.  Okay?

A    Okay.

Q    And at trial, you know that that's what the State has to prove to you, by shooting them with a firearm.  But you hear testimony from the medical examiner that says, yeah, Joe Smith is dead.  And you may even hear testimony from the

defendant, yes, I killed Joe Smith, and I would do it again.

But whenever that medical examiner testifies, the medical examiner says, Joe Smith did not die from a gunshot wound to the chest. Joe Smith died from repeated stab wounds. And then you hear further evidence from the crime scene people that there were no bullets found at the scene or shell casings or no gun, but there was a bloody knife.

Has the State proved to you beyond a reasonable doubt that this defendant caused the death by a gunshot wound to the chest?

A    No.

Q    No. So, what would it be your duty to do?

A    Come back with a not guilty.

Q    Absolutely. And that's all that we are asking that you do. The State and the defense both are entitled to a fair trial in both the guilt/innocence phase as well as the punishment phase. And as we've talked about, there are no automatics. The State has to prove to you what is required in all phases of this trial. Okay?

A    Okay.

Q    No different than any other type of case.

As you might expect, to prove to you those elements, you will hear from witnesses, and the evidence only comes from the witness stand in the form of testimony

or maybe sometimes in the form of documents or exhibits. Okay?

A    (Nods head).

Q    But whenever you hear from witnesses such as police officers, I notice that you say, you know, you give credit to law enforcement and say that, we hold them to a higher standard and I believe most officers tell the truth.

But I do like in your questionnaire how you qualified most officers tell the truth. You don't know until they take the stand and you hear what they have to say, correct?

A    Correct.

Q    And your job as a juror is absolutely to determine the credibility of the witnesses. And by that we mean all witnesses. So, whether it be a priest, a prostitute or a police officer, jurors under the law cannot just all of a sudden, based on a person's profession or because they are wearing a uniform, automatically hold them to a higher standard and say, I am going to always believe every word that comes out of that type of witness's mouth. The law says you have to wait.

A    Uh-huh.

Q    Wait until you hear what they have to say. And then at that point in time, then you can start judging their credibility and determine whether or not you believe them.

Would be able to wait until you hear a police officer testify before you decide whether or not you believe them?

A    Absolutely.

Q    Okay.  Thank you, Mr. Livingston.

Now I want to get more into the type of case that you have been called upon to potentially serve as a juror on today, and that is capital murder.

As the judge told you, there are only two possible punishments for the offense of capital murder, and that is life in prison without the possibility of parole and the death sentence.  Okay.

So, let's talk about what types of crimes constitute capital murder a bit.  And that is, you know, it's very specific.  It's a murder, and it's always a murder plus an additional aggravating factor.  And those aggravating factors could be murder of a child under the age of six, it could be murder of a police officer or a fireman in the line of duty, it could be murder of two or more individuals in the same common transaction.  Okay.

Or it could be like you have in this indictment which is murder plus an additional felony.  Murder plus a robbery is what we are contemplating here.  Okay?  And that's the additional aggravating factor.

So, I see by your questionnaire that you

recognize that not just because a life is taken is a case of capital murder eligible for the death penalty. Okay?

A    Right.

Q    The State of Texas, just as you indicate in your questionnaire, does not believe in eye for an eye.

A    Uh-huh.

Q    All right. Just because someone kills another, absolutely wrong, but it doesn't mean that it's either one of those that are eligible for the death sentence.

A    Right.

Q    Only capital murder, those cases that I've just mentioned, to name a few, are eligible to receive a sentence of death.

So let's say, for example, I turn to my co-counsel and I shoot her ten times. And I am thrilled I did it. I have been planning on doing it, brought the gun here this morning all shiny and new with new bullets. And I sat back and just laughed that I had killed her.

That's just, for lack of a better term, that's just a plain murder. Do you see that?

A    Yes.

Q    I haven't, you know, robbed her of her money.

A    Uh-huh.

Q    Or she is not a child under the age of six and she is not a police officer or fireman or any of those special

people that would elevate it to a capital murder where the death penalty would be eligible.  Understand that?

A    Yes, I do.

Q    Okay.  And just because the death penalty is an option does not mean that all capital murders are suitable for a death sentence.  Fair to say?

A    Yes.

Q    And in fact, you know, the State recognizes that.  And we don't even seek the death penalty in every capital murder because we recognize that, you know, the punishment must fit the crime.  And that's what the legislature contemplates in having you answer these questions that we call special issues in determining whether or not it's appropriate.  Okay?

A    Okay.

Q    The death penalty is always just merely an option for some capital murders where the State of Texas seeks the death penalty.  And this is one of those cases, of course, that the State is seeking the death penalty.

A    (Nods head).

Q    So let's talk about, for example, that indictment.  Let's say the State proves to you that a murder happened, but you don't believe that we've proved to you, based on the evidence that you heard, that a robbery has occurred.  So, have we proved to you capital murder?

A    No.

Q    No.  We've just proven to you murder.  So, at that point in time the jury would have before them a range of punishment, five years all the way up to ninety-nine years or life.  But the death penalty would then be off the table because we haven't proven to you the necessary things to make it a capital murder.

A    Okay.

Q    And, so, again the jury would be called upon to assess punishment within that range.  All right.  Does that make sense to you?

A    Yes, it does.

Q    All right.  And let's say, for example, I talked about capital murder has an additional aggravating factor.  For this type of capital murder, murder plus a robbery, I can tell you what it will always be.  It will always be an intentional murder.  All right?

It will never be a circumstance where there is an accident or somebody is acting in self-defense or by mistake.  They meant to do what it is that they set out to do, and they did it.  Okay?

A    Okay.

Q    Intentional.  And that is the difference, you know, for this type of capital murder.  All right.  It's going to be an intentional murder plus a robbery.

If, for example, we prove to you -- there's other lesser type of offenses that you may be called upon to consider. And the reason we talk about these now is because obviously it's too late, you know, once you're already serving as a juror to see how you feel about certain things. All right?

So, let's say you did not believe this was an intentional murder. You believe maybe that it was reckless. You know, somebody recognized that there was a danger and they consciously disregarded that and went ahead and acted anyway. That may be something lesser called a manslaughter. All right?

A    Okay.

Q    And then you could have other types of lessers that could call upon a different mental state such as criminal negligent homicide. Okay?

And, so, basically what I'm asking is you just look at the evidence and determine what we've proved to you. Okay?

A    Okay.

Q    Capital murder, always an intentional murder, not an accident.

A    Okay.

Q    Plus that aggravating factor, here robbery. All right?

A    Okay.

Q    I want to move on and talk to you now about these special issues because that is very different. As the judge told you, he would be surprised if you had ever seen those, and most lawyers haven't seen them.

And, so, in contemplating these special issues, I would say that, by looking at your questionnaire, that you very much recognize what it is that is at stake and at hand that you're going to be required to do, and that is, once again, hold the State to the burden. Okay?

Hold the State to the burden of beyond a reasonable doubt and make us prove it because, again, there is nothing automatic. Just because somebody is found guilty of capital murder doesn't mean that there is automatically a death sentence imposed. All right. The State of Texas has to prove to you those things beyond a reasonable doubt before a decision is made of what sentence is appropriate. Okay?

A    Okay.

Q    And I say that you recognize that because I'm looking at your questionnaire on page one and I see that you are in favor of the death penalty. And you say, it's the law in Texas. Which, of course, you know, the law in Texas does recognize the death sentence is appropriate in some cases.

I also see on page two of your questionnaire that you recognize that a life sentence rather than death could be appropriate under the proper set of circumstances. Is that how you feel, Mr. Livingston?

A     Yes, I do.

Q     Okay. And, again, your argument for the death penalty, I see you say, sometimes it's the most appropriate sentence. And then again, on page four, or rather page five, you talk about for some crimes and for some people.

And, so, you recognize that, you know, there is no type of person that commits the offense of capital murder. There's only facts and circumstances to look at; fair to say?

A     Yes.

Q     And, so, we just don't want you to make any automatic assumptions. Let me give you an example of what I think that you already realize and appreciate, just from looking at your questionnaire and how you term everything, you know, with regard to some people. And that is, let's say you hear about a thirty-five year old man that killed a child that's five years old. Sound pretty bad?

A     Yes, it does.

Q     Okay. But that's all you've heard and, so, you don't know what the appropriate punishment would be. Capital murder, yes, because he's killed a child under the

age of six.  But at this point in time you don't know the circumstances.  And I submit to you that there could be a whole host of different facts.

But let's say you get to -- You've heard, you know, the guilt/innocence phase and you believe beyond a reasonable doubt that, sure, that person caused the death, intentionally caused the death, planned it out even, if you believe that, of the child under the age of six.

But you hear additional facts in that punishment phase, and that is that that child under the age of six is actually the son of that thirty-five year old man.  And you hear that that thirty-five year old man is a loving father, a caring and devoted husband, and he has been sitting by the bedside of that five year old over at Children's Medical Hospital day in and day out for over a year because that five year old is suffering from terminal cancer.

That five year old is in pain every single day that he wakes up and every single night as he goes to sleep.  And, so, the thirty-five year old man, the father, couldn't stand to see his son suffer any longer, so he gives him a lethal dose of morphine.

All right.  So, capital murder, yes.  And in determining the proper punishment, can you understand how that's a bit of a different capital murder than what you

could hear if an individual, a thirty-five year old man goes onto the playground and just picks off a five year old kid with his assault rifle?

A    Yes, I can.

Q    Okay. And that's why, you know, the legislature contemplates that there are no automatics. And, you know, just because you hear that somebody has committed a capital murder and just because you believe that they have committed a capital murder beyond a reasonable doubt doesn't mean you know what the proper punishment is until you hear it. Okay?

A    (Nods head).

Q    And, so, the State is asking that you wait and consider the special issues before you make that determination. And that's what the law requires. All right?

A    Okay.

Q    To be qualified, that you don't make any automatic assumptions that a person that commits capital murder is the kind or type of person that is deserving of the death penalty, because the law doesn't ask you who deserves the death penalty. It asks you to answer these special issues.

And in turning to that, let's look at special issue number one. It says, do you find from the evidence beyond a reasonable doubt. So, again, that tells you that that's a burden on the State. The State must prove to you that there is a probability that the defendant would commit

criminal acts of violence that would constitute a continuing threat to society.

And you see the word probability there. It doesn't say beyond all certainty this defendant is going to commit criminal acts of violence and it doesn't say that there is a possibility, because anything is possible.

A    Right.

Q    But I submit to you that some jurors have told us that a probability means more likely than not. Can you see that?

A    Yes, I can.

Q    Okay. And by criminal acts of violence, again, the legislature doesn't define what we are looking for there. Okay? It's for you as an individual juror to determine what types of acts that you think this individual would probably commit that would cause them to be a continuing threat to society.

And if you have found somebody guilty of capital murder, you'll recall that the judge told you that there are only two possible punishments.

A    Right.

Q    Life without the possibility of parole and the death sentence. So, if you're determining how to answer these special issues, the law presumes a sentence of life without parole. Okay. That is the presumption.

Just like you are to presume the defendant innocent in the guilt/innocence phase of the trial, in answering these special issues, you are to presume that this defendant should receive a life sentence.  Okay?

A    Okay.

Q    You are to presume that the answers to special issue number one and number two are no, unless and until the State of Texas proves to you beyond a reasonable doubt the things in there.  All right?

A    Okay.

Q    And, so, when I say commit criminal acts of violence, and it's your job to determine what that would be, let's say I turn to my co-counsel and I sock her in the face.  Would that be a criminal act of violence to you, or could it be?

A    It could be.

Q    Okay.  And the reason I say it could be is because you haven't heard anything yet.

A    Right.

Q    And I know you want to consider everything in context, and that's what you would be called upon to do.

But that could be a criminal act of violence in your mind; fair to say, Mr. Livingston?

A    Yes.

Q    And, so, basically what we want you to recognize

is it doesn't say commit another robbery or commit another murder. It's just would that person in the society that they are in, wherever they find themself.

And Mr. Livingston, again, if a person is found guilty of capital murder, what society are we actually talking about?

For you and I, society is like going to the grocery store, maybe going to the movie theater.

A    Okay. Yeah.

Q    Coming here to the courthouse. But if a person has been found guilty of capital murder, where is their society likely to be?

A    Where we are.

Q    Or prison, right?

A    Oh, all right.

Q    Because the law presumes --

A    Right.

Q    -- an automatic sentence of life. All right?

A    Right.

Q    And, so, you're looking to determine, are they going to be a potential threat -- You get it now?

A    I'm there.

Q    I see the aha moment.

A    I know.

Q    That's okay. You're not the only one, Mr.

*Anne B. Meredith*
Certified Shorthand Reporter

Livingston. And I see that, you know, you recognize that now.

A   Yes, I do.

Q   That we are talking about, are they the type of person that are probably going to be a threat to the people that they come across even in prison? Because can you understand how that is a society in and of itself?

A   Yes.

Q   You have prison guards, you have teachers there, you have ministers, you have people there serving food, nurses, you have visitors; fair to say?

A   Right.

Q   Visiting those others. And, so, can you contemplate how prison would be a society as well?

A   Yes, I do.

Q   And do you believe that those individuals who are there serving a sentence, whether it be for their third DWI or for a drug conviction or whether it be for a murder, that they should all be able to enjoy a right to be free from continuing threats of violence?

A   Yes.

Q   Okay. Or continuing acts of violence?

A   Uh-huh.

Q   Fair to say?

A   Yes.

Q   All right. Now, in looking at special issue

number one, if you believe that the State has proven that to you beyond a reasonable doubt. And, again, the jury deliberates and determines whether or not we've proven that special issue number one.

If you do not believe that we've proven it, the answer to that is no and the defendant receives a life sentence --

A    Life sentence.

Q    -- without parole. Okay. And you stop and you don't look any further. All right?

A    All right.

Q    If the State of Texas does prove that to you beyond a reasonable doubt, then the answer is yes, and you move on to special issue number two. And what special issue number two is is basically the law of parties here in Texas. And let me give you an example.

Let's say that myself and my co-counsel, we sit at my kitchen table and we plan out to go rob the 7-Eleven. And she says, great, I've got a new gun that we should probably take along and try out.

And, so, she brings the gun along and the bullets, and I am driving us there. And we get to the 7-Eleven that we picked out and we planned to go commit this robbery. And we get there and we swap seats.

And I say, okay, you have this car gassed up

and ready to go, ready to hightail it out of here whenever I get in back. And she says, okay. And I said, oh, man, but I forgot my mask. And she says, don't worry about it. Just don't leave any witnesses. Here's the gun.

And so I go inside, take all the money from the till, I take a bunch of cigarette cartons. And then as I'm leaving out of there I'm like, oh, man, you know, I shouldn't leave any witnesses, just like she said. So, I take out the attendant right there in the 7-Eleven. I come outside, she is there waiting for me, and we take off.

I'm guilty of capital -- or I could be found guilty of capital murder; fair to say?

A    Yes.

Q    What the law of parties contemplates in Texas is that she, too, could be guilty of capital murder. Do you think that's fair?

A    Okay.

Q    And what the law of parties is is it says, if you aid or assist in the commission of an offense, that you can be guilty as a party. Okay?

A    Okay.

Q    Guilty of the same offense. So, even though she sat in the car, she didn't go in, did she aid or assist me?

A    Yes.

Q    Okay. In the offense of capital murder. So she,

too, could be guilty of capital murder.

A    Okay.

Q    Fair to say?

A    Yes.

Q    Does that sound fair to you?

A    Yes, it does.

Q    Okay.  And in answering special issue number two, you know, just because she is or could be found guilty of capital murder doesn't mean that there's any automatics, right?

A    Absolutely.

Q    With regarding to her punishment.

A    Right.

Q    And, so, if you were acting as a party, if you yourself are the shooter, the triggerperson, then fair to say that you've been the one that actually caused the death, okay?

A    Uh-huh.

Q    And you would have anticipated that a life would be taken.  But what special issue number two says is, do you find from the evidence beyond a reasonable doubt the defendant actually caused the death of the deceased -- that would be me.

A    Uh-huh.

Q    -- or did not actually cause the death of the

deceased but intended to kill the deceased or another, or anticipated that a human life would be taken?

In the example that I gave you, do you see how my co-counsel would have actually anticipated that a human life be taken?

A    Yes.

Q    And she did that because she told me, don't leave any witnesses, right?

A    And forget about the mask, just go in there and take care of it.

Q    Absolutely, you got it, Mr. Livingston. So, that's what special issue number two is. So, did they aid or assist?

And then special issue number two takes it a step further. Did that party, the person that didn't actually go in, actually anticipate that a life would be taken? All right?

A    Uh-huh.

Q    And, again, that's something that the State of Texas has to prove to you beyond a reasonable doubt.

If we do not prove that the person was actually the triggerperson or they are a party and that they did not actually anticipate, then you would answer special issue number two no. And, again, the trial stops and the defendant receives a sentence of what?

A    Life without parole.

Q    Absolutely, because that's the law.  That's what the law presumes.  And if we don't prove it, we don't overcome that burden.  All right?

A    Uh-huh.

Q    If we do prove it to you beyond a reasonable doubt, then the answer to special issue number two would be yes.

A    Yes.

Q    And then you move on to special issue number three.  And with regard to special issue number three, there is no burden.  You will notice that it doesn't say anything about proving anything beyond a reasonable doubt to you.  You notice that?

A    Yes, I do.

Q    Okay.  And because what special issue number three is, sometimes we call it the safety net.  Okay.  Because after -- If the State of Texas proves to you that a defendant is guilty of capital murder, and then you go on to consider, as the law requires you, to look at special issue number one and special issue number two, and if you answer both of those yes, then the defendant is sitting squarely on a sentence of death.  Okay?

A    (Nods head).

Q    But what special issue number three does, it asks you to take into consideration all of the evidence that

you've heard, okay, the crime itself that you heard in the guilt/innocence phase, and anything else additional, anything and everything that you've heard in the punishment phase of the trial. All right?

A    Okay.

Q    And then sort of categorize it into things, if you will. All right? And you would have certain categories such as, yeah, I find that, you know, something that I heard was mitigating.

Some people tell us maybe the age or whether or not a person was intoxicated on some substance or whether or not they were not the actual triggerperson, you know, some of those things may be mitigating.

A    Right.

Q    And the State of Texas doesn't tell you what you have to consider mitigating except for mental retardation.

A    Uh-huh.

Q    That's the only thing that the State says you must consider to be a mitigating circumstance. Okay?

A    (Nods head).

Q    But in terms of what is mitigating to you, it's your own personal decision. And what you may find to be mitigating, another juror may say, no, that's not mitigating at all. In fact, I think that's aggravating.

And we hear that a lot of times regarding

intoxication, voluntary intoxication.  And I saw where you speak to that.

A    Uh-huh.

Q    And you say, I think on your questionnaire you said, I think it could be, you know, in answering whether or not voluntary intoxication would be mitigating to you. I think on page six you say, I think but don't know.  Okay?

A    Right.

Q    And it may be one of those situations where you need to hear more.  Okay.  And certainly you haven't heard anything yet.  So, as you sit here right now, there are no automatics.

A    Uh-huh.

Q    And, so, what special issue number three does, it asks you just to look at everything, look at everything you've heard in context.  And then if you believe something is mitigating, then it goes in that category.  If you believe that something is nothing, then it just goes in no category. Or if you believe that something is aggravating or more, you might categorize it there.

But in contemplating special issue number three, you then go back and say, those things that I thought were mitigating, mitigating to me, somehow lessen the defendant's culpability.  Okay?

A    (Nods head).

*Anne B. Meredith*
Certified Shorthand Reporter

Q    You then ask yourself, do they rise to the level of being sufficiently mitigating?

A    Okay.

Q    Sufficiently mitigating so that I'm going to now overturn this sentence of death and make it a life sentence without the possibly of parole.  Okay?

A    Okay.

Q    And you may hear what to you are a thousand pieces of mitigating evidence, but if they don't rise to the level of being sufficiently mitigating, then you don't answer special issue number three yes.  The answer to that would be no, unless you find something that you believe in your mind and heart of hearts has risen to you, in your mind, to be the level of sufficiently mitigating, and then you would answer that yes.

A    Okay.

Q    So, in other words, do you find, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life in prison without the possibility of parole rather than the death sentence be imposed?  Okay.  And, again, it's what's mitigating and sufficiently mitigating to you.

Going back to the hypothetical of the 7-Eleven example. Let's say, you know, I'm the triggerperson and I take off and leave, and I leave my other party here, my co-counsel that planned this, leave her behind in the dust.

And, in fact, she wanted to stay behind. And she gets on the phone and calls 911 and tries to get assistance for the clerk, even though she aided and assisted and planned and participated in the intentional taking of the individual's life in the course of a robbery, guilty of capital murder.

And you may find, based on what you heard and based on her criminal history, or anything that you want to consider in that second phase of the trial, you may find that she is a future danger. Okay? And certainly, as you said before, you can see how special issue number two would apply.

A    Uh-huh.

Q    That she would be a party and actually anticipated.

But in special issue number three, some jurors may find the fact that she stayed behind and got assistance for that clerk and waited until the ambulance arrived to be mitigating, and some might find that it rises to the level of being sufficiently mitigating so much so that they would choose to overturn that sentence of death.

Can you see that?

A    Yes, I can.

Q    Okay.  And I am not going to ask you right now what you would find to be mitigating or even sufficiently mitigating.  Okay.  I'm just asking that if you hear something and that evidence to you is mitigating and if it rises to the level of being sufficiently mitigating, in your mind, would you be able to answer special issue number three yes?

A    Yes, I would.

Q    Okay.  And, so, basically that's all that that's contemplating because, again, it's just sort of mental gymnastics.  You've got to wait until you hear the evidence --

A    Uh-huh.

Q    -- to determine what the appropriate answer is to each of those special issues.  Okay?

And with regard to number one and number two, the State of Texas has to prove those to you.  All right?

Let me look back.  I wanted to go back on your questionnaire, page five.  You say what -- In deciding whether a person received a death sentence rather than a life sentence in a capital murder case, what would be important to you?  And you say, if the prosecution proved their case that requires capital punishment.

In my mind, you're already contemplating, even though you've never heard the law as it relates to capital murder and about these special issues, to me, you're

contemplating waiting until you hear it and waiting until the State proves to you that this is the appropriate case for a death sentence. Am I correct in assuming that?

A    Yes, you are.

Q    Okay. And, so, would you, Mr. Livingston, be able to wait until the State proves to you that somebody is guilty of capital murder?

A    Absolutely.

Q    And would you, again, just because somebody is guilty of capital murder, do what the law says and go through each of the special issues in determining whether or not we have proven that to you?

A    Yes.

Q    Okay. And that's what you're saying on page five; fair to say?

A    Yes.

Q    Just wait until the prosecution --

A    Right.

Q    -- proves it to you, that this is the case for it.

A    Uh-huh.

Q    Okay. And also, in looking on your questionnaire, page eight, you talk about the fact that some people feel -- we ask you about genetics, circumstances of birth, upbringing and environment, considering that when determining punishment. And you say, to a limited extent, depending on the crime.

Again, there are you contemplating just listening to everything as the law is requiring you to do in special issue number three?

A    Yes.

Q    And would you be able to do that, Mr. Livingston?

A    Yes, I would.

Q    I also want to ask you one other thing about your questionnaire, page fourteen.  You talk about the Bill Glass Prison Ministry.

A    Yes.

Q    Could you tell us a little bit about that?

A    Okay.  Bill Glass Prison Ministry is a Christian organization.

Q    Uh-huh.

A    And we go to prisons all over Texas and pretty much the United States, and we spread God's love and gospel and try to bring them to Christ.

Q    Okay.

A    That even though they have done bad things for which they are in prison, you know, God still loves them and we still love them, and we want to make sure that they are okay, and when they die, they will go to heaven.

Q    Okay.  Because you want them to hear about, learn about God and Jesus.

A    Right.

Q    Correct? Okay. And did you get involved in that through your church or somewhere else?

A    I got involved in it through a group called Christian Motorcycle Association.

Q    Okay. Are you a rider yourself?

A    Yes, I am.

Q    Great. How long have you been involved in Bill Glass Prison Ministry?

A    I was involved for about five years.

Q    Okay. Are you currently involved?

A    Not right now I'm not. I landed on my head one too many times, and I can't turn my head all that well. So, if you can't be an owl, you shouldn't be on a motorcycle.

Q    I understand, fair to say.

Are you currently involved, though, in the prison ministry?

A    No, I'm not.

Q    No, you're not. What time period were you involved in it?

A    Until last year.

Q    Okay. And in doing so, could you tell us approximately how many trips you made to various prisons?

A    I made about sixty.

Q    Sixty?

A    Uh-huh.

Q    Okay.  And in doing so, did you ever visit anybody on death row?

A    No, I didn't.

Q    No.  What about anybody that had received a sentence of life without -- or life without parole is new, as the judge told you.  But anybody with sentences such as that?

A    Yes, I have.

Q    Okay.  And, you know, I think that's a great work that you do and that certainly, you know, it's needed in our society to minister to those individuals.

But what I'm wondering is, if at all, your involvement in that -- In meeting with various inmates, was that like a one on one situation --

A    Yes, it was.

Q    -- that you would talk to the individuals?

A    Yes.

Q    Okay.  -- if that would at all affect you in listening to and evaluating the evidence in this type of case, understanding the gravity of it, okay?

And what I mean by that is, you know, you're in a unique situation.  You have the friend on death row, and I can respect and understand that you haven't had any contact with him.

But with regard to the prison ministry, how

do you think that that would affect you if you were to serve as a juror in this type of case?

A    I don't think it would affect me at all.

Q    Okay.  You don't think it would?

A    No.

Q    Understanding, you know, just as in any trial, that the defendant, as he sits there, is a human being. In this type of case, we are talking about a case where the State of Texas is seeking the death penalty.

And, you know, if the State proves to you beyond a reasonable doubt that this defendant is guilty of capital murder and if we prove to you the answer to special issue number one and number two are yes and you don't find anything sufficiently mitigating so that special issue number three is no, then the judge would have no choice but to sign a death warrant for this individual seated right over here --

A    Uh-huh.

Q    -- James Broadnax, okay?  And so, you know, we are talking about, some people -- sometimes we have jurors that tell us that, you know, yes, they are in favor of the death penalty.

A    Uh-huh.

Q    And they can think about it in theory all day long and, certainly, you know, based on some crimes, it's

deserving and warranted, but when actually called upon to do it, that maybe that might be a different set of circumstances. Okay?

A    Uh-huh.

Q    And, so, I just want to make sure that, based on your contact and experiences you have had in the prison ministry, that you're not going to have flashbacks to individuals that maybe you've sat and talked to for hours on end.

Would you just base your verdict on the evidence and the law in this case?

A    Yes, I would.

Q    Or is that going to come into play at all?

A    No.  We go out of our way not to ask them what they did.

Q    Okay.

A    And they don't usually tell us, because we treat them as individuals.

Q    Okay.  And I can respect -- You know, I understand what you're saying.  You don't ask them what they did because that doesn't really fit in line with what it is you're trying to do and what your goal is of being there.  Okay?

A    Uh-huh.

Q    But how would your -- Do you plan on getting back into the prison ministry at some point?

A     Yes, I do.

Q     Okay.  And why is it that you're not currently involved?

A     My means was the motorcycle.  We rode our motorcycles into the prisons.

Q     Okay.  I got you.

A     And because I can't ride it any more.

Q     I got you, they go hand in hand.

A     Yeah.

Q     I understand.  How would the -- Are you still friends or still in contact with individuals that are in that prison ministry?

A     Yes, I am.

Q     Okay.  And if you were to tell your friends that you served on this capital murder jury, or that you were in the process of doing so, where the State is seeking death, how do you think they would feel about that?

A     I don't think they would feel one way or another.  Like I said, we are -- The State, you know, the law, the State takes care of whether somebody is innocent or guilty.

Q     Absolutely.

A     And we are in there just for their souls and we don't make any judgments on anybody.  I mean we are all God's children.  And the State has a death penalty, and if the State's got it, then I don't see any problem with it.

Q    Okay.  And you know, I hear what you're saying, that you're not there to make a judgment in your role in the prison ministry.

A    Uh-huh.

Q    As well as those others aren't.  But if called upon to serve as a juror in this case, you will be making a judgment.

A    Absolutely, uh-huh.

Q    Okay.  And you are able to do that?

A    Yes, I am.

Q    All right.  Because, like I said, the State and the defense are both entitled to a fair trial.  And the State of Texas is entitled to a guilty verdict if we prove to you beyond a reasonable doubt the elements in those indictments.

A    Uh-huh.

Q    And we are entitled to a sentence of death if we prove to you each of these special issues --

A    Right.

Q    -- beyond a reasonable doubt and if you don't find anything to be sufficiently mitigating.  Okay?

A    Uh-huh.

Q    And, so, I just -- What prisons specifically did you visit?  I know you went to a lot probably, but.

A    Huntsville and I went to Angola.

Q    Angola?

A    Uh-huh, that's in Louisiana.

Q    Okay.  I was going to say that's not a Texas prison.  I've heard of it, but -- okay.

A    I have been around like three states.

Q    Okay.  What about any prisons here in Texas?

A    Like I said, Huntsville, and I have been to probably half a dozen prisons in this area.

Q    Okay.

A    I can't remember -- Most of them are down around the Houston area, around Sugarland and places like that.

Q    Okay.  And did you stay in contact with any one particular inmate?

A    No, I didn't.

Q    Huh?

A    No, I didn't.

Q    No, you did not?

A    No.

Q    So is it simply, you know, you go in on that occasion, speak to them about God's word, and then you leave and you don't have contact?

A    Right.

Q    Okay.

A    They fill out a questionnaire, and then we have -- we have counselors at the actual prison and they go talk to them.

Q    Okay.

A    And go from there.

Q    Okay.

A    We are just like the open door.

Q    I understand.  And Mr. Livingston, I have one final question because I think I'm out of time.  Are you more inclined, do you think, because based on this work, to give grace or mercy in your sentence?

A    Grace and mercy?  No.

Q    Or where do you think that fits in this type of crime?

A    I don't think -- I think just the evidence fits.

Q    Okay.  So, just what you hear, the circumstances and the evidence.

A    Right.

Q    Do you believe, though, in the concept of mercy?

A    Yes, I do.

Q    Okay.

MS. EVANS:  Pass the juror, your Honor.

THE COURT:  All right.  Sir, you've been, like I say, you've been going a long time.  Do you need a short break before we continue?

MR. LOLLAR:  I would like one.

THE COURT:  All right.  We will take a five minute break.

(After a recess, defendant and Prospective Juror Livingston present in open court).

THE COURT:  Mr. Lollar.

MR. LOLLAR:  Thank you, Judge.

THE COURT:  I want to --

MR. LOLLAR:  How are you, Mr. Livingston?

THE COURT:  I'm sorry.  I want to reintroduce to you now Brad Lollar who will talk to you on behalf of Mr. Broadnax.

I'm sorry for talking over you.

MR. LOLLAR:  That's quite all right, Judge.  Thank you.

EXAMINATION

BY MR. LOLLAR:

Q    And I'm Brad Lollar and this is Doug Parks, Keri Mallon.  We represent James Broadnax.

And Mr. Livingston, what we are going to do here, like the State said, we are trying to find twelve people who can be fair to both the State and the defendant in this case, and that's why we had so many people down. Originally we had over 800 people down filling out these questionnaires.  And I believe you are the 110th person that we have talked to individually here over the last five, six weeks or so.

Anyway, what we are trying to do here is find

jurors that can be fair to both sides and that don't come in with any preconceived ideas of what ought to happen and that type of thing. Okay?

A    Okay.

Q    So, with that in mind, I want to talk to you a little bit about some things you put in your questionnaire because I think what you put in your questionnaire tells us what you truly believe.

Now, obviously at the time you filled out the questionnaire, you didn't know about these special issues, and we don't expect jurors to have ever seen those issues before they come down to this type of an interview process here today.

But I want to mention to you, I think that, from the responses that I saw in your questionnaire, you are like a lot of jurors we have that think that, under Texas law, that if a person commits X offense, then the punishment is the imposition of a death sentence.

And is that what you thought before you came down here today, and am I correct in thinking that if you, you thought that if a person commits the offense of capital murder, then the death sentence is what they get?

A    No.

Q    Is that not what you thought?

A    No.

Q    What did you think?

A    I knew that there was a chance of life without parole.

Q    Okay.  And did you know what the dividing line was?

A    No, I didn't.

Q    Or what the --

A    No, I didn't.

Q    -- the issues were?

A    No.

Q    We have a lot of jurors who recognize that there is also the punishment of life without parole.  But we hear from them that they didn't know about these special issues and they thought that you just went back in the jury room and you took a vote maybe and the majority won, that type of thing, life without parole versus the death sentence.

What did you think the process was?

A    I had wondered about it.  And I only knew that there was life without parole because you follow other cases in the news and things, and I saw that --

Q    I'm sorry, other cases?

A    You know, you see on the news where you have other death penalty cases and they got life without parole.

Q    Okay.

A    So, I was aware there was an option for that.

Q    Okay.

**Anne B. Meredith**
Certified Shorthand Reporter

A    But I didn't really have any -- I never really thought about what it was --

Q    Okay.

A    -- that did that.

Q    All righty.  Well, on your first page of your questionnaire we asked if you're in favor of the death penalty, and you said, yes, it's the law in Texas.

A    Uh-huh.

Q    Well, from now you know that actually the penalty for capital murder in Texas is life without parole and then only a few get selected out for the death sentence.

A    Right.

Q    And these three special issues are what we look to to separate out that few --

A    Uh-huh.

Q    -- who get the death sentence.

A    Right.

Q    Now, knowing that, does that alter your opinion about the way you would answer any of these questions, or do you think you would still answer them pretty much the same?

A    I think I would answer them pretty much the same.

Q    Okay.  The second page of your questionnaire we asked you, the best argument against the death penalty, and you told us, the slim chance of someone being wrongly convicted.

On the fourth page we asked you, for what crimes do you think the death penalty should be available in Texas, and your answer was, like the one we're looking at.

A    Uh-huh.

Q    Is that the way you feel?

A    Yes.  Well, before, before I realized -- Would you ask that question one more time, please?

Q    Well, sure.  We asked you, for what crimes do you think the death penalty should be available in Texas, and your answer was, like the one we are looking at.

A    Yes, I think it should be available, yes.

Q    Okay.  Now, that obviously gives me some concern.

A    Okay.

Q    Representing a defendant in a case like this, that I'm thinking that you're of the mind that everybody who gets convicted of this type of offense should get the death penalty.

A    No, I said it should be available.

Q    Okay.

A    I didn't say you should automatically get it.  I said it should be available.

Q    Okay.

A    Because when you're reading that first question there, that said if you do this and this and this, that the death penalty is an option.

Q    Okay.  Well, let me tell you -- Let me make sure that we are on the same page and understanding what we are talking about here.

You've seen the indictment there in front of you?

A    Uh-huh.

Q    Have you had a chance to look at that?

A    No, I haven't.

Q    Take a look at that, and that is what the State has charged here in this case.

A    Okay.

Q    And as you can see, that's one of the seventeen different offenses that we have here in Texas that can result in the imposition of either life without parole or a death sentence.

A    Yes.

Q    It is the type of case where the State's alleging that the defendant on trial intentionally caused a murder during the course of the commission of a robbery.

A    Uh-huh.

Q    And did that with the use of a deadly weapon.

A    Right.

Q    To-wit: a handgun.  So that we understand exactly what that means, when we say intentionally, that means that the person doing the robbery formed in their

mind the intention to cause the death of the victim.  Okay?

A     Uh-huh.

Q     Not just to wound them, not to, you know, disable them, not to just harm them, but in fact to cause their death.

A     Right.

Q     Okay?  That's one of them.  When we say the word intentionally, that's defined under Texas law and it means that they had the conscious objective or desire to cause the result, the result being death.  Okay?

A     Right.

Q     So, what we are saying here is that this is the type of a case where the State is alleging that the defendant first formed an impression, an intention to commit a robbery of an individual, and to that end took a loaded gun and to that process started the robbery of that individual and, during the course of that, formed in their mind the intention to cause the death of the victim and then did whatever it took to cause that death and did that by using a deadly weapon.

A     Uh-huh.

Q     Okay?  So, that is what the State has got to prove in every case like this before the person can be charged with capital murder.

A     Right.

Q    Okay.  Now, on page four of your questionnaire, on the second question, we asked you your feelings about this type of a capital murder.  And your answer was, there is no good reason for killing someone while committing a robbery. There is nothing worth taking a life over.

A    Uh-huh.

Q    Right?  And, so, I guess the question I need to ask, when we come to special issue number one over here in the penalty phase of the trial, if a jury has found a defendant guilty beyond a reasonable doubt of doing exactly what the indictment says -- In this type of a case, again, we are talking about an intentional murder committed during the course of a robbery.  Okay?

And we also know obviously that the person who has been convicted of that offense was over eighteen, eighteen or older, they were not insane, it was not an accident, it was not -- oh, it wasn't done in self-defense or defense of a third party, or anything like that.

We can eliminate all of those things if we talk about putting you in the position of being on a jury who has found a defendant guilty beyond a reasonable doubt of what that indictment says.

A    Uh-huh.

Q    You and eleven other jurors have agreed that a defendant is guilty beyond a reasonable doubt.

So, then we get to special issue number one and that asks, do you find from the evidence beyond a reasonable doubt there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Now, we've had many people tell us, well, if you show me the type of person that would load a gun, first of all, get a gun, load it, go out to commit a robbery, and in the course of that robbery form the intention to kill the victim, cause the death of the victim and do that, and that has been proven to me beyond a reasonable doubt, then that is the type of person about whom I would think would always be a continuing threat to society.

How do you feel about that?

A    I would have to -- I guess I would have to listen to all the evidence.  On first blush, I would have to say yes.  But like I said, I would have to actually listen to everything and form the opinions as I went.

Q    Well, we have had people that have expressed to us that if it's the type of person that would do those sets of acts, all those different steps we just talked about, getting a gun, loading it, engaging in a robbery, they are the type of person who would engage in a robbery, and then the type of person that would intentionally cause the death of the victim during the course of that robbery, some people

say, well, no, that in and of itself is always going to prove to me that special issue number one should be answered yes.

A     No.

Q     You don't believe that?

A     I don't believe that.

Q     Tell me what types of things you would look at, apart from the offense itself, then, to help you answer special issue number one either yes or no.

A     I'm sure that during the trial they will bring up past things that the person either did or didn't do.

Q     Okay.

A     And I would kind of use that to see, I mean, if there was a history of it.

Q     Okay.  Past record maybe?

A     Yes.

Q     Criminal record or past history --

A     Of violence.

Q     -- of criminal acts?

A     Not necessarily crimes, but violent crimes.

Q     Okay.  All right.  And is that something that you think would be a matter that's capable of proof one way or the other, whether or not they prove whether or not the person on trial has committed acts of violence in the past?

In other words, you would expect if they have committed violent acts in the past, that's something

you would expect the State to show to you.

A   Yes.

Q   And if they haven't, that's something you would expect us to point out to you.

A   Yes.

Q   But I can't prove that he didn't.

A   Right.

Q   I could point out that he didn't.

A   Uh-huh.

Q   So, is that something that you think that you would be able to look at and answer that question one way or another?

A   Yes.

Q   You understand that in these first two special issues the presumption is that the answer to the question is no, and the law says that a jury must be persuaded by evidence presented during the trial that the answer should be yes before you're able to find it yes.

A   Yes, I'm aware of that.

Q   And in looking at the language that the legislature used in giving us special issue number one there, it says, do you find from the evidence beyond a reasonable doubt.  That's the same burden of proof that the State had in the first part of the trial.

A   Right.

Q    Then find the defendant guilty.  And if they are not able to do that beyond a reasonable doubt, then a jury is supposed to answer that question no.

A    Yes.

Q    Now resulting in a life sentence being imposed rather than a death sentence.  You understand that?

A    I understand that special issue number one and two are beyond a reasonable doubt.

Q    Okay.

A    And that three was kind of our opinion.

Q    Okay.

A    Yes, I understand that.

Q    What does that phrase mean to you, if you had to put it in other words, beyond a reasonable doubt?

A    That they showed, through past history, that this person has had a violent past and there is no reason to think that they would not continue doing those things when they are in prison.

Q    Okay.  All right.  And you see that the legislature used the word probability that the defendant would commit criminal acts of violence.

A    And that's what I meant by when I said, if they have a past of doing it, then they probably have a probability that they are going to keep doing it.

Q    What does the word probability mean to you?

It's not defined either.

A    That there is -- there is more, more than a little chance that they would do it.

Q    Okay.

A    Not that they would or wouldn't but, yes, they probably would, considering their past history or evidence.

Q    We have had jurors tell us that means more likely than not.

A    Yeah, more likely.

Q    How do you feel about that?

A    More likely.

Q    Over 51 percent.

A    Uh-huh.  I'm not really good at explaining things, so.

Q    Well, you're doing fine.  You're doing fine.

        And you see, the legislature goes on to say that whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

        And as the State has pointed out to you, that means, in reality, a prison society.

A    Yes.

Q    If they are the type of person that's going to continue to commit acts of violence, even if they are in the penitentiary, against, you know, whoever is around down

there --

A    Uh-huh.

Q    -- other prisoners, visitors, jailers, guards, wardens, nurses, doctors, whoever might be down there.  That if the State can show you that the person on trial is the type of person that would be committing criminal acts of violence against that society that he is in that would constitute a continuing threat to that society, that's the type of person that the legislature has singled out to go beyond the life without parole --

A    Uh-huh.

Q    -- and receive the death penalty.

Does that make sense to you?

A    Yes, it does.

Q    And do you see why the legislature put that special issue in there?

A    Yes, I do.

Q    It's to limit the number of people getting the death sentence.

A    Right.

Q    And it's meant to be a barrier to the imposition of a death sentence.

A    Okay.

Q    And let me tell you that the death sentence is never mandatory in Texas law, no matter what the person did.

A    I understand that.

Q    You understand that?

A    Yes, I do.

Q    And the way that this special issue is set up, the ones that separate life without parole from death, the presumption is that the answer should be no and that the person should receive for the offense of capital murder the sentence of life without parole.

A    Uh-huh.

Q    Do you see that that's the way the legislature has set this up?

A    Yes, I do.

Q    And is that something that you can agree with?

A    Yes, I can.

Q    Okay, very good.

Now, special issue number two is not given to a jury in every case.  It depends on whether or not the evidence has shown that more than one person was involved in the commission of the offense.  Okay?

A    Uh-huh.

Q    If more than one person was involved, if we have a parties type situation, then special issue number two requires a jury to look at the evidence and determine if the evidence proved beyond a reasonable doubt that the defendant actually caused the death of the victim, that he,

in other words, was the gunman.

A    Right.

Q    Or if he was not the gunman but was a party, whether or not, being a party, he actually anticipated that the death of the victim would occur --

A    Uh-huh.

Q    -- or that he intended that the death of the victim would occur.

A    Right.

Q    Does that make sense to you?

A    Yes, it does.  Like the prosecution told me about the mask and go in there and take care of witnesses.

Q    Okay.  Sure.

A    I understand that.

Q    That's exactly a good example there of that.  But that's again an issue that the burden of proof is on the State to prove --

A    Right.

Q    -- beyond a reasonable doubt.

A    Uh-huh.

Q    And the presumption to the answer is no, and you have to wait until the evidence persuades you otherwise, that the person on trial either was the gunman, beyond a reasonable doubt, or that the person anticipated or intended that death would occur.

A    Right.

Q    Okay.  Any question about that?

A    No, sir.

Q    Okay.  Now, I forgot to mention to you, now, in going through these special issues, this would be after you've heard evidence in the penalty phase and you and the jurors are back in the jury room.  And first you are required to consider special issue number one.  And after your consideration, you either answer it yes or no.

Well, if the twelve jurors agree that the answer to special issue number one is no, okay, they haven't shown us -- Yes, they have shown us he's guilty of this offense, and they have shown us that beyond a reasonable doubt, but they haven't shown us that he is likely to commit criminal acts of violence in the future that will make him constitute a continuing threat to prison society.

A    Uh-huh.

Q    Okay.  If y'all agree on that, then you sign that on the verdict form and your deliberations are over.  You never get to two or three.  Okay?

A    Okay.

Q    You come back in court.  You notify the bailiff, and the bailiff brings you back in court.  You let the judge know that that's your decision on special issue number one, and at that time the judge automatically -- or sentences the

defendant to an automatic life without parole.

A    Life without parole, uh-huh.

Q    Okay.  That's how that works.  And the same thing for number two.  If you've answered special issue number one yes, you go on to special issue number two and you consider that.  And if the answer is no, your deliberations are over with.

A    Right.

Q    And then you come back and tell us, and the judge sentences the defendant to life without parole.

Okay.  Any questions about those?

A    No.

Q    Okay.  Then we get to special issue number three.  And special issue number three is kind of a totally different question than you've been asked in one or two.

A    Uh-huh.

Q    Special issue number three, and we can read it, asks, do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?  Okay?

A    Okay.

Q    So, the first thing you notice about that is there is no burden of proof.

A    Right.

Q    In other words, the defense doesn't have to prove a mitigating issue beyond a reasonable doubt. We don't have to prove it by a preponderance of the evidence. There is no burden of proof in the presentation of mitigating evidence.

Let me take a moment to tell you where you are now in considering special issue number three. By this time where you come to special issue number three, you've found that a person is guilty of capital murder. They are an intentional murderer committed during a robbery.

A    Uh-huh.

Q    And you have found that, based on the evidence you've seen, beyond a reasonable doubt, this is the type of person who will continue to commit criminal acts of violence even in prison. Okay?

A    Okay.

Q    And frankly, Mr. Livingston, some people tell us, well, if I get to that point, if I have found that he's a capital murderer, an intentional killer, and I have been convinced beyond a reasonable doubt that this person is going to continue to cause violence in the penitentiary, then really, to me, there is nothing that is going to mitigate against the imposition of the death sentence for me.

You see what I'm asking there?

A   Yes, I do.

Q   How do you feel about that?

A   I think that -- I would think that would carry it all the way to special issue number three to see if there was something in the defendant's background, or whatever, that might have caused there to be a problem or a mitigating circumstance, I guess.

Q   Okay. So, you would not fall into that group of people who would say that there is no mitigating circumstance?

A   I would try very hard not to.

Q   Okay. And tell me what you mean by that.

A   I don't know what's going to happen when I'm actually on the jury.

Q   Sure.

A   If I get picked, I'm going to do the best I can.

Q   Sure.

A   And I'm going to try to follow all the rules and the evidence that's presented, but I'm going to give it my best shot.

Q   Okay.

A   I'm going to try as hard as I can not to let anything persuade me otherwise than what is prescribed by the law.

Q   Now, special issue number three has not always

been there. I can tell you that. That's an issue that the legislature has come up with relatively recently, probably around ten years ago, I guess, something like that.

But what it allows is for a jury who, although they recognize the defendant is guilty of capital murder and is probably going to be a future danger, there might still be something in the background of the defendant which would make them want to impose a life sentence rather than a death sentence.

A    Right.

Q    And we call those mitigating circumstances.

Do you have any ideas in mind about the type of thing that for you might be a mitigating circumstance sufficient to turn a death sentence into a life sentence?

A    No, I don't.

Q    Okay. Let me throw some things by you just to see what you think. Some people tell us that the age of a defendant at the time of the commission of the offense might be something, in and of itself, that they would look at as a mitigating circumstance.

A    No.

Q    No. Okay. The law says that a person cannot be executed for an act that took place when they were seventeen years of age, but anything above that is fair game as far as the law is concerned.

So, if a defendant turns out to be eighteen, nineteen, twenty, twenty-one, a youngish age like that, that is not something that you would look at to be a mitigating circumstance?

A    No.

Q    Okay. And some people have told us, well, if I hear about a parties situation during the course of the evidence of the trial, and I find that the defendant was not the leader of that party group but was rather a follower, that that's something that might be of importance to them sufficiently mitigating to avoid a death sentence.

How do you feel about that, recognizing now that, you know, the evidence is still showing you the defendant is guilty of capital murder?

A    No.

Q    Now, some people tell us that if we hear evidence that the defendant was under the influence of alcohol or mind altering drugs, something like that, that that would be a mitigating circumstance to them.

How do you feel about that?

A    I guess, depending on the circumstances, I would consider it.

Q    I'm sorry?

A    I guess I would consider it.

Q    Is that something you might look at?

A    I might look at.

Q    Do you think that could ever be a sufficient mitigating circumstance in your mind to avoid a death sentence?

A    I'm not sure.  I would have to -- I would have to listen to it and see what it was exactly.

Q    And one of the reasons I ask that is over on page eight -- well, maybe it's not.

A    I know which one you're talking about, though. It's the one about the alcohol.

Q    The one about the alcohol, six.  Page six, top of page six.  Yeah, because on the bottom of page five it told you what the law was.

A    Uh-huh.

Q    And the law is that evidence of voluntary intoxication -- and that means either by drugs or alcohol -- is not a defense in Texas.

You can't, you know, voluntarily ingest drugs or alcohol, go out and commit an offense, and then say, Kings X, you can't prosecute me.  Well, obviously that's not the law.

A    Right.

Q    But the law in Texas further says that evidence of voluntary intoxication can be taken into consideration as a mitigating circumstance.

A    Right.

Q    So, that's why I wanted to ask you about that because, in your questionnaire, you first mark yes, then mark no, and then you said, I think, and then finally answered by saying, don't know.

A    I'm not really sure.

Q    Okay.

A    I would have to look at the circumstances involved.

Q    Okay.

A    I don't have a -- I don't really have a -- Even now I don't have a yes or no answer to that one.

Q    Okay.  All right.  Some people tell us that the life history of a defendant, the things that have happened to the defendant being raised as a child up to adulthood, would make a difference to them, whether, you know, they were born with a silver spoon in their mouth or if they were born in abject poverty.

How do you feel about things like that?

A    I'm not sure I would consider whether they were rich or poor, but whether they were, you know, abused or some other mitigating circumstance like that.  I don't think whether you're rich or poor has any bearing on that.

Q    Okay.  Some people tell us that if the evidence shows them that the defendant was the victim of physical or sexual abuse as a child, that that might be something that

could be sufficiently mitigating to them.

A    I would take that into consideration, yes.

Q    Some people tell us if they hear from the friends and relatives of the defendant, the people that know him best, who tell them that this act that the defendant did on a particular day that got them here in the courtroom is kind of aberrant behavior for them, that they are normally not that way. How do you feel about something like that?

A    I don't think I would take that --

Q    Sorry?

A    I don't think I would take that as a mitigating circumstance.

Q    Okay. Has anything else occurred to you that might be a sufficiently mitigating circumstance?

A    No.

Q    Okay. Well, those are just some things that various people have told us about.

A    Uh-huh.

Q    And I wanted to see how you thought about that.

You understand that the law says that in hearing these -- hearing the evidence about these mitigating factors, you may be impressed by something as it being a sufficiently mitigating circumstance, but the juror seated next to you in the jury room does not feel is a mitigating circumstance, but that's okay. The law says that everybody

can have a different idea about what is sufficiently mitigating.

A    Uh-huh.

Q    There is no requirement that everybody has to be unanimous or be in agreement about what's sufficiently mitigating to them.

For instance, taking this as an example, if we have a juror whose father committed suicide and that had a life-long impact on them, and then you hear about the defendant on trial having a father who committed suicide, you know, that may have a special meaning to you as a juror.

A    Uh-huh.

Q    Which may not even go for any of your fellow jurors.  So, it's that type of personal moral judgment that each juror is expected to make in considering special issue number three and the mitigating circumstances of special issue number three.  You understand that?

A    Yes, I do.

Q    Okay.  And that's why there is not -- they list some things here, but the courts have told us that that's not an exhaustive list.  Anything can be viewed as by a juror to be a mitigating circumstance, any piece of evidence that you hear, any fact that you hear, anything you hear about a defendant or the way he was raised or where he was raised, about his character and his background.  All of

those things can be looked at.  And anything can be a sufficient mitigating circumstance to a juror, and that's fine with the law.

A    Right.

Q    Now, do you understand that only in the event that all twelve jurors agree unanimously that there are no mitigating circumstances sufficient to avoid the death sentence does the verdict form ever get signed saying that there is unanimous agreement there are no mitigating circumstances; you understand that?

A    Yes, I do.

Q    So, what the law contemplates is that all twelve jurors have to agree that there are no mitigating circumstances.  If only one juror, one juror disagrees and thinks there are mitigating circumstances, then the result is that the person will receive life without parole.

A    Okay.

Q    You understand that?

A    Yes, I do now.

Q    Okay.  Now, the prosecutor asked you about grace and mercy.  Remember her asking you about grace and mercy?

A    It was the last question.  I remember it.

Q    Well, it just about was.  Well, I take issue with that response.  You said grace and mercy don't fit, just the facts.  Well, grace and mercy are exactly what special issue

number three is talking about.

Under the law, a juror can decide to exercise grace and extend mercy sufficient to avoid a death sentence. The law allows each individual juror to do that. It is the personal moral judgment of the juror that controls the way they answer special issue number three.

MS. EVANS: Your Honor, I would object. Special issue number three does say, after taking into consideration all of the evidence, which is what this juror contemplated.

THE COURT: Sustained.

MR. LOLLAR: Well, if I can -- the law, where is my law?

MR. PARKS: Here is your law.

MR. LOLLAR: Your Honor, we would object under Morgan versus Illinois, Rogers versus State, People versus Buss, and State versus Worthy.

THE COURT: All right. The ruling stands.

MR. LOLLAR: Thank you.

THE COURT: Thank you.

Q    (By Mr. Lollar) You see how mercy and grace can play a role in answering special issue number three?

A    Yes. It still would have to be backed up by the facts.

Q    Okay. All right. Mr. Livingston, do you have any

questions about anything we've talked about?

A    No, I don't.

Q    All right.  Thank you so much.  Appreciate it.

A    Thank you.

THE COURT:  Thank you, sir.  All rise for Mr. Livingston.  You'll be stepping outside, then be coming right back in.

(Prospective Juror Livingston exits the courtroom).

THE COURT:  In the presence of Mr. Broadnax, what says the State?

MS. EVANS:  State has no challenge for cause.

THE COURT:  Mr. Broadnax.

MR. LOLLAR:  Judge, we do have a challenge for cause.

Your Honor, the juror has plainly told us that many of the mitigating factors that we intend to show in this trial, in the event the defendant is found guilty of capital murder, he would give no mind to.

He tells us that he would not consider age of the defendant to be a mitigating factor.  He would not consider whether the defendant was a follower or a leader in the circumstance of the offense.  He tells us that he would not consider whether the behavior of the defendant on the day in question was aberrant behavior would be a mitigating

factor to him.

He tells us that those factors would be irrelevant to him in answering special issue number three. And, therefore, under Lockett versus Ohio, Morgan versus Illinois, and Eddings versus Oklahoma, the juror is not qualified to sit as a juror in this case.

THE COURT:  It will be denied.

Ask him to return, please.

THE BAILIFF:  Yes, sir.

MR. PARKS:  Your Honor.

THE COURT:  Hold on just a second, Barney.

MR. PARKS:  Let the record reflect that this is a juror who is not acceptable to the defense.

THE COURT:  It will.

(Prospective Juror Livingston returns to the courtroom).

THE COURT:  Mr. Livingston, please be seated, sir.

Mr. Livingston, you have been accepted as a qualified juror for this case.  Now, remember when I told you what that means is we are in the process of qualifying that fifty number and then, once that's done, an actual jury will be selected.  Hoping to have that done certainly in three weeks.

PROSPECTIVE JUROR LIVINGSTON:  Okay.

THE COURT:  The day that's done, you'll be notified whether or not you are on the jury or not.

PROSPECTIVE JUROR LIVINGSTON:  Okay.

THE COURT:  And you'll be contacted by the coordinator, the same person that notified you to be here. And in that regard, are your telephone numbers on your questionnaire still the same?

PROSPECTIVE JUROR LIVINGSTON:  Yes, they are, sir.

THE COURT:  Okay.  I want to be sure we can get in contact with you.  Now, the sheriff is going to give you her business card, and should anything occur in your -- the coordinator's business card.

PROSPECTIVE JUROR LIVINGSTON:  Okay.

THE COURT:  -- anything occur in your life that you think might affect your service between now and when you're notified, give her a call and then we will deal with it.  All right?

PROSPECTIVE JUROR LIVINGSTON:  Okay.

THE COURT:  Please avoid all outside influence, the media, Internet.  Don't talk to anybody about the case.  You are going to tell them you are qualified. Well, what was it like?  Well, the judge told me I just couldn't talk about it.

PROSPECTIVE JUROR LIVINGSTON:  Okay.

THE COURT: That's the easiest way. It takes it off of you, puts it on me. And I would hate for you to be inadvertently disqualified.

PROSPECTIVE JUROR LIVINGSTON: Okay.

THE COURT: It's been a real pleasure meeting you. Thanks a lot.

All rise.

The Court's in recess.

(Discussion off the record).

MR. LOLLAR: Judge, can I supplement my objection?

THE COURT: Yes, you may. On the record.

MR. LOLLAR: And your Honor, we would ask the Court to particulary consider the Supreme Court case Gregg versus Georgia and particularly the Court of Criminal Appeals case Rogers versus the State where it says, the jury need not find any mitigating circumstance in order to recommend mercy.

I just don't know how it could be more plain than that.

THE COURT: Okay.

MR. LOLLAR: Rogers goes on to say, thus like Florida and Georgia, Texas plainly made an effort to guide the juror in exercising his discretion while at the same time permitting the jury to dispense mercy on the basis of

factors too intangible to write into a statute.

THE COURT: Thank you.

MR. LOLLAR: So, we renew our objection.

THE COURT: Yes, sir.

(After a recess, defendant present).

Prospective Juror No. 822, Leslie Allan, enters the courtroom.

THE COURT: Good morning. Thank you very much.

PROSPECTIVE JUROR ALLAN: Good morning.

THE COURT: Please be seated.

Be seated, counsel.

Well, my name is Webb Biard, and I will be with you this morning and through the noon hour in this part of the jury selection process. The actual Presiding Judge of this Court is Michael Snipes who you met at the large session. And should you be selected as a juror in this case, Judge Snipes will preside over that part of the trial.

Do this for me, please. Raise your right hand.

(Prospective Juror Allan sworn).

THE COURT: Okay. Also, I want to introduce to you at this time Andrea Handley.

MS. HANDLEY: Good morning.

PROSPECTIVE JUROR ALLAN: Good morning.

THE COURT: Elaine Evans.

MS. EVANS: Good morning.

PROSPECTIVE JUROR ALLAN:  Good morning.

THE COURT:  They represent Dallas County and the State of Texas.

Further to my right is Doug Parks.

MR. PARKS:  Hi.

PROSPECTIVE JUROR ALLAN:  Hi.

THE COURT:  He and Keri Mallon represent Mr. James Broadnax.  Mr. Broadnax.  And they very likely will be joined momentarily by co-counsel Brad Lollar.  Okay.

LESLIE ALLAN,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    On behalf of all of us, we appreciate your patience.  We never know how long some of these questioning of the jurors will take.

What I intend to do, if it's all right, is go through the noon hour.  Do you have any dietary reasons or any reason why you can't stay with us for about the next hour and a half maximum?

A    No, no.

Q    And then you wouldn't have to come back after lunch.  Okay?

A    (Nods head).

Q    Did you have an opportunity to read the pamphlet?

A    Yes, I did.

Q    Did that help you understand this process a little bit better than you did?

A    Yes, sir, it did.

Q    Good, that's the purpose of it.  As you sit here now, are you aware that this is a capital murder case?

A    Yes, sir.

Q    Do you understand that the State of Texas is seeking the death penalty?

A    Yes, sir.

Q    That's what we are all about here is if someone is found guilty of capital murder, then the punishment is either life in prison without parole or the death penalty. So, you can see how important this process is.

A    Yes, sir.

Q    And, therefore, there are some very strict rules and procedures that we all must follow, me, the attorneys and, of course, the jurors.  And, so, you'll understand why we have to go exactly according to the law of the State of Texas and the United States.

A    (Nods head).

Q    And it's a serious matter.  One thing I want to stress to you, Ms. Allan, is if someone is found guilty of capital murder, they are either going to receive the death penalty or life in prison without parole.

And in that regard, life in prison without parole means life in prison without parole. There was a time, if someone was given life imprisonment in a capital murder case, they could eventually become eligible for parole.

A    Uh-huh.

Q    That is no longer the law. So, your decision, should you be on the jury, will be to determine whether or not the person on trial is guilty or not guilty.

A    Okay.

Q    And then, should you find that person guilty of capital murder, then it will be your responsibility, along with the eleven other jurors, to decide the punishment. The judge cannot decide the punishment in a capital murder case. It must be decided by the jury.

And the way the jury decides punishment, should they find someone guilty, is by answering those special issues.

A    Uh-huh.

Q    Did you have an opportunity to read them?

A    Uh-huh.

Q    Do you think you have some understanding of them now?

A    Yes. Yes, sir.

Q    I understand it's probably something new for you,

and you probably didn't even know they existed until this morning, correct?

A    Correct, yes, sir.

Q    All right.  Well, these attorneys, they have the ability to explain it to you, and they will.  And for you to make your answers to our questions, first, you'll have ample opportunity to have these issues explained and the law explained.  And then you'll simply be asked, now that you know the law, can you follow the law in performing your duties as a juror?

Because as you sit here now, we don't expect that you know any of these laws.  It's not your job.  It's our job to explain them to you.  All right?

A    (Nods head).

Q    In reading the pamphlet, did you see what Judge Snipes has told us the trial date will be?

A    Uh-huh, yes, sir.

Q    August the 10th, two weeks.

A    (Nods head).

Q    And it says in there Monday through Friday.

A    Uh-huh.

Q    The jury would not be required to stay together overnight unless and until you were working on your verdict, going late into the evening, still hadn't reached a verdict, became fatigued, there is a possibility that the jury as

**Anne B. Meredith**
Certified Shorthand Reporter

a group would be taken to a fine hotel, county expense, individual private rooms, spend the night, come back together as a group, to avoid any outside influence on your verdict, because that's how important this case is.

I give you that information, it's in the pamphlet, but I go over it again with you to ask this question.

Now knowing the date and the length of the trial and the way Judge Snipes runs his court, do you know, as you sit here now, are you aware of any reason why you can't sit as a juror in this case?

A    No, I can't think of any reason.

Q    Good. Okay.

THE COURT: Without anything further from me, I want to reintroduce to you now Andrea Handley who will speak to you on behalf of Dallas County.

Ms. Handley.

MS. HANDLEY: Thank you, your Honor.

THE COURT: Yes.

EXAMINATION

BY MS. HANDLEY:

Q    Hi, Ms. Allan, how you doing?

A    I'm good. How are you?

Q    I'm just fine. How do you feel sitting up there as a potential juror in a case?

A    I'm nervous.

Q    Nervous.  What makes you nervous?

A    I've never done this before.

Q    Okay.  Have you ever done any kind of jury duty?

A    Never.

Q    Okay.  Well, I'll tell you this, is that this type of case is entirely different from a normal criminal case where you might get called down to sit as a juror, because I think you can appreciate this is not your garden variety everyday kind of case.  Okay?

A    Right.

Q    And what we do is is that morning when we called you down, there were hundreds of people there with you.  We called even more people that afternoon, and we called them all for this case.

We had them all fill out questionnaires.  And the reason we called, I think it was 800 to 1,000 people, is because out of that number of people, we are hoping to find twelve people --

A    Uh-huh.

Q    -- that are the right jurors for this particular case.  So, we bring you down here one at a time and our purpose is really two or threefold.

First of all, we want to tell you what the law is, because a lot of people don't know what the laws

are.  They particulary don't know how it comes into play in a capital murder case.  So, I'll probably be lecturing to you a lot there.

But we also bring you down one at a time because we want to get to know you a little bit better.  All right.  Because what's ultimately important in this case is it's one thing to maybe say you understand the law and you can follow the law.  You may be qualified technically to sit on the case.

But we are qualifying a pool of individuals, okay, about fifty people that we hope to get twelve from.  And when we get these fifty people, we will each come in and kind of pick out who is actually going to be on the jury.  And some of what factors into our decision as to whether or not we think this person is right for the case, either for the State or for the defense, is just how you feel.

A    Uh-huh.

Q    Because you can say you can follow the law, but we all do have life experiences.  We've all got biases, which is not necessarily a bad thing, that does influence how we see things and how we exercise judgment in a certain case.  So, we also help to kind of get that from you -- hope to get that from you.

And, unfortunately, I can't do a lot of talking to you because I usually do a lot of lecturing up

here.

A    Uh-huh.

Q    But understand this, if you are selected for a jury, you take an oath, and your oath is to follow the law and base your verdict on the evidence in the case. Well, you haven't been selected as a juror yet and you haven't taken that oath. Okay? So, you don't have to follow any single law right now with respect to this case. But you have taken an oath to tell us the truth.

A    Right.

Q    Okay. And what you tell us stays in this courtroom. I think you can appreciate the spirit and the intent of why we do it. Okay?

A    (Nods head).

Q    Okay. As I said, Ms. Allan, and I don't mean this as any kind of disrespectful thing to say to you when I say you're just twenty-four.

A    Yeah.

Q    Oh, I would give anything to be twenty-four again, I'm gonna tell you. But in my mind, I think that is important that you're just twenty-four, and I'll tell you why and you'll tell me if you've got a different idea on it.

A    Uh-huh.

Q    That the person I am today is an entirely different person than the person I was at twenty-four. And I don't

know that I really, at that point, if I had enough life experience or I was really ready to participate in certain things.

A    Uh-huh.

Q    Some people can, some people can't.  You know, I'm forty-three now.  I've had a long time to get used to doing this for a living because I have been through a lot. But at twenty-four, I don't know if I would have been appropriate, not just for personal reasons, but also was I able to bring enough to jury deliberation to be able to absorb the evidence and really put it in context.

And, so, I'm not saying any of that to be disrespectful to you.

A    Right.

Q    I hope you don't take it that way.

A    Not at all.

Q    But that is something that we do inquire of our jurors, particularly of people who are still so young and such as that.

I mean, tell me how you feel about that. You're twenty-four.  We've called you to potentially take part in one of the most important cases of your life here and of somebody else's life.

A    Right.  I mean it's overwhelming definitely.  But I would think it would be overwhelming for anyone at any

age.  I mean this is, like you said, it's very important.

Now, I understand, yes, I am twenty-four and I haven't had as many experiences, but I mean I'm very mature for my age.  I have a good head on my shoulder.  I'm in a career.  I have been through life and have experienced some, but I mean that's just up to you guys whether you feel that my age would be a good fit for this case.

Q    Sure.  And I will tell you there are some people who come up here at sixty-eight who are not right for this case.

A    Right.

Q    So, age sometimes really doesn't have anything to do with it.  I just wanted to know how you felt about it personally.

A    Uh-huh.

Q    You know, and what I'm hearing from you is that, is that you think you're capable of taking part in something like this.

A    Yes, most definitely.

Q    Okay.  And you understand what's at stake here is, if I am able to convince twelve jurors beyond a reasonable doubt that this defendant is guilty of capital murder, and if I am able to prove to them beyond a reasonable doubt that the answers to the special issues should be yes, yes and no, then they are required to return a verdict that would result

in a sentence of death.

A    Uh-huh.

Q    And once that happens, that's it, that's all. There is no, well, maybe the judge, he'll have a different idea about it or -- that's it.  And people need to understand that at that point a death warrant is signed.

A    Uh-huh.

Q    He is taken to Huntsville, Texas.  He stays there until the date of his execution.  On that day he is -- he's taken to Livingston, Texas.  He is strapped literally to a gurney, needles are put in his arm and he is fed poisons, be it minutes or --

A    Right.

Q    Okay.

A    Sorry, I'm just very nervous.

Q    Okay.  Well, and I don't mean to upset you.

A    That's fine.  Sorry.  I'm just nervous and everything.

Q    Okay.  Okay.  And, well, just for the record, I mean you're crying and a little overwhelmed right now, aren't you?

A    Yeah, a little bit.

Q    Okay.  Okay.  I don't do that to make you cry.

A    I know.  I know.

Q    And I don't do that to offend you.  The reason I

do that, Ms. Allan, is because sometimes it's one thing to talk about something academically, you know, and it's one thing to sit around with your girlfriends and maybe talk about what you would do on a case.

A    Oh, of course, I get that.

Q    But it's a tough row to hoe to call somebody down here to actually take part in it.

A    I know.  Yeah.

Q    Okay.  Okay.

A    No, I realize, I understand it's completely different, so it's just --

Q    Yeah.

A    -- the decision I had if I were to be called is just wow, you know.

Q    Sure.  And your reaction is actually quite -- it's not unusual.

A    Sorry.

Q    Some people -- Oh, no, it's nothing to be embarrassed about.  And I hope you -- I didn't mean to --

A    Oh, no, it's fine.

Q    I just want -- I think out of an abundance of fairness to you, first and foremost to you, because it's all about you right now, is what's right for you, Ms. Allan.

A    Right.

Q    And I would rather stick a pin in my eye, you

know, than put somebody in an uncomfortable position, a thing that they are not ready for right now.

A    Right.

Q    You might be a fantastic juror on a burglary case, you know, or maybe even something as burdensome as children or something, but sometimes this isn't the right case for somebody.

A    Right.

Q    And I kind of think, from your reaction, do you feel that way?

A    I think just at first, just hearing all that and being here and it is overwhelming, but I think I could definitely get used to that, being here, hearing it.  I think I can make a fair decision on, you know, the outcome.

Q    Okay.  Okay.

A    But, yeah, I'm just sorry.

Q    No, that's all right.  And I'm going to --

A    Just coming here, my heart was already pounding to begin with.

Q    That's okay.  And I am going to tell you that if we don't select you for this jury, if I stop asking you questions right now, I don't want you to walk out of here thinking that you've done something wrong.

A    Right.  No, I know.

Q    Because you haven't.  I've read your questionnaire,

and you seem to be just a lovely, talented individual.  Okay?

A    Thank you.

Q    But I think that's all the questions I'm going to ask for you right now.

THE COURT:  Thank you, Ms. Handley.

All rise for the juror, please.  You'll be stepping outside and then you'll be coming right back in.  Thank you.

PROSPECTIVE JUROR ALLAN:  All right.

(Prospective Juror Allan exits the courtroom).

THE COURT:  In the presence of Mr. Broadnax, what says the State?

MS. HANDLEY:  The State would challenge Ms. Allan.  She seems to be emotionally overwhelmed, overwhelmed and overcome by this, and I don't believe that she could really take part in this process given the emotional display that we've seen on the stand here.

THE COURT:  The Court observed her reaction to the questioning, and I have the same opinion.

Defense object?

MR. PARKS:  No objection.

THE COURT:  All right.  It will be granted.

MS. HANDLEY:  Thank you, your Honor.

(Prospective Juror Allan returns to the

courtroom).

THE COURT:  Thank you.  You're free to go.  You do not have to return.

PROSPECTIVE JUROR ALLAN:  Okay.

THE COURT:  Thank you very much.

MS. HANDLEY:  Thank you, Ms. Allan.  We appreciate it.

PROSPECTIVE JUROR ALLAN:  Bye.

(After the lunch recess, defendant present).

THE COURT:  Y'all ready for Ms. Stockton?

MS. HANDLEY:  Yes, sir, I am.

THE COURT:  Doug?

MR. PARKS:  Yes.

THE COURT:  All right. We are ready.

(Prospective Juror No. 824, Jennifer Stockton, enters the courtroom).

THE COURT:  Good afternoon, Ms. Stockton.

PROSPECTIVE JUROR STOCKTON:  Hi.

THE COURT:  Thank you very much.  Please be seated.

Thank you for being here.  My name is Webb Biard and I will be with you this afternoon during the jury selection process.

Before we go any further, do this for me, please.  Raise your right hand.

(Prospective Juror Stockton sworn).

THE COURT: All right. Ms. Stockton, again, my name is Webb Biard.

I also want to introduce to you at this time Andrea Handley.

MS. HANDLEY: Hi, good afternoon.

THE COURT: She, along with Elaine Evans, represents Dallas County, State of Texas. Ms. Evans.

Then we have Brad Lollar.

MR. LOLLAR: Hi.

THE COURT: Doug Parks and Keri Mallon. And they represent Mr. Broadnax, James Broadnax, the defendant.

JENNIFER STOCKTON,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    You know, Ms. Stockton, when you filled out your questionnaire, I know it took a long time to do it that day. We understand that. But trust me, it wasn't some idle exercise. The attorneys have read it, read it in detail, and they have pointed out some things to me that I want to go over with you --

A    Okay.

Q    -- right off the bat before we go any further. All right? I refer to page twelve in your questionnaire,

which it says at the top of the page, do you have any projects at your job which might affect your ability to concentrate if you were to serve as a juror in this case for a week or more?

From reading that pamplhet -- did you have an opportunity to do that?

A    Yes, I did.

Q    Do you see where Judge Snipes has told us -- he's actually the Presiding Judge -- that he anticipates the case could take up to two weeks?

All right.  With that in mind, you had answered, I would have to go to work following each day's service as a juror if there is no other speech/language pathologist in my hospital.  This will make for very long evenings but should not affect my concentration.

And then we go to page seventeen, down towards the bottom of the page.  How would you feel about being chosen as a juror in this case?  I would not like it. I am the provider for my household.  It would be difficult for me financially.

All right.  I cannot excuse you for financial reasons alone; however, we try to be reasonable about these things.  And some people serving it would pose more of a hardship on than it would on others, and we understand that.

So, I'm just going to ask you, and whatever

you say is going to be it.

A    Okay.

Q    You know, don't try to be a hero nor try to get out of the case.  You just tell me how you feel about it.

If you were required to serve as a juror from that Monday through Friday --

A    Uh-huh.

Q    -- 9:00 to 5:00 for two weeks, you would not have to spend the night.  The jury would not have to stay together at night unless and until you went into deliberations, and that's a possibility.

So, the attorneys wanted me to ask you and I am asking you.  Whatever you say is the right answer.  All right?  Do you think serving on this jury would pose such a severe economic hardship on you that it might affect your ability to sit as a juror in this case?

A    If it went beyond two weeks, it would.

Q    Well, we don't necessarily think it will.

A    Okay.

Q    But we kind of say that will be our cutoff date.  It might, but for the purposes of our conversation, we are saying up to two weeks.  So, you just tell me.

A    I can probably manage two weeks, but beyond that I can't.  It would pose a financial hardship.

Q    All right.  Okay.  All righty, then.  I'm going to

let the attorneys talk to you.  They might want to pursue that just a little further.

A    Okay.

Q    But I'll just -- Whatever you say is right.

Now I'm going to ask Ms. Meredith, if she would, to hand you your questionnaire.

A    Okay.

Q    From reading that pamphlet and hearing Judge Snipes' remarks and then appearing here today and hearing the attorneys and being here in the courtroom, as you sit here now, are you aware that this is a capital murder case?

A    Yes, sir.

Q    You understand that the State of Texas is seeking the death penalty?

A    Yes.

Q    Because of that, there are some very specific rules and procedures that we must follow, and I am sure you'll understand them.

A    Absolutely.

Q    If someone is found guilty of capital murder, there are only two possible punishments.  One is life in prison without parole.  The other is the death sentence.

And when I tell you life in prison without parole, I mean life in prison without parole.  There was a time when, if someone was found guilty of capital murder

and given a life sentence, they would become eligible, not necessarily receive it, but would become eligible for parole at some date after they had been in prison. But that is no longer the case. Life in prison means life in prison. I wanted you to know that.

And did the pamphlet help you understand this procedure a little bit better?

A    Yes, it did.

Q    Good. Have you ever served on a criminal jury before?

A    No, sir.

Q    All criminal jury trials are in two parts. A capital murder case is in two parts. The first part is guilt/innocence. Not guilty, or guilty of a lesser included offense either, the trial is over, you go home.

If you're found guilty, then you go into that punishment phase.

A    Uh-huh.

Q    And as you now know from reading that pamphlet, the jury does not write down on a blank line life in prison without parole or death. They answer those three special issues. And depending on how the jury answers the special issues determines the punishment.

And those answers aren't advisory to the judge. In other words, the judge can't say, well, I wonder

how Ms. Stockton felt about that, but I heard the same evidence she did and here's what I'm going to do.

Okay. In other words, a yes, yes and no is a death sentence just as if you had written it down on a blank line. Any other combination of answers is a sentence of life in prison without parole.

As you sit here now, do you now understand that?

A    Yes, I do.

Q    Did you know about those special issues before you appeared here this afternoon?

A    No, I did not.

Q    Well, 90 percent of the lawyers in this building don't know that. And, so, don't let that -- don't let that concern you.

And I want to stress one last thing. These are outstanding lawyers or they wouldn't be involved in this case. They are also outstanding individuals. The last thing in the world anybody is going to do, and I don't believe we could if we tried to, is intimidate a juror. I just don't think you're that type of person. But some people walk in and it's a little bit overwhelming to them.

A    Sure.

Q    Also, it's our job, not your job, our job to explain the law to you. You're not expected to know any

law. Our job is to explain the law to you.

And the bottom line question is going to be, not whether you knew it was the law, not whether you agree with the law, but can you follow that law and perform your duties as a juror and base your verdict on the evidence you hear in court?

If it leads to a guilty verdict, so be it. If it leads to a not guilty verdict, so be it. If it's a guilty verdict and it leads to answering the special issues a certain way, so be it. If it leads another way, so be it.

Does that make sense to you?

A    Yes, sir.

Q    All we want you to do is tell us how you honestly feel about these issues.

A    Okay.

Q    Is that fair?

A    Yes.

Q    Thank you.

THE COURT:  All right.  Without anything further from me, I want to reintroduce you to Andrea Handley now who is going to talk to you on behalf of the State of Texas.

MS. HANDLEY:  Thank you, your Honor.

EXAMINATION

BY MS. HANDLEY:

Q      Good afternoon again.  How are you doing?

A      Okay.

Q      Good.  Let me tell you what we're doing here.  I don't think you've ever served on a jury before.

A      No.

Q      In a death penalty case, you remember that morning you came down and you filled out this questionnaire, there were hundreds of people there.  We brought even more people that afternoon for this case and had them fill out questionnaires.  I would say 800 or 1,000 people showed up.  And out of all those people, it's our hopes to get twelve people out of all those who are qualified to sit on this particular jury.  And that's why we are bringing you down here one at a time.

And our purpose is twofold.  First of all, we want to tell you what the law is and see if you understand the law and can you follow the law.  And then also, because that may make you technically qualified, but also we want to feel you out personally because, even though we get a pool of qualified jurors, ultimately we, as well as the defense, have the opportunity after that to go through and kind of pick out and take people out of that jury.

And a lot of times our decisions on how to do that or who we do that to is kind of the feeling we get about them.  But first and foremost what's important is that

you're a qualified juror for the case.  It doesn't necessarily mean you're automatically on.

And you know, the judge asked you about your work situation because the law basically says this, is that once you are sworn in as a juror in a case, you're basically ours.  Okay.  And that we have a right to a commitment from you that we will get 100 percent of your concentration to the evidence in the case.

And that's why we go through the reason of asking you what's going on with work and is it going to be a hardship for you.  The key being there also, not necessarily that it may be financially hard for you, but will it affect your ability to concentrate in the case because, if it will, you're not good to either side.  And, so, that's why we ask you about that.

Personally, I know that sometimes I can do a lot of things at once.  I can work all night.  I can have a couple of things going on.  And I know myself well enough to know that I can handle it.  But, and sometimes I know myself well enough to know I can't.  I can't have two big projects going at the same time.

You had said in here that basically, if I'm understanding this correctly, you'll sit on the case during the day, but you will go to work at night; is that true?

A    Yes.

Q    What hours would you work at night, then?

A    As soon as I get there until I'm finished.

Q    Ahh.  So, it's like they give you a list of things to do and you stay until it's done?

A    I have a list of patients that I have to see every day.

Q    Okay.  Okay.  If we worked hypothetically from 9:00 to 5:00 -- and where do you work again?

A    In Carrollton.

Q    Oh, so you've got to go to Carrollton after that. You're going to get your list of patients.  I mean, what are we talking about here; how late do you think you're going to stay there?

A    Some are typically slower, so more than likely I have anywhere from five to ten patients to see.

Q    Okay.  And how long would that take you, do you think?

A    It depends on the severity of the case.  I'm sorry.

Q    Yeah.

A    I can't give you any more specifics.

Q    Okay.  I guess what I'm getting at, if you are there until 2:00 in the morning.

A    I don't see patients later than probably 10:00, but paperwork typically can take another hour, hour and a half.

*Anne B. Meredith*
Certified Shorthand Reporter

Q    Okay.  Okay.  And if that were the situation that you got there, you had patients and paperwork and you worked until 10:00 or 11:00 at night, are you going to be able to come then and start fresh with concentration on this particular case?

A    Sure.

Q    Okay.  All right.  Then fair enough.  I'm gonna -- I'm gonna believe you and I'm not gonna pick on you on that any more.  You're still young and I think you could still do that for a while.  Wait until you hit forty, it gets really hard.

Ms. Stockton, let me tell you then how I'm going to progress here.  I'm going to talk to you about the law that applies to any criminal case and particularly a capital murder case.  I'm going to walk you through that and tell you what the law is.

In order to be a qualified juror, you have to agree to follow the law.  You don't necessarily have to like it.  We would like to know if you don't like it.  But you have to agree to follow the law.

If you can't, you can't, and that's fine.  Nobody is going to write a letter to your employer or publish something in the newspaper saying you're not fit for this jury.  So, I want to walk you through that and tell you what the law is and, as we go through, talk to you

about some things in your questionnaire.

When you filled out your questionnaire, we just handed these questionnaires to everybody that day. I know Judge Snipes got up there and I think he said a few things about the law and just to kind of give you a really brief primer. But we know that you didn't have the pocketbook of law with you and we know you had never seen these special issues before in your life.

And, so, a lot of answers to the questions in there, at least the way I look at it, is I'm looking for people's gut reactions to kind of get a feel for where they are coming from and where they are going.

And, so, I already -- I understand that when you answered these questions, you didn't know what the law was at the time. And I guess my question to you would be, as we go along maybe, would that change your idea, would that change your answer now that you know what the law is, okay?

A    Okay.

Q    For example, I mean I'll just tell you from the get-go here that -- and a lot of people don't know this -- that just because somebody has been convicted of capital murder does not mean they automatically get the death penalty. It is always dictated by the facts of the case, by the individual defendant. That is what dictates whether

or not they will get life in prison without parole versus the death penalty.

You don't go back to the jury room and go, we've heard everything, how many think he should get life, how many think he should get death?  Instead you've got to look at the evidence and you have to look to see whether or not I, as a representative of the State, have proved to you beyond a reasonable doubt that it's the appropriate thing to do for this particular case.

Capital murder is different from murder.  And I hate to say a regular murder but, for lack of a special -- other terms, that's what I will call it.  It's, it's murder plus it's something more egregious.  Okay.  And only if and until I am found guilty of capital murder, that only means I am eligible for the death penalty.  Nothing is automatic in this kind of case.

If I took a gun out of my briefcase right now, turned to my co-counsel who is clearly just minding her business, and just shot her five times, laughed about it, stomped on her body a little bit, I'm sure you would agree with me that that's a particularly heinous case, isn't it?

A    Yes.

Q    But I am not, when I go to sentencing and trial in my case, I am not eligible for the death penalty because

that's merely considered a first degree murder. I intended to kill her, there is no question about it. I did what I had to do to kill her and I wanted to kill her, but it's not a capital murder case.

I may still get life in prison. I'm subject to a range of punishment, but under no circumstances could I ever receive the death sentence. In order to receive or be eligible to receive the death penalty, it's got to be a capital murder, which I think the easiest way to explain that is capital murder is a murder plus something else, plus an aggravating factor.

For example, it is the murder of a child under six years of age, or it is the murder of a police officer or firefighter while they are in the line of duty, or it is the murder of two or more people at the same time, or, as in this case, it is the murder of an individual while in the course of committing or attempting to commit another serious felony offense such as robbery like this case, or burglary or sexual assault.

But as with this case here, at least the charge in here, it is always this, it is always an intentional murder. Okay? Always an intentional murder plus something else.

And I want to make sure that you understand that because throughout your questionnaire -- And, again,

it was just your feelings at the time. Just kind of feeling you out there. I think you put on -- Do you have your questionnaire in front of you?

A    Yes.

Q    Good, good. Let's see here. Go to page five for me there, or page four, I'm sorry, page four, where we had asked you -- We had asked you, the second question down, if you had agreed with the State of Texas, the law in Texas that says murder, intentionally taking another life without justification in the course of committing or attempting to commit a robbery is a capital offense for which the death penalty is imposed, and you said yes.

And I will tell you it is one in which it's eligible for the death penalty. But I'm interested in your answer here where you said, murder in most cases should be punishable by death, few exceptions being the mental unstability or being mentally unstable.

You know now that murder in most cases is not -- the death penalty is not appropriate for those cases. It's not even an option. And you said here, few exceptions being the mentally unstable I think is what you're saying there.

A    Uh-huh.

Q    Understand this, particularly in a charge such as this. We are talking about intentional murder. If a

defendant is insane, legally insane, then he's going to be not guilty by reason of insanity. Okay?

A    Okay.

Q    If a person intentionally kills somebody but they do it in the course of self-defense and their actions are reasonable and their actions are justified, they are not guilty of murder. Okay?

We are not talking about a murder that's an accident. We are not talking about a murder where I just meant to hurt him but he died, anyway. That would be something else. We are talking about an intentional murder. Okay?

With respect to the mental stability, if you will, as long as it's not, you know, as long as it doesn't deem the person insane or incompetent, I'll submit to you that does come into the equation. If a person is found guilty of capital murder, that is something that you may consider in answering those special issues.

Okay. Does that make sense to you?

A    Yes.

Q    But I just want to make sure we are on the same point about what capital murder is, is it's intentional murder with no legal justification whatsoever. It's not self-defense. It wasn't an accident. I did it, I meant to do it. Okay.

Those things may become important because, you know, you had said again on page five, we asked you, the third question from the bottom, what would be important to you in deciding whether a person received a death sentence rather than a life sentence in a capital murder case, and you said mental competency.

When I hear mental competency, I think like a lawyer. And I think, if somebody is mentally incompetent, we can't even go to trial.

But I know that mental competency also means -- and I don't want to put words in your mouth -- but where were they going in their head? What were they thinking? Were they under the influence of anything?

And I see you nodding your head yes, so it seems to me that you're looking at what was going on in their head. Were their actions purposeful? What kind of life had they led maybe? Those things do become important if you get into the punishment phase.

A    Right.

Q    But before you ever get to that punishment phase of whether or not you're going to get life versus death, you're going to have to find that this person meant to do this murder. Okay? Are you with me on that?

A    Yes.

Q    Okay. If you've got questions or something,

just back up and we will go ahead and cover that.  You know, because a lot of people also say, like you did on page four, that the best argument for death penalty is an eye for an eye.  Nothing wrong with feeling that way.

But I'll tell you that the Texas law does not state eye for an eye.  Just, you know, with respect to the law, just because you commit murder does not mean you automatically also forfeit your life.  So, it's not an automatic eye for an eye.

And when you said the best argument against the death penalty, you seem to have brought up here that you don't -- you never want to run that risk that you may convict an innocent person.

And I think some people would say that at this point we need to kind of get our heads where we are already at the point where he's guilty.  You know, so whether or not he gets life or death, there might be other reasons for that outside of them being innocent or guilty.

If I haven't proved my case to you beyond a reasonable doubt, then by all means don't convict an innocent man or don't convict a man where I haven't carried my burden of proof.

But let's talk about that.  In any criminal case, there's always rules of law that apply.  Okay.  And the first and foremost is that I represent the State of

Texas which means I brought the criminal charges against the defendant.

And the law states that because I brought these criminal charges, it's always my obligation -- we call it my burden of proof -- to prove the case to you. You never look to the defense to do that. You always look to me. Because I brought the charges, I ought to be bringing the proof.

I have to prove my case to you beyond a reasonable doubt. There is really no definition of beyond a reasonable doubt. I'll submit to you it's a very high burden of proof. Okay?

So, a lot of people say, if you prove something to me beyond a reasonable doubt, it means I'm convinced, or it means that I'm confident that nobody else did it. You know, it's whatever you think it is. But do understand it's a very high burden of proof. It's not just 51 percent. It's way up there.

If, only if and until I prove that case to you beyond a reasonable doubt, the law states that you must at this point in time presume the defendant innocent. And we have all heard that presumption of innocence. As he sits here now, he's presumed innocent. And the reason is because I haven't proved a thing to you. And that presumption of innocence does not go away until I prove my case to you

beyond a reasonable doubt.

Do you have any problems with those propositions of law?

A    No.

Q    Can you presume him innocent at this point?

A    Yes.

Q    Would you hold me to my burden of proof to prove it to you beyond a reasonable doubt that he's guilty?

A    Yes.

Q    Before you would return that verdict?

A    Yes.

Q    As we sit here, also, you know, he has been indicted.  And I think you have a copy of the indictment up there on the witness stand.

The law states that the indictment is no evidence of guilt whatsoever, and you are not to consider it evidence of guilt.  The proposition that where there is smoke there is fire kind of applies maybe outside the courtroom, but in here it doesn't.

Just because he's indicted is not evidence of guilt.  That indictment is there because it tells him what I've charged him with.  And that indictment then also tells me now what I have to prove in order for you to find him guilty.

There's things on there we call elements.  I

have to prove to you who did it, when he did it, where he did it, how he did it, you know. And I -- No element is any less important than the other. I have to prove them all. I don't get points for proving five out of six.

And I carry that burden of proving those things to you beyond a reasonable doubt, every element. If I fail to prove any one of those elements, regardless of which one it is, your verdict must be not guilty.

I'll give you an example just to show you that there is no kidding around with that. It's kind of an extreme example. In the indictment I have alleged by shooting with a firearm, and that's called manner and means.

And let's say you're sitting on a murder case, if you will, where it's been alleged that the defendant caused the death of Joe Smith by shooting him with a firearm. That's in the indictment. That's an element I have to prove, and I am bound to it.

Let's say that the defendant gets on the stand and he says, yeah, I killed Joe Smith, and I am glad I did it. I would do it all over again if I got the chance. But the medical examiner takes the stand and says, Joe Smith is dead but he did not die from being shot with a firearm, he died because he was stabbed with a knife. Crime scene person gets up there and says, there was no gun or bullets at the scene, but there sure was a bloody knife.

I'm obligated to prove by shooting with a firearm. Have I done that?

A    No.

Q    What's your verdict?

A    Not guilty.

Q    Not guilty, precisely. And that's an extreme example but it goes to prove a very important point that you've got to hold me to that.

Everybody has a fifth amendment right. You know, I have the right, you have the right, fifth amendment right not to testify in a case. The law states that if anyone exercises that constitutional right, you can't hold them -- you can't hold that against them as evidence.

A    (Nods head).

Q    If I prove my case to you beyond a reasonable doubt, fine. If I don't prove it to you and he doesn't testify, you can't go, well, now, because he didn't testify, I'm going to give him something else.

I see you shaking your head yes. You also understand that there.

A    Yes.

Q    There is another element I want to cover with you here or a law that I want to cover with you, and that has to do with assessing the credibility of the witnesses and the evidence in the case. As a juror, that's what you do.

Evidence comes to you from one place and one place only. It's where you're sitting right now, from the witness stand, in the form of people testifying. Sometimes it's documents. Sometimes it's a physical piece of evidence you can hold. But that's where you get your evidence. You assess every single piece of evidence and you assess its credibility, particularly with respect to people.

The law states that a witness's credibility is to be assessed once they take the witness stand. In other words, you can't say, look, if you tell me that you're going to call a police officer or a priest to testify, I don't have to hear anything they say. I'm going to tell you right now, I'll believe everything they say.

If you do that, you're not following the law. You have to wait and assess their credibility after they testify. And I see you nodding your head yes. Does that make sense to you also?

A    Yes.

Q    I ask you that because on page seven we asked you about police officers. And you had stated in there -- we said, do you think they are more likely to tell the truth than the average person, and you said yes.

And I think that that's just a very honest opinion at that point. And there is nothing wrong with having that opinion or even that maybe expectation or

**Anne B. Meredith**
Certified Shorthand Reporter

assumption that they may be truthful more often than the regular person. But the law states that you can't go in and say, if it's a police officer, I'll automatically believe him.

So, you would follow that law and assess their credibility after they testify?

A    Yes.

Q    Okay. Those are just basic principles of law. They apply throughout the entire case. Our cases, as the judge said, are basically broken into two parts. We call it a bifurcated trial system.

In the first part of the trial you're called upon to answer one question, and one question only, and that is, has the State proved the defendant guilty beyond a reasonable doubt. You're not thinking about punishment. You're not thinking about what his sentence may be. Merely has the State proved him guilty beyond a reasonable doubt.

If I fail to prove any one of my elements, your verdict of capital murder is not guilty. Okay? And that's it, that's all for capital murder.

If I do prove to you beyond a reasonable doubt every element in the offense, then your verdict is, and I am entitled to, a verdict of guilty of capital murder. Okay?

A    (Nods head).

Q    That's just the first part of the trial. Now we

launch into the second part of the trial. Okay? And this is where criminal cases and capital murder cases are very different from a lot of other things, because you don't go back there now and just decide, does he get life without parole or does he get the death sentence. Instead, you're going to arrive at your verdict by answering those special issues. Okay?

A    (Nods head).

Q    Now, I'll submit to you, Ms. Stockton, that our lawmakers have said this. There is one automatic thing in capital murder cases, and that is this. That if you find somebody guilty of capital murder, they will automatically get life in prison without parole. Okay. That is an automatic because only one of two things can happen to a person guilty of capital murder, life in prison without parole or a sentence of death. Okay?

You've found him guilty of capital murder. We've already addressed that issue. Intentional murder in the course of committing or trying to commit a robbery. Not an accident, not a mistake. He did it, okay? Now we move on to whether or not he will receive the death sentence or life.

Remember the presumption of innocent we talked about in the first part? You presumed him innocent because I hadn't proved anything to you yet. Okay.

In the second part of the trial there is another presumption, and the presumption is is that a life sentence without parole is the proper thing to do. Our lawmakers decided that capital murder was egregious enough that you should automatically get life in prison. So, you are to presume that the proper sentence in the case at that point is life. And you are to continue to presume that life is the proper thing to do only if and until I can prove to you otherwise.

Some people may say, well, look, if you prove to me that he meant to kill somebody and he did it while robbing them or trying to, then I automatically think he should get the death sentence.

Somebody who says that is not a qualified juror because they have made an assumption. They have snapped to a decision already instead of doing what the law says, and that is wait to hear the evidence in the case and base your verdict on the questions, not on automatic snap decisions.

So, we will talk about the special issues here. And keep in mind he's now looking at life in prison without parole. So, that's where he's going to be the rest of his life, presumably, is in prison for the rest of his life.

And there is a distinction, kind of the

defining difference between the guy who will serve life in prison without parole versus the individual who will receive a death sentence. The difference between that sentence right there goes to the defendant, it goes to the individual.

And this is where you take a good hard look at the defendant who is on trial because the lawmakers recognize that he's spending the rest of his life in prison. That's where he will live. That's where he will eat, he will sleep, he will play, he will study, he will -- whatever it is he's going to do in prison, that's where he's going to do it for the rest of his life. He will be there till the day he dies.

We recognize that some people go to prison and they just do their time. They just do their time. They read books or work, or do whatever, but they do their time and they do it peacefully, if you will. They follow the rules. They do what they are asked to do and they do their time.

Those individuals that are doing their time, understand this, in Texas we don't have a separate prison for people who committed theft. We don't have a separate prison for people who committed robbery. We don't have another prison for people who committed murder, another prison for people who are there for driving while intoxicated. You know, they are all there together in

the same penitentiary.  And they are not all serving life sentences.  Some are serving some relatively short time there.

So, I'll ask you this.  For the guy who is in there who has been sentenced by a judge to serve five or ten years in prison for felony DWI, do you think that inmate has a right to expect that he should be physically safe while he's there?

A    Absolutely.

Q    Okay.  And that's kind of what it goes to right there, Ms. Stockson, is that we're looking at the protection, we are looking at the safety of the other people that are now in this defendant's society.

And if this particular defendant on the case that you found him guilty of, if we can prove to you beyond a reasonable doubt that he will be a threat, that he will commit -- more likely than not he will be committing criminal acts of violence that will constitute a threat to the people around him, then he's the type of person who is looking at a death sentence.

Does that make sense to you?

A    Yes.

Q    Does that seem fair to you?

A    Yes.

Q    Because I will submit to you that there might be people who committed capital murder who may never do

another bad thing in their life. But if he has -- If he's going to, I have to prove that to you. Okay? That's that first special issue that we call it the future dangerousness issue.

And as you go through these different issues, you always have to keep in mind that your decisions are based on the facts of the case and, most importantly, on the defendant in the case.

I will tell you that there's probably a hundred thousand different ways somebody could commit capital murder, specifically the intentional taking of a person's life while in the course of committing robbery, but no two defendants are alike and no two fact situations are alike. And to lump them all together really flies in the face of the law.

If a guy goes into a 7-Eleven, pulls out a gun, puts it to the face of a clerk, give me your money, the clerk gives him the money, and then he shoots him three times to ensure there are no witnesses, can you see how that person would be guilty of capital murder?

A    Yes.

Q    Intentionally killed somebody in the course of robbing them, didn't they?

A    Yes.

Q    Well, let me give you another analogy or way to

illustrate capital murder such as that. Let's say we've got a guy who lives on a street. There is a guy five houses down from him that he doesn't like at all. As a matter of fact, he detests him and has for years.

And he sits in his house and he plans out how he's going to kill this man because he wants to. And he goes and he buys a gun. He goes and get the bullets. He waits until the time is right. He walks those five houses down, knocks on that door. That guy opens the door. He puts a gun in his face and he says, give me your money. The guy says, I ain't giving you anything. He shoots him five times, steps in the house, grabs his money and leaves.

Can you see how he might also be guilty of capital murder?

A     Yes.

Q     Change the scenario a little bit because that sounds bad, doesn't it?

A     Uh-huh.

Q     Let's say that guy who planned that murder of him is actually a father and he's the father of two teenage kids. And that guy five houses down is actually a dope dealer. He sells dope. He sells it to kids. He sells it to teenagers. He continues to poison and pollute the kids and the people on that street and in that community and gets away with it and makes a lot of money doing it.

The man's kids are addicted to dope now. Now they are stuck on it because of that guy down there. This father, he knows what he's doing. He's not crazy. He decides he's going to put an end to it because apparently nobody else can.

And he goes down there and he knocks on the door, and he means to kill him and, quite frankly, he wants to kill him. And when he went in and he grabbed his money, he then took the money and took the wallet out of his pocket, walked down the street and dropped it in the charity box at the local hospital.

Has he committed capital murder?

A    Yes.

Q    He has, hasn't he?

A    Yes.

Q    And he goes to the police department and says, I did it. And understand that man is going to spend life in prison, isn't he?

A    Yes.

Q    Okay. At the very least, that's what he's going to get. Whether he deserves the death sentence or whether the guy at the 7-Eleven gets the death sentence depends on the facts of the case and the circumstances of the particular defendant.

And I only give you these illustrations to

show you that we can't lump them all into one category.  So, keeping in mind the death penalty is appropriate for those people that are gonna go to prison and continue to be a threat to society, look at special issue number one with me.

This is the first question you'll answer after you find somebody guilty of capital murder.  Do you find from the evidence beyond a reasonable doubt --

That should always tell you, when you see reasonable doubt, that I have to prove it to you.  Okay?

A     (Nods head).

Q     -- that there is a probability.  Notice it doesn't say a possibility, but a probability.

A lot of people tell us a probability to them means more likely than not.  Would you agree with that?

A     Yes.

Q     If I prove to you more likely than not that the defendant will commit criminal acts of violence.  That is not defined for you either.  But notice it doesn't say more likely than not the defendant will commit another murder or commit another robbery or punch another inmate in the face or threaten to do an inmate harm.  Criminal acts of violence are whatever you think they may be.

If I prove to you more likely than not he will commit criminal acts of violence that will constitute a continuing threat to society.

Well, we know what society he's in right now. We are talking about the prison society. We are not just talking about the inmates who deserve a right to safety, but also there's wardens and there's guards and there's nurses and doctors and dentists and clerks. There are people who come there to visit. We're talking about that entire society.

If he's the kind of individual who is going to go to prison for the rest of his life and not be a threat, then he is not the kind of individual that gets the death penalty.

You know that dad who went and killed that dope dealer down the street, maybe that was the only guy he was ever going to hurt in his life. And outside of that one act, he has been a fine father and husband and citizen his entire life.

That was the focus of his hatred. He did it. He got it taken care of. He took his licks. He knew what the punishment was going to be. And that's it, never do a thing again in his life.

Or you might look at that dad and go, well, who is he in prison with now? Drug dealers, right?

A    Uh-huh.

Q    And maybe he's not over his anger and maybe that has become the focal point of his life and now he's with a bunch of drug dealers and, quite frankly, he's going to be

a danger to them.  You might find that also but, of course, it would depend on the facts, wouldn't it?

A    Yes.

Q    I have to prove that to you.  Keep that in mind. And there is nothing automatic about it.  Just because you're guilty of capital murder, 7-Eleven guy or the dad, doesn't mean you're automatically a future danger.

Some people will say, well, don't you think anybody who would mean to kill somebody and rob them is the kind of person who would always be a future danger?  You can say whatever you want, but the fact of the matter is in this case we are talking about that decision has to be based on the facts.

So, whether you can say that right now about this particular defendant, or any defendant, without knowing the facts would be jumping to conclusions, I think, and you would not be following the law.

If I don't prove that to you, Ms. Stockton, then the answer to that question is no.  Okay?  The defendant receives that life in prison without parole sentence that is appropriate, and that's it.  Okay.  He's not a future danger.  That's it.  He gets life.  You go home.  Okay?

A    (Nods head).

Q    If, however, I prove to you that he is a future danger, then your obligation is not finished.  You answer

another question now.

We have something in Texas called the law of parties which basically contemplates that -- you've probably seen this -- that a lot of times more than one person commits a crime at the same time. You've got a partner or you've got a group all going together.

Well, the law states that if two or more people are involved in committing a crime, if the other people have aided, assisted, directed, encouraged, in other words, actively participated in the commission of the crime, then they can be held legally responsible as if they had done it themselves.

For example, if Ms. Evans and I go to her house tonight, we plan out a robbery. We are going to rob the local 7-Eleven because we want some extra cash. We sit at her kitchen table, plot out on Mapquest where the best store is, the most isolated store. She goes and buys the bullets. I go and I buy the gun.

We get in her car together. She grabs the ski masks. She drives us up to the 7-Eleven, parks in the back, says, I'm going to be the lookout. I'll honk the horn if anything happens. You go in there and get the money. I say, no problem.

I'm getting ready to go in the store. I say, I forgot my mask. And she says, don't worry about it, hands

me the gun. Just don't leave my witnesses. I go in the store, I rob the clerk of the money, and I kill the clerk so there's no witnesses.

Am I guilty of capital murder?

A    Yes.

Q    Sure. Do you think Ms. Evans could be guilty of capital murder?

A    Yes.

Q    She aided, assisted, participated. She was actively participating in this offense, wasn't she?

A    Yes.

Q    What you have to find in a capital murder case in order for a person, in order for Ms. Evans to also be eligible for the death penalty, you would have to find that she also anticipated somebody would die. Okay?

A    (Nods head).

Q    That's called the law of parties, and that's basically what special issue number two is asking you there. Have I proved to you beyond a reasonable doubt that either the defendant in the case is the actual triggerman like myself, or, if he's not the actual triggerman like myself, is he like Ms. Evans where he was an active participant in it and she anticipated somebody was going to die or she intended somebody was going to die when she handed me that gun? Okay?

A       (Nods head).

Q       If I can't prove that to you beyond a reasonable doubt that the defendant is the triggerman or a party, then your answer to that is no.  Okay.  And I see you shaking your head.  I think you get that.

A       Yes.

Q       If you do find that the defendant is a active participant or the triggerman, then you would answer that question yes.  Okay?  And then you're going to move on to the next issue.

Now, before we talk about the next issue, let's talk about where we are at this point.  You've already found the defendant guilty of capital murder, you know, be it the 7-Eleven guy, be it the dad who killed the drug dealer.

Okay.  Now you have found that the answer to special issue number one is yes, future dangerousness.  Either it's the 7-Eleven guy with the terrible attitude and record and you think that's enough to show you he's a future danger, or maybe it's the dad who's got it out for every drug dealer out there.  He's a future danger.  Okay?

You've also found yes to special issue number two where you've either found he's the actual triggerman or he actively participated in it.  Okay?

I'll submit to you at that point, Ms. Stockton, that the defendant is now sitting squarely on a

death sentence.  Okay?

A    (Nods head).

Q    But your obligation is not over at that point and it's not finished.  There is still one more thing you can do. And we've got this going on in Texas law, and I have always appreciated this, that we have juries, not just in capital murder cases obviously, but in any other regular kind of case, jurors still decide punishment in Texas.

You know, a lot of other states, it's automatic and really doesn't take necessarily into account the defendant or the circumstances.  Things are automatic. And that's always kind of sat sour with me.

In Texas it's different.  You always take everything into consideration.  You've heard the phrase, let the punishment fit the crime?

A    Yes.

Q    That is what this is always, always, always about. Your verdicts and your answers to questions are based on the evidence, but ultimately the punishment shall fit the crime.

And in going into a death penalty case, the lawmakers have basically said this.  That when you walk out of the door at the end of this trial, be it either giving a life sentence or having given a death sentence, you will not walk out of this courthouse and say, I felt like my hands were tied.

There was something about this case, and I never thought it would be there maybe, maybe it's the one in a hundred or million cases. But there was something about this case, there was something about the way it went down, there was something about the defendant, something about his circumstances that, quite frankly, I'm going to tell you right now, I know he's guilty of capital murder and I know he's a future danger, but I don't think he should get the death sentence. I think he should get life.

Special issue number three gives you that option. It's for the benefit of the defendant, of course, but I'll submit to you it's also for your benefit so that you can still look at everything. And if there is something about this case that you consider, we call it mitigating, which means lessens, to the point that it's sufficient enough to undo that death sentence into a life sentence, you are allowed to do that.

Okay. Do you think that's fair?

A     Yes.

Q     Okay. Do you see how that's kind of a lot of mental gymnastics? I mean you've already found him guilty of capital murder, haven't you?

A     Yes.

Q     You have declared that he's a future danger, haven't you?

A    Yes.

Q    But now you're saying, okay, I get all that, but I'm going to give him life.

Do you think that's ever possible to do that?

A    Could be.

Q    Could be.  And I think that that's the key, it could be.  You don't know now, do you?

A    No.

Q    Because you haven't seen anything, have you?

A    No.

Q    That's what that question asks you to do.  It says, go back there now and once again look at everything.  Look at everything.  And you can even think of it as categorizing evidence.  You know, what about this case and this defendant, what about this is mitigating?  What about this is, quite frankly, aggravating, and what about this is just whatever.

And it says, if there is anything mitigating, take a second closer look at it and ask yourself, well, sure it's mitigating, but is it sufficient to turn it into a life sentence versus a death sentence?

I can't tell you what's mitigating and what isn't.  It's entirely up to you.  Okay.  That's your own personal choice as to what's mitigating.  A juror might find the dad who killed the dope dealer, sure enough, he's guilty of capital murder, isn't he?

A      Yes.

Q      And yeah, now he's in prison with a bunch of dope dealers, isn't he?

A      Yes.

Q      And quite frankly, God help him, because he's going to be a danger to them, isn't he?

A      Yes.

Q      And special issue number two.  Well, he wasn't a party to it.  He actually pulled the trigger, didn't he?

A      Yes.

Q      But then you get to special issue number three, and now you look at the dad, don't you?

A      Yes.

Q      Taking into consideration all of the evidence, including the circumstances of the offense, which might include why he did it, the defendant's character and background.

Well, who is he?  Is he a father and a good husband, or is he a guy who has just been a ne'er-do-well and hasn't contributed a thing to society?

And the personal moral culpability of the defendant.  I think that probably goes more to why they did it.  Did he do it because, you know, he felt he had a moral reason to?  And don't get me wrong, there is no excuse for it.  Or did he do it because he thought the money would be

great so he could put new rims on his car? You know, you look at the personal moral culpability.

Taking all of that into consideration, is there anything in there that's mitigating? You might say no, not a darn thing, or you might say, there's about a hundred mitigating things in there. But the question still becomes, is it sufficiently mitigating?

I have been talking about burdens of proof and having to prove things to you. On this special issue number three, there is no burden of proof. I don't have to prove anything to you. They don't have to prove anything to you. It's just there for you so you don't walk out of here going, I just don't think that -- I think that was abundantly unfair. I know he did it. I know he's a future danger to those other, you know, but I don't think he deserves death.

That's what that's there for. Do you have any questions about that particular issue?

A     No.

Q     Do you think that's a fair thing to do?

A     Yes.

Q     Even for a person who is guilty of capital murder and is maybe a future danger?

A     Yes.

Q     Okay. As I said, we asked you a couple of things in your questionnaire about -- kind of touched on some

things that might be mitigating and might not be.

For example, I found it interesting that you did put in your questionnaire, we asked you about testimony concerning psychologists or psychiatrists, that oftentimes they testify. And it seems that you do have a good appreciation for their value, not only to people who need their assistance, but I'll tell you, Ms. Stockton, that oftentimes they are called to testify in cases such as this. And the reason they are called is in the hopes of helping the jurors understand maybe that mental capacity that you were talking about before.

A    Uh-huh.

Q    Where was that person's head at the time, you know.

And we asked you about intoxication also. You were correct when you agreed that intoxication is not a defense. It's never a defense. You can't say, I'm not guilty because I was drunk. But the law does say that you can consider it.

A    Uh-huh.

Q    For example, in special issue number three. If they were intoxicated you might say, had they not been intoxicated, this would have never happened. You can take that into consideration. What credibility you give it is entirely up to you.

So the question becomes, not today, well,

will you or will you not consider it mitigating?  It's not really the question today because we are not in the middle of this case.  The question becomes, will you go back and consider all the evidence once again and will you go into it with an open mind?  Would you?

A     Yes.

Q     And if you -- and I am talking about you personally.  If you, Ms. Stockton, believed that there was a mitigating circumstance and you personally thought it was sufficiently mitigating to turn that death sentence into a life sentence, would you do that?

A     Yes.

Q     Okay.  Basically I'm asking you, would you do what you thought was the right thing to do?

A     Yes.

Q     It's kind of a -- almost a rhetorical question.  You know, if you thought it was the right thing to do to turn that sentence into a life sentence, would you do the right thing to do -- would you do the right thing?

A     (Nods head).

Q     One second.  Do you have any questions about any of that right now?

A     No.

Q     Okay.  Okay.  And, again, I understand your opinions are your opinions on here.  And you have said

some things -- and I don't mean to offend you by saying this because it doesn't offend me -- that seem kind of harsh in your questionnaire, like that you don't want to waste tax dollars on incarcerating people, you know, in prison for the rest of their lives.

And I certainly appreciate that because I work hard and I pay a lot of taxes, and I like to take note on what I pay taxes for.

But you understand, Ms. Stockton, that there will always be circumstances where somebody found guilty of capital murder will not receive the death penalty because it's not appropriate evidence-wise and they will spend the rest of their life in prison, you know, that there are, in fact, situations for that.

So, I guess what I really need to get from you -- honesty time here -- is, are you going to go into a capital murder case and base your decision on the rule of law and the facts in the case, the circumstances of the offense and the particular defendant, or are you going to say, I don't really appreciate spending my money warehousing somebody for the rest of their life, it's cheaper to kill them?

Just tell me what you really feel. What's going to motivate you the most?

A    Oh, I have no motivation. I'm going to listen to

the facts of the case.

Q    Okay.  You see where I'm getting -- where I'm going with that?  Because if you were to aay --

A    Yes, but that's not how this questionnaire was directed.

Q    And it wasn't.

A    You asked my opinions of it, so.

Q    You're absolutely right.  You're absolutely right.  We didn't tell you what the law was at the time.  We didn't fill you in.  And I take no offense to anything you said.  I hope you don't think I did.  But I guess that's what I'm --

A    Unless you wrote the questionnaire yourself, then you shouldn't, so.

Q    Exactly.  Absolutely, you're absolutely right.  I guess where I'm going is is that there are some people, I will tell you this, there are some people -- and that's why we have to be very clear at this point -- who will say, whatever, just -- if you kill somebody, particularly if it's a capital murder, there ain't a thing out there that's going to change my mind.  I'm going to tell you that right now.

A    Uh-huh.

Q    You know, and those people are being honest and they have pretty much told us, I'm not going to follow the law.  I'm not going to even consider it.  I'm telling you right now I'll never do it.

And there is nothing wrong with people who feel that way. It's how they feel. And, so, that's what we are trying to get a feel for is, are you that person? Or are you the person who says, no, there might very well be something? But at the very least, I will absolutely consider everything and, if it's there, then I'll do it. And if it's not, I won't.

I see you shaking your head yes. I keep saying that because she has to write it down for the record.

So, all right. I appreciate you listening to me. I know that's a lot of information coming at you at one time. Do you have any questions about any of that?

A    No.

Q    Okay. You believe that you understand the laws as I've told them to you?

A    Yes.

Q    And you understand that not all murders are eligible for the death sentence? It has to be capital murder.

A    Yes.

Q    And even if you're guilty of capital murder, it doesn't necessarily mean you're going to get the death penalty. It's always based on the evidence in the case.

A    Yes.

Q    Will you wait until you get to the special issues to answer those yes or no?

A    Yes.

Q    In other words, just because you've found somebody guilty of capital murder, are you automatically going to assume they are a future danger?

A    No.

Q    You will hold me to prove it to you beyond a reasonable doubt?

A    Yes.

Q    And if you find the answers to those questions are yes, will you still go into special issue number three with an open mind?

A    Yes.

Q    Consider all the evidence again and, if there is a mitigating circumstance for you that's sufficient to turn it around, you're telling us you would do that?

A    Yes.

Q    Okay.  Thank you, Ms. Stockton.

A    You're welcome.

Q    I appreciate you giving me your time.

          THE COURT:  We thank you, Ms. Handley.

          Do you need a short five minute break?

          PROSPECTIVE JUROR STOCKTON:  I'm all right.

          THE COURT:  I want to reintroduce you at this time to Mr. Doug Parks now who will speak to you in behalf of Mr. Broadnax.

*Anne B. Meredith*
Certified Shorthand Reporter

Mr. Parks.

MR. PARKS:  Thank you, your Honor.

THE COURT:  Yes, sir.

EXAMINATION

BY MR. PARKS:

Q    Ms. Stockton, you doing all right?

A    I'm fine, thank you.

Q    Okay.  Ms. Stockton, I'm going to talk to you for about as long as Ms. Handley did most likely, so you're looking at another roughly forty-five minutes.

A    All right.

Q    But the good news is that that will be it and you can go on about your business.  I want to talk to you about your questionnaire some.

A    Okay.

Q    I want to talk to you about the guilt/innocence or merits phase of the trial.  I'll talk to you about these special issues for a while.

Just because I do that, I don't want you to get the impression that we believe that this jury will ever come to the place where they are having to answer those questions, but this is the only time that we have to talk to you about these issues, make sure you understand the issues and what's expected of you, so I'll spend some time with those.  Okay?

A    Yes.

Q    But before I get into that, I want to talk to you a little bit more about your work situation.  I'll be real honest with you, Ms. Stockton, this is hard work down here. It may look like it's nothing in the world but sitting on your rear for seven or eight hours a day, but it's work if you do the job, because you're going to have to listen to everything that's being said, you're going to have to pay attention, you're going to have to concentrate.

A    (Nods head).

Q    So, you're going to be putting in a full day's work down here.  And now I understand that you're going to have to go back and do pretty much a full day's work after that.

A    Yes.

Q    And, frankly, that concerns me, Ms. Stockton, because -- and I have -- And don't misunderstand me.  I am not in any way questioning your belief that you're able to do it.  It's been a long time since I was as young as you are.  But when I was as young as you are, I figured that I could do nearly anything and I was basically bullet-proof. And I learned a long time ago that that's not exactly true.

And I am just sitting here doing the math in my head.  If you're here until 5:00 o'clock in the afternoon, with the traffic going out from downtown, you're a good hour probably away from your work.  And I am a little curious.

Do you normally work during the day hours?

A    Yes.

Q    What are your regular hours?

A    6:30 to 2:30 or 3:00.

Q    2:30 to 3:00 in the afternoon?

A    Uh-huh.

Q    Do you see the same patients again and again or do you just see --

A    As long as they are in our hospital, yes.

Q    Okay.  So, they are actually in the hospital.

A    Yes, this is a hospital setting.  I also have home health patients and nursing facilities on the side, but I can push those off until the weekend.

Q    Okay.  So, you're going to be working all weekend, too.

A    Apparently.

Q    Okay.  Now, and your patients, I guess they are going to have to accommodate their schedules.  I understand they are in the hospital.  But I mean if you're seeing somebody at 10:00 or 10:30 or 11:00 o'clock at night, how is that going to affect your ability to work with them?

A    It will be difficult, honestly.  Most of what I do is swallowing issues, people that have had issues with their swallow.  And if I don't get to see them at a meal, that means I have a really tough time.

If I'm not getting to the hospital until 6:00, I'll have to have them eat a snack at some point during the day.  So, I typically like to see them at mealtimes.  But if it doesn't happen, I can -- and for two weeks, I can make it work.

Q    Well, you know, and I guess I'm looking at it not only from our standpoint and not only from your standpoint but from the standpoint of your patients also.

A    I appreciate that.

Q    I mean it's like Ms. Handley said, you know, we have a lot of people.  If you were the last person that we could possibly get to do this job, it would be one thing.  But there are, as she said, we've got probably 300 people --

A    Uh-huh.

Q    -- plus that we could get to that wouldn't have these kinds of issues.  And it's not -- You know, it's not an issue of whether or not you could serve or you could do the job.  It's these other considerations.

And I don't know.  I mean, is it something that you want to do that badly --

A    I honestly don't.

Q    -- that you would let your patients --

A    Honestly, no.  No, this is not -- This isn't something I want to do, but it's my duty.  And if I'm chosen, then I will do it to the best of my ability.

Q    Okay.  Okay.  Now, you tell us that you probably could manage financially if it didn't go more than two weeks.  What happens if it does go more than two weeks?

A    I already have vacation time scheduled in September, so I'm going to have a really tough time if it goes beyond that because I haven't saved up enough pay time off, so.

Q    Well, and we are saying that this is going to last two weeks.  But, you know, we can pretty much guess -- guess -- estimate what we think it's going to take to put the evidence on.

What we cannot do is know how long it's going to take someone or a jury to reach a decision.  They might reach a decision in two hours.  They might not reach a decision for two days.  We don't -- We don't know.

The last thing, by the way, that I want back in the jury room, and I think I speak for everyone, is somebody looking at their watch during deliberations because they have got the pressures of other things that causes them the need to get this over with.

A    Uh-huh.

Q    We see that.  I have been doing this a very long time.  And the last thing I ever want to see is a jury in the deliberation room, and it gets to be 4:30 in the afternoon or 5:00 o'clock, because it's just -- on a Friday.

It's just amazing how 5:00 o'clock on Friday seems to concentrate jurors' minds. And I am just cynical enough to believe that that's not always to do with the evidence, more to do with them wanting to get the heck out of here.

Are you going to feel any pressures if this thing goes along longer than we think and now it's two weeks and you are still in this trial? How is that going to affect you?

A As I mentioned, financially, yes.

Q Are you able to tell us, Ms. Stockton, that whatever the situation, whether, you know, it's your work situation, whether it's time, financial situation, if you are put on this jury, that you're going to be able to put all of those issues aside, regardless of how long it takes, and give this your full attention?

A My financial constraints would not impair my ability to concentrate on the actual trial. It would just be a very frustrating factor that I would have to consider later.

Q Well, you know, and I kind of interrupted myself awhile ago. If you get back out to the hospital at 6:00, you get away at midnight --

A Hopefully, it wouldn't be that long, but it's a possibility.

Q How far from the hospital to where you live?

A     Twenty minutes.

Q     So, you've got to get home, get in bed at midnight, 1:00 o'clock, something like that, and then up and back down here before 9:00 o'clock.  So, you're not going to get but about five hours of sleep?

A     That's about what I get now.

Q     You're used to that?

A     Unfortunately, yes.

Q     Okay.  All right.  All right.  Let me switch gears and go into the issue here.  You're the only one that can tell us about these things.  So, do you believe, Ms. Stockton, that you understand the guilt/innocence phase of the trial pretty well?

A     Yes.

Q     That the State of Texas has the burden of proof.

A     Yes.

Q     That they are required to prove everything that's in that indictment beyond a reasonable doubt.

A     Yes.

Q     That Mr. Broadnax is presumed to be innocent where he sits here today.

A     Yes.

Q     Do you, in fact, presume him to be innocent?

A     Yes.

Q     That's pretty much typical of any case, not just

capital murder cases.  So, those are not issues that you have any problem with; is that fair to say?

A    Correct.

Q    All right.  All right.  Well, I want to talk to you then about the special issues, the context of the special issues.  I'm going to be repeating some of the things that Ms. Handley said.  It's not that I don't feel like you were unable or incapable of understanding these.  I just want to make sure that we are all on the same page.  So, we will talk about context.

And the first thing I guess I want to make sure you understand, Ms. Stockton, is that these special issues are never presented to a jury for determination except in capital murder cases in which the State is seeking the death penalty and where twelve people have made a determination, based on the evidence, beyond a reasonable doubt, that the accused did exactly what he's charged with having done.

And in the context of a capital murder case where the allegation is of an intentional murder during the course and commission of a robbery, what that means is that the defendant was sane, was competent, made a decision to take someone else's property that didn't belong to him, and during the course and the commission of that offense, taking another person's property from them, he made a decision to

end that person's life and did whatever it took to accomplish that goal.

If those things were not true, you would not be faced with answering special issue number one. So, whatever else you might know about a defendant, you would know at least that, that he's an intentional murderer, he killed because he wanted to in order to take another person's property, and he had no legal excuse or justification for it. Okay?

A    Yes.

Q    Are you with me?

A    Yes.

Q    All right. Now then, I want to talk to you about some of the things that you put in your questionnaire. And I am a person who believes that people typically write down how they really feel when they answer these questionnaires. I believe they understand that that's what is required of them and that they do that, and they express their true feelings about these issues in their questionnaire.

Is that true of yourself?

A    Yes.

Q    I want to first start on the first page of your questionnaire where we asked if a person, if you are in favor of the death penalty. And as a general rule, people answer that question yes. We have a few people who mark no,

but most people say yes, as you did.

And in your explanation you said, I do not like the idea of my tax dollars paying for amenities for inmates accused of capital murder for life.

And there's a couple of things about that I want to visit with you about, Ms. Stockton.  One is the amenities that you're referring to.  What did you have in mind there?

A    Anything that they are allowed to do that is considered a luxury.

Q    Well, the prosecutor mentioned earlier reading books.  Would that be one?

A    I enjoy that, so that's a luxury for me.

Q    Watching television, I guess.

A    Yes.

Q    Any of those.  Do you believe that prisoners ought not to be allowed to do those things?

A    I think prison should be an unpleasant place, not somewhere that you can go to enjoy the rest of your life.

Q    Sure.  And please understand, all I'm asking for is your feelings about these matters.  There are no right or wrong answers to any of these questions.

Would it be fair to say that, as you understand prison life, at least, where they are able to read books, they are able to recreate, they are able to

watch television, that those are things that you feel like probably ought not to be allowed?

A    Yes.

Q    Now, let's talk a little bit about the tax dollar situation. How do you -- If I understand what you're saying is is that it's a waste of tax dollars to keep folks in the penitentiary the rest of their life if they are murderers.

A    Capital murderers.

Q    All right. Capital murderers. You mention that about murderers, I think, later on I think, also. But it doesn't matter. Capital murder. And frankly, Ms. Stockton, that's important and there is a reason why we ask these questions, and I will explain. In a little bit we will get to that so that I think you'll see where I'm coming from a little bit about that.

Over on -- Well, you've marked, as many people, that you believe in an eye for an eye. I've learned that a lot of people -- that means different things to different people. How do you see that concept of an eye for an eye?

A    Why should the defendant be allowed to survive in obviously a pleasant place, even though incarcerated, if you've just taken a life?

Q    And that's what a lot of people say, a life for a life.

A    Sure.

Q    Taking a life, then your life should also be forfeited. Is that how you mean it?

A    I'm assuming that there are extenuating circumstances when that wouldn't be the case, but, yes, for the most part.

Q    Okay. I'm always a little bit concerned about extenuating circumstances because what is extenuating for one person might not be for another. What do you have in mind when you say except for extenuating circumstances?

A    Again, in special issue three, some people are allowed to have those doubts, and a juror should be allowed to express those doubts. And it's not always -- You're right, it's individualized. But I think that there are extenuating circumstances. Could I name some right now? Probably not, but.

Q    Well, you understand, whatever extenuating circumstances -- I mention this because this is the thing that people say to us. You know, I could look at special issue number three --

We are kind of jumping ahead and I am not going to talk about it all at once. But I could answer special issue number three yes if the evidence showed me that the person acted in self-defense or if it shows me that it's an accident or if it shows me the person is

insane.

A    If you had all those, you wouldn't get to special issue three.

Q    That's right, you wouldn't get to there if it was any of those.  But whatever else it is, it's not any of those things.  We are on the same page there, right?

A    I hope so.

Q    Okay.  Well, you would be surprised how many people say, oh, yeah, I wouldn't give anybody the death penalty if they were innocent.  Well, we would hope not.  So, we have to talk about these things.  Okay?

A    Sure.

Q    All right.  And on page five, you again express what you've already told us.  In the middle of the page here we asked you to explain your response to life without parole.  And you responded, why should a convicted murderer be allowed to live, watch TV, work out, recreate, when he or she has taken the life of another human being?

You understand that's exactly what we are talking about asking a juror to allow in special issue number three if they've found the defendant guilty of capital murder and if we've even gone further than that and shown that he's going to be a future danger.

So, what we are asking you to honestly consider doing is just what you say should not be done

when we ask special issue number three. And you can see why I might be a little bit concerned whether or not you're really able to give special issue number three honest consideration.

A    This questionnaire doesn't offer any reason why I shouldn't consider that at this point.

Q    Well, you expressed your opinion, didn't you?

A    Yes. But, again, the extenuating circumstances are there, are present possibly in this case. I don't know.

Q    Okay, fair enough. Again, when we asked if you believe -- what purpose you believe the death penalty serves, you say, it permanently removes the murderer from being a drain on the citizens' taxes.

I'm assuming you still consider it -- You still feel that way; is that fair?

A    Yes.

Q    And you speak to mental competency a couple of places, and I just want to flesh that out a little bit. On page five you indicate mental competency would be important to you in deciding whether a person should receive the life penalty rather than the death penalty. And you refer to mental instability over on page four. The prosecutor talked to you about that.

Do you believe that those are the only issues that would ever be of consideration to you in making

a determination of whether there was sufficient mitigating circumstances to avoid the death penalty, mental issues?

A    No, the case could be made further.  I just couldn't think of any at this point.

Q    Do you believe that would be the most important thing to you as far as you know at this point?

A    Without the case in front of me, yes.

Q    Okay, fair enough.

You mention that your cousin's brother-in-law was killed in a gang related --

A    Uh-huh.

Q    -- shooting, I guess.  About how long ago was that, best guess?

A    Ten years.

Q    Anything about that that would cause you any concerns being a juror in this case?

A    Not in this case, no.

Q    Was your cousin's brother-in-law in a gang or was he just --

A    Not that we know of.

Q    Okay.

A    He was apparently an innocent bystander.

Q    I'm sorry?

A    He was apparently an innocent bystander.

Q    Okay.  Tell me a little bit about this temporary

restraining order that you refer to. I wasn't able to make out exactly what that was about.

A     I work for a home health company.

Q     Uh-huh.

A     And the CFO was embezzling money. And because they didn't want to ferret out who was actually involved, they indicted all of us or brought up charges on all of us, and we were all served with temporary restraining orders the next day. It was dropped less than six months later.

Q     Okay.

A     Or I don't know about the restraining order, but the case against me was dropped because I showed that I shouldn't have been brought up on charges.

Q     Were criminal charges brought against you?

A     No, they were --

Q     Just civil, just allegations?

A     Allegations I'm sure.

Q     Okay. Nobody was ever arrested or --

A     Oh, goodness no.

Q     Okay. We will probably come back to a couple of things as it relates to the issues that we are going to be talking about a little bit here.

With respect to special issue number one, I've explained the context to you, right?

A     Yes.

Q    So, you're to assume that you have sat on a jury, you've heard evidence that convinced you and eleven others that the accused person in that case, this hypothetical case, was in fact a capital murderer, that he had made a decision to kill another person and did so and did that in order to take that person's money.

Now you are being asked whether in that case you believe that the evidence proved to you beyond a reasonable doubt there is a probability he will commit criminal acts of violence that would constitute a continuing threat to society.

Do you have some thought, Ms. Stockton, about what kind of evidence you would like to hear that would help you answer that special issue in addition to the facts and circumstances of the case, if there is, if you would need any more than that?

A    A psychologist possibly stating anything relating to sociopathic tendencies might go a pretty long way in influencing that decision.

Q    What about past history of the person on trial, would that be of any importance to you, whether he had a history of violence or history of no violence?

A    It would.  Yes, it would.  It would be good information to have.

Q    I'm sorry?

A    It would be good information to have.

Q    The law says that a juror can answer special issue number one yes based solely upon the facts of the case as you have heard them.

Some jurors tell us that they could conceive of a situation where perhaps the facts of the case alone would prove to them that special issue number one should be answered yes.

Others say that they do not believe that would ever be possible, that they would have to have additional evidence, not just what happened on the day in question.

Some jurors tell us that what happened on the day in question would always answer that question for them yes if it proved that he was a capital murderer.

How do you feel about any of those issues; do you have a position there?

A    I think additional information would be very helpful.  I don't think -- Depending on the facts of the case, I don't know that I could speak to past history. Oftentimes past history can't be brought up in a trial.

Q    Well, I can tell you that it will, it can.  The law in the State of Texas is such that when you get to the punishment phase of the trial, you can get almost anything that anybody wants to offer.

So that if the defendant has a record of

*Anne B. Meredith*
Certified Shorthand Reporter

being in the penitentiary for violent acts half a dozen times, you would hear about that. If he's not been in the penitentiary, he's never been convicted, you would hear about that. Or anything in between. It's pretty much wide open in the State of Texas.

Of course, the law presumes that special issue number one is to be answered no. That's the presumption just like the presumption of innocence in the first part. And it's the State's obligation to prove that special issue number one before a jury would be justified in answering it.

Some jurors tell us that if they are answering that about a capital murderer, and they would be --

A    Uh-huh.

Q    -- then the answer to that question, in all honesty, to them, is always yes because anybody who would decide to kill another person, and do it, and take their property, would always be a future danger. Some people feel that way. They have an absolute right to feel that way. They have an absolute obligation to tell us if they do.

Do you feel that way or not?

A    No, I would like to hear evidence to support it.

Q    Special issue number two I'm not going to talk to you too much about. You may or may not, if you sit on this jury, ever see that special issue. That depends on the evidence and whether or not the judge submits it or not.

Special issue number three you will, assuming you get to that place. Because the way the law works is if you answer special issue number one no or special issue number two no, the trial is over and the person gets the automatic life penalty.

Only if you have answered yes, he is guilty, yes, he will be a future danger, do you ever get to special issue number three. Okay.

Now, special issue number three, you can read it there. It calls upon you to reconsider all the evidence that you heard, including the circumstances of the offense itself, the defendant's character and background, his personal moral culpability, to determine if there is sufficient mitigating circumstance or circumstances that would justify a life sentence rather than a death sentence.

Now, the difference between that, in all honesty, Ms. Stockton, and the other decisions that a juror has had to make is that that's pretty much a subjective decision. Everything else is objective.

You base your answer to the guilt/innocence question on the evidence that you hear. It really doesn't make any difference at that point in the trial whether a person has a long history of criminal offenses or not because it's got nothing to do with did he do what they allege. Okay?

A     Uh-huh.

Q     With special issue number one, and if you get to special issue number two, the same thing. You're going to be looking to evidence presented to you to try to convince you beyond a reasonable doubt that these answers, as they are written, have been proven to you. That's an objective decision. Either the State proved them to you or they didn't, right?

A     Yes.

Q     Now, however, when you get to special issue number three, the game changes because at that point you are called upon to make your own personal moral judgment in the matter. Because the law does not tell you what is a mitigating factor. The law does not tell you what weight to give a mitigating factor. The law does not require any two jurors to agree on what is a mitigating factor. The law does not require any jurors to agree on what weight to give mitigating factors. That is all pretty much an individual decision to be made by each individual juror for himself or herself.

So that the rules change in that, while it is one thing to say, will you follow the law. We expect you to follow the law and we expect you to apply the objective standards that the law requires. But when you get to special issue number three, there are no objective standards. Okay. You see what I'm saying?

A     Yes.

Q     So, and while I'm on the subject, the State of Texas is not a balancing state.  And what that means is this. I wouldn't expect you to know what that even means.  But every state that has the death penalty -- most states do not. But every state that has the death penalty has to have some scheme to make their statute constitutional.

Some states have a list of aggravators and a list of mitigators and they have the jurors balance back and forth between those two.  Those are balancing states. Here we just have -- I think us and maybe Oregon, one other state, has this method of making the determination.

But the point is, when you get to special issue number three, it does not ask you to balance aggravators with mitigators.  So, this talk about you might find something to be aggravating or something else to be aggravating or this person wasn't a productive citizen in his life, that question does not ask you to balance or set off mitigation against aggravation.  It asks you to look for mitigating circumstances, and that's all.

Does that makes sense to you?

A     Yes.

Q     So, you would not be following the law if you decided to go back there and say, well, I find a mitigating circumstance and I find it is probably even sufficient to

justify a life sentence, but I find this other thing is so aggravating that I'm going to offset those two. That's not how we do it in the State of Texas. Are you with me?

A    Yes.

Q    All right. So, let's talk about what we do do in the State of Texas. We do not define for jurors what is mitigating. We leave that up to the individual juror to decide for himself or herself.

What we do say is, though, is that you are to look at the circumstances of the offense, the defendant's character and background. Let's start there.

What does character and background mean to you in the context of that question? What do you think they are asking you to look at?

A    Probably past criminal history.

Q    Criminal history. Okay.

A    Job history, production in society, all that you mentioned earlier.

Q    Okay. Some jurors tell us that, in the context of that question, a person's youth might be a consideration for them.

Let me tell you what the law in the State of Texas is. A person must be eighteen years of age or older when the offense is committed to be considered for the death penalty.

But, you know, some jurors say that if a person is on the lower range of that, eighteen, nineteen, twenty, something like that, that would be a consideration for them.  Other jurors say that if they are old enough to be tried for the death penalty under the law, eighteen years of age, then age is not something that they would consider in the defendant's background, character, personal moral responsibility, those things.

How do you feel about that?

A    I think eighteen is eighteen.  If you can serve and die for your country, you can sure make a decision to shoot somebody and pay the price for it.

Q    And let me just make sure I'm understanding you. What I'm hearing you say is that, for you, relative youth would not be a consideration in answering that question.

A    It would not.

Q    Okay, fair enough.  We talked to you about voluntary intoxication in the questionnaire.

A    Yes.

Q    On page five we -- and I think the prosecutor mentioned this to you.  Page five we tell you that voluntary intoxication is not a defense, and that's true.  That's what the law is.  A person can't say, well, I am not guilty because I was voluntarily intoxicated.  And you understand that, and you marked yes, that you agree with that.

*Anne B. Meredith*
Certified Shorthand Reporter

A    Yes.

Q    On the top of the following page we tell you that, in Texas, evidence of intoxication -- we probably should have put voluntary intoxication, although it could be involuntary for that matter -- may be considered in mitigation of punishment.  Do you agree with this law?  And you indicated no, it was a choice of the defendant to drink, that this may have led to --

A    An exacerbation of the criminal act.

Q    Oh.  -- an exacerbation of the criminal act, but it does not excuse it.

And that's true, it doesn't excuse it at all because that's what a defense is is an excuse.

Do I take it from that that if you heard evidence of voluntary intoxication, when it comes to answering special issue number three, based on your answer there, that that would not be a consideration for you in answering that question?

A    It would not be.

Q    Okay.  Sometimes, particularly if there is a special issue number two given, that would indicate that there is more than one person involved in the offense. You see how that works?

A    Yes.

Q    Some people tell us that whether or not a person

was the follower rather than the leader, if there were more than two people, it might be a consideration for them in answering special issue number three.

How do you feel about that?

A    That would not be --

Q    Not?

A    That would not change my opinion on special issue number three.

Q    Sometimes you might hear from friends or family that know the defendant best who say that, well, you know, it may be -- apparently he did do the offense.  The juror found him guilty of the offense.  But this is an aberration for him.  This is not the way he would typically be.

Is that something that you think would be --

A    No.

Q    -- a consideration for you in answering --

A    They are not experts.

Q    I'm sorry?

A    They are not experts in criminal behavior.

Q    Okay.  There was another thing or two, Ms. Stockton.  Over on page eight of your questionnaire there is a question that we asked that kind of, sort of in a way, tracks special issue number three.  Down, not the last thing on the page, but kind of the next to the last.

Some people feel genetics, circumstances of

*Anne B. Meredith*
Certified Shorthand Reporter

birth, upbringing and environment should be considered in determination of punishment. And you indicated to us that all of these may be factors in a person's mentality but free will dictates the actual act. A person can choose to overcome negative environmental pressures as well as ignore genetic influences.

And I am assuming that that's what you meant at that point in time. Do you still believe that to be true?

A    Yes.

Q    Okay. And the reason I bring that up is is that sometimes jurors say to us that if a person was born or was raised in an abusive situation, physical abuse, mental abuse, perhaps even sexual abuse, that that would be a consideration for them.

Other jurors say that people are able to overcome those kinds of environmental issues and upbringing. And if they have got free will, that should not be a consideration, to them, at least.

Everybody feels something differently about that. How do you feel about physical abuse or background abuse?

A    It could potentially influence a decision, but I still think people can overcome if they have the will.

Q    Okay. So, I'm taking from that that it could be a consideration for you?

A    It would be -- It would be nice to hear that evidence.  I wouldn't make a decision right now if it would or would not affect me.

Q    Yeah, that's what I'm saying.

A    Yes.

Q    Depending upon what you heard --

A    Depending, yes.

Q    -- it might be a consideration for you.

A    Potentially.

Q    Sometimes in the background issue, you know, a person -- obviously people come from all kinds of backgrounds.  You know, to some people it might be that, if a person was from a privileged background, that that would be a mitigator for them.  Others no, it would be just the opposite from that.

I hesitate to say that because I've given you that speech about balancing, and I meant it when I said it.  But, you know, a person might come from a privileged background, they might come from a grindingly poor situation where they were raised in extreme poverty.

Do you think those, just those kinds of things, would be of any importance to you?

A    Absolutely not.

Q    Okay.  And, finally, sometimes there will be evidence where a person may have had a very disruptive upbringing where perhaps it was not a two parent home,

maybe the person was bounced between family members and family members or foster situations, just very little or no stability in their life as they were growing up.

What are your thoughts about that?

A    Again, going back to the previous, that might be. It would be interesting to hear to see how that might have influenced the behavior, but I don't think that I would consider it as a reason to say yes to special issue number three right now, but I would consider it.

Q    Okay.  It wouldn't be -- You would be glad to wait and hear about it.  But as you sit here, if I'm understanding you correctly, it would not be a consideration in how you would answer that question.

A    Correct.

Q    Is that fair to say?

A    Yes.

Q    Let me take a look at my time, Ms. Stockton.  I think I may be getting reasonably close to running out here. Let me just make sure I haven't.

You understand, Ms. Stockton, that we are allowed to give examples and hypotheticals in order to try to explain or illustrate some concept in the law, but you're not to take any of the hypotheticals or examples that we use as anything to do with this case or as indicating anything other than just an illustration; you understand that?

*Anne B. Meredith*
Certified Shorthand Reporter

A    Yes, I do.

Q    Is there anything that -- Are you waiting to hear about the case where the dope dealer goes down and kills the person and gives his money to charity before you could consider mitigating evidence in a case?

A    I would hope so, yes.

Q    Okay.  Got you.  I think, Ms. Stockton, I've pretty much covered everything that I wanted to cover.

Do you have any questions for me?

A    No, sir.

Q    Thank you very much.

THE COURT:  Thank you.  All rise, please, for Ms. Stockton.  You'll step outside and you will be coming right back in, Ms. Stockton.

(Prospective Juror Stockton exits the courtroom).

THE COURT:  In the presence of Mr. Broadnax, what says the State of Texas?

MS. HANDLEY:  We have no challenges.

THE COURT:  Mr. Broadnax?

MR. PARKS:  Yes, your Honor, we would challenge the juror.

You know, first, Judge, I would like for the Court to take into consideration the things that she has said in her questionnaire that indicate that Ms. Stockton

is certainly not a person who is likely to be fair and impartial in a case of this kind.

She would be much too anxious, I believe, to execute somebody to save a few bucks. And that certainly is a consideration that I believe, under Jones and Treadgill, the Court ought to give consideration to.

In addition to that, I am very, very concerned with any juror who tells us that they have to work almost a full day after they have worked as a juror all day here and would have to work over the weekend. I think that surely, with as many jurors as we have brought down, we could manage to find jurors who could give their full attention.

And I'm not accusing her of lying when she says that she believes that she could do it. I think she probably believes she can do it. But she's never sat on a jury of this kind. She doesn't know the kind of work that we expect out of jurors and the kind of attention that we expect out of jurors.

And I think it's doing the entire criminal justice system a disservice, in addition to Mr. Broadnax, to force a person on a jury who would have those kinds of problems.

In addition to all of those, we submit the juror for the reason that she absolutely cannot and will not give consideration to any of the mitigating evidence that

this defendant would proffer during the course of this trial.

She will not consider young age. She will not consider a follower rather than a leader. She will not consider voluntary intoxication. She will not consider background. She will not consider the manner in which he was raised. The very things that special issue number three call upon her to give consideration to.

Now, I'm not -- I didn't pin her down to would she consider it to be mitigation. I didn't try to pin her down as to what weight she would give it. She said she just would not consider those things in answering special issue number three. And the law expects that Mr. Broadnax would be entitled to a jury who will at least consider special issue number three.

We are entitled to all of those things. She is disqualified under the teachings of Lockett v. Ohio, Morgan v. Illinois, Eddings versus Oklahoma, and under the eighth, fourteenth, fifth and sixth amendments of the constitution.

THE COURT: Thank you. It will be denied.

Ask her to return, please.

(Prospective Juror Stockton returns to the courtroom).

THE COURT: Please be seated, folks.

Ms. Stockton.

PROSPECTIVE JUROR STOCKTON: Yes, sir.

THE COURT:  You have been accepted as a qualified juror.  Now, let me tell you what that means.

We are in the process of qualifying some, give or take, fifty jurors.  We anticipate being able to do that certainly within week after next or the week after that.

When that's done, you will be notified.  And then we are going to select the twelve actual trial jurors from that pool of qualified jurors.  The day that's done, you'll be contacted by the judge's coordinator.  And is your address, telephone number still correct on there?

PROSPECTIVE JUROR STOCKTON:  Yes, it is.

THE COURT:  The same person who told you to be here will call you and tell you whether you're on the jury or not.

PROSPECTIVE JUROR STOCKTON:  Yes.

THE COURT:  And that day you will know whether or not you're on the actual jury.  But I want you to assume, for outside influence, for media purposes, that you very likely will be on the jury as far as not getting any outside information.

PROSPECTIVE JUROR STOCKTON:  (Nods head).

THE COURT:  Newspaper, TV, Internet, friends, because I don't want you to be inadvertently disqualified.

The sheriff is going to give you the card of the coordinator in case anything should occur in your

personal life between now and then, and should it happen, that would affect your jury service.

PROSPECTIVE JUROR STOCKTON: Sure.

THE COURT: When that happens, give her a call and then we will deal with it.

It's been a pleasure meeting you. Good luck to you, ma'am.

PROSPECTIVE JUROR STOCKTON: Thank you, sir.

(After a recess, defendant present).

THE COURT: How about Mr. Ferris?

(Prospective Juror No. 740, Peter Ferris, enters the courtroom).

THE COURT: Good afternoon, sir. Please be seated.

PROSPECTIVE JUROR FERRIS: Thank you.

THE COURT: Please be seated, counsel.

Mr. Ferris, I'll say good afternoon to you again. My name is Webb Biard. I'll be with you this afternoon during the jury selection process.

The Presiding Judge of this Court is Michael Snipes. Judge Snipes you met at that large general session.

PROSPECTIVE JUROR FERRIS: Yes, sir.

THE COURT: Should you be selected as a juror, Judge Snipes will actually preside over the presentation of the evidence.

In that regard, do this for me, please. Raise your right hand.

(Prospective Juror Ferris sworn).

THE COURT:  Also I want to introduce to you at this time Gordon Hikel.

MR. HIKEL:  Good afternoon, sir.

THE COURT:  Andrea Handley.

MS. HANDLEY:  Good afternoon.

THE COURT:  They represent Dallas County, the State of Texas.

Further to my right is Brad Lollar.

MR. LOLLAR:  Good afternoon.

THE COURT:  Doug Parks.  Keri Mallon.

MS. MALLON:  Hi.

THE COURT:  And they represent Mr. James Broadnax.  Mr. Broadnax.

PETER FERRIS, having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    To give you a little idea of what we are doing, sir, we are in the process of qualifying some fifty prospective jurors.  Once that's done, the actual twelve actual trial jurors will be selected from that pool of the qualified jurors.

We anticipate that will be done in about two or three weeks. The day that's done, you will not be required to be here that day. The day that's done, those who are selected and those who are not will be notified by the same person who notified you to be here today.

A    Okay.

Q    But I will tell you today before you leave here whether or not you have been accepted as a qualified juror.

A    I see.

Q    Now, from hearing Judge Snipes' remarks and from filling out the questionnaire and being here today and reading the pamphlet, as you sit here now, are you aware that this is a capital murder case?

A    Yes, I am.

Q    You understand the State of Texas is seeking the death penalty?

A    I do.

Q    Because of that, and I have read some of your questionnaire, and I see that your wife works for Judge Hartman.

A    Yes, sir.

Q    So, you already have an idea that we have to strictly adhere to all the rules, the laws, the statutes, the principles.

A    Yes, sir.

Q    And, so, we'll be adhering to the law of the United States and Texas on capital murder cases.  And you will understand that, I'm sure.

A    Yes, sir.

Q    One of them is that you have the opportunity to talk to us one on one.

Now, if someone if found guilty of capital murder, there's only two possible punishments.  That's either life in prison without parole or death.  And when I say life in prison without parole, I mean life in prison without parole.

There was a time in the past where if someone was found guilty of capital murder and given life in prison, there would come a date, I think it was thirty years, forty years, when they would become eligible for parole.  That didn't mean they were going to get it, but they would become eligible.

That's no longer the law in Texas.  Three or four years ago that law changed.  If you get life in prison, you're going to serve life in prison.  So, you've got those two possible punishments.

A    Right.

Q    Now, have you ever served on a criminal jury before?

A    No, sir, I have not.

Q    All right.  That's no problem.  Did you read that pamphlet?

A    Yes, sir, I did.

Q    Did that help you just a little bit?

A    Yes, it did.

Q    Good.  All criminal jury trials in Texas, be it theft of a bycicle or a capital murder case, are tried in two parts.  The first part is guilt/innocence.  If a person is found not guilty of any offense or a lesser included offense, the trial is over, you go home.  If he's found guilty, then you go into the punishment phase.

Knowing what I've told you and what I think you've read, if somebody is found guilty of capital murder, then you go into the punishment phase in which you will hear evidence, and then you can also consider what you heard in the first part of the trial.

But you can hear evidence about the person on trial, good deeds, bad deeds, anything that either side thinks will help you decide what's the right punishment.  And you know it's either going to be life imprisonment or death.

A    Right.

Q    But in setting punishment, the jurors or the jury do not write down on a blank line life imprisonment or death.  They answer those three special issues.  They answer them

yes or no, and depending on the answers determines the punishment.

And one of the things that the attorneys are going to spend quite a bit of time with you this afternoon is if you find someone guilty of capital murder, which is intentionally causing the death of an individual -- In this situation, the indictment says robbery. And there's about fifteen different ways that you can commit capital murder.

If you found someone guilty of capital murder, could you still go into the punishment phase, listen to the evidence, then after all the evidence is presented, go back and answer the special issues either yes or no, depending on the evidence, and if it results in a death sentence, so be it, if it results in a sentence of life in prison, so be it.

That's what they are going to be talking to you about.

A    I understand.

Q    And some people can, some people can't. The only thing we have the right to expect of you is if you tell us how you honestly feel, bottom line. Whatever you say is correct as long as you're telling us straight from the way you feel.

Now, did you read the pamphlet of when the trial is going to be?

A    Yes, sir. It's supposed to start August 10th.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    That's right.  Now, you took a long time filling out that questionnaire, and we know it.  But it wasn't some idle exercise.  The attorneys have read it, and I've read your questionnaire but, frankly, not near as intently as the attorneys.

But I did notice this.  And I am going to hand this to you in a minute.  That on page twelve, at the top of the page, do you have any projects in progress at your job that might affect your ability to concentrate if you were to serve as a juror on this case for a week or more?  And you marked no, and you said, not at this time, but I will have to work at night to stay caught up.

All right.  Let me tell you what the law is.  And I can't excuse you for economic reasons under the law or because it might prove a hardship on you, but we try to be reasonable people.

And here's the law.  If you -- And you see where the judge talks about up to two weeks.

A    Yes, sir.

Q    All right.  That's going to be Monday through Friday, 9:00 to 5:00.  There will be a break in the morning, a break in the afternoon.  There will be a lunch break.

The jury would not have to stay together overnight unless and until, there is a possibility that if you went into deliberations and you went late into the night,

you hadn't reached a verdict yet, became fatigued, you would all be taken as a group to a fine hotel, individual private rooms, spend the night, then come back as a group the next morning, to avoid any outside influence.

A    Okay.

Q    That will give you an idea of how the procedure will go, and Judge Snipes frankly just told you about that in his pamphlet.  I tell you all this to ask you this.

Does your work condition, knowing that that's the way we anticipate the trial procedure to go, would your work condition, if you were on this jury, required to serve on this jury, would your work situation prevent or substantially impair your ability to sit as a juror in this case?

A    No, sir.  I work for IBM and I have given my managers a heads up that this might happen, and they understand it.

Q    Okay.

A    You have to do what you have to do.

Q    All right.  Now, you've read the pamphlet?

A    Yes, sir.

Q    You've heard my brief remarks, and you filled out the questionnaire.  And knowing the length of the trial and the schedule of the trial, as you sit here now, do you know of any reason why you can't sit as a juror in this case?

A    I don't know.  That's up to them, but --

Q    I understand.

A    But I think I just answered the question.  I don't have any problem with anything that I put on the piece of paper.

Q    Okay.  Well, is there anything you think, other than what you put on this paper, anything that might affect your jury service that you want to tell us about before we -- By the way, we are going to talk to you for about forty-five minutes from the State, forty-five minutes from the defense.

Is there anything you think that they should know concerning your ability to sit on this case?  Be glad to hear it.  I mean that's actually what this is all about.

A    Yes, sir, I understand.  I don't have any problem.  As I said, I don't have any problem with anything.  I brought a piece of paper.  I just think this is a highly publicized trial and, you know, it was in the paper.

And I will say, just going into it, is that I just came from a scout camp, and when I'm gone, my wife saves the papers up.  This took place about that same time last year, so I was reading -- I read the paper every day and I read everything kind of in a lump at the end, and to include, you know, it was pretty clear how everything was in the paper.

And, so, beyond that, you know, I know I have

to be open minded for everything that's being presented.

Q    All right.

A    But it was pretty well publicized.

Q    I think the attorneys are going to talk to you about this.  But I think the question would be, from what you've read or heard or seen from any outside sources, have you already established a conclusion in your mind as to the guilt or innocence of the defendant?

A    Yes, sir, I think I have.

Q    All right.  You think that would affect your -- would affect your verdict in this case?

A    I have to be honest and say that it's, you know, it's there.  I'm not going to -- I can't unring that bell.

Q    All I want you to do is be honest with me.

A    I can't unring that bell.  But I'm, you know, if there is another side to it that wasn't public information, then I can only go off what was in the paper or what was on the news.  But that is in my head.

Q    Have you formed a conclusion that he's probably guilty?

A    Yes, sir.

THE COURT:  All right.  I'm going to excuse you on my own motion.  Thanks a lot for telling us that.  Okay?

PROSPECTIVE JUROR FERRIS:  You're welcome.

THE COURT: Okay. Do you mind telling me, what's Judge Hartman's condition?

PROSPECTIVE JUROR FERRIS: My wife just had lunch with him last Friday. He's lucid. He has good days and bad. He's lucid, but he does have times when, if he doesn't see you on a regular basis, he doesn't really remember. He remembers her as his court coordinator actually better than he remembers his son right now.

THE COURT: Oh, okay. I was going to say something, but that's okay. He wouldn't probably remember me.

Okay. All right. Thank you. Thank you, sir.

MS. HANDLEY: Thank you, sir. Appreciate it.

THE COURT: Court's in recess until 9:00 o'clock.

(Court adjourned for the day).

*Anne B. Meredith*
Certified Shorthand Reporter

THE STATE OF TEXAS    (

COUNTY OF DALLAS        (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 29th day of June, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volumes 29 through 32) is $3,875.00 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 28th day of December, 2009.

Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter