REPORTER'S RECORD    *AP-76207*

VOLUME 30 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | ( | IN THE CRIMINAL DISTRICT |
| VS. | ( | COURT NUMBER SEVEN |
| JAMES GARFIELD BROADNAX | ( | OF DALLAS COUNTY, TEXAS |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

INDIVIDUAL VOIR DIRE EXAMINATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 30th day of June, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

**Anne B. Meredith**
Certified Shorthand Reporter

A P P E A R A N C E S:

HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas  75207-4313
Telephone No. 214 653-3600

BY:  MS. ANDREA HANDLEY, SBOT No. 08898800
     MS. ELAINE EVANS, SBOT No. 24032880
     MR. GORDON HIKEL, SBOT No. 00787696
     Assistant District Attorneys

                APPEARING FOR THE STATE OF TEXAS


     MR. BRADLEY LOLLAR, SBOT No. 12508700
     Attorney at Law
     1700 Commerce, Suite 450
     Dallas, Texas  75201
     Telephone No. 214 384-8178

     MR. DOUGLAS PARKS, SBOT No. 15520000
     Attorney at Law
     321 Calm Waters Lane
     Holly Lake Ranch, Texas  75765
     Telephone No. 903 769-3120

     DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
     133 N. Industrial Blvd., LB 2
     Dallas, Texas  75207-4399
     Telephone No. 214 653-3550

BY:  MS. KERI MALLON, SBOT No. 24049165
     Assistant Public Defender

                APPEARING FOR THE DEFENDANT


*Anne B. Meredith*
Certified Shorthand Reporter

CHRONOLOGICAL INDEX - VOLUME 30

|  |  |  |  | PAGE |
|---|---|---|---|---|
| Proceedings - June 30, 2009 |  |  |  | 5 |
| VENIRE PERSON | COURT | STATE | DEFENSE |  |
| PATRICIA HAY | 6 |  |  |  |
| Excused by the Court |  |  |  | 10 |
| MELVIN SMITH | 12 |  |  |  |
| Excused by Agreement |  |  |  | 18 |
| TANYA SANDERS |  |  |  |  |
| Excused by Agreement |  |  |  | 20 |
| AGWANA LONG | 22 | 27 | 70 |  |
| State's Challenge |  |  |  | 97 |
| Court's Ruling |  |  |  | 99 |
| LESLIE JONES | 102,167 | 107 | 147 |  |
| Defendant's Challenge |  |  |  | 168 |
| Court's Ruling |  |  |  | 169 |
| Adjournment |  |  |  | 171 |
| Reporter's Certification |  |  |  | 172 |

**Anne B. Meredith**
Certified Shorthand Reporter

ALPHABETICAL WITNESS INDEX - VOLUME 30

|  |  |  |  | PAGE |
|---|---|---|---|---|
| VENIRE PERSON | COURT | STATE | DEFENSE | |
| HAY, PATRICIA | 6 | | | |
| Excused by the Court | | | | 10 |
| JONES, LESLIE | 102,167 | 107 | 147 | |
| Defendant's Challenge | | | | 168 |
| Court's Ruling | | | | 168 |
| LONG, AGWANA | 22 | 27 | 70 | |
| State's Challenge | | | | 97 |
| Court's Ruling | | | | 99 |
| SANDERS, TANYA | | | | |
| Excused by Agreement | | | | 20 |
| SMITH, MELVIN | 12 | | | |
| Excused by Agreement | | | | 18 |

P R O C E E D I N G S:

(Defendant present).

THE COURT:  Are we ready for Ms. Hay?

(Prospective Juror No.894, Patricia Hay,

enters the courtroom).

THE COURT:  Good morning, Ms. Hay.  Thank you very much.  Please be seated.

PROSPECTIVE JUROR HAY:  Hi.

THE COURT:  Be seated, folks.

Ms. Hay, I would like to introduce myself to you.  My name is Webb Biard and I will be with you this morning during the jury selection process.

The Presiding Judge of this Court is Michael Snipes.  That's who you met at the large panel.  Should you be selected as a juror in this case, Judge Snipes will actually preside over the trial.  This will be our only opportunity to be together, for whatever that's worth.

Do this for me, please.  Raise your right hand.

(Prospective Juror Hay sworn).

THE COURT:  Thank you, Ms. Hay.

Ms. Hay, also at this time I would like to introduce to you Gordon Hikel.

MR. HIKEL:  Good morning, ma'am.

THE COURT:  Andrea Handley.

MS. HANDLEY:  Good morning.

THE COURT:  They represent Dallas County and the State of Texas.

Further to my right is Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  Doug Parks.  Keri Mallon.

MS. MALLON:  Hi.

THE COURT:  And they represent Mr. Broadnax, Mr. James Broadnax.

PATRICIA HAY,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    On behalf of everybody, we appreciate you being here and taking time to participate in your justice system. Also, we appreciate you filling out this questionnaire.  I know it took a long time to do it, but it invariably ends up saving you more time -- it will today -- than it did to fill it out.

I promise you it wasn't some idle exercise. The attorneys have read it in detail.  And they have asked me a couple of points for me to address initially.

And let me just refer to your questionnaire, and I go to page twelve.  And it's says, do you have any projects in progress at your job which might affect your

ability to concentrate if you were to serve as a juror on this case for a week or more?

Did you see where Judge Snipes has said in the pamphlet that the trial will start August the 10th and last up to two weeks?

A    (Nods head).

Q    Well, we pretty well, for the sake of our conversation, agree that it will last two weeks.  It might be less, it might be a little more.  But for the sake of our conversation, we are saying two weeks.

You answered, July and August are extremely busy at work as our fiscal year ends August 31st.  We have many tasks that are required to be finished by then.

And then I go to page seventeen and it says, would you feel -- how would you feel about being chosen as a juror in this case?  It sounds very interesting and I would like to do it, but it is very bad timing for my job.

I'll tell you, I cannot excuse jurors for economic reasons alone.  But believe it or not, we are practical people and sometimes serving poses a more severe hardship on somebody than it would other people, or at certain times it imposes a hardship that it wouldn't impose at other times.

So, let me ask you some questions.  And what I want you to do is, if you will, please just be straight up

with me.  And whatever you say I'm going to accept and so will the attorneys.

Assuming that you're on this jury starting August the 10th and it lasts two weeks, that would be Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, be a lunch break.

The jury would not have to stay together overnight unless and until you were deliberating your verdict -- and you know what that means?

A     (Nods head).

Q     -- and you went late into the evening and became fatigued, there is a possibility that the jury would be taken together -- it's called sequestered -- to a fine hotel, county expense, where you would have your own individual rooms, and then come back the next morning together, to avoid any outside influence.  That may or may not happen, but you might assume for a night or two nights that it's a possibility.

If that did happen, the judge would give you advance notice like, day after tomorrow, bring an overnight bag.  And that's the way that will work.

So, I give you that information.  And then going back to your questionnaire, and you just tell us, if you were on this jury during that length of time under those procedures, do you think that that would prohibit or

substantially impair your ability to sit and listen and concentrate on the evidence as it is presented?

A    Yeah, I do.  Even though I'm usually very good at compartmentalizing my life, you know, it's like when I get to work, I leave everything else behind and I concentrate on the task at hand.  I'm very good at that.

But my job, you know, is very important to me.  There's only two of us right now that are fully trained in going through the year-end process.  We have got a couple of people that we are training, but sometimes that's more work than it is to actually do it yourself.

And I know that I would be concerned about what was going on at work.  As it is, we normally work fifty to sixty hours a week, during August especially.  I'm set up at home, you know, where I can work from home.  A lot of times I'll go home and then work for three or four hours at night from home just trying to get through everything.

So, I think it would definitely be hard to be gone during August.  They don't let us take any kind of vacation.  We are discouraged from being sick during that time.  You know, they kind of jokingly say, call in dead but don't call in sick.  So, it's kind of a tough time at work.

THE COURT:  Well, I tell you, you know, you saw that there were like 600, 800 people there.  We are talking to a very small percentage of those people.  And the

attorneys were very impressed with your questionnaire. And I think you would have made a fine juror, but we understand. And you will be excused with the agreement of counsel.

PROSPECTIVE JUROR HAY:  Thank you.

THE COURT:  Good luck to you.

PROSPECTIVE JUROR HAY:  I would like to say I've always thought -- I absolutely love staying in hotels. I love it, I love it, I love it, I love it.  So I've always been intrigued, you know, when juries would be sequestered. Oh, I'd like that part of that.

MS. HANDLEY:  I don't think you would like that we don't give you a TV or radio, though.

PROSPECTIVE JUROR HAY:  Oh, well.  As long as I have a book, I'm happy.

MR. LOLLAR:  Thank you, Ms. Hay.

MS. HANDLEY:  Thank you, ma'am.

PROSPECTIVE JUROR HAY:  Thank you very much.

(Prospective Juror Hay excused from the courtroom).

THE COURT:  Juror excused on the Court's own motion.

Melvin Smith.

(Prospective Juror No. 903, Melvin Smith, enters the courtroom).

THE COURT:  Good morning, sir.

PROSPECTIVE JUROR SMITH:  Good morning.

THE COURT:  Please be seated, Mr. Smith.

Be seated, folks.

Mr. Smith, on behalf of everybody, appreciate you being here today.

PROSPECTIVE JUROR SMITH:  Thank you.

THE COURT:  And being on time.  That's certainly something I admire.

My name is Webb Biard and I will be with you this morning during this part of the voir dire selection process.  The Presiding Judge of this Court is Michael Snipes.  That's who you met at the large panel.

Should you be selected as a juror, Judge Snipes will actually preside over the trial, for whatever that's worth.

Also we have Andrea Handley.

MS. HANDLEY:  Good morning.

PROSPECTIVE JUROR SMITH:  Good morning.

THE COURT:  Elaine Evans.

MS. EVANS:  Good morning.

THE COURT:  They represent Dallas County and the State of Texas.

Further to my right is Brad Lollar and Doug Parks.

MR. LOLLAR:  Good morning.

MR. PARKS: Hi.

THE COURT: Keri Mallon. They represent Mr. Broadnax, Mr. James Broadnax.

PROSPECTIVE JUROR SMITH: Okay.

THE COURT: Do this for me before we go any further, please.

(Prospective Juror Smith sworn).

MELVIN SMITH,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Sir, we appreciate very much you filling out your questionnaire.

A    Okay.

Q    The attorneys have read it. It's going to save you a lot of time here today. We are going to be asking you questions about your questionnaire and see if these are still basically the way you feel about the process.

I'm going to ask the court reporter, please, to hand that to you.

All right, sir. Now, from reading the pamphlet, from hearing Judge Snipes' remarks, and from filling out the questionnaire, as you sit here now, you are aware that this is a capital murder case.

A    Yes.

Q    You understand the State of Texas is seeking the death penalty.

A    Yes.

Q    Because of that, there are some very specific rules and procedures that we must follow, and I think you'll understand that.

Did you have an opportunity to read that pamphlet?

A    Yes, sir.

Q    Did it help you a little bit understand the process?

A    Some.  I'm just court illiterate.

Q    Sir?

A    Some it did.  I'm just court illiterate.  I mean I'm kind of confused, yeah.

Q    Well, don't worry about that.

A    Okay.

Q    It's our job to explain to you what the law is.

A    Right.

Q    If someone is found guilty -- I'm just going to talk to you briefly and then the attorneys will talk to you.

A    Okay.

Q    If someone is found guilty of capital murder, there's only two possible punishments, life in prison without parole or death.  And that decision, if the person is found

guilty of capital murder, must be made by the jury.  It cannot be made by the judge.  That's a jury's decision in Texas.

And when I say life in prison without parole, I mean life in prison without parole.

A   Uh-huh.

Q   There was a time when you could eventually get to be eligible for parole on a capital murder case, but that's not the situation any more.  So, it's either life in prison without parole or death if the person is found guilty.

Are you with me on that?

A   Yes.

Q   Have you ever served on a jury before?

A   Yes, I did, October of '07.

Q   What kind of case was it?

A   It was a DWI.

Q   All right.  Did the jury set punishment in that case?

A   We didn't have to.  They had punishment but we didn't have to stay for the punishment.

Q   The judge set punishment.

A   Yes, sir.

Q   That's the way most DWI cases are done.  But that can't be done in a capital murder case.  The punishment must be set by the jury if the person is found guilty.

A    Right.

Q    Now, did you learn from that experience that the trial was actually in two parts? And by that I mean there was the part you heard, that's whether he's guilty or not.

A    Uh-huh.

Q    That's called the guilt/innocence phase. And then there is the punishment phase.

A    Right.

Q    And they are separate. They are separate parts.

A    Right.

Q    That's the way all criminal jury cases are tried, be it a DWI or a capital murder case.

A    Right.

Q    Two parts. Found not guilty, everybody goes home. Found guilty, then you go into this punishment phase.

A    Right.

Q    That's the way a capital murder case will be tried.

    Now, let me tell you, from reading that pamphlet, you see that Judge Snipes has told us that this trial will start August the 10th.

A    Uh-huh.

Q    Remember that?

A    Yes.

Q    It's going to last two weeks, Monday through Friday, 9:00 to 5:00. Be a break in the morning, break in

the afternoon, be a lunch break.  The jury will not have to stay together overnight unless and until you are deliberating your verdict.  And you know what that means because that's what you did, you deliberated when you found the person guilty of DWI.

A    Right.

Q    That's deliberation.  So, if you were deliberating your verdict and hadn't reached a verdict, went late into the night and became fatigued, there is a possibility that the jury would all be taken together as a group to a fine hotel, county expense, individual private rooms, where you would spend the night, and then come back together as a group in the morning, to avoid any outside influence.

I tell you that and give you the dates and the length, and after you've read the pamphlet and filled out the questionnaire and hear me talking just a little bit, as you sit here now, are you aware of any reason why you can't sit as a juror in this case?

A    Well, I have a medical problem that I can't sit long.  I have a problem with that.

Q    You want to tell us about that?

A    Well, I have a severe degenerative joint disease in both knees and arthritis real bad.  I'm a disabled vet.

Q    Are you?

A    Yes, sir.

Q    Well, my thanks go out to you.

A    Thank you.

Q    Do you think that would affect your ability to sit in this trial?

A    I do.

Q    Sir?

A    Yes, I do.

Q    Other than that, the judge would give you a break, you know, every hour or so, or let you stand up.  If you would be a little bit more specific about why you think you couldn't.

A    Well, it's the pain that I go through, sir.

Q    Are you taking medication for the pain?

A    Yes, I am.

Q    Do you mind -- It's probably in the questionnaire and I apologize.  Do you mind just stating for the record what medication you're under?

A    I'm on ibuprofen.

Q    Okay.

A    Yes, sir.

Q    Does that affect --

A    And I am due for a total replacement, but I have been prolonging that since '82.  And because of the age, I'm 49 now --

Q    Yeah.

A       -- and now I'm having to be put on a list to have it done.

Q       Okay.  Any other reason why you think you couldn't sit except for your arthritis?

A       No, I don't.

THE COURT:  Well, the attorneys have agreed to excuse you, sir.

PROSPECTIVE JUROR SMITH:  Okay.

THE COURT:  Okay.  For medical reasons.  Thank you.

PROSPECTIVE JUROR SMITH:  Thank you.

MS. HANDLEY:  Thank you so much for your time, sir.

PROSPECTIVE JUROR SMITH:  All right.  Thank y'all.

THE COURT:  The Court's going to excuse --

PROSPECTIVE JUROR SMITH:  Sir?

THE COURT:  You're being excused for medical reasons.  Watch that step.

(Prospective Juror Smith excused from the courtroom).

THE COURT:  Let's take a five minute break.

(After a recess, defendant present).

THE COURT:  All right.  Ladies and gentlemen. Let the record reflect we are in open court

in the presence of Mr. Broadnax who is here in open court.

And our next scheduled juror is Tanya Sanders. And it's now five till 10:00. Ms. Sanders was notified to report at 8:30, and she is yet to arrive.

I'm going to ask the bailiff to please raise your right hand, sir.

(Bailiff sworn).

THE COURT: State your name for the record, please.

BAILIFF MARTINEZ: Barney Martinez.

THE COURT: And Sheriff Martinez, what is your position with this court?

BAILIFF MARTINEZ: I'm a bailiff in this court.

THE COURT: And the primary duty at this time is to assist the jurors that arrive for voir dire; is that correct?

BAILIFF MARTINEZ: Yes, sir.

THE COURT: All right. What have you learned about Tanya Sanders?

BAILIFF MARTINEZ: I've called her cell phone numerous times. She does not answer. I called her house number. She did not answer. I called her work number and the deputy that answered the phone says that she works on the midnight shift and she is not working during this time.

THE COURT: You called the deputy?

BAILIFF MARTINEZ: Yes.

THE COURT: Oh, okay. I see she works for the Dallas County Sheriff's Department.

BAILIFF MARTINEZ: Yes, sir.

THE COURT: Is that your understanding?

BAILIFF MARTINEZ: Yes, sir.

THE COURT: All right. What says the State of Texas?

MS. HANDLEY: We have no objection to releasing this juror and moving on.

MR. LOLLAR: And, your Honor, we would agree.

THE COURT: All right. That will be approved by the Court and she will be excused.

MR. LOLLAR: Judge, could we go ahead and put something on the record we forgot to put on there yesterday?

THE COURT: Yeah.

MR. LOLLAR: In regards to Juror number 824, Jennifer Stockton, after our voir dire we submitted the Juror, and the Court held her to be qualified.

Would the record please reflect that we find her to be an unacceptable juror.

THE COURT: It will.

MR. LOLLAR: Thank you, Judge.

THE COURT: Yes, sir.

See y'all at 1:15.

(After the lunch recess, defendant present).

THE COURT:  We ready?  Everybody ready?

MR. PARKS:  Ready.

MR. HIKEL:  Ready.

THE COURT:  Ready for Ms. Long.

(Prospective Juror No. 868, Agwana Long, enters the courtroom).

THE COURT:  Good afternoon, Ms. Long.

PROSPECTIVE JUROR LONG:  Hello.  How are you?

THE COURT:  Thank you so much for being here. If you will have a seat, please.

PROSPECTIVE JUROR LONG:  Okay.

THE COURT:  Please be seated, counsel.

Ms. Long, I want to introduce myself to you. My name is Webb Biard and I will be with you this afternoon during the jury selection process.

PROSPECTIVE JUROR LONG:  Uh-huh.

THE COURT:  If you remember, the Presiding Judge of this Court is Michael Snipes, and Judge Snipes will actually preside over the trial should you be selected as a juror in this case.  That's the judge you met in the large group.

PROSPECTIVE JUROR LONG:  Yes.

THE COURT:  Do this for me before we go any further, please.

(Prospective Juror Long sworn).

THE COURT:  Okay.  Also, before we go any further, I want to introduce to you at this time Elaine Evans.

MS. EVANS:  Good afternoon.

PROSPECTIVE JUROR LONG:  Hello.  How are you?

THE COURT:  And Gordon Hikel.

MR. HIKEL:  Good afternoon, ma'am.

THE COURT:  They represent Dallas County and the State of Texas.

Further to my right is Doug Parks.

MR. PARKS:  Good morning, ma'am.

THE COURT:  Keri Mallon.  And they represent Mr. Broadnax, James Broadnax.  Mr. Broadnax.

AGWANA LONG,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    What we are in the process of doing, Ms. Long, is qualifying some fifty jurors, give or take a couple.  When that's done, the actual trial jury, the twelve men and women who are going to actually be on the jury will be selected from that group of fifty qualified jurors.  So, when you leave here today, I will tell you here in open court whether or not you are a qualified juror or not.

A    Okay.

Q    And then that decision of whether or not you'll be on the trial will be made in a couple of weeks, and at that day you will be called by the same person who called you to report today and told whether or not you're on the jury or not on the jury.  Okay?

A    Okay.

Q    Did you have an opportunity to read that pamphlet?

A    Yes, I did.

Q    All right.  Did that help you understand this procedure a little bit better?

A    Just a little bit.

Q    Okay, good.  From hearing Judge Snipes' remarks and filling out your questionnaire, reading the pamphlet, being here today, as you sit here now, are you aware that this is a capital murder case?

A    Yes.

Q    Do you understand the State of Texas is seeking the death penalty?

A    Yes.

Q    Because of that, there's some very specific rules, procedures and regulations that we all must follow, so one of those is that you have an opportunity to talk to us on a one on one basis.

In that regard, one of the attorneys from the State and from the defense team will talk to you for up to

forty-five minutes.  So, this process will take about an hour and a half.

A    Okay.

Q    And if you need to take a break during that time or stop for any reason, you just let me know if you need water, Coke, or whatever.

And I want to assure you that these are good lawyers, but they are also, more importantly to me, good people.  It's out of the question anybody is going to be intentionally embarrassed or intimidated.

A    Okay.

Q    And I want to also assure you that this is not some legal pop quiz in which we try to find out what twelve people know the most law and then they are on the jury. Knowledge of the law doesn't have anything to do with being a good juror because the lawyers are going to explain the law to you.

And then once you understand the law, you'll be asked, now that you know that's the law, can you follow the law and perform your duties as a juror and then base your verdict just on the evidence you hear in this courtroom? Some people can, some people frankly cannot.  In other words, they have already got their mind made up what they are going to do one way or the other.  And that would not be a qualified juror.

And now, frankly, is your opportunity to decide whether or not you think that you would be able to follow the law and base your verdict just simply on the evidence.

A    Okay.

Q    Now, you do understand that this is a capital murder case.

A    Yes.

Q    The State's seeking the death penalty.

A    Yes.

Q    If someone is found guilty of capital murder, there's only two possible punishments; that's life in prison without parole and death.

A    Yes, sir.

Q    And when I tell you life in prison without parole, I mean life in prison without parole.

There was a time when life in prison, in a capital murder case, that the person, should he be found guilty of capital murder and given life in prison, there was a time that person would eventually become eligible for parole. Didn't mean they would get it, but they would become eligible for it. They would come up before the parole board.

That's no longer the case. Life in prison means life imprisonment.

A    Okay.

Q    Now, in reading that pamphlet, did you see where Judge Snipes tells us the trial is going to start --

A    Yes.

Q    -- August the 10th?

A    Yes, sir.

Q    It's going to last two weeks.

A    Yes.

Q    That's Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, lunch break.

The jury will not have to stay together overnight unless and until you are deliberating on your verdict and you went late into the night and became fatigued and unable to concentrate any more.

You would be all taken, if that's what the jury decided they wanted to do, would be taken to a fine hotel at county expense, individual private rooms. They would spend the night to avoid any outside influence on their verdict.

Have you served on a criminal jury before?

A    No, sir.

Q    Okay. But you do know what I mean when I say deliberate?

A    Yes, sir.

Q    Okay. And that has happened before. I have had it happen before that the jury did have to stay overnight.

But if that situation should arise, you would be given plenty of advance notice. In other words, tomorrow morning bring your overnight bag because you might be required to spend the night together. The judge will tell you that.

A    Okay.

Q    All right. I give you that information to ask you a couple of questions. Knowing that that's the way the trial court proceeds and the time frame and the length, and looking back on filling out your questionnaire and thinking about coming here today, as you sit here now, are you aware of any reason why you cannot sit as a juror in this case?

A    No, sir.

Q    Okay, great.

THE COURT:    All right. Without anything further from me, I'm going to reintroduce you to Elaine Evans who is going to talk to you on behalf of Dallas County.

MS. EVANS:    Thank you, your Honor.

THE COURT:    Uh-huh.

EXAMINATION

BY MS. EVANS:

Q    Good afternoon again, Ms. Long.

A    Hello. How are you?

Q    Good, thanks. I wanted to talk to you a bit. First what we are going to do is we're going to talk about

some of your answers in your questionnaire.  Okay?

A    Okay.

Q    And then we are going to move on to talk a little bit about the law.  But as the judge told you, you're not going to be required to have a pop quiz at the end of this or even remember it if you were to serve as a juror when you come back here.  Okay.  Because the judge is going to give you the law if you were to serve as a juror in this case, and it comes in the form of the Court's charge.

And you were absolutely right, hit the nail on the head whenever you say on page eleven of your questionnaire that the judge knows the law, the jury is just there to implement the law the judge gave them and not go off emotion.

You were -- You hit it on the head because everything that you do in the courtroom is about the law and the evidence.  And that's what, if you were to serve as a juror in this case, or any criminal case, for that matter, you will take an additional oath, and that is to render a true verdict based on those two things, the law and the evidence.

And, so, I was actually shocked to see that you hadn't served as a juror before because you hit it dead on the head.  Do you watch legal shows on TV or something?

A    I have.

Q    Good.    That must be where it came from.

But I think it's important to recognize, even in answering these special issues in the punishment phase, you'll notice that everything says, do you find from the evidence, and taking into consideration all of the evidence. And in the guilt/innocence phase everything is based on the evidence.    Okay.

And I bring that up because we have talked to individually over a hundred jurors just like you that all came down from that big panel, and people have had a wide range of emotions or interests and concerns, or whatever, based on the type of case this is, being a capital murder, in a capital murder where the State is seeking the death penalty.

You know, some people come in and they are 100 percent in favor of the death penalty, so much so that they would do it themselves here on the courthouse steps. And they are not qualified as jurors, I would submit to you, because they have a bias too much so in favor of implementing the death penalty at all costs.    Okay.

And we have had other individuals come in here who would not for any reason be able to render a verdict of death.    And you know, that could come from moral, personal, religious reasons, whatever it may be.    But I would submit to you that those individuals, too, are not qualified because

they can't base their verdict on the evidence in the case. They are going to automatically kind of be predisposed one way or another.  Does that make sense?

A    Yes.

Q    And, so, what the State and the defense are both looking for here are just twelve qualified jurors that can sit and listen to the evidence and base their verdict on just that, the evidence and the law in the case.  Okay, Ms. Long?

A    Yes.

Q    And, so, with that I want to talk to you a little bit about your feelings regarding the death penalty and some of your answers from the questionnaire.

THE COURT:  Ms. Evans, I'm sorry, before we do that.

MS. EVANS:  Okay.

THE COURT:  I should have handed you your questionnaire earlier, Ms. Long.

PROSPECTIVE JUROR LONG:  Okay.

THE COURT:  And we appreciate you filling it out.  You will have it there in case Ms. Evans wants to ask you some questions about some of your answers.

MS. EVANS:  Thank you, your Honor.

THE COURT:  Uh-huh, thank you.

PROSPECTIVE JUROR LONG:  This one is not mine.

THE COURT:  Did I hand you the wrong one?  I

sure did. I'm sorry. Thank you. At least you can read it. There you go.

Q    (By Ms. Evans) All right. Yeah, we are not going to require you to change your answers to fit somebody else's questionnaire or something today.

And as the judge told you, really, we are just talking about how you feel. Okay? There are no right or wrong answers at this point. Your oath is just to tell us the truth because it's really our only opportunity to find out how you feel about things. Okay?

A    Okay.

Q    You say on that very first page, regarding whether or not you're in favor of the death penalty, you say, I have mixed feelings about the death penalty.

A    Uh-huh.

Q    Can you tell me what you mean by that?

A    When I said I have mixed feelings about the death penalty, meaning I'm for it on some cases and I'm against it on some other cases.

Q    Okay.

A    Depending on the situation.

Q    Okay. And it sounds like that's absolutely, you know, what the law contemplates. Just because a case is a capital murder doesn't mean that the State seeks the death penalty in every single capital murder case.

And it's only those capital murder cases that we will talk about a bit more what makes it a capital murder and eligible for the death penalty --

A    Uh-huh.

Q    -- you know, is it even available, is the death penalty even available.  Okay?

And, so, you're absolutely right, you know, depending on the circumstance when you say mixed feelings.

Of the cases -- And I know we haven't talked necessarily about the law yet.  But of the cases that are eligible for the death penalty, and those eligible would be, you know, capital murders which would be murder of say a police officer or a fireman in the line of duty, murder of a child under the age of six, or murder of two or more people in the same course of criminal episode conduct, or, for example, what we have here, murder in the course of another felony.  Okay.  An aggravating factor, here murder in the course of a robbery.

In any -- Is there a situation that you can think of -- You said in some situations not.  Can you tell me what you mean by in some situations not when you say you have mixed feelings?

A    I have mixed feelings according to if I'm against it or for it.

Q    Uh-huh.

A    Okay.  For it, basically if it's children and elderly people --

Q    Uh-huh.

A    -- because they are defenseless more so is the reason I'm for the death penalty.  But in reasons that I'm against it is just the case by case things that you have to hear, circumstances, things of that nature.

Q    Okay.  So, based on the evidence.

A    Yes.

Q    Like we talked about.

A    Uh-huh.

Q    Okay.  That makes perfect sense.  Some people, when they say they -- The reason I wanted to clarify is because some people, when they say they have mixed feelings, they mean that, you know, they personally are not a fan or in favor of the death penalty, but because the law says that we have the death penalty, then they could do that if they had to, but certainly not something that they personally feel is appropriate or right.  Okay?

A    Okay.

Q    But it doesn't sound like that's where you fit; is that a fair statement?

A    No, I think it depends on the crime.

Q    Depends on the crime.  Okay.  And what if -- You said in the cases that you're for it, what if the --

understanding what the law is as I just explained regarding capital murder or some of the cases that are capital murder cases, you know, the murder of a child under the age of six or a police officer in the line of duty or murder plus a robbery, would you be in favor of the death penalty in situations that do not involve a child victim or an elderly person?

A    The police officer in the line of duty, because they are there for our protection, I would be in favor of it. But other crimes, I would have to, you know, really hear the details to make a decision based on that part of it. I just couldn't say I'm in favor of it when --

Q    Sure.

A    -- just by saying what you're telling me about the murder and then while robbing someone. I don't know the circumstances of the situation, so I would need more evidence to go on before I say yes.

Q    Okay. You're absolutely right, Ms. Long. You haven't heard anything as you sit here today.

A    Huh-uh.

Q    And I am not really going to ask you what cases you would or you would not assess the death penalty.

A    All right.

Q    I just want to make sure that your mind is not foreclosed. For example, if you say that you're in favor

of the death penalty for if a child is killed or if an elderly is killed, I just want to make sure that you are automatically not going to foreclose the death penalty to cases where the victim is not a child or an elderly.

A    All right.

Q    Does that make sense?

A    Yes.

Q    And would you do that or you think you wouldn't? You would listen to the facts?

A    No, I would listen to the facts.

Q    Okay.  Okay.  Thank you.

And I want to explain to you, you know, it's the State's job in any type of criminal case to prove it beyond a reasonable doubt, to prove that the crime occurred, okay, in the guilt/innocence phase.

A    Okay.

Q    And in a capital murder case, if the State of Texas proves the elements in that indictment in front of you, proves the elements of capital murder, that an intentional murder occurred in the course of a robbery, then we are entitled to a verdict of guilty on capital murder.  Okay?

A    Okay.

Q    And in capital murder cases, if we get a verdict of guilty in capital murder where the State is seeking the

death penalty, it's then and only then in a case that we seek the death penalty that you would see these special issues.  Okay?

A    Okay.

Q    And, once again, the State has the burden of proving to you special issue number one and special issue number two, and there is no burden on special issue number three.

But if you find somebody guilty of capital murder and the State proves to you beyond a reasonable doubt special issue number one, then the answer to that is yes.  Then you move on to special issue number two.  And if the State proves to you beyond a reasonable doubt the answer to special issue number two would be yes as well, and then you would move on to consider again all the evidence in looking at special issue number three.

And if you do not find any circumstances sufficiently mitigating, then the answer to special issue number three would then be no and the State would then be entitled to a verdict of death.  The judge would have no choice but to then issue a warrant for the death of this young man over here.  Okay?

A    Uh-huh.

Q    I want you to take a look at Mr. Broadnax and realize, you know, it's our goal here, the goal of the

State, we believe we have the type and the quality of evidence that is going to cause a jury to answer those special issues yes, yes and no upon a finding of guilty on capital murder.  Okay?

A    Okay.

Q    And so, you know, sometimes jurors tell us, you know, yes, they are in favor of the death penalty on paper and they can talk about it, and for certain crimes they do believe it's appropriate, but when actually faced with having to do it and participate in this process themselves, they have some real concerns.

In looking at Mr. Broadnax, is there anything that gives you pause in being able to listen to the evidence in this case, knowing that it's the State's goal to see this young man on a gurney there in Huntsville, Texas?

A    No.

Q    No?  Okay.  And I say that, you know, not to be morbid, but I just -- I want to make sure, because not every single case is the type of case that every single juror can sit on.  Okay?

A    Okay.

Q    Some may be more appropriately suited for other types of cases and maybe not others.  Okay.

A    Uh-huh.

Q    And that's just based on experiences and feelings.

**Anne B. Meredith**
Certified Shorthand Reporter

I want to explain and I have kind of already mentioned how a jury arrives at the verdict. You don't go back there after a finding of guilty on capital murder and say, you know what, the defendant absolutely deserves a life sentence without the possibility of parole, or you don't go back and say, no, you know what, that crime deserves a death sentence.

The way you arrive at your verdict is in answering the special issues. There is nothing automatic about it. Okay?

A    Okay.

Q    And I think that you recognized that in answering your questionnaire. You do illustrate on page two that you think a life sentence is appropriate in some circumstances.

A    Uh-huh.

Q    And I see on page five that you don't believe in an eye for an eye. And I would submit to you the State of Texas doesn't either, and that's why we have these special issues for you to determine if it's an appropriate case. Okay?

A    Okay.

Q    And if the State of Texas has proven to you those things necessary to render a verdict of death. Does that make sense?

A    Yes.

Q    Okay.  On page four you say, at the time you filled out your questionnaire, that you hadn't really discussed the issue of the death penalty with any of your family members.

Had you thought any more about this being a capital murder where the State is seeking death since the time you came on the big panel?

A    No.

Q    No?  And, so, you still haven't discussed this issue with friends or family?

A    No, I didn't think I was going to be called back.

Q    Oh, you didn't think you would get called back?

A    No.

Q    I understand, don't pick me.  How did you feel when you got that call back?

A    When I got that call back?

Q    Uh-huh.

A    I was okay, no emotions about it.  I just said, I'll be there.

Q    Okay.  Just shocked --

A    Uh-huh.

Q    -- that we reached you because there were so many people or something?

A    Yes, there were a lot of people, that's why.

Q    Okay.  We have heard a lot of people say that,

Ms. Long.

A    Okay.

Q    In looking at your questionnaire, it looked like you hadn't heard anything about this case.  Is that still the situation here today?

A    Uh-huh.

Q    You have not?

A    No.

Q    Okay.  Also, on page fourteen we asked you about what church you belong to and how often you attend.  We also asked you about your church's position on capital punishment.

A    Uh-huh.

Q    And you didn't fill that in at the time.  Do you know your church's position?

A    No, I do not.

Q    You do not?

A    No.

Q    Okay.  And, so, I take it by that, would your religious views at all sway you in determining how you would answer the special issues or what verdict you would render in this case?

A    No.

Q    Okay.  You would base it on the evidence.

A    Yes.

Q    Is that fair to say?

Page five you talk about that, in your mind, life in prison is equivolent to the death penalty. Can you tell me what you mean by that?

A    Well, when I say life in prison is more so like the death penalty, because you're not going to be out in society. You're going to be there forever. So, the chances of you committing a crime, it just will be in prison walls. But as far as being out in society dealing with people, innocent people and, you know, getting in trouble is less likely.

Q    Okay. I want to come back to that. Okay?

A    Okay.

Q    I appreciate you for the answer. And then we are going to get to it because it contemplates kind of what you're talking about maybe in special issue number one. Okay?

A    Okay.

Q    I just want to get your feelings on that.

A    Sure.

Q    Now, we've talked about, you know, what capital murder -- what types of crimes are capital murders. Okay?

A    Uh-huh.

Q    It's always an intentional murder, never an accident. Never is there any sort of legal justification or defense like self-defense or anything like that involved. The defendant did what he did because that is what he set

out to do.  He did it on purpose.  Okay?

A    Okay.

Q    We are talking about an intentional killing of someone.  And it's not just an intentional murder.  You know, I could turn to my co-counsel right now and shoot him ten times and laugh about it and say, god, I'm glad I got rid of him.

But that case would not be a capital murder because it doesn't have any of those additional factors.  Okay?

A    Okay.

Q    He's just plain Joe sitting here minding his own business that I chose to kill.  Okay.  Even if I planned it out, that doesn't elevate it to a capital murder.  You've got to have one of those aggravating factors we talked about.

And, so, that wouldn't be eligible for the death penalty.  Do you understand that?

A    Yes.

Q    Okay.  Now, there are different ways or different types of capital murders.  And as you sit here now, you don't know the circumstances of this offense.

A    Uh-huh.

Q    And even after you hear the evidence in the guilt/innocence phase of the trial, if you believe that we have proven our case beyond a reasonable doubt and that this

defendant did, in fact, commit the offense of capital murder as we have set that out in the indictment, you still may hear additional evidence in the punishment phase. Okay?

And, so, in this process it's very important that you just keep an open mind in each phase of the trial, okay, because you don't know until you've actually heard it.

And, so, by way of illustration, what if I said to you that you heard of a thirty-five year old man that intentionally planned out and carried out the death of a five year old child; what would you think about that?

A    I would think he deserved the death penalty.

Q    Okay. Pretty gruesome, huh?

A    Yes.

Q    And as you said, you know, that's one of the things, you know, offenses against children --

A    Uh-huh.

Q    -- they may be deserving.

But what if you heard additional evidence that the thirty-five year old man was actually the father of that five year old child. And not only was he his father, but he is a loving and devoted father, loving husband, he's a pillar of the community.

He sat day in and day out in his son's hospital room there at Children's Medical Center because his son, at five years old, has been diagnosed with

terminal cancer. And for the past year he's been in pain day in and day out. And that father watches his son suffer, suffer endlessly every day. Okay. And, so, he goes and gets a lethal dose of morphine and injects it into his five year old son's body.

And that is capital murder, fair to say?

A    Yes.

Q    Because he's intentionally caused the death of that five year old.

A    Yes.

Q    He's eligible for the death penalty.

But what if I told you about a different circumstance of facts, same thirty-five year old man, but instead he goes out to a park, a playground where tons of kids are playing and he picks off the five year old, with his AK-47 assault rifle, who is climbing up a slide to slide down and be caught by his mommy.

Different, totally different --

A    Yes.

Q    -- sets of facts?

A    Uh-huh.

Q    Okay. And, so, can you understand how -- I know your initial response was pretty bad, yeah, he deserves the death penalty.

A    Uh-huh.

Q    Or if not the death penalty, he deserves to be put underneath the prison maybe.  But does that illustrate to you the importance of waiting to hear?  Because you just don't know until you've heard everything.

A    I believe you have to hear everything in order to make a decision.

Q    Okay, perfect.  And that's what -- You know, that's what the law contemplates is that, you know, you really have to follow through this process and make the State prove it beyond a reasonable doubt.

A    Okay.

Q    And then, just because you find a person guilty of capital murder doesn't mean that you can say at that point in time whether or not they get the death penalty or a life sentence, correct?

A    Correct.

Q    Because you've got to wait and hear and wait and reconsider all the evidence again in light of the special issues.  Okay.  And with that I want to move into the special issues and talk a little bit about them.

A    Okay.

Q    You know, as you've indicated throughout your questionnaire, just let the punishment fit the crime.  You think you could do that, Ms. Long?

A    Yes.

Q    Okay.  And again, realizing there are no automatic answers, you said that basically, whenever I asked you about life in prison versus the death penalty --

A    Uh-huh.

Q    -- you said that the chances of somebody committing another crime, and then you kind of paused and you said, well, at least, you know, outside of prison, or something to that regard.  Okay?

What special issue number one contemplates is future dangerousness.  So basically not, you know, looking back and saying, is this person deserving of the death penalty because of the crime they committed, but you can look at the facts of the original offense to determine whether or not they are going to be a future danger.

But what special issue number one is asking you is, are they going to be a danger such that, even in that prison society -- because I'll tell you what the law says.  If you find somebody guilty of capital murder, the presumption is that the defendant will receive a life sentence without the possibility of parole.  Okay?

A    Uh-huh.

Q    It's not unless and until the State proves to you special issue number one and special issue number two beyond a reasonable doubt --

A    Right.

Q   -- and then special issue number three, if you find nothing sufficient that you would answer that no, that the defendant receives a death sentence.  Okay?

A   Okay.

Q   So, the presumption is always a life sentence without the possibility of parole.  The presumption is no to special issue number one unless and until we prove it to you beyond a reasonable doubt.

A   Okay.

Q   And, so, where is that individual's society going to be if you find somebody guilty of capital murder?

A   Where is their society going to be?

Q   Uh-huh.

A   If they are found guilty?

Q   Uh-huh.

A   It would be within the prison.

Q   Absolutely.  And, so, can you see where -- or what do you think about that?  Can you contemplate prison being a society?

A   Yes.

Q   You can?  And, you know, there are guards there, there are visitors there.

A   Uh-huh.

Q   There's teachers, other individuals working there, going to visit their loved ones.

A    Uh-huh.

Q    As well as, you know, there's people there that are doing their time peaceably, you know, peacefully.

A    Okay.

Q    They may be there for a drug conviction or their third DWI or something like that.  But that's what special issue number one contemplates.  Are they going to be a danger to whatever society that the person is in, okay?

Special issue number one says, do you find from the evidence beyond a reasonable doubt that there is a probability.  And jurors have told us that, by probability, that means more likely than not to them.

Do you agree with that?

A    Uh-huh.

Q    You do?

A    Yes.

Q    It doesn't say that they are absolutely going to commit other crimes.

A    Uh-huh.

Q    Or it doesn't say that they possibly will, but there is a probability, more likely than not, that the defendant would commit criminal acts of violence.

What would be a criminal act of violence to you?

A    A criminal act of violence?

Q    Uh-huh.  That's one of the things we would have to prove to you.

A    Okay.  What, just in general?

Q    Right.  What comes to mind when I say criminal act of violence?

A    Assault, just any type of act, you know, that's unlawfully.

Q    Okay.  Against the law?

A    Yes.

Q    And Ms. Long, does it matter to you whether or not that criminal act of violence is being committed there in the prison society?

A    I think in a prison society it's more controlled than out in society.

Q    Okay.  And why do you see it as more controlled?

A    Because there you have the guards or, you know, and they are under watch and things of that nature.  Out in just everyday society, you know, you're just free to do whatever basically.

Q    Okay.  Now, even though an individual is under watch or there's guards there --

A    Uh-huh.

Q    -- can you contemplate of situations where people are still able to commit criminal acts of violence --

A    Yes.

Q    -- even though they are in prison?

A    Yes, they are able, but it's unlikely to take place with the guarded, the more controlled environment.

Q    Okay.  But you do think it's possible that we would be able to prove to you, right, that somebody would commit criminal acts of violence --

A    Yes.

Q    -- even though it's there in prison?

A    Yes.

Q    Okay.  And the State's burden on special issue number one again is just beyond a reasonable doubt.  Could you hold the State to the burden of beyond a reasonable doubt with regard to that?

A    Yes.

Q    Okay.  Not beyond all doubt or all possibility or 100 percent certainty, fair to say?

A    Yes.

Q    All right.  Now, do you think that the other individuals there in that society, other inmates, whether, you know, it be for a drug conviction or if they are a convicted murderer, do you think they have and deserve a right to be free from violence?

A    They do have a right to be free of violence.  I do agree with that.

Q    Okay.  And, so, in answering special issue number

one, what types of things would you look at to determine whether or not someone is going to be a future danger, now that you know that we're talking about the prison society?

A   I don't think anything would ensure you that the act would not happen again based on the -- I don't see where you --

Q   Let me back up just a little bit, Ms. Long.  Let me clarify something.

A   Okay, yeah.

Q   Whenever the legislature gave us special issue number one, they don't define what a criminal act of violence is.  That's why I asked you what it was to you.

I do want to point out that it doesn't say would commit another murder or would commit another robbery.

A   Uh-huh.

Q   So, it's just whatever a criminal act of violence would be to you.  So, in light of that, you said that you don't think you would ever be able to ensure that it would not happen again, fair to say?

A   That's true.

Q   But the State of Texas has to prove to you that there is a probability that the defendant would commit criminal acts of violence --

A   Okay.

Q   -- in the future.  Okay?

What types of things would you look to to determine whether or not we have proven that to you?

A   Whether you have proven it to me or not?  The character of the individual, are they remorseful, just different things to take into consideration.

I just can't explain it all offhand, but it would have to be something that said, okay, this person, you know, is going to actually commit a crime again because X, Y and Z.  I don't know what X, Y and Z may be, but, you know.  You know, if it's a decision to be made, I would have to hear it in order to go from there.

Q   Okay.

A   But right offhand, without any knowledge of anything of this nature, I just couldn't say at that point.

Q   I understand.  But you would base it on the evidence that you would hear in the courtroom?

A   Yes.

Q   Some people tell us that maybe based on the person's criminal history or what they have done since the time of the offense --

A   That's correct, yes.

Q   -- that would help determine what they are going to do in the future.  Do you think that's a fair assessment?

A   That's very fair.

Q   And, again, the law says that you can base it

solely on the facts of the case, the crime that was committed. But you just can't say automatically, because I found this person guilty of this heinous, horrible capital murder, I'm automatically going to answer these questions in such a way to give the defendant death.

You have to wait and reconsider everything in light of special issue number one and the evidence. But you can look to the facts of the original offense and say, you know what, yeah, based on that horrible, heinous crime, they are a future danger. They are going to be. They are probably going to commit criminal acts of violence in the future.

Okay. Does that make sense to you?

A    It makes sense.

Q    All right. Is there any level of violence that you would consider okay in those prison walls?

A    No.

Q    No? What about a threat of violence, would that constitute a criminal act of violence in your mind?

A    If someone is threatening another individual?

Q    Uh-huh. And you believe based on the evidence that, you know, maybe they are likely or they are able to carry out that threat, but all you hear is just a threat.

A    Yeah, I think that can be followed through at any time depending on the crime that was committed and the threat that is given to the person.

Q    Okay.  You do?

A    Yes.

Q    And in looking at, you know, you say on your questionnaire, I believe on page one, you kind of sound like you're contemplating special issue number one because you say that there are certain crimes so coldhearted that the death penalty is the accurate punishment.

And as I told you, the law does allow you to consider those facts of the offense in determining --

A    Uh-huh.

Q    -- okay, if the answer to special issue number one is yes.

In looking again at your questionnaire, you talk about the death penalty being an easy way out, or on page five you say that it's a quick fix.

A    Uh-huh.

Q    The death penalty.  And at one point, that life without the possibility of parole is a greater punishment --

A    Uh-huh.

Q    -- than the death penalty.  Can you explain your rationale on that?

A    Because I think they really have time to sit back and think about the crime that they committed, having to deal with it, having to deal with the pain that they have caused other family members.  How they, you know, ended their

life by having to be -- you know, there is no chance that you'll ever get out.

And then as far as the quick fix, I do. Some of them, the death penalty, I think it's giving them a way out so they won't have to deal with it. They don't have to think about it. It's just, okay, let's kill them, and that's the end of.

Q   Okay. And I certainly understand what you're saying, and you are not the only one that feels that way, Ms. Long. There's many that feel as you do, that maybe they should have to sit and think about what they have done for the rest of their lives --

A   Uh-huh.

Q   -- rather than know that on some date certain they are going to have that way out. Okay?

A   Okay.

Q   But in light of those feelings and in light of your feeling that you believe that life without the possibility -- phew, I can't talk today -- life without the possibility of parole is a greater punishment than the death penalty, would you ever answer the questions in such a way to cause there to not be a sentence of death based on your personal feelings regarding that?

A   Repeat that one more time.

Q   Well, you know, you know how you get -- how a

death sentenced is rendered.  It's by your answers to these questions.

A    Okay.

Q    Would you ever answer these questions in such a way automatically so that a person does not receive their death sentence -- receive a death sentence regardless of if the State has proven to you beyond a reasonable doubt the issues?

A    No.

Q    Simply because you feel that life is harsher?

A    I think life can be harsher, but I would definitely go by the evidence that's presented.

Q    Okay.  And as the law states, you would answer the special issues number one and number two, and if the State of Texas proves those to you beyond a reasonable doubt, we are entitled to answers of yes and yes.

A    Okay.

Q    Okay?  And, so, I just want to make sure.  I understand your beliefs and why you think maybe that life could be harsher, but I just want to make sure you would never automatically answer in such a way to just -- to a life sentence.  Okay?

And so, you know, in light of those feelings, though, that you've stated that maybe it's an easy way out or a quick fix, do you understand the importance of special

issue number one?  Because really the focus on special issue number one isn't really about punishing, you know, the person over there; it's about what or who he could harm in the future.

A     Uh-huh.

Q     Those individuals that are there in the prison.  Do you understand that?

A     Yes.

Q     Okay.  So, that's the importance of following the law in answering special issue number one.  And if you answer special issue number one yes, then you would move on to special issue number two.  If you answer special issue number one no, then you stop and the defendant receives a life sentence without possibility of parole.

A     Okay.

Q     Special issue number two is the law of parties.  And what that basically says is you can be held criminally responsible for an offense whether you're the triggerperson or if you aided or assisted in the commission of a criminal offense.  You understand what I mean by that?

A     Okay.

Q     So, for example, let's say my co-counsel and I go out to the 7-Eleven.  We planned to do this.  We picked out the 7-Eleven beforehand.  My co-counsel here supplied the gun and supplied the bullets.

We got there and I said, oh, darn, I forgot my mask. And he says to me, don't worry about it, just don't leave any witnesses. He stays in the car and has it ready to go for when I'm ready to leave. I go inside. I'm the one that shoots the clerk and takes the money. I can be found guilty of capital murder, fair to say?

A    Yes.

Q    Okay. You understand while parties -- based on the law of parties in Texas, that he too could also be found guilty of capital murder; do you understand that?

A    I understand what you said by him being there with you.

Q    How do you feel about that?

A    If he didn't actually do the shooting?

Q    Uh-huh.

A    I don't -- I don't agree with giving him the same crime as the person that actually did the shooting.

Q    Okay. Now, you understand the law in Texas, if you aid or assist in the commission of a criminal offense. And for capital murder, you know, basically to be guilty of capital murder, if he anticipated, should have anticipated that a death would occur, he could be found guilty of capital murder. All right?

A    Yes.

Q    And, so, would you have any problem finding

somebody guilty of capital murder if they aided or assisted, even though they weren't the triggerperson?

A    I don't know.

Q    You don't know?

A    No.

Q    Well, like I said, the law says that if you aid or assist in the commission of the offense.

A    Uh-huh.

Q    Say, you know, he and I just talked about doing a robbery together.

A    Uh-huh.

Q    But like I said, he supplied me the gun, the bullets, and told me, you know, do what you have to do sort of thing.  But maybe he didn't tell me, don't leave any witnesses.  But just do what you have to do, get the money, get the cigarettes, and then let's go.

But he supplied me gun and bullets.  Do you think he should have anticipated that a death could occur?

A    I don't know.  I would have to listen to it because, even though he probably provided you with those items, it could have been a scare tactic.  I don't know.

Q    Okay.

A    I don't know if his intention would have been, okay, go shoot the person and leave no witnesses.  I don't know.  I understand the law.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Uh-huh.

A    But I would also need to hear the evidence stating that this -- we both had the same intent to go do this robbery with, you know --

Q    Okay.

A    -- and actually seek out to murder someone.

Q    But if, after hearing everything, you found and believed from the evidence beyond a reasonable doubt that he did, in fact, aid or assist me in the commission of that --

A    Uh-huh.

Q    -- robbery where a death occurred, so it's, you know, an intentional murder plus that aggravating factor of robbery, if you found and believed from the evidence that the State did prove that to you beyond a reasonable doubt that that individual aided or assisted --

A    Uh-huh.

Q    -- and that he should have known that a life would be taken, if you believed that beyond a reasonable doubt, would you be able to find my co-counsel, the non-triggerperson, guilty of capital murder?

A    According to the law and the evidence, yes.

Q    Yes.  Okay.

A    I would have to.

Q    Now, I want to take that one step further.  What

special issue number two contemplates is, you know, again, just because somebody is guilty of capital murder, there's two possible punishments. Okay?

A    Okay.

Q    To receive a sentence of death, the State of Texas has to prove to you that either they are the actual triggerperson or they actually anticipated that a life would be taken. Okay?

A    Okay.

Q    They aided or assisted in a criminal offense and they actually anticipated it.

In my first example I gave to you whenever he said, don't leave any witnesses, do you think it could be found from the evidence that he actually anticipated the death would occur?

A    When he said, don't leave any witnesses?

Q    Uh-huh.

A    Yeah, to a certain extent, because it's still the other guy's judgment, the other person's judgment.

Q    Okay. The other person, the person that -- the triggerman?

A    Yes.

Q    Okay. Let me ask you, Ms. Long, could you ever return a verdict of death on the individual that just sat in the car? Even though he said, don't leave any witnesses,

you know, you said that it's the other person's judgment, the triggerman's judgment.

Could you ever return a verdict of death on the non-triggerman?

A    On the non-triggerman, I don't know.

Q    Okay.  And I hate to pin you down here.

A    I understand.

MR. PARKS:  Well, Judge, we're going to object to her trying to commit her to a set of facts.  She needs to explain the law, not mix up the statutes.

THE COURT:  Well, I'll allow Ms. Evans to continue.  And then, of course, you'll have plenty of opportunity to talk to Ms. Long.

MR. PARKS:  Yes, sir.

Q    (By Ms. Evans)  And Ms. Long, I'm not trying to commit you here today.

A    I understand what you're saying.

Q    Because the hypotheticals I give are just that.  They are just situations that may come up.  And the reason we talk to you about this is because we want to make sure that you are qualified and that you would be able to listen to the law and follow it as it's given to you because not every person, like I say, can follow the law as it's given.  Okay?

A    Okay.

Q    And it's just important we know that now because we don't know what may come up at trial, to be quite honest.

So, how do you feel I guess about finding or rendering a verdict of death on a person that did not pull the trigger but you have found aided or assisted in the offense?

A    If it was an intentional killing, if it's proven that it was intentional, that he set out to seek and kill an individual, I wouldn't have a problem with it.

But if it was just, not just taken lightly of it, but if I drove someone to do a robbery and it turned out to be a murder, I would have a little more sympathy on the driver if they didn't have any intention of the situation.

Q    Okay.  And when you say a little more sympathy, you know, special issue number two is asking you, do you find from the evidence --

A    Uh-huh.

Q    -- beyond a reasonable doubt that the defendant actually caused the death of the deceased, or did not actually cause the death of the deceased but intended to kill the deceased, or another, or anticipated that a human life would be taken?

A    Uh-huh.

Q    And you know, you can even not think of my example I gave if you wanted to.

A    Uh-huh.

Q    I'm just wondering, would you ever be able to answer special issue number two yes if the person on trial was the non-triggerperson, but they actually anticipated that a human life would be taken?

A    If they anticipated that the life would be taken before the crime was committed --

Q    Uh-huh.

A    -- yes, I would have to take it into consideration based on the law.  But can I actually do it?  I would -- It would be based on the evidence.

Q    Okay.

A    If we just knew that they were out to do -- go rob and actually kill someone, then yes, I would be able to enforce the law.  But I would have to know that they both had the same intention at the time in what they were going to follow through with.

Q    Okay.  I think I understand what you're saying.

I'm going to move on, because I may be close to running out of time, to special issue three quickly.

A    Okay.

Q    And that's basically after you take into consideration all of the evidence in the guilt/innocence phase as well as the punishment phase --

A    Uh-huh.

Q    -- in determining, is there something sufficiently mitigating toward overturning a sentence of death.  Because if you answer special issue number one yes and special issue number two yes, the defendant is sitting squarely on a death sentence.  Okay?

A    Okay.

Q    And it's whatever you find to be mitigating.  Some jurors find some things mitigating and others think no, that isn't mitigating to me.  It's whatever you find is mitigating.  Okay?

A    Okay.

Q    But it's not just what is mitigating.  If you find certain things are mitigating, you go back and look at it and say, well, but does it rise to the level of being sufficiently mitigating to overturn that sentence of death, okay?

A    Okay.

Q    I want to ask you how you feel about -- You talk about voluntary intoxication.  And you agree with the law that you shouldn't be able to say, oh, I was drunk when I did that so I'm not guilty, fair to say?

A    Yes.

Q    You can't go out and voluntarily intoxicate yourself and commit an offense.

A    Exactly.

Q    Okay.  And you agree with that law?

A    Yes.

Q    Regarding mitigation, you know, some people tell us that it is mitigating to them, meaning it lessens the defendant's culpability.  Other people tell us no, if you go out and voluntarily intoxicate yourself and then go commit a crime, then I think that that's worse.  That makes you, you know, worse off or more culpable.

How do you feel about that?

A    How do I feel about that?  I think you're still responsible for your actions if you voluntarily intoxicate yourself.

Q    Okay.  Now, I do see from your questionnaire that you say that if there was evidence that a person was high on drugs at the time --

A    Uh-huh.

Q    -- drugs or alcohol at the time, then that would automatically prevent you from rendering a sentence of death; is that correct?

A    It could.  Well, to go into detail with that --

Q    Uh-huh.

A    -- I do think you are responsible for your actions, but I do also think it plays your -- it altercates your thought process.

Q    Okay.

A    I don't think you're at full potential with your thought process.

Q    Okay.

A    Because that's one thing drugs do, prescription drugs, regular drugs, drugs on the street, it alters thought process.

Q    All right. I want to ask you how you feel about two statements that we've heard before during this process talking to jurors. Okay?

A    Okay.

Q    One juror said to us that a person who is not prone to murder would not do so simply because he or she is intoxicated. What do you think about that?

A    I don't really agree with that. I still think you're responsible for your actions, but I do think it alters your thought process.

Q    Okay. So, you're still responsible for your actions. But in terms of whether or not you would ever be able to render a sentence of death if you heard evidence that somebody was intoxicated, what's your thought on that?

A    I would still be able to render the verdict based on the crime that was committed.

Q    Okay. And you would still be able to give fair consideration, and if the State proved to you beyond a reasonable doubt the special issues, you would be able to

do that?

A    Yes.

Q    Okay.  What do you think about -- I've heard it said that there are criminals who just happen to also use drugs.  What do you think about that?

A    That's true.

Q    Okay.  You know, kind of the what came first, the chicken or the egg, you know.

A    Pretty much.

Q    And what's your thought on that?

A    I mean the drugs possibly could have had something to do with the crime, or it's just habit, you know, he's just a criminal.  I believe you can be a criminal and just happen to have drugs in your system.  Or I don't think it's just, just because you have drugs in your system, it's automatic that you go out and kill or do whatever the crime may be.

Q    Okay.  Or maybe you go and do drugs so that then you can go commit the crime.  Do you think that's a fair --

A    No, I don't think that's fair.

Q    -- safe to say?

A    No.

Q    You don't think individuals do that?

A    No.

Q    Okay.  Additionally I want to ask you, I notice that you have young, young children, lots of them, a seven

month old, a two year old, and a four year old.

A    Yes.

Q    And are they in day care during the summer?

A    Yes.

Q    Okay.  And you saw where this trial is scheduled to go August 10th and last for a period of about two weeks. So, we will finish up maybe about August 21st.  Typically the day runs from 9:00 o'clock in the morning until about 5:00 o'clock in the afternoon.  Is that going to pose any hardship on you in caring for your children?

A    No.

Q    Okay.

A    They are in day care.  My mother has a day care.

Q    Oh, that's very convenient.

A    Yes.

Q    Good.  And I ask you that because, you know, additionally we don't know -- Certainly the judge controls pretty much 9:00 to 5:00 as his day.

A    Okay.

Q    But we can't control how long a jury may deliberate. And if at some point in time the jury deliberates and it goes into the evening, one of the sides could ask that the jurors be sequestered.  And by sequestered, it means you would go to a hotel.  You would have no access to TV and phones until the jury reached their verdict.  Again, we don't know how long

that that would take.

How do you feel about that?

A    I wouldn't like it.  It would be a little hard, but I could do it.

Q    Okay.

A    I mean they are with people that love them, their father and their grandmother, so they would take very good care of my children.

Q    Okay.  So, that would not pose a problem for you?

A    No.

Q    Okay.

MS. EVANS:  Pass the juror.

THE COURT:  Thank you.  I will say this, which reminded me, there would be a sheriff's deputy there at the hotel.  And should someone need to contact you on a matter involving a child, you would be contacted.

PROSPECTIVE JUROR LONG:  Okay.  Thank you.

THE COURT:  All right.  Now I want to reintroduce to you Mr. Parks who is going to speak to you on behalf of Mr. Broadnax.

PROSPECTIVE JUROR LONG:  Okay.

EXAMINATION

BY MR. PARKS:

Q    Ms. Long, you doing all right?

A    Yes, sir, I am.

Q    Okay.  I'm going to take about thirty to forty-five minutes.  Are you good to go for that length of time without a break?

A    Yes, sir.

Q    Okay.  Ms. Long, I want to kind of give you a road map of where I'm headed and talk to you about some things that I believe hopefully will help you understand what's going on here, although I believe you have understood everything up to now.  Do you believe that you have?

A    I'm trying to.

Q    I know you are.  And these are not always easy concepts.  And I think people sometimes come into the courtroom with preconceived notions about what the process is when the State seeks the death penalty.

And I want to talk to you a little bit about the reality of the situation, a little bit of philosophy about what our legislature has set us about doing, and what we have a right to expect and demand from jurors, and what jurors have a right to expect and demand from us and their fellow jurors.  Okay?

A    (Nods head).

Q    So, it's going to be a little bit different from the way the State has conducted their portion of the voir dire; not any better, not any worse, just different.

A    Okay.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    And I am going to spend most of my time, Ms. Long, talking to you about the process of a capital murder trial in which the State is seeking the death penalty in the punishment phase.

Please do not have the idea that we anticipate that the jury will find Mr. Broadnax guilty of capital murder. We are not conceding that at all.  Okay?

A    Okay.

Q    I'm going to spend a little bit of time talking to you about the guilt/innocence stage.  But just because I spend most of my time with the punishment phase, don't read anything into that.

A    Okay.

Q    Fair?  Okay.

Let me talk to you a little bit about the first phase of the trial, and then we are going to talk about some of these other things.

Do you believe that you understand the basic concepts of this as well as any other trial, that Mr. Broadnax is presumed to be innocent where he sits here this afternoon?

A    Yes.

Q    And that the State of Texas has the burden of proving what they have put in their indictment, and everything that they have put in their indictment, beyond a

reasonable doubt. And that if they do that, they are entitled to a guilty verdict. If they fail to do that, then Mr. Broadnax is entitled to a not guilty verdict.

Now, there could be a situation where a jury would find a defendant not guilty of capital murder but guilty of some other offense. Let me take a couple of minutes to explain to you how that would happen.

In this case the State of Texas must prove that Mr. Broadnax intentionally took the life of the deceased during the course of the commission or attempted commission of the offense of robbery. Okay?

A    Okay.

Q    Now, I emphasized intentionally because that's what we call in law a culpable mental state. And there are four culpable mental states in the State of Texas. Intentional, knowing, reckless, and with criminal negligence. Okay. And almost always a defendant has to act with one of those culpable mental states for their actions to be against the law.

DWI is an offense in which that does not apply. But most of the time a person has got to act with some culpable mental state. Okay?

A    Okay.

Q    So, just like identity might be at issue in one case, or manner and means of how the offense was committed

might be at issue in another case, it might be that the culpable mental state would be at issue so that that's something that a juror would have to make a decision about.

I'll give you an example, for instance, quickly, the difference between intentional and knowing. Let's say a person went into the 7-Eleven store to rob it. And he had a gun and he told the clerk to give up the money, and the clerk did. And he then decided he didn't want any witnesses to this offense and shot the clerk dead because he wanted him dead so that he couldn't be a witness.

That's intentional. It was his conscious objective or desire to cause the result. That's the legal definition.

Now, let's say the same scenario. Goes into the 7-Eleven store with the intention of robbing it, has the gun, tells the clerk, hand over the money, and the clerk does. And he says to the clerk, don't follow me out of this store because I don't want you to see what car I get in and which direction I go, so don't come from around that corner, that counter.

And he begins to leave. And instead of following instructions, the clerk comes around the counter and, so, he shoots the clerk in the leg to keep him from following him out and seeing which direction he goes. He does that with the intention of preventing him from

following him out, not with the intention of killing him. You see the difference?

A    Yes.

Q    And even if the bullet say severed the femoral artery and the clerk died before he could get help, he's just as dead as he would have been had the defendant intended to kill him.  But the law makes a distinction in the culpable mental state.  He's guilty of murder but not capital murder because they didn't prove that he intended to cause the death. You follow what I'm saying?

A    Uh-huh.

Q    So, you see how that could, depending upon the facts and circumstances, be an issue for the jury to determine what was the culpable mental state?

A    Okay.

Q    You see what I'm saying?  And the law allows either side to offer evidence of the condition of the defendant's mind at the time of the commission of the offense, if an offense was committed, so that the jury can make a determination about that.  Does that make sense to you?

A    Uh-huh.

Q    So, a jury might be in a situation, depending upon the facts, where they find a person guilty of murder, for instance, instead of capital murder because of that

failure to prove specific intent. That's just an example of how it could happen.

So, one of three things would happen, as a juror, either guilty of capital murder, guilty of some lesser included offense, or not guilty at all. You understand how that process works?

A    Yes.

Q    That's an objective decision for a jury to make based upon the evidence that they have heard. Either the State has proven what they were expected to be proven by the law or they haven't. Make sense to you?

A    It makes sense.

Q    All right. Now, I want you to assume for me that in this hypothetical situation you have been selected as a juror and you and eleven others have heard evidence that convinced you beyond a reasonable doubt that the accused did, in fact, intentionally kill another person during the course of a robbery, and he is guilty of capital murder, and you so said by your verdict. Okay?

A    (Nods head).

Q    Only then and only in that circumstance would you ever be called upon to answer these special issues. Okay?

A    Okay.

Q    So, they are always asked about who? A capital murderer. Okay?

A    Okay.

Q    Okay.  Now, that kind of gets us to what I was telling you we were going to do awhile ago.  We were going to talk about the reality and philosophy.  Okay?

A    Okay.

Q    All right.  The reality is that we are in the process here in this courtroom of picking a death qualified jury.

What that means is this.  Every member of the jury, in order to be qualified, has got to say that they could answer these questions in such a way that the defendant would receive the death penalty if the facts and circumstances justified it.

If one person says no, I could not do that, they don't get to serve.  So, only people who say yes, I could do it, get to serve.  That's what I mean when I say a death qualified jury.  That's the way it's always been.  As far as I know, that's the way it always will be.

Okay.  So, we assume that every member of the jury has a predisposition to at least consider and assess the death penalty, that they are in favor of it at least philosophically.  Does that make sense to you?

A    Uh-huh.

Q    Now, on your questionnaire, you'll see on page one we give jurors five choices.  You, as most people here,

circled choice number two.

A    Uh-huh.

Q    Right?

A    (Nods head).

Q    All right.  If you circled choice number one, you're probably not going to be qualified to serve.

A    Uh-huh.

Q    Because that's a person who says that they believe that it always ought to be given, the death penalty.

A    Okay.

Q    If you had circled four or five, you probably would not be qualified to serve because those are people who are indicating to us that they could not assess the death penalty regardless of the evidence.

Are you with me?

A    Uh-huh.

Q    So, that just leaves two and three.

A    Okay.

Q    Now, three are those persons who say that they don't believe in the death penalty but they could follow the law and answer these questions in such a way that the death penalty is assessed if that's what the evidence and their oath required them to do.  They are qualified.  They would never serve.

The only people who ever serve on juries of this kind are those such as yourself who have circled two.

A    Okay.

Q    Okay?  Now, why do I tell you all of that?  I tell you because, Ms. Long, it is vitally important to Mr. Broadnax, or anyone else who is seated in his chair --

A    Uh-huh.

Q    -- knowing that the twelve people who are going to sit in judgment of him are death qualified, it is vitally important to him that those twelve jurors be able to follow the law.  Okay?

A    Okay.

Q    And that's what's going to basically lead us into the philosophy of how this process is intended to work by our legislature.  Okay?

A    Okay.

Q    By only asking these questions about persons who have been convicted of capital murder, the legislature is saying to us that the presumption is that, even though a person is a convicted capital murderer, he will not be a continuing danger to society.

So, the first thing that jurors are required to do is if they have thoughts of, well, anybody who is going to murder, who has murdered someone else, is going to be a continuing danger, you've got to put that out of your

head because that's not what the law says and that's not what our legislature intends.

What they intend by special issue number one is to have a process that identifies those persons, just exactly as that special issue says, who would probably commit criminal acts, not just an act, criminal acts of violence that would constitute a continuing danger to society.

Okay. So, they are asking jurors to -- While jurors can and should consider the facts and circumstances of the offense itself, you see, this is a far different question from did the defendant do the crime. Okay?

A    Okay.

Q    Now we are looking at predicting beyond a reasonable doubt what he will probably do in the future. And the legislature is serious that this is the question that the State must prove the answer to as yes. Otherwise, the process ends and the defendant gets an automatic life without possibility of parole. Okay?

And let me tell you, Ms. Long, the law is satisfied with that punishment. In fact, that is the default punishment for capital murder. It is the assumption of the law that the appropriate sentence for capital murder is life in the penitentiary. And the death penalty is reserved for, as our Court of Criminal Appeals has said, those few incorrigibles who cannot even be incarcerated

without fear of further violent outbursts against others.

Does that make sense to you?

A    Yes.

Q    I like to tell jurors that what our law basically is in the State of Texas is this.  A jury is not justified in assessing the death sentence for anybody for what they have done, regardless of how heinous it may be, how distasteful it may be, how horrible it may be.

The law does not allow the death penalty unless the State can prove that he is going to do things in the future that justify the death penalty.  It's the things that they can prove will probably happen in the future that justifies a death penalty.

Does that make sense to you?

A    Yes.

Q    Okay.  And, you know, we say this and then -- And I am guilty of it.  I'm not criticizing anyone.  I'm just saying, you know, you're never asked as a juror whether or not the defendant deserves the death penalty because that's not the decision you're called upon to make.  That's a subjective sort of a decision.  What might be deserving in the eyes of one juror might not be in another.

So, in order to try to make this an objective decision, just like guilt or innocence is an objective decision based on the evidence, special issue number one is

an objective decision based on the evidence.

And it would be wrong for a juror to go back into the jury room and say, well, I believe he deserves the death penalty so I'm going to answer that question yes, or I believe justice demands that he get the death penalty so I'm going to answer that question yes. I believe that the victim's family deserves closure so I'm going to answer this question yes. Any juror that does any of that is violating their oath. Okay?

A    Okay.

Q    And that's why I say it's vitally important to Mr. Broadnax, or anyone else seated where he is seated, because we've got twelve people over here who are for the death penalty. So we've got to, so as far as we are able to, to impress upon those jurors, that's fine, the law allows that, but only if you go through the process that has been set out and not make a decision what you think he ought to get and then answer these questions to get to that end.

Does that make sense?

A    Yes, it does.

Q    I've had jurors say, gosh, if I apply special issue number one literally, that's going to be extremely difficult for the State to ever prove because they are asking us to make a judgment about what probably will happen in the future beyond a reasonable doubt. That's nearly an

impossible standard.

That's fine.  For all I know, the legislature intended for it to be because they are trying to make this a barrier to the imposition of the death penalty so that it only is accomplished against those people that the professionals basically at the prison cannot even protect other people from.

And you kind of touched on that, Ms. Long, when you said that you believe that violence was less likely to occur in the controlled environment of the penitentiary. Well, you're exactly right about that.  Okay.

The law recognizes, though, that even in that controlled environment and even with the best efforts of the good people at the penitentiary whose job it is to control prisoners, there will be the occasional person who, for whatever reason, they are not able to control over time.

Because, you see, that speaks to acts of violence that would constitute a continuing threat to society, so they are trying to identify those people that even the penitentiary cannot protect others from over time. Okay?

     A     Okay.

     Q     So, the law recognizes that there will be such people.  It doesn't say how many.  It doesn't say whether it's one in a hundred.  It just says, you know, jurors are

charged with trying to determine if the person on trial in that individual case is such a person. And the law says that the State has got to prove it to you.

Does that all make sense to you?

A    Yes.

Q    You see how that process works?

A    Yes.

Q    Do you believe that you would be able to follow the law and follow your oath to a true verdict render according to the law and the evidence?

A    Yes.

Q    I believe you would, too, Ms. Long. All right.

Now, we don't define these terms for you. Probability is not defined. But our courts are pretty satisfied with what we tell jurors, which is more likely than not.

It doesn't define what an act of violence is in that context.

A    Okay.

Q    But you see what the context of that is. The prosecutor talked to you about threats, not just threatening to do something to someone. Well, that's fine. And a juror could, if they wished to, say that that fit their definition of acts of violence.

Now, whether it fits a definition of an act

of violence that would constitute a continuing danger to society is up to the jury to determine. But the context, you see, of that is whether a human being lives or dies.

And I think that the law expects jurors to define acts of violence in that context, not just, well, is it technically a criminal act of violence to threaten someone. Is it the kind of criminal act of violence that you believe constitutes a continuing threat to society such that this person must be put down?

You see what I'm saying?

A    Yes.

Q    Okay. So, you get to choose for yourself about that. But your obligation, I suggest to you, Ms. Long, is to see and define acts of violence in the context of the serious nature in which it is being asked. It is not a frivolous thing. A person's life literally hangs on it, or could.

You see what I'm saying?

A    Yes.

Q    All right. Have I beaten that to death for you?

A    I understand it.

Q    Okay. You understand what the law requires of jurors in that regard and you can accept that responsibility; is that fair to say?

A    Yes.

Q    Okay.  Just one other thing, Ms. Long.  If you are on this jury and you get -- If it does come to pass that you have to assess punishment in this case and answer special issue number one, if you're back in that jury room and some juror or jurors start saying, hey, you know, if I ever saw anybody who deserves the death penalty, it's this guy, you need to answer that question yes, are you going to be able to say, wait just a minute?  That's not what that question asks.  We have got to talk about what the question asks and whether the State has proven it.  Make sense?

A    Uh-huh.

Q    Can you do that?

A    Yes.

Q    Okay.  Special issue number two, I generally don't even talk about it.  But let's talk about it for a little bit because I want to clear something up.

First, a jury may or may not ever have to answer that question even if they find someone guilty of capital murder because it's not always given.  Special issue number one always is given.  Special issue number three always is given.  Special issue number two is only given if the judge believes that there has been some evidence raised that it could apply.  Okay?

A    Okay.

Q    And if you're given it, it's not a suggestion

necessarily. It does apply just if there is some evidence that raises it as a possibility.

There are two ways that a person can be a party in a capital murder case. Okay?

A    Okay.

Q    And I want to make sure you understand the two different ways that can happen.

A    Okay.

Q    The first way is that if a person, acting with the intent to assist or promote the commission of capital murder, either aids, attempts to aid, encourages, directs or solicits another person to commit capital murder, they are guilty as a party without regard to whether or not they anticipated that a life would be taken because what they would be doing is agreeing out front that they want the capital murder to occur. Okay?

A    Uh-huh.

Q    There was a case in Dallas a long time ago where a fellow named Howie -- I believe his name was Howie Long. I hope you don't think I think he was kin to you at all.

A    No.

Q    -- was tried. And this was a robbery of a 7-Eleven or a store of some kind. It may have been a supermarket. I wasn't involved in the case.

But the co-defendant had a gun but Howie --

No, Howie had the gun and the co-defendant said to Howie when they robbed him, "Shoot him, Howie, shoot him". Okay. There was evidence of a person who aided, encouraged actually another person to commit the offense of capital murder. So, there has to be an agreement that there be an intentional capital murder.

Now, there is another situation, which is kind of what the prosecutor was talking about, which is if two people or more conspire to commit one offense that's a felony, aggravated robbery, and during the commission of the aggravated robbery another offense is committed, capital murder, then the person who conspired is guilty as a party if he should have anticipated that as a result of the robbery the killing would happen. Okay?

A    Uh-huh.

Q    So, you would be able to listen to the evidence if that arose and make a decision whether one or the other of those situations occurred; would you not?

A    I would.

Q    Okay. All right. Special issue number three. This one, Ms. Long, is a great deal different from the other special issues. The reason I say that is that -- I'm making a note on my time. I don't want to run over.

We have talked about the jury being called upon to reach decisions based -- objective decisions based

on the evidence.  Special issue number three changes because in determining the answer to that question you do not look to either side for burden of proof.  Okay.

It gives you, as a juror, the opportunity to review the evidence that you have heard in both phases of the trial to make a determination whether or not there are any mitigating circumstances in the case that would be sufficient to justify a life penalty rather than a death penalty.  Okay.  And that is a subjective decision for each individual juror to make.  Okay?

A    Okay.

Q    Let me give you a little background about that, maybe make it a little bit better sense to you.  We used not to have that law.  We had a different special issue number one, and our special issue number one was then special issue number two.  I just-- It's always been sort of the same process but not the questions have not always been the same.

It used to be under the old way that if the jury went back and answered that the defendant was guilty of capital murder and answered the two special issues yes, then the defendant got the death penalty.

And if the jury or any member of the jury felt like, based upon the evidence that they had heard, that for whatever reason the life penalty was justified rather than the death penalty, they had no vehicle with which to express that

*Anne B. Meredith*
Certified Shorthand Reporter

and, so, they had to live with having given the death penalty to someone that they thought didn't deserve it. Okay?

A    (Nods head).

Q    So, our Supreme Court has forced special issue number three on the State of Texas and any other state that did not have a vehicle for people to express -- jurors to express their individual personal moral judgment about the matter.

So, now we have that that's available to jurors to do just that very thing. That's what the law calls upon them to do is to make a personal moral judgment about the particular case.

So, it's really not true to say that we let the punishment fit the crime because in death penalty cases our Supreme Court says that it is unconstitutional to make that decision based totally and only on the crime itself, that a jury must be given an opportunity to factor in the circumstances and background of the defendant.

So, it's not only about the crime. It's about the defendant as an individual also. And all of that is taken into consideration in reaching that final decision.

Does that make sense to you?

A    Yes.

Q    Okay. So, what we do is we tell jurors that (a) the death penalty is never mandatory. Some jurors believe

if they find someone guilty of capital murder, they have to give them the death penalty. No, that's not the law.

A    Okay.

Q    Okay. The law presumes the life penalty. The law is satisfied with a life penalty always, so that no juror ever has to apologize if it is their own personal moral decision to give life over death, even if they have answered those special issues yes and yes. And certainly they are never obligated to answer one of the special issues yes or no against the evidence.

You see what I'm saying?

A    (Nods head).

Q    If you understand that, you're a better person than I am because I kind of muddled that, but we straightened it up. All right. But you understand what I'm saying?

A    Uh-huh, I understood.

Q    Okay. All right. Here's something that jurors generally do not know, and that is this. We do not define in the State of Texas what mitigating circumstance or circumstances are. We leave that up to the individual juror to make a decision for himself or herself what they believe would be a mitigating circumstance. Okay?

A    Okay.

Q    And also we leave it up to the individual juror to determine for himself or herself what weight to be given to

that mitigating circumstance and to determine for themselves whether it is a sufficient mitigating circumstance or circumstances to justify the life penalty. So that they never have to ignore, or any other individual juror or jury, what is or is not mitigating.

What might be mitigating to you might not be mitigating to me. What might be sufficiently mitigating to me might not be sufficiently mitigating to you. Okay?

A    Okay.

Q    The only thing that I can say with certainty is this. That in order to answer that question no, there is no mitigating circumstance or circumstances to justify a life penalty rather than the death penalty, all twelve jurors must agree. Okay?

A    Okay.

Q    If any one juror makes a personal moral judgment that life is the appropriate verdict based upon the mitigating evidence that they have heard rather than the death penalty, then the death penalty cannot be imposed under law.

So, it places a great deal of responsibility and power in the hands of each of the individual jurors because it is literally an individual responsibility. No person can be executed in this state if as many as one juror says, that's not the right thing to me, my personal moral

decision in this matter is life.  Then life it is.  Okay?

A    Okay.

Q    All right.  So, I want to tell you that, you know, we see, we watch movies.  You ever seen Twelve Angry Men?

A    No.

Q    Okay.  It's an old black and white.  It's a good movie.  I recommend it to you if you ever see it, but I don't recommend it to you for the reality of it.  Like most other things that are television or movies, it's a dramatization.  Okay.  It's a drama.

But I think that movies like Twelve Angry Men, which is about a jury trial, and it's just a jury deliberating guilt or innocence, and they wind up screaming at each other and threatening one another and browbeating one another and, you know, and it's about the flow and ebb of everything going on and how the jury is persuaded one way or another.

It's a fine drama, but I don't believe that that's the way juries deliberate verdicts.  Okay.  I think that people typically are courteous to one another in the jury room, are respectful of one another in the jury room.  I'm not naive enough to believe that that's always the case, but I believe that that's typical.

I do know that jurors have a right to be respected by their fellow jurors and they have an obligation to respect their fellow jurors.  And it's not so much the

person who gets in a juror's face and says, this is the way it is and you are stupid if you don't vote like I do. I don't think people do that very often.

I do think what they do is they sit down by someone and say, now, honey, you know, we have been working hard back here, and I know it's your personal moral judgment that this person ought not to receive the death penalty, but see, we all feel differently about that, so you must be wrong. And it's the gentle persuasion. Okay?

Now, the law doesn't really tell us what deliberation is. I think we all have an idea of what jury deliberation is. But my dictionary says deliberation means careful consideration. Okay. And if you give careful consideration to the evidence that you have heard and to the law that the judge has given you, you have deliberated your verdict.

It does not necessarily mean justifying your personal moral judgment to other people. You don't have to be able to articulate what your position is if you don't wish to. You can if you want to. You don't have to defend your position if you don't want to. You can if you wish to.

Okay. But the point is this, is that the law expects twelve individual verdicts. Okay. The majority doesn't rule in the jury room. And every juror of these twelve death qualified jurors have got to be able to say, I

can follow the law. And if, after I have heard the evidence in the case, I believe the State has failed to prove their case, I will say not guilty.

And if I have been convinced beyond a reasonable doubt of a defendant's guilt, I'm going to make the State prove special issue number one to me. I'm not going to answer that question based on emotion, based on conjecture, based on anything other than hard evidence that I have heard. And if they prove to me that this is a person who cannot even be controlled in the penitentiary by our professionals, then I'm going to answer that question yes. If I haven't been convinced, it's no.

And finally, if I get to special issue number three and if I hear whatever evidence I believe is mitigating and sufficiently mitigating, or if based upon everything that I've heard, even if I cannot point to any particular thing that I believe is mitigating, having taken everything as a totality, I believe that mercy is the way to go, then I intend to exercise my right to give mercy if I choose to. That's my right, and I can do it. Okay?

A       (Nods head).

Q       And if that doesn't happen, then you go with what your own personal moral judgment is. You see what I'm saying?

A       Yes.

Q       And that's why, when I talked to you earlier, I

**Anne B. Meredith**
Certified Shorthand Reporter

talked to you about responsibilities and I talked to you about what you had a right to expect of us and fellow members of the jury.

You have a right to expect to be able to make your own personal moral judgment in the matter without criticism from the Court, from any of the personnel here, or from any member of the jury. You have a responsibility to respect your fellow jurors as they have a responsibility to respect you.

Would you expect --

You know, sometimes we talk about people raising their children and the church they go to as a personal moral judgment that they make and whether or not it would be appropriate for people to try to persuade you that you're wrong in your own personal moral judgments about your religion or who you marry or how many children you have, or things of that type.

Some things just don't seem to be appropriate. Do you agree with me about that?

A    Uh-huh.

Q    Either for them to try to change your mind or you to try to change theirs, you know.

I can see where, if a person has a disagreement about what some of the evidence said with respect to guilt or innocence, discussing that and making

**Anne B. Meredith**
Certified Shorthand Reporter

sure everybody is on the right page. But ultimately you have to make that final decision. It's your decision and nobody else's, right?

A    It's true.

Q    That's a lot of pressure, Ms. Long. I recognize it is. It's a lot of responsibility. Do you believe that you would be up to it?

A    Yes.

Q    Okay. I believe that I am five minutes ahead of time, Ms. Long, but I'm going to give them back to the Court. Thank you very much.

THE COURT: Thank you, Mr. Parks.

All rise for Ms. Long, please.

Ms. Long, watch that first step. You'll be stepping out for just a moment, then you'll be coming right back in.

PROSPECTIVE JUROR LONG: Okay.

(Prospective Juror Long exits the courtroom).

THE COURT: In the presence of Mr. Broadnax, what says the State of Texas?

MS. EVANS: Your Honor, the State believes that Ms. Long is not qualified for a number of reasons.

Number one, she has so narrowly defined when she thinks the death penalty should ever apply to cases involving child victims or elderly victims. And when asked

specifically about those type of capital murders involving a murder plus another felony, she sat there and gave it great thought and, you know, basically never committed that she could render a death sentence if appropriate on that type of offense unless the individual decided to go out there and set out to kill somebody. Could not do it if it was an intentional murder in the course of another crime.

The State believes that her narrowly defining where the death penalty would apply would prevent her or substantially impair her in her ability to follow the oath in this type of case.

Additionally, she said that where there is evidence that an individual has intoxicated himself by the way of drug use, and she says this in her questionnaire, she would never be able to impose the death sentence. And she all but said that and did not stray from that today when she said that it alters the person's thought process.

So, she did not look like that she again was going to be able to follow her oath with regard to that, though I think she ultimately said she would consider it.

Additionally, your Honor, with regard to parties on the nonshooter, she had -- it took her a while to agree that she could even find a nonshooter guilty of capital murder. She did finally agree that she would follow the law and find somebody guilty of capital murder if

**Anne B. Meredith**
Certified Shorthand Reporter

they are the nonshooter. But then she did go on to say, in answering special issue number two, that she may find sympathy for the nonshooter.

And your Honor, that certainly would not be basing her verdict on the evidence in the case if she decides to just happen to find sympathy in answering special issue number two.

So, for those reasons, the State does not believe she is qualified and would not be able to follow her oath in this case.

THE COURT: All right. It will be denied.

Mr. Broadnax.

MR. PARKS: We believe the juror is qualified, your Honor.

THE COURT: Ask her to return please, Barney.

(Prospective Juror Long returns to the courtroom).

THE COURT: Please be seated, Ms. Long.

Please be seated, counsel.

Ms. Long, the attorneys have accepted you as a qualified juror, and I certainly agree.

Again, let me tell you that this decision will be made whether or not you're actually on the jury in two to three weeks. That day you'll be notified by the same person who called you to appear and told whether you're on the jury

or not.

I ask you to assume that you are going to be on the jury as far as avoiding any outside influence such as media, Internet, trying to find out anything about the case.

In your questionnaire, is the telephone number on your questionnaire still your correct number?

PROSPECTIVE JUROR LONG:  Yes, sir.

THE COURT:  Because that's how we will contact you.

PROSPECTIVE JUROR LONG:  Okay.

THE COURT:  All right.  The sheriff is going to give you a card of the coordinator who called you to appear.  And should anything occur in your personal life between now and the trial date, give her a call and then we will deal with it.  All right?

PROSPECTIVE JUROR LONG:  Okay.  Yes, sir.

THE COURT:  It's been a real pleasure meeting you, ma'am.  Good luck to you.

PROSPECTIVE JUROR LONG:  Thank you.

(Prospective Juror Long excused from the courtroom).

THE COURT:  Court's in recess for ten minutes.

(After a recess, defendant present).

THE COURT:  Okay.  How about Ms. Jones?  Are we ready?

(Prospective Juror No. 924, Leslie Jones enters the courtroom).

THE COURT: Good afternoon, Ms. Jones. Thank you so much. Please be seated.

Please be seated, folks.

Ms. Jones, my name is Webb Biard and I will be with you this afternoon during the jury selection process. The Presiding Judge of this Court is Michael Snipes who you met at that large panel.

PROSPECTIVE JUROR JONES: Yes.

THE COURT: And should you be selected as a juror in this case, Judge Snipes will actually preside over the trial. I'm just helping out with the jury selection.

PROSPECTIVE JUROR JONES: Okay.

THE COURT: For whatever that's worth.

Do this for me, please. Raise your right hand.

(Prospective Juror Jones sworn).

THE COURT: All right. Also, I want to introduce to you at this time Gordon Hikel.

MR. HIKEL: Good afternoon.

THE COURT: Elaine Evans.

MS. EVANS: Good afternoon.

THE COURT: They represent Dallas County and the State of Texas.

Further to my right, Brad Lollar, Keri Mallon.

And they represent Mr. James Broadnax.  Mr. Broadnax.

LESLIE JONES,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    First off, we appreciate your patience.  We never know how long the interviews with the jurors are going to take.  I'll tell you that each side under our schedule procedures has the opportunity to talk to you for up to forty-five minutes each, so that will be an hour and a half.

So, in about an hour and a half I will then tell you, after you've concluded your conversation with the lawyers, whether or not you have been accepted as a qualified juror.  What that means is we are in the process of qualifying some fifty prospective jurors.  And then from that pool of fifty qualified jurors, the actual twelve trial jury will be selected.

That's going to be done in a couple of weeks, and you will be -- or two or three weeks, and you will be immediately contacted by the same person who told you to report here this afternoon and told if you're on the jury or not.

Did you have an opportunity to read the pamphlet?

A    This right here?

Q     Yes, ma'am.

A     Yes, sir.

Q     Did that help you a little bit?

A     A little.

Q     Okay.  Good.  At this time I'm going to hand you your questionnaire.

THE COURT:  Anne, if you would, please.

A     Thank you.

Q     All right.  That's the questionnaire that you filled out back on the day that you were here with the 600, 700 people or so.  I know it took a long time to fill it out, but it's going to save you more time than that today because the attorneys have read it.  It wasn't a waste of time, trust me.

A     Okay.

Q     The attorneys have read it.  They are not going to go over it in detail, but I'm sure there are a few of your answers that they will want to talk to you about and get you to explain more and say is that the way -- is that what you meant, or whatever, or tell us a little bit more about it.  And they will give you the page and the paragraph number.

A     Okay.

Q     And you can refer to it and you will have it there in front of you.

From filling out that questionnaire and

hearing Judge Snipes' remarks and then reading that pamphlet and appearing here today and sitting here in the courtroom, as you sit here now, are you aware that this is a capital murder case?

A    Yes, sir.

Q    Do you understand the State of Texas is seeking the death penalty?

A    Yes, I do.

Q    All right.  If someone is found guilty of capital murder, there's only two possible punishments.  That's either life in prison without parole or the death penalty.  And let me tell you this, Ms. Jones, under our current law that we are trying this case under, life in prison without parole means life in prison without parole, not a wink and a nod. It's life in prison without parole.

There was a time if someone was found guilty of capital murder and given life in prison, they would at some date become eligible for parole.  That is no longer the case.  Life in prison without parole is life in prison without parole, or the other possible punishment is the death penalty.

A    Okay.

Q    And from reading that pamphlet, did you see -- do you remember reading those special issues?

A    Yes, I do.

Q   All right.  And they are to be answered based on the evidence, and they determine the jury's verdict should someone be found guilty of capital murder.  And you would only see those special issues and only have to answer those special issues should you find the person guilty of capital murder.

If you find a person not guilty, you would never see them.  If you find the person guilty of a lesser included offense other than capital murder, like just found a person guilty of murder or robbery, then you would never see them.  Only if you have found a person guilty of capital murder.

A   I see.

Q   Now, from reading the pamphlet, did you see that the trial date is August the 10th?

A   Yes, I did.

Q   The trial is going to last two weeks, maybe a little shorter, maybe a little longer.  But for the purposes of our conversation, we are saying two weeks. That's Monday through Friday, that's 9:00 to 5:00, break in the morning, break in the afternoon, get a lunch break.

The jury would not have to stay together overnight unless and until there is a possibility if you commence deliberations -- and you know what I mean by deliberations?

A    Explain, sir.

Q    Okay.  Have you ever served on a jury before?

A    No, sir.

Q    All right.  Deliberations is when you're deciding your verdict.  That's after you've heard all the evidence, you've heard the jury arguments by the lawyers and the judge has read you the law, and you and the rest of the eleven members of the jury are back in the jury room deciding your verdict.  That's called deliberations.

Let's say you were deliberating your verdict and went late into the night, had not reached a verdict and became fatigued, unable to really concentrate like this case would deserve, there is a possibility you would all be taken to a fine hotel, county expense, individual private rooms, spend the night, come back and resume deliberations, to avoid any outside influence on your verdict.  That's a possibility.

A    Okay.

Q    Should that happen, Judge Snipes would give you advance notice.  In other words, he would say, bring an overnight bag tomorrow night and tell the people close to you that there is a possibility that you will be -- it's called being sequestered.  That's a possibility.

All right.  I've told you all that to ask you this question.  As you sit here now, after now that you know the procedure, the length of the trial, the way the day will

go, the possibility of being sequestered, from reading the -- thinking about the pamphlet and maybe thinking about being here today, as you sit here now, are you aware of any reason why you can't sit as a juror in this case?

A    No, sir.

THE COURT:  All right.  Okay.  I'm going to now have Mr. Gordon Hikel who is going to speak to you on behalf of the State of Texas and, like I say, up to forty-five minutes.  And when he concludes, then Mr. Lollar will speak to you on behalf of Mr. Broadnax.

All right.  If you need to take a break during this time, just let us know and we will stop.  Water, coffee, Coke, restroom, something like that, just let us know.

PROSPECTIVE JUROR JONES:  Okay.

THE COURT:  All righty?

PROSPECTIVE JUROR JONES:  Okay.

THE COURT:  Mr. Hikel.

MR. HIKEL:  Thank you.  May it please the Court.

EXAMINATION

BY MR. HIKEL:

Q    Ms. Jones, good afternoon, ma'am.

A    Good afternoon.

Q    How are you doing this afternoon?

A    Pretty good.  And you?

Q    I'm doing well.  Thanks for asking.  Let me explain -- You mentioned to the judge, and as reflected in your questionnaire on page ten, you've never been a juror before.  And, so, what I'm going to do is simply explain to you the process if you are selected as a juror in a case such as this capital murder case.

I want to begin by telling you that there are no right or wrong answers during this process here as we are talking.  There are only truthful and untruthful answers.  And I trust from reading your questionnaire that, Ms. Jones, that you'll be honest with both myself and with the defense when they ask you questions to see whether or not you're qualified as a juror.

A    Sure.

Q    And the reason why we do that, we -- You remember the day you came down, I believe it was April 24th, there was in the morning 400 or more of you.  In the afternoon another 400 came.

And the reason we talk to so many people is because there are some folks that say, look, in every murder case, death penalty, which is not the law in Texas.

Some folks say, look, I would never, ever, I could never, ever under any circumstances return a verdict which assesses the death penalty.  Those folks are probably not qualified.

There are some folks who come in here and say, look, if you tell me he killed someone and I find him guilty, death penalty automatically, which is also a person who is not qualified.

And here is why. Our legislature, the lawmakers of this state, has set up a process whereby if a person commits a crime that is classified as capital murder -- and we will talk more about what a capital murder is -- and if the State charges a person with capital murder and we were to prove that the person is guilty of capital murder, there is no automatic process that says guilty of capital murder, therefore, the death penalty. Because we don't have in Texas what's called an eye for an eye.

And the process that was set up by our lawmakers is this. If someone is charged with capital murder and the jury finds this person guilty of capital murder because the State has proven beyond a reasonable doubt that he or she is guilty of the offense, then you go into the second part of the trial called the punishment where only in a capital murder case will you ever see these three things called special issues.

It is the way those questions are answered that determines whether or not someone who is found guilty of capital murder gets the automatic life without the possibility of parole that he gets if he's found guilty, or

whether or not the automatic sentence will then be elevated to the death penalty, depending on whether or not those questions are answered yes, yes, and no.

Now, before we can talk about how you get to those three special issues, I'll go all the way back now and talk about the first part of a trial because, while a capital murder case is special, it's different in that only in a capital murder case will you see these three special issues.

A capital murder case is similar to any other criminal case. Whether it involves theft of a loaf of bread or a bicycle all the way up to capital murder, the first part of the trial is the same.

And this is what I mean by that. As a juror, you know, you'll be one of twelve people who, if you are selected, who in the first part of the trial will be asked to determine one question and one question only. And that question would be, did the State of Texas prove to me, a juror, beyond a reasonable doubt, the allegations or the things they said the person, the defendant, has done? That's the only thing you determine in the first part of a trial.

In front of you there is a piece of paper called an indictment. And that indictment, very brief, and all that the indictment is is a piece of paper as you're holding in your hands that tells the State of Texas what

you've got to prove. And you can read it, Ms. Jones.

A    Okay.

Q    Okay? Now, Ms. Jones, what it basically says is this. That indictments says that on or about June 19, 2008, in Dallas County, State of Texas, that the defendant, James Broadnax, committed the offense of murder in that he intentionally shot and killed one, I believe it's Stephen Swan, with a weapon, a firearm, a deadly weapon, while in the course of committing robbery.

So, that indictment lists what's called the elements of the offense, the things that we have got to prove to you, as a juror, beyond a reasonable doubt.

Now, let me go back now and say the law requires -- there's certain fundamental rights or principles of law that you must be able to abide by in order to be a qualified juror. The number one is this. As the defendant, Mr. Broadnax, sits here, he is presumed like any other person accused of a crime, before the State presents any evidence to prove to you, a juror, that he is guilty, you've got to presume that he is innocent of all charges.

It makes sense if you think about it because, as you sit there, you've heard nothing in terms of evidence. All you know is there is an allegation that we have made against the defendant. We haven't proven anything. And, so, the law says that, as he sits there today, he is to be

presumed innocent.

A    Okay.

Q    Okay?  Number two is this.  The piece of paper that you just read called an indictment, again, it tells the State what we have to prove, it puts the defendant on notice as to what he's accused of, and it tells the jurors, this is what the State has got to prove to me, a juror, beyond a reasonable doubt before we can say whether he's guilty or not.

I want to talk about witnesses because, as you would imagine -- I think you are the daughter of a DPD detective; is that correct?

A    Yes.  He's deceased.

Q    Oh, he is deceased?

A    He's been deceased for some time, about ten years now, but yes.

Q    Okay.  And he was a detective for thirty years?

A    In the Dallas Police Department.

Q    Dallas Police Department.  What was his name?

A    Marvin Buhk, b-u-h-k.

Q    B-u-h-k.

A    B-u-h-k.

Q    Okay.  Well, Ms. Jones, in every criminal trial the way the State of Texas goes about proving that the person is guilty is in the form we call evidence.  And that evidence comes in the form of either witnesses who comes into the

courtroom, takes the stand as you are there --

A    Uh-huh.

Q    -- raise their hands and take an oath to tell the truth.  The law says this, though.  Like, for example, your dad being a police officer.  The law says that the mere fact that a witness is a certain kind of witness, police officer, medical personnel, fire personnel, you as a juror cannot presume before he testifies --

A    Uh-huh.

Q    -- that everything he says is going to be truthful or I'm going to believe him simply because by virtue of his job.

What the law says is this, though.  Once a person has testified, you as a juror may then decide whether I believe all of what he said, some of what he said, or nothing at all from what he or she has said.  The point being is you have to wait until a person testifies to assess a person's credibility.  Can you do that?

A    Yes, sir.

Q    Okay.  All right.  Now, I've mentioned a couple of times the term, the words called beyond a reasonable doubt.  And you will see, Ms. Jones, in special issue number one, the second line, there are those words again.

A    Uh-huh.

Q    Special issue number two, the second line also,

you'll see those words there again.

A    Uh-huh.

Q    Now, back to the first part of the trial now, what's called the guilt/innocence, we have to prove beyond a reasonable doubt that the defendant is guilty as we alleged in the indictment.

Jurors have told us that beyond a reasonable -- Well, let me ask you this. What does that term mean to you, beyond a reasonable doubt?

A    Beyond a reasonable doubt. To me, I would have to have an open my mind and have to listen to everything.

Q    Right.

A    The whole case, the evidence, the evidence provided, I'm totally open-minded about this, and listen to the case, what is being brought forward.

Q    Okay. So, in other words, you understand that you have an obligation to simply assess the credibility of witnesses.

A    Uh-huh.

Q    The evidence presented by the State.

A    Uh-huh.

Q    And as you go back and you deliberate with your colleagues, the other eleven jurors, you would then ask yourself, okay, as I sit here as a juror, has the State proven to me beyond a reasonable doubt that he's guilty of

the offense as they allege in the indictment?

Now, I want to say to you this, Ms. Jones. The legislators, while they have provided us with these special issues, they did not define the terms beyond a reasonable doubt.

There was a point in time when we had that law, we had a definition for it, rather, and the Court realized that you jurors are smart enough to figure it out.

A     Uh-huh.

Q     I can tell you as a prosecutor what it does not mean.  It does not mean proof beyond all possible doubt, because the only way I can prove something to you beyond all possible doubt is if you were there as a witness and you saw it for yourself.  If that were the case, you would be a witness, not a juror.

It doesn't mean, like we have in certain states like California, beyond all doubts based upon all moral certainty.  We don't have that either.

All we say in Texas and some other states is beyond a reasonable doubt.  In other words, when I present all of the evidence to you, as a juror, if you have a doubt, is that doubt based upon reason and common sense?

A     Uh-huh.

Q     And that's what you would have to decide.  And it's entirely up to you what that term means as you assess

with your other colleagues, as you deliberate, have we proven it to you beyond a reasonable doubt.

Let me say this. So, we have those four, so far, principles I've talked to you about. The presumption of innocence; all witnesses are on the same level before they testify; an indictment is no proof of anything, it's just what I've got to prove and put him on notice of what he's accused of.

A    Uh-huh.

Q    Number four, the terms beyond a reasonable doubt, I've explained to you what it does not mean. You decide what it means as a juror.

And the fifth one is what's called the fifth amendment. The fifth amendment, among other things, it gives a person who is accused of a crime the right not to -- to choose whether or not he wants to testify in a case where he's accused.

For example, if a person is accused of a crime, the constitution gives him the right, him or her, all of us, the right to decide, do I or do I not want to testify? I as the State don't have the right to say, Judge, I want Mr. Broadnax to take the stand, or any defendant, and say I want him to testify.

The law says it's his absolute right. And because there are a lot of reasons why a person accused of

a crime will not testify, the law says you can't consider it for any reason at all, absolutely no reason.

So for example, if you're a juror, Ms. Jones, and you have read the indictment. And let's say at the close of the deliberations you and the other eleven jurors go back, you'll be in one jury room. As the judge mentioned to you, if you're sequestered, you go to twelve separate hotel rooms. And the reason for that is because in a hotel room there will be no deliberation. You are separated.

But when you're deliberating the case, now you are put in one room back here because the purpose of that is so that you can deliberate. Okay?

If, though, during that deliberation you say, you know, the State didn't quite prove it to me, but since the defendant did not testify, I'm going to tip the balance in favor of the State because he should have testified and tell me what happened and what didn't happen, the law says you can't do that.

And I see you're shaking your head no. You understand you can't do that.

A    I'm sorry.

Q    Exactly, because what the law says is, we do the proving -- the accusing, we've got to do the proving.

Can you follow that law, Ms. Jones?

A    Oh, yes.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Okay. All right. So, here we are now in the first part of the trial, the guilt or innocence, where the only question you're asked to decide is what? What are you asked to decide in the very first part of the trial, the one question?

A    The very first part of the trial?

Q    Yes, ma'am. Has the State done what?

A    Has the State proven to me that he is guilty.

Q    Right. Has the State proven to me beyond a reasonable doubt --

A    Beyond a reasonable doubt.

Q    -- that he is guilty.

Okay. Now, let's say that you and your eleven colleagues deliberate, you discuss. And you say, yes, I believe, we believe that the State has proven to us that he's guilty of the offense of capital murder in that he intentionally caused the death of someone in the course of committing a felony. In this case the felony we have alleged is robbery.

As you may or may not know, there are various categories of capital murder offenses. For example, if a police officer is murdered in the line of duty, that's a capital murder offense in Texas. If a child under the age of six is murdered, that's a capital murder offense.

A    Uh-huh.

Q    If two or more people are murdered in part of a one crime spree, that's capital murder.  If two or more persons are killed pursuant to a common scheme, murder, that's capital murder.

In this case, though, because we have alleged a felony offense, a robbery, whenever a person is charged with capital murder where the aggravating factor is a felony, in this case, a robbery --

A    Uh-huh.

Q    -- we've got to prove that the defendant intentionally, intentionally caused the death of the person in the course of robbery.  Okay?  In other words, it wasn't an accident.  It wasn't self-defense.  Because if it was self-defense, that would be a legal justification.  But it was a person's conscious objective to kill the other person for the property, that person's property.  Okay?

A    Okay.

Q    If we prove that to you beyond a reasonable doubt and you and your colleagues come back with a verdict of guilty, we then go into the second part of the trial called the punishment.

Now, Ms. Jones, that is where the similarity ends with a capital murder case and any other kind of criminal case.  It's now in the second part of a capital murder case, the punishment phase, that's where you encounter

these three special issues.

Now, let me say this.  I noticed that on page three of your questionnaire you mentioned that you faintly remembered something about this case, at the very bottom of page three.

A    Yes.

Q    Let me just say this, Ms. Jones.  We don't expect jurors to come to this courthouse with blank minds.  We understand you have lives, you read the newspapers, you watch TV, you surf the Internet, and those kind of things.  So, when you come here and you say, look, we've heard about the case, that does not disqualify you.

A    Okay.

Q    Here is the question, though.  You remember me saying that we have to prove in a courtroom by evidence that the defendant is guilty of the offense, and we've got to prove it to you beyond a reasonable doubt.

What that means is, whatever you may have heard outside the courtroom, newspapers, TV, Internet, you cannot bring those items into the courtroom with you and tell the jurors, hey, guess what I heard.  I know he's guilty because of what I heard outside the courtroom.

Do you understand that, Ms. Jones?

A    I understand that.

Q    Okay.  So, whatever you have heard about the case,

my question is this, will you allow that, whatever it may be that you heard, whatever you remember, will you allow that to affect you as a juror in deliberating the guilt or innocence of the defendant, Mr. Broadnax?

A    No, I will not.  I have not heard that much.  Like I said in there, just a little bit on TV.

Q    Okay.

A    I am clueless about what happened really.

Q    Okay.

A    I just heard the media and that was it.

Q    All right.  And, so, and you mention there also on page three that what one hears in the news media -- We asked you, is it a better source of information than testimony one hears in the courtroom?  And you said, I disagree.  And you are absolutely right because we have to prove it to you in the courtroom by evidence --

A    Uh-huh.

Q    -- whether or not he's guilty.

A    Right.

Q    And you can follow that law, correct, Ms. Jones?

A    Yes, sir.

Q    Okay.  All right.  I've mentioned to you that phase one or stage one of a trial, the only question is, is he guilty?  Did the State prove it to you beyond a reasonable doubt.  Then you come back into the courtroom, the judge

reads out your verdict.  If it's guilty, we proceed to these issues here.

Now, Ms. Jones, the judge mentioned to you that there is only one thing in this trial that automatically happens.  The only thing that happens automatically is this.  If the jurors find the defendant guilty as charged of the offense of capital murder, he automatically gets a life without the possibility of parole sentence.  That's the only thing that he automatically gets.

Remember I said to you when I began that before the automatic sentence now can be elevated to the death penalty, the Texas legislators have set up this process here that jurors must go through in deciding whether or not that automatic sentence that he got by virtue of being found guilty --

A     Uh-huh.

Q     -- is now -- should now rise to the level of capital murder.

Now, these issues are labeled one, two and three because they are to be considered in that order, number one, number two and number three.

Number one is what we classify as lawyers down here the future danger.  And it says this.  Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal

acts of violence that would constitute a continuing threat to society?

When you see the word probability, Ms. Jones, what does it mean to you, that word probability?

A    That there is a likelihood that he would do it.

Q    Very good.  In fact, jurors have told us that, that to them the word probability means more likely than not.

A    Uh-huh.

Q    And that word probability is there, and it's to be distinguished from the word possibility because you would agree with me that anything is possible, correct?

A    Anything is possible.

Q    Okay.  The legislature wants you as a juror, in looking at special issue number one, to ask yourself this question.  Based upon the evidence that I've heard, in other words, the circumstances of the crime.

A    Uh-huh.

Q    As you said on page one of your questionnaire when asked about the death penalty, are you in favor of it, you said yes.  In the very last sentence you said, provided all evidence is shown to be.

A    Right.

Q    Okay?  Exactly.  So, and you are absolutely right, Ms. Jones.  And there you have special issue number one.  It

says, from the evidence --

A    Uh-huh.

Q    -- which could be the facts of the crime, and whatever other evidence you heard, you ask yourself this question.  Has the State proven to me beyond a reasonable doubt there is a probability that the defendant I have now found guilty of capital murder --

A    Uh-huh.

Q    -- would commit criminal acts of violence that would constitute a continuing threat to society?

Now, when you see the words there, criminal acts of violence, what comes to mind, for example, when you hear those terms?  Give me some examples that you would think of.

A    Robbery, killing, right?

Q    Okay.  And how about -- how about, as you're looking at me right now.

A    Uh-huh.

Q    My colleague is sitting right here next to me.

A    Uh-huh.

Q    Out of the blue I just turn and I clock her in the face, punch her in the face, an assault.

A    Uh-huh.

Q    Would that in your mind constitute a criminal act of violence?

A    Yes.

Q    Okay.  But it's not a robbery, right?

A    It's not a robbery, right.  It's a certain degree. It's a different degree.

Q    Okay.  All right.  So, in other words, you as a juror would decide when we present evidence to you in part two of the trial, you would ask yourself this question.  Did that evidence that the State brought to me, as a juror, suggest to me that, beyond a reasonable doubt --

A    Uh-huh.

Q    -- that this defendant I found guilty of capital murder, is there a probability he would commit criminal acts of violence?

Now, you decide as a juror whether or not the examples that I just gave where I punched my colleague, whether it's another robbery, murder, rape or whatever, you decide if it constitutes a criminal act of violence.  That's in your parlance as a juror to decide.

What I tell you it doesn't mean is we don't have to prove another murder, we don't have to prove another robbery, we don't have to prove a sexual assault or rape. It's any criminal acts of violence.

And that's the reason why the legislature left it like that.  It's for you to decide what is or isn't a criminal act of violence based upon the evidence that we

have presented to you as a jury.  Okay?

A    Okay.

Q    Now, the very last word in special issue number one is what?

A    Special issue number one is society.

Q    Okay.  Now, remember now I told you and the judge told you, if a defendant is found guilty of capital murder --

A    Uh-huh.

Q    -- he is going to spend for sure the rest of his life where?

A    In prison.

Q    In prison.

A    With no parole.

Q    Right, without parole, as the judge told you.  You can take that to the bank.  There is no parole.

Now, here's the question now.  When you hear the word society as you and I are talking, what comes to mind when you hear the word society?

A    Us, the world.

Q    Right.  Going to church.

A    Where we live, where we go, where we work.

Q    Exactly.  Now, obviously then if the legislature has passed a law that says, if someone is found guilty of capital murder, he automatically gets life without parole.

A    Right.

Q    But they have provided a vehicle in these issues here that says to the juror, but you can decide whether or not that automatic sentence which he will get for the rest of his life and he will serve in prison --

A    Uh-huh.

Q    -- should be elevated to a death penalty by answering these three questions.

A    Okay.

Q    So, the legislature contemplated there are some individuals that, even while they are in prison society, could constitute a future danger.  Because in prison, what are some of the people you expect to encounter in prison?

What categories of people would you expect to be in a prison society?

A    In a prison society, there's the murderers --

Q    Okay.

A    -- the child molesters.

Q    Right.

A    The wife beaters or whatever they are called.

Q    Right.

A    Assault, for spousal assault.

Q    People who have been convicted of crimes, you expect them to be in prison.

A    Right.  Lesser crimes than murder definitely.

Q    Right.

A    And others, yes.

Q    How about guards, the guards who have to guard them?

A    Yes.

Q    Who work there, right?

A    Yes.

Q    How about the medical providers, doctors or nurses?

A    Yes.

Q    How about clergy people who volunteer to go talk to them about religion?

A    That's true.

Q    How about teachers who go to teach them if they get a GED or a college course and those kind of things?

A    I didn't think about that.  Yes.

Q    How about visitors who come to visit their loved ones who have been sentenced to like DWI crimes or wife beating crimes or those kind of things?  You expect all those kinds of people there, correct?

A    They are people, yes.

Q    Right, exactly.  So, the law recognizes or the legislature recognizes that even though a person has been found guilty of capital murder --

A    Uh-huh.

Q    -- he will spend the rest of his life in prison without the possibility of parole --

A    Uh-huh.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    -- you're still asked as a juror, is there a probability that he will constitute a future danger while in that prison --

A    To any of them.

Q    -- to any of those people that he encounters in that society?

And the State has to prove that to you beyond a reasonable doubt.

A    Okay.

Q    If we prove to you as a juror, beyond a reasonable doubt, that even while in prison for the rest of his life --

A    Uh-huh.

Q    -- this defendant will constitute a future danger to those that he encounters, then, and if you believe it beyond a reasonable doubt, the answer to special issue number one would have to be yes.

A    Yes.

Q    If you answer it no, if your colleagues and you answer it no, then the punishment phase of the trial stops and he gets an automatic sentence of life without the possibility of parole.

A    Yes.

Q    If, however, you answer the question yes because we've proven it to you beyond a reasonable doubt, then you go on to special issue number two.

Now, let me say this, Ms. Jones. Whether or not you see issue number two will depend on the judge, Judge Snipes, and what evidence is brought forward. But in case you are to encounter it, let me tell you what it means basically.

It will be called in Texas the law of the parties charge. Okay. And what it basically says is this. You would imagine there are situations where two or more people may conspire or get together to go commit a crime.

For example, if I'm going to want to rob a bank or something, you know, it would make sense that I would want to sit and discuss it with someone who, when I go in to do the robbery, I need somebody out there to be my lookout --

A     Uh-huh.

Q     -- or to drive the getaway car to help me get away quickly before the cops come, correct?

A     Correct.

Q     So, the law says this. If two or more people conspire, if we get together, me and my colleague here, Ms. Evans, okay?

A     Uh-huh.

Q     And we work for the government so we don't make a whole lot of money. We need some quick money for the weekend. July 4th is coming up. And we conspire. We say, look, let's rob this bank right at the corner of Mockingbird and 75. It's

a quick getaway, you know, it's right there at the interstate, let's do it.

A    Uh-huh.

Q    We say, great, let's do it, Gordon.  I say, you know what, around noon there is only one clerk in there because it's lunchtime.  They all go to lunch.  And we go there, broad daylight.  Ms. Evans says, here, I'll stay in the car.  I'm a better driver than you.  I'm going to wait outside.  Okay.  And I say, fine, I'll go in the bank.

As I get there I turn to Ms. Evans and I say, whoa, this is broad daylight.  I forgot the mask.  And she says to me, not a big deal, take care of the witness.  And she saw me with the gun.  I walk in there, I get the bag of money, realize I'm going to be seen, I shoot and I kill the bank teller and I take the money.

Now, because you have understood that in Texas a capital murder, one form of capital murder is if someone has intentionally killed in the course of robbery, that's a capital murder offense.  With the hypothetical I have given to you where I walk in the bank, shoot and kill the teller and take the money, that's a capital murder.

A    Yes.

Q    My colleague, if you as a juror find that my colleague either solicited, encouraged, directed, attempt to aid or aid me in the commission of that crime, the murder,

because she said to me, don't leave any witnesses, take care of it, the law says as a party she can be charged with the very same crime as me, the shooter.

A    Of course.

Q    Okay?

A    Uh-huh.

Q    You can follow that law?

A    Yes.

Q    Second scenario.  The law says if we get together, we conspire to go rob a bank and we talk about it, same scenario.  But I show Ms. Evans the gun because I'm about to walk into the bank.  And she knows me because we've known each other for years.  She knows I'm hot tempered and I can just go crazy in a minute and kill people.

I tell her, I'm just going to go rob them, that's all I'm going to do.  She says, okay, hurry up and come back, I'm waiting for you.  I go in there.  And we planned this robbery.  I go in there.  She is sitting outside, and all she hears is bam, bam, bam, shots fired.

I run outside with a smoking gun.  She said, what happened?  I said, he looked at me the wrong way, and you know me, right?  I'm hot tempered.  And, so, I popped him, I killed him.

The law says this.  If Ms. Evans and I conspire to commit armed robbery, as we did, here's the

question. Should it have been anticipated that in the course of committing that crime, aggravated robbery, should she have anticipated that someone could have -- would have been killed?

She knows I'm hot tempered, known each other for years. I go in. She saw me with a gun. I shoot and I kill him. All she agreed to do was what? Robbery.

But the law says this. If you, as a juror, believe that she should have anticipated in the course of that robbery someone would have been killed, she can be charged with the same crime as me.

Can you follow that -- Do you have any issue with that law? What are your thoughts about that?

A    It's hard to anticipate what someone is going to do.

Q    Exactly.

A    But she knows your personality and she knows the situation you would be in.

Q    Right.

A    She knows there is that slim chance.

Q    Because she saw me with a gun.

A    Because she knows you have a gun and she knows you're hot tempered.

Q    Right.

A    But in reality, it is hard to anticipate what someone might do.

Q    Very good.  And that's the reason why, as a juror, you would have to determine in the first part of the trial -- Go back to the first.

A    Uh-huh.

Q    -- should Elaine, the nonshooter, have anticipated that someone would have been killed?  Okay.  Should have anticipated.

Now, we get to special issue number two now. You notice there that the second to the last sentence doesn't have the word should have anticipated.  All it says is this is what you have to decide.  If it's the nonshooter -- In my example, my colleague Elaine, did she cause the death of the deceased?  Well, the answer is no.

A    No.

Q    She didn't cause the death.

Two, did she actually cause the death of -- if she did not actually cause the death but she intended to kill the deceased, well, the answer is no because she didn't intend it either.

A    No.

Q    But here's the other question.  Did she anticipate that a human life would be taken?  And that's the question you would have to decide as a juror based upon all the facts and all the evidence.

A    She anticipated that it could, that that could have

happened.

Q    Right, you're right.  And it's a question that you would have to decide as a juror.

A    Uh-huh.

Q    If you, as a juror, get to special issue number two and you decided the answer is yes, either because we have proven the defendant caused the death of the person --

A    Uh-huh.

Q    -- or did not actually cause the death but he intended to kill the person, or anticipated a human life would be taken, one of those three, if you answer the question yes, what happens now is the defendant is now looking at a death sentence because you have now elevated the life without parole.

A    Okay.

Q    You have now said yes to issue number one based upon the evidence.

A    Uh-huh.

Q    You've now said yes to issue number two, again, based upon the evidence, and we've proven it to you beyond a reasonable doubt.

But the law still says this, Ms. Jones.  It is not a finished process as yet because remember now I told you way back in the beginning that the legislators have set up this process whereby someone found guilty of capital murder

is not automatically sentenced to death. There must be a process you have to go through as a juror.

These issues are set up as barriers to the death penalty because the legislators believe someone who is found guilty of capital murder, that the proper sentence ought to be life without possibility of parole.

But obviously if they have provided a vehicle for the death penalty, they are saying to you as a juror, there are some persons, some individuals, that life without parole isn't good enough. They can be elevated to a death penalty if, and only if, the State proves to you issue number one is yes.

If you see it, you may or may not get to number two, issue number two, but if you answer that yes, then you still have to go on to issue number three.

A    Uh-huh.

Q    Issue number three is what's called the stop gap. It's the last -- It's the vehicle whereby you as a juror say, look, we have found somebody guilty of capital murder in that he's intentionally killed somebody trying to get their property. We found him guilty. That's part one of the trial.

You have said yes, he's a future danger in that even in prison we think he's going to commit other criminal acts. There is a probability he will commit

criminal acts that constitute a continuing threat to the prison society.  We have said yes.

We have said yes to number two in that he either caused the death, intended the death, or anticipated someone would be killed, and I said yes.

Now you get to this issue.  Now, look what it says now.  You notice now, Ms. Jones, there is nothing in there that says beyond a reasonable doubt.

A    No, there's not.

Q    Right, and the reason is this.

A    Because we've already done that.

Q    Exactly.  We don't have to prove it.

A    In one and two.

Q    Right, no one has to prove it.  All it says is this, Ms. Jones.  Do you, as a juror, find, taking into consideration all the evidence --

A    Uh-huh.

Q    And notice what it says now.  -- including the circumstances of the offense, so number one.  That two, the defendant's character.  Three, his background.  When you take all of those things into consideration, and the personal moral culpability of the defendant, in other words, his role and his part in the crime, all of those things.

Now, you may hear things like, for example, on page six.  Would you turn to page six --

A    Sure.

Q    -- please, Ms. Jones?

A    Sure.  Okay.

Q    Your answer at the very top, where you were told at the very top of page six that the law in Texas is that voluntary intoxication or evidence of intoxication, whether it's voluntary or not, that evidence of intoxication may be considered as mitigation in punishment.  And you are asked, do you agree with the law?  And you said, I'm not sure how I feel on this.

Let me tell you what the law says on this, Ms. Jones.  And by the way, others have -- other jurors have been very uncertain about what their feelings are on this issue.

A    Okay.

Q    So, you're not alone.

A    Okay.  So, let me just say this, though.  The law says that you may consider it as mitigating.  For example, on the bottom of page five you are told that the law is, voluntary intoxication is not a defense.  See the bottom of page five?

A    Yes, sir.

Q    And you said, yes, you agreed with the law.  And here is why.  If I have some bad neighbors that I don't like, Ms. Jones, and I want to get rid of them, if voluntary

intoxication was a defense to a crime, what do you think I would do?  Get drunk and go kill them, right?

A    Yeah.

Q    Right.

A    Probably something like that, yes.

Q    Exactly.  So, the law says this.  You can't get drunk, Gordon, go kill somebody, commit a crime, and use it as a defense.

In other words, a defense is something that absolves me and says, you know what, I know what you did, but you had a good legal reason.  Go and sin no more.  You can't do that.

But on top of page six what the law says is this, though.  If evidence is brought to you that at the time of the crime the person was intoxicated, whether by drugs or alcohol, a combination therefore, voluntary or not, you may consider that as mitigation.

Now, you don't have to, but you may.  My question to you is this, Ms. Jones.  Would you have an open mind that if you hear evidence that at the time of the commission of a crime the person may have been intoxicated, may have been intoxicated, would you at least have an open mind to the possibility that you may find that to be something that's mitigating?

A    Yes.

Q     Okay.  Because as you said on page one, the very front, you want to hear all the evidence.

A     I want to hear everything, all the details.

Q     Okay, right.  So if you hear things like, for example, the defendant was abused as a child or he is from a single parent home or he, in the hypothetical I gave you with Ms. Evans and myself, one of us may be a follower, one may be a leader.  You may hear stuff that he lived in foster care homes or a whole bunch of different homes.

The law says as you sit here, Ms. Jones, I can't ask you to tell me what you will or will not find to be mitigating.  Here's what the law requires.

At this point, because you've heard no evidence in this case, do you have an open mind that whatever the evidence you hear, as you're instructed by the Court to do, will you have an open mind to consider all the evidence, including the offense, defendant's character, his background, which could be genetics and environment --

A     It could be.

Q     -- all of those things, and his moral culpability, would you keep an open mind to hearing all that evidence and then making this determination?  Because you notice what it says, Ms. Jones, that there is a sufficient mitigating circumstance or circumstances.

Now, let me tell you why that's important,

Ms. Jones. The legislators didn't ask you to find if there is anything mitigating because, for example, you may find that his age or the fact that he was intoxicated or not intoxicated, the fact he's from a broken home or a single parent, or any of those things, you may find that, you know what, yeah, he didn't really have it good in life so I think that's mitigating somewhat. That isn't the question you're asked to decide.

What is the word that comes right before mitigating, Ms. Jones?

A    Oh, sufficient.

Q    Sufficient.

A    Sufficient.

Q    Now, there is a reason why the legislature put that word in there because you may find anything to be mitigating. The question is this. Does the things that you find to be mitigating, age, alcohol, high or not high, follower versus leader, broken home, single parent, moved all over the globe, bad childhood, bad environment, bad genetics, do you find those things that may or may not be mitigating to rise to the level where it becomes sufficient mitigating?

Sufficient mitigating whereby the person I have found guilty of capital murder, that I have said yes, is a future danger, number one, yes, he is a party, do I find

it rises to the level where that death sentence that he's now looking squarely at, I want to go back now and give him a life without parole because all those things about his background, all those things I heard rises to a level where it's sufficiently mitigating to turn back the hand and say, let me give him the life without parole versus the death sentence?

So that if you answer the question number three yes -- So, if you answer question number one yes, number two yes and number three yes, the defendant gets the sentence of life without the possibility of parole. But if you find no, there isn't, then the judge has no choice but to sign the death warrant for the defendant.

Do you understand that, Ms. Jones?

A    I understand that.

Q    Any questions or anything about that?

A    No, sir, I don't think so.

Q    Okay. Now, Ms. Jones, do you understand that issue number one, the very first issue, do you understand that there is no automatic answer to that question, that the only way you can answer that question is basically what?

A    From the evidence.

Q    The evidence. And whether or not the State has proven it to you by what standard?

A    Reasonable doubt.

Q    Beyond a reasonable doubt.

A    Beyond a reasonable doubt.

Q    Okay.  So, you are going to promise the Court and all the people in here that you're going to hold the State to its burden and make us prove to you beyond a reasonable doubt that it ought to be yes, correct?

A    Yes.

Q    Okay.  All right.  Now, in other words, as you told us on page one, just because someone is charged with capital murder and you have now found him guilty, you would wait to hear all the evidence in following this procedure set up by the legislators before you can answer those special issues, correct, Ms. Jones?

A    Yes, correct.

Q    Okay.  All right.  Now, let me ask you, on page two of your questionnaire at the very top, you are asked there, if you are in favor of the death penalty in some cases, do you agree that a life sentence, rather than the death penalty, would be appropriate under the proper circumstances in some cases, and you checked no.

        Now, let me just say this to you.  There is nothing wrong -- there is not a right or wrong answer.  All I want to make sure, Ms. Jones, is that in light of that answer that you've given there -- and I will say this to you.  We understand that on April 24th when you filled out this

questionnaire, you did not know what the law is in Texas for a death penalty case.

A    True.

Q    Correct?

A    True.

Q    You did not know that there was a process that has to be followed, correct?

A    Correct, I did not.

Q    All right.  Now that you understand that even after you've found a person guilty of capital murder and he automatically gets life without parole, that's the only thing that happens automatically.  You understand that, Ms. Jones, correct?

A    Uh-huh, yes.

Q    That the way it's then elevated from life without parole to a death penalty is you have to answer those special issues, correct?

A    Yes, you do.

Q    And you understand that in order to get the death penalty, the only proper combination, the only correct combination if we prove it to you is yes --

A    Yes, yes.

Q    -- yes, and no to number three.

A    Uh-huh.

Q    Any other combination, any other different way

besides yes, yes and no, he gets an automatic life.

Now, can you follow the law, Ms. Jones, as I have explained it to you?

A    Yes.

Q    Do you have any questions for me about anything at all?

A    No, you have cleared my mind quite a bit.

Q    Okay.  Now, let me ask you this.  The fact that your dad was a DPD detective for thirty years, is there anything about that that you believe you will give the State a leg up or anything about that with your dad?

A    A leg up?

Q    Yes.

A    As --

Q    Meaning that, in other words, in this case there will be police officers testifying.

A    Yes.

Q    My daddy was with DPD for thirty years, therefore, I'm going to trust these officers that everything they tell me to be true.

A    Oh, no.

Q    Okay.

A    No.

Q    All right.  Just wanted to make sure.

A    Huh-uh.

Q    I'm almost finished, Ms. Jones.

A    All right.

Q    Ms. Jones, some jurors have told us in the past that in a case like this where, as the judge told you, there's only two possible sentences, the automatic life without parole, if he's found guilty, but before it goes to the death penalty you must answer these issues, some jurors have said to us, I feel a sense of obligation to the victim's family to return the death penalty just to make them happy.

Do you understand that, as a juror, that the way you decide the issue as a juror has nothing to do with whether or not the defendant deserves to live or die; do you understand that?

A    Yes, it's not an eye for an eye.

Q    Exactly.  I couldn't say that better, Ms. Jones. You do also understand that the family's feelings or the family's request or the family's desire has nothing to do with your obligation as a juror in deciding, first of all, whether a defendant is guilty or not; do you understand that?

A    Yes.

Q    And it has nothing to do with how you answer issues number one, two and three; do you understand that?

A    Yes.

Q    Okay.  And you will promise me you're going to

hold me to my burden and make me prove them to you?

A    Oh, yes.

Q    Okay.  Any questions for me?

A    No, sir, I don't think so.

Q    Ms. Jones, I thank you so much for your time --

A    Oh, well, thank you.

Q    -- and your attention.

        MR. HIKEL:  Judge, we pass Ms. Jones.

        THE COURT:  We thank you, Mr. Hikel.

        You need a short break?

        PROSPECTIVE JUROR JONES:  I'm doing good, thank you.

        THE COURT:  Okay.  I'm going to reintroduce to you at this time Brad Lollar.

        PROSPECTIVE JUROR JONES:  Okay.

        THE COURT:  Who is going to talk to you on behalf of Mr. Broadnax.

        PROSPECTIVE JUROR JONES:  Okay.  Hi.

                    EXAMINATION

BY MR. LOLLAR:

    Q    How are you, Ms. Jones?

    A    Doing good.

    Q    Good.  I'm Brad Lollar and this is Doug Parks.  I believe he was out of the room when you first came in.

    A    Hi, nice to meet you.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Keri Mallon. And we represent James Broadnax.

And Ms. Jones, I want to talk to you a little bit. I've heard what you had to say to Mr. Hikel over here.

A    Uh-huh.

Q    Now, I think he's already asked you the question, when you came down to fill out this questionnaire, you knew nothing about these special issues.

A    No, sir, I didn't.

Q    And didn't know anything really about how this process worked in terms of a capital murder case.

A    I had no idea. I've learned quite a bit.

Q    Well, and then I take it that the context in which you answered the questionnaire here two months ago was done in your belief that, if a jury found a person guilty of capital murder, that they went back to the jury room and just decided life or death.

A    That is the way I thought it was.

Q    Yeah, that's what most people tell us.

A    I had no idea.

Q    Yeah, we don't have -- We don't expect jurors to know anything about these special issues before they come down here. But that kind of explains to me some of the things that you put in your questionnaire.

A    Yes, I look back at that and I go, oh.

Q    Well, I know, but now --

A    I really didn't know what I was talking about on some of this.

Q    Well, we don't expect people to.  But the one thing we do expect when people fill out the questionnaire is that they answer the questions truthfully.

A    Yes.

Q    And this -- We expect them to tell us what they really feel about these issues.  And I think you did that in answering your questionnaire; is that correct?

A    I felt I did.  I look back on it, and after all of this education here, I realize I just answered what was in my heart or my head at the time.

Q    Sure, sure.

A    I had no idea.

Q    And I believe you did that.  And I am looking at your questionnaire.

A    It shows.

Q    We reviewed it, and I believe you when you tell me some of these things here in your questionnaire.  Now, let me say this to you, Ms. Jones.  All we are doing now --

First, let me tell you this.  I think you were on the morning panel.

A    Yes, I was.

Q    There were about 400 people in that group that came down and filled out questionnaires in the morning.  We had

another 400 that afternoon.

A    Uh-huh.

Q    So, we have had 800 people --

A    That's a lot.

Q    -- fill out these questionnaires.  And you, I believe, are the 117th person that we've talked to individually.  Okay?

And the reason that we do that is to end up with a group of twelve --

A    Uh-huh.

Q    -- who can be fair to both sides.  Okay.  And that's, you know, they have got their side to worry about; I've got Mr. Broadnax to worry about.  Is that fair enough?

A    Yes.

Q    Okay.

A    And, frankly, what we are looking for are people who aren't extremists on one side or the other and who can follow the law.  Okay?

A    Uh-huh.

Q    And the reason I say that to you, Ms. Jones, basically is because some of the answers you gave me in your questionnaire --

A    Uh-huh.

Q    -- and forgive me if I'm saying this unfairly, and tell me if I am, but I do not see you as being slightly in

favor of the death penalty for a person convicted of capital murder.

A    Okay.

Q    Is that fair?

A    From what I wrote here?

Q    Yes, ma'am.

A    Yes.

Q    And, frankly, I don't see you being moderately in favor of the death penalty if you find a person guilty of capital murder.

A    Oh, okay.

Q    I see you being whole hog for the death penalty --

A    Okay.

Q    -- if you find a person guilty of capital murder. And I say that based on your answers on the first page.

A    Uh-huh, where I said I was in favor and such?

Q    Well, yeah.

A    And I wrote --

Q    And where you answer, if the evidence shows someone took a life as a plan to murder that person or while planning theft and someone is killed, they should be put to death.

A    Uh-huh.

Q    Okay.  And then we ask you over on page four, for what crimes do you think the death penalty should be available

in Texas, and your answer is, all capital murders.

A    Uh-huh.

Q    Okay?

A    Uh-huh.

Q    The next question, we asked you that, do you agree with the law in the State of Texas that says murder in the course of committing or attempting to commit robbery is a capital offense for which the death penalty may be imposed? You said, yes, robbery is a severe crime, but to intentionally take a life during this act should be a capital offense.

And back what you thought on the 24th of April --

A    Uh-huh.

Q    -- was, by saying capital offense, you meant death penalty offense.

A    Right.

Q    Okay. The next question, do you think there are some crimes that call for the death penalty solely because of the severe facts and circumstances, regardless of whether or not the guilty person has committed prior violent acts? And you say, yes, I think there should be. You shouldn't have to have a past crime history to get the death penalty.

A    Correct, you shouldn't have to --

Q    Right. So you think --

A    -- have this history.

Q    -- the death penalty is the appropriate punishment for a person convicted of capital murder?

A    If all the evidence points to that --

Q    Right.

A    -- person's guilt.

Q    Being guilty.

A    Right.

Q    Good enough.  The next question, if you believe in using the death penalty, how strongly on a scale of one to ten do you hold that belief?  You told us you were a ten.

A    Uh-huh.

Q    Okay.  Then we go over to the next page, page five. We ask you in the middle of the page, do you believe spending a lifetime in prison is equivalent to the death penalty? Your answer is no.  We ask you, well, how do you feel about a sentence of life without the possibility of parole, and you have circled neutral.

A    Uh-huh.

Q    And your response was, please explain, it depends what they were sentenced for.  Capital murder, no, with an exclamation mark.

A    Yes.

Q    Right?

A    Yes, you're right.

Q    And then the next question, what purposes, if any,

do you believe life without the possibility of parole serves? And your answer is nothing.

A    It doesn't serve a purpose.

Q    Right.  So, and then what purpose, if any, does the death penalty serve?  And your answer is, it gives closure.  And by that you mean closure to the victim's family.

A    It gives closure.

Q    Okay.  Now, Ms. Jones.

A    Yes, I know where you're going.

Q    Is it fair to state that you dislike the availability of life without parole for a person convicted of capital murder?

A    I, with capital murder --

Q    Just your honest feeling, your heart.

A    My honest feeling, my heart feeling is I can't see, if they are convicted of capital murder, why they have the parole situation.

Q    Well, they don't have parole.

A    I mean not parole, excuse me, not parole.

Q    Okay.

A    They would just be in prison for the rest of their life.

Q    Taking up space.

A    We would be paying for everything for them.

Q    Okay.  Would it be fair to say that you have a predisposition, if you were a juror in a case that decided for a person who is guilty beyond any reasonable doubt of the offense of capital murder -- and let me just in a moment explain to you what capital murder is.  It is the intentional taking of another human life during the course of a robbery.

A    Uh-huh.

Q    Okay.  In other words, the person formed in their mind the intent to cause the death of the victim.  Okay?

A    Okay.

Q    And not to wound them, not to harm them, not to maim them --

A    Not to hurt them.

Q    -- but to cause their death, and did what it took to get there.

A    Uh-huh.

Q    And doing all that during the course of a robbery where they were using a deadly weapon --

A    Uh-huh.

Q    -- a gun, and killed the person with that deadly weapon.  Okay?

A    (Nods head).

Q    That's the type of capital murder we are talking about.  That's the type of capital murder alleged in this case.

A    Uh-huh.

Q    And I think you very clearly told us in your questionnaire that to you, in your heart of hearts, death is the only appropriate penalty for that person.

A    If convicted, yes.

Q    Is that correct?

A    If all the evidence says that they are guilty.

Q    Yeah, no question --

A    Right.

Q    -- about there being a doubt about his guilt.

A    Right.

Q    But if you find him guilty, you would be predisposed to give him the death sentence.

A    Probably.

Q    And basically you know you can answer these questions --

A    Uh-huh.

Q    -- in such a way that he'll get the death sentence.

A    Right.

Q    Right.  And is that what I hear you saying?

A    Uh-huh.

Q    Okay.  Thank you, Ms. Jones.

A    Sure, thank you.

THE COURT:  I would ask you to go through the special issues.

Q    (By Mr. Lollar)  All right.  Let me do this.  Okay.
Let me go one step further now.  See, this special issue
number one asks, do you find from the evidence beyond a
reasonable doubt that there is a probability that the
defendant would commit criminal acts of violence that would
constitute a continuing threat to society?

A    Right.

Q    Okay.  Now, again, let me tell you where you are
by the time you're answering that question.  The State has
proven to you beyond any reasonable doubt that the defendant
is guilty --

A    Okay.

Q    -- of the crime he's charged with.  And that is
intentionally causing the death of a victim during the
course of a robbery.

A    Uh-huh.

Q    Okay?

A    Okay.

Q    So, they have shown you that the person on trial
is a violent person who was so violent that they decided to
commit a robbery and to kill intentionally the victim during
the course of that robbery.  Okay?

A    So it was planned.

Q    I'm sorry?

A    So it was planned.

Q    Yeah.

A    Yes.

Q    And when you say planned, it doesn't have to be planned for weeks or days or months.

A    No, no, but just intentional.

Q    But they had to persuade you in the first part of the trial --

A    Uh-huh.

Q    -- that the defendant formed in his mind the intent to cause death and did that.

A    Okay.

Q    And to that extent, that's what we call intentionally, and that's one of the requirements of a capital murder case the State's got to prove to you.

A    Right.

Q    Okay?  But if they prove to you that the person on trial is that type of a person, okay, you see how that might go to special issue number one?

A    Yes.

Q    Okay.  And a lot of people tell us -- and tell me if this is what you think.  If you show me that the person on trial is that type of a person, that's always going to be the type of person to me that's probably going to commit criminal acts of violence in the future.

A    Always the same type of person?

Q    Yeah.

A    It doesn't necessarily -- then you're stereotyping.

Q    I'm sorry?

A    Then you're stereotyping.

Q    Well --

A    You're saying --

Q    Let me rephrase it or put it in your own words. If you find that the person on trial is guilty of capital murder such as we've described, it's an intentional murder committed during a robbery, is that the type of person that, to you, there is a probability that he is probably going to commit criminal acts of violence in the future?

A    Probably.

Q    Okay.

        MR. LOLLAR:  That's all the questions we have, Judge.

        MR. HIKEL:  Judge, that's an improper question he's asking her.  And I think he needs to explain to her the law and then ask what her opinions are once he explains the law properly, Judge.  That's an improper question.

        Because, Judge, in other words, in asking the question, he's supposed to indicate to the juror, yes, this is the question and it's beyond a reasonable doubt, the burden of proof.

        MR. LOLLAR:  Judge, Mr. Hikel had forty-six

minutes to talk to this juror and explain the law to her.

MR. HIKEL: Well, Judge, I agree, I do. But he still can't ask her an improper question to try to disqualify her with an improper question. That's all I'm saying.

THE COURT: All right. I'd ask you to ask it again, Mr. Lollar, for the Court.

MR. LOLLAR: Okay.

THE COURT: And go over the burden of proof.

MR. LOLLAR: Sure.

Q    (By Mr. Lollar)  Well, let me -- I thought I understood what you told to me, but let me ask you again.

A    Okay.

Q    If the State proves to you that the defendant is guilty of capital murder --

A    Yes.

Q    -- that would prove to you that the defendant is a violent person?

A    Well, yes.

Q    Okay. And is that the type of person that, to you, about which you could say that there is a probability that he would commit criminal acts of violence that would constitute a continuing threat to society?

A    If he does it once, he would do it again is what you are asking me?

Q    There you go.

A    That's what you're asking me, correct?

Q    Now, let me go on to special issue number three. I'm not gonna talk to you about special issue number one, but let me tell you what --

THE COURT:  I still want you to get into the burden of proof.

MR. HIKEL:  Yeah.

MR. LOLLAR:  Okay.  Well --

THE COURT:  I understand, but I --

Q    (By Mr. Lollar)  You know, when we asked you -- When Mr. Hikel asked you what your definition of beyond a reasonable doubt was in the first part of the trial, you said you would have to listen to the case.  Okay?

A    You have to have all the evidence.

Q    That was your answer.

A    You have to have all the evidence.

Q    Right, sure.

A    But if he's proven -- You're saying he's already been proven guilty.

Q    Right, uh-huh.

A    So, all the evidence has already been there.

Q    Yep.

A    And then you're asking me if he is still a threat to society.

Q    Right.  Would that evidence --

A    After --

Q    Would that evidence persuade you beyond a reasonable doubt that the defendant on trial about which you could say there is a probability he would continue to commit criminal acts of violence?

A    I guess I'm misunderstanding because I guess what I'm thinking is in issue number one he's already been established --

Q    He's already been found guilty.

A    -- with all the evidence that he's guilty.

Q    Yes.

A    So, he is.  He would have a violent -- to me, after all of the evidence, then, yes, he would be capable possibly of having a violent -- of having the violence continuing through society.

Q    Now, see, that doesn't ask you whether it's possible.  It says whether there is a probability.

A    There is a probability.

Q    Okay.  Same thing to you?

A    Probability, it's possible, yeah.

Q    Okay.  See what that question asks, now, let's go through that.

A    Okay.

Q    Do you find from the evidence beyond a reasonable

doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Now, frankly, Ms. Jones, some people tell us -- I think you're telling us this, but I want to make sure.

A    Okay.

Q    That if the State shows me evidence in a case that persuades me beyond a reasonable doubt that the person on trial is the type of person who could take a loaded gun out to do a robbery, do a robbery, intentionally cause the death of the victim.

A    Okay.

Q    Okay?  And they have proven that to me beyond any reasonable doubt.

A    Uh-huh.

Q    And I have found that person guilty.

A    Uh-huh.

Q    Okay?  Then, to me, that evidence which shows me he is guilty is the same evidence about which I would say would always prove to me beyond a reasonable doubt that there is a probability that that person would continue to commit criminal acts of violence.

A    Not that evidence, not from that case.  That his personality, what he did, there is a probability that he would commit another violent crime.  Not based on that

evidence for that trial, for that crime.

Q    So, are you saying --

A    Do you follow me?

Q    -- you would require the State to bring something more?

A    No, no.  I guess I'm understanding that you're saying from the evidence --

Q    Uh-huh.

A    -- from that -- from this trial, does that persuade me that this evidence is going to carry through his whole life?

Q    Uh-huh.

A    Is that what you're saying?

Q    Right, that's what the question asks.

A    Okay.

        MS. HANDLEY:  No, that's not what the question asks.

A    I guess I'm not interpreting that question that way.

Q    Okay.  What I'm asking is this.

A    I'm interpreting -- I'm sorry.  Go ahead.

Q    Okay.  No, go ahead, answer, yeah.

A    I'm interpreting that the evidence from the trial that he's on right now.

Q    Uh-huh --

A    Okay.  He's guilty.  But I'm not saying that what

**Anne B. Meredith**
Certified Shorthand Reporter

he did, what his violent crime was that he did is going to persuade me to say, okay, he's going to do that particular violent crime again.

Q    Well, see, it doesn't --

A    It's just saying that -- I'm sorry.  Go ahead.

Q    It doesn't say that particular crime again.

MR. HIKEL:  Judge, Judge.

Q    It says criminal acts of violence.

MR. HIKEL:  Can I have her finish?  Can she finish her answer, Judge?

THE COURT:  Yeah.  Have you finished?

A    I'm sorry about that.  That he would be -- Let me start over.  Let me start over.

What I'm trying to say is what he did that he was committed, the crime he was committed for or found guilty for would not -- would, I would say that yes, he probably would be, probability of a threat to society, whether in prison or out of prison --

Q    Okay.

A    -- capable of violence.

Q    Okay.

A    Of creating some kind of violence.

Q    Okay.

A    Does that make sense?

Q    Yes, ma'am.  I understand you perfectly.

A    Am I making sense?

Q    Yes.

A    I've said it so many times, I'm like ahh, I don't know if I'm making sense here.

Q    So that the record is clear is you're saying that if you sat on a jury and found a person guilty of this type of crime --

A    Okay.

Q    -- that that, to you, is the type of person that would probably commit criminal acts of violence in the future.

A    I hate using that type of person, that stereotype, to --

Q    Well, is that a person about which you would say would probably commit criminal acts of violence in the future?

MR. HIKEL:  Judge, I still think he's asking an improper question, Judge.

THE COURT:  All right.

MR. LOLLAR:  And she answered.

A    I don't want to stereotype the personality --

THE COURT:  Let me ask it.

A    -- is where it's getting --

THE COURT:  Let me ask you something, okay?

PROSPECTIVE JUROR JONES:  Okay.

FURTHER EXAMINATION

BY THE COURT:

Q    When you get to special issue number one.

A    Uh-huh.

Q    And of course, you've had two good lawyers explain it to you for over an hour.

A    Oh, yeah.  Yes, I have.

Q    All right.  Forget the type of person.

A    Okay.

Q    When you get to special issue number one -- If you're in a capital murder case and you are at special issue number one, you have already decided that the person on trial --

A    Uh-huh.

Q    -- is guilty beyond a reasonable doubt of capital murder.

A    All right.

Q    You know that.

A    Yes.

Q    Will that evidence alone automatically cause you to answer special issue number one yes?

A    I guess I would have to say yes because I would feel that if he was convicted, that he would be -- there would be a probability he could commit a violent crime and continue to be a threat to society, whether in prison or out.

Q    Would you always answer special issue number one then yes?

A    Always?

Q    Yes, ma'am.

A    I'm sorry, it's just -- I'm just thinking of based on the evidence and stuff.

I guess I would say yes, if he was convicted. If he was actually convicted and we were going into the second part of that, yes.

THE COURT:  All right.  All right.  All rise.

MR. LOLLAR:  Thank you, Ms. Jones, we appreciate it.

PROSPECTIVE JUROR JONES:  Sorry about that.

MR. LOLLAR:  No, no, no.

MR. HIKEL:  Thank you, Ms. Jones.

PROSPECTIVE JUROR JONES:  Thank you, I appreciate it.

(Prospective Juror Jones exits the courtroom).

THE COURT:  In the presence of Mr. Broadnax, what says the State?

MR. HIKEL:  Judge, I guess the way the question was asked and the way she answered, she is probably disqualified, Judge.

MR. LOLLAR:  We will submit the juror for cause.

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT:  It will be granted.

MS. HANDLEY:  Judge, may we have a clarification because I'm obviously -- Please, I'm not taking issue with the Court's ruling.  But I'm just not hearing, will you hold the State to its burden of proving this to you beyond a reasonable doubt.

I mean I'm hearing a lot of gross minipulation of is this the type of person who --

THE COURT:  Yeah.

MS. HANDLEY:  For somebody to say, well, yeah, it sounds to me like he's a violent guy, it's really kind of a --

MR. LOLLAR:  Well, y'all didn't even try to qualify --

MS. HANDLEY:  Let me finish, Brad.

THE COURT:  Wait, wait, Brad.  Wait a minute, Brad.

MS. HANDLEY:  I mean if we could just get some clarification on this.

THE COURT:  Type of person is not going to get it.  There is no doubt about that.

MS. HANDLEY:  And even then, Judge, though, I think that the juror should be asked, are you going to make the State prove it to you beyond a reasonable doubt?

MR. HIKEL:  And, Judge, that is important

because the facts -- the law says the facts alone can be sufficient.

THE COURT: Facts alone, facts alone can do it.

MR. HIKEL: Yes, if you simply ask the proper question. Will you make the State hold us to the burden of proof in trying the capital murder. That has to be the question because that's what the issue asks about. And the facts alone can do that.

THE COURT: Facts alone can do that. But if you are automatically going to answer special issue number one yes in every case because you found somebody guilty, after all the other stuff she said, I found that she was a vacilating juror and I caused her. But I understand.

MS. HANDLEY: Fair enough, Judge. I'm just -- It just -- it seems to be a reoccurring thing.

THE COURT: I understand. But type of person, Mr. Lollar, and you know that.

MR. LOLLAR: Well, yes. And if we were talking about a moderate juror, I wouldn't care. But we're talking about a woman who, from question one, says she would never consider imposing life without parole. Then why are we even wasting our time talking to her and trying to rehabilitate her?

THE COURT: Well.

MS. HANDLEY: Well, why do we have a juror

on the panel who says, in all honesty, I can't give somebody the death penalty?

MR. LOLLAR:  Because you've got six on there that said they can't do anything but give them the death penalty.

MS. HANDLEY:  All right.  All right, Brad, easy.

THE COURT:  Here's the deal.  But I took it -- Mr. Lollar, I did take into consideration her questionnaire.

MR. LOLLAR:  Yes, sir.

THE COURT:  Ask her to return, please.

(Prospective Juror Jones returns to the courtroom).

THE COURT:  You will not have to serve. You're free to go.  Thanks a lot.

PROSPECTIVE JUROR JONES:  Thank you very much.

MS. HANDLEY:  Thank you, ma'am.

MR. HIKEL:  Thank you, Ms. Jones.

(Court adjourned for the day).

**Anne B. Meredith**
Certified Shorthand Reporter

THE STATE OF TEXAS  (

COUNTY OF DALLAS      (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 30th day of June, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volumes 29 through 32) is $3,875 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 28th day of December, 2009.

_Anne B. Meredith_
Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter