ORIGINAL

REPORTER'S RECORD

VOLUME 31 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| THE STATE OF TEXAS | ( | IN THE CRIMINAL DISTRICT |
| VS. | ( | COURT NUMBER SEVEN |
| JAMES GARFIELD BROADNAX | ( | OF DALLAS COUNTY, TEXAS |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

INDIVIDUAL VOIR DIRE EXAMINATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 1st day of July, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

**Anne B. Meredith**
Certified Shorthand Reporter

A P P E A R A N C E S:


HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas   75207-4313
Telephone No. 214 653-3600

BY:   MS. ANDREA HANDLEY, SBOT No. 08898800
MS. ELAINE EVANS, SBOT No. 24032880
MR. GORDON HIKEL, SBOT No. 00787696
Assistant District Attorneys


APPEARING FOR THE STATE OF TEXAS



MR. BRADLEY LOLLAR, SBOT No. 12508700
Attorney at Law
1700 Commerce, Suite 450
Dallas, Texas   75201
Telephone No. 214 384-8178

MR. DOUGLAS PARKS, SBOT No. 15520000
Attorney at Law
321 Calm Waters Lane
Holly Lake Ranch, Texas   75765
Telephone No. 903 769-3120

DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
133 N. Industrial Blvd., LB 2
Dallas, Texas   75207-4399
Telephone No. 214 653-3550

BY:   MS. KERI MALLON, SBOT No. 24049165
Assistant Public Defender

APPEARING FOR THE DEFENDANT

CHRONOLOGICAL INDEX - VOLUME 31

|  |  |  |  | PAGE |
|---|---|---|---|---|
| Proceedings - July 1, 2009 |  |  |  | 5 |
| VENIRE PERSON | COURT | STATE | DEFENSE |  |
| RICHARD KONUGAH<br>Excused by Agreement | 6 |  |  | 11 |
| ROBERT LEE PATTERSON<br>Prospective Juror Accepted | 13 | 23 | 58 | 84 |
| TRACEY WEST<br>Excused by Agreement |  |  |  | 86 |
| SCOTT FORD<br>Excused by Agreement | 88 | 96 |  | 118 |
| Adjournment |  |  |  | 119 |
| Reporter's Certification |  |  |  | 120 |

**Anne B. Meredith**
Certified Shorthand Reporter

ALPHABETICAL INDEX - VOLUME 31

| VENIRE PERSON | COURT | STATE | DEFENSE | PAGE |
|---|---|---|---|---|
| FORD, SCOTT | 88 | 96 | | |
| Excused by Agreement | | | | 118 |
| KONUGAH, RICHARD | 6 | | | |
| Excused by Agreement | | | | 11 |
| PATTERSON, ROBERT LEE | 13 | 23 | 58 | |
| Prospective Juror Accepted | | | | 84 |
| WEST, TRACEY | | | | |
| Excused by Agreement | | | | 86 |

*Anne B. Meredith*
Certified Shorthand Reporter

P R O C E E D I N G S:

(Defendant present).

(Prospective Juror No. 927, Richard Konugah,

enters the courtroom).

THE COURT:  Thank you, sir.  You'll have a seat right there, please.  I want to say good morning to you again.

PROSPECTIVE JUROR KONUGAH:  Good morning.

THE COURT:  We met out in the hall.  I didn't have this robe on.  I know your first name, but how do you pronounce your last name?

PROSPECTIVE JUROR KONUGAH:  Konugah.

THE COURT:  Konugah.

PROSPECTIVE JUROR KONUGAH:  Yes, sir.

THE COURT:  Is that correct?

PROSPECTIVE JUROR KONUGAH:  Yes, sir.

THE COURT:  Okay, good.  My name is Webb Biard again and I will be with you today during the jury selection process.

PROSPECTIVE JUROR KONUGAH:  Yes, sir.

THE COURT:  The Presiding Judge of this Court is Michael Snipes who you met at that large session.  And should you be selected as a juror, Judge Snipes will actually preside over the trial.

Also I want to introduce to you at this time

Andrea Handley.

MS. HANDLEY: Good morning.

THE COURT: Gordon Hikel.

MR. HIKEL: Good morning.

PROSPECTIVE JUROR KONUGAH: Good morning.

THE COURT: They represent the State of Texas and Dallas County.

Further to my right is Doug Parks.

MR. PARKS: Hi.

PROSPECTIVE JUROR KONUGAH: Good morning.

THE COURT: Keri Mallon.

MS. MALLON: Good morning.

PROSPECTIVE JUROR KONUGAH: Good morning.

THE COURT: And Doug Lollar. And they represent Mr. James Broadnax. Mr. Broadnax.

Do this for me before we go any further, please.

(Prospective Juror Konugah sworn).

THE COURT: Thank you.

RICHARD KONUGAH, having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Mr. Konugah, from filling out your questionnaire which we have here, and I will give it to you in just a

minute, and from reading the pamphlet -- and I saw you reading it and I told you to try to understand it as best you could, but we will give you plenty of time to understand it more.

A    Yes, sir.

Q    -- and from hearing Judge Snipes' remarks, and as you sit here now, are you aware that this is a capital murder case?

A    Yes, sir.

Q    Are you aware that the State of Texas is seeking the death penalty?

A    Yes, sir.

Q    All right.  All right.  Capital murder is the only crime in Texas for which the death penalty is a possible punishment.

A    Yes, sir.

Q    If someone is found guilty of capital murder, there's only two possible punishments, and that's life in prison without parole or death.

A    Yes, sir.

Q    And when I say life in prison without parole, I mean life in prison without parole.

A    Yes, sir.

Q    Not that you would become eligible for parole in thirty years or twenty years.  You never become eligible

for parole.  Life in prison without parole means just that. So, it's either life in prison without parole or death if you're found guilty of capital murder.

A    Yes, sir.

Q    And the way the jury decides what the punishment is, should they find someone guilty of capital murder, is by answering those three special issues that were in that pamphlet.  Do you remember reading those?

A    Yes, sir.

Q    Okay.  Did it help you understand it just a little bit better?

A    Yes, sir.

Q    Okay.  In other words, you don't write down on a blank line either life in prison without parole or death. You answer those three special issues.  You answer them yes or no, and depending on how you answer them determines the sentence.

And that's done, only done if you find someone guilty of capital murder, and that's only done at the end of the trial after you've heard all the evidence. Does that make sense to you?

A    Yes, sir.

Q    Have you ever served on a jury before?

A    No, sir.

Q    Okay.  That's no problem.  These lawyers will

explain the law to you. And let me say, like I told you out in the hall, these are outstanding lawyers but they are also good people.

A    Yes, sir.

Q    It's out of the question that anybody is going to try to embarrass or intimidate you in this process. You're not expected to know the law. That's not your job. It's our job to explain the law to you.

And if you have any confusion about the law or the way sometimes we say things that we think are making sense and they don't to a juror, if you have any questions, I want you to ask them. Fair enough?

A    Yes, sir.

Q    Now, from reading that pamphlet, did you see that Judge Snipes intends to start this trial August the 10th?

A    Yes, sir.

Q    And then that's when it's going to start and it's going to last up to two weeks. That will be Monday through Friday, 9:00 to 5:00, be a break in the morning, break in the afternoon, be a lunch break.

The jury will not have to stay together overnight unless and until you were working on your deliberations, in other words your verdict, and went late and were still working on it and it was late in the evening and you became fatigued, there is a possibility that the

entire jury would be taken to a fine hotel as a group, spend the night in individual private rooms paid for by the county, and then come back the next morning as a group to avoid any outside influence on your verdict.

That could happen. And if it did, the judge would give you plenty of notice about that. All right. Did that make sense to you?

A    Yes, sir.

Q    Okay. Now, knowing now when the trial is going to start, how long it's going to last, how Judge Snipes, pardon me, runs his court, from filling out the questionnaire, from hearing Judge Snipes' remarks, from thinking about being here today and reading that pamphlet, as you sit here now, do you know of any reason why you can't sit as a juror in this case?

A    Sir, we intend to, me and my wife, we are looking at buying a house in Allen, Texas, and we just --

Q    Allen?

A    Yes, sir.

Q    When do you think you would do that?

A    We haven't closed yet. I don't know. We may be closing by the end of July, so July, by the end of the month, sir, so.

Q    This month?

A    Yes, sir.

Q    What do you think the odds on that are?

A    Sir?

Q    How, how certain is that, I mean?

A    Well, we put to the deed and we had an offer, so we are just waiting to see if they are going to accept our offer, and then we are going to close.  But right now we are still waiting on the counter-offer, sir.

Q    Sir?

A    Waiting on the counter-offer.

Q    Okay.

MS. HANDLEY:  I think that that would be a problem, your Honor, if he's actually not a Dallas resident at the time.  And just out of an abundance of caution, I think we should agree.

MR. PARKS:  We agree.

THE COURT:  Okay.  You'll be excused, sir. You know, if you weren't living in Dallas County at the start of the trial, if that happened, then you couldn't sit on the jury.  That's what we are talking about.

PROSPECTIVE JUROR KONUGAH:  Okay.

THE COURT:  All right.

MR. HIKEL:  Thank you, Mr. Konugah.

MS. HANDLEY:  We appreciate it.

(Prospective Juror Konugah excused from the courtroom).

THE COURT:  The Court's going to excuse Mr.

Konugah on possibly not being a resident of Dallas County.

(After a recess, defendant present in open court).

THE COURT: Ready for Mr. Patterson?

MS. HANDLEY: Yes, sir.

(Prospective Juror No. 930, Robert Patterson, enters the courtroom).

THE COURT: Good morning again, Mr. Patterson.

PROSPECTIVE JUROR PATTERSON: Good morning.

THE COURT: Please be seated, sir.

Thanks a lot for being here and being on time. We really appreciate it. We met out in the hall. Again, my name is Webb Biard and I will be with you this morning.

The Presiding Judge of this Court, if you can recall in that big central jury room, is Michael Snipes, and he is the one that talked to you when you appeared.

PROSPECTIVE JUROR PATTERSON: Okay.

THE COURT: Should you be selected as a juror, Judge Snipes is going to preside over the trial because this is his court.

PROSPECTIVE JUROR PATTERSON: Okay.

THE COURT: And I am just helping out in this part of the trial.

PROSPECTIVE JUROR PATTERSON: Okay.

THE COURT: Also I want to introduce to you

at this time Andrea Handley.

MS. HANDLEY:  Good morning, sir.

PROSPECTIVE JUROR PATTERSON:  Good morning.

THE COURT:  Gordon Hikel.  They represent Dallas County --

MR. HIKEL:  Good morning, sir.

THE COURT:  -- State of Texas.

PROSPECTIVE JUROR PATTERSON:  Good morning.

THE COURT:  We have Doug Parks.

MR. PARKS:  Good morning.

PROSPECTIVE JUROR PATTERSON:  Good morning.

THE COURT:  We have Keri Mallon.

MS. MALLON:  Good morning.

PROSPECTIVE JUROR PATTERSON:  Good morning.

THE COURT:  Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  And they represent Mr. Broadnax.

PROSPECTIVE JUROR PATTERSON:  Good morning.

THE COURT:  Do this for me, please, sir. Raise your right hand.

(Prospective Juror Patterson sworn).

THE COURT:  Thank you.

ROBERT LEE PATTERSON,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Did you have an opportunity to read that pamphlet?

A    This one?

Q    Yes, sir.

A    I did, yes.

Q    Did that help you a little bit understand the process?

A    It did.

Q    Good, I hope it does.

Now, I want to tell you, to be a qualified juror, you're don't have to know the law.  That's not -- You're not expected to know the law.  You don't even have to agree with the law to be a qualified juror.

After these lawyers explain the law to you, and that's their job to explain the law to you, you'll be asked a bottom line question.  Now that you know that's the law, can you follow the law and perform your duties as a juror and base your verdict on the law of Texas and the United States and on the evidence that you hear in the courtroom?

That's going to be the bottom line question of whether or not you're a qualified juror.  Does that make sense to you?

A    It does.

Q    And in that regard, we are in the process of

qualifying some fifty jurors. And once that's done, the actual twelve jurors will be selected from that pool of qualified jurors.

A     Okay.

Q     Does that make sense to you?

A     It does.

Q     All right. We anticipate that being done in about a couple of weeks. And the day that -- You will not have to appear back for that should you be a qualified juror. And the day that's done, then the same person who notified you to appear will call you and tell you whether or not you are on the actual trial jury or not on the actual trial jury.

A     So, we will know -- I will know definitively after leaving here today whether or not --

Q     No, you'll know definitively whether or not you're a qualified juror.

A     Okay.

Q     But you won't know whether or not you're actually going to be on the trial jury until about two weeks.

A     But someone will call to let me know if I'm on the trial jury if I'm a qualified juror.

Q     That's right.

A     Okay.

Q     Or they will let you know you're not -- or they will let you know you're not going to be on the trial.

A    Yes.  Okay.

Q    They are not going to leave you hanging out there.
All right.  Does all that -- Do you follow me on that?

A    That was really my point.  Will I know definitively?

Q    Yes, sir.

A    Yes.

Q    In about two weeks.

A    Okay.

Q    Yeah.  Now, from reading that pamphlet and filling
out your questionnaire, Mr. Patterson -- by the way, I have
it here and I am going to hand it to you in just a minute.

A    Okay.

Q    -- and from hearing Judge Snipes' remarks and then
sitting here this morning, as you sit here now, are you aware
that this is a capital murder case?

A    I am.

Q    Are you aware that the State of Texas is seeking
the death penalty?

A    I am.

Q    Have you ever served on a criminal jury before?

A    Yes.

Q    Did the jury reach a verdict?

A    Yes.

Q    Did the jury set punishment?

A    Yes.

Q    That will help you a little bit.  It's not a requirement, but it helps.  Do you remember from that experience that the trial was in two parts?  And by that I mean there was the guilt/innocence phase where you decide whether or not the person is guilty or not.

A    Uh-huh.

Q    And then after you've found the person guilty, you go into the punishment phase, and then you decide what's going to be the punishment.

A    Yes.

Q    All right.  That's the way all criminal jury trials in Texas are tried, whether it's theft of a bicycle or a capital murder case.

A    Okay.

Q    Two parts.  Guilt/innocence, found not guilty, the trial is over.  If you're found guilty, then you go into the punishment phase.

A    Yes.

Q    And that's the way a capital murder case is tried, the same way.

Capital murder, what makes capital murder unique from any other type offense in Texas is -- one of the things that makes it unique, it is the only crime in Texas in which the death penalty is a possible punishment.

You cannot receive the death penalty for

murder. So, what does that tell you logically? There is a difference between -- statutory difference between murder and capital murder.

Capital murder is murder, intentionally causing the death of an individual in certain fact scenarios. Murder of a policeman or fireman, a child under the age of six, murdering someone while burglarizing their home, committing arson, kidnapping them, sexually assaulting them, robbing them, murdering more than one person in a single episode. Those are some definitions of capital murder.

Did you follow me on that?

A    I did.

Q    Okay. The range of punishment for murder is not less than five years or more than ninety-nine years or life. If someone is found guilty of capital murder, there's only two possible punishments. Do you know what they are?

A    I think so.

Q    What are they?

A    Life without possibility of parole and death.

Q    That's exactly right. And when you say life without the possibility of parole, trust me, that's exactly what that means. If someone is given life without parole, they will never leave prison.

There was a time in my career a while back where if someone was given life in prison in a capital murder

case, they would eventually become eligible for parole. That doesn't mean they would receive parole, but they would become eligible. They would go before the parole board. That's no longer the law in Texas. Life in prison without parole means life in prison without parole.

So, that's what we are going to be talking about. And we talk about a lot of hypotheticals, so we are going to be talking about -- and actually, if you found someone guilty of capital murder, would you be able to go in that second phase like you did in that other trial, and wait and then decide what's the proper punishment for that person who you had found guilty of capital murder?

Does that make sense to you?

A    Yes.

Q    In other words if you can, if you can say yeah, I can wait, even though I found someone guilty of capital murder, I can wait and then I can decide what the proper punishment is based on the facts and the law, like I said in the very beginning, you would be a qualified juror.

If you say no, if I find somebody guilty of capital murder, I know what I'm going to do in every case, either way, I would always give life in prison without parole, I would always give death, then frankly you wouldn't be a qualified juror because you've already got your mind made up.

Does that make sense to you?

A    Yes.

Q    What kind of case were you on, Mr. Patterson?

A    I'm sorry?

Q    What type of trial were you --

A    Two murder cases.

Q    Okay.

A    And one was actually a capital murder case.

Q    Did the State seek the death penalty in that case?

A    No.

Q    All right. So you already know, I guarantee you, you already know more than 50 percent of the lawyers in this building. Because the State, in a capital murder case, has the option of seeking death or not seeking death.

And if the State doesn't seek death, then you know from your service a finding of guilty is automatic life in prison. Is that what happened?

A    That is correct, yes.

Q    Okay, good. That's going to help you. It's not necessary, but that's really going to help you. And, so, you've already been through this process. And evidently two prior judges and two prior team of attorneys have decided that you are able to base your verdict on the law and the evidence. Is that -- is that the situation?

A    I did serve on those two juries; that is correct. And I think --

Q    Okay.  And you were able to do that.

A    Yes.

Q    And you were able to wait and listen to the evidence and then decide.

A    Yes.

Q    That's what it takes.  It's really that simple.  All right?

A    Okay.

Q    Now, did you read in the pamphlet the date that Judge Snipes is going to start this trial?

A    Yes.

Q    August the 10th, two weeks, Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, lunch break.

The jury will not have to stay together overnight unless and until you were deliberating late into the evening, became fatigued and unable to concentrate like you should on something this important.  There is a possibility you would all be taken to a fine hotel, county expense, individual private rooms, spend the night, eat, come back the next day as a group to avoid any outside influence.  That's called being sequestered.

Were you sequestered?  Was the jury sequestered in either one of those cases you were on?

A    No.

Q    Okay.    That's a possibility in a capital murder case.    It's not a guarantee but it's a possibility.

I give you those dates and I tell you the way Judge Snipes runs his court to ask you, as you sit here now, from hearing Judge Snipes' remarks, from filling out your questionnaire, from reading the pamphlet and from talking to me this morning, is there any reason why you can't sit as a juror in this case?

A    No.

Q    Great.    All right.    I'm going to hand you your questionnaire at this time.    I'm going to ask -- Anne.    I'm going to ask Anne to do that.

And from time to time the attorneys ask jurors, would you tell us a little bit more about your answer to question so and so on page five, and you will have it there.

A    Okay.

Q    Now, each side has been allotted forty-five minutes apiece to talk to you, so one of the attorneys for each side is going to talk to you for up to forty-five minutes.    Obviously that's an hour and a half.    So, in about an hour and a half we will conclude, and then I'll tell you whether or not you're a qualified juror in this case.

During that period of time, Mr. Patterson, if you need to take a break for any reason -- I know you

probably got up early and been going all morning.  So, if you need to take a break for restroom, coffee, Coke, water, just let us know.  Okay?

A    Okay.

Q    And I told you what kind of folks these attorneys are.

A    Yes, you did.

Q    So, just shoot straight with them.  All right?

A    Okay.

THE COURT:  Ms. Handley.

MS. HANDLEY:  Thank you, your Honor.

EXAMINATION

BY MS. HANDLEY:

Q    Good morning again, Mr. Patterson.  How are you, sir?

A    I'm great, thank you.

Q    Fantastic.  As the judge stated, my name is Andrea Handley and my colleague is Gordon Hikel, and we also have some other attorneys involved in this case.

We have been given the task of interviewing potential jurors for this particular case.  If you are ultimately selected to seat on this case, you'll probably see some additional attorneys come into play in the case, for one, Mr. David Alex.

But at this point we are just here

interviewing people now one by one, talking to them, seeing if, as the judge told you before, if they are qualified to go into that pool of jurors.

A large part of what we do with every juror that comes down here is we tell them what the law is and we see if they, in fact, do they understand the law and can they also follow the law. Some people just simply cannot. And if they cannot follow the law, then they are not a qualified juror. That's one thing that we do in this.

We also, Mr. Patterson, after getting that pool of fifty people in which we hope to pull twelve out, a lot of how we base our decision on who to take out and put on the jury, and we get an opportunity to do that as does the defense, is we are just kind of going with how we feel about that person.

And it's our hope that, outside of just talking to you today and lecturing you and educating you, that we can also get to know a little bit about you, you know, how you feel about things, kind of what makes -- what makes up Mr. Patterson. You know, how does he feel about this law? He says he can follow the law, but how does he really feel about it? And, so, it's our hope to do that also.

You have not taken any oath at this point with respect to following the law. The only oath you've

taken at this point is to tell us the truth, you know, to be open and honest with us. And I think that you probably went through that process before probably in a larger panel with a group of people and an attorney talking to you as a group; is that correct?

A    I believe that took place on the first day, yes.

Q    Right, right. And that's how regular, normal other criminal cases differ from a death penalty case is that, because of the importance of the case, because of what is at stake here, we do take the opportunity to talk to people one at a time individually so that you can speak openly and honestly in the hopes that we can get to know you a little bit better.

A    Okay.

Q    As his Honor stated, I think that you are already ahead of the game here by having served two times already on a criminal case. And because at two different points in time that the State's attorneys as well as the defense attorneys felt you were qualified, that's why you ultimately ended up on that panel.

And I am going to go ahead out on a limb and make an assumption that they believed that you were a gentleman that understood the law and could follow the law. And, so, I'm not really going to belabor a lot of the fundamental principles of law that come into play because I

think you've already been through that.

And I trust, as you've said throughout your questionnaire, you've made it plain that if it's the law, it's the law, and you follow the law. And, so, I trust that you're probably already at that point, Mr. Patterson, unless something was so distasteful to you about your last cases that that would change your opinion. Anything about that?

A    No.

Q    Okay. The one thing that does run true, runs completely through all criminal cases, the ones you sat on and the one today are those -- is that reoccurring theme, Mr. Patterson, and that is that I, as a representative of the State, have brought the charges in this criminal case and, therefore, I carry the burden of proof in this case.

And it is only if and until I can prove the elements of the offense to you beyond a reasonable doubt that you may return a verdict of guilty. And it is only if and until I can prove to you that the answsers to the special issues should be yes, yes and no that you may return a verdict that would result in a sentence of death for the defendant.

You're always looking to the State for the burden of proof and it's always -- I am always obligated to prove this to you beyond a reasonable doubt. I think you fully understand that I have to prove everything to you.

And if I fail to prove to you, for example, that it happened in Dallas County, Texas, then your verdict must be not guilty. Do you understand that, sir?

A    I do.

Q    Okay. I want to focus with you primarily on capital murder cases. When people fill out these questionnaires, I think it's fair to say that they have not at that point been educated on what the law really is with respect to murder and capital murder. They don't really know that there is actually a procedure and a protocol in place for arriving at a death penalty.

But nevertheless, we don't put you through a big education before we have you answer the questionnaire because we are just really looking for your gut reactions and your gut feelings. And we understand that a lot of times your answers aren't always in accordance to what the law is, but it's just how you feel.

What I have gathered a lot through your questionnaire is that I think that it's fair to say that you are a gentleman that believes that there are rules in place and that they must be followed with respect to the law and arriving at verdicts. I've seen that throughout your questionnaire there.

But let me tell you a little bit now about the difference between a murder and a capital murder. And you

might already know this. You've actually sat on a capital murder case. A capital murder is always this, Mr. Patterson, it is always a murder plus an aggravating factor.

It's, for example, the murder of a child under six years of age, or the murder of a police officer while he's in the line of duty, or the murder of two or more people at the same time, or it is the murder of a person while in the course of committing another serious felony offense, in this case, such as robbery.

And particularly in this case, with respect to the capital murder charge, not only must I prove to you that there was a murder, I must prove to you that that murder was committed intentionally, which is to say it was not an accident, it was not a situation where the person was killed recklessly or negligently such as driving on the highway, not paying attention, and running into somebody and killing them. That's not necessarily an intentional death. It's reckless, it's negligent, but it's not intentional.

We must show you that the murder in this case was done with intent, which is to say in just regular terms that when somebody kills somebody with intent, when they intentionally take their life, it means they meant to do it and they did everything that was necessary to carry it out.

It is not a murder with legal justification. For example, it is not a murder done in self-defense. It is

not a murder done by a person who was criminally insane. Those would be legal exceptions or legal justifications.

So, it is always, always an intentional murder, not a "I meant to hurt him but he accidentally died". It is an intentional murder. Do you understand that concept, sir?

A    I do.

Q    In addition, it's that intentional murder plus that aggravating factor of a defendant committing it during the course of a robbery or trying to commit a robbery. Those are the two things that I must prove to you beyond a reasonable doubt before you may find a defendant guilty.

If I fail to carry that burden on intent, if I fail to carry that burden in showing that there was a robbery or an attempt to commit a robbery, then your verdict would be not guilty with respect to capital murder, but it may still be something else. It may still be a murder case. But that is a capital murder case, that murder plus something else.

And as you stated on the first page of your questionnaire, you said that, with respect to the death penalty, I accept it as being an option. And I will tell you, sir, that you hit the nail right on the head. The death penalty is always an option. It is never automatic.

We have had a lot of people who have believed, and there is nothing wrong with this, but they believe that

if an individual is found guilty of capital murder, they therefore automatically receive the death penalty. That never happens under any circumstances.

Just because an individual is found guilty of capital murder does not mean they automatically get the death penalty. And even then it is only an option. And it will only happen if, when and until I, as a representative of the State, can prove to you that it's the proper thing to do in this particular case. Does that make sense to you, sir?

A    It does.

Q    I would like to focus a little bit with you on some things in your questionnaire. You have sat two times now on a murder case you said. And I think by virtue of the fact that you returned a verdict of not guilty and a verdict of guilty, I think you have a very good grasp of what's going on.

Apparently in one case the State did prove to you beyond a reasonable doubt the individual's guilt, and in the other case they did not carry their burden or perhaps it was a legal justification in that case.

Let me ask you about the capital murder case that you sat on where you found the defendant guilty. Was that here in Dallas County?

A    Yes.

Q    Can you remember the name of the defendant, sir?

A    Oh, I cannot, but I do recall that it was at a

little club on Ross Avenue near Flora Street that is now torn down. But I don't recall -- Robert may have been his first name, but I do not recall his last name.

Q    Okay. Briefly tell me, what were the circumstances of that offense; what was the defendant accused of doing?

A    In that particular case, a kidnapping and murder. The defendant was at a nightclub. A female he took from the club at gunpoint. And when he went into the parking lot with her, someone attempted to assist her, and he shot and killed that person.

Q    Okay. Okay. I see. So, the underlying felony there was the kidnapping --

A    That is correct.

Q    -- that was going on of the woman, and obviously the murder of the gentleman who was trying to come to her aid.

A    That is correct.

Q    Okay. I am also -- You have told the judge that the State did not seek the death penalty in that case.

A    Correct.

Q    Okay. So, you never really even reached a punishment phase in that case. Instead it was automatic. He automatically received life in prison without parole.

A    That is correct.

Q    And you did not have a punishment phase. That's

where this case becomes entirely different because in this case, because we are seeking the death penalty, we will have a punishment phase. Assuming you return a verdict of guilty, we will have a punishment phase. And it's kind of a whole, whole different animal from what you did there.

But it tells me that you do understand this, that the only absolute in a capital murder case, the only automatic thing in a capital murder case is that if an individual was found guilty of capital murder, they will automatically receive life in prison without parole. That's it, that's all. That's the only automatic thing about it.

In order for a jury to arrive at a verdict that would sentence an individual to death, you've seen the special issues there, Mr. Patterson, and I think you can appreciate that that's how we actually get to that verdict is by you answering questions one after another. And if those questions are answered yes, yes and no, it will result in a penalty of death. If they are answered in any other way, it goes back to that automatic life in prison without parole sentence.

I'll submit to you, sir, that when they made life in prison automatic, our legislature believed that the crime itself of capital murder was bad enough that there shouldn't be any other options at that point less than life in prison, that they considered that a just punishment for

that particular crime. Okay?

However, our lawmakers have recognized that in order for us to get a sentence of death, there is going to have to be something more. Capital murder is bad enough, you will be punished with life in prison without parole. But in order for you to get the death penalty, there has to be something else. Kind of like the murder plus something else to be capital, for there to be a death penalty, it has to be guilty plus something else.

An individual sentenced to prison for the rest of their life will obviously spend the rest of their life in prison. And they will be in a prison, they will be in there with other inmates. That is where they will sleep. it is where they will eat, it is where they will recreate, work, go to school. That's where they are going to be the rest of their life.

And I think you can appreciate that in Texas, although we have hundreds of prisons in Texas and we have thousands upon thousands of inmates, we don't necessarily have separate prisons for separate offenses. We don't house all car thieves in one prison, all burglars in another prison, all drug addicts or dealers in another prison, and all murderers in another prison. They are in and amongst each other in these prisons. There may be different classifications of where they are housed in their cells, but

they are all in there together.

What we look at in a death penalty case, the distinction between the individual who will receive life in prison without parole versus the man who will receive the death penalty, the distinction has to be how he will act once he is in prison.

If he is the type of individual that will go to the prison, will serve his time, will serve it peacefully, if you will, will follow the rules, will not be violent, will not commit criminal acts of violence, will not be a continuing threat to anybody within that prison society, then our legislature has deemed that the appropriate sentence for that individual will be a life sentence.

If, however, he is the type of individual that will get life in prison and will be a continuing threat to his society, his society being the people within that prison, if he is that type of individual that will be a continuing threat to them, that will commit criminal acts of violence, then he is the type of individual who the death penalty is appropriate for.

That is the distinction between somebody getting life and somebody getting the death penalty.  Does that make sense to you?  Have I made sense with that, sir?

A     Yes.

Q     That is something that I have to prove to you

beyond a reasonable doubt after you find him guilty of capital murder, that he will actually be a future danger. That's that first special issue that we talk about. And of course, the context in which we are going into this, keeping in mind that he is guilty of capital murder, that's done. You've found him guilty. He will spend the rest of his life in prison.

The question we now go into in the second phase of the trial, which is like you're starting all over again, is that first question as to whether or not he'll be a future danger. You will look to me to prove that to you through evidence. You may look at the crime he committed to help you answer that question, but you will always look to me to prove to you that that answer is yes.

If I can't prove to you the answer is yes, the answer is no, and he will continue to serve that life sentence because you have not found, I have not proved to you that more likely than not he's a future danger.

Does that make sense, sir?

A    Yes.

Q    So, that's the first special issue that's up there that I think you've already had a chance to read where the first question that they will pose to you is, do you find from the evidence beyond a reasonable doubt -- Again, any time you hear beyond a reasonable doubt, it's just a flag to

you to look to me to bring you the proof in the case. -- that there is a probability.

They have not defined any of these terms for you, Mr. Patterson. They are actually leaving it up to you to decide what that means. So, when they say a probability, would you agree with me that there is a difference between a possibility and a probability?

A    I would.

Q    Some people say that a probability means to them more likely than not. Would you agree with that, sir?

A    A probability, more likely than not, I would agree with that.

Q    Okay. If I prove to you beyond a reasonable doubt that more likely than not the defendant will commit criminal acts of violence. They have not defined for you, sir, what criminal acts of violence are. They have left that up for you to decide what are criminal acts of violence.

Notice they have not said is it more likely than not that he will commit another murder. They did not say that he will commit another robbery, that he will commit an assault on an inmate, that he will make threats of violence towards guards. They have not articulated what is a criminal act of violence. It is up for you to decide what that is and what that isn't.

Does that make sense to you also, sir?

A    Yes.

Q    If I, for example, Mr. Hikel, my colleague, is just sitting here minding his business and I just look over at him and just smack him square in the face, would you consider that a criminal act of violence?

A    No.

Q    Why not?

A    Criminal to me seems to mean something more than violence. I would agree that you have displayed some violence towards him, but whether or not it was criminal as I sort of formulate a definition in my mind, I would say no.

Q    Okay. Okay. Is it because you haven't heard enough surrounding circumstances as to why I hit him?

A    I don't think it is serious enough --

Q    I see.

A    -- to be considered a criminal act of violence.

Q    Okay. Okay. What are you thinking of, then, in terms of what would constitute a criminal act of violence, something to be serious enough to constitute a criminal act of violence?

A    If you were to take a gun, as an example, and shoot him.

Q    Okay. Okay. Anything else that would constitute a criminal act of violence for you?

A    Oh, I'm certain there are lots of things, but none

that are immediately coming to mind.

Q    Yeah.  And --

A    It has to do with the seriousness in my mind.

Q    I see.  I see.  And I don't know that necessarily the legislature has contemplated that it -- I think you can appreciate that they are not saying it has to go that far, that we don't have to prove that he necessarily is going to commit another murder.

However, if you are saying that a criminal act of violence to you is that he would shoot somebody with a gun, that's perfectly acceptable for you to say.

Are you looking at it in the context of it being committed within the prison society?  Is that how you're seeing it when you say whether or not it is or isn't a criminal act of violence?

A    In my mind, I would use my value system to make a judgment.  If, for example, someone were in a -- if I thought someone -- well, if someone -- if I trip you or if you tripped me, as an example.

Q    Uh-huh.

A    In my mind, that doesn't equate to a criminal act. If I slapped you, I don't think -- in my mind, that's not a criminal act.  If I were to cut you with a knife, I would say that's a criminal act.  I agree -- It's a value system from my perspective.

Q    Sure, sure.  Well, let me ask you this, Mr. Patterson.  I think you can appreciate that there are hundreds and hundreds of men and women doing time in our penitentiary system.  And they are doing time for everything from capital murder, life without parole, all the way down to property crimes, you know, forgery or felony DWI or maybe they are in there for drug possession.

A    Uh-huh.

Q    And they have been given a sentence by a judge, be it five years, be it ten years.  I hereby sentence you to ten years in the Texas penitentiary to do your time for having done your crime.

That individual that now goes to the penitentiary system to do that time, is it reasonable for him to expect that he can do his time safely without being threatened or assaulted?

A    Is it reasonable?

Q    Do you think that that's a reasonable expectation of that?

A    My perception of the criminal system today is no, it is not reasonable to have that expectation.

Q    Okay.  Do you think that they have a right to safety within the penitentiary?

A    I do.

Q    Okay.  What I'm hearing you say is that they enjoy

a right to safety. That -- you tell me if I'm wrong. That they ought not to be fodder for other inmates that may want to just hit them for no reason. However, if that happens, that's just part of the atmosphere.

A    I would agree with that statement.

Q    And if that inmate who is minding his business, let's say, and just gets slugged in the side of the face, do you think he has any rights against the person who has hit him in the face, keeping in mind he is an inmate in the penitentiary?

A    I think that it -- yes.

Q    Okay. Okay. And I am trying to wrap my head around how you feel on this. When the -- When the future dangerousness question then asks criminal acts of violence and this guy just gets socked in the face for no reason, you're saying that he has a right to safety, he has a right to not be just punched in the face for no particular reason, but you don't believe it's a criminal act of violence because it doesn't rise enough to a serious enough level?

A    I'm a little confused as to the person who is doing the hitting.

Q    The defendant, the person you have found guilty, we are talking about that person. Is he going to be a future danger? Is he going to commit, more likely than not, criminal acts of violence? And if he were to just hit another inmate

in the face passing him in the hallway, or something, would you consider that a criminal act of violence on the part of the defendant who has just hit somebody while passing them in the hallway?

A    I think that I would have to evaluate the circumstances of why he did it in order to come to a conclusion as to whether or not it rose in my mind to the level of criminal.

Q    I see.  Let's say he really -- Let's say it wasn't in self-defense.  Let's just say that it was for the purpose of showing out, wanting to be the big guy on the cell block, wanting to make a point that he's tough.  Would that change your mind at all?

A    The facts would be very important.  Did he hit the person such that it was fairly obvious to most reasonable folk that he intended to do serious damage?  Did he hit the person -- and I admit early on that it's a value judgment here that I will be making.

Q    Certainly, certainly, yes.

A    And my response to you would be, or is, depending on the circumstances, it could be either.  It could be criminal, it could not be, in my opinion.

Q    I see.  If I hit somebody hard enough to knock them out, do you think that's pretty serious?

A    I do.

Q    Okay.  In arriving at that answer to yes or no, you may look at not only the facts of the case that you've just found him guilty for, but you can look at also other pieces of evidence.  You can look at his background.  You can look at how he acted before the crime and how he's acted after the crime.

There's a host of things that you can do to make that prediction because it's somewhat of a prediction whether or not is he going to be a future danger.  And we didn't finish really there.  It says that constitutes a continuing threat to society.

We are talking about people within the penitentiary walls is basically what we are talking about when we say society.  Unless, of course, he escaped, his society will always be his prison society.  And outside of inmates in there, there are guards in there.  There is the warden.  There are administrators, clerks, educators, clergy, volunteers, people who come to visit.

And, so, the question not only -- or let me ask you.  Can you see or would you accept the definition of society to include all of those people in that penitentiary with him?

A    Yes.

Q    Okay.  How do you feel about an individual being part or claiming to be part of, for example, a gang?  And

when I say a gang, goodness knows you don't have to read a paper or turn on the TV to know there's all kinds of gangs out there. Some will tell you, I'm not a gang, I'm a club, or something. And others will say, I'm a criminal street gang or I aspire to be part of that gang. It's who I am and I claim them.

How does that -- How do you feel about that?

A    My general perception of gangs in the sense of which I think you're asking it is that is an organization that probably has a higher -- that does, in my opinion, have a higher probability of committing acts that are in violation of the law.

Q    Sure, sure. I think it's fair to say not a lot of gangs say that their mission in life is to put carpet in the churches or help the poor. I mean their mission, what they do, it's violence, and it's geared towards getting money or getting things for them by means of violent activity.

Do you think it's possible that you can still be part of a gang in a penitentiary?

A    I do.

Q    Okay. Okay. What kind of things might also help you, sir, to make that determination as to whether or not somebody would be a future danger?

A    Their history would be number one. What have they done in the past?

Q    Okay.  Do you think that a person necessarily has to have a lengthy criminal history in order to be a future danger?

A    Not necessarily, but I think it's a higher probability.

Q    Okay.  Okay.  Anything else besides that that would help you make that determination?

A    Simply my evaluation of that particular person. Where are they right now, in my opinion, from talking with them, from seeing their actions, from the opinion of others, from their history.  All of those things would go into my making --

Q    Yeah.

A    -- an evaluation.

Q    Do you think you're a pretty good judge of character?

A    I do.

Q    Do you think that you can see through somebody trying to put up a front or trying to act right?  I'm not really articulating this very well.  But a lot of people can sit here and smile at you and be polite at you and you know it's an act.  You know it's a show.  I mean you feel that you're good at reading people and knowing what their true motivations are?

A    Very good.

Q    Okay.  Okay.  Let me ask you a little bit -- I'm going to jump back here.  Your wife is a minister.

A    She is.

Q    Correct, sir?

And does that -- is that going to -- Does that influence how you feel about the death penalty or the appropriateness of it or whether it's right or wrong, the fact that she is a minister?  Tell me a little bit about that.

A    It does not.  My wife has been a minister for twenty years.  I am a member of her church, so we obviously agree.

Q    I think that's my phone buzzing.  I apologize.

A    We obviously have the same religious beliefs, but we draw -- she does not -- I make my independent decisions, so she does not -- her thoughts would not affect my opinion as it relates to this particular crime.

Q    Okay.  So with respect to the death penalty, does her church or do they take a position on it, on whether or not it's right or it's wrong, or is there, is there an official position, sir?

A    I am not aware of an official position, but I have heard my wife's position.

Q    And what is that, if you don't mind?

A    My wife is in favor of the death penalty.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    Okay.  So, some people's -- Okay.  So she --

You are able to square, then, your religious beliefs and the death penalty that there is no problem there with that, then.

A    That is correct.

Q    It doesn't sound like it.  I appreciate you telling me about that, sir.

That's the first special issue.  That is the first question that you must answer.  And again, sir, you will answer that question based on the evidence in the case.  You know, the law states that you can answer that question based strictly on looking at the criminal act that the person has committed and nothing else.  That looking at the facts and the surrounding circumstances of the offense itself can be sufficient for you to answer that question yes, okay?

A    (Nods head).

Q    And I think we asked you a question about that as to whether or not you believe at certain times that the facts alone of an offense could dictate whether or not somebody receive the death penalty.  I believe that you marked yes in there.

But even though that is the law, looking at just the circumstances of the offense alone, do you think that would be possible for you to do, to base your decision on special issue number one just on what this person has done

and the surrounding circumstances of that offense?

A    Yes, I do.

Q    Okay.  So you wouldn't necessarily need more, but it wouldn't hurt.  If you heard more, you would certainly take that into consideration.  But you believe the crime itself could tell you enough about that person?

A    I do.

Q    And let me -- Let me tell you this and make sure that this is clear with you, Mr. Patterson, is that the law does state that you may answer that question based strictly on looking at the evidence of the crime and the circumstances surrounding the crime.  You may do that, or you may require that I bring you more.  Okay.  That is appropriate.

But what the law also states is that you may not necessarily say, just because I have found an individual guilty of capital murder, I will automatically always answer special issue number one yes.  Because if you've done that, then you've jumped to a conclusion without reconsidering the evidence in the case and determining if it answers this question yes.  It's definitely answered, is he guilty, yes, it's definitely answered that question for you.

But now the law says, fine, you can look at it again and it can help you decide this question, but this is a different question.  That was, is he guilty?  This question now is, is he a future danger?  Does that make sense to you,

sir?

A    It does.

Q    And, so I guess the question thrown out there to you is, if you found somebody guilty of capital murder, and that is to say you have found them guilty of intentionally causing the death of another individual, and having done it while in the course of committing or trying to commit a robbery, would you therefore always answer special issue number one yes?

A    No, because of that probability issue.

Q    Okay.  You see it's an entirely different question, isn't it?

A    It is.

Q    It's an entirely different question.

A    It is.

Q    Here you are asked to determine guilt.  Now we are asking you to determine if he probably will be a future danger.

A    Yes.

Q    Not definitely he will be, but will he probably be a future danger.  Okay.  I think you get that and I appreciate that, sir.

        If you answer that question no, then that's the end of the trial and the defendant has received life imprisonment without parole, and you go home and your

obligation is done.

However, sir, if you answer that question yes, you are not finished at that point. You still have to answer more questions. If you answer the first one yes, you move on to the special issue number two. And I will just briefly tell you what that's about.

In the State of Texas we have what's called the law of parties which recognizes that oftentimes crimes are committed by more than one person at the same time. And when looking at two or more people committing a crime together, the law states that if the other individuals in the case, they aided or assisted or encouraged or directed, in other words, if they actively participated in the commission of the crime, they may be held liable and guilty as if they had done the crime themselves.

Okay. For example, if Mr. Hikel and I decide tonight that we are going to rob the 7-Eleven together, he goes and gets the gun, I go and I get the bullets. He drives us up to the 7-Eleven. He says, I'm going to sit out here and be a lookout. He hands me the gun after he loads it for me, hands it to me. I say, all right, I'm going to go in and rob this clerk. I say, oops, I forgot my mask. And he says to me, don't worry about it, just don't leave any witnesses.

I go in the store alone, I rob the clerk of her money, and I kill her in order to not leave any witnesses.

You can see how I would be guilty of capital murder, wouldn't I?

A    Yes.

Q    Okay.  Do you believe Mr. Hikel could be also guilty of capital murder?

A    I do.

Q    Okay.  He's not the triggerman.  But the law states, if he aided, assisted, participated or encouraged. In order for you to find him guilty of capital murder, in order for him to be eligible for the death penalty, you must also find that Mr. Hikel actually anticipated somebody would die.  And you may find that from the evidence when he said, here's a gun, don't leave any witnesses.

Does that make sense to you, sir?

A    It does.

Q    You must find that, an active participant in the crime.

So, special issue number two asks you, with respect to the defendant on trial, is he the actual triggerman?  And if he wasn't the actual triggerman, did he anticipate somebody would die or did he intend for somebody to die?  Does that make sense to you, sir?

A    Yes.

Q    If he -- If he didn't have that active participation, if he wasn't the actual triggerman, then your

answer to that question is no, and that's life in prison, and you go home. Your obligation is over.

But if you have answered that yes, your obligation is almost done in this case. By finding an individual guilty of capital murder, by finding that yes, they probably will commit criminal acts of violence in the future, and by finding that they were an active participant in the crime, I would submit to you that individual is sitting squarely on a sentence of death at that point, okay?

My burden of proof at that point, sir, is over. I have -- I have proved my case. I beg your pardon. I have proved my case at that point, but you still have one more question to answer.

And in the State of Texas, with respect to the death penalty sentence, our lawmakers recognize that we are asking you, calling upon you to do the ultimate act here, to render the ultimate punishment of death. And what will not happen in a case such as this is you will not leave the courtroom, either having returned a verdict of death or a verdict of life, you will not leave this courthouse saying, I felt my hands were tied. There was something about this case that in my mind, as an individual, I felt he shouldn't get the death penalty. I felt he should get life in prison. I felt that that should be his sentence in the case.

It gives you that option. And that comes from

you reassessing all the evidence in the case. It asks you that you go back now before you leave, go back one more time and look at everything. Look at everything. Look at the circumstances of the offense, look at the defendant. The things that you were talking about, you know, who is he? Where is he coming from? What were his motivations? Why did he do this? Has he been remorseful? Is this a one-time crime? Is this an anomaly?

Look at all that. And if there is something that speaks to you personally that you feel mitigates, which obviously lessens, his moral culpability or moves you towards mercy, then you have that option. That is what special issue number three is there for.

Do you think that -- Do you think that's a fair thing for the jurors to have?

A    I do.

Q    Yeah. And I submit to you I wholeheartedly agree with that because the case should always be decided on the evidence. It should always be decided on the defendant, what he did, who he is, why he did it. And if there is something that speaks to you that, in fairness, that it's right to give life versus death, then you ought to have that option.

And that's what special issue number three talks about. It says, do you find, taking into consideration all of the evidence -- Again, you're going in at this point

with an open mind. -- including the circumstances of the offense, his character, his background, his personal moral culpability, do you find that, anywhere in there, that there is a sufficient mitigating circumstance or circumstances that would warrant turning that death sentence into a life sentence?

They don't necessarily define what a mitigating circumstance is. That's for you to determine what you consider mitigating. But they do say to you that it must be sufficiently mitigating.

I'll submit to you there could be a hundred mitigating things about a particular person, their crime, their character, maybe their background. The question becomes, does it rise to the level of being sufficient?

Make sense to you?

A    Yes.

Q    We do not in the State of Texas nor the United States, for example, execute the mentally retarded. We do not do that. But you may find that a person is not mentally retarded but maybe they are very close to it.

You know, you may look at the circumstances of the offense. It may be Mr. Hikel who is on trial, who was the co-defendant, who was not the actual triggerman, maybe he stayed behind and tried to save the clerk. You know, maybe, maybe he then walked to the police station and turned

himself in.   Maybe he turned me in also.   Maybe he's been remorseful every day of his life.

He might still be a future danger because he just is what he is.   Maybe as long as I'm around telling him what to do, he'll be a future danger.   But maybe you'll look at that and you'll think that that's mitigating.   You may or you may not.

The point is it's for you to decide what's mitigating and it's for you to decide what is sufficiently mitigating.   It is an individual choice that you make personally.   Make sense to you, sir?

A    Yes.

Q    You don't necessarily have to be in agreement with anybody on what is mitigating.   And I think that what I need to make sure that you can appreciate is that we are kind of asking you to engage in some mental gymnastics here because you have found a person guilty of capital murder, intentionally murdering somebody in the course of committing a robbery.   You have found that they are a future danger. More likely than not they are going to commit criminal acts of violence in the future.   And you've found that they were either the triggerman or an active party to it.

And now we are saying to you, given all that, the guy with the horns and the bad guy, now we are asking you to consider whether or not you would actually turn that

verdict over into a life sentence versus a death sentence.

The question is not necessarily, tell me what right now is mitigating to you, because you don't know anything about the facts of this case. The question really becomes this, Mr. Patterson. Will you go into special issue number three with an open mind, and if you personally believe that there is a mitigating circumstance and it is sufficiently mitigating, will you answer that special issue number three?

A    Yes.

Q    In other words, some people may say, look, if this guy is so bad that he's a capital murderer and is so bad he's a future danger, there is never any time that I would ever say that that should be yes. Do you feel that way?

A    No.

Q    Okay. I can't pin you down to what's mitigating. But let me ask you, Mr. Patterson, is there anything that kind of touches you or drives you towards a sense of mercy or empathy towards an individual?

A    Nothing in particular, but I can envision a situation where looking at the totality of what has happened with that person, perhaps a lot of it being outside of that person's control, that would enable me in my opinion to consider it sufficiently mitigating.

Q    Uh-huh.

A    I can envision circumstances where I, I would be

convinced of sufficiently mitigating circumstances.

Q    You can envision that?

A    I can.

Q    For example, if you don't mind?

A    An example, if someone grew up in a neighborhood crime infested and no parental or adult control. They got involved with a gang early on. It's the only family they knew. They have simply had a history of criminal activities. There have been no attempts for anyone to try and help this individual. I cannot blame that individual 100 percent for the circumstances they find themselves in.

Q    Sure. I think you spoke to in your questionnaire about -- We asked the question about sometimes genetics or upbringing may have an effect on somebody. Actually, let me, let me go to that question here. I don't want to misspeak.

I think it's on page eight. If you turn to that, sir. It's the second question from the bottom there. It said, some people feel genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime. What do you think? You said, I disagree. We must be responsible for our decisions.

A    I agree with --

Q    Flesh that out with me with respect to what you

said in that comment.

A    Okay.  It seems to be inconsistent and I will try and explain it this way.  I feel very strongly that a person should be responsible for their actions.  I also believe that there are mitigating circumstances leading to certain actions.

So in hindsight, I wish that I would simply have left off "I disagree" because I believe that there can be mitigating circumstances.

Q    Okay.  Some people are given opportunities out there.  Maybe the difference for you is the person who never had the opportunity versus the person who had the opportunity but didn't want to take it.

A    There absolutely.

Q    Sure, sure.  I think I have fulfilled my time of speaking to you, Mr. Patterson, but --

MS. HANDLEY:  I'm sorry, four minutes?

Q    Oh, I've got four minutes.

MR. PARKS:  No, you don't.

Q    No, I don't.  Apparently I don't.

Mr. Patterson, I appreciate you being -- this helps me a lot.

A    Okay.

Q    I appreciate it, sir.  And I will tell you here, I think you are what we refer to as a court reporter's dream

because you're so articulate. She's probably never had a better juror up there.

So, thank you, sir. Thank you very much.

MS. HANDLEY: I'll pass the juror, your Honor.

THE COURT: We thank you, Ms. Handley.

Before Mr. Parks talks to you, you want to take a five minute break?

PROSPECTIVE JUROR PATTERSON: I'm good, actually.

THE COURT: Okay. Mr. Parks.

MR. PARKS: Thank you, your Honor.

EXAMINATION

BY MR. PARKS:

Q    Mr. Patterson, what you just saw was something of a comedy. We theoretically have a time limit that we talk to people about. And Mr. Hikel is an extremely competent and good timekeeper. This time he was wrong. I had to point it out to him.

Mr. Patterson, listen, this is not -- this is not an exercise in humor here. This is a serious situation that we are down here for. We have been at this several weeks now and we go about visiting with prospective jurors in different ways.

You seem to me to be a very logical thinker, and that's good. I'm going to try to approach this in a

logical fashion to make sure that we are on the same page. I believe that you have a good understanding of the concepts that we are talking about here.  It may be that I won't need my entire forty-five minutes because of that reason.

Mr. Lollar has sent me a question to ask you so I want to ask it and do that and then get into the other part of my visit with you.

A   Okay.

Q   You were born in Littleton, North Carolina.

A   Correct.

Q   And how old were you when you left Littleton?

A   Well, I went away to college when I was eighteen.

Q   Okay.

A   And I migrated out here to Texas when I was twenty-four.

Q   Very good.  Well, it turns out Mr. -- Well, first, is Littleton in Lincoln County by any chance?

A   No, but it is -- I've heard of Lincoln County.  I don't know exactly where it is.  It's in Halifax County.

Q   Okay.  Well, apparently Mr. Lollar's ancestors hail from Lincoln County and he wanted to know whether or not --

A   I've heard of Lincoln County but, no, it's in Halifax County, northeastern corner of the state.

Q   Okay.  I noticed one other thing on your

questionnaire I wanted to visit with you about just for a moment. Your son goes to Greenhill School.

A    He does, in fact.

Q    Has he gone there since he started?

A    He has.

Q    How does he like it?

A    He is the number one debater in Greenhill, number one football player, and he loves it.

Q    Excellent. Well, I will tell you that my oldest daughter, who happens to be her birthday today, went to several schools and Greenhill among them. She went to DISD, Greenhill, Wesleyan College in Connecticut, University of Texas in Austin, George Washington School of Law in D.C.

A    Uh-huh.

Q    Of all of those schools, she considers, hands down, Greenhill had the most influence on her and she just absolutely loves that school, so.

A    We have had kids there for seventeen years. We are big fans.

Q    I was doing the math. My daughter was gone by then. I think she was class of '86. I can't remember for sure. Anyway, I just wanted to make sure he was enjoying that.

A    Yes, sir.

Q    Mr. Patterson, typically what I do is talk to

people about their questionnaire a little bit. I'm not going to -- I've done that, okay, as far as any issues that I have unless they relate directly to one of these other issues.

A    Okay.

Q    I typically then move into what I call the merits phase of the trial, the guilt/innocence phase of the trial, and visit with jurors about that. I'm just going to touch on that with you because you've got experience as a juror.

I did wonder -- You found a person not guilty at one of your trials; is that true?

A    Correct.

Q    What was that person charged with; do you recall?

A    Yes, murder.

Q    Okay.

A    Yes.

Q    You were the foreman of both of those juries.

A    I was.

Q    Okay. Did you campaign or did they just happen to choose you?

A    I simply am who I am, and my fellow jurors made that determination.

Q    I have no complaint with that. I just -- Somebody has got to be and apparently they made a good choice in both cases.

You understand all of the concepts that are

involved there, presumption of innocence, burden of proof on the State, proof beyond a reasonable doubt, and they must prove everything that they put in their indictment beyond a reasonable doubt. You understand all of those concepts and did when you served in those other juries; would that be fair to say?

A    Yes.

Q    Okay. For that reason, Mr. Patterson, I'm not going to spend any more time. You don't have any reason to believe you couldn't do that in this case simply because the State is seeking the death penalty; is that true?

A    It is true.

Q    I want to move to these special issues, Mr. Patterson, and talk to you about those. You know already that the only time a juror would be faced with answering these special issues would be a situation where the State has proven to a jury that the defendant is guilty of capital murder and they are seeking the death penalty. Only then would a jury be faced with responding to these special issues, right?

A    Yes.

Q    All right. And what I generally tell prospective jurors is that, with respect to the guilt/innocence phase of the trial as well as these first two special issues, we call upon jurors to make an objective decision about whether or

not the State has proven what the law requires of them beyond a reasonable doubt. And they do that based on the evidence that they have heard and the law as the judge has given it to them to apply.

Now, that's not altogether true with special issue number three. We will talk about that when we get there. But you can see how guilt/innocence, either a person -- either the State has proven a person did the offense or they haven't, right?

A    Yes.

Q    And that's an objective decision that you made based upon the evidence that you heard during the course of the trial. The same exact thing is true with special issue number one and two. The State has a burden to prove what the legislature has determined that they must prove and not something else, okay?

Now, here is what I'm talking about, Mr. Patterson. Occasionally, and in fact pretty often, we have prospective jurors who believe that it will be their responsibility, if they find the defendant guilty of capital murder, to go back in the jury room and make a determination whether the defendant, based upon what he has done, deserves the death penalty. And that's just not true.

(Cell phone sounding).

Q    Yes, sir, is that you?

**Anne B. Meredith**
Certified Shorthand Reporter

A    Could I possibly?

Q    You go right ahead.

MS. HANDLEY:  Again, I think that's me, and I apologize.

PROSPECTIVE JUROR PATTERSON:  I have a transaction closing this morning and my assistant is wanting --

THE COURT:  Do you need to take that call?

PROSPECTIVE JUROR PATTERSON:  No, I do not. I just want to make certain that some things took place appropriately, but no, sir.  Thank you.

Q    (By Mr. Parks)  If the time comes that you need to do something --

A    I'm fine.

Q    -- just let us know, Mr. Patterson.  You're not going to offend us at all.

I believe what I was saying was is that it's not a determination for a jury to make whether or not a particular individual deserves the death penalty because that's basically a subjective sort of thing.  And it would not be right if a juror went back in the jury room and made a decision that they thought that justice or closure for the victim's family or any of those things caused them to think the right thing to do would be to give the death penalty and then go back in and answer these questions in

such a way to get to the result that they desire.

What the law contemplates, frankly, is that a juror might, with every fiber of their being, believe that the death penalty is richly deserved, but if the State hasn't proven these issues, that person should have, and the law contemplates that person would have the mental discipline to not answer those questions based upon the result that they wanted, but to answer the questions objectively whether or not the State had actually proved what they are required to prove. Does that make sense to you?

A    It does.

Q    And essentially the philosophy obviously is this, is that the legislature has determined that not every person who is guilty of capital murder should be executed. Okay.

Now, obviously if you take that to its logical conclusion, any -- to my way of thinking, at least, any intentional murder, when one human being makes a decision to end another human being's life without any legal excuse or justification, for whatever reason, is a horrible act. I think most people would agree with me. That's why it's against the law and that's why we set such harsh penalties or potentially harsh penalties for that activity.

What the law, however, understands is is that just because a person has committed what most people would consider to be a horrible crime does not mean that they will

be a future danger in the penitentiary, right?

A    I agree.

Q    Otherwise, it would just be an automatic death penalty. And this is the way the State has determined that we would identify those persons who the law believes should be executed from those capital murderers that the law believes should not is the future dangerousness issue.

That's the way we -- Different states do it different ways, but that's the way Texas has made the determination is we are going to identify what our Court of Criminal Appeals has described as those few incorrigibles who cannot even be confined without fear of further violent outbursts against others.

So, that's who we are looking for. Because all persons about whom special issue number one is asked is a capital murderer. The issue is whether or not the State can prove they are one of those few incorrigibles that the Court is talking about. Does that make sense to you?

A    It does.

Q    Okay. And it probably won't come as a surprise to you that the State and the defense do not always agree about these issues. Nothing personal about it. It's not to say, you know, cast any aspersions on anyone. The idea, though, is that twelve people will sit in this jury, all of whom are in favor of the death penalty. Not one person will

sit on this jury who is against the death penalty, okay?

So what is vitally important to Mr. Broadnax, and any other person in his position, is that the twelve people who sit on the jury who are in favor of the death penalty be able to follow the law and put aside, if you will, whatever personal desire they have or whatever personal beliefs that they have about the appropriateness or purpose or reasons why we should have the death penalty and put those aside and answer the questions according to the evidence that has been placed before them. Does that make sense to you?

A    Yeah. But if I could --

Q    Sure.

A    The concept just -- I guess I would put the death penalty in the same category I would put abortion in this sense. I take issue with -- I don't believe that I am in favor of the death penalty.

Q    Okay.

A    I don't believe that I am in favor of abortion. But each is the law and I accept each of them.

Q    Okay.

A    So, that would be my terminology.

Q    Fair enough. And we shouldn't say that probably. The reason we get in the habit is we put that on the questionnaire and ask people whether they are in favor of it or not, and that may not be a real good way of asking that

**Anne B. Meredith**
Certified Shorthand Reporter

question, quite frankly.

A    Yeah.

Q    And I understand what you're saying.  And I expect that you understand what I'm saying.

A    I do.

Q    That, you know, life experience tells us that we are probably going to wind up with twelve people who have varying views on the death penalty, and that really shouldn't matter.  The only thing that should matter is has the State met the burden that the law requires.

And that's -- And I guess the point I'm very clumsily trying to make is that that's all Mr. Broadnax is really entitled to is twelve jurors who will do that, but certainly we are entitled to twelve who will, and that's what we are really trying to get to.

Now, in that context, when we look at special issue number one, you know, it says what it says.  And as a juror, you have to assume that the legislature meant for the State to have to prove what that special issue requires and not something else.

For instance, it doesn't say, you know, do you find from the evidence beyond a reasonable doubt that a defendant will have the opportunity to commit criminal acts of violence?  Of course, anyone would have an opportunity to do that, you see.

The question is whether or not this is one of those persons who would take that opportunity and commit -- in probability commit criminal acts of violence that would constitute a continuing threat to society.

And one thing that you did understand and do understand, Mr. Patterson, is that criminal acts of violence, while each juror has the right to make their own determination what that means to them, it is, I would suggest, the intention of the legislature that they do that in the context of what that question would ultimately lead to, probably or possibly, if it's answered yes.

The context really is not, you know, might a person commit -- Well, let me put it another way. Each juror is given an opportunity, I guess, and probably required by the law to say, when I look at criminal acts of violence that would constitute a continuing threat to society, I'm looking at that in the context of whether a person lives or dies.

So, it is completely appropriate, as you indicated to the prosecutor, that you make a value judgment. That it's not just do you believe a person would commit some incidental act over time that might be construed, you see. It's not a checklist of slapping people in the face or separating out acts of violence away from the requirement that they be acts that would constitute a continuing danger

to society because that's the complete issue.

Am I making any sense to you whatsoever?

A    Yes.

Q    Okay.    There was a couple of things I wanted to mention about that.  And again, it's sort of -- This is a question that the law contemplates the State bring evidence that is relevant to that special issue.  And what Ms. Handley told you is exactly true in that our law says that a person could answer that question yes legally based solely upon the evidence that they heard about the offense.  They could. They don't have to.  They can require more.

But as Ms. Handley indicated to you, the law recognizes that those are two entirely different questions. So, it may very well be that what happened when the offense was committed does not speak to the answer to special issue number one very compellingly, or it might.  It just depends. But it is intended that this be a totally different question. If it's not, there would be no need in even having it.

Does that make sense to you?

A    Yes.

Q    And you know, what sort of evidence might you hear that would be relevant to that special issue?  Well, we have touched on some of it already.  What a person's history was. If they have a history of being violent in the past, that might inform your answer to that special issue.  If they had

no history of violent actions, that might inform your answer, or any combination of things in there. That's strictly up to each member of the jury what significance they want to place on things of that kind.

But you know, it is always true that the penitentiary is full. I believe it's some hundred and fifty-three thousand inmates in the penitentiary system. We have over a hundred penitentiaries in this state now. And it's true that they mix all kinds of sentences and all kinds of offenses in the penitentiary.

But you could potentially hear from some classification expert from the penitentiary who tells you how they do that. They don't just throw people in willy-nilly one with another, that they have a plan, that they try to implement a reasonable sort of plan. You can give that sort of testimony whatever value that you want to.

You know, Ms. Handley mentioned a person doing ten years in the penitentiary for some offense being thrown in with people who are doing long or even life sentences for murder in the penitentiary. Well, there's -- Just in that statement itself, which to me suggests that just because a person is doing a ten year sentence, he is less likely to be violent than a person doing life for murder, you can hear about whether or not that's true.

Now, counter-intuitively, statistics show us

**Anne B. Meredith**
Certified Shorthand Reporter

that the longer a person's penitentiary sentence is, the less likely he is to be violent in the penitentiary. There is a reason for that. The longer the sentence, the more a person is going to have to make a life where he is. The shorter the sentence, no matter what he does, he's going to be going home by and by.

So, statistically we can see that really there is no correlation or certainly no negative correlation in what a person is convicted of or how long his sentence is in whether or not he's going to be a danger or a violent person in the penitentiary. Those are the kinds of things that you can look at if you hear from people who testify. That's just an example of some kinds of evidence that jurors can hear in making a determination whether or not the State has proven their case.

So, the bottom line to this is that this is not a special issue that is intended to be answered based upon speculation or supposition. It is intended to be answered about the individual on trial.

You know, you might hear from witnesses who say, well, you know, bad things have happened in the penitentiary before, and people can commit offenses, people do commit offenses. Well, that's fair enough. But ultimately a jury must make a decision about not what somebody else has done or what might could happen but a decision about the

**Anne B. Meredith**
Certified Shorthand Reporter

individual that they are sitting in judgment of.

Does that make sense to you?

A    It does.

Q    Okay.  And do you believe you would be able to do that?

A    I do.

Q    The prosecutor mentioned gangs awhile ago, and certainly it's true that there are gangs, there are people in the penitentiary who belong to gangs, have belonged to gangs.  And the people who run the penitentiary understand that.  And frankly, they have identified seven or eight such groups.  They call them disruptive organizations.  Basically they are gangs.  And they have identified the seven or eight that they consider to be those that they need to single out for special attention.

And if a person goes into the penitentiary as a confirmed member of any one of those disruptive groups, they go immediately to what's called Ad Seg, administrative segregation.  They are placed in a single cell by themselves and kept there twenty-three out of twenty-four hours a day.

So, the point is is that the penitentiary is not run by the inmates.  It's run by professionals that we hire to do that.  And they recognize and take measures to protect themselves and the inmates.  And that's the kind of evidence that you can hear on that issue to make a

**Anne B. Meredith**
Certified Shorthand Reporter

determination.

Do you think it would be right and proper that we tell you all that we can about what goes on down there so that you can make an informed decision about special issue number one and whether the defendant would be a future danger?

A    Well, I think that information is always good.

Q    Sure.

A    So, as much information as is available I think I would prefer.

Q    Excellent.  Okay.

Now, Mr. Patterson I'm not going to spend any real time with you on special issue number two.  The prosecutor may have told you -- I don't remember.  I'll say it again.  We don't always give special issue number two.

Special issue number one is always given to a jury and so is special issue number three.  But special issue number two is only given if the judge, after the case is heard, determines that there has been some evidence, however slight it might be, some evidence that would raise that issue.

Okay.  And if there is some evidence, then the jury will be called upon to answer it.  But if there is not any evidence that there was more than one person involved or just the law of parties generally is not raised by the

evidence, you would never get that special issue, okay? So, we won't know whether this jury will or not until we have gone through the trial, fact of the matter. So, I'm not going to spend a lot of time on it or any time on it really, frankly.

Special issue number three, that one is different. I told you that we would kind of get around to that. That's the one that's kind of a subjective determination by a jury as to how they answer that particular question. One thing we know for certain, Mr. Patterson, and that is this, that a jury would never be called upon to answer special issue number three unless they had already determined that the defendant was guilty of capital murder and that he would be a continuing danger. Okay?

Because if the jury answers special issue number one no, the trial is ended. At that point you'll return your verdict in to court and the judge then assesses the automatic life without parole sentence. Okay? So, if that one is answered no, it's the life without parole, and you would never go on down.

So, only getting to special issue number three if you say guilty, yes to special issue number one, and if it was given, yes to special issue number two, then you're at number three. And the rules change significantly at that point because no one has any burden of proof on special issue

number three.  Okay?

And it basically says what it says.  It is intended to give jurors a vehicle through which they could assess a life penalty rather than a death penalty, if they believe that it is appropriate, that might not be available to them from the other questions that are asked of them.

We used not to have special issue number three.  It just did not exist.  We had a different special issue number one.  That doesn't really matter here.  But basically our Court of Criminal Appeals never did recognize, but finally the Supreme Court recognized, that in our system here in Texas that there were considerations that could be important to jurors that could not be given effect by answering these other questions, so that there finally had to be a way that a juror could give effect to mitigating evidence if the juror felt that was the appropriate thing to do.

Yes, sir.

A    Does that equate in any way with the concept that I've heard about jury nullification?

Q    Well, no.  This is just my opinion, not really.  A decision is supposed to be made with respect to special issue number three on the evidence.  But that concept, frankly, is so nebulous, if you will, that a juror is entitled, in my opinion, based upon Supreme Court decisions that have been

handed down, a juror is entitled to answer that question yes without being able to give any articulation as to why.

A     Okay.

Q     Okay.  Now, if that's -- You know, some might call that nullification.  To me nullification is rendering a verdict contrary to the plain evidence in the case because a juror thinks it's the right thing to do, finding someone not guilty when the State has proven that they are guilty simply because the jury thinks that they ought not to have ever been charged to begin with because of the facts and circumstances of the case.

The State sometimes gives the example of a fellow who has killed his five year old child, which would sound like an awful thing in a capital murder.  And then they go on to describe how the child was eaten up with cancer and he had absolutely no chance to live and they had done all they could do for him, and still he was suffering day after day after day, where theoretically that person is guilty of capital murder in the example they use.  He gives him a shot of morphine or something that ends his life.

Well, he did an act with the intent of causing that child's death, the child is under the age of six, so that's capital murder by definition.  Now, the jury might hear those facts and circumstances, faced with the awful prospect of having to send this father to the penitentiary

**Anne B. Meredith**
Certified Shorthand Reporter

for the rest of his life for doing what he considered to be an act of mercy.  A jury might say -- I'm not saying they would.  I'm just saying a jury under those circumstances, okay, they proved that he's a capital murderer, but under these facts and circumstances we refuse to find him guilty.  That's nullification.

A    Okay.

Q    So, this really theoretically is not nullification.  It is -- What the Court has said to us is that each individual juror has a responsibility of making -- of coming to his or her own personal moral judgment about whether or not the defendant should receive the life penalty rather than the death penalty.

And a lot of jurors -- It's kind of like when we talked about the special issue, it's like we're talking about either give him the death penalty or send him home.  Well, that's not true.

It's like you said in your questionnaire on page eight, despite a person's character, background, circumstances, they ought to be responsible for their act.

The law is making them responsible by giving them a life penalty.  The issue really is not whether or not they are being made responsible; it's whether or not their life should be ended.  And to me at least, you know, that's not the same thing as not holding them responsible.  Life

without penitentiary is a serious matter. I mean life without -- life without parole in the penitentiary.

A    A very good explanation. Thank you.

Q    So, when we come to there and what I like to tell jurors, Mr. Patterson, just to make sure we are all on the same page, I think jurors sometimes -- not you, I'm not talking about you necessarily. But jurors sometimes feel that, because we are going to all of this trouble here, we have been at this for weeks, we call jurors down one at a time, we displace them for the better part of the day, we take an hour and a half talking to them, that that's a whole lot of effort to go to if we are not going to give the defendant the death penalty, and they feel some obligation to do that, and they should not. Because what the law tells us is that the automatic punishment, as you already know, for capital murder is life without parole penalty. And the law is always satisfied with that.

In these cases in which the State has decided to seek the death penalty, it's up to the jury to stand between that executioner and the State of Texas and not let the district attorney make those decisions, but the law contemplates that the jury makes those decisions. And the law is always satisfied with a life penalty. It never requires, just because a person is guilty of capital murder, that the death penalty be imposed. And no juror has got to

apologize or explain himself or herself if they return a verdict of life penalty rather than the death penalty in a case in which they are seeking death.

You understand that --

A    I do.

Q    -- I'm reasonably certain.

So, when you get to special issue number three, the law would ask you to take all of these things into consideration, the thing that you have very eloquently spoken to already, so there is no need in me going back through all of that.

It's taking everything about the defendant, about the case, all that you have heard. And we are not a balancing state. We don't -- You know, you're charged with looking for mitigating circumstances, not looking for aggravating things to balance off against them. It just says look to see if you see a mitigating circumstance or mitigating circumstances, and no one will tell you what that is. It is whatever you think it is.

And one juror might think something is mitigating and another not, and that's okay. The law doesn't tell you what weight to give to mitigating evidence. So that one juror might think a mitigating factor is sufficient to justify the life penalty rather than the death penalty and another juror not. One juror may think one thing is, somebody

-- you know, it's just ultimately just what I said awhile ago. The law contemplates that each individual juror reach their own personal moral judgment in the matter and return that moral judgment to open court. Okay? So that you don't have to agree among yourselves.

I mean theoretically a jury could say, we believe there are sufficient mitigating circumstances to justify a life penalty, but none of you agree on what that is. All of you have a different reason for it. That's fine. It doesn't matter. The law doesn't say that you have to be able to articulate your position.

Now, the law expects the jurors to go back into the jury room and deliberate their verdict. I don't quarrel with that. My dictionary says deliberation means to carefully consider. And certainly we would expect every member of the jury to carefully consider the evidence and the law and come to their own personal judgment in the matter.

What it doesn't mean is that the majority rules. You have been on a jury. You know how that works better than I do once you get back into the jury room. But a juror is not required to defend their position if they have come to a personal moral judgment that the life penalty is appropriate. They can if they want to. They can say, here is why I believe this is the appropriate moral response

to this.  But they are not required to.

They could say, listen, I've carefully considered the evidence, I have reached my moral judgment in the matter, and I don't have to defend it to anybody. I don't have to explain it to anybody.  I don't have to articulate it to anybody.  It is mine.

Does that make sense to you?

A    It does.

Q    Okay.  We sometimes talk about the appropriateness of attempting to change someone's mind about what their personal moral judgment is, whatever it may be.  We talk about, you know, people making a decision what religion that they belong to, how they raise their children, what schools they go to, and whether or not they believe it to be appropriate for a person to try to tell them that they are going to the wrong church or anything else of their personal moral judgment.  And I guess people can do that.  I don't know how appropriate that would be.

But it's sort of like the same thing.  When a person has decided either way that their personal moral response to whether a person lives or dies, it doesn't get much more personal than that.  Would you agree with me about that or --

A    I would.

Q    Okay.  Am I making sense to you at all, Mr.

**Anne B. Meredith**
Certified Shorthand Reporter

Patterson?

A    I have followed, I think, everything that you've said.

Q    I thought you had.  And the whole purpose -- and I am going to wrap this up here.  My whole purpose in going about this the way that I have is to impress, so far as I'm able to and have the ability to, the serious nature of what's going on here, and I believe you appreciate that.  I believe you've appreciated that from the very first.  That there is nothing about this that is ordinary.  That the State is required by law to do certain things.

And you tell us in your questionnaire that you very strongly believe in that.  I can't remember exactly what you put, but again and again you tell us that you accept and you follow the law.  And that's what we need twelve people to do.  Okay?

And if the State can meet their burden, then we've got no complaint.  As long as we know that all twelve jurors have held the State to the burden that the law requires and has not speculated or supposed, but placed the burden on them that the law requires on them, we've got no way to complain or reason to complain about it.

By the same token, if the State does not meet their burden, we need twelve jurors who will hold them to the task, and if they don't meet the task, say so.  And I believe

you're just such a person.  Am I right about that?

A    I believe that I am.

Q    Is there anything, Mr. Patterson, that I need to explain?  I don't think that there is, but I want to give you an opportunity to ask me any questions that you might have, express any opinions, tell me to jump in the lake, anything like that.

A    No, I think I've heard and understood everything that you've said.

Q    Any reason why you couldn't be fair to Mr. Broadnax in this case?

A    No reason.

Q    Thank you, Mr. Patterson.  I appreciate it.

THE COURT:  Thank you, Mr. Parks.

All rise for Mr. Patterson, please.

You'll be stepping outside for about a minute and then you'll be coming right back in.  If you will leave that questionnaire there, please.

(Prospective Juror Patterson exits the courtroom).

THE COURT:  In the presence of Mr. Broadnax, what says the State of Texas?

MS. HANDLEY:  We have no challenges.

THE COURT:  What says Mr. Broadnax?

MR. PARKS:  We have no challenges.

(Prospective Juror Patterson returns to the courtroom).

THE COURT:  Please be seated, Mr. Patterson.

Be seated, counsel.

Well, Mr. Patterson, of course, the attorneys have accepted you as a qualified juror.  For what it's worth, I a hundred percent agree.  It's been a real pleasure meeting you.  I appreciate you being here and being so open with us.

Now, remember I told you the same person who notified you to be here is going to notify you within the next two to three weeks by phone whether or not you're going to actually be on the trial jury or not.  In that regard, pardon me, sir, I want to make sure that your telephone numbers on your questionnaire are still correct.

PROSPECTIVE JUROR PATTERSON:  They are.

THE COURT:  All right.  I'm going to ask you for me to assume that you're going to be on this jury as far as any outside information concerning this trial.  Avoid all media coverage at all costs because I think it would be a real tragedy if someone like you were inadvertently disqualified because of some information you might receive about the case.

And I have been told by my younger friends that not only newspaper or television but the Internet, too.  So, if you'll please from now until, if you're on the jury,

until it's all over with, avoid any information, outside information.

PROSPECTIVE JUROR PATTERSON:  Okay.

THE COURT:  The sheriff now is going to give you the card of the judge's coordinator who contacted you. And if anything should arise in your personal life between now and the trial date that you might think affects your jury service, give her a call and we will deal with it. All right, sir?

PROSPECTIVE JUROR PATTERSON:  Thank you.

THE COURT:  Thanks a lot.

PROSPECTIVE JUROR PATTERSON:  Thank you all.

THE COURT:  All rise.

(Prospective Juror Patterson excused from the courtroom).

THE COURT:  Court's in recess until 1:15.

(After the lunch recess, defendant present).

MR. LOLLAR:  Judge, the State and the defendant have agreed to excuse Juror number 939, Tracey West, based on the answers to her questionnaire.  She has apparently had much experience with the criminal justice system having two sons in prison right now, in the penitentiary.  She doesn't like prosecutors one little bit and she doesn't like court appointed lawyers even more.

So, based on that and other answers in her

questionnaire, we have agreed to excuse her.

MS. EVANS: Additionally, your Honor, the State believes that she has a bias against law enforcement as she makes it clear a couple of times in here that police officers lie and that they lied I guess in her son's case, as well as she herself applied to be a police officer and it appears that was not very fruitful.

And, so, the State believes that based on that and everything stated by the defense that she would have a bias against both the State and the defense.

THE COURT: And all of this in the presence of Mr. Broadnax, correct, Mr. Lollar?

MR. LOLLAR: Yes, sir.

THE COURT: Barney, if you will tell her she is excused, and we will be ready for Mr. Ford.

(Prospective Juror No. 871, Scott Ford, enters the courtroom).

THE COURT: Good afternoon, again, sir. How are you doing?

PROSPECTIVE JUROR FORD: Doing pretty good.

THE COURT: Please be seated, Mr. Ford.

Be seated, folks.

Mr. Ford, we met earlier today.

PROSPECTIVE JUROR FORD: Yes.

THE COURT: And again, appreciate you being

here and being on time. I know you were here early. That's something I really thank you for.

My name is Webb Biard and I will be here with you this afternoon during the jury voir dire selection process. The Presiding Judge of this Court is Michael Snipes. Should you be selected as a juror, Judge Snipes will preside over the trial, for whatever that's -- This will be the only opportunity we'll have to be together.

I want to introduce at this time Elaine Evans.

MS. EVANS: Good afternoon.

THE COURT: Andrea Handley. And they represent Dallas County, the State of Texas.

Further to my right is Keri Mallon.

MS. MALLON: Hi.

THE COURT: And Brad Lollar.

MR. LOLLAR: Hi.

THE COURT: And they represent Mr. Broadnax, James Broadnax.

Do this for me before we go any further, please.

(Prospective Juror Ford sworn).

SCOTT FORD,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    All right.  You know, when we spoke earlier, you hadn't had an opportunity to see that pamphlet yet.  Did you get the pamphlet?

A    Yes.

Q    Did you read it?

A    Yes.

Q    Did that help you a little bit to understand the procedure a little better?

A    Yes.

Q    Okay, good.  Have you ever served on a criminal jury before?

A    (Shakes head).

Q    All right.  And I am going to ask you, on behalf of everybody, to speak up for the record because everything that happens here needs to be recorded.  And I mean, just for me, don't shake your head, okay?

A    Okay.

Q    And I understand.  I mean that's a normal reaction, but we do need to have a record.

I'll tell you, it doesn't matter that you haven't served on a jury before, but in that -- because the lawyers are going to explain all the law to you.  You're going to have a good understanding of the law.

And it's not whether or not you know the law.  The bottom line question, Mr. Ford, is going to be, once you

**Anne B. Meredith**
Certified Shorthand Reporter

understand what the law is, can you follow the law and base your verdict on the evidence and the law in deciding your verdict?  That's the bottom line.

Just for a few minutes let me give you some basic principles.

A    Okay.

Q    All criminal jury trials, be it theft of a bicycle, capital murder case, are tried in two parts.  The first part is called the guilt/innocence phase.  If a person is found not guilty, the trial is over.

A    Okay.

Q    You don't go into the second phase.

If the person is found guilty, then you go into what's called the punishment phase and then you hear more evidence about the person on trial, good deeds, bad deeds, prior record, no prior record, mental condition, anything that either side thinks will help you decide what will be the proper punishment for this person who we found guilty of committing this particular crime.

A    Okay.

Q    Did that make sense to you?

A    Yes, sir.

Q    So, that's the way it all works.

Now, from hearing Judge Snipes' remarks, from filling out the questionnaire which we have here, and I am

going to give it to you in just a minute, from reading the pamphlet and talking to me for a minute, and as you sit here now, are you aware that this is a capital murder case?

A    Yes, sir.

Q    You understand that the State of Texas is seeking the death penalty?

A    Yes, sir.

Q    Did you know that?

A    Yes, sir.

Q    All right.  Because of that, because this is a capital murder case in which the death penalty is being sought, there are some very specific rules, procedures and regulations that we must go by, and I am sure you'll understand that.

I don't want to sound silly.  This is no time for that.  But we didn't get together and say, okay, how are we going to do this with Mr. Ford tomorrow afternoon? We are going to do it strictly in accordance with the law of the State of Texas and the United States of America as best we can.

A    Okay.

Q    You with me on that?

A    Yes, sir.

Q    And one of those rules of law is that you, Mr. Ford, have an opportunity to talk to us individually one on one.

Any other kind of criminal case except a capital murder case, there would be about seventy-five people sitting out there in the audience and the lawyers would talk to them as a group. But capital murder, we talk to each other one on one.

A    Okay.

Q    And I have got enough country common sense to know that this can be a little bit intimidating or embarrassing or hard on some people. Don't want it to be.

A    Okay.

Q    I'm asking you not to let it be, but I understand it might take you a minute or two to kind of relax. But these are outstanding lawyers or they wouldn't be involved in this case. That makes sense. But they are also good people.

It's out of the question, and I think you can tell by now, it's out of the question that anybody involved in this would intentionally embarrass you or --

A    Yeah.

Q    I mean, that's not going to happen. And here's something else I want you to feel good about is this is not some legal pop quiz test. In other words, we are not trying to find out what twelve people out of all the people we talk to know the most law and then they sit on the jury. That doesn't have anything to do with it, nothing to do with it.

What does have to do with it is, is can you

follow the law once it's explained to you? Does that sound like a fair deal?

A    Yes.

Q    And the only thing we have a right to ask of you, but we do ask of you, is that you tell us how you honestly feel.

A    Okay.

Q    In other words, can you wait, listen to the evidence, and if you think somebody is guilty, find them guilty? If you think they are not guilty, find them not guilty? And if you find them guilty, can you answer these three special issues? Which I know you've never seen before, but you've read them now and we are going to talk to you about them. Can you just answer those three special issues on the wall over there?

A    Yes.

Q    Answer them yes or no, depending on the evidence?

A    Yes.

Q    If you can, you're qualified. If you say, no, I can't do it, I've already got my mind made up, you're not qualified. Now is your opportunity in a minute, after you talk to the lawyers, to tell us, well, I can do it or I can't do it. And whatever you say we will accept.

What we can't accept is if you're not straight with us.

A    Okay.

Q    Fair deal?

A    I understand.

Q    All right.  Now, finally, from reading the pamphlet -- and I don't think it said anything in the questionnaire.  But from reading the pamphlet, do you see where Judge Snipes tells us the trial, the actual trial is going to start; did you see that?

A    No, I did not read that.

Q    August the 10th.

A    Okay.

Q    All right?  It's going to last up to two weeks.

A    Okay.

Q    Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, be a lunch break.  We don't work on the weekend.

The jury will not have to stay together overnight unless and until you are deliberating your verdict -- that means, you know, whether someone is guilty or not guilty or what the punishment is going to be.

And say you went late into the night and became fatigued and unable to really concentrate.  There is a chance you would all be taken to a fine hotel as a group, individual private room, paid for by the county, spend the night, eat, come back, pardon me, come back as a group and

then continue your deliberations.

A    Okay.

Q    From that information, from knowing that this is a capital murder case, for knowing that there's only two possible punishments if someone is found guilty of capital murder, and that's either life in prison without parole or death, knowing how long -- when the trial is going to start, how long it's going to take, how Judge Snipes runs his court, as you sit here now, do you know of any reason why you can't sit as a juror in this case?

A    No.

Q    Okay. Now, finally, one thing from me. I'm going to tell you that there's the two possible punishments if you are guilty of capital murder, and that's either life in prison without parole or death. And when I tell you life in prison without parole, I mean life in prison without parole.

A    I understand.

Q    I mean it's not a wink and a nod. It's not, well, we are hiding something from you. Life in prison without parole means life in prison without parole. Okay?

Now, one of the attorneys from the State and then one of the attorneys for Mr. Broadnax are going to speak to you for up to forty-five minutes each.

A    Okay.

Q    That's an hour and a half. So, an hour and a half

from now I will tell you whether or not you're a qualified juror. If you are a qualified juror, what that means is that we are in the process of qualifying some fifty, and once that's done, the actual twelve that are going to try the case will be selected.

And we anticipate that that decision will be made in about two weeks. And the day that decision is made, you will be called by the same person who notified you to be here and told if you're on the jury or not on the jury. Okay?

A    Okay.

Q    All right. Now, during this next hour and a half, if you need to take a break, if you need to get some water, coffee, Coke, restroom, let me know. All right? Thanks for being here.

THE COURT: I want to reintroduce to you now Elaine Evans who is going to talk to you on behalf of the State of Texas.

MS. EVANS: Thank you, your Honor.

EXAMINATION

BY MS. EVANS:

Q    Good afternoon again, Mr. Ford. How are you today?

A    Doing good.

Q    Good. A little bit different setting than it was whenever you first came down here, right?

A    Yeah.

Q    We are talking, or so far we've talked to over a hundred individuals just like yourself, one on one like this.

THE COURT:  Again, Ms. Evans, I apologize to you.

MS. EVANS:  Oh, no problem.

THE COURT:  This is your questionnaire.  It took time filling it out, but the attorneys have read it and it's going to save you time here today.  Okay?

PROSPECTIVE JUROR FORD:  Okay.

Q    (By Ms. Evans)  Because as the judge told you, in a case where the State is seeking the death penalty, each side, attorneys from each side get to speak with the jurors individually just like we are doing here today.

And, so, as the judge said, there are no right or wrong answers.  Right now you've just taken an oath to tell the truth.  And, so, really it's the only opportunity that the lawyers from both sides get to kind of know you and what your views are on the death penalty and on the different laws that may come up in a trial like this.  Okay?

Because as you sit here now, you're not going to hear about any of the facts of this specific case.  We are just going to give you hypotheticals maybe to illustrate some of the principles of law to see how you feel about it.  Because as you might imagine, if you're selected as one of

the twelve jurors and, you know, we hadn't talked to you about whether or not you agree with and can follow a certain law, it might be a bit uncomfortable if you're sitting there and you think, wow, you know, I wish somebody had asked me if I could really do this or explained this further.

So, that's why we do this, all right, just to know how you feel, so if you will just promise me that you will just let us know. And if you have any questions of me, if you don't understand something, just let me know that, too, Mr. Ford, okay?

A    Okay.

Q    All right. And as you might imagine, in all the people that we've talked to, people have had a wide range of feelings and things that they would like to talk about surrounding the death penalty. You know, there are many people that are for it. There are many people that are against it.

And it doesn't really matter if you're for or against the death penalty. What matters is, can you follow the law as it's given to you and could you and would you assess a verdict of death by answering these special issues if the State proves their case to you beyond a reasonable doubt and proves the answers to these special issues should be yes, yes and no?

A    (Nods head).

Q    Because at that point the State is entitled to a verdict of guilty on capital murder and entitled to a verdict where the judge would then be signing a death warrant for this defendant over here.

A    Okay.

Q    Okay?  And, so, that's what -- We just want to make sure you can follow the law regarding that.  But in looking at that, let's talk about your feelings on the death penalty.  On page four of your questionnaire you talk about obviously, you know, you're a different person now than you were when, I guess what, when you were sixteen?

A    Yes.

Q    You say about five years ago.  And I understand what you're talking about.  You know, each of us grow and evolve and maybe we get new information on things and it causes us to change our opinion.

But I would like to know, regarding that last question on page four, in what ways did your views change and what caused the change?

A    Let's see, family.  I just say, you know, being in high school and then getting -- I would say after high school, I graduated, I went to Eastfield, did a little automotive deal and just basically started working.

I mean, I wouldn't necessarily say that it changed my views on the death penalty.  I never really would

have a view.  It never crossed my mind all that much because I don't -- it doesn't affect me.

But just growing up, just growing up in general, five years ago, like anybody, they automatically grow up, they change in some way or form.  So, but I never really thought about the death penalty until, you know, being called in to this.

Q    Okay.  And I understand obviously, you know, when you're in high school and doing that sort of thing.  You appear to be a very law-abiding citizen.

A    Yes, ma'am.

Q    And I believe you are.  And, so, as you just said, it didn't really affect you in your day-to-day life and what you did and the way you would go about doing things.  And I feel quite certain none of your friends or family members were exposed to anything like that.  So, I understand why you wouldn't have thought about it or it wouldn't have crossed your mind.

When you initially learned that you had been called down to serve on a case that could potentially involve participating in a process that would then give someone the death penalty, what thoughts came to mind?

A    I mean if I were chosen, I would just have to know everything.  I would have to know the details.  I mean, I can't make a decision for something that I don't know.

Q    Absolutely.

A    I don't know anything about.

Q    And you reflect that throughout your questionnaire that, you know, it's going to be based on the evidence or you would look at the evidence and it has to be proven to you. And you are absolutely right on that. You're dead on, that's what the law is going to require of you.

But I'm wondering, you know, I think you said in here that one question that is kind of cliche about the letting ten guilty go free and the one innocent man, I think you said that that's a little touchy.

I'm not trying to be, you know, touchy feely, or whatever, in asking this question. But, honestly, did you have any sort of emotional reaction or thought when you learned that this was a death penalty case or that we were seeking the death penalty?

A    I mean no, not really. I just -- I mean that's something that doesn't come until later from what I understand. You know, you have to be proven guilty and then, from what you had said before, you know, then it evolves into that. So, I mean no, I didn't think about it. It has to be proven guilty first.

Q    Okay. You just came in and heard that this was the type of case on trial and you just are willing to hear and listen to the evidence as it's given to you. Is that

fair to say?

A    Yes.

Q    Okay.  And in talking about that, if the State does prove this defendant guilty of capital murder, and then the way -- I don't know if you're familiar, if you read from the pamphlet, the way that it's determined whether or not this defendant receives a sentence of life without parole or the death sentence is not determined by the jury going out, you know, after a verdict of guilty on capital murder and saying, okay, check he deserves life or check he deserves the death penalty.

That question will never be asked of you, you know, if the defendant should get life or death.  It comes by way of these special issues and how you answer those questions.  Okay?

A    Okay.

Q    And based on how you answer that is what will make that decision of whether or not it's life without parole or the death sentence.

So, what I need to know is basically if the State does prove the case to you, the person is guilty, the defendant is guilty of capital murder beyond a reasonable doubt -- and I know you don't know anything as you sit here now -- but if we prove that to you beyond a reasonable doubt and then you go on to answer those special issues, can you

keep an open mind in the punishment phase of that trial, knowing that this defendant in front of you here today, Mr. Broadnax, is potentially looking at the death penalty, as long as the State proves to you beyond a reasonable doubt what is required?

A    Sure.  I mean I don't know anything about it so I don't know how to answer.

Q    Okay.  Sometimes jurors, you know, come in here and, you know, they have never thought about the death penalty before.

A    Yeah.

Q    Like you said that you hadn't.  You don't have any reason to.  But, you know, they know it exists because it's the law, and it's the law in Texas, and they may agree with it in passing or in passing conversation, but when actually asked to participate in the process, you know, that's a different story.

And, so, I want to make it clear that it's the State's objective here, and the State believes that we have the type and the quality and the quantity of evidence in this case that would lead twelve jurors to a verdict of guilty on capital murder, and then would further lead twelve jurors to answer these questions on the special issues yes, yes and no, that would then result in a sentence of death for Mr. Broadnax.  Okay?

A    Okay.

Q    And, so, what that would mean is, you know, the judge would sign a warrant for his death. You know, and at some date in the future he would be given an execution date and then on that date he would be strapped down to a gurney in Huntsville, Texas and fed a lethal injection of poisons into his body until he died. Okay?

A    Okay.

Q    And that is the State's goal here and our objective. And we believe we have the type and quality of evidence that's going to lead the jurors to that verdict.

Do you think this is a process that you can participate in knowing that you may participate in causing the death of an individual?

A    Well, I mean that's kind of -- I wouldn't want to say yes, but I mean yeah, I could --

Q    Okay. And I understand --

A    -- at the time.

Q    Go ahead.

A    I mean that was just kind of a weird question. I mean I understand that's something that you have to ask, but I've never had anybody ask me that before, so it's kind of strange to have to answer.

Q    Oh, I know. And I don't ask you that or tell you that to be morbid or whatever.

A    No, I understand.

Q    I like the jurors to understand this is reality. You know, this is what you will be called upon to do if you are asked to serve as a juror on the case is to look at the evidence and determine if we have proven what we have to prove to you, and if we do, we are entitled to that verdict. Okay?

A    Okay.

Q    And you believe you could do that?

A    Yes.

Q    All right.  Moving on along, well, the same page, page four, Mr. Ford, where you say, whether or not the death penalty here in Texas is used too often or too seldom, you say you don't know the stats.  And that's fair, a lot of jurors, you know, tell us that.

But you do say, I believe it should be the last course of action.  Can you explain your feelings on that?

A    I mean knowing, knowing all the information, depending on the case and all that, I mean death penalty is -- I don't know how to answer.

Q    There is no right or wrong answer.

A    Yes.

Q    Honestly, I'm just asking you to kind of explain.

A    Yeah, I don't know anything about it.  I think

you have to know everything. It has to be -- you know, everything has to lead to that. It has to, you know, prove that they are guilty of murder or capital murder, and all of those things, in answering these questions like you said.

But yeah, I don't, I don't believe it should be something that should be taken lightly.

Q    Okay. And you are absolutely right. And you know, to be honest, the State of Texas doesn't take it lightly because, just because you're found guilty of capital murder doesn't mean that you automatically are put to death or, you know, or even receive a death sentence. Okay?

It's not even one, when the judge said that the State is seeking the death penalty, you know, it's our decision whether or not to even seek the death penalty or to make a determination that maybe the case just deserves life in prison without the possibility of parole, so we wouldn't even be calling upon you to answer those special issues. Because the State recognizes that every case, you know, kind of like you say, is not maybe the proper case.

A    Uh-huh.

Q    Or you wouldn't be able to answer those in such a way that would lead to a death sentence. So, I can appreciate that you would allow the evidence to do that.

The State doesn't believe in an eye for an eye because obviously in that case, you know, literally you

could take a life and you would give yours. And that's not the way that it goes about doing things.

As I described before, it comes by answering these special issues based on the evidence. And I think you do recognize that because in page two you do say in your argument for the death penalty, you say basically, when a human life is taken or the life of another is taken and is completely aware of the consequences, the death penalty should be looked at.

And I can appreciate what you're saying. You know, it's an option and it merely is that, an option for the jurors if we prove to you the special issues beyond a reasonable doubt. It's not automatic.

And I see on the top of page two that you do realize that there is also a place for life in prison without the possibility of parole, that sometimes the circumstances and the facts dictate that sort of a punishment, correct?

A    Yeah.

Q    Okay. Page one, you know, you say that you are in favor of the death penalty. And is that still your feelings here today?

A    Yes.

Q    And had you talked to any friends or family members since the time you came down on the big panel about the death penalty?

A    No.

Q    Or did you do any further research into it or --

A    No.

Q    Nothing?  Okay.  And you don't know anything about the facts of this case, fair to say?

A    Yeah.

Q    Okay.  You say, if you do the crime, be prepared to suffer for your actions, but only if they have rightfully been convicted.  And you are absolutely right.

And I submit to you that it's more of, you know, the State of Texas, yes, has to prove to you that the person is guilty first of capital murder beyond a reasonable doubt, but I submit to you that the death penalty is only then appropriate if we prove these special issues to you beyond a reasonable doubt as well.  Okay?

Because, remember, there is nothing automatic about it.  Just because you have been found guilty of capital murder doesn't mean that you're getting the death penalty, because the law actually presumes a life sentence unless and until we prove those.  Okay?  So, it's not to be taken lightly, just as you said.

Just to give you an overview, basically, you know, you're in what's called the voir dire right now while we are talking to you about your feelings on this.

If you were to serve as a juror in this case,

you will then be asked to take an additional oath and that oath would be to base your verdict on the law and the evidence and to render a true verdict based on those two things, and those two things alone, the law and the evidence.  Okay?

And you know, you have the guilt/innocence phase of the trial where we have to prove to you the elements that are found in that indictment for capital murder, that this is the defendant that did it and he did exactly what we said that he set out to do, okay, in that indictment.

If you find the defendant guilty of capital murder, then you move into the punishment phase.  And since the State is seeking the death penalty in this case, then and only then are you called upon to answer these special issues, okay, because you don't see these in regular types of trials and cases to answer these, and I think you understand that.

But there is no rubber stamp at any phase of the trial.  You do exactly what you said, you know, you've got to just sit there and hear everything, keep an open mind, and wait until the State proves it to you.  Can you do that, Mr. Ford?

A    Yes.

Q    Okay.  I want to talk to you about a bit of the defendant's rights --

A    Okay.

Q    -- first.  Okay.  You on page eleven talk about, regardless of what a judge says the law is, jurors should do what they believe is the right thing, and you say yes.  And you go on to say, go with the evidence in front of you.

And I would submit to you that your answer is not entirely wrong.  It's just I want to make it clear to you that the judge will give you the law in the case.  Okay.  And it's the judge's job to call the balls and strikes on what evidence comes in and what evidence doesn't come in.

But it's your job as a juror to evaluate that evidence, okay, in light of the law given to you by the judge.  Do you understand that?

A    Yeah.

Q    So, you do have to follow the law as given to you by the judge, so you're not entitled to do what you want as a juror, but you do base your verdict on the facts and the evidence before you.  Okay.  Could you do that, Mr. Ford?

A    Yes.

Q    All right.  Let's talk about again this type of case, capital murder.  What it always will be is an intentional murder, and that is not a mistake, not an accident, no self-defense or anything like that will apply.  It's intentional.

The defendant did what he set out to do and he did it on purpose and he meant to do it, okay, for this

type of murder. And it's not just a murder, but it's murder plus an aggravating factor.

And by that I mean it can be murder of a police officer in the line of duty, it can be a murder of a child under the age of six, murder of two or more people in the same course of criminal conduct, or it can be like we have in front of you here, murder plus another felony. Murder plus a robbery would be capital murder. Okay.

And only capital murders are eligible for the death penalty. And as the judge told you, there's two possible punishments, though, life or death.

A    Okay.

Q    Make sense to you?

A    Yes.

Q    All right. Do you agree or what do you think about what types of -- now that you know the law and what cases do fall under the death penalty, what do you think should be deserving or even eligible for the death penalty?

A    Let's see, I mean multiple murder, I mean intentional, police officer, you know, basically everything that you said is something that should be considered.

Q    Okay. You agree with all that?

A    Yes.

Q    Is there any other category of offense or crime that I didn't mention -- and there are other types of

capital murders that are eligible for the death penalty. I just named a few. -- that you think should fall into that? And I'm asking your feelings here, not what the law is.

A    I mean, I would have to think of -- think of crimes. I mean I couldn't think of any that I could say should be considered for the death penalty.

Q    Okay. You couldn't think of any others than what I mentioned?

A    Any others than what you had mentioned, no.

Q    Okay. How do you feel about the type that's before you here today? The murder -- and remember it's always going to be intentional, an intentional murder, all right, plus a robbery, plus another felony. Do you think that that is a crime for which the death penalty should be an option?

A    Sure.

Q    You do?

A    Yes.

Q    Okay. And why is that?

A    I mean it's murder plus, you know, another felony. That's two felonies. I mean anything, especially when it's considered with murder, that should be looked at, yeah.

Q    So, you do believe the legislature got it right in making one of those the type of case that could be eligible?

A    Yes.

Q    Okay. Whenever I tell you there's two possible

punishments for capital murder, let me give you an illustration as an example of different ways capital murder could be committed. Okay?

Let's say you have a thirty-five year old man and you hear about that he intentionally plans and carries out the death of a five year old child. What do you think about that?

A    I mean nothing positive, that's for sure. I mean --

Q    Okay.

A    -- how so are you asking me what I think about it?

Q    Well, it sounds pretty bad, doesn't it?

A    Yeah. Oh, yeah.

Q    And you don't know any of the surrounding facts or things about it. But what if I then told you that the thirty-five year old man is actually the father of that five year old kid, and he is a loving father, a devoted husband, pillar of the community and he had sat by that child's bedside day in and day out at the Children's Medical Hospital because the child is actually dying of terminal cancer.

He's suffered for over a year now and his father has watched his son in pain and he is basically at his last straw and doesn't know what else to do. And he goes and gets a lethal dose of morphine and gives it to his son. He's intentionally caused the death of that five year

old child, correct?

A    Yeah.

Q    So, guilty of capital murder, right?

A    Yeah.  I mean yeah.

Q    Okay.  And I see you struggling with that.

A    That's kind of a hard question.  I mean I don't see that circumstance very often, so.

Q    Absolutely, and I give it to you by way of example. Because what do you think if I told you then the scenario, a thirty-five year old man kills a five year old child, but instead the thirty-five year old man goes out to the local playground and just picks off the first five year old that's climbing up the slide to slide down to his mommy?

A    Yeah, that's completely different.

Q    Different scenario?

A    Yeah.

Q    Okay.  And, so, some jurors tell us, you know, they then understand why you have to wait and consider things in light of the special issues in making a determination because, you know, while some may feel that one person may be a future danger -- we are going to get to those -- maybe they wouldn't think another person would be, but it's just to illustrate there's different ways to commit --

A    Yeah.

*Anne B. Meredith*
Certified Shorthand Reporter

Q    -- capital murder, and you don't know until you actually hear it.  Okay.  Could you do that, Mr. Ford?

A    Yes.

Q    All right.  And whenever I say there are no automatics, you know, you could hear about the most horrible, heinous crime imaginable in the guilt/innocence phase of the trial, okay, about what the individual did to make them guilty of capital murder.  And you may think that that type of person is the type of person that nine times out of ten is deserving of the death penalty.  But recall that that's not what you're called upon to answer, correct?

A    (Nods head).

Q    In these special issues.

A    Yes.

Q    Nowhere does it ask you, do they deserve the death penalty or if that's what you're supposed to do.  And, so, just because somebody has committed a horrible and heinous act and you hear about that in guilt/innocence doesn't mean that they are automatically going to be a future danger, which is what question number one, special issue number one calls upon you to answer.

A    Right.

Q    How do you feel about that?

A    I mean, I don't really know how to answer that.

Q    Well, what types of things -- We will get more

into special issue number one and what it calls upon you to answer. But what types of things would you expect to hear in any given type of case, regardless of whether you're dealing with capital murder or not, to determine, you know, proper punishment or whether or not a person is going to be a danger?

A    All the facts, everything that happened, you know, step by step, just any knowledge about it, about the incident, I guess.

Q    Okay. And aside from the offense itself, which the law certainly does allow you to consider in making the determination whether or not somebody's going to be a future danger, what other types or examples of things would you expect to hear, for the prosecutor to bring you so that you could answer that?

A    I don't know. Evidence of a murder weapon. Like you were saying, in order for it to be -- there has to be more than one thing, two murders or --

Q    Okay. Let me stop you for just a little bit, Mr. Ford, because I don't think I made myself clear. I kind of transitioned and didn't tell you where I was going.

A    Okay.

Q    The jury has already found -- Let's just go ahead and say the jury has already found that we proved what we needed to prove to you in that indictment, okay, the

intentional murder plus a robbery. And you found from the evidence that it was proven to you beyond a reasonable doubt so you have found this defendant guilty of capital murder.

A   Okay.

Q   So, now we are moving into that other third phase of the trial.

A   Okay.

Q   The punishment phase. What additional evidence would be important to you, do you think, to hear in the punishment phase of a trial?

A   I think I would probably know what I would want to do by knowing all of the evidence. By knowing all the information, I think I would know at that point what I would decide by getting all the evidence.

Q   Right. Now, remember, there is nothing automatic. So, just because what you heard -- You do consider what you've heard in the guilt/innocence phase of the trial, but the punishment phase is a separate, you know, phase altogether --

A   Yes.

Q   -- that you may hear additional evidence that would help you to answer these questions. Okay?

A   Okay.

Q   What additional evidence would be important to you besides the facts of what this defendant has done?

A    I've never been in that -- I've never -- I mean I don't understand. I don't know what else could be, could be said.

Q    Okay. I'm not trying to cut you off. I think that we have come to an agreement. All right?

THE COURT: All right. All rise, please, for Mr. Ford.

You'll be stepping out, Mr. Ford, and you'll be coming right back in.

(Prospective Juror Ford exits the courtroom).

THE COURT: In the presence of Mr. Broadnax, what says the State?

MS. EVANS: Your Honor, the State doesn't believe that this juror is really understanding the process. And he is just kind of reciting that he would have to hear the facts and the evidence. But I don't think that he has enough real life experience at this point to sit in a case of this magnitude.

MR. LOLLAR: And, Judge, the juror's questionnaire tells us that he is twenty-one years of age. And we have been sitting here talking about it, and we just don't think he has ever thought about these issues before. It's something new to him. And we will agree to excuse the juror.

THE COURT: Ask him to return, please.

(Prospective Juror Ford returns to the courtroom).

THE COURT:  Mr. Ford, you will not have to serve.  You're free to go.  Thanks a lot.  See you.

PROSPECTIVE JUROR FORD:  Thank you.

MR. LOLLAR:  Appreciate it.

MS. MALLON:  Thank you.

THE COURT:  9:00 o'clock.

(Court adjourned for the day).

**Anne B. Meredith**
Certified Shorthand Reporter

THE STATE OF TEXAS    (

COUNTY OF DALLAS      (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 1st day of July, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volumes 29 through 32) is $3,875 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 28th day of December, 2009.

Anne B Meredith
_____
Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter