ORIGINAL

REPORTER'S RECORD

VOLUME 32 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| THE STATE OF TEXAS | ( | IN THE CRIMINAL DISTRICT |
|---|---|---|
| VS. | ( | COURT NUMBER SEVEN |
| JAMES GARFIELD BROADNAX | ( | OF DALLAS COUNTY, TEXAS |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

INDIVIDUAL VOIR DIRE EXAMINATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 2nd day of July, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

*Anne B. Meredith*
Certified Shorthand Reporter

A P P E A R A N C E S:


HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas  75207-4313
Telephone No. 214 653-3600

BY:  MS. ANDREA HANDLEY, SBOT No. 08898800
     MS. ELAINE EVANS, SBOT No. 24032880
     MR. GORDON HIKEL, SBOT No. 00787696
     Assistant District Attorneys


          APPEARING FOR THE STATE OF TEXAS



     MR. BRADLEY LOLLAR, SBOT No. 12508700
     Attorney at Law
     1700 Commerce, Suite 450
     Dallas, Texas  75201
     Telephone No. 214 384-8178

     MR. DOUGLAS PARKS, SBOT No. 15520000
     Attorney at Law
     321 Calm Waters Lane
     Holly Lake Ranch, Texas  75765
     Telephone No. 903 769-3120

     DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
     133 N. Industrial Blvd., LB 2
     Dallas, Texas  75207-4399
     Telephone No. 214 653-3550

BY:  MS. KERI MALLON, SBOT No. 24049165
     Assistant Public Defender

          APPEARING FOR THE DEFENDANT



*Anne B. Meredith*
Certified Shorthand Reporter

CHRONOLOGICAL INDEX - VOLUME 32

|                                          |       |       | PAGE |
|------------------------------------------|-------|-------|------|
| Proceedings - July 2, 2009               |       |       | 5    |

| VENIRE PERSON                          | COURT | STATE | DEFENSE |
|----------------------------------------|-------|-------|---------|
| WILLIAM KREIGHBAUM                      | 6     | 14    | 50      |
| Prospective Juror Accepted             |       |       | 79      |
| SHELBY HICKMAN                         | 83    |       |         |
| Excused by Agreement                   |       |       | 88      |
| ALEXANDER COOK                         | 91    |       |         |
| Excused by Agreement                   |       |       | 94      |

|                          | PAGE |
|--------------------------|------|
| Adjournment              | 95   |
| Reporter's Certification | 96   |

ALPHABETICAL INDEX - VOLUME 32

| VENIRE PERSON | COURT | STATE | DEFENSE | PAGE |
|---|---|---|---|---|
| COOK, ALEXANDER<br>Excused by Agreement | 91 | | | 94 |
| HICKMAN, SHELBY<br>Excused by Agreement | 83 | | | 88 |
| KREIGHBAUM, WILLIAM<br>Prospective Juror Accepted | 6 | 14 | 50 | 79 |

*Anne B. Meredith*
Certified Shorthand Reporter

P R O C E E D I N G S:

(Defendant present).

(Prospective Juror No. 874, William Kreighbaum, enters the courtroom).

THE COURT:  Good morning, sir.

PROSPECTIVE JUROR KREIGHBAUM:  Good morning.

THE COURT:  Please be seated, sir.

Thank you.  Be seated, folks.

Sir, on behalf of everybody, appreciate you being here.  My name is Webb Biard and I will be with you this morning during this part of the jury selection process.

The Presiding Judge of this Court is Michael Snipes.  That's who you met at the large general panel, and should you be selected as a juror in this case, Judge Snipes will actually preside over the trial.  This will be the only opportunity we have to be together.

PROSPECTIVE JUROR KREIGHBAUM:  Okay.

THE COURT:  And for my sake, do you pronounce your name Kreighbaum?

PROSPECTIVE JUROR KREIGHBAUM:  Kreighbaum.

THE COURT:  Kreighbaum.

PROSPECTIVE JUROR KREIGHBAUM:  Yeah.

THE COURT:  Okay, sir, thank you.

Also, I want to introduce some folks to you at this time.  Andrea Handley.

MS. HANDLEY:  Good morning, sir.

PROSPECTIVE JUROR KREIGHBAUM:  Good morning.

THE COURT:  Elaine Evans.

MS. EVANS:  Good morning.

THE COURT:  Gordon Hikel.

MR. HIKEL:  Good morning, sir.

PROSPECTIVE JUROR KREIGHBAUM:  Good morning.

THE COURT:  Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  These folks represent Dallas County and the State of Texas.

Further to my right is Brad Lollar, Doug Parks, Keri Mallon.

MS. MALLON:  Good morning.

THE COURT:  They represent Mr. James Broadnax.

Before we go any further, do this for me, please.  Raise your right hand.

(Prospective Juror Kreighbaum sworn).

WILLIAM KREIGHBAUM, having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    All right, sir.  We gave you a little time to read that pamphlet.  Have you had ample opportunity to do that?

A    Yes, I have.

Q    Do you think that helped you understand the process just a little bit better?

A    I do.

Q    Good, good.  Well, the attorneys are going to spend up to forty-five minutes for the State, forty-five minutes for the defense, going back over basically those legal principles. Some, most you've known since fifth grade, but some of the Texas capital murder procedure is unique to most people, and we understand that.  And, so, we are going to spend some time with you on that and we will give you plenty of opportunity for you to have a better understanding of it.

You're not expected to know the law at all. That's not your responsibility.  It's our responsibility to explain the law to you.

A    Okay.

Q    And trust me, these lawyers have the ability to do that.  They are obviously outstanding lawyers or they wouldn't be involved in this case.  They are also outstanding people. No one involved in this process is going to intentionally intimidate or talk down to or browbeat any juror.  I want you to relax as much as possible.

It's our job, my job and their job, to make sure you have an understanding of what the procedure and the law is.  And then the bottom line question is not going to be, did you know that was the law.  The lawyers might ask you

that.  The bottom line question is not do you agree with the law.  The lawyers will not ask you that.

The bottom line question is going to be, once you understand what the law is, will you be able to follow the law of Texas and the United States and perform your duties as a juror?

A    Okay.

Q    And can you apply the law to the facts that you hear in this courtroom and then make your decision?  That's going to be the bottom line question.

Have you ever served on a criminal jury before?

A    No, sir, I haven't.

Q    Okay.  That's no problem.  Just a couple of basic principles of criminal procedure in Texas.  All criminal jury trials are in two parts, be it theft of a bicycle or a capital murder case.

The first part is called the guilt/innocence phase.  The jury's sole issue or responsibility in that part of the trial is to determine whether or not the person on trial is guilty beyond a reasonable doubt of what he or she has been charged with.

Should the person be found not guilty, the trial is over.  If you are found guilty, then you go into the punishment phase.

A     Right.

Q     And if you were a juror, you would know which part of the trial you're in.  Because you never get into the punishment phase until the jury has come back into open court and said, your Honor, we find the person on trial guilty.

In the punishment phase you can hear additional evidence about the person on trial.  You can also consider all the evidence you heard in the first part about the crime itself.

But in the second part of the trial you very likely will hear information about a person on trial in a capital murder case.  You can hear almost anything about that person from grade school to the day of the trial --

A     Right.

Q     -- to help you decide what's the right punishment.

Now, from hearing Judge Snipes' remarks, from reading the pamphlet, from filling out the questionnaire, from sitting here in open court today, are you aware that this is a capital murder case?

A     Yes, I am.

Q     You understand that the State of Texas is seeking the death penalty?

A     I do.

Q     In Texas capital murder is the only crime in which the death penalty is a possible punishment.  There is a

difference between murder and capital murder, and the lawyers will explain that to you.

The death penalty is not an option for murder, only capital murder. So, obviously there is a difference between murder and capital murder. Were you aware of that?

A    I think I -- Yes, I think I was.

Q    Okay. Well, it wouldn't surprise me if you weren't. But the lawyers are going to -- they are going to get into all of that. Capital murder is murder under a specific fact situation, and we will get into that.

So, if someone is found guilty of capital murder, there's only two possible punishments. One is life in prison without parole. And when I say life in prison without parole, I mean life in prison without parole.

There was a time in my career, if someone was found guilty of capital murder and given life in prison, there came a date after so many years that they would be eligible for parole.

A    Uh-huh.

Q    That is no longer the law in Texas. It changed about four years ago. Life in prison without parole means life in prison without parole. And death. So, if you're found guilty of capital murder, you're going to either spend the rest of your life in prison or receive the death penalty, one of the two. And either one of them is serious punishment.

Do you agree?

    A    Yes, I do.

    Q    Okay.  All right.  So, we are talking about serious matters here.

          Now, did you see where Judge Snipes said the trial is going to start August the 10th?

    A    Yes, I did.

    Q    It's going to last two weeks, up to two weeks. That will be Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, be a lunch break.

          The jury will not have to stay together overnight unless and until you were deliberating your verdict either on guilt or punishment and the jury went late into the night in their deliberations and became mentally fatigued and hadn't reached a verdict yet but wanted to keep working, there is a possibility that you would all be taken to a fine hotel, county expense, individual private rooms, spend the night, come back in the morning as a group and continue your deliberations to avoid any outside influence.

          That's a possibility.  It's not a certainty. It's a possibility.  And if that should be the case, Judge Snipes would give you plenty of advance notice such as, members of the jury, there's a good chance you're going to get the case tomorrow.  See, we never know what the jury verdict is going to be or how long it's going to take.  So

he'll say, you might need to bring an overnight bag and tell the people close to you there is a possibility of being sequestered.

A   Right.

Q   You've heard that word.

A   Yep.

Q   And the judge would let you call your loved ones and say that is the situation.  He wouldn't catch you off guard at 5:00 o'clock in the afternoon and say, y'all are fixing to go to a hotel.  Okay?

A   Okay.

Q   I tell you all that and give you that information about when and how long and the way Judge Snipes runs his court.  Now, after hearing his remarks back in April and thinking about this for this time, as you sit here now, are you aware of any reason why you can't sit as a juror in this case?

A   No, sir.

Q   Good.  All right.  I'm going to give you your questionnaire at this time, and we appreciate you filling it out.  It wasn't some idle exercise.  The attorneys spent a good deal of time reading it.  It's going to save you more time here today than it did filling it out.  And I am sure there's going to be a few of your responses that they will want you to amplify on.

A   Okay.

Q   That's just the way it is.  And, also, I'll assure you that we knew and we know now that when you filled this out, you weren't aware of any of these laws that pertain to capital murder.  This is kind of a how you just got to feel at the time --

A   Right.

Q   -- situation.  Okay.  But remember, all we want to know is whether you're going to be able to follow the law and base your verdict on the evidence and not already have your mind made up what you're going to do.

And in that regard, here is all I ask of you. I only ask this, that you just give us your honest answers.

A   Yes, sir.

Q   Fair deal?

A   Yes, sir.

Q   In other words, this isn't some legal pop quiz in which the twelve people that know the most law get on the jury.  It doesn't have anything to do with it.  We just want to know how you feel.  Fair deal?

A   Fair enough.

THE COURT:  I'm going to ask Anne to hand this to you.

And Ms. Handley?

MS. HANDLEY:  Yes, sir.

THE COURT:  Okay.  Andrea Handley now is going to speak to you on behalf of the State of Texas.

MS. HANDLEY:  Thank you, your Honor.

EXAMINATION

BY MS. HANDLEY:

Q    Good morning again, Mr. Kreighbaum.  How are you?

A    I'm fine, thank you.

Q    First of all, let me just say on behalf of the State and everybody in this courtroom, we appreciate you showing up, you know, for jury duty on that first day when you filled out this questionnaire, and that you show up again today and now on time is just a plus.

You know, the system doesn't work only if and until the citizens come down here and participate in the process.  So, I thank you on behalf of everybody here.

As the judge stated, you know, what we are doing, Mr. Kreighbaum, is we are bringing all those people that came down there with you that morning -- we called even more that afternoon -- down here one at a time talking to them individually in the hopes that we can gather a pool of individuals that are technically qualified to serve on this case.  And then at that time we will make our selections and draw out of that pool twelve people to actually sit on this case.

So, our purpose here is really two-fold today.

And as the judge stated, to tell you what the law is, and not just the law in general with respect to every criminal case, but most particularly the law as it applies to a death penalty case because it really is entirely a different animal from any other criminal case you might be called to sit on.

We also want to feel you out, quite frankly. You know, as the judge stated, you haven't taken any oath here today to follow the law. You've only taken an oath to tell the truth. And that's what helps us make our final determination as to whether or not we feel comfortable putting you on the jury is if we can know a little bit about you.

Unfortunately, you know, I only have forty-five minutes to talk to you, as does defense counsel, and I have got a lot to cover. So, I hate that I have to lecture a lot to you, but if you've got an opinion or you think there is a question or something that I need to know, by all means, interrupt me. It doesn't offend me.

A    Okay.

Q    And quite frankly, I would rather spend my forty-five minutes talking to you about home repair which is one of your hobbies but, you know, I can't do that. So, I'm going to forge ahead on this and we will talk about the law here.

As his Honor stated, a qualified juror is just

basically this.  It's a juror that understands the law and is willing to follow the law.  And a qualified juror is an individual that will base their verdict, be it a verdict of guilty or innocent or a verdict of what the punishment is, that will base their verdict on the evidence in the case and nothing else.

A qualified juror is also an individual that will wait to hear all the evidence before they make that determination, before they return that verdict of guilty, before they return that verdict of a death sentence or a life in prison without parole sentence.

A qualified juror is not somebody who comes in with their mind already made up or who will make assumptions or will say, I will always do one thing in a particular case regardless of what the facts are.

I will tell you, from reading your questionnaire, I believe that you already are on that mode of thinking, sir.  And even on page seventeen when we asked you about being a juror and your opinions on it, you had stated to us, you said, I would be doing what I hope a fair minded citizen would do for me if I was the accused.

And fair minded, I think, is absolutely the key here.  I would be disingenuous if I said that everybody who came down here could be fair or that there weren't some people who had a hidden agenda.  It does happen, and we do

our best to filter those people out.

And it's not just unfair to the State, it's unfair to the defendant. Everybody deserves a right to a fair trial; you do, I do, this defendant does.

You also stated a few places throughout your questionnaire where you said, you know, every case has its own set of circumstances. And right there I think you recognize that you can't cut every case from the same piece of cloth. They are always different, and that's absolutely true.

You had also stated in here, when we asked your feelings about something, that cases are to be decided on the facts. And once again, you're absolutely true. It was a question with respect to people's emotions. And I think you said, really, emotions shouldn't drive what you do. It ought to be decided on the facts.

I will submit to you cases such as this are emotional, you know, and we are all human and you will be touched in it. But ultimately what drives you in the case should always be the facts of the case.

When you filled out this questionnaire, as the judge stated, you didn't know really what all the laws were with respect to this case or a criminal case, and we don't hold you to that. We understand that at that point we just wanted to hear what you had to say, what was the first thing on your mind. And sometimes it gives us, such

as yourself, a feeling that I think this man or I think this woman is maybe already on the same train with us on this.

So, we might ask you particular things about your questionnaire. But we do recognize that when you filled it out, you didn't have a pocket law guide. You hadn't been to a seminar on capital murder. You had probably never seen these special issues.

Most people have had the assumption, and I think it's a fair assumption, that if a person is found guilty of capital murder, then they get the death penalty. Or even that if a person is found guilty of capital murder, then a jury goes back to the jury room and decides, you know, well, how many want to give him life and how many want to give him death, and that's not how it's worked at either.

It's actually a process, there is a protocol in place, and for good reason, and you have to follow the laws in reaching that ultimate verdict and that ultimate conclusion as to what will happen.

Let me just tell you, you've never been on a criminal case before, but as the judge stated, these laws that play a part in any criminal case will come as no surprise to you. They are based in our constitution. They are based in fairness. They have been there for a long time and for good reason.

But in Texas, in any criminal case, it's

always conducted in two parts.  We call it a bifurcated trial system, a two part system.

In the first part of the trial the jury is called upon to make one determination only, and that is, is the defendant guilty of the charge he's been indicted for?  Has the State proved to me beyond a reasonable doubt that he's guilty?  Guilt is your only consideration at that point.

If you find the defendant not guilty, that's it, that's it.  If you do, however, find the defendant guilty, then you move on to that second phase of the trial which, while the same fundamental principles of law still apply, it's really a different thing now.

Now you're going to hear, as the judge stated, other evidence, things that may not have been appropriate in the first part of the trial because the only determination was guilt.  Now those things are appropriate because you are deciding now what the punishment this person will receive.  And I am sure you've heard of the saying, let the punishment fit the crime.  That is absolutely what we're talking about.  Let the punishment fit the crime.  And, so, you are focused at that point on punishment.

Now, in a death penalty case it's different from a different case because you don't go back there in another case and go, well, what do you think we should give the guy?  You know, you're given a range of punishment.  In

a capital murder case you say, let's answer the questions now and let's arrive at our verdict.

Those fundamental principles of law that come into play in every criminal case, first and foremost as we sit here today, any defendant in a criminal case is to be presumed innocent, and the reason being is I haven't proven a thing to you.

And it goes to the proposition that I, as a representative of the State, always carry the burden of proof in a criminal case. I must bring the evidence to prove it to you. The defense has no obligation whatsoever other than to show up. They have fulfilled their obligation. It's my burden of proof.

And not only must I bring you evidence, but I must bring you enough evidence and the type and quality of evidence to prove to you beyond a reasonable doubt that the defendant is guilty.

There is no definition of reasonable doubt, Mr. Kreighbaum. It is what you think it is. But I will tell you that the beyond a reasonable doubt burden that I have is a high burden. It's a high burden. It's not 51 percent. It's not, well, maybe he did it. It is a very high burden, as it should be, and I think you can appreciate that, sir.

Any criminal defendant, as well as any citizen,

I have this right and you have this right, and that's that fifth amendment right that you hear about. If a defendant elects and exercises his fifth amendment right not to testify, the law states that you may not hold that against him.

In other words, if I conclude my case, you go back to your jury room for deliberations and you say, I don't think she proved this case to me beyond a reasonable doubt, but she is this close. Well, because he didn't testify, I'm going to hold it against him and find him guilty, anyway. That doesn't happen in a criminal case. And I see you nodding and agreeing, and I think you fully understand that.

As we sit here today, also the law states to you that the indictment in this case is not to be considered evidence of any kind of guilt. The proposition of where there is smoke there is fire does not apply inside a criminal courtroom. An indictment is merely a piece of paper that gives the defendant notice of what he's been charged with, and it tells the State what I must prove to you beyond a reasonable doubt before you may return a verdict of guilty.

I am bound by that indictment and I must prove every element contained in that indictment. I must prove he did it. I must prove when he did it, where he did it, how he did it, and who he did it to. If I fail to carry my burden on any of those elements, your verdict must be not guilty.

And just to show you an out there example to

show how there is no kidding around or wriggle room on this, if I have alleged in a criminal indictment that an individual, a defendant killed somebody by shooting them with a firearm, I am obligated to prove that elelment.

If a medical examiner came on the stand and said, he's dead but he died from being stabbed, if the crime scene guy came on and said, I didn't find a gun but I found a bloody knife, even if the defendant said, yeah, I killed him and I am glad I did it, I have failed to carry that burden of proof and you must return a verdict of not guilty. And I see you again shaking your head in agreement.

A    Right.

Q    So, you have a good appreciation for what's going on there.

Your evidence comes to you only from the witness stand from where you're sitting right now. It comes to you in the form of testimony from people, be it civilians, be it police officers, be it doctors, it comes to you from the witness stand. It comes to you in the form of maybe documents. It could be a physical piece of evidence that you could actually hold. But that's where you get everything.

It is not your verdict -- Evidence is not what you heard on TV or what you read in the newspaper. I don't know if maybe you've already heard something about this case.

A    No, I haven't.

Q    I'll double check.  I know we asked you on page three here.  You said -- We asked you, have you heard about this case and gave you just enough facts to see if you remembered it, and you put on here TV coverage.

But it sounds to me like you just don't have any recollection of this particular case.  And I will tell you what the law states.  We understand people watch the TV and read the newspaper and surf the Internet, and that's fine.  But the law states that what you may have heard or seen or read stays outside of the courtroom.

A    Uh-huh.

Q    And if you recollect any of those facts, sir, is that something you could also do?

A    (Nods head).

Q    Okay.  Every witness -- One of your key jobs as a juror is to determine the credibility of the evidence which means assess the credibility of the witnesses.

The law states that you can't come in with any preconceived notions on who will always be credible. You must wait until they actually take the stand and then from that point make your determination as to whether or not they are credible.

And again I see you nodding and agreeing and I think that you agree with that also.

Okay. Let's talk a little bit, then, Mr. Kreighbaum, about murder and the difference between murder and capital murder. There are -- Capital murder is our highest offense in Texas. And capital murder does obviously always involve a murder.

And there is murder and there is capital murder. And I hate to refer to murder as a regular murder because I don't think there is anything regular about it or ordinary. But a person who is found guilty of murder cannot receive the death penalty. It must be capital murder.

If I took a gun out of my briefcase right now and my co-counsel is minding her business and I just loaded her full of bullets and I laughed about it and kicked her body, I think you would agree with me that that's a very heinous offense.

A     (Nods head).

Q     That I have intentionally caused her death. But the fact of the matter is, if convicted of that murder, the death penalty is not an option because, as heinous and as intentional as it is, it's not a capital murder.

Capital murder, as the judge stated, is always a murder plus something else, plus some aggravating factor, and that's what elevates it to capital and that's what elevates it to that potential penalty of death.

For example, it is the murder of a child

under six years of age, or the murder of a police officer or firefighter while they are in the line of duty, or it is the murder of two or more people at the same time, or, as in this case, it is the intentional murder of a person while you are committing or trying to commit another felony offense such as burglary, sexual assault, robbery.

The indictment in this case alleges an intentional murder during the course of committing or attempting to commit a robbery.

Capital murder is always this, then. In this particular case, for example -- and keep in mind I'm not talking about the facts of this case.

A    Right.

Q    But just principles of law. It is an intentional murder. We refer to it as culpable mental states. If I'm driving my car down the highway and I am not paying attention and I look up and I rear-end somebody and I kill them, that is murder, okay, but it's not an intentional murder. Maybe I've been reckless. Maybe I've been negligent.

An intentional murder is, just to put it in layman's terms, means I meant to do it. I meant to do it. It was not an accident. It was not a murder with a legal justification such as I killed him in self-defense. It is not an intentional murder where I am criminally insane.

It is not a murder where I meant to hurt him

and shot him in the knee, but he happened to die anyway because a main artery -- that would be I meant to hurt him, not I meant to kill him.

I am still culpable for a murder, but it's not an intentional murder. So, that's the one thing you need to remember in any -- in this particular kind of capital murder, it will always be an intentional murder. And it will be an intentional murder plus something else, and in this case a robbery or somebody trying to commit a robbery while they intended to kill somebody.

Does that make sense to you, sir?

A    Yes, it does.

Q    And does that seem fair to you that we have this kind of exclusive or limited category of cases to which the death penalty is available; does that seem fair?

A    Yes, it does.

Q    Do you think it should be broadened to include all murder cases?

A    No, I don't.

Q    Okay. Okay. And I will submit to you our legislature, our lawmakers agree, that they felt that it was the serious enough offense that it could potentially lead to a death penalty. That is something that is always paramount in these capital murder cases, the death penalty is never automatic under any circumstances.

*Anne B. Meredith*
Certified Shorthand Reporter

Just because a jury has found a defendant guilty of intentionally killing somebody during the course of committing a robbery under no circumstances means that they will automatically receive the death penalty or that the answers to the special issues will automatically be yes, yes and no.  Under no circumstances, it's not an automatic thing.  It is always based on the evidence and it is always after a thoughtful consideration of the evidence at hand.

I would like to talk to you now about the punishment phase of a capital murder case and I will just go ahead and jump ahead there.  And before you ever get to the punishment phase of a capital murder case, before you are ever called upon to answer those special issues, keep in mind and appreciate the context in which we are in now.

You have already found the defendant guilty of capital murder, you have found that he's intended to kill somebody, and you have found that he has done it in the course of a robbery or attempt to commit a robbery.  The question of guilt is decided.  It's not an accident.  You've already decided that, and that is the place you're at right now.

There is one thing, though, having said there's no automatics, there is one thing that is automatic in a capital murder case.  An individual found guilty of capital murder will automatically receive a sentence of life in prison without parole.  Okay?

A      (Nods head).

Q      That will automatically happen.  Once you return that verdict of guilty, he is sitting on a life sentence without parole.  There is no, can we give him less, can we consider a range?  That's what he's got, that's what he gets. It does not change.  Okay?

So, going into the punishment phase, you found him guilty, he's got his life sentence without parole.  Now we come to the question of whether or not this individual, this defendant will stay and sit on that life sentence without parole or whether or not he will be the individual that will receive a sentence of death.

Our legislatures have looked at this very carefully, I will submit to you, and have come up with a way to make that determination as to when it is appropriate and when it is not appropriate.  And I will submit to you that they say that what we need to do now is focus on the individual.  We need to focus on the defendant, see who is he, what has he done, what kind of person is he, and base our decisions on that.

He's serving life in prison without parole, so I think it goes without saying that he will be in the penitentiary for the rest of his life.

Not a lot of people have visited our Texas penitentiaries.  I will tell you that there are hundreds of

them, and within our prisons there are thousands, hundreds of thousands of inmates in there. And there are men and there are women serving various types of sentences within those penitentiaries.

There are people that are there serving time for anything from forgery to felony driving while intoxicated to burglary to child molestation to murder to capital murder. There are all kinds of people in there. And we don't necessarily have a separate prison for forgery and a separate prison for a car thief. They are all in the same penitentiary.

Now, they may be segregated at times according to their differences and such as that, but they are all in there together. And that is where this capital murderer will spend the rest of his life. He will live there, he will eat there, he will sleep there, he will play there, work if he's so inclined, watch TV. This is where he's going to be and he is going to be there with other inmates.

It is for -- I think an appropriate term, it is the society in which he will operate for the rest of his life. I think you can appreciate that within that society of inmates we also have guards, we have people who are not inmates, people who are not serving criminal time.

We have doctors that come in. There are nurses there. There is clerical staff. There are educators

who come in, clergy come in, volunteers come in.  People come to visit loved ones.

So, not only are there inmates in that society but there are also people in there who are not serving time. So, when we start talking about whether or not that individual who has been convicted of capital murder is the person who should receive the death sentence versus that life sentence, we need to look at that person in context of the society in which he's living in.

And most appropriately and importantly, we need to ask ourselves this.  Is he going to be the type of individual that will go into the prison, serve his time, not be a threat to the other people there, be it the inmates or be it the staff, who will abide by the rules?  Is he that guy?

Or is he the type of individual that will go into the penitentiary, into that society, and more likely than not commit criminal acts of violence that will continue to be a threat to the people that are within that society? If he's that kind of guy, then he's that defendant who is appropriate for the death penalty.

Does that make sense to you?

A    Yes, it does.

Q    That's the distinction that we make in determining whether or not he'll get life or whether or not he will get

death.  We look to that and we refer to it as --

MR. PARKS:  Your Honor, we are going to object to the continued suggestion by the State that the dividing line between life and death is a prisoner who does not abide by the rules.  That is not the law, never been the law, never be the law.

THE COURT:  You will have plenty of opportunity to express that.

Q    (By Ms. Handley)  I'm just covering the first issue with you, Mr. Kreighbaum, and I'm walking you through this.  Okay?

A    Okay.

Q    The distinction being, is he the -- We are looking at the individual at this point.  Is he going to be the person who is not a threat to the people in that society or is he going to be the person who is a threat in that society?

If he's going to be a future danger to those inmates, to those other peoples within that penitentiary wall, then he is the individual that we look further towards whether or not he should receive the death sentence.

Make sense to you, sir?

A    Yes, it does.

Q    Do you -- Do you believe that, you know, there are people in there serving not life sentences but maybe five years, maybe ten years for felony DWI, maybe a property

crime, is it reasonable for them to have an expectation of safety while they serve their time?

A    I do believe that.

Q    I think you would agree with me that prison is probably not a great place to be.

A    (Nods head).

Q    I think that if you've ever read a magazine, a newspaper, or seen the television, you've seen that there is violence in the penitentiary, correct?

A    Yes.

Q    Some might say, well, that's just the cost of doing time.  You got sentenced to ten years for DWI, and if you get kicked around a little bit by other inmates, so be it.  How do you feel about that?

A    I don't agree with that.  I think the loss of freedom is your punishment, not continued physical abuse, or whatever.

Q    A judge will sentence a man to ten years in the penitentiary, but I've never heard a judge say, I sentence you to ten years and a butt kicking on a daily basis or even once in a while.  I agree with you a hundred percent there.

A    Okay.

Q    So, that's what we are looking to.  And what I have to -- Keep in mind that burden of proof, you know.  I have to prove to you, Mr. Kreighbaum, that the defendant is that

individual who will be a future danger.

And I prove that to you by not only asking you to review again the facts and circumstances of the case, the crime he has committed, but I may also bring to you additional evidence to help you make that decision as to whether or not he is a future danger.

So, keep in mind you've found him guilty. But remember the presumption of innocence that he enjoyed in the first part of the trial?

A    (Nods head).

Q    He enjoyed the presumption of innocence because I hadn't proved to you that he was guilty.

Now going into the second phase of the trial he enjoys another presumption, and that presumption is that a life sentence is the appropriate thing to do because, once again, Mr. Kreighbaum, I haven't proved to you that he's a future danger.  It is for me to prove that.

Again, does that make sense to you?

A    Yes.

Q    You may not automatically assume he will always be a future danger because he's committed capital murder.

Let's look at the special issue first together here, and that's basically what it speaks to, that future dangerousness there.  They don't define the terms that are contained there within special issue number one.  Really,

again, it's for you to decide what those terms mean.

But I will submit to you that when it starts out, do you find from the evidence beyond a reasonable doubt, that is a flag to you, sir, that you need to look to me to prove it to you, that it's not an automatic, it's not an automatic assumption.

Have I proved to you beyond a reasonable doubt that there is a probability?  They don't define probability, but I think you would agree with me that it's more than a possibility, isn't it?

A    Yes.

Q    It doesn't say a certainty, it says a probability. Some people say, to them, that means more likely than not. Would you agree with that?

A    I agree.

Q    Have I proved to you that, more likely than not, that this defendant that you've just found guilty will commit criminal acts of violence?

They have not defined criminal acts of violence for you.  It does not say that he more likely than not will commit another murder or that he will commit a robbery or that he will commit an assault or that he will commit -- make threats of violence towards guards.  It doesn't say what a criminal act of violence is.  It's for you to determine what is a criminal act of violence.

If Ms. Evans is just sitting here minding her business and I just haul off and hit her in the jaw, would you consider that a criminal act of violence?

A    Yes, I would.

Q    If Ms. Evans and I are sitting in a cell together and she is minding her business, writing a letter to her mother, and I walk up and pop her in the jaw, would you consider that a criminal act of violence?

A    Yes, I would.

Q    Okay.  That's for you to decide what is and is not.  And it states, that would continue -- that would, pardon me, constitute a continuing threat to society.

That society, I submit to you, is that society of the penitentiary.  You decide that question yes or no based on the evidence in the case.

But just as you stated in here, it all depends on the facts of the case.  And again I'll say it because I think it's worth repeating, that just because somebody is found guilty of capital murder does not automatically mean they would be a future danger.  It will always depend on the circumstances of the case and the defendant.  In my almost twenty years of doing this, I've never seen two cases alike.

And just to give you an illustration, just to help illustrate what we are talking about here and how circumstances differ.  With respect to committing a capital

murder, an intentional murder and a robbery, envision, if you will, a man lives on a street. He knows that there is a neighbor five houses down who has a lot of money in his house.

This man sits there and thinks about it and says, you know what, I'm going to go not only take his money but I'm going to kill him. I'm going to kill him.

And he goes and he gets a gun and he gets a full magazine of bullets, he loads that gun, he walks five houses down, he knocks on the door. When that man answers the door, he puts a gun in his face, says, give me your money. The man says, get the heck out of here. He shoots him five times. He grabs his bag of money and he walks away.

Now, has he committed capital murder, sir?

A    Yes, he has.

Q    Sounds like a pretty bad guy, doesn't he?

A    Yes.

Q    On the one hand, that man who committed that capital murder may be some ne'er-do-well who doesn't have any job, likes to sit around, lay up, maybe do drugs all day, knows this guy keeps money down the street because he's an old man, he doesn't believe in banks, and word is that he's got a good bag of money over there.

And instead of getting a job, I think I'll just go take it from him. And because I know he'll probably call the police on me, I'm going to kill him so I don't leave

any witnesses.  So he does it, he takes the money and he goes and buys drugs and CDs and stuff such as that.

Pretty bad guy, isn't he?

A    Yes.

Q    That's a bad guy.  Well, change the factual scenario for you again.  The man who is sitting down in his house and contemplating killing the neighbor who is five houses down is actually a father and a husband, and he's got two kids who are strung out on dope.

This man has done the best he can to be a good citizen, a good provider, a good community person, and his kids are strung out on dope.  And the reason they are is because the guy who lives five houses down is an all-out dope dealer.  And nobody seems to be able to do anything about it.  This guy is over there selling dope, he's polluting the community, he's destroying families, and he is profiting on it.

And not only the community at large has he spred this cancer, but he's got his two kids hooked now, too.  And he is sick of it and he is going to take the law in his own hands.  He's going to and he knows what he's doing.  He's not insane.  He's not even temporarily insane.

He gets a gun, he loads it, he walks down the street, he knocks on that guy's door.  That dope slammer opens the door.  And he says, give me your money.  Give me

the proceeds of your spreading the filth in this community.

The guy tells him to blow off. He shoots him. And he shoots him because he means to kill him because he wants to put an end to this guy. He takes that guy's bag of money. He takes his wallet out of his pocket. He walks down to the local church and he drops it in the charity box. He goes to the police. He says, here's what I did. I have no defenses to it. I knew the consequences. I did it. I'm turning myself in.

Has that man committed capital murder?

A    Yes, he has.

Q    A little bit different from the other guy, isn't he?

A    True.

Q    Now, you see the point being that if I just tell you somebody has committed capital murder, can you automatically make the determination as to whether or not they will be a future danger?

A    No, you can't.

Q    The facts and circumstances are different.

A    Right.

Q    You go into that second phase knowing that, keeping an open mind. You may look at the facts and circumstances. In the first part of the trial you looked at what he did to decide if he was guilty, right?

A    (Nods head).

Q    Now you look at what he did to decide whether or not he's a future danger.  They are two different questions.  And you may actually look at that father who took the law into his own hands.  You may look at this question on future dangerousness and say to yourself, you know what, I'm looking at that, I'm looking at the other things that I've heard now.  I think that he was the only guy he would ever be a danger to.  That was the focus of his hatred and his vengeance, and he will never hurt anybody again.  He sits in his jail cell, he writes letters to his wife and his kids, you know, and minds his business.  He ain't gonna hurt anybody.

Or, Mr. Kreighbaum, you might look at him and the circumstances now that you're seeing and go, wait a minute, who is he serving time with, drug dealers, isn't he?  And you may find from the evidence that his hatred for drug dealers isn't over.  It's still there and it seeths and it burns.  And he has got it out for drug dealers, doesn't he?

Who is he serving time with in the penitentiary?

A    Other drug dealers.

Q    Other drug dealers.  And he -- You may very well find, yeah, he's a future danger.  He's a future danger to the other inmates in there, particularly the ones who are drug dealers and doing time for it.

So, you may answer that question yes or no.

It depends on the facts, doesn't it?

A    It does.

Q    So I'll move on, but I think it's just worth repeating that that question is always, I have to prove it to you, and you always have to wait and look at the facts and circumstances before you can automatically make up your mind.

Just because somebody's guilty of capital murder, the intentional killing of somebody in the course of a robbery, the law states you may not automatically answer that yes without a separate consideration as to future dangerousness.

A    (Nods head).

Q    If you answer that question no, the defendant will get that life sentence, and that's it and we all go home, and that's fine.

However, if you answer that question yes, if I've proved it to you beyond a reasonable doubt, your obligation as a juror is not over yet and you move on now to the second special issue.

I will tell you that in the State of Texas we have what's called the law of parties.  And the law recognizes that often two or more people may commit a crime together, work in concert to accomplish a criminal act.

And the law recognizes that if those other

people are in the crime and actively participating, they may be held liable, criminally liable, just as if they had done it on their own.  Make sense to you?

A    Yes.

Q    If Ms. Evans and I decide tonight that we are going to rob the local 7-Eleven, we meet at her house, we discuss it at her kitchen table.  She gets out a Map Quest of the closest 7-Eleven.  She goes and buys a gun.  I go and buy the bullets.  She drives us to the 7-Eleven.

She says, I'm going to sit here and be a lookout.  I'll blow the horn if somebody comes.  She hands me a gun.  I get ready to go into the store and I say, wait a minute, I forgot to bring my mask.  He'll be able to identify me.  She says, you've got a gun, Andrea, just don't leave any witnesses.  Kill them.

She sits in the car.  I go in the store, I rob the clerk of her money and I kill her so I leave no witnesses.  Am I guilty of capital murder?

A    Yes, you are.

Q    Okay.  The law envisions that Ms. Evans may also be guilty of capital murder.  She actively participated in the commission of a crime at that point.  Yeah, she's provided the gun, she's driven me down there.

In order for you to find her guilty, however, of capital murder and not just the planning of a robbery but

capital murder, and in order for her to be eligible for the death penalty, you must also find that she actually anticipated somebody would die.

You may or may not glean that from what I've just told you, that when she goes, well, don't leave any witnesses, and handed me a gun, that she actually anticipated somebody would die.

Special issue number two speaks to that. It's asking you, have I proved to you beyond a reasonable doubt that the defendant actually caused the death of the deceased? In other words, have I proved to you the defendant was the actual triggerman such as myself, or is the defendant somebody who actually anticipated somebody would die or intended somebody would die?

If you find she is a party to the case but she didn't anticipate anybody would die, she was not actively participating in it, then the answer to that special issue is no. Okay. And she is not eligible for the death penalty. Does that make sense to you, sir?

A     Yes.

Q     Because we've always got to have that intent. We've always got to have that I anticipated somebody would die. If the answer to that is no, if I haven't proved it to you, the defendant will receive his life sentence and that's it. Okay?

A       (Nods head).

Q       If the answer to that special issue is yes, based on the facts of the case, then you answer it yes.  I will submit to you, Mr. Kreighbaum, at that point the defendant is now sitting on a death penalty.

You've found him guilty of capital murder.  You have separately considered whether or not he's a future danger.  You believe he is.  And now you have decided that he is either the triggerman or an actual active participant in the crime.  Okay?

A       (Nods head).

Q       He's sitting on a death sentence.  But your obligation as a juror in this particular case is not over.  We still have another question to ask.  And it is still a question that you make a determination on based on the evidence of the case and particularly based on the individual, the defendant in the case.

I will say this to you, Mr. Kreighbaum, in trying to express why we have special issue number three, and I am sure we all have our different opinions, but you will not, as a juror, walk out of the courtroom at the end of this trial, having returned either a sentence of death or a sentence of life in prison without parole, you will not walk out of this courthouse going, I felt my hands were tied.

There was something about this case, and maybe

I never thought this would happen, but there was something about this case, the way it went down, the circumstances of the offense. There was something about this defendant. I know he's bad, but there is something about him that, quite frankly, I think he should get life in prison instead of the death penalty. And that option wasn't available to me and I felt my hands were tied. That's not going to happen. Okay?

A    (Nods head).

Q    There is always this last opportunity for you to re-review everything and make that decision for yourself. We call it the mitigating circumstances issue.

And basically what it's asking you to do is go back there now one last time with your fellow jurors, look at all the evidence again. Look at the circumstances of the offense, look at the defendant, look at his background. Where did he come from? What has he been doing all his life? How has he been acting? What's his moral character? You know, consider all that.

And if considering all of that you say, you know what, there is something here, I think it's mitigating and I think it lessens his moral culpability. And not only do I think it's mitigating, but I think it's sufficient. I think it is sufficiently mitigating to turn that sentence of death into a life sentence. If you personally feel that way, then you answer that question yes. And if you answer that

question yes, it means he will get a life sentence.  Okay?

A    (Nods head).

Q    Do you think that's a fair option for the jury?

A    Yes, I do.

Q    Do you think that that would ever be possible that somebody you've found guilty of capital murder, somebody you've concluded is a future danger, might actually have something sufficiently mitigating to turn that sentence around?

A    Yes.

Q    Okay.  And I don't want to put you on the spot and ask you what is and what is not, you know, mitigating to you because it's your own personal decision.  But the point is not -- At this point in time the question is not, tell me what is sufficiently mitigating right now that would change your mind in this case.

The question is, will you go into special issue number three, will you re-review all the evidence, and if you personally find that there is a sufficient mitigating circumstance, will you answer that question yes?  That's the question to you right now.

And you can see how it speaks to the -- the question says -- And keep in mind, I want to make sure you understand this, too.  At this point -- I have been talking about burdens of proof, that you always look to me.  On

**Anne B. Meredith**
Certified Shorthand Reporter

special issue number three, there is no burden of proof. I have no obligation to prove to you there is or there isn't.

Nobody has a burden of proof on this issue. I'll submit to you the issue is there for the benefit of the defendant, but it is also there for the benefit of you and your own personal moral judgment. Okay?

A      (Nods head).

Q      So it says, do you find, taking into consideration all of the evidence, the circumstances of the offense. Well, for example, the circumstances of the offense may be that daddy who killed that dope slinger, maybe he is a future danger to the other guys in that pen, okay, who were slinging dope and are there for it.

But maybe I want to look at the circumstances of the offense and I want to take into consideration his motivations for doing what he did, quite frankly. You know, he's guilty and he is going to serve life in prison. You know, look at the defendant's character and his background. You know, look at his personal moral culpability.

Maybe Ms. Evans was a party to it and maybe you found her guilty as a party to that capital murder that I committed. But maybe you look at it now and you go, well, actually I don't think she ever would have done it if it wasn't for Andrea Handley.

And actually she stayed out -- she stayed

afterwards and tried to save the victim and turned herself in and turned in Andrea Handley, you know. And she will -- she will always be a future danger as long as Andrea Handley is around. You know what, she's shown nothing but remorse and she tried to make it right and, for me, that makes a difference.

It might not make a difference for you, you know.

A     Uh-huh.

Q     We asked you about intoxication. We asked you about, what do you think about a person's upbringing or genetics or circumstances of birth? And we just asked you right there in the questionnaire how you feel about it just to see how you feel about it.

But the point is that's where you can consider those types of things. That's where you can consider somebody's upbringing. Is he a guy who was raised in a closet and fed dog food and had cigarettes put out on him? Maybe it's his parents that turned him into the monster that he is and, to me, they ought to be on trial. Maybe that moves you, maybe it doesn't. It's your personal choice.

Does that make sense to you, sir?

A     Yes, it does.

Q     Do you have any questions about what I've covered with you here?

A    No, I don't think so.

Q    Okay.  Is that a -- Is that kind of an education for you there?  Did you think that -- Did you ever have any idea that's how it actually worked?

A    No, it has helped quite a bit.

Q    And does it, most of all, Mr. Kreighbaum, does it make sense to you?

A    Yes.

Q    Does it seem fair to you?

A    Yes, it does.

Q    That the capital -- The sentence of death should never be automatic, should it?

A    I don't think it should, no.

Q    I don't either.  I'm the prosecuting attorney and I don't either, Mr. Kreighbaum.  I think that it should be arrived at by the evidence and the facts and it should be arrived at by consideration of the special issues and the evidence in the case.  So, I'm glad that you see that as a fair law and an appropriate law.

So, just to summarize, Mr. Kreighbaum, you understand those principles of law that we discussed before.  Those flow through every part of the criminal trial.

A    I do.

Q    You know, the burdens of proof and such as that.  That you, as you stated in your questionnaire, are always to

base your verdict in the case, be it your guilty or innocence verdict or your verdict of life or death, you are always to base it on the evidence in the case.

A (Nods head).

Q You are always to base it in accordance with the law in the case.

A (Nods head).

Q And you must always -- Can you and will you wait to consider the evidence and look at the evidence before you answer these questions?

A Yes, I can.

Q In other words, you will not automatically say, because he's committed capital murder, I will always say he is a future danger.

A (Nods head).

Q Do you understand that?

A I do.

Q I see you nodding your head yes.

Okay. You have no questions for me and I appreciate your time. I hope I've made that clear for you. Thank you very much, sir.

A You're welcome.

THE COURT: We thank you, Ms. Handley.

Now Mr. Lollar is going to speak to you for about forty-five minutes.

But before that, let me ask you, you have been going I'm sure since early this morning. Do you want to take a five minute break before we proceed? You're welcome to.

PROSPECTIVE JUROR KREIGHBAUM: I might. A glass of water would be great.

THE COURT: Okay. Let's take a five minute break, and the sheriff will tell you where you can get some water.

PROSPECTIVE JUROR KREIGHBAUM: Okay, certainly.

THE COURT: Court's in recess.

(After a recess, defendant and Prospective Juror Kreighbaum present in open court).

THE COURT: Thank you, sir. Please be seated.

Be seated, folks.

Just like I told you, Brad Lollar is going to talk to you on behalf of Mr. Broadanax.

EXAMINATION

BY MR. LOLLAR:

Q    How are you today, Mr. Kreighbaum?

A    I'm doing well, thank you.

Q    Good. I'm going to go over some things that I see in your questionnaire and then we will talk about these issues and about a trial in a capital murder case.

First of all, do you know of any reason why you couldn't be fair to either side in this case?

A      No, sir, I don't.

Q      Very good.  I see that you have seen something about the case on TV.  Have you formed any opinions based on what you saw on TV?

A      To be honest, sir, I can't even remember what I saw on TV at this point.

Q      Okay, very good.  That's fine.  All we ask is that a juror base their verdict not on what they saw on TV but on what they hear in the courtroom.  That makes it fair to both sides.  We never know what a juror has seen or not, and sometimes they get it confused with other cases.  So, as long as we are good on that, we are good.

I see that you were born in Peoria.

A      Yes, sir.

Q      And you spent a good first part of your life there in Peoria.  Do you know, by any chance, a woman by the name of Tierney Burgett, Burgett?

A      No, sir.

Q      She is the wife of a good friend of a lot of us here, Paul Brauchle, who is another criminal defense lawyer.  She was from Peoria and she would be about your age.  So, I know she had a number of sisters.  B-u-r-g-e-t-t.

A      Brigett, Burgett?

Q      Burgett.

A      No, sir.

Q    Very good.  Very good.  And then I see that you work as the creative director for The Intrasure Group.

Q    Yes.

Q    And tell me what The Intrasure Group is.

A    It is an advertising promotion company.

Q    Okay, very good.  And what does a creative director do?

A    I come with -- come up with ideas for -- ideas for selling our clients' products via TV commercials or print ads or promotions in stores, and things like that.

Q    And tell me who some of your clients are that you represent.

A    Actually 7-Eleven.

Q    Okay.

A    Thomas's English Muffins.

Q    Okay.

A    They also make bagels.  Orawheat Bread, AT&T.

Q    Okay.  All right.  Very good.

A    Those are the main ones.

Q    And I see you have a daughter and a son who are both off to college.

A    Yes, sir.

Q    And where are they going to school?

A    University of Texas.

Q    Both of them?

A    Uh-huh.

Q    Oh, that's good.  Hook 'em Horns.  Yes.

And I see your son is twenty-one.  Is he fixing to be a senior down there?

A    Yes, he is.  He's actually entering this summer, yeah.

Q    Oh, good.

A    I hope he's going to be a senior this year.

Q    What are they studying?

A    My daughter is studying fashion journalism, and my son is studying -- he's a history major, but I think it's journalism as well, so.

Q    Okay.  All right.  Very good.

All right.  I think that's all I had to ask you about.  Oh, no, here's one more.  You took a Corrections 101 class when you were in college yourself.

A    Yes, sir.

Q    Tell me what you remember about that class and what you learned in that class.

A    As I recall, I learned that -- the instructor that taught it actually worked in the prison system in Illinois. And as much as I recall, he was also I think a counselor of prisoners.  But prison is not a good place at all.  I mean it was basically all anecdotes that he would relate about what he witnessed and saw in prison.

Q    Okay.  Well, I suppose prisons in Illinois are much like prisons in Texas.  I don't think there is much difference among a prison from one state to another.

Is there anything about that experience that would influence you in any determinations you would make perhaps if you were a juror in this case?

A    No, sir.

Q    Okay.  Well, and having gone through that experience, I think you have maybe a leg up on other people that know nothing about the prison system, you know, that there are actually trained people who run the penitentiary systems.

A    Correct, I do.

Q    And that the prisoners don't run the institution and that there are actually professionals that are in place that have a plan and expect the prisoners to follow the plan.

A    (Nods head).

Q    Perhaps you also know that there are various ways that prison officials can discipline an inmate who is not following the rules and there are various levels of things they can do to them, so perhaps you have that insight and that's something more than other potential jurors have.

Is that fair enough to say?

A    Yes, sir.

Q    Very good.  Mr. Kreighbaum, I see that you have not served on a criminal jury before, but I think Ms. Handley has explained that very well to you.

You know that there's two phases to a trial. The first part of the trial is called the guilt or innocence phase.  And it is the job of the State at that point in time to prove beyond a reasonable doubt the indictment that has been presented by the grand jury in the case.

And let me tell you about those indictments. They are drawn up by the district attorney's office and presented to the grand jury and then they vote on whether or not there is enough evidence to send the case on up to court for trial.

A grand jury indictment does not mean that anybody has looked at the evidence to decide whether or not the defendant is guilty beyond a reasonable doubt, but simply whether there is probable cause in the case to send it on up to trial.

A    Right.

Q    Okay.  There before you in one of those folders is the indictment that's been presented in this case.  And I don't think you have been asked to look at that before, but just take a moment and look at that, if you would.

Okay.  And that is --

A    Sir, I'm sorry, I should restate, since you asked

me that question about, you know, where have I heard coverage about this.

Q    Yes.

A    It did jog my memory enough that I do recall about the particulars of, or the general particulars, of the case.

Q    Well, very good.  And let me ask you to follow up on that now that you perhaps remember something that you've seen on TV or read in the papers about this case.  Did you come to any conclusion as to the guilt or innocence of the defendant or what the appropriate punishment should be based on what you saw on that media coverage?

A    No, sir.

Q    Okay, very good.  So, we don't have to worry about that, either side.

A    (Nods head).

Q    Okay, very good.  As you can see, what is listed there in that indictment is the type of offense that fits under Texas law as being a capital murder.

As explained to you by Ms. Handley, capital murder is, number one, an intentional murder, and it is an intentional murder committed during the course of another serious offense, and in this case they allege the commission of a robbery.

Of course, they allege it happened on a particular day.  Of course, they allege it happened in Dallas

*Anne B. Meredith*
Certified Shorthand Reporter

County.  They have to put in the indictment what the manner and means are, and that means how the -- how the defendant caused the death of the victim.

And as Ms. Handley has explained to you, it is their burden to prove each one of those elements beyond a reasonable doubt.  And if they fail to do that, then the jury has an option, I guess, either of finding a defendant not guilty or of finding a defendant guilty of what's called a lesser included offense.

And let me spend just a moment talking about that.  Let's say, for instance that -- and let's quit talking about this case and just talk about a hypothetical case like this.  Okay?

A    Uh-huh.

Q    So, for the rest of the time I'm talking to you, we are not talking about this case.

A    Right.

Q    But we are talking about the trial of a person charged with an intentional murder during the course of a robbery.  Okay?

Let's say, for instance, that they prove to you beyond any doubt that a defendant intentionally caused the death of the victim but they failed to prove to you that that was in the course of the commission of a robbery.  Okay.  So, they have done one part of the indictment but they have

not done the other part.

Well, in that instance the judge would have submitted to you what's called a lesser included offense, and in that example it would be murder. Okay? So, you've got capital murder or murder or not guilty, okay, in that particular case.

So, the jury can decide that the elements have not been met before the jury to return a verdict of guilty for the offense of capital murder, but it does meet the elements of murder, so that's what you find a person guilty of.

Then in the punishment phase the judge would tell you in writing what the punishment range is for the offense that you found the defendant guilty of, in that case murder, where the penalty range is anywhere from five years up to ninety-nine years or life and a fine of up to $10,000. And the jury would go back and pick a number somewhere within that range, and that's what a jury does if they come to that type of a conclusion.

Does that make sense to you?

A    Yes, it does.

Q    Okay. And Ms. Handley talked briefly to you about what we call culpable mental states. And that has to do with that phrase that you see in the indictment here, intentionally. Okay?

A    Okay.

Q    That is what we call a culpable mental state. Culpable means guilty, a guilty mental state. And in Texas we've got four. Okay?

Ms. Handley explained to you we're driving down the street not paying any attention and we run over and kill somebody crossing the street. We can say that that is done with criminal negligence. Okay? And that's one type of homicide.

A    Uh-huh.

Q    If you kill somebody with criminal negligence, okay, you're guilty of criminally negligent homicide, and there is a penalty range for that.

The next one up is what we call recklessly. And the example we have been giving is if I go out on my front porch at midnight on New Year's Eve and I fire my gun up into the air. Well, I am aware that there is a -- there is a risk there, and I have consciously disregarded that risk by shooting my gun up into the air.

Well, you know, if a bullet goes up, it's got to come down. And if it comes down and kills somebody, I didn't mean to do that, but I took a risk and I was aware of the risk. I consciously disregarded the risk and I caused the death of an individual. The jury then could find me guilty, not of murder, but of manslaughter.

A     Right.

Q     Okay?

A     Okay.

Q     The other example, if I go in and to rob a 7-Eleven store and I have my gun and I confront the teller and I say, give me your money, and they do.  And I say, okay, I'm leaving now.  You're not going to get hurt.  Stay behind the counter. Don't try to follow me out.

Okay.  But you know, sure enough, here comes the teller around the counter.  And, so, to prevent the teller from following me out to see which way I go, I shoot that person in the kneecap, okay, and that's to disable them. That is my intent is to disable them.  I didn't mean to kill them but, unbeknownst to me, it hits the femoral artery and they die before the ambulance or the medical people can get there.

Okay.  Well, that clearly is a murder.  Well, that's a homicide, and in that case it would be a murder. I knowingly did the act which resulted in the death of the individual.  I did not intend that the individual die, but I knowingly did the act.  So, that's the other -- the third culpable mental state is knowingly.

The fourth one is intentionally.  And when we say intentionally, that's when the person goes into the 7-Eleven store to rob the store and they intentionally put a

bullet right between the eyes of the teller and then grab their money and run out.  Okay.

And when we say intentionally, there is a legal definition for that, and that is that they intend to cause the result, okay, and the result being death.

Now, we go through all that so that you have an idea of what the four culpable mental states are.  And it sometimes becomes the job of a jury to determine, okay, we've seen the act, but we've got to determine what was the mental state of the defendant at the time of the commission of the act.

A    Uh-huh.

Q    And, in fact, Texas law allows either side to introduce evidence to the jury in the first part of the trial about the condition of the mind of the accused at the time of the commission of the act.  And that's so that the jury can properly determine which level of offense we are talking about.

Only in the event that the jury determines beyond a reasonable doubt -- and that's one of the elements that a jury has to determine, beyond a reasonable doubt -- is that if the defendant acted intentionally do we have a capital murder.  Okay?

A    (Nods head).

Q    Does that make sense to you?

A    Yes, sir, it does.

Q    Okay.  Really, the trial of a capital murder case in the first part of the trial is no different than the trial of the theft of a bicycle.  You know, all criminal cases are pretty much -- they are all run by the same rules of evidence. They are all under the same Code of Criminal Procedure.

In a criminal trial in the State of Texas the State gets to go first because they have the burden of proof, and their burden again is proof beyond a reasonable doubt as to all of the elements of the indictment.

They put on whatever evidence they want to put on, then they rest.  Then it is a defendant's opportunity to put on testimony if we want to or need to.  Frankly, if they have not carried the flag to the mountaintop, so to speak, we have no obligation to put on any testimony because they haven't met their burden of proof.  Okay?

A    (Nods head).

Q    So, the law says that a defendant may present testimony if we want to, but we're not required to, and that would include the testimony of the defendant himself.

Certainly a jury may want to hear from a defendant.  Everybody may want to hear from a defendant, but it is a right of a defendant himself as to whether or not he chooses to testify.  If he wants to, he can.  If he doesn't want to, nobody can make him.  And in the event that they

don't, then a jury is instructed by the Court not to consider that as any evidence of guilt against them.

What the jury is expected to do is to look at the bulk of the testimony that has been presented and see if the State has proven the allegations in the indictment beyond a reasonable doubt. And if they haven't, then we've got a not guilty; if they have, we go on. Okay?

A   Right.

Q   Any question about that?

A   No, sir.

Q   Very good. Now, we get to these special issues over here and, Mr. Kreighbaum, please understand we do not expect that you have ever seen these before. And if you had, you would be probably in the one percent of persons running around that have.

A   Okay.

Q   And we have had, you know, I think you are the 121st individual juror we have talked to over the past six weeks out of 800 that came down and filled out questionnaires. We had a morning panel and an afternoon panel. So, you're number 121.

A   Okay.

Q   Okay. And we have heard all sorts of things from jurors. Many jurors believe that if a person is found guilty of capital murder in the State of Texas that the result is death. And that is not true.

The law in the State of Texas, as Ms. Handley told you, is that the law is always satisfied with there being a life without parole verdict for a person convicted of capital murder.  Okay?

A     Right.

Q     And capital murder, we told you, is not only murder committed during the course of a robbery but it's also during a burglary, a sexual assault, arson, kidnapping, terroristic threat.  There's actually nineteen different ways a person can commit the offense of capital murder in the State of Texas.  I don't need to go through all of them.  I'm sure you've heard of them before.

But the bottom line is the law is always satisfied with the result being life without parole.  And these special issues were set up by the legislature to weed out a certain select few individuals.  And they tell us, the courts tell us that the death penalty is reserved for those incorrigible few people who not only are guilty of capital murder but who cannot not refrain from committing criminal acts of violence in the penitentiary against other inmates, against jail guards, doctors, nurses, whatever, visitors.

Okay.  It is reserved for that select few. Otherwise, everybody else who is convicted of capital murder gets life without parole.  Does that make sense to you?

A     Yes.

Q    Does that seem fair to you?

A    That there is the eligibility --

Q    Yes.

A    -- for a select few?

Q    Yes.

A    For the -- Yes, it does.

Q    Okay.  Is that something you feel that you could go along with if you were selected as a juror?

A    Yes.

Q    I mean that process.

A    Uh-huh.

Q    Okay, very good.  These issues were set up by the legislature to be roadblocks to the imposition of a death sentence, and they are meant to be roadblocks.  And to that end the legislature gave us special issue number one and put the burden of proof again on the State.

And again they have got to prove special issue number one beyond a reasonable doubt.  That's the same high burden that they had in the first part of the trial in finding a defendant guilty.  Okay?

A    Right.

Q    But if we read it together, it says, do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

And obviously the society we are talking about now is prison society.

A    Right.

Q    Okay?  And unless -- Here's the bottom line. Unless the State can show that the person on trial is the type of person who is going to commit criminal acts of violence that would constitute a continuing threat to prison society, then they are supposed to get a life without parole sentence.  Okay?  And maybe I said that wrong.  Did I say that right?

A    I think you did.

Q    Okay.  Unless the State can prove beyond a reasonable doubt that the person on trial is that type of a violent person who is going to continue to commit criminal acts of violence against people around him in the penitentiary, then they are not supposed to get the death sentence.

A    Right.

Q    Does that make sense to you?

A    Yes, sir.

Q    Okay, very good.

Now, let me say this.  Now, obviously we are talking about in special issue number one about a person who has been found guilty of capital murder.  Okay?

A    (Nods head).

Q    So, whatever else we know about him, we know that on that particular date alleged in the indictment they did commit an intentional murder during the course of a robbery. I mean that's already been proved to you beyond any reasonable doubt. You and eleven other of your fellow jurors are satisfied that that has been proven. That is a fact. Okay.

Now, some people, in looking at special issue number one say accurately, say correctly, well, now, this question is asked to me what the defendant is likely to do in the future and that's the dividing line between who gets death and who gets life. That's correct. The death -- The issue requires the jury to predict future behavior. Okay?

Some jurors tell us, well, now, that is something -- I am not God. I cannot predict what somebody who is likely to do -- what somebody is likely to do in the future. I can't do that. I can never answer special issue number one yes because I'm not in a position to look down the road and figure out what somebody is likely to do in the future, much less am I in a position to find or to be able to find beyond a reasonable doubt what somebody is likely to do in the future. Okay. Some jurors have told us that.

Other jurors have told us, well, on the other hand, if you show me that the person on trial is the type of person who would go get a loaded gun, go commit a robbery and then intentionally kill the victim during the course of that

robbery, then that to me is always going to be a person who is likely to commit criminal acts of violence in the future.

How do you feel about either one of those views?

A    Well, it's -- The way I interpret that is, you know, the jury is asked to consider the likelihood of that individual based on -- you know, committing future acts of violence based on all the testimony from various people --

Q    Uh-huh.

A    -- post, you know, the first trial, and then draw from what you hear whether you think that is a possibility or not.

Q    And let me say this also because I didn't think -- I think I did not tell you this.  When we get into the second phase of a capital murder trial, again the State can present additional testimony and the defense can present additional testimony as to special issue number one.

A    Right.

Q    Now, many jurors have told us, well, what would be important to me in answering that question is if I find out whether or not the State has, pardon me, the defendant has a violent history.  And if they do, then obviously you would look to the State to present that evidence to you. If they don't, then obviously you would look to the defendant to present that kind of testimony.  Does that make sense?

A    Yes, it does.

Q    And it is certainly allowable in the trial, in the second phase of the trial, for the State to present any type of prior conviction of a criminal nature that a person has. And it is certainly allowable for the defense to point out if a defendant does not have prior convictions.

The State is also allowed, if they think that a person has done a criminal act but has not been prosecuted for it -- we call that an extraneous offense -- they can certainly present evidence to that if it goes to special issue number one. And obviously if the defendant doesn't have any, it's kind of hard to prove a negative, but we will be pointing it out to you if a person doesn't have a history of violent criminal actions. Does that make -- Is that fair?

A    Yes, it does seem fair.

Q    Okay. Is there anything else we need to talk to in regard to special issue number one?

A    No, I think I get it.

Q    I think -- I think you do. And you understand now the jury doesn't go back and say, how many for life, how many for death?

A    (Nods head).

Q    The jury certainly doesn't go back believing that a death sentence is required.

A    Right.

Q    There is no offense in the State of Texas that the death penalty is required for. And you understand that that is set up to be a roadblock and it's to separate out the wheat from the chaff. Okay?

A    I understand that.

Q    Very good. Special issue number two is pretty explanatory, self-explanatory. If there is more than one person involved in the commission of the act, then the question asks, is the person on trial the triggerman, or, if he's not the triggerman, the State has got to prove that he did intend that the victim die or he did anticipate that the victim would die. Okay. So, that's pretty explanatory.

Both of those first special issues, to me, looking at it, are pretty concrete things. The State -- You know, you're going to be able to look at a body of evidence and say yes or no.

A    Right.

Q    Yes or no. Okay?

Number three is a whole different animal. Okay. Number three, the first thing you see is there is no burden of proof on either side. There is none of this language, do you find from the evidence beyond a reasonable doubt.

Instead it says, do you find, taking into consideration all of the evidence, including the circumstances

of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

Okay. So, number one, we are out of this area of objective fact finding by the jury. We are now into the area of subjective.

A    Right.

Q    And how you, as an individual juror, view the evidence. Okay?

It is anticipated and it is expected that each individual juror make their own personal moral judgment in regard to that question. Okay?

Mitigating circumstances can be anything that you feel is a mitigating circumstance. Some states, in their death penalty law, list for a jury, okay, in the State of California, these are the mitigating factors and these are the aggravating factors.

We don't do that here in Texas. It is whatever you feel is mitigating, and then it's whatever you feel is sufficiently mitigating.

A    Uh-huh.

Q    And what we are saying by that is, if you've got twelve jurors back in the jury room, a fact can be mitigating

to one of them that is not mitigating to another.

A    Right.

Q    There is no requirement that they all have to unanimously agree on something as being sufficiently mitigating.  It can be something different for each of the twelve jurors.  You might think that five things are sufficiently mitigating, whereas the juror next to you might say, only one is mitigating to me.  Okay.

But the bottom line is that only in the event that all twelve jurors unanimously agree that there are no mitigating circumstances sufficient to avoid the death sentence does a person actually get the death sentence.

A    Right.

Q    If one juror feels one thing is sufficiently mitigating, then the person is going to get life without parole.  Okay?

A    Understood.

Q    Does that make sense to you?

A    Yes, it does.

Q    And that seems like a fair way to do it to you?

A    Yes.

Q    Okay.  Now, the law would also say that -- Well, I don't guess the law says this, but let's just talk about this.

Since it's anticipated that each juror makes

their own personal moral judgment, when we talk about personal moral judgment, that's like you deciding where you want to go to church, you know, how you want to raise your kids, who do I want to marry. Okay. That's your personal moral judgment.

And it seems obvious that you don't have the right to tell another juror what their personal moral judgment should be and they don't have the right to tell you what your personal moral judgment should be.

See what I'm saying there?

A    Right.

Q    We don't anticipate and we don't expect that one juror would get back there and try to bully another one into changing their own personal moral judgment. And that's the rules of the game, and that is the rules of what we are doing down here is that if one juror thinks that something is sufficiently mitigating, then that is the result.

A    Okay.

Q    He's going to get a life sentence. Okay. And that's just the way it is. There is no requirement ever that -- And we have had jurors tell us this. Oh, gosh, we would be so disappointed if we didn't all talk each other out of their opinions and come to a conclusion.

That's not what special issue number three is about. Okay?

A    (Nods head).

Q    Does that make sense?

A    Yes, it does, sir.

Q    Let me talk to you about a list, and I got this off the Internet last night. I was bored. There was nothing on TV. But just for purposes of illustration, I went and got California's. See, I told you California was one of those states where the legislature there has decided, we are going to tell jurors what is mitigating and what's aggravating. Okay?

And just for the heck of it, here is California's. Just for illustrative purposes, these are the aggravating and mitigating factors a jury can consider.

The circumstance of the crime and the existence of special circumstances. Okay. The presence or absence of violent criminal activity by the defendant. See how that could be a mitigating circumstance?

A    (Nods head).

Q    Okay. The presence or absence of any prior felony convictions.

A    (Nods head).

Q    See, that would also be relevant, those last two, for us on special issue number one. But certainly they can be, in and of themselves, a sufficient mitigating circumstance as it applies to special issue number three.

Here's the fourth one. Whether the crime was

committed while the defendant was under the influence of extreme mental or emotional disorder. That make sense to you?

A    Right. Yes, it does.

Q    Whether the victim was a participant in the defendant's homicidal conduct or consented to the killing. Well, I'm not sure I understand what that means. But, anyway, that's one of them in California.

Whether the crime was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation of his conduct. And I suppose the example Ms. Handley gave you about going down and killing the dope dealer down the street who was selling your kids dope.

A    Right.

Q    See, that could be a mitigating circumstance there.

Whether the defendant acted under extreme duress or under the substantial domination of another person. Okay.

Whether, at the time of the crime, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or the effects of intoxication.

Does that make sense to you?

A    Yes, sir.

Q    The age of the defendant at the time of the crime. That make sense?

A    Yes.

Q    Whether the defendant was an accomplice to the crime and his participation was relatively minor.

Okay. Those are the aggravating and mitigating factors that the State of California uses. Now, that's not to say that now -- you know now that Texas doesn't list out things individually.

But things -- We've heard from jurors that things such as whether the defendant was under the influence of a mind altering drug at the time of the commission of the offense would be a mitigating factor to them. Okay.

We've heard that hearing the life history of a defendant that brought them to the point where they would be committing murder during the course of an aggravated robbery, that that would be something of interest to them.

Whether or not the defendant growing up was the victim of physical abuse, psychological abuse or sexual abuse at the hands of another might be something that they would consider sufficiently mitigating.

Whether or not the friends and relatives of the defendant who know him best would come to you and say to the jury, well, I know him, I've known him all his life, he's not like this, and what he did on that day was an

aberration of his character.  Okay?

A   (Nods head).

Q   And remorse, standing alone, whether or not the person was remorseful could be a mitigating factor.

So you know, again, the things we talk about in special issue number three, that is not an exhaustive list, that's not an exclusive list.  It goes under the heading there, the defendant's character and background and the personal moral culpability of the defendant, all those things that we talked about and more.  Anything that you hear can be a mitigating circumstance to you sufficient to avoid the imposition of a death sentence.

As an example, if you yourself have a father who committed suicide.  Okay.  I'm just using that as an example.

A   Right.

Q   And you hear that a defendant in our hypothetical case had a father who committed suicide.  Okay.  Well, you know how that affected you.  Okay?  And you can put yourself in the moccasins of that defendant, I suppose, on that particular issue, where the other eleven jurors might not have had that experience and don't -- and aren't able to share that same experience.  Okay?

A   Right.

Q   You see how that could be individualized --

A    Yes, I do.

Q    -- according to each juror?  Okay.  So, that's what we are talking about.  Now, is that pretty clear?

A    Yes, sir.

Q    Okay.  Mr. Kreighbaum, do you have any questions about anything?

A    No, I do not.

Q    Okay.  Do you think that you could listen to the testimony presented by both sides and wait until you've heard the testimony presented by both sides before making up your mind about these special issues or guilt or innocence?

A    Yes, sir, I do.

Q    And do you think that, if either side presents anything as a mitigating circumstance, that you would be able to give consideration to whatever evidence presented?

A    Yes, sir.

Q    And can we count on you, then, to render your own personal moral judgment in regard to the mitigating circumstances?

A    Yes, sir.

Q    Okay.  Mr. Kreighbaum, I want to thank you for your time here today, and we appreciate it.

THE COURT:  Thank you, Mr. Lollar.

You're going to be stepping out for just a minute, then you'll come back in.  And watch that first step

when you come right off there.

All rise, please.

(Prospective Juror Kreighbaum exits the courtroom).

THE COURT: In the presence of Mr. Broadnax, what says the State?

MS. HANDLEY: We have no challenges.

MR. LOLLAR: We have no challenges.

THE COURT: All right. Ask him to return, Barney.

THE BAILIFF: Yes, sir.

(Prospective Juror Kreighbaum returns to the courtroom).

THE COURT: Please be seated, sir.

Be seated, counsel, please.

Mr. Kreighbaum, of course, you have been accepted as a qualified juror. Let me explain to you what that means.

We are in the process of qualifying some fifty jurors. When that's done, the actual twelve that are going to hear the case --

PROSPECTIVE JUROR KREIGHBAUM: Right.

THE COURT: -- will be selected.

We anticipate that that date, selection date, will be within the next two weeks. You will not have to

return for that selection day.

The day we select the actual trial jury, the same person who contacted you to appear here this morning will call you.  So, I want to make sure that your telephone numbers that are on that questionnaire is going to be correct.

PROSPECTIVE JUROR KREIGHBAUM:  (Nods head).

THE COURT:  They are still the same?

PROSPECTIVE JUROR KREIGHBAUM:  Yes.

THE COURT:  She is going to call you and tell you whether you are on the jury or not on the jury.  All right, sir?

PROSPECTIVE JUROR KREIGHBAUM:  Okay.

THE COURT:  You're not going to be left hanging on that.

Now, I want you to assume for me that you are going to be on the jury as far as any outside information, media, Internet, friends.  The easiest thing to do is if they say, well, what were y'all talking about up there all morning, is say, the judge told me I can't talk about it.

See, that just stops it.  Because once sometimes you get started, then you try to explain and then there you are.  Because I sure don't want somebody like you inadvertently disqualified.

It's been a real pleasure meeting you, sir.  The sheriff is going to give you the card of the coordinator

who contacted you.  Should anything occur in your personal life between now and the date of the trial that you think will affect your jury service, give her a call.  We will come up and deal with it.  Okay?

PROSPECTIVE JUROR KREIGHBAUM:  Okay, great.

THE COURT:  A real pleasure, sir.

PROSPECTIVE JUROR KREIGHBAUM:  Thank you.

MS. HANDLEY:  Thank you, sir.

MR. LOLLAR:  Thank you.

(Prospective Juror Kreighbaum excused from the courtroom).

THE COURT:  All right.  The Court's in recess.  Off the record.

(After a recess, defendant present).

THE COURT:  We are ready.

(Prospective Juror No. 962, Shelby Hickman, enters the courtroom).

THE COURT:  Thank you, Mr. Hickman.  Appreciate it.

Please be seated, folks.

Good morning to you --

PROSPECTIVE JUROR HICKMAN:  Good morning.

THE COURT:  -- again, Mr. Hickman.

My name is Webb Biard and I will be with you today during this part of the jury selection process.

PROSPECTIVE JUROR HICKMAN:  Okay.

THE COURT:  The Presiding Judge of this Court is Michael Snipes.

PROSPECTIVE JUROR HICKMAN:  Okay.

THE COURT:  That's who you met at the general large session.

PROSPECTIVE JUROR HICKMAN:  Yes, sir.

THE COURT:  And he is the Presiding Judge, as I told you, of the Court.  And should you be selected as a juror, Judge Snipes will actually preside over the trial.

Raise your right hand for me, please, sir.

(Prospective Juror Hickman sworn).

THE COURT:  Sir, on behalf of everybody here, we appreciate you being here, being on time.  I know you have been here since early this morning.  We never know exactly how long it's going to take to talk to each juror, but we certainly respect your time, and I want you to know that.

PROSPECTIVE JUROR HICKMAN:  Okay.

THE COURT:  I have introduced myself to you.

At this time I also want to introduce to you Elaine Evans.

MS. EVANS:  Good morning.

THE COURT:  And Andrea Handley.

MS. HANDLEY:  Good morning, sir.

THE COURT: They represent Dallas County and the State of Texas.

PROSPECTIVE JUROR HICKMAN: Okay.

THE COURT: Further to my right is Brad Lollar.

MR. LOLLAR: Good morning.

THE COURT: Keri Mallon.

MS. MALLON: Hi.

THE COURT: And they represent Mr. Broadnax. Mr. James Broadnax.

SHELBY HICKMAN,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q   All right. As you sit here now, are you aware that this is a capital murder case?

A   Yes.

Q   You understand the State of Texas is seeking the death penalty?

A   Yes, sir.

Q   Because of that, I'm sure you'll understand there's some very specific rules of procedures and statutes that govern the way we proceed in this part of the jury selection process.

A   Okay.

Q   And I don't want to sound silly, but the attorneys

and I didn't get together and say, okay, well, how are we going to proceed Thursday morning?  I mean we are, to the best of my ability, proceeding strictly in accordance with the law of the State of Texas.

A    Okay.

Q    And you will understand that, I hope.

And one of the things that the law, the Texas Code of Criminal Procedure, requires is that you and the other jurors have an opportunity to talk to us one on one individually.

A    Okay.

Q    All right.  Now, have you ever served on a criminal jury before?

A    No.

Q    All right.  That's no big deal.  But I'll tell you all criminal jury trials, whether it be theft of a bicycle or a capital murder case, are tried in two parts.

The first part is called the guilt/innocence phase.  The sole issue in that part of the trial is, is the person -- did the State prove that the person on trial is guilty beyond a reasonable doubt of what the State charged him with?  It's that simple.

Found not guilty, the trial is over.  If he is found guilty, then you go into what's called the punishment phase.

A    Right.

Q    And you hear additional evidence.  You consider everything you heard about the crime itself, and then you can consider additional evidence about the person who is on trial.  Does that make sense to you?

A    Yes, sir, it does.

Q    What we are looking for, sir, is people who can tell us, and mean it, that they can keep an open mind, who don't already have their mind made up, and once the law is explained to them, the law of Texas and the United States, once that's explained to them, can follow the law and perform their duties as a juror.  And wherever the law and evidence, wherever that leads them to their verdict, whatever that is, then that's what they will be guided by and not some idea that they already have of what the outcome should be.

A    Okay.

Q    Now, you filled out your questionnaire back there in April.

A    Yes, sir.

Q    And we appreciate it.  It wasn't some idle exercise.  I tell you these attorneys have read it in detail and it's going to save you more time here today than it took to fill it out.

A    Okay.

Q    There's a couple of things that have been pointed

out to me and I want to address them with you at this time.

A    Sure.

Q    And all I ask of you is just tell me straight up. Fair deal?

A    Right.

Q    Whatever you say I'll accept.

A    Okay.

Q    I notice on page twelve, this was the situation back in April.  Do you have any projects in progress at your job which might affect your ability to concentrate if you were to serve as a juror on this case for a week or more, and you marked yes.  Hospitals use my products for surgery. If they don't have them, they have to cancel surgery.

A    Right.

Q    Is that still the situation?

A    Yes.

Q    Did you see from reading that pamphlet that Judge Snipes says that this case is going to take up to two weeks?

A    Right.  And I might have another conflict.  On the 17th and 18th I've got a national meeting that I've got to be to in August.  So, if it starts on the 10th, it's two weeks --

Q    Right.

A    -- that might interfere.

Q    All right.  Here's the bottom line question.

Whatever you tell me, I accept.

A    Uh-huh.

Q    Like I say, I'm just asking you to be straight.

A    Right.

Q    If you are required to serve for the two weeks and not be able to continue with your work or miss that national convention, would that affect your ability to sit as a juror or substantially impair or prohibit your ability to concentrate on the evidence as it is presented?

A    No, it wouldn't interfere.

Q    All right.

A    It's just if I'm called at a meeting, I have to attend that meeting.

Q    Sir?

A    If I'm called to a meeting, I have to, you know, I've got to go to the meeting.  That's the thing.  So, it's not going to impair.

Q    You have to go to the meeting?

A    Yes, sir, I do.

Q    I mean, okay, in other words, you wouldn't be -- Are you telling me you wouldn't be able to serve; is that what you're telling me?

A    Oh, I could serve depending on the dates.

Q    Well, it's from the 10th, starting on the 10th and it's going to take two weeks.

A    Right, that's going to be an interference, then.

Q    It would affect your ability to sit as a juror?

A    Yes, sir.

Q    Sir?

A    Yes, sir.

Q    It would substantially impair it?

A    That's debatable.

Q    Well, that's what I --

A    Right, I mean --

Q    Whatever you say.

A    I've got to go to the meeting.

MS. EVANS:  Judge, the State and the defense I think will agree.

MS. MALLON:  We agree.

THE COURT:  Okay.  You understand essentially the import of the case?

PROSPECTIVE JUROR HICKMAN:  Right.

THE COURT:  I can't just say okay.

PROSPECTIVE JUROR HICKMAN:  Right, I understand.

THE COURT:  Okay.  But these are obviously fine people.

PROSPECTIVE JUROR HICKMAN:  Right.

THE COURT:  If they had -- Let me tell you this.  If they had said no, we ain't agreeing, you would have

**Anne B. Meredith**
Certified Shorthand Reporter

probably had to at least maybe serve.  All right?

PROSPECTIVE JUROR HICKMAN:  Yes, sir, I understand.

THE COURT:  You wouldn't have been happy. All right.  But the lawyers agreed to you, so we are going to excuse you for economic reasons.  Good luck to you, sir.

PROSPECTIVE JUROR HICKMAN:  Thank you very much.

MS. HANDLEY:  Thank you, sir.

MS. MALLON:  Thank you, sir.

(Prospective Juror Hickman excused from the courtroom).

THE COURT:  The Court excused the juror on its own motion as being impaired.

Now, Cook.  Who is going to talk to Mr. Cook?

MS. HANDLEY:  I guess I will.

MS. MALLON:  I am, Judge.

THE COURT:  We are ready for Mr. Cook.

MR. LOLLAR:  Yes, sir.

(Prospective Juror No. 794, Alexander Cook, enters the courtroom).

THE COURT:  Good morning, sir.  Please be seated.

PROSPECTIVE JUROR COOK:  Good morning.

THE COURT:  Mr. Cook, appreciate you being

here. I believe that you got a call and were told to come up early; is that correct?

PROSPECTIVE JUROR COOK: Yep.

THE COURT: Well, you saved us -- I tell you what we are doing. It's a little after 11:00. We are going to talk to you for about an hour and a half. We will go past the noon hour, but you won't have to come back should we --

PROSPECTIVE JUROR COOK: Okay.

THE COURT: -- proceed on through unless you have some kind of dietary problem.

PROSPECTIVE JUROR COOK: No.

THE COURT: Okay. All right. Now, my name is Webb Biard and I will be with you today during this part of the trial.

Also I want to introduce to you at this time Andrea Handley.

MS. HANDLEY: Good morning.

THE COURT: Elaine Evans.

MS. EVANS: Good morning.

THE COURT: They represent Dallas County and the State of Texas.

Further to my right is Brad Lollar.

MR. LOLLAR: Good morning.

THE COURT: Keri Mallon.

MS. MALLON: Hi.

THE COURT: They represent Mr. Broadnax.

Do this for me before we go any further. Raise your right hand.

(Prospective Juror Cook sworn).

ALEXANDER COOK,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    All right, sir. Mr. Cook, have you had an opportunity to read the pamphlet?

A    Yes.

Q    Did it help you understand the procedure just a little bit better than you did when you arrived here this morning?

A    Yes.

Q    Good. From reading the pamphlet, from filling out your questionnaire, from hearing Judge Snipes' remarks and sitting here and now in open court, are you aware that this is a capital murder case?

A    Yes.

Q    Do you understand that the State of Texas, pardon me, is seeking the death penalty?

A    Yes.

Q    Because of that, there's some very specific rules, procedures and regulations that you have to be able to follow

and that we have to go by, and I hope you understand that.

A    Yes.

Q    All right.  Now, in a capital murder case, if someone is found guilty of capital murder, there's only two possible punishments.  It's either life in prison without parole or death.  And when I say life in prison without parole, I mean life in prison without parole.

There was a time that you would become eligible for parole, but that's no longer the law.  So, if you're found guilty of capital murder, you're either going to serve the rest of your life in prison or suffer the death penalty.

Now, I think you would agree with me they are both serious --

A    Yes.

Q    -- penalties.  So, that's what we are going to be talking about.

Now, have you ever served on a criminal jury before?

A    No.

Q    All criminal jury trials are in two parts.  The first part is called the guilt/innocence phase.  The second part is called the punishment phase.

And that's the procedure whether it's theft of a bicycle or a capital murder case.  Every criminal case is two parts.  Is the person guilty?  If they are not guilty,

everybody goes home.

If you're guilty, then you go into the punishment phase. And in that part of the trial you can hear evidence about the crime -- you can consider the evidence you heard about the crime itself and then you can hear additional evidence about the actual person on trial, good deeds, bad deeds, prior record, no prior record, anything you think would help you decide what's the proper punishment for this person who we have found guilty of this crime.

Does that make sense to you?

A    Yes, sir.

Q    All right. Now, you read the pamphlet when Judge Snipes told us that the trial is going to start August the 10th.

A    Did he say August the 10th?

Q    It says that in the pamphlet.

A    That says it.

Q    Okay. Yeah.

A    I recall hearing something starting in late July.

Q    Right. But I'm sorry, but that pamphlet says August the 10th.

A    Yes, the pamphlet says August 10th.

Q    All right. It's going to last two weeks, Monday through Friday, 9:00 to 5:00, be a break in the morning, break in the afternoon, be a lunch break.

The jury will not have to stay together overnight unless and until you're deliberating your verdict, it goes late into the night, became fatigued but wanted to continue working on with your verdict the next morning, there is a chance you would all be taken to a fine hotel, county expense, individual private room, spend the night, come back as a group to avoid any outside influence. That could happen.

I give you those dates, the length of the trial, the way Judge Snipes runs his court, to ask you this. Are you -- And after you filled out the questionnaire that we have here, and I am going to give it to you in a minute, and back in April, and you thought about being here, and now you know how long the trial is going to last, when, where, as you sit here now, are you aware of any reason why you can't sit as a juror in this case?

A    My brother's wedding is August 15th in Maryland, and I probably need to be there one to two days on either side of that.

Q    Well, let me ask you straight up. Whatever you say I'll accept. All right. What if you weren't able to attend that wedding, how would that affect your ability to sit on this jury?

A    Probably wouldn't be too happy.

MR. LOLLAR:  Judge, we have agreed.

MS. HANDLEY:  We're fine with that, your Honor.

THE COURT: We are going to excuse you.

PROSPECTIVE JUROR COOK: Okay.

THE COURT: These good lawyers are going to excuse you, sir.

PROSPECTIVE JUROR COOK: Okay.

THE COURT: All right. I'm sure they would have liked to enjoyed getting to talk to you this morning, though.

PROSPECTIVE JUROR COOK: Yeah.

MS. HANDLEY: I think your brother, you don't want to have to suffer that.

PROSPECTIVE JUROR COOK: Thank you.

MS. HANDLEY: Thank you, sir.

(Court adjourned for the day).

*Anne B. Meredith*
Certified Shorthand Reporter

THE STATE OF TEXAS    (

COUNTY OF DALLAS      (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 2nd day of July, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volumes 29 through 32) is $3,875 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 28th day of December, 2009.

*Anne B Meredith*

Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter