REPORTER'S RECORD   *AP-76207*

VOLUME 33 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | ( | IN THE CRIMINAL DISTRICT |
| VS. | ( | COURT NUMBER SEVEN |
| JAMES GARFIELD BROADNAX | ( | OF DALLAS COUNTY, TEXAS |

* * * * * * * * * * * * * * * * * * *

INDIVIDUAL VOIR DIRE EXAMINATION

* * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 6th day of July, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

**Anne B. Meredith**
Certified Shorthand Reporter

A P P E A R A N C E S:

HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas  75207-4313
Telephone No. 214 653-3600

BY:  MS. ANDREA HANDLEY, SBOT No. 08898800
MS. ELAINE EVANS, SBOT No. 24032880
MR. GORDON HIKEL, SBOT No. 00787696
Assistant District Attorneys


APPEARING FOR THE STATE OF TEXAS



MR. BRADLEY LOLLAR, SBOT No. 12508700
Attorney at Law
1700 Commerce, Suite 450
Dallas, Texas  75201
Telephone No. 214 384-8178

MR. DOUGLAS PARKS, SBOT No. 15520000
Attorney at Law
321 Calm Waters Lane
Holly Lake Ranch, Texas  75765
Telephone No. 903 769-3120

DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
133 N. Industrial Blvd., LB 2
Dallas, Texas  75207-4399
Telephone No. 214 653-3550

BY:  MS. KERI MALLON, SBOT No. 24049165
Assistant Public Defender

APPEARING FOR THE DEFENDANT

**Anne B. Meredith**
Certified Shorthand Reporter

CHRONOLOGICAL INDEX - VOLUME 33

|                                              | PAGE |
|----------------------------------------------|------|
| Proceedings - July 6, 2009                   | 4    |
| 17 Prospective Jurors Excused by Agreement   | 4-5  |

| VENIRE PERSON | COURT | STATE | DEFENSE | |
|---------------|-------|-------|---------|------|
| PATRICIA HODGES | 7 | 13 | 53 | |
| Prospective Juror Accepted | | | | 85 |
| Adjournment | | | | 87 |
| Reporter's Certification | | | | 88 |

**Anne B. Meredith**
Certified Shorthand Reporter

PROCEEDINGS:

(Defendant present).

THE COURT:  Okay.  We will go on the record. Let the record reflect we are in open court.  This is July the 6th.  We are in the presence of Mr. Broadnax and his counsel and the State's counsel.

What says the State of Texas?

MS. HANDLEY:  The State's ready, your Honor.

THE COURT:  All right.  And Mr. Broadnax.

MR. LOLLAR:  Judge, we are ready.

We have been meeting with the prosecutors here this morning in regard to the next twenty-eight jurors that we have coming up and have seen that a number of them have issues that would make it appear that they would either be unqualified or unable to serve because of various reasons including work reasons.  A number of them have businesses that they cannot leave this time of year, and other problems.

So, for that reason we have agreed to excuse seventeen out of the twenty-eight that we have planned.

THE COURT:  All right.

MR. LOLLAR:  And those people are:  Karen Henderson, Juror 1069; Felix Cano, number 1026; Gordon Clark, number 1209; Robert Gatewood, number 1211; Sherrie Barnardin, number 1176; David Davis, number 1097; Stephen Scobee, number 1177; Edward Campbell, number 1104; Michael Gaitan, number

1235; Terry Hager, number 1258; Aurora Salazar, number 984; Brian Perez, number 1148; Fannie Horton, number 1029; Mark Lindsey, number 1002; and Rory Sanford, number 1207; Mary Rinne, number 1279; and Sharon Brown, number 1282.

What we are proposing is to see if we can move some people up to this afternoon, to see if we can talk to some this afternoon. And then we will get with the court coordinator and the Court to get some more people scheduled who hopefully won't have as many problems as these people have.

MS. HANDLEY: We are in agreement, your Honor, that that's true. After thoughtful discussion with defense counsel and going through the questionnaires individually with them, we did come to the conclusion with respect to the people he's read off there that they would be unable to serve or would, in fact, just be unqualified to serve.

THE COURT: It will be approved by the Court. And this was in the presence of Mr. Broadnax and Mr. Broadnax's knowledge; is that correct?

THE DEFENDANT: Yeah.

MS. MALLON: Yes, sir.

THE COURT: Okay. Court's in recess.

(After the lunch recess, defendant present).

(Prospective Juror No. 977, Patricia Hodges, enters the courtroom).

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT: Good afternoon again, Ms. Hodges.

PROSPECTIVE JUROR HODGES: Hi.

THE COURT: Thank you very much. Please be seated.

Be seated, folks.

Ms. Hodges, as I told you, I sure appreciate you being here. My name is Webb Biard and I will be with you this afternoon during the jury selection process.

The Presidng Judge of this Court is Michael Snipes who you met at the large central jury room with four or five hundred other people. And should you be selected as a juror in this case, Judge Snipes will preside over the actual presentation of the evidence.

Also with us this afternoon we have Andrea Handley.

MS. HANDLEY: Good afternoon.

PROSPECTIVE JUROR HODGES: Good afternoon.

THE COURT: Ms. Handley represents Dallas County and the State of Texas. And she has some co-counsel with her who may or may not appear here momentarily.

Also, as we go to my right, we have Brad Lollar and Doug Parks, and they represent Mr. James Broadnax. Mr. Broadnax. Thank you.

Do this for me before we go any further, please. Raise your right hand.

**Anne B. Meredith**
Certified Shorthand Reporter

(Prospective Juror Hodges sworn).

THE COURT:  Thank you.

EXAMINATION

BY THE COURT:

Q    Ms. Hodges, let me talk to you briefly, kind of give you an idea of the way the afternoon is going to proceed and then go over a few other legal matters with you.

I want to assure you that these are outstanding lawyers or they wouldn't be involved in this case, but they are also fine people.  It's out of the question that somebody like you, a prospective juror, would ever be embarrassed or intimidated or intentionally browbeat by these fine lawyers.  That's just not going to happen.  I understand this can be somewhat uncomfortable for some people, but I don't want it to be.

Also, I want to assure you that this is not some legal test where we try to find out what twelve people know the most law.  You're not expected to know any of these laws.  It's our job, not your job, our job to explain the law to you.

And then once you think you have a grasp of the different legal principles we are going to be talking about, you'll simply be asked the bottom line question.  And that is, can you follow the law of the United States and Texas in fulfilling your duties as a juror?

**Anne B. Meredith**
Certified Shorthand Reporter

You don't have to know the law to be a qualified juror. You don't have to agree with the law to be a qualified juror. But you do have to be able to tell us, and mean it, that you can follow the law in your service as a juror. And that will be solely up to you.

And the only thing we ask of you, Ms. Hodges, is that you just shoot straight with us and tell us. Does that sound fair?

A    Yes, sir.

Q    Also, if there is anything that's confusing to you, just say, wait a minute, and we'll go over that again with you because we want you to understand this process.

Now, some of these matters you've known about since the fifth -- legal concepts, you've known about since the fifth grade. There's others, I would assume, like these special issues, that you hadn't really thought about before, and we understand that.

You filled out your questionnaire back in April. And we know when you filled this out, some of these laws you weren't aware of, and that may or may not affect some of your answers. But don't, don't worry about that. This questionnaire was just to try to gather some information, just kind of get a feeling of how you just kind of first blush feel about these things.

Now, did you have an opportunity to read the

**Anne B. Meredith**
Certified Shorthand Reporter

pamphlet?

A     I did.

Q     Did that help you a little bit to understand?

A     Yes.

Q     Good, good, I hope it did.

Did you see in there where Judge Snipes tells us now -- you didn't know this in April either -- that he intends to start this trial August the 10th?

A     Yes.

Q     And the trial will last up to two weeks.  And the jury, during that time, that's Monday through Friday 9:00 to 5:00, break in the moring, break in the afternoon, be a lunch break.  The jury would not have to stay together overnight unless and until you were deliberating your verdict.

Have you ever sat on a criminal jury before?

A     I believe so, your Honor.  It was a murder case.

Q     Okay.  That would be a criminal jury.  Did the jury reach a verdict?

A     Yes.

Q     Did the jury set punishment?

A     Yes.

Q     All right.  So, from that experience -- how long ago was that?

A     Six, seven years ago.

Q    Okay.  From that experience, do you remember now that the trial was in two parts?  Guilt/innocence phase --

A    Yes.

Q    -- where you decided whether the person was guilty or not?

A    Yes.

Q    And then you got the punishment phase --

A    Yes.

Q    -- when you decided what was the correct punishment?

A    Yes.

Q    Okay.  You've got a leg up over most jurors by going through that process.  That's exactly the way a capital murder case is tried.  If somebody is found not guilty, the trial is over, there is no punishment phase.  But if they are found guilty, then you go into the punishment phase.

And you knew which part of the trial you were in, correct?

A    Yes.

Q    When you're deciding punishment, the issue of guilt is no longer a question.

A    Yes.

Q    Okay.  Now, in that murder case, do you recall, Ms. Hodges, that the range of punishment was not less than five years nor more than ninety-nine years or life?

A    I don't remember that, no.

*Anne B. Meredith*
Certified Shorthand Reporter

Q    That's the range of punishment for murder.

A    Okay.

Q    Not less than five years nor more than ninety-nine years or life.

The range of punishment for capital murder is there are going to be two possible punishments, that's either life in prison without parole or the death penalty.

A    Okay.

Q    And when I say life in prison without parole, I mean life in prison without parole.

A    Okay.

Q    There was a time in our law when someone could eventually become eligible for parole if they were given a life sentence.

A    Okay.

Q    That's no longer the law.

A    Okay.

Q    Life in prison without parole means life in prison without parole.

So, murder case, the range of punishment is obviously five and no more than ninety-nine or life.  In other words, you can't get the death penalty for murder.  The range of punishment for capital murder is life in prison without parole or death.  So, obviously there is a difference between murder and capital murder.  And these attorneys are

going to explain that to you here in just a moment.

But getting back to that pamphlet, since you have been in deliberations, you know what I mean by the word deliberations. There would be a chance, if you were on a jury, when the jury was deliberating their verdict and they went let's say late into the evening and hadn't yet reached a verdict, became fatigued, there is a chance you would all be taken to a fine hotel, county expense, individual private rooms, fed, spend the night, come back as a group, to avoid any outside influence.

That could happen. And should that happen, I know Judge Snipes well enough that he would give you plenty of advance notice like, two days from now, you might bring an overnight bag in case you are sequestered. That's the word. You've probably heard that word used.

Okay. I give you that information, give you those dates, I tell you how Judge Snipes intends to run his court to ask you this. As you sit here now, do you know any reason why you can't sit as a juror in this case?

A    No, sir.

Q    Great. Okay. At this time I want to hand you your questionnaire. You'll have it there with you, Ms. Hodges. The attorneys usually, and I don't know which one they would be, but usually they will say, tell us a little bit more about what you meant on page five, paragraph two.

A    Okay.

Q    And you will have it there to refer to because we know it's been a while.

A    Okay.

THE COURT:  So, without anything further from me, I want to reintroduce to you at this time Andrea Handley who is going to speak to you on behalf of the State of Texas.

Ms. Handley.

MS. HANDLEY:  Thank you, your Honor.

THE COURT:  Yes, ma'am.

MS. HANDLEY:  I appreciate it.

THE COURT:  Thank you.

EXAMINATION

BY MS. HANDLEY:

Q    Good afternoon again, Ms. Hodges.  How are you?

A    Fine, thank you.

Q    First of all, thank you for being here.  Thank you for showing up in April and filling out this questionnaire for us and thank you for accommodating us and coming down here this afternoon to talk to us.  It's people's willingness to participate that makes this system work, so I appreciate that and I think I speak on behalf of everybody here.

As the judge stated, this is kind of a different system.  This is a different process in a capital murder case.  You sat before on what sounds like a murder

case, and I don't know if it was necessarily a capital murder where the defendant automatically received life in prison or if it was a murder case where you assessed life in prison. Are you sure about -- I know it was a long time ago.

A    You know, now that I think about it, and I probably need to tell the judge this, too.  I think the judge set the punishment now that I think about that.

Q    Okay.

THE COURT:  Okay.  The judge can do that in a lot of cases.

PROSPECTIVE JUROR HODGES:  I think he did.

THE COURT:  I apologize for interrupting, Ms. Handley.

MS. HANDLEY:  That's fine, Judge.

THE COURT:  In a capital murder case in which the State seeks the death penalty -- And you understand the State is seeking the death penalty in this case.

PROSPECTIVE JUROR HODGES:  Yes, sir.

THE COURT:  -- if the jury finds someone guilty of capital murder, the jury must be the body that sets punishment.  A judge cannot set punishment in a capital murder case in which the State seeks the death penalty.  Any other case, the judge can if both sides agree.

PROSPECTIVE JUROR HODGES:  I kind of think the judge set this, I really do.

THE COURT:  Okay.  That's common.

PROSPECTIVE JUROR HODGES:  Okay.

THE COURT:  Okay.

Q    (By Ms. Handley)  Okay.  Okay.  So you, I believe, have a good appreciation for how the first part of a trial works.

A    Yes.

Q    And we'll talk briefly about that again for this type of case.  But also we're going to talk to you more about the punishment phase, the second half of a criminal case, and particularly how it works in a death penalty case or a case, at least, where we are seeking the death penalty and the special things that you go through in order to arrive at your verdict.

I know a lot of people, maybe you yourself might have thought, before you read the pamphlet and heard a little bit more about the law, that jurors would go back and decide, well, shouuld he receive life or should he receive death?  And actually as you can see, it's a very strict kind of protocol, the process of how you get there.  You don't say life or death.  Instead you answer a series of questions.

A    Okay.

Q    And thoughout your deliberations and the way that you arrive at your verdict, you're going to follow those principles of law that were important to you in that last

**Anne B. Meredith**
Certified Shorthand Reporter

case that you tried, that you sat on. They are just as important in this case, and I will touch on those briefly again.

We know that when you first filled your questionnaire out that day, you didn't have the pocket law, you know, guide with you. Nobody had sat down and talked to you specifically about a death penalty case or when it was appropriate or even when it was an option. And we understand that when you answered your questions, you were just basically giving us your feelings at that point and how you felt just knowing what you knew at that point.

We are going to talk to you about and tell you specifically about the law that's at hand. It may or may not change your answers. But the reason we are bringing people down one at a time is because obviously the stakes are very high in this case. We're talking about someone potentially receiving the death penalty.

And we need to ensure that our potential jurors understand the law. Pardon me. And we also, quite frankly, by reading your questionnaire and getting to hear you talk, get to know a little bit about you also. Okay?

Because what we are in search of here, ma'am, is we are hoping to get fifty people that are technically qualified to serve. And after we get the fifty or forty-eight people actually together, then we make our decisions

on who will actually sit on the jury.

And a lot of times either my decision or the defense's decision to accept you or not take you as a juror has to do just on how we kind of think that you feel, how you fit, you know. So, I may do a lot of lecturing because I think I have to tell you the law.

But if there is something that comes to mind that you think is important for us to know, then, by all means, now is the time to talk. This is the only time you can actually talk to us. Once you're on a jury, you know that you can't say, hey, prosecutor or defense attorney, let me ask you something.

So, a qualified juror, I will tell you, Ms. Hodges, is somebody who not only understands the law but will agree to follow the law. You don't have to like the law. You just have to agree to follow the law.

A qualified juror is also an individual that will base their verdict on the evidence in the case and nothing else. A qualified juror is a juror that will wait to hear all the evidence before arriving at their verdict, which is to say they haven't come in already with their mind made up. They haven't come in and said, look, if you show me that he willfully or intentionally killed somebody, I'll give them the death penalty.

That's not a qualified juror because they

haven't heard any of the facts and, therefore, they are not following the law. And I see you shaking your head yes.

A    Uh-huh.

Q    I'm taking it that you're in agreement with me and you're understanding that.

A    Yes.

Q    As you know from your prior service, ma'am, there are those laws that the judge mentioned to you we've heard all of our life, you know, but they come into play in every criminal case.

I represent the State of Texas which means I carry the burden of proof in this case. It's my obligation to bring you the evidence and to prove my case to you beyond a reasonable doubt before you may return a verdict. If I fail to do that, if I fail to prove my case beyond a reasonable doubt, your verdict must be not guilty of that charge.

As the defendant sits here today, ma'am, you are to presume him innocent at this point. And the reason is is because I haven't proved anything to you. He has what we call a presumption of innocence. It stays there only if and until I convince you beyond a reasonable doubt otherwise.

And I think you'll agree that makes sense, doesn't it?

A    Yes.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    I bring the charges, I ought to bring the proof.

Everybody enjoys that fifth amendment right not to testify.  I have that right.  You have that right.

If a defendant elects to exercise that constitutional right, you understand that you may not use that as evidence of guilt against him.

A    Yes.

Q    I also have to prove everything that's in the indictment.  You know, the indictment is not evidence of guilt.  It's just a piece of paper.  Tells him what he's been charged with and it tells me what I have to prove to you beyond a reasonable doubt.

I am obligated to that indictment and I must prove everything on it.  If I fail to prove even one element on there, your verdict must be not guilty.

If I have alleged in a criminal indictment against a defendant, for example, that he caused the murder of somebody by shooting them with a firearm.  And then in that trial the medical examiner says, for example, the person didn't die from a firearm, they were stabbed to death.  And a CSI person gets on the stand and says, there were no bullets or gun.  There was a bloody knife.  Even if the defendant gets on the stand and says, I killed him and I am glad I did.  The fact of the matter is the indictment says I must prove by shooting with a firearm.

Would I have proved that to you?

A    No.

Q    No.  And your verdict would be what?

A    Not guilty.

Q    It would be not guilty.  And as distasteful as it is, it's just an example to impress upon you the importance of following the law in all criminal cases.

A    Yes.

Q    I know that your -- I believe your father or your father-in-law was a California highway patrolman; is that correct?

A    My father was a Texas highway patrolman.

Q    Texas highway patrolman.

A    Yes.

Q    And some people might say, well, because your father was in law enforcement, you might come into the courtroom with a bias in favor of the State because he was law enforcement.

And if you did, if you did have that predisposition that, because your dad was a law enforcement officer, you're always going to side with the State or you're always going to give the State a leg up, then you would have a bias and you would not be a qualified juror.

I notice that you put in there that you don't necessarily believe police officers will always tell

the truth or are more truthful than the average person, so I think you have a good appreciation for that, too, then.

So, is it safe to say that nobody gets a leg up in here? I don't get a leg up because your daddy was law enforcement and he doesn't get a leg down because of that either; is that correct?

A    Yes, ma'am.

Q    Okay. Let's talk a little bit then about the differences between murder and capital murder.

Capital murder is the only crime in Texas in which a defendant could potentially receive the death penalty. And that's something that's always important to keep in mind, ma'am, that the death penalty is never automatic under any circumstances. It is merely an option that is available. It is merely a possibility. But it is never anything automatic. Okay?

A    Okay.

Q    Just because you have been found guilty of capital murder does not mean you will automatically get the death penalty. It does not automatically mean the questions should all be answered in a way that you would get the death penalty. Being found guilty of capital murder means, merely means there is only a possibility or an option to it. And that's just for capital murder.

Capital murder is, of course, different from

murder.  And I hate to say a regular murder because I don't think there is anything regular about murder.  But there is a distinction between a murder and a capital murder.

If I pulled a gun out of my briefcase right now and just turned and shot my co-counsel ten times and laughed about it while he's just minding his business, I think you would agree with me that would be particularly heinous, wouldn't it?

A    Yes.

Q    I have intended to cause his death and I have shot him a number of times to accomplish it.  Well, that's not capital murder and I could not receive the death penalty for that.  That is a first degree murder.  I could still maybe get life in prison, but the death penalty is not an option because it's not a capital murder.

A capital murder is always a murder, but it is a murder plus something else.  It's plus some type of aggravating factor, if you will.

So it is, for example, capital murder is the murder of a child under six years of age would be capital murder, or the murder of a police officer or fireman while they are in the line of their duty would be capital murder, or the murder of two or more people at the same time.

Or it is the murder of, as in this case here, what we've alleged in the indictment, it is a murder committed

*Anne B. Meredith*
Certified Shorthand Reporter

while in the course of committing or trying to commit another serious felony offense. In this case we've alleged robbery, but it could include burglary or it could include aggravated sexual assault.

So, it's always a murder plus something else. Does that make sense to you, ma'am?

A    Yes.

Q    And I will tell you that, just to make sure you understand this completely in this case where we have alleged a murder in the course of a robbery, another felony, that it is always, always an intentional murder. Okay?

A    (Nods head).

Q    I noticed that you've used the word willfully on the first page of your questionnaire here, and there is nothing wrong with that. I think that they are very -- would seem to be very closely related there, willlfully or intentionally.

But it is always an intentional murder, which is to say it's not a murder that was committed accidentally. It is not a murder that was committed with legal justification. For example, it's not a murder where you murdered somebody in self-defense. That's a legal excuse, so it's not that. It's not an accident. It's not a murder by somebody who is criminally insane. That would be somebody who could not be held liable for that.

I think the best way to put intentional in describing it is the person wanted to commit the murder, they wanted to see them die, and they did whatever was necessary in order to take their death. Intentional murder. So, we are always talking about that in capital murder. Okay?

A    Uh-huh.

Q    It's not even I don't like Mr. Hikel and, so, I'm going to shoot him in the knee to hurt him, you know, but then he accidentally dies, anyway. Well, I didn't intend to kill him. I just intended to hurt him. That's not a capital either. That's not an intentional murder.

So, it's important that you understand it does involve an intentional murder and it does involve that plus something else, in this case being a robbery.

A    Okay.

Q    Okay? Now, when I keep saying this case, I'm referring to the indictment. I'm not talking about the facts of this case here.

If I fail, ma'am, to prove to you that the murder was in fact intentional, then you cannot return a verdict of capital murder. Okay?

A    Right.

Q    If I fail to prove that it was in the course of committing a robbery or an attempt to commit a robbery, you

cannot return a verdict of capital murder. And I see you indicating that it appears you understand that.

A    Yes, yes.

Q    Okay. I'm not going to talk a lot about the guilt/innocence phase, you know, only to say that those propositions of law are always at play. You always look to the State to prove the case. You never look to the defense to prove anything. You always look to me to prove the case to you.

If I fail to prove it to you beyond a reasonable doubt, then you know what your verdict must be. If, however, I prove to you beyond a reasonable doubt the elements in the indictment, that there was an intentional murder and it was done in the course of committing a robbery, then you may and shall return a verdict of guilty of capital murder. Okay?

A    Yes.

Q    Now, that's the first page -- first phase of the trial, and it sounds like that's what you sat on in your case. You all went back as a jury.

A    Uh-huh.

Q    You sat down together, you deliberated, you talked, you discussed the evidence, and you collectively decided, does this make sense, have they proved to me beyond a reasonable doubt this person killed whoever they alleged.

A    Yes.

Q    Then you returned a verdict of guilty in that case. So, I think you have an appreciation for what deliberation is about, too.

A    Uh-huh.

Q    All right.  Assuming you have returned now a verdict of guilty of capital murder, that ends the first phase of the trial.  Okay?

I want to focus now on the second phase of the trial with you.  So, just so you appreciate where we are, just to make sure your mind is in the right place, we are not talking about whether or not the person is guilty any more.  We are not talking about was it an accident, was it justified.  You have found him guilty of capital murder. Okay?

A    (Nods head).

Q    As the judge told you before, a person found guilty of capital murder, one of two things will happen to them.  They will either receive life in prison without parole or they will receive a sentence of death.  Okay? Those are the only two things that can happen to a person found guilty of capital murder.  Okay?

A    (Nods head).

Q    We like to say there is nothing automatic in a death penalty case.  But there is one thing that's automatic,

and that's if you're found guilty of capital murder, you will automatically receive life without parole.  Okay?

So, you've found him guilty of capital murder. He is at this point looking at life without parole.  Does that make sense to you?

A    Yes.

Q    Okay.  What you're doing now, though, is you're going into the second phase of the trial, into the penalty phase, the punishment phase.  And this is where the determination will be made as to whether or not he will stay on that life without parole sentence or whether or not he will step up to the more -- obviously more egregious punishment of a death sentence.

A    Okay.

Q    You arrive at that verdict not by going back there and saying, does he deserve it.  You arrive at that verdict by looking at the evidence and answering those special issues that you looked at before.

During the punishment phase of a trial, there is now an opportunity to bring you even more evidence. Things that may not have been relevant in the first part of the trial are now relevant in the second part of the trial.

You may hear additional evidence in a capital murder case, in a punishment case, evidence about the defendant, about his character, who he is, his background.

You may hear whether or not somebody's ever committed any other kind of offenses. Now you'll hear a lot more evidence, okay, in order to answer this decision.

Now, understand, Ms. Hodges, I've said that he's going to automatically serve life in prison without parole, right?

A    Yes.

Q    So, where is he going to be the rest of his life?

A    In prison.

Q    He's going to be in prison. Unless he escapes, he's going to be in prison, isn't he?

A    (Nods head).

Q    Well, in deciding whether or not a particular defendant is the defendant who will serve just that life sentence or decide whether or not he's the person who will receive a death sentence, there is a distinction between the two individuals.

We need to make a distinction as to who receives life in prison and who receives the death sentence. Okay? There's got to be a way to distinguish these two individuals, if you will. And the lawmakers recognize that this person will be spending the rest of their life in the penitentiary.

I don't know if you've ever known anybody who has gone to the penitentiary personally, have you?

A    I have a friend who has a son that spent a short period of time there, yes.

Q    Spent a short -- okay.

A    Uh-huh.

Q    In our penitentiaries -- We have about 150 penitentiaries in Texas, and in those prisons there are thousands upon thousands of men and women serving time for various different criminal offenses.

We don't have separate penitentiaries just for murderers, penitentiaries just for house burglars --

A    Uh-huh.

Q    -- penitentiaries just for car thieves or forgerers. We don't necessarily do that.  They all serve time together in one penitentiary.  They may be classified into different sections but they all stay there together.  Some are only there for five years, some are there for the rest of their life.

What we are looking at now when we look at the defendant who has been convicted of capital murder is we are asking for you to look at him and make a decision on how he's basically going to act in that penitentiary.

And the question generally speaking becomes, is he going to be the type of defendant that serves his life sentence, goes there, serves his time peacefully, if you will, whatever that may be, follows the rules, is not a problem,

is not a threat or a danger to anybody else?  Is he that kind of guy?

Because if he's that kind of guy, then life in prison without parole is probably appropriate.  Make no mistake about it.  I would imagine life in prison without parole is no picnic.  It is a -- it is a punishment.

Or is he the type of individual who is going to go into the penitentiary and now be potentially a danger to the people that he is now living in and amongst?

See what I'm talking about there?

A    Uh-huh.

Q    You've got people who are serving time in prison for property crimes or maybe even violent crimes or whatnot.

Let me ask you this, Ms. Hodges.  Somebody who has been sentenced to do time in the penitentiary ten years for whatever it may be, burglary, forgery, do you think they have a right to be safe while they are in that penitentiary?

A    Yes.

Q    Okay.  Some might say, well, you know what, prison is no picnic.  You committed a crime.  It's just part of the lifestyle in the prison that, in addition to doing your time, you might also get roughed up a little bit.

Do you feel that way?  Would that be fair?

A    I'm sorry.  Say it again.

Q    I said that poorly, didn't I?

A    That's okay.

Q    Because you've told me that you believe they have a right to be safe.

A    I do.

Q    Okay.  I've never heard, in my years of doing this, I've never heard a judge say, I sentence you to ten years, and by the way, you know --

A    Right.

Q    -- and to get your butt kicked every day, too.

A    Right.

Q    It's not appropriate.

In that prison society, I think you would also appreciate that there's more than just inmates, aren't there?

A    Yes.

Q    There's wardens, there's guards, there are doctors and nurses, there are dentists, there are educators.  There are clergy that come in.  There are volunteers that come in to witness to the inmates.  There's even family members that come in for visitation, aren't they?

So, that prison population is kind of a society in and of itself, isn't it?

A    Yes.

Q    And what we are now looking at in this punishment

phase at making this determination as to whether or not this defendant receives life or the death sentence, the first thing we are looking at is, is he a danger to that population, that society, okay?

A    (Nods head).

Q    The question is never, or it is never, the law is never, because he's been convicted of capital murder, which you know is an intentional murder with something else, a robbery --

A    Uh-huh.

Q    -- just because he's been convicted of capital murder does not mean he will automatically receive a death sentence. Does that make sense to you?

A    Yes.

Q    Does that seem fair to you?

A    Yes.

Q    Okay. And that's really what that first issue goes to, that first special issue. And you see it up here on this board here where it says, do you find from the evidence beyond a reasonable doubt.

Keep in mind, ma'am, any time you see beyond a reasonable doubt, that's again for you to focus at me at this side of the table and ask yourself, have I proved it to you, because it's my obligation to prove this question to you.

A    (Nods head).

Q    It's my obligation to prove to you that he will, in fact, be a future danger, because there is nothing automatic. I've got to prove it to you first before you can say yes. If I don't prove it to you, then you would say no.

Have I proved to you beyond a reasonable doubt that there is a probability. None of these terms are defined for you, ma'am. It's really for you to decide.

But notice it doesn't say that he will absolutely and it doesn't say that he will maybe. It says probability. That's for you to decide what that means. I think you'll agree with me it's more than a possibility, isn't it?

A    Uh-huh.

Q    A lot of jurors tell us that a probability means to them more likely than not. Does that make sense to you?

A    Yes.

Q    Okay. If I prove to you more likely than not that the defendant will commit criminal acts of violence. Again, that is not defined for you. It does not say that the defendant will commit another murder or the defendant will commit another robbery or the defendant will commit an assault on an inmate.

Criminal acts of violence are for you to decide what is and what is not a criminal act of violence. And you may even look at it in context of what's going on

*Anne B. Meredith*
Certified Shorthand Reporter

in the penitentiary.

If I were to ball up my fist, and my co-counsel is minding his business, and just coldcock him in the face because I just felt like it, do you think that would be a criminal act of violence?

A    No.

Q    Why not?

A    I just think you got mad at him.  That's okay.  You didn't -- I mean, other than hitting him?

Q    Do you think that's an act of violence to hit somebody in the face?

A    Yes.

Q    Okay.

A    I do.

Q    Okay.

A    Yeah.

Q    Do you think that it's a criminal act?  Do you think he could press charges on me if he was just minding his business and I punched him in the face?

A    Probably.

Q    Okay.  Do you think if we are sitting in a jail cell together and he is sitting there writing a letter to his mother and I just come over and smack him in the face, is that a difference now?

A    No, probably not.

Q    Okay.  You think that that is then a criminal act of violence?

A    Yes.

Q    Okay.  And again, that's for you to decide.  I'm not trying to talk you into something or out of something.  But you see what they are saying there?

A    Yes.

Q    You decide what is and is not a criminal act of violence.

A    Okay.

Q    That would constitute a continuing threat to society.  Well, that word society, I think you understand now, also envisions not just the society that we are in right now --

A    Right.

Q    -- but also is he a continuing threat to the society that he's in now.  Does that question make sense to you, ma'am?

A    Yes.

Q    In deciding that question, whether or not he is or is not going to be a future danger, in deciding that question, you may look at all the evidence in the case now.  You may look back at the crime that you've just found him guilty of, and that may help you decide that question.  Or you may also look at additional evidence that I've offered

to you now in the punishment phase.  Okay?

A    Uh-huh.

Q    In the first part of the trial you looked at the criminal offense in order to decide if he was guilty, right?

A    Yes.

Q    Now in the second phase of the trial you look at that criminal act that he committed to help you decide if he's a future danger.

A    Okay.

Q    Do you see how you're looking at that --

A    Yes.

Q    -- for two separate questions?

Some people might say, look, if you prove to me that a man intentionally -- which means he meant to kill him and he did it -- if he intentionally killed somebody and he did it in the course of a robbery, then I'm always going to answer that question yes.

What's your -- What are your feelings on that, that the State doesn't even have to prove anything to me, I'm just going to say it's yes?

A    No, because I do think that additional evidence that comes in is important in deciding that question.

Q    Sure, sure.  And again you've hit the nail on the head.  It always is a consideration of the evidence in the case.

I'll submit to you, in my almost twenty years of doing this, I've never seen two defendants alike. I've never seen two criminal cases alike. It always, always depends on the particulars of the case, always fits on that.

It's easy for me to say, you know, a person's been found guilty of capital murder while in the course of a robbery, and it just sounds bad, doesn't it?

A    Right.

Q    It just sounds bad without hearing any details, doesn't it?

A    (Nods head).

Q    A man is sitting in his house. He's thinking about the guy who lives five houses down. Okay. He doesn't like him. He wants to see him die. He knows the guy has a lot of money over there, and he wants to take his money, too.

So, he goes and he buys a gun, he loads it with a full magazine, he walks five houses down. He knocks on the door. When that guy answers the door, he puts a gun up to him, shoots him five times, grabs his bag of money and leaves.

Does that sound like a capital murder to you?

A    Yes.

Q    Sounds pretty bad, doesn't it?

A    Yes.

Q    On the one hand I could say, well, let's flesh out the facts a little bit.  That guy who is sitting in his house and mad at everything is just a ne-er-do-well who has done nothing with his life.  He doesn't want to work.  It's just easier to take stuff.  He knows the guy down the street has a lot of money because he's an old man who doesn't believe in banks, and he's an easy target, and he went down there and killed him, he took his money and he spent it on dope and new rims for his car.

Sounds like a pretty bad guy, doesn't it?

A    (Nods head).

Q    Yeah.  On the other hand, we could say that the guy sitting in his house who hates that guy five houses down, he's actually a father and he is a husband.  And he is a good husband and he is a good father, and he's been a provider for them his entire life.  He's been a good citizen.  He's been a good church goer.  He's a decent, upstanding man who would give you the shirt off his back if you needed it.

And he hates that guy five houses down because that guy five houses down is a dope dealer and he slings dope 24/7 down there.  And he poisons kids and he poisons the community and he gets people hooked on dope and he ruins lives.  As a matter of fact, he got his two kids hooked on dope and now their lives are ruined.  And he hates him.

And he knows he's got a lot of money because he doesn't work except slinging dope. And he thinks, I'm going to take the law into my own hands. I know it isn't right, but I'm going to do it. I'm going to make the conscious choice to do it.

And he buys the gun and he gets some bullets and he walks down there. And when that dope dealer answers the door and says, what in the world do you want, he shoots him ten times.

He takes his bag of money, he walks it down to the local charity and he drops it in the box for the poor. He goes to the police department, says, I did it, I meant to do it, I'm glad I did it. I'm guilty. Let the chips fall where they may.

Has that man committed capital murder? Did he intend to kill him?

A    He intended to kill him, yes.

Q    He did. Did he intend to take his money?

A    Yes.

Q    He sure did. He's guilty of capital murder, isn't he?

A    Yes.

Q    Maybe there is a difference. You may or may not see a difference between those two guys, right? But you don't know that difference, do you, until you actually look

at the facts of the case, do you?

A    Correct.

Q    I only give you that illustration just to illustrate a point, ma'am.  That just because somebody's been guilty of capital murder, if you don't know anything about it yet, can you say they will always be a future danger?

A    No.

Q    That dad who killed that dope dealer, he may not be a future danger to the people in prison.  He may have been the kind of guy who said, I hated that one man.  That was my motivation to have him killed, and I did it.  And you may truly believe he'll never hurt anybody else.  He'll sit there and write letters to his wife and kids.

Or you may sit there and think about -- Or you may sit there and think, well, you know what, he hates dope dealers.  Now he's in the penitentiary.  Now he's around a lot of who?

A    Dope dealers.

Q    Dope dealers.  And you may think, you know what, there's a lot of men who are in trouble right now because he's not finished.

A    Uh-huh.

Q    And you may think, I think he's a future danger.

A    Uh-huh.

Q    I honestly do.  But you don't know that until you get there, right?

A    Right.

Q    That's the first question that you have to decide in the punishment phase.  So, you understand there is nothing automatic about it.

A    Yes.

Q    If I can't prove that to you beyond a reasonable doubt, then your answer is no.  Okay?  If I do prove that to you beyond a reasonable doubt, then your answer must be yes.  But you're not finished yet.  You've got another question to answer now.

We have something in Texas that we call the law of parties.  And Texas law recognizes that oftentimes more than one person commits an offense.  Two or more people commit a crime together, right?

And, so, our law provides for this, that if two or more people are acting together as parties in committing a crime, if they are aiding or encouraging, assisting or directing in the commission of a crime, they could each be held liable for the crime themself.

If my co-counsel, Mr. Hikel, and I decide tonight that we are going to rob the local 7-Eleven, we sit at his kitchen table, we plan it out together.  He brings up on the map the best 7-Eleven to go to.  I go and buy a

gun. He goes and buys the bullets. We get in his car together. He drives us down to the 7-Eleven.

I'm going to be the one who is -- I'm going to be the one who is going to go into the 7-Eleven to commit the robbery. He says, I'm going to sit out here and I'll be the lookout and honk the horn if somebody comes.

I'm getting ready to go in. I say, I forgot my mask. And he says to me -- He hands me the gun. He says, don't worry about it, just kill any witnesses. I go in, I rob the clerk. I kill the clerk.

Have I committed capital murder?

A    Yes.

Q    Okay. The law states that Mr. Hikel might also be found guilty of capital murder. If he actively participated in the offense and if he anticipated somebody would die, then he too can be held guilty for capital murder and he too may have the death penalty as an option.

Okay. Do you understand that? Does that make sense to you?

A    Yes.

Q    That's what that second special issue is asking you to decide.

It's basically asking you, ma'am, the defendant that you've just found guilty, is he the triggerman? Or if he's not the triggerman like I was, is he the person that

actively participated in the offense and anticipated somebody would die?

A        (Nods head).

Q        If you don't believe he was an active participant, if you don't believe that he anticipated somebody would die, you answer that question no.

A        Okay.

Q        If I have proved to you that he was, in fact, the triggerman or an active participant with knowledge, then you answer that question yes.

Does that make sense to you?

A        Yes.

Q        Okay.  If you answer that question no, then we are finished.  Okay.  If you answer one or two no, we are finished with the trial.  The defendant will get that life sentence that he's already got.  Okay.  And that's it.

A        Uh-huh.

Q        If you answer those first two questions yes, then I will submit to you at that point that the defendant is now basically sitting on a death sentence.  Okay?  I proved to you he's guilty of capital murder.  I proved to you that, in addition, he's a future danger and he is also a party to the offense or the triggerman.  He's sitting on a death penalty now.

But your obligation as a juror in a death

penalty case is not over at that point.  Okay?

A    (Nods head).

Q    And I will submit to you, ma'am, what you have, in my opinion, clearly articulated, that a verdict always depends on the facts of the case, doesn't it?

A    (Nods head).

Q    And I am sure that you've heard the expression, let the punishment fit the crime.

A    Yes.

Q    Okay.  And your verdict should always be based on the evidence in the case.  It should always be appropriate, I will tell you, for the facts of the case.

And what will not happen if you're selected on this jury and when this case is all said and done, when you walk out of the courthouse this day, either having returned a sentence of death or having returned a sentence of life, you will not walk out of this courthouse saying, I felt my hands were tied.  There was something about this case or there was something about this defendant that was important to me personally that I will tell you, from my mind personally, I think he should have got a life sentence versus death.

That will not happen because we will always give you that option.  Okay?  We have this special issue number three that we often refer to as the mitigating

circumstances offense or special issue.

Up until this point I have had to prove to you certain things, haven't I?

A    Yes.

Q    First I had to prove he was guilty, then I had to prove to you he was a future danger, and I had to prove to you he was the triggerman or a party.

A    Uh-huh.

Q    Okay.  That was my burden of proof when I proved those things to you.  My burden of proof is over with now. I've proved my case.

When you get to this last special issue, there is no burden of proof for either side.  I don't have to prove anything to you and they don't have to prove anything to you.

A    Okay

Q    Okay.  It's an issue, I will submit to you, that is there not only for the defendant's benefit but for yours also.

And it asks you now, go back again, go back with your fellow jurors and look at everything about the case.  Okay?

A    (Nods head).

Q    And look through it and decide amongst yourselves, and even for yourself independently, if there is something

about that case that moves you to change your death sentence to a life sentence.

And let's read it together here.  It says, do you find, taking into consideration all of the evidence -- So, again, everything that you've seen at this point is at your disposal.  -- including the circumstances of the offense, including the defendant's character, his background, his moral -- personal moral culpability, in looking at all of that, do you find that there is a sufficient mitigating circumstance or circumstances to warrant changing that death sentence to a life sentence?

There is really no definition of mitigating.  I think that you can kind of appreciate what that means.  It's something that lessens maybe your personal moral culpability.  So, they don't define what that is for you because that's up for you to decide what it is.

But keep in mind it does say, is there a sufficient mitigating circumstance.  Not just -- not just one, but is it sufficient?  There could be a hundred mitigating things about a case, about a defendant, but they might never rise to the level of being sufficient.

The circumstances of the offense, his character and background.  If we went back to our example about the dad who killed the drug dealer, you know, you decided he was a -- you may have decided he was a future

danger because he's with dope dealers now, right?

A     Uh-huh.

Q     You may have decided -- Well, you knew he was the actual triggerman, right?  So, he's sitting on a death sentence.

Now you can look at his motivations why he did it, maybe even who he killed, the circumstances in which it happened, that he put the money in the charity box.  That may move you to change that to a life sentence or it may not.  It's entirely up for you to decide.

And here's what's important.  And that's basically the gist of it is it's for you to decide.  So, the question is not -- I could sit here and say, Ms. Hodges, tell me right now today what would be sufficiently mitigating for you to turn a death sentence into a life sentence.  And I could throw some things around with you.  But we are not talking about this case, are we?  And I would be putting you on the spot right now about how you feel about certain things.

I think the more appropriate question is for you, Ms. Hodges, if you found yourself reconsidering all the evidence in the case, in a death penalty case, and you personally believed that there was not only a mitigating circumstance but that it was sufficiently mitigating to turn a death sentence into a life sentence, would you do it?

A    Yes.

Q    Okay.  We had asked you some questions in the survey here about intoxication.  We had asked you some things about upbringing and circumstances of birth and genetics.  And you know, we were just trying to feel you out there.  But those are some examples of some things that you could consider in a case and decide if it was mitigating.

Some people, some people may say, well, if the person wasn't intoxicated on alcohol or drugs, maybe they would never have done it.  You know, that's mitigating to me.  Others might say, you're the one who made the choice to drink.  That doesn't amount to a hill of beans to me.

A    (Nods head).

Q    Some people might say, well, he had a really poor childhood.  Other people might say, I had it worse.  People have had it worse and not done that bad.

So, you don't have to be unanimous on what is mitigating.  You must merely all be unanimous that there is no mitigating evidence, okay, in order for there to be a verdict of death.  But it's up to the individual to decide. Okay?

Any questions about anything I've covered with you here?

A    Just one question.

Q    Sure.

A    That is why additional evidence is allowed during the penalty phase but not during the trial, just curious.

Q    During a criminal case, in the first part of a criminal trial you're called upon to decide one question. Is the defendant guilty of this particular offense that he's on trial for?  And I'll give you an example, and this is not related to the case we're in right now.  Okay?  This is just a hypothetical to illustrate a point.

There may, in fact, be a neighborhood thief. There may be a guy who's got ten theft convictions.  Okay. And then all of a sudden a shop owner, something is missing from the shop and everybody shows up and says, well, it must be Larry the local thief.  He's been convicted ten times before, so he must be guilty now.

A    Okay.

Q    You know, well, if you went to trial with that proposition of I'm going to show how Larry committed theft ten times before, people might say, well, then he must have done it now.

A    Okay.

Q    Well, they are trying him really for his past and not for what he's on trial for now.

So, the law makes determina -- and that's just one example.

A    Okay.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    But the law wants you to focus on just one question right now.  Is he guilty of this crime that he's been charged with?

A    Okay.

Q    And whether or not there is -- You might hear things that might tug at you or you might feel are mitigating, but the appropriate place for that is not in guilt/innocence.  The dad who killed the drug dealer, I'd feel bad convicting him.  I'm gonna tell you, that would be a hard pill to swallow.  He's guilty, though, isn't he?

A    Uh-huh.

Q    My feelings, my mitigation for him might be held more appropriately, or definitely are, in the punishment phase of the trial.

A    Okay.

Q    Does that make sense?

A    Yes.

Q    Are you sure?

A    Yes.

Q    Okay.  Okay.  Any other questions about that process, then?

A    No.

Q    Okay.  Okay.  I know I've done a lot of talking, ma'am.  But I'm just going to trust that you understand.  If you don't, you'll tell us.

Any laws that I've told you that you have a problem with that you believe you cannot follow?

A    No.

Q    Will you always hold me to my burden of proof to prove to you, first of all, that he's guilty of capital murder?

A    Yes.

Q    And with respect to these special issues, ma'am, particularly number one and number two, do you understand that I have to prove to you those answers are yes before you can answer them yes?

A    Yes.

Q    In other words, just because somebody's found guilty of capital murder doesn't automatically mean they are going to be a future danger, does it?

A    No.

Q    You only answer that question only if and until I can prove it to you beyond a reasonable doubt.

And you also understand, ma'am, that going into special issue number three, that it's incumbent upon you to consider all the evidence.

A    (Nods head).

Q    What weight you give it is entirely up to you. But will you consider all the evidence?

A    Yes.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    And after careful consideration, will you then make your determination as to whether or not there is or is not a sufficient mitigating circumstance?

A    Yes.

Q    And if there is, you'll say yes.

A    (Nods head).

Q    And if there isn't, you'll say no.

A    (Nods head).

Q    Okay.  Okay.  Well, I appreciate you letting me lecture at you for forty-five minutes.

A    I learned a lot.

Q    If you've got no more questions for me, then?

A    I do not.

Q    All right.  Then thank you, ma'am.  I'm going to let the defense talk to you.  Appreciate it.

THE COURT:  Thank you, Ms. Handley.

Do you need a short five minute break before --

PROSPECTIVE JUROR HODGES:  Please.

THE COURT:  All right.  We'll take a five minute break, Barney.

(After a recess, defendant and Prospective Juror Hodges present in open court).

THE COURT:  Here you go, Ms. Hodges.  Watch that step.  Barney will help you there.

PROSPECTIVE JUROR HODGES:  I'm good.

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT:  Thanks again.  I want to reintroduce to you at this time Doug Parks who is going to talk to you on behalf of Mr. Broadnax.

EXAMINATION

BY MR. PARKS:

Q    How are you doing, Ms. Hodges?

A    Fine, thank you.

Q    Good.  Ms. Hodges, I'm going to take probably about the same amount of time that Ms. Handley did.  I'm going to talk to you about the same sorts of things that she did.  I just want to make sure that we are all on the same page.

Do you feel like you understand the law as it was explained to you by Ms. Handley?

A    Yes.

Q    Okay.  No need for me to go back over all of that with any real detail; is that fair to say?

A    That's fair to say.

Q    Okay.  If I feel like there is some issue that I want to make for sure you understand, then I'll talk to you about it.

A    Okay.

Q    But if you feel pretty comfortable, I may go kind of fast on some of it.

A    I do.

Q    You've served on a jury before so you understand

how the first phase, the guilt/innocence phase of a trial works.

A    (Nods head).

Q    Do you presume Mr. Broadnax to be innocent where he sits here this afternoon?

A    Yes.

Q    Okay.  You understand that it's the State's burden to prove the case that they have alleged in their indictment, if they can, beyond a reasonable doubt.

A    Yes.

Q    And are you able to hold them to that burden?

A    Yes.

Q    Okay.  Do you feel like you understand the burden of proof, quantum of proof, that is they must prove beyond a reasonable doubt?

We don't define beyond a reasonable doubt.  There was a time when we did.  And it may be that you served on a jury when we did, but I doubt it.

A    (Shakes head).

Q    I think that had changed -- I have been doing this for over thirty years.  And when I first started practicing, we didn't have a definition, then we did have a definition, and now we are back to not having a definition again.  So, I guess all things old or new again, or whatever the song says.

But at any rate, basically jurors are free to

make their own determination what beyond a reasonable doubt is so long as it is something that would comply with what the judge, I anticipate, will instruct you, and that is this.

That the State of Texas is not bound to prove their case beyond all possible doubt, but they are bound to prove it beyond all reasonable doubt. So that the law recognizes that some things are possible that are not reasonable.

I like to use the example, if I buy a lottery ticket, it's possible I'll win, but it's sure not reasonable for me to go buy something in anticipation of winning the lottery. Nobody would agree that that's reasonable.

A    Uh-huh.

Q    So, you see that it's an extremely high burden that the law places on the State.

A    (Nods head).

Q    And that burden is placed on the State not just in the guilt/innocence stage of the trial but in the punishment phase of the trial for all special issues except special issue number three.

So, again, just like the indictment must be proven to the jurors exactly as it's set out -- You remember Ms. Handley gave you that example about stabbing rather than shooting?

A    Yes.

Q    And a juror would be absolutely obligated to find a person not guilty, even if they knew for a fact that this person had killed another intentionally without any legal excuse or justification, simply because the State had not proven what the law required.

A    Yes.

Q    The same is true, Ms. Hodges, with respect to special issues number one and two.  There is absolutely no difference there.  Okay?

A    Yes.

Q    And just like a juror is not permitted to change what that indictment says to fit the verdict that they want --

A    Uh-huh.

Q    -- they are not permitted to change what these special issues require of the State.  Special issues are what they are, and they are not to be interpreted in a way that will justify some particular result.  Does that make sense to you?

A    Yes.

Q    It's exactly the same thing as the example that Ms. Handley gave you.  You know, the defendant may have taken the stand and said, yes, I stabbed that guy fourteen times because I wanted to kill him.  I'm glad I did it, and I would do it again if I had the chance.  And they allege shooting, not guilty.

The same is true with special issue number one. If they don't prove what the law requires them to prove, then the answer to that question is no regardless of whether or not a juror might want a different result from the life penalty. Does that make sense to you?

A    Yes.

Q    We will talk about that a little bit more as we go through. I want to caution you, Ms. Hodges, that just because I'm going to spend a good deal of time talking about these special issues, I don't want you to take that as any indication that we are conceding that this jury is going to find Mr. Broadnax guilty of capital murder.

At this point in time we have no other opportunity to talk to you about these issues, so we have got to do it now if we are ever to do it. But please don't, you know, have in the back of your mind, well, the lawyer spent thirty minutes talking about the punishment, they must expect we are going to get there.

A    Okay.

Q    You with me?

A    Yes.

Q    I want to talk to you a little bit about your questionnaire and how some of the things that you've said in your questionnaire may or may not relate to some of these issues that we're talking about.

We give people the questionnaires so that we can firstly learn a little something about them without having to sit here in open court and ask them all of these questions and fill them out as we go.  But we also want to try to find out how a person really feels about these issues from a philosophical standpoint.

And it really doesn't have anything to do with whether you would change your answers if you knew the law.  And I suspect that people have come to their long-held opinions over time, and just having the law explained to them or having a lawyer talk to them, then they will likely change their opinions one way or the other.  They are what they are. Does that make sense to you?

A    Yes.

Q    Now, I want to talk to you about those are yours, you're entitled to them the same as everybody who comes down here is entitled to their opinions.  And we have opinions all over the map, Ms. Hodges.

We have people who come down and say to us that they would never assess the death penalty, it didn't make any difference to them what the defendant had done or how the defendant had led his life, that it just was not in their view something that people ought to do.  We don't give life, we ought not to take life away.  And they are entitled to that feeling and that opinion just the same as everyone

**Anne B. Meredith**
Certified Shorthand Reporter

else is.

And I know from looking at your questionnaire, at least it appears to me that you have pretty strong opinions about these issues. You tell us on the front page of your questionnaire that you believe that if someone willfully takes another person's life, then the death penalty is appropriate for that person.

Would I be correct in assuming that you still feel that way?

A     Yes, sir.

Q     Okay. And you know -- And you use the word willfully. We don't use willfully that often in legal terms. It is from time to time. But we use intentionally just like Ms. Handley explained to you.

We have, in fact, four what we call culpable mental states in the State of Texas. And almost every criminal offense of any kind has to have some kind of a culpable mental state, not exactly every one but almost every one. DWI, for instance, is one that does not. Okay?

A     (Nods head).

Q     But nearly every other offense has got to either be done intentionally or knowingly or recklessly or with criminal negligence.

A     (Nods head).

Q     And the differences in those dictate where along

the scale of punishment, generally speaking, these offenses fall. Our law says that a person acts intentionally when it is his conscious objective or desire to cause the result.

That's just a legalese for saying pretty much exactly what Ms. Handley told you earlier. It's a situation where a person chooses, makes a decision to take another human being's life without legal excuse or legal justification, does it because he wants to and does whatever it takes to accomplish that goal. Okay?

A    (Nods head).

Q    That's what he set out to do. That's different from knowingly. And again the example sometimes used to distinguish those two is if you hypothetically could imagine a person going in let's say the 7-Eleven store with the intention of robbing it, demands the money, has a gun, gets the money and then bam, bam, bam, shoots the clerk dead right behind the counter and leaves.

As opposed to a situation where the same robber goes in, has a gun, demands the money, gets the money and says to the clerk, don't come around that counter and follow me out of here because I don't want you seeing where I go. And as he gets to the door, he sees the clerk doing exactly what he told him not to. He comes around the counter and he is going to look to see where he goes. So to prevent him from doing that, he shoots him in the leg.

He does an act clearly dangerous to human life, shoots another person with a deadly weapon, a firearm. But he does so not to kill him; he does so to keep him from following him out.

Now, in that example, assume that the person -- the bullet hit the femoral artery and the clerk bled to death before anybody could come and help him. The result is the same. He's dead either way. The defendant has killed him either way.

But the law sees a distinction between him setting that as his goal -- Oh, and it's not an accident as the law defines an accident. It is knowingly done. He does an act clearly dangerous to human life that causes death. He's guilty of murder, no question about it. Okay? But he wouldn't be guilty of capital murder in that circumstance because, in capital murder, the law requires the State to prove it was an intentional act.

You with me?

A      Yes.

Q      Okay. So, that's what they have got to prove. All right?

Sometimes that -- You know, we tell jurors, it's hard for us to -- We can't talk about the facts of the case that we are talking about. So, all cases are different. I don't know what the theory was in the murder case that you

were a juror on.

But in one circumstance it might be an issue of identity where they are trying to determine have they got the right person.

In another case it might be an issue of say self-defense.  We know the defendant killed a person, but were the circumstances such that he was justified in doing it?

Or it might be a situation where the mental capacity of the defendant is at issue and the jury's got to determine whether he even knew the difference between right and wrong.

In other another case it might be that culpable mental state because the law allows either side to introduce evidence to the jury as to the condition of the defendant's mind at the time he committed the offense.  Not necessarily was he criminally insane, but was the condition of his mind, for whatever reason, such that he may not have been able to actually form the intent that the law requires? So that the jury would have to make a determination whether it was intentional, knowing, reckless, or negligent, or none of the above.

You with me?

A     Uh-huh.

Q     So, you've got to be able to keep an open mind

throughout the course of the first part of the trial and not just not come into the trial with your mind made up what's going to happen but not make your mind up until you've heard all of the evidence and the law has been given to you and you can go back and deliberate your verdict, as you did in the other case.

Don't jump to any conclusions until you've heard everything. Does that make sense to you?

A    Yes.

Q    Okay. Do you feel like that you would be able to be such a person?

A    Yes.

Q    Okay. Now, Ms. Hodges, I then want to move on into these special issues a little bit and talk to you about the context of those questions, what they are intended by the law to be and to do. Okay?

A    (Nods head).

Q    Let me ask you this. Let's say hypothetically that you're on a capital murder jury and you have heard all of the evidence in the guilt/innocence phase of the trial, and you and eleven others, twelve of you have returned a verdict of guilty of capital murder and now you're going to be faced with the punishment issues.

What do you know about the defendant at that point in time?

A    I know whether or not the State in my mind has proved beyond a reasonable doubt that he committed those crimes.

Q    Yeah.  And that's something of a little bit of a trick question.  I don't mean for it to be.  But very often I'll have a juror say, I don't know anything about him. Well, yeah, you do.

You know, whatever else you may know about him, you know he's an intentional murderer, that he killed somebody because he wanted to, and did that in order to take possession of his property.  So, you know at least that, right?

A    Right.

Q    Okay.  Now, here is a person who would be -- for whom the death penalty would be appropriate if I understand what you are telling us here in your questionnaire.  Is that a fair assumption for me to make?

A    Yes.

Q    Okay.  Now, you understand, Ms. Hodges, that that question is always asked about capital murderers and no one else.

A    (Nods head).

Q    The law presumes that the answer to that question is no and that the State has a burden to prove that particular person on trial would be what we in shorthand

call a continuing danger before a jury would be justified in answering that question yes.  Okay?

A    (Nods head).

Q    Now, we have some jurors who tell us that, regardless of their feelings about it, that they could set aside their own personal feelings about whether or not an intentional murderer deserves the death penalty and force the State to answer that -- to prove that answer should be yes, that they can presume it to be no.

We have jurors who feel so strongly about that that they tell us, quite honestly, that they could be as fair as fair can be in the guilt/innocence phase of the trial.  If the State doesn't prove the defendant guilty, they will say he's not guilty.

But once they have been proven to be a capital murderer, that is the defendant, that that proof and that proof alone would always show them that this is a person who would probably commit acts of violence in the future that would constitute a continuing danger to society.  So that, in effect, the answer to that question would automatically be yes for them once guilt had been proven.

How do you feel about that?

A    I got a little bit lost.

Q    Okay.

A    But I know what you're trying to ask me.

Q    And I am not trying to hide the ball from you.

A    No, I know you're not.  But just put it now in a question, because I was listening to what you were saying, I just got wrapped up in it.

Q    Got lost in it.

A    Uh-huh.  Just give me the question.

Q    What I'm saying is is that -- Well, let me put it this way.  The law says that a juror is not prohibited from answering special issue number one yes based solely on the facts of the case that convinced them that the defendant was guilty.  Okay?

A    Uh-huh.  I think, after listening to the evidence, again I would have to use my interpretation.  But I think I could decide whether or not I think they would or would not commit future acts of violence.

Q    Okay.

A    I mean I wouldn't come into it saying, absolutely not, because he's been convicted of this crime, then I know for a fact he's going to commit criminal acts of violence. I don't believe that.

Q    That's what I'm trying to determine --

A    Okay.

Q    -- is, does that question have meaning for you aside from having found him guilty?  To you, is that a different question --

A    Yes.

Q    -- that you're being called upon to answer?

A    Yes.

Q    And could very well perhaps require different evidence from just the evidence that showed he was guilty?

A    Yes.

Q    Okay.  That's what I'm trying to determine, Ms. Hodges.  You know, we obviously have got to be very careful of folks getting on the jury who, once they find a person guilty, game over.

A    Exactly.

Q    You see what I'm saying?

A    Yes, I do.

Q    And I know that your feelings are very strong about this.  So what I'm really asking you I guess is, is that can you set aside your feelings that an intentional murderer ought to get the death penalty --

A    Yes.

Q    -- and answer the questions based upon what the law requires?

A    Yes.  Yes.

Q    Okay, fair enough.  Now, I'm going to suggest to you -- Well, let me ask it this way.  You know, the prosecutor talked to you about people all being mingled together in the penitentiary and that murderers and theives and drug addicts

and all sorts of people are in the penitentiary together.

And that's true. We have a hundred, I believe 112 penitentiaries in the State of Texas. We have 155,000 inmates locked up at any given time presently, and that keeps inching up over time.

So, obviously it's a big -- You know, we are not talking about some little old country town jail. And I don't want you to get the impression, if you have gotten the impression from the State's voir dire, that people are just thrown willy-nilly into the penitentiary and everybody mingles there together and that the visitors walk in when they want to and the prisoners wander around the penitentiary at will and that, you know, it's just a free for all.

You know, I can tell you that in any individual penitentiary the professional people down there classify, to the very best of their ability, and allocate people out to various levels of confinement and restraint.

You'll have prisoners who live in a dormitory type setting where it's a great huge room and they each have a little, about waist high, cubicle, but it's an open area. You can see all the way across it.

You have other inmates who are housed in two person cells in a pod around the common room that might have maybe twelve or fourteen or eighteen prisoners who share the common room.

And you might have a person who is classified into a situation that requires them to be in a single cell and out only one hour a day --

A    Uh-huh.

Q    -- in that close confinement.

So, there are people down there who run the penitentiary. Okay. Do you think that any of those things would be a consideration to you when you look at the proper answer to that question?

A    Yes.

Q    Because, you see, the reality of it is that, as our Court of Criminal Appeals has said, the purpose of special issue number one is to try, as best we can, to identify those few incorrigibles who cannot even be incarcerated without further fear of violent outbursts.

And we cannot, a juror cannot presume that a capital murderer would be a future danger simply because they are a capital murderer or that special issue would be meaningless.

A    I agree.

Q    And to speculate that one type of prisoner, for instance, if you take the example used by the State of the person who was convicted of some nonviolent offense and went down there for ten years, we can't assume that that person would be any less dangerous in the penitentiary than a

person who was convicted of capital murder. To do that would be just to speculate without evidence.

Does that make sense to you?

A    Yes.

Q    Because I can tell you, Ms. Hodges, without I hope fear of contradiction, there are a lot of people in general population in our penitentiaries guilty of murder and capital murder every day in every penitentiary.

So, what the law is looking to do is asking the jurors to set aside any personal predisposition that they might have and make their judgment based on what the State proves to them about the individual on trial.

And it is, I'll tell you, absolutely unconstitutional, Ms. Hodges, for a jury in a capital murder case in which the State seeks death to make their life or death decision based solely on the facts of the case. This business about let the punishment fit the crime, taken literally, is unconstitutional. You are required as a juror to consider not only the offense that was committed but the person on trial. And you must consider all of that, not just what happened at the offense.

Does that make sense to you?

A    Yes.

Q    Okay. Now, I'm worried and concerned about one thing, Ms. Hodges, and I want to talk to you about it. You

tell me.

A    Okay.

Q    You say that you believe that capital murder would be, or a potential for the death penalty would be appropriate where a person -- DWI that resulted in death.

A    Yes.

Q    Tell me about that.  You see where that would be an offense that a person really didn't want to kill anybody. They did it.

A    Right.

Q    Tell me about that a little bit.  Why are you --

A    I think it probably has to do with the fact that there is a history of alcoholism on my father's side of the family, and also for twenty years I was married to an alcoholic who is now deceased.  I do not drink at all and haven't for years.

And it truthfully has nothing to do with that.  I just kind of developed an allergy to alcohol when I was about thirty, and every time I would drink I would get a headache, so I just quit.

Q    Well, good.

A    It was easier to quit.  So I do -- but I do -- I think it's just been my exposure to people who have been alcoholics.  You know, I think they do owe it to themselves and society to seek rehabilitation.  I know it's hard.

**Anne B. Meredith**
Certified Shorthand Reporter

Again, I was married to one.

Q    Sure.

A    So I know it's very, very difficult.  But he was rehabilitated, so I know it can be done, so.

Q    Sure.  Sure.

A    I think that's where I come from on that, just kind of a personal history there more than anything else.

Q    Well, I had an idea that that might be the case. And here is, you know, what I'm really kind of I guess trying to do, and I think we are getting -- we are pretty much on the same page.  On page four of your questionnaire you indicate to us that convicted murder should result in the death penalty.

A    Uh-huh.

Q    That's about -- You see the number seven right there in the middle of the page?

A    Yes.

Q    It's that answer right above that where we ask you about the facts of the case themselves.

A    Uh-huh.

Q    I don't particularly care for that question because it kind of suggests that the jurors can do what I frankly believe the law does not allow them to do.

A    Well, and I think even in answering the question, but yet in seeing these three different -- especially the

special issue three, which I had absolutely no idea it even existed in a capital case.

Q    Sure.

A    I mean, I really do honestly think I could be very open and honest with my answers, even though I've stated very clearly, you know, what I do feel.  But that doesn't mean I think I wouldn't come into it with an open mind.  And I would tell you if I am so biased and dadadada, I would tell you that.

Q    I believe you would.  I don't get the sense, Ms. Hodges, at all that you're trying to --

A    (Shakes head).

Q    -- hide the ball in any way.

A    No.

Q    And I can honestly tell you, Ms. Hodges, that I don't -- I'm not afraid of a juror who has pretty strong opinions, as long as I'm satisfied that that is a person who has the kind of mental discipline --

A    Uh-huh.

Q    -- to say, this isn't about me and my feelings, and it's not about me going and explaining to my neighbors how it happened that I didn't vote for the death penalty --

A    Right.

Q    -- in the case.

A    Right.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    This is about me following my oath to follow the law and doing that.  And that's really what this is --

A    Uh-huh.

Q    -- mainly about.  And I appreciate that you're being candid with us about this.

Special issue number one, I'll go a little bit more about that, and then we will go and talk about special issue number three.

The thing that I want to say about special issue number one and reiterate, Ms. Hodges, is that the jury really cannot properly change what's being asked.  And I want to make sure that you understand why the law gives us the right to use hypothetical situations to try to illustrate points.  Jurors should not take away from these hypotheticals a misunderstanding of what the law is.

The law is that special issue number one is presumed to be no.  The law is satisfied with a no answer to that question and the law is always satisfied with a life penalty.

We don't set out, the legislature doesn't set out, no one sets out to give the death penalty.  Okay.  It is intended to be a punishment of absolute last resort.  The law presumes that all capital murderers are not going to be future dangers.  Does that make sense to you?

A    Yes.

Q    And it doesn't make exceptions.  It's not a situation where a juror goes into the punishment phase with the attitude, well, the law says that I must not automatically answer that yes.

What the law says is you automatically answer it no --

A    Uh-huh.

Q    -- unless the State proves what they are required to prove.  And it's not there to identify any particular sort of person as not being dangerous, because when you do that, it switches the presumption.

When you talk about examples of where a person might not be a future danger, the implication is that everyone else would be and only the vigilante killer of drug dealers would have that question answered no about them.  Well, that's not so.

A    Uh-huh.

Q    You know, that's kind of a fairy tale example not intended, I hope, I think not intended to suggest to you --

A    Right.

Q    -- that that was there to identify those few people who wouldn't be a future danger with the assumption that everybody else would be.

The assumption in law is is that everybody else wouldn't be, and we are only looking for that person

**Anne B. Meredith**
Certified Shorthand Reporter

among the few incorrigibles who would be.

Does all of that make sense to you?

A    Yes.

Q    So, the bottom line with that is this.  That if a juror gets back in the jury room and somebody starts saying, you know what, these are just awful things.  This is the worst thing I believe I've ever heard in my life.  I think the defendant deserves the death penalty.

You see, nowhere do we ask that question because that's a subjective thing, what a person does and doesn't deserve.  And that's an objective answer.  Just like guilt/innocence is an objective determination, special issue number one is an objective determination.

And I would hope that if you serve on the jury and any member of the jury begins to talk about, well, you know, it would be justice -- You mention in your questionnaire, many people do, that it might help -- you don't say closure exactly.

But, you know, as hard as this may sound coming from someone, this isn't really about doing what the family of the victim wants us to do.  There is no murder case in which --

A    Right.

Q    -- there is a good outcome.  And you know that from your own, from your own service.  But we don't let our

feelings for the family, those sorts of things, enter into whether the person is guilty or not guilty nor enter into these special issues.  Does that make --

A    Yes.

Q    -- sense to you?

I fear sometimes, Ms. Hodges, that jurors change the words in that first special issue and change would to could.  You know, is there a probability the defendant could commit acts of violence?  Well, of course, anybody could do anything.  We here in this courtroom could do what that's about, not likely to, but you know.

So, you can't allow the wording to be changed. You must hold the State to what the legislature intended for them to have to prove.  Does that make -- Do you feel like you could do that?

A    Yes.

Q    All right.  I'm not going to talk about special issue number two, Ms. Hodges, frankly.  We don't always see that special issue when it comes down to it.  One and three are always given.  Two is only given if the judge decides, after hearing the evidence, that it's been raised by some amount of the evidence.  So, I generally don't take my time with that.

Special issue number three, as we've told you, is totally different from the other.  This is more

**Anne B. Meredith**
Certified Shorthand Reporter

subjective to combination.  And it is, like Ms. Handley said, what is a mitigating circumstance is not defined and might not be the same for all jurors.  Whether or not a mitigating circumstance is sufficient to justify the life penalty is up to each individual juror.

What I do want to make sure jurors understand is this.  Because it seems like sometimes we talk as if, if the defendant is given a life penalty, that that's no penalty at all.  And I want to make sure that jurors understand that life without parole is a substantial punishment for a substantial offense.

A    Yes.

Q    Would you agree with me about that?

A    I agree.

Q    It's not likely that they are going to walk out the back door and beat us all home.

A    Right.

Q    They are going to die in the penitentiary.

A    Yes.

Q    The only real difference between life without parole and the death penalty is, with life without parole, we don't know when or under what circumstances.

A    Right.

Q    So, what this does is give jurors an opportunity to look at everything again to see whether or not, in their

judgment, in their own personal moral judgment -- And that is what our law, the cases tell us. That each individual juror has a responsibily to reach his or her own personal moral judgment about whether or not there is sufficient mitigating evidence to spare the life and impose the life penalty.

So, I do think it's appropriate. I disagree, I guess, with Ms. Handley a little bit about this. I think it is appropriate for us to talk to jurors about what their opinions are about some things because it's important for us to know as much as we can about individual jurors.

And one of the things that we tackle here in the questionnaire is the issue of voluntary intoxication. I know that you have some pretty strong feelings about it.

A    Voluntary what?

Q    Intoxication.

A    Oh.

Q    Over on page five we tell you at the bottom of the page that voluntary intoxication is not a defense. And that's absolutely true, it is not.

A    Right.

Q    At the top of page six we tell you that it may be considered in mitigation of punishment if a juror wishes to do that. Some jurors say yes, to them, that would be a mitigating circumstance.

Other jurors tell us no, that whatever else might or might not be mitigating, that voluntary intoxication, whether drugs or alcohol, would not be something they would consider when they answer special issue number three. And I think I understood you to say that that was your position in the matter.

A    Yes, yes.

Q    Okay.  Sometimes we talk to jurors about the youthfulness, if that's appropriate, of a defendant.  What our law says is this.  That any person who is under the age of eighteen cannot be tried for the death penalty.  But if a person is eighteen or older, then they are subject to being exposed to the death penalty for capital murder.

Sometimes jurors say that if a particular defendant was in the lower range of that, eighteen, nineteen, twenty years old, whenever the offense was committed, if it was, that that would be a consideration for them in answering special issue number three.

Other jurors do not feel that way.  They feel like if they are eighteen, it's the same as if they were thirty or fifty, or whatever else.

How do you feel about that issue?

A    If you're talking about the -- Are you talking about the DWI again or no?  Are you talking about just in general?

Q    No, I'm talking about just in general about mitigation, whether or not that would be a consideration for you.  Would that be something you would consider?

A    I think I would consider it, yes.

Q    Okay, fair enough.

We talk about, on page eight of your questionnaire, genetics and circumstances of birth and upbringing.  And you indicate that you believe that that would -- those kind of things, to a small degree, would be considered.

Can you expound on that for us a little bit, Ms. Hodges, to give us a little better idea of how you feel about that?

A    I think all of those things that were listed, your circumstances, your upbringing, all of those things, and genetics, are potentially mitigating factors.

I think, you know, again it just depends on where you were brought up, how you were brought up, what kind of home you were brought up in, single parent, your exposure to society, your education, your background.  I think those are mitigating circumstances that I would take into consideration.

Q    Fair enough.  And you understand -- I want to make sure you understand the context of where we are.  By the time you get to special issue number three, you would have

already decided the defendant was guilty, answered special issue number one yes.

A    Yes.

Q    So, we're considering answering this about a capital murderer that you believe is probably going to commit acts of violence in the future.

Some jurors say that, knowing that, regardless, that they would consider all of these things but that they would never rise to a level that would cause them to impose the life penalty rather than the death penalty.

Other jurors tell us that, even though they have made those other determinations, they have not foreclosed the opportunity to reach their own personal moral judgment about the matter.  And if they feel that it's appropriate, they could do that, give the life penalty, even for a dangerous capital murderer.  Could you do that?

A    Yes.

Q    Okay.  So, we're not -- If you are sitting on the jury, we are not talking to the wall when we talk to you about those things.

A    No.

Q    You're going to have an open mind --

A    Yes.

Q    -- in considering all of those things.

A    Yes.

Q    And keeping in mind that we are talking about life without parole --

A    Yes.

Q    -- as opposed to actual execution.

I've got about two minutes, Ms. Hodges.  I just want to cover -- I've talked to you about a jury's responsibility, and it is a heavy, heavy responsibility and power we give you.  Because I can tell you that if you sit on one of these juries, no person in the State of Texas can be executed unless all twelve jurors say so.

A    Okay.

Q    If one juror says no, my personal moral judgment is life, then life it is.

A    Okay.

Q    So, we give you that power and that responsibility as a juror, and I think it's appropriate because we are asking people to do probably one of the hardest things perhaps we would ever ask of a juror other than maybe to serve in combat.

A    Yes.

Q    Along with that you have certain rights, as do all of the members of the jury.  You have a right to your own personal moral judgment in the matter, as do all the other members of the jury.

**Anne B. Meredith**
Certified Shorthand Reporter

You do not have an obligation to articulate. If you come to your personal moral judgment that life is the appropriate penalty, you don't have to justify that to us, to the judge, or to any member of the jury, any more than they would have -- that you would have a right to demand that they explain their personal moral judgment. You don't even have to articulate what it is.

You can discuss it. You can defend it if you want to. You can debate it if you want to. But you don't have to. I suggest to you that when you go back to deliberate your verdict, if you have given careful consideration to the evidence that you've heard, the law that the judge has given you, and made a determination, that is your right to do if it didn't take you two minutes to do it.

A    Okay.

Q    You see what I'm saying?

A    Yes.

Q    And the same for anybody else on your jury.

Do you feel like you would be up to all of these responsibilities and rights and be able to serve?

A    Yes, I do.

Q    And be fair to both sides in this case?

A    Yes, I do.

Q    Thank you, Ms. Hodges.

THE COURT:  We thank you, Mr. Parks.

Ms. Hodges, you're going to step out for a minute. Watch that first step as you go down. Then you'll be coming right back in.

PROSPECTIVE JUROR HODGES:  Okay.

(Prospective Juror Hodges exits the courtroom).

THE COURT:  In the presence of Mr. Broadnax, what says the State of Texas?

MS. HANDLEY:  We have no challenges.

THE COURT:  Mr. Broadnax.

MR. PARKS:  No challenges, your Honor.

THE COURT:  All right.

(Prospective Juror Hodges returns to the courtroom).

THE COURT:  Please be seated, Ms. Hodges.

Ms. Hodges, you've certainly been accepted as a qualified juror by these fine attorneys.

I'm going to ask you to do a couple of things for me and then I'm going to give you a little information. First I want to make sure that the telephone numbers on your questionnaire are still current.

PROSPECTIVE JUROR HODGES:  Yes.

THE COURT:  All right.  In case anything should occur in your personal life between now and the date that the jury is selected, the sheriff is going to give you the card of the coordinator who asked you to appear today.

*Anne B. Meredith*
Certified Shorthand Reporter

PROSPECTIVE JUROR HODGES:  Okay.

THE COURT:  Give her a call if anything happens that would affect your jury service, and we'll deal with it.

Now, let me tell you this.  The date is becoming closer and closer, sometime next week, we think.  If it doesn't happen next week, don't give up on us.  But we think sometime next week this actual twelve man and woman jury will be selected from that pool of forty-eight to fifty qualified jurors.

Remember you talked to Ms. Handley about that?

PROSPECTIVE JUROR HODGES:  Uh-huh.

THE COURT:  And we are getting close to having our requisite number of qualified jurors, and then we are going to select the actual trial jury.

PROSPECTIVE JUROR HODGES:  Okay.

THE COURT:  You will be contacted, the reason I wanted you to make sure that number is right.  The same person who asked you to appear will call you that day and tell you whether or not you're actually on the jury or not on the jury.

PROSPECTIVE JUROR HODGES:  Okay.

THE COURT:  You're not going to be left hanging on that.

PROSPECTIVE JUROR HODGES:  Okay.

THE COURT:  Here's what I want you to do for me.  I want you to assume that you are going to be on the jury as far as receiving any outside information --

PROSPECTIVE JUROR HODGES:  Okay.

THE COURT:  -- about this case.

PROSPECTIVE JUROR HODGES:  Okay.

THE COURT:  And that's from friends or media or Internet.  It would be a shame if someone like you were inadvertently disqualified because of that.

PROSPECTIVE JUROR HODGES:  Okay.

THE COURT:  Pardon me.  It's been a real pleasure meeting you.  Good luck to you, ma'am.

PROSPECTIVE JUROR HODGES:  Thank you.

THE COURT:  Okay.

MR. LOLLAR:  Thank you, ma'am.

PROSPECTIVE JUROR HODGES:  You're welcome.

(Prospective Juror Hodges excused from the courtroom).

THE COURT:  Court's in recess until 9:00 o'clock.

(Court adjourned for the day).

**Anne B. Meredith**
Certified Shorthand Reporter

THE STATE OF TEXAS    (

COUNTY OF DALLAS      (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 6th day of July, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volumes 33 & 34) is $2,321.50 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 13th day of January, 2010.

_Anne B Meredith_

Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter