ORIGINAL

AP-76207

REPORTER'S RECORD

VOLUME 34 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| THE STATE OF TEXAS | ( | IN THE CRIMINAL DISTRICT |
| VS. | ( | COURT NUMBER SEVEN |
| JAMES GARFIELD BROADNAX | ( | OF DALLAS COUNTY, TEXAS |

* * * * * * * * * * * * * * * * * * * *

INDIVIDUAL VOIR DIRE EXAMINATION

* * * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

On the 7th day of July, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE WEBB BIARD, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

**Anne B. Meredith**
Certified Shorthand Reporter

A P P E A R A N C E S:


HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas  75207-4313
Telephone No. 214 653-3600

BY:  MS. ANDREA HANDLEY, SBOT No. 08898800
     MS. ELAINE EVANS, SBOT No. 24032880
     MR. GORDON HIKEL, SBOT No. 00787696
     Assistant District Attorneys


          APPEARING FOR THE STATE OF TEXAS



     MR. BRADLEY LOLLAR, SBOT No. 12508700
     Attorney at Law
     1700 Commerce, Suite 450
     Dallas, Texas  75201
     Telephone No. 214 384-8178

     MR. DOUGLAS PARKS, SBOT No. 15520000
     Attorney at Law
     321 Calm Waters Lane
     Holly Lake Ranch, Texas  75765
     Telephone No. 903 769-3120

     DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
     133 N. Industrial Blvd., LB 2
     Dallas, Texas  75207-4399
     Telephone No. 214 653-3550

BY:  MS. KERI MALLON, SBOT No. 24049165
     Assistant Public Defender

          APPEARING FOR THE DEFENDANT

**Anne B. Meredith**
Certified Shorthand Reporter

CHRONOLOGICAL INDEX - VOLUME 34

|  |  |  |  | PAGE |
|---|---|---|---|---|
| Proceedings - July 7, 2009 |  |  |  | 5 |
| VENIRE PERSON | COURT | STATE | DEFENSE |  |
| BETTY JACKSON | 7 | 17 | 50 |  |
| State's Challenge |  |  |  | 75 |
| Court's Ruling |  |  |  | 76 |
| DEDRICK MORRISON | 79 | 86 | 132 |  |
| State's Challenge |  |  |  | 163 |
| Court's Ruling |  |  |  | 164 |
| CLARENCE WINFIELD | 168 | 177 | 220 |  |
| Prospective Juror Accepted |  |  |  | 257 |
| Adjournment |  |  |  | 258 |
| Reporter's Certification |  |  |  | 259 |

*Anne B. Meredith*
Certified Shorthand Reporter

ALPHABETICAL INDEX - VOLUME 34

| VENIRE PERSON | COURT | STATE | DEFENSE | PAGE |
|---|---|---|---|---|
| JACKSON, BETTY | 7 | 17 | 50 | |
| State's Challenge | | | | 75 |
| Court's Ruling | | | | 76 |
| | | | | |
| MORRISON, DEDRICK | 79 | 86 | 132 | |
| State's Challenge | | | | 163 |
| Court's Ruling | | | | 164 |
| | | | | |
| WINFIELD, CLARENCE | 168 | 177 | 220 | |
| Prospective Juror Accepted | | | | 257 |

*Anne B. Meredith*
Certified Shorthand Reporter

P R O C E E D I N G S:

(Defendant present).

THE COURT:  Everybody ready?  We are ready, Barney.

(Prospective Juror No. 1391, Betty Jackson, enters the courtroom).

THE COURT:  Good morning, Ms. Jackson.

PROSPECTIVE JUROR JACKSON:  Good morning.

THE COURT:  Thank you very much.  Please be seated, ma'am.

Ms. Jackson, I would like to introduce myself to you.  My name is Webb Biard, and I will be with you this morning during this part of the jury selection process.

If you recall, the Presiding Judge of this Court is Michael Snipes, and that's who you met in the large panel when everybody was here that morning or afternoon.  I don't know which one you appeared.  And should you be selected as a juror in this case, Judge Snipes will preside over the actual trial, for whatever that's worth.  That might make some sense to you.  This is the first time we've met.

PROSPECTIVE JUROR JACKSON:  Yes.

THE COURT:  In that regard, let me give you just a little idea of how we are going to proceed this morning and, so, maybe this will make a little more sense

to you.

We are in the process now of qualifying, qualifying some close to fifty jurors. Once that's done, the actual twelve men and women who will actually try the case will be selected from that group of fifty. So, when you leave here this morning, I will tell you whether or not you are a qualified juror, and you will know that when you leave here.

PROSPECTIVE JUROR JACKSON: Yes.

THE COURT: And then in about, oh, a couple of weeks we will actually select the actual trial jury. And the day that's done you will be notified by that same person who asked you to appear today.

PROSPECTIVE JUROR JACKSON: Yes.

THE COURT: You'll get a phone call and tell you whether you are on the jury or not on the jury. In other words, you're not going to be left wondering, you know, if you're on the jury or not. You're going to get a personal phone call from the judge's personal coordinator. Okay?

PROSPECTIVE JUROR JACKSON: I understand.

THE COURT: Does that make sense to you?

PROSPECTIVE JUROR JACKSON: I understand.

THE COURT: And in that regard, let me introduce some other folks to you at this time.

Andrea Handley.

MS. HANDLEY:  Good morning, ma'am.

THE COURT:  And Gordon Hikel.

MR. HIKEL:  Good morning, ma'am.

PROSPECTIVE JUROR JACKSON:  Good morning.

THE COURT:  They represent Dallas County and the State of Texas.

Further to my right is Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  Doug Parks.

MR. PARKS:  Hi.

THE COURT:  Keri Mallon.

MS. MALLON:  Good morning.

THE COURT:  And they represent Mr. James Broadnax.

PROSPECTIVE JUROR JACKSON:  Good morning.

THE COURT:  And do this for me before we go any further, please, Ms. Jackson.

(Prospective Juror Jackson sworn).

BETTY JACKSON,

having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Ms. Jackson, did you have an opportunity to read that pamphlet?

A    I did.

Q    Did that help you understand this process a little bit better --

A    Yes.

Q    -- than when you got here this morning?

A    Yes.

Q    Good.  Okay.  Now, let me tell you this.  These are outstanding lawyers or they wouldn't be involved in this case, but they are also good people.  It's out of the question that anybody that's going to sit in your chair is going to be mistreated or browbeat or talked down to. That's just not gonna happen.  They are just going to be asking you questions about the law.  And it's their job, it's my job and their job to explain the law to you. You're not expected to know the law.  That's not your job.

A    Right.

Q    It's our job to explain the law to you, Ms. Jackson. And then you'll -- Bottom line question is going to be, once you understand the law, can you follow the law in performing your duties as a juror?

A    Okay.

Q    Does that make sense to you?

A    It makes sense.

Q    And this isn't some legal test where we're trying to find out who knows the most law and then they get on the jury.  That doesn't have anything to do with it.  You can

know all the law in the world and not be a qualified juror.

A      Right.

Q      Because you might not be able to follow the law. To be a qualified juror, you have to be able to follow the law of the State of Texas and the United States. And that's what we are going to be asking you once it's explained to you. Can you follow the law?

A      Right.

Q      Does that make sense and sound fair?

A      It's fair.

Q      Okay. And then you'll either tell us yes, I can or no, I can't. And that will be the determining factor.

Now, from hearing Judge Snipes' remarks, from filling out that questionnaire -- which I have here, by the way, and I am going to hand it to you in just a minute.

A      Uh-huh.

Q      And you'll have this with you during the questioning. -- and from reading the pamphlet and sitting here now as you are in the courtroom, are you aware that this is a capital murder case?

A      I'm aware.

Q      Are you aware the State of Texas is seeking the death penalty?

A      Yes, I am.

Q      Okay. If someone is found guilty in Texas of

capital murder, there's only two possible punishments that person can receive.  One of them is life in prison without parole -- and when I say life in prison without parole, I mean life in prison without parole -- and the other is death.

A    Right.

Q    There was a time when if someone received life in prison, they would become eligible at some date for parole. Didn't mean they would get it, but they would come up for parole.  That's no longer the law.

The law now in Texas is if you're found guilty of capital murder and you're given a life sentence, you will serve life in prison without parole.

A    Right.

Q    Okay.  Now, the range of punishment for murder is not less than five years or more than ninety-nine years or life.  You can't get the death penalty for murder.

A    Yes.

Q    Only capital murder.  So, that means logically there is a difference between murder and capital murder. And the attorneys are going to explain to you that difference.  That's going to be explained to you what capital murder is.

Also, if someone was found guilty of murder and then there was the punishment phase, they would write down on a blank line at the end of the punishment phase

the number of years they thought was the proper sentence. They would just write it down, anywhere between five and ninety-nine or life, and just write it on a blank line, and that would be the sentence.

Another difference between capital murder and murder is, when a jury decides the punishment, should they find the person guilty of capital murder and knowing it's only going to be one of two things, life in prison without parole or death, the jury makes that decision by answering three special issues, three questions.

Do you remember those questions on that pamphlet?

A    This one?

Q    Yes, ma'am.

A    Yes, I do.

Q    Okay.  And the jury is going to be required to answer those special issues, should they be selected as a juror and hear the case and then have heard the evidence in the punishment phase after they have found the person guilty, they are going to be required to answer those special issues yes or no.  Depending on the what?  The evidence.

And however they answer those special issues yes or no determines the punishment.  For example, a yes to one, a yes to two and a no to three is a death sentence.

Any other combination of answers such as a no to one or a no to two or a yes to three is a sentence of life in prison without parole.

One of the attorneys for the State and one of the attorneys for the defendant is going to talk to you for up to forty-five minutes. That's going to be an hour and a half. And they are going to spend a considerable amount of time asking you, should you find someone guilty of capital murder, would you still then be able to listen to the evidence in the punishment phase and then answer those special issues based on the evidence? They are going to spend a lot of time talking to you about that.

Or would you, if you found someone guilty of capital murder, already have it in your mind before you hear any evidence how you're going to answer those special issues?

If you say, I can keep an open mind and just wait and hear the evidence, good chance of being a qualified juror. If you say, I can't, I've already made up my mind what I'm going to do, well, now is your time to tell us. You wouldn't be a qualified juror.

Now, does that make sense to you?

A    Yes.

Q    In other words, if somebody already made up their mind whether a person is guilty or not guilty, they wouldn't

**Anne B. Meredith**
Certified Shorthand Reporter

be a qualified juror.

A    Right.

Q    If they already made up their mind what kind of punishment they are going to vote for, they wouldn't be a qualified juror, just the same concept.  Does that sound reasonable?

A    Reasonable.

Q    Okay.  From reading that pamphlet, did you see that Judge Snipes said he was going to start this trial August the 10th?

A    I saw that.

Q    And it's going to last up to two weeks.

A    Two weeks.

Q    Let me tell you how he runs his court.  He'll go from 9:00 to 5:00 Monday through Friday, be a break in the morning, break in the afternoon, be a lunch break.

The jury wouldn't have to stay together overnight during the trial unless and until, there is a possibility, if they were deliberating their verdict.

Have you ever served on a jury before?

A    Yes, I have.

Q    Criminal jury?

A    Yes.

Q    Did the jury reach a verdict?

A    Yes.

Q    Did the jury set punishment?

A    Yes.

Q    Okay.  You know what deliberation means.

A    Right.

Q    If the jury is deliberating late into the night, became mentally tired, there is a chance you would all be taken to a fine hotel, county expense, have an individual private room, fed, spend the night, come back as a group to avoid any outside influence on your verdict because of the type of case it is.

That could happen.  That's not necessarily going to happen, but it could happen.  I just wanted to tell you about that.

Now, having that information and knowing all you know now and being involved in this process, is there any reason why you think you can't sit as a juror in this case?

A    There is no reason.

Q    Good, good.  Now, one last thing from me.  From serving on that jury, do you realize that all criminal jury trials are in two parts?  And by that I mean the first part is the guilt/innocence phase.

A    Uh-huh.

Q    Where the only issue before you is, is the person guilty beyond a reasonable doubt?

A    Yes.

Q    And then the punishment phase.

A    Right.

Q    And you know, whatever part of the trial you're in, you know that's the part of the trial you're in.

A    Right.

Q    In other words, you're not sitting in the punishment phase unless you've found the person guilty, right?

A    That's correct.

Q    That's exactly the way a capital murder case is tried.

A    Uh-huh.

Q    And just like you had to wait until you found the person guilty to decide what you're going to do in the punishment, that's exactly what it takes to be on a capital murder jury.

A    I understand.

Q    Does that all make sense?

A    Yes.

Q    And you heard other evidence in that punishment phase, correct?

A    That's correct.

Q    That didn't have anything to do with the actual trial.

A    The trial, no.

Q    But you could consider the actual trial, you could consider the facts of that.

A    Right.

Q    And, so, you're ahead of a lot of people, I'll tell you. You don't have to have previously served on a jury, but I think it helps. Okay.

I'm going to hand you your questionnaire.

THE COURT: Anne, if you'll do that.

Q    From time to time -- I'm sorry.

From time to time the attorneys will say, turn to page so and so, paragraph so and so, and they might ask you about one of your answers. That's perfectly normal. They want you to maybe explain a little bit more.

But we appreciate you filling out the questionnaire. I know it -- We know it took time, but it's going to save you more time here today than if they had to go through that whole thing with you. Okay?

A    (Nods head).

Q    Now, you've been going early this morning, I know. We are going to talk to you for about an hour and a half, so if you need to take a break for any reason, water, anything, you let me know and we'll stop. Okay?

A    (Nods head).

Q    Thank you.

THE COURT: And now Andrea Handley is going to talk to you on behalf of Dallas County.

MS. HANDLEY: Thank you, your Honor.

EXAMINATION

BY MS. HANDLEY:

Q    Good morning again, Ms. Jackson. How are you doing today?

A    I can't complain.

Q    Okay. Well, you could but you're not going to, are you?

A    No, I'm not.

Q    Well, that's a good attitude to have.

Well, as the judge stated, my name is Andrea Handley. I'm an assistant district attorney, as is Mr. Gordon Hikel here, and we are in charge of helping to select the jury for this particular case. We have been down here every day bringing down jurors one at a time to talk to them individually on this case in the hopes that we can glean from that twelve people that can ultimately sit on this case.

And what we are looking for are twelve people that, as the judge said, can not only follow the law but twelve people that are right for this particular case. I think that you can appreciate that this is a different kind of case than anything else, isn't it?

A    Yes, it is.

Q    Yeah, we are talking about the death penalty here. And when you came down on April 24th to fill out this questionnaire, you remember there were just hundreds of people with you, weren't there?

A    Yes.

Q    And I will tell you what, we brought even more people that afternoon to fill out questionnaires.  So, we have got I think anywhere from eight hundred to a thousand people that were brought down just for this particular case. And out of all of those people, it's our hopes that we can get twelve people.  Okay?

A    (Nods head).

Q    And let me just ask you, why do you think we had to bring so many people down here?

A    So that people will have an open mind.

Q    So that people will --

A    To make sure, to make sure that you get a proper jury pool to have an open mind.

Q    Sure.

A    For a case like this.

Q    For a case like this.  And I think that that's pretty much what we are talking about is for a case like this.  Because it's not really just, you know, can you follow the law, but it's also are you the right person for this particular case.

And I see you nodding your head and I think you can appreciate that because it's really not the right case for everybody, and there is nothing wrong with it not being the right case for everybody.  You know, you yourself sat on a case involving a child, it sounds like.

A    Right.

Q    Was that physical or sexual abuse of a child?

A    Sexual.

Q    Okay.  And I will tell you from my years of doing this and picking juries, I have had people that -- where I had been picking a jury for a sexual assault of a child case, and some people have said, I'm gonna tell you, I would be a good juror on a murder case, I would be a good juror on a burglary case, maybe even a capital murder case, but I cannot sit on a sexual assault of a child case.  My feelings are going to filter into how I hear the evidence and my feelings are going to determine also how I arrive at my verdict, you know.  And because of my strong feelings about that case, I'm not a good juror for this particular case is what those people said to me.

And we find that time and time again with this particular case because we are talking about the death penalty here.

A    Uh-huh.

Q    And I wouldn't be sitting in front of you today,

Ms. Jackson -- And I will say, anything that I say, anything that the defense says to you, it's really just -- it's our opinions. It's not evidence in the case. And ultimately you will get the law from the judge in the case. Okay?

A    (Nods head).

Q    But -- And I just lost my thought there. Maybe it's too early for me, and I haven't had any coffee here.

But what I was going to say to you is, you know, my opinions are just my opinions at this point. What's important here -- I mean my opinion and their opinion, that and a buck sixty will get you a cup of coffee, okay?

What we need to hear is your opinions today. You haven't been sworn to take any oath at this point. You have not been sworn to follow the law at this point. And I think you understand that. The only oath that you took at this point is to tell us the truth.

A    Right.

Q    Not to follow the law, but just to tell us the truth. And that's what I want to explore with you a little bit about is your personal feelings and your personal experiences, okay? I'm sorry. Just a moment here.

I wouldn't be sitting in front of you today, Ms. Jackson, if I didn't feel that, as a representative of the State, that we had the type and the quality of evidence that is going to convince twelve people beyond a reasonable

doubt that the defendant is guilty of capital murder.  Okay?

And I wouldn't be sitting here in front of you today if I didn't think that we had the type and the quality of evidence that's going to lead twelve people to return a verdict of a sentence of death.  Okay?

A     (Nods head).

Q     And if and when that happens, Ms. Jackson, when a jury returns that verdict and they return the special issues yes, yes and no, at that point the defendant will receive a sentence of death.

And at that point, what's done is done.  The judge has no other option at that point other than to, figuratively and literally speaking, sign a warrant for his execution.  The judge doesn't go, well, let me second guess what the jury's done, or let me -- I disagree with them.

He has no choice other than to do that and sign that warrant for the execution of his death.  The defendant -- And that's the defendant in this case, and I need you to take a look at him.  He's the man seated at the end of the table over there.  He'll be transferred to Huntsville, Texas and a date will be set for his execution. And then he will sit there until that day comes.

And when that day comes, he'll be transferred to a unit that we call -- in Livingston, Texas where they actually do the executions.  A time and a place will be set

for that. And at that designated time, whether he likes it or not, he will be brought into what we refer to as the death chamber.

He will be strapped to a gurney and they will put needles into his arm and they will continue to pump poison into his body until he dies. Okay? That's the reality of the situation. That's the reality of what we are talking about here today.

And the reality of it is, Ms. Jackson, is that we are asking twelve people to take part in that execution, to take part in the death of another human being. Okay?

How do you feel about that, Ms. Jackson?

A     About taking part in that?

Q     Yes, ma'am.

A     Well, I don't have a problem in taking part in the trial or sitting on the jury. But are you asking me how do I feel about the death penalty?

Q     Uh-huh. I'm asking you how you feel because I'm going to ask you about that, too, Ms. Jackson. And again, you know, some people can say, well, I just sat on a jury and I just answered the special issues, you know. But the fact of the matter is you are an intricate, instrumental part in the death of another human being.

A     (Nods head).

Q     It won't happen without a jury's participation.

A    Right.

Q    You know, and I think some people can say, well, you know, it's not my fault or I just answered the questions and I am not the one who threw the switch. But the fact of the matter is the jurors are a part of that and they are a part of killing another human being.

A    Uh-huh.

Q    And I need to just know from you truthfully how you feel about taking part in something like that. That if you think that -- Do you believe that you're the right person for that kind of deal?

A    Yes, I believe I am.

Q    Okay. Now, you stated on your questionnaire there -- and that's on the first page there.

A    Uh-huh.

Q    We asked you, are you in favor of the death penalty, and you stated no.

A    Uh-huh.

Q    And then you stated again that you do not believe in the death penalty. You do not believe that the death penalty ever ought to be invoked. So, tell me about that. Tell me about your feelings on that.

A    I think life in prison without the possibility of parole is a worse sentence. That's my opinion.

Q    Right.

A    I believe -- I look at it like Ground Hog's Day. I think if you're in prison for the rest of your life, you're waking up to the same thing every day, and that's got to be -- that's got to be horrible.

Q    Uh-huh.

A    More horrible than death, to know that you're in a place where you'll never, never, never escape from.

Q    So, are your motivations then that you want to give the defendant the worst possible punishment?

A    I think I want to give the person the punishment I think is deserving for the crime.

Q    Uh-huh.

A    And I think life in prison without the possibility of ever getting out, I think, is -- I think that's terrible. I think that's a very, very -- I think that's worse than death.

Q    Okay.  Do you always think that or do you believe then that life in prison without parole --

A    Uh-huh.

Q    -- so that person has to wake up every day --

A    Right.

Q    -- that that's always the better choice than the death penalty?

A    To me.  Unless -- Now, I think I later said in here, too, that if it's a case where children are involved,

the sexual assault of a child, the sexual assault of a child and then murder, then I would consider the death penalty.

Q    Then you would consider the death penalty.

A    Yeah.

Q    I see where you're going.  And that is a -- I think that's a -- when it comes to kids, yeah, I get where you're coming from there.  I get where you're coming from.

So, if I'm understanding you, and I certainly appreciate what you're saying, that waking up in prison every day for the rest of your life has got to be a tough row to hoe and that that, in your opinion, is a worse punishment than death.

A    Uh-huh.

Q    Okay.  But you do see an exception where you feel the death penalty would be appropriate, and that would be in the situation of a person that not only sexually assaults a child but then actually murders that child.

A    Right.

Q    And am I understanding you, ma'am, that you say only in that situation then would you consider giving a death sentence?

A    I would consider it.

Q    Okay.  In all other situations life in prison, waking up every day and thinking about it, that's going to be the verdict that's rendered in that particular case for

you.

A    That's correct.

Q    Okay.  Do you think there is anything I could say or do to you to change your mind on that?

A    I don't know.

Q    Okay.  Okay.  All right.  Okay.  So, I think I'm understanding what you're saying there.  That only if it's a child involving or only if it's a case involving the sexual assault and then the subsequent murder of that child --

A    Uh-huh.

Q    -- would you consider giving the death penalty.  In all other cases, in all other capital murder cases where the defendant is found guilty, you would -- you would give life in prison without parole.

A    Right.

Q    Okay.  Okay.  I noticed also, ma'am, that in talking about the particulars throughout your questionnaire -- and we do, we do read these thoroughly and absorb them.  Turn to page five for me please, ma'am.

Okay.  It's the third question from the bottom.  And we asked you, what would be important to you in deciding whether a person received a death sentence rather than a life sentence in a capital murder case, and you said, knowing beyond any doubt that the person is guilty.

A    Right.

Q    Okay.  And I take it you, like many people, have concerns that the last thing you would ever want to do is sentence an innocent man to prison, correct?

A    Or death.

Q    Yes, absolutely, absolutely.  I can appreciate that.  I will tell you -- And I am going to look real quick and see when you sat on that other case.  When was that, ma'am, that you sat on that other case?  You put down you don't remember.

A    Right.

Q    Okay.  You think it was two years ago or ten years ago?

A    Oh, no, it was more ten and beyond.

Q    Okay.  At the time you tried that case -- and was that here in Texas?

A    Yes.

Q    I think that the Court might have given you a definition of beyond a reasonable doubt at that time.  I'll tell you now that there is no definition really for a judge to give you of beyond a reasonable doubt.  Okay.  I'll tell you that it is certainly a high burden of proof and rests on the State.

But I have seen and I have come across a lot of people who have expressed to me that in order for them to find an individual guilty of any crime, because we are

talking about the taking of the liberty of somebody --

A    Uh-huh.

Q    -- and particularly in a death penalty case, that before they could ever return a verdict of guilty in a case where a man could get the death penalty, they have got to be convinced beyond any doubt whatsoever.

Is that how you feel?

A    That is how I feel.

Q    Okay.  Because the law states -- And, again, we can talk about the law says this, the law says that, but you're not under any oath to follow the law today.  We are just talking.  You're under an oath to just tell us the truth and your real feelings.  The law states that I only have to prove the case to you beyond any reasonable doubt.  Okay?

A    (Nods head).

Q    And that means that it does leave room for doubt, that there can be in the minds of the juror doubt.  Okay.  It can't be a reasonable doubt, but there can actually be doubt.  There can be things you'll never know the answer to.  There can be things that you have a doubt about as long as it's not a reasonable doubt.

Some people say that's not acceptable.  In the case of the taking of another human being's life, it has to be beyond all doubt whatsoever.  How do you feel?

A    I understand about reasonable doubt.  I would

just feel better if I knew that this person whomever was absolutely, positively the one.

Q    Okay.  And I think that's a very fair thing to say, that some people have certainly said to us that, you know, I get reasonable doubt but, for me, I'm going to raise that standard of proof to beyond all doubt whatsoever.

Is that what I'm hearing from you?

A    It is and it isn't.  It is what you're hearing from me, but then I understand too about our laws and that the burden of proof is only beyond a reasonable doubt.  I get that.

Q    Okay.  I thought I heard a but.  You were going to say something else?

A    Huh-uh.

Q    Okay.  Okay.  So, you could return a verdict of guilty of capital murder and knowing that a person was going to be executed even if I hadn't proved everything to you beyond all doubt whatsoever?

A    Yes.

Q    Okay, fair enough.  Thank you.

I noticed on page three that you did put down -- you can turn to that with me there.  That we asked you if you had heard anything about this particular case, and you put down you heard it on the radio.  What station do you listen to, ma'am?

A    94.5.

Q    Okay.  That's not a talk radio, it's a music station?

A    It's a music station.

Q    That's where you think you heard it.  Did you see anything then on the TV about it?

A    No, I don't remember seeing anything on TV about it.

Q    Tell me exactly what you remember hearing about it.

A    It's two men shot at their recording session and something about a church.

Q    Okay.  Okay.

A    Them leaving the church or doing recordings for the church, or something like that.

Q    Okay.  What did you think when you heard that?

A    That that was terrible.

Q    Okay.  Did you hear any other -- You didn't hear any other details after that?

A    Well, not from the news.

Q    Okay.

A    We talked about it at work.

Q    What did y'all talk about at work?

A    That the guys, that the victims --

Q    Uh-huh.

A    -- were church guys and that they worked for their church and they did music.  And apparently they were trying to move some equipment, or something, and they were robbed and subsequently killed.

Q    Okay.  Did any of your co-workers actually know who they were, or how were they getting their information?

A    No, no one knew them.

Q    Nobody, okay.  Were they just saying, oh, and this is what I heard on the TV or this is what I --

A    Right, we were just -- we were just talking about current events.

Q    Okay.  Okay.  Okay.  Was anybody expressing any feelings about what should happen in that case or anything like that?

A    No, we didn't.

Q    Okay.  All right.  So, it's fair to say then that you haven't -- you don't have enough information that you've already formed in your mind a conclusion as to the guilt or innocence of the persons who --

A    No.

Q    -- allegedly did this?

A    No, I haven't.

Q    Okay.  Okay.  Let me talk to you a little bit now about some more personal matters.  You have a nephew that was convicted of murder; is that correct, ma'am?

**Anne B. Meredith**
Certified Shorthand Reporter

A    Yes, I think he was convicted of murder.  I think the sentence -- the disposition of his case, I think, was murder.

Q    Okay.

A    Because he got eight years.

Q    Okay.

A    And it was a -- it was sort of complicated.

Q    Okay.  Was that here in Texas?

A    Yes.

Q    Was it here in Dallas?

A    The actual event was in Arlington.

Q    In Arlington, so he wasn't convicted or sent to trial here in our office, then.

A    I think so.

Q    Okay.  You don't think it was Tarrant County then, it would have been Dallas County?

A    Oh, you know what, it may have been Tarrant County.

Q    Okay.  Okay.

A    But I guess what I'm thinking about the guys that -- his lawyers were from here.

Q    Okay, that's not unusual.  That's not unusual.  And did he have a jury trial or did he plea bargain?

A    Oh, yes.  No, he did not plea bargain.

Q    He had a jury trial?

A    Right.

Q    Okay.  And was it a jury that gave him eight years?

A    I think so.

Q    Okay.  Did you sit in on any of the trial?

A    No, I didn't.

Q    Okay.  Did you, did you take an interest in it or, you know, talk to his mom afterwards or something?

A    It's my brother's son.

Q    Okay.

A    So, yeah, I took an interest because he's my brother's son.

Q    Okay.  Okay.  Do you think he was treated fairly?

A    As -- Yes, I do.

Q    Okay.

A    He was.

Q    Okay.  Do you think his sentence was appropriate for what he did?

A    Yes, I think actually he probably was very blessed to get eight years, considering.

Q    Yeah.  Do you have any idea what he did, what he was accused of?

A    He was there.  He didn't actually commit the murder, but he was culpable because he was there.

Q    Okay.

A    When the -- when the murder happened.

Q    Okay.

A    And it was a -- They were intending on robbing, and they thought that the guy that they were going to rob, they thought that he had left the house.  They didn't know that his wife and daughter were in the house.  And then he subsequently forgot something and came home and found them there, and they shot him.

Q    Okay.  Okay.  Okay.  Have you heard the term before of law of parties?

A    No.

Q    In Texas we have what's called the law of parties.  And it basically envisions a situation where two or more people are committing an offense.  And it states that if the people are acting together to commit, you know, one offense, that they can all be held liable for that offense.

A    Uh-huh.

Q    And it can apply in a murder case and it can apply in a burglary or a robbery case.  If the people, if the person is aiding or assisting or directing or encouraging anybody in that group to commit the offense, then they too can be held liable for the offense as if they had done it themselves.

It sounds to me like your nephew was not the person -- Was the victim shot, is that what happened?

A    He was shot in the facial area.

Q    Okay.  It sounds to me like your nephew was not

the person who actually pulled the trigger, though.

A     He didn't pull the trigger.

Q     Somebody else did but, nevertheless, he was held as a party to the offense.

A     Right.

Q     The law of parties also applies in capital murder cases, actually, and even in a case where an individual could get the death penalty.

And the law basically states that if two or more individuals are actively participating together, you know, if he's aiding, assisting, encouraging or directing in the participation of an offense, let's say a robbery, and then in the course of that robbery somebody is killed and the other person, not the triggerman, you know, anticipated somebody was going to die, the law states that that person too may be eligible for the death penalty, even though they never pulled the trigger.

A     Right.

Q     You know, if Mr. Hikel and I tonight plan to rob a local 7-Eleven, you know, and I tell him, look, I know where there is a good 7-Eleven.  I know that there is only one clerk on duty at 11:00 o'clock at night.  I know she works alone and I know that's right before she dumps the register, so there's going to be a lot of money in there, and I think we need to go rob that place and get us some

extra money.  And he says, okay, sounds like a good idea to me, I'll map it out on the Mapquest for us.

And then later on we get in the car to go rob that store.  And I say, hey, I've got a gun and I have got some bullets here.  And we pull up outside the 7-Eleven.  And I say, you sit out here in the car and you act as a lookout, Gordon.  And if anybody comes, you honk the horn.  He says, okay, I'll do that.  And I say, I'm going to go in and rob this store.

Well, just as I get ready to go in and rob the store, I say, oh, by the way, I'm going to take my gun with me.  And he says, why are you taking your gun?  I say, because I don't want to leave any witnesses.

And I load that magazine and I wink at him and I go into that store and I rob that store and I kill that clerk not to leave any witnesses.  I may be found guilty of capital murder because I've intentionally killed somebody and I've done it in the course of a robbery.  Okay?

A    Uh-huh.

Q    And I may be subject to the death penalty.  Well, Mr. Gordon Hikel may also be subject to the death penalty even though he was not the triggerman.

You know, you may find that he actively participated in the offense of robbery.  He helped plan it, didn't he?  And he drove me up there and acted as a lookout.

And when he saw me get out of that car and put the magazine in that gun and say, I'm not going to leave any witnesses, a jury may very well find that he actually anticipated somebody was going to die, right?

A    (Nods head).

Q    If a jury believes that, then Mr. Gordon Hikel can actually get lethal injection for his participation in that crime.  He's not the triggerman, though.

A    Right.

Q    How do you feel about that?

A    But that's the law, right?

Q    It's the law.  But I'm not asking you about the law.  I'm asking you if you think -- Do you think that's fair that the person who is not the triggerman could actually get the death penalty?

A    No, I probably don't think it's fair, but I understand it.

Q    Yeah.  Okay.  Okay.  And capital murder is basically that, Ms. Jackson.  It's an intentional murder, but it's also a murder plus an aggravating factor.

You know, for example, it's the intentional murder of somebody while in the course of committing another felony offense such as robbery or such as burglary.

It would be the intentional murder maybe of -- also the murder of a child under six years of age.  Okay.

And you wouldn't even have to sexually assault that child first, you know. But if it's a baby under six and you intentionally kill that child, you're eligible for the death penalty.

And, again, I see just kind of that that one really affects you, doesn't it, the situation with the kids? I understand that.

Or maybe it's the murder of a peace officer or a firefighter while in the line of duty.

Those are capital murder cases and those are the ones that are eligible for the death penalty. And it's always just that they are eligible for the death penalty, not that they will absolutely get it, okay?

I mean, in order for somebody to actually receive a sentence of death, you know from reading that pamphlet that you have to answer those special issues.

And one of the first things that you're called upon to answer is you are to decide whether or not that person is going to be a future danger. You know, they have committed capital murder. And now you must decide, are they going to be a future danger?

Well, anybody who is found guilty of capital murder, as the judge stated to you, will automatically receive life in prison without parole. Okay?

So, when I went into that store and I robbed

that clerk in that store and I killed that clerk in order to ensure that there were no witnesses, I committed capital murder, and I will serve the rest of my life in prison. Okay? I will wake up there every day and I will die there every day.

And like you said, it will probably be miserable because every day I'll wake up and I'll have to think about it, won't I?

A    Uh-huh.

Q    So, I am being punished.

A    Right.

Q    I am being punished. And from what I'm hearing from you, I'm getting a pretty appropriate punishment, in your opinion.

A    Right.

Q    That that's a befitting punishment for a crime such as that; is that correct? Is that what I'm hearing from you?

A    That's correct.

Q    Okay. Okay. And I am also hearing that at that point I think that you're satisfied that me serving every day of the rest of my miserable life in prison is the appropriate sentence for that, that it's a worse sentence than death; is that correct?

A    Yes.

Q    Okay.  Now, had I sexually assaulted and then murdered a baby, then you're going to think about the death penalty.

A    Yeah.

Q    But, otherwise, you're satisfied with that.

Well, and the law states that, in terms of determining whether or not somebody gets life in prison without parole or the death penalty, that you consider those special issues.

And the first one is whether or not that person will be a future danger to society.  Well, they are going to be locked up in prison for the rest of their lives; aren't they?

A    Yes.

Q    Yeah.  They are not going to be out walking on the street with you and me.  They are going to be in the prison, and that's where they are going to stay.

And, so, the question becomes whether or not, when I go to prison to serve my life sentence, whether or not I'm going to be a future danger to the other people that I now live amongst.  Am I going to be a danger to the other inmates?  Am I going to be a danger to any of the guards?  You know, that becomes the question.

Because I may be that person who goes to prison, wakes up every day, thinks about what I've done,

you know, but I mind my business and I act right. Or I may be the person who wakes up every day, thinks about what I've done, I'm angry, and I take it out on people in prison.

You see what I'm saying?

A     Yes, I do.

Q     It's kind of looking for a distinction there between the two kinds of people, the two kinds of inmates that are going to be there.

A     Uh-huh.

Q     In order to be eligible for the death penalty, you would have to find that a person was, in fact, going to be a future danger. You would have to be able to make a prediction that they are the kind of person that's going to wake up, you know, and commit criminal acts of violence, that they are going to be a future danger to the other people in that penitentiary.

You're making a prediction, if you will. Okay. Do you think that's possible to predict the future like that?

A     Human behavior is strange.

Q     Uh-huh.

A     You don't know what they are going to do. But I think -- No, I don't think you can predict the future like that.

Q     Okay. Okay.

A    You can guess.

Q    You can guess.

A    Yeah.

Q    Yeah, I guess you could guess.  And that's what that first special issue says.  It says, do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?  That's the first question that you have to answer in the death penalty phase.

And keeping in mind, you know, you've found this person guilty of capital murder, that they intentionally took the life of somebody, that it wasn't an accident, it wasn't self-defense, it wasn't oops, I meant to hurt him.  It was I meant to kill him and I did.

A    Uh-huh.

Q    And I did it in the course of committing a robbery like how I committed that 7-Eleven robbery.

A    Right.

Q    So, now you look at who I am and what I did and you have to answer that question now.  Do you think that I'm going to commit criminal acts of violence in the future?  So, you think that's fair to say that I'm asking you to make a prediction into the future?

A    No, I don't think it's unfair.

Q    Okay.  Well, I guess I'm saying, is it fair to say that's what it's asking you, to make a prediction?

A    It's fair to say that it is asking for a prediction, but I understand.

Q    Okay.  Do you think that's possible to be able to really answer that question yes or no, to make a prediction as to what somebody's going to do in the future?

A    I think based upon someone's actions, their collective behavior, I think you could have a pretty good guess as to what their behavior will be at point B.

Q    Sure, sure.  And I think it's fair to say that that's kind of what that's asking you to do.

A    Uh-huh.

Q    Take a look at what the person did, maybe take a look at the individual now, and decide for yourself whether or not that person's going to be a future danger.

A    Right.

Q    And of course, we are talking about him being in and around inmates and wardens and guards and such as that, you know.  Is he going to be a future danger to those particular people?

A    Right.

Q    Okay.  If you don't think he is, then you answer that special issue no, you know, and he will serve that life in prison sentence, you know, that you have expressed that

you think is appropriate for a capital murderer.

If you think that he is going to be a future danger, then you answer that special issue number two, that second question. Remember we talked about the law of parties before?

A    Right.

Q    That's basically what that's asking you now. It's asking you, is the person who you've just found guilty, is he guilty because he's the triggerman, or is he guilty because, because he was an active participant in it and he actually anticipated somebody would die? It's kind of that law of parties question, okay?

A    (Nods head).

Q    So, you decide from the evidence whether or not it's been proved to you beyond a reasonable doubt that he was either the triggerman or that he anticipated somebody was going to die and he actively took participation in that.

For example, Mr. Gordon Hikel, in my example, you decide, you know, did Mr. Hikel, did he anticipate somebody would die when I went into that 7-Eleven to do it and was he a participant in that offense?

If you don't think he was, if you don't think that he did anticipate that, you answer that question no. Okay. But if you did think he was, you would answer that question yes. All right?

And if you answer that first and second question yes, Ms. Jackson, I'll submit to you that what's going on now is now the defendant is actually sitting on top of a death sentence.

Okay. He's been found guilty of capital murder. More likely than not he's going to commit criminal acts of violence that will constitute a continuing threat to society, that being that more likely than not, while he's in prison, he's going to continue to commit some criminal acts of violence.

Okay. It doesn't say that he's going to commit another murder.

A    Uh-huh.

Q    You know, criminal acts of violence is whatever you think it is. You know, but more likely than not he's going to do that. He is a party to the offense or he's the actual triggerman. If you say yes to those things, he's sitting on a death sentence.

Now, you still have one more question that you can answer. And I think that a lot of times this is really where your personal feelings play into the case and how you feel about the case or maybe how you feel about, you know, the death penalty in general.

Because the last question asks you to reconsider everything about the case, okay? It says,

taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character, his background, his personal moral culpability, looking at all of that, do you find that, in there, there is a sufficient mitigating circumstance to warrant that this death sentence that he's just earned should actually now be a life sentence?

Okay. Does that make sense to you what they are saying there to you?

A    Yes.

Q    It's giving you a chance to undo that death sentence. Okay? And it's saying to you that you can undo that sentence of death if you personally feel that there is a sufficient mitigating circumstance that warrants you to do it. Okay?

A    Uh-huh.

Q    You look at everything. You look at the crime. You look at who they killed. You look at why they killed them. You look at their personal background in all of that. And if you think there is something in there that speaks to you, your personal feelings, your personal moral judgments, the way you feel, if there is something that speaks to you and you think it is a sufficiently mitigating circumstance, then you can turn that sentence into a life sentence versus a death sentence.

Does that make sense?

A    Yes.

Q    Now, you've expressed, for example, that you think the death penalty is appropriate in the case of a person who sexually assaulted and then killed a child.

A    Uh-huh.

Q    Okay.  But that a life sentence without parole where you're going to have to wake up every day and think about it for the rest of your life is an appropriate sentence for any other kind of capital murder.  Is that correct, ma'am?

A    Right.

Q    Okay.  And coming in to special issue number three, I guess what I'm hearing is that if it's a situation where it's a man who has killed a baby, and I consider any kid a baby, I guess, but a man who sexually assaulted a child and then has killed that child, do you think that there is ever anything that would change your mind that says that that person should serve life in prison versus death?

A    If they kill a baby?

Q    Yes, ma'am.

A    To me, he or she deserves to die.

Q    All right.  There isn't anything that's going to ever change your mind that somebody who would commit that kind of offense would --

A    No.

Q    -- would deserve anything less than death or should receive anything less than death?

A    That's correct.

Q    Okay.  And I guess on the flip side of that, you know, is that if it's not that kind of crime, if it's not a baby and it's not a sexual assault of a baby, you've expressed to me that you think the appropriate sentence should be wake up every day for the rest of your life in prison.

A    That's right.

Q    Okay.  And, so, if it's not that child crime and they are guilty of it and they may, you know, be a future danger to the other inmates because they are kind of wild, you know, and they were a party to it, would you therefore automatically answer special issue number three to ensure that they get that sentence that you feel is appropriate, that life in prison without parole sentence, so that they can wake up every day for the rest of their life and think about it?

A    Right.

Q    Okay.

A    If he or she hasn't killed a child, right?

Q    Yes, ma'am.

A    Yes.

Q    If they haven't killed a child, then life in

prison without parole is always going to be the more appropriate sentence from you.

A    It's always going to be mine, yeah.

Q    Okay.  And -- Okay.  Okay.

Are there any questions about this, about this procedure or these kinds of cases that you, that you have for me?

A    No.

Q    Okay.  Okay.  It's kind of -- Well, it's a lot to absorb, you know.  It's a lot to absorb.  And ultimately a judge will give you the law in this case.  We are just trying to kind of feel you out and get where you're coming from.

And I think I have a pretty strong appreciation, Ms. Jackson, for how you feel.  You know, I think that you're a woman whose heart immediately goes to kids, which is certainly admirable.  And that in cases somebody -- Only in the case of somebody who sexually assaults and murders a child, that's the only case where the death penalty would be appropriate.  And in any other situation, you feel life in prison without parole where they wake up every day for the rest of their life, that would be the appropriate sentence.

A    Right.

Q    Okay.  Thank you very much for talking to me and listening to me talk to you, Ms. Jackson.  I appreciate it.

THE COURT:  Thank you, Ms. Handley.

Now Ms. Mallon will speak to you on behalf of Mr. Broadnax.

EXAMINATION

BY MS. MALLON:

Q    How are you doing, Ms. Jackson?

A    I can't explain.

THE COURT:  Do you need a break, ma'am?

PROSPECTIVE JUROR JACKSON:  No.

Q    Are you okay?  You don't need water or anything?

A    No.

Q    Okay.  Okay.  Like the judge told you, Mr. Parks and Mr. Lollar and I represent James here.  All right.  And I am going to take -- I don't know how much time I'm going to take but I won't take more than forty-five minutes.  Okay?

And before I get started, I would kind of like to explain to you what we are doing here because a capital murder case is completely different than any other criminal case.  And that's why we bring you in individually and talk to you because the State of Texas is seeking the death penalty.

So, all those people filled out questionnaires. I think we've talked to 130 people.  I think you're 130 actually.

A    Okay.

Q    And what we are trying to do from all of those people is we are trying to find fifty qualified jurors, fifty qualified individuals who can say that they won't jump to conclusions, that they will listen to all the evidence and they will follow the law as given to them by the Court. Okay?

A    Right.

Q    And from those fifty, we will come down to our twelve jurors who are going to sit on this case. And, so, what we are looking for is jurors who will follow the law.

And let me tell you this right off the bat. You can be against the death penalty and still be qualified to sit on this jury. Okay?

A    (Nods head).

Q    You have to be able to follow the law.

A    Right.

Q    And if you cannot follow the law, and that's fine, then you're not qualified. But I keep hearing you talk to the prosecutor and I've heard you say more than once that that's what the law requires or that's the law. And, so, I think you have appreciation for that.

A    Yes.

Q    And am I correct in saying that at this point you don't know anything about the case?

A    No.

Q      You don't know the facts.  You know nothing, right?

A      Right, only what I thought I may have heard.

Q      On the radio.

A      Right.

Q      And you know what he's charged with right there in the indictment, right?

A      Yes.

Q      Okay.  So, based on what you know, which is just what's in the indictment -- And let me tell you, the indictment is just a piece of paper.  Okay.  It's not evidence.  All the indictment does is tell the State what they need to prove and it lets us know what Mr. Broadnax is being accused of.  That's all it is.  Okay?

So, all you know is what he's charged with.  So, is it fair to say that at this point you couldn't say for sure what you would do if you were a juror on a capital murder case; is that fair to say?

A      Yes.

Q      Regardless of the circumstances because you haven't heard any facts.

A      Right.

Q      Is that right?

A      Right.

Q      Okay.  And based on your questionnaire, you don't seem to me to be someone who just jumps to conclusions.  You

strike me as someone who is going to listen to all the evidence and then make your decision based on the law that comes from the judge.  Am I right?

A    That's correct.

Q    Okay, good.  And let me tell you this, too.  This is obviously a very, very serious case.  They are seeking the ultimate penalty --

A    Uh-huh.

Q    -- which is death.

And the State of Texas, first  of all, is always satisfied, the law is always satisfied with a life penalty, always.  And actually the way it's set up is these special issues are meant to be a barrier, a roadblock to the imposition of the death penalty.

A    Uh-huh.

Q    Okay.  Does that make sense to you?

A    Yes.

Q    Okay, good.  And as a matter of fact, if you take a minute and look at that indictment.

A    This?

THE COURT:  Yes, ma'am.

Q    I think you should have it up there.  Is that the indictment?

A    Yes.

Q    Okay.  The State is required to prove every

element in that indictment beyond a reasonable doubt.  And I think you can appreciate that that's a very high burden.

A    Yes.

Q    Yes?  Okay.  And you have sat on a jury before and, so, I'm assuming that they thought you were qualified to sit on that jury, so you were able to follow the law and hold the prosecution to proof beyond a reasonable doubt; is that fair to say?

A    Yes.

Q    Okay.  And let me tell you a little bit about the burden of proof.  We have, you know, civil cases where someone is suing someone else for money.

A    Uh-huh.

Q    The burden of proof in that case is preponderance of the evidence.

A    Right.

Q    Fifty-one percent.  Okay.  And then we have another level, another burden of proof.  For instance, if the State of Texas was trying to take away a child from the parents, in a situation like that the burden of proof in that situation is clear and convincing.  So, that's higher than preponderance of the evidence.

And then, finally, up here we have beyond a reasonable doubt.  It's the highest burden we have.

A    Right.

Q    And the law does not define what beyond a reasonable doubt is.  What I can tell you is that it's more than clear and convincing, but it is not beyond all doubt.

A    Uh-huh.

Q    Does that make sense?

A    Yes.

Q    Okay.  And can you hold the prosecution to beyond a reasonable doubt and not force them to prove it beyond all doubt?

A    I can do that.

Q    Okay.  Because if you -- The only way you would know something for sure is if you were there and saw it, right?

A    Exactly.

Q    Okay.  So, you're not going to require them to prove to you beyond any doubt.

A    Right.

Q    Just a reasonable doubt.

A    Right.

Q    Okay.  Is that fair?

A    That's fair.

Q    And, again, the law does not define it, so that's up to you.  It's just not beyond all doubt.  And I think you can hold them to their burden and not a higher burden.

A    Right.

Q    Okay, good.  And the prosecutor already told you right now we are just asking you to tell the truth, okay?

A    Yes.

Q    You won't have to take an oath to follow the law unless you are picked to be a juror on this case, okay?  So, it doesn't matter right now if you think it's fair or unfair.  All that matters is whether or not you can follow the law as given to you by the judge.

A    Right.

Q    And I think you can do that.

A    Yes, I can.

Q    So, even if you think something is fair or not fair, are you still going to listen to what the judge says is the law and follow the law?

A    Yes.

Q    Okay, good.  Let's talk about these special issues.  And like I said before, these special issues are meant to be a barrier to the death penalty.  Okay?

Special issue number one.  Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Okay.  When we get to special issue number one, you have already found the defendant guilty of capital

murder.  Okay?

A    Uh-huh.

Q    And let's just use not the facts in this case but what's in the indictment there.  Okay.  An intentional killing during the course of a robbery.  Okay.  When you get to special issue number one, you have already determined beyond a reasonable doubt, you and eleven others, that the person is guilty.

A    Yes.

Q    Okay?  So, when you get to special issue number one, do you see with me, looking at that, that the burden -- that there is a burden of proof, beyond a reasonable doubt?  Do you see that up there in special issue number one?

A    Yes.

Q    Okay.  So, what that means is they have to prove that to you.  Okay?  The State has to prove to you beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

Okay.  So, that is asking you to make a prediction.  But they have to prove it to you, and if they don't, you answer that question no.  Does that seem fair?

A    Yes.

Q    Okay.  And the law presumes that the answer to that special issue number one is no because the default

penalty on a capital murder is life without parole.  Right?

A    (Nods head).

Q    Because the judge told you there's only two possible penalties.

A    Right.

Q    Life without parole and the death sentence.

A    Uh-huh.

Q    So, the law presumes that the answer to special issue number one is no until they prove it.  Okay?

A    Right.

Q    And if you will look with me at special issue number one, do you see that it says would commit, not could?  Does that make sense to you?

A    Yes, it does.

Q    Okay.  And criminal acts of violence, so it's not just one fight in the penitentiary.  They have to prove beyond a reasonable doubt the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

So continuing, continuing criminal acts of violence, does that make sense?

A    Yes.

Q    Okay.  And it is their burden.  Can you hold them to that burden?

A    Yes, I can.

Q    Okay.  Do you think that -- Can you foresee a situation where you could answer that question yes?

A    Yes, I can see it.

Q    Okay.  Let me give you an example, Timothy McVeigh.

A    Yeah.

Q    I mean no criminal history, you know, but it was such a heinous crime from the facts alone of what he did.

A    Right.

Q    Could you answer that question yes based on that case, the Oklahoma City bombing?

A    I could.

Q    Okay.  So, you can foresee a situation where they could prove to you beyond a reasonable doubt that someone would be a continuing threat to society in the penitentiary.

A    Uh-huh.

Q    Now, let me tell you, the law says that -- and it's actually the Criminal Court of Appeals -- the death sentence is reserved for those few incorrigibles that cannot even be contained safely in the penitentiary, that even in the penitentiary they are going to continue to commit criminal acts of violence.  Does that make sense to you?

A    Yes, it does.

Q    So, when you are answering special issue number one, you are answering based on what you think he will do in the future.

A    Right.

Q    Okay.  And that makes sense to you?

A    Yes.

Q    And you think that's something you can do?

A    I could do that.

Q    Okay, good.  And just to give you another example. You know how the trial goes because you've sat in one already.  You know, you do the guilt/innocence and then you come into the penalty phase.

A    Uh-huh.

Q    So, you know in the penalty phase you hear all kinds of stuff.  There's not much you don't hear in the penalty phase.

A    Right.

Q    And, so, if the prosecution was able to present to you evidence that the defendant had a very lengthy criminal history, would that have an impact on you in answering special issue number one?

A    When you say impact?

Q    Would that matter to you?  Would that be important to you in answering special issue number one?

A    I would take it into consideration.

Q    Okay.  Okay, good.  And I guess the opposite would be true, too, if they did not have any criminal history.

A    Right, I would take that into consideration.

Q    Okay, good.  So, what I'm hearing you say is that you can follow the law and hold the prosecution to their burden --

A    Uh-huh.

Q    -- in special issue number one; is that right?

A    That's correct.

Q    Okay.  And, again, you're not going to hold them to beyond any doubt.

A    No.

Q    Right?  Just a reasonable doubt.

A    Right.

Q    Okay.  And you can foresee a situation where you would answer special issue number one yes; is that right?

A    That's correct.

Q    Okay, okay.  I -- Special number two, we don't know if that's going to be an issue in the case or not. The judge makes that call based on the evidence in the case, so it may or may not.

But I guess what I want to point out to you is if you can see again, in special issue number two, the burden of proof is on the State.  Okay?  So, if it is a parties situation and the person is not, for lack of a better word the shooter --

A    Uh-huh.

Q    -- but is a party, and if they can prove to you beyond a reasonable doubt that the other person anticipated that a human life would be taken.  Okay.  It's their burden, beyond a reasonable doubt.  If they prove that to you, could you answer special issue number two yes?

A    Yes.

Q    Okay, good.  So, you can follow the law in that situation, too.

A    Yes.

Q    Okay.  Now, let's say, just so we can -- And let me say something else.  Just because we are talking about the penalty phase, I don't want you to take that to mean that we think a jury is ever going to find Mr. Broadnax guilty.  Okay?

A    Right.

Q    It's just this is the only opportunity we have to talk to you.  So, I don't want you to think, because we are talking about the penalty phase, we automatically think we are going to get there.  Okay?

A    Okay.

Q    Does that makes sense?

A    Yes, it does.

Q    So, if you answer special issue number one yes and you answer special issue number two yes, if it's given, then we go on to special issue number three.  Okay?  And

special issue number three, if you will read it with me.

Do you find, taking into consideration all of the evidence -- so that will include the evidence from the guilt/innocence phase as well as from the penalty phase -- including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

That's a lot of words.

A    Uh-huh.

Q    But basically what that is saying -- We call it the mitigation issue. -- even after you found him to be a future danger, which is what we call special issue number one, and he was either the shooter or a party and anticipated another life would be taken, when you get to special issue number three, first of all, you see there is no burden. Okay?

A    Right.

Q    So, neither side has a burden of proof in special issue number three. And special issue number three is a very personal thing to each individual juror.

Each individual juror is required to make their own personal moral judgment based on all the evidence,

based on everything they have heard about the defendant, the facts of the case, everything.  You make your own personal moral judgment on what the appropriate sentence is.  Okay?

A    Right.

Q    And it could be different.  It could be different.  Each individual juror could have a different belief on what is sufficient mitigation.  Okay.  Does that make sense?

A    Yes.

Q    Because it's a very personal decision.  It's like, you know, what church you go to or what religion you are or how are you going to raise your kids.  It's a very personal decision that you make individually.

It's not a democracy once you get to special issue number three.  It's your own personal moral judgment.  Does that make sense to you?

A    Yes.

Q    Okay.  And it can be -- And in order to determine whether or not there is sufficient mitigating circumstance, it could be one thing or it could be a hundred things.  It's up to you what your personal moral judgment is.  Okay?

Does that make sense?

A    Yes.

Q    Okay.  And you know, you may find one thing sufficient to give a life penalty.  The juror sitting next

to you may not.  Okay.  But that's that juror's personal moral judgment.  And in that situation I would expect that you could respect their decision just as you would expect them to respect yours.

A    Right.

Q    Okay.  And the prosecutor said that once you get to special issue number three, the defendant is sitting on the death penalty.  And I, I guess, agree to that to some extent.  But it takes twelve jurors, all twelve jurors to say, no, there is not a sufficient mitigating circumstance, before the defendant gets the death penalty.

If one juror says yes, there is mitigating circumstances to me, it's my personal moral judgment that there is sufficient mitigating circumstances, then it's life without parole.  Okay.  Does that make sense?

A    Yes.

Q    So, you can see how the State of Texas has set up barriers to the death penalty.

A    Uh-huh.

Q    So, and it's supposed to be that way.  It's supposed to be reserved for the worst of the worst who cannot even stay in the penitentiary without continuing to commit criminal acts of violence.

Does that make sense to you?

A    Yes.

Q    Okay.  Let me take a look at your questionnaire here, see if I have any questions about that.

On page five when it says -- Well, actually, let me back up a minute.  I think when you were talking to the prosecutor, you used the term deserving, whether or not the person is deserving of the death penalty.  And we hear that a lot from a lot of different jurors.

Can you see, after looking at these special issues, that that's not the question?  The question is not whether or not the defendant deserves the death penalty.

A    Oh, yes.

Q    But how you answer these special issues.

A    Uh-huh.

Q    Okay.  Okay.  And that makes sense to you?

A    Yes.

Q    Okay.  So, if you go back in the jury room and you're a juror on a capital murder case and one of your fellow jurors said, okay, how many think he deserves the death penalty, can you stop them and say, that's not the question?

A    Yes.

Q    We need to look at these special issues.

A    Yes.

Q    Okay, good.  On page six -- Well, on the bottom of page five we say -- we tell you that the law in the State

*Anne B. Meredith*
Certified Shorthand Reporter

of Texas is voluntary intoxication does not constitute a defense to the commission of crime. Do you agree with this? You said yes, that is the law.

And on page six, the law further provides that evidence of intoxication may be considered in mitigation of punishment. Do you agree with this law? And you said yes, I think all things should be considered. And that's exactly what we are asking you to do. Okay?

A    Uh-huh.

Q    In special issue number three, intoxication, how he was raised, if he was abused, age, you know, there's a variety of things that you might consider to be sufficient mitigation. Does that make sense to you?

A    Yes.

Q    Okay. And I think -- Let me make sure. On page eight, the second question from the bottom. Some people feel genetics, circumstances of birth, upbringing, environment should be considered when determining the proper punishment of someone convicted of a crime. What do you think? And you said, in some cases, yes, in others, no.

And that's absolutely fair.

A    Uh-huh.

Q    I mean, that is absolutely fair. Can you see that that question is relating back -- Can you see how that relates back to special issue number three?

A    Yes.

Q    Okay. And are those things that you could take into consideration if you got to special issue number three?

A    Yes.

Q    Okay, okay. And let me ask you about -- Okay, we already talked about that. I was going to ask you about your service on the jury, but I think we've gotten that.

A    (Nods head).

Q    So, let me just recap, make sure we are on the same page. Okay?

          If I heard you correctly -- and please tell me if I'm wrong.

A    Uh-huh.

Q    I certainly do not want to put words in your mouth. Okay? You're going to hold the prosecution to their burden, which is beyond a reasonable doubt.

A    Yes.

Q    And you're not going to hold them to the burden of beyond all doubt.

A    No, I won't do that.

Q    Okay. And I think once you have the law explained to you, it makes sense, right?

A    Uh-huh.

Q    Okay. And if you find -- If you were to find someone guilty of capital murder, you could answer these

special issues.

A   Yes.

Q   And you would hold the prosecution to their burden of a reasonable doubt in special issue number one and special issue number two.

A   Correct.

Q   Okay.  And you can foresee a situation where you would answer special issue number one yes.

A   That is correct.

Q   Okay.  And once you get to special issue number three, you're going to listen to -- you're going to consider all the evidence, everything you heard, and give careful consideration to any mitigating circumstances in order to determine whether or not it's sufficient to impose a life sentence rather than the death penalty.

A   That's correct.

Q   Okay.  And just one last thing, Ms. Jackson, and I said it earlier.  You can be against the death penalty and qualified to sit on this jury.  You just have to be able to follow the law.  You have to be able to put your feelings aside and follow the law as given to you by the judge.  And I think you can do that.

A   I can.

Q   Okay.  Thank you, Ms. Jackson.

MS. MALLON:  Sorry, Judge.

(Sotto voce discussion between defense counsel).

Q    Sorry, Ms. Jackson.  I have a couple more questions for you.  Okay.  This is my first go round so I need some guidance sometimes.

I want to talk a little bit more about special issue number three, and we have talked about it. I think you told the prosecutor that you would, other than a person convicted of killing a child --

A    Uh-huh.

Q    -- that you would automatically answer special issue number three yes.

Now, after we have talked about this, and I think I've explained it to you a little more, would you listen to the evidence, consider the evidence, and can you foresee a situation where you would say no, there is no mitigating circumstance, I think the death penalty is the appropriate sentence in this case, for someone other than a person convicted of killing a child?

A    Other than someone convicted of killing a child, it's always going to be life without parole.

Q    You're going to automatically answer special issue number three yes regardless of how bad the case is?

Let me give you a hypothetical, okay?  Let me give you a hypothetical.

A    Uh-huh.

Q    You have a situation where you and eleven others have found someone guilty of capital murder.

A    Uh-huh.

Q    They killed a person because they wanted to. It wasn't an accident. It wasn't a mistake.

A    Uh-huh.

Q    It wasn't self-defense. It wasn't defense of another person. There wasn't duress. They weren't forced to. They killed someone because they wanted to.

A    Uh-huh.

Q    That was their goal, that's what they did, and then they robbed them on top of that. And you and eleven others have found someone guilty of capital murder, and then you answer special issue number one yes.

A    Right.

Q    This person is going to be a future danger.

A    Uh-huh.

Q    They cannot be contained in the penitentiary.

A    Right.

Q    They are going to continue to commit criminal acts of violence that will constitute a continuing threat to society.

A    Uh-huh.

Q    Then you answer special issue number two yes.

A    Right.

Q    They were either the shooter or they anticipated that a human life would be taken.

A    Uh-huh.

Q    Okay.  And then you get to special issue number three.

A    Right.

Q    You can never foresee a situation other than --

A    Uh-huh.

Q    -- killing of a child where you would say no, there is not sufficient mitigation?

A    No, I could see mitigating circumstances.

Q    If you ever see a situation where you would say no, there is not sufficient mitigation in order to -- there is not --

A    Right.

Q    -- sufficient mitigation, can you --

A    Yes.

Q    You can see that situation.

A    I can see that situation.

Q    Okay.  So, you can foresee a situation where you think, based on all the evidence, there is not sufficient mitigation and the appropriate sentence is the death penalty.

A    Right, I can see that.

Q    Okay.  Okay.  So, you're not going to automatically answer special issue number one yes; you're going to listen

to the evidence.

A    Right.

Q    I'm sorry, special issue number three.  Sorry.
The mitigation issue.

A    I know what you mean.

Q    Okay.  You're going to listen to the evidence,
take everything into consideration, and then make your
determination after you've heard everything whether or not
you think there is sufficient mitigation.

A    That is correct.

Q    Okay.  You're not going to automatically say yes,
there is, because I want a life without parole?

A    Oh, no, no.

Q    Okay.  I think I'm done.

THE COURT:  All right.  One last thing from
me.  You've given some conflicting answers, and we understand
that.

PROSPECTIVE JUROR JACKSON:  Uh-huh.

THE COURT:  Certainly be surprised if people
didn't.  You told Ms. Handley a time or two that, except in
a case where a child was murdered, maybe sexually assaulted
before and then murdered --

PROSPECTIVE JUROR JACKSON:  Uh-huh.

THE COURT:  -- would be the only case in
which you could give the death penalty.  You said that both,

both no.  You said that a time or two.

And then initially you told Ms. Mallon that only in the case where a child was murdered would you vote no where the person received the death penalty.

PROSPECTIVE JUROR JACKSON:  Right.

THE COURT:  And then the last two or three answers you've given said that you believe, in the proper case, in a case that didn't involve the death of a child, if I understood you, that you could find that there were no sufficient mitigating evidence to vote no and the person would receive the death penalty then.

PROSPECTIVE JUROR JACKSON:  Right.

THE COURT:  All right.  If you would for me, please, tell me what your true answer is to those questions.

PROSPECTIVE JUROR JACKSON:  Are we talking about specifically number three?

THE COURT:  Yes, ma'am, that's all we are talking about.

PROSPECTIVE JUROR JACKSON:  I could consider everything in number three.  I could consider everything fairly --

THE COURT:  All right.

PROSPECTIVE JUROR JACKSON:  -- with an open mind and I could say yes.

THE COURT:  Okay.  Yes would be --

PROSPECTIVE JUROR JACKSON:  Or no, the death penalty.

THE COURT:  That's your true answer?

PROSPECTIVE JUROR JACKSON:  That is my true answer.  I could consider everything.

THE COURT:  In a case that didn't involve the death of a child?

PROSPECTIVE JUROR JACKSON:  Of a child.

THE COURT:  All right.  All rise, please.

If you will step outside for just a minute, then you'll be coming right back.

PROSPECTIVE JUROR JACKSON:  Do I leave everything?

THE COURT:  Yes, ma'am.

(Prospective Juror Jackson exits the

courtroom).

THE COURT:  In the presence of Mr. Broadnax, what says the State?

MS. HANDLEY:  Your Honor, the State would challenge this particular juror.  She's made it abundantly clear in her questionnaire where she states on the first page that she is not in favor of the death penalty.  I believe life in prison without any chance of parole.

She has articulated throughout her questionnaire that feeling with the one and only exception

stating in her questionnaire on page four, any crime where a child has been murdered or raped or murdered should carry with it the possibility of the death penalty regardless of the person's past.

She has been very adamant about that in my questions to her. And I think when she is allowed to freely speak without kind of the double speaker yes or no or all that, she will tell you that she feels the death penalty is only appropriate in the case of the murder or rape of a child.

As a matter of fact, she would never under any circumstances find a mitigating circumstance to undo a death sentence for someone like that. And likewise, as is consistent with her questionnaire, she's articulated to me as well as to defense counsel that in all other cases she believes life in prison without parole is the appropriate sentence to do and would answer the questions in such a way.

THE COURT: It will be denied.

MS. HANDLEY: She may say she will consider things, but she's not going to do it.

THE COURT: It will be denied.

MR. PARKS: We believe the juror to be qualified.

THE COURT: All right. Ask her to return.

(Prospective Juror Jackson returned to the

courtroom).

THE COURT: Please be seated, Ms. Jackson.

Ms. Jackson, you have been accepted as a qualified juror. Now, you'll be receiving that phone call here in the next couple of weeks telling you whether you're actually on the jury or not.

The sheriff is going to give you the personal card of the coordinator in case anything should occur in your life, personal life, that might affect your jury service.

PROSPECTIVE JUROR JACKSON: Okay.

THE COURT: Should that be, give her a call and you will return.

Now, is your telephone number that's on your questionnaire still your correct number?

PROSPECTIVE JUROR JACKSON: It is.

THE COURT: Because that's the number they are going to be calling to let you know if you're on the jury or not.

PROSPECTIVE JUROR JACKSON: All right. I gave two.

THE COURT: Good. Please avoid all outside influence. I don't want you being disqualified from possibly being on this jury. In other words, avoid the media, talking to friends. For instance, don't talk to your friends any more about this case. You know what I'm talking about.

PROSPECTIVE JUROR JACKSON:  I do.

THE COURT:  All right.  Good luck to you, ma'am.

All rise for the juror.

(Prospective Juror Jackson excused from the courtroom).

(After a recess, defendant present).

(Prospective Juror No. 1062, Dedrick Morrison, enters the courtroom).

THE COURT:  Mr. Morrison, have a seat, please.

Please be seated, counsel.

I want to say good morning to you again, Mr. Morrison.

PROSPECTIVE JUROR MORRISON:  Good morning.

THE COURT:  We met.

PROSPECTIVE JUROR MORRISON:  Yes, sir.

THE COURT:  I didn't have this robe on then. Again, my name is Webb Biard.

And let me introduce some other folks to you.

Gordon Hikel.

MR. HIKEL:  Good morning, Mr. Morrison.

THE COURT:  Andrea Handley.

MS. HANDLEY:  Good morning, sir.

THE COURT:  They represent Dallas County and the State of Texas.

Further to my right is Doug Parks.

MR. PARKS:  Good morning.

THE COURT:  Keri Mallon.

MS. MALLON:  Good morning, sir.

THE COURT:  They represent Mr. James Broadnax.

Brad Lollar is co-counsel with the defense team and he may or may not be here in a minute.

PROSPECTIVE JUROR MORRISON:  Okay.

THE COURT:  Do this for me before we go any further, please, sir.

(Prospective Juror Morrison sworn).

DEDRICK MORRISON, having been duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

Q    Mr. Morrison, we talked out in the hall for a minute.  I told you this was going to take up to about an hour and a half, which will take us to about 12:30, but at that time your responsibility for the day will be over. And you told me then that you would prefer to do that instead of stopping at 12:00 and then coming back at 1:30.

A    Correct.

Q    Is that right?

A    Yes, sir.

Q    Okay, good.  Let me give you some idea of what the

way the morning is going to go.  Did you have an opportunity to read that pamphlet?

A    Yes, sir.

Q    Did that help you a little bit?

A    Yes, sir.

Q    Okay.  I told you I thought it would probably help some, give you a little bit better understanding of the procedure.

A    Yes, sir.

Q    All right.  Now, do you understand from filling out that questionnaire -- And by the way, I have it here and I am going to give it to you in just a minute.

A    Okay.

Q    And then you will have it with you to refer to if you are asked any questions about it.  You filled out the questionnaire, which we appreciate you doing.  It's going to save you a bunch of time here today already having done that.

A    Okay.

Q    You heard Judge Snipes' remarks.  You've read the pamphlet.  You're sitting here now in open court.  Are you aware that this is a capital murder case?

A    Yes, sir.

Q    Do you understand the State of Texas is seeking the death penalty?

A    Yes, sir.

Q    Because of that, we have some very specific rules and procedures we must follow, and one of them is giving you the opportunity to talk to us one on one.  And I understand for some people this can be a little intimidating, but I don't want it to be.  And you don't seem, in talking to you outside, you don't seem to be that type of person.

But I'll assure you everybody involved in this process are professionals.  It's out of the question that anybody is going to intentionally intimidate or browbeat you, so I want you to relax as much as possible.  All right, sir?

A    Okay.

Q    This is not some test in which we try to find out who knows the most law, then they get on the jury.  That doesn't have anything to do with it.

A    Okay.

Q    It's our job to explain the law to you.  All I ask from you, and the only thing I have a right to ask of you, but I do have this right to ask of you, that is you shoot straight with us.

A    Okay.

Q    Honest answers.  Whatever they are are the right answer.

A    Okay.

Q    You follow me?

A    Yes, sir.

Q    In other words, this isn't going to be something like what's two plus two.

A    Correct.

Q    It's only one answer is four.  This is, how does Mr. Morrison feel about these matters?  All right.  Enough of that line.

On the pamphlet, you see that Judge Snipes tells you that the trial is going to start August the 10th.

A    Correct.

Q    Did you see that?  It's going to last up to two weeks.

A    Two weeks.

Q    Let me tell you how the judge runs his court. Monday through Friday 9:00 to 5:00, break in the morning, break in the afternoon, lunch break.  The jury will not have to stay together overnight unless and until you're deliberating your verdict.

Have you ever sat on a jury before?

A    No, sir.

Q    Do you know what deliberation means?

A    Yes, sir.

Q    All right.  Let's say for some reason the jury went late into the night and hadn't reached a verdict and

became fatigued.  There is a possibility you would all be taken to a fine hotel, county expense, individual private rooms, spend the night, and all come back together to avoid any outside influence.

If that happened, the judge would give you plenty of advance notice.

A    Okay.

Q    All right.  Now, I give you the date of August 12th, the two weeks, Monday through Friday, 9:00 to 5:00, possibility of having to spend the night together with other members of the jury to ask you, as you sit here now, are you aware or do you know of any reason why you can't sit as a juror in this case?

A    No, sir.

Q    All right.  Now, you've told me you know this is a capital murder case.

A    Yes, sir.

Q    You told me you know the State of Texas is seeking the death penalty.

A    Yes, sir.

Q    If someone is found guilty of capital murder, there's only two possible punishments.  Do you know what they are?

A    Yes, life in TDC or the death penalty.

Q    That's right.  Life in prison without parole.

When I say life in prison without parole, I mean life in prison without parole.

A    Okay.

Q    There was a time when somebody, if they were given life, they would eventually become eligible for parole. That didn't mean they would get it, but they would become eligible, go before the parole board. That's not the law any more. Life in prison without parole means life in prison without parole, or the death penalty.

And from reading that pamphlet, did you see the way the jury decides the punishment --

A    Yes, sir.

Q    -- is answering those three issues?

A    Correct.

Q    Did that make sense?

A    Yes, sir.

Q    Okay. And you answer them yes or no depending on the evidence.

A    Correct.

Q    All right. And the attorneys will spend some considerable time with you asking you if you would be able to answer them yes or no depending on the evidence. And if they result in a death sentence, so be it. If they result in a sentence of life in prison without parole, so be it.

If you can do that, that's going to be one

of the main requirements to be a qualified juror.  If you can't, you wouldn't be a qualified juror.  And all that means is you simply just wouldn't be able to sit on this trial.

A    Okay.

Q    Do you see what I'm saying?

A    Yes, sir.

Q    Because you've already done all you're required to do as a citizen by appearing here today.

A    Okay.

Q    Does that make sense to you?

A    Yes, sir.

Q    All right.  Enough from me.

THE COURT:  Gordon Hikel now is going to talk to you on behalf of the State of Texas.

Mr. Hikel.

MR. HIKEL:  Thank you, your Honor.

THE COURT:  Yes, sir.

MR. HIKEL:  Your Honor, does the juror have his questionnaire?

THE COURT:  No, he does not.

Let me hand this to Anne, and Anne will hand it to you, sir.

MR. HIKEL:  May it please the Court.

THE COURT:  Mr. Hikel.

EXAMINATION

BY MR. HIKEL:

Q    Mr. Morrison, again, good morning to you, sir.

A    Good morning.

Q    Mr. Morrison, again, my name is Gordon Hikel.  And as the judge mentioned a few moments ago, at this point the only oath you've taken is just the oath to tell us the truth. We know we give jurors that oath.  But you know, we, looking at your questionnaire, we know that in talking to us, you will tell us the truth.  Because at this point all we ask of you, Mr. Morrison, is just tell us honestly and truthfully what are your feelings, your thoughts, and your opinions about the law.

A    Okay.

Q    If you become a juror -- As the judge said to you, we are qualifying up to fifty people.  -- you will take another oath, and that other oath that you will take would then say that you will render a true verdict based upon the law and the evidence.

If, for example, you disagree with the law but you don't tell us at this point here and then you became a juror, then you are faced with a quandary.  You either do violence to your conscience and you would follow the law because you've taken an oath to do that -- and we don't want jurors doing that.  So, we actually called up 1,000 persons,

jurors, potential jurors.

If you remember back on April 24th when you came to this building and you filled out this all inclusive questionnaire, I think like eighteen pages, and you came that morning, we called about four or five hundred people. And that afternoon we called another four or five hundred people. So, we had between eight and I believe a thousand people we called just for the purpose of picking twelve jurors.

And the reason we do that, Mr. Morrison, is because we understand, first of all, that not every person should sit on all kinds of cases. For example, if my home were burglarized last night. Okay. And I got called as a juror, to be a juror, and I come up here and I heard a case involving burglary of a house, on that particular day I may not be a good juror.

A    Right.

Q    You know, because of the proximity of what happened to me. And the law recognizes that. And, so, we call all those people up to 1,000 to get twelve.

I'm going to talk to you about your questionnaire and talk to you about some principles of law. And you just tell me, let's say we have a conversation, and you tell me, you know, Gordon, Mr. Hikel, I disagree with the law. I can't follow the law. Whatever the case may be, you just tell me, okay?

A      (Nods head).

Q      In your questionnaire you mention that -- Let me see what page that is.  -- somebody by the name of Tony Robinson.  How do you know Tony Robinson?

A      He assists me in coaching in the Mesquite Peewee Football Association, Texan Flag Football Team.

Q      Okay.

A      He's the -- I'm the head coach.  He's the assistant coach.  He also assists me in coaching the Braves Baseball Team, which I'm the head coach of, at Mesquite League as well.

Q      Okay.  About how long have you known Tony Robinson?

A      Going on a year.

Q      A year.  And you know he works for the DA's office here.

A      Yes, sir.

Q      And I believe in your questionnaire you even mention that he is the head investigator for the DA's office.

A      Yes, sir.

Q      Okay.  Do you know how long Mr. Robinson has held that position?

A      No, but I think it's -- I'm not for sure, but I think it's approximately ten to twelve years because I know he said he's been -- I think he's been on the force for about eighteen years or so, so I'm not for sure.

Q      All right.  Do you know anything about Mr.

Robinson's family, wife and child or children?

A       Yes, they have a five year old named Seth.

Q       Named what?

A       Seth.

Q       Seth.

A       And he has a wife named Carmen who works for the school district --

Q       Okay.  And --

A       -- in South Oak Cliff.

Q       Okay.  Do you coach his son in anything or --

A       Yes, I coach him in football and also baseball.

Q       All right.  And how long have you known Mr. Robinson's wife?

A       About the same amount of time.

Q       What's her name?

A       Carmen.

Q       Carmen.  Okay.  And in terms of from where you live, without telling us the address, in terms of where you live and Mr. Robinson lives, how close apart are you guys?

A       Oh, approximately maybe 400 to -- anywhere between 400 to 600 yards, about maybe five or six football fields.

Q       Okay.  Have you guys visited each other at your respective homes?

A       Yes.

Q       So, would you consider -- If I were to ask you to

classify your relationship with Mr. Robinson, would you say you guys are very good friends?

A    Yes.

Q    Okay.  You understand that, as the Chief Investigator for the DA's office, it's possible Mr. Robinson may be involved in this particular case in some capacity?

A    Correct.

Q    Have you and he ever talked about this particular case?

A    No, sir.

Q    Okay.

A    He don't even know I'm up here, so.

Q    Oh, he doesn't?  Okay.  All right.

A    He doesn't know I'm a juror.

Q    In fact, when you came here on April 24th to fill out the questionnaire, did you tell him you came to this building?

A    No.

Q    All right.  Now, I mentioned a few minutes ago that it's possible Mr. Robinson could be involved.  In other words, he could come into the courtroom during the trial to participate in some investigative capacity as the head of the DA's office.  If that were to happen, tell us, what are your feelings about that?

A    Well, I respect him.  That's one thing I do.  One

incident we had in football when we first started the 2008 season.

Q    Uh-huh.

A    And the head coach -- And I asked to be assistant coach.  But the head coach ran off with the money and never came back, so I took the step of becoming actually head coach.

And not knowing that he was a chief investigator at the time, the Mesquite Texans Football Organization really didn't do anything to the gentleman that took the money, which was unfair to the kids.

Q    Right.

A    Because it's all about the kids.  And if I had known Tony, Coach Tony was the chief investigator, we would have asked him to look into it because it seemed like everybody else was peeling their feet, not wanting to even do it because the guy was their friend.

Q    Okay.  So, you respect Mr. Robinson that much because of your friendship and his capacity as the chief investigator that you would have wanted him to do something about that coach who ran away with the money?

A    Correct, because he could have investigated as far as the check stub was cashed, where it was cashed, and things of that nature.

The other individuals that was over the

Board of the Mesquite Texans, they wouldn't tell us any information pertaining to when our checks were cashed, where they was cashed. They would just tell us to go to our bank and our bank would handle it, which we felt wasn't right because it wasn't cashed at our bank.

Q    Okay. Let me ask you this. You are aware from filling out the questionnaire back on April 24th, from reading the handout or handouts this morning, that this is a death penalty case, correct?

A    Correct.

Q    And as the judge mentioned to you a few moments ago, the only two possible verdicts in a case like this, if you as a potential juror were to find the defendant guilty as charged, is either life in prison without parole or, depending on how these three special issues are answered, that could result in a verdict of death.

A    Correct.

Q    All right. If you are selected as a juror in this case and Mr. Robinson is involved, he comes in here and he sits, as sometimes they do as the investigator, do you feel any sort of pressure or anything, given your friendship, coaching his son, that you would feel an obligation to return a verdict, for example, the death penalty, knowing that, you know, that's what the office is going for?

A    No, because the law is the law.  You either abide by it or you don't.

Q    Okay.

A    And being a citizen, there are consequences and things of that nature for things that you do that don't abide by the law.

Q    Uh-huh.  Okay.  So, you're not worried about offending Mr. Robinson and your relationship with him if, you know, the evidence leads you away from either finding the defendant --

A    No.

Q    -- guilty or not giving the death penalty, depending on those issues?

A    No.

Q    All right.

A    It's all based on the facts of the case.

Q    Okay.  Mr. Morrison, let me just ask you something about who is Nathaniel Sanders?

A    Nathaniel Sanders is my cousin's husband.  He has a son named Nathaniel Sanders, Jr. who was recently killed in Austin by Austin P.D.

Q    First of all, let me say this on behalf of myself and the DA's office.  We are very sorry to hear of a death involving your nephew, I believe it is?

A    Cousin, second cousin.

Q    He was a young man?

A    Yes.

Q    I think he was eighteen years old?

A    He was nineteen.

Q    Nineteen?

A    He was eighteen going on nineteen.

Q    Okay.  When did this incident happen?

A    I don't know the specific date, but I know it was somewhere within the last month or so.

Q    Okay.  On or about May 13th or so, sound about right?

A    Somewhere in there.

Q    All right.  And where did this incident happen?

A    In Austin, Texas.

Q    Okay.  And the young man who was killed, Mr. Sanders or -- I tell you what, can I call him Nathaniel only to distinguish him from his dad for the purposes of this?  Or let me call him Junior.

A    Or Nate, either one.

A    Nate.  Okay.  All right.  Nate.  How close were you to Nate?

A    Well, we would have family reunions when he was growing up.  He loved basketball.

Q    Uh-huh.

A    I used to try to teach him things on the basketball

court.  I'm a football player.

Q    Right.

A    And he is more of a basketball athlete.

Q    Uh-huh.

A    I had surgery on my knee, I think it was 2006. And the doctor told me to stay off my knee.  And he was out there playing so I wanted to show him some things, teach him some stuff about basketball and give him some guidance.

And I got out there and I played on my knee. And I pushed him around a little bit to kind of see how tough he was and things of that nature.  And he just loved basketball.

Q    Uh-huh.

A    I just told him, no matter what you do in life, regardless of what it is, always try to do your best, always try to excel.

Q    Okay.

A    Always do one thing, always listen to others.  It never hurts to listen.

Q    Okay.

A    An individual may give you some important advice, advice that you may need.  But instead of you being stubborn, take that advice.  It may help you out in the longrun.

Q    Okay.  Mr. Morrison, tell us, what is it that you

know -- What do you know about the incident involving your nephew's death?

A    All I know is basically him and two other individuals pulled up at an apartment in Austin, and he was supposedly asleep in the back seat.  The gentleman driving was awake, pulled up to his girlfriend's or something.  Another gentleman was asleep in the front seat.

And the officer obtained the gentleman that was driving, basically took him to the back of the vehicle, then took him to the police car and left him in the police car.  Then supposedly the officer told him, I'm going to put you back in the vehicle.  He say he didn't want to go in the vehicle.

And then, all of a sudden, the officer went back to the vehicle.  And as he went back to the vehicle, I guess he attempted to drag Nathan out while he was asleep.  And once he dragged him out while he was asleep, I presume, and I don't know, they say that he may have dropped his weapon, got startled, and then grabbed Nathan by the head and shot him at gunpoint in the head, drug him out of the car and put him on the concrete and shot him again as he was laying on the concrete.

The other gentleman that was in the vehicle got out of the vehicle and started running and supposedly when he was shot then by the same officer.

*Anne B. Meredith*
Certified Shorthand Reporter

Q    Was that other gentleman named Sir Smith or something?

A    I don't know his name right off, to be honest with you.

Q    Okay.  Do you know the officer's name, by any chance?

A    I know it but I don't have it on the tip of my head.

Q    Does the name Quintana sound familiar?

A    Yes, Quintana sounds familiar.

Q    Okay.  There was a riot that took place sometime after the incident in Austin.  Do you know the details about that riot?

A    I just know from basically watching the news broadcast on my computer, it states that a lot of residents were coming out saying that it wasn't right and this and that, that justice needed to be done, this and that.

And then the officer -- The chief was telling them, you know, everybody just needed to go home.  We've got the situation under control.  Let us do our job.  And that the crowd was unnecessarily out here causing havoc, and basically just stay out of the way and let us do our job. We will get to the bottom of it.

Q    Did you attend the funeral of your nephew?

A    Yes.

Q    When was that?

A    It was that following, I want to say Monday.

Q    Okay.

A    That following Monday.

Q    All right.  Did you go to Austin to take part in any demonstrations or anything as a result of this incident?

A    No.

Q    Okay.  What are your thoughts --

A    I think --

Q    I'm sorry.

A    One thing about stuff like that is everything happens for a reason.

Q    Right.

A    And if you're any type of Christian person, the Lord is going to make the best way out of each situation. If it happened, he made it happen.  It happened for a reason.

Q    Okay.

A    You never know what the reason is.

Q    Okay.

A    But down the line sometime the reason will come forth.

Q    All right.

A    And the individual that knows that it happened for a reason, that reason will come to reality to them --

Q    Uh-huh.

A    -- about whatever happened.

Q    All right.  Mr. Morrison, do you consider Mr. Robinson such a good friend that you and he even talked about this situation; is that correct?

A    No, not this situation.

Q    You never told him?  Okay.

A    Are you talking about my nephew's situation?

Q    Yes.

A    My cousin's situation?  Yes.

Q    Nate, Nate's situation.

A    Yes, Nate's situation.

Q    Okay.  When it happened, you told Mr. Robinson about it.

A    Correct.

Q    You guys talked about it.

A    Yeah, I called Coach Tony and I said, well -- We was having something, a baseball game that weekend, and I told him I probably wouldn't be there.  And he said, "Why, Coach"?

And I said, "Well, my little cousin has been shot by Austin Police Department".  He said "No".  I said "Yeah".  And he say, "When did this happen"?  I was telling him about it.  He said, "Okay.  Well, I'm sorry to hear that", and everything.

*Anne B. Meredith*
Certified Shorthand Reporter

Then he explained to me, well, he'll take care of everything, you know. And all of a sudden I had to call him back and say, "Well, they scheduled the funeral for Monday instead of Saturday, so I'll be at the game on Saturday". I said, "But I just won't attend practice or nothing on Monday. I'll just cancel it and I'll just go to the funeral". He said "Okay". He said, "Well, our prayers will be with y'all".

He say, "Well, everything that happens", he say, "a lot of police work that was done was done improperly". He say that the individual that was I guess Quintana should have had his siren on and stuff like that.

But he say, "That's all right. Everything will come out to the wash". He say, "You have a lot of this situation, you have a lot of bad. The cop just didn't handle the situation good". He say, "But everything else will come clear about it".

Q    So, you guys talked about the incident again when you came in to practice on Saturday, that Saturday?

A    No, we had a game that Saturday.

Q    You didn't talk about it there at the game?

A    No.

Q    Okay. Do you understand that there was a videotape of the incident from one of the police cars?

A    Correct. But supposedly the videotape, one of the

videotapes was supposedly not running or hadn't been running or they couldn't find it, it wasn't there, something of that nature.

Q    All right.  But you have not seen a videotape of the incident.

A    No.

Q    You just heard that in one squad car they said it wasn't working, but in another squad car it may have been working but --

A    Correct.  See, supposedly one squad car caught a different angle of it.

Q    Right.

A    But supposedly it didn't catch the good angle. And the squad car I guess that was directly behind the vehicle --

Q    Right.

A    -- in the same station wagon didn't have the siren or the videotape running.

Q    Okay.  Well, Mr. Morrison, only you -- and by you I mean only you in terms of any one of us in here -- fully understands the effect that this has had on you and your family given the death of Nate at such a young age.

Tell us honestly, what are your feelings about this whole situation?  Because in this case here, your nephew was obviously an African-American male, correct?

A    Yes.

Q    So is this defendant here.  Okay.  Police officers will be involved in this case, who will testify in this case about the things they said that the defendant did or didn't do.  Given this whole scenario with your nephew Nate, the timing, where it happened, in this situation, if you are a juror, what are your thoughts about that?

A    Well, me as an individual person, it goes back to everything happens for a reason.  A lot of times when you're out in the street, things happen.  They happen so quick you just react.

Q    Right.

A    And as a police officer or as a human being --

Q    Uh-huh.

A    -- your main concern is honestly being in fear for your life as well.

If you take two individuals walking down the street on a dark night, one walking north and one walking south, any time they pass each other, each one of them is going to turn around to try to look at the other one to see exactly what's going on and what's happening.  That's the humanality of us as individuals.

But the thing I'm trying to tell you is that every time an officer or an individual go out there, they always have to be precautious and careful of their

surroundings and the situation that they put themselves in.

Q   You mean the officer or the person who is --

A   Both.

Q   Okay.  All right.

A   Both individuals, regardless if you are just an individual that is just --

Q   Right.

A   -- a plain Jane just somewhere.

Q   Right.

A   You have to be precautious of yourself in the situation and your surroundings.

Q   Right.

A   But the main thing I say to my kids is never try to put yourself in a situation that you have no control over.

Q   Uh-huh.

A   And me as an individual, I'm gonna probably go, I say, why was Nate out that late with them individuals?  A lot of stuff that was going on that I didn't know, and not being rude.  I consider Nate as a favorite cousin, a favorite nephew, a favorite brother, this or that of the family.

If anybody want to know something or want some advice or something, they would call me and ask my opinion --

Q    Right.

A    -- or ask as far as my opinion about it.

I didn't know Nate wasn't staying at home. I didn't know he wasn't from home. I didn't know he had left home and was staying somewhere else. I didn't know that.

And my saying to my family is, why ain't nobody try to go out there and try to get him? Why nobody didn't go out there and try to talk some sense into him, talk to him and let him know, this is what you need to do, this is how you need to do it?

And then they come and say, well, they go to church seven days a week, so he got tired of going to church. But an individual that's eighteen, you say to yourself, you can't turn Christianity on to them at eighteen. They have to make it for themselves.

Q    Right.

A    You can lead a child into the church. As he get older, he will go his separate way. Once he go his separate way, if he was reared in the church, the Lord will pull him back. He'll wake up to reality and say, well, this is where I need to be and this is what I need to do.

Q    Uh-huh.

A    And me personally, I feel that they should have gave him the choice to decide whether he wanted to go to church or not, and then he may have brought himself back.

Q    Okay.

A    Instead of allowing him to go out on the street to stay with this person or that person and live here and live there.

Q    Uh-huh.

A    That's just my opinion.

Q    Okay.  Well, let me -- let me cover a page of your questionnaire.  You were asked the question about the death penalty, whether are you in favor of the death penalty.  You put no.  And you said that you never know what causes an individual to perform whatever act they did.  Every individual would change in the essence of time.

What do you mean by that?

A    Well, to me, it depends on the situation.

Q    Right.

A    That's the reason I said that because, every situation, you have to know the situation.

Q    Right.

A    It could have been an accident and you say to yourself, does the individual get the death penalty for an accident?

Q    Uh-huh.

A    So, that's the conclusion of why I came to the answer.  And to say that if it was an accident, that individual who committed that crime on an accident, I know

an accident would be taken into consideration. But, still, he would either get the death penalty or life imprisonment.

At that time, if it had been an accident, with him serving life in prison, he would come to his sense of reality of what happened, how it happened, what made it happen, what caused the incident, what ran through his mind to make him do this or make him do that.

Q    Okay. Mr. Morrison, we know that when you filled out this questionnaire that, as a juror, a potential juror, we didn't expect you to know what the law is in Texas as to what sort of acts if a person commits could result in the issue of being charged with capital murder.

Let me tell you that in Texas, for this kind of capital murder where there is a robbery, a felony, in this case a robbery and death, it's always -- the State always has to prove that the person's death was intentional, never an accident, never knowingly; in other words, never knowingly, never reckless, never criminal negligence.

It always has to be that the person who caused the other person's death, that was what he set about doing.

A    Okay.

Q    He wanted this person dead. Okay? So, it was never an accident.

A    Okay.

Q    Because if it were an accident -- You know, if I

am driving down the road, for example, you know, I'm driving my car, heading home after work. It's been a long day. I'm on 75, I'm going 85 miles per hour. Reach down for a CD or spill my coffee in my lap, I reacted, slammed into someone and killed someone, that's an accident.

A    Right.

Q    For that I would never be charged with capital murder. I may be charged with manslaughter, I may be charged with criminally negligent homicide, but never capital murder.

A    Okay.

Q    Because for capital murder it requires, for example, the murder of a police officer in the line of duty, the murder of two or more people in the course of one criminal episode, the murder of a child under the age of six.

Or as in this case where there is a felony offense, we've got to prove the person committed a felony, whether it be robbery, burglary of a house, sexual assault, retaliation, and in the course of that felony he intentionally killed someone. Okay?

Now, in light of that information where understanding now that in Texas the death penalty requires a specific intent to kill someone, is your view -- would your view still be the same then that, you know, if there is

an accident, then I can't do the death penalty, but if there is an intentional death in the course of a felony and you prove it to me beyond a reasonable doubt, then, yes, I can answer yes or no whether a person is guilt or not guilty of capital murder; is that correct?

A    Correct.

Q    All right.  Now, flip to page seven of your questionnaire, if you will, Mr. Morrison.  There is a question in there about police officers that you were asked back on April 24th, which was before the incident involving your nephew Nate.

And in there, in regards to police officers, you put no when asked, do you believe that they are more likely to tell the truth than the average person.  But you went on to say, they are still individuals and they will try to cover themselves when they have done the wrong things.

Now, you said that even before you expressed the opinions about what you believe happened with your nephew.

In this case, this case that you were called for as a potential juror, there will be police officers.

Now, in light of your answer here in the questionnaire on April 24th, in light of your feelings about police officers involving the incident with your nephew Nate, and in light of the fact that police officers will be testifying in this case --

A    Okay.

Q    -- tell me, Mr. Morrison, how will you be affected as a juror in assessing their credibility as witnesses, meaning police officers?

A    Well, they are officers and that's who we look up to to uphold justice and protect us.  But at the same time, they are still individuals.

Q    Right.

A    And it goes back to the question before, reaction during a different time or a different incident.

Q    Uh-huh.

A    Each individual is going to react regardless of what happens or what don't happen, depending on the incident or the cause.

So when I say the reaction is, if something happened and they did something that they didn't do right or they felt they didn't do right at the time --

Q    Uh-huh.

A    -- they would know what they need to do to try to make it right.

Q    Okay.

A    And just going by you saying, if you are taking the questionnaire, your answer is A, B, C or D.

Q    Right.

A    Once you make your answer to B, you know that C

is the wrong answer, and when you are given the same test again --

Q    Right.

A    -- you know you're going to choose C.

Q    Okay.

A    Because nobody is perfect.  We all make mistakes. That's the humanality side of it.

Q    Okay.

A    And the humanality side of it being is just say, for instance, if the coach tell you, I want you to down block on the defensive end that's going to come in.

Q    Uh-huh.

A    If the defensive end get by you and you say, well, I down blocked but he got by me.  Next time I'm not going to down block.  I'm going to wait until I see what he is going to do, then I'm going to make sure I block him.

Q    Okay.

A    That's the same thing as my question here is saying.  If you do things but you do it in a precautionary event, regardless of which way you did it, you still know that there is a right way to do it.

Q    Uh-huh.

A    And the right way to do it, you going to make it be the right way to do it.

Q    Okay.  So, in other words, if police officers

were testifying in this case, in spite of your answer here and the issue with your nephew Nate, you would be able to evaluate their testimony as you would any other witness to determine if they are telling you the truth or not, or do you already have an idea about what you think of police officers that will affect you as a juror in assessing their credibility?

A    No, it will be all right because --

Q    Okay.

A    -- when you -- when something happens, it comes out.

Q    Right.

A    Just say, for instance, the Officer Quintana, he didn't have his dash camera on.

Q    Okay.

A    That's something that he know he should have done.

Q    Right.

A    As a regulatory process or procedure for officers, when they pull over a vehicle, they turn their dash camera on.

Q    Okay.  All right.

A    Or turn their siren lights on.

Q    Okay.

A    That's something that they are instructed and taught to do.

Q    Right.

A    But it didn't happen.  That's exactly the humanality side of it.

Q    Okay.  Mr. Morrison, let me ask you to look at page five and also page six of your questionnaire, if you can fold back those pages.

At the very bottom of page five you said you agree with the law that voluntary intoxication does not constitute a defense to the commission of a crime.

And then on page six, at the very top right, where you're asked about intoxication as a mitigation of punishment and asked do you agree with this law, you said yes.

But then in explaining your answer, you say that some individuals -- this is at the top of page six -- some individuals who commit crimes are under the influence of drugs and don't realize that they have done what they have done until they sober up.

Now, that sounds to me at the top of page six that what you're saying is, if someone commits a crime and he is on drugs, that -- would you say that you don't believe that they know what they are doing until they sober up?  Are you saying that that's a defense, then, to the commission of crime if they are on drugs?

A    No.

Q      Okay.

A      The problem is they are a drug addict, addicted to drugs.

Q      Okay.  Well --

A      And when you're addicted to drugs, you're going to do whatever you want to do or need to do to try to get the drug to fulfill your high or fulfill your addiction.

Q      Right.

A      And sometimes when the individual is already full of drugs or to whatever degree --

Q      Right.

A      -- they do things that they don't realize they done --

Q      Right.

A      -- until they wake up.  And it's just like an individual who goes out drinking at night sometimes.

Q      Uh-huh.

A      And he drinks so much that he don't even realize how he got home.

Q      Right.

A      Because he done drove home but he didn't realize, man, the last thing I remember was at the bar.

Q      Right.

A      I sat there and I had another drink and I had another drink and I had another drink, so I don't even

remember how I got home.

Q    Okay.  Well, let me stop you there, though.  But this is my question now.  Are you saying by the answer at the top of page six that if someone commits a crime and he or she is under the influence of drugs, okay, to the point to where he doesn't realize what he's done until he sobers up, now, what ought to be the effect of that on the person who committed the crime that was using drugs?

A    He done it.  That's the point.

Q    Okay.

A    It's done.  Regardless of what goes on and happened, you done it.

Q    Okay.

A    It's a done deal.  So, the only thing you can do is sit there and remorse about what you have done because it's done.

Q    Okay.  I mean --

A    There is nothing you can go back and change about it.

Q    So, it's not an excuse to say look, given the fact that you were high or something, we excuse you.  We know --

A    There is no excuse.

Q    Okay.  All right.

A    Because you, as an individual, you're the one that did the drugs.  We didn't go out there and say, okay, here

you go, here you go, here you go, keep taking them.

Q    Okay.  They are still responsible.

A    Yeah.

Q    All right.  Top of page five there.  And before we get into it, I want to talk to you about the founder of the Crips.  Is that the gang in L.A., the Crips?

A    Yes.

Q    And that was the African-American male who started that organization?

A    Correct.

Q    And there was a big story about, you know, I think it was a movie or something how he changed his life since he's been in prison in California.

A    Correct.

Q    Okay.  Let me, before we get into Mr. -- What is his name, by the way, do you know?

A    I can't think of his name.  I was going to write it down here, but I couldn't think of it.

Q    All right.  But you mention about him on page five as someone that, you know, has changed his life, I believe you said, after being in prison for so long.  But then you juxtapose his story with that of the police officer who was killed when the seven escaped from prison.

Why do you put those two together?  I mean, what's the idea there, the Crips founder and then these

seven guys?

A    Well, I was a potential -- Well, I came in to fill a questionnaire and everything out for the seven that was -- that escaped from prison.

Q    Right, uh-huh.

A    But I wasn't chosen as a juror.

Q    Okay.

A    And then the individual, I don't know his name that was the founder of the Crips, he's been in there and he did so much while he was in there confined with books and things, trying to reach out to different kids and different groups and different agencies and things like that, that it actually helped them and actually helped some individuals change their life around.  And that, to me, goes to say that he's done it, there is nothing else he can do about it.

Q    Okay.

A    All he can do is try to make it better in the situation now.  And his situation being confined to that was what it was, which is the death penalty.

Q    Uh-huh.

A    And he know that, and going in he knew that.

Q    Right.

A    So, he is an individual who made the choice to change his thoughts and behavior by trying to assist

different agencies and trying to help do good and things of that to make other individuals aware of what he's done --

Q    Right.

A    -- and how things happen.  But in all reality of life is that he's done it, it's done.  There is nothing he can do to change that.

Q    What would have been your thoughts about this individual if he had gotten the death penalty?

A    Well, I thought he did.

Q    Say it again.

A    I said I thought he did.  He would have died in prison one or the other.

Q    Right.  But I think it was commuted to life.  In other words, if indeed the DP or death penalty was carried out, he was executed.

A    Oh, so, it didn't happen?

Q    No.

A    Oh, okay.

Q    Right.  But my thoughts are, let's say he was executed prior to doing all these wonderful things that you said that he did, and I agree with you, what would your thoughts have been about that situation?  Would you conclude that there was a case where the death penalty was misapplied to someone or --

A    No, he did what he done and you can't change that.

It's been done.

Q    Okay.

A    The only thing that he could do like he was doing was trying to make it better for other individuals, to make them aware, don't do this, you know, like what I did.

Q    Right.  Okay.

A    Go a different route.

Q    Well, on the cover page of your questionnaire you mentioned that, you expressed that every individual -- you didn't say the word could change -- you say will change in the essence of time.

Do I -- What do you mean by that, that every individual will change?

A    Because every individual will change because you adapt to the situation that you're in.  That's change.  Change is the most constant thing in the world.

Q    Okay.

A    If you take an individual that lives in Texas.

Q    Right.

A    He moves to California.

Q    Right.

A    Regardless of what goes on and happened like that, the individual is going to change within the one to two year stage of their life.

Q    Well, let me stop you there only because of time.

But in the context in which you answered this question, the context of death penalty, what do you mean by, in that context, the death penalty, that every individual will change in the essence of time?

A    Being confined.

Q    Right.

A    An individual being confined, they are going to change.

Q    Okay.

A    They are going to change to adapt to the situation that they are in.

Q    Okay. Well, let me ask you this. Would that be the case whether or not a person is sentenced to death or life in prison is that he or she could change or will change?

A    Yeah, eventually they will change.

Q    Okay.

A    Either it will be for the better or the worse.

Q    All right.

A    An individual who knows they are going to serve the death penalty, some of them could change for the worse and, once they go, cause so much havoc in TDC that -- They already know they are going to get the death penalty so it don't matter.

Q    Okay.

A    You could take another individual, the same

individual or another individual, who may change for the better and try to assist in there and try to do different things.

Q    Right.

Q    To help the ones in there, to help them change their life around and do better.

Q    So, is that the reason why, given this possibility -- not the possibility.  You say that they will change.  Is that because you know that individual will change in the essence of time, is that the reason why you said that no, you're not in favor of the death penalty?

A    Correct, that's why I said that.  But my reality is based on the situation.

Q    Uh-huh.

A    Based on what occurred, what happened.  And the situation to me overweighs everything.

Q    All right.

A    And the situation being depending on what caused the death of what individual and, like you say, what the intent was going in.

Q    All right.

A    Just say, for instance, if an individual is on a football field, their intent is to win.

Q    Right.

A    If you have an individual who is six feet seven

and you have an individual who is six feet two.

Q    Uh-huh.

A    I'll say the six feet seven guy is basically going to be dominant over the six feet two guy.  But the six feet two guy is going to try to find a way to try to break the six feet seven guy down.

Q    Okay.

A    So, what I am saying is the six feet seven guy already knows his intent going in.

Q    Right.

A    He's going to destroy the six feet two guy regardless of what goes on, what happen.

Q    Okay.  Let me ask you to turn to page four of your questionnaire where you say there, for what crimes do you think the death penalty should be available in Texas, you said, taking the life of a helpless child and for taking the life of an individual just because you wanted to.

In other words, do you mean by that that if you find evidence that someone intentionally, in other words, I'm the shooter and I want to kill that guy and I go over there and I pull the trigger and I shoot and kill him because I wanted to, is that what you mean by that's the kind of case where you believe the death penalty should be an option?

A    Correct.

Q    Okay.

A    Because you intentionally do it, you're doing what you wanted to do.

Q    All right.

A    It was something that was already premeditated.

Q    Right.

A    It was like you're going to go to Jack's house --

Q    Right.

A    -- or you're going to go down the street and the first individual or whoever you see, that's whoever you're going to kill.

Q    Okay.  On page four you're asked there to rate on the scale of one to ten your belief for the death penalty.  You put the word yes.

You know, look at like the middle of the page.  If you believe the death penalty has -- in using the death penalty, how strongly on a scale of one to ten.

A    Page four?

Q    Yes, the middle of page four.  You see there, the middle of there?

A    Yes, I do.

Q    Okay.  And on a scale of one to ten, you put the answer, you put the word yes.  Did you misunderstood the question or --

A    It says, being one as the least and ten being the most.

Q    Right.

A    Do you hold this belief?

Q    Uh-huh.

A    I said yes, because if a person intentionally did something with intent, they knew they was going to do it, that means they knew they was going to do it.

Q    Okay.

A    You know what I'm saying?  The evidence and everything weighing back to this person did this knowing that he was going to do it, then he need the death penalty.

Q    All right.  In light of your answer on page six, then, alcohol, can a person be high on drugs and still have the intent to kill someone?

A    Yeah.

Q    A person can?

A    Yes.

Q    Okay.  All right.  Let me ask you then, let's jump quickly --

          MR. HIKEL:  Judge, how much time do I have?

          THE COURT:  You've got seven minutes.

          MR. HIKEL:  Thank you, Judge.

Q    Let me jump ahead to these special issues here because, Mr. Morrison, this is the only time in a death penalty case you'll ever see these three special issues.  You'll never see them in any other case except one where

there is a capital felony.

Your answer to those questions determines whether or not a person who has been found guilty of capital murder either gets the automatic sentence of life without parole or the death penalty.

And those three issues there, an answer of yes to one, yes to two, and no to three would automatically -- in other words, that means the judge will have no choice but to sentence the person to death.

Okay. Knowing that that's our objective, okay, look at issue number one. How do you believe the State could ever prove that issue to you yes?

A    They have got to show me evidence that --

Q    What evidence?

A    The evidence of the case.

Q    Okay. Well, you understand that if you are considering these issues here, you've already found the person guilty of capital murder. You've already found that this person has intentionally killed somebody in the course of, in this case, robbery. Then you get to special issue number one.

Now, some jurors have told us that -- and the law does allow you, by the way, to simply consider the evidence, the facts alone of the crime, in answering the question yes or no.

But some jurors have told us, given the fact that it's not an automatic process, I want more evidence besides the facts I've already found him guilty of.

What else would you require in special issue number one before you could answer that question yes?

A    First of all, I need to know the evidence as to in the case during the robbery or whatever the case is.

Q    All right.

A    The individual's intent when they went in to obtain or get something.

Q    Yes.

A    Regardless of what it was.

Q    Uh-huh.

A    And the individual knew going in that no matter what comes his way or what comes their way during the situation --

Q    Right.

A    -- they are going to do whatever they need to do --

Q    Correct.

A    -- whatever they need to do to survive.

Q    Uh-huh.

A    So, my answer would be yes because they automatically already know going in what they are going to do.

Q    Well, let me ask you this.  Are you saying that if

you as a juror find someone guilty of capital murder in that you believe beyond a reasonable doubt that the State of Texas has proven to me, Mr. Morrison, that that individual I found guilty intentionally killed somebody in the course of taking the person's property, i.e., robbing the person or attempting to rob the person, and I find the person guilty of capital murder, would your answer to special issue number one be automatically yes, or will you hold me to my burden of proof and make me prove to you the answer ought to be yes?

A    I've got to hold you to your burden of proof that the answer ought to be yes because you still have to prove beyond a reasonable doubt that that was the intent of him going in there to rob and kill.

Q    Well, you understand that's already been decided in the guilt/innocence stage of the trial because we never get to these issues here unless you've already concluded that yes, I have proven to you, the State has proven to you beyond a reasonable doubt that the defendant intentionally killed somebody to take the person's property. You've already determined that issue, that's yes. That's the only reason why you get to these issues.

A    Okay. Yes.

Q    Now, my question is this now. If we get to that point now where you're considering these issues now and you get to the very first one, do you --

A    Yes.  If it's proven upon a reasonable doubt that yes, that was their intention to go in and to rob and kill someone, yes.

Q    So, your answer would be automatically yes to number one, or would you make me prove it to you again beyond a reasonable doubt with additional evidence?

A    If it's already been proven, like you say --

Q    Right.

A    -- then yes, because you've already proved it. Whichever way you have proved it, whether it's being if he committed to it or whatever you call it, they say --

Q    Uh-huh.

A    -- and that means the individual said yes, I did that.  Other than that, you have to hear all the evidence, which you say you have to hear something for you to say yes, he's already been proven that that was the case, that he went in with robbery and intent to kill someone.

Q    Okay.  So, for you as a juror, if I prove that and you find him guilty of capital murder, intentionally killing somebody to rob them, and when we get to punishment issue number one, you are satisfied that your answer would be automatically yes because we have already proven this person intentionally killed somebody in the course of robbing them?

A    Correct.

Q    All right.

A    This is off the case.  I had an incident where I'm a deacon at the church.  And I have an individual that I used to try to teach things in basketball.  He was a good athlete.  He was a child to his parents.  He was in a father and a mother home.  In other words, he had both parents there in the household with him in order to try to steer him the right way.  But they would baby him so much and give him anything he wanted.

And he would play basket -- He played basketball at Lincoln High and he was good.

Q    Uh-huh.

A    And everybody used to talk about how good he was.  So, as he come to the church, I started coaching him at the age of seventeen and coached him up until he graduated.  And I am saying to myself, he's going to be good.  He'll get a scholarship somewhere.

But his attitude was the worst thing because his mom and dad let him get everything he wanted and he felt like everything was his.  And him and another individual at our church went in to rob an individual.  And when they went in to rob an individual, they killed the individual, and he only got ten years in prison.

Q    What are your thoughts about that?

A    I don't -- I didn't know all the evidence of the case because we wasn't told everything.  But my personal

opinion is that if you take someone else's life for something that they have worked hard for, that's not right. They worked hard for that, not you. It's not right for you to want to try to come in there and take it. You know, that's just not right.

Q    And do you believe that those facts as you mentioned to us would have warranted at least him being charged with a capital murder, seeking the death?

A    I do feel that because he took another individual's life trying to get something of that individual that was theirs, not his.

Q    Okay. And if you were to find that person guilty of capital murder and you considered these issues here now as you would in any capital murder case where we are seeking death, you would automatically answer the issue number one yes because of the facts and the facts alone of what the person did?

A    Correct, because even though I knew the individual and I kind of mentored the individual, you have been taught better.

Q    Right.

A    You know better. You have been raised better. So, the thing is to be is you have everything here. Your mom and dad do everything for you.

Q    Right.

A    So, why?  If you wanted something or whatever it was, all you've got to do is ask mom and dad.

Q    Right.

A    If they can get it, they will try to do it for you. They do everything else for you.

Q    Well, what if this person didn't have good parents, let's say from a single parent or from a bad environment or a bad neighborhood.  To what extent do you believe that that should affect you as a juror in deciding whether or not, first of all, a person intentionally committed the crime, and whether or not the person should get the death penalty?

A    Well, bad parents, that's nothing he had control over.

Q    Right.

A    But he has a grandma and a grandpa out there that will help assist in raising the kid.

Q    Okay.

A    I don't care where you go, when you go, what you do, granny is going to always be there.

Q    You still have a choice.

A    That's right.  My granny raised me and I didn't grow up with my mom or my dad.  I grew up with my granny. My granny raised me and taught me to do the right thing.

Q    Okay.

A    And then I had a coach who mentored me and let me

know that this is the thing that I do to help you as far as you going to mow yards and working gardens and raking leaves and stuff like that.

Q    Uh-huh.

A    He told me one day -- I moved to California, played college football, come back to East Texas and played with Stephen F. Austin.

He say, "Dedrick, do you know why I used to get you all those jobs mowing yards and raking leaves and trimming hedges and stuff like that that was paying you ten or fifteen dollars while you was over there"?

I said "No".  He said, "I got those jobs for you.  I saw something special in you.  I wanted to keep you off the streets like the other individuals are doing.  I don't want you out there like that.  Something special in you I see".

So, every individual has a choice.

Q    Okay.  All right.  Mr. Morrison, I'm out of time. The judge is saying I'm out of time.  So, I would love to continue talking to you but I'm out of time and, so, I'll pass you to the defense lawyer.

Thank you for your time, sir.

THE COURT:  Thank you, Mr. Hikel.

Mr. Parks.

MR. PARKS:  Thank you, your Honor.

EXAMINATION

BY MR. PARKS:

Q    Mr. Morrison, are you doing okay?

A    Yeah.

Q    To go straight on in?  Good.  Let me -- I'm keeping my time here because I don't want to run over.

A couple of things first I want to just cover with you real quickly and then I want to talk with you about the law involved in these cases and whether or not you would be able to follow that law.

A    Okay.

Q    Okay?  But before we do that, y'all spent a good deal of time talking about your relationship with the DA's investigator.

A    Yes.

Q    I think that I got from what you were telling Mr. Hikel that you and he are good enough friends that he would respect whatever decision you made in the case.

A    That is correct.

Q    Is that fair to say?

A    That is correct, it's fair to say.

Q    And if you were on this jury and the State failed to prove to you beyond a reasonable doubt that Mr. Broadnax is guilty, you would find him not guilty and that Tony would respect that decision on your part; is that right?

A    Correct.  But I thought he said he's already been proven.

Q    I'm sorry?

A    That hasn't already been proven?

Q    No.  No, sir.  That's one of the traps we sometimes fall in, Mr. Morrison, is that we spend so much time taking about the punishment phase that jurors can just assume that the decision has already been made that the defendant is guilty, and that is absolutely not so.

A    Correct, everyone has a proven of innocence before guilt.  That's the law.

Q    Well, I understand.  But you understand that as he sits here right now, Mr. Broadnax is presumed to be innocent.

A    Correct, until proven guilty.

Q    And can you presume him to be innocent?

A    Yes, until proven guilty.

Q    Okay.

A    Because it haven't been proved yet, right?

Q    Exactly right.

A    Okay.

Q    It has not.  You know, so what we sometimes omit to say to prospective jurors is that, you know, they may never, ever have to answer these questions because, depending upon what their verdict is at the first phase or guilt/innocence phase of the trial, it may be that the

defendant gets to go home if they find him not guilty, if the State has failed to prove their case.

Does that make sense to you?

A    No, not if he robbed somebody, he's not going home.

Q    Have you made up your mind, Mr. Morrison, that Mr. Broadnax robbed somebody?

A    Well, I thought that's what he said.

Q    No, that's not what he said.

A    That's not what Mr. what's his name said?

Q    It is not what he said.

A    Oh, okay.

Q    Now, you misunderstood him.  And I think Mr. Hikel would tell you that.

A    Okay.

Q    Okay?

A    That's what I thought he -- Well, I thought he said that at the end, that it's already been proven.

Q    Well, no, he -- What he was, I think, trying to say or was saying is that if it had already been proven so and so and so and so.

A    Okay.

Q    But, no, it has not been proven.  There's been no determination in this case at all.

A    Okay.

Q    That's what the twelve people who sit on this jury

will have to make a decision whether or not the State has proven their case.

A    Okay.

Q    And if they have not, then they vote not guilty and the trial is over.

A    Okay, understood.

Q    Okay.  Does that make sense to you?

A    It makes sense.

Q    And it sometimes is the situation, Mr. Morrison, where a person might be not guilty of capital murder but guilty of something else, what we call a lesser included offense.  Okay?

For instance, I'll give you a couple of quick examples of how that could happen.  You might hear evidence that convinced you, for instance, that a person -- And I am not talking about this case.  I'm not talking about Mr. Broadnax.  This is a hypothetical situation.

You might hear a case where you believe that the defendant intentionally killed a person but not during the course of a robbery, and it takes both of those things to make a capital murder.  So, in that case you would be justified in voting not guilty for capital murder but guilty of murder.

A    Okay.

Q    Does that make sense?

A    Yes, understood.

Q    That's what we call a lesser included offense.

A    Correct, because you're saying it has to be two in order to be capital.

Q    It has to be murder plus something else to be capital murder.

A    Okay.

Q    It could be a situation, for instance, where the defendant was alleged to have killed a police officer in the course of his duty, and there might be some question whether or not the police officer was acting in the course of his duty.  It's not a capital murder for a person to kill a police officer walking down the street in his civilian clothes not on duty.  He's just like any other citizen in that mode.

A    Correct.

Q    So, it might be that you would find, okay, he did kill this person, but he didn't know he was a police officer or acting in his official capacity.

A    Okay.

Q    So that would be murder, not capital murder.

A    Okay.

Q    Sometimes it might even be a situation where what we call the culpable mental state of the defendant is in question or is contested during the course of the guilt/

innocence phase of the trial.

Let me explain that to you a little bit so you'll know what I'm talking about.

A    Okay.

Q    There are four culpable mental states in the State of Texas.  A person either acts intentionally or knowingly or recklessly or with criminal negligence.  Okay.  And sometimes it may be that the jury is called upon to make a decision about the state of the defendant's mind when he did what he did in order to determine what the culpable mental state was.

And let me give you an example of what, for instance, the difference between intentional and knowing could be.  Let's say a person went into the 7-Eleven store.  Hypothetical situation, got nothing to do with this case.

Went into the 7-Eleven store, intended to rob it, had a gun.  Said to the clerk, give me the money, and the clerk gave him the money, and then he shot that person dead right there behind the counter and left.  Okay?

A    (Nods head).

Q    Contrast that with a situation where the same guy goes in and intends to rob the store, has a gun, tells the clerk, give me the money, and the clerk gives him the money.  And he says to the clerk, don't come around this counter and follow me out because I don't want you to know which direction

I go, so just stay behind the counter, I'm leaving.

And he gets out to the door, looks around and, sure enough, the clerk is coming around the corner doing -- the counter just like he was told not to do. And, so, to prevent him from following him out, he shoots him in the leg, intending to keep him from following him out. And let's say that the bullet severed the femoral artery and the poor clerk died before somebody could get to him, bled to death. Okay. He's just as dead as that first clerk.

A    Correct.

Q    Okay. And he is dead at the hands of the robber. But our law would say that in the second situation, that's not capital murder because there must be an intentional killing. That is to say a person must have the conscious objective or desire to cause the result. He must want to kill the other person, not just do something that causes death.

A    The death.

Q    And the law makes a distinction there between wanting something to happen and doing something that makes something happen even though you didn't want it to happen.

A    Okay.

Q    Are you with me?

A    Yes.

Q    So that a person under that circumstance, the jury

might find him guilty of a lesser included offense.

A    Okay.

Q    The law allows either side to introduce evidence to the jury about the condition of the defendant's mind at the time of the offense so that they can determine what that person's culpable mental state was.  Okay?

A    (Nods head).

Q    And it's different from was a person criminally insane.  If a person doesn't know the difference between right and wrong, then that's a defense.  It's what we call a justification -- I mean an excuse.  A person is excused from any criminal liability if he was insane at the time he committed the offense.  Okay?

A    Okay.

Q    It doesn't happen often, frankly, but it's there. So, a jury could be called upon to make those determinations about the culpable mental state depending upon the evidence that you hear.

A    Okay.

Q    Do you believe that you would be able to do that if that was an issue and make a decision, and if the State didn't prove the intentional culpable mental state, you would reflect that in your verdict?

A    Yes.

Q    All right.  And I do want to emphasize, Mr.

Morrison, that I'm going to talk to you about these special issues, but I want to emphasize again no decision has been made in this case.

A    Okay.

Q    And we are not, at this table, we are not conceding in any way that this jury will ever find Mr. Broadnax guilty and that this jury will ever be called upon to answer these questions.  But I've got to talk to you about them now or I never get an opportunity to.

A    Okay.

Q    And I need to assure myself, in order to do the kind of job I'm supposed to do for Mr. Broadnax, or anyone else that would be sitting in this chair, I've got to make sure that you understand what this process is and I have got to determine whether or not you can follow the process that the law expects.

A    Okay.

Q    Okay?  I wouldn't be doing my job if I didn't.

All right.  Now, I want to make sure that you understand about the context of these special issues.  I want to make sure you understand and I want to make sure I understand what you're saying to me.

A    Okay.

Q    Because I've got to know whether or nor you can participate in this process and be a fair and impartial

juror and give Mr. Broadnax a fair trial.

A     Okay.

Q     And I know that you believe you can, right?

A     Correct.

Q     I want to make sure of it so far as I can.

What I need to tell you is this.  No jury ever is called upon to answer these special issues unless they have, excuse me, first been convinced beyond a reasonable doubt from the evidence that the defendant is guilty of capital murder.  That is to say that he intentionally took the life of another person without legal excuse or legal justification and he did that in order to obtain another person's property.  Okay?

A     Okay.

Q     So, that's the context in which these questions were asked or are being asked.  Okay?  And the philosophy behind the process that we have, Mr. Morrison, is that the law recognizes that just because a person is an intentional murderer does not necessarily mean that they are going to be a future danger in the penitentiary.

A     Okay.

Q     If we were to assume that all intentional murderers were going to be a future danger, we wouldn't need that question at all.  Okay?

A     Okay.

Q    The purpose of special issue number one is to act as a barrier to the imposition of the death penalty. What the law says is this. That even for an intentional murderer who killed someone because they wanted to in order to get their property, okay, the preferred or default punishment for that person is life without the possibility of parole, not the death penalty.

A    Okay.

Q    Okay? Our Court of Criminal Appeals has said to us that the purpose of special issue number one would be to identify those few incorrigibles who cannot even be incarcerated without further violent outbursts. Okay?

A    Okay.

Q    So, that's what they are looking for jurors to determine from the evidence. And the law recognizes that is the defendant guilty, did he do what he is accused of having done, is a different question from will he in probability commit criminal acts of violence that would constitute a continuing threat to the society in which he will find himself, which, of course, will be the penitentiary.

A    Okay.

Q    You see what I'm saying?

A    Yes.

Q    That's two different questions.

A    Correct.

Q    Now, some jurors say to us -- and I believe that this is what you have said to Mr. Hikel, and I want to make sure that you understand what the process is.

Some people -- I have had jurors say to me, well, Mr. Parks, that calls upon me to make a decision beyond a reasonable doubt about what a person will probably do in the future. That's almost impossible. That's a prediction that would be extremely difficult to make regardless of the evidence. Okay?

A    Okay.

Q    And that may be true and that may be what the law intends. Okay? I'm not suggesting to you that the law intends that it be easy for the State to prove special issue number one to be yes because the result of that is very possibly going to result in an execution, and the law takes that extremely seriously.

A    Okay.

Q    Now, I have other jurors say that it's easy for them to answer that question yes. Now, the law presumes the answer is no, just like the law presumes a defendant is not guilty.

A    Innocent until proven guilty.

Q    It says the State's got to prove everything they put in that indictment.

A    Correct.

Q    Well, the same is true of special issue number one. The law presumes the answer to that is no and that it stays no until and unless the State can prove exactly what is asked in that question.  Okay?

A    Okay.

Q    So, jurors don't go back in the jury room and say, okay, based on the horrible facts of this case, do we believe that the defendant deserves the death penalty?  That's not what they do, not if they follow the law.

A    Okay.

Q    That's not what the law intends for them to do, you know, make a decision what they want to happen and then go back and answer the questions however they need to answer it to get that result.  They don't do it.

A    Okay.

Q    The law contemplates that a juror could hear facts of a case where a defendant committed a capital murder that just made their hair stand on end.  It might be the worst thing they ever heard in their life.  And they might believe that, if ever a person deserves the death penalty, it would be that person, and that justice demands the death penalty in that case.

But if that juror does not believe from the evidence beyond a reasonable doubt that that person will be

a continuing danger in the penitentiary, their duty and obligation is to say no to that question regardless of how they believe -- what they believe he deserves.

Does that make sense to you?

A    It makes sense.

Q    Is that something you believe you would be able to do?

A    Yes.

Q    You've told Mr. Hikel, as I understood it, Mr. Morrison, that you would automatically answer that question yes simply because you found someone guilty of capital murder. That if they were an intentional murderer, that's all you would need to know in order to answer that question yes.

Now, you understand that's not what the law contemplates.

A    Correct.

Q    But if that's the way you truly feel and if you sit on this jury and you find Mr. Broadnax guilty of capital murder, if you're going to automatically answer that question yes and we don't have a chance on that question, I need to know.

A    Correct, because I was under the impression that he said it was already proven.

Q    Okay.  So, what I think I'm hearing you say is that you're going to be able to wait.

A    And hear the evidence and see what the evidence is.

Q    And see what the evidence is.

A    The total facts.

Q    Not just the evidence that -- You can take into consideration the evidence of what happened, the offense. I'm not saying that you cannot. But it's kind of like apples and oranges.

On the one hand you're being asked, did he do what he is accused of doing? That's a different question than is he probably going to commit acts of violence in the future that would be a continuing danger to society.

A    (Nods head).

Q    Now, what he did may to some degree inform your answer to that special issue or it may not. You may say, that doesn't tell me a thing about what he's going to be doing in the future, what he did that one time, or it might. That's something that we let you do. You make that decision yourself. You just cannot say, okay, he's guilty of capital murder, now I'm going to say he's a continuing danger and answer that question yes automatically.

Now, let me ask you, would you do that or would you wait and --

A    No, you would have to have the evidence first.

Q    Okay. Do you have any thoughts, Mr. Morrison, about what sort of evidence you would kind of like to hear

aside from just what happened at the offense that might help you in deciding whether a person would be the kind of person who would commit criminal acts of violence in the penitentiary?

A    If a person is going to commit acts of violence in the penitentiary, that means he has a history of violence.

Q    And that's something that jurors very often say to us.

A    Correct.

Q    What is this person's history of violence in the past?  Does he have a violent history?  Has he been convicted of violent offenses?  Has he been to the penitentiary for violent offenses?  Or is this a person who has no violent convictions in his past or violent record in his past?  Those are things that would be a consideration in answering that question.

A    Correct.

Q    Does that seem like -- Does that make sense to you?

A    That's understood.  That's understood.

Q    Okay.  So, what I'm hearing you say, Mr. Morrison, is that if you were serving on this jury, if you were convinced that the defendant was guilty and you found him guilty, that's not going to answer that question for you. You're going to have to look at it as a different issue and

make your determination on that issue. Is that fair to say?

A    Correct, fair to say.

Q    All right. Now, I will tell you, Mr. Morrison, that if the jury answers special issue number one no, then the trial is over. You return that verdict to the Court and the judge sentences the defendant to life without parole. Okay?

A    Okay.

Q    So, only if you answer that special issue yes do you go on to the other special issue. And if you're given special issue number two and you answer it no, again, the trial is over. You return that verdict to the Court and the judge sentences the defendant to life in the penitentiary.

If you answer special issues one and two yes, then and only then would you be called upon to answer special issue number three.

A    Okay.

Q    Does that make sense to you?

A    It makes sense.

Q    Special issue number three, Mr. Morrison, is different from the other special issues, significantly different. The first decision that you would have to make as a juror would be to decide whether the defendant was guilty or not based on the evidence.

So, that's kind of an objective decision.

You look at the evidence. What did the State prove to me? Did they prove what they put in their indictment or did they not?

A    Okay.

Q    And special issue number one is pretty much the same thing. It's an objective sort of decision to be made. I see what the special issue requires of the State. I've heard the evidence that they have offered to try to convince me that the answer is yes. Either they did or they didn't. And the same would be true of special issue number two.

The special issue number three is more of a subjective determination by the jury. Neither side has a burden of proof on special issue number three.

Special issue number three is intended to give the jury a vehicle through which they can give effect to any mitigating evidence that they feel is in the case and would be a sufficient circumstance or circumstances to give the life penalty rather than the death penalty. Okay?

A    Okay.

Q    And I will break that down for you a little bit here in just a second. But you see how that's different from the other issues? Every other decision you looked to the State to prove beyond a reasonable doubt. But on special issue number three, you're just asked to re-examine the evidence that you've heard looking toward finding mitigating

evidence.

If there is no mitigating evidence in the case as far as you're concerned, then the answer to that question is no, and the person is executed. If there is mitigating evidence in the case that you believe is sufficient to justify the life penalty instead of the death penalty, then that gives you an opportunity to say so at that point and prevent the imposition of the death penalty. And each individual juror has that right and responsibility. Okay?

A    Okay.

Q    Now, I want to talk to you a little bit about a couple of things that are in your questionnaire that I believe impact on that special issue number three and how we look at it.

Turn over to page eight, if you would, please, Mr. Morrison. And I acknowledge to you freely that when you signed this or filled out this questionnaire, you had not read these special issues --

A    No.

Q    -- and didn't know what this question on page eight really was about. But if you see, it's down, not the last but the next to the last from the bottom.

We ask or say, some people feel genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment. What do

you think?  And you said no.  And that's not an unusual response for us to get.

But you see, if you look at special issue number three, that really is exactly what the law is asking you to do, to consider not only the circumstances of the offense but also the defendant's character and his background and his personal moral culpability.  Okay?

It is asking you, requiring you really, to consider the person as well as the offense, okay, to reach what the law describes as your own personal moral judgment about what the proper verdict in the case is.  Does that make sense to you?

A    It makes sense.

Q    Now, you said no here.  Let me ask you, if you're on this jury, would you be able to take special issue number three seriously and do what the law would ask you to do and to consider the background and character and those kinds of things?

A    Yes.  But on this question --

Q    Yes, sir.

A    -- genetics is, I thought it was like genetics of the parents.

Q    Well, genetics I think in that context could mean -- I guess it could mean a lot of things.  But it might mean if a person -- I'll give you an example.

We now know that it's unconstitutional to execute a person who is mentally retarded. But there is a standard for mental retardation that is not so easy to reach.

A    Okay.

Q    So that a person might be substantially impaired in his mental capacity --

A    Oh, I see.

Q    -- and not yet reach that level of what the law describes as being mentally retarded. And it might be that that would be a genetic circumstance, that he was born that way.

A    Correct.

Q    He couldn't help --

A    Correct.

Q    -- what that was.

It could be a situation -- And I am not talking about this case here. But you know, if a mother drank or did dope while the child was in utero and he suffered brain damage because of what his mother did, had nothing to do with him, it wasn't his fault.

A    Correct.

Q    He had no control over it.

A    Correct.

Q    Not a decision he made. But the result of that was what made him who he was.

A    Who he was.

Q    And the law says you can consider those kinds of things. And it doesn't have to be the result of a decision made on the part of the defendant. It could be how he was affected by the bad decisions of others.

A    Correct.

Q    Okay. You see where it's coming from?

So, all they are saying really is, take a look at all of this. You mentioned the young man who had two parents and they gave him everything that he needed. And you know from your own life experiences that there are people raised in all kinds of different circumstances.

A    Circumstances.

Q    And it may be that it's a situation where there was a grandma, and it may be even that some people don't even get the benefit of that.

A    Right.

Q    Maybe shoved from pillar to post, from one relative to another relative. You know, get out of here and go somewhere else. And was raised that way their whole life. That might be something that you want to take into consideration.

You work with young people.

A    Yes.

Q    You told us that people change in their lives.

And there is nothing -- As my wife wants to say, no truer words were ever spoke.  We are none of us who we were before.

A    Correct.

Q    And certainly as you get to be my age and Mr. Lollar's age, we are not the people we were twenty years ago --

A    Correct.

Q    -- or thirty years ago.  And that's true of all of us.

A    Correct.

Q    The law says that if a person was eighteen years of age at the time the offense was committed, if an offense was committed, then they can be subjected to the death penalty.  Under eighteen, seventeen or younger, the law does not allow the death penalty for.

Some jurors say to us that if the defendant was in the lower range of what the law allows, eighteen, nineteen, twenty years old, that that would be something that they could consider.  Might not standing alone be sufficiently mitigating, but they would consider age in answering special issue number three.

You see how that could be a consideration for a juror?  How do you feel about that?

A    Yeah.  Just like if an individual committed an offense when he was eighteen, depending on what -- how much

time invested in whatever incarceration it was, if that individual change, if he got twenty-five years, thirty years or whatnot.  If he was eighteen, he got twenty-five years, then obviously when he get out he's going to be somewhere in the range of forty-three or whatnot.

And you say to yoursself, well, has he changed in that lifetime, in that life span of twenty-five years that he's been there and now he's forty-three?  And the parole board will be the one to make that decision as to the change of that individual.

Q    Well, of course, and I don't mean to interrupt you, Mr. Morrison, but in the context of what we are talking about here, you know, there is no parole to be considered here.

A    Right.

Q    This is strictly either, if a person is guilty --

A    Either a death penalty or life in prison.

Q    Or the life without parole.  But you see, a juror might on one hand say, you know, to me it makes absolutely no difference what age a person was, that's not a consideration for me.  Another juror might say, well, you know, if a person is young, that might be something that I would consider in making a decision whether to execute him or whether to give him the life without parole penalty, for whatever reason.

It might even be an indication to you on special issue number one because, you see, special issue number one calls for acts of violence that constitute a continuing threat to society. And a juror could certainly interpret that as meaning an ongoing, however long he was going to be locked up, and never come a day when he was not going to be a future danger.

A    Correct.

Q    And a juror might say, well, you know, I know that people age out. You know, you're not the same guy when you're thirty as you were when you were eighteen.

A    Correct.

Q    You know, you've added some maturity to your life and some judgment to your life that you might not have had back in those --

A    Back then.

Q    -- earlier years. So that age would be a consideration for me even in answering special issue number one because I could maybe believe that a person might be a danger now but wouldn't be continuing on into the future.

There's all kinds of considerations that a juror can make in resolving these issues. Does that make sense to you?

A    It makes sense.

Q    Okay. Do you feel like that you would be able to

**Anne B. Meredith**
Certified Shorthand Reporter

use your life experiences and your own good judgment and consider the things that special issue number three call upon you to consider and ultimately reach your own personal moral judgment about what ought to happen?

A    Yes, sir.

Q    Whether it ought to be an execution or it ought to be a life without parole?

A    Yes, sir.

Q    Okay, fair enough.  And that's something that the law, of course, says to jurors.  I want to make sure that you understand that the law never, ever requires the death penalty.  Okay?

A    Okay.

Q    But the law is always satisfied with a life penalty.  So that if a juror reaches a personal moral judgment that the life penalty is the appropriate penalty, that juror does not have to justify his moral personal judgment to anybody.

A    Yeah.

Q    Does that make sense to you?

A    It makes sense.

Q    I mean you don't have to justify where you go to church.  That's your own personal moral decision.  You don't have to justify how you raise your children.  That's your own personal moral judgment.

You don't have to justify, if you decide from

the evidence that the appropriate sentence is life without parole, you don't have to justify it to anybody.

A    (Nods head).

Q    Okay?  By the same token, neither would any other juror have to justify it to you.  You know, it's everybody is expected to respect the moral judgments of their fellow jurors.

A    Okay.

Q    Does that make sense to you?

A    It makes sense.

Q    We don't tell you what a mitigating circumstance or circumstances is.  That's up to you to decide.  Our law says that you can decide one thing is mitigating and another person say no, I do not believe that it is.  That's fine.  They may have something they believe is mitigating that you don't believe is mitigating.  That's fine.  You do not have to agree on what is --

A    And what's not.

Q    -- or is not mitigating.  You don't have to agree on what weight to give it.  One juror might say, I believe that X is mitigating and I believe it is sufficiently mitigating to justify the life penalty.  And another juror might say, well, I believe it is mitigating also but, to me, it's not sufficient.

That's the individual decision making process

for a jury.  Does that -- Okay?

A    (Nods head).

Q    But the point is this.  That any juror, every juror is justified in saying, I have made my own personal decision about this.  My personal moral judgment is the life penalty is appropriate.  I don't have to explain why I have come to that conclusion.  I don't have to debate why I've come to that conclusion.  I don't have to articulate my reasons for coming to that conclusion.  That's my conclusion.  I'm entitled to it.  And since that is my conclusion, I am obligated by my oath to return that verdict into open court.

A    Okay.

Q    And it doesn't matter if there's one, two, ten or none that's with me because my obligation is to return my verdict.

A    Okay.

Q    Every juror's obligation is to return his or her verdict --

A    All right.

Q    -- and not to compromise their personal moral judgment in the matter.  The majority doesn't win.  Everybody is -- We need twelve people making their own decision.  Does that make sense to you?

A    Yes.

Q    Do you believe that you would be able to do that?

A    Yes.

Q    And respect whatever moral personal decision the other persons have come to and expect them to respect yours?

A    Yes.

Q    Let me flip through here just a second, Mr. Morrison, and see if there is something that I have overlooked.

You understand that the judge would instruct you that if you're one of our persons who is qualified to sit on the jury, that determination is made, you wouldn't be allowed to be talking to Tony about the facts of this case.

A    Correct.

Q    You know that.

A    Yes.

Q    That wouldn't be any problem for you?

A    No, sir.

Q    You played football for Stephen F. Austin?

A    Yes.

Q    What position?

A    Running back.

Q    Did you try to play further than --

A    Yeah.  The scouts was down, and during the four four two, the next thing you know, I hurt my knee.

Q    Oh, mercy.

A    But it wasn't meant to be.

Q    Well, you know, I guess that's certainly a good way to look at it.

A    My calling is to teach the kids, pass it on, the things that I know, pass it on to them, teach them how to play football and baseball and things of that nature that I know.

Q    I was in Austin a few weeks ago and my son-in-law coached his five year old soccer class.  You talk about the soccer team, about trying to herd calves.  Now, trying to get five year olds to go in the same direction --

A    It's hard to teach.

Q    -- it's interesting.

You're the -- You're coach of what, basically high school aged kids or --

A    No.  Right now -- I have, though.  But right now I coach the four, five and six year olds.  Some of them that I have coached are going into second.  But flag football usually range from the age of four, five and six.

And within basketball, the same thing, four, five and six.  You may have a few seven year olds that participate with the six year olds because their talent level is not as high.

Q    Okay.

A    Then within baseball, in baseball you can always play up but you can't play down.  So, my five year old, I let

him play with the six year olds. And this year coming up, God bless him, I'll let him play with the seven and eight year olds.

Q    Good.

A    Because he's more talented than a lot of the other kids.

Q    Right.

A    But that's because I work with him.

Q    Sure, sure.

A    And I don't teach, I don't teach but I emphasize to the parents that work with them at home.

Q    Sure.

A    And then that way their talents will increase.

Q    Right.

A    But the main thing is, no matter how old they get, keep them involved until they get out of school. The less time of them out in the street of doing this, doing that, the less time they have to get in trouble.

Q    Exactly.

A    So, keep them involved. That way the time that they are involved in whatever the sport is, the time that they will be at that facility in whatever they are doing, then it will be time for them to come home, go to bed and go back and do the same thing the next day.

Q    Sure. I'm going to wrap this up, Mr. Morrison.

**Anne B. Meredith**
Certified Shorthand Reporter

You understand that what we have here is a process that's been set up by the legislature.

A    Yes.

Q    And that not just the qualified juror but the fair and impartial juror lets that process work.  And even if it might go against their grain, they have got to follow the law and require the State to prove those things that the State has got to require or got to prove.  And you would do that.

A    Yes.

Q    And you haven't already made up your mind what you're going to do --

A    No.

Q    -- in any stage of this trial.

A    No, I have to hear the evidence.

Q    All right.  Thank you, sir.  I appreciate it.

THE COURT:  All rise.  Watch that first step, sir.  You'll be stepping out for a minute and then you'll be coming right back in.

PROSPECTIVE JUROR MORRISON:  Okay.

(Prospective Juror Morrison exits the courtroom).

THE COURT:  In the presence of Mr. Broadnax, what says the State of Texas?

MR. HIKEL:  Your Honor, just for the record, I believe Mr. Morrison is what's called a classic waffling

juror.

What I have in voir dire, he said -- I asked him three times about issue number one. I explained the law to him. He says, yes, he would find it automatically, he would vote yes. When Mr. Parks asked him, he said no.

I'm also concerned that on page eight of the questionnaire he answered no, he wouldn't consider those mitigation issues. When Mr. Parks asked him, he said yes.

I'm also concerned, Judge, with his answer on page seven about how he feels about police officers, that they lie to cover things up.

I'm concerned about what he said involving his nephew Nathaniel who was killed, Nathaniel Sanders killed on May 13th by police officers, and his answer about police officers here. That even though he says no, that he appears to have a bias against police officers in this case.

I'm also concerned about his reference on page nine of his questionnaire about a cousin who is in the federal pen for gun charges.

So, Judge, given his certain answers to me and then to Mr. Parks, contrary answers, the questionnaire, different answers, I'm going to ask that he be -- I'm going to submit him for cause as being a waffling juror, your Honor.

THE COURT: It will be denied. Ask him to return.

What says Mr. Broadnax?

MR. PARKS:  We believe he's qualified, your Honor.

(Prospective Juror Morrison returns to the courtroom).

THE COURT:  Mr. Morrison.

PROSPECTIVE JUROR MORRISON:  Yes, sir.

THE COURT:  You, of course, have been accepted as a qualified juror.  It's been a real pleasure meeting you, sir.

Now, the sheriff is going to give you the card of the judge's coordinator who called you.  Well, actually Barney told you to report.  But normally the judge's coordinator would tell you to report.  She is not here today.

In case anything happens in your personal life that might affect your jury service, give her a call and we will deal with it.

Are the telephone numbers on your questionnaire still correct?  On your questionnaire.

PROSPECTIVE JUROR MORRISON:  Yes.

THE COURT:  All right.  Because that's how we are going to call you.

PROSPECTIVE JUROR MORRISON:  Okay.

THE COURT:  Now, in about a couple of weeks

or later or earlier, a couple of weeks or earlier, the decision will be made. Remember I told you about who the twelve jurors. On that day the decision is made, you'll get a phone call telling you if you are on the jury or not on the jury.

PROSPECTIVE JUROR MORRISON: Okay.

THE COURT: All right. And I want you to avoid all outside information --

PROSPECTIVE JUROR MORRISON: Okay.

THE COURT: -- in the media or talking to friends. It would be a shame if you were inadvertently disqualified.

PROSPECTIVE JUROR MORRISON: Okay.

THE COURT: And I want to say good luck to you, sir. Glad to have met you.

PROSPECTIVE JUROR MORRISON: Okay.

THE COURT: All right.

MR. HIKEL: Thank you, Mr. Morrison.

MS. MALLON: Thank you, sir.

(Prospective Juror Morrison excused from the courtroom).

(Discussion off the record).

THE COURT: 1:30.

(After the lunch recess, defendant present).

THE COURT: Ready for Mr. Winfield.

(Prospective Juror No. 1321, Clarence Winfield, enters the courtroom).

THE COURT: Mr. Winfield, good to see you again. Have a seat, please, sir. Thank you.

We met earlier this afternoon. If you recall, my name is Webb Biard and I will be with you this afternoon in this part of the voir dire.

Do this for me, please. Raise your right hand.

(Prospective Juror Winfield sworn).

THE COURT: All right. Mr. Winfield.

PROSPECTIVE JUROR WINFIELD: Yes.

THE COURT: Mr. Winfield, just briefly, you remember the judge you met when you came down to fill out the questionnaire is the actual Presiding Judge of this Court and that's Michael Snipes. Should you be selected as a juror in this case, Judge Snipes will preside over the presentation of evidence, for whatever that's worth. This will be our only opportunity to be together.

Also I want to introduce to you Elaine Evans.

MS. EVANS: Good afternoon.

THE COURT: Andrea Handley.

MS. HANDLEY: Good afternoon, sir.

THE COURT: They represent Dallas County and the State of Texas.

Further to my right is Brad Lollar.

MR. LOLLAR:  Good morning.

THE COURT:  Doug Parks and Keri Mallon.

MS. MALLON:  Hello.

THE COURT:  And they represent Mr. James Broadnax.  Mr. Broadnax.  Thank you.

EXAMINATION

BY THE COURT:

Q    The way this is going to proceed -- And I know you've been here a while, and we appreciate you being here, being on time and also coming up on short notice.

On behalf of everybody, thanks a lot.

A    Yeah.

Q    The way this is going to work this afternoon, I'm going to talk to you for a minute, and then one of the attorneys will talk to you, one of the attorneys from each side.  The State and the defense will talk to you for up to forty-five minutes each, so we are looking at about an hour and a half.  We will conclude our conversations with you and at that time I will tell you whether or not you are a qualified juror.

And by that I mean we are in the process of qualifying some up to fifty jurors.  And then once that's done, the actual jury will be selected.

A    Okay.

Q    The twelve men and women.

And did you, from reading that pamphlet -- and I saw you reading it awhile ago and you told me it was helpful to you.  From reading that pamphlet, did you see where Judge Snipes tells us that this case is going to start August the 10th?

A    Yes, sir, I did.

Q    You remember he said it's going to last two weeks.

A    Yes, sir.

Q    Up to two weeks.  Well, let me tell you how Judge Snipes runs his court.  Start about 9:00 in the morning, conclude at 5:00 in the afternoon, Monday through Friday 9:00 to 5:00, break in the morning, break in the afternoon, be a lunch break.  The jury would not have to stay together overnight unless and until you were deliberating your verdict.

Have you sat on a criminal jury before?

A    Yes, sir.

Q    So, you know what I'm talking about when I say deliberation.

A    Yes, sir.

Q    And let's say you were deliberating late into the night and became tired, there is a chance that the entire jury, there is a chance you would be taken to a fine hotel, county expense, spend the night, and then come back the next

morning as a group to avoid any outside influence on your decision making.

A    Yes, sir.

Q    That could happen.  And if it did happen -- Pardon me.  If it did happen, Judge Snipes would tell you in plenty of advance like, tomorrow night bring an overnight bag and tell the people that need to know that you're liable to have to spend the night together.  It's being called sequestered.  That could happen.

I give you that information and I tell you how the judge runs his court and give you those dates to ask you a question.  As you sit here now, are you aware of any reason why you can't sit as a juror on this case?

A    No, sir.

Q    All right.  Now, from reading that pamphlet, from hearing Judge Snipes' remarks and filling out your questionnaire, as you sit here now, are you aware that this is a capital murder case?

A    Yes, sir, I'm aware of that.

Q    Do you understand that the State of Texas is seeking the death penalty?

A    Yes.

Q    Because of that we have these special procedures that are in place and one of them is that you have an opportunity to talk to the attorneys and to me one on one.

*Anne B. Meredith*
Certified Shorthand Reporter

Now, you were on another criminal jury before. What kind of -- what kind of case was that?

A    It was in San Angelo years ago and we tried a fellow for carrying a weapon into a licensed premises.

Q    All right.  Did the jury reach a verdict?

A    Yes, we did.

Q    Did the jury set punishment?

A    I don't recall.

Q    Okay.  From that experience, even though you don't recall whether the jury set punishment or not, do you realize the trial was in two parts?  And by that I mean there is the guilt/innocence phase.

A    Yeah.

Q    And then if a person is found not guilty, the trial is over.  And if there is a punishment phase, if the person is found guilty, then it's actually two separate time frames, in other words, and you would know which part of the trial you were in.

A    I recall that -- When you said that, I recall we did set the punishment for that, yes, sir.

Q    Okay.  And when you were in the punishment phase, you knew then that you were in the punishment phase because you had already found the guy guilty, right?

Well, that's exactly the way a capital murder case is tried.  That's the way every case in Texas is tried

from a theft of a bicycle to a capital murder case.

A    Okay.

Q    All right?  And, so, we are going to be talking to you about that quite a bit.

A    Okay.

Q    So, if somebody's found guilty of capital murder, there is a punishment phase.  And there's only two possible punishments for someone who is found guilty of capital murder.  Do you know what they are?

A    Death --

Q    Right.

A    -- or life imprisonment.

Q    Without parole.

A    Without parole, yes, sir.

Q    There was a time probably back there when you was trying that unlawful carrying of a firearm, a weapon, the rule then was, if you were found guilty of capital murder, there was a time you would become eligible for parole.  That doesn't mean you would get it, but you would come up before the board for parole after a certain number of years.  That's no longer the law.  Trust me on that.

A    Okay.

Q    No longer the law.  If someone is found guilty of capital murder, they are going to serve life in prison without parole or receive a death sentence.  There is no

longer parole. And we got that straight, right?

A    Yes, sir.

Q    That's important that you understand that.

All right. Now, you told me that that pamphlet helped you. Did you have an opportunity to go over it and see those three special issues?

A    Yes, sir.

Q    Or questions?

A    I looked at those, yes, sir.

Q    Did you know about those before you got here this afternoon?

A    No.

Q    I wouldn't expect you to. Most people in this courthouse don't know about those special issues. They are unique only to capital murder.

And let me tell you, you would never see those special issues, you would never be called upon to answer those special issues in any other trial except a capital murder case when you had found the person guilty of capital murder.

A    Okay.

Q    That's the only time you would ever see them.

Now, on that unlawful carrying case you were on, when you were back there setting punishment, there was a range of punishment.

A    I believe so.

Q    And there was a number of years. He might have been eligible for probation; I don't know. No such thing as probation in a capital murder case. But there was a range of punishment, whatever the years were.

When y'all set punishment, the presiding juror wrote down the number of years on a blank line. And then you came back into court and the judge said, we the jury having found the defendant guilty of carrying a weapon into a nightclub, right?

A    Right.

Q    Hereby assess his punishment at blank, and he read off a number of years. And that's the way that worked.

In a capital murder case the jury does not write down on a blank line if they set punishment life in prison or death. They don't do it that way. They answer those three special issues.

A    Okay.

Q    And they answer them yes or no. And depending on how they answer the special issues determines the punishment. Does that make sense to you?

A    Yes, sir.

Q    All right. And just frankly -- If you will just look at them for a second with me. You can look at them in the pamphlet or you can look at them up on the wall.

If one is answered yes and two is answered yes and three is answered no, it's the death penalty. And the lawyers are going to spend a lot of time with you on those special issues. And if they are answered any other way other than yes to one, yes to two and no to three, it's a sentence of life in prison.

And you answer those at the end of the trial, at the end of that punishment phase, just like you set punishment in that gun case at the end of the trial. That's when they are answered, after you've heard all of the evidence.

All right. Now, let me tell you something real important.

A    Okay.

Q    Remember what I told you, the only time you would ever see them is if you had found somebody guilty of capital murder.

A    Yes, sir.

Q    Just like the only time, in the gun case, the only time you saw what's the number of years the guy is going to get, that was after you found him guilty.

A    Yes, sir.

Q    So, you would only see those if you found somebody guilty of capital murder.

So, what they have got to mean to you to be

a qualified juror, that you can answer them either yes or no depending on the evidence that you hear. And if they end up resulting in a sentence of death, so be it. If they end up resulting in a sentence of life in prison, so be it.

Does that make sense to you?

A    Yes, sir.

Q    In other words, you can't come in to trial saying, if I find a person guilty, I know I've already got my mind made up what I'm going to do. Because one more last time, depending on what the outcome is, you don't see them --

A    Yes, sir.

Q    -- you're not called upon to answer them unless you've found a person guilty.

A    Okay.

Q    Okay. You think you're going to be able to follow the procedure?

A    Yes, sir.

Q    Okay. Does it make sense to you?

A    Yes, sir.

Q    Okay. You got any questions of me before the attorneys, you and the attorneys talk to each other?

A    No, sir.

Q    I'll be glad to answer them.

A    No, sir.

THE COURT: Okay. I'm going to reintroduce to

Case 3:15-cv-01758-N    Document 41-8    Filed 06/29/16    Page 177 of 259    PageID 9329

177

you at this time Elaine Evans now who is going to talk to you on behalf of the State of Texas.  All right, sir?

PROSPECTIVE JUROR WINFIELD:  Okay.

THE COURT:  All right.

MS. EVANS:  Thank you, your Honor.

EXAMINATION

BY MS. EVANS:

Q    Good afternoon, Mr. Winfield.

A    Hi.

Q    Hi.  Do you get back much to San Angelo any more?

A    No.

Q    No?

A    That was a different life.

Q    Right.  It's a nice town.  I have a couple of relatives there, so.

I see from your questionnaire -- I have looked through it thoroughly and I can certainly tell, as the judge was kind of just going through with you the process, that you appreciate very much so the process that's involved in our system of criminal justice and very much appreciate the law surrounding it.  Am I correct in seeing that?

A    Yes.

Q    Okay.  I do want to ask you, the way we are going to proceed, as the judge told you, it's the only opportunity --

**Anne B. Meredith**
Certified Shorthand Reporter

THE COURT:  I'm sorry, Ms. Evans.

MS. EVANS:  Sure.

THE COURT:  I do this to you every time.

MS. EVANS:  That's all right.

THE COURT:  I'm going to hand you your questionnaire, sir.

PROSPECTIVE JUROR WINFIELD:  Okay.

THE COURT:  There might be -- You might need to look at that from time to time and you will have it there in front of you.

PROSPECTIVE JUROR WINFIELD:  All right.

THE COURT:  All right.  Thank you.

MS. EVANS:  Thanks, Judge.

Q    (By Ms. Evans)  It's the only opportunity for the lawyers on both sides to be able to talk to you about your thoughts and feelings and the law that may come up in a case such as a capital murder.  Okay?

A    Yes, ma'am.

Q    And, so, the way we are going to proceed, I'm going to talk to you a little bit about your questionnaire. But as I said, I take it from there that you very much appreciate the law and the reason that we have it and that it needs to be followed by the jurors.

Then we are going to talk about a defendant's rights that come up in any type of criminal case.  And then

we are specifically going to talk about how a jury goes about reaching their verdict in a capital murder trial.  Okay?

A    Okay.

Q    Verdict in both guilt/innocence and punishment.

From your questionnaire, on page three, I see that you saw just a news blurb on the radio that said that the trial was coming up, or you heard that.

A    I believe that I did, yes.

Q    When you say just a blurb, that indicates to me that you didn't hear very much about the facts of this case.  Am I fair in assuming that?

A    Yeah, I didn't pay attention.  I wasn't paying attention.  I just, you know --

Q    I understand.  I just wanted to clarify that with you, Mr. Winfield.  So, I take it by the blurb you heard that you hadn't already formed an opinion as to what needs to happen in this case.

A    No.

Q    Okay.  And that's the important thing here because that's what the law tells you.  To be qualified as a juror, you just need to be able to keep an open mind to the facts and the evidence that you're going to hear there in that courtroom during the trial, okay, and apply it to the rule of law that the judge is going to give you.  And that's all it takes to be qualified is just to be fair, impartial, and

keep an open mind.

Okay. And I think you can do that, Mr. Winfield, based on what I've seen.

I did also want to ask you, it appears -- We appreciate you telling us about some of your stepchildren that have been involved with the legal system a bit. Are you close to any of those children now?

A    One of them is at the house right now.

Q    Okay.

A    Pretty close.

Q    And which one is that?

A    Theresa.

Q    Okay.

A    My stepdaughter.

Q    Okay. And you mentioned one that's currently getting drug treatment in Nexus.

A    She just completed that and she is, she is at the house now.

Q    Great. And did she successfully complete the program?

A    She completed that, yes, yeah.

Q    Great, that's very good to hear. We like to hear the success stories obviously.

Any of the involvement of those stepchildren that have had, you know, involvement in the legal system,

any of that, or going through that process with them or hearing about it, going to affect you if you were to sit as a juror here in this case?

A    I don't think so, no.

Q    Okay.  And do you believe that they have been treated fairly?

A    Yes.

Q    Okay.  Thank you.

And with regard to the stepson, that's not in Dallas County, correct?

A    No.

Q    The pending case?

A    No.

Q    Where is that?

A    Kaufman County.

Q    Okay.  I appreciate it.  I think that's all the questions I have about your questionnaire per se.  I may bring it up in talking about other things.  But as I said, it looks like you have an appreciation for following the law.

Here, as the judge told you, this is a capital murder case.  And capital murder is the only case for which the death penalty is an option.

For example, if I turned to my co-counsel and shot her ten times right now.  You know, I came here with the

gun, with the intent, with the plan and purpose to do it and I set out to do what I wanted to do, and I sat back here and laughed my head off afterwards. Pretty cold and callous, right?

A    Yes.

Q    But that's just a murder. I intentionally took her life with no legal defense or justification. She was minding her own business. So, I wasn't acting in self-defense where I would have a right to defend myself like you mentioned on the first page. I just did it because I wanted to.

But that case would not be eligible for the death penalty just because I took her life. Because, you see, in the State of Texas, the State doesn't believe in an eye for an eye, you know, a life for a life. Just because you killed somebody doesn't mean that you are going to receive the death penalty or even be eligible to receive the death penalty. Okay?

A    Okay.

Q    Does that make sense to you?

A    Yes.

Q    And understanding the law as the judge gave it to you and as you read in the pamphlet, you understand that for capital murder that the death penalty is merely an option. Okay. It's not an automatic just because somebody is found guilty of capital murder because there is another possible

punishment.

And actually the law presumes that a life sentence without the possibility of parole is appropriate and that that is what a person found guilty of capital murder will receive unless and until the State is able to prove those additional things to you in the punishment phase.

Do you understand that, Mr. Winfield?

A    Yes.

Q    And do you believe you would be able to follow that process?

A    Yes, ma'am.

Q    Okay.  And as I said, I think you can, too.

Capital murder, like I said, is not just taking her life, the example I gave you there.  It's always an intentional murder.  There is no legal defense or justification like self-defense.  It's not an accident. It's not a mistake.  It's what somebody set out to do.  That was their goal is to kill the person.

So, it's an intentional murder plus some sort of aggravating factor.  That aggravating factor could be that it's a policeman or a fireman in their line of duty.  It could be that you've killed a child under the age of six. It could be that you killed two or more people in the course of one criminal episode.  Or it can be like you have before you in this indictment which is an intentional murder plus

another felony, here being a robbery. Okay?

Do you understand that it takes something additional to be found guilty --

A    Yes.

Q    -- of capital murder?

And I see that whenever you filled out the questionnaire -- we are just asking for your opinions and your impression as you came in here in that big panel that day, and we understand that you didn't know the law at the time that you were filling this out.

I see on page four you say, for what crimes do you think the death penalty should be available in Texas, and you say, any willful taking of any life. And I certainly appreciate you saying any life because we get some people in here that think it matters who the victim in a case may or may not be.

A    Oh.

Q    But certainly now, hearing what the law is and that, you know, capital murder, to be eligible for the death penalty, requires something additional, an intentional murder. So, a willful murder, is that kind of what you meant by willful?

A    Yes.

Q    Intentional?

A    Yes.

Q    An intentional murder plus something else.  Do you understand that now, that being the law, that's the only crime available for the death penalty?

A    Yes.

Q    Okay.  And, again, I see that obviously on page one you're in favor of the death penalty, but I also see, by the same token, on page two where you say and agree that, under the proper set of circumstances, a life sentence may be appropriate.  Is that fair to say?

A    Yes, that's fair.

Q    Okay.  And then on page five of your questionnaire you talk about what purpose, if any, do you believe a life without the possibility of parole serves, you say the punishment is fitting for willful taking of life from others.

So, taken from that, if I substitute that word willful, that you agree or say you mean kind of an intentional taking, you see that an intentional taking of somebody's life can also be justified to receive a life sentence, fair to say?

A    Say that again.

Q    Well, is it fair to say in your answer on page five, and your belief as you sit here today, that just because somebody intentionally takes another's life doesn't mean that there is anything automatic that they should receive a death sentence?

A    Yeah.  Okay.

Q    You would take and listen to the facts and the circumstances --

A    Yes.

Q    -- of the evidence.

A    Yes.

Q    Correct?

A    You've got to.

Q    Okay.  And also on page five, with regards to what would determine death rather than a life sentence, you say, all the evidence would lead you, correct?

And you go on to say, to conclude, willfulness on the part of the criminal.  But I would also suggest to you that, again, you would take all of the evidence to determine whether or not the State has proven to you those special issues.  Okay?

A    Right.

Q    And we are going to get more into those special issues a bit later.  Again on page four you recognize that both you and your wife are in favor of the death penalty, but you say, in some -- it's needed in some instances.

And again on page four, whether the death penalty is used too often or too seldom, you say, the death penalty in Texas is used when it is needed.

And, so, am I correct in assuming since you

qualify your answers by "when it is needed" and "in some instances", you understand and appreciate that the law says that just because found guilty of capital murder does not mean you automatically receive a sentence of death, that there's no automatics.

A     Yeah.

Q     You're going to wait and listen to the evidence.

A     I've got to.

Q     Correct, Mr. Winfield?

A     I've got to see it all.

Q     Okay.  And that's all, I just want you to keep --

A     Right.

Q     -- keep that in mind.

A     Okay.

Q     That it's wherever the evidence leads you in determining whether or not the State of Texas has proven to you --

A     Right.

Q     -- what we are required to prove beyond a reasonable doubt.

A     Exactly.

Q     Okay, Mr. Winfield?

A     Exactly.

Q     And I believe you can do that, again, because on page two in the argument against the death penalty, you say,

it depends on the individual's special circumstance, but at all times we must keep in mind the rule of the law.

And that's exactly and that is all that both sides are asking you to do here, just keep a fair and open mind and do what you believe has been proven to you based on the facts that you hear there in that courtroom and the law that the judge has given to you.  Okay?

A    Yeah.

Q    Just render a true verdict based on the law and the evidence.

Now I want to talk a little bit about the process that you go through in order to reach your verdict. Okay?  Right now this process is the first stage of the trial, and it's the voir dire where we just talk and make sure that you understand and can follow the law.  Okay.

If you are selected as a juror in this case, you will then take an additional oath.  Right now you've just said you will tell the truth, right, Mr. Winfield?

A    Right.

Q    If you serve as a juror, you'll take an additional oath to render a verdict based on the law and the evidence, and only those two things.  Not on how you feel or anything like that, but just the law and the evidence.

And the guilt/innocence phase of the trial is where you will hear about the facts of the offense, what

happened on the date in question. Okay? On the date that we have in our indictment and did what we say happen and was it this person that did what we said that they did, okay?

A    Okay.

Q    And that's the guilt/innocence phase of the trial. If you find that the State of Texas has proven to you beyond a reasonable doubt everything in that indictment, you know, the facts of the case, the elements, kind of like a check list, if you find them guilty of capital murder, it is then and only then that you look at these special issues. Okay?

A    Right.

Q    If you think the State of Texas hasn't proven the person guilty, then you find them not guilty and you stop, and the trial ends there. There is no punishment. Okay.

But if you find the individual guilty of capital murder, then you go on to consider those special issues. But just as in the guilt/innocence phase of the trial where there is no automatics and you rely on the State of Texas to prove it to you, no automatics in the punishment phase either. Okay?

A    Okay.

Q    You may hear additional evidence at that time from the State. You may hear additional evidence also about a person's background or character, what type of person they have been or what type of person they were or what type of

person they have been leading up to the trial.  Okay?

A    Right.

Q    Then and only then can you answer those special issues based on the evidence that you hear in the courtroom.  Okay, Mr. Winfield?

A    (Nods head).

Q    So, that's kind of the process that you go through.  And it's how you answer those questions in those special issues that then determine whether or not the individual receives a sentence of life without parole or a death sentence.  Okay?

A    Okay.

Q    As you came in, you know, when you were just filling out that questionnaire, we have had some jurors tell us that they thought they actually went back there and voted for life or death.  You understand now, correct, that it doesn't happen that way?

A    Right.

Q    Fair to say?  Okay.

        Let's talk about the defendant's rights that can come up in any -- or they are a constant in any type of criminal case.  It doesn't matter if it's a misdemeanor possession of marijuana all the way up to this capital murder trial here today.  Okay?

A    (Nods head).

Q    The defendant has certain rights, and those are that he's presumed to be innocent as he sits here. Just because he has been indicted or accused of committing capital murder does not mean in any way, shape or form that he is guilty of that offense. That indictment before you is just a sheet of paper. And what it does is it lets the State know what it must prove to twelve jurors and it lets the defense know what he's been charged with doing. Okay?

A    Okay.

Q    Could you give this defendant his presumption of innocence?

A    Yes.

Q    Okay. And I keep talking about the burden of proof and the burden of proof is on the State. You probably remember that from your previous jury service.

A    Right.

Q    The burden of proof always rests solely on the State.

A    Right.

Q    The defense over there, they just have to show up. If they wanted to work crossword puzzles all day, they could certainly do that, you know. I know these two defense attorneys would not do that.

A    Okay.

Q    But if they wanted to, that's all that they would

need to do because the burden always rests on the State. Okay?

A     (Nods head).

Q     And it's our burden to prove it to the jurors beyond a reasonable doubt.

A     Right.

Q     There is no definition any more in the State of Texas of what beyond a reasonable doubt means.  It just means whatever it means to you as an individual juror.  Certainly it doesn't mean beyond all possible doubt or 100 percent certainty because some tell us, to believe something 100 percent, I would need to see that with my own eyes.

Is that a fair statement, Mr. Winfield?

A     Yes.

Q     Okay.  So, it's just beyond a reasonable doubt, but it is our burden and our burden alone.  Could you hold us to that burden?

A     Yes.

Q     And the defendant has what's called the fifth amendment right.  And those rights are that he does not have to testify against himself in a criminal trial.  Okay?

A     Yes.

Q     I can't, as the State, say, now I would like to call the defendant and let's hear what he has to say.  His own attorneys can't say, you get on up there and take that

**Anne B. Meredith**
Certified Shorthand Reporter

stand and tell these fine jurors what happened on that day. Can't do that. He can take the advice of his counsel in making that decision, but it's his decision and his decision alone whether or not to testify.

And there could be a whole host of reasons why someone would choose not to testify. Okay?

A    (Nods head).

Q    And, so, for that reason the law says you cannot hold it against him if he chooses not to testify. Could you give a defendant his fifth amendment right and not hold it against him if he chooses not to testify?

A    I believe that I could.

Q    Okay. And what I mean by that is, I keep talking about, you know, the elements in the indictment.

Let's say, for example, that the State has to prove to you an intentional murder, that a defendant intentionally committed the act of murder by shooting them with a firearm. Okay. And in doing so, then they took their property and robbed them.

Let's say that you're here at the trial. And I'm not talking about the facts of this case. This is just a hypothetical situation, okay?

And you believe that, yes, we proved that the individual took the property and robbed him, okay, and you believe it was this defendant here on trial. In fact, the

defendant took the stand and said, yeah, I did it. I intentionally killed him and I robbed him of all of his property.

All right. But then you hear further evidence and testimony that the defendant did not die from a gunshot wound to the chest as what we have indicted, by shooting the person with a deadly weapon. You hear evidence that the person was actually stabbed to death, and you hear further evidence that at the crime scene there was no gun or bullets found. There was a knife found.

So, the State of Texas did not prove to you that it was by shooting. You know, the manner and means was not by shooting with a firearm. It was really by stabbing. And, so, what would you need to do at that point in time if we did not prove to you what it is that we set out to prove?

A    Well, he couldn't be found guilty, right?

Q    Okay. And could you do that? Could you return a verdict of not guilty as, you know, distasteful as it may be? And you may want to go upstairs and tell my boss, that prosecutor needed to do a little more research on her case before she presented it to us.

Could you follow your oath and follow the law and the evidence and return a verdict of not guilty?

A    Sure.

Q    Okay. And, so, let's say, for example, that I

came this close, you know, you almost believed that we proved it but something was a bit shy so, you know, you were going to have to return that verdict of not guilty. However, the defendant didn't testify.

The law says you can't go back there and then say, well, you know, the evidence didn't prove it. They were almost there. The law says you can't, again, consider the fact that a defendant doesn't testify for any reason whatsoever.

A    Right.

Q    And so, Mr. Winfield, if you didn't believe the State proved it to you, would you not then go back there and consider the defendant's failure to testify for any reason?

A    No.

Q    Okay. You would not. Thank you.

On page seven of your questionnaire we asked you about if police officers are more likely to tell the truth than the average person. And you say, yes, the truth is the simplest way to solve problems. And I totally agree with you. That's page seven.

A    Okay, I'm getting to it.

Q    You say, the truth is the simplest way to solve problems. And I agree that we would hope that everyone that comes in to testify would be telling the truth. Okay?

A    Right.

**Anne B. Meredith**
Certified Shorthand Reporter

Q    But what the law says is that you cannot, simply by virtue of what a person's profession or occupation is, automatically presume that they are truthful, okay, truthful or credible. The law says you must wait and hear what they have to say before making that credibility determination. Because you may hear from a priest, a prostitute, police officers. But those individuals that I just named, they are all humans, correct?

A    True.

Q    Okay. So, is it fair to say that you would need to hear what they have to say before you would be able to judge whether or not what they are telling you makes sense and whether or not, what they are telling you, you find them to be credible?

A    I guess I would have to hear it, yes.

Q    Okay. And, so, just because a police officer walks in here -- You know, we've all been taught to respect authority and respect the police. And you can still respect authority and respect police officers for the occupation they do. But could you follow the law and wait until you hear what the officer has to say before you judge his credibility?

A    Yes.

Q    Okay. Now, again, let's talk about this type of case which is a capital murder. Let's say that you twelve

jurors, you know, find the person guilty of capital murder. You then go into the punishment phase of the trial where there's two options, that being life without parole and a death sentence. And, again, the way you reach that is by answering these special issues in the form of these questions. Okay?

A    Right.

Q    I want to give you an example of types of capital murders that you could hear. And, again, I'm not talking about the facts of this case. I'm just giving you an illustration of the types of cases you might hear about. Okay?

A    Okay.

Q    For example, it may be, you know, the thing that you think in mind about the robbery of a 7-Eleven where somebody goes in, they want to steal a bunch of cigarettes and cash, and they don't want to leave any witnesses. So, they go and they take the clerk to the bathroom and they go put a bullet in the clerk's head and they make off with all the money and the cigarettes. Capital murder?

Is that a capital murder?

A    I would think so.

Q    Okay. Because it's an intentional murder plus a robbery.

A    Right.

Q    Okay.  Let me give you another fact scenario. Let's say that you have an individual that lives on a street and he goes and he purchases a gun.  And he shines that gun up and he goes and gets bullets.  And he walks three houses down, rings that doorbell, and when his neighbor comes to the door, he says, give me all your money.  And his neighbor says, I'm not giving to give you anything.

And, so, that individual takes that shiny new gun that he just bought and shoots him square in the chest and kills him.  He did it because it's what he wanted to do. He set out to do it.  And then he takes all of his money that he has.  Pretty bad set of facts, huh?

A    It looks that way.

Q    And that's also another capital murder, fair to say?

A    Yes.

Q    All right.  But I give you that by way of illustration because, you know, that's guilty of capital murder, but you could hear that person that went down and shot his neighbor three houses down, you know, just held up that gun, shot him square in the chest and took all of his money off of him, you could then hear and learn additional facts there in the punishment phase that that individual has two teenage sons.  Those teenage sons are on drugs.

The reason that they started out using drugs

is because of this neighbor three houses down that first introduced them to crack cocaine, heroin and whatever other types of substances his sons are on. And not only is it these two boys that are on drugs, but the entire neighborhood has been riddled by this man's poison that he's distributed throughout.

And nobody would do anything about it. He called the police repeatedly saying, this is a dope house down here. Can't you do something about it? Nothing was ever done. And he is so sick and tired of seeing his two sons in and out of rehab and just suffering on a daily basis from the effects of the drug use --

A    Right.

Q    -- that this man continues to poison the neighborhood with. So, he goes down there and he takes the gun, he takes matters into his own hand. It's what we call vigilante justice. It's still against the law. You still can't do it.

A    Right.

Q    He goes down there and shoots him. And whenever he takes all that money, drug proceeds, it's drug money that he knew he would have on him, he didn't take it and go out and spend it on himself and his family. Instead he took it down and dropped it down into the donation box at the local charity. And then he went and turned himself in. He told

**Anne B. Meredith**
Certified Shorthand Reporter

the police, this is what I did.  This is why I did it.  I'll go ahead and accept my punishment.

Okay.  He's still guilty of capital murder, right?

A    I would think so.

Q    Okay, absolutely.  But can you understand how those facts could cause you to have a different impression in the punishment phase --

A    Certainly.

Q    -- than the guy at the 7-Eleven who just goes in, takes cigarettes and money and shoots the clerk square in the head because he doesn't want to leave any witnesses?

A    Certainly.

Q    Okay.  And that's what I want to illustrate to you is there could be -- You know, you don't know until you hear it.  And as you sit here now, you don't know about any of the facts of the case, correct?

A    Right.

Q    So, what the law says is there can be no automatics, you know, just because somebody is found guilty of capital murder.  They could be the type of person that is the most horrible, heinous individual that ever walked the earth.  They may be the type of person that you don't want to meet down on a dark alley or sit at a dinner table with.

But you can't stereotype them and then just

say, well, because I have automatically -- you know, found them guilty of capital murder, then I'm automatically going to answer these questions in such a way that they get the death sentence. Okay?

A    Yes.

Q    Because that's not what the law contemplates. That's not the process. All right?

A    Right.

Q    It's not who is deserving of a death sentence, but it's has the State proven to me what it is they are required to prove and have I answered these questions based on the law and the evidence, okay?

A    Right.

Q    And, so, moving into these special issues, understand that when you go into the punishment phase and look at these, again, there's no automatic answers. You've got to look to the State to prove the first two beyond a reasonable doubt. And then special issue number three, there is no burden.

But the burden of proof, again, is on the State. And now, instead of a presumption of innocence which the defendant has, you know, during the guilt/ innocence phase of the trial --

A    Right.

Q    -- now the presumption is that the defendant

should receive a life sentence. Okay. And, so, what that presumption means is that the answer to special issue number one and the answer to special issue number two are both no unless and until the State proves to you that the answer should be yes. Okay?

A    Okay.

Q    So, in looking at special issue number one. Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

By the word probability, do you understand that that's not saying that there is a mere possibility?

A    Right.                              .

Q    Okay. Some jurors tell us that probability to them means more likely than not. Do you think that's a fair assessment?

A    No. Reasonable doubt is --

Q    Let me, let me clarify what I'm talking about. The State always has the burden. Okay?

A    Right.

Q    And our burden is beyond a reasonable doubt. So, we are going to have to prove to you -- Basically what special issue number one is and what we call it, we call it future dangerous.

A    Right.

Q    Further dangerousness. Okay? We have to prove to you that not only is this individual guilty of capital murder but they are going to be a danger to society, whatever society that may be, okay, in the future.

You know, it has you look ahead and say, okay, State, prove to me beyond a reasonable doubt that this individual is the type of person that is probably, you know, there is a probability that they are going to commit criminal acts of violence that are going to be a threat in the future. Okay?

A    Right.

Q    You understand what that calls on you to answer? And, so, it's our burden to prove it again beyond a reasonable doubt.

But it doesn't say, you know, that we have to prove with all certainty that the individual is going to commit criminal acts of violence. And we don't have to -- It doesn't say that just there is a mere possibility. Because anything is possible, right?

A    Right.

Q    I mean, for example, I could say that I'm going to go run the New York marathon come this fall. But then if I further told you that I don't run a step in my life, is it very likely that I'm going to be able to go run that New York

marathon?

A    No.

Q    No.  And, so, what it's calling upon you to decide is, is there a probability, maybe more likely than not.  And you were right to catch that beyond a reasonable doubt is my burden, not more likely than not.

A    Right.

Q    There is a probability that the defendant would commit criminal acts of violence.  And by criminal acts of violence, it's not saying that the defendant would go on to commit another murder, commit another robbery.  It doesn't define for you what a criminal act of violence would be.

A    Right.

Q    But what if I turned to my co-counsel and just punched her slap dab in the face, would that be to you a criminal act of violence?

A    Well, it is.

Q    Okay.  And, so, could the possibility, you know, the mere threat, like if a person is threatening to carry out an act and you believe it to be, you know, they are able to carry it out, would that also constitute a criminal act of violence to you, a threat?

A    I don't know so much about just a threat.

Q    Okay.  And really it's whatever it is to you.

A    Right.

Q    Just understand that it's not defined, it's not saying that it must be another murder or another robbery.

A    Right.

Q    And I think you've already said that, you know, punching my co-counsel here would be a criminal act of violence.

A    Right.

Q    An assault.  And it says, that would constitute a threat to society.  Remember back whenever I told you if a person is found guilty of capital murder, you then look at two possible punishments, okay?

A    Right.

Q    And the law automatically says, if you're guilty of capital murder, then you're sitting squarely on a life sentence, okay, without parole.

A    Right.

Q    So, where is this individual's society if he's now been found guilty of capital murder?

A    Well, he's put away.

Q    He's put away.  He's in prison, right?

A    Yeah.

Q    And, so, by society we are not necessarily talking about where you and I go to the grocery store, the movie theater, the mall, coming here to the courthouse.  We may be talking about a prison society.

And prison society, whenever you talk about that, that could include ministers, that could include, you know, nurses, guards, other inmates, people coming to visit, you know, family members coming to visit inmates that are currently there.

Can you see how prison can also be a society?

A    Certainly.

Q    Okay. And, so, what special issue number one is contemplating is, is this person, in all probability, are they the type of person that's going to be a danger even in that prison society, okay?

A    Right.

Q    Can they not be controlled even there? All right? And, so, that's what you're being called upon to answer in question number one.

What types of evidence would you like to see in determining whether or not someone is, in fact, going to be a future danger?

A    I would want to know that person's history of any acts of violence.

Q    Okay.

A    Not just the one that he had already committed.

Q    Okay.

A    I would want to know a history of acts of violence.

Q    Okay, absolutely. And that could be the type of

evidence that you could hear in that punishment phase, okay?

A    Right.

Q    Now, I will tell you that the law says that you could decide based solely on the facts of the case that you heard in the guilt/innocence phase, okay?  You may decide that, you know, the crime that you have found him guilty for speaks enough or tells you enough about that individual person to then answer special issue number one and determine that, or you could require more as an individual juror.

Like you said, you would want to hear about a history perhaps.

A    Right.

Q    So, the law does allow you to do it solely on the facts, but you've got to wait.  You know, there's no automatics again, remember?

A    Right.

Q    It's just two separate issues to decide.  So, even if you believe somebody is guilty of capital murder, you have to wait and answer special issue number one in the context of special issue number one.

A    Right.

Q    And could you do that?

A    I believe that I could.

Q    Okay.  Because it's, you know, like I said, two different deals.  Special issue number one doesn't want to

know about the crime that you've already found him guilty for necessarily. You're not punishing somebody for what they have done. You're punishing them for what they are probably going to do in the future. Okay? And that's what it calls upon you to answer.

A     Okay.

Q     If you answer special issue number one no, you do not believe that they are going to be a future danger --

A     Right.

Q     -- then the trial stops. Okay. If you answer special issue number one yes, then you continue and you go on to special issue number two.

And can you see how in the example I gave you of the individual who goes down and kills his neighbor, you know, when you talk about a prison society you could say, well, you know, or some jurors could say, he's killed the only person he had a beef with, you know, the person that was poisoning the neighborhood?

A     Right.

Q     He was the local drug dealer. He took care of him. He isn't going to be a danger to anybody else. And, so, some jurors could see how they would answer special issue number one no given all the specific facts that they heard at trial. Okay?

But using that same example, some may say,

hey, if he's in prison, who may he be in prison incarcerated with? Well, likely other drug dealers, right?

A    Right.

Q    So, could you see how, using that example, the special issue number one could be yes, depending on the facts and circumstances as you heard it, correct?

A    Sure, yes.

Q    Okay. And, so, if you answer special issue number one yes, then you move into special issue number two. And it doesn't come up in all cases, so I'm just going to give you a quick illustration. Okay?

A    Okay.

Q    What special issue number two is, it's the law of parties. Let's say that myself and my co-counsel sit down at the dinner table and we plan out to go rob that local 7-Eleven. Okay.

She says, I got the gun, I got the bullets. You know, let's go, let's go, let's go. I say, okay, we're going to take that 7-Eleven over there that's not very busy late at night. We go, she is driving for me, and we pull up there. And I'm the one that goes inside. She hands me the gun, and it's loaded.

But as I'm about to leave the door to the car, I tell her, oh, man, I forgot my mask. And she says, don't worry about it, just don't leave any witnesses.

So, I go in. She stays in the car. I go in, take the cigarettes, take the money, and I shoot the clerk. I come back out and she speeds away.

I can be found guilty of capital murder, fair to say?

A    Yes.

Q    Intentional murder in the course of a robbery. All right. What the law of parties is, it says that my co-counsel too could be found guilty of capital murder because she's aided or assisted in the carrying out of that criminal offense, hasn't she?

A    Yes.

Q    Okay. And not only could she be found guilty of capital murder, if in special issue number two you believe that my co-counsel actually anticipated that a human life would be taken, then you could answer that special issue yes.

A    Yes.

Q    So, in other words, if I were the one on trial, the triggerperson, then I'm the one that actually caused the death. So, the answer to special issue number two, given that example, would be yes.

But by the same token, with the law of parties, my person that, you know, never went in but she actually participated and planned it with me to carry out this crime, you could believe or jurors could believe that

she actually anticipated a life would be taken based on her statement, right?

A    Yes.

Q    She said, don't leave any witnesses.

A    Right.

Q    So can you see how, based on the law of parties, you could answer special issue number two yes?

A    Yes.

Q    But if you didn't find from the evidence the person was the triggerperson or you didn't believe that they actually anticipated a life would be taken or that they didn't actually plan or participate, then special issue number two could then be answered or would then be answered no.  Okay?  Because the State has to prove that to you beyond a reasonable doubt, right?

A    Right.

Q    If you say no, the trial stops, the defendant receives a life sentence without the possibility of parole.

If you answer special issue number two yes, then you move on to special issue number three.  Special issue number three is very different in that after you answer special issue number one yes, special issue number two yes, the defendant is sitting squarely on a death sentence.  Okay?  But what special issue number three is, we sometimes call it the safety net.

And I can tell again by your questionnaire that you are going to be able to do just what it contemplates doing because, page eight of your questionnaire, you say, I believe the job of a juror has to be the consideration of the evidence as it is presented and the punishment for a crime has to include the consideration of all of the above before decisions are made.

And in referencing all the above, you're talking about the person's upbringing, you're talking about, you know, the circumstances, the genetics, the environment they were in. And it looks like that you believe that all of that would have to be considered before making a decision, fair to say?

A    I would want to see it all.

Q    Okay. And that is exactly what special issue number three -- what the law is telling you to do in special issue number three. Okay?

Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than the death sentence be imposed?

So, in other words, even though you have

found this person guilty of capital murder and then moved into the punishment phase, and even though you've answered special issue number one that they are going to be a future danger and special issue number two that either they were the triggerperson or they acted as a party, it then tells you to look at all of the evidence again.  Okay?

A    Right.

Q    Look at all that again in making your determination.  And you may hear a thousand pieces of what sound like mitigating evidence to you.

Some jurors tell us the age of the defendant or an upbringing or a bad childhood or abuse or whether or not they were intoxicated may, may -- You know, they have got to hear it because you haven't heard anything.

A    Right.

Q    -- may be mitigating to them and that they would consider it.  But the question in special issue number three is not whether it's mitigating, but does it rise to the level of being sufficiently mitigating, okay?

A    Okay.

Q    So that you would then overturn the sentence of death and give the individual a sentence of life without parole, okay?

So, in other words, you know, with the situation of the neighbor that then goes down and kills the

local drug dealer.

A    Right.

Q    You know, you may find him guilty of capital murder because that's what the law would require maybe in those set of facts if you believe the State had proved it beyond a reasonable doubt.

You may find in special issue number one that, yeah, he's going to be there with other drug dealers, so absolutely he's going to be a future danger. You may answer special issue number two yeah, he's the triggerperson, yes.

So, you may have answered yes and yes after finding a person guilty of capital murder in that example I gave you. But in special issue number three some people tell us, hey, you know, his family had been poisoned by this man down the street and nobody was doing anything about it. He gave the money to charity. He turned himself in.

So, do you understand how some people could find that maybe some of those circumstances would be sufficiently mitigating?

A    Sure.

Q    Do you understand that, and be able to answer special issue number three?

In the example of going into the 7-Eleven, you know, you could later hear evidence that she actually, instead of taking off in the car, she stayed behind and she

tried to help the clerk because she didn't want anybody to die. We just needed money. And then she turned herself in and helped them find the shooter, helped them find me.

A    Right.

Q    There could be all sorts of things. But you don't know until you hear it. And so, again, with special issue number three, there are no automatics. It's just asking you to consider everything. Okay?

A    Right.

Q    And, so, basically would you be able to, if you found or if you heard evidence that in your mind was mitigating, could you then go back and look at it and determine if, in your mind, it rises to the level of being sufficiently mitigating? And if you do believe that that piece of evidence, whatever it may be, is sufficiently mitigating, could you then answer special issue number three yes?

A    Yes.

Q    Okay. And that again is contemplating -- is exactly what the law contemplates. You know, you've found somebody guilty of capital murder and you may think that they are not a good human being. But then you move into these special issues and you have already found them to be a future danger but, again, take everything into consideration to determine your answer to special issue number three.

A      All right.

Q      Okay.   The law just is asking you to keep an open mind, follow the process.   Okay, Mr. Winfield?

A      (Nods head).

Q      On page six of the questionnaire we talk about voluntary intoxication.   The page before that, you do recognize what the law says, which is voluntary intoxication does not in any way, shape or form constitute a defense to committing a crime.

You say, voluntary means of a person's choices.   They choose to intoxicate themselves.   Which is exactly, I would submit to you, why the law says you can't go out and voluntarily get intoxicated by drugs or alcohol and then go commit a crime and say, oop, you know, King's X, I'm not guilty, I was drunk.   I was high or something.   Okay?

A      Right.

Q      But on page six it does tell you that the law here in Texas says you could or you may consider evidence of intoxication as mitigating.   And you agree with that and say, yes, intoxication means that something gets altered, the thinking process.   But it can make one do abnormal behaviors.

So, you agree that intoxication could be considered as mitigation, fair to say?

A      Yeah.

Q    Okay.  And, again, just because something may be mitigating to a certain juror -- And, again, it is up to you as a juror to determine what is mitigating for you.  Okay?  It may not be mitigating to the person sitting next to you.

In fact, some people tell us voluntary intoxication actually is worse to them, it's aggravating.  And that's okay if you feel that way because the law doesn't tell you what you have to find mitigating or what you find is not mitigating.  It just tells you to consider everything again and then categorize it.  All right?

A    Right.

Q    But if you find something to be sufficiently mitigating, then it is your duty as a juror in abiding by your oath to answer special issue number three yes if it is sufficiently mitigating.

A    Okay.

Q    Okay?

A    Yes.

Q    Okay.  And I am almost done here, Mr. Winfield, but I want to go back.  You understand that, you know, this case sits on its own.  Jurors are not --

While you don't have to check your opinions and your beliefs at the door -- you obviously bring in your own common sense, your own life experiences -- you can't allow those life experiences to influence you in how you go

about reaching your verdict and how you go about answering these special issues.

Do you understand that, Mr. Winfield?

A    Yes.

Q    Okay.  And, so I just --

MR. LOLLAR:  Judge, excuse me.  They certainly can.

MS. HANDLEY:  Well, yeah, that's kind of a misstatement.  Just --

MS. EVANS:  Okay.  Let me --

THE COURT:  Well --

MS. EVANS:  I'll rephrase it, your Honor.

THE COURT:  All right.

Q    (By Ms. Evans)  Here's what I'm getting at.  You know, you mentioned or we talked about your stepchildren.  Okay?

A    Uh-huh.

Q    And you said you didn't think that it would affect you.  I just want to make sure that nothing about their situation, or the situations you have dealt with, would you then bring in to the deliberations and in determining, you know, guilt/innocence or in determining these special issues, or would you rely solely on the evidence that you hear in the courtroom in this case?

A    I would do my best to do that.

Q    Okay.

A    To rely only on the information you give me.

Q    Okay.  And that's all the law is going to require of you, okay?

A    Right.

Q    Just rely on what you hear in this courtroom.  And you could do that, Mr. Winfield?

A    Yes.

MS. EVANS:  Pass the juror.

THE COURT:  Thank you, Ms. Evans.

Now Mr. Brad Lollar.  Time out?

MR. LOLLAR:  Can we take five minutes, Judge?

THE COURT:  All right.  Mr. Edmond -- I mean Mr. Winfield, you've been here a long time too, so we are going to take a five minute break.  All right?

PROSPECTIVE JUROR WINFIELD:  Good, that's real good.

THE COURT:  Yeah.  Okay.  Court's in recess for five minutes.

(After a recess, defendant and Prospective Juror Winfield present in open court).

THE COURT:  Thank you.  There you go.

Please be seated, counsel.

Mr. Brad Lollar now will talk to you on behalf of Mr. Broadnax.

EXAMINATION

BY MR. LOLLAR:

Q    How are we doing, Mr. Winfield?

A    Good.

Q    Good.  Well, thank you for coming down here today on short notice.  I know we kind of called you out of whatever you were doing.

A    Yeah.

Q    Just told you to be here, so we appreciate you being able to do that.  And Mr. Winfield, we have all read your questionnaire.

Let me reintroduce to you Doug Parks and Keri Mallon, and we represent James Broadnax.  And our whole purpose down here in doing this individual voir dire for both sides is to try to find twelve jurors out of that 800 we had come down here a couple of months ago and fill out these questionnaires.  I think you were in the morning session --

A    Yes.

Q    -- when we had 400 people down.  Then we had another 400 that afternoon.

A    Okay.

Q    And you are the 127th person that we have talked to individually like this over the past eight weeks.

A    Okay.

Q    Now, you may at times have looked over and seen us kind of gazing at the ceiling. That's because I've heard everything they have got to say 127 times. It may be new to you, but it's not new to me.

A    Right.

Q    Okay. And about that, Mr. Winfield, we do not expect that you would have ever seen these special issues before; is that right?

A    Yes.

Q    Is that fair to state, before you came down here today?

A    Yes.

Q    And like most jurors, maybe you feel that the law in Texas was that if you commit X offense, then the penalty is death. Okay. If you do this, then you get a death sentence. Okay?

A    Yeah.

Q    Now you know that's never the case. The law in Texas does not call for a death sentence for anybody for having done anything. Okay. You understand that now.

A    Yes, sir.

Q    And, in fact, the legislature has told us that the punishment for commission of the offense of capital murder is life without parole, period. Okay?

A    Okay.

Q    Unless one particular circumstance exists, and that's if the State can prove to a jury beyond a reasonable doubt that the person on trial is the type of person who, if we put him in the penitentiary, they are going to continue to commit criminal acts of violence against other people in the penitentiary.

And that is the dividing line.  If they can prove that beyond a reasonable doubt, then you go on to special issue number three.

A    Okay.

Q    But that's the dividing line that the legislature gives us in special issue number one.

And let's take another look at that.  Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Now, that's not talking about if we just let him go and he's back out on the street.  Okay?

A    (Nods head).

Q    Because we know that if he's convicted of capital murder, he's going to be in the penitentiary, and it's either going to be serving a life sentence without parole or waiting until the death sentence is carried out.

A    Right.

Q    Okay.  But what they are telling us there -- And I want to make it very clear to you, because it just can't be more important for jurors that might sit in a case like this to understand this law that the judge has given or that the legislature has given us.  Okay?

They are saying, the legislature is saying, if you commit the offense of capital murder, the punishment is life without parole.  Okay?

A    Yes.

Q    Except for those few, and what our highest Court in the State has said, is those incorrigible few that cannot be imprisoned without fear of them committing criminal acts of violence against the wardens, against the guards, against the visitors, against their fellow inmates.  Okay?

A    Right.

Q    And it's only those people that go on to get the death sentence.  Okay?

So, having said all that, I recognize what your personal opinions are about the death penalty.  Okay?

A    Okay.

Q    But your personal opinions -- You see, we have got people who come down here and say, well, I'm not for the death penalty.  I could follow the law and, you know, I could do it, but I'm personally not for it.  But I understand it's the law and, so, I could do it.  Okay?

A    Okay.

Q    We have had a lot of people tell us that.  And then we have other people who come down here and tell us, well, I'm for the death penalty for just about everything.  We had one guy that said basically for any criminal offense.  DWI, death penalty.  Theft, death penalty.

A    Huh-uh.

Q    Okay.  So, we have seen the whole waterfront in jurors' opinions.

A    Okay.

Q    Well, and we are glad to hear those and those are illustrative to us.  But the bottom line is, it doesn't matter what your personal opinion is as long as you can put those personal opinions aside and follow the law.

Does that make sense?

A    Yes, sir.

Q    Are you a person who can do that?

A    I believe that I am.

Q    Okay.  Let's test that a little bit.

A    Okay.

Q    All right.  We see here on the first page of your questionnaire, we ask, are you in favor of the death penalty?  And you say, yes, no person is entitled to take another person's life except in self-defense.  Okay.  That's perfectly all right.

We see down below that, given the choices that you had to choose from there, you chose number two which is, I believe the death penalty is appropriate in some murder cases and I could return a verdict in a proper case which assessed the death penalty.

And that's the one you chose out of the five options that we gave you there.

A    Yes, sir.

Q    Now, I want to refer you back to number one.  I believe the death penalty is appropriate in all murder cases.  And let me ask, why didn't you circle that one?  What was it there that kept you from circling that one, given the opportunity to circle that one?

A    When I considered what I believe to be murder --

Q    Okay.

A    -- some of it can be in self-defense.  If you've taken that person's life --

Q    Okay.

A    -- that's what I'm -- Any taking of another person's life is what I consider murder.

Q    Okay.  So, what we call murder, what legalese murder is --

A    Right.

Q    -- is the knowing or intentional taking of another person's life without legal justification or excuse.  Is that

kind of what you're talking -- See, if a person is acting in self-defense --

A    Right.

Q    -- and they commit a homicide, then --

A    Okay.  Well, see, I didn't see the word homicide.  That didn't come to me.  Just murder is the taking of another person's life.

Q    Okay.  If a person is acting in self-defense, for instance, if the prosecutor starts attacking me, I have a right to defend myself --

A    Yes.

Q    -- under Texas law.

A    Yes.

Q    And if it gets to the point where if she is using deadly force against me, I can use deadly force against her.

A    Right.

Q    Okay?  And actually I have not committed any type of criminal offense if I am using deadly force against her use of deadly force and I just have a better shot.  I'm a better shot than she is.  Okay?

A    Right.  And I consider that murder instead of homicide.

Q    Okay.  Well, that would be a justifiable homicide.

A    Right.

Q    Is what we call it.

A    Okay.

Q    But I see what you're saying there.  So, would I be correct in saying that you personally feel that any time a person takes another person's life, and it's not a self-defense type of situation, that you feel like the death penalty is appropriate for that person, or not?

A    I would sure have to look at everything.

Q    Okay.  Well, think about that and we may get back to that question again in just a bit.

A    Okay.

Q    If you would, please turn to page two.

We asked you, the best argument for the death penalty, and you say, we are to keep our society and culture as civil and peaceful as possible.  It's our responsibility to maintain and separate from our society those who will not abide by the law.

Okay.  We asked you the best argument against the death penalty, and you said, I honestly don't know.  It would depend only upon an individual's special circumstance, but at all times we must keep in mind the rule of law.

Okay.  Can you kind of expound on that and tell me what you meant there?

A    Well, again, I believe I would want to hear and see every bit of evidence --

Q    Uh-huh.

A       -- that is presented before I could make a decision.

Q       Okay.

A       Like you said, I would want to be as open-minded as possible.

Q       Sure.  If you would, turn over to page four.  We ask you up at the top, for what crimes do you think the death penalty should be available in Texas, and you say, any willful taking of any life.

Okay.  Now, and again I don't have any right to tell you what your opinion should be any more than anyone.  Now, but I think I'm accurate in stating that you, if you were the king of Texas, the absolute ruler of Texas, would have the death penalty apply to more offenses than our legislature does right now.  Is that fair?

A       If it was a willful taking of a life.

Q       Right.  And, now, the State has -- let me --

MR. LOLLAR:  We are beeping.  I don't know what that beep is.

MS. HANDLEY:  That's my phone, but I mean it shouldn't --

MR. LOLLAR:  Okay.

Q       (By Mr. Lollar)  I don't know if this was ever explained to you.  Let me tell you what capital murder is in Texas.  Now, one that we have been talking about is an

intentional murder committed during the course of a robbery. But there are actually eighteen other offenses that qualify as capital murders here in Texas.

Let me first make this distinction. When we talk about a capital murder, we are talking about an intentional taking of a human life. Okay? And what we mean by that is -- That word is defined, intentionally. And it means to set as your objective the result that the victim die. Not that they just be wounded, not that they just be harmed, but they actually die. Okay?

A    Yes.

Q    So, first we are talking about it being an intentional murder, and then it has to be committed during the course of the commission of another serious offense like burglary, sexual assault, robbery, kidnapping, arson, obstruction, retaliation or terroristic threat. Okay?

A    Right.

Q    So, we have that group of offenses that if you have an intentional murder committed while you're committing one of these other serious offenses, those qualify as capital murder offenses under Texas law.

Then we have examples like the killing of a police officer, a peace officer or a fireman who is in the performance of their duties.

A    Right.

Q    Okay.  We have the murder of a victim under the age of six.  Okay.  So, if you've got a child who has been killed, that's one way to get you a capital murder.

Then we have murder for hire.  We have being the person who hires a murder for hire.  If you're one of those two people --

A    Right.

Q    -- you can be tried for capital murder.

Murder of more than one person during the same transaction; in other words, a mass murder.  Or we have serial murder where you're, you know, killing different people at different times according to the same scheme or design.

A    Right.

Q    And then we have if you're a prisoner in a penal institution and you kill a guard or a warden or somebody like that while you're trying to escape.

A    Right.

Q    Okay.  So, we have all those different ways that a person can be charged with capital murder here in the State of Texas.  But understand that it's not just -- it's got to be one of those situations.  It's not what we call a regular murder.  Two guys fighting in a bar --

A    Okay.

Q    -- late at night, you know, one may willfully take

the life of the other one, but as long as it's not connected with a robbery or something like that, it's not a capital offense for which they can get the death penalty. The most they can get is five years to life, somewhere in that penalty range.

Okay. That all make sense to you?

A    Yes, sir.

Q    Okay. But when we are talking about capital murder, now we are talking about an intentional taking of a life. Okay?

A    Okay.

Q    Down below that top answer that you gave us, we asked you, do you think there are some crimes which call for the death penalty solely because of their severe facts and circumstances regardless of whether or not the guilty person has ever committed prior violent acts? And you say, yes, there is very little room for movement when one has taken life away from another.

Tell me what you meant by that.

A    Basically that you're not supposed to be killing somebody.

Q    I agree with that. That's true.

A    It's real simple to me.

Q    Well, and it is and you are exactly right. And it's a very serious offense for which you get a very serious

penalty.

A    Right.

Q    And like I say, when we are talking about capital murder, you understand that we are only talking about two possible sentences.

A    Right.

Q    Life without parole and death.  You understand that.

A    Yes, sir.

Q    Okay.  Would you agree that both of those are very serious punishments?

A    Yes.

Q    Okay.  The law in Texas is that, as we have discussed before, there is no offense for which the automatic penalty is death.  You understand that.

A    Yes.

Q    And the presumed answer -- Well, the presumed preferred punishment for someone who is convicted of capital murder is life without parole.  Okay.  Do you understand that?

A    Okay.

Q    There in front of you up there on the bench is the indictment in this case.  And if you would take a look at that.  Some place -- it's on another little deal like -- I think that's it right there.

Now, that's the indictment in this case.

A    It stops with a comma.

Q    Sir?

A    I've read it there.

Q    Okay.

A    And is there some more to it?

Q    No, that's it.

A    Oh, okay.

Q    You see the part where they are saying that on or about a particular day here in Dallas County that the defendant did intentionally cause the death of the victim and he did that by shooting him with a firearm, a deadly weapon, during the course of the commission of a robbery?

A    Yes, sir.

Q    Okay.  That's one of the types of offenses that we previously discussed that can qualify as a capital murder.

A    Okay.

Q    So, you can see how they have alleged the case here.  Now, what is required is the State prove every bit of that indictment beyond a reasonable doubt.  Okay?

A    Okay.

Q    And what I want to talk to you about now is what we call the mental state of the defendant at the time of the commission of the offense.

The law in Texas allows either side to

introduce evidence to the jury about the state of mind, the condition of the mind of the defendant at the time of the commission of the offense. And it does so because of what the State's alleged in the indictment. And like I said, they have alleged his mental state to be intentionally causing the death. Okay?

Let me tell you that that is one of four different what we call culpable mental states recognized by Texas law. Okay?

The other three -- Starting out at the top is intentionally. Then we have knowingly, recklessly, and then acting with criminal negligence. Okay?

And let me give you examples of homicides, different type of homicides committed with each one of those different types of mental states.

Okay. Let's say I'm driving down the road in my car and I am not paying any attention to my driving. I'm looking for a CD to stick into my CD player. And somebody walks across the street and I am not paying attention and I run into them and kill them.

Okay. Now, that is a homicide, but what we would call that is criminally negligent homicide. Okay. I was not paying attention. I was not aware of the risk. And as a result of me being not aware of the risk, then I caused somebody's death. Okay. That is a criminal offense. That's

something you can be prosecuted for. But in that type of a case, the State would allege that I was acting with criminal negligence. Okay?

A    (Nods head).

Q    Now, the next one up is what we call recklessly. All right. Let me give you an example of that. Back here on the 4th of July, just a couple of days ago, you could go outside of my house at midnight and you would hear people shooting their guns up into the air, okay, in celebration.

Well, a bullet comes up, a bullet comes down, and sometimes that ends up harming people and, in fact, even killing people.

A    Right.

Q    Okay. Well, in that type of a case I have acted recklessly. I was aware of the risk but I consciously disregarded that risk and shot the gun up into the air anyway. Okay. Now, if I'm charged with that type of a thing and they can prove that I acted recklessly, then I am guilty of the offense of manslaughter. Okay?

A    Okay.

Q    And that's a type of homicide.

Now let me give you an example of the next one up which is knowingly and compare that and contrast that with intentionally. Okay. We have the example of going into the 7-Eleven to rob it. Okay. And Ms. Evans gave you this

example.

If a person goes in to rob the 7-Eleven store and they tell the teller there, give me your money, and they do, and then they just shoot them in the head five times. Okay. Well, clearly in that type of a situation I have acted intentionally to cause their death. Okay?

A    Right.

Q    And that is capital murder. That's a intentional murder committed during the course of a robbery. Okay. That's capital murder. And I acted intentionally to get there.

A    Right.

Q    Now take this example. I go in and rob the 7-Eleven store. I point my gun at the teller and say, give me your money, and she does. Okay. And I said, okay, I'm leaving now. You're not going to get hurt. Just do this, don't come around that counter and follow me outside because I don't want you seeing where I go and what car I get into to get away.

Okay. And he starts out the door -- I start out the door. And sure enough, here comes the teller around the counter contrary to what I told her to do. Okay. And, so, I look back and I see her coming after me. And to prevent her from coming out of the store and seeing where I go, I shoot her in the kneecap.

Okay. Now, I don't intend to kill her. Okay. I intend to maim her, okay, and disable her so she can't see where I go. Okay. So, my intent at that -- That's why a jury is required to look at the condition of the mind of the defendant at the time of the commission of the offense to see if they can figure out what his condition was. Okay?

A    Okay.

Q    In that example, let's say that when I shot her in the kneecap, the bullet also cuts the femoral artery and the teller bleeds to death before the ambulance gets there or the police get there. Okay?

A    Okay.

Q    Now, I have committed a criminal offense, no question. I have committed a robbery and I knowingly fired that gun at her, and that is a serious thing that can cause death or serious bodily injury, but I didn't do that intentionally. I did not cause her death intentionally.

Do you see that distinction --

A    Yes, sir.

Q    -- between the two examples?

Okay. If we have that type of a situation, then we are presented with a case where a jury -- a person might be charged indeed with capital murder. The State may allege that they have acted intentionally, but the evidence presented shows the jury that, no, they didn't act

intentionally, but they certainly acted knowingly.  Okay.  The person acted knowingly.  Okay.

Now, certainly there was a robbery going on and certainly a death occurred.  But in that example the State failed to prove that the defendant knowingly caused the death, but the evidence shows that he knowingly -- pardon me, I said that wrong -- didn't intentionally cause the death but he knowingly caused the death.

In that instance, then the jury can consider whether or not the defendant has committed a lesser included offense, what we call lesser included offenses of the charged offense, which would be capital murder.

Okay.  So, you find him not guilty of capital murder because the jury believes that the defendant did not act knowingly --

THE COURT:  No.

Q    -- intentionally.  I'm sorry.  But they acted knowingly, so you find them not guilty of capital murder.  You find them guilty of murder or aggravated robbery which are both first degree felonies and the penalty range is the same, five to life.  Okay?

A    Okay.  You --

Q    Does that make sense?

A    You're throwing a lot of stuff out there.

Q    Yeah.  What I'm trying to convey, and maybe I'm

not doing a very good job of it here today, is this business about the culpable mental state of the defendant at the time of the commission of the offense.

A    Right.

Q    And it is a requirement in this type of an indictment that the State prove that a defendant acted intentionally --

A    Right.

Q    -- in causing the death of the victim.

A    Right.

Q    That may be the issue upon which the trial turns.

A    Okay.

Q    Okay.  Because if the jury determines that -- If the State fails to prove beyond a reasonable doubt that the person at the time of the commission of the offense committed the offense intentionally, then we are not looking at a capital murder.  We are looking at something lesser.  Okay?  Either murder or manslaughter or criminally negligent homicide.  It just depends on what you think the culpable mental state of the defendant was at the time of the commission of the offense.

A    Okay.

Q    Does that make sense?

A    Yes, sir.

Q    Okay.  Is that something you think you could keep

an open mind to?

A    I have to.  They have to prove to me what they did.

Q    Yeah, that's exactly right.  They have done the accusing.  Now they have got to do the proving.

A    You bet.

Q    Okay.  And it's not like this indictment was sprung on them by an unknown grand jury.  They wrote the indictment up and presented it to the grand jury.

A    Yeah.

Q    Okay.  So, they have got to prove everything they have there in that indictment.

A    Right.

Q    Okay.  Any questions about that?

A    Well, it's their job.

Q    Okay, very good.

Now, Mr. Winfield, I want to move to talking about the penalty phase of a capital murder trial.  Okay?

A    Okay.

Q    And please believe me, we don't think we are ever going to get there, okay, in this case.  Okay.  But I don't -- This is the only opportunity that we have to talk to you about these special issues.  And because these are so unique to this type of a case and because frankly no prospective juror -- except we have had like three or four lawyers come down here and they are aware of these special issues.

But, you know, we don't expect people to have ever heard about these special issues before, and that's why we have to take some time here talking to you about them, even though we don't feel here on the defense side we are ever going to get to the point of having to talk about them. Okay?

A     Okay.

Q     Because we don't think he'll be found guilty of capital murder.  Okay?

But in the event that he is, we have got to talk about these because that's part of our job.  Okay?  And we do that to make sure that you understand these special issues.

Now, we've already talked about special issue number one here a little bit ago.  Okay.  And, again, that's the dividing line that the legislature has set forth for us, for us here in the courtroom and for the jury.

You know, we hear from a lot of jurors, when they came down here and not having seen these special issues, again, we hear from a lot of them that say, well, I think that if you commit X, you automatically get the death penalty.

Well, that's not true.  There is no offense in Texas that you get the death penalty for the commission of the offense.  Okay?  It's only those who the State can prove beyond a reasonable doubt --

A    Okay.

Q    -- are the type of person about whom it can be said there is a probability that they are going to continue to commit criminal acts of violence even if we put them in the penitentiary, and they are going to constitute a continuing threat to that society there in the penitentiary. Okay?

We have had a lot of people that tell us, well, I didn't know about these special issues. I thought if you got found guilty of capital murder, you go back and take a vote back in the jury room, and how many for death, how many for life, okay? Well, that's not true either.

A    Right.

Q    That's not the way our system is set up. You get there, you get to the end result by going through these issues, one, two, three. Okay. But you may not get to two or three if the State hadn't proven to you beyond a reasonable doubt that the defendant is the type that's going to continue to commit criminal violent offenses in the penitentiary. Okay?

If you find as a jury, you know, this is a horrible offense and the defendant really deserves the death penalty, but that's not what I'm being asked here. I'm being asked whether or not he's the type that's going to continue to commit criminal violent acts in the penitentiary. Okay?

A    (Nods head).

Q    And even though I personally feel that he's deserving of the death penalty, that's not what I'm being asked.  I'm being asked to look at special issue number one --

A    Right.

Q    -- and answer that yes or no.  So, I can put aside my personal feelings about whether he deserves the death penalty or not.  That's not what I'm being asked.  I'm going to follow the law.

A    Right.

Q    And if the State hadn't proven it to me beyond a reasonable doubt, I'm going to answer it no, knowing that that's going to result in him getting life without parole.

A    Yeah.

Q    Is that something you could do if the State fails to prove to you beyond a reasonable doubt that he's that type of a person?

A    They have got to do their job.

Q    Okay.  Now, many jurors tell us that what they would look at, of course, is the offense that was committed, but they would also want to hear from the State, and I think you mentioned this earlier, about the person's history and whether or not they are the type of person that has been committing criminal acts of violence all their lives.

A    I would want to know it all.

Q    Okay, very good.  Now, obviously if the State can show you that the person on trial is the type of person that's been committing criminal acts of violence all his life, that's relevant to your determination of special issue number one.

On the other hand -- And you have sat as a juror before and you know how a criminal trial works.  In the first part of the trial, the guilt or innocence phase, the State goes first.  They have the burden of proof.  They put on everything they have to show the defendant's guilty.  Then they rest.  And then it's the defendant's opportunity to put on testimony if he wants to.  He doesn't have to.

A    Right.

Q    Okay.  But once you hear all the evidence, you go back and you determine whether or not the State has met their burden of proof in proving the defendant guilty.

Well, if you do find him guilty, then you go into the punishment phase.

A    Right.

Q    And again the State gets to go first.  They can put on whatever they have, and then they rest, that's relevant to these special issues.  Okay?  And then it's the defense's opportunity to put on testimony if we want to.  Okay?

But certainly if a defendant has a history of committing violent acts, that's something you might reasonably expect to hear from the State's attorneys in the punishment phase of a capital murder trial, right?

A    That's reasonable, yes.

Q    Sure.  Now, on the other hand, if they don't have a history of committing violent acts, do you think that would be relevant to your consideration of special issue number one?

A    Sure.

Q    Okay.  And you know, we are going to be sitting over here, and if that's something that, you know, is part of the evidence in the case that the person on trial does not have a history of committing violent acts, then that's something we can bring to you, and that would be relevant to your consideration, right?

A    Yes.

Q    Okay.  All right.  Special issue number two is only given to a jury in the event that the evidence in the case has shown that more than one person was involved in the commission of the offense.

A    Right.

Q    Okay.  If there is no evidence that anybody other than the defendant on trial committed the offense or participated in the commission of the offense, then you're

not even given special issue number two.

A    Right.

Q    Okay.  But if there is evidence of that, then special issue number two is asking you, do you find from the evidence beyond a reasonable doubt that the defendant actually caused the death of the deceased?  In other words, was he the gunman?

A    Right.

Q    Or if he did not, if he was not the gunman, did he intend that the victim die or did he actually anticipate that the victim would die, okay?

A    Yeah.

Q    And, again, that's an issue that the burden of proof is on the State to prove beyond a reasonable doubt.

A    Right.

Q    Okay.  Now, we think special issue number one and special issue number two are pretty objective things for a jury to determine.  You look at the evidence, you say yes or no.  Okay?

And, again, if the jury -- If the State fails to prove beyond a reasonable doubt that special issue number one should be answered yes, then your deliberations as a jury are over.  You write that down on the verdict sheet, you come back and give it to the judge, the judge sentences the defendant to life without parole.

A    Okay.

Q    Okay? And it's over. Same thing with special issue number two. If you answer that no, the trial is over, and then you come back and tell the judge, and the judge sentences the defendant to life without parole.

Now, if you answer both one and two yes, then you move to special issue number three, and that's a whole different thing. One more time let's read it together.

Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigation circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

Okay. So, in that one you'll see first right off there is no burden of proof on either side. It's not something that, for instance, the defense has to prove beyond a reasonable doubt that there are mitigating circumstances. We don't have that burden. There is no burden. Okay.

And it doesn't tell you what the mitigating circumstances are. Now, mitigating circumstance is anything that any particular juror thinks it is.

A    Right.

Q    Okay. A mitigating circumstance is something that

makes -- it's opposed to an aggravating.  An aggravating circumstance makes something worse.  A mitigating circumstance makes something a little bit not so worse.  Okay.  That's what a mitigating circumstance is.

Now, what is a mitigating circumstance?  Some people tell us that such things as, well, how old was the defendant at the time he committed this offense, okay?

A    Okay.

Q    That age can be a mitigating circumstance to them and, in fact, can be a sufficient mitigating circumstance to avoid a death penalty, just because they are young.  Okay.

The maturity level of a defendant may be something that a jury might look at as a mitigating circumstance.

A    Okay.

Q    You see how that might be a mitigating circumstance in some cases?

A    Yes.  Yes.

Q    And let me pull out a list here.  The lack of a significant prior criminal history or violent history might, in itself, be a mitigating circumstance sufficient to avoid a death sentence.

In other words, a jury can look at a situation, having considered all of the evidence that they heard, and say, yes, this defendant back on the date of March

the 19th of 2008, you know, did this act but, really, that's all he's done. Okay. And they might find that that is a sufficient mitigating circumstance to say, in this case the punishment should be life without parole instead of death. Okay?

A    Okay.

Q    You see how a jury could look at it that way and consider that to be a sufficient mitigating circumstance?

A    (No verbal response).

Q    The fact of whether or not, if we've got a parties situation, whether or not the person on trial was a follower and not a leader in leading to that situation, in getting that whole thing going. Jurors have told us that might be a mitigating circumstance for them.

The life history of a defendant that brought them to that point. You know, were they born with a silver spoon in their mouth or were they born in abject poverty and lived in abject poverty all their lives, being pulled around from one relative to another without parenting, without proper parenting. You know, all those types of things. The life history of a defendant that got them to the point where they are committing capital murder --

A    Right.

Q    -- might be a sufficient mitigating circumstance. Whether in fact the evidence shows that the

person on trial, when he was a child, when he was growing up, was the victim of physical abuse or sexual abuse might be a mitigating circumstance to a juror to make them want to avoid a death sentence for somebody.

Whether they hear from friends and relatives of the defendant that know him best, been with him all of his life, and come in and say, I know this person. What he did on that day was a horrible thing, but that really was an aberrant behavior for him, that he did not ever do that type of stuff before, and this is totally new. Okay. That that may be a sufficient mitigating circumstance.

And finally whether a defendant is remorseful for what they did, that that might be something that a jury would look at in determining whether or not the person on trial should get death or life.

Okay. You see how anything can be a mitigating circumstance?

A    Yes.

Q    And the law anticipates that a juror sit and listen to the testimony and give all of it careful consideration. And I think you're the type of person that can do that, can't you?

A    I believe so.

Q    Okay. Now, whether anything rises in your mind to the level of a sufficient mitigating circumstance to

avoid a death sentence is up to you.  The law says that each individual juror at that point, if you are down to special issue number three, have really got to issue their own personal moral judgment about the appropriateness of the death sentence at that point.

And Mr. Winfield, when we are talking about a personal moral judgment, let me say this about that.  Now, I have no right to tell you what your personal moral judgment about a situation is.

A    Right.

Q    You have no right to tell me about what my personal moral judgment is.

The law says that each of the twelve jurors in the jury room can look at these circumstances.  They might each find something to be sufficiently mitigating.  There is no requirement that they all have to agree on one particular thing being sufficiently mitigating.  I might find something to be mitigating that the juror sitting next to me does not find mitigating.

A    Right.

Q    And vice versa.  Something can be mitigating to them that is not to me.

A    Right.

Q    Okay?  That's fine.  There is no requirement that everybody has got to agree.  But we do tell you this.  Only

in the circumstance that all twelve jurors unanimously agree that nothing is sufficiently mitigating to avoid a death sentence is that verdict form signed which results in the judge sentencing the defendant to death.  Okay?

A    Say that one more time.

Q    Yes, sir.  Only in the circumstance that all twelve jurors agree that there is nothing sufficiently mitigating --

A    Yeah

Q    -- to avoid a death sentence do we get a death sentence.

A    Okay.

Q    Okay?  So, if one juror, one juror decides, hey, this is sufficiently mitigating to me to want to avoid a death sentence.  This is my personal moral judgment.

A    Right.

Q    And none of you other people here in this jury room have a right to tell me what my personal moral judgment is.

A    Right.

Q    Just as I don't have a right to tell you what your personal moral judgment is.  That's fine.  The law is satisfied.

A    Right.

Q    Okay.  Does that make sense to you?

A    Yes, sir.

Q    Okay.  Let me give you a couple of examples of what we are talking about there.  Let's say that you are a person whose father committed suicide at an early age when you were young.  Okay?

A    Okay.

Q    And you, rather than the other twelve people in the room who did not have that experience, know how that affected you growing up.  Okay?

A    Okay.

Q    So, that's something kind of personal to you.

And then you hear that the defendant on trial had a father who committed suicide and then has had problems all his life since that point in time.

Well, see, that may be something that resonates personally with you.

A    Right.

Q    And the other twelve jurors may not have had that experience.  But the law says that's fine.  As long as you think it's sufficiently mitigating, that's all she wrote.  Okay?

A    Right.

Q    Does that make sense to you?

A    Yes, sir.

Q    Okay.  One more area that people have told us can be a mitigating circumstance to them is this.  Whether, at

the time of the crime, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of the effects of intoxication.

Now, when we say intoxication, we mean either by alcohol or drugs. Okay? So whether, at the time of the crime, the defendant's conduct was the result or an offshoot of his voluntary intoxication either by alcohol or drugs.

Some people have told us that to them would be a sufficiently mitigating circumstance. Okay. And I mention that to you because obviously I see that your family has been affected by drug usage. Your daughter, bless her heart, has completed the Nexus program, and that's one of the programs that the judges here in this courthouse use pretty frequently and it seems to have a good success rate. So I'm very happy to hear that your daughter has completed that program and is now with you.

I see back on page six -- Well, at the bottom of page five we tell you what the law is. The law in Texas is voluntary intoxication does not constitute a defense to the commission of crime. Well, that's true. You can't go out, voluntarily get intoxicated, either with drugs or alcohol, commit a crime, and then say King's X, you can't prosecute me. That's not the way it is.

But over on the top of page six we do tell

you this, and it is written in Texas law.  That Texas law further provides that evidence of intoxication may be considered in mitigation of punishment.  And that is Texas law.  And we say it in our law books that evidence of intoxication may be considered in mitigation of punishment.

Okay.  We asked you if you agreed with this law, and you said yes, intoxication means that something gets altered, the thinking process, but it can make one do abnormal behaviors.

Well, that's your opinion about that.

A    Right.

Q    And that's certainly allowed by Texas law.  And Mr. Winfield, if you're in a situation where you sit on a jury and you hear that at the time of the commission of the offense the defendant's mind was addled by the use of drugs, that's important for two things.

Number one, it can go to that -- back to the, back to the guilt or innocence phase.  It goes back to that culpable mental state.  Remember that --

A    Right.

Q    -- the State's got to prove either --

MS. EVANS:  Your Honor, I have to object. That's not -- That's a misstatement of the law.

THE COURT:  I sustain the objection.  Time, I'll allow just a little bit more, Mr. Lollar.  Time's up.

**Anne B. Meredith**
Certified Shorthand Reporter

MR. LOLLAR: Okay. Well, we will wrap it up.

THE COURT: Okay.

Q    (By Mr. Lollar)  Whether, well, at the time of the commission of the crime, the capacity of the defendant to appreciate his actions.  It goes back to that culpable mental state.  Okay.  And that can be affected certainly by intoxication, voluntary intoxication.

In regard to special issue number three, voluntary intoxication can be a sufficiently mitigating circumstance, standing alone and by itself, for a juror to want to take it off the death sentence, put it back to life without parole.

Does that make sense to you, Mr. Winfield?

A    That makes sense.

Q    All right.  Mr. Winfield, do you have any questions of any of us before we finish here today?

A    That's just a lot to take in.

Q    Well, it is.  We appreciate you coming down. Like I say, do you know of any reason why you could not be fair to either the defense or to the State in this case?

A    No, sir.

Q    Very good.  Thank you, Mr. Winfield.  We appreciate it.

THE COURT:  Thank you, sir.  You're going to step outside for a minute, then you'll come right back in.

**Anne B. Meredith**
Certified Shorthand Reporter

PROSPECTIVE JUROR WINFIELD:  Sure.

THE COURT:  Okay?

PROSPECTIVE JUROR WINFIELD:  Sure.

(Prospective Juror Winfield exits the courtroom).

THE COURT:  In the presence of Mr. Broadnax, what says the State?

MS. EVANS:  State has no challenge.

THE COURT:  Mr. Broadnax.

MR. LOLLAR:  We have no challenge.

THE COURT:  Ask him to return, please.

(Prospective Juror Winfield returns to the courtroom).

THE COURT:  Please be seated, sir.

Be seated, counsel.

Sir, of course, the attorneys have agreed you're a qualified juror.  So do I, of course.

Now, remember what that means is in about a week or a little longer, two weeks, we are going to actually select the jury --

PROSPECTIVE JUROR WINFIELD:  Okay.

THE COURT:  -- from that fifty qualified. The day that's done, you'll be immediately called by the judge's coordinator telling you whether you are on the jury or not on the jury.

PROSPECTIVE JUROR WINFIELD:  Okay.

THE COURT:  So I want to make sure that those telephone numbers on your questionnaire are still correct.

PROSPECTIVE JUROR WINFIELD:  Yes.

THE COURT:  All right, sir.  The sheriff is going to give you the card of the judge's coordinator. Should anything occur in your personal life between now and then that you think will affect your jury service, call her and we will get back up here and deal with it.

PROSPECTIVE JUROR WINFIELD:  Okay.

THE COURT:  Please avoid all outside information about this case.

PROSPECTIVE JUROR WINFIELD:  All right.

THE COURT:  Including friends, media, Internet. It's been a real pleasure meeting you, sir.

PROSPECTIVE JUROR WINFIELD:  Nice to meet you.

THE COURT:  And thank you very much.  Good luck to you.

PROSPECTIVE JUROR WINFIELD:  Okay.

MS. EVANS:  Thank you, sir.

MR. LOLLAR:  Thank you, Mr. Winfield.

PROSPECTIVE JUROR WINFIELD:  Sure.

THE COURT:  Court's in recess until 9:00 o'clock.

(Court adjourned for the day).

THE STATE OF TEXAS    (

COUNTY OF DALLAS        (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 7th day of July, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volumes 33 & 34) is $2,321.50 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 13th day of January, 2010.

Anne B Meredith
_____
Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter