R E P O R T E R ' S   R E C O R D
VOLUME 35 OF _____ VOLUMES
TRIAL COURT CAUSE NO. F08-24667-Y

STATE OF TEXAS            )   IN THE CRIMINAL DISTRICT

VS                       )   COURT NUMBER SEVEN OF

JAMES BROADNAX           )   DALLAS, COUNTY, TEXAS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

INDIVIDUAL VOIR DIRE

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

ORIGINAL

On the 8th day of July, A.D., 2009, the above entitled and numbered cause came on to be heard for trial in the said Criminal District Court No. 7, with the Honorable Michael Snipes, Judge presiding, and the following proceedings were held, to wit:

Proceedings reported by COMPUTERIZED STENOTYPE MACHINE; Reporter's Record produced BY COMPUTER-ASSISTED TRANSCRIPTION.

A P P E A R A N C E S


MS. ANDREA HANDLEY
SBTN:  08898800
MS. ELAINE EVANS
SBTN: 24032880
MR. DAVID ALEX
SBTN: 24003256
MR. GORDON HIKEL
SBTN: 00787696
133 North Industrial Boulevard
Dallas, Texas   75207
(214) 653-3600
ATTORNEYS FOR THE STATE


MR. BRAD LOLLAR
SBTN: 12508700
1700 Commerce Street, Suite 450
Dallas, Texas   75201
(214)384-8178
MR. DOUG PARKS
SBTN: 15520000
321 Calm Water Lane
Holly Lake Ranch, Texas   75765
(903)769-3120
MS. KERI MALLON:
SBTN: 24049165
133 North Industrial Boulevard
Dallas, Texas   75207
(214) 653-3600
ATTORNEYS FOR THE DEFENDANT

INDIVIDUAL QUESTIONING OF PROSPECTIVE JURORS
CHRONOLOGICAL INDEX

(VOLUME 35)

July 8, 2009

| PROSPECTIVE JUROR | STATE | DEFENSE | PAGE | VOL. |
|---|---|---|---|---|
| JOHN FRANCIS VESSELS | 16 | 60 | | 35 |
| Venireperson accepted......................81 | | | | |
| | | | | |
| JOHN TROTTER | 89, 106 | 101, 116 | | 35 |
| State's challenge for cause................118 | | | | |
| Court's ruling.............................119 | | | | |
| Venireperson excused for cause............119 | | | | |
| | | | | |
| EMILY ALANE BLEVINS | 128 | 165 | | 35 |
| Venireperson accepted.....................189 | | | | |
| | | | | |
| CONNIE LOUISE SANCHEZ | -- | -- | | 35 |
| Venireperson excused for cause............203 | | | | |

| | PAGE | |
|---|---|---|
| Court adjourned............................203 | | 35 |
| Court Reporter's certificate..............204 | | 35 |

INDIVIDUAL QUESTIONING OF PROSPECTIVE JURORS
ALPHABETICAL INDEX

(VOLUME 35)

| PROSPECTIVE JUROR | STATE | DEFENSE | VOL. |
|---|---|---|---|
| EMILY ALANE BLEVINS | 128 | 165 | 35 |
| CONNIE LOUISE SANCHEZ | - - | - - | 35 |
| JOHN TROTTER | 89, 106 | 101, 116 | 35 |
| JOHN FRANCIS VESSELS | 16 | 60 | 35 |

P R O C E E D I N G S

THE COURT:  This is July 8th, 2009.  We're in open court.  Present is the State's counsel, Mr. Broadnax and his counsel.  What says the State?

MS. HANDLEY:  The State is ready, Your Honor.

THE COURT:  What says Mr. Broadnax?

MR. LOLLAR:  We're ready, Your Honor.

(Venireperson Vessels enters courtroom.)

THE COURT:  Good morning.  Please be seated, sir.  Mr. Vessels, I'd like to introduce myself to you.  My name is Webb Biard and I'll be with you this morning during this part of the jury selection process. If you recall, the presiding judge of this court is Michael Snipes, who you met with in that large panel. Should you be selected as a juror in this case, Judge Snipes will actually preside over the trial.

So this will be our only opportunity to be together.  Also, I'd like to introduce to you at this time Andrea Handley.

MS. HANDLEY:  Good morning.

THE COURT:  Elaine Evans.

MS. EVANS:  Good morning.

VENIREPERSON VESSELS:  Good morning.

THE STATE:  These folks represent Dallas

PROCEEDINGS

THE COURT: This is July 8th, 2009. We're in open court. Present is the State's counsel, Mr. Broadnax and his counsel. What says the State.

MS. HANDLEY: The State is ready, Your Honor.

THE COURT: What says Mr. Broadnax?

MR. LOLLAR: We're ready, Your Honor.

(Venireperson Vessels enters courtroom.)

THE COURT: Good morning. Please be seated, sir. Mr. Vessels, I'd like to introduce myself to you. My name is Webb Biard and I'll be with you this morning during this part of the jury selection process. If you recall, the presiding judge of this court is Michael Snipes, who you met with in that large panel. Should you be selected as a juror in this case, Judge Snipes will actually preside over the trial.

So this will be our only opportunity to be together. Also, I'd like to introduce to you at this time Andrea Handley.

MS. HANDLEY: Good morning.

THE COURT: Elaine Evans.

MS. EVANS: Good morning.

VENIREPERSON VESSELS: Good morning.

THE STATE: These folks represent Dallas County and the State of Texas.

Further, to my right is Brad Lollar.

MR. LOLLAR: Hi.

THE COURT: Doug Parks and Keri Mallon.

MR. PARKS: Hello.

MS. MALLON: Hello.

THE COURT: They represent Mr. James Broadnax in this case. Do this for me, please, sir, before we go any further. Please raise your right hand for me.

(Venireperson Vessels sworn.)

THE COURT: Here is the way we're going to proceed this morning: I'm going to talk to you for a minute and then one of the attorneys for the State and then one of the attorneys for Mr. Broadnax are going to talk to you for up to 45 minutes. This is going to take about one hour and a half. At that time at the conclusion of our conversation with you, and I hope that's what it is, a conversation with you, and I hope that's what it is, a conversation, I will tell you here in open court whether or not you are a qualified juror.

Now, what that means, Mr. Vessels, is we're in the process of qualifying some 50-odd jurors. When that's done, the actual jury that's going to try the case will be selected out of that pool of qualified jurors. The day that's done, you will then be contacted by the court coordinator, Judge Snipes' official court coordinator, and she will tell you by phone whether you are on the jury or not on the jury. And we anticipate that will happen some time next week. It might be a little longer, but it is coming down to it, so you'll get that phone call either way and that's what we're about this morning.

Now, if -- I appreciate you being here. Being here early and being on time. Did you have an opportunity to read the pamphlet?

VENIREPERSON VESSELS: Yes, sir.

THE COURT: Did that help you just a little bit to understand the process?

VENIREPERSON VESSELS: Yes, sir.

THE COURT: Good. There's a lot of things we're going to be talking to you about, sir, the principles of law that you've known since the fifth grade. Some other things we're going to be talking to you about are these special issues. Most people have never heard about them before and we understand that. Don't let that concern you at all.

It is not your responsibility to know the law. That's not your job. It is our job to explain the law to you and these attorneys have the ability to do that and they will do that and they'll take whatever time they need for you to feel comfortable that you understand the law that applies in this case. And then once that's done, you will be asked: Now that you understand the law, the procedure, will you be able to follow the law in Texas in the United States to perform your duties as a juror? If you can, then you'll be a qualified juror. If you cannot, then you won't be a qualified juror.

All that means is, is you wouldn't be able to serve on this case. You've already done all that you're required to do by being here today. That's all I'm asking you to do. And also, I'm asking you to do is just shoot straight with me and just tell us how you honestly feel and whether or not you can follow the law. Is that a fair deal?

VENIREPERSON VESSELS: Yes.

THE COURT: This isn't some pop legal quiz where we're trying to find out what twelve people know the most law. In other words, it is not, like, what's two plus two, where the right answer is four. This is not going to be that type of deal where we ask you legal questions and if you don't know the answer, then you can't serve. That doesn't have anything to do with it.

VENIREPERSON VESSELS: Okay.

THE COURT: All right. Now, from reading that pamphlet and hearing Judge Snipes' remarks and filling out your questionnaire, which I have here, sir, and I'm going to hand them to you in just a minute, as you sit here now, do you understand this is a capital murder case?

VENIREPERSON VESSELS: Yes, sir.

THE COURT: Do you understand the State of Texas is seeking the death penalty?

VENIREPERSON VESSELS: Yes, sir.

THE COURT: Have you ever served on a criminal jury before?

VENIREPERSON VESSELS: No, sir.

THE COURT: Okay. That's no problem. All criminal jury trials in Texas are in two parts. The first part is the guilt or innocence phase. The second part is the punishment phase. If the person is found not guilty, then there wouldn't be a punishment phase and if you're on the jury, you will know which part of the trial you're in.

In other words, you're not in the punishment phase unless you come back and say, We the jury find the person on trial guilty. That is the way every case from the theft of a bicycle to a capital murder case is tried. I want you to understand that.

VENIREPERSON VESSELS: Okay.

THE COURT: Now, do you also understand, knowing the State is seeking the death penalty, if someone is found guilty of capital murder, there's only two possible punishments? Do you know what they are?

MR. VESSELS: Life without parole and the death penalty.

THE COURT: That's exactly right. There's only two possible punishments. And let me stress this to you and believe me when I tell you, life without parole means life without parole. There was a time when somebody was sentenced to life in prison in a capital murder case and they would eventually become eligible for parole. Not that they'd get it, but they'd have a hearing before the parole board. That's no longer the law. It hasn't been for close to five years now.

The law is life in prison without parole means life in prison without parole. You're exactly right, there's only two possible punishments.

Now, there's a difference between murder and capital murder. Did you know that?

VENIREPERSON VESSELS: Yes, kind of. I didn't exactly know what it was.

THE COURT: And I wouldn't expect you to. The attorneys are going to explain it to you. The range

of punishment for murder is not less than five years or more than ninety-nine years or life. A capital murder is either life in prison without parole or death. And the way the jury will set punishment in a murder case would be when they listen to the evidence in the punishment phase and go back and then the entire jury will be back in the jury room and they'd decide what is the correct number of years for this person who they found guilty of murder.

Death is not a possible punishment for murder. Only capital murder. And they would write the number down on a blank line and come back in court and the judge would read it out loud and that would be the verdict. We the jury having found the person on trial guilty hereby assess the range of punishment at blank number of years. It would be anywhere from five to ninety-nine.

The jury in a capital murder case also sets punishment if they find a person guilty of capital murder. It is going to be life in prison without parole or death, but the jury does not write down on a blank line, Life in prison without parole or death. They answer those three special issues. Do you remember reading about them a little bit in that pamphlet?

VENIREPERSON VESSELS: Yes.

THE COURT: That's the first time you ever saw them, right?

VENIREPERSON VESSELS: Yes.

THE COURT: Okay. And the way the jury answers the issues either "yes" or "no" depends on the punishment. Are you with me on that?

VENIREPERSON VESSELS: Yes.

THE COURT: You're following me?

VENIREPERSON VESSELS: Yes, sir.

THE COURT: And each issue is separate from whether the person is guilty or not. That's already been decided. You're not deciding on the special issues unless you've already found the person guilty, okay?

VENIREPERSON VESSELS: Okay.

THE COURT: They're different from whether they're guilty or not and they're all different from each other. To be a qualified juror you're going to have to tell us in meaning, that even though you found somebody guilty of capital murder, you can still go into that punishment phase and then depending on the evidence, answer those special issues "yes" or "no."

If you can, basically you'll be a qualified juror. If you think you've already got your mind made up, what you're going to do if you find somebody guilty, either way, life in prison or death. If you already

have your mind made up, then you wouldn't be a qualified juror. Does that make sense to you?

VENIREPERSON VESSELS: Yes, sir.

THE COURT: What do you think, just from the initial bunch?

VENIREPERSON VESSELS: I haven't made a decision yet, no.

THE COURT: No. Do you think you can wait? Do you think you can just wait and listen and then make your decision?

MR. VESSELS: Yes, sir.

THE COURT: Do you already have your mind made up on what you're going to do?

VENIREPERSON VESSELS: No.

THE COURT: Okay. Good. Are you with me on that?

VENIREPERSON VESSELS: Yes.

THE COURT: Okay. You haven't already decided what you're going to do in this case?

VENIREPERSON VESSELS: No, sir.

THE COURT: Okay. Did you see where Judge Snipes tells us that he's going to start this trial August 10?

VENIREPERSON VESSELS: Yes.

THE COURT: And you'll see how he will run this court. And it is going to last up to two weeks.

VENIREPERSON VESSELS: Right.

THE COURT: You see how he runs his court Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon and a lunch.

VENIREPERSON VESSELS: Yes.

THE COURT: The jury will not have to stay together overnight unless and until you're deliberating and when you're deciding your verdict and went late into the night and become fatigued and unable to concentrate and still haven't reached a verdict, but want to continue, there is a chance you'll be taken to a fine hotel, county expense, individual private rooms, come back the next day as a group to avoid any outside influence, media coverage or friends calling you up or whatever.

Now, I tell you all of that and give you the dates and how long it is going to last, the way the judge runs his court, after all of this, filling out the questionnaire and hearing me talk for a minute, as you sit here now, is there any reason why you can't sit as a juror in this case?

VENIREPERSON VESSELS: No, sir.

THE COURT: Okay. Here's what I'm going to do, I'm going to hand you this questionnaire and I know it took time to fill it out, but it is going to save you more time than that today, okay?

VENIREPERSON VESSELS: Thank you.

THE COURT: From time to time, one of the lawyers might say look at Page 6 or 3 or 1 or whatever, and say, Tell us a little bit more about what you meant when you wrote that down.

VENIREPERSON VESSELS: Okay.

THE COURT: That happens to everybody. I don't know what page or what paragraph, but you'll have it there to refer to.

Now, you've been going since probably 6:30 or 7:00 this morning to get here. It is going to last one hour and a half. During that interim, if you need to take a break for whatever reason, let me know and we'll stop for about five minutes to accommodate you. Is that a fair deal?

VENIREPERSON VESSELS: Fair deal.

THE COURT: Good deal. All right. Ms. Handley?

MS. HANDLEY: Thank you, Your Honor. I appreciate it.

JOHN FRANCIS VESSELS, having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION FROM THE STATE

QUESTIONS BY MS. ANDREA HANDLEY:

Q. Good morning, again, Mr. Vessels. How are you doing today?

A. Fine.

Q. Good. I'm glad to hear that. As the judge said, my name is Andrea Handley. I'm an assistant district attorney. With myself, my colleagues, Elaine Evans and Mr. Gordon Hikel, we're in charge of selecting qualified jurors who may ultimately sit in this particular case.

A. Okay.

Q. As the judge said, we each have a certain amount of time to talk to you. What I'd like to do is talk to you about the law as it applies to a criminal case, particularly the law as it applies to a capital murder case where the State is seeking a death penalty.

I appreciate you being here. I appreciate you showing up that day to come down here in that big panel and filling out this questionnaire. We've all read it. We've absorbed it. It helps give us a pretty good idea of where you're coming from and whether or not you're the kind of person who ultimately may be qualified to sit on a jury. I appreciate that as well as you coming down here today and being on time. Our system doesn't work without the dedication and the

people like yourself taking time out of their schedules, so thank you on behalf of everybody here.

As the judge stated several times, we're looking for qualified jurors. And it is interesting because when the judge said to you, Will you wait and listen before you render your decision, I noticed you kind of looked at him, like, Well, of course. That's what we're talking about. Some people say, No, I've already made up my mind, and they haven't heard anything about this particular case. If they have already made their mind up as to what should happen in every capital murder case or every murder case or every regular case, then they're not qualified, because they've essentially told us they're not coming in with an open mind, they're not willing to follow the law, they're not going to base their verdict on the facts of the case. They're going to base it on something else. That individual is not a qualified juror.

So as we tell you the law and explain the law to you, the ultimate question is not: Do you like the law? The ultimate question is: Can you follow the law? So we'll tell you what that is and we'll walk you through that as we go along here.

We knew that when we had you come down here on April 24th and filled out that questionnaire of

seventeen or eighteen pages, nobody gave you a pocket law guide. Nobody gave you a primer or a class on capital murder and criminal law, so we knew that. We therefore take your answers to your questions and we keep that in mind, that you're not necessarily answering them within mind how they should be answered, for example. What we're looking for is how do you feel at that point, because it is not only important that you're qualified, but ultimately when we decide who will sit on the jury, we also want to look at how you feel about particular things. It helps us make our ultimate decision as to whether or not you're going to sit on this particular case.

I'm going to talk to you about the law and tell you what the law is. I may use examples. Anything I say is my opinion. If I give you examples, I'm just giving you examples. I'm not talking about this particular case. Ultimately, the person who will tell you what the law is, is going to be the judge that sits in the case and that will be Judge Michael Snipes. But if you have any questions, by all means, I need and want you to interrupt, okay?

A. Okay.

Q. That you have not sat on a criminal jury before is not necessarily a problem. I'll tell you that the

majority of people have not, but it doesn't mean they're not qualified or can't sit on this particular case. That's why we talk to you now.

Let me tell you a little bit about how the criminal law works and particularly in a criminal case.

As our judge stated, criminal cases in Texas are tried in two parts. You know, it is kind of like a two-act play. In the first part of the case the jury is called upon to answer one issue only and that is, is the defendant guilty of the charge? Has the State proved to me that the defendant is guilty?

At that point, you're not concerning yourself about punishment, only is he guilty of the charge. If you find him not guilty of that charge, then that's it. We don't go forward on that case, okay?

A. Okay.

Q. If, however, you do find the defendant guilty of capital murder, then we would move into the second phase of the trial. And as the judge stated, it is called the punishment phase of the trial.

Now, you're not deciding whether or not he's guilty anymore, because he's guilty. You wouldn't be there if he wasn't. Now you're taking into consideration all of the evidence. Maybe you're going to hear more evidence and you're going to ultimately

decide what the punishment will be in the case. In a capital murder case, as the judge stated, only one of two things are going to happen. They'll either get life in prison without parole or receive a sentence of death. Whether or not they get one of those two sentences is not based on the jury going back there and saying, How many think he should get life and how many think he should get death? It's not arrived at that way, as you see from the pamphlet we gave, but instead the verdict is arrived at by answering questions. And if the questions are answered "yes," "yes," and "no," then he does receive the death penalty. If they're answered in any other way, then he automatically receives life in prison without parole, okay?

A. Okay.

Q. Let's just talk generally now about criminal law and criminal cases and what I refer to as some fundamental propositions of law that apply in every criminal case, be it a capital murder case, be it theft of a bicycle, these apply. And you've probably already heard of these principles of law, because they're well grounded in fairness and law in our Constitution.

As we sit here today in this courtroom, you, as a juror, are to presume the defendant innocent at this point. Presumption of innocence is what you've

heard of, I'm sure. What that basically stands for, Mr. Vessels, is that you're to presume him innocent because I haven't proved to you otherwise. At this stage of the trial, you have heard absolutely no evidence whatsoever. So as far as you're concerned, at this point in the stage of the trial, he is innocent and you must presume him innocent until I prove it to you otherwise. Because an essential theme throughout the criminal trial is that I represent the State of Texas. I have brought the charges in this case and because I have brought the charges in this case, it is incumbent upon me, it is my responsibility to prove the case. And I'm sure that makes sense to you.

A. Yes.

Q. I bring the charges, I better bring the proof in a case like this.

A. Right.

Q. Not only do I carry what's referred to as the burden of proof -- because you always look to me. You never look to the defense to prove anything. You always look to the State. Not only do I have to bring you the proof, but I have to prove my case to you beyond a reasonable doubt. There's no definition necessarily of reasonable doubt. It's whatever you think it is. I'll submit to you that it's a very high burden of proof.

At one point in your questionnaire you used the term, If the evidence will solidly indicate the defendant's guilt. And I think that's a pretty fair definition, if you will, for beyond a reasonable doubt. Does it solidly indicate to me that the defendant is guilty? But regardless of what you may or may not think reasonable doubt is, do you understand it is a high burden of proof and it should be a high burden of proof, when you consider what's at stake here, a person's liberty and in this case, a person's life?

A. Right.

Q. So I carry the burden of proof. I have to prove my case to you beyond a reasonable doubt. The defense has no obligation in this case, other than to show up. They've already done that. I'm sure you've heard of a person's Fifth Amendment right not to testify. I enjoy that right as a citizen. So do you and so does any defendant in a criminal case.

The law states that if a defendant elects to exercise that constitutional right not to testify, you cannot use it as evidence against him in his trial. In other words, if I fail to prove my case to you beyond a reasonable doubt and a defendant doesn't testify, you can't go back to the jury room and say, Well, she didn't exactly prove the case to me, but because he didn't

testify I'm going to hold it against him.

You cannot do that. Do you understand that?

A. Yes.

Q. Can you follow that law and not hold that against the defendant if he elects not to testify?

A. Yes.

Q. The defendant has been indicted in this case, okay? That is the vehicle that brings this, actually, to trial. That brings us to this point, but the law states the indictment is not evidence of guilt. It is not to be considered by you as evidence of guilt. There's no "where there's smoke, there's fire."

All the indictment is at this point is a piece of paper and it remains that. And it tells the defendant what he's been charged with and it tells me what I am obligated to prove to you beyond a reasonable doubt before you can return a verdict of not guilty. Does that make sense to you?

A. Sure.

Q. In that indictment, it sets out that crime, if you will. It sets out what I have charged him with doing. We also refer to that as the elements of the offense. It says that I must prove not only that the defendant did it, but in Dallas County. I must prove to

you on the date that it happened. I must prove to you how it happened, the manner and means, we call that, who he did it to. These are the elements of the offense. The law states that I have to prove to you beyond a reasonable doubt every element of the offense. I don't get points for proving five out of six. I have to prove them all to you. Each one is just as important as the other.

If I fail to carry my burden of proof on any element in the indictment, then you must return a verdict of not guilty, okay?

A. Okay.

Q. I'll give you a far-out example just to show you how serious we are about that particular law. If you are selected to sit as a juror, let's say, in a murder case, and let's say that indictment alleges that a defendant caused the death of somebody by shooting them with a firearm, then that is an element of the offense. That is the manner and means that has been alleged and that is what I must prove to you beyond a reasonable doubt: by shooting with a firearm.

If you're sitting in that trial and let's say the defendant takes the stand and says, I killed the guy and I'm glad I did it. But then the medical examiner gets on the stand and says, This man is dead,

but he did not die by being shot with a firearm. He died by being stabbed. The CSI person takes the stand and says, There's no gun or bullets at the scene. There's a bloody knife. I have failed to prove to you that he killed him by shooting him with a firearm, haven't I?

A. Yes.

Q. And your verdict must be not guilty; do you understand that?

A. Yes.

Q. As distasteful as that is, and that is a far-out example, but it goes to make that point that you have to hold me to that burden. Is that something that you can and will do, Mr. Vessels?

A. Yes, I will.

Q. Okay. A very important job for a juror in a case, and this is solely your job to do this, is that you as a juror test the credibility of the evidence in the case. Your verdict must be based on only the evidence in the case. It may not be based on what you heard at the coffee shop. It may not be based on what your friend told you or what you read in the newspaper or saw on the TV. All evidence comes to you from the witness stand where you're sitting right now and from this Court. Does that make sense to you also, sir?

A. Absolutely.

Q. That's why we asked you on Page 3, and I think you have your questionnaire in front of you, whether or not you had already heard about this case. And you told us that you had in fact heard about it, there was some television news coverage of two men being shot outside a music studio. Also, there was some family talking about the men. Nothing more than after the initial report.

Is that pretty much where you stay at this point with having heard about this case?

A. Yes.

Q. You haven't gone and done any more research or anything on it?

A. No.

Q. There's nothing wrong with having heard maybe a little about the facts of a case that you might sit on. What the important part is, is the law states that what you may have seen on the TV, what you may have talked about with your family, you may not now bring that into your deliberations and use that as evidence against the defendant. Does that make sense to you?

A. Yes, ma'am.

Q. Is that something that you can and will do, also?

A. Yes.

Q. Just based on what little you've heard, have you already formed a conclusion as to whether or not the defendant is guilty or innocent?

A. No.

Q. Okay. Very well, then. Along with assessing the credibility of the evidence that comes to you from the witness stand, it comes to you in the form of people taking the stand. And they will swear to tell the truth and they will start to testify. And you, as a juror, will listen to what they say and you assess the credibility of the witness as they start to testify.

After they're finished testifying, then you decide their credibility. Do I believe all, some or none of what this person says? Does it wash with what's going on? Does it make sense to me? That's when you assess the credibility of a witness. You can't, for example, say, If you tell me that a priest is going to testify, I'm going to tell you right now before I hear any word he says, that I will automatically believe everything he says. Because you won't have listened to his testimony first and assessed his credibility from the witness stand. You will not have followed the law. Does that make sense?

A. Absolutely.

Q. I bring that point up with you because we did ask people about police officers. Because as you would expect, and I think that's on Page 7, officers are often called to testify in criminal cases. It is about the middle of the page there. We said, Do you believe police officers are more likely to tell the truth than the average person? And you said, Yes, understanding the reality of the truth is the only correct way to report an incident to make a revival. I couldn't agree with you more, quite frankly.

With respect to police officers, there's nothing wrong with you having a higher opinion of them or even maybe, I think it is fair to say, an expectation or an assumption that they will tell the truth.

A. Right.

Q. But what the law states is that you must start them off at the same level as any other witness. After they take the stand, after they are sworn in, then you decide whether or not you're going to give them that credibility and believe what they're saying. But the law states you cannot say, Well, Ms. Handley, if you tell me a police officer is going to testify, I'm going to automatically believe what they say. Does that make sense to you, sir?

A. Yes.

Q. Is that a law you can also follow?

A. Yes.

Q. A lot of what criminal cases are about, also, is not only can you understand the law and follow the law, but can you come in with an open mind, you know, and not only give the State a fair trial, but also give the defendant a fair trial.

In other words, can you come in open minded and not with any biases that you will hold against the State or that you would hold against the Defendant? We all have life experiences. We have all been through things in our life. We all know people in certain occupations. I mean, these are the things that make us who we are and help us form our opinions and our feelings. And there's nothing wrong with that.

If you didn't have opinions or if you didn't know people or if you hadn't been through experiences in your life, if that means you weren't qualified, then I guess we'd get people who lived in a basement their whole lives, you know, to sit on juries.

A. Right.

Q. The important thing is, is that regardless of what you may have been through, regardless of who you may know or your experiences, will you leave that outside the courtroom and judge a case strictly on the evidence in the case? Does that make sense to you?

A. Yes.

Q. I'm going to get to a point with you on that. You have stated that your nephew was murdered. And I'm sorry to hear that and I understand that you say that was never solved?

A. No.

Q. When did that happen, sir?

A. About '91.

Q. Was that here in Dallas County?

A. Yes. It was in DeSoto.

Q. Okay, in DeSoto. And that's remained unsolved and I'm assuming it's still an open case? They've just left it open?

A. As far as I know. I don't actively deal with it. It is not something I've ever followed up on, more than the initial -- after it happened.

Q. Okay. Well, that's a tough thing to go through. And I'll tell you to help illustrate my point here, is that some people might come into this jury process and say, my nephew was murdered. It remains unsolved. It is heavy on my heart. It's heavy on my mind and I cannot say that I can truthfully sit in a case involving a murder and say that I can't be unbiased. I cannot say that I will not carry that into the jury room and hold that against the defendant. It

will filter into my deliberations. It will filter into how I view the evidence.

That person would not be qualified, because they're carrying it so heavy on their heart and mind, it is affecting the way they deliberate and it's bleeding into the evidence in the case, which would be improper.

Do you feel that way, Mr. Vessels?

A. Not at all. That's all long gone.

Q. Okay. Excellent. Then that is something that you will leave behind and you'll judge this case strictly on the facts in the case?

A. Yes.

Q. Very well, then. I appreciate your answers on that. Those are -- as I stated, those fundamental propositions of law and they carry out -- through any criminal case, they carry out throughout the entire case, not only in the guilt phase of the case, but also into the punishment phase of the case. You always look to me to prove the case to you. You always look to me to prove the special issues to you, also, at least the first and second one. You never look to the defense to do that. And you always base your verdict on the evidence in the case.

Let's talk now about the specific offense of murder versus capital murder. You, like most of the people that we've had come in here, don't really have an absolute idea about what the difference between the two is.

A. Right.

Q. And I'd like to talk to you about that a little bit.

A murder is described as a first-degree offense. It is anything from -- it could be a first-degree offense, a second-degree offense. It is anything from you intentionally meaning to cause the death of somebody, all of the way down to you negligently causing the death of somebody. Maybe you're not paying attention on the highway and you hit somebody. Well, you didn't mean to kill them, but because of your negligence you did.

You know, there's various different levels of how you can take somebody's life by criminal means. A capital murder, Mr. Vessels, is the highest offense that we have in Texas. It is the highest offense that we have. It doesn't get any higher than that, okay. And a capital murder always involves that. It involves a murder, okay?

A. Okay.

Q. But what distinguishes a capital murder from a murder, and I hate to say a regular murder because I

33

don't think there's anything necessarily regular about a murder, but the distinction between the two is that in a capital murder, you'll always have a murder plus you'll have another aggravating factor.

It is that other aggravating factor that elevates it to a capital murder. For example, it may be the murder of a child under six years of age or it may be the murder of two or more people during the same criminal episode or it may be the murder of a police officer or a firefighter while they're in their line of duty.

Do you see what I'm saying? It is the murder plus something else that makes it a capital murder.

A. Okay.

Q. Or as in this case, as is alleged, it is the intentional murder of a person plus it is being committed while in the course of committing another felony offense. And I think you might have even articulated that for us on Page 4. The very first question on Page 4, sir, we said, What crimes do you think the death penalty should be available for in Texas? And you said, First-degree murder. Murder in the commission of a felony. That is a capital murder, sir. It is the murder during the commission of another

34

serious felony offense. You've also listed hate crime. I'll tell you at this point, that it does not constitute a capital murder. It is the murder during the commission of a felony offense that we're talking about in this particular case. Does that make sense to you that there's murder -- capital murder is murder plus an aggravating factor?

A. Yes.

Q. If I fail to prove, for example, to you that aggravating factor, then you can still find the defendant guilty of murder, but not capital murder, okay?

A. Okay.

Q. All right. So it is incumbent upon me to prove that, not only a murder, but a felony. In this case we've alleged robbery. What's important to understand and wrap your head around for a capital murder case, particularly one such as this with this charge, is that the murder must be an intentional murder, okay?

A. Okay.

Q. We call them culpable mental states. I mean, to intentionally kill somebody, I might shoot someone, but not really meaning to kill them, but hurt them and they die anyway, that's knowing. I may kill somebody on the highway by being negligent. Those are all mental

35

states, culpable mental states, things that are going through your mind when you commit them.

In a capital murder such as this, it is an intentional murder. And I think the easiest way to say that is that it means the person who did the murder meant to do it.

A. Okay.

Q. It was not an accident, okay? There was not a legal justification, such as self-defense. It was not a legal justification such as he was criminally insane. It was not a: I didn't mean to kill him. I just meant to hurt him but he died.

It is not that. It is and always is the person intended to kill them and they meant to kill them. Does that make sense to you, sir?

A. Yes, it does.

Q. Okay. If I cannot prove to you that it was an intentional killing, then it is not a capital murder, okay?

A. Okay.

Q. All right. But it is always an intentional murder. If and only if I can prove to you beyond a reasonable doubt that the defendant intended to kill the individual and he did it in the course of committing a robbery or trying to commit a robbery, only if I can

36

prove those things to you may you return a verdict of capital murder. Does that make sense?

A. Absolutely.

Q. If I fail to do that, he's not guilty of capital murder and it may be something else, okay?

A. Yes.

Q. If I prove to you beyond a reasonable doubt the person is guilty of capital murder, then you must return a verdict of guilty, all right?

A. Okay.

Q. And that is that guilt or innocence phase that we've been talking about. You've decided he's guilty. That's it, that's all. That question of whether or not he's guilty is over with, all right?

A. Okay.

Q. What we do now is now we move into the punishment phase and now we figure out what's going to happen to this person found guilty of capital murder. Will they receive life in prison without parole or will they receive a sentence of death, okay?

A. All right.

Q. Now, understanding that and understand where you are as a juror going into the second phase of a capital murder trial, you've found this person guilty of capital murder and as the judge stated before, if you

are found guilty of capital murder, you will automatically receive life in prison without parole.

Our legislators and lawmakers have decided that capital murder is a serious enough offense that if you're found guilty of it, you will automatically get life in prison without parole, okay?

A. Okay.

Q. That's a given. If he's found guilty of capital murder, he is going to get a life sentence. There's no way around it. That's the only automatic in a capital murder case is he will automatically receive life in prison without parole. So the question becomes: What does it take to elevate that life sentence to a death sentence, right?

A. Right.

Q. Because there's nothing automatic about the death penalty. Some people have thought, well, if he's guilty of capital murder doesn't he automatically get the death penalty? No, he doesn't. He automatically gets life without parole, but he never automatically gets the death sentence.

The only way he can get a sentence of death is if I prove to you beyond a reasonable doubt that it is appropriate and that he should, okay?

A. Okay.

Q. And once again, you know, I had that burden of proof to carry to prove him guilty, now I have that burden of proof to prove to you that it should be a death sentence versus the life sentence that he is already getting. Does that make sense?

A. Yes.

Q. Okay. Your decisions to your answers to the questions that you will answer to the special issues will always be decided on the evidence in the case, always be decided. The way you answer the question is decided entirely on the evidence in the case. And I will submit to you, Mr. Vessels, that I've been doing this almost twenty years now. I've never seen two criminal cases alike. I've never seen two defendants alike. I've never seen two victims alike. Every case is different when you look at its facts, okay? And that is what is incumbent upon you to do, just like the judge was saying, will you listen to the facts first before you answer the question? That's what you have to do, because the cases are never alike.

Some people may say, Well, Ms. Handley, if you show me a guy who intentionally killed somebody in the course of a robbery, well, I'm going to automatically say he should get the death penalty. Well, that person is making assumptions, aren't they?

A. Right.

Q. About the case, about the facts, about what a capital murder is. I'll give you an example just to illustrate a point on how facts can be very different even though somebody has committed the same crime. Capital murder is the intentional murder of somebody in the course of committing a robbery. Let's say that you have a man who is sitting in his house and he is contemplating killing his neighbor who lives five houses down, okay? He goes and he buys a gun. He goes and he buys the bullets. He sits there and thinks about it. He loads that gun up. He decides in his mind, I'm going to kill that guy and not only am I going to kill him, I'm going to take his money because I know he has a lot of money in his house. That man loads the gun, walks five houses down, knocks on the door, that neighbor opens the door, that man puts a gun in his face and says, Give me your money.

The neighbor says, I'm not giving you anything. He shoots him three times -- as many times as is necessary to kill him. He steps in, grabs his money, grabs his wallet and leaves. Does that sound like a capital murder to you?

A. Yes.

Q. Yes. He murdered him. He meant to do it, didn't he?

A. Yes.

Q. Had no question in his mind. And he took his money too, didn't he?

A. Yes.

Q. That's a capital murder. It sounds pretty bad, doesn't it?

A. Yes.

Q. Okay. You've just heard it was a capital murder. So let's change up the facts a little bit, okay?

A. Okay.

Q. That guy who is sitting in his house contemplating murdering the guy down the street, well, he knows the man down the street is an old man who doesn't believe in banks. So he knows he always has a lot of cash down there. And he's sitting at his kitchen table and he thinks he'd rather not work. He'd rather just take things from people instead of working. And so he figures, well, I'm going to take his money, but I'll need to kill him because I don't want to leave any witnesses because I know that old man will tell on me.

So he goes and he gets that gun and he walks down there at night when he knows that old man is going to be alone. That old man opens the door, he

shoots him, takes his money, kills him so he won't be a witness, goes spends the money on women, drugs and CDs. Pretty bad guy, isn't he?

A. Yes.

Q. Still just a bad guy. Well, let's change the facts up a little bit more now. Because that's a capital murder, isn't it?

A. I think so, yes.

Q. Yes. Let's say the man sitting at his kitchen table is actually a father and a husband. And he's always been a good husband, he's always been a good father. He's always provided for his family. He's been a stand-up guy. He is the kind of guy that will give you the shirt off his back. He's the kind of guy that you want as a neighbor and the kind of guy you want as a friend, okay?

A. Okay.

Q. And he's sitting at his table and he's thinking about the guy who lives five houses down who is a dope dealer. He's a dope slinger. It is all he does all day long is he sells dope. And he sells it to kids. And he just never seems to get caught. And not only is he polluting and destroying the lives of all of these kids and families in this community, but he's also managed to get his own kids hooked on dope, too. And now they're strung out and their lives are ruined. And he's tired of it and he decides, I'm going to take the law into my own hands. I know it isn't legal, but I'm going to do it because I'm sick and tired of him killing people.

So he goes and he gets a gun. And he goes and he gets the bullets. And he thinks about it and he says, I'm going to do it. I'm going to kill the man and I want to kill the man. He walks five houses down, knocks on that door, that dope dealer opens the door, he puts a gun to him and says, Give me your drug proceeds from the cancer that you spread around here. The guy says, Take a flying leap. And he kills him. And he's glad he did it. And he grabs his money, he takes his wallet, he walks down to the local church and drops it into the charity box for the poor, goes to the police department and says, Here's what I did. I'm turning myself in. I'm not crazy. I don't have an excuse. I meant to kill him. I wanted to kill him. I planned it out and I did it.

Is he guilty of capital murder?

A. That's capital murder.

Q. That's capital murder, isn't it? It sounds a little different from the guy that did it to just buy drugs, money and guns, doesn't it?

A. Yes.

Q. My point is this -- and my point is only this, Mr. Vessels: You can't really consider the facts of the case until you hear them, right? They were both capital murders, weren't they? But you might consider them entirely different in your assessment of what should happen.

MR. PARKS: Judge, we're going to object to that. That entire scenario is an attempt to get this juror to ignore what that special issue says and to make a decision about what should happen based on the facts of the case.

THE COURT: Overruled.

Q. (By Ms. Handley) As I was saying, Mr. Vessels, my point being is that it is important to look at the facts of the particular case and look at the defendant in the particular case when you answer these special issues, okay?

A. Okay.

Q. Because here's where we are at this point going into the punishment phase now, this person is sitting on a life sentence without parole, which means they are going to spend the rest of their life in prison, correct?

A. Correct.

Q. And so the lawmakers have said, in essence, what we need to make a distinction on is the person going to get that life sentence or are they going to get that death sentence. How are we going to make the distinction between that right there? And what we're looking at is that defendant who you found guilty of capital murder, is he going to be the individual who goes to prison, serves his time, follows the rules, doesn't assault or cause any kind of violent behavior to anybody, just minds his business and does his time, is he going to be that guy or --

MR. PARKS: Judge, we, again, object to this as an attempt to change what Special Issue No. 1 says. It says what it says. It doesn't say anything about somebody going and following the rules and anything the jurors to make decisions other than what Special Issue No. 1 says.

THE COURT: I understand and you'll have plenty of time to explain that to the juror.

Please proceed.

Q. (By Ms. Handley) As I was saying, Mr. Vessels, is he going to be the individual who goes to prison and just does his time or is he going to be the individual who goes to prison and continues to be violent, who continues to commit criminal acts of violence and is a continuing threat to the people that he's around now?

That's the distinction that we're looking for in that first Special Issue No. 1, okay?

A. Okay.

Q. I think as you can imagine, Mr. Vessels, there's hundreds of prisons in Texas. And in those prisons there's just hundreds of thousands of men and women serving time. And they're there for everything from forgery of a check all of the way to capital murder, okay? And I will ask you this, I don't know if you've ever visited a penitentiary or if you know anybody who has ever been --

A. No.

Q. -- but a person who is sentenced to serve a certain amount of time in prison, be it five or ten years, do you think it is reasonable that they have an expectation they will not have to suffer any kind of violence while they're there?

A. Well, yes.

Q. Yes. A judge sentences them to do time, doesn't he?

A. Right.

Q. He doesn't sentence them to go down there and get whipped, does he?

A. No.

Q. No. So what we're looking at is, is this defendant that you just found guilty of capital murder, is he going to be the guy that's actually going to be a future threat of danger to maybe those other inmates in that penitentiary? And I think as you can imagine also, there's people in the penitentiary besides inmates, aren't there?

A. Well, yes.

Q. There's guards, there's wardens, there's teachers, nurses, doctors, clergy, volunteers, educators, families come to visit. So it is kind of a society in and of itself, isn't it?

A. Yes.

Q. Okay. So that first special issue, that's what we're looking at now. We're asking you now to look at the evidence in the case -- and you may hear more evidence in the punishment phase. You may hear more things about the defendant, who he is as a person, what his background is. We're asking you now, look at the evidence in the case now and ask yourself this: Is he going to be a future danger to that society to whatever society he may be in? If he's not, then he's the person, he's the defendant, he's the guy who will serve life in prison without parole. If he is, then he may have come one step closer to the death penalty. Does that make sense to you, that distinction between the two?

A. Yes, I understand.

Q. Okay. Let's look at Special Issue No. 1, 'cause that's what it speaks to. It says, Do you find from the evidence beyond a reasonable doubt -- keep in mind, anytime you ever see that, "from the evidence beyond a reasonable doubt," it tells you that you're looking to me to prove it. I have to prove to you he is a future danger. You may not automatically assume he is a future danger. I have to prove it to you.

A. Okay.

Q. Okay. Do you find from the evidence beyond a reasonable doubt that there is a probability? They have not defined these terms for you. But they didn't say, Is it possible? They didn't say that he definitely will, they said, Is there a probability? Some jurors tell us that "probability" means more likely than not. Does that make sense to you?

A. Yes.

Q. If I prove to you more likely than not that the defendant would commit criminal acts of violence, again, that's not defined for you. They didn't say that he would definitely commit another murder or another robbery or an assault. It just says that he will commit criminal acts of violence. It is for you to decide what is and what is not a criminal act of violence.

If I'm just sitting here right now and Ms. Evans is completely minding her business, she hasn't done anything to me and I just hit her in the face and knock her out, would you consider that a criminal act of violence?

A. Yes.

Q. Okay. If I'm sitting in the jail cell with Ms. Evans and she's minding her business writing a letter to her mom and I just smack her in the face, would that be a criminal act of violence?

A. Yes.

Q. It is or it is not is entirely up to you, okay? Would he more likely than not commit criminal acts of violence that would constitute a continuing threat to society? Well, we're talking about his society now, aren't we?

A. Yes.

Q. And can you appreciate that the definition of society will not only include his society at large, but also that there is a prison society?

A. Okay.

Q. Understand this, Mr. Vessels, that you've already found him guilty of capital murder, but when you looked at the facts in the first phase of the trial you

49

were deciding the issues of whether or not he was guilty, right?

A. Right.

Q. You may now look again at what he has done. You may look at his criminal offense of what he has done, the things you have found him guilty of. And you can look at the other evidence, too.

Now, to decide this issue, this is an entirely different question than, Is he guilty? First, you look at the facts to decide is he guilty. Now, you may look at the facts of the offense and decide, Is he a future danger? Does that make sense to you?

A. Yes.

Q. In other words, just because he's guilty of capital murder, does not automatically assume he is a future danger. I have to prove to you that he is.

A. Okay.

Q. That dad who walked down the street and killed that dope dealer, maybe that's the only person -- he's guilty of capital murder, isn't he?

A. Well, yes.

Q. And now you're asking this question about him, aren't you?

A. Okay.

Q. Right. And you may find from the evidence in

50

that case and anything else that that man -- the only person he was ever a danger to was his neighbor five streets down that got his kids hooked on dope. If he's going to sit there and mind his business, he's going to write love letters to his wife and his kids, he's going to do his time, he's not going to be violent about it, and quite frankly, he's not going to be a future danger to anybody.

You may decide that or you might look at that dad and look at the evidence in the case and other things you've heard and he killed a dope dealer, well, who is he doing time with now, Mr. Vessels?

A. Criminals and --

Q. Is he doing time with dope dealers?

A. Well, yes.

Q. You might look at it and go, You know what, it wasn't just that dope dealer that he had it out for. I think he has it out for all dope dealers. They're part of that prison society, aren't they?

A. Yes.

Q. And you may or may not find -- yes, he may actually be a future danger to those other inmates, particularly those dope dealers. That's something you decide on the facts, okay? But you can't automatically say it until you actually look at it. And I have to

51

prove it to you. Does that make sense to you?

A. Yes.

Q. Okay. If you don't think the defendant is a future danger, then you answer that question "no" and he will get that life in prison without parole sentence, okay?

A. Okay.

Q. But if I do prove it to you, then you move on to the second question. Now, the second question has to do with the thing we call the law of parties in Texas. And it basically states this -- as you can imagine, sometimes crimes are committed by more than one person. It could be two or more people acting together. The law states that if you are acting with another person and committing a crime, if you aid or assist or encourage or direct in the participation of that crime, you may be held just as liable as everybody else.

If Ms. Evans and I go to her house tonight and we sit down at her kitchen table and plan out the robbery of a local 7-Eleven and she shows me where it is on the map, she goes and gets the gun, I go and buy the bullets and we plan this robbery together, she drives us up there in her car, I agree that I'm going to go in and commit the robbery and as -- I'm going to be the one that goes in and she says, I'm going to sit out in the

52

car. I'm going to be the good eye. I'll be the lookout. If somebody comes I'll blow the horn. I get ready to go in and do the robbery and I say, Ms. Evans, I forgot my mask. She hands me the gun and says, Don't worry about it. Just kill the witnesses. She stays in the car, I go in the store, I rob the clerk, I shoot and kill the clerk. Am I guilty of capital murder?

A. Yes.

Q. Certainly sounds like it, doesn't it?

A. Yes.

Q. Do you think Ms. Evans should be held guilty of capital murder?

A. Well, she was an accessory. She aided.

Q. Some people call it "accessory," yes. It is the law of parties. The law states that if you find, as a juror, that she aided, assisted or encouraged or participated -- that she actively participated in the commission of the offense, she may also be found guilty.

In order for you to find her guilty of capital murder, in order for her to be eligible for the death penalty, you must find that she actually anticipated somebody would die. When she handed me the gun and said, Kill the witnesses, you may look at that evidence and make a determination that, well, she anticipated somebody would die. Does that make sense to

you?

A. Yes.

Q. So that second special issue is basically asking you that, Mr. Vessels. It's asking you, do you find -- have I proved to you that the defendant on trial was the actual triggerman, like myself or have I proved to you if it wasn't the actual triggerman, was she at least actively participating and she anticipated somebody would die? Does that make sense?

A. Yes.

Q. Okay. If you don't think I've proved that to you, not the actual triggerman, not an active participant who anticipated death, then you answer that question "no," okay?

A. Okay.

Q. And the defendant will get life in prison without parole. They'll get that sentence they've already gotten, okay?

A. Okay.

Q. If you answer that question "yes," then I will submit to you, Mr. Vessels, that at that point that defendant is now sitting on a death penalty. I've proved to you he's guilty of capital murder. You've found him guilty of capital murder. We've gone into the next phase of the trial, the punishment phase, and you

come in with an open mind. You'll reassess the evidence. You've looked at that first special issue. You've decided that first special issue now as to whether or not he is a future danger, you know, based on the evidence in the case. You've made no automatic assumptions. You looked at the evidence in the case. You've answered Special Issue No. 2 by, again, looking at the evidence in the case. If you find that, then he's sitting on the death penalty at this point, but your obligation as a juror is not over yet.

I'll submit to you what Special Issue No. 3 is about is this, okay? It is kind of a long sentence so we'll go through that together.

In the State of Texas -- in this case, you've already said this before or understand that you really need to base your verdict on all of the evidence in the case, don't you?

A. Yes.

Q. And your verdict has to -- I like to say the punishment has to fit the crime. It has to be proper. If it is going to be the death sentence, then it has to be the proper sentence in this case, okay?

A. Correct. Okay.

Q. What's not going to happen, Mr. Vessels, is you're not going to walk out of court that day saying --

whether returning a life sentence or whether returning a verdict of death, you're not going to walk out of here going, You know what, my hands were tied. I had no other options. And I thought there was something about this case, I thought there was something about the evidence that I think, actually, the more appropriate thing to do was a life sentence, but they never gave me that option. Well, you have that option with Special Issue No. 3.

It says, Taking into consideration all of the evidence including the circumstances of the offense, the defendant's character, his background, his personal moral culpability. Looking at that, sir, do you find there's a sufficient mitigating circumstance that would cause you to say, This should actually be a life sentence versus a death sentence? You may look at that dad who robbed that drug dealer and say, I know he's a future danger to the other dope dealers and I know he was the triggerman, but quite frankly his motivations for doing what he did, I think it is a mitigating circumstance and I think it is sufficient to give him life.

You may look at a guy's background. He had a terrible upbringing. He was raised to be a criminal. He had no choice in it. You may find that a mitigating

circumstance. The point being, I can't ask you what you will or will not do right now because you haven't heard any evidence, have you?

A. No.

Q. The question to you is this, Mr. Vessels: Even though you've found somebody guilty of capital murder and you've found they are a future danger and he was the triggerman or an active party, will you still go into Special Issue No. 3 with an open mind?

A. Yes.

Q. And if you personally -- you, I'm talking about. If you feel there is a sufficient mitigating circumstance to warrant turning that sentence of death into life, will you do it?

A. Yes.

Q. That's the question. Okay.

MS. HANDLEY: I think I am out of time?

THE COURT: You have two minutes.

Q. (By Ms. Handley) All right. Any questions about what I've said to you? Does that make sense to you?

A. No. Everything is clear.

Q. Okay. Just to summarize, you understand that these propositions of law always carry out throughout the entire trial. I will say this real quickly, though,

that last special issue, there is no burden of proof on that.

A. Okay.

Q. I don't have to prove anything to you. They don't have to prove anything to you. I'll submit to you, it is not only an issue that's there for the benefit of the defendant, but it's also there for your benefit. It is entirely up to you to decide on that one.

A. Okay.

Q. But you do not find a person guilty of capital murder unless I haven't proved to you beyond a reasonable doubt that they intended to kill the person and that they did it in the course of committing or trying to commit a robbery. And only if I prove that to you may you return that verdict of capital murder. Once I prove that to you, then you go into the punishment phase and you go into it with an open mind and you go into it with your mind open.

I want to make sure I understand this from you, just because you've found a person guilty of capital murder, Mr. Vessels, will you always say he will automatically be a future danger?

A. I don't think so, no.

Q. No. Okay. And you kind of gave me a strange look. Because it makes sense. You have to hear the evidence and weigh the evidence before you can make that determination, correct?

A. Correct, yes.

Q. Even though he's committed capital murder doesn't automatically mean he's going to be a future danger. You may look at the circumstances of the offense again to decide that question.

First you look at the offense to decide if he's guilty, now you look at it to decide if he's a future danger. And you go into each question with an open mind. If I don't prove those things to you beyond a reasonable doubt, he'll get that life sentence without parole, okay?

A. Okay.

Q. If I do prove those things to you, you still go into Special Issue No. 3 with an open mind. And if you personally believe there's something sufficiently mitigating to give it a life sentence, then that's what you do.

A. Okay.

Q. One other thing real quick and I will move on after this. We talked about credibility of witnesses and not have biases. I've talked about prison now and you have apparently a brother-in-law who is a prison guard?

A. Yes.

Q. Where is he a prison guard, sir?

A. Childress.

Q. In Childress. Here is what's important and here's what I have to know from you as well as everybody else in this courtroom, you may or may not hear evidence in this case from people who work in the penitentiaries. You may or may not hear evidence or testimony from people who might be prison guards or were prison guards, okay? Those people have to have their credibility assessed just like everybody else.

You have to wait and assess their credibility when they take the stand and then you can decide whether you believe all, none or some of what they're saying. The question I have for you is because your brother-in-law is a prison guard, are you automatically going to have some kind of a bias against the defendant or hold that against him because of your brother-in-law's occupation?

A. No.

Q. You're not going to be thinking, I need to give this guy the death penalty because he could be a danger to my brother-in-law?

A. No. That didn't occur to me.

Q. Okay. Okay. And I wanted to make sure I covered that point with you, then. Thank you very much. I appreciate it.

THE COURT: Do you need to take a short break?

VENIRE PERSON VESSELS: No, I'm all right.

MR. LOLLAR: Can we take a little break?

THE COURT: Yes.

(Recess from 10:05 a.m. to 10:14 a.m.)

THE COURT: Now, Mr. Brad Lollar is going to talk to you on behalf of Mr. Broadnax.

VOIR DIRE EXAMINATION FROM THE DEFENSE

QUESTIONS BY MR. BRAD LOLLAR:

Q. How are you doing, Mr. Vessels?

A. I'm fine.

Q. Good. I'm Brad Lollar, Doug Parks, Keri Mallon and we represent James Broadnax.

A. Okay.

Q. And after I talk to you here for a while -- I'm not going to take as long as Ms. Handley did because she did go over a lot of things that I wanted to talk to you about, but I do want to talk to you about a number of things you've told us here in your questionnaire.

A. Okay.

Q. Because let me tell you what we're doing down

here, Mr. Vessels. You are one of the morning group who came in here a couple of months ago to fill out questionnaires.

A. Okay.

Q. And we had 400 people there that morning. That afternoon we had another 400 come in. So we have 800 jurors to choose from to get twelve that can be fair to both sides.

A. Okay.

Q. Okay?

A. Sure.

Q. And would you agree that everybody is deserving of a fair trial?

A. Absolutely.

Q. And a fair trial, one of the components of that has to be getting a fair jury.

A. Yes.

Q. And a jury that isn't biased going into the case or one way or another about what happened, right?

A. Sure.

Q. And a jury that can follow the law.

A. Right.

Q. Okay. So with that background, let me tell you, Mr. Vessels, everybody is entitled to their opinions about the criminal justice system. Everybody is entitled to their opinions about what the law ought to be, you know --

A. Right.

Q. -- or the way things should go.

A. Yes.

Q. Okay. And I have no right to try to make anybody change their opinion, okay?

A. Okay.

Q. On the other hand, I do have a right in representing Mr. Broadnax to get people who can fairly consider these issues, okay?

A. Okay.

Q. And you, I hope, would agree with that.

A. Absolutely.

Q. Okay. Now, the first thing I want to talk to you about is your brother-in-law is a prison guard and you told us where he was. Where is he?

A. Childress, Texas.

Q. Childress. Do you know what unit that is?

A. I don't know the name of it, no.

Q. Okay. Do you talk to him pretty frequently?

A. No. Maybe once a year or so. Actually, I'm going to meet him here on vacation in a couple of weeks.

Q. Okay. Is there anything about what you-all might have talked about or he's told you about prisons that would come into play in this type of case?

A. No. He tells me what things go on in the prisons and, you know, kind of just general stuff.

Q. Give me an example of something.

A. Well, I know that each prison makes its own -- one makes uniforms and one makes soaps. They are, like, self-supporting. They have a farm. They make soap and they have a farm and they do that. From my understanding, I thought people had cells, but evidently there they have, like, cubicles, like, half walls and it's all kind of open.

Q. Well, that varies from prison to prison, but that's true for some of them, yes, sir.

A. Yeah. I don't know, he just talks about they have to get up at 4:00 in the morning and they take them to breakfast and then they have to go out and work in the fields. And I don't guess they sleep much.

Q. All right.

A. Just general things like that.

Q. Okay. Anything about that that you think might come into play in your consideration of issues in this type of case?

A. No, not that I can think of.

Q. Okay. All right. The second thing I need to talk to you about is, it is unfortunate the murder of your nephew. I believe you said it was about 18 years ago?

A. Yes.

Q. In 1991?

A. Yes.

Q. In DeSoto?

A. Yes.

Q. Can you tell me something about the circumstances of that?

A. I was living in Amarillo at the time. And from what -- originally what had happened my sister called me and told me that Jimmy, that was my nephew, killed himself because he was shot through head. And that's what I went with.

Then I come down to the funeral and found out that they actually found a T-shirt with his blood on it down the alley down the street. So evidently there was somebody else in the house. From my understanding they were suspicious it was some schoolmate of his, some other 15-year-old kid.

Q. How old was your nephew?

A. He was 15.

Q. Fifteen?

A. Yes.

Q. Okay.

A.  And the odd thing about it too was Jimmy was left-handed and he was shot through the right temple and that's all I really know about it.  I mean, as far as my understanding a few months later, they still didn't have enough evidence to really go forward with anything, so as far as I know it has never --

Q.  Did they ever come up with any type of a motive?

A.  No, not really.  Not that I know of.

Q.  Okay.  Anything about that experience which would influence you as sitting as a juror in this case?

A.  No.  I don't think so.

Q.  Okay.  Mr. Vessels, I want to talk to you about some things you told us here in your questionnaire and the bottom line is this:  We're going to talk to you about these special issues over here a lot, but understand we never get there unless a jury finds a defendant guilty of capital murder.

A.  Right.

Q.  And we don't think they're going to in this case, so we're kind of wasting our time talking about this, but we have to because this is the only time I can talk to you about special issues, okay?

A.  Okay.

Q.  And I think you're like 99.99 percent of our jurors that have never seen these special issues before and didn't know that these were the rules by which a jury has to play in deciding whether a person gets life or death if they're found guilty of capital murder.

A.  Yeah, I didn't know about these.

Q.  If you're like most of our jurors you thought, well, if a defendant commits a certain type of offense then they get the death penalty.  Is that what you thought?

A.  More or less, I guess.

Q.  Okay.  And now you can see that that's not the case and under Texas law the death penalty is never automatic and it is never required.  In fact, the first sentence is "life without parole."  And what the legislature said is that is the punishment for a person who commits the offense of capital murder, okay?

A.  Okay.

Q.  Unless they're one of that select few that the State can prove is not only guilty of capital murder, but is also likely to commit criminal offenses, acts of violence against people in the penitentiary.

A.  Okay.

Q.  That's what Special Issue No. 1 tells us.

A.  Right.

Q.  And it puts a burden on the State to prove that

issue beyond a reasonable doubt, just like they had to prove a person is guilty of capital murder in the first part of the trial.

A.  Okay.

Q.  Now, here's where we get into our problems.  A juror can go into this and know that by the way he votes on these issues is going to determine whether or not a person gets life or death.

A.  Right.

Q.  Okay.  And if we have a juror who tells us, Yes, I think that both life without parole and death are both very serious punishments and are satisfactory punishments and I can honestly look at these issues to let them guide me on how I vote on these issues to get to the end.

A.  Right.

Q.  Okay.  That's one thing.  But, Mr. Vessels, and this is where I'm concerned because what you've told us here in your questionnaire quite plainly is that you have a bias against life without parole; is that right?

A.  I don't know if I have a bias against it.  I don't know if it is not more cruel than the death penalty.

Q.  Well, let me go through some of your answers that you gave us in your questionnaire.  Here on Page 2 you tell us the best argument for the death penalty is, Willful taking of another person's life should be the forfeiture of the assailant's life -- should result in the forfeiture of the assailant's life.

A.  Okay.

Q.  Is that what you thought?

A.  Yes.

Q.  And I assume, obviously, that you told us the truth when you made the answers to your questionnaire.

A.  Yes.

Q.  And that is how you felt.  When we go over here to Page 4 we ask you, For what crimes do you think the death penalty should be available in Texas and you said, First-degree murder or murder in the commission of a felony.

A.  Okay.

Q.  If we go over to Page 5 we ask you, Do you think spending a lifetime in prison is equivalent to the death penalty?  And you said, No.  We asked you, Which of the following accurately states your general belief regarding a sentence of life without the possibility of parole?  And you told us you were strongly opposed to that.

A.  Right.

Q.  And in explaining your response you said, I

69

believe that lifetime incarceration is both a financial burden on society and morally the criminal deprived another person of their life and should not be allowed to suffer for years in a cell.

A. Right.

Q. And then we ask you, For what purposes, if any, do you believe life without the possibility serves? And your answer was nothing. And then the next one, What purposes, if any, do you believe the death penalty serves? And you said, It ends the actions someone may repeat if unused.

If the death penalty is not used, they may repeat their willful taking of another person's life, is that what you meant there?

A. Yes, sir.

Q. Okay. So tell me where I'm wrong.

A. Okay. I will.

Q. Basically, it seems to me like you told us that you'd consider if you got the ability to answer these questions in such a way that a person gets death or life without parole, you would favor giving them death because it would be a financial burden on the taxpayers to keep them alive for life, it is morally wrong to give them life -- and you're afraid they may repeat their actions if you don't give them death.

70

A. Okay.

Q. Is that fair?

A. Yes, I guess.

Q. See, that's where I'm having a problem.

A. Okay.

Q. I'm not mad at you. Believe me.

A. I know.

Q. We're just trying to pick twelve people who can be fair to both sides.

A. I completely understand.

Q. Please understand, I'm not mad at you or criticizing you for having your opinions.

A. Right.

Q. Ain't nobody going to try to change your opinions, but this is a process where we try to pick people who can be fair to both sides.

A. Okay, sure.

Q. And if we have a juror -- a potential juror that tells us, I'm against life without parole and particularly for a person that I have found has willfully caused the death of another person and has done that during the course of committing a robbery and if that's what you're telling me, fine, we'll go on to the next juror.

MS. HANDLEY: I'm going to object, Your

71

Honor. First of all, that's improper for the juror to have -- their opinion is their opinion. The question ultimately comes down to this: Is whether or not you will follow the law in this case and will he base his verdict on the evidence in this case. These are his opinions --

THE COURT: Well, I'll allow Mr. Lollar to ask those questions, but I also understand the point the State made.

Q. (By Mr. Lollar) Tell me where you stand.

A. Well, honestly, yes, these are kind of my opinions. It's, like, I don't think the death penalty should be used for just anything less than murder and things like that that are going on. I guess the statement -- I think lifetime incarceration is a horrid thing. That's, like, who would want to be locked up for absolutely the rest of their life and never get out? But I do think that I would judge this case honestly and fairly. I mean, these are my opinions, but it doesn't mean that I couldn't make the judgment. I didn't know about these special issues and how the situation worked. I mean, I think I can take the evidence and honestly judge it.

Q. Do you think you could vote in such a way that the defendant would get life without parole even if you

72

personally dislike a person getting life without parole?

A. Yes. It is the law and I want to follow the same rules.

Q. Okay. Well, let me talk to you about another issue here. The indictment in this case is right there in front of you on another little folder.

A. Okay.

Q. Take a look at that. I don't know if you've seen that before.

A. Okay.

Q. Now, you see that the State has alleged in this case one of the types of murder that becomes capital murder?

A. Yes.

Q. They say, No.1, that the defendant intentionally caused the death of the victim --

A. Right.

Q. -- and did that during the course of committing a robbery with a deadly weapon, a gun.

Now, I want to particularly make sure that you understand that to get to capital murder, as opposed to murder, it has to be proven to you that the defendant formed in his mind at the time of the shooting the intent to cause death.

A. Right.

73

Q. Okay. Now, it is not to wound them not to maim them or keeping them from coming out of the store, whatever, he formed the intent to cause their death.

A. I understand.

Q. Okay. You got that?

A. Uh-huh.

Q. Okay. I'm not talking about this case anymore, but I'm talking about a case like this. If a jury sits on a case alleging capital murder alleged that way, an intentional murder during the course of a robbery, okay --

A. Okay.

Q. -- and a jury unanimously agrees that the State has proven that beyond a reasonable doubt --

A. Okay.

Q. -- then you get to the second phase of the trial where the jury hears more evidence and then is called upon to answer these special issues.

Now, the first special issue, again, is: Do you find from the evidence beyond a reasonable doubt that there is probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? That is going to be the society that he's going to be in, which is the penitentiary.

74

A. Right.

Q. Okay. Now, some people tell us, Mr. Vessels, well, wait a minute, if the State has proven to me already beyond a reasonable doubt and they've proven to all of the other jurors beyond a reasonable doubt that the person on trial is the type of person who would harm themselves with a loaded gun, go out and willingly do a robbery and during the course of doing that robbery form -- be able to have the ability to form the intention of causing the victim's death and doing whatever it took to accomplish that death, okay?

A. Okay.

Q. Then that is the type of person who, to me, is always going to be the type of person that's going to be likely to commit criminal acts of violence in the future. How do you feel about that?

A. That's a tough one.

Q. In other words, I'm saying to some jurors -- and jurors have told us this, you know, if you show me that he is the type of person that would do a capital murder, that is the type of person that I believe is likely to commit criminal acts of violence in the future, even if you put him in the penitentiary.

MS. HANDLEY: Objection.

MR. LOLLAR: Judge, she has 48 minutes to

75

talk her side of the case.

MS. HANDLEY: If this is a question geared towards this juror is qualified, then I think the question is relatively --

THE COURT: I understand. I'll allow him to ask any way he wants to and I have in my mind what is the qualification challenge.

Please proceed.

A. So basically you're asking me, do I think that if they can commit the crime once that's a guarantee they would do it again?

Q. (By Mr. Lollar) Not guaranteed. That's not what the question asks. Is there a probability?

A. A probability that they would do it again and if I think that's a true statement?

Q. Yes.

A. Yes.

Q. So if I'm understanding you, if the State proves the case beyond a reasonable doubt, you're going to answer Special Issue No. 1 "yes" because you think that's the type of person who probably would commit criminal acts of violence?

A. It would be a consideration. I thought she had to bring on more evidence --

Q. She doesn't have to bring on more --

76

MS. HANDLEY: I'd like the juror to finish his response, Your Honor.

THE COURT: Sustained.

A. I thought in the punishment phase she had to present more evidence of the perpetrator, whatever you call it. The defendant, I'm sorry, the defendant's personality and everything else and had another background that may or may not indicate that that --

Q. Well, the fact of the matter is, the State is not required to put on a bit more evidence in the punishment phase.

A. Okay.

Q. They don't have to do anything. They can rely upon facts of the case that have been shown in the first part of the trial.

MS. HANDLEY: Your Honor, the State does continue to carry the burden of proof to prove it to the jurors beyond a reasonable doubt.

MR. LOLLAR: Fine. That is not an objection or a response to what I said.

MS. HANDLEY: I object to the misstatement.

MR. LOLLAR: It is not a misstatement.

THE COURT: Wait a minute. I'll overrule the State's objection. Please proceed.

Q. (By Mr. Lollar) Where were we? I was

77

explaining that the State is not required to put on more evidence in the second part of the trial.

A. Okay.

Q. They can stand up and rest and just rely upon the evidence in the first part of the trial. They can if they want to, but they're not required to.

THE COURT: They still have to prove the answer to that is "yes" beyond a reasonable doubt. And do you understand this?

VENIREPERSON VESSELS: Yes.

Q. (By Mr. Lollar) Let me skip over Special Issue No. 2 there for a minute, that's pretty self-explanatory, and go on to Special Issue No. 3.

Now, Special Issue No. 3 allows a jury who has basically assessed a death penalty to back off of that and change that to a life sentence.

A. Yes.

Q. Do you understand that?

A. Right.

Q. Let me tell you where a jury would be at the time they get to Special Issue No. 3. Number one, that jury will have necessarily found that the person on trial is an intentional murderer who committed the act of intentional murder during the course of a robbery and they will have concluded, beyond a reasonable doubt,

78

that the State has successfully proven to them not only that, but also that the person would be likely to commit criminal acts of violence in the future against other inmates and guards and wardens and teachers and priests and whatever else might be at the penitentiary and they have persuaded the jury of that beyond a reasonable doubt, okay?

So here you are as a juror who at that point, now, is convinced beyond a reasonable doubt that the defendant is an intentional murderer, a robber who is likely to commit criminal acts of violence to the people around him at the penitentiary.

A. Okay.

Q. So then you get Special Issue No. 3 and it allows a jury to back off of that death sentence and change that to life. Frankly, people have told us that, Well, wait a minute, if you've already convinced me that he's an intentional murderer, a robber and he's likely to commit criminal acts of violence around the people -- on the people around him down at the penitentiary, then there ain't going to be nothing. There is no mitigating circumstance that can be shown to me that's going to make me want to back off a death sentence at that point and change that to a life sentence. Because if I do that, I'm basically allowing future violence to be

79

played out on the people in the penitentiary by the defendant and that ain't never going to happen with me.

A. Okay.

Q. How do you feel about that?

A. Well, you know, I'm kind of like in this place. It is, like, everything is black and white, yes or no. You're saying that I've made all of these decisions, so that's going to be my decision and that during the course of the trial I may not hear or understand something that may bring other issues that are mitigating factors that I might consider changing my mind under Special Issue No. 3. I can't predict it, but I'm not saying that I'm so hard that this is my answer and this is always going to be my answer and this is never going to change and nothing else can ever affect me.

Q. Okay. As you sit here today, can you think of some things that you might yourself consider to be a sufficient mitigating circumstance to change a death sentence to a life sentence or an intentional murder that you believe (Inaudible)?

MS. HANDLEY: Your Honor, I would object to a commitment. He cannot say now what he would or would not --

MR. LOLLAR: I didn't hear that from the

80

juror.

MS. HANDLEY: I'm not finished with my objection.

THE COURT: I'll overrule the objection. I'll allow you to ask that question.

Let me say this: You don't have to say anything, but if something comes to your mind, you might tell Mr. Lollar that. You're not required to say here what you would consider a sufficient mitigating circumstance, but if you're thinking of some things you'd like to think about, you can say that.

A. I can't think of anything off the top of my head.

MR. LOLLAR: Thank you, Mr. Vessels.

THE COURT: You'll be stepping out and coming right back in.

All rise for the juror.

(Venireperson Vessels exits courtroom.)

THE COURT: In the presence of Mr. Broadnax. What says the State?

MS. HANDLEY: We have no challenges.

THE COURT: Mr. Broadnax?

MR. LOLLAR: Judge, we do challenge Mr. Vessels. He told us if he finds the defendant guilty of capital murder he's going to answer Special

Issue No. 1 "yes" and can't think of anything that is going to mitigate against the death penalty in answer to Special Issue No. 3. We feel the juror is not qualified.

THE COURT: Be denied. Ask him to return, please.

All rise for the juror.

(Venireperson Vessels enters courtroom.)

THE COURT: Please be seated, sir. You've certainly been accepted as a qualified juror. I appreciate you being here and talking to us.

Now, the sheriff is going to give you the card of the judge's coordinator and that's the person that's going to be calling you and tell you whether you're on the jury or not.

VENIREPERSON VESSELS: Okay.

THE COURT: I want to make sure that the telephone numbers on your questionnaire are still correct, because that's how she's going to talk to you.

VENIREPERSON VESSELS: Okay. My cell phone number has changed.

THE COURT: All right. And that card will have her telephone number and should anything occur in your personal life between now and that day that you might think affects your jury service, give her a call and we'll deal with it, all right?

VENIREPERSON VESSELS: Okay.

THE COURT: I want you to assume from me that you're going to be on this jury and to avoid all outside influence, information, be it from friends, media, Internet. It would be a shame for somebody like you to be inadvertently disqualified. It has been a pleasure meeting you and thank you for being here.

VENIREPERSON VESSELS: Thank you.

(Venireperson Vessels exits courtroom.)

(Recess from 10:40 a.m. to 10:49 a.m.)

(Venireperson Trotter enters courtroom.)

THE COURT: Mr. Trotter, I want to say good morning to you. Thank you very much for being here. We apologize for it taking us a while to get to talk to you. We never know how long these conversations are going to take.

My name is Webb Biard and I will be with you this morning during the jury selection process. The actual presiding judge in this court is Michael Snipes. That's who you met back when everybody was here, the large crowd in the morning. And should you be selected as a juror in this case, Judge Snipes will actually preside over the trial.

VENIREPERSON TROTTER: Okay.

THE COURT: This will be our only opportunity to be together. Now, do this for me, please. Raise your right hand.

(Venireperson Trotter sworn.)

THE COURT: I also want to introduce to you at this time Andrea Handley.

MS. HANDLEY: Good morning.

THE COURT: Elaine Evans.

MS. EVANS: Good morning.

THE COURT: These folks represent Dallas County and the State of Texas. Further to my right is Brad Lollar.

MR. LOLLAR: Good morning.

THE COURT: Doug Parks.

MR. PARKS: Good morning.

THE COURT: Keri Mallon.

MS. MALLON: Hi.

THE COURT: And they represent Mr. James Broadnax. Mr. Broadnax. I want to talk to you a minute and give you an idea of how we're going to proceed. One of the attorneys for the State and one of the attorneys representing Mr. Broadnax are going to talk to you up to 45 minutes each. That's about an hour and a half we're going to take and that will take us to about 12:30. What I ask of you is if it is all right we'll proceed on past 12:00 and as we conclude our conversations with you at 12:30, then you would be free to go and you wouldn't have to come back until 1:00 and then you'd be here until 2:00. Is that all right?

VENIREPERSON TROTTER: That's fine.

THE COURT: Okay. No dietary problems?

VENIREPERSON TROTTER: No, sir.

THE COURT: Good. All right. The things that I want to go over with you, did you have an opportunity to read that pamphlet?

VENIREPERSON TROTTER: Yes, I did.

THE COURT: Did that help you understand this process a little bitter?

THE WITNESS: Yes, sir.

THE COURT: I also have your questionnaire and I'm going to hand it to you here in just a minute and if -- the attorneys will probably ask you some questions about some of your responses and you'll have it there in front of you because you filled it out in April.

VENIREPERSON TROTTER: Yes, sir.

THE COURT: And you can refresh your memory with it. And all I want you to do is tell us what you meant when you put it down. Now, I want to stress to you these are outstanding lawyers. They are also fine

people, without a question. Anybody involved in this is not going to push you or intimidate you or -- that's not going to happen. Sometimes your seat is a little hot for some people, but I want you to relax as much as possible.

All we're looking for is your honest answer. This is not some legal pop quiz in which we're trying to find what twelve people know the most law. That doesn't have anything to do with it.

VENIREPERSON TROTTER: Okay.

THE COURT: It is our job to explain the law to you. It is not your job, our job. Once that's done you'll be asked, can you follow the law and perform your duties as a juror and should you find someone guilty can you be able to set a sentence based on the evidence that you hear and not already have your mind made up on what you're going to do.

So that's kind of what we're going to be talking about.

VENIREPERSON TROTTER: Okay.

THE COURT: Some of these laws -- most of these laws, frankly, you've known since the fourth or fifth grade, but there are some of these statutes of law that pertain to capital murder that are unique to any other type case. And we assume -- I assume that you're

really not familiar with such matters of these special issues. Have you ever heard those before?

VENIREPERSON TROTTER: No, sir.

THE COURT: Did you know they existed?

VENIREPERSON TROTTER: No, sir.

THE COURT: Okay. We're going to spend a little extra time on that because we do know that the average lawyer is not familiar with these special issues, but the attorneys' job is to explain it to you.

Now, from reading that pamphlet and from hearing Judge Snipes' remarks and filling out the questionnaire and sitting in your seat there, are you aware this is a capital murder case?

VENIREPERSON TROTTER: Yes, sir.

THE COURT: Do you understand the State of Texas is seeking the death penalty?

VENIREPERSON TROTTER: Yes, sir.

THE COURT: All right. If someone is found guilty of capital murder, which is different from murder, by the way, and they're going to explain that to you, if someone is found guilty of capital murder there's only two possible punishments. Do you know what they are?

VENIREPERSON TROTTER: The death penalty or life without parole.

THE COURT: Exactly. And when you say life in prison without parole, I want to assure you, sir, that it is life in prison without parole. It is not in an "X" number of years someone becomes eligible for parole. It is life in prison without parole. That's the only two possible punishments for someone found guilty of capital murder. Frankly, capital murder is the only crime in Texas in which the death penalty is a possible function. You can't receive the death penalty for murder, okay?

VENIREPERSON TROTTER: Okay.

THE COURT: Now, you read that pamphlet and you see that Judge Snipes is going to start this trial August 10th. It is going to last up to two weeks, Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, there will be a lunch break. The jury will not have to stay together overnight unless and until the possibility of you deliberating your verdict. Do you know what I mean by deliberating?

VENIREPERSON TROTTER: Yes, sir.

THE COURT: Have you ever served on a criminal jury before?

VENIREPERSON TROTTER: Not on a criminal jury.

THE COURT: Civil?

VENIREPERSON TROTTER: Yes, sir.

THE COURT: You had to deliberate.

VENIREPERSON TROTTER: Correct.

THE COURT: Okay. Let's say you are deliberating your verdict in a capital murder case and went late into the night and had not reached a decision and wanted to keep working, but became mentally fatigued. There is a possibility that you will all be taken to a fine hotel, county expense, individual private rooms, spend the night to avoid any outside influence. You come back and resume your deliberations in the morning. You do that as a group.

VENIREPERSON TROTTER: Okay.

THE COURT: That's a possibility. Should it happen, the judge would give you plenty of advance notice and bring you water and a bag or whatever. I give you that information, date, length, the way the judge runs his court and after you filled out your questionnaire and you heard the judge's remarks, you've read that pamphlet, you thought about this, I guess some, since April, as you sit here now, are you aware of any reason why you cannot sit as a juror in this case?

VENIREPERSON TROTTER: No, sir.

THE COURT: Good. Now, you sat on that

89

civil jury and we'll be talking to you about the burden of proof. What kind of civil case was it?

VENIREPERSON TROTTER: It was a wrongful death lawsuit involving --

THE COURT: Okay. The burden of proof in that case is on the plaintiff to prove their case by a preponderance of the evidence that's the greater weight of the evidence of the believable and credible evidence.

VENIREPERSON TROTTER: Yes, sir.

THE COURT: Well, the burden of proof in a capital murder case is much higher than the burden of that. And the lawyers will talk to you about that. Without anything further, I want to reintroduce Andrea Handley who will talk to you on behalf of the State of Texas.

MS. HANDLEY: Thank you, Your Honor. Does the juror have his questionnaire?

THE COURT: He does not.

MS. HANDLEY: I'll hand it to him.

THE COURT: There is that questionnaire I was telling you about.

JOHN TROTTER,
having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION FROM THE STATE
QUESTIONS BY MS. ANDREA HANDLEY:

90

Q. Good morning again, Mr. Trotter. How do you feel today?

A. I'm good, thank you.

Q. Good. Let me tell you what, I appreciate you coming down here and giving us some of your time to do this. What's going on is we're bringing people down and talking to them individually in the hopes of finding a pool of potential qualified jurors and then from that we will pick out twelve jurors who will actually sit on this case here.

When you came down that morning, I think it was April 24th, I think you recall there were hundreds of people, weren't there?

A. Yes, ma'am.

Q. And we brought down even more people that afternoon. And I think it is fair to say we brought down about 800 to 1000 people to fill out questionnaires. And we brought them down here just for this particular one case.

Eight hundred to 1000 people in the hopes of finding 12 qualified people for a jury. And the reason we do that, Mr. Trotter, is I think you can appreciate this is a different kind of case than a regular criminal case. This is the case where the stakes don't get any higher. We're already talking

91

about the loss of somebody's liberty in a regular criminal case and here we're talking about the loss of somebody's life.

The reason we bring so many people is because so many people are not necessarily the right kind of people to be jurors on this case. When you get the jury summons in the mail, it does not say to you, necessarily, sir, that you must sit on this jury. That's not what it tells you. That's never what a jury summons tells you, that you have to sit on a jury. It only tells you that you have to appear for jury service so that we can have an opportunity to talk to you.

I'll tell you, by coming on the 24th and by coming here again today, you have already fulfilled your obligation. That is the only obligation you had this morning. I think some people think when they get a jury summons and they come down here they have to suck it up and maybe tell us what they think we want to hear or something and that's really not the objective here.

Our system is not about that. It is about getting people that are not only qualified for the case, but at that point they're the right person for that case. The law does not demand that you have to sit on this case and the law does not say that you have to violate your own personal feelings or your oaths or your

92

own personal moral or religious views. You don't have to do that.

The law does not say that you have to come down here and literally make yourself sick with stress to be on a jury. That's not what it is about. And so by talking to people individually, reading their questionnaires, filling them out about maybe some personal experiences that they've had, you have an opportunity now to speak to us openly and honestly to test that to see if maybe this isn't the right case for you at this time. And I think you can appreciate that, can you not, that we're asking a lot of you? We're asking a lot of you. And while there may be some people who say-- and there are some people who say, Under no circumstances whatsoever could I ever sit on a death penalty case. And they're not qualified and we respect that and we wouldn't ask them to sit on this.

There are some people who come down here and say, If you show me somebody who has committed a murder just tell me where to sign and I'll give him the death penalty. Well, I don't want that juror either. That's a little too aggressive, a little too anxious and that's suspicious.

And then we have people that come down here and say, look, I feel like I can follow the law, but

this isn't the right time for me or the right case for me because of things that have happened to me in the past or maybe things that are going on right now. Because the law states that if you do ultimately sit on the jury, Mr. Trotter, you have to come in completely unbiased and you can't be letting things that may be going on with you right now affect how you would deliberate or affect how you would receive the evidence in the case. And there's nothing wrong with that.

If it would affect you, if it is heavy on your mind now, just say that. That is fair. The law respects that and that's why we talk to you about it. Do you see what I'm saying?

A. Yes, ma'am.

Q. The only oath -- you've fulfilled your obligation to show up. The only oath you have taken right now, Mr. Trotter, is for you to tell us the truth, okay?

A. Okay.

Q. If you end up on this jury, you'll take an oath to follow the law. And there's no getting out of it then. It is not, well, I wish I had told them about this or I wish I had told them about that. Well, it's too late. It is simply too late. You're on the jury. So now is the time to talk and now is the time to be honest and whether or not you're the right person for this case at this particular time, okay?

A. Okay.

Q. This is a death penalty case and I did notice that reading through your questionnaire we started on the first page where you did on the one hand say you are in favor of the death penalty, but then when we asked you to categorize that one, two, three or five, you circled three that starts out saying: I do not believe the death penalty ever ought to be invoked.

So that kind of gave me pause right there. On the one hand you said you were in favor of it and on the other hand you said, I don't think it ought to ever be invoked. And then I read a little further and I think I see why maybe you've kind of got a quandary now or maybe you're going back and forth. And I can certainly appreciate that. It looks like you've had two situations, one going on right now that involves a criminal case, involves a murder.

A. That's correct.

Q. Right. What's going on -- is it your nephew?

A. It is actually my cousin. Although we are not very close, it is something that is going on within my family.

Q. Okay. He, I take it, has been charged with; is that correct, sir?

A. That's correct.

Q. Okay. And I don't want you to -- I know sometimes families talk about the specifics of cases in such as that, and I don't want you to necessarily tell us something that I think might be violating the confidentialities of your family or tell that I'm going to go tell the prosecutor about that or the defense attorneys, so I respect that. I'm not fishing for those kinds of details, but I do want to ask you, is this situation here in Dallas?

A. No, ma'am. I believe it is in Hunt County.

Q. He's been charged with murder?

A. Yes, ma'am. The last time I heard I believe they're going to plead.

Q. Okay. Okay. Okay. All right. So at this point in this stage, it is in a negotiation stage at this point? There is nothing settled? He could still go to trial, but you're thinking he may take a plea bargain or something?

A. Yes. The last time I heard they were going to plead guilty and get a sentence.

Q. Okay. You also had a situation, it looks like, with your uncle?

A. That's correct. That was a long time ago when I was much younger.

Q. And I'm understanding, and you'll correct me if I'm wrong, that he wasn't robbed, but he was trying to rob somebody?

A. What I was told he was in the process of committing a burglary of a pharmacy and was shot during that burglary.

Q. Okay. That's tough. That's tough. Is that your mom's brother?

A. Yes, my mom's brother.

Q. Okay. Okay. I'm sure she's had a difficult time with that? You put in your questionnaire that you've got, and I don't want to misquote you here, but on Page 2, and you can turn to that with me if you'd like, we asked you: Has there been any particular event in your life that has influenced the way you feel about the death penalty?

And you said "yes." And I believe here you're speaking to the situation you said when you were younger that you lost an uncle to gun violence and that it has left you with a negative view towards those who would turn a gun on another human being.

Let me ask you this, Mr. Trotter, you described to us that it was your uncle who was actually killed because he was trying to rob a pharmacy. You say

turning a gun on another human, so are you saying that the person who killed your uncle that maybe they could have done something short of that or that your uncle had a gun? Tell me what's going on.

A. I have issues with guns anyway. I don't know that they have a real good place in society. It just bothers me that somebody would shoot somebody else.

Q. Right. Right. Do you know was your uncle carrying a gun at the time?

A. That, I don't know.

Q. Okay. Okay. And I'll tell you this, and this kind of goes to whether or not you're the right person for this case, okay, this is a case where we have alleged in the indictment the use of a firearm. As a matter of fact, we have alleged that that firearm was used to kill another person and I'm hearing from you in your questionnaire that that situation with your uncle and any situation involving a gun definitely has had an effect on you?

A. (Venireperson Trotter nods.)

Q. You have to say "yes."

A. I would agree.

Q. Okay. And there's nothing wrong with that, okay? There's nothing wrong with that. We recognize in selecting juries that oftentimes there may be individuals such as yourself who say, look, my uncle was killed by gun violence and now my cousin is going to prison, quite possibly, because of gun violence and this is kind of a one-two punch. And now you're asking me to sit on a case where you have alleged not only gun violence, but that somebody was killed by a gun. And then some people say, Quite frankly, this is probably not the case for me. I've got such -- it has influenced me in such a way that it is going to affect me in how I receive the evidence in this case and how I deliberate in this case. Is that how you feel, Mr. Trotter?

A. Yes. I do feel that way.

Q. Okay. I think it is easy for some people to say, Well, I can set that aside and I recognize this case isn't my uncle's case or my nephew's case, but they can say that, but what it comes down to is: What is the truth?

I don't need you to tell me what you think I need to hear, so I'm going to trust that you tell me the truth, Mr. Trotter, that if it is a case involving a gun and involving gun violence that you've already been influenced by that and you're going to carry into that case of bias; is that correct?

A. I believe so. I could try to set it aside, but it will always be there in the background.

Q. Okay. And I'm also gathering, just by virtue of your questionnaire, that, you know, you have a cousin who is looking at a penitentiary sentence now with a gun. You have the uncle who was on the other side of it and -- I mean, that too, it would seem to me -- I don't know how -- you can only speak for yourself, Mr. Trotter, but that may, too, would affect how you may receive the evidence and how you would consider the evidence in your deliberations, is that true?

A. I believe so.

Q. You believe so. Okay. That's what it comes down to and you can be here for just two more minutes, Mr. Trotter, or we can keep you here maybe for about two more hours talking to you about this, so before we even move on, before we get any further, I'll just lay that again on the table for you once more: Do you believe because of your experience with your cousin and because of your experience with your uncle, because of your belief about guns and gun violence that you cannot set that aside and that that will affect your deliberations, that that would affect how you receive the evidence, how you consider the evidence and how you return your verdict in a criminal case?

A. It would be very difficult to set that aside, but I believe I could do it if I was asked to.

Q. Okay. And that's what I need to know, okay? That's what I need to know. And that's what I need to be certain about here at this point, because I think a lot of people say, well, it is my obligation so I'll try. Right now we have to have certainty.

I can give you an analogy and I don't want to give you a silly analogy and kind of lessen the seriousness of what we're talking about here, but if you're going to get on a plane to take a vacation -- have you ever flown on a plane?

A. Yes, ma'am.

Q. Many people have. So you're getting on the plane and you pass the captain and you pass the air stewards there and you see the captain and you say, Hey, do you think you can fly this plane?

And the pilot says to you, Well, I'll try. I think I can. I'll try.

Would you get on that plane?

A. Probably not.

Q. Probably not, would you? And it is a simple analogy, but I think it goes to make a point, Mr. Trotter, that we have to have some certainty here. And if you can't give us certainty, then that's fine too. There's nothing wrong with that, but if you can't tell me that you can 100 percent devote your time and

101

concentration to this case, that you can definitely say that you will set aside the influences that gun violence has had against you, that you will set aside the impact it has had on you, that you can set aside how it has made you feel. If you can't say that with certainty, then you're not necessarily a qualified juror for this particular case. And maybe you'll be on another case. So tell me how you feel.

A. To be honest, I don't think I could. It would be just too difficult for me to do that.

Q. Okay. I appreciate that, Mr. Trotter.

MS. HANDLEY: Your Honor, can we have a sidebar?

THE COURT: Yes.

(Off-the-record bench discussion.)

VOIR DIRE EXAMINATION FROM THE DEFENSE

QUESTIONS BY MR. DOUG PARKS:

Q. Mr. Trotter, my name is Doug Parks and I represent Mr. Broadnax. And I want to make sure that you understand what we're talking about down here. And I want to explain the law to you before I try to get you committed for what you can and cannot do. And I understand that these are very significant life experiences in your life.

We don't talk to anybody down here who

102

hasn't had some life experiences that will, to some degree or another, impact on their personal feelings about some of these matters.

If we went about this only by before we ever told anybody what the law is asking them questions like you've been asked, we might not ever get a jury. Here's the issue: If you are -- and you've not said anything in your questionnaire, despite what may have been implicated otherwise, that disqualifies you from sitting on this jury. Now, whether or not you are appropriate as the State deems appropriate, is up for them to decide. The law gives them --

MS. HANDLEY: I beg your pardon, Your Honor, that's actually for the Court to decide.

THE COURT: Well, I don't want to mislead this juror. It is my understanding of whether he is qualified or not. I'll leave it at that.

Q. (By Mr. Parks) If the State doesn't believe you are appropriate for this jury, the law allows them preemptory challenges and they can prevent you from sitting on this jury.

The issue that we're talking about is whether you're qualified to sit. And there's nothing in your questionnaire that you have said to us that disqualifies you from being a juror in this case. What

103

we need to do is to pursue the way the law works and then you tell us in all honesty how you really feel about whether or not you would be able to follow the law in this case.

A. Okay.

Q. So if you're selected as a juror in this case the first thing you would be called upon to do is listen to the evidence from the State to determine whether or not they have proven the defendant was guilty. That is an objective decision for you to be make based upon the evidence that you hear.

The law will contemplate that if you have been convinced beyond a reasonable doubt that the defendant did exactly what they have alleged in the indictment, then the State would be entitled to a guilty verdict. If after hearing the evidence you did not believe he did what they have alleged or if you have a reasonable doubt about that, then the law would expect you to reach a verdict of not guilty. And that would be based upon the evidence that you hear in the courtroom and the law that the judge gives you in the Court's charge. The charge is just a document that tells you all you need to know. You saw a charge in your civil trial.

A. Right.

104

Q. Do you believe that you would be able to make that decision based upon the law and the evidence or do you believe that these issues with your cousin and your uncle would in some way cause you to change either for or against the State or the Defendant of the decision that you would make?

A. Yes, sir. I believe I could make a verdict based on the evidence that I'm given.

Q. You're not going to say, Well, the State hasn't proven to me that he really did this, but I don't like guns so I'm going to find him guilty anyway?

A. No. I don't believe I would do that.

Q. And if you found him guilty, the way this process works -- and here's where we have a departure, I guess, from experience on the civil trial or even experience vicariously through watching television shows or movies or whatever, everybody kind of knows what the guilt or innocence phase of the trial is. And they even know what the punishment phase is when you're talking about assessing the range of punishment.

A death penalty case -- a capital murder case is where the State is seeking death. That is different from everything else. And the decision whether the defendant gets the death penalty is dependent upon the answering of these special issues.

You read them in that pamphlet.

A. Yes, sir.

Q. And again, it is contemplated that a juror will make a decision based on the evidence they hear in the courtroom. If the State has proven Special Issue No. 1 should be "yes," then the law contemplates that a juror would answer that question "yes." If they failed to prove it, then the law contemplates they answer it "no" and they base that not on their life experiences, not on the outside influences, but simply from the evidence that they have heard in the courtroom. Do you believe you would be able to do that?

A. Yes, sir.

Q. And the same is true of the other special issues that -- now, the State doesn't have a burden of proof in Special Issue No. 3, but basically what the law contemplates is that a person has the kind of mental discipline that they could ingest the evidence they hear, apply the law that the judge has given them and follow the oath they take, which is to a true verdict render, according to the law and the evidence.

That may be easier for some people than it is others depending upon life experiences, but the law would contemplate that however easy or hard that may be, the juror would have the kind of mental discipline to put aside those other issues and just follow the law and the evidence they've heard. Do you believe you would be able to do that if you were put in that position?

A. I believe I could do that, but it would be difficult to set aside any life experiences that I've had.

Q. People can't set aside their life experiences. That's impossible. The issue really is whether or not those life experiences would influence the way you reach your decisions in the case.

A. I don't think they would influence based on -- because I would be judging based on what's presented to me in the courtroom, rather than anything that's happened to me prior.

Q. Okay. Fair enough. Thank you. I appreciate you.

THE COURT: You are excused, Mr. Trotter.

FURTHER VOIR DIRE EXAMINATION FROM THE STATE
BY MS. ANDREA HANDLEY:

Q. All right. Thank you, Mr. Trotter. And obviously we might have different sets of opinions, because I do think just as you were attempting to state is that the way you answer questions and the way you see things is based on your life experiences and it makes you who you are, quite frankly. And it is not always completely black and white an objective in criminal cases. If it was, we'd feed facts into a computer and have it spit out an answer.

It all goes to the humans who decide the case using their experiences. And that's why I ask you that, you know, because I'm going to respect the fact that in your questionnaire on the last page there when we asked you about jury duty you used the word "stressful" and I recognize this is not always the right kind of case for everybody. And maybe it is because of your situation. Whether I decide to keep you on this jury or not, you know, I'm going to first respect you, Mr. Trotter, and ask you if this is the right case for you and not try to talk you into either way or not, okay? You stated to me that you think it would influence you, but now you've stated that you won't let it affect you and you stated before that you'd try and you stated, I can't give a for sure answer. That's just where I'm going here.

Can you tell me with absolute certainty that what happened to your uncle and what happened to your cousin will not affect the way you view the evidence or determine your deliberations? Can you tell me with absolute certainty?

A. Yes.

Q. Okay. Fair enough. Because I might very well not use a preemptory on you, Mr. Trotter. As a matter of fact, I think you might very well be a fine juror for this case because you already have an appreciation for the acceptability of anybody putting a gun in anybody's face. You've expressed to me that you have a problem with that, don't you? And I think a lot of people do. So let's talk a little bit, then, about this particular case, because I do need to feel you out about how you feel about the death penalty. Because, again, the stakes are the highest they ever get and you need to appreciate what my aim and what my goal is in this case.

I wouldn't be sitting before you today, Mr. Trotter, if I didn't think I had the type of quality of evidence to convince twelve people that the defendant is guilty of capital murder, okay? And I wouldn't be sitting here in front of you today if I didn't think I had the type of quality of evidence to convince twelve people that the answer to the special issue should be answered in a way that will return a verdict of death, okay?

And if and when that happens, you know, every juror, and you, particularly -- and I tell you this just because I think you need to be informed of this, you need to appreciate what's going on here. If

you return a verdict that mandates a sentence of death, that's it, that's all, okay? The judge can't second-guess your opinion and he can't change it. What's done is done. And the defendant will go down to Huntsville prison and he will have an execution date set. And regardless of what happens between the time he first gets to Huntsville until the date of his execution, regardless, it doesn't matter if he sits down there and comes up with a cure for cancer or brings peace to the Middle East, what's done is done. On the day of his execution, he will be transferred to Livingston, Texas, whether he likes it or not, he will be strapped to a gurney, needles are going to be put in his arm and they will pump poison into his veins until he dies, okay? And I'm not talking about an ambiguous or theoretical person here. I'm talking about the person who is sitting there towards the end of the table there, okay? And so the question becomes, Mr. Trotter, that's what we're talking about here.

That's the case I'm talking about having you participate in. The question becomes, are you the person who can sit on a case like this?

MR. PARKS: Judge, we object to that. She has not explained the law at all. She is trying to get a commitment from this juror without explaining the law

and it is in violation of my motion in limine.

THE COURT: Overruled.

Q. (By Ms. Handley) You may answer the question, Mr. Trotter.

A. Honestly, I don't think I could. It would be just too stressful of a decision for me to make and I don't know that I'd want that hanging on my conscience.

Q. Okay. That's a fair answer. And there's nothing wrong with that. I mean, we called 800 to 1000 people down here, Mr. Trotter, because it is not the right case for everybody and there is nothing wrong with that. You put that in your questionnaire. You actually used the word "stressful" and the law does not demand that you come down here and stress yourself out.

So you have to search within yourself and the question becomes this: Are your feelings -- the amount of stress that you're feeling, do you think that it is going to prevent or substantially impair how you receive the evidence in this case or how you're able to return your verdict?

A. I don't believe so. It would just be a matter of my own personal comfort.

Q. Let's get to the bottom of that, what that means. You say it would be a matter of your "own personal comfort." Now, you told me -- I asked you how

you feel about this kind of case and you said that it would stress you out -- tell me again. What did you say?

A. I wouldn't want that kind of decision hanging on my conscience if I had to decide one way or the other. I don't know that I would feel comfortable making that decision myself.

Q. Okay. But then on the other hand you're saying but, Okay, I can do it. Am I misreading you?

A. I could do it if I had to, but it would be very stressful.

Q. To what extent would it be stressful?

A. It would just be something I would be thinking about consistently and I don't know if -- it is not something that I can shut off.

Q. Okay. Would it be so stressful to you -- would you be thinking about that so much that it may affect your ability to concentrate on the evidence at hand?

A. Likely.

Q. Okay. And what it comes down to, and maybe this is just an easier way to say it, is that if you are just so stressed about it that you don't want to be the person who is responsible for it, I mean, the way a death verdict is arrived, is arrived by how you answer the special issues. And some people have said to us,

Because of the way I feel, because of the level of stress I have, because of my uncertainty and not wanting to be the person who makes that decision, I'm going to answer the questions in a way that's going to ensure that the person doesn't get the death penalty.

Regardless of the evidence, my true way I'm going to answer that is in a way they won't get the death penalty because I can't deal with that stress and that burden. Is that what I'm hearing from you?

A. I think I could answer the questions appropriately based on the evidence, it is just a stressful decision to have to make.

Q. Is it personal feeling or moral feeling or religious? What is it?

A. Just a personal feeling.

Q. Okay. And the stress that you're saying, I mean, how is it going to affect you? How stressed are you going to be?

A. I don't know.

Q. Do you throw up, do you get diarrhea?

A. Yes. Just anxious and nervous.

Q. Okay. And what are you anxious and nervous most about?

A. Like, today, I'm nervous because I'm not used to being around a lot of people. I get anxious around

**113**

others.

Q. Okay. Do you think your nervousness and your anxiousness would substantially impair your ability to participate in a case like this?

A. No, ma'am.

Q. Okay. So do you think you're the kind of person that could answer the questions knowing that you are going to take part in somebody's death?

A. I could answer the questions, but it would be stressful and it is a decision I don't know that I would want on my conscience.

Q. Okay. And I guess that's what I'm trying to get at with you, Mr. Trotter. I think on the one hand you're saying, Well, if I had to do it or if you told me I had to do it, you know -- I'll give you another silly analogy because sometimes it is easier for me to give analogies to make a point here.

You've seen the skyscrapers downtown? Have you seen those big skyscrapers downtown that we have?

A. Yes.

Q. Have you ever seen the window washers on those high skyscrapers? The people that get up there and wash the windows on the 80th and 100th floors. If you asked me about how I feel about cleaning windows on skyscrapers, I'm going to tell you I'm 110 percent for

**114**

it. I think it should be done. I think somebody should do it and I think it should be done on a regular basis, okay? But now if you told me that I had to be the one to get on that scaffold with that squeegee in my hand and that bucket of water and that I had to be the one to go up and do it, I'll tell you that's a whole other different matter. And I can sit there and be brave and I can tell everybody, Well, if you tell me I have to do it I'll do it. I'll try. I'll do the best I can. If you tell me I have to do it the I'll try, but I know in my heart of hearts, Mr. Trotter, that when you take me up to the 80th floor, I'm not going to do the job I'm supposed to be doing. My concentration, my stressfulness, my nervousness is going to be thinking about, am I going to fall? Is this thing going to slip? And I may try to do the job, but I'm going to tell you right now, I'm not going to give 100 percent to the job I'm supposed to be doing because I am going to be distracted. I am going to be stressful and I am going to be nervous. I can't give it 100 percent of my commitment, okay? Sometimes people see this analogy as how they feel. Do you see yourself anywhere within that analogy?

A. Yes, I do.

Q. Okay. And you can sit here and say, Well, if

**115**

you tell me I have to do, I can tell you I can do it, but if you put me in that position I cannot say that it will affect me. I cannot say I will give you 100 percent of my concentration. Is that how you feel?

A. That is how I feel.

Q. Okay. Do you feel like we're pulling you back and forth here?

A. Just a little bit.

Q. Yeah. And I don't want you to feel that way, Mr. Trotter. I just want to flesh that out with you. I am not looking for people to be on this jury that are going to be sick with stress or cannot say to me right now they can give me 100 percent of their concentration. If they tell me I cannot tell you that it will not substantially impair or prevent me from doing this, then I don't think they're appropriate for the case. And we need to hear it from you. So just once again, tell me what's going on here and we'll proceed from there.

A. I do think the circumstances of this case would just be too stressful on me and I wouldn't be able to devote 100 percent, like you said, similar to the skyscraper thing. I can say, yes, I can do it, but it would just be very stressful.

Q. Okay. You might be good for some other case, but not this case? You might be able to sit, for

**116**

example, on a burglary case, but not for this kind of a case?

A. Yes, ma'am.

Q. Can you see yourself sitting on a different kind of jury, but not this kind of jury?

A. Yes, ma'am.

Q. Sitting on maybe a different kind of case that doesn't involve gun violence?

A. Possibly.

Q. Or particularly, in this case, a death penalty?

A. Right. I think the death penalty is what concerns me the most.

Q. Okay. I appreciate your honesty, Mr. Trotter. I thank you for your time.

MS. HANDLEY: I pass the juror.

FURTHER VOIR DIRE EXAMINATION FROM THE DEFENSE BY MR. DOUG PARKS:

Q. Mr. Trotter, I'm kind of in an uncomfortable position here, because I feel very concerned about -- I understand what you're saying. Do you understand that the problem that I have is that my job is to represent Mr. Broadnax and if he is tried by twelve people that it doesn't bother them in the slightest bit to give him the death penalty, I have a question whether or not he's getting a fair trial.

117

Now, I don't want to have jurors who are going to have a nervous breakdown. And I'm not a mean and cruel person by talking to you about this thing and about these issues, but you see where ultimately discussions of this kind end up. It ends up with twelve people sitting over here on a jury who say, essentially, oh, you bet, -- and the twelve people that sit on this jury will be in favor of the death penalty, I can promise you that. We death qualify jurors in the State of Texas so the State can be sure of having twelve people who will give the death penalty if they prove those answers. And that's fine, that's appropriate, but we don't want twelve people who are so in favor of the death penalty that the burden that the State has instead of these special issues being barriers are merely speed bumps on the way to the death penalty.

I'm going to accept what you say to me about this. If it is your position that it would be hard for you to sit on this jury and answer these special issues in such a way that you know the defendant could get the death penalty, but that you could do it, if that's the appropriate thing for you to do, even though it is going to be extremely stressful to you, that's fine. That's selfish of me, okay, but because it puts a burden on you, but it's not a different burden

118

that's going to be on eleven other people on that jury.

On the other hand, if you're saying to me that because of the stress of the situation and you're just not going to be able to listen to the evidence and give your full attention to the evidence and you're not going to be able to make the kinds of decisions that the law would require for you to make, then that's fine and I'll accept that also. I just need to satisfy myself exactly where you stand on that regard.

A. I could answer the questions that are asked of me in the trial if I absolutely had to, but it would be very stressful knowing that this penalty is hanging over the whole proceedings.

Q. Sure.

THE COURT: Let me ask you to step out for just a moment, sir, and I'll ask you to come right back in.

(Venireperson Trotter exits courtroom.)

THE COURT: In the presence of Mr. Broadnax, what says the State?

MS. HANDLEY: We would challenge this juror, Your Honor.

THE COURT: For the record, Mr. Parks.

MR. PARKS: Well --

THE COURT: I understand. Do you think the

119

juror is qualified?

MR. PARKS: Yes, sir. I think he's qualified. I'm not sure where in the law it says that it has to be easy for people to make life-and-death decisions in cases of this kind. This questionnaire is clear that he does not have moral or religious or personal beliefs that would prevent him from answering the questions that would assess a death penalty. It would be extremely difficult for him, personally, but he said he could do it on more than one occasion. I believe he's qualified to sit on the jury.

THE COURT: Thank you, Mr. Parks.

The challenge will be granted and for the record, the Court bases this ruling on his answers and the Court's personal observation of the juror as he sat answering the questions.

(Venireperson Trotter enters courtroom.)

THE COURT: Sir, you will not have to serve and you are free to go. Thank you so much.

MS. HANDLEY: Thank you so much, Mr. Trotter.

The court is in recess until 1:15.

(Venireperson Trotter exits courtroom.)

MR. PARKS: Just for the record, we would object to the Court's ruling and state to the Court that

120

the ruling does deny this defendant of his rights to a fair and impartial jury and due course of process of law Fifth, Sixth, Eighth, and Fourteenth under the Constitution.

THE COURT: So noted.

(Recess from 11:38 a.m. to 1:19 p.m.)

(Venireperson Blevins enters courtroom.)

THE COURT: Is it Blevins?

VENIREPERSON BLEVINS: Yes.

THE COURT: Okay. My name is Webb Biard and I'm going to be with you this afternoon during this part of the jury selection process. The presiding judge of this court is Michael Snipes and that's who you met at the general session. Should you be selected as a juror, Judge Snipes will actually preside over the trial. I'll have you to do this for me, please, before we go any further. Raise your right hand.

(Venireperson Blevins was sworn.)

THE COURT: Let me talk to you for a minute before we go too far into the jury selection process. You have your pamphlet and you've had an opportunity to read that?

VENIREPERSON BLEVINS: Yes.

THE COURT: And did that help you just a little bit?

121

VENIREPERSON BLEVINS: A little bit.

THE COURT: Okay. Also, I have your questionnaire here and I'll hand this to you here in just a minute and you'll have it to refer to when the attorneys talk to you.

VENIREPERSON BLEVINS: Okay.

THE COURT: That was back in April, I think, when you filled it out. They might ask you to expound a little bit on some of your answers. I don't know which ones. It is not that I think they will, but at least you'll have it with you to look at.

VENIREPERSON BLEVINS: Okay.

THE COURT: From filling out the questionnaire and hearing the judge's remarks and reading that pamphlet and thinking about being here today, as you sit here now, are you aware this is a capital murder case?

VENIREPERSON BLEVINS: Yes.

THE COURT: Do you understand the State of Texas through the State's attorneys are seeking the death penalty?

VENIREPERSON BLEVINS: Yes.

THE COURT: Do you know that if someone is found guilty of capital murder there is only two possible punishments, did you know that? It's either

122

life in prison without parole or death.

VENIREPERSON BLEVINS: Okay.

THE COURT: If someone is convicted of murder, then the range of punishment is not less than 5 or more than 99 years or life in prison. And so obviously there is a difference between murder and capital murder because you can't get the death penalty for murder. The attorneys will explain to you the difference between murder and capital murder.

Briefly, murder is intentionally or knowingly causing the death of an individual. That's murder. Capital murder is murder, intentionally causing the death of an individual and certain facts of situations. The murder of a policeman, murder of a fireman, murder of a child under the age of six, murder someone while robbing them or kidnapping them, sexually assaulting them, burglarizing their home, murdering more than one person in a single episode, murder for hire, hiring someone to murder someone, murder while committing arson. Those are some examples of capital murder.

Two men driving down Central Expressway this afternoon, they get into a road rage, they both get out and one has a gun and shoots the other one. He means to and kills him, that's murder. But it is not

123

capital murder because it is not in one of those categories that I just talked about. Do you understand that?

VENIREPERSON BLEVINS: Yes.

THE COURT: Okay. That's one principle we're going to be talking about. Do you understand if someone is found guilty of capital murder, there are two possible punishments. Have you ever served on a criminal jury before?

VENIREPERSON BLEVINS: No.

THE COURT: All criminal jury trials are in two parts. The first part is the guilt or innocence phase and the second part is the punishment phase. If you're found not guilty, then you don't go into the punishment phase, obviously, the trial is over. If you're found guilty, then you go into the punishment phase. In the punishment phase you can hear additional evidence other than just the facts of the crime if that's what those attorneys want to present. And then you decide what's the punishment.

That's the way all criminal cases work from the theft of a bicycle to a capital murder case is tried. What we're going to be talking to you about, or the attorneys are, is if you were on a capital murder case and you found someone guilty of capital murder,

124

would you be able to do that and make that decision based on the evidence and the laws of the State of Texas in the United States and apply it to that part of the trial? And then if you went into the punishment phase, even though you found someone guilty of capital murder, would you be able to decide what's the proper punishment, either life in prison without parole or death, and keep an open mind to either of those two punishments?

That's what they're going to be talking to you about, and I think you agree with me, Ms. Blevins, that either one is a serious punishment. Life in prison without parole -- by the way, let me express, when I say life in prison without parole, I mean life in prison without parole, not after so many years someone becomes eligible for parole. That used to be the law, but the law now is that if you're sentenced to life in prison without parole, you will die in prison. I want you to understand that.

Now, these attorneys are excellent attorneys or they wouldn't be involved in this case, but they're also outstanding folks. No one involved in this process is going to intentionally intimidate or embarrass you. That's not going to happen.

Also, you're not expected to know any of

this law. That's not your job. That's our job. When I told you these were outstanding lawyers, by that, I mean they have the ability to explain the law to you and then the bottom-line question is going to be: Once you do in fact think you understand the law, will you be able to follow the law and perform your duties as a juror? And that's kind of what we're going to be talking about.

If you don't understand one of these concepts, just let us know. Basically, most of the things we're going to be talking about you've known since grade school, the laws you've heard about since you started taking different government courses. But some that specifically apply to capital murder or the procedure, I imagine would be new to you.

For example, did you know anything about these three special issues?

VENIREPERSON BLEVINS: No, I didn't.

THE COURT: Very few people do. Frankly, very few lawyers in this building know anything about this procedure. The attorneys will spend some time with you on those issues because they're so unique to most people. And basically, they're going to be asking you, even though you've found someone guilty of capital murder, can you then go into that punishment phase and listen to whatever evidence is presented and then answer those special issues either "yes" or "no" depending on the evidence? If you can't, basically, you go a long way to be a qualified juror. If you say, No, if I find someone guilty of capital murder, I'll already have my mind made up what I'm going to do about punishment, then you wouldn't be a qualified juror. But, frankly, and believe me on this, you have every right to feel either way, as long as you tell us how you feel. This is your opportunity to do that. This is your opportunity to do that.

Now, as I told you, one of the attorneys for each side, I think I told you, is going to speak to you for about 45 minutes each. So this is going to take us about another hour and a half. I know you got here through the noon hour and you were here early and I appreciate that, so if you need to take a break for any reason just let us know, all right?

VENIREPERSON BLEVINS: Okay.

THE COURT: In that regard, I want to introduce Gordon Hikel to you.

MR. HIKEL: Good afternoon.

THE COURT: And Andrea Handley.

MS. HANDLEY: Good afternoon.

THE COURT: They represent Dallas County and the State of Texas. And further to my right is Brad Lollar and Doug Parks, Keri Mallon. And they represent Mr. James Broadnax. Mr. Broadnax.

Now, finally from me, from reading that pamphlet, did you see where Judge Snipes said he's going to start this trial on August 10?

VENIREPERSON BLEVINS: Yes.

THE COURT: It is going to last up to two weeks. Let me tell you how I anticipate the judge is going to run this court. Monday through Friday, 9:00 to 5:00, break in the morning, break in the afternoon, there will be a lunch break.

The jury will not have to stay together overnight unless and until you commence deliberations. In other words, deciding your verdict. Should that happen and you went late into the night and became tired and you wanted to take a break, there is a possibility that the entire jury will be taken to a fine hotel, county expense, individual private rooms, fed, spend the night and come back the next morning to avoid any outside influence on your decision making.

That could happen. If it did happen, the judge would give you plenty of advance notice. Now, I tell you all that, give you those dates, the length of the trial and the way the judge runs his court to ask you: As you sit here now, are you aware of any reason why you can't sit as a juror in this case?

VENIREPERSON BLEVINS: No.

THE COURT: Okay. I'm going to hand you your questionnaire at this time, the sheriff is.

Thank you, Sheriff.

And Mr. Gordon Hikel is going to talk to you now on behalf of Dallas County. Mr. Hikel.

MR. HIKEL: Thank you, Your Honor, may it please the Court.

EMILY ALANE BLEVINS,
having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION FROM THE STATE
QUESTIONS BY MR. GORDON HIKEL:

Q. Ms. Blevins, again, good afternoon, ma'am. How are you doing today?

A. Good. Thank you.

Q. Ms. Blevins, I have to tell you, I read your questionnaire and it seems like we've asked you every conceivable question under the sun, these 18 pages. And we've all read these answers. And I have to say, frankly, I am very impressed by your answers. Because there are some definitive views that you have about the death penalty, about crime in the prison, which is fine. We want you to know that in this process as we talk to

you, myself and one of the lawyers from over there, what we're seeking to find out is once we explain to you what the law is, whether or not you can tell us, Yes, in spite of my personal views as have been expressed in the questionnaire, now that I know what the law is, I can or I cannot follow the law.

When we asked you on April 24th, you along with 800 or more other jurors that came to this building, to fill out this questionnaire, we did not expect you to know about the death penalty in Texas. Frankly, as the judge said about the lawyers in this building who practice law every day, don't know about these three special issues. So we do not expect you to know about them also.

However, what I'm going to do is go over some of the things in your questionnaire. I'm going to talk about what, Ms. Blevins, are your views on the death penalty, okay? On the very first page of your questionnaire, Ms. Blevins, you said when asked a question about the death penalty you said, I believe that the death penalty can serve as a deterrent for crime. And then if you will flip to Page 8 for me, please. You're asked on Page 8 at the very top to rank the objectives of punishment and you put, again, No. 1, a deterrent.

Let me begin by asking you this: If you get information or see studies that suggest the death penalty is not a deterrent. And I guess by "deterrent" you mean either specifically deterrent to the individual or a general deterrent to the public. But if you get information that suggests to you that it is not a deterrent, does that change your views about the death penalty?

A.   Yes.

Q.   In what way?

A.   I wouldn't place as much importance on it.

Q.   Meaning --

A.   Maybe feel that it is not necessary to use.

Q.   Tell me when do you think it is necessary to use?

A.   I think it should exist for -- it should exist because -- I don't know. I just think that's the ultimate deterrent for crime.

Q.   Okay. In other words, you like the idea of having a particular state, like here in Texas, we have the death penalty as ultimate sanction for a crime, correct?

A.   Yes.

Q.   Now, the judge has made it clear, and I will talk to you more about this, that in Texas we don't have the death penalty for murder. We have it if a person intentionally kills someone, and in this particular context, where another felony is committed.

For example, robbery, burglary of a house, sexual assault, retaliation. There are tons of other felonies together with intentionally killing someone in the course of one of those, some that I mentioned, then the laws of Texas provides that that person can be charged with the death penalty. So you like the idea of having it on the book, so to speak, but you only like it because you at least hope it will serve as a deterrent to whom? The defendant, the person who did the crime or to the members of the public?

A.   To the public and those people that the defendant is associated with.

Q.   Okay. Let me ask you this and we'll go more into -- we'll talk some more because I was impressed that you put -- let me ask you: Would you go to Page 16 of your questionnaire? I want to ask you this question here: On Page 16 you were asked: List three men and women in the public whom you respect the most and you put "Jesus" and I assume you mean Jesus Christ?

A.   Yes.

Q.   And then on Page 5 of your questionnaire you put there that you do believe in an eye for an eye. Now, an eye for an eye, we don't have that in Texas, meaning that, like the judge said before, if someone commits murder, we don't necessarily sentence a person to death because of murder. It has to be capital murder and it has to depend on how a juror answers those three special issues over here on your left-hand side.

The fact that you most admire Jesus and you believe in an eye for an eye, tell me how those two play out, given the fact that, you know, he taught about forgiveness and a second chance and those kinds of things, but you believe in eye for an eye. How do you balance those two out?

A.   Well, I think you still have to protect the public in some way and have a deterrent for any kind of crime.

Q.   All right. We will talk some more about this issue as we get into those three special issues, but I believe you said you never served as a juror before; is that correct?

A.   Yes.

Q.   Okay. Let me explain to you how in Texas how it works in terms of what a jury is actually asked to do. I'll talk to you about a trial and having two parts.

Part 1 of the trial is where a jury is

simply asked to decide one question and one question only and that question you're asked to decide in the first part is: Did the State of Texas prove to me, the juror, beyond a reasonable doubt that a citizen accused of a crime did in fact commit the crime? Okay? That's the only question you're asked to decide. I believe in front of you you have what's called an "indictment." The indictment is simply, as you have in your hands, a piece of paper. It gives notice to the defendant or the citizen what he's accused of and it gives the State notice what the State must prove.

What you have there simply says: On or about June 19th, 2008, in Dallas County, State of Texas, the defendant, James Broadnax, committed -- and it mentions a particular crime there. That piece of paper is no evidence of guilt or anything against Mr. Broadnax. Again, it is just notice. What he's charged with and what we have to prove, okay? So as he sits over there, Mr. Broadnax, he and any other defendant, any other person accused of a crime, at this stage is to be presumed innocent.

Obviously, the reason for that is because we haven't proven anything to you yet. You haven't heard anything. And so as he sits there, we have done the accusing, the law says to the State, you have to do the proving. And for me as a juror until you, the State, proves to me beyond a reasonable doubt that he's guilty, he's presumed innocent. Can you follow that principle of law, the presumption of innocence?

A. Yes.

Q. Okay. In addition to that, there will be witnesses who will testify in this case. As you would imagine that -- where you're sitting is called the "witness stand." Witnesses will come in, whether they are police officers, fact witnesses, doctors, medical personnel, they'll come in and raise their hand and take an oath to tell the truth.

Now, you said on Page 7 of your questionnaire when asked about police officers: Do you believe -- the question was: Do you believe police officers are more likely to tell the truth than the average person and you said "yes." You said: I think that seeing crime every day would make police officers want to live a more upright life. Now, I'll tell you, Ms. Blevins, I agree with that opinion. There's nothing wrong with that. But the law requires that as a juror you cannot say of any class or category of witnesses, just by virtue of his or her occupation that before he comes into the courtroom, he or she, I'm going to believe whatever he tells me because he's an officer or

a doctor or whatever the case may be.

Now, after he's testified and you as a jury evaluate what he or she has said, you may then choose to believe all of what he said, some of what he said or none of what she said, okay? Can you follow that principle of law, which is that you start off every witness at the same level and you will wait to assess his or her credibility after he's testified?

A. Yes.

Q. Okay. All right. I have mentioned a term several times called beyond a reasonable doubt. And I'm still talking about the first part of the trial called the guilt or innocence. I've thrown out this term a lot called beyond a reasonable doubt. If you look at Special Issue No. 1 and 2, the second line of those two issues you will see those words again, beyond a reasonable doubt.

Beyond a reasonable doubt, there is no definition for that. There is no legal definition. The law recognizes that you as a juror, you guys are smart enough to figure it out. What I can tell you is what it does not mean. It does not mean proof beyond all doubt. It does not mean proof beyond all possible doubt. What it means is if you have a doubt after hearing all of the evidence, is there some doubt that you have as a juror that's based upon reason and common sense? That's what it means.

That is the burden of proof that the State has in the first stage of the trial when you're trying to answer that one question, is the defendant guilty and did the State prove it to me beyond a reasonable doubt.

Let me show you, by way of example, an extreme example of how important it is your duty as a jury to hold the State to its burden of proof.

Let's say that you are a juror and you're sitting in one of these nice, soft, burgundy chairs, okay. Evidence has been presented to you and in the indictment the State alleges that the defendant committed a crime by shooting someone with a handgun, a deadly weapon, okay. Let's say you hear testimony that the defendant says, I did it. Not in this case, but that the defendant said, I did it and I'm really glad I did it. I hated that person, but I didn't shoot him though, I stabbed him. I stabbed him 50 times. The medical examiner comes to court and says, Yes, that person is dead, but not from a gunshot wound, he was stabbed several times, more than 40.

We have alleged a gunshot. That means that because we have alleged in the indictment a manner of means which is by gunshot, but the evidence proved stab

137

wounds, the law will require you in following your oath to render a true verdict to vote what?

A. Not guilty.

Q. Not guilty. Because we have failed to carry that burden of proof to you beyond a reasonable doubt that a person is guilty. And in that situation you had a doubt of the person's guilt based upon reason, that reason being that we said gun and the evidence says knife.

That's an example of what we mean in terms of beyond a reasonable doubt and that's an example of what we mean when we say that if we put it in the indictment, we have to prove it to you, you can't try to help the State out, okay?

A. Um-hum.

Q. You mentioned on Page 11 when asked a question about gun control, and I really liked the answer you gave there, you said, I think there should be certain controls of guns, but we still should retain our constitutional right to own them. When I read that I was impressed and let me tell you why: There's another part of the Constitution that's called the Fifth Amendment. The same way that you as a juror respect the Second Amendment right to own a gun is the same with the Fifth Amendment that that defendant, any defendant, has

138

a right to not testify if he or she doesn't want to. There are too many reasons why a person would not want to testify, too many to speculate. The law says if a person doesn't testify, you can't hold it against him or her. In fact, you can't even consider it for any purpose at all. Can you follow that law?

A. Yes.

Q. Okay. All right. So in the first part of the trial, again, you are trying to decide just one issue. And Ms. Blevins, let me tell you this: I want you to look at the defendant, Mr. Broadnax, sitting right over there. I want you to understand this, that we believe in the State of Texas that we have the type and the quality of evidence that will lead twelve fair and impartial jurors to find the defendant guilty as charged of capital murder.

We further believe that we will present evidence that will convince twelve fair and impartial jurors to answer these three special issues "yes," "yes," and "no." Now, if that happens, if we convince a juror beyond a reasonable doubt as to Issue No. 1 and you say "yes" beyond a reasonable doubt to Issue No. 2 and you say "yes" and "no" to question No. 3, the judge will have no choice but to sentence the defendant to death. He will sign a death warrant.

139

Some time in the future that defendant will eventually be strapped to a gurney somewhere and he will have needles injected into his veins where he will eventually die from the poisons. Now, in light of your views, Ms. Blevins, about your very strong health and well-respected religious views, my question to you is: Do you believe you have the constitution to participate in the process of that, that could eventually lead to the death of another human being?

A. Yes.

Q. Okay. All right. On Page 2 of your questionnaire when asked to give what's the best argument against the death penalty you said, sanctity of human life, which leads me to ask this question, then: If you believe that it is the best argument against the death penalty is the sanctity of human life and understanding that in this particular case, as the judge has said, one of two possible verdicts, life in prison without parole or the death penalty, depending on how those issues are answered, "yes," "yes," and "no," given your well-respected views of the sanctity of human life, help me understand those two positions.

A. Well, I think it is not to be taken lightly at all.

Q. Okay.

140

A. I think that's what I was thinking whenever I wrote that.

Q. Okay.

A. Even though I feel that it should be used sometimes. And I guess another argument against the death penalty would be possible rehabilitation of the criminal and, you know, that they might be able to have some kind of positive impact.

Q. We will talk about that, Ms. Blevins, in terms of possible rehabilitation as we get to Special Issue No. 3. Because I want you to understand that as a juror you will not be asked, Do you believe the defendant should live or should die? You will not be asked as a juror, Do you think he's worthy of living or dying?

A. Okay.

Q. Okay. What you'll be asked to decide in part one of the trial is, is he guilty? And then has the State of Texas proven to me beyond a reasonable doubt that he's guilty of the offense charged?

Now, there are several ways, as the judge mentioned to you, where one human being can kill another one, like, if I'm driving down the road and I'm going 80 miles an hour and I'm going home from work, it's been a long day, my cell phone rings and I bend down to pick up my cell phone up and I lose control and I crash into

someone and I kill someone, I may be charged with criminal negligent homicide, not a death penalty case at all because there is no specific intent to kill the person.

The next example: I'm standing on the top of 635 that goes over 75 and it is the middle of rush hour and I take a big rock and I throw the rock down and the rock smashes into someone's windshield and kills that person. I may be charged with manslaughter because I was reckless. I consciously disregarded the substantial risk and in doing that, somebody could get hurt. That is not a death penalty case either. That's a second-degree felony, 2 to 20 years.

The next example: I go into a 7-Eleven to rob the store. There's a clerk there and I use my gun and rob the clerk and I said to the clerk before I left, Don't come outside the door and look at me because if you do I'm going to shoot you in your leg. The clerk disregards my specific instructions, I take the money and the clerk comes around and sure enough, I shoot the clerk in his or her kneecap. It just so happens that I hit some major vein, I know you're a nurse and you have -- correct me because I don't know if there's a major artery, but I hit a major artery in the leg and the clerk bleeds to death. What I've done is, I didn't

intentionally want to kill the clerk. All I said was, Please don't come around and follow me because if you do I'm going to shoot you to stop you from seeing where I'm going.

Now, I caused the death of that person because I engaged in conduct, that shooting a person, and that is clearly dangerous to human life. That person dies and I could be charged with murder in that I knowingly killed that clerk, not capital murder. To get capital murder, the State has to prove that it was a person's specific intent.

Let's go back to the 7-Eleven example. I walk in there with my gun, the clerk is there by herself or himself, I rob the clerk and I turn to the clerk and I shoot the clerk two or three times in the head, the clerk dies. Is there any question in your mind what my intent was when I shot that clerk? Is there? You can say "yes" or "no."

A. No.

Q. Okay. Because, I mean, if I put a gun to the clerk's head and I pull the trigger two or three times, there is no question what my intent was. I wanted to kill that person. That would be the situation of capital murder, because I robbed the clerk, took the money and I shot and I killed the clerk.

Now, the judge said it is murder, a specific intent, plus an aggravating factor. Let's say in a hypothetical case we present that evidence to you in the first part of the trial and you along with your other eleven colleagues, called the jury, deliberate and you believe we have proven to you beyond a reasonable doubt the person is guilty. You render a verdict, you come back into the courtroom. The judge reads the verdict.

Now, that's where the similarity ends between capital murder and any other criminal trial. Because if you find a person guilty of capital murder, then and only then will you encounter these three special issues. If, for example, where I shot the clerk in the knee and the clerk died, it was murder. I was charged with murder. That murder carries a range of punishment of 5 to 99 years, okay? But in this case of capital murder where there is a murder, an intentional killing and robbery or some other -- one of those felonies and you find the person guilty as charged, you then come into these three special issues.

Now, let me ask you this question: On Page 6 of your questionnaire you are asked a question about alcohol. I'm curious about that answer because if you flip over back to Page 5 at the very bottom of Page 5

you say that you agree with the law that voluntary intoxication does not constitute a defense. You say that if you choose to become intoxicated, you're still responsible for your behavior.

On the top of Page 6 you say that intoxication: It may help to give a better idea of the person's motive or background. What did you mean by that?

A. Well, I mean, I think substances can alter your decision making, but you should still be responsible for what you have done, but it might give a better idea of a motive versus just being intoxicated.

Q. Okay. Understanding as you do on Page 5 at the bottom of Page 5 that in Texas under Texas law, voluntary intoxication does not constitute a defense, meaning that I can't or a person cannot go and get drunk or high on drugs, commit a crime and then say, Hey, I should be exonerated from it because I was drunk or I was high -- and you agree with that law on Page 5 -- tell me now as we get to the top of Page 6, then, if a person is intoxicated, how would I give you a better idea of a person's motive and that he was intoxicated?

A. Because he wasn't thinking clearly.

Q. Okay. And as a juror, let's say that you hear that kind of evidence in phase one of the trial where --

what is the only question you're asked to decide in the first part of the trial?

A. Guilty or not guilty.

Q. Okay. And you hear in the very first part of the trial a question pertaining to intoxication. How does that affect you as a juror in answering that question? Is a person guilty or not guilty?

A. It doesn't affect anything.

Q. Why?

A. Because the law says we can't consider that.

Q. Okay. And you can follow that law?

A. Yes.

Q. Okay. Now, let me say this to you, Ms. Blevins, that you're absolutely right. In terms of intoxication now, we'll get to Special Issue No. 3 where as you see there it says: The law in Texas further provides that evidence of intoxication may-- I'm reading Page 6 of the questionnaire at the very top. It says: The law provides that intoxication may be considered. And because I know you're an intelligent person, understand the word "may" means it is suggested, but you don't have to.

Before we get to issue No. 3, let's go all of the way back to issue No. 1. Now, by the time you have now visited issue No. 1, here is what has happened:

You as a juror, along with the other eleven jurors, you have decided that the State of Texas has proven to you beyond a reasonable doubt that the defendant is guilty of capital murder and that he has intentionally killed another human being while in the course of committing another felony. That's what you have decided now.

Now, there's nothing automatic that then says, he automatically gets the death penalty, as you can imagine. Because if it were an automatic process, there would be no need for these special issues. You do understand that, correct?

A. Yes.

Q. Okay. Now, as the judge said, though, there is one automatic thing that will happen if he is found guilty of capital murder. Do you know what that is? It is a trick question. He automatically gets life in prison without parole.

A. Okay.

Q. That's the only thing that happens automatically out of this whole process. If you find him guilty because we've proven beyond a reasonable doubt, he automatically gets life without parole.

Now, before that sentence can then be elevated now to the death penalty, these three issues have to be answered by a jury. We, in the State of Texas have to prove 1 and 2 to you by the same burden as we did in the first part of the trial beyond a reasonable doubt.

Now, let's read the very first one. It says: Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Let me begin with the very last word in issue No. 1, "society." If the defendant is found guilty of capital murder, we've discussed he will automatically spend the rest of his life where?

A. In prison.

Q. In prison. Now, when you and I hear the word "society" -- when you hear the word "society" what comes to mind outside of this courtroom for you?

A. The general public.

Q. General public.

A. Is this saying that it is people in jail?

Q. Correct. Correct. Remember, the judge said to you life without parole means just that. He is going to die in prison. Even if he discovers a cure for cancer, wins a Nobel prize for literature, he is not getting out of prison. He will die in prison if found guilty of capital murder.

The legislature recognizes, though, that while capital murder is that serious and there's an automatic life without parole, there's some individuals that even in prison could still be a future danger that may can get the death penalty depending on these three special issues. So No. 1 asks you this: As a juror in the second stage of the trial with the evidence, has the State proven to you beyond a reasonable doubt that there is a -- what is that word right there? That there is a what?

A. Probability.

Q. Probability. What does that word mean to you, Ms. Blevins, "probability"?

A. Greater than 50 percent chance, I guess.

Q. Okay. A lot of jurors have told us that. But it is not defined, again. Again, we recognize you guys are smart to figure it out. It does not mean possibility because you heard me, anything is possible, right, correct? I mean, it is possible I can win the Cowtown Marathon. It is possible I can win it if I'm the only one that shows up and nobody else does. So it means more likely than not that he would commit criminal acts of violence, which is again, is not defined for you.

I can't tell you what that means, but what

I can tell you is that it does not mean another murder, another robbery or a rape or anything like that. So for example, my colleague is sitting right here taking notes and minding her business and I'm a bad guy. I decided I don't like her and I pop her in the face, good right hand and you witnessed that. Would you consider that act on my part towards my colleague to be a criminal act of violence?

A. Yes.

Q. What if now I'm in prison and she's in her cell writing letters to her mom, she's been sentenced for using crack and she got a two-year sentence and I'm there for whatever I'm there for. And I don't like her and I just sucker punch her in the face for no reason at all. Would that be in your mind an act of violence?

A. Yes.

Q. Okay. Now -- if you notice it says, acts of violence. What we're asking you to do as a juror is based upon the evidence -- it is sort of, like, tell us what is the probability that this defendant will be a future danger to those in society. When you hear the word society in the prison context, what comes to mind?

A. Other prisoners and guards, visitors.

Q. Right, visitors. Perhaps people who do jail ministry?

A. Yes.

Q. Medical personnel, nurses, teachers. And so you're asked this question now -- we don't have prisons in Texas that are just for capital murder suspects or just for child molesters or just for murderers. Now, when they're in prison they are (Inaudible) differently by how they interact with other prisoners. Would you agree with me, Ms. Blevins, that when someone is sentenced to prison for a crime, possession of drugs or something, he is sent there to do his time, but not to be assaulted by other prisoners while in prison? Would you agree with me on that?

A. Yes.

Q. Okay. The legislature said to you, Now, as a juror if you find someone guilty of capital murder as you look at the first special issue it is simply this, has the State of Texas presented to you enough evidence that convinces you beyond a reasonable doubt that this defendant, not necessarily this defendant, but a defendant in a capital murder case, will still be a future danger even to the people he or she encounters in prison in that society? The law says this: You may even use the facts of the crime alone. But here's the difference, though. In part one you're only asked to decide is he guilty or not. In the second part you're

asked a different question. The first part is looking backwards, did he do it? The second part is looking forward, is he a future danger?

So while you may use evidence from part one to answer the question, you can't say automatically that if I find him guilty of capital murder and that he intentionally killed somebody, I can tell you this right now, that question for me will always be "yes." Do you see, Ms. Blevins, why that would be unfair to the defendant if you say or believe that if you find him guilty, automatically he will be a future danger? Can you see why that's unfair?

A. Yes.

Q. Why would it be unfair? Because I have to prove to you by what burden?

A. The burden of proof.

Q. Which is what?

A. That there is reasonable doubt.

Q. Well, look at the second line, what is it that I have to prove -- by what standard of proof do I have to prove to you that this guy while in prison will commit other acts of violence? What is that second sentence there?

A. Beyond a reasonable doubt.

Q. Correct. If, Ms. Blevins, it were an automatic process that if you find him guilty of capital murder that he's an automatic danger, then the legislature wouldn't give you Special Issue No. 1, correct?

A. Um-hum.

Q. Do you agree with me?

A. Yes.

Q. So the law requires you to do this: Yes, I've heard the evidence, Mr. Prosecutor, Mr. State, but you have to come back to me in part two, called the punishment, and prove to me with evidence beyond a reasonable doubt that there is probability that he will commit criminal acts of violence that will constitute a continuing threat to society, that society being prison.

If you believe from the evidence that we present to you in part two of the trial that the answer is "yes" and you answer the question "yes," then and only then do we move on to question No. 2. Because if you answer that question "no" that he's not a future danger, then the trial stops and the defendant gets what sentence?

A. Life in prison without parole.

Q. Very good. I'm testing you to make sure you're listening to me.

Now, you mentioned, Ms. Blevins, in here about the circumstances of the crime -- you mentioned

that on Page 4. Understanding now that, as opposed to when you filled out the questionnaire, that murder in and of itself -- and I hate the use the word "murder in and of itself" but this is the distinction from capital murder, murder in and of itself is not a crime where you can get the death penalty.

You say there in the second question though: Do you agree with the law -- that long, long question. And you put "yes" and you said that if it is severe enough depending on the circumstances.

At this point, given what I've explained to you about what a capital murder is, what other circumstances do you have in mind, if any, different than what I have mentioned where you believe "yes" the death penalty is one that I can consider? What do you have in mind?

A. Can you repeat the question?

Q. Sure. You mentioned on the second question on Page 4 with that long, long question: Do you agree with the law in the State of Texas that says murder in the course of committing or attempting to commit robbery is a capital offense for which the death penalty may be imposed and you said "yes."

And in your explanation you said: Yes, I feel that murder is a severe enough offense depending on

the circumstances to award the death penalty.

What set of circumstances did you have in mind when you put that there?

A. I guess I was considering, maybe -- I guess the intent, like, if there was rage involved or premeditation, those kinds of things, alcohol.

Q. Okay. You said "alcohol"?

A. Yes.

Q. All right. So you want to see, in other words, was it done intentionally?

A. I guess you have to -- I guess if you found someone guilty, you are saying they intended to do it in the first part, but I guess in the punishing phase I would consider intent as far as motivation and those sorts of things.

Q. Let me say this, Ms. Blevins, that you're absolutely right. Before you begin to look at these special issues, before you see them in the second part of the trial, it would have to be only, and only if you conclude as a juror, you and the eleven other jurors, that the State has proven to you beyond a reasonable doubt that the defendant intentionally killed another human being in the course of committing a robbery or attempting to commit a robbery.

You are absolutely right. As I said in

Special Issue No. 1, the law allows you as a juror in answering or in attempting to answer that question with a "yes" or "no" part of the evidence what you are allowed to consider is the evidence pertaining to the facts of the crime, the one that you've already decided happened. But the law says that you cannot say automatically, If I find him guilty, he's automatically a future danger. We still have to prove it to you beyond a reasonable doubt and that answer ought to be "yes." Okay?

A. Okay.

Q. If you answer "yes" you move on to No. 2. No. 2, I'll just tell you what it means. Essentially, Ms. Blevins, it is called the law of the parties in Texas. What it means is this: My colleague and I are government employees, as you know. We don't make a lot of money. This is Dallas County and we decide tonight that we want to rob a 7-Eleven because we need some extra cash and I tell my colleague, Look, you're a better driver than me, you drive the car. I'm going to go into the store with a handgun that I have. I'm going to rob the clerk, okay?

A. Okay.

Q. I'm going to get all of the cash I can. And around midnight at the end of the day they have all of

the money piled up. I've seen them before. And she says, Sure, let's do it.

We go to the 7-Eleven and she waits for me outside and says, hey -- as I'm walking out of the car she says, Hey, do you have your gun? And I say, Yes, I have it right here. And I say, Darn it, I forgot my mask. My colleague says to me, Don't worry about it. They'll only be one witness in there. Take care of the witness. Don't leave any witnesses. I say, Gotcha. I walk in there and get the money and as I'm leaving I turn around and put the gun to the clerk's head and fire once or twice and I kill the clerk. What crime can I be charged with?

A. Capital murder.

Q. Because robbery and intentional killing, correct?

A. Yes.

Q. My colleague never went into the store. All she did was she encouraged me because we planned it the day before. She aided me, here is the gun, but never went into the store. What crime can she be charged with?

A. I don't know.

Q. Well, the law says this: If two or more people are acting in concert, commit a particular crime and if

157

she either encouraged, directed, solicited, aid or attempt to aid me in the commission of the crime, that is the murder in this case, and if you hear a set of facts that, for example, she said, We planned it together. She says, Here's the gun, don't leave any witnesses. And we walk into the store and I shoot and I kill the clerk. Do you believe she has aided me in the commission of a crime?

A. Yes.

Q. Has she encouraged me?

A. Yes.

Q. Has she directed me?

A. Yes.

Q. You will conclude from all of the facts that, yes, the only difference between me and her is that I pulled the trigger, but she did all of the other things. The law says that in part one of the trial in guilt or innocence, that she can be found guilty of the same crime as I am if you believe beyond a reasonable doubt.

Now, here is the difference now with Special Issue No. 2, if she is not the trigger person and in my hypothetical she isn't, I am, you will have to find that not only did she do all those things, but that she actually anticipated that someone would die. Because it asks you: Did the defendant actually cause

158

the death? Well, the answer is "no" because I did.

If she didn't cause the death, did she intend? Well, you will conclude from the evidence that she did because she said, take care of the witness or you can conclude that she anticipated because she said, you forgot your mask, don't worry about it. Take care of the witnesses. That's for you to decide. But if you decide the answer is "yes" because we have proven to you beyond a reasonable doubt that either yes, she was a trigger person or she actually intended someone to be killed or she actually anticipated someone be killed, and you answer that question "yes," then and only then do we move on to issue No. 3.

Now, Ms. Blevins, let me tell you what has happened now before we get to issue No. 3 is this: You have as a jury concluded several things. No. 1 is you've concluded that that defendant is guilty of capital murder and intentionally killed somebody to rob them, okay? You've concluded that he is a future danger and that you've answered "yes" to issue No. 1. You've concluded as to issue No. 2 that he was either the trigger person or he intended that that person be killed or he anticipated someone be killed.

That means, Ms. Blevins, before we get to issue No. 3 now, the defendant is now sitting squarely

159

on the death penalty. But the law says this, though, you would not leave the courthouse as a juror, Ms. Blevins, and saying to yourself, wondering, You know what, I really wish there was something I could have done to reverse that verdict and given him life without parole, because there was something I found about his background or the circumstances of this crime that says to me, as a juror, even though he's a future danger, even though he is a party, he should have gotten life, rather than the death penalty. The law says this as you pointed out at the top of Page 6 of the questionnaire that says "intoxication." The law says that you may consider intoxication, whether alcohol or drugs, as a mitigating factor. You don't have to, but you may. Some jurors have told us that even if you're drunk or high, that's your decision to get drunk and high. You're still responsible. But the law says you can't close off your mind to hearing possible evidence that may or may not be mitigating.

You may hear, for example, as you said, I believe, on Page 8, you said that you believe from birth -- it's the second to the last question on the bottom of Page 8 -- you believe that people have a sense of right or wrong from birth. So even those circumstances can mold us and affect us, you said that

160

we still have the choice to do right from wrong. Nothing is wrong with that answer at all, but you, to be a qualified juror, must be open to the possibility of hearing evidence such as, well, he was very, very young when committed the crime.

The law says this in America: You cannot execute someone for a crime he or she committed younger than the age of 18. You may hear that the person was young enough and didn't know better, you may find it to be mitigating. You may hear evidence that he grew up in a single home, a broken family, bounced around with 30 different family members before he was 18 or 19 or 20, whatever the case may be. You may hear evidence that at the time of the crime he may have been high. You may hear evidence that he was fed dog food all of his life.

In the hypothetical that I gave you with me and my colleague with the robbery where I pulled the trigger, she's sitting in the car and she's on trial, you may consider the fact that even though I found her guilty of capital murder, the non-shooter, I found she's a future danger, "yes" to No. 1. I found that she was a party, "yes" to No.2, you may then decide, well, I don't know. I don't think I want to give her the death penalty because she didn't pull the trigger.

Now, here's the thing, though, when you

161

hear all of this evidence about not pulling the trigger, age, alcohol, single family that you find mitigating, look closer with me at Special Issue No. 3, right before the word "mitigating," what is the word that comes before mitigating?

A. "Sufficient."

Q. Why do you think that word is there? What does that mean to you?

A. That there is enough evidence.

Q. Exactly. In other words, you may hear something that you may consider to be mitigating. The question, Ms. Blevins -- and the reason -- we didn't write this, by the way. The legislature in Austin did. They're the ones that said, not only must it be mitigating, but it has to be sufficient mitigating. A sufficient mitigating circumstance or circumstances. Here's what it means: You as a juror may conclude that, yeah, I find that whatever I hear may be sufficient mitigating and that's your right and your prerogative to do that, but here's what I want you to look at, though. Issue No. 1 there is a burden of proof for the State beyond a reasonable doubt.

Issue No.2 is that the burden of proof on the State's part is beyond a reasonable doubt. Whenever you see those words "beyond a reasonable doubt," always

162

think this, the State of Texas has to prove that to me by that standard of proof.

In No. 3, though, you don't find those words at all. And that's because neither side has a burden to prove it to you. You just have to have an open mind that when you hear it, you can consider it to determine whatever I hear about his background and the circumstances of the crime, does it lessen his moral culpability sufficiently that mitigates the death penalty and getting life without parole? Do you see that there?

A. Yes.

Q. Okay. Now, you said earlier about the possibility of rehabilitation is something that's important to you in a case like this. Understanding that rehabilitation is forward looking, it is something that you would know if someone is sentenced today whether or not he will be rehabilitated 5, 10 or 20 years from now, how do you as a juror go about assessing in this all so quantum of evidence whether or not here is a guy, a person, you know, issue No. 3, I don't want to give him the death penalty. I want to give him life because maybe he will rehab. How do you make that determination?

A. By looking at his background and circumstances

163

and any kind of past potential.

Q. Past potential --

A. Past potential maybe in school or just other --

Q. In other words, there are certain things that you want to hear about the defendant's background to help you answer that question?

A. Yes.

Q. That's perfectly permissible because it says, the defendant's character and background and the circumstances of the offense, which again, Ms. Blevins, you, again, as a juror the same set of facts that you used to answer the first question, is he guilty, you can use it again to answer issue No. 1. Because it is still part of the evidence.

In question 2, it is still part of the evidence. In question 3, it is still part of the evidence. The only thing I want to stress to you is that there is nothing in this process that's automatic, except what?

A. Life in prison without parole.

Q. If what?

A. If he's found guilty.

Q. Okay. Now, here's my question to you: In light of your belief about a deterrent for capital murder, the punishment, do you believe that everyone can

164

be rehabilitated?

A. No.

Q. How do you as a juror then go about sifting through those whom you believe are and are not rehabilitated?

A. I don't have a set rule of thumb for anything like that, but I would think age would play into it.

Q. Tell me how. How would that affect you?

A. Well, a younger person wouldn't necessarily be a hardened criminal that would just -- it wouldn't be just cemented into their being to be -- to continue to do acts of violence, whereas, if someone has been doing acts of violence their whole life.

Q. So past crimes and those kinds of things?

A. Yes.

Q. Okay. Ms. Blevins, I'm out of time and it has been good talking to you, ma'am. I thank you so much for your time.

THE COURT: Do you need to take a short break?

VENIREPERSON BLEVINS: I think so.

THE COURT: Okay. Five minutes.

(Recess from 2:16 p.m. to 2:26 p.m.)

THE COURT: Thank you, again, Ms. Blevins. Please be seated, Counsel. Again, Keri

Mallon is going to talk to you on behalf of Mr. Broadnax.

MS. MALLON: Thank you, Your Honor.

VOIR DIRE EXAMINATION FROM THE DEFENSE

QUESTIONS BY MS. KERI MALLON:

Q. How are you doing, Ms. Blevins?

A. I'm well, thank you.

Q. Okay. Good. How do you feel about being here today?

A. Not particularly excited.

Q. No?

A. No.

Q. Okay. What did you think when you were called to come down? What were your first thoughts?

A. Called for today or before?

Q. Today.

A. I was a little surprised because it had been a little while and I didn't think I was going to get called.

Q. How do you feel about -- I know you just spent 48 minutes with the prosecutor talking to you about -- well, telling you what the law is and asking you yes-or-no questions. And I would actually like to dig a little deeper. I think they spend a lot of time telling you what it takes to be qualified and all of that is true, everything he said is true. And I think, honestly, all of the jurors that we've had who have come in most of them sat in your spot have given the same answers. And I think that it would be hard to answer any other way, but I'm going to ask you to dig a little deeper for me, okay? I really want to know how you feel, because I'm not sure I do at this point, okay?

A. Okay.

Q. I mean, their goal is to get a guilty verdict on capital murder and have this young man executed. So his life is literally in our hands. And I'm just asking you, keeping that in mind, if you will really, truly talk to me from your heart, okay?

A. Okay.

Q. First of all, I want to ask you a few questions about your questionnaire, okay?

A. Okay.

Q. I see that you are a nurse at Baylor?

A. Yes.

Q. What shift do you work?

A. I work the day shift, 7:00 a.m. to 7:00 p.m.

Q. Okay. So if you were chosen as a juror in this case, it wouldn't be a problem?

A. No.

Q. Okay. Good I wanted to make sure. And you work in ICU?

A. Yes.

Q. Tell me about that. What kind of patients do you take care of? What kind of people do you see?

A. I take care of two patients every day and sometimes I'm a charge nurse so I don't take patients then, but our patients are medical patients. We get a lot of ventilated patients and just a variety of problems.

Q. Okay. Are they, like, people that are already sick?

A. We do get a lot of chronic illnesses.

Q. Okay. My dad is in the medical field and sometimes he calls certain hospitals the "gun and knife club." Is that what Baylor is or is that Parkland?

A. Well, I work in a medical ICU and so those sort of cases go to the trauma ICU, but we do get an occasional trauma case.

Q. Okay. I didn't know that. Thank you. On Page 4 the prosecutor already talked to you about a couple of your responses, but I want to talk to you some more. The second question at the top of the page: Do you agree with the law in the State of Texas that says murder in the course of committing or attempting to commit robbery is a capital offense for which the death penalty may be imposed? You said: Yes. I feel that murder is a severe enough offense depending on the circumstances to warrant the death penalty.

So I guess my question is: Do you feel like in that situation that the death penalty should be an option or do you think it should always be the death penalty in that situation?

A. An option.

Q. Okay. I thought that's what you meant. I just wanted to make sure. And then in the middle of the page is says: If you believe in using the death penalty, how strongly, on a scale of 1 to 10? And you said 5. We see 1 and we see 10s. Rarely do we see anything in the middle. I was just curious how you got to that 5.

A. I guess I haven't really ever thought about it that much before. I guess my feelings are that it should exist, but based on some things that I've read it is used fairly often in the State of Texas.

Q. Okay. What kinds of things have you read?

A. Dallas Morning News. I don't have any specific things to point out.

Q. Okay. And is the reason you think it should be available is because you think it is a deterrent?

A. Yes.

Q. Okay. Why do you think it is a deterrent?

A. Well, it is the ultimate punishment, I guess.

Q. Okay. Does that mean you think it is a deterrent for that individual?

A. No.

Q. For everybody else?

A. Yes.

Q. Okay. Well, let me give you a little bit of history, and you won't know this because I was little or not around when this happened, so you definitely weren't even born. There was a time in Texas when we had the death penalty and then the Supreme Court came along and said it is unconstitutional, we're not going to have the death penalty. And then later on they changed their mind and we have the death penalty again.

Between those two times in the State of Texas, though, crime didn't change at all. The level of crimes. And as a matter of fact, there are other states where the death penalty is not an option and their crime rate is not higher than the crime rate in Texas. So if you thought the death penalty was not a deterrent, would that change your feelings on the death penalty?

A. I answered "yes" before.

Q. Why?

A. Because, I mean, I'm open to changing my opinions based on evidence. Although, what you just said may not be enough evidence. I mean, you just mentioned a few studies, but that may not be sufficient to change my opinion.

Q. Okay. I understand that. I understand that completely. On that same page on Page 4, the third question from the bottom: Do you think the death penalty is ever misused? And you said: Yes, I don't have any experience with this, but I'm sure that human emotions at times influence a juror's opinion about the death penalty. Tell me what you meant about that -- what you meant by that.

A. Well, it is obviously a very emotional thing whenever you're discussing when someone's life has been taken and viewing the families around those situations. I can understand where someone might make an emotional decision. I don't think that's right.

Q. Okay. Are you saying maybe make an emotional decision to impose the death penalty for the sake of the family when that's not necessarily the right thing to do?

A. Yes.

Q. Okay. Is that something you think you could not do, I mean, not make your decision based on what you think the family wants? Do you think you would be influenced by what you think the victim's family would want?

A. No.

Q. Okay. I thought that's what you were saying. I just wanted to make sure. On Page 5 in the middle of the page where it says: Which of the following accurately states your general belief regarding a sentence of life without the possibility of parole? And it looks like originally you circled "strongly in favor" and then you changed your mind to "moderately in favor." Was that a mistake or did you change your mind?

A. I don't remember. I think I may have changed my mind.

Q. Okay. Do you remember what your thoughts were?

A. Since I work in an ICU I see a lot of futility of life and I feel like one way to look at life if prison without parole is that it is a futile thing.

Q. Because --

A. Because they're not doing any good for anybody and the tax dollars are going there instead of possibly to foster care or where it can be better used.

Q. Okay. Those feelings that you have, do you think it would influence your decision if you were sitting on a capital case?

A. I don't know. Probably not.

Q. Okay. Probably not?

A. I mean, I don't really think those two things are equal, but that's what I was thinking when I circled that.

Q. Okay. Okay. I guess what I'm saying is I just want to make sure that if you were a juror in a capital case that you wouldn't think, well, I don't want my tax dollars going to support someone in prison, so I'm going to answer these questions --

A. Oh, no. Because I'm not even making the call of where our tax dollars go.

Q. Okay. And at the top of the page: Do you believe in an eye for an eye? And you said "yes." What do you mean by that?

We've hear some jurors say, well, I just mean that metaphorically because some jurors say, I believe a life for a life. What do you believe that to mean?

A. I think that whenever someone commits murder that they have given up their right to choose what their life is.

Q. Okay. So do you believe that if someone commits murder then their life should be forfeited as well?

A. Not necessarily, but they have forfeited their right to decide where their life is going.

Q. Okay. So --

A. So maybe I'm not necessarily -- maybe not necessarily believe an eye for an eye.

Q. Okay. Okay. Your belief, an eye for an eye, do you think that would influence the way you answered these issues if you were picked to sit on a capital murder jury?

A. If you're saying it means to take a life for --

Q. A life for a life.

A. Then, no.

Q. Okay. I want to talk to you about this and if this is difficult for you, I apologize. I don't know anything about -- on Page 6. And I think you mentioned it at another point when we asked you if you know anybody who has been a victim of a crime. You said you have a friend who was raped on multiple occasions.

A. Yes.

Q. Can you tell me a little bit about that? Was it a close friend?

A. Yes. Not now. We were good friends in college.

Q. Okay. Was this a child molestation thing?

A. Yes.

Q. Okay. Okay. So it wasn't a stranger?

A. It was a relative.

Q. It was a relative. Anything about -- was she involved in the criminal justice system?

A. No.

Q. Okay. Anything about that that may affect you in being a juror in this case?

A. No.

Q. Okay. I just had to ask. On Page 9, and I'm just curious, you say you have two family friends that are practicing lawyers at Mt. Vernon. Any of them criminal defense attorneys or prosecutors?

A. I don't really know what they do. They are just family friends.

Q. Okay.

A. They just have a practice there.

Q. Okay. I think that's all of the questions I have about your questionnaire and I appreciate that.

I want to focus mainly on these special issues. Let me tell you this, too, just because we're talking about the penalty phase, doesn't mean we think we're ever going to get there, okay? This is our only opportunity to talk to you, so we have to talk about these issues. I don't want you to think we think he's guilty because we're talking about the penalty phase. We don't, okay?

A. Okay.

Q. Now, I want to give you a little bit of context, too. If you get to these special issues, you have determined that somebody is guilty of capital murder, okay? What that means is that you and eleven other people have found beyond any reasonable doubt that the individual murdered someone because they wanted to, okay? It wasn't an accident or a mistake or self-defense or defense of another person, they weren't forced to do it. They did it because they wanted to and they did it in the course of a robbery, okay? You're in that situation before you get to Special Issue No. 1, okay?

How do you feel about the death penalty in that situation, an intentional murder and you've determined it's an intentional murder during the course of a robbery, what's your first thought?

A. I can't form any kind of opinion, because I don't know anything.

Q. Okay. Good. Well, when you get to Special Issue No. 1, and I don't think the prosecutor told you this, the presumption is that the answer to that question is "no." Does that make sense to you?

A. No.

Q. Okay. Well, if you read Special Issue No. 1: Do you find from the evidence beyond a reasonable doubt -- now, in the first part of the trial we have the guilt or innocence phase and then we have the penalty phase. The judge told you about that and the prosecutor told you about that.

A. Yes. I understand.

Q. Okay. Because in the first part in the guilt or innocence trial, Mr. Broadnax has a presumption of innocence and you cannot find him guilty only until and if they prove beyond a reasonable doubt that he committed the offense. Well, it is the same burden in Special Issue No. 1. They have to prove to you beyond a reasonable doubt that the defendant in a capital murder case would be a future danger. Since they have to prove that to you, that means that you presume that the answer to that is "no" unless they prove otherwise. Does that make sense?

A. Yes.

Q. Okay. And can you do that?

A. Yes.

Q. You can presume the answer is "no"?

A. Yes.

Q. Okay. So that means that the presumption is that life without parole is the appropriate sentence, does that make sense?

A. Yes.

Q. Okay. Now, I want to talk a little bit more about this Special Issue No. 1 and I'm going to read it because it helps me: Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

There are a couple of things that I want you to look at with me. You see it says "would," not "could." So they have to prove beyond a reasonable doubt that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

That's more than just one prisoner popping another prisoner in the face. Can you see that?

A. Yes.

Q. They have to prove beyond a reasonable doubt that there is going to be criminal acts of violence continuing throughout the person's history in the penitentiary, okay? Do you think that is a difficult thing for them to do?

A. To prove that?

Q. Um-hum.

A. I guess it would just depend on what kinds of -- if there has been things in the past. I don't think that would be too difficult to prove.

Q. Okay. So if they could bring to you evidence that this person has a history of violence or a history of crimes, then it may not be very difficult for them to prove; is that what you're saying?

A. Right.

Q. Okay. Okay. Well, we have had some jurors tell us that it would be nearly impossible for the prosecutor to ever prove that, because they're asking you to make a prediction, do you see that?

A. Yes.

Q. Okay. Because in Special Issue No. 1 -- actually the special issues -- all three of them, can you see they're really meant to be a barrier to the death penalty? Does that make sense to you?

A. Okay.

Q. Special Issue No. 1, a person cannot receive the death penalty for what they have done in the past, for the crime that you have convicted him of. They cannot receive the death penalty for that crime no matter how horrible it is, no matter how heinous it is. They can't. The only way they receive a sentence of death is by these special issues. So you're having to make a prediction -- and you're not having to make a prediction, they're having to prove to you beyond a

reasonable doubt what will happen in the future, okay? The legislature intended for that to be difficult, because that's a barrier to the death penalty; does that make sense to you?

A. Yes.

Q. Okay. How do you feel about that?

A. I mean, I think that's a good thing, probably.

Q. Okay. Would you change it if you could?

A. No.

Q. Okay. And you said that criminal history or history of violence would matter to you in Special Issue No. 1. Can you think of anything else that might matter to you in Special Issue No. 1?

A. No.

Q. Okay. And that's fine. That's fine. A lot of jurors say that. Do you see that nowhere in Special Issue No. 1 are you called upon to decide whether or not you think a defendant deserves the death penalty?

A. Yes.

Q. Okay. So if you are a juror on a capital murder case you don't go back to the jury room and say, how many do you think deserves life and how many think he deserves death, okay? Does that make sense?

A. Yes.

Q. And if you were chosen as a juror on a capital murder case and back in the jury room and someone started to do that, would you be able to say, you know what, that's not what we're supposed to do. We're not supposed to make that decision. We're supposed to answer these questions. Could you do that?

A. Yes.

Q. Okay. Okay. Let me just recap this: If you see from Special Issue No. 1 the burden of proof is on the State so the presumption is "no" and you agree with that, am I right?

A. Yes.

Q. Okay. And you're going to hold them to that burden of proof no matter how difficult it may be for them to prove?

A. Yes.

Q. Let me just tell you this, too, Ms. Blevins, the court of criminal appeals, which is our criminal court -- appellate court in the State of Texas has said that the death penalty is reserved for those incorrigible people who cannot even be in the penitentiary without committing criminal acts of violence and continuing to commit criminal acts of violence, okay?

A. Um-hum.

Q. So that, again, is just another inference of

181

how these are meant to be barriers to the death penalty not speed bumps, as my cocounsel likes to say. Does that make sense to you?

A. Yes.

Q. Okay. Okay. Good. I'm not really going to talk about Special Issue No. 2 because we may not have that in this case. We don't know. The judge makes that determination based on the evidence. And I think the prosecutor covered that pretty well, but I do want to talk to you about Special Issue No. 3.

It has already been stated there is no burden in Special Issue No. 3, okay? Special Issue No. 3 is a completely different animal. Now, if you have answered "yes," "yes" to Special Issue No. 1 and to Special Issue No. 2 if it is given, then you are at Special Issue No. 3 and a defendant accused of capital murder is very close to a death sentence at that point, okay? But Special Issue No. 3 is completely different.

What the law says is that in considering all of the evidence and in the penalty phase, I think you can see that there is going to be all kinds of information coming to you, much more than you have in the guilt or innocence phase. In the guilt or innocence phase it is just whether or not -- it is a very objective decision, did they prove beyond a reasonable

182

doubt that the defendant committed the offense, right?

A. Yes.

Q. And in Special Issue No. 1 and Special Issue No. 2 those are both objective questions as well because they have the burden of proof. Either they proved it or they didn't, okay? Let me back up just a minute: Do you think you understand what beyond a reasonable doubt -- do you think you understand what that means? I mean, the law says you decide what beyond a reasonable doubt is, but do you feel like you have a good grasp of that?

A. It seems kind of vague to me.

Q. Okay. Okay. And unfortunately none of us can tell you what it means. That's up to you. We can tell you what it doesn't mean. Like the prosecutor already said, it doesn't mean proof beyond all doubt because if it was beyond all doubt, I guess the only way to prove that is if you witnessed it and saw it for yourself, right?

A. Um-hum.

Q. I can tell you that we have other burdens of proof in our systems -- in a civil case when people sue each other the burden of proof in that case is by a preponderance of the evidence, which a lot of people say just 51 percent, so it is pretty low. And then we have

183

another burden of proof, which is what we call clear and convincing. And that would be in a situation where the State was trying to remove a child from a home because of abuse or neglect. The State has to prove that by clear and convincing evidence. So that's a pretty high burden. And then beyond a reasonable doubt is even higher than that. Does that help a little bit?

A. Yes.

Q. So it is higher than that, but less than beyond all doubt, okay?

A. Okay.

Q. So to go back to what I was saying, it is an objective decision in the guilt or innocence phase and in 1 and 2. Either they proved it to you or they didn't, okay? Once you get to Special Issue No. 3, it is really a more subjective decision that you have to make as an individual juror, okay? It's on guilt or innocence and Special Issue No. 1 and Special Issue No. 2. It takes all twelve of you to decide. It has to be unanimous whether or not they have proven what they're supposed to prove either in guilt or innocence or in the special issues. In Special Issue No. 3 it takes all twelve of you to say, No, there's no sufficient mitigation in order for a death sentence to be imposed, okay? It takes all twelve of you in order for that to

184

happen.

A. Okay.

Q. Okay. But, you don't all twelve have to decide the same things. For instance, we've talked about background, criminal history, intoxication, age. What you may find to be mitigating or sufficient mitigating, the juror next to you may not and perfectly that's okay. You can have twelve different ideas in there of what is mitigating and what is sufficient mitigating, sufficient mitigation. Does that make sense to you?

A. Okay.

Q. Because it is an individual decision. The law says that each individual juror must make their own personal moral judgement on what sentence is appropriate. Does that make sense?

A. Yes.

Q. Because this is the ultimate price, right?

A. Yes.

Q. This is the ultimate penalty. So it is important that each individual juror makes the decision that's right for them. It is not a democracy. It is not a majority rules. Each individual juror has a responsibility to make their own decision, okay? It is like -- it is a very personal decision. You wouldn't expect someone to tell you that you go to the wrong

church, right, or that you're the wrong religion. I wouldn't try to talk you into coming to my church or becoming my religion, just like I wouldn't expect that you would either. It is a very personal decision. Does that make sense?

A. Yes.

Q. Okay. And we've already talked about some of the things that could be mitigation and I think you've mentioned this and you even put that on your questionnaire: intoxication. That is something you could consider in mitigation of an offense in order to decide whether or not life without parole is the appropriate penalty.

Let me tell you this, too, Ms. Blevins, the law says you do not have to defend your position. If you believe life without parole is the appropriate sentence and you believe there is sufficient mitigating circumstances to warrant a life without parole penalty, that is your right. You do not have to defend it. You don't even have to be able to articulate it, okay? You may just say, Today I feel like exercising mercy and I'm going to and life without parole is my verdict. And that's perfectly acceptable, okay?

So I want to ask you if you were a juror on a capital murder case and you had decided life without parole is the appropriate sentence, but you had eleven others screaming at you telling you, no you're wrong and this is why you're wrong, could you hold up to that kind of treatment?

A. Yes.

Q. Okay. And if another juror was receiving that kind of treatment from the other jurors, would you be able to stand up and say, Hey, that's not right, they're entitled to their own personal moral judgment?

A. Yes.

Q. Okay. Okay.

A. Are you saying that if one juror chooses something different from all of the other jurors that you go with -- I mean, you have to have twelve people say death penalty?

Q. You have to have all twelve.

A. So if one person says life without parole, then it is life without parole?

Q. Yes.

A. Okay.

Q. Okay. And each juror is entitled to respect. Each juror is entitled to have their decision respected without any badgering; does that make sense to you?

A. Yes.

Q. Okay. And there is no right or wrong answer,

okay? It is completely up to you. Whatever you believe is right, you are entitled to do, okay?

Let me just ask you some things that -- I think we've already mentioned most of them, but there's just a couple of other things that jurors have told us about in considering mitigation. We talked about age and you said that is something you would consider, right?

A. Yes.

Q. And intoxication?

A. Yes.

Q. Okay. How a person was raised, would that matter to you, like, if they came from poverty?

A. Yes.

Q. Okay. That would matter to you. Abuse?

A. Yes.

Q. Okay. We have had some jurors tell us that if there was a party situation, if there were two people involved, if the person on trial that you had convicted of capital murder was more of a follower instead of a leader -- an instigator that that would matter to them. How do you feel about that?

A. I agree with that.

Q. Okay. You would consider that?

A. Consider it, yes.

Q. Okay. And all the law asks you to do -- requires you to do, actually, is give careful consideration. That's what "deliberate" means. To give careful consideration. We've had jurors tell us family or friends come in and testify that this incident was completely out of character for this person, they've never behaved like that before, that they would take that into consideration in Special Issue No. 3. How do you feel about that?

A. Yes. I would consider it.

Q. Okay. That's all I can ask. I don't think I have any more questions, Ms. Blevins. Let me just recap, okay? You're going to hold the State to their burden, right?

A. Yes.

Q. Okay. In the guilt or innocence phase and in Special Issues Nos. 1 and 2?

A. Yes.

Q. You don't ever expect us to prove anything to you, do you?

A. No.

Q. Okay. And you're going to give careful consideration to any mitigation that may be presented?

A. Yes.

Q. Okay. And you can take everything into

consideration in making your decision with regard to Special Issue No. 3?

A. Yes.

MS. MALLON: I think that is all I have.

THE COURT: Thank you very much. All rise, please, for Ms. Blevins.

If you'll step outside for a minute. Watch that first step and you'll be coming right back in.

(Venireperson Blevins exits courtroom.)

THE COURT: In the presence of Mr. Broadnax, what says the State of Texas?

MR. HIKEL: The State believes that she's a qualified juror.

THE COURT: What says Mr. Broadnax?

MS. MALLON: We believe she's qualified, Judge.

THE COURT: Ask her to return, please.

(Venireperson Blevins enters courtroom.)

THE COURT: Please be seated again, Ms. Blevins. Be seated, Counsel. Ms. Blevins, of course you've been accepted as a qualified juror by the attorneys and I couldn't agree more. A couple of things before you leave, the telephone numbers on your questionnaire, are they still correct and current?

VENIREPERSON BLEVINS: Yes, they should be.

THE COURT: Because the coordinator for Judge Snipes will be calling you here in all likelihood next week and telling you if you're on the jury or not on the jury.

VENIREPERSON BLEVINS: Okay.

THE COURT: We need to make sure -- we're not going to leave you dangling either way. We will let you know. She is going to want to get in touch with you. Now, the sheriff is going to give you all you need, a card. If anything occurs in your personal life between now and then that you think might affect your jury service, give her a call and then we'll come back up and deal with it.

VENIREPERSON BLEVINS: Okay.

THE COURT: I want you to do this for me, I want you to, for me, assume you're going to be on this jury, as far as any outside information, news, friends, Internet, TV, radio. I think it would be a shame if someone like you were inadvertently disqualified because of some outside influence. I just don't want that to happen. And the easiest way to do it is, if your friends at work or wherever say, what was it like -- the judge told me I can't talk about it --

VENIREPERSON BLEVINS: Okay.

THE COURT: -- until it is over. It has

been a real pleasure, ma'am.

VENIREPERSON BLEVINS: Thank you.

(Venireperson Blevins exits courtroom.)

(Recess from 2:54 p.m. to 3:04 p.m.)

(Venireperson Sanchez enters courtroom.)

THE COURT: I want to say good morning to you again. I mean, good afternoon to you again. You told me -- I asked you if you were ready and you said, I've been ready since about 1 o'clock. We understand that. We never know exactly how long it is going to take and I appreciate your good humor.

My name is Webb Biard and I'm going to be with you this afternoon during this part of the jury selection process. The presiding judge of this court is Michael Snipes and that's who you met. Should you be selected as a juror, Judge Snipes will actually preside over the presentation of evidence. And what we're doing now is we're in the process of qualifying some 50-odd, give or take, prospective jurors and then when that's done the actual trial jury will be selected from that pool of qualified jurors.

Now, we're coming right down to it and we expect that that decision will be made next week. And I will tell you this afternoon in open court in your presence whether or not you are a qualified juror. The judge's court coordinator, then, next week will call and tell you if you are or if you are not going to be on the jury. So that will give you a little bit better idea of how this is going to proceed.

Now, I'll ask that you do this for me before we go any further.

(Venireperson Sanchez sworn.)

THE COURT: All right. At this time I want to introduce to you Elaine Evans.

MS. EVANS: Good afternoon.

THE COURT: Andrea Handley.

MS. HANDLEY: Good afternoon.

THE COURT: They represent Dallas County and the State of Texas. As we go further to my right we have Brad Lollar and Doug Parks and Keri Mallon.

MS. MALLON: Hi.

THE COURT: And they represent Mr. Broadnax. Mr. Broadnax.

All right. I'm going to talk to you for a minute and then one of the attorneys for the State of Texas and then for Mr. Broadnax will talk to you for up to 45 minutes each. So that's about another hour and a half you're going to have to be here with us, but at that time -- and we will definitely conclude this afternoon your duties here today. So no later than 4:35

193

or 4:40 you will know whether or not you're a qualified juror or not.

A few things from me: You had an opportunity to read that pamphlet. I have your questionnaire here and I'm going to hand it to you in just a minute. You'll have it to refer to in your conversations with the attorneys. On behalf of the lawyers, I know it took you a long time to fill it out, but trust me on this, it will save you more time than that today, because the attorneys have read it and they're not going to go back over all of your answers. But I'm sure there will be one or two or more and I don't know what they are that they'll want you to expand on further.

I'm going to have the sheriff hand it to you in a minute and you'll have it to refer to. It was April when you filled it out.

From filling out the questionnaire and reading the pamphlet and hearing Judge Snipes' remarks and thinking about this, if you have, and being here today sitting there in the witness chair -- juror chair and -- do you understand this is a capital murder case?

VENIREPERSON SANCHEZ: Yes.

THE COURT: Do you understand the State of Texas through their attorneys are seeking the death

194

penalty?

VENIREPERSON SANCHEZ: I didn't, but now I do.

THE COURT: When did you learn that?

VENIREPERSON SANCHEZ: Well, just right now. They said -- the questionnaires are certain things that have to be yes or no before --

THE COURT: Yes. Well, I'm telling you this is a capital murder case and they're going to tell you the State of Texas is seeking the death penalty. Have you ever served on a criminal jury before?

VENIREPERSON SANCHEZ: No.

THE COURT: That's no problem. All criminal jury trials in Texas are tried in two parts. There is the guilt or innocence phase and the punishment phase. And that's true for the theft of a bicycle or a capital murder case.

VENIREPERSON SANCHEZ: Okay.

THE COURT: In the first part of the trial it is your job as a juror to decide whether or not the State has proven the person on trial is guilty beyond a reasonable doubt. If you find they have failed to do so, you will find the person not guilty and the trial is over. In any case you find they are guilty beyond a reasonable doubt, then you go into what's called the

195

punishment phase and you can hear more evidence about the person on trial, all right?

VENIREPERSON SANCHEZ: Okay.

THE COURT: Now, again, that's the way a capital murder case is tried and that's the way this case is going to be tried. If someone is found guilty of capital murder there are only two possible punishments if one is guilty of capital murder. Do you know what they are?

VENIREPERSON SANCHEZ: Yes. Life in prison or the death penalty.

THE COURT: That's right. Life in prison without parole and I mean -- when I say that, I mean life in prison without parole. It is not a wink and a nod. It's not well, in so many years they'll become eligible for parole. That's not the law. Trust me on this. It is life in prison without parole or the death penalty. Now, did you have an opportunity to read that pamphlet?

VENIREPERSON SANCHEZ: Yes.

THE COURT: Do you think that helped you a little bit to understand this process?

VENIREPERSON SANCHEZ: Yes.

THE COURT: Good. I hoped it would. So that will give you an idea of the way we're going to

196

proceed. And just briefly, there is a difference between murder and capital murder. And I don't expect you to know that, but there is. Murder is intentionally causing the death of an individual, knowing they're intentionally causing the death of an individual. Capital murder is intentionally causing the death of an individual, in other words, murder asserts specific fact situations, scenarios: Murder of a policeman, murder of a fireman, murder of a child under the age of six, murder someone while robbing them, kidnapping them, sexual assaulting them, burglarizing their home, murder for hire. And there are other examples.

Let me give you this one quick example -- and by the way, we use hypotheticals because we can't talk about any of the facts in this case, so we use examples. This one is not too farfetched, but it is used to show you the difference between murder and capital murder. Two men coming down Central Expressway, road rage, they pull over and they get out and one has a gun and shoots and kills the other one and means to kill him. That is murder. He intentionally caused the death. But it is not capital murder because why? Because it wasn't in one of those situations. He didn't rob him or sexually assault him. He wasn't a policeman or a fireman in the line of duty or a child under the

age of six. Do you see that difference?

VENIREPERSON SANCHEZ: Yes.

THE COURT: You cannot get the death penalty for murder. The range of punishment for murder in Texas is not less than 5 years to 99 years or life. Capital murder is the only crime in Texas for which you can receive the death penalty.

Another thing that makes capital murder unique in our system is the jury always has to be the body of a set punishment if the person is found guilty. The judge cannot set punishment. If everybody in the courtroom wants the judge to set punishment, he cannot do it. It must be by the jury. But in setting punishment or in letting the judge and the parties and the defendant know what the line of punishment is -- they don't write down on a blank line of a verdict form, life in prison or death. They answer three special issues and they were in that pamphlet. And I bet you a Coke you had never seen them before; is that right?

VENIREPERSON SANCHEZ: Correct.

THE COURT: No one -- I think there had been two people since we started that actually were aware of those special issues. Frankly, a vast, vast majority of the lawyers in this courthouse aren't aware of those special issues. You'll know more about them when you leave here, and I guarantee you, than half of the lawyers in this courthouse. And I mean that. Because these lawyers have the ability to explain them to you.

But anyway, if you find somebody guilty of capital murder, you go into the punishment phase, that second part that I told you about. And you'll hear evidence and then you will apply that evidence that you've heard plus the evidence you heard in the first part of the trial to answer these three special issues.

To be a qualified juror -- and I told you that's what we're trying to do. To be a qualified juror, you have to tell me in meaning that even though you found someone guilty of capital murder you can wait and go in that punishment phase and then answer those special issues based on the evidence. And if they result in death, so be it. Or if the result is this life in prison without parole, so be it. And you have a perfect right as you sit here now to feel any way you want to about whether you can do that or not.

The only right I have and the only right the attorneys have and the parties have is if you just tell us. That is what this is all about. Does that make sense to you?

VENIREPERSON SANCHEZ: Yes.

THE COURT: In other words, if you've already decided -- if I find somebody guilty of capital murder knowing now what capital murder is, well, then, I'm always going to answer these special issues in a way that either, one, they receive death; or, two, they receive life in prison. And there's nothing wrong if that's the way you feel as long as you tell us. Is that a fair deal?

VENIREPERSON SANCHEZ: Fair deal.

THE COURT: Now, from reading that pamphlet can you see where Judge Snipes tells us -- he tells the attorneys and he tells the jury that he is going to start this trial August 10th and we think it will last up to two weeks. That's Monday through Friday, 9:00 to 5:00, a break in the morning, break in the afternoon and a lunch break. The jury will not have to stay together overnight unless and until you are deliberating your verdict.

If you are deliberating your verdict late into the night and haven't reached a verdict and became mentally fatigued, there's a possibility that you'd all be taken to a fine hotel, county expense, individual private rooms, fed. You'd be taken as a group. You'd come back the next morning in a group to avoid any outside influence on your decision-making process. That could happen, might not happen, but could happen.

If it did happen, the judge will give you plenty of advanced notice, like, Tomorrow night or the night after tomorrow bring an overnight bag and tell the people that are close to you there's a chance that you're going to be sequestered. You've probably heard that word before, right?

VENIREPERSON SANCHEZ: Um-hum.

THE COURT: Now that I tell you all of that, now that you know, evidently now that you know the State of Texas is seeking the death penalty and this is a capital murder case and you know how Judge Snipes runs his court, and the length of the trial, and the dates of the trial, as you sit here now, can you think of any reason why you can't sit as a juror in this case?

VENIREPERSON SANCHEZ: When I filled out the questionnaire -- I have a 10-year-old son and he was -- usually the camp runs to one week before school and then a friend of mine's daughter watches him that week before school starts. She's going to college full-time and the camp leaves out two weeks before school, which would be the week from here -- he won't start school until the 18th and that might be a problem because my husband goes to work at 7 o'clock in the morning. So if we were sequestered or something that

might be a problem with him with daycare just that one week.

THE COURT: Well, can you make other --

VENIREPERSON SANCHEZ: I don't know. We don't really have anybody else. Our family is in Wills Point in Terrell, so it is not like it is really close, but I could see. It is only one week versus two weeks, because before they said it might start July 27th.

THE COURT: Well, I want to give you an opportunity to sit, but evidently I understand that as an exemption.

VENIREPERSON SANCHEZ: Yes. At the time it probably would have worked out, but with stuff changing --

THE COURT: Well, do you remember how that read that if you have a child ten years of age or under would be left unattended -- you tell me.

VENIREPERSON SANCHEZ: Like I said, at the time when I did the thing there wasn't going to be a problem, but there might be a problem that one week. I don't know. I don't know who I can get to watch him for that one week.

MS. HANDLEY: Are we talking about the week of August 10th, then?

VENIREPERSON SANCHEZ: Yes. He starts school on the 18th.

MS. HANDLEY: I see.

VENIREPERSON SANCHEZ: It is that one week. Normally he's covered because the camp runs and then the babysitter, but she's going back to college during the day, so it would be that one week there that would be --

MS. HANDLEY: You would have a 10-year-old -- you have a 10-year-old son, you're saying?

VENIREPERSON SANCHEZ: Yes.

MS. HANDLEY: Okay. And you're saying that you don't believe you could find adequate supervision for him?

VENIREPERSON SANCHEZ: I could try, but I don't really know anybody besides the lady's daughter at that time. The lady that used to watch him before, she moved.

MS. HANDLEY: All right. Your Honor, I think that you can talk with the juror about the exemption and explain whether or not she wants to claim the exemption.

THE COURT: I thought I did. You evidently knew about it because you brought it back up. You have a right to claim that exemption if that's what you want to do and whatever you say, I'll accept.

VENIREPERSON SANCHEZ: Considering the

circumstances that have changed with the babysitter and stuff, yes, because I don't know who would take care of him that week.

THE COURT: I'll accept your answer.

MS. HANDLEY: That's fine.

VENIREPERSON SANCHEZ: I'm sorry. It has changed.

MS. HANDLEY: No need to apologize.

THE COURT: You're excused. You waited all afternoon to tell us that. The exemption will be granted.

(Proceedings adjourned.)

circumstances that have changed with the babysitter and stuff, yes, because I don't know who would take care of him that week.

THE COURT:  I'll accept your answer.

MS. HANDLEY:  That's fine.

VENIREPERSON SANCHEZ:  I'm sorry.  It has changed.

MS. HANDLEY:  No need to apologize.

THE COURT:  You're excused.  You waited all afternoon to tell us that.  The exemption will be granted.

(Proceedings adjourned.)

COUNTY OF DALLAS )

STATE  OF  TEXAS )


        I, Joie Ann Rivera, Deputy Official Court Reporter in and for the Criminal District Court Seven of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all excerpted portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported to me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and will be paid by DALLAS COUNTY.

WITNESS MY OFFICIAL HAND this the 12th day of April, 2010.

JOIE ANN RIVERA, TEXAS CSR 8201
Expiration Date:  12-31-09
2706 Yale Drive
Rowlett, Texas  75088
469-733-5326