REPORTER'S RECORD
VOLUME 36   OF   VOLUME
TRIAL COURT CAUSE NO. F08-24667-Y
COURT OF APPEALS CAUSE NO. AP-76,207

THE STATE OF TEXAS    ) IN THE CRIMINAL DISTRICT COURT NO. 7

VS.                   ) DALLAS COUNTY, TEXAS

JAMES GARDIELD BROADNAX) JULY TERM, A.D., 2009

_____

**INDIVIDUAL VOIR DIRE**

_____

        On the 9th day of July, A.D., 2009, the following proceedings came on to be heard in the above-titled and numbered cause before the HONORABLE WEBB BIARD, Judge Presiding, held in Dallas, Dallas County, Texas,
        Proceedings reported by computerized Stenograph machine.
                    * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

ORIGINAL

2

A P P E A R A N C E S

HON. CRAIG WATKINS, Dallas County District Attorney

By:   Ms. Andrea Handley, Assistant District Attorney
      SBOT No. 08898800
      Ms. Elaine Evans, Assistant District Attorney
      SBOT No. 24032880
      Mr. Gordon Hikel, Assistant District Attorney
      SBOT No. 00787696
      133 N. Riverfront Blvd., LB19
      Frank Crowley Courthouse
      Dallas, TX   75207
      Phone: 214-653-3600

                ON BEHALF OF THE STATE OF TEXAS


                        -AND-



Mr. Brad Lollar                 Mr. Doug Parks
Attorney at Law                 Attorney at Law
SBOT No. 12508700               SBOT No. 15520000
1700 Commerce, Suite 450        321 Calm Waters Lane
Dallas, TX   75201              Holly Lake Ranch, TX   75765
Phone No. 214-384-8178          Phone: 903-769-3120



HON. LYNN RICHARDSON, Dallas County Public Defender

By: Ms. Kerri Mallon, Assistant Public Defender
SBOT No. 24049165
133 N. Riverfront Blvd., LB-2
Dallas, TX   75201
Phone: 214-653-3550

            ON BEHALF OF THE DEFENDANT BROADNAX

3

INDIVIDUAL QUESTIONING OF PROSPECTIVE JURORS
CHRONOLOGICAL INDEX
(VOLUME 36)

JULY 9, 2009

| PROSPECTIVE JUROR | State | Defense | Page | Vol. |
|---|---|---|---|---|
| **GARY FIDDICK** | 14 | 48 | | 36 |
| Court's ruling................................. 77 | | | | |
| Venireperson accepted......................... 77 | | | | |
| | | | | |
| **ALVIN CARTER** | 80 | | | 36 |
| Venireperson excused for cause............... 80 | | | | |
| | | | | |
| **ELSA OLVERA** | 89 | 127 | | 36 |
| Defense challenge for cause................... 154 | | | | |
| Court's ruling................................ 154 | | | | |
| Venireperson accepted......................... 154 | | | | |
| | | | | |
| **GEORGE PARADISE** | 160 | 198 | | 36 |
| Court's ruling................................. 225 | | | | |
| Venireperson accepted......................... 225 | | | | |
| Reporter's Certificate........................ 227 | | | | |

4

INDIVIDUAL QUESTIONING OF PROSPECTIVE JURORS
ALPHABETICAL INDEX

(VOLUME 36)

| PROSPECTIVE JUROR | State | Defense | Pg. | Vol. |
|---|---|---|---|---|
| **ALVIN CARTER** | 80 | | | 36 |
| Venireperson excused for cause................ 80 | | | | |
| **GARY FIDDICK** | 14 | 48 | | 36 |
| Court's ruling................................ 77 | | | | |
| Venireperson accepted......................... 77 | | | | |
| **ELSA OLVERA** | 89 | 127 | | 36 |
| Defense challenge for cause.................. 154 | | | | |
| Court's ruling............................... 154 | | | | |
| Venireperson accepted........................ 155 | | | | |
| **GEORGE PARADISE** | 160 | 198 | | 36 |
| Venireperson accepted........................ 225 | | | | |
| Reporter's Certificate....................... 227 | | | | |

**PROCEEDINGS**

THE COURT: We're in open court in the presence of Mr. Broadnax.

What says the State of Texas?

MS. HANDLEY: State is ready.

THE COURT: From Mr. Broadnax?

MS. MALLON: Ready.

THE COURT: Bring in Mr. Fiddick, please.

(Prospective Juror Barry Fiddick took the witness stand.)

THE COURT: Good morning to you, sir. Thank you for being here.

My name is Webb Biard, and I'll be with you this morning during the jury selection process. The presiding judge of this court is Michael Snipes, and should you be selected as a juror in this case Judge Snipes will actually preside over the trial. That's the judge you met with the lawyers together. Also, I want to introduce to you at this time Andrea Handley.

MS. HANDLEY: Good morning.

THE COURT: Gordon Hikel.

MR. HIKEL: Good morning, sir.

THE COURT: They represent Dallas County, State of Texas.

Further to my right is Brad Lollar.

MR. LOLLAR: Good morning.

THE COURT: Doug Parks.

MR. PARKS: Good morning.

THE COURT: And Kerri Mallon, and they represent Mr. Broadnax.

Before we go any further, do this for me, please.

(Prospective Juror Fiddick sworn.)

THE COURT: Have you have had an opportunity to read the pamphlet out in the hall?

PROSPECTIVE JUROR FIDDICK: Yes, sir.

THE COURT: Do you think that helped you understand this procedure just a little bit better?

PROSPECTIVE JUROR FIDDICK: Not really. I understand it the same. I'm familiar with the law.

THE COURT: You are?

PROSPECTIVE JUROR FIDDICK: Basically.

THE COURT: Good, good. Have you ever served on a jury before?

PROSPECTIVE JUROR FIDDICK: Yes, sir.

THE COURT: Have you ever served on a capital murder jury before?

PROSPECTIVE JUROR FIDDICK: No, sir.

THE COURT: Did the jury reach a verdict in the case that you were the juror?

PROSPECTIVE JUROR FIDDICK: Yes, sir.

7

THE COURT: What kind of case was it, Mr. Fiddick?

PROSPECTIVE JUROR FIDDICK: Drugs and money laundering, federal.

THE COURT: The federal judge set punishment, then, in that case?

PROSPECTIVE JUROR FIDDICK: Yes, sir.

THE COURT: In the State court, a judge can set punishment in every case except a capital murder case. The judge cannot set punishment in a capital murder case, should the person be found guilty of capital murder, only a jury can do that. From that experience you had, Mr. Fiddick, knowing that the judge, later at a hearing, set punishment — as you sit here now, are you aware that criminal jury trials are in two parts? And by that I mean, there's the guilt/innocence phase and then there's the punishment phase, should the person be found guilty. Do you understand that?

PROSPECTIVE JUROR FIDDICK: Yes, sir.

THE COURT: That's the way all cases in Texas are tried, be it theft of a bicycle or a capital murder case.

Now, as you sit here now, are you aware that this is a capital murder case?

PROSPECTIVE JUROR FIDDICK: Yes, sir.

8

THE COURT: Do you understand the State of Texas is seeking the death penalty?

PROSPECTIVE JUROR FIDDICK: Yes, sir.

THE COURT: If someone is found guilty of capital murder there's only two possible punishments. Do you know what they are, sir?

PROSPECTIVE JUROR FIDDICK: Life in prison or — if they're found guilty, life in prison or death.

THE COURT: That's right. Life in prison without parole. Let me stress, when I say "life in prison without parole," I mean life in prison without parole. There was a time if somebody was given life in prison they would eventually become eligible for parole. That's no longer the case in a capital murder case. Someone found guilty of a capital murder and given life in prison, they will serve the rest of their life in prison. So, there's either life in prison without parole or the death penalty.

Now, did you know that there's a difference between murder and capital murder?

PROSPECTIVE JUROR FIDDICK: Yes, sir.

THE COURT: What do you believe the difference to be?

PROSPECTIVE JUROR FIDDICK: My understanding is capital murder involves murdering someone while committing a crime.

9

THE COURT: That's exactly right, that's exactly right. Certain specific crimes: Murder of a policeman, murder of a fireman in the line of duty, murder of someone while burglarizing their home, sexually assaulting them, kidnapping them, robbing them, as the indictment in this case alleges, murder of a child under the age of six, murder while committing arson, murder for hire. Those are some examples of capital murder. Capital murder is murder, exactly like you said, while committing another specific type offense. So, that's exactly right, you cannot get the death penalty for murder. The range of punishment for murder is not less than five nor more than 99 years or life. Capital murder is the only crime in Texas that you can receive the death penalty.

Now, from reading that pamphlet, there's one thing in there that it stresses and that's these Special Issues. You only see these Special Issues, only if you'd found the person guilty of capital murder, okay?

PROSPECTIVE JUROR FIDDICK: Uh-hum.

THE COURT: And that would be done at the end of the punishment phase. Now, even though you weren't in the punishment phase, you understand that there was a hearing at a later date there in federal court, and the defendant was allowed to present evidence, and the State presented evidence, and the judge read a presentence report, and

10

then the judge set punishment at that time. That's the way that works, the case you were in. And that's the way a capital murder case works, in that there is that second part of the trial and evidence is presented, and then the jury makes their decision as to what's the right punishment, and they make that decision by answering those three Special Issues.

Are you familiar with those Special Issues at all?

PROSPECTIVE JUROR FIDDICK: Not offhand, sir.

THE COURT: Have you had the opportunity to read them outside?

PROSPECTIVE JUROR FIDDICK: Yes, sir.

THE COURT: I'll ask that you look at them again, just look at them again with me for a minute.

Now, the attorneys are going to spend a lot of time with you on these Specials Issues, mainly because they're points of law that most people aren't familiar with; as a matter of fact, most lawyers aren't familiar with. But, just briefly, if Special Issue No. 1 is answered yes and Special Issue No. 2's answered yes and Special Issue No. 3 is answered no by the jury, it's a death sentence. If they're answered any other way than yes, yes, no, it's in essence life in prison.

And to be a qualified juror you have to tell

11

us and mean it that even though you have found someone guilty of capital murder, you can still go into the punishment phase, and then based on all the evidence that you've heard in the first part and in the punishment phase, and keep an open mind, answer those Special Issues based on the evidence. If you can, then you've gone a long way to being a qualified juror. But if you say, no, if I find someone guilty of capital murder, I've already got my mind made up to what I'm going to do, then basically you would not be a qualified juror. And there's nothing wrong with that. It's just that this is your opportunity to tell us, and whatever you say will be accepted. That's very important. If you think you can do it, fine; if you say, no, I can't, fine. And that's what this is all about, really.

In that regard, what we're doing is qualifying some fifty jurors and then from that pool of qualified jurors we're going to select the actual trial jury. So, what I'm going to tell you today when you leave here is whether or not you're a qualified juror. And then if you are qualified, you are, sometime next week – and I think that's going to be right, because we're coming down to the conclusion of this selection process – the judge's coordinator will call you and tell you if you're on the jury or not on the jury. That's the way this is going to

12

proceed.

This morning one of the attorneys from the State and one of the attorneys from Mr. Broadnax are going to talk to you for up to 45 minutes each, so this is going to take about an hour and a half. And at the conclusion of that, then I'll tell you whether or not you're a qualified juror. I want to stress, this isn't some legal pop quiz where we try to find who knows the most law. That doesn't have anything to do with it. These attorneys will explain the law to you, and then once they explain it to you, you'll simply be asked: Can you follow the law? That's the bottom line question.

Now, from reading that pamphlet, did you see that Judge Snipes tells us that he's going to start this case August the 10th?

PROSPECTIVE JUROR FIDDICK: Yes, sir.

THE COURT: Going to last up to two weeks.

PROSPECTIVE JUROR FIDDICK: Yes, sir.

THE COURT: He runs his court Monday through Friday, 9 to 5, break in the morning, break in the afternoon, lunch break. The jury will not have to stay together over night unless and until you deliberate your verdict, just like you did in that federal case, and haven't reached a verdict and went late into the night and became fatigued, mentally fatigued. There's a possibility

13

you'd all be taken to a fine hotel, at the county's expense, individual private rooms, spend the night, fed, come back, to avoid any outside influence, be it from friends, media, whatever, because we don't want anything other than what you hear in the courtroom affecting your verdict. And that could happen. And if it happened, the judge would give you plenty of advance notice, like, the day after tomorrow be prepared, maybe, to spend the night in a hotel. Could, might not, but I just tell you all that. I give you all that information.

Knowing that you've heard Judge Snipes remarks, knowing that you filled out your questionnaire, which we appreciate — we got it, and I'm going to hand it to you in a minute. It wasn't some waste of time. The attorneys have read it in detail, then I'm going to go back over it in detail. They've already read it, and I'm sure if there's a question or two they'll ask you about. But after doing all that and sitting here and reading that pamphlet, as you sit here now, and understanding the way the judge runs his court, the days and the hours and the days of the week, is there any reason why you can't sit as a juror in this case?

PROSPECTIVE JUROR FIDDICK: No, sir.

THE COURT: All right. I'm going to hand you your questionnaire. You'll have it there, sir.

14

And without anything further from me, I'm going to reintroduce to you Andrea Handley who's going to talk to you on behalf of the State.

**PROSPECTIVE JUROR BARRY FIDDICK,**

after having been previously sworn, testified as follows:

**EXAMINATION,**

By Ms. Handley:

Q.   Good morning again. How do you feel today?

A.   I feel fine.

Q.   Good, good. I'm glad to hear that. I appreciate you coming down today and appreciate you coming down on the 24th, filling out the questionnaire for us, and then showing up again. This process doesn't work, only if and until people like yourself come down here, take the time out of their schedule to participate in the process. And I know you've done that before when you participated in that federal case. So, on behalf of myself and everyone here, thank you for at least taking that step so far. It's the first step in everything in seeing that these cases are taken care of.

As the judge stated, we both get an opportunity to talk to you. We bring you down one at a time in a case like this, because I think you can appreciate, this is not your garden variety criminal case. We're not here today to try a case for theft of a bicycle or even a

15

burglary; we're here on a death penalty case. And as the judge stated, we bring you down one at a time to talk to you specifically about capital murder cases, to education you on specifically how the process works in a death penalty case, to see if, first of all, are you the kind of person that understands the law and can you follow the law. You know?

And then also what we're doing is, we read your questionnaire, we like to listen to you also, feel you out a little bit and see what kind of person you are, to kind of give us a feeling of about who you are and how you feel about the issues and how you feel about the law in general. Just because you may be qualified does not necessarily mean you'll ultimately be on the case or that you'll ultimately sit as one of the twelve jurors. Okay?

So, I'm going to talk to you about the law. And I've got a lot to tell you, so it's going to sound like I'm doing all the talking here, which I really don't like, because I'd really like you to do most of talking, because I know everything about my case, but I don't know, really, a whole lot about the twelve people who will ultimately decide it. So I'm trying to hit both sides.

As we go along, if something doesn't make sense to you or you want to ask a question or something, by all means don't be shy about interrupting me and asking that question and telling me how you really feel. The only

16

obligation you have at this point, Mr. Fiddick, is to show up, and you've fulfilled your obligation by getting your juror summons and by coming down here when called. You've not taken an oath to follow the law at this point; the only oath that you've taken at this point is just to tell us the truth. Okay? Some people think that they're obligated to come up here and tell us what we want to hear, or that they're obligated, since they got called, to actually sit on the trial. And that's really not the law at all. You know, everybody's not necessarily qualified for a case like this and everybody is not necessarily the kind of juror that's appropriate for a case like this, because it is a death penalty case. And I get from reading your questionnaire that you've already got a good appreciation for how high the stakes are in this case and that it's nothing to be taken very lightly.

So, let me talk to you about the law in general. Let me talk to you about capital murder, and let me kind of ask you some questions about your questionnaire, also.

I think that you already have, maybe, a step up in this process in that you already sat on one criminal jury trial before, because there are fundamental principles of law that apply in every criminal case, be it theft of a bicycle, be it a capital murder case. And the same laws

that apply in this case, with respect to some fundamental propositions of law, also applied, I'll submit to you, in that federal case that you sat on.

First and foremost, Mr. Fiddick, as we sit here today, the law states that you are to presume the defendant innocent at this point. And the reason he has the presumption of innocence is because I haven't proved a single thing to you yet, and it's only if and until I prove my case beyond a reasonable doubt that you may return a verdict of guilty. And I'm sure that makes sense to you, doesn't it?

A.    Uh-huh.

Q.    I brought the charges, I must bare the proof. You always look to the State of Texas in this case to bring you the proof. The defendant has no obligation whatsoever. His only obligation is to show up, and he's already done that. I bring the proof in this case, and I have to bring proof to you enough and the type of quality to prove the case to you beyond a reasonable doubt. I think everyone's heard that term before. It's not necessarily defined; it's whatever you think it is. But I will tell you, Mr. Fiddick, that beyond a reasonable doubt is an extremely high burden. It's not, well, I think maybe he did it. Some people say beyond a reasonable doubt means to me that I'm confident, or I'm sure, or I believe in my heart he did

it. So, it's whatever you think it is, but it's definitely a high burden of proof.

I'm sure you've heard of this also – and it goes along with me having the burden of proof in this case – that everybody has a constitutional right, the Fifth Amendment right, not to testify. I have that right, you have that right, any defendant has that right. And the law states that if an individual on trial elects to exercise that constitutional right and not testify, you may not use that as evidence against him at his trial. Does that make sense to you, sir?

A.    Yes.

Q.    Is that a right that you can afford the defendant and a law that you can follow?

A.    Yes, ma'am.

Q.    As we sit here today, the defendant has been indicted, a formal charge has been brought against him, but the law states an indictment is not to be considered as evidence of guilt against the defendant. The proposition of, where there's smoke there's fire, he must have done something, doesn't apply in a criminal case. An indictment is merely a piece of paper that tells the defendant what he's been charged with, and it's also a notice to me, to the State. It tells me what I must prove to you, a juror, beyond a reasonable doubt before you may find him guilty.

In that indictment is the specific charge and it sets out the things I have to prove.

I have to prove that the defendant did it, that he did it on a particular date, that he did it in Dallas County, Texas, how he did it, what he did, and who he did it to. These are things we call the elements of the offense, and the law states that I have to prove each and every element of the offense beyond a reasonable doubt. I don't get points for proving just five out of six; I've got to prove them all. If I fail to carry my burden on any one of those elements, you must return a verdict of not guilty.

Just to give you a far out example of how serious that proposition is, if you've been called upon to sit on a murder case, and the indictment alleges that the defendant killed the other person by shooting them with a firearm, then I'm obligated to prove that to you, that he killed him by shooting a fire arm. If in the course of the trial you hear from the medical examiner that the victim died from a stab wound, not a gun shot wound, you hear from the CSI person that they didn't find a gun or bullets, they found a knife. Even if the defendant took the stand and said I killed him and I meant to do it, your verdict would still have to be not guilty, because I haven't proved to you that he killed that person by shooting 'em with a firearm, have I?

A.    No.

Q.    As a matter of fact, it showed that he was killed by stabbing with a knife. And that just goes to that proposition of, again, that burden of proof and that it's my obligation to prove.

Is that a law that you can follow also, Mr. Fiddick?

A.    Yes, ma'am.

Q.    Okay. When you sit on a jury in a criminal case, one of your most important duties as a juror — and this is why we have human beings sit on juries, is because we need people to assess the credibility of the witnesses in the case, as well as the evidence in the case. Computers and calculators are not capable of that. That's why we have people do that. You look at the person, you listen to the person, and then you assess their credibility after they've testified. That's what the law states, is that you assess the evidence that comes to you from the witness stand, and you wait until you hear the evidence before you decide what kind of credibility to give it.

For example, we asked you a question in your questionnaire, and you have it in front of you there. Turn to Page 7 with me, sir, if you would, please, and towards the middle of the page we asked you: "Do you believe police officers are more likely to tell the truth than the average

person?" And you said, "Yes." You said, "I think the nature of their work provides them with a better memory of details." There's nothing wrong with you having that assumption; as a matter of fact, I would tend to agree with you. And the law says there's nothing wrong with you believing, at this point, that they're more likely to tell the truth. But what the law states with respect to you being a juror is you may not at this point automatically assume that police officers will always tell the truth, that you must wait until an officer takes the stand, is sworn in, testifies, and then you make that determination as to whether or not you believe all, some, or none of what he says.

Does that make sense to you also, then?

A.   Yes.

Q.   And is that something that you could also follow, the law?

A.   Yes, ma'am.

Q.   Okay.  I think what's extremely important in a case like this, and this is why we talk to people one at a time, individually, in a case like this, is because a qualified juror is a juror who not only agrees to follow the law and base their verdict on the evidence in the case, but a qualified juror is an individual that doesn't have any snap assumptions or doesn't jump to conclusions before

hearing the evidence.  A qualified juror is somebody who will base their verdict on the evidence in the case, and that's to say — and not necessarily on any bias that they may bring into the courtroom or any prejudices or maybe even any stereotypes.  We're all who we are because we're formed by our personal, human experiences, what we've been through, what we've done, what we do.  It makes us up as a human being, and often times it determines how we look at something in particular.  We've all got baggage, so to speak, all these things that make us who we are and give us strong feelings about it, and we can't take that necessarily away from who we are.  But the law states that you can't necessarily bring it into the courtroom and let it cloud your judgment in terms of how you receive the evidence or how you return a verdict.  What I'm getting at is that you have — turn with me — well, I don't know what page it's on.  But you had stated in your questionnaire that you've actually been held up at gun point before; is that correct?

A.   Yes, ma'am.

Q.   How many years ago was that?  When was that?

A.   Two and a half years ago.

Q.   And that was outside of your home, was it?

A.   About two houses down.

Q.   Was that a robbery?  Did they take your wallet,

or what happened there?

A.   Well, they attempted to.  A truck pulled by, asked if we had a light.  There were three of us there.  We were showing a friend of ours a property around from our house, and they had asked for a light.  And we're like, no, and kept on walking.  And we're on the sidewalk, they're in street, and they stopped the truck and the passenger got out, held the gun at — I was first in line and the two friends behind, held the gun at the middle one and asked for his wallet.  We were just walking around from our house.  He honestly didn't have his wallet, so he kind of turned around and lifted his shirt to show him he didn't have a wallet.  Next thing I know, they turn to me and ask for mine.  Well, technically, yes, I had mine, but at that point I was like, well, he didn't shoot him, and I hear the third friend yell "run," and thankfully we ended up running and no one was shot.

Q.   Thank God.

A.   And they just casually drove away.

Q.   Did you file a police report?

A.   Yes.

Q.   Were they caught?

A.   Not that I'm aware of.

Q.   Okay, okay.  My point about that — let me just ask you this.  How does that feel to have a gun pointed at

you?

A.   Disturbing, to say the least.

Q.   Yeah, yeah.  Is it kind of like —

A.   Especially when we just bought the house, like, three months prior.

Q.   Okay.  You're thinking, oh, great, I just bought this house and now there's people out front with guns.

A.   Yes.

Q.   I'm glad that worked out for you.

My point about our life experiences and bringing them into the courtroom is, in the indictment in this case we have alleged that the crime was committed by use of a firearm, okay?  And, so, my point being is that some people may say, I've had an experience involving a gun, involving a fire arm, or involving violence, and it has made such an impact on me mentally or emotionally that I cannot truthfully say that I can set that aside and judge this case just on the facts of this case.  I will bring what happened to me into the courtroom.  I will bring a bias into the courtroom.  Because a gun was used, I'm automatically biased against the defendant because of that.  And the law states if you really feel that way, you're really not a qualified juror for this case.  So that's my question to you on your experience.  Can you set that aside and not hold that against the defendant in this case, if you make your

25

evidence of use of a fire arm?

A. I believe I can. If you'd like me to give you a more specific example.

Q. Certainly.

A. In the federal trial I was on it was a drug charge, it was about marijuana. Personally, I believe in the legalization of marijuana. I hated the fact that I had to follow the letter of the law and sentence him. Now, mind you, the money laundering and all that I agreed with, but personally I would like to see legalization. So, to me, even though, you know, there was something that I don't agree with, I was still able to follow the letter of the law.

Q. Okay. And you've hit the nail on the head, Mr. Fiddick, that's what it's all about. You don't necessarily have to like the law, you just have to be willing to agree to follow the law. And that's a perfect example. I'm glad you shared that with me. That gives us a good appreciate of where we're going with you in this situation, and that you won't necessarily hold that against the defendant, that a gun may have been used against you, and now you may see evidence in this case. Fantastic. Those are those propositions of law that carry through in every criminal case and carries throughout this case also.

What's really important to understand and get

26

your head around is that you always look to the State to prove the case to you, okay? Not only to prove a defendant is guilty, but then if you get into the punishment phase of the death penalty case, to prove those Special Issues, those questions to you. You've got to make me prove it to you. I've got to bring you the evidence, which is to say you can never say, just because somebody's been found guilty of capital murder they'll automatically receive the death penalty, because that would imply you jumped to a conclusion, and you haven't waited to listen to the evidence and base your verdict on the evidence instead of what you think should automatically happen. We know that when you filled in this questionnaire you didn't necessarily have a pocket law guide, or you hadn't been to a school on death penalty, so the questions were answered with -- really just how you felt at the time, and that's what we're looking for. So, to say that we would hold you definitely to your answers without you having an understanding of how they work in conjunction with the law may not really be fair, but it does give us a feeling about who you are and where you're going.

Capital murder, as the judge stated - and you, I think, you already have an appreciation for this, too - is the only crime in Texas for which you may get the death penalty. And a capital murder is different from, and for lack of a better term, a regular murder, because I don't

27

think there's anything regular about a murder. But it is different from murder in that it is a murder, plus it's some other aggravating factor, like you articulated before. The murder of maybe a police officer, or the murder of two or more people in the same criminal episode, or, as it is alleged in this indictment, the intentional murder of somebody in the course of robbing them or trying to rob them. That would be a capital murder. Not only must I prove to you that the murder was intentionally done, but I must prove to you that it was done in the course of a robbery or in an attempt to commit a robbery. If I can't prove to you that intent, if I can't prove to you that it was in the course of the robbery, you would return a verdict of not guilty for capital murder. An individual may still be guilty of murder, they may still be guilty of aggravated robbery, and that would be a different kind of penalty phase, but they would not be guilty of capital murder.

Does that make sense to you, also?

A. Yes, ma'am.

Q. We asked you about -- for what crimes you thought capital murder or the death penalty should be available. Turn with me please to Page 4. Very top question we said, "For what crimes do you think the death penalty should be available in Texas?" You said, "For killing multiple people or for those who only kill one person, yet are

28

mentally disturbed and not able to be rehabilitated." One way of committing capital murder is to kill two or more people during the same criminal episode.

Talk to me some more about your statement about the people who are mentally disturbed. I'm jumping around with you a little bit here. But also look now at Page 2. Go to page 2 with me, and we have on here, we asked you, "The best argument for the death penalty is..." You said, "If the person who commits the murder is mentally disturbed or has killed multiple people." And then we asked you the best argument against the death penalty, and you said, "Somebody is killing someone else, shouldn't they be held accountable for the murder?" And I don't know if you have them switched around, or -- did you mean to switch those around -- explain to me what's going on there.

A. I would say I misunderstood the question. My mind was on a different track.

Q. Okay, okay.

A. Well, that one's easy. The best argument against it is, someone needs to pull the switch, so someone else is killing, murdering, whether they're dropping gas pellets, or whatever else. To me, that's the biggest argument against the death penalty. Someone's having to kill the person, put them to death, and, yeah, so that should make them guilty of murder, and that would be an endless cycle.

29

Q.   I see.  I see where you're going there.  That's kind of a good (inaudible) thing is how many times has somebody committed murder.  That's something that every juror who potentially might be in this case has to get their head around and have an appreciation for.

Because some people can say, you know — quite frankly, Mr. Fiddick, I wouldn't be sitting in front of you today if I didn't think I had the type and quality of evidence to not only convince twelve people beyond a reasonable doubt that the defendant is guilty, but to also convince them that the death penalty is the appropriate sentence in this case.  And if I do that, then I am entitled to a verdict of guilty and a sentence of death.  If that happens, Mr. Fiddick, what's done is done.  The judge doesn't go, well, I think you got it wrong, and change it.  He must, at that point, sign basically a warrant for the execution for the death of the defendant.  I'm talking about this person sitting, you know, just a couple yards from you here, okay?  A lot of people may say, well, I'm not really the one throwing the switch or injecting them with a lethal injection, it's somebody else who's actually doing that.  I just answered some questions.  But the fact of the matter is, you are actually playing a part in it, you really are playing a part in it.  You are, as the other eleven jurors are, I am, we are all playing a part in the execution and

30

the ending of another person's life.  While the law may say we can do that, and we're not necessarily legally murderers that will be charged, nevertheless, we are involved in that.  I'd like to know how you really feel about that.

A.   So, I would like to clarify that.  Actually, that is the right answer, it just wasn't worded very well.

Q.   Okay.

A.   The person who would be pulling the switch, or whatever the form of death penalty is, is the person I'm referring to, is killing someone else.

Q.   I got you.  I got you.

A.   To be totally honest, I'm torn on that.  My mother was a pentecostal minister, so I had the upbringing that killing is wrong.  As I grew up and developed some more of my own ideas, I certainly do understand why we have a death penalty.  There are certainly certain cases where it seems to be valid.  Where that gray line ends, I — it's not black and white and never will be.

Q.   Okay.  I think you're correct.  I don't think it's ever really cut and dry or black and white.

Tell me what you mean when you say if a person who commits the murder is mentally disturbed.

A.   Well, that would be for a psychologist to decide.  But — and certainly I'm nowhere nears that.  But, basically, if someone is definitely having psychological

31

issues, that — I mean, for the most part, we have a long way to go in developing or figuring out how to treat people who have disturbed thinking, and until we do that, I personally, yeah, I believe someone who is mentally disturbed who has killed someone is very likely to do it again.  I think you know that's —

Q.   I'll tell you this.

A.   Serial killers are the perfect example of that.  These are people who are obviously very disturbed.  They may be very intelligent, but they're very disturbed, and they'll keep doing it no matter what.  So —

Q.   Don't you think it always involves a certain amount of mental disturbance for an individual to intentionally kill somebody just to take their property?

A.   Yes.

Q.   Yeah?

A.   Next question would be, did they intend to take their life when they pulled the trigger?

Q.   A capital murder case will always involve the intentional murder; it will never be an accident.  I must to prove to you that they intended to take the person's life, which is to say that it was not an accident.  It was not a, I'm going to shoot you in the knee so you can't run after me and turn me in.  That's not an intentional murder, but that would be a knowing murder, you know.  I could be

32

on the highway driving recklessly and kill someone.  That is a murder, but it's not an intentional murder.  An intentional murder is to put it, I think, simply is the person meant to do it, they meant to kill the person, no question about it.  It was not an accident.

In the United State's we do not put to death people that are mentally retarded.  We do not — if a person is criminally insane, they are not held liable for the commission of that offense.  So there are certain exceptions with respect to mental retardation or for people who are criminally insane.  That's not where this is going to apply.  Whether or not, you know, somebody could actually intend to kill someone and do it in the course of a robbery and be completely in their right mind, I don't know.  I think that that's kind of a global question that we're all still working on, is really how does the mind work and what motivates people.

Do you think people are just inherently evil?

A.   In order to believe in evil you have to believe in God.

Q.   Yeah, yeah.  I don't know, I don't know.  But that's something you look at in a case like this.  It's never cut and dry, it's never black and white.

Would you — in the case of considering whether or not to give somebody the death penalty, would you

have to be convinced that they were mentally disturbed in order to give them the death penalty?

A.  No.

Q.  Okay, okay.  Because you've put in here -- we asked you, "For what do you think the death penalty is appropriate?"  Oh, gosh -- turn to Page 5 with me, please.  Third question from the bottom, we said, "What would be important to you in deciding whether a person received a death penalty rather than a life sentence?"  And you said, "Killing more than one person, or premeditated, or causing extreme suffering to an individual before killing them or causing their death."  So you've kind of done an or, or, or.  You haven't said, at this point, there's only one circumstance in which I think it would be appropriate.

A.  No, I don't believe that there's ever one set.

Q.  I got you.  When we asked you in the questionnaire about capital murder in general, and you had articulated on Page 4 that you thought it was done too often, and you mentioned that because there have been, in fact, cases where -- let me see.  There have been questions -- fourth question from the bottom, you said, "Look at the people who are on death row and years later are proved innocent.  How many innocent people have died?"  Is your concern with respect to saying it's "too often" is that there might be room for the wrong person having been

put on death row?  Is that why you say "too often," because there have been instances where innocent people have in fact been convicted?

A.  Yeah.  I mean, literally they're finding people on death row that have been found -- at least the cases were returned and found innocent.  So, when that's the case, then you have to wonder how many of the people actually ended up dying on death row --

Q.  Right.

A.  -- that shouldn't have been there?  There have to be some and, to me, one's too many.  But --

Q.  Sure, sure.  And I'm hearing, then, what's important to you, then, in your consideration of a capital case, then, is you obviously want to be sure that you've got the right person.

A.  Yes.

Q.  Okay, okay.  And that's fair enough.  I wouldn't expect anything less from you.  I don't think the law would expect anything else from you either.

So, with respect, then, to capital murder and specifically the death penalty, Mr. Fiddick, I'm understanding that you're certainly not necessarily opposed to it.  I don't think people are necessarily in favor of it.  I think that maybe if the circumstances warrant it, they can do it.  If the law says that it's something appropriate and

---

the facts say that it's the appropriate thing to do, and they can follow the law, then they can certainly do it.

Is that kind of how you feel in this case?

A.  Yes.

Q.  Something that also sometimes comes into a person's decision on how they're going to answer the questions in a case or how they're going to receive the evidence is how the people closest to them also feel about the death penalty, and you said that you don't think your partner agrees with the death penalty.

A.  No.

Q.  Have you talked a little bit more about it since you came down and filled this out?

A.  Not really, no.

Q.  So, it kind of begs the question to me, then, are you going to go into the case and say, well, you know, I know the evidence says this, I know the evidence says it's an appropriate case for a verdict of death instead of life, but I don't want to disrespect the feelings and opinions of my partner, and I sure don't want to have to sleep on the couch either if I come back and do something that they think is wrong.  How is that going to affect you, if at all?

A.  A lot of people say we're a lot a like, but, yet, we disagree on probably more issues than we agree, so I

have no problems disagreeing with other people.

Q.  Okay.

A.  Doesn't make me right, doesn't make me wrong, it just makes me have a difference of opinion.

Q.  All right.  You won't be in the dog house or sitting out on the couch or something like that?

A.  No.

Q.  Okay.  Let's talk, then, more appropriate -- more specifically now about the punishment phase of a capital murder case, okay?  Mr. Fiddick, you will never get to the punishment phase of a capital murder case unless you have found the defendant guilty of capital murder, which is to say, unless you have found that the person intentionally took the life of another individual and did it in the course of committing or trying to commit a robbery.  Okay?  The question of guilt at that point has been decided.  You have found that person guilty, okay?  Only then will you move into the punishment phase of the case.  There are only two things that can happen to someone convicted of capital murder.  They will either receive life without parole, or they will receive a sentence of death.  Our legislatures believe that the crime of capital murder, in and of itself, is bad enough, that an individual convicted of it will automatically receive life in prison.  There is no consideration of a lesser range of penalties.  You're

guilty of capital murder, you are automatically going to serve life in prison. Okay? So you go into the punishment phase now knowing that, that the person has already got their life-in-prison sentence. The question then becomes, is that life-in-prison sentence going to be elevated to a sentences of death? And in order to make that determination, the jury is not called upon - and most people think this -- you're not called upon to go back into the jury room and say: How many think he deserves life and how many think he deserves death? It doesn't work that way. Instead, you're called upon to answer three questions, and depending on how you answer these three questions will depend on if he keeps that life sentence or if he's elevated to a sentences of death. Does that make sense to you?

A. Yes, ma'am.

Q. And again, how you answer these questions is always determined on the evidence in the case. And I will submit to you, Mr. Fiddick, he's been sentenced now and automatically he receives this life sentence without parole, which means he will eat, sleep, read, watch TV, work out, whatever, he will do it all in the penitentiary. This is where he will serve the rest of his life. So what we're focusing now in the punishment phase is, we're focusing on the individual, we're focusing on the

defendant. We need to make a distinction, in terms of individuals who are found guilty of capital murder, we're looking for a distinction in who receives -- keeps that life sentence and who gets that death sentence. I'll submit to you that the distinction between the two is how that individual will act in carrying out that life sentence. Will that individual be the type of person who will go to prison for the rest of his life, serve his time peacefully, whatever that may mean, follow the rules, you know, carry on? Or will he be the individual that will go into the penitentiary and continue to commit criminal acts of violence that constitute a threat to the people he's living in and amongst? If he is that person who will continue to commit criminal acts of violence, then he is that person that is more appropriate for the death sentence.

Does that make sense to you?

A. Yes.

Q. So, we make that distinction between the two. That's our starting place on who will and who will not receive the death sentence. He is in prison. Can you envision that he is in fact kind of living in a society of his own?

A. Yes.

Q. You and I are in a society right now. We go to

the grocery store, we go to restaurants and churches. We have a society. There's also a society in the prison and that's where his society will be for the rest of his life, unless, of course, he escapes, then he may be in our society. But presumably and hopefully he'll be in that society, so we look to determine what he's going to do in that society. Is he going to be a further danger to that society?

A lot of people say when they consider the death penalty, well, maybe it's a deterrent, or it's the right thing to do, because he's no longer a danger to society. And when we say that we think you and I, don't we? He's not going to hurt me, is he? But the question becomes: Is he maybe more likely than not going to hurt somebody else?

And I'll throw this out to you, Mr. Fiddick. We have hundreds of prisons in Texas, and we have hundreds and thousands of men and woman serving time in our penitentiaries for everything from forgery to drugs to burglary to murder to capital murder, and we don't necessarily house everybody in a different penitentiary. You may all be in the same penitentiary, you may have different classifications in the penitentiary according to your crimes, but there's a whole bunch of people in there. And not only are there inmates in there, but there's also

guards, wardens. We have educators in prisons, nurses, doctors, clergy who come into the prisons, visitors, volunteers. There's all kinds of people coming in that society there, so we look to that whole group as a society.

Let me ask you this. If an individual is sentenced, let's say for example, to ten years in the penitentiary for burglary of a home, do you think that that individual has a right to have an expectation of safety while he's in prison?

A. Yes.

Q. I've never in my years of doing this, ever heard a judge say, I hereby sentence you to ten years in the penitentiary and also to get your butt kicked every day by an inmate. That's not part of the sentence. And that's what we're looking at, is the other people in the penitentiary and is this particular defendant going to be a threat to them. The way -- I have to prove to you, Mr. Fiddick, that more likely than not he will be a future danger to these individuals, and I prove that to you by bringing you evidence. In order to make that determination as to whether or not he is or is not going to be a future danger, you may look at what he's done, you may look at the crime that you've just found him guilty of, and that may tell you -- that in and of itself may be enough for you to decide, I think more likely than not he's a future danger,

or you may need additional information to make that determination. You may say, tell me a little bit more about his past, or tell me a little bit more about what he's done to help me decide whether or not he is or is not going to be a future danger.

Does that make sense to you?

A.   Yes.

Q.   Do you think that's something possible to do, to predict whether somebody will be a future danger?

A.   Well, let's just say people do have a tendency to repeat patterns.

Q.   Yeah, I think they do. Some do, some don't. Some it's an anomaly, some it's a continuing pattern.

That's the first question you're called upon to answer. Look at that with me. We call it Special Issue No. 1 on the chart. You're going into the punishment phase now, and you're asked to answer this question: "Do you find from the evidence beyond a reasonable doubt," which tells you again you're looking to me to prove it, "that there's a probability." That's not defined for you. Notice it doesn't say that there's just a possibility, and it doesn't say do you find absolutely, beyond all doubt. It says, "Do you think there's a probability." Some people tell us that they think probability means more likely than not. Would you agree with that?

A.   Yes.

Q.   Have I proved to you more likely than not that the defendant will commit criminal acts of violence? That's not defined for you either. Criminal acts of violence is entirely up to you to decide. It doesn't necessarily say, do you find the defendant will commit another murder, or that he'll commit another robbery, or that he will commit another rape or an assault. It just says: Do you think he'll commit criminal acts of violence that would constitute a continuing threat to society? So, what we're looking at there is, you know, based on what he's done before, based on who he is, you need to answer this question, whether or not you think he'll be a future danger to society.

Do you think that's a question you would be capable of answering?

A.   I can give my own opinion.

Q.   Okay. Your opinion as to what the evidence tells you?

A.   Yes.

Q.   Okay. If you don't think he's a future danger, Mr. Fiddick, then you answer the question no. If you don't think he's ever going to commit — or if you don't think there's a probability that he'll ever commit another criminal act of violence, then you answer the question no.

If you think the answer is yes, then you move on to the second question. I'm going to leave that to somebody else to describe to you, because I'm kind of running out of time. But just a short version of that means this, Mr. Fiddick. You're called upon to answer the question, do you believe the defendant was the actual trigger man in the case? Or is he somebody that worked with somebody else in committing the offense and was an active participant in the crime, and he anticipated somebody would die? Because sometimes two or more people might commit an offense together. That's what that question goes to. But if you find the individual is a future danger, and you find that the individual was either the trigger man and active participant in the case, I'll submit to you that the defendant is now sitting squarely on the death sentence. But your obligation as a juror is not over at this point. You still have one more question to answer. Up until this point I've always had to prove things to you; I've always had a burden of proof. My burden, my obligation, is done at this point, I've proved my case to you.

Special Issue No. 3, there's no burden on either side, neither party has to prove anything to you. It's an issue there that is not only there for the benefit of the defendant, but it's also an issue that's there for the benefit of you. And, basically, what it says to you,

Mr. Fiddick is this. You found this person guilty of capital murder, which means they killed somebody and they meant to do it and it was no accident. They did it in the course of trying to rob this person or actually robbing this person. You've also found that this person is a future danger to the society in which you live in, which means more likely than not this particular defendant is going to commit some criminal acts of violence against the people inside that penitentiary or the society at large, even if they were ever to escape. But even considering all that, how bad he is, we're going to let you now re-review all the evidence in this case. We're going to let you decide whether or not there's something about the defendant, whether or not there's something about this particular case, whether or not there's something about the way this whole thing went down that says to you, individually, you know what? Even all that, I think he actually deserves a sentence of life versus death. And specifically, as you see here, it's a long question, but it says you take into consideration all of the evidence, the circumstances of the offense, his background, his character, his personal moral culpability. You look at all of that, and if there's something that's mitigating, which is to say lessens his moral culpability, then you identify that. Is there something that's mitigating in this case? And then you go one step further, and you ask

yourself:  It's mitigating, but is it sufficiently mitigating to turn that death sentence into a life sentence?

Does that make sense to you?

A.   Yes.

Q.   What is mitigating is entirely up to you to decide.  Some people might say, well youth may be mitigating to me.  The question becomes, is it sufficiently mitigating?  Some people say, well, he's very young; and others say, he's a man, and he knows what he's doing.  Some people may say, well, he was intoxicated at the time, and I think that might have altered how he felt.  Other people may say, I don't think it's mitigating at all.  He had made the choice to consume the intoxicants.  Some people may say, well, he was raised in a single-parent household and he didn't have the best -- you know, he didn't have two parents, and he was kind of shuffled around.  Other people may say, cry me a river.  I've been through it and I'm fine.  Just because it may be mitigating doesn't necessarily mean it's sufficiently mitigating.  What's mitigating to you is what speaks to you.  You know, was he raised like an animal?  He's not mentally retarded, but maybe he's just shy of it.  It may be mitigating, but it's got to be sufficiently mitigating.

Does that make sense to you?

A.   Yes.

Q.   In other words, Mr. Fiddick, it's an opportunity once again for you to look at everything and make the punishment truly fit the crime.  And I'll submit to you, I think it's a fair thing to do.

Do you think that's possible, Mr. Fiddick, that even after you found somebody guilty of intentionally killing somebody, taking their property in the course of doing it, more likely than not he's going to continue to be a criminal -- commit criminal acts of violence in his society or the society at large?  Do you think you could ever find something mitigating to turn that sentence over?

A.   That's where I'd have to hear the whole story and really know.

Q.   Sure.

A.   My assumption would be no, but --

Q.   And I'll tell you, I can't pin you down to anything right now because you haven't heard the case.  So I can't say, well, you always or will you never find something in this case, because you haven't heard a single thing.  The question to you then, I think more properly is, Mr. Fiddick, will you go into this last issue with an open mind?

A.   Yes.

Q.   Will you rereview all the evidence in the case?

A.   Yes.

47

Q.   And if you personally feel that there's something that's not only mitigating but sufficiently mitigating, will you then answer that question yes and reverse that sentence of death?

A.   I would have to wait and see.

Q.   Right.  It's kind of a rhetorical question.  Will you do what you think is the proper thing to do?

A.   Yes.

Q.   Do you have any questions for me about how this process works, Mr. Fiddick?

A.   No.

Q.   Do you think there's anything about this case, anything about what we've talked about, your personal feelings, maybe, on how you feel about the death penalty, or anything that you think we need to know about, because it might not entirely be fair to the State or it might not entirely be fair to the defendant?

A.   No.

Q.   All right.  Thank for listening to me.  I appreciate it, sir.

I'll pass the juror.

THE COURT:  Thank you, Ms. Handley.

We've been going since early this morning.  We're going to take a five-minute break, come back, then Mr. Lollar's going to talk to you.

48

(Recess taken.)

THE COURT:  Please proceed.

EXAMINATION,

By Mr. Lollar:

Q.   I'm Brad Lollar.  How are you doing?

A.   I'm doing fine.

Q.   Let me reintroduce Doug Parks and Kerri Mallon.  We represent James Broadnax.

It's our opportunity now to talk to you here for a bit of time.  Obviously we've heard what you've had to say to Miss Handley, and, of course, we've read your questionnaire.  What we're trying to do here, Mr. Fiddick, is we're trying to get twelve jurors out of that group of jurors that we had come down here a couple months ago, that can be fair to both sides in this case.  And I appreciate hearing in regard to your service on the federal jury that you were able to follow the letter of the law.  And that appears to be something that's of importance to you in serving as a juror in whatever kind of case that you may be called upon to serve as a juror on.  Is that a fair statement?

A.   Yes, sir.

Q.   And, of course, we do not expect that our jurors be familiar with these special issues at all, in fact ever have seen or heard of them before coming down here today.

49

We recognize that at the time you filled out your questionnaire you didn't know what procedure was used in a capital murder case to decide what the proper punishment is in that case. We did not expect that you've seen these issues before.

Is that correct in your case?

A. Yes, sir.

Q. But now you see that there is a particular procedure that must be followed by the jury sitting in a capital murder case, if they find a person guilty of capital murder. It's not a situation where if the jury finds a person guilty of X-offense that the result is death. As you can see now, under Texas law there's no offense no matter what you've done that automatically results in a death penalty. And the big dividing line there is that big Special Issue No. 1.

In looking at the first page of your questionnaire, remarkably perspicuous, because basically what you're saying is — "Are you in favor of the death penalty?"

"Yes, in extreme cases."

Well, obviously a capital murder is going to be an extreme case where the person appears to always be a threat to the public. Well, that's exactly what Special Issue No. 1 is asking you — with no ability to be reformed.

50

Well, that's exactly what Special Issue No. 3 is asking, see? In answering yours, I see exactly what the Texas law requires of a jury to determine before they can impose a death penalty. And I think it should be clear to you by now that the preferred punishment for the offense of capital murder under Texas law is life without parole. We stay at life without parole and unless and until the State is able to prove to you, the jury, beyond a reasonable doubt that the person on trial is the type of person who is going to continue to commit criminal acts of violence against others, even if we put him in the penitentiary, and would be continuing to commit those criminal acts of violence against the people around him in the penitentiary, whether it be fellow prisoners, or guards, whoever else might be at the penitentiary. That's what that issue is about, okay? You see that?

A. Yes, sir.

Q. And is that something that you think you would be able to do, is to hold the State to that burden of proof and unless they prove to a jury, all twelve jurors' satisfaction beyond a reasonable doubt, that the person on trial is the type of person who's going to continue to commit criminal acts of violence, even if we put them in the penitentiary, then you would be satisfied, and you would return a verdict of life without parole case?

51

A. Yes, sir.

Q. I want to ask you, Mr. Fiddick, about some of these things you told us about in this questionnaire, just for my information.

Mr. Parks and I both live in Oak Cliff. Where is Ballard Avenue? We know we've seen it, we just can't remember where.

A. Do you know where Spiral Diner is?

Q. Yes.

A. It's the street that runs along that. It's three blocks long and it dean-ends.

Q. How is that Spiral Diner? I've never eaten there. Is that —

A. Quite tasty, very tasty. I didn't think I would like the food.

Q. Now, let's see. I think you've already told us the answer to this question. You, yourself, were the victim of an aggravated robbery. And you understand that in this case the State is alleging that this was an intentional murder committed during the course of an aggravated robbery.

A. Yes, sir.

Q. You've told us — well, tell me, would you be able to set your personal experience aside and judge this case on its own merits? Or do you think that the

52

experience that you underwent would somehow influence your verdict in looking at the evidence in this case?

A. I don't think it would affect my verdict. Had they pulled the trigger it might be a different story.

Q. Well, thankfully they did not.

A. I might be the one this trial was about.

Q. Now, one other thing. You mentioned back here on Page 11 that you've lived in over fifty houses, in numerous cities. Tell me about that.

A. My mom was a single mom in the 60's, raising three kids on her own. We lived in twenty-eight houses before I was 18, that I'm aware of.

Q. Okay.

A. It's nice to finally own my own home and be in a stable location.

Q. All right. Very good. What different towns did y'all live in?

A. Oh, gosh. I was born in Houston, lived in Oklahoma for a little bit near Bartlesville, and one other city, I don't recall. Mostly in Kansas is where I grew up, in and around Wichita, Kansas. Eldorado, Douglas, Dallas, Augusta. There were a bunch.

Q. How did you end up back here in Dallas?

A. It's complicated. My mom always talked about Texas and how much she loved it. She was born in Kansas

but married my father who lived in Texas, and was only down here for a couple years before she got smart and divorced him, and that took her back to Kansas, which took me to Kansas. I ended up -- because of her talks about it, when I was old enough to get out on my own -- I knew Kansas wasn't the place for me, just didn't feel comfortable. I was interested in trying out other places, visiting other places, and I happened to have a friend of my sister's who I kept in touch with as a pen pal, is the initial reason I came down to Texas. They were looking for an additional roommate and wondered if I might be interested, and then I moved down here.

Q. Very good. Let's see if there was anything else. I think that's it.

A couple of comments you made that I want to get back to, but we'll get back to them when we talk about the special issues here in just a minute.

How long ago was your service on that federal jury?

A. I would have to guess, but I think it was like 1990.

Q. So it was quite awhile ago?

A. Yes.

Q. All right. Very good.

A. That would have been in Houston.

Q. That's it.

Mr. Fiddick, let me ask you to do one thing. There in front of you on another pamphlet up there is the indictment in this case, and if I could ask you to just take a moment to read that.

You'll see that what is alleged in this case is that the defendant committed an intentional murder during the course of the commission of a robbery, and of course that is one of the eighteen different ways under Texas law that a person can be charged with capital murder. The others are, you know, an intentional murder committed during a burglary, a kidnapping, a sexual assault, arson, terroristic threat; if we have a murder of a police officer or a fireman in the -- acting in the line of duty; if we have a murder of a child under the age of six. That is in and of itself a capital murder. If we have a murder for hire, a person who hired the murderer for higher; if we have the murder of more than one person during the same criminal transaction, or if we have a serial murder type situation, or if we have a person who is a prisoner in the penitentiary and murders a warden or guard in trying to escape, or murders somebody else in the penitentiary, if they are serving a term of life or 99 years for any other offense. Okay? So, those -- that's the pretty complete list of the different types of offenses which would qualify as a capital

murder and subject one to either a life sentence without parole or the death sentence under Texas law.

Now, as the judge has explained, a life sentence without parole means exactly that, there is no parole date. Now, that's sometimes something that jurors need to be told, because a few years ago under Texas law if they were sentenced to life for capital murder they would become eligible for parole after serving forty years, forty calendar years. That's no longer the case, the legislature has changed that. And when we say life without parole, that means that they will die in the penitentiary, whatever time the good lord calls 'em. Okay? So that's what we're talking about. So I think you would agree that whether a person who has committed the offense of capital murder either gets the death sentence or life without parole, either one of them is a very substantial and significant punishment. Would you agree with that?

A. Yes, sir.

Q. And you told us here on Page 2 of your questionnaire that you feel that a life sentence rather than the death sentence would be appropriate under certain circumstances. And can you explain to me what you were thinking about when you answered that question for us?

A. Well, as it's already been indicated, definitely in cases where someone is -- if multiple murders are

involved, if -- I'm drawing a blank on where I was going with it. But to me, it's usually if someone is likely to repeat their crime, as well. I would definitely say that's -- you know, the likely intent of someone to repeat the same crime again, murder.

Q. Let me talk to you about one thing you said right there, and then you also mentioned this a couple places in your questionnaire. The concept of multiple murders where more than one person gets killed during the same criminal transaction.

A. Uh-hum.

Q. Now, as you know, as we just talked about, that is one of the ways that a person can be charged with capital murder. And, yet, the legislature tells us that even for that offense nothing is automatic about getting a death sentence, that we're still looking at either life without parole or the death sentence, and the life without parole is the preferred punishment, except in the instance of those who qualify under Special Issue No. 1.

And we tell you here on Page 3, right at the top of Page 3 -- see that second paragraph there?

A. Uh-hum.

Q. We tell you that in this instance more than one person is alleged to have been killed during the course of this robbery, okay?

57

A. Uh-huh.

Q. Now, I want to be sure in qualifying you as a potential juror in this case, that if the State convinces you beyond a reasonable doubt that all the allegations in the indictment are true and correct, that still you would be able to set your personal feelings about the appropriateness of the death penalty aside and follow the law, as required to you in Special Issues 1, 2 and 3.

A. Yes.

Q. Okay, very good.

A. To me, even the multiple murderer ultimately opens that option of —

Q. Exactly.

A. — the death sentence.

Q. Yes.

A. It doesn't mean that it should be a given.

Q. That's correct. And in fact — and, again, we're going to talk about this, and I want to try to impress upon you, the way the special issues were written by the legislature tells us that the presumption is that a life sentence is the preferred punishment. Okay?

A. Uh-hum.

Q. We know that because they put the burden of proof upon the State in the first two special issues to have to prove things to the jury beyond a reasonable doubt before

58

the jury's entitled to find a person eligible for the death penalty. Okay? And by putting the burden of proof upon the State, it is like the burden of proof that the law puts upon the State in the first part of the trial. See, the State's got to prove beyond a reasonable doubt that the defendant's guilty, and if they fail to do that, combine that with the presumption of innocence that a person has in any criminal case, there's the presumption that exists that the answers to Special Issues No. 1 and 2 are no, and the law puts a burden upon the State to prove that the answer should be yes before a jury can find yes. Does that make sense?

A. Yes.

Q. Very good.

Now, obviously you have sat as a juror on a criminal case, and you know what the first part of the trial is about, it's where the jury's deciding whether or not the defendant is guilty of what he's charge with, and to that end the State has the burden of proof. They get to go first. They get to present whatever evidence they like to in proving the allegations in the indictment, then they rest, then it is the Defense's opportunity to present testimony. Although we're not required to, obviously we can. And then after hearing both sides' evidence, then the jury is — receives the law from the court, and you go back

59

and do your deliberations. Okay?

And this type of a case would be exactly like the case you sat on down in the federal courts. Now, of course down there they don't let juries decide punishment, so, obviously, that's the difference between federal court and Texas court.

Now, there's one issue I want to spend a moment talking to you about there. One of the allegations in the indictment is what we call the culpable mental state of the defendant, okay? And you'll see that they have said there in that indictment that the defendant intentionally caused the death of the victim, okay? That word "intentionally" is what I'm talking about. That's one of the four culpable mental states that Texas law provides, okay? And I want to tell you what the other three are and tell you some examples of each one of them. The other three are — you've got intentionally at the top, then you have knowingly, recklessly, and then acting with criminal negligence. Okay? And our law tells us that a homicide can be committed either of those four ways, okay? And depending, really, upon what the jury terms, the state of mind of the defendant was at the time of the commission of the offense, determines what level of offense we're talking about. Okay?

Let me give you some examples. If I'm

60

driving down the road in my car, and I'm not paying any attention, and I reach over to get a CD and stick in the CD player, and while I'm doing that, since I'm not paying any attention, somebody's walked out and I run over them and kill them. Okay? The mental state we're talking about there is acting with criminal negligence, okay? Obviously, I didn't intentionally kill them, I didn't knowingly kill them, I didn't recklessly kill them. I killed them by using criminal negligence. I was negligent in what I did, and it rose to the level that it can be a criminal offense. And if that's what the jury determines that my mental state was at that time, that's the level of offense I'm guilty of. Okay?

Now, down in our neighborhood if we go out on our front porches at midnight on New Year's Eve, we'll sometimes hear people shooting their guns off up until the air in celebration of —

A. Sometimes?

Q. Well, you duck at that point and get back inside.

But, obviously, the person who is firing a gun off into the air understands that there's a risk involved in doing that: Bullet's going to go up, it's going to come down, it may hurt somebody or even kill somebody. Well, again, they didn't intentionally cause a death, if that's what happened, they didn't knowingly do it, but the law says that if there was a substantial risk that they

disregarded and went ahead and did their action, that's somebody who's acting recklessly. And if a person acting recklessly causes the death of another person, that's what we call the offense of manslaughter. Maybe you've heard that phrase before.

Now, these next two we're going to go up to knowingly committing a homicide and then intentionally committing a homicide. We're going to use, basically, the same example. If I go in to rob a 7-Eleven store, and I have my loaded gun, and I go in and I tell the teller to give me the money, and she does, okay? And then I say, okay, I'm leaving now, you're not going to get hurt, but do this: Do not come around that counter and follow me out the door to see which way I go, okay? And I start backing out, and sure enough here she comes around the counter to follow me out and see which way I go, and to stop that I shoot her in the knee cap. Okay? Now, I have clearly done there an act dangerous to human life by shooting her in the knee cap. And if, despite what I wanted to have happen, she bleeds to death by the time the police or the ambulance get there, certainly I have caused the death of a person, and I did that during the course of a robbery. But my mental state was not to cause her death when I shot her, it was to hurt her, to maim her, to make her incapable of following me out the door. But that's not the same thing as intending to

cause her death. Do you see the distinction there?

A.   Uh-hum.

Q.   Now, if a jury should hear a case and determine that's what the mental state of the defendant was at the time of the commission of the offense, then what we're looking at is murder, but it's not capital murder. Okay?

In any indictment for capital murder there are included what we call lesser included offenses, and certainly murder and aggravated robbery are two lesser included offenses of the allegation of capital murder in an indictment. Okay?

Now, what the State has alleged here is that the defendant intentionally caused the death of the victim during the course of the commission of a robbery. That would be like if I were to go into the 7-Eleven store with my loaded handgun, ask the clerk for money, get the money, and then shoot her ten times in the head, clearly in that situation I intended to cause her death and not just wound her. You see the distinction there? That is a requirement, that is an element of the indictment that the State is required to prove in a capital murder case, as opposed to a murder case.

In the murder case, they can allege that the defendant acted intentionally or knowingly, but in a capital murder case they have to prove that it was the conscious

objective or desire of the defendant at the time of the commission of the offense to cause the death of the victim. Now, I spend so much time on that because it's important for anybody who's potentially a juror in this case to understand that the culpable mental state may have been the issue upon which the trial is being held. Okay? And it is a requirement, again, that the State prove an intentional murder as opposed to a knowing, reckless, or a person acting with criminal negligence. Does that make sense to you?

A.   Yes, sir.

Q.   The law specifically provides, our Texas law specifically provides, that either side may introduce evidence as to the condition of the defendant's mind at the time of the commission of the offense, and it's to that issue of what was his culpable mental state, because that may tell us what offense he's guilty of, if any. Okay?

Anything else we need to talk about in terms of the indictment, or what the State has to prove, or that type thing?

A.   Not at this time.

Q.   Okay, very good.

Let's talk about these punishment issues, these special issues. And, Mr. Fiddick, let me stress to you, I'm going to talk to you about these, and we're going to spend the rest of my time talking about 'em, but, the

bottom line is, we don't think this jury is ever going to get to these special issues, we don't think the jury is going to find the defendant guilty of capital murder. But this is the only time that we have the opportunity to discuss these with you, and, so, I've got to go ahead and do it, particularly since we don't expect everybody to have seen these before today. Okay? And let me tell you, if you're seated as a juror in a capital murder case like this, the first part of the trial is exactly like the federal trial. The State goes first, defendant goes second, everybody rests, close, judge prepares the charge, argument of counsel, jury goes back and retires to reach their verdict. If you find the defendant not guilty, everybody goes home. If you find 'em guilty of one of those lesser included offenses, then you come back and hear more testimony, potentially, by the State and by the defendant okay, and then you go back and set a punishment somewhere within the range of law that the judge will tell you is appropriate for the offense you found the defendant guilty of. Does that make sense?

A.   (No audible answer.)

Q.   Now, if a jury finds a defendant guilty of capital murder, then you come back, we essentially have the second part of the trial, which is called the punishment phase, and again the State gets to go first and present

65

whatever evidence they have or want to relevant to these three special issues, then they rest, then it's our opportunity to present evidence relevant to these three special issues. Okay? Then, again, the judge prepares the charge, we have argument of counsel, and the jury goes back to deliberate. Okay?

The first thing the jury's got to decide is the answer to Special Issue No. 1 again. And, again, it reads, "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?" And the society we're talking about there is prison society, because that's where he's going to be. By finding the person guilty of capital murder, you have assured that at the least that person's going to be in the penitentiary until the day he dies. So Special Issue No. 1 is meant to weed out those who the evidence shows would just serve their time and do okay from those who the evidence shows beyond a reasonable doubt would be continuing to commit criminal acts of violence against people, even down in the penitentiary. That's what it's meant to do. That's what the legislature has set it up to do. It is suppose to be a barrier to the imposition of the death penalty. Do you understand that?

A. Uh-huh.

66

Q. And it's not suppose to be a speed bump, it's suppose to be a barrier. And only those to whom the State can show beyond a reasonable doubt is that type of person that's going to continue to commit criminal acts of violence do we separate out and send on down the path to a death sentence. Does that make sense?

A. Yes, sir.

Q. Is that something that you think that you could do?

A. Yes, sir.

Q. And hold them to their burden of proof, presume that the answer is no and keep it a no, which you understand is going to mean that the person gets life without parole rather than a death sentence?

A. Yes, sir.

Q. Even if they've committed a capital murder?

A. Yes.

Q. Very good. Special Issue No. 2 is not always submitted to the jury. Special Issue No. 2 only is submitted in those instances where the evidence has shown that there's more than one person involved in the commission of the offense. Okay? If there's two or more people that are acting together in committing the offense, then what Special Issue No. 2 asks the jury to determine, "Do you find from the evidence beyond a reasonable doubt

67

that the defendant actually caused —." In other words, was the defendant the gun man, okay? Or did not actually cause the death of the deceased but intended to kill the deceased or anticipated that a human life would be taken? So that's what that Special Issue — again, meant as a road block to the death sentence by the legislature is given to the jury to determine. Again, it puts a burden of proof upon the State to prove that beyond a reasonable doubt, and if they fail to do that, then the case is over.

And let me back up and tell you, if the jury in looking at Special Issue No. 1 does not feel that the State has proven beyond a reasonable doubt that this is a future danger, then you answer that no. Your deliberations are over, and you don't even get to two and three. You come back and tell the judge and the judge immediately sentences the defendant to life without parole. Same thing with Issue No. 2. If you found the answer to No. 1 to be yes, you go on to 2. If you find that to be no, then your deliberations are over. You come back and tell the judge and the judge sentences the defendant to life without parole.

Now, if the jury determines 1 to be yes, 2 to be yes, then we go on to Special Issue No. 3. Okay? And as opposed to any other type of case under Texas law, and, you know, the case that you served on in the federal court, this issue requires a jury to look at certain things. Okay? And

68

I point out — I say that to you — point out to you the response that you gave on Page 8, about two-thirds of the way down, we say, "Some people feel genetics, circumstances of birth, upbringing, environment, should be considered when determining the proper punishment of someone convicted of a crime. What do you think?" And you said, "It's a valid concern, but should have no bearing on the case."

Well, that's true in regard to any other kind of case under Texas law but a capital murder case. Because if you look here at Special Issue No. 3, it's asking, "Do you find — take into consideration all of the evidence including the circumstances of the offense, the defendant's character, the defendant's background, and the personal moral culpability of the defendant that there's a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?" So, what that — what the legislature has done is instruct a jury that they must consider the background of the defendant. Okay?

Is that something you feel like you'd be able to do?

A. Again, I would have to say I guess it would depend on the circumstances involved.

Q. Sure. I'm not asking you how you would answer.

A. When I filled this out I couldn't think of any

69

reason why that would be an issue.

Q.   Sure.   But you do see what that Special Issue is requiring the jury to do?

A.   Uh-huh.

Q.   Let me go back to what you told us here on the first page.   You're in favor of the death penalty in extreme cases, where the person appears to always be a threat to the public with no ability to be reformed.   For instance, if you hear that the defendant on trial has the ability to be reformed, even though you found that they're guilty of capital murder, even though you found that they would be a future danger, if you are convinced from hearing the evidence that the person has the ability to be reformed, that, under Texas law, could be a certainly sufficiently mitigating circumstance for you personally to believe that the sentence in the case more appropriately should be life without parole than death.   The law gives you that ability, okay?   You understand that?

A.   Yes.

Q.   Mr. Fiddick, let me tell you, also, this.   In looking at Special Issues Numbers 1 and 2, those are kind of objective-type decisions, you know.   Do you find from the evidence that this and this has happened?   Yes or no.   There is no burden of proof on Special Issue No. 3.   So what the law says is that each individual juror is expected

70

to make their own personal moral judgment about the appropriateness of the death sentence.   Okay?   Each individual juror.   And only in the event that all twelve jurors unanimously agree that there is no sufficiently mitigating circumstance does the jury then return a verdict to the court to require the court to sentence the defendant to death.   So, you understand now all twelve jurors have to unanimously agree, and if one juror disagrees, then we're not going to have a death sentence.   Do you understand that?

A.   Yes, sir.

Q.   Now, the law also says that jurors don't have to agree that a particular thing is the sufficiently mitigating circumstance to avoid the death sentence.   Okay?   In other words, something that might be sufficiently mitigating to you might not be sufficiently mitigating to the juror sitting next to you, and, likewise, they could have something sufficiently mitigating to them that you don't feel is sufficiently mitigating.   That's all right, the law says that's fine.   There is no requirement that everybody agree.   The law says that every juror should come to their own personal moral judgment about these issues, and if something appears to the juror to be sufficiently mitigating, then that is their own personal moral judgment.   And in doing that, in talking about that — you know, when

71

you're talking about coming to your own personal moral judgment about something, that's about like, you know, me deciding what church I want to go to, or you deciding what church you want to go to or not go to church.   That's your own personal moral judgment, and I have no right to tell you what your church should be, and you have no right to tell me what my church should be.   So that's what we're saying, each individual juror is required to come to their own personal moral judgment about this issue.

Do you feel that's appropriate and fair?

A.   Yes.

Q.   And are you the type of person, Mr. Fiddick, if you were the one person who saw that there was something sufficiently mitigating in the case, nobody else did but you did, are you the type of person that could hold to your guns?

A.   Yes.

Q.   And not submit to the pressure of the other eleven other jurors?

A.   Yes.

Q.   And, likewise, if you're on the other side of that, if you don't think there is something but somebody else does, do you understand how it would be inappropriate to tell them what their personal moral judgment should be?

A.   Yes.

72

Q.   Very good.   Mr. Fiddick, let me talk to you about some things that people have told us that to them would be sufficiently mitigating.   And I'm not asking you to commit.   But what the law says is, you have to be able to give meaningful consideration to them.   Okay?   Such things as, the age of the defendant on trial at the time of the commission of the offense.   The law says that anybody who committed an act when they were 17 cannot be executed, but a person who commits an act when they are 18 can be.   Okay?   Some people say, well, if the evidence shows me that the defendant on trial is in that very low range 18, 19, 20, 21, 22, something like that, that is something, standing in and of itself, that would be a mitigating circumstance to me sufficient to avoid a death sentence.   Okay?   Because I guess they're thinking that person has a long life ahead of themselves, they can be reformed, they can contribute even — you know, even in the penitentiary.   They can do something worthwhile to other people — for other people.

How do you feel about the issue of age in and of itself?

A.   I believe it goes back to — I mean, we're dealing with laws.   We have to set an age somewhere, you know.   Do I agree with that age necessarily?   No, but that's where it is.

Q.   You'd be able to keep an open mind as to that?

73

A.   Yes.

Q.   Okay, very good.  Some people tell us that lack of significant prior history or violent history would be a sufficiently mitigating circumstance.  They recognize the person did an incredibly horrible act one time on one day, but if they have no history of violence, that would be relevant, not only to Special Issue No. 1, certainly, but also to Special Issue No. 3.

How do you feel about that?

A.   I agree with that.

Q.   Now, whether a person — if we have a party situation, it turns out to be the follower and not the leader of the group that got them to the point where they're committing a capital murder, is that something you'd look at?  In other words, they were acting under the domination of another person.

A.   I still don't understand what you're initially asking.

Q.   Some people tell us that might be a mitigating circumstance.

A.   Personally, no, I don't think it's a mitigating circumstance.  I mean, you know, one person jumps off a cliff, the other person should follow?  No.

Q.   Now, this goes back to something you told us in the questionnaire.  At the bottom of Page 5 we tell you

74

what the law is in regards to voluntary intoxication.  And when we say voluntary intoxication, we're talking about intoxication even by drugs or by alcohol.  And we tell you that the law says voluntary intoxication is not a defense.  You can't become voluntarily intoxicated and go out and commit a criminal offense and say kings-X, you can't prosecute me.  Obviously that is ridiculous.  But over at the top of Page 6 is the follow-up question, and Texas law specifically provides that evidence of intoxication, voluntary intoxication, may be considered in mitigation of punishment.

A.   Uh-hum.

Q.   So, the evidence might show a jury that at the time of the commission of the offense the defendant was taking a mind altering drug, for instance, that that may be something that the jury might look at as being a mitigating circumstance.

How do you feel about that issue?

A.   I would definitely say — personally, I do not — I choose not to do drugs.  I don't feel it's a good enough excuse for someone going out and committing murder.

Q.   And let me agree with you.  No one is saying it's an excuse, but they're saying it may be why the thing happened.

A.   Uh-hum.

75

Q.   So, you know, in hearing the evidence in the case can you keep an open mind to evidence such as that?

A.   I can.  And as I said, if it's killing one person versus multiple, to me, makes it also a decent amount of difference.  I mean, when you look at battered wives, they may premeditate and plan to kill the husband because they put them under such abuse.  Personally, I certainly wouldn't, you know — I certainly wouldn't find someone anywhere nears guilty of capital murder in that situation.  There are definitely circumstances where it varies.

Q.   Very good.  Some people feel that hearing about the background of the defendant and his life history that brought him to the point where he'd be committing that capital murder, you know, the whole life history of the person on trial, whether or not they were born with a silver spoon in their mouth, or whether they were born into abject poverty, whether they were raised by a single parent, under what circumstances, did they move from here and there, like you did in your life.  Some people feel that a life history of a defendant might be a mitigating circumstance to them sufficient to avoid a death sentence.  If they were abused as child, if they were sexually abused as a child, if they were physically and mentally abused as a child, that that could be something they would look at in terms of mitigation.

76

How do you feel about that?

A.   Personally, I think that if the abuse has caused them to be there, then they're likely to still be a threat to society.  So I don't see it as a mitigating circumstance.

Q.   Would you be able do keep an open mind to hearing about that?

A.   Yes, I always try to keep an open mind.

Q.   Sure.  Some people might — or have told us that if they hear from friends and relatives of the defendant who know him best, who's seen him all his life, who come in and tell them that this action was aberrant behavior for them and that they're not normally a violent person, okay, that could be sufficiently mitigating.

Would you be able to keep an open mind about that issue?

A.   Yes.

Q.   Very good.  Remorse, standing in and of itself, some people have told us that if the person on trial is sorry for what they did, and I believe in my heart that they're sorry for what they did, that that could be sufficiently mitigating, standing alone and by itself, to avoid a death sentence.

A.   It's a gray area.  I would have to — again, I think it depends a lot on the circumstances, but —

77

Q.   Very good.  You'd be able to keep an open mind to anything we presented to you?

A.   Yes.

Q.   Very good.  Mr. Fiddick, I think I'm about through.  Do you have any questions about anything we talked about?

A.   I don't think so.

Q.   Do you think you would be able to be a fair juror to both sides in this case?

A.   Yes.

Q.   Thank you, Mr. Fiddick.

THE COURT:  Thank you, sir.  If you'll step out for just a minute, and you'll be coming right back in.

(Prospective juror was excused from the courtroom.)

THE COURT:  What says the State of Texas?

MS. HANDLEY:  We have no challenges.

THE COURT:  Mr. Broadax?

MR. IOLLAR:  We have no challenges.

THE COURT:  Ask him to return.

(Prospective juror returned to the witness stand.)

THE COURT:  Counsel.  Mr. Fiddick, you've been accepted as a qualified juror.  Certainly agree with the attorneys on that.

Now, remember how this is going to proceed.  We should have this requisite number of qualified jurors

78

late this week or early next week.  When that's done, I'll tell you, you can anticipate a call next week.  You'll get the call from the judge's coordinator telling you whether or not you are on the jury or not on the jury.  But for me, I'd ask that you assume you're going to be on the jury, as far as any outside influence such as media, Internet, friends talking about, you know — friends say, well, what went on up there?  Well, the easiest thing to say is the judge told me I can't talk about it until the trial's over.  That's the easiest thing to say.

The sheriff is going to give you the card of the judge's coordinator in case anything should occur in your personal life between now and the trial.  You can give her a call, and we'll deal with it.  Also, I want to make sure that the telephone numbers on your questionnaire are correct, because that's the way you're going to be contacted.  Will you double check?  Make sure you wrote down the right number.

PROSPECTIVE JUROR PARADISE:  My numbers?

THE COURT:  Yes, however you want to be contacted.

PROSPECTIVE JUROR PARADISE:  Yes, sir, that's all correct.

THE COURT:  Great.  Been a real pleasure meeting you, sir.  Good luck to you.

79

MS. HANDLEY:  Thank you, sir.

MR. IOLLAR:  Thank you.

(Juror excused.)

(Prospective Juror Alvin Carter takes the witness stand.)

THE COURT:  Mr. Carter, I want to say good morning, thank you for your patience.  We never know how long this is going to take.

My name is Webb Biard, and I'll be with you here this morning.  We have the attorneys here, and I'm going to introduce them to you here in just a minute.  Before we do that, raise your right hand.

(Prospective juror sworn.)

Mr. Carter, the sheriff has told me that you expressed some concerns to him about your wife's health.

PROSPECTIVE JUROR OLVERA:  Yes, uh-hum.

THE COURT:  All right.  Did you read that pamphlet where Judge Snipes says the trial's going to start August 12th and last up to two weeks?

PROSPECTIVE JUROR OLVERA:  Yes, sir.

THE COURT:  Let me tell you how he runs his court.  Monday through Friday, 9 to 5, break in the morning, break in the afternoon, lunch break.  You wouldn't have to be together over night unless you were deciding your verdict, that could happen.  If that happened, you would be given plenty of notice, and you'd

80

all stay together in a fine hotel, county expense, individual private rooms.  So that's the way the trial's going to proceed.

PROSPECTIVE JUROR OLVERA:  Okay.

THE COURT:  August 10th, two weeks, and then Monday through Friday here in court.  And he's told me — and on behalf of all the attorneys, I want to express our concern for you and your wife.

Did you specify some concerns that her condition might affect your jury service?

PROSPECTIVE JUROR OLVERA:  Yes, sir.  About two weeks ago she had surgery and had to remove her breast, and she starts chemo this Tuesday, and I'll be the source of getting her back and forth with chemo treatment, and it will go on for about six months.

THE COURT:  Just for the record, that would make it a totally extreme hardship on you and her if you had to be here in the courtroom; is that correct?

PROSPECTIVE JUROR OLVERA:  Yes, sir, uh-hum.

THE COURT:  All right.  Thank you very much, sir.  You'll be excused by the attorneys.  I couldn't necessarily do it on my own, but your free to go.

MS. HANDLEY:  Thank you, sir.

MR. IOLLAR:  Thank you.

THE COURT:  Court's in recess until 1:15.

(Lunch recess taken.)

(Prospective Juror Elsa Overa takes the witness stand.)

THE COURT: Miss Overa, is that the correct pronunciation?

PROSPECTIVE JUROR OLVERA: Yes, sir.

THE COURT: Miss Overa, I'd like to introduce myself to you, my name is Webb Biard, and I'll be with you this afternoon during this part of the jury selection process. If you recall, the presiding judge in this court is Michael Snipes. That's who you met with that large jury panel, and I don't necessarily expect you to remember Judge Snipes, but he is the presiding judge, and should you be selected as a juror, Judge Snipes will preside over the actual presentation of evidence.

Also, I'd like to introduce to you Elaine Evans.

MS. EVANS: Good afternoon.

THE COURT: And Andrea Handley.

MS. HANDLEY: Good afternoon.

THE COURT: They represent Dallas County and the State of Texas.

Further to my right is Brad Lollar.

MR. LOLLAR: Hello.

THE COURT: Doug Parks and Kerri Mallon, and they represent Mr. Broadnax.

Do this for me, before we go any further, please, raise your right hand.

(Juror sworn.)

THE COURT: Miss Overa, the way we're going to proceed is, I'm going to talk to you for a short while and then one of the attorneys from each side will talk to you for up to 45 minutes, so this process is going to take about an hour and a half. At the conclusion of that, I will tell you here in open court whether or not you are a qualified juror. By that I mean this. We're in the process of qualifying some fifty prospective jurors, and once that's done the actual trial jury will be selected from that pool of qualified jurors. We anticipate that to be done next week. The day that's done, you will receive a phone call from Judge Snipes' court coordinator telling you if you are or are not going to be on the trial jury.

Now, from reading the — have you had an opportunity to read the pamphlet?

PROSPECTIVE JUROR OLVERA: Yes.

THE COURT: Did it help you a little bit to understand this process?

PROSPECTIVE JUROR OLVERA: Yes, sir.

THE COURT: Good. From reading the pamphlet, from hearing Judge Snipes' remarks in that large room, in filling out the questionnaire, and from appearing here

today, as you sit here now are you aware that this is a capital murder case?

PROSPECTIVE JUROR OLVERA: Yes, sir.

THE COURT: That the State of Texas, through their attorneys, is seeking the death penalty. Do you understand that?

PROSPECTIVE JUROR OLVERA: Yes, sir.

THE COURT: Because of that, we have some very specific procedures, rules, statutes, laws that we must follow, and I hope you understand that. One of those being that you have an opportunity in this type case to talk to the attorneys one-on-one instead of in a large panel, like almost every other kind of case that's tried.

Now, have you ever served on a criminal jury before?

PROSPECTIVE JUROR OLVERA: No, sir.

THE COURT: All criminal jury trials are in two parts. First part's called the guilt/innocence phase. If you find the person not guilty, the trial will be over. If the person's found guilty, then you go into what's called the punishment phase. In that part of the trial, you can hear additional evidence that either side thinks will help you decide the right punishment, and you may also consider all the evidence you heard in the first part of the trial, and then you reach your verdict, whatever

punishment you think is appropriate. And that's true in a theft of a bicycle or a capital murder case, either one.

Now, if someone is found guilty of capital murder there's only two possible punishments. Do you know what they are?

PROSPECTIVE JUROR OLVERA: Life in prison and the death penalty.

THE COURT: That's right. Life in prison without parole or the death penalty. So, there's only two possible punishments for someone who's found guilty of a capital murder.

There's a difference between murder and capital murder, and the lawyers will explain that to you here in a minute, but there is a definite difference. One difference is, for murder the range of punishment is not less than five years nor more than 99 years or life. Capital murder is the only crime in Texas for which the death penalty is a possibility. You cannot receive the death penalty for murder, only capital murder. So we're primarily going to be talking about the procedure in a capital murder case.

Now, some of these laws we talk about you have known since grade school: Right not to testify and those constitutional rights. But some of the matters we'll been talking about, such as those special issues. Remember

85

reading them in the pamphlet?

PROSPECTIVE JUROR OLVERA: Yes, sir.

THE COURT: I assume you've never seen those before?

PROSPECTIVE JUROR OLVERA: No, sir.

THE COURT: Didn't know they existed?

PROSPECTIVE JUROR OLVERA: No, sir.

THE COURT: So we'll spend an inordinate amount of time on those special issues, knowing that they're something completely new to you.

Now, there's nothing, Miss Overa, you won't be able to understand. Let me assure you this is not some legal pop quiz which we're trying to find out who knows the most law. That doesn't have anything to do with it. It's not your job to know the law, it's our job to explain the law to you. And trust me on this, these outstanding lawyers have the ability to do that, that's their job. Once the law's explained to you, you'll be asked, bottom line question, now that you know that's the law, can you follow the law and perform your duties as a juror?

PROSPECTIVE JUROR OLVERA: Yes, sir.

THE COURT: And one of those basic laws is, even though you've found someone guilty of capital murder, do you have the mental discipline to go into that punishment phase, that second part of the trial, and then listen to

86

the evidence, and then based on the evidence decide what the correct punishment is? Or do you believe, as you sit here now, if you found someone guilty of capital murder you already know exactly what you'd do, as far as punishment? Now, if you feel like you know what the punishment would be without hearing any evidence, there's nothing wrong with that, but you would need to tell us. Because if you've already got your mind made up, what you would do if you found someone guilty, you would not be a qualified juror. And, again, I stress that there's absolutely nothing wrong with that. That's what this process is all about.

You've done everything that's required of you by appearing here today and taking an oath to tell the truth. See? To sit on a jury, you have to take another oath that you'll base your verdict on the law and evidence. You haven't taken that oath yet. All you've done is taken an oath to tell the truth. So that's what we're going to be talking to you about.

Can you, if you found someone guilty — and I'm not presuming that anybody is guilty. I'm just saying, if you found someone guilty of capital murder, do you have the mental discipline to go into the punishment phase, look at those three special issues or questions, and then answer them "yes" or "no," and depending on your answers, determine

87

some punishment? I believe you started to say you think you do, and I didn't mean to cut you off. That's the decision you'll make here during this process.

I want you to look very briefly, if you would, at those three special issues on that wall over there. I'm not going to read them to you word-for-word and you read better than I can, and I'm not going to take up a lot of time with 'em, because the attorneys will spend quite a bit of time with you.

But here's when those special issues are addressed. If you would have been selected on a capital murder jury, and you had found the person guilty of capital murder — if you don't find the person guilty of capital murder, you never see those three special issues — and you'd go into the punishment phase, and you'd heard evidence, the judge read you the law, the attorneys presented final argument, and you're back in the jury room at the end of the trial. After you've found the person guilty, that's when you answer those three special issues.

And a yes to 1, a yes to 2, and a no to 3 is a death sentence. So you don't write down "life in prison" or "death," but that's — you'll know in effect what the verdict is. Any answer other than yes, yes, no is a sentence of life in prison without parole. When I say "life in prison without parole," Miss Overa, I mean life in prison

88

without parole. There's no such thing as parole, period. Trust me. If someone is found guilty of capital murder, they'll spend the rest of their life in prison. And, again, there's only those two possible punishments.

Now, from reading that pamphlet, do you see where Judge Snipes tells us that he's going to start this trial August the 10th? It's going to last up to two weeks, Monday through Friday, 9 to 5, break in the morning, break in the afternoon, and a lunch break. The jury would not have to stay together over night, unless and until you were deciding your verdict and you hadn't reached a verdict and you went late into the night and you became tired, unable to concentrate, there's a possibility that you would all be taken to a fine hotel as a group, have individual private rooms, fed, spend the night, and come back the next morning as a group to avoid any outside influence on your very important verdict. That could happen.

I have now given you those dates, starting date, length, days of the week, hours, the possibility of being sequestered, to ask you this. As you sit here, in filling out your questionnaire — and I have it here, and I'm going to hand it to you just a minute. From reading the pamphlet, from thinking about maybe this some since April, as you sit here now are you aware of any reason why you can't sit as a juror in this case?

PROSPECTIVE JUROR OLVERA: No, sir.

THE COURT: Great. Let me give you your questionnaire. Ask Laura to hand it to you. We appreciate you filling that out. I know it took time, but you're going to save more time than that today. The attorneys have read it. It wasn't some idle exercise, and you'll have it there in front of you to refer to in case they say, please turn to page so-and-so and look at answer six - I'm just making that up - and tell us a little bit more about your answer. Okay. I'm going to leave you with this one thing, and I can't be more honest with you. All I want you to do for me is just give us your honest answers. Is that a fair deal?

PROSPECTIVE JUROR OLVERA: Sounds good.

THE COURT: Good. I'm going to reintroduce to you Elaine Evans now who's going to talk to you on behalf of the State of Texas.

Miss Evans.

MS. EVANS: Thank you, Judge.

ELSA OVERA,
after having been previously sworn, testified as follows:

EXAMINATION,

By Ms. Evans:

Q.    Good afternoon, Miss Overa. I see you work for Big Brothers and Big Sisters.

A.    Yes.

Q.    Did you also serve as a big sister to a kid?

A.    Yes.

Q.    And how old is that child?

A.    She just turned 16.

Q.    Oh, great. How long have you been with her?

A.    Since October of 2006.

Q.    For —

A.    Almost a year.

Q.    An important time in her life, right?

A.    Right.

Q.    Appreciate the service that you do you there, and your employment, as well as serving as a big sister. I think it's a great organization.

As the judge told you, we just want to know your honest opinions, because it's the only time that the lawyers from both sides get to talk to you, okay, about how you really feel. And when you filled out this questionnaire, I know it wasn't very fair, because you didn't know any of the law at that time, and a lot of jurors, or most of the jurors that we talked to, had no clue how a jury goes about arriving at a verdict in a death penalty case, because it's very different than other cases you may see on TV or hear about other friends and family serving as a juror on. Okay? And I say that because I've

seen the questionnaire, and, correct me if I'm wrong or if I got a wrong opinion, but it looks like you, like most of the other jurors we talk to, thought that you go back and actually vote whether or not you're in favor of life or death for the individual.

Did you think that when filling this out?

A.    Yes.

Q.    Absolutely. And there is nothing wrong with that at all. I would tell you that we've talked to jurors that are so pro the death penalty that they would take the individual out and do it out on the courthouse steps themselves, if they could. And we've talked to other individuals who are so against the death penalty they think it ought never be invoked and that it's wrong, you know, for them to do and decide. And then we've talked to people like yourself who are in favor of the death penalty in some circumstances, in some murder cases, but obviously not automatically in every case is it deserving or does the state even seek it.

Does that make sense, Ms. Overa?

A.    Yes.

Q.    The reason I say that is because you are certainly entitled — you know, a lot of people say, well, I was just always kind of raised that the law is the law, and it's available here in Texas, so obviously I'm in favor

of and support the death penalty, because it's just what we do — you know, it's the law. There's nothing wrong with that feeling or deep-held belief that you have, okay, and nobody's going to ask you to check it at the door or ask you to change your mind on that. What's important, to be qualified as a juror in this type of case, a death penalty case, is that you're able to render a true verdict based on the law and the evidence, and that goes true for any type of jury trial. If you were to serve as juror in this case, you're going to take an additional oath and that is to render a verdict based on those two things and those two things alone, the law and the evidence. All right? So it's important to realize that there is a process that you go through to arrive at your verdict.

And you know now from reading the pamphlet and from the judge talking to you that nothing is automatic. Just because an individual is convicted of capital murder doesn't mean that they automatically receive a sentence of death, or just because somebody is convicted of capital murder doesn't mean the jury goes back there and deliberates as to whether or not the person deserves — or should live or should die. Okay? The way you arrive at a verdict in a death penalty is answering these three questions, okay? And your answers to those questions then determine what the judge will sentence that individual to.

Make sense?

A. Uh-hum.

Q. Okay. So, it's just important to keep in mind it is a process, and it really does, like the judge said, require the mental discipline to be able to do that and keep an open mind in every phase of the trial. All right?

So, even though — I think I saw in one of your pages you think that maybe the death penalty should be increased, so that it maybe can serve as more of a deterrent, and we wouldn't have individuals out there committing this type of crime. Nothing wrong with that feeling, okay? Nothing wrong with seeing —

I see throughout that you think the individual should pay for the crime they committed or be punished for the actions they did. Nothing wrong with that. But just realize there is a process here, and you have to keep an open mind to it and require the State of Texas to prove it to you.

The reason I say that, we're going to get more into these special issues down the road. But unlike any other type of case, you know, if you were to serve as a juror in a DWI case down in misdemeanor court or, you know, a regular murder — and I say "regular" because the judge told you there's a difference between murder and capital murder. But if you were to serve as a juror in any other

type of case and you were to assess punishment, then you would be doing exactly what you say throughout your questionnaire. You'd let the punishment fit the crime and you'd determine — or you try to punish the individual for what they did, okay, based on their actions, as well as you may hear additional evidence in the punishment phase of the trial that let's you know the character or the background of that individual or any previous criminal history, or lack thereof, to help you decide. By the same token, you could hear that, or you could hear that additional evidence in a death penalty case, but the difference is, in this type of case, you're not really punishing the individual for the act that they committed, you're not making them pay for the crime that they did, per say.

It is very different whenever the State seeks the death penalty, and that is a person convicted of capital murder automatically receives a sentence of life in prison without the possibility of parole. Okay? That's the only thing automatic about it. There's only those two choices, but the default is life without parole. Okay?

The way the jury goes about determining whether or not a person deserves the death penalty or — not deserves it, but whether or not they're going to receive the death penalty, okay, is by answering these questions. Question No. 1 calls on you to look into the future, not,

you know, punish the person for being a capital murderer or being a heinous individual. They may be all those things and maybe the type of person that you don't want to meet on a dark alley, but there's nothing automatic, there's no stereo-type. In other words, just because you've committed capital murder and just because you've been convicted doesn't mean you jump to Special Issue No. 1 and answer it yes. You have to determine if that person is probably — if there's a probability that person's going to be a danger in the future. Does that make sense?

A. Yes.

Q. And that's how, unlike any other type of crime, it's not really, you know — they're not receiving payment for what they did in the punishment. It's, look to the future and tell me: Is this person going to be a danger to those in his society? Okay? Make sense? So that's just kind of an overview.

In looking at your questionnaire, I get that you thought just right along the lines of so many of the other jurors, and I wanted to clarify that before we get into the process.

When the judge told you that there's a difference between capital murder and murder, in other words, if I turn to my co-counsel and I shoot her ten times over and I am happy about what I did, I planned to do it, I

brought my gun here today and it was nice and shiny and loaded full of brand new bullets, that is just a murder, because it's doesn't have any additional aggravating factor to elevate it to a capital murder. Okay? Capital murder is always going to be an intentional murder, it's what they set out to do, they meant to do it, it's not an accident, it's not a mistake. Intentional murder, plus some aggravating factor.

Some examples of capital murder could be murder of a police officer in the line of duty, a murder of a fireman in the line of his duty, or a murder of two or more individuals in the same criminal conduct, okay, same transaction. Or, like you have before you in this case, and that is an intentional murder, plus a robbery, plus another felony offense, okay, to aggravate it and elevate it to a capital murder. As the judge said, capital murder is the only offense for which the death penalty is an option. No other type of crime is it an option.

I see in your questionnaire again, when we're unfairly asking you where you think it should apply, that you say anything involving the murder of children or an innocent person. I will tell you that capital murder does include, if you murder a child under the age of six, that is a capital murder, and you're eligible — or the death penalty is an option if you murder a child under the age of

six. We had a juror tell us that they think possibly the legislature should change that age and say any child under the age of eighteen, you know, should qualify for a death sentence. And I tell you, I probably would believe that too, but it's not the law.

So, can you understand and follow the law as it's given to you by the judge?

A. Yes.

Q. When I say that capital murder is the only crime that carries with it the option of the death penalty, because it's just merely that, it's just an option. Okay? And, again, life without parole is what is the automatic here if someone is found guilty of capital murder, and then you have to go through and answer these questions, because it's a process. Remember, there's no automatics.

Can you hold the State to the burden and require us to prove the things that we're required to prove to you in each and every stage?

A. Yes.

Q. You could?

A. Yes, ma'am.

Q. And we're going to go more into that. I want to talk about the process. Right now this is called voir dire, and it's the time the lawyers get to talk to you about your feelings, because we can't talk to you if you're

sitting over here. We can't say, hey, how would you feel if we bring you this piece of evidence? It's too late. So we have to talk to you about what may come up in this type of case, all right, just to make sure, again, that you're qualified that, you know, you can base your verdict on nothing but the law and the evidence. And there can be people that disagree with the law or think that something ought to be changed about it, but at the same time they're qualified, because they can follow the law if the judge gives it to them. And I think you'd be able to do that, Miss Overa.

After the voir dire process, if you're selected to serve as a juror, that's the guilt/innocence phase. That's when you look at that indictment and you determine: Did the State prove everything they said they were going to prove? Did they prove that intentional murder, plus a robbery? Okay? And is it this defendant on trial that's the one that did it? And we have to prove each and every one of those things to you beyond a reasonable doubt in the guilt/innocence phase.

If the jury (sic) is convicted of capital murder, and only if they're convicted of capital murder, will you then move onto the special issues, okay? In the punishment phase of the trial, you could hear additional evidence, or you could conceivably answer the question to

99

Special Issue No. 1 based on what you heard in the guilt/innocence phase. But, again, everything remains separate and apart, and you have to keep an open mind to what you're going to hear throughout.

Now, I want to talk about some of the defendant's rights. In any type of criminal case the defendant has certain rights, and that is, as he sits here, he's presumed to be innocent. And whenever I talked to you about the indictment and the State having to prove that to you, that indictment in front of you is just merely a piece of paper and that's all it is. It's by no way, shape or form indicating that this man over here is guilty. The State is required to prove that beyond a reasonable doubt and at no time does the burden shift to the Defense. They could work cross word puzzles all day long so long as they showed up. That's all they're required to do.

Could you give this defendant his presumption of innocence?

A. Yes.

Q. Okay. And I saw where you had heard a little bit about this case in the media. I would submit to you that a lot of jurors have heard about it or watched news or TV, because that's what we do. We live in a society surrounded by audio/visual technology, and if you hadn't heard about it, or if we had just a bunch of jurors that sat down in

100

the basement and did nothing all day long, that might be a little odd, too. So we don't want to, you know, seal you off from everything. But the question to ask is — or to be qualified, you can't have formed an opinion based on what you heard or what you saw as to this defendant's guilt, or what you would do in punishment. Have you done that, Miss Overa, based on what you heard or saw?

A. No, I don't think so.

Q. And, so, moving on to — when I say that the State has the burden, that means that we have to prove it to you. We do the accusing, we gotta do the proving. Does that seem fair?

A. Uh-hum?

Q. And our burden is beyond a reasonable doubt. What does beyond a reasonable doubt mean to you?

A. That there's really no loopholes and no questions, like, well, they didn't answer that. I mean, everything shows up, it's proven.

Q. Okay. And that's a fair assessment, good definition. The reason I ask you what it means to you is because the law doesn't give us a definition. It's what it means to each individual juror, okay, in your mind. I would submit that it's not 100 percent certainty or beyond all doubt, because, probably, if you new something without any shadow of a doubt, like you sometimes hear on TV, or

101

one-hundred percent certain, then probably you saw it with your own eyes. Fair to say?

A. Yes.

Q. And the reason I ask you to answer is because she's writing everything you say. Okay, Miss Overa?

And, so, as long as you can hold us to beyond a reasonable doubt. And based on your definition, it sounds like you could hold us to beyond a reasonable doubt. Could you do that?

A. Yes.

Q. And require the State only to prove it to you?

A. Yes.

Q. Okay. Another one of the rights you hear about is the defendant's Fifth Amendment right. In any type of criminal case the State of Texas can't say, okay, Mr. Defendant, hop up on that stand and tell the jury about what you did on the day in question. Can't do that in the guilt/innocence or punishment. It's this defendant or any defendant's decision, and his alone, whether or not he's going to testify. He can make that on the advice of his counsel, but his lawyers can't even tell him to take the stand. It's his decision and his alone. There could be tons of reasons why somebody wouldn't want to testify. Could be that the State hasn't proven the case, and, so, he's advised, hey, don't testify, they didn't prove it.

102

All right? So, can you see how important it is in our system of justice that you not hold it against an individual if they decide not to testify?

A. Yes.

Q. And you wouldn't hold it against this defendant if he chose not to testify, correct?

A. No.

Q. Again, going back to that indictment, there's certain elements or certain things we have to prove. We have to prove where it happened, who it happened to, the manner and means, like the way somebody caused the death of an individual. Let's say, for example, we have to prove all of these beyond a reasonable doubt. Let's say that you were sitting, not on this case, because we can't get into the facts of this case, but you were just sitting as a juror on a murder case and the State alleged that the defendant caused the death of that individual by shooting them with a firearm. And you heard testimony from the defendant himself, and he said, yeah, I did it, and I'd do it again. But then you further hear testimony that — from the medical examiner that, well, yeah, that's the person that's deceased and they're dead, but they didn't die from a gun shot wound to the chest, they died from being stabbed to death, stab wounds. Okay? And then you hear further evidence from a crime scene tech that says, no, there's no

103

gun, or no bullets, or no shell casings, but there's a bloody knife. Has the State proven to you what we set out to prove beyond a reasonable doubt?

A. No, I wouldn't say they did.

Q. No, because we have to prove that manner and means. Fair to say?

A. Uh-huh.

Q. And if the State did not prove what we're the ones that charged the individual with, could you hold the State to the burden of beyond a reasonable doubt, and if we didn't prove it, could you return a verdict of not guilty?

A. Yes.

Q. Credibility of witnesses. You may hear in any type of criminal case from a variety of people, and whether or not — you know, the law says whether or not that individual is a priest, a prostitute, a police officer, you can't automatically start judging the credibility when they walk through these doors. Okay? You have to wait and after you hear what they have to say, then you can start judging their credibility, and then you can start, you know, say, well, based on their training and experience, I do find that they're credible and believable. But not until they take the stand and you hear what they have to say. You can't simply by virtue of their profession or by the fact that they wear a badge or uniform say that they're

104

more credible than others, start them off higher than others. Seem fair?

A. Yes.

Q. And the reason I explain that is because — once again, we haven't really explained a whole lot to you. And on Page 7, it's a bit of a trick question, because we ask, "Do you believe police officers are more likely to tell the truth than the average person?" And you say, "Yes," because you've basically had a positive experience with law enforcement. There's nothing wrong with that. Most individuals have had positive experiences with law enforcement and are taught, you know, from the time they're a small child to trust law enforcement. Nothing wrong with that. Just, if you hear from a law enforcement or a police officer witness, can you start them out the same — on the same playing field as any other witness on the case?

A. Yes.

Q. Okay. Thank you.

Moving into, again, this type of case, a capital murder, an intentional murder, plus an aggravating factor, here being a robbery, I want to give you an example of how important it is to keep an open mind in all phases of the trial, okay, and require the State to prove it. For example, a capital murder could be your typical 7-Eleven robbery where somebody goes in, guns blazing and says, give

105

me all the money in the register, and I want all those cartons of cigarettes, and you, you go get in the bathroom. And then before they leave, they don't want to leave any witnesses so they go and pop a bullet into the clerk's head and take off, okay, and take all the money and cigarettes. That would be capital murder; fair to say?

A.   Yes.

Q.   That is a case that's eligible — or the death penalty would be an option for.

But if I gave you another example, and I said that you had this guy on the street, and he'd been contemplating killing his neighbor for a long time, and he goes out and buys a new gun and buys the bullets and sits there and says, "You know what? Today's the day." And he marches down three houses down to that neighbor's house, rings the door bell, and that neighbor that he (inaudible) comes to the door, and he says, "Give me all your money."

And the neighbor says, "I'm not going to give you anything."

And, so, he shoots him, and he takes the money and he takes off.

Capital murder?

A.   I would say it's capital murder. You're absolutely right, because it's murder in the course of a robbery, taking the person's property. It's an intentional

106

murder, he set out to do it. So those are two scenarios. But if I further told you about that neighbor, or you heard further evidence about that neighbor and learned that that neighbor has been suffering and dealing with his teenage sons from a drug addiction. Those two teenage boys have a horrible drug addition, they've had it for quite some time now, as do all their other friends in the neighborhood, and the reason they started drugs and got hooked on drugs is because the neighbor that he went down there and killed is in fact the local drug dealer, and he's been supplying this poison to all the kids in the neighborhood for years and nobody will stop it. He's called the police to say, hey, that's a drug house down there. He's killing my boys, he's killing my boys' friends, please do something. And nobody does anything. So he goes down, and he takes matters into his own hands. Still not the right thing, still against the law, still a capital murder, but he goes down, and he shoots him, and that money he took is actually drug money.

And then you hear that he goes and takes that drug money down to the local charity and deposits it in their charity account. Okay? And then he goes and turns himself in and explains why he did what he did, that nobody would give him any help. All right?

And you kind of talked about that in your ability to keep an open mind to those sorts of things or to

107

the facts or circumstances of any case. And I saw that, I believe, on maybe Page 5, whenever you talk about, "If the person that was murdered was involved with any illegal activities leading up to their murder, or if the person was completely innocent." All right? And in answering the special issues and in keeping an open mind to — you don't know — I mean, you don't know if you're going to hear the case similar to a 7-Eleven robbery, that intentional murder, or if you're going to hear something, you know, like the neighbor that goes down and kills the local drug dealer, or a neighbor that's just ticked off at the guy down the street and goes and takes matters into his own hands and kills him. You just don't know. It could be a whole host of set of facts. And what the law is saying is you can't jump to any conclusions, and just because you've found somebody guilty of capital murder, you've got to wait, because you don't know what else you might hear, and you can't base it, you know, on anything else but the answers to these special issues.

In your answer to that, where you contemplate the person — the victim could be completely innocent, or they could be involved in something themselves, you know, Special Issue No. 3 – and we're going to get into that a bit later – gives you that opportunity, that out, if you will, if that's something that you choose to say, hey, that gives

108

me pause. Maybe that rises to the level of being sufficiently mitigating to me in my mind. But we'll get to that.

The important thing is, I give you those examples to illustrate that after finding somebody guilty of capital murder, if the State proves it to you, you then have to wait, because there's nothing automatic. No matter how horrible and heinous you think that person is, you don't base it on them paying for the crime they've committed, you base it on Special Issue No. 1, which is basically — we call it the future dangerousness question, okay? And, again, there's no automatic answer. Just in the first phase, as you said you could presume this defendant innocent, you now in the punishment phase, you have to presume that a life sentence is appropriate, because I told you, that's the only automatic. Because there's those two options, the law says life is appropriate unless and until the State can prove beyond a reasonable doubt that that individual is going to be a future danger, all right? That's Special Issue No. 1. The burden of proof, again, rests with the State, never shifts. It's our burden in Special Issue No. 1 and Special Issue No. 2 to prove those to you beyond a reasonable doubt. There is no burden in Special Issue No. 3. It's kind of a different sort of thing. But it's important to remember that you've got to

109

presume the answer to Special Issue No. 1 is no, okay? That they will not be a future danger. Just because they've committed a capital murder, no matter how horrible and heinous, doesn't mean they automatically will. The law says that you can take into account everything you heard in the guilt/innocence, the crime the person's on trial for that you just convicted them of. You can say, know what? That tells me all I need to know about that individual. He is going to be a future danger, because I can tell by his actions and what he did before that crime and during that crime and after that crime. But you've got to answer it in the context of Special Issue No. 1. You can't just stereotype and say, that person, he's the type of person that's always going to be, so I'm going to answer it yes. Presume no, look at the evidence from the first phase, look at any additional evidence that you may hear in the punishment phase to help you answer Special Issue No. 1. And it says, "Do you find from the evidence beyond a reasonable doubt that there's a probability," and when it says "probability" it doesn't say that without absolute certainty you know that this defendant, as he sits here today, is going to do other criminal offenses or going to be a continuing threat to society, okay? It's says a probability and probability isn't the same thing as a possibility. Do you see that difference?

110

A.   Yes.

Q.   Anything can be possible. You know, I could say I'm going to go win the New York marathon next week, but I don't run a step in my life. So possible but not probable, right?

A.   Correct.

Q.   Some people say probability to them means more likely than not. Does that seem fair?

A.   Yes.

Q.   Okay. That the defendant would commit criminal acts of violence. Now, the statute does not read, that would commit another murder, that the person would commit another robbery. It doesn't spell out what. It's kind of like beyond a reasonable doubt, no definition. It's for you as an individual juror to decide what is a criminal act of violence to you.

What types of things would you consider to be a criminal act of violence?

A.   Robbery, aggravated assault, anything like that.

Q.   Let's say for example that I turn to my co-counsel and I pop her in the face with my fist. Criminal act of violence? She's sitting there minding her own business, didn't do anything to instigate it.

A.   I would say yes.

Q.   You had some hesitation. Tell me about that.

111

A.   If she's not doing anything to deserve it, and you just hit her, yeah, it's violent.

Q.   And when you're answering Special Issue No. 1, think about the context, and I think that you already contemplated that in your questionnaire. If you find someone guilty of capital murder, what do you know they're automatically going to serve?

A.   Life in prison, no parole.

Q.   Absolutely. And, so, Special Issue No. 1 is answered in the context of what their society may very well be or will be if they're found guilty of capital murder, and that is prison society. Do you think that prison can also be a society?

A.   I believe so, yes.

Q.   And in you're saying you believe so, yes, there's people like guards, there's other inmates, there's, you know, priests, there's teachers, there's people that help with the day-to-day operations of that place, there's visitors of the other inmates, all right? I would submit to you that there are individuals there that are doing their time peacefully and then there's others that are just not, okay? And I think you recognize that. In one of your answers, I guess it's Page 8, whenever asked, "Do you think prison rehabilitates people?" you say, "No, it seems like prison makes you a bigger criminal, because you have to

112

protect yourself." So I think you realize, you know, the types of things that can go on in a prison society. Fair to say?

A.   Yes.

Q.   And, so, what's Special Issue No. 1 is calling on you to then answer, after having found somebody guilty of capital murder, do you believe the State has proven to you beyond a reasonable doubt that there's a probability that this defendant would commit criminal acts of violence that would constitute a threat to that society. Make sense?

A.   Yes.

Q.   So that, kind of like you said, individuals are having to protect themselves. All right?

What types of things would you look to to determine whether or not the State had proven to you that that individual on trial is going to be a future danger?

A.   Maybe what brought on the crime.

Q.   What brought it on?

A.   Uh-huh.

Q.   Okay. Any other additional evidence that you would hope to hear, or do you think that you can maybe base your verdict, like the law says, solely on the facts of the case?

A.   Maybe hearing the defendant — if there's any previous criminal activity or anything like that, you know,

see if there's a history of violence or crimes.

Q. So, maybe the individual's track record, what they did in the past is a good predictor of the future, as well. We hear people say that. The important thing to keep in mind is, it's a process, nothing automatic, okay? So, will you hold the State to the burden and require us to prove it to you?

A. Yes.

Q. Okay. If you answer Special Issue No. 1 no because you do not believe that they're going to be a future danger or a continuing threat to society, the trial stops and the defendant receives a punishment of life without parole, okay? If you answer it yes, then you move on to Special Issue No. 2.

Special Issue No. 2, what that is asking you is, "Do you find from the evidence beyond a reasonable doubt that the defendant actually caused the death of the deceased," or did not actually cause the death of the deceased but intended to kill the deceased or anticipated that a human life would be taken? What that amounts to is the law of parties here in Texas. And that says you can be held criminally responsible for the acts of another, so long as you aided, assisted, or solicited, or encouraged or participated in that offense in some way, okay? And, so, basically what that -- I mean, let's say myself, my

co-counsel, we sit together at my kitchen table and we plan out to do a 7-Eleven robbery. And I say, I know the best one to go to, there's no one there late at night. And she's like, great, I'll bring the gun, and I've got some bullets. So, we head off in the car, she's driving, and I'm sitting in the passenger seat, and we get there to that 7-Eleven, and I say, okay, I'm going in, I'm taking the cigarettes and taking the money. She's, like, great, do what you gotta do, and I say, oh, man, I left the mask sitting there on the kitchen table. And she's like, don't worry about it, don't leave any witnesses. So I go in, and I take the cigarettes and take the money, and I kill the clerk, because I don't want to leave any witnesses, and then come back outside with all the stuff, and we take off.

I'm guilty of capital murder, or I could be found guilty, correct?

A. Correct.

Q. And with the law of parties, Special Issue No. 2 is saying, she too could be found guilty of capital murder; fair to say?

A. I would say so. Yeah, I would think so. She didn't do anything to stop it.

Q. Because we sat there and planned it together. And what the law says is by mere presence, you're not going to be guilty of a crime, okay? But didn't it sound like

she was more than merely present?

A. Yes.

Q. We sat there and planned it out together, she's kind of the get-away driver, maybe acting as a look-out for me, okay? And then what Special Issue No. 2 is saying is, are you the actual trigger person? So you decide, did the State prove to you beyond a reasonable doubt that the person on trial is the person that pulled the trigger and killed the individual and robbed them. Okay? Capital murder, okay? Or, if not the actual trigger person, did they participate in that offense to a level that makes them a party, criminally responsible here in Texas, and in doing so, did they anticipate, actually anticipate that a human life would be taken?

Can you see how some jurors could say, by my co-counsel saying, don't leave any witnesses, that she would be -- and then she sees me going in with the gun, she even provided it, that she would be actually anticipating that a human life would be taken?

A. Yes.

Q. You have some hesitation. What is that?

A. Well, I mean, because she didn't actually commit the murders, so I'm not sure if she could be charged with it. I mean, even though she provided everything, didn't stop it and gave you the idea of leave no witnesses, she

didn't actually pull the trigger, so she didn't actually do it. But she was involved in it.

Q. Right.

A. So --

Q. What the law of parties is, is basically, if that involvement rises to a level that makes you responsible, okay, and by that you aid, assist, encourage, or attempt to aid the individual in the commission of that crime in any way, then you can be charged with and convicted of that offense that results, okay? Capital murder. And we sat there and planned that out, right?

A. Yes.

Q. And then she says, don't leave any witnesses.

So, what Special Issue No. 2 is saying is if you're not the trigger person, you had actually anticipated. All right? So, in other words, if she had no clue that I was going to go in there and do that, you know, in fact, she handed me a toy gun or something and had no clue, no reason to believe I had another gun, you know, that I would pull out and then later kill the clerk, you know, that would be a fact question or a question for the jury to determine. Did the State prove it to me beyond a reasonable doubt? But what the law says is you can be found guilty of capital murder, and you can receive the death penalty even if you were not the trigger man. All right?

How do you feel about that? Do you think it's fair?

A. I believe it's fair.

Q. So long as we prove it to you beyond a reasonable doubt.

A. Correct.

Q. All right. If the answer to Special Issue No. 2 is yes, then you move on to Special Issue No. 3. If you do not believe the State proved Special Issue No. 2 to you and so you answer it no, the trial stops, he receives a sentence of life without parole, okay? If you answer it yes, though, you move on to Special Issue No. 3. As I told you, there's no burden there. It's a different sort of question you're being asked to consider. We call it the safety net. And basically what that means is, if you found somebody guilty of capital murder, then you go on and you answer Special Issue No. 1 yes, that they're going to be a future danger, Special Issue No. 2, yes, that they're the trigger person, or they actually anticipated a life would be taken, that person is sitting squarely on a death sentence, okay?

Now, what Special Issue No. 3 is saying, take into consideration everything you've heard, everything you heard in the guilt/innocence phase and everything that you heard there in that punishment phase, including

circumstances of the offense, the defendant's character and background and the personal, moral culpability of the defendant, all right? Take all that into consideration again, everything you hear, because you're required — the law tells you, you have to give meaningful consideration to all the evidence you've heard. But, then, it is your job as an individual juror to then classify or categorize what you heard. And you may think that some things are mitigating, meaning it kind of lowers their criminal responsibility. And, again, I think you kind of spoke to that when you say, well, if the victim was doing something, committing a crime in the process, then, hey, that may lower the person's culpability.

Am I fair in assuming that's what you were meaning?

A. Yes.

Q. Okay. So you can say something lessens their moral culpability or responsibility for the offense and find something to be mitigating. Or you may think that certain things are aggravating or make it worse, you know? That they were planning it out, or — some people say intoxication on drugs or alcohol is mitigating to them, lowers it. Other people say, no, I think that's worse if they're out there doing drugs and alcohol and committing crimes. All right? It's for your job and your job alone

to determine what is mitigating to you, all right? And just because something is mitigating, or you may hear a thousand pieces of evidence that you, in your mind, are mitigating or kind of lowers the responsibility, it has to rise to the level of being then sufficiently mitigating, all right? Sufficiently mitigating so much so that you would then overturn that sentence of death and return a verdict — or answer that Special Issue No. 3 that would then result in a life sentence, okay? Make sense?

A. Yeah.

Q. Let me give you an example. You know, a juror could, in that example I gave you about the neighbor that kills their drug dealing neighbor —

MR. PARKS: Judge, we're going to object, that's a suggestion that that's what that question has asked for, and is too fact specific, and it diminishes the intention of the legislature.

THE COURT: Overruled.

Q. (By Ms. Handley) You, as a juror, will hear the evidence in the specific case on trial, okay? And what you're required to do throughout the entire process is keep an open mind and consider and weigh all the evidence you hear and determine: Did the State prove what they had to prove to you? And then in Special Issue No. 3, just give everything meaningful consideration again, give it another

look, and determine to you if there's something that rises to the level of being sufficiently mitigating. For example, some people tell us in that illustration about the person that kills their drug dealing neighbor, with regard to Special Issue No. 1, they could see where, you know what? He killed that one person that he had a bone to pick with, because he had ruined the entire neighborhood, he had ruined that individual's son. He's not going to be a danger — I don't believe he's going to be a danger to anyone else, because he's killed the one person he had a beef with, all right? And, so, some people say they could see where answer to Special Issue No. 1, in that scenario, would then be no, and the trial would stop, life without parole. All right?

Some people tell us, on the other hand, if that individual is then serving a life sentence in prison, because that's the only thing automatic if you're found guilty of capital murder, who do you think he's going to be serving his sentence with there in prison?

A. The hard core criminals.

Q. And potentially other drug dealers; fair to say?

A. Yes.

Q. So, if you hear evidence that the individual has this deep-held belief and hatred now against drug dealers, do you see where it would be possible, depending on what

121

you hear, to answer Special Issue No. 1 yes, that he is going to be a danger to others in that society?

A. I guess he would be.

Q. Understand?

A. Uh-hum.

Q. And then carrying that through to Special Issue No. 3, you may find and take all that into consideration and it may tug at your heart, and you may find that, you know what? That's mitigating to me, I guess, that he killed a drug dealer, but you know, what rises to the level of being sufficient to me is the fact that he then goes and donates the money to the local charity, or because he goes and turns himself in afterwards and confesses. And it's not — the question right now is not what you will or you won't find to be mitigating, or what would rise to the level of being sufficiently mitigating in your mind. The question just is, if you individually, as a juror sitting and hearing the evidence and looking at it all again find something to be mitigating and then you find that to rise to the level of being sufficiently mitigating, so much so that you then feel like it's your, you know, oath that you should now return or turn over that death sentence into a life sentence, would you then answer that question yes, if you thought it was the right thing to do?

I probably —

122

MR. PARKS: Judge — let her answer the question.

Q. (By Ms. Handley) Go ahead.

THE COURT: I'll sustain the objection.

A. I would say yes.

Q. (By Ms. Handley) Okay. And, you know, that's all the law's contemplating. As you sit here right now, you haven't heard any of the facts of this case, you haven't heard any of the evidence. After you hear the guilt/innocence phase of the trial you still cannot automatically answer any of these questions, you've got to wait and consider everything. And that's what the law says, just take everything into consideration. And as you sit here right now, you may be thinking in your mind: I can't think of anything that might cause me to, but I'd keep an open mind. You're still qualified, okay? It's just, if you hear something that in your mind is sufficiently mitigating, would you then answer that question "yes" if you thought it was the right thing and overturn that sentence of death?

A. Possibly, yes.

Q. I think I understand why you said "possibly, yes," because as you sit here right now, you don't know what you're going to hear. Fair to say?

A. Yes, correct.

123

Q. Even back before you even knew the law or knew these special issues existed or how a person goes about determining the verdict in this type of case, it looks like you were already speaking to that, like I said, in your questionnaire, where you were, you know, kind of looking at issues at what makes a person dangerous, you know, if the victim in any way, shape or form had something to do — or they were involved in activities that led to their death. Specifically, you know, what would be that determining factor for you, whether or not a person receives death or a life sentence, you said if that person that was murdered was involved in any illegal activities leading up to their murder, or if the person was completely innocent. So I could see where that might be a consideration in your mind. Fair to say?

A. Yes.

Q. So, that is the type of thing that Special Issue No. 3 is contemplating, okay?

A. Okay.

Q. And, again, as you sit here right now, you don't have to tell us what would or wouldn't be. Some people think, you know, well, I'm going to wait until I hear it, but they say that maybe age or maybe circumstances at birth, or if the person was abused, or if they're a leader or a follower, or if, you know, they're under the influence

124

of drugs or alcohol. But just because some other juror back there finds something to be mitigating to them, that doesn't mean that that has to be mitigating to you. And just because something is mitigating, the question that thing calls for is, is it sufficiently mitigating to overturn that sentence of death, okay? Make sense, what it's asking you?

A. Yes.

Q. And, so, that question is, you know, based on your personal assessment after you've looked at all the evidence again. And after hearing about the process, does it sound like something that you would be able to do in keeping an open mind in all parts of this capital murder trial?

A. Yes.

Q. Okay. You'd be able to listen to the evidence and base your verdict on only those two things, the law and the evidence in the case?

A. I believe so, yes.

Q. What's the hesitation?

A. Well, I don't know, just the whole moral — even though it may be the law, some people follow the law, some don't, and some have no intent to follow it ever.

Q. Okay. You mean the individual on trial?

A. Well, just in general.

125

Q.   Okay.  And, you know, that is something that you may hear evidence of or something to consider, okay?  The question, though, is, if you were to serve as a juror in this case, would you as a juror follow the law as the judge gives it to you and as the judge instructs you are to follow it, okay, and not base your verdict, in other words, on any sort of automatic response or automatic predisposition towards thinking about an individual or a particular crime?  Okay?  No knee-jerk reactions.  You've got to go through the process and require the State to prove it to you.

A.   Oh, yeah.

Q.   You would do that?

A.   Yes, ma'am.

Q.   Just because the State — you know, I would tell you — you say in here that you are in favor of an eye for an eye, and, again, nothing wrong with your beliefs, all right?  But I will tell you that the State of Texas itself does not support the proposition of an eye for an eye, because if it did, you know, it would include any death of an individual, would then be — you would pay for it with your own life, okay?  And that's not the law, it's only capital murder.  And then we would not need these Special Issues, if the State of Texas believed that if you kill an individual then you deserve to pay for it with your own

126

life, okay?  So, just keep that in mind, that the State of Texas doesn't believe in that proposition, and just because we the State are seeking the death penalty doesn't mean that anything has been proven to you.  You've got to wait until you get in the courtroom and determine, did we prove it in answering these special issues?  All right?

A.   Yes, ma'am.

Q.   You could do that?

A.   Yes, ma'am.

Q.   Oh, I did want to ask one question.  Your brother, I saw, had a DWI —

A.   Correct.

Q.   — a while back?  Anything about that that would cause you pause in listening to the evidence in this case?

A.   I don't believe so.

Q.   Do you believe he was treated fairly?

A.   For the most part, you know.  He didn't get stopped until he was already at his apartment, parked in his apartment complex, so he was already home safe, there was no car accident.  So I'm a little impartial of whether, you know, the police officer would have just let him go ahead and go inside or maybe write him some kind of ticket.  Did he really need to take him in for DWI?  But, I mean, he was driving intoxicated.  That I don't question at all.

Q.   Just the circumstances of that; fair to say?

127

A.   Uh-huh.

Q.   And, again, that's all the law asks you to contemplate here.  Listen to the circumstances and the facts of the case, and this time you get to decide what's fair and appropriate, okay?  But it has to be based on the law and the evidence, all right?

A.   Uh-hum.

Q.   Is your brother a younger brother, older brother?

A.   Older.

MS. HANDLEY:  Pass the juror.

THE COURT:  Do you need to take a short five-minute break?

A.   That would be nice.

(Recess taken.)

THE COURT:  Mr. Parks is going to speak to you now on behalf of Mr. Broadnax.

EXAMINATION,

By Mr. Parks:

Q.   Ms. Overa, you doing all right?

A.   Yes.

Q.   You had your break.  Ready to go for 30, 40 minutes?

A.   Yes, sir.

Q.   Maybe 45, but I'll try not to take that long.  What I want to do, Miss Overa, is tell you

128

kind of a road map of what we're going to do here.  I'm going to talk to you a little bit about your questionnaire and ask you to kind of flush out some of your answers for me.  I'll talk to you some about the guilt/innocence phase of the trial, and then I'll talk to you about these special issues.  Now, one thing that I want to make sure that you understand is that just because I'm going to talk about the special issues, the punishment phase of the trial, I do not want you to assume that we believe that it's a foregone conclusion that Mr. Broadnax is going to be found guilty of this offense.  We're not suggesting that at all.  It concerns me — I was frightened, either earlier this week or one day last week - these days sort of run together - by a juror who told us after he had completed 45 minutes right where you are, he was under the impression that we'd already had a trial, that Mr. Broadnax had been found guilty, and that all we were going to do was to decide punishment.  That scared me, because we never know, and it's a great concern to me.

We do this all the time.  We've been at this about seven weeks.  I've heard their voir dire, they've heard my voir dire.  We probably hear each other in our sleep by this time.  But you as a juror and the other prospective jurors are hearing all of this for the first time.  I've become concerned that you read things into some

129

of the things that we say to you, that you make assumptions, not just you but jurors in your position, prospective jurors, make assumptions based on what they think that they are being told, just like that juror made an assumption that Mr. Broadnax already had been found guilty because we're spending all this time talking about punishment. You shouldn't do that.

The real purpose of voir dire, what we're doing now, is to explain the law and see whether or not a juror can follow the law. It's not about making judgments about a person's character, or their good citizenship, or whatever. That person is a good citizen who says I understand the law, and I can follow the law, and I will follow the law. That person is a good citizen who says, I understand that law, I disagree with the law, and I cannot in good conscious follow law. That's a good citizen, too, just as good as that first one.

A. Uh-hum.

Q. The one who's not a good citizen is the one who says, I understand the law, when they don't, and I can follow the law, when they can't, because they're not being forward with us, truthful with us so that, you know, we wind up not knowing about that and a person just not get a fair trial. So, we encourage everyone just to tell us the truth about these issues and not worry about the effect of

130

their answers or the consequences that might come. Worse thing that could happen to somebody is that we would say thank you very much, we appreciate your honesty, you're not going to have to serve on the trial; or, thank you very much, we appreciate your honesty, you're one of those persons that's in the qualified pool. Whatever it is, we respect the effort and the time that everyone gives to come down here.

Let me — before we go into the questionnaire, let me talk to you a little bit about the guilt/innocence stage of the trial to make sure that you are — we're on the same page here. You know that Mr. Broadnax is presumed in law to be innocent where he sits here this afternoon. The question is, do you yourself presume him to be innocent?

A. Yes.

Q. You understand that the State of Texas has the burden of proof, that that burden of proof never shifts to the defendant. We're not required to prove that Mr. Broadnax is innocent. It's up to them to prove, if they can, that he did exactly what they have alleged in their indictment. You understand that?

A. Yes, sir.

Q. And would you be able to hold them to that burden?

131

A. Yes, sir.

Q. And if they failed to prove what they have alleged in any part of that indictment, could you and would you return a verdict of not guilty?

A. Yes, sir.

Q. Sometimes, Miss Overa, there are situations involving what we call lesser included offenses, where a person could be charged with capital murder, for instance, yet the evidence suggests that if he is guilty, he's guilty of some lesser offense. Let me give you a couple of examples of how that could happen. For instance, you know now that a capital murder is an intentional killing during the course of the commission of robbery, as it's alleged in this case, okay? So, obviously there is — if the State fails to prove either one of those two things, that is to say an intentional murder during the course of a robbery, that doesn't necessarily mean that the defendant is totally not guilty. He may be not guilty of capital murder, but might be guilty of robbery or murder. If you heard a case and you are convinced by the evidence that the defendant did in fact intentionally kill the deceased, but you had a reasonable doubt whether or not it was during the course of a robbery, then you would find the defendant not guilty of capital murder, guilty of murder. Does that make sense to you?

132

A. Yes, sir.

Q. By the same token, you might find that there was a homicide, a murder, during the course of the commission of a robbery, but that it was not an intentional murder, okay? And, so, that's another way that a person might be faced with the possibility of deciding upon the lesser included offense, okay?

Would you be open to considering lesser included offenses if they were given — if you were given that option in the Court's Charge?

A. Yes, sir.

Q. Okay. Now, let me talk to you about beyond a reasonable doubt. And let me preface what I'm about to say, just so the record is clear, that I am not criticizing Miss Evans, okay? I want to talk to you about a couple things that lawyers — I've been doing this nearly forty years. I must have heard a thousands times two things that, to my way of thinking, are some of the silliest things we say down here, but we're all guilty of saying them, okay? I want to make sure you understand two things. When you're told that the Defense has not got to do anything except be here and that we could sit here and work cross word puzzles, if we want to, is just not true. Now, I say it's not a criticism of Miss Evans. She probably heard it a hundred or more times, I've heard it a thousand

times. But the fact of the matter is, I don't like to hear that, because it diminishes the role of defense counsel and turns us into nothing more than potted plants. The fact of the matter is, we're required to give and perform effective assistance of counsel to anyone we represent. We've got to do whatever it takes within the rules to be effective at the job. So it's literally not true that we can just sit here and work cross word puzzles. It's not a criticism of anything you've heard today. That's just one of the things we say down here. You could go into any courtroom in any trial and the chances of hearing that said by someone is nearly a hundred percent, okay? And you have a right to expect us to vigorously defend Mr. Broadnax as a juror. I would hope that's what you would expect would happen, so that you could have the benefit of all the information that you could get in order to make the proper decision in the case. Is that fair?

A.   Yes.

Q.   Okay. I want to talk to you about beyond a reasonable doubt. And first, again, let me say, this is not a criticism, because we say this all the time. And to some extent, it's correct, but jurors really can't just make up whatever beyond a reasonable doubt is. They have to do it — it's true that beyond a reasonable doubt is whatever each individual juror says that means to them, but

it is not without guidance and boundaries, okay? I expect in this case Judge Snipes will instruct the jury that the State of Texas is not bound to prove their case beyond all possible doubt, but they are bound to prove it beyond all, that's a hundred percent, all reasonable doubt. So, the law recognizes there is a difference between reasonable and possible. The example I like to use is, it is possible if I buy a lottery ticket that I'll win the lottery. It would not be reasonable for me to go buy a new car in anticipation of winning the lottery. Does that make sense to you?

A.   Yes.

Q.   So there is a difference between what's reasonable and what's possible, okay? Which leads me to that second thing that irritates me, and that's when lawyers say, well, the only way you could be a hundred percent sure is if you were a witness to whatever happened yourself. Well, again, to my way of thinking that's one of the silliest things we say down here, because eyeball witness testimony is the least reliable of the evidence that we hear down here. I mean, we hear about DNA and fingerprints, and we see videotapes, and, you know, somebody coming in and saying what they saw is probably the least reliable of anything. So that really doesn't make much sense. All the law really requires, and I think you

put it pretty well, so long as — I believe you said there were no loop holes. I took that to mean so long as there was not something that was unexplainable that you were convinced of, that if everything was proven to your satisfaction, that would be beyond a reasonable doubt to you. Is that — did I understand you correctly?

A.   Yes, sir.

Q.   Okay. All right.

Now, I want to talk you a little bit about some of the things in your questionnaire real briefly, Miss Overa. On Page 3 you indicate to us that you have heard about the case, and I want to follow up on that just a little bit. Can you recall what it is you've heard about this?

A.   If it's the case that I remember from, I believe it was sometime last summer. It was — took place in Garland.

Q.   Uh-huh.

A.   And I believe it was a recording studio or something?

Q.   Okay.

A.   I don't remember how many — if it was more than one person or two. I just remember the victim — well, the actual incident. I don't remember much else.

Q.   How did you hear about that, do you recall? Was

it the television, or did you read about it?

A.   In the news, on the television.

Q.   Do you recall whether or not you saw anybody involved in the case on television, anybody that was arrested, or any of the victims' families or anything like that?

A.   All I remember — no, I just remember hearing about it on the news, like hearing that, you know, I believe it was two gentlemen were shot at a recording studio in Garland. I don't remember hearing anything else as far as if somebody was arrested or anything about the family.

Q.   From what you heard or perhaps even possibly read about it at the time, did you form any opinions as to whether or not Mr Broadnax is guilty or —

A.   No.

Q.   — innocent?

A.   No.

Q.   Fair enough.

Own Page 5, Miss Overa — and the prosecutor touched on this. I haven't kept score. But I guess it's about half and half of the people we ask if they believe in an eye for an eye. About half say "yes" and about half say "no." But a lot of the people that say "yes" don't always agree as to what that means to them. What does an eye for

137

an eye, in this context, mean for you?

A.   I guess for me if, you know — for instance, if it was two drug dealers and one took one out of business and one killed the other one, you know, they're both kind of putting themselves out there in illegal crime.  If it's something of the matter that, you know, somebody goes and commits a crime on a completely innocent person that's not involved with — you know, doing anything wrong, just completely innocent, then, you know, that kind of makes me question the eye for an eye.

Q.   Some people say that they feel like if a person has intentionally caused another person's death without any legal reason, call it justification or excuse, that to them a life is a life for a life, or whatever, and if a person who does that, they should give up their life.  Other people take the position, I don't mean that so much literally, I mean it in the context that if a person does an act like that they have got to be punished, but not necessarily with losing their life.  Do you fit in any one of those two categories?

A.   I don't really feel that I do.  I mean, I think before I would decide that somebody, depending whether they should get the death penalty or life in prison, I guess I would need to hear more about why this person would — why they would need the death penalty over life in prison.

138

Q.   Fair enough.

There's a couple other things I'll probably talk to you about, but I will do that more in the context of talking about these special issues, so we'll come back to the questionnaire.

What I want to do now, Miss Overa, is to talk to you about these special issues, and I want to tell you a couple of things before we get started with this, just so that I know we're both on the same page.  The context of these questions are this:  No jury would ever be called upon to answer these special issues unless they had found the accused person guilty of capital murder.

Do you understand that?

If they're found not guilty, of course, of anything, then they go home.  If they're found guilty of one of those lesser included offenses that I talked to you about a few minutes ago, then the jury would be sent back to the jury room to decide a number of years within whatever range was appropriate for the offense that the person had been convicted of.  So they would never answer these questions.  So, if you came back, let's say by way of example, with a guilty verdict of murder, rather than capital murder, the judge would then say the range of punishment for murder is from five years to 99 years or life.  Y'all go back in the jury room and decide where in that range of punishment you

139

believe it's appropriate to assess, and you would do that, and there would be no questions at all.  So, the only time a jury is ever, ever called upon to answer these questions, means they are answering the question about a capital murder.  With me?

A.   Yes, sir.

Q.   Make sense to you?

A.   Perfectly.

Q.   Now, let me ask you this question.  It's a little bit of a trick answer, so I'll warn you out front.  I want you to assume that you have been seated on a capital murder jury, you've heard the evidence.  You and the eleven other jurors with you have agreed unanimously that the defendant is guilty, and you now move to the punishment phase and are facing answering these special issues.

What do you know about the defendant at that point?

A.   That he had committed capital murder and by capital murder he took somebody's life, and either — I guess in this instance, accused of — or proven guilty of burglary.  Right now I believe that's all I know.

Q.   You know, you're one of the few people that I've asked that.  I don't ask it to every juror, Miss Overa, but most — I generally get nothing, I don't know anything about him, because I haven't heard anything, which is not

140

so.  You hit it exactly right.  You would know — whatever else you knew about it, you would know that the defendant was an intentional murderer and that he killed someone because that's what he wanted to do in order to get their property.  Whatever else you might know, you'd know that, right?

A.   Correct.

Q.   So that's the context in which this question is always answered.  So, what the law says is this.  We presume that the answer to that question is no, the same as we presume in the guilt/innocence phase of the trial that the defendant is innocent, because it's the burden of the State of Texas to prove what the legislature has set out in that special issue to each and every member of the jury beyond a reasonable doubt, just as it was required that they prove to each and every member of the jury everything that they put in the indictment.  So, the special issue is essentially the same as the indictment.

And you remember when the prosecutor talked to you about what we call manner and means?  That if they alleged a murder by shooting with a firearm and proved that it was murder by stabbing with a knife, or at least if the evidence raised a reasonable doubt about that issue, then the juror is required under their oath to return a verdict of not guilty.  Even if they know the person killed the

other guy, they can't be concerned with that. They can only be concerned with, did the State prove what they put in that indictment? That's the oath that each juror took.

The same is true of that special issue, okay? They have to prove what the legislature has set out for them to prove. What I tell jurors is this. You can't be changing the question to suit yourself, okay? You can't say, well, based upon what I have heard and what the defendant did, what the State has proven to me he did, this is a person who deserves the death penalty, so I'm going to answer these questions in the way that ensures that that's what happens. That's absolutely not what the law contemplates, okay? The law contemplates that you might go back into the jury room as a juror and say, this is the worse set of facts I ever heard in my life. I can't believe that the defendant did what he did, and if I ever saw anybody that deserves the death penalty it's him. But the State hasn't proven to me that this is a person who cannot even be incarcerated in the penitentiary without further acts of violence. They haven't proven to me beyond a reasonable doubt that he's going to be a future danger, so I have got to answer that question no, and it doesn't matter what I think he deserves.

You see how that law is set up?

A. Yes, sir.

Q. Do you believe that you have the kind of mental discipline that would allow you to answer that question independently of what you thought ought to happen and base it solely on whether or not the State has proven, or not, what that question asks?

A. Yes, I believe so.

Q. Now, here's a concern to me sometimes, Miss Overa, and we have jurors who sometimes honestly tell us that, you know, I see that question as different from, is he guilty. It's not the same — they're not asking you the same thing, but I know the law allows me to answer that question yes based solely on the facts of the case. So, if the State shows me that the defendant made a decision to kill somebody, he did it because that's what he wanted to do, wasn't an accident, it wasn't self-defense, he wasn't insane, he wasn't under duress. He did it, didn't have to, but he did because he wanted to, and he did it because he wanted to take somebody's property. If that has been proven to me beyond a reasonable doubt, then that is a person about whom I would always say is going to be a future danger. Now, other jurors do not feel that way, other jurors say that Special Issue No. 1 is a different question from is he guilty, and I can put aside, in a manner of speaking, the fact that I found him guilty and now look at the evidence to decide whether or not he's

143

going to be a future danger.

Do you see yourself in either one of those two categories? How do you feel about all that?

A. How do I feel about answering No. 1?

Q. Well, that's a long question. Let me put it to you directly. Do you believe that if the State convinced you beyond a reasonable doubt that the person was a capital murderer, that you would always say that he would be a future danger?

A. No, I don't believe so.

Q. So you're open to answering that question based upon what's being asked of you and not just because you found the person guilty of capital murder?

A. Yes.

Q. I want to talk to you a little bit about what this thing says. The first thing it says is the State has the burden to prove to you beyond a reasonable doubt that there is a probability, not that it just could happen, that there's a possibility that he might do something in the penitentiary, but that there's a probability, more likely than not, that he will commit criminal acts of violence – but it doesn't stop there – that would constitute a continuing threat to society. Now, just as Miss Evans told you, the law does not define for you what a criminal act of violence is, but the context of that question is clear. It

144

seems to me that what the legislature is asking you is that is this a person who would commit the kinds of criminal acts of violence in the penitentiary that would justify executing him? Most of the time when we ask jurors what they're thinking about when they are looking at acts of violence in context of that question, most of the time our jurors say murder, robbery, rape. They go instinctively to serious matters. And it's only when the State talks to them about hitting somebody in the face do they actually go there. The point being that this is a serious question, that if answered yes, puts someone down the road, significantly down the road, to being taken by the State of Texas and executed. And I would hope that jurors would, when they define for themselves what they think acts of violence in the context of that question is, would bare in mind that in the context of that, what the serious nature of the question is. Does that make sense to you?

A. Yes.

Q. You see it says "acts," it's plural. It's not just, would he do something sometime and constitute a continuing threat to society? Some jurors interpret that, that for however long he's there, he's always going to be a continuing threat, not just something that might periodically happen for one reason or another. But this is a person who cannot even be confined in our penitentiaries

145

without fear of him committing other violent acts against others. Does that make sense to you?

A. Yes, sir.

Q. If you were on this jury, do you believe and are you telling me that you could give real meaning to that Special Issue and require the State to prove it to you beyond a reasonable doubt, just like the laws would expect?

A. Yes, sir.

Q. And if they failed to do that, answer it "no" regardless of whether you believe he deserves the death penalty?

A. Yes, sir.

Q. And you understand that the differences that we're talking about here is whether the person dies at the hands of the State of Texas by lethal injection, or that they die in the penitentiary at some unknown time, of unknown causes, they're being punished. Does that make sense to you?

A. Yes, sir.

Q. Do you think that life without parole is a substantial punishment?

A. Yes.

Q. And do you think that it's an adequate punishment for capital murder?

A. Yes.

146

Q. Well, the law agrees with you, Miss Overa. The law is always satisfied with a verdict that results in a life without parole rather than a death penalty, the same as the law is always satisfied if a jury comes back and says not guilty. We don't remonstrate with those jurors. We don't say, oh, what bad citizens you are. The State of Texas has asked you to execute this person and now you haven't, you're a bad person. That doesn't happen. A jury comes in and says not guilty, we say thank you all very much for your service.

The same is true in the punishment phase of a capital murder trial. If a jury comes back with a "no" to that first Special Issue, the Judge are will immediately sentence the defendant to life without parole. And the judge will say to you then, the law is satisfied with your verdict, thank you very much for your service. Okay?

We have jurors, I think, sometimes, Miss Overa, that believe that we're going to all this trouble, taken all these weeks to pick a jury, that some how it's their duty and obligation to return a verdict of death or it will all have been for nothing. And if a juror believes that, they're absolutely on the wrong path, because the law is always satisfied with that life verdict, if that's a proper verdict of the jurors.

Do you understand what I'm saying?

147

A. Yes.

Q. Now, let me talk to you a minute about Special Issue No. 3. Let me look at my time. You said a couple things in your questionnaire, Miss Overa, that concerns me a little bit, so we need to talk about it.

Just like I told you earlier, if this jury were to answer Special Issue No. 2 "no," the trial is over. You return that verdict, the judge sentences the defendant to life, and we're done. The same is true of Special Issue No. 2. If you're given that and you answer that "no," then the trial is over, you return your verdict to the court, and the judge sentences the defendant to life in the penitentiary.

The only way you get to Special Issue No. 3 is if you have said "guilty, yes, and yes," okay? So, the context of that Special Issue is, that you're answering that Special Issue about a person that has been proven to you is both an intentional murderer, who kills someone to get their property, and who you believe will probably commit criminal acts of violence that will constitute a continuing threat to society, that is, you believe he will be a future danger. Okay? Again, some jurors say to us that if they have made those determinations, listened carefully to the evidence, returned a verdict of guilty, returned verdicts of "yes" and "yes," then when they get to Special Issue No. 3, that while

148

they may be able to consider what that question asks them to consider, that there is no mitigating fact or factors that would ever cause them to change a death penalty to a life penalty for an intentional murder they believed to be a future danger. Other jurors say to us that even in those circumstances, even if he is an intentional murderer, even if he is, in their opinion, going to be a continuing danger, they can honestly and openly consider, give meaningful consideration, to any mitigating evidence that they hear, and that if it rises to a level that they believe justifies the death — the life penalty rather than a death penalty, then they can vote that way. And that is just a place where a juror has got to look into their own heart, judge for themselves honestly, and tell us honestly whether or not they can really give meaningful consideration to mitigating evidence once they have reached that point.

And here's the thing that I'm concerned about on your questionnaire, and I'm going to ask you the question in a minute. But we kind of address the issue on the questionnaire a little bit. If you look over on Page 8 down at the bottom, just before the business about your brother's DWI, we ask about genetic circumstances at birth, upbringing and environment, and whether those things should be considered in determining the proper punishment. And now I concede to you that we ask you that question before we told

you what the law was. But my experience is, if these are things that people generally do not believe or (inaudible) to a proper punishment, we're not going to change their mind about that in voir dire. You can see from the Special Issue when it says that you should look at the defendant's character, and his background, and his personal culpability, that those are things that could very well be what we asked you about here, upbringing, environment, certainly those are part of his background, and he has a right to have jurors that can give meaningful consideration to that. Now, he doesn't have a right to ask someone to commit them to what they would do. But if we have a juror who says, I understand that that's what this asks me to do, but the way I feel about it, it doesn't really matter what his background was, if he did it, and if he's going to be a future danger, that's not going to matter to me in any, shape, form or fashion, and I will not give it any consideration. Other jurors feel differently about that sort of thing. And it could be such things, Miss Overa, as the kind of personal history he has. Was he born with a silver spoon in his mouth? Was he born in abject poverty? Was he raised in a stable household? Was he banned from pillar to post? Almost an infinitesimal amount of things that could be a part of a person's background. Now, you told me in your questionnaire that environment and

upbringing was matterless to you. Is that so — would that be something that you would not consider, or now that you know the law, do you believe that you could give meaningful consideration to background and character?

A.   I believe now that I know the law, I could.

Q.   Miss Evans mentioned a couple things that we talk about very often. Let me just run a couple things by.

Our law says that if a person is 17 years old when he commits a capital murder the State cannot seek the death penalty, but if he's 18 they can. Some jurors say to us that if a defendant is in that lower range, 18, 19, 20, something like, that that's — that that is something about the defendant personally that they could give meaningful consideration to when they answer Special Issue No. 3. Other jurors feel that that's not really a consideration, so long as they're 18 years-old. How do you feel about that?

A.   I have to go with whatever the law says. If the law says 18 that then they would consider the death penalty.

Q.   They're considered adults.

A.   Then you know —

Q.   It wouldn't make any difference to you whether they were 18, 19, 20 or 45?

A.   No.

Q.   Okay. Another one of the things that we talk

about, and we address it in the questionnaire, is voluntary intoxication. We tell you at the bottom of Page 5 that it's not a defense that a person can become voluntarily intoxicated from alcohol or drugs, that that does not excuse — it's not a defense. I mean, they can't say, okay, you can't prosecute me now, because I was intoxicated at the time. But we tell you at the top of Page 6 that the law says that that's something that a juror may consider in mitigation, and asks how you feel about it, and you indicated no, that that's not something you believe would be a consideration. Am I right about that?

A.   Correct.

Q.   Now, that the law's been explained to you, Miss Overa, and now that you see Special Issue No. 3 speaks to person moral culpability, character and background, if you heard evidence of voluntary intoxication, do you believe that that's something you could give consideration to in answering Special Issue No. 3, or would it be something that would not be of any consequence to you in answering that question?

A.   I don't believe it would be of any consequence.

Q.   Fair enough.

Let me check my time again, Miss Overa. I've got about five minutes.

What I want to do, really, is just ask you if

you understood pretty much everything that's gone on?

A.   Yes, sir.

Q.   Any questions of me at all?

A.   No, sir.

Q.   One other thing I want to touch with you real quickly, and it goes back to that juror who thought that we'd already tried Mr. Broadnax, because he was reading into what was being said to them about things.

The law allows us to give hypothetical situations. Theoretically, they are to explain a proposition of law, but they're not to be taken as any example of what the law expects. And I'm talking to you frankly about this vigilante dope-dealer killer example that you get. I want to make sure that you understand that the law does not set out any standards from which jurors must work in order to answer these questions. Special Issue No. 3 was not drafted against the possibility that some vigilante would go down the street and kill his dope-dealing neighbor. That's got nothing to do with Special Issue No. 3. It is not a standard by which jurors should measure any individual defendant's level of culpability. Do you understand that that was just, what I considered to be, an outrageous example that was given to you by the State, I suppose, to illustrate the law? But it is not to be used as any kind of a standard. Do you understand that?

153

A.   Yes, sir.

Q.   The law does not contemplate that jurors answer Special Issue No. 3 by weighing the relative value of the deceased against the victim.  You don't go back there and say, okay —

MS. EVANS:  Your Honor, I would object again. The law doesn't say what a juror may consider to be mitigating or may not, or how they're suppose to arrive at that decision.  They certainly could consider a victim's background, if they wanted.

THE COURT:  Sustained.

Q.   (By Mr. Parks)  Nowhere in Special Issue No. 3 does it call upon you to make a decision about whether or not the victim had a value greater than the defendant.  It calls upon you to look at the circumstances of the offense, defendant's character and background, okay?  And you've got to be able to look through the evidence to try to determine if you can find mitigating evidence, as it relates to the individual defendant, and if you do, whether or not that is sufficiently mitigating to change a death sentence to a life sentence.  Do you understand that's what that question is about?

A.   Yes, sir.

Q.   Do you think you would be able to do that?

A.   Yes, sir.

154

MR. PARKS:  Thank you.

THE COURT:  All right, Miss Overa, you'll be stepping out, and then you'll come right back in.  Watch that first step.  You probably already know that.

(Prospective juror was excused from the courtroom.)

THE COURT:  What says the State?

MS. EVANS:  State has no challenges.

THE COURT:  Mr. Broadnax?

MR. PARKS:  Your Honor, we would, of course, submit this juror for cause for the reason that she cannot consider the mitigating evidence that will be evidence in this case, and to allow her to sit on the jury would be a violation of Eighth, Fifth, Fourteenth and Sixth Amendments of the United State's Constitution, and in violation of the teachings of *Lockett V. Ohio, Morgan V. Illinois, Eddings versus Oklahoma*.

THE COURT:  Thank you.  That will be denied. Ask her to return, please.

(Prospective Juror Overa returned to the witness stand.)

THE COURT:  Please be seated again, Miss Overa. Miss Overa, of course you've been accepted as a qualified juror by the attorneys.  I certainly agree with that. Here's where we go from here.  This process should be concluded tomorrow, or today, or early next week, then you should receive a call from the court coordinator telling

155

you if you're on the jury, not on the jury.  You won't be left hanging on that.  So I want to make sure that the phone numbers on your questionnaire are current and correct, and even if your numbers haven't changed, to make sure you wrote down the correct numbers.

PROSPECTIVE JUROR PARADISE:  Yes, sir, all the numbers are correct.

THE COURT:  That is going to be the way we get in touch with you, correct?

PROSPECTIVE JUROR PARADISE:  Yes, all the numbers are correct.

THE COURT:  Now, the sheriff is going to give you that coordinator's card, telephone number.  Should anything occur in your personal life between now and then that you think might affect your service, call her, she will let us know, and we'll have you come up, and we'll deal with it.  Anything that might affect your jury service.  From me, I'll ask you to assume that you are, in fact, going to be on the this jury, as far as any outside information.  Don't talk to your friends or ask them anything about it.  If they ask you what's it like up there, what's going to happen, just say that 'ole judge told me I can't talk about this case until it's over. Also, avoid all media coverage, TV, newspaper, radio, Internet, because I don't want somebody like you ·

156

inadvertently disqualified from being able to serve.

It's been a real pleasure meeting you, ma'am. Thank you.  Good luck to you.

PROSPECTIVE JUROR PARADISE:  Thank you.

(Recess taken.)

THE COURT:  Bring in Mr. Paradise.

(Prospective Juror Paradise took the witness stand.)

Please be seated there, Mr. Paradise.  Be seated, Counsel.

Mr. Paradise, of course, you and I've had a brief conversation in the hall, me telling you how much I appreciate your patience.  Let me say it again, on behalf of all the attorneys — before we go any further, raise your right hand for me, please.

(Prospective Juror Paradise sworn.)

The way this process is going to work is I'm going to talk to you for a minute, and then one of the attorneys from each side, one from the State and one from Mr. Broadnax, and I'll introduce the attorneys to you here in just a send, are going to talk to you for, as you know from sitting out there, up to 45 minutes each.  So what we're going to do is, we've got about another hour and a half to go, maximum.  At that time, or before then, I will tell you whether or not you are a qualified juror.  Now, what that means is, we're in the process of qualifying a

157

sufficient number to select as the actual trial jury. We anticipate that being done this week or early next week, and the day that's done Judge Snipes' court coordinator is going to call all the jurors and tell 'em if they're actually on the trial jury or not on the trial jury. That's what we're about today.

Now, when you were before Judge Snipes back in April, you filled out this questionnaire. I know it took a long time for you to do it, but I tell you it wasn't some idle exercise. The attorneys have read it, and it's going to save you a lot of time here today, because they're not going to go back over it in detail, and they're not going to ask all these questions again, but there might be one or two that they'll want to follow up on. And frankly they read it in a lot more detail than I do.

Now, I've been asked — and let me talk to you about this situation. I read in your questionnaire about your wife's situation.

I want you to look at the indictment in this case, if you would.

PROSPECTIVE JUROR PARADISE: Okay.

THE COURT: This is a capital murder case, and you know that and knew it when you came here.

PROSPECTIVE JUROR PARADISE: Yes, sir.

THE COURT: Mr. Broadnax has been indicted for

158

intentionally causing a death of an individual by — in the course of a robbery, shooting a person with a firearm.

With the tragic incident with your wife, would you just tell us how you think that would affect your jury service?

PROSPECTIVE JUROR PARADISE: It wouldn't.

THE COURT: That's good enough for me.

Now, also from reading that pamphlet, did you see that Judge Snipes is going to start the trial August the 10th?

PROSPECTIVE JUROR PARADISE: That's correct.

THE COURT: And it's going to last up to two weeks.

PROSPECTIVE JUROR PARADISE: Yes.

THE COURT: Monday through Friday, 9 to 5, break in the morning, break in the afternoon, and a lunch break. The jury will not have to separate at night unless and until you went into long deliberations and for some reason hadn't reached a verdict and the entire jury became mentally fatigued, there's a possibility you'd be sequestered. Of course you, certainly more than anyone we talked to this whole time, know what sequestered means. That's a possibility, Mr. Paradise, not a guarantee. And I know Judge Snipes, with his military background, will tell you in plenty of advance notice to be prepared to

159

maybe bring an overnight bag, that you might have to spend the night. And what would happen is, you all would be taken - you know how it works - you'd be taken to a fine hotel as a group, individual, private rooms, to avoid any outside influences. That could happen.

The reason I've given you those dates and that length of time and the way Judge Snipes runs his court, as you sit here now, and from filling out the questionnaire and from reading that pamphlet, sitting here today and going through that voir dire, and maybe thinking about this case a little bit, as you sit here now, are you aware of any reason why you can't sit as a juror in this case?

PROSPECTIVE JUROR PARADISE: I can say my office would probably have a good reason, but we have three trials scheduled throughout the month of August, as I looked at my calendar today, and one of them is in Houston and would be attending all of them. That would be the only burden. I'm not required to be there, but I'm at every trial.

THE COURT: They're trial lawyers, I believe you said?

PROSPECTIVE JUROR PARADISE: Yes, sir.

THE COURT: Now, here's the bottom line question. If you had to be here and couldn't be in that trial, would that prevent or substantially impair your

160

ability to concentrate on the evidence as it is presented?

PROSPECTIVE JUROR PARADISE: Oh, no, sir. Place the burden on them.

THE COURT: Well, they may need to find out how hard it is without you.

PROSPECTIVE JUROR PARADISE: I think they just did this afternoon.

THE COURT: I'll tell the attorneys, you're now studying law also, as I understand.

PROSPECTIVE JUROR PARADISE: That's correct.

THE COURT: All right. I'm going to ask the reporter to please hand to you your questionnaire and you'll have it there. And the way this works, Mr. Paradise, is one of the attorneys, if they want to talk to them a little bit more, they'll say turn to page so-and-so, paragraph so-and-so, and you'll have it there in front of you, because we know it's been since April since you've filled it out.

Thanks a lot for being here.

I'm going to reintroduced to you Andrea Handley who's going to speak to you on behalf of the State of Texas.

PROSPECTIVE JUROR GEORGE PARADISE, after having been previously sworn, testified as follows:

EXAMINATION,

By Ms. Handley:

Q. Good afternoon, Mr. Paradise.

A. Thank you.

Q. Appreciate you being here, appreciate you showing up on the 24th and again today. And it sounds like you are committed and understand that sometimes it's just our civic duty, and people are going to be inconvenienced, and particularly your employer.

You're a paralegal right now, correct?

A. Yes.

Q. How long have you been doing that again, sir?

A. Well, technically I've been an investigator and paralegal for the last twenty-five years, so to speak.

Q. What kind of law firm is it? Is it mostly civil?

A. Civil, we do civil.

Q. Are you specializing in something over there?

A. Employment and personal injury.

Q. Okay, employment and personal injury. Do you primarily represent plaintiffs or —

A. All plaintiffs.

Q. And they are litigation attorneys, they are going to trial?

A. We go to trial quite often. I also have an administrative practice where I actually practice before the federal courts on social security, so I'm in court

quite often.

Q. You're studying law now?

A. I'm actually preparing to take the bar in February.

Q. Okay, okay. I was going to ask you if you anticipated on taking it a step further.

A. I've already passed the bar once. We have a special exemption, we've applied before the bar, and I have a hearing in Austin in November, and if everything works out, I'll be able to sit for February.

Q. Good man. Because I'm going to tell you, from my experience, it's always the paralegals and investigators that do most of the work. So you should probably shoot for that attorney position and get somebody else to do all the grunt work.

I'm going to take your word for it, then, that if you're called upon to do service in this case and it lasts up to two weeks and there might be some time when you're sequestered, that that's fine with you. And then you're saying that they're just going to have to get along and get along without you.

A. Obviously, there's always going to be a burden on all parts.

Q. Fair enough, fair enough. So that's not going to prevent you from sitting in this case. I appreciate that.

Q. Have you ever served — sat on a jury before?

A. I have not. I've never been chosen to sit.

Q. Kind of like, I've been called many times —

A. Many times.

Q. — but never actually been seated, and usually because it was always my case. So I (inaudible) an exception there.

I'm not going to — you know, I'm going to brush over with you how these criminal trials work, because even though you're in civil practice primarily I think you already have a good appreciate for the legal process, particularly the process of going to jury trials, principles of law, such as that.

We bring jurors down here on death penalty cases one at a time and voir dire them one at a time, because of, obviously, the nature of the case, the high stakes, you know, what's at stake here. It's not just a person's liberty and freedom, but we're talking about the potential taking of an individual's life as the ultimate punishment. We need to tell you about the law, particularly how it applies in a death penalty case and how that may be different from a regular case, but also feel you out and see if you've got any other kinds of biases or maybe life experiences that would ultimately prevent you from being the — a completely unbiased and fair juror for this

particular case.

The judge asked you briefly about that, about the situation with your wife, and a I hope you understand that I'm not going to delve into this further just to be nosey or what not. But I am somewhat interested in knowing some of the circumstances surrounding that. You said it was a 2004 case —

A. Correct.

Q. — and it was here in Dallas. Can you briefly tell me what happened, sir?

A. I received a call, and I was told that she was shot and deceased. To my knowledge, there's never been any evidence at all to find — or they haven't had any suspect whatsoever and haven't found anybody at this point.

Q. Did they suspect that this was in a robbery attempt or something?

A. You know, I never really got a fair answer, and I think, obviously, just through any investigation, first people you're going to look at is immediate family or whatever. She was found in her car, and so the question is whether the police officers that were involved — I'm not sure what their mind was or what their thought was.

Q. Was she in her private driveway or out in a public place?

A. She was less than a mile from her apartment. We

had actually just split up and it had been maybe, I don't know, maybe a couple weeks, two, three weeks. She was just a couple — maybe a mile, half a mile from her apartment.

Q. Are you satisfied that enough steps — because I'm assuming nobody's ever been arrested for this crime.

A. That's correct, not to my knowledge.

Q. And are you — how do you feel about the quality of the investigation or even what you're — at the point you're at right now with that?

A. Well, obviously, any time you have a death of someone that's very close — and I was married to her for nineteen and a half years, almost twenty years. There was a time — the first year was very, very difficult. There was a lot of frustration and just the fact that we weren't getting any information. That pretty well went away, just due to the fact, I don't know, type of individual that I am and prayers that I made and things that I did, and I have a pretty good group around me and surrounded me to do things. We need to always try to keep a level head, always try to understand what needs to be right and what's wrong. Those are the things that I do have control over. I don't have any control over what the Dallas police department or any other police department did. The only thing that I can do is just wait and see, and hopefully they will figure out what they needed to.

Q. Is it considered, then, still an open case, a pending case, in the hopes of something?

A. There was an article in the newspaper this past year bringing it to the forefront again. Her sister is married to a very high FBI agent, and I think they're going to keep poking a stick at it any way, so to speak.

Q. For what it's worth, I've been doing this a while, and I've had some cases come to me recently that were committed twenty-five years ago, twenty years now, and now we have a suspect and enough evidence. Just for whatever that's worth.

A. I always felt or always thought that it was somewhat of a random type deal. And the question is, somewhere, somewhere down the line, somebody is going to say something to someone else, in which case somebody's going to want to get off doing something and say, hey, I know somebody who did this.

Q. Do you have any kind of lingering, maybe, suspicion or animosity towards the police force, or any anything like that? Has it left any kind of taste in your mouth?

A. You know, it's just in anything that you do, being a business man and doing what I do — you know, I have a number of subordinates underneath me. I demand people to work and do what they need to do. I will always

look at individuals based on the quality of work that they do.

Do I believe that this particular investigating unit did the best they possibly could? Without having the opportunity to review all their reports, it would be difficult for me to say that. On just the surface of it, I believe they may very well have missed a few things.

Q. I see. Okay. Well, I appreciate you telling us that. And I'll ask, as the judge asked you before, whether or not you think that would affect you at all in how you receive the evidence in this case?

A. Absolutely not.

Q. Or how you return your verdict? That's not going to sway you either way? In other words, the obvious question to you is, are you going to hold it against the defendant because he's been charged with an offense involving, you know, the intentional death of an individual by a firearm?

A. I interview clients every single day, and I determine what their story is, to understand who, what, and where, and what they've done. Every individual that walks in is different, and if you ever try to place them differently than that you wouldn't be able to do what I do.

Q. You're absolutely right. I guess it's fair to

say, then, that you wouldn't necessarily hold it against the State, you know, because you might not have gotten everything that you and your wife needed and deserved in that investigation? You wouldn't hold it against the State in this particular case?

A. No.

Q. I think also, Mr. Paradise, you hit the nail on the head with your last statement there that nothing's black and white, no two cases are ever alike. You are just very familiar with that. You never met two clients alike, you've never seen two factual situations alike. If we could paint them all with the same brush, life would be a lot easier, wouldn't it? And that's what, I submit to you, a capital murder case comes down to. And particularly with respect to whether or not the individual receives a sentence of life or a sentence of death, it will always be dependent on the particular circumstances of that offense, as well as that particular defendant, as to whether or not you will get a life sentence or whether or not you will receive a sentence of death.

You are obviously familiar with this, that in a criminal case, you know, we carry the burden of proof in every criminal case.

A. Absolutely.

Q. The defendant doesn't have to prove his

169

innocence. And we carry a burden of proof of beyond a reasonable doubt, which is obviously a much higher standard than what you deal with in a civil case. But suffice it to say, it's a high burden of proof, as it should be in a criminal case when you're talking about somebody's liberty or freedom or death. If I'm able to prove to you my case beyond a reasonable doubt, then obviously the law requires that you return a verdict of guilty.

A. That's correct.

Q. We have indicted the defendant in this case with the charge of capital murder, which is to say, you know, capital murder always — it always involves a murder, but it's a murder plus something else. You know, not every murder defendant, not every person convicted of murder is eligible for the death penalty. You're only eligible for the death penalty if you're convicted of capital murder, and even then it is never anything automatic. A lot of people make a lot of assumptions about how the process works, and a lot of people have come in here and thought, if I find a defendant guilty of capital murder, then we go back and say: Well, how many thinks he should live, and how many thinks he should die? And it's actually not arrived at by that process. Whether a person convicted of capital murder receives that life in prison without parole or whether he'll receive that sentence of death is based on

170

the answering of special issues. I think you had an opportunity to review the Special Issues?

A. I have, and I understand the issues of intent.

Q. And you're familiar with the legalese, so you can muddle through that. If we can say something in 500 words versus 5, we're going to.

But that's the difference between a capital murder case and a regular murder case, and the punishment ranges are obviously different. And the things to keep in mind is what you already said before, it's based entirely on the facts in the case. Just because you've found the defendant guilty of capital murder doesn't mean he automatically gets the death penalty. It just means it's merely an option for the jury.

A. Okay.

Q. The punishment will always fit the crime. And with respect to a capital murder case, the punishment will always fit according to what your answers to the Special Issues are.

You've already got a good grasp of that. A capital murder is intentional murder. It's not what you deal with a lot, I think, in your business: Criminally negligent homicide, or people, perhaps, acting recklessly, or maybe even a knowing action on their part. Maybe you do or don't deal with intentional death, I don't know. But you

171

understand the culpable mental states and how they apply with respect to this case, with respect to this particular charge the defendant has been indicted for: Intentionally causing the death of another individual while in the course of committing or trying to commit a robbery. That's what makes it a capital murder, is the robbery and it's intentional, and it's in the course of committing a robbery.

If I've failed to carry my burden on the intent, if you don't believe beyond a reasonable doubt that a defendant intended to kill the individual, then you'll return a verdict maybe, perhaps, of murder, but not of capital murder. If I fail to prove to you it was in the course of committing a robbery or trying to commit a robbery, you'll not return a verdict of capital murder, but maybe just murder. There's always the lesser included offenses, if you will.

I want to focus your attention now on the punishment phase of the capital murder case, which is to say — we're going to jump ahead, and we're going to say, assume if you will, if you're a juror on a capital murder case, you've listened to the evidence presented by the State, and you believe I have proved to you beyond a reasonable doubt that the defendant intentionally caused the death of another individual and did it while in the course of committing or trying to commit a robbery. That question

172

has been decided, that's it, that's over, he's guilty of that. Any defendant found guilty of capital murder will automatically receive the sentence of life in prison without parole.

You may or may not be familiar with the — life without parole is a fairly recent thing. We've always used to have the possibility of parole and now it means exactly what it means. If you're convicted of capital murder you will automatically get life in prison without parole. That's it, that's all. That's the only automatic thing about a capital murder case. The question then becomes, if you're automatically going to get life in prison without parole, what makes the distinction, how do you jump to getting a sentence of death? You know, what is the distinction between either one or the other? In keeping in mind you've automatically received this life sentence, then you'll presumably be in prison for the rest of your life, of course — unless of course you escape, that that's where you're going to be. And I will submit to you what our law makers are having you do now is focus on the defendant, on the defendant convicted of capital murder, and ask yourself in looking at him and looking at the evidence, is the type of individual — is he the type of individual that will go into the penitentiary and do his time — will he do his time, you know, peacefully, whatever that may be in that

173

context, will he go and will he just do his time? Or will he be that capital murder defendant that will go into the penitentiary and continue to commit criminal acts of violence that will constitute a threat to the individuals that he's around? Because if he's that kind of individual, then he's on the road now to that death penalty. If he's not, then he's going to serve that life sentence without parole. And the law makers and the legislature consider that punishment enough for the guy that can just do his time. That's good enough. For the guy who can't and is a future danger, he's on that path now to a death sentence. That's what that first Special Issue is that you're called upon to ask.

You've already had the chance to read it. Obviously, we go through it again here. "Do you find from the evidence beyond a reasonable doubt," again just indicating what to me to prove to you. It's not automatic. "that there's a probability." They don't define probability for you, sir, it's up to you to decide what probability means. A lot of jurors say it means more likely than not. Is that something you would agree with?

A. Yes.

Q. "Is it more likely than not that the defendant would commit criminal acts of violence?" They don't define that for you either. What they don't say is: Do you find

174

it more likely than not that he'll commit another murder, or he'll commit another robbery, or he'll commit a rape, or he'll assault another inmate, or he'll threaten a prison guard. They don't articulate what a criminal act of violence is, they leave it entirely up to you. It's for you to decide what is and what is not a criminal act of violence. Some people say it doesn't have to be something physical, it could merely be a verbal threat that I want to kill you if I get a chance. Other people say, no, I think if you lay hands on somebody and hit them without any really legal justification, I consider that a criminal act of violence.

I will submit to you — I will ask you this question, sir, that people are sentenced to prison all the time for various different crimes, and we don't have prisons for separate offenses. We don't send all burglars one place and all the murderers in another. An individual that is sentenced to do time in the penitentiary, for example burglary, is it reasonable for that particular individual, that defendant, to expect a right to safety while he's in prison?

A. Yes. I would think that anybody — I mean, we understand how prisons are, how they work, and what they are. And the unfortunate part is — beliefs as far as the way prisons are. The question is, what situation will or

175

will not be in. But I think that you do have an absolute right to try to be safe while you're in prison, without a doubt.

Q. Certainly. Exactly. And, so, you're looking at now criminal acts of violence, and it says, "that will constitute a continuing threat to society." Well, obviously you and I — in our society which you and I live in, we're out in the street, we're grocery shopping, we're in and amongst each other. This is our society that we operate in. This capital murderer now which has been sentenced to life in prison at least, at the very least, he will live, work, eat, sleep, play, watch TV, educate, go to church, inside the penitentiary, and he will do it in and amongst other people. And obviously there's not just inmates in prison, but you've got doctors, you've got lawyers and paralegals coming in to assist people in representation, you've got clergy, visitors, you've got a whole host of people in and around the penitentiary and that particular group of people. And can you then also accept that our definition of society at large would also include a society that's kind of in the penitentiary, that that too is also a society? Does that make sense to you, sir?

A. Yes.

Q. Okay. That's what Special Issue No. 1 is going

176

to. It's asking you to now look at the evidence again, because you've already found him guilty of capital murder, and the law states that you can look at what he's done, you can look at the offense that he committed, but now you're looking at first separate question. First time you looked at it, it was to decide if he was guilty or not. Now the law is stating we're starting all over again. You can now look at the criminal offense he committed and decide this time not for the purposes of is he guilty, but now look at it to decide the question: Do I believe he's going to be a future danger?

A. I would assume I would have the opportunity to look at history.

Q. Absolutely. And there you're kind of one step ahead of me. The law says you can look at the crime to help you decide that question. And for some people they're able to look at the primary offense and the circumstances surrounding it and say that's enough for me to answer the question right there, that's enough information for me to tell you beyond a reasonable doubt you've proved to me more likely than not he'll be a future danger. Other people, like yourself, say that's fine, I'll consider that, but I would like to see something else. And it's obviously at this time in the second phase of the trial that you may, in fact, hear that. You may hear a history, you may hear a

background of the defendant, you may hear more circumstances surrounding the commission of the offense. You'll hear other things that will be presented to you to help you decide whether or not a person is a future danger.

So, let me pose that question to you then, sir. What kind of things would you like to hear or see or know about an individual or even the crime that would help you decide that question, whether or not they were going to be a future danger?

A. As an abstract and analytical thinker my goal always is, no matter what I do, is try to look at everything that's available to me. Obviously, in anything that would have to do with the life or death of any individual, I would think that you would have the opportunity to look at all the evidence available to you, and if you're able to do that, that's what you need to do in order to base your decision. You can't do it any other way. I wouldn't know of any other way to do that.

Just to make decisions even on the civil side, as far as what we do, I will say that plaintiffs are not always truthful. The unfortunate part is we always find out one way or another. And the question is, what do we do then? We always tell everybody, at least give us the opportunity to know exactly what's going on, whether it's going to be truthful or not, to know all the facts. If we

find out what all the facts are, we can usually deal and make a decision what direction we need to go in.

In this particular case, I think it's extremely important that all of the facts would be allowed, and, of course, we all know that there are some things that probably will not be allowed during the trial of this case. I would hope that anything that would be critical to the point of the trial would be admitted, as far as evidence, so the jurors, all jurors, would have an opportunity to look at and have a clear understanding of what the evidence is in order to make a decision.

Q. And I understand we're speaking — really, we're speaking in the abstract right now, because we can't get into the particulars of this case.

A. And I have no evidence, correct.

Q. Sure, and you have no evidence. But even saying that — because I think you hit on this a little bit more when you said I'd like to see a history of an individual in order to make that determination. I mean, can you speak a little bit more there and tell me, maybe, the kind of things that would help you decide?

A. I'm assuming that this young man is our defendant, and the question is — I'm always going to look, as far as history, from childhood to adulthood. Depending upon what direction, who, when and what, who's done,

whether he's been on a progressive path, he or she, whoever they may be. And, you know, sometimes there's always things in life that make things a little bit different as far as who we are and what we are, but there are always individuals that you can see and look through history as to whether or not they're going to continue down the road that we think is probably against our society.

Q. With respect to whether or not somebody's had an extensive history or pattern of criminal activity, do you think that — and we kind of ask that question on the questionnaire where we said, "Do you think that a person could be eligible or may be subject to the death penalty just solely for what they did on this one time?" Which is to say, I guess, that — let's say that this is the first really bad thing somebody's ever done, criminally speaking. What, if anything, does that mean to you?

A. Death is a very egregious thing no matter what. It's one of the worse things you could do to another individual. The question is: Where was the malice? How it was it done? And was the intent so great that it would bring what you're asking? Without having all the evidence to know, I couldn't answer that question.

Q. Maybe, for example, knowing the motivation for the offense?

A. Well, that would all be a part of everything that

would lead up to a decision to be made as to whether or not I can answer that question. If all of the elements are in play, absolutely I can answer that question. I mean, if you're going to do a hypothetical, we can do a hypothetical.

Q. I'm a little weary of that. I know on the one hand we're very ambiguous when I'm like, well, what would you like to see? without giving you a specific. But, on the other hand, I don't want to commit you to any type of hypotheticals, you know. But I've heard some jurors say that, well, I think motivation, I think a person's motivation for committing an offense is very important and speaks to who they are as an individual and speaks to whether or not — you know, their character. Did they rob the person because they were desperate? Or did they rob the person because they were just a ne'er-due-well and were lazy?

A. Or just didn't give a darn and did it any way.

Q. Or did it any way, you know. But some people might look at: Who did he kill? You know, did he engage in — and, of course, that's why I'm weary of doing hypotheticals, 'cuz people will say, well, that's crazy, that's ludicrous, but it just goes to show a point. Did I walk down the street and knock on my neighbor's door and plug him full of five bullets and take his money because

he's a local dope dealer, and I'm tired of him poisoning everybody, and the cops don't seem to do anything about it, and took the dope proceeds and dropped it in the charity box. Am I that capital murder? Or am I the guy who doesn't want to get a job, and I walk down, and I plug the eighty-year old man full of bullets, and take his life savings out of his mattress and spent it on wine, woman and song? Am I that capital murder? You know, some people say it I makes a difference.

A.   And I think it would.

Q.   Okay, okay. I'm trying to pin you down, and I can't necessarily do that now. But the question becomes, for purposes of whether or not you're a qualified juror, Mr. Paradise, is that just because you found an individual guilty of capital murder, and understanding the context in which you go into the punishment phase, you're talking now about an individual who has intentionally taken somebody's life. There's no mistake, it's not self defense, it wasn't an accident. They did it and they meant to do it, and in the course of doing that they robbed this person or tried to. This is the person we're talking about. So, the law states that you can't necessarily say, just because he's guilty of capital murder we'll always answer that question yes, and I will always find him to be a future danger, because the question is really different. It's not, is he

guilty now? The question — we know he's guilty. The question is, is he a future danger? And it's not necessarily an automatic assumption, it depends.

Dope dealer that I killed, am I ever going to lay a hand on anybody else, or is that the one and only guy I want to hurt? You know, maybe I won't be a future danger, maybe that was the only guy I had it out for. Or you may look at me and say, well, now, Miss Handley, you're going to prison, and guess who you're going do be surrounded by? A bunch of dope dealers, and you may still have a bone to pick with them, and you may very well be a future danger to those dope dealers in the penitentiary. See, it depends on the facts. And, so, that goes to what you were saying earlier, it just depends on the facts of the case. And I trust that that's what you're telling me here —

A.   That's exactly what I'm telling you.

Q.   — is that you're going to wait to hear the evidence and make the decision.

If I can't prove to you, sir, that the defendant is a future danger, which is to say more likely than not he's going to commit criminal acts of violence while in the penitentiary, or whatever society he may find himself in, if I can't prove that to you, then obviously you answer that question no, and that life sentence that he's already got is where he remains. He remains on that life

sentence, and he goes to the penitentiary to peaceably do his time.

If, however, I do prove to you that more likely than not he's a future danger, then you're required to answer that question yes, and we move on now to the second Special Issue.

I am sure you have heard of before the law of parties that states — the law envisions and understands at times two or more people can commit the same — can commit an offense together.

Miss Evans and I plot together to rob the local 7-Eleven. She goes and buys the gun, I go and buy the bullets. She drives us down there in her car. She agrees to sit and be the look-out, you know, and I agree to go in and rob the clerk. I'm getting ready to go into the store, and I say, Elaine, I forgot the masks. And she hands me the gun and says, don't worry about it, just kill the witnesses. I go in the store, I rob the clerk, and I killed the clerk. I'm guilty of capital murder, clearly. I'm the trigger man in that situation.

A.   That would be intent.

Q.   That would certainly be intentional, and I've robbed that clerk. That's guilty of capital murder. Law of parties states that if my co-counsel here either aided, assisted, directed, encouraged, in other words, if she

participated in the offense of the crime, and with respect to capital murder, if she anticipated somebody would die, she too may be held liable for capital murder.

Does that make sense to you?

A.   She's just as guilty, correct.

Q.   And under the law that's kind of what they're saying: She's just as guilty. In order for her to be eligible for the death penalty, you must also find that she actually anticipated that I was going to kill somebody. Special Issue No. 2 speaks to that. Whether that will actually become an issue in the trial, we don't know until we get there. That's something the judge would submit in the charge or would not. But it asks you to consider this: Have I proved to you beyond a reasonable doubt that the defendant is either the trigger man, or, if he's not the trigger man, was he an active participant in the capital murder or the robbery, and he anticipated somebody would die? It goes to the parties question. It's either "yes" or "no," is what it is. If I can't prove to you that he was the trigger man or that active party, that answer is no, and that life sentence remains a life sentence. If, however, I do prove it to you, your answer must be yes and — but your obligation is obviously not over.

Now, up to this point, sir, I've carried the burden of proof. I've had to prove to you he's guilty of

185

capital murder, now I've had to prove to you that he's a future danger, and I've had to prove to you he was the trigger man or an active participant. I've carried that burden of proof. My burden of proof at this point now is over. I've done my job. And I will submit to you that the defendant is now sitting almost squarely on a death sentence. Okay?

You still have one more question that you have to answer, and it's that Special Issue No. 3, and we call it the mitigating circumstances question.

Have you ever heard of that before today in your law studies and such as that, the special issue —

A.   Use it every day.

Q.   Well, there you go. It's been a long time since I've studied civil law. You're absolutely right, the mitigation and the — but with respect to the death penalty, are you familiar with that also?

A.   I am.

Q.   Okay. Then you know exactly what I'm talking to. We can call it the safety net issue, we can call it the mitigating circumstances issue. I think it's fair to say that it's an issue that's not only there for the benefit of the defendant, obviously, but it's there for the benefit of the jury.

We do not execute the mentally retarded in

186

the United States, for example. And I think that's where mitigation first started to come around, but it allows for you to take those other things into consideration, you know. Looking at everything about the circumstances of the offense, his character, his background, his personal, moral culpability, look at all that, and if there's something that personally speaks to you that you find to be mitigating — and not only mitigating, but sufficiently mitigating to undue that death sentence, then it gives you that option to do it. It could be me who walked down the street and killed that dope dealer. I may very well may be a future danger, but you're looking at my motivations for doing it. Or maybe it's the woman who's been battered her entire life by her abusive husband, you know. Kills him and his brother, you know. Maybe that speaks to you too, and maybe that's a sufficiently mitigating circumstance. Again, I'm weary to give you specific mitigating circumstances, because —

A.   I follow you completely.

Q.   You follow me completely. The question becomes then for you, sir, is that something that you're open to?

A.   Yes.

Q.   Absolutely, okay. You seem entirely up on all of this. I don't want to sound so presumptuous telling you things you already know. So, let me ask you some other things here. You have a Bachelor of Science in social

187

work?

A.   I do.

Q.   What was your initial intent with your degree in social work? What were you wanting to do with that?

A.   When I first left college, I actually worked in a relocation for juvenile delinquents. We were the last step for kids that were basically on a road of death. And the question is whether we — they would survive or not. Not all of them did, but we had a pretty good recidivism rate, I mean, as far as it was one of the lowest in the State. It worked, or at least worked to a point.

The question is, if you look at individuals, you look at people, hopefully we all become judges somewhere along our life trying to determine who, what and where as far as personality and where they go. There were kids that were in my program that either — they would either make it or they didn't, and there was quite a few of 'em that I could just tell just by looking and understanding and listening to who they were, and knew they weren't going to make it. Most of 'em either ended up dying or are in prison today.

Question: Where do you go from there? Judgment is always based on what you can or what you can't do, judgment is always based on acts and actions. And there's always things that people are going to have to do in

188

order to prove who they are and what they are in order to make it right, if there's a right way to do it.

Q.   Kind of the age who you were working with. About what age were you looking at?

A.   Fourteen to 18.

Q.   Do you think it's fair to say that even for 14 to 18 there were some people, some juveniles, that you looked at and said, I can tell you right now, this kid ain't going to make it?

A.   Absolutely.

Q.   Okay, okay. How does — you know, we don't execute people who are 17.

A.   I know.

Q.   And all that, you're familiar with that. But how does that factor into you — the whole death penalty, and such as that, that we might be seeking the death penalty for someone who's relatively considered young? I mean, old enough, obviously, to vote and go to war, and such as that, but still relatively young.

A.   You're old enough to die for your country, you should be old enough to die if you do something wrong.

You know, Texas being Texas, who it is, and obviously we know — I mean, I read papers that we do whatever — Texas leads the country as far as death penalty is concerned. All of that taken into consideration, the

189

question is, is it over used or not? I really don't know. It has to be based on the individual. Obviously, I wouldn't want to find out that there was an innocent man that I gave the death penalty to, and I know we've had some things overturned recently, including just in this county alone, as far as not only death but life sentences. Obviously, evidence is important. It's important that whatever job is done in order to present a capital case has to be done correctly and it should be done correctly.

Q. Sure.

A. And as long as the evidence points in a direction where it needs to, I think the unfortunate part is you have to only come to one conclusion, and if it comes to that point, you have to do what the law requires.

Q. For the individuals that you looked at in your work, and you said, I can tell you right now he's done, it's a — I don't want to say a lost cause. I don't know what your words would be. But how did you reach that assessment with those people?

A. Well, obviously because of close contact that I had, listen, hearing, requesting things to be done, finding out a little bit more about history, attitude of the individual, and whether or not that little shell that hopefully, I think, every individual may or my not have, and I've had an opportunity throughout my life to know some

190

really, really bad guys, that you knew that's all they were going to do. They were going to be bad guys and that was it. You know, even — it may change for a little while, but there's that path, there's that light, there's that thought that I think whether — I don't, maybe just because of who I am and the studies and understanding that I've done and the people that I've worked with, you just — you have a feeling, you know, you just know, that it's — they're just not going to do it, and I haven't been wrong. So — and I say that —

Q. Yeah. Has there always been maybe one thing that's been consistent with the ones where you say you haven't been wrong?

A. One thing consistent. Well, every individual is different. I mean, what I look at — I would think that probably that wanton disregard for other individuals. That might be more like it. Just, I'm the guy that's always going — I'm never going to tell you I'm sorry. I'm always going to be the bully guy. I'm always going to take away your milk money, or do whatever it may be. But there's always that wanton disregard that I think all of them had somewhere in common. They just didn't give a damn, excuse my French.

Q. I was just checking my time. I didn't want to run out of time, Mr. Paradise. Okay, okay.

191

I find that fascinating, and I'm wanting to explore that with you a little bit more, because I guess that Special Issue No. 3 is really — that's the things that it speaks of. And I hate to say, you know, is there an excuse for his behavior? I don't know if it's excuse making. It's, you know, something sufficiently mitigating that would warrant turning, you know, death into life. And I can't pin you down right now, but — as to what you would think is or isn't mitigating, but can you tell me what maybe moves you towards — that would be something significant, if you saw it in a person's life or their personality or something about them that you would say, hey, wait a minute, that experience, or that character, or that — that's going to be important to me, that means a lot if somebody's been through that?

A. Well, I think I know what you're trying to ask. The question is - and since I don't have any understanding other than there was a murder in this case.

Q. Sure.

A. If there's an individual that — you know, I mean, once I look at everything and you put it together, as far as facts and whatever, and whether you get to hear the defendant or not, and in this you may or may not, hopefully you would have enough evidence to be able to make a decision as to whether or not that particular individual

192

would continue to go down that road and cause harm to any other human being. And if he or she did, then I think that you would be obligated to go to the fullest extent of the law.

Q. And in terms of — because, obviously, criminal acts of violence is up for you to you decide. But you understand we're looking at it in context of actions occurring within the penitentiary. You've expressed to me that you believe it's not a great place to be, and I don't think anybody's going to say — people like (inaudible) lift weights and it's not a pleasant place. But — and having said that, though, there is a right or expectation that you ought not to have to go there and live in violence or be threatened by other people, also.

In terms of criminal acts of violence that would constitute a continuing threat to society, if that threat to society is the people inside that penitentiary, either being other inmates or guards or educators or something, what moves you to say that that's violent, that's enough, that's unacceptable?

A. Let me kind of give you just a thought of history, okay?

Q. Okay.

A. When I first got out of school, besides working, I was an aid for a state senator in the State of Florida,

193

and we had an opportunity, or I had an opportunity, to do death row on a couple of occasions, not only because of what we were looking at as far as changes, and because there was an electric chair versus what we have today, obviously it's not a pretty sight. But I had an opportunity to interview probably eighty inmates on death row, in which case I have maybe a little better understanding of not only what death row is, but the individuals that were on death row.

Q.    Okay.

A.    So I got a little more of an insight as far as the individuals, who to look, what, where. And some repented and some of 'em said, you know, I'm just ready to go. I did it, I know I did it, and, yeah, I don't belong outside 'cuz I'll do it again. And, obviously, that's a decision that I think that individual is in the right place. And whether it happens or not, that's not always up to me, it's up to the courts and states. And, of course, we know sometimes it could be years before — with all the appeals that are available to each and every individual. The question is; can you get to that point, and if the individual is — if they're that egregious to our society, then I think that they need to be placed in that position, and I think that's what you're asking.

Q.    For those individuals that told you, look, I did

194

it and, quite frankly, I'll do it again if I get out, or the others who, you know, whatever — it sounds like somebody accepting about their fate or maybe their capabilities. Do you think they necessarily always felt that way? Like the moment they were found guilty, do you think they accepted that or that was something that came over time?

A.    It's funny you ask that question, because, as I said, they started out, you know — some of my questions were, because of the program I was doing, what can I bring back to my kids to make sure they don't end up like you? And, know, they said, well, I started out down that path at that same age, doing those exact same things, and I didn't have any conscious, didn't have any feelings, didn't have any thoughts, and I'm here, and I deserve to die, and I'm going to. Period.

Q.    What did you bring back to your kids then?

A.    I actually wanted to bring 'em there.

Q.    It's a good idea.

A.    Didn't get the opportunity to do that. As I said, the program that we had had an awful lot to do with water, ocean, and we commanded responsibility from each other in order to protect their life. So we changed some of the scenarios that, without him, you die, and visa versa, without one another. We put you in a life

195

threatening situation, and you need to learn to depend upon one another. If we see that one individual isn't doing that and says, I don't give a darn, obviously, you're going to weed that individual out, or try to, and they'll be kicked out of the program. And every kid that we had that was kicked out of the program was in prison within six months, and most of them for a very long term.

I think we brought back the fact that life is more important than death, and if you continue on the road you're on, you only have one option, which is death. So either you change it, or keep going and doing what you're going to do.

Q.    You're going to be called upon to make a decision based on — obviously you can look at the entire life of the person, but — you know, from the time they're committing the offense to the time you return the verdict, relatively speaking, not a long time has expired between that.

A.    I understand.

Q.    You know, from the time they've done this to time they've gone to trial. Do you think that's enough time for you to make an assessment as to whether or not this person is just going to continue on that path?

A.    I would hope that there would be enough evidence from both the defense side and the prosecution side to

196

weigh out either one of them and to look at what you would need. And, yes, to your question.

Q.    As I've heard people say, anybody can change over time, and he could possibly be rehabilitated, and I guess my response to them is, we're kind of talking about right now. You know, we're not talking about — it says "continuing threat to society," and I don't know how long until his execution date it would be, but we're not talking about, you know, maybe ten or twenty years in the future. We're talking about what he's going to do in the future, we're talking about when he gets to the penitentiary. See what I'm saying?

A.    I do.

Q.    And, so, you know, are you inclined to say, well, I need to look at what his potential may be fifteen or twenty years, now, down the the line, or do you —

A.    Obviously, I'm always going to want to look at, as I said, everything. I don't know who this gentleman is or what he's done. He may not be a bad guy at all. He may meet badder guys in prison, in which case, he's the one who's going to be threatened. I don't know that. What I do know is that I can only make a judgment based on what I have and what I'm given. Give me an opportunity to speak with him for a couple hours, I would probably have a different thought, and one way or another maybe it'll

197

answer your question. I don't have that opportunity. Obviously, my judgment's maybe a little bit different, but just through experience, whatever, you'd be able to listen and understand.

Q. One last question. Do you think you would get a lot from talking to his mother, or do you think she would come in kind of biased?

A. Mom's are always mom's, but sometimes mom's are pretty truthful, and if you ask mom the right question she may go: He's been a bad boy all his life. And I've heard moms say that before.

Q. Do you think it's possible to have not been a bad boy all your life, but in fact now be a future danger?

A. Yes.

Q. Depends?

A. Things happen to people, yeah.

MS. HANDLEY: Mr. Paradise, I appreciate you answering my questions. Thank you. I think this will help us make our decisions in this.

I'll pass the juror.

THE COURT: Thank you, Miss Handley.

At this time, Miss Mallon will now speak to you. And I assume you want to proceed on without taking a break.

PROSPECTIVE JUROR PARADISE: Sir?

198

THE COURT: I assume you want to proceed on without taking a break?

(Court reporter requests a break.)

(Recess taken.)

THE COURT: Kerri Mallon now is going to talk to you on behalf of Mr. Broadnax.

EXAMINATION BY:

MS. MALLON:

Q. The reason we're laughing is because we've been doing this for seven weeks, and he's had trouble with my name for seven weeks.

THE COURT: I finally got the last name right, now the first name wrong. Please proceed.

Q. (by Ms. Mallon) Mr. Paradise, my name's Kerri Mallon. This is Doug Parks, and Brad Lollar's the other attorney who's disappeared, and we represent Mr. Broadnax.

I have got so many questions for you just because you have such an interesting background.

A. Gee, thanks.

Q. So I want to talk to you about some of the questions you've answered already. I also want to talk to you about some of the things on your questionnaire, just because I'm just really interested on how you got there, you know, what your thought process was. I think you are probably the most middle of the road juror we've had in

199

seven weeks. I mean, you are just like right down the middle of the road, so I'm just curious on some of your answers and how you got there.

On the very first page when it says, "Are you in favor of the death penalty?" and you say, "I'm not for or against. My decision will be based on the situation." Do you have — did you have anything in mind when you wrote that answer, like, this particular case I would say yes, this particular case I would say no?

A. Well, this question, "Are you in favor? Yes or no. Please explain your answer." The only way to explain an answer like that, there is no yes or no.

I think you just have to look at all the facts and determine what brought that individual to that point, and if they came to a point to where it warrants the death penalty, then that's what they should get. And, you know, there's a — I know that there's a line, and I know we need to look at it in the greatest light as we possibly can in order to make sure that anybody's life is sacred, because we're human. Period. There's always a line where you have to understand that you can't cross, and if you do then you need to be punished for it, one way or another, because, society, that's what we do in society. And if we didn't do that, then I guess where would we be. I mean, if we didn't have any laws, people would just be doing what they did in

200

the past, in which case, gee, you've already been hung because somebody would have hung you whether you did it or not, and we don't need to go backwards, we need to go forward. Will we be able to change whatever we do and what we're doing today or what we've done for the last ten years? Will this be barbaric compared to what we do fifty years from now? Maybe. But I'm not living fifty years in the future, I'm living today. That's what I mean by the situation. You have to look at it.

Q. It sound to me like you really come from a place — and tell me if I'm wrong. You — seems like you're very much a big-picture kind of person. You want to see where this person started, how they got to where they are, what they did, and maybe what affect it's had on people; is that right?

A. Life is a big picture. You have to look at all the facts.

You know, there's a statement that I made recently to a certain people — to a certain individual is that, you know, the difference between life and fiction, fiction has to make sense.

Q. That's true.

A. The question is, where do we go from there?

Q. Okay. Where did you get your interest in the law?

201

A.   You know, I think I was probably born with it, from what my mother told me, then, of course, as all kids, Perry Mason never lost.  You know, I guess it's always — the unfortunate part is I've always been somewhat of a late bloomer, always — that interest always there.  Would always — I guess I'm the ultimate mediator within my family.  I come from a large family, and I'm the middle child, so I was always doing the mediating from either side to try and bring justice to each, and that's not always the greatest thing that you can do.  Sometimes you get your butt beat just for trying.  But I guess — it's just been a natural progression.  You know, the law's not always right, just like life isn't always right.  But you have to bring all of it together to try and determine what's for the greatest of the good, and I think that's what we try and do, and what I try and do in the practice that we do today.

In the social security practice that I had, not everybody is — should be entitled to SSI benefits, and there are some where the court has ruled against 'em that you knew should have had it.  And then you see other individuals and go:  What the heck, how did you get it?  And, so, why?  So it's just a question of how we do it, what we do, and whether or not we can fight for what's right, and make sure that if you deserve something, whether it be good or bad, that you need to be able to do that.

202

Q.   Okay.  Now, your Bachelor's Degree was from Florida State?

A.   Correct.

Q.   Where'd you go to law cool?

A.   Well, actually, I haven't yet.

Q.   Oh, really?

A.   I'm part of — I've taken the Bar, and I've passed the Bar, and I'm working under an exemption as of the moment.  And the exemption is, we petitioned the Bar in order to allow me to test again, and if I pass, to allow me to get my Bar card.  There's an exemption that was - he knows - which I kind of fell under, and, so, I'm just utilizing everything that I have as far the law is concerned.

Q.   So how did you learn all about the law?

A.   I study a lot.  Over the last twenty-some years my original — one of the lawyers that I used to work for, he was very — he kept me in the library eighteen hours a day, and whether he'd have me look up ficti — he'd just make up some kind of case and he'd want me to go find something to make it work, which we did.  I don't know, there's a lot more to it now.

Q.   Did you ever — how much have you studied criminal law?

A.   Well, I hope to feel that I'm fairly well

203

rounded, yeah.  You know, obviously I read the Penal Code before I came here just to have an understanding of what we were doing and what we weren't doing.  I have a lot of friends that are criminal attorneys or defense attorneys.  You know, it's all part of the business, no matter what.  I think any good lawyer should have a well-rounded understanding of - whether it be a criminal law, or whether it be water rights, or oil rights, or what - but I think you should at least have an understanding.  And how else can you advise anyone, even if it's just in a small group, I mean — but you also want to make certain that the individuals that you have that are around you has the knowledge so you can direct them to the right people.  Without knowledge, you won't be able to direct them to the right people.  That's my opinion.

Q.   Have you ever studied capital punishment or anything with respect to the death penalty?

A.   Except for, you know — obviously — I don't want to call it a fascination.  I mean, I think I would call it more of an eye-opening and an awakening when I had the opportunity to do death row.  There was more that I learned through those trips, plus just reading on my own.  You have a greater understanding and maybe a greater awareness than the average individual.

Q.   Can you tell me more about that, about your

204

experience on death row?  I think that's very interesting.

A.   Well, I was there mainly for a purpose, because there was complaints, and part of the complaints were people were not being treated properly on death row.  And the unfortunate part is some of the individuals, especially because Florida, at that particular time there was suffrages, as far as what they were doing.  And, heck, there were people in a very small room that maybe got out once a week for exercise, that had been there for sixteen years or longer, in which case, that's a very long time.

The center that I worked with, it was part of his committee in order to make reports and do whatever, and part of my job as his aid was to interview and try to come to the conclusion of whether or not — what we could do to improve at least the conditions on death row.

There was some legislative changes that was done after that.

Q.   As a result of the work you did?

A.   Yeah, I believe that happened.  Basically, it was just a matter of, you know, sometimes we even forget whether you're on death row or not.  You're still a human being, and you still should have some basic needs, and people need to at least exercise that right.  Whether you're going to die or not, that's not the question.  The question is:  What can we do while you're here?  And I

205

think it's important that everybody understands that. You just don't forget about someone.

Q. I agree completely. I don't want to be nosey or be insensitive, but I do have to ask you some more questions about your wife, and I apologize. I think you can appreciate our concern.

A. That's fine.

Q. And I believe you when you say that you can put that aside and not bring it back to the jury room with you. Frankly, I'm astonished and impressed about the fact that you can do that. I think that tells a lot about the kind of person you are and really the mental discipline you have. I think that's amazing.

You're very middle of the road according to your questionnaire. I would never have guessed you experienced a horrible thing like that in your life. Do you mind telling me her name?

A. Her name is Kim Lewis, Kim Lewis Paradise.

Q. And I guess my concern is, is that, you know, if you were a juror on a capital murder case and you got to the penalty phase, so you knew beyond a reasonable doubt, you and 11 others, that a person had been — you had determined that someone was guilty of capital murder. And let's just use what's in the indictment here, an "intentional murder in the course of a robbery." I guess

206

my concern is that because of what happened to you, that you would be more inclined to more severely punish a person.

A. Let me answer this question or let me put it this way to you. Hypothetically, let's assume that during the course of a trial I found out that this young man was the man who killed my wife. I would not be able to use that against him in any reason at all, because if I did, it would be against my moral fiber. It has to be based on what we have before us. Now, would I want him tried again? Absolutely. And would I sit on that jury? No, and you wouldn't allow me.

Q. Right. Okay, okay. That's fair enough. I appreciate that.

A. That's the best way for me to put it.

Q. That's crystal clear. I appreciate that very much.

Let me ask you a couple more things about your questionnaire. On Page 3, you know, we asked if you heard anything in the media about this case, and you said, yes, you did. "I heard about the incident on TV when it happened." Do you remember anything in particular that you heard?

A. When I first walked into the central jury room I didn't know anything. When Judge Snipes started bringing

207

up some of the facts of the case, I do recall about the music guys, I think is what it was, and that it happened in Dallas. That's what I heard. It isn't that I've done any study or looked, and even since then I haven't just because I knew that this day was coming, and I thought it would be best just to leave it alone.

Q. So nothing that you heard on TV or — would affect — you don't have an opinion right now as to Mr. Broadnax?

A. If you have an opinion based on television you're a bigger fool than I am.

Q. Okay. I just have to ask. We have had some people who actually have come in here researching the case.

A. No. Gee, it's in the newspaper, it must be true.

Q. Page 4: "Do you think the death penalty is ever misused?" You said, "Yes. In the past, not all the evidence has been brought before the jury." What are you talking about there?

A. Well, has it ever been misused? And I keyed in on the word "ever," and, of course, I can ask the court the same thing. Has it ever been misused? Well, obviously, we know that it has, because we know there's been evidence that innocent people have gotten the death penalty. In that particular case, yes, it was misused. Whether it was because of the new technology we have today or whether it

208

was through shoddy evidence and whether there was railroaded in or not, but, yeah. I mean, when I looked at this question and you asked — when I was writing about this question, to me, that goes to when the death penalty first started up until today, or until the day when I read this. And absolutely, yes, it's been misused. Yeah.

Q. Okay. But — I understand what you're saying. You're comment on that, please explain — I was just curious if there was anything in particular you were thinking about when you said "evidence has not been brought before the jury."

A. Well, as I said, from time to time now and even looking at old cases, I mean, there are times where evidence has not been placed before the jury in order to show guilt or innocence. In which case, if you don't have all the evidence, how can you make an honest decision on life or death and live with that decision, without the evidence?

Q. Okay, I understand.

A. That's what I meant by that.

Q. I got you. On Page 5, "Do you believe in an eye-for-an-eye?" and you said "Sometimes."

A. Well, yeah. I have to — you know, there are times where the protection of family, to protect life, there are things that one will do that they may not

209

ordinarily do. You know, if you look for — as an eye-for-an-eye, meaning, would I go out and take the life of one other because they killed my brother or my sister or my wife? The first couple days after my wife passed away the answer would have been absolutely, yes. If I — if that gentleman, he or she, whomever did it — it probably would have been more of a reaction than anything else, but then again, no.

Q. Okay, okay. I think what you're saying is emotionally —

A. There were times where — I mean, just — yeah. I think, you know, if we read and understand the Bible, and we look through life, I mean, there's always been somewhere where Cane and Abel, whoever it may be, wherever we go, you'll find that, and you'll find that in every person living today, or at least if you press them hard enough somebody's going to do something, so — or at least that's my personal opinion.

Q. Okay. Fair enough.

I was going to question you about what kind of law you practice, but you already told us that.

How long were you an investigator? Or are you still doing investigation and paralegal work?

A. I think as what we do as far as our job, it's all part of investigating. You're investigating all the facts

210

in order to determine which direction to go in and what's best for your client.

Q. I got you.

A. But, yeah. I don't know if I can even separate that.

Q. I understand. How do you know Terry Moore?

A. Pardon me?

Q. How do you know Terry Moore?

A. When she was in Tarrant County, and, then, of course, some of the lawyers and stuff that I know, which — matter of fact I think we have a — and I just lost his name. But anyway, he's working over here now, and they're lawyers that I dealt with and, you know, socialize with in the past. It was before she became part of this job.

Q. Is that Mike Ware?

A. No, it wasn't Mike. He's just taken over one of the divisions here under Terry.

Q. Andy Beach?

MS. HANDLEY: Kelly?

A. Kelly, yeah. Thank you. If you tell him I forgot his name he'll kill me. He's a good guy. Kelly was a lawyer that I worked with in the past on the civil side.

Q. (by Ms. Mallon) Are you friends with Miss Moore, or —

A. More business acquaintance than friends. I mean,

211

we're not personal friends of any kind, no. On the other side, I would probably be more friends with Kelly. But I know he just recently came over here, and I haven't even spoken with him since he got his new position.

Q. That friendship or acquaintance, would that affect your service as a juror in this case if you were chosen?

A. Absolutely not.

Q. Would you give the State a leg up because you knew those two people?

A. Nobody deserves a leg up, it should be fact.

Q. Okay.

A. I think we're in business long enough to understand that.

Q. All right.

A. If anything, yeah, the legs just need to be equal on both sides.

Q. A level playing field, right?

A. Yeah.

Q. I think that's all the questions I have about your questionnaire, but I do want to talk to you some more about these Special Issues. And just because we obviously see it differently than they do — and I don't mean to insult you in any way. I'm a rookie on this case. I mean, this is my first capital murder case, so it's — I'm — you

212

know, these are fairly new to me, so I'm just getting a grasp of it.

I just want to talk to you a little bit about this. Special Issue No. 1 — and, again, you know the context. You have already, you and eleven others, have found someone guilty beyond any reasonable doubt of capital murder, an intentional murder during the course of a robbery. Now, when you get to Special Issue No. 1, you know, I'm sure from your studies, that the presumption is that answer is no, right?

A. Presumption should always be the beginning, correct.

Q. Okay. Because — and we like to compare it to the presumption of innocence. You know, in the guilt/innocence phase we enjoy the presumption of innocence, and in the penalty phase we enjoy the presumption is no until and unless they can prove it beyond a reasonable doubt.

Now, we have had jurors tell us that it would be nearly impossible for the prosecution to ever prove Special Issue No. 1 beyond a reasonable doubt, because you understand what a high burden reasonable doubt is. I mean, obviously you do, because you've been studying it for so many years. And, so, for them to actually prove beyond a reasonable doubt that there is a probability that the

213

defendant would commit criminal acts of violence that would constitute a continuing threat to society, they're going to have to prove to you something that may or may not happen in the future. And, so, in order to prove that beyond a reasonable doubt, we've had some jurors say that would be nearly impossible for them to do. Now, on the other hand, we've had jurors who say if you prove to me he committed capital murder, that is always going to be, for me, proof beyond a reasonable doubt that they're going to be a future danger.

How do you feel about either one of those, or are you somewhere in between?

A. Well, life in history is kind of like a mirror, there's always progressions of what you're going to be looking at. The understanding that on Special Issue 1 that there's a probability – and, of course, the key word being probable, we're looking at as to whether or not an individual is more likely than not to do malice in the future versus what they have done in the past. And the only way that you can judge that is by facts that you're looking at for all of history. And if — and this is only for me, because of training and whatever else I've had or the opportunity to look I'm going to look at steps in life, and if you took a step to become a lawyer versus — and now you're taking a step to defend a capital murder trial,

214

whether you're appointed or were wanted, but you're here, there's a step, and after you end this step there'll be a new step in your life. Does that mean that you're going to end up doing this all the time? No. But it does mean that you'll probably have more of an understanding of what direction you're going to go in versus you did before you started. And that's the step that I would have to understand in order to have that word probability come up and get past Special Issue No. 1. We're never, ever going to be absolutely sure, but hopefully we would make a decision based on more likely than not.

Q. Okay. And the question really is not whether or not the defendant would be a future danger, but whether or not they can prove that beyond a reasonable doubt.

A. The burden is always on the State, correct.

Q. And, you know, I'm sure you know, because it sounds like you've done a lot of research, that Special Issue No. 1 really is the barrier to the death penalty.

A. You have to get past it before you can go any further.

Q. Right. And when you look at Special Issue No. 1, you know, the answer to that question very well may decide whether or not someone lives or dies. So, when you're looking at criminal acts of violence that would constitute a continuing threat to society, I mean, those are, you

215

know, acts of violence that would be worthy of the death sentence. Do you agree with me on that?

A. I think so, yeah, yeah.

Q. And you can see in there — and again, I don't mean to insult you. I just —

A. And you're not, and you don't need to say that, you're not. You're doing a good job. You're doing a job that you're suppose to do.

Q. Thank you. We just see things very differently, and, so, I obviously point out different things. It's a high burden for them; do you agree?

A. It should be a high burden for any individual in order to look at. I mean, when you're judging life or judging the possibility of one's life, I think the burden should always be high.

Q. That leads me to a question I have about the program you were doing for the juvenile delinquents. You were saying that — I think you were saying from talking to them you had a feeling, or you could tell, which path they were going to go, whether they were going to continue down the bad path or hopefully deviate and take another path that wasn't so bad.

How do you think they got there, to this bad path?

A. Well, you know, if you remember anything about

216

how you grew up or anything, we — the way I kind of picture things is there's always crossroads in one's life. And the question is, what road or what path does one want to go down? This young man sitting here is at a crossroad of his life now, and the unfortunate part is it's not in his hands any more, he's already chosen to be on this path.

The question is, what happens next? As you look at what individuals' choices are and where they're going to end up or what they do, and all you can do is do a hypothetical, and the word probability come in at that point. It's more likely than not they're going to go down that road than they would this road. And, I think, that's the decision that I was able to make on the guys that I work with.

I only ever — I mean, in my life I have met probably seven people that I thought were purely evil, and, I mean, two of them ended up on death row, the rest of them ended up being murdered somewhere down the line. I can say today that I'm thankful that they did, because they were just pure evil. That was my opinion. Not everybody is evil, and I don't know. Of course, some people say evil doesn't even exist, but that's for another day. I just think that we just have to look at what we have in front of us, and hopefully we're going to make the best possible decision.

217

Q.   Do you think people are born evil or that life makes them that way?

A.   You know, I guess that's a pretty tough question. I would hope that -- do we have bad spirits? Do we have bad genes, bad blood? I don't know. I've known some pretty bad kids that, when I was growing up, that ended up being pretty good guys. So, I guess -- and then I've seen it happen the opposite way around, where he was a pretty good kid, and there was that road in life that took 'em in another direction, and the next thing you know they went off the deep end. And, of course, sometimes a domino effect comes into play, that once you start, you just don't stop. I mean, kind of like getting a tattoo, you get one, you end up with fifteen, and then you go, whoa, what's up with that? And, you know, one more's not going to make a difference. And there's that one they get one and stop, I'm done. You know, I think it's -- if we were able to answer that question I would be a much greater man than who I am. I can only give what God gives to me, so --

Q.   Let me ask you this question. Some of those kids you dealt with, did you see situations where you could see how their life got them to the point where they were? How, you know, the way they were raised, or the things they were taught or not taught, or what they were born into, those circumstances got them to the point where they were when

218

you came in contact with them?

A.   In any boy's life, my opinion, there always has to be a hand somewhere. And, of course, some kids are raised a little bit harder than others, family history, beatings, abuse all along. Obviously, that will change an attitude or make you a lot -- a little different than maybe you should be one someone actually places a hand and shows you not only the kindness but life of what you need to do, and places you in the direction where you need to go. So, yeah, obviously, yeah, you have to look at that. You have to see who and what and where.

Q.   Okay. Now, with respect to Special Issue No. 1, if the jury decides that the answer to that is no, that the person is not going to be a future danger, then, you know, the trial's over with, the penalty is life without parole, and you never get to Special Issue No. 2 or 3. Let me ask you, do you think life without parole is a substantial penalty for capital murder?

A.   Obviously, life without parole is still a very long time, depending upon the age, and he's a very young man. Is it a substantial penalty? Sure. I mean, I would think it would be, depending upon who and what. And then again, what's going to happen to him when he gets inside? I don't know. He or she, whoever it may be. Yeah, it's a tough penalty, I think. Life -- if there is for sure no

219

parole any more, and that's my understanding of the law today.

THE COURT: That is definitely the law.

A.   Yeah, it's a substantial penalty. And does it deserve to go higher? Depending upon the facts, yes.

Q.   (By Ms. Mallon) Okay. And with a life-without-parole penalty, a person is still going to die in prison, it's just -- it's not going to be at the hands of the State. It's just going to be, you know --

A.   Hands of the prisoner or just life itself, yeah.

Q.   And you would agree with me, wouldn't you, that the question in Special Issue No. 1 is not whether or not the person deserves the death penalty. You know, we've had a lot of jurors come in and say that they actually thought that's what happened. If you found someone guilty of capital murder, you went back to the jury room and it was a decision of: Does he deserve life, or does he deserve death? And you agree with me that that's not even --

A.   I understand the difference. I understand that the burden has to be met in order to get to that.

Q.   The question is whether they can prove beyond a reasonable doubt that he's going to be a future danger, right?

A.   That's correct.

Q.   Okay. I think I have beat that to death. I'm

220

not going to talk about Special Issue No. 2, because we don't know if that's going do be at issue in this case. It's whether or not the judge decides that it is.

Special Issue No. 3, I do want to talk about. Because I know you can tell that Special Issue No. 1 and Special Issue No. 2 are objective decisions, right? It's whether or not they have proven it.

A.   Yes.

Q.   Well, once you get to Special Issue No. 3, it's really a subjective decision, and there's no burden of proof. And this is where your own personal moral judgment becomes the deciding factor. And, you know, I know you've read it a couple times now. But, you know, "Do you find, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background and personal, moral culpability," I think from what you've told me that I think you really have an insight into Special Issue No. 3, because you dealt with those kids.

A.   That is the question -- the first two issues, to me, depending upon if the evidence is there, why it can get to these two issues. The third issue is the issue that one that you have to look, not only within one's self, but look in the individual themselves to determine whether or not the circumstances warrant anything more.

221

Q. Absolutely.

A. And, yeah, I don't know of any other way to do that other than you have to make a decision and it has to be a gut feeling.

Q. Right. And the law says each individual juror is required to make their own personal, moral judgment.

A. It would be a very personal judgment.

Q. Right. I mean, we've compared it to choosing your religion, or the church you want to go to, or —

A. I think even more so.

Q. Okay. That's good to know. And, you know, once you get to Special Issue No. 3, it's not a democracy, you make your own individual decision.

A. It has to be based on the facts that you have brought before you.

Q. Right.

A. And whether the intent — whether the State has met their burden.

A. No, and that's the best way that I can tell you.

MS. MALLON: I think I'm getting a look here. I need to wrap this up.

THE COURT: Not from me.

MS. MALLON: Oh, okay, okay.

THE COURT: No, I was just — just heard something over there.

222

Q. (By Ms. Mallon) I do have just a few more questions for you, Mr. Paradise. If you're deciding Special Issue No. 3, would you agree with me that everybody deserves to have their individual decision respected?

A. Yes.

Q. If you decide — and, you know, mitigation, you decide what's mitigating to you, each individual decides what's mitigation to them. So, what may be mitigation to you may not be mitigation to the person next to you and vice versa. Does that make sense?

A. Depending upon how they understand or decipher the word itself, yeah. And I think — I would hope that when it comes time, or if it came time, to Special Issue No. 3, that the court would lay down specific understanding of what mitigating circumstances means to all the individuals so everybody would have an understanding and view it on the same plane.

Q. Well, that's not defined for you, that's up to you. You're the one who makes that decision. It's not defined for you and it can be different for each individual juror. It can be one thing that you find sufficient, it can be twelve things that you find sufficient. This is where — that's why I say it's your individual, personal, moral judgment. I mean, the law says that you can decide mercy alone is enough to find sufficient mitigation to make

223

that sentence a life-without-parole sentence and not the death penalty.

A. I have the ability to do both, if that's what you're asking me.

Q. It takes all twelve, it takes all twelve, for a death sentence to be imposed.

A. I understand that.

Q. Okay. Let me ask you this. If you had decided that life without parole was the appropriate penalty for you, that you made that personal, moral judgment, and you had eleven others back there who were saying you are crazy, you're wrong, the appropriate punishment is the death penalty, could you withstand their argument and —

A. Apparently you don't know me very well.

Q. Well, I'm guessing I know the answer to that. But I just want —

A. It may be the other way around.

Q. Well, in that you would respect someone else's decision?

A. There's always — you know, I mean, you're going to have to stand behind whatever decision you make. I don't think that you should allow other people to make decisions for you, whether it be for the greater good or not. I think that if the evidence is presented correctly, I would hope that most of the jurors, especially since as

224

much time that you all have taken, that you're going to choose the right individuals to make the decisions and do the things that are necessary for this particular trial. I mean, you guys have taken more time than most cases that I've ever seen, and you're not there yet. I mean, you're still working on a pool in order to get to where you need to go, so you still have another step to go.

Q. One thing I just want to mention. I think when you were talking to the prosecutor you said something about it's not an excuse in reference to Special Issue No. 3. Understand, that's not what we're saying. We're not saying that anything, you know, in his background or character or moral culpability is an excuse for the capital murder. We're just saying that, you know, there might be something you might find mitigating.

A. I understand that, yeah. I clearly understand that.

MS. MALLON: I think that's all I have, Mr. Paradise. Thank you very much.

THE COURT: We thank you, Ms. Mallon.

Sir, you'll be stepping out for just a moment, then you'll be coming right back in again. Watch that first step.

(Prospective Juror Paradise left the courtroom.)

THE COURT: In the presence of Mr. Broadnax,

what says the State of Texas?

MS. HANDLEY: No challenges.

THE COURT: What says Mr. Broadnax?

MS. MALLON: No challenges.

THE COURT: Have him return.

( Prospective Juror Paradise returned to the witness stand.)

Of course — please be seated, counsel. Of course, you have been accepted as a qualified juror by the attorneys, and let me say I completely agree.

Now, let me give you a few last instructions. Are the telephone numbers on that questionnaire still correct and were they correct when you wrote them down, as far as any —

PROSPECTIVE JUROR PARADISE: Absolutely.

THE COURT: — juxtaposition?

PROSPECTIVE JUROR PARADISE: My office and my cell phone number.

THE COURT: What's the best way to call you, office or cell phone?

PROSPECTIVE JUROR PARADISE: If it's during business hours, it's probably easier to reach my receptionist and just tell 'em to interrupt me no matter what.

THE COURT: The judge's coordinator is going to

call you, it will be next week, and tell you if you're on the jury or not on the jury. Also, the sheriff now is going to give you her card, personal card, here at the courthouse. Should anything occur in your personal life between now and then that you think might affect your service, give her a call, and we'll immediately deal with it.

Now, for me, I want you to assure that you are going to be on the jury. I know I don't have to tell you this, but for the record I am. Please avoid all outside information, media, TV, radio, newspaper, Internet. And you in your firm members will understand more than anybody that if they say, "What went on up there?" just say, well, that old judge told me not to say — talk about this until it's all over with. And we'll be calling you.

PROSPECTIVE JUROR PARADISE: I am allowed to tell them that I was chosen as a qualified juror, correct?

THE COURT: That's exactly right, exactly right, sure. It's been a real pleasure to meet you. Thanks a lot.

PROSPECTIVE JUROR PARADISE: You, too. I look forward — I wish you well. Thank you all for your time.

(End of Proceedings.)

---

227

STATE OF TEXAS

COUNTY OF DALLAS

### REPORTER'S CERTIFICATE

I, Laura Weed, Official Court Reporter in and for the County Criminal Court No. 2 of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me..

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid by Appellant/Dallas County.

DATED this 8th day of February, A.D., 2010.

Laura Weed, CSR
Texas CSR No. 2112
Official Court Reporter
County Criminal Court No. 2
133 N. Industrial Blvd., LB-15
Dallas, TX 75207
Telephone: 214-653-5616
Certification Expires: 12/31/10