REPORTER'S RECORD

VOLUME 37 OF 73 VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| THE STATE OF TEXAS | ( | IN THE CRIMINAL DISTRICT |
| VS. | ( | COURT NUMBER SEVEN |
| JAMES GARFIELD BROADNAX | ( | OF DALLAS COUNTY, TEXAS |

ORIGINAL

* * * * * * * * * * * * * * * * * * * *

INDIVIDUAL VOIR DIRE EXAMINATION

* * * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS
SEP 16 2010
Louise Pearson, Clerk

On the 17th day of July, 2009 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE QUAY PARKER, Presiding Judge, sitting for the HONORABLE MICHAEL SNIPES, Judge of said Court, held in Dallas, Dallas County, Texas:

Proceedings reported by computerized machine shorthand.

**Anne B. Meredith**
Certified Shorthand Reporter

A P P E A R A N C E S:


HONORABLE CRAIG WATKINS
Criminal District Attorney
Frank Crowley Courts Building, 10th Floor
133 N. Industrial Blvd., LB 19
Dallas, Texas   75207-4313
Telephone No. 214 653-3600

BY:  MS. ANDREA HANDLEY, SBOT No. 08898800
     MS. ELAINE EVANS, SBOT No. 24032880
     MR. GORDON HIKEL, SBOT No. 00787696
     Assistant District Attorneys


          APPEARING FOR THE STATE OF TEXAS



     MR. BRADLEY LOLLAR, SBOT No. 12508700
     Attorney at Law
     1700 Commerce, Suite 450
     Dallas, Texas   75201
     Telephone No. 214 384-8178

     MR. DOUGLAS PARKS, SBOT No. 15520000
     Attorney at Law
     321 Calm Waters Lane
     Holly Lake Ranch, Texas   75765
     Telephone No. 903 769-3120

     DALLAS COUNTY PUBLIC DEFENDER'S OFFICE
     133 N. Industrial Blvd., LB 2
     Dallas, Texas   75207-4399
     Telephone No. 214 653-3550

BY:  MS. KERI MALLON, SBOT No. 24049165
     Assistant Public Defender

          APPEARING FOR THE DEFENDANT




*Anne B. Meredith*
Certified Shorthand Reporter

CHRONOLOGICAL INDEX - VOLUME 37

| | | | | PAGE |
|---|---|---|---|---|
| Proceedings - July 17, 2009 | | | | 4 |

| VENIRE PERSON | COURT | STATE | DEFENSE | |
|---|---|---|---|---|
| JAMES McELROY | | 6 | 34 | |
| Prospective Juror Accepted | | | | 45 |
| RUBY WOODWARD | | | | |
| Excused by agreement | | | | 48 |
| Prospective Jurors Excused by Agreement | | | | 51 |

WITNESS:

| | COURT | STATE | DEFENSE | |
|---|---|---|---|---|
| SHARON JOHNSON | | | 52 | |
| Prospective Jurors Excused by Agreement | | | | 56 |

ALPHABETICAL INDEX - VOLUME 37

| WITNESS OR VENIRE PERSON | COURT | STATE | DEFENSE | PAGE |
|---|---|---|---|---|
| SHARON JOHNSON | | | 52 | |
| JAMES McELROY | | 6 | 34 | |
| Prospective Juror Accepted | | | | 45 |
| RUBY WOODWARD | | | | |
| Excused by agreement | | | | 48 |

***Anne B. Meredith***
Certified Shorthand Reporter

PROCEEDINGS:

(Defendant present).

THE COURT:  Okay.  We are ready for Mr. McElroy.

(Prospective Juror No. 1335, James McElroy, enters the courtroom).

THE COURT:  Come in, Mr. McElroy.  Just have a seat right there, if you would, please, sir.

PROSPECTIVE JUROR McELROY:  Yes, sir.

THE COURT:  Thank you, ladies and gentlemen. Be seated, please.

And good morning to you, Mr. McElroy.  I'm Judge Quay Parker.  I'm a Senior District Judge from McKinney just north of town here.  And Judge Snipes is the Presiding Judge in Criminal District Court Number 7 which is where this case is pending.

Judge Snipes had asked me sometime ago if I would assist him in the jury selection process in this capital murder case.  And, so, that explains to you what I'm doing here today and also, consequently, why you're here today.

So, anyway, the attorneys are going to talk to you a little bit about some of the law and procedural aspects of a capital murder case which is, as you know --

PROSPECTIVE JUROR McELROY:  Yes, sir.

THE COURT:  -- being an attorney, a breed of

a -- kind of an animal of a different breed, you know, so to speak.

But they will go over the law with you, explain it to you, and then ask you questions and get your ideas, your thoughts, your opinions, if you will, concerning the law as it applies to a capital murder case, not specifically this case, but any capital murder case.

So, Ms. Andrea Handley is seated at the counsel table right in front of you.

MS. HANDLEY:  Good morning.

PROSPECTIVE JUROR McELROY:  Good morning.

THE COURT:  She is an assistant district attorney here in Dallas County and will be talking to you on behalf of the State of Texas.

Mr. Brad Lollar, Mr. Parks, Doug Parks, and Ms. Kelly Mallon.

MS. MALLON:  Good morning.

THE COURT:  And then Mr. James Broadnax.

Keri, excuse me, Keri Mallon.

MS. MALLON:  That's okay.

THE COURT:  And Mr. James Broadnax is the defendant in this case.

Ms. Handley.

MS. HANDLEY:  Thank you, your Honor.  I appreciate it.

JAMES McELROY,

testified as follows:

EXAMINATION

BY MS. HANDLEY:

Q    Good morning again, Mr. McElroy.  How are you today?

A    Oh, I'm fine.  You doing all right?

Q    Thanks.  I appreciate you being here.  I know you just got a call yesterday and I appreciate your time.

Let me tell you what's going on, and I'm sure you've probably already figured this out.  Obviously this is a death penalty case.  You know that we bring people down one at a time to talk to them, test their qualifications, explain the law to them, basically looking for whether or not the individual is a qualified juror.

If you're qualified, you end up in the pool of potential jurors and then ultimately we will make our strikes and exercise the peremptory challenges and come up with those twelve people that sit on this jury.

You are -- You are so ahead of the game in this.  I think you can appreciate that the majority of the people coming down here have never even -- this is the first time they have even driven past a courthouse let alone been in one.  We spend an exorbitant amount of time with those folks explaining the law to them and then ultimately seeing if they can follow the law.

You are an attorney.  You are a litigator, it sounds like primarily, though, in civil practice, commercial litigation.

Just from reading your questionnaire, you hit the nail on the head with respect to what I think the issues are in this case and what becomes important.  I'm not going to go into the specifics of fundamental principles of law.  I think you have a very good appreciation for those laws, sir.

I will, though, just touch one more time, for the record, what's applicable in a death penalty case just so we can go over it one more time.

You've had a chance to read the pamphlet.

A      (Nods head).

Q      Does that explain to you, you have a good appreciation for what we're doing in a punishment phase in a capital murder case?

A      Yes, I've never seen the specific questions before, but I knew generally what we were going to be asked.

Q      Right, right.  And oftentimes what we usually say to people is that 90 percent of the lawyers who practice in this courthouse have never seen the special issues before.  It's a very rare kind of situation.  It's a very specialized area of the law.

But as you know, the death penalty is only an option in a capital murder case.  That obviously we have to

prove to you in the first part of the case that he's guilty of capital murder.

We have alleged in this case in the indictment the capital murder is by virtue of him having intentionally caused the death of an individual and doing it in the course of committing another felony offense, in this particular case that being robbery.

Obviously, if we prove capital murder to you, you return a verdict of capital murder. You may or may not know now that obviously, you know, that's an automatic life sentence for a defendant committed -- convicted of capital murder.

It's relatively new that life in prison now means literally life in prison, so that is going to apply in a capital murder case. If you get life, there is no parole. That's it, that's all.

You know, we used to have the forty years and the thirty years, and we have now come up with that's it, that's all. If you get life, that's where you're going to be the rest of your life.

In order for a defendant to be sentenced or to receive a sentence of death, obviously the jurors don't go back and just, how many think he should die and how many think he should live? We get to that ultimate verdict by virtue of you answering the questions each independently to

*Anne B. Meredith*
Certified Shorthand Reporter

themselves.

That first special issue that you're going to answer, tell me, you've probably heard this before, goes to future dangerousness.

A     Uh-huh.

Q     The concept of future dangerousness.

And I will tell you, on page four of your questionnaire -- Do you have that in front of you?  You've got the pamphlet but --

MS. HANDLEY:  Do we have his original questionnaire up there, Judge?

THE COURT:  Yes, I do.  I'm sorry, I have it right here.  Here, Mr. McElroy.  I'm sorry.  I've got your questionnaire.  I know you don't remember your responses from over two months ago I guess now it is.

Q     (By Ms. Handley)  We might ask you about some things in there, so I'm going to have that right in front of you.

But with respect to special issue number one, the future dangerousness issue, I'm looking at your response on page, I'm sorry, page five actually, if you would go to that with me.

Third question from the bottom, what would be important to you in deciding whether a person receives a death sentence rather than a life sentence in a capital case?

And you stated, the State proving beyond a reasonable doubt that the defendant will likely commit violent crimes in the future.

At that point did you know that was the standard, Mr. McElroy, or was that just your personal opinion?

A    No, I think I knew that was the standard.

Q    Okay.

A    Or something close to it.  It seems like the way I learned it or heard about it was a continuing threat to the society.

Q    Exactly.  And even though you may just be recollecting that that is the legal standard, do you also believe that from a personal standpoint?

A    Oh, if it's the law, yes.

Q    Okay.

A    If I'm instructed that I've got to find that, yes, that's fine with me.

Q    Okay.  Okay.  And I guess it goes to the question of some people obviously believe that if an individual is found guilty of capital murder, intentionally causing the death of somebody, doing it in the course of committing a robbery or trying to commit a robbery, then you know, to heck with these other special issues.  The question becomes, do they deserve it or not?

Some people are then, you know, primed or educated that actually there are steps to go through, that this is a legal standard that we must meet.

A    Uh-huh.

Q    And, so, okay, well, I agree with that and I will follow the law.  But even if that wasn't there, I think the person should die, anyway.

A    Oh, no, I don't feel that way.

Q    Okay.

A    No.

Q    Okay.  That is the first special issue.  We gave it to you in the pamphlet and it's obviously right up there in front of you too.  And you've hit the nail on the head. The standard is always evidence beyond a reasonable doubt. You know better than anybody that our standard in a criminal case of beyond a reasonable doubt is obviously a much higher standard than what you're held to carry there in the civil courts.

A    (Nods head).

Q    But it is something that we have to prove to you. The law states you can answer that question by looking at the crime that you've just found him guilty of, looking at all the surrounding circumstances of that particular offense. The law states you can base your answer to that question just on that and that alone.

And some people are able or capable of doing that, of looking at the crime and saying, I can make a determination on future dangerousness just by looking at what he did.  The law says that's fine.  Other people say, I would like to see some more evidence, and that's appropriate too.

You know in the punishment phase, it's at that time that we can bring you additional evidence, if a defendant has done something before, an extraneous offense, if you will, evidence of his character, anything that's going to help you make that determination as to whether or not he's a future danger.

The standard is probability which, you know, the courts have held generally means more likely than not. Obviously not a possibility, not a definite, but a probability.

Criminal acts of violence is not defined. It's for you to decide what is and what is not a criminal act of violence.  And we are looking to see that that criminal act of violence would constitute a continuing threat to society.

The definition of society, again, is not necessarily defined for you, but it may and should include not only society at whole -- at large and what you and I are functioning in now, but also that prison can constitute a society in and of itself.

A    Uh-huh.

Q    We are asking you to look at the defendant now in context of when he goes to this prison society, where he will presumably be for the rest of his life unless he escapes, that you look at him in that context, how he's going to interact with other inmates that are there.

You know that we don't have separate prisons just for murderers and separate prisons just for burglars. How he is going to interact with those other inmates in there as well as guards, wardens, clergy, visitors, educators, anybody that may come in and out of that.

We are looking to the defendant and how he's acting in there.  And the question becomes, based on the evidence in the case, based on what you've seen, the act that he has committed, based on anything else that we have shown you, then you make that determination.  Will he more likely than not be a future danger to the people that he is around, be it the society of the penitentiary or wherever else he may find himself.

In terms of being able to make that determination as to whether or not somebody is a future danger, is there anything that jumps out at you that would help you make that determination?

A    No, but I'm glad you clarified that because I always wondered if prison was considered society.  Is he a

threat to kill someone in prison? And I was curious about that, and you told me that that is.

Q    Yeah, yeah. Well, and I think that the definition to society, you know, it's not just the prison society. You can also think of it in terms of society at large. But it should necessarily include that as a society.

I mean people do escape from prison. You've seen the Texas seven. But for the most part, and presumably, he will be in that penitentiary society. And people are sentenced to do time in prison. They are sentenced to do, you know, I sentence you to ten years in the penitentiary for the crime of burglary.

I'll ask you, the individual who is sentenced to do that ten years or five years or even twenty years, do you believe that they have a right to safety --

A    Oh, sure.

Q    -- while in the penitentiary?

And I believe the question goes to that. It speaks to that, not only the safety of the other inmates, but then also maybe the safety of the people who work there, who come and visit there, who, you know, volunteer there, and such as that.

So, the society definition, it looks -- it looks broadly not just at our society but also narrowly to the population that he's operating there in.

A    Yeah, I understand that now and I appreciate the focus of the definition of what society is.

Q    Sure.

A    I understand it now.

Q    And let me -- Let me step back with you now because you said, you know, that he may commit another murder in prison.  Criminal acts of violence is not necessarily defined. I mean what it doesn't say, it does not say, do you think it's more likely than not that the defendant you've found guilty will commit another murder or will commit another robbery or will slug somebody in the face or will make threats to do people harm.  It doesn't say what criminal acts of violence are.  It's up for you to decide.

When you say, you know, is it more likely than not he's going to kill somebody again, is that kind of where your standard is in terms of what would constitute a criminal act of violence?

A    Oh, no, it would be lower than that.  I understand that criminal acts could be, you know, assault, could be all sorts of things, could be sexual offenses or whatever.

Q    Sure.

A    So, I understand that it does not have to be another murder.

Q    Okay.  Okay.  And where you place that bar, where you place that standard is obviously up to you.  I think a

lot of people have said to me before that, look, I think that another inmate in the penitentiary certainly has a right to safety, but to say that he has an expectation of safety may be unreasonable, that he shouldn't expect it because it's going to happen.  It's just part of doing time.

I mean, do you have any feelings about that?

A    Oh, I don't, I don't think -- My personal belief is you shouldn't expect to be assaulted, sodomized, or whatever, in prison.  That you have some reason to believe that if you do your time and behave the way you're supposed to behave, that you'll be free from all that, so.

Q    Sure.  Sure.  Okay.  Prison is not a pleasant place obviously.

A    Right.

Q    You know, but it does kind of go to that and you are asked to look at the defendant --

A    Uh-huh.

Q    -- in that context.  You are asked to look at what constitutes a criminal act of violence in that context.

Some people have said, look, if -- You know, if I'm just sitting here right now and my colleague, Gordon Hikel, is minding his business, I just shove him out of his chair, you know, in our environment right now he has every right and I would think expectation to go say, look, I'm going to charge you with assault.  That's ridiculous.

Some people may say, shoving somebody out of their chair in the penitentiary, ahh, not so much a criminal act of violence because of the environment.

How do you feel about that?

A    Well, I wouldn't -- I wouldn't classify in my mind pushing his cellmate off the -- off the chair in the cafeteria in a prison to be a criminal act of violence.  I think it would take more than that.  It would take something that would likely get him charged.

Q    Right.  Okay.  Okay.  Fair enough.  Fair enough.

In making that determination as to whether or not he's more likely than not going to be that future danger, if you will, what are the kind of things that would speak to you or would help you in deciding that question yes or no?

A    Criminal background before this offense, what -- how -- I don't know if he's incarcerated now.  My guess is that he is.  Have there been any problems during his incarceration prior to trial, and just his proclivity to be violent.

Q    Okay.  Okay.  Do you think it's possible that an individual who has, who has had a -- or there is a lack of a criminal record of violence, that that person could still be a future danger?

A    Oh, yes.

Q    Do you think that -- Okay.  Well, that answers that

for me.  That answers that for me.

And obviously you -- I believe you understand this so I don't want to insult your intelligence.  But you understand that going into the first special issue, there is obviously nothing automatic.  Just because you're found guilty of capital murder does not mean you are automatically going to be a future danger.  You understand that this is a question that you are asked to consider entirely separate.

You looked at the circumstances of the offense in the first phase of the trial to decide whether or not he was guilty.  Now you're looking at it in terms of deciding whether or not he's a future danger, that obviously there is nothing automatic about it.

A    Yes.  Oh, I understand that.

Q    Okay.  Some people don't.  Some people think, well, if he's guilty of capital murder, he meant to kill somebody, he robbed them while doing it, then he's automatically a future danger.

And I get that you appreciate those people are not qualified because they have jumped to a conclusion and they have based it -- they have already made up their mind and they haven't heard any evidence in the case.  So, I think you're pretty much up to speed on that, that we will have to prove that to you with evidence.

We have special issue number two there.  It

goes to the law of parties, which I'm sure you're fully up to speed on and comfortable with that proposition. Whether that becomes an actual issue ultimately in this case is yet to be decided. It will be something left to the judge when he's putting together the charge and looking at the case.

If it does become an issue, then obviously special issue speaks to this in this case. You're called upon to ask yourself, if the defendant was the actual triggerman, so to speak, and if he was not the actual triggerman, was he a party to the offense? Did he aid, assist, encourage or direct? In other words, was he actively participating in it?

In order for you to find somebody guilty of capital murder, you have to find not only that they were a party, that they had that active participation, but that they should have anticipated somebody would die.

When you get to special issue number two, now it asks you the same thing, but there is an additional thing there. Not so much any more should he have anticipated somebody would die, but did he actually anticipate somebody would die.

If you think he was the actual triggerman, if we prove that to you, or if you think he was an active party in the participation of this offense and he anticipated somebody would die, then obviously the answer to special

issue number two is yes.

A    (Nods head).

Q    I take it you understand that concept of law of parties.  Do you have any questions about that?

A    No, I understand it.  I started with it in law school, but not in this context.  But I understand if more than one person is involved in the crime, they both figured, well, if we have to -- if we have to shoot, we are going to shoot.

Q    Uh-huh.

A    Then whether you actually pull the trigger or not, you're still --

Q    Sure.  Sure.

A    -- still responsible.

Q    And I'm sure you can envision a situation where maybe two people get together and all they really planned was to rob somebody.

A    Right.

Q    Nobody was ever supposed to die.  You know, nobody was supposed to get hurt.  But, yet, I take it upon myself to sneak a gun into the situation and kill the person.

Well, you might truly and probably should find, if that's the basis of the evidence, if my cohort had no, no reason to believe that anybody was going to die, then he may, in fact, be guilty of aggravated robbery or robbery,

but whether or not he's guilty of also capital murder would become a question of should he have anticipated.

And you look into the evidence. You know, what were our conversations? Did we carry a loaded gun? I mean, but there are situations where nobody was supposed to die. This was just supposed to be a robbery. And I believe it speaks to that question also.

So, whether or not that becomes an issue, the judge will make that determination, and then you'll be called upon to answer that question there.

A    (Nods head).

Q    If you find the answers to special issue number one and two are yes, then I would submit to you, Mr. McElroy, that the defendant is sitting squarely on a death penalty at that -- at that point.

My burden of proof ends at that point. I carry no more burden of proof and obviously the defense has never carried a burden of proof, but you still have your special issue number three. I'm sure you've heard this referred to as the mitigating circumstances issue that calls upon the jury to again reassess all of the evidence in the case, you know, look at everything all over again. Look at the circumstances of the crime, look at the defendant, look at his character, look at his background.

It goes to -- Obviously it's there for the

benefit of the defendant. I've always believed really it's there for the benefit of the jurors, you know, more in my opinion than maybe a defendant, you know.

I appreciate that in Texas, you know, we're still one of the last states that allows a jury to assess punishment because they trust that we can look at the circumstances of the offense and the particular defendant and then let the punishment fit the crime. I personally believe it should be that way in all states, but I'm glad it is in Texas because no two defendants are alike, no two situations are alike.

Well, he may still be looking at an automatic life without parole sentence, but you're not going to walk out of this courthouse saying, I thought my hands were tied. There was something about this guy or there was something about this case that, I get he's a capital murderer and I get he's a future danger, but there was something unique about this case that moves me to say, death sentence is not appropriate here.

Now you've got that option. You will not walk out of here with your hands tied. You will not go to your car going, I feel that was abundantly unfair. I think there was something about this guy that dictates that maybe he should have got life instead of death.

I can't pin you down now to what is or is not

a mitigating circumstance. Obviously it's not defined for you. It's entirely up to you to decide, you know. And what becomes important also in that stage, sir, is that there does not have to be an agreement on what is and is not a mitigating circumstance.

You may find age to be a mitigating circumstance; another juror may not find it to be mitigating. There does not have to be an agreement on that. But obviously it's more than just a mitigating circumstance; it has to be sufficiently mitigating. Sufficiently mitigating.

I'll submit to you what you glean to be a mitigating circumstance and whether or not it's sufficient speaks to you looking at the evidence in the case, you know. And I could go through a lot of analogies with you and such as that but, again, I'm not trying to pin you down to anything in particular.

The question becomes, and it's kind of a rhetorical question, if you personally felt that there were a circumstance that came up in the case or about the defendant and you personally felt it was sufficiently mitigating to turn that life sentence -- that death sentence into a life sentence, would you do that?

A    Oh, yes.

Q    Okay. In other words, it's like I'm asking you, would you do what you thought was the proper thing to do?

A    Sure.

Q    And it sounds like you would.

A    Uh-huh.

Q    Keeping in mind you know nothing about this case, you know nothing about the particular defendant in this case or the circumstances other than what he's been indicted for, is there anything, though, that speaks to you in terms of somebody having had a particular circumstance of their background or their character or something that you would think may lessen a person's moral culpability or may be mitigating?

You know, we asked you that question about upbringing and genetics and background, and I think you can see that that's really what that question is hitting on in special issue number three.

A    If I think -- If I understand your question correctly in my mind, coming into it, there is nothing that would impact me more than anything else, and we just have to look at the defendant's background and education and history and family, and whatever else they want to present, on a clean sheet, view him individually.

Q    That's true, absolutely right.  I mean, what may be mitigating for one person may not for another, you know. And that's the point is that you can't go in saying, I'm not even going to consider something.  If you show me he's guilty

of capital murder, if you show me he's a future danger, there isn't absolutely anything in the world that's going to change my mind.

Well, obviously that's a juror who is saying, I'm going in with a closed mind.

A     Uh-huh.

Q     And what I'm hearing you saying is, I'm going in with a blank -- with a clean slate, a clean sheet of paper, and I'm looking at it and then I'm deciding whether or not is there something mitigating and, secondly, and most importantly, is it sufficiently mitigating?

A     Yes, that's my -- That's how I would view it.

Q     Okay.  Okay.  Any questions about any of that, how the procedure works?

A     No.

Q     Okay.

A     I think I've got it.

Q     Okay.  I'll tell you that in order -- you know, you must be unanimous on special issue number one and two. All twelve jurors must unanimously agree, you know, that the answer should be yes.

On special issue number three it's really -- all jurors must be unanimous that there are no sufficient mitigating circumstances in order for him to receive a sentence of death.  Okay?

A    (Nods head).

Q    But again, you know, it's kind of -- You only need to be unanimous that there are none. Obviously the flip side of that is you don't have to be unanimous on what is. You know, one person can find that something is sufficiently mitigating to turn that sentence into a life sentence, and so be it. That is -- it is what it is. Okay?

I'm looking at a couple of things in your questionnaire here. Let's see here. There's a couple of things that may have jumped out at me. Go with me, if you don't mind, to page seven. Page seven. And I just want to know your personal opinions on some things and feel you out here.

The very first question we asked you, what are your thoughts and feelings about the criminal justice system? You said, Dallas County is a tough place to be a defendant. Why do you say that?

A    Well, based -- I've lived here all my life and even I knew who Henry Wade was when I was a kid. And I have always -- I think Dallas has a tough reputation, or I think Dallas is a tough town to be a defendant, just like I said here.

I think the prosecutors are tough, I think the police are tough, and I think the system's tough. And it's probably tougher here than it is in South Texas and in

other parts of the State.  That's not bad.

Q    Sure.

A    It's just my view of how we are.

Q    Well, let me ask you this.  If you've been reading the paper or watching the news, you know, we've taken some hard licks for some things that have happened under prior administrations.  And now we have even reviewed cases where people were convicted twenty, thirty years ago and have said, hey, not right, not proper.  We are going to undo that conviction.  Something that we're very active in today and something we're very proud of.

What do you think about or do you have an opinion on what's going on now today with our administration now versus what's happened before, or do you think that maybe we weren't fair before or --

A    No.  And I think I kind of referenced that in the second clause of my answer where I said, I believe that generally the prosecutors do an excellent job.  I mean, I'm sure the number of cases y'all prosecute is staggering.

Q    Sure.

A    So, there are going to be the exceptions to, you know, a clean conviction, if that's the right term.  And I think those are being addressed now, I know the DNA cases, and we are trying to, you know, unwind and make good on those cases.

But I think, like I say, generally for your run-of-the-mill defendant, it's a tough place to be, and the prosecutors and the police do a good job.

Q    Okay.  Okay, then.  Okay.  So, in terms of anything that may be going on, it hasn't necessarily made you suspicious of our office or suspicious of prosecution or --

A    Oh, no.

Q    Okay.  I think sometimes I've heard some people say that, well, it's win at any cost with these prosecutors, which I take issue with personally, but what I think personally doesn't amount to anything right now.

A    Yeah.  I don't -- I read this the other day.  I can't remember the case.  But one of the prosecutor's statements was that we have an obligation to do justice and to be fair, so they were looking at it from that regard.

Q    Okay.

A    I think that's right.

Q    Okay.  Talk to me -- And I kind of chuckled when I saw this, when we asked you about prosecutors and defense attorneys.

A    Uh-oh.

Q    And you said, defense attorneys, hard working but often with limited resources.  And I kind of chuckled because I think if I was answering this I'd say, prosecutors, hard

working but with limited resources.

Where is that coming from?

A    Which answer is that?

Q    This is where we asked you what you think about police officers, prosecutors, defense attorneys.

A    Is that on page seven?

Q    It's the third one down, page seven.

A    Oh, police officers.  Well, that may be coming more from my personal perspective.

Q    Right.

A    The criminal work I do is on the Northern District appointment panel in the federal courts.

Q    Okay.

A    And speaking anecdotally, if you want to hear kind of what my -- that answer is based on.  I was appointed a couple of years ago to represent a person charged with drug conspiracy, a bad case.  And the U.S. attorneys are very friendly when you go to the first appearance because they know they have you generally.

And he asked me, he said, "Oh, by the way, did you know we had your guy wired"?  I said, "No".  And he goes, he said, "You're going to need to bring your own CDs".  He said, "The government won't use its own CDs to burn the conversations any longer".  I said, "CDs"?  He said, "Yeah".

And I said, "How many phone calls you got"?

He goes, "Oh, we've got about 4,500". And he said, "Do you speak Spanish"? And I said, "Not since high school". He goes, "They are all in Spanish". And you know, pats me on the back. "Bring us the CDs and we'll give them to you".

What am I going to do? You know, that's how I kind of viewed it.

Q    Yeah.

A    You know, I don't have anybody in my office. I'm court-appointed. You know, my resources are limited. And, so, that's in the federal system. I've got to believe somebody over here is kind of in the same position.

Q    I get you. I get you. So, that and take an immersion course real quick, right?

A    Yeah.

Q    And let's see if you can listen to 4,500 CDs of phone calls.

A    Yeah, learn what onion means in Spanish when they say it --

Q    Yeah.

A    -- when it means a certain kind of dope, you know.

Q    Okay. I get what you're saying. I think we could swap war stories all day long, all of us. I think we've all been in the same boat there.

A    Yeah, that's right.

Q    Okay. But obviously, just for the record, sir,

you're not going to -- Are you going to go into this saying, hey, I've got to give the defense side a leg up because they are really being mistreated or being asked --

A    Oh, no, certainly not in this case. I mean I understand the lawyers.

Q    Yeah.

A    I know the reputation of at least one of the lawyers on the other side, so I know the defendant is getting good representation. At least that's my personal opinion.

Q    Sure.

A    He's well represented.

Q    Which one would that be? Which lawyer do you know?

A    I know Mr. Lollar.

Q    Brad Lollar. Yes, sir. Okay. Well, and I will certainly agree with you that he's a fine attorney.

A    And I am sure the other lawyer as well. I didn't --

Q    Oh, Doug's okay.

A    No slight intended.

Q    No. Actually every three of the individuals sitting over here is more than abundantly qualified to handle this kind of case, so you are correct in your thinking there.

Still on page seven, talk to me about credibility of testifying officers is always an issue.

A    Yes.  Again, it's anecdotal.  In high school I got a speeding ticket in Highland Park.  I happened to know the judge.  I taught his kids how to swim.  I was a lifeguard.  And it was -- You know, I got deferred adjudication for two weeks or something.

But I remember asking the judge, I said, "Why did you believe him instead of me"?  He goes, "Because he wears the uniform".

Q    Right.

A    And I was, you know, seventeen, eighteen, whatever I was at the time, and I will never forget it.

So, you know, that's kind of my feeling there. Just because they have the uniform doesn't make them any more truthful than any other witness.

Q    Absolutely.  And, again, you've just hit the nail square on the head in terms of what you're required to do as a juror.  You don't make any assumptions.  And just because somebody's got a uniform on or a badge, heaven forbid you give them automatic credibility.  That's the kind of thing that becomes a slippery slope and gets us into a lot of trouble.  So I can appreciate your answer there --

A    Uh-huh.

Q    -- and certainly agree with you.  There is nothing wrong with that.  You need to look at every person individually.

And unfortunately, you know, there have been some bad apples that have just given a whole crew of good men and women a hard time, and that's a battle they have to fight every day.  But, still, you'll look at each one of them and judge their credibility independently.

Well, gosh, Mr. McElroy, you're so up to speed on this, you've saved me a lot of -- a lot of talking and all.  Anything about the process that you've got any questions on how it works?

A    No, I'm afraid I understand it.

Q    Okay.  And this case is slated to begin on August 10th.

A    So, it got pushed back from when we were here in April.  I was wondering about that.

Q    Yes, sir, it did.  It did.  And I will tell you that we have been telling jurors that if you're selected for this particular jury, pencil in two weeks.

Now, this is in Judge Snipes' court.  I know that he tends to run a tight ship and he is not going to waste anybody's time.  So, you know, I believe that it will be run efficiently and we are not going to be wasting people's time.

But you've also put on here that you could probably rearrange your schedule in terms of if you've got some stuff on your docket.  I know we seem to do that every other day, rearrange stuff on our docket.  Is that something

that you could -- you could work with on us?

A    Well, like everybody else, it won't be easy, but I can do it if I have to.

Q    Excellent.  Okay.  Okay.  I appreciate that.  I appreciate that.

Mr. McElroy, thank you very much for talking to me.  I appreciate it.  I'm not going to -- I'm going to go ahead and pass you to our able counsel here.

A    My pleasure.

THE COURT:  All right.  Thank you, Ms. Handley.

How are you doing, Mr. McElroy?

PROSPECTIVE JUROR McELROY:  Oh, I'm fine.

THE COURT:  You need to take a short break, drink of water or anything?

PROSPECTIVE JUROR McELROY:  No, I'm in good shape.

THE COURT:  Anybody else?

All right.  Mr. Lollar.

MR. LOLLAR:  Thank you, Judge.

THE COURT:  Yes, sir.

EXAMINATION

BY MR. LOLLAR:

Q    How are you, Mr. McElroy?

A    Good morning.

Q    Let me reintroduce Doug Parks, Keri Mallon, James

Broadnax.

There's Gordon Hikel.  He's another one of the --

MR. HIKEL:  Good morning.

Q    -- prosecutors involved in the case.

First, Mr. McElroy, let me tell you how appreciative we are of you coming down on such short notice, and let me give you an explanation.  What we are doing is qualifying a group of jurors and then we are going to meet and do our strikes.  Okay?

We were set to do that -- We had qualified all we needed last week, and today we were supposed to get together and do our strikes.  Well, then yesterday we heard from a nurse out of ICU at Presbyterian that one of our jurors was out there with severe brain trauma.  So, we don't know anything more about it than that.  I don't know if she was involved in a car wreck or something.

But then we were scrambling and you were the next one coming up anyway, so that's why we called you late yesterday afternoon to see if you could be here this morning.  Thankfully you are.  But we do appreciate it.  Give you that explanation.  We are not normally that disorganized to call somebody and ask them to be down here tomorrow morning.

A    I wondered because last week I was set to come and then at 7:30 that Friday morning they called and said, well,

we don't need you any more.

Q    Yeah.

A    And then yesterday they called, and she called twice.  That one time she said, we really like you.  Then she called back about two minutes later and said, I want to go beyond that.  Said, I would like you to be there.

THE COURT:  Kind of used me, didn't they, Mr. McElroy?  Yeah.

A    Yes, I understand the power.  I understand it.

Q    Well, Mr. McElroy, I'm going to talk to you here for a little while.  I think you understand the basic game plan of what's involved, what's required of a juror in a capital murder case.

Now, in the first part of the trial, the guilt or innocence phase, that's just exactly the same way as a DWI trial.  And you're familiar, having served on that, that the State goes first.  They have got the burden of proof.  We have the opportunity to go second.

You listen to all the evidence and go back and make up your mind, has the State proven beyond a reasonable doubt the allegations in the indictment?

Now, the indictment in this case is in one of those folders there in front of you.

A    Yes, I have it.

Q    Okay.  And one thing I want to point out to you

is the culpable mental state required in this case is that of intentionally. And, of course, in Texas we've got four culpable mental states that a criminal defendant can have.

We have got intentionally at the top. And, again, that means that they formed the conscious objective or desire to cause the result. So, in this context, they are saying that at some point the defendant formed the intention to cause the death of the victim.

Now, that is an element they have got to prove, just like everything else they have got to prove in the case. And that is a necessary element and it is quite frequently the case that, in a criminal case, that that may be the issue upon which the case is tried, whether a person acts intentionally or knowingly or recklessly or with criminal negligence.

So, to that end, the law in Texas allows either side to introduce evidence as to the state of mind of the defendant at the time the offense was committed. Okay?

And I think you can appreciate that if the State proves that the action was done but they failed to prove that it was done intentionally, then the person is not guilty of the charged offense. They are guilty of a lesser included offense.

And that can go, you know, from murder to

voluntary manslaughter to criminally negligent homicide. It all depends on what the jury believes unanimously that the defendant's state of mind was.

Other than that, you know, a capital murder trial, first phase is just like a DWI case. The rules are the same. The rules of evidence are the same. And you are familiar with those from your experiences and your profession.

Now, I think that's all I need to say about the first part of the trial. I trust that you would be able to presume the defendant innocent and hold the State to their burden of proof.

A    Oh, sure, I know he's innocent as he sits there right now.

Q    Very good.

A    And it's their burden.

Q    Then we get to these three special issues. We are going to talk to you about these because we do not expect jurors, even lawyers, to necessarily be familiar with the three special issues.

And yet, in your questionnaire, you pretty well hit it right on the head. When we talk about special issue number one and special issue number two, you see that the burden again is put on the State to have to prove that the answer should be yes before they can get a yes answer. And they have to prove the answer should be yes beyond a

*Anne B. Meredith*
Certified Shorthand Reporter

reasonable doubt. That's the same high standard that we put on them in the first part of the trial.

And by the legislature putting a burden of proof on the State, we know from that that the presumption to the question is -- the presumption is that the answer to the question is no. Okay?

A    (Nods head).

Q    So, if we look at special issue number one, we have to presume that the answer is no, which means that the defendant gets a life sentence without parole.

It stays that way unless and until the State can prove to the satisfaction of all twelve jurors that the person in front of them not only is guilty of the act that they are charged with but is also the type of person that is likely to continue to cause criminal acts of violence even if he's in the penitentiary against, you know, other inmates, against the wardens, the jailers, the nurses, the doctors, the visitors. You know, that society is the society we will necessarily be talking about.

But that's what the State has to prove. They have got to prove that he's the type of person that's going to continue to commit criminal acts of violence that would constitute a continuing threat. Okay?

And by saying that, I think you appreciate that. You've said that you would look to see what type of

violent history a defendant has.  If he has a whole lifelong exhibition of criminal violent acts, that's one thing.

If, on the other hand, you know, maybe if a person got in a fight playing a basketball game, that's not, you know, a criminal act of violence that's going to constitute a continuing threat to society.  It may be an act of violence.

But, anyway, you've got to look at those things and decide if they are a continuing -- if they are a criminal act of violence that's going to constitute a continuing threat to society.

On the other hand, if they have no history of committing criminal acts of violence that would constitute a continuing threat to society, then we would expect that the juror would take that into consideration as well.

Do you think you would be able to do that?

A    Oh, sure.

Q    Very good.

Let me -- let me say this to you.  These special issues, the first two are meant to be roadblocks to the imposition of a death sentence.  And the legislature has told us that the punishment for the act of capital murder is life without parole.

And it's only those, or the Court of Criminal Appeals has said, those few incorrigible defendants who are

going to continue to be a violent threat to the people around them in the penitentiary that are supposed to be singled out for execution.  That's the way it's supposed to work.

A    Okay.

Q    You understand that?

A    Uh-huh, yes.

Q    And that's why they put these two special issues in there which are meant to be barriers to the imposition of the death penalty.  We are not supposed to execute people just because they are guilty of capital murder.  We are only supposed to execute people who are capital murderers who are going to be continuing to commit criminal acts of violence.

And I think you have an appreciation of that, you understand that.  Is that okay with you?

A    Yes.

Q    Okay.  And that's something you would be able to follow as a juror?

A    Surely.

Q    Very good.

Special issue number two again goes to the issue of parties.  It's only given to a jury in the event that this is a parties case.  And as Ms. Handley explained to you, for a -- oh, let's just, for lack of a better term, call them the shooter and the nonshooter, okay?

A    (Nods head).

Q    Special issue number two asks, is this the shooter?  Or if it's the nonshooter, did the nonshooter actually intend that the victim die or was actually anticipated that the victim would die in what they were doing?

So, it's that type of situation.  The examples we have given, you know, you go in there and kill the -- rob the store, kill everybody in there so there are no witnesses, you know, and the other person goes and does that.  Well, they are guilty, they anticipated, so that special issue would be answered.

But, again, those first two special issues are really objective determinations to be made by the juror.  The burden of proof is on the State.  They have got to prove it beyond a reasonable doubt.

If you get to special issue number one and the jury decides no, the State hasn't shown us beyond a reasonable doubt that he's going to be a continuing danger, then your deliberations are over at that point.  You sign that verdict sheet, come back, give it to the judge, the judge sentences the defendant to life without parole.  Okay?

If you answer number one yes, you go on to number two.  But if you have not been convinced of that special issue beyond a reasonable doubt, your deliberations are over.  You sign that to the verdict sheet, give it to

the judge, life without parole.

If you answer yes, yes, then you come to special issue number three.  And this is meant to be a special issue different from the first two special issues.  There is no burden of proof.  It requires the jury to look at all of the evidence that they have heard in the case.

It tells the jury to take into consideration all of the evidence, including the circumstances of the offense, the defendant's character, the defendant's background, and the personal moral culpability of the defendant.

So, the jury is required to do that.  And what we like to point out is that the law anticipates that this is a personal moral judgment made by each of the jurors about the appropriateness of the death penalty for the person sitting in front of you.  Okay?

It's not meant to be a majority vote.  It's not meant to be really something that you try to talk the other juror in to or out of.  It is asking each juror to pass their own personal moral judgment about the appropriateness of the death penalty based on what you've heard.

Now, this is the only type of case in Texas law where the special issue requires a jury to look at the background of the defendant.  There is no other case.  Obviously you can present evidence to a jury about the

background of a defendant in the punishment phase. But in this type of a case, the jury is required to look at the background of the defendant and his character and his personal moral culpability.

And what does that mean? Well, anything which might have affected why he did what he did on the day in question. Okay. To that end, we can bring evidence of a mental condition. We can bring evidence of abuse as a child, extreme poverty. Well, you know, whether they were born with a silver spoon in their mouth or were they born into abject poverty? Did they have the advantages that normal people have or did they not have those advantages and, in fact, had disadvantages?

We can bring all that before a jury. The State can do likewise. They can present whatever they want to present. And then special issue number three again requires a juror to make their own personal moral judgment about the appropriateness of the death penalty for this person.

Does that make sense to you?

A    Interestingly, yes, it does make sense.

Q    Yeah.

A    Now after y'all explained it.

Q    Well, very good.

You know, Mr. McElroy, we can spend up to an

hour and a half talking to you.  I don't think we need to.

Do you have any questions about anything?

A     No.

Q     Can you be fair to both sides?

A     I can be fair to both sides.

Q     Very good.  Thank you.

THE COURT:  All right.  Very good.

Thank you, Mr. McElroy.  I'm going to ask you to step out for just a moment with my bailiff and let me confer with the attorneys and then I'll bring you back and give you a result.  Thank you.

(Prospective Juror McElroy exits the courtroom).

MS. HANDLEY:  We have no challenges, your Honor.

MR. LOLLAR:  We have no challenges.

THE COURT:  Okay.  Then Mr. McElroy has been qualified.  Bring him back in.

(Prospective Juror McElroy returns to the courtroom).

THE COURT:  Mr. McElroy, come back in, if you would, please, sir.  Thank you.  Just go ahead and have a seat there.

Thank you, ladies and gentlemen.  Be seated.

Mr. McElroy, after conferring with the

attorneys, you have qualified as a prospective juror in this case. I anticipate we will strike the jury Monday morning and that you will be notified at sometime thereafter whether or not you're on the jury either as a juror or an alternate. All right?

PROSPECTIVE JUROR McELROY: Yes, your Honor.

THE COURT: All right. Very good. Thank you so much for coming down. Again, let me apologize for any inconvenience we might have caused you. But we kind of got hit with this unusual situation yesterday and needed one more qualification in order to make out our panel.

So, thank you so much for being here.

PROSPECTIVE JUROR McELROY: How many are on a panel in this kind of case?

THE COURT: Forty-seven.

PROSPECTIVE JUROR McELROY: Forty-seven.

THE COURT: Yes, sir.

PROSPECTIVE JUROR McELROY: For some reason I came up with 48, so that should have been.

THE COURT: Well, it should have been. You are number 48, as a matter of fact.

MS. HANDLEY: Thank you, sir.

THE COURT: Thank you very much.

(Prospective Juror McElroy excused from the courtroom).

(Discussion off the record).

THE COURT:  Mr. McElroy was Prospective Juror number 1335, James Daniel McElroy.

MR. LOLLAR:  Yes, sir.

THE COURT:  Okay.  Now then, and he would be Prospective Juror number 48, I believe.

MS. HANDLEY:  Is it 48 or 47?

THE BAILIFF:  Forty-seven.

MS. HANDLEY:  Forty-seven.

MR. LOLLAR:  Well, if we excuse Ms. Woodward, he would move up to 47.

THE COURT:  He would move up to 47.  He's 48 right now, right?

MS. HANDLEY:  Okay.

MR. LOLLAR:  Correct.

THE COURT:  Okay.  So, he's number 48.  We anticipate excusing number 47.  It's Ms. Woodward, did you say?

MR. LOLLAR:  Yes, sir.

THE COURT:  And I think she is number --

MS. MALLON:  Twenty-seven, I believe.

THE COURT:  Twenty-seven, Keri?

MS. MALLON:  Yes, sir.

THE COURT:  Okay.  Number 27 on our list.

MR. LOLLAR:  Your Honor, if you would permit,

we will go ahead and get that on the record.

THE COURT: Okay. Let's do that.

MR. LOLLAR: Your Honor, comes now the attorney for the defendant and would state here in the presence of the prosecutors that yesterday afternoon we were notified by the court coordinator that she had received a call from the Intensive Care Unit at Presbyterian Hospital here in Dallas that notified her that one of our prospective jurors who was qualified for our panel, the 27th juror to qualify, Ms. Ruby Woodward, was in fact in Neurological Intensive Care Unit suffering from severe brain trauma. We don't know more about it than that.

But today we have received a FAX from a doctor at Presbyterian who tells us that Ms. Woodward is still in the Neurological Intensive Care Unit and he says that it's medically inappropriate for her to participate in jury selection or serve as a juror now or for the next sixty days.

In light of that, we have agreed with the State to excuse this juror based on the medical reason that we just stated for the record, and we have qualified another juror here this morning to hopefully take her place.

MS. HANDLEY: I take no issue with what Mr. Lollar has just put on the record.

THE COURT: All right. Very good.

MR. LOLLAR:  Judge, for the record, here is that letter from Presbyterian.

THE COURT:  Yeah.  Why don't we go ahead and mark this as an exhibit and just attach that to her questionnaire, if you would, for me, please, Mr. Lollar.

MR. LOLLAR:  I don't know what our exhibit numbers are up to, but there we go.

Secondly, we have a group -- Since we are at the conclusion of qualifying jurors, we thought it appropriate to put on the record that during the course of our jury selection process, we have from time to time agreed with the State in regard to other prospective jurors that we thought were not qualified based on the answers they gave us to their questionnaires.

They were either people who were on our system of one who always believes in the death penalty or who says they could never return a verdict which assessed the death penalty, or fives who say that they could never under any circumstance return a verdict which assessed the death penalty, or they expressed that they had work problems or some type of time problems which would prevent them from giving their full attention to the case over the two week period of time that we are going to require, or these are people who simply because of the news media coverage that they had seen told us that they would be unable to come into

**Anne B. Meredith**
Certified Shorthand Reporter

the trial without having predisposed their verdict or sentence.

MS. HANDLEY:  I believe there were also some individuals who were too closely associated with perhaps the district attorney's office or law enforcement, and we had agreed on individuals such as those also.

MR. LOLLAR:  Yes.

And for the record, Judge, I have a stack of them here.  I would like to read into the record --

THE COURT:  Yes, sir.

MR. LOLLAR:  -- the names and juror numbers.

THE COURT:  Okay.

MR. LOLLAR:  Burt Brice, b-r-i-c-e, number 1539; Kathleen Simpson, number 1206; Michael Gibson, number 1213; Delores Razo, r-a-z-o, number 1255; Sonia Jiminez, number 1290; Jennifer -- well, I can't even read that. It's s-u-t-l-a-b-a-u-h or b-a-c-h, number 1291; Betsy Halford, number 1323; Arlie Cox, number 1329; Donna Griffin; number 1333; Henry Nguyen, n-g-u-y-e-n, number 1338; James Quintanilla, Jr., number 1367; Patricia Cannon, number 1377; Rosalinda Martinez, number 1398; Carol Plachy, p-l-a-c-h-y, number 1406; Alexander Rodriguez, number 1407; Brian Childers, number 1417; Amanda Moore, number 1421; Momina Farooq, number 1422; Linda Slape, number 1427;  Michael Carter, number 1435; Linda Swails, number 1443; Mitchell

Coates, number 1456; Jonquil Wilson, number 1458; Kay Eubanks, number 1461; Rickford Sasseen, number 1465; Anay, a-n-a-y, Ramirez, number 1466; Cameron Hutchings, number 1485; Jeffrey Floyd, number 1494; Kristen Reinsch, r-e-i-n-s-c-h, number 1505; Sherian Null, number 1530; Johnny Carter, number 1540; Amber Procell, p-r-o-c-e-l-l, number 1521; Robert Bohlman, b-o-h-l-m-a-n, number 1574; Nancy Geary, g-e-a-r-y, number 1579; Minnie Lewis, number 1583; Deborah Huber, number 1611; Agustin Lopez, number 1615; Karen Henderson, number 1069; Felix Cano, c-a-n-o, number 1026; Gordon Clark, number 1209; Robert Gatewood, number 1211; Sherrie Bernardin, b-e-r-n-a-r-d-i-n, number 1176; David Davis, number 1097; Stephen Scobee, s-c-o-b-e-e, number 1177; Edward Campbell, number 1104; Michael Gaitan, g-a-i-t-a-n, number 1235; Terry Hager, number 1258; Aurora Salazar, number 984; Brian Peren, p-e-r-e-n, number 1148; Fannie Horton, number 1029; Mark Lindsey, number 1002; Rory Sanford, number 1207; Mary Rinne, r-i-n-n-e, number 1279; and Sharon Brown, number 1282.

That is the group of jurors who we agreed not to call down for the reasons previously stated.

THE COURT: Okay. Ms. Handley, anything further from the State?

MS. HANDLEY: No, your Honor. I agree with that. We went through these questionnaires together. We had discussions about each one of these jurors and agreed with --

both parties agreed that the person was either disqualified, unfit, unable to serve on this particular jury.

THE COURT:  Okay.  Anything further, Mr. Lollar?

MR. LOLLAR:  One further thing, your Honor.

THE COURT:  Yes, sir.

MR. LOLLAR:  We would call Sharon to testify in regard to another stack of jurors, and these are people who ostensibly would have been jurors we would have talked to.

THE COURT:  Okay.

MR. LOLLAR:  But they had various issues that Sharon can address.

THE COURT:  Okay.  All right.  Let me get you to raise your right hand.  Let me swear you as a witness.

(Witness sworn).

THE COURT:  Thank you, ma'am.  You may proceed. Who is going to -- Okay.  Mr. Lollar.

SHARON JOHNSON, having been duly sworn, testified as follows:

EXAMINATION

BY MR. LOLLAR:

A     Would you state your name, please.

A     Sharon Johnson.  I'm the court coordinator for Criminal District Court Number 7.

Q    And Ms. Johnson, has it been part of your duties to actually call the jurors as they came up in order so that we could interview them --

A    Yes.

Q    -- in this case?

A    Yes.

Q    And you had had problems with this stack of jurors; is that correct?

A    Yes.

Q    Could you go through there and tell us what their names and their juror numbers are and the various problems you had getting ahold of these jurors?

A    Okay.  The first one is Scott Lawton, juror number 316.  I made like several attempts to call him, left messages, but he never called back.

Emerly -- Emery Garth, number 425, the phone numbers were no good, either one of those that was on here.

Sandra Clinton, 571, again, phone numbers are no good.

Sergio Moreno, number 604, I left messages at both phone numbers.  Nobody called back.

Jester Jefferson, 621, phone number is no good.

Sergio Bethancourt, 778, again no answer, several times.  In fact, there wasn't any -- just nobody answered.  I couldn't leave a message.

Terry Sivie, s-i-v-i-e, juror 902, was on vacation until July 20th.

Q    And that was somebody that we needed before then; is that correct?

A    Yeah, we needed him before then, and he was on vacation.

Q    Okay.

A    Actually answered his phone on vacation.

Gwenavive McDonald, number 940, she has a broken ankle, and I have a medical statement from her doctor to the effect that she just is not going to be able to do her jury duty if she is called.

Juan Barrera, 943, I did talk to him.  His thing was he has kids for the summer.  There is no way he has a babysitter for them, will not be able to come.  And that's pretty much the bottom line.  Wasn't going to be here.

Okay.  Jim Lackey, 947 or 946, I'm sorry. He was on vacation until July 6th and, again, I needed him before then.

Eric Stephens, 961, phone number was no good.

Marshall Broome, b-r-o-o-m-e, 997, pretty much told me that there is no way he was going to do it. He's got a daughter in college, cannot afford to be off work.  This causes a financial hardship for him, and he ain't

coming.  Can't really argue with him too much.

Annie Dewberry, number 1007, I did get ahold of her, and here again she told me she works for the State and needs two weeks notice to get off from her job.

So, that's it.

Q    And that's the group that --

A    That's the group that -- Oh, yeah, this other one. Did we do Carol Green?

Q    We don't need to.

A    Never reached her.

Q    Never reached her.

A    Well, that's it.

THE COURT:  All right.  Very good.

THE WITNESS:  They are the ones that I couldn't get ahold of.

THE COURT:  Tried to contact or did contact and --

THE WITNESS:  I tried to contact them.

THE COURT:  -- couldn't get them to come down for one reason or another.

THE WITNESS:  Yeah, pretty much.

THE COURT:  And are the parties agreed, Ms. Handley and Mr. Lollar, that these folks can be excused by agreement of the parties?

MS. HANDLEY:  Yes, your Honor.  Sharon

brought that to our attention when that was happening, and we were certainly satisfied that these people were -- they were not going to -- she was not going to be able to get in contact with them.

With respect to the children issue and the work issue, these were people that could either claim exemptions or were going through very seriously obvious hardships and unable to serve on this case. And, so, we were satisfied with that and in agreement with that.

MR. LOLLAR: That's correct.

THE COURT: Very good. All right. Well, those parties, then, those prospective jurors that Sharon has just gone over will be excused by agreement of the parties, then.

MR. LOLLAR: Yes, sir.

THE COURT: Okay, very good. Thank you very much. Anything else? Any other housekeeping matters we need to take up?

MR. LOLLAR: Judge, I think that's it.

THE COURT: Okay.

MR. LOLLAR: Until Monday at 10:00.

THE COURT: Monday at 10:00.

MR. LOLLAR: In Judge Snipes' court.

THE COURT: In Judge Snipes' court upstairs in CDC 7. And we will see you all then and there.

MR. LOLLAR:  Very good.  Thank you.

THE COURT:  Anything else?

MR. LOLLAR:  Nothing.

THE COURT:  Thank you all for being here again today.

(Court adjourned for the day).

**Anne B. Meredith**
Certified Shorthand Reporter

THE STATE OF TEXAS    (

COUNTY OF DALLAS      (

I, Anne B. Meredith, a certified court reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all the proceedings held in the above styled and numbered cause which were reported by me on the 17th day of July, 2009.

I further certify that this reporter's record of the prooceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record (Volume 37) is $383 and will be paid by Dallas County.

WITNESS MY OFFICIAL HAND this the 13th day of January, 2010.

Anne B. Meredith, CSR No. 177
Expiration Date:  12-31-2010
Deputy Official Court Reporter
Criminal District Court No. 7
133 N. Industrial Blvd.
Dallas, Texas  75207
Phone No. 469 328-8152

**Anne B. Meredith**
Certified Shorthand Reporter