REPORTER'S RECORD

VOLUME 3_8 OF __ VOLUMES

TRIAL COURT CAUSE NO. F08-24629-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS, | ) | IN THE CRIMINAL DISTRICT |
| | ) | |
| VS. | ) | COURT NO. 7 of |
| | ) | |
| JAMES GARFIELD BROADNAX | ) | DALLAS COUNTY, TEXAS |

ORIGINAL

FILED IN
COURT OF CRIMINAL APPEALS
SEP 16 2010
Louise Pearson, Clerk

--------------------------------

SELECTION OF THE TRIAL JURORS

Monday, July 20, 2009

--------------------------------

On the 20th day of July, 2009, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Quay Parker, the Honorable Webb Biard, and the Honorable Mike Snipes, Judges presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand utilizing computer-aided realtime transcription.

NATASHA K. SPOERL, CSR
Acting Official Court Reporter

APPEARANCES:

**MR. DAVID M. ALEX**                    FOR THE STATE OF TEXAS
Assistant District Attorney
SBOT No. 24003256
**ANDREA LYNN HANDLEY**
Assistant District Attorney
SBOT No. 08898800
**MS. LISA BRAXTON SMITH**
Assistant District Attorney
SBOT NO. 00787131
Frank Crowley Criminal Courts Building
133 North Industrial Boulevard, LB19
Dallas, Texas   75207
Telephone: 214-653-3630
Facsimile: 214-653-

**MR. BRAD LOLLAR**                    FOR THE DEFENDANT
SBOT NO. 12508700
Law Offices of Brad Lollar
1700 Commerce Street
Suite 450
Dallas, Texas   75201
Telephone: 214-384-8178
Facsimile: 214-

And also

**MR. DOUGLAS H. PARKS**
SBOT NO. 15520000
Law Offices of Douglas Parks
321 Calm Water Lane
Holly Lake Ranch, Texas   75765
Telephone: 214-521-2670
Facsimile: 903-769-3465

                    *        *        *

CHRONOLOGICAL INDEX

VOLUME __

SELECTION OF THE TRIAL JURORS

MONDAY, JULY 20, 2009

| PROCEEDINGS | Page | Vol |
|---|---|---|
| Proceedings on the record................... | 6 | |
| Consideration of the following venirepersons: | | |
| Venireman Jerome Williams........... | 7 | |
| Venireman Jason Ross............... | 7 | |
| Venireman John Wherry.............. | 8 | |
| Venireman Jon Desmond.............. | 8 | |
| Venirewoman Sue McCormick.......... | 8 | |
| Venirewoman Shaven McCraney......... | 8 | |
| Venirewoman Elaine Clements......... | 13 | |
| Venireman Bradley Wiltshire........ | 14 | |
| Venirewoman Mattie Vation.......... | 14 | |
| Venireman Alez Folz................ | 20 | |
| Venirewoman Ashley Rivera.......... | 21 | |
| Venireman Curtis Riser............. | 26 | |
| Venireman Johnny Sanford. ......... | 30 | |
| Venirewoman Vicki Wood............. | 31 | |
| Venirewoman Kelly McDonald......... | 31 | |
| Venirewoman Helen Noble............ | 31 | |
| Venireman Billy Henry.............. | 32 | |
| Venirewoman Heather Egar........... | 33 | |
| Venireman John Maguire............. | 33 | |
| Venirewoman Lisa Davison.......... | 35 | |
| Venireman Carl Jackson............. | 35 | |
| Venirewoman Leah Kunard............ | 36 | |
| Venireman Bruce McDonald........... | 36 | |
| Venirewoman Teresa Randeals........ | 37 | |
| Venirewoman Kimberly Morris........ | 38 | |
| Venireman Guy Ferreira............. | 38 | |
| Venirewoman Rindy Woodward......... | 38 | |
| Venireman John Cantwell........... | 39 | |

PROCEEDINGS                                          Page         Vol


Consideration of the following venirepersons:

          Venireman Alexander Konkle.......... 40
          Venireman Wesley Marshall........... 41
          Venireman Lance Bedford............. 41
          Venireman Steve Zaidel.............. 41
          Venireman William Stinson.......... 42
          Venireman Lyle Livingston.......... 42
          Venirewoman Jennifer Stockton....... 43
          Venirewoman Agwana Long............. 44
          Venireman Robert Patterson......... 51
          Venireman William Kreighbaum........ 68
          Venirewoman Patricia Hodges........ 68
          Venirewoman Betty Jackson.......... 69
          Venireman Dedrick Morrison......... 71
          Venireman Clarence Winfield........ 79
          Venireman John Vessels............. 80
          Venirewoman Emily Blevins.......... 81
          Venireman Barry Fiddick............ 82
          Venirewoman Elsa Overa............. 82
          Venireman George Paradise.......... 83
          Venireman James McElroy............ 83




PROCEEDINGS                                          Page         Vol


Judge Biard states jury is empaneled......... 83

Statement on the record by Ms. Handley....... 83

Response by Mr. Lollar....................... 84

Court Reporter's Certificate................. 86

**STATE'S VOIR DIRE EXHIBITS INDEX**

| Number | Description | Offered | (Excluded) Admitted | Vol |
|---|---|---|---|---|
| 1 | Excerpt of Reporter's Record, Voir Dire Examination of Robert Patterson | 54 | -- | |

**DEFENDANT'S VOIR DIRE STRIKE EXHIBITS INDEX**

| Number | Description | Offered | (Excluded) Admitted | Vol |
|---|---|---|---|---|
| 1 | Photo of Venirewoman Shaven McCraney | 9 | 9 | |
| 2 | Photo of Venirewoman Mattie Vation | 14 | -- | |
| 3 | Photo of Venirewoman Ashley Rivera | 21 | 21* | |
| 4 | Photo of Venireman Curtis Riser | 26 | -- | |
| 5 | Photo of Venirewoman Agwana Long | 44 | -- | |
| 6 | Photo of Venireman Robert Patterson | 51 | -- | |
| 7 | Photo of Venirewoman Betty Jackson | 69 | -- | |
| 8 | Photo of Venireman Dedrick Morrison | 71 | -- | |

\* Judge took judicial notice

**NATASHA K. SPOERL, CSR**
Acting Official Court Reporter

PROCEEDINGS

JUDGE BIARD:  Comes now Cause Number F08-24667, styled the State of Texas versus James Garfield Broadnax.  What says the State of Texas?

MS. HANDLEY:  The State is ready, Your Honor.

JUDGE BIARD:  What says Mr. Broadnax?

MR. LOLLAR:  We are ready, Your Honor.

JUDGE BIARD:  All right.  Let the record reflect that Mr. Broadnax is in open court and accompanied by his trial attorneys.  And we will now proceed with the actual selection of the trial jurors.

Are there any matters that need to be addressed before we go into the actual jury selection by the State?

MS. HANDLEY:  No, Your Honor.

MR. LOLLAR:  Yes, Your Honor.

JUDGE BIARD:  All right, sir.

MR. LOLLAR:  Your Honor, may the record reflect that we have been qualifying a panel of 47 jurors over the course of the past seven weeks -- seven to eight weeks, and that each of these jurors has been thoroughly interviewed.  The Court graciously allowed each side 40 minutes per juror.

So each of these jurors have had the law explained to them.  Each of these jurors has qualified in that they have said that they understand the law and can follow the law.  Therefore, we feel that the panel, as currently constituted, is a legally qualified panel.

We would move the Court to disallow any peremptory challenges.  We feel that the system, the institution of the use of peremptory challenges masks a number of societal ills that have found its way into the legal system, including racial discrimination in the exercise of peremptory challenges.  We feel that we should take the first twelve qualified jurors as they appear on the list.  And we move those feelings and that motion under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

JUDGE BIARD:  Thank you, Mr. Lollar.  That will be denied.  Any other issues to be addressed?

MS. HANDLEY:  No, Your Honor.

JUDGE BIARD:  All right.  Juror Jerome Williams, what says the State of Texas?

MS. HANDLEY:  We accept this juror.

MR. LOLLAR:  We accept this juror.

JUDGE BIARD:  Trial juror number 1:  Jason Ross, what says the State of Texas?

MS. HANDLEY:  We exercise a peremptory

strike.

JUDGE BIARD:  State's peremptory number 1. John Wherry, what says the State of Texas?

MS. HANDLEY:  We exercise a peremptory strike.

JUDGE BIARD:  State's number 2.  Jon Desmond, what says the State of Texas?

MS. HANDLEY:  We accept the juror.

MR. LOLLAR:  We exercise a peremptory challenge number one -- I'm sorry, Your Honor.  Go ahead.

MR. PARKS:  Judge, we would reurge our previously stated challenge for cause, advise the Court that this is not an acceptable juror, exercise peremptory strike and request the Court to grant an additional strike at this time.

JUDGE BIARD:  That will be denied.  Defense strike number 1.  Sue McCormick?

MS. HANDLEY:  We exercise a peremptory strike.

JUDGE BIARD:  State's number 3.  Shaven McCraney, what says the State of Texas?

MS. HANDLEY:  We are exercise a strike.

JUDGE BIARD:  State's number 4.

MR. LOLLAR:  Your Honor --

JUDGE BIARD: In regard to the State's exercise of their fourth peremptory challenge on juror number 165, Shaven McCraney, we'd first ask that the Court take judicial notice that Ms. McCraney is African American as is the defendant in this case. Here is the photo of Ms. McCraney. We would ask that be made part of the record.

JUDGE BIARD: The Court will take judicial notice that Ms. McCraney is African American.

MR. LOLLAR: Can we ask that this be marked as Defendant's Voir Dire Strike Exhibit Number 1?

JUDGE BIARD: It will be admitted for that purpose.

MR. LOLLAR: Your Honor, we would suggest that the State has struck this juror solely on the basis of her race.

JUDGE BIARD: What says the State of Texas?

MS. HANDLEY: Your Honor, with respect to juror number 165, Ms. McCraney, I'll state for the record now, and also in anticipation of any other challenges hereto who we're striking. We have elected to eliminate from the panel for our purposes any juror that states on the first page of their questionnaire with respect to where it states, "And with reference to the death penalty, which of the following best

represents your feelings?"

This particular juror has stated herself as a 3 where she says, "Although, I do not believe the death penalty ever ought to be invoked," she has also on page 1 -- when we asked her, "Are you in favor of the death penalty, "she does say "yes," but she does list herself as a number 3, Your Honor.

We will not -- we have elected to strike all jurors who are listed as a 3 or who have stated that they are not in favor of the death penalty.  And she does certainly fall into that category there.

In fact, when she does state "yes" to the first question, she says, "I will state yes, but I'm really unsure."  And we think that that's certainly brought out while talking to her during voir dire.

She is a single woman with no children. And our concern with her, in addition to obviously being a number 3, is that she's taken it upon herself to mentor young adult men, particularly the ones without a father figure.  We think that this hits very close to home on our case and falls much into the defense's anticipated defensive argument that much of the defendant's woes can be traced back to him having a bad father or a lack thereof.

MR. ALEX:  Judge, let me add something to

that, if I may.  I took this juror on during the individual voir dire.  And Ms. McCraney, before she came into the room, was an extremely nervous person.  In fact, she was so nervous, I think the Court even commented on it at the very beginning, and asked us to be nice to this woman because she seemed to be very un-at-ease with the whole situation.

And then when Ms. McCraney came in, she would not look at the defendant at all.  There was a point during the voir dire examination in which I asked Ms. McCraney to look at the defendant.  Because if she answered the questions in the appropriate way, this would be the human being that would ultimately be put to death.  And her look at the defendant wasn't a very quick glance, she could not look at him at all.  In fact, I asked her to do that on a couple of occasions, and she couldn't do it.

In addition to that, she told us during the voir dire -- and I would categorize this person as very weak on the death penalty.  She said that if she -- she could not -- she said she couldn't do it especially if it was up to her alone.  She said the only way she can even consider it is if she had other people to sort of prop her up.

This shows a very, very weak person as it

NATASHA K. SPOERL, CSR
Acting Official Court Reporter

relates to how they don't believe in the death penalty, Judge.

And I would think under all of the questions that the defense asked her about their own personal moral judgment and being able to hold up against the others, that this would be somebody that the defense wouldn't like, somebody who couldn't stand fast to what they believe in. She basically said she would cater to whatever the eleven jurors would do, that she could not make a decision on her own.

And I would like to just add those perceptions and comments to what Ms. Handley has already said.

MR. LOLLAR: Judge --

JUDGE BIARD: Anything from Mr. Broadnax?

MR. LOLLAR: Yes, sir.

JUDGE BIARD: All right.

MR. LOLLAR: In regard to the explanations that have been tendered by the prosecutors here, we'd suggest that those are subjective explanations, that those are merely a pretext and will contribute to significant diminution of an oral representation on this jury. We would suggest that the characterizations of Ms. McCraney as being extremely nervous, we do not agree with. We think she was no more nervous than anybody

else put in a position of walking into the room and finding a good 12, 15 people looking at her.

As the Court recalls, we did her examination down in the judicial conference room on the second floor of this courtroom. We recall that she did look at the defendant on many occasions during the course of her examination by both the defense and the State. We do not recall her saying that she needed to be propped up and supported in her decision-making. In fact, we recall her as having said that she would be able to assess the death penalty if the State met their burden.

Now all of this could have been cured if we had taken a videotape of the voir dire examination of the individual jurors as we suggested. That request was denied by the Court. We would suggest that what we're going to see here today are a bunch of subjective explanations not supported by the record, not supported by the written record, but which could have been presented and preserved for appellate court review.

We suggest that the excuses given by the State here today are pretext, and they're striking Ms. McCraney because of her race.

JUDGE BIARD: The *Batson* challenge will be denied. Elaine Clements, what says the State of Texas?

NATASHA K. SPOERL, CSR
Acting Official Court Reporter

MS. HANDLEY:  We accept this juror.

MR. LOLLAR:  We accept this juror.

JUDGE BIARD:  Juror number 2.  Bradley Wiltshire, what says the State of Texas?

MS. HANDLEY:  We accept this juror.

MR. LOLLAR:  We exercise peremptory challenge number 2.

JUDGE BIARD:  Defense challenges number 2. Mattie Vation, what says the State of Texas?

MS. HANDLEY:  We exercise a peremptory strike on Ms. Vation.

MR. LOLLAR:  Your Honor, this is the second African American candidate of the qualified panel.  We would ask first that the Court take judicial notice that this juror is also African American.  We have her photograph here for the record, and we would ask that that be marked as Defendant's Voir Dire Strike Exhibit Number 2.  We would suggest to the Court that this juror has been struck solely because of her race.

JUDGE BIARD:  What says the State?

MS. HANDLEY:  Your Honor, again, in accordance with our decision to not put anybody or to agree to anybody for this particular case who has either been classified as a 3 on the scale, or who have stated that think are not in favor of the death penalty, Ms.

Vation does fall into that category on page 1 of her questionnaire.

In answer to the question, "Are you in favor of the death penalty," she states, no, she is not. She believes in chances, that too many innocent people have died, and she has to think about her loved ones.

With respect to her thoughts on the death penalty -- and we'll give the concerns about that. In addition to her obviously not being in favor of it, she says she's been influenced by all the innocent persons sentenced to death. She also has a daughter that has a drug addiction.

And in the questionnaire on page 5, when we ask, "what is important in deciding life versus death," she states, "If a person is bound with condition, then let them live but not in the free world."

On page 6, on the use of drugs or alcohol at the time of the offense, she had stated that it would in fact automatically prevent her from returning a sentence of death in a capital murder case. She had stated, "under the influence led them in a total direction out of their minds."

She had stated to us that her daughter has fought this addiction for years. And in voir dire, she -- on page 8 when we asked, "What makes a person

dangerous," she states, "to corner him would bring out his worst."

She also lists rehabilitation as the one and only factor that she checks on page 8 with respect to what's important in terms of punishment.

We believe that the situation with her daughter, the situation with drugs, her feelings about drugs and addiction and that it's a person out of their mind in such as that, hits squarely on what we believe and anticipate is going to be a defensive theory in this case and in which we have been talking about quite often in voir dire by the defense of intoxication; in particular, the use of drugs.

This woman also -- and this causes a great deal of concern. On page 10, she stated that she has in fact sat on a jury before, and in that case -- that's on page 8 -- or I'm sorry, not page 8, page 10 of her questionnaire. She said it was a DWI case. On the verdict/punishment, she put on there, "I got off."

But when we questioned her about that -- apparently they found the defendant not guilty -- she said that she had more influence over the other jurors. And her reasoning in finding the defendant not guilty in that case was that he was old, and he needed his license.

So she convinced them to find him not guilty, which in our opinion is a textbook nullification. Her decision to find that defendant not guilty were not based on the evidence in the case, but the fact that he was old and needed a license.

Her questionnaire was full of spelling errors and, of course, grammar. But she seemed entirely too anxious to get on this jury, and she's got a voir dire here and a questionnaire that is full of compassion.

She's got several people that would seem that she knows that are in and out of the penitentiary. And, again, you know, through her questionnaire, she states things that I think really emphasize that she's not in favor of the death penalty and couldn't do it, things like, "I value life just that much."

In addition, looking through her questionnaire, we had some concerns. For example, on page 2 where we ask, "What is the best argument for the death penalty," she appears to be looking for total brutality in terms of whether or not she could assess it or what is actually important to her.

She has a brother that has done time in the penitentiary for theft, apparently. I think she classified him as a habitual. She's also got a nephew

who is doing time for rape.

It's for those reasons, Your Honor, that we have elected to exercise a peremptory strike against Ms. Vation.

MR. LOLLAR:  And, Your Honor, we've discussed with the Court that the excuses given by the State here are merely pretext.

We note that many of our jurors that have qualified have daughters, sons, or other close relatives that have drug-addiction problems.

We note that many of the jurors who have qualified here have questionnaires full of compassion.

We note that many people who have qualified here on the panel know people who have been in the penitentiary.  And we would further suggest that that is an explanation with disproportionate impact on minorities since we know that 20 percent of the adult black male population in the country are incarcerated. So we feel that that question and that reason and that excuse by the State is an explanation with a disproportionate impact on minorities.

The excuse given by the State that she would look, in determining who would get the death penalty, to total brutality is something other jurors have told us, and many jurors have said things like that

in their questionnaires as to what they would look for when determining who should get the death penalty.

And, finally, we have many people on this panel who have relatives, brothers, nephews, cousins, etc. who have people close to them in the penitentiary.

So again, we suggest that the State has used this strike in a purely racial manner, and we would ask the Court to disallow the strike and to seat this juror on the panel.

JUDGE BIARD:  The challenge will be denied. That's State's peremptory number 5.  The Court will be in recess for five minutes.

(There was a recess taken.)

JUDGE PARKER:  Are we ready to go?

MS. HANDLEY:  May I add one more thing to the record with respect to Ms. Vation?

JUDGE PARKER:  Yes, ma'am.  Go ahead.

MS. HANDLEY:  With respect to my comments on compassion, the concern that I had was that we had questioned her about having seen news coverage on this particular case.  And she articulated that she had seen some of it and had absorbed that.

She had stated in there, "after having said that she saw this on TV and saw what happened, that "I also have compassion for the ones that did it,"

referring to the individual that murdered these two men outside the Garland recording studio.

But outside of our other reasons for striking Ms. Vation, primarily she is not an individual who is in favor of the death penalty. Thank you, Judge.

JUDGE PARKER: All right. Thank you. And I think that Judge Biard has already denied his *Batson* challenge, so --

MR. LOLLAR: If it could be clarified for the record, is the State saying that they're going to strike anybody that has heard anything about the case? We have many, many jurors who say that they saw things about the case on the news.

MS. HANDLEY: No, sir. My -- I said that in context, that after she said she had seen it on the news, she started to talk about how she had compassion for whoever has murdered those men. That was my point.

JUDGE PARKER: Okay. Thank you. Anything else, Mr. Lollar, with regard to that?

MR. LOLLAR: No, Your Honor.

JUDGE PARKER: All right. Next prospective juror is number 227, Alex Folz, F-O-L-Z.

MS. HANDLEY: We accept this juror.

MR. LOLLAR: We accept the juror.

JUDGE PARKER: Okay. That would be juror

number 3.

The next juror to be considered is prospective juror number 208, Ashley Rivera.

MS. HANDLEY: Juror number 208, we exercise a strike on her.

MR. LOLLAR: Well, the State's three for three. Three minority jurors who have qualified, they have used consecutive strikes on all three. We would ask that the Court to take judicial notice of the fact that Ms. Rivera is Hispanic American.

We are tendering to the court reporter Defense Exhibit Number -- Defense Exhibit Voir Dire Strike Number 3. We will suggest to the Court that the State has struck this juror solely because of her race. She's Hispanic American.

JUDGE PARKER: The Court will take judicial notice of the fact that Ms. Rivera is a Hispanic female. Does the State wish to be heard on this matter?

MS. HANDLEY: We do, Your Honor. With respect to juror number 208, Ms. Rivera, on the first page of her questionnaire in response to the question, "Are you in favor of the death penalty," she states that, no, she is not.

In addition to that, Your Honor, on page 2 when we asked the juror, "Do you have any moral,

religious, or personal beliefs that will prevent you from returning a verdict which would result in the execution of another human being," on page 2 there she has striked "yes," indicating that she does.

In addition, also the concern is that with respect to when it may be an appropriate case for the death penalty, she has listed that she is looking for a "psycho killer." She has also listed rehabilitation as her number one factor with respect to where -- how she categorizes punishment.

This woman has four children and no job. And it appears from talking to her and going through her ministry, that what she has decided to do is to study ministry. And not necessarily -- I don't think by going to schools, but she's a big follower and proponent of people such as Benny Hinn.

I spoke with this woman and, in talking to her, it was my impression she so desperately wanted to sound intelligent, but she absolutely could not give a straight answer.

For example, where I had concerns with her is, we were talking about defendants and what you would be looking for and such as that. And she kept saying that she wanted to know if the defendant had availed himself to resources. But this woman simply could not

articulate even what a resource was. She appears to be wanting to give grace to people just out of a personal feeling and not necessarily any kind of -- any kind of evidence standpoint.

If I could have a moment here.

With respect to Special Issue Number 3, I recollect that this juror is stating that she was looking for hardcore evidence, that she didn't know if she could punish someone if they hadn't been in trouble before. And that would mean with respect to having a criminal record or criminal background. And she wanted to see proof of increasingly violent crimes. She said thefts and robbery, things that are increasingly -- she needs to see this progression.

As stated before, she's not in favor of the death penalty, and I think that her views are grounded in religious reasons. She is of the mind that everybody can change. And, again, with her, she said it was important to know if all available options were available to the defendant while he was in jail. She spoke of rehab or counseling, etc. Has he had opportunities to better himself? Had he been made aware of these possible resources?

She went on and on about -- indicating to me that she couldn't return a verdict of death until she

had seen that all of these options, all of these resources--whatever the name may be--have actually been available to the defendant, and he's tried them.

She did show hesitation in whether or not she could take part in a process such at this. She -- and, again, this is just the feeling I'm getting for this woman and why I'm uncomfortable with it. She's a woman who doesn't watch TV. She just doesn't get out there and really avail herself of other experiences. She's just very much into following her Christian beliefs and learning the ministry.

She travels with ministers, and she's also had a relative who has actually been murdered by another relative. Very close in proximity to this, as a matter of fact, in 2007.

And it is for those reasons that we elected to exercise a strike on Ms. Rivera.

In addition, Your Honor, on page 7 of her questionnaire, when we asked, "Do criminal justice systems fairly protect the rights of persons accused of committing a crime," she indicated on there that she strongly disagrees.

JUDGE PARKER: Thank you, Ms. Handley. Mr. Lollar, anything further from the defense?

MR. LOLLAR: Yes, Your Honor. The defense

would again suggest that the reasons given by the prosecutors here are merely pretext in order to accomplish their goal of racial discrimination in the seating of this jury. We fail to see how a juror who has had a relative murdered would somehow make that juror a better juror for the defendant. We don't see the logic in that at all.

Again, we would show -- we would say that when the prosecutor says that the juror showed hesitation and that they answered the questions as if they wanted to sound intelligent, these are again matters that could've been solved had we videotaped voir dire and would have had that record here before us.

We contest the suggestions made by the prosecutors that this juror was answering questions in such a way that she wanted to sound intelligent, or we also contest -- and we also contest that she showed hesitation. She had the law explained to her, and she said she could follow the law in each and every instance. She said she could assess the death penalty if the State does their job.

Again, we feel that the strike made by the State here is merely for purposes of a juror's race and note that they are three for three in that regard.

JUDGE PARKER: All right. Thank you, Mr.

Lollar.  Anything further from the State --

MS. HANDLEY:  Nothing further, Your Honor.

JUDGE PARKER:  -- regarding this matter?  The *Batson* challenge is denied.  That's State's peremptory strike number 6.

The next prospective juror is number 222, Curtis Riser.  What says the State?

MS. HANDLEY:  We exercise a strike, Your Honor.

JUDGE PARKER:  Okay.  Anything further from the defense, Mr. Lollar?

MR. LOLLAR:  Yes.

JUDGE PARKER:  Okay.  Go ahead.

MR. LOLLAR:  Well, now the State is four for four.  We would ask the Court to take judicial notice that the State has struck Mr. Curtis Riser, who is an African American male.  Here is his photograph, which we would ask to be marked as Defendant's Voir Dire Strike Exhibit Number 4.

We would suggest that the State has struck this juror solely because of his race, as they have the other three minorities that have come up.

JUDGE PARKER:  Does the State wish to be heard on this matter?

MS. HANDLEY:  Yes, Your Honor.  Again,

we've already stated for the record that we had made a decision that we are not going to -- that we are going to strike any juror that lists themselves as 3 or states that they are not in favor of the death penalty.

With respect to Mr. Riser, juror 222, on the first page of his questionnaire, when we asked him, "Are you in favor of the death penalty," he states he is not.

When we asked him to state on a scale of 1 to 5 what best represents his feelings, he does list himself as a 3.

On page 4, when we asked him to list on a scale of 1 to 10 with respect to his feelings on the death penalty, he lists himself as a 1, which is the lowest on the scale there. He also believes that the death penalty is used too often; he believes that everybody can change.

On page 6, with respect to the questions about drugs and alcohol, in addition to the reasons articulated in his voir dire, he thinks they should be considered because drugs and alcohol can cause the mind to be altered. A person usually wouldn't commit the offense otherwise.

This concerns us because we think that this goes squarely to the defensive theory in this case: the

defendant not being in his right mind, being under the influence of intoxicating substances. We've done quite a bit of extensive voir dire on this, and somebody not being able to form intent because they were under the influence of intoxicants. He seems to be speaking directly to this.

He also -- my concern is, I think that he does believe in rehabilitation and thinks -- he put down here that prison rehabilitates inmates. He currently has a cousin in prison for murder, but is going to look at it in terms of a defendant getting into prison and not getting worse but in fact getting better.

Also, he spoke about how he has two good parents, two good parents that emphasized education, and he says that he does this also with his own son. This is a concern with us again because we believe this is going to one of the defensive theories of the defendant being able to trace back his problems to having a lack of a good father figure and not having two good parents around to raise him. So we have a concern with respect that. But this juror is successful because he had two good parents that were examples for him. His mom was a laborer, and his dad was also a laborer.

He had stated then also that "I see my son in this room." And that kind of gave me pause because

apparently his son is about the same age as this particular defendant in this case.

But first and most primarily, Your Honor, Mr. Riser doesn't believe in the death penalty. And he is a 3, and he lists himself as a 1 on a 1-to-10 scale.

JUDGE PARKER: Thank you, Ms. Handley. Mr. Lollar?

MR. LOLLAR: Yes, Your Honor. Thank you. What the juror actually says is, "I can see him sitting here." He didn't say that he saw his son here.

Now, if the Court will remember that we have many qualified jurors who in their questionnaires told us that they believe that the penitentiary does rehabilitate people. And we ask the Court to compare the ones who the State has allowed to sit on the jury with the ones that they are now saying they will not allow anybody who says that prison rehabilitates people.

Again, the State has asserted that they struck this individual because this individual has a relative in the penitentiary. We have many, many people on this jury who say that they have friends or relatives in the penitentiary. We would ask the Court to compare those that have said they would and who the State has allowed on this jury with what they are now saying they are going to disallow, which is a person with a relative

in the penitentiary.

Now, the State now says that they're going to strike a person who says they have two good parents, which is absolutely illogical to the defense as to why they would want to strike a juror who said that they grew up with two good parents.

And we would suggest to the Court that all of these reasons given by the State are merely pretext to accomplish their goal of purposeful discrimination in the seating of this jury.

JUDGE PARKER: All right. Thank you, Mr. Lollar.

Ms. Handley, anything further from the State on this matter?

MS. HANDLEY: No, sir.

JUDGE PARKER: Defendant's *Batson* challenge will be denied, and this will be the State's peremptory strike number 7.

We'll next consider prospective juror number 265, Johnny Stanford -- or Sanford, I'm sorry. Sanford, S-A-N-F-O-R-D.

MS. HANDLEY: We would exercise a strike on this juror.

JUDGE PARKER: Mr. Lollar, any comment on the defense?

MR. LOLLAR: No, sir.

JUDGE PARKER: Okay. All right. State's strike -- peremptory strike number 8.

Next, we'll consider prospective juror number 277, Vicki Wood.

MS. HANDLEY: We accept this juror.

JUDGE PARKER: Does the defense accept this juror?

MR. LOLLAR: Yes, peremptory challenge number 3.

JUDGE PARKER: I'm sorry?

MR. LOLLAR: We exercise peremptory challenge number 3.

JUDGE PARKER: Okay. Defendant's peremptory challenge number 3.

Next to be considered is prospective juror number 272, Kelly McDonald.

MS. HANDLEY: We accept the juror.

MR. LOLLAR: We accept the juror.

JUDGE PARKER: That will be juror number 3. To be considered next, prospective juror 337, Helen Noble. What says the State?

MS. HANDLEY: We accept the juror, Your Honor.

MR. PARKS: Your Honor, this was a juror

who, through her interview, made it plain that she could give no meaningful consideration to the defendant's individual mitigation in violation of the United States Constitution which the Court heard in denying the defense's challenge for cause.

This is not an acceptable juror to the defense. Therefore, we must exercise strike number 4, and respectfully request the Court to grant us an additional strike at this time.

JUDGE PARKER: Defendant's strike number 4. The request for an additional strike is denied at this time.

Juror next to be considered is prospective juror 301, Bill Henry -- Billy Henry, I'm sorry. Billy Henry, H-E-N-R-Y. What says the State?

MS. HANDLEY: We accept the juror.

MR. PARKS: Your Honor, this was a juror who, through the course of his interview, made it clear that he could give no meaningful consideration to defendant's individual mitigation. And the Court heard, in denying the defense's challenge for cause, as he is unconstitutionally disqualified or constitutionally disqualified. We renew our challenge for cause. But because of his unacceptability as a juror, we are forced to exercise our fifth strike, and we request the Court

grant us an additional strike at this time.

JUDGE PARKER:  Defendant's peremptory strike number five.  The request for an additional strike at this time is denied.

The next juror to be considered is prospective juror number 284, Heather Egar, E-G-A-R.

MS. HANDLEY:  We accept this juror.

MR. LOLLAR:  We exercise peremptory challenge number 6.

JUDGE PARKER:  Defendant's peremptory challenge number 6.

Juror next to be considered is prospective juror number 289, John Maguire, M-A-G-U-I-R-E.  What says the State?

MS. HANDLEY:  We accept this juror.

JUDGE PARKER:  Defense?

MR. PARKS:  Your Honor, because it was plain from his interview that this was a juror who could not give meaningful consideration to the defendant's individual mitigation and is disqualified under the Constitution of the United States, we renew that challenge for cause.

Because the Court heard in denying our challenge for cause at the time, we would state that this juror is not an acceptable juror to the defense.

We are forced to exercise our seventh peremptory strike, and we request an additional strike from the Court at this time.

JUDGE PARKER:  Thank you.  The Court accepts the defendant's peremptory strike number 7 and denies the request at this time for an additional strike.

MR. LOLLAR:  Your Honor, would the record please reflect when Mr. Parks is reurging the objections that we had made previously, that the Court's ruling would be the same --

JUDGE PARKER:  Yes.

MR. LOLLAR:  -- in that regard.

JUDGE PARKER:  On the challenge for cause?

MR. LOLLAR:  Yes.

JUDGE PARKER:  You're talking about the challenge for cause?

MR. LOLLAR:  Yes.

JUDGE PARKER:  The Court's ruling will remain the same on any challenge for cause.

MR. LOLLAR:  And could we ask Judge Biard if that would be his ruling also?

JUDGE BIARD:  Yes.

MR. LOLLAR:  Thank you.

JUDGE PARKER:  Thank you.

Next juror to be considered is prospective juror 392, Lisa Davison. What says the State?

MS. HANDLEY: We accept the juror.

JUDGE PARKER: Defense?

MR. PARKS: Your Honor, based upon her interview, because Lisa Davison showed herself to be a person who was not able to give meaningful consideration to the defendant's individual mitigation, she is disqualified under the United States Constitution and the various cases stated to the Court at the time. We renew our challenge for cause.

And our renewal is denied? Is that correct, Your Honor?

JUDGE PARKER: Yes, yes. The ruling on the challenge for cause is the same as before. Denied.

MR. PARKS: Because this is not an acceptable juror to the defense, we must exercise our strike number 8, and would respectfully request the Court grant the defense an additional strike at this time.

JUDGE PARKER: All right. Thank you. And the Court accepts defendant's peremptory strike number 8 and denies the additional strike at this time.

The next juror to be considered is number 544, Carl Jackson, J-A-C-K-S-O-N. What says the State?

MS. HANDLEY:  We exercise a strike.

JUDGE PARKER:  The State's peremptory strike number 9.  Is that correct?

MR. LOLLAR:  Yes.

JUDGE PARKER:  Yes.  All right.  Okay.

The next juror to be considered is prospective juror number 401, Leah Kunard, K-U-N-A-R-D.  What says the State.

MS. HANDLEY:  We exercise a strike.

JUDGE PARKER:  State's peremptory strike number 10.

The next juror to be considered is prospective juror number 451, Bruce McDonald, M-C-D-O-N-A-L-D.  What says the State.

MS. HANDLEY:  We accept the juror.

JUDGE PARKER:  Defense?

MR. PARKS:  Your Honor, this juror, Mr. McDonald, showed through the course of his interview that he was not able to give meaningful consideration to this defendant's individual mitigation.  We renew our challenge for cause.

JUDGE PARKER:  Challenge for cause is ruled the same.  Overruled and denied.

MR. PARKS:  Because this is not an acceptable juror to the defense, Your Honor, we exercise

strike number 9, and we respectfully request the Court grant the defense an additional strike at this time.

JUDGE PARKER: The Court accepts defendant's peremptory strike number 9 and at this time denies any request for additional strikes.

The next juror to be considered is prospective juror 601, Teresa Randeals, R-A-N-D-E-A-L-S. What says the State?

MS. HANDLEY: We accept the juror.

MR. PARKS: Your Honor, this juror also made it clear that she was not able to give meaningful consideration to the defendant's individual mitigating evidence that will be presented to the jury in the case in violation of the United States Constitution. We renew our challenge for cause at this time.

JUDGE PARKER: Challenge for cause is denied.

MR. PARKS: Because this is not an acceptable juror to the defense, Your Honor, we exercise peremptory challenge number 10 and respectfully request the Court grant the defense an additional strike at this time.

JUDGE PARKER: The Court accepts the defendant's peremptory strike number 10, denies any additional strikes at this time.

The next juror to be considered is prospective juror 626, Kimberly Morris.  What says the State?

MS. HANDLEY:  We accept the juror.

MR. LOLLAR:  We accept the juror.

JUDGE PARKER:  Ms. Morris will be juror number 5.

The next juror to be considered is prospective juror number 573, Guy Ferreira, F-E-R-R-E-I-R-A.  What says the State?

MS. HANDLEY:  We accept the juror.

MR. LOLLAR:  We accept the juror.

JUDGE PARKER:  Mr. Ferreira will be juror number 6.

The next on my list was prospective juror number 596, Rindy Woodward.  We did put on the record last Friday that Ms. Woodward was in intensive care, I think at Presbyterian Hospital, with severe head injuries and would not be able -- and I believe we did receive a statement from her doctor saying that she would not be physically nor mentally capable of participating in this trial.

MR. LOLLAR:  Yes, sir.  That was a letter that was faxed to Sharon Johnson, the court coordinator, and that was actually included as part of the record.

JUDGE PARKER: And also, as I recall that both parties did agree to excuse Ms. Woodward on that basis.

MR. LOLLAR: That is correct.

JUDGE PARKER: And that we proceeded to pick another prospective juror to replace her --

MR. LOLLAR: That's correct.

JUDGE PARKER: -- as number 46. Is that correct?

MS. HANDLEY: Yes, sir.

JUDGE PARKER: Okay. And, let's see, the next juror to be considered is prospective juror number 474, John Cantwell, C-A-N-T-W-E-L-L. What says the State?

MS. HANDLEY: We accept this juror.

JUDGE PARKER: Okay. And the defense?

MR. PARKS: Your Honor, based upon his interview, Mr. Cantwell made it perfectly clear that he would be unable to and could not and would not consider, give meaningful consideration to the defendant's individual mitigating evidence to be presented in this case in violation of the Constitution of the United States. We, therefore, renew our challenge for cause made at that time.

JUDGE PARKER: The challenge for cause will

be denied.

MR. PARKS:  Because this is not an acceptable juror to the defense, Your Honor, we would exercise strike number 11 and would respectfully request the Court grant an additional strike at this time.

JUDGE PARKER:  Thank you, Mr. Parks.  The Court does accept the defendant's peremptory strike number 11 and denies at this time an additional strike.

We'll take about a five-minute recess.  Do y'all want ten minutes?

MS. HANDLEY:  That's fine, Your Honor.

MR. PARKS:  It doesn't matter.

(There was a recess taken.)

JUDGE BIARD:  Is everybody ready?  All right.  Ladies and gentlemen, we're back on the record in Texas versus Broadnax.

Juror 660, Alexander Konkle.  What says the State of Texas?

MS. HANDLEY:  Ready to proceed.  Oh, I'm sorry.  On 660, we accept this juror, Your Honor.

MR. PARKS:  May it please the Court.  Based upon his interview, Mr. Konkle showed himself to be disqualified on many levels.  It's my recollection that he was not able to give meaningful consideration to this defendant's individual mitigation, that he would answer

Special Issue Number 1 "yes" automatically.

He's also a juror who, on question number 3, the State saw fit to give the example of a person who might be deserving of a "yes" answer to that question. If he tried to save the victim after he shot him, prayed over him, and ran down to the police station to surrender. We would renew our challenge for cause at this time.

JUDGE BIARD: The ruling stands, and that will be defendant's strike number 12.

MR. PARKS: And because this is not an accepted juror, Your Honor, we will exercise defendant's strike number 12 and respectfully request an addition strike at this time.

JUDGE BIARD: Strike Number 12. Your request at this time is denied.

Juror number 551, Wesley Marshall?

MS. HANDLEY: We will exercise a strike, Your Honor.

JUDGE BIARD: I show that to be State's number 11. Juror number 468, Lance Bedford?

MS. HANDLEY: We accept the juror.

MR. LOLLAR: We exercise defense peremptory challenge number 13.

JUDGE BIARD: Correct. Juror 412, Steve

Zaidel?

MS. HANDLEY:  We accept the juror.

MR. LOLLAR:  We accept the juror.

JUDGE BIARD:  Are y'all on number 7?

MR. LOLLAR:  Yes, sir.

JUDGE BIARD:  Juror 4 -- pardon me.  Juror 684, William Stinson?

MS. HANDLEY:  We accept the juror.

MR. LOLLAR:  We accept the juror.

JUDGE BIARD:  Juror number 8.  Juror 797, Lyle Livingston?

MS. HANDLEY:  We accept this juror.

MR. PARKS:  Your Honor, based upon his examination by the defense, it was clear that he could not and would not give meaningful consideration to this defendant's individual mitigation evidence in violation of the Constitution of the United States.  We reurge our challenge for cause at this time.

JUDGE BIARD:  The ruling stands.  It will be denied.

MR. PARKS:  Because this is not an acceptable juror to the defense, Your Honor, we would exercise our peremptory challenge number 14 and respectfully request the Court for an additional strike at this time.

JUDGE BIARD:  That request will be denied at this time.

Juror 824, Jennifer Stockton?

MS. HANDLEY:  We accept the juror.

MR. PARKS:  Your Honor, because this juror made it clear based upon her examination that she could not and would not give meaningful consideration to this defendant's individual mitigation evidence that will be submitted to the jury in the event that the punishment phase of this trial is submitted, it violates the Constitution of the United States.  We now renew our challenge for cause at this time.

JUDGE BIARD:  The ruling stands.  Challenge is again denied.

MR. PARKS:  Because this is not an acceptable juror to the defense, Your Honor, we exercise our peremptory challenge number 15 and respectfully request the Court grant an additional strike at this time.

JUDGE BIARD:  That request at this time will be denied.

MR. PARKS:  Your Honor, are you sure?

JUDGE BIARD:  That's number 15; correct?

MR. PARKS:  Uh-huh.

JUDGE BIARD:  Well --

MR. PARKS:  Okay.

JUDGE BIARD:  And that's defendant strike number 15.

MR. PARKS:  Yes, sir.

JUDGE BIARD:  Juror 868, Agwana Long.

MS. HANDLEY:  We exercise a strike, Your Honor.

MR. LOLLAR:  Your Honor, the State is now five for five and has struck every available minority member of the jury.  We would ask the Court to take judicial notice that Ms. Long is African American.  We would tender her photograph to the Court as Defendant's Voir Dire Strike Exhibit Number 5.

We would suggest that this strike has been made solely on the basis of the juror's race.  And now it is clear that there is becoming a pattern by the State of abusing their strikes in a racially discriminatory manner.  This is purposeful discrimination by the State in regard to every minority-qualified juror that has come up.

And, again, based on *Batson versus Kentucky* and the defendant's Fourteenth Amendment right, we ask the Court to disallow the strike and quash the panel.

JUDGE BIARD:  May I hear from the State?

MS. HANDLEY:  Yes, Your Honor.  Our

decision to exercise a strike on this particular juror is based not only on her answers to the questions but also on -- in talking to her during the voir dire.

When she states on the first page of her questionnaire that she "has mixed feelings about the death penalty," I think it becomes very apparent in talking to her.

We felt, first of all, that she had wanted to narrowly define death penalty to those cases where she states that you've tortured someone or a case where it's a situation of a helpless child or elderly. When she was questioned about this a little bit more, she did qualify it to include also police officers because they're there for our protection. But when queried about murder with robbery, she seems to hesitate and said, well, she -- she doesn't think about that and maybe hear more.

I have a strong concern on page 5 when she states that she's "strongly in favor of life without parole." She states that the "death penalty is a quick fix, and I think life without parole is the greater punishment."

When we talked to her about a quick fix, she had articulated that, well, they have time to sit and think about it and deal with the pain that they've

done to their family.  The death penalty will give you a way out so you don't have to think about it.

With respect to questions about future dangerousness in conjunction with that, she stated, "Well, you're there forever, and your chances of committing another crime are slim.  In prison, it's more controlled, and there are guards there to watch you.  They may be able to commit crimes, but it is unlikely because of a more controlled environment."

She seemed to be pretty adamant about this point, and this also seemed to be something that was voir dired extensively with defense.  They were relying heavily on making those points to the jurors when we talked about that, and she had just offered this up.

She also, with respect to "What are you looking for in determining whether or not there's a future danger and future act," she had said, "Anything that would ensure you that that act would not happen again."  And I took from that that she was referring to that -- the act of murder that he's just been convicted of -- that that would not happen again.

When I asked her about whether or not a threat would qualify as violence or a criminal act, she said, "Well, if you threaten another person and it can be followed through at any time."

On page 6, when asked about use of drugs or alcohol, the question asks, "Would it automatically prevent you from assessing the death penalty?" And on her questionnaire on page 6, she in fact checks on there "yes." She said, "I believe drugs alter a person's way of thinking and acting." She also goes on to say in her questionnaire, "I had seen people that are bipolar, go into a rage that missed out on counseling or taking medications."

She states in voir dire, "You're still responsible, but you are not at your full potential with drugs. All drugs do that."

When Ms. Evans talked to her about a situation where "Is it not reasonable to say that if you weren't already prone to maybe being the kind of person that would commit murder, then drugs would be something that would make you do that?" And her response was that, she doesn't agree with that.

To the comment that some criminals just also happen to do drugs, meaning that drugs don't necessarily make you do the crime, she spoke in terms of "drugs have something to do with you doing the crime." Basically stating that it's the drugs that make you do things that you're not already prone to do.

This is a concern to us because this seems

to be a very strong defensive theory here of the defendant being intoxicated. They voir dired on it, that an act like this could be an anomaly; but for you being intoxicated, you wouldn't do something like that. This woman seems to be feeding directly into that situation there.

With respect to the law of parties also-- which we don't know if that's going to become an issue, and it might still be--she had stated, when being asked about that, that "If you didn't actually do the shooting," she said, "I don't agree with you getting the same punishment as the shooter."

And to the question of whether or not you could find him guilty, she responded, "Well, I don't know" and kind of wanted to make excuses for the non-shooters such as "even though you gave him the gun, it could have just been a scare tactic." It doesn't appear that she's in favor of the law part of it at all and that she could even follow it.

When asked if she could give the death penalty to a non-shooter, her response is, "I don't know." She seemed to be very hesitant and put a lot of qualifiers on if she could or couldn't do it, saying she was more sympathetic to the non-shooter.

She states in her questionnaire that --

this woman has also been placed on probation for a theft by check. We had seemed to be following a pattern that we were not accepting jurors that had been in that situation before but, nevertheless, appears she was on there.

And just from a personal standpoint, Your Honor, when she was speaking with Elaine Evans, her affect seemed to be very flat, and she would agree with Elaine and say things such as well, yes, you know, "okay, if that's the law, I can follow the law." It seemed that she was saying "yes" to Elaine because she had to.

And to Doug Parks, Mr. Parks started talking to her and spending a lot of time with her on his philosophies and argument, such as violence is controlled in prison and that criminal acts of violence in prison really have to be over the top. Talking about deliberations, you know, what they don't have to be, having to apologize for your personal moral, decisions and such as that.

But all of that, she seemed to be absolutely in agreement with him not just saying, yes, I agree with him, but now kind of full body nod -- head, body, and soul agreement with him. And obviously -- well, and that's fine, Judge. That will finish up.

MR. LOLLAR: Your Honor, again, we see that the State has lapsed into justifying their peremptory challenge in regard to minority defendant -- minority prospective jurors based on subjective things which although the record in written form will not reflect.

This is again a reason why the Court should have granted our motion to videotape the voir dire so that the appellate courts and this Court at this time would have the availability of going back and looking at the juror to see if in fact the recorded -- the video-recorded voir dire of the juror would show that she was doing a head/body nod when Mr. Parks was talking to her.

We think that such a subjective explanation of the reasons that the State is proffering for this strike are merely pretext. The other things that the prosecutor relies on, the record will reflect that she qualified on every aspect of the law. When the law part was explained to her, she said she could follow that law. And when Special Issue Number 2 was explained to her, she said she could follow that law and hold the State to their burden of proof.

This is again a pretext for the striking of a minority juror that contributes to the body of strikes that we have seen here today and proves purposeful

discrimination on the part of the State in exercise of peremptory challenges.

JUDGE BIARD:  The challenge will be denied. That's State's number 12.  Mr. Parks, just so there is no confusion between defense counsel and the Court, I will entertain another request.

MR. PARKS:  I understand.

JUDGE BIARD:  Okay.

MR. PARKS:  Yeah.  No confusion.

JUDGE BIARD:  Okay.  Calls juror number 930, Robert Patterson.  What says the State of Texas?

MS. HANDLEY:  We exercise the strike on Mr. Patterson.

MR. LOLLAR:  Your Honor --

JUDGE BIARD:  State's number 13.

MR. LOLLAR:  We would ask the Court to take judicial notice that this is now six for six where the State has struck all of the available minority qualified jurors here in the exercise of their peremptory challenges.  We would ask the Court to take judicial notice of Mr. Patterson, that he is an African American male.  We would offer his photograph for the record as Defendant's Voir Dire Strike Exhibit Number 6.

The Court will recall -- the Court said of this juror that he was the best juror you had ever seen.

This is the man who is vice president of a bank, that's got a son at Hampton College, that has a daughter at Episcopal School, I think, something like that.

This was the -- the record will reflect that this juror's answers to the questions he gave are the most professional answers that I, in my 35 years of experience; Mr. Parks, in his 35 years of experience; Ms. Mallon, in her many years of experience.

You'll recall this juror, Judge. He was the man that we all agreed was the best juror any of us had ever seen in our entire experience, and the State has continued to strike him solely on the basis of his race. This is -- he has served on two juries, one of which we recall he assessed the life sentence on. He was the foreman of that jury as he was the foreman of the other jury.

Once again, the State is demonstrating purposeful racial discrimination in the exercise of their peremptory challenges. We would ask the Court under *Batson* versus Kentucky and under Article 35.261 of the Code of Criminal Procedure and enacted by the legislature of the State of Texas, also under the Constitution of the State of Texas Articles 1, 12, 19, and 21, to disallow the strike made here by the State and to seat this juror on the jury. In the alternative,

we ask pursuant to Article 35.261 of the Code to quash the entire panel, and we'll start again.

JUDGE BIARD:  Thank you.  Response?

MS. HANDLEY:  With respect to Mr. Patterson, I guess he does appear to be a fine gentleman.  I'd love to have him as a banker and a neighbor.  But in terms of him sitting on a capital murder case where the State is seeking the death penalty, that I'm not comfortable with.

We have in fact asked the court reporter to give us a transcript of the voir dire examination of Mr. Patterson so that we could take serious consideration in exercising -- whether or not to exercise a strike on him.

And I will tell you, Judge, that ultimately what it comes down to is Mr. Patterson does not believe in the death penalty.  That is what we gleaned from talking to him and from his answers.

I will start, Your Honor, by telling you -- and this comes directly from the transcript of his examination -- why we believe he fundamentally doesn't believe --

Your Honor, I have a copy of it if you want to go along with this -- the transcript.

MR. LOLLAR:  Your Honor, might I interject

here at this point that it is curious to the defense and we think significant that the State has only ordered the transcript of Mr. Patterson, who is an African American male, in order to make their objections here to the Court here today.  We again feel that that's evidence of purposeful discrimination.

MR. ALEX:  Judge, I'm going to mark the voir dire examination of Robert Lee Patterson.  Would you like for me to mark it with -- probably during the trial, we'll have State's Exhibit 1.  Would you like for me to use a letter instead?

JUDGE BIARD:  I think Mr. Lollar used Voir Dire Exhibit Number 1.  Use State's Voir Dire Exhibit Number 1 --

MR. LOLLAR:  Voir dire state -- pardon me. Voir Dire Strike Exhibit Number 1.

JUDGE BIARD:  Okay.

MR. ALEX:  Would it be okay if I mark it --

JUDGE BIARD:  That's fine.

(Voir Dire Strike Exhibit 1 was marked.)

JUDGE BIARD:  Please proceed.

MS. HANDLEY:  On page 46 of the transcript and beginning on line 15.  Now, this is during the defense voir dire, and this is where Mr. Parks was

talking to Mr. Patterson, talking about his theories and such as that.

And Mr. Parks was going on, and he states --

JUDGE BIARD:  I believe Mr. Lollar had this juror.

MS. HANDLEY:  I beg your pardon, Your Honor, then Mr. Lollar.

"The idea, though, is that twelve people will sit on this jury, all of whom are in favor of the death penalty.  Not one person will sit on this jury who is against the death penalty.  So it is vitally important to Mr. Broadnax and to any other person in his position that the twelve people who sit on the jury, who are in favor of the death penalty, be able to follow the law and set that aside, if you will."

He further goes on there and says,

"If you will, whatever personal desire they have or whatever personal beliefs that they have about the appropriateness or purposes or reasons why you should have the death penalty, and put those aside and answer the questions according to the evidence that has been placed before them.  Does that make sense to you?"

And he says, "Yes, but if I could --"  He says, "Sure."

It appears that after telling this juror one, two, and going into three times that everybody who sits on this jury is going to be in favor of the death penalty, now Mr. Patterson says, "The concept just -- I guess I would put the death penalty in the same category that I would put abortion in this sense. I take issue with. I don't believe that I am in favor of the death penalty."

He states, "Okay. I don't believe that I am in favor of abortion, but each is the law, and I accept each of them."

Okay.

"So that would be my terminology."

And so much is stated here, Judge, because he wants to make sure that Mr. Lollar has been corrected in his assertion that nobody will sit on this jury who is not in favor of the death penalty. He wanted to clear that up for the record and said that "Now, make no mistakes about it, I am not in favor of the death penalty."

This gentlemen has sat on two juries before. He did not assess a life sentence on one of those juries. It was an automatic sentence in that case. I believe it was a capital murder case where they found the defendant guilty, and life was an automatic

sentence. So that's not something he had set. He just arrived at a verdict.

He has been on another murder case, though, where he sat as the foreman, and that jury found the defendant not guilty. We had concerns with respect to talking to this juror about future dangerousness and specifically, Judge, criminal acts of violence.

From my notes and also from the transcript on page 16, I'm starting down on line 19, "We often give jurors the example of me just hitting a co-worker." And I stated to him, "If I, for example -- Mr. Hikel, my colleague, is just sitting here minding his business. And I just look over at him and just smack him square in the face, would you consider that a criminal act of violence?"

And he states, "No."

When I ask him why not, he said, "Criminal to me means something more than violence. I would agree you have displayed some violence towards him, but whether or not it was criminal an absolute formulating definition in my mind, I would say no."

And I said, "Is it because you haven't heard enough surrounding circumstances as to why I hit him?"

And he said, "I don't think it's serious

NATASHA K. SPOERL, CSR
Acting Official Court Reporter

enough to be considered a criminal act of violence." He goes on to say, "If you were to take a gun as an example and shoot him."

Then I asked, "Anything else that would constitute a criminal act of violence for you?"

And he said, "It'd have to go with the seriousness in my mind."

He goes on on page 18 to talk about it some more. And he says, "You know, if I tripped you or if you tripped me, for example. In my mind, that doesn't equate to a criminal act. If I slapped you, in my mind that's not a criminal act. But if I were to cut you with a knife, I would say that is a criminal act."

My concerns are just that, Your Honor. That, first of all, I would think that hitting somebody square in the face is in and of itself a criminal act of violence, but he doesn't find that --

And he takes it one step further, where Mr. Patterson's actually looking for the -- not just the display of a handgun, but the shooting of somebody with a handgun. Not just maybe the possession of or displaying of a knife, but actually cutting someone with a knife is what he's looking for in order for something to constitute a criminal act of violence.

We also had a concern, Judge, about this

business on nullification.  He -- Mr. Patterson on his own, without being solicited, asked, you know, a question.  He said, "Well, with respect to Special Issue Number 3" --

Let me find it in the transcript, Judge. On page 56, after being -- discussing Special Issue Number 3 and mitigating circumstances, after a discussion by defense counsel, the mitigation and such as that, he asks, "Does this equate in any way with the concept that I've heard a little bit about jury nullification?"

That he would bring that up on his own unsolicited also gave us concern because, quite frankly, as the defense has gone into with each of these jurors, they have emphasized that a juror could answer Special Issue Number 3 for any reason whatsoever and have suggested to the jurors that they don't have to articulate why, and it could be based on nothing but mercy.  I took issue with that, but that seems to have been the tenor of their voir dire.

We also had some concerns about mitigating circumstances.  I asked this juror about mitigating circumstances and whether or not it was anything in particular that maybe touched him or moved him towards that direction, and he stated that -- and I'm looking at

page 35.

He said, "Well, I can actually envision a circumstance where I would be convinced of sufficiently mitigating circumstances."

And I asked him, if he wouldn't mind, tell us what that is.

And he said, "If someone grew up in a neighborhood, crime infested, and no parental or adult control. They've been involved with a gang early on, the only family they knew. They had simply had a history of criminal activity. There had been no attempts of anyone to try and help this individual. I cannot blame that individual a hundred percent for the circumstances that they find themselves in."

This would seem to hit very close to the defensive theories of the defendant's poor upbringing, not having good parental control. We have seen that he had some gang involvement here. And I think that there will be a strong argument made that nobody has really extended a hand to this particular defendant to help him and to guide him in the right direction. Mr. Patterson seems to already be thinking and expressing that particular situation.

I think Mr. Alex might want to add something to the record, Your Honor.

MR. ALEX: Judge, if you don't mind, I'm going to switch out or at least look at the one that you have there because I tabbed the voir dire exhibit. And if defense counsel doesn't mind, I'm just going to hand him the other one to look at, if that's all right with the Court.

Judge, I was the one who ordered this transcript with the court reporter, Anne Meredith. I did not sit in on this voir dire in particular of Mr. Robert Patterson.

And I'm going to be quite frank with the Court. When I read Mr. Patterson's questionnaire, I liked the guy. I thought he'd be somebody that I could relate to. He seemed to be a very strong member of the community. I liked where his kids went to school. I liked what he said on his questionnaire.

And there were notations in the notes from the other members of our team, specifically Ms. Elaine Evans and Mr. Gordon Hikel -- who is also an African American -- about this guy's belief in the death penalty. And I didn't want to rely on their notes because obviously the notes -- if a person says, well, you know, maybe it's kind of like abortion. And I didn't want to rely on it, so I wanted to see what he actually said.

And I'd be willing to bet there's not a prosecutor in this whole state that would put somebody on a death penalty case who does not believe in the death penalty. I think Ms. Handley has said to the Court on numerous occasions that anybody who has said they're not in favor of the death penalty, will not be on this jury.

In fact, Judge, defense counsel himself has told the jurors on more than one occasion -- and Ms. Handley has pointed out in this record -- when talking to Mr. Patterson, he told Mr. Patterson, sir, nobody's going to sit on this jury if you're not in favor of the death penalty.

And that's when Mr. Patterson interrupted, and you could -- from reading the record and I wasn't there -- you could tell that defense counsel was making an assumption that obviously they even believe in. And that is, if you don't believe in the death penalty, you're not going to be sitting over here, sir.

And going into all of that, Mr. Patterson made it a point to interrupt defense counsel and say, wait a minute. If you're throwing me into that category, let me correct you. I don't believe in the death penalty, just like I don't believe in abortion.

And the words that he says are pretty

specific.  And I didn't want to rely on anybody's notes about it.

It is really sort of a difficult position for me, Judge, because I like Mr. Patterson, and I am an African American.  And I think that he would have made a fine juror but for the fact that he made it clear before this was over with.

He says, "Yeah, but if I could" -- and he's interrupting; I don't know if it was Mr. Parks or Mr. Lollar -- if I could.

And finally defense counsel said, "sure."

He says, "I guess I will put the death penalty in the same category as I would put abortion in. I'd take issue with.  I don't believe that I'm in favor of the death penalty."

And I think that any prosecutor, who would put a person on the jury who says they don't believe in the death penalty, is just asking for trouble.  They've already told you they don't believe in it.

And that's the reason, that's the reason Mr. Patterson is getting struck primarily.  That is -- all the other things that defense counsel said about Mr. Patterson that were favorable, those are true. Those are true.  But for the fact that --

And I guess the only other thing that I

NATASHA K. SPOERL, CSR
Acting Official Court Reporter

needed to have clear in my head before we struck Mr. Patterson, Judge, because I wasn't there with this whole business about nullification. And defense counsel times three has said to the Court, in their whole career, they've never -- dot, dot, dot.

Well, I'll tell you in my whole career--and it's not been as long as theirs--I've never heard a juror who was a non-lawyer and on their own bring up the term "nullification." And that scares me. It's a legal term, and we all know what it means. It's not something that's favorable to the State. But for the juror on its own, during the Special Issue Number 3 to just come right out and say --

And I'll tell you again, I did not want to rely specially on somebody's notes. The notes that I read said that the juror said something about nullification, and that scared one of the members of my team. But I didn't know if somebody else had mentioned it first because it is a very specific legal term. But whichever defense counsel was doing the voir dire with this witness is talking about Special Issue Number 3, and the concept comes out of the juror's own mouth. And that is, does that equate in any way with the concept of a juror knowing about jury nullification.

Now, not being there, Judge, this guy

could -- he could either be one of the smartest non-lawyer jurors in the world and say to himself, well, we've already answered Special Issue Number 2 and Special Issue Number 1.  And the guy's sitting on the death penalty unless we find something that's favorable mitigated sufficiently to say life.

And to make that legal maneuver and get all the way around to say that that equates to nullification, that scares me quite a bit actually because that means he's had some conversation about jury nullification.

He has told us that he is such a strong person, that everyone around him has voted on him being the foreman on at least two occasions.

And the fact that he potentially could be the foreman here, who is telling me about jury nullification and doesn't believe in the death penalty, is in my mind all race neutral.

What would be not race neutral, Judge, is for me to let this jury on simply because he is African American, and that would be -- it's not the thought behind *Batson*, but the notion of leaving him on just because he's African American.  Whether he was not African American, he would be struck every day all day, I think is completely race neutral, and Mr. Patterson is

not a believer in the death penalty.

MR. LOLLAR: In response, Your Honor, as his questionnaire clearly shows the Court on page 1, "Are you in favor of the death penalty?" "Yes."

With reference to the death penalty, which of the following statements best represents your feelings?" He is not a 3. He's a 2. And he has circled that and indicated that to the Court.

With regard to the State's reported reason for striking him, that he would not consider necessary, the prosecutor turned around hitting her co-counsel in the face, a number of our jurors told us that. They would have to consider the context in which it happened and see if it amounted to a criminal act of violence that constituted a continuing threat to society.

And since the courts of this state and since the legislature have declined to define for us what they mean when they talk about criminal acts of violence that would constitute a continuing threat to society, the juror is perfectly within his rights -- as so many of our other jurors were to say -- that hitting in the face would not constitute that to their satisfaction Special Issue Number 1.

In regards to Special Issue Number 3 the Court will recall Mr. Patterson's voir dire in regard to

what he said and how the issue of jury nullification came up. That was in response, as the Court will recall -- and this is again after the State has already told him this. As they told every juror that it was the unanimous vote of all twelve -- the unanimous vote of all twelve of the jurors, that there we no sufficient mitigating circumstances that would allow them the indication of the death sentence.

And that's where he came up with that. It was in response to talking about Special Issue Number 3 and the requirement under law that all jurors had to unanimously agree that there were no mitigating circumstances sufficient to avoid the death sentence.

We were asking him in particular, pointing out to him that should a single juror not feel that the State -- that the evidence did not show a sufficient mitigating circumstance, only in that event would there be a death sentence returned.

So again, we feel that these excuses given by the State are nothing more than purposeful discrimination. They are pretext for them to further their goal in this case of striking every minority juror who qualifies as a juror in this case. And that is their goal. They're going to do it, and so far they're six for six. The Court should disallow the strike on

this juror.

JUDGE BIARD:  The challenge will be denied. State's strike number 13.

Juror Number 874, William Kreighbaum?

MS. HANDLEY:  We accept the juror.

MR. LOLLAR:  We accept the juror.

JUDGE BIARD:  Juror number 9.  Correct?

MR. LOLLAR:  Yes.

JUDGE BIARD:  Juror 977, Patricia Hodges.

MS. HANDLEY:  We accept the juror.

MR. PARKS:  Your Honor, based upon the examination of Patricia Hodges, I will tell you that this is not an acceptable juror to the defense for the reasons that she said that she could not consider voluntary intoxication meaningfully, which is mitigation -- individual mitigation evidence that we expect to come forward to this jury in this case.

Likewise, she was one of many jurors that the State used this, what I call, vigilante example to suggest to her that Special Issue Number 3, the mitigation issue, was there so that the juror could exercise the decision not to execute a person who's son was addicted to drugs by the neighborhood drug dealer, and that the police wouldn't do anything about it.  And he finally went down, and he shot the person so he could

steal his money and take it and give it over to the church.

My recollection is she seemed to ingest that example pretty wholeheartedly, so we consider she is not at all acceptable to us. Having already used our fifteenth peremptory challenge, we respectfully request the Court grant us an extra peremptory challenge to exercise on this particular juror.

JUDGE BIARD: That request will be granted.

MR. PARKS: And so we exercise peremptory challenge number 16, Your Honor.

JUDGE BIARD: Defendant's strike number 16. Juror 1391, Betty Jackson. What says the State?

MS. HANDLEY: We exercise a peremptory.

MR. LOLLAR: Your Honor, we would ask the Court to take judicial notice that juror 1391, Betty Jackson is an African American. The State is now seven for seven in striking minority members of this panel. We would offer her photograph for the record as Defendant's Voir Dire Strike Exhibit Number 7.

We suggest that the strike has been made solely for the purpose that the juror is an African American, and the State continues in their desire to strike every minority member and have only a white jury serving in this case with an African American defendant.

JUDGE BIARD: What says the State?

MS. HANDLEY: Your Honor, page 1 of Ms. Jackson's questionnaire, she is not in favor of the death penalty. She lists herself as a 3 on a scale of 1 to 5. And on page 4, she puts herself as a 2 on the 1-to-10 scale.

Your Honor might remember Ms. Jackson. She had stated not only to myself but also to the defense that she would only give the death penalty in the case of the sexual assault and/or rape of a murder -- and murder of a child. I believe she's articulated this pretty clearly both to myself and to the defense.

I think that if the Court had questioned her and had asked her specifically, "will you only give the death penalty in a case of a child rapist or murderer," she would have said "yes," instead of the way that you posed it to her with "yes" or "no" answers. But I don't take offense with what the Court did.

It's for those reasons. And, primarily, she's not in favor of the death penalty, Your Honor. So we chose to strike this juror.

MR. LOLLAR: And we urge again that is a mere pretext in the State's striking her. As they have shown throughout the course of this voir dire peremptory challenge exercise, they intend to strike every minority

member from the jury.

JUDGE BIARD:  Challenge will be denied. Juror 1062, Dedrick Morrison.

MS. HANDLEY:  We exercise a strike.

MR. LOLLAR:  And, once again, Your Honor, the State is now eight for eight in striking juror 1062, Mr. Dedrick Morrison.  And so the record will recall and the Court will recall, his best friend is the chief investigator for the District Attorney's office.

And we will offer his photograph in evidence here as Defendant's Voir Dire Strike Exhibit Number 8, again proving patternable discrimination on the part of the State of Texas in the exercise of their peremptory challenges in this case.  Every minority that has qualified, that has come up for consideration, the State has used their peremptory challenges to strike. The pattern has become very clear.

There is nothing in the voir dire examination of Mr. Morrison which should give them any cause to want to strike him.  The Court will recall he was the coached, and again, the State has used their peremptory challenges in an effort to purposely discriminate against these minority jurors in assurance that they have an all-white jury in this case.

JUDGE BIARD:  The State's response?

MS. HANDLEY: Your Honor, with respect to juror number 1062, Mr. Dedrick Morrison, he does state on the first page of his questionnaire that he is not in favor of the death penalty. With respect to him being the best friend -- or at least a good friend of Tony Robinson, Mr. Robinson said he is a swell guy. He's a nice man, but you do not want him on a criminal case involving the death penalty --

MR. LOLLAR: Which we would object to as being outside the record. We never talked to the chief investigator for the District Attorney's office.

MS. HANDLEY: And in response to defense counsel's argument --

JUDGE BIARD: I'll overrule that objection.

MS. HANDLEY: Going through the voir dire and the questionnaire of Mr. Morrison, primarily, he's not in favor of the death penalty, and that seems to flush out when you start to really look at his questionnaire.

He makes a lot of comments about -- well, he has stated that in his opinion, that once you go to prison, you adapt after being confined, and you can change. Well, then he puts that on the first page of his questionnaire, and he tends to articulate that also when he's being talked to by the lawyers.

And he says, "It's because you will change is the reason that I'm not in favor of the death penalty.

When we asked him on page 2 about his argument for the death penalty, he says, "The individual was in their right frame of mind and understood exactly what he or she was doing."

And the argument against, he stated, "The individual was forced to perform the act of violence and was under the influence of drugs."

Again, his comments would appear to feed directly into the defensive argument that the defendant here had less culpability by reason of his intoxication. It would appear to cover all those defensive theories of not only intoxication, but also what they've been throwing out to jurors about being a follower when he said that he's performed to -- forced to perform this act of violence.

When he states again on page 4, the individual understood exactly what he or she was doing, this becomes important to him in assessing his decision on whether or not somebody should receive the death penalty or what becomes most important to him; that the person understood exactly what he or she was doing. "Individuals are known to crack based on the level of

stress and pressure they are under."

He states on page 6, "The evidence of intoxication," he says, "Some individuals who commit crimes are under the influence of drugs and don't realize what they have done until they sober up."

He tells us during his voir dire that, "They will do something that they don't even realize what they've done until they sober up, like the drunk that doesn't remember driving home."

Again, Judge, this hits squarely on the defensive theory of intoxication and what they seem to be heavily voir diring with on each panel member.

I had some concerns also about his comment about the member of the Crips, becoming a changed man, in that we do believe we have evidence of gang affiliation in this case, and that concerns us.

There is also -- and I think the defense even had a problem with this -- is that Mr. Morrison is a nice guy. He seems like a nice guy. He talks a lot. He doesn't really get to the point, but he uses a lot of analogies. And, quite frankly, I don't know if he really gets it or not.

By the time he got to the defense voir dire, he apparently thought that the defendant had already been found guilty in this case. And that was

after having had the judge, the DA, as well as the defense talk about life without parole in this case or discussing that with him.

Then after each one of us talking about life without parole and that parol means just that, no parole, we started talking about a defendant getting a life sentence at 25. And then the parole board looking at him again and him getting out around the age of 43, and perhaps now he's a changed man. He just wanted to talk about time changes everybody.

Clearly, I don't -- I hope he understands this guy is not getting out. He states to us that we are not the same person at 30 as we were at 18. And I think he truly believes this, and I think that he thinks that given time, within a relatively short period of time, any defendant is going to change in prison, particularly a young defendant. He's all about kids. As a matter of fact, he states to us that it's his life's work to help kids.

What really jumped out at us also here is that he has -- his second cousin was killed by an Austin police officer, and this happened on May 13th. And so we're talking about close proximity of time here.

And in that case, his second cousin was also a kid around 18 or 19 years of age, the same as the

defendant.  He stated that -- he kind of made some analogies there to this defendant, that he wasn't getting the proper support from his family and even said, if I had just had a chance to talk to him and mentor him, this probably wouldn't have happened.  It appears that he had a strong connection with that kid, and we talked to him again about wanting to talk to him about football and baseball.

And in his version of events, he states there that his cousin was asleep in the backseat of a car.  An officer tried to drag him out while he was asleep.  The officer got startled, shot him in the head once, dragged him out, and shot him in the head again.  Then on his questionnaire, he puts down that officers will tend to cover for each other.

When we started talking to him about that situation -- which seems particularly horrific, where apparently even riots have even broken out in Austin about this.  When we asked him about it, it's like he's making excuses for the officer, and he makes excuses for anybody who has ever been in any kind of act like that.

He says, "Everything happens for a reason. The reason he killed him will come to him eventually. Nobody is perfect; we all make mistakes."

I see him making the same argument here

with the defendant and the co-defendant killing these men in Garland, that apparently they killed them for a reason and that eventually this is going to come to Broadnax.

He states, "You're not the same person at 18. After 18, the Lord will pull you back." That is in the nicest way, but I think this juror has just taken a lot of -- maybe a lot of hard knocks or something in his ball-playing days.

But the defense is talking circles. And when they are making this football analogy, he talks in terms of being very forgiving. It's like something nothing seems to move this guy, and everything happens for a reason, Judge.

He's very strong on the fact that these 18-year-old men just need some guidance and, with the proper guidance and God pulling you back, ultimately you're going to be fine.

That's not going to be the kind of person who's going to go for the death penalty, particularly in a case like this with a young defendant, as the analogy, sitting so close to home with him. And he states right there, Your Honor, on the first page of his questionnaire, he's not in favor of the death penalty.

MR. LOLLAR: Well, as the Court will recall

of this juror's voir dire examination, we contest that he talked in circles. We contest that he didn't get it. The cold record will reflect exactly what he had to say, since the State is basing their strike on their subjective views of how he testified.

Again, this is a juror who would benefit this Court and the appellate courts in this state to have been able to see a videotape of this juror's voir dire examination.

We suggest that the excuses given by the State in their exercise of this peremptory challenge is merely a pretext.

We note, now that we are closing towards the end of this jury selection, that the State has used their peremptory challenges to strike every minority candidate from this panel. It is their goal.

We suggest the pattern, not just the individual strikes but the collective pattern, that the use of their strikes for the stated reasons that they gave, should show that there has been purposeful discrimination on the part of the State here.

This is excuses that they give, supposedly race neutral, in order to ensure that what they're going to end up with is an all-white jury here in this case. The courts of this state and of this land are well

familiar with the history of the Dallas County District Attorney's office in uses of peremptory challenges in death penalty cases to strike minority members.

I am reminded of a song by The Who where it says, "Meet the New Boss, Same as the Old Boss." We have seen this examination, this voir dire process --

MR. ALEX: Judge, I'm going to --

MR. LOLLAR: -- strikes used by the State in this case exactly as we have seen the Dallas DA's office do over the course of time. It has shown purposeful discrimination in the exercise of the peremptory challenges used by the State in this case.

We would ask the Court in *Batson versus Kentucky* and under Article 35.261 of the Code to disallow the strike, the peremptory challenge of the State in this case.

We would ask in the alternative either that the juror be restored to the panel, or that the entire panel be quashed and we start again.

JUDGE BIARD: The challenge will be denied. That's the State's fifteenth and final peremptory challenge.

Now we go to 1321, Clarence Winfield. Mr. Parks?

MR. PARKS: Your Honor, may it please the

Court, Mr. Winfield is not an acceptable juror to the defense. Mr. Winfield's examination will show that he was at least substantially impaired in his ability to give meaningful consideration to mitigation in this case and to this defendant's individual mitigation.

Also, we'll point out to the Court that Mr. Winfield was qualified by the use of vigilante, killing a drug dealer and his money being taken to give to the church, that Mr. Winfield's fully and completely accepted a hit in the face as an act of criminal violence and that would be a continuing threat to society. For all of those reasons, he is not acceptable to the defense. We would respectfully request an additional strike to use on this juror.

JUDGE BIARD: That request will be denied. Juror -- Mr. Winfield will now become juror number 10. 1345, John Vessels?

MR. PARKS: May it please the Court, Mr. Vessels is not a juror acceptable to the defense. Mr. Vessels was subjected to what I have, perhaps not fairly, referred to as the nodding off voir dire where he essentially sat there and nodded his head up and down and said "yes" to every proposition that was proposed to him by the State of Texas.

He also bought into the vigilante drug

dealer killing as an example about a person that might not be a continuing danger to society, although a capital murder. And as an example of a person who has been proven guilty of capital murder and perhaps a continuing danger to society, the Special Issue Number 3 was there to protect from the death penalty rather than the life -- to give the life penalty rather than the death penalty.

He essentially in all respects indicated that he would answer Special Issue Number 1, automatically guess. We challenged this defendant -- this venireman for cause. That was denied. We respectfully renew our challenge for cause.

JUDGE BIARD: That will be -- the ruling stands. It will be denied.

MR. PARKS: And we respectfully request the Court grant the defense an additional peremptory strike to use on this juror.

JUDGE BIARD: That again will be denied. Mr. Vessels will become juror number 11. 1313, Emily Blevins. Mr. Parks?

MR. PARKS: May it please the Court, this prospective juror, Emily Blevins, is not a juror who would be acceptable to the State -- to the defense for the following reasons: Ms. Blevins, although while she

appeared to be more reasonable certainly than Mr. Vessels and Mr. Winfield again was given the hit-in-the-face example, and she also agreed that a hit in the face would be a criminal act of violence that would constitute a danger to society in her view. That caused me considerable concern.

She also indicated on page 5 of her questionnaire that she believed in an eye for an eye. And when we inquired about that, she said, "When a person commits murder, they have forfeited their right to decide." I'm not exactly sure what that means, but I would guess that she probably meant they have forfeited their right to live in that context.

For those reasons, she is not an acceptable juror to the defense, and we would respectfully request an additional strike for this juror.

JUDGE BIARD: That will be denied. Ms. Blevins becomes juror number 12.

1094, Barry Fiddick. What says the State?

MS. HANDLEY: We accept him.

MR. LOLLAR: We accept Mr. Fiddick.

JUDGE BIARD: Juror number 13, Barry Fiddick. 1178, Elsa Overa?

MS. HANDLEY: We accept.

MR. LOLLAR: Your Honor, we strike --

JUDGE BIARD:  Ms. Overa.

MR. LOLLAR:  Overa.

JUDGE BIARD:  Defendant's number 1 in the alternate group.  1389, George Paradise.  What says the State?

MS. HANDLEY:  We strike.

JUDGE BIARD:  James McElroy becomes juror number 14.

Your Honor, Judge Snipes, you have a jury, sir.

JUDGE SNIPES:  Thank you very much, sir.

JUDGE BIARD:  Thank you very much, Counsel.

MS. HANDLEY:  May we say something on the record, Judge?  I want it just for -- to sort of clear up for the record, because we have articulated that we have elected to strike any persons within this pool who are not have -- are not in favor of the death penalty.

We struck juror number 123, Sue McCormick. She had listed herself as a 3 in reference to whether or not she was in favor or not in favor.  She left that blank but did state she was a 3.

Denise McCraney or Sharon McCraney, number 165, had listed herself as a 3 on the 1-to-5 scale.

Juror 131, Mattie Vation is not in favor of the death penalty.

Juror number 208, Ashley Rivera is not in favor of the death penalty.

Juror 222, Curtis Riser is not in favor of the death penalty, and a 3 on the 1-to-5 scale, and a 1 on the 1-to-10 scale.

Johnny Sanford, juror 265, is not in favor of the death penalty; a 3 on the 1-to-5 scale and a 1 on the 1-to-10 scale.

Carl Jackson, juror 544, is not the favor of the death penalty; a 3 on the 1-to-5 scale and a 3 on the 1-to-10 scale.

Juror number 39, 13, 91, is not in favor of the death penalty; a 3 on the 1-to-5 scale and a 2 on the 1-to-10 scale.

And Dedrick Morrison is not in favor of the death penalty.

And George Paradise, in asking whether in favor or not in favor, had also left that blank.

MR. LOLLAR:  And our response, Your Honor, the State has struck eight out of eight qualified minority jurors.  The examples -- the reasons that they use in striking these are illogical and subjective. They are explanations with the district court's impact on minority populations in this country and in this state.  They use disparate questioning and disparate

treatment, as the record will reflect.

They have shown purposeful discrimination in the exercise of their peremptory challenges in the denial of this defendant's Fourteenth Amendment rights under *Batson* -- as expressed in *Batson versus Kentucky*, *J.E.B. versus Alabama* and its progeny, and in violation of Article 35.261 of the Code of Criminal Procedure.

We would ask again that the Court restore these stricken jurors to the jury or, in the alternative, quash the panel and let's begin again.

JUDGE BIARD:  That will be denied.

On behalf of Judge Parker and myself, I'd like to express appreciation to counsel for your very professional presentation.

The Court is in recess.  Thank y'all very much.

MS. HANDLEY:  Thank you, Judge.

(There was a discussion off the record.)

(This completes Volume ____ of the Reporter's Record, the selection of the trial jurors by Judge Biard and Judge Parker, which was heard on Monday, July 20, 2009.)

NATASHA K. SPOERL, CSR
Acting Official Court Reporter

STATE OF TEXAS )

COUNTY OF DALLAS )

I, Natasha Spoerl, Deputy Official Court Reporter in and for the Criminal District Court 7 of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court and were reported by me.

I further certify that this transcription of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that Dallas County did not pay a substitute court reporter while I prepared this transcript.

WITNESS MY OFFICIAL HAND this the ___15th___ day of ___January___, 2010.

___Natasha Spoerl___
Natasha Spoerl, Texas CSR #8410
Expiration Date: 12/31/2010
Deputy Official Court Reporter
Criminal District Court 7
Frank Crowley Courts Building
133 N. Industrial Boulevard
Dallas County, Texas
Dallas, Texas 75207-4313
(214)215-5858 (972)563-6650 Fax

**NATASHA K. SPOERL, CSR**
Acting Official Court Reporter