REPORTER'S RECORD

VOLUME 39 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE CRIMINAL DISTRICT |
| | ) | |
| VS. | ) | COURT NO. 7 |
| | ) | |
| JAMES GARFIELD BROADNAX | ) | Of DALLAS COUNTY, TEXAS |

ORIGINAL

========================================================

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

PRETRIAL HEARING

========================================================

On the 24TH day of JULY, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

```
                        A P P E A R A N C E S


FOR THE STATE OF TEXAS:


  HONORABLE DAVID M. ALEX
  SBOT NO. 24003256
  HONORABLE LISA SMITH
  SBOT NO. 00787131
  HONORABLE GORDON HIKEL
  SBOT NO. 00787696
  HONORABLE ANDREA HANDLEY
  SBOT NO. 08898800
  HONORABLE ELAINE EVANS
  SBOT NO. 24032880
  133 N. INDUSTRIAL BLVD.
  FRANK CROWLEY COURTHOUSE
  DALLAS, TEXAS 75207
  TEL. 214-653-3600


FOR THE DEFENDANT:

  HONORABLE BRAD LOLLAR
  SBOT NO. 12508700
  1700 COMMERCE ST, STE. 404
  DALLAS, TEXAS 75201
  TEL. 214-384-8178

  HONORABLE DOUGLAS H. PARKS
  SBOT NO. 15520000
  321 CALM WATER LANE
  HOLLY LAKE RANCH, TEXAS 75765
  TEL. 903-769-3120

  HONORABLE KERI MALLON
  SBOT NO. 24049165
  DALLAS COUNTY PUBLIC DEFENDERS OFFICE
  133 N. INDUSTRIAL BLVD., LB 2
  FRANK CROWLEY COURT BLDG.
  DALLAS, TEXAS  75207
  TEL. 214-653-3550
```

# VOLUME 39

## PRETRIAL HEARING

JULY 24TH, 2009                                    PAGE   VOL.

PROCEEDINGS................................     3     39

CASE CALLED BY THE COURT..................     3     39

ADJOURNMENT...............................    41     39

REPORTER'S CERTIFICATE....................    42     39

PROCEEDINGS

(Court convened.)

THE COURT:  This is the State of Texas versus James Broadnax.  This is a hearing with regard to whether expert testimony would be admissible, and I will make the appropriate ruling at the appropriate time.

However, I will hear from you, Mr. Lollar, what the nature of the testimony is.

MR. LOLLAR:  Yes, Your Honor.

We intend to call Dr. John Roache, deputy chair of research in the Division of Alcohol and Drug Addiction at the University of Texas Health Science Center at San Antonio, Texas.

And he will say that he has reviewed records which include a number of things: All of the audiotapes that the State have proffered to us, which include the videotape of the defendant's arrest in Texarkana, his interview with their police department, all four interviews the defendant gave on June 23rd.

He has also reviewed jail records and medical records of the Dallas County Sheriff's Office in regard to this defendant, and he has certainly come to conclusions based on Mr. Broadnax's case that are based on those.

THE COURT:  What conclusions?

MR. LOLLAR:  The bottom line conclusion, it is consistent -- Mr. Broadnax's behavior is consistent with what he tells people at the jail, psychiatric assessors and assessments at the jail about getting wet marijuana on the night of the offense.  The doctor will explain what effect that has on the brain.

He will also talk about PCP intoxication as that affects human behavior.  He talks about how a person becomes aggressive or violent under PCP and he will talk about how brain development and brain adolescence is affected by the use of PCP.

THE COURT:  The State wish to be heard before we call the witnesses?

MR. ALEX:  No.  I think I heard, as far as preponderance, so it should really be quick, if I understood the opinion, that in his opinion the defendant was under the influence.

MR. LOLLAR:  Was consistent with being under the effect of PCP at the time of the offense, right?  Everything else is just his basic foundation for his expertise.

MR. ALEX:  Shouldn't take long.

### JOHN ROACHE

was called as a witness and testified as follows:

### DIRECT EXAMINATION

BY LOLLAR:

Q. Tell us your name, please.

A. John Roache.

Q. And would you tell us what your occupation or profession is.

A. I'm a clinical pharmacologist with 26 years of experience in doing drug abuse research. I'm a professor of psychiatry. The Chief of the Alcohol and Drug Addiction department. And the deputy chair of research at the Health Science Center in San Antonio.

Q. How long have you been with the U.T. Health Science Center?

A. I have actually been with the U.T. system for 22 years. I have been in San Antonio for 11.

Q. All right, sir. Let me show you what has been marked as Defendant's Exhibit Number 1. Is this a copy of your curriculum vitae?

A. Yes.

Q. And does that list your experiences, your vocational background and the papers and addresses and the seminars that you have gone to?

A. Mostly. I believe it's a little bit out of

date.

Q.    All right.

A.    I have added more since.

MR. LOLLAR:  Offer Defense Exhibit No. 1.

THE COURT:  Hold on a second.  A couple of housekeeping matters.  Whenever the lawyers wish to approach a witness, they need ask one time per witness. And I will always allow it.

MR. LOLLAR:  Yes, sir.

THE COURT:  And then if the witnesses have titles, which I believe you're a doctor, are you not, sir?

THE WITNESS:  Yes, sir.

THE COURT:  Then you will refer to him as Dr., not Mr.

Is there any objection to Defense Exhibit 1?

MR. ALEX:  No.

THE COURT:  Okay.  Defense Exhibit 1 is admitted.

Q.    (BY MR. LOLLAR:)  Specifically, Dr. Roache, could you tell us what is the subject matter of your expertise?

A.    In the human, the effects of drug abuse, I have done a lot of research on the subject looking at

why people use drugs, how the drugs affect them and their cognitive functions, their performance and ability to sustain life functions.

Q. All right. Doctor, let me ask you, did I ask you to review certain materials that I have sent to you in regard to the defendant in this case named Broadnax.

A. Yes. You sent me materials.

Q. And could you kind of list for the Court what materials you have reviewed in preparation for your testimony here today?

A. I have watched four DVD videotapes, the Texarkana arrest, of the Garland Police Department interview. The news media interview, I believe there were four -- stated it to be four different news stations. I have watched them all. I have also reviewed the police report -- and I guess it is the Garland police report -- and the Dallas County jail assessments of mental health.

Q. All right, sir. And would the records from the jail which you have reviewed include the records made by the medical and psychiatric departments?

A. Yes, it does.

Q. And would that include screenings and evaluations by various people there in the psychiatric department?

A.   Yeah.   It appears to be a complete record from the initial time of arrest up though -- I have forgotten the last date, but up through about September of 2008.

Q.   All right, sir.   Let me ask you, Doctor, in reviewing those records from the jail, what did you learn about the mental condition of the defendant at the time he was brought into the jail?

A.   Um, he reported early on hearing voices, being under the influence of wet marijuana.   And, let me see, so those are two --

THE COURT:   Wet marijuana, is that PCP-laced marijuana?

A.   Um, the term "wet" is used to apply to many substances.   The process whereby tobacco or herbal leaves or marijuana are dipped in formaldehyde and it might contain other substances as well.

The re -- there is a small amount of research, literature on the subject which has shown that usually this contains PCP.   Othertimes, it contains PCP and not formaldehyde, which is embalming fluid. But it is a process of getting the PCP and the drug onto the herbal material to be smoked, marijuana --   His note was that he had used it within the last two or three days.   He consistently -- and

reported a pattern daily of marijuana.

Q. (By Mr. Lollar) All right. And Doctor, what -- do the records that you reviewed reflect that Mr. Broadnax reported to the jail mental health screeners when he was first being screened that he had in the past 72 hours smoked wet marijuana.

A. He has stated that he had smoked a blunt, which is a large amount of marijuana put into -- like emptying a cigar, a tobacco cigar, and refilling it with marijuana and dipping it in the embalming fluid.

And so that is a large amount of marijuana, put into -- like emptying a cigar, a tobacco cigar, and refilling it with marijuana and dipping it into the embalming fluid. And so that is a large amount of habitual pattern of regular use. All the data are entirely consistent with that pattern of use.

Q. All right, sir. Do the jail records that you reviewed reflect that he has been in the Dallas County jail at about 2:00 in the morning on Saturday, June 21st?

A. That's correct.

Q. Do your records -- do your records reflect that he was screened in during the book-in procedure and referred to the psychiatric department for evaluation?

A.    Yes, he was.  I think he was evaluated approximately a little more -- just a few hours over two days after the alleged incident.

Q.    That -- the day he was booked in, I believe was a Saturday, is that correct, Saturday the 21st of June, 2008?

A.    I believe so.  And then the medical health evaluation occurred subsequent to that.

Q.    Do those records reflect that at the time that he was booked in, he was assigned to a closed behavioral observation cell within the psychiatric ward of the Dallas County jail?

A.    The records indicate that he was put into the observation cell because of some comments made during the media interviews, I believe.

Q.    The records also reflect that on the morning of June 23rd, that would be Monday morning, following his book-in on --

A.    Okay.

Q    --the 21st, that he was evaluated by several psych assessors and by psychiatrists there in the jail?

A.    Yes.

Q.    And do the records reflect that he was suffering auditory hallucinations and he was delusional?

A.    He reported auditory hallucinations.  I think the delusional thought content, to my recollection, comes in later in the records.

Q.    All right.  They're reflected at the time. He was set up for further evaluations the following day by --

A.    Yes.

Q    -- other psychiatric --

A.    Yes.

Q.    And is that the time at which or shortly following the diagnosis there, the evaluation that the medical staff did on the morning of June 23rd or shortly after that time, that he was allowed to be interviewed by the four television stations?

A.    Yes.  My memory is he was interviewed approximately around the noon hour or, I forgot it if was before or after, but it was sometime in the morning.  I have forgotten the exact time, sir.

Q.    All right.

A.    But -- on that date.

Q.    Following the television interviews on that day, was he then placed in suicide prevention?

A.    Yes.

Q.    And later evaluated?

A.    Yes.

Q.    And then later on, Doctor, was the evaluation made that he was suffering from substance abuse psychosis?

A.    I think that shows up in the records explicitly by Dr. Lane, one month later.

Q.    Is that around July 20, 2008?

A.    Huh?

Q.    July 20, 2008?

A.    Yes, sir.

Q.    All right.  And do the records reflect that he was started on a regimen of antipsychotic medications, sedatives, and antidepressants at that time?

A.    Yes.

Q.    That have continued to this day?

A.    Yeah.

Q.    Doctor, in reviewing all of these materials that were submitted to you, have you come to any conclusions about Mr. Broadnax's mental state, both at the time that he made the television interviews as well as at the time that the offense was committed?

A.    Yes, I have several.

Q.    And would you state for the Court what your conclusions are based on your training and experience, the research that you have done in the field and all the materials that were submitted to you for review?

A.    Yes.  Mr. Broadnax, he said that from the history that I have -- of the material and information that I have gleaned -- a typical pattern of him growing up in an impoverished environment.  He is an uneducated person.

There  is probably a family history of, family history of problems and distress that interfere with brain function and development and developing socially adaptable -- socially adaptable methods of living.

The records state that he had an intent to commit a burglary or a theft.  But had been a daily user of marijuana, and on or about the time of the commission of the alleged crime, he had smoked wet, which would include not only marijuana but PCP and formaldehyde as psychoactive substances affecting brain function.

So PCP is a hallucinogen.  It causes psychotic states, including hallucinations, and delusional thinking, which include an altered recognition of reality and understanding what is going on around you.

He claimed in the police report when asked or -- when asked about what, you know, why these things happened, he made a comment about his mind going

blank and seeing colors.  This is entirely consistent with hallucinations from PCP.

Q.   Let me interrupt you there, Doctor.  You say in the police report, meaning --

A.   It was in the interviews.  It was in the interviews.  And but that is consistent with, and I would like to take a moment to explain what that might mean.  And that is that under the influence of PCP, things can be surreal or unreal.

Almost as going through a cartoon or watching a life passing by.  It is called a dissociative anesthesia. It causes individuals to disassociate themselves from their current conditions. And you don't fully realize what is going on around you.

And his statements and what we know about the clinical pharmacology, PCP, are consistent with this occurring on or about the time of the incident.

Q.   Doctor, you mentioned that during his television interviews, he began reciting to the reporters about what happened at the time of the murders, is that his mind went blank and he saw colors?

A.   Yes.

Q.   Is that what is known in psychiatric patients as --

A.   Yeah, yeah.  It is an dissociative state in which there are hallucinations or distortions to your visual and auditory senses.  And you're not thinking about what is going on.

Q.   All right, sir.  And the use of wet permanently alters brain structure?

A.   Formaldehyde is an organic solvent that can cause neurotoxicity and alter brain development.  PCP itself wouldn't necessarily produce permanent and irreversible changes of the brain with the exception that there are a few studies showing that chronic use of PCP alters the neuro-development state of the brain in later life.

And in this particular case, I don't know whether the PCP has been chronic or not.  Marijuana has certainly been chronic daily for many years.

Q.   And marijuana usage alone alters the brain structure?

A.   Marijuana is certainly going to alter the developmental processes of the brain that are normally developing during the adolescence and growth.  Use in childhood is going to affect the neurochemimcal development of the brain in later life.

It is not an organic or toxic thing where brain cells or brain volume is diminished, but it

alteris the synaptic connections and the neurochemical processes.

Q.    You have talked about how drug usage or PCP, formaldelyde or even itself interferes with brain development in adolescents?

A.    Yeah.  So normally the brain developes over time.  There is the limbi system which are the lower, more primitive centers of the brain that are involved in emotional regulation.

And there is the cortical functions, the higher functions that involve cognitive and thought processes and particularly in the frontal cortex, that involves -- that develops in later life, usually not until your early 20's.

We in neuroscience surmise this is one of the reasons, this is the biologic explanation for why childhood and adolescence is associated with poor decision-making and poor impulse control and there is a process by which the human brain develops to learn to control itself.

And so Mr. Broadnax would be of the age and condition where those brain functions have not been very well developed, logical decision making, thinking about long term consequences, acting upon impulse and feeling rather than logic and reason.

Q.   Doctor, what you just said about Mr. Broadnax being of that age, you understand that he is 19?

A.   Uh-huh, yes.

Q.   And the statement that you made would be true of all 19 year olds?

A.   It would be.  It would be.  And but growing up in an uneducated, impoverished environment without good family social support networks, without good mentoring experiences and under the influence of substances, of course, makes it even more difficult to develop good functioning.

Q.   Would it be true that Mr. Broadnax because of those factors that his brain would not be as developed as a normal one?

A.   Yes.

Q.   And Doctor, let me ask you also, and do the records reflect that at some point he was diagnosed with substance induced psychosis?

A.   Yes.

Q.   By the medical professionals in the jail?

A.   Right.

Q.   And then at some point that resolved and then they just pushed it over to regular psychosis and he has continued to be treated for psychosis even after the substance psychosis had resolved?

A.    Right.

Q.    So the issue there is that the chronic use of drugs alters brain function.  Under the influence of drug intoxication, it produces a psychotic state.  It is not true that all PCP users become violent.

A.    Okay.  But there are clearly cases where that has happened.  And one of the things that the research field has concluded at this point may predict who becomes violent under the influence of PCP is if they have a maybe previously unrecognized mental disorder on the psychotic dimension.

And the fact that Mr. Broadnax repeat -- consistently recorded an ongoing history of hearing voices, the fact that there was a violent -- he reported being under the influence and experiencing PCP psychosis and drug-induced psychosis, and that now even after being in a sobering environment and no longer under the influence of substances, there seems to be a persistent pattern of this and a worsening of this diagnosed by a jail psychiatrist is entirely consistent with the idea that he may have fully developed now a psychotic syndrome.

Q.    Do the records reflect that he has continued to receive Risperdal during the course of his incarceration here in Dallas?

A.   The records that I reviewed, yeah.

Q.   And what is Risperdal?

A.   It is an antipsychotic medication used to treat schizophrenia.

Q.   Do they also reflect that he has been consistently prescribed a medication known as Trazadon.

A.   Yes.

Q.   And what is Trazadon?

A.   It is usually considered an antidepressant that has heavy sedative properties.  It is often used to treat depression or sleep disturbances or agitation in general.

Q.   And those are two of the medications that he has been prescribed since he has been booked into the Dallas County jail?

A.   Yes.

Q.   Doctor, are there any other conclusions that you would offer to the jury in regards to Mr. Broadnax other than what we have talked about here?

A.   I could only speculate about giving -- how all of these things impact and give a neuroscientific explanation for the grandiose sort of statements he was making to the news media.

Q.   Can you address that?

A.   So with the condition of possible familial

mental illness, a long history of poor brain development, underperformance on -- in terms of social functioning and development, once arrested and clear that he has been captured for a capital crime, when the media were interviewing him, that was his chance before the -- before society -- to explain how unhappy he was with things and how his life had not been good and expressing anger, contempt.

It was, it indicates the possible mania which would go along with schizoaffective illnesses and on that dimension. And it might just possibly explain how one could be led to that state, that he is having these schizo -- psychoaffective; physcotic drug-induced mood disturbances, psychotic disturbances and visual and auditory hallucination, thought disorders, that would lead one to brag about what he had done and that -- present himself as a powerful individual.

Q. Doctor, do the records which you have reviewed from the Dallas County jail indicate that Dr. Lane also believed or suspected that the defendant had developed schizoaffective psychosis?

A. Yes.

Q. Now, would the age of the defendant and these symptoms which you have noted in the jail records be consistent with the onset of schizophrenia in a

teenager?

A. Right. Schizophrenia usually has an onset in late adolescence, in the teenage years, yes.

Q. That would be consistent with it?

A. Entirely consistent.

Q. And are there any other things, Doctor, that we need to talk about?

A. I can't think of any.

MR. LOLLAR: We pass the witness.

MR. ALEX: May I proceed, Your Honor?

THE COURT: Yes, sir.

### CROSS-EXAMINATION

BY MR. ALEX:

Q. Doctor, my name is David Alex. I'm an Assistant District Attorney here in Dallas. I have got a few questions for you.

I am obviously not an expert in the field that you're in, so if my questions don't make sense to you or if you don't understand them, would you tell me that?

A. Yes, sir.

Q. All right. Very good. What I want to start off with, did you make a writen report as it relates to your findings and conclusions?

A. A very brief one that I gave to the defense

attorney.

MR. ALEX:  I'm going to approach.

Q.   (By Mr. Alex)  I'm sure what the Judge has is Defense Exhibit 1, and I'm assuming what I'm showing you here is a copy of that.

A.   Well, this is my curriculum vitae, not my report.

Q.   Okay.  All right.  Maybe I am confused.

MR. ALEX:  May I have this marked, Your Honor, as State's Exhibit 1 now?

THE COURT:  Be State's Exhibit 1 for the Rule 705 hearing.  Likewise, your defense exhibit, Defense Exhibit 1 is marked for the 705 hearing.

Q.   (By Mr. Alex)  What the Court Reporter has marked here as State's Exhibit 2, this is a written report that you --

A.   Yes, sir.

Q    --that you have made on the case?

A.   Yes.

Q.   Okay.  Fine.

MR. ALEX:  We would offer the exhibit, Judge.

THE COURT:  Any objection?

MR. LOLLAR:  No, sir.  However, what is State's Exhibit 1?

MR. ALEX: I don't know, Judge.

THE COURT: We will go off the record. This needs to be 1 for the 705.

Q. (By Mr. Alex) And so we are clear now, I'm showing you State's Exhibit 1 for the 705 hearing.

THE COURT: And I assume there is no' objection for the purpose of this hearing?

MR. LOLLAR: No, Your Honor.

THE COURT: It's admitted for the purpose of the hearing.

Q. (BY MR. ALEX:) And before I go any further, Doctor, I want to try to get as clear in my head as I can, when we say an expert opinion, in my mind, that means that I have reviewed a bunch of records, I have looked at everything that they have given me, and I have concluded something based on my expertise, okay?

Are we kind of on the same page with that?

A. Yes.

Q. And the question that was asked of you on direct about your conclusions or opinions, that was mixed in with a lot of factual stuff, so I want to be clear in my mind that when you get in front of the jury that I understand what it is you're actually saying is your expert opinion, okay?

Can we do that? Because I'm going to ask

You --

A.   All right.

Q   -- a couple of questions regarding that.  What I heard you say is your -- well, I will tell you what. Let's do it this way.

Can you concisely tell me what your expert opinion is in this case as it relates to the defendant's mental state at the time of the offense? Are you going to give an opinion regarding that?

A.   Yes.

Q.   Okay.  Now, that is great.  Tell me what your opinion is as succinctly as you possibly can.

A.   That he was under the influence of wet marijuana and including marijuana intoxication and PCP intoxication, possibly complimented -- complicated by formaldehyde intoxication.

Q.   Let me go slow too if you don't mind.  I'm a little --

A.   Under the influence of marijuana.

Q.   Gotcha.

A.   PCP and formaldehyde.

Q.   And your opinion is that he's under the influence of that at the time of the offense?

A.   Yes.

Q.   Is that right?  And the basis of that opinion

-- tell me what the basis of that is.

A.    From the review of records, which are entirely consistent with the quan -- the pattern of marijuana use --

Q.    When you say "review of records," I don't want to cut you off, but I want to -- at least I want to make sure I understand what you're saying.  Which records did you specifically rely on to determine at the time of this offense he was under the influence?

A.    His statements to the news media.

Q.    Okay.

A.    To the mental health evaluators in the jail. And to the -- I would need to double-check my own notes that I don't have in my possession. I apologize to the Court.

THE COURT:  That's all right.

A.    But I'm thinking he told the arresting officers as well.

I apologize to the Court, but I believe he told the arresting officers.

Q.    (By Mr. Alex) Okay.  So the things that he told to the news media, the mental health and any police officers.  And anything else that you have reviewed that you concluded that at the time of this offense he was under the influence?

A.   Um, I don't know, Judge, and I apologize for my ignorance here, but the defense attorney has also already verbally conveyed some history to me.

Q.   Okay.  All right.  And we haven't heard that yet, have we?  Okay.  So --

A.   May I clarify what history I'm referring to?

Q.   Sure. But let me just -- before we get to that.  So you're not saying that you are basing this on any objective observations that you made, all of this is statements by the defendant?

A.   Uh, no.  I mean, excuse me.  So it is statements in the record, yes.

Q.   To different people?

A.   Yes.

Q.   And my question is, and just so you understand what I'm trying to do is when we get in front of the jury, I need to try and figure out, first of all, what your opinion is and then what the basis is.

A.   Yes.

Q.   And if I believe the basis of the opinion is not rationally related to the basis, then I'm probably going to object.  If I don't, then I'm not going to object.  So I'm not trying to --

A.   I understand.

Q    --trying to get you into any kind of situation.

A.   I understand.

Q.   I'm just trying to see what all you have used to base the opinion.  So far, all I have heard is statements of the defendant and statements of the defendant's lawyer.

Anything else that you have looked at -- for instance, let me ask you this.  Are you making an opinion based on what happened on June 19th, the date of the offense as to what you have observed in the videos to the news media?

Is that a clear question or not?

A.   Um --

Q.   (By Mr. Alex) Is that part of your opinion or is it just based on --

A.   What I observed in the news video was the defendant's statements and behavior.

Q.   Okay.  And are you in any way sort of extrapolating back two days earlier, does that form the basis of your opinion on what happened?  You realize that the interviews were on the 23rd, is that what you --

A.   Yes, I understand that.

Q.   And what was the date of this offense?

A.   Um, let's see --

Q.   June 19th?

A.    June 19th.

Q.    Okay.  So we are talking about the 19th, 20th, 21st, 22nd, 23rd, some five days later that we are looking at a video?

A.    That's correct.

Q.    And what I'm trying to figure out is you're not -- part of your opinion is not based on what you saw five days later as to what happened on the 19th, is it?

A.    Um, I believe my opinion is based upon statements made both to the media on the 23rd, to mental health providers on the 21st --

Q.    That is what I am asking.

A.    And it is -- all of it is entirely consistent with the defendant's statements about his own pattern of use and substances used.

Q.    Okay.  All right.  And so the statements of the defendant are what you're relying on.  Am I hearing that correct?

A.    That is correct.

Q.    Okay.  Very good.  And what I have heard you say, and I'm not trying to be tricky, I just want to be clear, are you saying definitely that he was under the influence or you're just saying he was consistent with someone who was under the influence?

A.    I have heard him say it.  The mental health authorities of the jail concluded it.  I reviewed those records. And the pattern of behavior that I see is consistent with it.

Q.    Okay.  So can I state that your opinion is that his behavior is consistent with somebody who was under the influence at the time?

A.    Yeah.

Q.    Okay.  Very good.  And then your -- what you relied on was these statements that you told us about; is that right?

A.    I believe so.

Q.    I know you told us a lot of the facts that you looked at, and you know, the effects of drugs on a person and all of that.  And some people say that is your expert opinion, I accept that as that being you're the expert on that, okay?

But what I'm asking you is have you drawn any more conclusions as it relates to this case as far as an expert opinion?  And I will tell you one of the things I heard you say that sounded like an opinion, and that was, did you form an opinion of the state of mind of the defendant at the time he gave the interviews to the media.

A.    I -- I -- I did.

Q.    Okay.  And can you tell me what that opinion is, clearly defined, what the opinion is?

A.    I was attempting to give the -- our logical understanding of, based upon neurobehavioral development of how an individual would stand before the media and proclaim their involvement in such a crime.

Q.    Okay.  What is your opinion, sir -- that is all I'm asking you -- do you have an opinion as to what his state of mind was when he gave that -- those interviews?

A.    I believe he was still suffering from kind of the onset of schizoaffective illness, drug induced in part.  He was no longer intoxicated by PCP although he was still almost certainly under the influence of marijuana which produces a disinhibition.

So it is the emotional brain being activated without the logical brain thinking and reasoning about what is going on.  Add to that a grandiosity that is a mood disturbance associated with schizoaffective illness, that would make one in a very realistic way without logic and reasonable emotional thought brag about their powerfulness.

Q.    Okay.  Is that it?

A.    That is an opinion.

Q.    So when he is talking to the media, he is

suffering from a mental illness?

A.    Yes.

Q.    And that mental illness is schizoaffective.

A.    Yes.

Q.    And that is the opinion you're going to tell the jury?

A.    Um, yes.

Q.    Okay.  And he is also suffering from the effects of drugs.  You said marijuana and PCP.

A.    I'm saying that the PCP is no longer acutely intoxicating, but if he has used it repeatedly, and I don't know whether he has or not --

Q.    Okay.

A    --it would have altered the brain development. I do have an opinion that he has used marijuana chronically and was still under the influence of marijuana at the time.

Q.    So, and when we are talking about opinions, I mean you would agree with me that you're going to say that this is possible and that is possible, that is really not much of an opinion, right?  I mean, the thing is you're going to say for sure he was under the influence of marijuana?

A.    Right.

Q.    All right.  And you want to say that he was

possibly under the influence of PCP, is that it?

A.   Um, he is not intoxicated by PCP at the time, no.

Q.   And he is also suffering from grandiosity is what we talked about.

A.   Yes.

Q.   Would you label that a mental illness?

A.   Yes.

Q.   Okay.  And that is -- and that is it, right?

A.   Yes.

Q.   All right.

A.   You're asking about related to the interviews.

Q.   Related to the interviews.

A.   Yes.

Q.   All right.  And did you draw a conclusion about that as to whether he was being truthful, about whether he was being remorseful, about being any conclusion?

All of these things you're saying when I look at it, this is what I see from my expert opinion, are you drawing any conclusion about whether he was being truthful.

A.   No.

Q.   Okay.  About whether he was remorseful?

A.   No.

Q.    Okay.  Okay.  So his is it, right?

A.    Yes.

Q.    All right.  And the basis of that opinion is what?  Well, let me ask you this first.  Have you ever done any studies on -- strike that, Judge.

The basis of this opinion, is it just what you see in the video?

A.    Uh, what I see in the video combined with the history as revealed in both the written record and verbal communications with the defense attorney about his psychosocial history.

Q.    Okay.  And I will get to that in one second.  Combined history of what is in the written record and what is told to you by defense counsel; is that right?

A.    Yes.

Q.    Okay.  All right.  And then other than these two opinions, is there any other opinion that you're going to be giving this jury that is based on your exspertise?

A.    I just don't know the answer to that question because I think I have stated previously for the record what my opinions were.

And so, I'm not sure if you're trying to just say I have only formed one opinion or not.

Q.    Well, Mr. Roache, you understand the reason

for this hearing is, is so that we get to know what your opinions are really clearly so when we walk out of here, nobody should be wondering about what your opinions are --

A.    Okay.  So, I have listed before.  I guess I need to list again.

Q.    Well, that is why I get to cross examine you, Doctor, I mean, you have listed in the report but what I'm saying --

MR. LOLLAR:  Excuse me.  If the witness could finish his train of thought before he interrupts him with another question.

A.    It is obviously my opinion was he was under PCP psychosis --

MR. ALEX:  Judge, my only concern is when counsel asked him what his conclusions were he gave a lot of things that were just facts in the record, and at this point, when I leave out of here, I need to know what his opinions are going to be in front of the jury.

THE COURT:  I'm going to let you develop it.

Q.    (By Mr. Alex)  Okay.  Other than the drug problem and the other two opinions that you are going to give to the jury, what are the other opinions?

A.    Okay.  So the chronic history of polysubstance

use.

Q.   Okay.

A.   Under the influence of PCP, marijuana and formaldehyde at the time of the crime.  Onset of a schizoaffective illness.  Evidence -- I have an opinion or it is evidence, I'm having trouble making these distinctions as you are, but for polysubstance use and induced psychosis, so psychotic behaviors.  At the time of the offense and subsequent to that.

Q.   Will you repeat that for me one more time?

A.   Drug induced psychosis at the time of the offense and subsequent to that where in the midst of what Dr. Lane diagnosed it as psychosis, that he has an onset of probably schizoaffective illness.

Q.   Okay.  And the onset of schizoaffective in your opinion was what?

A.   He was reporting regular auditory hallucinations consistently through the written record that I have observed.  Those are the facts.  This is consistent with an onset of schizoaffective illness at the time of the -- and throughout this time period.

Q.   At the time of the what?  At the time of the offense, is that what you're --

A.   Well, it is hard to disentangle what is drug induced and under the influence of the drug as opposed

to what is the delayed emergence of a brain disorder.

Q. Doctor, I'm not trying to argue with you. I'm just trying to figure out what your opinion is. Is your opinion that at the time of the offense, he was suffering from schizoaffective illness; is that one of your opinions?

A. He was the very early signs of it, yes. He was experiencing an onset of the illness, yes.

Q. Okay, thank you, sir.

Anything else as far as what jury opinion is?

A. Um, I believe I have said it all.

Q. Okay. And you understand that if you make a report and you say my opinion is one, two, three, four and five, and I see that as pretty clear, right?

A. Uh-huh.

Q. And then if you get on the stand in front of the jury and you give another opinion, you understand I have the right to object; is that right?

A. Yes.

Q. Okay. So if I'm not clear what your opinions are, then we really can't distrust them. They didn't take place. So you didn't write down what your opinions were going to be in the trial, did you?

A. Um, I tried to give a brief synopsis of what

conclusions I could draw.

Q.    All right.  Very good.  And would you do me a favor?  If you draw any more conclusions or opinions that weren't covered in this hearing, would you let me know what they are so that in case we need to have another hearing before you get in front of a jury?

A.    Yes, sir.

Q.    We have that agreement?

A.    Yes.

Q.    Very good.  And if there is any other information that you have used in basing these opinions, would you let me know that as well?

A.    Yes.

Q.    Okay.  Very good.  And then finally what is it that the defense attorney told you about this defendant or this case that is a basis of these opinions?

A.    Um --

Q.    Well, let me ask you this first, do you have that in note form?  Did you make notes of that, what he told you that is the basis of this --

A.    No, sir, I actually don't.

Q.    So it is all up in your head?

A.    It is.

Q.    Do you have any notes with you today?

A.    Um, I didn't come prepared with all my notes,

no, sir, I didn't.

Q.    But you knew you were coming for a hearing in which you would have to qualify as an expert and give opinions and the basis of the opinion?

A.    Yes, sir.

Q.    And part of that are the notes.  And you're saying there is no notes in here about what the defense attorney told you about the defendant in the case?

A.    No, sir.

Q.    Why wouldn't you make notes of that?

A.    Um, I -- I -- I thought the basis of my testimony was based upon the records and I didn't know the admissibility of anything that the defense attorney would or wouldn't tell me.

Q.    Okay.  Did you just tell this Court that part of the basis of your opinions are what the defense attorney told you?

A.    I was -- I'm sorry -- I was informing the Court of the fact that the defense attorney did say some things about the individual's past history.

THE COURT:  That did not form any part of the basis of your opinion?

THE WITNESS:  Yes, sir, it does.

THE COURT:  It does.

THE WITNESS:  The -- the -- the opinion

that, uh, that goes to the issue of brain development, that part of the opinion. Not -- not that he was under the influence of marijuana. Not that he was experiencing psychosis. Not that he was under the influence of PCP. It has no bearing on those opinions.

Q. (By Mr. Alex) Okay. Well, tell me what it was he told you that formed the basis of any of these opinions?

A. Um, that the individual was not employed. That the individual, Mr. Broadnax, was -- had a broken home. That he reported chronic patterns of marijuana use although that also is in the written record as well.

Q. Is that it?

A. That is it.

Q. Your opinion he is not being very well educated, where did that come from?

A. Well, that is actually in the record. 9th grade education, I believe.

Q. Okay. And that is your basis of saying that he is uneducated. Nothing about what the defense attorney told you?

A. Well, both. It is in the record that he has a ninth grade education, yes.

Q. And the poverty, did that all come from him

telling you about his broken home?

A.    Yes.

Q.    Okay.  And there is no way --

A.    Well, and being unemployed.

Q.    And there is no way for you to give me any specifics as to what he told you about him being from a broken home or about --

A.    Um --

Q.    And there is no way for you to give me any specifics as to what he told you about him being from a broken home or about --

A.    Um --

Q    --his education or about his poverty?

A.    The specifics are that, um, he, uh, was, um, didn't have a father in his life.  That his mother had -- I don't want to give testimony when I don't have the written record about those things.

But what I have in my mind, sir, and I'm sorry, I don't have it in writing, is that he did not have a two parent home in which he was brought up. That he was employed.

And um, that he had a chronic pattern of other substance use.  But that is also in the record. So those are the things that he said to me.

But in the record is the fact that he has a

ninth grade education and the fact that he reported daily marijuana use.

Q. Okay. And if you would get with your notes later and you find things there that are beyond this, you would let me know that as well, would you not?

A. Yes, sir.

Q. Okay. Very good. And noting then what you have just told the Court for the basis of these opinions including what the defense attorney has told you, are there any other interviews that you did?

A. No.

Q. Did you ever interview the defendant?

A. No.

Q. Do you know if any were done?

A. Do not.

Q. You have -- you have testified, or one of your basis of your opinions was that the development of the brain of an adolescent; is that correct?

A. That's correct.

Q. All right. Would a brain scan at all help in that type of testimony of the defendant?

A. Um, may I ask for clarification? Are you asking would a scan of his brain tell us whether it was less developed than an average 19 year old? Is that your question?

Q. Well, I think what your opinion was, about that adolescent's brain compel -- and I'm not a doctor, okay, so forgive me -- but are you better -- and I don't want to ask you to repeat it again because you said it a couple of times -- but is it your opinion that the adolescent's brain develops shorter than others?

A. Adolescence is a process of developing to the adult brain.

Q. Okay. And the question that I'm asking you is that in, to your knowledge, nobody has ever imaged the defendant's brain; is that right?

A. Not to my knowledge, I wouldn't know.

Q. And your expertise in brain imaging, you have expertise in that area?

A. I have published in the area.

Q. Okay. And are you saying that imaging the defendant's brain would do you no use in giving this opinion?

A. Um, I guess I would have to say that because my specific expertise is not in brain imaging. I read that literature. I have published on the subject. But I cannot -- I cannot -- I'm not a neurologist to evaluate a brain image. I work with neurologists who are.

Q.    So you're really not qualified to give an opinion on brain imaging and that --

A.    I am -- I do -- am qualified to give an opinion on brain imaging. I can't interpret -- I'm not -- I'm not the neurologist. A neurologist does that. I'm qualified to state what the neurologists' conclusions are.

Q.    You want to give this jury an opinion about the conclusion of the neurologist but you're not qualified to give it. Is that what you're saying?

A.    Um, Judge, may I explain --

I'm having trouble with understanding what I am being asked. I'm qualified to give --

THE COURT:    That is what happens when you get two guys that are geniuses to talk to each other.

A.    I know. I know. I'm qualified to give opinions about substance abuse, behavior as a clinical pharmacologist. I am not a neurologist. Neurologists interpret the image itself. If you brought me a picture of his brain, I would take it to a neurologist. But I am well read in the literature. I am published with neurologists in studies looking at drugs and brain development. So I am getting tripped up by the technicalities here. But I can't look at the image.

Q.    (By Mr. Alex) Okay.

A.    A neurologist could and I would be able to interpret what the neurologist says.

Q.    Okay.

A.    Is that clear?

Q.    Yeah.  That is.  And as it relates to your opinion about the development of the brain, that is all I was trying to figure out.  You're going to give to this jury an opinion about the development of the brain?

A.    I'm a translational scientist.  I'm trying to convey in every day language what the field and we as a collaborative team of scientists that involve a variety of expertise come together and conclude about brain development.  I have done such studies.  I'm continuing to do such studies, and I work with other experts who do those studies.

Q.    And I'm not -- I'm not arguing with that or even asking that.  I'm just asking you about your opinion as to the brain development of an adolescent. You said you were going to give that opinion; is that right?

A.    I can.  And I have tried to articulate what the field knows about brain development, yes.

Q.    And you're saying to me that a scan from your knowledge of the field, a scan of the defendant's brain

will not help in that opinion?

A.   Um, what the field, the state of the art of what we know about brain development, I have tried to describe normal brain development of a normal 19 year old.  And further, I have stated what the field knows about how drugs can alter that brain development.

The state of the art is not such that we can look at his brain and say it's -- it would show a difference if it was looked at by a neurologist -- if a neurologist looked at it, it would show -- a drug impaired brain would look different than a normal non-impaired drug brain.

Q.   Thank you, sir.  And you're giving an opinion upon a person who is -- you're saying has been using drugs for all of his life but you are not interested in taking a picture of his brain to see if that corroborates that, right?

A.   Um, my interest, I think I would be interested in seeing that picture but, you know --

Q.   Okay.  All right.

A.   But I mean, I'm sorry --

Q.   And just finally, I didn't ask you about any specific publications or research articles as it relates to -- I think in your CV you listed all of the things that you were involved in, any specific

publications or research articles as it relates to any of the specific drugs we are talking about, PCP or formaldehyde?

A.    No.

Q.    Because I don't think I saw any in here of PCP or formaldehyde?

A.    There are not.

Q.    Okay.  And so there is none that you're relying on --

A.    I have worked with polysubstance abusers for a long time.  I publish mainly on other drugs.  I have not published an article on PCP.

Q.    Or formaldehyde?

A.    That's correct.

Q.    Okay.  And did you rely on any articles on PCP or formaldehyde in forming an opinion?

A.    Uh, published in the literature, yes, I did.

Q.    Okay.  And what were those?

A.    I didn't come up here with my briefcase full of things and I cannot quote all of those articles to you.  I can provide a list to the attorneys if you wish.

Q.    Well, sir, you're giving this Judge an opinion on PCP and formaldehyde, and you have not done any research --

A.    I have --

MR. ALEX:    Let me finish my question, Judge.

THE COURT:    Yes.

Q.    (By Mr. Alex) And you're giving this Court An opinion on the effects of PCP and formaldehyde, And many of your opinions are based on that, you have not done any research on and you didn't bring the article --

A.    I actually have a few in my briefcase.

MR. ALEX:    And let me finish my question, Judge, please.

THE COURT:    Don't talk at the same time.

Q.    (By Mr. Alex) But you did not bring any articles -- you didn't bring any of the names of the articles you used in forming those opinions; is that correct?

A.    I didn't carry them up to the stand, that is correct.

Q.    But you have them here?

A.    I actually have some in my briefcase.

Q.    Okay. And I can -- I would like to put those on the record, Judge, if we can, because we --

THE COURT:    Hold on.  Go get them.

(Pause in proceedings)

THE WITNESS:    Judge, may I address the

Court?  May I address you?

THE COURT:  Sure.

Off the record.

(Discussion held off the record)

THE COURT: Hold on.  Hold on.

Go ahead, Mr. Alex.

Q.   (By Mr. Alex)  And the articles that you relied upon in forming your opinions, specifically as it relates to PCP and formaldehyde, can you give us what those articles are?

A.   There are four articles here.

MR. ALEX:  May I approach the witness, Judge?

THE COURT:  Yes, sir.

Q.   (By Mr. Alex) And do I have copies of these already?

A.   No, sir.

Q.   Is it --

MR. ALEX:  It will be a lot faster, Judge, if I can have somebody who will run the copies while we are talking.  Do you have more than one copy or not?

A.   That is all I have got with me.

Q.   Well, I will do it afterwards if that is okay.

A.   Please.

Q.   I will make copies if that is okay.  You have

got four articles.

A.    Okay.

Q.    And can you put these names on them for the record?

A.    There is one, published by Mendick & Fields on Acute Psychotic Reactions Considered Dipto Intoxication, published in the Journal of Emergency Nursing, Volume 28, Page 432, 2002.  There is one by Marsu, Delkas & Hickson.  I don't know, other than giving you these, if you want to take the time to spell those names or not.

Q.    We will offer them for the record when we are making copies if that's okay.

A.    Entitled Neuropsychological Effects of Formaldehyde Use, published in the Journal of Psychoactive Drugs, Volume 40, Page 207.  That is published in 2008.

There is one I don't actually think will help the Court at all, so I'm not going to refer to that one.

One by Peters, Hilder, Meshak, Yucubian, McCremens and Ellish, published in Substance Abuse -- Substance Use and Misuse, Volume 40, Page 63 in 2005.

Q.    Okay.  And those are primarily the articles you have relied upon up to this point; is that correct?

A.    That combined with my years of experience and reading other articles. These are just three that I happened to grab and be reading recently.

Q.    Okay.  Very good.  And then the one that you're saying isn't going to help us very much, what is that one?

A.    This is just a more general review article that talks about aggressive behavior in general.

Q.    Do you mind if I get a copy of this?

A.    No, you can have it.

Q.    Okay.  Very good.  And then, Doctor, how many times have you testified in this area before?

A.    Um, this is only the second time I have been on a capital case.  I have testified in criminal and civil cases about drugs of abuse.

Q.    Okay.  I guess my question is -- I will be more specific.  How many times have you testified about the effects of PCP and formaldehyde on a person in any case as an expert before?

A.    Zero.

Q.    Zero?

A.    Uh-huh.  First time.

Q.    Okay.  And that is not the area of your research?

A.    The effects of drugs on the brain and behavior

are the area of my research. I have worked with polysubstance abusers for 25 years, many of whom have used PCP. I haven't published an article on PCP.

Q. Okay. And how are you -- and let me ask you this, you're not a person whose -- you're a teacher; is that correct?

A. I'm a researcher.

Q. Okay. And how did you come to get involved in this case? Were you contacted by the defense, or were you solicited as a defense witness?

A. I was contacted by the defense.

Q. Do you advertise or solicit as an expert?

A. No, I don't.

Q. Okay. So they solicited you for this case?

A. That's correct.

Q. Very good. And what do you make for testifying, how much do you make?

A. Um, I have a fee -- for testifying?

Q. Yes, sir. Well, for this case. I mean, I want to be specific for this case.

A. I charge $200 an hour for doing research. And I charge for spending the day to travel up here, um, um, I think it is $1,500.

Q. All right. Thank you, sir.

MR. ALEX: That is all.

THE COURT: Redirect?

MR. LOLLAR:  Brief redirect.

REDIRECT EXAMINATION

BY MR. LOLLAR:

Q.   Let me ask you this.  One of the things that you said you reviewed in arriving at the conclusions that you did about Mr. Broadnax's mental state were the videotaped interviews that he conducted with the four television stations?

A.   Yes, sir.

Q.   And is it fair to state that part of your conclusions were based on your observations of the defendant during those interviews?

A.   Yes.

Q.   As well as what he said and the context of what had happened during the night of the murder.

A.   Yes.

Q.   And specifically, the part where he is talking about his mind went blank and he saw colors.  Saw nothing but colors.

A.   Yeah.

Q.   And that is significant to you as a clinical pharmacologist because of why?  Why is that significant to you?

A.   Because those are symptoms and signs of the

drug effects and the drug intoxication and state.

Q.    Very good.  Thank you.

MR. LOLLAR:  That is all we have.

THE COURT:  Any recross?

MR. ALEX:  No, sir.  Thank you.

THE COURT:  Okay.  May the witness be excused for the purposes of this hearing?

MS. SMITH:  Yes, sir.

THE COURT:  You may step down, Doctor.

Is there any objection to the doctor testifying?

MR. LOLLAR:  No.

THE COURT:  Good.  The Court has made the appropriate balancing test for determining a fact in issue.  The jury could use that in determining the weight --

MR. LOLLAR:  I'm assuming this is a guilt/innocence --

It goes to the diminished capacity of the defendant

THE COURT:  I will see the parties in chambers.

(Off-the-record discussion was had.)

(Court adjourned.)

THE STATE OF TEXAS )

COUNTY OF DALLAS.)


     I, SHARON HAZLEWOOD, Official Court Reporter in and for Criminal District Court No. 7 of Dallas County, State of Texas, do HEREBY CERTIFY that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     Witness my hand this the _30th_ day of _June_, 2010.


_____Sharon Hazlewood_____
SHARON HAZLEWOOD, CSR
Certified Shorthand Reporter
Official Court Reporter
Criminal District Court No. 7
972-739-3906
Texas CSR No. 628
Expiration Date:  12/31/10

Reporter's Certificate

STATE OF TEXAS )

COUNTY OF DALLAS )

I, Natasha Spoerl, Deputy Official Court Reporter in and for the Criminal District Court 7 of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court and were reported by me.

I further certify that this transcription of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that Dallas County did not pay a substitute court reporter while I prepared this transcript.

WITNESS MY OFFICIAL HAND this the ___15th___ day of ___January___, 2010.

_____Natasha Spoerl_____
Natasha Spoerl, Texas CSR #8410
Expiration Date: 12/31/2010
Deputy Official Court Reporter
Criminal District Court 7
Frank Crowley Courts Building
133 N. Industrial Boulevard
Dallas County, Texas
Dallas, Texas 75207-4313
(214)215-5858 (972)563-6650 Fax

**NATASHA K. SPOERL, CSR**
Acting Official Court Reporter