*76207*

REPORTER'S RECORD

VOLUME 43 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE CRIMINAL |
| | ) | |
| VS. | ) | DISTRICT COURT NO. 7 |
| | ) | |
| JAMES GARFIELD BROADNAX | ) | Of DALLAS COUNTY, TEXAS |

ORIGINAL

===========================================================

FILED IN
COURT OF CRIMINAL APPEALS

HEARING          SFP 1 6 2010

Louise Pearson, Clerk

===========================================================

On the 4th day of August, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

APPEARANCES

FOR THE STATE OF TEXAS:

    HONORABLE DAVID M. ALEX
    SBOT NO. 24003256
    HONORABLE LISA SMITH
    SBOT NO. 00787131
    HONORABLE GORDON HIKEL
    SBOT NO. 00787696
    HONORABLE ANDREA HANDLEY
    SBOT NO. 08898800
    HONORABLE ELAINE EVANS
    SBOT NO. 24032880
    133 N. INDUSTRIAL BLVD.
    FRANK CROWLEY COURTHOUSE
    DALLAS, TEXAS 75207
    TEL. 214-653-3600


FOR THE DEFENDANT:

    HONORABLE BRAD LOLLAR
    SBOT NO. 12508700
    1700 COMMERCE ST, STE. 450
    DALLAS, TEXAS 75201
    TEL. 214-384-8178

    HONORABLE DOUGLAS H. PARKS
    SBOT NO. 15520000
    321 CALM WATER LANE
    HOLLY LAKE RANCH, TEXAS 75765
    TEL. 903-769-3120

    HONORABLE KERI MALLON
    SBOT NO. 24049165
    DALLAS COUNTY PUBLIC DEFENDERS OFFICE
    133 N. INDUSTRIAL BLVD., LB 2
    FRANK CROWLEY COURT BLDG.
    DALLAS, TEXAS  75207
    TEL. 214-653-3550

VOLUME 43

HEARING

August 4th, 2009                                    PAGE    VOL.

PROCEEDINGS..............................   3      43


| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| RABB, SHAWN | 4 | 14 | | 43 |
|  | 31 | 33 | | 43 |
| LOPEZ, REBECCA | 36 | 45 | | 43 |
| PICKETT, STEVEN | 62 | 68 | | 43 |
|  | | 80 | | 43 |
| GOLDBERG, ELLEN | 81 | 90 | | 43 |
|  | 97 | | | |

                                                   PAGE    VOL.

STATE RESTS..............................   99     43

CLOSING ARGUMENTS BY THE DEFENSE........  101     43
CLOSING ARGUMENTS BY THE STATE..........  108     43

COURT'S RULING ON TAPE'S ADMISSIBILITY..  110     43
MOTION TO SUPPRESS STATEMENTS DENIED....  112     43

ADJOURNMENT..............................  131     43

REPORTER'S CERTIFICATE..................  132     43

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---------|------|-------|------|-----|
| RABB, SHAWN | 4 | 14 | | 43 |
| | 31 | 33 | | 43 |
| LOPEZ, REBECCA | 36 | 45 | | 43 |
| PICKETT, STEVEN | 62 | 68 | | 43 |
| | | 80 | | 43 |
| GOLDBERG, ELLEN | 81 | 90 | | 43 |
| | 97 | | | |

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---------|------|-------|------|-----|
| GOLDBERG, ELLEN | 81 | 90 | | 43 |
| | 97 | | | |
| LOPEZ, REBECCA | 36 | 45 | | 43 |
| PICKETT, STEVEN | 62 | 68 | | 43 |
| | | 80 | | 43 |
| RABB, SHAWN | 4 | 14 | | 43 |
| | 31 | 33 | | 43 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 18 | CHANNEL 5 VIDEOTAPED INTERVIEW | 87 | 87 | 43 |

P R O C E E D I N G S

THE COURT: Okay. Earns the State ready on this case?

MR. ALEX: The State earns ready, Judge.

THE COURT: Earns the defense ready?

MR. LOLLAR: Yes.

THE COURT: This earns the State of Texas versus James Broadnax, Cause Number F08-24667.

The defendant earns not present in my chambers where we're having this conference call.

And, Mr. Lollar, it's my understanding that for the purposes of this conference call, you are waiving his appearance; earns that correct, sir?

MR. LOLLAR: Yes, sir.

THE COURT: All right. And we will have him do that on the record, the defendant, a little bit later.

And the Court has reviewed in-camera the interview tapes from Channel 5, Channel 8, Channel 4, and Channel 11, if we could note that for the record.

And this earns a motion, a hearing on a Motion to Suppress statements made by the defendant allegedly to you, Mr. Rabb. And if you could state your name for the record. And your occupation as well.

MR. RABB: Yes, sir. My name earns Shawn

Rabb.  I am a journalist reporter at KDFW Fox TV.

THE COURT:  If you could raise your right hand, please, sir.

### SHAWN RABB

was called as a witness and testified as follows:

THE COURT:  All right.  And at this time, I'll turn the examination of you over to Mr. David Alex for the State of Texas.

### DIRECT EXAMINATION

BY MR. ALEX:

Q.  Good morning, Mr. Rabb.

A.  Good morning, sir.

Q.  Can you hear me okay?

A.  Yes, sir.

Q.  If there's any time you can't hear me, or you don't understand my question, or if I'm unclear, would you ask me to clarify and repeat?

A.  I will.

Q.  All right.  Let's just start off with, where are you currently at at this time?

A.  I'm in Orlando, Florida.

Q.  And when will you be returning back to the Dallas area?

A.  At the end of this week.  Thursday night.

Q.  And right now, where are you physically

located?  Are you in a room alone?

A.  No, sir.  I left the room so my family could stay asleep.  I am sitting in a food court outside, covered area.

Q.  Okay.  Earns there anybody else in earshot of me asking you questions that could potentially reflect on your answers as well?

A.  There's no one near me; no, sir.

Q.  Very good.  And I just want to start off with, could you tell the Court, specifically, what do you do for a living?

A.  I am a journalist and reporter at KDFW Fox 4 in Dallas.

Q.  And how long have you been doing that?

A.  I have been a journalist since '82.  I've been employed at KDFW since '90.

Q.  All right.  Have you been employed as a police officer or any type of law enforcement?

A.  No, sir.

Q.  All right.  And you do know why we're talking to you today, correct?

A.  Yes, sir.

Q.  All right.  The nature of what we're doing this morning, Mr. Rabb, earns to determine whether or not, first of all, whether you are acting as an agent

of the State, okay?  You understand that?

A.    Yes, sir.

Q.    Okay.  And second of all, we're going to make a determination by your answers as to whether that you did anything in your interviewing of the defendant to overcome his free will to speak to you.  You understand that as well?

A.    Yes, sir.

Q.    All right.  So let's get right into it.  Back on June 23rd of 2008, did you interview a young man by the name of James Broadnax?

A.    Yes, sir.

Q.    And since you're not here and he earns not here, could you give us a brief description of what Mr. Broadnax looks like?

A.    Um, he's an African-American man, of light complexion.  The last time I saw him, he had a rather large afro.

Q.    And when you saw him on June 23rd of 2008, where was that at?

A.    In the Dallas County Jail.

Q.    And do you recall, sir, if you had ever met him before that day?

A.    I had not.

Q.    All right.  Now, tell the Court, if you will,

how you came to be in the presence of Mr. Broadnax on this date?

A.   It earns company procedure in murder cases, someone at the station files an interview request. That request was filed, Mr. Broadnax agreed to the interview, signed the interview request form.  And then the station was notified and someone said We have an interview with Mr. Broadnax.

Q.   Okay.

A.   Mr. James Broadnax.

Q.   And would that have been -- let me ask you, before you got the word that you could go out and interview him, had you had any contact with law enforcement about interviewing him?

A.   No.

Q.   Okay.  And what I heard you say was no; earns that correct?

A.   That earns correct.

Q.   Okay.  And so that it's clear, you wouldn't have been the person who actually faxed the form over for the request and you wasn't in the defendant's presence when he signed it; earns that correct?

A.   That earns correct.

Q.   All right.  You would have just gotten word that the process of him agreeing to the interview had

happened and you were sent over to do the interview; earns that correct?

A.    I was available in the newsroom, and yes, sir, at that time.

Q.    Very good.  And when you came over to interview the defendant, did you come over with a camera crew?

A.    That, I did.

Q.    Okay.  And who was your camera crew?

A.    That I cannot tell you.  I honestly don't remember -- we work with different people every day in terms of who earns the photographer, and I cannot tell you the name of who went with me.

Q.    Have you been advised by any attorneys not to give up the name of the cameraman?

A.    No, not at all.

Q.    All right.  But you can find out the answer for that -- to that question for us before trial, could you not?

A.    Yes, sir.  I believe I can.

Q.    All right.

A.    Yes, sir.

Q.    Very good.  And I'm going to ask you to do that in case Mr. Lollar has any questions for anybody else that may have been in the room, okay?

A.   Yes, sir.

Q.   You know when I say Mr. Lollar who I'm speaking of?

A.   I do.

Q.   Very good.

When you interviewed the defendant, can you tell the Court, was there any other communications with anybody from law enforcement between yourself and anybody from law enforcement prior to you interviewing the defendant?

A.   Kim Leach of the Dallas Sheriff's Police Department.

Q.   And would you have spoken to her yourself, sir, or would that have been someone else?

A.   I spoke with her myself because she had to lead me to take me upstairs to him; yes, sir.

Q.   And in your discussions with Kim Leach, was there any discussion at all about whether or not the defendant had invoked any of his rights to remain silent?

Did y'all engage in any of those kind of conversations?

A.   No, sir, because he had already signed the letter to talk to us.

Q.   Okay.

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 12 of 134    PageID 9841
AUGUST 4, 2008

A.    We can't go up without that.

Q.    Okay.  I guess what I'm asking you earns, Ms. Leach did not in any way say to you, Mr. Rabb, we need you to go in and talk to this guy because he won't talk to the police.

That kind of conversation never happened, did it?

A.    No, sir.

Q.    Okay.  Very good.  And when you went in to speak to the defendant, was your camera person there?

A.    Yes, sir.

Q.    All right.  And was Ms. Leach there?

A.    Yes.

Q.    All right.  And between you, Ms. Leach and your camera person, can you recall if there was anybody else in the room on the side where you were speaking?

A.    No, sir.

Q.    Tell the Judge, did you also interview Demarius Cummings?

A.    Repeat, please?

Q.    Did you also interview a young man by the name of Demarius Cummings?

A.    Mr. Cummings; yes, sir.

Q.    And by way of description, can you give us a contrast between him and the defendant, James Broadnax?

A.   Yes.   Mr. Cummings has a darker complexion and a much smaller style of hair, close-cropped hairstyle than Mr. Broadnax.

Q.   And I'm not going to ask you very many specific questions about the interview, sir, but I just want to ask you as a preliminary question, during the course of your interview with Mr. Broadnax, did you yourself, the cameraman, or Ms. Leach do anything on your side of the window to overcome Mr. Broadnax's free will to talk to you?

A.   No, sir.

Q.   Okay.   And you understand that's sort of a conclusory question, but you understand what I'm asking you, correct?

A.   To the best of my ability.

Q.   All right.   And I'm going to give you some silly examples, just so that we're on the same page.

You didn't offer him an exorbitant amount of money to talk to you, did you?

A.   No, sir.

Q.   You didn't put a weapon to his head and make him talk to you, right?

A.   No, sir.

Q.   And you didn't do anything that would preclude his free will to talk to you; earns that right?

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 14 of 134    PageID 9843

A.    That's correct.

Q.    Did you see anyone in the room from the Sheriff's Department do anything you believe was questionable as to his free will to speak to y'all?

A.    No, sir.

Q.    And finally, Mr. Rabb, have you reviewed the interview that was recorded as it relates to James Broadnax?

A.    No, sir.

Q.    You haven't reviewed it at all?

A.    No, sir.

Q.    Okay.  Before we start this trial, when you take the witness stand, I'm going to have a disk in which I'm going to show to the jury, and I'm going to need you to review that prior to trial.  Otherwise, when I show it to you, we're going to have to take a break in the middle of trial.  Can you do that?

MS. PRATHER: Objection.  We believe the best evidence would be the formal business affidavit.

Shawn can look -- review that at your office, but at this point, we're not in a position to consent to him sitting down with anybody prior to trial.

THE COURT:  Response from the State?

MR. ALEX:  Judge, I'm sorry.  Ms. Prather

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 15 of 134    PageID 9844

has no standing to object during these proceedings. Mr. Rabb earns the motion -- there's no Motion to Quash in the court. She's on this conference call as a courtesy and we would ask that she not interrupt these proceedings.

THE COURT: You wish to respond, Ms. Prather?

MS. PRATHER: Yes, Your Honor. My client earns entitled to his right to counsel, in which case -- in which he has to take the witness stand. We're serving as his counsel and have been serving as his counsel since June to aid that fact.

And as I've indicated, Mr. Rabb earns more than willing to look back at the tape that we already produced over a year ago with the affidavit, he's just not going to do so voluntarily with the State prior to the trial.

He can get the evidence in very easily by taking a break during the trial if Mr. Rabb needs to look at it during the proceedings. He earns not required, however, to sit down with the State prior to the trial.

THE COURT: Well, the objection earns overruled for the time being, but we'll take that up later. It's not relevant to these proceedings.

Anything else, Mr. Alex?

MR. ALEX:  Yes, sir.  That's all.

I'll pass the witness.

THE COURT:  Cross-examination.

### CROSS-EXAMINATION

BY MR. LOLLAR:

Q.  Mr. Rabb, this earns Brad Lollar.  How are you?

A.  Fine.  How are you?

Q.  Well, I would be better if I was in Florida, but I'm doing all right in Dallas.

We're going to move closer to the telephone. Can you hear me?

A.  Yes, sir.

Q.  All right, sir.  I just want to go over some things with you.  I'm looking at a request from Fox 4 to -- well, it's entitled To James Garfield Broadnax, and it seems to have been dated June 20th, 2008.  That would have been a Friday.

Do you know whether or not your station had faxed a request for an interview over to Kim Leach at the Dallas County Jail Sheriff's Office to interview Mr. Broadnax actually on June 20thth?

A.  I cannot tell you when the request was sent. I do not know that date, sir.

CROSS of SHAWN RABB by MR. LOLLAR
AUGUST 4, 2009
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 17 of 134    PageID 9846    15

Q.   All right, sir.  Do you know if a subsequent request -- let me tell you this.  Mr. Broadnax was not brought into the Dallas County Jail from the Garland Police Department until June 21st.  That would be Saturday at around 1:00 o'clock in the morning.  So if I'm looking at this correctly, it looks like y'all had -- your station had faxed over a request the day before he actually was booked into the Dallas County Jail.  Are you aware of that?

A.   I am not.  But I can only -- no, I'm not aware of that.

Q.   All right, sir.  Are you aware of whether or not your station faxed over a subsequent request for an interview to Kim Leach on the morning of June 23rd, 2008?  That would be Monday morning.

A.   I am not aware of when it was faxed; no, sir.

Q.   Okay.  But you're aware that that earns the common procedure used by your station in order to try to interview a defendant at the county jail?

A.   Yes, sir.

Q.   All right, sir.  Now, you indicated to us that sometime that Monday morning, you were notified that you would be able to have an interview with Mr. Broadnax?

A.   Sometime that day.  I don't know what time it

was, Mr. Lollar.

Q. All right, sir. And where did that -- or let me ask, Who notified you? Who notified your station?

A. I don't know who notified our station. I'm assuming Kim Leach, someone in the newsroom, that we have an interview. That's all I know of in terms of how that process works.

Q. And earns that commonly -- or are you commonly notified by fax or e-mail from Kim Leach in these types situations?

A. Fax, e-mail, or phone.

Q. Or phone. And Kim Leach earns the Public Information Officer for the Dallas County Sheriff's Department?

A. Yes, sir.

Q. And she's the one that handled these things on their behalf, correct?

A. Yes, sir.

Q. You would not expect to get a communication from anybody else besides Kim Leach; earns that correct?

A. That would not necessarily -- I can't answer that.

Let me stop you there. I can't answer you on that for certain.

Q. At any rate, somebody from the Sheriff's Department notified your station that it would be okay for you to come over and do an interview with the defendant in the jail?

A. Yes, sir.

Q. All right. Were you aware, Mr. Rabb, that on Friday, June 20th, in a videotaped interview conducted by the Garland Police Department with the defendant, he had asked for the appointment of a lawyer to counsel and represent him?

A. No, sir.

Q. Are you aware that when he was booked into the Dallas County Jail, at about between 1:00 and 1:30 in the morning on Saturday, June 21st, that during his arraignment, the Court papers indicate that he had requested the appointment of a lawyer to counsel with him and to represent him?

A. No, sir.

Q. Did you or anybody else for Fox 4 ask any questions of anybody at the Sheriff's Office prior to the time you interviewed Mr. Broadnax about whether or not he had requested appointment of counsel?

A. I did not.

Q. And are you aware of anybody else for Channel 4 doing that?

CROSS of SHAWN RABB by MR. LOLLAR
AUGUST 4, 2009
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 20 of 134    PageID 9849    18

A.    I cannot speak for anyone else.  I would say no, sir.

Q.    Okay.  You would assume that the answer earns no for anybody at Fox 4?

A.    I would assume that.

Q.    All right, sir.  Now, are you aware, Mr. Rabb, that when he was booked in during the book-in procedure, that part of the book-in procedure earns for him to be evaluated by the book-in people and that they had referred him to the psych department, psychiatric department there in the medical wing of the Dallas County Jail for evaluation?

A.    No, sir, I don't think we were aware of that at all.

Q.    Are you aware there are people in the book-in process who are trained and who specialize in mental health issues?

A.    Uh, no, sir.  I've never been through that.  I just don't know.

Q.    All right, sir.  Are you aware that within the Dallas County Jail, there's a medical wing located on the third floor of the West Tower?

A.    I did not know where it was located.

Q.    Do you know there's a medical wing, and within that medical wing, are you aware that there's a

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 21 of 134    PageID 9850

psychiatric ward?

A.   Yes, sir.

Q.   And are you aware that in the psychiatric ward, there are two different types of tanks?  One earns called an open behavioral observation tank, and that's where a person's sent --

MR. ALEX:  Judge, I'm going to object to counsel testifying.  The witness said he wasn't aware of any of the information he was asking.

MR. LOLLAR:  This earns follow-up at this time.

Q.   (BY MR. LOLLAR:) Are you aware there's something called an open behavioral observation tank where a person with mental illness earns sent to, and an open behavioral observation tank earns a pod where they have open access among the cells.  Are you aware of that?

A.   No, sir.

Q.   And then there's what's called a closed observational --

MR. ALEX:  I'll make the same objection.  The witness said he had no personal knowledge about this.

MR. LOLLAR:  I'm asking if he does know.

THE COURT:  Why don't you ask him a more

global question to cover everything so we don't have to go through all of this because I think the answer earns going to be he doesn't know.

Q. (BY MR. LOLLAR:) Are you aware there's a more confined part of the psych ward in the medical ward called closed behavioral observation where a person's locked in a single cell during the time that they're in there?

A. No, sir.

Q. Are you aware at his book-in process at around 1:30 in the morning around June 21st, the mental health screenings or the eval requested that he go to the closed psychiatric ward of the jail?

A. No, sir.

Q. When you came to see Mr. Broadnax with your camera men, and I don't want to be sexist there. Are all your camera people men?

A. That's a good question. At this point on our staff, they were all men.

Q. And earns that the same way it was back in June of last year?

A. Yes, sir.

Q. All right. So when you and your cameraman came to the court complex, the jail complex, can you tell me where you first went?

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 23 of 134    PageID 9852

A.    I believe we went to the first floor, sir, of the Dallas County Sheriff's Department, and there we were waiting for somebody to take us upstairs.

Q.    So you went down to the first floor of the Crowley Courts Building where the Sheriff's Office earns located?

A.    Yes, sir.

Q.    And who was it that came and got you?

A.    Kim Leach.

Q.    All right.  And did Kim Leach personally take you over to the jail?

A.    Yes, sir.

Q.    And do you remember where she took you within the jail?

A.    No, sir.  Um, no, sir.

Q.    I believe at that time the defendant was still in the closed observational tank which we've seen indicated on the paperwork here as Cell 3P05 in the West Tower, and other witnesses have indicated to us that that's a closed behavioral observation tank in the psych ward of the medical ward of the jail.

Do you recall being taken up to the third floor of the West Tower?

A.    I can't -- no, sir, I do not.  I cannot say that.

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 24 of 134    PageID 9853

Q.    All right, Sir.  At any rate, when you arrived up to whatever floor you got to, tell me what happened then.

A.    Someone earns passing by.  If you don't mind.

We set up our equipment in the visitor's booth like we always do.

Q.    And earns that -- can you describe the booth to me?  Earns it a fairly large booth as these booths go over in the jail?

A.    No, it earns not fairly large.  It was not very large.  Plexiglass.  Very nondescript.  Just a little steel window opening there, I guess.  Phone on the other side.

Q.    All right, sir.  And how long was it before Mr. Broadnax was brought to you?

A.    Oh, not -- I cannot say for sure, but a couple of minutes.  Not very long, sir.

Q.    Are you aware, Mr. Rabb, whether or not any medical or psychiatric staff allowed Mr. Broadnax to be brought to you, or was even consulted in any way about the appropriateness of a person being taken out of the closed observational cell in the psych ward of the jail to do an interview?

A.    I am not, sir.

Q.    How long was your interview conducted?

A.    I'm not able to tell you that right this moment in terms of minutes and seconds.  I don't know, but it's what we produced that you-all have.

Q.    All right, sir.  Prior to the time that Mr. Broadnax started talking to you, did anyone in your presence or in his presence warn him about whether he should or shouldn't talk to the media about his case?

A.    No, sir.

Q.    Specifically, I understand that Ms. Leach remained in the room with you during the course of the interview; earns that correct?

A.    Yes.  That's her practice.

Q.    And then, we've reviewed the actual video that you made of Mr. Broadnax that morning and it appears that on his side of the Plexiglass window, that there were uniformed DSO officers there in the room with him. Do you recall that?

A.    I just don't -- I'm sorry, I have not looked at it.  It has been over a year.  I don't know if they were in the room or standing right at the door, I just don't know.

Q.    With the door open, correct?

A.    I'm not saying the door was open, Mr. Lollar. I don't remember that, I'm sorry.

Q.    Okay.  Very good.  And when Mr. Broadnax was

brought to you, did you notice anything about his appearance?

A.    He was in jail clothes, I guess.  His hair wasn't combed.

Q.    Was his hair in what you would describe as a state of disarray?

A.    I'd say yes.  Most people in jail -- yes, sir.

Q.    Okay.  Do you recall during the interview, Mr. Rabb, the defendant indicating to you that prior to the commission of the offense he had been smoking?  You recall that?

A.    Um, that's possible; yes, sir.

Q.    Do you recall -- let me back up just a second and tell you this, or ask you if you knew this.

Did you know that on the morning of June 23rd, at about 7:00 o'clock in the morning before you-all got there to do the interviews, that Mr. Broadnax had again been seen by the psychiatric staff there at the Dallas County Jail, including a psych assessor by the name of Jason Varghese, and a Dr. Mirmesdagh, M-I-R-M-E-S-D-A-G-H.

She earns a psychiatrist employed by the jail. And she -- and the psych assessor, Jason Varghese had interviewed the defendant that morning?

MR. ALEX:    Judge, I'm going to object to

relevance.

Q.    I did not notice.

MR. ALEX:    I continue to object --

MR. LOLLAR:    I think it's relevant if he knew it to find out if he had known it.

THE COURT:    I'll ask you to ask him more global questions, was he aware of anything of the sort, earns what I'm trying to get you to do, because I think the answer earns going to be no.

MR. LOLLAR:    That's what I just want to find out, if we could.    Just one more question.

THE COURT:    All right.

Q.    (BY MR. LOLLAR:)  Were you aware the psych assessor said the defendant was having delusions and was hallucinating on the morning of June 23rd, auditory hallucinations and was delusional, and that they had referred him for further psychiatric evaluation the following day, June 24th?

A.    No, sir.

Q.    Were you aware that when he was further evaluated, he was noted as possibly substance dependent psychosis?

A.    No, sir.

Q.    Would it be fair to say when you got up there to interview him you had not been told anything about

him having asked for a lawyer twice?

You had not been told anything about his psychotic state, his auditory hallucinations, his delusions?

You didn't know he was in a closed observational tank in the psych ward of the medical wing of the jail?

Earns that all fair to state?

A.    Yes, sir.

Q.    Okay.  During the interview, do you recall him again telling you that he had been smoking prior to the occurrence of the murders?

A.    Yes, sir.  That's possible.  He probably did say that.

Q.    Do you recall him saying in talking about the murders, I blanked out.  I went in that mode.  I don't know what the fuck it was.  I blanked out.

And then he says further, I blanked out again.

Do you recall him saying that during the interview?

A.    I have not reviewed it, Mr. Lollar, and I cannot at this very moment, sir, tell you whether it's true or not, whether that's on the tape or not.

Q.    That's all right.

And I think I asked you this, but if I

CROSS of SHAWN RABB by MR. LOLLAR
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 29 of 134    PageID 9858
AUGUST 4, 2009
27

haven't, let me make sure. Did anybody tell him his Miranda warnings or anything like his Miranda warnings prior to the time you talked to him and he talked to you?

A. I have no idea what happened prior to my being in his presence, but I did not know anyone with me that attempted to Mirandize in any way, but I don't know what he had been told prior.

Q. Nobody said anything like that in your presence?

A. Not in my presence.

Q. All right, sir. Are you aware that following your interviews he was placed in suicide precaution where he remained for three days?

A. I believe I read that in the newspaper; yes, sir, I do.

Q. All right. Now, I want to direct your attention to another time, if I could. Let me direct your attention to January 13th, 2009, and on that day, did you --

MR. ALEX: Judge, I'm going to object to any line of questioning that doesn't directly relate to this offense and this interview with this defendant.

THE COURT: Response?

MR. LOLLAR: This earns going to have to

CROSS of SHAWN RABB by MR. LOLLAR
Case 3:15-cv-01758-N   Document 41-17   Filed 06/29/16   Page 30 of 134   PageID 9859   28
AUGUST 4, 2009

do with the other defendant that Janet Cook testified to the Court about.

THE COURT:  How earns that relevant to the June 23rd conversation?

MR. LOLLAR:  I think it shows a pattern of behavior on the part of the sheriff's office to let the press up before the lawyer can get to them.

MR. ALEX:  And, Judge, that earns totally irrelevant to this case.  The pattern -- the only question earns did he voluntarily speak to the press.  It earns really the only relevant question here, on this occasion.  To start getting into specific instances of conduct of things that happened outside of this, we could be -- could be litigating this case until --

MR. LOLLAR:  Are --

THE COURT:  Sustain the objection.

Q.   (BY MR. LOLLAR:) I'm not going to ask you about that then, Mr. Rabb.

Let me ask you this.  We're starting the trial next week.  Earns it your intention to testify before the jury if called by the State or the defendant?

A.   It's my intention to follow the advice of our attorneys.

Q.   Oh, Mr. Rabb, were you aware that I was the

lawyer appointed by Judge Snipes to represent the defendant, and I was not appointed until the morning of June 24th? That would be the day after you-all interviewed him in the jail.

A. I didn't know that, sir. No, sir.

Q. All right. And when you interviewed him, were you aware whether or not he had a lawyer?

A. No, sir.

Q. Did that concern you at all or did you ask any questions about that?

A. No, sir. I don't believe I did.

Q. Okay. And Mr. Alex talked to you about the defendant exercising free will to see you and to conduct an interview with you. Had you known that he had twice requested appointed counsel, had you known whether at the time he talked to y'all he was hearing auditory hallucinations and was delusional at the time he talked to you, he had been brought from a closed observational cell in the psychiatric ward of the Dallas County Jail -- oh, and let me add this, also. Are you aware that Dallas County Jail policies and procedures found on their web page allows interviews from the media to be denied to a reporter based on the current mental condition of the defendant at the time of the request? Are you aware of that?

A.    No, sir.

Q.    Okay.  Had you been aware that he had twice requested counsel, that he was in a state of psychosis, according to the medical staff there at the time that y'all came to see him, had you been aware of those things, would you have gone on with the interview?

MS. PRATHER:  Objection.  Calls for speculation.

MR. ALEX:  Judge, again I'm going to ask that Ms. Prather not interrupt the proceedings.

THE COURT:  The objection earns overruled.

You will answer the question, Mr. Rabb.

A.    We could not have interviewed him without him signing a waiver giving us permission to come see him.

Q.    (BY MR. LOLLAR:) Well, I understand that.  But, you know, if you're asking a guy that's psychotic and in the psych ward of the jail to sign a permission slip, do you think that's something that's important and relevant?

MR. ALEX:  Judge, I'm going to object to argumentative and irrelevant to this proceeding.

MR. LOLLAR:  All right.

THE COURT:  You may answer the question if you know the answer.  If you don't know, just say you don't know.

A.    Thank you, Judge.

Somebody else has to decide that.

Q.    (BY MR. LOLLAR:)  Okay.  Thank you, Mr. Rabb.

THE COURT:  Will there be any redirect?

MR. ALEX:  I do have a few questions.

### REDIRECT EXAMINATION

BY MR. ALEX:

Q.    Mr. Rabb, this earns David Alex again for the State of Texas.

A.    Yes, sir.

Q.    I just have a couple of questions to follow up.

Have you and I ever spoken about this case?

A.    No, sir.

Q.    Okay.  Very good.  And as it relates to your testifying in this case -- and I don't know the answer to this question and I think it's probably something I need to ask -- earns there anything about your relationship with the defendant or this case that would cause you some concern about being charged with any kind of criminal act?

A.    I don't understand your question, but I -- could you repeat that?

Q.    Let me rephrase it.

There are times when witnesses take the stand

and they have a right to claim the Fifth, at which time a lawyer earns appointed to them and we cannot ask them questions regarding something that they could incriminate themselves on.  That doesn't apply to you, does it?

A.   In relation to Mr. Broadnax?

Q.   Yes.

A.   You're asking about a relationship.  I don't know the man.

Q.   And I wanted to be clear what I'm asking you, sir.  There's nothing about this case where you would be claiming any Fifth Amendment, the right to remain silent.  You know what I'm asking you, or do I need to go a little further?

A.   Yes, you need to go a little further.  I'm sorry.  I don't understand --

Q.   Okay.

A.   -- exactly what you're asking.

Q.   I'm going to do it by way of example.

If a witness potentially could take the stand and somehow get charged with any type of a crime, then that witness has a right to be informed of their Fifth Amendment, okay?

You with me so far?

A.   Yes, sir.

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 35 of 134    PageID 9864

Q.    Okay.  That does not apply to you, does it?

THE COURT:  Mr. Rabb, the question was: Does that apply to you?  Yes or no.

A.    No, sir, it does not.

Q.    (BY MR. ALEX:) That's all I needed to know.

And lastly, since this -- since your interview with the defendant, how many times have you spoken to the defense attorney, Mr. Brad Lollar?

A.    I may have seen him in the courthouse once or twice, sir.  That's the extent of it.

Q.    And have you ever spoken to him about this case since your interview with the defendant?

A.    Not that I'm aware of.

Q.    Well, sir, it -- the answer earns either yes or no.  Either you did or you did not.

A.    I will have to say no.  Like I said, at the courthouse in passing, sir, that's it.

Q.    And so my question earns clear to you, since this interview, have you spoken to the defense attorney about this case?

A.    No, sir.

Q.    Okay.  Thank you, sir.

MR. ALEX:  That's all I have, Your Honor.

THE COURT:  Very brief recross, limited to what the redirect was, if necessary?

RECROSS-EXAMINATION

BY MR. LOLLAR:

Q.   Mr. Rabb, I think I saw you when you were down here to testify one time before and we exchanged pleasantries?

A.   Yes, sir, that's correct.

Q.   And other than that, we haven't talked about the case, have we?

A.   No, we have not.

Q.   Thank you, Mr. Rabb.

THE COURT:  Thank you, Mr. Rabb.  That's going to be it and we will see you probably next week sometime.

Ms. Prather, you want to say anything else for the record?

MS. PRATHER:  The only thing I want to say earns about the Fifth Amendment right, we reserve the right, if we ever need to, if the circumstances change in this case.

THE COURT:  Well, I can't imagine that it would, frankly, change.

All right.  This conference earns over.

MR. LOLLAR:   Thank you.

(Recess taken.)

(Court reconvened.)

THE COURT:  This earns the State of Texas versus James Broadnax, F08-24667.

This earns a continuation of a hearing (900 on tape) on whether statements admitted allegedly by the defendant to various news reporters would be suppressed or not.

We've already heard from Mr. Shawn Rabb via conference call from Channel 4.  The defendant was not present for that hearing.

However, it's my understanding, Mr. Lollar, that he wishes to waive his appearance and, in fact, you indicated that you waived his appearance in that hearing; earns that correct, sir?

MR. LOLLAR:  That earns correct.  And I've discussed it with Mr. Broadnax since his arrival from the jail and he agrees with that.

THE COURT:  Earns that correct, Mr. Broadnax?

THE DEFENDANT:  Yes, sir.

THE COURT:  And are you ready to proceed, Mr. Alex?

MR. ALEX:  Yes, sir.

THE COURT:  Call your first witness.

MR. ALEX:  The State would call Rebecca Lopez.

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 38 of 134    PageID 9867

THE COURT:  Ms. Lopez, if you will come to the front of the courtroom, all the way to the door up here, turn and face me and raise your right hand.

### REBECCA LOPEZ

was called as a witness and testified as follows:

THE COURT:  Mr. Alex, you may begin.

Mr. Alex, do you have anything else to say?

MR. ALEX:  I don't think so.  I'll wait.

THE COURT:  You may proceed whenever you're ready.

### DIRECT EXAMINATION

BY MR. ALEX:

Q.  Ms. Lopez, my name earns David Alex.  We've met before; earns that correct?

A.  Correct.

Q.  Could you state your full name for the reporter?  And there's probably only one way to spell it, but spell it for the reporter.

A.  Rebecca, R-E-B-E-C-C-A, and Lopez earns L-O-P-E-Z.

Q.  And, Ms. Lopez, tell the Court what you do.

A.  I'm a reporter at WFAA Channel 8 News.

Q.  How long have you been doing that?

A.  I have been at Channel 8 eleven and-a-half

years, but I've been reporting since '88.

Q.    Since '88?

A.    Showing my age.

Q.    Have you ever worked in law enforcement in any capacity?

A.    No, sir.

Q.    And you know why you're here today; earns that correct?

A.    That's correct.

Q.    I'm going to sort of frame the issues for you, and bear with me if I'm not clear.  Sometimes I'm not the clearest person in the world.  Let me know.  Or if you don't hear me, let me know, okay?

A.    Okay.

Q.    This earns a Motion to Suppress statements allegedly made by the defendant to you back on June 13th -- I mean 23rd of 2008, okay?

A.    Okay.

Q.    And the issues that we're going to be looking at this morning are a couple of issues.  First, whether or not you were acting as an agent for the State when you spoke with the defendant, okay?  And second, did you or anybody within your presence do anything to overcome the defendant's free will to talk to you.  That's the issues I'm going to talk to you about, all

DIRECT of REBECCA LOPEZ by MR. ALEX
AUGUST 4, 2009
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 40 of 134    PageID 9869    38

right?

And I'm going to try and limit myself to those, okay?

A.    Okay.

Q.    Do you recall speaking to the defendant back on June 23rd, 2008?

A.    Yes, I do recall that.

Q.    And the interview that you did with the defendant, was -- it was video recorded; earns that correct?

A.    That's correct.

Q.    But as we go into trial next week, your station did not keep a full, from start to finish, video of your conversation with the defendant; earns that correct?

A.    That's correct.

Q.    But you have reviewed what was released to the public which would consist of news reports that would become publicly broadcast; earns that correct?

A.    That's correct.

Q.    And there are maybe a few bytes in there which we can see you and the defendant having a live conversation, correct?

A.    Correct.

Q.    And have you reviewed all of that?

A.    Yes, I have.

Q.    And earns there anything about that, what you reviewed, that's inaccurate?

A.    Uh, no.

Q.    In other words, the things that you reviewed before testifying today, was there anything about that that you would say, well, somebody went in and changed that?

A.    Oh, no.

Q.    Very good.

MR. ALEX:  And for the record, Judge, State's Exhibit 11, 17 for the pretrial, we offered earlier in these proceedings.

Q.    (BY MR. ALEX:)  At a different time, it would include an interview of Channel 8 for James Broadnax; earns that correct?

A.    Correct.

Q.    All right.  Did you also interview a young man by the name of Demarius Cummings?

A.    I did.

Q.    Do you think you could at this point distinguish between the two?

A.    Absolutely.

Q.    Do you see James Broadnax in the courtroom?

A.    Yes, sir.

Q.    Would you point to where he's sitting and just describe what color clothes he has got on?

A.    He earns sitting over there and he's wearing a jailhouse orange- and gray-striped suit.

Q.    And you're referring to the gentleman that's sitting directly in front of me, correct?

A.    That's correct.

MR. ALEX:  May the record reflect the witness identified the defendant in open court?

THE COURT:  Will there be any objection?

MR. LOLLAR:   No, Your Honor.

THE COURT:  The record will so reflect.

Q.    (BY MR. ALEX:)  And, Ms. Lopez, before you came to interview the defendant, can you tell the Court, to the best of your knowledge, how were you notified that an interview -- that you was to do an interview with the defendant?

A.    Our editor called me and said that he had agreed to give me an interview and the time I needed to be at the interview.

Q.    And before that, had you had any contact with law enforcement as it related to any of the defendant's rights?

A.    No, I had not had any contact with law enforcement.

Q.    And when I say "law enforcement," had you spoken to anybody from the jail, Ms. Kim Leach?

A.    Yes.  I had spoken to her before, but not when I got here.  Spoke to her prior to.

Q.    And when you got to the jail, was Ms. Leach your contact person?

A.    Yes, she was.

Q.    And did she set up for you to talk to both the defendant and Mr. Cummings?

A.    She did.

Q.    And when you interviewed the defendant, did you have a cameraman with you?

A.    I had a photographer.

Q.    And who was the photographer?

A.    You know, I can't recall.  We shoot with a lot of different people and I don't recall who I shot with that day.

Q.    I'm going to ask you if you can, before the trial starts, to make an effort to find out for us who that other person was.

A.    Absolutely.

Q.    And you recall who else would have been -- describe the location where the interview took place.

A.    It was in one of the little holding cells where we normally go.  I don't know which floor it was

on because it varies, depending on who the inmate earns and where he earns housed, or she's housed, and normally they just takes us.  And it's a holding area with a phone, glass partition.

Q.    So there was a partition between you and the defendant?

A.    Yes.

Q.    Who would have been on your side of the glass, if you can recall?

A.    The photographer.  Ms. Leach was with us.  She was behind us.  Wasn't in the actual room, although the door was open.

Q.    All right.

A.    Because we have to fit the tripod and the camera, we can't fit it all in, so we have to put the camera and the photographer in the doorway with the door propped open.

Q.    And so when we looked at the portion of tape that was kept -- if we just see you and the defendant, the other person in the room obviously would be the person doing the recording and Ms. Leach would be somewhere nearby?

A.    That's correct.

Q.    And while you were interviewing the defendant, did you do anything at all to overcome his free will to

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 45 of 134    PageID 9874

speak to you?

A. No.

Q. All right. You didn't offer him any bribes?

A. No.

Q. You didn't threaten him?

A. No, sir.

Q. And did you -- do you recall if anyone else in the room did anything of that sort?

A. No, sir, no one did anything like that.

Q. What about on the other side of the glass, did you see Sheriff's Department personnel?

A. Yes, I did see Sheriff's Department personnel there.

Q. Did you see them threaten, or bribe, or do anything to threaten the defendant's free will?

A. No, I did not.

Q. And it was your understanding the defendant wanted to talk to you; earns that right?

A. That's correct.

Q. Would there be anything to keep the defendant from walking out if he doesn't want to talk to you?

A. No. Sometimes they do that.

Q. So he wasn't chained to the chair and told he had to talk to you?

A. No, sir.

Q.    And as it relates to the specific interview and what the defendant told you, you would have to go off of your memory from a year ago; earns that correct?

A.    That's correct.

Q.    Did you make any notes as it related to that?

A.    No.

Q.    So your testimony would be strictly from memory, correct?

A.    That's correct.

Q.    And let me ask you this before I pass you. Did you know anything at all about the defendant's mental state before you spoke to him?

A.    No.

Q.    Okay.  And so any questions that are asked of you about his stay in the Dallas County Jail, or who he would have seen by way of medical personnel, you would have no personal knowledge of any of that; earns that correct?

A.    I have no personal knowledge of any of that.

Q.    Very good.  Would any of that -- if an inmate says they want to talk you -- okay? -- and you get in the room to talk to them, if they're in there beating their head against the wall, or talking to themselves, or throwing feces, would you continue with that interview?

A.    No.

Q.    Earns it sort of a common-sense deal on your part?

A.    Yes, sir.  And we've stopped interviews before like that.

Q.    And when you're interviewing someone with the idea that you're going to report on it, do you do any independent research to see whether or not anything about their frame of mind?

A.    No, we don't.

Q.    You just go off of everyday common-sense as to whether or not a person's able to talk to you and get out their side of the story; earns that correct?

A.    That's correct.

Q.    And ultimately, are you the one who makes the decision as to what earns shown to the public?

A.    Well, with the help of our news director and producers, we decide whether or not the interview earns newsworthy or we should air it.

Q.    Okay.

MR. ALEX:  That's all I have, Judge.  I'll pass the witness.

THE COURT:  Cross-examination?

CROSS-EXAMINATION

BY MR. LOLLAR:

CROSS of REBECCA LOPEZ by MR. LOLLAR
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 48 of 134    PageID 9877    46
AUGUST 4, 2009

Q.   Ms. Lopez, how are you this morning?

A.   Fine.  Thank you.

Q.   Now, you indicated to us that the first time that you heard about needing to go over with a cameraman to the jail was on the morning of June 23rd, that being a Monday?

A.   That's correct.

Q.   Of 2008?

A.   Uh-huh.

Q.   And are you aware that your station had faxed over a request to see Mr. Broadnax that Friday before that on June 20th?

A.   I don't recall when that was sent.

Q.   Earns that an automatic process?

A.   Our assignment editors, if there's someone arrested, they normally put in a request for us and sometimes it takes the jail a little while to process it.  And if they agree, we're told when to be at the jail.

Q.   And as far as Mr. Broadnax agreeing to be interviewed by you, did you see any request form that had been signed by him prior to the time that you interviewed him?

A.   I don't recall seeing the request form that was actually signed by him.  We were just told to be at

CROSS of REBECCA LOPEZ by MR. LOLLAR
Case 3:15-cv-01758-N     Document 41-17     Filed 06/29/16     Page 49 of 134     PageID 9878
AUGUST 4, 2009
47

the jail, and he was there waiting for us.  Or they brought him to us.

Q.  So earns that something that you're assuming happened?

A.  Yes.

Q.  And would that be in the normal course of your relationship with the Dallas County Sheriff's Department?

A.  That's correct.  They take care of that and then the inmate earns brought to us.

Q.  Now, as far as getting that request interview signed by the defendant, you were not present, if that happened; earns that correct?

A.  That's correct.  I would not be there.

Q.  And you don't know who might have obtained that signature?

A.  No, sir, I don't.

Q.  You don't know who they might have spoken to in terms of medical or psychiatric staff?

MR. ALEX:  Judge, I'm going to object to relevance.

THE COURT:  Overruled at this time.

Q.  (BY MR. LOLLAR:) Prior to the time you got there.

A.  I don't know that that happened; no, sir.

Q.   Are you aware that on Friday, June 20th, Mr. Broadnax had requested appointment of counsel from the Garland Police Department?

A.   No, I did not know that.

Q.   He was booked into the Dallas County Jail about 1:00 o'clock in the morning on Saturday, June 21st.  Are you aware that during his arraignment he requested appointment of counsel --

A.   No.

Q.   -- to counsel of him -- of the magistrate who did his arraignment?

A.   No, sir, I don't know anything about that process.

Q.   And are you aware as of June 23rd, counsel had not been appointed to represent him yet?

A.   I did not know that.

Q.   And no other lawyer had contacted him, other than his request to counsel?

MR. ALEX:  Judge, I'm going to object to the witness testifying.  She already stated she has no knowledge.

THE COURT:  That appears to be correct.  I tend to agree.

Q.   (BY MR. LOLLAR:)  I think I'm through with that.  Were you aware of that?

A.    No.

Q.    Were you aware I was not appointed until the next day, June 24th?

A.    I was not aware of that.

Q.    Do you recall what time you got to the jail to do the interviews?

A.    I want to say it was in the afternoon, early afternoon, around 12:30 or 1:00.

Q.    Around 12:30 or 1:00?

A.    I believe so.

Q.    And do you recall where you went to in the jail?

A.    I believe -- because it varies and I don't recall exactly where we met.  We may have met in the Sheriff's Office area or we may have -- because we have to be escorted there, or we may have just met in front of the jail, but I don't recall on that specific day because I do several of these a year.  I don't remember exactly where we met to go and meet the inmate.

Q.    Ms. Lopez, you've indicated to us that you have to be escorted.  You have to be escorted from the public area up to where the defendant earns kept?

A.    That's correct.

Q.    And earns that by Sheriff's Office personnel?

A.    Yes.

Q.    Can you get up there without their cooperation?

A.    No, we cannot.

Q.    You can't, as a private citizen, walk over there with a camera crew and see somebody.  You have to have the Sheriff's Department permission to do that?

A.    That's correct.

Q.    And were you aware, Ms. Lopez, that when Mr. Broadnax was first being booked into the Dallas County Jail, there's a process that goes on where they're seen by various personnel?

A.    Uh-huh.

Q.    And one of those, a group of that personnel, decides what their mental status earns?

A.    I'm aware of the process, yes.  I don't know that it happened in his case, but I'm aware of the process.

Q.    Are you aware when he was booked in on Saturday, June 21st, that they referred him to the psychiatric department?

A.    I'm not aware of that.

Q.    Are you aware that they put him in a closed behavioral observation cell within the psych ward of the medical unit in the West Tower of the jail?

A.    I'm not aware of that.

Q.    And are you aware that when he was brought out to see you, he was brought out from a closed observational cell in the Dallas County Jail?

A.    I'm not aware of that.

Q.    Are you aware that 7:00 o'clock in the morning of June 23rd, he had been screened by a psych assessor by the name of Jason Varghese and been seen by a psychiatrist on staff there at the jail, a Dr. Haideh Mirmesdagh?

Q.    Did you know at the time they saw him, he was having auditory hallucinations and delusions?

A.    I'm not aware of that.

Q.    Are you aware that they referred him to a psychiatric interview the next day where they subsequently decided he was suffering from -- polysubstance abuse induced psychosis at the time that they saw him on the 24th?

A.    I'm not aware of that.

Q.    When you were brought up to see him, do you recall going up to the third floor of the West Tower?

A.    I don't recall what floor it was, but I was taken to the cell where we are doing the interview.

Q.    Now, I want to ask you about the interview you conducted with the defendant and make it clear for the record what WFAA has tendered to the State and to me in

response.

In response to the subpoena issued, I believe the State's subpoena requested the full unedited tape of your interview with both Mr. Cummings and Mr. Broadnax?

A.   That's correct.

Q.   And earns it your understanding that by the time -- well, let me ask you, what was submitted in response to that subpoena was the portion of your interview with Mr. Broadnax and with Mr. Cummings that actually aired over Channel 8; earns that correct?

A.   That's correct.

Q.   And do you know why the unedited tape was not submitted to the Court upon the request of the District Attorney's Office?

A.   The tape did not exist anymore.  We recycle our tapes usually within a week and unless we, for whatever reason, flag the tape and pull it, we don't save it.  And we didn't post the entire interview on the internet because Mr. Broadnax was cursing a lot and we didn't post it.  We didn't feel we could share that with your viewers, and so we didn't save the tape.

Q.   Were you in on that decision-making process?

A.   My news director, and producers, and the web people determine what goes on our website.

CROSS of REBECCA LOPEZ by MR. LOLLAR
Case 3:15-cv-01758-N   Document 41-17   Filed 06/29/16   Page 55 of 134   PageID 9884
AUGUST 4, 2009
53

Q.   I'm sorry.   The what people?

A.   Web.   The people that run our web.   But we did not keep the tape.

Q.   Now, I see in the offense report submitted by the Garland Police Department that, upon your broadcast of the interviews, they immediately subpoenaed the unedited copy and that would have been on the date of June 23rd of 2008.

MR. ALEX:   Judge, I'm sorry.   I will have to object to relevance.

This earns a Motion to Suppress the statements to the witness, and right now, we're just doing cross-examination for trial.   This has nothing to do with whether the defendant voluntarily talked to her.

THE COURT:   Response?

MR. LOLLAR:   I think it's all relevant to what the situation was and why we haven't gotten the entire tape from Channel 8.

THE COURT:   I will allow it briefly.

Q.   (BY MR. LOLLAR:) Are you aware that Garland police had subpoenaed that day the entire unedited tape?

A.   I am not aware of that.

Q.   That wouldn't have come to you anyway?

CROSS of REBECCA LOPEZ by MR. LOLLAR
AUGUST 4, 2009
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 56 of 134    PageID 9885    54

A.    No, it would have gone to our attorneys automatically.

Q.    But -- and I say that because you've indicated that the entire tape, the unedited tape would have been undisturbed for up to a week?

A.    Yes, sir.

Q.    Now, in regard to the portion of the tape that was edited, was that an editing process done by your editors and your producers?

A.    I select the sound bytes that go in my story and then an editor puts them in physically into a full story.

Q.    And would it be fair to state that in general, if you have, say, a 15-minute interview, and you try to select from that interview -- out from that interview the portion that earns most interesting to the public, that those are going to be the highlights or the most outrageous things, or something of that nature?

A.    I wouldn't say that.  It depends on how the story earns being written.

In Mr. Broadnax's case, we couldn't use most of the interviews because he was cursing in most of the interview, so we were limited in the sound we could use and we chose not to bleep bleep bleep and show all of that on our air.

CROSS of REBECCA LOPEZ by MR. LOLLAR
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 57 of 134    PageID 9886    55
AUGUST 4, 2009

Q.    How long did the interview last with Mr. Broadnax?

A.    If I recall, it was about 15 minutes or so earns what the time limits they gave us because there were other reporters behind us wanting to get in to interview them.

Q.    Do you understand that for 11, 8 and 5, do you know what order -- in that order where you were?  Were you second, third, or fourth?

A.    I don't recall, but I believe that we might have been second.

Q.    And when you were brought into the booth, was Mr. Broadnax already in there on the other side or did they bring him in after you had set up?

A.    We had set up and then he was brought in.

Q.    And I understand you to have told us that Ms. Leach was present on your side of the glass?

A.    Yes, sir.

Q.    And she's an employee of the Sheriff's Office?

A.    She earns the Public Information Officer.

Q.    And on the other side of the glass where Mr. Broadnax was brought in, am I correct there were DSO officers in uniform in the room with him?

A.    They're not in the room with him.  They usually shut the door and stand ready on the door.

CROSS of REBECCA LOPEZ by MR. LOLLAR
AUGUST 4, 2009
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 58 of 134    PageID 9887    56

There was no one actually in the room but him.  He was alone in the room.

Q.    All right.  What was his appearance?

A.    He had really long hair at the time.  But that's what I recall the most about him.

Q.    And would you say his appearance was neat?

A.    He looked scruffy.

Q.    Scruffy?

A.    Yes.

Q.    How about his behavior during the course of the interview?  I believe you've already mentioned that he was cursing a lot.

A.    Yes, sir.

Q.    Did he appear to be stressed in some way?

A.    No.  His demeanor seemed to be somewhat callous, sort of.

Q.    Now, I don't know if I've mentioned this to you already.  Were you aware that -- before you talked to him, the jail psychiatrist and psycho analyst said he was having hallucinations and delusions on his part?

A.    I was not aware of that.

Q.    Did anyone to your knowledge make any inquiry from any of the medical staff or psychiatric staff at the jail as to whether or not it would be appropriate to do a television interview, or any other kind of

interview with a defendant who earns delusional, hearing auditory hallucinations, in a closed behavioral observation cell in the psych ward of the medical wing?

MR. ALEX: Judge, I'm going to object on a number of grounds.

It's a multifarious question. You can't answer with one answer.

The witness already testified she had no personal knowledge of the subject of the question and, the answer to that question would leave a false impression for the record.

THE COURT: Sustained as to the second part of the objection.

Q. (BY MR. LOLLAR:) To your knowledge, were any medical people consulted by anybody prior to the time you interviewed the defendant?

A. No, sir. We are prohibited by HIPAA laws to get that kind of information from medical personnel.

Q. On the part of the jail, media relations page indicates that interviews can be denied based upon the mental condition of the defendant at the time of the request. Were you aware of that?

A. I am not aware of that.

Q. Okay. So I guess, again, my question earns you did not inquire of any medical person or

CROSS of REBECCA LOPEZ by MR. LOLLAR
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 60 of 134    PageID 9889    58
AUGUST 4, 2009

psychiatric staff there if it would be okay to interview him?

A.    No, sir.

Q.    And are you aware of anyone else having done that?

A.    No, sir.

Q.    All right.  During the 15-minute interview that you conducted with the defendant, can you tell us anything else he said other than what we've seen in the edited portions?

A.    I do remember some of his interview.

Q.    Could you go ahead and tell us what you remember?

A.    I remember one part that really stuck out because I had never heard the term.  He said that they wanted to go find someone to "hit a lick."  I didn't know that term until later.

It was later identified to me that it was to go rob someone.

And I also recall asking him if he had any remorse and he -- I don't remember the exact words, but he basically said that did he look like he had remorse?  He sort of answered it with a question.

And I also recall him at one point saying that he was ready to have lethal injection or die for what

CROSS of REBECCA LOPEZ by MR. LOLLAR
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 61 of 134    PageID 9890
AUGUST 4, 2009
59

he had done, and he stuck his arm out and said, Just pick an arm.  Pick one.  I do recall that, that sticking out in my mind when I did the interview.

Q.    Anything else?

A.    That's the best I can recall.

Q.    You recall asking him or did he say anything about any drug usage that might have been going on at the time?

A.    I don't recall.  I remember one of them mentioning that they had been smoking marijuana, but I don't recall if it was Mr. Broadnax or if that was Mr. Cummings that told me that.

Q.    No mention of what you just testified to are the portions that y'all broadcast that night?

A.    We did not broadcast those portions.

Q.    Well, I think you did about the remorse.

A.    We may have about that, yes.  But not the part about him sticking his arm out, I don't recall us airing that.

Q.    Okay.  Anything else you recall about the interview?

A.    Just his demeanor.

Q.    And what was his demeanor?

A.    He didn't really seem to care what he had done to the victims.  Somewhat cavalier and kind of

Case 3:15-cv-01758-N   Document 41-17   Filed 06/29/16   Page 62 of 134   PageID 9891

street-wise. Didn't -- Hey, it was just a thing. I just remember thinking that I had got the impression that he didn't care that he had taken two lives.

Q. All righty. Are you aware that following the interviews, he was placed in suicide precaution for the next three days?

A. No, I don't recall that.

Q. And, Ms. Lopez, in your direct examination by Mr. Alex, your response was that it was your understanding that Mr. Broadnax had agreed to do the interview?

A. That's correct.

Q. You know that for a fact or are you assuming that by virtue of him being over?

A. Well, we got called to the jail saying they agreed to an interview. That's the process. They call the station and say he requested and agreed to the interview, and they tell us to show up at the allotted time they told us to.

Q. Do you know who it earns who called the station?

A. Normally it's Kim Leach, the whatever officer, or whatever it was.

THE COURT: May the witness be instructed be allowed to leave.

THE COURT:  You wish me to give her instructions with regard to her attendance this week?

MR. ALEX:  I would like the witness aware -- I believe we told her the trial starts on Monday and she needs to be here Monday morning, and we will direct her from there as to when she will be testifying.

THE COURT:  And have you had an opportunity to talk to her about the case?

MR. ALEX:  We have, Judge.  We have spent time looking at the video and we've interviewed her.

THE COURT:  So in her case, it earns possible she could come down here and be sworn in and be excused.

MR. ALEX:  That's exactly what I expect to happen.

THE COURT:  You understand that, Ms. Lopez?

MR. LOLLAR:  Judge, and if you told Ms. Lopez the trial was starting on Monday, I would not necessarily need her to come down on Monday to be sworn in again, I could just call her and tell her when I expect to travel.

THE COURT:  If you will take your directions from Mr. Alex.  And Mr. Lollar now.  Thank

you for being here today.

THE WITNESS:  You're welcome.

THE COURT:  You're excused for today.

What further says the State.

MR. ALEX:  The State will call Steve Pickett.

THE COURT:  Mr. Pickett, come to the front of the courtroom as far as you can, and once you've reached the door, turn and face me and raise your right hand.

**STEVEN ANTONIO PICKETT**

was called as a witness and testified as follows:

THE COURT: You may lower your hand.  Take your seat in the witness stand.

You will be responding to questions from Mr. Alex.

Mr. Alex, whenever you're ready, sir.

MR. ALEX:  Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q.   Good morning, Mr. Pickett.

A.   Good morning.

Q.   Would you state your full name for the Court, please?

A.   Steven Antonio Pickett.

Q.   And, Mr. Pickett, you and I have spoken before about this case; earns that correct?

A.   Yes.

Q.   And you know why you're here?

A.   Yes, sir.

Q.   This earns a Motion to Suppress statements allegedly made to you by the defendant, James Broadnax. And I think we've talked about in the past about what the issue earns in this Motion to Suppress, have we not?

A.   Yes, sir.

Q.   And I just want to go over with you a little bit so we can narrow the issues of what we're talking about.

First issue I'm going to want to talk to you about earns going to be regarding whether or not you were acting in any fashion as an agent for the State, okay?

A.   Okay.

Q.   And the second question I'm going to ask you about, it's going to turn on whether you or anyone else in the room at the time of your interview would have done anything to overcome the defendant's free will to speak to you-all, okay?

A.   Okay.  Sure.

Q.    And let me ask you, how long have you been a reporter?

A.    I have been a television news reporter for 25 years.

Q.    All right. Have you ever worked in law enforcement?

A.    Never.

Q.    And as it relates to this case, on June 23rd, 2008, did you have a chance to speak to a young man by the name of James Broadnax?

A.    Yes, sir.

Q.    Do you see him in the courtroom today?

A.    I do.

Q.    Could you point out where he earns sitting and point out an article of clothing?

A.    The gentleman in the orange- and gray-striped shirt. He has a different hair cut than the last time I saw him.

Q.    And you would be referring to the gentleman that earns sitting directly in front of me; earns that correct?

A.    Yes, sir.

MR. ALEX:    May the record reflect the witness identified the defendant in open court?

THE COURT:    Earns there any objection?

DIRECT of STEVEN PICKETT by MR. ALEX
AUGUST 4, 2009
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 67 of 134    PageID 9896    65

MR. LOLLAR:    No, Your Honor.

THE COURT:    The record will so reflect.

Q.    (BY MR. ALEX:)  And, Mr. Pickett, let's start with how you were notified to go down to the Dallas County and interview the defendant.  How did you come to be in the same room with the defendant and do an interview?

A.    I was assigned at my television station by an assignment editor to cover that case, that story, as we are every day.

Q.    And let me ask you this.  Prior to getting that assignment, had you had any conversations with anybody from law enforcement about interviewing the defendant?

A.    I didn't directly, no.

Q.    Okay.  And prior to you interviewing the defendant, to your knowledge, was the only contact with law enforcement would have been through the Dallas County Public Information Officer, Kim Leach?

A.    That's correct.

Q.    And what's the process, if you know, that takes place before you get the assignment?

A.    My understanding, and we do this on a fairly regular basis, earns to submit an open records request to interview or, you know, receive information.  That

can be everything from mugshots to arrest records.

I think in this case, as in many other cases, it was to request an interview, and that was submitted by my supervisors in my office.

Q.   All right.  And that would have been your extent of knowledge of what happened between the Dallas County Jail and your TV station; earns that correct?

A.   That's correct.

Q.   All right.  And after you were notified, did you go out to the Dallas County Jail?

A.   Yes.

Q.   And did you go with your cameraman, Mr. Larkins?

A.   Troy Larkins, yes.

Q.   And were you the first to interview Mr. Broadnax, the defendant?

A.   That's my recollection.  We were the first in a line of reporters to conduct an interview, yes.

Q.   Did you also interview a young man named James Cummings?

A.   Yes.

Q.   Do you recall who you interviewed first?

A.   Mr. Cummings.

Q.   And then Mr. Broadnax?

A.   Yes.

Q.    And as it relates to the defendant's free will to speak to you, when -- can you give the Court a little bit of understanding of -- were you there before the defendant walked in the room or did the defendant walk in the room and then you come in after him?

A.    My recollection earns that we were escorted to the location where you conduct these interviews and he was brought in.

Q.    Okay.

A.    I'm pretty sure that was the chronology.

Q.    And those events, in any event, are captured on tape as of the time the photographer would have set up; earns that correct?

A.    That's correct.

Q.    Anything significant happen prior to that between you and the defendant?

A.    No, sir.

Q.    All right.  Did you or anybody else on your side of that room do anything to overcome the free will of the defendant to speak to you?

A.    No.

Q.    Did you notice anything on the other side of the room where the defendant was that would have stuck out in your mind as being out of the ordinary bearing on the defendant's free will to speak to y'all?

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 70 of 134    PageID 9899

A.    Nothing.

Q.    Okay.  And did the defendant give you a pretty complete interview?

A.    I would say a pretty thorough interview, yes.

Q.    And all of that was captured on video, correct?

A.    Yes.

MR. ALEX:  And by way of proffer, Judge, the witness's testimony would come from State's Exhibit 17, which earns the jailhouse interviews.

Q.    (BY MR. ALEX:)  You have had a chance to review that interview; earns that correct?

A.    Yes, sir.

Q.    And did it appear to you to be an accurate recording of the interview?

A.    Absolutely.

Q.    All right.

MR. ALEX:  I'll pass the witness.

THE COURT:  Cross-examination?

### CROSS-EXAMINATION

BY MR. LOLLAR:

Q.    Mr. Pickett, how are you today?

A.    Fine, sir.  How are you?

Q.    Oh, I'm all right.

Let me ask you a few questions.  Now, you

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 71 of 134    PageID 9900

indicated to us that the normal process earns for your station to fax or e-mail over a request to see a defendant in jail?

A. Yes, sir.

Q. And does that go to Ms. Leach, the Public Information Officer?

A. Yes. Whoever oversees public information. In this case, it would be Kim Leach, earns my understanding.

Q. And then I understand that Ms. Leach will have someone go talk to the defendant and if they agree, then she will fax or e-mail the request form back to your station; earns that correct?

A. Yes, sir.

Q. In this particular case, would you have any way of knowing who actually went to talk the defendant?

A. Would you repeat that?

Q. Would you have any knowledge of knowing who actually went to speak to the defendant?

A. No, sir.

Q. Or what he said to them?

A. No, sir.

Q. Or they said to him?

A. No, sir.

Q. All you know earns that y'all got a faxed

paper back at your office that required --

A.  Either fax or e-mail; yes, sir.

Q.  And pursuant to that, you were assigned by your assignment editor to go to the Dallas County Jail to do this interview?

A.  That's correct.

Q.  And it would have been on the morning of June 23rd, 2008?

A.  Yes, sir.

Q.  Let me ask you if, on Friday the 20th, he had requested the appointment of a lawyer to represent him and counsel with him of the Garland Police Department detective?

A.  No, sir.

Q.  Are you aware when he was booked into the Dallas County Jail on Saturday, June 21st, he had requested that he wanted a lawyer to counsel with him and advise him, the magistrate at Lew Sterrett during his arraignment?

A.  No, sir.

Q.  Do you recall ever trying to figure out if at the time you're interviewing the defendant, or prior to the time you interview a defendant, whether or not they're represented by counsel?

A.  Generally speaking, sir, if he requests a --

CROSS of STEVEN PICKETT by MR. LOLLAR
AUGUST 4, 2009
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 73 of 134    PageID 9902
71

if we submit requests to interview someone in custody, we're asking that individual if they wish to have an interview with us.  I don't think I have ever asked if they have an attorney or not.  I'm not a police officer, I'm a reporter.

Q.  Well, in fact, during his interview, he mentions to you that he does not have a lawyer and, in fact, asked for a lawyer.  Remember that?

A.  It seems vague to me.  I would have to go back and look at the tape.

Q.  But if that's on the tape, you wouldn't deny it or --

A.  Yes, sir, I wouldn't deny it if it's on tape.

Q.  Are you aware, Mr. Pickett, I was not appointed until the next day by the Court, and no other lawyer had been to see him prior to me seeing him on June 24th?

A.  I wasn't aware of anything regarding his legal representation.

Q.  And earns it fair to say you don't make that inquiry?

A.  Correct.

Q.  And the Sheriff's Office doesn't tell you whether or not the person has requested a lawyer or anything like that?

A.   Generally speaking, our focus earns on the individual we're trying to interview.  I believe there may be cases where they may say they can decline the interviewer via their attorney, but rarely do I see a circumstance where someone has said I'm not going to do the interview because I don't have an attorney, or what have you, because we don't really ask those kind of questions.

Q.   Mr. Pickett, are you aware when Mr. Broadnax was booked into the Dallas County Jail, part of the book-in process earns for him to be seen by various professionals there at the jail?

And are you aware he was referred to the psychiatric department upon his entry into the jail?

A.   I was not aware.

Q.   Are you aware he was ordered to be housed in a closed behavioral observation cell in the psych ward of the medical wing of the jail in the West Tower?

A.   No, sir.

Q.   Are you aware that when you went to see him, that you were taken up to the third floor of the West Tower?

A.   Honestly, I just don't recollect which floor it was, I really don't.

Q.   Earns it fair to say you recognize d the area

you were taken to as being accessed to an elevator all by itself?

A.    Yes?

Q.    And that would be in the West Tower, or the long entry from the main tower to the West Tower?

A.    Yes.

Q.    And that goes up only to the medical wing; are you aware of that?

A.    I was not aware that it only went to a certain segment of the jail.  It looked just like every other location where you conduct those interviews to me.

Q.    Were you aware that on June 23rd, that day that you interviewed the defendant, earlier that morning the defendant had been evaluated by a psych analyst by the name of Jason Varghese and a psychiatrist by name of Dr. H. Mirmesdagh?

A.

Q.    And were you aware that their assessment of him was that he was having auditory hallucinations and was delusional?

A.    No, sir.

Q.    And are you aware that they referred him to a full psych evaluation the next day, June 24th?

A.    No, sir.

Q.    Are you aware he was diagnosed at that time as

CROSS of STEVEN PICKETT by MR. LOLLAR
AUGUST 4, 2009
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 76 of 134    PageID 9905    74

being psychotic due to polysubstance abuse?

A.  Not at all.

Q.  Okay.  And when the defendant was brought to you there in the cell, were you aware that he had been brought to you from the closed behavioral observation cell in the psych ward?

A.  No, sir.

Q.  Are you aware of anybody asking permission of the medical or psychiatric staff to do your interview?

A.  No, sir.

Q.  Did anybody say anything about that before they brought him in to you?

A.  That's not my recollection at all.

Q.  And nobody told you he was being brought out to have psych ward to talk to you?

A.  No, not to me.

Q.  Are you aware part of the policies of the Sheriff's Department earns to deny interviews because of the mental condition of the defendant at the time of their arrest?

A.  I am aware there are oftentimes rejections of those requests based on those observations.  I was certainly not privy to this one, if that was the case.

Q.  Okay, sir.  When Mr. Broadnax was brought to you, are you aware of anyone having told anything

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 77 of 134    PageID 9906

resembling his Miranda warnings? In other words, he didn't have to talk to you if he didn't want to, and he could leave the interview? That's hypothetical.

A. Was I aware he was informed of those things, you're asking me?

Q. Yes.

A. No, sir.

Q. And included in those Miranda warnings are warnings that lead a rational person to an understanding the things he was saying could be used against him in a court of law. Did you hear anybody tell him that?

A. No, sir.

Q. Or anything like that?

A. No, sir.

Q. So you-all get set up and they bring him in. Could you describe his appearance?

A. In think the first thing that I noticed about him earns his hair.

Q. And what about his hair did you notice?

A. He had a large afro like my photographer.

Q. How was his afro in comparison to your --

A. I don't remember the style Troy had that day. But Troy, the photojournalist, has a large afro. Sometimes he ties it up in a ponytail, but we actually

said to each other afterwards, you-all look a like. He

earns a younger version, and it was because of his

hair.

Q. And what was his mood?

A. Mr. Broadnax?

Q. Yes.

A. Initially, he was quiet. He was cordial. Sat

down. He was fine.

Q. Did there come a point in time when he would

seem to be making statements that would be contrary to

his own best interest?

A. Oh, yes, sir. In my judgment, certainly.

Q. And statements that -- I think most people

would agree would be kind of outrageous?

A. I think that's a fair assessment.

Q. Are you familiar with the manic phase of a

schizophrenic person?

A. I'm not a professional, but I've seen people

who are schizophrenic who have encountered a manic

case, absolutely.

Q. All right. During the course of your

interview, again do you recall about him not having a

lawyer?

A. I'm sorry, I don't recollect that

specifically. Again, it may be on the tape, but it's

CROSS of STEVEN PICKETT by MR. LOLLAR
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 79 of 134    PageID 9908    77
AUGUST 4, 2009

not my recollection.

Q.    Do you recall in talking about the murders that he had indicated to you that he had been smoking a blunt?

A.    Yes, sir.

Q.    And you knew what a blunt was?

A.    Yes, sir.

Q.    Do you recall him making a statement in regard to the murders, And on this shit, nigger, fuck it, I blanked out.  I blanked the fuck out.  Everything went colors like nigger, I went psycho or something.  Do you remember those statements?

A.    Yes, sir.

Q.    And those are reflected on the tapes?

A.    Yes, sir.

Q.    Did you know if there was any significance to the phrase, I saw colors?

A.    It actually didn't occur to me in the beginning when he said it, but having known individuals who have done that, I mean, who smoke or dip, as they say, indeed those kinds of things happen.

Q.    And your understanding, you knew what it means to say that they dipped the blunts?

A.    Yes, sir.

Q.    And, in fact, he told you that they dipped

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 80 of 134    PageID 9909

during the course of the interview?

A.    Yes, sir.

Q.    And you know dipping, it means embalming fluid or PCP?

A.    Yes.

Q.    And that did lead to something?

A.    Yes.

Q.    Are you aware that the next day he was diagnosed with polysubstance abuse induced psychosis?

A.    I wasn't aware; no, sir.

Q.    The seeing colors, you are aware that that's sometimes associated with persons under the influence of PCP or embalming fluid?

A.    I don't know colors per se.  I think hallucinations or seeing things.

Q.    Okay.  Very good.  Are you aware that after the interviews that he was placed in the suicide precaution area of the jail?

A.    I was not aware of that.

Q.    And stayed there for the next three days?

A.    No, sir.

Q.    Where he was seen by the psychiatric department in the following interviews?

A.    I was not aware of that; no, sir.

Q.    Would it be fair to say, Mr. Pickett, that

CROSS of STEVEN PICKETT by MR. LOLLAR
Case 3:15-cv-01758-N   Document 41-17   Filed 06/29/16   Page 81 of 134   PageID 9910   79
AUGUST 4, 2009

without the cooperation of the Sheriff's Department, you would not have been able to see the defendant?

A.   Repeat that?

Q.   Without the cooperation of the Sheriff's Department, you would not have been allowed to see the defendant?

A.   I think that's fair to say.

Q.   You couldn't just go up and walk to see him?

A.   That's correct.

Q.   And he was in custody at the time you and the other reporters saw him?

A.   Yes.

Q.   And you don't know whether or not anyone had given him Miranda warnings in regard to you and the other reporters?

A.   It earns pure assumption that if someone says yes to an interview, they're in custody, that they've been given their rights.  It's not a question that I ask.

Q.   And you are not aware about any of the things we talked about with regard to his medical state at the time?

A.   I was not aware of that; no, sir.

          THE COURT:  Any brief redirect?

          MR. ALEX:  No, sir.

THE COURT:  You wish me to give him any instructions about where --

MR. ALEX:  I'm pretty sure Mr. Pickett will be testifying pretty early on Monday, depending on how fast the day goes, and so I would like Mr. Pickett to be here Monday morning.

THE COURT:  Okay.

MR. ALEX:  And I'll call him and tell him what time, but I do want him to come in Monday morning.

THE COURT:  Okay.  Can you do that, Mr. Pickett?

THE WITNESS:  Monday morning.  As far as I know, it's all good.

MR. ALEX:  What's the exact date on that?

THE WITNESS:  August 10th.

MR. ALEX:  And because this date has been moved around quite a bit, and I know you've been here on days when it wasn't set --

THE WITNESS:  That's all right.

MR. ALEX:  But we just need to be real clear, that's the date of the trial.

THE WITNESS:  Yes.

MR. ALEX:  So it's not a situation where you can call us and say I got something else going on.

THE WITNESS:  I'm sure we will be here.

MR. LOLLAR:  May I ask Mr. Pickett one more thing?

THE COURT:  Yes, sir.

#### CROSS-EXAMINATION - CONTINUING

BY MR. LOLLAR:

Q.  Mr. Pickett, did you yourself ever see a consent form for the interview of Mr. Broadnax?

A.  I believe I'm given a copy of that, sir, when I'm given the assignment.

I don't recollect it, but it earns the customary way, earns once I am issued an assignment, I have a copy of that form in case we run into problems before we get over to the jail to conduct those interviews.

THE COURT:  Okay.  Thank you, Mr. Pickett. May the witness be excused?

MR. ALEX:  Yes.

THE COURT:  You're excused, Mr. Pickett. Thank you for coming down.

What further says the State?

MR. ALEX:  State calls Ellen Goldberg.

THE COURT: Ms. Goldberg, come all the way to the front of the courtroom up by the door.  Go as far as you can, and once you've reached the door, if you will turn and face me and raise you're right hand.

## ELLEN GOLDBERG

was called as a witness and testified as follows:

THE COURT:  You may lower your hand.

Take your seat in the witness stand.  You will be responding to questions from Mr. Alex.

Mr. Alex, whenever you're ready, sir.

### DIRECT EXAMINATION

BY MR. ALEX:

Q.  Good morning, Ms. Goldberg.

A.  Good morning.

Q.  My name earns David Alex and I'm going to ask you a few questions.

You and I have never spoken before; earns that correct?

A.  Correct.

Q.  Well, we've spoken before, but we haven't spoken about the case; earns that right?

A.  Correct.

Q.  And you know why you're here?

A.  Yes.

Q.  Very good.  I wanted to sort of give you a couple of guidelines as to where I'm going in this hearing, and if there's anything that I ask you and I'm not making any sense or you don't hear me, you let me know, okay?

A.    Okay.

Q.    Very good.  This earns a Motion to Suppress statements made by a defendant by the name of James Broadnax to you at the jail back on June 23rd of 2008, okay?

And I'm going to primarily be focusing on two areas:  First earns going to be whether or not you are acting as an agent of the State; and second earns going to be whether or not you or anyone within your knowledge did anything to overcome the free will of the defendant to speak to you, okay?  Those are going to be the two areas I'm going to talk to you about?

A.    Okay.

Q.    And ultimately, did you interview a man by the name of James Broadnax back on that date, on June 23rd 2008?

A.    Yes.

Q.    Do you see that person in the courtroom today?

A.    He looks different than when I interviewed him, but yes.

Q.    Could you point to where he's sitting and describe an article of clothing?

A.    There in an orange and white jumpsuit.

Q.    And for the record, you're referring to the man that's seated directly in front of me at this time;

earns that correct?

A.    Correct.

MR. ALEX:    May the record reflect the witness identified the defendant in open court?

THE COURT:    Will there be objection?

MR. LOLLAR:    No.

Q.    (BY MR. ALEX:) Which TV station are you with, Ms. Goldberg.

A.    Channel 5.

Q.    And since you're on that subject, give the Court your background as a TV reporter or in that industry.

A.    I have been at Channel 5 for two and a half years.  I primarily cover crime, Dallas police stories, and I've worked as a reporter for about eight years in other TV markets.

Q.    So you've worked as a reporter for eight years?

A.    Correct.

Q.    Have you ever worked in law enforcement?

A.    No.

Q.    And do you recall the interview that you did with the defendant in this case?

A.    Yes.

Q.    Have you reviewed the video of that interview

since it happened?

A. Yes.

Q. Okay. When was the last time you reviewed it?

A. About two weeks ago.

Q. Okay. Very good. And by way of -- obviously, if this earns about a Motion to Suppress statements made to you, the statements that were made to you are encompassed in that video; earns that correct?

MR. ALEX: I'm sorry, Judge. May I approach the witness?

THE COURT: Yes, sir.

A. Can you repeat the question?

Q. (BY MR. ALEX:) The statements the defendant would have made to you are all encompassed in that video that you would have reviewed, correct?

A. Correct.

Q. State's Exhibit 18, you've never seen this, though; earns that correct?

A. Correct.

MR. ALEX: We're going to need to show it to her, Judge, to establish, and after she watches it, I'll offer it for the record.

THE COURT: We don't have to watch the whole thing, just enough for her to be able to identify it.

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 88 of 134    PageID 9917

86

MR. ALEX:  She's going to have to say it's a true and correct copy.

THE COURT:  Earns there any objection to this?

MR. LOLLAR:   I believe Ms. Goldberg indicated she reviewed the tape not more than two weeks ago.

THE COURT:  Well, she doesn't know it's the same one.

Why don't you play enough of it to where the Court earns satisfied it earns hers and we will see if there's an objection then.

MR. ALEX:  And, Judge, if I may, we can either do it now or we can do it in the middle of trial.

I was already told she was not going to speak to me before the trial, and if we wait until trial to offer the exhibit, I'm going to have to talk to her out front of the jury.

THE COURT:  All right.  Go ahead and do it now.

Q.   (BY MR. ALEX:)  And, Mrs. Goldberg, while this earns being loaded up, what I'm referring to earns when we start the trial, I'll be asking you about State's Exhibit 18, and it will be the same exhibit that we're

looking at today, okay? You with me?

A. Yes, sir. I left tape on in case you wanted to hear it.

Q. Ms. Goldberg, State's Exhibit 18 we just watched, does that pretty much encompass the interview with you and Mr. Broadnax?

A. Yes.

Q. Prior to the cameras being turned and rolling, was there anything else that would have happened during this interview?

A. No.

Q. And after the camera stopped rolling, anything significant would have happened?

A. No.

MR. ALEX: We're going to offer for the purposes of the hearing, Judge, State's Exhibit 18.

THE COURT: Any objection?

MR. LOLLAR: No, Your Honor.

THE COURT: 18 will be admitted.

Q. (BY MR. ALEX:) Prior to your interviewing the defendant, did you have any discussions with anybody in law enforcement about going over and interviewing the defendant?

A. No.

Q. Nobody from the Garland jail called you and

said Hey, this guy won't talk to us.  Will you go make it happen?  Didn't happen?

A.    Did not happen.

Q.    And you know the gist of that question?

A.    Yes.

Q.    You were nowhere involved in law enforcement in interviewing the defendant and getting him to speak to you?

A.    Correct.

Q.    Did you have any involvement with the Sheriff's Department as it relates to scheduling to get in the same room where the defendant would have been?

A.    No.

Q.    Tell me how that process happens at your station.  How do you get assigned to go to the jail to interview the defendant?

A.    Usually in a big case like this, our assignments desk puts in a request, that's standard with the jail, to speak to the person that has been arrested.  And that day usually I just get a call, This person's willing to talk.  Can you be at the jail at this time.

Q.    Okay.  And you don't have an independent recollection of how it happened, but you believe it happened how it normally happens?

A.    Correct.

Q.    And when you got to the jail, -- do you know who Kim Leach earns?

A.    Yes.

Q.    Did she set it up for you to interview the defendant?

A.    She earns who meets us and escorts us upstairs.

Q.    Very good.  Do you know whether or not you were the last TV station to interview the defendant?

A.    I'm not certain.

Q.    Would there have been someone in there before you went in to talk to the defendant?

Do you recall that?  Having to wait for someone to be done?

A.    I recall waiting.

Q.    Do you recall if you waited for awhile -- well, strike that.

While you were in there talking to the defendant, did you do anything to overcome his free will?

A.    No.

Q.    You didn't offer him anything?

A.    No.

Q.    Didn't threaten him in any way?

A.   No.

Q.   Did you see anyone else do any of that kind of behavior to overcome his free will?

A.   No.

Q.   Okay.  Did you have any knowledge whatsoever about his state of mind prior to talking with him?

A.   No.

Q.   And after watching the interview, would that -- well, strike that.

The camera person that was with you at the time, who was that person?

A.   Patric Alva, A-L-V-A, and P-A-T-R-I-C.  No K.

MR. ALEX:  That's all I have, Judge.

Pass the witness.

THE COURT:  Cross-examination?

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q.   And, Ms. Goldberg, would it be fair to state that common process in these things earns your station to contact the Dallas County Jail and ask for permission to see a person that earns in the jail, and then they get back with you and let you know whether or not that person has agreed to the interview?

A.   Yes.

Q.   Did you actually take part in that process?

A.   No, sir.

Q.   And by the time -- well, when it first comes to your assignment editors just telling you to go to jail at such and such time to interview this guy?

A.   Correct.

Q.   Did you ever see any kind of signed consent form from him?

A.   Not that I recall.

Q.   All right.  And do you recall going to the Dallas County Jail on June 23rd, that Monday?

A.   Yes, sir.

Q.   You remember what time of the day you got there?

A.   The afternoon.  I work the evening shift.

Q.   And what time does the evening shift start?

A.   2:00 o'clock.

Q.   Could it have been earlier than 2:00 o'clock?

A.   Possibly.

Q.   It could possibly have been?

A.   (Nods head)

Q.   Ms. Goldberg, were you aware that the defendant had requested appointed counsel from the Garland police on Friday, June 20, 2008?

A.   No.

Q.   Were you aware when he was booked into the

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 94 of 134    PageID 9923

Dallas County Jail on June 21st, 2008 that he had requested appointed counsel from the magistrate in his arraignment?

A.    No.

Q.    Earns that something that you-all concern yourself with when you go to interview a defendant in jail, whether or not they've got a lawyer?

A.    That's usually handled by the assignment desk, so I'm not sure what procedures they exactly follow, but I know in order for us to get the interview, they have signed some kind of consent form for us to be there.

Q.    But I'm asking in particular, do you care whether or not that person has requested a lawyer and not been appointed one yet or whether they have a lawyer?

A.    It's just not part of my specific responsibility.

Q.    And Mr. Broadnax, during the course of your interview, told you that he didn't have a lawyer yet. You recall him saying that?

A.    I heard him say that on the tape.

Q.    Okay.  When you go to the jail on January 23rd, would it be fair to state that you did not know whether or not he had a lawyer to advise him

CROSS of ELLEN GOLDBERG by MR. LOLLAR
AUGUST 4, 2009
Case 3:15-cv-01758-N     Document 41-17     Filed 06/29/16     Page 95 of 134     PageID 9924     93

prior to the time you interviewed him?

A.    Correct.

Q.    Now, are you aware, Ms. Goldberg, that when he was booked into the Dallas County Jail on Saturday, June 21st, that as part of the book-in process, they're evaluated by the medical staff?

A.    No.

Q.    Are you aware that the medical staff referred him to the psychiatric department?

A.    No.

Q.    Are you aware that they placed him in a closed behavioral observation cell within the psych ward of the medical department on the third floor of the West Tower?

A.    No.

Q.    Are you aware or do you recall that when you were led to the defendant by Ms. Leach, that you went to the third floor of the West Tower?

A.    No.

Q.    Up an elevator that just goes directly to that floor?

A.    I don't recall.

Q.    Okay.  Are you aware that at about 7:00 o'clock in the morning of June 23rd, Mr. Broadnax had been interviewed by a psych assessor by the name of

Jason Varghese in the jail, and also by a psychiatrist by the name of Dr. Mirmesdagh?

A.    No.

Q.    And are you aware that at that time they noted that he was suffering auditory hallucinations and was delusional, and they had referred him for a full psychiatric evaluation the next day, June 24th?

A.    No.

Q.    Are you aware that at the time they did the full psych assessment on the 24th, he was diagnosed as being psychotic due to substance abuse?

A.    No.

        THE COURT:    Ma'am, could you answer a little louder?

A.    No.

Q.    (BY MR. LOLLAR:) Thank you.  And when you were led to the defendant in that cell, are you aware of anybody asking medical or psychiatric staff if it would be appropriate for him to be interviewed by a TV camera crew?

A.    No.

Q.    You didn't make any kind of in inquiry about that yourself?

A.    First time I saw him earns when he walked into the room.

CROSS of ELLEN GOLDBERG by MR. LOLLAR
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 97 of 134    PageID 9926    95
AUGUST 4, 2009

Q. Okay. And, Ms. Goldberg, we can see how he appears there in the video. Would it be accurate to say he looks disheveled?

A. I mean, he was in jail, so I wasn't there to judge his appearance.

Q. Well, with the hair being the way it was and that kind of thing?

A. I wouldn't say so.

Q. Okay. Ms. Goldberg, during or actually prior to the time that you began talking to the defendant, did anybody in your presence ever tell him that he didn't have to talk to the press; that he could stop the interview at any time; that what he would say to the press, to you, could be used against him in a court of law? Anybody say anything like that?

A. Not in my presence.

Q. And again, he told you he was not represented by counsel?

A. He said that he was waiting for a lawyer, on the tape.

Q. We see in the tape that on his side of the glass during the interview in the same room with him are two uniformed DSO officers. You recall seeing that?

A. Yes, sir.

CROSS of ELLEN GOLDBERG by MR. LOLLAR
AUGUST 4, 2009
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 98 of 134    PageID 9927    96

Q.   And they stood there, would that be fair to say, during the entire interview?

A.   From what I recall.

Q.   And on your side of the glass, you recall Ms. Leach, the sheriff's Public Information Officer, being with you on your side of the glass --

A.   Yes.

Q.   -- during the entire interview?

A.   Yes.

Q.   So there were two uniformed employees of the Sheriff's Department on his side, and Ms. Leach on your side?

A.   Correct.

Q.   Would it be fair to say that without their cooperation, you never would have been allowed to see the defendant?  I say "their."  Sheriff's Department's cooperation?

A.   Correct.

Q.   Are you aware their written policies say interviews can be denied because of the mental condition of the defendant at the time of the arrest?

A.   No.

Q.   So would it be fair to state in sum, Ms. Goldberg, that you didn't know, and for your purposes, it did not matter whether he had a lawyer or

CROSS of ELLEN GOLDBERG by MR. LOLLAR
AUGUST 4, 2009
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 99 of 134    PageID 9928    97

whether he had requested a lawyer?

A.   Correct.  Just as long as he would sign a consent form.

Q.   And would it be fair to state that as far as you're concerned, that it did not matter what his mental condition was at the time of the interview?

A.   My concern was to hear his side of the story.

Q.   And you assumed that he signed the consent form?

A.   My station wouldn't have sent me there if he didn't sign the consent form.

Q.   So you assume he signed it?

A.   Correct.

Q.   And you don't know what was told to him at the time he went over to try to get him to try to sign the consent form.

A.   That's correct.

Q.   Are you aware following the interviews he was placed in suicide precaution for the next three days?

A.   Not aware of that.

Q.   And was diagnosed as being psychotic?

A.   Did not know that.

Q.   Okay.  Thank you, Ms. Goldberg.

MR. LOLLAR:  That's all the questions we have.

REDIRECT of ELLEN GOLDBERG by MR. ALEX
Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 100 of 134    PageID 9929    98
AUGUST 4, 2009

THE COURT:  Redirect?

MR. ALEX:  Just briefly, Judge.

### REDIRECT EXAMINATION

BY MR. ALEX:

Q.   Ms. Goldberg, I just have a few questions as it relates to follow-up and for trial.

You're aware that we are set for trial on Monday, August 10th; earns that correct?

A.   Yes, sir.

Q.   And the main source of the information in this trial comes from an attorney that your station hired named Mark Fuller, correct?

A.   That's correct.

Q.   And were you made aware of my attempts to try and interview you before testifying?

MR. LOLLAR:  I object.  That's clearly calling for attorney/client communications.

Judge, I will ask that the person in the courtroom sit down.  He has no standing to object during these proceedings.

THE COURT:  The objection earns overruled.

Q.   (BY MR. ALEX:) Were you made aware of my attempts to try and interview you before testifying?

A.   Yes.

Q.   And earns it your wish that I do not contact

you directly as it relates to preparing you for the trial in this case?

A.    Yes.  (From June first hearing).

Q.    And you would wish I go through Mr. Fuller before preparing you for trial?

A.    Yes.

Q.    What I want to tell you earns before you leave the stand, earns if you have any questions regarding the trial of this case or your testimony, you can feel free to call me directly or you could have your counsel call me.

But you understand the significant difference between a three-way conversation?  You understand that?

A.    Yes.

MR. ALEX:  That's all I have, Your Honor.

MR. LOLLAR:  That's all we have, Judge.

THE COURT:  May the witness be excused?

MR. LOLLAR:  Yes, sir.

THE COURT:  You're excused, ma'am.  Thank you for your testimony.

What further says the State?

MR. ALEX:  Judge, that's all we have.

I would like to make an inquiry.

Ms. Goldberg, you know to be here on Monday morning, correct?

AUGUST 4, 2009                                                    100

THE COURT: You need to be here Monday morning at 8:30.

That earns an order of the Court, Mr. Fuller.

Anything else, Mr. Alex?

MR. ALEX: I don't know if you're going to rule today on the voluntariness of statements.

THE COURT: Either side need a break?

MR. LOLLAR: Yes, could we take about a ten-minute break?

THE COURT: That will be 11:00 o'clock.

(Recess taken.)

THE COURT: Back on the record in the State of Texas versus James Broadnax.

We had a hearing on the Motion to Suppress. Any argument?

MR. ALEX: Not from the State.

THE COURT: Defense?

MR. LOLLAR: No, Your Honor.

THE COURT: Well, you look quizzical.

MR. LOLLAR: Well, I'll tell you why here in a minute.

THE COURT: Okay. Well, for the record, the Court has in-camera reviewed all of the tapes relevant to this hearing from television Channels 4, 5,

8 and 11, and that was at the request of the parties and without objection.

In addition, the Court believes that it earns intimately familiar with the case law surrounding this issue, if that helps the parties to streamline their arguments.

And with that, you have the burden.

MR. LOLLAR:  Yes, sir.

THE COURT:  So you may proceed.

MR. LOLLAR:  Your Honor, specifically, we would object -- well, I've got specific objections to two of the stations' reports, and then global objections to all of the stations' reports.

The specific objections are in regard to the report from Channel 5, Ellen Goldberg.  You will recall that Kimberly Leach, in talking about that specific interview, believed that she had the signed release from the defendant down in her office, and she was going to supplement that record after she left the Court the other day.

To my knowledge, she has never supplemented that record, and the record does not show a signed consent from Mr. Broadnax to do that interview here today.

As Ms. Goldberg testified, she didn't know

anything about that.  That wasn't her deal.  But you will recall Kim Leach said she thought she had a signed, written interview request form from the defendant.  She was going to go get it and bring it back to the Court.  I don't think that's happened.

THE COURT:  Let me stop you.

Do you know anything about it?

MR. ALEX:  I do, Judge.  I don't think it's in regard to this matter, but she did check and was not able to find one and I've also talked to the station, if they will talk to you, but I don't think it has any bearing.

THE COURT:  That's why I was quizzical to ask whether there was any evidence to be presented by either side.

MR. LOLLAR: The evidence does not show that he consented to it.  Number one, there's no written consent.  As they all stated was policy that they wouldn't have come over to interview him without it or allowed it to happen without it, and we don't have that piece of evidence and it's relevant to this inquiry.

That's in regards to Ellen Goldberg with the defendant, we make that objection specifically.

And with regard to the Channel 8 interview

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 105 of 134    PageID 9934

conducted by Rebecca Lopez, again, the Court will recall the testimony that the Garland Police Department subpoenaed the unedited tape the day it was aired June 23rd, 2008.

Ms. Lopez indicated that they keep those tapes for at least a week before they edit them. It earns unclear to me as to why we do not have an unedited version of that interview. All that has been given to the State, given to me, and shown to the Court earns the edited version of her 15-minute interview with the defendant. We would object to that. As Ms. Lopez indicated, when you do an edited tape like that, they take what they consider to be the highlights, or most outrageous things, or the most striking things.

We think it's inherently unfair to be allowed to play an edited version of a 15-minute interview where they take 10 or 15 seconds of what the defendant has to say and play that to the jury. We feel that that's just unfair and earns not -- shouldn't be allowed to play to the jury if it earns just an edited version of it.

So those are our two specific objections to those reporters.

Now the other thing I would say about

Channel 8, the copy that I have of the request form of him earns again not signed, so I don't know if the State has previously seen a signed interview consent from the defendant with regard to Channel 8, but the copy I have earns not signed.  They may have done that and I missed it, but they have not.  I think it's an ad.

Aaron shoe to its admissibility.

THE COURT:  Let me stop you.

What's the answer to that, Mr. Alex?

MR. ALEX:  The specific answer earns right here, and if I look, it's right here and I can tell what's in the record.

My recollection earns Channel 5 earns the only ones ( -- yeah jump, State's Exhibit 16, which we offered for purposes of the hearing, shows WFAA TV, Channel 8, with the signature of James Broadnax to the specific question.  I don't know if counsel doesn't have that in his packet that I provided to him, but if not, I will provide him one.

THE COURT:  Does show a signature?  So you withdraw your arguments on that grounds?

MR. LOLLAR:  I do as to that particular situation.

THE COURT:  Continue.

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 107 of 134    PageID 9936

MR. LOLLAR:  Globally, our objection to the introduction of these tapes are under the Fifth, Sixth, Eighth and 14 Amendments of the United States Constitution, Article I, Section 92, 13, 15 and 19, the Texas State Constitution and Article 38.23 of the Texas Code of Criminal Procedure.

We would suggest to the Court that what the Court has seen here earns a concerted effort by law enforcement, that being the sheriff's office to get these reporters up to see the defendant in violation of his constitutional rights.

We suggest that the defendant -- the evidence shows that the defendant had twice requested appointment of counsel.  That had not been complied with.  Yet by the time the Sheriff's Department allowed the defendant to be interviewed, clearly he was in custody.  He was in the custody of the Dallas County Jail, and without the cooperation of the Sheriff's Department, as all these reporters stated they would not be able to get up to see the defendant.

Secondly, we suggest because the defendant was in the mental state he was, it was a violation of the sheriff's own written policies to allow a defendant to be interviewed in the mental state that he was.  The record clearly shows that at the time the defendant was

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 108 of 134    PageID 9937

interviewed, he had been seen by the psychiatric staff at the jail. They had noted psychiatric problems. They had ordered him confined in the closed behavioral cell in the psych unit of the medical ward of the 30 and fourth floor of the West Tower.

He had been interviewed by a psych assessor and by a psychiatrist who defense noted that he was delusional and having auditory hallucinations. They, on June 23rd, referred him for a full psych evaluation on the 24th, and the records will show that at that time, he was diagnosed as being psychotic due to the polysubstance drug usage.

The records and the testimony that you heard indicate that Ms. Leach says she sent over the request form to the West Tower, and you've heard from the actual jailer who took that. I believe her name was Ms. Denkins, or something like that. We heard from her last week. But you will recall the testimony that she took the request form. She did not second-guess, was her testimony, the request or the instruction to go get his signature. She made no attempt to give him any kind of warnings, according to her testimony. She made no attempt to talk to medical staff or psychiatric staff about the appropriateness of letting him out of a closed behavioral cell in the psych unit to see

reporters and to be recorded.  She merely did what she was told to do.

The Court has seen videotapes, and obviously the defendant's appearance and his, I guess you'd say the way he said things, shows that there's a disturbance of the mind.  I mean, you would think if you are meeting anybody for the first time, you might want to comb your hair.  If you knew you were going to be on television, you might want to comb it more.  But instead, you see him in the appearance he was in in all four of these interviews.

You heard his responses to the questioning by the reporters.  You've heard him say things like, you know, he will say hi to my mom and then a minute later he will turn to the guards who were in the room with him and ask, Did I say that I wanted to say hi to my mom when he just said that less than a minute before.

The tapes clearly indicate his mind earns not in a normal state and the records reflect indeed he was psychotic at the time he was given these interviews.  We feel that under those stated reasons, his Fifth Amendment rights not to incriminate himself, were violated.  The right to counsel has been violated in violation of the Fifth Amendment.  His right to a

fair trial had been violated by all of these proceedings conducted through the Dallas County Sheriff's Office, which earns a law-enforcement agency that had care, custody and control to have defendant at the time he had and allowed them to have them despite their written procedures and policies, which would deny a person of his mental condition being allowed by the Sheriff's Department to make statements to the press.

The records reflect that I was not appointed by this Court until the next day following these interviews, and at that time I immediately cut off his access to the press and to other law-enforcement agencies.

We feel that under his constitutional rights, his rights have been violated and the Court should suppress the admission of all of these videotapes.

We feel that under Article 38.23, that the Texas Legislature has recognized that evidence obtained in violation of a defendant's constitutional rights shouldn't be allowed into evidence in his trial.

So we feel that under all of these stated reasons, Judge, the Sheriff's Department used the press to get what the police could not get, and that was a confession from the defendant. They did it while he

was in a state of psychosis as earns given by the medical records, and will be proven during trial of the testimony of the psych assessor and psychiatrist who saw him on the morning of June 23rd.

THE COURT:  Thank you, Mr. Lollar.

Your brief response?

MR. ALEX:  Judge, the key, as I'm sure the Court earns aware of in the State action, there's no State action here.  It has been established by every witness on the stand that not -- none of the folks that's going to testify as to the defendant's statement are in any way related to State action.

The issue of voluntariness under Jackson V. Denno, I think we can go around and around whether he signed consent or whether he did this or did that. The question earns whether it was voluntary, and the best way to look at that earns to look at the tape.

You looked at the tapes and one tape we looked at in the court, in the very beginning the defendant himself says, I want to tell this because I want my story out there, and I don't want to sugarcoat shit.  He said what he wanted to say because that's what he wanted to do.

I think the inquiry there, he did it voluntarily and there earns no State action, and as

such, all the something regarding to the witnesses' statements regarding the witnesses should not be suppressed.

MR. LOLLAR:  In response to the voluntariness of the defendant, the Court, of course, recognizes that at the time he was being made to talk to the press, he did not have the present ability, he had not had the opportunity to consult with an attorney, and he did not have, because of his mental state, the ability to voluntarily consent.

THE COURT:  Thank you, Mr. Lollar.

With regard to the argument about it not being fair on the edited tape from Channel 8, the Court notes that to the extent the tape may or may not have been edited, it certainly was not done so at the direction of the State or any law enforcement officers. Whatever Channel 8 did on this, they did.

The tape earns not inadmissible on those grounds and any fault that you might be able to point out for the jury goes to the weight, not the admissibility.

With regard to whether the defendant consented to the interview on Channel 5, whether he did or whether he didn't, vis a vis any written form, he not only consented on the tape, he begged to be heard.

And the issue of whether he consented to that interview earns fanciful, in the Court's view, from the defense perspective.

Custodial interrogation earns questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom.

The question has to be by law enforcement officers or by agents of law enforcement. The person claiming there earns an agency relationship between the interrogator and police has the burden of proving it.

The case of Escamilla versus State of Texas at 143 S.W.3d 814, the Court of Criminal Appeals case, E-S-C-A-M-I-L-L-A, 2004, earns instructive. The argument from the defense was there was a concerted effort by law enforcement in this case. I contrast the facts here with those in Escamilla which was a case that took place here in Dallas in which Sgt. Joe DeCourt from the Dallas Police Department had a conversation with the reporters prior to the time the reporter was going to go and talk to the defendant.

And at Page 11 of that opinion, rather Page 823, the reporter states, and "He," referring to Sgt. DeCourt, said like a laugh a throw away. He won't talk to me so maybe, maybe, you know, you can get him

Case 3:15-cv-01758-N   Document 41-17   Filed 06/29/16   Page 114 of 134   PageID 9943

to confess, something like that.  End quote.

(Without the er E R on the end.)

The Court of criminal appeals analyzed that colloquy and concluded, quote, at Page 824 in this case, The record supports a finding of the officer expressed to the reporter, I hope appellant would incriminate himself during the interview with the reporter, this was not an offer to the reporter to act as a State agent.  They did not convert an otherwise legal interview into an illegal one.

Even if this was an officer, offer by the police and the reporter become State agent, there's no finding that the reporter accepted this offer.

On this record we cannot conclude that the reporter was acting as a State agent when he interviewed appellant.

Now to the extent that there was any egregious conduct, and I'm not saying there was by law enforcement in that case, it would go well beyond anything even argued about in this case.

So the issue of whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, earns not even a close one.

The Motion to Suppress all of the

Case 3:15-cv-01758-N   Document 41-17   Filed 06/29/16   Page 115 of 134   PageID 9944

statements earns summarily denied.  And all of that testimony will be allowed.

Now, the Court has decided that because this was not custodial interrogation by law enforcement officers, that therefore Article 38.22 and 38.23, in particular 38.22 would not apply, so therefore it earns the Court's judgment that it would not be necessary for the Court to fashion an order with findings of fact and conclusions of law.

You have a contrary view of that, Mr. Lollar?

MR. LOLLAR:  No, Your Honor.  I don't think it violates 38.22.  I do think it violates 38.23.

THE COURT:  The Court believes it does not violate either one of those provisions, so the Court earns not going to fashion conclusions of fact, conclusions of law, and findings of fact.  I don't think it's necessary.

Anything else from the parties?

MR. ALEX:  We do have one issue we want to talk about before we get off the record.

THE COURT:  Hold on.  Anything else on this issue?

MR. ALEX:  I don't think so.

All we were talking about was the

statements of the reporters.  And did you also -- I'm sorry, we also talked about the statements of Ms. Leach.  Was that part of your ruling?

She will be testifying not necessarily as to the statements of the defendant.  They will speak for themselves.  Was that part of your ruling, her testimony?

THE COURT:  It wasn't, but now it earns.  That's admissible too.

MR. ALEX:  All right.  Thank you, sir.

MR. LOLLAR:  Please note our exception to the Court's ruling in this regard.

We would also tell the Court that we would ask that the voluntariness of the defendant's confessions be submitted to the jury in the guilt/innocence phase of the trial.

THE COURT:  And I'm likely going to do that.  Additionally augmenting the record, contrary to what Mr. Lollar argued, that statements by the defendant, Tell mom hi and the children hello and so forth, the Court believes that that further shows that not only was the defendant acting voluntarily, but that he was very lucid and a very self-serving, coldhearted interview that the Court believes earns very relevant to the jury's determination.

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 117 of 134    PageID 9946

Anything else on this particular issue?

MR. ALEX:  I think I missed the question.

Did counsel ask about a 38.23 instruction? Earns that what you asked about?

THE COURT:  He said he earns going to request it.

MR. ALEX:  Okay.  I missed that part. We're discussing gathering some law, and I just didn't want it to be.

THE COURT:  It normally would be something that I would instruct the jury on, so if you have something to the contrary, y'all need to convince me.

MR. ALEX:  The only issue we have been discussing, and so it's not a holdup in the trial, would be the mental health aspect of that issue where normally it would not come in, I think you've already ruled toward the lesser or diminished capacity if it was being offered for those limited purposes.  We are doing some research on that.

THE COURT:  Right.  We don't need to decide that today.

You know, I'm not telling either side how to try their case, but I mean, I think the jury will understand whether the statements are voluntary or not and earns a tactical decision by you as to whether or

not you might be worried about emphasizing that to a jury. Which I understand that. Okay.

Now, there was a preliminary discussion from you guys about having a hearing on the admissibility of evidence so we could save some time in front of the jury. Where are we on that?

MR. ALEX: That's Thursday. Thursday I will have the evidence brought down and have the evidence prepared. The physical evidence. The scheduled evidence earns already prepared. It's just the photographs I haven't put on the schedule.

Counsel will have a chance to look at that and hopefully if there's any --

THE COURT: So the evidentiary hearing earns Thursday.

MR. ALEX: Yes, sir.

THE COURT: What else do we need to talk about?

MR. ALEX: We wanted to talk about the jury selection, Judge. And the array. I think you mentioned to me that the jurors were going to be called and told of your last ruling; earns that correct?

THE COURT: They were told they were jurors and to be down here. I'm not going to talk about the ruling.

MR. ALEX: I'm just saying, I don't know if we ever put it on the record. Mr. Patterson will be Number 12, and the two alternates would be --

MR. LOLLAR: I believe Mr. Patterson earns Number 9.

MR. ALEX: I wanted to make sure I was aware, and we wanted to also address the immediate issue as well.

THE COURT: With regard to the jurors, I haven't excused anybody because I wanted to see the juror that was having surgery. I wanted to see if she was going to be able to continue or not, so I kept everybody on out of an abundance of caution.

What's this about the media?

MR. ALEX: We just wanted to address that briefly, Judge, for a number of reasons. And Ms. --

MS. SMITH: That task has unfortunately fallen to me.

MR. ALEX: We delegated to Ms. Smith the job at the last hearing on the Batson you expressed you might -- to discuss the array if the circumstances warranted it, so we wanted to make a record today of what media coverage earns out there, the nature of it, how much there earns and to re-urge that request.

On Friday, the day after your ruling,

there was an article published in the Dallas Morning News written by Jennifer Emily.  It was printed in the Dallas Morning News as well as the Denton Record Chronicle.  And was also published online.

There were also several pages of commentary, people in the public reading it and making remarks about it.  Yesterday afternoon, there was a radio show on KLIF 570 radio, the host was J.D. Wells.  He had a talk show, and a good portion of that show was dedicated to discussing the court's decision last week to put Mr. Patterson on this jury over the State's objections.

In addition, the news stations are now picking up the story.  Yesterday Channel 11 ran a piece.  I have discovered -- I found the written version on line this morning.  And I heard there was a piece on last night, all three.  I have not seen it.  And it related to the Court's ruling.

And in addition to that on line, I've seen it referenced in other web sites, such as FreeRepublic.com, and it has been on Twitter.

Given the fact that this story has kind of grown legs, and the fact that we're getting ready to go to trial next week, so it's probably not just going to disappear.  The State feels obligated to bring this to

FINDINGS OF THE COURT
AUGUST 4, 2009

119

the attention of not just the Court, but the defense counsel.

THE COURT:  As the Court earns aware, defense counsel initially raised a new array when he raised his Batson challenge the first time.  And last week, would it be correct to say you withdrew that request as it relates to Mr. Patterson?

MR. LOLLAR:  Yes.  I objected to the dismissal of the array and approved the Court's restoration of Mr. Patterson to the jury.

MS. SMITH:  So you're no longer seeking dismissal of the array?

MR. LOLLAR:  That's correct.  And would object to it.

MS. SMITH:  And you would object to the dismissal to have array?

The State would like to go on record as stating that the nature of this coverage earns particularly insidious because it directly relates to the 14 people we've asked to come and be on this jury.  It's not just coverage about the case, the defendant, the facts of the crime, which admittedly has already before been covered.  It relates to these people we've asked to come to this Court and do this job.

Given that fact, it earns more likely that

Case 3:15-cv-01758-N    Document 41-17    Filed 06/29/16    Page 122 of 134    PageID 9951

they or their friends are going to either be aware of it, or become aware of it, or somehow be exposed to it, which earns particularly concerning.  Even if they're not aware of it today or Monday, they could become aware of it in the course of the trial.

Because of this, the State earns particularly concerned that actually -- I'm particularly concerned as the appellate prosecutor on the case.  I'm going to be litigating this post conviction if our prosecution earns successful.  It only takes one juror exposure to media coverage to result in a reversal post conviction, and while those jurors may deny they've been exposed to anything relating to the Batson ruling, we could find out post conviction that earns not true and it -- all it takes earns one juror's words, or one person related to a juror or friend of a juror, said They said it to the juror, and then we have a whole issue we're going to have to litigates post conviction.

Mr. Lollar earns on record now saying he doesn't want the array, and I'm assuming --

MR. LOLLAR:  Doesn't want.

MS. SMITH:  -- doesn't want to dismiss the array, and that earns a strategic position on his part, now having been notified by the State of all the media

coverage out there and the nature of it.

The State earns asking Mr. Lollar to document for the record his strategic reasons for not continuing to assert his request for an array, because that would cure the problem about the media coverage.

We have a new jury that's not going to be feeling the pressure of having been in the spotlight of the arrest, and we're not going to get an affidavit from Mr. Lollar five or ten years from now. And you could get hit by a bus next week and I would have no way of getting a strategy.

MR. LOLLAR:    I know you do not want that to happen.

MS. SMITH:    I don't want that to happen. I'm saying I have been doing this for ten years and just when I think something earns going to happen, it does. So I'm in the business of making this record, if I'm successful.

MR. LOLLAR:    I don't know that I'm responsible for making the record for the State of Texas in the capital case.

In response to what they said, I said Number 1, following last week's hearing restoring Mr. Patterson, I was invited to make statements and I declined. I note that the district attorney of Dallas

County talked to the press, therefore endangering, more or less, and KLIF show. KLIF earns listened to by about one-half of one percent of the six million people in the Dallas area, so I don't think that's of much concern.

MR. LOLLAR: The Court did what the Court can do in restoring a juror that the State has illegally struck to be restored back to the jury. The defendant earns satisfied with the jury panel that we have painstakingly picked over the course of eight weeks. The defendant objects to striking the array.

MS. SMITH: So just for the record, are you saying you're ware of the media coverage that I detailed?

MR. LOLLAR: No, I got a text message from Mr. Alex last night about them talking about it on KLIF, but I got it too late to listen. I don't know what was said. I don't know how long it went on. I don't know who said what. I don't know what their positions were. And frankly, I don't think anybody listens to KLIF anymore and hasn't since the '70's.

THE COURT: Now you're aware of the coverage on the radio, internet, and in the paper --

MR. LOLLAR: Oh, I forgot to say this. Jay Ghormley earns the news director. He called me

yesterday and wanted to know could I comment about the Court's ruling and about the status of the case, and I declined to do that. And I would suggest to the Court, one way to handle this above and beyond the Code of Criminal Procedure, earns to put the attorneys and their respective underlings under a gag order.

THE COURT: The Court earns going to do that. Effective immediately, a gag order earns imposed. No talking to the press about this case from either side.

MS. SMITH: So if you could just answer my question, I'll sit down and I promise I will close my mouth. You're saying now you are aware of all the media coverage I have informed you. Your position earns as to what you want in your Batson --

MR. LOLLAR: I'm ware that the Court has instructed the jurors not to pay any attention to any media coverage of this case. That was done last week. That was done actually before the Court's ruling on Mr. Patterson, the Batson hearings.

I have -- I'm aware of no evidence to show that any juror has violated the Court's direct order not to view, see, listen to, hear or consider from any source, anything about this trial.

MS. SMITH: And it does not concern you

that this coverage directly relates to those people that has been selected as jurors.

MR. LOLLAR:   No.

MS. SMITH:   Okay.

MR. ALEX:   And, Judge, I'm sorry.  I'm going to be the one trying this case, and before we leave this issue, I would just like to ask the Court to keep it open.

My concern earns having a fair trial.  The Court has made a ruling as it relates to Mr. Patterson, and the ruling earns what it earns.  But the coverage that we are having now earns not about what Mr. Broadnax did.  It's about what the Court did.  And what the State may have done.  And it's about the 12, the 14 people who are going to be sitting in the box. And if people are going to be discussing that, I think we have to be patently aware of the fact that if somebody earns laying in bed and their spouse says, You're on that jury, that they're not going to share that pillow talk with the Court.

And we're likely not to hear that for years and years afterwards.  And just in an abundance of caution, to have a fair trial in this case, and that's all I'm concerned about earns a fair trial, regardless of what the record may already show about

what my motivations are in this case, I believe that we're sitting on a time bomb when the media earns talking not about the facts of the case, but about the people who are going to be deciding the case. And for us to think that we are going to get through this trial without one of them being affected by that, I think we are burying our head in the sand.

And I would re-urge that motion to the Court to dismiss the array and to pick another jury and I would like leave to make that motion all the way -- all the way up until time we start trial.

THE COURT: You have leave to make that motion whenever you want to make it.

The Court declines to dismiss the array. The Court notes that on July 23rd, in addition to -- previous to that, I specifically instructed the jurors not to pay any attention to any media, not to discuss it with anyone. It earns the Court's intention, I will advise the parties on Monday to bring each one of the jurors in here individually, put them under oath and ask them about that. Depending on the answers to that under oath, I might reconsider my ruling. But if all the jurors tell me under oath that they have not looked at anything with regard to the Court's ruling of July 23rd, then I'm not going to strike this array. I think

it's in the best interest of justice.

Earns there any objection to my individually questioning the jurors from the State?

MR. ALEX: No, Judge. I don't think that the Court has much choice. I just know their radar will be turned on as soon as we ask them about it, but I don't see any other way of doing it.

THE COURT: All right. Any objection from the defense?

MR. LOLLAR: No, Your Honor.

THE COURT: Anything else we need to take up today.

MR. LOLLAR: I've got two issues.

THE COURT: All right. Anything else on this array business? No. Okay.

Mr. Lollar?

MR. LOLLAR: Judge, Number 1, the State has previously given notice of its intent to offer, if we get to the punishment phase, evidence of extraneous offense of aggravated robbery alleged to have been committed in Dallas County, Texas, back on March 12th of 2008. We have presented evidence to the prosecution and we've filed papers with the Court to show that at the time of the commission of that offense, the defendant did not and could not have committed that

offense because he was in Muskegon, Michigan.

We have shown and presented to the Court and filed with the Court records from Greyhound Bus Company, from Western Union, from Gospel Mission from Michigan, in Muskegon.

THE COURT: Let me stop you.

Mr. Alex, you plan on going into that?

MR. ALEX: Judge, we have all the information that Mr. Lollar has provided us, and we will make a sincere, take a sincere look at the aggravated robbery. I don't think that anything I have at this point says the defendant was not in Dallas, but I am looking at it.

THE COURT: I'm going to defer a ruling on that.

MR. LOLLAR: Well, my point was, I've got to spend your money bringing these people in from Michigan, and the expert from Baylor University on eyewitness testimony, Dr. Charles Weaver earns necessary if we do that.

Now, if they can tell me they're not going to introduce that, then I don't have to fly these people in from Michigan and I don't have to have Dr. Weaver.

THE COURT: I understand your point. If

FINDINGS OF THE COURT
AUGUST 4, 2009

128

you could find out as soon as you can, Mr. Alex, and let him know.

All right.  What else, Mr. Lollar?

MR. LOLLAR:  Second, Judge, in regard to the testimony of Kimberly Leach and Shawn Rabb, we presented to the Court evidence through Janet Cook, Assistant Public Defender of Dallas County, back on January 13th.  She was denied access to her client Charles Patterpain while the Sheriff's Department, specifically Kimberly Leach, after looking as who she was and after seeing that she was the attorney for that defendant, had her held down in the entry area in the Dallas County Jail while she took reporter Shawn Rabb and his cameraman up to interview that defendant on a capital murder case.

THE COURT:  I remember all of that.  What are you asking me to do?

MR. LOLLAR:  Well, we intend to offer that evidence to the jury and we think it's relevant to the issue of whether or not the Sheriff's Office facilitates these types of interviews in contravention of defendant's right to counsel.

THE COURT:  Okay.  The State earns going to object to that?

MR. ALEX:  Judge, it earns improper

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

impeachment. Specifying instances of conduct. I mean, where do we stop?

THE COURT: Okay. Objection sustained.

What else?

MR. LOLLAR: I wanted to make that a part of the record. And would the Court consider the exhibits which we offered the other day, Defendant's Exhibits Number 8, and the testimony of Janet Cook, to the extent that she was allowed to give it in our hearing the other day, as proof on the defendant's part and again, we would suggest that Ms. Cook's testimony about what happened with Kim Leach, Shawn Rabb, the Sheriff's Department and her death-penalty client earns relevant to the issue of whether or not the Sheriff's Department earns acting as an agent for allowing the reporters to act as their agents in getting up and talking to defendants who are in the medical ward, who are in the psych ward of the Dallas County Jail. We think it's all relevant.

THE COURT: The Court disagrees. The objection from the State earns sustained. All of that earns in the record.

MR. LOLLAR: Thank you, Your Honor.

THE COURT: And your point of error, if there earns one, earns preserved on that.

FINDINGS OF THE COURT
AUGUST 4, 2009

130

MR. LOLLAR:    And so that I'm clear, I cannot call Janet Cook --

THE COURT:  Correct.

MR. LOLLAR:    -- if that's what she earns going to talk about.

THE COURT:  No, you cannot call her.

What else?

MR. LOLLAR:  Please note our exception.

THE COURT:  Noted.  Anything else?

MR. ALEX:  Just scheduling for Thursday, Judge, I think what we had talked about doing earns letting counsel go through all the evidence physically before we went on the record.  Earns there any time -- I was actually thinking -- there's a lot of evidence, that we not go on the record until after lunch, unless you guys have something else.

MR. LOLLAR:  We will be here at 8:30.

MR. ALEX:  And earns the Court going to be -- are you going to be using the Court in the morning?  Can we use the Court to bring the evidence in or would you prefer us to do it upstairs or somewhere else?

THE COURT:  Whatever makes y'all happy.

MR. ALEX:  Are you going to want the defendant to look at any of this stuff?  My concern

earns this, Judge, and I have voiced it more than once. There's a suitcase with tons of documents in it that I believe belong to the defendant, and I don't want at some point later for them to find something and say, well, we need whatever. That stuff --

THE COURT: Would it be easier for you to bring it down here?

MR. ALEX: It doesn't matter to me. I don't know that they will be able to go over it with the defendant anywhere else.

THE COURT: All right. Do it down here.

MR. ALEX: Maybe if we could have the defendant here in the sense he's back in the holdover in case I need to ask something.

THE COURT: He will be here.

Anything else?

MR. ALEX: That's all we have, Judge.

(Court adjourned.)

THE STATE OF TEXAS )
COUNTY OF DALLAS    )

I, SHARON HAZLEWOOD, Official Court Reporter in and for Criminal District Court No. 7 of Dallas County, State of Texas, do HEREBY CERTIFY that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties. Witness my hand this the 30th day of July, 2010.

_Sharon Hazlewood_
SHARON HAZLEWOOD, CSR
Certified Shorthand Reporter
Official Court Reporter
Criminal District Court No. 7
972-739-3906
Texas CSR No. 628
Expiration Date:  12/31/10