*76207*

REPORTER'S RECORD

VOLUME 44 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

THE STATE OF TEXAS ) IN THE CRIMINAL DISTRICT
)
)
)
)
VS. ) COURT NO. 7
)
)
)
JAMES GARFIELD BROADNAX ) Of DALLAS COUNTY, TEXAS

ORIGINAL

================================================================

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

PRETRIAL HEARING

================================================================

On the 6th day of August, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

A P P E A R A N C E S

FOR THE STATE OF TEXAS:


   HONORABLE DAVID M. ALEX
   SBOT NO. 24003256
   HONORABLE LISA SMITH
   SBOT NO. 00787131
   HONORABLE GORDON HIKEL
   SBOT NO. 00787696
   HONORABLE ANDREA HANDLEY
   SBOT NO. 08898800
   133 N. INDUSTRIAL BLVD.
   FRANK CROWLEY COURTHOUSE
   DALLAS, TEXAS 75207
   TEL. 214-653-3600


FOR THE DEFENDANT:

   HONORABLE BRAD LOLLAR
   SBOT NO. 12508700
   1700 COMMERCE ST, STE. 404
   DALLAS, TEXAS 75201
   TEL. 214-384-8178

   HONORABLE DOUGLAS H. PARKS
   SBOT NO. 15520000
   321 CALM WATER LANE
   HOLLY LAKE RANCH, TEXAS 75765
   TEL. 903-769-3120

   HONORABLE KERI MALLON
   SBOT NO. 24049165
   DALLAS COUNTY PUBLIC DEFENDERS OFFICE
   133 N. INDUSTRIAL BLVD., LB 2
   FRANK CROWLEY COURT BLDG.
   DALLAS, TEXAS  75207
   TEL. 214-653-3550

VOLUME 44

PRETRIAL HEARING

AUGUST 6th, 2009

|  | PAGE | VOL. |
|---|---|---|
| PROCEEDINGS............................... | 3 | 44 |
| CASE CALLED BY THE COURT.................. | 3 | 44 |
| ADJOURNMENT............................... | 41 | 44 |
| REPORTER'S CERTIFICATE.................... | 42 | 44 |

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 29 | CRIME SCENE PHOTO | | 17 | 44 |
| 30 | CRIME SCENE PHOTO | | 17 | 44 |
| 31 | CRIME SCENE PHOTO | | 17 | 44 |
| 32 | CRIME SCENE PHOTO | | 17 | 44 |
| 34 | CRIME SCENE PHOTO | | 17 | 44 |
| 35 | CRIME SCENE PHOTO | | 17 | 44 |
| 36 | CRIME SCENE PHOTO | | 17 | 44 |
| 43 | CRIME SCENE PHOTO | | 20 | 44 |
| 44 | CRIME SCENE PHOTO | | 20 | 44 |
| 45 | CRIME SCENE PHOTO | | 20 | 44 |
| 46 | CRIME SCENE PHOTO | | 20 | 44 |
| 47 | CRIME SCENE PHOTO | | 20 | 44 |
| 48 | CRIME SCENE PHOTO | | 20 | 44 |
| 49 | CRIME SCENE PHOTO | | 20 | 44 |

2

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 50 | CRIME SCENE PHOTO | | 20 | 44 |
| 51 | CRIME SCENE PHOTO | | 20 | 44 |
| 53 | CRIME SCENE PHOTO | | 20 | 44 |
| 54 | CRIME SCENE PHOTO | | 20 | 44 |
| 409 | CRIME SCENE PHOTO | | 22 | 44 |
| 410 | CRIME SCENE PHOTO | | 22 | 44 |
| 411 | CRIME SCENE PHOTO | | 22 | 44 |
| 412 | CRIME SCENE PHOTO | | 22 | 44 |
| 413 | CRIME SCENE PHOTO | | 22 | 44 |
| 414 | CRIME SCENE PHOTO | | 22 | 44 |
| 415 | CRIME SCENE PHOTO | | 22 | 44 |
| 416 | CRIME SCENE PHOTO | | 22 | 44 |
| 417 | CRIME SCENE PHOTO | | 22 | |
| 428 | CRIME SCENE PHOTO | | 21 | 44 |
| 429 | CRIME SCENE PHOTO | | 21 | 44 |
| 430 | CRIME SCENE PHOTO | | 21 | 44 |

PROCEEDINGS

(Court convened.)

THE COURT: This is the State of Texas versus James Broadnax, Cause Number F08-24667.

Is the State ready on this case?

MR. ALEX: Yes, sir.

THE COURT: Defense ready?

MR. LOLLAR: Yes, sir.

THE COURT: Okay.

MR. ALEX: Judge, just procedurally, what we did today is the State brought down all the physical evidence and all of the evidence that we intend to offer in the case-in-chief, potentially in punishment, and record evidence to go over with the defense.

We also have had a chance to go through the evidence with the defense in an effort to eliminate needless time in court and we -- I think that we have -- I think we may be on the same page as far as what the defense would potentially be objecting to photographically. I'm not quite sure what physical evidence that we went over today, but I will let defense counsel speak to that.

THE COURT: Well, I didn't want to get to that.

MR. ALEX: I'm sorry.

THE COURT: I thought you --

MR. ALEX: I thought you asked me --

THE COURT: No, I just asked if you were ready. Okay.

Y'all can sit down. We're all friends.

First, it's my understanding that the State intends to file a mandamus action asking the Court of Appeals for relief on my decision to grant the defendant's Batson challenge in part on July 30, 2009. Therefore, the posture of the case is that at this time is unknown. It may remain unknown for the next 96 hours, so what we're doing is we're proceeding as if we're going Monday, and then if we're not, we're not. We will figure that out when the time comes.

It's my intention right now, though, regardless of what happens on this mandamus, to bring the jury down here so I can figure out in the event that the case is stayed, what their schedule is. However, knowing the lawyers in this case, I'm sure they're going to have some sort of opinion whether that's prudent or not, so now I seek your input on that.

First from the State.

MR. ALEX: I would just like to make sure that I understand what the Court is saying. On

Monday -- and I'm going to -- I think I've told the Court that we were working on a mandamus. I anticipate it will be filed either today or first thing tomorrow is what my appellate lawyers are telling me. And if the Court is saying that he's going to, regardless of whether a stay is ordered, he would still bring the jury down on Monday and inquire about the future schedule. I just want to make sure I understood what you're saying.

THE COURT: That is exactly what I said. Also, I was going to admonish them again on not looking at any press or anything, because it might mean a little more coming up here than over the phone.

MR. ALEX: Do you anticipate that there will be press here on Monday?

THE COURT: Yeah.

MR. ALEX: Do you think if we brought them down and sat them, you would allow the press to shoot through the door? Would you --

THE COURT: No.

MR. ALEX: So they wouldn't be allowed to do anything in the courtroom on Monday.

THE COURT: If, in fact, the case gets stayed, then no.

MR. ALEX: That's my only concern, Judge,

is that if they're here, and there's a gang of cameras and all of that --

THE COURT: I'm not going to allow it.

MR. ALEX: Well, they will be in the hall. We can't stop them from being out there, you know. They're going to want to assert their rights to be in the courtroom.

THE COURT: Are you trying to suggest to me that I shouldn't bring them down here?

MR. ALEX: I'm just bringing up issues. You're asking what I had thought and if the Court hadn't thought of those issues, I want to bring them up because I'm concerned about there's going to be a circus out there, and if they're sitting out there waiting around or whatever the case may be, then potentially we've put something in they hadn't already seen, so I wanted to bring that up as an issue to think about.

THE COURT: Well, they know there is press because I told them there's press, and they are not to look at it, so they know that, so they shouldn't be surprised by that.

MR. ALEX: I'm not saying they don't know there is press, but if the press is in the hall and they're interviewing somebody, we can't tell them they

can't do stuff in the hall. And if these folks are coming in and out, we very well could be adding problems to the case.

THE COURT: Okay. Well, the problem is because of the posture of the case now, is we don't know what their schedules' going to be on down the road, and so I want them here so we can talk about it. There's no perfect solution to this.

MR. ALEX: I agree with you. I thought that you were asking for -- I was bringing up an issue in case the Court hadn't considered that, and that's my biggest concern is that when this trial does get started that, you know, both sides gets a fair jury and it's not going to be a jury that has been exposed to press by something that we may have done. And that's my only concern.

And I don't think I have another option of asking them their schedule short of just asking them over the phone.

THE COURT: I'm not going to do that. We need to do more than that on this. I'm going to have my bailiffs in the hall to make sure that as jurors come up, Barney, that you get them back here, okay?

Does the defense have any objection to my doing that?

MR. LOLLAR:  No, sir.  It was our understanding that one of the things the Court wanted to do on Monday, -- now this is something we talked about a couple of days ago before we found out the State was planning to mandamus the Court, to talk to them individually to see if they had seen any of the media coverage.

THE COURT:  I am going to do that.

MR. LOLLAR:  You are going to do that Monday.  Judge, could we go on in respect to something --

THE COURT:  Is this a new issue --

MR. LOLLAR:  No.

THE COURT:  -- because I want to handle this one.

MR. LOLLAR:  Same issue.

Yesterday, the State of Texas notified the Court and the defense that it was their intention to mandamus the Court and request a stay of these proceedings during the mandamus action based on the Court's ruling in the Batson matter.  And Your Honor, we've thought about that and would ask the Court one further thing in regard to that.

To the extent that we think the State may say that Article 35.261 of the Texas Code of Criminal

Procedure is in contrast to the federal requirements under the Fourteenth Amendment as stated in Batson-v-Kentucky, and Alabama and all its progeny, to find Article -- let me preface that by saying we don't think Article 35.261 limits the Court's ability in any way to adequately handle a Batson challenge and situation to the extent that it does, we would like the record to reflect that we ask the Court to find Article 35.261 unconstitutional.

THE COURT:  I'm inclined to do that.

MR. LOLLAR:  We just wanted that covered in the record, Your Honor.

THE COURT:  I'm not going to do that.

All right.  So that is issue Number 1. Issue Number 1 is I'm going to have the jury come down here regardless of what happens.  They are to be here at 8:30.  With any luck at all we will have them here before the press gets here, so that would obviate that.

And then I will discuss with them at that time what their schedule is and remind them not to be doing anything with regard to any publicity on this case.  That's the end of that issue.

All right.  Next, with regard to the troublesome matter of Mr. Rabb and what conceivably could happen on that.  I wanted the two parties' input

into how I should proceed on this. I envision this happening. I envision coming in here and frivolously invoking his right against self-incrimination when it doesn't exist, because he's not in any jeopardy of anything, but that it is some sort of attempt by Ms. Prather to have fanfare in this case for her own self-serving purposes as opposed to Mr. Rabb's, or the defendant's, or the State, or anybody else in this case.

In the event that he does that, my intention was to take the jury out, admonish him that he wasn't in any jeopardy of anything, and order him to testify.

What's your perception of that, Mr. Alex?

MR. ALEX: Um, I think it might be dangerous ground. I think I know Mr. Rabb and I think you're probably right, Judge. I would probably -- I think I would probably prefer, rather than you just order him to testify, to perhaps, and I'm just thinking out loud right now, Judge.

I talked to Mr. Watkins and Mr. Brooks. I think I'd prefer to immunize him and then he doesn't have any Fifth Amendment right.

THE COURT: That would be great if you do that and we wouldn't have to worry about it. I just

don't know if we have to immunize him at all.

So why don't you prepare, if that's the way you want to go, those kind of papers without putting the part in about what you're going to immunize on, and then I will have a hearing outside the presence of the jury to figure out exactly what he is going to do. Of course, this could be something that happens months from now.

MR. ALEX: Right. I like that idea, and I can have the paperwork prepared to go either way, that he thinks that he's got a Fifth Amendment right, it could very easily be tied to some privilege. Who knows how creative they can be. But I can have that prepared.

THE COURT: Well, based on my colloquy with Ms. Prather, I think we should be prepared for anything and.

Everything.

Mr. Lollar?

MR. LOLLAR: Well, I don't think Shawn Rabb is going to take the Fifth Amendment on anything. I think he will follow Ms. Prather's advice, but Ms. Prather understands there's no grounds on which he can possibly be charged with a criminal offense.

THE COURT: Well, that's correct. But you

have not been the victim of her screed on this like I have.

MR. ALEX: And, Judge, just for the record, I kind of think outside the box sometimes, and I'll tell you, I have seen the affidavits that were presented as it related to the motions to quash and the mandamus that the press did, and I'll be just straight up honest with you. There was just a bunch of stuff in those affidavits that was just flat out false, and as far as Mr. Rabb is concerned, I think his affidavit said that everything that's important in this trial is included in that tape, and I think he's probably deathly afraid one of us is going to ask him what his mental impressions of the defendant, and that's obviously not anywhere in any of the tapes.

And if he's concerned about that, I certainly can immunize him on that or anything else that's not included on the tapes that he may not have included in our affidavit if you get where I'm going with this.

THE COURT: I want you to go as broad as you can on that because, again, as unusual as the behavior has been on that, I think we should anticipate anything and everything.

MR. LOLLAR: I'm thinking that if we're

going to get stayed either by the Court of Appeals or somebody in Austin, it will happen by 5:00 o'clock tomorrow.

Would you tend to agree with that? They won't try to get us over the weekend.

THE COURT: No. 5:00 o'clock tomorrow.

MR. LOLLAR: And I don't think they will come flying in here 8:59 Monday morning. I think we will know it by the end of the afternoon.

THE COURT: But that's not related to this. I'm being prophylactic and preparing for the worst. So that takes care of all of that.

Now, with regard to the evidence, what objection do you have, Mr. Lollar?

MR. LOLLAR: Judge, we've gone through all the physical evidence that the State has brought down that they intend to offer. In regard to the physical items of evidence, I don't believe we have any objections.

MS. MALLON: No.

MR. LOLLAR: In regard to certain photographs, we do have objections with regard to State's Exhibits 20, 21, and 22. We do not have objection to their introduction. We will object to continuous display of a State's exhibit during the

course of the trial.

It's the State's common practice to try to leave these type of photographs up for the jury to see throughout the entire trial, whether anybody is referring to them or looking to them or talking about them or anything like that, and we do object to that.

THE COURT: Response?

MR. ALEX: Judge, these two guys are part of this trial, whether counsel likes it or not, and I think if their pictures are there, they will be able to look at the defendant the whole trial.

THE COURT: I got it. That's in my discretion. I'm not going to let them do it.

MR. LOLLAR: Our further objection with regard to this, Judge, is they sometimes like to prop these up on the Judge's bench and we think that gives the jury the impression that you are siding with them over the defendant, so we would object to that as well.

THE COURT: Okay. Overruled. There's no other place to put them.

MR. LOLLAR: Sir?

THE COURT: There's no other place to put them.

All right. What else?

MR. LOLLAR: In regard -- can we go up to

the bench?  Because you're probably going to need to look at those.

THE COURT:  Well, no, not yet.

MR. LOLLAR:  In regard to a group of photographs from the -- first from the crime scene, we would object specifically to State's Exhibit Number 29, 30, 31, 32, 34, 35 and 36.  We object under Rules 401, 402 and 403, and would suggest whatever probative value they have is outweighed by their prejudicial value.

THE COURT:  You do not object to State's Exhibit 33?

MR. LOLLAR:  No, sir.

THE COURT:  Can I have those?

MR. LOLLAR:  And we have some more from the crime scene as well.

THE COURT:  Well, let's go with these first.

MR. LOLLAR:  Okay.

THE COURT:  Response from the State?

MR. ALEX:  May I approach, Judge?  I'm not sure what is left if we take those out to show the jury.

You have the whole envelope there?

My basic response is a general response, and that's that we have the burden to show that this

was a specific intent crime and if we're not able to show all of the injuries that was inflicted, the evidence we believe will show by the defendant, then it's very difficult to show the specific intent to kill.

You have the photograph that counsel had not objected to.  This is Stephen Swan who was shot in the chest and then in the head at close range.  If we look at these photographs, there's no head shots and the only shot to the chest is here with the shirt on.  And to the layman, I mean, that could be anything.  These shots, we're asking to introduce --

THE COURT:  Are there any of these that you will agree on or do you want them all to come in?

MR. ALEX:  Yes, sir, I want them all to come in.  I can show the Court how many photographs I'm not offering.  There's probably a total of 70.  It was a very bloody crime scene and the blood went from one end of the parking lot to the other and dripping down.  There's about 20 different angles that could be shown and I left all of those out.  I can show you the ones I left out and I have not left any photo in that shows the same angle of the same injury more than once.

But I do believe, in a specific intent crime, that the exit of the bullet that came out

through Mr. Swan's head and the entry of the bullet through Mr. Swan's head, and then the injuries as it pertains specifically to the matter that comes out of his mouth, and the way he bled will all be corroborative of the defendant's own statements to the media.

And there's no other witnesses to the crime due to his actions.

I think I heard, I get it, Mr. Alex.

MR. LOLLAR:  Judge, there are photos of the crime scene I would ask the Court to consider in conjunction with these, and there are injuries on the autopsy photographs they shall try to explain something, they're shown in the autopsy photographs, and I don't think there is any need to show this many and this graphic of photographs of a crime scene, and I think it violates Rule 403.

THE COURT:  The Court has conducted the appropriate balancing test under Rule 403, and the Court concludes that for the reasons stated by Mr. Alex, as well as importantly for the crime-scene investigator to be able to give whatever opinions he has about his observations of the scene, that the relevant exhibits, State's Exhibits 29 through 32, inclusive, and State's 34 through 36, inclusive, are

more probative than prejudicial.

The objections are overruled.

Other objections, Mr. Lollar?

MR. LOLLAR:  Yes, sir.  In our second folder of crime-scene photographs of Mr. Butler, we object to 54, 53, 52, 51, 50, 49, 48, 47, 46, 45, and 43.

THE COURT:  For the same reasons?

MR. LOLLAR:  Yes, sir.

THE COURT:  And these are the reasons you previously articulated as to 29 through 32 and 34 through 36?

MR. LOLLAR:  Yes.

THE COURT:  If I could see those?

MR. ALEX:  The ones on the outside, the prior ones you objected to.

MR. LOLLAR:  Yes.

THE COURT:  I'm inclined to admit all of the exhibits.  However, I do have a question about State's Exhibit 52, Mr. Alex.  Why is that necessary?  Because it has the picture of the good Lord on his hand there.  I don't want to worry about that.

MR. ALEX:  Can I see the rest of these, Judge?

I believe, Judge, what Ms. Giannone, the

crime-scene investigator in this case, and each one of the victims, she took a picture of the right hand and left hand, as we always know there's always in these cases issues of the conditions of the hand of the deceased, and the issues are multifarious.

But here, these are the only -- nobody's going to take the cross off his finger and then take the picture. The hand is just the way it is.

If they were -- if there were bruises on the knuckles, if there was evidence, the hands sort of speak for themselves, and we think that we need to offer both pictures of his right and left hand because there is evidentiary value there. Obviously if there was a fight -- not a fight. If there's a defensive wound or not a defensive wound, and that's just -- I'm going to say it the wrong way -- that's just his left hand and he has a ring and a cross is -- and the point is, we can't take the cross off. It is what it is.

And, I mean, to say that the jury shouldn't see the guys hands just because it has a cross on it, we've got both hands of Mr. Swan and we plan to show the jury both hands of Mr. Butler.

THE COURT: The Court's concern on State's Exhibit 52 is it's not just his hand. It is also in saying to the jury this is a God-fearing, God-loving

man, which is not to criticize you at all. It is just me trying to be fair here.

MR. ALEX: I understand, Judge. My only point is his hands are what they are.

THE COURT: Okay. I'm not going to decide on 52. You might want to take some look at some case law on it.

But as to 43 through 51, 53 and 54, the Court has made its balancing test under Rule 403 for the reasons I previously stated as to the exhibits pertaining to Mr. Swan. The Court deems those exhibits to be more probative than prejudicial.

And again, when I say all of these are admissible, that is assuming the correct foundation is laid. We are just addressing the 403 aspect of it.

So 52 is not admitted at this time, but 43 through 51, 53 and 54 are admitted, subject to the appropriate foundation, anyway.

And what further says the defense?

MR. LOLLAR: Your Honor, in regards to the autopsy photographs, I believe these regard Mr. Butler. We would object to State's Exhibits 428, 430 and 431, again, because we believe the probative value is outweighed by the prejudicial value and they're not relevant under Rules 401.203 and 304.

MR. ALEX: Judge, repeat numbers -- the State's response are going to be they are necessary for the medical examiner to explain her findings; yes, sir.

THE COURT: Let me see them.

You wish to be heard further on this, Mr. Lollar?

MR. LOLLAR: No, sir.

THE COURT: State's 428, 429 and 430, I have examined those. The Court concludes conducting its balancing test under Rule 403 that the exhibits are more probative than prejudicial. Subject to the correct foundation, those are all admitted. The objections are overruled.

What further says the defense?

MR. LOLLAR: In regards of to the autopsy photograph, Exhibits 409, 410, 412, 413, 414, 415, 416 and 417, autopsy photos of Mr. Swan.

THE COURT: 409 through 417, inclusive?

MR. LOLLAR: Yes, sir. On the same ground that we made the objection to 401, 402 and 403.

THE COURT: I will state for the record what is apparent to anyone. Murder cases are gruesome by their very nature. There is nothing we can do about that. It is what it is.

I'll say this in passing, Mr. Alex. You

might want to warn the family about the gruesome nature of these, and if they're going to stay in the courtroom, the worst thing we could have is some sort of outburst from them which could cause us to have a mistrial, which is a disaster, tsunami-type disaster.

MR. ALEX:  I understand.

THE COURT:  The Court has conducted its balancing test under Rule 403.  State's Exhibits 409 through 410 -- through 417 are more probative than prejudicial, and based on my experience, are likely necessary in order for the medical examiner to give her opinions.

What further says the defense?

MR. LOLLAR:  Judge, in regards to all of the photographs the Court has just examined, the photos of the crime scene and the medical examiner at the scene, that the number of photographs introduced by the Court is cumulative and repetitive.  We would ask the Court to take into consideration the volume of the pictures.

THE COURT:  Right.  But I understand from the State there are many, many, many more pictures that you're not going to offer; is that right, Mr. Alex?

MR. ALEX:  Yes, sir.  And I tendered all of those to counsel in case they are interested in

introducing them at any time in the trial, but there is at least about a hundred more pictures in these folders that I'm not offering which shows various examples of blood and gore taken out at the scene.

They do actually show different angles, but I do believe if I offered all of this, is it would be sort of overwhelming.

THE COURT:  I agree and appreciate it.

So your objection is noted and overruled as to those exhibits.  I mean, pending some sort of required foundation of the law being laid.

And, yes, sir, Mr. Lollar.

MR. LOLLAR:  Judge, we understand there was also a videotape made of the crime scene and the State has tendered me a copy of the audiotape.  He has not indicated whether he has, in addition to the crime scene photos, wish to offer the videotape of the crime scene.

THE COURT:  Mr. Alex?

MR. ALEX:  Yes, sir, Judge.  Maybe I wasn't clear.  And I'll be crystal clear at this point.

Everything on the exhibit list that I have given to Mr. Lollar that is not marked for the record, I intend to offer, including the crime-scene video, which is a crime-scene investigator going through and

panning the area to show the -- how the crime scene was secured. It goes through every piece of evidence, the evidence markers --

THE COURT: Hold on. How can I rule on this if I haven't looked at it?

MR. ALEX: Certainly. I --

THE COURT: How long does it last?

MR. ALEX: It's probably not more than -- here. Let me find it. I can tell you.

MR. LOLLAR: Did I understand you to say you're only offering that for record purposes?

MR. ALEX: No. What I'm saying, the evidence schedule has the items that I'm only offering for the record. Everything else that's on here, I'm offering for all purposes, guilt/innocence, and then stuff that's for punishment. So if it's on here, then I'm planning on offering it unless it says otherwise.

And I wanted to make sure we're on the same page with that.

MR. LOLLAR: Okay.

MR. ALEX: So that is one of the items that I'm offering, and that's the crime-scene video.

And 401, I can pull it out for the Court and you can view it or whatever the Court pleases.

MR. LOLLAR: Well, again, if we're going

to have a video in addition to all the still photographs, I think it's cumulative and we object to that on those grounds.

THE COURT: While you are cueing up the film, I mean, yes, I want to do that, what other objections do you have, Mr. Lollar?

MR. LOLLAR: Judge, there's a stack of photographs that appear to have been taken of the defendant's jail cell on June 19th of 2009. We object specifically to State's Exhibit 476, 477, 478 and 479. These appear to be photographs of a letter that somebody sent to the defendant. They're not his writings. It's just something found in his cell.

THE COURT: Response?

MR. LOLLAR: And we don't think that that is relevant to any issue before the jury. Certainly not at the guilt or innocence phase, and it would not be relevant to any of the issues before the jury at the punishment phase if we get there. That's the first thing.

THE COURT: Let me see them first.

Are you trying to offer these during guilt/innocence?

MR. ALEX: No, sir.

THE COURT: Because I would not allow you

to do that.

MR. ALEX:  No, I'm not planning on doing it during guilt/innocence.

MR. LOLLAR:  I'm sorry, you're not going to offer them in what?

MR. ALEX:  Not in guilt/innocence, no.

MR. LOLLAR:  I don't think they're relevant to anything.  I don't think there is any relevance.

Again, under 401, 402, 403, they're not relevant to the issue of whether or not the defendant would commit criminal acts of violence or cause continuing threats to society.  They're not relevant to the second special issue, and they're not relevant to the third special issue.

THE COURT:  Response?

MR. ALEX:  Yes, sir.  And maybe I should have looked at exactly what it was before I said guilt/innocence, Judge.

Obviously, the letter is written to him, Judge.  It's not just something left in his cell by anybody else.  It's just addressed to J.B., James Broadnax, so we don't have a problem with a connection here and it being out of context.

However, it appears that whoever this

person is that writing the defendant is giving him some advice about temporary insanity in a capital murder case. I don't have any intention of offering this in my case in chief, but it could be very interesting rebuttal evidence, depending on if the defendant testifies, and what he says, or depending on the case the defendant puts on.

And I would agree that at first blush on guilt/innocence that this isn't on its face relevant, but it could be relevant in guilt/innocence and clearly in punishment if the jury is deciding whether somebody is a future danger or not, it will go directly to -- if you will bear with me. There are a lot of letters, Judge, I just need to know if it the one that I'm familiar with.

Okay. I know exactly which letter this is. I think in punishment, Judge, when the jury is deciding whether the defendant is a future danger or not, this letter goes straight to the heart of whether or not he is -- well, this is what I will say -- we will withhold this until some point we feel it is relevant.

THE COURT: And by "this," you're referring to 477 and 478?

MR. ALEX: Yes, sir. Because the thing

is, I believe it will become relevant and there's no need me telling defense at this point why I think it will become relevant, but I think I can explain it to the Court at the proper time.

THE COURT:  Are you talking about in guilt/innocence of --

MR. ALEX:  In either part of the case, Judge.  I won't offer that without approaching the Court and making a proffer.

THE COURT:  I defer ruling on 476 through 479.

MR. LOLLAR:  How about the other ones?

MR. ALEX:  Well, clearly, 476, Judge, it is eaten up with Folk Nation, and we've already heard from the gang expert, the defendant making self-acclamations to the Folk Nation, and to -- I think we have already taken testimony on this.

THE COURT:  Yeah, we have.  But hold on.

And I am of the view that that would be relevant in the event we reach a punishment phase, okay?  Now, I'm just focusing on guilt/innocence.

MR. ALEX:  Oh, no, sir, I'm not planning on offering this.  And again, I'm probably not the clearest person of the day.  The evidence that we have on the evidence schedule has guilt/innocence evidence

and punishment evidence. This is clearly punishment evidence to the gang affiliation.

THE COURT: Well, I'll tell you what. I'm not going to make any rulings on punishment phase evidence right now. I want to see how the trial goes.

MR. ALEX: Very good. And that would be the same as 479 as well, Judge, that will be a punishment phase piece of evidence.

THE COURT: All right.

MR. ALEX: That we could revisit at the proper time.

MR. LOLLAR: In addition, Your Honor, we have objections to State's Exhibits 463, 464, 465, 467, 468, 469, 470, 471, 472, 473, 480, 481 -- -

THE COURT: Hold on. 467 through 473. And then 480.

MR. LOLLAR: 481, 482, 483, 495, 496, 497, 475, 474, 499, 500 --

THE COURT: Slow down. You're skipping around now. 474, what was the next after that? 478?

MR. LOLLAR: 498.

THE COURT: All right.

MR. LOLLAR: 499, 500, 501, 502, 503, 504, and 505. We feel that again these are photographs taken in the defendant's cell and they are photographs

which have -- or photographs of items which have no relevance to any issue at all in guilt/innocence.

THE COURT:  Are you offering them in guilt/innocence?

MR. ALEX:  Not in my case-in-chief, Judge; no, sir.

And if I think in any rebuttal any of these things are relevant to any issues that were brought up, then I will definitely address it with the Court before I put any of this in front of the jury.

THE COURT:  Let me see those, though, so I can get an idea of what it is.

MR. LOLLAR:  And, Your Honor, again, we would say that they have no relevance to any issue before the jury, and in the penalty phase, under Rule 401, 402 and 403.  And whatever relevance they do have is outweighed by the prejudicial value.

THE COURT:  Does WPI 839 have any significance?

MR. ALEX:  I'm sorry, Judge?

THE COURT:  WPI 839.

MR. ALEX:  Is that on a pill?

THE COURT:  Yeah.

MR. ALEX:  Is it an inscription on a pill?

THE COURT:  Uh-huh.

MR. ALEX: Yeah, it's a Wellbutrin pill that's an antipsychotic drug that you are supposed to take and not hoard it.

MR. LOLLAR: It is one of his prescribed drugs.

MR. ALEX: It is a direct violation of the jail's policy on hoarding drugs and that kind of thing.

And again, Judge, that kind of stuff I wouldn't be offering in guilt/innocence. That will strictly be a punishment phase piece of evidence.

THE COURT: What's your theory that the Art of War is going to be relevant in punishment? Because I'm aware of that, and that's studied at the Army War College, and there's nothing nefarious about it at all.

MR. ALEX: Yes, sir. There's absolutely nothing nefarious about it if you're in the military and you're studying military, but if you're out committing double homicides, then I believe it goes to the heart of everything that we are here for.

If you're out hunting people, if you are bragging about hunting people and you're taking weapons and getting on public transit and you're bragging about looking for victims to find, and you're attracting their attention away from them and you're slaughtering

them, you know, I think those kind of things are used for good purposes and are used for bad purposes. Clearly --

MR. LOLLAR:  I don't believe there is any evidence that he read the Art of War prior to the time of the commission of the offense, Your Honor.

MR. ALEX:  Well, we're talking about future danger here, Mr. Lollar.  We're talking about somebody who has already killed --

MR. LOLLAR:  I tell you what.  I will withdraw my objection if the State produces copies of the defendant's copy of the Art of War, and if they want to make any type of argument to the jury about that, that's fine, if that's what they want to base their idea of future dangerousness on.

I also was shown photographs of what they described as books about murder, which included Murder at 1600 Pennsylvania Avenue by Margaret Truman; and also some James Grisham novels, and they also gave me notice that they were to do some photographs of that to show that the defendant is likely to commit criminal acts of violence in the future that would constitute a continuing threat to society.

MR. ALEX:  Judge, probably for expediency sake, the punishment evidence, we probably would feel a

lot better in making those arguments at that time because right now we are just arguing in a vacuum, but I do believe that all of this stuff will pan out especially after --

THE COURT:  Yeah, I don't want to hear anything else about punishment evidence today.

Is the film ready?

MR. ALEX:  I believe it is, Your Honor.

THE COURT:  You wish to be heard, Mr. Lollar?

MR. LOLLAR:  Well, on just one more thing. After the Court sees this, I understand -- and I've seen on the internet videos made by somebody of the victims set to music showing different, you know, phases of their life and such, and I wanted to inquire of the State whether or not they were intending at either phase of the trial to introduce those types of videos.

If so, I want to bring the case to the Court where Judge Nelms was reversed for introduction of those types of videos in the punishment phase.

THE COURT:  I wish you would bring me that case.

MR. LOLLAR:  I will bring you that case.

THE COURT:  I am always receptive to both

sides giving me case law in support of their positions.

MR. LOLLAR:  Yes, sir.

THE COURT: So I don't have to rule in a vacuum.  I would encourage more of that from both sides.

MR. LOLLAR:  That's why I was trying to get an idea from the State if they had any intention of trying to offer such videos of the victims' lives set to music.

THE COURT:  Mr. Alex?

MR. ALEX:  No, sir, Judge.  I think probably the best way to proceed at this point is I have painstakingly put together this schedule of evidence, and at this point, that's all the evidence I intend to offer in both phases of the trial.  And if there is anything else, I will make sure that both counsel and the Court is aware of it.

And I understand the reason for the hearing today, and I don't have any intentions at this point of offering anything like that.

The only thing that they don't -- haven't seen is that there is some pictures of Death Row that I have been waiting to come in at some point showing Death Row and general population at the Polunsky Unit.

MR. LOLLAR:  Well, and that was the next

area that I wanted to inquire about.  I know that you don't want us to talk about punishment phase evidence at this point, but I just don't see how pictures of the Polunsky Unit, aerial photographs of the Polunsky Unit and videotapes made of the Polunsky Unit are relevant to any issue that this jury is ever going to see.

THE COURT:  Response?

MR. ALEX:  Again, Judge, I do believe that the punishment phase of the trial will speak for itself, but just from a general standpoint, the jury is going to hear evidence from -- I'm almost quite certain -- from both sides by way of expert or some kind of opinion as to what life is like in prison and whether or not there is an opportunity to be a danger in prison or not be a danger in prison, and that's to the heart of this case.

The community in which the defendant would be living in if he is found guilty, is going to be Polunsky.  And if he is at Polunsky, and if the issue is the opportunity to commit a crime, a picture is a thousand words.

I mean, if there is guards or there is no guards, or if there are fences or no fences, or if the inmates are together or not together, I think the defense 's own experts testify to that all the time.

MR. LOLLAR: Well, the point I'm trying to make --

THE COURT: Don't talk at the same time, guys.

MR. LOLLAR: Right.

THE COURT: Are you through, Mr. Alex?

MR. ALEX: Yes, sir.

MR. LOLLAR: The point I'm trying to make is if he's at Polunsky, he's been assessed the death penalty, If he is doing a life sentence, he will be at anywhere but Polunsky.

So how are pictures at Polunsky relevant to any issue? I mean, if they are trying to show how he will be if the jury doesn't give him death, well, then Polunsky is the one unit they can't show him.

THE COURT: That seems pretty compelling actually, Mr. Alex.

MR. ALEX: Judge, I just left Polunsky last week. Half of the Polunsky Unit they have got death row and they have got a general population.

And anybody that gets a sentence over 50 years will be at Polunsky. They will either be in the death row unit or they will be over in the general population unit. But it's also called Polunsky. I'm not quite sure what Mr. Lollar is referring to.

THE COURT: Well --

MR. ALEX: Maybe he is referring to the Ellis Unit where death row used to be.

MR. LOLLAR: I don't believe that -- I'm sorry. I don't believe that's true. I don't think people -- I don't think everybody in TDC who gets over a 50-year sentence is at Polunsky period. We have got thousands and thousands of people serving time in TDC who got over a 50-year sentence.

MR. ALEX: And I don't disagree with that at all, Judge. I think the general propisition at first was that there is no way that he would be at Polunsky if -- if by this jury sentencing him, it's obvious that he could be either on death row or in general population at Polunsky, and the pictures would certainly show what the community is like.

MR. LOLLAR: Then I will amend my objection to the photographs, any photographs showing death row on Polunsky.

THE COURT: Response to that? That does appear to be compelling as to death row.

MR. ALEX: Judge, I think that there was pictures that have come in these cases on a regular basis. I think the thing that the jury is going to have to decide is if this guy is going to be a future

danger in the community that he's going to be in.

And the contrast between death row and general population is something that we're going to be discussing throughout the whole punishment phase of the trial. And to see one without seeing the other, you can't really make a reasonable comparison.

MR. LOLLAR: Well, again, I would say any description of death row will not be relevant to what the State is asking this jury to do.

THE COURT: I defer ruling on that for the time being. Although I understand both sides argument, I think their -- neither arguments are ludicrous, and any case law either side can have in support of their positions would be appreciated.

MR. LOLLAR: And finally, Your Honor, in regard to the photographs that the Court has admitted over the defense objection, may we have a running objection to those photographs?

THE COURT: That's granted.

MR. LOLLAR: And if at the time the State offers the photographs, if I stand up and object and say Your Honor, we object to these photographs on the ground that we offered in the sub rosa hearing prior to trial, would that be satisfactory with the Court?

THE COURT: I didn't know we were having a

secret hearing.

MR. LOLLAR:  Pardon me?  Well, not a sub rosa hearing.  I mean -- well, you know what I mean.

THE COURT:  I'm just teasing you.

MR. LOLLAR:  I mean pretrial, today, on August 6th.

THE COURT:  All right. Yeah, that's fine.

MR. LOLLAR:  Is what we'll call the grounds for the objection.

THE COURT:  Yes.  Yes.  Yes.  Yes.

And the person that took this is going to be on the stand testifying about it; is that right, Mr. Alex?

MR. ALEX:  Yes, but it will be -- I doubt that I'll call every crime-scene investigator out there, and I believe the one who took all the pictures will be sponsoring this as well.  Isabel Giannone, although I don't think she was the one holding the camera, but she was directing everything out there.

(Video played.)

THE COURT:  Are there objections?

MR. LOLLAR:  Judge, our objection is it's cumulative of the still photographs we've seen and it's repetitive and we would object on those grounds.

THE COURT:  The objection is overruled.

In addition to the Court's previous ruling that I make the appropriate balancing test under Rule 403, the prior exhibits were more probative than prejudicial, and the same ruling as to the videotape and further bolstering that ruling by stating that the Court did observe the film and what it adds as opposed to being cumulative is a better overall perspective of the crime scene, including such things as giving jurors a frame of reference as to the relevant positioning of things and distances and so forth, and that, therefore, it's not cumulative but is relevant in and of itself for those reasons.

Anything else from the defense?

MR. LOLLAR: No, sir.

THE COURT: Anything from the State?

MR. ALEX: Yeah. I'm still waiting on their exhibit list and their witness list, Judge.

MR. LOLLAR: Keep on waiting.

MR. ALEX: I guess I'm not getting one. That's all I have, Judge.

THE COURT: All right. Then by way of summary, here's where we are.

I have not ruled on potential punishment evidence, although I have urged the parties once again if they have case law supporting their positions and

it's out there, it would be helpful to me if y'all would provide it to me.  That's for both sides.

I have not ruled on State's Exhibit 52 specifically, but as to all other evidence in the guilt or innocence phase, in the event that the State is able to provide adequate evidentiary foundation, all of those other exhibits would be admitted; the objections now are overruled.

Anything else from the parties?

MR. ALEX:  That's all we have.

THE COURT:  I want everybody here at 8:15 Monday morning no matter what happens in the next 96 hours.  We are going to have the jury here.

Reminding you, Barney will ensure that none of the jurors are accosted by press.  He will hustle them back here into the jury deliberation room, if he wants to keep on being my bailiff, that is.

And when the time comes, we need to be prepared to find out what Mr. Rabb does and what sort of immunity grant could be given him, and that will be done outside the presence of the jury.

Anything else from the State or the defense?

MR. LOLLAR:  Just a couple of things I wanted to follow up with Mr. Alex about.

I had sent Mr. Alex a list of witnesses who appear on the witness list the State has presented to us, but we have not been able to find in any of the written materials, and I understand Mr. Alex has been busy, but do you think we can expect to get those sometime soon?

MR. ALEX:  I can guarantee you, Mr. Lollar, that 90 percent of those names are in the materials you have, and I will spend a bit of time pointing that out to you, but I can, -- I have looked at the list and I can guarantee you most of those names are on the materials you have.

MR. LOLLAR:  Well, like I say, I have looked for them but I can't find them, and there is about 20 names on your witness list I think that I can't find in the written materials you told me about.

MR. ALEX:  Okay.  I'll look at that.  And I also have a subpoena in place for another round -- I know this is a different type of -- for another round of medical records.  I am waiting for them to get them to me and I will get you those as well.

MR. LOLLAR:  And the other object that we need to talk about or the subject that we need to talk about again is this extraneous, the aggravated robbery.

I don't want to have to fly these people

in from Illinois at citizens' expense -- Michigan, I'm sorry -- and I don't want to have to bring up the expert witness from Baylor on the issue of identification if I don't have to.

MR. ALEX:  Well, all I can tell you at this point, Mr. Lollar, and I can't tell you how to try your case, but I haven't seen anything in the materials as of yet that puts your client somewhere else.  The documents that I have, there's a whole week or two --

THE COURT:  Okay.  Time out.  So the bottom line is, he does intend to proceed with that.

MR. LOLLAR:  Okay.

THE COURT:  So you need to bring your witnesses in.

MR. LOLLAR:  Yes, sir.

THE COURT:  All right.  Anything else from the parties?

MR. ALEX:  That's all I've got, Your Honor.

MR. LOLLAR:  That's it.

THE COURT:  I know everybody here wants to vigorously represent their client, I understand that, but again I request as I always do to keep your contentiousness to a minimum to the extent that you can.

We're in recess.

(Court adjourned.)

THE STATE OF TEXAS )

COUNTY OF DALLAS    )


        I, SHARON HAZLEWOOD, Official Court Reporter in

and for Criminal District Court No. 7 of Dallas County,

State of Texas, do HEREBY CERTIFY that the above and

foregoing contains a true and correct transcription of

all portions of evidence and other proceedings

requested in writing by counsel for the parties to be

included in this volume of the Reporter's Record, in

the above-styled and -numbered cause, all of which

occurred in open court or in chambers and were reported

by me.

        I further certify that this Reporter's Record of

the proceedings truly and correctly reflects the

exhibits, if any, offered by the respective parties.

        Witness my hand this the 28th day of

_____July_____, 2010.


_____
SHARON HAZLEWOOD, CSR
Certified Shorthand Reporter
Official Court Reporter
Criminal District Court No. 7
972-739-3906
Texas CSR No. 628
Expiration Date:  12/31/10