Case 3:15-cv-01758-N   Document 41-19   Filed 06/29/16   Page 1 of 84   PageID 10011

REPORTER'S RECORD

VOLUME 45 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE CRIMINAL DISTRICT |
| | ) |
| | ) |
| | ) |
| VS. | ) COURT NO. 7 |
| | ) |
| | ) |
| JAMES GARFIELD BROADNAX | ) Of DALLAS COUNTY, TEXAS |

ORIGINAL

===================================================

TRIAL ON MERITS

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

===================================================

On the 10TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

# A P P E A R A N C E S

FOR THE STATE OF TEXAS:


    HONORABLE DAVID M. ALEX
    SBOT NO. 24003256
    HONORABLE LISA SMITH
    SBOT NO. 00787131
    HONORABLE GORDON HIKEL
    SBOT NO. 00787696
    HONORABLE ANDREA HANDLEY
    SBOT NO. 08898800
    HONORABLE ELAINE EVANS
    SBOT NO. 24032880
    133 N. INDUSTRIAL BLVD.
    FRANK CROWLEY COURTHOUSE
    DALLAS, TEXAS 75207
    TEL. 214-653-3600


FOR THE DEFENDANT:

    HONORABLE BRAD LOLLAR
    SBOT NO. 12508700
    1700 COMMERCE ST, STE. 404
    DALLAS, TEXAS 75201
    TEL. 214-384-8178

    HONORABLE DOUGLAS H. PARKS
    SBOT NO. 15520000
    321 CALM WATER LANE
    HOLLY LAKE RANCH, TEXAS 75765
    TEL. 903-769-3120

    HONORABLE KERI MALLON
    SBOT NO. 24049165
    DALLAS COUNTY PUBLIC DEFENDERS OFFICE
    133 N. INDUSTRIAL BLVD., LB 2
    FRANK CROWLEY COURT BLDG.
    DALLAS, TEXAS  75207
    TEL. 214-653-3550

VOLUME 45

## TRIAL ON MERITS

AUGUST 10TH, 2009                                PAGE    VOL.

PROCEEDINGS.................................    3      45

CASE CALLED BY THE COURT...................    3      45

HEARING....................................    3      45


| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| RABB, SHAUN | | | 7 | 45 |
| | | | 8 | 45 |

| | PAGE | VOL |
|---|---|---|
| TWO WITNESSES SWORN BY THE COURT......... | 16 | 45 |
| JUROR KELLY McDONALD EXAMINED BY THE COURT........... | 20 | 45 |
| JUROR McDONALD EXCUSED FROM JURY SERVICE. | 22 | 45 |
| JURORS EXAMINED BY THE COURT............. | 25 | 45 |
| JURY PANEL SWORN BY THE COURT............ | 40 | 45 |
| JURY INSTRUCTIONS BY THE COURT........... | 40 | 45 |
| ARRAIGNMENT AND INDICTMENT PRESENTED...... | 46 | 45 |
| OPENING STATEMENTS BY THE STATE........... | 47 | 45 |
| OPENING STATEMENTS BY THE DEFENSE......... | 58 | 45 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| JOHNSON, NATHAN | 65 | | | 45 |
| PURCELL, CHAD | 79 | | | 45 |
| SWAN, CRAIG | 98 | 115 | | 45 |
| PICKETT, STEVEN | 117 | 131 | | 45 |
| | 145 | 150 | | 45 |
| | 154 | | | 45 |
| BUSBY, DEBORAH | 155 | 179 | | 45 |
| BARG, EVELYN | 195 | 222 | | 45 |
| JOHNSTON, JEFF | 231 | 268 | | 45 |
| GOLDBERG, ELLEN | 270 | 277 | | 45 |
| | 283 | 285 | | 45 |

| | PAGE | VOL. |
|---|---|---|
| HEARING................................ | 287 | 45 |
| ADJOURNMENT............................. | 297 | 45 |
| REPORTER'S CERTIFICATE.................. | 298 | 45 |

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| RABB, SHAUN | | | 7 | 45 |
| | | | 8 | 45 |
| JOHNSON, NATHAN | 65 | | | 45 |
| PURCELL, CHAD | 79 | | | 45 |
| SWAN, CRAIG | 98 | 115 | | 45 |
| PICKETT, STEVEN | 117 | 131 | | 45 |
| | 145 | 150 | | 45 |
| | 154 | | | 45 |
| BUSBY, DEBORAH | 155 | 179 | | 45 |
| BARG, EVELYN | 195 | 222 | | 45 |
| JOHNSTON, JEFF | 231 | 268 | | 45 |
| GOLDBERG, ELLEN | 270 | 277 | | 45 |
| | 283 | 285 | | 45 |

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARG, EVELYN | 195 | 222 | | 45 |
| BUSBY, DEBORAH | 155 | 179 | | 45 |
| GOLDBERG, ELLEN | 270 | 277 | | 45 |
| | 283 | 285 | | 45 |
| JOHNSON, NATHAN | 65 | | | 45 |
| JOHNSTON, JEFF | 231 | 268 | | 45 |
| PICKETT, STEVEN | 117 | 131 | | 45 |
| | 145 | 150 | | 45 |
| | 154 | | | 45 |
| PURCELL, CHAD | 79 | | | 45 |
| RABB, SHAUN | | | 7 | 45 |
| | | | 8 | 45 |
| SWAN, CRAIG | 98 | 115 | | 45 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 18 | CHANNEL 5 INTERVIEW - ELLEN GOLDBERG - DISC | 276 | 277 | 45 |
| 20 | PHOTO ID - SWAN | 100 | 100 | 45 |
| 21 | PHOTO ID - SWAN and BUTLER | 101 | 101 | 45 |
| 23 | CRIME SCENE PHOTO - INTERSECTION of STATE and GLENBROOK | 87 | 87 | 45 |
| 24 | CRIME SCENE PHOTO - LOOKING EAST | 73 | 74 | 45 |
| 25 | CRIME SCENE PHOTO - LOOKING WEST | 73 | 74 | 45 |
| 26 | CRIME SCENE PHOTO - BICYCLE | 73 | 74 | 45 |
| 27 | CRIME SCENE PHOTO - AERIAL | 87 | 87 | 45 |
| 28 | CRIME SCENE PHOTO - CRIME SCENE & FIRE STATION | 87 | 87 | 45 |
| 31 | CRIME SCENE PHOTO - SWAN - FULL BODY POCKET | 87 | 87 | 45 |
| 45 | CRIME SCENE PHOTO - BUTLER - FACE DOWN, BLOOD POOLING | 87 | 87 | 45 |
| 253 | PHOTO - REAR PASSENGER SIDE OF CAR | 108 | 109 | 45 |
| 273 | PHOTO - NIKE SHOES, PIPES, RECEIPT & CHL | 109 | 109 | 45 |
| 277 | SWAN'S RECEIPT FOR GUN | 110 | 110 | 45 |
| 398 | WARRANT/AFFIDAVIT - DEFENDANT TEXARKANA | 267 | 267 | 45 |
| 399 | TITLE HISTORY - SWAN CAR | 267 | 267 | 45 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 400 | TITLE HISTORY - DYMON SMITH CAR | 267 | 267 | 45 |
| 402 | VIDEO - TEXARKANA TRAFFIC STOP | 239 | 239 | 45 |
| 403 | VIDEO - CHANNEL 11 | 125 | 125 | 45 |
| 405 | VIDEO - CHANNEL 5 - DEMO WITH SUBTITLES | 277 | 277 | 45 |
| 537 | AIS RECORD | 177 | 177 | 45 |
| 538 | AIS RECORD | 177 | 177 | 45 |
| 539 | JAIL MEDICAL RECORDS | 158 | 158 | 45 |
| 540 | POLICE REPORT | 267 | 267 | 45 |

1

REPORTER'S RECORD

VOLUME 45 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE CRIMINAL DISTRICT |
| | ) |
| | ) |
| VS. | ) COURT NO. 7 |
| | ) |
| | ) |
| JAMES GARFIELD BROADNAX | ) Of DALLAS COUNTY, TEXAS |

======================================================

TRIAL ON MERITS

======================================================

On the 10TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

---

i

VOLUME 45

TRIAL ON MERITS

AUGUST 10TH, 2009

| | PAGE | VOL. |
|---|---|---|
| PROCEEDINGS............................. | 3 | 45 |
| CASE CALLED BY THE COURT.................. | 3 | 45 |
| HEARING.................................. | 3 | 45 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| RABB, SHAUN | | | 7 | 45 |
| | | | 8 | 45 |

| | PAGE | VOL |
|---|---|---|
| TWO WITNESSES SWORN BY THE COURT......... | 16 | 45 |
| JUROR KELLY McDONALD EXAMINED BY THE COURT.......... | 20 | 45 |
| JUROR McDONALD EXCUSED FROM JURY SERVICE. | 22 | 45 |
| JURORS EXAMINED BY THE COURT............. | 25 | 45 |
| JURY PANEL SWORN BY THE COURT............ | 40 | 45 |
| JURY INSTRUCTIONS BY THE COURT........... | 40 | 45 |
| ARRAIGNMENT AND INDICTMENT PRESENTED...... | 46 | 45 |
| OPENING STATEMENTS BY THE STATE.......... | 47 | 45 |
| OPENING STATEMENTS BY THE DEFENSE........ | 58 | 45 |

---

2

APPEARANCES

FOR THE STATE OF TEXAS:

HONORABLE DAVID M. ALEX
SBOT NO. 24003256
HONORABLE LISA SMITH
SBOT NO. 00787131
HONORABLE GORDON HIKEL
SBOT NO. 00787696
HONORABLE ANDREA HANDLEY
SBOT NO. 08898800
HONORABLE ELAINE EVANS
SBOT NO. 24032880
133 N. INDUSTRIAL BLVD.
FRANK CROWLEY COURTHOUSE
DALLAS, TEXAS 75207
TEL. 214-653-3600

FOR THE DEFENDANT:

HONORABLE BRAD LOLLAR
SBOT NO. 12508700
1700 COMMERCE ST, STE. 404
DALLAS, TEXAS 75201
TEL. 214-384-8178

HONORABLE DOUGLAS H. PARKS
SBOT NO. 15520000
321 CALM WATER LANE
HOLLY LAKE RANCH, TEXAS 75765
TEL. 903-769-3120

HONORABLE KERI MALLON
SBOT NO. 24049165
DALLAS COUNTY PUBLIC DEFENDERS OFFICE
133 N. INDUSTRIAL BLVD., LB 2
FRANK CROWLEY COURT BLDG.
DALLAS, TEXAS 75207
TEL. 214-653-3550

---

ii

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| JOHNSON, NATHAN | 65 | | | 45 |
| PURCELL, CHAD | 79 | | | 45 |
| SWAN, CRAIG | 98 | 115 | | 45 |
| PICKETT, STEVEN | 117 | 131 | | 45 |
| | 145 | 150 | | 45 |
| | 154 | | | 45 |
| BUSBY, DEBORAH | 155 | 179 | | 45 |
| BARG, EVELYN | 195 | 222 | | 45 |
| JOHNSTON, JEFF | 231 | 268 | | 45 |
| GOLDBERG, ELLEN | 270 | 277 | | 45 |
| | 283 | 285 | | 45 |

| | PAGE | VOL. |
|---|---|---|
| HEARING................................ | 287 | 45 |
| ADJOURNMENT............................ | 297 | 45 |
| REPORTER'S CERTIFICATE.................. | 298 | 45 |

iii

**CHRONOLOGICAL INDEX OF WITNESSES**

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| RABB, SHAUN | | | 7 | 45 |
| | | | 8 | 45 |
| JOHNSON, NATHAN | 65 | | | 45 |
| PURCELL, CHAD | 79 | | | 45 |
| SWAN, CRAIG | 98 | 115 | | 45 |
| PICKETT, STEVEN | 117 | 131 | | 45 |
| | 145 | 150 | | 45 |
| | 154 | | | 45 |
| BUSBY, DEBORAH | 155 | 179 | | 45 |
| BARG, EVELYN | 195 | 222 | | 45 |
| JOHNSTON, JEFF | 231 | 268 | | 45 |
| GOLDBERG, ELLEN | 270 | 277 | | 45 |
| | 283 | 285 | | 45 |

iv

**ALPHABETICAL INDEX OF WITNESSES**

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARG, EVELYN | 195 | 222 | | 45 |
| BUSBY, DEBORAH | 155 | 179 | | 45 |
| GOLDBERG, ELLEN | 270 | 277 | | 45 |
| | 283 | 285 | | 45 |
| JOHNSON, NATHAN | 65 | | | 45 |
| JOHNSTON, JEFF | 231 | 268 | | 45 |
| PICKETT, STEVEN | 117 | 131 | | 45 |
| | 145 | 150 | | 45 |
| | 154 | | | 45 |
| PURCELL, CHAD | 79 | | | 45 |
| RABB, SHAUN | | | 7 | 45 |
| | | | 8 | 45 |
| SWAN, CRAIG | 98 | 115 | | 45 |

v

**STATE'S EXHIBITS**

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 18C | HANNEL 5 INTERVIEW - ELLEN GOLDBERG - DISC | 276 | 277 | 45 |
| 20 | PHOTO ID - SWAN | 100 | 100 | 45 |
| 21 | PHOTO ID - SWAN and BUTLER | 101 | 101 | 45 |
| 23 | CRIME SCENE PHOTO - INTERSECTION of STATE and GLENBROOK | 87 | 87 | 45 |
| 24 | CRIME SCENE PHOTO - LOOKING EAST | 73 | 74 | 45 |
| 25 | CRIME SCENE PHOTO - LOOKING WEST | 73 | 74 | 45 |
| 26 | CRIME SCENE PHOTO - BICYCLE | 73 | 74 | 45 |
| 27 | CRIME SCENE PHOTO - AERIAL | 87 | 87 | 45 |
| 28 | CRIME SCENE PHOTO - CRIME SCENE & FIRE STATION | 87 | 87 | 45 |
| 31 | CRIME SCENE PHOTO - SWAN - FULL BODY POCKET | 87 | 87 | 45 |
| 45 | CRIME SCENE PHOTO - BUTLER - FACE DOWN, BLOOD POOLING | 87 | 87 | 45 |
| 253 | PHOTO - REAR PASSENGER SIDE OF CAR | 108 | 109 | 45 |
| 273 | PHOTO - NIKE SHOES, PIPES, RECEIPT & CHL | 109 | 109 | 45 |
| 277 | SWAN'S RECEIPT FOR GUN | 110 | 110 | 45 |
| 398 | WARRANT/AFFIDAVIT - DEFENDANT TEXARKANA | 267 | 267 | 45 |
| 399 | TITLE HISTORY - SWAN CAR | 267 | 267 | 45 |

vi

**STATE'S EXHIBITS**

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 400 | TITLE HISTORY - DYMON SMITH CAR | 267 | 267 | 45 |
| 402 | VIDEO - TEXARKANA TRAFFIC STOP | 239 | 239 | 45 |
| 403 | VIDEO - CHANNEL 11 | 125 | 125 | 45 |
| 405 | VIDEO - CHANNEL 5 - DEMO WITH SUBTITLES | 277 | 277 | 45 |
| 537 | AIS RECORD | 177 | 177 | 45 |
| 538 | AIS RECORD | 177 | 177 | 45 |
| 539 | JAIL MEDICAL RECORDS | 158 | 158 | 45 |
| 540 | POLICE REPORT | 267 | 267 | 45 |

August 10, 2009

3

PROCEEDINGS

(Court convened; jury not present.)

THE COURT: All right. On the record.

This is the State of Texas versus James Broadnax. This is Cause Number F08-24667.

Is the State ready?

MR. ALEX: Yes, sir.

THE COURT: Is the defense ready?

MR. LOLLAR: We're ready to proceed Your Honor; yes, sir.

THE COURT: All right. Several matters before the jury gets here. The jury is not present.

What I intend to do, ultimately, is to bring the jury out, swear the jury and then send them to the jury room and interview each of them with regard to whether they have complied with the Court's order not to discuss this case with anyone, do not look at any publicity on the case, and remind them of their obligation in that regard. And then assuming that none of them have violated that order, then to proceed from there.

In addition, as I understand it, the State has asked that the Court waive the Rule with regard to family members being present during this stage of the trial who will, nevertheless, be testifying in the

4

punishment phase in the event of a conviction; is that correct, Mr. Alex?

MR. ALEX: That's correct, Judge, and they'll probably be introducing the victim, Stephen Swan, in the guilt/innocence phase as well.

THE COURT: All right. And do you object to that, Mr. Lollar?

MR. LOLLAR: The only objection we would have, Judge, is if the family members or friends, relatives of the decedent's have any type of emotional outburst in front of the jury.

THE COURT: All right. Well, I am going to allow the family members to remain in the courtroom. That's within my discretion. I'm going to allow it.

And I'm sure you've done this, Mr. Alex, I know -- and as I've said repeatedly, I have a very high regard for your professionalism, so I'm sure you told the family members that it's not in their best interest to have an emotional display, because that could lead to a mistrial, and you --

MR. ALEX: I have, Judge.

THE COURT: Right. I knew you had. All right. So please don't do that, folks.

Two other matters that have to be resolved. The first one is that Juror Kelly McDonald

5

has medical issues that as a preliminary -- my preliminary opinion is that she is disabled, but I intend to bring her out here and interview her, and I wanted to just get the parties' initial impressions as to whether or not this is going to be a contentious matter.

In other words, is there either side that's going to insist on her presence to any lengthy degree.

Mr. Alex?

MR. ALEX: Judge, I think -- I'm confident the Court can inquire about the matter and, I mean, we certainly think that Ms. McDonald is qualified and would like to have her sit, but if it's going to -- we're not going to ask her to be inconvenienced to the degree that I would -- I would want to be inconvenienced, so I'm sure the Court will handle the questions and if -- if she says that it's something she can't do, then we won't be fighting to keep her there.

THE COURT: All right. Your -- your view of that?

MR. LOLLAR: Judge, from what the coordinator has told us, I think she's scheduled for some type of procedure tomorrow, so in light of that, as well as what else we've been told about her medical

6

condition, we would have no objection to excusing her.

THE COURT: Well, I'm going to bring her out here and put all of that on the record.

And I hope that, consistent with the ends of justice, we can understand that these things happen, but we'll see about that.

Now then, Mr. Alex, do you have anything to report to me with regard to the status of witness Shaun Rabb?

MR. ALEX: No, sir. My understanding from the Court was that he would come in this morning and you would make certain inquiries and then we would go from there.

THE COURT: Right. Okay. So you have nothing beyond that?

MR. ALEX: No, sir.

THE COURT: Well, he's here.

Mr. Rabb, if you'll come all the way to the front of the courtroom up by the door, and when you've reached the door, turn and face me and raise your right hand. All the way to the front. Raise your right hand.

**SHAUN RABB**

was called as a witness and testified as follows:

THE COURT: You may lower your hand.

**7**

Take your seat in the witness stand.

**VOIR DIRE EXAMINATION**

THE COURT: Now, as I understand the posture of the case, there would be no legitimate reason for you to invoke your rights under the Fifth Amendment, and so I want to ask you if it is your intention to do that if you're called as a witness in this case?

THE WITNESS: It is not my intention, sir, at this point; no, sir.

THE COURT: Okay.

THE WITNESS: I mean, I don't know what the circumstances might would be, Your Honor.

THE COURT: Okay. Well, --

THE WITNESS: But --

THE COURT: As I see it, you would just be talking about the interview that you had with the defendant, which I previously ruled will not be suppressed on the grounds that were urged by the defense, and it doesn't appear to me that you're in any jeopardy whatsoever.

Would you agree with that, Mr. Alex?

MR. ALEX: I would agree with that 100 percent, Judge, but, of course, -- can I ask him a question?

**8**

THE COURT: Yes, sir.

**VOIR DIRE EXAMINATION**

BY MR. ALEX:

Q. Mr. Rabb, you don't plan on invoking any kind of privilege in testifying today, do you?

A. Um, as I mentioned just now, sir, it's not my intention.

Q. Okay.

A. No, sir.

THE COURT: Any questions from the defense?

MR. LOLLAR: No, sir.

**VOIR DIRE EXAMINATION**

THE COURT: Okay. And then you are under lawful subpoena to be down here. I know what I would like. I would like for you to not have to be down here all the time. However, frankly, that's going to be between your attorney and Mr. Alex, and I'm not going to impose myself on that, because you are under lawful subpoena.

Do you have any questions for me?

THE WITNESS: If Mr. Alex could give me some idea, Your Honor, as to when I might testify, because of the scope and nature of what I do, and I'm currently at the federal building covering another

**9**

matter.

THE COURT: I'm sure you are.

THE WITNESS: If he could give me an idea if I would be up Wednesday or Thursday, that would help with planning for me as well as whoever would replace me at the federal building.

THE COURT: I understand that, but I can't make him do that and I'm not going to.

THE WITNESS: I understand, sir.

THE COURT: All right. We're -- you may step down, sir.

THE WITNESS: Thank you, sir.

THE COURT: Thank you.

So then, as far as I know, there is nothing else that needs to be taken up before the jury gets here.

Does the State have anything else?

MR. ALEX: Judge, just briefly.

THE COURT: Yes, sir.

MR. ALEX: And this could be -- this could be my inexperience showing, but if you swore the jury in and then we -- for some reason we don't have twelve qualified, would jeopardy be attached?

I mean, we all know what they're going to say. None of them may say that they heard anything in

**10**

the media and none of them may say that anything affected them, but they've been sworn once, in the big panel to tell the truth, so I'm a little -- I'm always guarded against swearing the jury in.

THE COURT: Well, let me tell you how to fix that so that won't be a problem at all. We won't take a chance on that.

MR. ALEX: Okay.

THE COURT: We'll bring them out first before I swear them, then I'll re-swear them as to whether or not they've heard anything about the case, then that takes away that issue.

MR. ALEX: The only other issue that Mr. Lollar and I talked about is, it's an evidentiary issue, Judge, and it's probably not going to come up until either before lunch or after lunch, and it's going to be with one of the videos, or actually, all of the videos.

We have, for demonstrative purposes, used subtitles on the videos, and it's my understanding -- I don't want to misquote Mr. Lollar's objection. He -- he told me that he'd be objecting to that because it appears that the font is bigger in places that are unfavorable to the defendant and -- and -- and smaller in places where it isn't. And I thought we might take

**Page 11**

that up before we start, just so that we're not having to go back and forth when trial starts.

THE COURT: Okay. Will there be that objection, Mr. Lollar?

MR. LOLLAR: Judge, there will. We were tendered these subtitled copies of the television interviews last Thursday afternoon. When we went back to my office and looked at them, we saw that the subtitles are in different font sizes. And that's correct. And the parts where it's unfavorable to the defendant, the font sizes seem to be made larger.

On anything that we could say is favorable to the defendant, the font sizes are smaller.

So we did have that objection, and I believe I mentioned that to the Court last week. And, of course, on last Thursday afternoon after viewing the videotapes, we did object with Mr. Alex.

The second thing in regard to that is, since the defendant's speaking English and you can understand him, I don't know why we need to have subtitles.

MR. ALEX: And I -- I'd like to respond just briefly, Judge, if I can.

THE COURT: Go ahead.

MR. ALEX: The -- the -- the tapes that

**Page 12**

we're going to offer are going to be for demonstrative purposes only. We're not going to be offering them for all purposes. And there's -- there's plenty of case law to support that notion.

Typically when we use transcripts in these kind of things, the jury can use them for demonstrative purposes. It's just the way of us demonstrating our evidence. This is a simple thing as if we were highlighting a transcript of a -- of a medical record or something like that.

And, you know, specifically, I had two interns do this for the last few months. I had no hand in that. And what they tell me is, when a person is talking slow like I am now, there's a box that's filled up with words and it's going to fill up the box. When it's a person's who's talking fast, then there's more words and the font's going to be smaller. There's no -- I mean, even if there was, but there's no intent to make anything bigger or smaller. But I think nature of demonstrative evidence is we're trying to present it to the jury so that they can understand it.

And there's tons of places in the tape where he's talking slang and he's talking fast and that, and I think from our perspective, it will help the jury in understanding what they're seeing.

**Page 13**

And I understand that there's always the 403 concern when you're talking about demonstrative evidence, and I just don't think that the nature of what he's saying on the tapes, that there's anything that we could put up there that's going to be any more damaging than what he's actually saying.

THE COURT: Do you have anything else to say about this beyond what you said previously?

MR. LOLLAR: No, Your Honor.

THE COURT: The objection's overruled for the reasons stated by Mr. Alex.

Anything else the parties want to bring up before the jury gets here?

MR. LOLLAR: Judge, we had subpoenaed four witnesses to be here this morning at 8:30 with the -- these are medical personnel from the Dallas County jail.

THE COURT: Yes, sir.

MR. LOLLAR: Three of them were supposed to be here at 8:30: Jason Varghese, Dr. Mirmeshdagh and Todd Ridge. I'd ask if any of them are present.

MR. ALEX: Gordon, why don't you call the hall and see if anybody's out there.

MR. LOLLAR: And the fourth one is Dr. Layne, who by -- I talked to the lawyers for

**Page 14**

Parkland. He is out of town until tomorrow, and I agreed to let him come in Wednesday morning at 8:30 to be sworn in.

THE COURT: What do you want me to do is just swear them in?

MR. LOLLAR: Yes, sir. Swear them in and get telephone numbers for them.

THE COURT: All right.

MR. LOLLAR: And if we can release them until we need them.

THE COURT: All right. Sure.

MR. LOLLAR: And the last thing I wanted you to be aware of before we get going, when the jury is sworn and everything, you normally ask are the parties ready to proceed, and preserve our objections that we have previously made in regard to the Court's rulings on diminished capacity. We will say No, we are not ready to proceed.

So I just wanted to let you know that outside the presence of the jury, and I can go ahead and say that now.

THE COURT: You can say it now. I don't want you to say it in front of the jury.

MR. LOLLAR: Yes, sir.

THE COURT: Say it now.

15

MR. LOLLAR: And then suggest you not even ask me.

Judge, we are not ready to proceed in this case because of the Court's prior rulings on the issue of diminished capacity. And particularly, the testimony of Drs. Platt and Roache that the Court heard sub rosa, and -- not -- yes, sub rosa, pretrial. And for those reasons, we are not ready to proceed, but we understand the Court would overrule our objections in that regard --

THE COURT: Yes, sir.

MR. LOLLAR: -- and we're ready to go ahead.

THE COURT: Yes, sir. The objection's overruled.

MR. LOLLAR: Thank you, Your Honor.

THE COURT: Anything else?

MR. ALEX: I think those witnesses are out in the hall, Judge, if you want to swear them now.

THE COURT: Okay. Let's bring them in.

MR. ALEX: I think Mr. Hikel is getting them for you.

THE COURT: Okay. If you can do something to accommodate Mr. Rabb, --

MR. ALEX: Oh, I'm sorry, Judge.

16

THE COURT: -- I would personally appreciate it.

MR. ALEX: No, I will. I will.

THE COURT: Folks, if you'll please come all the way up here to the front of the courtroom, right up here, right in front of me up by this X up here. Yes, ma'am.

Good morning.

DR. MIRMESDAGH: Good morning.

THE COURT: Okay. If you'll both raise your right hand.

(Two witnesses sworn by the Court.)

THE COURT: Okay. You may lower your hands, and would you state your name, ma'am?

THE WITNESS: Haideh Mirmeshdagh, H-A-I-D-E-H.

THE COURT: H-A --

THE WITNESS: I, D as in David, E-H.

THE COURT: Okay.

THE WITNESS: Is the first name.

Last name is Mirmesdagh. M, as in Mike, I-R-M-E-S, D, as in David, A-G-H.

THE COURT: A-J-H?

THE WITNESS: A-G-H.

THE COURT: A-G-H.

17

Mike, India, Romeo, Mike, echo, Sierra, Delta, Alpha, golf, hotel. Correct?

THE WITNESS: Yes.

THE COURT: Okay. Sorry. My Army creeps back in every now and then.

And your name, sir?

THE WITNESS: Jason Varghese.

THE COURT: Last name?

THE WITNESS: V as in Victor, A-R-G-H-E-S-E.

THE COURT: All right. You're now both sworn as witnesses in this case.

The lawyers in this case for both sides are officers of this Court. As officers of this Court, they have the full authority of the Court to order you to be present to testify as witnesses, and in the event that they should order you to testify as witnesses, you have to come down here.

Theoretically, you could be held in contempt of court if you choose not to. We certainly don't want that to happen, okay? So when Mr. Lollar communicates with you as far as when he needs to have you down here, you need to make sure that you're down here, okay? You both understand that?

WITNESSES: Yes.

18

THE COURT: All right. As witnesses in the case, you are not allowed to discuss your testimony with each other or with anyone else in the case.

You are permitted to discuss your testimony with the attorneys in the case for each side. However, it is your right to do that. You don't have to do that.

Your obligation in this case is to tell the truth. You're not the State's witness; you're not the defendant's witness. You're a witness for the truth.

Any questions for me?

WITNESSES: No.

MR. ALEX: Judge, may I interject one second? I think I've also subpoenaed these two, Jason Varghese -- and what I'm going to ask the Court is to -- is to not place them under the Rule because they would be considered expert witnesses, and I think my expert witness is going to want to interview them in any potential -- and any potential opinion that he may want to give before the trial is over.

THE COURT: Any objection to that?

MR. LOLLAR: No.

THE COURT: Okay. That's granted.

MR. ALEX: And I'm sure that Mr. Lollar --

THE COURT: You understand that, Mr. Varghese? I previously told you that you couldn't discuss your testimony with any other witnesses? I've decided that I'm not going to require that of you, okay? So you can discuss it with Mr. Alex's witness in the case.

MR. LOLLAR: A couple of questions. Could I ask you to, the very best number to get you, would you write that down underneath your names?

THE COURT: That doesn't need to be on the record.

(Off-the-record discussion was had.)

THE COURT: Okay. We're in recess.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT: This is the State of Texas versus James Broadnax. The parties are here. The defendant is here. The jurors are not here, except for Juror Kelly McDonald.

Could you please stand and raise your right hand.

**JUROR KELLY McDONALD**

was called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the jury box. And if you could just -- no, no, no.

THE JUROR: Just stay here?

THE COURT: Stay right where you are.

THE JUROR: Okay.

**EXAMINATION**

THE COURT: Just tell me and the parties what your medical situation is right now.

THE JUROR: Sure. I had a kidney stone removed last Monday, and they put a stint in running from my kidney through the rest of my system, and the stint has to be removed tomorrow. I can't keep it in for longer than a week.

And also, because of the stint, I have to have frequent breaks --

THE COURT: All right.

THE JUROR: -- and unexpected breaks.

THE COURT: Do you feel like your medical situation prevents you from being a qualified juror in this case, ma'am? By that, I mean, would it affect your ability to pay attention to the evidence in the case and to consider the credibility of witnesses?

THE JUROR: If I'm -- I mean, if I have to have a break and I can't have a break, I'm in discomfort then. I still have pain pills. I haven't taken any today. And I don't know how it will affect me tomorrow. I may have some significant pain after that happens, but I don't know at this juncture how I'll feel because I can't predict, you know, my discomfort. If I'm that uncomfortable, obviously, I would be distracted.

THE COURT: So is it fair to say, then, that because of your physical illness, your medical condition, that this would hinder your ability to perform your duties as a juror?

THE JUROR: Yes.

THE COURT: Is that fair to say?

THE JUROR: Yes.

THE COURT: Questions based on my questions?

MR. ALEX: No, sir.

MS. HANDLEY: No.

MR. LOLLAR: No, Your Honor.

THE COURT: All right. Ma'am, if you'll please go back through that door.

And Barney, take her back to the jury room. And then also get me the jury list from the bailiff that's in there now.

Under the case of Landry versus State, at 788 S.W.2d 577, 579, the Court from Texas Court of Criminal Appeals, Article 36.29(a) of the Code of Criminal Procedure, it is within my discretion to decide whether a juror's physical condition would hinder her ability to perform her duties as a juror.

It is the judgment of this Court that Ms. McDonald has expressed a medical condition which would hinder her ability to perform her duties as a juror and I intend to excuse her.

Is there any objection from the State?

MS. HANDLEY: No objection.

MR. ALEX: No, sir.

THE COURT: Any objection from the defense?

MR. LOLLAR: No, Your Honor.

THE COURT: All right. Then she will be excused.

And as I have it -- correct me if I'm wrong -- Mr. Barry Fiddick would -- well, no.

Ms. Emily Blevins, who would have been removed from the jury because of Mr. Patterson being on the jury, will now be on the jury.

Would you agree with that, Mr. -- Mr. Alex?

MR. ALEX: Yes, sir.

MS. HANDLEY: Yes.

MR. LOLLAR: Yes.

**23**

THE COURT: Okay. So then the jury would -- the alternate jurors in the case will be Mr. Fiddick and Mr. McElroy.

Would you agree with that, Mr. Alex?

MR. ALEX: Yes, sir.

MR. LOLLAR: Yes, sir.

THE COURT: All right. And it is my intention to start bringing the jurors out one at a time, assuming they're all here, starting with Mr. Jerome Williams.

Are you ready for that, Mr. Alex?

MR. ALEX: Yes, sir.

THE COURT: All right. And so that's what we'll do.

Barney, if Mr. Jerome Williams is here, bring him out.

THE BAILIFF: All rise for the juror.

(Juror present.)

THE COURT: Be seated, please.

And don't do that, anymore, Barney, okay?

THE BAILIFF: Okay.

THE COURT: Good morning, Mr. Williams.

JUROR WILLIAMS: Good morning.

THE COURT: You need to stand now and raise your right hand.

**24**

(Juror sworn.)

THE COURT: You may lower your hand. Take your seat in the jury box.

I had previously instructed you and all of the jurors not to discuss this case with anyone, not to look at any media coverage, whether by way of the internet, newspaper, television and so forth, essentially to keep your mind free of anything that might undermine your ability to be a fair and impartial juror.

Have you complied with that order?

THE JUROR: Yes, sir, I have.

THE COURT: All right. So are you stating under oath that you have not discussed the case with anyone, nor have you observed media in any way, shape or form?

THE JUROR: That is correct.

THE COURT: Questions based on my questions?

MR. ALEX: No, sir.

MR. LOLLAR: No, sir.

THE COURT: All right. You may be excused. Thank you, sir.

Now Ms. Elaine Clements.

MR. ALEX: Judge, before you bring in the

**25**

next witness, can I -- can I make one request?

THE COURT: Sure.

MR. ALEX: And -- and I don't propose to tell the Court how to do its job, but could we just ask them like an open-ended question, like did you see anything, or have you heard anything? I think that when we ask them if they complied with the law, it's kind of got a chilling effect.

THE COURT: I'll do that. Sure.

I do want to ask them if they got the order though.

(Juror present.)

THE COURT: Good morning, Ms. Clements. If you'll raise your right.

(Juror sworn.)

THE COURT: You may lower your hand. Take your seat in the jury box.

You were previously instructed that you are not to discuss this case with anyone, and that you were not to look at any media coverage, newspaper, internet, television, anything of the sort, and would you tell the Court whether or not you have had any exposure to any of those things by way of talking about the case with others, looking at the media, or anything along those lines?

**26**

THE JUROR: No, sir, I have not.

THE COURT: Questions based on my questions?

MR. ALEX: Just briefly, Judge.

Ma'am, did anybody try and talk to you about any media coverage or anything like that?

THE JUROR: No, sir.

MR. ALEX: Very good.

No further questions.

MR. LOLLAR: No questions.

THE COURT: You may be excused. Thank you, ma'am.

And this will be Mr. Alex Folz.

MR. ALEX: Judge, I'm going to let Ms. Handley handle this portion. I'm going to step out for a second.

THE COURT: Roger that.

(Juror present.)

THE COURT: Mr. Folz, if you'd raise your right hand.

(Juror sworn.)

THE COURT: You may lower your hand. Take a seat in the jury box there.

I had previously instructed all of the jurors in this case to not discuss the case with

August 10, 2009

27

anyone, to not have any exposure to any sort of media or publicity about this case, whether in written form, computers, television, whatever, and I'll ask you if you -- if you have been able to comply with that order?

THE JUROR: Yes, I have.

THE COURT: All right. Have you had any exposure with any sort of media coverage on this case or discussed it with anybody?

THE JUROR: No, I have not.

THE COURT: Questions based on my questions?

MS. HANDLEY: I have no questions.

MR. LOLLAR: No, Your Honor.

THE COURT: All right. You're excused, sir. Thank you.

Next will be Ms. Kimberly Morris.

(Juror present.)

THE COURT: Good morning, Ms. Morris. Would you raise your right hand?

(Juror sworn.)

THE COURT: You may lower your hand. Take your seat in the jury box.

I previously had instructed you not to discuss this case with anyone and not to have any sort of media exposure, whether by way of the internet, the

28

written word, television, anything along those lines. Have you been able to comply with my order in that regard?

THE JUROR: Yes.

THE COURT: All right. So you have not had any exposure with the media and you have not discussed this case with anyone.

THE JUROR: No.

THE COURT: All right. Questions based on my questions?

MS. HANDLEY: No, Your Honor.

MR. LOLLAR: No, Your Honor.

THE COURT: All right. Thank you, ma'am.

Mr. Guy Ferreira.

If the parties will remind me at the end of the day to remind them again not to have any media exposure.

(Juror present.)

THE COURT: Mr. Ferreira, if you'll turn and face me and raise your right hand.

And also, is that the correct way to pronounce your name?

THE JUROR: Ferreira, yes.

THE COURT: Ferreira. Raise your right hand.

29

(Juror sworn.)

THE COURT: You may lower your hand. Take your seat in the jury box.

I previously had instructed you and all of the jurors not to have any discussions with anyone about this case, not to observe any sort of publicity on this case through the media by way of internet, television, newspaper print, anything along those lines. Have you complied with that order, sir?

THE JUROR: Yes, I have.

THE COURT: Have you had any exposure whatsoever with anyone or anybody about this case?

THE JUROR: No.

THE COURT: All right. Questions based on my questions?

MS. HANDLEY: No, Your Honor.

MR. LOLLAR: No, Your Honor.

THE COURT: You're excused, sir. Thank you.

Mr. Steve Zaidel.

(Juror present.)

THE COURT: Mr. Zaidel, would you turn and face me and raise your right hand?

(Juror sworn.)

THE COURT: You may lower your hand. Take

30

your seat in the jury box right there, sir.

Just a couple of questions for you.

I had previously instructed all of the jurors not to discuss this case with anyone, not to observe any media, whether by way of printed form, television, anything along those lines. Have you been able to comply with that order, sir?

THE JUROR: Yes.

THE COURT: Have you had any exposure to anyone about this case?

THE JUROR: No.

THE COURT: Questions based on my questions?

MS. HANDLEY: No, sir.

MR. LOLLAR: No, sir.

THE COURT: Thank you, sir. We'll be starting shortly.

Mr. William Stinson.

(Juror present.)

THE COURT: Mr. Stinson, would you raise your right hand?

(Juror sworn.)

THE COURT: You may lower your hand. Take your seat in the jury box.

I had previously instructed all of the

FIRM NAME

31

jurors, including you, to not discuss the case with anyone, to not have any exposure to the media by way of television, news print, whatever. Have you been able to comply with that order, sir?

THE JUROR: Yes, Your Honor.

THE COURT: Okay. Have you had any exposure whatsoever to any media on this case?

THE JUROR: No, Your Honor.

THE COURT: Questions based on my questions?

MS. HANDLEY: No, Your Honor.

MR. LOLLAR: No, sir.

THE COURT: All right. You're excused, sir. Thank you. We'll be starting soon. You're excused.

I believe we now have Mr. William Kreighbaum.

(Juror present.)

THE COURT: Sir, would you turn and face me and raise your right hand?

(Juror sworn.)

THE COURT: You may lower your hand, sir. Take your seat in the jury box there.

I had previously instructed all of the jurors, including you, to not have any discussions or

32

exposure with anyone regarding this case, no conversations about the case, to not read anything about it on the internet, not watch television about it or read anything about it in the news.

Have you been able to comply with that order, sir?

THE JUROR: Yes, sir.

THE COURT: All right. Is it correct to say that you've had no exposure to anyone with regard to this case?

THE JUROR: Yes, sir, that is correct.

THE COURT: Questions based on my questions?

MS. HANDLEY: No questions.

MR. LOLLAR: No, Your Honor.

THE COURT: All right. Thank you, sir.

Mr. Clarence Winfield.

(Juror present.)

THE COURT: Mr. Winfield, would you raise your right hand, please?

(Juror sworn.)

THE COURT: Okay. If you'll lower your hand. Take your seat in the jury box there.

I had previously instructed all of the jurors, including you, sir, not to have any discussions

33

with anybody about this case, not to watch any news media by way of print, or television, or the internet or anything along those lines.

Have you been able to comply with my order?

THE JUROR: Yes, sir.

THE COURT: All right. Have you had any exposure whatsoever to any of those mediums?

THE JUROR: Just heard a blurb on the radio and turned it off.

THE COURT: You turned it off before you could hear anything.

THE JUROR: Yes.

THE COURT: All right. Questions based on my questions?

MS. HANDLEY: No questions.

MR. LOLLAR: No questions.

THE COURT: All right. Thank you, sir.

Mr. John Vessels.

(Juror present.)

THE COURT: Mr. Vessels, would you turn and face me and raise your right hand.

(Juror sworn.)

THE COURT: You may lower your hand. Take your seat in the jury box.

34

I previously instructed you and all of the jurors not to discuss the case with anyone, not to read anything about it in the newspaper or on the internet, not to watch any television or listen to any radio.

Have you been able to comply with that order?

THE JUROR: Yes, sir.

THE COURT: All right. Have you had any exposure to any of those mediums?

THE JUROR: No, sir, Your Honor.

THE COURT: Questions based on my questions?

MS. HANDLEY: No, sir.

MR. LOLLAR: No, Your Honor.

THE COURT: All right. Thank you, sir. You're excused.

Ms. Emily Blevins.

(Juror present.)

THE COURT: Ms. Blevins, would you turn and face me and raise your right hand.

(Juror sworn.)

THE COURT: Lower your hand. Take your seat in the jury box. Right there.

I previously instructed you and all of the jurors not to discuss this case with anyone, not to

35

have any exposure to the media by way of television, radio, newspaper, internet and so forth.

THE COURT: Have you been able to comply with my order?

THE JUROR: Yes.

THE COURT: All right. Have you had any exposure to any of those mediums, ma'am?

THE JUROR: No.

THE COURT: All right. Questions based on my questions?

MS. HANDLEY: No questions.

MR. LOLLAR: No questions.

THE COURT: All right. You're excused, ma'am.

Mr. Robert Patterson.

(Juror present.)

THE COURT: Mr. Patterson, would you raise your right hand.

(Juror sworn.)

THE COURT: You may lower your hand. Take your seat in the jury box there, sir.

I previously instructed you and all of the jurors in this case not to discuss this case with anyone, not to have any exposure whatsoever to any form of media, be that radio, television, newspapers or the

36

internet.

Have you been able to comply with that order, sir?

THE JUROR: I have been.

THE COURT: Have you discussed this case with anyone or had any other exposure to the case?

THE JUROR: I have not.

THE COURT: Questions based on my questions?

MS. HANDLEY: No questions, Your Honor.

MR. LOLLAR: No questions, Your Honor.

THE COURT: All right. You're excused, sir. Thank you.

Mr. Barry Fiddick.

(Juror present.)

THE COURT: Mr. Fiddick, would you turn and face me and raise your right hand.

(Juror sworn.)

THE COURT: You may lower your hand. Take your seat in the jury box there, sir. No, sir. In the jury box.

I previously instructed you and all of the jurors in this case to not discuss the case with anyone, to not have any exposure to the media, either by way of radio, television, internet or the newspaper.

37

THE COURT: Have you been able to comply with that order, sir?

THE JUROR: Yes, sir.

THE COURT: All right. Have you had any exposure to any of those mediums?

THE JUROR: No, sir.

THE COURT: All right. Questions based on my questions?

MS. HANDLEY: No questions, Your Honor.

MR. LOLLAR: No questions.

THE COURT: All right. Thank you, sir.

And finally, Mr. James McElroy.

I recognized Mr. McElroy this morning and I'm going to ask him about that also.

(Juror present.)

THE COURT: Mr. McElroy, turn and face me and raise your right hand.

(Juror sworn.)

THE COURT: You may lower your hand. Take your seat in the jury box there.

I previously instructed you and all of the rest of the jurors in this case not to discuss the case with anyone, not to examine any media coverage on this, whether that be television, radio, newspaper, or the internet.

38

Have you been able to comply with that order, sir?

THE JUROR: I have followed the Court's instructions.

THE COURT: All right. Have you had any exposure to any of those mediums?

THE JUROR: No, Your Honor.

THE COURT: All right. Now, you and I know each other, and I had not realized that until this morning. Is there anything about your knowledge of me that would cause you to not be fair and impartial in this case?

THE JUROR: None whatsoever, Your Honor.

THE COURT: Questions based on my questions?

MS. HANDLEY: No questions.

MR. LOLLAR: No questions, Your Honor.

THE COURT: All right. You're excused, sir. Thank you.

All right. The Court is satisfied that all of the jurors have correctly followed the Court's instruction to not discuss the case and to not have any media exposure.

The Court does intend to proceed with this trial.

39

Is the State ready?

MS. HANDLEY: We're ready.

THE COURT: Is the defense ready?

MR. LOLLAR: Subject to our previous discussion.

THE COURT: Okay. And for the record, you don't have to say that anymore. That's preserved.

MR. LOLLAR: Thank you.

THE COURT: All right? And I'm going to take a very brief recess and then we'll start.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

I'll have order in the courtroom, please. Good morning, ladies and gentlemen. Thank you for being on time this morning.

This is the trial of the State of Texas versus James Broadnax.

You may recall that I was the individual that originally swore you many months ago, but either Judge Biard or Judge Quay were the ones that conducted voir dire examination in this case. Those are visiting judges fully qualified to do that, and I asked them to do that so that I could continue to conduct other business, other trials and so forth, so I do want to

40

thank you for being down here.

I appreciate your patience in this case, and I appreciate your following the Court's orders in the case.

The first thing that I'm going to do is swear you in; give you some brief instructions, and then we'll proceed with the trial in this case.

And if you'll all please rise at this time and raise your right hand.

(Jury sworn.)

THE COURT: You may take your seat in the jury box.

All right. By the oath you've just taken as jurors, you become officials of this Court and active participants in the public administration of justice.

If at any time you cannot clearly hear the proceedings, please do not hesitate to let it be known to me or any member of the Court's staff, and what we're talking about there are these bailiffs here.

No one may discuss this case with you during your service as jurors.

Do not feel offended if the lawyers in this case do not communicate with you. To maintain the integrity of the jury system, the law prohibits them

41

from speaking with you until you are released from duty on this case. If someone does contact you or tries to contact you, report that fact to the bailiff at once.

Now I'm required under the law to give you that instruction, and I'll tell you now, it's not going to be a problem in this case. All of the lawyers in this case have a very high integrity and they're all professionals and you need not worry about that.

The bailiffs in this case are your conduit to me. You can't talk to me, you can't talk to the lawyers, but if you've got questions about things like, you know, where to get lunch, that sort of thing, these are your guys. Parking, any situations like that. They can't talk about the case itself, but they can help you out and they're all professionals. They're all excellent at what they do, and they can do that.

Do not discuss the evidence in this case with your fellow jurors until you are instructed to deliberate, or with your spouse, significant other, or your friends until you've been discharged from jury service.

I can't overemphasize how important that is. Your natural inclination might be, after you've heard some testimony in the case and we take a break, to discuss the case amongst yourselves. You're not

42

allowed to do that. You can never discuss the case amongst yourselves until such time as you retire to consider your verdict in the case.

You can never discuss the case with anybody else until such time as you're discharged from jury service. If you were to do something like that, it could result in a mistrial. I can't overemphasize how important it is that you not discuss the case amongst yourselves or with anyone, and you not expose yourself to any coverage of this case.

I don't allow the jurors to take notes. The reason for that is simple. I want you all to pay equal attention to the case. All of you will judge the credibility of the witnesses. I don't want anybody to have more importance in this case, any jurors, than anyone else. And if I allow you to take notes, and those of you who don't take notes may rely on those that do too much, so I don't allow that.

Do not go to any of the locations referred to by the witnesses in this case or perform any type of individual investigation of the facts in this case. You will receive all the evidence here in the courtroom from right up there.

Do not look in books, encyclopedias, the internet, dictionaries, Twitter, My Space, Facebook,

none of that, or go to the library, or review courthouse records in order to obtain information over and above what is presented to you during the trial.

Please listen carefully to the testimony. No testimony will be read back to you unless you disagree about a specific statement made by a witness during the trial.

The lawyers may choose to give opening statements in this case. These statements are not evidence but are made to help you understand the nature of the case and the evidence.

Your oath states that you will render a verdict only on the evidence submitted to you under my rulings.

The evidence you may consider will consist of the testimony of witnesses. Evidence will also be presented in the form of physical objects or documents called exhibits.

During the trial, the attorneys may make objections. This is a necessary procedure during the trial, and when an objection is made, I must rule on it. There may be times when I must send you to the jury room to allow the parties to argue before me in the courtroom. You must not concern yourselves with the objections or my rulings.

You must not consider testimony or exhibits to which an objection was sustained or that I instruct you to disregard.

Some testimony or exhibits may be introduced for a very limited purpose. If that happens, I will instruct you to consider this evidence only for an express limited purpose and you must do so under your oath.

Each of you must determine the facts as you see them. To do so, you must evaluate the credibility of each witness and decide the weight and value to be given their testimony. In considering the weight and value of the testimony of a witness, you may consider the person's appearance, attitude and behavior, the person's interest in the outcome of the tri -- of the case, his or her relationship to the defendant or with the State of Texas. The inclination of the witness to tell the truth. The probability or improbability of the witness's statements. The reasonable inferences from those statements and all other factors you feel will help you in giving the testimony of that witness the degree of credibility you feel it deserves.

The trial will proceed as follows: The State of Texas will present the Indictment and arraign

the defendant. The prosecutor may then make an opening statement. The defense attorney may do so as well or at a later time.

The prosecutor will then offer evidence through witnesses. The defense attorney may cross-examine each witness, and when the prosecutor is finished presenting the State's case, the defense attorney may or may not present his evidence. Remember, the defendant is never required to prove his innocence. The prosecutor may cross-examine each defense witness, if any. And when the defense is finished presenting its witnesses, the prosecutor may put on rebuttal witnesses and the defense may then do the same.

At the conclusion of the presentation of all the evidence, I will read you the Court's Charge and each side will present closing arguments. You will then be permitted to deliberate.

Can I see the lawyers up here for just a second?

(Off-the-record discussion was had.)

THE COURT: The Court will recognize Mr. David Alex to present the Indictment and arraign the defendant.

MR. ALEX: May it please the Court?

THE COURT: Yes, sir.

MR. ALEX: Counsel.

Good morning, folks. I think I met most of y'all during jury selection, but for those of you I have not, my name is David Alex. I'll be the lead prosecutor in the case.

What I'm about to read to you is the Indictment. It sets in stone what the State must prove beyond a reasonable doubt in order to get a guilty verdict. It also gives the defendant notice of what he's charged with.

(As read:) True Bill of Indictment. In the name and by the authority of the State of Texas: The Grand Jury of Dallas County, State of Texas, duly organized at the July Term, A.D., 2008, of the 204th Judicial District Court, Dallas County, in said Court at said Term, do present that one Broadnax, James Garfield, the defendant, on or about the 19th day of June, A.D., 2008, in the County of Dallas and said State, did unlawfully then and there intentionally cause the death of Stephen Swan, an individual, hereinafter called the deceased, by shooting the deceased with a firearm, a deadly weapon. And the defendant was then and there in the course of committing and attempting to commit the offense of

August 10, 2009

47

robbery of the said deceased.

And it's signed by the foreman of the grand jury and by the Honorable Craig Watkins, your elected DA.

THE COURT: Thank you, Mr. Alex.

And to the Indictment, how do you plead? Do you plead guilty or not guilty?

MR. LOLLAR: Not guilty.

THE COURT: The plea is not guilty and we're for trial.

The Court will recognize Mr. David Alex for opening statement.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

MR. ALEX: Cold. Calculated. Total disregard for human life. Folks, that's what this case is about. And at this time during the trial is my opportunity to sort of forecast for you what the evidence will show and what the State will prove to you beyond a reasonable doubt.

And the State will prove to you beyond a reasonable doubt that the defendant in this case, the man seated at this table, James Broadnax, on June 19th, 2008, did intentionally murder, execution style, Stephen Swan, in addition to Matthew Butler during the

48

course of robbing them here in Dallas County.

Now specifically the evidence is going to show that in the early morning hours of June 19th of 2008, sometimes after midnight, 12:30, 1:15, these two men right here, Stephen Swan and Matthew Butler, were at their place of business at Zion Gate Records in Garland where they made Christian music, where they played, where they honored their Lord and savior.

And at some point in that morning, they were getting ready to end their day, and so they did what they normally do before they go outside, or after they walk out the doors, they lock the door. And you'll hear that's a normal practice for them. And while they were standing outside of the Zion Gate Records, their paths came across the defendant and his cousin, Demarius Cummings, the co-defendant. And they engaged Mr. Swan and Mr. Butler in some small talk about music.

They were obviously in front of a music studio, and you'll hear that Mr. Broadnax fancies himself as a rapper, so there was some commonality there.

In fact, what you'll hear and the facts will show that Mr. Swan and Mr. Butler didn't shy away from the defendant and his cousin, but they did engage

49

them in small talk. But what you'll hear and what the evidence will show, is they engaged in that talk about music, Mr. Butler and Mr. Swan had no idea that the defendant had already planned their demise.

What you'll hear and what the evidence will show is while they were engaged in that small talk, the defendant had on his person, concealed, a handgun. And what you'll hear while they were engaging in that small talk with the defendant and his cousin, that the defendant and his cousin had already plotted out, hours before, a manhunt.

What you will hear, while they were out there having small talk, is that Mr. Swan and Mr. Butler had no idea that earlier that day, the day before, that Wednesday, that the defendant and his cousin started their day off with an assault rifle that they took from an apartment in east Dallas where they were living with family members. And they took that assault rifle and they traded it in for a handgun because they were going on a manhunt. They were going to hit a lick, which is street talk for they were going to go rob somebody. But they couldn't do it with an assault rifle, so they traded it in with a handgun.

And took the public transportation, where obviously they couldn't get on with an assault rifle,

50

and they started their manhunt, and what you will hear is they wound up downtown Dallas, they got on a DART train and headed toward Garland. And from the defendant's own words, they went to Garland because that's where the rich white folks live. And they were going to go catch somebody slipping, which again, you will hear quite a bit of street talk in this case.

But these two guys had no idea that this was going on as they engaged in the small talk with the defendant. That all of this had already been set in place by the defendant and his co-defendant.

They didn't know that they had gotten off the Garland DART train there and wandered around a little bit looking for victims to rob.

And so while they stood there talking to the defendant, they just thought it was just another day. They had no idea that this would be the last conversation they would ever have on this earth.

And, folks, as that conversation neared an end, the defendant and the co-defendant turned away pretending to leave, all along knowing they weren't going anywhere, all along the evidence will show knowing that they intended to kill and take whatever they could.

And so you will hear that as the defendant

51

turned away, he turned back to Mr. Swan and Mr. Butler and asked him for a cigarette. And as their attentions were distracted, you'll hear that the defendant pulled the firearm, the handgun that he had concealed, and shot Mr. Butler.

And immediately after shooting Mr. Butler, his attentions were drawn to Mr. Swan, and he shot Mr. Butler in the chest. And that wasn't enough. After he shot Mr. Swan in the chest, he turned his attention again to Mr. Butler, who was trying to get away, and he shot Mr. Butler again in the back. And Mr. Butler went down.

It wasn't enough, the facts will show. The defendant then turned his attention to Mr. Swan once more. After he laid on the ground bleeding from the chest, blood dripping down into the street, he took the firearm, all four and-a-half pounds of the trigger pull, and he squeezed the trigger one more time as he placed that handgun in close proximity to Mr. Swan's head and sent the bullet through his head and into his brain to make sure he was dead.

But that wasn't enough. After shooting Mr. Swan in the head, he again turned his attention to Mr. Butler. And he walked up on Mr. Butler as he laid there bleeding, and again he took this handgun, all

52

four and-a-half pounds of trigger pull, put the handgun near the head, close range, of Mr. Butler, and again squeezed the trigger, sending a bullet through his head and into his brain, making sure that he was dead.

And folks, what the evidence will show is that the defendant did not demand property at gunpoint at that point. What he did was he had the -- Mr. Swan, Mr. Butler's attention distracted so he could execute them. And after he executed them, then he went through Mr. Swan's pockets. They took his keys to his car. They took his wallet and his personal effects and they got into Mr. Swan's car and they left the scene. They left Mr. Swan and Mr. Butler there bleeding and dying in the parking lot in front of the Zion Gate Records.

Cold, calculated, total disregard for human life. And if you remember those three things in this case, while this is a serious case, folks, you will find that it's not a complicated case to decide at all.

Now that same -- earlier the same morning after the defendants leave the scene, Mr. Nate Johnson is getting off from work and he drives on his bicycle and he's coming across the scene and he runs across the dying bodies of Stephen and Matt. And he's panicked. And -- and you're going to see Mr. Nate

53

Johnson. He's a little quirky, and he's going to take the stand and you -- you may be taken little aback by Mr. -- by Mr. Johnson, but that's just the way he is.

He was on his bicycle at 1:00 o'clock in the morning coming from Advanced Foods and he came across the scene and he panicked and he drove his bicycle to the fire station to get help.

And the firemen arrived on the scene. The firemen called the police. And they found at the scene, Mr. Butler and Mr. Swan shot multiple times execution style; had no idea what was going on.

The police arrived. There was evidence there but there was no evidence of who had committed this crime. The defendant had made sure that he had gotten rid of any witnesses to the crime.

The police stayed at the scene for awhile, and after awhile they were able to identify the body of Mr. Butler because his wallet was still there. They didn't take his wallet. They only took Mr. Swan's wallet. And after they were able to identify Mr. Butler, they were able to identify Mr. Swan and they were able to notify their families that their loved ones were deceased.

And in those ensuing hours as the police are working the case, the defendant is now concerned

54

about getting caught. And the evidence will show one of the things he did was he changed the plates on Mr. Swan's car to avoid getting caught.

He also went to the pawn shop and pawned some of the items, about $15 worth of tools out of the back of Mr. Swan's car.

And another act to try and avoid getting caught, he got rid of the murder weapon. He brought it back to the person he had traded it for earlier in the day. The person that he had brought the assault rifle to and traded it for the murder weapon, he brought back to that person, got the assault rifle back and left the murder weapon sitting under the mattress of the neighbor. The police were able to ultimately recover the murder weapon.

You'll hear that Demarius Cummings showed the police where this man lived. And the police were able to recover that weapon.

You'll hear experts testify that they compared the bullets at the scene with the casings from the gun and all the shots fired into both of these human beings came from only one gun.

Now, folks, even though the facts will show the defendant tried to avoid getting caught, after he went back to his apartment in east Dallas in

55

Mr. Swan's car, he had the property of Mr. Swan, and his family saw the property and they were very suspicious of what was going on, and he told them that he had hit a lick. He didn't tell them he killed anybody.

And Ms. Evelyn Barge will take the stand and she'll testify to you that he was there in Mr. Swan's car, and she saw it.

THE COURT: Mr. Alex, you have used twelve minutes; however, I will allow you to continue as necessary.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

MR. ALEX: And after he went back to his house, exchanged the guns, pawned the stuff, he and Mr. Demarius Cummings left the house on Junction in east Dallas and headed for Texarkana, where he is originally from, in Mr. Swan's car.

When they got to Texarkana, it just so happened that the police officers in Texarkana was out on a different stop. They noticed a car had been in an area that they had seen once before that day, earlier, and they ran the plates. And the plates came back to a different car. And so they pulled them over. And after pulling them over, they were able to determine

56

that this car was actually stolen from this double homicide, and they were arrested. And that was the same day. That was on June 19th of 2008 at about 7:00 p.m.

So the chronology is, early morning hours we've got the double homicide, and at about 7:00 p.m. the same day, they were arrested in Texarkana.

They were brought back to Garland. They were booked into the Garland jail, and at some point on the 21st of June, they were brought to the Dallas County jail.

Now the most interesting thing that you will find in this case, the evidence that you will hear is going to come from the defendant's own mouth, because after he was booked into the Dallas County jail on the 21st, arrested on the 19th, on the 23rd of June, some four days after arrest, the media came to the jail to interview the defendant. And the defendant gave interviews to the media, and you'll get to see three of those interviews: One from Channel 4, one from Channel 5 and one from Channel 11.

And, folks, what you're going to hear the defendant say in these interviews, the evidence is going to show, it's going to be shocking. It's going to be shocking. The defendant is going to tell you

57

about this cold, calculated, execution-style murder/robbery, just as cold and plainly as I'm talking to you right now.

In each of those interviews you're going to see that he shows absolutely no remorse for anything that he's done. In each of those interviews, he's going to tell you exactly how he killed the victims. That he popped this guy after asking him for a cigarette and he popped that guy, and then he popped this guy again, and he popped that guy in the head and popped this guy in the head, and he just talks about it like he's going to the bathroom. That's what you'll hear.

And the reporters, doing their job, trying to get the story out, that the defendant may want to get out, are throwing him softballs. They're trying to humanize him and they ask, Sir, what would you like to say to the family of these victims, hoping that he would say I'm sorry. And the defendant sits there and stares in the camera and says Fuck them. Fuck them and their fucking families.

Folks, I could try and summarize for you what's in those videos, but I couldn't do it any justice, because what you'll see in those videos is a cold, calculated person who has no regard for human

58

life. And I can't imitate that. And you'll get to see it for yourself.

And at the end of this case, folks, there will be no question, based on the evidence in your mind, that the defendant is guilty of the capital murder of Stephen Swan, a living, breathing human being.

THE COURT: Thank you, Mr. Alex.

Will you have opening statement, Mr. Lollar?

MR. LOLLAR: I do. Thank you, Your Honor.

THE COURT: Yes, sir.

MR. LOLLAR: May it please the Court?

THE COURT: Yes, sir.

MR. LOLLAR: Co-counsel. Attorneys for the State.

And ladies and gentlemen of the jury. Good morning. We haven't seen you-all in -- some of you in several months. We trust that you-all recall the things that we talked about during our voir dire with each one of you individually. We would ask you to withhold thinking about punishment until we get to the punishment phase.

Now, some trials are about whether or not the person on trial is responsible for the act they're

August 10, 2009

59

charged with. This is not that case. James Broadnax is responsible for the deaths of Matthew Butler and Stephen Swan.

That does not, however, relieve the State of their duty and obligation to prove the case beyond a reasonable doubt and to prove to you each of the elements of the Indictment, including the mental state of the defendant at the time of the commission of the offense.

Yes, the evidence is going to go much as Mr. Alex has told you. What we will show in presentation of the evidence is that -- and during cross-examination of the State's witnesses is the following:

James Broadnax arrived in Dallas, Texas, on May the 1st, 2008, by way of Greyhound bus, from Muskegon, Michigan, where he had been living at a homeless shelter for about four and-a-half months.

He came down to Dallas, the evidence will show, to live with his mother, Audrey Kelly, who was here at the time. That the evidence will show you that when he got here, Ms. Kelly had already left. That is a pattern of behavior that you'll see has plagued Mr. Broadnax all of his life. When he got here, having no mother to live with, you'll hear that he went to

60

live with some of his cousins, Gatewoods. One of their family members is Demarius Cummings, who is his cousin. And he went to live with -- stay with them and -- in the area of town known as The Corners. That's southeast of downtown Dallas.

What you'll hear is that he took up with Demarius, and Demarius got him doing things he hadn't previously done, one of which is smoking wet marijuana blunts.

Now, you will hear during the testimony what wet marijuana blunts are, and those are marijuana cigarettes that have been dipped in embalming fluid and PCP.

You will hear that on the day that this occurred, these events occurred, that they went and were smoking these PCP soaked marijuana cigarettes. And that those led, we think, to the commission of the offense. You'll hear about that.

Now, once Demarius and Mr. Broadnax were arrested in Texarkana by the Texarkana police, as Mr. Alex has told you, they were brought back to the Garland City Jail. And then on Saturday, June 21st, Mr. Broadnax was brought down to the Dallas County jail, which is the complex of buildings here right behind us.

61

You will see that upon being booked into the Dallas County jail, that there are -- you will be told there are people that do these screenings of the people as they are brought into the jail, and you'll see that among the things that the screeners noticed of Mr. Broadnax, was that there was something wrong with his mental condition, and at that time they referred him to the Psychiatric Department and they ordered him held in a closed behavioral observation cell in the psych ward of the medical ward of the Dallas County jail back here.

You will see that he remained there, and let's see, that was early on a Saturday morning, June 21st, about 1:00 o'clock in the morning is when he was brought into the jail. You'll see that he remained in the closed behavioral observation cells for the rest of that Saturday, for that Sunday, and then throughout Monday up until about 2:00 o'clock that afternoon.

Now, you'll hear from the psychiatrists and psych assessors who interviewed Mr. Broadnax about 7:30 in the morning of Monday, June the 23rd, and they will tell you their impressions of what they believed about Mr. Broadnax's mental condition at that time --

MR. ALEX: Judge, I'm going to have to object. The Court's already ruled the mental state of

62

the defendant in this phase of the trial was not relevant to his guilt and innocence, and this is totally improper.

THE COURT: Response?

MR. LOLLAR: Judge, if we could --

THE COURT: Yes.

MR. LOLLAR: Could we approach?

THE COURT: Yeah.

(Off-the-record discussion was had.)

THE COURT: Whenever you're ready, Mr. Lollar.

MR. LOLLAR: Thank you, Your Honor.

The medical professionals who saw him about 7:30 in the morning of Monday, June the 23rd, noted that he was having auditory hallucinations, that he was delusional, and they believed that he was still under the influence of a drug.

Now, later on that morning, the public information officer for the Dallas County Sheriffs Office, a lady by the name of Kimberly Leach who had been on the job about a month at that time, got these requests from all of the media here in Dallas, and she caused Mr. Broadnax to be contacted, to see in the condition that he was, whether or not he wanted to be interviewed by these TV stations.

63

Now, the evidence will show that at that time, he had requested appointment of counsel when he was arraigned on that Saturday morning when he was brought into the jail. My appointment was not effective until the next day, June the 24th. He had not seen any type of lawyer to counsel with him despite his requests.

The evidence will show you that he was taken from his closed behavioral observational cell in the psych ward of the medical ward of the Dallas County jail, out to see those four reporters, one from Channel 4, 5, 8 and 11, and that he did make shocking statements to each of these reporters. You'll hear all of that. We'll just ask you to withhold, I guess, forming any conclusions about those until you heard all of the evidence relevant to that.

After he made these statements to the four television reporters, then he was placed in a suicide precaution tank where he was kept for the next three days. You're going to hear all about that during the presentation of the evidence.

Now, we say all of this just to prepare you, kind of, for what you're going to hear on these tapes. They're awful, and they are terrible. Not only is he admitting the commission of the offense, but

64

saying some awful things. We would just ask you to withhold until you hear all of the evidence, judgments that you make about that.

We would ask you again -- as we told you in voir dire examination, the trial is in two parts, and we would ask you to wait until you hear all of the evidence. That's all we can ask.

We thank you for your attention.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Lollar.

Mr. Alex, are you ready to call your first witness?

MR. ALEX: Yes, Your Honor.

THE COURT: All right, sir.

MR. ALEX: The State will call Nathan Johnson, Your Honor.

MR. LOLLAR: Judge, we'd invoke the Rule.

THE COURT: The Rule is invoked.

MR. LOLLAR: May we approach?

THE COURT: Yes, you may.

(Off-the-record discussion was had.)

MR. ALEX: Judge, I am going to make one inquiry. Is there a Lakarrame Cole in the courtroom? Lakarrame Cole?

THE COURT: Are you Mr. Nate Johnson? Are

65

you Nate Johnson, sir?

MR. ALEX: Come up.

THE COURT: All right. Come all the way to the front of the courtroom, all the way up by the door. When you've reached the door, turn and face me and raise your right hand. All the way to the door, sir. Raise your right hand?

**NATHAN JOHNSON**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand. Keep your voice up, sir.

Mr. Alex, whenever you're ready.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, sir.

A. **Nathan Nett Johnson.**

Q. A little bit slower, Nathan.

A. **Nathan Nett Johnson.**

Q. Nathan Nett Johnson?

A. **Yes, sir.**

Q. All right. And, Mr. Johnson, you know why you're here; is that right?

66

A. Yes, sir.

Q. Okay. And we're going to kind of cut to the chase a little bit, but first, tell the jury a little bit about yourself. How old are you?

A. **I'm 40 -- 43 years old.**

Q. Okay. And are you married?

A. **Yes.**

Q. What's your wife's name?

A. **Jo McCullough.**

Q. One more time?

A. **Jo McCullough.**

Q. Jo McCullough?

A. **Yes.**

Q. Okay. And where do y'all live?

A. **We live at 308 Kingsley in Garland, Texas.**

Q. All right. You live out in Garland?

A. **Yes, sir.**

Q. How long have you lived there in Garland?

A. **We live -- I've been living in Garland over 30 something years.**

Q. Okay. And were you -- are you a native Texan? Were you born here in Texas?

A. **Yes. Dallas, Texas.**

Q. You go to schools here in Texas?

A. **Yes. I graduated from Garland High School.**

67

Q. And what do you currently do for living, Mr. Johnson?

A. I was working at a warehouse. They shut down.

Q. Was that at Advanced Foods?

A. Yes.

Q. Okay. And back in June of 2008, were you working there at the time?

A. Yes, I was.

Q. Okay. Are you a little nervous?

A. A little bit. Like I say, a lot of people.

Q. Okay. Very good. And back on June the 18th of 2008, that would have been a Wednesday; is that right?

A. I think so. It may have been a Thursday. I don't know.

Q. Back then, what shifts were you working?

A. Second shift.

Q. What -- what time would that be?

A. From 4:00 -- from 4:15, maybe, sometime 2:00 or 3:00 o'clock in the morning. Sometimes 1:00 o'clock in the morning.

Q. Okay. So you'd start working on one day, and when you'd get off, it would actually be a different day.

A. Yeah, it would be a different time. Like

68

night shifts. Like a shift.

Q. And I know you -- you talk fast and I talk slow, but we're going to talk one at a time, okay?

A. All right.

Q. All right. You let me finish answering the question and then you answer it, because this young lady here has got to take down everything we're saying, all right?

A. Yes.

Q. Okay. So on -- and I'm going to bring you back to a moment in time and then we're going to go backwards, okay?

A. Okay.

Q. Did there come a time in June when you were riding home from work and you discovered two bodies?

A. Yes, sir.

Q. All right. We're going to talk about that day, okay?

A. Okay.

Q. All right. Now, would that have been early in the morning?

A. That was at night. Well, 1:00 o'clock in the morning.

Q. All right. So that would have been after midnight --

69

A. Yes.

Q. -- when that happened; is that right?

A. Yes.

Q. Did you go to work that previous day?

A. Did I go to -- yes, I did.

Q. Okay. What time did you go to work?

A. I got to work about 3:30 because we started at 4:15, and I clocked out at 1:06 and I may --

Q. I'm going to ask you specific questions, okay?

A. Okay.

Q. So you did work that day?

A. Yes, I did.

Q. All right. And how did you get to work?

A. Bicycle.

Q. All right. Is that how you normally went?

A. Yes, sir.

Q. Okay. And is it a long drive from where you live on your bicycle to work?

A. It take me to -- sometimes, it takes me about 30 minutes.

Q. Okay. All right. And when you went to work, we're going to talk about that evening before you found the bodies, okay? You with me on the same day?

A. Yes, sir.

Q. All right. And when you clocked out from

70

work, -- well, what do you do at work?

A. I was a palletizer. It's like a forklift driver.

Q. Okay. All right.

A. They put boxes on pallets.

Q. All right. Were you a forklift driver?

A. Yes.

Q. Okay. Very good. And when you got off from work that morning, what time did you get off from work?

A. I clocked out at 1:06.

Q. A.M.?

A. A.M.

Q. Okay. And that would have been June 18th?

A. Yeah, I think so.

Q. June 19th.

A. June 19th, yeah, 19th, something like that.

Q. I asked you a trick question.

A. Well, --

Q. You actually went to work on the 18th, but you got off on the 19th.

A. On the 19th.

Q. Okay. Very good. And then after you left work, what did you do?

A. Well, I was coming home -- I was coming home and I discovered two bodies.

71

Q. Okay. And when you were coming home, you were on your bicycle.

A. Yes, sir.

Q. All right. And did you have occasion to cross State Street?

A. Um, the way I came, I come down Ranger Street and I come through the parking lot of the Garland bus station.

Q. Okay.

A. And State Street. And I took a right on Walnut and I crossed over to Glenbrook. To Glenbrook, to State Street and to whatever that ...

Q. Okay. You've got a pretty good memory. You remember that specifically?

A. I remember it like it was yesterday.

Q. All right. And as you were coming home, tell the jury what you saw. Did you see something that startled you?

A. Well, I was coming home on my bike. It was late -- it was dark, late at night. I thought it was two trash body -- two trash bags, and the more I get closer, I seen two bodies laying in the street, and I -- I had my cell phone on me and it's a store on the corner of Glenbrook and Walnut. Yeah, Glenbrook and Walnut. And a fire station. So I seen like, you know,

72

bodies, so I went to the fire station and got the firemen and woke them guys up and they came -- and I showed them where the bodies at and they came and that was it.

Q. Okay. And when you -- when you were riding your bike and you saw something that appeared to be, you know, in the street there, as you got closer, could you tell they were human beings?

A. Yes, I did, the more I got closer.

Q. And when you saw that, did that panic you or did it frighten you?

A. Yes, it did. It scared me. It panicked me.

Q. All right. And you didn't use your cell phone to call 911.

A. No, I went to the fire station.

Q. Okay. And is that because you were panicking?

A. Because I was scared and never seen two dead bodies, and it was dark, and I didn't know, you know, if they still around or nothing, who -- whatever they did.

Q. Okay. All right.

MR. ALEX: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) And I've showed you a couple

73

of photographs already, have I not?

A. Yeah.

Q. Of the crime scene?

A. Yeah.

Q. Let me show you State's Exhibits 24, 25, and 26. Do these pictures accurately show what you saw when you were going down the road?

A. Let me see.

Q. And I just want you to say yes or no at this point, and then we'll talk about it later.

A. I won't touch it, but (examining exhibits) --

Q. Okay. Take your time.

Okay. Listen to me for a second. Do these pictures show the scene out there?

A. Yes, sir.

Q. Okay. All right.

MR. ALEX: Judge, we're going to offer State's Exhibits 24, 25 and 26, and may the record reflect that the photographs have been previously tendered and given to counsel?

THE COURT: Will there be objection?

MR. LOLLAR: Judge, we do object on the grounds offered at a pretrial hearing. We would ask the Court to recall the grounds we made at that time.

THE COURT: Okay. And that objection's

74

overruled.

State's Exhibits 24 through 26 are admitted, and you may publish.

MR. LOLLAR: And may we have a running objection to the photographic exhibits to be offered by the State?

THE COURT: That's granted.

MR. LOLLAR: Thank you, Your Honor.

Q. (BY MR. ALEX:) And, Mr. Johnson, I'm going to put some photographs up here and -- and so you can talk about them, you've got a screen there next to you.

A. Okay.

Q. You can see it there or you can see it up here, okay?

A. Okay.

Q. And --

THE COURT: Mr. Alex, let me interrupt you for a second. I think this is a good time to take the jury's first recess for the morning.

I'm going to remind you not to discuss the testimony.

All rise for the jury.

Mr. McElroy, you will be the last juror out. If you will, shut the door behind you.

(Jury not present.)

75

THE COURT: We are in recess until 10:10 a.m. by that clock.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT: Okay. Let me have a word, please.

The jury is not present.

This is the State of Texas versus James Broadnax.

The right to a public trial is a fundamental right. People can be in -- in the courtroom during the testimony of witnesses. However, I'm allowed to control decorum in the courtroom. We're not going to have people going in and out of the courtroom during the testimony of witnesses. So you're allowed to leave during the breaks. You can't go in and out at other times. So I hope everybody heard that.

And call the jury.

MR. ALEX: And, Judge, just a bit of clarification. I've got folks kind of running in and out at varying times. Is that okay? I'm trying not to have him go to too much --

THE COURT: Limit it as much as you can.

THE BAILIFF: Please rise.

76

(Jury present.)

THE COURT: Be seated, please.

Mr. Alex, you may proceed whenever you're ready, sir.

MR. ALEX: Thank you, Your Honor.

THE COURT: Yes, sir.

**NATHAN JOHNSON**

was re-called as a witness and testified as follows:

**DIRECT EXAMINATION - CONTINUING**

BY MR. ALEX:

Q. Mr. Johnson, you're the same Nate Johnson who testified before the break; is that right?

A. Yes, sir?

Q. Okay. And we just went over with the jury the scene that you came upon when you were going home; is that correct?

A. Yes, sir.

Q. State's Exhibit Number 26, does this look like a photograph of your bicycle?

A. Yes, it is.

Q. All right. And where it's parked there, is that where it ultimately ended up when you came back with the firemen?

A. Yes, it is.

Q. All right. And State's Exhibit 24, is this a

77

photograph -- and you know what, Mr. Johnson, so that we're both on the same page, is this a photograph -- well, I'll tell you what. Let me use the stylus, sir.

Does this photograph show what you saw in the area right here when you were riding down State Street as you approached the bodies that you found?

A. Yes, it is.

Q. Okay. And as you were riding and you got closer, was it clear to you that these were two human beings?

A. Yes, it is.

Q. Okay. And State's Exhibit 25, as you got closer, is this the scene that you saw?

A. Yes, it is.

Q. And while you were there, Mr. Johnson, did the fire department personnel, did they follow you back to the scene?

A. Yes, they did.

Q. Okay. And when they followed you back to the scene, did you stay at the scene and wait for the police?

A. Yes, I did.

Q. And did you speak to the police?

A. Yes, I did.

Q. All right. And did you give them a written

78

statement?

A. Yes, I did.

Q. You've had a chance to review that; is that correct? Some time ago?

A. Yeah.

Q. Okay.

A. You came to my house.

Q. Very good. And while you were there, the police showed up and did you -- did you ever see anybody -- well, strike that.

Did you give your statement there at the scene or back at the police station?

A. I gave it right there.

Q. At the scene?

A. Yes.

Q. All right.

MR. ALEX: Judge, that's all I have. I'll pass the witness.

THE COURT: Cross-examination.

MR. LOLLAR: We have no questions. Thank you.

THE COURT: May the witness be permanently excused?

MR. ALEX: We have no objection to that, Your Honor.

79

MR. LOLLAR: Yes, sir.

THE COURT: You're permanently excused, sir. Thank you for your testimony. You may step down.

What further says the State?

MR. ALEX: The State would call Chad Purcell, Your Honor.

THE COURT: Chad Purcell.

Mr. Purcell, if you'll come all the way to the front of the courtroom, all the way to the very front, up by the door. Go as far as you can. When you've reached the door, turn and face me and raise your right hand. All the way to the front.

Raise your right hand.

**CHAD PURCELL**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand. You'll be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Your Honor.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, sir.

A. Cloyce Chad Purcell.

80

Q. And, Mr. Purcell, what do you do for a living?

A. I'm a firefighter in Garland.

Q. How long have you been doing that?

A. A little over twelve years.

Q. And you know why you're here today, correct, sir?

A. Yes, sir.

Q. All right. We're going to talk about June the 19th of 2008. Were you on duty then?

A. Yes.

Q. And where -- where specifically do you work?

A. Central Fire Station. It's at 1019 Austin Street.

Q. And in the vicinity of Garland, is that downtown Garland?

A. Pretty close to it; yes, sir.

Q. And did there come a time -- tell the jury a little bit about how you-all work at the Central Station on -- in particular, on -- on June the 18th, going into June the 19th, give the jury some idea of who was there and how y'all respond to things.

A. C shift was on duty. We were -- being around 1:00 in the morning, we were all in bed. And we have a station bell or buzzer on that -- but the front door that can be activated by civilians when they come up to

81

the station.

So about 1:00 o'clock that -- that buzzer went off and a few of us got up to kind of see what was going on.

Q. Okay. So about 1:00 o'clock in the morning on June the 19th, the buzzer goes off.

A. Uh-huh.

Q. Were y'all asleep?

A. Yes.

Q. Okay. And if there was a fire, what would have happened?

A. Well, we would just get up --

Q. Okay.

A. -- and go to the apparatus and -- and respond.

Q. All right. So that's the normal course of y'all's business.

A. Correct.

Q. All right. The buzzer goes off. What happens?

A. Two of us got up and went to the front door to see what was going on, and when we opened the door, no one was at the door. So we -- one of the guys walked out to the -- the door is recessed about ten feet off the street. And he walked out to the -- to the street edge to see if we could -- you know, see if there was a

82

car outside or somebody out by the street.

And we didn't see anybody, but about the time he turned around to come back into the station, I had just kind of stayed at the door and left the door open, and about the time he turned around, we heard somebody hollering, you know, just really loud, Hey, hey, hey, hey, hey. And so not --

Q. Was that the young man that just left the courtroom, Mr. Nate Johnson?

A. Yes.

Q. Okay.

A. But we couldn't see him because he was coming from one of the sides. There's shrubs on either side of the door and we couldn't see him. And obviously Donald didn't see him when he walked out, so --

Q. Now, who was Donald?

A. He was the other guy that got up with me.

Q. Okay. Very good.

A. And --

Q. I'm going to cut you off here a little bit and we're going to go -- kind of fast forward a little bit, all right?

A. All right.

Q. So when he arrives and rings the buzzer, y'all are a little taken aback?

FIRM NAME

Page 79 to 82 of 297

August 10, 2009

83

A. Uh-huh.

Q. Okay. But ultimately, is he able to communicate to you why he's there?

A. Once we got calmed -- got him calmed down a little bit, yes.

Q. Okay. And once you got him calmed down, was there an indication that you needed to -- to go back somewhere else for -- for a particular reason?

A. Yes. He -- he informed us that he had passed a couple of bodies. He said that he thought they had been beat up or, you know, they were bleeding quite a bit.

And I tried to get the address out of him to see where they were. He couldn't give me an address. He just kept saying they were down the street, you know, around the corner, and so we -- by that time, three or four more guys had gotten up and come to see what was going on. And so we got on the ambulance and the engine and I just told him to, you know, show us where they were, and so we followed him.

Q. So y'all followed him.

A. Uh-huh.

Q. And how far did you have to go?

A. It was about a block and-a-half.

Q. Okay. Not very far?

84

A. No.

Q. And were the police called at any time from --

A. Yes.

Q. -- by you guys?

A. As soon as we got in the apparatus and got started en route, we called the dispatcher on the radio and told them that we were going to investigate a possible, you know, some body -- a possible -- I don't remember how we described it on the radio, but some -- some bodies that somebody thought they had seen.

Q. Okay.

A. And so, we --

Q. How many different units did you guys take from the fire department?

A. Initially just the ambulance and the engine.

Q. And you would have been in which one?

A. The engine.

Q. Okay. And who was in the other one?

A. The ambulance was Mr. -- it would have been Buchanan and Isenburg.

Q. Am I stretching your memory at this point?

A. No, I remember.

Q. Tell me what you guys did in response to this scene. When did you go and what did you see?

A. We went out the street right up in front of

85

the station, took a left on State Street, went about a black and-a-half and found -- that's when we -- when we found the victims laying in the parking lot of the Zion recording studio.

Q. And were there any -- were there any other emergency personnel there --

A. No.

Q. -- or were you guys the first ones there?

A. We were the only ones there.

Q. Okay. And what did y'all do?

A. The engine crew got out. Normally with these situations we'll split up. If you have multiple victims, and -- kind of the ambulance will take one patient and we'll take another one on the engine.

We went up and assessed -- the engine crew got out and assessed the patient that was closer to the building. The ambulance crew assessed the patient that was a little bit closer to the street.

And once we had determined that there was multiple gunshot wounds in our victim and with the -- where the location of the gunshot wounds and everything, there was just not really any signs of life and we decided not to work the patients because there were signs incompatible with life with the injuries that they had sustained.

86

Q. Okay. Did y'all check a pulse?

A. Yes.

Q. And did either one of the victims that you saw have a pulse?

A. No, no pulses, no breathing. Pupils were dilated. And just no signs of life at all in the victims.

Q. Was the -- were their skin, was it still warm to the touch?

A. Very warm.

Q. Would you describe this as perhaps a -- a fresh crime scene?

A. Definitely.

Q. Okay. And were you there -- I'll show you a couple of photographs and to sort of highlight for the jury what it was that you saw.

State's Exhibit 23 -- no, I will tell you what. Maybe I should offer them first.

State's Exhibits 23, 27, 28, 31 and 45, do those accurately depict the scene as it was the night that you came upon it?

THE COURT: Don't forget to ask to approach, Mr. Alex.

MR. ALEX: I'm sorry, Judge.

THE COURT: And that's granted.

87

A. (Examining exhibits) Yes, sir. Yes.

Q. (BY MR. ALEX:) Okay. And speak up a little bit --

A. Okay.

Q. -- because the court reporter's got to hear you.

Does these accurately reflect the scene?

A. Yes.

MR. ALEX: We'd offer State's Exhibits 23, 27, 28, 31, and 45, and the last two, Judge, are pretty graphic photographs, if anybody in the courtroom wants to leave, and we'd offer those at this time, Your Honor.

Tender to counsel. And they have been previously tendered to counsel before this date.

MR. LOLLAR: Same objections, Your Honor.

THE COURT: All right. The objection's overruled.

State's Exhibits 23, 27, 28, 31 and 45 are admitted, and you may publish.

Q. (BY MR. ALEX:) State's Exhibit 23, Mr. Purcell?

A. Yes, sir.

Q. Is that the scene out there -- do you recall if there was a business out there called the Zion Gate

88

Records?

A. Yes, sir. It's located in the far end of the picture of that building.

Q. Is that a scene where you're looking down the street from -- which street is that, State Street?

A. That's State Street, and you're standing on Glenbrook.

Q. Okay. Very good. State's Exhibit 27, is that an aerial photograph of the locations that we're talking about?

A. Yes, sir.

Q. All right. And I'll tell you what. Since I'm not as fancy with that equipment as -- I'll try it though.

Okay. Show us up there with your hand -- and I think if you mark this, if you put your hands on the screen up here. The corner here that we're looking at here, --

A. Yes, sir.

Q. Well, maybe not. Is that the stylus?

You can use this stylus and show us the corner that we just saw in the previous picture.

A. You know, that's going to be right over here (indicating).

Q. Very good. Works pretty good, doesn't it.

89

So that's the corner we were looking at just then; is that correct?

A. Yes.

Q. And would you put where the -- the bodies were, were they near the trees there in front of the Zion Gate?

A. Yes. There was -- one was about right there and the other one was probably a little bit further up in the parking lot right -- right in there (indicating).

Q. And how familiar with are you with this location?

A. Not -- I mean, it's right around the corner. We -- we inspect these businesses on a regular -- you know, annually, so, I know I had inspected the office or the recording studio at some point during that year, because I remember being up there and talking to the guys during the inspection.

Q. So this wouldn't have been your first time there.

A. No.

Q. State's Exhibit 28. And as a point of reference, you might need a little bit of reference with that one.

MR. ALEX: Go out some. Okay. Very good.

90

Q. (BY MR. ALEX:) Do you see where the -- the firehouse parking lot is on that photograph?

A. (No response.)

Q. Let me see if I can give you a reference.

MR. ALEX: Do we have another stylus or not?

A. Looks like it's probably going to be right in here, but ...

Q. (BY MR. ALEX:) Okay. Would you look up on the screen here for me, if you would?

A. Okay.

Q. State's Exhibit 28, if I'm pointing to the right-hand corner of the photograph, does that look like the parking lot of the firehouse?

A. Which, right in here?

Q. Yes.

A. Yes.

Q. Okay. And then if we were going to show the jury the location of Zion Gate Records, would it be there on State's Exhibit Number 28 that I just marked?

A. Yes.

Q. And the fire department would be right here; is that correct?

A. Yes.

Q. Okay. And with your stylus, could you show

91

the jury the -- the way that you got from the firehouse to Zion Gate Records?

A. We would have come out and gone up this street here and then down State Street.

MR. ALEX: For the record, the witness is drawing a line from the firehouse and -- and down to State -- to State Street in a -- in a most direct manner.

Q. (BY MR. ALEX:) That's -- okay. And when you got there, the two young men that you saw out there in the street, were they all the way out in the street or were they in the part of the parking lot, or can you give us a little guidance there?

A. Both of the victims were in the parking area.

Q. Okay. Do you recall meeting them before?

A. No. I mean, like I said, I think I may have met one of them during the inspection.

Q. Okay.

A. You know, maybe a five-minute visit, but --

Q. All right.

A. -- not on a regular visit or anything.

Q. Okay. All right. State's Exhibit 31. The two folks that were out there in the street in the -- in the parking lot area there, give the jury the two -- if you could distinguish the two, was this the young

92

man that we see here versus the other young man? The other -- the other young man, was he sort of in a fetal position?

A. Correct.

Q. Okay. And this young man would have been closer to the street; is that correct?

A. Yes.

Q. And when you approached him, did you see any movement at all?

A. No.

Q. Okay. Did you see anybody in the scene anywhere around his body or anything like that?

A. No.

Q. Okay. Do you recall if you kicked any shells from a gun, or if you dis -- disturbed the crime scene at all?

A. The only thing we did as far as disturbing the crime scene was, we did lift up the victim's shirt in this photo just to check the torso for any further injuries.

Q. So other than the shirt being lifted up, that would have been the only thing you did while you were there at the crime scene to this particular individual; is that correct?

A. Yes, sir.

93

Q. You didn't pull his pockets out as we see here in State's Exhibit 31.

A. No, sir.

Q. Okay. All right. And in State's Exhibit 45, this would have been the individual that was in the fetal position; is that correct?

A. Yes, sir.

Q. Did you do anything -- well, let me ask you this: When you come to the crime scene, your first objective is what?

A. Always scene safety and, you know, assessing our patients.

Q. Okay. And if a person potentially is alive and could use some -- some help, you're not going to be concerned about walking through blood or anything else if you can help save that person's life, will you?

A. Correct.

Q. Okay. When you arrived on this crime scene, was it pretty obvious to you that these people were not living?

A. Yes, sir.

Q. And did you make it a point not to disturb the crime scene?

A. Yes, sir.

Q. Did you do anything as it relates to this

94

individual besides checking his vital signs that might change or alter the way this person would have been before you got there?

A. No, sir.

Q. Okay.

MR. ALEX: We can turn the lights up, Judge.

Q. (BY MR. ALEX:) And, Mr. Purcell, when you arrived on this crime scene, and it was a pretty fresh crime scene, did you have any concern for your own safety?

A. Yes, sir. Immediately after we assessed the patients and determined that we were not going to initiate CPR or try to resuscitate them, that -- that was the next thing that we thought about, was just kind of looking around, making sure that we didn't see somebody waiting, you know, around the corner, just kind of securing the crime scene and making sure that there was -- you know, that our safety was taken care of.

Q. Okay. How long did it take before the police arrived?

A. Probably about three, four minutes.

Q. When the police arrived, --

COURT REPORTER: Did you say 30?

95

THE WITNESS: Three to four.

Q. (BY MR. ALEX:) You're kind of soft-spoken. I'm going to ask you to speak up little bit.

A. Okay.

Q. We're almost done.

A. All right.

Q. When the police arrived, did they secure the crime scene?

A. Yes.

Q. And what does that mean?

A. They taped off the area, they blocked off the street that -- they blocked off State Street at -- I think it's 10th on the -- the west end and Glenbrook on the east end, and then, you know, came in and started, you know, looking for evidence and things like that.

Q. And the location that you were at, that was in the County of Dallas; is that correct?

A. Yes, sir.

Q. There in Garland?

A. Yes.

Q. And did you see anybody enter that crime scene that you thought shouldn't have been there?

A. No. I mean, other than the person that came to the station and brought us there, and I had told him as soon as we got there that, you know, he needed to

96

stick around and -- and make sure that he was there for when the police came, but other than that, he was the only one there.

Q. Okay. And then I guess my question is, you didn't see this crime scene disturbed by anybody that wasn't law enforcement.

A. No, sir.

Q. All right. And ultimately, did you-all write a report as it relates to what you saw?

A. Yes.

Q. And is that what you did?

A. Yes.

Q. Okay. And you didn't give like a written statement the police, did you?

A. I don't think we did affidavits or anything on this one.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Cross-examination.

MR. LOLLAR: We have no questions. Thank you.

THE COURT: May the witness be permanently excused?

[No response.]

THE COURT: May the witness be permanently

97

excused?

MR. ALEX: We have no objection, Your Honor.

MR. LOLLAR: Yes, sir.

THE COURT: You're permanently excused, sir. You may step down. Thank you for your testimony.

What further says the State?

MR. ALEX: The State will call Craig Swan, Your Honor.

THE COURT: Craig Swan.

Sir, if you'll come all the way to the front of the courtroom, as you've seen the other witnesses do. When you've reached the door, turn and face me and raise your right hand.

Mr. Swan, if you'll come to the front of the courtroom. Once you've reached the door, turn and face me and raise your right hand. Raise your right hand, sir.

**CRAIG SWAN**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand. You will be responding to questions from Mr. Alex.

Mr. Alex, whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

98

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, sir.

A. Craig Arthur Swan.

Q. And, Mr. Swan, you're a little soft-spoken as well. I'm going to ask you to speak up a little and into the mike, okay?

A. Okay.

Q. You know why you're here; is that correct?

A. Yes, sir.

Q. Stephen Swan was your --

A. My son, my oldest son.

Q. --your oldest son. And I told you that you were going to come in and introduce him to the jury; is that correct?

A. Yes, sir.

Q. All right. Introduce yourself first. Tell the jury, what do you do for a living?

A. I am a -- currently working as a mid-range computer operator for Affiliated Computer Services in Dallas.

Q. And how long have you been doing that?

A. I've been in that particular position for about five and-a-half years.

August 10, 2009

**99**

Q. How long have you been doing this type of work?

A. Since 1984.

Q. All right. And -- and so that's who you are.

A. Yes.

Q. That's what you do.

A. Yes, sir.

Q. Okay.

A. I've been involved in the -- everything from computer operations to application programming.

Q. All right. And tell the jury a little bit about your family. Are you married?

A. Yes. I've been married. Tomorrow will be our 35th anniversary.

Q. And what's your wife's name?

A. Jean Lewis Swan.

Q. Is she here today?

A. Yes, sir, she is.

Q. All right. She's sitting out in the audience supporting you as well; is that correct?

A. Yes, sir.

Q. Okay. And you have, other than Stephen, do you have other kids?

A. Yes, sir. We have a daughter Deborah who is not quite two years younger than Steve, and then we

**100**

have a younger son, Michael, who is four years younger than Steve.

Q. All right. And I don't think I ever asked you how old Steve was when he was killed.

A. He was 26.

Q. And Deborah and Michael are both here as well; is that correct?

A. Yes, sir.

Q. Okay. I'm going to show you State's Exhibit 20. Who is that?

A. That's Stephen.

Q. Okay.

A. And that is -- that is our son Steve.

MR. ALEX: We're going to offer State's Exhibit 20, Your Honor.

MR. LOLLAR: No objection.

THE COURT: State's Exhibit 20 is admitted.

You may publish.

Q. (BY MR. ALEX:) And I'll tell you what, while I'm here, State's Exhibit 21, is that a photograph -- who is that a photograph of?

A. That is Stephen and his friend Matt Butler. Stephen is the taller one on the left. On our left.

Q. Okay. Very good.

**101**

MR. ALEX: We're going to offer State's Exhibit 21 as well, Judge.

THE COURT: Any objection?

MR. LOLLAR: No, sir.

THE COURT: State's Exhibit 21 is admitted.

Q. (BY MR. ALEX:) So Stephen is on the right and Matthew is on the left; is that correct?

A. In the photo, yes. It's -- as we look at it, he's on the left, Stephen is.

Q. Gotcha. Now let's -- let's tell the jury a little bit about -- tell the jury a little bit about Steve, okay? You said -- how old did you say he was?

A. He was 26.

Q. 26 years old. What did he do for a living at the time?

A. At the time, he was working for Elipse Communications which is a -- they provide web hosting and support to the real estate industry. He had been -- he was particularly used by them in the area of -- of security. That is data security.

Q. Okay.

A. Protecting their web servers, and therefore their clients, and the applicants for apartments who would give sensitive information, such as social

**102**

security numbers.

His primary function with them was keeping those sites free from hackers.

Q. Gotcha. Did -- did Stephen grow up -- did you-all live here in Dallas County your whole life?

A. No, sir, not -- not always. Steve was born in Dallas County.

Q. Okay.

A. At Presbyterian Hospital in Dallas. We lived in Garland until he was 13, and we moved in late 1994 to Collin County in an incorporated area north of Salina.

Q. Okay.

A. And then in 2003 we moved to Frisco.

Q. And is that where you currently live?

A. We -- yes. My wife and I currently live in Frisco.

Q. And tell the jury a little bit about Steve growing up. Did he -- what -- what kind of schools did he go to?

A. Steve was -- Steve was home schooled through high school.

While he was still technically in high school in 1998, he began taking courses at Collin County Community College, the Preston Ridge campus in Frisco.

103

And later he attended the University of Texas at Dallas.

Q. And did your other kids, did they also -- were they home schooled?

A. Yes, sir.

Q. Did there come a time -- was Steve -- was Steve married?

A. No, he was never married.

Q. Where did he live at the time of his death?

A. At the time of his death, he was living in Carrollton.

In January, the very beginning of 2005, Steve, Debbie and Mike, our three children, rented a house together in Carrollton, so they were all living together.

Q. So there did come a time when the three of them left your home and moved in together at another location.

A. Right. Right. Debbie had -- had actually, since 2002, had been living away from us while she was at college, and after she graduated, January 2008, was when Mike and Steve moved out to -- to live together, all three of them, in Carrollton.

Q. So how often would you see Steve after he moved out of your home?

104

A. I'd say actually make eye contact with him, physically be with him about once every two weeks.

Q. And on June 19th of 2008, when would have been the last time you saw Steve?

A. Probably about two weeks earlier.

Q. Two weeks before?

A. Yes.

Q. When would have been the last time you had spoken to him?

A. I can't remember. The last communication I had from him was a text message that he sent me the previous Sunday, which was Father's Day, wishing me a happy Father's Day.

Q. Okay.

A. In fact, I still have it on my phone.

Q. All right. Can you tell the jury, how were you notified that Steve had been -- had been killed?

A. By phone call. We received a phone call from our daughter's cell phone, but she was unable to speak when we answered, so a Garland police detective actually got on the phone and told us what had happened.

Q. And where were you at when you were told?

A. We were at our home.

Q. Do you remember what time of morning it was?

105

A. Yes, sir. It was about 5:30.

Q. Did you ever have to go out to the scene?

A. No, sir, not to the scene.

Q. Okay. And what kind of car did Steve drive?

A. He had a 1995 Ford Crown Victoria.

Q. And how long had he had that?

A. Since 2001, probably -- I believe it was October 2001.

Q. Okay. Do you think you could recognize that if you saw it again?

A. Yes, sir.

Q. Do you-all have the car at home at this point?

A. Yes, sir.

Q. Was it -- was it returned back to you-all?

A. Yes, sir, it was.

Q. Okay. Can I ask you to look at some photographs to see if you can identify it?

A. Sure.

Q. Okay. Before I do that, when you were notified of Steve's death, do you have any way of knowing whether or not Mr. Butler, -- whether his family had been notified?

A. At the time we were notified, --

Q. Yes, sir.

A. -- no. No.

106

Q. Okay. Were you aware that Mr. Butler was deceased as well when you were --

A. No, sir, we were not aware of that until we were en route to -- to the children's -- to our -- our kid's house. We were on our way over there to meet with the detectives so they could explain more to us, and we received a call from a friend.

At the time when we -- all the time we were in the car riding over there, of course, we were in a complete state of shock, but we had no idea where he was killed.

Granted, it was the Garland Police who called, but that did not register with me in my state of shock, because when I talked to them, I had already been notified by my wife that Steve had been murdered.

Q. Okay.

A. And so we didn't know where he was murdered, whether he was out jogging and -- and somebody shot him, you know, near his home or whether it was at a place where he did some contract work. We -- we didn't -- we didn't know where it was, but a friend called and notified us that Matt had also been killed, and that pretty much ...

Q. So you were notified at some point?

A. Yes.

107

Q. What was the relationship like between Matt and Steve?

A. They were very close friends, and they both loved music and they both were really gung-ho to get this project moving along.

Q. What did they do there at the Zion Gates? What was their main function there?

A. They were a recording studio. They would bring in clients who wanted to cut a record or cut a CD, as it would be these days. And they would -- would record their -- their session.

Q. Okay.

A. And they also --

Q. And if they were there at 1:00 o'clock in the morning, that wouldn't have been uncommon.

A. No, especially not for -- not considering that Steve had the other job. You know, they worked during the day, so --

Q. Let me ask you this: Did they have a -- a -- if they were going to leave out of the studio for any period of time, would they lock it?

A. We have heard that they always locked the studio, even if they just stepped out for a break.

Q. Okay. And that was something they did on a regular basis, do you --

108

A. Yes.

Q. -- from what you were told.

A. Yes.

Q. Okay. Very good. And --

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir. And as necessary to develop his testimony.

Q. (BY MR. ALEX:) The photographs that I asked you to look at previously, State's Exhibits 253, 273 and 277, I want you to take a look at those and see if the photograph two -- State's Exhibit 253, does that appear to be a photograph of Steve's car?

A. Yes, sir.

Q. Okay. And --

MR. ALEX: We're going to offer State's Exhibit 253.

THE COURT: Is there any objection?

MR. LOLLAR: No, sir.

THE COURT: State's Exhibit 253 is admitted.

Q. (BY MR. ALEX:) And I told you there were some items found in the car when it was recovered, and I was trying to see if they belonged to Steve. Do you recall that?

A. Yes, sir.

109

Q. Okay. State's Exhibit 273, there's a number of items there; is that correct?

A. Yes, sir.

Q. Including one of them would be Steve's identification for a concealed handgun license?

A. Yes, sir.

Q. Okay.

MR. ALEX: And, Judge, conditionally I'm going to offer State's Exhibit 273, and -- and let the Court know that the predicate for that will be laid.

THE COURT: Is there any objection?

MR. LOLLAR: Are you offering it for record purposes?

MR. ALEX: I can offer it for record purposes, but I want to ask the witness to testify as to the contents of it at this point, Judge.

THE COURT: Is there any objection?

MR. LOLLAR: We have no objection.

THE COURT: State's Exhibit 273 is admitted.

Q. (BY MR. ALEX:) And 277, does that a -- appear to be a photo of a receipt from a Bullet Trap shooting range?

A. Yes, sir.

Q. Okay. And -- and you were able to identify

110

that as well; is that correct?

A. Yes, sir.

Q. All right.

MR. ALEX: We're going to offer 277 at this time as well, Judge.

MR. LOLLAR: No objection.

THE COURT: State's Exhibit 277 is admitted.

Q. (BY MR. ALEX:) Let's start with State's Exhibit 273. Now, you would have no way of knowing what was in the car when it was recovered; is that correct?

A. That's correct.

Q. The items that we see here in State's Exhibit 273, do you recognize any of the items there?

A. Um, yes, sir.

MR. ALEX: Zoom in on the pipes.

Q. (BY MR. ALEX:) The pipes that are there, --

A. Yes, sir.

Q. -- do those look familiar to you?

A. Yes, sir.

Q. Tell me how.

A. Well, back in 2005, my wife took photographs of Steve's pipe collection. There were three or four of them, and those three pipes I could easily pick out

**111**

of those photographs.

Q. Okay. So they looked similar to pipes that Steve would have had --

A. Yes.

Q. -- in his car, perhaps.

A. Well, yeah, if he -- if he wanted to smoke them when he was away from his house, yeah, they could very --

Q. Okay. What about the tennis shoes there, do those tennis shoes look familiar to you at all?

A. I do not recognize those tennis shoes as being his.

Q. All right. The receipt, I think, that we have there, we've got a better copy of it, --

A. Right.

Q. -- but I think there's also a concealed handgun license there.

MR. ALEX: Would you zoom on that for me.

A. Yes, sir. They have that -- that is, I mean, the photograph is obviously him, so that's apparently his concealed handgun license.

Q. (BY MR. ALEX:) All right. I think Mr. Hikel's going to zoom in on that for us if he can. Well, maybe he won't.

A. I can see -- I can see, even with it fuzzy

**112**

like that, that's his photo.

Q. Very good.

A. And that's also his signature.

Q. Very good. Thank you, sir.

Any of the other items in that photograph you recognize as being Steve's?

A. No, sir. I cannot positively identify the other items.

Q. Does that appear to be like a shop towel there?

A. Yes, but I --

Q. There's no way for you to know?

A. Again, I'm -- I don't know.

Q. And the shirt that's there, does that look like anything Steve might have had?

A. Not that I -- not that I can recognize in the photo.

Q. All right. And finally, Mr. Swan, State's Exhibit 277, I had you look at that receipt once before; is that correct?

A. Yes, sir.

Q. And is that a receipt from a purchase by your son for a firearm?

A. Um, looking at the cost, yes, that would -- that cost would be consistent with purchasing a

**113**

firearm.

Q. Was your son -- would it be -- would it be correct to say that he was a gun enthusiast?

A. Yes, he enjoyed shooting and owned several firearms.

Q. And did he go to the shooting range on a regular basis?

A. Yes, the Bullet Trap was -- ever since we moved back to the city, the Bullet Trap was his primary place he went to -- went to shoot.

Q. And would he commonly carry a weapon on him?

A. Yes, he -- he had a concealed handgun license, so he frequently did carry a weapon.

Q. Would it be uncommon for him to be out at work without his weapon?

A. I'm sorry, could you state that again?

Q. Would it be uncommon for him to be out at work without his weapon?

A. Not necessarily, --

Q. Okay.

A. -- because I don't know, where he worked at Elipse, I do not know their policies there or the policies of the landlord for having a weapon on the premises. And you understand, it could be possible that -- most employer's don't allow their employees to

**114**

carry weapons on the premises.

And if it's a situation where the landlord of the employer doesn't allow weapons on the premises either, they may not even be able to keep them in their car, and since he did go to Zion Gate from work, I really have no way of knowing whether he would normally have carried a weapon at that time because I'm not familiar with the policies of the employer or the landlord of the employer's location.

Q. Very good. Very good.

MR. ALEX: That's all I have with the lights, Judge.

Q. (BY MR. ALEX:) And finally, Mr. Swan, I told you I was going to have to show you a photograph for identification purposes. State's Exhibit 409, is that a photograph of your son?

A. Yes, sir.

Q. Stephen Swan?

A. Yes, sir, it is.

Q. Okay.

MR. ALEX: I'm going to offer it for the record at this time, Your Honor.

MR. LOLLAR: No objection.

THE COURT: It's admitted for record purposes.

**115**

409, Mr. Alex?

MR. ALEX: Yeah.

We're going to pass the witness, Your Honor.

THE COURT: All right. Cross-examination?

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Sir, I just have a couple of -- a couple of questions for you.

I'm sorry for your loss.

Did the District Attorney's Office ever pass on to you a letter to your family from Mr. Broadnax?

A. No, sir.

MR. LOLLAR: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) Let me give you that.

A. No.

MR. LOLLAR: That's all the questions we have.

THE COURT: Will there be any redirect?

MR. ALEX: May I approach, Judge?

(Off-the-record discussion was had.)

MR. ALEX: That's all I have, Judge.

THE COURT: May the witness be permanently excused?

**116**

MR. ALEX: Yes, sir.

MR. LOLLAR: Yes.

THE COURT: You're permanently excused, sir. You may step down.

What further says the State?

MR. ALEX: The State would call Steve Pickett, Your Honor.

THE COURT: Steve Pickett.

Mr. Pickett, if you'll come all the way to the front of the courtroom up by the door, go until you can't go any further, sir, all the way to the door. When you've reached the door, turn and face me and raise your right hand.

**STEVEN ANTONIO PICKETT**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand. You'll be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Your Honor.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, please, sir?

A. Steven Antonio Pickett.

**117**

Q. And it's probably not necessary to ask what you do for a living. I'll bet a bunch of folks in here already know. What do you do for a living?

A. I'm a news reporter, CBS 11 news.

Q. How long have you been a news reporter?

A. I've been a news reporter for about 26 years. Almost 14 at Channel 11.

Q. And that's Channel 11 here in Dallas, local TV station?

A. KTVT, CBS 11 here in Dallas; yes, sir.

Q. And you know why you're here today; is that right?

A. Yes, sir.

Q. We're going to go right to the matter at hand. Did you interview a young man by the name of James Broadnax while he was in jail?

A. Yes, sir.

Q. Do you see him in the courtroom today?

A. I do.

Q. Would you point to where he's sitting and describe an article of clothing?

A. To my left, beige shirt, striped tie.

Q. And would you be referring to the young man sitting directly in front of me?

A. Yes, sir.

**118**

MR. ALEX: May the record reflect that the witness has identified the defendant in open court?

THE COURT: Will there be objection?

MR. LOLLAR: No objection.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) And, Mr. Pickett, how did that come about?

A. Typically, in many cases, cases similar to this, television stations such as CBS 11 will submit requests for interviews to individuals who are accused. That request was submitted to the Sheriff's Department where they handle the jail and those who are being housed.

I was given a call the morning of that I was assigned to conduct those interviews.

Q. And this would have been on what date, June the 23rd of 2008?

A. I believe that's correct; yes, sir.

Q. And do you know whether or not he had been booked into the Dallas County jail on June 21st, 2008?

A. Um, I had --

Q. Do you have any knowledge of that?

A. I had done stories previously about arrests.

Q. Okay.

A. So there was coverage regarding his arrest and

119

the other gentleman's arrest so that we knew they were in custody.

Q. Okay. Very good. And at the time that you -- would you have personally made those requests or would there be a situation where someone else at your station would make the request, they'd get the clearance and then they'd call you and say You got the go. You can go do it?

A. Generally speaking, and in this case, I have an assignment editor, someone who assigns us to stories. They make the request. They submit the paperwork. Individuals either say yes or no, and the reporter is then assigned if you indeed get clearance to conduct that interview.

Q. All right. And I guess the point that I'm trying to get across is you have to rely on the folks that are sending you out there that the person has actually agreed to the interview; is that correct?

A. That's correct.

Q. You're not looking at the signed request yourself, are you?

A. That's correct.

Q. All right. And so in reliance upon that, you go out to the Dallas County jail; is that correct?

A. Yes, sir.

120

Q. And then you meet with their public information officer.

A. Yes.

Q. Do you recall what her name is?

A. Kimberly Leach.

Q. Is that somebody that you know on sight?

A. Yes.

Q. And when you meet with her on this day, what do y'all do?

A. We are -- we immediately go to that area where the interview is conducted. Now, I just call them cells, --

Q. Okay.

A. -- so they're glass partitions. I've done several of them. And that's where we had it.

Q. And prior to you getting there, had you spoken to anybody from law enforcement about an interview with the defendant?

A. No.

Q. Personally?

A. No.

Q. No one from the Garland Police Department called you and said, Hey, Mr. Pickett, we need you to go over --

A. Un-uh.

121

Q. -- and try and get a confession from old Broadnax there.

A. No, sir.

Q. It didn't happen.

A. No, sir.

Q. Have you ever worked for law enforcement?

A. No, sir.

Q. And when you got over to the jail and you talked to Ms. Leach, did she allow you to interview with the defendant?

A. Yes.

Q. And who all was there when you interviewed the defendant?

A. My recollection is my photographer and Ms. Leach. There were -- there was at least one guard on the other side of the glass that brought Mr. Broadnax to the location.

Q. And you were -- your -- your cameraman's name, what is his name?

A. Troy Larkens.

Q. And you two would have been the only ones there from your station when you were interviewing the defendant; is that correct?

A. That's correct.

Q. And you believe that Ms. Leach may have sat in

122

on the interviews?

A. Yes. Not directly in that room, but it's hard to close the door, so there's someone -- she is -- my recollection is that she was in that hallway.

Q. And when you arrived there at the location where the interviews were going to take place, was Mr. Broadnax already there to talk to you or did they have -- somebody have to bring him in to you?

A. My recollection is that they brought him.

Q. And you-all captured that interview on tape; is that correct?

A. Yes.

Q. And you gave us a copy, the District Attorney's Office a copy; is that correct?

A. I didn't give you a copy.

Q. Your station did.

A. Yes, sir.

Q. Very good. And when I say Y'all, that's one of those southern terms for y'all -- y'all folks there at Channel 11, all right?

A. Yes.

Q. And you -- you got a complete interview captured on video; is that correct?

A. Yes, sir.

Q. The things that happened before the interview

123

was recorded. Is there anything that significantly happened prior to that as it relates to the defendant's statement to you?

A. Not to my recollection.

Q. Okay.

A. Anything prior to that, no.

Q. And when I say Significant, I mean anything that would bear on the defendant's free will.

A. No.

Q. Okay. Nothing happened in your presence prior to that tape coming on that would have possibly overcome the defendant's free will to talk to you.

A. No, sir.

MR. LOLLAR: Judge, I object to speculation.

THE COURT: If -- if you know. To the best of your knowledge.

THE WITNESS: To the best of my knowledge, no.

THE COURT: All right. Overruled.

Q. (BY MR. ALEX:) And when the defendant was brought in to see you, you didn't hear anything in the back before he was brought in, any kind of threats or promises from anybody in the back on the other side?

A. No, sir.

124

Q. All right. You've had an opportunity to review the video in this case?

A. Yes, sir.

THE COURT: Don't forget to ask, Mr. Alex.

MR. ALEX: I'm sorry, Judge.

THE COURT: It's okay. Just a formality.

MR. ALEX: In hindsight, may I approach the witness?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) State's Exhibit 403, I had you in the offices on our first meeting review the -- the video in this case; is that correct?

A. Yes, sir.

Q. All right. And is it a complete accounting of what happened there?

A. Yes, sir.

Q. All right. Anything altered, or deleted, or anything like that?

A. Not that I saw on that tape, no.

Q. All right.

MR. ALEX: We're going to offer State's Exhibit 403, Your Honor.

MR. LOLLAR: And, Judge, we would reoffer the same objection as we offered in our pretrial hearings in regard to this matter, as well as the

125

further objections we offered this morning in regard to the subtitles.

THE COURT: Yes, sir.

State's Exhibit 403 is admitted.

You may publish.

MR. ALEX: And I'm offering 403 for all purposes, Judge, as I'm going to only offer 404 for demonstrative purposes. That's the one that has the subtitles.

THE COURT: All right.

MR. LOLLAR: Same objection, Your Honor.

THE COURT: It's admitted for demonstrative purposes, 404 is. 403 for all purposes.

403 is demonstrative; 404 is for all purposes, Mr. Alex?

MR. PARKS: Just the opposite.

MR. ALEX: 404 is for all purposes. I'm sorry, Judge. 403 is for all purposes and 404 is --

THE COURT: Demonstrative.

MR. ALEX: -- demonstrative.

THE COURT: Okay.

MR. ALEX: And as soon as my technical gurus over here get it going, we'll go forward, Judge.

May I proceed, Your Honor?

THE COURT: Yes, sir.

126

(Videotape played.)

Q. (BY MR. ALEX:) May I proceed, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) Mr. Pickett, when you went in to speak to the defendant, you had -- what was it that you had that you were reading to him, was that a press release?

A. It's an affidavit. Any time, you know, charges are filed, there's details on why an individual is arrested, and we submit a request to get that arrest affidavit. Our staffers retrieved it and I have it as part of my packet.

I like to have the information on the person I'm interviewing, what are the charges against him, et cetera, et cetera.

Q. And that's through like an open records request?

A. That's correct.

Q. And that would have been done through the Garland Police Department?

A. That's correct. That's my understanding, yes.

Q. Okay. But you wouldn't have done all that yourself.

A. We have staffers that do that.

Q. Again, you have to rely on somebody else to

127

get you that information and assume that it's from the proper sources.

A. Correct.

Q. And what you read to him was from an affidavit that you had with you; is that correct?

A. Yes, sir.

Q. All right. And initially, he -- he wouldn't tell you the truth.

A. Um, what I believed was not the truth, it was just a different story than Mr. Cummings had said to me prior to his interview.

Q. Some people may say you -- you went above and beyond to get his true story, and in talking to him, I mean, you could have just taken that story and walked off; is that right?

A. Yeah, I guess so. I guess we could have. We are limited by time. We only have a certain amount of time and then we have to leave.

Q. But your interest was in getting the truth. What he wanted to tell you and the true story; is that right?

A. It was trying to get at the heart of what I believed to be the truth, and the only reason why I believed his initial story was false, is because we had interviewed Mr. Cummings prior to Mr. Broadnax, and

128

Mr. Cummings gave a different --

Q. Wait. We can't go into what Mr. Cummings told you, --

A. I'm sorry.

Q. -- but you had reason to believe that he wasn't being truthful with you.

A. That's correct.

Q. All right. And that's why you pressed on.

A. That's correct.

Q. All right. And then toward the end of the interview when he started telling you what happened, there was a time when he said that, you know, it's hard, it's really hard being up in this -- in the terminology he was using, was hard being up in this bitch, do you recall that?

A. Yes.

Q. All right. And you were asking him some questions. Did he -- did he ever at any time, either on camera or off camera, express any remorse for anybody except for himself?

A. Not that I recollect, no.

Q. Okay. All right. How about --

A. His mother.

Q. His mother. And did you -- did you have any problems or did you -- and let me ask you this: If you

129

were to go and visit somebody and talk to them in the jail and you thought, you know what? This person's just not right, either you think they're too tired to talk to you, or too crazy to talk to you, how would you handle a situation like that?

A. Well, I would ask them about it. Are they sober, or are they -- if I felt that, you know, that they weren't mentally stable or something like that, I'd use my judgment and I -- I would ask questions about it.

Q. And you would -- you would use your judgment in that as a news reporter, reporting things to the public, you would want it to be as accurate as possible; is that correct?

A. That's correct.

Q. And that's what you pressed on when interviewing Mr. Broadnax?

A. That's correct.

Q. And did you see any signs of him being intoxicated at all?

A. No, sir.

Q. Did you see any signs of him not being rational?

A. I would say that his answers, very pointed directed statements were surprising. Were they

130

rational? They were rational in the way he provided them.

Q. Okay. And they were responsive to your questions.

A. Yes, sir.

Q. And, in fact, at the very beginning, he -- he obviously had a vested interest to hide what he did, and he did a pretty good job of that, didn't he? Initially.

A. I think that's a fair assessment.

Q. Yeah. And that was all done in a very clever way.

A. It was just direct.

Q. Okay. And he even caught you in a couple of times about when the bus would stop and couldn't have been there because the bus wouldn't have been running. I mean, it was a very intelligent conversation, would you agree with that?

A. Yes, I would say it was an intelligent conversation.

Q. Very good.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Cross-examination?

MR. LOLLAR: Thank you, Your Honor.

August 10, 2009

131

CROSS-EXAMINATION

BY MR. LOLLAR:

Q. Mr. Pickett, how are you?

A. I'm fine, sir.

Q. Good. I want to talk to you about some matters, and if at any time you don't understand what I'm asking you about, just let me know and we'll see if we can clear it up.

Now, you're a reporter for Channel 11. You've been there for a number of years; is that correct?

A. Yes, sir.

Q. You've had other occasions to interview people who were in the Dallas County jail before this event; is that a fair statement?

A. Yes, sir.

Q. And, now, as to exactly how a reporter ends up interviewing a person in jail, you kind of told us what you believe to be the -- the policy, and I want to go over that with you for a minute.

A. Okay.

Q. If there is somebody that your station wants interviewed, do they initiate a request with the Sheriffs Office?

A. That's correct.

Q. And how do they do that?

132

A. It's -- it's a formal request. There's a form, an open records request or interview request. You submit that either via mail or e-mail today. Most likely e-mail these days, or a letter is faxed to that office.

Q. And who does it go to in the Sheriffs Office?

A. Typically it goes to the public information officer of the Dallas County Sheriffs Department in this case.

Q. Okay. And is that, at the time, a lady by the name of Kimberly Leach?

A. Yes, sir.

Q. And do you know how long she had been on the job on June the 23rd of 2008?

A. I -- I don't know. A year or two, maybe. I -- I -- is my recollection. Maybe.

Q. Would it surprise you if she had been there for a little over a month?

A. Well, okay. If you say so. It's been over a year now, so she's, I would say, about a year she's been there.

Q. But back at the time that y'all -- that you assumed that that's what happened here, you did not do that all yourself.

A. That's correct.

133

Q. So you assumed that somebody in your station faxed or e-mailed one of these requests over to Ms. Leach, and somehow that request was conveyed to Mr. Broadnax.

A. That's correct.

Q. Now, you didn't see that happen, but that's your understanding of how things go.

A. That's -- yes, sir.

Q. And as to who exactly might have taken that request to him and what they might have told Mr. Broadnax, what they might have promised, what they might have threatened, anything, you have no knowledge.

A. That's right.

Q. And the next thing you know is that on the morning of Monday of June the 23rd of 2008, your assignments editor was telling you to go to the jail to do this interview.

A. Yes, sir.

Q. And would it be fair to state that you came with your cameraman, Mr. Larkens, down here to the courthouse? This courthouse.

A. The day of the interview, you're saying?

Q. Yes, sir. Where did you go, initially?

A. Oh, I went to the jail. I'm sorry.

Q. You went straight to the jail?

134

A. Yes. Went -- went straight to the front entrance of the Dallas County jail, yes.

Q. And is that where Ms. Leach met you?

A. That's correct.

Q. And from there, where did you go?

A. They put us on an elevator. I don't even recollect which floor. But we go up and then go down a wing. And we have to submit identification. We're escorted to on elevator. We go up and the escorts take us to that particular location.

Q. Okay. And do you recall being taken up in a special elevator between the West Tower of the jail and the North Tower of the jail, there's a little elevator, and it only goes up three floors?

A. I -- I wouldn't know one from the other, sir.

Q. Okay.

A. I just know that we went up an elevator.

Q. Did they -- did they tell you, or did you know that you were in the medical wing when you went up there?

A. No, sir.

Q. Okay. Do you know whether or not -- well, do you know where they had Mr. Broadnax at the time they brought him out for your interview?

A. No, sir. No particular place. I assumed he

FIRM NAME                                    Page 131 to 134 of 297

135

was in custody, and that could have been a variety of places. I just knew he was in custody.

Q. So did you know that they brought him out of the psych ward --

MR. ALEX: Judge, I'm going to object to the lack of personal knowledge. It's already been established outside the presence of the jury that this witness has no personal knowledge of any of this.

THE COURT: Response?

MR. LOLLAR: Well, if the State is going to object to these questions that I'm going to be asking of these reporters, then I'll have to cross them at a later time.

THE COURT: The objection is sustained at this point.

How much longer do you have on -- on the witness, Mr. Lollar?

MR. LOLLAR: Oh, a little bit. Not much.

THE COURT: Okay. Go ahead.

MR. LOLLAR: Maybe another five, ten minutes.

THE COURT: Okay. Sorry to do this to you Mr. Pickett, but we're going to take a recess for lunch for the jury, and that we will be in recess until 12:30, but I have some instructions for you.

136

Do not discuss the testimony in the case. There is media in the building. Do not talk to them either.

The bailiff is going to have some special instructions for you as to where to report and so forth.

There's a cafeteria on the first floor. That's where I recommend you go for your lunch. You can eat down there or you can bring your food back up here.

Tomorrow when you are recessed for lunch, I'm going to buy your lunch for you. I do that for two reasons: Number one, to thank you; and number two, more importantly, I want you to get to know each other outside this whole jury process. It's been my experience it helps you when it comes time for deliberations.

Don't discuss the case.

All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

Anything we need to take up before 12:30, Mr. Alex?

MR. ALEX: Not that I can think of at this time, Your Honor.

137

THE COURT: Anything, Mr. Lollar?

MR. LOLLAR: Not relevant to this witness's testimony; no, sir.

And Mr. Alex and I spoke yesterday about general scheduling and how long he anticipated his evidence to take, and if we could go back in chambers and talk about that, --

THE COURT: It doesn't need to be on the record.

MR. LOLLAR: Yeah.

THE COURT: Okay. We're in recess.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

Good afternoon, ladies and gentlemen. Thank you for being on time.

Mr. Lollar, it's your witness.

MR. LOLLAR: Thank you, Your Honor.

**CROSS-EXAMINATION - CONTINUING**

BY MR. LOLLAR:

Q. Would you state your name again for the record, please?

A. Steve Pickett.

Q. And, Mr. Pickett, you are the same Steve Pickett who was testifying before the lunch break here;

138

is that correct?

A. Yes, sir.

Q. And, Mr. Pickett, to pick up where we left off, I think we were talking about the procedure that's normally followed when y'all want to talk to somebody in jail, and you told us that you got word from your assignments editor to come down here. You came down to the jail where you met Ms. Leach.

A. Correct.

Q. And she took you up to a certain location in the jail.

A. Yes.

Q. And they produced then the defendant, Mr. Broadnax, for you to interview; is that correct?

A. Yes, sir.

Q. And I think we had talked about a few matters. You don't know what was told to him before they brought him to you.

A. That's correct.

Q. You don't know where he was housed and what type of unit it was, or whether or not it was psych ward or what.

A. Yes, sir, that's correct. I did not know.

Q. Okay. Well, let me -- let me make sure I understand this. Prior to the time you talked to

139

Mr. Broadnax, you talked to Demarius Cummings who is the co-defendant in the case here; is that correct?

A. Yes, sir.

Q. And that means he's the other person charged, besides the defendant.

A. Yes, sir.

Q. And had you done that right before you talked to Mr. Broadnax?

A. Yes, sir.

Q. And was that also done through the arrangements of the Sheriff's Department?

A. That's correct.

Q. And you've indicated to us that while Ms. Leach can't be seen in the videotape, she was there on your side by the open door?

A. You know, that's my recollection is that Mr. Cummings was first, Mr. Broadnax was second, and the escorts, and the escorts being either Ms. Leach or some other representative from the Sheriff's Department takes you to that location, and they stand outside while we go into that room.

Q. Okay. And on his side when they bring him in and seat him, are they standing outside the open door as well?

A. Yes. That's correct.

140

Q. And by They, I mean the -- they're called DSO officers, Dallas --

MR. PARKS: Dallas Sheriffs Office sheriff escorts.

Q. (BY MR. LOLLAR:) -- office escorts?

A. Yeah, and I would have called them jailers.

Q. Jailers?

A. Yes, sir.

Q. And they're in uniform.

A. Yes, sir.

Q. Now, Ms. Leach does not wear a uniform; is that correct?

A. That's correct.

Q. But they're all employees of the Dallas Sheriffs Office.

A. Yes, sir.

Q. And they are law enforcement.

A. Ms. Leach is not a law enforcement officer.

Q. Certainly the uniformed officer was.

A. Yes.

Q. Did, in your presence, did anybody tell him that he didn't have to talk to you?

A. In my presence?

Q. Yes.

A. That's not my recollection; no, sir.

141

Q. Okay. Anybody tell him that what he said could be used against him here in court?

MR. ALEX: Judge, I'm going to object to relevance.

THE COURT: Response?

MR. LOLLAR: It's a voluntariness issue.

THE COURT: I'll allow it.

Q. (BY MR. LOLLAR:) Did anyone tell him that?

A. I did not hear that, sir.

Q. Now, did you know, or do you know whether or not at the time you talked to him he had actually requested that a lawyer be appointed to represent him and counsel with him?

MR. ALEX: Judge, I'm going to object to relevance.

MR. LOLLAR: It goes to voluntariness.

THE COURT: I'll allow it briefly. Very briefly.

MR. LOLLAR: Thank you.

Q. (BY MR. LOLLAR:) Do you know whether or not that had --

THE COURT: I'm not going to allow you to do it with all of these reporters, though, okay? Just keep that in mind.

Go ahead.

142

A. I did not know that, sir.

Q. (BY MR. LOLLAR:) Is that something you normally inquire about, is to see whether or not they've been asked for the appointment of a lawyer; if a lawyer has been appointed to them?

A. As a reporter, I ask if the individual in the jail wants to talk to me.

Q. And that's all you ask.

A. Yes, sir.

Q. Okay. Now, in your interview, I heard him say a number of things and I heard you say a number of things. I want to talk to you about those issues. I remember him saying I want my lawyer. Do you remember him telling you that?

A. I remember him saying he told someone I want an attorney. I want my lawyer, yes.

Q. And I remember hearing you tell him, If you tell me the truth, your life may be spared. Did you tell him that?

A. I think what I said, sir, is if you tell me the truth, your life could be spared.

Q. And where do you get that idea from?

A. Well, it's just my supposition, sir, in having a conversation with him.

Q. Okay. I remember him saying a number of times

143

that he was smoking blunts. Do you remember him saying that?

A. Yes, sir.

Q. Both before and after the offense times.

A. I'm sorry?

Q. Both before an offense, the -- both before and after the offense times.

A. That's my recollection; yes, sir.

Q. And then specifically, I recall him saying that at the time the robbery was about to begin, -- and these are his words, not mine. Forgive me. I blanked out. I blanked the fuck out. Everything went colors, like nigger, I went psycho or something.

Remember him saying those words?

A. Yes, sir.

Q. Do you know specifically about the -- about what he said, Everything went colors, do you know how that can be, that in an event, all of a sudden things go colors?

A. Generally speaking, as a news reporter, I've interviewed people who have used drugs that have, you know, hallucinogenic events or what have you, so that's what I thought he was suggesting.

Q. So you thought that's what he was talking about, was a -- in relation --

144

A. When he said I saw colors, it was -- it was -- it was in relation to his drug use, based on what he said.

Q. All right. He said, after talking about the killing of Mr. Swan and Mr. Butler, I had to rest my head. I had to level my head out?

A. Yes, sir.

Q. Do you remember him saying that?

A. Yes, sir.

Q. Do you know what Levelling his head out meant?

A. To me, it means to come down from the high.

Q. And then I recalled a number of times you were asking him about -- well, I recall him saying, What am I living for? My life has been fucked up since I was born.

Do you remember him saying that?

A. Yes, sir.

Q. He tells you he's got a little brother. He doesn't know where the little brother is?

A. Yes, sir.

Q. And in just general regard to his appearance as he appeared before you there, Mr. Pickett, you agree his hair is all disheveled and hadn't taken any care to do anything to dress up for a television interview; is that right?

145

A. I -- I think that's a fair assessment.

Q. Okay. Thank you, Mr. Pickett.

MR. LOLLAR: I think that's all the questions we have.

THE COURT: Any redirect, Mr. Alex?

MR. ALEX: Yes, sir.

**REDIRECT EXAMINATION**

BY MR. ALEX:

Q. Mr. Pickett, Mr. Hikel is going to find a portion in here that I want to ask you about and he's going to keep the volume down while we can talk; is that okay?

A. Certainly.

Q. Mr. Lollar asked you about a -- a certain part of this interview, and your response was you thought he was suggesting drug use. Do you recall that?

A. Yes, sir.

Q. All right. Let me ask you this as a general proposition. Do you -- do you get the -- do you understand the distinction between a person who is a psychopathic killer versus someone who uses drugs? Does that -- does that distinction in your mind -- can you make that distinction in your mind?

A. I think I certainly can; yes, sir.

Q. Now, if a person is without a conscience and

146

they're antisocial and they're a psychopathic killer, is it -- is it beyond your conception as a layman that this person would go in -- in a psycho mode when he told you?

MR. LOLLAR: I think I'd object to speculation on Mr. Pickett's part.

THE COURT: Overruled. I believe it's in response to your examination.

Q. (BY MR. ALEX:) And my question may not be clear to you. Is it clear to you?

A. No. I was going to ask you to repeat it.

Q. Okay. And then what I want to do is I may want to compare and contrast to you two maybe states of minds, okay?

A person who says they see colors because perhaps they're on some psychopathic drug, or just a person who -- I'm sorry -- who, because they're on some psychotic drugs or psychodelic drug, as you may say, or just a person who is a cold-blooded killer and they go into a certain mode, and when they go into that mode, that's what they see. Do you see the difference?

A. Yes, sir.

Q. There's no why for you to tell this jury which mode he was in at that time, is there?

A. That's right.

147

Q. And when he says he's seeing colors and he goes in that mode and he goes psycho, that could just be who he is.

A. That's him giving us his statement.

Q. Correct. And when he says to you, I don't have a conscience, that suggests that this is a man who would just as soon kill you as he would look at you, doesn't it?

A. That's what he essentially says when he says he doesn't have a conscience to me.

Q. And this whole deal about colors, that's just a -- there's no way for you to say one way or the other as you sit there today. You're not a psychiatrist or a psychologist; is that correct?

A. That's right.

Q. All right. But you're not suggesting to this jury that this guy is -- he is -- well, okay. Let me get off of that.

There was a point in there where he -- where Mr. Lollar asked you about lay it down, where he said lay it down, do you recall that?

A. Yes.

Q. Do you recall the context is that he had just finished shooting a man in the head, and he was telling him, Lay it down. I don't need that shit.

148

The context of that full conversation was he was eliminating a witness. If we -- if we need to play it back, we can, but I think the answer and the question that was asked to you suggested that he was talking about he was coming down off of drugs. Would you like to see that context again?

A. Sure.

Q. Okay. Let's see if we can find that, Gordon.

(Videotape played.)

Q. (BY MR. ALEX:) Okay. And the context of Lay it down, the jury can look at it at any time they want and they can make their own decision for themselves.

But the point that I was trying to see if I could clear up was the whole idea of when we hear someone like Mr. Broadnax describe what he just described there, did it appear he was -- as though he was having -- this would have been four days -- the offense happened on the 19th. This was the 23rd. So you've got the 20th, the 21st, 22nd, 23rd, 24th, okay, so four days later. Did he appear to be having any problems recounting what he did?

A. No, sir.

Q. Did he give you some pretty good details there?

A. He did eventually.

149

Q. And the details about how he killed who and how many shots he fired, would it surprise you to know that he was exactly on with the medical examiner's report?

A. I hadn't seen the medical examiner's report. I just let him describe to me --

Q. Gotcha. But the point is, if we're suggesting that he was seeing colors because of some drug that he may have taken, or some -- something that's making him blank out, would it be -- would it be surprising to you that four days later he can give you such detailed analysis of what he did?

A. If he was on drugs, would it surprise me that he would be able to do it? Is that your question?

Q. Yes, sir.

A. It would be surprising to me if he were to give that kind of detail if he was still having the effects of that kind of drug use. I would make -- that would be from my vantage point, certainly.

Q. Thank you, sir.

MR. ALEX: That's all I have.

THE COURT: Brief recross?

**RECROSS-EXAMINATION**

BY MR. LOLLAR:

Q. And, Mr. Pickett, the prosecutor has asked you

150

to compare the actions of a person who is describing an event that occurred while they were high on drugs. And specifically PCP, are you familiar with PCP?

A. I'm somewhat familiar. I -- I know some folks who have used it; yes, sir.

Q. And again, I don't know what you know about it or anything like that, so I don't want to spend much time on that, but Mr. Alex was asking you to compare a person who does an action such as this while they're high on PCP, as opposed to what he called a psycho killer who -- do you remember him asking you that?

A. Oh, yes, sir.

Q. And you would expect a psycho-killer type to have a word of these type of activities, wouldn't you, having prior experience with these type of activities?

MR. ALEX: Counsel knows that's an improper question.

THE COURT: Sustained.

Q. (BY MR. LOLLAR:) Now, I believe on June the 24th, Mr. Pickett, following up on these stories, you went to a particular neighborhood here in Dallas; is that correct?

A. Yes, sir.

Q. And what neighborhood did you go to?

A. I went to what others have called the

151

Junction, to the East Dallas neighborhood.

Q. And where is that?

A. It in East Dallas. Some would call it South Dallas, a neighborhood that is known for a public housing community, and a neighborhood that was told to me where, after talking to him, that his relatives and friends lived.

Q. And what was your purpose in going down to the Junction?

A. I wanted to find people who knew him, his friends and family, people in that community, to find out, how does a person who told me what he told me cultivate that kind of mindset in that community. I would like to hear from them.

Q. And I've seen the piece you did on that. Of course, we can't go into that here, but during the course of that time you were down there, did you meet and talk with a man by the name of Omar Jahwar?

A. Yes, sir.

Q. And what is your understanding that Mr. Jahwar is or does?

A. Mr. Jahwar is the director of an organization called Vision Regeneration. I've done a number of stories with him. He has -- he's well connected in communities that have dealt with people who have been

152

involved in gang activity, youth gang activity, juvenile crimes, things of that matter.

Q. And what does Vision Regeneration, his organization, do?

A. It works specifically to help rehabilitate, reconnect people who've been involved in those kinds of acts, come from those kinds of communities, to build themselves up, to empower themselves to do more.

Q. And that's in an attempt to try to get them out of that neighborhood and out of that mindset?

A. Yes, sir.

Q. And has he been successful, as far as you know?

A. It's not been less than maybe a month ago, sir, that I did an entire series on Vision Regeneration's efforts, which included reports on individual --

MR. ALEX: Judge, I'm going to have to object to relevance at this point --

THE COURT: Response?

MR. ALEX: -- at this stage of the trial.

THE COURT: Response?

MR. LOLLAR: I think we'll show relevance later on.

THE COURT: Sustained at this time.

153

MR. LOLLAR: All right.

Q. (BY MR. LOLLAR:) Can you describe that project that you found down there in the Junction where Mr. Cummings and his family lived?

MR. ALEX: Judge, I think you just sustained an objection, did you not?

THE COURT: This is a different question.

MR. ALEX: I'm sorry. Well, --

THE COURT: The question was, can you describe the project at the Junction.

MR. ALEX: Oh, I thought he was talking about Vision Regeneration. I'll withdraw it.

THE COURT: All right.

A. Primarily public housing, public assisted housing, relatively low income, almost exclusively African-American community.

Q. All right, sir. Thank you, Mr. Pickett.

THE COURT: Anything else, Mr. Alex?

MR. ALEX: Just one question, Judge.

**REDIRECT EXAMINATION**

BY MR. ALEX:

Q. You would not in any way suggest just because a person lives there, that they're going to be cold-blooded killers, are you?

A. No, sir, I'm not suggesting that.

154

Q. Very good.

MR. ALEX: That's all I've got, Judge.

THE COURT: Anything else?

MR. LOLLAR: That's all we've got.

THE COURT: All right. May the witness be permanently excused?

MR. LOLLAR: Yes.

THE COURT: Mr. Alex?

MR. ALEX: Yes, sir.

THE COURT: You're permanently excused, sir. Thank you for your testimony.

What further says the State?

Who's your next witness, Mr. Alex?

MR. ALEX: It's going to be Deborah Smith, (sic) Your Honor.

THE COURT: Deborah Smith.

By the way, ladies and gentlemen, it's going to be a long trial, so if you want to bring beverages in here with you, you can do that.

I see that Juror Number 1 has already taken it upon himself to do that. That's good initiative, sir.

MR. ALEX: It's actually Deborah Busby, Your Honor.

THE COURT: Ms. Busby, would you come all

155

the way to the front of the courtroom, all the way to the very front up by the door, and when you've reached the door, turn and face me and raise your right hand. All the way to the front of the room, ma'am.

**DEBORAH ANN BUSBY**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand. You will be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, ma'am.

A. My name is Deborah Ann Busby.

Q. And, Ms. Busby, tell the jury what you do for a living.

A. I'm a registered nurse and I work at the Lew Sterrett jail.

Q. Lew Sterrett jail?

A. Uh-huh.

Q. Okay. And do you work for the jail or do you work for Parkland?

A. I work for Parkland Hospital.

156

Q. All right. And does Parkland Hospital have a contract with the jail in which the nurses go over and work?

A. Yes.

Q. And what are your current duties?

A. It's, you know, central intake. I see the inmates when they first bring them in and screen them, look for medical problems.

Q. And, Ms. Busby, I talk slow, you talk fast, all right?

A. Okay.

Q. So I'm going to ask you to slow down a little bit and maybe I'll speed up little bit, but we need --

A. Okay.

Q. -- we need to be clear, okay?

And you work at the jail; is that correct?

A. Yes.

Q. All right. And what do you do at the jail?

A. I work in the central intake area.

Q. Central intake area?

A. Uh-huh.

Q. And what do you do at the central intake area?

A. Do medical screenings.

Q. Medical screenings.

A. Uh-huh.

157

Q. All right. So let me ask you a hypothetical. If I got in trouble and I was going to the Dallas County jail, when I was being booked in, would I have to be seen by a nurse before I went to jail?

A. Yes.

Q. Okay. And would you be one of those people?

A. Yes.

Q. And if you were going to rec -- make some recommendations [sic] about where I may go in the jail, would that also be part of your job?

A. Yes.

Q. All right.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir.

Congratulations, by the way.

MR. ALEX: Thank you, Judge.

Q. (BY MR. ALEX:) State's Exhibit 539, do you recognize that?

A. Yes.

Q. Okay. And what is that?

A. It's an assessment form that we use.

Q. Okay. Is this the assessment form that you used when you assessed James Broadnax?

A. Yes.

Q. Okay.

158

THE COURT: Ms. Handley, I don't have an exhibit log as it pertains to this exhibit.

MS. HANDLEY: You wouldn't, Your Honor. That's something that we're adding.

THE COURT: Okay.

MR. ALEX: It's actually going to be a part of the medical records, Judge, but I'm just going to offer them separately.

THE COURT: Okay.

MR. ALEX: At this time, Judge, we're going to offer State's Exhibit 539.

THE COURT: Is there objection?

MR. LOLLAR: No objection.

THE COURT: State's Exhibit 539 is exhibit -- is admitted.

Q. (BY MR. ALEX:) And, Ms. Busby, I want you to -- to look at this for me, if you will.

Now I came over to the jail to see you and talk about that, didn't I?

A. Yes.

Q. Some time ago. And when I came over to talk to you about it, did you recall, or even remember seeing Mr. James Broadnax?

A. No, not at the time.

Q. Okay. And how was it that you were able to

159

remember him? Is it when we started talking about the high profile case that it was?

A. Yes.

Q. Okay. And then you remembered who he was?

A. Yes.

Q. Okay. And did you also assess a young man by the name of Demarius Cummings, his cousin?

A. Yes. His cousin, yes.

Q. Okay. And when you assessed the defendant, James Broadnax, does he look like he looked today?

A. I think he had longer hair.

Q. Longer, kind of bushier hair?

A. Yes.

Q. All right. And I'm going to put this up on the document camera here, and you'll be able to see it right there, and we're going to go through some of the things that are on here, is that okay?

A. Uh-huh.

Q. And if you recall, just right off the bat, do you remember if -- when the defendant came in, did he appear to you to be under the influence of any kind of drugs or anything?

A. Not that -- not that I can recall.

Q. Okay. And to be fair, Ms. Busby, if anything would have been out of the ordinary, would you have put

160

it on this form?

A. Yeah, anything out of the ordinary, you write on the form.

Q. You'd put it on the form?

A. Uh-huh.

Q. And it -- and would it be fair to say if it's not on the form, it isn't happening?

A. Yes, sir.

Q. All right.

THE COURT: Let me interrupt you a second, Mr. Alex.

You need to say yes or no as opposed to uh-huh, okay?

THE WITNESS: Oh, okay.

THE COURT: Go ahead, sir.

Q. (BY MR. ALEX:) Would that be fair to say?

A. Yes.

Q. Okay. Otherwise, you would just be speculating; is that right?

A. Yes.

Q. Okay. And is it your -- is it your common practice to write on the form things that would be anything that would cause you any kind of concern?

A. Yes.

Q. All right. Can you -- can you read that from

161

where you're at?

A. Yes, I can.

Q. All right. The first line of -- the first line of questions here have to do with medical history; is that right?

A. Yes.

Q. Whether or not he's on current medications, the answer was no; is that right?

A. Yes.

Q. Current medical problems, no.

Head injury, no.

And who would be the person answering these questions, would there be someone with him answering or would it be him?

A. Just him.

Q. All right. And then that's the nature of an assessment, you're talking to the person one on one?

A. Yes.

Q. And let me ask you this: What if you've got a person there that's not only talking to you, but he's talking to an imaginary friend, what would happen then?

A. Then we would put the -- write down it's a psych evaluation.

Q. You -- would you write that down on the form somewhere.

162

A. Yes.

Q. That he was talking to his imaginary friend?

A. Yes.

Q. Okay. And that would all be a part of your assessment; is that right?

A. Yes.

Q. Okay. So what we see here is no to that question, and no to the head injury, no to the ear, nose.

High blood pressure there's a yes; is that right? I'm sorry. Where we see --

A. Asthma.

Q. I'm sorry. Asthma is a yes; is that right?

A. Yes.

Q. Okay. High blood pressure, no.

No kidney problems.

No diabetes.

No stroke.

No cancer.

No cough.

No unintentional weight loss.

No HIV.

No hepatitis.

No venereal disease.

Tobacco use, we've got yes; is that right?

163

A. Yes.

Q. And then drug use, it's yes too; is that correct?

A. Yes.

Q. So the defendant told you that he used drugs, right?

A. Yes.

Q. Okay. Now, do you -- do you think you specifically remember him telling you that, or you just know it because it's on the form?

A. Because it's on the form.

Q. Because it's on the form, I gotcha.

And the type that we have here, can you tell us what that means and would you -- is that marijuana?

A. Marijuana.

Q. I'm sorry?

A. Marijuana.

Q. Okay. And, let's see, the question right above it says Alcohol use. We forgot that one. And he said yes; is that correct?

A. Yes.

Q. All right. So if we were talking about cigarettes, we're talking about this right here; is that right?

A. Yes.

164

Q. What does that mean?

A. Half a pack.

Q. Okay. And would that be daily, do you think?

A. Probably.

Q. Okay. You're not really going to say because it ain't on this form, are you?

A. Un-uh.

Q. Okay. Very good.

And then the second one here, we're talking about alcohol; is that right?

A. Yes.

Q. Okay. And that's 1 to 2. What is that designation?

A. Beer.

Q. Beer?

A. Uh-huh.

Q. Okay. I'm glad you're here, because there's no way I would know that.

And the frequency, let's see. The frequency, what does that mean?

A. Occasionally.

Q. Occasionally, okay. And then the last use, we're still talking about alcohol, is -- can you tell what that says?

A. It looks like June 1st.

165

Q. It look like June 1st?

A. Yes.

Q. Okay. It is whatever it is on the form; is that right?

A. Yes.

Q. Okay. And then if we go to -- I know I'm probably making everybody dizzy with this, but I'm going to -- bear with me, if you will.

All right. When you go to drug use, Item 28, okay?

A. Okay.

Q. And we go across, the only type of drugs that you listed here was marijuana; is that right?

A. Yes.

Q. And frequency was occasional?

A. Yes.

Q. And the last use would have been whatever this says. It could be 6/18, it could be -- can you tell us what that is? Is that your writing there?

A. Yeah, but --

Q. Sometimes it's hard to read our own writing.

A. Yeah.

Q. Can you be -- do you know what that is?

A. It could be 18, it could be the first.

Q. Okay. Very good. It could be 18, it could be

166

the first, right?

A. Yeah.

Q. Okay. And then, let's go to -- appears to be under the -- under drug or alcohol influence, and you marked no, right?

A. Yes.

Q. And to be fair, at this point you don't have any independent memory of that as you sit there right now, do you?

A. No.

Q. But that's what you've got on the form, right?

A. Yes.

Q. You feel -- feel pretty confident about it? If it was different, you'd have marked different?

A. Yes.

Q. Okay. And then Concerns for alcohol or drug withdrawal, you marked no; is that right, Number 30?

A. Yes.

Q. Okay. And then they go on to ask some more historical questions like Did you finish high school. He said no.

Can you read English? Yes.

Can you write English? Yes.

Were you in special classes? No.

Do you see all of that?

167

A. Yes.

Q. All right. And I imagine that there's a reason for all, and because if somebody makes a response to you and you mark it on this form, then that may go into where they would be physically put in jail; is that right?

A. Yes.

Q. Okay. Now, the physical exam here, can you tell us what these designations mean here? They seem to all say the same thing.

What is this?

A. Within normal limits, WNL.

Q. Within normal limits, okay.

Anything there that wasn't not within normal limits?

A. No.

Q. Okay. Now, there's a second page to State's Exhibit 539, which is your assessment form, and we're going to go to that next.

Now, Ms. Busby, do you know when the defen -- well, let me -- let me ask it to you this way.

Do you know if the defendant was coming from the Garland jail when he came over to Lew Sterrett, or if he was coming off the streets, or do you have any knowledge of that?

168

A. No, they don't give us that information.

Q. Okay. So all you know is they bring them to you and you're assessing them; is that correct?

A. Yes.

Q. All right. And this would have been on June the 23rd -- I'm sorry. June the 21st of 2008; is that right?

A. Whatever's on the form.

Q. If that's what it says on the form. Very good.

A. Looks like --

Q. Is that your signature there?

A. Yes.

Q. And does that appear to be June 21st of 2008?

A. Yes.

Q. Okay. And I may have to come up there for you to show me what time that was, but I'll do that in one second, okay?

A. Yes.

Q. Let's finish the second part.

Now, there's a mental health screen in here as well; is that correct?

A. Yes.

Q. Okay. And what's the care system?

A. It's on the front of the paper.

169

Q. Okay. And when it asked Was the care system checked, and you put no, what's the care system?

A. It's on the front of where the --

Q. Okay.

A. You got to come back to the front.

Q. And just as a general number, --

A. These numbers, where it says -- like below the name, --

Q. Okay.

A. -- that's the care system.

Q. Okay. Gotcha, I think.

A. You see where it says suicidal or homicidal? You see that there? Okay. Right here. Does the arresting officer or anyone else believe that this inmate is a health risk due to medical or mental conditions, is that where we're reading at?

A. Yes.

Q. Okay. Mental retardation, or suicidal, or homicidal ideations, and we checked no there; is that correct?

·A. Yes.

Q. Visible signs of self harm, and we checked no there as well.

And you're telling us that has something to do with the care system?

170

A. That's what -- that's what it's called.

Q. Oh, okay. Gotcha.

Now, who filled that out?

A. Well, the -- the -- the CMA. Medical assistant.

Q. Medical assistant?

A. When they bring them in the first time, the CMA sees them and take the vital signs.

Q. Okay. So when you get this form, are those two things already circled?

A. Yes.

Q. Okay. Very good. And that tells you that somebody's already either checked with the arresting officers or whoever they needed to and -- to find that information out; is that correct?

A. Yes.

Q. Okay. Very good. All right.

But the form on this side, it says Was care system checked? It says no, and I guess what I'm trying to figure out is, what does that mean? Does that mean there's a data base or something that somebody has to look up and --

A. Oh, it should have been marked yes, because this stuff had been checked.

Q. Very good. History: Was outpatient or

171

inpatient psych treatment? No.

And are you -- are you asking Mr. Broadnax these questions now when you're checking these things?

A. Yes.

Q. Okay. Have you ever been depressed? Are you asking him these things and he's responding; is that correct?

A. Yes.

Q. Okay. And he says no.

Are you depressed now? And he says no.

Recent loss or suicide? He says no.

In fact, every one of these questions that's asked, -- Have you ever been a victim of abuse? No.

History of sex offense charges? No.

Social Security? No.

All of those are all checked no; is that correct?

A. Yes.

Q. All right. And then when we go over to medication -- okay, let's see. Medications.

What do we see here in this form, part of the form, and this is, again, we're talking about State's Exhibit 539, second page. What are -- what are we looking at here?

A. You want me to read it?

172

Q. Yeah, what does that say?

A. No meds. N-O, M-E-D.

Q. Okay. And then what is this? And let me get it all the way on.

A. Patient placed in CBO for observation.

Q. Okay. And what's CBO?

A. Closed behavioral observation.

Q. All right. And then problems, list notes. That's asthma, is that what that says?

A. Yes.

Q. And what else?

A. And toothaches.

Q. Toothache, gotcha. Okay.

And then bottom of this form would be where you would write your notes if there were something to write; is that correct? Would it be in this area here?

A. Yes.

Q. Like that?

A. Either place.

Q. Okay. Anywhere on the form --

A. Anywhere.

Q. -- you could write your notes as to what you observed; is that right?

A. Yes.

Q. Okay. Now, we're going to go back to this one

173

area because it seems to be an area of -- of concern. And that is, Patient placed in closed behavioral observation.

Now, when we looked at this form, none of these things are checked yes as it relates to the defendant's mental health screening or mental health status exam; is that right?

A. Could you repeat it?

Q. All of the answers given here are no on the form when it comes to his mental health screening or to his mental status exam; is that correct?

A. Yes.

Q. And the only place that you're not sure about was the care system checked, and I think you said that because the front part of that was filled out by somebody else, then that should have been checked yes as well; is that right?

A. Yes.

Q. So the question is, why would he be sent to closed behavioral observation if -- if he doesn't have any kind of mental problem, or anything mental that you would have seen?

Do you recall me asking you that question before?

A. Yes.

174

Q. All right. And -- and what is your -- what is your response to that?

A. For the reason he was brought in for, he needed to be put in a single cell.

MR. LOLLAR: I'm sorry, Judge, I can't hear her.

THE COURT: Okay. If you would repeat that, please, ma'am.

A. Because the reason he was brought in for.

Q. (BY MR. ALEX:) Okay. Was it because it was a high profile case?

A. Yes.

Q. Okay. Is that what you told me before?

A. Yes.

Q. All right. And when it's a high profile case, do -- do you guys routinely put them where they can be watched?

A. Yes.

Q. Okay. And is this your first time doing that?

A. No.

Q. Okay. And did you also say that --

MR. ALEX: We can -- we can have the lights, Judge. I'm just about done.

Q. (BY MR. ALEX:) And you said you also did Demarius Cummings; is that right?

175

And, I'm sorry, the defendant's cousin.

A. Oh, yeah.

Q. Okay. And when -- when we say The defendant's cousin, when they were brought in to you, at some point, either then or afterwards, you would have known about this high profile case yourself; is that right?

A. Yes.

Q. And when I say His cousin, then that person sort of comes to mind to you; is that right?

A. Yes.

Q. Okay. Now, I'm going to show you State's Exhibit 538 and 537. Is that the jail classification screens for the Dallas County jail?

A. Yes.

Q. Have you seen that before?

A. Yes.

Q. And does it show a person by the name of Demarius Cummings?

A. Yes.

Q. And does it show whether or not he went to behavioral observation that same day or not?

A. Well, it wouldn't show him here.

Q. It shows he went to behavioral observation?

A. Oh, down here. We don't look at these forms, we just mostly look at -- what they come in -- what

176

they come in for.

Q. Okay. And since --

A. We don't have access to it, is what I'm saying.

Q. Okay. And on June 21st, 2008 --

A. Uh-huh.

Q. -- at 7:35 a.m., does it show that he also went to behavioral observation?

A. Yes.

Q. Okay. Would that be consistent with -- with what you're telling us today as far as high profile cases?

A. Yes.

Q. Okay. And then State's Exhibit 537, which is an AIS form as well, does it show Mr. Cummings -- I mean, Mr. Broadnax --

MR. LOLLAR: Judge, excuse me. I'm going to object to Mr. Alex quoting from something that's not in the record.

MR. ALEX: I apologize, Judge.

We're going to offer at this time, Judge, the AIS printouts of the jail classifications of Mr. Broadnax and Mr. Cummings.

THE COURT: And the jury's probably not familiar with what AIS stands for, so would you

177

enlighten them?

MR. ALEX: Yes, sir.

MR. LOLLAR: Could we have just a moment, Judge?

THE COURT: Yes, sir.

MR. LOLLAR: We have no objection.

THE COURT: State's Exhibits 537 and 538 are admitted.

You may publish.

Q. (BY MR. ALEX:) Now, I think you told the jury that you didn't really have access to this AIS system; is that right?

A. We only have limited access.

Q. Limited access. But the AIS system is a computer system --

A. Uh-huh.

Q. -- for the jail where you can go on and look up information on certain inmates; is that correct?

A. That's correct.

Q. All right.

A. Yes.

Q. And this printout basically shows that on June 21st, 2008, that both Demarius Cummings and James Broadnax was checked in the jail between 6:29 a.m. and 7:35 a.m.; is that right?

178

Mr. Broadnax shows 6:29 a.m.?

A. Uh-huh.

Q. And Mr. Cummings shows 7:35 a.m.; is that right?

A. Yes.

Q. So you just saw one after -- one right after the other; is that right?

A. Yes.

Q. Okay. And they both were placed in behavioral observation, according to your memory, is because they were high profile cases; is that correct?

A. Yes.

Q. All right. And that's not uncommon.

A. No.

Q. So it would be untrue to say that you thought there was something wrong with him, other than he was being charged with a double homicide capital murder and he needed to be excluded for observation; is that correct?

A. Yes.

Q. All right.

MR. ALEX: I'll pass the witness.

THE COURT: Cross-examination.

MR. LOLLAR: Is it -- is it up there?

MR. ALEX: The exhibits are over there.

August 10, 2009

179

THE COURT: The exhibits are with the witness.

MR. LOLLAR: May I approach the witness?

THE COURT: Yes, sir.

And again, ma'am, I'll remind you not to say uh-huh, okay? You -- you forget every now and then.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. How are you, Ms. Busby?

A. Fine.

Q. Okay. First of all, are you the one that filled out this entire form, with the exception of the little part up there above that you said was filled out by some medical assistant?

A. I filled out -- the medical assistant filled it out and I'd go over it with the -- with the inmate.

Q. Did you fill out everything here on the second page?

A. Like I said, the medical assistant came in and do the stats, then we go over -- they come to my room and --

Q. Slow down. So medical assistants come in and do this part?

A. Before. Okay. They have a new system now,

180

but --

THE COURT: Hold on a second. Hold on a second, please, ma'am.

Mr. McElroy, can you understand the witness?

THE JUROR: Yes.

THE COURT: Okay. Let me know if you can't. Just raise your hand.

Q. (BY MR. LOLLAR:) Let me go over here and get this thing on the overhead screen.

And I guess maybe, Ms. Busby, if you could explain the process when a person comes in to the jail, who do they see first when they come in the jail, if you know?

A. Okay.

Q. Do you know?

THE COURT: Do you want the lights off, Mr. Lollar?

MR. LOLLAR: No, I think, Judge, it's fine. If I can zoom it out. I know how to do that.

THE COURT: Mr. Hikel, will you assist Mr. Lollar?

MR. LOLLAR: Zoom it out some. Okay. Thank you.

Q. (BY MR. LOLLAR:) Okay. If you could --

181

because I'm going to have to refer to it for a minute, but what is the process?

A. **When the inmate comes in, they bring them up to the medical assistants. She takes the vital signs and asks them the questions. If there's a yes to any question, they come over to see the nurse.**

Q. Okay. So if I understood what you said, when the person's first brought in to the jail, they're brought to the medical station.

A. **Uh-huh.**

Q. Is that correct?

A. **Yes.**

Q. And there they're screened by a medical assistant?

A. **Yes.**

Q. So is it the medical assistant who would be asking them all these questions, you know, like their history, and current medical problems, head injury, trauma, is that something that the medical assistant fills out?

A. **Yes.**

Q. And they're the ones who circle all of these things; is that right?

A. **Yes.**

Q. Now, you talked about this area right up here

182

about whether the arresting officer or anyone else believed this inmate's a health risk due to medical or mental condition, mental retardation, or suicidal or homicidal ideations. Who fills that out?

A. **The medical assistant. When he first walk -- when they first come in, all of this is filled out.**

Q. Okay. And would the medical assistant have talked to the people that brought them in, say, from the Garland jail?

A. **Well, whatever jail he came from, yes.**

Q. I'm sorry?

A. **Yes.**

Q. The medical assistant does that.

A. **Yes.**

Q. Okay. So if there is a concern voiced by whoever brings them in, then that's what is reflected up there in that little second paragraph there; is that right?

A. **Yes.**

Q. And the medical assistant makes note of all of that.

A. **Yes.**

Q. And I see that we have some basic indications here, it looks like somebody has taken his blood pressure, checked his temperature and that type of

183

thing.

A. Yes.

Q. Who does that?

A. The medical assistant.

Q. So that's all done before they see you.

A. Yes.

Q. And can you indicate to us what his temperature was at the time he was checked? Is that it right there?

A. He had a 99.4.

Q. 99.4? And what is normal temperature?

A. 98.6.

Q. So he had a slightly elevated temperature; is that right?

A. Yeah. Yes.

Q. What about blood pressure?

A. 147 over 90.

Q. And is that elevated?

A. It's slightly elevated.

Q. And how about -- what are these first two indications?

What's HR?

A. Heat rate.

Q. And how is 74?

A. 74 is normal.

184

Q. And what's the second one?

A. Respiration rate.

Q. Respiration rate? And what is that?

A. 19.

Q. Is that normal?

A. Yes.

Q. Okay. And what is this indication here? Can you see what that is?

A. It's blurred. It looks like oxygen level. It's a hundred --

Q. Oxygen level?

A. A hundred percent.

Q. Okay. All right. So if I have understood what you've told us, all these indications here were done by somebody else other than yourself; is that right?

A. Uh-huh. Yes.

Q. And then we see the notation, See nurse. Who would have stamped that on there?

A. The CMA.

Q. The CMA?

A. Uh-huh.

Q. What's a CMA?

A. Certified Medical Assistant.

Q. And is that the person who would have been

185

making all of these notations?

A. Yes.

Q. And why would they stamp, See nurse?

A. Anything there's a yes to, they have to see a nurse.

Q. I'm sorry?

A. Anything -- question that they answer yes to, they have to see the nurse.

Q. So if there's anything in here that is answered yes, then they have to see the nurse.

A. Yes.

Q. Okay. Now, particularly these indications down here about how much they smoke, how much they drink and what type of drugs they've been using, is that a notation made by you or is that by the Certified Medical Assistant?

A. Anything that's written out is made by me.

Q. Okay. So that would have been made by you?

A. Yes.

Q. Okay. And then the recommended housing here, right there, I can make out CBO, but what is that above there?

A. West Tower.

Q. West Tower, CBO. And CBO is closed behavioral observation?

186

A. Yes.

Q. Okay. And here on the second page, again we start out with a bunch of -- oh, it's a form where somebody's gone down and circled No for everything and Yes for the very last thing. Would that have been done by the medical assistant?

A. Yes.

Q. And right here, we see that he has been ordered in the disposition -- if I can zoom in on that. There we go.

Like ER is what, emergency room?

A. Yes.

Q. And GP is general population?

A. Yes.

Q. GPND is what?

A. General population, not Decker.

Q. Not? I'm sorry?

A. Decker.

Q. Not?

A. The Decker Jail.

Q. The Decker Jail?

And then we have OBO? What is OBO?

A. Open behavioral observation.

Q. And what is open behavioral observation?

A. It could be like an eight-man tank. It's just

187

not locked up by his self.

Q. Is that in the medical ward?

A. It's in the psych ward.

Q. In the psych ward?

A. Yeah.

Q. And is all of that located on the third floor of the West Tower?

A. It could be -- they have more than one floor, so it could be third floor.

Q. Okay. And it could be different floors?

Is the third floor of the West Tower a medical unit?

A. It's a psych unit.

Q. That's the psych unit. Okay.

Now open behavioral observation is a tank within that psych ward; is that correct?

A. Yes.

Q. And how many beds are in that tank?

A. I think eight. I don't work up there, so --

Q. Okay. And am I to understand that they can go from one tank to the other -- they can go from one cot to the other? They're not locked in to a particular room in open behavioral observation?

A. As far as I know. Like I said, I don't work up there.

188

Q. Okay. You've never been up there?

A. No.

Q. Ma'am?

A. No.

Q. And then closed behavioral observation is CBO; is that correct?

A. Yes.

Q. And what is closed behavioral observation as opposed to open behavioral observation?

A. You're in a single cell.

Q. They're locked in a single cell within the psych ward.

A. It can be any floor.

Q. Okay. Do you know where he was specifically sent?

A. No. They don't give us that information.

Q. Are you the one that makes that determination?

A. Yes.

Q. And am I to understand, Ms. Busby, that those CBO cells are in high demand and short supply?

A. I wouldn't really know that, sir.

Q. You don't know that?

A. No.

Q. Okay. Now, I see -- as for references that you made in regard to Mr. Broadnax here, I see that you

189

referred him to medical; is that right?

A. Yes.

Q. And why, if you know, did you refer him for medical treatment?

A. Because he has asthma.

Q. Because he had asthma?

A. Yes.

Q. And then I see that you've also referred him to psych. And what does that mean, the psychiatric --

A. Just for evaluation.

Q. A full evaluation?

A. Just for an evaluation.

Q. And why did you refer him for a psychiatric evaluation?

A. Only because of what he came in for, a high profile case.

Q. Just because it's high profile?

A. Just because. If there was anything else, I would have written it down.

Q. Okay. Now, while we're on that subject, let me ask you about that. You work an eight-hour day?

A. 12 hours.

Q. 12-hour day. And how many days a week do you work?

A. Well, one week it's three, one week it's four.

190

Q. Okay. And is it safe to say that you've seen a number of people since the time you filled out this form?

A. Yes.

Q. And do you remember this person specifically or are you -- is your testimony based on what you're looking at here on the form that you filled out?

A. The form that I'm filling out.

Q. Okay. So you don't remember him specifically.

A. No.

Q. Okay. All right. So you're saying everybody gets received to the psych department that comes in on a -- on a high profile case?

A. As far as I know, yes.

Q. And in regard to Mr. Cummings, did you do the evaluation on him or was that done by someone else?

A. His cousin?

Q. Yes.

A. Yes, I saw both of them.

Q. You did both of them?

A. Yeah.

Q. Did you refer him to psych also?

A. Yes.

Q. Did you refer him to CBO?

A. Yes.

191

Q. Okay. And do they -- I guess it goes without saying that if you send someone or order that he be taken in a closed behavioral observation tank, that they have to do what you say.

A. We just do recommendations.

Q. Okay.

A. Nothing -- they just go by our recommendations. It's up to them whether they do it or not.

Q. And the -- again, the recommended housing here on the first page, whose signature is that?

A. It's mine.

Q. That's your signature? Okay.

Is your order that a person be held in closed behavioral observation, is that reviewed by someone else?

A. Yes. Wherever they take him to, they review to see whether or not they need to be in observation.

Q. Okay. And if -- once they get up to closed behavioral observation, are they eventually seen by a psychiatric staff?

A. Supposedly. Like I say, I don't -- I don't work that floor. I do the central intake.

Q. So you don't know what happens to them after you send them off to CBO.

192

A. No.

Q. Okay. Do you assume that some type of an assessment's made by --

MR. ALEX: Judge, I'm going to object to any --

Q. (BY MR. LOLLAR:) -- Medical health professionals?

MR. ALEX: Judge, I'm going to object to any further questioning. The witness has already said she has no idea what happens after that point.

THE COURT: Sustained as to the assumption.

Q. (BY MR. LOLLAR:) Well, are there mental health professionals who work in the Dallas County jail?

A. Yes.

Q. And like you, do they work for the Parkland health system which has got the contract for health provision in the jail?

A. Yes.

Q. And do you know whether or not they work on the weekends?

A. I'm sure someone works on the weekend. Like I say, I'm not that familiar with what goes on upstairs.

Q. Okay. So you don't know what happens to them

193

after they leave you.

A. Yes.

Q. And you've never been up to the psych ward.

A. No.

Q. Okay. All right. Do you know anything about PCP usage?

A. I've heard of it.

Q. You've heard of it?

A. Yes.

Q. Okay. Do you know whether or not a person who has ingested PCP, do you know whether or not that that comes in waves? It's cyclic?

Do you know what I'm talking about?

A. No.

Q. All right. Thank you, Ms. Busby.

MR. LOLLAR: That's all the questions we have.

THE COURT: Will there be any brief redirect?

MR. ALEX: No, sir.

THE COURT: May the witness be permanently excused?

MR. ALEX: I have no objection, Your Honor.

MR. LOLLAR: Yes, sir.

194

THE COURT: You're permanently excused, ma'am. You may step down.

And we will take a recess for the jury until 1:40 p.m.

All rise for the jury.

(Jury not present.)

THE COURT: We'll be in recess until 1:40 p.m.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

What further says the State?

MR. ALEX: The State would call Evelyn Barg, Your Honor.

THE COURT: Evelyn what?

MR. ALEX: Evelyn Barge, B-A-R-G-E [sic].

THE COURT: Ms. Barge, would you come to the front of the courtroom all the way up by the door. When you've reached the door, turn and face me and raise your right hand.

**EVELYN BARG**

was called as a witness and testified as follows:

THE COURT: You may lower your hand.

Keep your voice up, ma'am. I notice that you have a very soft voice.

195

Take your seat in the witness stand.

These two gentlemen over there at the end of the jury have to be able to hear you.

Whenever you're ready, Mr. Alex.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, ma'am.

A. **Evelyn Barg.**

Q. And, Ms. Barg, spell your last name for me.

A. **B-A-R-G.**

Q. That's what I thought.

You know why you're here; is that correct?

A. **Yes, sir.**

Q. All right. Do you know the defendant in this case, James Broadnax?

A. **Yeah. A little bit, yeah.**

Q. Okay. You've seen him before.

A. **Uh-huh.**

Q. All right. Is he in the courtroom today?

A. **No.**

Q. James Broadnax isn't in the courtroom?

A. **Yes.**

Q. Okay.

196

A. **Yes.**

Q. Now, he looks different today --

A. **Oh yeah.**

Q. -- than what you recall?

A. **Yes.**

Q. Okay. What do you remember about James Broadnax that's different today than from what you recall?

A. **I recall, the way he's dressed and stuff.**

Q. And what about his hair, is his hair the same?

A. **No, no hair.**

Q. What's the difference today about his hair than what you remember?

A. **Because he don't be all hanging out and stuff, --**

Q. Okay.

A. **-- all out over his head and stuff.**

Q. Are you a little nervous?

A. **Yes, sir.**

Q. All right. What I want you to do is, if you see Mr. Broadnax in the courtroom, I want you to point to him and describe one piece of clothing that he has on.

A. **The white shirt and a tie.**

Q. White shirt and a tie? And just point to

197

where he is at, if you would.

A. **Right there.**

Q. All right.

A. **Next to that young lady.**

Q. Okay. You're referring to the gentleman that's sitting directly in front of me?

A. **Yes, sir.**

MR. ALEX: May the record reflect the witness has identified the defendant in open court?

THE COURT: Will there be objection?

MR. LOLLAR: No objection.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) And so the jury understands, Ms. Barg, if you had to sort of guess, how many times would you have actually seen the defendant before today, would it have been more than ten?

A. **Yes.**

Q. More than 20?

A. **Yeah.**

Q. More than 30?

A. **About 30.**

Q. Okay. So you've seen him quite a bit.

A. **Uh-huh.**

Q. And where would you see him at?

A. **At his auntie's house.**

198

Q. Okay. And his auntie would live where?

A. **In the Junction in south -- East Dallas.**

Q. Junction in East Dallas?

A. **Uh-huh. In some apartments.**

Q. And what would -- did you live there?

A. **No, sir.**

Q. Okay. Tell the jury why you would be there.

A. **Because we was church members. We was going to church together.**

Q. Okay. James would go to church with you?

A. **He came one time.**

Q. All right. And was there somebody there at that apartment that -- that you knew better than James?

A. **Yeah.**

Q. Who is that?

A. **My son and my -- my deceased husband.**

Q. And your deceased husband.

A. **Yes.**

Q. All right. Let's talk about that and let's give a timeframe there of what we're talking about. Okay?

A. **Uh-huh.**

Q. Okay. Back in June of 2008, okay, was your husband living then?

A. **No, sir.**

199

Q. All right. Now, let's go back further then. When did your husband die?

A. April the 12th.

Q. All right. And were you going over to the apartments over on Junction in East Dallas before he died?

A. Yeah, to check on him because he was taking chemo therapy.

Q. All right. He had cancer?

A. Yeah.

Q. And was he sick?

A. Yeah.

Q. Now, were you guys together at that time or were you estranged? Were you broken up?

A. We were not together.

Q. You were not together at the time.

A. Un-uh.

Q. And he was living in the apartment over on Junction.

A. Yes, sir.

Q. And that was -- that was Alice Gatewood's apartment?

A. Yes, sir.

Q. And that would be the lady who you would call the defendant's aunt; is that correct?

200

A. Yes, sir.

Q. All right. And who all lived in that apartment, that you recall?

A. It was James, his mother, Alice and Alice kids, and my son and, oh, there was quite a few people staying there.

Q. Lots of people living there.

And just to be fair, let's give a timeframe, okay? Let's talk about before your husband passed. Your husband passed, did you say it was April?

A. Uh-huh.

Q. Before your husband passed, was the defendant's mother living there?

A. Yes, sir.

Q. Okay. And you would see her there?

A. Yes.

Q. Do you recall her name?

A. Audrey.

Q. Audrey Kelly?

A. Uh-huh.

Q. Okay. Is she in the courtroom today?

A. Um, no.

Q. Have you seen her today?

A. No, sir.

Q. Okay. And after your husband died -- okay.

201

And let's stick at that time point.

Before April, you would go there to see your husband who was dying; is that correct?

A. Yeah, I'd go see him when he called me because he was kind of depressed and stuff because he had prostate cancer and liver cancer, and he was kind of going through a little bit.

Q. Okay. What was his name?

A. Ricky Lee Don Barg.

Q. Ricky?

A. Lee Don Barg.

Q. And was it -- did you see the defendant living there prior to your husband dying?

A. No, sir.

Q. Okay. And then after your husband died, did you continue to still go over to these apartments?

A. Yeah, because he had asked me to keep an eye on Alice because she was kind of sad and stuff.

Q. Okay.

A. Something about, you know ...

Q. And was his son living there as well?

A. Yes.

Q. What was his son?

A. Christopher.

Q. Christopher?

202

A. Toles.

COURT REPORTER: What was his last name?

THE WITNESS: T-O-L-E-S.

Q. (BY MR. ALEX:) And why was he living there?

A. Because he was staying over his father's.

Q. Okay. Gotcha. His father who had just passed.

A. Yeah. He had -- when his daddy got out of the hospital, he was taking care of his father, and his father passed while he was taking care of him.

Q. Okay. And at some point after your husband passing, did James Broadnax show up on the scene?

A. Yes.

Q. Okay.

A. Afterwards.

Q. Now, I'm going to fast forward in time a little bit and we're going to go all the way to June the 19th of 2008, and I'm going to ask you as a point of reference, okay? This is the starting point. Did you see James come to the apartments there in a Crown Victoria, a nice looking car?

A. Yes.

Q. Okay. Now, that's going to be our point of reference, okay?

Now, let's go back and tell the jury, how long

FIRM NAME

August 10, 2009

203

do you think he had been living at these apartments prior to that point?

A. Not long. About three weeks.

Q. About three weeks?

A. About three weeks.

Q. And when he showed up for the first time, were you there?

A. No, I -- I wasn't there when he showed up, but I know his mother had been saying he was coming, so I --

Q. So his mother had sort of been saying, you know, James was coming.

A. Uh-huh.

Q. Had you ever met him before that?

A. No, sir.

Q. Okay. And when he showed up, how did -- were you there the same day, or after he showed up, or the next day? Give me a feel for that.

A. He was there when we got out of church.

Q. Okay. So do you go to church quite a bit?

A. Yeah. We was in a 30-day revival.

Q. Okay. And did you take people to church in your van on a regular basis?

A. Oh, yes.

Q. What size van did you have?

204

A. I got a -- I think it's a miniature van.

Q. Okay. And did you go around and pick up people and bring them to church?

A. Yes.

Q. Okay. And when you got out of church that day that James arrived and you got to the house, is that how you knew James was there?

A. Yeah. Audrey had introduced me to her son.

Q. Okay. And did he have his bags there with him?

A. Yes, sir.

Q. And did you see bags?

A. I seen a black bag.

Q. Okay. Very good.

And so Audrey and her son were both there at the apartments at least three weeks before you saw James in the car; is that right?

A. Yes, sir.

Q. All right. Okay. And at some point, did Audrey leave and -- and what I'm asking you, Ms. Barg, let's make this understandable. I don't want you to tell this jury anything that you don't know from your own personal knowledge, okay?

A. Okay.

Q. If you don't know it because you saw it, or

205

you tasted it, or you felt it, or -- do you understand what I'm saying?

A. Yes.

Q. I don't want you to tell them what somebody else told you, okay?

A. Okay.

Q. Now, were you aware that Audrey Kelly -- did she leave before you saw James in this car?

A. Yeah, she had left.

Q. Okay. So she was no longer living there when James came to the apartment in a car that didn't belong to him on June the 19th.

A. Yes, sir.

Q. Okay. Do you know how long she had been gone?

A. About a week or something.

Q. All right. And so we're going to fast forward again and we're going to go to the day when James showed up in this -- in this vehicle, all right?

A. Yes.

Q. Do you remember that day?

A. Yes.

Q. And tell me how that day is memorable to -- is memorable to you.

Why don't you -- why were you over at the apartments on Junction on that day?

206

A. Because Alice had called me.

Q. Okay. And when she called you, was she upset?

A. Yeah. She was just crying. She was hysterical.

Q. Okay. Now, when your husband was living, did he own an assault rifle?

A. Yes, he did.

Q. What kind of assault rifle was it?

A. An AK.

Q. An AK? Can you describe it?

A. It was like the one with the scope in and, you know, with the --

Q. The bayonet?

A. -- banana -- yeah, with the knife hooked to it. He had the whole thing.

Q. The whole thing?

A. Yeah.

Q. And where did he keep it at? Did he keep it at the apartment in Junction?

A. He kept it in the bedroom where him and Alice shared.

Q. Okay. And at the time that you went over to Alice's house, had you ever seen it over there?

A. He showed it to me before he had passed.

Q. Okay. And after he passed, did you know if

207

the assault rifle was still there?

A. Yes, it was.

Q. And do you know which room the defendant, James Broadnax, was sleeping in?

A. He slept in the same room that the gun was in.

Q. Okay. And do you know his cousin Demarius Cummings?

A. Yes.

Q. Does he also live there as well?

A. He be there sometime. He didn't stay there, but he be there.

Q. Okay. So he didn't actually live there. He came around from time to time.

A. Yes, sir.

Q. And -- and so when you went over to the apartments back in June 19th, of 2008, Alice is upset; is that correct?

A. Yes.

Q. And does it have anything to do with this assault rifle?

A. Yeah, because they had took it. She had told me they had took it.

Q. Okay. And again, you weren't there when it was done, right?

MR. LOLLAR: Judge, excuse me. I'm going

208

to object to hearsay.

A. No.

Q. Okay.

THE COURT: Okay. That -- that objection's sustained.

Ask another question.

MR. ALEX: Okay.

Q. (BY MR. ALEX:) You weren't there when it was gone; is that right?

A. No.

Q. But she was highly upset when she called you and asked you to come over; is that right?

A. Yes, sir.

Q. And when you got there, was there a gun there?

A. No, sir.

Q. All right. And do you know about what time of -- of day or morning that was?

A. It was between 9:00 and 10:00.

Q. Between 9:00 and 10:00?

A. In the morning.

Q. And when you got there, do you know who all was there?

A. It was Alice, Lesha and Cupcake.

COURT REPORTER: Alice and who?

THE WITNESS: Her daughter Lesha and

209

Cupcake.

COURT REPORTER: Lesha?

THE WITNESS: Uh-huh.

Q. (BY MR. ALEX:) And Lesha, do you know if her real name is Arnesha Lucky?

A. I didn't --

Q. Does that sound right?

A. Yeah.

Q. Okay. Y'all called her Lesha.

A. Yeah.

Q. And Cupcake, do you know what her real name was?

A. No, sir.

Q. Was Cupcake well?

A. No, she was sick also.

Q. Okay. And is Cupcake alive today?

A. No, she deceased.

Q. She's deceased. Did she have like diabetes and that kind of thing?

A. She had something wrong with her. I can't really say.

Q. But she was not well.

A. No, sir.

Q. All right. But Arnesha, Cupcake, Alice -- was Alice there?

210

A. Yes, sir.

Q. Okay. And was Demarius Cummings there?

A. No, sir.

Q. And I'm talking about when you first went there.

A. When I first went there?

Q. Right, was Demarius Cummings there?

A. No.

Q. Okay. Very good.

And what about your son, was he there?

A. No.

Q. Okay. And while you were there, the gun is missing. Alice is upset; is that right?

A. Yes, sir.

Q. All right. Did at some point the defendant, James Broadnax, and Demarius Cummings come back to the apartment complex?

A. Yes, they did.

Q. And how long had you been there when that happened?

A. About 45 to an hour.

Q. Okay. And when they came back, describe for the jury, were they walking? Were they in -- in the car?

What was the situation?

211

A. They was in a car.

Q. Okay. Do you remember what kind of car it was?

A. A Crown Vic.

Q. A Crown Victoria?

A. A Crown Vic -- a Crown Victoria, whatever.

Q. It's all right. I get tongue tied all the time.

The Crown Victoria that you saw, did it appear to be a new car or an older model car?

A. It was kind of -- to me, it was clean.

Q. It was clean.

A. It was clean.

Q. And I think you had said to me once before it was the kind of car you hadn't seen around there in awhile.

A. No, not at all.

Q. Did it stick out?

A. Yeah.

Q. Tell me why it stuck out.

A. Because it was -- it wasn't no dents or nothing on it, you know. It's just a clean body car.

Q. All right. And that would -- that kind of stuck out to you.

A. Yes, sir.

212

Q. All right. Had you seen the defendant and Demarius Cummings driving around in cars before that?

A. No.

Q. All right. And so when they -- did they come into the apartment while you were there?

A. Yes, sir.

Q. Tell the jury what happened.

A. They came in the house and Dee, he the one Alice was asking about the gun.

Q. All right. Now, when you say Dee, who are you talking about?

A. Demarius pulled the big gun. James had the pistol. He pulled out the gun and Alice laid it on the couch.

Q. Okay. What else happened, if anything?

A. I didn't see anything else.

Q. Did anybody talk about where they got the car from?

A. No, not really. They was just saying they did a lick.

Q. They were saying they did what?

A. They did a lick.

Q. They did a lick?

A. They hit a lick.

Q. And what does that mean?

213

MR. LOLLAR: Judge, excuse me. Hearsay again unless we can identify who we're talking about.

Q. (BY MR. ALEX:) You're talking about Demarius Cummings and --

A. James Broadnax.

Q. -- James Broadnax?

A. Yes.

Q. Were they both saying they hit a lick?

A. Well, James was, and then Demarius was like -- he was scared. He was like not saying too much.

Q. Okay. So Demarius was acting scared?

A. Yes, sir.

Q. But James was talking about hitting a lick.

A. Yeah.

Q. Was he bragging about it?

A. He wasn't bragging, he was just bold with it.

Q. Okay. He was bold. He wasn't -- he wasn't acting scared like Dee was.

A. No, he wasn't acting scared like Dee was.

THE COURT: I didn't hear that. He was bold?

THE WITNESS: He was bold.

THE COURT: All right.

THE WITNESS: Like coming in bold and hardcore.

214

Q. (BY MR. ALEX:) Hardcore. Okay.

And -- and as it relates to -- have you seen James Broadnax and Demarius Cummings together before that?

A. Yes, sir.

Q. Them interacting together?

A. Yes.

Q. Would you -- if you had to characterize one as a leader and one as a follower, which one would you say would be the leader?

A. James.

Q. James? Okay.

And give me an example of what you mean by that.

A. Because he just -- he just -- he's bold. He talk real bold. He got -- he's real smart and he talk real bold.

Q. And that was sort of his character when he was there around Demarius.

A. Yes.

Q. And was Demarius more quiet?

A. He talked, but he wasn't like outspoken like James, I'll put it like that.

Q. All right. Now, when they come back and James is talking bold about hitting a lick, and -- and did

215

you take that to mean that this car was stolen from somebody?

A. Yes, sir.

Q. Okay. And did anybody there ask him, you know, anything about what -- what had happened or what they had did?

MR. LOLLAR: Object to hearsay.

THE COURT: Sustained. Ask another question.

Q. (BY MR. ALEX:) This would have been while you were there; is that correct?

A. Uh-huh. Yes, sir.

Q. Did you hear the defendant talk about what he had -- did? James Broadnax?

A. He was saying that he had -- they had went out and did something, but ...

Q. Are you okay, Evelyn?

A. (Shakes head) He had said they had went out and --

Q. Take a minute if you need a minute.

THE COURT: Haze, hand her a Kleenex.

A. They said they had went out and did something. I'm just nervous.

Q. (BY MR. ALEX:) You're nervous?

A. Yeah.

216

Q. Okay.

A. He had said they went out and did something.

Q. He said they went out and did something?

A. Yeah.

Q. Okay. And was that in response to somebody asking him a question?

A. Yes, sir.

Q. Okay. And did he say what they did?

A. Yeah. They had robbed somebody.

Q. Okay.

A. But he didn't put it like they robbed somebody. He said they had hit a lick.

Q. All right. And as best you can, I want you to tell the jury what he said about what happened.

A. He said they had went out and hit a lick and he say when it come out, that he had did it, and we -- I wasn't saying nothing. I was just listening.

Q. Did you have any idea that this car had come from a double homicide at that time?

A. No, sir.

Q. Okay. Had you seen anything on the news that morning about a double homicide?

A. No, sir.

Q. And when you saw that car, he said that they had hit a lick, did he say anything about whether they

217

killed anybody?

A. No, sir.

Q. Okay. Did he say anything about the victims when he was talking about hitting a lick?

A. Yeah, they said they -- he was tied up.

Q. He said they tied them up?

A. (Nods head)

Q. And then I think -- you correct me if I'm wrong -- the last thing you said that he said was that if it comes out, he did it.

A. Yes, sir.

Q. Okay. Now, did he -- did they have any property in the house that didn't belong to them?

A. They had a pistol.

Q. Okay. Anything else?

A. No.

Q. Was there any -- did you see any identification cards --

A. Oh, yeah.

Q. -- or credit cards --

A. Yeah, I seen --

Q. -- anything like that?

A. Yes, sir.

Q. What did you see?

A. I seen Stephen Swan's ID.

218

Q. Okay. You saw an ID that said Stephen Swan on it.

A. Yes, sir. He had a picture ID.

Q. Okay. And that was in the house.

A. Yes, sir.

Q. And at that time, did that -- you knew neither one of these guys was Stephen Swan, right?

A. Yeah.

Q. Okay. At that time, what were you thinking?

A. I was just thinking they did something crazy.

Q. Okay. But at that time you still had no idea what had happened; is that right?

A. No, sir.

Q. Okay. And while they were there, did you ever go out to the car and look in the car or see anything that was in the car?

A. Yeah.

Q. Okay. Can you describe what you saw?

A. I saw -- they had opened the door and the stuff in it. They had popped the trunk and there was -- it was just noodles, oil, and different stuff like that in the trunk of the car.

Q. There was some food in there?

A. Yeah, there was some food.

Q. And there was like some oil?

219

A. It was a case of oil.

Q. Okay. Did you see any tools or anything like that?

A. No, I didn't. Not to my remembrance, I don't.

Q. But you didn't look for rifles in the car, did you?

A. No. No, sir.

Q. Okay. Very good.

And what was -- what was everybody else doing?

A. We was all doing about the same thing, just looking, and Alice was talking to them.

Q. Okay. And the Judge has already told you, you can't tell the -- tell the jury what Alice said, but you can -- you can tell us what the defendant said, okay?

A. Uh-huh.

Q. And did the defendant say anything about what he was going to do with the car?

A. They was going to go sell the car.

Q. Okay. And -- and did you hear the defendant talking about going to sell the car?

A. Yes, sir, I was sitting there and he was saying they was going to go sell the car.

Q. Okay. And anything else you can recall about what the defendant said that day?

220

Would that have been before or after 12:00 noon?

A. Before.

Q. Okay. And when they -- when they left the apartments there, were you there when they left?

A. Yes, sir.

Q. Okay. Tell the jury how that happened.

A. They had left and we all was sitting in the house and we was watching the news, and that's when I seen Stephen Swan's picture on the news, and they had left the ID on the table.

Q. So after they left, -- did they -- did they leave in that car?

A. Yes, sir.

Q. Okay. Did they ever come back after they left?

A. No.

Q. Okay. And did you -- were you outside when they actually pulled up, or you just saw them leave out the house?

A. I was outside when they left.

Q. Okay. And then at -- at -- on the 12:00 o'clock news is where you saw a picture of Stephen Swan?

A. Yes, sir.

221

Q. And you also saw at that time that his ID was on the table there.

A. Yes, sir.

Q. Were you troubled by that?

A. Yes.

Q. Did you realize at that point what had happened?

A. Yeah. It hit me then, after I seen the picture. When I seen the picture on the news, then I seen the ID, and I had told Alice, I said, They killed that man. Me and Cupcake told her. I said, They killed that man.

But I -- I was thinking it was just one guy, but then when they showed Matthew Butler, it was two guys, and it really did, it shook me up 'cause I was just surprised that they would do something like that.

MR. ALEX: One second, Judge?

THE COURT: Yes, sir.

MR. ALEX: I'll pass the witness.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Ms. Barg, my name is Brad Lollar. I have a few questions. If you have any questions about what I'm asking, just stop me and I'll see if I can clear it

222

up.

Were you related to anybody that was living in that apartment there at the Junction besides your ex-husband?

A. My son.

Q. Just him.

A. Uh-huh.

Q. And how did it come to be that he was living in that apartment?

A. Because he was there with his father.

Q. I'm sorry?

A. He was there staying with his father. He had -- he was staying with me, and then he had a little incident at my house, then he moved. His father took him in with him.

Q. You're talking about Christopher.

A. Yes.

Q. That's your son?

A. Yes.

Q. And Mr. Dunbar was his father?

A. Mr. Barg.

Q. Pardon me?

A. Ricky Barg.

Q. I'm sorry. I thought you said Dunbar.

A. No.

223

Q. Okay. So that's how your son came to be living over there.

How big an apartment was it?

A. It's a two-bedroom apartment.

Q. And how many people were living there?

A. About eight or nine people.

Q. Eight or nine? You've indicated your -- your husband, Mr. Barg, your son, Mr. Toles. Of course, Alice Gatewood lived there.

A. Uh-huh.

Q. Arnesha Lucky was living there. Audrey Kelly, the defendant's mother, was living there.

A. Uh-huh.

Q. Who else --

THE COURT: Hold on, Mr. Lollar.

You have to say yes or no, ma'am.

THE WITNESS: Oh, okay.

THE COURT: You can't say uh-huh.

THE WITNESS: Oh, okay.

Q. (BY MR. LOLLAR:) You might want to pull that microphone towards you and talk right into that, and that --

A. Oh, okay.

Q. -- kind of broadcasts out here, okay?

Who else besides the people I just named?

224

A. It was Cupcake.

Q. Cupcake. Okay.

A. She was staying there.

Q. Anyone else?

A. And Dymon, he'll be there off and on, him and his girlfriend.

Q. Who?

A. Alice son Dymon.

Q. Darron?

A. Dymon.

COURT REPORTER: Dalmond?

THE WITNESS: Dymon.

MR. LOLLAR: What did she say?

COURT REPORTER: Dalmond.

MR. LOLLAR: Dalmond?

THE WITNESS: Uh-huh.

Q. (BY MR. LOLLAR:) All right. So there are about eight or nine people living there in that two-bedroom apartment; is that right?

And you talked about Audrey Kelly living there and you've indicated that she kept saying that James was coming. Did she say where he was coming from?

A. No, sir.

Q. Did she say how he was going to get there?

A. On a bus.

225

Q. Greyhound bus?

A. Yes, sir.

Q. And do you remember a day when he did come down on the Greyhound bus?

A. I'm not for sure.

Q. Do you remember anybody going to get him from the Greyhound Bus Station?

A. Danky and his cousin.

Q. Which cousin?

A. Danky Dymon.

Q. Dalmond?

A. Uh-huh.

COURT REPORTER: Are you saying Danky or are you saying Dalmond?

THE WITNESS: Danky is his nickname, but his name is Dymon.

Q. (BY MR. LOLLAR:) Okay. Danky?

A. Uh-huh. Yeah.

COURT REPORTER: D-A-L-M-O-N-D?

THE WITNESS: Uh-huh. Yeah.

COURT REPORTER: Okay. Do you know how to spell his middle name?

THE WITNESS: No.

Q. (BY MR. LOLLAR:) Okay. His real name is Dalmond but they call him Danky?

226

A. Yeah.

Q. Okay. And do you recall that would have been around March the -- pardon me. May the 1st?

A. Something -- yes, something like that.

Q. Okay. Now, specifically you have told us that the day that your husband passed away was on April the 12th?

A. Uh-huh.

Q. And that James Broadnax was not living there at the time your husband passed away?

A. No.

Q. And hadn't lived there prior to the time your husband passed away.

A. Not to my rec -- knowledge, he hadn't done that.

Q. And do you remember him coming in a Greyhound bus on or around May the 1st?

A. Yeah.

Q. Now, the day that this car showed up, the Crown Vic over at the Junction, did you see them first drive in?

A. No, sir.

Q. Do you know who drove?

A. I know who drove out.

Q. Who drove in?

227

A. I don't know who drove in.

Q. You said that the gun, you later saw there; is that right?

A. Yeah.

Q. And who had the gun?

A. James had the gun.

Q. Now, earlier you said Demarius pulled out the gun.

A. Demarius pulled out -- James had a pistol. Demarius had the gun, the big gun. They had two guns.

Q. Okay. And you said you saw Stephen Swan's ID. You must have gotten a pretty good look at it.

A. Yes, I did.

Q. Did you have it in your hand?

A. Yes, I picked it up. They had passed it to Alice and she laid it on the table.

Q. Okay. Alice had laid it on the table?

A. Yes.

Q. And was that after both Demarius and James had already left out of there?

A. No. That was before they -- that was before they had left.

Q. Okay. When they left out, did they leave the ID's there?

A. Yes, they left the ID. Yes, they did.

228

Q. And what other identification cards were there besides the one with the picture on it?

A. There was some credit cards.

Q. Some credit cards? Anything else that you saw?

A. No.

Q. And you saw all of that laying there on the table there in the apartment prior to the time they left out.

A. Not the credit card. They took the credit cards with them. They just left the ID.

Q. Okay. Now, did you call the police?

A. Yes, we did.

Q. When did you call the police?

A. About 15 minutes after they had left, after I had seen the news.

Q. Okay. And did you call the Garland police?

A. Yes, I did.

Q. Okay. Were you the first person to call the Garland police out to that apartment?

A. Yes, I was.

Q. Okay. And did the police come out and interview you?

A. Yes, they did.

Q. That same day?

229

A. Yes.

Q. Okay. And you gave them a written statement, I believe; is that correct?

A. Yes, sir.

Q. All right. All right. Thank you, ma'am.

MR. LOLLAR: That's all the questions we have.

THE COURT: Any redirect?

MR. ALEX: Nothing further from this witness, Your Honor.

THE COURT: May the witness be permanently excused?

MR. LOLLAR: Yes.

THE COURT: Mr. Alex?

MR. ALEX: Subject to recall, Judge.

THE COURT: Yeah. You're excused for the time being, ma'am. We may need to bring you back later.

MR. ALEX: I think she knows, Judge, that she -- she may be called at a later time.

THE COURT: All right. What further says the State?

MR. ALEX: The State would call Off. Johnston from Texarkana.

You want to approach just briefly?

230

THE COURT: I think we were on the record and there is not going to be an objection, as I understood it.

Is that correct, Mr. Lollar?

MR. LOLLAR: If it's what we talked about outside the jury's presence; yes, sir.

THE COURT: We'll perfect the record after the jury goes out.

Off. Johnston, are you here?

Off. Johnston, if you'll come all the way to the front of the courtroom, all the way up by the door. When you've reached the door, turn and face me and raise your right hand. All the way to the door, sir.

Raise your right hand.

**JEFF JOHNSTON**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand. You'll be responding to questions from Mr. Alex.

Mr. Alex, whenever you're ready, sir.

MR. ALEX: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, sir.

August 10, 2009

231

A. Off. Jeff Johnston.

Q. And tell the jury what you do for a living.

A. Texarkana Texas Police Department, patrol officer.

Q. All right. I'll ask you to keep your voice up. I'm not sure -- touch that microphone, if you will. Okay. Keep your voice up so we can hear you, okay?

A. Yes, sir.

Q. You know why we are here; is that correct?

A. Yes, sir.

Q. How long have you been a police officer?

A. Since February of 2001.

Q. And has all of your experience been there in Texarkana?

A. Yes, sir.

Q. Prior to that, tell the jury about your education.

A. I graduated from high school, attended a little bit of college, immediately went to start work at the police department and I've been there ever since.

I am a field-training officer. I've been to multiple schools. Just regular training.

Q. All right. I'm going to bring your attention

232

back to June 19th of last year, 2008, all right? Were you on duty at that time?

A. Yes, sir.

Q. And tell the jury a little bit about what you were doing that day just prior to 6:00, 7:00, 8:00 o'clock that evening.

A. We were on routine patrol. We had initially responded to assisting our POP team, which is the Problem Oriented Police. They handle special situations such as high crime areas, they'll focus on that.

They had made a traffic stop with a guy. He -- they got into a physical altercation, ended up having to arrest and went to the ground.

We transported them because they had some warrants, and took them up to the Bi-State, which is our -- our jail. And on our way back, --

Q. I'm going to stop you there for one second.

A. I'm sorry.

Q. When you say Bi-State, Texas and Arkansas, you-all share a jail?

A. Yes, sir. It's a -- it's a -- we live on the state line of Texas and Arkansas, and all of the police departments are located inside of that building. Our jail's on the top floor.

233

Our -- all of our offices, they will remain on that floor.

Q. Okay. Carry on.

A. I'm sorry?

Q. And after you -- you went to the Bi-State Jail, --

A. Yes, sir.

Q. -- you were about to tell the jury what you did next.

A. We were coming back just to -- to go to our beat which is, you know, where we patrol on a regular basis. We -- our recruit officer at the time, Off. Thompson, he noticed a car that was in the area over there when we -- when they were having that fight with the officer. We -- he -- he said, you know, I noticed it over there, so I ran the license plate on my in-car computer. We can run license plates. It came back to a 1991 Cadillac. I ran --

Q. And what kind of car was it?

A. It was actually a Ford Crown Vic, beige in color.

Q. Did that raise flags to you?

A. Yes, sir. I ran it again, just to make sure that I didn't type it in wrong, and certainly enough, it came back to a '91 Cadillac.

234

Q. Let me stop you there for one second.

All right. So the fight that you were assisting in earlier, this car was seen in that area.

A. Yes, sir. By my recruit officer.

Q. And your recruit officer's name is?

A. Dustin Thompson.

Q. Okay. And this area which the car was seen at earlier, what -- in Texarkana, Texas, what part of town was this?

A. It's a high-crime area. There's a lot of narcotics, burglaries. High-crime area. It's one of our -- you know, most cities have a subdivision where it's, you know, not that great, and that's what area it was that day.

Q. And so this car, your -- your recruit says to you, Hey, that -- that's the car that we saw over by where the fight was, and y'all ran the plates.

A. Yes, sir.

Q. And when you ran the plates, they came back to a different car than the one you were looking at.

A. Correct.

Q. What did you do next?

A. Well, we followed it for just a second. We got to a stoplight at the corner of New Boston and Summerhill. I said, Well, we're going to make a

235

traffic stop on this since it's, you know, fictitious. We activated our lights. It pulled over to the corner of Melton and MacArthur, which is not, you know, far away from the point where we activated our lights.

I approached the driver's-side door and made contact with Mr. Broadnax. He was operating the vehicle. I asked him for his driver's license and insurance. He said he didn't have anything, no --

Q. I'm going to stop you there one more time.

A. Okay.

Q. When you say Mr. Broadnax, do you see the gentleman that was driving that vehicle when you pulled it over?

A. Yes, sir.

Q. And he identified himself to you as James Broadnax?

A. Yes, sir.

Q. Do you see him in the courtroom today?

A. Yes, sir.

Q. All right. Is his appearance different today than it was when you saw him back on June 19th?

A. Yes, sir.

Q. And how is it different?

A. His hair was longer. He was wearing a hat with hair coming out of the sides. He was -- T-shirt

236

and blue jeans.

Q. And if you will, are you referring to the gentleman that's seated directly in front of me?

A. Yes, sir.

MR. ALEX: May the record reflect that the witness has identified the defendant in open court?

THE COURT: Will there be objection?

MR. LOLLAR: No, Your Honor.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) So the defendant gets out of the car.

You know, why don't we do this, Off. Johnston. The -- this stop was captured on videotape; is that correct?

A. Yes, sir.

Q. And before I -- before we -- before we look at that, let -- you -- you've had an opportunity to look at that video; is that correct?

A. Yes, sir.

Q. All right. And is it -- when you looked at it, did it accurately capture the events that happened out there after you turned on your lights and the camera?

A. Yes, sir.

Q. Is there anything about that when you looked

237

at it that you'd say this is different or altered in any way?

A. No, sir.

Q. Now, the -- the actual sound on the video itself, -- sorry.

MR. ALEX: May I approach the witness, Judge?

THE COURT: Yes.

Q. (BY MR. ALEX:) The actual sound on the video comes on in the middle of it; is that right?

A. Yes, sir.

Q. Okay. And that's no -- you don't control -- you weren't controlling that at the time, were you?

A. No, sir. When we activate our master switch on our -- you know, to turn on the lights, it's supposed to automatically come on. Sometimes it does, sometimes it doesn't. We used some of our older equipment that we had that day. I believe I was driving Unit 277. My normal car is 275.

Q. Okay.

A. And so it's, you know -- and when you're talking, I want you to pretend like that -- that lady all the way in the back over there is trying to hear you, okay?

A. Okay.

238

Q. All right. Very good.

Now, State's Exhibit 402, you had a chance to -- to view this yesterday?

A. Yes, sir.

Q. Okay. Did you guys come into town yesterday?

A. Yes, sir.

Q. All right. How did y'all get here?

A. We drove in from Texarkana.

Q. All right. How long does it take to drive from Texarkana to Dallas?

A. Um, about two hours and 45 minutes, you know, speed limit, traffic.

Q. So it took y'all what, about two hours, hour and-a-half?

A. No, it took us about two hours and 30, 45 minutes.

Q. Okay. All right. Now, let's say I'm -- let's say I'm the defendant and I'm leaving Dallas and I'm going to Texarkana, you're saying it's probably anywhere from two hours and 45 minutes to a three-hour drive, depending on what part of Dallas.

A. Yes, sir, depending on traffic and, I mean, I've been down here before where traffic's bad, so ...

Q. And State's Exhibit 402 is a fair representation of your stop that you're telling the

239

jury about; is that correct?

A. Yes, sir.

MR. ALEX: We'd offer State's Exhibit 402 for all purposes, and may the record reflect, Your Honor, the exhibit has been tendered to opposing counsel previously.

MR. LOLLAR: We have no objection.

THE COURT: State's Exhibit 402 is admitted and you may publish.

Q. (BY MR. ALEX:) Okay. Off. Johnston, what we'll do is if we turn the volume up on this, we're just going to hear a bunch of static, aren't we?

A. Yes, sir. We wear a belt pack and the microphone is part of the belt pack and it rubs, and there's a lot of -- it -- it's hard to decipher sometimes.

Q. All right. So what we'll do is I'm going to turn the volume down on it and then I'm going to have you sort of narrate to the jury what's going on, that way they only have to hear it once, okay?

A. Okay.

Q. And in a second it will come up on that screen, and any of these screens up here you can look at, is that okay?

A. Yes, sir.

240

Q. All right. And so the question that I'll be asking you is, describe for the jury what they're seeing on the -- on the video. Is that okay?

A. Yes, sir.

Q. And if at any time you need us to pause it, would you let me know?

A. Yes, sir.

Q. All right.

(Videotape played.)

A. This is the initial -- when you hit the master button, it activates the lights and it's supposed to activate the sound. This is the corner of Melton and MacArthur Street.

Q. And there will be times when I'll stop it and I'll ask you questions as well. Okay?

A. Yes, sir.

(Videotape played.)

Q. You're in the car right here in which we're looking. Okay, is that you?

A. Yes, sir.

Q. All right. What's going on right now?

A. I'm approaching the driver's side and I'm making contact with the actual driver of the vehicle. I asked him for his driver's license and insurance.

And he's telling me he doesn't have any at the

241

time. Automatically, any time that happens, I have them step out to get further information.

Due to the fact it was fictitious tags on the vehicle, you know, I always have somebody step out.

The passenger was attempting to get out and I asked him to just stay in the car.

I believe Off. Thompson is right on the other side. You can kind of see him right here talking.

Q. Okay. And is that the officer that was with you?

A. Yes, sir. That was a recruit, Off. Thompson, at the time.

Q. Okay. I'm going to ask the --

MR. ALEX: Mr. Hikel, would you pause it there?

Q. (BY MR. ALEX:) When the -- When the def -- when the person who got out of the car right here, is this the person you identified as James Broadnax?

A. Yes, sir.

Q. And did he have a ponytail hanging out the back of his hat? And we'll see it in a second, but his hair is a lot longer than it is now?

A. Oh, yes, sir.

Q. Okay. When you pull a -- a vehicle over such as this, are you trained to look for signs of

242

intoxication?

A. Yes, sir. When they make contact with you, you know, we look for smell. I mean, smells, bloodshot eyes, slurred speech.

Q. And if you saw any of that in this case, would you have made note of it?

A. Oh, yes, sir.

Q. All right. And the jury has got to see the defendant get out of the car and walk to the back. Now, other than having to pull his pants up from around his, wherever it was, and walk back there, he wasn't stumbling as he was walking, was he?

A. No, sir.

Q. And he was actually doing a pretty good job, considering his pants were sagging.

A. Yes, sir.

Q. All right. Did you smell any marijuana in the car?

A. No, sir.

Q. Did you smell any alcohol on his breath?

A. No, sir.

Q. Did you make any note of his eyes being bloodshot?

A. No, sir, I --

Q. And is the timestamp on this tape, -- and if

243

you don't want to whip your head around, you can see it right there as well. Does it have a timestamp on it? Or is it hard to see?

A. Yeah, it's 1952. Military time would be 7:52.

Q. 7:52 p.m.?

A. P.M.; yes, sir.

Q. And do you think that that was working accurately?

A. Yes, sir.

Q. Okay. And -- and so at 7:52 p.m. on June 19th, the defendant's getting out of the car and you don't see any signs of intoxication at all.

A. No, sir.

Q. All right. Tell me what's going on here at the back of the vehicle.

A. Um, I'm asking Mr. Broadnax his name, you know, trying to get some information. His date of birth, full name.

He gives me his full name. You know, I'm talking to him about who the car belongs to, who -- you know, where he got it and whatnot. Just kind of making conversation with him.

Q. He -- did he indicate to you at all that this was his car?

A. He had -- he told me that he got it from a

244

friend of his that lived in San Antonio and they had been in town at the time. He didn't really go into much detail.

Q. And -- and -- and let's be fair about any of the statements that he gave to you. Would you have any independent recollection of those statements as you sit here today or would you -- your recollection be based on the report that you wrote?

A. Just the report I wrote. It's been awhile back.

Q. And you've reviewed that report; is that correct?

A. Yes, sir.

Q. And the statements that you're giving to the jury are the ones that you would have included in your report and reviewed.

A. Yes, sir.

Q. All right. So, he told you he had gotten the car from somebody -- a friend of his out of San Antonio?

A. In San Antonio --

Q. All right. Okay.

A. -- is what I recall him saying.

Q. And we're going to roll the -- the rest of the video.

245

MR. ALEX: Mr. Hikel.

A. We continue on talking. Just basic conversation.

Q. (BY MR. ALEX:) Is the defendant's speech, is it -- is it normal?

A. Oh, yes, sir. He was real calm.

Q. Calm?

A. He was polite. And he -- yes, sir; no, sir. He never got agitated or anything.

This is Off. Brower. He was the backup unit that pulled up to assist.

I asked him to identify the passenger, the front-side passenger and the rear passenger.

Q. And what we see here is a young man who appears to be pretty collected; is that right?

A. Yes, sir. He wasn't shaking or -- you know, sometimes when we talk to people on a traffic stop they'll get real nervous, sweat, and -- and stuff.

Q. And he didn't show any signs of that.

A. No, sir.

Q. And in hindsight, you know at this point that he had -- he had committed a double homicide that same day.

A. No, sir.

Q. Okay.

246

A. Now I'm patting him down for weapons or anything. He -- due to the area, the fictitious tags on the vehicle, you know, just basic Terry frisk to pat for weapons.

When I got to his back pocket I felt what appeared to be a driver's license. I asked him if I could remove it. When I did remove it, it was an Arkansas high school ID card with his name on it.

THE COURT: Hold on a second, sir.

The jury doesn't know what a Terry frisk is, so have him explain that.

Q. (BY MR. ALEX:) Okay.

A. A Terry frisk is basically a pat for weapons when you believe that, you know, they might be armed or something. It's just for an officer safety, a pat down.

This -- Off. Brower over here is -- I'm continuing to talk to him. Off. Brower is getting the information and patting these subjects, also conducting a Terry frisk on them.

Q. Are any of these guys showing any signs right now of nervousness at all?

A. No, sir. I was mainly talking to Mr. Broadnax. I didn't really speak to Mr. Cummings or Harris at the time.

247

Q. And is Mr. Broadnax smoking a cigarette there? Can you tell?

A. I can't really tell if he's smoking one at the time or not.

Q. But at this point he's not under arrest; is that right?

A. No, sir.

Q. And you wouldn't have been stopping him from smoking if he wanted to?

A. No.

Q. Okay.

A. I had walked around to -- my recruit, Off. Thompson, was at the rear of the vehicle. I had walked around to give him the information on Mr. Broadnax so he could check warrants, to see if they had any outstanding warrants.

Q. And as we see here, there's no sway, there's no jumping around. He's not cussing you or anything like that, is he?

A. No, sir.

Right now, we're just waiting for information, which is our -- the -- the people who check warrants for us at Bi-State, they communicate by radio. It takes a little bit of time to go get a warrant checked through the computers.

248

At this point, I believe I'm stepping back to speak with Off. Thompson. He's in training right now, so I'm pretty much having to supervise what he's doing at the time to make sure it's appropriate. Or the correct procedure.

Q. Did you have any idea that this car that these guys were sitting on didn't even belong to them? Did you have any idea of that?

A. No, sir.

Q. You knew at least that the plates didn't match the car. You knew at least that much; is that correct?

A. Yeah, correct.

I kind of went on his word at the time that he was borrowing it from a friend. Maybe he wasn't aware of it that the -- the plates had changed, because he never mentioned anything about it.

Off. Brower is searching the car right now. He gave us consent, you know. Due to the fact there was fictitious tags on it, I asked him for consent to search the vehicle for any, you know, weapons, drugs, narcotics, whatnot, and he gave permission.

Q. So what's going on here with all the hand movements, is he talking to the other two guys out there?

A. I believe he was. Like I say, I was at the

249

back of the car with Off. Thompson.

We're still waiting on the return, a warrant return to see if they have any warrants.

This is Off. Sutton. He had -- he really -- he showed up to make sure -- there were three subjects out there. He kind of showed up to make sure that there wasn't any -- going to be any problems. He didn't talk to anybody. He just kind of stayed there for officer safety.

Q. And we kind of described a little bit about what the sound would be like if we turned it up. At this point we're going to turn it up just a little bit to give the jury some understanding of why we've got it turned down right now.

A. Okay.

Q. You can't -- you can't really distinguish what people are saying at this point, can you?

A. No, sir. It's -- unless you're standing still and somebody's speaking real loud, it's just hard to make out.

I think this is Mr. Cummings. He walked up to give Mr. Broadnax a cigarette at that time.

Q. Mr. Cummings or Mr. Harris?

Mr. Cummings would be the one with the do-rag on or with the tank top, do you recall?

250

A. I don't remember exactly which one was what.

Q. Was your primary focus with Mr. Broadnax?

A. Yes, sir.

Q. Okay. We're going to kind of fast forward just a little bit.

What's the next thing significant that happens? Do the warrants come back?

A. Yes, sir. Information channel advised that they had warrants on all three subjects and that they were valid and they had them in hand.

Our -- any time we have warrants, unless they're out of state or from another agency, they can walk back to records which is -- and pull them out of a file cabinet to make sure they are valid and they have a hard copy and it wasn't a mistake in the computer.

Q. All right. And the warrants that were valid on the defendant, did you make note in your report of what kind of warrant that was and what the warrant number was?

A. Yes, sir.

Q. Do you have the report up there with you?

A. No, sir.

Q. Would you know the exact warrant number off the top of your head?

A. No, sir.

251

Q. All right.

A. At this point, we -- we had got confirmation on the warrants, on all three of them.

This is Off. Brower. Sorry. He steps up and he handcuffs Mr. Broadnax at the time.

I had walked over behind them and assisted Off. Thompson, and Off. Sutton was handcuffing the other two subjects.

Mr. Broadnax was taken to Off. Brower's car and Mr. Cummings was taken to our patrol vehicle, which is the one with the video. And Mr. Harris was taken to Off. Brower's vehicle.

Q. So after the warrants were confirmed, did y'all separate them?

A. Yes, sir.

Well, no. We put Mr. Broadnax and Harris in -- into one car, which was Off. Brower's, and Mr. Cummings was in our vehicle.

Q. And the car that Mr. Broadnax and Mr. Harris was in, did you capture any conversation that would have taken place in the back of that car?

A. No, sir.

Q. Okay. At this point, what are we -- what are y'all thinking is going on with this vehicle here?

A. Not much. We're thinking that it's just a

252

routine traffic stop where he maybe switched tags. We still haven't run the VIN number. We had just taken them in for some misdemeanor warrants --

Q. Okay.

A. -- at that time.

Q. And what's the next significant thing that happens out there?

A. At this -- you know, we've got them secured for the warrants and I approached the front of the vehicle where the VIN number's located by the driver's-side windshield, front windshield right here to get the motor vehicle registration and the VIN number, which is located directly under it.

Off. Brower and Officer -- his recruit officer at the time, Shermer, began to search the vehicle.

And this is me to the left. This is Off. Brower. He gets the keys, he does an inventory search of the vehicle.

Any time we arrest people out of the vehicle, if we don't have anybody to release it to, we immediately take them and have the vehicle impounded at our lot.

I'm getting the information, the VIN number, and the -- off the motor vehicle registration.

Q. Okay.

253

A. And also on the motor vehicle registration in Texas, it has the actual license plate that's supposed to be on the vehicle. It's supposed to on -- be displayed on the vehicle at the time.

Q. Okay. All right. And when you're running these things, when you get the -- this vehicle information number and the other information you're getting, what do you do with it?

A. We usually run it on our information channel, but I believe they were busy that day, so I had come back to my car and used my in-car computer. We're -- we're able to run license plates and pull warrant checks through NCIC, which is the National Crime Information Center, through our lap -- or mobile computers.

Q. And when you ran this VIN number on the car here, this Crown Victoria, what was the result of that?

A. It takes a few seconds to come back with a -- with a return, and what had happened is the initial screen showed up from an NCIC hit, which is any criminal information on the vehicle. It showed that it was involved in a homicide in Garland. It belonged to a victim of a homicide.

Q. And once you -- once you received that information, what did you do?

254

A. Well, I walked up and I told Off. Brower exactly what was, you know, going on, and I got an NCIC hit that, you know, said it was involved in a homicide. We were discussing it for a second and walked back up to the front of the car and had our information channel run it just to make sure I had ran the accurate tag. Double-checked the VIN. You know, at first I thought it was a mistake.

Q. So did this routine traffic stop just turn into something else?

A. Yes, sir.

Q. So what did you guys do in response to that -- let me ask you that before we move off of this subject.

When you -- when you ran the plates, did the plates come back to a Dymon --

A. Smith.

Q. -- Smith?

A. Yes, sir. It was out of Dallas, Texas. I don't remember the exact address. I noted it in my report.

It -- it came back to a '91, 1991 Cadillac four door, which obviously it's not a Cadillac, it's a Ford F1 -- or a Ford Crown Vic. I believe it was a '95 model.

We're discussing right here, you know, when I

255

told him exactly what had happened, we immediately stopped searching the vehicle.

I had called my lieutenant to let him know about it. This is not something we run into every day, so it's -- it was kind of like a shock to all of us.

Q. And so when you -- when you received that information, the crime scene had just turned into something a lot more serious.

A. Yes, sir.

Q. And how many capital murders had you worked up to that point?

A. None at all.

Q. Okay. So you were getting some advice --

A. Yes, sir.

Q. -- on what to do next.

A. Yes.

Q. All right.

A. We had -- we're are kind of discussing it right now, calling the Lieutenant, who's calling other people; have him respond to the scene.

I think shortly they lock up the vehicle or -- or stop their search.

Q. And I believe if we continued looking at this video, which the jury certainly can at any point, what we're going to see here is the crime scene at this

256

point is halted.

A. Yes, sir.

Q. You guys do not do anything else with any of the property in the car; is that correct?

A. No, sir.

Q. And when you -- when you get the advice of what to do next, is this vehicle ultimately taken from this crime scene and -- and stored?

A. Yes, sir. After, you know, a little while, what we had initially did is when we found out they were wanted for, you know, -- in a vehicle that belonged to a homicide, we separated them all.

We had another officer respond to the scene, and that way we had each one in a separate vehicle. Cummings was still in my vehicle, and I think the other two were transported immediately to Bi-State to our criminal investigation division in our interview rooms. They were --

Q. So they were taken from the scene to interview rooms at y'all's station.

A. Yes, sir.

Q. And the defendant was as well.

A. Yes, sir.

Q. And what happened to the car? Did y'all leave it there unattended?

257

A. No, sir. We stayed with it the entire time until the wrecker driver got there.

Q. Anybody put anything in it or take anything out of it?

A. No, sir.

Q. Okay.

A. I believe at one point when they were searching the trunk, if you had to back it up a little bit, you could see Off. Brower and Off. Shermer searching the trunk. This is before they discovered it was -- was involved in a homicide. They were checking the bags and everything. They found a CDL and a Scream mask from the movie, the ones that go over your face, which they found a little suspicious. They never removed it, took it out. And they -- as soon as I told them it was involved in a homicide, they -- they put it back in and just halted what they were doing.

Q. And let me -- let me just ask you this: You -- what kind of a license did you say?

A. It was a CHL, concealed handgun license.

Q. Okay. And was the person's named on it Stephen Swan, do you recall?

A. I believe the last name was Swan.

Q. Okay. So whatever it was --

A. Yeah.

258

Q. Okay. It stayed in the car after y'all realized this was a homicide, potential homicide involved vehicle, and nobody would have taken anything out or added anything to that trunk; is that correct?

A. No, sir.

Q. And when you -- were you there when the wrecker came to tow the car off?

A. Yes, sir. Me and recruit Off. Thompson stayed there the entire time. They used a rollback wrecker, hooked it up from the front, pulled it directly on the flatbed and drove it straight to the Bi-State.

We followed them in. We let them in with our vericards, which is the access to the underground park. Only police officers and anybody that works at Bi-State has access to it.

When we got into the Bi-State, they unloaded it. At that time, crime-scene tape was put up around it and officers stayed with it the entire time.

Q. Okay. I'm going to stop you there for one second. If we -- if we turned the tape off at this point, we're not going to miss much more, other than just watching the crime scene here. Nothing else significant happens here, does it?

A. No, sir. They were all in custody.

Q. Okay.

259

A. We didn't talk to them or question them at any time out there.

Q. All right. And so you were there when the car was taken.

A. Yes, sir.

Q. And you can say that from the time you stopped the car until the time it got to the wrecker, that it hadn't been tampered with at all.

A. No, sir.

Q. Now ultimately, while you were out at the scene, did you talk to any of the detectives back here in the Dallas/Fort Worth area?

A. I talked to Det. Sweet. He was the contact person on the NCIC hit.

Q. Tell the jury how that happens. If you're looking at a computer and you see this, how do you -- is there a phone number that comes up on the computer?

A. It -- it depends. It had basic information. The description of the car. And under comments, I believe it had been involved in a homicide --

MR. LOLLAR: Objection to hearsay, Judge.

A. -- in Garland.

THE COURT: Sustained.

Ask another question.

Q. (BY MR. ALEX:) The question that I was asking

260

you, sir, is you're looking at a computer screen; is that correct?

A. Yes, sir.

Q. And how did you know who to call? Was it by looking at what was on the computer screen?

A. Yes, sir. His number was in -- on the computer screen.

Q. Okay. And you dialed that number.

A. Yes, sir.

Q. And you got ahold of Det. Sweet.

A. Yes, sir.

Q. And when you talked to Det. Sweet, did they ultimately come out and pick up the car?

A. Yes, sir.

Q. Was that a result of your conversation with him?

A. Yes, sir.

Q. Okay. And so what did he say to you?

A. Um -- he filled me in on the --

MR. LOLLAR: Objection to hearsay, Judge.

THE COURT: Hold on.

Response?

MR. ALEX: Judge, we'll offer it for the limited purpose to show what the response was to these officers from Det. Sweet's conversation.

261

THE COURT: The objection's overruled.

Q. (BY MR. ALEX:) Okay. You can -- you can answer it.

A. He -- he had filled me in that they had a double homicide.

I told him we had the vehicle; that when I ran the tag, it came back to a homicide victim, and kind of explained to him who we had in custody.

And that's when he said, you know, Let me call you right back and --

Q. Okay. And did -- did ultimately, did you speak to him and did they make arrangements to come and pick up the vehicle?

A. Yes, sir.

Q. Okay. When they were -- when they came to pick up the vehicle, did you have any other contact with the defendant, James Broadnax?

A. No, sir. He was in an interview room and I never -- I was working on paperwork and I never spoke to him any.

Q. What about Demarius Cummings, did you have any other contact with him?

A. No, sir.

Q. What about Lonnie Adams?

A. No, sir.

262

Q. And so after you were able to reach Det. Sweet, they were able to arrange for the car to be picked up and brought back to Garland.

A. Yes, sir.

MR. ALEX: May I approach the witness, Judge?

THE COURT: Yes, sir.

How much longer do you have with this witness?

MR. ALEX: Not very much, sir. I've got three documents and clarification of a name. Do you want to take a break first or --

THE COURT: Yeah. We'll take a recess until 3:00 p.m.

All rise for the jury.

We're in recess until 3:00 p.m.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT: That's the extent of the statements, right, Mr. Alex? Mr. Alex?

MR. ALEX: Yes, sir.

THE COURT: Okay. Was there any objection?

MR. LOLLAR: No, sir.

THE COURT: Okay. Ready to go.

263

THE BAILIFF: All rise.

(Jury present.)

THE COURT: Be seated, please.

You may continue with your witness whenever you're ready, Mr. Alex.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**JEFF JOHNSTON**

was re-called as a witness and testified as follows:

**DIRECT EXAMINATION - CONTINUING**

BY MR. ALEX:

Q. All right. State your name again.

A. **Off. Jeff Johnston.**

Q. All right. And, Off. Johnston, did I provide you with a copy of your report?

A. Yes, sir.

Q. Okay. And for the record, did we mark that as State's Exhibit 540?

A. Yes, sir.

Q. And you told the jury earlier that when you stopped this Crown Victoria, that the defendant was driving; is that correct?

A. Yes, sir.

Q. And that he had warrants out, or at least a warrant?

264

A. Yes, sir.

Q. And did you put the warrant number in your report?

A. Yes, sir.

Q. You have that report with you. Can you tell the jury what that warrant number was?

A. **It was Number 06-CR-01090. It was for a possession of tobacco by a minor.**

Q. Okay. And --

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) And we're looking at State's Exhibit 398. Have you had an opportunity to compare the warrant number on State's Exhibit Number 398?

A. Yes, sir.

Q. And is it the same as the warrant number that you arrested the defendant on?

A. Yes, sir.

Q. Okay. And so the jury knows, you don't have in your hand a -- a physical paper warrant when you arrest them out at the scene; is that right?

A. No, sir.

Q. No --

A. **They keep them all stored up at the Bi-State.**

Q. But you get a confirmation, and through

265

contact through the computer, and through verbally contacts that tell you there's a good warrant.

A. Yes, sir.

Q. Is that right?

A. **The dispatcher checks it through the computer and then gets a hard copy, which is that right there.**

Q. All right. And I'm going to show you State's Exhibit 399. Is this the certified copy of the title history from the Texas Department of Transportation?

A. Yes, sir.

Q. And does it bear on it a VIN number on the second page of State's Exhibit 399?

A. Yes, sir.

Q. And did you put the VIN number of the vehicle, the Crown Victoria that you stopped, in your report?

A. Yes, sir.

Q. It's a pretty long number?

A. Yes, sir.

Q. And I'm going to ask you to compare the VIN number on State's Exhibit 399, the certified copy, with what you have in your report and tell me if it's the same.

A. **(Examining document.) Yes, sir, it's the same number.**

Q. All right. And finally, I'm going to ask you

266

to take a look at State's Exhibit 400, which is another certified copy of a public record by the Texas Department of Transportation, and does the second page of that, does it bear a -- a license plate number?

A. Yes, sir.

Q. And I'm going to ask you to -- did your report include the license plate number of the Crown Victoria when you pulled it over?

A. Yes, sir.

Q. I'm going to ask you to compare the plate number off of this certified copy of State's Exhibit 400 with the plate number in your report.

A. **It matches.**

Q. All right.

MR. ALEX: At this time, Judge, we're going to offer 540 for the record. That's the officer's report. And we're going to offer State's Exhibits 398, 399 and 400 for all purposes.

And may the record reflect they have previously been tendered to opposing counsel?

MR. LOLLAR: No objection.

THE COURT: State's Exhibits 398 through 400 are admitted for all purposes.

State's Exhibit 540's admitted for record purposes only.

267

MR. ALEX: Permission to publish and summarize, sir?

THE COURT: Yes, sir.

MR. ALEX: Folks, State's Exhibit 398 is a warrant for James Broadnax for possession of tobacco by a minor. It bears a case number on it, which is the warrant the defendant had been arrested on out at the scene.

State's Exhibit 399 is a certified copy of a title history for a vehicle with a VIN number that matches the VIN number of the vehicle that the officer pulled over, and it is registered to a Jean and Craig Swan in Salina, Texas.

And State's Exhibit 400 is another certified copy of a public record from the Texas Department of Transportation, and on the second page of it, it shows that the license plate that was on the car, the Crown Victoria that was stopped, was actually registered to a Dymon Smith. Not Dalmond, but Dymon Smith, at 2250 Dathe in Dallas, Texas.

That's all I have, Judge. I'll pass the witness.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

268

Q. Just a couple of questions, Off. Johnston, if I could.

A. Yes, sir.

Q. Now, you had talked about you and Off. Brower who was with you and out in that neighborhood because there was some kind of disturbance going on with some other people; is that right?

A. Yes, sir.

Q. And that had nothing to do with this car in which Mr. Broadnax was, and Mr. Cummings, and Mr. Harris.

A. No, sir. It was just seen in the area by my recruit officer.

Q. Right. They just happened to be driving through and there was this other deal going on that involved your officers.

A. Yes, sir.

Q. And then I think it's now clear that the outstanding warrant that you arrested Mr. Broadnax on was a minor in possession of tobacco?

A. Yes, sir.

Q. Okay.

MR. LOLLAR: That's all the questions we have. Thank you.

THE COURT: Any redirect?

269

MR. ALEX: Nothing further for this witness, Judge.

THE COURT: May the witness be permanently excused?

MR. ALEX: We have no objections.

MR. LOLLAR: Yes, sir.

THE COURT: You're permanently excused, Officer.

THE WITNESS: Thank you.

THE COURT: Thank you for your testimony. What further says the State?

MR. ALEX: The State would call Ellen Goldberg.

THE COURT: Ellen Goldberg. Officer, you are reminded it's a three hour and 45 minute drive back to Texarkana.

MR. ALEX: May we approach, briefly, Judge?

THE COURT: Mr. Lollar?

(Off-the-record discussion was had.)

THE COURT: Ms. Goldberg, please come to the front of the courtroom up by the door up here. All the way to the front.

Turn and face me and raise your right hand.

270

**ELLEN GOLDBERG**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Your Honor.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, ma'am.

A. Ellen Goldberg.

Q. And, Ms. Goldberg, tell the jury what you do for a living.

A. I'm a reporter for Channel 5.

Q. Okay. How long have you been a reporter -- in the business of reporting?

A. About eight years.

Q. How long have you been with Channel 5?

A. A little over two years.

Q. And who did you work with before you went to Channel 5?

A. A station in Albuquerque, New Mexico.

Q. All right. And you know why you're here; is

August 10, 2009

271

that correct?

A. Yes, sir.

Q. We're going to go right to June 23rd of 2008.

Did you have occasion to interview a young man by the name of James Broadnax?

A. Yes, sir.

Q. Do you see him in the courtroom today?

A. Yes, sir.

Q. Would you point to where he's sitting and describe an article of clothing?

A. He's sitting right there in a tan shirt.

Q. Okay. And is he the gentleman that would be sitting directly in front of where I'm standing now?

A. Yes, sir.

MR. ALEX: May the record reflect that the witness has identified the defendant in open court?

THE COURT: Is there any objection?

MR. LOLLAR: No, Your Honor.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) Now, Ms. Goldberg, I want to talk to you a little bit about how the interview came about, okay?

Tell the jury typically how it works when someone is in jail that you-all may want to interview, how do you get from Point A to Point B?

272

A. Um, our assignment desk, who's in charge of handing out the assignments for the day, usually put -- in a big arrest, goes ahead and automatically files those requests with the jail, and if they come through and the person accepts the request, then someone will call me and say You need to go to the jail at this time.

Q. Okay. So someone will have their eye out for potentially someone that the public may want to hear from at the station, and they'll do the paperwork and then they'll notify you of when and where to go.

A. Yes, sir.

Q. In this case, were you notified that you could go out to the Dallas County jail and speak to James Broadnax and Demarius Cummings?

A. Yes.

Q. And when you went on this particular day, did you go alone?

A. No. I was with a photographer.

Q. And when you -- when you got to the Dallas County jail, can you tell the jury, did you meet with anybody in particular who sort of was the go between, between you and the inmate?

A. Kimberly Leach.

Q. And what was her position?

273

A. She's a public information officer for the Sheriffs Office.

Q. And is that someone you know on sight when you see her?

A. Yes.

Q. Very good.

And when you met with Kimberly Leach, did she assist you to where you needed to go?

A. Yes.

Q. And tell the jury what happened after you met with Kimberly Leach and you -- you got the green light to do the interviews, tell the jury what you did and what happened.

A. She took us upstairs to an area to wait for our interview.

Q. And you had done interviews at the jail before.

A. Yes.

Q. And you've done them with the assistance of Kimberly Leach.

A. Correct.

Q. And did you have to wait in line to talk to the defendant, Mr. James Broadnax, or were you able to just go right in when you got there?

A. I don't recall.

274

Q. Okay. But at some point you were able to speak to Mr. Broadnax; is that correct?

A. Correct.

Q. All right. Was it face to face in the same room or was there some partition between the two of you?

A. A partition between the two of us.

Q. All right. And was the interview captured on videotape?

A. Yes.

Q. Have you had an opportunity to review that?

A. Yes.

Q. And --

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) I'm going to show you what's been marked as State's Exhibit 18. Have you had an opportunity to review that?

A. Yes.

Q. Okay. And -- and you hesitated a little bit. You were in a hearing once before; is that correct?

A. That's correct.

Q. And if I represented to you that State's Exhibit 18 is the same tape, would you have any reason to doubt that?

August 10, 2009

275

A. No, sir.

Q. Okay. Very good.

The tape that's State's Exhibit 18, did it capture substantially everything that happened between you and Mr. Broadnax?

A. Yes.

Q. And prior to you talking to Mr. Broadnax, did you make him any threats or offers that are not captured on this tape?

A. No.

Q. Did you do anything, or did anybody in your presence do anything to overcome his free will to talk to you?

A. No.

Q. Did you notice anybody on the other side of the glass where the Sheriff's Department personnel would be, do or say anything that would have overcome his free will?

A. No.

Q. Did you hear any screaming in the background where people were getting beat or anything like that?

A. No.

Q. Did you witness the defendant being abused in any way?

A. No.

276

Q. Very good.

Have you ever worked with law enforcement?

A. No.

Q. Were you working with law enforcement when you obtained this interview?

A. No.

Q. Did anybody from the Garland Police Department call you and maybe suggest, Hey, Ms. Goldberg, why don't you come down there and get a confession for us; did that ever happen?

A. No.

Q. Very good.

MR. ALEX: At this time, Judge, we're going to offer State's Exhibit 18.

THE COURT: Any objection?

MR. LOLLAR: Same objections we offered in the pretrial hearings, Judge.

THE COURT: And the objection's overruled.

MR. ALEX: And for purposes -- for dem -- for demonstrative purposes, Judge, we're going to offer State's Exhibit 405, which includes subtitles.

MR. LOLLAR: And same objections.

THE COURT: That objection is overruled.

State's Exhibits 405 and State's Exhibits 18 are admitted.

277

MR. ALEX: 405 for demonstrative purposes only.

THE COURT: Yes, sir.

MR. ALEX: Permission to publish?

THE COURT: Yes, sir.

MR. ALEX: May we approach just briefly, Judge? I apologize.

(Off-the-record discussion was had.)

(Videotape played.)

MR. ALEX: I'll pass the witness, Your Honor.

THE COURT: Cross-examination?

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Ms. Goldberg, just a few questions. How are you today?

A. Good. Thank you.

Q. All right. And again, I think you told us this. Your station contacts the public information officer of the Dallas County Sheriffs Office and -- Kim Leach --

A. Correct.

Q. -- and asks if you can come see him; is that about it?

A. Yes, sir.

278

Q. And then she notifies you back somehow, either by e-mail or fax, that you can.

A. Correct.

Q. And now I understand that the process you -- that you told us about before is that she somehow has somebody contact the defendant in his cell and gets him to sign off on a request form, and then that's brought back to her, and then that's when she faxes y'all saying y'all can come.

A. I don't know the specific process, but something of that nature.

Q. Well, and that's what I was going to ask you. All of that happened before you got down here; is that correct?

A. Correct.

Q. And did you and your photographer meet her down in the Sheriffs Office downstairs?

A. I don't recall.

Q. Okay. You either met her down there or over at the jail?

A. Yes.

Q. And it was through her that you were let up into the jail.

A. Correct.

Q. And do you recall what floor you were taken

August 10, 2009

279

to?

A. No, sir.

Q. Do you know whether or not it was the medical wing or psych ward?

A. No, sir.

Q. Okay. And, of course, I think you -- you don't know what was said to Mr. Broadnax by whoever went over to talk to him at the behest of Kimberly Leach.

A. Correct.

Q. Okay. And you don't know what kind of promises, or what threats, or whatever might have been said to him at that time.

A. No.

Q. Now, we see during the course of the interview you mentioned about him having a lawyer and he tells you he doesn't have a lawyer; is that right?

A. That's what he said on the tape.

Q. Is that something that you-all check on before you go over to see somebody in the jail?

A. No, sir.

Q. So whether he had a lawyer, whether he's requested a lawyer, is not something that you see as part of your job.

A. No, sir.

280

Q. Okay. And where they brought him from, you don't know where he was when they went to get him.

A. Correct.

Q. And you don't know what the psychiatrist had said about him who had interviewed him that morning.

A. No.

Q. You weren't aware that any psychiatrist had interviewed him --

MR. ALEX: Judge, I'm going to object to any further questions about -- the witness has already testified she has no personal knowledge of it, and it's already been established that she doesn't have any personal knowledge of it.

THE COURT: Sustained.

Q. (BY MR. LOLLAR:) Well, at any rate, you talked to him for what, about 15 minutes here?

A. Yes.

Q. Is that correct? Is that the time limit that Ms. Leach had given y'all to talk to him?

A. I don't recall a time limit.

Q. And among -- among the things he says to you are What evidence do they have on me? What evidence do they got on me? Remember him asking you that?

A. I just saw him ask me that, yes.

Q. Did you think it was unusual that he would not

281

be able to recognize that what he was saying to you would be evidence against him?

A. No.

Q. You didn't think that was unusual?

A. What's your question?

Q. Well, do you think it was unusual that he would not be able to recognize that confessing to you on a TV broadcast would be evidence?

A. I was simply there because he wanted to tell his story, so I was there to get what he had to say.

Q. Okay. And then he tells you, among other things, I just blanked out when that shit happened? Remember him saying that?

A. I don't know if that specifically -- no.

Q. He was talking about the robbery and the -- and the -- what happened? He said I just blanked out when that shit happened. You recall him saying that?

A. No.

Q. Okay. Now, he asks for you to make sure that this tape was seen by his family, and then about two minutes later he turns around and asks the guards there if he's told you that or not. Do you remember him saying that?

A. Yes.

Q. Okay. And speaking of that, now two of these

282

guards were in the room with him when you were doing this interview; is that right?

A. Correct.

Q. And Ms. Leach was in the room with you. Although she's not seen on camera, she was in the very same side of the cell, side of the glass in the same area there; is that right?

A. Yes.

Q. Did you hear any of them tell him that he didn't have to talk to y'all, or what he said could be used against him in court?

A. Not in my presence.

Q. Okay. And, Ms. Goldberg, let me make this clear for the record, if it's not, and for the jury. Without the Sheriff's Department help, you wouldn't have been able to get up there and see him; isn't that correct?

A. They had to submit a request form to him, correct.

MR. LOLLAR: That's all the questions we have, Judge. Thank you.

THE COURT: Any redirect?

MR. ALEX: Yes, sir.

REDIRECT EXAMINATION

BY MR. ALEX:

283

Q. Ms. Goldberg, this is going to sound kind of silly, but have you ever visited somebody in jail before, not related to the job?

A. **No.**

Q. Okay. Would -- would you be surprised that if you want to see somebody in jail you just go see them as long as you're on their visitation list?

A. **No.**

Q. Okay. And so the protocol that's in place with the sheriff's department before you guys have to see them, is sort of an extra step. Would you accept that, from what a normal person would have to do if they were just going to visit somebody in jail? Would you accept that?

A. **Different stuff, yes.**

Q. Okay. And you're not a lawyer; is that right?

A. **Correct.**

Q. And you don't purport to tell this jury that there's something wrong with you talking to an inmate that doesn't have a lawyer yet. You're not suggesting that to the jury, are you?

A. **Can you repeat the question?**

Q. You're not suggesting to the jury that there's something wrong with you talking to an inmate who doesn't have a lawyer present. You're not suggesting

284

that, are you?

A. **No.**

Q. And you're not suggesting that there's something wrong with you not warning him that this could be used against him. You're not suggesting that, are you?

A. **No.**

Q. Okay. And -- and finally, Counsel asked you some questions about -- well, let me ask it this way: Did the defendant appear to you to be answering your questions when you asked them?

A. **Yes.**

Q. You didn't ask him his name and he didn't say Buddy Buddy, did he?

A. **No.**

Q. Okay. And when he made it the -- the points that he wanted to make, he made it real clear what they were, didn't he?

A. **I think the tape speaks for itself.**

Q. Okay. Very good.

MR. ALEX: That's all I have, Judge.

THE COURT: Recross?

**RECROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Ms. Goldberg, I think Mr. Alex suggested to

285

the jury that if you want to see somebody in jail, you just show up and are allowed up to see him. That's not true at all. You've got to be on their visitation list, which can be changed out once a week. He can have five people on his visitation list, and nobody but those people on his visitation list can come up to see him. That's how it normally happens.

So, were you aware of that?

A. **I've never visited anyone in jail.**

Q. Okay.

MR. LOLLAR: That's all we have, Judge.

THE COURT: May the witness be permanently excused?

MR. ALEX: Yes, sir.

THE COURT: You're permanently excused, Ms. Goldberg. Thank you for coming down here. Appreciate your time.

Ladies and gentlemen, we have moved quicker today than I had anticipated that we would.

Therefore, I'm going to send you home in just a moment with the following instructions; that I cannot emphasize to you too much how important these are.

First, do not discuss the case with anyone. That includes your spouse or significant

286

other.

Second, make absolutely certain that you have no exposure whatsoever to the press, either by way of newspaper, television, internet, radio, whatever. No exposure.

Mr. McGaughey will take you back there in just a moment and give you instructions about where you will report tomorrow.

We're ahead of schedule, ladies and gentlemen, and I'll apprise you of where we are in the case probably tomorrow after I've talked to the lawyers some.

I'm going to ask you to be here at 8:45 a.m. tomorrow morning. Keep in mind that Dallas is the ninth biggest city in the country and that this is probably the busiest part of the ninth biggest city in the country.

It's important that y'all come down here, including the alternate jurors in the case. In the event that one of these jurors is not able to continue for whatever reason, you would be asked to step into the case so that we could avoid a mistrial. So it's incredibly important that y'all come.

Mr. McGaughey, I think, has already given you his cell phone number. He's going to ask for

287

yours, and in the event that you need our assistance tomorrow morning on getting down there, then he can help you with that.

We will be taking a lunch recess tomorrow at 11:30, regardless of how the case is going. And your lunch will be provided for you. That's from me.

So I'll ask the lawyers to remain in the courtroom.

Again, I want to thank you for your service. We'll see you at 8:45 tomorrow morning.

All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

What else do you have in your case-in-chief, Mr. Alex?

MR. ALEX: Judge, without being able to exhale first, it appears that the crime-scene investigator is probably going to take up the most time tomorrow, because there's a lot of evidence.

And between that and the experts on the DNA, and ballistics, and medical examiner, and Mr. Shaun Rabb, got a pawn shop employee, I -- I believe I can get all of that on tomorrow, but I'd hate to promise that, but I need to kind of sort of go through and see what it is specifically that I still

288

need to get accomplished.

I don't anticipate it will be much more than what I just mentioned.

THE COURT: Do parties anticipate being able to argue to the jury tomorrow?

MR. ALEX: Well, speaking for myself, I doubt that I'll be done at lunch tomorrow. And so if I'm not done until after lunch tomorrow, that would depend totally on what the defense does, Judge, I would assume.

THE COURT: Okay. Do you know what you're doing yet?

MR. LOLLAR: Well, we're going to call the medical people from the jail.

THE COURT: Right.

MR. LOLLAR: So, I think there's -- now we heard today for the first time this guy named Ridge is in the hospital, and I don't know what that's about, so I was planning on calling him, but even in his absence, we'd still have Varghese, Mirmeshdagh and Frank Layne.

THE COURT: Okay. For planning purposes, let's plan on arguing Wednesday then.

MR. LOLLAR: Okay.

THE COURT: Have the parties had the opportunity to examine the Court's proposed Charge in

289

guilt/innocence?

MR. ALEX: No, sir.

MR. LOLLAR: Mr. Parks has.

MR. ALEX: I haven't yet. Is there one here?

THE COURT: Yes, sir.

MR. ALEX: Okay. And I -- I haven't, Judge.

THE COURT: Okay. And I will tell you, I'll hear objections to that in the morning before the jury gets up here.

MR. ALEX: Tomorrow morning?

THE COURT: Yes, sir.

And also, I just wanted to let you know, as is my usual practice, I took in all -- I took out all of the heretofores and hereins and legalese like I always do.

Did you wish to be heard, Mr. Alex?

MR. ALEX: Yes, sir.

Counsel for the defense has suggested that he wanted to call mental health experts. I think that we have sort of argued the diminished capacity relevance in guilt/innocence before today. We talked about it in terms of voluntary intoxication.

I think we talked about it in terms of

290

temporary insanity, and I would think that the Court's pretty much ruled on that. And if it's going to be offered for anything other than guilt or innocence of the defendant, then we would be asking for a limiting instruction on any of that evidence if it's going to be going towards something other than guilt/innocence.

And -- and I just wanted the Court to be aware of that. We'd be asking for it prior to any expert was to testify unless the Court -- I haven't looked at it. I don't know what -- is there lessers in the Charge?

COURT REPORTER: Just murder.

MR. ALEX: Murder, okay.

THE COURT: Well, as I understood it, and I have previously ruled that evidence of diminished capacity is not admissible in the guilt/innocence phase, but I had understood you were calling these witnesses as to the issue of the voluntariness of the statement; is that correct, sir?

MR. LOLLAR: That's correct. And also to put in the part about the wet blunts.

MR. ALEX: I guess the -- the -- my only concern is, Judge, I understand, and I'll be asking for a limiting instruction on -- on that evidence as far as the mental health professionals to go towards the

August 10, 2009

291

voluntariness of the statement alone. That way, the jury's not going back there thinking they can find this guy not guilty because of this evidence. But the part about the wet blunts, we're talking about voluntary intoxication, which you've completely already ruled --

MR. LOLLAR: I have a right to talk about the condition of the mind of the accused at the time of the commission of the offense under Texas law, and I think we're clear on that. And I'm also clear that I can suggest to the jury that by voluntary intoxication, that can be considered by them as lessening the culpable mental state. That's what the court ruled.

MR. ALEX: I guess the -- the -- my concern, Judge, is when we allow evidence in that's not relevant to any issue in guilt and innocence, then if you say to the jury, You're allowed to consider that to go to the state of mind of the defendant at the time of the offense, the next question is, so what? What are you going to do? You can't find him not guilty because of it. You can't give them -- you can't -- are they saying that they could find him guilty of a murder because of it? That's diminished capacity. All it will do, will confuse the heck out of the jury as to why it's there.

THE COURT: Okay. I'll hear argument on

292

this at 8:30 a.m. tomorrow. If there's any authority supporting either one of your positions, I'd like to hear that at 8:30 a.m., keeping in mind that I have ruled that evidence of diminished capacity is not going to be admissible in the guilt/innocence phase of the trial.

Anything else from the parties?

MR. ALEX: That's all we have, Judge.

THE COURT: See you at 8:30.

We're in recess.

MR. ALEX: You know what, Judge? I'm sorry.

There was a situation, and I apologize, that came up today that I do want to put on the record at this time, and it is as it relates to the extraneous aggravated robbery that we had previously talked about that we gave notice of extraneous to this aggravated robbery and --

THE COURT: I know what it is. You were going to find out whether or not you could tie it to this defendant, whether you -- have you reached a conclusion?

MR. ALEX: No, sir, it's -- it's significantly different than that.

The victims in the -- that aggravated

293

robbery, while standing in the hall waiting to be sworn in, said to one of my prosecutors, I believe it was, that John Calhoun, who is the young man who the -- who we have been told by him, the murder weapon was given to him by the defendant, and if I'm losing the Court, I'd -- I'd repeat that if I need to.

THE COURT: No, I have it.

MR. ALEX: Okay. So John Calhoun, who was going to be a witness today, was out in the hall. The witness from the aggravated robbery, who had -- initially had said there were three men in the car and had identified the defendant and Mr. Cummings, while out in the hall, said that Mr. Calhoun was also the third person that was in the car with the defendant and Mr. Cummings when they hit that lick back three months previous.

And I don't know that it's really Brady per se, but I wanted the defense to know and I want the Court to know because it -- I don't anticipate that I'm going to be calling Mr. Calhoun without Mr. Weatherspoon. I think he was -- originally appointed him as a lawyer -- without being able to talk to him first, because I think he came in front of you and said he wanted to voluntarily testify, but because of the fact, I think we would, at the very least, need

294

to have -- I think Mr. Spoon -- Weatherspoon spoke to him today, but I think he's in a trial right now, so I haven't had an opportunity to speak to him at all about where we go from there, but I just wanted --

THE COURT: Well, but this is going to be a punishment witness anyway, right?

MR. ALEX: Actually, Mr. Calhoun would have been the young man who would have came in and said that the defendant brought the AKA assault rifle to him and he gave the defendant the murder weapon. And then after the offense, the defendant came back and got the assault rifle and put the murder weapon under his mattress. So he would have been a guilt/innocence witness, but more than likely not. He may be --

THE COURT: Well, why don't you find out tonight and give an answer for me tomorrow at 8:30.

MR. ALEX: Well, I can't tell you that I'll have an answer. I can tell you that I'm not going to be calling him without being able to -- I can tell you right now, Judge, that Mr. Weatherspoon is in a trial and he's going to have to talk to that young man before we can do anything else, but it's not going to hold up this trial, is what I can tell you.

Whether or not -- what I'm going to do with it, who knows? I don't know. I haven't had a

295

chance to really evaluate it at all. I just wanted the Court to be aware of it, and defense counsel, and have it on the record.

THE COURT: You wish to be heard, Mr. Lollar?

MR. LOLLAR: Well, you know, this is the one occurring on March the 12th, which is a month and-a-half before he got here, so, you know, and that's what their witness testified to here today, so if they persist in trying to put on evidence about an aggravated robbery which the defendant did not do because he was in Michigan on the day of the offense, and they know that, then, okay. That's fine.

THE COURT: Well, I had understood as far as guilt/innocence, it was just going to be testimony with regard to how the weapon was disposed of; isn't that right, Mr. Alex?

MR. ALEX: That's exactly right, Judge.

And, you know, I feel like I have to respond when counsel throws out innuendoes like I would try and put a case on somebody when they're not good for it, so I need to speak to that. And the fact of the matter is, the information that I have on this extraneous does not exclude the defendant.

The only information I have is a proffer

296

from defense counsel that his sister knew where he was during this time period. There's a week gap in the paperwork that shows he was not in Michigan where he's claiming he was, so I just need to make sure the record is clear with all that, in case anybody wants to read something into that.

THE COURT: Wish to be heard further, Mr. Lollar?

MR. LOLLAR: No.

THE COURT: Anything else tonight?

See the lawyers back here at 8:30.

We're in recess until tomorrow morning.

MR. LOLLAR: Judge, can we -- we had previously talked to the Court about maybe using the defense witness room to store our stuff in, rather than having to lug it around, but now the press has taken over the defense witness room.

THE COURT: You can put it in my chambers.

MR. LOLLAR: Okay. I guess we can do that.

(Off-the-record discussion was had.)

(Court adjourned.)

297

THE STATE OF TEXAS )

COUNTY OF DALLAS )

I, SHARON HAZLEWOOD, Official Court Reporter in and for Criminal District Court No. 7 of Dallas County, State of Texas, do HEREBY CERTIFY that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

Witness my hand this the 2nd day of April, 2010.

_Sharon Hazlewood_
SHARON HAZLEWOOD, CSR
Certified Shorthand Reporter
Official Court Reporter
Criminal District Court No. 7
972-739-3906
Texas CSR No. 628
Expiration Date: 12/31/10