REPORTER'S RECORD

VOLUME 46 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE CRIMINAL DISTRICT |
| | ) |
| | ) |
| | ) |
| | ) |
| VS. | ) COURT NO. 7 |
| | ) |
| | ) |
| | ) |
| JAMES GARFIELD BROADNAX | ) Of DALLAS COUNTY, TEXAS |

ORIGINAL

=================================================================

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

TRIAL ON MERITS

=================================================================

On the 11TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

A P P E A R A N C E S

FOR THE STATE OF TEXAS:

HONORABLE DAVID M. ALEX
SBOT NO. 24003256
HONORABLE LISA SMITH
SBOT NO. 00787131
HONORABLE GORDON HIKEL
SBOT NO. 00787696
HONORABLE ANDREA HANDLEY
SBOT NO. 08898800
HONORABLE ELAINE EVANS
SBOT NO. 24032880
133 N. INDUSTRIAL BLVD.
FRANK CROWLEY COURTHOUSE
DALLAS, TEXAS 75207
TEL. 214-653-3600

FOR THE DEFENDANT:

HONORABLE BRAD LOLLAR
SBOT NO. 12508700
1700 COMMERCE ST, STE. 404
DALLAS, TEXAS 75201
TEL. 214-384-8178

HONORABLE DOUGLAS H. PARKS
SBOT NO. 15520000
321 CALM WATER LANE
HOLLY LAKE RANCH, TEXAS 75765
TEL. 903-769-3120

HONORABLE KERI MALLON
SBOT NO. 24049165
DALLAS COUNTY PUBLIC DEFENDERS OFFICE
133 N. INDUSTRIAL BLVD., LB 2
FRANK CROWLEY COURT BLDG.
DALLAS, TEXAS  75207
TEL. 214-653-3550

## VOLUME 46

## TRIAL ON MERITS

AUGUST 11TH, 2009

|  | PAGE | VOL. |
|---|---|---|
| PROCEEDINGS......................................... | 3 | 46 |
| CASE CALLED BY THE COURT.................... | 3 | 46 |
| HEARING............................................... | 3 | 46 |
| JURY PRESENT....................................... | 11 | 46 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| GRUSZECKI, AMY | 12 | | | 46 |
| McNEAR, CLINT | 37 | 56 | | 46 |
| GIANNONE, ISABEL | 61 | | | 46 |

|  | PAGE | VOL. |
|---|---|---|
| HEARING............................................... | 110 | 46 |
| JURY PRESENT....................................... | 113 | 46 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| GIANNONE, ISABEL | 113 | | | 46 |

|  | PAGE | VOL. |
|---|---|---|
| HEARING............................................... | 147 | 46 |
| JURY PRESENT....................................... | 153 | 46 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| GIANNONE, ISABEL | | 154 | | 46 |
| ALLEN, SUSAN | 162 | 182 | | 46 |
| NICHOLS, JAMES | 184 | 202 | | 46 |

ii

|                              |        |        |      | PAGE | VOL. |
|------------------------------|--------|--------|------|------|------|
| HEARING......................|        |        |      | 208  | 46   |
| JUROR PATTERSON SWORN........|        |        |      | 209  | 46   |
| JURY PRESENT.................|        |        |      | 215  | 46   |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | | VOL |
|-------------------|------|-------|------|--|-----|
| RABB, SHAUN       | 216  |       |      |  | 46  |

|                              |      |       |      | PAGE | VOL. |
|------------------------------|------|-------|------|------|------|
| HEARING......................|      |       |      | 223  | 46   |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|-------------------|------|-------|------|-----|
| RABB, SHAUN       |      |       | 225  | 46  |

|                              |      |       |      | PAGE | VOL. |
|------------------------------|------|-------|------|------|------|
| JURY PRESENT.................|      |       |      | 228  | 46   |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|-------------------|------|-------|------|-----|
| RABB, SHAUN       | 229  |       | 240  | 46  |
|                   | 241  | 241   |      | 46  |
|                   | 248  |       |      | 46  |

|                                     | PAGE | VOL. |
|-------------------------------------|------|------|
| STATE RESTS CASE-IN-CHIEF...........| 252  | 46   |
| HEARING.............................| 253  | 46   |
| MOTION FOR INSTRUCTED VERDICT.......| 253  | 46   |
| MOTION DENIED.......................| 253  | 46   |
| DEFENDANT ADMONISHED BY THE COURT...| 255  | 46   |
| ADJOURNMENT.........................| 256  | 46   |
| REPORTER'S CERTIFICATE..............| 257  | 46   |

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---------|------|-------|------|-----|
| GRUSZECKI, AMY | 12 | | | 46 |
| McNEAR, CLINT | 37 | 56 | | 46 |
| GIANNONE, ISABEL | 61 | | | 46 |
| | 113 | 154 | | 46 |
| ALLEN, SUSAN | 162 | 182 | | 46 |
| NICHOLS, JAMES | 184 | 202 | | 46 |
| RABB, SHAUN | 216 | | 225 | 46 |
| | 229 | | 240 | 46 |
| | 241 | 241 | | 46 |
| | 248 | | | 46 |

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---------|------|-------|------|-----|
| ALLEN, SUSAN | 262 | 182 | | 46 |
| GIANNONE, ISABEL | 61 | | | 46 |
| | 113 | 154 | | 46 |
| GRUSZECKI, AMY | 12 | | | 46 |
| McNEAR, CLINT | 37 | 56 | | 46 |
| NICHOLS, JAMES | 184 | 202 | | 46 |
| RABB, SHAUN | 216 | | 225 | 46 |
| | 229 | | 240 | 46 |
| | 241 | 241 | | 46 |
| | 248 | | | 46 |

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 16 | BUSINESS RECORDS OF MEDIA REQUESTS - KIM LEACH | 236 | | 46 |
| 16A | EXCISED VERSION OF STATE'S EX. 16 | 237 | 237 | 46 |
| 18 | CHANNEL 5 INTERVIEW (DISK) - ELLEN GOLDBERG | | 147 | 46 |
| 20 | PHOTO ID - SWAN | | 147 | 46 |
| 21 | PHOTO ID - BUTLER | | 147 | 46 |
| 23 | CRIME SCENE PHOTO - INTERSECTION OF STATE & GLENBROOK | | 147 | 46 |
| 24 | CRIME SCENE PHOTO - LOOKING EAST | | 147 | 46 |
| 25 | CRIME SCENE PHOTO - LOOKING WEST | | 147 | 46 |
| 26 | CRIME SCENE PHOTO - BICYCLE | | 147 | 46 |
| 27 | CRIME SCENE AERIAL PHOTO | | 147 | 46 |
| 28 | CRIME SCENE PHOTO - CRIME SCENE & FIRE STATION | | 147 | 46 |
| 29 | CRIME SCENE PHOTO - HEADSHOT UP | 70 | 71 147 | 46 46 |
| 30 | CRIME SCENE PHOTO - HEADSHOT DOWN | 70 | 71 147 | 46 46 |
| 31 | CRIME SCENE PHOTO - FULL BODY POCKET | 70 | 71 147 | 46 46 |
| 32 | CRIME SCENE PHOTO - SWAN - FULL BODY TWO POCKETS | 70 | 71 147 | 46 46 |
| 33 | CRIME SCENE PHOTO - CHEST SHOT THROUGH SHIRT | 70 | 71 147 | 46 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 34 | CRIME SCENE PHOTO - CHEST SHOT UNDER SHIRT | 70 | 71 / 147 | 46 / 46 |
| 35 | CRIME SCENE PHOTO - BACK OF HEAD | 70 | 71 / 147 | 46 / 46 |
| 36 | CRIME SCENE PHOTO - SIDE OF HEAD | 70 | 71 / 147 | 46 / 46 |
| 37 | CRIME SCENE PHOTO - POOLING IN BACK - BULLET LODGED | 70 | 71 / 148 | 46 / 46 |
| 38 | CRIME SCENE PHOTO - POOLING IN BACK | 70 | 71 / 148 | 46 / 46 |
| 39 | CRIME SCENE PHOTO - RIGHT HAND | 70 | 71 / 148 | 46 / 46 |
| 40 | CRIME SCENE PHOTO - LEFT HAND | 70 | 71 / 148 | 46 / 46 |
| 41 | CRIME SCENE PHOTO - SWAN & BUTLER | 71 | 72 / 148 | 46 / 46 |
| 42 | CRIME SCENE PHOTO - BLOODSPOTS | 71 | 72 / 148 | 46 / 46 |
| 43 | CRIME SCENE PHOTO - BUTLER - POOLING BENEATH FACE | 71 | 72 / 148 | 46 / 46 |
| 44 | CRIME SCENE PHOTO - BUTLER LODGED BULLET FRAGMENT | 71 | 72 / 148 | 46 / 46 |
| 45 | CRIME SCENE PHOTO - BUTLER FACE DOWN - BLOOD POOLING | 71 | 148 | 46 |
| 46 | CRIME SCENE PHOTO - BUTLER - HEADSHOT | 71 | 72 / 148 | 46 / 46 |
| 47 | CRIME SCENE PHOTO - BUTLER - SHOULDER BULLET WOUND | 71 | 72 / 148 | 46 / 46 |
| 48 | CRIME SCENE PHOTO - BUTLER - CHEST BULLET WOUND | 71 | 72 / 148 | 46 / 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 49 | CRIME SCENE PHOTO - BUTLER - CHEST BULLET WOUND | 71 | 72<br>148 | 46<br>46 |
| 50 | CRIME SCENE PHOTO - BUTLER - ARM BULLET WOUND | 71 | 72<br>148 | 46<br>46 |
| 51 | CRIME SCENE PHOTO - BUTLER - ABOVE BULLET WOUND | 71 | 72<br>148 | 46<br>46 |
| 52 | CRIME SCENE PHOTO - BUTLER - RIGHT HAND | 71 | | 46 |
| 53 | CRIME SCENE PHOTO - BUTLER - FACE UP SPREAD EAGLE | 71 | 72<br>148 | 46<br>46 |
| 54 | CRIME SCENE PHOTO - BUTLER - LEFT HAND | 71 | 72<br>148 | 46<br>46 |
| 55 | CRIME SCENE PHOTO - MARKER 1 BULLET CASING CLOSE UP | 71 | 71<br>72<br>148 | 46<br>46<br>46 |
| 56 | CRIME SCENE PHOTO - MARKER 1 BULLET CASING - EXPANDED VIEW | 71 | 71<br>72<br>148 | 46<br>46<br>46 |
| 57 | CRIME SCENE PHOTO - MARKER 1 BULLET CASING - MIDRANGE VIEW | 71 | 71<br>72<br>148 | 46<br>46<br>46 |
| 58 | CRIME SCENE PHOTO - MARKER 2 LIGHTER - CLOSE UP | 71 | 71<br>72<br>148 | 46<br>46<br>46 |
| 59 | CRIME SCENE PHOTO - MARKER 3 BULLET CASING - CLOSE UP | 71 | 71<br>72<br>148 | 46<br>46<br>46 |
| 60 | CRIME SCENE PHOTO - MARKER 4 CIGARETTES & BLOODSTAINS | 71 | 71<br>72<br>148 | 46<br>46<br>46 |
| 61 | CRIME SCENE PHOTO - CLOSE UP CIGARETTES & BLOODSTAINS | 71 | 71<br>72<br>148 | 46<br>46<br>46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 62 | CRIME SCENE PHOTO - MARKERS 5-14 - WITHOUT BODIES | 71 | 71 72 148 | 46 46 46 |
| 63 | CRIME SCENE PHOTO - MARKERS 5-10 HIGHLIGHT 10 | 71 | 71 72 148 | 46 46 46 |
| 64 | CRIME SCENE PHOTO - MARKERS 5-9 - PROXIMITY | 71 | 71 72 148 | 46 46 46 |
| 65 | CRIME SCENE PHOTO - MARKER 5 TISSUE CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 66 | CRIME SCENE PHOTO - MARKER 6 CONDOM | 71 | 71 72 148 | 46 46 46 |
| 67 | CRIME SCENE PHOTO - MARKER 7 BULLET CASING & TWIG | 71 | 71 72 148 | 46 46 46 |
| 68 | CRIME SCENE PHOTO - MARKER 8 | 71 | 71 72 148 | 46 46 46 |
| 69 | CRIME SCENE PHOTO - MARKER 9 BULLET CASING CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 70 | CRIME SCENE PHOTO - MARKER 10 BULLET CASING CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 71 | CRIME SCENE PHOTO - MARKER 11 BULLET CASING CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 72 | CRIME SCENE PHOTO - MARKERS 11 & 12 - MIDRANGE (BENCH) | 71 | 71 72 148 | 46 46 46 |

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 73 | CRIME SCENE PHOTO - MARKER 12 SHARPIE CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 74 | CRIME SCENE PHOTO - MARKER 14 HIGHLIGHT 14 | 71 | 71 72 148 | 46 46 46 |
| 75 | CRIME SCENE PHOTO - MARKER 14 BULLET CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 76 | CRIME SCENE PHOTO - MARKER 14 BULLET MIDRANGE | 71 | 71 72 148 | 46 46 46 |
| 77 | CRIME SCENE PHOTO - MARKER 15 BEER BOTTLE | 71 | 71 72 148 | 46 46 46 |
| 78 | CRIME SCENE PHOTO - BEER BOTTLE CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 79 | CRIME SCENE PHOTO - BEER BOTTLE MIDRANGE | 71 | 71 72 148 | 46 46 46 |
| 80 | PHOTO - HANDGUN - RIGHT | 44 | 44 148 | 46 46 |
| 81 | PHOTO - HANDGUN - (SERIAL NUMBER) | 44 | 44 148 | 46 46 |
| 82 | PHOTO - HANDGUN - MIDRANGE | 44 | 44 148 | 46 46 |
| 83 | PHOTO - HANDGUN - LEFT | 44 | 44 148 | 46 46 |
| 84 | PHOTO - HANDGUN - RIGHT MIDRANGE | 44 | 44 148 | 46 46 |
| 85 | PHOTO - TOOLSET - (OPEN) | 47 | 48 148 | 46 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 86 | PHOTO - TOOLSET - (CLOSED) | 47 | 48 | 46 |
|    |            |      | 148 | 46 |
| 87 | PHOTO - CLOTHES - WHITE TANK, BLACK SHORTS | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 88 | PHOTO - CLOTHES - BLACK & WHITE SHIRT | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 89 | PHOTO - CLOTHES - BLUE BOXER SHORTS | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 90 | PHOTO - CLOTHES - WHITE SOCKS | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 91 | CLOTHES FROM CAR - MULTICOLOR "TX" HAT | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 92 | PHOTO - FILA HIGHTOPS (FRONT) | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 93 | PHOTO - FILA HIGHTOPS - SIDE VIEW | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 94 | PHOTO - FILA HIGHTOPS - SIDE VIEW - CLOSE UP | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 95 | PHOTO - FILA HIGHTOPS - SIDE VIEW - CLOSE UP (RULER) | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 96 | PHOTO - FILA HIGHTOPS - SIDE VIEW - CLOSE UP (SWAB) | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 97 | PHOTO - SIDE VIEW - CLOSE UP (SWAB) |  | 126 | 46 |
|    |            |      | 148 | 46 |
| 98 | PHOTO - WHITE NIKE HIGHTOPS (FRONT) | 124 | 126 | 46 |
|    |            |      | 148 | 46 |
| 99 | PHOTO - WHITE NIKE HIGHTOPS SIDE VIEW | 124 | 126 | 46 |
|    |            |      | 148 | 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 100 | PHOTO - WHITE NIKE HIGHTOPS - CLOSE UP - (FRONT) | 124 | 126 148 | 46 46 |
| 101 | RP .380 CASING (STREET, NORTH OF BUTLER) | | 148 | 46 |
| 102 | DNA SWAB (ITEM #7994-01) | | 148 | 46 |
| 103 | METAL LIGHTER - (PARKING LOT, NEAR RIGHT HAND OF SWAN) | | 148 | 46 |
| 104 | CIGARETTES (PARKING LOT, NEAR RIGHT HAND OF SWAN) | | 148 | 46 |
| 105 | TISSUE - (PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 106 | CONDOM - (PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 107 | RP .380 CASING (PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 108 | PROJECTILE -(PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 109 | RP .380 CASING (PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 110 | RP .380 CASING (PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 111 | RP .380 CASING (PARKING LOT, NE OF NW CORNER OF BLDG.) | | 148 | 46 |
| 112 | BLACK SHARPIE PEN - (SIDEWALK, UNDER BENCH NW CORNER OF BLDG.) | | 148 | 46 |
| 114 | PROJECTILE JACKET - (SIDEWALK, NEAR FRONT OF 806 STATE ST.) | | 148 | 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 115 | EMPTY SHINER BOCK BEER BOTTLE (UNDER BUSHES OF MEDIAN, NW CORNER OF BLDG.) | | 148 | 46 |
| 118 | RECEIPT & BUSINESS CARD (FRONT LEFT PANT POCKET - BUTLER) | | 148 | 46 |
| 119 | FOLDING KNIFE (FRONT LEFT SHIRT POCKET - SWAN) | | 148 | 46 |
| 120 | POCKET LINER (FRONT RIGHT PANT POCKET - SWAN) | | 148 | 46 |
| 121 | POCKET LINER (FRONT LEFT PANT POCKET - SWAN) | | 148 | 46 |
| 122 | POCKET LINER (REAR LEFT PANT POCKET - SWAN) | | 148 | 46 |
| 123 | CELL PHONE, TISSUE, PEN, LIGHTER, CHAPSTICK (FRONT LEFT SHIRT POCKET OF SWAN) | | 148 | 46 |
| 124 | BLOOD SWAB - BUTLER (BLOOD POOL) | | 148 | 46 |
| 125 | BLOOD SWAB - SWAN (BLOOD POOL) | | 148 | 46 |
| 126 | BLOOD SWAB (BLOOD SPATTER IN STREET BETWEEN VICTIMS) | | 148 | 46 |
| 127 | BLOOD SWAB (BLOOD SPATTER IN STREET NEAR SWAN) | | 148 | 46 |
| 128 | BLACK LONG SLEEVE SHIRT (NO SIZE) (BLACK/RED BACKPACK FOUND IN TRUNK) | | 148 | 46 |
| 129 | WHITE NIKE AIR SHOES, SIZE 10.5 (BLACK/RED BACKPACK FOUND IN TRUNK) | | 148 | 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 130 | BLACK/RED BACKPACK (TRUNK OF VEHICLE) | | 148 | 46 |
| 130A | 3 PIPES, RAG, 2 DIMES, NICKEL, CONCEALED HANDGUN LICENSE, RECEIPT | | 148 | 46 |
| 131A | BIRTH CERTIFICATE - BROADNAX | | 148 | 46 |
| 131B | USPS RECEIPT FOR BIRTH CERTIFICATE | | 148 | 46 |
| 131C | APPLICATION FOR BIRTH CERT., PAGE 1 | | 148 | 46 |
| 131D | APPLICATION FOR BIRTH CERT., PAGE 2 | | 148 | 46 |
| 131E | APPLICATION FOR BIRTH CERT., PAGE 3 | | 148 | 46 |
| 131F | JAUNITE/MONEY ORDER RECEIPT | | 148 | 46 |
| 131G | MASK | 142 | 142 149 | 46 46 |
| 131H | PICTURE | 142 | 142 149 | 46 46 |
| 131I | SPIRAL NOTEBOOK/RED | 142 | 142 149 | 46 46 |
| 131J | SPIRAL NOTEBOOK/BLACK | 142 | 142 149 | 46 46 |
| 132A | JACKET/LION LINING (TRUNK OF VEHICLE) | | 149 | 46 |
| 132B | JACKET (TRUNK OF VEHICLE) | | 149 | 46 |
| 133 | SUITCASE CONTAINING CLOTHING, ETC. (TRUNK OF VEHICLE) | | 149 | 46 |

| | STATE'S EXHIBITS | | | |
|---|---|---|---|---|
| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
| 134 | DUFFLE BAG CONTAINING CLOTHING, ETC. (TRUNK OF VEHICLE) | | 149 | 46 |
| 135 | DNA SWAB (HOOD D) | | 149 | 46 |
| 136 | DNA SWAB (HOOD E) | | 149 | 46 |
| 137 | DNA SWAB (LEFT REAR AREA) | | 149 | 46 |
| 138 | DNA SWAB (LEFT REAR QUARTER PANEL B) | | 149 | 46 |
| 139 | GRAY FILA SHOES, SIZE 13 (JAMES BROADNAX) | | 149 | 46 |
| 140 | GRAY FRUIT OF THE LOOM TANK TOP (LARGE), WHITE TANK TOP (NO SIZE), FOOT ACTION GRAY STRIPED SHIRT (SIZE 4XL), RISK JEANS PANTS (SIZE 32x32) (JAMES BROADNAX) | | 149 | 46 |
| 141 | FOUR WHITE SOCKS, PURITAN BLUE BOXER SHORTS (XL) - (JAMES BROADNAX) | | 149 | 46 |
| 142 | BLACK MULTICOLORED TX CAP (LARGE) (JAMES BROADNAX) | | 149 | 46 |
| 143 | WHITE NIKE SHOES (SIZE 10) - (D. CUMMINGS) | | 149 | 46 |
| 144 | BLACK NIKE TEAM SHORTS (SIZE XXL) (D. CUMMINGS) | | 149 | 46 |
| 145 | ADIDAS NAVY BLUE DALLAS MAVERICKS JERSEY #31 (SIZE XXL) (D. CUMMINGS) | | 149 | 46 |
| 146 | HANES WHITE TANK TOP (SMALL), MEDONA  GRAY TANK TOP (NO SIZE) (D. CUMMINGS) | | 149 | 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 147 | WHITE MARISH FRANCOIS & GIRBAUD (D. CUMMINGS) | | 149 | 46 |
| 148 | TWO WHITE SOCKS (D. CUMMINGS) | | 149 | 46 |
| 149 | TWO WHITE SOCKS (LONNIE HARRIS) | | 149 | 46 |
| 150 | TWO WHITE TOWELS (TRUNK OF VEHICLE) | | 149 | 46 |
| 151 | BUCCAL SWAB (D. CUMMINGS) | | 149 | 46 |
| 152 | TX LICENSE PLATE GVJ-961 (VEHICLE) | | 149 | 46 |
| 153 | GSR KIT (SWAN) | | 149 | 46 |
| 154 | BLOOD STANDARD (SWAN) | | 149 | 46 |
| 155 | BULLET (SWAN) | | 149 | 46 |
| 156 | NAIL CLIPPINGS (SWAN) | | 149 | 46 |
| 157 | HEAD HAIR STANDARD (SWAN) | | 149 | 46 |
| 158 | CLOTHES (SWAN) | | 149 | 46 |
| 159 | BULLET (BUTLER) | 146 | 146<br>149 | 46<br>46 |
| 160 | BULLET (BUTLER) | 146 | 146<br>149 | 46<br>46 |
| 161 | GSR KIT (BUTLER) | 146 | 146<br>149 | 46<br>46 |
| 162 | HAIR STANDARD (BUTLER) | 146 | 146<br>149 | 46<br>46 |
| 163 | BLOOD STANDARD (BUTLER) | 146 | 146<br>149 | 46<br>46 |
| 164 | CLOTHING (BUTLER) | 146 | 146<br>149 | 46<br>46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 165 | FINGERNAIL CLIPPING (BUTLER) | 146 | 146 | 46 |
|     |                              |     | 149 | 46 |
| 166 | FINGERNAIL CLIPPING (BUTLER) | 146 | 146 | 46 |
|     |                              |     | 149 | 46 |
| 167 | TAPE LIFTS FOR EXHIBITS: 21, 22, 29, 39A, 39B | 146 | 146 | 46 |
|     |                                               |     | 149 | 46 |
| 168 | TAPE LIFTS FOR EXHIBIT 28 | 146 | 146 | 46 |
|     |                           |     | 149 | 46 |
| 169 | TAPE LIFTS FOR EXHIBITS: 40A THROUGH 40D | 146 | 146 | 46 |
|     |                                          |     | 149 | 46 |
| 170 | TAPE LIFTS FOR EXHIBIT 44 | 146 | 146 | 46 |
|     |                           |     | 149 | 46 |
| 171 | TAPE LIFTS FOR EXHIBIT 45 | 146 | 146 | 46 |
|     |                           |     | 149 | 46 |
| 172 | NATHAN JOHNSON - GSR (COLLECTED BY BLUM) | | 149 | 46 |
|     |                                          | | 149 | 46 |
| 173 | PHOTO - BOTTOM NIKE SHOE (RULER) | 108 | 109 | 46 |
|     |                                  |     | 149 | 46 |
| 174 | PHOTO - BOTTOM NIKE SHOE (CLOSE UP SHOT) | 108 | 109 | 46 |
|     |                                          |     | 149 | 46 |
| 175 | PHOTO - BOTTOM NIKE SHOE (SIDE ANGLE) | 108 | 109 | 46 |
|     |                                       |     | 149 | 46 |
| 176 | PHOTO - BOTTOM NIKE SHOE (CLOSE UP - SIDE ANGLE) | 108 | 109 | 46 |
|     |                                                  |     | 149 | 46 |
| 177 | PHOTO - BOTTOM NIKE SHOE (RULER) | 108 | 109 | 46 |
|     |                                  |     | 149 | 46 |
| 178 | PHOTO - TOP & BOTTOM NIKE SHOE (SWAB) | 108 | 109 | 46 |
|     |                                       |     | 149 | 46 |
| 179 | PHOTO - NIKE SHOE (SWAB) | 108 | 109 | 46 |
|     |                          |     | 149 | 46 |

xvi

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 180 | PHOTO - TRUNK - SUITCASE WITH MASK | 108 | 109<br>149 | 46<br>46 |
| 181 | PHOTO - MASK & PIC. OF GROUP | 108 | 109<br>149 | 46<br>46 |
| 182 | PHOTO - CLOSE UP - GROUP PICTURE | 108 | 109<br>149 | 46<br>46 |
| 183 | PHOTO - SS CARD - BROADNAX | 108 | 109<br>149 | 46<br>46 |
| 184 | PHOTO - SUITCASE, SS CARD, PICTURE OF GROUP | 108 | 109<br>150 | 46<br>46 |
| 185 | PHOTO - SUITECASE, MASK, SS CARD, PIC. | 108 | 109<br>150 | 46<br>46 |
| 186 | PHOTO - SUITECASE (CLOSE UP SHOT) | 108 | 109<br>150 | 46<br>46 |
| 187 | PHOTO - SS CARD (BROADNAX) - CLOSE UP | 108 | 109<br>150 | 46<br>46 |
| 188 | PHOTO - CAR - FRONT DRIVER'S SIDE - CLOSE UP | 108 | 109<br>150 | 46<br>46 |
| 189 | PHOTO - HOOD WITH RULER | 108 | 109<br>150 | 46<br>46 |
| 190 | PHOTO - HOOD WITH RULERS | 108 | 109<br>150 | 46<br>46 |
| 191 | PHOTO - CAR - HOOD C - F | 108 | 109<br>150 | 46<br>46 |
| 192 | PHOTO - CAR - HOOD A | 108 | 109<br>150 | 46<br>46 |
| 193 | PHOTO - CAR - HOOD WITH RULER | 108 | 109<br>150 | 46<br>46 |
| 194 | PHOTO - CAR - HOOD B (CLOSE UP) | 108 | 109<br>150 | 46<br>46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 195 | PHOTO - HOOD (CLOSE UP WITH RULER) | 108 | 109 150 | 46 46 |
| 196 | PHOTO - HOOD (CLOSE UP) C | 108 | 109 150 | 46 46 |
| 197 | PHOTO - HOOD (CLOSE UP WITH RULER) | 108 | 109 150 | 46 46 |
| 198 | PHOTO - HOOD (CLOSE UP) D | 108 | 109 150 | 46 46 |
| 199 | PHOTO - HOOD WITH BLOODSPOTS | 108 | 109 150 | 46 46 |
| 200 | PHOTO - HOOD (CLOSE UP) F | 108 | 109 150 | 46 46 |
| 201 | BUCCAL SWAB (BROADNAX) | | 150 | 46 |
| 202 | BROWNING ARMS .380 CALIBER PISTOL (4407 HATCHER #149, DALLAS, TX - BETWEEN MATTRESSES IN CALHOUN'S BEDROOM) | 131 | 131 150 | 46 46 |
| 202A | DNA SWAB FROM RIGHT GRIP OF .380 CALIBER PISTOL | | 150 | 46 |
| 202B | DNA SWAB FROM LEFT GRIP OF .380 CALIBER PISTOL | | 150 | 46 |
| 202C | DNA SWAB FROM RIGHT SIDE/SLIDE OF .380 CALIBER PISTOL | | 150 | 46 |
| 202D | DNA SWAB FROM LEFT SIDE/SLIDE OF .380 CALIBER PISTOL | | 150 | 46 |
| 202E | DNA SWAB FROM TRIGGER OF .380 CALIBER PISTOL | | 150 | 46 |
| 202F | DNA SWAB FROM INSIDE BARREL OF .380 CALIBER PISTOL | | 150 | 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 202G | DNA SWAB FROM POSSIBLE BLOOD FROM LEFT SIDE OF .380 CALIBER PISTOL | | 150 | 46 |
| 202H | PACKAGE | | 150 | 46 |
| 203 | PISTOL MAGAZINE | 131 | 131 150 | 46 46 |
| 206 | PHOTO - HOOD - CLOSE UP BLOODSPOT WITH RULER | 108 | 109 150 | 46 46 |
| 207 | PHOTO - HOOD - CLOSE UP BLOODSPOT WITH RULER | 108 | 109 150 | 46 46 |
| 208 | PHOTO - LEFT REAR QUARTER PANEL WITH LABEL | 108 | 109 150 | 46 46 |
| 209 | PHOTO - HOOD | 108 | 109 150 | 46 46 |
| 210 | PHOTO - HOOD WITH BLOODSPOTS | 108 | 109 150 | 46 46 |
| 211 | PHOTO - LEFT REAR QUARTER PANEL WITH BLOODSPOTS | 108 | 109 150 | 46 46 |
| 212 | PHOTO - LEFT REAR QUARTER PANEL B & C | 108 | 109 150 | 46 46 |
| 213 | PHOTO - CLOSE UP OF BLOODSPOT | 108 | 109 150 | 46 46 |
| 214 | PHOTO - CAR - BLOODSPOTS WITH RULER | 108 | 109 150 | 46 46 |
| 215 | PHOTO | 108 | 109 150 | 46 46 |
| 216 | PHOTO OF HOOD WITH RULERS MARKING BLOODSPOTS | 108 | 109 150 | 46 46 |
| 217 | PHOTO OF FLAT TIRE - REAR DRIVER'S SIDE (CLOSE UP) | 108 | 109 150 | 46 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 218 | PHOTO OF TIRE WITH NAIL STICKING OUT | 108 | 109 150 | 46 46 |
| 219 | PHOTO OF NAIL IN TIRE (CLOSE UP) | 108 | 109 150 | 46 46 |
| 220 | PHOTO OF WHITE NIKE HIGHTOPS (CLOSE UP - RULER) | 124 | 126 150 | 46 46 |
| 221 | PHOTO OF WHITE NIKE HIGHTOPS - SIDE VIEW | 124 | 126 150 | 46 46 |
| 222 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP WITH BLOODSPOTS | 124 | 126 150 | 46 46 |
| 223 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP WITH BLOODSPOTS (RULER) | 124 | 126 150 | 46 46 |
| 224 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP - SOLE WITH BLOOD | 124 | 126 150 | 46 46 |
| 225 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP - BLOOD WITH RULER | 124 | 126 150 | 46 46 |
| 226 | PHOTO OF WHITE NIKE HIGHTOPS - DIFFERENT ANGLE - BLOOD | 124 | 126 150 | 46 46 |
| 227 | PHOTO OF WHITE NIKE HIGHTOPS - DIFFERENT ANGLE - BLOOD | 124 | 126 150 | 46 |
| 228 | PHOTO - CLOTHES IN CAR - NIKE HIGHTOPS (SWAB) | 124 | 126 150 | 46 46 |
| 229 | PHOTO - BLACK MESH NIKE SHORTS & SOCKS | 124 | 126 150 | 46 46 |
| 230 | PHOTO - KHAKI SHORTS & MAVERICKS JERSEY | 124 | 126 150 | 46 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 231 | PHOTO - WHITE & GRAY TANKS - MAVERICKS JERSEY | 124 | 126<br>150 | 46<br>46 |
| 232 | PHOTO - WHITE NIKE HIGHTOPS | 124 | 126<br>150 | 46<br>46 |
| 233 | PHOTO - BLACK ADIDAS SANDALS | 124 | 126<br>150 | 46<br>46 |
| 234 | PHOTO - TOP OF RT - BOTTOM LFT SANDALS | 124 | 126<br>150 | 46<br>46 |
| 235 | PHOTO - CLOSE UP OF BOTTOM OF SANDAL | 124 | 126<br>150 | 46<br>46 |
| 236 | PHOTO - CLOSER SHOT OF BOTTOM OF SANDAL | 124 | 126<br>150 | 46<br>46 |
| 237 | CLOSE UP PHOTO OF BOTTOM OF SANDAL (RULER) | 124 | 126<br>150 | 46<br>46 |
| 238 | PHOTO - BOTTOM SANDAL (SWAB) | 124 | 126<br>150 | 46<br>46 |
| 239 | PHOTO - WHITE SOCKS WITH BLOODSPOTS | 124 | 126<br>150 | 46<br>46 |
| 240 | CLOSE UP PHOTO - WHITE SOCKS WITH BLOODSPOTS | 124 | 126<br>150 | 46<br>46 |
| 241 | CLOSE UP PHOTO - WHITE SOCKS WITH BLOODSPOTS (RULER) | 124 | 126<br>150 | 46<br>46 |
| 242 | PHOTO OF BLUE/YELLOW STRIPED BOXER SHORTS | 124 | 126<br>150 | 46<br>46 |
| 243 | PHOTO OF WHITE TANK & BELT WITH LONE STAR BUCKLE | 124 | 126<br>150 | 46<br>46 |
| 244 | PHOTO OF WHITE TANK & BELT WITH LONE STAR BUCKLE | 124 | 126<br>150 | 46<br>46 |
| 245 | PHOTO OF BLUE JEAN SHORTS - POCKET DESIGN | 124 | 126<br>150 | 46<br>46 |

xxi

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 246 | PHOTO OF CLOTHES FROM CAR - MAVERICKS JERSEY | 124 | 126 / 150 | 46 / 46 |
| 247 | PHOTO OF SWAB | 124 | 126 / 150 | 46 / 46 |
| 248 | PHOTO OF BLACK MESH NIKE SHORTS WITH SWAB | 124 | 126 / 150 | 46 / 46 |
| 249 | PHOTO - SWAB | 124 | 126 / 150 | 46 / 46 |
| 250 | PHOTO OF CAR FRONT, LICENSE PLATE GVJ-961 | 108 | 108 / 150 | 46 / 46 |
| 251 | PHOTO OF FRONT PASSENGER SIDE OF CAR | 108 | 108 / 150 | 46 / 46 |
| 252 | PHOTO OF FRONT PASSENGER SIDE OF CAR | 108 | 108 / 150 | 46 / 46 |
| 253 | PHOTO OF REAR PASSENGER SIDE OF CAR | | 150 | 46 / 46 |
| 254 | PHOTO OF REAR OF CAR WITH LICENSE PLATE | 108 | 108 / 150 | 46 |
| 255 | PHOTO OF REAR DRIVER'S SIDE OF CAR | 108 | 108 / 150 | 46 / 46 |
| 256 | PHOTO OF DRIVER'S SIDE BACK OF CAR - FLAT TIRE | 108 | 108 / 150 | 46 / 46 |
| 257 | PHOTO OF DRIVER'S SIDE FRONT OF CAR | 108 | 108 / 150 | 46 / 46 |
| 258 | PHOTO OF FRONT DRIVER'S SIDE - SPOT ON BUMPER | 108 | 108 / 150 | 46 / 46 |
| 259 | CLOSE UP PHOTO OF REAR DRIVER'S SIDE FLAT TIRE | 108 | 108 / 150 | 46 / 46 |
| 260 | CLOSE UP PHOTO OF REAR DRIVER'S SIDE FLAT TIRE | 108 | 108 / 150 | 46 / 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 261 | PHOTO OF BACK SEAT FROM BACK PASSENGER DOOR | 108 | 108 150 | 46 46 |
| 262 | PHOTO OF BACK SEAT FROM BACK DRIVER'S SIDE DOOR | 108 | 108 150 | 46 46 |
| 263 | PHOTO OF FRONT SEAT - DRIVER'S SIDE | 108 | 108 150 | 46 46 |
| 264 | PHOTO OF CAR - STEERING WHEEL - DRIVER'S DOOR | 108 | 108 150 | 46 46 |
| 265 | PHOTO OF CAR - FRONT SEAT & STEERING WHEEL - DRIVER'S DOOR | 108 | 108 150 | 46 46 |
| 266 | PHOTO - FRONT PASSENGER SEAT | 108 | 108 150 | 46 46 |
| 267 | PHOTO - OPEN TRUNK | 108 | 108 150 | 46 46 |
| 268 | PHOTO - OPEN TRUNK CLOSE UP | 108 | 108 150 | 46 46 |
| 269 | CLOSER UP PHOTO - OPEN TRUNK | 108 | 108 150 | 46 46 |
| 270 | PHOTO - SUITCASE IN TRUNK | 108 | 108 150 | 46 46 |
| 271 | PHOTO - OPEN SUITCASE IN TRUNK | 108 | 108 150 | 46 46 |
| 272 | PHOTO - BLACK/RED BAG | 108 | 108 150 | 46 46 |
| 273 | PHOTO - NIKE SHOES, PIPES, RECEIPT & CONCEALED HANDGUN LICENSE | | 150 | 46 |
| 274 | PHOTO - WHITE RAG | 108 | 108 150 | 46 46 |
| 275 | PHOTO - CLOSE UP OF PIPES | 108 | 108 150 | 46 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 276 | PHOTO - SWAN'S CONCEALED HANDGUN LICENSE | 108 | 108 150 | 46 46 |
| 277 | PHOTO - SWAN'S RECEIPT FOR GUN | | 150 | 46 |
| 278 | PHOTO - BLACK CLOTHING, PIPE & HOUSE SHOES | 108 | 108 150 | 46 46 |
| 279 | CLOSE UP PHOTO OF HOUSE SHOES | 108 | 108 150 | 46 46 |
| 280 | PHOTO OF BLACK SHIRT | 108 | 108 150 | 46 46 |
| 281 | PHOTO OF SWAB | 108 | 108 150 | 46 46 |
| 282 | PHOTO OF SWAB | 108 | 108 150 | 46 46 |
| 283 | PHOTO OF WHITE NIKE SHOES - TOP ANGLE | 108 | 108 150 | 46 46 |
| 284 | PHOTO OF BACK OF RIGHT NIKE SHOE WITH BLOODSPOT | 108 | 108 150 | 46 46 |
| 285 | CLOSER UP PHOTO OF BACK OF RIGHT NIKE SHOE WITH BLOODSPOT | 108 | 108 150 | 46 46 |
| 286 | CLOSER UP PHOTO OF BACK OF RIGHT NIKE SHOE WITH BLOODSPOT (RULER) | 108 | 108 150 | 46 46 |
| 287 | PHOTO - BOTTOM OF LEFT NIKE SHOE | 108 | 108 150 | 46 46 |
| 288 | CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE - BLOODSPOT | 108 | 108 150 | 46 46 |
| 289 | CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE - BLOODSPOT (RULER) | 108 | 108 150 | 46 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 290 | CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE - BLOODSPOT (RULER) | 108 | 108 150 | 46 46 |
| 291 | DIFFERENT ANGLE, CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE | 108 | 108 150 | 46 46 |
| 292 | PHOTO OF CAR - REAR DRIVER'S SIDE WINDOW | 108 | 109 150 | 46 46 |
| 293 | PHOTO OF CAR - REAR DRIVER'S SIDE WINDOW (WITH MARKER & RULER) | 108 | 109 150 | 46 46 |
| 294 | CLOSE UP PHOTO OF BLOODSPOT | 108 | 109 150 | 46 46 |
| 295 | CLOSER UP PHOTO OF BLOODSPOT | 108 | 109 150 | 46 46 |
| 296 | CLOSE UP PHOTO OF BLOODSPOT WITH MARKER & RULER | 108 | 109 150 | 46 46 |
| 297 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 298 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 299 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 300 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 301 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 302 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 303 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

xxv

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 304 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 305 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 306 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 307 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 308 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 309 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 310 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 311 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 312 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 313 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 314 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 315 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 316 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 317 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 318 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

xxvi

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| | **STATE'S EXHIBITS** | | | |
| 319 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 320 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 321 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 322 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 323 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 324 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 325 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 326 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 327 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 328 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 329 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 330 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 331 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 332 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 333 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 334 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 335 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 336 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 337 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 338 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 339 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 340 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 341 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 342 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 343 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 344 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 345 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 346 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 347 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 348 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 349 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 350 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 351 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 352 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 353 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 354 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 355 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 356 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 357 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 358 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 359 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 360 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 361 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 362 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 363 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 364 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 365 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 366 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 367 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 368 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 369 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 370 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 371 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 372 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 373 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 374 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 375 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 376 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 377 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 378 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 379 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 380 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 381 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 382 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 383 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 384 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 385 | MAP | 59 | 59 | 46 |
| | | | 151 | 46 |
| 386 | MAP | 59 | 59 | 46 |
| | | | 151 | 46 |
| 387 | MAP | 59 | 59 | 46 |
| | | | 151 | 46 |
| 389 | MAP | 59 | 59 | 46 |
| | | | 151 | 46 |
| 390 | CS DIAGRAM | 93 | 94 | 46 |
| | | | 151 | 46 |
| 391 | DNA REPORT | 195 | 195 | 46 |
| 392 | SEROLOGY REPORT | 193 | 193 | 46 |
| 393 | BALLISTICS REPORT | 175 | 175 | 46 |
| | | | 182 | 46 |
| 394 | AUTOPSY REPORT | 19 | 19 | 46 |
| | | | 151 | 46 |
| 396 | BOOK-IN PHOTO - CUMMINGS | 40 | 40 | 46 |
| | | | 151 | 46 |

xxxi

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 398 | WARRANT/AFFIDAVIT - DEFENDANT - TEXARKANA | | 152 | 46 |
| 399 | TITLE HISTORY - SWAN CAR | | 152 | 46 |
| 400 | TITLE HISTORY - DYMON SMITH CAR | | 152 | 46 |
| 401 | VIDEO - CRIME SCENE | 93 | 94<br>152 | 46<br>46 |
| 402 | VIDEO - TEXARKANA TRAFFIC STOP | | 152 | 46 |
| 403 | VIDEO - CHANNEL 11 | | 152 | 46 |
| 404 | VIDEO - CHANNEL 11 - DEMO WITH TITLES | | 152 | 46 |
| 405 | VIDEO - CHANNEL 5 - DEMO WITH TITLES | | 152 | 46 |
| 406 | VIDEO - CHANNEL 4 | 229 | 230 | 46 |
| 407 | VIDEO - CHANNEL 4 - DEMO | 230 | 230 | 46 |
| 409 | AUTOPSY PHOTO OF SWAN | 19 | 19<br>152 | 46<br>46 |
| 410 | AUTOPSY PHOTO OF SWAN | 19 | 19<br>152 | 46<br>46 |
| 411 | AUTOPSY PHOTO OF SWAN | 19 | 19<br>152 | 46<br>46 |
| 412 | AUTOPSY PHOTO OF SWAN | 19 | 19<br>152 | 46<br>46 |
| 413 | AUTOPSY PHOTO OF SWAN | 19 | 19<br>152 | 46<br>46 |
| 414 | AUTOPSY PHOTO OF SWAN | 19 | 19<br>152 | 46<br>46 |
| 415 | AUTOPSY PHOTO OF SWAN | 19 | 19<br>152 | 46<br>46 |

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 416 | AUTOPSY PHOTO OF SWAN | 19 | 19 | 46 |
| | | | 152 | 46 |
| 417 | AUTOPSY PHOTO OF SWAN | 19 | 19 | 46 |
| | | | 152 | 46 |
| 418 | AUTOPSY PHOTO OF SWAN | 19 | 19 | 46 |
| | | | 152 | 46 |
| 419 | AUTOPSY PHOTO OF SWAN | 19 | 19 | 46 |
| | | | 152 | 46 |
| 420 | AUTOPSY PHOTO OF SWAN | 19 | 19 | 46 |
| | | | 152 | 46 |
| 422 | PAWN TICKET | 52 | 52 | 46 |
| | | | 152 | 46 |
| 423 | PAWN RECEIPT | 52 | 52 | 46 |
| | | | 152 | 46 |
| 424 | PAWN FIELD RECEIPT | 52 | 52 | 46 |
| | | | 152 | 46 |
| 537 | ALS RECORD | | 153 | 46 |
| 538 | ALS RECORD | | 153 | 46 |
| 539 | ALS RECORD | | 153 | 46 |
| 540 | POLICE REPORT | | 153 | 46 |

REPORTER'S RECORD

VOLUME 46 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| THE STATE OF TEXAS | ) IN THE CRIMINAL DISTRICT |
| | ) |
| | ) |
| VS. | ) COURT NO. 7 |
| | ) |
| JAMES GARFIELD BROADNAX | ) Of DALLAS COUNTY, TEXAS |

==============================================================

TRIAL ON MERITS

==============================================================

On the 11TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

---

VOLUME 46

TRIAL ON MERITS

AUGUST 11TH, 2009

| | PAGE | VOL. |
|---|---|---|
| PROCEEDINGS | 3 | 46 |
| CASE CALLED BY THE COURT | 3 | 46 |
| HEARING | 3 | 46 |
| JURY PRESENT | 11 | 46 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| GRUSZECKI, AMY | 12 | | | 46 |
| McNEAR, CLINT | 37 | 56 | | 46 |
| GIANNONE, ISABEL | 61 | | | 46 |

| | PAGE | VOL. |
|---|---|---|
| HEARING | 110 | 46 |
| JURY PRESENT | 113 | 46 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| GIANNONE, ISABEL | 113 | | | 46 |

| | PAGE | VOL. |
|---|---|---|
| HEARING | 147 | 46 |
| JURY PRESENT | 153 | 46 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| GIANNONE, ISABEL | | 154 | | 46 |
| ALLEN, SUSAN | 162 | 182 | | 46 |
| NICHOLS, JAMES | 184 | 202 | | 46 |

---

APPEARANCES

FOR THE STATE OF TEXAS:

HONORABLE DAVID M. ALEX
SBOT NO. 24003256
HONORABLE LISA SMITH
SBOT NO. 00787131
HONORABLE GORDON HIKEL
SBOT NO. 00787696
HONORABLE ANDREA HANDLEY
SBOT NO. 08898800
HONORABLE ELAINE EVANS
SBOT NO. 24032880
133 N. INDUSTRIAL BLVD.
FRANK CROWLEY COURTHOUSE
DALLAS, TEXAS 75207
TEL. 214-653-3600

FOR THE DEFENDANT:

HONORABLE BRAD LOLLAR
SBOT NO. 12508700
1700 COMMERCE ST, STE. 404
DALLAS, TEXAS 75201
TEL. 214-384-8178

HONORABLE DOUGLAS H. PARKS
SBOT NO. 15520000
321 CALM WATER LANE
HOLLY LAKE RANCH, TEXAS 75765
TEL. 903-769-3120

HONORABLE KERI MALLON
SBOT NO. 24049165
DALLAS COUNTY PUBLIC DEFENDERS OFFICE
133 N. INDUSTRIAL BLVD., LB 2
FRANK CROWLEY COURT BLDG.
DALLAS, TEXAS 75207
TEL. 214-653-3550

---

| | PAGE | VOL. |
|---|---|---|
| HEARING | 208 | 46 |
| JUROR PATTERSON SWORN | 209 | 46 |
| JURY PRESENT | 215 | 46 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| RABB, SHAUN | 216 | | | 46 |

| | PAGE | VOL. |
|---|---|---|
| HEARING | 223 | 46 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| RABB, SHAUN | 225 | | | 46 |

| | PAGE | VOL. |
|---|---|---|
| JURY PRESENT | 228 | 46 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| RABB, SHAUN | 229 | | 240 | 46 |
| | 241 | 241 | | 46 |
| | 248 | | | 46 |

| | PAGE | VOL. |
|---|---|---|
| STATE RESTS CASE-IN-CHIEF | 252 | 46 |
| HEARING | 253 | 46 |
| MOTION FOR INSTRUCTED VERDICT | 253 | 46 |
| MOTION DENIED | 253 | 46 |
| DEFENDANT ADMONISHED BY THE COURT | 255 | 46 |
| ADJOURNMENT | 256 | 46 |
| REPORTER'S CERTIFICATE | 257 | 46 |

### CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| GRUSZECKI, AMY | 12 | | | 46 |
| McNEAR, CLINT | 37 | 56 | | 46 |
| GIANNONE, ISABEL | 61 | | | 46 |
| | 113 | 154 | | 46 |
| ALLEN, SUSAN | 162 | 182 | | 46 |
| NICHOLS, JAMES | 184 | 202 | | 46 |
| RABB, SHAUN | 216 | | 225 | 46 |
| | 229 | | 240 | 46 |
| | 241 | 241 | | 46 |
| | 248 | | | 46 |

### ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| ALLEN, SUSAN | 262 | 182 | | 46 |
| GIANNONE, ISABEL | 61 | | | 46 |
| | 113 | 154 | | 46 |
| GRUSZECKI, AMY | 12 | | | 46 |
| McNEAR, CLINT | 37 | 56 | | 46 |
| NICHOLS, JAMES | 184 | 202 | | 46 |
| RABB, SHAUN | 216 | | 225 | 46 |
| | 229 | | 240 | 46 |
| | 241 | 241 | | 46 |
| | 248 | | | 46 |

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 34 | CRIME SCENE PHOTO - CHEST SHOT UNDER SHIRT | 70 | 71 / 147 | 46 / 46 |
| 35 | CRIME SCENE PHOTO - BACK OF HEAD | 70 | 71 / 147 | 46 / 46 |
| 36 | CRIME SCENE PHOTO - SIDE OF HEAD | 70 | 71 / 147 | 46 / 46 |
| 37 | CRIME SCENE PHOTO - POOLING IN BACK - BULLET LODGED | 70 | 71 / 148 | 46 / 46 |
| 38 | CRIME SCENE PHOTO - POOLING IN BACK | 70 | 71 / 148 | 46 / 46 |
| 39 | CRIME SCENE PHOTO - RIGHT HAND | 70 | 71 / 148 | 46 / 46 |
| 40 | CRIME SCENE PHOTO - LEFT HAND | 70 | 71 / 148 | 46 / 46 |
| 41 | CRIME SCENE PHOTO - SWAN & BUTLER | 71 | 72 / 148 | 46 / 46 |
| 42 | CRIME SCENE PHOTO - BLOODSPOTS | 71 | 72 / 148 | 46 / 46 |
| 43 | CRIME SCENE PHOTO - BUTLER - POOLING BENEATH FACE | 71 | 72 / 148 | 46 / 46 |
| 44 | CRIME SCENE PHOTO - BUTLER - LODGED BULLET FRAGMENT | 71 | 72 / 148 | 46 / 46 |
| 45 | CRIME SCENE PHOTO - BUTLER - FACE DOWN - BLOOD POOLING | 71 | 148 | 46 |
| 46 | CRIME SCENE PHOTO - BUTLER - HEADSHOT | 71 | 72 / 148 | 46 / 46 |
| 47 | CRIME SCENE PHOTO - BUTLER - SHOULDER BULLET WOUND | 71 | 72 / 148 | 46 / 46 |
| 48 | CRIME SCENE PHOTO - BUTLER - CHEST BULLET WOUND | 71 | 72 / 148 | 46 / 46 |

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 16 | BUSINESS RECORDS OF MEDIA REQUESTS - KIM LEACH | 236 | | 46 |
| 16A | EXCISED VERSION OF STATE'S EX. 16 | 2372 | 37 | 46 |
| 18 | CHANNEL 5 INTERVIEW (DISK) - ELLEN GOLDBERG | | 147 | 46 |
| 20 | PHOTO ID - SWAN | | 147 | 46 |
| 21 | PHOTO ID - BUTLER | | 147 | 46 |
| 23 | CRIME SCENE PHOTO - INTERSECTION OF STATE & GLENBROOK | | 147 | 46 |
| 24 | CRIME SCENE PHOTO - LOOKING EAST | | 147 | 46 |
| 25 | CRIME SCENE PHOTO - LOOKING WEST | | 147 | 46 |
| 26 | CRIME SCENE PHOTO - BICYCLE | | 147 | 46 |
| 27 | CRIME SCENE AERIAL PHOTO | | 147 | 46 |
| 28 | CRIME SCENE PHOTO - CRIME SCENE & FIRE STATION | | 147 | 46 |
| 29 | CRIME SCENE PHOTO - HEADSHOT UP | 70 | 71 / 147 | 46 / 46 |
| 30 | CRIME SCENE PHOTO - HEADSHOT DOWN | 70 | 71 / 147 | 46 / 46 |
| 31 | CRIME SCENE PHOTO - FULL BODY POCKET | 70 | 71 / 147 | 46 / 46 |
| 32 | CRIME SCENE PHOTO - SWAN - FULL BODY TWO POCKETS | 70 | 71 / 147 | 46 / 46 |
| 33 | CRIME SCENE PHOTO - CHEST SHOT THROUGH SHIRT | 70 | 71 / 147 | 46 / 46 |

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 49 | CRIME SCENE PHOTO - BUTLER - CHEST BULLET WOUND | 71 | 72 / 148 | 46 / 46 |
| 50 | CRIME SCENE PHOTO - BUTLER - ARM BULLET WOUND | 71 | 72 / 148 | 46 / 46 |
| 51 | CRIME SCENE PHOTO - BUTLER - ABOVE BULLET WOUND | 71 | 72 / 148 | 46 / 46 |
| 52 | CRIME SCENE PHOTO - BUTLER - RIGHT HAND | 71 | | 46 |
| 53 | CRIME SCENE PHOTO - BUTLER - FACE UP SPREAD EAGLE | 71 | 72 / 148 | 46 / 46 |
| 54 | CRIME SCENE PHOTO - BUTLER - LEFT HAND | 71 | 72 / 148 | 46 / 46 |
| 55 | CRIME SCENE PHOTO - MARKER 1 BULLET CASING CLOSE UP | 71 | 71 / 72 / 148 | 46 / 46 / 46 |
| 56 | CRIME SCENE PHOTO - MARKER 1 BULLET CASING - EXPANDED VIEW | 71 | 71 / 72 / 148 | 46 / 46 / 46 |
| 57 | CRIME SCENE PHOTO - MARKER 1 BULLET CASING - MIDRANGE VIEW | 71 | 71 / 72 / 148 | 46 / 46 / 46 |
| 58 | CRIME SCENE PHOTO - MARKER 2 LIGHTER - CLOSE UP | 71 | 71 / 72 / 148 | 46 / 46 / 46 |
| 59 | CRIME SCENE PHOTO - MARKER 3 BULLET CASING - CLOSE UP | 71 | 71 / 72 / 148 | 46 / 46 / 46 |
| 60 | CRIME SCENE PHOTO - MARKER 4 CIGARETTES & BLOODSTAINS | 71 | 71 / 72 / 148 | 46 / 46 / 46 |
| 61 | CRIME SCENE PHOTO - CLOSE UP CIGARETTES & BLOODSTAINS | 71 | 71 / 72 / 148 | 46 / 46 / 46 |

vii

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 62 | CRIME SCENE PHOTO - MARKERS 5-14 - WITHOUT BODIES | 71 | 71 72 148 | 46 46 46 |
| 63 | CRIME SCENE PHOTO - MARKERS 5-10 HIGHLIGHT 10 | 71 | 71 72 148 | 46 46 46 |
| 64 | CRIME SCENE PHOTO - MARKERS 5-9 - PROXIMITY | 71 | 71 72 148 | 46 46 46 |
| 65 | CRIME SCENE PHOTO - MARKER 5 TISSUE CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 66 | CRIME SCENE PHOTO - MARKER 6 CONDOM | 71 | 71 72 148 | 46 46 46 |
| 67 | CRIME SCENE PHOTO - MARKER 7 BULLET CASING & TWIG | 71 | 71 72 148 | 46 46 46 |
| 68 | CRIME SCENE PHOTO - MARKER 8 | 71 | 71 72 148 | 46 46 46 |
| 69 | CRIME SCENE PHOTO - MARKER 9 BULLET CASING CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 70 | CRIME SCENE PHOTO - MARKER 10 BULLET CASING CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 71 | CRIME SCENE PHOTO - MARKER 11 BULLET CASING CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 72 | CRIME SCENE PHOTO - MARKERS 11 & 12 - MIDRANGE (BENCH) | 71 | 71 72 148 | 46 46 46 |

ix

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 86 | PHOTO - TOOLSET - (CLOSED) | 47 | 48 148 | 46 46 |
| 87 | PHOTO - CLOTHES - WHITE TANK, BLACK SHORTS | 124 | 126 148 | 46 46 |
| 88 | PHOTO - CLOTHES - BLACK & WHITE SHIRT | 124 | 126 148 | 46 46 |
| 89 | PHOTO - CLOTHES - BLUE BOXER SHORTS | 124 | 126 148 | 46 46 |
| 90 | PHOTO - CLOTHES - WHITE SOCKS | 124 | 126 148 | 46 46 |
| 91 | CLOTHES FROM CAR - MULTICOLOR "TX" HAT | 124 | 126 148 | 46 46 |
| 92 | PHOTO - FILA HIGHTOPS (FRONT) | 124 | 126 148 | 46 46 |
| 93 | PHOTO - FILA HIGHTOPS - SIDE VIEW | 124 | 126 148 | 46 46 |
| 94 | PHOTO - FILA HIGHTOPS - SIDE VIEW - CLOSE UP | 124 | 126 148 | 46 46 |
| 95 | PHOTO - FILA HIGHTOPS - SIDE VIEW - CLOSE UP (RULER) | 124 | 126 148 | 46 46 |
| 96 | PHOTO - FILA HIGHTOPS - SIDE VIEW - CLOSE UP (SWAB) | 124 | 126 148 | 46 46 |
| 97 | PHOTO - SIDE VIEW - CLOSE UP (SWAB) | | 126 148 | 46 46 |
| 98 | PHOTO - WHITE NIKE HIGHTOPS (FRONT) | 124 | 126 148 | 46 46 |
| 99 | PHOTO - WHITE NIKE HIGHTOPS SIDE VIEW | 124 | 126 148 | 46 46 |

viii

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 73 | CRIME SCENE PHOTO - MARKER 12 SHARPIE CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 74 | CRIME SCENE PHOTO - MARKER 14 HIGHLIGHT 14 | 71 | 71 72 148 | 46 46 46 |
| 75 | CRIME SCENE PHOTO - MARKER 14 BULLET CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 76 | CRIME SCENE PHOTO - MARKER 14 BULLET MIDRANGE | 71 | 71 72 148 | 46 46 46 |
| 77 | CRIME SCENE PHOTO - MARKER 15 BEER BOTTLE | 71 | 71 72 148 | 46 46 46 |
| 78 | CRIME SCENE PHOTO - BEER BOTTLE CLOSE UP | 71 | 71 72 148 | 46 46 46 |
| 79 | CRIME SCENE PHOTO - BEER BOTTLE MIDRANGE | 71 | 71 72 148 | 46 46 46 |
| 80 | PHOTO - HANDGUN - RIGHT | 44 | 44 148 | 46 46 |
| 81 | PHOTO - HANDGUN - (SERIAL NUMBER) | 44 | 44 148 | 46 46 |
| 82 | PHOTO - HANDGUN - MIDRANGE | 44 | 44 148 | 46 46 |
| 83 | PHOTO - HANDGUN - LEFT | 44 | 44 148 | 46 46 |
| 84 | PHOTO - HANDGUN - RIGHT MIDRANGE | 44 | 44 148 | 46 46 |
| 85 | PHOTO - TOOLSET - (OPEN) | 47 | 48 148 | 46 46 |

x

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 100 | PHOTO - WHITE NIKE HIGHTOPS - CLOSE UP - (FRONT) | 124 | 126 148 | 46 46 |
| 101 | RP .380 CASING (STREET, NORTH OF BUTLER) | | 148 | 46 |
| 102 | DNA SWAB (ITEM #7994-01) | | 148 | 46 |
| 103 | METAL LIGHTER - (PARKING LOT, NEAR RIGHT HAND OF SWAN) | | 148 | 46 |
| 104 | CIGARETTES (PARKING LOT, NEAR RIGHT HAND OF SWAN) | | 148 | 46 |
| 105 | TISSUE - (PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 106 | CONDOM - (PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 107 | RP .380 CASING (PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 108 | PROJECTILE -(PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 109 | RP .380 CASING (PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 110 | RP .380 CASING (PARKING LOT, SOUTH OF SWAN) | | 148 | 46 |
| 111 | RP .380 CASING (PARKING LOT, NE OF NW CORNER OF BLDG.) | | 148 | 46 |
| 112 | BLACK SHARPIE PEN - (SIDEWALK, UNDER BENCH NW CORNER OF BLDG.) | | 148 | 46 |
| 114 | PROJECTILE JACKET -1 (SIDEWALK, NEAR FRONT OF 806 STATE ST.) | | 48 | 46 |

## STATE'S EXHIBITS

xi

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 115 | EMPTY SHINER BOCK BEER BOTTLE (UNDER BUSHES OF MEDIAN, NW CORNER OF BLDG.) | | 148 | 46 |
| 118 | RECEIPT & BUSINESS CARD (FRONT LEFT PANT POCKET - BUTLER) | | 148 | 46 |
| 119 | FOLDING KNIFE (FRONT LEFT SHIRT POCKET - SWAN) | | 148 | 46 |
| 120 | POCKET LINER (FRONT RIGHT PANT POCKET - SWAN) | | 148 | 46 |
| 121 | POCKET LINER (FRONT LEFT PANT POCKET - SWAN) | | 148 | 46 |
| 122 | POCKET LINER (REAR LEFT PANT POCKET - SWAN) | | 148 | 46 |
| 123 | CELL PHONE, TISSUE, PEN, LIGHTER, CHAPSTICK (FRONT LEFT SHIRT POCKET OF SWAN) | | 148 | 46 |
| 124 | BLOOD SWAB - BUTLER (BLOOD POOL) | | 148 | 46 |
| 125 | BLOOD SWAB - SWAN (BLOOD POOL) | | 148 | 46 |
| 126 | BLOOD SWAB (BLOOD SPATTER IN STREET BETWEEN VICTIMS) | | 148 | 46 |
| 127 | BLOOD SWAB (BLOOD SPATTER IN STREET NEAR SWAN) | | 148 | 46 |
| 128 | BLACK LONG SLEEVE SHIRT (NO SIZE) (BLACK/RED BACKPACK FOUND IN TRUNK) | | 148 | 46 |
| 129 | WHITE NIKE AIR SHOES, SIZE 10.5 (BLACK/RED BACKPACK FOUND IN TRUNK) | | 148 | 46 |

## STATE'S EXHIBITS

xii

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 130 | BLACK/RED BACKPACK (TRUNK OF VEHICLE) | | 148 | 46 |
| 130A | 3 PIPES, RAG, 2 DIMES, NICKEL, CONCEALED HANDGUN LICENSE, RECEIPT | | 148 | 46 |
| 131A | BIRTH CERTIFICATE - BROADNAX | | 148 | 46 |
| 131B | USPS RECEIPT FOR BIRTH CERTIFICATE | | 148 | 46 |
| 131C | APPLICATION FOR BIRTH CERT., PAGE 1 | | 148 | 46 |
| 131D | APPLICATION FOR BIRTH CERT., PAGE 2 | | 148 | 46 |
| 131E | APPLICATION FOR BIRTH CERT., PAGE 3 | | 148 | 46 |
| 131F | JAUNITE/MONEY ORDER RECEIPT | | 148 | 46 |
| 131G | MASK | 142 | 142 149 | 46 46 |
| 131H | PICTURE | 142 | 142 149 | 46 46 |
| 131I | SPIRAL NOTEBOOK/RED | 142 | 142 149 | 46 46 |
| 131J | SPIRAL NOTEBOOK/BLACK | 142 | 142 149 | 46 46 |
| 132A | JACKET/LION LINING (TRUNK OF VEHICLE) | | 149 | 46 |
| 132B | JACKET (TRUNK OF VEHICLE) | | 149 | 46 |
| 133 | SUITCASE CONTAINING CLOTHING, ETC. (TRUNK OF VEHICLE) | | 149 | 46 |

## STATE'S EXHIBITS

xiii

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 134 | DUFFLE BAG CONTAINING CLOTHING, ETC. (TRUNK OF VEHICLE) | | 149 | 46 |
| 135 | DNA SWAB (HOOD D) | | 149 | 46 |
| 136 | DNA SWAB (HOOD E) | | 149 | 46 |
| 137 | DNA SWAB (LEFT REAR AREA) | | 149 | 46 |
| 138 | DNA SWAB (LEFT REAR QUARTER PANEL B) | | 149 | 46 |
| 139 | GRAY FILA SHOES, SIZE 13 (JAMES BROADNAX) | | 149 | 46 |
| 140 | GRAY FRUIT OF THE LOOM TANK TOP (LARGE), WHITE TANK TOP (NO SIZE), FOOT ACTION GRAY STRIPED SHIRT (SIZE 4XL), RISK JEANS PANTS (SIZE 32x32) (JAMES BROADNAX) | | 149 | 46 |
| 141 | FOUR WHITE SOCKS, PURITAN BLUE BOXER SHORTS (XL) - (JAMES BROADNAX) | | 149 | 46 |
| 142 | BLACK MULTICOLORED TX CAP (LARGE) (JAMES BROADNAX) | | 149 | 46 |
| 143 | WHITE NIKE SHOES (SIZE 10) - (D. CUMMINGS) | | 149 | 46 |
| 144 | BLACK NIKE TEAM SHORTS (SIZE XXL) (D. CUMMINGS) | | 149 | 46 |
| 145 | ADIDAS NAVY BLUE DALLAS MAVERICKS JERSEY #31 (SIZE XXL) (D. CUMMINGS) | | 149 | 46 |
| 146 | HANES WHITE TANK TOP (SMALL), MEDONA  GRAY TANK TOP (NO SIZE) (D. CUMMINGS) | | 149 | 46 |

## STATE'S EXHIBITS

xiv

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 147 | WHITE MARISH FRANCOIS & GIRBAUD (D. CUMMINGS) | | 149 | 46 |
| 148 | TWO WHITE SOCKS (D. CUMMINGS) | | 149 | 46 |
| 149 | TWO WHITE SOCKS (LONNIE HARRIS) | | 149 | 46 |
| 150 | TWO WHITE TOWELS (TRUNK OF VEHICLE) | | 149 | 46 |
| 151 | BUCCAL SWAB (D. CUMMINGS) | | 149 | 46 |
| 152 | TX LICENSE PLATE GVJ-961 (VEHICLE) | | 149 | 46 |
| 153 | GSR KIT (SWAN) | | 149 | 46 |
| 154 | BLOOD STANDARD (SWAN) | | 149 | 46 |
| 155 | BULLET (SWAN) | | 149 | 46 |
| 156 | NAIL CLIPPINGS (SWAN) | | 149 | 46 |
| 157 | HEAD HAIR STANDARD (SWAN) | | 149 | 46 |
| 158 | CLOTHES (SWAN) | | 149 | 46 |
| 159 | BULLET (BUTLER) | 146 | 146 149 | 46 46 |
| 160 | BULLET (BUTLER) | 146 | 146 149 | 46 46 |
| 161 | GSR KIT (BUTLER) | 146 | 146 149 | 46 46 |
| 162 | HAIR STANDARD (BUTLER) | 146 | 146 149 | 46 46 |
| 163 | BLOOD STANDARD (BUTLER) | 146 | 146 149 | 46 46 |
| 164 | CLOTHING (BUTLER) | 146 | 146 149 | 46 46 |

FIRM NAME

xv

**STATE'S EXHIBITS**

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 165 | FINGERNAIL CLIPPING (BUTLER) | 146 | 146<br>149 | 46<br>46 |
| 166 | FINGERNAIL CLIPPING (BUTLER) | 146 | 146<br>149 | 46<br>46 |
| 167 | TAPE LIFTS FOR EXHIBITS: 21, 22, 29, 39A, 39B | 146 | 146<br>149 | 46<br>46 |
| 168 | TAPE LIFTS FOR EXHIBIT 28 | 146 | 146<br>149 | 46<br>46 |
| 169 | TAPE LIFTS FOR EXHIBITS: 40A THROUGH 40D | 146 | 146<br>149 | 46<br>46 |
| 170 | TAPE LIFTS FOR EXHIBIT 44 | 146 | 146<br>149 | 46<br>46 |
| 171 | TAPE LIFTS FOR EXHIBIT 45 | 146 | 146<br>149 | 46<br>46 |
| 172 | NATHAN JOHNSON - GSR (COLLECTED BY BLUM) | | 149<br>149 | 46<br>46 |
| 173 | PHOTO - BOTTOM NIKE SHOE (RULER) | 108 | 109<br>149 | 46<br>46 |
| 174 | PHOTO - BOTTOM NIKE SHOE (CLOSE UP SHOT) | 108 | 109<br>149 | 46<br>46 |
| 175 | PHOTO - BOTTOM NIKE SHOE (SIDE ANGLE) | 108 | 109<br>149 | 46<br>46 |
| 176 | PHOTO - BOTTOM NIKE SHOE (CLOSE UP - SIDE ANGLE) | 108 | 109<br>149 | 46<br>46 |
| 177 | PHOTO - BOTTOM NIKE SHOE (RULER) | 108 | 109<br>149 | 46<br>46 |
| 178 | PHOTO - TOP & BOTTOM NIKE SHOE (SWAB) | 108 | 109<br>149 | 46<br>46 |
| 179 | PHOTO - NIKE SHOE (SWAB) | 108 | 109<br>149 | 46<br>46 |

xvi

**STATE'S EXHIBITS**

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 180 | PHOTO - TRUNK - SUITCASE WITH MASK | 108 | 109<br>149 | 46<br>46 |
| 181 | PHOTO - MASK & PIC. OF GROUP | 108 | 109<br>149 | 46<br>46 |
| 182 | PHOTO - CLOSE UP - GROUP PICTURE | 108 | 109<br>149 | 46<br>46 |
| 183 | PHOTO - SS CARD - BROADNAX | 108 | 109<br>149 | 46<br>46 |
| 184 | PHOTO - SUITCASE, SS CARD, PICTURE OF GROUP | 108 | 109<br>150 | 46<br>46 |
| 185 | PHOTO - SUITCASE, MASK, SS CARD, PIC. | 108 | 109<br>150 | 46<br>46 |
| 186 | PHOTO - SUITECASE (CLOSE UP SHOT) | 108 | 109<br>150 | 46<br>46 |
| 187 | PHOTO - SS CARD (BROADNAX) - CLOSE UP | 108 | 109<br>150 | 46<br>46 |
| 188 | PHOTO - CAR - FRONT DRIVER'S SIDE - CLOSE UP | 108 | 109<br>150 | 46<br>46 |
| 189 | PHOTO - HOOD WITH RULER | 108 | 109<br>150 | 46<br>46 |
| 190 | PHOTO - HOOD WITH RULERS | 108 | 109<br>150 | 46<br>46 |
| 191 | PHOTO - CAR - HOOD C - F | 108 | 109<br>150 | 46<br>46 |
| 192 | PHOTO - CAR - HOOD A | 108 | 109<br>150 | 46<br>46 |
| 193 | PHOTO - CAR - HOOD WITH RULER | 108 | 109<br>150 | 46<br>46 |
| 194 | PHOTO - CAR - HOOD B (CLOSE UP) | 108 | 109<br>150 | 46<br>46 |

xvii

**STATE'S EXHIBITS**

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 195 | PHOTO - HOOD (CLOSE UP WITH RULER) | 108 | 109<br>150 | 46<br>46 |
| 196 | PHOTO - HOOD (CLOSE UP) C | 108 | 109<br>150 | 46<br>46 |
| 197 | PHOTO - HOOD (CLOSE UP WITH RULER) | 108 | 109<br>150 | 46<br>46 |
| 198 | PHOTO - HOOD (CLOSE UP) D | 108 | 109<br>150 | 46<br>46 |
| 199 | PHOTO - HOOD WITH BLOODSPOTS | 108 | 109<br>150 | 46<br>46 |
| 200 | PHOTO - HOOD (CLOSE UP) F | 108 | 109<br>150 | 46<br>46 |
| 201 | BUCCAL SWAB (BROADNAX) | | 150 | 46 |
| 202 | BROWNING ARMS .380 CALIBER PISTOL (4407 HATCHER #149, DALLAS, TX - BETWEEN MATTRESSES IN CALHOUN'S BEDROOM) | 131 | 131<br>150 | 46<br>46 |
| 202A | DNA SWAB FROM RIGHT GRIP OF .380 CALIBER PISTOL | | 150 | 46 |
| 202B | DNA SWAB FROM LEFT GRIP OF .380 CALIBER PISTOL | | 150 | 46 |
| 202C | DNA SWAB FROM RIGHT SIDE/SLIDE OF .380 CALIBER PISTOL | | 150 | 46 |
| 202D | DNA SWAB FROM LEFT SIDE/SLIDE OF .380 CALIBER PISTOL | | 150 | 46 |
| 202E | DNA SWAB FROM TRIGGER OF .380 CALIBER PISTOL | | 150 | 46 |
| 202F | DNA SWAB FROM INSIDE BARREL OF .380 CALIBER PISTOL | | 150 | 46 |

xviii

**STATE'S EXHIBITS**

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 202G | DNA SWAB FROM POSSIBLE BLOOD FROM LEFT SIDE OF .380 CALIBER PISTOL | | 150 | 46 |
| 202H | PACKAGE | | 150 | 46 |
| 203 | PISTOL MAGAZINE | 131 | 131<br>150 | 46<br>46 |
| 206 | PHOTO - HOOD - CLOSE UP BLOODSPOT WITH RULER | 108 | 109<br>150 | 46<br>46 |
| 207 | PHOTO - HOOD - CLOSE UP BLOODSPOT WITH RULER | 108 | 109<br>150 | 46<br>46 |
| 208 | PHOTO - LEFT REAR QUARTER PANEL WITH LABEL | 108 | 109<br>150 | 46<br>46 |
| 209 | PHOTO - HOOD | 108 | 109<br>150 | 46<br>46 |
| 210 | PHOTO - HOOD WITH BLOODSPOTS | 108 | 109<br>150 | 46<br>46 |
| 211 | PHOTO - LEFT REAR QUARTER PANEL WITH BLOODSPOTS | 108 | 109<br>150 | 46<br>46 |
| 212 | PHOTO - LEFT REAR QUARTER PANEL B & C | 108 | 109<br>150 | 46<br>46 |
| 213 | PHOTO - CLOSE UP OF BLOODSPOT | 108 | 109<br>150 | 46<br>46 |
| 214 | PHOTO - CAR - BLOODSPOTS WITH RULER | 108 | 109<br>150 | 46<br>46 |
| 215 | PHOTO | 108 | 109<br>150 | 46<br>46 |
| 216 | PHOTO OF HOOD WITH RULERS MARKING BLOODSPOTS | 108 | 109<br>150 | 46<br>46 |
| 217 | PHOTO OF FLAT TIRE - REAR DRIVER'S SIDE (CLOSE UP) | 108 | 109<br>150 | 46<br>46 |

FIRM NAME

xix

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 218 | PHOTO OF TIRE WITH NAIL STICKING OUT | 108 | 109 150 | 46 46 |
| 219 | PHOTO OF NAIL IN TIRE (CLOSE UP) | 108 | 109 150 | 46 46 |
| 220 | PHOTO OF WHITE NIKE HIGHTOPS (CLOSE UP - RULER) | 124 | 126 150 | 46 46 |
| 221 | PHOTO OF WHITE NIKE HIGHTOPS - SIDE VIEW | 124 | 126 150 | 46 46 |
| 222 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP WITH BLOODSPOTS | 124 | 126 150 | 46 46 |
| 223 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP WITH BLOODSPOTS (RULER) | 124 | 126 150 | 46 46 |
| 224 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP - SOLE WITH BLOOD | 124 | 126 150 | 46 46 |
| 225 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP - BLOOD WITH RULER | 124 | 126 150 | 46 46 |
| 226 | PHOTO OF WHITE NIKE HIGHTOPS - DIFFERENT ANGLE - BLOOD | 124 | 126 150 | 46 46 |
| 227 | PHOTO OF WHITE NIKE HIGHTOPS - DIFFERENT ANGLE - BLOOD | 124 | 126 150 | 46 |
| 228 | PHOTO - CLOTHES IN CAR - NIKE HIGHTOPS (SWAB) | 124 | 126 150 | 46 46 |
| 229 | PHOTO - BLACK MESH NIKE SHORTS & SOCKS | 124 | 126 150 | 46 46 |
| 230 | PHOTO - KHAKI SHORTS & MAVERICKS JERSEY | 124 | 126 150 | 46 46 |

xx

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 231 | PHOTO - WHITE & GRAY TANKS - MAVERICKS JERSEY | 124 | 126 150 | 46 46 |
| 232 | PHOTO - WHITE NIKE HIGHTOPS | 124 | 126 150 | 46 46 |
| 233 | PHOTO - BLACK ADIDAS SANDALS | 124 | 126 150 | 46 46 |
| 234 | PHOTO - TOP OF RT - BOTTOM LFT SANDALS | 124 | 126 150 | 46 46 |
| 235 | PHOTO - CLOSE UP OF BOTTOM OF SANDAL | 124 | 126 150 | 46 46 |
| 236 | PHOTO - CLOSER SHOT OF BOTTOM OF SANDAL | 124 | 126 150 | 46 46 |
| 237 | CLOSE UP PHOTO OF BOTTOM OF SANDAL (RULER) | 124 | 126 150 | 46 46 |
| 238 | PHOTO - BOTTOM SANDAL (SWAB) | 124 | 126 150 | 46 46 |
| 239 | PHOTO - WHITE SOCKS WITH BLOODSPOTS | 124 | 126 150 | 46 46 |
| 240 | CLOSE UP PHOTO - WHITE SOCKS WITH BLOODSPOTS | 124 | 126 150 | 46 46 |
| 241 | CLOSE UP PHOTO - WHITE SOCKS WITH BLOODSPOTS (RULER) | 124 | 126 150 | 46 46 |
| 242 | PHOTO OF BLUE/YELLOW STRIPED BOXER SHORTS | 124 | 126 150 | 46 46 |
| 243 | PHOTO OF WHITE TANK & BELT WITH LONE STAR BUCKLE | 124 | 126 150 | 46 46 |
| 244 | PHOTO OF WHITE TANK & BELT WITH LONE STAR BUCKLE | 124 | 126 150 | 46 46 |
| 245 | PHOTO OF BLUE JEAN SHORTS - POCKET DESIGN | 124 | 126 150 | 46 46 |

xxi

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 246 | PHOTO OF CLOTHES FROM CAR - MAVERICKS JERSEY | 124 | 126 150 | 46 46 |
| 247 | PHOTO OF SWAB | 124 | 126 150 | 46 46 |
| 248 | PHOTO OF BLACK MESH NIKE SHORTS WITH SWAB | 124 | 126 150 | 46 46 |
| 249 | PHOTO - SWAB | 124 | 126 150 | 46 46 |
| 250 | PHOTO OF CAR FRONT, LICENSE PLATE GVJ-961 | 108 | 108 150 | 46 46 |
| 251 | PHOTO OF FRONT PASSENGER SIDE OF CAR | 108 | 108 150 | 46 46 |
| 252 | PHOTO OF FRONT PASSENGER SIDE OF CAR | 108 | 108 150 | 46 46 |
| 253 | PHOTO OF REAR PASSENGER SIDE OF CAR | | 150 | 46 46 |
| 254 | PHOTO OF REAR OF CAR WITH LICENSE PLATE | 108 | 108 150 | 46 |
| 255 | PHOTO OF REAR DRIVER'S SIDE OF CAR | 108 | 108 150 | 46 46 |
| 256 | PHOTO OF DRIVER'S SIDE BACK OF CAR - FLAT TIRE | 108 | 108 150 | 46 46 |
| 257 | PHOTO OF DRIVER'S SIDE FRONT OF CAR | 108 | 108 150 | 46 46 |
| 258 | PHOTO OF FRONT DRIVER'S SIDE - SPOT ON BUMPER | 108 | 108 150 | 46 46 |
| 259 | CLOSE UP PHOTO OF REAR DRIVER'S SIDE FLAT TIRE | 108 | 108 150 | 46 46 |
| 260 | CLOSE UP PHOTO OF REAR DRIVER'S SIDE FLAT TIRE | 108 | 108 150 | 46 46 |

xxii

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 261 | PHOTO OF BACK SEAT FROM BACK PASSENGER DOOR | 108 | 108 150 | 46 46 |
| 262 | PHOTO OF BACK SEAT FROM BACK DRIVER'S SIDE DOOR | 108 | 108 150 | 46 46 |
| 263 | PHOTO OF FRONT SEAT - DRIVER'S SIDE | 108 | 108 150 | 46 46 |
| 264 | PHOTO OF CAR - STEERING WHEEL - DRIVER'S DOOR | 108 | 108 150 | 46 46 |
| 265 | PHOTO OF CAR - FRONT SEAT & STEERING WHEEL - DRIVER'S DOOR | 108 | 108 150 | 46 46 |
| 266 | PHOTO - FRONT PASSENGER SEAT | 108 | 108 150 | 46 46 |
| 267 | PHOTO - OPEN TRUNK | 108 | 108 150 | 46 46 |
| 268 | PHOTO - OPEN TRUNK CLOSE UP | 108 | 108 150 | 46 46 |
| 269 | CLOSER UP PHOTO - OPEN TRUNK | 108 | 108 150 | 46 46 |
| 270 | PHOTO - SUITCASE IN TRUNK | 108 | 108 150 | 46 46 |
| 271 | PHOTO - OPEN SUITCASE IN TRUNK | 108 | 108 150 | 46 46 |
| 272 | PHOTO - BLACK/RED BAG | 108 | 108 150 | 46 46 |
| 273 | PHOTO - NIKE SHOES, PIPES, RECEIPT & CONCEALED HANDGUN LICENSE | | 150 | 46 |
| 274 | PHOTO - WHITE RAG | 108 | 108 150 | 46 46 |
| 275 | PHOTO - CLOSE UP OF PIPES | 108 | 108 150 | 46 46 |

FIRM NAME

xxiii

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 276 | PHOTO - SWAN'S CONCEALED HANDGUN LICENSE | 108 | 108 150 | 46 46 |
| 277 | PHOTO - SWAN'S RECEIPT FOR GUN | | 150 | 46 |
| 278 | PHOTO - BLACK CLOTHING, PIPE & HOUSE SHOES | 108 | 108 150 | 46 46 |
| 279 | CLOSE UP PHOTO OF HOUSE SHOES | 108 | 108 150 | 46 46 |
| 280 | PHOTO OF BLACK SHIRT | 108 | 108 150 | 46 46 |
| 281 | PHOTO OF SWAB | 108 | 108 150 | 46 46 |
| 282 | PHOTO OF SWAB | 108 | 108 150 | 46 46 |
| 283 | PHOTO OF WHITE NIKE SHOES - TOP ANGLE | 108 | 108 150 | 46 46 |
| 284 | PHOTO OF BACK OF RIGHT NIKE SHOE WITH BLOODSPOT | 108 | 108 150 | 46 46 |
| 285 | CLOSER UP PHOTO OF BACK OF RIGHT NIKE SHOE WITH BLOODSPOT | 108 | 108 150 | 46 46 |
| 286 | CLOSER UP PHOTO OF BACK OF RIGHT NIKE SHOE WITH BLOODSPOT (RULER) | 108 | 108 150 | 46 46 |
| 287 | PHOTO - BOTTOM OF LEFT NIKE SHOE | 108 | 108 150 | 46 46 |
| 288 | CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE - BLOODSPOT | 108 | 108 150 | 46 46 |
| 289 | CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE - BLOODSPOT (RULER) | 108 | 108 150 | 46 46 |

xxiv

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 290 | CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE - BLOODSPOT (RULER) | 108 | 108 150 | 46 46 |
| 291 | DIFFERENT ANGLE, CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE | 108 | 108 150 | 46 46 |
| 292 | PHOTO OF CAR - REAR DRIVER'S SIDE WINDOW | 108 | 109 150 | 46 46 |
| 293 | PHOTO OF CAR - REAR DRIVER'S SIDE WINDOW (WITH MARKER & RULER) | 108 | 109 150 | 46 46 |
| 294 | CLOSE UP PHOTO OF BLOODSPOT | 108 | 109 150 | 46 46 |
| 295 | CLOSER UP PHOTO OF BLOODSPOT | 108 | 109 150 | 46 46 |
| 296 | CLOSE UP PHOTO OF BLOODSPOT WITH MARKER & RULER | 108 | 109 150 | 46 46 |
| 297 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 298 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 299 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 300 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 301 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 302 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 303 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

xxv

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 304 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 305 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 306 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 307 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 308 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 309 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 310 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 311 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 312 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 313 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 314 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 315 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 316 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 317 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 318 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

xxvi

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 319 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 320 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 321 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 322 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 323 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 324 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 325 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 326 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 327 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 328 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 329 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 330 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 331 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 332 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 333 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

xxvii

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 334 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 335 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 336 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 337 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 338 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 339 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 340 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 341 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 342 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 343 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 344 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 345 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 346 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 347 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 348 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

xxviii

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 349 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 350 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 351 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 352 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 353 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 354 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 355 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 356 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 357 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 358 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 359 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 360 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 361 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 362 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 363 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

xxix

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 364 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 365 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 366 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 367 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 368 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 369 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 370 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 371 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 372 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 373 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 374 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 375 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 376 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 377 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 378 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |

xxx

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 379 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 380 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 381 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 382 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 383 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 384 | CRIME SCENE PHOTO - RECORD ONLY | | 151 | 46 |
| 385 | MAP | 59 | 59 | 46 |
| | | | 151 | 46 |
| 386 | MAP | 59 | 59 | 46 |
| | | | 151 | 46 |
| 387 | MAP | 59 | 59 | 46 |
| | | | 151 | 46 |
| 389 | MAP | 59 | 59 | 46 |
| | | | 151 | 46 |
| 390 | CS DIAGRAM | 93 | 94 | 46 |
| | | | 151 | 46 |
| 391 | DNA REPORT | 195 | 195 | 46 |
| 392 | SEROLOGY REPORT | 193 | 193 | 46 |
| 393 | BALLISTICS REPORT | 175 | 175 | 46 |
| | | | 182 | 46 |
| 394 | AUTOPSY REPORT | 19 | 19 | 46 |
| | | | 151 | 46 |
| 396 | BOOK-IN PHOTO - CUMMINGS | 40 | 40 | 46 |
| | | | 151 | 46 |

xxxi

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 398 | WARRANT/AFFIDAVIT - DEFENDANT - TEXARKANA | | 152 | 46 |
| 399 | TITLE HISTORY - SWAN CAR | | 152 | 46 |
| 400 | TITLE HISTORY - DYMON SMITH CAR | | 152 | 46 |
| 401 | VIDEO - CRIME SCENE | 93 | 94 / 152 | 46 / 46 |
| 402 | VIDEO - TEXARKANA TRAFFIC STOP | | 152 | 46 |
| 403 | VIDEO - CHANNEL 11 | | 152 | 46 |
| 404 | VIDEO - CHANNEL 11 - DEMO WITH TITLES | | 152 | 46 |
| 405 | VIDEO - CHANNEL 5 - DEMO WITH TITLES | | 152 | 46 |
| 406 | VIDEO - CHANNEL 4 | 229 | 230 | 46 |
| 407 | VIDEO - CHANNEL 4 - DEMO | 230 | 230 | 46 |
| 409 | AUTOPSY PHOTO OF SWAN | 19 | 19 / 152 | 46 / 46 |
| 410 | AUTOPSY PHOTO OF SWAN | 19 | 19 / 152 | 46 / 46 |
| 411 | AUTOPSY PHOTO OF SWAN | 19 | 19 / 152 | 46 / 46 |
| 412 | AUTOPSY PHOTO OF SWAN | 19 | 19 / 152 | 46 / 46 |
| 413 | AUTOPSY PHOTO OF SWAN | 19 | 19 4 / 152 | 6 / 46 |
| 414 | AUTOPSY PHOTO OF SWAN | 19 | 19 4 / 152 | 6 / 46 |
| 415 | AUTOPSY PHOTO OF SWAN | 19 | 19 4 / 152 | 6 / 46 |

xxxii

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 416 | AUTOPSY PHOTO OF SWAN | 19 | 19 4 / 152 | 6 / 46 |
| 417 | AUTOPSY PHOTO OF SWAN | 19 | 19 4 / 152 | 6 / 46 |
| 418 | AUTOPSY PHOTO OF SWAN | 19 | 19 4 / 152 | 6 / 46 |
| 419 | AUTOPSY PHOTO OF SWAN | 19 | 19 4 / 152 | 6 / 46 |
| 420 | AUTOPSY PHOTO OF SWAN | 19 | 19 4 / 152 | 6 / 46 |
| 422 | PAWN TICKET | 52 | 52 / 152 | 46 / 46 |
| 423 | PAWN RECEIPT | 52 | 52 / 152 | 46 / 46 |
| 424 | PAWN FIELD RECEIPT | 52 | 52 / 152 | 46 / 46 |
| 537 | ALS RECORD | | 153 | 46 |
| 538 | ALS RECORD | | 153 | 46 |
| 539 | ALS RECORD | | 153 | 46 |
| 540 | POLICE REPORT | | 153 | 46 |

---

3

PROCEEDINGS

(Court convened; jury not present.)

THE COURT: This is the State of Texas versus James Broadnax. This is Cause Number F08-24667. Mr. Lollar, did you have an objection as to the mooted portions of the last video audiotape of Ms. Ellen Goldberg?

MR. LOLLAR: No.

THE COURT: You did not.

MR. LOLLAR: Well, are you saying that I have objection to the muted vers -- the muted portion?

THE COURT: Yes, sir. I mean, I'm --

MR. LOLLAR: Well, I --

THE COURT: -- aware of your previous objections, and those are preserved.

MR. LOLLAR: Yes, but -- I appreciate how the State handled that in the sense that they did not play that portion.

THE COURT: Right. So there -- there had been some rumbling about an objection. You withdraw that, as far as that portion of it?

MR. LOLLAR: No, sir. Now, my only con -- no. I mean, I do with -- I don't remember making an objection --

THE COURT: You did up here. You were

4

talking about making an objection about the fact that there was a -- the muted portion. That's beyond your objection about the grounds for reasons to suppress the whole thing.

MR. LOLLAR: Right. My concern was that if the jury wants to see that played back for them, back there, --

THE COURT: Right.

MR. LOLLAR: -- that they would play the whole thing without the muted portion.

THE COURT: Okay. Well, --

MR. LOLLAR: That's my concern.

THE COURT: Okay. We'll fix that if it comes up.

MR. LOLLAR: That was my only objection.

THE COURT: All right. And then there was an issue about John Calhoun. Do you have anything to update me on that, Mr. Alex?

MR. ALEX: No, sir. We're not calling Mr. Calhoun.

THE COURT: You're not calling him.

MR. ALEX: We're not calling him at this point, Judge. We don't have any intention of calling him at this point.

THE COURT: Okay. So if he does get

**5**

called, it will be in the punishment phase, correct?

MR. ALEX: If -- if for some reason, Judge, he becomes a witness again, I will make sure that the Court is aware of it. At this time, I don't even think it's proper for me to talk to Mr. Calhoun.

THE COURT: Okay. Well, here -- here's my request to you.

MR. ALEX: Okay.

THE COURT: I'm not making you do anything, okay? But the problem that I have is the Court has to pay for these defense witnesses to come in, and if there's no reason to have the defense witnesses come in, I'd like to know so that I don't have to spend county money on witnesses that don't need to be here. You see what I'm saying?

MR. ALEX: I understand exactly the Court's concern, Judge, and I'll address it very directly, and that is, whether Mr. Calhoun takes the stand or not, doesn't end the inquiry of whether or not we put on the extraneous of the other aggravated robbery.

THE COURT: Okay. Got it. Make sure that you do whatever you need to do to get the funding for the witness.

MR. MALLON: Yes.

**6**

THE COURT: Now with regard to the admissibility about testimony surrounding wet blunts during the case-in-chief, I'd ask the parties to see if they had any case law authority to support their opposing positions.

Do you have any authority on that, Mr. Alex?

MR. ALEX: Judge, I'm not offering any evidence on wet blunts or anything like that, and -- and I don't have any authority other than Rule 401, which is relevance. And if the black letter law says it's not relevant to any issue in the case, then it's not admissible. And I -- I fail to see how it can be used for a lesser, and it can't be used for guilt/innocence to decide whether he committed it or not. And it -- it can't be used to decide whether or not the statement was voluntary or not, then I fail to see where the relevance is, and I -- I just think it would be totally misleading to the jury, because you have to give them a limiting instruction on it, but what would you limit it to? Otherwise, they could consider -- they could go back and say, Well, he -- he could be not guilty because he was high off wet, which is contrary to the law.

THE COURT: Okay. Do you have any case

**7**

law to support your position?

MR. LOLLAR: Judge, we again would point out to the Court the brief we submitted on the issue of the diminished capacity, and specifically under Article 38.36 of the Texas Code of Criminal Procedure, either side is allowed to present evidence to the jury as to the condition of the mind of the accused at the time of the commission of the offense.

And we think the medical records and the testimony of Jason Varghese and Dr. Mirmesdagh reflect that the defendant told them that at the time of the commission of the offense, he had been smoking wet blunts, and we feel that is relevant.

THE COURT: Okay. Thank you.

MR. LOLLAR: Thank you.

And again, we would submit to the Court the case law we have previously submitted, Mays -v- State 2009, Texas, 0424.527; Ruffin -v- State 2008, Texas, 1211.351; Jackson -v- State, 160 S.W.3d 568; and under the authority of Clark versus Arizona, 548 U.S. 2006 case.

THE COURT: Okay. I anticipate that neither side would be able to come up with any new authority on this, so I went and researched it.

Voluntary intoxication is not a defense to

**8**

the commission of crime. Furthermore, any decision by the defendant to use narcotics is not relevant to whether or not he was able to form an intent relevant for the crime and will not be admissible in the case-in-chief. It will be admissible in the punishment phase.

Anything else before the jury gets down here at 9:00 o'clock?

Mr. Alex?

MR. ALEX: Um, I don't think so, Your Honor.

THE COURT: Mr. Lollar?

MR. LOLLAR: So that I'm clear, we will not be able to present the testimony of Jason Varghese or Dr. Mirmesdagh?

THE COURT: Correct.

MR. LOLLAR: Or the medical records.

THE COURT: Correct.

MR. LOLLAR: Please note our exception.

THE COURT: It's noted.

Anything else?

MR. LOLLAR: No.

THE COURT: All right. We're in recess.

MR. ALEX: Judge, I'm sorry.

THE COURT: You always do that.

9

MR. ALEX: I know you asked me once, but, I mean, I don't think we addressed the -- and -- and just for the record, I don't know that we addressed -- I think yesterday there was a -- there was a proffer that those -- that evidence would be offered to go toward the voluntariness of the statement, --

THE COURT: Yes.

MR. ALEX: -- which I don't think is -- you ruled on this, then you ruled on guilt/innocence. I think you ruled that it wasn't admissible to show that he's not guilty or that he is guilty. But I think the original submission yesterday was going toward the voluntariness of the statements, and I don't know if that's what counsel was asking just then or not.

MR. LOLLAR: Well, that is -- I would like to address that because Dr. Mirmesdagh --

MR. ALEX: I probably, Judge, --

THE COURT: I'm not allowing that either, okay? The evidence shows pretty clearly that it had been four days past his last possible opportunity he could have taken PCP, so I'm not allowing that.

MR. LOLLAR: And Dr. Mirmesdagh will testify, according to her records, she noted that he was still under the influence of drugs at the time she saw him at 7:30 on June the 23rd.

10

THE COURT: Response to that?

MR. ALEX: Yeah, I'm -- Judge, I'm only speaking to the part of the medical records that would be outside of the realm of voluntary intoxication, and I don't know if they were offering -- that's what I'm trying to get clarification on.

I thought yesterday they was going to offer doctors to say something about whether or not he could voluntarily give the statement. I don't think that the jury could use the fact that he voluntarily took drugs to say that the statement's involuntary, but there could be other stuff the doctors may be able to testify to --

THE COURT: If they're going to testify that they thought that he was under the influence the morning that he gave those statements, I think the jury is entitled to hear that.

MR. ALEX: Okay.

THE COURT: All right?

MR. ALEX: All right.

MR. LOLLAR: So I can present --

THE COURT: Yes.

MR. LOLLAR: -- Jason Varghese and Mirmesdagh.

THE COURT: Well, I don't know about --

11

who's Jason Varghese? I'm talking about the witness that's going to say at the time that he was giving that statement, he was under the influence and, therefore, that could affect voluntariness of the statement.

MR. LOLLAR: Both of them saw him at the same time.

THE COURT: Both of them did? Okay. Then yes.

MR. LOLLAR: And they both made records.

MR. ALEX: And we'll get a limiting instruction on that evidence.

THE COURT: Yeah.

MR. ALEX: Okay. And that's -- that's the only thing I wanted to -- to make sure that we were addressing, because I don't know that we addressed that this morning.

THE COURT: All right. We're in recess.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

Good morning, ladies and gentlemen. Thank you for being on time this morning.

We continue now with the trial of the State of Texas versus James Broadnax.

And what further says the State?

12

MR. ALEX: The State would call Dr. Amy Gruszecki, Your Honor.

THE COURT: Dr. Gruszecki, if you'll stand and face me.

**AMY GRUSZECKI**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex.

Mr. Alex, whenever you're ready.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. Good morning.

A. Good morning.

Q. State your full name for the jury, please.

A. Dr. Amy Gruszecki.

Q. And tell the jury what you do for a living.

A. I'm a medical examiner for the County of Dallas.

Q. And what does a medical examiner for the County of Dallas do?

A. A medical examiner is a forensic pathologist, which means I'm a doctor specialized to do autopsies to determine the cause and manner of death of individuals

13

who die suddenly and unexpectedly.

Q. And what qualifies you to make those opinions?

A. I have a Bachelor of Science Degree in biology.

I did a Master's of Science degree in forensic science.

I went to medical school for four years.

I went to -- I did a year of residency in internal medicine.

I did four years of residency in pathology.

And then I did a specialized year in fellowship, called forensics, which allows me to do what I do now.

I'm board certified in anatomic pathology and forensic pathology, and so that's -- those are my qualifications.

Q. And how long have you been a medical examiner?

A. I've been working for Dallas County for just over four years.

Q. And specifically, who do you work for? What's the name of the business that you work for?

A. It's the Southwestern Institute of Forensic Sciences.

Q. Is there an acronym that we normally use a bunch that if the jury hears, they'll know what we're

14

talking about?

A. Yes. We call it SWIFS.

Q. Okay. And so if I slip up and say SWIFS, we're talking about the Southwest Institute of Forensic Sciences.

A. Yes.

Q. Okay. Medical Examiner's Office in particular is who you work for.

A. Yes.

Q. All right. And tell the jury, just give them an overview of when a person dies in Dallas County, how is a decision made whether or not to come to you, or whether they go somewhere else?

A. Okay. We -- we have a statute which determines the individuals that when they die, they will come to us.

The statute just generally consists of people who die suddenly and unexpectedly. That means people who have died of a car accident, which would be a sudden unexpected death. People who have died because of a homicide or a suicide, those are sudden and unexpected deaths, so those individuals would come under our jurisdiction.

Additionally, we also get a subset of people who die suddenly and unexpectedly who may die of

15

natural causes, like a heart attack, but they didn't have known heart issues or anything like that, so they will also come to our office for an examination so we can determine why it is that they had died.

Q. All right. And specifically, were you called on to do an autopsy in Case Number 2127-08?

A. Yes.

Q. And how is it -- is there any significance to that case number?

A. That case number is a unique case number. The bodies or the individuals that come to our office for examination are each assigned a unique case number. In this case, it's 2127-08. All the paperwork and all the photographs and everything that we have for that -- for that case will have that number on it, and it's a unique identifying case number.

Q. All right. And is there any significance to maybe the amount of deaths that we may have had any particular time of year?

A. Well, actually, we number -- the -- the cases are numbered sequentially, so at this time of the year, we had 2127 -- 2127 bodies that came under our jurisdiction at that time.

Q. At that time. Okay.

And the name associated with that case number

16

is what?

A. Is Stephen Louis Swan.

Q. All right. Can you briefly give the jury an overview of what an autopsy consists of?

First, let me ask you this. Is autopsy, the science, is that -- is that an accepted science in the community in which you work?

A. Yes.

Q. All right. Give the jury a brief overview of what an autopsy consists of.

A. Okay. To do an autopsy examination, it consists of about three parts. The first part is an external examination. The body is brought out to me. I will look at it and I will examine it from head to toe on the outside.

I'll look at eye color. I'll look for scars. I'll look at -- if they have hair on their chin, and their face, mustaches, beards.

I'll look for any outstand -- any injury that's visible on the body. For instance, were they in a car accident. Do they have obvious broken bones, or contusions, or scrapes, or something from the car.

Do they have any gunshot wounds. Do they have any stab wounds, any of that. All of that is part of the external examination.

17

I will document that either in writing and sometimes by photograph, depending on what the injury is.

After the external examination is complete, the next part of the examination is the internal examination. An incision is made across the chest and into the abdomen, and all of the internal organs are examined one by one.

The internal organs are examined for natural disease. If they have coronary artery disease, cancer, or anything like that, in addition to if there's any injuries to those organs as well. Every case, the same. If it's an injury, whether there's injuries and natural disease, all of that will get documented.

During that internal examination, also we will take substances or fluids from the body for toxicology. We'll take blood, eye fluid, urine, if there's any, and muscle, and we'll submit that for a drug screening.

After that internal examination of the torso is completed, the next part we do is the head. An incision is made in the back of the head. And none of the procedures that we do interferes with viewing the body for a funeral. Everything we do is hidden in a way that a person could still be viewed at a funeral. An incision is made across the back of the head, and

18

the scalp is reflected and the top of the -- the skull is removed and the brain is examined for, again, natural disease and if there's any injury to the brain as well.

After all that is done, I prepare a report which lists my findings.

Q. Very good. And the report, did you prepare a report in this case?

A. I did.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir, and as necessary to develop her testimony.

Q. (BY MR. ALEX:) And as it -- as it relates to the report, do you also document your findings and your autopsy with photographs?

A. Yes.

MR. ALEX: May I have one second, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) We're going to start with State's Exhibit 394. Is that a true and correct copy of the report that you would have submitted in this case.

A. Yes.

Q. And there's front and back pages; is that

19

correct?

A. Front and back pages, yes.

Q. All right. And in addition to that, State's Exhibits 409 through 420, are those the photographs associated with this case?

A. Yes. State's Exhibits 409 through 420 are photographs that I have taken during the time of the autopsy procedure.

Q. All right. And the procedure that you described for the jury as being the normal procedure for an autopsy, did you follow all those procedures in this case?

A. Yes.

MR. ALEX: At this time, Judge, we'd offer the report, State's Exhibits -- I'm sorry -- 394 and 409 through 420 exclusively, Your Honor.

THE COURT: Inclusive, you mean?

MR. ALEX: Inclusive; yes, sir.

MR. LOLLAR: Judge, we have no objection to State's Exhibit 394.

In regard to State's Exhibits 409 through 420, we'd offer the same objections that we offered at the pretrial hearings.

THE COURT: State's Exhibits 394, and 409 through 420 are admitted. The objection's overruled.

20

MR. LOLLAR: May we have a running objection?

THE COURT: Yes, sir.

MR. LOLLAR: Thank you.

MR. ALEX: Permission to publish?

THE COURT: Yes, sir.

MR. ALEX: And again. I'm going to let any members of the audience know if they'd like to leave, now would be the time to do it.

Q. (BY MR. ALEX:) All right. Let's go through --

THE COURT: Let me interrupt you, Mr. Alex.

Ladies and gentlemen of the jury, these photographs are graphic, and I'm only telling you that so that you can be prepared for it. It is necessary that you observe them, because they have been admitted into evidence and they are about to be published.

Q. (BY MR. ALEX:) Let's talk about the report first, Dr. Gruszecki. I have State's Exhibit 394 here in front of me and you've got the original up there?

A. I do.

Q. All right. Let's go through the -- your general examination. Can you tell the jury what size of man Stephen Swan was?

21

A. He was a — 175 pounds and 76 inches tall.

Q. Okay. And your date of death here, time of death, date of examination, and time of examination, the date of death, how would that have been determined?

A. The date of death was the time and the -- the date that the individual was found dead.

Q. Okay. And that would be June 19th, 2008?

A. It is. And he was found at approximately 1:20 in the morning.

Q. All right. And the time of examination, you have here 7:15 a.m.?

A. Yes.

Q. And how old of a man was he?

A. He was 26 years old.

Q. All right. Is there -- the length is not in feet, but how tall of a man would he have been if he had been standing?

A. Oh, you're going to make me do math. 76 inches is six foot four; is that correct?

THE COURT: Yes.

THE WITNESS: Thank you, sir.

Q. (BY MR. ALEX:) Now, tell the members of the jury your -- your external examination, the results of that.

A. On my external examination, he had brown-red

22

hair. He didn't -- he had a small scar on the bottom of his chin, but probably most significantly, he had gunshot wounds to his head and to his chest.

Q. And when you do an internal examination, tell the jury, what are you looking for there? Are you looking for something other than the -- the -- your natural result for the cause of death?

A. When I do the external examination on the -- in this case, on the head, and look at the brain as well as on the chest, I will look -- I will follow the track of the gunshot wounds and the bullets, the way the bullet proceeded through the body and what it hit on its way through the body.

In addition to that, I also look to see if there was any natural disease as well.

Q. But -- but did you notice any natural disease at all that would have contributed to the cause of death?

A. No.

Q. So let's talk about the evidence of the injury. Could you describe the evidence of injury on Mr. Stephen Swan?

A. Sure. He had a gunshot wound to the head. There was an entrance on the right side of the head on the temporal region, which is roughly about right here

23

(indicating).

This gunshot wound was an intermediate-range wound, which we'll talk about probably in a moment. The projectile passed through the temporal region of the head below -- through the skin of the -- the side of the head, through the -- basically through the top -- the bone on top of your -- the eye. So it went through the bone at the base of the skull this way, in this direction (indicating).

It went through the bone on the side, on the left side of the base of the skull as well, and then it exited on the left side of the head, right in front of the ear. This little part on your ear right here is called the tragus, and there was a gunshot wound of exit right in front of that on the left side.

There was no soot or stippling on the exit wounds, but there was stippling around the entrance wounds.

Shall I describe what I mean by stippling?

Q. Yes, tell us what that -- the significance of stippling.

A. Okay. An entrance wound can be classified in three different ways. It can be classified as a close-range wound. It can be classified as an intermediate wound, which is what this is, or a distant

24

wound.

A close-range wound is when the gun is right up against the skin or very, very close to the skin, and what happens in an -- in a close-range wound is that there is fine powdered soot that will either be around the wound or inside of the wound, and that is because all of -- all that, as the bullet is fired, the gunpowder lands on the skin.

As it -- it reaches a more -- let's go to distant. A distant-range wound is as the bullet is fired, all of that gunpowder particles and everything falls off before it hits the skin. A distant wound is anything from roughly 12 to 18 inches away from the body. Now, that may not sound very distant, but in my world, that's what a forensic pathologist will refer to as distant. It could be anywhere from 12 to 18 inches away to, say, a football field length away. Those would all be a distant shot, and that would leave no soot, gunpowder particles or anything on the skin.

The — the middle range is the intermediate range, and that is where you have the -- the smaller soot-like stuff that you see on the skin falls away as the bullet is fired, but there's still some heavier particles of gunpowder that fly with the bullet and embed themselves in the skin. That produces this

25

polka-dotted appearance around the wound, which I refer to as stippling, and that's basally the embedding of these heavier gunpowder particles on the skin.

So an intermediate-range wound is pretty much anywhere from contact to about six to eight inches away from the wound. Now these are just general numbers. If you really want to know exactly, you have to test fire the gun with the same ammunition and everything else to produce the same effect, but just generally speaking, and for rule of thumb, those are -- those are good numbers to determine.

So this entrance wound had stippling around it so, therefore, it's an intermediate-range wound.

Q. All right. And as it relates to the gunshot wound to the head, that would be consistent with me, say, standing here over co-counsel with a gun, anywhere from close to contact, twelve inches away and firing it into her head.

A. Yes, sir.

Q. Okay. All right. And continue to tell us about the other evidence of injury you saw to Mr. Stephen Swan.

A. Mr. Stephens [sic] also had a gunshot wound to the chest. On the left chest was a gunshot wound which, um, was approximately about right here on his

26

chest, and this gunshot wound weren't like through the skin. It did not have any soot or stippling around it.

He was wearing clothes at the time, so the clothes may be able to tell more if there's any gunpowder particles on the clothes, it may help with range of fire.

As far as I'm concerned, I did not see any on my examination.

So the gunshot wound was on the left chest. The projectile passed through the -- through the chest and hit the upper lobe of the left lung. It went through the lower lobe of the left lung and it exited in the back through rib nine and it lodged within the muscle of the back, so I actually was able to recover the bullet from -- from his back.

Q. Okay. And as it relates to the type of injuries it would have caused to Mr. Swan, assuming he was alive when he was shot, can you give the jury some feeling for that?

A. The gunshot wound to the head would have been pretty severe immediately. It's a devastating wound to have traumatic brain injury like that. And he had subarachnoid hemorrhage on his head and contusion on his brain. And in addition, the -- the base of his skull had multiple fractures, so that would have been a

27

devastating injury relatively immediately.

It may not have stopped his heart immediately, but that would have been an injury that would have at least made him lose consciousness.

Q. Okay. And I'm going to stop you there. And ultimately, without -- without immediate attention, it would have been a fatal wound.

A. Yeah. Even with immediate attention, it may have been a fatal wound.

Q. So if I had shot co-counsel in the head like that and left her sitting there, it ultimately would have ended her life.

A. Likely.

Q. Very good. All right. Let's go to -- to your next --

A. The gunshot wound to the chest, that was a wound that went through the lungs so that the deceased would have had difficulty breathing.

The other information which I did not mention earlier as I was describing the wound is, there was approximately 1400 milliliters of blood in his left chest. To give you an idea of how much 14 [sic] milliliters of blood is, first of all, there should be no free blood within the left chest. All the blood should be in the vasculature. But, if you think about

28

a bottle of water that everybody carries around, that's about 500 milliliters, so we're talking essentially three of those bottles filled with blood, that was how much blood was in his left chest as a result of this wound.

It would make it difficult for him to breathe, not to mention the loss of all that blood, the heart couldn't pump blood to the brain and to everywhere else that it needed, so it would also be a very devastating wound.

MR. HIKEL: May I approach the witness, Judge?

THE COURT: Yes, sir.

THE WITNESS: Thank you. Appreciate it.

Q. (BY MR. ALEX:) Okay. Dr. Gruszecki, as part of your report, you do a diagram to sort of aid the jury, and right now I'm going to excise just the last page and I'll put it back together.

You do a diagram to sort of aid the jury as to entrance.

MR. ALEX: Gordon, would you [sotto voce conversation].

A. This is a diagram in my writing. And what you're focusing in on right now is the exit gunshot wound. This is a diagram of the left side of the head,

29

and right here is a laceration, which was the exit wound.

Q. (BY MR. ALEX:) All right. And then the entrance?

A. And this is the entrance gunshot wound, and as I said, it was on the right temple region of the head, and in the center you see a circle that I drew, and that circle represents the entrance of the gunshot wounds. But then you see all those dots that I drew around there, that represents the stippling. And I believe we'll see photos of that soon.

Q. Very good. And I'm going to back up just one second.

The very first photograph, State's Exhibit 409, do you take what's called an ID photo so that when you start the process off, you have a -- a facial shot of the individual you're doing an autopsy on?

A. That is correct.

Q. State's Exhibit 409, the case number that's here, 08-2127 is what's on the report; is that right?

A. Yes. That's the unique identifying case number assigned to this case. It will be in all the photographs that you see.

Q. So any photograph or report that we see from

30

your office with this number, will refer to this individual; is that correct?

A. Yes.

Q. Okay. Now, if we go to the wounds to the head that we were just talking about, you -- do you normally take more of an outer view and then try to focus in on the injury?

A. Yes, I do.

Q. All right. State's Exhibit 414?

A. So, this is a photograph of the gunshot wound to the head that I described. This is an entrance gunshot wound.

Around the edge of the wound you may be able to see that this is a darkened circle around the edge. That's called a rim of abrasion. It's characteristic of an entrance gunshot wound.

Q. I'm going to switch it on you. State's Exhibit 415, do we have a more close-up view of what you're talking about?

A. Yes. And -- and there you can see better the sort of seared edge of the abrasion.

Now, the rim of abrasion, think of it like if you fall down and skin your knee, you get an abrasion on your knee, well, this is an abrasion that's caused by the bullet as it passes through the skin.

31

Again, it's characteristic of an entrance gunshot wound.

Now, the other thing that you can see clearly in this photograph, and -- if Mr. Alex will back up slightly, the photograph, you can see the stippling.

So the stippling is all of these red and black dots here that -- that surround the wound. So that's all the unburned gunpowder particles as they embedded in the skin as the projectile was headed towards the head.

Q. Okay. And as it relates to the specific intent to kill, that would be evidence of a person's intent to take someone's life, whether they hold a gun to a person's head versus like to their foot, or their legs as they're trying to get away or something like that, right?

A. It would be a devastating wound, yes.

Q. Okay. Very good. And if we're going to talk about the exit wound, the -- State's Exhibit 418, that's sort of the -- the distance shot of that; is that correct?

A. That is. And as you can see in the left ear and you can see in the -- right here, in the exit wound, it's sort of an irregular laceration that the bullet made as it exited the head.

32

Q. And I'm going to switch it up on you and go to the fifth photograph that you would have took that would have been closer up.

A. As you can see, this exit wound is less round. It's more irregular. It does not have a row of abrasion. All of these are characteristics of an exit wound. And there's no soot or stippling around it either.

Q. And the path of the bullet, would it have actually entered the brain or no?

A. It -- it did not -- it actually did enter the brain inferiorly, right -- it passed beneath the skull right underneath the brain, enough to cause the bones to break and cause a contusion on the inferior aspect of the brain as well as some subarachnoid hemorrhage.

Q. Thank you, ma'am.

And then as it relates to the second gunshot wound that you spoke of, gunshot wound to the chest area, State's Exhibit 416, what are we looking at here?

A. This is a gunshot wound to the right chest, and as you see, which is very -- stark different from the other wound that we looked at that was an entrance wound, this does not have soot, or stippling, or gunpowder particles around it. There are no polka-dotted particles around this wound.

**33**

It also has a rim of abrasion.

Q. All right. And the closer up view of that would be State's Exhibit 417. I'll tell you what, let me move this one out first.

A. So what you see here is a round entrance wound with a rim of abrasion.

Q. And this would be indicative of an entrance wound.

A. This is a -- yes, this is the entrance wound.

Q. When the -- a person comes to the Medical Examiner's Office, do you take a photograph of the person sort of as is, the way that y'all received them?

A. Yes. At the -- before I begin my examination, before we collect any evidence, before I do any examination at all, I take a photograph of the body, which I refer to as an as-is, which shows how the body was received by me immediately first -- upon viewing it.

Q. Okay. So State's Exhibit 410, -- I'll tell you what. If I put it this way, I could probably get the whole thing on.

A. So this is an as-is photograph of the pers -- or the upper half of the deceased's body.

As you can see also, it has the case number up at the top, which is the unique identifying number.

**34**

You can also see that the hands have paper bags over it, and this is to preserve any evidence, or any soot, or anything that may be on the hands in the time from transporting the body from where it's found to my examination table. And you can see that he is fully dressed as well.

Q. Okay. And did you also take a photograph of the lower half of the body, State's Exhibit 411, to document primarily how the person arrived at your office?

A. That's correct. And this is the lower half of the body, and also, you can see up in the upper left-hand corner there the unique identifying case number as well.

Q. And finally, there's a photograph that you would have taken, the projectile of the bullet, State's Exhibit 420, that would have been removed from the body of Mr. Swan?

A. Yes. This envelope, this yellow looking envelope, the manilla envelope, that's all written in my handwriting. This is -- it is also labled with the case number and the deceased's name.

When I removed the bullet from this individual's back, I photographed it and sealed it in this envelope and submitted it for evidence.

**35**

Q. Thank you.

MR. ALEX: Judge, I think we can have the lights.

Q. (BY MR. ALEX:) And, Dr. Gruszecki, the -- ultimately, would you make an opinion as to the cause of death of Stephen Swan?

A. Yes. It is my opinion that Stephen Swan died as a result of multiple gunshot wounds.

Q. And the manner of death?

A. Homicide.

Q. And when we talk about -- you're not an expert in recreating crime scenes; is that correct?

A. That's correct.

Q. But you could give me an opinion on whether or not something was consistent with known facts or not, could you not?

A. Yes.

Q. All right. I'm going to ask you this. If -- hypothetically, if I was -- if I was an assailant with a handgun, would -- would you have any opinion as to what size of a handgun would create this type of a hole, entrance hole?

A. I would not.

Q. Okay. Very good. If I had a small-armed handgun and I was intent on robbing and killing

**36**

somebody and I shot them as they -- in the chest area, and in addition was shooting at another individual and then shot a person directly in the head next, would that be consistent with your findings?

A. Yes.

Q. Okay. Very good.

That's all I've got.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Cross-examination?

MR. LOLLAR: We have no questions.

Thank you, Doctor.

THE COURT: May the witness be permanently, excused?

MR. ALEX: We have no objections to that, Your Honor.

MR. LOLLAR: Yes, sir.

THE COURT: You're permanently excused, Doctor. Thank you for your testimony.

What further says the State?

MR. ALEX: The State is going to call the --

THE COURT: Who are you calling, Mr. Alex?

MR. ALEX: It's going to be Clint McNear, Your Honor.

37

THE COURT: Clint McNear.

Are you Mr. McNear? It's actually Off. McNear, is it not?

MR. ALEX: It is, Your Honor.

THE COURT: Off. McNear, will you please come all the way to the front of the courtroom up by the door. When you've reached the door, turn and face me and raise your right hand.

**CLINT McNEAR**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. Okay. Off. McNear, would you tell the jury your full name?

A. Clint McNear, M-c-N-E-A-R.

Q. And tell the jury what you do for a living.

A. I'm an investigator for the Garland Police Department.

38

Q. How long have you been an investigator for the Garland Police Department?

A. Approximately ten years.

Q. And what did you do before that?

A. Worked the streets as a patrol officer.

Q. How long did you do that?

A. Roughly six years.

Q. And before that, what did you do?

A. Served in the United States Marine Corps.

Q. Marine Corps?

A. Yes, sir.

Q. You should speak up when you say that. How long were you in the Marine Corps?

A. A year active duty.

Q. And before that, what did you do?

A. I was in high school.

Q. All right. So you went from high school to the Marine Corps, to serving your community at the Garland Police Department; is that correct?

A. Yes, sir.

Q. All right. And you've been a Garland Police Officer for how long?

A. A little over 15 years.

Q. College?

A. No, sir.

39

Q. All right. Training and experience at Garland to be a detective?

A. Various schools, altogether since my employment there, about 2200 hours of various schools and training.

Q. And experience on the street with suspects and -- and witnesses; is that correct?

A. Yes, sir.

Q. And in this case, did you-all go out and collect a weapon that turned out to be the murder weapon in this case?

A. Yes, sir, we did.

Q. All right. And just as a general matter, we're talking about the double homicide of Stephen Swan and Matthew Butler; is that correct?

A. Yes, sir. That is correct.

Q. Did you assist in that investigation?

A. Yes, sir.

Q. Were you the lead detective on it?

A. No, sir.

Q. Who was the lead detective?

A. Det. Sweet.

Q. All right. Was Det. Sweet with you when you went out and recovered the weapon?

A. No, sir, he was not.

40

Q. All right. Let's start off with, did you assist in interviewing a young man by the name of Demarius Cummings?

A. Yes, sir, I did.

Q. All right.

MR. ALEX: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

MR. ALEX: Thank you.

Q. (BY MR. ALEX:) State's Exhibit 396, is that a photograph of Mr. Demarius Cummings?

A. Yes, sir, it is.

Q. And that appears to be the photograph he took when he was booked into the Dallas County jail?

A. I believe so; yes, sir.

Q. Okay.

MR. ALEX: I'm going to offer State's Exhibit 396 at this time.

THE COURT: Will there be objection?

MR. LOLLAR: No.

THE COURT: State's Exhibit 396 is admitted.

MR. ALEX: Permission to publish?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) His appearance, Det. McNear,

41

significantly different than the defendant in this case; is that correct?

A. Yes, sir.

Q. And when you interviewed Mr. Cummings, we -- we can't go into anything that he said, but was he ultimately somewhat cooperative?

A. Yes, sir.

Q. All right. Was he ultimately the source of where to find this gun?

A. Yes, sir, he was.

Q. All right. And did you-all go out to the Junction Street apartments in search of this gun?

A. Yes, sir.

Q. All right. And without going into anything that Mr. Cummings said, did he direct you to those apartments?

A. Yes, sir, he did.

Q. All right. And when you went out to those apartments, did you know who or where you were looking to find a gun?

A. We had a person and an apartment pointed out to us.

Q. Okay. And it was pointed out to you by whom?

A. Demarius Cummings.

Q. All right. And after that was pointed out to

42

you, did you-all go to that apartment and speak to that person and get consent to go in and search for the weapon?

A. Yes, sir.

Q. Was that a person by the name of John Calhoun?

A. Yes, sir, it was.

Q. All right. And was Demarius Cummings with you-all when you went into the apartment of John Calhoun?

A. Um, we passed by with him and then got him out of the area --

Q. Okay.

A. -- before taking him back.

Q. All right. So he was not physically with you when you went into that apartment.

A. No, sir.

Q. Very good. But after entering into the apartment of John Calhoun -- excuse me -- did you ultimately find this murder weapon hidden in between a mattress?

A. Yes, sir.

Q. All right. Now, I'm saying "murder weapon," Det. McNear, but obviously you didn't witness this offense; is that right?

A. That's correct.

43

Q. All right. And if there's testimony that will come up later that connects it to the offense, that would just be other expert testimony; is that correct?

A. That's correct.

Q. But in hindsight, as a detective, you're confident that this is the murder weapon as well; is that right?

A. I believe so; yes, sir.

Q. Very good. All right.

State's Exhibit 80, 81, 82, 83 and 84, I'll ask you to look at those exhibits, and as you look at those exhibits, did -- when you collected the weapon, did you turn it over to crime scene there at -- crime scene investigator in Garland?

A. Yes, sir, I did.

Q. And would it have been turned over to a young lady by the name of Isabel Giannone?

A. Yes, sir, that's correct.

Q. All right. And is he [sic] a civilian that works at Garland crime scene?

A. Yes, sir.

Q. All right. And does this appear to be the same weapon that you turned over to her?

A. Yes, sir, it is.

Q. All right. And that includes a serial number;

44

is that correct?

A. Yes, sir.

Q. And would you read that serial number in for the record, please?

A. 71, N as in Nora, 03924.

Q. Okay.

MR. ALEX: We would offer it at this time, Your Honor, State's Exhibits 80, 81, 82, 83 and 84.

THE COURT: Will there be objection?

MR. LOLLAR: No, Your Honor.

THE COURT: State's Exhibits 80 through 84 are admitted.

You may publish.

MR. ALEX: It may be quicker to do it this way, Your Honor.

Q. (BY MR. ALEX:) And did that weapon include a magazine, Off. McNear?

A. Yes, sir, it did.

Q. And did it also include what we would commonly call a projectile or a bullet?

A. Yes, sir.

Q. And all of those items would have been under the mattress at John Calhoun's apartment; is that correct?

A. Yes, sir. They were altogether.

45

Q. In addition to recovering the murder weapon, Det. McNear, were you one of the officers that would have went out to a pawn shop, EZ Pawn over in east -- Southeast Dallas?

A. Yes, sir, I was.

Q. Over on 2nd Street?

A. Yes, sir.

Q. All right. And when you went out to the pawn shop, did you have -- let me ask you this as a general proposition. Do you-all have the technology, if you know that something could have been pawned by a particular person with a particular name, is there a process where you can go on the internet, some way, and look up and see if -- let's say, for instance, I left here today and I went and pawned some of Ms. Handley's property and I used my ID at the pawn shop down the street. Is there any way for law enforcement to know that?

A. Yes, sir, there is.

Q. How is that?

A. **Computer data base program where various input can be put in and a search conducted for property of a person, and things of that nature.**

Q. And after speaking to Mr. Demarius Cummings, did you-all -- were you-all able to locate a pawn shop

46

where he may have frequented soon after this offense?

A. Yes, sir.

Q. And did you-all go out to the 2nd Street there in Southeast Dallas to an EZ Pawn?

A. Yes, sir, we did.

Q. Speak to a young man by the name of Jermaine Johnson?

A. Yes, sir, we did.

Q. And did you recover some tools that was pawned by Demarius Cummings and the defendant in this case, James Broadnax?

A. Yes, sir, we did.

Q. All right. And in speaking to Mr. Jermaine Johnson, were you able to determine that the tools came from the car in which was taken from the crime scene?

MR. LOLLAR: Judge, we'll object to hearsay.

THE COURT: Response?

MR. ALEX: I'll withdraw it, Judge.

THE COURT: Sustained.

Q. (BY MR. ALEX:) Were you able to determine that the tools that you recovered were fruits of the robbery in this case?

A. Yes, sir, we were.

Q. Okay. And in addition to the tools, were you

47

able to determine that there was a receipt -- well, let me ask you this: When you go and you recover tools or any items from a pawn shop that potentially could be evidence in a crime, do they just give them to you or do you have to write them a receipt?

A. **We fill out a form, which is basically a seizure form, that we'll take the property and it will be set for a hearing.**

Q. And do you try and determine whether or not there's other evidence there by way of receipt of any type that may have been given to anybody who would have pawned the items?

A. **Yes, sir. We'll either obtain the original or a copy of the original pawn receipt when the original transaction took place.**

Q. All right. Take a look at State's Exhibits 85 and 86 and tell me if those appear to be the tools that you recovered from the pawn shop.

A. **Yes, sir, they are.**

Q. And when you-all went out there, it would have been on June the 24th of 2008; is that correct?

A. **I believe that's correct; yes, sir.**

MR. ALEX: At this time, we'll offer State's Exhibits 85 and 86, Your Honor.

MR. LOLLAR: No objection.

48

THE COURT: State's Exhibits 85 and 86 are admitted.

You may publish.

Q. (BY MR. ALEX:) Now, Off. McNear, when you went out there to speak to Mr. Johnson, did you-all inquire as to whether or not there were -- there was any video evidence by way of video cameras that may have been utilized by the pawn shop?

A. Yes, sir, we did.

Q. All right. And did you-all sit down and watch a video as it related to the two individuals showing up to pawn these items?

A. Yes, sir, we did.

Q. And did you personally watch that video?

A. Yes, sir, I did.

Q. All right. And in doing so, tell the jury what you saw in the video.

A. **Pretty short, simple video. You see Demarius Cummings and James Broadnax enter, approach the counter. Had some tools. The transaction took place. I believe they only sold or pawned half the property. Then you see them exit the store.**

Q. Is the car shown anywhere on the video?

A. **I believe there's a short frame where you can see the car pulling up to the store.**

FIRM NAME

Page 45 to 48 of 257

49

Q. And in all fairness, we don't have that video today, do we?

A. No, sir, we don't.

Q. All right. Do you have any idea where that video is?

A. No, sir.

Q. All right. It's your understanding that the pawn shop -- they -- they think they gave it to you-all; is that correct?

MR. LOLLAR: Objection to leading, Your Honor.

THE COURT: Sustained.

Q. (BY MR. ALEX:) Well, Mr. McNear, we can explain to the jury why the video is -- is not here. Would you like to do that?

A. Yes, sir.

Q. Can you do that by way of narrative?

A. Yes, sir.

Q. Okay. Tell the jury why you think we don't have a video here.

A. All the stores, businesses that we deal with, all have various different types of video. There's no set system that's used out there, so generally when we go to retrieve a video, they'll have to either have a company come in and retrieve that video for us, or

50

they'll have to have a technology person come in and burn a CD or -- in some fashion. They could not get it for us that day, and when we called back to check at a later time, they stated that they didn't have it and they believed that an officer had picked it up.

Q. All right. And you checked and nobody at your station had picked up the video; is that correct?

A. That's correct.

Q. All right. And at that time there was no video to obtain; is that correct?

A. That's correct.

Q. But are you telling this jury that you watched the video in which -- and when you say James Broadnax, you've already identified Demarius Cummings. Do you see James Broadnax in the courtroom today?

A. Yes, sir, I do.

Q. Have you ever seen him before today?

A. Yes, sir, I have.

Q. All right. Would you point to where he's sitting and describe an article of clothing he has on?

A. A white shirt and a green-colored striped tie.

Q. And that would have been sometimes around 11:00, 11:30 in the morning that the folks would have been at the pawn shop? Does that sound about right?

A. Yes, sir, the morning after the -- the

51

offense; yes, sir.

MR. ALEX: May the record reflect that the witness -- I'm sorry.

Q. (BY MR. ALEX:) You're referring to the gentleman sitting directly in front of me; is that correct?

A. Yes, sir, I am.

MR. ALEX: May the record reflect that the witness has identified the defendant in open court?

THE COURT: Will there be objection?

MR. LOLLAR: No, Your Honor.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) And I think you previously testified that as part of your investigation at the pawn shop, you would have collected a few items. State's Exhibit 423, is that one of the items that you-all would have collected?

A. Yes, sir, it is.

Q. And State's Exhibit 422, EZ Pawn receipt ticket?

A. Yes, sir.

Q. And then State's Exhibit 424, would that be a receipt that you wrote when you collected the tools?

A. Yes, sir, it is.

Q. All right.

52

MR. ALEX: We'd offer State's Exhibits 423, 424, and 422 at this time, and may the record reflect that they've previously been tendered and given to opposing counsel.

THE COURT: Will there be objection?

MR. LOLLAR: No objection.

THE COURT: State's Exhibits 422 through 424, inclusive, are admitted.

And you may publish.

MR. ALEX: I may need to do this with the document, Your Honor.

Q. (BY MR. ALEX:) Off. McNear, let's start with State's Exhibit Number 423, and let me see if I can zoom in on it. See if this helps or hurts.

As a general proposition, I'm going to go across with this and hopefully I won't make everybody dizzy, but I'm going to go across with this and let it zoom in.

Does this appear to be a ticket that you would get when you pawn an item that shows how much money you got for it?

A. Yes, sir. This is the tag attached to the property for their inventory purposes.

Q. Okay. So this is -- okay. So it wouldn't be given to the person. This is what they would keep at

53

the pawn shop.

A. Yes, sir. This would be attached to the tool set so when it was placed in storage, it's a form of their tracking.

Q. Okay. And it bears the name of Demarius Cummings; is that correct?

A. Yes, sir.

Q. And the date 6/19/08?

A. Yes, sir.

Q. With the ticket number. And it says it's for hand tools; is that correct?

A. Yes, sir.

Q. And this one may be a little more difficult, but we'll see what -- the best we can do.

State's Exhibit 422, we'll start with the top half here.

And again, we're looking at what's -- what's considered an EZ Pawn receipt. This would have been the copy that they would have kept of a receipt; is that correct?

A. Yes, sir.

Q. And there is an identification type and number; is that correct?

A. Yes, sir.

THE COURT: Is this State's Exhibit 423,

54

Mr. Alex?

MR. ALEX: 422, Your Honor. I apologize.

THE COURT: That's all right.

MR. ALEX: State's Exhibit 422 is what we're speaking about.

Q. (BY MR. ALEX:) And the type appears to say that it's a -- sorry.

(Sotto voce discussion.)

Q. (BY MR. ALEX:) It appears to say that it's a driver's license with a number. Does that appear to be what it's saying there?

A. Yes, sir.

Q. Do you know if you can pawn something at a pawn shop without a driver's license?

A. I don't believe --

Q. And if you don't know, that's fine.

A. I don't believe so; no, sir.

Q. So if you and I went to a pawn shop and we wanted to pawn something and I had a driver's license and you didn't, then I would be the one pawning it.

A. That's correct.

Q. Does it show a time there?

A. Yes, sir.

Q. Does that appear to say 11:29 a.m.?

A. Yes, sir, it does.

55

Q. And the city for Mr. Cummings he listed here was Texarkana; is that right?

A. Yes, sir.

Q. It shows his height, sex, eyes, date of birth, date that it was made, June 19th, 2008, the amount of money he would have potentially received, and finally there appears to be a signature line; is that correct?

A. Yes, sir.

Q. I said "finally," but you know how lawyers are. There is a -- also a box here that describes what it is that's being pawned; is that correct?

A. Yes, sir.

Q. And, Off. McNear, the --

MR. ALEX: That's all I have for the document, Judge.

Q. (BY MR. ALEX:) When you-all watched this video that we don't have, would you have watched it there with the young man, Jermaine Johnson, who would have been working at the time? Would he have also watched the video with you-all of the --

A. Yes, sir.

Q. Okay. Do you -- do you have occasion to frequent pawn shops at all in your line of work?

A. Yes, sir.

Q. And let's just say, for instance, I reported

56

to you that somebody broke in my house last night and took some of my property, as a detective, would not one of the first things you'd do would be to check the local pawn shop around that hour to see if that type of property was pawned?

A. That would be the first thing; yes, sir.

Q. So pawn shops would be frequented by detectives on a regular basis.

A. Yes, sir.

Q. Would that be fair to say?

A. Yes, sir.

Q. And the people working there would deal with police officers on a regular basis.

A. Yes, sir.

Q. Okay. All sorts of people.

A. Yes, sir.

Q. Okay. Detective, as a general matter, -- that's okay.

MR. ALEX: I'll pass the witness, Your Honor.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Detective, just one question. When you-all recovered the pistol from between the mattresses at

57

Mr. Calhoun's apartment, did you-all take any kind of precautions not to, I guess, mess up any physical evidence that might be on that?

A. Yes, sir.

Q. And what particularly did you do?

A. The weapon and the magazine, everything that we recovered when we located it between the mattresses, was laying on, I believe, a towel or a pillow case or some cloth, and so I just took it as it sat in that container, rather than touching it, and transported it that way.

Q. And is that in an attempt to preserve any type of biological evidence that might be on the weapon?

A. Any form of evidence, -- yes, sir -- that may have been on it; yes, sir.

Q. Such as any DNA?

A. Yes, sir.

Q. Okay. Thank you.

MR. LOLLAR: That's all I have.

THE COURT: Redirect?

MR. ALEX: Yes, sir.

Q. (BY MR. ALEX:) Detective, probably what I need to do at this point is, just so the jury has some idea of the locations we're talking about, State's Exhibit 385, did that appear to be a Mapsco

58

diagramming a -- to give the jury an overview of this whole crime-scene area that we're talking about, A would be the location in Garland; C would be a location of the crime scene; D would be perhaps a location of Mr. Nate Johnson's residence; E would be the apartments on Junction; and F would be the location of the pawn shop. Does that appear to be correct?

A. Yes, sir.

Q. Okay. State's Exhibit 386, general locations in it's -- it's significant to the jury, A would be the location of Nate Johnson's work; B would be the crime scene; C would be the firehouse; and D would be Nate Johnson's residence there in Garland.

Does that appear to be the -- 386?

A. Yes, sir.

Q. Okay. State's Exhibit 387, is that an aerial photo of the apartments on Junction which shows the location generally where the murder weapon was found?

A. Yes, sir.

Q. Okay. Did you ever go out to the location where Alice Gatewood would have resided?

A. Within the same apartments?

Q. Yes, sir.

A. I did not make the initial trip; no, sir.

Q. Okay. Have you ever gone out there at any

59

time during your investigation?

A. I've been to the complex several occasions. I didn't go when the interview was conducted with --

Q. Okay. I understand.

And State's Exhibit 389 would show the proximity of the Junction Street apartments where the murder weapon was taken to the pawn shop; is that correct?

A. Yes, sir, it is.

Q. All right. And State's Exhibit 388, can you identify whether or not this is the location where Alice Gatewood would have lived with the defendant or anyone else?

A. I don't know that.

Q. Very good.

MR. ALEX: At this time, Judge, we'll offer State's Exhibits 385, 86, 87 and 89.

THE COURT: Any objection?

MR. LOLLAR: No objection.

THE COURT: State's Exhibits 385 through 387, inclusive, and State's Exhibit 389 are all admitted.

MR. ALEX: That's all I have for this witness, Your Honor.

MR. LOLLAR: We have nothing further.

60

THE COURT: May the witness be permanently excused?

MR. ALEX: We're -- we're going to keep the witness on standby, Judge, as he's one of the detectives in the case.

THE COURT: All right.

You're excused for the time being, Detective. Thank you for your testimony.

What further says the State?

MR. ALEX: Judge, our next witness will be the crime-scene person.

THE COURT: We'll take a brief recess for the jury until approximately 10:00 o'clock. It might be a little later. It depends on how long it takes to set up.

All rise for the jury.

We're in recess.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

What further says the State?

MR. ALEX: The State would call Isabel Giannone, Your Honor.

THE COURT: Isabel Giannone, if you'll come to the front of the courtroom all way to the door.

61

Go as far as you can.  When you've reached the door, turn and face me and raise your right hand.

**ISABEL GIANNONE**

was called as a witness and testified as follows:

THE COURT:  Lower your hand.  Take your seat in the witness stand.

Make sure you keep your voice up.

Mr. Alex, whenever you're ready, sir.

MR. ALEX:  Thank you, Your Honor.

THE COURT:  Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q.  State your full name, ma'am.

A.  Isabel Giannone.

Q.  And tell the jury what you do for a living.

A.  I'm a forensic investigator.

Q.  And who do you work for?

A.  The Garland Police Department.

Q.  How long have you been there?

A.  For a year and-a-half.

Q.  And what did you do before that?

A.  I was working at Dillard's.

Q.  Dillard's?

A.  Yes.

Q.  How long did you do that?

62

A.  For about seven months.

Q.  Okay.  And what did you do before that?

A.  I was in school, in college.

Q.  College?

A.  Yes.

Q.  Where did you go to college?

A.  To Baylor University.

Q.  And what did you study at Baylor University?

A.  Forensic science.

Q.  And how long of a study is that?

A.  It was about four to five years.

Q.  Okay.  And did you get a degree in that?

A.  Yes.  A Bachelor of Science.

Q.  Okay.  And you have to speak up little bit.

A.  Okay.

Q.  You're a little soft-spoken.

A.  Sorry.

Q.  Most people really speak up when they talk about Bachelor of Science.

Is it forensic science?

A.  Yes.

Q.  And are you a police officer?

A.  No.  No, I'm a civilian.

Q.  Civilian.  So you're a civilian forensic crime-scene investigator.

63

A.  Correct.

Q.  All right.  And the jury's probably seen all kinds of shows about crime-scene investigators.  You haven't been in any of those, have you?

A.  No.

Q.  Okay.  But you do have a degree in crime-scene investigation.

A.  Yes.

Q.  And four years?

A.  Yes.

Q.  Okay.  Let's -- what does a crime-scene investigator do?

A.  We arrive on the scene and we document and process the crime scene, which involves video, photographs, processing for fingerprints, blood spatter, if that's there.  Also collecting evidence and processing that as well.

Q.  Okay.  Now, I want you to pretend like that person all the way back there is trying to hear you when you talk, okay?

A.  All right.

Q.  And the court reporter has got to -- got to hear you as well, okay?

A.  Okay.

Q.  All right.  And did you process different

64

crime scenes as it relates to this case?

A.  Yes.

Q.  All right.  Let's start with on June the 19th, the early morning hours of 2008.  Were you called out to a crime scene out in -- in downtown Garland?

A.  Yes.

Q.  All right.  And was that crime scene primarily out in front of the Zion Gate Records?

A.  Yes.

Q.  And when you went out there, what was the purpose for that?

A.  To document the crime scene as it was.

Q.  Document the crime scene.

A.  Yes.

Q.  Obviously, okay.

And I guess -- specifically, when you went out, do you go out with a team?

A.  No.

Q.  Okay.

A.  We arrive and there --

Q.  How many of you guys go out to the crime scene to document it from -- from forensics, on this case?

A.  On this case, two.

Q.  Two.  You and who else?

A.  Debbie Blum.

65

Q. All right. And it was your job to -- was the crime scene already secured?

A. Yes, it was.

Q. Okay. What does that mean for it to be secured?

A. Secured, meaning that there was crime-scene tape around the scene to where no one can enter without having to -- to sign an evidence log, or not evidence log. A major incident log.

Q. Why is that important?

A. To see who was in the crime scene and when.

Q. I mean, why is it important to have a secure crime scene? Give the jury some understanding of that.

A. Well, if it's not secured, then there could be, you know, evidence could be tracked out, or new evidence could be tracked in, and we don't know if that was supposed to be there or not before the crime scene, so it's just to make sure that it's as close as possible to when it actually occurred.

Q. Okay. And so practically speaking, it's only going to be as secure as long as it was there before the police or somebody arrived; --

A. Right, correct.

Q. -- is that correct?

A. Yes.

66

Q. So a fresh crime scene would be a lot more secure once the police secure it than something that had been sitting there for a day or two before y'all arrived.

A. Yes.

Q. Okay. And was it your understanding that this was pretty fresh? That y'all got there, or police, or fire department got there soon after it happened?

A. Soon, yes.

Q. Okay. And the significance of that would be if there's -- let's say, for instance, there's evidence of gunshots and there's shell casings at different places and somebody was to remove one, then there could potentially be more than one weapon when we think there's only one, right?

A. There could be.

Q. So it's important to at least -- to secure the crime scene; is that right?

A. Yes. That's very important. Yeah.

Q. All right. And then when you enter this crime scene and it's secure, do you see evidence of -- of some -- of folks that had been murdered?

A. Yeah.

Q. Okay. Tell the jury what you observed as a general -- as a general matter.

67

A. As a general -- when I first arrived, I observed two bodies on the floor and there was -- there was signs of what appeared to be gunshot wounds on the bodies. There was blood on the floor and casings.

Q. Okay.

A. Or cartridge cases.

Q. An what did -- what did you-all do, did you document it with a camera, with a video camera?

A. Video, yes. And digital photography.

Q. And Ms. Giannone, let's do this, all right?

A. All right.

Q. Tell me how many times you've testified before.

A. None.

Q. This is your first time?

A. This is my first time.

Q. Okay. This is what we're going to do. I'm going to try and be as clear as I can, okay?

A. Okay.

Q. And let me finish before you start talking, and I'm going to let you finish before I start talking, okay? Are we together?

A. Yes.

Q. Very good. Okay. And keep your voice up.

A. All right.

68

Q. Tell the jury what you did by way of photographing the crime scene.

A. I photographed the crime scene using a digital field format starting out from the outside and working my way in.

Q. Okay. So you started on the outside and worked your way in.

A. Yes. To show what the crime scene looked like in reference to everything else surrounding the crime scene. And then I focused in closer on the crime scene itself, and then a little closer on the actual evidence that was apparent in the crime scene.

Q. Okay. And so if I was looking at your photographs, I'd get the impression that I was walking in to the crime scene, from looking at your photographs; is that correct?

A. Yes.

Q. Okay. Very good. And then when you-all video the crime scene, is that an attempt to get sort of the panoramic view, what you can't get with just one shot?

A. Yes.

Q. Okay. Very good.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir. And as necessary to develop her testimony.

69

MR. ALEX: Thank you.

Q. (BY MR. ALEX:) And when we say the crime scene, we've already introduced a number of photographs from the crime scene such as State's Exhibit 24, 25 and 26. Would these be photographs that you took?

A. Yes.

Q. Okay. And then I want you to look at State's Exhibits 29 through 40, with the exception of State's Exhibit 31.

A. All right.

Q. Okay?

A. Yes.

Q. And you've looked at these photographs prior to taking the stand; is that correct?

A. Well, yes.

Q. Okay. At some --

A. Not these exactly, but --

Q. Okay. Take a look at those. Tell me if those are -- accurately reflect the crime scene that you documented.

A. Yes.

Q. Okay. And then take a look at State's Exhibits 41 through 54, with the exception of 45.

A. All right.

Q. Okay. Take a look at State's Exhibits 55

70

through 79, inclusive.

A. (Witness complied.)

Q. And do all of those photographs accurately depict the crime scene that you documented?

A. Yes.

Q. State's Exhibit 401 is a copy of the crime scene video that you-all took out there; is that correct? That you guys provided to us?

A. Yes. Yes.

Q. Okay. And State's Exhibit 390 is a diagram that you prepared to document the crime scene for this case; is that correct?

A. Yes.

Q. All right.

MR. ALEX: At this time, Your Honor, we would offer State's Exhibit 29 through 40, with the exception of 31, which the Court's previously held its ruling on.

THE COURT: 31's admitted. 45's admitted.

MR. ALEX: And we would offer State's Exhibit 29 through 40, inclusive.

MR. LOLLAR: To which we object on the grounds offered in the pretrial hearing on this matter.

THE COURT: As to Exhibits 29 through 40, with the exception of 31, that has been previously

71

admitted, those are all admitted.

The objection's overruled.

MR. ALEX: And we would also offer State's Exhibit 55 through 79, inclusive, Your Honor.

MR. LOLLAR: We would object to State's Exhibits 56, 63 and 74 under the grounds previously raised at the pretrial hearing on this matter.

We have no objection to the others in that block between 55 and 79.

THE COURT: Okay. And the objection is overruled for the reasons I previously stated outside the presence of the jury.

State's Exhibits 55 through 79 are admitted.

MR. ALEX: And we'd offer State's Exhibits 41 through 54.

And you know what, Judge? This is what I'm going to do with these. Let me make one double-check on that.

(Sotto voce discussion.)

MR. ALEX: At this time, Judge, we're going to offer State's Exhibits 41 through 54, with the exception of 45 that's already in, and -- at this time for all purposes.

MR. LOLLAR: And we have the same

72

objections we raised in the pretrial matter in regard to -- this pretrial hearing in regard to this matter.

THE COURT: What about State's Exhibit 52, Mr. Lollar?

MR. LOLLAR: 52?

MR. ALEX: It's the hand. The photo of the hand, I believe it is.

MR. LOLLAR: Yes. We did -- have the same objections that we raised previously to that.

THE COURT: Okay. State's Exhibits 41 through 44 are admitted.

Your objection's overruled as to those.

46 through 51 are admitted. Your objection is overruled on those.

The objection as to State's Exhibit 52 is sustained.

State's Exhibits 53 through 79, inclusive, are all admitted, and your objection's overruled as to those.

And again, your objection as to 52 is sustained.

MR. ALEX: I understand the rulings, Judge.

And again, the same admonishment to the audience. If anybody wants to leave, this might be a

73

good time to do it.

Q. (BY MR. ALEX:) Ms. Giannone, we're going to start with the documenting of crime scene. This was early in the morning. What was the lighting conditions?

A. It was very dark.

Q. Okay. Very dark. Speak up.

A. Sorry.

Q. All right. Did you have to use artificial lighting to take photographs?

A. Yes.

Q. All right. State's Exhibit 23, --

THE COURT: Do you want the lights down, Mr. Alex.

MR. ALEX: That would be great, Judge.

THE COURT: Yes, sir.

MR. ALEX: Thank you.

Q. (BY MR. ALEX:) That would be one of those outer pictures looking in; is that correct?

A. That is correct.

Q. And that would be looking from one direction to the other towards the crime scene where the bodies were found; is that correct?

A. Yes.

Q. All right. If we wanted to look at it from

74

the other direction, is that what we would be seeing in State's Exhibit 24?

A. Yes.

Q. Crime-scene tape is what we see going across the middle here?

A. Yes.

Q. And if we were coming from that direction and we're getting closer to the actual crime scene, State's Exhibit 25, what we would see coming from -- would that be State Street and Glenbrook.

A. Yes.

Q. And we see here in State's Exhibit 25 a bicycle and the body of Stephen Swan and Matthew Butler from a little bit closer distance; is that correct?

A. Yes.

Q. And we start to see the beginnings of -- we start to see the beginnings of little markers here.

Did you also -- you also document the crime scene with numeric markers and yellow cones?

A. Yes.

Q. Okay. That was not there when you arrived at the crime scene, though, is it?

A. No.

Q. These are things that you put there.

A. Yes.

75

Q. Very good.

And if we were going to look at the crime scene in the daytime with regular lighting, did you also take aerial photographs of the crime scene in the daytime?

A. Yes.

Q. State's Exhibit 27, would we be looking at primarily the area right here? For the record, State's Exhibit 27, a circular in front of the Zion Gates recording studio?

A. Yes.

Q. Okay. And the areas surrounding it, is this a drive through -- I'm sorry -- a drive through for a bank behind it?

Is there a bank in this general vicinity? Are you aware of that or not?

A. I don't know.

Q. Okay. Very good.

Now, the bicycle that was there, did you-all keep the bicycle?

A. We did for awhile.

Q. Okay. But ultimately, you gave it back to Mr. Nathan Johnson; is that correct?

A. Yes.

Q. State's Exhibit 26, is that a closer-up of the

76

bicycle at the scene when you arrived?

A. Yes.

Q. State's Exhibit 31, is that a photograph of a man later identified as Stephen Swan?

A. Yes.

Q. And would this have been -- when you took these photographs, would anybody have moved, that you're aware of?

A. Not that I'm aware of.

Q. And if there were any significant movements to the body by paramedics or other officers, would they have made you aware of that so you could make notations in your log?

A. Yes.

Q. Okay. Tell the injury what it was that you saw and documented in this photograph by way of injury and evidence.

A. Well, the injury would have been the gunshot wounds, or the apparent gunshot wounds on the body. And we also found a few items on the floor near the body.

Q. Okay. Ms. Giannone, let's do this.

A. Okay.

Q. I'll ask a specific question.

A. All right.

August 11, 2009

77

Q. What we see here in State's Exhibit 31, the dark fluid, --

A. Yes.

Q. -- it may be difficult to tell in this picture, but is -- what is that, is that blood?

A. Yes.

Q. Okay. It's not a motor oil stain there, right?

A. No.

Q. Okay. Very good.

And did it appear to be -- when you were there, was it still pooling there on the -- the ground there?

A. Yes.

Q. Okay. And what we see here, were you able to at least visually identify that as being human blood?

A. Well, visually, —

Q. I'm sorry. Go ahead.

A. -- it appeared to be blood, yes.

Q. Okay. And all I'm asking you at this point is, you didn't test it at that point; is that right?

A. No.

Q. But you could clearly tell it wasn't like a stain from oil or something like that, right?

A. Right.

78

Q. Okay. Very good.

And what we see here, his pockets appear to have been pulled out; is that correct?

A. Yes.

Q. And as we get -- and that showed one of the pockets, if we looked at another angle of State's Exhibit 32, we can actually see that both of his pockets had appeared to have been turned inside out; is that correct?

A. Yes.

Q. Now, as we get closer to Mr. Swan, State's Exhibit 29, was there evidence there, at least visually, -- now, you didn't go in and do the type of an examination that a medical examiner would do; is that correct?

A. Correct.

Q. But visually at the scene, did there appear to be trauma to Mr. Swan's head, perhaps from a gunshot wound?

A. Yes.

Q. And let me ask you this: When you got there, was Mr. Swan's glasses still on him or do you have any idea?

A. They were still on him.

Q. They were still on him.

79

A. The way you see in the photograph.

Q. Okay. And if we look at the other angle of Mr. Swan's head here, we see evidence of injury by way of tissue that would have been protruding from his mouth; is that correct?

A. That's what it appeared to be, yes.

Q. Okay. And -- and blood?

A. Yes.

Q. And we can potentially -- I don't think you can see the other side of his head from here, but did there appear to be evidence of injury on both sides of his head?

A. Yes.

Q. Okay. And State's Exhibit 36 actually shows that other side where the injury to the head -- now, you wouldn't have known at that point that it was -- did you know at that point what you were looking at was a gunshot wound or not?

A. No.

Q. Okay. But did you find other evidence surrounding the body suggestive of gunshot wounds?

A. Yes.

Q. Did you find what we commonly call shell casings?

A. Yes.

80

Q. The remains of bullets once they were fired and entered a body and exited?

A. Yes.

Q. You found those kind of things?

A. Uh-huh.

Q. So as a crime-scene investigator with a four year degree, it would be safe to say that gunshots happened out here at this crime scene; is that correct?

A. Correct.

Q. All right. And -- and finally, there was other evidence to Mr. Swan's head showing evidence of trauma of some sort; is that correct?

A. Yes.

Q. State's Exhibit 35.

And did you note, as it relates to Mr. Swan, what appeared to be some type of trauma to his chest area, State's Exhibit 33?

A. Yes.

Q. Is that what you have here with the ruler?

A. Yes. That was to document a defect in the shirt.

Q. And again, keep your voice up for me if you will.

A. Sorry.

Q. And State's Exhibit 34 was the documenting

81

after the shirt was lifted up to see what, if anything, was underneath it; is that correct?

A. Yes.

Q. And there was what we -- do we see here what appears to be a gunshot wound to the chest?

A. Yes.

Q. Okay. State's Exhibit 37, are you familiar with the term of pooling of blood?

A. Yes.

Q. Okay. Do you see in State's Exhibit 37, -- it may be a little difficult with the coloration on the document camera -- but do we see different colorations on the back?

Are we looking at the back of Mr. Swan here?

A. Yes.

Q. Do we see different colorations of where the blood may or may not have pooled on as he laid on his back?

A. Yes.

Q. Okay. And in particular, do we see an object here just under the skin on the back of Mr. Swan?

A. Yes.

Q. All right. And State's Exhibit 38 is -- is a broader view of Mr. Swan's back, and perhaps what we just saw earlier, potentially a bullet sticking under

82

the skin of Mr. Swan. You can't say for sure that's a bullet, though, can you?

A. No.

Q. But you did see an entrance wound on his chest.

A. Yes.

Q. And you did not see a corresponding exit wound on his back; is that correct?

A. Correct.

Q. Now, do you often document the hands of a -- of -- well, let me ask you this:

When you go out to a crime scene, -- and you -- and you didn't witness this crime happen; is that correct?

A. Correct.

Q. For all you know, there may not even have been a crime.

A. Correct.

Q. Right? And so, is it -- is it your position to document everything that's out there and then let the detectives figure out what's applicable and what's not applicable?

A. Yes.

Q. And are you trained to take photographs of victims, suspects, anyone's hands who may have been

83

involved in a crime?

A. Yes.

Q. And potentially, the evidence could be anything from A to Z; is that correct?

A. Yes.

Q. It could be evidence of a struggle.

A. Uh-huh.

Q. There could be evidence, perhaps, of somebody trying to remove evidence?

A. (Nods head.)

THE COURT: You have to answer out loud.

Q. (BY MR. ALEX:) You have to say yes or no.

A. Oh, yes. Yes.

Q. All right. And so it's -- it's what you do. You'll document the hand; is that correct?

A. Correct.

Q. And the -- the way you find the hands are the way you find them; is that right?

A. Yes.

Q. Okay. And it's your testimony that the hands will contain, in many occasions, evidence relative to a crime.

A. Yes.

Q. Okay. The right hand of Mr. Swan, State's Exhibit 39, this is how you document them; is that

84

correct?

A. Yes.

Q. Did you see any signs of trauma to the hand when you documented it at the time?

A. No.

Q. On the front side?

A. No.

Q. Did you see tearing of the fingernails or anything like that?

A. Not that I remember, no.

Q. Not that you recall. And that's why you take the photograph; is that correct?

A. Yes.

Q. Okay. And the photograph, pretty much, it speaks for itself; is that right?

A. Yes.

Q. Okay. And we have the State's Exhibit 40. Would that be the reverse side or the backs of the left hand?

A. Yes.

Q. And this would also be the side in which the defendant suffered some kind of trauma to the chest which appears to be a gunshot wound; is that correct?

A. Yes.

Q. And there appears to be maybe blood evidence,

85

perhaps, on his hand; is that correct?

A. Yes.

Q. And as it relates to the State's Exhibit 41, I think we had explained to the jury there were actually two victims that you documented; is that correct?

A. Yes.

Q. Does State's Exhibit 41 give us a -- the proximity of the victims? Here you see Mr. Swan; is that correct?

A. Yes.

Q. And then here further up in the parking lot on the left-hand corner of State's Exhibit 41, we see Mr. Butler; is that correct?

A. Yes.

Q. All right. The -- the markers that we see here, we can see a little bit better, would be places that you would mark with numbers to show items of evidence that you could identify later; is that correct?

A. Yes.

Q. And just by way of example, marker Number 2 here, which is not real clear, was for a -- what appeared to be a cigarette lighter near the hand of Stephen Swan; is that correct?

A. Yes.

86

Q. And you have photographs of each and every one of those numbers individually; is that correct?

A. Yes.

Q. All right. All right. We're going to move to the -- the evidence surrounding the other person found in the parking lot.

State's Exhibit 53, was this person later identified as Matthew Butler?

A. Yes.

Q. Okay. And this would be sort of an outer view looking at Mr. Butler as he laid there with obvious signs of injury; is that correct?

A. Yes.

Q. And we don't really -- we can't really tell colors very good in here, but would this -- would this be the area -- and again, for the record, I am drawing on the diagram with arrows pointing toward the street, of which the blood was flowing from the body of Matthew Butler towards the street?

A. Yes.

Q. Okay. And the majority of the blood surrounding Matthew Butler would have been pooling in an area just to the right of his body; is that correct?

Well, I guess right as we look at it. Straightaways.

87

A. Yes.

Q. Now, Ms. Giannone, you -- let me ask you this: As a general matter, you didn't interview the defendant in this case; is that right?

A. Right.

Q. Have you ever saw the videos in this case?

A. No.

Q. All right. Let me ask you this, if this is consistent.

I'm going to put back State's Exhibit 51 on here again, okay? And you see where there's a distance between Mr. Swan and Mr. Butler; is that correct?

A. Yes.

Q. And there appears to be a blood trail coming from somewhere around the State's exhibit marker in the bottom-left corner; there appears to be another blood area around and in between your markers 3 and 4 here, and there appears to be what looks like a blood trail leading up to where Mr. Butler is laying. You see that?

A. Yes.

Q. And State's Exhibit 42, I'll do it this way. If we're looking at State's Exhibit 42, the line that we see here, is that line that went all the way up to where Mr. Butler would have been laying, which is a

88

little difficult to see right now, but in the upper left-hand corner; is that correct?

A. Yes.

Q. Is all of that consistent with Mr. Butler perhaps being shot down here near Mr. Swan and moving to the place in which he finally laid?

A. Yes.

Q. Okay. And if we looked at the close-up of Mr. Butler's injuries as he lay there on the parking lot, the dark areas underneath Mr. Butler's head, would that have been consistent with being shot in the back, falling to the ground, and his head smashing into the concrete that way?

A. Yes.

Q. Would that be consistent?

A. It would be consistent.

Q. And the injuries that we see on State's Exhibit 43, would it be consistent here on the -- I guess we would call that the right side of his face, with someone coming up to him at close range and firing a handgun into his -- into his head?

A. Yes.

Q. Okay. And State's Exhibit 46, would that also be consistent with someone trying to get away, getting shot in the back and their head slamming down to the

89

concrete?

A. Yes.

Q. And this photograph may be a little more difficult to -- to tell, but I'm going to give you a bit of a reference here. And again, if this is Mr. Butler's ear in this direction here, would this area here be consistent with someone's head slamming against the concrete after getting shot in the back?

A. It could be, yes.

Q. Okay. Now, you weren't there when it happened; is that correct?

A. Correct.

Q. And you haven't watched the videos as to the defendant's account of what happened; is that correct?

A. The defen --

Q. Well, the videos in which the defendant gave interviews to the media, you haven't watched those.

A. I watched one.

Q. You watched one?

A. Yes.

Q. Okay. And -- and the evidence I'm asking you about now, basically I'm asking you whether it's consistent with evidence that may have been presented there, okay? And if you hadn't seen it, that's fine. I'll ask another question, okay?

90

A. Okay.

Q. State's Exhibit 47, again we're looking at the back of Matthew Butler, with his shirt lifted up; is that correct?

A. Yes.

Q. And that also would be consistent with Matthew Butler trying to get away and getting shot in the back; is that correct?

A. It may be, yeah.

Q. Okay. And then we have a photograph of Mr. Butler's chest, State's Exhibit 48, and I guess it gives some reference to a photograph. It might be difficult, but this would be -- I'm sorry. This would be sort of the -- the nipple area of Mr. Butler; is that correct?

A. Yes.

Q. And that will give us a reference of what we're looking at, and then there is evidence perhaps of some sort of -- obviously trauma to this side of the body as well, is that correct?

A. Yes.

Q. And if we were looking at State's Exhibit 49, as it is your practice to document outside coming in, we would be looking at a closer photograph of Mr. Butler's chest as evidence -- perhaps one of the

91

nipples on his chest, and perhaps either an entrance or an exit of a gunshot wound with the blood trailing out; is that correct?

A. Yes.

Q. And State's Exhibit 51, we're still looking at Mr. Butler, the man with the striped shirt laying there in the fetal position; is that correct?

A. Yes.

Q. And you-all are lifting his arm up to get -- to document any potential evidence there to his -- it looks like around his elbow area; is that correct?

A. Yes.

Q. And what we see here is potentially -- I'm sorry. What we see here potentially is gunshot wounds, maybe an entrance and an exit, but two potential wounds to his -- his arm elbow area; is that correct?

A. Correct.

Q. And that would be consistent, Ms. Giannone, with -- with the statement that the man was reaching for some cigarettes and then was shot in the attempt of reaching; is that correct?

A. It might be.

Q. Okay. And then you've got a close-up of his arm area, State's Exhibit 50, which potentially shows a gunshot wound to that arm area, and what appears to be

92

stippling; is that correct?

A. Correct.

Q. And you know what stippling is.

A. Yes.

Q. All right. And I think the medical examiner has explained to the jury as well what it is.

A. All right.

Q. That would indicate that the person was shot at a -- at a very close range; is that correct?

A. Correct.

Q. Close and personal, as if they were asking for cigarettes or something of that nature.

A. It might be, yeah.

Q. Okay. And State's Exhibit 54 is the right hand of Mr. Butler; is that correct? I'm sorry. The left hand of Mr. Butler; is that correct? I think this is probably the thumb area.

A. I'm not sure. I believe that might be Swan's.

Q. You think that is Swan's?

A. Yeah. Hand.

Q. Okay.

(Sotto voce discussion.)

Q. (BY MR. ALEX:) Okay. Very good. I don't think we have photographs of Mr. Butler's hands.

Okay. All right. And we're going to -- we're

FIRM NAME

August 11, 2009

93

going to turn for a second, Ms. Giannone, and we're going to talk about your documentation of a crime scene as it relates to those markers you put out there, okay?

A. All right.

Q. And as we do that, we're going to talk about that evidence. You also collected the physical evidence out there as well; is that correct?

A. Yes.

Q. All right. We're not going to open up these packages because we have, um, pictures of it, okay? But as we get to it, we'll offer it all into evidence when we're done, okay?

A. All right.

Q. Very good. All right. Assuming --

MR. ALEX: Did I offer 401?

MS. HANDLEY: No.

THE COURT: You have not offered 390 or 401.

MR. ALEX: Very good. Thank you, Your Honor.

Q. (BY MR. ALEX:) Did -- did you identify 390 already as being a diagram that you did in connection to the case?

A. Yes.

Q. All right. And you -- you also identified 401

94

as being a copy of that video of the crime scene; is that correct?

A. Yes.

Q. All right.

MR. ALEX: We'd offer both of those at this time, Your Honor.

MR. LOLLAR: We have no objection to 390, Your Honor. We do object to 401 under Rules 401, 402 and 403, and because it's cumulative.

THE COURT: Okay. The objections are overruled.

State's Exhibits 390 and 401 are admitted.

Q. (BY MR. ALEX:) All right. And we'll do this -- State's Exhibit 390, I'm going to zoom in so that we have a point of reference, and we'll start off with the body of perhaps Stephen Swan --

A. Yes.

Q. -- as it focuses.

We see here the 2 there by the body of Stephen Swan, and I think we have talked about that briefly as being a lighter; is that correct?

A. I believe so, yes.

Q. All right. Let's do this. State's Exhibit 58, as soon as I zoom out, that would be what we're looking at in that diagram.

95

A. Yes.

Q. And then so the jury has some idea of where you found that marker 1, we're going to zoom in on 390, and we see there what you have identified as a 1; is that correct?

A. Yes.

Q. And relatively speaking, State's Exhibit 56, that 1 would have found -- been found in the street just to the bottom of where Matthew Butler was laying; is that correct?

A. Yes.

Q. And as is your practice to take an outside photograph looking in, what are we looking at here?

A. A cartridge case.

Q. Tell the jury what a cartridge case is.

A. It's part of the bullet that's left behind once the bullet exits the barrel.

THE COURT: Let me interrupt you for a second, Mr. Alex.

I need to put something on the record and I also want to give the jury one more break before lunch. It will just be a very brief break though. We'll be back in about eight minutes, and then after that, as soon as your lunch is here, you'll be released for lunch.

96

All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

The jury is not present.

At a pretrial hearing earlier in this case, the Court conducted a 403 balancing test and determined that State's Exhibits 29 through 40, and 41 through 51 were more probative than prejudicial. The same ruling was made with regard to State's Exhibits 53 through 79, and also 401 and 390.

The Court, having carefully considered the prejudicial effect as to the probative value on State's Exhibit 52, I decline to admit that exhibit and that exhibit only.

But the record should reflect that I did make that decision on that exhibit and not as to the others.

And with that, we'll be in recess for about five minutes.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

You may proceed whenever you're ready, Mr. Alex.

**ISABEL GIANNONE**

August 11, 2009

97

was re-called as a witness and testified through the interpreter as follows:

**DIRECT EXAMINATION - CONTINUING**

BY MR. ALEX:

Q. State your full name, ma'am?

A. **Isabel Giannone.**

Q. How do you say your last name?

A. **Giannone.**

Q. Giannone. Very good.

State's Exhibit 55 was the shell casing that you just described for the jury found out at the crime scene, the shell casing being evidence that a gun had been fired; is that correct?

A. **Yes.**

Q. What kind of gun would leave a shell casing after it's fired?

A. **A semi-automatic, would be one.**

COURT REPORTER: I'm sorry. An automatic what?

THE WITNESS: Semi-automatic, or automatic, yeah.

Q. (BY MR. ALEX:) A semi-automatic weapon?

A. **Yeah.**

Q. Okay. And how is it that it would leave a shell casing?

98

A. **It ejects the shell casing once the bullet is fired.**

Q. All right. Your marker Number 3, we're going to talk about -- look at your notes and tell me where your marker Number 3 was found. It may have been covered by the body here.

A. **I believe it might have been. It should have been near the shoe, the right foot, I believe.**

Q. Near the right foot?

A. **Yes.**

Q. And would that be where you had found another shell casing?

A. **Yes.**

Q. Okay. State's Exhibit 59, as I zoom out, you will see -- is that the other shell casing?

A. **Yes.**

Q. And that's a separate and different shell casing than we've just seen; is that correct?

A. **Correct.**

Q. So there's at least evidence of two gunshots out at this crime scene; is that correct?

A. **Correct.**

Q. All right. State's Exhibit 60 shows the relative location of four -- is that correct? -- which was some cigarettes that you documented out there; is

99

that correct?

A. **Yes.**

Q. Which was also near where the bodies were found; is that correct?

A. **Yes.**

Q. Now, Ms. Giannone, there are times when you will document everything out there, whether it turns out to be related to the crime or not; is that correct?

A. **Correct.**

Q. You've got your notes up there? Tell the jury what 5 was.

A. **Five, I believe, was a tissue.**

Q. Tissue?

A. **Yes.**

Q. All right. Near the crime scene and you documented it, right?

A. **Yes.**

Q. 6 was?

A. **The condom.**

Q. 7 was?

A. **7 was another shell casing.**

Q. Okay. And 8 was?

A. **The projectile.**

Q. Projectile? What's a projectile?

A. **It was part of a bullet that might have been,**

100

**you know, ricocheted and just lost its form.**

Q. And 9?

A. **9 is another casing.**

Q. Another casing. Separate and different; is that correct?

A. **Yes.**

Q. All right. We're not going to look at the condom and the tissue. We're going to go straight to 7, which is another projectile; is that correct?

A. **Yes. Or -- no. Casing.**

Q. That's what I meant. Another casing. So now we have three different casings, three -- at least three pieces of evidence of gunshots; is that correct?

A. **Yes.**

Q. All right. State's Exhibit Number 68 at marker 8, is that what we're talking about when we say a projectile?

A. **Yes.**

Q. All right. It looks like a piece of lead to me. Why is that?

A. **Mostly, bullets are made of lead.**

Q. Very good. And it's your opinion that this was part of a bullet at one point.

A. **Yes.**

Q. Okay. All right. And State's Exhibit 69,

101

that's -- that's your marker Number 9. Is that another sign of evidence of gunshots?

A. Yes.

Q. And what is that?

A. Another cartridge case.

Q. Okay.

A. Shell casing.

Q. Does that make four now?

A. I believe so, yeah. 1, 2 ... yes.

Q. And then marker 10, what is that?

A. Another casing.

Q. Okay. Evidence of five shots.

A. Yes.

Q. And again, you didn't see the interview where the defendant told us how many times he had shot; is that correct?

A. I saw an interview right after it -- it came out, --

Q. Gotcha.

A. -- and I don't remember.

Q. Did you also document -- State's Exhibit Number 11 was actually another shell casing; is that correct?

A. Yes.

Q. Now we have evidence of maybe six shots; is

102

that correct?

A. Yes.

Q. Okay. And then finally State's Exhibits 11 and 12. 11, you can't see it there, but what was 11?

A. A shell casing.

Q. A shell casing?

And 12 is what?

A. 12 is a black Sharpie pen.

Q. Okay. Sharpie pen. Did it turn out to have anything to do with this offense? Well, strike that.

You documented it because it was there; is that correct?

A. Yes.

Q. Very good. And 11 we already saw; is that correct?

A. Yes.

Q. All right. So what I'm going to do now is I'm going to talk about 14, which we'll try and get some relative distance from the other markers.

14, as we see here in the diagram, and then the cluster of markers that we had before was further up in the parking lot; is that correct?

A. Yes.

Q. Okay. And to get a -- to get a better view of how they all sort of fit together, State's Exhibit 62

103

(sotto voce discussion), we've got 14 here; is that correct?

A. 14, yes.

Q. I can zoom in if I need to.

A. Yes.

Q. Do you recall that's 14?

A. Yes.

Q. All right. And then the cluster here -- now, in this picture, the bodies of Stephen Swan and Matthew Butler have been removed; is that correct?

A. Actually, I don't remember if we had removed them or not.

Q. All right. And then there's a cluster of -- that we saw earlier of those markers, is that correct?

A. Yes.

Q. And then you had the Sharpie pen up here and the shell casing here; is that correct?

A. Yes.

Q. All right. And this is tissue right here.

A. Yes.

Q. Okay? And that would give us some frame of reference of where the body would have been; is that correct? If that's the tissue right there at marker 5?

A. Well, -- yes.

Q. Okay. Very good.

104

And again, I think the reason I'm confusing you is the bodies very well could still be in the picture further down in that direction; is that correct?

A. Correct.

Q. Okay? And now, 14 was -- your marker 14, State's Exhibit 76, shows another, what is that?

A. Another projectile.

Q. Projectile?

A. Yes.

Q. Piece of the bullet that would have hit bone or whatever, and could have broken into more than what we would normally think of when we see a bullet; is that correct?

A. Correct.

Q. And -- and finally, your marker 15 was just documenting a beer bottle that was out there, as it is your practice to do anything that potentially could be in the crime scene; is that correct?

A. Yes.

Q. Very good.

MR. ALEX: All right. We can -- we can raise the lights, Judge.

Q. (BY MR. ALEX:) Now, were you there at the crime scene when -- did you arrive before or after the

105

police arrived?

A. After.

Q. All right. Did you -- did the Medical Examiner's Office come out?

A. Yes.

Q. And did you arrive before or after that?

A. Before.

Q. So when the Medical Examiner's Office came out, did they have someone to examine the bodies of Stephen Swan and Matthew Butler?

A. Yes.

Q. To determine, I guess, the official cause or the official time of death.

A. I believe so, yeah.

Q. Okay. And as part of the documentation of the crime scene, we've got the video, which we're not going to show at this time. We're going to move on to the next crime scene that you would have documented, okay?

A. All right.

Q. And when I say "crime scene," I'm talking about an event in which evidence related to this crime would have been brought to you and someone would have asked you to process it.

A. Yes.

Q. All right. At some point later that day, were

106

you asked to process a vehicle that may have been taken in this crime scene?

A. Later that day, I believe I was told of a vehicle. I believe it was the next day early in the morning.

Q. Okay. At some point after processing this crime scene, --

A. Yes.

Q. -- someone would have brought you a late model Crown Victoria, about a 14 year-old car to process; is that correct?

A. Yes.

Q. All right.

A. Yes.

Q. And you processed it, and tell -- tell the jury what you did.

A. I photographed.

Q. Photographed?

A. The vehicle, yes.

Q. And did you collect the evidence?

A. And collected evidence, yes.

Q. You collected the evidence in the car.

A. Yes.

Q. Okay. Very good. And I'm sorry. I'm having a difficult time hearing you, but -- and those

107

photographs, what were you trying to capture, primarily?

A. The condition of the vehicle, the way we found it.

Q. All right. Did you get pictures of the license plate?

A. Yes.

Q. Did you get pictures of the outer part of the car?

A. Yes. Yeah.

Q. The inner part of the car?

A. Yes.

Q. And the trunk area.

A. Yes.

Q. Okay. Very good.

All right. We're going to cut down on some of the jury's sitting time, and I'm going to ask you, have you looked at State's Exhibits 250 through 291, with the exceptions of 253, 273 and 277? These are all photographs that you would have taken.

A. Yes.

Q. In addition, these are all photographs that you would have taken, State's Exhibits 173 through 179, 183, 187 through 200, 206 through 219, 292 through 296. And just for the identification for the record

108

purposes, I also want you to identify State's Exhibits 180 through 186, if you will.

A. Sure.

THE COURT: Mr. Alex, I am advised the jury's lunch is here, so we will be breaking fairly soon.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

A. Yes.

MR. ALEX: At this time, we're going to offer for all purposes, Judge, State's Exhibits 250 through 291 with the exceptions of 253, 273 and 277.

MR. LOLLAR: We have no objection.

THE COURT: State's Exhibits 250 through 291, inclusive, excepting out 253, 273 and 277 are admitted.

MR. ALEX: In addition, we'll offer for all purposes, Judge, State's Exhibits 173 through 179, 183, 187 through 200, 206 through 219.

THE COURT: 187 through 200 and 183 just by itself?

MR. ALEX: Yes, sir.

THE COURT: And 187 through 200, then what?

MR. ALEX: 206 through 219, and 292

109

through 296 for all purposes.

And just for the record, at this time, Judge, identified by the witness, 180 through 186.

THE COURT: Any objection?

MR. LOLLAR: No objection.

THE COURT: State's Exhibits 173 through 179, inclusive, are admitted; State's Exhibit 183 is admitted; State's Exhibit 187 through 200 are admitted; 292 through 296 are admitted; 206 through 219 are admitted; 180 through 186 are admitted for record purposes only.

MR. ALEX: And, Judge, I think I can do this in a pretty expedient manner, if you'll give me the lights real quick.

THE COURT: I'll tell you what. I don't want the jury's lunch to get cold, --

MR. ALEX: Okay.

THE COURT: -- so we'll go ahead and take a recess now. We're not going to get through with this witness anyway.

We'll be in recess until 1:00 o'clock. It's a lengthy recess, I understand that. I want y'all to get to know each other though.

Do not discuss the case.

All rise for the jury.

110

(Jury not present.)

We're in recess until 1:00 o'clock.

(Court reconvened; Jury not present.)

THE COURT: On the record.

Raise your right hand.

(Witness sworn by the Court.)

THE COURT: Can we have order, please? State your name for the record.

THE WITNESS: Lakarra Mecole.

THE COURT: Spell that.

THE WITNESS: L-A-K-A-R-R-A, M-E-C-O-L-E.

THE COURT: Okay. You've just been sworn in as a witness in this case. That means that you cannot discuss your testimony with any of the other witnesses in the case.

It also means that you may discuss the case if you wish to do so with the lawyers. You don't have to if you don't want to do so. You're not a witness for either side. You're a witness for the truth. Do you understand that?

THE WITNESS: (Nods head.)

THE COURT: You have to answer out loud.

THE WITNESS: I didn't hear you.

THE COURT: You've just been sworn in as a witness in this case. You can discuss your testimony

111

in the case if you wish to do so with the lawyers in the case. You don't have to. But you cannot discuss the case with any of the other witnesses. Do you understand that?

THE WITNESS: Yes.

THE COURT: All right. Also, if the lawyers ask you to come up here, they have the proxy of the Court, that means the authority of the Court to order you to come up here. If you choose to decide not to do once they've asked you to do so, you could be held in contempt. Do you understand that?

THE WITNESS: Yes.

THE COURT: That means you could go to jail.

THE WITNESS: Yes.

THE COURT: All right? Do you understand that?

THE WITNESS: Yes.

THE COURT: All right. Any questions for me?

THE WITNESS: No.

THE COURT: All right. You're excused.

On the record. Has the State had the opportunity to inspect the Court's proposed Charge in guilt or innocence?

112

MR. ALEX: I have not personally, Judge. But I do have a representative of the D.A.'s Office, somebody in the appellate department that has the Charge.

MS. HANDLEY: She just gave us a new Charge. We're giving it to our appellate department, but we personally have not looked at it. We haven't time.

MR. ALEX: We just got a new one? Is that --

MS. HANDLEY: Yes.

MR. ALEX: Okay. If we -- if we can, Judge, if you'll give us little bit, I can give you an answer to that.

THE COURT: Okay. Well, I'll just tell you right now, there's nothing in it other than changing happy to glad, basically.

MR. ALEX: Okay.

THE COURT: All right. Has the defense had an opportunity to inspect the Court's proposed Charge?

MR. PARKS: We have, Your Honor.

THE COURT: And is there any objection?

MR. PARKS: Well, there is no objection to the Charge as it presently is constituted. However,

113

depending upon further evidence, we may have a request for additional charge on voluntariness of the confession.

THE COURT: All right. And we'll see how that goes. I understand that, and I'll carry that.

All right. Mr. Alex, you ready to proceed?

MR. ALEX: Yes, sir.

THE COURT: Mr. Lollar, you ready to proceed?

MR. LOLLAR: Yes, sir.

THE COURT: Call the jury.

THE BAILIFF: All rise.

(Jury present.)

THE COURT: Be seated, please.

Continue now with the trial of the State of Texas versus James Broadnax.

Mr. Alex, whenever you're ready to continue with your witness.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**ISABEL GIANNONE**

was re-called as a witness and testified as follows:

**DIRECT EXAMINATION - CONTINUING**

BY MR. ALEX:

114

Q. State your name, ma'am.

A. Isabel Giannone.

Q. And are you same the same Ms. Giannone who testified prior to the break?

A. Yes.

Q. Very good. We were about to start telling the jury about the vehicle that you processed. And tell the jury, if you will, as part of your duties there at Garland as a forensic expert collecting and documenting data, did you document evidence on a late model Crown Victoria?

A. Yes.

Q. All right. And was it brought to you by detectives in the Garland Police Department?

A. Yes.

Q. Would that have been the lead detective, Det. Sweet?

A. Yes.

Q. All right. And when it was brought to you, would you have any idea firsthand of where it came from or how it relates to this case?

A. I was told by the detectives it was found in Texarkana.

Q. Okay. And so you were asked to process it as it relates to this case.

115

A. Yes.

Q. All right. I'm going to show you some photographs and ask you -- that you've previously identified, State's Exhibit 250, is that the vehicle we're talking about?

A. Yes.

Q. License plates GVJ-961?

A. Yes.

Q. All right. And did it also have that same license plate in the back? State's Exhibit 254?

A. Yes.

Q. And was part of what you were looking for evidence potentially on the out of the car -- outer of the car of perhaps blood evidence?

A. Yes.

Q. State's Exhibit 251, would that be one view of the car from the side?

A. Yes.

Q. And as it related to blood evidence, did you see on the exterior of the car, different places that could have been blood spatter?

A. I saw red stains that appeared to be blood spatters.

Q. Okay. And -- and so the jury understands, and I hate to keep killing co-counsel, but if I took a

116

pistol and pointed it at her head and fired close range, does the head bleed a lot?

A. Yes.

Q. Okay. And if that bullet was to hit her head, would there perhaps be evidence surrounding this area that would have red spots?

A. Yes.

Q. Okay. And that's kind of what you were looking for on the car?

A. Yes.

Q. Very good.

State's Exhibit 188, and the jury may not be able to see this, but are we looking at the hood of the car?

A. Yes.

Q. And you've got markers here perhaps that you've marked, places where there's potential red spots or blood; is that correct?

A. Yes.

Q. Okay. In addition, State's Exhibit 292, this would be still in the upper portion of the car, front-seat area, outer exterior where you have these markers above the door here; is that correct?

A. Yes.

Q. Okay. And if we got in close enough, we could

117

probably see that we're looking at the left rear drive door there?

A. Yes.

Q. Is that one of the areas that we were looking at?

A. Yes.

Q. And just by way of example, the jury can take this back and look at it if they choose to, but whatever we see these markers on the car are where you are documenting what could have potentially been blood; is that correct?

A. Correct.

Q. All right. And here we've got the left rear area; is that correct?

A. Yes.

Q. State's Exhibit 296.

Okay. And there's a -- a number of photographs that document that; is that correct?

A. Yes.

Q. Now, did you do anything as sort of a general manner when you're looking at a car, the exterior of it, to sort of give you some idea of where the blood may be?

A. We analyze it visually first.

Q. Okay. And do you use a -- a luminol of any

118

type?

A. We use Bluestar, which is similar to luminol.

Q. And what is that?

A. It helps with the visualization of -- of blood stains -- of blood evidence, so you have to have low lighting. You spray it on and it will react chemically to the blood, causing it to luminesce.

Q. Okay. Did you do that here?

A. Yes, we did.

Q. And did you spray the whole car?

A. No, we sprayed the areas of where we -- we saw the -- the majority of the -- the visual blood.

Q. So you visually looked at it with your eyes.

A. Yes.

Q. And you would spray it with the -- what did you call it?

A. Bluestar.

Q. Bluestar.

A. Yes.

Q. And then it would give you some reaction that gave you the first indicator that could potentially be blood; is that correct?

A. Correct.

Q. Very good. Now, did you also document inside of the vehicle?

119

A. Yes.

Q. All right. State's Exhibit 296, I guess, if the car was sitting on its trunk it would look like that, but let's do it this way. That's the way the front seat would have looked when it was brought to you; is that correct?

A. Yes.

Q. State's Exhibit 261, back of the car; is that correct?

A. Yes.

Q. Did you see anything inside of the car that resembled potential blood?

A. No.

Q. In the front or the backseat?

A. Not that I recall -- I don't remember, but not that I recall, no.

Q. Nothing that you've documented.

A. No.

Q. Very good. State's Exhibit 267, that's the picture of the car with the trunk up?

A. Yes.

Q. All right. And what did the trunk have in it?

A. It had vari -- various clothing, a suitcase, a duffel bag, from what I can remember.

Q. All right. State's Exhibit 268, does it show

120

a large --

A. Uh-huh.

Q. -- black suitcase here?

A. Yes.

Q. And does it show here a red and black backpack?

A. Yes.

Q. The clothes that we see here are clothes that was associated with the suitcase; is that correct?

A. Some were, but that's how we found it when we opened up the trunk.

Q. Right. That's how you found it.

A. Yes.

Q. Gotcha. In State's Exhibit 272, that's the red backpack that we just saw; is that correct?

A. Yes.

Q. Now, did you inspect the contents of the red backpack?

A. Yes.

Q. And the contents of the red backpack would have included several items, including State's Exhibit 278; is that correct?

A. Yes.

Q. And I think -- State's Exhibit 278, all of these item here, the pipe, the shirt, this item right

121

here, -- I'm sorry. This item right here, these were all in the red backpack; is that correct?

A. Yes.

Q. Shop towels in the backpack, State's Exhibit 274?

A. Yes.

Q. State's Exhibit 275, were the smoking pipes in the backpack?

A. Yes.

Q. State's Exhibit 276, concealed handgun license belonging to Stephen Swan was in the black backpack; is that correct?

A. Yes.

Q. State's Exhibit 283, the shoes that we see here, I believe these were the Nike shoes, were they were in the backpack?

A. Yes.

Q. And we see -- 284, we see a different view of that with a red stain on it, which I think you-all -- State's Exhibit 285 has got a close-up of that stain; is that correct?

A. Yes.

Q. And this would have came out of the red and black backpack.

A. Yes.

122

Q. Very good.

Now the big suitcase that was in the trunk of the car, did you-all document those items?

A. Some of the items. Not all.

Q. You took photographs of some of them?

A. Yes.

Q. There were a lot of clothes in there?

A. A lot of clothes, yes.

Q. You didn't take each one out and take a picture of it, did you?

A. No.

Q. All right. State's Exhibit 183 appears to be a social security card and an application for birth record. Do you remember that?

A. Yes.

Q. Okay. Social Security card. This would have been located in the large suitcase?

A. Yes.

Q. It bore the name of James Broadnax; is that correct?

A. Yes.

Q. And if you recall, the application for birth record, did it also have James Broadnax's information up on it?

A. Yes.

123

Q. Okay. That's good.

MR. ALEX: We can raise the lights, Judge.

Q. (BY MR. ALEX:) And before we go into the physical evidence, Ms. Giannone, we'll go on to the other two crime scenes as they may, that you would have documented, okay?

A. Uh-huh.

Q. You documented the car with photographs and you collected the evidence; is that correct?

A. Yes.

Q. And then the next thing you would have done in this case, and maybe not in direct sequence, were you asked to document the clothing of suspects in this case?

A. Yes.

Q. So three sets of clothes were brought to you and were told to you that they were taken off of the suspects; is that correct?

A. Correct.

Q. And that would be the reason that you would have documented them; is that right?

A. Yes.

Q. Okay. And just so we can give the jury some idea of how much more you've got, the other crime scene you would have documented would have been a weapon that

124

was brought to you at some later point; is that correct?

A. Yes.

Q. Very good.

I'm going to show you State's Exhibits 233 through 245, okay? 87 through 96, okay? And then 98. We'll do it this way. This one is a little different. 98, 99, 100. Okay?

A. Okay.

Q. 220, 221, 222, 223, 224, 225, 226, 227, 228, 229.

248, 249. And we put them in a certain order that we want to show them; is that correct? Not necessarily in numerical order.

231, 230, 232, 246 and 247.

A. Yes.

Q. Okay. These are all photographs that you would have taken; is that correct?

A. Yes.

Q. All right. And we've got them sort of separated by the individuals who they came from; is that correct?

A. Yes.

Q. All right.

MR. ALEX: Do I need to repeat that? Do I

**125**

need to repeat that, Mr. Lollar?

We're going to be offering all of the above-mentioned exhibits at this time, Judge.

THE COURT: I've got them.

MR. ALEX: You've got them?

THE COURT: Yes, sir.

MR. ALEX: Thank you.

MR. LOLLAR: We have no objection to 232 through -- that's 232. 98, 99, 100, 220 through 231, 246 and 247, 233 through 245, or 87 through 97.

THE COURT: 97 was not offered.

MR. PARKS: 96.

MR. LOLLAR: Well, it's in there.

MR. ALEX: Which one?

MR. LOLLAR: 97.

MR. ALEX: We'll offer 97 as well, Judge.

THE COURT: All right. Well, the witness didn't identify it. She'll have to do that.

MR. ALEX: I guess I missed this one.

Q. (BY MR. ALEX:) State's Exhibit 97, is that a photograph that you took?

A. Yes.

Q. Very good.

THE COURT: So you do offer 97?

MR. ALEX: Yes, sir.

**126**

THE COURT: And to that, there's no objection?

MR. LOLLAR: No, sir.

THE COURT: Mr. Lollar, you did not say whether or not you had an objection to 248 and 249.

MR. LOLLAR: I didn't see 248 and 249. (Examining exhibits) And Mr. Alex has shown me those and I have no objection to them.

THE COURT: Okay. State's Exhibits 87 through 100, inclusive, are admitted.

State's Exhibits 220 through 245, inclusive, are admitted.

And State's Exhibits 246 through 249 are also admitted, and you may publish.

And if you need me to remind you of any of that, I can, Mr. Alex.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

MR. ALEX: And at this point, Judge, I think I will just offer them. They will be mentioned in later reports and the jury can review them at that time if they need to.

THE COURT: Thank you, sir. I'm sure the jury appreciates that.

Q. (BY MR. ALEX:) And when you collected the

**127**

clothes of the different suspects after arrest, you would have done presumptive tests for blood on any of the clothing that you collected?

A. On some of the clothing.

Q. Okay. And tell the jury what a presumptive test for blood is.

A. Presumptive test is a test that tests for blood, and so -- but it's not a positive -- even if it shows positive, it's only presumptive positive. We send it off to a lab for verification.

Q. So it just gives you some general idea that you won't be wasting your time for further analysis.

A. Correct.

Q. And they'll see a couple of vials in those pictures, --

A. Yes.

Q. -- and the vials they see, is that the presumptive tests?

A. Yes, it is.

Q. All right. Very good.

All right. Now, finally, as it relates to processing the crime scene, again, anything related to this crime, was a weapon brought to you to be processed?

A. Yes.

**128**

Q. All right.

MR. ALEX: And I think these are admitted already, right?

Q. (BY MR. ALEX:) I think these photographs have been admitted already, State's Exhibits 80 through -- 80, 81, 82, 83, and I seem to recall that I may have --

MR. ALEX: Where is that note I wrote you about these.

MS. HANDLEY: I don't know.

Q. (BY MR. ALEX:) Is this the weapon that was brought to you to be processed?

A. Yes.

Q. All right. This weapon was previously identified and admitted through Det. McNear. Do you know who that is?

A. Yes.

Q. Was he working with Det. Sweet in this case?

A. Yes.

Q. All right. And did you have an idea that this may have been involved with this case?

A. Yes.

Q. Tell the jury what you did to process it.

A. I swabbed it. I took DNA swabs from the -- from the gun.

Q. Talk to that person back there for me.

August 11, 2009

**129**

A. -- DNA swabs from the gun and I also processed it for fingerprints.

Q. Okay. So you swabbed it for any potential further examination of it for DNA?

A. Yes.

Q. All right. And you would have kept those swabs and sent them to the lab?

A. Yes.

Q. And then you fingerprinted it?

A. Yes.

Q. All right.

THE COURT: Hold on, Mr. Alex.

Mr. McGaughey, is the firearm safe?

THE BAILIFF: Yes, sir.

MR. ALEX: Thank you, Judge.

And for the record, Judge, I did handle this weapon a minute ago without gloves, and any future DNA testing for any post conviction or anything like that testing, should that be -- should be on the record.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) Let's do this. Would you take a look at -- would you tell the jury what the exhibit number is there that you're looking at?

A. Exhibit Number 202 and 203.

**130**

Q. I'm sorry?

A. Number 202 and 203.

Q. And State's Exhibit 202, is that the weapon that you processed that we see in State's Exhibits 80 through 84?

A. Yes.

Q. And the magazine?

A. Yes.

Q. All right. And do we have the bullet or the round that we see here in State's Exhibit 82?

A. No, we do not.

Q. Okay. Where would that be?

A. That was used during the processing of the gun.

Q. Okay.

A. At the lab.

Q. All right. And so when the gun is sent out to the lab for processing, they would have used the bullet here to do any testing; is that correct?

A. Yes.

Q. All right. And let's stick that in here so I don't have to -- and stick the magazine in there as well.

MR. ALEX: If there's no objections from the defense, Judge, I'm going to stick it in this --

**131**

this bag.

THE COURT: Any objection?

MR. LOLLAR: No.

Q. (BY MR. ALEX:) And how do you know that this is the same gun and magazine that's in the photograph that's --

A. From the serial numbers.

Q. The serial number matches up?

A. Yes.

Q. Very good.

MR. ALEX: We're going to offer at this time, Judge, State's Exhibit 202 and 203.

MR. LOLLAR: No objections.

THE COURT: State's Exhibits 202 and 203 are admitted.

MR. ALEX: Permission to publish?

THE COURT: You may.

MR. ALEX: Is it okay if I hand it to the jury, Your Honor?

THE COURT: Yes, sir.

The jury is advised the weapon is safe.

MR. ALEX: Is it okay if I retrieve it from the jury, Your Honor?

THE COURT: Yes, sir.

MR. ALEX: Thank you, sir.

**132**

Q. (BY MR. ALEX:) Now, Ms. Giannone, you wouldn't be the person who would test that weapon to see if it actually is the murder weapon, were you?

A. No.

Q. But you're aware that there are tests that can be done that compare the shell casings found at the scene --

A. Yes.

Q. -- to see if they come from the same gun.

A. Yes.

Q. And there are also tests to tell whether or not this gun would have fired particular types of firearms.

A. Yes.

Q. Probably didn't use the right word.

A. That's all right.

Q. Okay. Let's talk about the physical evidence that we have laid out before us.

A. Yes.

Q. You've had an opportunity to look at all that evidence; is that correct?

A. Yes.

Q. And we've gone through each piece one by one; is that correct?

A. Yes.

133

Q. All right. State's Exhibit 101 is a .380 shell casing from the scene. You have had a chance to review that; is that correct?

A. Yes.

Q. State's Exhibit 102 is a DNA swab; is that correct?

A. No. 102 would be a metal lighter.

Oh, State exhibit. Sorry.

Q. Right. You don't have any -- you don't have an exhibit list up there with you.

A. No, I don't know.

Q. Okay. But the DNA swab, the Item 799401, you've reviewed that; is that correct?

A. Yes.

Q. All right. Now, the metal lighter, what we marked as State's Exhibit 103; is that correct?

A. Yes.

Q. The cigarettes, State's Exhibit 104?

A. Yes.

Q. The tissue, you -- you physically looked at here on the table, State's Exhibit 105; is that correct?

A. Yes.

Q. The condom, State's Exhibit 106?

A. Yes.

134

Q. The .380 shell casing, State's Exhibit 107?

A. Yes.

Q. And the projectile, what we looked at and said was a -- a piece of lead from a gun, State's Exhibit 108; is that correct?

A. Yes.

Q. The other projectile, State's Exhibit 109, a .380 casing; is that correct?

A. Yes.

Q. State's Exhibit 110 is another casing, what we called a casing from the -- from a firearm, .380; is that correct?

A. Yes.

Q. State's Exhibit 111 would have been another shell casing; is that correct?

A. Yes.

Q. State's Exhibit 112 is the black Sharpie pen?

A. Yes.

Q. And State's Exhibit 114 is a projectile jacket --

A. Yes.

Q. -- on the sidewalk near the building; is that correct?

A. Yes.

Q. All right. Tell -- tell the jury, real

135

quickly, what's the difference between a projectile jacket and a casing.

A. A jacket's usually made up of a copper that encases the bullet so that when it's fired and hits an object, it will come off like a jacket.

Q. Okay. So if we have five casings and one jacket, that's not necessarily evidence of six gunshots, is it?

A. No.

Q. Okay. The casing -- the jacket could have been a part of one of those casings; is that correct?

A. Correct.

Q. Very good. State's Exhibit 114-A is going to be the package that all of that stuff goes in. You looked at that; is that correct?

A. Yes.

Q. All right. State's Exhibit 115 is going to be the empty shattered beer bottle, and you've reviewed that on the table, have you not?

A. Yes.

Q. State's Exhibit 118, it was a receipt and business card from the front-left pants pocket of Mr. Butler?

A. Yes.

Q. State's Exhibit 119 was the folding knife?

136

A. Yes.

Q. And State's Exhibit 120 would have been the pocket liners from the right-front pant pocket of Stephen Swan; is that correct?

A. Yes.

Q. And that is also here. You've reviewed it prior to the jury coming in; is that correct?

A. Yes.

Q. All right. State's Exhibit 121 would have been the other pocket lighter from the front-left pant pocket of Mr. Swan?

A. Yes.

Q. State's Exhibit Number 122 would have been the rear-left pants pocket.

A. Yes.

Q. Okay. State's Exhibit 123 would have actually been the cell phone that Mr. Butler -- Mr. Swan would have had; was returned back to his family; is that correct?

A. Correct.

Q. So State's Exhibit 123 is going to consist of some tissue, a pen, a lighter and chap stick that was from his left-shirt pocket; is that correct?

A. Yes.

Q. State's Exhibit 124 is going to be a blood

**137**

swab from the pool of blood that Mr. Butler was laying in; is that correct?

A. Yes.

Q. And 125 would have been a blood swab from Stephen Swan, the pool of blood that he would have been laying in.

A. Yes.

Q. State's Exhibit 126 would have been the blood spatter in the street between the two victims.

A. Yes.

Q. And that would have been a swab as well.

A. A swab, yes.

Q. State's Exhibit 127 was a blood swab of a spatter in the street near Mr. Swan, correct?

A. Yes.

Q. State's Exhibit 128 would have been the black long-sleeve shirt that was found in the backpack in the trunk?

A. Yes.

Q. State's Exhibit 129 is going to be the white Nike Air Shoe, size ten and-a-half, that was found in the black and red backpack.

A. Yes.

Q. State's Exhibit 130 is going to be the black and red backpack?

**138**

A. Yes.

Q. Okay. And there's no need for us to open up all of these bags to know that; is that correct? You've inspected them.

A. Correct.

Q. Very good.

And State's Exhibit 130-A is going to contain the three pipes that we saw in the photograph, the rag, two dimes and nickel, and the concealed handgun license belonging to Stephen Swan.

A. Yes.

Q. And then there was a receipt --

THE COURT: What was that last exhibit, Mr. Alex?

MR. ALEX: I'm sorry, Judge?

THE COURT: What was the last exhibit?

MR. ALEX: 130-A. A as in Alpha.

THE COURT: Okay.

Q. (BY MR. ALEX:) And the receipt we didn't show to the jury just a second ago, but I think they saw it when Mr. Swan, Craig Swan was on the stand, he identified a receipt that was taken from the car. And that would be the same receipt that you would have collected; is that correct?

A. It might have been.

**139**

Q. Okay. Let's -- let me show that to you, just to make sure.

THE COURT: What exhibit number is this?

MR. ALEX: This is going to be State's Exhibit, let's see. Let me find it, Judge. It's included in 130-A, but I think we have a -- a -- an individual picture of it. I'll find 130 -- I'll find the photograph of it real quick.

THE COURT: This is the receipt you're referring to?

MR. ALEX: Yes, sir.

I'll tell you what I'll do, Judge. I'll find it in the photographs that we just went through.

Where are all the photographs we just went through?

MS. HANDLEY: Okay. 277 is right here. Okay.

MR. ALEX: Okay. That's the photograph number?

MS. HANDLEY: Yes. That was admitted with Mr. Swan.

MR. ALEX: 277. Okay.

(Sotto voce discussion.)

THE COURT: I have 277 as previously admitted.

**140**

MR. ALEX: Okay.

THE COURT: All right.

MR. ALEX: Which means it's probably going to be with the Court already.

(To the Court Reporter:) Sharon, where would the evidence be that's already been admitted?

(Off-the-record discussion was had.)

Q. (BY MR. ALEX:) All right. And these items have already been admitted: State's Exhibit 273, that would have been out of the red backpack?

A. Yes.

Q. Okay. State's Exhibit 277 is a receipt that came out of the backpack?

A. Yes.

Q. Okay. And the receipt that we have here I think was identified from the victim's dad as being where he would have purchased the firearm.

And that physical item is what we're now admitting, Ms. Giannone, included in State's Exhibit 130-A; is that correct?

A. Yes.

Q. State's Exhibit -- and State's Exhibit 131, -- we'll start with 133.

133 we have physically marked as the large suitcase that was in the trunk of the car, okay?

141

A. Yes.

Q. You've examined that and you can identify that; is that correct?

A. Yes.

Q. All right. Now the items that are in the suitcase, 131-A is going to be the birth certificate that we just looked at; is that correct?

A. Yes.

Q. 131-B is going to be the receipt for the birth certificate; is that correct?

A. Yes.

Q. Both bearing the name of James Broadnax?

A. Yes.

Q. 131-C was the application; 131-D and 131-E are all documents, the physical documents of that application for birth certificate; is that correct?

A. Yes.

Q. All bearing the name of James Broadnax?

A. Yes.

Q. All physically located in the large suitcase.

A. Yes.

Q. Very good.

There's a money order receipt, State's Exhibit 131-F; is that correct?

A. Yes.

142

Q. And I think you have identified for purposes, for the record purposes at this point, 131-G, was a mask of some sort?

A. Yes.

Q. Okay. 131-H was a picture of some sort.

A. Yes.

Q. And 131-I and -J were spiral notebooks; is that correct?

A. Yes.

MR. ALEX: And, Judge, I'm going to offer those things only for the record at this time, 131-G, H, and I, and J.

THE COURT: Okay.

MR. LOLLAR: No objection.

THE COURT: Admitted for record purposes, 131-G through J, inclusive.

Q. (BY MR. ALEX:) And we'll continue with the offer for all purposes, okay, Ms. Giannone?

132-A is going to be the jacket in the trunk.

132-B is also a jacket in the trunk; is that correct?

A. Yes.

Q. 133, we have already -- you've already identified as a suitcase.

134 was a duffel bag in the trunk containing

143

clothing; is that correct?

A. Yes.

Q. 135 is going to be the DNA swab on the hood of the car?

A. Yes.

Q. 136 is going to be the swab of what was marked as the hood of the car, under E, as in Example?

A. Yes.

Q. And 137 was going to be another swab from the left-rear area of the car; is that correct?

A. Yes.

Q. 138 is a DNA swab from the left-rear quarter panel.

139 is the gray Fila shoes, size 13, that was identified with James Broadnax; is that correct?

A. Yes.

Q. 140, 141, 142, 143 and 144, 145, State's Exhibit 146, 147, 148, 149, 150 are all clothing associated with the three suspects that we saw in the photographs here; is that correct?

A. Yes.

Q. All right. 151 would have been a buccal swab from Demarius Cummings?

A. Yes.

Q. 152 was the license plate from the vehicle?

144

A. Yes.

Q. 153 was a gunshot residue kit from Stephen Swan?

A. Yes, it is.

Q. You recall seeing that in the autopsy box there?

A. Yes.

Q. 154 is a blood standard of Stephen Swan?

A. Yes.

Q. Okay. 155 was the bullet recovered from Stephen Swan at the autopsy; is that correct?

A. Yes.

Q. And these items would have been sent to you as a matter of course from the medical examiner; is that correct?

A. Correct.

Q. All right. 156, 157 are both returned to you from autopsy of the Stephen Swan, the nail clippings and the hair standards; is that correct?

A. Yes.

Q. And 157, 158 are both -- 157 we've already talked about.

158 are going to be the clothes of Stephen Swan, and all of that's contained in this box; is that correct?

145

A. Yes.

Q. All right. 159 and 160 are bullets that were recovered from the autopsy of -- I'm sorry.

MR. ALEX: We'll withdraw those offers, Judge.

THE COURT: Which ones?

MR. ALEX: 159 and 160.

THE COURT: All right.

Q. (BY MR. ALEX:) For the record, any of the items that may have been tendered to you from autopsy of Matthew Butler, you would have had care, custody and control of those items; is that correct?

A. Yes.

Q. And you've identified them for the record, which we're not offering at this time, but you have identified them; is that correct?

A. Yes.

Q. And those would be items 159, 160, 161, 162, 163, 164, 165, 166, and they would all be contained in the box sitting in front of me; is that correct?

A. Except for 159 and 160, which are here.

Q. Except for 159 and 160. Those are the bullets.

A. Yes.

Q. And those are up there with you?

146

A. Yes.

Q. Very good. You've identified all of those items as well?

A. Yes.

MR. ALEX: We would only offer those for the record at this time, Your Honor.

THE COURT: Which is 159 through 166?

MR. ALEX: Yes, sir.

THE COURT: All right.

MR. LOLLAR: No objection.

Q. (BY MR. ALEX:) 167, 168, 169, 170, 171 are all tape lifts that would have been done by the SWIFS of the different items of clothings; is that correct?

A. Yes.

Q. And they would have been returned to you for safekeeping.

A. Yes.

MR. ALEX: And we would only offer those for the record at this time as well, Judge.

THE COURT: All right.

Q. (BY MR. ALEX:) 172 would have been a gunshot residue kit collected from Nathan Johnson; is that correct?

A. Yes.

MR. ALEX: And, Judge, if you'd like, I

147

could repeat those items to offer, but I would offer all of the above-mentioned physical items identified by the witness at this time for all purposes, except for the ones I offered only for record purposes.

THE COURT: Okay. I'm going to take a recess for the jury so I can review all of this. It's rather complicated, and I don't need to do it in front of you.

All rise for the jury.

(Jury not present.)

THE COURT: All right. Be seated, please.

With regard to any of the exhibits offered by the State in the last rendition of exhibits, is there any objection?

MR. LOLLAR: No, Your Honor.

THE COURT: Okay. So this is what I want to do now. I want to review with the parties and see if you agree with me or not as to what's in now and what's not.

I have 18 in. 20 and 21.

I do not have 22 in.

MR. ALEX: No, sir. That would be punishment phase.

THE COURT: I have 23 through 36 in.

MR. ALEX: Yes, sir.

148

THE COURT: 37 through 51 in.

MR. ALEX: Yes, sir.

THE COURT: 52 was not admitted.

53 and 54 are in.

And 55 through 72 in.

73 through 90 in.

91 through 100 in.

101 through 109 have not been admitted.

MR. ALEX: Those are the ones that we just offered, Judge.

THE COURT: Okay. And there was no objection?

MR. LOLLAR: No, Your Honor.

THE COURT: Okay. 101 through 109 are admitted.

110 through 120 are in except for 113, 116 and 117.

MS. HANDLEY: Right.

MR. ALEX: That's correct, Judge.

THE COURT: 121 through 130-A are all admitted.

131-A through F are admitted, and then I have G through J as are, but then I think subsequently they were admitted.

MR. ALEX: G through J, Judge, are for

149

record purposes only.

THE COURT: Okay.

MR. ALEX: Those would be things that we would offer in the punishment phase.

THE COURT: All right. G through J are admitted for record purposes only.

132-A and B are admitted.

133, 134 are admitted.

135 through 144 are admitted.

145 through 155 are admitted.

156 through 158 are admitted.

159 through 166 are admitted for record purposes only.

167 through 172, record purposes only.

MR. ALEX: Through 171, Judge. 172 we offered for all purposes.

THE COURT: Is there any objection to 172?

MR. LOLLAR: No, Your Honor.

THE COURT: 172 is admitted for all purposes.

173 through 179, admitted for all purposes.

180, 181, 182, record purposes only.

I have 183 in for all purposes.

MR. ALEX: Yes, sir.

150

THE COURT: 184 through 186, record only.

MR. ALEX: 184? Yeah, that's -- that's exactly right, Your Honor.

THE COURT: All right. 187 through 190 for all purposes.

191 through 200 for all purposes.

201 and 202-A -- well, actually, 202 itself and then A through H for all purposes.

203 admitted for all purposes.

I do not have 204 or 205 admitted.

MR. ALEX: No, sir. 204, no. 205 is the white towel.

THE COURT: You didn't offer it.

MR. ALEX: Very good. Okay. That means I may not know exactly if it's --

THE COURT: 206 through 213 are admitted.

MR. LOLLAR: Is that 206 through 213?

THE COURT: Yes, sir.

214 through 228 are admitted.

228 through 245 are admitted.

MR. ALEX: Yes, sir.

THE COURT: 246 through 263 are admitted.

264 through 281 are admitted.

282 through 296 are admitted.

And I think you offered 297 through 384

151

for record purposes only.

MR. ALEX: I have not done that yet, Judge, but I'll to it at this time.

During the pretrial hearing, I proffered to the Court that there was a numerous amount of bloody photos that we were not offering in front of the jury.

THE COURT: And I recall that.

MR. ALEX: And --

THE COURT: Is there any objection to 297 through 384 for record purposes?

MR. LOLLAR: No, sir.

THE COURT: 297 through 384 are admitted for record purposes.

I have 385 through 390 as admitted for all purposes.

MR. ALEX: I don't think I offered 388 at this point, Judge.

THE COURT: That's correct. You did not. Okay. So 388 has not been offered.

391 through 393 have not been offered yet.

MR. ALEX: That would be our next witnesses, Your Honor.

THE COURT: I've got 394 in, but not 395.

MS. HANDLEY: Right.

THE COURT: 396 in, but not 397.

152

MR. ALEX: That's correct.

THE COURT: 398 through 402 are in.

403 is in.

404 and 405 are in for demonstrative purposes.

406 through 408 are not in.

409 through 411 are admitted.

412 through 420 are admitted.

I don't have 421 admitted.

MS. HANDLEY: It's a duplicate, Your Honor, of 420. We won't be offering it.

THE COURT: So it's not admitted.

422 through 424 are admitted.

425 through 427 have not been admitted.

430 through 48 -- through 438, rather, have not been admitted.

439 through 447 have not been admitted.

448 through 456 have not been admitted.

457 through 465 have not been admitted.

466 through 474 have not been admitted.

475 through 483 have not been admitted.

484 through 492 have not been admitted.

493 through 501 have not been admitted.

502 through 505 have not been admitted.

506 through 519 have not been admitted.

153

520 through 536 have not been admitted.

537, and 538, and 539, have all been admitted.

540, for record purposes only.

And that's what the Court has. Is there any objection to that rendition from the State?

MS. HANDLEY: No objection.

THE COURT: Any objection from the defense?

MR. LOLLAR: No, Your Honor.

THE COURT: All right. Are y'all ready to proceed or do you need a break?

MR. ALEX: Well, I'm about to pass the witness, so I guess it would be up to defense counsel.

MR. LOLLAR: Whatever the Court prefers.

THE COURT: Let's keep going. Call the jury.

We need the witness back on the stand.

THE BAILIFF: All rise.

(Jury present.)

THE COURT: Be seated, please.

And will there be further direct examination, Mr. Alex?

MR. ALEX: We'll pass the witness at this time, Your Honor.

154

THE COURT: Cross-examination.

**ISABEL GIANNONE**

was re-called as a witness and testified as follows:

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Ms. Giannone, how are you?

A. I'm fine. Thank you.

Q. This is your first time to testify?

A. Yes.

Q. You're doing very well.

A. Thanks.

Q. I wanted to ask you a few questions about what your testimony has covered.

I'm curious, the Zion Gate music studio itself, did you go up to the business itself?

A. Up to the business, yes.

Q. Yes. Was the door locked or opened?

A. I don't remember.

Q. Did you find --

A. No. I believe it was locked.

Q. It was locked?

A. I believe so, yes.

Q. All right. Did you find -- well, let me ask this: Matthew Butler's pockets, were they disturbed at all?

155

A. Not that I recall.

Q. And, in fact, wasn't his wallet still on him?

A. Yes.

Q. And, you know, keys and things like that?

A. I don't recall finding keys. I don't remember.

Q. Did either one of the individuals, Mr. Butler or Mr. Swan, have the keys to the Zion Gate studio on them?

A. I don't remember.

Q. Okay. Now, you've indicated to us that one of the things you did was to take the pocket liners and the pants pockets from Mr. Swan's clothing.

A. Yes.

Q. Is that correct?

And what was your purpose in doing that?

A. For possible future processing, like DNA.

Q. Is it possible to DNA test those pocket liners to see if they, for instance, had any DNA on them from Demarius Cummings or James Broadnax?

A. Yes, it's possible.

Q. Okay. And then I want to talk to you about the -- the weapon which -- I believe that is State's Exhibit 202, and then the magazine's 203, and then the bullet that was still in the magazine, I believe that's

156

204. I want to ask you about those in particular.

Did you process each of those items for biological evidence?

A. I believe so.

Is it okay to look at my notes?

THE COURT: Yes.

THE WITNESS: Yes.

A. The gun and the magazine I did process. I believe I also processed the bullet.

Q. Okay.

A. Actually, I did not process the bullet for DNA.

Q. You did not process the bullet that was found in the magazine, but was found in the gun.

A. It was not found in the magazine. When I received the evidence, it was in the towel, but not the magazine.

Q. It was in the towel?

A. Yes.

Q. Oh, okay. The bullet itself.

A. Yes.

Q. Okay. Was the magazine still in the gun?

A. I don't remember. I don't think it was, but I don't remember.

Oh, here it is. (Examining document.) No.

157

Q. Okay. It was out of the gun as well?

A. Yes.

Q. Do you know if that had been taken out by the officers?

A. I believe so, yes, to clear it.

Q. Det. McNear and whoever else? Det. Sweet?

A. Yes.

Q. And they would have taken those things out of the gun once they came into possession of it?

A. Yes.

Q. Okay. And particularly in regard to the weapon itself, I believe you've indicated to us that you took DNA swabs, --

A. Yes.

Q. -- and can you describe to the jury what that is and how you do that?

A. What we do is we take deionized water and we moisten the swab, and then we run it across the surface of whatever we want to process, and that should take pick up residual DNA.

And then we store it and let it dry first so it doesn't accumulate, or it doesn't grow mold, basically. And then we store it and send it off to a lab for DNA.

Q. And so once it's dried and -- you do send that

158

off to your laboratory for DNA analysis.

A. Yes.

Q. And is that in the hopes of finding whose DNA is on the gun?

A. Yes.

Q. Okay. And same thing with the magazine?

A. Yes.

Q. And again, in regard to the bullet, you don't think you did swabs on the bullet.

A. I don't believe I did.

Q. Okay. You've also indicated to us that you took fingerprints.

A. Yes.

Q. Or tried to take fingerprints off of the weapon, the magazine.

A. Yes.

Q. And how about the bullet, --

A. Yes.

Q. -- did you try to take --

A. I did try.

Q. Were you successful in lifting any comparable prints --

A. No.

Q. -- off of the bullet?

A. No.

159

Q. Off of the magazine?

A. No.

Q. And how about off of the gun?

A. No.

Q. But you were able to get the DNA swabs done on the magazine and the gun.

A. That's correct.

Q. Okay. Which laboratory did you send those items to?

A. To the -- the DNA swabs?

Q. Yes.

A. Yes, we sent them to -- to SWIFS, I believe, for -- it was --

Q. To SWIFS or to --

A. No, I sent it to --

Q. -- DPS?

A. -- DPS Garland.

Q. Okay. And there's a -- in Garland is a Department of Public Safety crime laboratory also?

A. Yes.

Q. And that's where you sent the DNA samples.

A. That's correct.

Q. That you got off of the gun.

A. Yes.

Q. And I believe you indicated -- I remember

160

Mr. Alex mentioning a -- a buccal swab from Demarius Cummings. Do you know if that buccal swab was also obtained from Mr. Broadnax?

A. I believe so, yes.

Q. I'm sorry?

A. Oh, I'm not sure. May I look?

Q. Sure.

A. Actually, no, I don't have on here that I have a buccal swab of -- of Broadnax.

Q. So you might not have been responsible for that.

A. Correct.

Q. Okay. And how do you do a buccal swab?

A. You take clean swabs as well, and you rub them against the interior of the -- the cheeks, the roof of the mouth and under the -- the tongue.

Q. And is that the commonly accepted way to get a DNA sample --

A. Yes.

Q. -- from a person?

A. Yes.

Q. Okay. And you sent those all off to DPS crime lab.

A. Yes.

Q. In Garland.

161

A.   Yes.

Q.   All right.  Thank you.

MR. LOLLAR:  That's all the questions we have.

THE COURT:  Any redirect?

MR. ALEX:  No, sir.

THE COURT:  May the witness be permanently excused?

MR. ALEX:  There's no objections from the State, Judge.  However, we're probably going to keep her on standby to bring anything back.  And she will be back maybe for the punishment phase, so we're going to keep her on standby.

THE COURT:  You're excused for now, ma'am.  We'll see you later.  Thank you for your testimony.  You may step down.

What further says the State?

MR. ALEX:  The State's going to call Susan Allen, Your Honor.

THE COURT:  Ms. Alexander.

MR. ALEX:  Susan Allen, A-L-L-E-N.

And, Judge, for scheduling purposes, I believe this is our next to the last witness.  Actually, I apologize.  Two more.

THE COURT:  It's all right.  I've got it.

162

Ms. Allen, will you please come all the way to the front of the courtroom, all the way up by the door.  Go as far as you can.  When you've reached the door, if you'll turn and face me and raise your right hand.

THE WITNESS:  Sure.

**SUSAN ALLEN**

was called as a witness and testified as follows:

THE COURT:  You may lower your hand.  Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex.

Mr. Alex, whenever you're ready.

MR. ALEX:  Thank you, Judge.

And I'm going to approach, if I can, to clear off some of the mess off of the -- not mess, but the evidence off of -- is that okay?

THE COURT:  Yes.

MR. ALEX:  Thank you, sir.

May I proceed, Your Honor?

THE COURT:  Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q.   State your full name, ma'am.

A.   My name is Susan Allen, A-L-L-E-N.

163

Q.   And, Ms. Allen, tell the jury what you do for a living.

A.   I am a forensic firearm examiner.

Q.   And what does a forensic firearm examiner do?

A.   I examine firearms, ammunition components, bullets, cartridge cases.

Primary concern is to try to determine whether a bullet or a cartridge case was fired from a particular firearm.

Q.   How long have you been doing that?

A.   Um, since 1996.

Q.   Okay.  And what qualifies you to do that kind of work?

A.   I receive -- I'll give you my education, experience, training.  I've received my Bachelor of Science degree from Western Carolina University in 1986.

I was right out of college.  I was hired with the Charlotte North Carolina Crime Lab as a crime-scene investigator.

I also worked with the Kansas Bureau of Investigation as a latent print examiner.

I've been working as a firearm examiner since 1996, first starting with the Fort Worth Police Department Crime Lab.

164

I also worked with the Dallas County Crime Lab, which is also called Southwestern Institute of Forensic Sciences here in Dallas, also called the Dallas County Crime Lab.

I have worked with the Plano Police Department in the same capacity, and now I work with the Dallas Police Department.

Q.   Okay.  And while you were working with the Plano Police Department, what were you doing there?

A.   The same thing, as a firearms examiner, a forensics firearm examiner, mainly working and in charge of the National Ballistics -- National Integrated Ballistics Information Network, also called NIBIN.  It's our firearms database, and our primary concern is to try to get as much evidence, firearms evidence, cartridge cases, bullets, from guns and imaged into this database to help associate one crime scene to another.

Q.   And while you were working there at the NIBIN Center and Plano Police Department, were you called upon to examine some evidence by the Garland Police Department as it related to a -- a homicide case?  I'm going to give you -- is the -- is the NIBIN number the best way for you to identify your case?

A.   Yes.

165

Q. NIBIN Number P as in Paul, N as in Nancy, C as in candy, 08-097. Is that a case that you worked?

A. Yes, it is.

Q. All right. And what were you asked to do in that case?

A. In that case, we also, up in Plano, called Plano NIBIN Center, we would receive evidence from other agencies to help work their case, identify the cartridge cases and bullets to guns.

We were -- we did evidence up there free for police agencies.

And that -- I was -- there was evidence from Garland that was submitted to our laboratory to determine if bullets or cartridge cases were fired in a particular gun.

Q. All right. And the science of that ballistics comparison, is it the type of science that's relied upon by other experts in your field?

A. Yes.

Q. Okay. Just can you -- can you briefly describe to the jury, how is it that you're able to determine whether any particular bullet was fired from a gun, or whether any particular shell casings all came from the same gun? Give the jury some idea how you're able to do that.

166

A. Well, during the manufacturing process of the gun, there are certain -- there are unique microscopic characteristics, imperfections, that are left on the gun, primarily the barrel of the gun, or other areas of the gun that may come in contact with the cartridge case.

Those areas, we look at microscopically, comparison, using a comparative analysis, um, and able to look at these unique random marks and identify certain of these marks to each other, from one bullet to another, or one cartridge case to another.

Q. Okay. And -- and you're able to determine, for instance, where if I gave you five cartridge casings and ask you to tell whether they all came from the same gun, you could tell that.

A. Yes.

Q. And that's based on the markings?

A. It's based on the unique microscopic markings left behind by that gun.

Q. Okay. And if I gave you some -- some bullets, for lack of a more professional, legal term, as you would use, what would you call a bullet once it's been fired?

A. A fired bullet.

Q. A fired bullet. Very good. Very, very

167

technical.

If I gave you some fired bullets, could you tell whether they came from a specific gun?

A. Yes.

Q. Very good. And as it relates to this case, when the Garland Police Department --

MR. ALEX: I think I asked to approach once already, didn't I?

THE COURT: No, but I've given up on you.

MR. ALEX: Okay.

Q. (BY MR. ALEX:) State's Exhibit 393, is this a report that you generated as it related to the items that the Garland Police Department brought you?

A. Yes, it does.

Q. Okay. And I see you brought with you some show and tell there. What is that?

A. This is a cartridge. One unit of ammunition. It allows us to kind of show you a little bit about what a cartridge looks like.

Bullet. And the cartridge case. This is usually what I receive. I'll receive a bullet or a cartridge case. These are two components that I -- I usually receive from crime scenes along with, sometimes, a gun. And it just gives -- it's a show and tell. It shows you a little bit of what we look at.

168

Our bullet has some rifling impressions on it, and our cartridge case has markings on the primer. Those are the areas that we look at for identification. And we also look at the rifling area around the bullet for identification purposes also.

And these are the two areas that we look at under a microscope side-by-side and try to just match the striated areas, or the impressed areas, on both bullets or both cartridge cases.

Q. Okay. And you have a copy -- I guess you have the original of this report; is that correct?

A. Yes, I do.

Q. I'll take the copy with me and we're going to -- I'm going to try and identify the items that was brought to you.

Were you -- tell the jury, while I find these items, how many shell casings were brought to you to be compared.

A. I received six fired Remington .380 auto cartridge cases.

Q. Okay. And did you re -- tell -- tell the jury what else you received to compare.

A. I also received four bullets, fired bullets.

Q. Fired bullets?

A. And one fired part of a bullet.

169

Q. Okay. And while I gather that information, did you receive a weapon as well?

A. Yes, I did. Sorry.

Q. And what kind of weapon did you receive?

A. I also received a Browning 9 millimeter short, which is also called a .380 auto caliber semi-automatic pistol.

Q. Okay. And did you receive a magazine with that as well?

A. I received a magazine with the gun.

Q. All right. I'm going to have you to look at State's Exhibits 203 and 202, and if you want to do it through the bag or if you want to do it out of the bag, that's fine, and tell me if those are items that you received for comparison.

A. Yes. I see my markings on it. Case number. Item number. And my initials.

Q. Okay.

A. On both.

Q. And so you're certain that's the -- that's the weapon that you examined in your examination of the -- of all of these items.

A. Yes.

Q. Okay. And then I'm going to have you look at State's Exhibits -- and hopefully you won't have to

170

open them. If you do, then we'll do that.

A. Okay.

Q. State's Exhibits 101, -- I'll tell you what. Let's do it this way.

You're ahead of me, aren't you?

A. Trying to get them organized. It's kind of like what I do when I get them out. When I receive evidence, kind of get them in order.

Q. Okay. You have 101 there?

A. I have 101. I've got them on the opposite side. Okay.

Q. 107, 108?

Am I interrupting your process?

A. Yeah, well, -- okay. 107.

Q. Okay.

A. Which is my Item Number 7.

Q. Okay. Tell you what. As I call out the exhibit number, tell the jury what that item is. Is that okay?

A. That's fine.

Q. State's Exhibit 101 is?

A. 101 is my Item Number 1. It's a fired Remington .380 cartridge case.

Q. Cartridge case.

A. Uh-huh.

171

Q. And that would be what part of your show and tell?

A. This would be this part.

Q. Very good.

And 107?

A. And 107 is my Item Number 7, which is also another .380 auto cartridge case.

Q. Okay. And let me -- and I'm going to help you out a little bit. When I -- when I numbered these, I did them in the order of your report, so 108 should be your Item Number 8.

A. Yes.

Q. Okay. And tell the jury what that is.

A. That Item Number 8 is a lead core from a jacketed bullet, which means I've got a jacketed bullet, and from impact, a lot of times there's a jacketing, a metal jacketing around the bullet, the lead portion of the bullet.

On impact, a lot of times the jacketing will come apart from the lead portion which is inside, and they'll separate. So Item Number 108 is just the lead portion within the jacketed bullet.

Q. Okay. So if -- if I may? If this was entering a person's skull as a full bullet, what may be left is what we see there, potentially.

172

A. Potentially.

Q. Okay. Very good.

And 109?

A. Is my Item Number 9. It's a fired .380 cartridge case.

Q. Okay. And 110?

A. 110 is my Item Number 10, which is also another cartridge case.

Q. Okay. 111?

A. Is my Item Number 11, another cartridge case.

Q. Okay. 114?

A. My Item Number 14, which is a partial bullet jacket.

Q. Okay. Do you want to explain what that is?

A. It's the jacketing around the -- around the lead portion of the bullet. And this particular item was a part of the jacket.

Q. Okay. So if the bullet was striking wood, or bone, or anything like that in exiting, then that could be what's left.

A. Yes.

Q. And the last item you have there is?

A. Number 103, which is my Item Number 3, which is a fired cartridge case.

Q. I'm sorry? May I see that one again?

August 11, 2009

173

A. (Indicating.)

MR. ALEX: May I have a second, Your Honor?

THE COURT: Yes.

Q. (BY MR. ALEX:) What you have marked up there as 103 is a -- tell me what that is again?

A. A fired cartridge case.

Q. Okay.

MR. ALEX: May I have one second, Judge?

THE COURT: Yes, sir.

MR. ALEX: Thank you.

(Sotto voce discussion.)

Q. (BY MR. ALEX:) All right. Now, did I leave that report up there? And what is it marked?

A. My report?

Q. Yeah, the copy of your report?

A. Item Number 3 is a fired cartridge case.

Q. No, ma'am, I'm sorry.

A. Oh.

Q. The report that you generated in this case.

THE COURT: That's 393.

THE WITNESS: Oh, I'm sorry.

Q. (BY MR. ALEX:) That's okay. I'll keep this copy, all right?

You've got your original?

174

A. Yes.

Q. All right. The report that you wrote, you examined all of the items that you just described; is that correct?

A. Yes.

Q. You compared the casings to one another and you compared the bullets to the gun; is that correct?

A. I compared the cartridge cases to the -- the test-fired cartridge cases from the gun, and I compared the one -- well, Item Number 14 to test-fired bullets from the gun.

Q. Okay. And Item Number 14 would be State's Exhibit 114; is that correct?

A. Yes.

Q. Very good. And you generated a report; is that correct?

A. Yes, I did.

Q. All right.

MR. ALEX: And at this time, --

Q. (BY MR. ALEX:) And you've signed that report. You did that back on September 27th, 2008; is that correct?

A. That is correct.

Q. Okay.

MR. ALEX: All right. At this time, we're

175

going to offer a report generated by Ms. Allen, Judge, State's Exhibit 393.

MR. LOLLAR: No objection.

THE COURT: That's admitted. State's Exhibit 393 is admitted.

Q. (BY MR. ALEX:) Let's talk about the results of your testing, okay?

Tell the jury a little bit about the firearm that you examined.

A. Um, Browning, a 9 millimeter short caliber, also called a .380 auto caliber pistol. It's Model Number 125. Serial Number 71, N as in Nancy, 03924.

Q. Now, there's a magazine that goes along with that; is that correct?

A. That is correct.

Q. How many bullets does this gun hold in total?

A. If I can refer to my notes. My memory is not that great.

That particular magazine holds six cartridges.

Q. And there was a -- when -- when the items were submitted to you, did they submit a full unfired bullet to you?

A. Yes. There was also an unfired cartridge that was submitted.

Q. Okay. And when you say "unfired cartridge,"

176

is that the same as a bullet that hasn't been fired?

A. Well, a lot of people call it that.

Q. Okay. Very good. Very good.

A. But it's actually -- the correct terminology, it is a cartridge --

Q. Okay.

A. -- that has not been fired.

Q. Because it has all of the components to it.

A. It has all of the components to it, yes.

Q. Very good. And you compared it -- did you actually use that in -- when you're testing?

A. That cartridge I did use as one of my tests.

Q. All right. So that -- that piece of evidence we wouldn't have to show the jury as you received it, you would have used it when you were firing it then.

A. That is correct.

Q. All right. Tell the jury what you did -- well, before you do that, how does -- how does this gun operate? Is it the type of gun that I could shoot and all of the evidence that -- the casings would stay in the gun? Would it eject?

Tell the jury how that particular gun operates.

A. This particular gun is a semi-automatic firearm. The cartridges are held in the magazine.

177

Load the magazine. Put the magazine into the grips of the firearm.

In order to fire this particular firearm, the slide has to be pulled to the rear, which picks up the very top cartridge in the magazine, places it in -- as you release the slide, it puts the first cartridge into the chamber of the firearm. At that point, the firearm is ready to be fired.

As each -- as each trigger is pulled, the bullet goes out the barrel; cartridge case is ejected from the gun. Another cartridge is placed into the chamber and is ready to be fired again for each pull -- each pull of the trigger.

Q. So you don't have to pull the slide back each time.

A. No.

Q. Very good. And how much pressure would it be if I was trying to fire this weapon one after the other, how much pressure am I pulling against?

A. I tested the trigger pull of this particular firearm, and it was approximately five and-a-half pounds of trigger pull, which means, kind of, if you had a five and-a-half pound bag of sugar tied to a string and you pulled that five and-a-half pounds up with your finger, that's about how it would feel, how

178

the five and-a-half pounds of pressure would be.

Q. So if I was firing that weapon that would be a pretty deliberate act, wouldn't it? It's not like I could just touch it and it would go off. I'd have to pull through five pounds -- five and-a-half pounds in order to fire it.

A. Yes, that's true.

Q. And when you take that weapon and you compare it with the items that you have up there, give us -- tell us what some of your conclusions were as it relates to your comparisons.

A. What we'd normally do with the gun that comes into the laboratory, I'll document all pertinent information about the gun, make sure that the safeties work, make sure that there's no malfunctions in the gun.

I use two cartridges for test fire and test fire the firearm. See if it works. It did. It functioned. Collect the test-fired cartridge cases and bullets.

I test fire my gun in a 500 gallon water tank and recover the bullets in the water. Cartridge cases usually go flying somewhere and I have to find them. Not that far, it's just that they do get ejected from the gun.

179

And I take those components, the bullet and the cartridge cases. I take them to my comparison microscope and I first look at the two bullets from the gun and the two cartridge cases from the gun, just to get familiar with what I'm looking at.

When I have evidence to be compared, I'll compare the evidence to the ones from the gun and make that identification.

Q. And did you make identifications with the items you have there?

A. Yes. I was able to identify all six cartridge cases to the gun.

Q. All right. Now, you said six cartridge cases. Did you have a total of five or six?

A. Six fired .380 auto caliber cartridge cases.

Q. Okay. I think one of them, you said, was a jacket, perhaps?

A. The jacketing was Item Number 14.

Q. Very good.

A. My Item Number 14.

Q. Very good. So your items 1, 3, 7, 9, 10 and 11 were all cartridge cases; is that correct?

A. That is correct.

Q. And was either one of those -- and 14 would have been the fired partial bullet jacket; is that

180

correct?

A. That is correct.

Q. All right. And all of them would have came from one gun.

A. They came from the Browning 9 millimeter short.

Q. The weapon that you have up there.

A. Yes.

Q. All right. What other comparisons did you do?

A. There were three other bullets that were submitted to me from -- from the Medical Examiner's Office.

Q. Okay. And the medical examiner would be the person who would have done the autopsy; is that correct?

A. That is correct.

Q. All right. And for right now, let's also talk about the item that's marked on your report as DCME-3, which would have been the jacketed bullet from Stephen Swan?

A. Yes.

Q. Let's see.

A. Yes.

Q. What conclusions would you have drawn from that?

181

A.  I was able to identify that item -- my Item Number DCME-3 was fired from the Browning 9 millimeter short caliber pistol.

Q.  And then 1-A and 1-B, which are at this point not in evidence, just for the record, you did look at those and compare those as well; is that correct?

A.  That is correct.

Q.  Okay.

MR. ALEX:  And, Judge, as it relates to 393, we will withdraw the offer of this report as it relates to 1-A and 1-B at this time.  So we'll offer it in a limited capacity.

THE COURT:  393 minus 1-A and 1-B?

MR. ALEX:  Yes, sir.

THE COURT:  Any objection to that, Mr. Lollar?

MR. LOLLAR:  393?

THE COURT:  Yes, sir.  It was previously admitted in its entirety.

MR. LOLLAR:  That's the report.

MR. ALEX:  The report makes a reference to 1-A and 1-B which is bullets from autopsy of Mr. Butler which are not in evidence at this time.

MR. LOLLAR:  Okay.

MR. ALEX:  So we'll withdraw that from the

182

report at this time.

THE COURT:  Unless there's no objection.

MR. LOLLAR:  There's no objection.

THE COURT:  It's admitted for all purposes.

MR. ALEX:  Which we'll offer it for all purposes.

Q.  (BY MR. ALEX:)  All right.  So you compared 1-A and 1-B, which would have been bullets from the autopsy of Matthew Butler as well; is that correct?

A.  That is correct.

Q.  All right.  Give us your results of that.

A.  The three fired bullets that I received were identified as being fired from the Browning pistol.

Q.  All right.  So all of the shell casings and all of the bullets came from the weapon that you have there in front of you.

A.  That is correct.

MR. ALEX:  That's all I have, Your Honor.  I'll pass the witness.

THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q.  Just a couple of questions, Ms. Allen.

How old is that gun?

183

A.  How old is the gun?

Q.  Uh-huh.

A.  I did not research the -- the age of the gun.

Q.  Okay.  And how many cartridges can that gun hold in total?

A.  Total, the gun can hold seven cartridges.

Q.  Thank you, ma'am.

MR. LOLLAR:  That's all we have.

THE COURT:  Any redirect?

MR. ALEX:  Nothing further, Your Honor.

THE COURT:  May the witness be permanently excused?

MR. LOLLAR:  Yes.

MR. ALEX:  No -- no -- no objections, Your Honor.

THE COURT:  You're permanently excused, ma'am.  Thank you for your testimony.

What further says the State?

MR. ALEX:  The State will call Mr. Nichols, James Nichols.

THE COURT:  James Nichols.  All right.

Thank you for your testimony, ma'am.

Is everybody on the jury okay?

Mr. Nichols?  Is that Mr. Nichols there in the blue shirt?

184

MR. HIKEL:  No, Judge.

THE COURT:  Mr. Nichols, if you'll come all the way to the front of the courtroom up by the door.  When you've reached the door, turn and face me and raise your right hand.  All the way to the door.

Raise your right hand.

**JAMES NICHOLS**

was called as a witness and testified as follows:

THE COURT:  Lower your hand.  Take your seat in the witness stand.

Respond to questions from Mr. Alex.

Whenever you're ready, sir.

MR. HIKEL:  I'll be talking to Mr. Nichols.

THE COURT:  All right.  Go ahead, Mr. Hikel.

MR. HIKEL:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. HIKEL:

Q.  State your name again for the record, please?

A.  My name is James Nichols.

Q.  And, Mr. Nichols, what is your occupation?

A.  I'm a forensic scientist with the Texas Department of Public Safety Crime Laboratory in Garland.

185

Q. And what are your -- what are your duties as a forensic --

A. My duties include accepting evidence from law-enforcement agencies, examining evidence for biological material, performing DNA analysis on any biological material, reporting my results, and then testifying in court.

I also train new analysts in the laboratory and also perform validations of new instruments and technologies for our laboratory.

Q. Tell the jury, what's your training and education that allows you to perform these functions?

A. I have a Bachelor of Science from Texas Tech University in microbiology and a minor in chemistry.

And the core subjects of this degree program focus in genetics, molecular biology and biochemistry.

And upon appointment with the Department of Public Safety Crime Laboratory, I went through a formalized training in the Austin laboratory in examining items of evidence for serology, which are body fluids, and performing presumptive tests and then performing DNA analysis on these items.

Q. And how long have you been performing these tests?

A. For eleven years.

186

Q. Prior to that, what did you do?

A. I was in -- at Texas Tech. I was a student.

Q. And so, for -- since you graduated for those 11 years, you've been working for the Texas Department of Public Safety in the capacity you've testified about?

A. Yes, sir.

Q. Okay. Tell the jury, what is -- what is DNA?

A. DNA is deoxyribonucleic acid, and it is the genetic material that is present in the nucleus of the cells throughout your body. It's in most cells throughout your body, and it's the genetic material that's passed from the mother and the father in combination to their offspring and it is unique to that individual, with the exception of identical twins who would have the same DNA profile. But other than -- the twins, all relatives and all individuals have their own unique DNA profile.

Q. Is it appropriate to call you -- is it Mr. Nichols or Dr. Nichols?

A. Mr. Nichols.

Q. Okay. Mr. Nichols, have you testified before in court as an expert witness in this area?

A. Yes, I have.

Q. Has that been on few or many occasions?

187

A. On many occasions.

Q. Okay. Now, I know we see a lot of shows on television about DNA and all those kind of things, and sources of DNA. Tell the jury, what are the various sources of DNA?

A. Well, DNA is -- the type of nuclear DNA testing that we do is present within the nucleus of the cells, and this is in most human bodily fluids, such as blood, saliva, semen, on skin cells throughout the body, and it's also present on the cells within the scalp of the hair.

Q. All right. And, Mr. Nichols, I'm holding in my hands here a Blackberry, and you can see me touching this. If I -- as I'm touching this particular object right now, and I give it to you to ask you to perform a DNA analysis, is it possible that you could take this object and not get a good DNA sample, even though I'm touching it?

A. Yes, that is possible.

Q. Tell the jury, what are some of the factors that affect either the presence of and the quality of the DNA material in the samples that you're testing.

A. And there's many factors that would come into effect. It would be on that individual. Each person is different in the amount of cells that they may

188

slough off onto that item may vary between individuals.

Another factor would be the amount of time you handled that item, so these are the two main factors that I would think would affect the ability whether to obtain a DNA profile from an item.

Q. Okay. Now, am I correct, Mr. Nichols, that -- again it's hypothetical -- if I were to touch it as I am, give it to you to perform analysis, and let's assume for my question that you don't find any DNA. Is there, therefore, a logical conclusion that I did not handle this object because there's not any of my DNA there?

A. No.

Q. Okay. So the presence or the absence of DNA could be affected by a lot of factors, correct?

A. Correct.

Q. All right. Now, is it possible to take DNA material from a particular object from a crime scene, perform analysis to find if there's any DNA sample in that particular material?

A. Yes.

Q. Okay. And in doing so, let me ask you, do you then take, for example, the materials, whatever it is you're going to test for the DNA sample, and tell the jury how you then go about taking a particular piece of

189

evidence from a crime scene and performing DNA analysis to find the presence or absence of DNA. How do you do that?

A. The process begins by taking an item and extracting the DNA. The extraction process is just a biochemical process in which the cell is broken down and the DNA is released.

The next step that we perform is quantitation, which is to measure how much DNA is in that sample.

The next step is amplification, which is the polymerase chain reaction, which is PCR, and that is a chemical process in which 15 different locations on the DNA chromosome are amplified so that from a very small amount of DNA, we can get many, many copies, and it's large enough for us to analyze.

And then the final step is the actual analysis in which the PCR product is put through a genetic analyzer, and the DNA profile is obtained from that.

We can do this on the crime-scene stains and follow the same procedures on known standards of a known blood or buccal swab, and a buccal swab is a cheek swab and get a known standard from an individual and then compare that to the crime scene DNA profile to determine if that person is a possible contributor or not.

190

Q. Mr. Nichols, is one person's DNA different from another?

A. Yes.

Q. Am I correct that -- or tell the jury, in terms of DNA, is it correct that 99 percent of the population's DNA are -- are similar; is that correct?

A. Correct. Roughly, yes.

Q. Okay. And is it one percent that makes it different that distinguishes my DNA from your DNA, for example?

A. Yes. When I spoke of the PCR reaction, we are targeting 15 specific areas, and these are 15 -- these areas, these 15 areas are chosen because they do vary between individuals and they vary by repeated units, which are called short tandem repeats, and that's why we analyze these very specific areas, because they do differ between individuals.

Q. Over a person's lifetime, does his or her DNA change?

A. No, sir.

Q. Okay. Let me ask you to assume, again, back to my Blackberry that I'm handling here. I pass it to Mr. Alex and one or more of these gentlemen, before it finally gets to you to perform the DNA analysis, am I correct that one of the possibilities could be that

191

there will be no quality DNA on this object to be tested because of all the people who have handled it?

A. The quality, I don't know would be affected, but the number of contributors could possibly increase with just as many people -- the more people that come in contact with an item, the chances of finding more and more individuals' DNA is increased with that.

Q. Obviously, if before it gets to you, the last person that touches this wipes it off, it's possible that he or she can even wipe off, if there's any DNA sample on the particular object? Is that possible too?

A. Yes. If an item would be cleaned, I would expect to not be able to -- that would diminish the chances of getting a DNA profile.

Q. Okay. Mr. Nichols, are you familiar with someone by the name of Kimberly Mack?

A. Yes, sir.

Q. Who is Kimberly Mack?

A. Kimberly Mack is a forensic scientist in our laboratory and she works in the serology section. And the serology section studies the presence of body fluids, such as blood, and semen, and saliva. And she's a screener, in which she examines items of evidence, performs presumptive tests on items for possible blood or semen, and then collects those stains

192

for future DNA testing.

Q. Okay. Prior to your taking the stand a few minutes ago, did you and I meet over in the other courtroom and talk for a few minutes?

A. Yes, sir.

Q. You are familiar -- I'm not going to ask you to testify to the contents of her report, but you're aware that Ms. Kimberly -- Kimberly Mack, right. Did you rely on the report prepared by Ms. Mack in preparation for you preparing your DNA report?

A. Yes, I did.

Q. Okay.

MR. HIKEL: Judge, at this time, may I approach the witness?

THE COURT: Yes.

Q. (BY MR. HIKEL:) Let me show you what has been marked as State's Exhibit Number 392. If you can turn to the last page. Is that document signed by Kimberly Mack?

A. Yes, sir.

Q. And did you rely on this report in preparing your DNA report?

A. Yes.

MR. HIKEL: Judge, we move to admit State's Exhibit 392.

193

MR. LOLLAR: And we have no objection. No objection.

THE COURT: 392 is admitted.

You may publish.

MR. HIKEL: Thank you, Your Honor.

Q. (BY MR. HIKEL:) Mr. Nichols, I just want to concentrate -- and let me ask you some questions about some of the items submitted for DNA analysis after Ms. Kimberly Mack performed this presumptive test for blood. And what I'd like to ask you is this:

As far as you know, did she collect what is known blood standards from Stephen Swan and Matthew Butler?

A. Yes, sir.

Q. Okay. Do you know what she also collected from the pocket, the front right-pant pocket of Stephen Swan; the left front-pant pocket of Stephen Swan; and the right left [sic] pant pocket of Stephen Swan, that those items were collected and submitted for a DNA analysis?

A. Yes, sir.

Q. Okay. In addition to that, do you know that there was a left -- both left and right side of white Nike shoes that were also submitted for DNA analysis?

A. Yes, sir.

194

Q. And finally, that there was a handgun that was submitted, or swabs from the handgun were submitted also for DNA analysis?

A. Yes, sir.

Q. In fact, in the handgun, was there -- were there several swabs from the left and right grip of the pistol, the left and right side of the pistol, the trigger of the pistol, and the inside barrel of the pistol, and the left side of the pistol swabs of all of those were collected and submitted to the lab for DNA analysis?

A. Yes, sir.

Q. Okay. In addition to that, does the report indicate that there are buccal swabs collected from a Demarius Cummings and a James Broadnax that were also submitted for DNA analysis?

A. Yes, sir.

Q. Let me talk to you about those items, those items being the pant pockets of Mr. Swan, the white Nike shoes, and the results from the pistol. Did you perform DNA analysis -- analysis on those items?

A. Yes, I did.

Q. If you would, Doc -- Mr. Nichols, on Page 2, did you prepare a report also that documented your findings in this particular case?

195

A. Yes, I did.

Q. All right.

MR. HIKEL: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. HIKEL:) Let me show you what has been marked as State's Exhibit Number 391 and ask, do you recognize this document?

A. Yes, sir. This is the report I generated.

Q. Okay. And this is a copy of the report that you have there, Mr. Nichols?

A. Yes, sir.

MR. HIKEL: Move the admission of Exhibit 391.

MR. LOLLAR: No objection.

THE COURT: State's Exhibit 391 is admitted.

MR. HIKEL: Thank you.

Q. (BY MR. HIKEL:) Let's go to Item 2-G, which was a swab from the left side of the pistol. Mr. Nichols, did you perform a DNA analysis to determine whether or not there was the presence of DNA on the left side of the pistol that was submitted by the Garland Police Department?

A. Yes, I did.

196

Q. Okay. Tell the jury, what were your findings as pertained to the left side of the pistol for the presence of DNA.

A. The DNA profile from the swab of the left side of the pistol, Item 2-G, is consistent with the DNA profile of Stephen Swan.

Q. Okay. And let me ask you, what was the form of the DNA that is referenced there in -- that came from the pistol?

A. That swab, there was a presumptive test for the presence of blood on that swab. It was positive.

Q. And that was found on the left side of the pistol that was submitted, correct?

A. That -- that was as indicated at the submission; yes, sir.

Q. All right? Would you turn to -- and I'm referring here to item -- to Exhibit 392, which would have been Kimberly Mack's report, and ask you as pertains to the front left-pant pocket of Mr. Swan, which would be Item 21 referenced in your report on Page 2, what were your findings there as pertains to the presence or absence of DNA?

A. No stains having the appearance of blood were detected on the pocket liner, Item 21.

Q. Okay. And let me ask you about the left and

197

right Nike sneakers that were submitted for DNA analysis. First of all, was one of the items submitted for analysis a presumptive test for blood? The results of that presumptive test.

A. For which item?

Q. For Items Number 29-A and B, which would have been the left and right white Nike shoes that were submitted.

A. Yes. A presumptive test for blood was positive on the stains from the white Nike shoes, Items 29-A and 29-B.

Q. Okay. Would you tell the jury, what was the DNA profile for the stains found on the left Nike shoe as indicated in your report?

A. The DNA profiles from the stains from the left Nike shoe, Item 29-A, stain one, and the right Nike shoe, Item 29-B, stain four, are consistent with the DNA profile of Matthew Butler.

Q. Okay. Let me ask, once you've obtained this result of the DNA test, do you then attempt to quantify the probability of, in this particular case, Mr. Butler's DNA being on that particular item?

A. Yes. When the DNA profile is obtained, we then perform a statistical analysis to determine the rarity or commonness of that DNA profile within the

198

population.

Q. Okay. And what were the results as pertained to the statistical analysis on that particular item as pertains to Mr. Butler?

A. The probability of selecting an unrelated person at random who could be the source of the DNA profile, is approximately 1:163.7 quintillion for Caucasians, 1:928.5 sextillion for blacks, and one -- and 1:384.6 quintillion for Hispanics.

Q. Now, Mr. Nichols, I believe on Page 1 of your report, you indicate to us the -- the population of the earth is 6.5 billion?

A. Yes, sir.

Q. If we were to use the population of the earth as your standard reference, how many earths will be required to have this particular number that you mentioned here?

A. A quintillion is a one with 18 zeroes after it, so in order to get one quintillion, it would be one billion times one billion.

Q. Okay. So that's a whole -- that's a whole lot of earths populations.

A. Roughly -- yes. So a billion times the earth's --

Q. Okay.

199

A. -- population.

Q. And what that means is that you -- let's assume that we're able to get all of those numbers of people lined up, in order to get this particular DNA results, you have a one chance of picking out another person of having identical DNA to Mr. Swan?

A. These statistics are saying that the probability of an unrelated person at random being selected and them matching that DNA profile, is that statistic of 1:163.7 quintillion for Caucasians.

Q. Let my ask you, concerning -- one second.

MR. HIKEL: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. HIKEL:) Mr. Nichols, sitting in front of me is a handgun, which I'm not going to touch. It's in plastic bag. But assuming that I were to handle that particular item out of the plastic bag, and myself and several individuals handled that weapon, and you are then to perform a DNA analysis, okay? So you understand?

A. Yes.

Q. I handled it, as well as several other persons handle it, it is then sent to you for you to perform a DNA analysis.

200

A. The --

Q. And you don't find my DNA. Does it therefore mean that I did not handle that weapon?

A. No, it does not.

Q. Okay. And again, I believe you mentioned to the jury that if several persons were to handle, in this particular case, that item, the handgun in front of you, that factor, several handlers, could affect the presence of DNA?

A. Yes.

Q. And the quality of the DNA?

A. Yes. The more people that handled an item, I would expect to find possibly more and more individual -- possible contributors to a DNA profile from that item.

Q. Okay. I don't believe I asked you this question, but I think it's my last question. Referring to item 21 in Ms. Mack's report, does that indicate that's the front left-pant pocket of Stephen Swan?

A. Yes.

Q. Okay. Who were the contributors of -- oh, first of all, were there any contributors of DNA on that particular item?

A. The DNA profile from the swab of the

201

left-front pocket, Item 21, is consistent with a mixture from Stephen Swan, Demarius Cummings, and at least two other individuals.

Q. Okay. So at least in terms of known contributors, we have, from the pocket of Stephen Swan, we have Stephen Swan himself, correct?

A. Yes.

Q. And a Demarius Cummings, correct?

A. Yes. The DNA profile is consistent, yes.

Q. With those individuals.

A. Yes.

Q. Okay. And let me ask you to assume Mr. Cummings were -- to be an African-American or black male, what is the statistical comparison done to show the probability of his DNA being found from that source?

A. For this item, the probability of selecting an unrelated person at random who could be a contributor to the swab of the left-front pocket, Item 21, is approximately 1:65.1 thousand for Caucasians, 1:368.9 thousand for blacks, and 1:69.69 thousand for Hispanics.

MR. HIKEL: Judge, I pass the witness.

THE COURT: Cross-examination?

**CROSS-EXAMINATION**

202

BY MR. LOLLAR:

Q. Mr. Nichols, just a few questions, if I could. My name is Brad Lollar. If I ask you something that you don't understand, and believe me, I don't -- I don't claim to be an expert in DNA, but I want to ask you this. You've said that each individual person has unique DNA, right?

A. Correct.

Q. Except if they have an identical twin.

A. Yes, sir.

Q. And in that event, then both of the individuals would have the same DNA.

A. That is correct.

Q. Okay. Okay. So what is this -- what I do not understand about DNA testing is this one in a quadrillion business, okay? Because if it's unique, why can't y'all just say it's unique and that came from the person?

A. Well, with the exceptions of identical twins, everybody's DNA does vary, and in these 15 areas that we test, we perform statistics on these to determine the rarity of that DNA profile within the population.

Q. Okay. Let me ask it again. Why can't y'all just say whether or not, you know, this sample that we took from, say, for instance, the pocket liner, belongs

203

to Demarius Cummings?

A. When we do our analysis, we are only analyzing these 15 locations, so without analyzing probably the entire DNA profile of all 46 chromosomes, we can't say that that is that person.

Q. All right. So you examine 15 locations, chromosomes.

A. Yes, sir.

Q. And you compare that to another sample's 15 chromosomes.

A. Correct.

Q. And how many chromosomes are there in the entire what?

A. One cell that -- within the nucleus, there would be 23 pairs of chromosomes.

Q. 23 pairs?

A. Yes, sir. So 46 chromosomes.

Q. So how many different locations are there in that entire 46 chromosomes?

A. There's millions.

Q. A million?

A. Millions.

Q. Millions?

A. I don't know the exact number, but millions of locations.

204

Q. Okay. Now, let me ask in regard to the items that you did test, you've indicated that you did test what had been presumptively told to you by Ms. Mack was a blood spot on the left side of the pistol, right?

A. Yes, sir.

Q. And you were able to obtain a DNA profile, and that was of the victim Stephen Swan; is that correct?

A. That is correct.

Q. Okay. And then you said from the left and right Nike sneakers, and I think those are size 10 1/2 Nike sneakers, you are able to obtain DNA profile of what was presumptively blood, and that belonged to the victim, Mr. Butler, Matthew Butler; is that correct?

A. Correct.

Q. Okay. And then from one of these pocket liners that had been submitted to -- to y'all that Ms. Mack had told you that there was presumptively blood on, you had a combination of Mr. Swan and Demarius Cummings; is that correct?

A. For the left-front pocket, Item 21.

Q. Left-front pocket.

Now, how about the swabs from the pistol? How many different swabs did you examine that came from the submitted pistol?

A. Um, the DNA that I tested from the pistol were

205

Items 2-A, which is a grip of the pistol. The right grip, excuse me. The left grip 2-B. The trigger, Item 2-E. And those were all the swabs from the pistol that I tested.

Q. Were you able to obtain a DNA profile from the right grip?

A. Um, which side of -- the right grip?

Q. Yes.

A. Item 2-A? Yes, the DNA profile from the swab of the right grip, Item 2-A, is consistent with a mixture from Demarius Cummings and an unknown individual.

Q. Demarius Cummings?

A. Yes, sir.

Q. And an unknown individual. Now, you had the sample from Mr. Broadnax that you compared to those and it was not his; is that correct?

A. Yes, James Broadnax was excluded as a contributor to the right grip of the pistol.

Q. Demarius Cummings' DNA was on the right grip of that pistol.

A. The DNA profile is consistent with a mixture from Demarius Cummings and an unknown individual.

Q. And so what's the odds of it being anybody else?

206

A. At the -- at the nine locations that were consistent with Demarius Cummings, the probability of selecting an unrelated person at random who could be a contributor to the swab to the right grip, is approximately 1:1.06 million for Caucasians, 1:403.7 thousand for blacks, and 1:1.101 million for Hispanics.

Q. And you're able to exclude James Broadnax as the contributor of that sample.

A. Yes, sir.

Q. How about on the left grip of the pistol?

A. No DNA profile was obtained from the swab of the left grip of the pistol, Item 2-B.

Q. And how about from the trigger of the gun?

A. The DNA profile from the swab of the trigger, Item 2-E, is consistent with a mixture. James Broadnax and Demarius Cummings are excluded as contributors as to the swab of the trigger.

Q. Okay. So both Cummings and Mr. Broadnax were excluded as the contributor of that sample from the trigger.

A. Yes, sir.

Q. Okay. Now, if I've -- I've been sitting in this chair for the past three or four days, would it be possible for you and your people, if I got up from this chair, you can come over here and test this chair and

207

see if you can get epithelial cells which you can DNA test to see if I've been sitting here, right?

A. Yes, sir.

Q. And so if I said, No, I've never sat in that chair at all, and you come along and are able to get my DNA from this chair, that kind of shows the jury that I'm not being truthful; is that right?

A. Um, sure.

Q. Okay. Now, I have never touched Mr. Hikel's Blackberry, okay? And as -- as he said, if you -- if he hands you his Blackberry, you might not be able to get his DNA off that Blackberry; is that a fair statement?

A. Yes.

Q. Okay. Would you get my DNA off that Blackberry?

A. I would not believe -- I would not expect to, no.

Q. And if you did get my DNA off that Blackberry, then that means that I wouldn't be telling the truth about not having touched his Blackberry.

A. Correct.

Q. Did you test any other items that we haven't talked about here?

A. Um, a stain from the Nike shoe, Item 43-A, was

208

also extracted, and no DNA profile was obtained from that item.

Q. Okay. Thank you.

MR. LOLLAR: I believe that's all the questions we have.

THE COURT: Any redirect?

MR. HIKEL: Hold on one second, Judge.

No questions, Judge.

THE COURT: May the witness be permanently excused?

MR. HIKEL: Yes.

MR. LOLLAR: No objection, Your Honor.

THE COURT: You're permanently excused, sir. Thank you for your testimony.

As I understand it, there's only one more witness for the State; is that correct?

MR. ALEX: Yes, sir, Judge. That would be Mr. Shaun Rabb and one last -- that last video with Mr. Shaun Rabb, assuming that --

THE COURT: We'll take a recess for the jury until 3:10 p.m. All rise for the jury.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT: Be seated, please.

On the record.

209

Mr. Parks, you have your witnesses here?

MR. PARKS: No, sir.

THE COURT: Okay. Are you hoping to wait until tomorrow to call them?

MR. PARKS: Yes, sir.

THE COURT: Okay. I will allow that.

Okay. Can we have order, please?

Mr. Alex? Can we have order, please?

On the record in the State of Texas versus James Broadnax.

The jury is not present.

It has been brought to my attention that juror Robert Lee Patterson has some sort of personal relationship with two witnesses for the State, that being Mr. Shaun Rabb and Mr. Steve Pickett, and I intend to bring the juror out and find out the nature of that.

Bring Mr. Patterson out.

(Juror Patterson present.)

THE COURT: Mr. Patterson, will you take your seat in the jury box there.

If you will stand and face me and raise your right hand.

(Juror Patterson sworn.)

THE COURT: Okay. You may take your seat

210

in the jury box.

It has come to my attention that you have some sort of relationship, either a social or professional relationship, with a witness who has previously testified, Mr. Steve Pickett; and a witness who is about to testify, Mr. Shaun Rabb; is that correct, sir?

THE JUROR: That is correct.

THE COURT: Would you please tell us what that relationship is.

THE JUROR: In the case of Mr. Pickett, I have met him through my wife. My wife is a United Methodist pastor and she knows Steve and his wife. And through her, I met Steve.

And also through -- we were at a function several years -- well, last year, and he actually interviewed me in connection with a -- it had to do with the election.

THE COURT: Okay. How well would you say that you know Mr. -- Mr. Pickett?

THE JUROR: Not well at all. That's the only time that I've met him.

THE COURT: Do you consider yourself to be a close, personal friend of his?

THE JUROR: I do not.

211

THE COURT: The relationship that you've just described, is that the extent of it?

THE WITNESS: It is.

THE COURT: All right. And with regard to Mr. Rabb, if you would describe that relationship.

THE JUROR: Um, I have met Mr. Rabb on several occasions. Again, through my wife. My wife was profiled by Channel 4 two years ago, and as a part of that profile, I was also interviewed by Mr. Rabb, but I have probably met him five times over the last ten years.

THE COURT: Okay. And do you consider yourself to be a close personal friend of his?

THE JUROR: I do not.

THE COURT: Okay. Would you say that your relationship with Mr. Rabb and Mr. Pickett is roughly essentially the same?

THE JUROR: Um, I know Mr. Rabb a little bit better.

THE COURT: Okay. All right. Now, you have received previously instructions that all witnesses are to be treated the same, whether they're the Pope, or Charles Manson, until such time as they hit the witness stand.

Can you still follow that instruction?

212

THE JUROR: I can.

THE COURT: Is there anything about your relationship with either one of these witnesses that in your judgment would affect your ability to fairly and impartially evaluate the credibility of the witnesses in the case, not only those witnesses but all of the witnesses in the case?

THE JUROR: No.

THE COURT: Okay. And do you feel in your own mind that you can be a fair and impartial juror in this case?

THE JUROR: I do.

THE COURT: Questions based on my questions?

MR. ALEX: No, sir.

MR. LOLLAR: No, Your Honor.

THE COURT: All right, sir. You may step back into the jury room.

The Court believes that Mr. Patterson can still be a fair and impartial juror in this case. This has nothing to do with any previous issues that have come up with Mr. Patterson of which the parties are both well-aware.

Are there any objections from the State based on the new information that's been provided to

August 11, 2009

213

the Court --

MR. ALEX: No, sir.

THE COURT: -- and that only to Mr. Patterson continuing to stay on the jury.

From the State?

MR. ALEX: No objections from the State, Your Honor.

THE COURT: From the defense?

MR. LOLLAR: No, Your Honor.

THE COURT: All right. Get your next witness out here. -

Call the jury.

All right. Something else has been brought to my attention before we call our next witness.

Come up here, sir. Raise your right hand.

(Witness sworn.)

THE COURT: Take your seat in the witness stand up here.

THE WITNESS: Well, --

THE COURT: No, sir. Over here. You're directed to sit in the witness stand.

You're now under oath.

State your name.

THE WITNESS: Paul Walker.

214

THE COURT: Paul Walker. Would you tell everyone in the courtroom what you just related to my bailiff, Mr. Martinez?

THE WITNESS: Well, I'm a Lieutenant over the Sheriffs Intelligence Section. I received an e-mail in regards to some information that you received in regards to a threatening e-mail.

THE COURT: Okay. This has to do with me, then?

THE WITNESS: Yes, sir.

THE COURT: Okay. I don't have any questions for him. I'm not worried about me.

MR. ALEX: Do we need to be concerned about anything?

THE COURT: Anything that the State or the defense have anything to be concerned about or just me?

THE WITNESS: I believe it was for you.

THE COURT: Okay. I'm not worried about it.

Any questions based on that?

MR. ALEX: My only concern is we could be unintended victims. Is there any threats to the Court that we should know about? There's no bomb threats or anything like that, is there?

THE COURT: Okay. We don't need to do

215

this on the record. We can talk about it back in the back if we need to.

MR. ALEX: All right.

THE COURT: That's all. Thank you.

THE WITNESS: Okay.

THE COURT: Yeah, have him come back to chambers.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

What further says the State?

MR. ALEX: The State would call Shaun Rabb, Your Honor.

THE COURT: Shaun Rabb. Mr. Rabb, if you'll come all the way to the front of the courtroom up by the door, sir. Go as far as you can. All the way to the door. Turn and face me and raise your right hand.

**SHAUN RABB**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex, and probably some cross examination from Mr. Lollar.

216

MR. ALEX: Thank you, Your Honor.

THE COURT: Mr. Alex, whenever you're ready.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, sir.

A. **Shaun David Rabb.**

Q. And, Mr. Rabb, would you tell the jury what you do for a living.

A. **I'm a journalist.**

Q. How long have you been a journalist?

A. **Since 1982.**

Q. Where do you currently work?

A. **KDFW TV here in Dallas.**

Q. And how long have you worked for KDFW TV?

A. **Since 1990.**

Q. And the acronyms always gets lost on me. What channel is that?

A. **KDFW Fox 4.**

Q. Fox 4.

A. **News.**

Q. And you worked for them for how long?

A. **Since 1990.**

Q. What did you do before that?

A. **I worked radio and TV in Houston, Texas.**

August 11, 2009

217

Q. How long have you worked in that industry?

A. Since 1982.

Q. Now, you know why you're here; is that correct?

A. Yes, sir.

Q. All right. I'm going to direct your attention to any time you're asked to go to the jail and do an interview of anybody at the jail, tell the jury what the procedures are that you follow in doing that. And as a general matter, what's the procedure that you would follow to get to the jail to interview anybody that you would want to talk to?

A. We go to the jail and someone from the Sheriffs Department takes us to a floor in the jail where we sign in, produce ID, and then we are taken to what is essentially a visitors area where we interview those folks who are accused and being held. They're on one side of the glass and we're on the other.

Q. Okay. And as a preliminary matter, do you take all of that on yourself or are you assigned by someone at your station?

A. No, sir, we are assigned those stories.

Q. Okay. And what happens sort of behind the scenes before you get there? Do you know what happens there? In other words, is the defendant ever asked if

218

he wants to talk to you?

A. Yes, sir.

Q. And does he sign any documents that you ever see before you go and talk to one of those folks?

A. He signs a document, yes.

Q. All right. And then are you sent out by someone at your station and say, Hey, Mr. Rabb, you've got clearance to go out and talk to somebody?

A. Yes, sir.

Q. All right. Very good.

But you wouldn't necessarily be the person who would send that document over or receive it yourself; is that correct?

A. No, sir.

Q. All right. So it's sort of a two-pronged kind of a system here. Somebody at your station would handle all of that, getting the documents signed and back, and then they would give you the go ahead and call you and say, Hey, you can go over to the jail and interview such and such; is that correct?

A. More or less, yes. Somebody says, We have an interview, and they see who's available in the news room and they send them.

Q. Very good. And you're relying on those people that the protocol has been followed before you get to

219

the jail; is that correct?

A. Yes, sir.

Q. Very good. An as it relates to James Broadnax back in June of -- 23rd of 2008, did you interview a young man by the names [sic] of James Broadnax?

A. Yes, sir.

Q. Do you see him in the courtroom today?

A. Yes, sir.

Q. Could you point to where he's sitting and describe an article of clothing?

A. Yes, sir. He's sitting in the third chair from Mr. Lollar -- second chair from Mr. Lollar. His left hand is resting on his chin. He has on a shirt that appears to be grayish, and a striped tie.

Q. Is this who you're referring to as Mr. Lollar?

A. Yes, sir.

Q. Very good.

And the gentleman sitting directly in front of me, is that the man you've identified as James Broadnax?

A. Yes, sir.

Q. Very good.

MR. ALEX: May the record reflect that the witness identified the defendant in open court?

THE COURT: Is there objection?

220

MR. LOLLAR: No, Your Honor.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) Now, Mr. Rabb, when you -- when you went out to interview the defendant, did you go alone, did you go with a camera crew? How did you go?

A. Traveled with a photographer.

Q. Okay. And who was your photographer?

A. I'm sorry, sir, I -- I don't remember who the photographer was.

Q. Male, female?

A. Male photographer.

Q. And was there anybody else with you from your station when you did the interview?

A. No, sir.

Q. And when you got to the Dallas County jail, were there other photographers or other -- other reporters there to interview Mr. Broadnax?

A. Yes, sir. We were not the first ones.

Q. And did you also interview Demarius Cummings?

A. Yes, sir.

Q. And do you know in which order you did the interview of Mr. James Broadnax?

A. I believe I interviewed Mr. Broadnax first and then Mr. Cummings.

221

Q. All right. Very good.

And when you interviewed Mr. Broadnax, did you have to wait for another reporter, another station to finish before you could go in?

A. I -- I can't recall that.

Q. Very good.

A. I'm sorry.

Q. That's all right.

And as preliminary matter, have you ever worked in law enforcement?

A. No, sir.

Q. Have you ever worked in any capacity for the Sheriffs Department as a civilian?

A. No, sir.

Q. All right. Or for any police department as a civilian?

A. No.

Q. All right. Did anyone from the Garland Police Department call you and ask you to go over and try and get a statement from the defendant?

A. No, sir.

Q. Did anybody from any source suggest to you that you needed to circumvent the law and try to get a statement from the defendant?

A. No, sir.

222

Q. All right. Did you in any way act in color of authority of law enforcement in talking to the defendant?

A. No, sir.

Q. Now, when you went in to interview the defendant, did it capture -- did you get that captured on a video?

A. Yes, sir.

Q. And did it capture everything as it relates to your encounter with the defendant there on June 23rd, 2008?

A. Yes, sir.

Q. All right. So if you -- if you accept the fact that maybe Steve Pickett had spoke to the defendant first, -- would you accept that fact if you don't recall it?

A. I believe Channel 11 was first, yes.

Q. All right. And so you would have went in to talk to the defendant at some time after that; is that correct?

A. Yes, sir.

Q. Have you reviewed the video as it relates to your interview with the defendant recently?

A. No, sir.

Q. Okay. So if I showed you a -- a tape of an

223

interview that was presented to us from your station, there would be no way for you to know that that's it without looking at the whole thing; is that correct?

A. Yes, sir, I have not -- I have not looked at it since.

Q. Okay.

MR. ALEX: Judge, we may need to take a break and have him look at it.

THE COURT: All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

What the Court wants you to do is go ahead and take the exhibit up to him, show it to him. Say this is whatever State's exhibit it is. Start playing it long enough for him to be able to say whether it's him or not, and then we'll see if there's any objections, without us having to listen to the whole thing, which I don't want to do.

MR. ALEX: Judge, this witness is going to have to swear under oath that what's on this exhibit is a complete -- is a complete caption of -- of what happened there, and I don't know any other way for him to answer that --

THE COURT: How long is it?

MR. ALEX: All of these are about 15

224

minutes.

How many?

THE COURT: This one is nine minutes and 46 seconds.

THE COURT: All right. Go ahead.

MR. ALEX: Because I don't think there's any way for him to truthfully answer that question without looking at it all.

And the Court is fully aware that I've tried to make this happen before today, Judge.

THE COURT: Right. I'm not bitching at you.

Is there any objection to us proceeding this way?

MR. LOLLAR: No, sir.

THE COURT: All right. Go ahead.

What exhibit did you just show him, Mr. Alex?

MR. ALEX: It's State's Exhibit 406.

THE COURT: Okay. This was what? 40 what?

MR. LOLLAR: Six.

MR. ALEX: And, Judge, for the record, I guess while we're still here, I am going to voluntarily mute this tape because defense counsel has suggested to

225

me that he was going to object to his client's mention of shooting at or -- other people or not -- this ain't the first time. I've shot at people before. I don't think that particular objection to this tape has been put on the record, but I know where that is on the tape, and we're going to mute that at that point.

THE COURT: Okay. So the objection as to that part is sustained.

Is that accurate, Mr. Lollar?

MR. LOLLAR: Yes, sir.

THE COURT: All right. Whenever y'all are ready. Start at the beginning.

(Videotape played.)

MR. ALEX: And, Judge, since I haven't had a chance to interview Mr. Rabb, do you mind if I ask him a few questions now before we bring the jury in?

THE COURT: Very briefly.

**VOIR DIRE EXAMINATION**

BY MR. ALEX:

Q. Mr. Rabb, when this tape ended, we see the defendant coming back and sitting down after you say, Hold up. Hold up.

Was there anything else that happened after that?

A. At that point, I believe he was getting ready

226

for the next interview.

Q. Okay. We still see the Fox 4 logo on the screen, he's sitting down, and your recollection is that you guys left and somebody else came in.

A. Yes, sir.

Q. So there wasn't any more interviewing going on.

A. No, sir.

Q. Very good. And before it started, this tape actually starts with the defendant sitting there and you sitting there, and then it's rolling and y'all are talking. Do you recall if you walked -- how he came in or anything that happened before the tape starts?

A. I don't, Mr. Alex.

Q. I'm sorry?

A. I do not.

Q. You don't recall anything about what happened?

A. I know they had to put a microphone on him.

Q. Okay. Was there any conversation that happened -- plug it up.

Was there any conversation that happened prior to -- and I want you to look at the way it starts because it's going to be a question in front of the jury and I'd rather you have some idea what the question is before I ask it.

227

The way the tape starts that you-all provided to us, you guys are both sitting there. There is -- in front of this tape is a conversation with you and Demarius Cummings, and then it ends and the very next thing we see is you sitting there and the defendant sitting there, and then there's talking. And what I want to know is, do you recall if there was at least an introduction? Because I don't even think we see that.

My name is Shaun Rabb, sir. And I'm asking you to try and think back and tell us, if you can, if there was anything that happened before this started.

A. Well, I didn't prepare the tape, but certainly there would have been an introduction.

Q. Okay.

A. I would have told him who I was.

Q. At least that much.

A. Yes, sir, and that he's agreed to talk to us.

Q. Because this is how it starts, what we're looking at right now.

MR. ALEX: Gordon, is there not volume?

MR. HIKEL: No, there's no sound now. It will come up suddenly.

MR. ALEX: No, there's sound, we're just not hearing it. Start it over, please. At the beginning.

228

(Videotape played.)

Q. (BY MR. ALEX:) All right. Hopefully, Mr. Rabb, we'll see when it starts, it's going -- it starts off with, Mr. Broadnax, tell me what happened.

A. Uh-huh.

Q. And then he answers, but there's no introduction on the tape.

A. Well, again, I didn't prepare it, but I always introduce myself. And you've agreed to talk to me.

Q. Very good.

A. Yes.

Q. You can turn it off.

And to your recollection, there was nothing else said other than introduction before we see this; is that correct?

A. No, sir.

Q. Very good.

MR. ALEX: That's all, Judge. I'm sorry.

THE COURT: Call the jury.

(Jury present.)

THE COURT: Be seated, please.

Ladies and gentlemen, thank you for your patience.

And the witness has been sworn, so you may proceed whenever you're ready.

229

MR. ALEX: Thank you, Your Honor.

**SHAUN RABB**

was re-called as a witness and testified as follows:

**DIRECT EXAMINATION - CONTINUING**

BY MR. ALEX:

Q. Would you state your name one more time, sir?

A. Shaun Rabb.

Q. Same witness on the stand before the break; is that correct?

A. Yes.

MR. ALEX: May I approach, Judge?

THE COURT: Yes, sir.

MR. ALEX: Thank you, sir.

Q. (BY MR. ALEX:) And, Mr. Rabb, State's Exhibit 406, what we just looked at at the break, is that a capture of your interview between yourself and the defendant?

A. Yes, sir.

Q. Very good. And as far as you can tell, there has not been any material alterations to what you just saw and what actually happened there; is that correct?

A. That is correct.

Q. Very good.

MR. ALEX: We'd offer 406 for all purposes, Judge, and 407, which has subtitles, for

230

demonstrative, with the understanding of the Court's ruling on the parts that are not admissible.

MR. LOLLAR: And, Judge, we would have the same objections as we offered at a pretrial hearing on this issue.

THE COURT: On the demonstrative exhibit and then the -- the previous other objections, all of which are overruled.

MR. LOLLAR: Yes, sir.

THE COURT: State's Exhibit 406 is admitted. 407 is admitted for demonstrative purposes. And you may publish.

MR. ALEX: Thank you, Judge.

Q. (BY MR. ALEX:) Mr. Rabb, just prior to starting this, what we're going to see here is you sitting there with the defendant, and your first words to the defendant is Tell me what happened; is that correct.

A. Yes.

Q. Now, prior to that happening, was there an introduction period where you told him who you was?

A. Yes.

Q. Very good. Did you ask him if he wanted to talk to you?

A. Yes, sir.

231

Q. All right. And did he tell you that he wanted to talk to you?

A. Yes.

Q. Did he say, No, sir, I don't want to talk to you. Get away from me?

A. No, sir.

Q. All right. Was there anything about your exchange before what we see on the tape that would make you think that he was not voluntarily talking to you?

A. Not that I recall, sir.

Q. Okay. Well, that's -- that's an important issue here, Mr. Rabb. If you're saying you don't recall it, does that mean it could have possibly happened?

A. My posture is to introduce myself and say, You have agreed to talk to us. The defendant says yes.

Q. Okay.

A. And I go forward.

Q. Well, let me ask you this: If he had said, I don't want to talk to you, would you've gone forward?

A. Um, I would have tried to talk -- get him to talk to me. That's what I do as a reporter.

Q. Right. And my question to you, sir, is: Did any of that happen before what we see on the tape?

A. I just don't recall that. I don't think it

232

did.

Q. You don't think it did.

A. No, sir.

Q. All right. Let me ask you this then: Did you do anything before what we see on this tape to overcome the defendant's free will to talk to you?

A. No, sir. I don't believe I did, Mr. Alex.

Q. Mr. Rabb, I'm not trying to argue with you, sir, but I don't believe I did is not as finite as I did not.

Do you understand the difference between overcoming somebody's free will to talk to you?

A. Yes, sir. I did not force him to speak to me.

Q. Thank you, sir. All right. And you're sure of that.

A. Yes, sir.

Q. Very good. And have you ever worked for law enforcement?

A. No, sir.

Q. Okay. And nobody from law enforcement asked you to get his statement; is that correct?

A. That is correct.

Q. Very good.

MR. ALEX: We'll publish, Your Honor.

THE COURT: All right.

233

(Videotape played.)

THE COURT: Okay.

Q. (BY MR. ALEX:) Mr. Rabb, right towards the end of the tape there, we hear you say, Hold up a second. Hold up a second. And the defendant comes back down and sits down. What's going on right there?

A. As you heard me say, we're shooting -- we're shooting video up at -- B-roll.

Q. I'm sorry?

A. We're shooting what's called B-roll. Video of the defendant.

Q. I'm sorry. I'm having a hard time understanding you.

A. Initial B hyphen roll, R-O-L-L. It's called B-roll. It's just video.

Q. B-roll?

A. Yes, sir.

Q. And what does that mean?

A. Video.

Q. Okay. So you're just telling him, We're still shooting. Hang tight. Is that it?

A. Yes, sir.

Q. All right. And the defendant goes and they change the mike with the sheriff's personnel?

A. Yes, sir.

234

Q. Remember seeing that?

A. Yes, sir.

Q. They were pretty cordial with him when they were doing all of that; is that correct?

A. So it appeared.

Q. I'm sorry?

A. So it appeared; yes, sir.

Q. So it appeared.

A. Yes, sir.

Q. Did you ever hear any of them threaten him?

A. No, sir.

Q. Okay. Did you ever hear any of them offering him anything to talk to you?

A. No, sir.

Q. Okay. Did you ever hear anything that sounded out of the ordinary as it relates to his free will to speak to you?

A. No, sir.

Q. Thank you, sir.

And when he came and sat back down, there was no other conversation between you and him; is that correct?

A. No, sir.

Q. Very good. There were parts in the interview with the defendant where he appeared to be leaving and

235

he came back in. Do you recall that?

A. Yes, sir.

Q. All right. And it was -- it was -- I'm not sure because he was walking out and you were standing in front of the camera, and at about 5:35, I heard him say, Tell them I said fuck them. Do you recall that?

A. Yes, sir.

Q. Okay. Do you remember when that happened?

A. He was outside of the door at that time.

Q. Okay. So he wasn't actually in the room.

A. No, sir.

Q. Okay. Because I think you were standing in front of the camera at that point. He was walking out the door, and then all you could hear him say was, Tell them I said fuck them, and at that point he was not in view of the camera even if he wasn't in front of it?

A. That's correct.

Q. Thank you, sir.

And then he comes back in and says, Let's keep it rolling, right?

A. Yes, sir.

Q. All right. And finally, Mr. Rabb, what has been marked as a pretrial exhibit, State's Exhibit 16, I'm going to ask you to look at. Tell you what we'll do is, Pretrial Exhibit 16, in the middle of this

236

exhibit, do there appear to be a couple of documents representing Fox 4 -- would it be correct to say Fox 4 News?

A. Yes, sir.

Q. And that would be 1, 2, 3, 4 documents. Is that what it appears to be?

A. Yes.

Q. All right. And does there appear to be two of them relating to Demarius Cummings and two of them relating to James Broadnax?

A. Yes.

Q. Okay. And as it relates to James Broadnax and this document, --

MR. LOLLAR: Judge, excuse me. I think Mr. Alex is referring to a document that's not in evidence.

MR. ALEX: I'm about to offer it. I'm just seeing if he will be able to authenticate it.

THE COURT: Is there objection?

MR. LOLLAR: Well, I object to going into the contents of the document before it's admitted.

THE COURT: Okay. Offer the document.

MR. ALEX: All right. Very good. We would offer State's Exhibit 16, Judge, as it relates to -- and we'll excise this -- it's been previously

- August 11, 2009

237

admitted in the pretrial as it relates to the evidence as it relates to Fox 4, the four documents I just spoke of, and I would remark it if the Court would like.

THE COURT: I do want you to do that.

Any objection?

MR. LOLLAR: No, sir.

THE COURT: No?

MR. LOLLAR: Not if he remarks it and offers it that way.

MR. ALEX: I'm going to mark it as 16-A, if that's all right with the Court.

THE COURT: Any objection to that?

MR. LOLLAR: No.

THE COURT: And it will just be the -- the documents that pertain to Channel 4, correct, Mr. Alex?

MR. ALEX: Yes, sir, and it will be primarily just the two documents relating to James Broadnax.

THE COURT: Just the two relating to him.

Any objection to that, Mr. Lollar?

MR. LOLLAR: No, sir.

THE COURT: 16-A is admitted, which will be a two-page document pertaining to Channel 4 and Mr. Broadnax.

MR. ALEX: And if I could substitute at a

238

later time, Judge, I'll photocopy that and excise it out.

THE COURT: That's granted.

Q. (BY MR. ALEX:) And as it relates to 16-A, the first page, what we have is we've got a time up in the right corner that says 1:20; is that correct?

A. Yes.

Q. Does that sound about the time you think you went in?

A. About that time in the afternoon, yes.

Q. And there's a signature here that says James Broadnax; is that correct?

A. That is correct.

Q. All right. And the second page is the same document that hasn't been signed by anyone; is that correct?

A. That's correct.

Q. All right. And does it appear to you to be the type of document that Gregg Millett, the assignments editor, would send over to the Dallas County jail requesting an interview of James Broadnax?

A. Yes, sir.

Q. And do the two documents in tandem appear to be a blank form that's sent over to the jail, that's signed and sent back to Mr. Gregg Millett prior to you

239

being sent out to interview him?

A. Yes, sir.

Q. Does that appear to be the process?

A. Yes, sir.

Q. All right. And you -- you don't -- you didn't have any -- any personal input in that document, though; is that correct?

A. No, sir.

Q. But does it appear to you to be the process that would normally take place?

A. Yes, sir.

Q. Okay. Thank you.

And, Mr. Rabb, I asked you before if you'd ever been law enforcement. Do you have any kind of legal degrees at all?

A. I do not.

Q. All right. Is it your understanding before you go -- before you as a reporter go out to the jail and interview somebody, that you have to do the same thing that someone from law enforcement has to do, and that's read them their rights and all that kind of stuff?

A. No, sir.

Q. All right. And if you thought -- if your editor or anybody else thought that was supposed to

240

happen, you would know it, wouldn't you?

A. Oh, yes, sir.

Q. Thank you. And when you go out, do you concern yourself at all as to whether the person has a lawyer or not?

A. No, sir.

Q. All right. It's a simple matter of you get the go ahead and you go in and you talk to them; is that correct?

A. Yes, sir.

Q. All right. And in your profession, you do that all the time; is that right?

A. Yes, sir.

Q. And there's nothing against the law in you, a reporter, going in and talking to an inmate without first reading him his rights.

MR. LOLLAR: Judge, if I could take the witness on voir dire on that issue?

THE COURT: I will allow it. Go ahead.

**VOIR DIRE EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Rabb, do you know what the status of the law is in that regard?

A. No, sir.

Q. Are you a lawyer?

241

A. No, I'm not.

Q. Had no legal training.

Have you talked to your lawyers about that?

A. No, sir.

MR. LOLLAR: Then he's got no basis to make the answer and we'd object to the question.

MR. ALEX: I'll withdraw the question, Judge.

THE COURT: All right. Sustained.

**DIRECT EXAMINATION - CONTINUING**

BY MR. ALEX:

Q. All right. Mr. Rabb, thank you for --

MR. ALEX: I'll pass the witness.

THE COURT: Cross-examination?

MR. LOLLAR: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Rabb, how are you?

A. Good, sir.

Q. Good. I want to talk about some general policies that the television stations, and particularly KDFW has with the Dallas County Sheriffs Department. Is there a person there at the Sheriffs Department that y'all deal with?

A. Yes, sir.

242

Q. And who would that be?

A. The person in the public information office.

Q. And is that Ms. Kimberly Leach?

A. Yes, sir, at this time.

Q. And she was the public information officer back on June the 23rd, that's a Monday -- Monday morning of 2008; is that correct?

A. Yes, sir.

Q. Were you aware that Mr. Broadnax had been booked into the Dallas County jail the Saturday preceding that? That's going to be June the 21st.

A. I was not.

Q. Okay. Somehow -- well, at some point on Monday your assignments editor told you, Go over and interview this guy over at the jail.

A. Yes.

Q. Or these guys.

A. Yes, sir.

Q. Demarius Cummings and James Broadnax.

A. Yes, sir.

Q. And all of this that Mr. Alex has talked to you about, the e-mails or faxes that went back and forth between your TV staff and the public information officer, that's outside your knowledge.

A. Absolutely.

243

Q. Would it be fair to state that you don't know what happens when the request from your TV station is sent over to a public information officer?

A. Yes, sir.

Q. I mean, somehow it's got to get up to him, to the person in jail.

A. Yes.

Q. But you don't know what they tell them.

A. No, sir.

Q. Whether they promise them something, threaten them, you know, tell them they can be on national television, whatever, you don't know what that is that they've told them.

A. I do not.

Q. And so you're sitting around the news room, your editor tells you to go to the jail.

A. Yes, sir.

Q. And you and your cameraman came down here to -- do you remember whether you went straight to the jail or did you go by Ms. Leach's office first?

A. We went to the first floor of the jail and there we wait so we may be escorted into the facility.

Q. And who escorted you into the jail?

A. Kim Leach.

Q. And did you bypass all of the security devices

244

there when you did that?

A. Well, we went through them, yes.

Q. And do you recall where she took you within the jail?

A. We went up the elevator to a floor where we signed in, and I don't know, Mr. Lollar, if that's the third floor. I'm sorry, sir. Exactly what floor that is.

Q. And in regard to that, we've talked previously about this last week or sometime.

A. Yes, sir.

Q. I was asking you at that time, do you recall whether you were taken to the third floor of the West Tower of the jail.

A. I do not know again what floor we were taken to.

Q. Okay. Is there any indication when you get to wherever they took you that that was the psych ward?

A. No, sir.

Q. Okay. All right. Did anybody ever indicate to you that they were getting the defendant out of the psych ward to talk to you?

MR. ALEX: Judge, I'm going to object. The question has been asked and answered, and no matter how many times you ask it, the witness has no personal

245

knowledge of where he's coming from.

THE COURT: I'm going to allow him to answer that question, but that's it, though, on this.

A. No, sir.

Q. (BY MR. LOLLAR:) All right. And again, Mr. Rabb, nobody -- I mean, you don't know what has been told to Mr. Broadnax prior to the time you got to see him.

A. That's correct.

Q. And when the tape starts here, y'all are already seated. You've indicated to us that you thought you had done some basic introductions.

A. Yes, sir.

Q. And then we hear the interview, such as it was.

Now, can you tell me what you perceived about Mr. Broadnax's appearance?

A. Um, that he was in somewhat disarray and in jail clothing.

Q. I'm sorry, disarray and --

A. Jail clothing.

Q. And jail clothing?

A. Yes, sir.

Q. And certainly, his kind of disheveled appearance, maybe?

246

A. His hair was uncombed, yes.

Q. When you start talking to him, you start talking about the events of that day and he tells you what went on up until the time of the shooting there in Garland; is that correct?

He had indicated to you previously that he had been smoking blunts, correct?

A. Yes, sir.

Q. And then he went -- he talks about the shooting. You remember he said, I blanked out. I blanked out. I went in that mode. I don't know what the fuck it was. I blanked out. I blanked out.

Do you remember him saying that?

A. Yes, sir.

Q. And later, you asked him did the weed, or about smoking weed, and if that caused it, and his answer was, Weed don't make you blank out.

Do you recall him saying that?

A. Yes, sir.

Q. You asked him about his family, what his life has been like, and he says it's been hell. H-E-L-L [sic]. Do you remember that?

A. Yes, sir.

Q. Do you know what that was about?

A. I did ask him about his family.

247

Q. Yes, sir.

A. And his life; yes, sir.

Q. And he says, among other things, he's nothing to live for. I don't even know why I was ever born.

Do you remember him saying that?

A. Yes.

Q. Do you remember him saying he ain't got no family. He's never met his father.

Do you remember him saying that?

A. Yes, sir.

Q. He's got a younger brother one year younger than him, and he says he's never met him.

A. Yes, sir.

Q. Mr. Rabb, you attempted to get him to talk more about that and he just closed down; is that correct?

A. Yes, sir.

Q. Was Ms. Leach there in the room with you during the interview?

A. No, sir.

Q. Was she standing outside the door there?

A. She was standing in close proximity.

Q. And I recall hearing at the end of the interview you talking to what sounds like a woman's voice. Was that Ms. Leach there also?

248

A. Mr. Lollar, I'm not sure if it was Ms. Leach or if it was the next news station crew coming in.

Q. Okay. They were there ready to come in right after you?

A. Yes, sir.

Q. Okay. All right. And, Mr. Rabb, I understand your position. You would have tried to get him to talk even if he said he didn't want to talk you, I understand that position --

A. Yes, sir.

Q. -- from a journal -- a journalist.

And would it be fair to say that, I believe as you said to Mr. Alex and to the jury, you don't know if he has a lawyer; you don't care if he's got a lawyer. You don't care if he's requested a lawyer or the assistance of counsel.

A. That's correct; yes, sir.

Q. Okay. Mr. Rabb, thank you.

MR. LOLLAR: That's all we have.

THE COURT: Any redirect?

MR. ALEX: Yes, sir.

**REDIRECT EXAMINATION**

BY MR. ALEX:

Q. Mr. Rabb, counsel asked you a few questions about the defendant's appearance, you recall that?

249

A. Yes, sir.

Q. Let me ask you some specific questions about that. Did the -- did the defendant -- did the defendant rationally answer your questions?

In other words, did you ask him about what happened on the day of the offense, and then did he start talking about what he had for breakfast? Did he answer your questions?

A. Yes, sir.

Q. Okay. And did he respond to your questions and it may not -- morally it may not be rationally [sic], but did he answer your questions in a rational manner?

A. He answered my questions.

Q. Okay. Very good. And did you at any time think that this -- this guy was not in his right mind?

A. Well, that's a judgment I can't make, Mr. Alex, but I -- you know, he answered my questions. We had a conversation.

Q. Okay. And I'm not asking for a judgment, I'm asking you, did you see any signs of him being intoxicated at all?

A. No, sir.

Q. Okay. And I guess that's -- that's probably not a fair question, --

250

A. Right.

Q. -- in his right mind.

Do you know anybody in their right mind that would kill two people and not feel any remorse?

A. No, sir.

Q. Okay. And so when we start talking about going into that mode, you don't know if this is just a cold-blooded killer or not, do you?

A. I don't know.

Q. Very good.

Now, when you attempted to talk to him about his life and -- and he didn't give you any details about it, you were actually trying to find out more about why he was saying his life was hell; is that right?

A. Yes, sir.

Q. Okay. And he wouldn't give you any details on that, would he?

A. Not many; no, sir.

Q. All right. And as -- as a reporter, do reporters do any investigating on their own?

Did you do any investigating on your own to see what his life was like?

A. We had some other people attempt to try to find some history on Mr. Broadnax.

251

Q. Okay. Very good. And let me ask you this, Mr. Rabb: When -- when -- when a person looks at the video -- when you are talking to somebody who may have harmed somebody else and you're asking them, you know, what would you like to say to the family, when I look at it, I say, Well, okay. He's throwing him a softball. He's looking for him to say I'm sorry. Is that a -- is that a common response, I'm sorry for what I did?

A. I -- I'm looking for -- I try to give people an opportunity to express what their thoughts are.

Q. And when he said Fuck them, did that shock you at all?

A. I was -- I was, you know, I was embarrassed by the language.

Q. Just the language?

A. I was embarrassed by how he portrayed him himself.

Q. Very good.

MR. ALEX: That's all I have, Judge.

THE COURT: Recross?

MR. LOLLAR: Nothing further. Thank you.

THE COURT: May the witness be permanently excused?

MR. LOLLAR: Yes, sir.

252

THE COURT: Mr. Alex?

MR. ALEX: Judge, we -- we may have some questions for him if we get to any other phase of the trial. I don't -- I can't say that I wouldn't.

THE COURT: All right. You're excused subject to recall, Mr. Rabb.

Thank you for your time.

THE WITNESS: Yes, sir.

THE COURT: You may step down.

What further says the State?

MR. ALEX: Thank you, Mr. Rabb.

At this time, Judge, ladies and gentlemen of the jury, the State would rest its case.

THE COURT: The State of Texas has rested their case.

Y'all can sit down.

Okay. Here's where we are, folks. The State of Texas has rested its case. We have not yet heard from the defense, and I'm going to allow the parties some time tonight to get their thoughts together before we begin the defense case. We'll start with that tomorrow morning at 8:45 a.m.

The exact same drill as we had earlier this morning as to where to go and all of that.

You're reminded not to discuss the case

253

amongst yourselves at any time or with anyone else, and you're reminded not to review or be exposed to any sort of press coverage whatsoever.

And I want to thank you for your paying attention today. I've watched you having closely and you have been doing that.

At this time, all rise for the jury.

The parties will remain in the courtroom.

(Jury not present.)

THE COURT: Be seated, please.

Is there a motion from the defense?

MR. LOLLAR: Your Honor, at this time the defense would move for an instructed verdict in so much as the State has wholly failed to prove each and every element of the offense beyond a reasonable doubt.

THE COURT: Okay. And that motion is denied.

Before the parties leave for the day, I'm putting the finishing touches on what I propose to have as the Charge in this case, subject to whether you request the voluntariness instruction or not, and I intend to take up a -- any objections to the Charge tomorrow morning at 8:30, so please make sure that you have my finalized copy, which I'm working on right now as we speak.

254

And then if you'll have your witnesses ready to go at 8:45 tomorrow morning.

MR. LOLLAR: Well, in that respect, Judge, I was going to get with the State. I believe they've got the contact numbers for Ms. Leach and for the jail guard that testified in the pretrial hearing, and I'd ask for their assistance in letting me have those numbers so I can have both of them here.

THE COURT: I'm sure he'll do that. If he doesn't, let me know.

MR. LOLLAR: And then we have -- I got the number for Dr. Mirmesdagh, and Jason Varghese, and Dr. Layne, who's supposed to be here at 8:30 in the morning.

THE COURT: Okay. How many witnesses do you think you're going to have?

MR. LOLLAR: Those five.

THE COURT: All right. And you don't know whether you're going to have rebuttal or not.

Any idea?

MR. ALEX: I doubt it.

THE COURT: Okay. Okay. Does -- do you want me to admonish your client about testifying?

MR. LOLLAR: Not at this time, Judge.

THE COURT: But later, maybe? Let me

255

know.

MR. LOLLAR: You can go ahead and admonish him now if you'd like.

THE COURT: I do want to and make sure that I don't forget.

You have the absolute right to testify in your own behalf if you wish to do so, sir. If you choose not to testify in your own behalf, I'll instruct the jury they can't take that as a circumstance against you.

You have two veteran lawyers, outstanding lawyers.

Ms. Mallon is an outstanding lawyer, too, but she's not a veteran.

And have you consulted with them about your right to testify, sir?

THE DEFENDANT: Not yet.

THE COURT: Okay. Well, you make sure you do that because we'll be asking you about that again tomorrow morning.

Anything else before 8:30 tomorrow morning?

MR. LOLLAR: I just need to get with Sharon and get the --

THE COURT: Well, that doesn't need to be

256

on the record.

(Proceedings adjourned)

257

STATE OF TEXAS )

COUNTY OF DALLAS   )


I, SHARON HAZLEWOOD, Official Court Reporter in and for Criminal District Court No. 7 of Dallas County, State of Texas, do HEREBY CERTIFY that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.    I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

Witness my hand this the ___ day of _____ , 2010.

SHARON HAZLEWOOD, CSR
Certified Shorthand Reporter
Official Court Reporter
Criminal District Court No. 7
972-739-3906
Texas CSR No. 628
Expiration Date:  12/31/10

FIRM NAME

Page 257 to 257 of 257