REPORTER'S RECORD

VOLUME 47 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE CRIMINAL DISTRICT |
| | ) | |
| VS. | ) | COURT NO. 7 |
| | ) | |
| JAMES GARFIELD BROADNAX | ) | Of DALLAS COUNTY, TEXAS |

ORIGINAL

=====================================================

FILED IN
COURT OF CRIMINAL APPEALS
SEP 16 2010
Louise Pearson, Clerk

TRIAL ON MERITS

=====================================================

On the 12TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

APPEARANCES

FOR THE STATE OF TEXAS:

HONORABLE DAVID M. ALEX
SBOT NO. 24003256
HONORABLE LISA SMITH
SBOT NO. 00787131
HONORABLE GORDON HIKEL
SBOT NO. 00787696
HONORABLE ANDREA HANDLEY
SBOT NO. 08898800
HONORABLE ELAINE EVANS
SBOT NO. 24032880
HONORABLE GRACE SHIN
SBOT NO. 24033062
133 N. INDUSTRIAL BLVD.
FRANK CROWLEY COURTHOUSE
DALLAS, TEXAS 75207
TEL. 214-653-3600

FOR THE DEFENDANT:

HONORABLE BRAD LOLLAR
SBOT NO. 12508700
1700 COMMERCE ST, STE. 404
DALLAS, TEXAS 75201
TEL. 214-384-8178

HONORABLE DOUGLAS H. PARKS
SBOT NO. 15520000
321 CALM WATER LANE
HOLLY LAKE RANCH, TEXAS 75765
TEL. 903-769-3120

HONORABLE KERI MALLON
SBOT NO. 24049165
DALLAS COUNTY PUBLIC DEFENDERS OFFICE
133 N. INDUSTRIAL BLVD., LB 2
FRANK CROWLEY COURT BLDG..
DALLAS, TEXAS  75207
TEL. 214-653-3550

# VOLUME 47

## TRIAL ON MERITS

### AUGUST 12TH, 2009

| | PAGE | VOL. |
|---|---|---|
| PROCEEDINGS............................... | 3 | 47 |
| CASE CALLED BY THE COURT................... | 3 | 47 |
| HEARING.................................... | 3 | 47 |
| JURY PRESENT............................... | 15 | 47 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| VARGHESE, JASON | 18 | | | 47 |

| | PAGE | VOL. |
|---|---|---|
| HEARING.................................... | 22 | 47 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| VARGHESE, JASON (HEARING) | | | 22 | 47 |
| | | | 24 | 47 |

| | PAGE | VOL. |
|---|---|---|
| JURY PRESENT.............................. | 24 | 47 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| VARGHESE, JASON | 25 | 43 | | 47 |
| | 64 | | | 47 |
| MIRMESDAGH, HAIDEH | 69 | 90 | | 47 |
| | 105 | 110 | | 47 |
| | 117 | 119 | | 47 |
| LEACH, KIMBERLY | 121 | 141 | | 47 |

|                                              | PAGE | VOL. |
|----------------------------------------------|------|------|
| HEARING......................................| 148  | 47   |
| JURY CHARGE CONFERENCE........................| 149  | 47   |
| JURY PRESENT..................................| 155  | 47   |
| HONORABLE KERI MALLON SWORN BY THE COURT      | 157  | 47   |
| TRANSCRIPT READ INTO RECORD...................| 158  | 47   |

| DEFENSE WITNESSES    | DIR. | CROSS | V.D. | VOL |
|----------------------|------|-------|------|-----|
| HICKLEN, CHRISTIE    | 158  | 166   |      | 47  |

|                                              | PAGE | VOL. |
|----------------------------------------------|------|------|
| STIPULATION..................................| 173  | 47   |
| STIPULATION ADMITTED.........................| 173  | 47   |
| DEFENSE RESTS................................| 173  | 47   |
| STATE CLOSES.................................| 174  | 47   |
| BOTH SIDES REST AND CLOSE....................| 174  | 47   |
| JURY CHARGE..................................| 174  | 47   |
| STATE WAIVES OPENING ARGUMENT................|      | 47   |
| CLOSING ARGUMENTS BY THE DEFENSE.............| 187  | 47   |
| CLOSING ARGUMENTS BY THE STATE...............| 187  | 47   |
|                                              | 191  |      |
| JURY RETIRES TO DELIBERATE...................| 198  | 47   |
| ALTERNATE JURORS INSTRUCTED..................| 198  | 47   |
| VERDICT......................................| 203  | 47   |
| ADJOURNMENT..................................| 204  | 47   |
| REPORTER'S CERTIFICATE.......................| 205  | 47   |

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| VARGHESE, JASON | 18 | | | 47 |
| (HEARING) | | | 22 | 47 |
| | | | 24 | 47 |
| (IN PRESENCE OF JURY) | 25 | 43 | | 47 |
| | 64 | | | 47 |
| MIRMESDAGH, HAIDEH | 69 | 90 | | 47 |
| | 105 | 110 | | 47 |
| | 117 | 119 | | 47 |
| LEACH, KIMBERLY | 121 | 141 | | 47 |
| HICKLEN, CHRISTIE | 158 | 166 | | 47 |

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| HICKLEN, CHRISTIE | 158 | 166 | | 47 |
| LEACH, KIMBERLY | 121 | 141 | | 47 |
| MIRMESDAGH, HAIDEH | 69 | 90 | | 47 |
| | 105 | 110 | | 47 |
| | 117 | 119 | | 47 |
| VARGHESE, JASON | 18 | | | 47 |
| (HEARING) | | | 22 | 47 |
| | | | 24 | 47 |
| (IN PRESENCE OF JURY) | 25 | 43 | | 47 |
| | 64 | | | 47 |

| STATE'S EXHIBITS NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 541 | SUICIDE RISK ASSESSMENT REPORT - JASON VARGHESE | 45 | 46 | 47 |
| 542 | EXCERPTS OF MEDICAL RECORDS | 52 | 52 | 47 |
| 543 | MENTAL HEALTH FOLLOWUP NOTE - DR. MIRMESDAGH | 115 | 115 | 47 |

| DEFENSE EXHIBITS NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 1 | MEDICAL & PSYCHIATRIC RECORDS FROM DALLAS COUNTY JAIL FOR JAMES BROADNAX | 16 | 16 | 47 |
| 2 | MEDICAL & PSYCHIATRIC RECORDS FROM DALLAS COUNTY JAIL FOR JAMES BROADNAX | 16 | 16 | 47 |
| 3 | MEDICAL & PSYCHIATRIC RECORDS FROM DALLAS COUNTY JAIL FOR JAMES BROADNAX | 16 | 16 | 47 |
| 4 | MENTAL HEALTH SCREENING | 21 | 25 | 47 |
| 5 | SUICIDE RISK ASSESSMENT | 21 | 25 | 47 |
| 6 | SUICIDE OBSERVATION LOG | 38 169 | 38 169 | 47 47 |
| 7 | EVALUATION - DR. MIRMESDAGH'S | 72 169 | 72 169 | 47 47 |
| 8 | MENTAL HEALTH FOLLOWUP NOTE - TODD RIDGE | 107 | 107 | 47 |
| 9 | COURT RECORDS | 130 155 | 155 | 47 47 |
| 10 | MEDIA RELATIONS INFORMATION | 132 | 132 | 47 |
| 11 | JOB DESCRIPTION OF KIMBERLY LEACH | 133 | 133 | 47 |

157    157    47

12    TRANSCRIPT OF CHRISTIE
HICKLEN'S TESTIMONY

REPORTER'S RECORD

VOLUME 47 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

THE STATE OF TEXAS ) IN THE CRIMINAL DISTRICT

VS. ) COURT NO. 7

JAMES GARFIELD BROADNAX ) Of DALLAS COUNTY, TEXAS

=========================================================

TRIAL ON MERITS

=========================================================

On the 12TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

---

**APPEARANCES**

FOR THE STATE OF TEXAS:

HONORABLE DAVID M. ALEX
SBOT NO. 24003256
HONORABLE LISA SMITH
SBOT NO. 00787131
HONORABLE GORDON HIKEL
SBOT NO. 00787696
HONORABLE ANDREA HANDLEY
SBOT NO. 08898800
HONORABLE ELAINE EVANS
SBOT NO. 24032880
HONORABLE GRACE SHIN
SBOT NO. 24033062
133 N. INDUSTRIAL BLVD.
FRANK CROWLEY COURTHOUSE
DALLAS, TEXAS 75207
TEL. 214-653-3600

FOR THE DEFENDANT:

HONORABLE BRAD LOLLAR
SBOT NO. 12508700
1700 COMMERCE ST, STE. 404
DALLAS, TEXAS 75201
TEL. 214-384-8178

HONORABLE DOUGLAS H. PARKS
SBOT NO. 15520000
321 CALM WATER LANE
HOLLY LAKE RANCH, TEXAS 75765
TEL. 903-769-3120

HONORABLE KERI MALLON
SBOT NO. 24049165
DALLAS COUNTY PUBLIC DEFENDERS OFFICE
133 N. INDUSTRIAL BLVD., LB 2
FRANK CROWLEY COURT BLDG..
DALLAS, TEXAS 75207
TEL. 214-653-3550

---

**VOLUME 47**

**TRIAL ON MERITS**

| AUGUST 12TH, 2009 | | PAGE | VOL. |
|---|---|---|---|
| PROCEEDINGS | | 3 | 47 |
| CASE CALLED BY THE COURT | | 3 | 47 |
| HEARING | | 3 | 47 |
| JURY PRESENT | | 15 | 47 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| VARGHESE, JASON | 18 | | | 47 |

| | PAGE | VOL. |
|---|---|---|
| HEARING | 22 | 47 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| VARGHESE, JASON | | 22 | | 47 |
| (HEARING) | | 24 | | 47 |

| | PAGE | VOL. |
|---|---|---|
| JURY PRESENT | 24 | 47 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| VARGHESE, JASON | 25 | 43 | | 47 |
| | 64 | | | 47 |
| MIRMESDAGH, HAIDEH | 69 | 90 | | 47 |
| | 105 | 110 | | 47 |
| | 117 | 119 | | 47 |
| LEACH, KIMBERLY | 121 | 141 | | 47 |

| | PAGE | VOL. |
|---|---|---|
| HEARING | 148 | 47 |
| JURY CHARGE CONFERENCE | 149 | 47 |
| JURY PRESENT | 155 | 47 |
| HONORABLE KERI MALLON SWORN BY THE COURT | 157 | 47 |
| TRANSCRIPT READ INTO RECORD | 158 | 47 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| HICKLEN, CHRISTIE | 158 | 166 | | 47 |

| | PAGE | VOL. |
|---|---|---|
| STIPULATION | 173 | 47 |
| STIPULATION ADMITTED | 173 | 47 |
| DEFENSE RESTS | 173 | 47 |
| STATE CLOSES | 174 | 47 |
| BOTH SIDES REST AND CLOSE | 174 | 47 |
| JURY CHARGE | 174 | 47 |
| STATE WAIVES OPENING ARGUMENT | | 47 |
| CLOSING ARGUMENTS BY THE DEFENSE | 187 | 47 |
| CLOSING ARGUMENTS BY THE STATE | 187 | 47 |
| | 191 | |
| JURY RETIRES TO DELIBERATE | 198 | 47 |
| ALTERNATE JURORS INSTRUCTED | 198 | 47 |
| VERDICT | 203 | 47 |
| ADJOURNMENT | 204 | 47 |
| REPORTER'S CERTIFICATE | 205 | 47 |

## CHRONOLOGICAL INDEX OF WITNESSES

**WITNESS** **DIR.** **CROSS** **V.** **D.** **VOL**

| WITNESS | DIR. | CROSS | V. | D. | VOL |
|---|---|---|---|---|---|
| VARGHESE, JASON | 18 | | | | 47 |
| (HEARING) | | | 22 | | 47 |
| | | | 24 | | 47 |
| (IN PRESENCE OF JURY) | 25 | 43 | | | 47 |
| | 64 | | | | 47 |
| MIRMESDAGH, HAIDEH | 69 | 90 | | | 47 |
| | 105 | 110 | | | 47 |
| | 117 | 119 | | | 47 |
| LEACH, KIMBERLY | 121 | 141 | | | 47 |
| HICKLEN, CHRISTIE | 158 | 166 | | | 47 |

## ALPHABETICAL INDEX OF WITNESSES

**WITNESS** **DIR.** **CROSS** **V.** **D.** **VOL**

| WITNESS | DIR. | CROSS | V. | D. | VOL |
|---|---|---|---|---|---|
| HICKLEN, CHRISTIE | 158 | 166 | | | 47 |
| LEACH, KIMBERLY | 121 | 141 | | | 47 |
| MIRMESDAGH, HAIDEH | 69 | 90 | | | 47 |
| | 105 | 110 | | | 47 |
| | 117 | 119 | | | 47 |
| VARGHESE, JASON | 18 | | | | 47 |
| (HEARING) | | | 22 | | 47 |
| | | | 24 | | 47 |
| (IN PRESENCE OF JURY) | 25 | 43 | | | 47 |
| | 64 | | | | 47 |

iv

## STATE'S EXHIBITS
**NO.** **DESCRIPTION** **OFF.** **ADM.** **VOL.**

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 541 | SUICIDE RISK ASSESSMENT REPORT - JASON VARGHESE | 45 | 46 | 47 |
| 542 | EXCERPTS OF MEDICAL RECORDS | 52 | 52 | 47 |
| 543 | MENTAL HEALTH FOLLOWUP NOTE - DR. MIRMESDAGH | 115 | 115 | 47 |

## DEFENSE EXHIBITS
**NO.** **DESCRIPTION** **OFF.** **ADM.** **VOL.**

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 1 | MEDICAL & PSYCHIATRIC RECORDS FROM DALLAS COUNTY JAIL FOR JAMES BROADNAX | 16 | 16 | 47 |
| 2 | MEDICAL & PSYCHIATRIC RECORDS FROM DALLAS COUNTY JAIL FOR JAMES BROADNAX | 16 | 16 | 47 |
| 3 | MEDICAL & PSYCHIATRIC RECORDS FROM DALLAS COUNTY JAIL FOR JAMES BROADNAX | 16 | 16 | 47 |
| 4 | MENTAL HEALTH SCREENING | 21 | 25 | 47 |
| 5 | SUICIDE RISK ASSESSMENT | 21 | 25 | 47 |
| 6 | SUICIDE OBSERVATION LOG | 38 | 38 | 47 |
| | | 169 | 169 | 47 |
| 7 | EVALUATION - DR. MIRMESDAGH'S | 72 | 72 | 47 |
| | | 169 | 169 | 47 |
| 8 | MENTAL HEALTH FOLLOWUP NOTE - TODD RIDGE | 107 | 107 | 47 |
| 9 | COURT RECORDS | 130 | | 47 |
| | | 155 | 155 | 47 |
| 10 | MEDIA RELATIONS INFORMATION | 132 | 132 | 47 |
| 11 | JOB DESCRIPTION OF KIMBERLY LEACH | 133 | 133 | 47 |

| 12 | TRANSCRIPT OF CHRISTIE HICKLEN'S TESTIMONY | 157 | 157 | 47 |

3

PROCEEDINGS

(Court convened; jury not present.)

THE COURT: Okay. If I could have order, please.

Mr. Alex, you ready?

MR. ALEX: Yes.

THE COURT: Okay. This is the State of Texas versus James Broadnax. This is Cause Number F08-24667.

The State of Texas has rested its case. The jury is not present.

There was conflicting reports about whether the State of Texas wanted the law of parties added to the instructions or not. I didn't really think it was necessary. On the other hand, I thought it was fine to do it.

So what does the State want me to do on that, do you want parties in there or not?

MR. ALEX: No, sir, we -- we won't be requesting it.

THE COURT: All right. That takes care of that.

Now, as far as the proposed submitted instruction on the voluntariness of the statement, is there any objection from either side as to the

instruction that I have on that?

MR. ALEX: Judge, could you give me a page number on it?

THE COURT: Page 8.

MR. ALEX: Is it the page that starts off, You are instructed that under our law --

THE COURT: Yes, sir.

MR. ALEX: -- the confession of a defendant?

THE COURT: Yes, sir.

MR. ALEX: Yeah, Judge, I think our first objection would be that there is absolutely no issue raised at this point. Now, it may be raised after some other testimony this morning as to whether the reporters were acting as State agents. I think there were questions asked, but none of the questions, in and of themselves, raise the issue because all the answers were no, we weren't acting as State agents. And the questions themselves are -- are not evidence, and so our -- our position is it hasn't been raised, at least at this point, by any of the evidence as to whether they were acting as State agents.

And secondarily, when we get down to the application, the application appears to apply to all the reporters and all of the statements en masse.

Whereas if -- if the jury is going to consider whether they're State agents and the statement was voluntary, they should consider each statement on its own.

So the way it reads right now is that the defendant gave his statement to the reporters. It doesn't give them the opportunity to make an independent evaluation on each statement. They'd have to take it all or leave it all. And in that -- in that vein, first of all, we don't think that the issue has been raised, at least as far as agents of law enforcement, but second of all, if the Court does include that, we think it needs to be separated out per statement, because that's the way the evidence was presented.

THE COURT: Okay. Hold -- hold on.

I tend to agree with that. The reporters names are as follows: Steve Pickett, Ellen Goldberg, Shaun Rabb.

As far as your first argument, I'll take that under advisement.

I'm -- as you know, I tend to be circumspect about my Charges to the jury, as you know.

MR. ALEX: Yes, sir, I -- I do. My only concern is that if -- sometimes the questions may tend to mislead the jury on what the law is. If we ask the

question enough times as to whether or not you gave a person their rights, at some point the jury thinks that's the law --

THE COURT: I understand your argument, sir.

MR. ALEX: Thank you, sir.

And if -- I don't know if the second page -- the second page that I have here would be Page 9, I guess. That would be the, I guess, 38.226 as to the voluntariness of the statement. I'm sorry. That goes to the -- to the substances specifically applied.

And I think the way it reads here is that -- does yours just say PCP? Is that it, Judge?

THE COURT: Yes, sir.

MR. ALEX: Okay. And I would imagine -- as it reads right now, we would have no objection. Although if the counsel for the defense is asking for anything else, then we might want to weigh in on that at -- at that time.

THE COURT: Okay.

MR. ALEX: Thank you.

THE COURT: Any other objections to the Charge?

MR. ALEX: As a whole, Judge, -- let me see. There was -- there was a lesser-included of murder, and the State doesn't believe that there is any evidence that this wasn't an intentional act, and I think the -- the application applies the mental states as being the cause of the -- of the lesser, and we don't believe that there has been any evidence raised in the question of whether this was intentional or not.

And -- and secondary, I think that if we do give a lesser-included of murder, we would be asking for a limiting charge on any evidence of voluntary intoxication. I think we -- we spoke about that prior to the -- prior to the defense proffering that they wanted to put on the doctors to talk about the mental state, and I think the Court has ruled that it does not apply toward the guilt or innocence of the defendant, or as it relates to the lesser, but it would apply to the voluntariness of the statement.

And my -- my concern is, is that the jury will go back there, they will hear evidence of voluntary intoxication, they will see a lesser here that has to deal with mental state, and then will connect the two and they will use it to find him potentially guilty of a lesser or to -- or hang up on that issue. And without a limiting instruction, -- I do believe there was, in some of the individual voir

dires, legal proffers to the jury that they could find him guilty of a lesser based on voluntary intoxication, and that would be -- we would ask for a -- a limiting instruction.

And I have a limiting instruction that I would like to proffer, if the Court would like to --

THE COURT: Have you got it written out?

MR. ALEX: I do, Your Honor.

THE COURT: Just submit it to the staff attorney.

MR. ALEX: Okay. Thank you, Your Honor.

THE COURT: I don't need to have it on the record.

MR. ALEX: And -- and as I understand it, what we have in our Charge as a party, you've already taken that out, correct?

THE COURT: Correct.

MR. ALEX: Anything else, Grace?

Ms. Grace is my legal counsel here, Judge.

MS. SHIN: Judge, without changing anything substantive, can the State insert headings and do some reorganization just so that it's easier for the jury to understand the instructions?

THE COURT: You can ask me to do that.

MS. SHIN: Well, then, can you do that?

9

THE COURT: Right. And submit that to the staff attorney. Sure.

MS. SHIN: Okay. Thank you.

THE COURT: I'll consider that.

Anything else?

MR. ALEX: That's all.

THE COURT: Okay. Now, -- yes, sir.

MR. PARKS: I suppose you were about to call on me, Judge, so --

THE COURT: Yes, sir.

MR. PARKS: -- I -- I did very, very small things, and they only relate to the proposed voluntary confession charge.

In the first paragraph, we have no problem particularly without just how it is or how the State wants to amend it. I do think, though, if you go down 1, 2, 3, 4, 5 lines from the top, --

MR. ALEX: Which page, Doug?

MR. PARKS: On this first page.

THE COURT: 8 and 9.

MR. PARKS: We should insert, between Persons and acting, it should Law -- Statement made orally to law enforcement or persons knowingly or unknowingly acting as agents of law enforcement.

I don't think they have to know they're

acting as -- as law-enforcement agents.

THE COURT: Okay. I'll take that under advisement. I don't recall that that's the law, but we'll look at that.

MR. PARKS: And the only other thing I had was the business about the PCP.

I had written out a proposal, which I believe Ms. Smith indicates she thinks it's too broad; that it should say PCP or any other mind-altering drug, or mental illness, or defect, or a combination thereof.

THE COURT: Okay. We'll take that under advisement. I don't think that's right, though. I tend to agree with the State on that.

What else on the --

MS. SHIN: Can you repeat what additions you want to the limiting instructions? I didn't catch that.

MR. PARKS: Yeah. Let me show you.

MS. SHIN: Oh, no, not -- not that. The other one.

(Sotto voce discussion.)

MS. SHIN: Judge, I think that other "mind altering drug," that's too broad.

THE COURT: I -- I already said that I agreed with that.

11

MS. SHIN: Okay. Thank you.

THE COURT: Anything else about the charge?

MR. PARKS: Nothing from the defense, Your Honor.

THE COURT: Okay. Good.

Thank you. Bye, Christina.

Take a look at all that and let me know what you think.

What -- what's the issue?

MR. ALEX: Oh, there's a laundry list of extraneous offenses listed in the extraneous charge, and it's my understanding that the defense has no objection to that list; is that -- is that correct, Mr. -- Mr. Lollar or Mr. Parks? Which page?

MR. PARKS: Are you talking about the --

THE COURT: The standard boiler plate --

MR. PARKS: The standard?

THE COURT: -- 404(b) instruction.

MR. PARKS: Oh, you know, it just -- that's the standard one.

Last night I was just sort of playing with this and I struck out everything from after it says consider the same --

THE COURT: Well, here -- here's the

mission on that.

MR. PARKS: Okay.

THE COURT: You get your proposed modifications to the staff attorney and I'll look at it.

MR. PARKS: All right.

THE COURT: Easy mission. Let's not overcomplicate things.

All right. Now, what is the status on your witnesses, Mr. Lollar?

MR. LOLLAR: Judge, three of the witnesses are present.

The fourth is not yet, and that would be Dr. Layne. Dr. Layne was served a subpoena by Vicki Duran of the sheriff's staff last week. I subsequently heard from lawyers for the Parkland Health System who informed me that he was out of town until yesterday.

THE COURT: Have you got the name and number for the lawyers? Can you secure that? And then I'll have my court coordinator call them and tell them that they need to have him down there unless they want to get in trouble with me.

MR. ALEX: Which one was this? I'm sorry.

MR. LOLLAR: Layne.

MR. ALEX: Okay. He was out of town, you said?

MR. LOLLAR: That's what they told me.

THE COURT: But he's also supposed to be here at 8:30 this morning --

MR. LOLLAR: Yes, sir.

THE COURT: -- and he's not here.

Okay. What about the missing witness?

MR. LOLLAR: Well, now, we've got the transcript, I'm -- I'm told. This is -- and here it is -- of Christie Hicklen, and we would propose, Judge, since she has been examined and cross-examined at the pretrial hearing, and that she is currently unavailable, that we would submit the transcript, have the court reporter read it to the jury, and then we have a stipulation at the end of it from Mr. Alex.

THE COURT: Okay. Is there any objection from the State to that?

I can tell you right now, if you don't agree to that, I'm going to delay the trial until such time as she can get here.

MR. ALEX: Judge, I don't have a problem with the transcript coming in. I'm just going to -- I think this is the only copy we have right now.

Is this what you're going to do first?

MR. LOLLAR: Uh-huh. Well, no. Not first, no.

MR. ALEX: I'm going to get a few copies of that made right now.

MR. LOLLAR: Okay. And then can we have -- David, I think you were going to bring the fourth update on the medical records? We've got the three here, and this is the last one.

MR. ALEX: What are you asking about?

MR. LOLLAR: Have you got the fourth?

MR. ALEX: You have the fourth. I gave you copies. I gave them to you. If you want -- you want another copy; is that it? Are you asking me for --

MR. LOLLAR: I thought you told me yesterday you were going to bring the fourth one down to put it here in the file.

MR. ALEX: Well, I can --

THE COURT: Go off the record on this. We don't need to hear this.

(Off-the-record discussion was had.)

THE COURT: Brad, the court reporter can't read the testimony and take it down at the same time.

MR. LOLLAR: Okay.

THE COURT: So we'll do question and answer, just like it is, and have Barney answer it, if that's all right.

MR. ALEX: Okay.

You know what? I've got one marked already, Brad.

THE COURT: Do we need to have this right now? Is this urgent for calling the jury out here, Mr. Lollar?

MR. LOLLAR: We can supplement the record when we get that fourth group.

THE COURT: Okay. So it's nothing we need to delay anything about right now, right?

MR. LOLLAR: No, sir.

THE COURT: Okay. So both sides are ready for the jury?

MR. ALEX: Yes, sir.

THE COURT: Okay. Good. As soon as the jury's ready, we'll bring them out.

THE BAILIFF: All rise.

(Jury present.)

THE COURT: Be seated, please.

Good morning, ladies and gentlemen. Thank you for being on time this morning once again. You've been good about that.

The State of Texas has rested its case-in-chief. What says the defense?

MR. LOLLAR: Thank you, Your Honor.

May we approach the court reporter?

THE COURT: Yes, sir.

MR. LOLLAR: Your Honor, at this time we would offer, for record purposes, what has been marked as Defendant's Exhibits 1, 2 and 3, which are records from the jail regarding the defendant, James Broadnax. These are the medical and psychiatric records of the Dallas County jail.

THE COURT: Any objection for record purposes?

MR. ALEX: There isn't, Judge, but the record should also reflect that those exhibits also have States' exhibit stickers on them. So it's not confusing to anybody, they're State's Exhibits 485, 486 and 487, sequentially, also on those exhibits so that if anybody is wondering why there's two, they were premarked.

THE COURT: All right. State's Exhibits D-1 through D-3, -- I mean, excuse me -- Defense Exhibits 1 through 3 are admitted for record purposes.

MR. LOLLAR: We would call Jason Varghese.

THE COURT: Jason Varghese.

MR. LOLLAR: And he has previously been

17

sworn.

THE COURT: I'll swear him again in front of the jury.

How do you spell that, Varghese?

MR. LOLLAR: V-A-R-G-H-E-S-E.

THE COURT: Okay.

MR. ALEX: And, Judge, as we had previously requested, I think the Court was going to give a limiting instruction as it related to voluntary intoxication and the evidence coming out.

THE COURT: When do you want me to give that?

MR. ALEX: I would love for you to give it prior to the testimony.

THE COURT: All right. Mr. Varghese, would you sit down, please?

Lawyers up here. Lawyers up here.

(Off-the-record discussion was had.)

THE COURT: Sir, if you'll please stand up, turn and face me and raise your right. Raise your right hand.

**JASON VARGHESE**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Lollar.

Mr. Lollar, whenever you're ready.

MR. LOLLAR: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. LOLLAR:

Q. Would you tell us your name, please, and spell your name for the court reporter?

A. Yes. My name is Jason Varghese, J-A-S-O-N. Last name is Varghese, V-A-R-G-H-E-S-E.

Q. And, Mr. Varghese, how old are you?

A. 30.

Q. And what is your occupation or profession?

A. Um, my job title is psychological assessor. I'm a licensed professional counselor.

Q. And where did you get your training to become a licensed psychological counselor?

A. It was actually -- my bachelor's was at University of Texas at Austin, and my Masters was at Southwestern Assemblies of God University.

Q. And where do you -- where are you currently working?

A. Parkland Hospital here in the jail.

Q. And let me ask about that. Is there a medical facility -- are there medical facilities located there

19

in the Dallas County jail?

A. Yes. There's -- there's a medical and mental health facilities for the patients here.

Q. And that's located in the Lew Sterrett Justice Center right here behind us?

A. Yes. In the infirmary.

Q. And does Parkland Hospital currently have contracts to provide medical and mental health treatment for inmates in the Dallas County jail?

A. As far as I know, yes.

Q. How long have they had that contract, do you know?

A. I don't know.

Q. How long have you worked for them in that capacity?

A. It's been about a year and about eight -- seven or eight months.

Q. And tell us what you do on a daily basis.

A. Well, right now what I do is I work on the acute care floor and those are the inmates that are mentally ill that I want -- for one, I do suicide risk assessments on inmates that are placed on suicide watch or suicide precautions.

I also coordinate with the psychiatrist to provide follow up care for those inmates that are

housed in the floors that I work on. We follow up with them, the psychiatrist does once a week, so I just coordinate with the psychiatrist along with that.

I'm also working on developing electronic medical record systems for us as well half the time, so those are the job duties that I do.

Q. All right, sir. I want to direct your attention back to June of last year. Were you employed in the same capacity back on the date of June 23rd of 2008?

A. Yes.

Q. And were you doing the same type of things that you're doing now back then?

A. Except for the computer part. I -- I'm -- just started working on the computer programming earlier this year.

Q. All right, sir. And as part of your duties, do you see people who are in what's called the closed behavioral observation unit there in the -- what's referred to as the psych ward of the medical ward of the jail?

A. Yes.

MR. LOLLAR: And may I approach the witness, Your Honor?

THE COURT: Yes, sir, and as necessary to develop his testimony.

MR. LOLLAR: Thank you.

Q. (BY MR. LOLLAR:) Mr. Varghese, let me show you what have been marked as Defendant's Exhibits Number 4 and Number 5 and ask if you recognize what these are?

A. Yes. The Number 4 is mental health screening that we do on inmates when they first come in on the floor. Mental -- I'm sorry.

Defendant's Exhibit 5 is the suicide risk assessment, or part of it that I do.

Q. And ask you to -- let me ask you to look through there. Are these forms that appear to have been completed by you?

A. Yes.

Q. And do they refer to an inmate by the name of James Broadnax?

A. Yes.

MR. LOLLAR: We would offer Defendant's 4 and 5.

THE COURT: Any objection?

MR. ALEX: I just need to see what they are, Judge. (Examining exhibits)

Well, Judge, the suicide risk assessment is on June the 24th, which is the date after the statement. I don't think that's going to be relevant to anything we're talking about today.

THE COURT: Response?

MR. LOLLAR: I think -- we'll show relevance.

MR. ALEX: My understanding that the -- the purpose of this testimony, Judge, was the voluntariness of the statement. If this is after the statement, I'm going to be objecting to what happened after the statement. Obviously, it didn't possibly bear on what happened the day before.

THE COURT: All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

The jury is not present.

Mr. Lollar, will you proceed with the testimony so the Court can evaluate whether or not it would be relevant.

MR. LOLLAR: In regard to that exhibit, Your Honor?

THE COURT: Yes, sir.

MR. LOLLAR: Yes, sir.

**VOIR DIRE EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Varghese, you recall what that second document was that I showed you?

A. Yes.

Q. And let me see if I've got another copy up here we can refer to.

THE COURT: Here.

Q. (BY MR. LOLLAR:) Mr. Varghese, I understand that you interviewed Mr. Broadnax on the morning of June the 23rd and that some time later that day he was placed into suicide precautions there in the Dallas County jail.

And then I see that you interviewed him again on the 24th, the next day, and did this evaluation; is that correct?

A. Yes.

Q. And does this evaluation contain references to information he had told you on the day before about smoking wet blunt marijuanas?

A. Yes.

MR. LOLLAR: So that's the relevance. It reinforces what he told him the day before.

THE COURT: Response?

MR. ALEX: If that's -- if that's all we're talking about, Judge, and we're not talking about evaluations made after the statement.

THE COURT: The objection is going to be

overruled.

Call the jury.

MR. ALEX: Can I ask just one question, Judge?

THE COURT: Yes, sir.

**VOIR DIRE EXAMINATION**

BY MR. ALEX:

Q. Mr. Varghese, this document that Mr. Lollar is offering, it says pages -- it says there's eight pages; is that correct?

A. Yes.

Q. But he's only offering Pages 5, 6, 7 and 8; is that right?

A. That's correct.

MR. ALEX: That's all.

I just wanted to make sure that this was the same document I had.

THE COURT: Call the jury.

THE BAILIFF: All rise.

(Jury present.)

THE COURT: Be seated, please.

An admonition to the lawyers. The bailiffs have been informed that the jurors are having a hard time hearing the testimony.

Go ahead, Mr. Lollar.

25

MR. LOLLAR: Thank you, Your Honor.

**DIRECT EXAMINATION - CONTINUING**

BY MR. LOLLAR:

Q. Mr. Varghese, if you can, just speak loud enough for the last juror down there to hear what you're saying, and referring back again to Defendant's Exhibit Number 4, let me ask you what this is?

A. This is the mental health screening that we conduct on the inmates who are first brought into the floor that I work on.

MR. LOLLAR: And I'm sorry, Judge, was Defendant's Exhibit 5 admitted?

MR. ALEX: We withdraw our objections, Judge.

THE COURT: Defense Exhibits 4 and 5 are admitted.

MR. LOLLAR: Thank you.

Q. (BY MR. LOLLAR:) Mr. Varghese, let me ask you, we'll -- we'll start here at the top and then I'll show the jury this on the overhead projector here, but what is this form?

A. This is a -- basically the questionnaire that we conduct on the inmates that first come in.

Our goal is to make sure that the inmates that come to that floor are seen within the first 24 hours

26

of them coming to the -- to that floor.

Usually we would like for the psychiatrist to be the first person or -- or to see the patient within the first 24 hours, but that may not always be the case, so I as a professional counselor, you know, take it upon myself to ensure that anybody that comes in to that floor within the first 24 hours, I want to ensure that they're seen, so this is a questionnaire that I conduct, along with the psychiatrist who will also do it later on, whether it be the same day or later on that week.

Q. If a person is brought in and booked into the jail on a weekend, what happens then?

A. We have another person that works weekends who will also ensure that people are seen in a timely manner.

Q. Now, if Mr. Broadnax was brought in on Saturday, June the 21st, and booked into the jail on that day of 2008, but the medical records do not reflect that any other person saw him before that time except for the RN that saw him at the initial screening downstairs on the first floor, can you explain that?

A. Yes. We only have one person that works over the weekend as a -- as an equivalent to what I do, and then psychiatrists who works on Saturdays, just that

27

Saturday, so it may not be the case where that person can see that patient. There might be other emergencies that occurred. They also have to see the patients that are on suicide precautions, so they're placed where they're at until they're able to be seen by staff. So it may not always be the case 100 percent of the time where they're seen, but we try to do our best in a timely manner.

Q. So that person who came in on a Saturday would be placed in line to be seen by the psych assessor or by the psychiatrist.

A. Yes, sir.

Q. And on June the 23rd, let me ask you again if you saw an individual by the name of James Broadnax?

A. Yes.

Q. And what was the purpose in your seeing him?

A. The purpose was to ensure that he was seen. He was -- like I said before, if he was brought into that floor, I want to ensure that he is seen either by myself or a psychiatrist.

Q. Now, I understand there has been a lot of people you've seen between now and last June.

A. Yes.

Q. Do you independently recall Mr. Broadnax?

A. I don't re -- I recall interaction with him

28

along with the doctor, but I don't recall the specifics of the interaction.

Q. And let me ask you to look at the man seated at the counsel table between Mr. Parks and Ms. Mallon. Do you recognize that person?

A. **Yes.**

Q. Is that Mr. Broadnax?

A. **Yes.**

Q. All right. Very good.

Do you recall what cell he was in when you saw him?

A. **I believe we actually saw him in the 11 tank, which was -- we brought him out to the 11 tank cell.**

Q. Okay.

A. **If I remember it cor --**

Q. You brought him out from where?

A. **From -- it looks like it was tank 5.**

Q. And is tank 5 a closed behavioral observation cell there in the psych ward?

A. **Yes, it is.**

Q. And when you bring him out, what do you do, do you go through this form with them?

A. **Yes.**

Q. And did you get information from Mr. Broadnax?

A. **Uh-huh.**

29

Q. And then you make observations of him at the same time.

A. **Yes.**

Q. And let me get over to the overhead projector at this point.

MR. ALEX: I don't think that's what you want.

MR. LOLLAR: All right.

THE COURT: Is Mr. Hikel in here? He knows how to operate that thing.

Take another recess for the jury. All rise for the jury.

(Jury not present.)

THE COURT: If the witness will please keep your voice up. The jury's told me again they can't hear you, okay?

THE WITNESS: Okay.

THE COURT: Be seated, please.

We're not going to start until we're ready.

(Sotto voce discussion.)

THE COURT: This was all supposed to take taken place before the jury gets in here, I'll remind everybody.

(Off-the-record discussion was had.)

30

THE COURT: All right. Get the jury.

THE BAILIFF: All rise.

THE COURT: Be seated, please.

MR. LOLLAR: And Mr. Hikel tells us that the side lights have burned out since yesterday, so I think that's clear enough anyway.

**DIRECT EXAMINATION - CONTINUING**

BY MR. LOLLAR:

Q. And, Mr. Varghese, this is the form that you completed during your interview with Mr. Broadnax; is that correct?

A. **Yes.**

Q. And this refers to his book-in number. That's a specific number given to every individual that comes into the jail; is that correct?

A. **Yes.**

Q. And he was in the Lew Sterrett West Tower in 3P05, which is the closed behavioral observation --

A. **That's correct.**

Q. -- cell.

Now, the first of the charges here, Capital Murder of Multiple Persons. Patient states that he has higher irritability and anger. States no past psychiatric HS.

Is HS history?

31

A. **Yes.**

Q. No past psychiatric history. States that he has audio hallucinations; denies they are command in nature.

What does that mean?

A. **That means that the auditory hallucinations that he has is not instructing him to do certain things. Is not giving him any types of direction. So there's not -- there's not any commands given by the voices that he hears.**

Q. And in regard to the next portion, psychiatric history, you ask, Ever seen a psychiatrist? And his answer is no.

As to hospitalizations, he said none.

On disability for psych, the answer was no.

Outpatient treatment, no.

Currently in treatment, no.

And then on the psychiatric symptoms, since incarceration, you've listed irritability and anger.

A. **Yes.**

Q. And on psychiatric symptoms prior to incarceration, you've listed irritability and anger.

On psychiatric symptoms, When not using drugs, ever have hallucinations? And what was his answer?

A. **Yes.**

32

Q. And the next part is not filled out, if you ask were they auditory, visual, or other, and what did you see and hear? And what did he say?

A. **Just talking.**

Q. Just talking. Talking in his head?

A. **Yes.**

Q. And you asked if current hallucinations or paranoia. He answered yes.

When not using alcohol or drugs, have you ever felt paranoid for no reason? His answer was yes.

And here he states that he believes he was set up. Is that what he told you?

A. **Yes.**

Q. On biological family history of mental illness, on maternal side, no. Siblings, yes.

Did he tell you who among his siblings had a psychiatric history?

A. **I don't recall.**

Q. All right, sir.

On his paternal side, no.

Children, no.

And then current psychotropic medications, he was not taking any psychotropic medications; is that right?

A. **That's right.**

33

Q. And on Page 2 is a continuation of the form. Trauma history. History of physical or sexual abuse, and it looks like it had originally been marked no, but then that was crossed out and you put a question mark. And then the notation 6/23/08, error, J.V.

Do you recall what that was about?

A. **I don't recall. I don't know enough to -- to be able to make a statement on that.**

Q. Would there have been something that he would have told you --

A. **If there was, I would have documented it in detail, but I don't remember.**

Q. Okay. You just don't recall?

A. **Yeah. I don't recall.**

Q. All right. Current suicidal ideation, no.

Current homicidal ideation, that's not filled in.

Past suicide attempts, no.

Family history of suicide, no.

Recent trauma or loss, no.

Next is substance abuse history, drugs. And then we have the notation?

A. **It would be seven to -- seven to eight years old.**

Q. Since seven or eight years of age.

34

A. **Uh-huh.**

Q. Okay? Age first used alcohol, yes.

Drugs, yes.

Yes to what? Marijuana.

And down here in the substances used recently, we have listed marijuana, in parenthesis Wet?

A. **Weed.**

Q. Weed, okay.

Route, smoke. The last used two to three days ago.

And then wet blunt. Route, smoke. Also two or three days ago.

Do you know what a wet blunt is?

A. **To my knowledge, I believe it was marijuana probably either laced with something like PCP or formaldehyde. I'm not sure exactly though.**

Q. PCP or formaldehyde.

A. **Yeah.**

Q. Past drug treatment, no.

Medical history and history of head injuries are all unmarked.

Mental status observation. These are the observations that you make about the person you're interviewing, and you marked that he was disheveled, his speech was normal. His mood was dysphoric. What

35

does that mean?

A. **Kind of agitated. Overall just agitated kind of a look.**

Q. Agitated?

A. **Yeah.**

Q. All right. Affect was dramatic. What does that mean?

A. **Just overly expressive about his feelings at the time.**

Q. All right, sir. And then Motor. What is motor?

A. **Just their movement.**

Q. Movements?

A. **Yeah.**

Q. And you noted agitation there as well, correct?

A. **Yes.**

Q. On the psych or social history, last school grade was the eighth grade?

A. **Correct.**

Q. Military history, none.

VA eligible, no.

Number of times previously incarcerated, jail one time; prison, none.

After leaving CMC. What is CMC?

A. I'm not sure of the exact definition of that.

Q. Okay. You will be incarcerated in the community, homeless, house or apartment.

And that contains your signature?

A. Yes.

Q. Your title. And the date of 6/23 of '08; is that correct?

A. Yes.

Q. And then on the next page, This is your treatment plan, correct?

A. Yes.

Q. And again, the book-in information: Age 19. Date of birth: October 30th, 1988.

Current plan for housing is unmarked.

Legal is unmarked.

Psychiatric treatment. You referred to the psychiatrist; is that correct?

A. Yes.

Q. For a follow-up evaluation, is that what that would be for?

A. Yes.

Q. And you note severe agitation, aggression or combativeness; is that correct?

A. Yes.

Q. And again, that was signed by you that morning.

A. Yes.

Q. Okay. Mr. Varghese, let me direct your attention to the next day, June the 24th, and did you have occasion to again evaluate James Broadnax?

A. Yes.

Q. And where was he at the time you saw him then?

A. He was placed on suicide precautions.

Q. Would that have been sometime during the afternoon of June the 23rd, the Monday, the day before you saw him here Tuesday morning?

A. Probably.

Q. And when you saw him, can you explain what they do in the jail in terms of inmates who they believe are suicidal?

A. They are placed in a special area of the jail where they are monitored every 15 minutes by an officer. They're taken out of their clothes. They're given paper gowns, or suicide smocks, to prevent any type of self harm. And they are met with by a psychiatric provider every day from then on until, yeah, they're taken off.

Q. Mr. Varghese, is a log made by the personnel there of the persons who are in suicide precaution?

A. Yeah, but it's by the Sheriffs Department.

Q. Let me ask you to look at Defendant's Exhibit Number 6, and do you recognize what that is?

A. It looks like it's a suicide observation log for Mr. Broadnax.

MR. LOLLAR: We would offer Defendant's Exhibit 6?

THE COURT: Is there any objection?

MR. ALEX: These are all things that are observed after the statement?

MR. LOLLAR: Yes.

MR. ALEX: Okay. I think there has been a previous ruling, but you know what, Judge? I'm not going to object.

THE COURT: Defense Exhibit 6 is admitted.

Q. (BY MR. LOLLAR:) Mr. Varghese, let me show you first Defendant's 6 and then we'll get back to 5. Does this appear to be a log made by the staff there in the psychiatric ward on James Broadnax dated June the 23rd of '08?

A. Yes.

Q. And that shows third shift; is that correct?

A. Yes.

Q. Do you know what time the third shift starts?

A. I don't know.

Q. Very good.

Again, it shows his name and his book-in number, location 3P12. Now 3P12 is the --

A. That's one of two tanks that we use for the suicide precautions.

Q. All right, sir. It shows he arrived on the floor June the 21st of '08 at 1:00 p.m., correct?

A. Yes.

Q. And time and date, placed on SP. Is that suicide precaution?

A. Yes.

Q. June the 23rd of '08 at 2:20 p.m.

A. Yes.

Q. And then along the left here are the times that one of the staff members would have gone by and visually seen him; is that correct?

A. Yes.

Q. And they make notes of his -- his behavior, and that starts again at 2:20 on that day, and there's an officer -- I don't know what that notation is there. Is that a number there?

A. I believe so. I'm not sure.

Q. That's visitation?

A. Yes.

Q. And then as we look down, every 15 minutes they make a note about what he's doing. 2:35, 2:50,

3:05, 3:20, 3:35, and on. Like, for instance, he's standing at the window talking to sites -- talking to psych, sitting down, sitting down, sitting down, standing.

And so they make a visual observation of him, and that continues for the next three days, I believe; is that correct?

A. I believe so. I'm not sure. I have not looked at these records.

Q. Up here, when it ends, the last notation is located on the fourth page, and I believe that refers to June the 26th.

And then on -- attached behind are the assessments done by someone else; is that correct? You did not do that assessment.

A. That's my assessments.

Q. All right, sir. And so when you came to see him, or the second time you saw Mr. Broadnax would have been on the morning of June the 24th.

A. That is correct.

Q. And he was in suicide precaution at that time.

A. Yes.

Q. And this is the assessment that you did on him then.

A. Yes.

41

Q. Referring to Defendant's Exhibit Number 5.

Now, the comments that you made are he denies current psychiatric symptoms?

A. That's correct.

Q. No psychiatric treatment history.

A. That's correct.

Q. And then on substance abuse, dependence factors associated with suicide risk, comments: Patient -- is PT patient?

A. Yes.

Q. -- patient had reported earlier that he smoked wet marijuana and variety of other drug uses up until two or three days ago.

A. Yes.

Q. Okay. Personality factors associated with suicide risk marked impulsive, irritable, easily angered, displays anger when disappointed, correct?

A. Yes.

Q. The second page, current legal situation factors associated with suicide risk, nothing is marked but you noted Patient states today that he just wants to go on with his trial.

A. Yes.

Q. Recent psycho social stressors associated with suicide risk, subjective denial of psycho social

42

stressor.

What does that mean?

A. Denied any stressors at the time.

Q. Okay. And recent situational factors associated with suicide risk, none present.

A. Yes.

Q. Historical factors associated with suicide risk, subjective denial of his clinical factors associated with suicide risk.

And assessment of suicide risk factors for young offender, and that was not applicable.

A. That's correct.

Q. And then your -- I don't know what I did there.

Your formulation. Patient is 19 year-old African-American male who presents to suicide precaution due to suicidal statements he made after interview yesterday. Patient at this time denies he is suicidal, guarded. What is that word?

A. Recommend.

Q. Recommend continue suicide precaution.

A. That's correct.

Q. And again, that was signed and dated by you.

A. Yes.

Q. Why at that point did you recommend continued

43

suicide precautions?

A. Because he was guarded. I didn't feel like I got enough information to really feel comfortable to take him off suicide precautions, so we maintained him for another day, at least another day.

Q. All right. And, Mr. Varghese, I believe that's the last time you saw Mr. Broadnax; is that correct?

A. That is correct.

Q. Thank you.

MR. LOLLAR: Pass the witness.

THE COURT: Mr. Alex, do you want the instruction now or after you --

MR. ALEX: After would be fine, Judge.

THE COURT: All right.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

CROSS-EXAMINATION

BY MR. ALEX:

Q. Mr. Varghese, my name is David Alex and I've got a few questions for you, okay?

A. Yes.

Q. And you and I have met before; is that correct?

A. Yes.

Q. Some time ago I came over to the jail and talked to you about these medical records; is that right?

A. Yes.

Q. Very good. And I just want to start, as a general notion, when -- when a person is brought to the Dallas County jail on a -- a high-profile case such as this double homicide, is it uncommon that they will wind up in your wing?

A. That's not uncommon.

Q. Okay. And is it pretty routine, if they're going to send them up there before they send them to general population, perhaps for their own protection and the protection of other inmates?

A. Yes.

Q. Okay. So there's nothing uncommon about that; is that correct?

A. No.

Q. All right. And when you first saw the defendant here, James Broadnax, that would have been the morning of June 23rd of 2008; is that correct?

A. Yes.

Q. And when you looked at the records Mr. Lollar just showed you in context -- I'll tell you what. Let's do this.

---

THE COURT: Okay. State's Exhibit 541 is admitted.

Q. (BY MR. ALEX:) Let's talk a little bit about what defense counsel didn't offer.

The first page of State's Exhibit 541, it talks about the patient's reliability; is that correct?

A. Yes.

Q. All right. You know what? Let's do it on the overhead.

What does "patient reliability" mean?

A. Basically, it's just the reliability of the interview, what the patient states and our level of confidence in what is being stated.

Q. How important is that?

A. It's very important. It determines --

Q. When you're meeting him for the first time, do you have any other medical records on him?

A. Just the ones from the day before, more than likely.

Q. And do you have the benefit of speaking to any family members?

A. No.

Q. Any friends?

A. No.

Q. Do you have any prior research on what he may

---

45

MR. ALEX: May I approach the witness, Your Honor?

THE COURT: Yes, sir. And as necessary.

MR. ALEX: All right. Mr. Lollar, is that exhibit up here that you have --

MR. LOLLAR: They're right here.

Q. (BY MR. ALEX:) All right. Let's start with Defense Exhibit Number 5. That's your suicide risk assessment; is that correct?

A. Yes.

Q. Now, how many pages of this is there?

A. There's a total of eight pages.

Q. How many pages has defense counsel introduced?

A. Four.

Q. Okay. 5 through 8?

A. Yes.

Q. All right. I want you to look at 541, is that the complete suicide risk assessment?

A. Yes.

Q. All eight pages?

A. Yes.

MR. ALEX: We'd offer State's Exhibit 541 at this time.

THE COURT: Any objection?

MR. LOLLAR: No.

---

47

have done before he got to jail?

A. No.

Q. So basically all you have is what he's telling you.

A. Yes.

Q. And the reliability of that would be extremely important for anything else you do; is that right?

A. Yes.

Q. And if -- if the reliability is poor, then you're not about to send him back to general population with everybody else, are you?

A. No.

Q. Okay. All right. Let's just look at the first page that wasn't offered by defense counsel, and that's going to be Page 1 of 8; is that right?

A. Yes.

Q. Okay. And that -- and what we'll see here is, there's a bunch of information here basically telling you what it's all about. It's in suicide risk assessment and management, right?

A. Yes.

Q. Identifies the defendant, his book-in number, the location where he's at; is that correct?

A. Yes.

Q. All right. And then when we look at -- I

---

don't know if it's my eyes or the document camera, but it looks a little blurry.

When it says Reliability of the patient, initially, is that you that marked fair and then crossed it out and then put poor?

A. Yes.

Q. All right. Does that give the jury some indication of -- of how reliable that you thought the information was that he was giving you?

A. Yes.

Q. Okay. And again, that's pretty important, isn't it?

A. Yes.

Q. All right. Because if you can't really rely very much on what a person is telling you, then you've got to do a lot more digging before you can decide whether or not they need to be in suicide watch, or mental health, or around other people or any of that; is that right?

A. That is correct.

Q. Okay. And I think you said before that his mood was highly irritable and angry.

A. Yes.

Q. Would that be a -- a caution not only for himself but for other inmates?

A. Yes.

Q. And as part of your job, is it not only to -- to treat the patient, but to also make sure that the other patients in your ward or anywhere else in the jail are not affected by him?

A. Yes.

Q. Okay. And again, we're talking about on this -- this suicide risk assessment was done actually on June 24th of 2008; is that correct?

A. That's correct.

Q. Now, I believe as it relates to his voluntary intoxication, I want to talk about that in relationship to a statement that he may have given the day before to the media. Were you aware at the time -- well, let me ask you this: Did you actually see any of the statements that he gave to the media at the time that you did this?

A. No, I did not.

Q. So you hadn't even seen him say things like Fuck the family and all that kind of stuff when you saw this.

A. No.

Q. And your -- you've made some statements in here that -- well, let's go to to Page 2, and that is another page that was not offered previously; is that

correct?

A. Yes.

Q. All right. In here, we say -- you -- you say that the patient made statements yesterday -- all right. I'm going to try not to make everybody's eyes go weird.

I'm going to pull this apart, and just so we know, we're talking about State's Exhibit 541. And we're going to try and focus in on this statement right here.

Patient made statements yesterday of not wanting to live. Patient denies at this time he's suicidal. Patient very guarded. Denies that he has any mental problems. Or issues. "I'm not crazy." And you put that in quotes.

Why do you put that in quotes?

A. I just quoted exactly what was said.

Q. What he told you.

A. Yes.

Q. All right. And so -- and again, you don't have the benefit of seeing the interviews which is the subject of all this conversation; is that correct?

A. Yes.

Q. All right. But you have -- obviously at this point, you've seen a note of some sort somewhere in the file about statements he may have made to the media; is that correct?

A. I must have, yes.

Q. All right.

MR. ALEX: I already asked to approach, didn't I?

MR. HIKEL: Yes.

THE COURT: You already did; yes, sir.

MR. ALEX: Thank you, Judge.

Q. (BY MR. ALEX:) State's Exhibit 542, these are also part of the medical records; is that correct.

A. Yes.

Q. All right. And they also refer to meeting with you on a suicide precaution assessment.

A. Yes.

Q. Is that correct?

A. Yes.

Q. And that is dated 6/24/08 at 8:43 a.m.?

A. Yes.

Q. Okay. And then on the same -- or actually, on 6/23 of 08, there's a note in the medical records regarding why he was placed on suicide precaution; is that right?

A. Yes.

Q. Okay. And then on that same date, we see

another note as it relates to him going to suicide precaution; is that correct?

A. Yes.

Q. All right.

MR. ALEX: And, Judge, for the record, the records of the -- the hospital records have been on file prior to 14 days. These are excerpts and we're going to offer State's Exhibit 542 at this time.

MR. LOLLAR: No objection.

THE COURT: Stat's Exhibit 542 is admitted.

Q. (BY MR. ALEX:) And so these records complete -- sort of complete the idea of why he was on suicide watch; is that right?

A. Yes.

Q. So let's just do this. I'll publish them to the jury this way and you correct me if I'm wrong.

On 6/24/08 at 8:43, met with patient today. This would have been you; is that correct?

A. Yes.

Q. While on suicide precautions and conducted evidence base risk, patient at this time guarded but denied suicidal, denied any mental issues. I'm not crazy.

And that's basically what we saw there; is that right?

A. Yes.

Q. Upon consulting with provider T. Ridge.

And who is T. Ridge?

A. He's a nurse practitioner; works in the psych department.

Q. Okay.

Patient to remain on suicide precautions for further stabilization.

And again, what we just -- what you just told the jury in that was because of his state of irritability and anger, that's the only thing that you could objectively observe; is that correct?

A. And the -- and also being guarded. Yeah.

Q. And the fact that he had a high-profile case.

A. Yes.

Q. Very good. The next page of this is also -- goes back to 6/23/08; is that correct?

A. Yes.

Q. And it appears to be a note by Joe Jackson who would be LPCI.

What does that stand for?

A. It's a licensed professional counselor intern.

Q. Okay. Do you know Mr. Jackson?

A. Yes.

Q. All right. So this would be a note from him.

Patient placed on suicide precaution by Sheriffs Department staff because of statement he made at the news station interview today. Patient reported he said I am not going to prison for the rest of my life. Either y'all -- you-all will kill me or I'm going to take others with me that will make you kill me. I am not -- I am not going to kill myself.

Okay? So the Sheriffs Department is the one who would have put him on suicide precaution; is that correct?

A. Yes.

Q. And you would have had the benefit of this note when you talked to him?

A. Well, I didn't talk to them, but -- oh, I'm sorry. Yes. Yes, I did.

Q. On the 24th when you talked to him, you would have looked at the previous note; --

A. That's correct;

Q. -- is that correct?

A. Yes.

Q. And there's reference to you having seen something about the statements he made before.

A. Yes.

Q. So is it logical to conclude that the only reason he was kept in suicide watch was either for his irritability or anger toward himself or others, or for the safety of others?

A. Yes.

Q. Okay. Now, let's just talk a little bit about -- and again, you didn't note any mental illness, did you?

When you saw him, did you see any -- I mean, let me ask you this: He did say to you that he was hearing voices and he'd heard voices before he got to jail; is that right?

A. That's correct.

Q. But when you say that his reliability is poor, did you have some doubt about that or question about that?

A. Well, that reliability was made after the initial screening, --

Q. Okay.

A. -- and I -- I just felt like there was just enough of a suspicion on my part just to keep him there for another few days just because I wasn't sure.

Q. Okay. Very good. And then when we look at Defense Exhibit 6, while he's on suicide watch, and if the jury was to go through and look for this every 15 minutes, I mean, you've -- you've seen this, right?

56

A.   Yes.  Just now.

Q.   Have you ever worked a suicide watch or seen people who were in suicide watch?

A.   I've seen people in suicide watch, yes.

Q.   And you've seen records of that?

A.   Yes, I have.  Yeah.

Q.   We don't see anything about him beating his head on the walls, do we?

A.   No.

Q.   You don't see anything about him throwing feces at anybody.

A.   No.

Q.   You don't see anything about him standing in the window talking to himself.

A.   No.

Q.   All of the things that we see are just normal things:  Lying on the bed, feeding, eating, cleaning up, lying on bunk, standing in corners of cell, and I would imagine if we looked at a suicide log of someone who was mentally ill, you would probably see some signs of that, wouldn't you?

A.   Yes.

Q.   Okay.  And nobody said they saw him in there talking to himself or -- or anything like that; is that right?

58

A.   It's just that -- ideas or thoughts to kill others and --

Q.   And you didn't check.  Is there any -- can you remember any reason why you wouldn't have checked that?

A.   My only understanding from it -- why some of this information might be missing is that I was sitting along with a psychiatrist at the time, so I might have just -- may not have documented, feeling that she was also there, so --

Q.   All right.  So when this happened, the psychiatrist was there as well?

A.   Yes.

Q.   At the same time.

A.   Yes.

Q.   And that would be Dr. Mir --

A.   Mirmesdagh.

Q.   Mirmesdagh, very good.  And Dr. Mirmesdagh's here today; is that right?

A.   Yes.

Q.   Okay.  Very good.

MR. ALEX:  May I have one second, Judge?

THE COURT:  Yes, sir.

Q.   (BY MR. ALEX:)  So you've got two mental health providers in the room with him; is that correct?

A.   Yes.

57

A.   Not to my knowledge, no.

Q.   Okay.  And let's just talk a little bit about Defendant's Exhibit 4, and this is the mental health screening that you and Mr. Lollar, the defense counsel talked about, that you actually did the morning before.

Do you know what time -- would this have been around the same time as the other note at 8:43, or would it have been near that time or --

A.   Roughly.  It would have been around -- sometime in the morning.

Q.   Okay.  And so if I told you that he had talked to the media later on that day, you'd agree that this would have been before he spoke to the media.

A.   Yes.

Q.   Okay.

A.   Yes.

Q.   And he said that he believed he was set up; is that right?

A.   Yes.

Q.   Okay.  And you don't know anything about the facts of this case; is that right?

A.   No.

Q.   All right.  Very good.

And when we -- when we talked about current homicidal ideation, what is that?

59

Q.   And he's telling you all about his drug use.  Were you in -- were you in there -- did you -- did you know when he checked into the Dallas County jail?

A.   I don't recall if I did or not.

Q.   Okay.  And it would be -- it would be something that would be of interest to you if he's telling you he's used drugs two or three days ago; is that correct?

A.   Yes.

Q.   Okay.  All right.  I think that's all I got.

When you were talking to him, did he have any problems answering your questions?

When you asked him -- when you asked him a question, did he respond to you or did he respond to something else in the room?

A.   Oh, he responded to me, yeah.

Q.   To you.  And do you feel like he was speaking to you voluntarily or do you feel like he was being compelled to talk with you?

A.   Um, just the second interview, I just felt like he was a little more reserved, a little more guarded.  Yeah.

Q.   And when -- when I say voluntarily, I'm not really talking about him being guarded, I mean, do you think that he understood what it means to speak to you

voluntarily?

A. Yes.

Q. Okay. And would you have -- do you think that from the time you spoke to him to the time that you saw him again, that he would not be capable of voluntarily speaking to someone else?

A. No.

Q. All right. Did he appear to you to be under the influence of drugs at that time?

A. **It's really hard to tell. I can't remember. He could have been. I'm just not sure.**

Q. Okay. But he was highly irritability; is that correct?

A. Yes.

Q. And very angry.

A. Yes.

Q. Now, if you knew that at the time that he booked into the Dallas County jail on June the 21st of 2008, that prior to that he was incarcerated in the Garland jail for two days, since June 19th, then that means at the time you saw him he would have been in jail incarcerated continuously since the 19th through the 20th, to the 21st, to the 22nd, to the 23rd, almost four days. Okay?

Four days being incarcerated. And if he had

---

61

told you that he had used drugs 2 or 3 days ago, there would be no way for you to know that independently, would there?

A. **No, there isn't.**

Q. And if you knew that in hindsight, then that would obviously not be true, would it?

A. **That's correct, yes.**

Q. All right. And would that affect any further diagnosis that anyone would make as it relates to his use of drugs prior to going to jail?

In other words, if he's telling you I last used drugs two to three days ago and he was incarcerated two or three days ago, that would either mean that he was smoking dope in jail, or he's lying to you, right?

A. Yes.

Q. And if he's lying to you about his use of drugs, and then he's later diagnosed with some kind of substance abuse, all of that would be affected by the previous lie, wouldn't it?

A. **Somewhat, yes.**

Q. Because, correct me if I'm wrong, when a -- when a mental health professional looked at the records, they go back and they look at the historical records; is that correct?

---

A. **That's -- that is correct.**

Q. And then they go from there and they take those historical records and they use that as a basis of their current evaluation; is that correct?

A. Yes.

Q. So if we see an evaluation of polysubstance abuse early on, on the 23rd, based on what the defendant would tell you; is that correct?

A. Yes.

Q. Do you-all give them any urinalysis?

A. No.

Q. So you wouldn't have even known if he was lying or not based on any objective material; is that correct?

A. **Not to my knowledge, no.**

Q. And if anybody relies on those lies later on, because they wouldn't know when he was in the Garland jail; is that correct?

A. No.

Q. All right. Then that would affect potentially any further diagnosis as well; is that right?

A. **I wouldn't say that altogether. I mean, I -- I wouldn't say that entirely. I mean, he may have used it prior to going to that jail, the Garland jail, but we -- but I see it --**

---

63

Q. But I guess my point is, if you asked him when the last time he used, and he said the 21st, or if he said two to three days ago, and that was not correct, would that not call into question his -- his veracity about his drug use at all?

A. Yes.

Q. Okay. And that's not something that you-all would independently check when you're talking to them; is that right?

A. **No. That -- that's correct.**

Q. If you're looking at a screen that says he checked into the jail on the 21st, and he's telling you he last used on the 21st, would it be natural to assume that you-all thought that he used drugs before he came to Dallas County jail?

A. Yes.

Q. Out in the free world?

A. Yes.

Q. But if you knew in hindsight that he wasn't in the free world, would that affect several -- what you saw back then?

A. **It would somewhat, yes.**

Q. Very good.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Redirect?

**REDIRECT EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Varghese, could he have been talking about two to three days before he came to jail?

A. **He could have been.**

Q. And, you know, if he wasn't arrested until 7:00 o'clock on Thursday night and he's booked into the Dallas County jail at 1:00 o'clock on Saturday morning, he didn't spend two days in the Garland jail, did he?

A. **I'm sorry. Can you repeat that?**

Q. It would just be a few hours over 24 hours.

A. **What was the --**

Q. If he's arrested in Texarkana, Texas, --

A. **Uh-huh.**

Q. -- at around 7:00 o'clock in the evening on the 19th, and he's booked into the Dallas County jail at 1:00 o'clock in the morning on the 21st, --

A. **Okay.**

Q. -- there's only, what, 26 hours between those times or so, right?

A. **Yes.**

(Sotto voce discussion.)

THE COURT: Anything else, Mr. Lollar?

MR. LOLLAR: Yes, sir.

MR. ALEX: It's all there.

Q. (BY MR. LOLLAR:) Mr. Varghese, let me ask you this: You work around persons with mental illnesses all the time, don't you?

A. **Yes.**

Q. Are they often very good historians?

A. **Not often.**

Q. Why not?

A. **Because their way of thinking is disorganized at times. They -- they have a hard time just putting a sentence together at times. It's just difficult for them, so it's just that -- mental illness itself is really difficult for them to be able to cope with, and much less keep up with history.**

Q. So that's one reason. Often, aren't mentally ill people actually -- deny that they have mental illness?

A. **That -- that also happens, yes.**

Q. And they will -- for instance, if they've been hospitalized, they'll tell you they haven't been hospitalized.

A. **Yes, that can happen as well.**

Q. And that happens all the time, doesn't it?

A. **I wouldn't say --**

Q. Well, frequently.

A. **Frequently, yes. I mean, --**

Q. Okay. So when Mr. Alex points out that in terms of reliability, I mean, you didn't have a his -- y'all have a system over there where you can type in a patient's name and any time that you've seen them before, that will come up and you can see what happened with them previously if they've been in the psychiatric department there.

A. **And in addition, we also have ways of pulling in other records from -- in the past if they've been there before. We can retrieve records, yes.**

Q. Right. And what's that called? I forgot.

A. **Medical or -- electronic medical record?**

Q. Well, the system that you tie in. Atlas? Is it Atlas?

A. **Oh, Emerald?**

Q. I'm sorry?

A. **The name of the program?**

Q. Yes.

A. **Emerald?**

Q. Yes. And does that tie into records of mental health provision to people from other institutions?

A. **It does not. It just -- we -- once we retrieve it through via fax or mail, we can scan it into the system. We're not -- we're not connected with other people.**

Q. What is the system called where you can tie in and get records from other institutions in regard to mental health?

A. **I'm not aware.**

Q. Okay. All right. When you say that his reliability was poor, is that one of the things you check to see if y'all have a prior history on him?

A. **The reason I checked that was because I -- I didn't have a good feel of the patient and I wanted to -- like I said, he was guarded, and the reason I put poor is because of that reason. I didn't feel confident of information as of yet. I wanted to keep him there to evaluate him some more.**

Q. And, Mr. Varghese, apparently some people in this world think to be mentally ill you have to be seen throwing feces at walls. That's not true, is it?

A. **That's not true.**

Q. There's all different types of mental illness.

A. **That is correct.**

Q. Thank you, Mr. Varghese.

MR. LOLLAR: That's all we have.

THE COURT: Recross?

MR. ALEX: No, sir.

THE COURT: May the witness be permanently

68

excused?

MR. ALEX: Yes, sir.

MR. LOLLAR: Yes, sir.

THE COURT: You're permanently excused, sir. You may step down.

Ladies and gentlemen of the jury, with regard to the testimony of that you just heard, Mr. Jason Varghese, you are given this limiting instruction.

You are instructed that you may only consider such evidence or testimony in this case of Mr. Jason Varghese of voluntary intoxication to the extent it relates to the voluntariness of the defendant's statements to the various television reporters that previously testified in this case.

Is that sufficient, Mr. Alex?

MR. ALEX: Yes, sir. Thank you.

THE COURT: All right. We'll take a recess until 10:15 a.m.

All rise for the jury.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

MR. LOLLAR: At this time, we'll call Dr. Mirmesdagh.

69

THE COURT: Ma'am, if you'll come all the way to the front of the courtroom up by that door, turn and face me and raise your right hand.

Raise your right hand.

**HAIDEH MIRMESDAGH, M.D.**
was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You will need to keep your voice up so that Mr. McElroy over there can hear you, the last juror down there. Make sure you keep your voice up, okay?

Mr. Lollar, whenever you're ready.

**DIRECT EXAMINATION**
BY MR. LOLLAR:

Q. Ma'am, tell us your name, please.

A. **My name is Haideh Mirmesdagh.**

Q. Could you spell your first name and your last name for the court reporter?

A. **The first time is Haideh, H-A-I, D as in David, E-H. Last name is Mirmesdagh, M as in Mark, I-R, M as in Mark, E-S, D as in David, A-G-H.**

Q. And, Doctor, what is your occupation or profession?

A. **I'm a psychiatrist.**

70

Q. What is your background and your educational training to enable you to be a psychiatrist?

A. **I went medical school in Austria, Vienna, and I did residency for family medicine, physical medicine, rehab in Austria, then I --**

Q. I'll tell you what. Let me stop you for just a second.

MR. LOLLAR: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Not only that, you're going to have to slow down because you talk really fast.

Q. (BY MR. LOLLAR:) Try to push that up there a little bit. That may -- may help you, but you've got to speak really loud because these things don't always work real well, okay?

A. **I did my medical school in Vienna, Austria. Finished my school in 1991. Did my two residency in family medicine and physical medicine and rehabilitation, and then I moved to United States and did one year of internal medicine in Lincoln Medical Center, which is affiliated with Cornell, in New York, and did three years of residency of psychiatry after that.**

Q. And when were you licensed to practice

71

medicine?

A. **Here in United States?**

Q. Yes.

A. **It was two years ago. 2007.**

Q. Two years. And you are a psychiatrist as well as a medical doctor?

A. **Yes.**

Q. And is your license to practice medicine here on file in Texas?

A. **Yes, sir.**

Q. Dr. Mirmesdagh, let me ask you what your current occupation is in terms of your psychiatry.

A. **I am working with Parkland Hospital in the jailhouse and I do the program for the psychiatric assessment program right now.**

Q. And that would be back here behind us in the Dallas County jail?

A. **That's right.**

Q. And how long have you been doing that?

A. **Since April 2008.**

Q. Let me direct your attention to the date of June the 23rd of 2008. Were you doing that on that date?

A. **I was at that time in the closed observation area and suicide tanks.**

Q. Doctor, let me --

MR. LOLLAR: May I approach, Your Honor?

THE COURT: Yes, sir, and as necessary to develop her testimony.

Q. (BY MR. LOLLAR:) All right. Let me show you what has been marked as Defendant's Exhibit Number 7 and ask if you recognize what this is?

A. **Yes. This is my evaluation.**

Q. And when did you conduct this evaluation?

A. **Um, June 23rd, 2008.**

Q. And was this on an individual by the name of James Broadnax?

A. **That's right.**

MR. LOLLAR: We would offer Defendant's Exhibit Number 7?

THE COURT: Any objection?

MR. ALEX: I have no objections, Your Honor.

THE COURT: Defendant's Exhibit 7 is admitted and you may publish.

Q. (BY MR. LOLLAR:) Doctor, let me ask you, this is the only page -- you just made a one-page report; is that correct?

A. **That's right, yeah.**

Q. Okay. Have you ever seen that individual

---

originally?

A. **Is that -- I was born in Iran.**

Q. Iraq?

A. **Iran.**

Q. Iran, I'm sorry.

A. **Okay.**

Q. Very good.

And, Doctor, you filled out this report on that particular date; is that correct?

A. **That's right.**

Q. And we see a time noted here of 7:19 a.m. on June the 23rd. Is that when you would have been making your rounds?

A. **Those dates are -- I mean, those dates usually is reliable, but then -- the time is -- depends on when they printed that for me. They usually just -- the clerk prints the forms for us before we go see the patient.**

Q. Very good. Would that have been sometime in the morning or --

A. **Yeah. We usually see them between 7:00 and 11:00 a.m.**

Q. Between 7:00 and 11:00.

A. **That's right.**

Q. Okay. Very good.

---

73

before or have you ever seen him since?

A. **No.**

Q. Would you be able to recognize him if you saw him here today?

A. **I think so, yes.**

Q. Now, do you see, looking over at the defense table there, the man in the striped tie?

A. **I -- I'm not sure.**

Q. You're not sure?

A. **I think he changed very much, yeah.**

Q. But the report references that you interviewed a person by the name of James Broadnax.

A. **That's right.**

Q. Did you interview him alone or were you with Jason Varghese?

A. **I am not hundred percent sure. It was long time ago. Usually at that time I did it with Mr. Varghese.**

Q. Okay. Very good. Let me put this on the overhead.

THE COURT: Mr. Lollar, I'm curious. I'm sure the jury is too. Would you ask the witness where she's from originally? I'm trying to place her accent.

MR. LOLLAR: Yes.

Q. (BY MR. LOLLAR:) Where are you from

---

75

And does this tell us where the facility was, the Lew Sterrett West Tower?

A. **That's right.**

Q. And you noted the blood pressure of Mr. Broadnax was 142/90, and you took his pulse rate at 96 response rate. Temperature, 97.7.

A. **These -- these are not things that I measure. This come from the intake or from the medical part.**

Q. Okay. Now, you -- one of the things you're asked to do is talk about current medications. Did it appear that he was taking any current medications?

A. **I don't recall I asked that.**

Q. Okay. You didn't fill in anything.

A. **Right.**

Q. All right. And allergies, what is NKDA?

A. **No known drug allergy.**

Q. No known drug allergies. Okay.

I see over here on the right that there's a notation. Would that have been a statement made by him?

A. **Uh-huh. That's right.**

Q. I a psych; lawyer?

A. **Uh-huh. That's right.**

THE COURT: Hey, Doctor, can you say yes or no?

76

THE WITNESS: Yes. Sure.

THE COURT: Thank you.

THE WITNESS: I'm sorry.

THE COURT: No problem.

Q. (BY MR. LOLLAR:) Now, under the heading Subjective History, what's DX?

A. Diagnosis.

Q. History and Diagnosis?

He made the statement, I was high when I got here?

A. Yes, sir.

Q. Okay. And denies any -- what is that?

A. Depression.

Q. Depression? Or anxiety.

A. That's correct.

Q. Okay. And we see here that notation. What does that mean, Sister?

A. Sister.

Q. What does that mean?

A. Question mark, psychiatric history.

Q. I'm sorry?

A. Question mark, psychiatric history.

Q. I'm sorry, I just didn't hear you.

A. When somebody says my sister has some psychiatric history, I don't know about it, that's how

77

I write it?

Q. Okay.

A. So --

Q. So he's saying that his sister has some type of diagnosis, but he doesn't know what it was.

A. That's right.

Q. Okay. Did he identify who the sister was? Which sister?

A. I'm not sure. I would write it if I knew.

Q. Okay. All right. And then the notation, Patient denies past history?

A. Psychiatric history.

Q. Psychiatric history? What is that?

A. In patient. No suicides in patient or family.

Q. All right. Very good.

Now, under the Mental Status, you circled AO. What does that mean?

A. It means alerted and oriented.

Q. And you, under Mood, you have circled several things. Are these all different characteristics that they want you to look for?

A. Yes.

Q. And then you circle the ones that are appropriate --

A. That's right.

78

Q. -- for the individual you're -- you're evaluating.

A. That's right.

Q. And under Mood, you've circled Guarded. Or, I'm sorry, that's his attitude; is that right?

A. Yes.

Q. And then Disrespectful, irritable, angry; is that correct?

A. Yes.

Q. You've noticed as to Psycho Motor, appeared to be normal.

A. Yes.

Q. Thought process, I can't tell if you circled that or not. Did you circle anything in there?

A. Goal directed. Yes, I did.

Q. Goal directed, all right.

Speech, normal.

Volume? What is volume?

A. It means when they are talking loud or in the lower volume.

Q. Okay. What is that notation?

A. Rate. It means like I did, fast.

Q. He was talking quickly?

A. Yes.

Q. All right. Sleep, appeared to be normal; is

79

that correct?

A. Yes, sir.

Q. An insight in judgment, what is this notation here?

A. Poor.

Q. Poor.

A. Yes.

Q. Thought coherent? What does that say?

A. Congruent with process.

Q. Congruent with process.

Okay. And hallucinations you noted?

A. Yes.

Q. And then you've drawn an arrow down here that says no command voices; is that correct?

A. I can't see -- I cannot see after the --

Q. I'm sorry.

A. No commands dash. It means no commands in the nature. Only voices. That's why voices only.

Q. All right. So is that for a person who's hearing voices in their head but they're not commanding them to do anything?

A. That's right.

Q. And that's why you -- the notation you made, no commands.

A. This is what he said, yes.

80

Q. Okay. And under Delusions, you have circled yes.

You've circled Paranoid.

Under Involuntary Movements, you didn't note any. You circled none.

A. That's right.

Q. Suicidality, you have none.

Homicidality, you have none, with a question mark, capital murder, multiple persons. Is that what you found to be the -- the charge that he was in jail for?

A. Yes.

Q. Okay. Now, you have another notation out here at the side: Many drugs in the past?

A. That's right.

Q. Cannabis, age 12. Daily.

Oh, so he's saying he's been smoking marijuana daily since 12.

A. That's right.

Q. All right. And the last time on June the 21st of '08?

A. That's what he said, yeah.

Q. Your assessment, -- now, what is an assessment?

A. **Assessment is a diagnosis, actually, what you**

81

**conclude from all the interview.**

Q. Okay. And so that's what your kind of report card is on the individual that you've been doing the assessment on.

A. **That's right. Psychiatric.**

Q. And for Axis 1, Axis 1 is the mental health problems; is that correct?

A. **That's right.**

Q. And polysubstance dependence?

A. **That's right.**

Q. And then you circled this notation, malingering. That's ruled out?

A. **Rule out.**

Q. What does that mean?

A. **It means when you are not sure about it, you just talked about that option. You just write it down.**

Q. You're saying you need to rule -- you need further study to determine if he's malingering --

A. **That's right.**

Q. -- or if what you're seeing is appropriate.

A. **That's right.**

Q. Okay. You haven't said he is malingering.

A. **No, it's just rule out.**

Q. You -- okay. All right. ASPD?

A. **Antisocial personality disorder.**

82

Q. Now, that's an impression or a diagnosis at this point?

A. **This is actually -- you cannot really diagnose it the first time. I believe I wrote it too fast. Usually it's rule out malingering and antisocial personality.**

Q. Okay. I'm sorry. You're -- you're talking fast --

A. **Fast?**

Q. -- and too low.

A. **Okay. To rule out the -- the antisocial personality disorder, you need actually need longer evaluation to rule out. You need more in details, which I didn't have. And I believe I wrote it too fast. I meant rule out malingering and antisocial personality disorder.**

THE COURT: Doctor, you're going to have to slow down --

MR. LOLLAR: Okay.

THE COURT: -- okay?

Q. (BY MR. LOLLAR:) Let me see if I can --

THE WITNESS: I'm really -- I'm sorry. That's how I talk.

THE COURT: I'm not fussing at you, it's just that --

83

Q. (BY MR. LOLLAR:) Doctor, you --

THE WITNESS: Sorry. I try.

Q. (BY MR. LOLLAR:) -- you told us you think you wrote that down in haste.

A. **Yes.**

Q. You don't think that that is appropriate for you to have written that down there at that time.

A. **No, I'm not saying that.**

Q. Okay. Well, you --

A. **I usually write deferred by the Axis 2. If I have something that I write Rule Out, I don't remember what happened, what I -- why I was thinking of antisocial personality disorder.**

Q. All right. And Axis 2 is the mood disorders; is that correct?

A. **Axis 2 is actually personality disorder.**

Q. Personality disorder.

A. **Yes.**

Q. Okay. And let me ask, in regard to what you wrote down there, a psychiatrist or psychologist cannot make a diagnosis of antisocial personality disorder without knowing the person's history before age 15.

A. **That's right.**

Q. Is that correct? And that's a requirement of the American Psychiatric Association.

**84**

A. (Nods head.)

Q. And it's -- you know, it has ...

MR. LOLLAR: Can I approach the witness, Your Honor?

THE COURT: Yes, sir. And as necessary.

Q. (BY MR. LOLLAR:) What is this I'm showing you?

A. **The DSM-IV. That's from the American association, psychiatric association.**

Q. It's called the DSM-IV?

A. **That's correct.**

Q. And it's the Diagnostic and Statistical Manual, Mental Disorders, Fourth Edition, from the American Psychiatric Association.

A. **That's correct.**

Q. And this is the standard reference that you all go by.

A. **That's right.**

Q. This is y'all's Bible in the psychiatric world?

A. **So to say, yes.**

Q. So to say, so to say, okay.

And there are certain requirements that a person -- well, that a doctor has to have before you can make any type of diagnosis such as that.

**85**

A. **That's right.**

Q. And would you agree, Doctor, at the time you wrote that down there, you didn't have enough history on the individual to make that diagnosis.

A. **That's right.**

Q. That could have been your impression, but that's not a diagnosis.

A. **That's true.**

Q. Very good.

On Axis 4 you have BA. What is that?

A. **Oh, Axis 3.**

Q. Or Axis 3. I'm sorry.

A. **That's a medical diagnosis.**

Q. Yes.

A. **Medical problems.**

**A BA is bronchial asthma.**

Q. Asthma?

A. **Uh-huh.**

Q. Okay. All right. And Axis 4, those are what's happening around him to give him problems?

A. **Stressors.**

Q. Okay. And you put Legal, his legal situation?

A. **That's correct.**

Q. Very good. And Axis 5 is his general assessment?

**86**

A. **Or functioning, yes.**

Q. And you put that as a 70?

A. **That's right.**

Q. Okay. Very good. Now, I see that you have made a notation here, keep CBO. What does that mean?

A. **CBO is closed -- closed behavioral observation.**

Q. And you wanted him kept in closed behavioral observation?

A. **That's right.**

Q. Do you remember why?

A. **Usually when I'm not sure if somebody is having any problems or not and I need more observation, to be on the safe side, we keep them there.**

Q. Okay. So you had found him in closed behavioral observation and you ordered that he be kept there.

A. **(Nods head.)**

Q. And you have that ability within the jail.

A. **That's right.**

Q. Yes? We have the last notation here on this, Finished ninth grade; is that correct?

A. **That's right.**

Q. Okay. Now, all right. Let's see what this is here. Patient does or does not demonstrate verbalized

**87**

understanding. Did you circle anything in regard to that, or is that circle around the CBO part only?

A. **That's only for CBO.**

Q. Okay. Very good. And you have RTC one week. What does that mean?

A. **Return to clinic.**

Q. I'm sorry?

A. **It means to be seen again.**

Q. To be seen --

A. **Follow-ups, yes.**

Q. -- again within a week?

A. **Yes. That's the usual CBO interval from seeing the patients.**

Q. Okay. We note your handwriting here, No medications for now.

A. **That's right.**

Q. And then underneath, Patient still on drugs; is that correct?

A. **Question mark, yes.**

Q. With a question mark.

A. **Yeah.**

Q. Was that an issue that you had? A question that you had?

A. **That's not -- no, it means I wasn't sure if he was on drugs or not.**

Q. Very good.

A. The influence of drugs or not.

Q. But that was a concern you had.

A. That's right.

Q. Now, what does that mean, Constant --

A. Constant medicine for bronchial asthma. Whoever has any medical problems, we refer them to medical doctors.

Q. Okay. And bronchial asthma.

A. That's right.

Q. Very good. You noted that he had no response to internal stimuli. What does that mean?

A. It means I did not see any noticeable response to anybody talking to him, looking around, or giving me impression that he has any situation that needs immediate help.

Q. A person can be having auditory hallucinations and not give an external response to those stimuli; is that correct?

A. It's possible.

Q. Very good.

And the notation, States hearing voices all the time.

A. That's right.

Q. What did that mean? Why did you write that down?

A. I just wrote it down that usually if somebody has auditory hallucination, it's not all the time, so that --

Q. All right. Very good.

And then what is this right here?

A. This, I cannot read it. It's not my handwriting. I think it's noted at the dates that the nurse see my notes and they just follow up the -- the orders. That's what they do usually.

Q. Okay. Very good.

So, Dr. Mirmesdagh, when you saw him on the morning of June the 23rd, it was sometime that morning, right?

A. Right.

Q. And he claimed to you to be having auditory hallucinations. You thought he was having delusions; is that correct?

A. Um, I -- based on my notes, yes.

Q. Okay. Very good.

You thought he was paranoid?

A. That's right.

Q. And you ordered him kept in the closed behavioral observation.

A. That's right.

Q. Okay. Very good. Thank you, Doctor.

MR. LOLLAR: That's all we have. Pass the witness.

THE COURT: Cross-examination?

MR. ALEX: Yes, sir.

**CROSS-EXAMINATION**

BY MR. ALEX:

Q. And I'm -- I'm going to try my best at your name, Dr. Mirmesdagh?

A. Very good, yeah.

Q. Very good. We've met before; is that correct?

A. (Nods head.)

Q. Yesterday, perhaps? The first day you were here we had a brief conversation?

A. That's right.

Q. And I'm going to have a few questions for you and I'm going to ask you as a general notion at first. Do you -- how -- how long have you been working at the Dallas County jail?

A. I started in Feb -- April 2008 exactly.

Q. And currently you work part time or full time?

A. Full time.

Q. And what are your hours?

A. We are 6:00 to 2:00.

Q. 6:00 to what?

A. To 2:00.

Q. To 2:00?

A. Uh-huh.

Q. And in the course of -- let's go back to the time around you saw Mr. Broadnax. In the course of that time, how many patients would you say you see a day?

A. Average, because sometimes different -- right now in the PAP, because everybody's new evaluation, I see ten new -- ten to twelve new patients. At that time, I could see up to 20, 25 patients.

Q. Up to 25 patients a day.

A. Yeah.

Q. Okay. And when -- do you re -- maybe if I showed you a photograph.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) When you -- when you first saw the defendant, -- this is probably not a very good photo, but State's Exhibit 537 -- was his hair a lot longer than it is now?

A. I recall his face, yeah.

Q. Okay. On State's Exhibit 537.

A. Yes.

Q. Okay. And his hair -- he looks different than

92

he did today; is that right?

A. Yes.

Q. He's pretty cleaned up today, right?

A. That's right.

Q. Okay. Very good.

And the -- I guess as a general matter, treating 20 patients a day, that's quite a bit, isn't it?

A. It is.

Q. Okay. And when you treat these patients, you don't treat them with the idea of having to come into court and testify in front of 12 or 14 members of the community, do you?

A. No.

Q. All right. Your job is to do the best you can do with the number of patients you have, and make the impressions on the notes so that anybody who comes after you will have some idea of what your impressions are; is that correct?

A. That's right.

Q. All right. And when we looked at this document that defense counsel has offered, we have to kind of look at it in that context, don't we?

A. (No response.)

Q. Is that correct?

93

A. That's right, yes.

Q. Okay. And so, just -- let me ask you this: At the beginning of this document, we see the term, I need a psych.

It doesn't say Doctor, does it?

A. I wrote what he said.

Q. What he said. And he's -- he's talking to a mental health professional, right?

A. (No response.)

Q. Is that correct?

A. Yes. That's right.

Q. And he's telling you he's hearing voices all the time, right?

A. That's right.

Q. Which is inconsistent with what you know to be normal with somebody hearing voices; is that correct?

A. That's correct.

Q. All right. And at the same time, he's not asking you for help, he's telling you he needs a psych lawyer; is that right?

A. That's right.

Q. Sounds to me like he's thinking about his case and not about --

MR. PARKS: Judge, we would object to argument.

94

MR. ALEX: Judge, it's cross-examination and I'm just asking her opinion.

THE COURT: Overruled.

Q. (BY MR. ALEX:) Okay. And again, Doctor, what you have on the paper is what you recall, and I understand that you treated hundreds of patients since then and it probably would not be fair to ask you specifically the context of everything on this paper; is that correct?

A. That's correct.

Q. All right. But if we look at it as a whole, I just want to ask you some general impressions.

All right. You made it a point to say he's not responding to internal stimuli; is that correct?

A. That's right.

Q. And then you went on to say, Noted, he states he hears voices all the time.

A. That's correct.

Q. And so what we're basically seeing here is, it's inconsistent of what you normally see of someone hearing voices, that they hear them all the time; is that right?

A. That's right.

Q. And if somebody was going to pretend to hear voices, right? As -- just as a hypothetical, there was

95

no -- there would be no way for you to know they're pretending if they're not responding to them; is that correct?

A. That's correct.

Q. You'd have to take their word for it.

A. That's right.

Q. In other words, if I'm hearing voices and the voices are telling me to throw the pen down, you may be able to look at that and say, Okay, this guy's responding to some voices. You may be able to objectively observe that; is that correct?

A. That's correct.

Q. I may hear voices and I may be talking back to them and you may say, Okay. There's something objectively I can look at and say, Here is a person who's hearing voices; is that correct?

A. That's correct.

Q. But if I just say to you, Hey, Doc, I need a psych lawyer, and by the way, I'm hearing voices all the time, and there's no objective evidence to look at, then the notations would be just what we have here, wouldn't they?

A. That's correct.

Q. Okay. And -- and again, all you can go off of is what he's telling you; is that correct?

96

A. That's right.

Q. Did you see any objective, any ob -- any objective evidence of him hearing voices?

A. If I did, I would write it down.

Q. You would have wrote it down. Okay.
And so this is all what he's telling you; is that correct?

A. That's right.

Q. He also tells you that when he got -- when -- I saw him when I got here; is that correct?

A. That's right.

Q. All right. And you would -- you would at this point probably -- and correct me if I'm wrong -- not know if you had looked at the date that he booked into the Dallas County jail. So I want you to look at State's Exhibit 537, and at the very bottom down here, does it say June 21st, 2008 at 6:29 a.m.?

A. Right.

Q. And that appears to be the date that he was booked in and put into the behavioral observation; is that correct?

A. It says so, yes.

Q. Okay. And if he had told you that he last used cannabis -- that being marijuana; is that correct?

A. That's correct.

98

Q. Oh, I understand. I understand. Okay.
Okay. And then let's talk about what the world "malingering" means, okay? You and -- counsel asked you about the word malingering and you've got on here Ruled out malingering.
Now, as a general notion, if we were to look at the 20 patients that you had saw that day, you're not suggesting that every one of those would have on there Rule out malingering, would it?

A. No.

Q. Okay. And "malingering" means, in just ordinary terms, faking, doesn't it?

A. That's right.

Q. Okay. And -- and so as a general impression, after speaking to the defendant, you wrote on there Rule out malingering; is that correct?

A. That's correct.

Q. Okay. And then if we go to the polysubstance dependence, that was the Axis 1 diagnosis; is that correct?

A. That's right.

Q. That would be totally based upon what he told you.

A. Yes.

Q. There's no objective data there at all to make

97

Q. -- on June 21st, 2008, then that potentially could be true as long as he was out in the free world before he got booked in; is that correct?

A. That's true.

Q. And if you were aware that he was incarcerated since June 19th, 2008, that would mean, if this was true, he was smoking dope in jail. If this -- if what he told you was true.

A. If that's what the patient told me.

Q. Okay. And -- and you would have no way of knowing that he was in jail at the time that he told you he last used marijuana, right?

A. Are you talking about the 21st?

Q. On the 20 -- on the 21st; yes, ma'am.

A. No, I couldn't know that.

Q. Okay. All right. But if you were -- let's say, for instance, he told you, Okay, Dr. Mirmesdagh, I lasted used drugs and marijuana on the 21st of 2008, and then later on somebody had come to you like the next day and had said, You know what? That guy was in jail in Garland on the 21st, would that have any bearing on how you would say the reliability of this is?

A. I'm not supposed to change anything that I write.

99

that diagnosis, is it?

A. That's right.

Q. All right. You-all don't drug test them; is that correct?

A. No.

Q. And so again we're relying on a person who is looking at -- who knows he's looking at a double count of capital murder that we've got written down here; is that correct?

A. That's right.

Q. Relying on a person who's already asked for a psych lawyer, not another psych doctor; is that correct?

A. Yes, sir.

Q. Relying on a person who says he hears voices all the time, which is inconsistent with a person -- of people hearing voices; is that right?

A. Yes, sir.

Q. And relying on a person who says they're hearing voices but you see no objective -- no objective evidence of them hearing voices; is that right?

A. That's correct.

Q. Okay. And if we go to the Axis 2 diagnosis, and I understand that in order to diagnose somebody with antisocial personality disorder, you've got to

know a little bit about their past; is that right?

A. That's correct.

Q. Okay. But what I didn't hear counsel ask you, and I wanted to see if we can tell the jury, what does it mean -- was there a time when -- when we would just say that a person was a sociopath? Do you -- you understand the word Sociopath?

A. Yes, sir.

Q. Or a psychopath?

A. Yes, sir.

Q. Is the antisocial personality disorder similar to that term?

A. It's different.

Q. It's different? Okay. Tell the jury what -- what it means to be diagnosed with antisocial personality disorder.

Would -- would one of the criteria be the --

MR. LOLLAR: Judge, could she finish? He's asked her a question. Could she answer that question?

MR. ALEX: I'm narrowing the question down, Your Honor, if I can.

THE COURT: Okay. Sustained. Ask another question.

Q. (BY MR. ALEX:) I'm going to narrow the

---

independently -- from independent memory as you sit there right now everything he said; is that correct?

A. That's correct.

Q. But his general mood was disrespectful, right?

A. That's right.

Q. Angry, and irritable; is that correct?

A. That's correct.

Q. Okay. And when you say, finally, Doctor, that no medications for now, patient still on drugs, in part, did that have anything to do with him self-reporting when the last time he used drugs?

A. That's correct.

Q. Okay. And if that would have been a lie, then that would -- that would -- you still may not have given him any medication, but it would have changed your thought process, would it not have?

A. Could you repeat the question, please?

Q. Okay. And I know that probably wasn't the clearest question in the world.

Let me ask -- me ask it this way: If I was to check in to Dallas County jail today and you were to see me and I was to say, Doc, before I got to jail, I used some drugs. You would be very guarded about giving me any medication; is that correct?

A. That's right.

---

question down, ma'am, and that's this: Would one of the criteria be the lack of remorse for committing crimes?

A. That's right.

Q. Okay. And is that -- is that something that you could objectively observe?

A. That's right.

Q. Okay. And if somebody was to commit a double homicide and shoot two people five times close range in the head and show absolutely no remorse whatsoever, would that be consistent with someone who has an antisocial personality disorder?

A. That's not the only criteria.

Q. I understand. My only question is, is that consistent?

A. Yes.

Q. Okay. Because you've -- you've already told the jury that you could not diagnose him with that without having further history; is that correct?

A. That's correct.

Q. And what you wrote here would have been the result of your impressions of the defendant after you interviewed him; is that correct?

A. That's correct.

Q. And you probably couldn't tell them

---

Q. Now, if I was to check in jail today and you saw me three days from now, and I told you that I used drugs before I went to jail, would that equation change a little bit? Would you -- you may still be a little concerned, but not as concerned. It had been more than 48 hours since I could have possibly used drugs; is that right?

A. That's possible, yes.

Q. Okay. And you're not telling the jury that you actually saw signs of him being intoxicated when you talked to him, are you?

A. I just can say what I wrote.

Q. What you wrote.

A. Yes.

Q. Very good. And that's fair. I mean, you -- you -- at this point in time, a year later, it's very difficult for you to say whether you thought he was intoxicated at that time.

A. That's right.

Q. All right. But when we look at the general and the specific of the -- of the note that you wrote, it would be very likely that what he told you that he used on 6/21/08, you were talking to him on 6/23/08, that played a major rule in your thoughts about him; is that correct?

A. I believe so.

Q. Okay. And, I'm sorry. I did say the last area, but I think the Court knows I very rarely stick to that.

The -- the Keep CBO, okay? We see him, we assess him, and we say, Okay, we're going to keep him in closed behavioral observation, right?

A. That's right.

Q. The truth of the matter is, you wanted him to stay in CBO because you were concerned about potential other patients and inmates; is that correct?

A. Concerned about what?

Q. Other -- other inmates or other patients that he could be around.

A. I believe so because of by the homicidality, I have a question mark on that.

Q. Okay. And when you say homic -- say that word, because I -- I can't say it very well.

A. Homicidality.

Q. Homicidalality [sic]?

A. Uh-huh.

Q. Very good. I can't say that. Homicidalality. You put a question mark there, which means you're not going to put him with other inmates if you're sure he ain't going to kill anyone.

105

A. That's one possibility, yes.

Q. Okay. Very good.

MR. ALEX: That's all I have, Your Honor.

THE COURT: Redirect?

MR. LOLLAR: Yes.

**REDIRECT EXAMINATION**

BY MR. LOLLAR:

Q. Doctor, what's a psych lawyer?

A. I don't know.

Q. I don't either. So when he asked you for a psych lawyer, did you know what he was talking about?

A. I don't recall that. I usually -- when I write in quote, quote what the patient says exactly.

Q. Did you order a toxilogical [sic] screen?

A. We don't do that in the jail.

Q. You don't do that at the jail.

A. No.

Q. Why don't y'all do that at the jail?

A. I don't know. They said we are not supposed to do that. We are not legally.

Q. If he presented at Parkland Hospital with the same symptoms, is a toxilogical screen something that they would have done out there?

A. I do not work in the Parkland. I don't know.

Q. Okay. Now, Mr. Alex has suggested that he's

telling you this --

MR. LOLLAR: May I approach your, Your Honor?

THE COURT: Yes, sir.

MR. LOLLAR: You got a stapler?

THE COURT: You don't keep get to keep it though.

MR. LOLLAR: Thank you.

Q. (BY MR. LOLLAR:) Doctor, do you know a nurse practitioner that works with you by the name of Todd Ridge?

A. I know him, yes.

Q. And let me show you what has been marked here as Defendant's Exhibit Number 8, and if I could -- this is three pages. If I could ask you to just take a look at that and see if you recognize what that is.

A. Should I talk? Should I say what I see?

Q. Yeah. Do you -- well, do you see what this is?

A. This is evaluation. Same thing that I did. Same page.

Q. And is it dated?

A. That's 6/24/08.

Q. Okay. And if you could turn it over to the next page, does that appear to be an Inmate Request

107

Form?

A. That's right.

Q. From a James Broadnax dated 6/25?

A. That's right.

Q. And if you could turn over to the next page, this is also dated 6/25 of '08?

A. That's right.

Q. And by Todd Ridge?

A. Yes, sir.

MR. LOLLAR: And we would offer Defendant's Exhibit Number 8.

THE COURT: Any objection?

MR. ALEX: Are you offering this with the highlights in it?

MR. LOLLAR: Yes.

MR. ALEX: I have no objections, Your Honor.

THE COURT: Defense Exhibit 8 is admitted.

Q. (BY MR. LOLLAR:) Let me put this up here, Doctor. Does this appear to be a mental health follow-up note conducted 6/24 of '08 at 6:42 a.m.? And I think we saw down at the bottom by Todd Ridge?

A. Yes.

Q. Of James Broadnax?

A. Yes.

Q. Let's see here. And Mr. Alex has suggested that he was telling you these things to make -- to fake a mental illnesses, and he's telling you to fake mental illnesses by these things that he's said.

MR. ALEX: Judge, I'm going to object to the form of the question.

MR. LOLLAR: Well, that's --

THE COURT: Overruled.

Q. (BY MR. LOLLAR:) Now, you see the notations made by Mr. Ridge, in talking to the defendant, who tells him I've never had mental problems?

A. That's what he wrote. I wasn't there.

Q. You see that? I have never had mental problems?

A. Yes, sir.

Q. And he's saying to Mr. Ridge, Just send me to a cage. There's nothing wrong with me mentally?

A. Yes.

Q. And you see Mr. Ridge's notations that his mood, his attitude was inappropriate, manipulative, impatient, irritable.

He notes on Axis 1, polysubstance dependence?

A. That's right.

Q. And down at the bottom, Continue SP's. Continue suicide precautions?

---

MR. LOLLAR: That's all we have.

THE COURT: Recross?

**RECROSS-EXAMINATION**

BY MR. ALEX:

Q. Doctor, I'm -- I'm sorry. I do have a few more questions for you based on those -- those documents.

Suicide precaution. Can you tell the jury -- well, let's do this since it's cross-examination.

In suicide precaution, you've got a person who's there, who's basically not given anything but sort of a smock, and they watch him on a regular basis; is that -- is that correct?

A. They're observed, yes.

Q. Okay. And so if Mr. Broadnax had claimed to be hearing voices and he was in suicide precaution after giving these interviews, then he would have been -- all of his clothes would have been taken from him; is that right?

A. That's right.

Q. He would have been in a room that's pretty cold; is that correct?

A. Depends. Sometimes.

Q. Okay. People complain about it being cold?

A. Yes, they did.

---

A. That's right.

Q. And this again is on June the 24th.

The next page is an Inmate Request Form from the inmate, James Broadnax, dated June 25th?

A. Yes.

Q. And he writes, I wanted to know if y'all going to move me off the crazy psych floor because I'm mentally sane?

A. Yes. I see.

Q. Okay. And then the next page is again a form signed by Mr. Ridge on June 25th?

A. Yes.

Q. Where he's talking to the defendant again, and the defendant says I'm straight. I'm straight, man.

A. Yes.

Q. Okay. And Mr. Ridge orders at that time to discontinue suicide precautions and move him into crisis stabilization?

A. Yes.

Q. With ibuprofen for the bad molar that he noted.

A. Yes.

Q. Is that correct?

A. That's correct.

Q. So, thank you, Doctor.

---

Q. And anything that could potentially hurt himself is taken from him; is that correct?

A. That's right.

Q. And it's -- in regards to just a regular cell, it's probably a place that people who are not suicidal or -- or crazy would not want to be. Would you agree with that? It would be uncomfortable.

A. It's very uncomfortable.

Q. Okay. All right. So we've got a young man who, before he talks to the media, he claims to hear voices; is that right?

A. That's correct.

Q. Okay. And then he's put in suicide watch; is that correct?

A. Yes.

Q. And then on the 24th, he's saying to Mr. Ridge while he's in this uncomfortable place -- is that right? -- I've never had any mental problems. Just send me into a cage. Nothing mentally wrong with me; is that right?

A. That's what he wrote, yeah.

Q. Okay. He doesn't want to be in there anymore; is that right?

A. That's what the paper says, yeah.

Q. And the paper says also that he's no longer

hearings voice, doesn't it?  No hallucinations, no delusions, just in a matter of one day.

A.  That's right.

Q.  Okay.  And -- and now he's -- he's still inappropriate, and the attitude that Mr. Ridge marks here is Manipulative; is that right?

A.  That's right.

Q.  Okay.  And he's still irritable, according to Mr. Ridge's report.

A.  Yes.

Q.  And the polysubstance dependence on Axis 1 would have followed over from anything that he had said previously; is that correct?

A.  I believe so, yes.

Q.  And so if somebody says I'm an addict on day one, in all likelihood, all of these assessments we see all the way through is going to be historical.

A.  That's right.

Q.  Okay.  Regardless of whether it's true or not, if it's all self-reporting.

A.  If it's self-report, yes.

Q.  Okay.  And then if we go to the 25th, we've got a young man who's now no longer wanting to be in suicide watch and he sends out a kite, that being an Inmate Request Form, saying I want to know if y'all

113

going to move me off the crazy floor because I'm mentally sane; is that right?

A.  That's what the paper says.

Q.  And when he said this, he's still standing there with a smock, with no clothes in this room that they're doing suicide watch on; is that right?

A.  I wasn't there.  I think so.

Q.  No, I mean, that's physically where he would still be on the 25th.

A.  Should be, yeah.

Q.  Okay.  And we looked at all of the suicide logs.  There's nothing in there about him talking to himself, was there?

I'm sorry.  You -- you didn't look at that, did you?  That was probably the previous witness.

MR. ALEX:  I'll strike that, Your Honor.

Q.  (BY MR. ALEX:)  And then on the 25th, again he's seen by Mr. Ridge.

A.  Right.

Q.  He's still in the suicide watch, and he's saying, I'm straight, man.  And he does -- he's still manipulative.  His attitude is still inappropriate. He's still claiming not to hear any voices or have any delusions, and this is just two days after he had told you that he was hearing voices all the time, right?

A.  That's correct.

Q.  Okay.  And then -- so Mr. Ridge says, Okay. I'm going to let you out of suicide watch, right?  He discontinues suicide precautions; is that right?

A.  That's right.

Q.  Okay.  But he keeps him on crisis stabilization.  That means he stays up there in the psych ward; is that correct?

A.  He stays actually in the same area.

Q.  Okay.  Same area, except he gets his stuff back, doesn't he?

A.  That's correct.

Q.  Okay.  All right.  And now that he's got his stuff back, State's Exhibit --

MR. ALEX:  May I approach, Your Honor?

THE COURT:  You already asked, sir.

MR. ALEX:  Oh, okay.

Q.  (BY MR. ALEX:)  State's Exhibit 543, this is another report from Mr. Ridge on May the -- I'm sorry.

A.  June.

Q.  June the 26th.  That looked like a five at first.  June the 26th of '08; is that correct?

A.  That's right.

Q.  And that is also by Mr. Ridge?

A.  That's right.  That's his handwriting.

115

MR. ALEX:  This is not one that's already been introduced, is it?

THE COURT:  No.

MR. ALEX:  All right.  We're going to offer State's Exhibit 543, Your Honor.

MR. LOLLAR:  No objection.

THE COURT:  All right.  It's admitted.

Q.  (BY MR. ALEX:)  And so the -- the last time Mr. Ridge would have saw him before he went back -- well, let me ask it this way:  So he's taken out of the suicide cell where he seems to be able to figure out how to manipulate his way out of there.

MR. LOLLAR:  I'll object to that question, Judge.

MR. ALEX:  It's just a question, Judge.

MR. PARKS:  Well, it wasn't.

THE COURT:  That's sustained.  It's a sidebar.  The jury will disregard that.

Q.  (BY MR. ALEX:)  Let me ask you this, Doctor. He wrote down Manipulative, right?

A.  Yes.

Q.  And the defendant went from being -- hearing voices all the time to not hearing voices any time; is that right?

A.  That's right.

Q. And then Dr. Ridge decided he was going to move him from suicide watch to a regular crisis stability cell; is that correct?

A. Yes.

Q. All right. And then on the 26th, Dr. Ridge sees him again, he's not in suicide watch anymore; is that right?

A. That's right.

Q. But the psych floor is much more restrictive than general population; would that be correct?

A. That's correct.

Q. And so now he's saying to Dr. Ridge, I'm okay. Nothing wrong with me; is that correct?

A. That's correct.

Q. And Dr. Ridge makes a note that the patient submitted a kite requesting transfer back to GP. Is that general population?

A. That's right.

Q. Okay. And he says he's no longer hearing voices; is that right?

A. Uh-huh.

Q. I'm sorry?

A. Yes, that's right.

Q. And no delusions.

A. Yes.

---

117

Q. And so now Dr. Ridge discontinues the crisis stabilization and he's sent down to the general population; is that correct?

A. That's correct.

Q. All right. And that's what the form says; is that right?

A. That's what it says.

Q. Okay.

MR. ALEX: That's all I have, Judge.

THE COURT: May the witness be permanently excused?

MR. LOLLAR: Just a couple more questions, Judge?

THE COURT: I normally don't allow but one redirect and one recross, but I'll allow it in this case.

FURTHER REDIRECT EXAMINATION

BY MR. LOLLAR:

Q. Did you or any other medical professional agree that James Broadnax could be taken out of his closed behavioral observation cell to talk to media?

A. I don't know about that.

Q. Well, would you have made some kind of a note if you'd agreed to that?

A. Oh, if I had agreed to that.

---

118

Q. Yes.

A. I should ask my supervisor.

Q. Okay. Do you recall that happening in this case? Do you recall anybody asking you if he could be taken out of his cell to be interviewed by media?

A. I don't recall that.

Q. And Mr. Alex asked you if he's taken out of suicide precaution and put back in CBO, he gets his stuff back, is the comment he made. Well, the only thing he gets is one of those orange uniforms that we've seen of the videotapes; is that right?

A. Right. The commissary --

Q. He doesn't get any of his personal property back or anything like that.

A. That's correct.

Q. That's all taken from a person when they first come in in the jail.

A. That's right.

Q. So he would get out of his smock and into a jail uniform, and that's about it; is that right?

A. And they get commissary, like toothbrush and things like that. A comb.

Q. Thank you, Doctor.

THE COURT: Anything else, Mr. Alex?

---

119

MR. ALEX: Judge, I've got to follow up just a bit on this whether or not --

FURTHER RECROSS-EXAMINATION

BY MR. ALEX:

Q. Doctor, you're not suggesting to the jury that if someone wants to come and visit an inmate, that they've got to get your permission before they can visit them. You're not suggesting that, are you?

A. We never had this situation. I don't recall having any -- anybody coming to me asking for that.

Q. Okay. And maybe my question's not clear. If you're -- if you have a patient that you are seeing on a -- like this patient, Mr. Broadnax; is that correct?

A. That's right.

Q. And you're not saying that there's any violation of the law if someone comes and visits this patient without your permission. You're not saying that, are you?

A. No, I'm not saying that.

Q. Okay. Very good.

MR. ALEX: That's all I have, Judge.

THE COURT: May the witness be permanently excused?

MR. LOLLAR: Yes, Your Honor.

THE COURT: The State?

MR. ALEX: We have no objections, Judge.

THE COURT: You're permanently excused, Doctor. Have a good time on your vacation.

THE WITNESS: Thank you very much. I appreciate that.

THE COURT: What further says the defense?

MR. ALEX: We'll call Kim Leach.

THE COURT: Ms. Leach?

Mr. Alex, did you want the same limiting instruction given to the jury?

MR. ALEX: I would.

THE COURT: All right. With regard to the last witness, Dr. Haideh Mirmesdagh, the jury is given the following additional instruction:

You are instructed that you may consider -- may only consider evidence or testimony from that witness as it pertains to voluntary intoxication to the extent it relates to the voluntariness of the defendant's statements to the various television reporters who've previously testified in this case.

Is that sufficient, Mr. Alex?

MR. ALEX: Thank you, Judge.

THE COURT: All right. All the way to the front of the room, ma'am. Up to the door.

When you've reached the door, raise your right hand.

**KIMBERLY LEACH**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Lollar.

Whenever you're ready, sir.

**DIRECT EXAMINATION**

BY MR. LOLLAR:

Q. Would you tell us your name, please.

A. **Kimberly Leach.**

Q. And, Ms. Leach, is that L-E-A-C-H?

A. **That's correct.**

Q. And how are you employed?

A. **I'm the public information officer for the Dallas County Sheriff Department.**

Q. You may want to pull that microphone in towards you a little bit and say that again.

A. **I am the public information officer for the Dallas County Sheriffs Department.**

Q. And how long have you been in that position?

A. **Roughly about a year and-a-half.**

Q. What day did you start of last year?

A. **May 12th.**

Q. May the 12th.

A. **Uh-huh.**

Q. And on the weekend of June the 21st, 22nd and 23rd of 2008, were you the public information officer at that time?

A. **That's correct.**

Q. Now, from time to time, does the media here in Dallas want to talk to a person who's incarcerated in the Dallas County jail?

A. **That's correct.**

Q. And does that happen on a pretty frequent basis?

A. **Pretty much every day.**

Q. And are you the person they have to go through in order to arrange that?

A. **That's correct.**

Q. Now, if a person -- if a reporter or anybody else just showed up down at the jail and wanted to go up and see them, would they be allowed to do that without having gone through you?

A. **If they were on the visitor's list, perhaps, but we've had the policy in place so that I know who's coming.**

Q. Tell the jury what a visitor's list is.

A. **That's a list that inmates can -- can put certain people on: Family members, friends.**

Q. And how many can be on it at one time?

A. **I'm not a hundred percent sure.**

Q. Five? Does that sound right?

A. **Sounds right.**

Q. And can they change that out once a week?

A. **I know they can change it. Once a week sounds about right.**

Q. But if a person shows up that's not on that list, y'all don't let them in; isn't that right?

A. **I think it depends on the circumstance. If someone showed up and they contacted us and we had something signed from the person saying they wanted to -- to be interviewed, then they could do it.**

Q. They can -- they can have certain visitors who come in a distance of greater than 50 miles, they can get a special visit even without being on the list; is that right?

MR. ALEX: Your Honor, I'm going to object to counsel testifying and leading the witness.

Q. (BY MR. LOLLAR:) Is that correct?

THE COURT: Sustained. Ask another question.

A. **I -- I'm not --**

124

THE COURT: You may answer.

Ask it again.

Ma'am, hold on while I rule on the objections.

THE WITNESS: Okay.

THE COURT: The objection was sustained.

I instruct you to ask another question.

Ask another question.

Q. (BY MR. LOLLAR:) If a media person showed up without having first gone through the -- through you, they wouldn't be allowed up to see the person.

A. It hasn't happened, so I don't know.

Q. Okay. And what is the normal course of what they have to do in order to see somebody in the jail?

A. Um, there's a form that has been in place for several years. Our policy is that they write a letter. They have to put the book-in number, the person's name, cell number, that kind of thing, and then they also put in their basic information. We would like to have the opportunity to interview you.

And at the bottom of it, it has a signature place. Yes, then they sign there; no, they sign no if they don't want to be interviewed. And then it's also witnessed by a jailer and then it's faxed back to me.

Q. Okay. So is that request form from the media,

125

is that something they either mail to you, or e-mail to you, or fax to you?

A. It is faxed or e-mailed.

Q. Okay. And then do you take it over to the individual in jail, or do you fax it to somebody else?

A. I fax it to whatever jail that the inmate is in, and then I call over usually to a jailer, say I just faxed you a request. Please take it over to the inmate, have them sign yes or no, and then fax it back to me.

Q. And how many different jails do we have?

A. Currently we have North, West, South, and then Decker is open with a few -- a few folks.

Q. So four separate jails in the complex.

A. That's correct.

Q. And so if a defendant's located in the West Tower, you would fax it to that particular tower?

A. Correct.

Q. And then somebody there would go take it to him.

A. Correct.

Q. Okay. And what if that person happens to be in the psych ward of the West Tower, what do you do?

A. It's faxed over to the person. I'm not a medical person, so I don't make a call on whether an

126

inmate has a right to speak or not.

Q. Okay. And in this particular case, do you recall getting these -- these forms from the various media here in Dallas wanting to interview James Broadnax back on the date of June 23rd, 2008?

A. Correct.

Q. And you got that from Channels 4, 5, 8, and 11 and the Morning News.

A. Correct.

Q. And did you cause to be sent over to the West Tower these request forms from these various media people?

A. Right. I facilitate the requests, correct.

Q. And do you know who it would have been that would have gone to his cell to talk to him about whether or not he wanted to talk to the media?

A. We have three different shifts of jailers, and that's my point of contact, and I fax it over and whoever's the jailer on that shift, usually it's a sergeant or lieutenant, and then they take it.

Q. Okay. And do you know if, particularly for a person who happens to be in the psych ward in a CBO, in a closed behavioral observation tank, do you have to get any kind of medical clearance?

Do you talk to any doctors or nurses before

127

your people, the sheriff's employees, go to him to see if he wants to talk to the media?

A. Again, I'm -- I'm not a medical person. It is faxed over to that person and that would be up to them.

Q. Well, that's not my question. My question is, do they check with the medical people?

A. I don't know that.

MR. ALEX: Judge, I'm going to object to the lack of personal knowledge. The witness has already said she didn't do it and she doesn't know.

He's asking what somebody else did.

THE COURT: Do you know, ma'am?

THE WITNESS: No.

Q. (BY MR. LOLLAR:) Okay. Now, --

MR. LOLLAR: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) Ma'am, do you, in considering whether or not to allow a jail inmate to speak to the media, do you consider whether or not that person has a lawyer or has requested a lawyer?

A. No, sir.

Q. You don't care about that at all.

A. It's not a matter of whether I care or not. If -- if an attorney wants to notify me and ask that

their client not be interviewed, then I do take that, I put it on my wall and I will not let that happen.

We have 300 inmates that come into the jail every day.

Q. So you've got a total population --

A. I don't have time to do that.

Q. You've got a total population between 6 and 7,000 at any given time?

A. Correct.

Q. Okay. So if the media calls, you make no attempt to find out if they've asked for a lawyer, got a lawyer, or anything like that.

MR. ALEX: Judge, I'm going to object to relevance.

THE COURT: I'm going to allow it. Overruled.

Q. (BY MR. LOLLAR:) Let me show you what's been marked here as Defendant's Exhibit Number 9 and ask if you recognize what that is?

A. It states here Defendant's Affidavit of Indigence.

Q. Turn it over to the next page. And what is that?

A. This is an arraignment sheet.

Q. What is an arraignment?

---

documents are about, it's irrelevant and it's improper.

THE COURT: Okay. This isn't the right witness for this.

Objection sustained.

MR. LOLLAR: Well, we'll offer Defense Exhibit Number 9.

MR. ALEX: And I'm going to object to relevance at this time, Judge.

MR. LOLLAR: Okay. I'm going to have to bring her back.

THE COURT: Let me see the lawyers up here.

(Off-the-record discussion was had.)

Q. (BY MR. LOLLAR:) Now, Ms. Leach, would you know whether or not, if at the arraignment that takes place in the magistrate's courtroom there at the jail, when people are first brought in, they're taken before the magistrate. You're familiar with that, aren't you?

A. At some point, yes.

Q. And they are --

A. Sometimes the intake process can take up to six hours.

Q. They're arraigned, and what that means is they're told what they're charged with.

A. Correct.

---

129

A. I'm assuming it's when a person is arraigned. These are -- these are -- this is paperwork I don't normally see.

Q. Okay. And what's the third page?

A. The third page here says Instructions relating to preliminary initial appearance.

Q. Okay. Do those appear to be in reference to an indi -- to a defendant by name of James Broadnax?

A. His name is on that form, yes.

Q. And do these appear to have been signed by a magistrate at -- for Dallas County, Texas?

A. It does appear so.

Q. And are these arraignment sheets filled out at a time when the person's brought in to the jail, when they're initially arraigned?

A. I would assume so. I'm not -- I'm not well-versed on these forms.

Q. Okay. And do these reflect activities that happen there at the arraignment?

MR. ALEX: Judge, I'm sorry, I'm going to have to object.

A. I don't have any --

MR. ALEX: The witness has said more than once she has no personal knowledge of the documents, and to continue asking her questions about what the

---

131

Q. And a bond is set.

A. Correct.

MR. ALEX: Judge, --

Q. (BY MR. LOLLAR:) You're aware of that, aren't you, Ms. Leach?

A. Correct.

Q. And then they're asked whether or not they're indigent and whether or not they want a lawyer.

A. I have no idea what the process is. That's not part of my job description.

Q. Okay. So you've never heard about that.

A. I'm a media relations person. I don't go down into intake. I don't have any knowledge of this.

Q. Okay. All right. So when the media calls, you don't find out whether or not they've got a lawyer or have asked for a lawyer.

A. Nope.

Q. And you didn't in the case of James Broadnax.

A. Correct.

Q. Okay. Now, let me ask if you're familiar with Defendant's Exhibit Number 10 and 11?

COURT REPORTER: Was Number 9 admitted or not?

MR. LOLLAR: Not at this point.

THE COURT: No.

132

A. (Examining exhibits) Correct. Yes, I am.

Q. (BY MR. LOLLAR:) Okay. And what is Defendant's Exhibit Number 10?

A. This is the media relations information about how to obtain a inmate interview.

Q. And where is that from?

A. This is on our website.

Q. On the website for the Sheriffs Office.

A. Correct.

Q. And it tells them what they've got to do in order to do what we've supposedly been talking about.

A. Correct.

MR. LOLLAR: We would offer Defense Exhibit 10.

THE COURT: Any objection?

MR. ALEX: I have no objection, Your Honor.

THE COURT: Defense Exhibit 10 is admitted.

Q. (BY MR. LOLLAR:) And Number 11. Let me show you Defendant's Exhibit Number 11, and can you tell me what that is?

A. Yes. Job description information, it looks like.

Q. And that's part of your job description; is

133

that right?

A. Correct.

THE COURT: Was that a yes, ma'am?

THE WITNESS: Yes. Correct.

MR. LOLLAR: We would offer Defendant's Exhibit 11.

THE COURT: Any objection?

MR. ALEX: I have no objections, Your Honor.

THE COURT: Defense Exhibit 11 is admitted.

Q. (BY MR. LOLLAR:) In regard to Defendant's Exhibit Number 10, this again is the page from y'all's website --

A. Correct.

Q. -- that's available to the media people here in town.

A. Yes.

Q. You have to have a password to get into it; is that correct?

A. Yes.

Q. And all the media know what that password is.

A. Yes.

Q. And this tells them exactly what they've got to do to get an inmate interview.

134

A. Correct.

Q. Is that right?

They need their full name, date of birth, your name and media affiliation, the purpose of your interview request, and it tells you where to e-mail it and fax it; is that right?

A. Yes.

Q. And this part right here. You note there interviews may be denied based upon jail staffing, emergency condition, or the inmate's physical or mental condition at the time of the request, correct?

A. Yes.

Q. Did you make any attempts in faxing the media requests over to the West Tower where you knew James Broadnax was housed, did you make any attempt to find out what his mental condition was at the time?

A. In the AIS system, sometimes there's information in there when I look up an inmate. Sometimes it's not filled in until days later, and again, I'm not a medical person. So I fax it over and I don't make that medical call. I don't have that expertise.

Q. So what's the answer to my question? Did you make any?

A. I faxed it over. I'm a facilitator. I fax it

135

over to the lieutenant or the sergeant. They take it around to the appropriate people. That's the extent of my -- my job.

Q. Okay. And let me show you what has been marked here as State's Exhibit 537. You recognize what that is?

A. Yes.

Q. And what is 537?

A. It's the AIS system.

Q. And what is AIS?

A. It's the Adult Identification System, and it has information about the person. And sometimes it's completed in AIS on time and sometimes it's not.

Q. Okay. Did you make any attempt to look at the AIS screen to find out about this defendant, James Broadnax?

A. At some point I did, yes.

Q. Okay. And at what point did you do that?

A. I don't recall.

Q. Okay. Do you see listed right here, it shows the very first entry, June 21st, 2008, his custody level was maximum and his status, behavioral observation, West Tower, 3P05?

A. Yes.

Q. And it's put there by a Phyllis Daniels?

A. Yes.

Q. Did you make any attempt to find out --

A. We have a lot of inmates that are under behavioral observation, so again, I don't make that medical call.

Q. Did you make any attempt to find out if he was in behavioral observation?

A. Again, I fax it over. As I've stated, that's my procedure, so I think I've answered that.

Q. Now, this is part of your job description, -- is that correct? -- Defendant's Exhibit number 11.

A. That's correct.

Q. And talking about media community relations unit, that would be you, --

A. Correct.

Q. -- right?

However, certain information must be withheld from the news media in order to protect the constitutional rights of an accused.

A. Right.

Q. Is that correct?

And at the bottom of Defendant's Exhibit 11, under the scope and content of the release of information, it says, The scope and content of each release of information must be determined according to the facts of each situation. Generally, a description of the circumstances, which is not legally privileged, and which will not prejudice the rights of suspects.

A. Correct.

Q. Okay. So your job description tells you to be mindful of the constitutional rights of an accused, and also to be mindful of things that you might do which would prejudice the rights of suspects.

A. I'm also mindful of the constitutional rights of the inmate if he chooses to speak, whether his attorney allows him to or not. That's the inmate's right.

Q. Where would we find that in the Constitution?

MR. ALEX: Judge, I'm going to object --

A. That's the inmate's right.

MR. ALEX: -- and let the -- ask the witness to continue with the answer before she's cut off.

THE COURT: Sustained.

Wait until he's answered -- asked the question, okay? Don't talk at the same time. The court reporter can't take it down, that's the main reason.

Q. (BY MR. LOLLAR:) Okay. So you're supposed to be mindful of those, based on part of your job

description.

A. I'm mindful of all of that, yes.

Q. Okay. Now, in this particular case, you've already told us you didn't check to see if he had a lawyer, you didn't check to see what his mental condition was, but you facilitated the arrangement of the media to see Mr. Broadnax on June the 23rd.

A. Yes.

Q. And you got all of these requests from the media the morning of June 23rd?

A. Some of them started coming in over the weekend.

Q. Okay. Did you know that on the morning of June the 23rd, he had been seen by a psychiatrist and psych assessor?

A. I don't recall that I did, no.

Q. Okay. Would it have made a difference?

A. No. Again, I'm not a medical professional. I have no background in that whatsoever.

Q. In these interviews that the jury's seen, they're taken inside the Dallas County jail; is that right?

A. That's correct.

Q. And how do they get inside the Dallas County jail?

A. Again, once they -- once the inmate -- Mr. Broadnax signed that he did want to speak to the media, I arranged the interviews and I walked the media over, escorted them over so that he could speak to them, as he requested.

Q. Do you remember where you went to?

A. One of the jails.

Was that what you're asking? I'm not sure.

Q. Yes, ma'am. You recall that you went to 3P05, in the West Tower?

A. I go to the guard area and then the guard comes down, and then they escort all of us.

I'm not an officer so I can't go behind the jail walls by myself, so the officer will come down, get us, and take us to him.

Q. Do you recall going to the West Tower and up to that elevator --

A. I believe that's where --

Q. -- that goes only to the third floor?

One at a time.

A. I believe that's where he was.

Q. Okay. And you know what that area is.

A. It's one of the many medical facilities that we have in all of our jails.

Q. Okay. And did you stay with the reporters

Q. while they did the interviews?

A. Yes.

Q. You're not seen on camera, but I think we can hear you talking in the background on a couple of them; is that right?

A. I am in the background, yes.

Q. And you were, in fact, in the room with some of the reporters when they were doing the interviews with Mr. Broadnax.

A. Yes. And if I can explain the reason I did, was I schedule them 20 minutes apart because there's a lot of logistics involved in trying to get four cameras into the jail. And then also, Mr. Cummings was up on the second floor and he had also agreed to do interviews, so I had to stagger and take different media around, so that's part of the reason why I stayed.

Q. And then we see that in the -- in the videotaped interviews that have been played for the jury, there are actually uniformed DSO officers with Mr. Broadnax on his side of the glass; is that right?

A. I believe that's correct.

Q. Okay. And, Ms. Leach, you're not aware that -- of any suggestion that Mr. Broadnax requested the media come to see him.

141

A. I'm not aware of any in this situation, no. I'm only aware that he signed that he wanted to talk to them.

Q. It was the media that requested to come to see him.

A. They usually will request on high profile crimes such as this. A lot of times I learn from them who is actually in jail.

Q. And the bottom line is, you facilitated the media seeing him on June the 23rd.

A. I faxed it over. He signed, yes, and then I escorted them to the jail, yes.

Q. Okay.

MR. LOLLAR: That's all the questions we have.

Thank you.

THE COURT: Cross-examination.

MR. ALEX: Yes, sir.

CROSS-EXAMINATION

BY MR. ALEX:

Q. Ms. Leach, one of the -- one of the answers that you just gave the jury about not being an officer and not having access to the jail, if you left here right now, could you just go see any inmate you wanted?

A. No, I could not.

---

Q. Could you go and see any officer up in the jail that you wanted?

A. No. I'd have to call over and ask, and they'd have to come down and get me.

Q. Okay. You'd have to do the same thing I have to do.

A. Correct.

Q. You're a civilian.

A. Yes, I am.

Q. And you're not a part of law enforcement.

A. No, I'm not.

Q. Have you ever had a law-enforcement license in Texas, any kind of law-enforcement license in Texas or any other state?

A. No, sir.

Q. And did you initiate the -- the interviews with the media or did they contact you about it?

A. I did not contact them, like I said. And I remember this one specifically because I started getting e-mails over the weekend, so it was initiated by them.

Q. So it's a situation where the person would have been arrested in a high-profile case where the media would have covered when these folks were murdered.

143

A. Correct.

Q. And when the person was arrested, they know he's arrested probably before you.

A. That is correct.

Q. And then they start sending -- did you get a lot of requests?

A. I was flooded with requests, yes.

Q. And is that sort of the sum and substance of your job? You get tons of requests from the media?

A. Yes. I have a three-ring binder that's about that thick right now, and it's only for this first half of the year.

Q. Okay. And the -- and in this particular case, did Mr. Lol -- did you get a letter from Mr. Lollar the day after the interview saying, Please don't let anybody talk to my client?

A. The only letter I received was after the interviews had already occurred. Correct.

Q. And it was -- it was processed and sent to you dated June 24th; is that correct?

A. That's correct.

Q. And it was a request not to allow his client to talk to any media; is that right?

A. That's correct.

Q. Have you allowed anybody to talk to him after

that?

A.  No.  Garland News, as a matter of fact, had sent in a request that morning, and when I received the letter, I called -- I called them and let them know that regardless of whether the inmate wanted to talk or not, they would have to go through Mr. Lollar at that point.

Q.  And so I'm not going to say it's a courtesy to Mr. Lollar.  Let me put it this way.  Now you're -- you've never been a lawyer; is that correct?

A.  That's correct.

Q.  And you couldn't sit here and tell the jury about constitutional law or anything like that, could you?

A.  No.

Q.  Even though it's in your job description to protect the Constitution, or whatever it says, you're not a lawyer; is that correct?

A.  That's correct.

Q.  But if a lawyer contacts you and you get that information, do you honor their contact?

A.  Yes, I do.

Q.  Okay.  And with the amount of media requests you get, what you're telling this jury is you don't go and try to call around and find out if somebody is

145

represented if someone is requesting to speak to an inmate.

A.  Correct.

Q.  And as a general matter, do you believe that it's every inmate's right to tell their story to the public if they want to?

A.  Yes, I do.  I feel it's not my -- who am I to deny someone that, if that's what they truly want to do.

Q.  They could very easily get on TV and give an alibi, couldn't they?

A.  They could.

Q.  And the whole world would know, Hey, I wasn't even there.  I got this car from Thomas Wilson, or whatever.

A.  That's right.

Q.  And it would be their choice to get on TV and tell whatever story they wanted to tell.  Wouldn't it?

A.  That's correct.

Q.  And your job primarily is not to stand in the way of that if it's something that the media has requested and something that the inmate is -- assents to; is that correct?

A.  That is correct.

Q.  And to your knowledge -- well, let me just say

this to you.  You didn't -- let me -- let me just ask you this.

You did not go into the area where these interviews took place and start questioning the defendant about what happened in this case, did you?

A.  No, I did not.

Q.  And you did not, with any intent to circumvent the law, go and get the reporters and bring them in to try and get a confession from the defendant, did you?

A.  Not at all.  As a matter of fact, after the first confession, I really thought that I was going to have to tell the other reporters that it was going to stop, because I didn't expect them to continue.

Q.  Okay.

A.  And --

Q.  Okay.

A.  -- they did.

Q.  Okay.  And so if there's any suggestion that you were acting with the Garland Police or with the sheriffs, the law enforcement, to get a confession from this defendant, your answer to that is no way; is that correct?

A.  Absolutely not.

Q.  Regardless of what the question that's asked to you by defense counsel, the only evidence that

147

you're giving this jury is that you did not.

A.  Right.

Q.  Okay.

A.  I had no idea what an inmate is going to say when they agree to do an interview.  I have no idea what they're going to say.

Q.  But you were there when -- when Mr. Broadnax testified, where he -- where he gave his statement --

A.  Yes.

Q.  -- to the media; is that correct?

A.  Yes, sir.

Q.  And initially, he tried to give an alibi.  He tried to say he didn't know anything about this, didn't he?

A.  That's right.

Q.  Initially, he said, You know what? Y'all -- Y'all got me wrong.  I don't know nothing about this; is that right?

A.  That's right.  Yes, sir.

Q.  And that was his right to say that.

A.  That's right.

Q.  Just like it was his right to tell the world and everybody else what he did.

A.  Right.

Q.  Did you see anything that happened in there

from anybody on either side of the glass to overcome his free will to talk?

A.   No.

MR. ALEX:  That's all I have, Your Honor.

THE COURT:  Redirect?

MR. LOLLAR:  We have no further questions.

THE COURT:  May the witness be permanently excused?

MR. LOLLAR:  Yes.

THE COURT:  And the State?

MR. ALEX:  We have no further -- we agree, Your Honor.

THE COURT:  All right.  You're permanently excused.

It's appropriate for us to take a lunch break now.  I need to talk with the lawyers anyway.

It's 11:33 now.  We're only going to break until 12:30.

All rise for the jury.

Do not discuss the case, ladies and gentlemen.

(Jury not present.)

THE COURT:  This is the State of Texas versus James Broadnax.  The jury is not present.  The lawyers are present.  The parties are present.

149

This is roughly the fourth time we've discussed the jury instructions in this case.  I have handed out to both parties what the Court intends to instruct the jury as its final instructions.

Is there any objection from the State to the Court's final instructions?

MR. ALEX:  Judge, if we could, I know that the appellate lawyers have looked at it and Mr. Hikel has looked at it, but I just finished questioning the witnesses.  I would like to read it before I make my objections.  If I could do that after lunch, I'd appreciate that.

THE COURT:  Is there any objection from the defense?

MR. PARKS:  Your Honor, just a couple.  And they're things that we discussed previously.

THE COURT:  Tell me.  What are they?

MR. PARKS:  They are only the issue about the voluntariness of the confession.  We would ask, in the application page of that charge, where it speaks to the reporters specifically, it's three lines down, beginning with Statement on June 23, 2008, to the reporters Steve Pickett, Ellen Goldberg or Shaun Rabb, the reporter was actually -- was acting, I'm sorry.  Was acting as agents of law enforcement, I would ask

after "law enforcement" and before "and," that the following be included:  Whether knowingly or unknowingly.

THE COURT:  Okay.  And that objection's overruled.  I decline to add that.

MR. PARKS:  Yes, sir.

And then in the paragraph, same charge, where it says "under the influence of PCP," we would ask that the Court add "marijuana, formaldehyde, or a combination thereof."

MR. ALEX:  We don't object to that.

THE COURT:  That would appear to be appropriate.

Is there any objection from the State?

MR. ALEX:  We have no objections to that, Judge.

THE COURT:  Marijuana.  What else?

MR. PARKS:  Formaldehyde.

THE COURT:  Or any combination.

MR. PARKS:  Yes, sir.

THE COURT:  Okay.  Anything else, Mr. Parks?

MR. PARKS:  No, sir.  That's all.

THE COURT:  You still need more time, Mr. Alex?

151

MR. ALEX:  Just as a -- as a preliminary matter, Judge, we had -- we had asked for a limiting instruction in the Charge on the voluntary intoxication, and I believe what you verbally said to the jury, we would like that included in the Charge, for the stated reasons earlier, that I believe the jury could potentially go back and say they could find the defendant guilty of the lesser because of some evidence of voluntary intoxication.

THE COURT:  Well, I've already given it to them once, so I can give it to them again.  That's fine.

MR. ALEX:  That's all I think that I -- that's all I have at this time.

THE COURT:  So with that, you have no other objections?

MR. ALEX:  Yes, sir.

THE COURT:  Okay.  No other objections from the defense?

MR. PARKS:  No, Your Honor.

THE COURT:  So that's the way the Charge will read.

We will be in recess until 12:30, but having said that, how many more witnesses have you got?

MR. LOLLAR:  I want to get into the

arraignment sheet.

This is part of the Court's file. Can I ask the Court to take judicial knowledge of Defendant's Exhibit Number 9?

THE COURT: Any objection to that?

MR. ALEX: I'm just going to take Mr. Lollar's word it's part of the file.

Can I see what it is?

MR. LOLLAR: Uh-huh. In the other case. The case was filed at the time.

MR. ALEX: I'm sorry?

MR. LOLLAR: The case that was filed against the defendant at the time. Y'all didn't file this case against him until several months later.

MR. ALEX: Is it in that file? That's all I'm asking.

MR. LOLLAR: Yes. It's got the case number on there.

MR. ALEX: Okay. Yeah. If it's in the --

MR. LOLLAR: In the other case.

MR. ALEX: If it's in the file, Judge, I have no objection.

THE COURT: It is. Neither one of y'all are liars. Quit insinuating that you are.

And then we'll have the transcript, read the testimony of Christie Hicklen.

MR. LOLLAR: Right.

THE COURT: Any other witnesses?

MR. LOLLAR: No, sir.

THE COURT: What about that doctor you had me fuss at?

MR. LOLLAR: We're going to call him in punishment.

THE COURT: Okay.

MR. LOLLAR: Should we get there.

MR. PARKS: Should we get there.

THE COURT: All right. Good. So we're going to have this case going to the jury at about 1:00 o'clock, I would think.

MR. LOLLAR: I would think.

THE COURT: All right. How long does the State want for final argument?

MR. ALEX: How long do y'all want? Can I ask that?

MR. LOLLAR: Five minutes.

MR. ALEX: So we'll take ten, Judge.

THE COURT: Now, you told me that before and I know you and it went over 15, so --

MR. LOLLAR: Yeah. He told me a five-minute opening. As I recall, 15 minutes into

it, --

THE COURT: Let's be careful. I'll give you 15.

MR. ALEX: Thank you, Judge.

THE COURT: And you can have 15 also if you want it, okay?

MR. LOLLAR: Okay.

THE COURT: I know this is important to everybody, but we're all professionals here. Let's keep that in mind.

We're in recess until 12:30 p.m.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT: Okay. On the record in the State of Texas versus James Broadnax.

The jury's not present.

The defense is going to offer testimony of a witness who is not present. I will briefly explain that to the jury, and then I'll turn it over to you, Mr. Lollar.

And Ms. Evans will act the role of Mr. Alex, and then you will be the defense lawyer, and Ms. Mallon will be the witness.

And then you are asking me to take judicial notice of something?

MR. LOLLAR: Well, Judge, I was going to go ahead and offer Defendant's Exhibit Number 9 and publish that to the jury and then go into the transcript.

THE COURT: That's fine. And there's no objection to that.

MR. ALEX: There isn't, Judge.

THE COURT: Line up the jury.

THE BAILIFF: All rise.

(Jury present.)

THE COURT: Be seated, please.

What further says the defense?

MR. LOLLAR: Your Honor, at this time we would offer what has been marked as Defendant's Exhibit Number 9 which are copies of papers which are a part of the Court's file.

THE COURT: Is there any objection?

MR. ALEX: No, sir.

MR. LOLLAR: May we publish?

THE COURT: You may.

Defense Exhibit 9 is admitted.

MR. LOLLAR: Ladies and gentlemen of the jury, this is the defendant's application of indigence, arraignment sheet, and instructions relating to preliminary initial appearance.

These are papers that are completed by persons at the Dallas County jail upon a person being booked in when they're brought before a magistrate to be arraigned.

And the arraignment sheet indicates that Mr. Broadnax was brought before a Magistrate Jonathan Vickery on June the 21st, 2008, at 5:45 in the morning, where he was told that he was charged with the offense of capital murder of multiple persons.

He was also told of his rights to have attorneys appointed to represent him, and he requests appointment of counsel. And the Judge sends that paperwork on to the Court here. So all of this is -- whoops -- was filled out on June the 21st, 5:45 in the morning, showing he requested appointment of counsel.

THE COURT: All right.

MR. LOLLAR: And secondly, Judge, we have -- our next person would be one of the jail guards, one of the DSO officers by the name of Christie Hicklen.

We had pretrial testimony in regard to Ms. Hicklen last week and we got a transcript of her testimony.

It turns out that Ms. Hicklen was not understanding that she needed to remain in attendance

upon the Court --

THE COURT: What's the transcript number? The exhibit number?

MR. LOLLAR: The exhibit number is Defendant's Exhibit Number 12.

THE COURT: Are you offering that?

MR. LOLLAR: We will offer Defendant's Exhibit Number 12.

THE COURT: Any objection?

MR. LOLLAR: We have no objections, Your Honor.

THE COURT: Defendant's 12 is admitted.

The witness is not here, but her testimony was formerly sworn. There has been no objection to its admissibility, so as I understand it, Ms. Elaine Evans for the State of Texas, is going to demonstrate what occurred in this previous hearing by acting the role of the prosecutor at that time, and Mr. Lollar will act as himself, and Ms. Mallon will act as the witness in this case.

Ms. Mallon, if you'll please come forward.

This is permitted under the Rules of Evidence, ladies and gentlemen.

Raise your right hand.

(Ms. Mallon sworn by the Court.)

THE COURT: Lower your hand. Take your seat in the witness stand.

Ms. Evans, whenever you're ready.

MS. EVANS: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MS. EVANS:

(TRANSCRIPT AS READ INTO THE RECORD:)

Q. State your name, ma'am.

A. **Christie Hicklen.**

Q. Is that Hicklen with an L on the end?

A. **Yes.**

Q. What do you do for a living?

A. **I work for the Dallas County Sheriffs Department as a detention service officer.**

Q. Any particular area that you work in?

A. **Mine is the West Tower.**

Q. West Tower?

A. **Uh-huh. Mental health.**

Q. Mental health?

A. **Uh-huh.**

Q. Would you spell your name for the record?

A. **C-H-R-I-S-T-I-E, H-I-C-K-L-E-N.**

Q. Ms. Hicklen, you know why you're here; is that right?

A. **Yes.**

Q. Were you the person back on June 23rd, 2008, that would have physically went and retrieved the defendant, James Broadnax, to bring him to interviews with the media?

A. **Yes.**

Q. For the record, do you see James Broadnax in the courtroom today?

A. **I do.**

Q. If this is chair 1, 2, 3, 4, 5 and 6, which chair is he sitting in?

A. **Six.**

Q. And for the record, you're referring to the gentleman that's sitting directly in front of me; is that correct?

A. **Yes.**

MS. EVANS: May the record reflect that the witness has identified the defendant in open court?

THE COURT: Go ahead and read my part.

MS. EVANS: (As read:) Is there an objection?

MR. LOLLAR: No, Judge.

MS. EVANS: (As read:) The record will so reflect.

Q. (BY MS. EVANS:) Ms. Hicklen, what -- working in the West Tower of mental health as a detention

160

service officer, do you have to have any special training other than the regular detention service officer to work in the Mental Health Unit?

A.  Yes.

Q.  How much training is that?

A.  40 hours.

Q.  Would I be correct to say that for a detention service officer, safety is the number one rule?

A.  Yes, it is.

Q.  On this particular day, June 23rd, 2008, would it have been somewhere between noon and 1:00 o'clock -- and if you don't know, that's okay -- that you would have went and got the defendant for the interviews?

A.  It was between noon and 1:00.

Q.  When you went to the defendant's holding place, can you describe where he was being held?

Let me ask it this way:  Was he in the Mental Health Unit there?

A.  Yes.

Q.  And is there a difference between a behavioral observation and a closed behavioral observation, or do they say open and closed?

A.  This is a difference between open and closed.

Q.  Tell the Judge what the difference is.

A.  Well, in an open tank, the inmates are able to

161

come and go out of their cell as they wish, whereas if you're in a closed tank, and in his case, he was in a -- he was in a tank, in a suicidal tank, the only time he would come out is if he was being interviewed by a psychiatric doctor.

Q.  So he was in the suicide area.  Do you have a suicide area in this behavioral observation area?

A.  Well, actually, suicide is different from a closed observation tank.  You know, once you're in suicide, you're housed there until a doctor says differently.  They will either -- they will either move you to a closed tank or an open tank, depending on the individual's behavior.

Q.  Very good.  And how were you -- how did it come to be your job to retrieve the defendant to bring him to these interviews?  How were you selected?

A.  Well, I was just in the area at the time.  I was a floor officer at the time.

When the control center officer notified that particular tank and said that Mr. Broadnax had a visit then, I was the officer that was there to transport him to visitation.

Q.  So your understanding was that he had a visit.  Did you know at that time it was the media?

A.  No.

162

Q.  When you went to get him to go to his visit, can you describe his demeanor?  How was he acting?

A.  His demeanor was okay.  He wasn't combative or -- I didn't second guess taking Mr. Broadnax out to go to his visit.

Q.  When you say you didn't second guess, let me give you a couple of different hypotheticals.

If he was -- if you thought he was dangerous at all to you, himself or anybody else, would that violate your number as far as taking him out?

A.  By myself?  Yes.

Q.  You would have brought other folks into the situation.

A.  Right.  I would have asked additional officers to assist me.

Q.  The second part of this hypothetical is, if he was in there, for lack of a better term, he was obviously psychotic, talking to -- let me ask you that.  Was he talking to himself?

A.  No.

Q.  Did he drool?

A.  No.

Q.  Did he have any indicators of a person who was suffering from -- and you're not a medical doctor; is that right?

163

A.  No, I'm not a medical doctor.

Q.  How long have you worked in mental health?

A.  I have been in mental health a little bit over a year now.

Q.  And at that time, how long had you been in mental health?

A.  Maybe about ten months.

Q.  And prior to that, you had been in the jail for how long?

A.  I had been in the jail a total of four years.

Q.  And you've seen people that showed signs of what you thought might have been psychotic, right?

A.  Right.

Q.  Did you see any of those signs in the defendant?

A.  No.

Q.  Did you let him know he had a visit?

A.  I let him know he had a visit.

Q.  Did he say, No, I don't want to go?

A.  No.

Q.  Were you aware at all that he had already signed a consent form to speak to the media?  Was any of that brought to your attention?

A.  Not at all.

Q.  So when you went and took him to his visit,

164

where did y'all go?

A.  We went to the visitation booth.

Q.  Did you have somebody else with you when you went?

A.  There were additional officers there. Initially -- they came after. I escorted him out of the tank myself and additional officers came to the visitation area once we were back there.

Q.  And you had no concern for your safety at that point other than the general -- like I would imagine you were always on guard; is that right?

A.  Right.

Q.  As far as the way he was acting, you had no real concerns for your safety. He wasn't aggressive towards you or anything like that.

A.  No.

Q.  And when you got to the visitation, what -- what was going on?

A.  Well, they were -- the news media was setting up and I asked him, Do you want to interview? And he said that he did.

So they had the microphone that I assisted with, you know, putting it on his -- on his suit, on the jumper. I just placed him in the cell that he was interviewed in and just waited on the outside of the

165

door until the interview was finished.

Q.  And on the way up to do the -- up to doing the interview, did you have any discussions with him as to what he should do or should not do?

A.  Not at all.

Q.  Was the first time you realized this was a media interview when you saw them and you asked him did he want to interview with these folks? Was that the first time you realized it was the media when you got up there and saw?

A.  Right. Once we came inside, yes. Uh-huh.

Q.  And you asked him specifically at that point whether he wanted to interview with the -- it was obvious there were reporters out there; is that right?

A.  Right. There was different sets of -- different stations, you know. Each one I asked him was he okay with doing an interview.

Q.  And he said to you yes.

A.  Right.

Q.  At that point, would you have known anything specific about his mental state? If the doctors had diagnosed him or if had seen anybody, would you know any of that information at that time?

A.  Whether or not he had been diagnosed with anything?

166

Q.  Yes, ma'am.

A.  No.

Q.  He was in suicide watch; is that right?

A.  Right.

Q.  And just to recap, you brought him up at the request of -- was it the sergeant?

A.  No, it would be the control center officers, because that's their first stopping point once they get to whatever floor the inmate may be on. They would notify the floor officers or the floor site officer that an inmate has an visit, whether it be an attorney visit or whatever.

Q.  That's all I have, Judge. I'll pass the witness.

MS. EVANS:  Cross-examination.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q.  Ms. Hicklen, let me -- just a few questions for you.

Did you make notes or any kind of recordation of what you're testifying about?

A.  No.

Q.  So this is all just from your memory.

A.  Yes.

Q.  June the 23rd of 2008.

167

A.  Right.

Q.  And this is July the 27th, 2009, for the record.

Where is 3P5?

A.  It's in the West Tower, third floor of the West Tower.

Q.  And what kind of a cell is that?

A.  3P5 is a open tank.

Q.  You mean an --

A.  Open observation tank, meaning the inmate -- no, I'm sorry. It's a closed tank, and that means again, you're in a closed tank. The inmate is allowed one hour a day to come out for recreation.

Q.  And who gets placed in closed behavioral observation?

A.  Depending on -- the doctors decide who gets placed. We don't. I guess if you have -- if you don't get along well with other inmates, or whatever the case may be, the doctors are the ones who determines who goes in open or closed.

That's normally the relationship between the inmate and the doctor.

Q.  I'll show you what's been marked as State's Exhibit Number 16. Kimberly Leach just told us this is her handwriting here.

A. Uh-huh.

Q. Do you see what tank those requests were sent to?

A. 3P5.

Q. 3P5?

A. Uh-huh.

Q. And that would be your -- that's what you would describe as being closed behavioral observation.

A. Yes.

MR. LOLLAR: (As read:) Defendant's Exhibits Number 6 through 7 were marked for identification.

Q. (BY MR. LOLLAR:) Let me show you what's been marked as Defendant's Exhibits 6 and 7. I show you this to ask you to take a look at them.

A. Okay.

Q. You testified that you went and got him out of suicide.

A. Uh-huh.

Q. Do you see here on Defendant's Exhibit 7 is the suicide information log.

A. Right.

Q. And it shows when a person is placed on suicide prevention; is that correct?

A. Yes.

Q. And what was the date and time at which he was placed on suicide prevention?

MR. LOLLAR: Well, we'll go ahead and offer Defendant's Exhibit 6 and 7.

MS. EVANS: You're offering this whole thing as 7?

MR. LOLLAR: Uh-huh.

MS. EVANS: Are these just the medical records?

MR. LOLLAR: Yes.

MS. EVANS: I have no objection, Judge, for them being offered at all.

I do object to them continuing to ask the witness about documents that they have no knowledge of. I think the Court can review the documents as they come in.

The witness -- well, I guess the witness can say whether -- whether she has any knowledge of them or not.

I'll withdraw the objection.

MR. LOLLAR: And the Court says, And the net effect of it is going to be the same. However, I'm going to consider them.

Defendant's Exhibit 7 is admitted.

Defense Exhibit Number 6 through 7 was admitted into

evidence.

Q. (BY MR. LOLLAR:) Let me show you what has been marked as Defendant's Exhibit Number 6. Do you recognize this as the Dallas County jail health -- mental health clinic note brief?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And the second page of that, does that indicate actually that he was placed in suicide prevention after the interviews were conducted?

MS. EVANS: Judge, again, the witness cannot properly answer that question. She doesn't have personal knowledge. The documents that they have there speak for themselves and there are other documents that will complete the whole story.

To ask the witness these questions at this point is totally misleading the Court.

MR. LOLLAR: (As read:) The Court: I guarantee you I'm not being misled, but it does seem to me -- I mean, why can't I just look at them?

(As read:) Well, you can. I was going to ask the witness to look at Defendant's Exhibit Number 7 and this is the Lew Sterrett West Tower jail facility Suicide Observation Log?

A. That is the log.

Q. (BY MR. LOLLAR:) Are the people in charge of suicide prevention required to see a person every 15 minutes?

A. Yes.

Q. And do they make a log of what they observe?

A. That's correct.

Q. And what is this for? Oh, I'm sorry. Is this what this is?

A. Yes.

Q. And this would be in regard to James Broadnax?

A. Yes.

Q. Does it show when he was placed on suicide prevention?

A. Yes.

Q. What was the date he was placed --

A. 6/23 of '08.

Q. And what time was he placed on suicide prevention?

A. 2:20 p.m.

Q. 2:20 p.m. And actually, his notations start running at 2:00 o'clock that afternoon; is that correct?

A. (Witness nods head.)

Q. And then there are notations for every 15

minutes around the clock for actually the next three days. Does that appear to be correct?

A. Ask me that again.

Q. These notations, are these made every 15 minutes around the clock?

A. Yes, they are.

Q. For a person in suicide precaution.

A. Yes.

Q. So having seen the documents we've shown you here, that you went and got him from 3P5, and he wasn't placed in suicide prevention until after the television interviews were over. Does that freshen your recollection?

A. I don't know if -- there should be other suicide logs that started before then because his was pulled for the interviews prior to the --

Q. Well, I agree with that, but I think all the interviews were over with by 2:00 o'clock.

A. I can't say because the shift changed for me. Actually before I left there were -- they were -- they were still -- they were still conducting interviews.

Q. All right. Thank you.

MR. LOLLAR: The Court asks Anything else?

MS. EVANS: I have nothing further, Judge.

MR. LOLLAR: The Court asks May the witness be excused for the purposes of this hearing?

MS. EVANS: No objection to that, Judge.

MR. LOLLAR: No objection.

The Court says Thank you for your testimony, ma'am. You may step down.

THE COURT: Is that it? Okay, Ms. Mallon, you can go back to the defense table.

What further says the defense?

MR. LOLLAR: Judge, and I believe we have a stipulation of testimony in regard to a discussion that Mr. Alex had with this witness, Christie Hicklen, following her testimony.

THE COURT: All right.

MR. ALEX: That is correct, Your Honor.

THE COURT: All right.

MR. ALEX: And my understanding of the stipulation is, the State is agreeing that Ms. Hicklen was mistaken; that when she thought she got the defendant from suicide watch, when he was actually in the CBO at that time; is that correct?

MR. LOLLAR: Yes.

MR. ALEX: Okay.

THE COURT: All right. That's admitted.

MR. LOLLAR: And, Your Honor, with that, and members of the jury, the defense will rest.

---

THE COURT: The defense rests.

What says the State by way of rebuttal?

MR. ALEX: The State will close its case-in-chief.

MR. LOLLAR: And the defense closes.

THE COURT: Both sides rest and close.

All right. Here's where we are. You now have all of the evidence that you're going to have in the case as far as the case-in-chief.

You do not yet have my instructions to you or the arguments of counsel. I'll read the instructions to you now. It is necessary that you pay close attention. It's not necessary that you try to memorize the rather lengthy instructions because you will have a copy back there with you when you begin your deliberations.

After I finish reading the instructions, then the lawyers will argue the case and you will retire to consider your verdict in the case.

(As read:) The defendant, James Garfield Broadnax, stands charged by Indictment with the offense of capital murder, alleged to have been committed on or about the 19th day of June, 2008, in Dallas County, Texas. The defendant has pleaded not guilty.

Our law provides that a person commits murder when he intentionally or knowingly causes the death of an individual.

"Individual" means a human being who is alive.

A person commits capital murder when such person intentionally commits the murder in the course of committing or attempting to commit the offense of robbery.

A person acts intentionally or with intent with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

A person commits a robbery if, in the course of committing theft, as defined in these instructions, and with intent to obtain or maintain control of the property, he intentionally or knowingly or recklessly causes bodily injury to another.

"In the course of committing theft" means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft.

Attempt to commit an offense occurs if,

176

with specific intent to commit an offense, a person does an act amounting to more than mere preparation that tends, but fails, to effect the commission of the offense intended.

"Bodily injury" means physical pain, illness or any impairment of physical condition.

"Theft" as used in these instructions, is the unlawful appropriation of the corporeal personal property of another, with the intent to deprive such other person of the property.

A person acts knowingly or with knowledge with respect to the nature of his conduct or to circumstance surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly or with knowledge with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

A person acts intentionally or with intent with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts recklessly or is reckless with respect to circumstances surrounding his conduct

177

or the result of his conduct when he is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

"Appropriation" and "appropriate," as those terms are used in these instructions, means to acquire or otherwise exercise control over property other than real property.

Appropriation of property is unlawful if it is without the owner's effective consent.

"Property," as used in these instructions, means tangible or intangible personal property or documents, including money, that represents or embodies anything of value.

"Deprive" means to withhold property from the owner permanently.

"Owner" means a person who has title to the property, possession of the property, or a greater right to possession of the property than the person charged.

"Possession" means actual care, custody,

178

control or management of the property.

"Effective consent" means assent in fact, whether express or apparent, and includes consent by a person legally authorized to act for the owner.

Consent is not effective if induced by deception or coercion.

"Individual" means a human being who is alive.

A "firearm" means any device designed, made or adapted to expel a projectile through a barrel by using the energy generated by an explosion, or burning substance, or any device readily convertible to that use.

A firearm is a deadly weapon.

Our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded a defendant, and in the event he elects not to testify, that fact cannot be taken as a circumstance against him.

In this case, the defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the defendant.

179

You are instructed that if there is any testimony before you in this case regarding the defendant having committed offenses other than the offense alleged against him in the Indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident of the defendant in connection with the offense alleged against him in the indictment and for no other purpose.

You are instructed that under our law, a confession of the defendant made while the defendant was in jail, or other place of confinement, or in the custody of an officer, shall be admissible into evidence if it appears that the same was freely and voluntarily made without compulsion or persuasion.

However, before a statement made orally to law enforcement or persons acting as agents of law enforcement may be considered voluntary, it must be shown beyond a reasonable doubt that prior to making such statement, the accused was warned by the person to whom the statement was made, or by a magistrate that,

one, he has the right to remain silent and not make any statement;

Two, that anything said by the defendant will be used against him at trial or in court;

Three, that he has the right to terminate the questioning at any time during the interviewing or questioning;

And four, that he is entitled to the services of an attorney, his own, or if he is unable to employ one, a court-appointed attorney to advise him prior to and during any questioning or interrogation.

So if you find from the evidence or you have a reasonable doubt thereof that at the time the defendant gave any statement on June 23rd, 2008, to a reporter, Steve Pickett, Ellen Goldberg or Shaun Rabb, the reporter was acting as an agent of law enforcement and failed to give the defendant the above warning, you shall disregard any such statement and not consider such statement for any purpose, nor any evidence obtained as a result thereof.

Moreover, if you find from the evidence or you have a reasonable doubt thereof that at the time of the defendant's statement to the reporters on June 23rd, 2008, the defendant was under the influence of PCP, marijuana, formaldehyde, or any combination

thereof to such an extent as to be reduced to a condition of mental impairment such as to render his statement not wholly voluntary, then such statement would not be freely and voluntarily made, and in such case, you will wholly disregard the statement referred to and not consider it for any purpose, nor any evidence obtained as a result of such statement.

You are instructed that you may only consider evidence of voluntary intoxication or testimony of witnesses Jason Varghese or Dr. Haideh Mirmesdagh to the extent it relates to the voluntariness of the defendant's statements to the various television reporters that previously testified in this case.

To warrant a conviction of the defendant of capital murder, you must find from the evidence beyond a reasonable doubt not only that on the occasion in question, the defendant, James Garfield Broadnax, was engaged in the commission or attempted commission of the robbery or attempted commission of the robbery, if any, but also that the defendant, James Garfield Broadnax, shot Stephen Swan with the intention of thereby killing him.

Unless you find from the evidence beyond a reasonable doubt that the defendant, James Garfield

Broadnax, on the alleged occasion, specifically intended to kill Stephen Swan when he shot him, if he did shoot him, you cannot convict him of the offense of capital murder.

Now, if you find from the evidence beyond a reasonable doubt that on or about the 19th day of June, 2008, in Dallas County, Texas, the defendant, James Garfield Broadnax, did unlawfully then and there intentionally cause the death of Stephen Swan, an individual, by shooting the said Stephen Swan with a firearm, a deadly weapon, and the defendant, James Garfield Broadnax, was then and there in the course of committing or attempting to commit the offense of robbery of the said deceased, then you will find the defendant guilty of capital murder.

If you do not so believe or if you have a reasonable doubt thereof, or if you're unable to agree, you will next consider whether the defendant is guilty of the lesser-included offense of murder.

If you find from the evidence beyond a reasonable doubt that on or about the 19th day of June, 2008, in Dallas County, Texas, the defendant, James Garfield Broadnax, did intentionally or knowingly cause the death of Stephen Swan, an individual, by shooting Stephen Swan with a firearm, a deadly weapon, but you

have a reasonable doubt as to whether the defendant was then and there engaged in the commission of robbery or attempted robbery of Stephen Swan at the time of the said shooting, if any;

Or, if you find from the evidence beyond a reasonable doubt that on or about the 19th day of June, 2008, in Dallas County, Texas, the defendant, James Garfield Broadnax, did knowingly cause the death of Stephen Swan by shooting him with a firearm, a deadly weapon, but you have a reasonable doubt as to whether the defendant, James Garfield Broadnax, intentionally killed Stephen Swan, as the term "intentionally" has been defined, then you will find the defendant guilty of murder, but not capital murder, regardless of whether you find from the evidence beyond a reasonable doubt that the defendant, James Garfield Broadnax, was then and there in the course of committing or attempting to commit the offense of robbery of Stephen Swan of his property.

Unless you so find beyond a reasonable doubt or if you have a reasonable doubt that the defendant is guilty of murder as defined in these instructions, or if you have a reasonable doubt, you will acquit the defendant of murder.

If you should find from the evidence

beyond a reasonable doubt that the defendant is either guilty of capital murder or murder, but you have a reasonable doubt as to which offense he is guilty of, then you should resolve that doubt in the defendant's favor and find the defendant guilty of the lesser-included offense of murder.

If you have a reasonable doubt as to whether the defendant is guilty of any offense defined in this Charge, you will acquit the defendant and say by your verdict not guilty.

Voluntary intoxication does not constitute a defense to the commission of crime. You are instructed that you may consider all relevant facts and circumstances surrounding the killing, if any, and the previous relationship existing between the accused and the deceased, if any, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the shooting in question, if any.

In all criminal cases, the burden of proof is on the State. All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt.

The fact that a person has been arrested, confined or indicted for or otherwise charged with the offense gives rise to no inference of guilt at their trial.

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant.

It is not required that the prosecution prove guilt beyond all possible doubt. It is required that the prosecution's proof excludes all reasonable doubt concerning the defendant's guilt.

In the event you have a reasonable doubt as to the defendant's guilt after considering all of the evidence before you, and these instructions, you will acquit him and say by your verdict not guilty.

You are the exclusive judge of the facts proved, of the credibility of the witnesses and the weight to be given their testimony, but you are bound to receive the law from the Court which has been given to you in these instructions.

After you retire to the jury room, you should select one of your members as your presiding juror. It is his or her duty to preside at your deliberations, vote with you, and when you have unanimously agreed upon a verdict, to certify your verdict by using the appropriate form attached to these instructions and signing the same as presiding juror.

No one has any authority to communicate with you except the bailiff who has you in charge.

During your deliberations in this case, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

After you have retired, you may communicate with this Court in writing through the bailiff who has you in charge. Do not attempt to talk the bailiff, or the attorneys, or the Court, or anyone else concerning any question you may have.

Your verdict must be by a unanimous vote of all members of the jury. After you've reached a unanimous verdict, the presiding juror will certify the verdict by filling in the appropriate form attached to this Charge and signing his or her name as presiding juror.

After arguments, you will retire to consider your verdict.

And the instructions in this case were signed by me, the presiding judge of Criminal District Court Number 7.

The Court will recognize Mr. David Alex to open for the State of Texas, unless you wish to reserve, sir.

MR. ALEX: We'll waive the opening, Judge, and we'll reserve the opportunity to rebut.

THE COURT: The Court will recognize Mr. Brad Lollar for the defense.

MR. LOLLAR: Thank you, Your Honor.

May it please the Court?

THE COURT: Yes, sir.

MR. LOLLAR: Co-counsel, honorable members of the prosecution and ladies and gentlemen of the jury.

First, let me thank all of you for the time and attention that you have given to us in the trial of what obviously is a very difficult case.

I want to particularly thank Mr. Fiddick and Mr. McElroy for the services that they have given us as alternate jurors here in the case.

Ladies and gentlemen, you have heard the evidence brought to you by both sides here and now is the time for you to determine whether or not the State has proven every element of the Indictment in this case

188

beyond a reasonable doubt. That includes all of the elements that we've talked about -- we talked about in voir dire examination. You see them recapped here in the Court's Charge in the application page.

Now, we told you in my opening statement that part of the evidence that the State would present to you are these videotapes made by these reporters on the morning of June the 23rd, a couple days after Mr. Broadnax had been brought into the Dallas County jail, and we told you -- I told you they would be terrible and awful, and certainly they are. And now you know what I'm talking about. They're absolutely shocking.

We have brought to you evidence to show you that when he was brought in, he was referred to the psych department, he was placed in behavioral observation, closed behavioral observation, a cell in the psych ward of the jail.

We have shown you that he was interviewed by the psych assessor, Jason Varghese, and Dr. Mirmesdagh in the morning of June the 23rd, and their reports are in evidence and you've heard them discussed.

The doctor and Mr. Varghese noted that the defendant was having auditory hallucinations. He was

189

delusional. And that the doctor thought he might still be under the influence of the drug that Mr. Varghese noted Mr. Broadnax had told him about, that being the PCP and embalming fluid, soaked marijuana cigarettes known as wet blunts.

The tapes, as you see, are the substantial portion of the evidence against the defendant. They are particularly relevant once you hear the evidence from the DNA analyst who tells you that the defendant's DNA is not on the gun that caused this murder. Demarius Cummings' DNA is on that gun, but James Broadnax's is not. That's also relevant to the testimony you heard from Evelyn Barg, who tells you that it is the defendant who got the gun out of his clothes. First she said it was the defendant and then she switched that to say -- first she said it was Demarius Cummings, and then she switched that to say that, no, it was the defendant.

Well, now, you know that there's no DNA of the defendant on the murder weapon, but there certainly is DNA of Demarius Cummings on the murder weapon.

So in light of that, you see how important these videotapes made by the reporters become in this case. It is the reason we're trying this case for death, are those videotapes.

190

So what did the Judge tell you about that? The Judge tells you in the Charge that if you have a doubt that Mr. Broadnax voluntarily consented to these interviews, either due to the state of his mind or due to the, you know, the effect of the wet blunts, then you can disregard the tapes.

Now, as I've said, these decisions are yours to make. I know that you'll do what your oaths require of you to do, which is to hold the State to their burden of proof. Their burden of proof includes proving all of the elements in the Indictment, which includes the part of the Indictment talking about the mental state of the defendant at the time of the commission of the offense.

The Indictment requires that the State show you that the defendant intentionally caused the death of the victim, Stephen Swan. And you have the legal definition of what "intentionally" means contained here in the Court's Charge, which you'll carry back to the jury room with you. And it does mean his conscious objective or desire to cause the result.

Ladies and gentlemen, thank you very much. I appreciate your attention, and I know you'll -- you'll do what the law requires of you to do. Thank you.

191

THE COURT: Thank you, Mr. Lollar.

MR. LOLLAR: Thank you, Your Honor.

THE COURT: The Court will recognize Mr. David Alex to close for the State of Texas.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

MR. ALEX: Good afternoon, folks. I'm not going to take up a bunch of your time. I do want to, on behalf of the victim's family and the State of Texas, thank you for your time and attention in the case. And while it has not been a very long case, I think initially, in my opening remarks, I told you it was a very serious case. And I think I told you that while it was very serious, it was not very complicated.

And my fear sometimes is, when a case is not very complicated, people will go back to the jury room and they will say, Well, here it is, 1:00 o'clock, Wednesday afternoon. If the case wasn't so complicated, why are we here two and-a-half days later talking about these facts.

And sometimes people will go back and they'll start creating issues that aren't there. And sometimes the evidence can be so overwhelming that people can say, Well, maybe there's something here, or maybe there's something there.

Folks, let me tell you. This is about as plain a case as it gets. It really is. It is about as plain as it gets.

The defendant took the handgun that you all saw, and executed Stephen Swan and Matthew Butler for no other reason but cuz they had stuff and he didn't. That's what this case is about. Cold, calculated, total disregard for human life. And it's really just that simple.

Now, we -- I could stand up here and tell you that, you know, this is -- there's some issue here about the voluntariness of those statements that he gave to the media, and I could play them for you over and over and over again, but I don't think I need to do that. I think each and every one of you know that these statements were voluntary. And all you have to do is call upon your own common-sense.

When you think about the defendant's demeanor on those tapes, when we talk about voluntary, all we're talking about is something that he did of his own free will. All we're talking about is something that someone else didn't overcome his free will and make him give these statements.

And when you think about what he said at the very -- the very initial part of the statements and at this point he's going to spin a yarn. He's going to tell what he did. He's going to tell -- and here's what -- here's how you know it was voluntary. Think about when you're talking about your kids. Think about when you're talking about your grandkids, think about when you're talking about something you enjoy doing. Think about when you're talking about something you enjoy doing. Think about when you talked about anything that you're proud of. Think about anything that you're proud of, and then think about what this man told the whole world about what he did to those two people. He was proud of that. Wasn't nothing more voluntary than -- than it could be.

If I was standing here talking to you about my kids, you would know it was voluntary because you would hear it in my voice, that -- that proudness. It's the same thing you heard in the defendant's voice when he was talking about slaughtering two human beings for no other reason because -- he called it slither. And they had stuff and he needed stuff. There's nothing more voluntary in the world, folks, than to look at someone and to see just how proud of what they did. That's how you know it was voluntary.

And all of this business that you read about in the Court's Charge, now the Court's got to give you the law as it relates to voluntariness, if the reporters are State actors. If they're police officers. If they're law enforcement engaged in the business of trying to get a statement from a suspect. And the law requires them to read them certain rights if they're going to have them in custody and then question them.

And y'all know that these reporters weren't acting as State actors. You may not have noticed it, but they didn't even want to talk to me. They didn't even -- they didn't want to take the stand. They didn't want to talk to me. All they were there for was to get the defendant's story out to the public. That was their sole purpose. Whatever that story was. If it was going to be an alibi, so be it. If it was going to be he did it, so be it, but they were not there because Garland Police Department called them and said Hey, this guy won't talk to us. Will y'all go get a confession.

That is so far from the evidence in this case that it's laughable, and if you go back there and you spend any time on that, then I think we've just wasted all of y'all's time, because those reporters were there for one reason, the same reason all of y'all got jobs, and that's to make money and to put out into

with Steve Pickett, he wasn't even giving up the fact that he was there. And he wanted to put that out there to the community. He wanted his alibi out there. He wanted the fact that he got this car from Thomas Wilson, whoever he was. He was going to plant the seeds of getting away with this crime early. Calculated.

You think he went up there to talk to the media planning to confess? No. You -- you saw it. He went up there to the media voluntarily because he wanted to portray an innocent man.

And when you think about -- when you start thinking about what's voluntary and what's not, think about what happens next. You can see the point where his mind splits and Steve Pickett is telling him, Look, man. You're telling me this but it's inconsistent with the affidavit. The affidavit says your family saw you in the victim's car the same day with the victim's property. And he says oops. Let me read that paper.

And you can see the wheels turn in his head. You can see the calculations going and you can see the voluntariness of what he was doing. He realized at that point, you know what? The same thing he told Evelyn Barg about three or four days later, if it comes out, that I did it. He knew he was caught,

the public what sells.

When you've got a guy who has committed a double homicide, then we're going to go talk to him.

They were not agents of the State in any way, form, or fashion, and there's no evidence to support that, regardless of how many times he asked Ms. Leach what was her job description, okay?

Now, let's just talk about why we're really here. Mr. Lollar says that the only reason we're seeking the death penalty on the defendant is because of these statements. And that too is insulting.

The reason we're seeking the death penalty is because this man slaughtered two people for no other reason than to take their property. The only reason. You know, folks, if the defendant had went up to these two young men, these two Christian young men and had said to them at gunpoint, Give me your keys and give me your wallets, you know what would have happened? They would have gave them the keys, the wallet, and they would have drove off, and we would only be talking about an aggravated robbery. We wouldn't be talking about a death penalty case. But did he do that? Is that what the evidence shows?

The evidence shows that this man right here, premeditated, with a pistol on his person, said Hey, look. Your shoes are untied. And when he went down, he shot them to death. Now, it's a little bit of political -- he didn't say your shoes are untied, but y'all understand what I'm saying.

Give me a cigarette. What does that show? Does that show anything other than someone who is so cold and so calculated and has total disregard for human life, and that's why we're here, and that's what this case is about. It's about none of that. The statements that he gave to the media doesn't change what he did. It doesn't add to what he did. It only amplifies the fact that he is as cold as they get, and they get no colder.

And I'm going to sit down, folks, but what I want to say to you is this: The elements in this case are pretty simple, and they've been proven to you beyond all reasonable doubt. And there's no other verdict in this case but to have a guilty of capital murder.

Thank you.

THE COURT: Thank you, Mr. Alex.

In just a moment, you will retire to consider your verdict in this case. Once you have retired to consider your verdict, the first thing that

you have to do is send a note to me through Mr. McGaughey telling me who your presiding juror is.

The presiding juror is in charge of conducting the schedule for your deliberations and things of that sort. The presiding juror has no more vote than the other eleven of you. I wish you good luck in reaching a unanimous verdict in this case.

Mr. Fiddick and Mr. McCreary will remain behind.

All rise for the jury.

(Jury retired to deliberate.)

(Jury not present.)

THE COURT: Be seated, please.

Let me see the lawyers up here.

(Off-the-record discussion was had.)

THE COURT: Mr. Fiddick and Mr. McElroy, as alternates jurors, you will not participate in the deliberations in this case.

However, I'm not going to discharge either one of you. In the event that something should happen, we might need to have you for the punishment phase of this case in the event a verdict of guilty is returned.

However, I am going to release you for the day and ask you to be back here tomorrow morning at 8:45 a.m., because regardless of the verdict in this case, if this is a verdict of guilty, we are not going to continue with the punishment phase until tomorrow morning.

Now, it's absolutely critical, essential, that neither one of you expose yourself in any way, shape or form to any media coverage of this case, because it's going to be out there, and you're directed not to do that.

You're not to discuss the case amongst yourselves or with anyone else. In short, you have all of the same obligations that you previously had.

Does either of you have any questions about that?

JUROR MCCREARY: No, Your Honor.

JUROR FIDDICK: No, Your Honor.

THE COURT: All right. Then we'll see you at 8:45 a.m. tomorrow morning in the same way that we've done the first three days of this trial.

All rise for alternate jurors.

(Off-the-record discussion was had.)

THE COURT: We're in recess, except for the matter that was just brought to my attention. Let me see the lawyers up here.

Everybody else, we're waiting on the verdict.

I will have order in the courtroom, please.

(Benchside, on the record:)

MR. PARKS:  May it please the Court.

During Mr. Alex's final argument, he made an argument that I believe should have been or was objectionable.  I am aware of the contemporaneous objection rule, but I know that sometimes from a practical standpoint is a bit more harmful to the defense to make a contemporaneous objection.

Mr. Alex argued that these were two young Christian men.  That's outside the record, particularly in view of the fact that the Court did not allow the State to put in the photograph, State's Exhibit Number 52, showing the wearing of the ring with the cross, and we believe that was outside the record, prejudicial, and so harmful that we would ask for a new trial.

THE COURT:  You want to respond?

MR. ALEX:  I'd love to.

THE COURT:  Briefly.

MR. ALEX:  Just that the defendant's own statement, that they watched them come out of the Zion Gate Christian recording studio, and it is a totally reasonable deduction from the evidence, that that is in front of the jury, that they are Christian men, and it has been mentioned more than once in this trial this studio produced Christian music, and as such, it's a reasonable deduction from the evidence that these were Christian men, and I believe probably even the person that introduced both of these young men, described them as Christian men.

THE COURT:  The objection is overruled.  The Court notes that exactly what Mr. Alex said as the victims in the case were introduced by others.  The clear nature of their job occupation there was that they were producing Christian music.  It's a reasonable inference that that's kind of what their livelihood was.  In addition, there was no objection during final argument.

The objection's overruled.

We're in recess.

We're in recess, folks.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT:  If we could have order in the courtroom, please.

This is the State of Texas versus James Broadnax.  The jury is not present.  The jury is deliberating.

It has come to my attention that some of the exhibits may be misnumbered, so would you tell me what the situation is, Mr. Alex?

MR. ALEX:  Yes, sir, Judge.

When I made the offer of State's Exhibit 103, I represented to the Court that it was a metal lighter.

However, the testimony in the case shows that 103 was a shell casing, and it is marked as such.  And I'd like to correct that in the record, as well as the metal lighter referred to, which is in evidence, is actually State's Exhibit 102.  And I referred to in my offer of State's Exhibit 102 as the DNA swab, but it is actually State's Exhibit 101-A.

And so what the record should read is, State's Exhibit 101-A is the DNA swab, Item 7994-01.

State's Exhibit 102 is the metal lighter.

And State's Exhibit 103 is a shell casing.

THE COURT:  Any objection from the defense?

MR. LOLLAR:  No, Your Honor.

THE COURT:  The record will so reflect.

MR. ALEX:  Thank you, Your Honor.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT:  Be seated, please.

Mr. Robert Patterson, it is my understanding that you are the presiding juror in this case; is that correct, sir?

THE FOREPERSON:  That's correct, sir.

THE COURT:  It is also my understanding that the jury has reached a unanimous verdict in this case; is that correct?

THE FOREPERSON:  That is correct.

THE COURT:  Accused and counsel, please stand and receive the verdict.

The verdict in the case of State of Texas versus James Broadnax is as follows:

We, the jury, unanimously find the defendant guilty of capital murder as charged in the Indictment.

You may be seated.

Ladies and gentlemen of the jury, tomorrow we will begin the punishment phase of this case.  I'm going to allow the parties to gather their thoughts and do further preparation for this portion of the case.

You are reminded that you are still under the same instructions that you were previously.  You are not to discuss the case amongst each other.  You are not to be exposed to any sort of media pub --

publicity whatsoever. Your instructions remain the same as they have been.

We will begin the punishment phase tomorrow. I'll ask you to be here at 8:45 a.m.

I thank you again for your service.

All rise for the jury.

(Jury not present.)

THE COURT: The Court has distributed the Court's proposed Charge in punishment to the parties. Is about to do it now, actually. I'll ask you to please examine that in your usual alacrity so that we can ensure that the proper administration of justice is not delayed by lawyers in the case.

Anything else from the State of Texas?

MR. ALEX: That's all we have at this time, Your Honor.

THE COURT: Anything from the defense?

MR. LOLLAR: Yes, sir. Could we go back to your chambers to discuss an issue?

THE COURT: Yes. We're in recess until 8:45 a.m.

(Court adjourned.)

THE STATE OF TEXAS )

COUNTY OF DALLAS   )

I, SHARON HAZLEWOOD, Official Court Reporter in and for Criminal District Court No. 7 of Dallas County, State of Texas, do HEREBY CERTIFY that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

Witness my hand this the __1st__ day of _April_____, 2010.

_____
SHARON HAZLEWOOD, CSR
Certified Shorthand Reporter
Official Court Reporter
Criminal District Court No. 7
972-739-3906
Texas CSR No. 628
Expiration Date: 12/31/10