REPORTER'S RECORD

VOLUME 48 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE CRIMINAL DISTRICT |
| | ) | |
| VS. | ) | COURT NO. 7 |
| | ) | |
| JAMES GARFIELD BROADNAX | ) | Of DALLAS COUNTY, TEXAS |

ORIGINAL ORIGINAL ORIGINAL

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk
RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 21 2010

Louise Pearson, Clerk

=================================================================

PUNISHMENT PHASE

=================================================================

On the 13TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

A P P E A R A N C E S

FOR THE STATE OF TEXAS:

    HONORABLE DAVID M. ALEX
    SBOT NO. 24003256
    HONORABLE LISA SMITH
    SBOT NO. 00787131
    HONORABLE GORDON HIKEL
    SBOT NO. 00787696
    HONORABLE ANDREA HANDLEY
    SBOT NO. 08898800
    HONORABLE ELAINE EVANS
    SBOT NO. 24032880
    133 N. INDUSTRIAL BLVD.
    FRANK CROWLEY COURTHOUSE
    DALLAS, TEXAS 75207
    TEL. 214-653-3600


FOR THE DEFENDANT:

    HONORABLE BRAD LOLLAR
    SBOT NO. 12508700
    1700 COMMERCE ST, STE. 404
    DALLAS, TEXAS 75201
    TEL. 214-384-8178

    HONORABLE DOUGLAS H. PARKS
    SBOT NO. 15520000
    321 CALM WATER LANE
    HOLLY LAKE RANCH, TEXAS 75765
    TEL. 903-769-3120

    HONORABLE KERI MALLON
    SBOT NO. 24049165
    DALLAS COUNTY PUBLIC DEFENDERS OFFICE
    133 N. INDUSTRIAL BLVD., LB 2
    FRANK CROWLEY COURT BLDG..
    DALLAS, TEXAS  75207
    TEL. 214-653-3550

VOLUME 48

PUNISHMENT PHASE

AUGUST 13TH, 2009                                    PAGE   VOL.

PROCEEDINGS...............................  3    48

CASE CALLED BY THE COURT..................  3    48

HEARING...................................  3    48

JUROR ZIEDEL SWORN........................  19    48

JURY PRESENT..............................  20    48

OPENING STATEMENT BY MR. ALEX............  21    48


| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BUTLER, THERESA | 28 | | | 48 |

|  | | | PAGE | VOL. |
|---|---|---|---|---|
| STIPULATION............................. | | | 37 | 48 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| DYER, TRACY | 39 | | | 48 |
| SWAN, JEAN | 62 | | | 48 |
| HAMB, RICHARD | 67 | | | 48 |
| TURNER, MARK | 73 | 83 | | 48 |
|  | 85 | 86 | | 48 |
| BARGER, DAVID | 87 | | 95 | 48 |
|  | 96 | 99 | | 48 |
|  | 110 | 113 | | 48 |
| DOTY, DARRELL | 115 | | | 48 |

|  |  |  | PAGE | VOL. |
|---|---|---|---|---|
| HEARING.......................................... | | | 122 | 48 |
| JURY PRESENT..................................... | | | 129 | 48 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| KIRVIN, SCHESSER | 130 | 154 | | 48 |
| | 165 | 168 | | 48 |

|  |  |  | PAGE | VOL. |
|---|---|---|---|---|
| HEARING.......................................... | | | 169 | 48 |
| JURY PRESENT..................................... | | | 173 | 48 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| CONTRERAS, MORRIS | 173 | 185 | | 48 |
| | 193 | | | 48 |
| GUTIERREZ, MARCOS | 198 | 211 | | 48 |
| UTSEY, MATTHEW | 216 | 238 | | 48 |
| | 250 | | | 48 |

|  |  |  | PAGE | VOL. |
|---|---|---|---|---|
| HEARING.......................................... | | | 257 | 48 |
| JURY PRESENT..................................... | | | 259 | 48 |
| HEARING.......................................... | | | 260 | 48 |
| ADJOURNMENT...................................... | | | 261 | 48 |
| REPORTER'S CERTIFICATE........................... | | | 262 | 48 |

iii

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---------|------|-------|------|-----|
| BUTLER, THERESA | 28 | | | 48 |
| DYER, TRACY | 39 | | | 48 |
| SWAN, JEAN | 62 | | | 48 |
| HAMB, RICHARD | 67 | | | 48 |
| TURNER, MARK | 73 | 83 | | 48 |
| | 85 | 86 | | 48 |
| BARGER, DAVID | 87 | | 95 | 48 |
| | 96 | 99 | | 48 |
| | 110 | 113 | | 48 |
| DOTY, DARRELL | 115 | | | 48 |
| KIRVIN, SCHESSER | 130 | 154 | | 48 |
| | 165 | 168 | | 48 |
| CONTRERAS, MORRIS | 173 | 185 | | 48 |
| | 193 | | | 48 |
| GUTIERREZ, MARCOS | 198 | 211 | | 48 |
| UTSEY, MATTHEW | 216 | 238 | | 48 |
| | 250 | | | 48 |

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARGER, DAVID | 87 | | 95 | 48 |
| | 96 | 99 | | 48 |
| | 110 | 113 | | 48 |
| BUTLER, THERESA | 28 | | | 48 |
| CONTRERAS, MORRIS | 173 | 185 | | 48 |
| | 193 | | | 48 |
| DOTY, DARRELL | 115 | | | 48 |
| DYER, TRACY | 39 | | | 48 |
| GUTIERREZ, MARCOS | 198 | 211 | | 48 |
| HAMB, RICHARD | 67 | | | 48 |
| KIRVIN, SCHESSER | 130 | 154 | | 48 |
| | 165 | 168 | | |
| SWAN, JEAN | 62 | | | 48 |
| TURNER, MARK | 73 | 83 | | 48 |
| | 85 | 86 | | 48 |
| UTSEY, MATTHEW | 216 | 238 | | 48 |
| | 250 | | | 48 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 22 | PHOTO ID - BUTLER | 32 | 32 | 48 |
| 116 | PHOTO - NURSES STATION (BROADNAX) | 153 | 153 | 48 |
| 204 | NURSE'S NOTE | 150 | 150 | 48 |
| 395 | BLUEBACK | 70 | 70 | 48 |
| 425 | JAIL CALL LOG - BROADNAX | 78 | 79 | 48 |
| 426 | AUTOPSY REPORT - BUTLER | 41 | 41 | 48 |
| 427 | PHOTO ID - BUTLER | 37<br>48 | 38<br>48 | 48<br>48 |
| 428 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 429 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 430 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 431 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 432 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 433 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 434 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 435 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 436 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 437 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 438 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 439 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 440 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 441 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 442 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 443 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 444 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 445 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 446 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 447 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 448 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 449 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 450 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 451 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 452 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 485 | MEDICAL RECORDS (6/21/08 - 4/24/09) | 148 | 148 | 48 |
| 544 | CD WITH SUBTITLES - JAIL CALL - 1/9/09 | 94 98 | 96 98 | 48 |
| 545 | CD WITH SUBTITLES - JAIL CALL - 1/26/09 | 94 | 96 | 48 |
| 546 | CD - JAIL CALL - 1/9/09 | 92 | 92 | 48 |
| 547 | CD - JAIL CALL - 1/26/09 | 92 | 92 | 48 |
| 548 | CD - JAIL CALL - 1/19/09 | 92 | 92 | 48 |
| 549 | CD - JAIL CALL - 4/1/09 | 92 | 92 | 48 |
| 550 | CD - JAIL CALL - 3/25/09 | 92 | 92 | 48 |
| 551 | CD - JAIL CALL - 1/22/09 | 92 192 197 | 92 193 197 | 48 48 48 |
| 552 | CD - JAIL CALL - 11/14/08 | 92 | 92 | 48 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 553 | CD - JAIL CALL - 10/11/08 | 92 | 92 | 48 |
| 554 | CD - JAIL CALL - 1/12/09 | 92 | 92 | 48 |
| 555 | CD - JAIL CALL - 11/22/08 | 92 | 92 | 48 |
| 556 | CD - JAIL CALL - 1/15/09 | 92 | 92 | 48 |
| 557 | CD - JAIL CALL - 1/10/09 | 92 | 92 | 48 |
| 558 | CD - JAIL CALL - 1/21/09 | 92 | 92 | 48 |
|     |                          | 192 | 193 | 48 |
| 562 | CD WITH SUBTITLES JAIL CALL - 1/22/09 | 192 197 | 193 | 48 48 |
| 563 | CD WITH SUBTITLES JAIL CALL - 1/21/09 | 192 | 193 | 48 |
| 566 | CD WITH SUBTITLES JAIL CALL - 1/10/09 | 167 | 167 | 48 |
| 567 | CD WITH SUBTITLES JAIL CALL - 1/9/09 | 167 | 167 | 48 |
| 571 | PHONE CALL LOG (9/16/08 - 3/14/09) | 92 | 92 | 48 |
| 572 | PHONE CALL LOG (4/16/09 - 5/26/09) | 92 | 92 | 48 |
| 573 | TEN PRINT CARD | 70 | 70 | 48 |
| 574 | PHOTO - TREVAUN MILLER - JAIL FIGHT | 183 | 184 | 48 |
| 575 | PHOTO - TREVAUN MILLER - JAIL FIGHT | 183 | 184 | 48 |
| 576 | PHOTO - BROADNAX - JAIL FIGHT | 183 | 184 | 48 |
| 577 | JAIL CELL DIAGRAM | 220 | 220 | 48 |
| 578 | LETTER FROM INMATES TO DA | 257 | 258 | 48 |

## DEFENSE EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 1 | MEDICAL RECORDS - (ALSO MARKED STATE'S EX. 485) | 148 | 148 | 48 |
| 13 | KITE FROM BROADNAX - 7/11 | 160 | 160 | 48 |
| 14 | SICK CALL REQUEST - 7/11/08 | 160 | 160 | 48 |
| 15 | DALLAS COUNTY MENTAL HEALTH FOLLOWUP NOTE - 7/20/08 | 160 | 160 | 48 |
| 16 | BOARD HEARING NOTIFICATION | 189 | 189 | 48 |
| 17 | BOARD HEARING NOTIFICATION | 211 | 213 | 48 |

REPORTER'S RECORD

VOLUME 48 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

THE STATE OF TEXAS ) IN THE CRIMINAL DISTRICT
)
)
)
VS. )
) COURT NO. 7
)
)
JAMES GARFIELD BROADNAX ) Of DALLAS COUNTY, TEXAS

==========================================================

PUNISHMENT PHASE

==========================================================

On the 13TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

---

VOLUME 48

PUNISHMENT PHASE

| AUGUST 13TH, 2009 | | PAGE | VOL. |
|---|---|---|---|
| PROCEEDINGS............................... | | 3 | 48 |
| CASE CALLED BY THE COURT................. | | 3 | 48 |
| HEARING................................... | | 3 | 48 |
| JUROR ZIEDEL SWORN....................... | | 19 | 48 |
| JURY PRESENT............................. | | 20 | 48 |
| OPENING STATEMENT BY MR. ALEX............ | | 21 | 48 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BUTLER, THERESA | 28 | | | 48 |

| | PAGE | VOL. |
|---|---|---|
| STIPULATION........................... | 37 | 48 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| DYER, TRACY | 39 | | | 48 |
| SWAN, JEAN | 62 | | | 48 |
| HAMB, RICHARD | 67 | | | 48 |
| TURNER, MARK | 73 | 83 | | 48 |
| | 85 | 86 | | 48 |
| BARGER, DAVID | 87 | | 95 | 48 |
| | 96 | 99 | | 48 |
| | 110 | 113 | | 48 |
| DOTY, DARRELL | 115 | | | 48 |

---

A P P E A R A N C E S

FOR THE STATE OF TEXAS:

  HONORABLE DAVID M. ALEX
  SBOT NO. 24003256
  HONORABLE LISA SMITH
  SBOT NO. 00787131
  HONORABLE GORDON HIKEL
  SBOT NO. 00787696
  HONORABLE ANDREA HANDLEY
  SBOT NO. 08898800
  HONORABLE ELAINE EVANS
  SBOT NO. 24032880
  133 N. INDUSTRIAL BLVD.
  FRANK CROWLEY COURTHOUSE
  DALLAS, TEXAS 75207
  TEL. 214-653-3600

FOR THE DEFENDANT:

  HONORABLE BRAD LOLLAR
  SBOT NO. 12508700
  1700 COMMERCE ST, STE. 404
  DALLAS, TEXAS 75201
  TEL. 214-384-8178

  HONORABLE DOUGLAS H. PARKS
  SBOT NO. 15520000
  321 CALM WATER LANE
  HOLLY LAKE RANCH, TEXAS 75765
  TEL. 903-769-3120

  HONORABLE KERI MALLON
  SBOT NO. 24049165
  DALLAS COUNTY PUBLIC DEFENDERS OFFICE
  133 N. INDUSTRIAL BLVD., LB 2
  FRANK CROWLEY COURT BLDG..
  DALLAS, TEXAS  75207
  TEL. 214-653-3550

---

| PAGE | VOL. |
|---|---|

| HEARING............................... | 122 | 48 |
| JURY PRESENT........................... | 129 | 48 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| KIRVIN, SCHESSER | 130 | 154 | | 48 |
| | 165 | 168 | | 48 |

PAGE VOL.

| HEARING............................... | 169 | 48 |
| JURY PRESENT........................... | 173 | 48 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| CONTRERAS, MORRIS | 173 | 185 | | 48 |
| | 193 | | | 48 |
| GUTIERREZ, MARCOS | 198 | 211 | | 48 |
| UTSEY, MATTHEW | 216 | 238 | | 48 |
| | 250 | | | 48 |

PAGE VOL.

| HEARING............................... | 257 | 48 |
| JURY PRESENT........................... | 259 | 48 |
| HEARING............................... | 260 | 48 |
| ADJOURNMENT........................... | 261 | 48 |
| REPORTER'S CERTIFICATE................. | 262 | 48 |

iii

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BUTLER, THERESA | 28 | | | 48 |
| DYER, TRACY | 39 | | | 48 |
| SWAN, JEAN | 62 | | | 48 |
| HAMB, RICHARD | 67 | | | 48 |
| TURNER, MARK | 73 | 83 | | 48 |
| | 85 | 86 | | 48 |
| BARGER, DAVID | 87 | | 95 | 48 |
| | 96 | 99 | | 48 |
| | 110 | 113 | | 48 |
| DOTY, DARRELL | 115 | | | 48 |
| KIRVIN, SCHESSER | 130 | 154 | | 48 |
| | 165 | 168 | | 48 |
| CONTRERAS, MORRIS | 173 | 185 | | 48 |
| | 193 | | | 48 |
| GUTIERREZ, MARCOS | 198 | 211 | | 48 |
| UTSEY, MATTHEW | 216 | 238 | | 48 |
| | 250 | | | 48 |

iv

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARGER, DAVID | 87 | | 95 | 48 |
| | 96 | 99 | | 48 |
| | 110 | 113 | | 48 |
| BUTLER, THERESA | 28 | | | 48 |
| CONTRERAS, MORRIS | 173 | 185 | | 48 |
| | 193 | | | 48 |
| DOTY, DARRELL | 115 | | | 48 |
| DYER, TRACY | 39 | | | 48 |
| GUTIERREZ, MARCOS | 198 | 211 | | 48 |
| HAMB, RICHARD | 67 | | | 48 |
| KIRVIN, SCHESSER | 130 | 154 | | 48 |
| | 165 | 168 | | |
| SWAN, JEAN | 62 | | | 48 |
| TURNER, MARK | 73 | 83 | | 48 |
| | 85 | 86 | | 48 |
| UTSEY, MATTHEW | 216 | 238 | | 48 |
| | 250 | | | 48 |

v

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 22 | PHOTO ID - BUTLER | 32 | 32 | 48 |
| 116 | PHOTO - NURSES STATION (BROADNAX) | 153 | 153 | 48 |
| 204 | NURSE'S NOTE | 150 | 150 | 48 |
| 395 | BLUEBACK | 70 | 70 | 48 |
| 425 | JAIL CALL LOG - BROADNAX | 78 | 79 | 48 |
| 426 | AUTOPSY REPORT - BUTLER | 41 | 41 | 48 |
| 427 | PHOTO ID - BUTLER | 37 | 38 | 48 |
| | | 48 | 48 | 48 |
| 428 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 429 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 430 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 431 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 432 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 433 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 434 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 435 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 436 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 437 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 438 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 439 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 440 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 441 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 442 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |

vi

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 443 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 444 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 445 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 446 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 447 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 448 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 449 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 450 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 451 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 452 | AUTOPSY PHOTO - BUTLER | 43 | 43 | 48 |
| 485 | MEDICAL RECORDS (6/21/08 - 4/24/09) | 148 | 148 | 48 |
| 544 | CD WITH SUBTITLES - JAIL CALL - 1/9/09 | 94 / 98 | 96 / 98 | 48 |
| 545 | CD WITH SUBTITLES - JAIL CALL - 1/26/09 | 94 | 96 | 48 |
| 546 | CD - JAIL CALL - 1/9/09 | 92 | 92 | 48 |
| 547 | CD - JAIL CALL - 1/26/09 | 92 | 92 | 48 |
| 548 | CD - JAIL CALL - 1/19/09 | 92 | 92 | 48 |
| 549 | CD - JAIL CALL - 4/1/09 | 92 | 92 | 48 |
| 550 | CD - JAIL CALL - 3/25/09 | 92 | 92 | 48 |
| 551 | CD - JAIL CALL - 1/22/09 | 92 / 192 / 197 | 92 / 193 / 197 | 48 / 48 / 48 |
| 552 | CD - JAIL CALL - 11/14/08 | 92 | 92 | 48 |

vii

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 553 | CD - JAIL CALL - 10/11/08 | 92 | 92 | 48 |
| 554 | CD - JAIL CALL - 1/12/09 | 92 | 92 | 48 |
| 555 | CD - JAIL CALL - 11/22/08 | 92 | 92 | 48 |
| 556 | CD - JAIL CALL - 1/15/09 | 92 | 92 | 48 |
| 557 | CD - JAIL CALL - 1/10/09 | 92 | 92 | 48 |
| 558 | CD - JAIL CALL - 1/21/09 | 92 | 92 | 48 |
| | | 192 | 193 | 48 |
| 562 | CD WITH SUBTITLES JAIL CALL - 1/22/09 | 192 197 | 193 | 48 48 |
| 563 | CD WITH SUBTITLES JAIL CALL - 1/21/09 | 192 | 193 | 48 |
| 566 | CD WITH SUBTITLES JAIL CALL - 1/10/09 | 167 | 167 | 48 |
| 567 | CD WITH SUBTITLES JAIL CALL - 1/9/09 | 167 | 167 | 48 |
| 571 | PHONE CALL LOG (9/16/08 - 3/14/09) | 92 | 92 | 48 |
| 572 | PHONE CALL LOG (4/16/09 - 5/26/09) | 92 | 92 | 48 |
| 573 | TEN PRINT CARD | 70 | 70 | 48 |
| 574 | PHOTO - TREVAUN MILLER - JAIL FIGHT | 183 | 184 | 48 |
| 575 | PHOTO - TREVAUN MILLER - JAIL FIGHT | 183 | 184 | 48 |
| 576 | PHOTO - BROADNAX - JAIL FIGHT | 183 | 184 | 48 |
| 577 | JAIL CELL DIAGRAM | 220 | 220 | 48 |
| 578 | LETTER FROM INMATES TO DA | 257 | 258 | 48 |

viii

## DEFENSE EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 1 | MEDICAL RECORDS - (ALSO MARKED STATE'S EX. 485) | 1481 | 48 | 48 |
| 13 | KITE FROM BROADNAX - 7/11 | 1601 | 60 | 48 |
| 14 | SICK CALL REQUEST - 7/11/08 | 1601 | 60 | 48 |
| 15 | DALLAS COUNTY MENTAL HEALTH FOLLOWUP NOTE - 7/20/08 | 1601 | 60 | 48 |
| 16 | BOARD HEARING NOTIFICATION | 1891 | 89 | 48 |
| 17 | BOARD HEARING NOTIFICATION | 2112 | 13 | 48 |

3

P R O C E E D I N G S

(Court convened; jury not present.)

THE COURT: This is the State of Texas versus James Broadnax. The jury has returned a verdict of guilty as to capital murder.

We're about to start the punishment phase of the case.

Is the State ready for the punishment phase?

MR. ALEX: Judge, the State really would prefer another 10, 15 minutes, if I have it.

THE COURT: No, no, no. I'm just saying --

MR. ALEX: We're ready for the punishment phase, Judge.

MR. LOLLAR: Yes, sir.

THE COURT: Okay. What I was hoping to do, and the only reason we're here now, and if you need to send Andrea to go get witnesses ready, or whatever, or if you want to go do it and let her handle this, I just wanted to see if we could solve any evidentiary issues.

Do you know anything you've got objections to?

MR. LOLLAR: Yes, sir.

4

THE COURT: Okay. Would you tell me?

MR. LOLLAR: Yes, sir.

In regard to the jail calls, phone calls made by the defendant from jail, what the State has done is just take little snippets of each, you know. There were something like 26 hours worth of the jail calls, and they've taken about four minutes in total, and they'll take like one sentence or two out of this tape, and one sentence or two out of this tape, and one sentence or two out of this tape. We think they should all be played in context.

THE COURT: Okay. Well, do you --

MR. LOLLAR: And we also think he's been misquoted on some of them.

MS. HANDLEY: They're here, David.

THE COURT: Okay. Do you have the capability of placing them in context by way of cross-examination?

MR. LOLLAR: No, sir. We would have to play the entire tape that that sentence is in.

MR. ALEX: Judge, I can speak to that, if I can.

THE COURT: All right.

MR. ALEX: What Mr. Lollar is talking about is demonstrative evidence that we've given him in

5

advance of actually demonstrating it, but we do plan on offering any -- any snip that we're going to offer, the whole tape will be offered before the snip is played, so it will be just like we did with the -- with the media tapes. We would offer the whole tape.

And obviously, we can publish to the jury whatever we want to publish, and if counsel wants to publish the rest of it, he can, but we're not just going to offer part of the tape. We wouldn't just offer pages 5 through 8 --

THE COURT: So he'd have the opportunity to be able to use the other portions of the tape to establish his point that he thinks it's in context.

MR. ALEX: Yes, sir. I'm going to offer the whole tape. Now, I may not play the whole tape, --

THE COURT: Right.

MR. ALEX: -- but I'm going to offer the whole tape --

THE COURT: All right.

MR. ALEX: -- and I'm going to publish to the jury --

THE COURT: All right.

MR. ALEX: -- those portions that I think is --

THE COURT: I understand.

6

MR. ALEX: -- relevant.

THE COURT: Do you wish to be heard further on that?

MR. LOLLAR: Well, I just want to make sure. Am I going to have the capability to play the entire tape? Is the equipment here?

MR. ALEX: Yes, sir. The tapes will be on individual disks, and I will offer the tape before I go into any of the evidence that's on it, and if you have -- if you need some technical assistance, I think if you ask one of these folks nicely, I'm sure they will help you with that.

THE COURT: Okay. Actually, I'm going to direct that --

MR. ALEX: Okay.

THE COURT: -- so we don't have to worry about asking nicely.

Get our man Hikel in here. He's our best techno guy.

MS. HANDLEY: He will be here by that time. Right now he's helping a witness with some tapes, but he will be here shortly.

THE COURT: All right. Any other objections?

MR. LOLLAR: No, sir.

7

MR. PARKS: Well, I have -- I've filed a couple of motions, Judge, to exclude evidence of bad acts that we -- that we might want to take up at some point in time. I don't know when they're going to offer --

THE COURT: What are this -- what are you talking about?

MR. PARKS: Let me bring you the motions and --

THE COURT: Okay. While you're doing that, where are we on the mysterious aggravated robbery?

MR. ALEX: Well, Judge, --

MS. HANDLEY: I met with Ms. -- if I may. I met with Ms. Mallon and -- and discussed with her our concerns that they had shown us certain records and that, from what was given to us, was a huge gap in time during the time that the extraneous offense occurred.

She directed me to a -- to a purported money gram that was purportedly picked up by a James Broadmax [sic] in Muskegon about two days prior to that. I've learned since then since there's four James Broadmaxes, or Broadnaxes.

COURT REPORTER: Is it Broadmax or Broadnax?

8

MS. HANDLEY: Well, it said Broadmax, but I've learned since then there's four James Broadnaxes.

I was told by Ms. Mallon with respect to this -- this void of time here that they can't show in documents, that they have affidavits from people. And I said If you could tell us the names, or show us the affidavit, we could look into that, see if we're satisfied with that, and they've -- they've elected not to do that. So we still at this point have this unexplained gap of time where he -- he could have been in Dallas.

MR. ALEX: And that was the date of the offense during that unexplained week in time that the documents don't support.

And, Judge, I'll tell you just flat out, if there was a document where the defendant signed for this money gram, I'm sure that if you go and pick up a money order from Western Union, they're not just going to give it to you without a signature.

If we had that document, I would be comfortable that he was not here committing this aggravated robbery, even though I've got two witnesses that swear to me he's the one who did it, Judge, I have no --

MR. LOLLAR: We have given you --

**9**

MR. HIKEL: Let him finish.

MS. HANDLEY: Let's let him finish.

MR. ALEX: If I had the documents, Judge, --

THE COURT: Don't talk at the same time.

MR. ALEX: -- I could represent to the Court that I would not be going forward on that case. At this point, all I've got is circumstantial contradictory evidence, and at this point I'm not -- I am not at a point where I'm going to say to the Court we're not going forward on that.

THE COURT: Mr. Lollar?

MR. LOLLAR: Well, we've given you the money gram where he signed for the receipt of the money two days before on March the 12th.

MS. HANDLEY: If you could direct us to that, because we don't have that. We have what looks like a computer printout that was pointed out to me by Ms. Mallon.

MR. LOLLAR: Go get that.

MS. MALLON: The computer printout?

MS. HANDLEY: No, not the computer printout. We're speaking of something that the defendant would have physically signed.

MR. ALEX: And in order to get the money

**10**

order. I don't think they're going to give you a money order without a signature.

MS. MALLON: Well, we subpoenaed all the records they had on that, and that's all that they gave us.

THE COURT: Okay. So you don't have it. All right. And that will go to the weight, not the admissibility.

Further objections, Mr. Lollar?

MR. ALEX: And, Judge, I guess the --

THE COURT: Actually, I asked Mr. Lollar. Waiting for Mr. Lollar.

MR. LOLLAR: No, sir.

THE COURT: No? Okay.

What, Mr. Alex?

MR. ALEX: Well, the exhibit list will include a majority of the punishment evidence, but it's not going to include all of the punishment evidence because the -- the tapes that we talked about before are not on there, so if you're asking if we have objections, they probably -- they have all of this evidence prior to trial, it's just not on the exhibit list and it's probably not --

THE COURT: What are you talking about?

MR. ALEX: It's probably not a hundred

**11**

percent sure what else I'm going to offer that ain't on the exhibit list, and that -- I want to be real clear. I'm going to offer -- I'm going to lay a predicate for the jail tapes, and that's going to include a disk with all of the jail tapes. I'm going to offer certain ones of them.

And I do believe the -- let me just -- just give me one second, Judge. I've got some other things to mark this morning.

Where's that pad at that I had evidence on?

Chris, do you have that?

MS. HANDLEY: Here you go.

MR. PARKS: It's interesting that his mother sent this money gram money, so unless she's sending it to other James Broadnaxes, it would be a mighty interesting --

MR. ALEX: I think everything else is pretty much all on the exhibit list. If there's anything else, I'll make sure the Court is aware it.

And I don't think there's going to be much more that will be offered.

I know there's some photographs that defense counsel has that relate to the jail incidents. One of the jail incidents he got in a fight and they

**12**

took photographs of both people. Defense counsel has photographs as part of the discovery, but they are not at this point on the evidence schedule.

In addition, there was a -- an incident in jail where he was giving the jailers a hard time and they had to take him to the ground. And they took him to the nurse, and there's a photograph of that that will be offered. And they have copies of all that. I just don't think that's on the exhibit list.

MR. LOLLAR: Are you going to start out with the jail calls?

MR. ALEX: The jail calls will be on pretty -- pretty quickly.

And, Judge, I have the person here who's going to lay the predicate for it. I don't know if you want to do anything pretrial on that, but I could just make a proffer to the Court that he's president of the company of VAC, and he would basically lay the foundation of how the system works and that it is practical and possible to capture the calls. The calls were captured on proprietary software, and it is practical and possible to download them to a disk, and he will identify the inmate ID number as it's downloaded. He will -- he will identify the list of calls that we'd be offering with the inmate ID number.

13

And in addition to that, Mr. Barger would come in and testify that he properly downloaded that disk, and that would be the authentication that we would be offering to admit those tapes.

And then I do want to bring to the Court's attention that I'm not going to admit all of those tapes initially. I would admit them at the points in time where I think they're most relevant. And we believe that under the Rules of Evidence, we can offer those statements of the defendant and it's not hearsay.

THE COURT: Okay. If we have to send the jury out for you guys to argue with each other, we'll do that. We'll just take our time on it. I won't have a bunch of argument in front of the jury, though.

MR. ALEX: Do you know, has Hamb printed him yet?

Do y'all know if -- Brad, --

MR. LOLLAR: Yeah.

MR. ALEX: -- do you know if he's been printed by Dep. Hamb yet?

MR. LOLLAR: I don't think he has.

MR. ALEX: No?

THE COURT: Let's get that done.

Did you hear me, Mr. Alex?

MR. ALEX: Yes, sir. Mr. Barger should be

14

getting that done as we speak, Judge.

(Off-the-record discussion was had.)

THE COURT: Back on the record.

Turning to the motion to exclude evidence of bad acts, possession of contraband, this is a Motion in Limine filed by Mr. Parks, specifically seeks to exclude evidence that Mr. Broadnax's jail cell contained Bupropion, unauthorized pornographic material, books and various writings related to murder, robbery, and gang lifestyle.

MR. PARKS: That would be the Art of War, etc.

THE COURT: Right. Okay. As Mr. Parks correctly points out, the governing statute for this is Subsection 2(a)(1) of Article 37.071, which the Court can allow evidence to be given to the jury about any matter that I deem relevant to sentence, including evidence of the defendant's background or character. And I'll hear argument from you, Mr. Parks, as to why this evidence should not come in.

MR. PARKS: Well, Judge, I don't know -- I don't believe that it is relevant to any of the issues that the jury will be called upon to de -- to determine whether or not he has a copy of murder mysteries or the Art of War in his cell, or a bikini-clad young woman,

15

goes to whether or not he will be a future danger in the penitentiary.

The -- the one pill that they're alleging is contraband, of course, is an item that is prescribed for him. It wasn't like he smuggled it in or anything. He just didn't apparently take it when it was first given to him. I just think that those things have -- have no real relevance to the issue of sentencing.

THE COURT: Okay. As to the Art of War, I've thought about that and I'm going to allow it, although its real probative value is questionable in my eyes. It's probative enough that I'll allow it. It's admissibility goes to the weight, not the admissibility.

What about this Bupropion, Mr. Alex?

MR. ALEX: Judge, the evidence is going to be that at the time that an inmate is given their medications, especially psych meds, I'm talking about Wellbutrin, that they are to take it at that time. If they hoard that medication, it is in violation of the rules of the jail, and any violation of the rules of the jail potentially are going to lead to conflict. And I think that the overall evidence in this case is going to show there's been lots of conflict with the defendant in jail not wanting to follow the rules.

16

And you'll also hear evidence that the -- that Mr. Broadnax has a tendency to want to shake folks down for their meds. And that's been given to defense counsel as well.

And so the fact that -- that his cell is shaken down and he's got antipsychotic meds in his cell, is a -- is a gross violation of the jail rules, and I think even out of the context of a death penalty case, that would be highly probative --

THE COURT: All right. That's enough argument on that.

And what about the bikini-clad women? Is that because it's a violation of the rules? Because otherwise, it wouldn't be relevant.

MR. ALEX: Judge, in particular, I can show you what -- and Judge, just -- I'll find the photographs that we're talking about, and as a general -- a general notion, I think that the punishment phase of any trial, especially capital murder trial, whether the jury has to decide the -- the moral blameworthiness of the defendant, especially in the mitigation issue, if the defendant has pictures of the Virgin Mary on his wall, that would be used to show the kind of things he aspires to.

What I'm going to produce to the Court at

August 13, 2009

17

this time goes to --

THE COURT: I just want to see these bikini-clad photos Mr. Parks is talking about.

MR. PARKS: Well, and I may have used "bikini" a little loosely, Judge, but not too much.

THE COURT: Okay. Well, --

MR. ALEX: I'll show you State's Exhibits 497, 498 and 499, Judge. These are pornographic photographs that are stuffed inside of a Bible, and I think that -- I think that what we're talking about here is he's had a Bible in his room. Not Bible, --

THE COURT: I don't need to hear all of that. They are not bikini-clad photographs, Mr. Parks.

MR. PARKS: I was thinking about the one that he was using as an artist's model.

THE COURT: I'm going to allow this.

MR. ALEX: And State's Exhibit 4 -- 504 and 505 are probably the two specific ones he's talking about, and I think you will hear -- and if you don't hear that, we will withdraw it, Judge, but I think you will hear that the Gangster Disciples, part of their -- part of their gang genre is to show winged women --

MR. PARKS: Is that an E?

MR. ALEX: Winged, W-I-N-G-E-D women.

18

THE COURT: W-I-N-G-E-D, Haze.

MR. ALEX: And I think Mr. Parks has all the data that our gang guy used as a part of their gang insignias.

THE COURT: If that happens, I'm going to let those in too.

Now we've got a new issue. It's been brought to my attention that Juror Steve Ziedel's phone, keys and watch were stolen from the basket downstairs at the security check in. He's filled with white hot rage, apparently, and doesn't want to sit as a juror anymore, so we need to bring him in and see what's going on with him.

Have the jurors been brought up here yet?

THE BAILIFF: Yes, sir.

THE COURT: All right. Go ahead and bring Mr. Ziedel out.

Also, -- off the record.

(Off-the-record discussion was had.)

MR. ALEX: I think our appellate section, Judge, the Honorable Ms. Shin has looked at it, and I think the first Charge we got --

THE COURT: I don't need to hear about it now.

MR. ALEX: Oh, I'm sorry. I thought you

19

were asking.

THE COURT: I just wanted you to look at it now.

MR. ALEX: Okay. I'm sorry. I misunderstood.

(Off-the-record discussion was had.)

THE COURT: Haze, we need to go on the record.

I'll have order, please.

Mr. Ziedel, it's been reported to me that various items were stolen from you while going through security, and I very much am sorry about that.

THE WITNESS: Uh-huh. Yes.

THE COURT: You know, you are a juror in this important case and we would like to have you be able to continue.

I'll ask you to please stand now and raise your right hand.

(Juror Ziedel sworn.)

THE COURT: You may lower your hand. Take your seat.

I'll instruct the bailiffs to ensure that communication is made to whatever security personnel we can to see if we can do whatever we can to recover these items.

20

But let me ask you this: Given your current emotional state, would you be able to continue as a fair and impartial juror in this case?

THE WITNESS: Yes.

THE COURT: All right. Any questions based on my questions?

MS. HANDLEY: No, sir.

MR. LOLLAR: No, Your Honor.

THE COURT: Thank you, Mr. Ziedel. I'm sorry about this.

All right. We're in recess.

(Recess taken.)

(Court reconvened; Jury present.)

THE BAILIFF: All rise.

THE COURT: Be seated, please.

Good morning, ladies and gentlemen. Thank you for being on time again this morning.

We have completed the guilt/innocence phase of this trial. We're now in the punishment phase.

Does the State wish to have opening statement for the punishment phase or will you go directly into the evidence?

MR. ALEX: I'll do an opening, Your Honor.

THE COURT: All right. You may proceed.

21

MR. ALEX: May it please the Court, counsel.

Folks, at the beginning of the punishment phase I have the opportunity to give you another forecast of what I expect the evidence will show and what the State will prove in this phase of the trial.

And at the beginning of this phase of trial, the punishment phase, you will get to consider all the evidence that you received in the guilt/innocence phase.

And I don't want to downplay that because the evidence in the guilt/innocence phase answers two questions for you. And I think we didn't focus a lot on those questions because it would not have been proper. At the guilt/innocence phase it's all about whether he did it or whether he didn't do it.

This phase is about whether he's a future danger and whether or not there are mitigating circumstances sufficient for you to say life versus death. And so at this phase, we're going to focus on that evidence, but when we focus on that evidence, we're going to sort of pinpoint the evidence that is specific to this part of the trial.

And what I want you to realize is, there were parts of the guilt/innocence phase that we did not

22

emphasize, for that reason, and what you will see, -- you'll review some of the evidence again. You won't have to review it all, but when you look at the videos in particular, I think the evidence of future dangerousness is real clear. I'm going to sort of pinpoint for you a little bit.

When we talk about future dangerousness, it is very apparent from the evidence. The State will prove to you beyond a reasonable doubt that the defendant is a future danger, because if you think about the act itself, -- and I will say to you the act itself is sufficient enough for you to say future dangerousness is proven.

If you had to predict after he shot Mr. Butler that he would not commit acts of violence again, you would have been wrong, because the evidence will show he turns around and shoots Mr. Swan in the chest.

And after he shot Mr. Swan in the chest, both of them are shot --

MR. LOLLAR: Judge, excuse me. This is not opening argument. This is closing argument.

THE COURT: Sustained.

MR. ALEX: And the evidence will show that after he shoots Mr. Swan in the chest, the evidence

23

will show he doesn't stop there; that he continues to shoot and he shoots Mr. Butler again.

And the evidence will show that he doesn't stop there.

MR. LOLLAR: Judge, excuse me. Same arg -- same objection.

THE COURT: Overruled at this time.

MR. ALEX: And the evidence will show that he shoots again Mr. Swan in the head at close range.

The evidence will show that he didn't stop there; that he continued to shoot Mr. Butler again in the head, close range.

And while you did consider that in the guilt/innocence phase, that evidence will be presented to you again for the purpose of future dangerousness.

Now, what other evidence is there in the guilt/innocence phase of future dangerousness? Well, when we were playing the videotapes, there were parts that were muted, and there were just parts that weren't emphasized, and what I want to say to you is, there was a part in the media videos where the defendant is sitting there and he's talking about his gun, and he says he wraps it in a flag because I'm a fork, and he throws up a pitchfork.

And we didn't focus in on that in the

24

guilt/innocence phase, but what you'll hear from a gang expert from the Dallas Police Department is that what he's referring to is he's a member of the Folk Nation.

In particular, the pitchfork identifies him as a Gangster Disciple. And you'll hear evidence from the gang expert that he also self identifies himself as a member of the 7 Fours, and what you will hear from that expert is if you take the alphabet and you go through the alphabet and you stop on the seventh letter, it's going to be a G, for gangster. And then if you go through the alphabet and you stop on the letter four, it's going to be a D, for disciple, and he's going to tell you that the Gangster Disciples is one of the oldest criminal street gangs in the country. Originated in Chicago.

And he's going to tell you that this man sitting over here, the evidence is going to show, that not only is he a member of it, but on the videotape he brags about being a member of it, and on the videotape in front of the whole world, the evidence is going to show, he wants everybody out there to know that he is the Folk Nation.

And the gang evidence expert is going to tell you that it is a violent street gang. They're involved in murders and robberies. And the evidence is

25

going to show it's very consistent with the facts of this case.

And the evidence is going to show that it wasn't just by mere circumstance that the cameras was rolling on him when he decides he wants to shout out to the whole country, I'm a Folk.

And there will be no question in your mind after listening to that evidence of who he is and what he's about. And as you go on to see the evidence outside of this case, outside of the gruesome murders that you've heard about, you will hear that while he was in jail, the evidence will show while he has everything to lose waiting on a death penalty case, he cannot control -- or let's say this. He does not choose to control his anger while he's in jail.

The evidence is going to show that he's locked up in a single cell after he comes from the psych ward, after he manipulated his way out of the psych ward, the evidence will show that while he's in the single cells, he's shaking down his neighbors around him for their commissary and their drugs. He's terrorizing his neighbors around him for their commissary and their drugs, and he's fighting with other inmates and he's fighting with the jail staff.

And, folks, the evidence is going to show

26

all of this is while he's waiting for a trial for his life.

The evidence is going to show that these are all intentional acts on themselves. And they will further show to you that -- you will hear from folks from the penitentiary, from a warden, of what it would be like when he got to the penitentiary if he was among the general population. What that population would be like.

And you'll hear from the warden that it's not going to be unsimilar to where he's at right now but for one reason, but for one way. Right now he's in the care of Dallas County jail, the evidence is going to show, locked in a single cell, and he still cannot control, or doesn't choose to not control his anger. And the evidence is going to show that when he goes to the penitentiary, if he's in general population, that he will be in an open bay. He will be locked into a cell at night, but he will be able to come out in the morning and be around other inmates, and guards, and other prison personnel, civilians, until it's time to lock up again at 10:00 o'clock at night.

That's what the warden is going to tell you. And she's going to say to you that it's not a place where danger is completely eliminated.

27

Folks, I'm not going to go through every piece of evidence that we're going to bring you here in the punishment phase, but you will hear all the evidence you need to make a determination the defendant is a future danger, and that there is no evidence sufficiently mitigating to say life versus death.

THE COURT: Thank you, Mr. Alex.

Mr. Lollar, will you have opening statement or will you reserve?

MR. LOLLAR: Your Honor, may it please the Court, we'll reserve our opening statement until the presentation of our case.

THE COURT: Okay. Something's come to my attention I need to tell the lawyers about. This will just take a second.

(Off-the-record discussion was had.)

THE COURT: Excellent news for Mr. Ziedel. We've recovered your car keys.

JUROR ZIEDEL: Thank you.

THE COURT: I thought you'd like that.

All right. Call your first witness, Mr. Alex.

MR. ALEX: The State will call Theresa Butler, Your Honor.

THE COURT: Theresa Butler.

28

Ma'am, if you'll come all the way to the front of the courtroom up by the door. When you reach the door, turn and face me and raise your right hand.

**THERESA BUTLER**

was called as a witness and testified as follows:

THE COURT: Take your seat in the witness stand, ma'am. I know this is a very emotional time for you, ma'am, but you've got to keep your voice up, okay? So that Mr. McCreary (sic) can hear you.

Mr. Alex, whenever you're ready.

MR. ALEX: Thank you.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. Would you state your full name, ma'am.

A. **Theresa Butler.**

Q. And, Ms. Butler, you know why you're here today; is that correct?

A. **I do.**

Q. Would you tell the jury your relationship with Matthew Butler?

A. **He was my son.**

Q. Okay. And tell the jury, how many kids did you have?

A. **Only Matthew.**

August 13, 2009

29

Q. So he was your only son.

A. Right.

Q. Your only child.

A. Yes.

Q. Tell the jury a little bit about yourself. What do you do for a living?

A. I've been an executive assistant. I'm unemployed now.

Q. Okay. And how long have you been unemployed?

A. Since Monday, a week and-a-half ago.

Q. Since we were getting ready for this trial?

A. Uh-huh.

Q. Okay.

A. Yes.

Q. And have you been here every day since?

A. Yes.

Q. And Ms. Butler, I told you that I needed you to come in and sort of introduce Matthew to the jury. As his mother, Mathew's father's name is?

A. Michael.

Q. And is he here today?

A. He is at work.

Q. Okay. And has he been here for the trial?

A. Yes.

Q. Very good. And what does he do for a living?

30

A. He's a firefighter/paramedic for the City of -- City of Richardson.

Q. Richardson? Very good.

And tell the jury a little bit about Matthew. Where did he -- was he born here in Texas?

A. He was born in Garland, Texas.

Q. All right. And where did he grow up?

A. Garland, Texas.

Q. Okay. Did he go to schools in Garland?

A. Uh-huh. Yes.

Q. All right. You guys were a Garland family.

A. We lived there all of his life.

Q. And who did he live with?

A. His father and me. Uh-huh.

Q. And where -- did he graduate there in Garland from high school?

A. Matthew graduated from Dallas Academy. It's a private school.

Q. Okay. And after he graduated from high school, what did he do?

A. He went to college at Collin County Community College.

Q. All right. And what did he study?

A. Audio engineering.

Q. Audio engineering?

31

A. Uh-huh.

Q. Okay. And did he complete his studies in audio engineering?

A. He never finished.

Q. Okay.

A. And I did forget to say, Matthew went off to school at Abilene Christian University, but had to come home from school. He got sick.

Q. So he had a bout with sickness?

A. Yes.

Q. And after going to Abilene Christian and the community college, what did he wind up doing for a living?

A. He opened a studio, a recording studio, in downtown Garland.

Q. And do you know when he opened that up?

A. 2005.

Q. And the name of it was?

A. Zion Gate Records.

MR. ALEX: May I approach the witness, Your Honor?

THE COURT: Yes, sir, and as necessary to develop her testimony.

Q. (BY MR. ALEX:) State's Exhibit 22, is that a photograph of Matthew?

32

A. Yes.

Q. Okay.

MR. ALEX: We'd offer State's Exhibit 22.

THE COURT: Any objection?

MR. LOLLAR: No objection.

THE COURT: State's Exhibit 22 is admitted.

Q. (BY MR. ALEX:) And he's sitting here in front of a keyboard. Was he also a musician?

A. Yes.

Q. Was that one of his hobbies?

A. That was -- he loved music.

Q. Was that his life?

A. It was his life. Until he had children and a wife.

Q. All right. And did he run the Zion Gate Records alone?

A. He, um, he was there full time all the time, and Steve Swan helped him part time.

Q. And did you know Steve Swan as well?

A. Very well, uh-huh.

Q. Is that Steve Swan over there in the State's exhibit over to your far left?

A. Yes, that is.

Q. And he and Matthew in front of the Zion Gate

33

Records in the middle.

A.  Yes.

Q.  All right.  And what was the relationship like between Steve and Matt?

A.  They were really good friends.

Q.  What did Steve do for Matt?

A.  Leveled him out. Matt was a dreamer. Matt wanted to do all of these great things and Steve was the one that said, Hold on a minute.

Q.  And tell me, did -- at some point, did Matthew get married?

A.  Yes, he did.

Q.  And who did he marry?

A.  Jamie.

Q.  Jamie Butler?

A.  Yes.

Q.  Okay.  And did they have a family?

A.  Yes. Right away. Matthew Garrett Butler, Jr., and then Mikayla Grace after that.

Q.  And how old -- how old were the kids at his death?

A.  Matthew was two and-a-half and Mikayla was one and-a-half. They're 11 months apart.

Q.  And, Ms. Butler, can you tell the jury a little bit about his family, his wife and kids?

34

A.  Um, Jamie is beautiful, smart, intelligent, redhead. Matthew dreamed of marrying a redhead. He said that God was going to give him a redhead wife. And he married Jamie after knowing her for a short time, and she's -- she's a strong, strong Christian woman.

Matthew Garrett Butler, Jr., was born shortly after they married and he's -- both of the children are just the joy of our lives. And Matthew is now three and-a-half and taken after his daddy's musical talents and abilities.

And Mikayla as well. She's -- they're just -- they're just brilliant, beautiful little children.

Q.  Very good.

A.  It's what keeps us going.

Q.  Very good.

And your relationship with Matthew's children, do you have a strong relationship with them?

A.  Yes.

Q.  Ms. Butler, when was the last time before his death that you had spoken to your son?

A.  Um, Tuesday night. Um, they came by to drop off the kids, and I'll never forget it. Matthew was very passionate about pretty much anything in his life, but he had noticed that I had lost weight and he came

35

up to me and grabbed me by the shoulders and he was like, Mom, what are you doing? You look so good.

And I told him what happened and he said, You keep it up, mom. I love you and I love dad, and you can just -- you got to keep it up. We were walking, and so ... and then he took the time to go back and put some stakes back in the garden so the tomato plants wouldn't die on the ground. The stakes are still right where they -- right where he put them.

Q.  Very good.  And that was the last time you knew Matt to be a live, living human being; is that correct?

A.  Um, that was the last time I saw him.

Q.  Okay.

A.  I talked to Matthew every day, sometimes multiple times a day, and we were very close. And I did talk to him at 6:30 that night and he had told me --

Q.  Which night?

A.  On Wednesday, the 18th.

Q.  Okay. The 18th?

A.  And he told me he was going -- he was very excited. That Sunday before, they -- the boys, Steve and Matthew, had recorded a symphony orchestra project and he told me that he was going to meet Steve.

36

Steve worked with me at Elipse. I got him a job there, and --

Q.  Steve Swan did.

A.  Yes.

Q.  Okay.

A.  Steve Swan worked with me at Elipse.

And so they had recorded this symphony orchestra, and so he was so excited about it, he said that they were going to go to the studio and work on it and finish it so they could deliver it on Thursday like he promised.

Q.  On Thursday?

And do you know if they were actually working on that at the time of his death?

A.  I know that they had been. I know that they were working on some of Steve's -- not working on it, but listening to some of Steve's stuff too. Musicians, they were both very proud of stuff that they did, so I know that was Steve's song, We All Die Before Our Time was up on the computer screen when Jamie started up the computer, or went in and looked at the computer the next day.

Q.  So the next day when y'all went into the store, that was the song -- last song they had saved for the day was We All Die Before Our Time.

37

A. It was Steve's song and he had wrote it and recorded it at his home and he -- he must have been letting Matthew listen to it, and they were just listening to it at the studio.

Q. And, Ms. Butler, --

(Sotto voce discussion.)

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Cross-examination?

MR. LOLLAR: I'm sorry for your loss, ma'am.

THE WITNESS: Thank you.

MR. LOLLAR: Thank you.

We have no questions.

THE COURT: All right. You may step down, ma'am.

You're permanently excused, but that means you can remain in the courtroom.

What further says the State?

MR. ALEX: Judge, just for the record, I think defense counsel is going to stipulate that State's Exhibit 427 is one and the same person as the State's Exhibit 1 -- State's Exhibit 22.

THE COURT: Any objection?

MR. LOLLAR: No.

38

THE COURT: All right. So you're offering --

MR. ALEX: We're offering it for the record.

THE COURT: All right. And that's 427?

MR. ALEX: 427.

THE COURT: All right. It's admitted for record purposes.

What further says the State?

MR. ALEX: The State would call Dr. Dyer, Your Honor.

THE COURT: Dr. Dyer.

Doctor, would you please come all the way to the front of the courtroom up by the door. Once you've reached the door, if you'll turn and face me and raise your right hand.

**TRACY DYER, M.D.**

was called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

39

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. Good morning.

A. Good morning.

Q. State your full name for the jury, please.

A. My name is Tracy Dyer, D-Y-E-R.

Q. And what do you do for a living?

A. I am a medical examiner at the Dallas County Medical Examiner's Office.

Q. And how long have you been a medical examiner for Dallas County?

A. For three years.

Q. And what did you do before that?

A. Um, before that, I was in -- training in school for quite some time.

Q. All right. How many years of school did you take?

A. Well, an undergraduate degree, and then actually, after that, I went to law school at the University of Kansas.

Following law school I was a Navy Judge Advocate for about five and-a-half years, and then I decided on a career change, so I went to medical school at Oregon Health Sciences University in Portland,

40

Oregon, and I finished my training there, so a lot of years of school.

Q. Very good.

Tell the jury what a medical examiner does.

A. Our responsibility is to determine cause and manner of death for individuals that die in sudden or unexpected ways.

Q. And I think the jury probably heard from Dr. Amy Gruszecki in the guilt/innocence phase, and primarily what you would do would sort of mirror what she did when it comes to autopsies; is that correct?

A. Absolutely. She is a colleague of mine.

Q. Very good.

And did you do an autopsy on a person identified to you as Matthew Butler?

A. Yes, I did.

Q. And taking in mind that the jury has heard what an autopsy is and what it consists of, the internal and external examinations, I'm going to ask you, is there a unique case number associated with that autopsy of Matthew Butler?

A. Yes, there is.

Q. Would you tell the jury what that is?

A. It's 2126-08.

Q. And --

41

MR. ALEX: May I approach the witness, Judge?

THE COURT: Yes, sir. And as necessary to develop your testimony.

Q. (BY MR. ALEX:) Did you prepare a report as it related to the autopsy of Matthew Butler?

A. I did.

Q. Is this a copy of the original of State's Exhibit 426?

A. Yes, it is.

Q. And does it bear your signature on it?

A. It does.

Q. Very good.

MR. ALEX: We'd offer State's Exhibit 426, Your Honor.

MR. LOLLAR: No objection.

THE COURT: Okay. State's Exhibit 426 is admitted.

Q. (BY MR. ALEX:) And, Dr. Dyer, what we'll do is I'm going to ask you specifically, did you -- when you examined Matthew Butler, -- we'll start from the end and we'll work our way forward, okay?

A. Okay.

Q. What was your conclusion from that examination as to his cause of death?

42

A. Mr. Butler died from multiple gunshot wounds.

Q. And the manner of death?

A. Homicide.

Q. All right. And did you observe multiple areas of injury that would have contributed to the cause of that death?

A. Yes.

Q. All right. And we're going to talk about those, okay?

A. Okay.

Q. And we'll document them with photographs as we go. Is that okay?

A. That would work fine.

Q. Thank you, ma'am.

MR. ALEX: And again, folks, this would be a good time to leave if you don't want to see these kind of photographs.

At this time, Judge, may --

Q. (BY MR. ALEX:) Have you had a chance to look at the photographs?

A. I have.

Q. All right. State's Exhibits 428 through 452, inclusive, are those photographs taken in connection with the autopsy of Matthew Butler?

A. They are.

43

MR. ALEX: We would offer State's Exhibits 428 -- actually, Judge, 428 through 452, and I would also add to that the ID photo which is 427, which I sat down somewhere.

That would be the one we stipulated to. 427 through 452 for all purposes.

THE COURT: Is there objection?

MR. LOLLAR: Your Honor, in regards to 427, we have no objection.

In regard to the others, we have -- offer the same objections that we offered in the pretrial hearing conducted on this issue.

THE COURT: All right. The 4.03 objection; is that right?

MR. LOLLAR: Yeah.

THE COURT: The objection's overruled.

State's Exhibit 427 through 452, inclusive, admitted.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) All right. What we'll do, Dr. Dyer, we'll start with when a -- when a person comes into the Medical Examiner's Office, -- and again, that's the acronym for the place of business that you work is SWIFS correct?

44

A. That's correct. The Medical Examiner's Office is part of the Southwestern Institute of Forensic Sciences, also known as SWIFS.

Q. Very good.

When they come into the Medical Examiner's Office, do you-all take what we commonly refer to as an ID photograph with the unique number on it?

State's Exhibit 427, does it bear the unique number there?

A. Yes, it does.

Q. And the person in State's Exhibit 427 would be Matthew Butler; is that correct?

A. Correct.

Q. All right. And when you -- when you talk about evidence of injury, we're going to go through and as I show the photograph, if you will tell the jury what the evidence of injury is that we're looking in the photograph, perhaps give them the path of any particular gunshot wound and -- and that sort; is that correct?

A. That would be fine.

Q. Is that okay?

A. Yes.

Q. All right. Very good.

State's Exhibit 428, when they come to the

45

Medical Examiner's Office, do you take an as is photo to show --

MR. ALEX: Judge, could you drop the lights just a bit?

Q. (BY MR. ALEX:) -- Is that the way, State's Exhibit 428, that the upper half of Mr. Butler was when he arrived?

A. Yes.

Q. And State's Exhibit 429, would that be the lower half of Mr. Butler?

A. Yes.

Q. And when you number in your report -- let's say, for instance, most of the injury that you observed, fatal injuries to Mr. Butler would have been gunshot wounds; is that correct?

A. That's correct.

Q. And when you number them in your report, if the jury was to look at that at a later time, there is no significance in the order in which you -- you put them; is that correct?

A. No, they're numbered just for convenience purposes. They don't implicate any sort of order of gunshot wounds or the severity of the injuries.

Q. Thank you, ma'am.

State's Exhibit 432, let's get the exhibit

46

sticker there. What are we looking at in State's Exhibit 432?

A. This is what I had labeled as gunshot wound Number 1, which was a gunshot wound to the right side of the victim's face.

Q. Okay. And we'll use State's Exhibit 433 for you to give us a little detail about that wound.

What are the little marks surrounding the hole here we see in Mr. Butler's face?

A. So that the center defect is the main gunshot wound, but all of the little marks that you see around that are what we call stippling.

Stippling is basically burning particles of gunpowder as they come out of the end of the barrel of the gun.

If those particles are close enough to the skin, they still are burning when they strike the skin, so they make additional little abrasions or marks on the skin that will be -- that are permanent.

In other words, they are -- you can't wipe them off. They're actually little burn marks in the skin. That implicates a certain range of distance that the barrel of the gun was from the skin, and that, for general purposes, is somewhere in the range of inches to a couple of feet.

47

Q. And the -- would you categorize this as an entrance wound?

A. Yes, this is an entrance wound.

Q. And -- and how do you distinguish between like an entrance and an exit?

A. This -- the central defect is very round and regular, and there is skin missing from the middle of it, which is very indicative of an entrance wound.

There's also what we call a marginal abrasion, which is the red portion of the wound there that you can see, that occurs as the bullet passes into the skin and actually scrapes a little bit of the skin on the side of the entrance wound.

Q. And were you able to tell the path of the bullet that would have entered the head of Mr. Butler?

A. Yes. This was -- this was a gunshot wound that involved his face. It actually went through the mandible, it went through the back of his tongue, it went through some soft tissues on the left side of his face, and it came out on the left side of his face.

Q. And so if we were going to look at the exit wound, you saw evidence of that particular wound and the bullet exit; is that correct?

A. Correct.

Q. All right. State's Exhibit 442, what are we

48

looking at here?

A. This is the exit wound on the -- the left side of the face near the jaw line.

Q. And so, if you were -- if you were going to categorize the -- would you say it was up to down, the direction?

A. No. Actually, the -- well, the primary direction was right to left.

Q. Okay.

A. It also then went a little bit downward and really not front or back. You know, everything being in three dimension. So it was primarily right to left and slightly downward.

Q. So if I was sort of standing over Ms. Handley -- and you can't see one way or the other, because if you change the body and the position of the gun, then any hypothetical we can give would change; is that correct?

A. That's correct.

Q. But if I was standing over her, and slightly down toward from right to left, that would be consistent.

A. Yes.

Q. Okay. And then when we look at State's Exhibit 443, can we see the significant difference

49

between an exit and an entry?

A. Yes. As you can see here, the wound is not round, it's more what we call stellate or irregular. There's no stippling. There is a little bit of a bruise there above it, and there's also none of the marginal abrasion right around the skin edges of the wound, so this is an exit wound.

Q. I'm going to show you what has been marked as State's Exhibit 434.

MR. ALEX: Let's see. Zoom out. I'm going the wrong way, Mr. Hikel.

All right. There we go.

Q. (BY MR. ALEX:) State's Exhibit 434, tell the jury what they're looking at here.

A. Well, you can see portions of two different wounds here. There's some wounds on the arm, which I believe we'll discuss later, and then there's the one that's just beneath the sticker on the body which is on the right side of the trunk there near the right nipple, and this I labeled as gunshot wound Number 2, and it's an entrance wound.

Q. And it's an entrance wound.

And State's Exhibit 435, is that a -- that doesn't appear to be a very clean entrance wound, does it?

50

A. No, it is generally round and it does have a marginal abrasion, but it also has these additional contusions around it. And this wound actually may have been associated with one that we'll discuss later that went through the arm.

Q. There's a potential that it could have been a reentry.

A. Exactly.

Q. Okay. Very good.

And when we say Reentry, I know at this point you can't say for sure because you weren't there, but there's a potential that it could have -- that one of the shots could have gone through another part of the body and reentered in that side of the chest; is that correct?

A. Correct.

Q. And so we've got the -- hold on a second. State's Exhibit 436, I'm going to zoom out on that, hopefully, to give us some context of what we're looking at here.

Is this the arm wound that we saw in the previous picture?

A. Actually, this is -- this is Number 3. It's a -- it's a slightly different wound.

Q. Okay. Very good.

51

Explain to the jury what we're looking at here.

A. This one is Num -- gunshot wound Number 3, which was sort of on the back side of the arm. Again, it is very round. Clearly an entrance wound. And it actually has some of that fine stippling around it that we saw more prominently on the face wound.

This wound, I am quite certain, actually went through the arm, it came out the axilla and then reentered the right side of the chest, and I'm more certain on this one because the exit and the reentry are very close together, so I'm -- I'm sure that that's what happened on this wound.

Q. Okay. And so this is where it would have entered the arm?

A. Yes.

Q. And then State's Exhibit 437, what are we looking at there?

A. This is the same entrance wound, I believe. It's -- it's turned.

Q. Okay. Let's do it --

A. It's turned for us, yeah.

Q. Okay. Let me turn it that way.

A. Thank you.

Q. Would this be the -- the underside of the

52

armpit of the right arm?

A. Yes. So this is the wound. It went through the arm. It exited right into the armpit area and then actually reentered the right side of the chest very close to that.

Q. Okay. So is this the exit? Or this is --

A. Well, the entrance is on the arm, and then you can see the exit right in the axilla area.

Q. Okay.

A. But there's probably a better picture of that.

Q. Okay. Very good.

State's Exhibit 438?

A. That's the one that -- now you can clearly see those -- the two wounds that are close together, one's an exit and one's a reentry into the chest.

Q. And the one that's the reentry to the chest is the one that we had looked at previously?

A. I don't believe we've seen that one previously.

Q. Okay. Very good.

And this picture may give us a better idea of what -- what you're talking about as the exit and the reentry.

I think you have a stylus up there. So the jury can -- it's right in front of you there.

August 13, 2009

53

If you can mark on the screen in front of you, would you mark the one that is the -- what you're calling the exit and then the one that's the reentry.

**A.   So this is the exit here (indicating).**

Q.   Okay.

**A.   And this is reentry here.**

Q.   And that's the one you have labeled in your report as gunshot wound to the arm, Number 3.

**A.   Yes.**

Q.   All right.  Tell the jury what the path of it was.

**A.   This bullet went through the arm and reentered the chest.  It went through the right lung.  It actually went downward through the liver and into the abdomen and was recovered from within the first lumber vertebral body, which is one of the vertebral column bones fairly low in the body.**

Q.   And what direction was it going?

**A.   This bullet went right to left again and downward, and did not again have much in the way of front/back deviation.**

Q.   Okay.  And, Dr. Dyer, the entrance and the reentry in this case can be a little confusing so, let's see, would it -- would it be better if I showed you these pictures up close, or can you tell from that

54

the orientation of it?

**A.   Oh, that's -- that's the one with the stippling.  We've seen a little bit of that stippling on one of the previous photos, but that's the best picture that -- to show the stippling around the entrance wound.**

Q.   And which wound would this be in your report?

**A.   Oh, this is entrance wound for Number 3, the one that goes through the right arm and into the chest.**

Q.   And so when Mr. Butler was shot in the back of the arm, it would have been at what we call close range.  Not contact, but close range.

**A.   Well, technically we call that medium range, but for most people, they would consider that certainly close, because again, we're talking about a few inches to a couple of feet.**

Q.   And that would also be consistent -- and I know you weren't there and you can't say for sure -- with the person maybe reaching for an item and then getting shot in the back of the arm in a downward motion.

**A.   That would be consistent.**

Q.   Okay.  State's Exhibit 445, let's zoom in on it to give it some context.  What are we looking at there?

55

**A.   This is an exit wound for gunshot wound Number 6.**

Q.   Okay.  And gunshot wound Number 6 is going to be a wound to the back?

**A.   Yes.**

Q.   All right.  Perhaps we'll do that -- we'll do that one first.

We'll go instead to State's Exhibit 449.  State's Exhibit 449, what are we looking at here?

**A.   This is a gunshot entrance wound on the right side of the back.**

Q.   On the right side of the back.  And what's the path of this wound?

**A.   This bullet traveled into the back on the right side.  It then went through a -- a rib on the back right side.  It came up through the middle of the chest and perforated a couple of the large vessels in the chest, one that feeds the lungs, and then actually the aorta as it comes off of the heart.  And then it came out the front left side of the chest, so it crossed from back to front and from right to left.**

Q.   And did you say it traveled through the heart?

**A.   It did not actually hit the heart, but it hit a couple of the large vessels that come off of the heart.**

56

Q.   And State's Exhibit 450, it is a -- again shows that this is actually an entrance wound as opposed to an exit wound; is that correct?

**A.   Correct.  It's very round, regular, and has a marginal abrasion that goes all the way around the wound.**

Q.   And we will go back to State's Exhibit 445, and what are we looking at here?

**A.   And this is the associated exit wound that was on the front left side of the chest.**

Q.   And again, to corroborate the exit versus entrance, we can see that this is not quite -- well, you tell the jury the difference here.

**A.   It's a little more irregular.  It has no marginal abrasion.**

Q.   State's Exhibit 447, can you tell the jury what we're looking at here?

**A.   This is gunshot wound Number 5, which was a gunshot wound on the left shoulder, so what you're seeing here is the top of the left shoulder.  And it's -- it's a smaller wound.  It just -- you see the entrance and the exit here, the entrance being the one that's more towards the body, and the exit being the one that's a little bit further down on the arm.**

Q.   And State's Exhibit 448 may give us little bit

57

better reference of what we're talking about when it comes to -- you're saying what we're looking at here is an entrance and an exit?

A. Correct. So on this screen, the entrance is on the left and the exit is on the right, and you can see that it sort of skimmed along the surface because there's a very large area of marginal abrasion that extends out, so basically the bullet was scraping the skin before it penetrated in, went through the soft tissues and then came out on the right side of that screen.

Q. So if I stuck the pen in like that, that's kind of the way it was -- went in?

A. Correct.

MR. ALEX: For the record, the pen is going across State's Exhibit 448 from left to right.

Q. (BY MR. ALEX:) Dr. Dyer, the -- State's Exhibit 442, what are we looking at here?

A. This is the mucosa, called the buccal mucosa on the upper side of the left upper lip, and we always examine in the mouth for any injuries that might be in there, and looking at the buccal mucosa there, you can see that it was lacerated or torn.

Q. And would that be consistent with a person who may have been standing, shot, and who, not on their

58

own, but for the force of after being shot in the back, would have hit the ground?

A. Yes. It's a blunt-force injury that probably occurred from either something striking his face, or him falling and striking the ground.

Q. And, Dr. Dyer, I don't know, if you recall, was there significant trauma to the face as if Mr. Butler had struck the ground with his face? Do you recall that?

A. On the external surfaces?

Q. Yes, ma'am.

Let me show you again the -- and it -- and it may be hard to tell.

State's Exhibit 428, I think I've got a crime scene photo, but the -- what you were looking at primarily was the gunshot wounds and document -- documenting those; is that correct?

A. Yes. And, you know, any other injuries that might be noted, like the buccal mucosa. I mean, there's obviously a lot of blood in this picture.

Q. And how many bullets did you recover?

A. Two.

Q. All right. State's Exhibit 442, which is probably already in evidence, I'm quite sure, this would be the marking on the package that you would have

59

put it in after you recovered it?

A. Yes.

Q. And it bears your case number?

A. Yes.

Q. And where it was removed from?

And is that what we're looking at, that you would have taken from the body, as soon as I stop making everybody dizzy.

All right. I see what I'm doing wrong. Okay. Very good.

What we see at the bottom here is the bullet that you would have recovered from the body of Mr. Butler; is that correct?

A. Yes, that's one of them. This is the bullet that I recovered that was in the left side of the chest.

Q. All right. And then State's Exhibit 451, would that be the -- the other bullet you recovered from, what does this say? The lumbar --

A. Lumbar vertebra Number 1, yes.

Q. Is that correct?

A. Yes.

Q. Thank you.

(Sotto voce discussion.)

MR. ALEX: Can I have a second, Judge?

60

We're done with the overhead.

Q. (BY MR. ALEX:) Now, when Mr. Butler was received there at the Medical Examiner's Office, y'all would have documented his height, as well as his length and his weight; is that correct?

A. Yes.

Q. And how much did he weigh?

A. 198 pounds.

Q. And what was his stated age?

A. 28.

Q. All right. And the -- I'm not going to ask you to break it down, but how many inches was his length?

A. 72.

Q. All right. So six feet?

A. Six feet.

Q. That's kind of easy, huh?

And you didn't see any evidence of -- you said that the manner of his death would have been homicide and the cause of his death would have been multiple gunshot wounds; is that correct?

A. Correct.

Q. And did you see any natural causes that would have caused his death in spite of these wounds?

A. None.

61

Q. Okay.

MR. ALEX: That's all we have.

THE COURT: Cross-examination?

MR. LOLLAR: We have no questions. Thank you.

THE COURT: May the witness be permanently excused?

MR. ALEX: We have no objections, Your Honor.

MR. LOLLAR: Yes.

THE COURT: You're permanently excused, Doctor.

Take a 12-minute recess for the jury. All rise for the jury.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

What further says the State?

MR. ALEX: The State would call Jean Swan, Your Honor.

THE COURT: Jean Swan?

If you'll come all the way up here, ma'am, all the way to the front of the courtroom. Turn and face me and raise your right hand.

**JEAN SWAN**

62

was called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the witness stand, ma'am.

Please try to keep your voice up, ma'am. Thank you.

Mr. Alex, whenever you're ready.

MR. ALEX: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, ma'am.

A. Jean Swan.

Q. And, Ms. Swan, you know why you're here; is that correct?

A. Yes.

Q. All right. And tell the jury your relationship with Stephen Swan.

A. He was my son.

Q. Okay. And I know this is difficult, Ms. Swan, and we're going to -- we're going to try and get through it, okay?

We've -- we've talked a little bit about this phase of the trial in which you can give the jury a little understanding of how this has impacted your family; is that correct?

A. Yes.

63

Q. All right. And I think your husband has already introduced Stephen to the jury, so they have a little knowledge about who Stephen was, and what I want to ask you from a general -- as a general prospective, how has Stephen's loss affected you personally?

A. Well, he was my first-born son. I'm not the same person. I've lost not only a friend and my son, but the big brother to my younger children. He was their hero. He was -- he was looked up to by all of our friends and all of even friends of my age.

It just reflects -- his music reflects everything he worked his whole life for. He worked all of his life to get to a level of accomplishment and ability, and then he just got cut off.

Q. So did Steve -- was his music a part of your life?

A. I had no music talent, but it was part of my life, yes.

Q. Did you -- how did his music -- what did his music mean to you?

A. What it meant to me was that he was -- he was so smart and so passionate about so many things, including his music, and I home-schooled him. He was self-taught. He self-taught himself music.

He didn't even play the piano. It wasn't

64

until he played with the earphones until he could play and just -- you know, I was surprised.

He trained his voice, he trained himself on every instrument that he played.

Q. How many instruments did he play?

A. Well, he played several -- guitars. Several types of guitars. Base. Piano. He could play drums. He was learning harmonica and -- and he worked on his voice. He had written hundreds of songs and recorded and pretty many -- did every track, wrote every track and performed every track, except for the drums that his brother would do.

Q. So when you say you home-schooled him, you didn't really home-school him in the music, did you?

A. No, but what it meant to me is that he was self-taught and he could teach himself.

By the time he was nine-years old, he was managing his own education. And everything he was interested in, he was able to teach himself and other people.

Q. And if you were to sum up Steve's life in a couple of phrases, how would you do that?

A. It would be very difficult.

Q. Okay.

A. But he loved the Lord. He was saved when he

65

was four-years old, and it was a genuine conversion because the rest of his life was a spiritual growth.

He loved -- he loved his country. He gave himself to volunteering and worked for several organizations. He was just given to that.

In fact, when he was working with Matt, he was giving that time to Matt. He gave like one night a week to another one of his friends that just needed help. He was disabled and he just was loving. He loved his family, he loved his country, he loved the Lord, and he was so talented and smart, but he never promoted himself or bragged. He just served. I guess that would be it.

Q. And so he would have given anybody anything that they wanted if they had asked.

A. I think so.

Q. Okay. And how has this affected your family and friends?

A. Well, my family is just crushed. I mean, my son is -- my younger son has even said none of us look the same, none of us sound the same.

I know it's only been just a little over a year, but we're just not the same family.

We'll recover. We know he's with the Lord and we're going to see him. And it's not that. It's just

66

that for now, it's a very hard recovery. It was so sudden and tragic. He had just recovered from cancer. Spent a year fighting cancer. Sorry.

Q. That's all right.

A. And after all the difficulties he had and struggles he had, and he just was about to realize some of the benefits of all that he had worked for, and then he -- it was all over.

He had no enemies either.

Q. People liked him.

A. I think he only had admirers. I never knew anybody who didn't admire him.

Q. Okay, Ms. Swan.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Cross-examination.

MR. LOLLAR: We're sorry for your loss, ma'am.

THE WITNESS: Thank you.

MR. LOLLAR: We have no questions.

THE COURT: You may step down, ma'am.

THE WITNESS: Thank you.

THE COURT: What further says the State?

MR. ALEX: The State would call Richard Hamb, Your Honor.

67

THE COURT: Richard what, sir?

MR. ALEX: Dep. Richard Hamb.

THE COURT: Oh, Richard Hamb, right.

Dep. Hamb, would you come all the way to the front of the courtroom, as usual. When you've reached the door, turn and face me and raise your right hand.

**DEP. RICHARD HAMB**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex.

Mr. Alex, whenever you're ready.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, sir.

A. Richard Hamb, H-A-M-B.

Q. And tell the jury what you do for a living.

A. I work for the Dallas Sheriffs office as a fingerprint technician. I work in the identification section of the jail.

Q. Identification section of the jail?

68

A. Yes.

Q. And what do you do over at the identification section?

A. We classify and compare fingerprints of prisoners booked in.

I'm also the custodian of jail records.

Q. All right. And so you -- is it possible to take someone's prints on a piece of paper and compare them to another set of prints on another piece of paper and tell if they're from the same person?

A. Yes.

Q. And those prints on a piece of paper, what do you call those?

A. Rolled ink fingerprints.

Q. And did I ask you to do that in this case?

A. Yes.

Q. All right.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) Can you tell the jury what State's Exhibit 573 is?

A. It shows the fingerprints of James Broadnax.

Q. All right. And when you say James Broadnax, are you talking about the defendant in this case?

A. Yes. I fingerprinted him this morning in the

69

holdover.

Q. And would you point to where he's sitting and describe, let's say, the color of his shirt?

A. The light-colored shirt. He's the third person at defense table in the striped tie.

Q. All right.

MR. ALEX: May the record reflect that the witness has identified the defendant in open court?

THE COURT: Any objection?

MR. LOLLAR: No objection.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) All right. So the prints on this card, State's Exhibit 573, are the defendant's?

A. Yes.

Q. And State's Exhibit 395, does it also bear fingerprints on it as well?

A. It does.

Q. And does it bear a picture of someone on it?

A. Yes.

Q. With the information that would be used when booked into the Dallas County jail.

A. Yes, sir.

Q. All right. And you made a comparison of those.

A. Yes.

70

Q. All right.

MR. ALEX: We're going to offer State's Exhibit 573 and 395 at this time, Your Honor.

MR. LOLLAR: No objection.

THE COURT: Let me see those, please. 395 and 573?

State's Exhibit 395 and 573 are admitted. You may publish.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) So, Dep. Hamb, when you compared the prints, -- well, what do we commonly call State's Exhibit 395?

A. It's a blueback, a certified pack of records.

Q. All right. So it's records from the Dallas County jail?

A. It is.

Q. And on the first page of it, we've got a fingerprint card; is that correct?

A. That's correct.

Q. And then -- well, I guess that would be the second page.

A. Yes.

Q. And then on the third page we have a photograph of the defendant when booked in with

71

information on it; is that correct?

A. That's correct.

Q. And the type of information that would be included on that would be -- let's just go over that for a minute.

Well, first, let me ask you this: When you compared the prints in 573 and 395, did it appear to come from the same person?

A. They are.

Q. They are the same person?

A. They are the same person.

Q. So the person who is photographed in 395, it would be fair to say, is the man sitting over there; is that correct?

A. Yes, it is.

Q. And the information on this packet would relate to him; is that correct?

A. Yeah. That's his jail book-in information.

Q. All right. And when we say the AIS number is 2725502, is that a unique number that the jail uses to classify individuals?

A. Yes, it is.

Q. All right. And does it show his book-in date as being Saturday, June 21st, 2008?

A. That's correct.

72

Q. And it also shows six-three, 160 pounds, that kind of thing; is that correct?

A. Yes, sir.

Q. Very good.

MR. ALEX: That's all I have for this witness, Your Honor.

THE COURT: Cross-examination?

MR. LOLLAR: No questions.

THE COURT: May the witness be permanently excused?

MR. ALEX: We have no objections, Judge.

MR. LOLLAR: Yes.

THE COURT: You're permanently excused, sir.

What further says the State?

MR. ALEX: The State would call Mark Turner, Your Honor.

THE COURT: Mark Turner.

Sir, if you'll come all the way to the front of the courtroom up by the door, when you've reached the door, turn and face me and raise your right hand.

**MARK TURNER**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take

73

your seat in the witness stand.

You'll be responding to questions from Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, sir.

A. **It's Mark Turner.**

Q. And, Mr. Turner, what do you do for a living?

A. **I'm the president and chief operating officer of ValueAdded Communications in Plano, Texas.**

COURT REPORTER: What's the name of it again?

THE WITNESS: ValueAdded Communications.

Q. (BY MR. ALEX:) And what does ValueAdded Communications do?

A. **We are specifically in the telephony industry with a niche market in inmate telephone systems.**

Q. What kind of industry?

A. **Inmate telephone systems. Telecommunication.**

Q. Telecommunication. Very good.

Specifically inmate phone calls; is that correct?

74

A. **That's correct.**

Q. And you know why you're here today; is that correct?

A. **That's correct.**

Q. Do you-all have a contract with the Dallas County jail?

A. **The company called Unisys had the contract, and they had contracted to us to provide all the communications equipment for the Dallas County jail.**

Q. Very good.

And so can you tell the jury, is it possible when an inmate makes a phone call from the Dallas County jail, for it to be recorded and then brought into court?

A. **Yes, it is.**

Q. All right. Tell the jury the mechanism from -- from your perspective that allows that to happen.

A. **All of the phone calls, once an inmate is verified to make a phone call, they do that by placing a pin number into the system. The pin number verifies them with their inmate ID. Then they place the number that they would like to call into the system.**

**The system verifies whether they can call that number or not, whether it is blocked or is allowed to**

75

be called.

**When the call has been placed, the called party must positively accept that they understand that this call is coming from the jail, and they do that by pressing, for example, a five to verify that someone -- it's not an answering machine; that someone is positively accepting the call.**

**Then the communication path is delivered between the inmate and the called party. That call then, in its entirety from the time the call begins to ring, all the way through, is recorded and stored on the system.**

Q. And when you say "stored on the system," is it the type of system that's capable of properly and accurately storing the call?

A. **Yes, it is.**

Q. All right. And we don't have to go into the inner workings of the software, but is there a way to safeguard, say for instance, manipulation or tampering?

A. **Yes. All of the call recordings, once the call is completed and are stored, they are stored in a proprietary algorithm that we utilize, so there's no way to -- for anyone to manipulate the call.**

Q. Or if it's manipulated, it would be easy to tell, wouldn't it?

76

A. **Absolutely.**

Q. All right. And as it relates to the particular pin numbers, it's a combination of personal information of a particular inmate; is that correct?

A. **That's correct.**

Q. And it probably wouldn't be proper for us to tell the whole world what that combination is right now, would it?

A. **No, sir.**

Q. But you're able to identify an inmate by their ID number, which is cross-referenced to an AI -- AIS number; is that correct?

A. **That's correct.**

Q. All right.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir. And as necessary.

Q. (BY MR. ALEX:) Now, do you -- do you -- does your company do training here at the Dallas County D.A.'s Office in showing investigators how to download this type of phone calls?

A. **Yes, we do.**

Q. And -- and in doing so, is there security measures in place?

A. **Yes.**

Q. All right. And so if I were just to walk into

77

any room in this building, could I get on there and -- and pull up somebody's phone call?

A. No, sir.

Q. All right. These are done in secure areas in the D.A.'s Office; is that correct?

A. That's correct.

Q. All right. State's Exhibit 425 is an affidavit and a log of phone calls, and I'm going to ask you, by way of authentication, do you know who the affiant is, Scott Seacat?

A. Yes, I do.

Q. And who is Scott Seacat?

A. He was hired to be the on-site administrative assistant.

Q. Here in the Frank Crowley and the jailhouse; is that correct?

A. Yes.

Q. All right. Is he a direct employee of yours?

A. No. He actually works for the Unisys Corporation.

Q. All right. And the inmate call records that I have here in State's Exhibit 425, if you were going to download jail phones calls for James Broadnax with ID Number 2725502, would you also be able to download a list of phone calls?

78

A. Yes.

Q. All right.

A. If you know the inmate ID, simply put in the date and time range you're looking for, and all the calls would be displayed.

Q. All right. And State's Exhibit 425 is just that. A printout of the phone calls would have been made by inmate ID number 2725502 between September 15th of '08 and June 7th of '09; is that correct?

A. That's correct.

Q. All right. And that would all relate to -- well, you don't -- you don't know anything about the way a person's booked into the jail; is that correct?

A. That's correct.

Q. The way you would identify it would be the inmate ID number.

A. That's correct.

Q. Very good.

MR. ALEX: We'd offer State's Exhibit 425 at this time, Your Honor.

THE COURT: Any objection?

MR. LOLLAR: No objection.

THE COURT: State's Exhibit 425 is admitted.

Q. (BY MR. ALEX:) And finally, Mr. Turner,

79

when -- by way of authentication, if -- if a person with the D.A.'s Office, an investigator trained to download these calls, downloads them, are they capable of downloading them to disk and producing them in court?

A. Yes, they are.

Q. In fact, that's probably one of the reasons you-all were hired is for that purpose; is that correct?

A. That's correct.

Q. And if it's done incorrectly, -- or let me say this: Is there also a way to change it from this proprietary software and -- and say, for instance, put it in a different type of file and then put subtitles on it?

A. Yes, there is.

Q. All right. But it would be obvious that it's been altered; is that correct?

A. Yes.

Q. Very good.

And I know I said "finally," but let me ask you this: Is it also possible that someone could get someone else's pin number and make phone calls on that person's pin -- pin number?

A. Yes.

80

Q. All right. Is there any safeguards in place for that?

A. Not at this time.

Q. All right. What about -- can you -- can I -- if I was in the Dallas County jail and I had a pin number, could I just call anybody I wanted for as long as I wanted, as -- as number of people as I wanted?

Could I call 25 people in the first week I was there?

A. Yes.

Q. Okay. And after you reach a certain number of calls, do you have to then update your call list?

A. Yes.

Q. Okay.

A. If you want to change the call list, you have to update it. Request an update.

Q. How many calls can I make before you have to update it?

A. I believe it's ten.

Q. Ten?

A. I believe.

Q. Okay. So, for instance, if -- if Ms. Handley and I are both in jail -- and I've killed her twice, so being in jail is not a big thing -- but if we're both in jail and she gets my inmate call number, but I've

81

already called ten people that month, she couldn't then call one of her family members, could she?

A. No, sir.

Q. Okay. Now she would have to wait until the next month and use it before I put ten calls on there, wouldn't she?

A. Yes.

Q. Very good.

And primarily, this system that you-all use, is it just here in Dallas County?

A. No, sir. It's actually -- it originated with the Federal Bureau of Prisons. The same system the Federal Bureau of Prisons uses.

Q. And how many different counties would you say are using it here in Texas?

A. Here in Texas, we just have -- there is just Dallas County.

Throughout the United States, there's 70 large counties, twelve State Departments of Correction and the Federal Bureau of Prisons.

Q. So it's a pretty reliable system.

A. Yes.

Q. Do you know if -- can you -- currently, when you pick up the phone as an inmate and make a call, is there a 15-minute limit on it?

82

A. Yes, it is.

Q. And is it very expensive?

A. To make a phone call?

Q. For that one 15-minute call.

A. I don't recall the rates. It just depends on the calling area, whether it's local or long distance.

Q. Could I -- could I, for instance, call someone's cell phone from the Dallas County jail?

A. If they had established a prepaid account. There are no collect calls allowed to cell phone.

Q. All right. And what does that mean, "prepaid account?"

A. Someone from the outside has established an account for a specific phone number and has prepaid the funds that would be required to place a call to that number.

Q. All right. So if I'm calling my mom, my mom's cell phone, she would have had to already set it up and put some money towards that account in order for me to call her.

A. That's correct.

Q. And when that money is used up, then calls will no longer go through.

A. That's correct.

Q. Until she puts more money on it.

83

A. Right.

Q. Very good.

And do inmates have the capability of -- let's say for instance from the Dallas County jail, if I called my mom, could my mom then turn and call my cousin?

A. Yes.

Q. Okay. And -- and so they could get a bunch of calls with just one dime, so-to-speak.

A. Yes. It's still limited by the 15 minutes, but yes.

Q. Very good.

MR. ALEX: That's all I have, Your Honor.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Turner, a couple of questions.

If I understood your testimony, what you said to the jury is that every outgoing phone call made by any defendant in the Dallas County jail is recorded.

A. Yes. With the exception of legal calls.

Q. And how do you -- tell me about that. How do you know they're calling a lawyer as opposed to somebody else?

A. We utilize feeds from the Bar Association. We

84

register with -- with the Bar so that all of those are set aside as special numbers. Any number being dialed to those, as I said, is non record.

Q. Okay. And tell me about the telephone systems that are available to the inmates in the jail.

A. They actually have the -- just an inmate handset. They have an inmate telephone set that hangs on a wall in a living unit.

Q. Don't they have -- if a person's in a single cell, don't they have a telephone that kind of rolls around?

A. Yes. In some cases, we do have portable phones.

Q. Okay. And that's how the people there can use them.

A. Yes.

Q. Okay. All right. Thank you.

THE COURT: Redirect?

MR. ALEX: Can I have one second, Judge?

THE COURT: Yes, sir.

**REDIRECT EXAMINATION**

BY MR. ALEX:

Q. Mr. Turner, was there a time here in Dallas County when the system that they currently use was not

85

in place?

A. Yes, there was.

Q. And the dates on the aff -- on the affidavit and the call log that you have up there, calls prior to that would have been under a previous system; is that correct?

A. That's correct.

Q. And if -- let's say, for instance, an inmate would have checked in on June 21st of 2008, up until -- I think that log there starts in September; is that correct? Could you look at it and tell me?

A. Yes, September 15th.

Q. If those calls were not captured prior to you-all changing the system over, there's no way to get those calls; is that correct?

A. That's correct.

Q. All right.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

MR. LOLLAR: Just one further question.

RECROSS-EXAMINATION

BY MR. LOLLAR:

Q. Mr. Turner, you said the Bar Association. Which Bar Association? The Dallas bar or --

86

A. Well, we have -- we have several feeds that we set up as a contract that we would download from. I -- I can't remember all of them off the top of my head, but there are several ways that we pull information for attorneys.

And in instances where an attorney may change a phone number and it's not registered yet, there are processes in place for the attorney to register with the county and then it gets downloaded into our system.

Q. Thank you.

THE COURT: May the witness be permanently excused?

MR. LOLLAR: Yes.

MR. ALEX: Yes, sir.

THE COURT: You're permanently excused, sir. Thanks for your testimony.

What further says the State?

MR. ALEX: The State would call David Barger, Your Honor.

THE COURT: Mr. Barger, if you'll come to the front of the courtroom. Turn and face me and raise your right hand.

DAVID BARGER

was called as a witness and testified as follows:

THE COURT: Lower your hand. Take your

87

seat on the witness stand.

You'll be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Your Honor.

THE COURT: Yes, sir.

DIRECT EXAMINATION

BY MR. ALEX:

Q. State your full name, sir.

A. David Barger.

Q. And what do you do for a living?

A. I'm an investigator for the Dallas District Attorney's Office.

Q. How long have you been doing that?

A. 21 years.

Q. And what did you do before that?

A. I was an investigator for InterFirst Corporation for two years, and prior to that, six years with the Dallas.

Q. And what did you do for the Dallas Police Department?

A. I was a patrol officer for three years, and a narcotics detective for the final three years I was there.

Q. So how -- how many years of your life have you

88

dedicated to law enforcement?

A. Over 27 years.

Q. All right. And what about college?

A. University of Mississippi, bachelor's degree. Some graduate study at Sam Houston State University.

Q. And currently you're assigned to primarily capital-murder cases; is that correct?

A. Correct.

Q. And are you primarily assigned to myself as an investigator?

A. Yes.

Q. And did you do work on this case as it relates to James Broadnax?

A. I did.

Q. And did you download the calls on the call log up there in front of you, which would be State's Exhibit -- would you tell me the State's exhibit number up there on the call log?

A. State's Exhibit 425.

Q. 425. Did you print that out?

A. I did.

Q. And after printing that out, did I ask you to download all the calls that was related to that printout?

A. I did -- yes, you did.

89

Q. And tell the jury, and you don't have to give away any token secrets, but when you download the phone calls off of a particular inmate, what do you do to -- to -- to maintain that it's one inmate versus another? Is there a particular number you're looking for?

A. In the VAC system, we use the inmate's unique AIS number that identifies him.

Q. And in this case, what was the unique AIS number?

A. 2725502.

Q. And would you look at the blueback that's there in front of you, the Dallas County record there, and is that the same AIS number assigned to the defendant, James Broadnax?

A. On State's Exhibit 395, the AIS number on the sheriff's profile is 2725502.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) I'm going to show you what's been marked as State's Exhibit 571 and 572. What are those?

A. Those are CD's.

Q. Okay. And what do they contain?

A. They contain the recorded phone conversations based on that unique AIS number.

90

Q. All right. And as the deputy sheriff has told this jury, it's the same AIS number associated with the defendant, James Broadnax; is that correct?

A. That's correct.

Q. And so these would be purportedly the calls of James Broadnax.

A. Right.

Q. Right. Okay. And the -- when you download these calls, how can you ensure that you're downloading them properly and that they haven't been tampered with before you get them?

A. We use the VAC software that we have been shown to use, that requires us to plug in the inmate's AIS number. We can also put in a range of dates of phone calls that we would like to retrieve, and we simply enter that information into the system and it processes it and gives us first a report of all the calls in that date range.

And secondly, if we want to have a recorded copy on CD of any of the calls that were captured, then we push a couple of buttons and it -- it will burn a CD for us in a proprietary player that, when burned to the CD, also has a report of the -- of the captured calls.

Q. And so State's Exhibits 571 and 572 are accurate recordings, as you took them off the system of

91

the ValueAdded Communications of James Broadnax, the person in -- under that AIS number; is that correct?

A. Correct. These are the CD's that are burned in VAC, the ValueAdded Communications proprietary player, and they're, in this case, on two disks.

Q. All right. And I'm going to ask you to look at -- now, you had -- do you have the capability of also taking off individual calls and putting them on disk?

A. Yes.

Q. All right. And is State's Exhibit 546, 547, 548, 549, 550, 551, 552, 553, 554, 555, 556, 557 and 558, are all of those individual calls from the larger disk with all the calls?

A. Yes, they are.

Q. All right. And you downloaded these the same way you did the -- 571 and 572?

A. Right. Using -- using an optional save feature in the proprietary system.

Q. All right.

MR. ALEX: At this time, Judge, -- at this time, for record purposes only, we're going to offer State's Exhibit 571 and 572, which is the complete calls associated with the AIS number mentioned.

MR. LOLLAR: No objection.

92

THE COURT: Okay. State's Exhibits 571 and 572 are admitted for record purposes.

MR. ALEX: 546 and 547, which are calls dated January 9th, 2009, and January 26th, 2009, we're offering for all purposes.

THE COURT: Are you offering 546 through 558, inclusive?

MR. ALEX: No, sir, not -- well, yes, sir. No, not at this time. At this time, I'm only offering 546 and 547?

THE COURT: Any objection?

MR. LOLLAR: No, Your Honor.

THE COURT: 546 and 547 are admitted.

MR. ALEX: And at this time, Judge, for the record, we're going to offer 548 through 558.

THE COURT: Any objection for record purposes only?

MR. LOLLAR: No.

THE COURT: Admitted for record purposes only.

MR. ALEX: Permission to publish 546 and 547.

THE COURT: You may.

Q. (BY MR. ALEX:) Now, Mr. Barger, again, the -- in the process of burning these, you would have had to

93

listen to them; is that correct?

A. Correct.

Q. And you would have had to listen to a number of these in the process of burning them; is that correct?

A. I would.

Q. And is there a person out in the hall by the name of Lakarrame Cole?

A. Last I checked.

Q. Okay. And is she the co-defendant, Demarius Cummings' sister?

A. Yes.

Q. And is the co-defendant, Demarius Cummings, does he go by the nickname of D?

A. Yes.

COURT REPORTER: Just the letter D?

MR. ALEX: D, as in the letter D.

Q. (BY MR. ALEX:) I'm going to play the first call of January 26th, 2009, and does this appear to be a call -- is that first call a call between -- that purports to be a call between the defendant and Ms. Lakarrame Cole?

A. Yes.

Q. All right. And in addition, did we -- State's Exhibit 544 and 545, did I ask you to take those calls

94

and add subtitles to them? Or did we -- did we have those calls -- did they -- did they -- actually, we had an intern to take a program called Movie Maker and put subtitles on them; is that correct?

A. Right. That's correct.

Q. And you downloaded these calls, 545 and 544; is that correct?

A. Correct.

Q. And those would be -- would be exact copies of what we just entered --

A. Right.

Q. -- except for these would have subtitles entered; is that correct?

A. That's correct.

Q. And -- and you can tell this jury that these are exact copies.

A. Yes, sir.

Q. All right.

MR. ALEX: And for demonstrative purposes, Judge, we're going to offer 544 and 545.

THE COURT: Any objection?

MR. LOLLAR: Yes. May I take the witness on voir dire?

95

THE COURT: Yes, sir.

**VOIR DIRE EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Barger, how are you?

A. Good, sir.

Q. On these subtitles, --

A. Yes.

Q. -- somebody's got to type in what they hear.

A. Right.

Q. Right?

A. Yes.

Q. Who did that?

A. We've had two or three people, I think, on the trial team that have participated in that.

Q. And if they mishear something that's said, would they type in what they misheard?

A. That could happen, yes.

Q. So you're not guaranteeing the accuracy of what y'all have up here on the subtitles.

A. When -- when you're transcribing anything of -- of that nature, you're going to type what you think you've heard on the recording.

Q. Okay.

MR. LOLLAR: That's all the questions I have.

96

THE COURT: So is there any objection to 544 and 545?

MR. LOLLAR: No.

THE COURT: State's Exhibits 544 and 545 are admitted.

MR. ALEX: And for demonstrative purposes, Judge, we're going to offer both of those and we're going to publish State's Exhibit 545 at this time, which is a call from January 26th of 2009.

THE COURT: Yes, sir.

**DIRECT EXAMINATION - CONTINUING**

BY MR. ALEX:

Q. And while she's T'ing that up, Mr. Barger, when we hear in the beginning, is there an opportunity for the person on the other end to not accept the call?

A. Yes.

Q. We hear a -- a recorded voice saying You're receiving a call from Dallas County jail, and it goes on and gives them an opportunity not to accept the call, correct?

A. Right. That's what we commonly hear on every call.

Q. All right. And it also informs them that it has been recorded and may be used later; is that right?

A. Right.

97

Q. Okay. Very good.

(CD played.)

Q. (BY MR. ALEX:) Let's see if we can get it -- can we get it going through those speakers?

MR. ALEX: We'll get it together in a second.

We're going to start it over now.

THE COURT: All right.

(CD played.)

Q. (BY MR. ALEX:) Mr. Barger, that's one of a couple of calls that we're going to play all the way through, but there were parts of that call where the defendant is audibly laughing that you couldn't actually put on subtitles, do you recall that part? Of different parts of it?

A. Yeah.

Q. All right. And the -- I think they will speak for themselves.

That -- that was actually January 26th of 2009; is that correct?

A. I remember that call being in January of this year, yes.

Q. All right. And that would have been some five months after the offense, nearly?

A. Five, six months, yes.

98

Q. And the offense would have been June 18th?

A. Correct.

Q. And five months after the offense, the defendant is still saying Fuck the family, right?

A. Yeah.

Q. State's Exhibit 546 is going to be a call from January 9th of -- of '09.

MR. ALEX: Permission to publish?

THE COURT: You may.

MR. ALEX: And, I'm sorry, that's -- the demo is actually going to be 544 with the subtitles.

Permission to publish that?

THE COURT: Okay. And there was objections, but that was overruled.

544 is admitted. You may publish.

MR. ALEX: And I think this is also a 15-minute call as well, Judge.

THE COURT: All right.

Q. (BY MR. ALEX:) And -- and, Det. Barger, while this is starting up, this is going to be a -- appear to be a conversation between the same two people, Mr. Broadnax and Ms. Cole; is that correct?

A. That's correct.

(CD played.)

Q. (BY MR. ALEX:) Mr. Barger, do you know what

99

an SRT is?

A. Yes.

Q. Is that the Security Response Team at the Dallas County jail?

A. Yes. There's a special response team for the Dallas Sheriffs Office, the jail. Yes.

Q. Okay. Very good.

(CD played.)

Q. (BY MR. ALEX:) Okay. Mr. Barger, the date of that call would have been January of '09 too; is that correct?

A. That's correct.

Q. And that would have been prior to the first call we heard, so we heard them in kind of reverse order; is that right?

A. I believe that's correct.

MR. ALEX: That's all I've got, Judge. I'll pass the witness.

THE COURT: Cross-examination?

MR. LOLLAR: Yes.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Barger, how you doing?

A. Good, sir.

Q. All told, I think this is about 26 and-a-half

100

hours worth of jail calls that were recorded, made by Mr. Broadnax; is that correct?

A. If you say so. There was a lot of -- lot of hours of calls, yes. Yes.

Q. And, of course, part of y'all's duties is to listen to those.

A. Yes.

Q. And it's part of my duties too, you understand.

A. Yes, I do.

Q. Okay. Would it be fair to say that the great majority -- in fact, I think he only talked to three people the entire time he's been in the Dallas County jail: His mother, the evangelist Ava Carter, and Lakarrame Cole; is that right?

A. I don't know if that's the extent of that list or not. There may have been some others. I can't tell you for --

Q. You have the log there in front of you?

A. I do.

Q. Could you see if any calls were connected to any other number but to those three?

A. I have not done an extensive search of this to -- to verify what you're saying, but there are a limited number. I know it's a small number of people

101

that he's connected with.

I have made a list of -- of phone numbers, and there's a very long list of phone numbers that he's attempted to call. Some of those calls, he has connected with. But you are correct to say that there are just a few people that -- that he's actually talked to on a regular basis.

Q. Now, the list that you have there, the log, shows the date of each call, the time of each call, the duration of each call; is that correct?

A. That's correct.

Q. And then over on the far right-hand side of the completion code, --

A. Right.

Q. -- which says, for instance, the phone rang but nobody picked it up, or the call was not accepted.

Now the people on the receiving end have got to accept these calls; is that right?

A. That's right.

Q. And if they don't accept it, then the call doesn't go through.

A. That's my understanding, yes.

Q. And some people simply can't afford to accept the phone call, even at two dollars a call.

A. That's right.

102

Q. And others may not want to accept a call.

A. True.

Q. For whatever reason.

A. Right.

Q. So a lot of the notations are Carrier blocked call. What would -- do you know what that would mean?

A. I've asked VAC for some explanations on some of these completion codes.

Q. Uh-huh.

A. It's been described to me that that could come up if there's no money in the account. If there's no funding source available to complete the call, you might get that code.

Q. And I believe Mr. Turner explained that for some of these people, they've got to put money into a particular account in advance --

A. Right.

Q. -- to accept a call.

A. Right.

Q. Okay. So if there's no money in the account, that could explain why the carrier would not accept it?

A. True.

Q. Okay. Now, in your review of these 26 hours worth of phone calls, did you see where Mr. Broadnax was exclusively calling his mother, Audrey Kelly, up

103

and -- oh, and I think there was one or two calls to Ava Carter, the -- the evangelist.

But up until the date of January the 9th, he had exclusively called Ava Carter and his mother. And then starting on January the 9th, --

MR. ALEX: Judge, I'm going to object and ask the witness to at least be allowed to answer before we move on to the next question, --

THE COURT: Overruled.

MR. ALEX: -- if there is a question.

THE COURT: I'll allow it.

Go ahead.

A. What's the first question?

Q. (BY MR. LOLLAR:) Yeah. You see where the calls that were completed, the completed calls, were only to his mother and Ava Carter, up until January the 9th of this year?

A. I can't say that with any degree of certainty.

Q. Take a look at the log there. Look at the first call there on 9/24, and that's to Ava Carter.

A. 9/24 of '08?

Q. Yep. The completed call, and that's to number (214) 946-3286.

A. There was a 15-minute call on 9/24 of '08 to (214) 946-3286.

104

Q. And you've listened to that call?

A. Maybe I have. I don't recall. There are a lot of calls I've listened to over the past year.

Q. Okay. And then I think the next completed call is on October the 1st of 2008.

A. Your question?

Q. October 1st, 2008, do you see that call?

A. Yes.

Q. And that would be the telephone number (214) 998-6676.

A. Right.

Q. And you know that to be his mother's cell phone number.

A. I don't know that from looking at the reports I have in front of me.

Q. Okay.

A. I don't have that cross-reference in front of me. All I see is a phone number right now.

Q. Okay. Assuming that that's a fact, and I think you can verify that, if you'll look at the next 51 completed calls, are all to that same number, to his mother's cell phone number, taking you up to January the 9th. You see that?

A. I see the January 9 of '09, a 15 minute call to (972) 662-3474.

105

Q. And that's one of the calls we just heard. That was to Lakarrame Cole?

A. Yes. I believe that's correct.

Q. And then the only other call he ever made to Lakarrame Cole was that other one we heard on January the 26th; is that correct? I'm sorry. Until we get to the second disk.

On that first disk, just the two completed calls to Lakarrame Cole? January 9th and 26th.

A. January 26, '09, 15-minute call?

Q. Yes.

A. (972) 662-3474?

Q. Yes.

A. Okay.

Q. Same number as on January the 9th.

A. I see that, yes.

Q. And then every other call made after January the 26th up to through -- or up to, I guess, March the 25th is to his mother again. Is that correct?

A. Is that a question?

Q. Yes.

A. If you say so.

Q. Okay. And then on Jan -- March the 25th, 26th, 28th, 29th, and April 1st, those calls are all to Lakarrame; is that right?

106

A. Once again, I can -- I can link these dates and phone numbers, but without a cross reference, you know, with the phone number to a name, I -- I can only tell you that he dialed that number. Unless I hear the call or hear the context of the call, all I can tell you from looking at this log in front of me, is I've got a date and the time, a duration of the call and a phone number.

Q. And then after April 1st of 2009, there are no further calls to Lakarrame's number; is that correct?

A. I don't recall there being any, but --

Q. And after that call on April 1st, all of the remaining phone calls that were completed were to his mother, going up until April 13th.

A. Okay.

Q. Is that correct?

A. I believe that's correct.

Q. And then since April the 13th of 2009, he hadn't talked to anybody on the telephone; is that right?

A. I believe that's correct. We've not recovered any completed calls that I know of for the past month or so.

Q. And you listened to that last call with his mother?

107

A. Either I or somebody on our staff did.

Q. Somebody on your staff did?

A. Possibly. There's been a lot of calls.

Q. Now, I want to talk to you about a couple of things we just heard on State's Exhibits 546. That was the call made to Lakarrame on January the 9th.

THE COURT: Mr. Lollar, are you going to have a significant amount of time on this witness?

MR. LOLLAR: Oh, I think I'll finish up with Mr. Barger here in just a couple seconds, --

THE COURT: All right.

MR. LOLLAR: -- unless we're going to go on with those others with him. We're not.

THE COURT: All right. Go ahead.

Q. (BY MR. LOLLAR:) I guess the question I want to ask you, Mr. Barger, now, you have certainly been the lead investigator for the D.A.'s Office in regard to this case; is that correct?

A. That is correct.

Q. And you heard on -- that tape you just heard, the telephone call of January the 9th, Mr. Broadnax say to Lakarrame that he had a fight with the SRT's.

A. Right.

Q. And that's the Special Response Team?

A. Right.

108

Q. Now, Special Response Team is a group that has to go to certain individuals that are in the jail. For instance, they're on a high-profile case, or if they're, you know, high muckety mucks in the Aryan Brotherhood, or something like that, and they have to go with them everywhere they go; is that right?

A. It's been described to me that way. I don't know specifically what their -- what their duties are within the Sheriffs Office.

Q. Okay. Now, you're aware of the -- the -- when he was being booked in, once he had been placed into the closed behavioral observation cell and then was being moved from there to the suicide prevention cell, you're aware of an incident he had with the SRT's then at that time, on January 23rd of 2008.

A. Well, without looking at the report, I can't tell you.

Q. Are you aware of any other incident he's had with the SRT's besides that one?

A. I'm aware of one in particular.

Q. When?

A. I don't recall the specific date.

Q. Okay. And on some of these calls -- now, he says things happen, but you know for a fact they don't happen, right? I mean, you found that out

August 13, 2009

109

subsequently, right?

A. I'm not sure about what specific incident you're talking about.

Q. Well, for instance, when he says to her that when I came up to see him and talk to him about a -- a life sentence without parole, oh, that he -- he said -- he told Lakarrame that, what, he was going to tear my bitch ass up and all that kind of stuff, he has never --

MR. ALEX: Judge, I --

Q. (BY MR. LOLLAR:) -- been anything but respectful with me.

MR. ALEX: Judge, I'm going to object to counsel testifying from the defense table. He can't put evidence in as to what his client told him.

THE COURT: It's cross-examination. There's a question. Overruled.

You may --

Q. (BY MR. LOLLAR:) So do you think sometimes he says things that really didn't happen? Do you think that's possible?

A. It's possible, yes.

Q. Okay.

MR. LOLLAR: That's all the questions we have.

110

THE COURT: Redirect?

MR. ALEX: Yes, sir.

**REDIRECT EXAMINATION**

BY MR. ALEX:

Q. Mr. Barger, when the def -- when the defendant on the tape was talking about fighting with SRT's, --

A. Yes.

Q. -- counsel asked you about that incident; is that correct?

A. Yes.

Q. Are you aware of the incident when the SRT's went into his cell to do a shakedown?

A. Yes.

Q. With an SRT by the name of Kirvin?

A. Yes.

Q. And when she went in, he was so disruptive that she thought that her life was in danger, do you recall that?

A. I do.

Q. And they had to take him down to the ground?

A. That's correct.

Q. And then after that they took him to the nurse?

A. That's right.

Q. And at the nurse's station, they again had to

111

take him down to the ground because he was so violent and disruptive.

A. Yes.

Q. And when you heard that on that phone call there, is that consistent with what you know about this incident with Ms. Kirvin?

A. It is.

Q. And are you also aware of the incident in the gym when he was in a fight with another inmate?

A. Yes.

Q. And in that incident, the SRT's who are there to maintain the peace, had to restrain Mr. Broadnax; is that correct?

A. That's correct.

Q. And in doing so, the other inmate was being restrained, and Mr. Broadnax was still trying to get at him.

A. That's correct.

Q. And is all of that consistent with him saying that he's fighting with the SRT's?

A. It is.

Q. And finally, are you aware of the incident where he turned and struck another inmate and tried to knock him out? Are you aware of that?

A. I am.

112

Q. And in that incident, the SRT's, or the jailers, were trying to maintain peace coming from court; is that correct?

A. That's correct.

Q. And in that incident, are you aware, based on the question of counsel, that the SRT, or the jailer said that if Mr. Utsey hadn't moved, he would have knocked him out?

A. That's true.

Q. Is that consistent with --

COURT REPORTER: I'm sorry. What was the name? Spell it?

MR. ALEX: Utsey, U-T-S-E-Y.

Q. (BY MR. ALEX:) And is all that consistent with what he's saying on the tape about fighting with the SRT's?

A. Yes, it is.

Q. Okay. And none of that sounds like stuff he just made up. That's stuff you're aware of; is that correct?

A. These are documented incidents. Yes.

Q. And finally, you were not at the window when he claims to have threatened his lawyer, were you?

A. I was not.

Q. You were not there. You would have no

113

personal knowledge of that.

A. I would not.

Q. All right.

MR. ALEX: That's all I have, Your Honor.

THE COURT: Recross?

**RECROSS-EXAMINATION**

BY MR. LOLLAR:

Q. He talks about that fight with Tiptoe in one of those calls we just heard. The first call that we heard. And he describes what went on down there. Did y'all talk to Tiptoe?

A. No, I don't believe we have.

Q. I have. And I believe -- you talk about Utsey, I believe his name is Utsey. Have you talked to the other people over there in the jail about Mr. Utsey?

A. Yes, I have.

Q. Okay.

MR. LOLLAR: I believe that's all we have at this time, Judge.

THE COURT: Anything else?

MR. ALEX: That's all I have of this witness, Judge.

THE COURT: Okay. We'll take a lunch break until somewhere in the neighborhood of 12:45 to

114

1:00 o'clock.

All rise for the jury.

Don't discuss the case, folks.

We're in recess.

(Luncheon recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

Good afternoon, ladies and gentlemen.

What further says the State?

MR. ALEX: The State will call Mr. Doty, Your Honor.

THE COURT: Come up to the front of the room, sir. Turn and face me. Raise your right hand.

**DARRELL DOTY**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Your Honor.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

115

Q. State your full name, sir.

A. It's Darrell Doty, D-O-T-Y.

Q. And, Mr. Doty, what do you do for a living?

A. I'm an investigator for the District Attorney's Office.

Q. And how long have you been doing that?

A. I have been with the DA for two and-a-half years.

Q. What did you do before that?

A. I was a deputy with the Dallas Sheriffs Office for almost 20 years.

Q. And that's here in Dallas County?

A. Yes.

Q. And where did you work at?

A. I worked for seven years in the Warrant Execution Section and then the last ten years I was there, I worked in the Physical Evidence Section.

Q. Okay. Warrant Execution? Did you physically work over next door in the Lew Sterrett Jail?

A. Yes. The first three years that I was with the Sheriffs Office, I was a detention officer in the jail.

Q. So a detention officer, is that what we commonly refer to as a DSO officer?

A. Yes.

116

Q. All right. And what do -- before I ask you that, so total law enforcement would be what?

A. A little over 22 years.

Q. 22 years.

A. Yes.

Q. And what did you do before that?

A. I worked for a sign company.

Q. Okay. Tell the jury about your education.

A. I graduated high school and I have about 35 hours of college.

Q. Okay. The majority of your adult life you've pledged to law enforcement; is that correct?

A. Yes.

Q. Now, you -- you spent most of that law-enforcement career with the Sheriffs Department; is that correct?

A. Yes.

Q. All right. Tell the jury a little bit about what a detention service officer does.

A. Basically just watches the inmates, takes care of them, and just anything that they may need.

Q. And do you have to be any particular size, or weight, or muscle tone to be a DSO?

A. No.

Q. All right. DSO's, do you have female DSO's?

117

A. Yes.

Q. Old and young?

A. Yes.

Q. Male DSO's old and young?

A. Yes.

Q. Okay. And when you're over at the jail and you're watching inmates, are you able to carry firearms?

A. No.

Q. Any kind of weapons?

A. No.

Q. At least carry mace on you?

A. Back when I worked at the jail we couldn't, but I think they do now.

Q. You think they do now?

A. Yeah.

Q. They carry like a big stick or baton on them in case they need some help?

A. No.

Q. All right. And you don't need to be 200 pounds, rippled with muscles to work there.

A. No.

Q. All right. And so would you classify that as being a dangerous job?

A. Yes.

118

Q. All right. And a lot of it just depends on who you're working with; is that correct?

A. Correct.

Q. All right. Now, tell the jury about the difference between a DSO officer, detention service officer, and someone who may be a SRT.

SRT, is that the Security Response Team?

A. Special Response Team.

Q. You've seen those guys over there?

A. Yes.

Q. And do they wear a different color uniform?

A. Yes, they do.

Q. What do they wear?

A. I believe it's a black -- like a BD unit -- BDU uniform.

Q. And those folks are -- are -- they have special training; is that correct?

A. Yes.

Q. And they're there to take care of any kind of situation that may get out of hand; is that correct?

A. Correct.

Q. They typically would handle anybody who could potentially be violent.

A. Yes.

Q. All right. And have you ever been in SRT?

119

A. No. They didn't have it when I worked the jail.

Q. Very good. And when you're working at the jail, is there a difference between like general population and people who are in, say, single cells?

A. Yes.

Q. All right. And if we're talking about general population, could you be in general population and be in, say, a room like this most of the day, and then at night get locked down in a cell?

A. They would get locked in a cell, but it was like eight to ten people to a cell.

Q. Eight to ten people?

And then during the day they get to come out and hang out with one another?

A. Yes.

Q. And then at night they go back in the cell and they get locked down; is that right?

A. That's correct.

Q. And then there's a part of general population where you're just in single man cells; is that correct?

A. Yes.

Q. And -- and potentially, you could -- if you've got a capital murder charge, potentially you could be there because of the type of charge you have; is that

120

right?

A. That's correct.

Q. And they also use it for other violent offenders and people who just can't quite make it in that community setting; is that right?

A. That's correct. And they can't follow the rules.

Q. Okay. All right. But to be fair, and if you've just got a high-profile case and charged with a heinous crime, you could wind up there even if you've never done anything wrong; is that correct?

A. That's correct.

Q. All right. Now, back in June 19th of this year, as a DA investigator, did you go over to the jail with a camera?

A. Yes.

Q. All right. And your prior experience with the Sheriffs Department for many years was a physical evidence technician; is that correct?

A. That's correct.

Q. And tell the jury a little bit about your experience as a physical evidence technician. What did you do in that capacity?

A. We're responsible for all Dallas County calls and other agencies, when they don't have their own

August 13, 2009

121

crime scene unit, they would call us to come and work anything from thefts, burglaries, up to murders.

Q. And was part of that documenting different types of crime scenes photographically?

A. Yes.

Q. And you've got training, and experience, and education in that as well, I take it?

A. Yes.

Q. And when you came to work for us, we kind of got a very seasoned crime-scene tech to work for the D.A.'s Office, didn't we?

A. Yes.

Q. All right. And back on June 19th of 2009, were you asked to go over to the cell of James Broadnax and take pictures of anything that he might have had in his cell?

A. Yes, I was.

Q. And as a prior DSO, sheriff's officer, you're aware that the inmates, basically, short of legal mail and that kind of thing, have no privacy right in that cell.

A. That's correct.

Q. All right. And so --

MR. LOLLAR: Judge, excuse me. May we approach the bench?

122

(Off-the-record discussion was had.)

THE COURT: All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

The jury has been retired to hear Mr. Lollar's objection.

MR. LOLLAR: Yes, sir. I -- from reading the paperwork that had been given to us about this incident, believed, apparently falsely, that this was a -- what -- what Mr. Doty is fixing to talk about is when he went over with the sheriffs and went into the defendant's cell, photographed everything and took stuff, and that's what we're fixing to hear about.

I -- I had believed, based on the paperwork I had been shown, that that raid, if you want to call it, on the defendant's cell, was initiated by the Sheriffs Department.

Now what I'm hearing is, this raid was initiated by the D.A.'s Office, and those are two different entities. I certainly agree that the sheriff has every right to go into an inmate's cell when they believe something's wrong, or for whatever reason. I do not believe that the District Attorney's Office has the right to go into a defendant's cell in the Dallas County jail without a warrant.

123

THE COURT: Response?

MR. ALEX: Yeah. Judge, let me -- let me first respond to this.

Counsel starts his argument out by saying that he's been misled. And, you know, we -- we've been through this running around. If he's going to call me a liar, then I'd like to know --

MR. LOLLAR: I haven't called you a liar once.

MR. ALEX: All right. But I want to make sure that we're not doing here, because the counsel has not been misled about anything that's about to be put on.

I gave him the paperwork that's in --

MR. LOLLAR: Right.

MR. ALEX: -- that's generated by the Sheriffs Department that explains the situation that we're about to talk about right now.

MR. LOLLAR: Which is exactly right. He gave me letters --

MR. ALEX: Can I finish, Your Honor?

THE COURT: Yes, sir.

MR. ALEX: And in giving him -- and I'm going to produce the report for you right now so you'll know exactly what I'm talking about.

124

The report that we're referring to, Judge, is a report from the Dallas County jail. It's an incident report. It is the result of Mr. Doty going over and photographing the defendant's cell.

Upon photographing his cell, there was contraband found, and once the contraband was found, the DSO and the SRT's took measures to --

THE COURT: Let me see the report, Mr. Alex.

MR. ALEX: Okay. And what you'll see as the report starts, it's an incident report that refers to --

THE COURT: Let me read the report.

MR. ALEX: Okay.

THE COURT: Mr. Lollar, is this what you were provided?

MR. LOLLAR: I was going to ask the Court's permission to take a look at it.

(Examining document.) Yes, sir, that's the paperwork that was given to me.

THE COURT: Okay.

MR. LOLLAR: And as the Court sees, it's on Dallas County jail --

THE COURT: Okay.

MR. LOLLAR: -- letterhead, so I thought,

125

based upon that record, that this was an incident that was precipitated by the Sheriffs Department wanting to do something. Now, I think the defendant, even if he's in jail, has the right not to have his cell raided by the District Attorney's Office without a warrant under the Fourth Amendment.

THE COURT: Okay. Both parties need to keep their voices down.

MR. LOLLAR: Yes, sir.

THE COURT: Both sides.

Okay. How was it you went up there that day? This is June the 19th.

It says here, Pigpen stated that inmate Broadnax needed to be strip searched and escorted to the holdover. Broadnax was strip searched and escorted to the third floor holdover at approximately 10:00 a.m. Inv. Darrell Doty, with the D.A.'s Office, Sgt. Elder, SRT Pigpen, arrived to 2EU66 to search Broadnax's property.

So how did that happen?

THE WITNESS: I was asked by Lt. David Barger, my supervisor, to go over there and meet with the supervisor; that a shakedown was going to -- they were going to shake down his cell, and while they were there, I was to take photographs and photograph any

126

contraband that they recovered.

THE COURT: Okay. So it was a request from the Sheriffs Department to your boss, David Barger, who previously testified in this case, correct?

THE WITNESS: I don't know about that.

THE COURT: You don't know.

THE WITNESS: He just asked me to go --

MR. ALEX: Judge, I could speak to that. It was actually at our request, the District Attorney's Office request to shake down the cell.

Mr. Lollar is absolutely right, that it was at our request, and we believe that the law allows it. I've got probably five or six cases here to present to the Court.

He's got no privacy right in the cell at all, and I don't think that you're going to find anything in this case law I'm about to present to you that says he does.

And it was at the request of the District Attorney's Office, and I don't want the Court to be misled by that and to think that it was at the request of the Sheriffs Department.

THE COURT: Okay. I'll see the case law.

MS. HANDLEY: We're making copies right now, but if you want to give that to the Court, --

127

THE COURT: No, I want a copy. I don't need to have copies made for others. I want to see it.

MS. HANDLEY: Gordon, show -- show the Judge what you've got.

THE COURT: I'm looking at the case of Soria versus State of Texas, 933 S.W.2d 46 at 60, quoting, The Supreme Court has held the prisoner has no Fourth Amendment expectation of privacy in his cell. Hudson versus Palmer, 468 U.S. 517.

1984 Supreme Court case, the law of the land.

(As read:) Moreover, a shakedown search of a pretrial detainee's cell does not violate the Fourth Amendment or due process, Brock versus Rutherford 468 U.S. 576, 1984, appears to be right on point.

MR. LOLLAR: I disagree. If you let us look at those cases, it's going to be by law enforcement by the sheriffs, by the people who had him in control. It's not going to be by the district attorneys.

THE COURT: Let's take a ten-minute recess while the Court reviews the authorities.

(Recess taken.)

(Court reconvened; Jury not present.)

128

THE COURT: Everybody sit down. Let's not forget who the Judge is here.

In conducting research on this, apparently the issue is not as clear-cut as either side has presented it.

Given that, we're going to not allow any further testimony from this witness until such time as this issue is resolved. So if you have other authority more on point, I'd like to see that.

The same from you.

Have you got another witness you can put on the stand?

MR. ALEX: I definitely have got other witnesses to put on the stand, Judge.

THE COURT: Okay. Well, just release him. We're just going to do this correctly.

MR. ALEX: I'd like to do it in front of the jury so they don't wonder, all of a sudden there's an objection and the witness is gone. I'd like to just say No further questions.

THE COURT: No. That will be even more misleading. I'm not going to allow you to do that. If he gets to testify, he'll get to testify.

Call your next witness.

Call the jury.

129

MR. ALEX: Do I understand the Court's ruling that he is not allowed to testify until we get you some case law to support the position or what's the --

THE COURT: No. I have not made an a decision.

MR. ALEX: Okay. That's what I --

THE COURT: It's in abeyance. I just said that.

MR. ALEX: I didn't understand, Judge. That's the problem.

THE COURT: The decision is in abeyance until I can get more support of what your argument is, what his argument is and so forth.

MR. ALEX: Call in Kirvin.

THE BAILIFF: All rise.

(Jury present.)

THE COURT: Be seated, please.

Ladies and gentlemen of the jury, the last witness, Mr. Darrell Doty, has been temporarily excused until such time as the Court can make some conclusions regarding some legal matters that were brought up, but I did not want to delay the jury while I was making that resolution, so I've asked the State to call another witness and they have done that.

130

What further says the State?

MR. ALEX: The State would call Off. Rachel Kirvin, Your Honor.

THE COURT: Ma'am, if you'll please stand, face me and raise your right hand.

**SCHESSER RACHEL KIRVIN**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, ma'am.

A. Full name is Schesser Rachel Kirvin.

COURT REPORTER: What's the first name?

THE WITNESS: Schesser. It's spelled S-C-H-E-S-S-E-R.

THE COURT: And you're last name is what?

THE WITNESS: Kirvin, K-I-R-V-I-N.

THE COURT: Thank you.

Q. (BY MR. ALEX:) Okay. Tell the jury what you

131

do for a living?

A. I'm on the Special Response Team, and generally what we do is we deescalate a lot of the riots, escalated -- escalated tensions between inmates or any type of things that may go on in -- within the jail system, we basically respond to that.

Q. Okay. And, Ms. Kirvin, who do you work for?

A. Dallas County Sheriffs Department.

Q. Sheriffs Department?

A. Yes, sir.

Q. Very good.

How long have you been working for the Sheriffs Department?

A. Almost three years.

Q. Three years?

Okay. What did you do before that?

A. I worked for TXU. HR.

Q. All right. And before that, what did you do?

A. Well, I worked for HR for 13 and-a-half years, so, -- with TXU.

Q. With TXU?

And then you decided you wanted to become a -- tell me about your -- your service here at the Sheriffs Department. Did you start off with the Special -- is it Special or Security Response Team?

132

A. Special Response.

Q. Special Response Team. Did you start out of there with your career with the Sheriffs Department?

A. No, sir. I started off as a detention service officer, basically. Within a year, --

Q. How long did you do that?

A. A year. A year and -- it might be a year and three months.

Q. Okay. And then from there, where did you go?

A. To the Special Response Team.

Q. And is that pretty common when you start at the Sheriffs Department, that you start off as a detention service officer?

A. Pretty much.

Q. And then going to the Special Response Team, did you have to have any kind of specialized training?

A. Yes, sir, we do.

Q. About how many, if you had to guesstimate, Special Response Team members do y'all have there at the Sheriffs Department?

A. Currently, I think our roster's about 35.

Q. And out of -- would you have any idea how many employees the Sheriffs Office has over there?

A. No.

Q. Would it be close to over a thousand, maybe?

133

A. A little over a thousand, yes.

Q. All right. And in order to be an SRT, do you have to apply for that?

A. Yes, you do.

Q. Do you have to take a test?

A. Yes, you do.

Q. And is it a -- is it a type of position that you have a lot of people trying to get, and you have to take a test, and then they select the best of those folks?

A. Yes and no.

Q. Okay.

A. You have to go through physical tests, --

Q. Okay.

A. -- which comprise of running -- physical, basically anything that's physical in order to qualify, and then once you are accepted, you go into the academy.

Q. Okay. And then when you go into the academy, what kind of things are you taught?

A. Well, we learn defense tactics, riot control, how to deal with inmates. Just anything as it deals with, you know, calming an inmate down or, like I said, riot control. Restraint.

Q. And the -- if you had to say what your

134

number one job is as an SRT, is that to keep the community over there at Lew Sterrett safe?

A. Yes.

Q. Okay.

A. Control.

Q. All right. And could it potentially be a dangerous job?

A. Yes, sir. Most definitely.

Q. Okay. And is the jail over there the type of jail where you just don't have any opportunity for someone to be dangerous?

A. I'm sorry. Repeat that question again?

Q. It's a silly question.

Is everybody locked down in a single cell by themselves without any ability to get to any other inmate or to you-all where it's completely safe? Is that the scenario over there?

A. Yes.

Q. That is the scenario?

A. For single-cell inmates.

Q. No. I mean, as a general matter, the -- the jail, the population of the jail, is it the type of scenario where no one has the ability to be dangerous?

A. (No response.)

Q. That's okay. I'm going to move on.

135

And let's do this. Did you work last night?

A. Yes, I did.

Q. What shift did you work?

A. 10:00 -- 10:00 to 6:30.

Q. 10:00 last night till 6:30 this morning?

A. Yes, sir.

Q. And when I spoke to you last night, I said maybe you should try to get the night off, didn't I?

A. Correct.

Q. All right. But you worked and you've been here since 10:30 last night.

A. That's correct.

Q. Very good.

And I'm going to try and do this as fast as I can, all right?

All right. Let's talk about the incident back in January of this year, okay?

A. Okay.

Q. Do you-all, on a regular basis on the midnight shift, do what's called shakedowns in the single cells?

A. Yes, we do.

Q. Okay. Tell the jury what a shakedown is and the purpose of it.

A. A shakedown is generally when we go into a cell and look for contraband or anything that may

136

endanger an inmate, and as we enter the cell, those things, contrabands, are taken out of the cell.

Q. So in the single cells, the inmates are housed by themselves; is that correct?

A. Yes.

Q. And their access to anything outside of the cells, is it just through like a chute where the food comes in?

A. That is correct.

Q. And how do they get any of their toiletries or commissary?

A. Through the chute.

Q. Okay. Are they allowed to go to the store and shop for things?

A. No.

Q. All right. And can they get in, as a regular basis, like razor blades, or razors to shave with?

A. To my knowledge, sometimes they do get razors, --

Q. Okay.

A. -- if they're attending court or something.

Q. Okay.

COURT REPORTER: If they do what? If they're attending court?

THE WITNESS: Yes.

137

Q. (BY MR. ALEX:) If they're what?

A. If they're attending court the following day, they are given razors to shave with.

Q. So they can have a regular razor with a handle on it to shave with?

A. Yes.

Q. And there are certain items that they can -- that they're allowed to have; is that right?

A. That is correct.

Q. And then there are certain items that they're not allowed to have.

A. That is correct.

Q. And I would assume that the purpose of this list of things they're not to have is for the safety of themselves, and you, and everybody else; is that right?

A. That is correct.

Q. Okay. And so potentially, it could be a dangerous situation if they had contraband in their cell.

A. That is correct.

Q. And do y'all shake down the cells every night or is it at random?

A. Generally at random. Sometimes twice, three times a week.

Q. Okay. And do you still -- well, let's --

138

let's move on from there.

Okay. So back in January, the 22nd, I guess that night going into the morning of the 23rd, did you have occasion to shake -- shake down the cell that James Broadnax, the defendant in this case, was in?

A. Yes, sir.

Q. And -- I'm sorry. I'm thinking about the last witness that was up there.

It was July 23rd of last year, --

A. Right.

Q. -- was it not?

A. That is correct.

Q. All right. And I got sleep last night.

July 23rd, 2008, at that point, do you know how long the defendant would have been incarcerated down there at the single cell?

Did you have any idea at that time?

A. No, but I know he was fairly new, because like I said, we're pretty much familiar with the faces, and I know he was really new to that population. Okay. Very good.

So we all know that you are on the same page as us, do you see that person in the courtroom that I've been referring to as James Broadnax?

A. Yes, sir.

139

Q. Could you point to where he's sitting and describe an article of clothing?

A. To the left, gray shirt. He's got a gray and green tie.

Q. Okay. This is chair 1, 2, 3, 4, and 5. Are you referring to the gentleman that's seated directly in front of me?

A. Yes, sir.

MR. ALEX: May the record reflect that the witness has identified the defendant in open court?

THE COURT: Is there any objection?

MR. LOLLAR: No.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) And so, back on July the 23rd of last year, at sometimes at 11:30 in the morning, were you all shaking down the defendant's cell?

A. Yes, we were.

Q. Do you have -- up to that point, do you recall ever shaking his cell down before then?

A. That was the first time.

Q. All right. And when it's the first time that you are involved in shaking down an inmate's cell that you're not familiar with, is there something that you normally do to try and keep the peace?

A. Yes.

140

Q. What do you do?

A. What I do is I kind of explain what a shakedown -- well, what a shakedown is, and the position that an inmate should assume as we enter the cell.

Q. And do you do that after you go into the cell?

A. Just right before we enter the cell.

Q. As you're still standing outside the cell.

A. That is correct.

Q. Okay. And you explain -- what do you explain to him?

A. Well, we basically tell the inmate, in this case it was Mr. Broadnax, that when we come -- when we come to his cell, we need him to move -- get from his bed, place his hands on the wall, elbows on the wall, and while we're conducting our shakedown, he should not be turning left or right.

Q. And why do you do that?

A. For safety.

Q. Okay. And you told that to him.

A. Right.

Q. All right. And then what happens?

A. Well, um, I was the first one entering, so again, knowing that he was fairly new, I just was not -- I've never seen him before, I kind of explained

141

to him what a shakedown was. When we come in the cell, we expect for you to basically have your elbows on the wall. You should not be turning left or right until we exit the cell. And he turned to me and says, What if I don't?

And I said, Well, you wouldn't want to do that, would you?

And he looked at me again and he says -- he just looked.

And I said, I told you, you don't want to do that. Keep your hands on the wall.

And at that time he turned again, and that's when he was basically taken down.

Q. All right.

A. With minimum force.

Q. And let me stop you there for a second.

You hadn't -- you didn't know him from before.

A. Correct.

Q. Did you -- do you have the ability to research before you go into a person's cell and see what they're charged with, whether they're charged with a double homicide, or whether they're charged with DWI, or anything like that?

A. No. We have so many inmates to deal with. But before we enter the cell, there's usually a card --

142

Q. Okay.

A. -- that lists minimum, maximum, medium, you know, so we have a general idea if this person's a maximum or medium inmate.

Q. Okay. And so if he's standing -- would you stand up for me, please?

A. Certainly.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) And if you use this wall as an example, am I about as tall as Mr. Broadnax is?

A. Pretty much.

Q. All right. Would you step down?

(The witness came down from the stand.)

Q. (BY MR. ALEX:) So he's standing over you like this, and he's saying, Well, what if I don't?

Is he saying it in a very nice way, like, Please, ma'am, if I don't listen to you, --

A. No.

Q. Was he saying it in an aggressive way?

A. Pretty much, yes.

Q. Okay. All right. And you've already told him what needs to be done, right?

A. Right.

Q. And when he says that to you, is he facing you

143

directly?

A. Well, yeah. He's looking. His hand is not on the wall.

Q. He's not complying; is that right?

A. That is correct.

Q. All right. And he's looking down at you and he's saying, What if I don't, right?

A. Correct.

Q. And then what's the next thing that happens?

A. I said him, I says, You don't want to do that. You basically want to comply.

Q. Okay.

A. At this time, we're actually basically advising him and ordering him. Well, I am.

Q. Turn this way, because the jury is the one that needs to hear what you're saying. They'll decide the case; the Judge will give us the law.

A. Okay. I'm advising him and ordering him to basically comply by placing his hands or keeping his hands on the wall.

Q. So what does he do after that, does he comply?

A. Well, at this time, he's just like -- just like this (indicating).

Q. So he's kind of halfheartedly complying?

A. Yeah. Kind of halfway. Yeah, exactly.

144

Q. You position me the way he was. Was he kind of like looking back at you like this?

A. Yes, looking back.

Q. Was he cussing or anything?

A. Not at that time, he wasn't cussing, no.

Q. Not at that time, okay.

So this -- at this point, what should he have been doing?

Should he have been here like this (indicating)?

A. Yes. That's exactly how he should be doing.

Q. And is that the way that you can ensure that you're not going to have any trouble?

A. That is correct.

Q. All right. And instead of that, what does he -- does he kind of halfheartedly --

A. He gets up off the wall and he turns back around and he just looks at us.

Q. All right. And then his elbow, as he's turning this -- I mean, where you're standing, if I'm about his height, is his elbow right about here?

A. Well, yeah.

Q. Okay.

A. That's exactly what --

Q. And then this is what was going on?

August 13, 2009

145

A. That is correct.

Q. All right. And did you have any fear that you could be struck?

A. Pretty much.

Q. All right. Did we -- did you demonstrate this for me earlier?

A. No.

Q. In the months before this -- before this date today?

A. Yes, I did.

Q. And did I ask you to show me what was going on?

A. I did -- you did.

Q. And as he's turning, if he had just turned hard enough, could he have struck you in the face?

A. Yes, he could have.

Q. All right. And so he's not complying, and what do you have to do?

A. At that time, we kind of all moved in. I was the first one on him, so I took him down.

Q. Took him down.

A. Right.

Q. How many people?

A. There was four of us.

Q. You can have your seat.

146

(The witness returned to the stand.)

Q. There's four of you. And do you do that for safety?

A. Correct.

Q. All right. And so you take him to the ground, and what happens?

A. Um, at that time he was cussing and yelling. Shortly after that we took him to the nurse because that's just general procedures.

Q. All right. And I know it's not polite to cuss in -- cuss in court, but the jury needs to know somewhat the demeanor of the person they have to decide his fate for. What are the things that he said to you?

A. He was saying stuff like, Bitch ass mother fuckers, y'all ain't going to do shit. Fuck y'all.

He was just really, really irate at that time.

Q. Sure. And those are the types of things he was saying to you.

A. Correct.

Q. The jury has heard plenty of the types of things -- his -- his regular speech pattern, and it was, Bitches, and Fuck y'all, and those kind of things?

A. Correct.

Q. Okay. All right. And it's four of y'all at this time that's trying to control him, and he's not

147

saying, Okay. I'm going to -- I'm going to comply. He's still mother fucking you and bitching you, right?

A. Correct.

Q. Okay. And then what happens after that?

A. Well, shortly after that, we basically had him restrained --

Q. Okay.

A. -- and took him to the nurse.

Q. And took him to the nurse.

A. Uh-huh.

Q. And why do you do that?

A. Well, it's just any procedure, any time we place a hand on inmates, you know, we have to take that inmate to the nurse --

Q. All right.

A. -- just to be evaluated.

Q. Just to be evaluated and documented.

I mean, let's be fair. If y'all had beat him up here, he'd have some bruises and stuff on him that y'all would have to account for.

A. That's correct.

Q. All right. And when he goes down to the nurse, did they take a picture of his face?

A. They did.

Q. All right. And while he's down there at the

148

nurse, is he complying at this point? Is he saying, Okay, guys. You know, it's four of y'all and one of me. I'm going to behave.

Is that what's going on down there?

A. No.

Q. What's happening now once you see the nurse?

A. Our trip from his cell to the nurse station, very combative, very out of control. Even the nurse's station, he was out of control.

Q. And down at the nurse's station, did y'all have to take him down again?

A. Yes.

Q. Okay.

A. Yes.

Q. And --

MR. ALEX: Judge, at this time, I think State's Exhibit 485, also marked as Defense Exhibit 1, has only been offered for the record. I'm going to offer it. It is the first round of medical records for all purposes.

MR. LOLLAR: I have no objection.

THE COURT: State's 485 is admitted for all purposes.

Q. (BY MR. ALEX:) And do you recall, when you went to the nurse, how many of you-all were there?

149

A. There was still four of us.

Q. Four of you. Okay.

All right. And you're down at the nurse's station. There's four of you. And what precipitated him having to be taken to the floor at that time?

A. (No response.)

Q. If you recall.

A. I can't recall. No. I can't recall.

Q. All right. And you've seen -- I've shown you the note out of the -- the file there, the medical records that the nurse wrote about that; is that correct?

A. That is correct.

Q. All right. And if you'll give me one second. I don't know if I stuck it back in my stuff.

Okay. All right. State's Exhibit 204, does that appear to be the note from a nurse by the name of Helen Alma Ashley? It's electronically signed there?

A. That is correct.

Q. And the date is July 23rd of 2008?

A. Correct.

Q. And does it refer to when y'all went down to the nurse's station with the defendant, James Broadnax?

A. That is correct.

Q. All right. And -- well, that is a -- I think

150

counsel --

MR. ALEX: We're going to offer State's Exhibit 204, Judge.

THE COURT: Is it a part of the medical records previously admitted?

MR. ALEX: It is, Judge.

MR. LOLLAR: No objection.

THE COURT: State's Exhibit 204 is admitted.

MR. ALEX: Permission to publish?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) Ms. Kirvin, I just want you to see if you recall this.

I'm going to publish this to the jury by reading it.

(As read:) Inmate to clinic. Escorted by SRT's. Minor use of force. Inmate attempted to fight with SRT in clinic and was taken to the floor. Inmate shows no visible sign of injury at this time. Inmate continues to argue and curse at the officers. Will not sit still when asked. Inmate states, quote, I don't like to follow orders. End quote.

(As read:) Inmate would not answer questions by this nurse and continues to stare at the officers.

I'm not sure, but it's DS as above.

151

(As read:) Prior to inmate being escorted to clinic, he states my leg, knee, back, neck, arm hurt. My whole body hurts. No bruising, redness, swelling or scratching noted to inmate. Noted to have full range of motion. Full weight bear.

(As read:) Will refer to psych, as no inmate repeatedly states, I don't give a fuck about them. Fuck them ho's. Man, I don't give a fuck about nothing. I didn't care which they give me, life or death. I don't care.

The note that's written by Ms. Ashley, do you recall if those events happened down there on that day?

A. Yes, very briefly.

Q. And, Ms. Kirvin, do you still work with inmates in the area where Mr. Broadnax was at that time?

A. Yes, I do.

Q. All right. And do you still do shakedowns?

A. Yes, we do.

Q. Do you still have contact with Mr. Broadnax?

A. I think the last time I did was probably, approximately, about a month ago.

Q. Okay. And is it -- does it make your job harder when you have to come into court and testify in these kind of things and then have to deal with the

152

inmates?

Well, let me -- let me strike that. Does it make it any easier?

A. Does it make it any easier?

Q. Right.

A. No, it doesn't.

Q. Okay. And primarily, you don't go to work every day with the thought in mind of having to come to court to testify, do you?

A. No, not at all.

Q. Part of your job is to keep things as peaceful as possible, isn't it?

A. That is correct.

Q. Are you going to work every day looking for conflicts?

A. Nope. Try and deescalate it.

Q. And the less conflict there is, the more [sic] problems you have; is that correct?

A. The less conflict?

Q. The less problems you have on a day-to-day basis.

A. That's correct.

Q. All right. And there was a photograph I think that I showed you earlier that was taken down in the -- I think the witness has got out of order, and so have

153

I. Give me one second.

State's Exhibit 116, does it bear the name of James Broadnax 2 East Upper 66? Would that be the location that he was at?

A.   Yes.

Q.   July 23rd of '08?

A.   That is correct.

Q.   And can you tell by the apparatus surrounding him, -- this would have been a photograph taken down at the nurse's station.

A.   That's correct.

MR. ALEX: We would offer State's Exhibit 116, Your Honor.

THE COURT: Is there any objection?

MR. LOLLAR: No objection.

MR. ALEX: Permission to publish?

THE COURT: State's Exhibit -- well, I haven't admitted it yet.

MR. ALEX: Oh, I'm sorry.

THE COURT: State's Exhibit 116 is admitted.

You may publish it.

MR. ALEX: May I publish it by handing it to the jury, Your Honor?

THE COURT: Yes, sir. And you may pass it

154

around.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Cross-examination.

MR. LOLLAR: Thank you, Your Honor.

THE COURT: Yes, sir.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q.   Ms. Kirvin, my name is Brad Lollar. I've got a few questions. If I don't ask something right, just tell me and we'll get it cleared up.

A.   Okay.

Q.   So if I understand what you're saying, Mr. Broadnax here was new to -- to that area, and you hadn't seen him before; is that correct?

A.   **Well, as an inmate housed in the single cell, that was my first encounter with him, correct.**

Q.   Okay. And how long had you been working there in that area of the jail, those single cells?

A.   **Well, we shake it down at least two, three times a week.**

Q.   No, I mean, how -- do you work a particular area in the jail or are you all over all of the floor --

A.   **We're all over.**

155

Q.   Okay. Very good.

And are you saying that you shake down every single cell three to four times a week?

A.   **Approximately three to four times per week, yes.**

Q.   And this was the first time, to your knowledge, that his cell had been shaken down.

A.   **That's correct.**

Q.   And I believe you indicated you work the midnight shift, --

A.   **Correct.**

Q.   -- and I take it it was at nighttime when y'all went to his cell to do this?

A.   **Yes.**

Q.   Do you remember about what time of day it was?

A.   **It was approximately around maybe 12:30. 12:30, 1:00 o'clock.**

Q.   In the morning.

A.   **Correct.**

Q.   And was he awake or was he asleep?

A.   **Um, I think he was asleep when we came in, if I'm not mistaken.**

Q.   Okay. So he's asleep, and what do y'all do? You said you started talking to him on the other side of the door, right?

156

A.   **Well, let me go back for a second.**

Q.   Uh-huh.

A.   **When we're doing shakedown, inmates know that we're on the floor because the other inmates let them know that we're there.**

**When I walked in, when the -- when the door was opened, yes, he was laying asleep on the bed at the time. So I asked him if he will basically get up.**

**I explained to him that it was his first encounter -- I even explained to him that because I knew that it was his first time, my encounter with him the first time, that when we come in to shake down, basically we ask him to place his elbows to the wall. He shouldn't be turning left or right.**

Q.   Okay. So you said if -- if they're awake or whatever, the inmates will let each other know. But if he was asleep, he wasn't notified in advance that you were coming; is that a fair statement?

A.   **I would say so.**

Q.   So y'all woke him up in the middle of the night and doing something new to him; is that a fair statement?

A.   **I would say so.**

Q.   And you're trying to explain to him what -- what the process is and how he's got to assume that

157

position there against the wall, and is that when he said What if I don't?

A. Well, he got up, basically, and he did get undressed.

Q. He did get on the what?

A. He did get undressed.

Q. I'm -- I'm sorry. What word are you saying?

A. He got undressed, because he did have on his --

THE COURT: Undressed.

Q. (BY MR. LOLLAR:) Oh, undressed.

A. Correct. So he did comply when we asked him to basically get undressed and get to the wall. And I told him, I says, I -- I don't know if you've been shook down before, but because it's our first encounter, nights when we come into the cell, we want you to basically assume that position.

Q. Okay. Let me -- let me interrupt you there. What do you mean, he got undressed?

A. Okay. When we shake down a cell, an inmate is supposed to basically take their -- their bottom pants and their top off. They're only allowed to be in their boxers.

Q. Okay. And so he was woken up out of his sleep, and there were four of you there?

158

A. There was four of us, correct.

Q. Four of you SRT officers.

A. Correct.

Q. And you're telling him to take off his clothes and get up against the wall.

A. Correct.

Q. And you're explaining all of that to him, and this was his first time seeing that.

A. Correct.

Q. And then we've seen what happens after that. What if I don't, and then you said he looked at you, and that's when he was sat upon.

A. Well, he did assume his position. Not exactly like it should. He did get close to the wall, but his hands were not on the wall.

And I explained to him at that time, I said, I'm not sure if you've been shook down before, but this is my first encounter with you. On nights, when we come in, we basically want you to place your hands on the wall. Assume that position. And you shouldn't be turning left or right.

Q. And maybe I missed it, but did he ever harm any of y'all?

A. No.

Q. Either there, or later on down at the nurse's

159

station?

A. If he harmed any of us?

Q. Harmed you.

A. No, not -- not -- no.

Q. Okay.

MR. LOLLAR: May I approach the witness, Your Honor.

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) Ma'am, I want to show you three pieces of paper.

MR. LOLLAR: And for the record, these are portions that came out of what Mr. Alex just introduced here, Defendant's Exhibit Number 1.

Q. (BY MR. LOLLAR:) And I don't expect that you will have ever seen these before, --

A. Correct.

Q. -- but you said the date that this all happened was on July the 23rd of 2008; is that correct?

A. Correct.

Q. And let me show you this first page here. Do you recognize what an Inmate Request Form is?

A. Yes, sir.

Q. And what do you call those over in the jail?

A. A kite.

Q. A kite. And does this appear to be a kite

160

from James Broadnax dated July the 11th?

A. Yes.

Q. And he was in that cell, 2EU66?

A. Correct.

Q. And can you tell us what it says?

Well, first, let me do this. Well, they're already in evidence.

MR. LOLLAR: We'll offer Defendant's 13, 14 and 15.

MR. ALEX: Just let me see what it is, Mr. Lollar.

THE COURT: I don't have a Defense Exhibit 12.

COURT REPORTER: Do you want me to look for it later, Judge?

THE COURT: No. I want to call it 13, 14 and 15, and we'll find out about 12 later. But I don't think there is a 12.

MR. ALEX: No objections, Your Honor.

THE COURT: 13 through 15, inclusive, are admitted.

Q. (BY MR. LOLLAR:) And, I'm talking again about Defendant's Exhibit Number 13 here. Does that appear to be a kite from James Broadnax dated July the 11th? That's his book-in number and that's his cell number;

161

is that correct?

A. Right.

Q. And can you read for the jury what his kite -- now, a kite goes to somebody. It's a request for something; is that right?

A. That is correct.

Q. And in this case, it would be for a nurse or some -- to get a nurse's attention?

A. Correct.

Q. And what does it say?

A. It says, I really need to see a psych. It's important. I'm seeing shit. Thank you.

Q. And then there's some notations down there by a nurse, and I can't even read those. Can you read those?

A. Something has flu.

Q. Patient has flu, maybe?

A. Yeah.

Q. 7/15 of '08? And then somebody's signature?

A. Correct.

MR. LOLLAR: May we publish, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) And then I want to show you what has been marked here as Defendant's Exhibit Number 14, and do you see this again refers to James Broadnax,

162

the same cell number, dated July the 8th -- pardon me, July 11th, 2008, and this is a sick-call request; is that right?

A. Correct.

Q. So that would be on the same date that that other one was there, right?

A. Okay.

Q. And this is a request for mental health attention, and can you read what it says?

A. It says I can't sleep. My mind is playing tricks on me with something. I'm seeing shit in my cell. I'm hearing voices. I'm hearing voices fucking.

Q. Probably talking.

A. Talking to me. I am paranoid.

I don't understand what that --

Q. I'm paranoid, like somebody around me all the time. I need help.

A. Correct.

Q. And that was dated again on July the 11th.

Does it look like some nurse -- got the attention of some nurse on July the 12th, and she notes he says, I see blood coming out of the walls, voices in my head. Right?

A. Correct.

Q. And then she notes flat blunted affect, poor

163

eye contact, frequent forehead rubbing, states he has been having AV, audio visual hallucinations since before arrest. Cannot say what voices are telling him. Statements incongruent with chart. Right?

A. Uh-huh.

Q. And then provide followup 7/22; is that right?

A. That's correct.

MR. LOLLAR: May I publish, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) And then let me show you this, marked July the 20th, 2008, at 10:11 a.m.

Does this appear to be a Dallas County jail health, mental health follow-up note?

Does that appear to be what that says?

A. Yes.

Q. And again, it's James Broadnax, same book-in number, cell 2EU66. It has a lot on here I don't want to take your time looking at, but on Axis 1 down there, you see where it says Substance induced psychosis, anxiety, malingering, mental illness?

Do you see that?

A. Uh-huh.

Q. And that's again by a doctor. I don't think you can read that signature there, but it looks like a number of different medications have been prescribed at

164

that time; is that correct?

A. Correct.

Q. Trazodone, Benadryl, Bupropion, Clonazepam, and Risperdal. Do you know what any of those things are?

A. They're psych medicines, yes.

Q. Those are all psych medicines?

A. Some.

Q. Okay.

MR. LOLLAR: May we publish this, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) Okay. So that would have been four days before y'all made this shakedown of his cell in the middle of the night when he was asleep, correct?

A. Yes, sir.

Q. Thank you, ma'am.

MR. LOLLAR: That's all we have.

THE COURT: Redirect?

MR. ALEX: Yes, sir.

**REDIRECT EXAMINATION**

BY MR. ALEX:

165

**Q.** Ms. Kirvin, are you indicating to the jury that y'all mistreated James Broadnax when y'all went up there?

**A. No, not in any way.**

**Q.** Did you try your best to avoid the situation that eventually happened?

**A. That's correct.**

**Q.** And when it comes to the documents that counsel just introduced from the medical records regarding seeing stuff and all of that, is that the first time you've seen those documents?

**A. That's the first time of seeing the documents.**

**Q.** All right. When you went into the cell to talk to the defendant, was he talking to himself?

**A. No.**

**Q.** Was he running from the walls as though blood were coming out of the walls?

**A. No.**

**Q.** Was he acting in any way, for lack of a better term, crazy?

**A. No. He was fairly calm at the time.**

**Q.** Initially?

**A. Yeah.**

**Q.** Okay. Until he had to follow the rules.

**A. That is correct.**

166

MR. LOLLAR: I'll object to that question, Judge.

THE COURT: Sustained.

**Q.** (BY MR. ALEX:) Well, at what point did he become a problem? Was it after you told him that he needed to do something that he obviously didn't want to do?

**A. Correct.**

**Q.** Okay. And then it became a problem.

**A. That is correct.**

**Q.** All right. Now, the documents that the jury is currently looking at now, is it -- is it uncommon for inmates to try and manip -- and manipulate the guards and the whole system there? Is that uncommon?

**A. No, it is very common.**

**Q.** Very common.

And if you had been aware that prior to him saying that he was seeing things coming out of the wall, prior to that, it was hearing voices all the time, and then the doctor said, Okay. You can go back down to the regular population, and now he's seeing things coming out of the walls. Well, tell you what. Let's do this.

MR. ALEX: At this time, Judge, we'll offer State's Exhibit 567, which has previously been

167

authenticated, a phone call from the jail.

THE COURT: Previously admitted for record purposes only; is that right?

MR. ALEX: Right.

THE COURT: Any objection?

MR. LOLLAR: No, sir.

THE COURT: It's admitted.

You may publish.

MR. ALEX: And -- one second, Your Honor.

And for demonstrative purposes, Judge, we're going to offer State's 566, the same phone call with subtitles on it.

THE COURT: The same objection, I take it?

MR. LOLLAR: Yes, sir.

THE COURT: The objection's overruled. It's admitted for demonstrative purposes.

How long does this.

MR. ALEX: It's not very long, Judge.

THE COURT: -- take?

(CD played.)

**Q.** (BY MR. ALEX:) All right. And, Ms. Kirvin, when we're talking about manipulating the guards and the system, all these documents that counsel just showed you, if you had previously known that he first was hearing things and now he's seeing things, would

168

that be consistent with what you just heard from Mr. Broadnax's mouth about manipulating folks?

**A. Correct.**

**Q.** All right. But you didn't see any signs when you walked in the cell of him being in any kind of way having any kind of mental breakdown or anything like that.

**A. That is correct.**

**Q.** All right.

MR. ALEX: I'll pass the witness, Your Honor.

THE COURT: Recross?

**RECROSS-EXAMINATION**

BY MR. LOLLAR:

**Q.** Ms. Kirvin, am I missing something? I mean, you went into the cell. He was asleep; isn't that correct?

**A. That is correct.**

**Q.** And y'all woke him up; is that right?

**A. That is correct.**

**Q.** And you don't know if he's having mental problems or not, do you?

**A. That's correct.**

**Q.** Okay. Thank you.

MR. LOLLAR: That's all we have.

169

THE COURT: May the witness be permanently excused?

MR. ALEX: We have no objections, Your Honor.

MR. LOLLAR: No objection. You're permanently excused, ma'am. You may step down. Thank you for your testimony.

THE WITNESS: You're welcome.

THE COURT: We'll take a brief recess for the jury at this time.

The parties remain in the courtroom.

All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

Returning to the issue of the legality of the shakedown search, however the parties want to phrase it, that was conducted by Inv. Doty, it appears that the defense has found some case law on point; is that right, Mr. Lollar?

MR. LOLLAR: That's correct, Your Honor.

THE COURT: All right. Tell me about that.

MR. LOLLAR: I think it's directly on point.

THE COURT: All right. Well, tell me

170

about it.

MR. LOLLAR: Let's see, it's United States of America versus Elliott Cohen, C-O-H-E-N, 796 F.2d, 20.

THE COURT: Why don't you let me see it. (Examining document.) Of course, the parties for both sides have an ethical obligation to bring to me authority which questions this case. Is there such authority?

MS. MALLON: I just checked, Judge, and it --

THE COURT: Not to mention, this is a Second Circuit case.

MS. MALLON: I understand that. I understand that.

It was denied and served by the Supreme Court. It's been followed by other circuits and has not been overturned.

MR. LOLLAR: What year is that case.

MR. PARKS: '80s.

THE COURT: The case is 796 F.2d 20, 23, and I will allow you to brief it. I'm not going to decide yet.

We're in recess until 2:10.

MR. ALEX: We've got lots of further

171

witnesses to go, too, Judge. We're not relying on this to continue today. I can finish the day off without even having this -- these witnesses.

MR. PARKS: Judge, while we're passing out case law, I don't want to wait until the last minute to hand this to you, so I'll do that. It's not anything --

THE COURT: Will this have to do with this issue or something else?

MR. PARKS: It's something else.

THE COURT: All right.

MR. PARKS: But, I don't want you saying, Hey, why did you wait till the last minute to put this on us.

THE COURT: What's this on?

MR. PARKS: That's on the issue of the prison videos, which I assume will come up maybe tomorrow.

THE COURT: What's this about, Mr. Alex? Prison videos.

MR. ALEX: I'm sorry, Judge?

THE COURT: Prison videos.

MR. ALEX: What about it?

MS. HANDLEY: Well, we're jumping around. I'm assuming this speaks to that we have some pictures

172

of a penitentiary that will assist the witness in describing to the jurors the different locations in the penitentiary, how they work, the populations and classifications.

MR. ALEX: That's -- that's exactly right, Your Honor.

MR. PARKS: Yeah. That's actually a tomorrow issue.

THE COURT: Okay. And I'll direct y'all's attention to Sells versus State at 121 S.W.3d 748, which I take it, Mr. Parks says, supports his position that that evidence is inadmissible.

MR. PARKS: Sort of. I -- I mean, Sells does not say it is inadmissible. Sells did, however, deny the admission of it, and that was affirmed.

THE COURT: Ah. Well, that's a horse of a different color, as we both know.

All right. We're in recess.

MR. ALEX: How long did you say, Judge?

THE COURT: 2:10.

(Recess taken.)

(Court reconvened.)

THE BAILIFF: All rise.

(Jury present.)

THE COURT: Be seated, please.

August 13, 2009

173

What further says the State?

MR. ALEX: The State would call DSO Off. Contreras, Your Honor.

THE COURT: Mr. Contreras, please come to the front of the courtroom, all the way to the door. Go as far as you can. When you reach the door, turn and face me and raise your right hand.

**MORRIS CONTRERAS**

was called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex.

Whenever you're ready, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name, sir.

A. **Morris Contreras.**

Q. All right. Mr. Contreras, you're going to have to speak up a little bit. One more time.

A. **Morris Contreras.**

Q. What do you do for a living?

A. **I work at the Dallas Sheriffs Department, North Tower.**

Q. All right. And I want you to pretend like

174

you're talking to that lawyer way back there, Mr. Maedgen --

A. **Yes, sir.**

Q. -- when you're talking, okay?

A. **Yes, sir.**

Q. All right. And what do you do for the Sheriff's Department?

A. **I'm a DSO.**

Q. And what does DSO mean?

A. **We work -- detention service officer.**

Q. Very good. How long have you been a detention service officer?

A. **For three and-a-half years.**

Q. And what did you do before that?

A. **I had a job over at Six Flags.**

Q. I'm sorry?

A. **I had a job as a Six Flags employee before I joined the department.**

Q. And tell the jury about your education.

A. **I attended college for about -- approximately two years.**

Q. All right. And as a detention service officer, what is part of your duties?

A. **Care, custody and control of inmates.**

Q. And what's your number one job, is it safety?

175

A. **Yes, sir.**

Q. And is that over at the Lew Sterrett jail just behind this building?

A. **North Tower, Lew Sterrett, yes.**

Q. Is there any particular area that you work on a regular basis?

A. **Second floor.**

Q. Second floor of?

A. **West side. 2 West of North Tower.**

Q. 2 West, North Tower. And I'll bet the jury has no idea what 2 West North Tower is, but is the jail broken down into different areas based on geographical locations?

A. **It's just broken up in different sections, ranging from minimum custody to maximum custody.**

Q. Very good.

And I assume if there's a North Tower, there's a South Tower.

A. **Yes, sir.**

Q. And then there's the West Tower?

A. **Yes.**

Q. Very good.

You work in the North Tower.

A. **Yes, sir.**

Q. Second floor.

176

A. **Yes.**

Q. Back in January of this year, where were you working?

A. **2 West.**

Q. 2 West. And in 2 West, is there a gym there?

A. **Yes, sir.**

Q. And who -- who among the inmates are allowed to go to the gym?

A. **A maximum of 16.**

Q. 16 at one time?

A. **Yes, sir.**

Q. All right. Are the folks that are in the single cells allowed to go to the gym?

A. **Yes.**

Q. Are they are allowed to go with other people?

A. **Yes.**

Q. And so are the folks in the single cells up in the -- is it the -- tell me what you call it, your acronym, is it 2 West Uppers?

A. **What was that?**

Q. What's the acronym you use for that location that you were working?

A. **I was working the floor that day, 2 West on the floor.**

Q. 2 West on the floor.

177

A. Yes, sir.

Q. Would that be the first floor?

A. It's broken up in sections. The second floor is divided in 2 West floor, 2 West Lowers, 2 West Uppers.

Q. Very good.

And did you have occasion on that day, January 21st, 2009, at sometimes after 3:00 p.m., to have to break up a fight in the gym?

A. Yes, sir. I observed a fight between two inmates.

Q. All right. And did you see how the fight got started?

A. No, sir.

Q. All you saw was the fight in progress.

A. Yes.

Q. All right. Was one to those folks involved in the fight a man by the name -- identified as James Broadnax?

A. Yes, sir.

Q. Do you see him in the courtroom today?

A. Yes, sir.

Q. All right. Could you point to where he's sitting and describe an article of clothing?

A. Wearing a white suit.

178

Q. Okay. And if this is chair 1, 2, 3, 4, 5, 6 and 7, are you referring to the gentleman that's seated directly in front of me?

A. Number six, yes.

MR. ALEX: May the record reflect the witness has identified the defendant in open court?

THE COURT: Any objection?

MR. LOLLAR: No, Your Honor.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) Now, Mr. Contreras, how many of the detention service officers were in the area that you were in when you first observed the fight?

A. I believe it was four.

Q. Four. And how many inmates was there in the gym?

A. Approximately twelve.

Q. Twelve. So you guys had them outnumbered, I take it.

A. Yeah. Yes, sir.

Q. You did. Four of you to twelve of them.

A. It was just two inmates fighting.

Q. Right. At that time.

A. Yes, sir.

Q. All right. Is there always a concern that when inmates start fighting, that it could potentially

179

turn out to be a free-for-all?

A. Yes, sir.

Q. Were any of the officers that were around you or near you Security Response Team?

A. Yes, sir.

Q. All right. How many of those were Secure -- I'm sorry -- Special Response Team?

A. There was only one SRT present.

Q. And the other were detention service officers.

A. Regular DSO's; yes, sir.

Q. And so when you saw the two inmates fighting, what did y'all do?

A. We immediately told them to stop, and we went in the gym and restrained both of them and escorted them out separately.

Q. When all right. And when you restrained them, what does that mean? Did you have to go and physically put your hands on him?

A. We pull him away.

Q. All right. And when you pulled him away, was the other inmate that was involved in the fight, was his name Trevaun Miller?

A. Trevaun Miller; yes, sir.

Q. And when you pulled him away, was Trevaun Miller pulled away by one person?

180

A. He was pulled away by myself around Off. Bryant.

Q. Okay. And then was the defendant pulled away by somebody else?

A. He was pulled away by SRT Polk and Off. Batley.

Q. All right. And as you're holding inmate Trevaun Miller, is he still trying to get at James Broadnax?

A. No, sir.

Q. Was James Broadnax still trying to get at Mr. Miller?

A. From what I observed, he was still trying to get to him.

Q. Okay. And I guess that's -- is that a yes?

A. Yes, sir.

Q. Okay. So you're holding Trevaun Miller after you've broken up the fight, and the defendant over here is still trying to get at him.

A. Yes, sir, from what I observed.

Q. All right. Now, I'm going to have to follow up on that because you were there, right?

A. Yes.

Q. At this time, your eyes deceive you.

A. No.

181

Q. So the jury needs to know, were you trying to get at him or not?

A. No.

Q. I understand when you have to take the stand in a trial, it puts you in a different kind of position when you got to go back up here and work with these inmates; is that correct?

A. Yes.

Q. Not the best place in the world for you. You don't want to be on the stand, do you?

A. No.

Q. I didn't think so.

So, when you're in the gym and you're outnumbered twelve to four, you almost have to rely on the fact that these other guys are not going to get involved and take advantage of that fact and then you-all are in trouble, aren't you?

A. **Yeah. We understand the situation, that's why we're already trained to be aware of our surroundings. So we know there was no other inmates were being involved. It was just those two inmates.**

Q. Right. But my point is, in a jail situation where you have a lot of inmates who are allowed to gather, --

A. Yes.

182

Q. -- one of the things that you have to do on a regular basis is keep the peace; is that right?

A. Yes, sir.

Q. And if the peace gets broken by some guys who don't want to keep the peace, then there's always going to be --

MR. PARKS: Judge, we're going to object. This jury's determination is for the individual sitting here in the courtroom and not based on what some other bunch of unnamed people might or might not do. It's irrelevant.

THE COURT: The objection is to relevance?

MR. PARKS: Yes, sir.

THE COURT: Overruled at this time.

Q. (BY MR. ALEX:) Off. Contreras, --

A. Yes, sir.

Q. -- was the defendant, James Broadnax, engaged in the fight?

A. Yes, sir.

Q. And when the fight was over, was he still the aggressor?

A. **Yes, sir. From what I observed.**

Q. Okay. And when a fight breaks out, is there always the potential that it could turn into a melee?

A. Yes.

183

Q. Thank you, sir.

And is that a dangerous situation to you?

A. **Yes, it is.**

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) I'm going to show you what's been marked as State's Exhibit 574, 575 and 576.

When the fight is broken up, are the inmates taken to the nurse and are they -- photographs taken of them?

A. **Yes, sir. Immediately.**

Q. In 574, 575, are those photographs of inmates Trevaun Miller?

A. Yes.

Q. And 576 is the defendant here, James Broadnax.

A. Yes.

Q. All right.

MR. ALEX: We'd offer State's Exhibits 574 through 576, Your Honor, and may the record reflect that the witness --

THE COURT: But not 575?

MR. ALEX: No. Through 576. I'm sorry.

THE COURT: Any objection?

MR. LOLLAR: No objection.

THE COURT: State's Exhibits 574 through

184

576 are admitted.

You may publish.

MR. ALEX: It may be easier to publish this way. There's only three photographs, Judge.

THE COURT: I think it would be easier.

Q. (BY MR. ALEX:) Mr. Contreras, State's Exhibit 574 and 576, is that -- is that pretty much the way their faces looked when they were done with the fight?

A. Yes, sir.

Q. All right. Now, the jury has heard from a jail phone call the defendant saying he didn't need a shank because he had his hands. Would you say that -- you don't know who started this fight, right?

A. No, sir.

Q. But it's pretty clear who got the best of who, isn't it?

A. Yes, sir.

Q. Okay. And the inmate, Trevaun Miller, do you know if he was up in the single cells as well?

A. **Yes, sir. He was located also on 2 East Uppers.**

Q. Do you know if he would have been a maximum security inmate as well?

A. **I believe so.**

Q. So he either would have had a high-profile

185

case or he would have been a problem inmate himself; is that correct?

A. Yes.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Cross-examination?

MR. LOLLAR: Thank you.

THE COURT: Yes, sir.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Contreras, is it true that inmates are placed in a single cell sometimes because their case has attracted media attention?

A. Yes, sir, it is.

Q. And have you seen the -- I know that there's a review that they do every once in awhile --

A. **Single cell review.**

Q. I'm sorry?

A. **Single cell review, yes.**

Q. Single cell review. How often do they do that?

A. **I believe they do it twice -- once every two weeks.**

Q. And have you seen those in regard to Mr. Broadnax here?

186

A. **No, sir. That's currently done on dayshift.**

Q. Okay. Would it surprise you that he was in a single cell because his case had attracted media attention?

A. **He -- as far as I know, he's been in there ever since he got to Dallas County.**

Q. All right. Now, in regard to this particular incident, this was sometime back in January of this year; is that right?

A. Yes, sir.

Q. And this is between, of course, Mr. Broadnax, and another inmate by the name of Trevaun Miller; is that right?

A. Yes.

Q. And do you know why Mr. Miller was in a single cell?

A. **I have no knowledge, sir.**

Q. Okay. Can you get in a single cell because you keep having fights with people in general population?

A. **Yes.**

Q. Okay. And you don't know who started this fight; is that right?

A. **No.**

Q. You didn't see that part; is that right?

187

A. **I didn't see what -- what initially started it.**

Q. What is a -- what is an inmate supposed to do if another inmate starts beating on him?

A. **I believe to defend yourself.**

Q. Now, in regard to this particular incident, were there several reports written up or is that part of the -- part of the process there is to write up reports about it?

A. **It was just -- yes, sir -- one report generated. Written by myself.**

Q. I'm going to show you here --

MR. LOLLAR: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) I'm going to show you what has been marked here as Defendant's Exhibit Number 16. Do you recognize what that is?

A. **Yes, sir. Board hearing.**

Q. And what is a board hearing?

A. **There's a board hearing that's generated every time they have an incident, and it tells them whether they're going to be denied any type privileges for up to 30 days.**

Q. Okay. And tell me, what is the process once

188

an incident has happened between the incident and getting to the board hearing.

A. **Yeah. Once an incident occurs, we got to generate a report, and this brings up a board hearing which we got to read to them every time there's a fight or any other incident that occurs.**

Q. Okay. And looking through here now, what is this, the second page?

A. **That's just a confirmation of service saying that we read that to him and they comprehend what we read.**

Q. Okay. And the third page?

A. **This is their refusal, whether they wish to appeal the process or just waive their rights to a disciplinary hearing.**

Q. Okay. And the fourth page?

A. **That's the report.**

Q. Your report?

A. **Yes, sir.**

Q. And --

A. **That's a nurse refusal.**

Q. And seventh page?

A. **Affidavit.**

Q. And the eighth page?

A. **Another affidavit.**

189

Q. Is that the same thing?

A. **Yes, sir. They're written -- handwritten copy and a hand-typed copy.**

Q. And that's your signature there on that one?

A. **Yes, sir.**

Q. Very good.

MR. LOLLAR: We'll offer Defendant's 16.

THE COURT: Any objection?

MR. ALEX: I have no objections, Your Honor.

THE COURT: Defense Exhibit 16 is admitted.

MR. LOLLAR: May we publish, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) And, Mr. Contreras, let me ask you this: Now, in this case, you have your report here on the fourth page that you wrote; is that right?

A. **Yes.**

Q. Did either one of them want to see the nurse?

A. **Both of them refused.**

Q. Both of them refused?

A. **From what I recall, yes.**

Q. Okay. And neither one of them wanted to file any type of complaint against the other.

A. **No, sir.**

190

Q. And as a result of this fight, can they be restricted? Can they get restrictions placed upon them?

A. **Yes, sir, they can.**

Q. Tell the jury -- tell the jury what restrictions are.

A. **For a fight, you can get a maximum restriction time for up to 30 days which denies you the privileges of television, commissary and phone. You can only call your attorneys.**

Q. Of course, in the single cells, they don't have television, right?

A. **No, sir.**

Q. And they don't have a radio.

A. **No.**

Q. So they're basically locked in these single cells for 23 out of 24 hours a day; is that right?

A. **Yes, sir. Only -- they only come out for rec.**

Q. They only come out for the one-hour break --

A. **Yes, sir.**

Q. -- during the day.

A. **Yes.**

Q. Now, when they put them on restriction, then they can't get anything from the commissary for as long as the restriction period is.

191

A. **Yes, sir. No commissary, no visits, no phone.**

Q. No visitation by anybody except for lawyers.

A. **Yes, sir.**

Q. And no telephone privileges.

A. **No telephone privileges.**

Q. Can't make any phone calls.

A. **No, sir. Only for attorneys.**

Q. So in this particular incident, both of them received 15 days restriction; is that right?

A. **Yes, sir.**

Q. Okay. And you didn't see who started it.

A. **No, sir.**

Q. You don't know why Trevaun Miller was in a single cell.

A. **No, sir.**

Q. Okay. Referring to your report here that you wrote, --

A. **Yes.**

Q. -- that's your signature there?

A. **Yes, sir.**

Q. Now, do you say anything in here about having to restrain him and he was aggressive toward the other guy after you restrained him?

A. **No, sir. I just put on there that minimum force was used and they were escorted out separately.**

192

Q. And let's -- let me read that here. (As read:) Secured by SRT Polk, Bryant, Batley and myself.

A. **Yes, sir.**

Q. And the inmates were restrained using minimum force.

A. **Uh-huh.**

Q. Is that right? Okay.

Thank you, Mr. Contreras.

MR. LOLLAR: Pass the witness.

THE COURT: Redirect?

MR. ALEX: Just briefly, Judge.

At this time, Your Honor, we're going to offer State's Exhibit 551, which is a jail call dated January 22nd, 2009; 558, jail call dated January 21st of 2009 and -- for all purposes.

THE COURT: Any objection?

MR. LOLLAR: No, sir.

MR. ALEX: And we will offer for demonstrative purposes, Judge, 562, which includes subtitles for January 22nd, 2009; and 563 for demonstrative purposes, which includes subtitles for January 21st, 2009.

THE COURT: So 562 refers to 551, and 563 refers to 558?

MR. ALEX: Yes, sir.

193

THE COURT: All right. And the objection's the same, I take it?

MR. LOLLAR: No, sir.

THE COURT: Pardon me?

MR. LOLLAR: No objection.

THE COURT: No objection? All right.

MR. LOLLAR: Same objection, I'm sorry.

THE COURT: Okay. The objection is overruled.

The exhibits are admitted.

**REDIRECT EXAMINATION**

BY MR. ALEX:

Q. Mr. Contreras, are you aware that the inmates have the ability to use the jail phone call -- jail phone when they're in single cells?

A. Yes.

Q. And do they -- do they sort of drag a portable phone along and they'll give it to them to use?

A. **Yes, sir. The phone gets passed around to single cells.**

Q. Are they allowed to dial their pin numbers and their numbers themselves or does somebody do it for them?

A. **They're allowed to do it.**

Q. All right. And how do they effectuate that,

194

do they open the cell door open and bring it in, or what?

A. **There's a feeder port, and they just -- they normally will kneel down on the single cell and use the phone from there.**

Q. Okay. And so they reach through the feeder port?

A. **Yes, sir.**

Q. And it's big enough for them to dial on the phone.

A. **Yes, sir.**

Q. Okay. And it's big enough for their hand to get all the way through to that phone.

A. **Yes, sir.**

Q. All right. And you haven't listened to any of the jail calls, have you?

A. **What was that?**

Q. You haven't listened to any jail calls related to this fight, have you?

A. **No, I haven't.**

THE COURT: Which one are you playing?

MR. ALEX: January 21st, 2009, Judge.

THE COURT: Which is 562?

MR. ALEX: For demonstrative purposes, Judge, it's going to be 563.

195

For all purposes, it's going to be 558.

THE COURT: Okay.

(CD played.)

Q. (BY MR. ALEX:) All right. Off. Contreras, you don't have the benefit of listening to these calls before or after something like this happens; is that correct?

A. **No, sir.**

Q. But it sounds to me when the inmates are on the -- what he calls the block, are we talking about a row of single cells?

A. **Yes.**

Q. And on the row of single cells, you could yell down there to whoever you want and they can yell back; is that right?

A. **Yes, sir.**

Q. And you could yell to your heart's content, but you're not going to be able to fight as long as you're behind them doors, are you?

A. **Yes.**

Q. And apparently, according to what the defendant is saying, that Mr. Miller was flapping his gums and yelling up and down the block.

A. **They normally talk to each other through the doors --**

196

Q. Okay.

A. **-- or through their intercoms, or through the toilets.**

Q. And the defendant's response to Mr. Miller's words was, Well, when you see me, just chunk it up, right?

A. **Yes, sir.**

Q. So in other words, in response to a bunch of words, the defendant was like, Well, let's fight about it.

A. **Yes, sir.**

Q. Is that what it sounded like to you?

A. **Yes, sir.**

Q. Okay. And he said when the door opened, and let that be the bell. Did you hear that?

A. **Yes.**

Q. All right. Is that a dangerous situation when you're working around these guys?

A. **Yes, sir, it is.**

Q. Is there constant talk going back and forth in the single cells?

A. **Yes.**

Q. And as long as it's talk, then you don't have to get involved in breaking up a fight, do you?

A. **No, sir.**

August 13, 2009

197

Q. But when somebody challenges somebody else to a fight, then what you have is what ended up in the gym; is that correct?

A. Yes, sir.

MR. ALEX: And at this time, Judge, we'll publish for demonstrative purposes the call on January 22nd, 2009, State's Exhibit 562; and for all purposes, 551.

THE COURT: All right.

(CD played.)

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Recross?

MR. LOLLAR: Nothing further.

THE COURT: May the witness be permanently, excused?

MR. ALEX: We have no objection, Your Honor.

MR. LOLLAR: Yes.

THE COURT: You're permanently excused, sir. You may step down.

What further says the State?

MR. ALEX: The State would call Marcos Gutierrez, Your Honor.

THE COURT: Marcos Gutierrez.

198

Mr. Gutierrez, please come all the way to the front of the courtroom. All the way to the front of the courtroom, sir, up to the door. Keep going. All the way to the door, sir. All the way up here.

When you've reached the door, turn and face me and raise your right hand.

**MARCOS GUTIERREZ**

was called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex.

Whenever you're ready, sir.

MR. ALEX: Thank you, Judge.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. Good morning.

A. Hi.

Q. Is it morning for you?

A. Good morning.

Q. It's not morning, is it.

A. Good afternoon.

Q. Thank you, sir. My name is David Alex. We've met before; is that right?

199

A. Yes, sir.

Q. Okay. I'm going to ask you a few questions about an event that happened back May 13th of 2009, okay?

A. Yes, sir.

Q. Tell the jury what you do for a living.

A. I work as a jailer. I work at Dallas County, at North Tower. I've been working there for about two years, and I like working there.

Q. All right. How long have you been doing that?

A. Two years.

Q. You told me that already, didn't you?

A. Yes.

Q. All right. It's getting -- getting a little warm, okay?

Let's do -- let's do this. Are you a detention service officer?

A. Yes.

Q. And before you became a detention service officer, what did you do?

A. I worked as a warehouse worker at a cabinet company at Quality Cabinets in Duncanville, Texas.

Q. Very good. And what kind of education do you have?

A. Twelfth grade.

200

Q. Twelfth grade. Very good.

Back -- on May 13th of 2009 at about 12:20 p.m., and let's go -- let's go even further back than 12:20 p.m., were you assigned to escort the inmates from the single cells over to court?

A. Yes.

Q. And were you assigned to take an inmate by the name of James Broadnax to court?

A. Yes.

Q. Okay. Do you see him in the courtroom today?

A. Yes, sir.

Q. All right. Would you point to where he's sitting and describe an article of clothing?

A. He's pointing [sic] right -- he's right there, sir.

Q. All right. Just describe one article of clothing for me.

A. He's wearing a tie. He's wearing yellow and green, it appears.

Q. Is that chair 1, 2, 3, 4, 5, 6, 7?

A. It would be chair 6.

Q. All right. And you're referring to the gentleman that's sitting directly in front of me; is that correct?

A. Yes.

201

MR. ALEX: May the record reflect the witness identified the defendant in open court?

THE COURT: Any objection?

MR. LOLLAR: No, Your Honor.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) And were you also assigned to take an inmate by the name of Matthew Utsey to court?

A. That's correct.

Q. And were they in close proximity to one another?

A. Yes.

Q. All right. And have you reviewed the report as it relates to this incident recently?

A. Yes, I have.

Q. Would you know just right off the top of your head which -- what -- what their cell numbers were?

A. They were -- they lived on the East Uppers, and they were housed in the East Uppers, and they all -- they lived one cell across from the other cell. So they could see each other.

Q. Oh, so they faced each other.

A. They faced each other.

Q. Gotcha. And they'd be across from one another.

A. Yes.

202

Q. And did you have to escort him to court and then back from court?

A. No, I just had a to -- I was working on that floor, --

Q. Okay.

A. -- on the West Uppers, and so I was helping my comrades up -- downstairs, and then while I was helping them, there was some court inmates coming -- arriving on the floor. Therefore, it's part of my duties to pat search them coming from court.

Q. Okay.

A. Coming back from court, I mean.

Q. Coming back from court.

A. Coming back from court.

Q. All right. And so someone else would have taken them out of their cells and escorted them to court; is that correct?

A. Yes.

Q. And then you would have been escorting them back from court?

A. Back from court.

Q. From court.

A. Back from court.

Q. And where you first saw inmate Utsey and the defendant would have been where?

203

A. They would have been right there on the wall. We told them, or I ordered them, Get on the wall, which means like they would have to be on the wall like as in being pat searched.

Q. Okay.

A. And they would be in the -- again in the position of being pat searched, you know.

Q. And then from there, what happens?

A. From there, once they were pat searched, I -- they know where they're supposed to be at. And I escorted them back to their East Uppers floor, and while I was walking them up, --

Q. All right. Let me just ask you this real quick before we go any further. Are they handcuffed at all?

A. No.

Q. All right. Good. Do they have any leg irons at all?

A. No.

Q. All right. So they're both walking freely.

A. They were walking freely.

Q. All right. And there's two of them and one of you.

A. Yes.

Q. All right. And is that typical?

204

A. That's -- that's typical.

Q. All right. And you're not an SRT; is that right?

A. I'm not an SRT.

Q. Do you know if there were any prior orders that either Utsey or the defendant had to be handled by SRT's?

A. I wasn't aware of any of them being ordered to be on the SRT.

Q. That you were aware of at that time.

A. Not at that time aware of that.

Q. What about at right now, are you aware of any of that?

A. I'm aware of that now that he's SRT now only.

Q. Okay. And as you were walking them back to their cells, tell the jury the order in which they were walking.

A. In the order? I don't understand your question.

Q. Okay. Maybe that's not clear. All right. There's three of you guys, right?

A. Yes.

Q. All right. Somebody's in front, somebody's in second, somebody's in back. Are y'all walking side-to-side, or -- give the jury some idea of how

205

you're walking.

A. Broadnax was in front, and Matthew Utsey was second, and I was in the back.

Q. Okay. And --

A. They always -- they're always walking in front.

MR. ALEX: May the witness --

THE COURT: Step down and demonstrate?

MR. ALEX: Judge, I'm sorry. Yes, sir.

THE COURT: Do you need a break, Mr. Alex?

MR. ALEX: No, I'll be fine, Judge.

THE COURT: All right.

Step down, sir.

(The witness came down from the stand.)

MR. ALEX: And may counsel and I also approach?

THE COURT: Yes, sir.

MR. ALEX: All right.

Q. (BY MR. ALEX:) Would you position me in the part where, if I'm in the lane and I'm walking this way, and my -- okay. I'll be in the front. Position Ms. Handley where Mr. Utsey would be.

A. Mr. Utsey would be right here, and you would be Broadnax.

Q. And am I about the same height as James

206

Broadnax or would he be taller than me?

A. You're probably about the same height as James Broadnax.

Q. Okay.

MR. ALEX: And, Judge, just for demonstrative purposes, can the defendant stand?

THE COURT: Yes, sir.

MR. ALEX: Okay.

Q. (BY MR. ALEX:) All right. Do you -- do you think he's about the same height as he was back then, Mr. Gutierrez?

A. Yes.

Q. Okay. And about the same size as he was back then?

A. Yes.

Q. Okay. And Mr. Utsey, was he about the same height as Mr. Handley?

A. Mr. Utsey is a lot more shorter.

Q. Even shorter than Ms. Handley.

A. About, right.

THE COURT: Maybe you should get Ms. Evans up here to demonstrate this.

MR. ALEX: I'm sorry, Judge?

THE COURT: I said, maybe you should get Ms. Evans up here to demonstrate this, Mr. Alex.

207

MR. ALEX: Ms. Evans, would you step in, please?

Ms. Handley, you step out.

Q. (BY MR. ALEX:) Does this appear to be about --

A. The same height as Utsey.

Q. Okay. And you're walking behind them.

A. I'm walking down this way and I'm escorting you back to their housing units.

Q. Okay. All right. And as we're walking, did something happen by way of a violent nature?

A. Yes.

Q. Okay. Tell the jury what happened.

A. What had happened is, just out of the blue while I was escorting both of the inmates back to court, Broadnax turned around and just, out of the blue, just struck him on the upper portion of his arm, aiming towards, it appeared, his face, and punched him right here, and he landed a -- like a blow right here to this portion of his arm.

Lucky he didn't hit his face, but he did make a slight smart-alecky comment and said, Gutierrez, you should have let me hit him again.

Q. All right. Let's break it down just a little bit, okay?

208

I'm -- I'm Mr. Broadnax, and you're saying there's no warning of any kind, that you were able to tell, and I'm assuming you're kind of paying attention, --

A. Uh-huh.

Q. -- because you're kind of outnumbered.

A. Yes.

Q. All right. And so Mr. Broadnax, he turns and he strikes at Mr. Utsey. Does Mr. Utsey move at all?

A. Yes.

Q. Does he move down?

A. Mr. Utsey's trying to duck and look out.

Q. And so he -- did it appear as though he was trying to hit him in the face?

A. It appeared.

Q. And he wound up hitting him in the arm.

A. In the -- in the arm.

Q. Okay. And was it a -- a pretty substantial punch or was it just kind of like, Hey, man, how you doing?

A. It looked like a sub -- it appeared like it was a substantial punch.

Q. Now, if he had -- if he had hit him in the face, could he have potentially knocked him to the ground?

209

A. He could have knocked him out.

Q. Okay. So is it was a -- it was a --

A. It was an intentional blow.

Q. Okay. And --

A. Or an intentional strike.

Q. And what does Mr. Utsey do as he's laying on the ground, does he get up and fight back?

A. No. He's walking toward me, and since -- since he walked towards me -- and come over here -- and so I'm telling him, Go over there, and I'm telling him, Go over here. Y'all got to stop, and then they all get up and other officers come over here and help me out.

Q. And what is Mr. Broadnax saying to me?

A. After that, he made a smart-aleck comment. He said, You should have let me hit him again.

Q. Okay. All right. And -- all right. You can have your seat. You can have your seat, Mr. Gutierrez.

(The witness returned to the stand.)

Q. (BY MR. ALEX:) And let me ask you this: Did you see Mr. Utsey kicking, throw anything at him, anything like that?

A. No.

Q. Were there words being exchanged as y'all were walking?

A. No.

210

Q. Okay. And from your recollection, it just came out of the blue.

A. Say -- what's that again?

Q. I'm sorry. That might not have been an intelligent question.

From your recollection, it was just all of a sudden.

A. It was just out of the blue.

Q. All right. Very good.

And had you seen any conflict between the two of them up on the single cells as their cells faced each other, personally? Had you seen anything like that?

A. I had never witnessed anything like with them exchanging any words, but --

Q. I know you've probably heard things, people up on the cells.

Is there constant chatter up there?

A. There's constantly -- constant chatter all the time amongst the inmates.

Q. And people tell you things?

A. Uh-huh.

Q. Right?

A. And then there are other inmates that tell me things.

211

Q. Okay. And we're not really here for you to tell the jury what other people told you, okay? Just what you observed, what you felt, what you tasted, what you smelled with your own senses, okay?

A. All right.

Q. All right.

MR. ALEX: That's all I've got, Judge. I'll pass the witness.

THE COURT: Cross-examination.

MR. LOLLAR: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Gutierrez, let me show you here a packet I just marked as Defendant's Exhibit 17 and ask you to just take a look through that for a second and see if you recognize what those things are.

A. (Examining exhibit.)

THE COURT: Hold on there.

Is this the same as Defendant's Exhibit 16, but just as to this incident?

MR. LOLLAR: Yes, sir.

THE COURT: Is there any objection to this?

212

MR. ALEX: It's already been admitted into evidence, hasn't it, Judge? The whole thing, or no?

THE COURT: No, I don't think so.

MR. ALEX: May I approach, Judge?

THE COURT: Yeah, because that's going to take too long for him to read that.

Hold on.

MR. ALEX: Well, Judge, it includes an affidavit from the defendant, and the counsel knows he can't offer statements of his own client.

MR. LOLLAR: It's part of the exhibit, but it's still hearsay, Judge. It's a statement made by the defendant offered by the defense attorney, and it is -- it is hearsay.

THE COURT: With the exception of that, if that's redacted, is there objection?

MR. ALEX: I have no other objection, Your Honor.

MR. LOLLAR: Judge, it's --

THE COURT: All right. Let me see it.

MR. LOLLAR: It's a business record. It's an exception to the hearsay rule. It's part of the certified copies. It's his explanation of what happened.

THE COURT: Okay. The objection is

213

sustained as to this. Otherwise, it's admitted.

Redact that out. The rest of it's admitted.

Q. (BY MR. LOLLAR:) Did Mr. Broadnax tell you why he hit him?

A. No, sir.

Q. He didn't?

A. He did not tell me.

Q. Didn't say anything at all?

A. He did not say anything at all.

Q. Okay. Were the two of them taken to a nurse?

A. I believe -- I can't recollect or remember if I took Broadnax, but I believe they refused to go to a nurse.

Q. Both of them?

A. I believe.

Q. You want to look at your report there?

A. Yeah.

Q. Okay.

A. (Examining document.) Okay. Yes, they were. They were taken to them.

Q. Does that refresh your recollection?

A. Yes, but I wasn't the one that took them to the nurse.

Q. Okay. Were any injuries noted?

A. No injuries. There was no injuries.

214

Q. There were no injuries.

A. No injuries.

Q. Okay. Well, do you recall Mr. --

MR. LOLLAR: May I publish, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) Do you recall Mr. Broadnax telling you in regard to that --

MR. ALEX: Judge, I'm going to object if counsel is going to testify for Mr. Broadnax after the Court has already instructed him that's hearsay. He cannot offer the statement by his client because it's --

THE COURT: I don't need a lengthy --

MR. ALEX: I will just -- I will just object to the hearsay.

THE COURT: All right. And that's sustained.

MR. LOLLAR: Well, all right.

Q. (BY MR. LOLLAR:) Did you see Mr. Utsey spit on Mr. Broadnax?

A. No, sir.

Q. Okay. Might that have happened before they got off the elevator to get back to the floor?

A. No, sir.

Q. Could it -- it could not have happened?

215

A. I wasn't there in the elevator.

Q. Right. So you don't know what happened before.

A. I don't know what happened in the elevator.

Q. Okay.

MR. LOLLAR: That's all the questions we have, Judge.

THE COURT: Any redirect?

MR. ALEX: That's all I have, Judge.

THE COURT: May the witness be permanently excused?

MR. ALEX: We have no objections.

THE COURT: All right. You're permanently -- any objection from the defense?

MR. LOLLAR: Yes.

MR. PARKS: Yes.

THE COURT: Okay. You can step down.

Take a recess until 3:10 p.m.

All rise for the jury.

We're in recess.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: You may be seated.

What further says the State?

MR. ALEX: The State would call Matthew

216

Utsey.

THE COURT: Matthew Utsey.

Mr. Utsey, would you raise your right hand.

**MATTHEW UTSEY**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. You'll be responding to questions from Mr. Alex.

Mr. Alex, whenever you're ready.

MR. ALEX: Thank you, Your Honor.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q. State your full name.

A. Matthew Utsey.

Q. Is it Utsey or Utsey [pronouncing]?

A. Utsey.

Q. All right. I've been -- I have not been pronouncing it right, but we'll try and get it right.

Mr. Utsey, now I want you to talk like you're speaking to somebody way back in the corner over there when you're talking, all right?

A. All right.

Q. And, Mr. Utsey, how old of a man are you?

A. 24.

217

Q. And are you married?

A. No, sir.

Q. All right. Do you have kids?

A. No, sir.

Q. You know why you're here; is that correct?

A. Yes, I do.

Q. You've been in the Dallas County jail before; is that right?

A. Yes, sir.

Q. And back in May of this year, were you in the Dallas County jail for three -- actually, four cases?

A. Yes, sir.

Q. And those cases were a domestic violence assault, a misdemeanor; is that correct?

A. Yes, sir.

Q. Felony injury to a child.

A. Yes, sir.

Q. Felony retaliation.

A. Yes, sir.

Q. And a misdemeanor violation of protective order; is that correct?

A. That's correct.

Q. And for those cases, you were in the Dallas County jail; is that right?

A. That's right.

218

Q. And ultimately, you received a deferred probation on all of those; is that correct?

A. That's right.

Q. All right. As part of your stay in the Dallas County jail, did you come in contact with a man by the name of James Broadnax?

A. Yes.

Q. All right. Do you see him in the courtroom today?

A. Yes.

Q. Would you point to where he's sitting and describe an article of clothing?

A. The green and white tie.

Q. All right. And if this is chair 1, 2, 3, 4, 5, 6 and 7, are you referring to the gentleman seated in chair 6 directly --

A. Six.

Q. -- direct --

A. Yes, sir.

Q. -- directly in front of me?

A. Yes, sir.

Q. Thank you.

MR. ALEX: May the record reflect the witness identified the defendant in open court?

THE COURT: Any objection?

219

MR. LOLLAR: No, Your Honor.

THE COURT: The record will so reflect.

Q. (BY MR. ALEX:) And I may have actually said May, but around June 15th of 2009, -- June 15th, 2009, were you up on the single cells up there in the West -- the West Uppers?

You know what? Strike that, Mr. Utsey.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir.

MR. ALEX: All right.

THE COURT: And as necessary.

Q. (BY MR. ALEX:) State's Exhibit 577, is that a diagram of the single cells as they relatively appeared back in June of this year?

A. I think I got out on June 12th.

Q. You think you got out on June 12th?

A. Yeah, I believe.

Q. And so before you got out of jail, is that the way those cells looked while you were there?

A. Yeah. Yes, that's the way.

Q. All right. And that is while -- when you were in the single cells, this is the way they looked; is that correct?

A. That's correct.

Q. All right.

220

MR. ALEX: We would offer State's Exhibit 577.

Q. (BY MR. ALEX:) And you also marked on here where your cell would have been, and where Mr. Broadnax's cell was, a gentleman by the name of D'Angelo; is that correct?

A. That's correct.

Q. All right.

MR. ALEX: We'd offer State's Exhibit 577, Your Honor.

MR. LOLLAR: We have no objection.

THE COURT: It's admitted.

Q. (BY MR. ALEX:) And was your cell directly across from Mr. Broadnax's, or somewhat across from Mr. Broadnax?

A. Somewhat. Not directly across.

Q. Was it close enough to where y'all could speak to one another?

A. Yes.

Q. And the way these cells are --

MR. ALEX: Put this up. We don't have to turn the lights off. Just put it up.

Q. (BY MR. ALEX:) -- Would you have to yell in order for you-all to speak to one another?

A. Kind of everybody did, yeah, because of the

221

doors. Yell through the crack.

Q. Because the doors are thick?

A. Yes.

Q. Very good. And could you sort of describe back in June of '09 what this environment was like for you while you were up there?

Was there a lot of talking going back and forth?

A. Yes.

Q. All right. Describe for the jury what this environment was like for you.

A. Just all the time, I mean, talking trash all night long. I was just -- it was all hours. I mean, it was always yelling. Hardly sleeping. I mean, that's just how it was like.

Q. And up here on these cells that's up here on the -- on the monitor here, I think we can see where it says 62. Was that your cell?

A. Yes.

Q. And Broadnax, the defendant, was in 66; is that right?

A. That's right.

Q. And there was an inmate by the name of D'Angelo in 67?

A. That's right.

222

Q. And are you telling the jury that these guys up here didn't sleep at night, they were just up there just yelling all the time?

A. Probably three days maybe up, and then a few days sleep at night. It just all depend. It varied.

Q. It varied.

A. And they would sometimes sleep during the day and then up all night. Sometimes vice versa. It just all depends. I don't know why, but that's just the way it was.

Q. Okay. And -- and how did you fare up there with these guys?

Let me -- let me ask the question a different way. You're not a very big person, are you?

A. No, sir.

Q. All right. Let's do it this way.

You recall James Broadnax and his reputation there on the block when you were there. Do you recall what kind of -- what kind of person he was while he was there across from you and y'all were in single cells?

A. Yes.

Q. All right. Did y'all have any conflict?

A. Yes.

Q. All right. Explain that to the jury.

A. The conflict or --

223

Q. Okay. Well, let me -- let me go a little bit more specific.

Did there come a time when he just punched you coming back from court?

A. Yes.

Q. All right. Let's go further back in time than that, okay? Before he punched you, did you have any idea that he didn't like you or that he wanted to get you?

A. Yes.

Q. All right. Tell the jury why that is and what that was about.

A. Well, I -- I really don't know how -- how it started, it's just every day I was going to court because I had to go to court when he had to go to court. And I was kind of -- I kind of kept to myself and I got picked on a lot, but he just kept telling me every day he was going to beat me; he was going to get me when I get out when he goes to court with me, and finally, for about a week, like I didn't have to go -- they didn't get him when -- when I had to go, or they left them behind then got me, and finally the last day, that's when he got his opportunity.

That's just how it happened. Every day it was just, I'll get you in the morning or I'll get you the

224

next day.

That's how it was.

Q. So why would -- I mean, what is it about you and him, was it just -- you have any idea why he wanted to get you?

A. I still don't.

Q. Okay. And while -- while Mr. Broadnax was up there on the single cells, do you-all get a chance to get commissary?

A. Yes.

Q. All right. Did he have to -- do a lot of people on those single cells, do they take medications?

A. Yes.

Q. Your Honor. Did you take medications?

A. Yes.

Q. All right. And did Mr. Broadnax ever try to take any of your stuff?

A. Yes.

Q. All right. Tell the jury about that.

A. Just -- just wanted -- I can't remember the name of the pills offhand, just wanted them pills. I can't think of it. It was my sleeping pills.

Q. Okay. Was it something like Bupropion or Wellbutrin?

A. No, not Wellbutrin.

August 13, 2009

225

Q. Okay. One of the pills that you took to help you got to sleep.

A. Yeah.

Q. And so why was he trying -- I mean, he couldn't just come out of his cell and come in there and take it from you, could he?

A. No. We all had to go to rec.

Q. You had to go to rec.

A. Yeah.

Q. All right. So when you had to go to rec, was that -- tell -- tell the jury what happened. I mean, was he trying to take it from you then, or was he threatening you, or what was going on?

A. That's why I didn't go to rec. I didn't do any of that.

Q. Okay.

A. Because, I mean, it's -- that's where everybody -- I mean, it was just too much violence. I just didn't go to rec, that's why I stayed in my cell.

Q. Well, how did you know he was trying to get your pills?

A. I mean, he asked for them.

Q. Did he say as for them ---did he say, Mr. Utsey, can I please have your pills.

A. Yeah.

226

Q. Is that the way he said it?

A. He didn't say please, but he -- I mean, he wanted them.

Q. It was clear to you that he wanted them.

A. It wasn't a threat at first.

Q. Okay. All right. At first he was just trying to get them from you.

A. And if I didn't do it, then, you know, then the threats came on.

Q. And are you saying that the threat -- and here's what I'm having a hard time understanding, Mr. Utsey. You said that if you didn't do it, then it would be a problem. Did you ever give him your pills?

A. No.

Q. All right. And so were you concerned because you didn't give him your pills there was going to be a problem?

A. Yes.

Q. All right. Did he ever actually verbally threaten you?

A. Yes.

Q. Okay. Tell the jury about that. What did he say?

A. He just said he was going to get me. I mean, either spit on me, or he'd get me when I got out in the

227

morning to go to court, because he knew I had to go to court. We all talked. Everybody knew. And he said he was going to punch me when I got out.

And I told -- and that's exactly how it happened.

Q. All right. So he had already -- he had already told you he was going to hit you.

A. Yeah, and I already reported that.

Q. All right. And do you think it was because you wouldn't give him your pills, or what?

A. I don't know. Maybe he had nothing better to do. I mean, I don't know.

Q. All right. But you never did give him your pills.

A. No.

Q. Did he ever ask you for any of your commissary or any of your other stuff that you would be able to get?

A. I didn't really make commi -- I didn't have that much money.

Q. Okay.

A. So, I mean, I made it like maybe twice.

Q. All right. Did you ever see him squeezing anybody else for their commissary or pills?

A. No. He got my commissary one time. Somebody

228

passed something to me.

Q. Okay.

A. Yeah.

Q. Now, tell the jury, is it possible when you're in these single-man cells, you've got some pretty thick doors here; is that right?

A. Yes.

Q. Is there room up under the doors to where you can do what they call fishing?

A. Yeah. Shoot a line; yes, sir.

Q. Shoot a line? And tell the jury how that works.

A. You take a string and you -- either a toothpaste or a soap and you tie it -- you got your blankets and you take string and you inter -- you do it like this and then you make you a string, and you get it long enough where you can just slide it under the door, and that's how you do it.

Or if your chute's open, you can shoot it out your chute.

Q. So you could pass stuff between the inmates even when you're in a single cell behind a very thick door; is that correct?

A. Oh, yes.

Q. And threats can be made.

FIRM NAME

229

A. Yes.

Q. And items can be passed around.

A. Yes.

Q. And what you're telling this jury is you're not a hundred percent sure why he tried to punch you, but he did tell you he was going to get you.

A. Yeah. And he told me he was going to -- I was lucky. When he found out I was going, he told me I was lucky to be leaving.

Q. Let's go to that day and -- and maybe it might be a little difficult for you to remember the exact day, but if I tell you that you ultimately -- you pled guilty to those cases and you received deferred probation; is that right?

A. That's right.

Q. And if would have -- if would have happened June 16th of 2009, then the day you would have got punched, would that have been June 15th of 2009? Does that sound about right?

A. I -- I believe I got out on a Tuesday, and I can't remember if it was June 12th, or June 15th, but --

Q. That's okay. Let's talk about that day. Do you remember that day?

A. Yes, I remember it.

230

Q. You were going to court; is that right?

A. Yes, sir.

Q. And ultimately when you went to court, did you plead and get probation that day?

A. Yes.

Q. Did you know you were going to be going home after that?

A. Yes.

Q. Were you looking for any trouble?

A. No. No.

Q. If you got in any trouble, would there be a chance that you wouldn't be going home?

A. Very possible.

Q. All right. And had you contemplated that?

A. Excuse me. Yes.

Q. And so you went to court, and did they come and get you at the same time as they got Mr. Broadnax?

A. Not that morning.

Q. Not that morning, okay.

Tell the jury how it was you came to be in the same place as Mr. Broadnax on that day.

A. That afternoon, I think -- I don't remember exactly what time it was. Maybe 2:00 or 3:00 or something around there, the second shift, they came and got us both and they didn't -- they didn't handcuff us,

231

they just took us. And when we got up to the 2 East, or as soon as you come up the stairs and you're right there going down the hall, that's when -- that's when it happened, as we was walking.

We was walking and they stopped. The officer got distracted by another officer because he asked him a question, and he turned around. When he turned around, I kind of looked back, and as I went to look back, I seen it coming. I moved out of the way and he hit me right here (indicating).

Q. All right. And so you didn't see it coming until he had already started swinging at you.

A. Yes, sir. It was already coming.

Q. And he would have been -- the officer would have been behind you; is that right?

A. Yes, sir.

Q. And the defendant would have been somewhat in front of you, either to the front or to the side of you; is that correct?

A. Yes, sir, it is. More to the side and a little bit in front.

Q. More to the side, but to the front of you.

A. Yes.

Q. Okay. And what you recall was your attention was distracted and so was the officers'; is that

232

correct?

A. Yes.

Q. Somebody called the officer's name?

A. Yes. Another officer did.

Q. All right. And the next thing you know, the defendant's fist was coming towards your head.

A. Yes.

Q. And then you moved out of the way and you got hit in the arm.

A. Yes.

Q. All right. Did you swing back?

A. No, sir. I just stepped back and that was it.

Q. All right. You didn't kick him?

A. No, sir.

Q. All right. You didn't spit on him?

A. No, sir.

Q. Did you do anything to him before that happened?

A. No, sir. There was no words. We just walked.

Q. You were just walking.

A. Just walked.

Q. All right. And was it a pretty substantial punch?

A. I mean, yeah, man. He hit me in my arm.

Q. If he hit you in the face, do you think he

233

would have hurt you?

A. Probably, yes. I've had surgery on my face, probably, yeah.

Q. Yeah, okay. It wasn't just like, Hey Utsey, how you doing?

A. No, sir.

Q. All right. And after that, what happened?

A. I went to a nurse, and then after that I went back to the same cell.

Q. Right next to the defendant.

A. Yes, sir.

Q. All right. He was in his cell.

A. Yes, sir.

Q. Was he talking to you after that?

A. I really -- I mean, I didn't pay it no attention. I had it blocked out. I decided I was going home, and I couldn't tell you exactly what words were said or anything like that.

I just blocked it out and I laid down because I knew I was getting out within a few hours.

Q. You were -- were ready to go.

A. I was ready to go home, yes.

Q. And while you were up there on the single cells, -- well, would it be fair to say that you didn't fit in very well up there?

234

A. No, because I wasn't rowdy.

Q. And did you get terrorized up there on a daily basis?

A. Some days.

Q. All right. Was the defendant a part of that?

A. Yes, some days. Just picking, just stuff like that.

Q. Mind games?

A. Mind games, yeah.

Q. Tell the jury what that means.

A. Just basically trying to be a bully, I mean, to me because I was small. I don't -- I don't know why it came about, but there was a lot of bullying and a lot of trash talking, threatening and just basically a lot of fighting words said.

Q. And it was aimed at you.

A. Yeah. A lot of times.

Q. But you wasn't the only person that he aimed at, to be fair; is that right?

A. I wasn't the only, no.

Q. Would you have been the smallest person up there, perhaps?

A. There was some also my size.

Q. Some other folks your size?

A. Yeah. One.

235

Q. And why were you up there in the first place in single cells?

A. I had been in two prior altercations and I wanted to be by myself. I thought it would be better if I was by myself because I didn't want to get in any more trouble. I knew I was already on a hot plate, and that's what I wanted.

Q. And so you had been in prior altercations down when you were in general population?

A. Yes.

Q. And describe general population to the jury. What is that like?

A. You got eight men in a tank instead of one by yourself. That's the only difference, really. And you can watch TV. That's the difference.

Q. And at night, are you allowed to just walk around like you want?

A. Not at night, no.

Q. And what happens at night?

A. At nighttime, they close your door and you're closed in the tank. During the day, everybody -- it's four tanks, or four different cells, and all eight. Eight. It's 32 people then, and all of them can walk around the dayroom and everything, but you can't do that in -- in where I was at, in single cell.

236

Q. All right. So in the general population you had 32 people, if it was full; is that what you're saying?

A. Yes.

Q. And you call it an eight-man tank because there's four people in each -- in each tank.

A. Seven or eight.

Q. Okay. Something to that effect. There's a lot of folks in one area; is that right?

A. Yes.

Q. And the only time you're separated from other folks is at night when you're locked in.

A. That's correct.

Q. And then when you're locked in, you're still not by yourself, are you?

A. No, sir.

Q. You're in there with how many people when you're locked in?

A. Seven or eight people or however many is in that tank.

Q. Gotcha. And then in the morning they unlock the doors and y'all get to mingle.

A. Yes.

Q. And I guess mingle is probably not the right word because -- was there a situation that you were

237

getting into fights in that scenario?

A. Yes.

Q. All right. And were people trying -- and -- and so the jury understands why you were even up there near James Broadnax, did they have you down as a Hispanic person?

A. I believe when I first came in; yes, sir.

Q. And did people mistake you for being Hispanic?

A. Yes.

Q. And were they trying to get you to join one of these Hispanic gangs?

A. Yes.

Q. And did you have a fight?

A. I didn't get a chance to.

Q. All right. Did you wind up in the nurse's office quite a bit?

A. Yes.

Q. All right.

MR. ALEX: That's all I've got, Judge. I'll pass the witness.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

BY MR. LOLLAR:

Q. Mr. Utsey, my name is Brad Lollar. I have a

238

few questions for you, if you don't mind.

If I ask you something you don't understand, tell me and we'll see if we can get it cleared up. Is that all right?

A. Okay.

Q. Okay? Mr. Alex asked you if you ever saw Mr. Broadnax trying to squeeze other inmates for commissary items and you said no; is that right?

A. I've never seen that, no.

Q. Never seen that.

A. No.

Q. Now, Mr. Utsey, I understand that you were in general population when you first came into jail. When did you first come in?

A. Um, April -- April 25th, maybe. I don't know the exact date, but it was around there.

Q. Around April the 25th of this year, 2009?

A. Actually, I was in one time, and then I got bonded out and then came back.

Q. Okay. And was April 25th about the second time you came in and then you stayed in custody until you got your probations.

A. That's correct.

Q. In June?

A. June.

239

Q. All right. And what we're -- until June the 16th, I guess, is the day you went to court; is that right?

A. I don't remember the exact date.

Q. Okay. Did you get released from jail the same day that you went to court?

A. Yes.

Q. So whatever date's on your court papers would be the day that you got released from jail.

A. I reckon.

Q. And about what time -- well, you were in -- you were in general population. About what date was it that they moved you to a single cell?

A. I want to say a little bit after my birthday, because I know I was -- I don't really remember the date, but I think I was there for three and-a-half weeks, maybe, in a single cell.

Q. Three and-a-half weeks?

A. Yeah, something like that.

Q. So, let's see, you would have gotten there the last week of May; is that right?

A. I don't know the exact date.

Q. If you got out June the 16th and you'd been there three weeks, 17 days would be two and-a-half weeks, and it's the middle of May?

240

A. I was almost there for a month.

Q. Almost a month.

A. Yeah.

Q. And how do you feel you were with, well, just being a cell mate in general to the people around you?

A. I don't know. I mean, --

Q. I mean, did you cause them any problems?

A. I was more to myself. I didn't -- I didn't like coming out myself.

Q. Okay. Were you disruptive in any way?

A. I didn't get in any problems up there.

Q. So did you have any trouble with anybody else besides Mr. Broadnax?

A. I -- I did.

Q. Pardon me?

A. Yes, I did.

Q. And what kind of trouble did you get into with other people?

A. It was just the same stuff, just the same old stuff.

Q. What do you mean?

A. Just the picking and the threatening. I mean, that's just all it was. If I was out of the cell, go to rec, stuff like that. I mean, ...

Q. Okay. Did you have those type of problems

241

with everybody out there?

A. No. There was only two, sometimes three. One at first, and then he was pretty nice to me.

Q. What's his name?

A. I can't think of his name. He was on the right of me.

Q. In which cell?

A. In 63.

Q. In 63? You had problems with a guy in 63. And what type of problems did you have with him?

A. He was -- I can't -- I mean, it was the same stuff, just the trash talking, just the picking. I mean, just -- that's just all it was basically concerned with, to see if you would get out and fight or not, whether you wanted to fight or not, and I didn't want to fight anybody.

Q. Any trouble with anybody else up there besides the guy in 63?

A. I had a little -- a few problems with D'Angelo for a little while, but --

Q. Now, that's the guy that you have there in 67?

A. Yeah. It's right across -- he would have been right across from me.

Q. And what problems did you with have with D'Angelo?

242

A. That was just their -- I don't know, their group. D'Angelo, the guy on the right, another little guy down there, and James Broadnax.

Q. Okay. And -- okay. You're currently -- let's see. Let me say this correctly. You were in jail because you were charged with assault, family violence; is that correct?

A. That's correct.

Q. And violation of a protective order; is that right?

A. That's correct.

Q. And injury to a child.

A. That's correct.

Q. Correct? And retaliation.

A. That's correct.

Q. Is that correct? And you pled guilty to all of those.

A. That's right.

Q. And I believe you're on a five-year deferred adjudication probation on your felonies?

A. Yes.

Q. So you understand that the State over here would be the one to decide if you ever violated your probation, would bring that to the attention of the Court.

243

A. Yeah.

Q. And you understand that -- well, and, Mr. Utsey, I'm going to ask you, have you ever described yourself as being a killing machine?

A. No.

Q. No?

A. No.

Q. And have you -- the person that I believe was the victim in the family violence assault, was that a girl you were living with at the time?

MR. ALEX: Judge, I'm going to have to object. It's a clear violation of the State's Motion in Limine going behind the facts of these offenses. It's been established he's on probation, and that -- the Court told counsel to approach if he was going to do anything else.

Q. (BY MR. LOLLAR:) Well, let me ask it this way.

MR. ALEX: I'm going to object, Your Honor.

THE COURT: Okay. Hold on. What's your question?

MR. LOLLAR: Did you tell her you were a killing machine?

MR. ALEX: Judge, again, that is a direct

244

violation, and I ask that you tell the jury --

THE COURT: Okay. The objection's sustained.

I'm not going to instruct the jury.

Q. (BY MR. LOLLAR:) Mr. Utsey, I believe that back on May the 4th of 2009, you got into a fight with a guy by the name of Adrienne Lopez; is that correct?

A. That's correct.

Q. And that's when you were down in 6 West 06?

A. That's correct.

Q. General population? And then on May the 7th you got in a fight with a guy out of 4 West 09 by the name of Ezechiel Ruiz; is that correct?

A. That's correct.

Q. And that's when they moved you to a single cell.

A. That's correct.

Q. Now, you said that you kind of kept to yourself and you weren't a problem to anybody and they just picked on you; is that right?

A. In -- in the population I was a little more talkative because we played a lot of card games and stuff. It was a little different.

Q. And you said to Mr. -- you said to the jury in

245

response to Mr. Alex's questions that you kept to yourself. You weren't a rowdy. You never gave your pills to anybody else; is that right?

A. That's correct.

Q. Is that correct?

A. Yeah.

Q. And you said you had really no money in your own commissary account.

A. Not much. I think I had $40 the whole time I was there.

Q. Okay. And you just got terrorized up there by all these people around you.

A. At times.

Q. Is that right?

A. Yes.

Q. Did you ever -- would you say that you ever taunted them? Do you know what that means?

A. To an extent, yes.

Q. To an extent, you did?

A. No, I know what that means.

Q. Okay.

A. But I never taunted anybody.

Q. You never taunted anybody.

A. Un-uh.

Q. And would it be a fair statement to say to

246

everybody around you, -- now, see, you're in a single cell on the second floor.

Is it a fair statement that everybody around you there is charged with capital murder?

A. Yes.

Q. Is that right?

A. Yes.

Q. And, Mr. Utsey, did you -- in fact, do you remember D'Angelo Anderson? Is that his name? Is that D'Angelo that lived over there in 67?

A. I remember him.

Q. Okay. Did you call him a monkey?

A. No.

Q. Did you call him a nigger?

A. No.

Q. No?

A. No.

Q. Okay. Remember Benjamin Lott who was in 2EU60?

A. I don't know the name. I don't know him.

Q. Okay. Do you know the guy who was down in 60? You see where 60 is? It's two down from you.

A. No. I never went that far down.

Q. Did you call him a nigger?

A. No, I didn't.

247

Q. Did you call him a monkey?

A. No, I didn't.

Q. Did you ever call James a young mutt?

A. No, I didn't.

Q. You never did.

A. No.

Q. Did you tell Benjamin Lott that you were going to show up at everybody's trial and testify against them?

A. No, I didn't.

Q. You did not.

A. No.

Q. All right. Were you always begging for stuff from them?

A. No, I didn't.

Q. Would you always be telling them that you're -- y'all are going down for life and I'm fixing to get out?

A. I did ask them to -- I didn't want to be in it because I knew I was getting out, and I didn't want to be a part of anything, that's why I stayed in my cell.

Q. Well, you were taunting them with it, weren't you? You said you would be --

A. No, they all knew I was leaving. That was the problem. That was a big problem. I should have never

248

have been around --

Q. Well, but you were taunting them with it. You were saying, you know, basically, Ha-Ha, y'all are going down for life. I'm going to be back with my girlfriend.

A. I didn't say that.

Q. You did not say anything like that. To any of them.

A. I said I'm getting out.

Q. Okay.

A. I'm -- I'm trying to go home. That was my exact words. I'm trying to go home. Y'all can say whatever y'all want to. I'm going home.

Q. Would you say you had an attitude problem up there?

A. Not really.

Q. Not really. Okay.

Do you remember Jason Luper? I believe he was in 64. Remember Jason Luper?

A. I don't even know him.

Q. Did you try to sell your drugs to him?

A. Un-uh.

Q. Because you didn't have any money in commissary?

A. No, I didn't. I don't even know who that is.

249

Q. Remember Theron Lacy?

A. Yes. That's the name. He was on the right of me.

Q. The guy in 63?

A. Yes.

Q. Theron Lacy. Did you tell him that you were going to testify against him in his trial?

A. No, I didn't.

Q. And you were always talking trash to him.

A. No, I didn't.

Q. No? Did you call him nigger?

A. No, I didn't.

Q. Didn't call him a monkey?

A. No, I didn't.

Q. Now, on this day in question, you spit on James.

A. No, I didn't.

Q. You didn't.

MR. LOLLAR: That's all the questions we have, Judge.

THE COURT: Any redirect?

MR. ALEX: Yes, sir.

**REDIRECT EXAMINATION**

BY MR. ALEX:

Q. Mr. Utsey, --

250

THE COURT: Both sides are reminded what the trial is about and not go down these rabbit trails. Both sides are reminded of that.

Go ahead, Mr. Alex.

Q. (BY MR. ALEX:) Mr. Utsey, the first time you and I met, that was back on June 22nd, 2009. You hadn't been out of jail very long; is that correct?

A. That's correct.

Q. I think you were showing up for your probation, to talk to your probation officer the first time in court; is that right?

A. That's right.

Q. And I showed up and talked to you; is that correct?

A. That's correct.

Q. All right. And when I -- when I talked to you, I was talking to you about the defendant; is that correct?

A. That's correct.

Q. All right. And did -- did you tell me that the defendant was the meanest, baddest person in the single-cell area?

A. Yes.

Q. All right. And that he bragged about taking money from other people forcefully?

251

A. That was outside world.

Q. I'm sorry?

A. Outside. Free world.

Q. In the free world?

A. Yes.

Q. And tell me what you mean by that.

A. I guess he was robbing people. I mean, --

Q. So when he was in the single cells, he talked about taking money from people forcefully when he was a free man.

A. Yes.

Q. All right. And you would hear him talk about that in his cell.

A. Yes.

Q. And would he just be talking to himself?

A. No, there was -- there was four -- it was four of them. They all -- the -- Lacy, the little guy that he mentioned down there a few cells down, and James, and D'Angelo. They all usually talked amongst each other.

Q. All right. And did the defendant talk about these crimes that he was in jail for?

Did he show any -- did you tell me that he showed no remorse for any --

MR. LOLLAR: Judge, I'll object to that

252

form of examination, direct examination of his witness.

THE COURT: Are you objecting based on it being leading?

MR. LOLLAR: Yes.

THE COURT: Sustained.

Q. (BY MR. ALEX:) Did the defendant talk about how he felt about the crimes that he committed in this case?

A. Well, I mean, not much about the crimes, just -- I mean, the only words that I can say is that he wished he could just sign for 20, so whatever that means.

Q. Okay. All right. And did the defendant ever tell you that you wouldn't leave there alive?

A. Yes.

Q. Okay. Did he ever say anything to you about whether the guards were able to protect you while you were up there?

A. Yeah. Eventually, that he was going to be able to get to me. I mean, you're not a hundred percent protected because -- it's true, though. You have to come out sometime. When you go to court.

Q. All right. And I don't know if the jury can hear you, but I guess what you're saying is, it wasn't directly that way, but he basically told you at some

253

point, you got to get out of there where I can get to you; is that right?

A. Exactly.

Q. Okay.

A. Which I didn't go outside or anything.

Q. Now, did the defendant talk any kind of gang talk while he was up there in the cell?

Do you recall back -- when I talked to you back on 6/22/09, you saying that he constantly talked gangster talk.

MR. PARKS: Object to leading.

THE COURT: Sustained.

Q. (BY MR. ALEX:) The question is: Do you recall whether he ever talked about anything about any kind of -- and let me just ask you this. You were up there because they were trying to get you to join a gang; is that right? Down in the cells?

A. Partially, yes.

Q. Okay. And that was partially why you were fighting; is that right?

A. Partially.

Q. Okay. And while you were up there on single cells, did you hear the defendant talking any stuff about any kind of gang talk?

A. I don't know what kind of gang he's in, but I

254

know he's in a gang, that's all I know.

Q. And how do you know?

A. Just because the day he got in is his -- whatever he said, B-day, whatever it is. That's all I know.

Q. And what did that mean to you?

A. I would think birthday.

Q. Okay. And you're -- you're probably losing me and the jury at this time. What does birthday have to do with gangs?

A. The day he got in.

Q. Okay. So you heard him talking about the day that he got in a gang?

A. Yeah.

Q. And he referred to it as his birthday?

A. Yeah. B-day.

Q. Okay.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) All right. Mr. Utsey, I'm going to show you what has been marked as State's Exhibit 578. Do you see that? And I don't want you to say what it is, I just want you to look at it, okay?

Do you see that this piece of paper is marked State's Exhibit 578?

255

A. Yes.

Q. Okay. And does it appear to you to be a letter from Jason Luper, D'Angelo Anderson, and Benjamin Lott? Does it say From?

A. Yes.

Q. All right. Are those the same three people that Mr. Lollar just finished asking you about? D'Angelo Anderson. D'Angelo would be the name that you wrote up here; is that correct?

A. Yes. I know what's coming, and --

Q. And -- just listen to the question.

And counsel just asked you about a guy by the name of Benjamin Lott; is that correct?

A. Yes.

Q. And then he asked you about a man by the name of Jason Luper, and you said I don't know the name, but I -- there was a guy down there. Do you remember that?

A. No, that's -- that's him. I don't know -- don't know him.

Q. Okay. And I'm not asking you if you know him.

A. Yeah.

Q. I'm just asking you if you recall the question that counsel asked you about a Jason Luper. And if you don't, that's okay.

A. Yeah, I -- I don't.

256

Q. That's all right.

A. I thought it was the one on the right of me.

Q. All right. And this appears to be a letter from those three individuals -- is that correct? -- dated July 31st, 2009?

A. Uh-huh.

Q. And I want you to read that for a second for me, if you will. To yourself. Tell me when you're done.

A. (Examining document.) Okay.

Q. Finished? Okay. Now, counsel asked you a series of questions about whether you called a bunch of people the N word. A nigger, do you recall that?

A. Yes, I do recall, but I never said that.

Q. Okay. And I'm not asking you that right now, I'm just asking you if you recall the question.

A. Yes.

Q. And Jason Luper, Benjamin Lott, D'Angelo Anderson, all of those people, he asked you whether you called them a nigger; is that right?

A. Yes, sir.

Q. He asked you whether you taunted these people; is that correct?

A. That's correct.

Q. All right. And you don't know anything about

257

that; is that correct?

A. That's correct.

Q. All right. This letter I just showed you from those three people, does it speak directly to that? In other words, does it speak to the -- to anything about the questions I just asked you about?

Does it basically deny all of that?

A. Basically, to me. It doesn't say anything.

Q. Okay.

MR. ALEX: At this time, Judge, we're going to offer State's Exhibit 578. The Court can review it.

THE COURT: Take a brief recess for the jury. All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

State's Exhibit 578 is a letter that was written to Mr. Alex apparently from various persons that are in the North Tower. Not written by the witness, and the witness could not possibly know about it. Nor does it specifically or even inferentially refer to any of the racial epitaphs that have been discussed, so what is your theory of admissibility on this, Mr. Alex?

MR. ALEX: Judge, it directly rebuts every

258

question that the defense has asked Mr. Utsey, and that was the basis of all of these questions would have to come from these individuals, and the only questions that was asked of Mr. Utsey were the ones that you just laid out there, and that was You teased these guys, you called them racial names, and you were disruptive with these guys.

THE COURT: Okay.

MR. ALEX: That letter specifically says, Mr. Alex, we're not going to go on the stand and lie for the defendant.

THE COURT: Right. It also implies Mr. Lollar asked them to lie.

I'm not letting this in.

Call the jury.

MR. ALEX: I'll offer it for record purposes, Judge.

THE COURT: Okay. And it's admitted for record purposes.

MR. ALEX: Judge, before the jury comes back in, -- this doesn't have to be on the record. It's just scheduling.

(Off-the-record discussion was had.)

THE BAILIFF: All rise.

(Jury present.)

259

THE COURT: Be seated, please.

You may proceed, Mr. Alex.

MR. ALEX: Judge, we'll pass the witness.

MR. LOLLAR: We have no further questions.

THE COURT: All right. May the witness be permanently excused?

MR. ALEX: We have no objections, Your Honor.

MR. LOLLAR: Yes, sir.

THE COURT: You're permanently excused, sir. You may step down.

All right. You may recall that a certain witness was held in abeyance until I made some legal rulings? In other words, I suspended his testimony until I considered it.

Because that is something that I need to do and I don't want to consume your time doing that, I'm going to send you home now. I'll ask you to come back again tomorrow, 8:45. Same drill as before.

I'm reminding you again, no discussions about the case, no looking at press coverage on the case.

Thank you very much for being here, folks, and thank you for paying attention.

All rise for the jury.

260

(Jury not present.)

THE COURT: Okay. In a moment, we're going to be in recess until 8:30 a.m. I do not want to hear any argument from any lawyers the rest of today. I want you to listen to me, okay?

At 8:30 tomorrow a.m., I want you to address whether or not shakedown search, whatever you want to call it, from that witness, I guess his name was Doty; is that right, Ms. Handley?

MS. HANDLEY: Yes.

THE COURT: And here is what I have now, so here's what you need to focus on.

We have a variety of cases from the Second Circuit not controlling on this Court, which do suggest that the search would not be permissible, and so the testimony would not be admissible.

We have a Supreme Court case which allowed for a similar search, but that was of a convicted prisoner, which is distinguishable from the case at hand, and so that is what I want y'all to address, okay? Whether that case controls, and if so, why; and/or why I should pay attention to that Second Circuit case, keeping in mind that the Court's circumspect about these sorts of things.

And we are in recess until 8:30 a.m.

261

(Court adjourned.)

262

THE STATE OF TEXAS )

COUNTY OF DALLAS   )

I, SHARON HAZLEWOOD, Official Court Reporter in and for Criminal District Court No. 7 of Dallas County, State of Texas, do HEREBY CERTIFY that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

Witness my hand this the __1st__ day of __April__, 2010.

_Sharon Hazlewood_
SHARON HAZLEWOOD, CSR
Certified Shorthand Reporter
Official Court Reporter
Criminal District Court No. 7
972-739-3906
Texas CSR No. 628
Expiration Date: 12/31/10

FIRM NAME                                    Page 261 to 262 of 262