REPORTER'S RECORD

VOLUME 49 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE CRIMINAL DISTRICT |
| | ) |
| | ) |
| | ) |
| | ) |
| VS. | ) COURT NO. 7 |
| | ) |
| | ) |
| | ) |
| JAMES GARFIELD BROADNAX | ) Of DALLAS COUNTY, TEXAS |

ORIGINAL ORIGINAL

====================================================

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

PUNISHMENT PHASE

====================================================

On the 14TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

A P P E A R A N C E S


FOR THE STATE OF TEXAS:


    HONORABLE DAVID M. ALEX
    SBOT NO. 24003256
    HONORABLE LISA SMITH
    SBOT NO. 00787131
    HONORABLE GORDON HIKEL
    SBOT NO. 00787696
    HONORABLE ANDREA HANDLEY
    SBOT NO. 08898800
    HONORABLE ELAINE EVANS
    SBOT NO. 24032880
    HONORABLE GRACE SHIN
    SBOT NO. 24033062
    133 N. INDUSTRIAL BLVD.
    FRANK CROWLEY COURTHOUSE
    DALLAS, TEXAS 75207
    TEL. 214-653-3600


FOR THE DEFENDANT:

    HONORABLE BRAD LOLLAR
    SBOT NO. 12508700
    1700 COMMERCE ST, STE. 404
    DALLAS, TEXAS 75201
    TEL. 214-384-8178

    HONORABLE DOUGLAS H. PARKS
    SBOT NO. 15520000
    321 CALM WATER LANE
    HOLLY LAKE RANCH, TEXAS 75765
    TEL. 903-769-3120

    HONORABLE KERI MALLON
    SBOT NO. 24049165
    DALLAS COUNTY PUBLIC DEFENDERS OFFICE
    133 N. INDUSTRIAL BLVD., LB 2
    FRANK CROWLEY COURT BLDG.
    DALLAS, TEXAS  75207
    TEL. 214-653-3550

# VOLUME 49

## PUNISHMENT PHASE

<u>AUGUST 14TH, 2009</u>

|  | PAGE | VOL. |
|---|---|---|
| PROCEEDINGS............................... | 3 | 49 |
| CASE CALLED BY THE COURT.................. | 3 | 49 |
| HEARING.................................. | 3 | 49 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARGER, DAVID | 13 | | | 49 |
|  | 18 | 24 | | 49 |
|  | 31 | 33 | | 49 |
|  | 33 | | | 49 |

|  | PAGE | VOL. |
|---|---|---|
| JURY PRESENT............................. | 35 | 49 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| DOTY, DARRELL | 35 | 60 | | 49 |
|  | 69 | 73 | | 49 |

|  | PAGE | VOL. |
|---|---|---|
| HEARING.................................. | 74 | 49 |
| JURY PRESENT............................. | 76 | 49 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| NELSON, BARRETT | 77 | | | 49 |

|  | PAGE | VOL. |
|---|---|---|
| HEARING.................................. | 133 | 49 |
| JURY PRESENT............................. | 139 | 49 |

| STATE'S WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| NELSON, MELODY | 140 | 227 | | 49 |
| | 249 | 254 | | 49 |

| | PAGE | VOL. |
|---|---|---|
| HEARING............................... | 256 | 49 |
| ADJOURNMENT........................... | 262 | 49 |
| REPORTER'S CERTIFICATE................ | 263 | 49 |

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARGER, DAVID | 13 | | | 49 |
| | 18 | 24 | | 49 |
| | 31 | 33 | | 49 |
| | 33 | | | 49 |
| DOTY, DARRELL | 35 | 60 | | 49 |
| | 69 | 73 | | 49 |
| NELSON, BARRETT | 77 | | | 49 |
| NELSON, MELODY | 140 | 227 | | 49 |
| | 249 | 254 | | 49 |

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| BARGER, DAVID | 13 | | | 49 |
| | 18 | 24 | | 49 |
| | 31 | 33 | | 49 |
| | 33 | | | 49 |
| DOTY, DARRELL | 35 | 60 | | 49 |
| | 69 | 73 | | 49 |
| NELSON, BARRETT | 77 | | | 49 |
| NELSON, MELODY | 140 | 227 | | 49 |
| | 249 | 254 | | 49 |

*SHARON HAZLEWOOD, CSR          972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 6 | PHOTO OF JAIL CELL DRAWING | 38 | 38<br>256 | 49<br>49 |
| 7 | PHOTO OF PITCHFORKS ON CELL WALLS | 38 | 38<br>256 | 49<br>49 |
| 8 | PHOTO OF DRAWING "GANGSTER CITY" | 38 | 38<br>256 | 49<br>49 |
| 9 | PHOTOS - GANG STUFF | 38 | 38<br>256 | 49<br>49 |
| 10 | PHOTO - LETTER FROM FLINT | 38 | 38<br>256 | 49<br>49 |
| 11 | PHOTO - LETTER FROM FLINT | 38 | 38<br>256 | 49<br>49 |
| 12 | PHOTO - LETTER FROM FLINT | 38 | 38<br>256 | 49<br>49 |
| 13 | CV for B.K. - BARRETT NELSON | | 256 | 49 |
| 14 | RED NOTEBOOK WRITINGS | | 256 | 49 |
| 15 | BLACK NOTEBOOK WRITINGS | | 256 | 49 |
| 16 | BUSINESS RECORDS OF MEDIA REQUESTS | | 256 | 49 |
| 16A | FOX 4 RELEASE | | 256 | 49 |
| 18 | CHANNEL 5 INTERVIEW - ELLEN GOLDBERG - DISC | | 257 | 49 |
| 20 | PHOTO ID - SWAN | | 257 | 49 |
| 21 | PHOTO ID - SWAN & BUTLER | | 257 | 49 |
| 22 | PHOTO ID - BUTLER | | 257 | 49 |
| 23 | CRIME SCENE PHOTO - INTERSECTION of STATE and GLENBROOK | | 257 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 24 | CRIME SCENE PHOTO - LOOKING EAST | | 257 | 49 |
| 25 | CRIME SCENE PHOTO - LOOKING WEST | | 257 | 49 |
| 26 | CRIME SCENE PHOTO - BICYCLE | | 257 | 49 |
| 27 | CRIME SCENE PHOTO - AERIAL | | 257 | 49 |
| 28 | CRIME SCENE PHOTO - CRIME SCENE & FIRE STATION | | 257 | 49 |
| 29 | CRIME SCENE PHOTO - HEADSHOT UP | | 257 | 49 |
| 30 | CRIME SCENE PHOTO - HEADSHOT DOWN | | 257 | 49 |
| 31 | CRIME SCENE PHOTO - SWAN - FULL BODY POCKET | | 257 | 49 |
| 32 | CRIME SCENE PHOTO - SWAN - FULL BODY TWO POCKETS | | 257 | 49 |
| 33 | CRIME SCENE PHOTO - CHEST SHOT THROUGH SHIRT | | 257 | 49 |
| 34 | CRIME SCENE PHOTO - CHEST SHOT UNDER SHIRT | | 257 | 49 |
| 35 | CRIME SCENE PHOTO - BACK OF HEAD | | 257 | 49 |
| 36 | CRIME SCENE PHOTO - SIDE OF HEAD | | 257 | 49 |
| 37 | CRIME SCENE PHOTO - POOLING IN BACK - BULLET LODGED | | 257 | 49 |
| 38 | CRIME SCENE PHOTO - POOLING IN BACK | | 257 | 49 |

*SHARON HAZLEWOOD, CSR          972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 39 | CRIME SCENE PHOTO - RIGHT HAND | | 257 | 49 |
| 40 | CRIME SCENE PHOTO - LEFT HAND | | 257 | 49 |
| 41 | CRIME SCENE PHOTO - SWAN & BUTLER | | 257 | 49 |
| 42 | CRIME SCENE PHOTO - BLOODSPOTS | | 257 | 49 |
| 43 | CRIME SCENE PHOTO - BUTLER - POOLING BENEATH FACE | | 257 | 49 |
| 44 | CRIME SCENE PHOTO - BUTLER LODGED BULLET FRAGMENT | | 257 | 49 |
| 45 | CRIME SCENE PHOTO - BUTLER - FACE DOWN, BLOOD POOLING | | 257 | 49 |
| 46 | CRIME SCENE PHOTO - BUTLER - HEADSHOT | | 257 | 49 |
| 47 | CRIME SCENE PHOTO - BUTLER - SHOULDER BULLET WOUND | | 257 | 49 |
| 48 | CRIME SCENE PHOTO - BUTLER - CHEST BULLET WOUND | | 257 | 49 |
| 49 | CRIME SCENE PHOTO - BUTLER - CHEST BULLET WOUND | | 257 | 49 |
| 50 | CRIME SCENE PHOTO - BUTLER - ARM BULLET WOUND | | 257 | 49 |
| 51 | CRIME SCENE PHOTO - BUTLER - ABOVE BULLET WOUND | | 257 | 49 |
| 53 | CRIME SCENE PHOTO - BUTLER - FACE UP SPREAD EAGLE | | 257 | 49 |
| 54 | CRIME SCENE PHOTO - BUTLER - LEFT HAND | | 257 | 49 |
| 55 | CRIME SCENE PHOTO - MARKER 1 BULLET CASING CLOSE UP | | 257 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 56 | CRIME SCENE PHOTO - MARKER 1 BULLET CASING - EXPANDED VIEW | | 257 | 49 |
| 57 | CRIME SCENE PHOTO - MARKER 1 BULLET CASING - MIDRANGE VIEW | | 257 | 49 |
| 58 | CRIME SCENE PHOTO - MARKER 2 LIGHTER - CLOSE UP | | 257 | 49 |
| 59 | CRIME SCENE PHOTO - MARKER 3 BULLET CASING - CLOSE UP | | 257 | 49 |
| 60 | CRIME SCENE PHOTO - MARKER 4 CIGARETTES & BLOODSTAINS | | 257 | 49 |
| 61 | CRIME SCENE PHOTO - CLOSE UP CIGARETTES & BLOODSTAINS | | 257 | 49 |
| 62 | CRIME SCENE PHOTO - MARKERS 5-14 - WITHOUT BODIES | | 257 | 49 |
| 63 | CRIME SCENE PHOTO - MARKERS 5-10 HIGHLIGHT 10 | | 257 | 49 |
| 64 | CRIME SCENE PHOTO - MARKERS 5-9 - PROXIMITY | | 257 | 49 |
| 65 | CRIME SCENE PHOTO - MARKER 5 TISSUE CLOSE UP | | 257 | 49 |
| 66 | CRIME SCENE PHOTO - MARKER 6 CONDOM | | 257 | 49 |
| 67 | CRIME SCENE PHOTO - MARKER 7 BULLET CASING & TWIG | | 257 | 49 |
| 68 | CRIME SCENE PHOTO - MARKER 8 | | 257 | 49 |
| 69 | CRIME SCENE PHOTO - MARKER 9 BULLET CASING CLOSE UP | | 257 | 49 |
| 70 | CRIME SCENE PHOTO - MARKER 10 BULLET CASING CLOSE UP | | 257 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 71 | CRIME SCENE PHOTO - MARKER 11 BULLET CASING CLOSE UP | | 257 | 49 |
| 72 | CRIME SCENE PHOTO - MARKERS 11 & 12 - MIDRANGE (BENCH) | | 257 | 49 |
| 73 | CRIME SCENE PHOTO - MARKER 12 SHARPIE CLOSE UP | | 257 | 49 |
| 74 | CRIME SCENE PHOTO - MARKER 14 HIGHLIGHT 14 | | 257 | 49 |
| 75 | CRIME SCENE PHOTO - MARKER 14 BULLET CLOSE UP | | 257 | 49 |
| 76 | CRIME SCENE PHOTO - MARKER 14 BULLET MIDRANGE | | 257 | 49 |
| 77 | CRIME SCENE PHOTO - MARKER 15 BEER BOTTLE | | 257 | 49 |
| 78 | CRIME SCENE PHOTO - BEER BOTTLE CLOSE UP | | 257 | 49 |
| 79 | CRIME SCENE PHOTO - BEER BOTTLE MIDRANGE | | 257 | 49 |
| 80 | PHOTO - HANDGUN - RIGHT | | 257 | 49 |
| 81 | PHOTO - HANDGUN - (SERIAL NUMBER) | | 257 | 49 |
| 82 | PHOTO - HANDGUN - MIDRANGE | | 257 | 49 |
| 83 | PHOTO - HANDGUN - LEFT | | 257 | 49 |
| 84 | PHOTO - HANDGUN - RIGHT MIDRANGE | | 257 | 49 |
| 85 | PHOTO - TOOLSET - (OPEN) | | 257 | 49 |
| 86 | PHOTO - TOOLSET - (CLOSED) | | 257 | 49 |
| 87 | PHOTO - CLOTHES - WHITE TANK, BLACK SHORTS | | 257 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 88 | PHOTO - CLOTHES - BLACK & WHITE SHIRT | | 257 | 49 |
| 89 | PHOTO - CLOTHES - BLUE BOXER SHORTS | | 257 | 49 |
| 90 | PHOTO - CLOTHES - WHITE SOCKS | | 257 | 49 |
| 91 | CLOTHES FROM CAR - MULTICOLOR "TX" HAT | | 257 | 49 |
| 92 | PHOTO - FILA HIGHTOPS (FRONT) | | 257 | 49 |
| 93 | PHOTO - FILA HIGHTOPS - SIDE VIEW | | 257 | 49 |
| 94 | PHOTO - FILA HIGHTOPS - SIDE VIEW - CLOSE UP | | 257 | 49 |
| 95 | PHOTO - FILA HIGHTOPS - SIDE VIEW - CLOSE UP (RULER) | | 257 | 49 |
| 96 | PHOTO - FILA HIGHTOPS - SIDE VIEW - CLOSE UP (SWAB) | | 257 | 49 |
| 97 | PHOTO - SIDE VIEW - CLOSE UP (SWAB) | | 257 | 49 |
| 98 | PHOTO - WHITE NIKE HIGHTOPS (FRONT) | | 257 | 49 |
| 99 | PHOTO - WHITE NIKE HIGHTOPS SIDE VIEW | | 257 | 49 |
| 100 | PHOTO - WHITE NIKE HIGHTOPS - CLOSE UP - (FRONT) | | 257 | 49 |
| 101 | RP .380 CASING (STREET, NORTH OF BUTLER) | | 257 | 49 |
| 101A | OPEN | | 257 | 49 |
| 102 | DNA SWAB (ITEM #7994-01) | | 257 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 103 | METAL LIGHTER - (PARKING LOT, NEAR RIGHT HAND OF SWAN) | | 257 | 49 |
| 104 | CIGARETTES (PARKING LOT, NEAR RIGHT HAND OF SWAN) | | 257 | 49 |
| 105 | TISSUE - (PARKING LOT, SOUTH OF SWAN) | | 257 | 49 |
| 106 | CONDOM - (PARKING LOT, SOUTH OF SWAN) | | 257 | 49 |
| 107 | RP .380 CASING (PARKING LOT, SOUTH OF SWAN) | | 257 | 49 |
| 108 | PROJECTILE -(PARKING LOT, SOUTH OF SWAN) | | 257 | 49 |
| 109 | RP .380 CASING (PARKING LOT, SOUTH OF SWAN) | | 257 | 49 |
| 110 | RP .380 CASING (PARKING LOT, SOUTH OF SWAN) | | 257 | 49 |
| 111 | RP .380 CASING (PARKING LOT, NE OF NW CORNER OF BLDG.) | | 257 | 49 |
| 112 | BLACK SHARPIE PEN - (SIDEWALK, UNDER BENCH NW CORNER OF BLDG.) | | 257 | 49 |
| 114 | PROJECTILE JACKET - (SIDEWALK, NEAR FRONT OF 806 STATE ST.) | | 257 | 49 |
| 115 | EMPTY SHINER BOCK BEER BOTTLE (UNDER BUSHES OF MEDIAN, NW CORNER OF BLDG.) | | 257 | 49 |
| 116 | PHOTO OF BROADNAX AT NURSE'S STATION | | 257 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 118 | RECEIPT & BUSINESS CARD (FRONT LEFT PANT POCKET - BUTLER) | | 258 | 49 |
| 119 | FOLDING KNIFE (FRONT LEFT SHIRT POCKET - SWAN) | | 258 | 49 |
| 120 | POCKET LINER (FRONT RIGHT PANT POCKET - SWAN) | | 258 | 49 |
| 121 | POCKET LINER (FRONT LEFT PANT POCKET - SWAN) | | 258 | 49 |
| 122 | POCKET LINER (REAR LEFT PANT POCKET - SWAN) | | 258 | 49 |
| 123 | CELL PHONE, TISSUE, PEN, LIGHTER, CHAPSTICK (FRONT LEFT SHIRT POCKET OF SWAN) | | 258 | 49 |
| 124 | BLOOD SWAB - BUTLER (BLOOD POOL) | | 258 | 49 |
| 125 | BLOOD SWAB - SWAN (BLOOD POOL) | | 258 | 49 |
| 126 | BLOOD SWAB (BLOOD SPATTER IN STREET BETWEEN VICTIMS) | | 258 | 49 |
| 127 | BLOOD SWAB (BLOOD SPATTER IN STREET NEAR SWAN) | | 258 | 49 |
| 128 | BLACK LONG SLEEVE SHIRT (NO SIZE) (BLACK/RED BACKPACK FOUND IN TRUNK) | | 258 | 49 |
| 129 | WHITE NIKE AIR SHOES, SIZE 10.5 (BLACK/RED BACKPACK FOUND IN TRUNK) | | 258 | 49 |
| 130 | BLACK/RED BACKPACK (TRUNK OF VEHICLE) | | 258 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 130A | 3 PIPES, RAG, 2 DIMES, NICKEL, CONCEALED HANDGUN LICENSE, RECEIPT | | 258 | 49 |
| 131A | BIRTH CERTIFICATE - BROADNAX | | 258 | 49 |
| 131B | USPS RECEIPT FOR BIRTH CERTIFICATE | | 258 | 49 |
| 131C | APPLICATION FOR BIRTH CERT., PAGE 1 | | 258 | 49 |
| 131D | APPLICATION FOR BIRTH CERT., PAGE 2 | | 258 | 49 |
| 131E | APPLICATION FOR BIRTH CERT., PAGE 3 | | 258 | 49 |
| 131F | JAUNITE/MONEY ORDER RECEIPT | | 258 | 49 |
| 131I | SPIRAL NOTEBOOK/RED | 104 | 104 | 49 |
| | | | 258 | 49 |
| 131J | SPIRAL NOTEBOOK/BLACK | 104 | 104 | 49 |
| | | | 258 | 49 |
| 132A | JACKET/LION LINING (TRUNK OF VEHICLE) | | 258 | 49 |
| 132B | JACKET (TRUNK OF VEHICLE) | | 258 | 49 |
| 133 | SUITCASE CONTAINING CLOTHING, ETC. (TRUNK OF VEHICLE) | | 258 | 49 |
| 134 | DUFFLE BAG CONTAINING CLOTHING, ETC. (TRUNK OF VEHICLE) | | 258 | 49 |
| 135 | DNA SWAB (HOOD D) | | 258 | 49 |
| 136 | DNA SWAB (HOOD E) | | 258 | 49 |
| 137 | DNA SWAB (LEFT REAR AREA) | | 258 | 49 |
| 138 | DNA SWAB (LEFT REAR QUARTER PANEL B) | | 258 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 139 | GRAY FILA SHOES, SIZE 13 (JAMES BROADNAX) | | 258 | 49 |
| 140 | GRAY FRUIT OF THE LOOM TANK TOP (LARGE), WHITE TANK TOP (NO SIZE), FOOT ACTION GRAY STRIPED SHIRT (SIZE 4XL), RISK JEANS PANTS (SIZE 32x32) (JAMES BROADNAX) | | 258 | 49 |
| 141 | FOUR WHITE SOCKS, PURITAN BLUE BOXER SHORTS (XL) - (JAMES BROADNAX) | | 258 | 49 |
| 142 | BLACK MULTICOLORED TX CAP (LARGE) (JAMES BROADNAX) | | 258 | 49 |
| 143 | WHITE NIKE SHOES (SIZE 10) - (D. CUMMINGS) | | 258 | 49 |
| 144 | BLACK NIKE TEAM SHORTS (SIZE XXL) (D. CUMMINGS) | | 258 | 49 |
| 145 | ADIDAS NAVY BLUE DALLAS MAVERICKS JERSEY #31 (SIZE XXL) (D. CUMMINGS) | | 258 | 49 |
| 146 | HANES WHITE TANK TOP (SMALL), MEDONA GRAY TANK TOP (NO SIZE) (D. CUMMINGS) | | 258 | 49 |
| 147 | WHITE MARISH FRANCOIS & GIRBAUD (D. CUMMINGS) | | 258 | 49 |
| 148 | TWO WHITE SOCKS (D. CUMMINGS) | | 258 | 49 |
| 149 | TWO WHITE SOCKS (LONNIE HARRIS) | | 258 | 49 |
| 150 | TWO WHITE TOWELS (TRUNK OF VEHICLE) | | 258 | 49 |
| 151 | BUCCAL SWAB (D. CUMMINGS) | | 258 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 152 | TX LICENSE PLATE GVJ-961 (VEHICLE) | | 258 | 49 |
| 153 | GSR KIT (SWAN) | | 258 | 49 |
| 154 | BLOOD STANDARD (SWAN) | | 258 | 49 |
| 155 | BULLET (SWAN) | | 258 | 49 |
| 156 | NAIL CLIPPINGS (SWAN) | | 258 | 49 |
| 157 | HEAD HAIR STANDARD (SWAN) | | 258 | 49 |
| 158 | CLOTHES (SWAN) | | 258 | 49 |
| 159 | BULLET (BUTLER) | | 258 | 49 |
| 160 | BULLET (BUTLER) | | 258 | 49 |
| 161 | GSR KIT (BUTLER) | | 258 | 49 |
| 162 | HAIR STANDARD (BUTLER) | | 258 | 49 |
| 163 | BLOOD STANDARD (BUTLER) | | 258 | 49 |
| 164 | CLOTHING (BUTLER) | | 258 | 49 |
| 165 | FINGERNAIL CLIPPING (BUTLER) | | 258 | 49 |
| 166 | FINGERNAIL CLIPPING (BUTLER) | | 258 | 49 |
| 167 | TAPE LIFTS FOR EXHIBITS: 21, 22, 29, 39A, 39B | | 258 | 49 |
| 168 | TAPE LIFTS FOR EXHIBIT 28 | | 258 | 49 |
| 169 | TAPE LIFTS FOR EXHIBITS: 40A THROUGH 40D | | 258 | 49 |
| 170 | TAPE LIFTS FOR EXHIBIT 44 | | 258 | 49 |
| 171 | TAPE LIFTS FOR EXHIBIT 45 | | 258 | 49 |
| 172 | NATHAN JOHNSON - GSR (COLLECTED BY BLUM) | | 258 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 173 | PHOTO - BOTTOM NIKE SHOE (RULER) | | 259 | 49 |
| 174 | PHOTO - BOTTOM NIKE SHOE (CLOSE UP SHOT) | | 259 | 49 |
| 175 | PHOTO - BOTTOM NIKE SHOE (SIDE ANGLE) | | 259 | 49 |
| 176 | PHOTO - BOTTOM NIKE SHOE (CLOSE UP - SIDE ANGLE) | | 259 | 49 |
| 177 | PHOTO - BOTTOM NIKE SHOE (RULER) | | 259 | 49 |
| 178 | PHOTO - TOP & BOTTOM NIKE SHOE (SWAB) | | 259 | 49 |
| 179 | PHOTO - NIKE SHOE (SWAB) | | 259 | 49 |
| 180 | PHOTO - TRUNK - SUITCASE WITH MASK | | 259 | 49 |
| 181 | PHOTO - MASK & PIC. OF GROUP | | 259 | 49 |
| 182 | PHOTO - CLOSE UP - GROUP PICTURE | | 259 | 49 |
| 183 | PHOTO - SS CARD - BROADNAX | | 259 | 49 |
| 184 | PHOTO - SUITCASE, SS CARD, PICTURE OF GROUP | | 259 | 49 |
| 185 | PHOTO - SUITECASE, MASK, SS CARD, PIC. | | 259 | 49 |
| 186 | PHOTO - SUITECASE (CLOSE UP SHOT) | | 259 | 49 |
| 187 | PHOTO - SS CARD (BROADNAX) - CLOSE UP | | 259 | 49 |
| 188 | PHOTO - CAR - FRONT DRIVER'S SIDE - CLOSE UP | | 259 | 49 |
| 189 | PHOTO - HOOD WITH RULER | | 259 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 190 | PHOTO - HOOD WITH RULERS | | 259 | 49 |
| 191 | PHOTO - CAR - HOOD C - F | | 259 | 49 |
| 192 | PHOTO - CAR - HOOD A | | 259 | 49 |
| 193 | PHOTO - CAR - HOOD WITH RULER | | 259 | 49 |
| 194 | PHOTO - CAR - HOOD B (CLOSE UP) | | 259 | 49 |
| 195 | PHOTO - HOOD (CLOSE UP WITH RULER) | | 259 | 49 |
| 196 | PHOTO - HOOD (CLOSE UP) C | | 259 | 49 |
| 197 | PHOTO - HOOD (CLOSE UP WITH RULER) | | 259 | 49 |
| 198 | PHOTO - HOOD (CLOSE UP) D | | 259 | 49 |
| 199 | PHOTO - HOOD WITH BLOODSPOTS | | 259 | 49 |
| 200 | PHOTO - HOOD (CLOSE UP) F | | 259 | 49 |
| 202 | BROWNING ARMS .380 CALIBER PISTOL (4407 HATCHER #149, DALLAS, TX - BETWEEN MATTRESSES IN CALHOUN'S BEDROOM) | | 259 | 49 |
| 202A | DNA SWAB FROM RIGHT GRIP OF .380 CALIBER PISTOL | | 259 | 49 |
| 202B | DNA SWAB FROM LEFT GRIP OF .380 CALIBER PISTOL | | 259 | 49 |
| 202C | DNA SWAB FROM RIGHT SIDE/SLIDE OF .380 CALIBER PISTOL | | 259 | 49 |
| 202D | DNA SWAB FROM LEFT SIDE/SLIDE OF .380 CALIBER PISTOL | | 259 | 49 |
| 202E | DNA SWAB FROM TRIGGER OF .380 CALIBER PISTOL | | 259 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 202F | DNA SWAB FROM INSIDE BARREL OF .380 CALIBER PISTOL | | 259 | 49 |
| 202G | DNA SWAB FROM POSSIBLE BLOOD FROM LEFT SIDE OF .380 CALIBER PISTOL | | 259 | 49 |
| 202H | PACKAGE | | 259 | 49 |
| 203 | PISTOL MAGAZINE | | 259 | 49 |
| 204 | OPEN | | 259 | 49 |
| 206 | PHOTO - HOOD - CLOSE UP BLOODSPOT WITH RULER | | 259 | 49 |
| 207 | PHOTO - HOOD - CLOSE UP BLOODSPOT WITH RULER | | 259 | 49 |
| 208 | PHOTO - LEFT REAR QUARTER PANEL WITH LABEL | | 259 | 49 |
| 209 | PHOTO - HOOD | | 259 | 49 |
| 210 | PHOTO - HOOD WITH BLOODSPOTS | | 259 | 49 |
| 211 | PHOTO - LEFT REAR QUARTER PANEL WITH BLOODSPOTS | | 259 | 49 |
| 212 | PHOTO - LEFT REAR QUARTER PANEL B & C | | 259 | 49 |
| 213 | PHOTO - CLOSE UP OF BLOODSPOT | | 259 | 49 |
| 214 | PHOTO - CAR - BLOODSPOTS WITH RULER | | 259 | 49 |
| 215 | PHOTO | | 259 | 49 |
| 216 | PHOTO OF HOOD WITH RULERS MARKING BLOODSPOTS | | 259 | 49 |
| 217 | PHOTO OF FLAT TIRE - REAR DRIVER'S SIDE (CLOSE UP) | | 259 | 49 |

*SHARON HAZLEWOOD, CSR          972-739-3906*
*CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS*

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 218 | PHOTO OF TIRE WITH NAIL STICKING OUT | | 259 | 49 |
| 219 | PHOTO OF NAIL IN TIRE (CLOSE UP) | | 259 | 49 |
| 220 | PHOTO OF WHITE NIKE HIGHTOPS (CLOSE UP - RULER) | | 259 | 49 |
| 221 | PHOTO OF WHITE NIKE HIGHTOPS - SIDE VIEW | | 259 | 49 |
| 222 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP WITH BLOODSPOTS | | 259 | 49 |
| 223 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP WITH BLOODSPOTS (RULER) | | 259 | 49 |
| 224 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP - SOLE WITH BLOOD | | 259 | 49 |
| 225 | PHOTO OF WHITE NIKE HIGHTOPS - CLOSE UP - BLOOD WITH RULER | | 259 | 49 |
| 226 | PHOTO OF WHITE NIKE HIGHTOPS - DIFFERENT ANGLE - BLOOD | | 259 | 49 |
| 227 | PHOTO OF WHITE NIKE HIGHTOPS - DIFFERENT ANGLE - BLOOD | | 259 | 49 |
| 228 | PHOTO - CLOTHES IN CAR - NIKE HIGHTOPS (SWAB) | | 259 | 49 |
| 229 | PHOTO - BLACK MESH NIKE SHORTS & SOCKS | | 259 | 49 |
| 230 | PHOTO - KHAKI SHORTS & MAVERICKS JERSEY | | 259 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 231 | PHOTO - WHITE & GRAY TANKS - MAVERICKS JERSEY | | 259 | 49 |
| 232 | PHOTO - WHITE NIKE HIGHTOPS | | 259 | 49 |
| 233 | PHOTO - BLACK ADIDAS SANDALS | | 259 | 49 |
| 234 | PHOTO - TOP OF RIGHT - BOTTOM LEFT SANDALS | | 259 | 49 |
| 235 | PHOTO - CLOSE UP OF BOTTOM OF SANDAL | | 259 | 49 |
| 236 | PHOTO - CLOSER SHOT OF BOTTOM OF SANDAL. | | 259 | 49 |
| 237 | CLOSE UP PHOTO OF BOTTOM OF SANDAL (RULER) | | 259 | 49 |
| 238 | PHOTO - BOTTOM SANDAL (SWAB) | | 259 | 49 |
| 239 | PHOTO - WHITE SOCKS WITH BLOODSPOTS | | 259 | 49 |
| 240 | CLOSE UP PHOTO - WHITE SOCKS WITH BLOODSPOTS | | 259 | 49 |
| 241 | CLOSE UP PHOTO - WHITE SOCKS WITH BLOODSPOTS (RULER) | | 259 | 49 |
| 242 | PHOTO OF BLUE/YELLOW STRIPED BOXER SHORTS | | 259 | 49 |
| 243 | PHOTO OF WHITE TANK & BELT WITH LONE STAR BUCKLE | | 259 | 49 |
| 244 | PHOTO OF WHITE TANK & BELT WITH LONE STAR BUCKLE | | 259 | 49 |
| 245 | PHOTO OF BLUE JEAN SHORTS - POCKET DESIGN | | 259 | 49 |
| 246 | PHOTO OF CLOTHES FROM CAR - MAVERICKS JERSEY | | 259 | 49 |
| 247 | PHOTO OF SWAB | | 259 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 248 | PHOTO OF BLACK MESH NIKE SHORTS WITH SWAB | | 259 | 49 |
| 249 | PHOTO - SWAB | | 259 | 49 |
| 250 | PHOTO OF CAR FRONT, LICENSE PLATE GVJ-961 | | 259 | 49 |
| 251 | PHOTO OF FRONT PASSENGER SIDE OF CAR | | 259 | 49 |
| 252 | PHOTO OF FRONT PASSENGER SIDE OF CAR | | 259 | 49 |
| 253 | PHOTO OF REAR PASSENGER SIDE OF CAR | | 259 | 49 |
| 254 | PHOTO OF REAR OF CAR WITH LICENSE PLATE | | 259 | 49 |
| 255 | PHOTO OF REAR DRIVER'S SIDE OF CAR | | 259 | 49 |
| 256 | PHOTO OF DRIVER'S SIDE BACK OF CAR - FLAT TIRE | | 259 | 49 |
| 257 | PHOTO OF DRIVER'S SIDE FRONT OF CAR | | 259 | 49 |
| 258 | PHOTO OF FRONT DRIVER'S SIDE - SPOT ON BUMPER | | 259 | 49 |
| 259 | CLOSE UP PHOTO OF REAR DRIVER'S SIDE FLAT TIRE | | 259 | 49 |
| 260 | CLOSE UP PHOTO OF REAR DRIVER'S SIDE FLAT TIRE | | 259 | 49 |
| 261 | PHOTO OF BACK SEAT FROM BACK PASSENGER DOOR | | 259 | 49 |
| 262 | PHOTO OF BACK SEAT FROM BACK DRIVER'S SIDE DOOR | | 259 | 49 |
| 263 | PHOTO OF FRONT SEAT - DRIVER'S SIDE | | 259 | 49 |

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 264 | PHOTO OF CAR - STEERING WHEEL - DRIVER'S DOOR | | 259 | 49 |
| 265 | PHOTO OF CAR - FRONT SEAT & STEERING WHEEL - DRIVER'S DOOR | | 259 | 49 |
| 266 | PHOTO - FRONT PASSENGER SEAT | | 259 | 49 |
| 267 | PHOTO - OPEN TRUNK | | 259 | 49 |
| 268 | PHOTO - OPEN TRUNK CLOSE UP | | 259 | 49 |
| 269 | CLOSER UP PHOTO - OPEN TRUNK | | 259 | 49 |
| 270 | PHOTO - SUITCASE IN TRUNK | | 259 | 49 |
| 271 | PHOTO - OPEN SUITCASE IN TRUNK | | 259 | 49 |
| 272 | PHOTO - BLACK/RED BAG | | 259 | 49 |
| 273 | PHOTO - NIKE SHOES, PIPES, RECEIPT & CONCEALED HANDGUN LICENSE | | 259 | 49 |
| 274 | PHOTO - WHITE RAG | | 259 | 49 |
| 275 | PHOTO - CLOSE UP OF PIPES | | 259 | 49 |
| 276 | PHOTO - SWAN'S CONCEALED HANDGUN LICENSE | | 259 | 49 |
| 277 | SWAN'S RECEIPT FOR GUN | | 259 | 49 |
| 278 | PHOTO - BLACK CLOTHING, PIPE & HOUSE SHOES | | 259 | 49 |
| 279 | CLOSE UP PHOTO OF HOUSE SHOES | | 259 | 49 |
| 280 | PHOTO OF BLACK SHIRT | | 259 | 49 |
| 281 | PHOTO OF SWAB | | 259 | 49 |
| 282 | PHOTO OF SWAB | | 259 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 283 | PHOTO OF WHITE NIKE SHOES - TOP ANGLE | | 259 | 49 |
| 284 | PHOTO OF BACK OF RIGHT NIKE SHOE WITH BLOODSPOT | | 259 | 49 |
| 285 | CLOSER UP PHOTO OF BACK OF RIGHT NIKE SHOE WITH BLOODSPOT | | 259 | 49 |
| 286 | CLOSER UP PHOTO OF BACK OF RIGHT NIKE SHOE WITH BLOODSPOT (RULER) | | 259 | 49 |
| 287 | PHOTO - BOTTOM OF LEFT NIKE SHOE | | 259 | 49 |
| 288 | CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE - BLOODSPOT | | 259 | 49 |
| 289 | CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE - BLOODSPOT (RULER) | | 259 | 49 |
| 290 | CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE - BLOODSPOT (RULER) | | 259 | 49 |
| 291 | DIFFERENT ANGLE, CLOSE UP PHOTO - BOTTOM OF LEFT NIKE SHOE | | 259 | 49 |
| 292 | PHOTO OF CAR - REAR DRIVER'S SIDE WINDOW | | 259 | 49 |
| 293 | PHOTO OF CAR - REAR DRIVER'S SIDE WINDOW (WITH MARKER & RULER) | | 259 | 49 |
| 294 | CLOSE UP PHOTO OF BLOODSPOT. | | 259 | 49 |
| 295 | CLOSER UP PHOTO OF BLOODSPOT | | 259 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 296 | CLOSE UP PHOTO OF BLOODSPOT WITH MARKER & RULER. | | 259 | 49 |
| 297 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 298 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 299 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 300 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 301 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 302 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 303 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 304 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 305 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 306 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 307 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 308 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 309 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 310 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 311 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 312 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 313 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 314 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 315 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 316 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 317 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 318 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 319 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 320 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 321 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 322 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 323 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 324 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 325 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 326 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 327 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 328 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 329 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 330 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 331 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 332 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 333 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 334 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 335 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 336 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 337 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 338 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 339 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 340 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 341 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 342 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 343 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 344 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 345 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 346 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 347 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 348 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 349 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 350 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 351 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 352 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 353 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 354 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 355 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 356 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 357 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 358 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 359 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 360 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 361 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 362 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 363 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 364 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 365 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 366 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 367 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 368 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 369 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 370 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 371 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 372 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 373 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 374 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 375 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 376 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 377 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 378 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 379 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 380 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 381 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 382 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 383 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 384 | CRIME SCENE PHOTO - RECORD ONLY | | 260 | 49 |
| 385 | MAP | | 260 | 49 |
| 386 | MAP | | 260 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 387 | MAP | | 260 | 49 |
| 389 | MAP | | 260 | 49 |
| 390 | CS DIAGRAM | | 260 | 49 |
| 391 | DNA REPORT | | 260 | 49 |
| 392 | SEROLOGY REPORT | | 260 | 49 |
| 393 | BALLISTICS REPORT | | 260 | 49 |
| 394 | AUTOPSY REPORT | | 260 | 49 |
| 395 | BOOK-IN - DEFENDANT BLUEBACK | | 260 | 49 |
| 396 | BOOK-IN PHOTO - CUMMINGS | | 260 | 49 |
| 398 | WARRANT/AFFIDAVIT - DEFENDANT - TEXARKANA | | 260 | 49 |
| 399 | TITLE HISTORY - SWAN CAR | | 260 | 49 |
| 400 | TITLE HISTORY - DYMON SMITH CAR | | 260 | 49 |
| 401 | VIDEO - CRIME SCENE | | 260 | 49 |
| 402 | VIDEO - TEXARKANA TRAFFIC STOP | | 260 | 49 |
| 403 | VIDEO - CHANNEL 11 | | 260 | 49 |
| 404 | VIDEO - CHANNEL 11 - DEMO WITH TITLES | | 260 | 49 |
| 405 | VIDEO - CHANNEL 5 - DEMO WITH SUBTITLES | | 260 | 49 |
| 406 | VIDEO - CHANNEL 4 | | 260 | 49 |
| 407 | VIDEO - CHANNEL 4 - DEMO | | 260 | 49 |
| 409 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 410 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 411 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 412 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 413 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 414 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 415 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 416 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 417 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 418 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 419 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 420 | AUTOPSY PHOTO OF SWAN | | 260 | 49 |
| 422 | PAWN TICKET | | 260 | 49 |
| 423 | PAWN RECEIPT | | 260 | 49 |
| 424 | PAWN FIELD RECEIPT | | 260 | 49 |
| 425 | JAIL CALLS LOG - DEFENDANT | | 260 | 49 |
| 426 | AUTOPSY REPORT - BUTLER | | 260 | 49 |
| 427 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 428 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 429 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 430 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 431 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 432 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 433 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 434 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 435 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 436 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 437 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 438 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 439 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 440 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 441 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 442 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 443 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 444 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 445 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 446 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 447 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 448 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 449 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 450 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 451 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 452 | AUTOPSY PHOTO - BUTLER | | 260 | 49 |
| 453 | VIDEO - DEATH ROW & GEN. POP. | 199 | 199 | 49 |
| | | | 260 | 49 |
| 455 | PHOTO - AERIAL POLUNSKY UNIT | 176 | 177 | 49 |
| | | | 260 | 49 |
| 456 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
| | | | 41 | 49 |
| | | | 260 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 457 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 | 49 |
| 458 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 | 49 |
| 459 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 | 49 |
| 460 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 | 49 |
| 461 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 | 49 |
| 462 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 | 49 |
| 463 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 | 49 |
| 464 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 | 49 |
| 465 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 | 49 |
| 466 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 |    |
| 467 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |      | 41 | 49 |
|     |             |      | 260 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 468 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 | 49 |
| 469 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 |    |
| 470 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 | 49 |
| 471 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 | 49 |
| 472 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 | 49 |
| 473 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 | 49 |
| 474 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 | 49 |
| 475 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 |    |
| 476 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 | 49 |
| 477 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 | 49 |
| 478 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |                               |    | 41 | 49 |
|     |                               |    | 260 | 49 |

XXX111

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 479 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |    | 41 | 49 |
|     |             |    | 260 | 49 |
| 480 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |    | 41 | 49 |
|     |             |    | 260 | 49 |
| 481 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |    | 41 | 49 |
|     |             |    | 260 | 49 |
| 482 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |    | 41 | 49 |
|     |             |    | 260 | 49 |
| 483 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |    | 41 | 49 |
|     |             |    | 260 | 49 |
| 484 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |             |    | 41 | 49 |
|     |             |    | 261 | 49 |
| 485 | MEDICAL RECORDS 6/21/08 - 11/26/08 | 38 | 38 | 49 |
|     |             |    | 41 | 49 |
|     |             |    | 261 | 49 |
| 486 | MEDICAL RECORDS 11/26/08 - 4/24/09 | 38 | 38 | 49 |
| 487 | MEDICAL RECORDS 4/24/09 - 6/29/09 | 38 | 38 | 49 |
| 488 | MEDICAL RECORDS 6/29/09 - 7/21/09 | 38 | 38 | 49 |
| 489 | SCHOOL RECORDS - DISD | 38 | 38 | 49 |
| 490 | SCHOOL RECORDS - HOPE H.S. | 38 | 38 | 49 |
| 491 | SCHOOL RECORDS - MT. VERNON | 38 | 38 | 49 |
| 492 | SCHOOL RECORDS - TEXARKANA ISD | 38 | 38 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 494 | TOOLS - BLACK CHEST | 38 | 38 | 49 |
| 495 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |            |    | 41 | 49 |
|     |            |    | 261 | 49 |
| 496 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |            |    | 41 | 49 |
|     |            |    | 261 | 49 |
| 497 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |            |    | 41 | 49 |
|     |            |    | 261 | 49 |
| 498 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |            |    | 41 | 49 |
|     |            |    | 261 | 49 |
| 499 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |            |    | 41 | 49 |
|     |            |    | 261 | 49 |
| 500 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |            |    | 41 | 49 |
|     |            |    | 261 | 49 |
| 501 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |            |    | 41 | 49 |
|     |            |    | 261 | 49 |
| 502 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |            |    | 41 | 49 |
|     |            |    | 261 | 49 |
| 503 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |            |    | 41 | 49 |
|     |            |    | 261 | 49 |
| 504 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |            | 39 | 39 | 49 |
|     |            | 103 | 103 | 49 |
|     |            |    | 261 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 505 | PHOTO - JAIL CELL - DEFENDANT | 38 | 38 | 49 |
|     |  | 39 | 39 | 49 |
|     |  | 103 | 103 | 49 |
|     |  |  | 261 | 49 |
| 506 | OPEN |  | 261 | 49 |
| 507 | OPEN |  | 261 | 49 |
| 508 | POLUNSKY UNIT DEATH ROW 2-TIER CELL BLOCK | 176 | 177 | 49 |
|     |  |  | 261 | 49 |
| 509 | POLUNSKY UNIT DEATH ROW VIEW OF CELLS FROM INSIDE DAY | 176 | 177 | 49 |
|     |  |  | 261 | 49 |
| 510 | POLUNSKY UNIT DEATH ROW CELL | 176 | 177 | 49 |
|     |  |  | 261 | 49 |
| 511 | POLUNSKY UNIT DEATH ROW CELL FURTHER INSIDE | 176 | 177 | 49 |
|     |  |  | 261 | 49 |
| 512 | POLUNSKY UNIT DEATH ROW TOILET & SINK INSIDE CELL | 176 | 177 | 49 |
|     |  |  | 261 | 49 |
| 513 | POLUNSKY UNIT DEATH ROW ELECTRIC FENCING - BARBED WIRE | 176 | 177 | 49 |
|     |  |  | 261 | 49 |
| 514 | POLUNSKY UNIT DEATH ROW INDOOR "RECREATIONAL" AREA | 176 | 177 | 49 |
|     |  |  | 261 | 49 |
| 515 | POLUNSKY UNIT DEATH ROW OUTDOOR REC AREA - GATES | 176 | 177 | 49 |
|     |  |  | 261 | 49 |
| 516 | POLUNSKY UNIT DEATH ROW OUTDOOR REC AREA - INSIDE UNIT | 176 | 177 | 49 |
|     |  |  | 261 | 49 |
| 517 | POLUNSKY UNIT DEATH ROW "PIPE CHASE" LOCKED DOOR | 176 | 177 | 49 |
|     |  |  | 261 | 49 |
| 518 | POLUNSKY UNIT DEATH ROW SHOWER | 176 | 177 | 49 |
|     |  |  | 261 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 519 | POLUNSKY UNIT DEATH ROW VISITATION WINDOW WITH PHONES | 176 | 177 261 | 49 49 |
| 520 | POLUNSKY UNIT - DORMITORY (PU-D)    BUNK | 176 | 177 261 | 49 49 |
| 521 | POLUNSKY UNIT - DORMITORY AISLE OF MULTIPLE BANKS | 176 | 177 261 | 49 49 |
| 522 | POLUNSKY UNIT - DORMITORY BUNK (2) | 176 | 177 261 | 49 49 |
| 523 | POLUNSKY UNIT - DORMITORY DAY ROOM - TELEVISIONS | 176 | 177 261 | 49 49 |
| 524 | POLUNSKY UNIT - DORMITORY OUTSIDE REC AREA - VOLLEYBALL COURT | 176 | 177 261 | 49 49 |
| 525 | OPEN | | 261 | 49 |
| 526 | POLUNSKY UNIT - GENERAL POPULATION CELL | 176 | 177 261 | 49 49 |
| 527 | POLUNSKY UNIT - GENERAL POPULATION THREE-TIER CELL BLOCK | 176 | 177 261 | 49 49 |
| 528 | POLUNSKY UNIT - GENERAL POPULATION SHOWER AREA | 176 | 177 261 | 49 49 |
| 529 | POLUNSKY UNIT - GENERAL POPULATION PHONES IN DAY ROOM | 176 | 177 261 | 49 49 |
| 530 | POLUNSKY UNIT - GENERAL POPULATION DINING HALL (ZOOMED IN) | 176 | 177 261 | 49 49 |
| 531 | POLUNSKY UNIT - GENERAL POPULATION THREE-TIER CELL BLOCK (2) | 176 | 177 261 | 49 49 |

xxxvi

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 532 | POLUNSKY UNIT - GENERAL POPULATION DINING HALL (ZOOMED IN) | 176 | 177<br>261 | 49<br>49 |
| 533 | POLUNSKY UNIT - GENERAL POPULATION CONTACT VISITATION (INDOOR) | 176 | 177<br>261 | 49<br>49 |
| 534 | POLUNSKY UNIT - GENERAL POPULATION CONTACT VISITATION (OUTDOOR) | 176 | 177<br>261 | 49<br>49 |
| 535 | POLUNSKY UNIT - GENERAL POPULATION CELL (2) INSIDE CELL | 176 | 177<br>261 | 49<br>49 |
| 536 | POLUNSKY UNIT - GENERAL POPULATION OUTDOOR REC AREA - WEIGHTS | 176 | 177<br>261 | 49<br>49 |
| 537 | AIS RECORD | | 261 | 49 |
| 538 | AIS RECORD | | 261 | 49 |
| 539 | JAIL MEDICAL RECORDS | | 261 | 49 |
| 540 | POLICE REPORT | | 261 | 49 |
| 541 | SUICIDE RISK ASSESSMENT REPORT - JASON VARGHESE | | 261 | 49 |
| 542 | EXCERPTS OF MEDICAL RECORDS | | 261 | 49 |
| 543 | MENTAL HEALTH FOLLOWUP NOTE - DR. MIRMESDAGH | | 261 | 49 |
| 544 | CD WITH SUBTITLES - JAIL CALL - 1/9/09 | | 261 | 49 |
| 545 | CD WITH SUBTITLES - JAIL CALL - 1/26/09 | | 261 | 49 |
| 546 | CD - JAIL CALL - 1/9/09 | | 261 | 49 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 547 | CD - JAIL CALL - 1/26/09 | | 261 | 49 |
| 548 | CD - JAIL CALL - 1/19/09 | | 261 | 49 |
| 549 | CD - JAIL CALL - 4/1/09 | | 261 | 49 |
| 550 | CD - JAIL CALL - 3/25/09 | | 261 | 49 |
| 551 | CD - JAIL CALL - 1/22/09 | | 261 | 49 |
| 552 | CD - JAIL CALL - 11/14/08 | | 261 | 49 |
| 553 | CD - JAIL CALL - 10/11/08 | 94 | 94 | 49 |
| | | | 261 | 49 |
| 554 | CD - JAIL CALL - 1/12/09 | 71 | 71 | 49 |
| | | | 261 | 49 |
| 555 | CD - JAIL CALL - 11/22/08 | | 261 | 49 |
| 556 | CD - JAIL CALL - 1/15/09 | | 261 | 49 |
| 557 | CD - JAIL CALL - 1/10/09 | | 261 | 49 |
| 558 | CD - JAIL CALL - 1/21/09 | | 261 | 49 |
| 565 | JAIL CALL WITH SUBTITLES - 1/12/09 | 71 | 71 | 49 |
| 566 | CD WITH SUBTITLES JAIL CALL - 1/10/09. | | 261 | 49 |
| 570 | JAIL CALL WITH SUBTITLES - 10/11/09 | 94 | 94 | 49 |
| 573 | TEN-PRINT CARD | | 261 | 49 |

## DEFENSE EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 18 | PROPOSED JURY CHARGE | 76 | -- | 49 |

PROCEEDINGS

(Court convened; jury not present.)

THE COURT:  This is the State of Texas versus James Broadnax.  The jury is not present.

This is Cause Number F08-24667.

When we recessed the case yesterday, the issue of whether I was growing to allow the testimony of Inv. Doty had been held in abeyance while I considered the objection posed by the defendant that the search by a D.A. investigator violated his Fourth Amendment rights, as was urged in -- was actually held in the Cohen case at 796 F2d 20, 23, which is a Second Circuit case not controlling here in the State of Texas.

As far as I know, there is no mandatory authority in the State of Texas, and as far as I can tell, this is an issue of first impression.

But I will ask you, Mr. Alex, and I'm not asking you to argue the position.

MR. ALEX:  Okay.

THE COURT:  But I do want you to tell me -- proffer for me what his testimony would be if I allowed it.

MR. ALEX:  Thank you, Judge.

Judge, I had an opportunity to -- to

reflect after clearing my head yesterday, and I just -- my thoughts were -- the testimony would be Mr. Doty -- probably David Barger would have to be the person to set up -- Mr. Doty does not know what happened prior to him being asked to go over to the jail and take the photographs, which was obvious from his testimony when you were asking him about whether the sheriff initiated any of this or whether we did, and first of all, I want to tell the Court that the testimony would be that the D..A.'s initiated it, and the initiation was done primarily because we were listening to the phone calls, and Mr. Barger and I had the conversation about the fact that the jailers had no idea of what this guy was talking about; whether he was talking about snatching up the maintenance man; that he was talking about Ms. Kirvin.

He was still -- and I'm not going to use the words that he was using, but they're all here played before the jury already, that he was talking about shaking people down for their commissary.

And Mr. Barger's thoughts and my thoughts was we -- I would expect them to let us know if there was something going on. We needed to know and we needed to let them know what was going on.

He had conversations with Capt. Shields.

Capt. Shields told Mr. Barger that they shake down the cells on regular basis on the midnight shift, and David Barger is the one that suggested that they shake the cell down for whatever, weapons and then those kind of things.

THE COURT: So let me stop you there then.

MR. ALEX: I'm sorry.

THE COURT: So was the purpose of the shakedown search, or whatever you want to call it, a -- primarily for security reasons?

MR. ALEX: It would have been security reasons, Judge, and it was primarily us informing them of the information. And -- and I'm not going to --

THE COURT: Security reasons as opposed to trying to gather evidence to bolster the State's case.

MR. ALEX: That's correct, Your Honor.

THE COURT: All right. And I'll hear from your appellate lawyer if she wants to tell me something.

MS. SHIN: I think Mr. Alex pretty much covered everything.

Under the law, Hudson established that an inmate has no privacy right to his cell, and I think the only area where it's unclear is whether that's a blanket rule, or whether that rule only applies when

the search is conducted for institutional safety reasons.

The Crim. Apps. in Soria, -- this is Texas -- held that Hudson applied to both convicts and pretrial detainees. So assuming that Hudson only applies in the context where the search is conducted for institutional security reasons, I think the facts stated by David Alex established that that -- that we met the requirements of Hudson.

So under Hudson, because the search was conduc -- conducted for security reasons, no Fourth Amendment rights were violated.

THE COURT: Okay. So are you telling me that I shouldn't draw any distinction between the Fourth Amendment rights of a pretrial detainee and a convict serving time?

MS. SHIN: Well, the Crim. Apps. didn't in Soria, so under -- because Soria is binding authority, that's the State's position, that that distinction shouldn't be drawn.

THE COURT: Who's going to argue this for y'all?

MR. PARKS: Well, Judge, initially, I guess, my first reaction is it don't fit under the law, change the facts.

I think it's pretty clear that it's a Fourth Amendment violation based on Cohen and -- and the logic of Cohen where a search is instigated by the District Attorney's Office for the purpose of obtaining evidence in the case against the defendant that's on trial.

It -- it not only is the holding of Cohen, it makes sense, and while Cohen may not be binding on the Court, it certainly is instructive, and the writ was denied by the Supreme Court.

So I think that certainly the Court would be able to -- to consider that as -- as -- as a pretty serious instruction in the matter, aside from the fact that logically it makes sense, since the Supreme Court case, Hudson, spoke of a search that was instituted by the prison authorities for the purpose of prison security.

Now, today it's changed. No -- no mention yesterday when we were talking about this case that was instigated for any other purpose than by the District Attorney's Office to toss Mr. Broadnax's cell.

Now we hear that really they were concerned about the security of the -- of the Sheriffs Office, and -- and, you know, that's just something that I can't change, can't do anything about, what --

what they say happened.

But I believe it is a violation of his Fourth and Fourteenth Amendment rights. I think that a plain logical reading of what happened and the purpose of what happened is reasonably clear, and it violates not only those constitutional provisions, but Article I, Sections -- well, let's see, 9, 13, 19, and Article 38.23 of the Code of Criminal Procedure.

(Sotto voce discussion.)

MR. PARKS: I am instructed to say that if it was for security reasons, there was no reason for the District Attorney's Office to be involved anyway. They could have just advised the sheriff and let the sheriff run his own jail.

(Sotto voce discussion.)

MR. PARKS: And -- well, I think the facts are pretty clear that they sent somebody over there prepared to gather evidence and take photographs. And what happened, I think, belies the explanation.

MS. SHIN: Your Honor, may I respond?

THE COURT: No. It's an excellent argument by the defense. However, the Court relies on the Court of Criminal Appeals case Soria versus State, 933 S.W.2d 46 at 60, which pretty clearly does not make a distinction between pretrial detainees and convicts

as far as the Fourth Amendment, and so I'm going to allow the testimony.

Anything else before we call your first witness, Mr. Alex?

MR. LOLLAR:  Please note our exception, Your Honor.

MS. HANDLEY:  Did you want to take --

THE COURT:  Noted.

MS. HANDLEY:  -- up -- I'm sorry, Your Honor.

Did you want to take up the business about us also showing a videotape of the inside of the penitentiary, submitted a case yesterday, Sells?

THE COURT:  I'm also going to allow that.

MS. HANDLEY:  Thank you, sir.

THE COURT:  The case that you cite says it was not error for the Court to not allow it.  It doesn't say that I can't allow it, and I think it's within my discretion and I'm going to allow it for whatever limited relevance it might have.

And I've also made the balancing test under Rule 403, decided it's more probative than prejudicial, but I'll -- you can go ahead and preserve your objection, as I can see that you want to do that, Mr. Parks.

MR. PARKS:  Well, yes, we do want to do that, Judge, --

THE COURT:  Yes, sir.

MR. PARKS:  -- and also to bring up a -- a couple more issues while we don't have a jury in here and perhaps save a little time with respect to Warden Nelson also.

Of course, we do except to the Court's ruling --

THE COURT:  Yes, sir.

MR. PARKS:  -- in that matter.

THE COURT:  And thank you.

MR. PARKS:  And Page 232 of the defendant's pretrial motions, there is a motion that I don't believe has ever been ruled on.  It's fairly simple and it deals with Warden Nelson's testimony or the type of testimony that she would offer.

It's a Motion in Limine to preclude testimony concerning violent acts committed by others in prison.  And typically what happens in these cases is that someone, either the warden or A.P. Merillat, or Royce Smithey, will come to testify about what acts other people have done in the penitentiary, what weapons other people have fashioned in the penitentiary, having absolutely nothing to do with the

defendant --

THE COURT:  Is your objection to relevance?

MR. PARKS:  The objection is relevance. And also, I believe there are constitutional issues involved under Woodson and Jurek with respect to individualization of punishment.

COURT REPORTER:  Woodson and who?

MR. PARKS:  Jurek.

COURT REPORTER:  Spell it, please?

MR. PARKS:  J-U-R-E-K.

THE COURT:  Okay.  When is that testimony coming down?

MS. HANDLEY:  Next.

THE COURT:  You're not calling that Doty guy fist?

MR. ALEX:  We will, Judge, but -- but I'm able -- we've got the warden down here prepared to go. She's just -- she's been on the road all day.  We -- not knowing what the ruling was, we just got them prepared to go on --

THE COURT:  Well, I want to hear from Mr. Doty first because I need to go look at this.  You know, we're not going to make any mistakes here by me being rushed, okay?

So have Mr. Doty here ready to go at 9:00 o'clock.

MR. LOLLAR:  Your Honor, for -- for the record, may we have running objection to Mr. Doty's testimony --

THE COURT:  Absolutely.

MR. LOLLAR:  -- in regards to the search of the defendant's cell --

THE COURT:  Yes, sir.

MR. LOLLAR:  -- instituted --

THE COURT:  I want all of these alleged errors to be preserved.

MR. LOLLAR:  Thank you, Your Honor.

THE COURT:  I think that's fair.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT:  Back on the record in the Broadnax case.

The defense has requested the testimony of Mr. Barger because they believe it will further assist them in preserving their alleged error in this case.

Mr. Barger, turn and face me and raise your right hand.  No, stand up.

I know you're previously sworn.  It doesn't matter to me.

#### DAVID BARGER

was re-called as a witness and testified as follows:

THE COURT:  Lower your hand.  Take your seat in the witness stand.

Mr. Lollar, whenever you're ready.

MR. LOLLAR:  Thank you.

#### DIRECT EXAMINATION

BY MR. LOLLAR:

Q.   Would you state your name, please.

A.   David Barger.

Q.   And, Mr. Barger, you previously testified in this case; is that correct?

A.   Yes.

Q.   And you told us that you are the investigator assigned to Mr. Alex.

A.   Correct.

Q.   And that you have assisted him in preparation of the evidence in this case; is that correct?

A.   That's correct.

Q.   Now, Mr. Doty is one of your investigators that work under your direction?

A.   That's correct.

Q.   And let me ask if back on June the 19th of this year, 2009, you instructed Mr. Doty to go to the jail to basically shake down the cell of Mr. Broadnax?

A.   Not exactly.  I -- I cannot dispatch one of my people to go to the jail to do anything over there without the assistance of the Sheriff's Office.

Q.   And in formulating the plan to do that, did that come from Mr. Alex?

A.   It comes from a collaboration sometimes of -- of the trial team, yes.

Q.   So the attorneys in the case.

A.   Well, yeah.  The trial team.  The investigators and the -- and the prosecutors.

Q.   Whose idea was it to shake down the cell?

A.   Well, it's not a novel idea in that --

Q.   That's not my question.  Whose idea was it?

A.   You know, I -- I can't recall.  It was either Mr. Alex or myself that probably thought of doing that.

Q.   Okay.  So either you or Mr. Alex --

A.   Yes.

Q.   -- came up with the idea of doing that.

A.   Right.

Q.   And was that a plan that you came up with on that day, or did you come up with it before that day, June 19th?

A.   I think we have discussed the possibility from time-to-time.  Not just in this case, but perhaps in other cases as well.

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

Q.    So did you initiate, the D.A.'s Office, initiate the decision to contact the Sheriff's Office and go over and shake down the defendant's cell?

A.    Not exactly.  Yes, I initiated it, but it was with a phone call to Capt. Danny Shields.

Q.    Uh-huh.

A.    They do regular shakedowns of cells as a matter of course.

My conversation with Danny Shields was along the lines of if we can do a shakedown this week, I would like to have one of my people there so that he could take photographs in the cell.

Q.    And was that based on any security threat that you believed existed?

A.    We always consider these types of high profile cases to be ripe with possible security threats. Either, you know, through phone conversations that we monitor, through incident reports that we read from the jail.

Our concern often is -- is -- is security of the staff that keep and have these people in charge in the ad seg area.  Sometimes they're not aware of some of the things that we may hear on phone conversations that might come to bear on their security, so we try -- we try to keep -- if we hear anything or if we get any

intelligence information in the course of our trial prep that -- that will help them in their operation of security, then we share that with them.

Q. And in this particular case, was the decision that you made to call the sheriff to do the shakedown, was that based on any particular security threat that you had received, or perceived?

A. It's based -- it was based on -- on what we knew of his behavior from the incident reports.

And we have -- we have had other instances where inmates such as Broadnax would, you know, secret razors and things like that in their cell, so since the Sheriffs Office conducts regular shakedowns anyway, we wanted one of our people over there to assist them in -- in a sense that they would stand by and take photographs of anything in the cell that was something of value.

Q. You said the incident reports. What incident reports --

THE COURT: Let me stop you there, Mr. Lollar. If you want to develop this further, you can do so at the next break. I'm not going to hold the jury up though.

Okay. It's 9:00 o'clock.

You want may step down, but be ready to

testify again at the first break.  It will be roughly 10:00 o'clock.

MR. ALEX:  Judge, I will probably put Mr. Barger on first and lay the predicate for that because Mr. Doty will not have any knowledge of why they were there.  And I -- I will lay all that out for the jury before we start.

THE COURT:  All right.  Well, we'll see with -- if Mr. Lollar wants to develop it further at a break outside the presence of the jury, I'll allow it.

You can step down, sir.

Call the jury.

MR. LOLLAR:  Judge, I think to preserve our objection, we need to go ahead and finish hearing him outside the presence before they put him on in the presence, because if the Court hears something that changes the Court's mind, then you're not going to allow him or Doty.

THE COURT:  Well, here's the problem with that, okay?  Dang it.  I told everybody I wanted to start at 8:30 this morning and not hold the jury up, and that's the problem I have with it, but I'll allow you to do it.

Bring Mr. Barger back in here.

MR. ALEX:  Probably initially, I made a

proffer to the Court as to what --

THE COURT: Go ahead and take your seat again, Mr. Barger.

MR. ALEX: I made a proffer to the Court as to what Mr. Barger is going to say, but if he's here, I would much rather bring out the testimony that I'm going to ask him.

THE COURT: Okay. We're going to do the whole thing. The jury can wait till tomorrow, if necessary.

Mr. Lollar, are you ready?

MR. PARKS: Yes, sir.

THE COURT: Go ahead.

## DAVID BARGER

was re-called as a witness and testified as follows:

### DIRECT EXAMINATION - CONTINUING

BY MR. LOLLAR:

Q. Mr. Barger, you were saying that because of some incident reports is why you felt there was a security concern. What incident reports are you talking about?

A. Well, there's -- the first one that I recall is the -- the takedown incident shortly after he was booked in with SRT Kirvin.

Q. Well, in regard to that, you didn't order

the -- or suggest that his cell needed to be shaken down then, did you?

A.    No, we did not.  We --

Q.    Okay.

A.    You know, the -- the Sheriffs Office, like I said, they conduct regular shakedowns.  We don't -- we don't always get information about these inmates unless there's some sort of report written on it.  And, oh, we -- we prefer to have a relationship with the Sheriffs Office where we collaborate primarily for the purpose of operational security.

Q.    Okay.  So what other incident report are you referring to that led you to have a security concern?

A.    I think the other elements that led to that may have been the phone conversations.

Q.    What phone conversations did you hear that led you to have a security concern that led you to request a shakedown on June the 19th?

A.    Well, I think -- I think later -- later, after that takedown, there was some discussion on one of the phone calls about that particular takedown by Mr. Broadnax.

Q.    Would that be shortly after?

A.    I don't remember -- don't remember specifically when that conversation was.

Q.    Well, would it have been shortly after he's booked into the jail?

A.    It could have been, yes, but --

Q.    So that would be back in June of '08.

A.    It may have been.

Q.    Well, it was, if you're talking about the shakedown --

A.    Okay.

Q.    -- the takedown that occurred when he was being booked in.

A.    It was -- this was -- this was a fairly random request.

Q.    And so it wasn't based on any particular security concerns that day.

A.    Not that -- no, not that particular day, no.

Q.    Or the preceding week.

A.    Perhaps not.

MR. ALEX:  Judge, I'm sorry.  I hate to interrupt, but I'm going to be the person offering the testimony.  I can make this real easy and quick and tell the Court what I'm going to be offering.

THE COURT:  No.  No.  I'm going to let him go as long as he wants to go.  I'll let him preserve his error and then you can do whatever you need to do, but he gets to have his turn.

Q. (BY MR. LOLLAR:) So, Mr. Barger, what you're saying is, is that this shakedown that y'all requested, was not based on any particular security concerns that you perceived that day or that week --

A. No, it wasn't.

Q. -- preceding the shakedown.

A. I don't recall any imminent security concern, no.

Q. Just a generalized security concern?

A. That's correct.

Q. And why was it necessary for y'all to be there for the sheriff to do a shakedown?

A. Well, you know, we -- we do this not just in this case, but in any high-profile case with a capital murder defendant. There's a reason that these inmates are in administrative segregation.

We sent Darrell Doty over there to take any photographs in -- in the cell of anything that would be of value to us.

Q. So this is a -- a widespread practice of your office, I guess you would say.

A. I wouldn't say it's widespread, but on high profile violent defendants, it's not uncommon.

Q. Did you have any probable cause to believe there would be any contraband in his cell?

A.    We didn't need any probable cause.  He's in custody.

Q.    Did you have any?

A.    You know, the probable cause issue is not relevant to us.

Q.    Well, it may be.

A.    The man -- the inmate is in custody and has no reasonable expectation of privacy, is the way we understand it.

Q.    Did you attempt to get a warrant from a judge to search his cell?

A.    Absolutely not.

Q.    Because you didn't believe you had to.

A.    Absolutely not.

Q.    Okay.  And again, tell me why it would be necessary for a DA's investigator with a camera to be present if the purpose of the search is to alert the sheriff that there's an imminent threat.

A.    Well, because as an investigator, you just never know what you're going to find, and you can't always rely on the Sheriffs Office to take -- sometimes the Sheriffs Office does take photographs during or after a shakedown of any contraband or anything that they think is of value to them.

Q.    So --

A.    We wanted to ensure that there was somebody present from our office that -- that had a camera that could take photographs during or after the shakedown.

Q.    Okay.  So y'all were there just to see what he had in his cell.

A.    Partly.

Q.    And to take pictures of it.

A.    Yes.

Q.    What's the other part?

A.    Well, again, we have the operational security component of does he have anything in his cell that would harm somebody.

Q.    And is that your concern or is that the sheriff's concern?

A.    It is always our concern because we do work in collaboration with them, and we do not want to see a guard get hurt.

Q.    And did you have any knowledge that he had anything in his cell that would be a security risk?

A.    No specific knowledge, no.

MR. LOLLAR:  That's all the questions we have.

THE COURT:  Cross-examination.

MR. ALEX:  Yes.  And this will -- Judge, this will be the evidence that I would offer through

the witness.

**CROSS-EXAMINATION**

BY MR. ALEX:

Q.   Mr. Barger, back around May and June of this year, had we collected a number of phone calls from Mr. Broadnax?

A.   We had.

Q.   And primarily the folks listening to those phone calls were spread out between my two interns, myself, you and maybe two or three other people; is that correct?

A.   That's correct.

Q.   And did you listen to the majority of those calls yourself, or did Ms. Pam Smithen listen to a bunch of them and make notes for us?

A.   Our intern, Pam Smithen, listened to a majority of those calls.

Q.   Mr. Barger, --

A.   I listened to -- to a number.

Q.   All right.  Mr. Barger, just answer the question, sir, all right?

And so specifically, the -- the intern would have listened to the majority of the questions and made notes and passed on to us what we thought was important; is that correct?

A. That's correct.

Q. All right. And so there was numerous calls of just baby, baby, baby; love you, love you, love you, right?

A. Right.

Q. And then there were calls specifically around the date of Ms. Kirvin's takedown of the defendant where he is talking about her in a way that was threatening; is that correct?

A. That's what I recall.

Q. Okay. And specifically, you wouldn't have listened to that initially and been the first person to listen to that; is that correct.

A. That's correct.

Q. All right. But the jury has heard these calls contemporaneous with the -- with the incidents, and it's already in front of the jury, but you could not at this point tell defense counsel each and every call that was made that was a security threat, could you?

A. No, I couldn't.

Q. All right. Let me walk you through that then. The gym fight that he had with Mr. Trevaun Miller; is that correct?

A. Yes.

Q. Did the Sheriffs Department have any idea that

the defendant, Mr. James Broadnax, actually was the one who said, When the doors open, let that be the bell.

A.   No, they wouldn't have known that.

Q.   Just answer the question, Mr. Barger.

Did they know that?

A.   No.

Q.   All right.  Did they know that Mr. Broadnax had previously, on the jail calls, and we'll -- that on October 11th of '08, that he admitted to be a Gangster Disciple to his mother's boyfriend?  Would they have any way of knowing that?

A.   No.

Q.   Would a person who is Gangster Disciple in the jail be a threat to the guards?

A.   Yeah.

Q.   Did they have any way of knowing that on November 14th of '08, that the defendant expressed a desire to snatch up the maintenance man the next time he came by the door?

Would they have any way of knowing that he said that on the phone calls?

A.   No.

Q.   Did we have a conversation about the security at the jail that they did not monitor the phone calls?

A.   That's correct.

Q.    And on November 22nd, was he bragging about giving the jail guards a hard time and fighting with the jail guards?

A.    I believe that's correct.

Q.    Would he -- would the jail guards know any -- have any way of knowing that while he's smiling in their face, that he's bragging about giving them a hard time and fighting with them?

A.    They wouldn't know that.

Q.    And then would they have any way of knowing about the threatening nature of the calls that he had with Lakarrame Cole on January 9th of this year --

A.    No.

Q.    -- where she asked him about a shank, and he said, I don't need no shank.  I got my hands.  Do you recall that?

A.    I do.

Q.    All right.  Would they have any idea of knowing that he was talking about money-making ventures while he was in jail and in prison?

A.    No.

Q.    Would he have -- would they have had any idea that he was manipulating them to get them out of his cell faking being sick with his blood pressure just so he could walk around and see what was going on in the

jail.

A.   No.

Q.   Would they have had any way of knowing that he was asking -- well, that he had all -- he said that he would kill anyone in the jail who tried to mess with him sexually?

A.   No.  They wouldn't have a way of knowing that.

Q.   And -- and when I ask you would they have a way of knowing it, that's probably not totally correct. If they listened to the calls, they would know; is that correct?

A.   That's true.  If they did.

Q.   And you and I had the conversation that they were not listening to these calls; is that correct?

A.   Right.

Q.   And did you call over to the Capt. Shields and have a conversation with him about Mr. Broadnax?

A.   I did.

Q.   And the culmination of that conversation, did it result in a shakedown just in the daytime versus what would have happened at midnight that night?

A.   That's right.

Q.   Would they have had any way of knowing that he had -- we talked about inmate Tray [sic] Miller.  Would they have any way of knowing that he talked about

getting contraband, smoking in the jail without getting caught?

A.    No.

Q.    Would they have had any way of knowing that he was bragging about threatening his attorney?

A.    No.

Q.    Would they have any way of knowing that he had already talked about he'd put a slug in that N-I-G-G-A if he got the chance, talking about one of his mom's boyfriends?

A.    No.

Q.    And when you take all of those calls in context, did you have a concern for the security -- specific concern for the security of the folks that might be looking over him?

A.    A culmination of those facts gives me a general concern all the time of -- of people's safety.

Q.    Mr. Barger, --

A.    Yes.

Q.    Is that a yes?

A.    Yes.

Q.    Okay.  And specifically, this case was divided up amongst a lot of people; is that correct?

A.    That's correct.

Q.    Would -- would you be able to tell the Court

on your own, without the help of this sheet of paper I have in front of me, of what was on those calls specifically?

A.    No.  It would be difficult.

Q.    All right.  And -- and to be -- to be truthful about it, you may not have actually listened to all of these calls; is that correct?

A.    That's correct.

Q.    You would have read the notes on it passed on to you by Ms. Smithen and you would have downloaded these calls when I asked you to; is that correct?

A.    That's correct.

Q.    And did I also tell you that I had an injure -- I had a concern about the safety of those folks up there because I'd like for them to tell me if they had information about my safety.

A.    That's true.

Q.    And ultimately, the decision to make -- to shake down the defendant's cell, can you make that decision?

A.    I cannot.

Q.    Can you leave here right now and walk over to the jail and see any inmate you want without having the escort of the sheriff?

A.    No, I can't.

Q. And if you wanted to see anything in any inmate's cell, would the sheriff have to approve that?

A. Yes, they would.

Q. And would they have to go through their own procedures in deciding whether that's going to happen?

A. Yes.

Q. And finally, do you feel as an investigator with the D.A.'s Office, is it part of your duty to collaborate with the sheriff and to make sure that they're aware of any intell that you have?

A. Yes.

Q. All right. And the -- the addition to Mr. Doty to go over to take the -- the photographs, that was in case something was found; is that correct?

A. That's correct.

Q. All right.

MR. ALEX: That's all I have, Your Honor. That's what I would offer with this witness.

THE COURT: Redirect?

MR. LOLLAR: Yes, Your Honor.

#### REDIRECT EXAMINATION

BY MR. LOLLAR:

Q. Mr. Barger, you just testified under oath that your concern was based on telephone calls that y'all had listened to made by the defendant in May and June

of 2009.

A.    Right.

Q.    The last call he made, as is reflected in the records introduced by y'all here in this courtroom --

A.    Yes.

Q.    -- was made on April the 13th.

A.    Yes.

Q.    So what calls did the defendant make in May or June that you based your concerns on?

A.    Well, not having those records in front of me, I can't tell you off the top of my head.

Q.    You also testified that your concern was based on the takedown that the SRT, Off. Kirvin, was testifying about yesterday; is that correct?

A.    That was part of it, yes.

Q.    And that was on July the 23rd, a month after y'all shook down his cell.  So that's not true, is it?

MR. ALEX:  That was July 23rd of '08.

A.    Yeah, that was '08.

Q.    (BY MR. LOLLAR:)  So eleven months earlier.

A.    Right.

Q.    Okay.  When you talked to Capt. Shields, did you tell him about these phone calls?

A.    I don't recall specifically the litany of issues that we were concerned about.

MR. LOLLAR: I think that's all the questions we have, Judge.

THE COURT: Recross?

**RECROSS-EXAMINATION**

BY MR. ALEX:

Q. And, Mr. Barger, just -- just finally, the decision -- the call that you would have made over to Capt. Shields regarding a shakedown would have been in June; is that correct?

A. Yes.

Q. And were we preparing to go to trial?

A. Yes.

Q. Was there a culmination of all the calls being put together and lists being put together of everything that was going to be presented in the trial?

A. Yes.

Q. And was that just the most opportune time that we had to sit down and talk about all these phone calls?

A. Yes.

Q. All right. That's all.

MR. ALEX: That's all I have, Judge.

**FURTHER REDIRECT EXAMINATION**

BY MR. LOLLAR:

Q. You sat down with Capt. Shields and talked to

34

him about the phone calls?

A. No. The trial team sat down and talked about it.

Q. Okay. So bottom line here is, is that y'all decided, just for general purposes, to go shake down his cell and take photographs of what you found.

A. We decided to call Capt. Shields to see if we could come over when they did a shakedown, and they cooperated with us; we cooperated with them.

Q. Did they have the shakedown already planned?

A. Not specifically. They already do shakedowns, but they do them at night.

Q. So they did this shakedown for you.

A. They changed the schedule in order to accommodate us, yes.

Q. Okay.

MR. LOLLAR: That's all we have, Judge.

THE COURT: You may step down, sir.

Call the jury.

My ruling is the same.

MR. LOLLAR: And may we have running objections on Barger's testimony?

THE COURT: You have all of that, sir.

THE BAILIFF: All rise.

THE COURT: Ms. Handley, is your next

35

witness in the courtroom?

MR. ALEX: I'm getting him, Judge.

(Jury present.)

THE COURT: Be seated, please.

Good morning, ladies and gentlemen.

What further says the State?

MR. ALEX: The State would call -- recall to the stand Mr. Darrell Doty, Your Honor.

THE COURT: Mr. Doty, come forward.

You were previously under oath. However, I'm going to swear you again. Raise your right hand.

**DARRELL DOTY**

was re-called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Alex.

Whenever you're ready, sir.

**DIRECT EXAMINATION - CONTINUING**

BY MR. ALEX:

Q. Would you reintroduce yourself to the jury, sir.

A. Darrell Doty.

Q. Okay. Mr. Doty, what do you do for a living?

A. I'm an investigator for the District

Attorney's Office.

Q. And we've gone over this a little bit with the jury the other day and we're not going to go over it all again, so just some of the preliminaries.

How long have you been with the District Attorney's Office?

A. About two and-a-half years.

Q. And before that?

A. I was with the Dallas Sheriffs Office for 20 years.

Q. And what -- what did you do specifically before you left the Sheriffs Department?

A. I worked in the Physical Evidence Section.

Q. And does that include documenting evidence photographically?

A. Yes.

Q. And back on June 19th of this year, were you asked by your supervisor to go over to the jail and photograph some items in an inmate's cell by the name of James Broadnax?

A. Yes.

Q. And when you -- when you got there, did you have to be escorted by the jailers up to his cell?

A. Yes.

Q. And did you bring a camera with you?

A.   Yes.

Q.   And was the inmate there at the cell when you got there?

A.   No.

Q.   Okay.  And when you got there, was there a Sgt. Elder, maybe, who would have escorted you from the secured area over to where the cells were?

A.   Yes.

Q.   And was there also an SRT by the name of -- the last name of Thigpen who also assisted you?

A.   Yes.

Q.   And -- and when you got to the cell, did you photographically document the items in the cell?

A.   Yes.

Q.   All right.

        MR. ALEX:   May I approach, Your Honor?

        THE COURT:   Yes, sir.

Q.   (BY MR. ALEX:)   State's Exhibits -- and you've looked at these prior to today; is that correct?

A.   Yes.

Q.   6, 7, 8?

        6, 7, 8, 9, 10, 11, 12, and then we switch to 456 through -- 456 through 496.  Do those look like photographs you took?

A.   Yes, it is.

Q.   And then we'll go 500 through 505.

A.   Uh-huh.

Q.   And then you've got 497, 498 and 499.  Are all of those photographs that you took in the cell?

A.   Yes.

Q.   And that would have been what was designated as you U66; is that correct?

A.   Yes.  That's his cell.

Q.   The cell number?

A.   Yes.

Q.   Very good.

MR. ALEX:  We would offer all of the above-listed exhibits at this time, Your Honor.

THE COURT:  Will there be objection?

MR. LOLLAR:  And we have the same objections we offered outside the jury's presence here this morning.

THE COURT:  All right.  And that's the 401 objection as well as the Fourth Amendment objection, correct?

MR. LOLLAR:  Yes, sir.

THE COURT:  Both of which are preserved.

The objections are overruled.

State's Exhibits 6 through 12 and 456 through 505, inclusive, are admitted and you may

publish.

MR. ALEX:  Well, Judge, I believe --

THE COURT:  Hold on.

Did you wish to speak further?

MR. LOLLAR:  Yes, Your Honor.  Also 403 objection.

THE COURT:  All right.  And that's overruled as well.

MR. LOLLAR:  And may we have a running objection?

THE COURT:  Yes, sir.  You sure do.

MR. ALEX:  I believe that the Court had reserved its ruling on 40 -- 504 and 505, and I'll only offer those for the record at this time.

THE COURT:  Okay.  504 and 505 are admitted for record purposes.

MR. ALEX:  Permission to publish?

THE COURT:  Yes, sir.

Q.  (BY MR. ALEX:)  While we're doing that, Mr. Doty, as a preliminary matter, did you have any role in the decision of going over to the jail and photographing, or was you just simply following the directions of your supervisor, David Barger?

A.  I was following his direction.

Q.  And while you were over there, we'll give the

jury sort of an overview of what you would have done while you were there.

Would you start off documenting the cell on the outside and work your way in, generally?

A.   Yes.

Q.   And then specifically, did you document each individual area of the cell, generally?

A.   Yes.

Q.   And then specifically, did you focus in on individual pieces of items in the cell to document what they actually was?

A.   Yes.

Q.   All right.

MR. ALEX:   We have certain technical people, Judge, that are much smarter than I am.

THE COURT:   I told you not to let Mr. Hikel leave the courtroom anymore.

How long is this going to take, Mr. Alex?

MR. ALEX:   Tell you what, Judge, --

MS. HANDLEY:   There you go.

THE COURT:   Thank you, Ms. Sauter.

MS. SAUTER:   You're welcome, Your Honor.

THE COURT:   Mr. Alex, you had indicated that you were offering 456 through 503, inclusive, but as I have it, some of those are medical records.   Were

you offering those also?  Specifically, 486 through 495.

MR. ALEX:  456.  The medical records start at 485.  That's correct, Your Honor.  And, -- I'm sorry.

THE COURT:  So that was a mistaken offer, correct?

MR. ALEX:  Yes, sir.

THE COURT:  All right.  So for the record, State's Exhibits 456 through 484 are admitted.

485 was previously admitted.

486 through 494 have not yet been admitted.

495 through 503 are admitted.

And, Mr. Lollar, all of your objections are preserved for the record:  401, 403, Fourth Amendment.

Whenever you're ready, Mr. Alex.

Q.    (BY MR. ALEX:)  And, Mr. Doty, State's Exhibit 456, what are we looking at here?

A.    That's the front door to his cell.

Q.    All right.  And we can kind of see, it's a pretty thick -- is it a pretty thick door there?

A.    Yes.

Q.    All right.  Pretty secure door?

A.    Yes.

Q.    All right.

THE COURT:  Do you want the lights down?

MR. ALEX:  That would be great, Judge.

Q.    (BY MR. ALEX:)  457, what are we looking at here?

A.    The entrance to his cell.

Q.    And what we see here on the -- in the entrance, that bag, what was in that bag?

A.    It's just a bag that he keeps all of his belongings in.

Q.    Okay.  And is the term "commissary" sound -- if I said the term "commissary," what would that mean to you?

A.    It's just some food that he can receive or buy while he's in jail.

Q.    All right.  458, is that the inside of the cell door?

A.    Yes.  I'm standing inside, and they shut the door so I could take a photograph of it.

Q.    And when we look at the inside of the door, apparently people write on the insides of the door; is that correct?

A.    Yes.

Q.    Now, you wouldn't necessarily know who put

those pitchforks there, or the six point star, or the Four, GD or the FOL, apparently KS there. You wouldn't know who put that; you'd just be documenting it; is that correct?

A.   That's correct.

Q.   And in addition, just like you wouldn't know who would have put the Tejano Proud on there; is that correct?

Tejano Proud would be like a Hispanic gang?

A.   Yes.

Q.   State's Exhibit 459, is that a closer up of the inmate's commissary bag there?

A.   Yes.

Q.   And was there -- was it -- was it pretty full?

A.   Yes.

Q.   All right.  Lots of soups and noodles and beefs and things that we see there; is that correct?

A.   Correct.

Q.   State's Exhibit 460, is that a photograph of the -- probably not very good photograph.  Is that a photograph of the inmate's cell?  I mean, his bunk?

A.   Yes.

Q.   And State's Exhibit 461, in photographing the cell, did you-all come across a razor blade?

A.   Yes.

Q.   You may not be able to see it really well because it's -- the color of it on a -- on a gray blanket; is that correct?

A.   Yes.

Q.   All right.  We'll try another photograph.

And you've worked in the jails before; is that correct?

A.   Correct.

Q.   And an inmate is given a device to shave with, it's already a disposable razor with a handle on it; is that correct?

A.   Correct.

Q.   They're not given an individual blade.

A.   Correct.

Q.   In order to have an individual blade, you'd have to alter that to get the blade out; is that correct?

A.   Correct.

Q.   All right.  And is that one of the items that you photographed when you went into Mr. Broadnax's cell?

A.   Yes.

Q.   Let's see if we can actually get it ...

And that would be the blade portion of a disposable razor after it had been disassembled so that

the sharp edge would be, I guess, to the right of the photograph as we look at it; is that correct?

A.  Yes.

Q.  The holes would be where the -- perhaps where the handle would hook into it.

A.  Yes.

Q.  As a former detention service officer, are these blades -- can be used for a lot of reasons; is that correct?

A.  Correct.

Q.  And what would be your biggest concern of an inmate who had altered this and had it in his cell?

A.  Use it as a weapon.

MR. PARKS:  Your Honor, it's irrelevant, what his biggest concern is, and it's -- irrelevant.

THE COURT:  Overruled.  I'll allow it.

Q.  (BY MR. ALEX:)  As a -- as a Sheriffs Department personnel, a former, if an inmate had -- well, what you see there, secreted in his cell, is it a potential weapon and a safety hazard to you?

A.  Yes.

Q.  All right.  State's Exhibit 463, would this have been the corner to the cell as you walk in?

A.  Yes.

Q.  And are these the items that he would have had

on his tray?

A. Yes. His little shelf there at the end of the bed.

Q. Okay. And specifically, what we're looking at here was a pill that he would have had on this shelf. I think initially when you -- when you documented it, was it laying out that way or was -- did you-all have to move stuff around before you saw it?

A. I believe it was up underneath some magazines, or a book, or something.

Q. Okay. And you're not a -- you're not an expert on what this pill is, are you?

A. No.

Q. Okay. But you've -- you've worked in the jails before and you know that this is a violation of the rules at the jail, don't you?

A. Yes.

Q. All right. If an inmate is taking medications, they're to take the medication and not keep it around for any other purpose; is that right?

A. Yes. That's the way it was when I worked there.

Q. Okay. And you don't think that they just allowed them to have vials of medicine in the cells now, do you?

A.    I don't think so.

Q.    Okay.  One of the books that they have on that -- on that shelf was that the defendant would have had on that shelf was James Clavell, The Art of War; is that correct?

A.    Yes.

Q.    All right.  I guess it's edited with a foreword by James Clavell, done by Sun Tzu?

THE COURT:  So the author of it is Sun Tzu, Mr. Alex, is that what you're saying?

MR. ALEX:  Yes.

THE COURT:  So the jury's not confused about that.

Q.    (BY MR. ALEX:)  And when we look at the face of the book, this is not something that he would have gotten off a book cart.  This would have been something that was sent to him; is that correct?

A.    Yes.

Q.    And when you open the book up, it just basically tells you the other books that are written by this author; is that correct?

A.    Correct.

MR. PARKS:  Judge, that's misleading.  That's not books by the author of The Art of War.

THE COURT:  That's sustained.

Q.    (BY MR. ALEX:)  These would be other books written by James Clavell; is that correct?

A.    Yes.

Q.    Thank you.

And if we were to open the book up, (As read:) The most useful important book ever written for aspiring leaders.  If you know the enemy and you know yourself, you need not fear the result of a hundred battles.  If you know yourself and not the enemy, for every victory gained, you will also suffer a defeat.  If you know neither the enemy nor yourself, you will succumb in every battle.

And this book appears to be about war; is that correct?

A.    Yes.

Q.    All right.  And photographing his cell, you photographed everything to document what was in there; is that correct?

A.    Correct.

Q.    And is that what your training has been in physical evidence with the Sheriffs Department?

A.    Yes.

Q.    All right.  In taking photographs, did the person -- the inmate in this cell have a -- a pretty significant library here just to the rear of his -- his

bunk?

A. Yes.

Q. And if you had to guesstimate, would it have been over 40 books there?

A. Yes.

Q. And is that -- State's Exhibit 473, is that just a sampling of some of the books that the inmate would have had in his cell?

A. Yes.

Q. Now, there was some -- I guess for lack of a better term -- some raps that the inmate would have wrote while he was -- and, of course, you wouldn't necessarily know who wrote this, would you?

A. No.

Q. This would have just been something you found in his cell; is that right?

A. Yes.

Q. And you wouldn't know at this point whether or not it's consistent with anything else that's found in his cell; is that correct?

A. Yes.

Q. All right. Let's do this. I'm going to -- it might be a little difficult for the jury to focus in on it, so I will try not to make them too dizzy as I read it.

(As read:)  Say look.

Well, it's called free-style writing; is that correct?

A.  Yes.

Q.  And I'll go ahead and -- (As read:) Freestyle write'n.  Say look.  Fade em, fade em, tape em up.  I H hit em later.  I'm so high and cloud proof like a sky scraper.  Hogtie'n body bag M.  Send em to the major.  Then I bomb the whole country.  Send da press, send da paper.  Hold up.  Stop N rewind.  That shit I'm about a tell a little story while I'm in this bitch?

(As read:)  Yeah, I hit the lick, but the reason I got caught cuz the nigga snitching.  Shit.  Now this bitch unreadable, me, I got two counts of murder.  I might go to trial and tell the Judge I'm going to merck em because I'm JB, bitch.  Do you know who you fucking wit?  Get money out da ass hoe.  Now dat's some expensive shit.  My words come blunt.  I just call it tasteless.  Roll fast-ass bluntses and stack dope in cases.

(As read:)  See da money come early N my fingernail's dirty, cuz I been counting dirty money since 12:30.  Then my folks, capital F-O-L-K-S, get da bricks, take em home and weigh em.  If they short, take em back to the trap and spray em.

THE COURT:  You need to move it up, sir, for the jury's sake.

MR. ALEX:  I'm not sure that the jury's going to see it all, Your Honor.

Q.  (BY MR. ALEX:)  And the -- and that was pretty much the last of it, and we'll just kind of go through it this way.

And specifically, Mr. Doty, right here he says A little story why I'm in this bitch.  Yeah, I hit the lick, but the reason I got caught, cuz nigga's snitch'n.  And he says I got two counts on murder.  I might go to trial and tell the Judge I'm going to merck em cuz I'm JB.

And you wouldn't know -- the defendant in this case's initials is J.B.; is that correct?

A.  Yes.

Q.  All right.  And State's Exhibit 475, there were a number of writings in his cell; is that correct?

A.  Yes.

Q.  All right.  And you documented those; is that right?

A.  Yes.

Q.  Okay.  Do you know what a Glock is?

A.  Yes.  It's a handgun.

Q.  All right.  I'll tell you what.

(As read:)  These niggas ain't real like they say they is.  Living like they say they is.  Don't know what true is.  Respect is what they posed.  Feel.  Wouldn't know loyalty if it ran up in they mama crib.  A gangsta MU fuck a, yeah, JB tril is what that is.  Lord know I ain't perfect.  Just as I ain't do it, mean I deserve this.  Life full of anger and pain on the surface.  Murda natural.

(As read:)  So the nigga got mercked quick.  Perfection the option, but a nigga can't live wit.  But I perfected everything I had to work with.  R-I-P to my folks in the hearses.  So I give respect in at least one of my verses.

(As read:)  Glock cocked and ready.  And my motto goes, money ova bitches, so no cash on hoes.  They just get hard and watch my cash unfold and may they bury me a G when my casket close.

State's Exhibit 477, and I'll go out on this.  Does this appear to be a letter that someone wrote the defendant in jail?

**A.**   Yes.

**Q.**   Starts off, (As read:)  JB, say homey.  Yeah, I hope it ain't too late.  Seen how often they run law library, but I believe it would be in your best interest to try to get a list, even if it's just one of

cases similar to yours where the defendant got little to no time with or without the temporary insanity plea.

(As read:)  You know, the worst case scenario, but what did they take in consideration to spare certain individual's life of death sentences when others believe they deserved it.  Especially for a multiple homicide where robbery was the incentive.  In parenthesis, capital murder.  Preferably, where the details are equally or more gruesome.  I'm sure such cases exist too.  If so, to my knowledge, in parenthesis, Nate, smiley face, close parenthesis, these can be used as references to enlighten the jury and give them something to compare your case to and hopefully give you a little leniency.

(As read:)  I hear these comparisons are a lawyer's best friend and biggest ally.  Think ten questions.  Me Nate.  And can be used in numerous -- (Sotto voce discussion) -- in numerous ways throughout the trial.

(As read:)  Simple and plain.  Simple and plain.  How or why should we give him life with no parole when this person's charged with worse, and he only got 30 years.  The jurors are your average every-day Joe.  They're also supposed to be the first-timers, so they don't know about the 30 years

that fool got.  You feel me?

(As read:)  So in my opinion, especially during the punishment phase, I feel comparisons could have a very big impact on the jury and almost guarantee, at the very least, a little leniency.  And that's on your lawyer and their presentation though.  If they believe in them, they going to press the issue.  But why wouldn't they if they have your best interest at heart.

(As read:)  On the temporary insanity tip, I feel that's your really only option, all based on their interview, and only you know how good of a defense that will make considering the situation.  And if it hasn't been already, that should be the focal point of your studies, because if mother fuckers is getting off of behind that, the jury should know about it.  Use your resources, homey.  It's by any and all means.  Knowledge is power.  Holler back.  One.  And it's signed, it looks like CDEPX.

Did you find inside some literature, some religious literature, some notes in the defendant's cell?

A.    Yes.

Q.    This would have been -- I think we can see there, it says finding sanctuary there at the top?

A. Yes.

Q. And inside of it, was there a note that appeared to be from another inmate?

A. Yes.

Q. Which says, I want a brown life -- well, first it gives the name of with C. Gray with a book-in number, and apparently an F-L-A-C-O. It looks like a nickname of some sort?

A. Yes.

Q. All right. And the note would have said, (As read:) I want a brown, light skin -- I don't know if the jury can read that. I'm not going to read it all out loud. I'm not going to read it all. All right. That was 479.

And then 495, the defendant had a Bible in his room as well; is that correct?

A. Yes.

Q. All right. And inside the Bible, did he have some items inside of it?

A. Yes.

Q. State's Exhibit 480, is that a close-up of the -- all the book -- most of the books that he had down there by his bed?

A. Yes.

Q. And did you take close ups just to get an idea

to document what some of those books were?

A.    Yes.

Q.    All right.  And did you lay them sort of out in a row to get a -- a pictorial view of -- of that library?

A.    Yes.

Q.    All right.  And those are the kind of things you could get off the cart at the jail; is that right?

And we showed a photograph of the Bible and some of the things that were in it, and the religious literature.  Did he have pornography stuffed inside the Bible?

A.    Yes.

Q.    All right.  State's Exhibit 497, is that one of the pornographic photographs he had inside the Bible?

A.    Yes.

Q.    And is that also a violation of the rules?

A.    Yes.

Q.    State's Exhibit 498, was that another piece of pornography he had stuffed in the Bible?

A.    Yes.

Q.    State's Exhibit 499, was that another piece?

A.    Yes.

Q.    Did he have some drawings in the cell as well?

A. Yes.

Q. State's Exhibit 500, is that one of those drawings?

A. Yes.

Q. State's Exhibit 501?

A. Yes.

Q. State's Exhibit 502?

A. Yes.

Q. State's Exhibit 503?

A. Yes.

Q. All right. And State's Exhibit 476 is another -- what appears to be letter. I'll focus in on it and then I'll go back out and then we'll read that.

And it reads, Peace to the nation. And the gods of the nations. And all honorable respect to our Chairman King Hoover. Folk love 74GD. Say boss, fuck these bitch made-ass niggas. I got to get at that nigga, win or loose. Good luck on me. Bring me up, because I was about to lose it. I'm trying to get in -- I'm trying to get back in my zone. With much love and respect for the nation in teaching of our dear honorable chairman. I'm what -- I am what I am. What I'm not, I'll never be. Much love and respect. It's signed Flint D. Gangstas make the world go round.

Now, you don't know any significance that the

7 4 or the GD have on it, do you? You're not a gang person?

A. No.

Q. Very good.

State's Exhibit 496, did it appear that there was some kind of code that he had stuffed in the Bible that had something to do with cards?

A. Yes.

Q. Did you ever see anything like this before?

A. No, I haven't.

Q. State's Exhibit 6, you see there where it says Folk Nation, with pitchforks? Was that one of the drawings he had in his cell?

A. Yes.

Q. And at the bottom, you've got a six point star. You've got 7 4 at the top and you've got GD at the bottom; is that right?

A. Correct.

Q. All right. And right in the sort of naval area of the young lady here, you have got the -- sort of a J.B. kind of insignia; is that correct?

A. Correct.

Q. And did you also document on the walls the same sort of pitchforks that we saw in the previous photograph?

A.   Yes.

Q.   State's Exhibit Number 8, it's probably very difficult to tell what is being depicted with the letters here, but we can see buildings there; is that correct?

A.   Yes.

Q.   And then we can see perhaps -- we'll do that with another witness.

Let's go down to the very bottom.  You can see the pitchforks here; is that correct?

A.   Yes.

Q.   And the GD on either side.  And the 7 4 in the middle.  We see the six point star there again, and we see a saying here, G74D, till da world blow, and you've got another pitchfork; is that correct?

A.   Yes.

Q.   State's Exhibit Number 9, let's get an overview.  Again, there's a lot of stuff going on in State's Exhibit Number 9, a drawing; is that correct?

A.   Yes.

Q.   But we see the six point star up here again; is that correct?

A.   Yes.

Q.   And we see Gangsta City, 6336, and another 4 on the other side and a 7 on that side; is that

correct?

A.   Yes.

Q.   Inside the stars?

A.   Yes.

Q.   And then at the bottom, we also see pictorially the pitchforks as well; is that correct?

A.   Yes.

Q.   All right.

MR. ALEX:   That's all we have, Judge.

THE COURT:   Cross-examination.

### CROSS-EXAMINATION

BY MR. LOLLAR:

Q.   Mr. Doty, how are you?

A.   Fine, sir.   Thank you.

Q.   When you talked about the things that you found there in his cell, and I want to talk to you about some of those items you found.   That little razor blade, would that be something he could use to cut his hair?

A.   They're not supposed to take the razors apart.

Q.   Is that something he could use to cut his hair?

A.   I don't know.

Q.   You don't know if a person could cut their hair with a razor blade?

A.    I guess they could.

Q.    They don't give them scissors in there to cut their hair or anything like that, do they?

A.    Well, when I worked in there, they would write a kite to have their hair cut.  They go out and actually have a barber.

Q.    Now, the pill that you found, do you know whether that was one of the prescriptions that was prescribed for him?

A.    I don't, no.

Q.    Okay.  Anybody tell you that that -- well, it's noted on there what it is.

      Now, in these single cells such as what Mr. Broadnax is in, there is no televisions; is that right?

A.    Right.

Q.    There are no radios allowed; is that right?

A.    Right.

Q.    So they're in there 23 hours a day.

A.    Yes, sir.

Q.    And they can read; is that right?

A.    Yes.

Q.    And there is a library that comes around, a rolling cart of books and they can take one off of there and read it and put it back on for the next

62

person, and that type of thing.

A.   Yes, sir.

Q.   And then there are -- it is allowed for people on the outside to -- to mail them books; is that correct?

A.   Yes.

Q.   Okay.  And I believe you saw -- we'll come back to that one, because that's one that Mr. Alex certainly thinks is significant.

Here it is.  The Art of War.  Found that book in his cell?

A.   Yes.

Q.   And do you know what that book is about?

A.   I don't know.

Q.   You've never read The Art of War.

A.   No.

Q.   And I believe that it's correct, as is stated on the back of that book, we saw that also, that was written 2500 years ago by a Chinese general, okay?

A.   Okay.

Q.   And it's -- it's about how to live your life. There's nothing nefarious about The Art of War.  I'm sure many of our jurors might have read that.  I know when I was in school at U.T. it was required reading, and I understand it's required reading at West Point.

Do you see anything nefarious about a person reading a classic work of literature?

A.    I don't, no.

Q.    And I don't know why in the world it's significant to show other books written by James Clavell.  Do you know any significance of that, or why that should be evidence of why a jury should impose a death sentence on somebody?

A.    He just asked me to take photographs.

Q.    Here's some Battlefield of the Mind.  You ever read that?

A.    Nope.

Q.    They Dare to Love the Ghetto.  I believe that's a required reading book now in sociology classes.  Do you know anything about that?

A.    Nope.

Q.    And this is one I'm not familiar with.  It's called Hand of Evil, but it says it's a New York Times best-selling book.  I don't know about that one.  Do you know anything about Hand of Evil?

A.    No, sir.

Q.    By J.A. Jance.  And then the other reading material here.  I'll turn it this way and then we can go down and see what type of things he's reading.

Thomas Harris, Hannibal; Improbable Cause,

there's another one by J.A. Jance; Iris Johansen, Bad Luck and Trouble.

There's a Dean Koontz book. I can't see that one.

A book called Pandemic.

Now there's The Purpose Driven Life. Do you see anything nefarious about reading The Purpose Driven Life?

A.   No, sir.

Q.   Have you ever read that?

A.   Yes, sir.

Q.   There's The Road, by Cormac McCarthy. You see that?

A.   Yes, sir.

Q.   Bone Garden by Tess Gerritsen.

Here's The Appeal by John Grisham. Anything nefarious about reading The Appeal by John Grisham?

A.   No, sir.

Q.   There's a Jackie Collins book, Chances.

An Unfinished Canvas.

A book by Stuart Woods, got two copies of that.

And here we have Murder on K Street by Margaret Truman. Now, Margaret Truman is the daughter of President Truman. Are you familiar with those --

with her writings?

A.    No, sir.

Q.    Nope?

This is a book called Unchained, and this is a story, I believe, about a guy who came out of a gang. Are you familiar with that book at all?

A.    Nope.

Q.    In regard to these -- these type of pictures, can people mail stuff to a person in custody?

A.    Not pornographic pictures.

Q.    Well, they're not supposed to, I understand that, but can they mail them to them?

A.    Oh, yes, they can.

Q.    And say he gets one of those in the mail, now, if he tells the guard, Somebody has sent this to me, here it is, he'll get written up for possession of pornography, won't he?

A.    Yes.

Q.    There in his cell you see a deck of cards, correct?

A.    Yes.

Q.    You said this was some kind of a code. If I can get down there, you recognize what these things are?

THE COURT:    Let me know if you want the

lights out, Mr. Lollar.

MR. LOLLAR:  That's all right, Judge.  I think we can see it.

THE COURT:  All right.

A.   That would be the cards.

Q.   (BY MR. LOLLAR:)  Do you know what they represent?

That's tarot cards.  Tarot notations.

A.   Okay.

Q.   Fortune telling, whatever.  That's what that is.  That's the code.

Now, these letters that people have written him that -- you know, he didn't write those.  Somebody wrote to him, right?

A.   Yes, sir.

Q.   Okay.  And these are drawings by Mr. Broadnax, you assume?

A.   I assume, yes.

MR. LOLLAR:  Something happened here.  I don't know what happened to the picture.

MR. ALEX:  Zoom out, Mr. Lollar.  Just keep going.

MR. LOLLAR:  Oh.

Q.   (BY MR. LOLLAR:)  Does it appear that Mr. Broadnax has some artistic talent?

A.    Yes.

Q.    Yes?

A.    Yes.

Q.    So a person locked in a cell 23 hours a day for going on a year reads books most of the day; is that right?

A.    Yes.

Q.    Now, following your -- I don't know what you call it.  A raid on his cell?  Is that a fair statement?

A.    A search.

Q.    I understand all of these things were seized from him; is that correct?

A.    You would have to talk to the jailer about that.

Q.    They took the Bible.  Ten reference books, 26 books, five beef noodles, eight chili noodles, a can of tuna, cheddar cheese, five corn chips, two honey buns, three strawberry doughnuts, two shebangs, and a Skittle.

Do you know why those would have been seized from him?

A.    No.

Q.    Those are items he purchased off the commissary cart?

A.   Well, the food, yes.

Q.   And that's -- now, so the jury understands, every day for lunch they get a bologna sandwich, and after awhile that gets kind of -- you'd get kind of board with that, wouldn't you?

A.   I don't think they get that every day.

Q.   So they can buy things off of the commissary to supplement that?

A.   Yes.

Q.   Okay.  And I remember the sheriff discontinuing to serve ketchup, so if they want ketchup for anything that might come in a meal, they've got to buy it off of commissary; is that right?

A.   I don't know about that.

Q.   All right.  So do you know what violation it would have been to have five beef noodles?

A.   No, I don't.

Q.   To the extent that they would seize them from him?

A.   No, sir.

Q.   Or a Bible?  Do you know any reason they'd seize a Bible?

A.   If it had those pornographic pictures in it, maybe they just took the whole thing.

Q.   All right.  Thank you, Mr. Doty.

MR. LOLLAR:  That's all we have.

THE COURT:  Redirect?

MR. ALEX:  Yes, sir.

## REDIRECT EXAMINATION

BY MR. ALEX:

Q.    Mr. Doty, if an inmate is caught with a razor in his cell, will they place him on restriction?

A.    Yes, sir.

Q.    When they place him on restriction, do they take him to a different place and confiscate all of his stuff and take an inventory of it so they can give it back to them when they're done with restriction?

A.    Yes, sir.

Q.    All right.  And if they're caught with drugs in their cell that they're not supposed to have in violation of the rules, do they place them on restriction?

A.    Yes.

Q.    And will they confiscate all of their personal items, and lock them down, and inventory them so they can give them back when they're done with restriction?

A.    Yes.

Q.    All right.  And counsel asked you about the need to show the jury all these books in his cell.  Do you recall that?

A.    Yes.

Q.    All right.  If there's any claim that the defendant is illiterate, would these books rebut that?

A.    Yes.

Q.    All right.  Counsel says that people from West Point, U.T. grads read The Art of War.  That might say something about the defendant's intellect, might it not?

A.    Yes.

Q.    All right.  And if The Art of War is about tactics in war, perhaps, need a person be concerned if they already know this is the -- the result of their desires if they're reading The Art of War and learning about tactics of killing people, perhaps?

A.    Perhaps, yes.

Q.    That might be a concern that somebody might want to be concerned about or know about.

A.    Yes.

Q.    It would be different if you've never killed anybody and you're reading about tactics of killing.  But if you've already killed two people, that might be a little concern.

A.    Yes.

Q.    Okay.  And then have you had an opportunity -- well, let's do this.

MR. ALEX: Which call is it, do you know?

MS. EVANS: January 12th.

MR. ALEX: January 12th? Okay.

At this time, Your Honor, we're going to offer State's Exhibit 554, which is a jail call from January 12th of 2009 and -- for all purposes, and State's Exhibit 565, which is the same jail call with the subtitles.

MR. LOLLAR: Same objections we've previously offered, Your Honor.

THE COURT: 554; is that right?

MR. ALEX: Yes, sir.

THE COURT: The objections are overruled. State's Exhibits 554 and 565 are admitted. For all purposes, 554; and 565 for demonstrative purposes.

And you may publish.

Q.   (BY MR. ALEX:) And, Mr. Doty, you haven't listened to the jail calls that the defendant made from the Dallas County jail, have you?

A.   No.

Q.   All right. And you know that in order to get books in jail like The Art of War, he would have had to have requested it and it sent to him; is that correct?

A.   Yes.

Q.   All right. Have you ever heard of the books

called The Art of Seduction or The 48 Laws of Power?

A.   No.

(CD played.)

Q.   (BY MR. ALEX:)  All right.  And, the counsel told you what The Art of War was about.  And The 48 Laws of Power, Law Number 3, conceal your intentions, and Law Number 15, crush your enemies totally.  Would that be something important the jury might want to know about someone who's already been convicted of a double homicide?

A.   Yes.

Q.   And these are the kind of books he's asking for?

A.   Yes.

Q.   The Art of Seduction, the most effective form of power, an indescribable primer, how to take what you want from whoever you want.

Was the kind of things that he's asking for book-wise, would that be important to a jury in deciding the fate of the defendant?

A.   Yes.

Q.   All right.

MR. ALEX:  That's all I have, Judge.  I'll pass the witness.

73

THE COURT:  Recross?

## RECROSS-EXAMINATION

BY MR. LOLLAR:

Q.  Now, The Art of War is not about killing people, Mr. Doty.  It's about, you know, like you -- I remember from reading it back in U.T., and I haven't seen it since, if you have a smaller army and you're about to be attacked by a bigger army, you back your army up against a river so there's no escape so your people will fight harder, okay?

It's not about how to kill people.  It's about where to position your armies and how to go into battle.  It has nothing to do with killing people.

A.  I haven't read it, so --

Q.  Okay.

MR. LOLLAR:  I think that's all we have, Judge.

THE COURT:  May the witness be permanently excused?

MR. ALEX:  Well, I have no further questions for this witness, Your Honor.

THE COURT:  May he be permanently excused, Mr. Alex?

MR. ALEX:  I have no objection, Judge.

MR. LOLLAR:  No objection.

THE COURT:  You're permanently excused, sir.  You may step down.

We'll take a recess until 10:30 a.m.

All rise for the jury.

(Recess taken.)

(Court reconvened; Jury not present.)

THE COURT:  It is my understanding that the State is going to call a gang expert as its next witness.

The defense -- I previously, in a Rule 702 through 705 hearing, decided that under Daubert/Kelly this evidence was admissible.  Do you recall that, Mr. Lollar?

MR. LOLLAR:  Yes, sir.

THE COURT:  Okay.  The question has been posed to me, and someone seized the limiting instruction from me.  I've been asked to give a limiting instruction citing Beasley versus State at 902 S.W.2d 452, 457, and the State opposes that limiting instruction.

And what is your argument on that, Mr. Alex?

MR. ALEX:  Judge, Beasley was a case where the State put into evidence of a defendant's membership in the Aryan Brotherhood, but put on no evidence of the

criminal -- the -- the prison gang's violence, that specific evidence of any violence. And, you know, there -- there was no connection between the two.

Here, Judge, we've got a defendant who commits a double murder, homicide, robbery and when he's bragging about it, he throws up a gang sign. The causal connection is huge. The expert's going to say that's exactly what those gang members do. They involve themselves in murder, and robbery, and dope dealing.

And not only is there a causal connection given us by the defendant himself, but the connection is for the whole world to see. He's throwing it out there, you know. This is what I do.

THE COURT: Okay. Okay. Too -- too verbose.

Your response, please, Mr. Parks?

MR. PARKS: Well, Judge, I think we're talking apples and oranges.

What Beasley speaks to is all of the stuff that they will claim that the Gangster Disciples do that they cannot connect him with. And that's not -- Beasley's not speaking to the offense on trial.

THE COURT: The Court finds that the Beasley case is inapposite to the facts as I have heard

them in the 702 hearing.

I decline to give the limiting instruction.

Call the jury.

MR. PARKS:  Judge, can we mark this for the record?

THE COURT:  Sure.

MR. PARKS:  Your Honor, outside the presence of the jury, we would offer Defense Exhibit Number 18, the proposed Charge that has been denied by the Court.

THE COURT:  Okay.  And that's denied.  But I guess it was admitted for record purposes.

THE BAILIFF:  All rise.

(Jury present.)

THE COURT:  Be seated, please.

What further says the State?

MR. ALEX:  The State would call Barrett Nelson, Your Honor.

THE COURT:  Is this Officer or Detective?

MR. ALEX:  It's a detective, Judge.

THE COURT:  Det. Nelson, if you'll come to the front of the room.  All the way to the front, up by the door.

Turn and face me and raise your right

hand.

**BARRETT NELSON**

was called as a witness and testified as follows:

THE COURT:  Lower your hand.  Take your seat in the witness stand.

You'll be responding to questions from Mr. Alex.

Mr. Alex, whenever you're ready.

MR. ALEX:  Thank you, Judge.

THE COURT:  Yes, sir.

**DIRECT EXAMINATION**

BY MR. ALEX:

Q.    State your full name, sir.

A.    Barrett Keith Nelson.

Q.    And, Mr. Nelson, tell the jury what you do for a living.

A.    I work for the City of Dallas as a police officer.

Q.    And do you have a nickname?  Do people call you BK Nelson?

A.    Yes, sir.

Q.    And what do you do for the Dallas Police Department?

A.    I work in the gang unit.

Q.    How long have you been in the gang unit?

A.    In the gang unit, twelve years.

Q.    And prior to that, what did you do?

A.    I was in patrol.  Southwest, sir.

Q.    And is southwest, is that an area of town that you worked in?

A.    Yes, sir.  That's Oak Cliff.  Sub -- southwest -- Southwest Substation off of Illinois.

Q.    And how long did you work in that area?

A.    Four years, sir.

Q.    Four years?

A.    Yes.

Q.    What did you do before that?

A.    College student.

Q.    All right.  Where did you go to college at?

A.    Grambling State University.

Q.    Grambling State University.

      And prior to that, what did you do?

A.    High school student.

Q.    And tell me -- tell the jury, have you ever served the country in the military?

A.    Yes.  I'm currently serving with the United States Air Force Reserve.  917 Security Forces at Barksdale.  I work at the range.  I teach people how to shoot.

Q.    And how long have you been in the reserves?

A.    20 years.

Q.    20 years.  And so, since high school, you've been serving your country in some form or fashion.

A.    Yes, sir.

Q.    Tell the jury what it takes to be a gang officer at the Dallas Police Department.

A.    To be a gang officer with the police department, first you have to interview.  It's only 35 of us.  It's 3,000 officers, so a very low percentage make it.  We normally have about 30 or 40 people apply for one spot.

Q.    All right.  And what are the qualifications that they look for in a gang officer?

A.    They review everything you've ever done.  They look at your arrests, they look at your history.  They talk to people about you; see what kind of person you are.  Make sure you come in to work.  Make sure you're doing what you're doing.  They want the best of the best in the gang unit.

Q.    Okay.  And ultimately, the people that you deal with aren't the best of the best, are they?

A.    No, sir.

Q.    And so they take that into consideration as well, your temperament.

A.    Yes, sir.

Q.    And do you have to take any specialized training to be a gang officer?

A.    Most of our training is on-the-job training. Also, you go to conferences.  You go to classes.

We're all members of the Texas Gang Investigator Association here in the State of Texas.

You go to conferences every year and you also, you know, talk to other agency -- other gang units within the -- the State of Texas, and sometimes out of Texas also.

Q.    And then the sum and substance of what you do, is it based on intelligence?

A.    My job is, as we call it, meeting and greeting.

We go to these apartment complexes, we go to these neighborhoods to identify and subsequently arrest gangs members if they commit crimes.

Q.    And gathering intelligence, you do that by a lot of sources; is that right?

A.    Yes, sir.

Q.    Talking to folks?

A.    Talking.

Q.    All right.  Talking to other folks about other folks?

A.    Yes, sir.

Q.   Research?

A.   Yes, sir.

Q.   Does research play a major role in it?

A.   Research plays a major role in it. Definitely.

Q.   Are gangs in -- in -- in Dallas County and in this country as a whole, do they have a tendency to have documentation that you can go and research and try to find out about a gang that you're interested in?

A.   Most of these gangs nowadays, it's weird. They have their own web sites, so you can click on any gang nowadays and you can get everything about them; their history, what colors they wear, where they hang out, what they're doing, and you actually get photos of them too.

Q.   All right.  So anybody could go and do that and find out about any gang they want.

A.   Anybody can do that; yes, sir.

Q.   All right.  But, if you were gathering intelligence, a gang officer wouldn't stop there, would they?

A.   No, sir.

Q.   A gang officer would want to corroborate that, wouldn't they?

A.   Yes, sir.

Case 3:15-cv-01758-N   Document 41-23   Filed 06/29/16   Page 120 of 198   PageID 10459

82

Q.   And how would you do that?

A.   By talking to other officers, other gang unit people who've hopefully contacted that certain gang or that individual; getting any kind of information by talking to those officers.  Talking to principals, talking to teachers, people who have had contact with these individuals.

Q.   And if you were trying to figure out whether a person was in a gang, or affiliated, or associated, let's say, for instance, a gang in Garland that may not be in Dallas, would you rely on Garland's intell and those officers and information that they have?

A.   Yes, sir.  We'd call Garland.

Q.   Is that something that folks -- experts in your field rely on a regular basis?

A.   Yes, sir.

Q.   All right.  And would that be a way of corroborating what you may find, say, on the internet?

A.   Yes, sir.

Q.   And -- and specifically, the types of gangs that we have in the Dallas/Fort Worth area, do you run into a gang that goes by the name of Gangster Disciples?  Do you run into those guys very often here?

A.   Not very often.  Not very often.

Q.   All right.  And did I ask you to find out as

CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

much as you could about the Gangster Disciples?

A.    Yes, sir, you did.

Q.    And did I ask you to do that in preparation of the testimony today?

A.    Yes, sir.

Q.    Did I also ask you to review documents, video tapes, phone calls, all sorts of things in determining whether a young man by the name of James Broadnax was a member, or part of, or associated with a gang?

A.    Yes, sir.

Q.    All right.  And you understand, that's why you're here today.

A.    Yes, sir.

Q.    All right.  Did you have an opportunity to review the media interviews as it relates to James Broadnax?

A.    Yes, I did.

Q.    And in reviewing those media interviews, was there an indication by the defendant, and in -- in looking at the interviews, the person on the interviews that you reviewed that I represented to you by the name of James Broadnax, do you see that same person in the courtroom today?

A.    Yes, I do.

Q.    All right.  And could you point to where that

person is and describe an article of clothing?

A.    Um, sitting at that table.  From the left to the right, the second person.

Q.    All right.  And so it's your opinion that the person sitting directly in front of me is the person that you saw on the media interview we're talking about.

A.    Yes, sir.

Q.    All right.

MR. ALEX:  May the record reflect that the witness has identified the defendant in open court?

THE COURT:  Any objection?

MR. LOLLAR:  No, Your Honor.

THE COURT:  The record will so reflect.

Q.    (BY MR. ALEX:)  You never met the defendant before; is that correct?

A.    No, sir, never met him.

Q.    All right.  But I did ask you to look at that video and see if you can give me an opinion as it related to what he said at a time when he was talking about his pistol.  Do you remember that?

A.    Yes, sir.

Q.    And it was during the middle of one of the interviews where he says he wrapped his flag around it because I'm a Folk, and it almost sounds like he's

saying four, and he throws up something that looks like a pitchfork. Did you look at that?

A. Yes, sir, I did.

Q. And in looking at that, did you look at it more than once?

A. Several times.

Q. Did you -- did you freeze frame it?

A. Played it over thousands and thousands of times.

Q. All right. Thousands is probably an exaggeration, Mr. Barrett [sic], but we'll forgive you for that. But you looked at that; is that correct?

A. Yes, sir, I did.

Q. And what's your opinion on that?

A. That was a self-admission of gang membership. If you look at the tape and you hear what he says, he says he wraps his flag around his pistol because he's a Folk. Now, when we first heard it, we thought he said four, but after playing it over and over, he was saying Folk.

Folk is a allegiance of gangs in Shreveport that are Folk Nation. Excuse me. I'm thinking about going back to Barksdale.

Not Shreveport, Chicago.

Q. Chicago?

A.   Chicago.

Q.   And is there a distinction on the east coast between Folk Nation and People Nation?

A.   The Folk Nation and People Nation is kind of like -- since it's football season, it's like American League and National League.

People Nation, you will have people like Latin Kings, Vicelords, P Stone Rangers, a couple of other groups.  They ally themselves with people.

Folk Nation is Gangster Disciples and most Crips, and they align themselves with Folk.

Q.   And do they -- do they have Sunday tea together?

A.   No, sir.

Q.   Are they rivals?

A.   Very much rivals.

Q.   And are they particularly found -- well, they founded in the east coast.

A.   They are founded in the Midwest, in Chicago.

Q.   And so when you look at this video, the defendant is talking about -- he's bragging about a double homicide robbery, is he not?

A.   Yes, he is.

Q.   And in the middle of bragging about a double homicide robbery, is when he throws up -- is it -- is

the Gangster Disciples, do they have any common symbols that they use?

A.  Gangster Disciples have a symbol that they use which is a pitchfork, but that pitchfork has to be pointed in the up direction.  And with the hand sign of a pitchfork, it's like giving a shout out to the gang.

Q.  And so when you looked at the video, did you see him talking about wrapping his flag -- now, when it comes to colors and flags and all of that kind of thing, is that typical gang talk?

A.  Yes, sir.

Q.  And would a flag just be some kind of cloth item that would represent their color?

A.  A flag is their bandana.

Q.  Bandana.  Gotcha.  So if we watched a video of the defendant being arrested out in Arkansas or something, he had something wrapped around his head, that potentially could be a flag.

A.  Yes, sir.

Q.  And if he's talking about wrapping a flag around a pistol and he throws up -- did you see whether or not he threw up something that looked like a pitchfork?

A.  It was -- it was something like a pitchfork, sir.

Q.   Okay.  Would that -- would that pitchfork and the -- the representation that he's a Folk, would that identify him as -- with a gang in the Folk Nation?

A.   Yes, sir.

Q.   And in particular, would the pitchfork point you to the Gangster Disciples?

A.   Yes, sir.

Q.   All right.  And you say that was a self-admission; is that correct?

A.   Yes, sir.  That's definitely self-admission.

Q.   Now, did you also listen to a phone call that the defendant made from jail?

A.   Yes, sir.

Q.   All right.  We'll just go on.

And when you listened to the phone call from jail, describe for the jury what you heard in that phone call from jail.

A.   That phone call discussion was talking and -- and they were discussing some things and then he said, Hey, remember when you -- if you were OG?  And he's like, Yeah, I remember that.  And he said, Well, I'm a member of that organization.  With him stating that he's a member of that organization, that's admittance that he's a member of that gang.

Q.   Okay.  And did he say -- did he ask his -- his

mom's boyfriend, Hey, you remember when you told me you was a member of OG74?

Tell the jury the significance of 7 4.

A.   7 4.  Most of these gangs, they use alphabet, but they'll flip it around and they'll -- they'll use the numbers.  The seventh letter in the alphabet is G, which stands for gangster.

The fourth letter in the alphabet is D, disciple.  So if he's saying he's a member of 7 4, that's Gangster Disciple.

Q.   And what does OG mean?

A.   He's an original gangster.  He's -- he's been there awhile.  He's -- he's got his claim to fame. He's been there.  Everybody knows him as OG.

Q.   Okay.  And so if -- if the defendant is asking an older guy something about be being an OG74, in gang talk, he said, Hey, are you -- you know, are you an original or an old school gangster of Gangster Disciples.

A.   Yes, sir.

Q.   All right.  And after listening to that phone call and looking at that tape, did you come to a opinion on whether the defendant was a member of a criminal street gang?

A.   Yes, I did.

**Q.** And what was that opinion?

**A.** That he is a member.

**Q.** A member of what?

**A.** Like Gangster Disciples.

**Q.** And is there a distinction between Black Gangster Disciples and just Gangster Disciples?

**A.** You have Black Gangster Disciples, the BGD, and you have Gangster Disciples.

One was founded by David Barksdale, and one was founded by Larry Hoover. They did merge. You will find some BD graffiti, but Black Gangster Disciples, they're the largest group. They do -- they do hang out with one another, but they do keep their separate identities. You have BD's and you have Black Gangster Disciples.

**Q.** And so if we're looking at a bunch of symbols that say 7 4, would that represent Gangster Disciples?

**A.** Yes, sir.

**Q.** All right. I'm going to -- I'm going to play that tape where he -- you say he self-admits; is that correct?

**A.** Yes, sir.

**Q.** Okay. And that's State's Exhibit -- for the demonstrative purposes, I'll supplement the record with what the State's exhibit is, but the jury is currently

looking at it.

The exhibit that we're about to look at, though, is what we just talked about; is that correct?

A.   Yes.

Q.   All right.

MR. ALEX:   Back it up and let it go into it, please.

(CD played.)

Q.   (BY MR. ALEX:)  All right.  And that's what we were just talking about; is that right?

A.   Yes, sir.

Q.   And what's the significance if a person is a member of a criminal street gang of -- he knows he's in front of the media, the whole world, of throwing out that gang sign and saying he's a Folk, is there any significance in that?

A.   At that point in time, once he said that, every -- every member of Black Gangster Disciples or Folk Nation was like, Yeah, he's representing us even though he's -- he's behind jail.  He's locked up.  He's showing his allegiance to the gang.  You know, he's ride or die.  He's there for life and death.

Q.   Okay.  Because he didn't have to say that.

A.   No, he didn't have to say that whatsoever.

Q.   He's talking about a double homicide and a

robbery.  Are those the kind of things that the Gangster Disciples do as a criminal street gang?

A.  Sell narcotics, murders, agg robberies, yes.

Q.  All right.  And all of these are the ways they fund the organization?

A.  Yes, sir.

Q.  And I'd imagine any organization, in order to survive, has got to have a way of making money.

A.  Yes, sir.

Q.  And is it true, though, that back when the Black Gangster Disciples first started back in Chicago, that there was a time when they were engaged in lawful and legal things?

A.  They held protests at stores that were selling bad meat.  They actually walked with Jesse Jackson with his Operation PUSH.  They did some things that were notable; yes, sir.

Q.  And is it also true that there's probably people who hold office back in Chicago who are still card-carrying members?

A.  Yes, sir.  That's true.

Q.  All right.  And -- but there did come a time when that particular street gang turned to violence, selling drugs, robberies and murders as a way of funding the organization.

A.   Yes, sir.

Q.   And how old of a gang is the Gangster Disciples -- Black Gangster Disciples?

A.   Late '60's, 1960's.  So most of their older members right now would be, what, late 50's, late 60's.  Yeah, they've -- they've been around for quite awhile.

Q.   And if we're talking about 60's, would they -- would they rival one of the oldest gangs in this country?

A.   Yes, sir, they would.

Q.   If we looked at the west coast, we would be talking about the Bloods and the Crips; is that right?

A.   Yes, sir.

Q.   And they would have started organizing around the '60's; is that correct?

A.   Yes, sir.

Q.   And if -- if we talked about this particular defendant, you are aware that this jury's found him guilty of -- of robbery, murder of two people, and are you telling the jury that that's very consistent with what he's telling the world here when he throws up his pitchfork and says he's a Folk?

A.   Yes, sir.

Q.   All right.

MR. ALEX:  And, Judge, for the record, the

exhibit that was just showed to the jury was Exhibit -- demonstrative purposes, State's Exhibit 404.

THE COURT: Previously admitted?

MR. ALEX: Yes, sir.

THE COURT: The record will so reflect.

MR. ALEX: And at this time, Judge, we would offer as State's Exhibit 553, a jail call from October 11th of 2008 for all purposes; and State's Exhibit 570 for demonstrative purposes, which is also the same call from October 11th of '08.

THE COURT: 553 previously admitted for record purposes only; is that right?

MR. ALEX: Yes, sir.

THE COURT: And what is --

MR. ALEX: 570 would be for demonstrative purposes only.

MR. LOLLAR: We have the same objections, Judge, that we offered previously.

THE COURT: Those objections are overruled.

553 and 570 are admitted.

MR. ALEX: Permission to publish the demonstrative?

Q. (BY MR. ALEX:) And, Mr. Barrett Nelson, the call that you listened to, tell the jury if this is

what you listened to when we were talking about the conversation of OG74, okay?

A.   Yes, sir.

(CD played.)

Q.   (BY MR. ALEX:)  And, now, in that conversation he self-admits to being a part of the OG74; is that correct?

A.   Yes, he does.

Q.   All right.  And the -- I had you look at a lot of evidence, some evidence that was taken from his cell; is that correct?

A.   Yes, sir.

Q.   And -- and I also -- I think the jury has probably reviewed a lot of the evidence from his cell.

MR. ALEX:  May I approach, Your Honor?

THE COURT:  Yes, sir.

Q.   (BY MR. ALEX:)  And we're not going to go through a whole lot of it again, but wherever the jury sees a pitchfork, is that sort of the call sign of the OG's, of the -- of the Gangster Disciples?

A.   Yes, sir.

Q.   And where they see the six point star, and there's like a 7 on one side and a 4 on the other side, normally you're going to see a G and a D at the bottom; is that correct?

A.    Yes, sir.

Q.    All right.  And all of that designates what?

A.    Gang affiliation.

Q.    In which gang?

A.    Gangster Disciples.

Q.    And I also asked you to look at some of the letters that he had in his cell.  For instance, when he talks about -- when he says Folk in letters or in writings that he writes and he puts them in capital letters, for instance, like this one, State's Exhibit 474 where he says Free Style Writing, when he puts F-O-L-K in all caps, does that have any significance?

A.    He's admitting his allegiance to Folk Nation. That's where Gangster Disciple resides.

Q.    And is it -- is it common for gangs to show respect to each other by capitalizing references to them?

A.    Yes, sir.

Q.    Kind of like a Christian might do when they talk about God, they would capitalize it; is that correct?

A.    Yes, sir.

Q.    All right.  Here in this free style writing, he's talking about a little story why I'm in this

bitch, and he's talking about his case, apparently. He's talking about two murders, and in all of that, he's giving respect to the gang; is that correct?

A.   Yes, sir.

Q.   All right.  And then we have another letter here, I don't know, can you read that 476, or do I need a bigger version of that?

A.   No, I can try, sir.

Q.   Let me see it.  I've read it once.

Does it say Peace to the nation and the lords of the nations, and all honorable respect to our Chairman King Hoover, Folk love, 74GD.  Who is King Hoover?

A.   That's Larry Hoover.  That's the original founder of Black Gangster Disciples.

Q.   Okay.  Say boss, this being a letter apparently being written to the defendant; is that correct?

A.   Yes, sir.

Q.   Boss is spelled with two S's on the end with dollar signs in it?

A.   Yes, sir.

Q.   And in looking at all the writings, does it appear the defendant's call sign is Boss with two S's.

A.   Yes, sir.

Q.   All right.

(As read:)  Say boss, -- and, you know, I think I'm tired of repeating these words.  Okay.  Let's do this.

He says, Say boss.  He does a little cursing and then he says, Good looking on bringing me up because I was about to lose it, but I'm trying to get back in my zone.

Now, when -- when gangsters are talking about a zone, primarily they're talking about their business.  What they do.

A.   Yes, sir.

Q.   All right.  Making money by any means necessary.

A.   Yes, sir.

Q.   All right.

(As read:)  With much love and respect for the Nation.

When they say the Nation, what are they talking about?

A.   Folk Nation.

Q.   Folk Nation.

(As read:)  And teaching of our dear honorable chairman, -- and who would be the chairman?

A.   Larry Hoover.

Q.    I am what I am, and what I'm not, I'll never be.

Is that a common phrase you see with Gangster Disciples?

A.    Yes, it is.

Q.    All right.  And then there's -- it's signed by a Flint D.  And then he's got, Gangstas make the world go round in sort of gang lingo; is that correct?

A.    Yes, sir.

Q.    And is that -- when they see that Gangstas make the world go round, is that something common that you would see the way it's written there from Gangster Disciples?

A.    And especially he has the six pointed David star here where except he puts the star where a G O should be.  Where you have G-O, you don't have the O. You've got the six pointed David star that's associated with Gangster Disciple.

Q.    Okay.  And since the jury has seen most of these already, I'll just have you describe them for them in kind, and then we'll move on to the next evidence as it relates to gangs.

State's Exhibit Number 8, at the bottom here, we see the six point star; is that correct?

A.    Three point -- yes, sir.  Six point star right

there.

Q. Okay.

A. And you see the pitchforks, which is another symbol of Gangster Disciples. Of course, their phrase, their logo to the world below, G74D till the world blow.

Q. All right. And that's all indicative of the Gangster Disciples; is that correct?

A. Yes, sir.

MR. ALEX: May I publish, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) In State's Exhibit Number 7 on the walls we have pitchforks as well?

A. Yes, sir.

Q. Okay. And those pitchforks are indicative of the Gangster Disciples; is that correct?

A. Yes, sir.

Q. State's Exhibit Number 9, at the bottom we've got GD, and on the top we've got the six point star with 7 4; is that correct?

A. Yes, sir.

Q. Is that all indicative of Gangster Disciples?

A. That's all indicative of Gangster Disciples.

Q. Now, you can't tell the jury what all of this writing is in the middle, can you?

A.   No, sir, I can't.

Q.   But at the bottom, we've got the pitchforks and all those; is that correct?

A.   Yes, sir.  Pitchforks again.

Q.   State's Exhibit Number 9.

And the letter that we talked about earlier where he's called a boss and they talk about King Hoover, that's shown in State's exhibits 11, 10 and 12, respectively, and so that you can read them; is that correct?

A.   Yes, sir.

Q.   All right.  State's Exhibit 6, this is probably the most notable item in this cell because it spells out Folk Nation with all the pitchforks, the 4 -- 7 4, and the GD on the six point star; is that correct?

A.   Yes, sir.

Q.   And all of that is encased in the word B-O-S-S; is that right?

A.   Yes, sir.

Q.   Is that another form of self-admission, in your opinion?

A.   Yes, sir, definitely.

Q.   Okay.  And -- and -- and finally, would this set of photographs, Mr. Nelson -- Det. Nelson, State's

Exhibit 504 and 505, which have only been offered for the record at this time, do the Gangster Disciples, when they are giving -- what -- what's it mean to, say, tag an item: A wall, or a car, or sidewalk or anything?

A. Tagging is the stuff you see in your neighborhoods where you see some gang writing on your fence, or stop sign, or on the street, on the curb. We're all familiar with that type of tagging, that type of graffiti that goes on in our neighborhood and stuff.

Q. And when a Gangster Disciple draws items, is it common for them to draw wings on them?

A. Yes.

Q. And is that part of the literature when you researched this particular gang?

A. Yes, it is.

Q. And is it also common to put wings on bikini-clad women as part of their call signs?

A. Yes, sir.

Q. All right. State's Exhibits 504 and 505, does that appear to be gang related as they are the wings and the bikini-clad women?

A. Yes, sir.

Q. And in your research of this particular gang, had you seen photographs very similar to these on the

internet?

A.    Yes, sir.  Yes, sir.

Q.    Okay.  All right.

MR. ALEX:  We would offer State's Exhibit 404 --

THE COURT:  504.

MR. ALEX:  504 and 505 at this time for all purposes, Judge.

THE COURT:  Any objection?

MR. LOLLAR:  The same objection we offered previously, Your Honor.

THE COURT:  Yes, sir.  And that objection is overruled.

State's Exhibit 504 and 505 are admitted.

Q.    (BY MR. ALEX:)  And what we're looking at here, this appears to be a young lady in a -- in a bikini of some sort, but there's wings drawn on them, and are you saying to the jury that that's indicative of Gangster Disciple type drawings?

A.    Yes, sir.  Yes, sir.

Q.    Now, of course, Mr. -- Det. Nelson, if a person is not associated with Gangster Disciples, this could just be something they like to draw; is that correct?

A.    Yes, sir.

Q.   Okay.  But when you combine all of the other things you find in his cell with this, then in your opinion, it is indicative of Gangster Disciple membership.

A.   It's like making a cake.  You got to add eggs, milk.  Once you have all of these elements together, yes, sir, you have a gang member.

Q.   All right.  And did I also ask you to look at a couple of items for, at this point, have only been offered for the record, State's Exhibit State's Exhibit 131-I and 131-J?

A.   Yes, sir.

Q.   All right.

MR. ALEX:  And, Judge, these have previously been identified by the officers in Texarkana and by the Garland detective -- forensic, I'm sorry.  Civilian forensic investigator.  We're going to offer them for all purposes at this time.  131-I and 131-J.

THE COURT:  Any objection?

MR. LOLLAR:  403.

THE COURT:  The objection's overruled.  They're admitted.  131-I and 131-J.

Q.   (BY MR. ALEX:)  And did I provide you with copies of these two notebooks to review?

A.   Yes, sir.

Q.    All right.    Did you bring those up here with you?

A.    Yes, sir.

Q.    Okay.    Where are they at?

A.    They're in the D.A.'s workroom.

Q.    All right.    And where would -- where would they be if Mr. Hikel was going to --

A.    My partner can get them.    She -- she knows where she put them.

Q.    All right.    And as part of the gang training, do you also have to train other people?

A.    Yes, sir, I do.

Q.    And the young lady walking out right now, is she in training?

A.    She's in training; yes, sir.

Q.    Did you have to go through that same kind of training?

A.    Yes, sir, I did.

Q.    And how long do you ride around with another officer before they let you go on your own?

A.    She's going to be with me a year.

Q.    A year.

A.    Yes, sir.

Q.    Very good.

And I want you to look through these and see

if it's the same as the items I provided you as far as copies is concerned.

A.    (Examining documents.)

Q.    And you've looked at those prior to the jury coming in; is that correct?

A.    Yes, sir.

Q.    And are those copies that I gave you substantially the same as what's in those two notebooks?

A.    Yes, sir.  They're identical.

Q.    Except for they're not actually bound; is that correct?

A.    Yes, sir.

Q.    All right.  And it's been represented to you, at least by me, and the evidence will reflect, State's Exhibit 268, that these notebooks were found in a suitcase in the back of the victim's car, State's Exhibit 268, 269 which have previously been admitted, in the back of the victim's car, along with items of the defendant:  A social security card, birth certificate and those kind of items, okay?

And when you look at the notebooks, just as a general matter, can you connect these to the defendant?

A.    Yes, sir.

Q.    Even if you didn't know they came out of a car

that he had taken and had a suitcase in, would there be a way for you to connect it to him?

A.    Yes, sir.

Q.    How is that?

Do you see the initials J.B. in there quite a bit?

A.    I see the initials J.B. in there an awful --

Q.    Do you see the --

A.    -- an awful lot.

Q.    All right.  You see -- go ahead.

A.    And you can also, by -- by the rap songs that he wrote in these -- in these notebooks, he identifies himself as J.B.

Q.    All right.  And do you also see the call sign of Boss in there quite a bit?

A.    Yes, sir.

Q.    And did we see that in his cell when someone was writing to him and it would say Boss?

A.    Yes.

Q.    All right.  Let's do this, if you will.  You keep the originals there.

And is there a black and a red notebook in total there?

A.    Yes, sir.

Q.    All right.  And when you looked at those

108

notebooks, when you first looked at them and you go through them, does it appear to be a lot of lyrics in there written by someone with the same handwriting?

A.   Yes, sir.

Q.   And do they appear to be tagged by -- with J.B. all throughout?

A.   Yes, sir.

Q.   All right.  And when you look at those lyrics and from a general perspective, is the general theme of those lyrics robbing, killing and selling dope?

A.   Yes, sir, that's all it's about.

Q.   Is that all consistent with the Gangster Disciples' way of making money?

A.   Yes, sir.

Q.   All right.  Let's just go through them.

Let's go through them, and let's look at the black one.

I'll tell you what.  Let's do this first. Would you turn to the red notebook toward the end, and let's talk about the things that are in those notebooks that are similar to what the jury may have seen in his cell, okay?

A.   Yes, sir.

Q.   I'm going to show you toward the end of that red notebook.

MR. ALEX: Mr. Hikel, you need to stay right here all the time.

Q. (BY MR. ALEX:) All right. You can use that stylus right there, and you can point out for the jury the things that are in this exhibit.

MR. ALEX: For the record, that would be -- you've got them up there. It's the red notebook. Would you tell me the State's Exhibit Number on that red notebook? Is it 131?

THE WITNESS: Sir, it is 131.

MR. ALEX: Is it I or J?

THE WITNESS: I.

MR. ALEX: Okay. Thank you, sir.

Q. (BY MR. ALEX:) Would you point out with that stylus different areas of the same things that we saw in his cell?

A. If you look at top right-hand corner, right in here, that's the first thing, myself as a gang officer, I got pitchforks. Pitchforks is going to automatically have you question an individual about their gang affiliation. You wouldn't write pitchforks unless you're a member of the Gangster Disciples.

If you look right there, you have 7 and 4. We talked about that a few minutes ago. The seventh letter of the alphabet is what? G. The fourth letter

is D.  Gangster Disciples.

If you come over here, this one, you have the six point David star.

Q.    Why a six point David star?

A.    Six point David star is for David Barksdale.

Q.    Okay.  All right.

A.    And that is the leader of -- in that omission that he said to the all mighty, you know, that's for David Barksdale.

Q.    Sort of a play on words, a Star of David, David Barksdale.

A.    Yes, sir.  The Star of David.

Q.    All right.

A.    That's some more gang graffiti there.

If you come down here, you have the wings, and you have a heart, and you have a pitchfork.

Sorry.  I got heavy handed.

Again, you've got 7 4 inside, and you got GD, Gangster Disciples, and you have pitchforks.

Q.    And you have the wings, which you -- you told the jury you'll see them put on different things, including people; is that correct?

A.    You have wings, and you also have the devil's tail coming out of the bottom of the heart also, located right here.

Another thing that I -- I saw was the A, the upside down A.  An upside down A is a disrespect to Vicelords, because Vicelords use the A a lot.  So if you're a true Gangster Disciple, everything that you write, you're going to have an upsidedown A on it.

Here you have Boss, which is his nickname, also, besides J.B.

Q.   What about this -- this world here with the hand on it?  Does that -- does that have more to do with the mentality of a gang?  I mean, --

A.   That's a mentality.

Q.   Okay.

A.   He's saying the world is his.  He's going to take what he wants.

Q.   And let's be fair.  You can't say that he actually made these drawings; is that right?

A.   This is what was presented to me, sir.  I wasn't there when he did it.

Q.   If he had them in his possession, it would say something about who he is; is that correct?

A.   Yes.

Q.   All right.

A.   Also here, if you look at it, MOB, that has two plays.  Gangster Disciples do not get along with Bloods.  If you are versed in Bloods, MOB is a member

of the Blood family.

But on this one, this speaks something totally different.  MOB stands for money over bitches, which means he's going to get his money any way he can.

Q.   All right.  And is that sort of a general mentality of any street hustling, money over --

A.   Any street-hustling gangster, the first thing to him is money.  I'm going to get my money.

Q.   So if he's got a tattoo of that on his arm, MOB is not a contradiction to Gangster Disciples.

A.   No.  It's not a contradiction whatsoever.

Q.   If we go to the next page of that, we see in the middle of the crown here, do we see Folk?

A.   Yes, sir, we see Folk located right there.

Q.   Okay.

A.   That's Folk Nation.

Q.   All right.  And then again in the same exhibit.

And the jury will get a chance to look at most of this.

We'll kind of -- we'll kind of shortcut it a little bit.

When we talked about some of the legitimate things that the Gangster Disciples may have done, did they come up with some -- some pretty respectful sort

of things that they stood for back in the day, and does it still remain a part of some of the things that they teach?

A. Yes, sir.

Q. Okay.

A. On this six pointed star, each star represents a -- I mean, each point represents a saying. If you look at this one, it says Loyal, power, respect and knowledge.

Q. And are those part of the things on that six point star?

A. He has a couple of them, I say, misrepresented, because it's loyalty, love, life, understanding, knowledge.

Q. Okay. And those are the things that would be on the star.

A. Yes, sir.

Q. All right. And if we saw those, just those letters above the star, that's what they would stand for.

A. Yes, sir.

Q. All right. And all in all, of all of the things that you've seen so far, would it represent somebody with some pretty good knowledge of the Gangster Disciples?

A.    It represents a person who knows the basics of the gang and what they do.

Q.    What does it mean to have knowledge as it relates to the gang -- the gang life?

A.    In -- like the old saying, if you don't know where you come from, you don't know where you going. You got to know the history of your gang, and in Gangster Disciples, they preach that. You need to have your knowledge about the gang.

Q.    And at the back of that notebook there on the back page, not the page, but actually the hard cover there, --

A.    Yes, sir.

Q.    -- is this -- is this what's there?

A.    Yes, sir.

Q.    All right.

A.    And you see right here you have three L's. You have an L right here. That can represent life.

You have an L right here. That represents loyalty.

You have an L right there. That represents love.

You have a W right there. That's wisdom.

You have a U right there. That's understanding.

And, of course, you have your K, for knowledge.

Q.   And -- and knowledge is something that would actually be something that you would have to have in order to produce all of this stuff; is that correct?

A.   Yes, sir.

Q.   And then before you looked all of this up on the internet and started researching it, did you know all of this stuff?

A.   No, I didn't, and I'm actually kind of impressed with Gangster Disciples in a sense, because most of our gangs, they're about getting money.

Q.   Okay.

A.   And this is -- this is an organization.  And I call it an organization.  An organization who has well over 25,000 strong around the Chicago area.  They -- they're teaching their younger generation how to be a gang member.

Q.   And, Det. Nelson, professionally, I can appreciate that you would respect them.  You know, we say things in professions that can be taken out of context.  Surely you're not saying to the jury that you think that this is an honorable gang.

A.   No, sir.  No, sir.

Q.   Okay.  They -- they've gotten to the point

where they're -- they're organized and not just loose-leaf kind of guys like we have here in Dallas.

A.    Their -- their organization and the way they disperse their knowledge about their gang is -- is impressive.

Q.    Now, we'll just give the jury a little sampling of -- of the writings that go throughout this red notebook, because we could potentially be here for quite some time if we went through all of it; is that correct?

A.    Yes, sir.

Q.    All right.  So let's do this, if you will. Are there multiple references to murder, to robbery, and to selling drugs?

A.    It's multiple references.

Q.    Let's go through some of those and then we'll -- we'll wrap it up, okay?

A.    Yes, sir.

Q.    Basically at the very beginning of the notebook, we see references to body bags.  Let's say -- this would be a lyric, I guess you would say, and right off we see the references to J.B.; is that right?

A.    Yes, sir.

Q.    Okay.  And we see the references to the body bag M's wit concrete bricks, and when we start talking

about getting money by any means necessary, we see a lot of references to that as well; is that right?

A.    Yes, sir.

Q.    All right.  And I'm not -- I think at some point the -- I'll move it -- I'll move it along.

And then if we go -- and here, let's do this, Detective.  We'll point out to the jury the references that will tie this notebook to the defendant particularly.

Again, here we've got him saying I'm J.B.; is that right?

A.    Yes, sir.

Q.    And you've made some notations up there, did you not, as to some of these items; is that correct?

A.    Yes, sir.  I highlighted them.

Q.    All right.  If you see me put an item up there that you think is significant to the gang culture and the gang life, you let me know, okay?

A.    Yes, sir.

Q.    All right.  Now, here we're talking about what's highlighted here.  Money on my mind.  Yeah, I'm talkin to the grave.

So we've got the reference of making money all the way to the grave; is that correct?

A.    Yes, sir.

118

Q.    All right.  And then at the very bottom here when he starts talking about shots popping off, we're talking about gunshots here in this lyric; is that correct?

A.    Yes, sir.

Q.    All right.  The context of it, the -- the jury can read at some point if they so desire.

A.    Yes, sir.

Q.    The -- the next one that I have here in this -- in this notebook perhaps deserves a little bit more time.

And if you'd turn to the page where he talks about Told da jury, fuck you, said Judge, kiss my ass.

Let's talk about that one a little bit, because it -- apparently, whoever wrote this, had already contemplated the fact that they may be in a position to say something to folks deciding their fate?

A.    Yes.

Q.    So let's talk about this just a bit.

So I killed on the first verse.  Second one, black hearse.

A.    Uh-huh.

Q.    Now I spit retarded like my mouth got a sick curse.  Bitch we ride carrots floating like caskets.  Money, motivation, gotta down.  I don't know practice.

119

Better than Houdini.  Treatin beats like magic.  Throw away the trap.  You can label this a classic.  But your boy burnin up.  You can label me a hazard.  Arkansas dirty boy, south side bastard.  I never finished school, they wouldn't pass me in the class.  Told the jury Fuck you.  Say, Judge, kiss my ass.  So know I bake cakes all day.  No math.  What you made off it, I did a bird and a half.

Now, is that reference to drugs?

A.  Yes, sir.

Q.  Okay.  They all heat wave, summertime draft, and then the next thing I can read is floating on a roll with the riffraff, gone with the lollygag, Have to body bag M, is what we see here at the bottom, and give em a title tag.

And there's the reference again to body bagging M and title tagging em; is that correct?

A.  Yes, sir.

Q.  And, Mr. Barrett, throughout this notebook, is there just multiple references to body bags, and -- and death and murder; is that right?

A.  Yes, sir, it's -- it's all through here as far as narcotic selling, not leaving witnesses.  As the gangsters say on the street, No faces, no cases.

Q.  All right.  And what does that mean?

A.    If a person's not alive, they can't testify against you.

Q.    Okay.  And there's references to that in here as well; is that right?

A.    Yes, sir.

Q.    Okay.  And when we talk about the other ways gangs make money, and specifically connected to this defendant, he sort of signs J.B. -- he signs J.B. on just about everything he writes, doesn't he?

A.    Yes, sir.

Q.    All right.  Still with the same notebook, we're talking about J.B. thank milligrams on up to two kilograms.  Every five minutes -- and then we're talking about thanking, flipping a gram.

Are we having references to drug sales here?

A.    Flipping a gram, he's talking about getting his money in the dope game and taking a gram and flipping it to a larger product.

Q.    Okay.

A.    Also, another one is birds.  Birds are kilos. It's a kilo of cocaine.

Q.    And then we've got the reference to Arkansas sought southern smoke at its best.  Dat's where I reside, but I was born on da west.

And again, Mr. -- Det. Nelson, in all

fairness, these appear to be raps; is that correct?

A.   Yes, sir.  He's -- he's writing lyrics to songs that he's coming up with.

Q.   Okay.  These would be things that he would be creating in his mind though.

A.   Yes, sir.

Q.   And they're all consistent with the gang mentality that we're talking about; is that correct?

A.   Yes, sir.

Q.   All right.  Still in the same notebook, we have more references to body bagging M and -- and toe tag M; is that correct?

A.   Yes, sir.

Q.   All right.

A.   On that next page he has one where he's -- see me in da hood.

MR. PARKS:  Judge, we'd object to that being nonresponsive.

THE COURT:  Okay.  One at a time.  I think Mr. Parks had it right.

Mr. Parks, what was your objection?

MR. PARKS:  Nonresponsive.

THE COURT:  Sustained.

Q.   (BY MR. ALEX:)  What do you see on the next page of the notebook, sir?

A.    C me N da hood.  Yeah, dat Folk, that's what I throw up.

Q.    All right.

A.    That's another self-admission of Folk Nation.

Q.    Is that the page I have up here right now?

A.    That's the page ...

Q.    Starting off with redemption?

A.    The one where you had the J.B. milligrams, if you go to the next page, if you go down.

Q.    All right.  Okay.

A.    It says C me N da hood.  Yeah, dat's dat Folk that I throw up.

Q.    All right.  So that's where he's talking about --

A.    There it is, is right above what you got highlighted.

Q.    Okay.  Would you point it out there with your stylus?

A.    He has a one located right here, but if you read that phrase, me as a gang officer, he's admitting Folk Nation again, which is Gangster Disciple.

Q.    Okay.

A.    C me N da hood.  Yeah.  Yeah, dat Folk, dat's what I throw up.

Q.    And he's got Folk, and would you -- would you

circle that so the jury can know what you're talking about?

A.    Folk is right here, and it's capitalized.

Q.    And it's all in caps?

A.    Yes, sir.

Q.    All right.  And the next item of -- of interest as it relates to gang mentality in that notebook would be what, sir?  That you noted.

A.    I highlighted one in the back.

Q.    Tell me where it starts off.

A.    I'm back bitch, fresh out of the same burn.

Q.    Very good.  And what we have here is -- appears to be another -- a lyric that he's writing; is that correct?

A.    Yes, sir.

Q.    But he's talking about an honorary murda, M-U-R-D-A.

      Is there any doubt in your mind what that's talking about?

A.    That's -- that's murder, M-U-R-D-E-R.

Q.    And when we go down to the -- the next part that's highlighted here, is this where he's talking about witnesses?

A.    Yes, sir.

Q.    All right.

A.    Those -- those three.  Well, actually, those four.  If you start right here and you end right here (indicating).

Q.    And is that a mentality that we're talking about that says, But you don't need no walkin and talkin for holding heads.  It only take minute for a witness, bitches to turn fed.  So I'm going to slaughter everybody so there is no trial.  Meanwhile, ask me cuz I don't know y'all.

He's talking about in these lyrics, killing all the witnesses.

A.    He's saying he's not going to have anybody identifying him, so if there's no witnesses, nobody can say anything in court.

Q.    And again, Mr. Barrett -- Det. Barrett [sic], if we were looking at the lyrics of some rapper out of New York who's never killed anybody, these might not be so shocking, would they?

A.    You would take it as the normal stuff that you hear on the radio.

Q.    And in all fairness, there's gangster rap that mirrors this kind of stuff; is that right?

A.    Yes, sir.  Yes, sir.

Q.    All right.  But we -- we already know we're talking about a young man who's killed two people.

That could be sort of trouble.

A.   Yes, sir.

Q.   Okay.  All right.  Well, and there's -- there's plenty more of that kind of stuff in the red notebook; is that correct?

A.   Yes, sir.

Q.   All right.  We'll -- is there a place in the -- in the -- in this notebook where the defendant specifically -- I'll tell you what.  Let's go to the other notebook.  The black notebook.

Is there a place in here where he -- he has in here what you've identified as dope notes?

A.   Yes, sir.

Q.   All right.  Tell the jury what dope notes are.

A.   Dope notes is a ledger of how much you sell, and sometimes you -- you give dope on credit.  So as a good businessman, you have to write everything down.

Q.   All right.  And just like any business person, you'd write out your plans; is that right?

A.   Yes, sir.

Q.   All right.  And in the black notebook, is there a page in there that's called P-L-A-N-Z?

A.   Yes, sir.

Q.   And tell -- tell me for the record the exhibit number on that.  Is that 131-J?

A.   Yes, sir, 131-J.

Q.   All right.  In that notebook, does he have his plans written out?

A.   Yes, sir.

Q.   All right.  And I guess most people would write their plans out, but here if we're talking about these plans, we start off with 200 TK.  Is -- now, if you're from Texarkana, would that be a common phrase to say TK?

A.   TK is Texarkana.

Q.   All right.  And we've got (As read:) Job core, weldin?

A.   Yes, sir.

Q.   Right?  Very good stuff.

A.   Uh-huh.

Q.   We've got Army infantry.  Sounds like he's thinking about options; is that right?

A.   But also, Black Gangster Disciples like to send their recruits to the military.

Q.   All right.  Mr. -- Mr. Nelson, I didn't ask you that, did I?

A.   No, sir, you didn't.

Q.   All right.  And then we've got Escort service. It's a business; is that correct?

A.   Yes, sir.

Q. All right. I mean, that's stuff anybody might see in their plans; is that right?

A. Yes, sir.

Q. All right. He's got Benchin, 375 to 420. A young man wants to lift some weights, it sounds like?

A. Yes, sir.

Q. His meantime work. A trip to Vegas, perhaps? Looks like somebody who's thought about many options, doesn't it?

A. Yes, sir.

Q. All right. And as we go down, we see some limos, some Crown Vics. You know what kind of car we're talking about in this case?

A. We're talking about that police car, that Crown Vic that's so popular nowadays right now.

Q. Popular car for people to -- to drive in; is that right?

A. Yes, sir.

Q. All right. (As read:) You know I already question gigolo. So maybe he was thinking about that in his plans?

A. Yes, sir.

Q. Black on B, and B and W, and he's got Guts written there. It sounds like some reference to sex; is that right?

128

A.   Yes, sir.

Q.   All right.  22's black?

A.   That's the rims he going to put on that Crown Vic.

Q.   Okay.  And then we get down to serious business here, six pounds of dro, Spanish.  Six zips, 150 to 200.  What's that all about?

A.   Dro is hydro.  That's that -- it's a very potent narcotic weed.  Marijuana.

Q.   Hydroponic?

A.   Yes, sir.

Q.   Grown indoors?

A.   Yes, sir.

Q.   Artificial lighting?

A.   That's the good stuff, as they call it.

Q.   Lots of watering?

A.   Yes, sir.

Q.   All right.  And so we've got six pounds of dro.  Looks like we're thinking about how many zips it's going to take when we put them -- when you put the marijuana in the bags.  Are they typically used in like ziplock bags?

A.   Yes, sir.

Q.   All right.  And we've got a count there. We've got maybe Mexico for a week, and then we've got

some notes about Mexico.  We got another six pounds of dro and six chronic.  What's the chronic?

A.    Chronic is that -- that popular weed from California.

Q.    Okay.  We're talking about marijuana, perhaps?

A.    Yes, sir.

Q.    All right.  And -- and then we've got a bunch of notations down here like you might see in somebody's checkbook or something; is that correct.

A.    Yes, sir.

Q.    Does it have anything to do, you think, with the drugs?

You've seen dope notes before; is that right?

A.    Yes, sir.  That's nothing but how much money he's anticipating on accumulating from selling this -- selling his weed.

Q.    And you see the notations for Chronic again?

A.    Yes, sir.

Q.    And we see how many zips we're going to get out of it.

A.    Yes, sir.

Q.    Okay.  You've got QP.  Quarter pound, half pound, perhaps?

A.    Yes, sir.

Q.    Is those figures kind of accurate?

A.    That's about average; yes, sir.

Q.    Okay.  And we see Ice over here.  What's Ice?

A.    Ice is methamphetamine.

Q.    And look all the way down here, we've got some more notes about the weed and the coke; is that right?

A.    Yes, sir.

Q.    Okay.  And that was titled Plans; is that right?

A.    Yes, sir.

Q.    And so we went from the army infantry all the way down to the weed and coke; is that right?

A.    Yes, sir.

Q.    Sounds like we've thought about the whole spectrum.

A.    Yes, sir.

Q.    And if the jury wants to, they can look more into this notebook.  They'll see that he had also looked at options where he pulled up stuff off the internet, or whoever -- whoever -- I mean, you don't know where this notebook was found.  You only know what was told to you; is that right?

A.    Yes, sir.

Q.    Okay.  Whoever this belonged to had looked up some stuff on line for jobs, looks like?

A.    Yes, sir.  Definitely.

Q. Okay. And in the black notebook there was a letter; is that correct?

A. Yes, sir.

Q. All right. And in that letter, we start off with What up Folk in capitals; is that right?

A. Yes, sir.

Q. So the black notebook as well as the red notebook has indicators of -- of the gang mentality of -- of Gangster Disciples; is that correct?

A. Yes, sir.

Q. And it appears to be somebody writing a letter. We see the term OG in there; is that right?

A. Yes, sir.

Q. Let me start by saying I miss ya OG. I ain't got no use -- I ain't gonna use no codes.

Now, when gang members are writing to each other, is it common for them to use codes?

A. They try to use codes. They know that their mail's going to get read by the authorities, so when they try to, you know, hide things, they'll use a code, with him saying he's not going to use any codes. So he's like, you know, I don't care if they read what I'm writing.

Q. Okay. And he goes on, and whoever this is sending the letter to whoever it was, and -- you have

the notebooks up there?

A.    Yes, sir.

Q.    All right.  Was this something that was actually inside the binders of the notebook?

A.    Yes, sir.

Q.    All right.  And that would seem a little different.  It couldn't have actually been sent to somebody if it's in the binder, could it?

A.    Yes, sir.  It's still in the binder.

Q.    Still in the binder.  So whoever wrote it, would still be there; is that right?

A.    Yes, sir.

Q.    Okay.  And so maybe it was never sent.

A.    Still in the binder.  Never sent.

Q.    Okay.  All right.  But whoever's writing to who -- whoever, the person they're writing to is an OG.

The writing looks similar to some of the other writing in the notebook?

A.    Yes, sir.

Q.    Okay.  And telling him to keep his head up and that kind of thing; is that right?

A.    Yes, sir.

Q.    Okay.  And that the reference there is obviously is to -- to the gang; is that right?

A.    Yes, sir, it is.

133

Q.    And in the same notebook we see Arkansas Gangster there right in the middle; is that correct?

A.    Yes, sir.

Q.    All right.  And then we've got J.B. tagged a few lines down; is that correct?

A.    Yes, sir.

Q.    And that's in the black notebook.

A.    Yes, sir.

MR. ALEX:  Judge, I'll pass the witness.

THE COURT:  Cross-examination?

MR. LOLLAR:  We have no examination.

THE COURT:  No questions?

MR. LOLLAR:  Un-uh.

THE COURT:  Okay.  Ten-minute recess for the jury.  All rise for the jury.

(Jury not present.)

THE COURT: Be seated, please.

May the witness be permanently excused?

MR. ALEX:  Not at this point, Judge.

THE COURT:  You're excused for the time being.

How long for the next witness, do you think?

MS. HANDLEY:  She's back there ready to go.  It shouldn't take that long, Your Honor.  We have

some photographs.  I think a ten-minute, 15 minute video.

THE COURT:  30 minutes then?

MS. HANDLEY:  Sure.

THE COURT:  Okay.  All right.  Well, I'm not going to let them go to lunch then.

Now, I had the staff attorneys conduct some research on this next witness.  And let me ask you, Mr. Alex, what exactly are you intending to get out of this witness?

MR. ALEX:  Ms. Handley is going to take the next witness, and I'll let her speak for the --

MS. HANDLEY:  Judge, Warden Melody Nelson, she's going to testify that she has been up through the ranks as a correctional officer, all the way up to warden, and she has worked in the Polunsky Unit and several units.

She's going to talk about the process when an inmate comes to TDC and then classification.

She will testify to what the different classifications are and what that means in terms of where a particular inmate is housed, who he has contact with, what kind of access and freedom he has, what it takes to move in and out of those classifications.

She will also talk about --

THE COURT: Just let me just ask you this. Are you planning to elicit from her any specific acts of conduct committed by other inmates?

MS. HANDLEY: I -- I read their motion and --

MR. ALEX: No.

MS. HANDLEY: No, Judge. No. I think --

THE COURT: Because the staff attorneys tell me that's not admissible.

MS. HANDLEY: I'm not going to offer that on any kind of direct testimony with her. I think that do they have the potential to gather; are they around each other, yes. I think it's fair to say that -- that -- do they have opportunities to commit violence? Yeah. That happens.

Are there even things at their disposal that they can create weapons out of? Yes. That happens.

I'm not going to talk about, for example, the guard that had their throat cut, you know. I won't -- I won't talk about that, obviously.

THE COURT: Okay. Because that's not admissible.

MS. HANDLEY: No. I don't believe it is.

THE COURT: All right. With that proffer,

do you have objections to the testimony, Mr. Lollar, or Mr. Parks?

MR. PARKS:  Well, I certainly have no objection to the classification issues, you know, as long as we stay away from specifics.

I will inquire, do you intend to go into the select statistics from her?

MS. HANDLEY:  The what statistics?

MR. PARKS:  The statistics.

MS. HANDLEY:  You mean from the EAC Report?

MR. PARKS:  Yeah, the EAC.

MR. ALEX:  I might ask her if she gets the EAC Report every day, you know, and what's the purpose of it, but I won't draw out the specific instances of conduct that are -- that are -- I'm not going to talk about how many homicides occurred last year, if that's what you mean.

MR. PARKS:  Okay.  What's the purpose of asking about it?

THE COURT:  Ms. Handley, he asked you a question.

MS. HANDLEY:  What's the purpose of asking her about it?

MR. PARKS:  Why ask about it if you --

MS. HANDLEY: That's part of the operations of -- of the institution there. It helps them keep track of what's going on and -- and necessitates maybe different policy changes. They have to adapt to what's going on within the penitentiary.

THE COURT: Is there any objection to that?

MR. PARKS: Well, yes, Judge, because all that really does is leave the impression with the jury that there are these -- these tons of statistics that bear out what they've got to say, and I either have to let that go in like that or get into the statistics myself.

THE COURT: Are you going to ask actual numbers?

MS. HANDLEY: No, sir. No.

MR. PARKS: That's their point. They won't ask numbers.

THE COURT: You are going to?

MR. PARKS: I guess I'll have to.

THE COURT: Your objection's overruled. I'm going to allow it.

MR. LOLLAR: Judge, can I inquire, is the State going to ask Ms. Nelson to display weapons that she has seized or have been seized from other inmates

138

over the past years?

MS. HANDLEY:  I have asked her to bring some things for demonstrative purposes, Your Honor, just to show that weapons can be fashioned out of things found in the penitentiary.

THE COURT:  And you object to that?

MR. PARKS:  We do.

THE COURT:  Okay.  I'm going to allow that.  Overruled.

Okay.  This is our last witness; is that right?

MS. HANDLEY:  Well, --

MR. ALEX:  I've got a lot of evidence that I only offered for record purposes I'm going to offer for all purposes before I rest.

THE COURT:  I mean, by way of witnesses.

MR. ALEX:  Yes, sir.

THE COURT:  Okay.  Keep in mind, obviously you can have rebuttal.

Okay.  And you guys want me to recess so y'all can get your case ready, right?

MS. HANDLEY:  Yeah.

THE COURT:  Okay.  We'll do that.

Call the jury.

MR. ALEX:  Are we going now or are we

going to lunch?

MS. HANDLEY:  All right.  I'm ready to go.  Let's just go.

MR. ALEX:  I'm probably going to wait until after lunch to rest, Judge, because I need to look at what I haven't offered.

THE COURT:  I'm not going to make them go to lunch, come back and have you do that.  If you would like to wait until Monday to rest, I'll let you do that.

MR. ALEX:  That would be great.

THE BAILIFF:  All rise.

(Jury present.)

THE COURT:  Be seated, please.

Ladies and gentlemen, I wanted to be fair to you and give you kind of an idea where we are.

The State of Texas is getting ready to call their last witness during the punishment phase of the trial.  There may be some other exhibits that they're going to offer, but I'm not going to have you wait to decide which ones of those they're going to do.  This will be their last actual live witness, so -- and rather than send you on lunch break now and have you come back for just one witness, we're going to plow ahead with this and then I'll just cut you loose for

the weekend and we'll start on Monday with the defense case, okay?

What further says the State?

MS. HANDLEY:  We call Melody Nelson.

THE COURT:  Ma'am, if you'll come all the way to the front of the courtroom up by the door.  When you've reached the door, turn and face me and raise your right hand.

**MELODY NELSON**

was called as a witness and testified as follows:

THE COURT:  You may lower your hand.  Take your seat in the witness stand.

You'll be responding to questions from Ms. Handley.

Ms. Handley, whenever you're ready, ma'am.

MS. HANDLEY:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MS. HANDLEY:

Q.   Ma'am, would you please introduce yourself to our jury?

A.   Yes, ma'am.  My name is Melody Nelson.  I'm a assistant warden with the Texas Department of Criminal Justice Institutional Division.

Q.   I understand that you -- you have the rank Major; is that correct, Warden?

A.    I had the rank; yes, ma'am.  I promoted.

Q.    Is it -- and you promoted since then.

A.    Yes, ma'am.

Q.    What is the proper way to address you then, ma'am?

A.    Warden is fine.

Q.    Warden is fine, okay.  All right.

Could you tell the jury, please, what you -- I believe you just said that.

What is your current occupation, Warden?

A.    I'm currently an assistant warden at the Christina Melton Crane Unit in Gatesville, Texas, and I hold the rank of assistant warden.

Q.    Assistant warden.  Thank you, ma'am.

Could you tell the jury a little bit -- or -- tell them about your work history with the Texas Department of Criminal Justice.

A.    Yes, ma'am.  I have 20 years of service, all in the area of corrections.  I started out as a correctional officer down in Rosharon at the Ramsey 3 Unit.  I promoted to sergeant there.

Promoted to the Darrington Unit in Rosharon shortly after that.

I worked at -- then I took a lateral transfer; was a lieutenant at the Huntsville Unit known as The

Walls for a period of six, six and-a-half years total, and promoted to captain there.

Was a captain there about three years and then promoted to the Polunsky Unit where I was the major of correctional officers over the Texas Death Row and ad seg. Stayed there about three and-a-half years. And almost two years ago, I promoted to assistant warden and was moved to the Gatesville Unit.

Q.   So how many years is that, Warden?

A.   20.   20 total.

Q.   20 years you -- you dedicated your career to the prison system and working within that.

A.   Yes, ma'am.

Q.   And is it fair to say that -- that you -- maybe an analogy here is, to a business corporation, you started in the mail room and have worked your way all the way up to vice president or CEO.

A.   Yes, ma'am.

Q.   Okay. Could you explain to the jury a little bit -- or let me say, I'd like for your testimony today, I'd like you to be able to tell the jurors about the prison system, you know, how it -- how it operates, how inmates are classified, the way that the inmates may move -- have interaction with one another, what their schedules are. We'll get to that. But I'd also

like you to talk a little bit about who all is in the penitentiary and who works there.

Now, sometimes people refer to them as prisons guards or correctional officers. What's the correct term?

A.   It's actually correctional officers.

Q.   Could you explain to the jury what it is, what are the duties of a correctional officer?

A.   Correctional officers are basically assigned to a facility to provide that -- the first level of security, or the first level of observation of -- of the offender population.

They do things such as -- every facility is required to count a minimum of eight times a day, or eight times in a 24-hour period. So the officers count. The officers make inspections for sanitation and maintenance issues in the housing areas and in the work areas of -- of the offender population.

They're required to -- what we call shake down or search an offender's cells. They have X amount of cells that they're required to search in their -- in their daily routine.

Their -- their biggest thing is just the hands one-on-one observation and safety and security to -- for themselves and -- and for the offender population

144

as well against one another.

Q.    Outside of the correctional officers, could you explain your duties as a warden or assistant warden?

A.    Basically, as an assistant warden, I oversee the activities of our entire population, both the offenders and the staff.

I oversee all the activities that are given to the offender population, church services, legal services, law library, medical services, and basically it's an administrative role, but I'm basically the liaison between all of our non-security individuals and our security individuals in making sure that we provide a safe atmosphere for our staff and the offenders.

Q.    And with respect to your appearance here today in court, Warden, you drove down this morning from -- from your -- the prison where you're currently working?

A.    Yes, ma'am.

Q.    And do you get paid any additional salary or monies for coming to court to testify?

A.    No, ma'am.

Q.    I -- I had called you and ask you if you could fit this into your schedule to -- to help us out with the jurors; is that correct?

A.    Yes, ma'am.

Q.   Okay.   Can you tell the jury how many prisons we currently have in Texas?

A.   I think there's 109 that we currently operate. Some of those are, I think, under our private umbrella, but we still maintain the overall supervision of those, or security of those facilities.

Q.   Are these facilities scattered throughout the State of Texas?

A.   Yes, ma'am.   They're all over from Amarillo, Pampa, Texas, all the way to Edinburg, Texas, El Paso, all the way to East Texas.   We're scattered everywhere.

Q.   And I understand it's probably a fluid number, but can you tell us approximate -- approximately how many inmates we would have in these 109 prisons?

A.   I think right now our -- our population is somewhere around 149,000, 150,000.   Something in that -- that category.

Q.   Okay.   With respect to the Texas prisons, do we also have prisons that -- that have specialized functions or serve special needs?

A.   Yes.   We have psychiatric facilities, we have facilities set up for any offender deemed mentally retarded.   We have medical facilities for our female offenders who are pregnant or have recently given birth.   We have medical facilities for offenders who

require either some hospice or a hospital-type setting.

Q.    Okay.  One of the things that -- that a juror may be called upon to consider is -- is how a defendant would act in a society.  And is it your understanding, Warden, that an individual found guilty of capital murder, would automatically receive a sentence of life in prison without parole?  If convicted today.

A.    Yes.  Yes, that's my understanding.

Q.    Or having been convicted this week --

A.    Right.  Yes.

Q.    -- we'll say that that individual would receive a sentence of life in prison without parole.

Presumably, then, Warden, that individual will be serving the rest of their life in our prison system --

A.    Uh-huh.

Q.    -- and I'd like to have you speak to the concept of the prison actually being a society also in itself.  And particularly, explain to the jury who is in the prison system besides the actual inmates.

A.    We employ medical personnel, nurses, doctors, dentists, optometrists.

We also employ chaplains.

We have free-world individuals, what we consider free-world individuals, volunteers who come on

for our substance abuse. And we also have facilities set up just for substance and alcohol abuse, so we have those types of counselors.

We have clerks. We have mail room staff. We have a group of individuals who work in what we call a count room, and they basically oversee the -- the housing and the -- the moves every day. You get on some of your larger facilities, that's quite an undertaking of 3,000 offenders, and the movement in and movement out, movement from cell to cell requires quite a staff.

We have a law library staff. Like I say, we have, you know, on top of that, just correctional officers and correctional supervisors in and out.

Q. And in addition, Warden, do we also have family members actually coming into the prison system itself to visit inmates?

A. Yes, ma'am. Most facilities have visitation every weekend. Some have it Fridays, but most all of our -- the norm is Saturdays and Sundays 8:00 to 5:00, and families and friends of -- of the offender population visit.

Q. Okay. And we may speak to that a little bit more, but -- but are there even occasions where they can have contact visits with individuals coming in off

148

the street, out of the free-world, if you will?

A.   Yes, ma'am.  They have -- there are certain levels, custody levels, that once an offender reaches that custody level, they will obtain contact visitation with immediate family members, children, wives, husbands, mother-in-laws, father-in-laws, aunts, uncles, things of that nature.

And then there is one custody level that we currently have that has contact visits with everyone on their visitation list, whether it's a friend or a family member, and that's our outside trustees, our G-1 status offenders.

Q.   If you will, Warden, I'd like you to take the jury through how an inmate is brought into the penitentiary system.

After a conviction, after an inmate is sentenced, for example, to -- to -- well, sentenced to a prison term, what process do they go through?

A.   Once they leave a jail, they will come to one of our in-processing, or what we call a diagnostics facility.  Currently we have a couple of those set up.

And they, for the first few days, they undergo some medical tests.  The inmate is interviewed by medical staff to know what medical concerns he's had in the past.  Surgeries.  Any ongoing chronic illnesses,

things of that nature.  He's tested for some things.

We have socialists on staff that will interview and review any jail records that were brought with the offender to TDC.

They'll interview them, get family histories.  Anybody in their family who -- you know, we get a -- what we call a family history sheet.  Their mothers, their fathers, their grandmothers, grandfathers.

They also talk to them at that time about visitation list.  Offenders are allowed to have up to ten individuals on their visitation list.  They'll talk to them at that time about who they're allowed to visit with.

Some of the offenders come in and their families may be their victims, and so it's explained to them at that time, those individuals cannot visit without going through a certain procedures.  But mostly we get a background of their -- their criminal history, of education levels.  That's another thing.  They'll test some of them.  Depending on what custody or what -- they'll actually give them some tests to see what level of education that they have.  Are they going to be a required student when they come to TDCJ.

And so they'll have -- when they get that, and we -- then they'll produce what is called a travel card

for that individual, and that travel card will contain that information. How many arrests, how many were violent. What his rationale of his offense was. Things of that nature. Things that the prison system uses.

Any gang affiliation, whether he's known to be a gang member, or he's suspected or -- monitored. Those are our three levels of our gangs that we -- he'll actually talk to somebody. They'll start a gang file or they'll not start one.

And then basically he will sit in this diagnostics process, and once that's done, the socialists will send this information to our headquarters, which is called our state classification, and the --

Q. Okay. So -- so let me stop you there. So it begins first with the diagnostics process where you're saying they're getting information coming with them, maybe some history on their offense or if they have a criminally -- a criminal history. They're looking at that also. It's taking into consideration maybe the special custody needs of the person --

A. Or any special needs.

Q. Or any special needs they may have. They may have physical disabilities or -- or be ill, or

pregnant, if it's a female penitentiary, and -- and obviously we do have different prisons for men and women, do we not, ma'am?

A.    Yes, we do.

Q.    Okay.  And after the diagnostics process there, is -- is that done right there in the prison where they will eventually reside?

A.    No.

Q.    Okay.

A.    No.  That's -- we have a couple of facilities set up that are just in-processing type facilities. The -- the Byrd Unit in Huntsville is -- was the -- was our main one, but because of our numbers, we've extended it to a couple of other facilities.  I think the Middleton -- the John Middleton Unit in Abilene, I believe, also does it.

And they'll do the same intake processing and then that information then goes to someone and they will decide, based upon the information that is received, and there will be things that the individual will tell the sociologist that may take some time to corroborate to make sure that -- that we're putting this person in the safest environment for him and for others, i.e., crimes against other people that may be incarcerated, they'll ask, do you have any enemies,

known enemies.

They'll look at jail reports. And he may say I had an enemy in the county jail and he came to TDC, and then we'll -- they'll actually pull that up or contact the jail authorities and -- and get those reports.

Q. Is a lot of that done through self-reporting? The inmate telling them themselves?

A. A lot of it is and a lot of it -- some of it may come off of the -- the jail reports. Some of -- you know, some of the jails send a whole lot of information and some send a very vague amount of information about his incarceration while there.

Q. After the diagnostic process, do they then go to what's referred to as classification?

A. Yes. They'll -- they'll be classified and they'll receive a -- what is -- what state classification considers their first classification level, and then they are sent to a facility. They are put on a -- on a bus and -- and go to a facility.

There they will meet with what is called a unit classification committee, which is chaired by a warden or a major, and then two other individuals. And then they will review what is recommended by the state classification.

153

Q.    And what -- what is the purpose of classification?  Why do we have that?

A.    We have that -- it's -- it's a -- it's a system set up to ensure that the offender is receiving the amount of treatment that they need, and that they are put into a situation, an environment that is both safe for them and others, other offenders.

Q.    Can you tell the jury what are the different classifications within the prison?

A.    Currently, we have what is called G-1, G-2, G-3, G-4, G-5.  Now those are all general population.  That means they are not restricted to their cells for a long period of time.  They actually roam, walk free through -- through our prisons, so-to-speak.

Q.    All right.  Let me -- okay.  I'm just going to put this up here just to -- kind of as a visual to follow along, Warden.

You said there's G-1 through -5, which stands for general population.

A.    Uh-huh.

Q.    And then is there also something we call administrative segregation?

A.    Administrative segregation and then death row.

Q.    And then death row.

I'd like for you to explain to the jurors --

we'll go through that.  Who -- who generally are we going to find, what kind of an offender is going to be in the General-1 population?

A.    That's going to be your nonviolent offender that is eligible for parole within a one-year eligibility.  It doesn't mean they're going home within a year, it just means they're eligible to be reviewed by parole.  They are mostly convicted or convicted of nonviolent, no sex offenses, no things of that nature.

Those are what we consider our outside trustees.  Those offenders live and work primarily outside of our perimeter fences.  They are our tractor drivers.  They are our support staff as far as on some of our facilities as -- as maintenance workers.

They -- we have individuals that we have tracking dogs -- our outside trustees work with those animals.  We have farms, so they'll be in charge of chickens and hogs and cattle and swine.  Those are usually the individuals who will be working in those areas.

Q.    What about General Population 2?

A.    General Population 2 are those offenders that we consider minimum custody, however, cannot, for whatever reason, for their crime or for the amount of time that they're doing, or for previous convictions,

can't be outside trustees but can live and work inside our perimeter fences and require a minimum amount of supervision, meaning one correctional officer to, you know, a couple of hundred of them in a housing area. They can work in all areas of our -- inside of our perimeter.

If they -- if a G-2 offender is to leave our perimeter, however, they will leave under -- under armed supervision, but they're under unarmed supervision on the inside of our perimeter. The outside trustees, I'll tell you, are on unarmed supervision outside of the perimeter fence, so that's a -- another distinction.

Q.    What about General Population 3?

A.    G-3s is a relatively new -- I say relatively new, within the last three to last probably four years, I guess. And what they are is any offender doing over a 50-year sentence who has done less than ten years of that sentence, they are considered general population, they live with general population. However, what is restricted with them is their areas of work.

They cannot work where they have multiple access to multiple areas of our facilities, say maintenance, for instance, because our maintenance workers go all over. On the inside, a G-3 offender

would not be eligible for that job, and that's pretty much, -- they're -- they're treated as general population. Their big thing is or their big designation or custody designation really has to do with their work, with what their work sites.

Q. So maybe one of the primary differences between G-2 and G-3 would be the -- the work options?

A. The work options and -- and we norm -- we house G-3s together. However, G-3s and G-2s can live in the same buildings. We just try not to put them in the same cells.

They can be in the same pod or same cell block, they're just usually housed with someone that is also a G-3 offender.

Q. Now, you mentioned, Warden, that -- that anyone serving a sentence of 50 years or more who has not already served ten years of that sentence would be a G-3.

A. Correct.

Q. Okay. Now, the -- I'm sure you know, Warden, that in the -- life without parole is relatively new; that in 2005 the legislature mandated or changed the law that a person convicted of capital murder would now receive life in prison, which meant life without parole, --

A.    Yes, ma'am.

Q.    -- as of 2005.

Along with that new law, did we also get a new mandate with respect to classification and where a person serving life without parole, what -- what category that they would go into?

A.    I -- I think the amendment or the addendum to life without parole offenders that come in will always maintain that G-3 level and never promote. They'll promote in time-earning stats, but they won't promote in their custody level beyond the G-3, I believe is -- and -- which is new, so ...

Q.    Sure. And could you explain just how -- what is G-4?

A.    G-4 offenders are offenders who have displayed poor institutional adjustment, meaning they've had several disciplinary infractions. They have to have two major disciplinaries within a six-month period to be considered and -- before they are placed in that custody level, they again will go -- anytime an offender receives a -- what is called major disciplinary, they go before the unit classification committee and that classification committee will decide if that individual has a need for closer supervision, meaning their hours -- out-of-cell hours are reduced.

The amount of staff that supervises them is increased by one. Usually there's two staff members instead of one in a housing area where G-4 offenders are, and usually, like I said, they -- they've just displayed some disciplinary problems and either multiples or some sort of disruptive behavior that we need to put them in that.

Q. What about G-5?

A. G-5 are offenders who have displayed some violent acts either against staff or other offenders. It's -- or who just cannot adjust to the institutional rules.

It takes -- it really does take some effort on the offender population to get to that G-5. You al -- you have to have a weapons possession, narcotics possession or use, or like I said, a staff assault or an inmate assault to get to that G-5 level.

Q. Now, an inmate coming into a -- a person sentenced to capital murder life in prison without parole, are they going to come in as a G-3?

A. Yes. Normally. I mean, under normal circumstances, if you're just telling me you have an offender who got -- who was sentenced to life without parole, they will come in, and all offenders come in as a time-earning class, a Line 1, and they will come in

as a Line 1 G-3, unless there are extenuating circumstances that would preclude that, that would prevent or to make the classification committee believe that he needed to be in a more restrictive custody.

Q.   Okay.  So as we -- as we go up the level, they're 1, 2, 3, 4, 5, we're talking about that they can't carry on with the rules properly, or they displayed violent behavior and it can bump them up to a higher classification.

A.   Right.  Yes, if they've got -- or a history of -- of some violence and -- in a -- in a jail or prison setting, in an institutional-type setting.

Q.   If an inmate coming in as, normally speaking, as a G-3, if there seems to be a necessity to make him a G-4, does that mean he'll always be a G-4?

A.   No.  He will be reviewed after a period of six months, usually, following that first initial classification.  Six months later he will be again reviewed by unit classification.

If that offender, during that six-month period has displayed some improvement in their behavior and in their disciplinary, they can be promoted back to that G-3 status.

Q.   Would the same apply to going from a G-5 to a G-4?

A.    Yes, but G-5s we normally review once a year because of -- because of -- the reason that there is there has to be a violent, or some type of violent nature.  And a G-4 can just be a repetitive disciplinary problem, where a G-5 has used some sort of weapon, or fights, or -- or something of that nature.  Something more serious.

Q.    So would it be fair to say that they would be classified as a G-5 for a year and then they would be reviewed again?

A.    Yes.

Q.    And if they did not have any other major disciplinary actions or their behavior was perhaps starting to conform to the standards, then they could be reviewed and considered for a lesser classification.

A.    Right.  A lesser classification.

Q.    Tell us what administrative segregation is.

A.    Administrative segregation in our prison system is set up to segregate offenders who are violent in nature.  There again, gang members who have participated and/or who are known and confirmed to be gang members, I think we currently track 11, what we call security-threat groups, if they are a member, a known member, a confirmed member of that, we will put them in administrative segregation.