76207

REPORTER'S RECORD

VOLUME 50 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE CRIMINAL DISTRICT |
| | ) |
| VS. | ) COURT NO. 7 |
| | ) |
| JAMES GARFIELD BROADNAX | ) Of DALLAS COUNTY, TEXAS |

ORIGINAL    ORIGINAL

===========================================================

FILED IN
COURT OF CRIMINAL APPEALS

SEP 16 2010

Louise Pearson, Clerk

PUNISHMENT PHASE

===========================================================

On the 17TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

SHARON HAZLEWOOD, CSR          972-739-3906
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TEXAS

A P P E A R A N C E S


FOR THE STATE OF TEXAS:


   HONORABLE DAVID M. ALEX
   SBOT NO. 24003256
   HONORABLE LISA SMITH
   SBOT NO. 00787131
   HONORABLE GORDON HIKEL
   SBOT NO. 00787696
   HONORABLE ANDREA HANDLEY
   SBOT NO. 08898800
   HONORABLE ELAINE EVANS
   SBOT NO. 24032880
   133 N. INDUSTRIAL BLVD.
   FRANK CROWLEY COURTHOUSE
   DALLAS, TEXAS 75207
   TEL. 214-653-3600


FOR THE DEFENDANT:

   HONORABLE BRAD LOLLAR
   SBOT NO. 12508700
   1700 COMMERCE ST, STE. 404
   DALLAS, TEXAS 75201
   TEL. 214-384-8178

   HONORABLE DOUGLAS H. PARKS
   SBOT NO. 15520000
   321 CALM WATER LANE
   HOLLY LAKE RANCH, TEXAS 75765
   TEL. 903-769-3120

   HONORABLE KERI MALLON
   SBOT NO. 24049165
   DALLAS COUNTY PUBLIC DEFENDERS OFFICE
   133 N. INDUSTRIAL BLVD., LB 2
   FRANK CROWLEY COURT BLDG.
   DALLAS, TEXAS  75207
   TEL. 214-653-3550

# VOLUME 50

## PUNISHMENT PHASE

AUGUST 17TH, 2009                                              PAGE    VOL.

PROCEEDINGS.............................................    3      50

CASE CALLED BY THE COURT................................    3      50

HEARING................................................    3      50
JURY PRESENT...........................................    5      50

STATE RESTS ON PUNISHMENT..............................   14      50

OPENING STATEMENTS BY THE DEFENSE......................   15      50

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| SILVER, CHERYL | 22 | 53 | | 50 |
| | 73 | 76 | | 50 |
| LANE, FRANK | 77 | 114 | | 50 |
| | 162 | 166 | | 50 |
| ROACHE, JOHN | 171 | | 189 | 50 |
| | 191 | 192 | | 50 |
| | 216 | 219 | | 50 |
| HOLYFIELD, CLARA | 221 | 233 | | 50 |
| | 239 | | | 50 |
| THOMPSON, TERESA | 240 | 259 | | 50 |
| | 268 | 269 | | 50 |
| | 272 | | | 50 |
| KELLY, AUDREY | 274 | | | 50 |

                                                            PAGE    VOL.

HEARING................................................   308      50

ADJOURNMENT............................................   314      50

REPORTER'S CERTIFICATE.................................   315      50

## CHRONOLOGICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| SILVER, CHERYL | 22 | 53 | | 50 |
| | 73 | 76 | | 50 |
| LANE, FRANK | 77 | 114 | | 50 |
| | 162 | 166 | | 50 |
| ROACHE, JOHN | 171 | | 189 | 50 |
| | 191 | 192 | | 50 |
| | 216 | 219 | | 50 |
| HOLYFIELD, CLARA | 221 | 233 | | 50 |
| | 239 | | | 50 |
| THOMPSON, TERESA | 240 | 259 | | 50 |
| | 268 | 269 | | 50 |
| | 272 | | | 50 |
| KELLY, AUDREY | 274 | | | 50 |

## ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| HOLYFIELD, CLARA | 221 | 233 | | 50 |
| | 239 | | | 50 |
| KELLY, AUDREY | 274 | | | 50 |
| LANE, FRANK | 77 | 114 | | 50 |
| | 162 | 166 | | 50 |
| ROACHE, JOHN | 171 | | 189 | 50 |
| | 191 | 192 | | 50 |
| | 216 | 219 | | 50 |
| SILVER, CHERYL | 22 | 53 | | 50 |
| | 73 | 76 | | 50 |
| THOMPSON, TERESA | 240 | 259 | | 50 |
| | 268 | 269 | | 50 |
| | 272 | | | 50 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 18 | CHANNEL 5 VIDEO WITHOUT MUTED PART | 11 | 11 | 50 |
| 52 | CRIME SCENE PHOTO - RING ON BUTLER'S FINGER | 12 | 13 | 50 |
| 131G | MASK FOUND IN SUITCASE | 9 | 9 | 50 |
| 131H | PHOTO - MASK FOUND IN SUITCASE | 9 | 9 | 50 |
| 159 | BULLET (BUTLER) | 5 | 6 | 50 |
| 160 | BULLET (BUTLER) | 5 | 6 | 50 |
| 161 | GUNSHOT RESIDUE KIT (BUTLER) | 6 | 6 | 50 |
| 162 | HAIR STANDARD (BUTLER) | 6 | 6 | 50 |
| 163 | BLOOD STANDARD (BUTLER) | 6 | 6 | 50 |
| 164 | CLOTHING (BUTLER) | 6 | 6 | 50 |
| 165 | FINGERNAIL CLIPPING (BUTLER) | 6 | 6 | 50 |
| 166 | FINGERNAIL CLIPPING (BUTLER) | 6 | 6 | 50 |
| 167 | TAPELIFT FROM CLOTHING & BODY OF BUTLER | 6 | 6 | 50 |
| 168 | TAPELIFT FROM CLOTHING & BODY OF BUTLER | 6 | 6 | 50 |
| 169 | TAPELIFT FROM CLOTHING & BODY OF BUTLER | 6 | 6 | 50 |
| 170 | TAPELIFT FROM CLOTHING & BODY OF BUTLER | 6 | 6 | 50 |
| 171 | TAPELIFT FROM CLOTHING & BODY OF BUTLER | 6 | 6 | 50 |
| 180 | PHOTO - SUITCASE WITH MASK | 7 | 7 | 50 |
| 181 | PHOTO - MASK WITH A GROUP OF OTHER PICTURES | 7 | 7 | 50 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 182 | GROUP PHOTO INCLUDING DEFENDANT | 7 | 7 | 50 |
| 184 | GROUP PHOTO INCLUDING ITEMS FOUND IN SUITCASE | 7 | 7 | 50 |
| 185 | PHOTO - ITEMS FOUND IN SUITCASE | 7 | 7 | 50 |
| 186 | PHOTO - ITEMS FOUND IN SUITCASE | 7 | 7 | 50 |
| 201 | BUCCAL SWAB (JAMES BROADNAX) | 9 | 10 | 50 |
| 205 | WHITE TOWEL DNA WAS TESTED ON | 9 | 10 | 50 |
| 397 | FIRE/EMS REPORT - GARLAND | 9 | 9 | 50 |
| 427 | AUTOPSY PHOTO - BUTLER | 10 | 11 | 50 |
| 486 | MEDICAL RECORDS 11/26/08 - 4/24/09 (DEFENSE EX. 2) | 8 | 8 | 50 |
| 487 | MEDICAL RECORDS - 4/24/09 - 6/29/09 (DEFENSE EX. NO. 3) | 8 | 8 | 50 |
| 488 | MEDICAL RECORDS - 6/29/09 - 7/21/09 | 8 | 8 | 50 |
| 489 | DISD SCHOOL RECORDS | 8 | 9 | 50 |
| 490 | HOPE HIGH SCHOOL RECORDS | 8 | 9 | 50 |
| 491 | MT. VERNON SCHOOL RECORDS | 8 | 9 | 50 |
| 492 | TEXARKANA ISD SCHOOL RECORDS | 8 | 9 | 50 |
| 494 | BLACK CHEST OF TOOLS | 9 | 10 | 50 |
| 549 | JAIL CALL - 4/1/09 | 153 | 153 | 50 |
| 550 | VIDEOTAPE | 152 | 152 | 50 |
| 557 | TAPE | 135 | 135 | 50 |

## STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 559 | TAPE | 153 | 153 | 50 |
| 560 | TAPE | 152 | 152 | 50 |
| 566 | TAPE | 135 | 135 | 50 |
| 579 | CHANNEL 5 INTERVIEW. | 11 | 12 | 50 |
| 580 | SUBSET OF COMPLETE MEDICAL RECORDS | 116 | 116 | 50 |
| 581 | DEFINITION OF ANTISOCIAL PERSONALITY DISORDER | 145 | 146 | 50 |
| 582 | DSM-IV-TR DEFINITION OF SCHIZOAFFECTIVE DISORDER | 156 | 156 | 50 |
| 583 | STUDY - DRUGS OF ABUSE & THE ELICITATION OF HUMAN AGGRESSIVE BEHAVIOR | 168 | 168 | 50 |
| 584 | REPORT - DR. ROACHE | 193 | 194 | 50 |

## DEFENSE EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 19 | CURRICULUM VITAE - DR. SILVER | 25 | 25 | 50 |
| 20 | MENTAL HEALTH CLINIC BRIEF NOTE - 10/6/08 | 84 | 84 | 50 |
| 21 | CLINIC NOTE - 7/20/08 | 84 | 84 | 50 |
| 22 | MEDICAL RECORD | 84 | 84 | 50 |
| 23 | MEDICAL RECORD - MEDICATIONS | 84 | 84 | 50 |
| 24 | MEDICATION ORDER FORM - 10/30/08 | 84 | 84 | 50 |
| 25 | FOLLOW-UP CLINIC NOTE - 11/4/08 | 84 | 84 | 50 |
| 26 | MEDICATIONS PRESCRIBED ON 11/4/08 | 84 | 84 | 50 |
| 27 | MEDICATIONS CONTINUED | 84 | 84 | 50 |
| 28 | CLINICAL NOTE - 2/18/09 | 84 | 84 | 50 |
| 29 | FOLLOW-UP NOTE BY MR. ADAMS - 3/31/09 | 84 | 84 | 50 |
| 30 | 2/14/09 MEDICATIONS | 84 | 84 | 50 |
| 31 | PSYCHIATRIC PROVIDER PROGRESS NOTE - 6/16/09 | 84 | 84 | 50 |
| 32 | MEDICATIONS ORDERED - 6/19/09 | 84 | 84 | 50 |
| 33 | CHRONIC CLINIC NOTE - 6/29/09 | 84 | 84 | 50 |
| 34 | CURRICULUM VITAE - DR. ROACHE | 172 | 172 | 50 |
| 35 | STATE MAPS OF ARKANSAS, CALIFORNIA, GEORGIA, TEXAS & MICHIGAN | 278 | 278 | 50 |
| 36 | STATE MAPS OF ARKANSAS, CALIFORNIA, GEORGIA, TEXAS & MICHIGAN | 278 | 278 | 50 |

## DEFENSE EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 37 | STATE MAPS OF ARKANSAS, CALIFORNIA, GEORGIA, TEXAS & MICHIGAN | 278 | 278 | 50 |
| 38 | STATE MAPS OF ARKANSAS, CALIFORNIA, GEORGIA, TEXAS & MICHIGAN | 278 | 278 | 50 |
| 39 | STATE MAPS OF ARKANSAS, CALIFORNIA, GEORGIA, TEXAS & MICHIGAN | 278 | 278 | 50 |
| 40 | MEDICAL RECORDS OF BAYLOR MEDICAL CENTER AT IRVING | 308 | 308 | 50 |

REPORTER'S RECORD

VOLUME 50 OF _____ VOLUMES

TRIAL COURT CAUSE NO. F08-24667-Y

THE STATE OF TEXAS ) IN THE CRIMINAL DISTRICT
)
)
)
VS. ) COURT NO. 7
)
)
)
JAMES GARFIELD BROADNAX ) Of DALLAS COUNTY, TEXAS

==============================================================

PUNISHMENT PHASE

==============================================================

On the 17TH day of AUGUST, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause to be heard before the Honorable MICHAEL SNIPES, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by machine shorthand; computer-aided transcription.

---

APPEARANCES

FOR THE STATE OF TEXAS:

HONORABLE DAVID M. ALEX
SBOT NO. 24003256
HONORABLE LISA SMITH
SBOT NO. 00787131
HONORABLE GORDON HIKEL
SBOT NO. 00787696
HONORABLE ANDREA HANDLEY
SBOT NO. 08898800
HONORABLE ELAINE EVANS
SBOT NO. 24032880
133 N. INDUSTRIAL BLVD.
FRANK CROWLEY COURTHOUSE
DALLAS, TEXAS 75207
TEL. 214-653-3600

FOR THE DEFENDANT:

HONORABLE BRAD LOLLAR
SBOT NO. 12508700
1700 COMMERCE ST, STE. 404
DALLAS, TEXAS 75201
TEL. 214-384-8178

HONORABLE DOUGLAS H. PARKS
SBOT NO. 15520000
321 CALM WATER LANE
HOLLY LAKE RANCH, TEXAS 75765
TEL. 903-769-3120

HONORABLE KERI MALLON
SBOT NO. 24049165
DALLAS COUNTY PUBLIC DEFENDERS OFFICE
133 N. INDUSTRIAL BLVD., LB 2
FRANK CROWLEY COURT BLDG.
DALLAS, TEXAS 75207
TEL. 214-653-3550

FIRM NAME

---

VOLUME 50

PUNISHMENT PHASE

| | PAGE | VOL. |
|---|---|---|
| AUGUST 17TH, 2009 | | |
| PROCEEDINGS | 3 | 50 |
| CASE CALLED BY THE COURT | 3 | 50 |
| HEARING | 3 | 50 |
| JURY PRESENT | 5 | 50 |
| STATE RESTS ON PUNISHMENT | 14 | 50 |
| OPENING STATEMENTS BY THE DEFENSE | 15 | 50 |

| DEFENSE WITNESSES | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| SILVER, CHERYL | 22 | 53 | | 50 |
| | 73 | 76 | | 50 |
| LANE, FRANK | 77 | 114 | | 50 |
| | 162 | 166 | | 50 |
| ROACHE, JOHN | 171 | | 189 | 50 |
| | 191 | 192 | | 50 |
| | 216 | 219 | | 50 |
| HOLYFIELD, CLARA | 221 | 233 | | 50 |
| | 239 | | | 50 |
| THOMPSON, TERESA | 240 | 259 | | 50 |
| | 268 | 269 | | 50 |
| | 272 | | | 50 |
| KELLY, AUDREY | 274 | | | 50 |

| | PAGE | VOL. |
|---|---|---|
| HEARING | 308 | 50 |
| ADJOURNMENT | 314 | 50 |
| REPORTER'S CERTIFICATE | 315 | 50 |

---

**CHRONOLOGICAL INDEX OF WITNESSES**

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| SILVER, CHERYL | 22 | 53 | | 50 |
| | 73 | 76 | | 50 |
| LANE, FRANK | 77 | 114 | | 50 |
| | 162 | 166 | | 50 |
| ROACHE, JOHN | 171 | | 189 | 50 |
| | 191 | 192 | | 50 |
| | 216 | 219 | | 50 |
| HOLYFIELD, CLARA | 221 | 233 | | 50 |
| | 239 | | | 50 |
| THOMPSON, TERESA | 240 | 259 | | 50 |
| | 268 | 269 | | 50 |
| | 272 | | | 50 |
| KELLY, AUDREY | 274 | | | 50 |

**ALPHABETICAL INDEX OF WITNESSES**

| WITNESS | DIR. | CROSS | V.D. | VOL |
|---|---|---|---|---|
| HOLYFIELD, CLARA | 221 | 233 | | 50 |
| | 239 | | | 50 |
| KELLY, AUDREY | 274 | | | 50 |
| LANE, FRANK | 77 | 114 | | 50 |
| | 162 | 166 | | 50 |
| ROACHE, JOHN | 171 | | 189 | 50 |
| | 191 | 192 | | 50 |
| | 216 | 219 | | 50 |
| SILVER, CHERYL | 22 | 53 | | 50 |
| | 73 | 76 | | 50 |
| THOMPSON, TERESA | 240 | 259 | | 50 |
| | 268 | 269 | | 50 |
| | 272 | | | 50 |

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 18 | CHANNEL 5 VIDEO WITHOUT MUTED PART | 11 | 11 | 50 |
| 52 | CRIME SCENE PHOTO - RING ON BUTLER'S FINGER | 12 | 13 | 50 |
| 131G | MASK FOUND IN SUITCASE | 9 | 9 | 50 |
| 131H | PHOTO - MASK FOUND IN SUITCASE | 9 | 9 | 50 |
| 159 | BULLET (BUTLER) | 5 | 6 | 50 |
| 160 | BULLET (BUTLER) | 5 | 6 | 50 |
| 161 | GUNSHOT RESIDUE KIT (BUTLER) | 6 | 6 | 50 |
| 162 | HAIR STANDARD (BUTLER) | 6 | 6 | 50 |
| 163 | BLOOD STANDARD (BUTLER) | 6 | 6 | 50 |
| 164 | CLOTHING (BUTLER) | 6 | 6 | 50 |
| 165 | FINGERNAIL CLIPPING (BUTLER) | 6 | 6 | 50 |
| 166 | FINGERNAIL CLIPPING (BUTLER) | 6 | 6 | 50 |
| 167 | TAPELIFT FROM CLOTHING & BODY OF BUTLER | 6 | 6 | 50 |
| 168 | TAPELIFT FROM CLOTHING & BODY OF BUTLER | 6 | 6 | 50 |
| 169 | TAPELIFT FROM CLOTHING & BODY OF BUTLER | 6 | 6 | 50 |
| 170 | TAPELIFT FROM CLOTHING & BODY OF BUTLER | 6 | 6 | 50 |
| 171 | TAPELIFT FROM CLOTHING & BODY OF BUTLER | 6 | 6 | 50 |
| 180 | PHOTO - SUITCASE WITH MASK | 7 | 7 | 50 |
| 181 | PHOTO - MASK WITH A GROUP OF OTHER PICTURES | 7 | 7 | 50 |

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 182 | GROUP PHOTO INCLUDING DEFENDANT | 7 | 7 | 50 |
| 184 | GROUP PHOTO INCLUDING ITEMS FOUND IN SUITCASE | 7 | 7 | 50 |
| 185 | PHOTO - ITEMS FOUND IN SUITCASE | 7 | 7 | 50 |
| 186 | PHOTO - ITEMS FOUND IN SUITCASE | 7 | 7 | 50 |
| 201 | BUCCAL SWAB (JAMES BROADNAX) | 9 | 10 | 50 |
| 205 | WHITE TOWEL DNA WAS TESTED ON | 9 | 10 | 50 |
| 397 | FIRE/EMS REPORT - GARLAND | 9 | 9 | 50 |
| 427 | AUTOPSY PHOTO - BUTLER | 10 | 11 | 50 |
| 486 | MEDICAL RECORDS 11/26/08 - 4/24/09 (DEFENSE EX. 2) | 8 | 8 | 50 |
| 487 | MEDICAL RECORDS - 4/24/09 - 6/29/09 (DEFENSE EX. NO. 3) | 8 | 8 | 50 |
| 488 | MEDICAL RECORDS - 6/29/09 - 7/21/09 | 8 | 8 | 50 |
| 489 | DISD SCHOOL RECORDS | 8 | 9 | 50 |
| 490 | HOPE HIGH SCHOOL RECORDS | 8 | 9 | 50 |
| 491 | MT. VERNON SCHOOL RECORDS | 8 | 9 | 50 |
| 492 | TEXARKANA ISD SCHOOL RECORDS | 8 | 9 | 50 |
| 494 | BLACK CHEST OF TOOLS | 9 | 10 | 50 |
| 549 | JAIL CALL - 4/1/09 | 153 | 153 | 50 |
| 550 | VIDEOTAPE | 152 | 152 | 50 |
| 557 | TAPE | 135 | 135 | 50 |

### STATE'S EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 559 | TAPE | 153 | 153 | 50 |
| 560 | TAPE | 152 | 152 | 50 |
| 566 | TAPE | 135 | 135 | 50 |
| 579 | CHANNEL 5 INTERVIEW. | 11 | 12 | 50 |
| 580 | SUBSET OF COMPLETE MEDICAL RECORDS | 116 | 116 | 50 |
| 581 | DEFINITION OF ANTISOCIAL PERSONALITY DISORDER | 145 | 146 | 50 |
| 582 | DSM-IV-TR DEFINITION OF SCHIZOAFFECTIVE DISORDER | 156 | 156 | 50 |
| 583 | STUDY - DRUGS OF ABUSE & THE ELICITATION OF HUMAN AGGRESSIVE BEHAVIOR | 168 | 168 | 50 |
| 584 | REPORT - DR. ROACHE | 193 | 194 | 50 |

### DEFENSE EXHIBITS

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|---|---|---|---|---|
| 19 | CURRICULUM VITAE - DR. SILVER | 25 | 25 | 50 |
| 20 | MENTAL HEALTH CLINIC BRIEF NOTE - 10/6/08 | 84 | 84 | 50 |
| 21 | CLINIC NOTE - 7/20/08 | 84 | 84 | 50 |
| 22 | MEDICAL RECORD | 84 | 84 | 50 |
| 23 | MEDICAL RECORD - MEDICATIONS | 84 | 84 | 50 |
| 24 | MEDICATION ORDER FORM - 10/30/08 | 84 | 84 | 50 |
| 25 | FOLLOW-UP CLINIC NOTE - 11/4/08 | 84 | 84 | 50 |
| 26 | MEDICATIONS PRESCRIBED ON 11/4/08 | 84 | 84 | 50 |
| 27 | MEDICATIONS CONTINUED | 84 | 84 | 50 |
| 28 | CLINICAL NOTE - 2/18/09 | 84 | 84 | 50 |
| 29 | FOLLOW-UP NOTE BY MR. ADAMS - 3/31/09 | 84 | 84 | 50 |
| 30 | 2/14/09 MEDICATIONS | 84 | 84 | 50 |
| 31 | PSYCHIATRIC PROVIDER PROGRESS NOTE - 6/16/09 | 84 | 84 | 50 |
| 32 | MEDICATIONS ORDERED - 6/19/09 | 84 | 84 | 50 |
| 33 | CHRONIC CLINIC NOTE - 6/29/09 | 84 | 84 | 50 |
| 34 | CURRICULUM VITAE - DR. ROACHE | 172 | 172 | 50 |
| 35 | STATE MAPS OF ARKANSAS, CALIFORNIA, GEORGIA, TEXAS & MICHIGAN | 278 | 278 | 50 |
| 36 | STATE MAPS OF ARKANSAS, CALIFORNIA, GEORGIA, TEXAS & MICHIGAN | 278 | 278 | 50 |

FIRM NAME

**DEFENSE EXHIBITS**

| NO. | DESCRIPTION | OFF. | ADM. | VOL. |
|-----|-------------|------|------|------|
| 37 | STATE MAPS OF ARKANSAS, CALIFORNIA, GEORGIA, TEXAS & MICHIGAN | 278 | 278 | 50 |
| 38 | STATE MAPS OF ARKANSAS, CALIFORNIA, GEORGIA, TEXAS & MICHIGAN | 278 | 278 | 50 |
| 39 | STATE MAPS OF ARKANSAS, CALIFORNIA, GEORGIA, TEXAS & MICHIGAN | 278 | 278 | 50 |
| 40 | MEDICAL RECORDS OF BAYLOR MEDICAL CENTER AT IRVING | 308 | 308 | 50 |

---

weekend on Dr. Roache.

Instead, I just put in a short clip of her interview of the defendant and not necessarily have the whole testimony typed up and read into the record.

But I anticipate that it will be a rebuttal issue, but I just wanted to bring it to the Court's attention, and I'll get the Court the documents about her surgery and her week's -- week's bedrest.

Who knows, maybe by the end of the defense's case she'll be feeling better.

THE COURT: Okay. We don't need to take that up.

Mr. Lollar, do you have anything you want to put on the record?

MR. LOLLAR: Judge, the first witness we're going to lead off to -- off with this morning is supposed to be Dr. Lane, and the Court swore him in last week and told him to come here when the lawyers told him to, and Mr. Parks left a message for him to be here at 8:30.

MR. PARKS: And he's not, and to compound that, I went off and left his phone number at my apartment, but I have sent my mitigation investigator to get that.

MR. LOLLAR: We can go ahead with another

---

PROCEEDINGS

(Court convened; jury not present.)

THE COURT: The jury's not present.

This is State versus Broadnax.

I want to thank both sides for working together to get those depositions done. I appreciate that. It shows good professional courtesy.

My plan on that is to evaluate those depositions today after I've sent the jury home, and then I'll entertain objections to the depositions tomorrow morning at 8:30.

And I don't want to rush anybody, so y'all can take all the way until 9:00 if you want, but is there anything else you need to talk about, Mr. Alex?

MR. ALEX: No, there's -- there's maybe an issue for rebuttal, Judge. I talked to Mr. Lollar; sent him an e-mail over the weekend.

I had planned on putting Rebecca Lopez on on rebuttal. She's got a very short video clip, and she's got prior testimony, but she had surgery on Thursday of last week and I've got a note from her doctor and a letter basically saying she's on bedrest for a week, but I -- my proposal to the defense was, and obviously she's got prior testimony that we could read into the record, but I know Sharon was working all

---

witness here this morning. She has got a Power Point presentation.

MS. MALLON: We're working on that now.

MR. LOLLAR: So we're working on that right now to get that up and running.

THE COURT: Okay.

(Off-the-record discussion was had.)

THE COURT: Call the jury.

(Jury present.)

THE BAILIFF: All rise.

THE COURT: Be seated, please.

Good morning, ladies and gentlemen. I hope you had a good weekend. It's time to get back to work.

We continue now with the trial of the State of Texas versus James Broadnax, and I believe the State has some evidence they wish to offer.

MR. ALEX: Yes, sir.

THE COURT: Whenever you're ready.

MR. ALEX: Thank you, Judge.

Judge, at this time, the State would offer physical evidence that has only been offered for the record up to this point. 159 and 160, which are bullets recovered at the autopsy of Matthew Butler.

THE COURT: Okay. Hold on.

6

Any objection to 159 and 160?

MR. LOLLAR: No, Your Honor.

THE COURT: 159 and 160 are admitted for all purposes.

MR. ALEX: 161, which is the gunshot residue kit of Mr. Butler.

Do you want me to go through the whole list of physical stuff, Judge?

THE COURT: Yes.

MR. ALEX: 162, which is a hair standard of Mr. Butler.

163 is a blood standard of Mr. Butler.

164, which is the clothes of Mr. Butler from autopsy.

165 and 166 are trace evidence taken from Mr. Butler's body.

167, 168, 169, 170 and 171 are all tapelifts taken from both the clothing and body of Mr. Butler, and we would offer those for all purposes at this time, Judge.

THE COURT: Any objection?

MR. LOLLAR: No, Your Honor.

THE COURT: State's Exhibits 161 through 171, inclusive, are admitted.

MR. ALEX: In addition, Judge, we would

7

offer certain photographs that has only been admitted for the record at this time, and those would be State's Exhibits 180, 181 -- well, I'll give a description of them as I go through.

180 is a photo of the suitcase with a mask.

181 is a photo of a mask with a group of other photographs.

182 is a group picture including the defendant.

184 is a group picture that includes items found in the suitcase.

185 and 186 is also photographs of items that were found in the suitcase.

THE COURT: 183 was previously admitted, as I have it.

MR. ALEX: Yes, sir.

THE COURT: And with that exception, is there any objection to State's Exhibits 180 through 186?

MR. LOLLAR: No, Your Honor.

THE COURT: State's Exhibits 180 through 186 are admitted.

What further says the State?

MR. ALEX: In addition, Judge, we would

8

offer the medical records that have not been offered up to this point, and that would be State's -- may I approach the bench, Judge?

THE COURT: Yes.

MR. ALEX: State's Exhibits -- 485, I believe, is already in for all purposes, Judge.

THE COURT: That's correct.

MR. ALEX: And we would offer State's Exhibit 486, which are medical records of the defendant that have been on file for more than 14 days. State's Exhibit 487. And for the record, Judge, 486 also has a Defense Exhibit 2 sticker on it.

487 also has a Defense Exhibit 3 on it. And 488, which is the last round of the medical records.

THE COURT: That's State's Exhibit 488? Is there any objection to State's Exhibits 486 through 488?

MR. LOLLAR: No, Your Honor.

THE COURT: State's Exhibits 486 through 488 are admitted.

MR. ALEX: We would also offer certain school records of the defendant, Judge, that have been on file for more than 14 days and that would be --

THE COURT: 489 through 492?

9

MR. ALEX: Yes, sir.

THE COURT: Any objection?

MR. LOLLAR: No, Your Honor.

THE COURT: State's Exhibits 489 through 492 are admitted.

MR. ALEX: And we would offer an EMS/fire department report that has also been on file, Judge, State's Exhibit 397.

THE COURT: Any objection to 397?

MR. LOLLAR: No, Your Honor.

THE COURT: State's Exhibit 397 is admitted.

MR. ALEX: And as far as the other physical evidence, Judge, that we need to offer at this time, is going to be State's Exhibit 201, which is a buccal swab of the defendant; State's Exhibit 205, which is the white towel that DNA was tested on; State's Exhibit 494 are the tools that was previously identified as coming from the pawn shop; State's Exhibit 131-G and 131-H are the mask that was found in the suitcase.

THE COURT: Any objection to State's Exhibit 131-G or 131-H?

MR. LOLLAR: No, Your Honor.

THE COURT: 131-G and 131-H are admitted.

August 17, 2009

10

Any objection to State's Exhibit 201?

MR. LOLLAR: No, Your Honor.

THE COURT: State's Exhibit 201 is admitted.

Any objection to State's Exhibit 494?

MR. LOLLAR: No, Your Honor.

THE COURT: State's Exhibit 494 is admitted.

Did I miss any, Mr. Alex?

MR. ALEX: The 131-G?

THE COURT: I -- I did those. I did those.

MR. ALEX: Okay. I'm sorry, Judge.

THE COURT: Mr. Parks, what did you say?

MR. PARKS: 205.

THE COURT: Yeah. Any objection to 205?

MR. LOLLAR: No, Your Honor.

THE COURT: 205 is admitted.

MR. ALEX: And, Judge, there is an autopsy ID photo, State's Exhibit 427, that may only be in for record purposes. We're going to offer it for all purposes at this time.

THE COURT: Any objection?

MR. LOLLAR: Same objections that we offered previously in the pretrial hearing on this

11

issue.

THE COURT: The 4.03 objection is overruled.

State's Exhibit 427 is admitted.

MR. ALEX: And, Judge, for demonstrative purposes, we're going to offer State's Exhibit 579, which is the Channel 5 interview of the defendant, and as the jury may recall, we muted parts of it during the guilt/innocence phase.

We're going to offer the Channel 5 video, which is State's Exhibit 18, which is offered for all purposes. We muted it during the guilt/innocence phase. We're going to re-offer State's Exhibit 18 without the muted part.

THE COURT: And I take it the objection there is the same objection it's been?

MR. LOLLAR: Yes, sir.

THE COURT: All right. State's Exhibit 18 is admitted for all purposes, including the formerly muted portion.

And 579 you're offering for demonstrative purposes?

MR. ALEX: Yes, sir.

THE COURT: And there is an objection to that. That's the same objection, I believe.

12

MR. LOLLAR: Yes, sir.

THE COURT: All right. And that objection is overruled.

579 is admitted.

MR. ALEX: And we would -- we would like to publish that at this time, Your Honor.

THE COURT: Which one?

MR. ALEX: State's Exhibit 579, the demo of the muted portions of the Channel 5 video.

THE COURT: Are we ready, Mr. Hikel?

MR. HIKEL: Yes, sir.

THE COURT: All right. Then go ahead.

MR. ALEX: And so the jury understands, Judge, this would have been the video that they saw in which the volume went down for about five seconds and then it started back up later.

MR. ALEX: Can we just lower the lights a bit, Judge?

(Videotape played.)

MR. ALEX: All right. Thank you, Judge.

THE COURT: All right. Anything else from the State?

MR. ALEX: Yes, sir. I'm going to publish the -- a few of the items out of the suitcase, Judge.

Oh, I'm sorry, Judge. State's Exhibit 52,

13

I don't know if it's in for the record or not at this point.

THE COURT: It's in for the record, but it's not admitted otherwise.

MR. ALEX: I just wanted to make sure it was in for the record.

THE COURT: There is no objection to it coming in for record purposes, is there?

MR. LOLLAR: That's correct, Your Honor.

THE COURT: It's admitted for record purposes only.

MR. ALEX: And I'm just going to publish in front of the jury, Judge.

THE COURT: Which ones are you publishing?

MR. ALEX: State's Exhibits 180, and 181, 182, 184, 185 and 186.

THE COURT: You may.

MR. ALEX: Folks, as you'll see, State's Exhibit 184 is a photograph of the suitcase found in the victim's car.

And out of that suitcase, in the compartment, came the items here in State's Exhibit 185: A mask, and identification information of the defendant.

State's Exhibit 186 shows the application

14

for birth certificate, Social Security card, the mask, and a photograph, all found in the same compartment of the suitcase.

State's Exhibit 180 shows that compartment in which the mask came out of. And State's Exhibit 182 is the photograph that came out of that same compartment, which included the defendant.

Y'all can look at those if you like.

And finally, folks, the evidence depicted in those photographs coming out of the suitcase, State's Exhibit 131-G.

Permission to publish, Judge?

THE COURT: Yes, sir.

MR. ALEX: And 131-H, 131-F, and 131-C are all items coming out of the suitcase.

THE COURT: What further says the State?

MR. ALEX: That's all, Judge.

At this time, Judge, ladies and gentlemen of the jury, the State would rest its case.

THE COURT: The State has rested.

What says the defense?

MR. LOLLAR: We're ready to proceed, Your Honor.

THE COURT: All right. Call your first witness.

15

MR. LOLLAR: Pardon me?

THE COURT: Call your first witness.

MR. LOLLAR: May we present opening argument?

THE COURT: Oh, yes. Opening statement.

MR. LOLLAR: May it please co-counsel, honorable members of the prosecution.

Ladies and gentlemen, it is now our time to start presenting evidence to you in regard to the two Special Issues that you will be called upon to address here in the punishment phase of this trial.

And as you recall, these are the two Special Issues. I want to remind you of them. Special Issue Number 1, Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

And you recall, we discussed that in voir dire with each of you to make sure that you understood that that is supposed to be a barrier to the imposition of a death penalty in the State of Texas. We don't expect necessarily that everybody observing this trial knows what the special issues are, but we know that you know what the Special Issues are.

We also know that you will recall Special

16

Issue Number 3, Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole, rather than a death sentence, be imposed.

You'll recall these are the Special Issues that are now squarely before you.

To that end, we intend to call, I think, in total, about 19 witnesses. The first group of witnesses are professional witnesses. Many of you told us that you would consider that the age that a person was when he committed a capital murder, would be significant to you in determining Special Issue Number 3.

To that end, we're going to present to you Dr. Cheryl Silver, who is a professor at UT Southwestern Medical School here in Dallas, and she is an expert on brain development in adolescents, and you're going to hear why age of a person at the time they commit a violent act is important to your consideration in Special Issue Number 3.

Secondly, we will present the testimony of

17

Dr. Frank Lane. Now, Dr. Lane is a medical doctor, a psychiatrist, who has been treating James Broadnax over here in the Dallas County jail over the course of the last year. His various diagnoses and impressions of James you will hear.

He will tell you that he believes that -- well, his first examination of James occurred in July of last year, around July the 20th, following the reports that James told the people in the jail there that are already in evidence that he was having auditory and visual hallucinations.

Dr. Lane subsequently saw him and did not -- diagnosed at that time that he had polysubstance induced psychosis.

Now, we'll talk to you and we'll talk to Dr. Lane about how a substance induced weeks or months earlier, can subsequently induce psychosis in a person.

Dr. Lane continued to treat James for psychosis over the course of basically the next year, ending just here a month ago, and to that end, he prescribed antipsychotic medications.

He prescribed -- you'll hear all the different medications he has prescribed. Risperdal is an antipsychotic. Trazodone is a sedative.

There are three different types of

August 17, 2009

18

antidepressant medications that Dr. Lane has prescribed over the last year. You'll hear Dr. Lane's diagnosis of polysubstance abuse induced psychosis changed to psychosis.

And then you'll hear that it further is clarified as schizoaffective disorder, and we'll explain what all that is.

This afternoon we'll present to you the testimony of Dr. John Roache, who is the head of addiction studies and psychopharmacologist at the University of Texas, San Antonio, Health Science Center. He's going to talk to you about PCP and what these wet blunts do to people and how they make a person violent. And we're going to have him talk to you about that.

He will give you his impressions that James was under the influence of PCP at the time this act was committed, based upon what he's told in the medical records the doctors there in the jail, and also based upon his examination of the videotapes made by the news media on January the 23rd, specifically, when James is describing to them how he went psycho, how he saw colors. And that has a special significance when we're talking about the ingestion of PCP and wet blunts. That is a synesthesia, where one sensed is

19

transposed onto another sense, and that is evidence that, in fact, the defendant was under the influence of the PCP at the time that he's describing there to the news media.

Now, following this presentation of these expert witnesses here today, we're going to point out some things, particularly in regards to Special Issue Number 1, particularly since many of you told us that what you would look for --

MR. ALEX: Judge, I'm going to have to object. That's argument.

THE COURT: Sustained.

MR. LOLLAR: One of the things that we think is appropriate for your consideration in Special Issue Number 1 is whether or not Mr. Broadnax has any type of prior criminal history. The State has rested in their case in punishment and you've heard nothing about any prior criminal convictions. You've heard nothing about prior criminal acts of violence. We think that is significant to Special Issue Number 1.

You also know that James sometimes says things that simply aren't true in these telephone calls and in these interviews with the media. For instance, when he says to his cousin that he cussed me out, you've already been told that did not happen.

20

MR. ALEX: Judge, I'm sorry. That is totally improper argument in this case.

THE COURT: It does appear to be argument. Sustained.

MR. LOLLAR: Well, you will also hear when James tells the news media that he was locked up in juvenile for six months, that never happened. He's never been locked up in juvenile or never been locked up anywhere.

So you're going to be hearing evidence about a total and complete lack of prior criminal record, prior violent history on James Broadnax's part before June the 19th of 2008.

Then you will recall when Shawn Rabb was talking to Mr. Broadnax there in the jail and asked him what his life had been like, and he says Hell. H-E double L Hell. Capital H-E double L Hell.

So we're going to present about 12, 14 witnesses who have known James since he was born, and they're going to give you some insight into what that life has been like and how James came to be a person who says to Mr. Rabb, and says to the world, I should have never been born. You're going to hear about that.

One of the main witnesses you got to hear from is James's mother, Audrey Kelly, and we're going

21

to have to spend some time with her, because to understand James' life, you have to understand Audrey Kelly's life. And these people are all from Arkansas. They've all come in, you know, from great distances: Arkansas, Georgia, Michigan, to be here with us this week. We ask you to consider their testimony so as that will give you some idea of James Broadnax's background and character that are subject matters of your consideration in answering Special Issue Number 3.

Appreciate your attention.

THE COURT: Thank you, Mr. Lollar.

MR. LOLLAR: Thank you, Your Honor.

THE COURT: Call your first witness, please.

MR. LOLLAR: Call Dr. Cheryl Silver.

THE COURT: Dr. Silver.

MR. LOLLAR: Go get her.

And Ms. Mallon will be presenting her testimony.

THE COURT: All right, Sir.

Thank you for your assistance, Mr. Hikel.

MR. HIKEL: Thank you, Judge.

MS. MALLON: I have thanked him as well, Judge.

THE COURT: Professional courtesy between

FIRM NAME

**22**

the parties always goes a long way with me.

Has somebody gone to get Dr. Silver?

MS. MALLON: She's right there.

THE COURT: Oh, okay. I'm sorry. I didn't see you come in. I'm sorry. I apologize.

Stand up, please.

THE WITNESS: I'm sorry. I'm short.

THE COURT: Yeah. You snuck in on me. You didn't get away with that the other day.

Raise your right hand.

**CHERYL SILVER, M.D.**

was called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the witness stand.

You will be responding to questions from Ms. Mallon.

Ms. Mallon, whenever you're ready.

MS. MALLON: Thank you, Judge.

THE COURT: Yes, ma'am.

**DIRECT EXAMINATION**

BY MS. MALLON:

Q. Good morning, Dr. Silver.

A. Good morning.

Q. Could you please introduce yourself to the jury by stating your name?

**23**

A. I'm Dr. Cheryl H. Silver.

Q. And, Dr. Silver, will you please tell them what your educational background is?

A. I have a Ph.D. from the University of Texas at Austin in school psychology, which gave me a specialty in children, and then I came up here to Dallas and did a -- an internship in clinical psychology, followed by a postdoctoral fellowship in clinical neuropsychology.

Q. And, Dr. Silver, you're going to have to speak up a little bit. You're kind of soft spoken.

A. Okay.

Q. You can talk into the microphone and hopefully that -- that will help.

Okay. And can you please tell the jury what you're -- what you're currently doing professionally?

A. I'm a professor in the Department of Rehabilitation Counseling at U.T. Southwestern Medical Center here in town, and I also have a faculty appointment in the psychiatry department. I run a graduate program in rehabilitation counseling, and I see children and adolescents and young adults in a clinical practice, and I do little bit of research and work on a lot of committees.

Q. Are you a member of any professional organizations?

**24**

A. Yes.

Q. Can you please tell the jury what those are.

A. Sure. I'm a member of the American Psychological Association, the Division of Neuropsychology. I'm a member of the National Academy of Neuropsychology, and I'm a member of the International Neuropsychological Society.

Q. And, Dr. Silver, have you ever been published?

A. Yes.

Q. Can you describe that? Some of your pub -- some of your publications?

A. Most of my pub -- publications have either been in the area of learning disabilities, which is a childhood disorder that we now know extends into adulthood, or in the area of executive functioning, which has to do with how we problem solve, how we develop strategies and make decisions.

MS. MALLON: Your Honor, can I approach the witness?

THE COURT: Yes, ma'am, and as necessary to develop the testimony.

Q. (BY MS. MALLON:) Dr. Silver, I'm going to show you what has been marked as Defendant's Exhibit 19. Could you take a look at that for me, please, --

A. Sure.

**25**

Q. -- and tell the jury what that is?

A. That's my CV.

Q. Okay. And does this indicate your education, your professional background and any publications or organizations --

A. Yes.

Q. -- that you've participated in.

MS. HANDLEY: You're offering this --

MS. MALLON: Yes. Judge, we'd offer Defense Exhibit 19.

MS. HANDLEY: We have no --

THE COURT: Any objections?

MS. HANDLEY: No objections, Your Honor.

THE COURT: Defense Exhibit 19 is admitted.

Q. (BY MS. MALLON:) Okay. Dr. Silver, I'd like to -- let me -- before we get started, have you ever testified before?

A. Yes, I have.

Q. Okay. Have you ever testified in a criminal case?

A. No, I never have.

Q. Okay. It has just been civil matters?

A. Yes.

Q. Okay. About how many times have you

26

testified, if you recall?

A.   I believe about four times.

Q.   Okay.  Well, what I'd like to do today is talk to you about adolescent brain development and have you kind of describe that process to the jury.

So can you start by explaining how a brain develops, I guess, from the time a child is born up through adolescence?

A.   Sure.  I think the important thing is for me to help you by explaining to you the two main processes that happen in brain development.

Before I do that, it would be best for me to describe what a nerve cell in the brain is, and so I brought a few slides with me to show you some -- some pictures and some diagrams that I think will help with what I'm about to say.  And I brought my lazer pointer and I'm not sure if I'll be able to do that from this angle, but I'm going to try.

Q.   Dr. Silver, --

THE COURT:  You can step down if you need to.

Q.   (BY MS. MALLON:)  Well, let me --

THE WITNESS:  Oh, okay.  I can do that.

Q.   (BY MS. MALLON:)  And -- all right.  It should be right here beside you on the screen right there.

27

A.   I'm sorry, what?

Q.   Right there.  Those are the same slides?

A.   Yeah.

Q.   So you can view off of there, and if you need to draw on it, you can.

A.   Oh, okay.  Great.  You do have technology here.

Well, I'll probably view off here or I might just look up there and use the lazer pointer to help you guys.

Q.   Can you describe the first slide for us?

A.   The -- the first slide is a schematic drawing of a neuron.  A neuron is the nerve cell in the brain.  A neuron has a couple of different parts, and I'm going to show you a diagram in just a few seconds.

The neuron has a cell body there in the middle, and then it has branches that come out of the cell body that you can see look a lot like tree branches.

Now, how do I move the slides?

Q.   I'll take care of it for you.

A.   Oh, okay.

Q.   Are you ready for the next one?

A.   Yes.  Thank you.

Q.   And tell us what this is, please.

28

A.   This is a -- a better drawing of a neuron to show you the parts.  Up at the top on the left, the pink part there with the -- the dark circle in the middle is the cell body.  And then as I said, there are tree branches that come out of every neuron.  Some of the branches there at the top are called dendrites, and some of the branches are over there on the right and they're called axons.

I believe there are about a hundred billion.  The researchers say about a hundred billion neurons in the brain, so the brain is packed with all of these cells and they all have branches that come off of them, and the branches are very important because the branches make the connection from neuron to neuron.  They send the electrochemical signals from neuron to neuron that allow our brains to work.  And so everything we do, whether it's understanding what we see, understanding what we hear, moving our bodies, remembering things, thinking about things, it all has to do with chemical or electrochemical transmission from one neuron to another in the brain that makes it happen.

Q.   Dr. Silver, is it fair to say that as a child learns different skills, the branches grow?

A.   That's exactly right.

29

Q.   Okay.

A.   Yes.

Q.   Okay.

A.   And that's the first process I'm going to talk about.

Q.   Okay.

A.   We're not going to -- don't worry about that slide yet.  We're not going to look at that slide.

In fact, would you take it back to the next -- the previous one?

Q.   I sure can.

A.   So we're just thinking about those neurons.

So it's true that the first process I'm going to talk to you about is the growth of these branches on the neurons in the brain.

In early life, babies are constantly growing more branches on their neurons.  With every experience a baby or a child has, they're growing more connections.

So you think about a baby who doesn't know how to talk, doesn't know how to sit up, can't even sit up, they don't have a lot of neural connections.  They don't have a lot of skills yet.  But as they go through learning how to sit, and stand, and walk, as they go through learning how to make sounds, and say words, and

30

say sentences, what they're doing is they're building a huge net of connections between neurons that make all of these -- these functions happen.

And so the first process is that the -- throughout childhood, there's all these connections that are being made that help the brain work, that help the brain figure out how the child is supposed to do things.

Q. So as we are younger, we actually have more branches; is that right?

A. We have more branches, yes.

Q. Okay.

A. And we talk -- I'm going to talk a little bit later about volume or density. The research that I'm going to show you in just a few minutes relates to measuring the volume or density of these connections in the brain.

But before I talk about that, I want to talk about the second phase of this process that has to do with the branches that come out of the neurons. And the second phase is called pruning.

What the brain does is just what we do with our clippers when we go out and -- and prune trees. We're getting rid of the branches that we don't want. So the brain naturally has this process of pruning.

31

Q. Dr. Silver, can you possibly explain that in more simple terms?

A. Every -- every-day terms?

Q. Yes. Illustrate that for us, if you can.

A. I can think of a real life example, so I'm not going to talk about the brain for a minute, but I'm going to talk about real life.

THE COURT: Yeah. I'm -- I'm a country boy and you're losing me.

THE WITNESS: Well, you'll get this.

THE COURT: All right.

THE WITNESS: For sure.

THE COURT: All right.

THE WITNESS: At least I hope so.

THE COURT: All right.

A. The way I think of it is that if you lived here in Dallas and you've never been to Fort Worth, and you say to some people, How do I get to Fort Worth, well, someone might say, Well, you take this highway down to Waco, and then you get on this other highway and that takes you to Fort Worth.

Well, you try that path and, in fact, it works. You get to Fort Worth.

And maybe another person, another friend says, Well, there's another way. You take this highway and

32

it goes up to Sherman. And then when you get to Sherman, you get on this other highway and that takes you over to Fort Worth.

Well, you will get to Fort Worth. It works, but over the course of a couple of weeks, or a couple of months, you try other ways and you discover that it's a much -- there's a much better way. There are a couple of better ways to get to Fort Worth. You don't have to go all the way down to Waco. You don't have to go all the way up to or Sherman, but there are much more efficient, better, faster ways that work better for you to get to Fort Worth.

Well, that's exactly -- and so what happens is, you probably never take that path down to Waco and back up again anymore. You're just never going to use it. Well, it's kind of a use it or lose it principle in the brain. The brain starts pruning these extra branches that they don't need, and then that makes the brain actually less bulky as a child goes into adolescence and young adulthood.

So it's the whole idea as children go through adolescence and young adulthood, they're pruning off the branches that are not terribly efficient, they're not very good. They don't really help the child walk the best way, the most coordinated way. Or put

33

language together in the best way so that they make sense to other people.

So that whole process of pruning is the other half of the brain development where the -- the -- the connections between neurons get more and more and more dense, and then finally they start to prune away in adolescence and young adulthood.

Q. Doctor, --

A. So that's the first process.

Q. I'm sorry.

A. Uh-huh.

Q. Is it fair to say that during the pruning process, that ineffective or weak connections are the ones that are pruned away?

A. That's exactly right. Ineffective ones, the ones that just don't get the child to the skillful behaviors the way you want the child to be skillful at walking, skillful at running, skillful at thinking.

Q. Okay. And how -- how have you come to this -- this knowledge? How did you guys in your research, how -- how did you develop this?

A. Well, there's research being done all over, but the main project is happening in Washington, D.C. through the National Institutes of Health, particularly the National Institute of Mental Health where a big

August 17, 2009

34

project has been going on since the 1980s called the Pediatric Brain Imagining Project.

Before I get to that, can we look at one or two other slides?

Q. Absolutely.

A. That's a picture of the outside of a brain. If you've never seen this before, let me just orient you and tell you that that's the left side of the brain, so what you're seeing there would essentially be if you took off my skull and you look at the outside of my brain here.

This -- this brain comes from an autopsy study where the brain was taken from an individual after their death, and for a long time, that's the only way scientists were able to look at the shape of the brain and the parts of the brain.

If you'll move me to the next slide.

This, however, is an MRI scan of the brain. Magnetic Resonance Imaging is a scanning technique that started about in the '70s, really got to be in more general use in the '80s, and the amazing thing about it is it allows scientists, physicians now, to look at the living brain, to look inside the living brain and look at the structures, the parts of the brain, compare people to other people, find brain tumors, look at all

35

kinds of things that they wouldn't have been able to do before, and they can do it without putting the person at risk.

It's not like getting an x-ray or a CT where the brain -- or the individual is exposed to radiation, but this is just based on magnetic pulses. So it's completely safe and they can do MRI studies of children without hurting the children. So --

Q. Are -- I'm sorry. Are MRI's a large part of this project you were telling us about?

A. Yes, they certainly are.

So the -- the project going on in Washington, D.C. has the goal of mapping out brain development, and I believe they started about the age of 3, and they're intending to go up to the age of 27 years old, and they want to map normal brain development and abnormal brain development to see what brains look like from the inside out in children and all the way through adolescence and adults.

They're interested in looking at the cell bodies and the dendrites that I told you about, those branches which they call gray matter because, in fact, they look gray when you look at a brain.

And so, I think the next slide shows you a pretty colored picture that these researchers have used

36

to show the basics of what they've found.

You see, it says down at the bottom, decrease in gray matter volume during development, so what that means is the gray matter, the branches, the dendrites of the neurons that I said, grew and grew and grew, and then gradually disease and prune. That's the gray matter. And volume has to do with the bulk of the brain.

So in these pictures, they use the colors red and yellow to show parts of the brain that are really bulky. And then they show green and gradually into blue to show parts of the brain that are not quite as bulky after some pruning has happened. And then they use purple to show the thinnest areas of the brain, the less dense areas of the brain after the most pruning has occurred.

Q. Dr. Silver, let me stop you right there. So we -- I just want to clarify.

When you -- when we see up there the red and the yellow, and you're talking about thickness, are those the branches that you were describing to us earlier?

A. Right. So when I -- I shouldn't use the word thickness. I should probably continue to use the word density. So how densely are all those branches packed

37

together. How many branches are there between all of the neurons.

Q. And then we can see from 5 years old on up to 20 and possibly beyond, does this slide depict the pruning process?

A. It -- it depicts -- it can't -- it can't -- well, yes, indirectly it shows the pruning process because it shows the density of the brain and I -- can you see that it says 5 years old over there, and then goes over to 20, and the arrow continues beyond 20?

I believe they have data now on 22 to 23 year olds, and as I said, they hope to get data up to the age of 27.

So in this slide, it does show indirectly the pruning process because it shows you that back when a child is 5, 6, 7, there's lots of red and yellow, and the red and yellow tells us that the brain, the density of those dendrites, the density of those branches is very thick.

And then as you move further to the -- to the right on that slide, more blue appears in the middle of the brain showing that pruning is happening in the middle of the brain and then gradually more and more of the brain becomes blue. And by the right side of the slide, I can't see any yellow at all. I hardly see any

38

red, except under the bottom of the brain, and so it says that the parts of the brain that used to be dense, dense with all of those branches in early childhood, have now pruned themselves away and the -- the brain, all of the parts of the brain are a whole lot less thick than they were before.

I have another slide that shows it in a slightly different way. This is a graph, and simply it shows the amount of gray matter volume, or gray matter density in a child and adolescent's brain. You can see that the curve goes up from the left side.

Oh, I should tell you that the -- the solid dark line at the top, that curve, represents all the boys in the study. And the dotted line, the heavy dotted line, represents all the girls in the study. They have enrolled more than 2,000 children at this point and they're scanning them every two years so that they have the same brains and they're chronicling the same brains as the children go through childhood, adolescence and an early adulthood.

So you see that the curve goes up showing more and more development of the dendrites of the branches that connect the neurons so that there's a huge mass of it.

And then there's some arrows there to show

39

when the volume kind of reaches its peak. And after that, you see the curve goes down. The curve continues to go down. It never plateaus. There's a decrease. There's a pruning of those branches that connect the neurons through 18 years old, 20 years old. 22 years old is as far as it goes there. And we believe that as they -- they see kids who are older, young adults, that's going to keep on going down because it doesn't show any sign of levelling off.

So overall, what I've told you about the growth of these dendrites, these brain connections and then the pruning of them, suggests that there's more and more bulkiness happening until maybe about the age of 10, 11, 12. At that point the brain starts pruning and it doesn't complete its pruning until at least the age of 22. So the brain is not operating at its best way, it's most efficient way until at least the age of 22, based on this research.

Q. Dr. Silver, did you say there were two processes --

A. Right.

Q. -- involved in brain -- adolescent brain development?

A. Thank you for the prompt. I appreciate that.

So this is the slide you saw before, except

40

I've added a word to it, and the word is myelination. The second process that happens in brain development through childhood and adolescence is the -- the development of, or the brain manufacturing a fatty substance that wraps around the axon of every neuron. You see -- I guess I don't need my pointer. You can see the axon there on the right, and you can see that it shows kind of a fatty sheath, or an orange sheath wrapped around that axon.

That fatty sheath is actually not orange. They just do it for this drawing so you can see it. It actually looks white, just like fat on a piece of meat looks white, so when we talk about the axons of the brain that are myelinated, we talk about white matter, because it appears white.

Q. What does the myelination do?

A. What myelination does, is helps the speediness and the timing of the signals, of the messages that go around the brain. So I think of an electrical -- electrical wire that doesn't have a cord, an insulated cord around it. There's just sort of electrical energy everywhere, and that would happen if the brain didn't have the natural property of myelinating itself, myelinating its axons.

But by putting that insulating sheath on the

41

axons, when one neuron sends a message to the next, it goes speedily across that -- that axon that has the nice insulation, and that chemical, electrochemical signal moves quickly to the next one, the next neuron, and the next one and the next one.

So what that means is as -- and that myelinization increases through childhood. Myelination starts actually before a baby is born. And there's rapid myelination throughout childhood, and adolescence, and early adulthood as well. And with more and more parts of the brain being myelinated, the brain does its thinking, its seeing, its moving, all of that faster and more efficiently because the electrochemical signals can go from one brain to another faster.

It also means that more and more neurons from around the brain can have their input because their timing is controlled and they're giving information to each other very rapidly.

So if you think about a baby, this kind of is a little silly, but if you think about a baby, if you gave the baby a baseball bat and asked them to play baseball with you, well, they don't have the coordination.

But by the time a kiddo gets old enough to --

42

to be, what, preschool or in school, they know how to -- to move a bat. They know how to look at the ball.

And so it's all the neurons from various places in the brain that help them to see when the ball is coming, see how fast it's calling -- coming, to figure out how they should put their feet, how they should move their arms in order to -- to hit the ball. And our thinking happens the same way.

Children can't do a lot of complicated thinking because they don't have the neurons that are pruned, and they don't have the myelinizafion that helps all of the information come together in a good way so that they can consider everything about -- about a decision making -- a decision that they have to make.

And let's -- let's look at the next one.

Q. Okay. And, Dr. Silver, let me ask you this: How does the myelinization process work in the brain? Where does it start and where does it end?

A. It's -- the myelinization process in the brain happens in a regular pattern in -- in all humans. It starts from the bottom of the brain up, because the bottom of the brain has really vital functions that keep us alive. It starts from the bottom of the brain up and it goes from sort of the back of the brain to

43

the front of the brain so that the last part of the brain -- and I'll show you this on our last slide.

The last part of the brain to be myelinated to get that efficiency, is the frontal lobe of the brain.

I -- I chose this slide just to show you how the white matter goes everywhere in the brain, so the white matter there you see are the myelinated fibers that go from front to back and side to side, and one side of the brain to the other, to connect all of our thinking, all of our movements to put everything together in an integrated way. So I think that really shows you where the white matter is.

Q. So, Dr. Silver, if I'm understanding you correctly, all the white that we see and the jury sees, that's all of the myelinization in the brain?

A. That's right.

Q. Okay.

A. So there's a graph. So in -- in children and adolescents' development, unlike the branching of the dendrites where they're picking up density, there's no pruning because the more myelin you have, the better.

And so what nature has done for us, if you look at those lines, they continue to go up. Again, the boys are the solid line and the girls are the dotted line. And this research shows that

44

myelinization continues throughout childhood, adolescence, and into early adulthood.

And I do know of at least one study now using another kind of MRI scan that shows that myelinization may very well continue till almost 30.

So we know that the brain has not reached its adult level of being able to integrate information effectively at the age of 12, or 14, or 18, or 20, but, in fact, it's going to be into the 20s where we really reach our adult potential.

Q. And so what is -- what is the effect on the brain? The two processes you told us about, how does that affect an adolescent brain?

A. Well, as I -- as I said, we start out with pretty undeveloped skills, whether we're talking about walking and running and playing baseball, or whether we're talking about doing reasoning and decision making.

A young child won't really usually think about the consequences of his or her actions. A young child usually can't think of two or three things at the same time in order to -- to make a decision. An adolescent -- an early adolescent becomes a little bit better about that. Someone in later adolescence becomes a little bit better, but then it's not till

45

into the 20s that the brain really has all of the efficient connections that would allow someone to think about all of the -- the elements that they have to think about, whether it's making a decision about investing in a bank, or whether it's making a decision about how you're going to behave with your spouse or your teacher.

It's not until really early adulthood that all of that comes together and gives us our maximal functioning as — as human beings.

Q. So, Dr. Silver, let's talk about a 19-year old, because that's what we're talking about in this case.

So are you saying that at 19, based on the research, that the brain is not fully developed, or it's not functioning at its peak; is that fair to say?

A. It's not -- not -- the brain of a 19-year old is not functioning at the level that we would think of as a normal adult.

Q. Okay.

A. Because the process, those two processes haven't reached their peak to reach adult maturation of the brain.

Q. So at 19, is the brain still pruning the branches?

**46**

A. The brain is still pruning.

If you think about that slide where the curve went up and it continues to go down, and that slide went as far as the age of 22, and it was still going down.

Q. And the myelination, the graph, I think, also shows that at 22, the brain is still going through that process as well?

A. Right. It's still myelinating. There's still myelin being applied to those axons. And as I said, the frontal lobe is usually the last -- well, it's always the last to get -- to get myelinated.

Q. Okay. Let's talk about that. The frontal lobe. What is the frontal lobe of the brain responsible for?

A. If you look at -- so the -- the red part is the frontal lobe, and if you look at the far right of the frontal lobe, that controls our motor movements, so that's just called the frontal cortex.

But in front of that area that controls our motor movements is something called the prefrontal cortex, and all of our thinking, being able to come up with strategies, weighing one thing against another, thinking about consequences, deciding should I act on my impulses, or should I stop and think before I do

**47**

something, all of that is controlled by the -- the prefrontal cortex in the middle and into the front of the frontal lobes.

Q. Is that what we call the executive functions?

A. That's exactly right.

Q. Okay.

A. We call them executive functions. Paying attention, solving problems, coming up with a strategy, deciding if your strategy is working or not, all of that we call executive functions.

Q. Is part of that -- part of the executive functions learning from past mistakes and applying it to current situations?

A. That's right.

Q. Okay.

A. Yeah.

Q. And reasoning, is that part of that?

A. Yes.

Q. And decision making?

A. Yes.

Q. And I think impulse control is a big one, right?

A. That's right.

Q. So you were saying earlier that the brain develops from bottom to top, and back to front.

**48**

A. That's correct.

Q. So that the front portion of the frontal lobe which controls the executive function, is the last to develop; is that right?

A. That's right.

Q. Okay. Now, I want to talk to you about the temporal lobe right there on the slide. What's -- what's the temporal lobe responsible for in the brain?

A. Well, a couple of things. The temporal lobe is -- is really the seat of our memory. So where you store your memories is in the -- the temporal lobe.

Inside -- deep inside the temporal lobe, though, is kind of the primitive part of the brain that has to do with our emotions, and to some extent, our motivations. But primarily our emotions.

Q. Is that called the emotional part of the brain?

A. People call it the emotional part of the brain.

One of the structures -- you probably don't need to know this -- is called the amygdala. That's the structure of the brain that is intimately involved with our emotions, and our emotional reactions, and our emotional memories.

Q. Now, since the temporal lobe is behind the

**49**

frontal lobe, does that mean that it develops before the frontal lobe?

A. Um, the inside certainly does.

Q. Okay.

A. There's some information to suggest that the very far outside that has to do with memories of the temporal lobe is later in developing too, but the inside definitely develops before the frontal lobes.

Q. Okay. So what --

A. I'm sorry. Develops. Myelinates before the frontal lobes.

Q. Okay. So it's more fully developed than the frontal lobe.

A. More myelinated.

Q. Myelinated, okay. What effect does that have on the brain?

A. Well, we -- you mention about adolescence, so especially in adolescence, there's an understanding among the researchers who look at adolescent brain development, that the amygdala, because it's the emotional part of the brain, because it has myelin on it and it's working very efficiently, will sometimes jump ahead, if you will, of the function of the frontal lobes that are supposed to slow an individual down and say, is this a little risky? Should I do this? Maybe

50

I ought to stop and think before I act.

And so in adolescence, more than in children, in adolescence, there's a tendency to act on emotions and to be very reactive about emotions and not engage our frontal lobes to think about whether that's a good thing to do. Certainly not at a level where we would expect adults to be able to do that kind of thinking.

Q. And in a 19 year-old brain, can the frontal lobe be overwhelmed by the temporal lobe?

A. You could -- you could say that. In that the amygdala, the emotional part of the brain, is revved up and ready to go, but the myelin hasn't gotten to the front of the frontal lobes to the decision-making part of the brain enough so that the decision-making part of the brain can't get in there and cool down the -- the emotional part of the brain.

Q. I've heard it described, the brain, as having a well-developed accelerator but partly developed brakes?

A. Yes.

Q. Does that sound accurate?

A. That's right. Yes.

Q. Okay. So with the temporal lobe being more myelinated than the frontal lobe, would that make a 19-year old possibly more susceptible to peer pressure?

51

A. Yes.

Q. And why do you think so?

A. Well, the experts in adolescent development, emotional development, talk about the fact that peers mean so much more to adolescents than they do to children and to adults. What kids do -- what kids do has a lot to do with what the other kids in their environment tease them about, or tell them to do, or dare them to do.

And so for an adolescent, more than children, more than adults, that -- that emotional part of the brain can -- can kind of guide what the -- how the -- the adolescent responds to the pressure from peers.

Q. Okay. And based on your research, could a 19-year old act impulsively?

A. Oh, yes. Absolutely.

Q. Be emotionally volatile?

A. Yes.

Q. Likely to take risks?

A. Yes.

Q. Act rashly?

A. Yes.

Q. Act without logic?

A. Yes.

Q. Reactive to stress?

52

A. Yes.

Q. And focus on the short term payoff versus the long-term consequences?

A. Yes.

Q. Okay. Now, we talked a lot about the brain -- adolescent brain development. Let me ask you, can genetics also affect brain development?

A. Yes.

Q. Could it negatively affect brain development?

A. I'm not sure what you mean.

Q. Well, if a person, you know, is born with, you know, under the influence of drugs or alcohol, could that have a negative effect on brain development?

A. Yes.

Q. Okay. What about environment, does that have an effect on brain development?

A. Yes, it does.

Q. Okay. And do drugs and alcohol also have an effect, or could it have an effect on brain development?

A. Yes.

Q. Okay. I think that's all I have, Dr. Silver. Thank you.

MS. MALLON: I'll pass the witness.

THE COURT: Let's take a break before we

53

start cross-examination.

We'll be in recess until 10:10 a.m.

However, before I let the jury go, I want you to know for your planning purposes of -- I feel guilty about how I misled you on the scheduling, so I'm buying your lunch again today.

All rise for the jury.

We're in recess.

(Recess taken.)

(Jury present.)

THE COURT: Be seated, please.

Cross-examination, Ms. Handley?

MS. HANDLEY: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MS. HANDLEY:

Q. Good morning, Dr. Silver.

A. Good morning.

Q. Appreciate you being here today and -- and coming down and talking to the jury about -- about what you do and particularly bringing your flash points so we could see some slides.

Now, we did have a little bit of testimony earlier in the trial about the brain and particularly the frontal lobe. We had it from a medical examiner, though, and I think you're bringing us kind of a

54

different orientation to that. I think it's pretty obvious you're very enthusiastic about your work and about what you do?

A. I hope so. I do like to teach.

Q. It carries you across, it certainly does. And that is what you do. You're a teacher, is that what -- you're a professor?

A. That's right.

Q. Okay. And with respect to what you've brought to us today and what you've told us about adolescent brain development, what -- you said that you also have a -- you counsel with children; is that correct?

A. No, I don't do any counseling.

Q. You don't do any individual counseling with adolescents or anything like that.

A. No. I do assessment and diagnosis.

Q. Okay. Okay. And -- and with -- I'm just curious. With the information that you brought us and what the scientists are looking at, I mean, what are we -- what are we doing with that? Are we developing a pill, or are we just developing ways to -- as you've got an article here on children with disabilities, ways to help kids with learning disabilities. I mean, what are we doing with all of this today?

A. The -- the main goal of that project in

55

Washington is to try to determine how the -- the normal brain develops. First of all, just what normal development looks like.

And at the same time, they're enrolling children in the study who have abnormal brains, so they might be children who have psychiatric disorders, or developmental problems. So they're looking at how the brain changes, based on having some kind of disorder.

And then when they have -- my understanding is when they have all of that set and they have all the information they need about brain development, then they're going to start doing twin studies and things like that to look more and more into about how genetics and environment affect the way the brain develops and might make changes, systematic changes in the way the brain develops.

Q. Okay. Then we might make systematic changes in the way the brain develops or we might just learn how to deal with that?

A. Yeah, the -- I'm sorry. The way that genetics or environment make changes in the way the -- the brain develops.

MS. HANDLEY: May I approach, Your Honor?

THE COURT: Yes, ma'am, and as necessary to develop her testimony.

56

THE WITNESS: I'm losing my voice. Can you hear me? Yeah?

Q. (BY MS. HANDLEY:) I can hear you just fine, but I'll try not to get you talking up here too much.

I wanted to take a look at your CV. Very thorough. I'm seeing a lot of education on your part and some clinical activities.

You've published many, many abstracts, it looks like.

I'm seeing a lot of stuff on -- on work with children.

Have you done any work in our penitentiaries?

A. No.

Q. Have you done any work in our -- in our jails?

A. No, I have not.

Q. So you're not -- you're not here saying that you've got any specialties with respect to the criminal mind or what's going on in our penitentiaries or how the brain is functioning in that respect. You're not here for that today then.

A. No. I don't do anything with the criminal system.

Q. Okay. Okay. And I have noticed, ma'am, that -- that you have referred throughout your testimony to -- you say a lot of children. You keep

57

saying Kids. And you say children and such as that. And you realize we're not here today really talking about a kid. We're not talking about a five-year old or a twelve-year old or even a 15-year old. We're taking about a man, the defendant in this case, James Broadnax, correct?

A. Yes. I understand he's 19?

Q. No. He's actually 20.

A. Or was 19 at the time of this --

Q. He's 20 now, ma'am.

You understand why you're here, don't you?

A. Yes.

Q. Why do you think you're here?

A. Well, I understand that -- that the Court wanted someone to come in and talk to the jury a bit about how the brain develops.

Q. Okay. Okay.

THE COURT: Let me stop you there. That's actually misleading. It's not the Court that wants it; it's the lawyers for the defense, as is their right to do, but I don't want the jury to get the impression that I ordered this. I did not.

THE WITNESS: Oh, I see. I'm sorry.

Q. (BY MS. HANDLEY:) And I think, ma'am, that if you were -- if you were really truly just called here

August 17, 2009

**58**

for the -- for kind of an opinion on the adolescent brain, I think we would agree that sometimes kids -- kids do some pretty odd things, don't they?

A. That's right.

Q. Okay. But you understand that in this particular case, the defense is going to try to draw an analogy or a parallel to this particular defendant and his age at the time of 19, or perhaps his age now of 20 to your testimony. You do understand that, don't you?

A. Well, I imagine they will, although I have no idea what they're going to say or how they're going to use my testimony.

My -- my role, I understand, was just to present the research on brain development.

Q. Okay. Because you're certainly not here to give an opinion with respect to this particular defendant, are you?

A. That's correct.

Q. In fact, you have -- you've never talked to the defendant in this case, have you?

A. That's correct.

Q. You have not assessed -- given him any assessments, any tests, any clinical trials, nothing like that, have you?

A. That's right, I have not.

**59**

Q. You have not talked to his family.

A. No, I have not.

Q. Okay. And -- and are you familiar with any of the facts of the particular offense in this case?

A. I might have some familiarity, but -- but really know very little.

Q. Okay. What do you know about the facts of this offense?

A. Well, I know that someone was killed and I know that the defendant was accused of participating in that.

I think I remember it, knowing that there were two young men involved. That -- well, Mr. Lollar talked about some drug use this morning, so there must have been some drug use. That's about all I know.

Q. You're making that assumption that there must have been some drug usage.

A. Yeah.

Q. So with respect to the offense and this defendant, you don't know, for example, whether or not -- or would it tell you something about an individual if you had heard that in the commission of a criminal offense that a lot of planning went into it?

A. I'm sorry. What was the beginning of your question? Would it --

**60**

Q. Would that help you in -- in assessing an individual and their function and their intellect and maybe their level of maturity that in committing their particular offense, that -- that a lot of planning actually went into it.

A. If I were assessing an individual, it would be important to know what their -- their level of thinking is in their daily life, not just their level of thinking when I test them.

Q. Right. And it may say something to you if that person showed a lot of forethought or that person showed a lot of planning, manipulation, took special efforts to -- to get away from the crime and to conceal evidence afterwards. That might tell you a little bit of something about their intellect or maybe how their brain is functioning and their abilities then.

A. Yes.

Q. Okay. But -- but just to be fair, ma'am, you have not talked to the defendant at all in this case.

A. That's correct. I have not.

Q. So you cannot come to court and say that he's a very immature kid who would hide in the corner and cry about what he's done. You can't say that.

A. I can't say anything about what he would do.

Q. Okay. And nor can you say that he's actually

**61**

a very street-wise or intelligent individual who's capable of -- of manipulation, is very cunning and very calculating. You can't say that either.

A. No. I don't have any information about him.

Q. Okay. You're just here to -- to talk to us about the global proposition, if you will, about adolescent brain development.

A. That's correct.

Q. And that as we get older, we mature, correct?

A. Correct.

Q. And I'm throwing the word out there, "mature." I don't know. You might have a different definition of that, but as we get older, we gain more knowledge. We're able to use that knowledge perhaps to our advantage and to our benefit. As we get older, we learn more things and we incorporate them in how we act and what we do in the future, correct?

A. That's right.

Q. I would imagine, ma'am, that you're certainly -- you're not here to -- to say that we're all cut from the same cloth.

A. That's correct.

Q. Okay. That -- that we've all, everybody in this room, has been through this brain development that you've talked to us about today, yet maturity and --

August 17, 2000

62

and how we deal with everything, it's a very individualized thing, isn't it?

A. You mean it differs from person to person?

Q. Certainly. Yes.

A. Yeah. It certainly does.

Q. I mean, with age comes knowledge, it comes experience, and how you put that into place, and what you do with that is going to be a very individualized thing, isn't it?

A. That's right.

Q. Okay. You can't -- I would assume you're not coming in here to tell us today that -- that there's a certain point in time, or a certain age that one gets to and they're no longer violent. You wouldn't say that.

A. I don't know a lot about violence and violent behavior, so I wouldn't speak to that at all.

Q. Okay. Because one -- one of the propositions, one of the things the jury is called upon to -- to decide in this case are -- are certain special issues. And I don't think you've ever even seen this before, Doctor, have you? Special Issue Number 1?

A. I saw it from the side earlier this morning.

Q. Okay. And it -- basically it speaks to whether or not more likely than not this particular

63

defendant will be a future danger to the people that he's around, okay?

A. I see.

Q. But you can't say necessarily that a person will or will not be a future danger once they reach a certain age.

A. No, I certainly can't say about this individual since I haven't met him or assessed him.

Q. Okay. And again, you talked a lot about kids, kiddos, I think you said, and children, and such as that. You're not -- I don't think you're trying to leave us with the idea that we're just -- 18-year olds and 19-year olds are just bumbling idiots, incapable of rational thought, right?

A. No, I don't mean that.

Q. Okay. Okay. As a matter of fact, 18-year olds, 19-year olds, and even some 15-year olds and younger than that, they can distinguish between right and wrong.

A. Yes.

Q. Okay. They have the ability --

A. Well, I guess there are some people who can't, but --

Q. Some people who can't.

A. -- most people can.

64

Q. But for the most part, they can. That they have the ability to make choices.

A. Right.

Q. And -- and appreciate consequences?

A. Right.

Q. Okay.

A. Many people. Most people.

Q. Okay. And -- and along that vein, we've -- we've had an opportunity to talk before and -- and about adolescence, and it kind of got me thinking about -- about maturity and about what people are capable of at certain ages. And you tell me if you're not familiar with this in your work, ma'am.

With respect to our -- our laws, there is -- there is certain things in our laws, there is societal norms, there are even religious propositions that place people at certain ages and say that they are now mature enough to do certain things, aren't they?

A. Yes.

Q. For example, in a court of law, I believe that the age of eight has been found to be the age of reason, and even younger than that that we will put a six-year old on the stand, and as long as that child knows right from wrong, a truth from a lie, that child is allowed to take the stand and testify? Were you

65

familiar with that?

MS. MALLON: Judge, I'm going to object. The prosecutor is asking the witness to comment on stuff she doesn't know anything about.

MR. ALEX: Your Honor, she can say whether or not --

THE COURT: The objection is overruled.

Q. (BY MS. HANDLEY:) Ma'am, I'm sure you've heard that in many states that a child of 13 can actually emancipate from their parents, can't they?

A. Actually, I didn't know that.

Q. Okay. Okay. The age of 13, we even have norms in our film industries. At 13 you can actually go and see a PG-13 movie now, correct?

A. That's right.

Q. As a matter of fact, we have categories now that speak specifically to ages, don't we?

A. That's right, we do.

Q. Okay. And our film industry has deemed at the age of 13, it's okay now to see a movie with some nudity, perhaps, or maybe some adult content, isn't it?

A. I suppose so.

Q. In our -- religiously in our Jewish community, have you heard of a Bar Mitzvah?

A. Yes.

66

Q. Where we recognize that a -- that a young man has come of age at the age of 13. He can now engage in religious services, he can enter into binding contracts, and he is even -- he can even testify before religious courts. Are you aware of that?

A. That's true, yes.

Q. And that's the age of 13.

Many states, at the age of 14, a child can actually work, can't they?

A. I imagine so. I'm not entirely sure.

Q. Okay. And then there are ages 14 to 18 where it varies in some states that a -- an individual younger than 18 could actually receive an abortion without the consent of their parents. Did you know that?

A. I have heard that, yes.

Q. Okay. We have certain states that a person under the age of 18 can actually go and have body modifications, piercings and tattoos and such as that, did you know that?

A. I imagine that would be true, as I walk down the street and -- and guess the age of some of the kids out there.

Q. Uh-huh. We've even deemed under the age of 18 is the -- that there is an age of consent for sexual

67

purposes.

A. Right. I've heard that.

Q. Okay. I think you'd agree with me that that's a pretty big decision, isn't it?

A. Yes, it is.

Q. Okay. Age 15, you can get a learner's permit to drive a cart, correct?

A. Right.

Q. All right. Age 16 you actually get your driver's license.

A. Right.

Q. The law -- the law deems that 16 is an appropriate age for you to take a several ton vehicle and put it on our public roads and highways. So that's at 16.

You can also then again work as an adult at age 16. I don't know if you knew that.

A. Yes.

Q. At 17, you can now get into an R-rated film. So again, we have a film industry and law saying that you're mature enough to go to an R-movie.

You know you can join the military with consent at the age of 17, did you know that?

A. I think I heard that, yes.

Q. Okay. And at the age of 17, and I can speak

68

specifically to Texas, you are now considered an adult in the legal system if you commit a crime. Did you know that?

A. I believe I've heard that.

Q. Yeah, that you will actually be tried as an adult and that there are even situations where you may be younger than 17, but could be certified an adult, based on a Court seeing what you've done and your actions, that they could actually certify you as an adult to stand trial as an adult, even though you're under age 17? Did you know that?

A. I've heard that term, but don't know much about it.

Q. Juvenile certification, you're saying you've heard that before?

A. Yes.

Q. Let's talk about 18. At 18 you can travel inside and outside of the country by yourself without consent or escort.

A. I didn't know that.

Q. Okay. You can rent a hotel room or a motel room. You can apply for a credit card. Did you know that?

A. No, I didn't know that.

Q. You can open a checking account. Did you know

69

you could take out a loan or a mortgage at the age of 18?

A. I didn't know that.

Q. Okay. You could sign a legal contract and be bound to that legal contract. Were you aware of that, ma'am?

A. Yes, I think I've heard that.

Q. Okay. You can even give your own consent for medical procedures. You don't have to have somebody older than you giving you that consent.

We talked a little bit about -- before about you can -- you can go in and have body modifications without any kind of adult, if you will, or older person's consent.

And I think most importantly, and maybe this speaks to you, ma'am, Dr. Silver, you can join the military without consent at age 18. Did you know that?

A. Yes.

Q. Okay. And our military appreciates and our laws appreciate that at the age of 18, we consider you mature enough, intelligent enough, wise enough that we can put you in a war overseas fighting for your country at age 18.

A. Is that a question?

Q. It's quite significant, wouldn't you agree?

70

A. Yes.

Q. Okay. As a matter of fact, we require all our males to sign up for this selective service at age 18. Did you know you could hold public office at age 18?

A. Yes. As a matter of fact, wasn't there something in the news within the last couple of months about a 15-year old running for mayor somewhere?

Q. I'm glad you mentioned that. Let me ask you if you recognize these names, ma'am.

Kyle Corbin?

A. I don't recognize the name.

Q. Jeffery Dunkel?

A. No.

Q. Sam Juhl?

A. No.

Q. That's J-U-H-L.

Christopher Sealy?

A. No.

Q. Michael Sessions?

A. Yes.

Q. These are -- these are all men who are currently mayors of cities and took office at the age of 18. So you've -- you've heard correctly, ma'am.

You can vote at age 18.

A. Right.

71

Q. You can get married at 18. You can get a divorce at 18. You can have children and raise children at 18.

MS. MALLON: Judge, is there a question for Dr. Silver?

Q. (BY MS. HANDLEY:) Were you aware of that, ma'am?

A. Yes. I mean, you could have children at 13. There's no law against that, as far as I know.

Q. And even before 18, and anybody who's got children, oftentimes we allow people even much younger than that to actually babysit our children, don't we?

A. I think so.

Q. Our most precious commodity.

At 18 you can be called to jury duty. I think you would also agree that that's a pretty -- that could be a daunting task. There's a lot of responsibility that goes into that, doesn't it?

A. That's true.

Q. But the law deems an 18-year old fit to actually sit in jury duty.

You could work as a detention officer over at the county jail. Did you know that. Didn't know that?

A. I didn't know that.

Q. Okay. And finally, ma'am, with respect to age

72

and -- and a case such as this, the law states that if you commit a capital murder, a capital offense of at least the age of 18, that you are -- you may be subject to a sentence of the death penalty. Did you know that?

A. I did know that.

Q. You did know that, okay.

So just to sum up, and because I certainly don't mean to -- to minimize the work that you do, ma'am, whether we're mature or not is, of course, it's a very individual thing, isn't it?

A. Yes.

Q. Okay. And -- and you're not here to suggest that -- that at age 18, 19 or 20 that you shouldn't be held accountable for your actions, are you?

A. No, I'm not saying that.

Q. Okay. And you're certainly not here, once again, to talk specifically about this particular defendant.

A. Right. That's correct.

Q. Okay. Well, thank you very much, ma'am. I appreciate that.

A. Sure.

THE COURT: Redirect?

MS. MALLON: Thank you, Judge.

73

**REDIRECT EXAMINATION**

BY MS. MALLON:

Q. Dr. Silver, none of the -- none of the laws or the rules that that prosecutor just listed for you, none of that changes the way the brain develops, does it?

A. That's correct.

Q. Okay.

A. And there are -- there are policies.

Q. Okay. Okay. And if the military paid attention to the research that's out there, they may change their policy.

A. Well, they might.

Q. Okay. And, in fact, in the colonial times, I think it was -- you had to be 13 before you could go to war, and that's obviously absurd now, isn't it?

A. Right. Policies change.

Q. Okay. Now, as far as the prosecutor was talking to you about planning, is it fair to say you can make a plan that's illogical, impulsive and not thought out.

A. That's true. That would still be a plan.

Q. Okay. And although maturity is individual for each person, would you say that maturity is affected by

FIRM NAME

August 17, 2009

74

the way the brain develops?

A. Yes.

Q. Okay. And the research we've talked about today stops in the early 20s. 22, 23?

A. That's right. What I showed you today.

Q. Okay. Is that because that's as far as the research has gotten? Are you looking into even older individuals?

A. That's -- that's the research that's been published so far, so some of the other research that's going on, simply hasn't been written up in papers and put into the published literature yet.

Q. Okay. So the research is continuing into the mid 20s?

A. I think 27 is the research in Washington, D.C.

Q. Okay.

A. There's some other research that I know has gone to 30 and beyond.

Q. Okay. And I just want to talk to you a couple more things. We mentioned just briefly in your testimony that environment can have an effect on brain development.

Can you tell the jury how the environment can have an effect on brain development?

A. Yes, I think I can. When -- when I talked

75

about the development of the dendrites, and I think I said something like with every experience a child has, more and more connections are made in the brain. And so we know that things like poverty, where a child isn't exposed to as much, isn't exposed to reading, isn't exposed to language, doesn't have the cultural advantages, we know that with lower levels of -- of stimulation, of exposure, that the brain growth -- the growth of those dendrites can actually be -- can be arrested, can be hurt so that the brain doesn't follow the normal course of -- of development.

Q. Now, let me ask you about drug use. If an individual started smoking marijuana at the age of eight, would that negatively -- or would that affect brain development?

MR. ALEX: We're going to have to object. This is outside the scope of any hearing that we've had on this witness of drug use and brain development.

THE COURT: Sustained.

Q. (BY MS. MALLON:) Does drug use affect brain development?

MR. ALEX: Judge, we would make the same objection as there's --

THE COURT: Sustained.

MS. MALLON: I have nothing further,

76

Judge.

THE COURT: Recross?

**RECROSS-EXAMINATION**

BY MS. HANDLEY:

Q. Ma'am, being impulsive or volatile or focusing on short term, that's certainly not reserved just in 19-year olds, is it?

A. You mean just that one age?

Q. Sure.

A. No, of course not.

Q. Okay. Just as being calculating and manipulative, that's just not reserved for 22-year olds, is it?

A. That's correct.

MS. HANDLEY: Nothing further, Your Honor.

THE COURT: May the witness be permanently excused?

MS. HANDLEY: No objection.

MS. MALLON: Yes, Your Honor.

THE COURT: You're permanently excused, Doctor. Thank you for your testimony.

THE WITNESS: Thank you, sir.

THE COURT: What further says the defense?

MR. LOLLAR: May I check and see if Dr. Lane is here?

77

THE COURT: Yes, sir.

Doctor, would you please come all the way to the front of the courtroom up by the door. All the way to the very front. Go as far as you can. When you've reached the door, turn and face me and raise your right hand.

Raise your right hand.

**FRANK LANE, M.D.**

was called as a witness and testified as follows:

THE COURT: Lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Lollar. And then some cross-examination from the State, I'm sure.

Mr. Lollar, whenever you're ready.

MR. LOLLAR: Thank you, Your Honor.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

BY MR. LOLLAR:

Q. Would you tell us your name, please.

A. Frank Lane.

Q. And, Mr. Lane, what is your occupation or profession.

A. I'm a physician.

Q. And what is your specialty?

78

A. Psychiatry.

Q. Can you give us some idea of your educational background which leads you to become a psychiatrist?

A. I graduated from Hillcrest High School here in Dallas. Went to Colorado College in Colorado Springs. Got my degree in biology and psychology, then went to the University of Texas medical branch in Galveston. Got my medical decree. Came to the University of Texas Southwestern Medical School here in Dallas for my residency, specialty training in psychiatry. Finished in 1986.

I passed my board exams two years later and I've been practicing ever since.

Q. So you've been a practicing psychiatrist since 1988; is that correct?

A. '86.

Q. '86. All right, sir.

And do you -- currently are you -- are you working with the Parkland Jail Health System over in the Dallas County jail?

A. That's correct.

Q. And is that in addition to a private practice that you have?

A. Yes.

Q. And what is the nature of your private

79

practice?

A. General adult psychiatry, addiction psychiatry, adolescent psychiatry and medical hypnosis.

Q. And where is your office located?

A. In East Dallas over by White Rock Lake.

Q. All right, sir.

In addition to the private practice, you mentioned that you do work with the Parkland health provisions here in the Dallas County jail; is that correct?

A. That's correct.

Q. And how long have you been doing that?

A. About two years.

Q. All right, sir.

Let me ask you if you recognize the man seated second to my right here, Mr. James Broadnax?

A. Yes.

Q. And how have you come to know Mr. Broadnax?

A. Um, as part of the clinical staff here taking care of inmates that have mental illnesses.

Q. All right, sir.

And now, would it be true to say that you have -- I believe you've seen Mr. Broadnax ever since last July on a frequent basis; is that correct?

A. That's correct.

80

Q. And do you know why --

MR. LOLLAR: May I approach the witness, Your Honor?

THE COURT: Yes, sir. And as necessary.

Q. (BY MR. LOLLAR:) I'm going to show you, Doctor, -- let me show you what has been admitted here as Defendant's Exhibits 13 and 14, and let me ask you to take a look at those.

A. (Witness complied.)

Q. Do you recognize what Defendant's Exhibit 13 is in general?

A. This looks like what we call a kite. And it's a request from an inmate.

Q. And does that appear to be from an inmate by the name of James Broadnax?

A. Yes.

Q. Does that appear to be dated on July the 11th of last year?

A. Yes.

Q. And can you read what the request was by Mr. Broadnax at that time?

A. (As read:) I really need to see a psych. It's important. I'm seeing shit.

Q. All right. And then if I could ask you to take a look at Defendant's Exhibit Number 14, and if

81

you could, state in general what that is.

A. It's a sick call request. Also another kite.

Q. And does that also appear to be in relation to a James Broadnax?

A. Yes.

Q. Does it appear to be dated July the 11th of 2008?

A. Yes.

Q. And can you read what the complaint was to -- is this to an LVN?

A. Well, that's the person who picked it up.

Q. Okay.

A. It's to the medical staff in general.

Q. To the mental health staff in particular?

A. Yes.

Q. And could you read what the complaint was by Mr. Broadnax on July the 11th of last year?

A. (As read:) I can't sleep. My mind is playing tricks on me or something. I'm seeing shit in my cell. I'm hearing voices talking to me. I'm paranoid, like somebody calling me all the time. I need help.

Q. Now, what is the bottom part of that exhibit?

A. It looks like notes written by the nurse that went by that answered this.

Q. And would the nurse have gone by in response

82

to this request by Mr. Broadnax?

A. Yes.

Q. And can you describe what the nurse says in her notes as part of Defendant's Exhibit Number 14?

A. Her note's dated on July the 12th.

Q. You might want to keep your voice up just a little bit.

A. And she quotes him saying, I see blood coming out of the walls; voices in my head.

And her objective observation -- observations are that his affect was flat or blunted.

Q. What does that mean?

A. Not reactive normally.

Q. Okay.

A. Normal emotional response.

Poor eye contact, meaning that he's either looking down or with his eyes closed most of the time.

Frequent forehead rubbing. States he has been having auditory and visual hallucinations since before arrest. Cannot say what the voices are telling him. Statements incongruent with chart.

Q. And does she sign that? Do you see her situation on there?

A. Yes.

Q. And then what is the -- the plan that this

83

nurse recommends?

A. Provide follow-up July 22nd. Seen by provider yesterday.

Q. All right, sir.

Now, let me ask you, Doctor, as a result of those requests by Mr. Broadnax and requests by the nurse for a follow-up examination, did you perform that follow-up examination yourself on the date of July the 22nd of 2008?

A. I believe it was on the 20th.

Q. On the 20th? I think you are correct.

And, Doctor, I'm going to show you also what has been marked as Defendant's Exhibits Number 20, and do you recognize what that is?

A. Yes. That's a mental health clinic brief note.

Q. All right, sir. Let me ask you, if you could, if you could go ahead and look through 20 through -- Defendant's Exhibits Number 20 through -- Defendant's Exhibits -- if I could ask you Doctor, just to look through Defendant's Exhibits Number 20 through 33 and see if you recognize what those are.

A. (Witness complied.) Yes.

Q. All right, sir. Are these all records kept in the treatment of Mr. Broadnax by the Dallas County

84

jail?

A. Yes.

MR. LOLLAR: And we would offer Defendant's Exhibits 20 through 33.

THE COURT: Any objection?

MR. ALEX: I have no objections, Your Honor.

THE COURT: Defendant's Exhibits 20 through 33 are admitted. And you may publish.

Q. (BY MR. LOLLAR:) In regard to Defendant's Exhibit Number 20, could you tell us what that is and what the date on that was?

A. That's a mental health clinic brief note and it is dated October the 6th of 2008.

Q. All right, sir.

Let me get back to that one in just a minute, if I could.

Now, in regard to Defendant's Exhibit 13 and 14, Mr. Broadnax had first indicated that he wanted to see a psychiatrist in the mental services area on July the 11th, and then the nurse saw him the next day and set him for a follow-up interview with you; is that correct?

A. That's correct.

Q. And you did your first interview of him on

85

what day, do you recall?

A. July the 20th.

Q. And let me show you Defendant's Exhibit Number 21. What is Defendant's Exhibit Number 21?

A. It's my clinic note from that day.

Q. All right, sir. And would this be something that you would make in talking with Mr. Broadnax on that day?

A. Yes.

Q. And that becomes part of his medical history and part of his medical charts there in the jail; is that correct?

A. That's correct.

Q. Could you tell the jury what your impressions were, and if you recall, what Mr. Broadnax -- how he was at the time you saw him?

A. Yes. I wasn't the first psychiatrist to see Mr. Broadnax while he was incarcerated. I looked over his medical chart and read the note by the previous psychiatrist and any other of the treatment staff seeing him.

Q. Can I interrupt you?

At that point, do you recall if the previous psychiatrist that has seen Mr. Broadnax was

86

Dr. Mirmesdagh?

A. That's correct.

Q. And do you recall the date that she had seen him would have been on June the 23rd of 2008.

A. Yes, that's correct.

Q. All right, sir. Thank you.

Go ahead.

A. And my notes were that he had no prior history of a diagnosis or treatment for a mental illness, and that there were multiple documentations of him denying mental illness, but now that he was claiming hallucinations and sleep disturbance, mood disturbance, anxiety symptoms and nightmares, and I put in quotes, (As read:) I was on whack, you know, embalming fluid. My mind was not working right. Man, I had no memory of talking to that reporter or TV cameras or nothin'. End of quote.

And the rest are my observations.

Q. And, Doctor, let me again point out here on your report, you have put the words that he told you on that day; is that correct?

A. That's correct.

Q. And he was stating that he was on whack at the time of the commission of the offense that he was charged with?

87

A. Yes.

Q. And you know what whack is?

A. It's a street term for PCP.

Q. All right, sir.

And then the rest of the notations on Defendant's Exhibit 21 are your observations; is that correct?

A. That's correct.

Q. And your follow-up plan and your diagnosis; is that correct?

A. That's correct.

Q. Can you tell us what your observations were?

A. That he was alert and oriented at the time, but he was drowsy, but his affect was blunted and he was trying to cooperate, though he was guarded.

He didn't feel well. He had a depressed mood. His body language was agitated. He seemed suspicious, and fearful, and distressed.

I couldn't tell if his thinking was logical or goal directed, but his speech was slow. His sleep was diminished; claiming poor sleep.

Thought content was congruent with the history. He was claiming auditory hallucinations, but did not appear to be responding to internal stimuli.

He seemed paranoid. There were no involuntary

88

movements. He denied being suicidal or homicidal.

He made a statement to me that I -- I need to talk to my attorney because I've got to use the insanity defense.

My conclusion was that he had a substance induced psychosis, anxiety, versus malingering mental illness, antisocial personality traits. No physical condition I could think of. Psychosocial stressors, including the incarceration. A global assessment of -- functioning score of about 70.

He did seem to verbalize that he understood what I was telling him and what -- and understanding what the treatment plan was. I was going to come back and see him August 31st for a follow-up visit.

I put him on the medications Trazodone, Benadryl, Bupropion, Clonazepam and Risperdal.

Q. All right, sir.

If I could go back through some of those things with you now.

All right. As a result of what you saw and what you heard him saying to you, did you come to certain conclusions about his mental state at that time?

A. Yes.

Q. And what were your conclusions?

89

A. That he was most likely suffering mood and perceptual disturbances from phencyclidine or PCP, and marijuana.

Q. Now, specifically in -- in regard to that, Doctor, now, you knew he wasn't getting PCP there in the jail.

A. Correct.

Q. Are you talking about the PCP that he had allegedly used prior to the time he got arrested?

A. Yes.

Q. And tell us how a -- now, the date you're doing this is on July the 20th, and if we're talking about PCP ingestion last on June the 19th, a month earlier, roughly, can you tell us how a substance can be ingested that can cause psychosis in a person even a month later?

A. Yes. Phencyclidine is a unique and dangerous drug. It's been illegal since 1978 even for veterinarian use. And when it was put on the market in 1952, it was taken off the market by 1955 for human use. It was originally designed to be an anesthetic, but it caused bad trips, psychosis and violent behavior.

It wasn't even safe to be used in animals, so it was discontinued in veterinarian use in 1978.

90

It is used in research animals to create conditions similar to schizophrenia so that we've got an animal model for disrupting the brain's functions so that we can test the medications on them to see if they might be useful for human beings.

This drug is deposited in fat and brain, and the drug can come out of storage in fat and brain at different times, even four months afterwards.

So when these people are subject to flashbacks and reexperiencing psychotic symptoms, hallucinations, delusions, inability to structure a thought in an ordinary fashion, it's because of that erratic release of the drug from those tissues over time.

Q. Can you tell the jury what psychosis is in general? What is psychosis?

A. Psychosis would be a state where you're not able to integrate information and use it properly. And examples usually given are hallucinations, delusions and disorganized thought.

So a hallucination would be a sensory experience that you're having, but it's not really taking place. You're seeing something that isn't there, or you're hearing something that isn't a sound anyone else can hear. You're feeling, smelling, tasting, or having an emotional experience and no one

91

knows why you're having it because it's being generated inside your brain, just like you would in a dream.

When you're in a dream, you generally don't know that you're in a dream. You experience sights, smells, and everything, depending on how vivid the dream is. So that covers hallucinations.

Delusions would be false beliefs, like thinking you're Napoleon, or Jesus Christ, or something out of the ordinary like that. Or an alien.

Depersonalization is a common effect of this drug where the person doesn't feel like they're in their body. That's originally why it was developed as an anesthetic, because they could see something being done to their arm or leg, let's say, like cutting on it, and they wouldn't feel anything. So there's a disassociation. You know, the brain's faculties are not connected together where it can use the information properly.

And disorganized thinking is the other aspect to psychosis. Sometimes a person is not hallucinating, is not delusional, but cannot put together information in a useful way to go forward with their day. They can't make plans and they can't implement their plans because they're too disorganized in their thought. And those cover the conditions of a psychosis.

92

Q. All right, sir.

Now, I want to ask this: You subsequently started him on certain medications that you ordered on that day; is that correct?

A. That's correct.

Q. And was that based on your diagnosis and the observations that you made of Mr. Broadnax on July the 20th?

A. That's correct.

Q. Now, I'm sure the State's going to ask you, did you only do that because of what he told you, or was that in conjunction with what you were observing about him at the time as well?

A. Both.

Q. All right, sir.

And what type of medications did you start Mr. Broadnax on on July the 20th?

A. Um, --

Q. And go through them one at a time, please.

A. Trazodone is an antidepressant medication that has a sedative property to help improve sleep.

Benadryl is an antihistamine, and it is also something that can improve sleep. So those were both given at bedtime.

Bupropion is an antidepressant that increases

93

energy levels, and so that's given in the morning. Clonazepam is an antianxiety agent that turns down the alarm system of the brain, and that was given twice a day, half a milligram.

MR. ALEX: Judge, I'm sorry. Could the witness repeat that last med?

THE WITNESS: Clonazepam.

MR. ALEX: Clonazepam. Got it. Thank you.

A. And it's an antianxiety agent.

And Risperdal is an antipsychotic agent. It's one of the newer medicines known as an atypical antipsychotic, and these medications have been found to be more useful in treating a psychosis caused by an amphetamine or PCP. So I put him on Risperdal, two milligrams at bedtime also.

Q. (BY MR. LOLLAR:) And did you prescribe these particular medications in order to deal with the psychosis, the anxiety, and the other disorders that you noted there?

A. Yes.

Q. All right, sir.

Let me show you next Defendant's Exhibit Number 20, and can you tell what Defendant's Exhibit Number 20 is?

August 17, 2009

94

A. Mental health clinic brief note.

Q. And what is the date of that?

A. The date of it is October the 6th.

Q. And what does that report?

A. Um, it says (As read:), Off. Logan called to report that the patient wants to be seen by psych. Saw the patient at cell side and he reported that he hears voices, he feels like something is crawling on him. The patient reported that he needs his medication increased. Explained all current medication to the patient. Will report to the provider the patient's request and complaint, and it's signed by the nurse that was on duty.

Q. All right, sir.
So that was in early October.

A. Yes.

Q. All right, sir.
Let me show you Defendant's Exhibit Number 23. Would those be the medications that you prescribed for Mr. Broadnax?

A. Yes.

Q. And over the course of the next, oh, nine or ten months, did you continue prescribing that family of medications?

A. Yes.

95

Q. All right, sir.
And those include the Risperdal, Trazodone, Bupropion, and Clonazepam that you've already discussed.

A. Yes.

Q. Now, the indications, what is an indication? Is that what -- the reason why you're prescribing the medication?

A. That's correct.

Q. And for the Risperdal, you indicated psychosis?

A. Yes.

Q. For the Trazodone, you indicated MDD. What is MDD?

A. Major depressive disorder, or sleep disturbance.

Q. All right, sir.
For the Bupropion? MDD?

A. Yes.

Q. Same thing? Major --

A. Same thing.

Q. -- depressive disorder?

A. Uh-huh.

Q. And the Clonazepam for GAD. What is GAD?

A. Generalized anxiety disorder.

96

Q. What is that?

A. It would be like having your alarm system turned up where you're jumpy and any little noise would make you jump, or you'd be overly fearful.

Q. All right, sir.
And let me show you what has been marked here as Defendant's Exhibit Number 24. Is that again the medication order form, and this one dated October the 30th?

A. Yes.

Q. And at that time, again you were prescribing Trazodone, Benadryl, Vistaril, Bupropion, Risperdal and Cipro.

A. Excuse me. The date is November. That's his birth date.

Q. That's his birth date. I'm sorry. The date of November the 4th; is that correct?

A. Yes.

Q. All right, sir.
And at that time the indications you were looking at was major depressive disorder, generalized anxiety disorder, and schizoaffective. Can you tell the jury what schizoaffective disorder is?

A. Well, that's a term that's used when you've got symptoms that are overlapping between a mood

97

disorder and a thought disorder. So you've got mood disturbances like depression and anxiety, and then you've got thought disorder like the report of hallucinations.

Q. All right, sir. Now a schizoaffective disorder, is one of the characteristics of that a recurring bounce of psychosis?

A. Yes.

Q. And is that something that you were seeing in Mr. Broadnax that from time to time it would seem the psychosis would appear, get worse and then recede?

A. Yes.

Q. Let me show you what has been marked as Defendant's Exhibit Number 25 and ask what this is.

A. This is a follow-up clinic note that I made on November the 4th.

Q. And would that be based on your interview of Mr. Broadnax on that date?

A. Yes.

Q. Can you tell us what your general impressions were and what you were thinking at that time?

A. It seemed that his psychotic symptoms had improved, but the toxic exposure was probably fading at this point.

Q. Now, can I ask you, what toxic exposure are

98

you referring to?

A. To what he told me about PCP and Cannibis.

Q. All right. Would that be something, the PCP use -- usage, along with the Cannibis, would that be something that could be termed as toxic exposure?

A. Absolutely.

Q. All right, sir.

So toxic, I always think of poisonous. Is that kind of the same thing, poisonous and harmful?

A. Certainly.

Q. All right, sir.

So what was your impression about his mental state at that time?

A. It seemed to be improving. He was still depressed and he still had generalized anxiety symptoms and possibly some post-traumatic stress disorder symptoms. I put a question mark there.

Q. Let me stop you at that point. What is post-traumatic stress disorder?

A. That would be a series of symptoms a person experiences after a life-threatening event, or an event in which you see someone else seriously injured or killed, or someone that you could identify with being seriously injured or killed.

And this series of symptoms that you have from

99

that would be called a post-traumatic stress disorder.

Q. All right, sir.

What other impressions did you have at that time?

A. A possibility he also had antisocial personality disorder.

Q. And describe what that is and why you say it was a possibility.

A. Well, antisocial personality disorder, first of all, a personality disorder is a more entrenched derangement of the personality that can't be diagnosed until the age of 18 or older, and it is an enduring pattern of behavior. And it occurs not simply after exposure to a drug, or, say, in response to a medical condition like a brain tumor or hormone imbalance or something of that nature.

The personality disorders include such things as paranoid personality disorder, antisocial personality disorder, histrionic personality disorder, and to -- to nail down those diagnoses of general pattern of behavior, you'd have to have more information from other sources: His family, his teachers, his employers, and -- to give you a long range perspective. Otherwise, you wouldn't know what the pattern of his behavior is.

100

Q. All right, sir.

Now, in regard to the antisocial personality disorder, is it required that you know what the person's history was prior to the age of 15?

A. Yes.

Q. And you didn't have that type of history available to you; is that correct?

A. That's correct.

Q. So what you wrote there was an impression, but not exactly a diagnosis; would that be fair to say?

A. That's fair to say.

Q. And I think you noted on other times that he's got traits of antisocial behavior. Certainly, that would apply to what, 85, 90 percent of the people in the jail, because that's one of the traits of antisocial, is that the person's jailed.

A. Or that -- that they're breaking the law.

Q. Yes, sir. All right.

What were your other impressions on that date, November the 4th?

A. That he was drowsy, mentally slow. His affect was very blunted, even though he was trying to cooperate. He was depressed and dysphoric.

Q. What is dysphoric?

A. Not feeling well.

101

He was still fearful. He seemed still distressed and psychomotor activity was less than what I would expect in a young man.

His thought processing was concrete.

Speech was slow.

He still complained of decreased sleep pattern.

Insight and judgment were at that point fair. Thought content seemed to be congruent with the diagnosis.

At that time he didn't seem to be having hallucinations or delusions, but those were put in question marks.

There were no involuntary movements. He denied being homicidal or suicidal.

It seemed like he had an oral cavity infection. I made a note in the margin about that. And he told me that he had an empty socket but claimed he was brushing his teeth.

Q. You may want to keep your voice up just a little bit so the last juror down there can hear you.

A. Yes.

So my assessment was that the psychosis, secondary to drug abuse, was resolving, but he still had depression and symptoms similar to those of PTSD.

August 17, 2009

102

And I still noted he could meet the diagnosis for sociopathy or any social personality disorder.

He appeared to have an oral or a dental abscess. He still seemed to have extreme anxiety. His global assessment of functioning score was 65.

Q. All right, sir.

Anything else noteworthy on that date?

A. Well, I had written in the margin the symptoms that you usually see with post-traumatic stress disorder, being recurrent dreams, emotional numbing, foreshortened future, the impression of a foreshortened future, and increased startle responses.

Q. Did you continue him on the medications that you had previously prescribed for him?

A. Yes. I discontinued the Benadryl, the antihistamine. I increased the Trazodone dose to 200 milligrams at that time.

In place of the Benadryl, I added Vistaril, which is another sedating antihistamine, and I increased his morning antidepressant.

I continued him on the Risperdal, and I gave him an antibiotic on the possibility of an oral infection.

Q. For the tooth problem he was having.

A. Yes.

103

Q. All right, sir.

Now, that was on November the 4th, and again, let me show you Defendant's Exhibit Number 26. Are those the medications you prescribed at that time?

A. That's correct.

Q. And did the indications, the major depressive disorder, generalized anxiety disorder and schizoaffective disorder?

A. Yes.

Q. All right, sir.

Did those medications continue, looking at Defendant's Exhibit Number 27, up -- well, maybe you can see the date on that. Are you more familiar with the dates on those? Through September.

A. 29th.

Q. All right, sir.

Now, this one's a bit harder for me to read, but let me show you Defendant's Exhibit Number 28, and do you recognize what Defendant's Exhibit 28 is?

A. Yes. That's my note from February.

Q. All right, sir.

Let me take you forward then to February. Would it be safe to say that these medications that you had prescribed continued to be given to him there in the Dallas County jail between November and February of

104

2009?

A. Yes.

Q. And did you see him on the date of February the 9th?

A. It looks like it's February the 18th.

Q. February the 18th, I'm sorry.

And are those the notes you made on February the 18th?

A. Yes.

Q. And that's the same copy we have here as Defendant's Exhibit 28.

A. Yes.

Q. Can you tell us your impressions and what he was telling you and what you observed on that day?

A. He told me that he had a trial date set for July 28th and that he had talked to his attorney the day before. And that he's been worried about his mother who works as a truck driver and he was interested in trying to increase the antidepressant.

He was still complaining of poor sleep. He said that he was having disturbing dreams, and he seemed to be able at that point to laugh about it.

And then we got into a discussion about films that he had seen. I think he saw The Bourne Identity and The Bourne Supremacy, or something like that.

105

And now, I think he was reading something like The Bourne Ultimatum. I think it was a book he was reading.

Q. It was what? I'm sorry?

A. I think it was a book he was reading.

Q. Okay. And what were your impressions of his mental status on that day?

A. Well, he had improved quite a bit by February of 2009. He was alert and oriented.

His affect showed a full range because he was able to laugh at something. He was cooperative.

He told me he was working out. And his mouth was better. He was more positive. More hopeful.

He was still anxious about the legal problems.

His motor activity had become more normal for a young man. He seemed goal directed, logical at this point.

He still complained of poor sleep. I wasn't sure if his judgment was completely back in place, but his thought was congruent. He wasn't having any auditory hallucinations and no delusions.

He had no involuntary movements.

He wasn't suicidal or homicidal.

And my conclusion was that the depression or mood disorder, secondary to the drug abuse, was -- was

**106**

improving.

He might still have some post-traumatic stress disorder symptoms, and I made the note to keep him on the antidepressants, but that I could go ahead and remove the antihistamines like Benadryl and Trazodone.

The possibility of antisocial personality disorder remained on the diagnosis. And he had no physical problems.

His global assessment of functioning score had improved to 70.

He understood everything I was saying to him and -- and what the treatment plan was.

I planned to follow up with him in three months.

Q. All right. Very good.

Let me show you what has been marked here as Defendant's Exhibit 29, and do you recognize what this is?

A. This is another chart entry.

Q. What is the date of that chart entry?

A. Um, it looks like March 31st of 2009.

Q. Let me -- let me, before we get to that one, then, show you Defense Exhibit Number 30, and you see that's dated February the 14th of 2009?

A. Yes.

**107**

Q. And do those reflect the medications that you had him on in February of this year?

A. Yes.

Q. All right, sir.

And those would include the Trazodone, Doxepin, and what are those -- Bupropion. What are those two others?

A. The two others are Doxepin and Mirtazepine. These are both antidepressant medications that improve sleep at night.

Q. All right, sir.

So at that point, you had him on three different types of -- of antidepressant medications?

A. Yes.

Q. All right, sir.

And then if we could look at Defendant's Exhibit 29, and was that made by you?

A. No.

Q. Can you describe what date that applies?

A. It appears to be March 31st of '09.

Q. And is that a follow-up note by a mental health --

A. Yes.

Q. -- worker there in the jail?

A. Yes, it is.

**108**

Q. And can you describe what is seen here?

A. This is the physician assistant, Mr. Adams, and he notes that the patient stated he was fine except that he wanted an increase in his antidepressant Wellbutrin. He was able to sleep six to eight hours per night.

He says he was worried about his upcoming trial. He denied suicidal or homicidal ideation.

And the rest of the observations are that he was alert, oriented; that his mood was in normal range, and that his psychomotor activity was normal; that he was goal directed.

Linear and logical speech seemed to be normal.

Insight and judgment was deemed to be adequate. Thought content was congruent with the diagnosis. He wasn't having hallucinations or delusions, no involuntary movements. He wasn't suicidal or homicidal. So he repeated the impressions of depressive disorder, not otherwise specified; post-traumatic stress disorder symptoms, polysubstance dependence history; antisocial personality disorder; no medical conditions.

Psychosocial stressors were legal problems.

Global assessment of functions score was 70.

He understood what was being told to him,

**109**

understood the treatment plan. And his follow-up was planned for June the 16th.

Q. All right, sir.

Let me show you what has been marked as Defendant's Exhibit 31 and ask if you recognize what this is?

A. This is a psychiatric provider progress note.

Q. And what is the date of that?

A. The date is June the 16th.

Q. Of this year?

A. 2009.

Q. And I -- I don't think that you did that yourself; is that correct?

A. No.

Q. Nevertheless, could you go through there and just kind of interpret for the jury what the assessor saw at that time?

A. Psychiatric provider progress note, the reason for it is routine follow up.

This is kind of a check-off sheet generated by a computer, so it has a lot of things like he speaks English.

On the Centrum Rating Scale, he still has a score of one on irritability, but zero for mania. Depression, he scored it as -- it looks like a zero.

110

Mood lability, it looks like that was scored at zero -- anxiety looks like it was scored at one.

MR. ALEX: I'm sorry. May I inquire, is that the 16th or the 19th?

MR. LOLLAR: 16th.

THE WITNESS: This is June 16th.

A. Level of interest, score nine. Energy level, nine. Insomnia score, level one.

Suicidal risk assessment, patient denied he's suicidal. Homicidal risk, denied.

No labs were reviewed. Assessment provider documents, treatment management plan. (As read:) This patient presented with appropriate affect, euthymic mood. Look rested, cooperative, hopeful.

Psychomotor is normal. Thoughts are linear, logical, goal directed. No sign of mania or psychosis. Does not seem depressed.

Medication review. Patient is compliant with medications, yes. Side effects, none.

Medication response. Full response. Continue current medications.

Labs ordered. And then there were no labs checked. Oh, except for one: Thyroid stimulating hormone.

Q. (BY MR. LOLLAR:) All right, sir.

111

A. Under Diagnosis, he's got it listed as depressive disorder, not otherwise specified.

Antisocial personality disorder presumed.

And it just notes that he was provided information about his medication, treatment, and what his follow-up would be, and he understood everything.

Q. All right, sir.

And the back page?

A. That's from June the 16th of '09.

THE COURT: Doctor, you need to keep your voice up so Mr. McCreary (sic) over there --

A. It's a medication order sheet from June the 16th of '09.

Q. (BY MR. LOLLAR:) Would that be the medications he was taking on June the 16th?

A. It appears to be.

Q. All right, sir.

And then let me show you Defendant's Exhibit Number 30 -- Number 32. Are these the medications that were ordered as a result of that examination? And I believe that's dated June the 19th.

A. June 19th. There was a decision made to discontinue the Wellbutrin in favor of a different antidepressant, Zoloft.

Q. All right, sir.

112

Let me show you defendant's Exhibit Number 33, and is that dated June the 29th of this year?

A. June 29th, 2009.

Q. And what is that?

A. Chronic clinic note.

Q. And if I could just ask you to talk about the chief complaints, history of present illness. Describe what is noted there.

A. (As read:) Chief complaint, history of present illness. Has been having elevated blood pressure. Sometimes feel like along the collarbones. Also has a history of asthma and bipolar illness, and never took blood pressure meds.

Q. Now, let me ask you about this. It says also has a history of asthma and bipolar illness?

A. Yes.

Q. Now, is what you had previously placed in your notes led this assessor to note that was bipolar?

A. I really don't know why.

Q. Would that be something else? That could just be a mistake by that person?

A. I think that was a mistake.

Q. Okay. I didn't think I'd seen anything in regard to bipolar before then.

A. I don't think anybody else had concluded that

113

he had bipolar disorder.

Q. All right, sir.

All right. Doctor, would it be fair to state that during your treatment of Mr. Broadnax over the months between July of last year and June of this year, that you believed that he had a mental illness, mental disorder, and you prescribed appropriate medications to deal with that issue, and it appears that those medications, in fact, resolved the psychosis?

A. Yes.

MR. LOLLAR: Your Honor, may I publish these to the jury?

THE COURT: You may, sir.

Q. (BY MR. LOLLAR:) Thank you, doctor.

MR. LOLLAR: We'll pass the witness.

THE COURT: All right. Before we have cross-examination, I'm going to recess the jury until 12:45 p.m.

You are reminded not to discuss the case.

Your lunch is here.

Doctor, we'll need you back at 12:45.

All rise for the jury.

All right. We're in recess till 12:45.

(Court reconvened; Jury present.)

THE COURT: Cross-examination?

MR. ALEX: Yes, sir.

**FRANK LANE, M.D.**

was re-called as a witness and testified as follows:

**CROSS-EXAMINATION**

BY MR. ALEX:

**Q.** Dr. Lane, my name is David Alex and we've met before; is that correct?

**A.** Yes.

**Q.** All right. And I think we first met probably during the course of this trial; is that correct?

**A.** That's correct.

**Q.** And we've had brief opportunities to sit down and talk a little bit about some of your medical notes in the medical records; is that right?

**A.** That's right.

**Q.** And I want to start off with sort of a general proposition. The jury will have before it --

MR. ALEX: May I approach the witness, Your Honor?

THE COURT: Yes, sir, and as necessary.

**Q.** (BY MR. ALEX:) They will have before it a wealth of medical records which we have broken down into four areas. I think the first one is when the defendant first checked into jail.

The second one goes through about the first quarter of '09.

The third one goes through probably about April, June of '09.

And then the last one goes through July of '09.

And I'm going to ask you as a general -- as a general matter, there's no way for you to tell the jury everything in these records, is there?

**A.** I haven't looked at them.

**Q.** Okay. And that's -- and that's -- and I guess what I'm trying to get at is those records, if you take from me, if you will, are not in any kind of order chronologically, and so what I'm going to do is I'm going to have you look at State's Exhibit 580 and just peruse through that and tell me if it appears to be in chronological order of -- as it relates to the defendant's mental health.

And I put tabs on the sides with dates on them, if that will be helpful to you.

**A.** (Witness complied.)

**Q.** And Doctor, this may help in expediating matters. Let's just do this, if you will.

If you see, as we're talking about them, if you see anything that's out of order, would you bring that to the jury's attention?

**A.** Out of chronological order?

**Q.** Out of chronological order, okay?

And we're going to -- I'm going to go ahead and offer them. We're going to get started, and as we're talking, if you see anything that's out of order, then you let -- you let me know, okay?

**A.** All right.

**Q.** Let's put it back together. And I don't mean to take them from you, but I think what you'll find is that they are in chronological order.

MR. ALEX: We're going to offer, Judge, State's Exhibit 580 as a subset of the complete medical records previously mentioned.

THE COURT: Is there going to be objection?

MR. LOLLAR: No objection.

THE COURT: 580 is admitted.

Subset of which medical records?

MR. ALEX: All four, Judge. It would be State's Exhibits 5 -- I'm sorry -- 485, 486, 487 and 488.

THE COURT: All right.

**Q.** (BY MR. ALEX:) And, Doctor, if we start off with the book-in sheet where the nurse sees the defendant, is it true or untrue that there is -- well, let me ask it this way:

Is there anything on that sheet that checks the second page of the mental health screening, do you see anything there that indicates a -- any kind of mental disorder or problem by the defendant?

**A.** No.

**Q.** Okay. But the defendant was referred to psych; is that correct?

**A.** Yes.

**Q.** All right. And just looking at the face of this sheet, you couldn't look at it and say, Well, he was referred to psych because the nurse saw something. You couldn't look at that and say that, could you?

**A.** Not from this sheet.

**Q.** Okay. All right. And as a general matter it would be untrue, then, to say that the nurse sent him to psych because she saw something that was psychotic, based on this sheet.

**A.** There's no -- there's no note of psychosis.

**Q.** Very good.

And then if we go to the next thing in line here, we've got labs that are taken on June 23rd; is that correct?

**A.** Yes.

**Q.** And what's the PPD?

118

A. That's a tuberculosis test.

Q. Okay. So they check to see if you've got TB when you go to jail, right?

A. Yes.

Q. But they don't check to see if you have drugs in your system, do they?

A. Usually not.

Q. Okay. And they didn't in this case; is that correct?

A. As far as I know, that's true.

Q. And if they had tested him for drugs, it would be in some records that you would have probably reviewed prior to seeing him, would -- would that be a correct statement?

A. If they were in the medical record, I would have seen them.

Q. Okay. All right. And so when we get to the morning of June 23rd -- let's see, I think there's a time here -- when Jason Varghese sees the defendant, -- and you know who Jason Varghese is; is that correct?

A. Yes.

Q. All right. Is he another mental health provider there?

A. Yes, he is.

Q. Okay. And we see that there is a couple of

119

documents here from June 23rd from Jason Varghese and Dr. Mirmesdagh; is that correct?

A. That's correct.

Q. And you know who Dr. Mirmesdagh is.

A. Yes.

Q. All right. Now, you see here that at the very beginning when the defendant is first looked at, it says, (As read:) The patient states he has high irritability and anger. He has no past psychiatric history, but he states that he's been having audio hallucinations and denies they are commanding in nature.

Can you describe to the jury, what's the significance about making the notation about they're not commanding in nature?

A. Well, it's generally thought to be more dangerous if a person is having hallucinations or voices telling them to do things, generally because if they're hearing this voice and then looking around and no one is there, they generally think God's telling them to do something, and most people are going to do it if they think that. If they believe that.

And so, if a voice is telling them the guy next to you is Satan; you better kill him before he kills you, then you would.

120

So a command hallucination is considered a much more dangerous type of hallucination, and that's why they went to the trouble to make the distinction that he was not having command hallucinations.

Q. Okay. And so if -- if -- if, for instance, co-counsel was over there hearing voices that were commanding in nature, would there be -- would I be able to see something objectively, perhaps? You know, if somebody's talking to you, I mean, you've -- you've treated people that we typically think about, people that live under the bridge who are just highly psychotic; is that correct?

You've treated those people before; is that correct?

A. Yes.

Q. And -- and I think for the jury to have a visual, we can see sometimes people who are hearing voices just in the way they're -- they're reacting; is that right?

A. That's correct.

Q. Okay. And -- and so here, would this be -- when they asked the defendant if they are commanding, or would it be something that they would be observing? Just as -- denies their commanding nature so it appears as though they're asking a real question?

121

A. Yes, he would have to answer that question.

Q. Okay. Very good.

And then as we go through and we see the note from June 23rd from Dr. Mirmesdagh, one of the things that he says at the very beginning is, I need a psych lawyer. You see that?

A. Yes.

Q. Okay. And this would have been -- did you ever view the interviews that he would have given on this date, June 23rd, 2008?

A. I saw an interview that was put on the internet.

Q. Okay. Did you see it all the way through?

A. I don't know if I saw it all the way through, but I saw what they had on the internet.

Q. Okay. Do you remember which channel it was?

A. I believe they said it was the Fox News.

Q. Fox News, okay.

And this would have been before he would have went to those interviews, while he's talking to Dr. Mirmesdagh, he tells her he was high when he got there and denies any depression.

And one of the things that she writes here is he's disrespectful, irritable and angry, and that he's guarded. And I think when we see the note from Jason

August 17, 2009

122

Varghese, -- let me ask you this as a general -- as a general matter.

If, at the beginning of this treatment he's not being truthful with Dr. Mirmesdagh, let's say, for instance, about the drugs he had taken, would there be any way for Dr. Mirmesdagh to really know that? If he self-reports and he tells her, Hey, look, I've done PCP, and that's not truthful, would there be any way for her to objectively know that?

A. No.

Q. Okay. And so we have to sort of rely on what he says from the very beginning, don't we?

A. That's right.

Q. And then once we rely on that, it sort -- it sort of carries its way all the way through his medical treatment, doesn't it?

In other words, if you see him a month later, and two months later, and four months later, you're looking at the records and you're looking at what she writes here as polysubstance dependence, she writes, Rule out malingering, and then there's all this information about his drug use, and you sort of rely on that as well; is that correct?

A. That's correct.

Q. All right. But if the beginnings of it is not

123

true, then everything else that we talk about as far as polysubstance dependence, the drug-induced psychosis and all that, just kind of falls to the wayside, doesn't it?

A. Yes.

Q. Okay. All right.

And do you find it interesting that while he's seeing a mental health professional, where the -- I'm assuming when you talk to a patient, you're trying to get them to help you help them, if that makes sense.

Is that typical? You need some information so you can help them?

A. Yes.

Q. And it appears to me at this point, he's really not thinking about a psych doctor, he's thinking about a psych lawyer. He's thinking about his case.

Does that strike you as -- as sort of what we're seeing here?

A. Well, I took note of the same thing.

Q. Okay. And so if we looked at the medical records all the way through, we see a heightened concern for the defendant even when he's talking to the jail psychiatrist about his case; would that be fair to say?

A. Well, yes.

124

Q. Okay. All right.

And here, she says no command -- hears voices but no commands. Voices only.

She notes that he's -- a question mark with capital murder, multiple people.

And you see here where he says he last used on June 21st of 2008?

A. Yes.

Q. All right. Would it be -- when -- when you-all look at these records, would it have been sort of a starting point if he arrived at the jail on June 21st of 2008 and he said he last used on June 21st, 2008, what -- if you were seeing him and he told you that, would you assume that he had used in the free world before he came to jail?

Would that -- would be what you would have assumed?

A. Yes.

Q. All right. But if you found out after the fact that he was actually incarcerated in another jail and brought straight over to Lew Sterrett after the fact, would that sort of affect how you viewed what he told you about his drug use?

A. I'm not sure about that because what I hear about availability of -- of drugs, you know, in transit

125

and in other jails, I don't think they're in Dallas County jails, but I don't know where else he was.

Q. Okay. And let's assume that you found out he was in the Garland jail for a double homicide of two of their citizens, and the Garland Police was holding him captive there to bring to Lew Sterrett, and they're the ones who went all the way to Texarkana, picked him up and brought him to Garland jail and then brought him to Lew Sterrett, would that be sort of interesting to you that he was incarcerated on 6/21 of '08?

A. Yes.

Q. Okay. And that would sort of weigh in on him being a source of the information about the drug use, wouldn't it?

It would be -- it would be proof that he's not very reliable, at least as it relates to his drug use.

A. If -- if the -- the doctor wrote this, wrote that correctly, --

Q. Okay.

A. -- yes.

Q. And you don't have any reason to think she didn't write it correctly, do you?

A. No.

Q. Okay. All right.

And then she wrote Polysubstance dependent.

126

And then she wrote out rule out malingering. What's malingering?

A. Malingering would be feigning an illness.

Q. Feigning an illness.

It would mean that perhaps when he -- he says he's hearing voices, but there's no symptoms, there's no objective symptoms of evidence of him reacting to hearing voices, it could mean that she had her questions about whether he was really hearing voices.

A. Yes.

Q. Okay. And again, there's no test that you can give a person. It's not like you can put them in some kind of machine, or x-ray machine, and -- and see the voices in their head, is there?

A. No.

Q. Okay. So again, this is all self-reporting and you have to be able to rely on the person who just asked for a psych lawyer to be honest with you about the voices; is that right?

A. That's correct.

Q. Okay. And so she says, In abundance of caution, no medication of now; patient still on drugs with a question mark; is that right?

A. Yes.

Q. Okay. And so even the documents themselves

127

don't definitively say that she believed that he used these drugs when he said he did; is that right?

A. I'm sorry. What's your question?

Q. I'm sorry.

There's a question mark behind Patient still on drugs; is that correct?

A. That's right.

Q. All right. And that would tend to -- to make one believe that she was not definitive about him being still on drugs, or else she would have just wrote, Patient still on drugs without the question mark.

A. Well, I think she was questioning whether he was still under the influence of a drug.

Q. Okay. Very good.

And there's a note here, no response in terms of stimuli; states hearing voices all the time.

Now, let's talk about that a little bit. Is that inconsistent with what you-all know about a person who hears voices, that they hear them all the time?

A. Some people will say that.

Q. Okay.

A. And some people won't. It's really variable.

Q. It's really variable. Okay.

So it's -- it's not -- hearing voices all the time is -- is not inconsistent with the fact that

128

you're hearing voices? Is that what you're saying? Or are you saying that the studies vary?

A. I'm saying people will report that differently sometimes. They are hearing them all the time, and you say, Even while I'm talking to you? And they'll say yes. And you'll wonder why they're not distracted, but they'll tell you that anyway.

Q. Okay. I respect your response. That people do say they're hearing them all the time.

A. Uh-huh.

Q. But my question to you is, as it relates to psychosis, is hearing voices all the time inconsistent with any particular kind of psychosis?

A. No.

Q. Okay. All right. And so it's -- it's -- you can hear voices all the time and still not have any external objective evidence that you're hearing them.

A. Yes. You could.

Q. All right. And if we -- if we move along from there, Doctor, as it -- as it relates to the information that the defendant is providing to you-all, at that point, he's self-reported that he's hearing voices and that he's used these drugs; is that right?

A. Yes.

Q. And as he -- as he stays in the Dallas County

129

jail, you-all don't do a whole lot of investigating it as far as, let's say, for instance, the diagnosis of antisocial personality disorder. You-all don't go out and try and figure out if he's been in jail as a juvenile or not, do you?

A. Well, we do look at the record that we have available to us, and if we know of any others, we try to order it.

Q. Okay. And the record that you had available would be what?

A. Well, immediately, it would be the AIS, the county record.

Q. Okay.

A. Of how many times he's been to Dallas County jail.

Q. All right.

A. And then anything in the medical record that's part of the electronic medical record, that would come up right then.

Q. Okay.

A. And the rest --

Q. And that would be something that's done on every case.

A. Well, I hope it is. I know I do it.

Q. All right. Now, how many patients would you

130

have normally seen back then in a regular day, back in June of '08?

**A. Probably eight to twelve.**

Q. Eight to twelve. All right.

Could it be up to 20 if you're working a full-time shift?

**A. I think people on a full-time shift might be pushing it if they saw 20.**

Q. Okay. So eight to twelve in one single day?

**A. Yeah. If they're just checking to see if they're having a problem with their medicine or something like that, it could be a brief visit.**

Q. Okay. Very good.

**A. But if they're doing a new-patient evaluation, they couldn't see that many.**

Q. And you're aware as it relates to, let's say, a diagnosis like antisocial personality disorder, that when you're looking for juvenile records, many times juvenile records are sealed and destroyed and that kind of thing. Are you aware of that?

**A. Yes.**

Q. Okay. All right.

So juvenile records may not be readily available, even though it's a necessary component to make that diagnosis.

131

**A. Yes.**

Q. Would you agree with that?

**A. Yes.**

Q. Okay. Now, if we -- if we start with the notion -- and assume for me, if you will, that the defendant is not truthful with you, with Dr. Mirmesdagh when he first reports his drug use and hearing voices, okay? And if you assume for me that, if we go all the way through his medical records to the very end, would that affect his diagnosis from the beginning to the end?

**A. Well, if you didn't believe he was using any illicit drugs, yes.**

Q. Okay. And if you didn't believe he was hearing voices.

**A. Yes.**

Q. Okay. And let me ask you this as a general matter as well. If -- if you thought that -- if Ms. Handley was your patient, -- and you see patients in the regular world; is that correct?

**A. That's correct.**

Q. In the free world. And when -- when someone comes to you in the free world, are you concerned at all that perhaps this person is coming to see me for some other reason other than getting help? Does that

132

ever concern you?

**A. Yes.**

Q. Okay. And what are some of the reasons somebody might come see you in the free world other than just to get help for a mental problem?

**A. They may be trying to get disability.**

Q. Okay. Disability. There may be a particular drug that they're trying to get, maybe?

**A. Or that.**

Q. Okay. And so you have to kind of -- you've got to have to kind of rule those kind of things out and you have a mechanism in place; is that right?

**A. Yes.**

Q. Usually the people that come and see you in free world are not looking at a double homicide capital murder, are they?

**A. Not usually.**

Q. Okay. And in the jail setting, you would also have to be a little guarded as well, wouldn't you?

**A. More guarded.**

Q. More guarded.

And that's why we see things like rule out malingering in Dr. Mirmesdagh's report at the very beginning of his stay; is that right?

**A. That's correct.**

133

Q. And let me ask you this: Are you aware that the jail records inmate's phone calls?

**A. No.**

Q. Okay. And -- and if you -- if you had to say that you had all the information that you could possibly have about James Broadnax, would your diagnosis be the best it could be?

**A. If you had everything?**

Q. As much information as you could possibly receive.

**A. Yes, I suppose it would be the best.**

Q. But it would be limited, really, to the amount of information that you have about him; is that correct?

**A. Yes.**

Q. And the sources of that information as well; is that right?

**A. That's right.**

Q. If you knew that he had a -- a sort of a history of manipulating the jail guards and the nurses to get what he wanted, would that play any role in how you viewed the things that he was telling you?

**A. Um, I'm not sure.**

Q. Okay.

**A. I know --**

134

Q. Let's do this. I'm going to play that -- I'm going to play that call for you and you tell me -- just give me one second.

Now, when we start talking about malingering, we're basically talking about faking a sickness; is that right?

A. That's correct.

Q. And we fake a sickness probably for a whole lot of reasons, right?

A. I assume.

Q. I mean, it could be A to Z.

A. Yes.

Q. Here, if he's asking for a psych lawyer and he's giving evidence of psychosis, it could very well be that he's thinking about his case coming down the road, couldn't it?

A. That's possible.

Q. All right. I'm going to play a call for you.

(Tape played.)

THE COURT: You need to put the exhibit number on that.

MR. ALEX: I'm sorry, Judge. That's going to be -- give me one second. Sometimes I get a little ahead of myself.

It's going to be January 10th, 2009, and

135

that's for all purposes, Judge, State's Exhibit 557.

THE COURT: Folks, y'all probably figured this out, but the appellate courts will grade our paper, so-to-speak, on this, so they have to know what -- what you're looking at, so I'm not trying to be annoying, but it's just something we have to do.

MR. ALEX: That would be State's Exhibit 557, Judge, for all purposes, and 566 for demonstrative purposes.

THE COURT: Thank you.

(Tape played.)

Q. (BY MR. ALEX:) All right. And, Dr. Lane, there's no way for you to know that while you're treating a defendant and he's telling you these kind of things, that he's also malingering when it comes to like physical illness, because you-all don't have access to these calls; is that correct?

A. That's correct.

Q. All right. And when it comes to being manipulative, we did see in the records there that there were a couple of times that he was noted as being manipulative; is that correct?

A. Yes.

Q. All right. And his self-reporting of -- of hearing voices, if we looked at the chronology of those

136

records, he went from hearing voices to the interviews, he went to suicide watch, and after he got into suicide precaution, he started sending out kites saying, Hey, there's nothing wrong with me now. I'm fine, I'm fine.

Do you recall seeing those in the records?

A. I saw them yeah, after -- after he was put on suicide precaution.

Q. So after he was in suicide watch, -- and correct me if I'm wrong. Is suicide watch a single cell, it's not very big where they don't give you anything you can hurt yourself with?

You don't even have any real clothes, you've just got kind of a smock with all of your parts hanging out?

A. You have a paper drape on that's open in the back. No clothes, no mattress, no blanket. Nothing.

Q. And the objective there is to make sure that you don't hurt yourself.

A. That's correct.

Q. And so after he was put there after he said he was hearing voices, was when he decided that he wasn't hearing voices anymore; he wanted out of there.

And what we see in those records is, there's numerous kites of him saying Let me out of here. There's nothing wrong with me.

137

Do you recall that?

A. I recall those notes, yes.

Q. Okay. Let me approach. And the reason I put these in the order that I did is so that if the jury looked at them, they could see after he checked in and was saw on the 23rd, which was the date that he gave the interviews, and he saw Dr. Mirmesdagh, they -- they put him in the suicide tank primarily, -- let's see, primarily because of his talks on the media and his thoughts about hurting someone else or hurting himself.

Does that sound like a note that you read in there?

A. I don't remember seeing that note.

Q. Okay. All right.

Let's see, we'll find it here for you. Okay. He's put in suicide precaution. Recent suicidal thoughts and attempts, and they did that on June 24th of 2008.

Does that look about right?

A. Yes.

Q. And that would have been subsequent -- if I told you that the interviews was on the 23rd, that would have been subsequent to that; is that correct?

A. Yes.

Q. All right. And then after that is when we see

138

the kites -- well, when we look at his suicide log, we don't see anything here relating to him reacting to any kind of internal stimuli, do we? Have you had a chance to look at those?

A. No, I didn't see these.

Q. Okay. Is it -- is it uncommon or is it common if a person is hearing voices all the time when they are in suicide watch, that they'll be making notations and they'll say Appears person is talking to himself, or that kind of thing.

You see that in these?

A. Sometimes the guard will make those notes.

Q. Okay. All right.

And then on the 25th, after he's been there for one day, he says, I want to know if y'all are going to move me off the crazy floor, because I'm mentally sane, right?

A. Yes.

Q. Okay. And then --

A. On the 28th.

Q. I'm sorry?

A. That's on the --

Q. 25th?

A. 25th.

Q. And then on the 25th as well was when

139

Dr. Ridge would have seen him; is that correct?

A. That's a nurse practitioner, Tom Ridge.

Q. Okay. Gotcha. And he's still telling the nurse at that point, I'm straight, man; is that right?

A. Yes.

Q. Okay. And they -- and they discontinue him on the suicide precaution, but they leave him up in the psych ward; is that right?

A. On crisis stabilization.

Q. Okay. And it appears that the kites he sends out after that, he's ready -- he's sent back down -- he's discontinued on crisis stabilization on the 26th; is that correct?

A. Yes.

Q. And that would have been after at least a couple of kites of saying that he was straight; is that right?

A. Yes.

Q. Okay. And then after he's sent down to the general population, --

A. He never made it to general population.

Q. Okay. He -- he went back down to the single cells; is that correct?

A. Well, this was a recommendation, but it's subject to administrative --

140

Q. Review.

A. -- review, right.

Q. Right.

A. So if the Sheriff's Department sees a reason that they can't send him to general population, they don't.

Q. Okay. And maybe -- maybe general population, I'm using it in a loose term. He -- he did leave the psych ward area and went down to the single cells; is that right?

A. Well, not necessarily. They have single cells on the psych unit.

Q. Okay. Were you aware that when he left there, the records show that he went down to the two upper, -- two west uppers?

A. Right. Those are single cells.

Q. Okay. But he was discontinued in the crisis stabilization and it was recommended that he go down to general population; is that right?

A. That was a recommendation.

Q. Okay. And do you know where he went from there?

A. Over to two west uppers, which is single cells.

Q. All right. And is that not considered general

141

population?

A. No, that's -- that's on the same floor as the psych office, so we can go down there and see those guys.

Q. Okay. All right.

And you would be seeing him on a monthly basis?

A. Um, whatever the follow-up was on that last note.

Q. Very good.

And so the next time that you would have saw him after the -- the 26th, after Ridge saw him on June 26th, would have been --

A. That's when he was supposed to follow up.

Q. Okay.

A. He saw him on June 25th.

Q. Okay.

A. So he set a next day follow-up.

Q. Next day follow up?

And on 26, was there a follow-up done?

The next follow-up that we see, actually, is not until you see him again, and that's on July 20th; is that correct?

A. I guess so.

Q. Okay. So it was recommended that he be seen

142

on the 26th, but wasn't actually saw until July, according to the records.

A. That's correct.

Q. All right. And in between that time, between the time that he left that -- the area where he would have been in suicide watch and sent to the single cells, he started saying that he was seeing things; is that correct?

The note there that's in front of you there in July, is he saying that he's seeing things?

A. Hold on. (Examining document.) Yes. In July, he was.

Q. And so he went from hearing things, to I'm straight, to now he's seeing things; is that correct?

A. Yes.

Q. All right. And you also -- you don't have the benefit of going down to his cell and -- and -- let me ask you this: Do you know if the -- if the jailers shake down their cells to check to see if they've got any contraband?

A. Sometimes they do.

Q. All right. I'm going to read to you a letter from -- State's Exhibit 477 and 478 that someone wrote to the defendant, and I'm going to ask you if this in any way would affect your diagnosis as far as what the

143

defendant is telling you, okay?

(As read:) Say homey. I hope it ain't too late, seeing how often they run the law library, but I believe it will be in your best interest to get a list, even if it's just one of the cases similar to yours where the defendant got little to no time with or without the temporary insanity plea. You know, the worst case scenario, and what they -- but what did they take into consideration to spare certain individuals' life or death sentences when others believed they deserved it, especially for a multiple homicide where robbery was the incentive, preferably the details are equally or more gruesome.

(As read:) I'm sure such cases exist too. If so, to my knowledge, parenthesis Nate, close parenthesis, these can be used as references to enlighten the jury and give them something to compare your case to and hopefully give you little leniency. I hear these comparisons are a lawyer's best friend and biggest ally. Think ten questions. And can be used in numerous ways throughout the trial. Simple and plain, how or why should we give him life without parole when this person's charge was worse and he got only 30 years.

(As read:) The jurors are your average

144

every-day Joe. They're supposed to be first timers, so they didn't know about the 30 years that fool got. You feel me? So in my opinion, especially during the punishment phase, I feel comparisons can have a very big impact on the jury and almost guarantee, at the very least, a little leniency, that's your lawyer, and their presentation though.

(As read:) If they believe in them, they going to press the issue. But why wouldn't they if they have your best interest at heart.

(As read:) On the temporary insanity tip, I feel that's really your only option, all based on that interview, and only you know how good a defense that will make considering your situation. And if it hasn't been already, that should be the focal point of your studies, because if mother F'ers is getting off behind that, the jury should know about it. Use your resources, Homey. It's by any and all means. Knowledge is power. Holler back.

And you wouldn't have had the benefit of knowing that people were giving him advice to use a temporary insanity for his case. There would be no way for you to know that, would there?

A. No.

Q. All right. And, Doctor, I'm going to -- I'm

145

going to move on to -- the defense counsel asked you about the diagnosis of antisocial personality disorder. Okay?

A. Yes.

Q. And when we -- when we leave the notion that his self-reporting of drug use, and voices, and seeing things, and that was all -- the -- the culmination of that would have been a diagnosis of some kind of psychosis; is that right?

A. Yes.

Q. All right. And if we leave that and we go to the other diagnosis of the traits, that was antisocial personality disorder; is that right?

A. Yes.

Q. Okay. And I think we -- we used the term, but we never defined it. State's Exhibit 581, does that appear to be an acceptable definition of antipersonality -- antisocial personality disorder?

A. Yes.

Q. All right.

MR. ALEX: We're going to offer State's Exhibit 581, Your Honor.

THE COURT: Any objection?

MR. LOLLAR: No objection.

THE COURT: No objection?

146

MR. LOLLAR: No, sir.

THE COURT: State's Exhibit 581 is admitted.

Q. (BY MR. ALEX:) And so it says 301.7 antisocial personality disorder. What would be the origins of this particular illness? If we wanted to find it somewhere, where would be the place where you would go to read up on it?

A. Well, you would go to a textbook of psychiatry, I suppose, and the diagnostic manual of the American Psychiatric Association.

Q. And is a DSM-IV, is that a common tool for people in your trade?

A. Yes.

Q. All right. And if you will, it says diagnostic criteria for 301.7 antisocial personality disorder.

You know what? You read it, because I'm -- my voice is starting to -- to taper off.

A. Do you want the most recent version?

Q. Sure. Is that not the most recent version?

A. Well, this is the DSM-IV-TR. If this is from the DSM-IV, it's kind of dated.

Q. Okay.

A. But it says DSM-IV-TR, so we'll take it.

147

Q. So that is the TR.

A. Okay.

(As read:) There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15, as indicated by three or more of the following: One, a failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest;

Two, deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure;

Three, impulsivity or failure to plan ahead;

Four, irritability and aggressiveness as indicated by repeated physical fights or assaults;

Five, a reckless disregard for safety of self or others;

Six, consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior, or honor financial obligations;

And seven, a lack of remorse as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

Criteria B. The individual is at least 18 years of age.

Criteria C. There is evidence of conduct

148

disorder with onset before the age of 15.

And D, the occurrence of antisocial behavior is not exclusively during the course of schizophrenia or a manic episode.

Q. Okay. And I'm going to ask you, as a general matter, when you look at the video of the defendant, did you see a total lack of remorse there?

A. Yes.

Q. And did you also see where he self-reported that he had been to juvenile and spent some time in the juvenile facility?

A. I don't recall that, but ...

Q. Okay. And as it relates to fighting, at least since he's been in jail, are you aware of the fights that he's had since he's been in jail?

A. No.

Q. And is that something that you-all get when you look up the records? Like if you went to go see him today and you pulled up the records, would his jail fights automatically come up?

A. No.

Q. All right. And so if I represented to you that he's been in at least two fights in jail, would that surprise you?

A. No.

149

Q. Okay. And then deceitfulness, as indicated by repeated lying, would you -- would you agree with me that what we just heard that in that phone call was pretty deceitful to get out of his cell, the malingering chest illness just to get out of his cell?

A. Yes.

Q. All right. Reckless disregard for the safety or [sic] self of others?

Do you know anything about the facts of this case?

A. Not other than --

Q. What you saw on the video?

A. Yeah.

Q. What you saw on the video, would you say that there was a reckless disregard for the safety of others?

A. Yes.

Q. Okay. And you wouldn't necessarily know anything about his inconsistent work habits or his honor to financial obligations, would you?

A. No.

Q. Would you have asked him about those things when you were talking to him? Because I think what you said earlier is that you saw traits of antisocial personality disorder; is that right?

150

A. Yes.

Q. Okay. Would you have asked him about those things, or do you recall?

A. I may have, but I don't recall.

Q. Okay. And finally, he was at least -- let's see, it says, the individual is at least 18 years of age. At the time you were seeing him he was 19, perhaps even going on 20; is that right?

A. That's correct.

Q. Okay. And I think what I heard you say to counsel was that primarily there's no way you could make a specific diagnosis because you would not have known his history, his juvenile history; is that right?

A. Correct.

Q. Okay. And I could show you the video again where he self-admits being in juvenile trouble. But if you took -- if you took the fact that he self-admits to that, would you have any problem diagnosing him with an antisocial personality disorder?

And I know that's a hypothetical, and it's -- it's if you had known that.

A. Well, it would help.

Q. Okay. Very good.

Now, as it relates to a couple of specific things that you talked about on direct examination,

151

would you explain to the jury the difference between when you said logical versus goal-directed thinking? When you -- when you circled those on the mental health notes.

A. Right. Goal-directed thinking is pretty much what you hear it as. A person has a goal and he's got an idea how he's going to attain that.

Logical thinking would be whether you feel like he connects because of A, and B, then C, you know. The dots are connected together in a -- in a way that is understandable. That's logical reasoning.

Q. Okay. And so if he's -- if he's thinking about his case when he's talking about [sic] you and he's self-reporting hearing voices and seeing things, that could be considered goal directed, because he's thinking about the end game.

A. That's a possibility.

Q. All right. And I think that there was an opinion that you gave that he was most likely suffering from mood problems from PCP and marijuana. Again, that is completely based on what he self-reports to you; is that right?

A. Yes.

Q. Okay. And that's obviously without the benefit of knowing anything that he may have in his

152

cell, or what he's talking to people about on the cell -- on the -- on the phones; is that correct?

A. That's correct.

Q. All right. Because when it comes to manipulative, --

MR. ALEX: Play the 3/25 clip.

Q. (BY MR. ALEX:) I'm going to play another call for you and see if -- there's a couple of things that I'm going to ask you about after I play it.

MR. ALEX: And that's going to be -- that's going to be State's Exhibit 550 for all purposes, Your Honor, and State's Exhibit 560.

550 for all purposes, and 560 for record purposes. And we'd offer them at this time, Your Honor. I don't think they've been previously offered.

THE COURT: Any objections?

MR. LOLLAR: No, Your Honor.

THE COURT: State's Exhibits 550 and 560 are admitted.

Which one was demonstrative? 560?

MR. ALEX: 560.

THE COURT: All right.

(Videotape played.)

Q. (BY MR. ALEX:) All right. And that's the

153

defendant discussing a conversation about the co-defendant, and a little guarded about talking about, because he doesn't know what the co-defendant's already said. Does that sound to you like someone who is really trying to work the system?

A. Well, he's certainly being cautious.

Q. Okay. Very good. And --

MR. ALEX: Play the April 1st.

And at this time, Judge, we're going to offer State's Exhibit 549 for all purposes, jail call from April 1st, 2009 and 559 for demonstrative purposes.

THE COURT: Any objection?

MR. LOLLAR: No, Your Honor.

THE COURT: State's Exhibits 549 and 559 are admitted.

(Videotape played.)

Q. (BY MR. ALEX:) All right. And this call sort of demonstrates the defendant's unwillingness to take responsibility for his actions, and also of him trying to get away with the crime. Would you agree with that?

A. I didn't really hear all of that, but --

Q. All right. Let's hear it again.

And let me -- let me set that up for you for real. This is the defendant talking to a young lady

154

the name of Lakarrame Cole, who would be the defendant's cousin and the co-defendant's sister, okay? And so he's talking to Ms. Cole.

A. Okay.

Q. Did I lose you there?

A. No, I'm with you.

Q. Okay. Very good.

And I guess the point is, is this an indication of manipulation?

(Videotape played.)

Q. (BY MR. ALEX:) And Alice would have been the defendant's aunt who turned him in after the crime, okay?

And does this appear to be a situation that fits right into the antisocial personality disorder?

A. It certainly wouldn't be inconsistent with that.

Q. Okay. Very good.

And then when it comes to following the rules while he's in jail, would you have any idea that he is constantly looking for ways to get around the rules in jail?

Would that fit into the antisocial personality disorder?

A. Yes, it would.

155

Q. All right.

MR. ALEX: Play the January 22nd one.

And, Judge, for the record, this is already in evidence, 551 for all purposes; 562 for record purposes.

THE COURT: All right. 562 record or demonstrative?

MR. ALEX: It's for demonstrative, Your Honor.

(Videotape played.)

Q. (BY MR. ALEX:) And would this -- would this kind of thought pattern be consistent with the antisocial personality disorder?

A. Yes.

Q. Okay. And, Doctor, if we -- if we talked about the other diagnosis that you made, the post-traumatic stress disorder, that simply could be the result of having -- well, you know what? We'll skip that.

You're aware that the defendant caused the death of two innocent people; is that right?

A. Yes.

Q. Okay. Very good.

And I think counsel asked you a little bit about the schizoaffective disorder, you recall that?

156

A. Yes.

Q. State's Exhibit 582, I don't know that we really -- is that the DSM-IV-TR definition there?

A. Yes.

Q. Okay.

MR. ALEX: I'm going to offer State's Exhibit 582 at this time, Your Honor.

THE COURT: Any objection?

MR. LOLLAR: No objection.

THE COURT: State's Exhibit 582 is admitted.

Q. (BY MR. ALEX:) And in the records, when we look at your mental health notes, I think there's probably a total of maybe four?

A. Yes.

Q. Or three?

A. Four.

Q. And in any of these notes, and I'm just going to kind of show the jury what we're talking about, what we're looking at here is the one note from July 20th; is that correct?

A. Yes.

Q. And then there's Assessment and there's Axis 1, 2, 3, 4 and 5; is that right?

A. Correct.

157

Q. In any of these assessments, was he ever actually diagnosed with schizoaffective disorder?

A. No.

Q. Okay. And so the assessment area, if the jury goes back and looked at these, the assessment area would be where you would put schizoaffective if you had diagnosed him with that; is that correct?

A. (No response.)

Q. Is that correct?

A. If -- if I thought it was. But see this?

Q. Right. If you thought that it was --

All right. Why don't you read that for the jury what you're pointing out to me on State's Exhibit 582.

A. Criteria D or schizoaffective disorder, is the disturbance is not due to the direct physiological effects of a substance.

In other words, a drug of abuse, or medication, or general medical -- medical condition.

Q. Okay. And so, what -- basically what we're talking about is if you believe that he did the drugs, then schizoaffective is probably not going to be a proper diagnosis; is that right?

A. Well, it would be confounded. You'd have to get more information of whether he had those symptoms

158

**prior to using drugs, --**

Q. Gotcha.

A. **-- and that would take a lot of family, teachers, and other people giving you that information.**

Q. Gotcha. And it wouldn't be necessarily true that the two are mutually exclusive, it just would mean that if you -- if you believed what he told you about the drugs, and -- and pretty much if a person tells you they're using drugs, you're going to take them at face value and treat them; is that right?

A. **That's correct.**

Q. Because if you don't treat them and their condition worsens, then you're not doing your job, right?

A. **Right.**

Q. Okay. And in -- in believing that perhaps he did the drugs, the schizoaffective -- what you just read to the jury, is sort of inconsistent there.

A. **Right.**

Q. Okay. All right. And -- and if we just summed up, Doctor, if the defendant was not being truthful about his drug use, then everything that we see in those medical records about drug-induced psychosis would just sort of go out the window, wouldn't it?

159

A. **Yes, if -- I mean, if he wasn't using them.**

Q. Okay. And we know -- well, you at least know now that he was malingering on at least one occasion when you heard that phone call when he was talking to his mother about faking the illness in his chest; is that right?

A. **Yes.**

Q. So we know that he's not above that; is that correct?

A. **Correct.**

Q. And we know that at least more than one doctor other than yourself wrote in the notes, Rule out malingering; is that correct?

A. **That's correct.**

Q. And it's not true that in every medical record we look at at someone in jail, they're going to have Rule out malingering, will they?

A. **Correct.**

Q. There had to have been something there to make you say, Well, I question whether or not this person is really hearing voices or seeing things; is that correct?

A. **That's correct.**

Q. And as it relates to that diagnosis, you would not have all the information that perhaps the jail may

160

have, or that we may have in listening to his phone calls; is that correct?

A. **That's correct.**

Q. And then, when we get to the schizoaffective disorder, I think we just told the jury that it's -- it's inconsistent with what he's saying; is that correct?

A. **You just don't have enough information.**

Q. And finally, Doctor, the bipolar information that was in the record, you believe that to be a mistake; is that right?

A. **I believe so.**

Q. All right. You didn't find anything wrong with his thyroid, did you?

A. **I never found the test.**

Q. All right. And -- but y'all tested him for medical things that could have been wrong with him; is that right?

A. **Um, I believe there were labs drawn, but I'm not sure exactly which ones they drew and who drew them.**

Q. All right. But you didn't note any physical impairments to him, for instance, I mean, if he wanted to go out and get a job, there was nothing stopping him from doing it physically, were there, from what you

161

could see?

A. **Not that I could see.**

Q. All right.

MR. ALEX: May I have one second, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) And, Doctor, I promise you this. This is my last line of questioning.

Assume for me, if you will, that the defendant is thinking about his case and -- and he is making up these things about hearing voices and seeing things, okay?

And he's not -- he's not -- he doesn't have a psychosis, but he's psychotic, okay? Assume for me that, if you will.

A. **Okay. Can you say that again?**

Q. Well, I tell you what. Let me -- let me -- let me -- let me ask you this. Just assume that he's not being truthful about his drug use and about hearing voices and seeing things, okay?

A. **Okay.**

Q. And then if you were to treat him with Risperdal or any of those things for psychosis, would it hurt him?

Would it -- would it -- let me ask you this:

162

Would it have significant long-ranging side effects if you were treating him for it, even though he didn't have it?

A. It's very unlikely, but possible.

Q. Okay. But it's very unlikely.

And as a general course, if somebody is tells -- tells you that they're having these hallucinations, either audio or visual, your course of action is going to be probably to treat them for that while they are at the Dallas County jail; is that correct?

A. That is correct.

Q. All right.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Redirect?

MR. LOLLAR: Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. LOLLAR:

Q. Doctor, let me see if you recognize this definition from the DSM. The American Psychiatric Association's definition of antisocial personality disorder.

(As read:) A pervasive pattern of disregard for and violation of the rights of others that begins

163

in childhood or early adolescence, and continues into adulthood. Therefore, it is essential in making a diagnosis to collect material from sources other than the individual being diagnosed. Also, the individual must be age 18 or older, as well as have a documented history of a conduct disorder before the age of 15.

Does that sound familiar from the DSM to you?

A. Yes.

Q. All right, sir. And, you know, one of the things that Mr. Alex asked you about was the notation from Dr. Mirmesdagh or Jason Varghese about the wet usage being two or three days before.

Now, as they have testified, could that have meant to the defendant two or three days before he was brought into the jail?

A. Yes, it could.

Q. So that would put it back on June the 19th if he came in on June the 21st.

Now, in regard to the suggestion from Mr. Alex that he was just faking about the PCP usage, and has been faking mental disorders and mental illnesses, now you do see in those papers that Mr. Alex showed you that when he was put in the suicide precaution tank, that he was repeatedly writing letters to the medical staff saying, I'm sane. There's nothing wrong with me

164

mentally. Get me out of here.

You saw those.

A. I saw those.

Q. And if a person's going to try to fake to a jury that they have mental illness, that's kind of an odd thing that you would expect them to do, is to write to a psychiatrist that I'm sane. I have no mental problems. That would not be logical, would it?

A. No.

Q. And, Doctor, it would seem to me that if you're trying to fake mental illness to a jury when you know the jury trial is coming up, the closer you get to trial, the more you'd want to look crazy. Wouldn't that make logical sense?

A. Yes.

Q. And instead, as you saw, in treating him from July through October, November, February, on up into the last notations you see there in June, he got better during the course of the antipsychotic medications to the point where he had no indices of psychosis at all. Isn't that what the records that we've shown to you --

A. Yes.

Q. -- and the jury have indicated?

A. Yes.

Q. So that doesn't make any bit of sense at all

165

if he was trying to fake illness that he would get better the closer his trial gets here, does it?

A. Correct.

Q. And finally, Doctor, you have -- you have, what, 22 years of experience in this field; is that correct?

A. Yes.

Q. And you're well-aware that sometimes people try to feign mental illnesses to you.

A. Yes.

Q. And you are aware, from looking at Dr. Mirmesdagh's diagnosis, that that's one of the things that she would suggest for later people seeing these records to rule out malingering. That's what -- one of the notations that she made.

A. Yes.

Q. She also noted that she thought the defendant might still be under the influence of drugs. You saw that in her report.

A. Yes.

Q. And then when you saw him in July, it appeared to you, and you diagnosed that he was having substance abuse induced psychosis based not only on what he said, but upon what you observed; is that correct?

A. That's correct.

166

Q. And that's when you started the antipsychotic medications that we've heard about, and those continued for the next eight, nine months, up until the point where the medication seemed to work.

And June 16th, just a couple of months ago, no psychosis noted, which would run totally contrary to a person trying to fake a mental illness for the benefit of a jury; is that correct?

A. It seems reasonable.

Q. Thank you, Doctor.

MR. LOLLAR: That's all we have.

THE COURT: Very brief recross?

MR. ALEX: Yes, sir.

**RECROSS-EXAMINATION**

BY MR. ALEX:

Q. And, Doctor, on that same line, when we get to June 19th of '09 on your note, Counsel asked you a bunch of questions about that note.

One of the things that wasn't said to the jury is that the defendant said to you, Everything is fine now. The only problem is I'm going through trial, and medicine can't fix that.

Do you recall that? Him telling you that?

A. I don't think that's my note.

Q. Okay. Look on 6/16/09 on the notes up there,

167

and see if you see that note. I think I have them tabbed on the side.

A. June 16th of '09?

Q. And perhaps -- perhaps it's another health provider.

A. Because I didn't see him after February of '09.

Q. Okay. Very good.

It will be another health provider, but would you look and see if that was the quote that they put in there from the defendant as trial's approaching, so the -- the quote is, Everything is fine now; is that correct?

A. Yes.

Q. And then the mental health provider's the one who says, His only problem is that he's going through his trial and he don't think medicine can fix that; is that correct?

A. Yes.

Q. And then they continue him on his current medications; is that right?

A. Yes.

Q. Okay. Very good.

And while I'm here, State's Exhibit 583, is this one of the studies that we were talking about --

168

or this is a study that deals with PCP and the effects of PCP; is that correct?

It would be Drugs of Abuse and the Elicitation of Human Aggressive Behavior by Peter Hoaken and Sherry Stewart. Is that what that appears to be?

A. Yes.

Q. All right.

MR. ALEX: We're going to offer State's Exhibit 583, Your Honor.

THE COURT: Any objection?

MR. LOLLAR: We have no objection.

THE COURT: State's 583 is admitted.

Q. (BY MR. ALEX:) And, Doctor, you may not be aware of this, but I think one of the defense's experts, Dr. Roache, provided us with this article about PCP, but on page 1545, does it say that the reputation of PCP and the empirical evidence to support that reputation are considerably discrepant. While PCP may indeed lead to violent behavior in some individuals, the effect appears inconsistent and may be explained by factors other than direct pharmacological action.

Does it say that here?

A. Yeah, that's what it says.

Q. Although mass media representations would

169

suggest that PCP is the most likely to produce a violent rage, the loser is at best inconsistent, and it cites a 1979 study by Farman & Farman and a study from 1991 by Ken Locke; is that correct?

A. Yes.

Q. And one study attempting to demonstrate a causal link between aggression and PCP even went so far as to suggest that the clinical and forensic assumptions were not warranted. And that is a 2001 study by Gillette, Pollard, Modard and Elaine; is that correct?

A. Yes.

Q. And it goes on to say that research with the animals appear to suggest a relationship, but findings are somewhat ambiguous.

And it goes on later to say that, in fact, whether there is such a relationship truly exists are at this time in question due to the lack of controlled laboratory studies, and that's a 1991 study; is that correct?

A. Yes, that's what it says.

Q. All right. And then in the last paragraph, it says, Classification of PCP into drug class is difficult because it is not truly a hallucinogen, nor is it truly a psychomotor stimulant, and because its

170

effects are so poorly understood, it is difficult to assess in respect to the systems discussed previously; is that right?

A. That's what it says there, but these are psychologists.

Q. Okay. And this is a paper given to us by defense expert, Mr. Roache, and you would agree with me that that's what this study says; is that correct?

A. That's what the authors have the opinion of.

Q. Okay. Very good.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: May the witness be permanently excused?

MR. LOLLAR: Yes, sir.

THE COURT: From the State?

MR. ALEX: Yes, sir.

THE COURT: You're permanently excused, Doctor. Thank you for your testimony.

We'll take a ten-minute recess for the jury. All rise for the jury.

We're in recess.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please.

171

What further says the defense?

MR. LOLLAR: Call Dr. John Roache.

THE COURT: Dr. Roache.

Doctor, up to the front of the courtroom. All the way to the door. Turn and face me and raise your right hand.

**JOHN ROACHE, M.D.**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Lollar, and then some cross-examination from the State.

Mr. Lollar, whenever you're ready.

MR. LOLLAR: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. LOLLAR:

Q. Would you tell us your name, please, and spell your last name for the court reporter.

A. John Roache, R-O-A-C-H-E.

Q. And, Mr. Roache, what is your occupation or profession?

A. I'm a professor in the Department of Psychiatry at the University of Texas Health Science Center, San Antonio; and Chief of the Division of

172

Alcohol and Drug Addiction; and I'm the Deputy Chair for research of the department there.

Q. All right, sir.

MR. LOLLAR: May I approach the witness, Your Honor?

THE COURT: Yes, sir, and as necessary.

Q. (BY MR. LOLLAR:) Doctor, let me show you what's been marked as Defendant's Exhibit 34 and ask if you recognize what this is?

A. I believe it's to be a dated version of my curriculum vitae.

Q. You have a more current?

A. Not with me. I'm sorry.

Q. Okay. Well, we'll go with the dated one then, okay?

A. Yeah.

MR. LOLLAR: We'll offer Defense Exhibit 34.

THE COURT: Any objection?

MR. ALEX: No objection, Your Honor.

THE COURT: How dated is it?

MR. LOLLAR: Pardon me?

THE COURT: How dated is it?

Q. (BY MR. LOLLAR:) How dated is it?

A. I believe that's dated 2007, of November.

173

Q. You can update it since here?

A. I could.

Q. Very good. Doctor, your CV tells the articles that you have written, the research that you have participated in with the National Institute on --

A. Drug Abuse?

Q. -- Drug Abuse. All of the different courses that you have taught over the years.

How long have you been doing work in the area of addiction?

A. A little more than 26 years.

Q. Tell us some of your background and experience which qualifies you educationally to be in the position that you are currently in.

A. For those 26 years, I've been doing research in the clinical pharmacology of drugs of abuse.

A lot of my work has focused on the effects of drugs of abuse and how it affects cognitive and performance behavior. The ability to perform psychomotor performance, also neurocognitive tests of logical reasoning and -- and memory and -- and choice decision making, that sort of work.

I've also done a lot of work in the area of trying to understand why people abuse drugs. That goes into factors of -- risk factors of genetics and

August 17, 2009

174

environmental vulnerability and causes of why people do what they do. And that leads also into impulse control and those sorts of things.

And there's an advancing state of the art in understanding the -- the brain physiology of how all of this happens.

Q. All right, sir. What is your educational background?

A. I'm a pharmacologist. I'm a Ph.D. pharmacologist. I do have a clinical license, but I've been doing clinical research for 26 years. I have doctors, nurses, psychologists, psychiatrists who work with me and for me on the clinical research studies that we do.

Q. And what is the Division of Alcohol and Drug Addiction within the Department of Psychiatry there at U.T. Health Science Center in San Antonio?

A. The Department of Psychiatry in San Antonio is a pretty large department. We heavily focus a lot on research.

The Division of Alcohol and Drug Addiction is one of the largest divisions in the department and has a broad range of research: Animals, animal models, mice, rats, monkeys.

We do clinical studies, phase 1, 2 and 3

175

clinical trials in developing new treatments for patients. Most of my work has been in the area of alcohol, cocaine and methamphetamine dependence.

Q. All right, sir. Are you familiar with PCP intoxication as well?

A. Yes, I am. I've run across it in my experience a number of times.

Q. Doctor, have I asked you to review certain materials that I sent you some time ago relative to Defendant James Broadnax and this case here?

A. Yes. I've reviewed those materials.

Q. And among the materials that you reviewed, can you list for the jury what all you've seen?

A. I've seen videotapes of the initial interview by the police department. I saw the in -- in-dashboard camera of the arrest in Texarkana, and I observed the media interviews that were done that were given by defense counsel. It seemed to be pretty complete. I -- from the four different Dallas area news stations.

Q. And, Doctor, have you reviewed the medical records in regard to the defendant, James Broadnax, compiled by the medical and mental health staff there at the Dallas County jail?

A. Also, the medical records that were provided that appeared to go from the time of initial arrest and

176

custody through -- I think it's about November of 2008.

Q. Now, you were present in the courtroom here during the cross-examination of Dr. Lane, the witness who was on the witness stand.

A. I heard the cross-examination, not the initial testimony.

Q. All right, sir.

And so the jury understands, that's permissible under the rules since you've been previously qualified as an expert in this case, and we've had previous testimony from you prior to the time that the trial started here.

Let me get right to one issue if I could, Dr. Roache. Now, you've heard Dr. Lane's testimony about having seen the defendant on several occasions since he's been confined here in the Dallas County jail, and his diagnosis and treatments of the defendant conducted over the period of the last ninth months or so; is that correct?

A. Yes.

Q. Do you concur with the finding of Dr. Lane?

A. I'm -- I'm not sure which all findings. All possible findings?

Q. Well, let me -- let me specifically ask the following:

177

Do you have an opinion, based on everything that you've seen and what you know about the business of psychopharmacology, do you have an opinion about whether or not James Broadnax was under the influence of PCP, wet blunts, at the time he committed the murders?

A. Yes, I do.

Q. And what is your opinion?

A. My opinion is that all the evidence is very consistent with that; that he was, in fact, under the influence of marijuana and -- and probably -- and wet blunt, which is probably PCP and formaldehyde.

Q. All right, sir. We'll get more in depth with that here in just a minute.

You've seen the diagnosis that Dr. Lane made of Mr. Broadnax on July the 20th, that he was at that time exhibiting to -- what Dr. Lane appeared to be substance abuse induced psychosis. Do you agree with that diagnosis?

A. Not having the interview to diagnose Mr. Broadnax myself, I -- I have to defer to his expert opinion, but it sounds entirely consistent with that conclusion to me; yes, it does.

Q. And you'll be able to expound on that here in a moment as well.

A. Yes.

Q. You've seen the course of treatment that Mr. Lane prescribed for Mr. Broadnax, treatment with antipsychotic medications: Risperdal, Trazodone, the different types of antidepressants. You've seen how that played out over the course of nine months of treatment, and you've also seen how, here as recently as June, that the psychosis appears to have been controlled and is no longer obvious in his treatment; is that correct?

A. That's correct.

Q. All right, sir.

Dr. Roache, first of all, would you tell the members of the jury what -- what is PCP and what does it do to you?

A. PCP is phencyclidine. It's been around on the drug abuse scene for about 40 years, and it's known under many different names. It's been used in various generations, really, for a variety of purposes.

It is a unique pharmacological class. Its primary mechanism of action is understood to be it binds to the glutamate receptor, a type of glutamate receptor in the brain known as the NMDA receptor.

And that is -- glutamate is an excitatory neurotransmitter in the brain that controls overall brain activity and the -- and the stimulation direction. It's excitatory. And they're also inhibitory neurotransmitters.

So this drug blocks the receptor and -- and prevents the excitation from one of the mechanisms of the glutamate stimulation of the brain.

PCP was originally developed as an -- as an anesthetic tranquilizer and was taken off the market because a lot of patients had unusual clinical side effects after anesthesia after -- after surgery where they had bizarre psychotic-like reactions; that that occasionally happened with normal, healthy medical patients in treatment. So it was taken off the market for those purposes.

Now, it's primarily just abused illegally.

So it's not a sedative, it's not a stimulant, it's not a -- not a classic hallucinogen, but it has all those characteristics.

It has some stimulating properties, it has sedative properties, it causes hallucinations, and in some cases, psychotic behavior.

Q. Doctor, you've talked about the side effects that people are experiencing that had been initially prescribed this medication when it first came out. What do those side effects include?

A. Of patients receiving it in surgical applications?

Q. Yes. What were the side effects that made them discontinue the use of the drug?

A. Well, of its -- of its psychomimetic nature, and it goes in line with the hallucinogens. Many hallucinogens do this. There's depersonalization, derealization where people feel, you know, out of the ordinary, out of place.

There's -- there can be visual hallucinations in particular. Perhaps auditory, but it's altered sensations. There can be also tactile hallucinations where you feel things on your skin that aren't there.

There can be a thought disorder where logical reasoning is -- is not logical, and A plus B equals F, when it doesn't. But it seems logical to you at the time.

Q. And one of the side effects that have been noted with use of PCP is actions of great violence.

A. There -- there are cases of violence that have been observed, and that's been observed in -- in -- mostly in the drug-abuse context where there's a rage, a strong sense of strength and invincibility, aggression, assaultiveness that is seen in emergency rooms in overdose cases.

And there have been cases where people that were seemingly living a normal life in a drug intoxicated state committed violent acts.

Q. Now, the -- how long would such a -- such a drug, if it were -- if you take a marijuana cigarette and -- and dip it in this substance, this PCP, and then inhale it and smoke it, how long would the course of that drug remain in your system and be affecting your -- your actions and thoughts?

A. So, the direct intoxication from PCP itself would be lasting for a matter of a few hours, but there are cases where patients seen following instances of PCP use to still show disturbances. Although the PCP is no longer at high blood levels, there might still be some stored in the -- in body tissues, but it's mostly being eliminated, but there are yet still cases. And where there are persistent behavioral effects beyond that.

There are animal studies that have shown persistent disturbances.

There are clearly cases in state hospitals and in mental health facilities where patients come in intoxicated and show sustained symptoms of disturbance of a psychotic nature that have occurred over days to weeks following intoxication.

Q. Doctor, you -- one of the things that Dr. Lane has explained to the jury is how PCP can store itself into the fatty cells of the body, and then re-emerge at a later time. Do you concur with that?

A. I'm -- I'm not certain that I'm -- whether that's -- explains the phenomenon. I think -- I think the phenomenon on persists and effects is more likely due to the altered neurochemistry that occurred during the influence of the PCP, and is particularly going to be true if PCP were used chronically. I mean repeatedly, not just one time.

Q. And would you expound on that? What you mean, that it changes the body chemistry?

A. Well, so blocking the NMDA receptor, blocking the excitatory neurotransmission of a neurotransmitter that's normally engaged in maintaining brain activity, would result in activation through negative feedback loops in the -- in the brain neurochemistry of increased glutamate activity.

This can cause changes in the synaptic connections of neurons in the brain. In an extreme case, it can actually cause cell death and -- and -- and cell damage in the brain cells, and so it changes the -- the dynamic processes of neural activity in the brain, and that's a time-related process that takes

183

time for the brain to re-adjust and re-equilibrate.

Q. Doctor, can the use of PCP actually induce psychosis in a person?

A. Yes, it's actually considered one of the best experimental models, animal models for -- for schizophrenia for psychotic behavior.

Healthy normal subjects receiving PCP can show increases in some psychotic activity, and particularly feelings of paranoia. It's a -- it's a delusion, a sense, a feeling that people are out to get you, or that sort of thing. That's been observed.

If you give PCP to a -- a schizophrenic who's stabilized, it can make them unstable and increase their psychotic behavior.

In animal models, there's various activity that you can see in rats, for example: Decreased social interactions where rats would normally go up and sniff each other and groom each other and cuddle, you know, that doesn't happen under the influence of PCP.

There are animal models where it will show increased aggressive behavior. So, you know, a rat in his home cage and you bring in a -- a foreign rat that isn't normally there, there can be fighting for dominance, you know, who's the -- who's the dominant rat and -- and in that case, what you can see is

drug-induced increase in aggression and hostility.

Q. All right, sir.

Let me change to a different subject for just a moment. What is the typical onset of schizophrenia? What is the typical age of onset?

A. Um, in late adolescence and young adulthood, typically. I'm -- I'm not sure of the exact number, but it would be in the late teens, early 20s.

Q. All right, sir.

Can PCP actually trigger an already existent latent psychosis?

A. One of the -- one of the findings in it was referred to by the prosecuting attorney in -- with the earlier witness, is that instances of aggression and violence are actually relatively rare. It's not that common. Not everybody -- clearly, not everybody under the influence of PCP goes and commits acts of violence.

And that's also true in the animal studies as well.

So what you get -- you see a baseline rise in level of activity of agitation and arousal in rodent models.

In the resident intruder model where an intruder rat is introduced into a resident home cage rat, you'll see increases in aggression there, though

185

aggression is the normal behavior for the rat in that case. So you'll see an increase in what's normally there.

And in clinical populations, in patients, very clearly lots of people who have used PCP recreationally and lots of surgical patients never showed any evidence of aggression, or hostility, or violence, but some do.

And the current opinion on that is that the drug is unmasking an under -- under previously not recognized, an underlying latent tendency that was there otherwise.

Q. All right, sir.

Do you recall seeing in the interviews that the defendant did with the news media, certain statements he made that his mind went blank at the time of the murders and he saw colors? Remember those statements?

A. Yes.

Q. Can you expound on that, and why that might be indication, typically in regard to seeing colors? What's that all about?

A. Yeah. I believe -- I don't remember which news station, but one of them, he -- he stated his mind went blank and he was, um, -- may I refer to my notes?

Q. Sure.

186

A. I have this quote here.

I went into that mode. He stated, I blanked out. I went into that mode. I blanked out.

And then later he said, Weed don't make you do that. I been smoking since I was seven.

And I think what that indicates to me is that he's referring to the fact that the wet marijuana is different than regular marijuana, and it put him into that mode which would -- I interpret to be the more psychotic -- psychotomimetic effects of PCP.

Q. All right, sir.

Now, would the hallucinations, and psychosis, and auditory hallucinations be side effects of the PCP usage in some individuals?

A. So he had stated from the first mental health evaluation in the jail that he always hears voices. That seems to suggest an ongoing condition that pre-existed his arrest. Could that be due to repeated cycles of drug use? It could.

Could it be due to an underlying condition that previously existed prior to PCP use? It could.

Q. All right.

A. Did I answer your question?

Q. Yes, I think so.

You have mentioned that one of the things that

187

you do in your studies in the past 26 years is try to figure out why people use drugs. Could you expound to the jury about that?

A. Well, it's -- it's without question at this point in the advancement of behavioral neuroscience that there are both environmental causes and genetic causes that -- that explain a lot of everyday normal behavior, and its variations and extremes, including the pathological conditions.

We don't -- there isn't an addiction gene, there isn't a violence gene. It's not as simple as a particular genetic defect. There's mult -- multiple determined causes. There could be reasons why, you know, based upon environmental causes, nature, nurture factors of, you know, parenting, or the lack thereof. Education, economic opportunities, role modeling, peer pressure, those sorts of environmental factors, but there are clearly genetic factors as well that -- you know, parental substance abuse, parental mental health disorder getting passed on to children with genetic risk factors for that.

There can be genetic variation in some of the risky behaviors that affect cognitive function, intellectual capability.

We think a big risk factor is the -- the

188

emotionality and the tendency to -- to have anxiety, depression, become distressed and disordered by those environmental stresses is a big risk factor for substance abuse.

As is the cognitive, control processes, where you -- you stop and you think rather than impulsively act, and you think about the consequences, you decide if I do this and -- here's going to be the consequence, so the -- the decision-making process that uses logic and reason is an important factor.

And -- and -- and all of these factors are -- have genetic and environmental influences that determine them.

Q. Would you be surprised to find in hearing the history of a close relative, a mother, or a father of an individual, that if you find impulsivity and poor choices being made by the subject, that you would see that same thing exhibited by the parent?

MR. ALEX: Judge, I'm going to object to that. That's beyond the scope of what this witness has been previously qualified to testify to as an expert.

THE COURT: Response?

MR. LOLLAR: He just talked about the genetic influences of this very thing.

MR. ALEX: He's been qualified as an

189

expert in drug abuse and the effects of drug abuse. We're getting into social factors and what a mother may do and how it will affect the son. There's been no qualification on this witness on that, Judge.

MR. LOLLAR: He talked about the genetic influence at the time we had the pretrial hearing, and now I'm just developing that.

THE COURT: I'll allow it briefly, although I tend to think there is some merit to the objection.

Q. (BY MR. LOLLAR:) Doctor, let me -- do you recall the question?

A. No. Could you please restate it?

Q. Sure. What I'm asking is, if you're looking at the subject in question and you find poor impulse control and this emotionality that you described here a moment ago, do you believe that if you looked at the parent, say a mother or father of that individual, that you might tend to see the same thing exhibited in their lives, which would then be passed down to them genetically?

MR. ALEX: Judge, can I take the witness on voir dire?

THE COURT: Yes, sir.

**VOIR DIRE EXAMINATION**

190

BY MR. ALEX:

Q. Dr. Roache, have you testified in the hearing about any of what the parent does, how it affects genetically with the child previously?

A. You're talking about when we met before?

Q. Yes, sir. The opinion that you're about to give the jury right now.

A. Um, specifically, I don't believe so.

Q. Okay. And so what would be the basis of the answer? Do you -- do you study those kind of things?

A. Yes, I do.

Q. The genetics of a parent and a child and how it's passed along?

A. The colleague researchers in my institution are very focused on that, and I'm collaborating in those studies.

Q. So you're an expert in that area too.

A. I have expertise in the risk factors for substance abuse; yes, I do.

Q. That's not what the question was. The question was, if my son is going to behave like I behave. That's the basis of the question, right? The question that counsel just asked you.

A. There are environmental and genetic factors that -- that explain the inheritability of those

191

behaviors.

MR. ALEX: That's all I have, Judge.

THE COURT: Go ahead, Mr. Lollar.

**DIRECT EXAMINATION - CONTINUING**

BY MR. LOLLAR:

Q. Dr. Roache, so your -- your answer to that is yes, that you might expect to see that in a parent of the individual.

A. I would -- I would say that we don't have existing data on the inheritability of impulse control.

Q. Uh-huh.

A. What we have very strong evidence of is that a substance abuse, or emotional disturbance in parents has a genetic and biologic inheritable factor for children.

Q. All right, sir. Let me see if I can ask this question, Dr. Roache.

If a person uses PCP who is not known to have a history of violence, and then you said that the use of PCP can trigger violent acts in some individuals, and then they do a -- a horrible act, a horribly violent act, can that factor be considered by a trier of fact and determine what the proper punishment should be so --

MR. ALEX: Oh, Judge, that is --

192

A. That's not my expertise.

THE COURT: Hold on. Hold on.

MR. ALEX: I'm going to object. That's a totally improper question. The form of the question and the answer to the question is improper.

THE COURT: Ask another question.

Q. (BY MR. LOLLAR:) Doctor, I think I'm going to pass you for cross-examination and come back later on. Thank you.

THE COURT: Cross-examination?

MR. ALEX: Yes, sir.

**CROSS-EXAMINATION**

BY MR. ALEX:

Q. Dr. Roache, my name is David Alex. We've met before; is that correct?

A. Yes.

Q. We had an opportunity to talk at a previous hearing?

A. Yes.

Q. And I think at the previous hearing you had wrote a report about your findings; is that correct?

A. I had written a brief report to the attorney, yes.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes.

193

Q. (BY MR. ALEX:) And I think it was introduced. In the -- do you have a copy of it up there?

A. No, I don't.

Q. I'm sorry?

A. No. Not with me, no. I --

Q. So you prepared a report of your findings; is that correct?

A. Yes.

Q. All right.

A. And it's been entered into -- or you have it.

Q. Well, --

A. You received it last time I was here.

Q. Perhaps.

THE COURT: Let's go off the record for a second.

(Off-the-record discussion was had.)

THE COURT: Back on the record.

Q. (BY MR. ALEX:) State's Exhibit 584, is that the report that you wrote as to your findings?

A. Yes, sir, I believe it is.

Q. All right.

MR. ALEX: We're going to offer State's Exhibit 584, Your Honor.

THE COURT: Any objections?

MR. LOLLAR: No objection.

August 17, 2009

194

THE COURT: State's Exhibit 584 is admitted.

Q. (BY MR. ALEX:) And do you have a copy up there?

A. No, I don't.

Q. All right. Do you have one with you?

A. I actually do.

Q. All right. I can assist you with that. Is it over here somewhere?

A. It's in my briefcase.

MR. ALEX: Is it okay if I bring him his briefcase, Judge?

THE COURT: Yes, sir.

A. Excuse me. I'm very sorry. I have all of the medical records here.

THE COURT: Hold on a second. Just go up there and examine him, that way he can look at it while you're looking at it. I'm not going to make the jury wait on this.

MR. ALEX: Yes, sir.

THE COURT: Dr. Roache, we're going to do it this way.

Pay attention to him.

THE WITNESS: Okay.

Q. (BY MR. ALEX:) Dr. Roache, 584 is your report

195

as it relates to your finding; is that correct?

A. Yes.

Q. And the materials reviewed are just what you told the jury about earlier; is that correct?

A. Yes.

Q. All right. Anything else that's not on here that you've told the jury that you reviewed?

A. Well, other than scientific literature, --

Q. Okay.

A. -- that's not listed on there.

Q. All right. So did you ever speak to any family members of the defendant?

A. No.

Q. Okay. So we were just talking about environmental factors, and let's see what you said. You said education. Did you ever look at the school records of the defendant?

A. Um, he made a statement to the media about --

Q. Dr. Roache, we're going to have an understanding here, okay? I'm going to ask -- I'm going to try and be as direct with my questions as possible.

A. I believe I was answering.

Q. Okay.

A. That -- that was in the media.

196

MR. ALEX: Judge, I'm going to object to nonresponsive.

THE COURT: Sustained.

Q. (BY MR. ALEX:) Did you ever look at the medical -- the school records --

A. No.

Q. -- of the defendant?

A. No, I did not.

Q. All right. And you know that counsel has copies of them here. They're here and have been introduced into evidence; is that right?

A. I don't know, but -- I mean, I haven't been here.

Q. You never looked at them.

A. No.

Q. All right. That was one of the factors you talked about, environmental factors, was education; is that right?

A. Sure.

Q. Would that have helped?

A. Knowing what his school records were? I suppose so.

Q. Okay. You listed a number of environmental factors, causes when you were looking at risk factors -- is that correct? -- for substance abuses?

197

A. Yes.

Q. Education was one; is that correct?

A. Yes.

Q. All right. Did you ever talk to any of his family members about his education?

A. No.

Q. Did you talk to anybody about his education?

A. No.

Q. All right. Did you talk to any of the family members about, you know, his upbringing?

A. No.

Q. All right. Anything -- talk to any of them about any family drug abuse or drug use from the family members themselves?

A. No.

Q. All right. And as far as the history of the defendant, did you speak to anybody that knew him personally that could give you any kind of history on him?

A. I -- I did not interview the defendant or any family members of that kind, no.

Q. All right.

A. No. The answer is no.

Q. All right. And you kind of beat me to the punch. I haven't asked you if you interviewed the

defendant yet; is that right?

A. I did not.

Q. Okay. Well, let's talk about that, are you -- you're a professor of psychiatry?

A. Yes.

Q. All right. And so what does that mean, primarily?

What do you do? Do you teach?

A. I do. I teach and I do clinical research in drug abuse.

Q. All right. And a professor of psychiatry does what as far as the field of psychiatry?

A. Well, I'm not a psychiatrist.

Q. I understand.

A. So -- so I teach and do research in drug abuse.

Q. What do you teach, though? Do you teach anything that deals with psychiatry?

A. I do. I teach in the area of clinical pharmacological agents that are used in psychiatry on a routine basis.

Q. All right. And so you're fully aware that if a psychiatrist, like Dr. Lane, was going to give anybody an opinion on a person as it relates to any kind of psychosis, the first thing they would do would

be to sit down and talk to them, wouldn't it?

A. Yes.

Q. All right. And you're giving this jury an opinion, I think there's two opinions, and one is that he was -- and you correct me if I'm wrong, because I might have wrote it down wrong -- the first is that he was under the influence of marijuana and possibly PCP at the time of the offense? Is that your opinion?

A. Yes.

Q. Okay. And you're making that opinion without ever talking to him.

A. I'm making it based upon the information that I reviewed.

Q. Okay. And I guess that would be a no, right?

A. I didn't talk to him.

Q. Okay. And the other opinion that you're giving is that at the time that he spoke to the media, that he was still under the effects of PCP, is that it?

A. Yes. That's consistent with Dr. Lane's diagnosis of drug-induced psychosis.

Q. All right. And, Dr. Roache, I'm not asking you what Dr. Lane thinks at this point, I'm asking you what you think.

MR. PARKS: Well, Judge, we're going to object to arguing. He answered his question.

THE COURT: I don't think he did. I sustain the objection.

MR. ALEX: You said you think he did, Judge?

THE COURT: I don't think he did.

MR. ALEX: Okay. All right.

THE COURT: Okay. This will go a lot smoother if you just wait until he finishes his question, and then you can answer, okay? You can't talk at the same time.

Q. (BY MR. ALEX:) So I'm -- I'm really -- I'm not asking you what Dr. Lane's opinion is, I'm asking you what your opinion is, okay?

And is it your opinion, based on looking at all the evidence, that at the time he spoke to the media that he was still under the effects of PCP?

A. Um, I believe I stated he wasn't actually intoxicated at the time, but he was still -- it's consistent with suffering the effects of -- the aftereffects of PCP, yes.

Q. So would that mean he was still under the effects of the PCP at the time?

A. He's not intoxicated, but --

THE COURT: Hold on a second. I'm getting confused.

At which time, when he was interviewed or the offense allegedly took place?

THE WITNESS: He was not intoxicated at the time.

Q. (BY MR. ALEX:) At the time that he was talking to the media, was he still under the effects of the PCP?

Would that be a yes or a no?

A. Yes.

Q. Okay. He was. And have you ever had any conversations with the other expert who is the drug recognition expert in this case?

A. No.

Q. All right. So you wouldn't have any idea if he's already testified to the contrary.

A. I wouldn't have any idea.

Q. All right. All right. So let's talk about the first opinion that you've given about him being under the influence at the time of the offense.

Now, one of the things you said about being under the influence was that it would depend somewhat on, you know, how much the person used, whether they were a consistent user or was a first-time user and that kind of thing. That would depend on how long it would last; is that correct?

202

A.   Um, not entirely.

Q.   Okay.

A.   There are -- there are examples of a single use showing persistent effects for days, at least.

Q.   For days.

A.   Yes.

Q.   Okay.  And so, again, do you know who the drug recognition expert is in this case?

A.   I do not.

Q.   Okay.  Very good.

So you're saying one single use will affect you for days.

A.   There are reports of that.

Q.   Okay.  All right.  And your -- your only basis of your opinion that the defendant was under the influence is his self-report; is that correct?

A.   Yes.

Q.   Okay.  All right.  And so if he's not being truthful, then the opinion totally goes out the window; is that right?

A.   Um, I don't -- I don't really think that's the case.

Q.   Okay.  Well, let me ask it to you this way:

If -- if your opinion is he's under the influence at the time of the offense, and you sat down

203

with him and you said to Mr. Broadnax and you looked him in the eye and you questioned him about it, could you get a feel for whether or not he's being truthful to you?

A.   There are a variety of ways of doing that on interview, but I have not conducted that interview.  But --

Q.   And, sir, I'm not asking you if you did.  I'm asking you if you sat down with a person and looked him in the eye and talked to him, could you get a feel for whether they're telling you the truth?

A.   I can't do it by looking in his eye.

Q.   All right.  By talking to them and looking at them?

A.   Right.  By taking the history and seeing whether the history given is consistent with.

Q.   But you've never done that.  Instead, you've relied on his self-reporting to the jail doctors; is that right?

A.   And the news media.

Q.   And the news media.

And so when, in the news media, he says he went into that mode and he saw colors, right?

A.   (Nods head.)

THE COURT:  Is that a yes, sir?

204

THE WITNESS:  Yes.

Q.   (BY MR. ALEX:)  You take that in combination with his self-reporting, and that's how you formed your opinion; is that right?

A.   Um, well, I -- I also believe he said some other things that are consistent with that, yes.

Q.   That are consistent with him being under the influence.

A.   Yes.

Q.   Okay.  And, but you would agree with me that the best way to determine that would be to sit down and just talk to the young man.

A.   It would add -- would add additional information, yes.

Q.   Okay.  Very good.

And some of the things that you said about PCP, as a general nature, there is no literature that says that PCP makes you violent, is there?

A.   That's correct.

Q.   The literature is all over the place, isn't it?

A.   Yes.

Q.   And there is no -- it's not like we can get a group of folks and give them PCP in a controlled situation like you would animals, and then be able to

205

determine whether or not it's going to actually make them violent.  We can't do that, can we?  It just wouldn't be professionally sound.

A.   There's a -- there's a couple of studies that have done that.

Q.   Okay.  Recently?

A.   Um, in the last decade.

Q.   Okay.  And the result of any of those studies, none of them will say that PCP will make you violent, will it?

A.   That's correct.

Q.   All right.  And so as a general proposition, if a person is violent and they do drugs, and then they go out and commit violent acts, we can't say that the violent acts are due to the fact that they took drugs, can we?  If they're already prone to be violent.

A.   In that scenario you paint, that's correct.

Q.   All right.  Do you have any idea how many jail fights the defendant's been in since he's been in jail?

A.   I do not.

Q.   Would you not want to know those things before you come in front of this jury and give them the opinion you gave them?  Would that not matter to you at all?

A.   Sure.  It's more information to formulate an

206

opinion, but --

Q. So the more information you get, the better it is; is that correct?

A. Sure.

Q. Did the -- did counsel for the defense give you any of the phone calls that the defendant was making from jail?

A. No.

Q. All right. So you would have no idea of knowing whether he was caught malingering talking on the phone and talking about how he was faking being sick. You wouldn't know that either, would you?

A. No, I haven't -- no prior knowledge of that.

Q. And you would have no way of knowing that if five months after this offense that he was still on the phones talking about the victims and the victims' families the same way he was in the jailhouse interviews. You wouldn't know that either, would you?

A. I would not. I have no prior knowledge.

Q. All right. And in -- in the questions that counsel asked you, I think your responses was that your chronic use over time would change the chemis -- the chemistry in your brain?

A. There's several studies that have shown that.

Q. All right. And the -- the chronic use over

207

time, again, that's the kind of thing you can sit down and ask a person how long they been using it, and that would help you in determining that factor, wouldn't it?

A. Yes.

Q. But you weren't asked by defense counsel to do that.

A. I was not.

Q. Okay. And again, the statement that the defendant made on the video that Weed don't make you do that, talking about blanking out; do you recall that?

A. Yes.

Q. And your opinion was that -- in your opinion, you thought that he was referring to the fact that he had smoked not just weed, but probably PCP, and that was what he meant by that; is that correct?

A. I -- I don't think it's what he meant. It's my interpretation of the -- of the explanation. So may I?

I don't know what his intent in making the statement was. I think it's descriptive of the phenomenon. Weed -- weed does not make you do that, so I presume he's pointing to the fact that he did something more than weed.

Q. Okay. And that's another one of those scenarios where if you sat down and talked to him, you

208

could have asked him what he meant; is that right?

A. Yes.

Q. Okay. And when a person's talking about -- when they're talking about -- and tell me if you recall this when you watched the news videos.

He said that when he got up that day, he plotted up and -- and I'm going to use his words and maybe it will trigger in your mind what he said.

He said, We got up that morning and we plotted up the shit.

Do you remember that?

A. Something to that effect.

Q. And so from early that day, before he did anything, he had already planned on committing a robbery.

A. I believe so, yes.

Q. And are you aware that after he did that, that he took an assault rifle from the home he was in and went and traded it for a handgun so that he could get on public transit?

A. I believe so.

Q. All right. It takes a lot of thought processing to do that.

A. Sure.

Q. And in doing so, he wound up downtown Dallas,

209

and then they made the decision, you know what? We're not going to rob the folks here in downtown Dallas. We're going to go where we perceive the money is.

A. I believe so.

Q. Okay. And so they were able to ride the rapid transit, get on the DART train, make it to the -- to Garland, and then sort of stalked their victims.

Do you recall him saying that when we walked up, we were watching them lock up from the bank and that kind of thing?

A. Yes.

Q. All right. He even knew that it was a Christian music store because he said they -- they talked about -- in one of the videos he said they talked about music and rap and that kind of stuff.

A. Yes.

Q. It sounds pretty calculated, doesn't it?

A. Yes.

Q. All right. And in doing all of that, he -- he told -- I guess he told everybody that he decided they were going to pretend to leave, and then as he came back, he told the victims, Hey, can I get a cigarette? And as the victim was reaching for the cigarette is when he decided to execute them.

A. I believe so.

210

Q. That's pretty calculated, isn't it?

A. That's when he pulled the gun and shot, yes.

Q. Okay. Do you think it didn't take any calculation to do that?

A. Well, I believe he also made statements to the effect that he wished he didn't have the gun in his possession.

Q. Okay.

A. Um, and I believe --

Q. Dr. Roache.

A. Okay.

Q. The question is, do you believe it took some calculation to ask the person for a cigarette, divert their attention, and then to gun them down versus just pulling the gun and saying Give me your wallet? That was a calculated decision, don't you think?

THE COURT: Let me interrupt you, Mr. Alex.

I know you want to explain your answers. You can't do that on cross-examination. If you need to explain, you can do it when you get on redirect.

So there's a question. Answer the question.

THE WITNESS: All right.

THE COURT: Go ahead and answer. The

211

question was, do you think it was calculated?

A. What was calculated --

Q. (BY MR. ALEX:) All right. Let me ask it this way:

If I walked up to you and I wanted your wallet, I could do it a couple of ways, right? I could put a gun in your face and I could say, Give me your wallet. That would be one way to do it.

Or I could say, Hey, Dr. Roache, your shoes are untied, and when you go down to tie them, I could shoot you in the head.

That's sort of a calculation, isn't it? That's sort of a decision that I'm making, right?

A. Yes.

Q. Okay. And what the defendant did here was, he decided to distract -- distract their attention and then gun them down and then go through their pockets, right?

A. I don't believe I can answer the question, what his intent was.

Q. Well, did you hear what he said on the videos?

A. I don't remember hearing him saying it was a distraction.

Q. Okay.

A. I remember him -- hearing him say that when we

212

asked for a cigarette and he got one out, I pulled the gun.

Q. Is that what you recall?

A. That's what I recall.

Q. Okay. And we could replay it, but that's okay. It's probably been awhile since you've seen it; is that right?

A. I reviewed that portion of the tape last night, I believe.

Q. Okay. All right.

So you're thinking that wasn't an intentional act.

A. To pull the gun is.

Q. Okay. And do you think that he just wanted a cigarette and then -- then in that particular instance he decided he didn't want the cigarette, but instead he wanted to shoot the guy; is that what you're saying?

A. I don't think so.

Q. Okay. All right.

So after he shot the guy who was reaching for the cigarette, he was able to accurately describe the -- how many times he shot each person. There was two people shot.

And the medical examiner's report almost mirror images what he tells the -- the world,

213

basically.

A. Yes.

Q. And so he showed an immense memory of the events; would you agree with that?

A. Yes.

Q. All right. And so we've seen a bit of calculation, we've seen a bit of manipulation, and we've seen some great memory about exactly what he did.

A. Yes.

Q. All right. And then after that, he had the frame of mind to change both license plates on the car that he had just stolen. He was able to make it back to where he lived. Are you aware of that?

A. Yes.

Q. He was able to make it to a pawn shop and, with the assistance of his co-defendant, pawned some of the items without being detected and caught.

A. Yes.

Q. And get home. Return the murder weapon. Do you recall that? Or get rid of the murder weapon?

A. I -- I don't remember that. I'm sorry.

Q. Okay. I think in the video he said he got rid of the murder weapon; do you recall him saying that?

A. I'm -- I'm -- something like that. I'm really not sure.

214

**Q.** And you would -- you would agree with me there is another area of calculation.

**A.** Yes.

**Q.** Not to be caught.

And -- and then finally he's able to get all of his stuff loaded up into the victim's car and effectively leave the whole State of Texas without getting caught.

**A.** Yes.

**Q.** You would agree with me that it takes a certain amount of calculation to do that.

**A.** Yes.

**Q.** Okay. And then you've reviewed the video where they were caught driving the victim's car.

**A.** Yes.

**Q.** The defendant was in the driver's seat.

**A.** Yes.

**Q.** And when he gets out, he's not stumbling; is that right?

**A.** That's correct.

**Q.** He's walking pretty straight?

**A.** Yes.

**Q.** And if you were looking at him for signs of intoxication, he doesn't have a bunch of sway; is that right?

215

**A.** That's correct.

**Q.** He looks pretty cool, doesn't he?

**A.** Yes.

**Q.** Pretty calculated. Pretty calm.

**A.** Yes.

**Q.** Okay. And then after that, he's brought back to Garland and you said you reviewed the interview between him and the Garland detective; is that correct?

**A.** That's correct.

**Q.** And he was pretty calculating -- well, let me ask you this: He was pretty cool then, wasn't he?

**A.** Yes.

**Q.** All right. There wasn't any real signs of intoxication there, were there?

**A.** That's correct.

**Q.** And he was basically able to foil the detective. The detective wasn't able to get him to confess, was he?

**A.** The detective was not able to get him to confess, --

**Q.** All right.

**A.** -- that's correct.

**Q.** And so a seasoned Garland detective, he was able to give him a story about where he had been, and what he had done, and that was that; is that right?

216

**A.** Yes.

**Q.** And in all of that, there was no real signs of intoxication, right?

**A.** That's correct.

**Q.** And then ultimately he's brought to the Dallas County jail where the jury can see his demeanor for themselves; is that right?

**A.** Yes.

**Q.** And you're saying to the jury all of that was done under the influence of PCP. That's your opinion.

**A.** Yes.

**Q.** Okay. Very good.

MR. ALEX: That's all I've got, Judge. I'll pass the witness.

THE COURT: Redirect?

**REDIRECT EXAMINATION**

BY MR. LOLLAR:

**Q.** Now, Doctor, you wanted to expound upon some things that Mr. Alex was cutting you off about. Could you expound on those things you wanted to talk about?

THE COURT: Specifically, you were wanting to expound on whether it was cold and calculating decision-making or not.

**A.** The -- the fact that someone is capable of making decisions and plans, doesn't mean that

217

everything they do is decided or planned. That's the point Number 1, and that's the main thing I wanted to be able to say.

**Q.** (BY MR. LOLLAR:) All right, sir. Now, you have indicated to the jury that you thought based not only on what Mr. Broadnax was telling the medical people in the jail, the mental health providers in the jail, but also what you observed on the videotapes made on the 23rd, that Number 1, you thought he was under the influence of PCP at the time he committed the act; and he was also still under the influence of PCP when he was doing the interview; is that correct?

**A.** Not -- not -- he wasn't intoxicated with PCP, --

**Q.** Right.

**A.** -- but that there is evidence for chron -- either chronic exposure to the drugs or a drug-induced psychosis. I think there is evidence for that, and the -- the logical conclusion is, if that's true, then he was in that drug-induced psychotic state.

**Q.** Doctor, on another subject that you did testify about at pretrial, does the use of drugs, just in general, retard brain development?

**A.** Yes, it does.

**Q.** And could you des -- talk about that?

FIRM NAME

218

A. There's a variety of ways that can happen. Number 1 is indirectly, because while intoxicated on the drug, there's all kinds of things you're not doing. I mean, basically, the brain is very adaptable. We learn, you know. Any -- the way to understand it is like learning a motor skill. If you're learning to play the piano, you have to practice and train, and in doing that, you're engraining neurocircuits to train your motor cortex to move the fingers properly.

The same principle then applies to all forms of learning, and there's many, many studies showing rats, for example, in an impoverished environment versus an enriched environment.

Impoverished environment is where they're in a cage and they got food and they do nothing all day, versus an enriched environment where they have things to climb on, and things to chew, and interact with other rats. And their -- their brains are different.

So the brain's very plastic and adapts based upon our circumstances. So under the influence of drugs, your brain develops differently than if -- if you're in a sober state. That's -- that's without doubt.

And there are -- and in pharmacological studies where drugs are given versus a saline

219

injection, versus a controlled treatment, you see changes in neurochemistry as well, both -- both in the neuroconnections and also in the biochemical makeup of those neurons.

Q. Very good, Doctor. Thank you.

MR. LOLLAR: I believe that's all the questions we have.

THE COURT: Brief recross?

MR. ALEX: Yes, sir.

RECROSS-EXAMINATION

BY MR. ALEX:

Q. And, Doctor, just finally, you don't do this kind of thing for a living, do you? Come into courtrooms and testify?

A. No, I don't.

Q. All right. And you don't have web sites out there saying hire me, --

A. Nope.

Q. -- I'll come in and give you a story, that kind of stuff.

A. No.

Q. All right. But yet, you get paid for what you do.

A. Yes.

Q. And what are you getting paid for this?

220

A. Well, it -- $1500 to travel here to Dallas and spend my day doing this.

Q. All right. And what -- do you get an hourly wage?

A. It's $1500 for the day.

Q. Okay. And that's all you're making off the whole case?

A. Well, that's for today.

Q. All right.

A. Oh, I'm sorry. I also charged $200 an hour for research.

Q. For research. Okay.

A. Watching the hour's worth of videotape, and considering the case, and trying to take notes.

Q. How many hours would you say you've spent on this case, total?

A. I haven't totaled that up, but probably 15.

Q. 15 hours?

A. Yeah.

MR. ALEX: That's all I've got, Judge.

THE COURT: May the witness be permanently excused?

MR. LOLLAR: Yes, sir.

THE COURT: From the State?

MR. ALEX: I have no objection.

221

THE COURT: You're permanently excused, Doctor. Thank you for your testimony.

What further says the defense?

MR. LOLLAR: Call Clara Holyfield.

THE COURT: Miss Holyfield, would you please come all the way to the front of the courtroom up by the door, go all the way to the door. Go as far as you can.

Once you're reached the door, turn and face me and raise your right hand. Raise your right hand.

CLARA HOLYFIELD

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Lollar.

Whenever you're ready, sir.

Oh, Mr. Parks. Excuse me. Haven't heard from you in awhile. Go ahead, sir.

MR. PARKS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. PARKS:

Q. Will you state your name for the jurors, please.

FIRM NAME

222

A. My name is Clara Holyfield, H-O-L-Y-F-I-E-L-D.

Q. Miss Holyfield, do you mind if I ask you, what age woman are you, please?

A. I'm 47-years old.

Q. And where do you live?

A. I live in Hope, Arkansas.

Q. And what do you do there in Hope, Arkansas?

A. I work for Hope public schools.

Q. And are you a married lady?

A. Yes, sir, I am.

Q. And do you have children?

A. Yes, sir, I do.

Q. And have you lived in Hope, Arkansas, for a very long time?

A. Yes, sir. 16 years.

Q. Now, are you related to James Broadnax?

A. Yes, sir, I am.

Q. How are you related to him?

A. His mother is my first cousin.

Q. So that would make him your second cousin.

A. Yes, sir.

Q. And Miss Holyfield, let me -- what's his mother's name?

A. Audrey Eason. Well, Audrey Eason. Her last name now is Willis, I think.

223

Q. Okay.

A. She's married.

Q. And she's your first cousin.

A. Yes, sir.

Q. And would it be fair to say that you have known James pretty much his whole life?

A. Pretty much.

Q. Do you remember the first time you ever saw him?

A. Yes, sir, I do.

Q. How old was he then?

A. I think he was like two or three.

Q. Okay. And what were the circumstances of your seeing him when he was two or three?

A. Well, his mother came home to visit her auntie. Well, it's her mother that raised her, to be -- and then James came with her.

Q. And what was -- what was she doing at that time, do you know?

A. She was in the Army.

Q. In the Army?

A. Uh-huh.

Q. And where was she living, if you remember?

A. I think it's -- I want to say Michigan. Somewhere. I don't know. But I just know she was in

224

the Army.

Q. But she brought James with her when she came to visit and you saw him there for the first time.

A. Yes, sir, I did.

Q. And I'm going to assume, Ms. Holyfield, that was a pretty short visit.

A. Yes, it was.

Q. They went on back to wherever she was stationed?

A. Yes, they did. Uh-huh.

Q. Was she married at the time, do you know?

A. Yes, she was.

Q. Do you recall who she was married to?

A. James Broadnax.

Q. And did she have any other children, that you're aware of?

A. No. She was pregnant with one.

Q. Okay.

A. Uh-huh.

Q. That would, of course, then be a child younger than --

A. Yes, sir.

Q. -- James.

A. Uh-huh.

Q. Did she have any children older than James?

225

A. Yes, sir, she do.

Q. How many did she have?

A. She had Audrey -- I mean, three other ones.

Q. Okay. That would be Aaron. Aaron would be her oldest; is that correct?

A. Yes.

Q. And then two daughters --

A. Uh-huh.

Q. -- between Aaron and James.

A. Between -- let me see. Yes, that's it. Correct.

Q. Do you recall, after that short visit and -- and you saw James basically as a baby, do you recall the next time you saw him?

A. The next time I seen him was a length of time. I'm saying James was probably like in the tenth grade -- I mean, he was ten years old. Probably about ten or eleven. It had been a length of time, because he was like two or three when I first seen him, and then he came around, he was about ten years old when he came -- when I seen him the second time.

Q. Okay. So some eight years --

A. Yes. It was some time in between.

Q. -- or thereabout had passed.

A. Yes.

226

Q. And do you recall the circumstances of seeing him that time?

A. Yes. He had moved back.

Q. Audrey.

A. Yes.

Q. And was she then living in Hope when she --

A. When I -- when I seen her, she had moved back to Texarkana when James was about ten years old.

Q. Okay. And do you recall if she was married at that time?

A. No. She wasn't married at that time.

Q. And so she had James when she moved back to Texarkana.

A. Yes, she had him with her.

Q. And you saw him -- did you see him on a pretty regular basis after that?

A. Well, not really. Like once or twice. I might have seen James once or twice. I really didn't see James. I went to visit probably a couple of times.

Q. Okay. Could I take it from that she just didn't bring James around or --

A. Well, it's not that. She didn't really have the transportation, and they stayed in Texarkana and I was in Hope, Arkansas.

Q. Okay.

227

A. So we just, you know ...

Q. When you were around James in that age period, ten, eleven years old, --

A. Uh-huh.

Q. -- what sort of young fellow was he?

A. He was -- I mean, he never did give me any problems. He was a sweet kid.

Q. And you have children.

A. Yes, I do.

Q. Do you have children about his age?

A. Yes, I do.

Q. Did they get an opportunity to -- to play or visit with --

A. Uh-huh. Tory. My son Tory, yes.

Q. Okay. And it would be fair to say that James is just like the rest of the kids?

A. He was when he was around me.

Q. Okay.

A. I didn't have any problems with him.

Q. Do you know about how long they stayed in Texarkana?

A. I really don't know. When I went back over there, they had moved, and where they moved to, I do not know.

Q. Okay. Okay. Now, when they were living in

228

Texarkana, if you know, were Audrey's daughters living with her?

A. No.

Q. And what about Aaron, was he living with her?

A. No.

Q. Did Aaron ever live with her to any great extent, as far as you know?

A. Aaron lived with them when they stayed with Betty. That's when Aaron stayed with James now.

Q. And after a period of time, I have kind of come to understand what I think the family dynamics are, Ms. Holyfield, but I know the jury doesn't. Tell them who Betty is.

A. Betty is my mother's sister. She didn't have any kids of her own. She raised my nieces and she raised Audrey.

Q. Okay.

A. So Audrey mother was, you know, not in the picture. It was my auntie that raised Audrey.

Q. Okay. So Audrey, James's mother, --

A. Correct.

Q. -- was not raised by her biological mother or biological father.

A. Correct.

Q. She was actually raised by her aunt?

229

A. Yes.

Q. And that would be Betty Eason?

A. Correct.

Q. And would it be fair to say that Audrey had Aaron at a pretty early age?

A. Audrey had Aaron when she was 17.

Q. And did Betty Eason take Aaron basically from that point --

A. Yes.

Q. -- and raise him?

A. You see, when she had Aaron, Audrey kind of -- Betty was just kind of in the picture. Betty started raising Aaron when he was like three-months old, and Betty raised Aaron.

Q. Okay. Now, who raised the girls, as far as you know?

A. The girls was raised by their daddy.

Q. And would that be who?

A. Steve.

Q. Steve? Do you remember Steve's last name?

A. Steve, and -- I just know he stayed in Michigan.

Q. Okay. So he was from Michigan.

A. Correct.

Q. And at some point he took the girls and took

230

them to Michigan with him.

A. Correct.

Q. So James's older brother then would have been raised by --

A. Betty.

Q. -- Betty.

A. Uh-huh.

Q. Who was not really his grandmother, but was kind of like a grandmother.

A. Correct.

Q. And his two sisters were raised by their father.

A. Correct.

Q. Who is not James's biological father.

A. No.

Q. And he was raised by whom?

A. Now, James was raised by -- you know, I can't really say. When he left here, he left with his mom, and where he end up at, I don't know.

Q. Okay. And what about the child that she was pregnant with, do you know whether that child was born?

A. I really -- she said he was born and his name was Michael. I never seen him.

Q. You never saw him?

A. I never seen him.

231

Q. Do you have any idea where Michael would be?

A. Never seen him. She came back and said Michael was with his dad.

Q. Do you know who that would be?

A. She said James Broadnax.

Q. Okay. Ms. Holyfield, if you know, do you know who James's father is?

A. No. I do not know.

Q. Did Audrey ever live with you?

A. Yeah. Once upon a time, yes, she did. She stayed with me for about six months.

Q. And was that in Hope?

A. That was in Hope, Arkansas.

Q. And did she have James with her at that time?

A. No.

Q. Okay. Do you know where James was during that period?

A. No.

Q. Let me -- did she have the girls with her at that time?

A. She had the girls with her at that time.

Q. And let me call your attention back to an occasion -- did you have an occasion to come home one day to something of a surprise?

A. Yes, I did.

232

Q. What was that?

A. When I came home, the police had my house surrounded.

Q. And was Audrey arrested?

A. Yes, she was.

Q. And was she charged with abusing one of her daughters?

A. Yes, she was.

Q. And was it after that that Steve came from Michigan and got his daughters --

A. Correct.

Q. -- and took them back?

A. Correct.

Q. Ms. Holyfield, you indicated to me that you had seen at least some of the interviews that -- one or more of the interviews of James on the television set.

A. Yes, I have.

Q. Did that look like anything you'd ever seen from James?

A. In my dealings with James, it just -- when I seen that interview, it didn't look like James. He just -- it just didn't look like him to me.

Q. Did you ever know when he was going -- coming up, anything that -- did you ever see him show any sign of violence to anybody?

233

A. No.

Q. Was he disrespectful to his elders?

A. No, he was not.

Q. Mean to his siblings?

A. No.

Q. Would you have expected James to have ever wound up over here in this chair?

A. No, I did not.

Q. Thank you, ma'am.

MR. PARKS: We'll pass the witness.

THE COURT: Cross-examination?

MR. ALEX: Yes, sir.

**CROSS-EXAMINATION**

BY MR. ALEX:

Q. Ms. Holyfield, my name is David Alex. I have a few questions for you. If you -- sometimes, this time of day, I don't make a whole lot of sense. If I don't make sense to you, let me know.

A. Yes, sir.

Q. All right. We never met before; is that right?

A. Never.

Q. Okay. Just -- it's -- when I listen to your testimony, and correct me if I'm wrong, --

A. Uh-huh.

234

Q. -- your real interaction with the defendant sounds like it wasn't very extensive.

A. Exactly.

Q. Okay. Okay. All right. So any question about how the defendant was as a child, we have to keep that in mind, that you didn't have a lot of interaction with him; is that right?

A. That's correct.

Q. Okay. And so someone who would have spent more time with him on a regular basis would probably even be able to give the jury a better idea of how he was like growing up. Would that be fair to say?

A. That would be fair.

Q. Okay. All right.

And specifically, this incident you're talking about when Audrey was living with you, what year would that have been?

A. Um, I got my -- I got married in '98. It had to be around '99.

Q. Okay. And the -- the daughter that you say they accused Audrey of abusing, what was her name?

A. Nikki.

Q. Nikki? And did Nikki wind up going to CPS?

A. Yes, she did.

Q. And the other girls went to dad in Michigan?

235

A. No. Both of them went to CPS.

Q. Okay.

A. They called the dad the same day, and the dad and grandmother came and picked them up.

Q. All right. And -- and Audrey had been living with you for how long then?

A. About six months. She came back -- where he was staying at, I don't know, but when she came back, she came back with the two girls, and James was not with her.

Q. Ms. Holyfield, --

A. Uh-huh.

Q. -- there was a man living at that apartment at that time, wasn't there?

A. At my apartment? No, I stayed at home. I was married.

Q. Okay. And what was your husband's name?

A. His name was James Moss.

Q. I'm sorry?

A. James Moss.

Q. Okay. And is it true that Audrey was actually arrested for some credit card kind of fraud?

A. No, sir. Audrey was arrested for hot checks.

Q. Hot checks.

A. Yes, sir.

236

Q. She was arrested for hot checks around that same time this happened.

A. Exactly.

Q. And the person who was actually charged with messing with this -- this child was a man, wasn't it?

A. No, sir.

Q. Okay.

MR. ALEX: Judge, I need a second. I've got to go to the bathroom and I've got some records here that I really would like to --

THE COURT: All you have to do is ask.

All rise for the jury.

(Recess taken.)

(Court reconvened; Jury present.)

THE COURT: Be seated, please. Whenever you're ready, Mr. Alex.

MR. ALEX: Thank you, Your Honor.

**CLARA HOLYFIELD**

was called as a witness and testified as follows:

**CROSS-EXAMINATION - CONTINUING**

BY MR. ALEX:

Q. State your name for the record.

A. Clara Holyfield.

Q. Are you the same Ms. Holyfield who just testified prior to the break?

237

A. Yes, sir.

Q. Okay. And I just wanted to clarify a couple of things because I think I was thinking about a different situation that would have happened in like 2001.

A. Okay.

Q. So you're saying in 1999 the police came out and CPS took Nikki; is that right?

A. Yes.

Q. And you don't know if Audrey was ever charged for anything?

A. Well, they didn't charge -- I don't know. I really don't know. I mean, the police just took her.

Q. All right. And you don't really have any personal knowledge of what happened with Nikki, do you?

A. No, I do not.

Q. And you wouldn't be surprised if we did a criminal history on Audrey, there's no injury to a child or anything like that?

A. I don't know. I don't know, because I wasn't there, but they took her because they said she had hurt the baby. That's it.

Q. And while you were there for those six months, did you ever see her abusing any of the kids?

A. No.

238

Q. And did she give them love and nurture?

A. Yes, the girls.

Q. All right. And she took care of them?

A. The girls.

Q. And the boys weren't staying there then, right?

A. No.

Q. All right. Did you have kids at the house?

A. Yes, I did.

Q. Did she abuse any of your kids?

A. No.

Q. And she had been in the Army; is that right?

A. Correct.

Q. And did you say that Audrey was your sister?

A. No. That's my first cousin.

Q. Your first cousin, gotcha. And is she here today?

A. Yes, she is.

Q. Okay. Very good. And, I'm sorry, when was the last time you saw James before today?

A. Oh, that's when he was in Hope, he was staying with his little girlfriend. He was about 17. The last time I seen James, it's been a couple of years.

Q. What was the girlfriend's name?

A. I don't know. I just know he had a little

239

girlfriend around the corner from where I stayed at.

Q. Okay. And do you recall, was that the same -- is that girl here today?

A. No.

Q. Okay. Was there -- was the police called out to that apartment quite a bit for domestic disputes?

A. Around the corner where he is staying at?

Q. Yeah.

A. No. Not as I recall.

Q. Not as you recall?

A. No.

Q. Okay. All right.

MR. ALEX: That's all I got, Judge.

THE COURT: Any redirect?

**REDIRECT EXAMINATION**

BY MR. PARKS:

Q. School starts in Hope tomorrow?

A. No, it don't start tomorrow. I have to do my lunch forms tomorrow.

MR. PARKS: Nothing further, Judge.

THE COURT: May the witness be excused to go back to Hope?

Any recross?

MR. ALEX: No, sir.

THE COURT: May the witness be permanently

240

excused? From the State?

MR. ALEX: Yes, Judge.

THE COURT: You're permanently excused, ma'am. You may step down. Thank you for coming down here.

What further says the defense?

MR. LOLLAR: Teresa Thompson, Your Honor.

THE COURT: Teresa Thompson.

Would you please come all the way to the front of the courtroom. Go as far as you can. All the way to the door. And once you've reached the door, turn and face me and raise your right hand. All the way to the front.

**TERESA THOMPSON**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Parks.

Mr. Parks, whenever you're ready, sir.

MR. PARKS: Thank you, Your Honor.

THE COURT: Yes, sir.

**DIRECT EXAMINATION**

241

BY MR. PARKS:

Q. State your name for the jury, please, ma'am.

A. Teresa Thompson.

Q. Ms. Thompson, can you tell the jury where you live?

A. 210 North Bradley, Eldorado, Arkansas.

Q. And have you lived there in Eldorado for quite some time?

A. A year.

Q. Okay. And before that, where did you live?

A. Texarkana, Arkansas.

Q. Ms. Thompson, I just want to let the jury know a little bit about you. Are you a married lady?

A. Single.

Q. Single?

And do you mind if I ask your age?

A. 38.

Q. And are you employed?

A. Not right now.

Q. What kind of work have you done in the past?

A. I'm a CNA.

Q. I'm sorry?

A. Certified nursing assistant.

Q. Let me ask you whether or not you recognize the young man seated next to me here?

242

A. Yes.

Q. Who is that?

A. My nephew.

Q. James Broadnax?

A. James Broadnax.

Q. Now, how are -- are you his mother's sister?

A. Yes.

Q. Okay. And his mother's name is Audrey?

A. Yes.

Q. And Audrey is out in the hall here today.

A. Yes.

Q. And, Teresa, you understand what kind of trouble James has gotten in and you understand that this jury has convicted him of capital murder.

A. Yes.

Q. Let me ask you, do you recall the first time you ever laid eyes on James?

A. He was two months old.

Q. Okay. And do you recall the circumstances of your having seen him?

A. My father's funeral.

Q. Okay. And where was that?

A. Hope, Arkansas.

Q. Okay. So you had gone to your father's funeral and -- and Audrey, of course, had come for the

243

funeral and -- and brought James; is that right?

A. Yes.

Q. At that time, do you recall whether Audrey was married?

A. Yes, she was married.

Q. Who was she married to?

A. James Broadnax.

Q. Okay. And did she have other children besides James?

A. Yes.

Q. How many?

A. Four.

Q. And at the time that she came to the funeral with James, how many of those children did she have with her, if you remember?

A. I'm not sure.

Q. Okay. All right.

A. I don't know if she had her other two daughters with her at the time or not, but I know she had James, so I'm not sure.

Q. Okay. And her children would have been Aaron. That was the oldest; is that right?

A. Yes. Right.

Q. And then she had two girls, Nikki and Kerrin?

A. Yes, sir.

244

Q. And then James.

A. Yes.

Q. And then the youngest of all would have been Michael; is that correct?

A. Yes.

Q. Have you ever seen Michael in your life?

A. No, sir.

Q. Do you know where Michael is?

A. No, sir.

Q. Michael would have been about how much younger than James?

A. About two years.

Q. Okay. And when -- when Audrey came with James to the funeral, was she in the service at that time?

A. Yes.

Q. Do you remember where she was stationed, by any chance?

A. I think California. I'm not -- not sure. I think it was California.

Q. Okay. Now, after that time, and I'm going to assume, Ms. Thompson, that she didn't stay but just a couple of three days at the funeral.

A. Yes, sir.

Q. And -- and went on back where she was stationed.

245

A. Yes.

Q. Do you recall, over the years, did -- did you have an occasion to be around James or was that the only time you ever saw him?

A. I was around James.

Q. And explain the circumstances of your being around James to the jury. How did --

A. Like how do I know him? What kind of relationship we had?

Q. Yeah. I mean, how old was he when you first began to be around him a good deal, those kinds of things.

A. When I first really started to know James, he was about three or four. They had left from, I believe it was California, and they had first came to Hope to live, and so he was staying -- his mother had moved in an apartment complex, and I used to go by and visit them often, and he was about three or four when I just actually started having contact with him.

Q. Okay. So let me interrupt you there, Ms. Thompson.

When he was there, three or four, Audrey had moved back to Hope; is that right?

A. Yes, sir.

Q. And -- but she had moved back without Michael.

246

A. Yes.

Q. I mean, there was -- she didn't -- James was the only child?

A. James, Nikki and Kerrin.

Q. And Kerrin.

Now, Betty Eason raised Aaron; is that right?

A. That's correct.

Q. Okay. So Aaron was really never in -- in Audrey's family. He was always with Betty Eason.

A. Yes.

Q. Okay. Now, did James also -- was he also partially raised by Betty Eason?

A. Yes.

Q. Okay.

A. Partially.

Q. Let's go back to when James was three or four and they moved back to Hope. Did you begin to see James on a regular basis at that time?

A. Yes.

Q. Okay. What kind of child was he?

A. He was a regular child.

Q. Okay. Did you see his interaction with -- with Betty Eason, for instance?

Did she live there in Hope?

A. Yes, sir.

247

Q. Okay. What -- during the time that Betty had James and James was -- was with Audrey there in Hope, what sort of relationship did you see between James and his mother, for instance?

A. It was a okay relationship.

Q. Did you ever see her being physically abusive to him?

A. No.

Q. Did you ever see her being physically abusive to the other children?

A. No. Not with my own eyes, no.

Q. Okay. You know there was a situation between she and Nikki at some point.

A. Yes, sir.

Q. Okay. But you weren't -- you didn't see that. You weren't there at that.

A. No, sir.

Q. Okay. As time went on, did -- did James -- did they stay there in Hope or were there occasions when they moved away?

A. Um, she moved around quite a lot, my sister did.

Well, first, James stayed with me on occasion. For -- the first time he was like in the third grade, and he stayed with me for over a year. It's just due

248

to, you know, her moving around or whatever, and that was the first time he stayed with me.

Q. Okay. And he was in third grade?

A. Yes, sir.

Q. And so that year that you had him there in the house, did you have other children?

A. Yes, sir. I have three other children. I had two at the time.

Q. And are they -- in age, how are they with James? Older, younger?

A. One is older -- no. I'm sorry, I'm so nervous. I'm sorry.

Q. That's all right.

A. And I just -- I want to be truthful. I want to make sure I get it right.

My son, he turned 19 in June.

Q. Okay.

A. And my daughter, she will be 18 on the 27th, so all of them were right there together in age.

Q. Okay. So that year he was in third grade and stayed with y'all, he would have what, gone to school with your children and --

A. Yes, sir. He went to school with my children. He stayed -- like I say, he stayed with me. He was like -- he was like my son, actually. I took care of

249

him, took him to school. I fed him. They slept in the same bed. Him and my kids are like sisters and brothers.

Q. And did he give you problems?

A. No, sir. He -- no.

Q. Was he respectful?

A. Yes, very much so.

Q. Do what you asked him to do?

A. Yes.

Q. Go to school when he was supposed to go to school?

A. Yes, sir.

Q. And do all of those kinds of things.

A. Yes, sir.

Q. So after he spent that year with you when he was, I guess, about nine-years old, at that point, nine to ten, what happened that he -- that he moved from your house?

A. His mother got married again, and so they wound up moving to Arkadelphia some years down. I can't -- you know, I can't really recall. Before then, I think they stayed in Texarkana, Arkansas, in Branfall Courts.

Q. Okay. So she, I guess, Audrey then, at the end of the year, came and got James. Or did he go to

250

Betty's house?

A.   I don't know.  It was so many different instances that they had to move, and back and forth, and so it's just hard for me to recall and just set down a date of when this and that happened, so --

Q.   Without trying to go through the places, would it be fair to say, Ms. Thompson, that James has had to live in a lot of different places?

A.   Yes, sir.

Q.   In his life?

A.   Yes, sir.

Q.   All right.  And with a lot of different men in his life?

A.   Yes, sir.

Q.   Did there come a time when they moved back to Hope, Arkansas, and you were able to be around James a good deal more?

A.   Yes.  James stayed with me again.  Like I say, he stayed with me like four different occasions.  The first time he stayed with me was when I was in Hope, Arkansas.

The second time he would have stayed with me, I would have been in Texarkana, Arkansas, in Smith-Keys Apartments.

The third time, I was in Mount Vernon, Texas.

251

The fourth time, I was back in Hope, and that's the last time he lived with me.  James was in the eleventh grade the last time he stayed with me.

Q.   Okay.  Let's go back to the second time he stayed with you.

A.   Uh-huh.

Q.   About how old was he that time?

A.   When I was in Smith-Keys, he -- he would have been around eleven or twelve.

Q.   And how long, if you remember, did he stay with you at that time?

A.   It was awhile.  His mother had gotten locked up at the time and so it was over a six-month period.

THE COURT:  Let me interrupt for a second.  I didn't understand the witness.

Did you say James was in the eleventh grade or was 11-years old?

THE WITNESS:  The last time he stayed with me?  He was in the eleventh grade.

THE COURT:  Okay.

Q.   (BY MR. PARKS:)  Okay.  Let's -- we're going to -- we're going to talk about that in a minute, Ms. Thompson.

But the second time he stayed with you, he was -- remind me.  About how old?

252

A.   It was around eleven or twelve.

Q.   Eleven or twelve, okay.  So he would have been gone a year, year and-a-half, and then he came back and stayed with you about six months.

A.   Yes, sir.

Q.   Go to school with your children and everything like before.

A.   Yes, sir.

Q.   Was he a changed child or was he still respectful --

A.   He was still the same.

Q.   -- and doing the things --

A.   James was always respectful towards me.

Like I said, James is like a son to me.  He didn't have, you know, a lot of places to go, and I was like -- to me, he was like a child, and I'm sure I was like a second mother to him.

Q.   And you -- you were kind of the place of last resort.  He could always come to you.

A.   Yes, sir.

Q.   After that six-month period, how did it come to pass that he -- he left your home that second time?

A.   He got -- he moved to Arkadelphia.  That's when he was kind of stable.

When he was around 13 years old, 13 or 14, his

253

mother had gotten married to a pretty, you know, nice man, and they stayed in Arkadelphia and they stayed down there for like three years.

Q.   Okay.  And would you tell the jury what that nice man's name was?

A.   Darryl Maxwell.

Q.   Is it fair to say that Darryl Maxwell was sort of a contrast to the other men that your sister had married and been with?

A.   Yes, sir.

Q.   And so they lived down there about three years in a pretty stable relationship?

A.   Yes.  To my recollection.

Q.   And that would have taken James to about 16 years old, something around there?

A.   Yes.  I believe.

Q.   And did he then have occasion to come back and live with you the third time?

A.   Yes.

Q.   Or was that the fourth time?

A.   Yes.  That was after the -- after the third time.

Q.   Okay.  And do you remember about how long he stayed that time?

A.   When I was in Mt. Vernon, he stayed about

FIRM NAME

**254**

three months before his mother moved down there, and then they wind up getting an apartment and she moved with -- you know, he moved with her.

Q. Okay. So she -- she finally came on back.

Now, did Darryl come back with her?

A. No.

Q. So Darryl is out of the picture.

A. Yes, sir.

Q. And -- and Audrey comes back and James moves in with his mother.

A. Yes, sir.

Q. And do you know about how long that lasted?

A. I don't know how long they just actually stayed in Mt. Vernon. It wasn't a year. They didn't even stay a year.

Q. Okay. And then did that result in his coming back and staying with you the fourth time?

A. Fourth time James stayed with me when I was in Hope, I really don't -- I don't understand -- I can't remember the circumstances that he wind up coming back and living with me. That would have been the last time that he was actually in school, and that's when he was around, I believe, the eleventh grade. Tenth or eleventh grade.

Q. Okay. And there's been some, I guess you

**255**

could say, discrepancies about how far James did go in school. Do you think that -- was he going to school whenever he was with you that last time, or just saying he was going to school, do you know?

A. He was skipping classes that last time when he was like eleventh or -- like I say, the eleventh -- tenth or eleventh grade, I can't remember. But I know he was skipping classes because a deputy came to my house and knocked on my door, and it was for truancies, and so they were telling me I had to go to court for him, you know, not going -- it was this one certain class. I don't know. He said it was the teacher or whatever. But they were going to make me go to court, and I was like, no way, because I have two other children. They were going to school at the time and doing -- you know -- so that's when he wind up having to go back and stay with Mama Betty that last time.

Q. And had he -- Mama Betty, for the jury, is Betty Eason?

A. Yes, sir.

Q. That would be his grandmother, except she really wasn't his grandmother.

A. Correct.

Q. Now, had he had to stay with Betty Eason from time to time throughout his life?

**256**

A. Oh, yes.

Q. Did you see the relationship that he had with Betty Eason, or that she had with him?

A. She didn't like him.

Q. She didn't like him?

A. No, sir.

Q. How did she treat him?

A. Like a outcast.

Q. Let me -- let me bring that subject up, Teresa.

Do you know who James's father is?

A. I never met him.

THE COURT: Hold on a second.

Haze, give her some Kleenex. Thank you.

Q. (BY MR. PARKS:) We talked about this yesterday and we both knew this was going to be hard.

A. Yes, sir.

Q. You don't know who James's biological father is.

A. No, sir.

Q. It is not James Broadnax.

A. No.

Q. Did Audrey ever tell you who his dad was, that you recall?

A. Un-uh. She had said the name, but I just know

**257**

he was some white man or something.

Q. Not someone you ever met.

A. No.

Q. Not someone who's ever been in his life.

A. (Shakes head.)

Q. And the fact that James is mixed blood, had a white father, was that a problem for him with Betty Eason?

A. Yes.

Q. And -- and how would that manifest itself?

A. The point that he was mixed, she just did not like that.

And my mother, she was up in age, and so, she was just -- she just did not like white people. I don't know if it was the things she had experienced in her life or whatever, but she just didn't. And with him being, you know, half white, she just didn't like him. She always used to say he was a half breed and --

Q. Call him names.

A. He was -- and she just did not like him. She hated him.

Q. Did she let him know that?

A. Excuse me?

Q. Did she let him know that?

A. Yes. All the time.

258

Q. But despite that, sometimes he was forced to have to live with her.

A. Yes.

Q. And put up with whatever.

A. Yes.

Q. You have expressed to me, Ms. Thompson, some regrets about James.

A. Yes.

Q. Aside from your mother, how do you feel about him?

A. I love him. I love him like he was my son.

Q. You expressed to me yesterday that you felt that there was a good deal of blame. Would you -- would you tell the jury what you meant by that?

A. Excuse me? Sorry.

Q. You told me yesterday that you felt like there was a good deal of blame to go around.

A. Yes, sir.

Q. Explain to the jury what you meant by that.

A. We have a big family. A big family. And Audrey was kind of unstable. We all make mistakes. She wasn't the best mother, and I'm not sure none of us have won the best mother award, but in order for -- there was no one to step in. He really didn't have anyone besides me, basically, and it was just -- I was

259

single and I just really wasn't financially able to take care of James and my other two kids at the same time. That's why it always led that he had to be here or be there. His mother was always in relationships, or -- not good relationships.

And out of everybody in the family, you know, people are saying, you know, this and that, but if someone else had of tried to help, you know, this may not have even happened. I don't know. I don't know.

Q. Thank you, Ms. Thompson.

MR. PARKS: I'll pass the witness.

THE COURT: Cross-examination.

#### CROSS-EXAMINATION

BY MR. ALEX:

Q. Ma'am, my name is David Alex. I just have a few questions for you. If you -- if I'm not making any sense to you, let me know, okay?

A. Yes, sir.

Q. All right.

MR. ALEX: May I approach, Your Honor?

THE COURT: Yes, sir, and as necessary.

Q. (BY MR. ALEX:) Ma'am, Mr. Broadnax is -- is your nephew; is that right?

A. Yes, sir.

Q. And when he was going to -- when he was in

260

Mt. Vernon, he went to school there; is that right?

A. Yes, sir.

Q. And was -- when he first enrolled there, was he living with you or was he living with his mom?

A. Living with me.

Q. Okay. And so you would have been the person that signed him up?

A. Yes, sir.

Q. All right. State's Exhibit Number 491, those would be his school records from Mt. Vernon; is that right?

A. Yes.

Q. Okay. And he did pretty good in school, didn't he?

A. He was okay.

Q. All right. He wasn't uneducated, was he?

A. No, he wasn't uneducated.

Q. He's always been -- as far as you know, he's always had -- and if I use the word "Snap," would you know what I would be talking about?

A. When you say Snap, --

Q. Yeah, like if we're having a conversation, I wouldn't have any problems following you, or what you're saying, or -- or you wouldn't have any problems following me. He's -- he's a pretty intelligent kid,

261

wasn't he?

A. Yeah.

Q. Okay.

A. He was okay.

Q. All right. And he had choices.

A. Yes.

Q. He knew what his choices were?

A. We all have choices; yes, sir.

Q. I mean, when he was in school here in Mt. Vernon, he was -- let's see, he was scoring like an 88 in introduction to -- it looks like applied sciences?

A. Agricultural science.

Q. Agricultural sciences. 86 in world history; 76 in geographical studies. It didn't look like he did too good in algebra, 58?

A. Right.

Q. But he got an 81 in chemistry; is that right?

A. Uh-huh.

Q. That's not bad grades, is it?

A. No, sir.

Q. All right. So you wouldn't -- you would disagree with the notion that he was uneducated, wouldn't you?

MR. PARKS: Well, Judge, if -- if he's

August 17, 2009

262

suggesting to the witness that anybody has ever suggested that, he's misstating the record. That -- maybe -- ask him to restate the question.

THE COURT: Re-ask the question.

Q. (BY MR. ALEX:) You would disagree with the notion that he's uneducated, wouldn't you?

MR. LOLLAR: That's the same question.

MR. ALEX: Well, it's the question I would like to ask, Judge.

THE COURT: Go ahead.

A. Do I have to just answer yes or no or can I explain?

Q. (BY MR. ALEX:) No, you can explain.

A. He wasn't uneducated, --

Q. Okay.

A. -- but when he went from place to place, he didn't have anyone to motivate him.

Q. Okay.

A. They don't care if, you know, he did his work or would, you know, what, so when he was with me, that was a factor in my home, you know. Come home from school, do their work, get a snack and -- he had to. He had no other choice. You know, I used to tell him all the time, as being a child, that's the only job you have is to go to school and get your education. The

263

rest I did. So when he was with me, he didn't have any other choice.

Q. Okay. And you -- and you made sure you instilled in him those kind of values; is that right?

A. Yes.

Q. Okay. All right.

And so he got -- for the most part, he got some pretty good guidance from you, didn't he?

A. Yes, sir.

Q. All right. And when he was in Texarkana, you didn't really see any real problems with him, did you?

A. No, sir, I didn't.

Q. Okay. All right.

And then were you aware that he ever attended school in Dallas?

A. I knew he had to come to Dallas for awhile.

Q. All right.

A. Like I say, he was here and there.

Q. All right. Let's -- let's kind of -- the timelines I'm a little confused about. Maybe you can help me with it.

Let's start back at the time that this offense happened back in 2008. Where were you living then?

A. Excuse me?

Q. When this offense happened, when these two

264

people were killed, --

A. Oh, yes.

Q. -- where were you living then?

A. I was living in Texarkana.

Q. Texarkana.

A. Yes, sir.

Q. And do you -- do you know where the defendants were living -- was living?

A. He was in Dallas or something.

Q. Was he in Dallas?

A. Yes, sir.

Q. Do you know Demarius Cummings?

A. No, sir.

Q. Okay. That's a different side of the family?

A. Yes.

Q. All right. Ever met him before?

A. When he was little, maybe, but just actually having activity with that side -- because that's Audrey's side of the family.

Q. Okay. Very good.

So when -- when had been the last time -- do you remember when this offense happened, when these folks were killed?

A. Yes, sir.

Q. Okay. Do you remember when the last time you

265

saw him before that?

A. I want to say I was living in Texarkana still.

Q. All right.

A. And -- I'm not sure.

Q. Okay. This would have been June of 2008. Had it been a year since you'd seen him? June of '07, perhaps?

A. No, sir, it hadn't been quite a year.

Q. Okay. So within nine months to a year?

A. Yes, maybe so.

Q. And if you can recall, when the last time you saw him, what were the circumstances there?

A. I can't even remember who they were living with at the time. I want to say she was married to Russell Kelly.

Q. Okay.

A. And they were living in Texarkana.

Q. And did you have any interaction with him at that time?

A. Yes. Whenever James was around me, he would always come by and see me or whatever, whether he was staying with me or not. Or, you know, if I was around him, I would check on him.

Q. But he would be very respectful when he was around you.

FIRM NAME

August 17, 2009

266

A. Yes, sir.

Q. And you would agree with me that young people sometimes will -- they will be respectful around the people that they really respect, but when they leave and they go out, they're in all kinds of stuff. That happens quite a bit, doesn't it?

A. I would agree; yes, sir.

Q. All right. And you can't imagine -- can you think of any reason why James would be riding around with one of those Scream masks in his -- in his suitcase? That would just be totally outside his character as far as you know, wouldn't it?

A. Yes, sir.

Q. All right. Because you wouldn't think that there would be any real use for something like this in the middle of June while you're riding around in a stolen car, would you?

A. No, sir.

Q. All right. That character would be something that you're totally unfamiliar with; is that right?

A. Yes, sir.

Q. Okay. And that just is -- that's just the kind of way life is sometimes. People can -- can be a certain way around us because they respect us, but when they're out, they could be a different way; is that

267

right?

A. Some occasions; yes, sir, that's true.

Q. All right. And you -- you don't have any information about the defendant being a drug addict, do you? Did you ever see him doing any drugs?

A. Um, he used to smoke marijuana on occasion.

Q. Marijuana? Okay. Did you see him high?

A. If he was high, I just -- I didn't know.

Q. Okay. All right.

So you -- if you -- you wouldn't say to this jury that he was an addicted -- a drug addict, a crack head or --

A. No, sir.

Q. -- anything like that.

A. Not to my knowledge; no, sir.

Q. You wouldn't characterize him that way; is that right?

A. No, sir.

Q. Okay. But you were aware that he smoked marijuana?

A. Yes, sir.

Q. All right. And have you ever talked to him about this -- about what he did in this case? Has he ever -- has he ever confided in you about what he did?

A. I just never really wanted to talk about it.

268

It was just -- it's all so surreal, I just ...

Q. Okay. All right.

MR. ALEX: That's all I have, Judge. I'll pass the witness.

THE COURT: Redirect?

MR. PARKS: Just a couple of things, Your Honor.

**REDIRECT EXAMINATION**

BY MR. PARKS:

Q. Ms. Thompson, on one of the interviews that James gave to the media, he made a remark about having been locked up in juvenile for six months. Do you know if he was ever locked up?

A. Not to my knowledge. This is the first time, to my knowledge, James has ever been in trouble.

Q. And do you believe as close as your family is, if he had been locked up for as much as six months, you would have probably heard about it?

A. Yes, sir.

Q. Okay. And lastly, if I understood what you were saying, when -- when James was in your house, he was treated like the rest of your children?

A. Yes, sir.

Q. And he was expected to do the things that your other children did?

269

A. Yes, sir.

Q. And do you believe, Ms. Thompson, that if circumstances had allowed you to raise James by yourself, that we wouldn't be in this courtroom today?

A. Yes, sir.

MR. PARKS: That's all I have, Judge.

THE COURT: Recross?

MR. ALEX: Just briefly, Judge.

**RECROSS-EXAMINATION**

BY MR. ALEX:

Q. And you're saying to the jury that the only time that you're aware of that James was locked up was for this case; is that right?

A. Yes, sir.

Q. And the last -- before this offense had happened, you had seen him within nine months to a year; is that right?

A. Yes, sir.

Q. And so if he would have gone to jail in May of '07, that would have been within that nine months to a year; is that right?

A. I believe so.

Q. Okay. And if that had happened, that would just be a circumstance you were unaware of; is that right?

August 17, 2009

270

A. I would know.

Q. You would know.

A. Yes, sir.

Q. Okay.

MR. ALEX: May I approach the witness, Judge?

THE COURT: Yes, sir.

Q. (BY MR. ALEX:) You know what? Ms. Thompson, as a general matter, we would like to know everything that our kids or our second kids are into, but there are many times they'll be into stuff that we don't know about. You would agree with that, right?

A. That's true.

Q. All right. State's Exhibit 454-A, does that appear to you -- does a violation date 5/23/07? Is that what it appears to be?

A. Yes, sir.

Q. And does it appear to be by the name of James Broadnax?

A. Yes, sir.

Q. And does it appear to be a judgment and sentence for James Broadnax for, let's see, possession of a controlled substance where he was found guilty?

A. I don't know anything about that.

Q. You don't know anything about that.

271

A. No, sir.

Q. So if he went to jail for that, that would just be a circumstance that could have happened that you were unaware of; is that right?

A. Yes, sir, --

Q. Okay.

A. -- it is, because I --

Q. And so as a general matter, people could potentially -- when he's not with you and he's with somebody else, there's no way for you to say that he didn't go to juvenile hall somewhere when he was living somewhere else and you just not know about it.

A. Sir, I understand your question. We have a big family.

Q. Okay.

A. Our family talks. If James had of been locked up, they may not have tried to help, but they would have told everybody in the family and we would have known he was in juvenile.

Q. Okay. But you were totally unaware of whether or not he was locked up just in 2007 for this possession charge; is that right?

A. Not to my recollection, he was not.

Q. Okay. Very good.

272

MR. ALEX: That's all I've got, Judge.

**FURTHER REDIRECT EXAMINATION**

BY MR. PARKS:

Q. Well, Ms. Thompson, do you know if he's ever been convicted of any such offense?

A. Not to my recollection.

Q. If he was locked up, do you know how long that lasted?

A. I've never known him to be locked up.

Q. Okay. Thank you, Ms. Thompson.

MR. PARKS: That's all I have.

THE COURT: Anything else, Mr. Alex?

MR. ALEX: No, sir.

THE COURT: May the witness be permanently excused?

MR. PARKS: Yes.

THE COURT: Mr. Alex?

MR. ALEX: I have no objections, Judge.

THE COURT: You're permanently excused, ma'am. Thank you for your testimony.

What further says the defense?

MR. LOLLAR: Your Honor, can we approach?

THE WITNESS: Can I say -- excuse me. May I say something to the jury?

THE COURT: No.

273

THE WITNESS: No?

THE COURT: You can only answer questions from the lawyers. Sorry, ma'am. I'm not being mean.

THE WITNESS: Okay.

THE COURT: It's not my rule. It's the Texas Code of Criminal Procedure.

Mr. Alex, I'm not fussing at you, but your voice is a little bit too loud.

MR. ALEX: Thank you, Judge.

THE COURT: I can hear you up here, so I'm sure the jury can hear that as well.

MR. ALEX: Oh, I'm -- I'm sorry, Judge.

MR. LOLLAR: May we approach, Your Honor?

THE COURT: Yes, sir.

(Off-the-record discussion was had.)

THE COURT: Well, let me do this. Does the jury have any burning desire to go home right now?

Apparently not. Okay.

What further says the defense?

MR. LOLLAR: Call Audrey Kelly.

Judge, we do have to -- I want to bring to your attention, we've got to review these videotapes.

MS. MALLON: I gave them to him.

THE COURT: I've already done it.

MR. LOLLAR: Oh, have you?

August 17, 2009

274

THE COURT: Yes, sir.

Miss Kelly, will you please come all the way to the front of the courtroom. All the way to the very front up here by the door. Go until you can't go any further, ma'am. All the way to the door. Keep going. All the way to the front.

Okay, ma'am. If you'll raise your right hand.

**AUDREY KELLY**

was called as a witness and testified as follows:

THE COURT: You may lower your hand. Take your seat in the witness stand.

You will be responding to questions from Mr. Parks; is that right? Mr. Lollar, all right.

Whenever you're ready, sir.

MR. LOLLAR: Yes, sir.

**DIRECT EXAMINATION**

BY MR. LOLLAR:

Q. Would you tell us your name, please.

A. **Audrey Kelly.**

Q. And, Ms. Kelly, how old of a lady are you?

A. **I'm 45.**

Q. And where do you currently live?

A. **Eldorado, Arkansas.**

Q. And where were you born?

275

A. **Texarkana, Arkansas.**

Q. And what is the date of your birth?

A. **11/11/1963.**

Q. Now, Ms. Kelly, I understand that you were born to Arthur and Lucy May Cummings; is that correct?

A. **Yes, sir.**

Q. Those are your natural parents.

A. **Yes, sir.**

Q. Were you raised by your natural parents?

A. **No.**

Q. Tell us how -- how it came to be that you were not raised by them.

A. **Um, kind of I was -- my mother Lucy May, was at work one day, or she went to work, and I was left with my aunt. And my father came by to visit and took me and my brother to the store with permission from my aunt who we were with at the time.**

**And we got to the store, -- and all of this is what was told to me, so I don't, you know ...**

**We went, and my brother ended up back at the house, and I ended up down in Hope with my aunt and uncle who adopted me.**

Q. All right. Now, let me see if I understand what you're saying. You have an older brother; is that correct?

276

A. **He's deceased.**

Q. He's deceased now.

A. **Yes.**

Q. He was older than you were?

A. **Yes.**

Q. And what was his name?

A. **Christopher Cummings.**

Q. And how much older than you were was he?

A. **Two years.**

Q. Two years older.

A. **Yes, sir.**

Q. So your father, Arthur, and your mother, Lucy May, had Christopher and then had you.

A. **Yes, sir.**

Q. And one day when you were a little bitty baby, your father came home, got you and took you to Hope, Arkansas; is that correct?

A. **Yes, sir.**

Q. To live with who?

A. **Glen and Betty Eason.**

Q. And who were they in regard to Arthur?

A. **Betty was Arthur's sister. She's my aunt.**

Q. Okay. And did you ever see your real mother again?

A. **No.**

277

Q. Never saw Lucy May Cummings again.

A. **No, sir.**

Q. How about your brother, Christopher?

A. **Um, once that I remember. That was in 1983, I believe it was. That was the last time I saw him.**

Q. Okay. So never saw your mother; saw him one time --

A. **Yes.**

Q. -- during your entire life.

A. **(Nods head.)**

Q. And you were taken to live with Arthur's sister, Betty Eason?

A. **Yes.**

Q. And her husband?

A. **Yes.**

Q. And what was Mr. Eason's name?

A. **Glen.**

Q. Glen? And did they raise you?

A. **Yes.**

Q. And where did they live?

A. **In Hope.**

Q. In Hope.

Now, one of the things I want to do, Audrey, so the jury gets some understanding of all the different places that you have lived and that James has

FIRM NAME

278

lived, --

MR. LOLLAR: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. LOLLAR:) Let me show you what have been marked here as Defendant's Exhibits 35, 36, 37, 38 and 39. Do you recognize these as being maps of Arkansas -- whoops -- California, --

A. Uh-huh.

Q. Texas?

I actually got -- I'm sorry. Georgia.

A. Uh-huh.

Q. Texas. And Michigan.

A. Yes.

MR. LOLLAR: We would offer 35 through 39.

THE COURT: Any objection?

MR. ALEX: No, sir. No objections.

THE COURT: 35 through 39 are all admitted.

Q. (BY MR. LOLLAR:) Now, I know during the course of our talk, we're going to be talking about a number of different locations here in Arkansas; is that correct? Different places that you lived with James?

A. Yes.

Q. And that would include Texarkana. And I'm

279

just going to take a map and -- take a pen and mark around Texarkana, and that would include Hope, Arkansas?

A. Yes.

Q. That would include Eldorado, Arkansas?

A. James wasn't with me in Eldorado.

Q. But Eldorado is discussed a lot in the testimony that you're about to give; is that correct?

A. Yes.

Q. And where is Arkadelphia?

A. It is up near Little Rock. It's closer --

Q. There we go.

A. Right there (indicating).

Q. Okay. Any other locations that y'all lived with James, or James and you lived?

A. In Arkansas? No.

Q. All right. Now, we're going to be talking about a location in California when you were in the Army. Was that outside of Monterey?

A. Yes.

Q. And there is Monterey right there. Anywhere else in California?

A. No.

Q. Okay. We're going to be talking about Marietta, Georgia. And do you know where Marietta is?

280

A. (Indicating)

Q. Right there?

A. Uh-huh.

Q. Okay. We're going to be talking about different locations here in Dallas. I know we're going to be talking about San Antonio.

A. Yes.

Q. We're going to be talking about Dallas. We're going to be talking about --

A. Fort Worth.

Q. -- Fort Worth.

We're going to be talking about Mt. Vernon. Do you see Mt. Vernon on there?

A. It's going to be --

Q. There is Mt. Pleasant. There is Texarkana.

A. More or less in between Mt. Pleasant and Texarkana.

Q. All right. So somewhere right around in there?

A. Uh-huh.

Q. And, of course, there is Texarkana again.

A. Right.

Q. And then we're going to be talking about locations in Michigan. I'm talking about Muskegon, Michigan?

281

A. Yes.

Q. And Muskegon is right here? Anywhere else in Michigan?

A. No.

Q. Okay. So that's twelve different locations we've circled there on the maps to show the jury where you were at the times; is that correct?

A. Yes.

Q. Now, if I can just hold this up. Now, the Arkansas map, right down in the corner of Arkansas, is where Texarkana is located; is that right?

A. Yes.

Q. And over here, kind of in the center, south of the State of Arkansas is Eldorado?

A. Yes.

Q. To the northeast of Texarkana is Hope?

A. Yes.

Q. And further north towards Little Rock is Arkadelphia.

A. Yes.

Q. Is that right?

Okay. I believe you'd indicated that you were originally born in Texarkana, but you were taken to Hope.

A. Yes.

282

Q. Is that right?

A. Yes, sir.

Q. Now, tell me about -- tell me about Mr. and Mrs. Eason that raised you.

First of all, their names are Betty and Glen.

A. **Betty and Glen.**

Q. Betty and Glen.

A. **Uh-huh.**

Q. And was she known throughout James's life as Big Mama?

A. **Yes.**

Q. Or Big Betty?

A. **Big Mama.**

Q. Okay. Very good.

Tell us about -- tell us about them?

A. **They were loving people. They were -- they raised me and my two cousins, Jackie and Teresa. We were raised as sisters. They adopted us and just took care of us and did what parents do. Um, schooling, clothing, I mean, everything, you know.**

Q. Okay.

A. **That was mama and daddy. That was it.**

Q. Okay. Very good.

Now, Ms. Kelly, you're currently living in Eldorado; --

283

A. **Yes.**

Q. -- is that correct?

And are you currently married?

A. **Yes.**

Q. And who are you married to?

A. **J.C. Jones.**

Q. J.C. Jones?

A. **Yes.**

Q. And who does he work for?

A. **He works for Lion Oil.**

Q. Lion, L-I-O-N?

A. **Yes.**

Q. Oil Company?

A. **Yes.**

Q. And does he work on the big tanks there?

A. **Yes.**

Q. Are you currently working?

A. **No.**

Q. Have you worked there since you've been last back in Eldorado?

A. **Yes.**

Q. And who did you work for?

A. **Walmart.**

Q. What did you do for them?

A. **I was an ICS supervisor in the shipping and**

284

receiving department.

Q. All right. Have you had other occupations during your adulthood?

A. **Yes.**

Q. And were you a long distance truck driver for a significant period of your adulthood?

A. **Yes.**

Q. And I know you've worked for a bunch of different companies, a bunch of different trucking companies: Western Express, Super Service, Swift; is that correct?

A. **Yes.**

Q. And others.

Did there come a point in time when you had to quit working as a long distance truck driver here recently?

A. **Yes.**

Q. And what was the cause of that?

A. **Well, um, I quit driving when this incident happened with my son.**

Q. With James?

A. **(Nods head.)**

Q. Okay.

A. **Because I -- I couldn't drive for awhile because I couldn't focus and different things. I mean,**

285

I just couldn't do my job the way I was supposed to, and I didn't do it for awhile.

Um, I went back shortly -- probably about a month after that, and I stayed up until April of this year when my mother passed away, and that's why I didn't go back out. My -- I live -- that's why I'm living in Eldorado now.

Q. So Betty passed away in April of this year?

A. **Yes.**

Q. And you have not gone consistently back out on the road truck driving since that happened also?

A. **No.**

Q. You've tried it a couple of times and it didn't work out for one reason or another?

A. **Right.**

Q. Now, who is your oldest child?

A. **Aaron Eason.**

Q. And how old is Aaron now?

A. **29.**

Q. Where is Aaron now?

A. **Aaron is in Waco, in the McLennan County Jail.**

Q. And why is Aaron in the McLennan County Jail?

A. **He is there for parole violation for sexual assault.**

Q. And I understand that that had something to do

286

with molesting his stepsister; is that right?

A. Yes.

Q. And that somehow that became a federal case. Something -- something about going across state lines; is that right?

A. Yes, sir.

Q. And that when he moved to -- to Waco after being paroled on that, that he did not register as a sex offender; is that correct?

A. Yes.

Q. And then they put an additional state charge on him for failure to register as a sex offender.

A. Yes.

Q. So he is in the McLennan County Jail serving a sentence for the state offense, and serving a sentence for the parole violation from the federal authorities.

A. Yes.

Q. Is that your understanding?

A. Yes.

Q. And when is he expected to be released?

A. Sometime mid September.

Q. All right. Now, how old were you when Aaron was born?

A. I was 16.

Q. 16?

287

A. Uh-huh.

Q. And who's Aaron's father?

A. Calvin Horton.

Q. Who was he to you?

A. He was my high school sweetheart.

Q. Okay. Did y'all ever get married or anything?

A. No.

Q. And was that there in Hope, Arkansas? Was that -- were you in Hope when Aaron was born?

A. Yes, I was in Hope.

Q. And so --

A. But he was born in Texarkana.

Q. Oh. Calvin was your Hope High School boyfriend; is that right?

A. Yes.

Q. Did they let you continue in school after Aaron was born?

A. Yes.

Q. And did you graduate from high school?

A. Yes.

Q. What year would that have been in?

A. In 1982.

Q. All right. Now, did you stay together with Calvin?

288

A. No.

Q. Did you eventually get married to a man by the name of James Steven Martin?

A. Yes.

Q. And how old were you at the time you married Mr. Martin?

A. I was 18.

Q. Okay. What did -- what were you doing or what was he doing at the time you-all got married?

A. He was in the Air Force.

Q. And did you -- where was he assigned?

A. RAF Upper Heyford, England.

Q. So did you go with him over to England?

A. Yes.

Q. And how long did y'all remain in England?

A. Three years.

Q. Now, while you were there in England, did you -- did you become pregnant again?

A. Yes.

Q. And did you bear a child on June the 16th of 1985?

A. Yes.

Q. And who would that be?

A. NiQuia Marie Martin.

Q. Would you spell NiQuia's name for the court

289

reporter?

A. N-i-Q-U-I-A.

Q. And she goes by Nikki; is that right?

A. Yes.

Q. And she was born in June of '85.

A. Yes.

Q. All right. While you were over there and your husband was in the Air Force, did you work or did you stay at home and take care of the babies?

A. I stayed at home.

Q. All right. And you had Aaron with you at that time?

A. No.

Q. Tell us what happened to Aaron.

A. Aaron was in Hope with my parents.

Q. And how did it come to be that you left Aaron there with your -- with your folks there in Hope?

A. He didn't want to leave his Big Daddy, my dad. He didn't want to leave him because he was so attached to him.

Q. How old was Aaron at that time?

A. Aaron was -- when I first went, he was three.

Q. Okay. So he stayed in Hope, Arkansas, with Big Mamma and Big Daddy, --

A. Yes.

290

Q. -- and you went off to England with your husband.

A. Yes.

Q. And did Aaron ever come live with you during the time that you were there in England or anything?

A. No.

Q. He stayed here.

A. Yes.

Q. And you were there for how long?

A. Three years.

Q. Okay. When you-all left England, where did you go to?

A. We went to Muskegon, Michigan.

Q. And you've identified that for us on one of the maps there.

A. Yes.

MR. LOLLAR: May I approach?

THE COURT: Yes, sir. And as necessary.

Q. (BY MR. LOLLAR:) I'm showing you Defendant's Exhibit 39. Is this where Muskegon is located within the State of Michigan?

A. Yes.

Q. It's on the -- one of the Great Lakes. Which Great Lake is that? Is that Lake Michigan?

A. Yes. Uh-huh.

291

Q. Up in here?

THE COURT: Is that the upper or lower peninsula, Mr. Lollar?

MR. LOLLAR: It is on the lower peninsula.

THE COURT: All right.

Q. (BY MR. LOLLAR:) When y'all went to Muskegon, was that because your husband had finished his term in the Air Force?

A. Yes.

Q. And when you got to Muskegon, what did y'all do there?

A. He worked for a company there. I can't remember the name of the company. But he worked there until it closed down, and I worked at K-Mart.

Q. And would that have been in 1986 that y'all got there?

A. Yes. That was in '86.

Q. And did you become pregnant again with your third child?

A. Yes.

Q. And was that a little girl?

A. Yes.

Q. And was she born September the 3rd of 1986?

A. Yes.

Q. And what is her name?

292

A. Kerrin.

Q. How do you spell that.

A. K-E-R-R-I-N.

Q. Okay. And was James working at that time and you were also working, --

A. Yes.

Q. -- excepting you, of course, had the baby and were home for that.

A. Yes.

Q. Did you -- come a point in time when you had pneumonia right before Kerrin was born?

A. Yes.

Q. And she was born in September and you had pneumonia in August, I believe?

A. Yes.

Q. Now, were all, even though he was working, were y'all having financial difficulties?

A. Yes.

Q. And as a result of that, what did you do in March of 1987?

A. I joined the Army.

Q. And you say you joined the Army.

A. Uh-huh.

Q. You enlisted in the Army; is that correct?

A. Yes.

293

Q. Where were you sent for your basic training?

A. Fort Jackson, South Carolina.

Q. And how long were you at your basic training?

A. Three months.

Q. Where were the kids when you joined the Army?

A. Aaron was in Hope with my mother still. NiQuia and Kerrin were with James in Muskegon.

Q. And would Kerrin have been about what, six months old -- six months old at the time you joined the Army?

A. Yes.

Q. And got sent off to Georgia. Pardon me. South Carolina.

A. Yes.

Q. After you completed your basic training, where were you assigned?

A. I went to Fort Sam Houston.

Q. Here in Texas?

A. In San Antonio, Texas.

Q. All right. And how long were you at Fort Sam Houston?

A. Right about six months.

Q. And were you taking any specialized training there at Fort Sam Houston?

A. Pharmacy.

FIRM NAME

294

Q. What were you doing in the pharmacy?

A. Filling prescriptions, making IV's for the --

Q. Well, I mean, were you -- were you a pharmacy tech? Is that what you were?

A. Yes.

Q. Pharmacy technician?

A. Yes.

Q. Not a pharmacist.

A. No. Pharmacy tech.

Q. Now, while you were at Fort Sam Houston, who had Nikki and Kerrin?

A. James.

Q. Back up in Michigan?

A. Yes.

Q. Did they ever join you down here?

A. He came down maybe to visit.

Q. Okay.

A. But that was about it.

Q. All right. And Betty still had Aaron.

A. Yes.

Q. Okay. After you had stayed there in Forth Sam Houston for about six months, were you reassigned somewhere also?

A. Fort Ord, California.

Q. And could you show them -- could you show --

295

just pick up the map of California there and show them where Fort Ord is. Is that outside of Monterey, California?

A. Yes.

THE COURT: What year was that?

Q. (BY MR. LOLLAR:) That would be 1988?

A. Yes. It would be right about here.

Q. Right about the central coast, just south of San Francisco?

A. Uh-huh.

THE COURT: About a hundred miles south of San Francisco.

A. Just south of San Jose.

Q. (BY MR. LOLLAR:) Very good. That would have been in the year 1988; is that correct?

A. Yes.

Q. And once you got to Fort Ord, how was the relationship between you and Mr. Martin at that time?

A. It wasn't good. Um, we were arguing a lot, and as I said before, we had financial problems and that was basically the reason for all the arguments. So we decided to get a divorce.

Q. Was he still living up in Michigan?

A. Yes.

Q. And you were out at Fort Ord in California by

296

this time.

A. Yes.

Q. And did he -- did y'all get a divorce there that year?

A. Yes.

Q. And did he keep the girls?

A. Briefly.

Q. Okay. Now, did there come a point in time when you learned that your father, Glen Eason, who was ill, or became ill?

A. Yes.

Q. And did you try to get permission to go home to Arkansas to see him?

A. Yes.

Q. Did Mr. Eason, in fact, die in November of 1988?

A. Yes.

Q. Now, I want to make sure that we understand what you're fixing to talk about, Audrey.

Were you working as a pharmacy tech there at Fort Ord?

A. Yes.

Q. And did you meet a man by the name of Woody Meggs?

A. Yes.

297

Q. Is that M-E-G-G-S?

A. Yes.

Q. And was he also a pharmacy tech?

A. Yes.

Q. And was he a white man or black man?

A. He was white.

Q. Did you and Mr. Meggs have an affair?

A. Yes.

Q. And as a result of that, did you become pregnant?

A. Yes.

Q. Now, at the time, though, that you were having this -- maybe affair was not the -- the right word.

A. It wasn't an affair.

Q. A liaison, maybe, with Woody Meggs?

A. Something like that.

Q. Okay. You were also dating James Garfield Broadnax, III.

A. Not at that time.

Q. Okay. After you had this encounter with Mr. Meggs, did you start dating James Garfield Broadnax, III?

A. Yes.

Q. And he was a black man.

A. Yes.

298

Q. Okay. And did you marry -- did you end up marrying Mr. Broadnax?

A. Yes.

Q. After you gave birth to James --

A. Yes.

Q. -- Broadnax seated to my right.

A. Yes.

Q. And for the record, you do identify your son sitting two seats down from me here.

A. Yes. He's my baby.

Q. All right. Now, am I to understand that -- keep this clear -- you had the encounter with Mr. Meggs, became pregnant, then you met and started going with James Garfield Broadnax, III, --

A. Yes.

Q. Get you a Kleenex there if you need to.

Is that right?

A. Yes.

Q. And then you had James, and then married James Garfield Broadnax.

A. Yes.

Q. The third; is that right?

A. Yes.

Q. Now, you knew him at the time you were in the hospital giving birth to James, our James.

299

A. Yes.

Q. All right. Is it true that when you came out of the anesthetic for having the baby, you found out that James Garfield Broadnax, III, had put his name on the birth certificate as being the father of the child?

A. Yes.

Q. You didn't have anything to do with that; that's something he did on his own.

A. Yes.

Q. Is it also true that the day that James was born, Woody Meggs came to see his newborn son?

A. Yes.

Q. Is that the last time Woody Meggs ever saw James?

A. Um, he saw James just before I left California.

Q. How old was James at that time?

A. James was about -- he was a couple months old at the time.

Q. Okay. So Mr. Meggs saw him twice within the first two months of his life?

A. Yes.

Q. And has James, our James, ever seen Woody Meggs again?

A. No.

300

Q. Did he even know that James Garfield Broadnax, III, was not his father up until about age twelve or so?

A. Yes, he did.

Q. When did he find that out?

A. Um, I always was honest with him. And I, you know, I just told him, you know, the person that's on your birth certificate and the person that you're named after is not your biological father. And I told him who his father was and I told him where he was from and everything.

Q. Okay. So James has never met his real father, his biological father.

A. No.

Q. After you left Fort Ord when James was two months old, did you ever -- have you ever seen Woody Meggs again?

A. No.

Q. So that man was in and out of your life and you haven't seen him since and James hasn't seen him since.

A. No.

Q. Okay. When you left -- well, let me back up. After James was born, did you, in fact, marry James Garfield Broadnax, III?

301

A. Yes.

Q. And what year would that have been in?

A. That was in '89.

Q. In 1989?

A. Yes.

Q. Okay. And how long were you together with James Garfield Broadnax, III, before y'all divorced?

A. Probably about a year-and-a-half, maybe two years.

Q. And during that period of time, did you become pregnant again?

A. Yes.

Q. And when y'all left Fort Ord, where did you go to?

A. Irving, Texas.

Q. And why did you go -- come to Irving, Texas?

A. I went there to find a place because my husband, James Broadnax, was getting a medical discharge and he was -- stayed there to finish up everything that he had to do regarding his paperwork and everything, and --

Q. Staying in California?

A. Yes.

Q. Okay.

A. He stayed at Fort Ord. And I came to Texas

FIRM NAME

— August 17, 2009

302

where his mother was at the time.

Q. Did his mother live in Irving?

A. Yes.

Q. And so you moved down to where you thought you-all would be living, or close to the area you'd be living.

A. Yes.

Q. With him. With James.

A. Yes.

Q. Okay. And you brought this James Broadnax with you to Irving.

A. Yes.

Q. And did James Broadnax, III, eventually come and join you there in Irving?

A. Yes.

Q. How long were you there in Irving by yourself before he came?

A. About a month.

Q. Okay.

THE COURT: Mr. Lollar, I may have missed this, but did you ask her about how it was that she was in the Army and then got out?

MR. LOLLAR: Well, I'll ask that. I don't think I did ask that.

Q. (BY MR. LOLLAR:) You were in the Army. Did

303

you complete your term in the Army?

A. Yes.

Q. And were honorably discharged?

A. Yes.

Q. How long had you served in the Army?

A. At that time, two years.

Q. Okay. Now later, we'll get to this. Later on, you joined up with the Army reserves.

A. Yes.

Q. But you were actually in the Army for a two-year term.

A. Yes.

Q. All right. Very good.

And that's -- you had completed that term there at Fort Ord?

A. Yes.

Q. And, so that just worked out that you were getting out of the service. Then you got with Mr. Broadnax and moved to -- to Irving.

A. Yes.

Q. Okay. Did your term end in March of 1989?

A. Yes.

Q. Okay. Now, when Mr. Broadnax came to -- to join you there in Irving, were y'all living with his mother or did you have your own apartment?

304

A. Had my own apartment.

Q. And I understand that you became -- you became pregnant; is that correct?

A. Yes.

Q. Was Mr. Broadnax working at the time you became pregnant?

A. Yes. We were still both in the military at the time.

Q. Okay. And when was -- when did you give birth to your next child, Michael?

A. Um, November 13th, 1989.

Q. Okay. Now, at that point, were you a stay-at-home mom with James, our James, and newly born Michael?

A. James, Michael, and also NiQuia and Kerrin.

Q. You had the girls at that point?

A. Yes.

Q. Okay. Now, how were relationships with Mr. Broadnax going by the time he got down here to Irving?

A. At first they were -- everything was fine. And then once he got there, I mean, he started being violent and abusive towards me. Not the children. And --

Q. Abusive towards you and the children?

305

A. No, just me.

Q. Just you.

A. Yes.

Q. And as a consequence of that, what happened?

A. We separated and divorced.

Q. Okay. Now specifically, would that have been about in July of 1990 that you decided to -- to leave Mr. Broadnax and go back to Hope, Arkansas?

A. Yes.

Q. And you were going back to live with your mom?

A. Yes.

Q. Now, your father had died at that time.

A. Yes.

Q. Correct?

So you're going back to live with Betty Eason back in Hope.

A. Yes.

Q. What kind of car -- or how did you get -- how were you supposed to get from Irving to Hope?

A. I had a car. Um, I had a little red Sprint that I just kind of packed up whatever stuff that I could, and my children, and was on my way out.

Q. And how many kids were with you at that time, four?

A. Four.

FIRM NAME

306

Q. So that would be --

A. NiQuia, Kerrin, James and Michael.

Q. Okay. And did anything happen as you tried to go back to Hope, Arkansas?

A. Yes. James Broadnax, III, tried to stop me from leaving. He was in another car and he pulled up beside me and tried to make me pull over, and I wouldn't stop. So he rammed my car and ran me off the road. My car flipped three times. Landed on the wheels. Um, and --

Q. And were the kids in the car?

A. Yes.

Q. Were any of them -- did they even have safety seats back at that time for kids or --

A. Not --

Q. -- did you have any safety seats in the car?

A. No.

Q. So you got three little kids in the car and you've been rammed, the car flips three times, lands on its wheels. Were any of the kids injured?

A. Um, my three old -- NiQuia and Kerrin, they got some scratches and a couple of scrapes, and James ended up with a scar where some glass had cut him, and Michael, he got a couple of scratches, but that was about it.

307

Q. Okay. Did you have to take James to the hospital?

A. Yes.

Q. And do you recall if you went over here to Baylor?

A. We went to Parkland, I believe it was.

Q. Baylor or Parkland? One of the two?

A. I believe it was Parkland.

Q. And how old was James at that time?

A. Whew, James was right about -- he wasn't quite a year yet.

MR. LOLLAR: May I approach, Your Honor?

THE COURT: Yes, sir.

A. Well, he was over a year. That was in '90.

Q. (BY MR. LOLLAR:) Let me show you what has been marked here as Defendant's Exhibit Number 40, and I didn't have this to show you yesterday when we talked, but I want you just to take a look at that, and do you see that this is an affidavit and business records from Baylor Medical Center of Irving?

A. Okay.

Q. And just take a look through there. Does that bear a date on it?

A. Yes.

Q. What is the date?

308

A. 9/6 of '90.

Q. Okay. And just go ahead and take a look at these records right here for just a second and familiarize yourself with them.

A. Okay. (Examining document.)

Q. Do those appear to be the medical records of Baylor Medical Center at Irving in regard to James's trip to the hospital?

A. Yes.

MR. LOLLAR: We would offer Defendant's Exhibit 40.

THE COURT: Any objection?

MR. ALEX: No objection, Your Honor.

THE COURT: That's admitted.

This is also a good time to break for the day, so we're going to do that. And I will see the jury back here at 8:45 in the morning.

You are reminded not to discuss the case, not to look at any press. The lawyers will remain in here. We've got a lot of work to do tonight after the jury goes home.

All rise for the jury.

Have a good evening, folks.

(Jury not present.)

THE COURT: You may step down, ma'am. Be

309

back tomorrow morning, though, at 8:45, okay?

THE WITNESS: Yes, sir.

THE COURT: Be seated, please.

I have distributed the Court's proposed punishment Charge.

Has the State of Texas had the opportunity to inspect the Charge yet?

MS. HANDLEY: We have several of them.

MR. ALEX: We have, Judge.

THE COURT: Any objection?

MR. ALEX: No objection.

THE COURT: Has the defense had the opportunity to inspect the Charge?

MR. PARKS: We have, Your Honor.

THE COURT: Any objections?

MR. PARKS: Yes, sir, we do. And some of them are kind of standard, but some maybe not.

THE COURT: If you would prefer, we can address it in the morning. I just wanted to make sure everybody had seen it.

MR. PARKS: Oh, that's fine.

Yeah, I've seen it. In fact, we might just visit informally about one of the issues.

THE COURT: Okay. All right. That's enough of that.

FIRM NAME

August 17, 2009

**310**

Now, I took the liberty of examining the depositions in this case, and I take it you're going to want to play the videotape; is that right, Mr. Lollar?

MR. LOLLAR: Yes, sir.

THE COURT: All right. So given that, if there are objections, we need to get that fixed so that we can start making modifications to the tape, and so I'd rather do that tonight than tomorrow so we can get that squared away.

Now, I'll tell you what I did. I don't want to compromise your case in any way, Mr. Lollar, so if you don't want me to do this, I won't do it; okay? But I have looked at things that potentially might be objectionable, and I could bring that to y'all's attention.

However, if you don't want me to do that under some theory that I'm giving the State an advantage, I won't do it.

MR. LOLLAR: Well, --

THE COURT: But on the other hand, if we don't do that, then we won't be able to get that --

MR. LOLLAR: Those weren't delivered until this afternoon. I haven't had a chance to read the transcripts, and I certainly haven't seen the tapes.

MR. ALEX: I haven't either, Your Honor,

**311**

and I'd love to see them before we talk too much about them.

I know my counselor were there and they'll advise me, but we haven't even really had a chance to confab over it. I'd like a little time to do that.

THE COURT: Well, the tapes are going to be the same thing as the -- as the transcripts, so --

MR. ALEX: Right.

THE COURT: -- so the objections are going to be identical, one way or the other, so ...

MR. LOLLAR: Maybe if we could get here at 8:00 --

THE COURT: We said 8:30 before.

MR. LOLLAR: Do you want to back it up to 8:15 and then we can address the --

THE COURT: Well, I can tell you now. We don't have to play anything because I've reviewed them, okay? And it's pretty straightforward. Actually, the lawyers did a good job, both for the State and for the defense.

It's pretty concrete extenuation mitigation evidence for the most part. There are a couple of things. We don't need to spend Avogadro's Number of amount of time on it, I guess is what I'm trying to say.

**312**

MR. ALEX: Judge, we don't need to play anything? I don't know if I understand.

THE COURT: No. The tape's the same as the transcript, so for purposes of making my rulings, we don't need to play the tape.

MR. ALEX: Oh, I see. We just need to let you know if we've got any objections and then you'll rule on them.

THE COURT: Right.

MR. ALEX: I understand.

THE COURT: Because they're exactly the same.

MR. LOLLAR: So if we're here at 8:15, maybe we could address that issue?

THE COURT: I don't even think it will take that long, really. I mean, there's not a lot of objectionable stuff. There's some stuff in there that could be objected to, but not a lot. The lawyers for both sides did a good job.

MR. LOLLAR: Well, I knew they would.

THE COURT: Okay. So let's -- let's be here at 8:30.

MR. LOLLAR: 8:30.

THE COURT: Anything else we need to take up?

**313**

How many more witnesses you got?

MS. MALLON: 25.

THE COURT: How many more witnesses you got, Mr. Lollar?

MR. LOLLAR: Let me find my list.

THE COURT: My sense is that you probably don't have too many more. If you're putting mom on now, that's normally one of the last witnesses.

MR. ALEX: Un-uh.

THE COURT: Okay.

MR. LOLLAR: At least six.

MR. PARKS: Does that include the depos?

MR. LOLLAR: No, that does not include the depos, so we've got the eight. Nine, ten. I'm sorry. And then three custodian of records.

THE COURT: Okay. How long are these witnesses?

Do you think we can get the case to the jury tomorrow?

MR. LOLLAR: Audrey will be the longest witness.

THE COURT: Right.

MR. LOLLAR: I would say Wednesday.

THE COURT: Okay.

MR. LOLLAR: And then it depends on what

314

they do.

THE COURT: Okay. I understand all of that.

All right. Anything else we need to take up tonight?

MR. ALEX: Nothing on the record.

(Court adjourned.)

315

THE STATE OF TEXAS )

COUNTY OF DALLAS )

I, SHARON HAZLEWOOD, Official Court Reporter in and for Criminal District Court No. 7 of Dallas County, State of Texas, do HEREBY CERTIFY that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

Witness my hand this the 1ST day of _____, 2010.

_____

SHARON HAZLEWOOD, CSR
Certified Shorthand Reporter
Official Court Reporter
Criminal District Court No. 7
972-739-3906
Texas CSR No. 628
Expiration Date: 12/31/10

FIRM NAME