# TAMES Barcode Cover Sheet



861e53dc1fab4c93860086bbd3b27f92

| | |
|---|---|
| **Case Number:** | WR-81,573-01 |
| **Style:** | Broadnax, James Garfield |
| **Event Date:** | 10/22/2014 |
| **Event Details:** | HABEAS CORPUS RECEIVED - 11.071/This Court/11.071 WRIT RECD/11.071/ |
| **Filename:** | WR-81,573-01 11.071 WRIT RECD 11.071 10-22-2014 |
| **Document Description:** | RECORD--Volume 1 of 3 |
| **Document Remarks:** | 3 Volumes CR |
| **Document(s):** | |
| **Generated By:** | bhooper |
| **Generated On:** | 10/27/2014 11:06:02 AM |

SCANNED

APR 0 5 2016

355

**APPLICANT**  JAMES GARFIELD BROADNAX                    **APPLICATION NO.** 81,573-01

11.071 APPLICATION
FOR WRIT OF HABEAS CORPUS                    XXX

11.071 APPLICATION FOR WRIT OF HABEAS CORPUS IS DENIED WITH WRITTEN ORDER.

Per Curiam                                               5/20/15
**JUDGE**                                                 **DATE**

WR-81,573

Ex Parte:

JAMES GARFIELD BROADNAX

This document contains some
pages that are of poor quality
at the time of imaging.

CAUSE NO.: F-0824667 Y

IN THE CRIMINAL DISTRICT COURT NO. 7

DALLAS COUNTY, TEXAS

# DEATH PENALTY

---

## POST CONVICTION WRIT OF HABEAS CORPUS
## (ART. 11.07, V. A. C. C. P.)

---

RECEIVED IN
COURT OF CRIMINAL APPEALS

OCT 22 2014

Abel Acosta, Clerk

ATTORNEY FOR APPLICANT:

LYDIA M. V. BRANDT
THE BRANDT LAW FIRM, P.C.
P.O. BOX 850843
RICHARDSON, TX 75085-0843

ATTORNEY FOR STATE:

HON. CRAIG WATKINS

FRANK CROWLEY COURTHOUSE

DALLAS, TX 75207-4313

GARY FITZSIMMONS
DISTRICT CLERK
FRANK CROWLEY COURTHOUSE
133 N RIVERFRONT BLVD., LB 12
DALLAS, TEXAS 75207-4313

EX PARTE                                    *Cause No.F0824667-Y*

JAMES GARFIELD BROADNAX          IN THE CRIMINAL DISTRICT COURT NO. 7

                                          DALLAS COUNTY, TEXAS

_____**\*INDEX\***_____

(VOL. 1)

Clerk's Cover                                                        VOL.1-01

**Application for Writ 12-20-2011**                                  VOL.1-02

Writ Exhibits Vol. I of II 12-20-2011                               VOL.1-111

Writ Exhibits II of II 12-20-2011                                   VOL.1-290

Clerk Certificate                                                   VOL.1-352

No. F-0824667 Y

*Ex Parte:*

JAMES GARFIELD BROADNAX

**Application for Writ of Habeas Corpus**

**CRIMINAL DISTRICT COURT NO. 7**

**Dallas County, Texas**

CLERK'S COVER SHEET

Applicant's Name: **JAMES GARFIELD BROADNAX**

Offense: **CAP MUR FEL**

Case No.: **F08-24667-Y**

Plea to Offense: **Not Guilty**

Sentence: **DEATH - TDCJ;**Fine: **$0** ; Court Costs: **$460.00**

Trial Date : **August 21, 2009**

Judge's Name: **Judge Michael Snipes**

Appeal: **YES**

Court of Appeals Cause Number: **AP-76,207**

Reporter: **UNKNOWN**
(If Applicable)

Hearing Held: **NO**

Findings of Fact & Conclusions Filed: **YES**
(Pertaining to the Application for Writ)

Recommendation: **DENY**
(Trial Court's recommendation regarding Application)

Judge's Name: **Judge Michael Snipes**

Name of Counsel if Applicant is represented: **Lydia M. V. Brandt**

1



IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TX

2011 DEC 20  ʡ: 9: 48

---

**TCCA Cause No. AP-76,207**
Criminal District Court No. 7, Cause No. F08-24667-Y

---

**Ex Parte JAMES GARFIELD BROADNAX**, Petitioner

---

*Application*
For Post Conviction Writ of Habeas Corpus
under TEX. CODE CRIM. PROC. § 11.071

&
*Motion for Evidentiary Hearing*

&

*Motion for Oral Argument before Texas Court of Criminal Appeals*
(constitutional challenge to statute, facially & as applied)

&
*Exhibits*
(in Support Thereof in Separate Volumes I and II)

---

**DEATH-PENALTY CASE**

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR JAMES BROADNAX

2

TABLE OF CONTENTS

TABLE OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.   Basis of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.   Overview of Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        A.   Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        B.   Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        C.   Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        D.   State Habeas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  GROUND ONE (Denial of *Procedural* Right to Counsel and Due Process, and to Equal
    Protection, Re: Media Interviews — 6th and 14$^{1}$h amendment violations). Mr.
    Broadnax was denied his procedural 6th & 14th amendment right to counsel, due
    process of law, and equal protection, during the media interviews . . . . . . 5
  GROUND TWO(Denial of *Substantive* Right to Counsel and Due Process, and to Equal
    Protection, Re: Media Interviews — 6th and 14th amendment violations). Mr.
    Broadnax was denied his substantive 6th & 14th amendment right to counsel, due
    process of law, and equal protection, during the media interviews . . . . . . . 5
        A.   Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            1.   Year 2007:  Texas Fair Defense Act & Dallas County
                              Procedures for Appointment of Counsel in Death
                              Penalty Cases . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            2.   06-21-2008:  Both Mr. Broadnax and Mr. Cummings were
                              arraigned; the 6th amendment right to counsel
                              attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            3.   06-23-2008:  TV Interviews of Mr. Broadnax . . . . . . . . . 10
            4.   Year 2008:  Dallas County computer problems were
                              "catastrophic" & affected case management . 11
            5.   06-23-2008:  Appointment of Maedgen for co-defendant
                              Cummings . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            6.   06-24-2008:  Appointment of Lollar for Broadnax . . . . . . 16
            7.   08-04-2009:  Suppression Ruling: "Not Even Close" . . . . 17
        B.   Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            1.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                a.   Procedural and Substantive Right to Counsel . . . . . 20
                b.   Structural Error & Automatic Reversal . . . . . . . . . 21
                 c.   Constitutional Challenges to Statute, Facially & As
                     Applied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

3

2.    Both on its face and as applied, the Texas Fair Defense Act and the Dallas County procedures implementing it, violated Mr. Broadnax's *procedural* 6th and 14th amendment right to counsel and to due process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3.    Both on its face and as applied the Texas Fair Defense Act, and the Dallas County Procedures implementing it, violated Mr. Broadnax's *substantive* 6th and 14th amendment Right to Counsel and to due process of law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    a.    More Compelling Interest of Broadnax . . . . . . . . . . 27
    b.    Media Interviews A "Critical Stage" . . . . . . . . . . . . 28

4.    Equal Protection Violation: The denial of counsel violated Mr. Broadnax's right to equal protection . . . . . . . . . . . . . . . . . . 31

5.    Materiality & Unfairly Prejudicial: The media interviews were material and unfairly prejudicial . . . . . . . . . . . . . . . . . . . . . . 32

    a.    Had Mr. Lollar been appointed on June 23, 2008, he would have stopped and/or prevented the media interviews altogether . . . . . . . . . . . . . . . . . . . . . . . . 33

    b.    The Dallas County judges, prosecutors and defense bar were aware that the media sought immediate access to persons accused of capital crimes, including Mr. Broadnax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    c.    Judge Michael Snipes is aware of the material and unfair prejudice done by uncounseled media interviews . . 34

    d.    The uncounseled media interviews were the focal point in both phases of the trial . . . . . . . . . . . . . . . . . . . . . . . 35

        (1)    Guilt/Innocence Phase: The prosecutor played the media interviews on both days of its presentation in guilt/innocence . . . . . . . . . . . . . . . . . . . . . . 36

        (2)    Punishment & Gang Membership: The prosecutor referred to the media interviews to argue gang membership . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        (3)    Punishment & Psychopathy: The prosecutor referred to the media interviews to argue psychopathy . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        (4)    The Texas Court of Criminal Appeals supported its affirmation of future dangerousness in direct appeal on the television interviews . . . . . . . . 39

    e.    The jurors notes and interviews confirm the media interviews were material and unfairly prejudicial . . 40

6.  Mr. Broadnax did not voluntarily and knowingly consent to the uncounseled media interviews ...................... 41

7.  The error is structural; automatic reversal must follow .... 42

8.  Conclusion ........................................ 43

GROUND THREE (IAC & Media Interviews – 6th and 14th amendment violations). Mr. Broadnax was denied his federal constitutional right to effective assistance of counsel, who failed to perform an adequate investigation into, and develop and present, the facts of Lollar's appointment and the media interviews .... 44

A.  Statement of Facts .................................... 44

B.  Argument and Authorities .............................. 44

1.  Standard of Review ......... .................... 44

2.  Constitutionally deficient performance for failure to adequately investigate, develop and present the facts of Lollar's appointment and media interviews ............................. 46

3.  Reasonable probability of different outcome ........... 49

GROUND FOUR: (False and Misleading Gang Testimony  -8th & 14th amendment violation). Mr. Broadnax was denied his right to due process and to be free from cruel and unusual punishment, through false and misleading evidence of gang affiliation sponsored by the prosecution ...................... 51

A.  Statement of Facts .................................... 51

1.  Prosecution Discovery Notices ...................... 51

2.  Prosecution Gang Expert, Detective Nelson ........... 52

3.  The Jury Notes .................................... 54

B.  Argument and Authorities ............................. 54

1.  Standard of Review .............................. 54

2.  Nelson's testimony was false and misleading .......... 55

    (a)  Statutory criteria ........................... 55

    (b)  Broadnax did not satisfy the statutory criteria ..... 58

    (c)  Broadnax not in Dallas County gang database ..... 62

3.  The evidence of gang membership was material and unfairly prejudicial; and raised the reasonable likelihood of the adverse outcome at trial ................................. 63

GROUND FIVE: (Free Speech & Gang Evidence- pt and 14th amendment violations). Mr. Broadnax was denied his right to free speech by materially false and misleading evidence of gang affiliation ........................... 66

A.  Statement of Facts .................................... 66

B.  Argument and Authorities ............................. 66

1.  Standard of Review .............................. 66

2.  The prosecution violated Broadnax's free speech rights ... 67

GROUND SIX: (IAC & Gang Evidence — 6th & 14th amendment violation). **Mr.** Broadnax was denied his right to effective assistance of counsel, who failed to object to, and/or properly cross examine on, and/or call its own defense gang expert to refute evidence of gang affiliation ........................ 68

    A.   Statement of Facts ............................... 68

    B.   Argument and Authorities ............................. 68

        1.   Standard of Review ............................... 68

        2.   Constitutionally Deficient Performance .............. 70

            a.   Deficient Performance ....................... 70

                (1)   The pre-trial investigation into gang membership was superficial ........................ 70

                (2)   Failure to adequately object to, and/or cross-examine the prosecutor's gang expert, and/or offer rebuttal testimony ..................... 71

            b.   Reasonable Probability of Different Outcome ..... 73

GROUND SEVEN: (ASPD & PCL-R- Use of False and Misleading Evidence : 8th and 14h amendment violations). Mr. Broadnax was denied his right to due process, and to be free from cruel and unusual punishment when the prosecution used materially false and misleading evidence of future dangerousness based on ASPD and PCL-R ............. .................. ....... 75

    A.   Statement of Facts ................................. 75

    B.   Argument and Authorities ......................... 79

        1.   Standard of Review ............................. 79

        2.   The evidence of ASPD and psychopathy to prove future dangerousness was false and misleading .............. 81

        3.   The evidence of psychopathy was material and unfairly prejudicial ..................................... 82

GROUND EIGHT (IAC & ASPD, PCL-R- 6th and 14th amendment violations). **Mr.** Broadnax was denied his right to effective assistance of trial counsel, who sponsored defense expert testimony of ASPD, which opened the door to the prosecutor-sponsored, unreliable and invalid testimony on psychopathy and ASPD ...................................................... 86

    A.   Statement of Facts ................................. 86

    B.   Argument and Authorities ............................. 86

        1.   Standard of Review ............................... 86

        2.   Constitutionally Deficient Performance .............. 88

            a.   Deficient Performance ....................... 88

            b.   Reasonable Probability of Different Outcome ..... 89

CONCLUSION ....................................................... 91

"VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

MOTION FOR EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

MOTION FOR ORAL ARGUMENT
      BEFORE TilE TEXAS COURT OF CRIMINAL APPEALS . . . . . . . . . . . . . . . 96

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

## EXHIBITS

| | |
|---|---|
| State App. Exhibit 1: | Dallas County Procedures for Appointment of Counsel in Death Penalty Cases, As Amended May 2007 |
| State App. Exhibit 2: | Dallas Counsel Indigent Defense Plan for the Appointment of Counsel in Felony Cases, Revised January 2009 |
| State App. Exhibit 3: | Business Records Affidavit, and Sheriffs Dept Records (Dallas County Book In) |
| State App. Exhibit 4: | 2008 Calendar |
| State App. Exhibit 5: | Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Broadnax) |
| State App. Exhibit 6: | Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Cummings) |
| State App. Exhibit 7: | Business Records Affidavit, and Sheriff's Dept Records (Media Requests) |
| State App. Exhibit 8: | Devin Krause, *County IT in Dismal Shape*, DALLAS MORNING NEWS (Sept 29, 2010) |
| State App. Exhibit 9: | Devin Krause, *Audit Confirms IT Deficiencies*, DALLAS MORNING NEWS (Jan 18, 2011) |
| State App. Exhibits 10, 11, 12: | Tatum Report: Final Report of Findings; Final Report of Recommendations; Summary of Findings and Recommendations |
| State App. Exhibit 13: | Cmptr Print Out (B070, Lollar/Broadax) |
| State App. Exhibit 14: | Cmptr Print Out (B070, Maedgen/Cummings) |
| State App. Exhibit 15: | Email from Dana Wrisner, Criminal District Manager |

State App. Exhibit 16:     Cause No. FOS-24629, Trial Docket Sheet

State App. Exhibit 17:     Business Records Affidavit, Jail Visitors log

State App. Exhibit 18:     Affidavit of Brad Lollar

State App. Exhibit 19:     (deliberately omitted)

State App. Exhibit 20:     Affidavit of Auditor and Billing Records

State App. Exhibit 21:     Lollar Request: No Media, No Law Enforcement

State App. Exhibit 22:     SCOTT GOLDSTEIN, *Prosecutors Undecided on Pursuing Death Penalty in Farmers Branch Police Officer's 1983 Slaying*, DALLAS MORNING NEWS (9-10-2010)

State App. Exhibit 23:     Affidavit of Jennifer Reif

State App. Exhibit 24:     Affidavit of Cliff Jenkins Affidavit

State App Exhibit 25:      of Stewart (gang expert)

State App Exhibit 26:      Affidavit of Edens, Ph.D. (ASPD & PCL-R)

## <u>TABLE OF ABBREVIATIONS</u>

The following are a list of abbreviations used within the pleading:

CR _____            CR is the abbreviation for Clerk's Record, as required by TEX. R. APP. PROC. 34.1. It is followed by the volume number before the colon, and the page numbers after the colon.

RR _____            RR is the abbreviation for Reporter's Record, pursuant to TEX.R. APP. PROC. 34.1, which is the trial transcript testimony recorded by the court reporter. The abbreviation RR is followed by the volume number before the colon, and the page numbers after the colon.

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS          vii

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
CRIMINAL DISTRICT COURT NO.7, DALLAS COUNTY, TX

| | |
|---|---|
| Ex Parte James Garfield Broadnax,<br>*Applicant,* | TCCA No. AP 76,207<br>Trial Court Cause No. FOS-24667-Y |

## APPLICATION FOR POST CONVICTION WRIT OF HABEAS CORPUS UNDER TEX. CODE CRIM. PROC. § 11.071

James Broadnax (hereinafter also referred to as Applicant) petitions pursuant to TEx. CoDE CRJM. PROC. § 11.071 for a writ of habeas corpus because he is confined by the State of Texas under a sentence of death, in violation of the laws and constitutions of the State of Texas and of the United States. Applicant has never before sought habeas corpus relief for these convictions and sentences. This is his first appearance in state court for this purpose.

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS

11

# INTRODUCTION

1.    BASIS OF CONFINEMENT.

James Garfield Broadnax, inmate number #999-549, is confined by the Texas Department of Criminal Justice, Institutional Division, by Rick Thaler, Director, Texas Department of Criminal Justice. Applicant is being denied his liberty and also faces execution under an unconstitutional conviction for capital murder and the concomitant sentence of death.

2.    OVERVIEW OF PROCEDURAL HISTORY.

A.    Indictment. Mr. Broadnax was originally charged in Cause No. FOS-24629 with capital murder and arraigned on June 21, 2008. The case was initially assigned to Criminal District Court# 1, Judge Robert Burns, and reassigned to Criminal District #7, Judge Michael Snipes. Subsequently this case was dismissed, but only after Mr. Broadnax had been charged with capital murder in Cause No. FOS-24667.

Under this latter Cause No. FOS-24667, Mr. Broadnax was indicted on September 8, 2008. The indictment alleged that on or about the June 19, 2008, he did

> unlawfully then and there intentionally cause the death of Stephen Swan, an individual, hereinafter called deceased, by shooting the deceased with a firearm, a deadly weapon, and the defendant was then and there in the course of committing and attempting to commit the offense of robbery of the deceased.

(CR 1:2).

---

B.    Jury Trial.  The defense counsel were Bradley Lollar, lead counsel, and co-counsel Keri Mallon and Douglas Parks.  The presiding judge was Michael Snipes.  The guilt/innocence phase of the trial was held beginning on August 10, 2009.  (RR Vol. 45).  The jurors returned a unanimous verdict of guilty on August 12, 2009.  (RR Vol. 47:203; CR 3:635).  The punishment phase began on August 13, 2009.  (RR Vol. 48).   On August 20, 2009, the jurors answered "yes" to the future dangerousness special issue No. 1, and "no" to the mitigation special issue No.2. (RR Vol. 54:4-5; CR 3:650, 651).  On August 21, 2009, the trial judge sentenced Mr. Broadnax to death.  (RR Vol. 54:7; CR 3:698).  The Motion for New Trial was denied.  (CR 3:701).

C.    Direct Appeal.  Mr. Broadnax filed his Notice of Appeal on August 21, 2009 Mr. John Tatum was appointed to represent Mr. Broadnax.  The direct appeal raised fifty-six (56) issues. *See* Direct Appeal Brief.

D.    State Habeas.  On August 24, 2009, undersigned counsel, Lydia Brandt, was appointed to represent Mr. Broadnax in this state habeas. (CR 3:705).  (Order of Texas Court of Criminal Appeal, dated September 14, 2009).  The State of Texas filed its direct appeal brief on August 10, 2011.  Under TEX. CODE CRIM. PROC. 11.071 § 4(a), the application for writ of habeas corpus is due "not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals...." However, TEX. CODE CruM. PROC. 11.071 § 4(b) permits the trial judge to grant one, ninety (90) day extension for good

cause. Mr. Broadnax requested that ninety (90) day extension, and the trial court granted it, making the application for writ of habeas corpus due on or before December 23, 2011. Hence, this Application is timely filed.

GROUND ONE (Denial of *Procedural* Right to Counsel and Due Process, and to Equal Protection, Re:Media Interviews – 6 th and 14th amendment violations). Mr. Broadnax was denied his procedural 6th & 14th amendment right to counsel, due process of law, and equal protection, during the media interviews

GROUND Two (Denial of *Substantive* Right to Counsel and Due Process, and to Equal Protection, Re:Media Interviews – 6 th and 14th amendment violations). Mr. Broadnax was denied his substantive 6th & 14th amendment right to counsel, due process of law, and equal protection, during the media interviews

A.    Statement of Facts

1.    Year 2007:  Texas Fair Defense Act & Dallas County Procedures for Appointment of Counsel in Death Penalty Cases

Both on its face, and as applied, [1] the Texas Fair Defense Act, and the Dallas County Procedures implementing it, are unconstitutional because they violated Mr. Broadnax's procedural and substantive 6th and 14th amendment rights to counsel.  "Once attachment 't.. .. occurs, the accused at least is entitled to the presence of appointed counsel during any "critical stage" of the postattachment proceedings; what makes a stage critical is what shows the need for counsel's presence." *Rothgery,* 554 U.S. at 212 (Alito,

In the case at bar, the media interviews of Mr. Broadnax were a "critical stage" in the proceeding, because they were events that "so prejudice[d] the outcome of the defendant's prosecution that, as a practical matter, [Mr. Broadnax had to] be represented ... in order to enjoy genuinely effective assistance of counsel." *Rothgery,* 554 U.S. at 217.

---

Pursuant to TEX. CIV. PRAC. & REM.CODE § 37.006(b) (Vernon 2008), the Office of the Attorney General has been notified of this challenge by service of this pleading.

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS            5

However, Dallas County failed to appointment counsel to represent Mr. Broadnax at the time of the media interviews, a critical stage in the proceedings. The appointment of connsel in Dallas County is impermissibly premised on a "specified period after [an accused's} magistration," rather than on the need for counsel in a "critical stage" of the postattachment proceedings.  *See Rothgery*, 554 U.S. at 217 (Alito, J. concurring, Roberts, Scalia, JJ. join).

Texas Fair Defense Act

On September 1, 2007, the Texas Fair Defense Act2 became effective. It provides:

> In a county with a population of 250,000 or more, the court or the courts•
> designee shall appoint counsel as required by this subsection *immediatelv*
> *followinthe expiration of one working day after the date on which the court*
> or the courts' designee receives the defendant's request for appointment of
> counsel.

TEX. CODE CRIM. PROC. Art. 1.05l(i) (emphasis supplied).

---

[2]   The Texas Fair Defense Act and the revised 2009 Dallas County procedures continue to hinge on a specific period from the magistration. *Compare* State App. Exhibit 2:  Dallas County Indigent Defense Plan For the Appointment of Counsel in Felony Cases (amended 2009) (para. 4.3 "Counsel shall be appointed for eligible defendants within one working day of the court's receipt of a request for appointed counsel").

Dallas County Procedures
for Appointment of Counsel in Death Penalty Cases

The Dallas County procedure, recites in pertinent part:

Appointment of Counsel

.... Attorneys shall be appointed *as soon as practicable* after charges are filed, unless the state gives notice in writing that the state will not seek the death penalty.

State App Exhibit 1:Dallas County Procedures for Appointment of Counsel in Death Penalty Cases, As Amended May 2007.

2.     06-21-2008: Both Mr. Broadnax and Mr.Cummings were arraigned; the 6tb amendment right to counsel attached

Mr. Broadnax was booked in to the Dallas County jail on June 21, 2008 at 2:51 am and assigned to the North Tower under Book-In No. 08047374. State App. Exhibit 3: Business Records Affidavit, and Sheriffs Dept Records (Dallas County Book In).

Mr. Broadnax requested appointment of counsel, which is reflected by him completing a Defendant's Affidavit ofIndigence for Cause No.F08-24629, on June 21,2008 at 5:45am (a Saturday). State App. Exhibit 4:2008 Calendar. This document was signed by Magistrate Vickery on that same date, and the case was assigned to Criminal District Court No. 1 (CDC# I), Judge Robert Burns. State App.Exhibit 5: Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Broadnax).

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                7

The "Order" portion of the Defendant's Affidavit of Indigence for Cause No. F08-24629, contains a handwritten entry reciting the appointment of "Brad Lollar" to represent Mr. Broadnax. However, the Order does not recite the date of the appointment.

Damarius Dwight Cummings, the co-defendant, completed a Defendant's Affidavit of Indigence for Cause No. FOS-24628,[3] on June 21, 2008 at 5:32 am (a Saturday). It was signed by Magistrate Vickery on that same date and assigned to Criminal District Court No. 7. State App. Exhibit 6: Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Cummings).

The "Order" portion of the Defendant's Affidavit of Indigence for Cause No. F08-24628, contains a handwritten entry reciting the appointment of "Ward Maedgen" to represent Mr. Cummings. However, the Order does not recite the date of the appointment.

---

[3]    Subsequently, Cause F08-24628 was dismissed on January 28, 2011, and Mr. Cummings was charged with capital murder in Cause No. F08-24666.

uauas L.oumy, 1exas

ORDER

On this the _____ day of _____ the Court, avmg reviewed the foregoing affidavit finds t e e en us mdtgent and to eflFloy **hereby** approves the affidavit and appoints;
(1.) TheHonorable ('£V(J__ , Phone:
(2.) The Chief Public efender represented by the Honorable — —  — ——  — —• Phone·
• a practJcmg attorney of this state to represent the defendant in said causes.

Signed this _____ day of _____ _____

_____
Judge, CriminalDistrict Court No. 1 (FK}
Dallas County, Texas

## State App. Exhibit 5: Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Broadnax)

★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★ ★

ORDER

On this the: _____ day of _____ , _____ ,the Court.having reviewed the foregoing affidavit finds the defendant is indip:m ami : **' ! '' '! Y sc i** , a h:Teby approvn the affidavan i)Oi:
(1.) ThcHononablc **C/____ ///d./__ .Phone: eJ7- £1 J** ,
(2.) The Chief Public Defender represented b)' the onol 1ble — —  •--·-,....-..,...,.....•
Phone:_____a pnacticing anomey of this state to represent thi! dl!fendam in said caiJSts.

Signed lhis _____ day o( _____ — — — —

_____
j;dgc, CriminalDletrict Court No.7 (FY)
Dallas Counry, Texas

## State App. Exhibit 6: Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Cummings)

_____
EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS        9

3.    06-23-2008: TV Interviews of Mr. Broadnax

Psych assessor, Jason Varghese, and psychiatrist, Dr. H. Mirrnesdagh, had evaluated Mr. Broadnax on June 23, 2008 at the Dallas County jail (formally named the Lew Sterrett Justice Center) before the media interviews **ancr** him as being psychotic due to polysubstance abuse. (RR 43:74; 50:85-86). The medical records reflect that before his arrest, and on June 23, 2008, **Mr.** Broadnax had been having auditory and visual hallucinations and was delusional, that he had no memory of talking to reporters on June 23, 2008, and that he was on "whack" [the street term for PCP] at the time of the commission of the charged offense. (RR 50:86-87). It is a substance that can cause psychosis even a month after its ingestion. (RR 50:89-92). Mr. Broadnax was 19 years old at the time.

Nonetheless, reporters from various television stations, including channels 4, 5, 8, and 11, were allowed to interview and videotaped Mr. Broadnax:

> On June 23, 2008 Ellen Goldberg, a reporter for KXAS NBC-5 ("NBC-5"), conducted an interview of defendant James Broadnax. The entire interview was taped. Before Broadnax spoke to Goldberg, he gave interviews to several other local television stations. In the first interview, Broadnax initially denied killing two men outside a Christian recording studio in Garland a few days earlier. But, as the interview progressed, he began to change his story and eventually confessed to the two murders. During later interviews (including a brief interview with Goldberg), Broadnax gave similar confessions.
>
> Shortly thereafter, the Dallas County District Attorney's Office (the "DA's Office") subpoenaed the video outtakes of these interviews from the television stations, including NBC-5. Like other stations, NBC-5 complied with the subpoena, producing all tapes of its interview with Broadnax. ....

(CR 2:348; RR 43:3).

The media interview requests received from the Dallas County Sheriffs Officer contained a faxed time/date stamp of 10:08 am, June 23, 2008 (bottom). State App Exhibit 6: Business Records Affidavit, and Sheriff's Dept Records (Media Requests).[4] During the suppression hearing on the media interviews, Steve Pickett, the first reporter to interview Mr. Broadnax was not asked what time he had conducted the interview. However, the record does reflect that the second interview of Mr. Broadnax by Channel 8 was conducted in the early afternoon about 12:30 pm or 1:00pm. (RR 43:49, 55). Hence, it appears that the interview themselves did not begin until after 10:08 am on June 23, 2008.

::.l Pt is

4.    Year 2008: Dallas County computer problems were "catastrophic" & affected case management

In 2008, the Dallas County computer was "faulty, inadequate and outdated, ...." State App Exhibit 8:Devin Krause, *County IT in Dismal Shape,* DALLAS MORNING NEWS (Sept 29, 2010). In 2008, an outside, independent consultant, Miami-based eGov Consulting Services, issued a report that "**gave** the county computer system its lowest rating in seven out of eight categories."*ld* Indeed, one ofthe Dallas County Commissioners had described the problems with the computer system as "catastrophic," and "on life support." *Id.* State App Exhibit 9: Devin Krause, *Audit Confirms IT Deficiencies,* DALLAS MORNING NEWS (Jan 18, 2011).

---

4    The fax time/date stamp at the top shows a date of June 20, 2008 at 7:38. Mr. Broadnax was not at the Dallas County jail at that time; he was in the Garland facility. State App Exhibit 3: Business Records Affidavit, and Sheriffs Dept Records (Dallas County Book In). *See also* RR 39:14-15. Even as early as June 20, 2008, Mr. Broadnax had requested appointment of counsel when he in the Garland jail.

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS            11

The problems noted in 2008 continued into 2010, despite reports from three separate consultants (Miami-based EGov Consulting Services, Deloitte & Touche, and Atlanta-based Tatum, LLC), who over the years had put Dallas County on notice. Among the 2010 Tatum findings:

> *The Adult Information System, the county's main criminal justice computer system, is unstable and has problems that affect* jail operations, public safety and *case management.*

State App Exhibit 8: Devin Krause, *County IT in Dismal Shape*, DALLAS MORNING NEWS (Sept 29, 2010); State App Exhibits 10, 11, 12:  Tatum Report: Final Report of Findings; Final Report ofRecommendations; Summary of Findings and Recommendations.

### 5.    06-23-2008: Appointment of Maedgen for co-defendant Cummings

In the year 2008, the computer system did not capture the appointment notifications in "real time," unlike current practice in 2011.[5]  Case management and concomitant

---

[5]    According to several telephone calls on November 29, 2011(fii Wris}i;)stated that in 2008, court appointments were typically done by telephone notification with the court coordinator calling into the telephone number of the attorney that is on file with the court. However, the appointment could also be done in person, when the attorney was at the courthouse. The date entered on the computer print out of 6/24/08, is reflective only of the date when the court-coordinator manually entered Mr. Lollar's name as appointed counsel.

In 2011, a court coordinator can email notification to counsel that will capture in "real time," the actual time and date of notification and appointment of the attorney. The process of reassigning death penalty cases through the presiding judge, a new procedure to ensure the uniform assigned of capital cases did not go into effect until October 1,2009. Mr. Wrisner stated in the November 29, 2011 conversations that she was not permitted to provide an without a written request being made and submitted to all the Dallas County judges for tlleir"prior approval.

---

Ex PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                    12

appointment of counsel problems are reflected in the computer, and print, records of Dallas County.

Both Mr. Cummings, and Mr. Broadnax had been arraigned by the same Magistrate Judge, Judge Vickery, on June 21, 2008 at 5:32 am (Cummings) and 5:45 am (Broadnax), respectively. Both completed the Defendant's Affidavit of Indigence on June 21, 2008 (a Saturday). State App Exhibit 6: Cummings FOS-24628; State App Exhibit 5: Broadnax Trial Docket FOS-24629.

The Dallas County Computer Print out shows that Mr. Ward Maedgen was appointed as counsel for co-defendant, Mr. Cummings. It is dated June 23, 2008 in Cause No. F08-24628. State App Exhibit 14: Computer Print Out (under B070 entry). The Dallas County computer printout shows that Brad Lollar was appointed as counsel for Mr. Broadnax. Mr. Lollar's name was input into the computer on June 24, 2008 at 10:09 am in Cause No. F08. State App Exhibit 13: Computer Print Out (under B070 entry); State App Exhibit 15: Email from Dana Wrisner, Criminal District Manager. Although they had been arraigned within a matter of 15 minutes of each other, Mr. Broadnax was appointed counsel one-day later (June 24, 2008) than Mr. Cummings had counsel appointed for him (June 23, 2008).

DA CASE ID F-0824629          JUDCL CASE ID F-0824629

A010 DEF NAME BROADNA          COIO OEF NAME BROADNA

NAMfS

8070

ASSOCIATED NAME LOLLAR_BRAD_____          NAME REF CODE ⊂⊃

Cf APPOINTED Y  BAR NO _____BOND MAKER _  DT BOND MADE_____          _ ＼

B070

ASSOCIATED NAME ALEX_DAVID_____          NAME REF CODE LP0809080

CT APPOINTED_  BAR NO --- BOND MAKER_  DT BONO MADE _____

State App. Exhibit_ : B70 Broadnax 6-24-2008

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NAMES

8070

ASSOCIATED NAME MAEDGEN_WAR0_2/2076595_____          NAME REF CODE C  0806230

CT APPOINTED Y  BAR NO -----BOND MAKER_  DT BOND MADE_____          _

8070

ASSOCIATED NAME JOHNSON_PAUL·-----          NAME REF CODE CD0911050

CT APPOINTED Y  BAR NO ----BOND MAKER _  DT BONO MADE---

8070

ASSOCIATED NAME ALEX_DAVID_____          NAME REF CODE LP0809080

CT APPOINTED _  BAR NO _____ BOND MAKER_  DT BOND MADE _____

State App. Exhibit__ : B70 Cummings 6-23-2008

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS          14

There is no document in the court files that capture the dates of appointments:

Cause No. FOS-24629. As aforementioned, the "Order" of appointment of Mr. Lollar does not record the date of appointment for Cause No. FOS-24629, the case under which Mr. Broadnax was initially charged. There is no other entry in this file (as for example a Trial Docket Sheet), which records the date of appointment for Mr. Lollar. State App. Exhibit 16: Cause No. FOS-24629, Trial Docket Sheet.

Cause No. FOS-24667. The Clerk's Record for Cause No. F08-24667 (the current case in litigation) is silent as to the date on which Mr. Lollar was appointed by the court to represent Mr. Broadnax. No where in the Trial Docket sheet is there an entry reflecting both the name *and* date on which lead defense counsel, Brad Lollar, (or the two other trial attorneys, Doug Parks and Keri Mallon) was appointed. (CR 1:4, 8, 13).

Likewise, there is no individual written court order in the clerk's record for Cause No. F08-24667 that memorializes the date on which any of the three, trial-defense counsel (Lollar, Parks, Mallon) were appointed to represent Mr. Broadnax.

Neither the court coordinator for CDC #1, Helen Wilhelm, or the court coordinator for CDC #7, Sharon Johnson, had any independent recollection of the appointment of Mr. Lollar in 2008.[6]

---

[6]   This information was learned in several telephone calls on November 28, 2011 between undersigned counsel and Ms. Johnson, and on November 30, 2011 with Ms. Wilhelm.

6.     06-24-2008: Appointment of Lollar for Broadnax

Mr. Lollar represented to the court at the August 4, 2009 hearing to suppress the media interviews that "[t]he records reflect that/ *was not appointed by this Court until the next day following these interviews* [by channels 4, 5, 8, and II on June 23, 2008], and at that time I immediately cut off his access to the press and to other law-enforcement agencies." (RR 43:108-109). *See also* RR43:24, 28-29, 72 ("I was not appointed until the morning June 24th ...."; "no other lawyer had been to see him prior to the time I went to see him on June 24th ....").

In his affidavit, Mr. Lollar describe!'l the circumstances of his appointment as reflective of his position that he had been appointed on June 24, 2008:

6.     Although many of my time sheets and other documents recite that I was appointed on June 23, 2008, I had checked the computer printout for Dallas County and it records my name as counsel appointed to represent Mr. Broadnax, followed by the date, June 24, 2008.

7.     I believe that I was appointed on June 24, 2008, the day after the media interviews on June 23, 2008, based on my recollection of the circumstances of my appointment, which are as follows:

a.     I was appointed on the same day as I visited Mr. Broadnax in the Dallas County jail. The jail visitor log[7] shows that I saw Mr. Broadnax for the first time on June 24, 2008.

b.     I also recall that I had seen the broadcasts of the media interviews of Mr. Broadnax before I had been appointed to represent Mr. Broadnax. The media interviews had been the "talk of the courthouse," and the defense bar was saying that as a result of the broadcasts, they "felt sorry" for whoever got appointed to the

---

[7]     *See* State App. Exhibit 17: Business Records Affidavit, and attached Jail Visitors list.

case because of the difficulty it would cause in representing the accused.

c.    Because I had already seen the media interviews before I had been appointed, upon learning of the appointment and immediately before I visited Mr. Broadnax in the Dallas County jail, I prepared a written document. That written document was drafted by me to prevent any further media or law enforcement interviews of Mr. Broadnax. I hand delivered that writing to jail personnel who were authorized to prevent further interviews, and I did that immediately before I visited with Mr. Broadnax at the jail.

8.    My billing records also show that I had requested payment for work in the Broadnax case for the period that began on June 24, 2008.

State App. Exhibit 18: Affidavit of Brad Lollar.

Upon information and belief, defense counsel had not done any due diligence pre-trial or trial investigation into, or sought to develop, and to present the facts underlying his appointment.

7.    08-04-2009: Suppression Ruling: "Not Even Close". Upon information and belief, prior to the August 4, 2009 hearing, defense counsel had not performed any due diligence pre-trial or trial investigation into, or sought to develop, and to present the facts that would have revealed the "who, when, where, or how" media personnel *initially* learned about Mr. Broadnax's presence at the Dallas County jail. *Compare* RR 43:15-16. Defense counsel speculated that Dallas County law enforcement had "tipped off" the media to Mr. Broadnax's presence in the Dallas County jail. This appears to have been the basis of their objection — "reporters-as-state-agents" — at the suppression hearing.

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS         17

27

Had a due diligence investigation been done prior to the hearing, defense counsel would have learned

> that the media can and does obtain location information from various public information sources, without prior law enforcement contact. They also would have learned that sometimes, to avoid answering questions, the media invokes legal privilege even outside a courtroom setting. With these facts, defense counsel would have been alerted to possible problems asserting "reporters as state agents," and been on notice to explore other theories as well.

State App. Exhibit 24: Affidavit of Iiff Jenkin }

Without adequate defense preparation, the prosecutor took charge of the August 4, 2009 suppression hearing instead of the defense. The prosecutor framed the two (2) issues for resolution as being whether reporter(s) who interviewed Mr. Broadnax:

- "were acting as an agent of the State," and

- if they did anything to overcome his free will"

(RR 43:5-6, 37, 64, 84).

There were no questions at the hearing from the defense about the "who, when, or how" the news station personnel (such as the reporter's assignments editor) *initially* learned that Mr. Broadnax was present at the Dallas County jail *(i.e.,* by a communication initiated by law enforcement, or instead from their own due diligence searches of public information sources).

- Shawn Rabb, reporter for KDFW (Channel 4), was asked by the prosecutor: "Before you got the word that you could go out and interview him, had you had any contact with law enforcement about interviewing him?" (RR 43:7, 9). His response was vague: it was

EX PARTE JAMES BROADNAX: APPLICATION FOR POST CONVICTION WRIT OF HABEAS CORPUS          18

"company procedure in murder cases, someone at the station files an interview request." (RR 43:7).

- Rebecca Lopez, a reporter for WFAA (Channel 8), was asked by the prosecutor whether she had "had any contact with law enforcement as it related to any of the defendant's rights"prior to her assignments editor called to say that Mr. Broadnax had agreed to an interview. Ms. Lopez testified:"I had not had any contact with law enforcement." (RR 43:40, 60-61).

- Mr.Steve Pickett, a reporter for Channel1!, (RR45:117). was asked by the prosecutor: "[P]rior to getting that assigrunent, had you had any conversations with anybody from law enforcement about interviewing the defendant?" He answered: "I didn't directly, no." (RR 43:66). Thereafter he described the open records process to obtain an interview. (RR43:66).

- Ms. Ellen Goldberg, a reporter for Channel 5, was asked by the prosecutor:"Prior to your interviewing the defendant, did you have any discussions with anybody in law enforcement about going over and interviewing the defendant.... Nobody from the Garland jail called you and said Hey, this guy won't talk to us. Will you go make it happen? Didn't happen?" To which Mr. Goldberg responded:"Did not happen." (RR43:88).

Indeed, Mr.Lollar's questioning seemed to indicate that he believed that the reporters had followed a standard open records procedure:

Lollar:    Ms. Goldberg, would it be fair to state that common process in these things is your station to contact the Dallas County jail and ask for permission to see a person that is in the jail, and then they get back with you and let you know whether or not that person has agreed to the interview?

(RR 43:91). Yet, Mr. Lollar objected to the admission of the television interviews based on the reporters acting as agents of the state. (RR43:105-106).

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CoNVICTION WRIT OF HABEAS CORPUS                19

The trial judge denied the Motion to Suppress. (RR 43:113). The ruling was based on a finding that "on this record we cannot conclude that the reporter was acting as a State agent when he interviewed appellant," and "whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, *is not even a close one.*" (RR 43:113). The Texas Court of Criminal Appeals agreed reciting in its direct appeal opinion: "Here, all four interviewers testified that they had no such agreement with law enforcement personnel, and the appellant points to no evidence of any agreement." Slip Op. *Broadnax v. State,* slip op. No. AP,76, 207 (Tex. Crim. App. 2011) *B. The Appellant's Television Interviews.*

Upon information and belief, after the suppression hearing, but before the trial, defense coWlSel did no further investigation into this issue. Yet, during the trial defense counsel once again objected to admission of the media interviews based on the media as state agents.

B.    Argument and Authorities.

1.    Standard of Review

a.    Procedural and Substantive Right to Counsel

In *Rothgery v. Gillespie County,* TX, 554 U.S. 191, 194-195 (2008), the Supreme Court held that "the *[procedural]* right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty...." The attachment of the

right does not require that a public prosecutor be aware of that initial proceeding or involved in its conduct.

The *substantive* right to appointment of counsel is not measured by a "specified period after [an accused's] magistration." Instead, "[o]nce attachment occurs, the accused at least is entitled to the presence of appointed counsel during any "critical stage" of the postattachment proceedings; what makes a stage critical is what shows the need for counsel's presence." *Rothgery,* 554 U.S. at 212 (Alita, J., _ *f-tr*(r7.f:h·1 -*f!* \œ-,;        ct {

As explained in *Michigan* v. *Harvey,* 494 U.S. 344, 357-58 (1990):

> The accused's right to the assistance of counsel is not limited to participation in the trial itself. *A defendant is entitled to the aid of his lawyer from the time of arraignment "when consultation, thoroughgoing investigation and preparation fare} vitally important," Powell* v. *Alabama,* 287 U.S. 45, 57 (1932), through the time of first appeal. See *Penson,* 488 U.S., at 85; *Anders* v. *California,* 386 U.S. 738 (1967); *Douglas* v. *California,* 372 U.S. 353 (1963). Just as the Sixth Amendment's right to "the Assistance" of counsel necessarily encompasses a right to the effective assistance of counsel, *see Cronic,* 466 U.S., at *654--655; Avery* v. *Alabama,* 308 U.S. 444, 446 (1940), so too *the accused's right to have counsel* "for his defence" in a "criminal prosecutio[n]" *includes* the right to rely on counsel *after the government's role has shifted from investigation to accusation and the "defendant finds himself faced with the prosecutorial forces of organized society." Kirby* v. *Illinois,* 406 U.S. 682, 689 (1972) (opinion of Stewart, J.)....

### b.    Structural Error & Automatic Reversal

Where a defendant is deprived of counsel at a critical stage in the proceeding, this error is structural error and therefore, reversal is automatic. *Johnson* v. *United States,* 520 U.S.

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                21

461, 468-69, 117 S. Ct. 1544, 1549-50, 137 L. Ed. 2d 718 (1997) (A "structural" error, we explained in *Arizona* v. *Fulminante,* is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," 499 U.S., at 310, 111 S.Ct., at 1265. We have found structural errors only in a very limited class of cases: *See Gideon* v. *Wainwright,* 372 U.S. 335, 83 S.Ct. 792,9 L.Ed.2d 799 (1963) (a total deprivation of the right to counsel); ...."

### c. Constitutional Challenges to Statute, Facially & As Applied

"A statute is unconstitutional as applied when its application to the litigant deprives him of a constitutional right. *See Tex. Workers' Comp. Comm'n* v. *Garcia,* 893 S.W.2d 504, 518 n. 16 (Tex.1995). A facial constitutional challenge requires a showing that a statute is always unconstitutional in every application. *See id.* at 518. Thus, for a statute to be facially, and therefore always, unconstitutional, it must also be unconstitutional as applied to the individual at issue. *See id.; Santikos* v. *State,* 836 S.W.2d 631, 633 (Tex.Crim.App.1992); *Rodriguez* v. *State,* 47 S.WJd 86, 88 {Tex.App.-Houston [14th Dist.] 2001, pet. refd)."

*In re C.MD.,* 287 S.W.3d 510, 514-15 (Tex. App. – Hous. [14th Dist.] 2009, no pet.).

Mr. Broadnax will show that "in its operation the statute [Texas Fair Defense Act, and the Dallas County procedures implementing it] is unconstitutional as to him in his situation...." *SeeSantikosv. State,* 836 S.W.2d631, 633 (Tex.Crim.App.1992). [8] Further Mr.

---

[8] In *Santikos,* the Texas Court of Criminal Appeals wrote:

This rule conforms with the criterion for standing to challenge the facial constitutionality of a statute as enunciated by the Supreme Court of the United States:

---

Broadnax will show, he "has presently been injured by the statute." *Meshell v. State,* 739

S.W.2d 246, 250 (Tex.Crim.App.1987); *see also In re C.MD.,* 287 S.W.3d 510, 515 (Tex.

App.--Hous. [14th Dist.] 2009, no pet.).

---

"A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations. *Broadrick* v. *Oklahoma,* 413 U.S. 601, 610, 37 L.Ed.2d 830, 93 S.Ct. 2908 (and cases cited). A limited exception has been recognized for statutes that broadly prohibit speech protected by the First Amendment. (cites omitted)."

*Ulster County Court v. Allen,* 442 U.S. 140, 154-155 (1979).

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                    23

2.    Both on its face and as applied, the Texas Fair Defense Act and the Dallas County procedures implementing it, violated Mr. Broadnax's *procedural* 6th and 14tb amendment right to counsel and to due process

On its face, both the Texas Fair Defense Act as well as the Dallas County procedures implementing it, are unconstitutional because appointment of counsel is impennissibly predicated on a specific period after magistration:

> TEX. CODE CRIM. PROC. Art. 1.051(i):"immediately following the expiration of one working day after the date on which the court or the courts' designee receives the defendant's request for appointment of counsel...";

> ·Dallas County Procedures: "as soon as practicable after charges are filed"

Federal constitutional law is clear that the right to counsel is not measured by a specified period of time after magistration. Instead counsel must be appointed within a reasonable time as will allow for adequate representation at any before trial, as well as the trial itself. The media interviews were a in the prosecution of Mr. Broadnax, and he was entitled to be represented by counsel at that time. -*0{1lj...r(- '''-+'· Olj:)l ·

And as applied, both the Texas Fair Defense Act as well as the Dallas County procedures implementing it, are unconstitutional because they did nothing to instruct or inform those involved in the appointment-of-counsel process, as to how to implement the. directive, particularly when in the case of Mr. Broadnax, the media had been on his heels for several days (since June 20, 2008). The Dallas County procedures failed altogether to impose accountability for counsel appointment when his capital case was reassigned. Was the original court (CDC#1), or its court coordip.ator responsible to make the initial appointment of counsel

---

for Mr. Broadnax, or did that responsibility devolve onto the court to whom the case was reassigned (CDC #7)?

The systemic computer problems in Dallas County also made it impossible to adequately train and monitor those involved in the appointment-of-counsel process. This resulted in the appointment of counsel for Mr. Broadnax to be handled in rote, assembly-line fashion. His case was merely passed from CDC# I to CDC#7, with apparently no thought that the absence of counsel in the interim could -and did- work an irreparable injustice on Mr. Broadnax.

Both Mr. Cummings, and Mr. Broadnax were similarly situated. Both had been arraigned by the same Magistrate Judge, Judge Vickery, on June 21, 2008 at 5:32 am (Cummings) and 5:45 am (Broadnax). Both had completed the Defendant's Affidavit of Indigence on June 21, 2008 (a Saturday). Both had requested appointed counsel (in Broadnax's case as early as June 20, 2008 when he was in the Garland jail, and again at the arraignment on June 21, 2008). State App. Exhibit 5: Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Broadnax); State App. Exhibit 6: Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Cummings). Counsel was appointed for Mr. Cummings on June 23, 2008. But counsel was not appointed for Mr. Broadnax until June 24, 2008, the day after the media interviews.

Mr. Lollar attests to problems with case management at the Crowley Criminal Courthouse in 2008:

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                25

5.    I remember that my appointment to represent Mr. Broadnax came from Criminal District Court (CDC) #7, Judge Michael Snipes, although I can not recall if I learned of the appointment from Judge Snipes or from his court coordinator Sharon Johnson.    I do not remember the appointment coming from Criminal District Court #1.

12.    In 2008 at the time Mr. Broadnax case came into the criminal justice system, there had been problems with the assignment of capital cases among the various felony courts based on "the wheel." Both non-capital and capital felony cases were assigned to the felony courts in sequence *(e.g.* CDC #1, then CDC #2, etc.), so that as each felony case came up on the computer, it was assigned to the next felony court on the list. When all the courts received one felony case, whether it was capital or not, the computer would start assigning cases to the courts anew *(e.g.* CDC #1, then CDC #2, etc.). As a result, some felony courts were assigned several unrelated capital cases within the same time period, while other felony courts were not assigned any capital cases at all.

13.    Sometime after the year 2008, "the wheel" assignment system was changed. All the capital cases were funneled through the presiding judge, who in turn oversaw the distribution of capital cases among the felony courts, and made reassignment of the capital cases as appropriate.

State App. Exhibit 18: Affidavit of Brad Lollar.

Mr. Broadnax's deprivation of counsel at the time of the media interviews, rendered defense counsel ineffective throughout the pre-trial and trial proceedings. *See infra, §5- The Media Interviews were Material and Unfairly Prejudicial.*

3.    Both on its face and as applied the Texas Fair Defense Act, and the Dallas County Procedures implementing it, violated Mr. Broadnax's *substantive* 6th and 14th amendment Right to Counsel and to due process of law

Both on its face, and as applied, the Texas Fair Defense Act, and the Dallas County Procedures implementing it, are unconstitutional because they violated **Mr.** Broadnax's substantive right to counsel during a "critical stage" of the postattachment proceedings. *Rothgery,* 554 U.S. at 217.

a.    More Compelling Interest of Broadnax

The Supreme Court has held that "[l]ike other first amendment rights, the right to gather news is not, of course, absolute." *In re Express-News Corp.,* 695 F.2d 807, 809 (5th Cir. 1982), *citing Zemel* v. *Rusk,* 381 U.S. I, 17 (1965). Indeed, the courts have recognized that "Sixth Amendment rights of the accused must be protected *alwavs." United States v. Gurney,* 558 F.2d 1202, 1210 (5th Cir. 1977). Although discussed in the context of pre-trial publicity, the courts have ruled that "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences....., the trial courts must take strong measures to insure that the balance is never weighed against the accused." *United States v. Columbia Broad. Sys., Inc.,* 497 F.2d 102, 104 (5th Cir. 1974) *citing Sheppardv. Maxwell,* 1966,384 U.S. 333, 362 (1966).

Mr. Broadnax's Sixth Amendment right to counsel, which had attached at the arraignment, outweighed any First Amendment right of the media to news gathering. By elevating the media's right to unbridled access to Mr. Broadnax, the denial of his Sixth

---

Amendment resulted in material and unfair prejudice, which rendered Mr. Broadnax's counsel ineffective in every phase of the trial. *See infra, §5- The Media Interviews were Material and Unfairly Prejudicial.*

### b.   Media In.terviews A "Critical Stage"

Several factors made the media interviews a "critical stage." First, there was the grossly unequal, power-balance between highly educated, experienced reporters and Mr. Broadnax. The reporters themselves had been drawn into the Broadnax litigation so that "their side of the story" could be a matter of public record. The reporters "lawyered up." Both prior to, and during, the courtroom proceedings, the media requested, and did receive, counseled representation. This representation was by reputable law firms, such as Jackon Walker, LLP, Vincent & Elkins, and Sedgwick, Detert, Moran & Arnold, LLP. *See* RR 43:13, 29, 34, 99; CR2:280, 345, 347.

In contrast, Mr. Broadnax had been requesting counsel since June 20, 2008 (Garland jail) before he was transportad to the Dallas County jail. And at his arraignment in Dallas County, he once again requested counsel. Unlike the reporters who told their side of the story aided by counsel, Mr. Broadnax was left to fend for himself, despite the fact that Mr. Broadnax was an uneducated, impoverished, 19 years old, and experiencing a drug induced psychosis at the onslaught of the media requests from channels 4, 5, 8, and 11.

Second, it is "common knowledge among the Dallas County judges who handle criminal cases at the Crowley Courthouse that when a capital murder occurs, the press seeks

---

to interview and videotape the person accused of capital murder as soon as they possibly can get access to the accused." State App. Exhibit 20: Affidavit of Brad Lollar. Indeed, the presiding judge in the Broadnax trial, Judge Snipes, recently admonished a capital-accused defendant in an unrelated case because of an uncoWiseled media interview. ("It probably was not the smartest thing for you to do to go on television and talk to reporters," Snipes said. "I'm 99.9 percent sure you wouldn't have done that if Mr. Johnson was already assigned to the case.") State App. Exhibit 22: ScoTT GOLDSTEIN, *Prosecutors Undecided on Pursuing Death Penalty in Farmers Branch Police Officer's 1983 Slaying,* DALLAS MoRNING NEWS (Sept. 10, 2010).

Third, prosecutors also know this as well. State App. Exhibit 20: Affidavit of Brad Lollar, para. 9. The prosecution makes extensive use of the media interviews in its criminal prosecutions. Dallas County District Attorney's Office (the "DA's Office") subpoenaed the video outtakes of these interviews from the television stations." (CR 2:348; RR 43:3). *See infra:* subsec. 5.d. – The WICOWiseled media interviews were the focal point in both phases of the trial.

Fourth, the Wifairly prejudicial and inflammatory influence of the media interviews infected every aspect of the trial proceedings. "The media interviews [of Mr. Broadnax] had been the "talk of the courthouse," and the defense bar was saying that as a result of the broadcasts, they "felt sorry" for whoever got appointed to the case because of the difficulty it would cause in representing the accused." State App. Exhibit 20: Affidavit of Brad Lollar, para. 7b. *United States v. Columbia Broad. Sys., Inc., 491* F.2d 102, 104 (5th Cir. 1974)

*citing Sheppardv. Maxwell,* 1966,384 U.S. 333,362 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.....,the trial courts must take strong measures to insure that the balance is never weighed against the accused.").

Mr. Broadnax's encounter with the media, is akin to the defendant in *White v. Maryland* 373 U.S. 59, 59-60 (1963). In Mr. White's case, the preliminary hearing held on August 9, 1960 was not considered by the State of Maryland at that time to be an arraignment. So Mr. White plead guilty at a preliminary hearing without the appointment counsel.

Like Mr. White, Mr. Broadnax confessed to the reporters and did so without appointed counsel, either because Dallas County did not consider the media interviews a critical stage, or because of procedural irregularities.

In Mr. White's case, when he was later arraigned and had appointed counsel to represent him, he entered pleas of 'not guilty' and 'not guilty by reason of insanity.' Mr. Broadnax, too, plead not guilty. However, for both Mr. White and Mr. Broadnax, the appointment of counsel of came too late to protect their rights. At the trial of both of them, their uncounseled assertions (Mr. White's plea of guilty made at the preliminary hearing on August 9, 1960, and Mr. Broadnax's "confession" to the reporters) were introduced in evidence.

In Mr. White's case, the U.S. Supreme Court held the error to be structural and reversed, notwithstanding that "under Maryland law there was 'no requirement (nor any practical possibility under our present criminal procedure) to appoint counsel' for petitioner

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS     30

at the preliminary hearing ... nor was it necessary for appellant to enter a plea at that time."

*White,* 373 U.S. at 60.

The same result must inure to the benefit of Mr. Broadnax. The media interviews constituted a critical stage in the proceeding. They were events that "so prejudice[d] the outcome of the defendant's prosecution thaas a practical matter, [MrBroadnax had to) be repre5iented ... in order to enjoy genuinely effective assistance of counsel." *Rothgery,* 554 U.S. at217.

4. Equal Protection Violation: The denial of counsel violated Mr. Broadnax's right to equal protection

In *Sanders* v. *Palunsky,* 36 S.W.3d 222,224-25 (Tex. App.--Hous. [14th Dist.] 2001, no pet.), the court held:

> The principle of equal protection guarantees that "all persons similarly situated should be treated alike." *City of Cleburne* v. *Cleburne Living Ctr.,* 473 U.S. 432,439 (1985) (citing *Plyler* v. *Doe,* 457 U.S. 202, 216 (1982)); *see Mayhew* v. *Town of Sunnyvale,* 964 S.W.2d 922, 939 (Tex.l998); *In re MA.C.,* 999 S.W.2d 442, 445 (Tex.App. — El Paso 1999, no pet.). Thus, to assert an equal protection claim, the deprived party must establish two elements:
>
> (1)  that he was treated differently than other similarly-situated parties; and
>
> (2)  he was treated differently without a reasonable basis.

In Mr. Broadnax's case, his right to equal protection was violated. He was treated differently from his co-defendant. Mr. Cummings. Both had been charged with capital murder. Both Mr. Cummings, and Mr. Broadnax had been arraigned by the same Magistrate

EX PARTE JAMES BROADNAX: APPLICATION FOR POSTCONVICTION WRIT OF HABEAS CORPUS                31

Judge, Judge Vickery, on June 21, 2008 at 5:32am (Cummings) and 5:45am (Broadnax), respectively. Both completed the Defendant's Affidavit of Indigence on June 21, 2008 (a Saturday). State App Exhibit 6: Cummings F08-24628; State App Exhibit 5: Broadnax Trial Docket F08-24629. Both co-defendants had requested appointed counsel. The right to counsel had attached for each of them at the arraignment on June 21, 2008.

Yet, Mr. Broadnax had been treated differently without a reasonable basis. Dallas County appointed counsel for Mr. Cummings, at least as early as June 23, 2008 in Cause No. FOS-24628. State App Exhibit 14: Computer Print Out (under B070 entry). Dallas County appointed counsel for Mr. Broadnax one-day later, on June 24, 2008 — a day after the media interviews took place.

Had Mr. Lollar been appointed at least by June 23, 2008 at about 10:00 am, he could and would have taken the same steps as he had taken on June 24, 2008 at about 10:00 am to stop or prevent the media interviews altogether. App. Exhibit 18: Affidavit of Brad Lollar; State App. Exhibit 17: Business Records Affidavit, and attached Jail Visitors list; State App. Exhibit 21: Lollar Written Request: No Media, No Law Enforcement.

## ?' u eridenu

S.   Materiality & Unfairly Prejudicial: The media interviews were material and unfairly prejudicial

Dallas County's failure to appoint counsel for Mr. Broadnax during the media interviews, violated Mr. Broadnax's procedural and substantive 6th and 14th amendment rights to counsel and due process of law, and to equal protection. The media interviews were

material and unfairly prejudicial, rendering defense counsel ineffective throughout the entirety of trial.

### a.    Had Mr. Lollar been appointed on June 23, 2008, he would have stopped and/or prevented the media interviews altogether

The earliest the media interviews began was after after 10:08 am on June 23, 2008. (RR 43:49, 55), State App. Exhibit 7:   Business Records Affidavit, and Sheriffs Dept Records (Media Requests).

The delay in Mr. Lollar's appointment had a substantial and injurious effect on Mr. Broadnax's trial rights, rendering defense counsel ineffective.  When he was appointed on June 24, 2008, Mr. Lollar took immediate steps to prevent any further interviews by the media or law enforcement and Mr. Broadnax:

> upon learning of the appointment [on June 24, 2008 at about 10:00 am] and immediately before I visited Mr. Broadnax in the Dallas County jail, I prepared a written document.  That written document was drafted by me to prevent any further media or law enforcement interviews of Mr. Broadnax. I hand delivered that writing to jail personnel who were authorized to prevent further interviews, and I did that immediately before I visited with Mr. Broadnax at the jail [10:15 am].

App.Exhibit 18:Affidavit ofBradLollar;StateApp.Exhibit 17: Business Records Affidavit, and attached Jail Visitors list; State App. Exhibit 21: Lollar Written Request: No Media, No Law Enforcement.

Hence, had Mr. Lollar been appointed at least by June 23, 2008 at about 10:00 am, he could and would have taken the same pre-emptive action as he had taken on 1 08 PÅ r.r-j at about 10:00 am to stop or prevent the media interviews altogether.

---

    b.    The Dallas County judges, prosecutors and defense bar w.ere aware that the media sought immediate access to persons accused of capital crimes, including Mr. Broadnax

Mr. Lollar attested that it is common knowledge among the judges, prosecutors and criminal defense bar, that the media seek immediate access to an accused in a capital murder case:

9.    It is common knowledge among the Dallas County judges who handle criminal cases at the Crowley Courthouse that when a capital murder occurs, the press seeks to interview and videotape the person accused of capital murder as soon as they possibly can get access to the accused. .The prosecutors and defense counsel, who represent an accused, also ·know that the media seek immediate access to a capital murder suspect.

10.    Mr. Broadnax's case is typical of a high profile capital murder case in which typically the press seeks immediate access to the suspect. In Mr. Broadnax's case, the press did in fact interview him on the frrst business day, Monday June 23, 2009, following his incarceration in Dallas County jail on Saturday, June 21, 2008.

State App. Exhibit 18: Affidavit of Brad Lollar.

    c.    Judge Michael Snipes is aware of the material and unfair prejudice done by uncounseled media interviews

Judge Snipes, who presided over the Broadnax trial, was quoted in an unrelated capital murder case, admonishing Gary Wayne Pettigrew about uncounseled media interviews:

"It probably was not the smartest thing for you to do to go on television and talk to reporters," Snipes said. *"I'm 99.9 percent sure you wouldn't have done that if Mr. Johnson was already assigned to the case."*

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS    34

State App. Exhibit 22:   SCOTT GOLDSTEIN, *Prosecutors Undecided on Pursuing Death Penalty in Farmers Branch Police Officer's 1983 Slaying,* DALLAS MORNING NEWS (Sept. 10, 2010).

d.    The uncounseled media interviews were the focal point in both phases of the trial

The prosecution made extensive use of the media interviews, both in guilt/innocence, as well as in the punishment phases, to urge the jurors to render a verdict of capital murder, and a vote for yes to the future dangerousness issue, which would, and did result, in a sentence of death.

In opening statement of the guilt/innocence phase, the prosecutor told the jury:

Now the most interesting thing that you will find in this case, the evidence that you will hear is going to come from the defendant's own mouth, because after he was booked into the Dallas County jail on the 21st, arrested on the 19th, and on the 23rd of June, some four days after arrest, the media came to the jail to interview the defendant. And the defendant gave interviews to the media, and you'll get to see three of those interviews: One from Channel 4, one from Channel 5 and one from Channel 11.

...And *the defendant sits there and stares in the camera and says Fuck them. Fuck them and their fucking families.*

Folks, *I could try and summarize for you what's in those videos, but I couldn't do it any justice,* because what you'll see in those videos is a cold, calculated person who has no regard for human life. And I can't imitate that. And you'll get to see it for yourself.

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS          35

45

And at the end of this case, folks, there will be no question, based on the evidence in your mind, that the defendant is guilty of the capital murder of Stephan Swan, a living, breathing human being.

(RR 45:56-58).

(1)    Guilt/Innocence Phase: The prosecutor played the media interviews on both days of its presentation in guilt/innocence

The prosecutor presented its evidence in guilt/innocence phase on August 10 & 11, 2009. (RR 45, 46, 47). As promised, the prosecutor played the media interviews of Mr. Broadnax on each day. (August 10, 2009- RR45:125-Channel11; RR45:277-Channel 5); (August 11, 2009 – RR 46:230-Channel4).

Following the defense presentation on August 12, 2009, the prosecutor's closing argument pivoted on the media interviews again:

> ... And I think I told you that while it was very serious, it was not very complicated.... *I could play them [the videotapes of the media interviews} over and over again, but I don't think I need to do that. I think each and every one of you know that the statements were voluntary.* And all you have to do is call on your own common-sense.

(RR 47:192).

Following a verdict of capital murder, (RR 47:203; CR3:365), the prosecutor again made extensive use of the media interviews to urge the jury to find that Mr. Broadnax was a future danger. The prosecutor made use of the media interviews, to contend that Mr. Broadnax was both a gang member and a psychopath:

> And what I want you to realize is, there were parts of the guilt/innocence phase that we did not emphasize, .... you'll review some of the evidence again. You

---

EX PARTE JAMES BROADNAX:APPLICATION FORPOST-CONVICTION WRIT OF HABEAS CORPUS                36

46

won't have to review it all, but when you look at the videos in particular, I think the evidence of future dangerousness is real clear.

(RR48:23).

The media interviews overshadowed the mitigation evidence presented by the defense.[9] Two of the three defense experts had not had any contact with Mr. Broadnax. Certainly, the testimony from family members that Mr. Broadnax was a "sweet child," and "respectful" was not credible when juxtaposed against his wild-imagine on the television screen, in which the jurors hear for themselves Mr. Broadnax blurt out:    "Fuck em" [the victims and their

---

[9]   The defense evidence included:

- Defense expert, Dr. Silver, M.D., who although she had not interviewed Mr. Broadnax, testified that she had been asked to tell the jury about the research on brain development, and in particular about the brain development of a 19 years, which "is not functioning at the level ... of a normal adult." (RR50:45,57);

- Defense expert, Dr. Lane, M.D., a treating psychiatrist, who testified that Mr. Broadnax had a substance induced psychosis, among other things, when he saw him. (RR 50:77, 88);

- Defense expert, Dr. Roache, Ph.D., a professor and pharmacologist, specializing in clinical pharmacology of drugs of abuse, who testified that although he had not interviewed Mr. Broadnax, the evidence was consistent that Mr. Broadnax was under the influence of PCP, and in a drug-induced psychotic state. (RR50:171, 174, 177, 179-180, 185, 217);

- Families members who testified that Mr. Broadnax's mother, Audrey Kelly, was unstable, with a drinking problem, and had her daughter removed from her because she had injured them (RR 50:221, 234-235; RR 51:39-43; RR 52:39-40; RR 52156, 157-159); the abuse Mr. Broadnax experienced at the hands of Betty Eason, his grandmother, because he was bi-racial and she did not like white people. (RR 50:240, 249, 257; RR 51:265-266); and that Mr. Broadnax was a "sweet child," very respectful, and not violent. (RR 50:249; RR 51:164, 191; RR 52:112).

---

families). (RR45:56-58); *Broadnax v. State,* slip op. No. AP,76,207 (Tex.Crim.App. 2011)

*H  Sufficiency of the Evidence -Future Dangerousness.*

        (2)    Punishment & Gang Membership: The prosecutor referred to the media interviews to argue gang membership

In the punishment phase of the trial, the prosecutor argued to the jury that the testimony of Detective Nelson was to be taken into consideration in rendering a verdict on the special issues, and in fmding future dangero sness in particular. This testimony pivoted on the media interviews:

> Now, what other evidence is there in the guilt/innocence phase of future dangerousness? *Well, when we were plavint the videotapes there were parts that were muted, and there were just parts that weren't emphasized, and what I want to say to you is, there was a part in the media videos where the defendant is sitting there and he's talking about his gun, and he says he wraps it in a flag because I'm a fork, and he throws up a pitchfork.* (RR 48:23).

        (3)    Punishment & Psychopathy: The prosecutor referred to the media interviews to argue psychopathy

The prosecutor also referred to the media interviews of Mr. Broadnax to argue future dangerousness, based on false and misleading testimony that Mr. Broadnax was a psychopath. The prosecutor focused in on the media interviews to cross-examine Dr.Roache, who agreed that Mr. Broadnax showed an "immense memory" of the events, as well as manipulation and calculation. (RR 50:212-213). The prosecutor cross-examined Dr. Lane about anti-social

personality disorder, (RR 50:146-158), and later introduced the 20 traits from the Hare Psychopathy Checklist Revised, through the state's own expert, Dr. Price, in support of what the jury saw and heard from Mr. Broadnax in the media interviews. (RR 52:248-249).

Indeed in closing, the prosecutor replayed the video clips and urged the jury:

Let's *look at one o(the video clips*, and as we look at the video clips, I'm going to leave this checklist [the 20 traits of psychopathy admitted through Dr. Price], and I want you to see for yourself whether or not the defendant has the characteristics. (RR 53:68).

... You·.know, you could *look at that tape* and you could say, My God, so cold, so calculated..... (RR 53:69).

But what did he tell you, at least *in one of the videos*, and even in this video? I shot him. Boy, I ain't got no problems at gun play. (RR 53:74).

(4)    The Texas Court of Criminal Appeals supported its affirmation of future dangerousness in direct appeal on the television interviews

Even the Texas Court of Criminal Appeals in its direct appeal opinion relied primarily on the television interviews to support a finding of future dangerousness. The Court noted that the interviews showed:

- Mr. Broadnax "confessing to murdering two defenseless men in order to steal their car..., [and] described to reporters how he shot each man a second time.....,"

- the lack of remorse shown when "in the same television interviews .... appellant coldly and calmly walked reporters through the murders," responded "Fuck em," when asked if he had anything to say to the

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                                           39

victims' families, and shook his head when the reporters if he was remorseful, and

- "In one of the interviews the appellant discussed the probability that he would commit criminal acts of violence that would constitute a continuing threat to society,...."

Slip Op. *Broadnax* v. *State,* slip op. No. AP,76, 207 (Tex. Crim. App. 2011) *H. Sufficiency of the Evidence -Future Dangerousness.*

### e.    The jurors notes and interviews confirm the media interviews were material and unfairly prejudicial

Ultimately, the jurors answered yes to future dangerousness, and no to the mitigation special issues, that resulted in a sentence of death. (RR 54:4-5; CR3:650, 698). But before they did, the jwy sent three (3) notes to the court, after it had retired to deliberate following the completion of the punishment phase. (CR 3:645, 646, 648). One of those three reflect the jurors concern with the content of the media interviews as they deliberated:

- Note to the Court: Need school records, Journals from car and jail, Transcript of 4:30 phone call on 8/12, Video of Channel 5 Interview, Photos from crime scene shown today by Prosecution, and the Court's response (21 Aug 09) (CR 3:648).

Post judgment interviews confirm that the uncounseled media interviews played at the trial, were material and unfairly prejudicial introduced against Mr. Broadnax:

4.    .... Mr. Folz elaborated about the television interviews and stated the most troubling aspect were the callousness of Mr. Broadnax and his comments regarding the victims and their families, specifically, "Fuck them and Fuck their families."

EX PARTE JAMES BROADNAX: APPLICATION FOR POST CONVICTION WRIT OF HABEAS CORPUS    40

50

5.    .... Mr. Vessels discussed some of the most memorable evidence being the television interviews Mr. Broadnax conducted with reporters. His impressions from the interviews were that Mr. Broadnax was completely heartless, callous, he was bragging about the incident, proud of his actions, he had no remorse, and the event was pre-calculated.

6.    .... Mr. Kreighbawn stated some of the most damaging evidence for Mr. Broadnax was his confession to the news reporter and his lack of remorse in the television interviews.

State App. Exhibit 23: Affidavit

**6.    Mr. Broadnax did not voluntarily and knowingly consent to the uncounseled media interviews**

The "consent" to the media interviews was not knowingly or voluntarily made by Mr. Broadnax. As aforementioned, there was an unequal power balance between educated reporters, and Broadnax, an uneducated, impoveii hed      ear, suffering from a drug induced psychosis, who was left to fend for h·   elf against    onslaught of media from channels 4, 5, 8, and 11.

Also as aforementioned, the medical records reflected that Psych assessor, Jason Varghese, and psychiatrist, Dr. H. Mirmesdagh, had evaluated Broadnax at about 7:00am on June 23, 2008 before the media interviews and diagnosed him as being psychotic due to polysubstance abuse. (RR 39:24; RR 43:74; 50:85-86). The medical records also reflect that before his arrest, and on June 23, 2008, Mr. Broadnax had been having auditory and visual hallucinations and was delusional, that he had no memory of talking to reporters on June 23,

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS          41

2008, and that he was on "whack" [the street term for PCP] at the time of the commission of the charged offense. (RR 50:86-87).

7.    The error is structural; automatic reversal must follow

The right to counsel in Mr. Broadnax's case had attached by the time of the media interviews — an event that was a "critical stage." It is a long standing basic federal constitutional right that "counsel must be appointed within a reasonable time after attachment *to allow for adequate representation.at any critical stage before trial, as well as at trial itself*" (emphasis added)). *Rothgery,* 554 U.S. at 218 (Alito, J. concurring, Roberts, Scalia, JJ.join), citing *Coleman v. Alabama,* 399 U.S. 1, 9 (1970) (plurality opinion) (right to counsel at preliminary hearing, *White v. Maryland,* 373 U.S. 59, 60 (1963) *(per curiam)* (right to counsel guaranteed at a pretrial lineup); *United States v. Wade,* 388 U.S. 218 (1967), *Michigan v. Harvey,* 494 U.S. 344 *(1990), Estelle v. Smith,* 451 U.S. 454, 470-471 (1981) (right to counsel at pretrial interrogation, a pretrial psychiatric exam, and certain kinds of arraignments).

Where a defendant, such as Mr. Broadnax, was denied counsel by Dallas County far enough in advance of the media interviews, a "critical stage," where his admissions reverberated throughout every phase of the trial, the error was structural, and reversal is automatic.

## 8.    Conclusion

The uncounseled media interviews of Mr. Broadnax were events that "so prejudice[d] the outcome of the defendant's prosecution that, as a practical matter, [Mr. Broadnax had to] be represented ... in order to enjoy genuinely effective assistance of counsel." *Rothgery*, 554 U.S. at 217.    Dallas County had no rational basis to appoint counsel for co-defendant, Cummings, on June 23, 2008, but delay appointed of counsel for Mr. Broadnax until the day after the media interviews; thereby denying him equal protection. The Texas Fair Defense Act and the Dallas County Procedures for Appointment of Counsel in Death Penalty Cases as amended May 2007, under which Mr. Broadnax's counsel was appointed in 2008, both facially and applied, violate federal constitutional law because they denied him his procedural and substantive 6th and 14th amendment right to counsel at a critical stage in the proceedings. The error is structural and automatic reversal is required.

Hence, habeas relief should be granted.

GROUND THREE (IAC & Media Interviews – 6tb and 14'h amendment violations). Mr. Broadnax was denied his federal constitutional right to effective assistance of counsel, who failed to perform an adequate investigation into, and develop and present, the facts of Lollar's appointment and the media interviews

A.    Statement of Facts

The Statement of Facts recited in Grounds One and Two, above, are incorporated by reference herein.

B.    Argument and Authorities.

1.    Standard of Review

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undennined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* v. *Washington,* 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

In *Wiggins* v. *Smith,* 539 U.S. 510, 521 (2003), the Court held that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                44

54

reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.*" (emphasis supplied).

The ABA Guidelines

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. *Rompilla v. Beard,* 545 U.S. 374 (2005), *citing Wiggins v. Smith,* 539 U.S. 510, 522 (2003) ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'").

TEXAS GUIDELINE 11.1 – Trial Investigation provides in part:

A.     Counsel at every stage have an obligation to conduct thorough and independent investigation relating to the issues both guilt and penalty.

Thereafter, the guideline delineates various aspects of the investigation relating to the guilt/innocence phase, which include by way of example, but not limitation:

g.     Research and preparation of pretrial strategy for suppression motions, .....

h.     Plan trial strategy, including ... pretrial motion practice, .... probable legal issues arising during trial, presentation of defense case, .... possible rebuttal issues, .....

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS      45

TEXAS GUIDELINE 11.2 – The Duty to Assert Legal Claims provides in part:

A.    Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should:

   3.    Evaluate each potential claim in light of: ...

      c.    The importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited; ....

B.    Counsel who decide to assert a particular legal claim should:

   1.    Present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law; and

   2.    Ensure that a full record is made of all legal proceedings in connection with the claim.

GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL, TEX. GUIDELINE 11.2-*The Duty to Assert Legal Claims* (adopted April 21, 2006).


   2.    Constitutionally deficient performance for failure to adequately investigate, develop and present the facts of Lollar's appointment and media interviews

Upon information and belief, the performance of trial counsel was deficient because defense counsel did not perform any due diligence investigation prior to, or after the August 4, 2009 hearing, into the facts of the appointment of Mr. Lollar. Mr. Lollar attests he was unaware that Mr. Cummings had been appointed counsel on June 23, 2008:

   11.    I did not know that the Dallas County computer printout shows that June 23, 2008 was the date that Ward Maedgen was entered as having been

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                    46

appointed to represent Damarius Dwight Cummings, the co-defendant of Mr. Broadnax. The trial of Mr. Cummings case, like the trial of Mr. Broadnax's case, was presided over by Judge Snipes of CDC #7.

State App. Exhibit 18: Affidavit of Brad Lollar. This discrepancy would have put him on notice that investigation was necessary. Also, despite conjecture that law enforcement had "tipped off" the media, the defense failed to do any pre-trial due diligence investigation into the "how, who, when, where," questions concerning the media as agents of law enforcement, as well. → where is this evidence ... *bot*

The point is not just that Mr. Lollar failed to challenge the admission of the media interviews on bases other[10] than that raised in the August 4, 2009 suppression hearing although Mr. Broadnax does contend these issues were readily discoverable had defense counsel performed effectively.

The foundation of this IAC challenge is that defense counsel, and Mr. Lollar in particular, failed to conduct an adequate due diligence investigation into his appointment and the media interviews in violation of the capital guidelines. TEXAS GUIDELINE 11.1 – Trial Investigation. Without an adequate due diligence investigation into these areas, Mr. Lollar was not prepared for the August 4, 2009 hearing, and could not strategically have made a decision concerning one or more legal theories on which to object and preserve, and/or

---

[10] *(e.g.,* challenges to the statutory appointment procedures, the Dallas County computer problems as it affected case management, the timely of the appointment of Mr. Lollar a day after the appointment of counsel for Mr. Cummings, etc.). *See* Statement of Facts, *supra.*

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                47

prevent, the admission of the media interviews at trial. TEXAS GUIDELINE 11.2 - The Duty to Assert Legal Claims.

The factual theory he chose had no basis in fact, as Mr. Lollar himself seemed to have realized in his question to Ms. Goldberg at the suppression hearing.[11] *See also* State App. Exhibit 24: Affidavit of Cliff Jenkins. Even the court ruled that as raised by defense counsel, the issue of the media as agents of law enforcement, "is not even a close one," citing prior precedent, *Escamilla v. State,* 143 S.W.3d 814 (Tex. Crim. App. 2004) (RR 43:113).

Thus, any assertion of "strategy" was not reasonable because defense counsel lacked the necessary facts relevant to discover and select among plausible options — a direct and proximate result of the inadequate investigation. *See Wiggins v. Smith,* 539 U.S. 510, 521 (2003) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.")* (emphasis supplied).

---

[11] Lollar:    Ms. Goldberg, would it be fair to state that common process in these things is your station to contact the Dallas County jail and ask for permission to see a person that is in the jail, and then they get back with you and let you know whether or not that person has agreed to the interview? (RR 43:91).

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                48

58

The deficient performance of trial counsel adversely impacted all aspects of the trial, because once those media interviews were played to the jury, they adversely impacted both phases of the trial, and culminated in the imposition of a sentence of death.

### 3.    Reasonable probability of different outcome

*InStricklandv. Washington,* 466 U.S. 668,695-696 (1984), the Court discussed how the prejudice determination is analyzed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality o.f the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, *a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support Taking the unoffectedfindings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask* **if** *the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.*

Mr. Broadnax incorporates by reference the arguments as to materiality and unfair prejudice, and lack of voluntary and knowing consent, raised in Grounds One and Two, *see Argument and Authorities B.5, B.6, supra.* The media interviews were the focal point of both the guilt/iimocence and punishment phases of the trial. But for the admission of this evidence, there is a reasonable probability but that for Mr. Lollar's deficient performance the outcome would have been different.

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS    49

59

The failure of Mr. Lollar to adequately investigate, develop and present the facts of his appointment and the media interviews, and adequately research the law, resulted in a breach of his "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Kimmelman* v. *Morrison,* 477 U.S. 365, 384 (1986), *citing Strickland v. Washington,* 466 U.S. 668, 686 (1984).

Hence, habeas relief should be granted.

GROUND FouR: (False and Misleading Gang Testimony – 8th & 14ᵗʰ amendment violation). Mr. Broadnax was denied his right to due process and to be free from cruel and unusual punishment, through false and misleading evidence of gang affiliation sponsored by the prosecution

## A.    Statement of Facts

The following Statement of Facts is common to Grounds Four, Five and Six, and therefore, this Statement of Facts is incorporated by reference in each of these Grounds.

### 1.    Prosecution Discovery Notices

The prosecutor provided defense counsel with several discovery notices. *See e.g.* Discovery and Notice of Extraneous (1st, 2nd, 3rd, 4ᵗʰ 5th) (CR 1:22, 104, 106, 108; CR 2:370, 535). These notices included CD's of interviews of Mr. Broadnax by the media and law enforcement, and recorded jail phone calls.

Discovery Notice 4th, dated May 18, 2009, contains the photocopied contents from the Red and Black notebooks "found in a suitcase in CW vehicle," (Discovery Notice 4th) that have writings with the words: "Gangsta," "MOB," "Folk;" as well as various symbols such aswings, afive-pointedstar, apitchfork; (CR1:119, 120, 124,133, 141,146, 156, 173, 184). Discovery Notice 5th , dated June 24, 2009, includes a CD with an inmate call log, and "photos of defendant's cell." (CR 2:535).

The prosecutor also filed States [sic] Potential Witnesses, Amended June 22, 2009, which identifies Nelson, Barrett "BK" as a potential witness. (CR 2:528).

---

## 2.    Prosecution Gang Expert, Detective Nelson

During the punishment phase of the trial, the prosecutor called Detective Barrett Keith Nelson, who testified that he had worked for 12 years in the gang unit for the Dallas Police Department, and was a member of the Texas Investigator Association in the State of Texas. (RR 49:77-78, 80). The scope of Detective Nelson's testimony was defined by prosecutor Alex when he asked:

Alex:    Did I ask you to fmd out as much as you could about the Gangster Disciples?

Nelson:    Yes sir, you did.

Alex:    Did I also ask you to review documents, video tapes, phone calls, [including media interviews] all sorts of things in determining whether a young man by the name of James Broadnax was a member, or part of, or associated with a gang?

(RR 49:82-83).

Detective Nelson testified that "most of the gangs ... have their own web sites, ... their history, what colors they wear, where they hang out, what they're doing, and ... photos of them too." (RR 49:81). He also testified that in gathering intelligence, he would not stop there. He would corroborate whether a person is a gang member by "talking to other officers, ... talking to principals, talking to teachers, people who have had contact with these individuals." (RR 49:82). Detective Nelson analogized identifying an individual as a gang member akin to "[i]t's like making a cake. You got to add eggs, milk. Once you have all of these elements together, yes, sir, you have a gang member." (RR 49:104).

Because he did not base his "cake making" on objective criteria, the testimony from Detective Nelson was more akin to a tea-leaf-read e. Detective Nelson was the only person at trial who, as his own testimony reflects, was able to divine gang membership from what he had been was shown: "... if you read that phrase, me as a gang officer, he's admitting ...." (RR49:122; RR49:89, 104, 122).

Absent objective le and valid into guide him, Detective Nelson erroneously concluded that Mr. Broadnax was a member of the Gangster Disciples, based on drawings, such as a pitchfork symbol (RR 49:87, 100); his wearing of a bandana as a flag of the gang, (RR 49:87); phone conversations about OG74 (RR 49:89); certain words written in capital letters, like F-0-L-K or boS-S, (RR 49:95-98), the abbreviation, MOB (RR 49:111-112); lyrics to a song (RR 49:108); and various drawings with a devil's tail, or wings or a heart (RR 49:110).

Yet at the conclusion of Nelson's testimony, the defense waived any examination whatsoever.

| | |
|---|---|
| Court: | Cross-examination? |
| Lollar: | We have no examination? |
| Court: | No questions? |
| Lollar: | Un-uh. |

(RR 49:133}

---

3.    The Jury Notes

The false and misleading testimony of gang affiliation had an adverse impact on the jury deliberation as to future dangerousness. The jury sent three (3) notes to the court, after it had retired to deliberate following the completion of the punishment phase. (CR 3:645, 646, 648). From those notes, it is apparent that they were interested in the evidence mistakenly identified as indicia of gang membership:

- Note to the Court: Photo titled Free Styling found in Jail (20 Aug 09) (CR 3:645).

- Note to the Court:Js the letter presented to Mr. Swan by the defense attorney evidence and if so, can we review,-Tape of jail conversations on 8/12. And the Court's response (21 Aug 09) (CR 3:646).

- Note to the Court: Need school records, Journals from car and jail, Transcript of 4:30 phone call on 8/12, Video of Channel 5 Interview, Photos from crime scene shown today by Prosecution, and the Court's response (21 Aug 09) (CR 3:648).

B.    Argument and Authorities.

1.    Standard of Review

In *Ramirez v. State*, 96 S.W.3d 386, 397 (Tex. App. – Austin 2002, pet. ref d), the court reversed and remanded the judgment of the jury because "the testimony [was] false and misleading to the trier of fact," relying on *Napue v. Illinois*, 360 U.S. 264 (1959); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935). In support of the outcome, the court reasoned as follows:

> Many cases discussing a *Mooney-Pyle-Napue* contention refer to the testimony as being "perjured testimony" or as involving "perjury." *See, e.g., Pyle*, 317

---

U.S. at 216, 63 S.Ct. 177. While this terminology is still used, it is sufficient if the testimony is false and misleading to the trier of fact. *See Napue,* 360 U.S. at 269; *Alcorta,* 355 U.S. at 32.

> *There is no need for a defendant to show the witness knew the testimony was false or otherwise harbored a sufficient culpable mental state to render the witness subject to prosecution for perjury.* Moreover, the Court of Criminal Appeals has made clear that whether the rule is violated or not does not depend upon the defendant's ability to demonstrate the witness's specific factual assertions were technically incorrect or "false." *It is sufficient if the witness's testimony gives the trier of fact a false impression.* ·

Dix, § 22.53.

*Ramirez* made it clear that *it is of no consequence "{w}hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." Ramirez,* 96 S.W.3d at 397, *citing Giglio,* 405 U.S. at 154, 92 S.Ct. 763. The outcome hinges on the obligation of the prosecution to do justice:

The prosecutor is:

> [T]he representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligations to govern at all; and whose interest; therefore, *in a criminal prosecution is not that it shall win a case, but that justice shall be done.*

*Ramirez,* 96 S.W.3d at 397, *citing Berger v. United States,* 295 U.S. 78, 88 (1935).

2.    Nelson's testimony was false and misleading

(a)    Statutory criteria

TEX. CODE CRJM. PROC. Art. 61.01 (1) states that the terms, "Combination" and "criminal street gang," have the meanings assigned by TEX. PENAL CODE § 71.01.

---

TEX.PENAL CoDE § 71.01 defines these terms as follows:

(a)    "Combination" means three or more persons who collaborate in carrying on criminal activities, although:

  (1)    participants may not know each other's identity;

  (2)    membership in the combination may change from time to time; and

  (3)    participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations.

(d)    "Criminal street gang" means three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities.

The criteria for Criminal Combination and Gang is set out in TEx.CoDE CRJM. PROC. Art. 61.02, provides in pertinent part:

( c)    Criminal information collected under this chapter relating to a criminal street gang must:

  (1)    be relevant to the identification of an organization that is reasonably suspected of involvement in criminal activity; and

  (2)    consist of:

    (A)    a judgment under any law that includes, as a finding or as an element of a criminal offense, participation in a criminal street gang;

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                56

66

(B)    a self-admission by the individual of criminal street gang membership that is made during a judicial proceeding; or

(C)    except as provided by Subsection (d), any two of the following:

    (i)    a self-admission by the individual of criminal street gang membership that is not made during a judicial proceeding, including the use of the Internet or other electronic format or medium to post photographs or other documentation identifying the individual as a member of a criminal street gang;

    (ii)    an identification of the individual as a criminal street gang member by a reliable informant or other individual;

    (iii)    a corroborated identification of the individual as a criminal street gang member by an informant or other individual of unknown reliability;

    (iv)    evidence that the individual frequents a documented area of a criminal street gang and associates with known criminal street gang members;

    (v)    evidence that the individual uses, in more than an incidental manner, criminal street gang dress, hand signals, tattoos, or symbols, including expressions of letters, numbers, words, or marks, regardless of how or the means by which the symbols are displayed, that are associated with a criminal street gang that operates in an area frequented by the individual and described by Subparagraph (iv);

    (vi)    evidence that the individual has been arrested or taken into custody with known criminal street gang members for an offense or conduct consistent with criminal street gang activity;

(vii)    evidence that the individual has visited a known criminal street gang member, other than a family member of the individual, while the gang member is confined in or committed to a penal institution; or

(viii)    evidence of the individual's use of technology, including the Internet, to recruit new criminal street gang members.

(b)    Broadnax did not satisfy the statutory criteria

ght Stew3who provided an arfldavit for state habeas, and who is a nationally certified Gang Awareness Trainer, concludes:

a.    The testimony of Detective Nelson created the false and misleading impression that Mr. Broadnax was a gang member attempting to attribute to Mr. Broadnax gang criteria based on TEX. CODE CRIM. PRoc. Art. 61.02 (c) (2) (iv, v).  However, as more fully discussed below, the Gangster Disciples and Folk Nation is not recognized as a Dallas criminal street gang.  Further, the various signs, lyrics, and drawings, which Detective Nelson testified about, do not support the statutory criteria from which gang membership can be attributed to Mr. Broadnax.  It appears that any "gang" persona attributable to Mr. Broadnax is simply the efforts of a scared young man from an impoverished and high risk ground attempting to protect himself, and/or exhibit the free speech rights of an aspiring rap artist.

As a bases for his conclusion, Mr. Stewart attests:

(b)    Gangster Disciples & Folks Nation – Not a Dallas Criminal Street Gang

(1)    Gangster Disciples

Based on his testimony, Detective Nelson was unaware of a "documented area" in the Dallas/Fort Worth area that is frequented by

Gangster Disciples.... Furthermore, he made no attempt to offer evidence that Mr. Broadnax was associated with or frequented any area in which the Gangster Disciples operated as a criminal street gang in the Dallas/Fort Worth area. The testimony of Detective Nelson offers no evidence that Mr. Broadnax had anything other than an incidental use of various gang references.

Further, Mr. Broadnax is not listed in any Dallas gang database. Further, Mr. Broadnax does not have any specific gang-related tattoos, which is a strong indicator that Mr. Broadnax was not a gang member.

### (2) Folk Nation

The basis for the misleading impression given by Detective Nelson appears to have been based, in part, on televised recordings of a statement made by Broadnax which included the words, "wrapped my flag around it, 'cause I'm a Folk" (RR 49:83 and State Exhibit 404). Broadnax's reference to "Folk" or the Folk Nation has no current meaning. The term relates to an affiliation dating back some 30 years ago before Broadnax's birth which is no longer valid. In current gang terminology, members reference their individual gangs, with signs and symbols. I observed no mentioned of "Gangster Disciples" in the televised interviews.

Only one televised interview provided the "Folk" reference which Detective Nelson testified was a "shout out to the gang" (RR 49:88). Based on my experience with gangs, a true gang member would have taken the opportunity to use all three media outlets to shout out to his fellow gang members and establish his reputation. Broadnax did not avail himself of this opportunity. Detective Nelson testified in response to a hypothetical question by the prosecution that if the defendant was arrested while wearing something wrapped around his head, that potentially could be a flag by stating, 'a flag is their bandana" (RR 49:88). In my expert opinion, a bandana is not a significant gang symbol given my observation that bandanas are regularly worn by a variety of individuals in our current society who have no association whatsoever with gangs.

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICHON WRIT OF HABEAS CORPUS                    59

### (3)    A Gangsta Wanna-be

Often young men like Mr. Broadnax, who was 19 years old at the time of his arrest, who come from a high risk backgrounds operate on the fringe of gang membership as "gang wannabes" without ever actually being a part of an organized street gang. Gang membership may seem appealing, particularly to a Black boy for whom society offers few opportunities to overcome severe poverty.

Further, young men facing incarceration often have real and legitimate fears of danger and vulnerability within jail or prison walls. It is not unusual for such a young person to try to establish a tough or unafraid persona by claiming gang membership in the hope that by doing so, he will be left alone and can survive unhurt or avoid physical or sexual attack.

Finally because of the popularity of gangsta rap, most young Black men like Mr. Broadnax are well versed in gang language, both verbal and nonverbal. Consequently acquiring a gang persona may simply demonstrate the efforts of a scared young man in an attempt to protect himself and overcome his fears.

### c.    No Evidence that Items Showed Broadnax As Gang Member

As demonstrated below, the various items to which Detective Nelson referred, do not rise to the level of indicia of gang membership by Mr. Broadnax

### (1)    OG74

Detective Nelson testified that he based his optmon, in part, on statements made during a recorded phone call made between Broadnax and his mom's boyfriend during which BroadnaX asked if he was a member of OG74 and the man replied, 'yeah I remember that.' Broadnax replied that he was a member of that organization (RR 49:94-95, State Exhibit 553). Based on my personal knowledge of Black culture, "OG" is often used generically to denote an older man's knowledge and experience. Since no corroboration was given regarding the veracity of this man's assertion, a reasonable person with knowledge of Black culture might suggest that his statement was braggadocio rather than statement of fact.

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                    60

## (2)    Drawing and Lyrics

Detective Nelson testified at length about the notebooks found in the victim's car which were alleged to belong to Mr. Broadnax and contained raps lyrics and gang symbols (RR 49:105). The prosecution states in their question, "You can't say that he actually made these drawings; is that right?" Detective Nelson gives a non-responsive answer, "This is what was presented to me, sir. I wasn't there when he did it" (RR 49:112). As a gang expert, I would have testified that a notebook as described in the testimony containing rap lyrics and gang symbols, could, in fact, be just that without implying character as suggested in the hypothetical question and response between the prosecution and Detective Nelson: "If he had them in his possession, it would say something about who he is; is that correct?"- Answer by Detective Nelson: "Yes" (RR 49:112). Detective Nelson also testified that the drawings on their own, without an association with a gang member, "could just be something they like to draw" (RR 49:104).

Detective Nelson testified:

> "He's writing lyrics to songs that he's coming up with"
> and answers affirmatively that "These would be things
> that he would be creating in his mind though" (RR
> 49:122). He also testified that the lyrics were "tagged
> by-with J.B. all            throughout" (RR 49:109).
> The use of the
> word "tagged" impennissibly suggested a gang affiliation.
> Detective Nelson should have simply referred to "J.B." as
> a signature of the original lyrics, and a matter of
> establishing ownership of Mr. Broadnax's creative
> property.

As a gang expert, I recognize that popular culture has embraced rap music which utilizes gang symbols and references. To suggest that writing rap lyrics and drawing symbols identify a person as a gang member is a gross over statement.   Particularly among African American males, the rap persona which utilizes many gang references, denotes a macho reputation, financial success and attractiveness to the opposite sex. Gang symbolism is merely a prop to portray these characteristics.

### (3)    Tattoo & MOB

Detective Nelson testified that a tattoo denoting "MOB" suggests the Gangster Disciples' rivalry with the Bloods gang. He goes on to state that it can also mean "money over bitches" but connects the statement to "street hustling" (RR 49:113). As a gang expert, I would have testified that MOB is a popular tattoo that is frequently seen on popular rap stars and in its popular usage, has no relevance to gang membership.

### (4)    Jail Cell Contents

The district attorney's investigator, Darrell Doty, testified about photos and various items taken from Mr. Broadnax's cell.    None of this satisfies the statutory criteria because, as Investigator Doty acknowledged he had no idea who placed scratches in the paint denoting gang symbols on the cell walls (RR 49:43-44). Hence, without credible evidence, Investigator Doty's testimony attributing gang membership to Mr. Broadnax created the false and misleading impression that certain gang symbols were the product of Mr. Broadnax's efforts.

In summary, it is my expert opinion, the prosecution failed to provide credible and sufficient evidence that Mr. Broadnax was a gang member and thereby created a materially false and misleading impression that he was a member of a "combination" or "criminal street gang," in particular the Gangster Disciples, thereby creating the misperception that Mr. Broadnax was a future danger.

State App Exhibit 25: Affidavit of Stewart (gang expert).

### (c)    Broadnax not in Dallas County gang database

Mr. Stewart also attests:

Based on his testimony, *Detective Nelson was unaware of a "documented area" in the Dallas/Ft. Worth area that is frequented by Gangster Disciples.* Furthermore, he made no attempt to offer evidence that Mr. Broadnax was associated with or frequented any area in which the Gangster Disciples operated as a criminal street gang in the Dallas/Ft. Worth area.    The testimony of

Detective Nelson offers no evidence that Mr. Broadnax had anything other than an incidental use of various gang references.

Further, *Mr.Broadnax is not listed in any Dallas gang database.* Further, *Mr. Broadnax does not have specific gang-related tatoos,* which is a strong indicator that Mr. Broadnax was not a gang member.

State App Exhibit 25: Affidavit of Stewart (gang expert).

3.    The evidence of gang membership was material and unfairly prejudicial; and raised the reasonable likelihood of the adverse outcome at trial

There is a reasonable probability the materially false and misleading testimony of gang membership adversely affected the outcome of the trial. U.S. CaNST. Amend. XIV; *Napue v. Illinois,* 360 U.S. 264 (1959); *Pyle v. Kansas,* 317 U.S. 213 (1942); *Mooney v. Holohan,* 294 U.S. 103, 112–13 (1935).

In the punishment phase of the trial, the prosecutor argued to the jury that the testimony of Detective Nelson was to be taken into consideration in rendering a verdict on the special issues, and in finding future dangerousness in particular:

> Now, what other evidence is there in the guilt/innocence phase of future dangerousness? Well, when we were playing the videotapes, there were parts that were muted, and there were just parts that weren't emphasized, and what I want to say to you is, there was a part in the media videos where the defendant is sitting there and he's talking about his gun, and he says he wraps it in a flag because I'm a fork, and he throws up a pitchfork. (RR 48:23).
>
> And we didn't focus in on that in the guilt/innocence phase, but what you'll hear from a gang expert from the Dallas Police Department is that what he's referring to is he's a member of Folk Nation.(RR 48:24).
>
> In particular, the pitchfork identifies his as a Gangster Disciple. And you'll hear evidence from the gang expert that he also self identifies himself as a

member of the 7 Fours, ... and he's going to tell you that the Gangster Disciples is one of the oldest criminal street gangs in the country.   Originated in Chicago.(RR 48:24).

And he's going to tell you that this man sitting over here, the evidence is going to show, that not only is he a member of it,.... (RR 48:24).

And *the gang evidence expert is going to tell you that it is a violent street gang. They're involved in murders and robberies.* (RR 48:24).

This opening statement was followed by evidence of the murder of Matthew Butler, from his mother, Theresa Butler, and other family members, as well as the medical examiner, Tracy Dyer, M.D.   (RR 48:28, 38).   The prosecutor also called witnesses to introduce telephone calls made by Mr. Broadnax from the Dallas County jail, that included contents about fighting with jail pers0lmel, a "take down,"allegedly becauseMr. Broadnax was "very combative, very out of control," and would not comply with a search of his cell that jail personnel wanted to conduct, and fights with other inmates. (RR 48:73, 86, 109-112, 145-147).   The prosecutor also called the investigator for the Dallas County District Attorney's Office, who took pictures of the contents ofMr. Broadnax's cell, and the writings on the walls and door, which were introduced into evidence and referred to by Detective Nelson, the prosecutor's gang expert. (RR 48:114).

The testimony ofDetective Nelson, in conjunction with the aforementioned evidence, heightened the unfairly prejudicial effect of the media interviews, and overshadowed the mitigation evidence presented by the defense. Ultimately, the jurors answered yes to future dangerousness, and no to the mitigation special issues, that resultedina sentenceof death.(RR 54:4-5; CR3:650, 698).

In summary, the right of Mr. Broadnax to federal due process of law and to be free from cruel and unusual punishment was violated when the prosecutor sponsored the false, misleading and unfairly prejudicial evidence of gang membership. The objective evidence is that Mr.Broadnax did not meet the criteria for "Criminal Combination,"or Criminal Street Gang," under TEX. CODE CRJM. PROC. Chap. 61.

There is a reasonable likelihood that the use of this materially misleading and false evidence adversely affected the outcome of the punishment phase of the trial. Mr. Broadnax faces a death sentence based on invalid and unreliable evidence of gang membership that had no objective basis in fact or law. U.S.CoNsT. Amend. VIII; *Graham v. Florida,* 130 S. Ct. 2011 (2010) ("The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'") *citing Weems v. United States,* 217U.S. 349,367 (1910). U.S.CONST.Amend. XIV; *Napue v. Illinois,*360 U.S. 264 (1959); *Pyle v. Kansas,* 317 U.S. 213 (1942); *Mooney v. Holohan,* 294 U.S. 103, 112-13 (1935) (and its progeny for the proposition that the knowing use of false testimony violates federal requirement of due process and denies an accused of a fair trial).

GROUND FIVE: (Free Speech & Gang Evidence – pt and 14th amendment violations). Mr. Broadnax was denied his right to free speech by materially false and misleading evidence of gang affiliation

A.     Statement of Facts

The Statement of Facts in Ground Four is incorporated by reference.

B.     Argument and Authorities.

1.     Standard of Review

In ..._t v. *State,* 322 S.W.3d 662, 668 (Tex. Crim. App. 2010), the Texas Court of

Criminal Appeals recognized that the federal guarantee of free speech is applicable to citizens

of the State of Texas;

> The First Amendment provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech." This guarantee of free speech, which was made applicable to the various states by the Due Process Clause of the Fourteenth Amendment, *Gitlow v. New York,* 268 U.S. 652, 666 (1925), generally protects the free communication and receipt of ideas, opinions, and information, *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 390 (1969); *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 571-72 (1942).

In *Martinez,* that protection includes a protection for "fonn or content of individual

expression. The *Martinez* court wrote:

> An individual's right to free speech and expressive conduct is protected from "arbitrary govenunental interference...."[67] Therefore, as a general rule, the govenunent is prohibited from "prescrib[ing] the form or content of individual expression."

*Martinez* v. *State,* 323     ⬤ ◄▌ (fex. Crim. App. 2010), *citing Cohen* v. *California,*

403 U.S. 15, 19, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Tinker* v. *Des Moines Indept. Comm.*

*Schoo/Dist.,* 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)("The Constitution says

that Congress (and the States) may not abridge the right to free speech."), *United States v. Playboy Ent.Group, Inc.*, 529 U.S. 803, 812, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) ("Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles.").

### 2.    The prosecution violated Broadnax's free speech rights

The prosecutor violated the free speech rights of Mr. Broadnax through the use of false and misleading evidence that various writings by Mr. Broadnax were indicia of gang membership, when they were in fact an exercise of free speech.  Mr. Stewart attests:

> As a gang expert, I recognize that popular culture has embraced rap music which utilizes gang symbols and references. To suggest that writing rap lyrics and drawing symbols identify a person as a gang member is a gross over statement. Particularly among African American males, the rap persona which utilizes many gang references, denotes a macho reputation, financial success and attractiveness to the opposite sex. Gang symbolism is merely a prop to portray these characteristics.

State App Exhibit 25: Affidavit of Stewart (gang expert).

Mr. Broadnax incorporates by reference the arguments in Grounds Four and Six. The false and misleading evidence of gang membership, violated the free speech rights of Mr. Broadnax, heightened the unfairly prejudicial effect of the media interviews, and overshadowed the mitigation evidence presented by the defense.  Hence, habeas relief should be granted.

---

GROUND Six:(IAC & Gang Evidence — 6th & 14th amendment violation). Mr.Broadnax was denied his right to effective assistance of counsel, who failed to object to, and/or properly cross examine on, and/or call its own defense gang expert to refute evidence of gang affiliation

A.    Statement of Facts

The Statement of Facts in Ground Four is incorporated by reference.

B.    Argument and Authorities.

1.    Standard of Review

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact fmder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

## The ABA Guidelines

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. *Rompilla v. Beard,* 545 U.S. 374 (2005), *citing Wiggins v. Smith,* 539 U.S. 510, 522 (2003) ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'").

TEXAS GUIDELINE 11.1 — Trial Investigation provides in part:

A.   Counsel at every stage have an obligatin to conduct thorough and independent investigation relating to the issues both guilt and penalty.

Thereafter, the guideline delineates various aspects of the investigation relating to the punishment phase, which include by way of example, but not limitation, discovery well in advance of trial as to the evidence the State intends to use during the punishment phase of the trial, development of rebuttal witnesses for the State's extraneous offenses, planning of the cross examination of the State's witnesses.

TEXAS GUIDELINE 11.2 — The Duty to Assert Legal Claims provides in part:

A.   Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should:

3.   Evaluate each potential claim in light of: ...

c.   The importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited; ....

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS    69

B.    Counsel who decide to assert a particular legal claim should:

    1.    Present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law; and

    2.    Ensure that a full record is made of all legal proceedings in connection with the claim.

GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL, TEX. GUIDELINE 11.2-*The Duty to Assert Legal Claims* (adopted April 21, 2006).

2.    Constitutionally Deficient Performance

a.    Deficient Performance

    (1)    Tbe pre-trial investigation into gang membership was superficial

Trial counsel failed to adequately investigate, develop and refute that Mr. Broadnax was a gang member contrary to TEXAS GUIDELINE 11.1 – Trial Investigation. The billing records of counsel and their investigators reflect that Mitigation Investigator, Brendan Ross, performed one hour of research into Gangster Disciple of Dallas on March 5, 2009. State App Exhibit 20 C1 & C2: Billing Records Brendan Ross 3/5/2009 entry. Other than that, the available billing records do not reflect additional investigation into gang membership. There is no indication of any effort to consult with, or hire, a gang expert.

(2)    Failure to adequately object to, and/or cross-examine the prosecutor's gang expert, and/or offer rebuttal testimony

At trial, and as raised in the direct appeal, (Issue Nos. 35, 36), the defense objections were limited to TEX.R.Evm. 401 (lack of relevancy) and TEX.R. Evm 403 (more prejudicial than probative) (RR49:38-39, 41, 103, 104), and Fourth Amendment violations. (RR49:38, 41 (running objections preserved)).

Defense counsel's performance was deficient because as a result of a superficial pre-trial investigation into gang membership, defense counsel failed altogether to object to and/or cross-examine the prosecution's gang expert to show:

- the unreliable and invalid foundation underpinning Nelson's testimony of gang membership, because Mr. Broadnax did not meet the criteria for "Criminal Combination," or Criminal Street Gang,'under TEX. CODE CRIM. PROC. Chap. 61;[12]

- Mr. Broadnax is not listed in any Dallas gang database;

- Mr. Broadnax does not have specific gang-related tatoos; and/or

- rebut the prosecution's gang expert, with a defense-expert on gangs.

Defense counsel also failed to object on the basis of a violation of Mr. Broadnax's First and Fourteenth amendment right to free speech. U.S.CoNST.Amend. I, U.S.CONST. Amend.

---

[12]    Because defense counsel failed to object to and rebut, the unreliable and invalid foundation underpinning Nelson's testimony of gang membership, the false and misleading evidence reverberated as the case proceeded into the appellate court. The Texas Court of Criminal Appeals, wrote: "Through Detective Nelson's testimony, the State established evidence of the appellant's gang membership......"" Slip Op. *Broadnax v.State,* slip op. No. AP,76,207 (Tex. Crim. App. 2011) G. *Testimony on Gang Membership.*

XIV; *Gitlow v. New York,* 268 U.S. 652, 666 (1925); *Strickland v. Washington,* 466 U.S. 668, 686 (1984).

Dwight Stewart, a member of the Hays County Gang Task Force, and who is nationally certified Gang Awareness Trainer, attested that trial counsel knew or should have known about the statutory criteria for gang membership, and sought to rebut the prosecution's expert witness testimony:

> Since 2006, I have presented Continuing Legal Education (CLE) seminars at a variety of venues including The Center for American and International Law (CAILAW) in Plano, Texas on the subject of gang education, specifically for attorneys practicing capital defense. Thus, counsel for Mr. Broadnax knew or should have known to investigate whether or not Mr. Broadnax was listed in the Dallas Gang database.

> Although State witness, Melody Nelson, Asst. Warden with the TDCJ Institutional Division testified that Gangster Disciples are not recognized as a security threat that requires automatic administration segregation, but are instead considered a 'clique' (RR 49:164), defense counsel offered no cross-examination of the State's primary gang witness, Detective Nelson. Likewise, defense counsel did not cross-examine the prosecution's investigator, Mr. Doty, relating to his testimony of gang signs within the jail cell and the misleading implication of Mr. Broadnax's gang membership.

> If I had been asked to testify as a gang expert on behalf of Mr. Broadnax, I could have offered the following testimony:

> A.    gang activity is not a solo activity but requires three or more members who provide structure and hierarchy and operate together in criminal enterprise. There is no evidence that Mr. Broadnax had any gang associates or entered into any criminal gang enterprise.

> B.    attraction to gang membership can be a result of poverty, social isolation and alienation from family in an effort to find identity and belonging in a surrogate-type gang family.

---

As a result, trial counsel's performance was deficient because they failed to follow TEXAS GUIDELINE 11.2 – The Duty to Assert Legal Claims.

Any assertion of "strategy" is not reasonable because defense counsel lacked the necessary facts relevant to discover and select among plausible options – a direct and proximate result of the inadequate investigation. *See Wiggins v. Smith,* 539 U.S. 510, 521 (2003) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has.a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.")* (emphasis supplied).

b.     Reasonable Probability of Different Outcome

*InStricklandv. Washington,* 466 U.S. 668, 695-696 (1984), the Court discussed how the prejudice determination is analyzed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, *a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and*

---

*taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.*

Mr. Broadnax incorporates by reference the arguments in Grounds Four and Five above. The false and misleading evidence of gang membership heightened the material and unfairly prejudicial effect of the media interviews, and overshadowed the mitigation evidence presented by the defense. Ultimately, the jurors answered yes to future dangerousness, and no to the mitigation special issues, that resulted in a sentence of death.(RR 54:4-5; CR3:650, 698).

But for the admission of this evidence, there is a reasonable probability but that for defense counsel's deficient performance the outcome would have been different. The failure of defense counsel to adequately investigate, develop and refute the false and misleading evidence of gang membership, resulted in a breach of "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Kimmelman v. Morrison,* 477 U.S. 365, 384 (1986), *citing Strickland v. Washington,* 466 U.S. 668, 686 (1984).

Hence, habeas relief should be granted.

GROUND SEVEN: (ASPD & PCL-R- Use of False and Misleading Evidence -8th and 14th amendment violations). Mr. Broadnax was denied his right to due process, and to be free from cruel and unusual punishment when the prosecution used materially false and misleading evidence of future dangerousness based on ASPD and PCL-R

A.    Statement of Facts

During the punishment phase of the trial, the defense called Dr. Lane, a psychiatrist, who was one of several medical personnel who had treated Mr. Broadnax at the jail. (RR 50:77, 83). In response to questioning by Mr. Lollar, Dr. Lane testified that one of his impressions was that Mr. Broadnax had antisocial personality disorder (ASPD):

Q.    ... What other impressions did you have at that time?

A.    A possibility he also had antisocial personality disorder.

Q.    And describe what that is and why you say it was a possibility?

A.    Well, antisocial personality disorder, first of all, a personality disorder is a more entrenched derangement of the personality that can't be diagnosed until the age of 18 or older, and it is an enduring pattern of behavior. And it occurs not simply after exposure to a drug, or, say, in response to a medical condition like a brain tumor or hormone imbalance or something of that nature.

The personality disorders include such things as paranoid personality disorder, antisocial personality disorder, histrionic personality disorder, and to nail down those diagnoses of general pattern of behavior, you'd have to have more information from other sources: His family, his teachers, his employers, and -- to give you a long range perspective. Otherwise, you wouldn't know what the pattern of his behavior is.

Q.    ... Now, in regard to the antisocial personality disorder, is it required that you know what the person's history was prior to the age of 15?

A.    Yes.

Q.    And you didn't have that type of history available to you; is that correct?

A.    That's correct.

Q.    So what you wrote there was an impression, but not exactly a diagnosis; would that be fair to say?

A.    That's fair to say.

Q.    And I think you noted on other times that he's got traits of antisocial behavior.   Certainly, that would apply to what, 85, 90 percent of the people in the jail, because that's one of the traits of antisocial, is that the person's jailed.

A.    Or that-that they're breaking the law.

(RR 50:99-100, 102, 106, 1 11).

The prosecutor, David Alex, cross examined Dr. Lane.  (RR 50:114).   The thrust of the cross-examination of Dr. Lane, was to have him tie the various diagnostic criteria of ASPD[13] to behaviors of Mr. Broadnax.  *See* (RR 50:146-150) (criteria of lack of remorse

---

[13]    Without objection the prosecutor put into evidence Exhibit 581, the definition of ASPD (RR 50:145), and Prosecutor Alex asked Dr. Lane to read the diagnostic criteria into the record:

A.    There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15, as indicated by three or more of the following: One, a failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest; Two, deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure; Three, impulsivity or failure to plan ahead; Four, irritability and aggressiveness as indicated by repeated physical fights or assaults; Five, a reckless disregard for safety of self or others; Six, consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior, or honor financial obligations;   And seven, a lack of remorse as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

Criteria B.  The individual is at least 18 years of age.

shown by video of defendant; conduct disorder before age 15 as shown by self-report of time in juvenile facility; criteria of aggressiveness shown by fights in jail; reckless disregard for the safety of others as shown on the video; criteria of at least 18 years of age, and Broadnax was 19 going on 20 at time of interview by Dr. Lane).

In a hearing out of the presence of the jury, the prosecutor called Jack Randall Price, Ph.D., a clinical and forensic psychologist.[14] (RR 50:215,216, 218). Dr. Price was not called to testify that Mr. Broadnax was a psychopath. Instead he was called to educate the jury on characteristics of a psychopathic personality based on the Psychopathy Checklist Revised (PCLR) criteria, as set out in SE-595, so that the jury could apply the facts of the Broadnax case to the criteria in order to answer the special issues, particularly as to future dangerousness. (RR 50:220-222, 224). Dr. Price testified that he did not have a professional opinion about how the jury might use the criteria. (RR 50:226).

Mr. Parks objected that the testimony of Dr. Price was inadmissible under TEx. R. Evm. 401 (definition of relevant evidence"), 403 (probative value outweighed by unfair prejudice and jury confusion), 702 (testimony by experts when specialized knowledge would assist the trier of fact). (RR 50:227-228). Mr. Alex responded that the testimony of Dr. Price

---

Criteria C. There is evidence of conduct disorder with onset before the age of 15.

And D, the occurrence of antisocial behavior is not exclusively during the course of schizophrenia or a manic episode.

(RR 50:146-148).

[14] The transcript mistakenly appends M.D. after his name. (RR 50:215).

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS          77

was admissible to rebut the testimony of Dr. Lane who "talke[ed] about a psychopath when he talked about antisocial personality disorder. And if we look at the characteristics of a psychopath and we go through them by each one, the defendant hits on all fours..... the term has been used by Dr. Lane...." (RR 50:229).

The court ruled the testimony admissible:

> So I have performed the gatekeeping function.... and find the testimony is sufficiently reliable and relevant, ... could conceivably assist the trier of fact ... in understanding the evidence or in determining a fact in issue, and if the expert has made an effort to sufficiently tie the pertinent facts of the case to meet the requirement, it would be helpful to the jury. The probative value is not substantially outweighed by prejudicial effect.

(RR 50:230).

In the presence of the jury, the prosecutor called Dr. Price. (RR 50:239). Using a power point presentation, Dr. Price discussed the 20 traits of psychopathy. (RR 50:247, SX-595, SX-597). He began by telling the jury that psychopathy, "it's roughly the same thing as what ... you heard about, the antisocial personality disorder." (RR 50:248). "It's a person whose traits, ... are against society.... the kind of person they are." (RR 50:249). These traits included:

- Glibness/Superficial Chann
- Grandiose Sense of Self-Worth
- Need for Stimulation/Proneness to Boredom
- Pathological Lying
- Conning/Manipulative
- Lack of Remorse of Guilt
- Shallow Affect
- Callous/Lack of Empathy
- Parasitic Lifestyle

---

EX PARTE JAMES BROADNAX: APPLICATION FORPOST-CONVICTION WRIT OF HABEAS CORPUS                    78

- Poor Behavioral Controls
- Promiscuous Sexual Behavior
- Early Behavior Problems
- lack of Realistic, Long Term Goals
- Impulsivity
- Irresponsibility
- Failure to Accept Responsibility for Own Actions
- Many Short-Term Marital Relationships
- Juvenile Delinquency
- Revocation of Conditional Release
- Criminal Versatility

(RR. 50:249-257).

Dr. Price concluded his testimony by saying that "It's a very persistent condition; ... there is no effective treatment," that it is "relatively infrequent in society in general." (RR 50:258, 259).

## B.    Argument and Authorities.

### 1.    Standard of Review

In *Ramirez* v. *State*, 96 S.W.3d 386, 397 (Tex. App. — Austin 2002, pet. ref'd), the court reversed and remanded the judgment of the jury because "the testimony [was] false and misleading to the trier of fact," relying on *Napue* v. *Illinois*, 360 U.S. 264 (1959); *Pyle* v. *Kansas*, 317 U.S. 213 (1942); *Mooney* v. *Holohan*, 294 U.S. 103 (1935). In support of the outcome, the court reasoned as follows:

> Many cases discussing a *Mooney-Pyle-Napue* contention refer to the testimony as being "perjured testimony" or as involving "perjury." *See, e.g., Pyle,* 317 U.S. at 216, 63 S.Ct. 177. While this tenninology is still used, it is sufficient if

the testimony is false and misleading to the trier of fact. *See Napue,* 360 U.S. at 269; *Alcorta,* 355 U.S. at 32.

*There is no need for a defendant to show the witness knew the testimony was false or otherwise harbored a sufficient culpable mental state to render the witness subject to prosecution for perjury.* Moreover, the Court of Criminal Appeals has made clear that whether the rule is violated or not does not depend upon the defendant's ability to demonstrate the witness's specific factual assertions were technically incorrect or "false." *It is sufficient if the witness's testimony gives the trier of fact a false impression.*

Dix, § 22.53.

*Ramirez* made it clear that *it is of no consequence "[w]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." Ramirez,* 96 S.W.3d at 397, *citing Giglio,* 405 U.S. at 154, 92 S.Ct. 763. The outcome hinges on the obligation of the prosecution to do justice:

The prosecutor is:

[T]he representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligations to govern at all; and whose interest; therefore, *in a criminal prosecution is not that it shall win a case, but that justice shall be done.*

*Ramirez,* 96 S.W.3d at 397, *citing Berger* v. *United States,* 295 U.S. 78, 88 (1935).

2.    The evidence of ASPD and psychopathy to prove future dangerousness was false and misleading

The evidence of ASPD and psychopathy to prove future dangerousness was false and misleading, as reflected in the attestation of Dr. Edens, an expert in this area:

4.    I am familiar with the research literature on the *Hare Psychopathy Checklist-Revised* (PCL-R) and have used it in both clinical and research settings. The PCL-R is a 20-item checklist of psychopathic traits (e.g., remorselessness, grandiosity, superficial charm) that typically is scored based on a semi-structured interview and review of available collateral information. Examinees can receive a score ranging from 0 (zero) to 40, with higher scores indicating that they are more psychopathic. Aside from conducting quite a bit of scientific research on Dr. Hare's instruments, particularly their relationship to violence, I also have published extensively on the potential misuses and abuses of these scales in forensic evaluations, especially in the context of capital murder trials. I am also familiar with the Diagnostic and Statistical Manual 4th Edition (DSM-IV) diagnosis of APD, having lectured on the DSM-IV in graduate and undergraduate courses and having published several federally-funded, scientific research articles regarding various controversies regarding APD specifically.

6.    In response to these questions [posed in state habeas], at the time of the Broadnax trial, I am of the opinion that, for purposes of addressing future dangerousness, *there was essentially no scientific justification for introducing into evidence an APD diagnosis,* which in this case was merely a clinical impression documented by one of the witnesses in jail medical records. *Following the introduction of APD evidence, there was no legitimate scientific reason to have then introduced evidence concerning the PCL-R in this case, in particular equating it with the DSM-IV diagnosis of APD.* Once introduced, there is a strong probability that the PCL-R stigmatized the defendant with an irrelevant and pejorative label ("psychopath") and set of personality traits (e.g., superficial charm, grandiosity) *having little or nothing to do with his likelihood of future dangerousness if not put to death. At the time of the trial, published scholarly reviews criticizing the use of psychopathy*

*and APD diagnoses in capital murder cases were available in the scientific literature and mental health professionals who work in this area are familiar with these research findings. As such, numerous experts would have been available to aid in a challenge to the introduction of this evidence or, at a minimum, serve as a rebuttal witness* to the expert witnesses called by the prosecution. Infonnation supporting these opinions is detailed in paragraphs 7 through 13 below.

State App Exhibit 26:Affidavit of John Edens, Ph.D.(ASPD & PCL-R)(Emphasis supplied).

3.    The evidence of psychopathy was material and unfairly prejudicial

The evidence of ASPD and psychopathy to prove future dangerousness was material and unfairly prejudicial, as reflected in the attestation of Dr. Edens:

11.    Of note, the unfair prejudicial effects of introducing the PCL-R in the trial of Mr. Broadnax are likely magnified by statements made during direct testimony by Dr. Price that there is essentially no treatment for psychopathy. [footnote omitted].    Early reviews of the psychopathy/treatmentliterature were quite pessimistic, with some even arguing that treatment might make psychopaths worse. More recent published scientific research, however, suggests that there are interventions that can significantly reduce the likelihood of future violent behavior among individuals with psychopathic traits, particularly those who are relatively young. [footnote omitted]. As such, *asserting that psychopaths cannot be treated runs counter to what is currently known about treatment efficacy with these individuals-but it does bolster the stereotype of a capital defendant as a hopeless case who will never be anything other than a dangerous predator.*

12.    Another significant problem concerning introduction of evidence regarding the PCL-R is that, noted above, it has been shown to artificially increase the inaccurate perception that a capital defendant will be dangerous in the future. At present there is little evidence to support the assertion that psychopathy scores actually have any bearing on a convicted capital defendant's likelihood of engaging in future violence in U.S. prisons. That is, the available scientific studies suggest

that PCL-R scores are at best very weakly related to violent behavior in U.S. prisons. This assertion is based on the results of a published meta-analysis [footnote omitted] in which my colleagues and I statistically aggregated the results of all available individual research studies examining the relationship between PCL-R scores and violence in U.S. prisons, which consisted of an aggregated sample size of over 800 inmates across five individual studies. I am not aware of any published studies of the PCL-R in the U.S. that have examined whether it can reliably predict the violent behavior of capital defendants, life sentenced offenders, or those offenders who are in administrative segregation-but the fact that it has not performed well in five U.S. prison studies of non-capital offenders suggests that its poor accuracy would be similar or worse among capital defendants serving life sentences. [footnote omitted]

13. *Aside from having an unfair prejudicial impact and having little or no demonstrated probative value concerning future dangerousness in capital cases, it is also worth stressing that a growing body of scientific research indicates that PCL-R scores are highly unreliable in "real world" criminal cases* (as opposed to controlled scientific research studies). Initially this concern was based primarily on several anecdotal examples of large scoring disparities across experts testifying about the same defendant in criminal cases. [footnote omitted]. More recently, however, several "field studies" of the PCL-R have reported that in adversarial settings experts disagree considerably on the scoring of this rating scale and, not surprisingly, results also suggest that prosecution experts tend to give higher scores than do defense experts. [footnote omitted). It is unclear whether prosecution witnesses overestimate psychopathy, defense witnesses underestimate psychopathy, or both, but the key point is that how psychopathic a defendant is described to be at trial appears to some extent contingent on who conducts the examination.

14. To summarize my professional opinions in regards to the trial of Mr. Broadnax, *there seems to be no scientifically valid or reliable reason to have introduced evidence concerning the PCL-R in this case in response to earlier evidence and testimony concerning APD--which is itself largely extraneous to a scientifically based assessment of risk factors for future violence in prison.* Once introduced, there is a strong probability that *the PCL-R unfairly stigmatized the defendant* with an irrelevant and pejorative label ("psychopath") and set of personality

traits (e.g., superficial charm, grandiosity, conning/manipulative). Given that (a) *the PCL-R has little or no predictive validity in relation [to] future dangerousness* in capital trials and (b) scores provided by examiners in adversarial settings seem *highly unreliable,* I am of the opinion that it has little or no probative value in capital cases, in addition to being unfairly prejudicial. Obviously it is the role of the legal system (rather than social scientists) to determine the legal admissibility of mental health evidence in terms of its probative and prejudicial value, but to the extent that admissibility is to be informed by scientific data, the above-noted research findings lead me to the opinion that the PCL-R should not be introduced in cases such as that of Mr. Broadnax. Given that this evidence was introduced, I am of the opinion that an expert familiar with this area of research should have been called to rebut this evidence rather than simply let it go unchallenged. At a minimum, the cross-examination of Dr. Price should have addressed the points I have noted above regarding the limitations of APD and PCL-R evidence in these cases.

State App Exhibit 26: Affidavit of John Edens, Ph.D. (ASPD & PCL-R) (Emphasis supplied in part).

In addition, the false and misleading evidence of ASPD and psychopathy, heightened the unfairly prejudicial effect of the media interviews, (RR 50:212-213; RR 53:68, 69, 74), and overshadowed the mitigation evidence presented by the defense. Ultimately, the jurors answered yes to future dangerousness, and no to the mitigation special issues, that resulted in a sentence of death. (RR 54:4-5; CR3:650, 698).

In summary, the right of Mr. Broadnax to federal due process of law and to be free from cruel and unusual punishment was violated when the prosecutor relied on the false, misleading and material testimony concerning both ASPD and the PCL-R to argue that Mr. Broadnax was a future danger. There is a reasonable likelihood that the use of this materially misleading evidence adversely affected the outcome of the punishment phase of the trial

94

subjecting Mr. Broadnax to a death sentence based on ASPD and the PCL-R traits that have no indicia of validity and reliability in a criminal trial. U.S. CONST. Amend. VIII; *Graham v. Florida,* 130 S. Ct. 2011 (2010) ("The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'") *citing Weems* v. *United States,* 217 U.S. 349, 367 (1910). U.S. CONST. Amend. XIV; *Napue v. Illinois,* 360 U.S. 264 (1959); *Pyle v. Kansas,* 317 U.S. 213 (1942); *Mooney v. Holohan,* 294 U.S. 103, 112–13 (1935) (and its progeny for the proposition that the knowing use of false testimony violates federal requirement of due process and denies an accused of a fair trial).

GROUND EIGHT (lAC & ASPD, PCL-R — 6th and 14tll amendment violations). Mr. Broadnax was denied his right to effective assistance of trial counsel, who sponsored defense expert testimony of ASPD, which opened the door to the prosecutor-sponsored, unreliable and invalid testimony on psychopathy and ASPD

A.    Statement of Facts

The Statement of Facts recited in Ground Seven, above is incorporated by reference herein.

B.    Argument and Authorities.

1.    Standard of Review

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Stricklandv. Washington,* 466 U.S. 668,686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

## The ABA Guidelines

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. *Rompilla v. Beard,* 545 U.S. 374 (2005), *citing Wiggins v. Smith,* 539 U.S. 510, 522 (2003) ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'").

TEXAs GUIDELINE 11.1 — Trial Investigation provides in part:

A.    Counsel at every stage have an obligation to conduct thorough and independent investigation relating to the issues both guilt and penalty.

Thereafter, the guideline delineates various aspects of the investigation relating to the punishment phase, which include by way of example, but not limitation, discovery well in advance of trial as to the evidence the State intends to use during the punishment phase of the trial, development of rebuttal witnesses for the State's extraneous offenses, planning of the cross examination of the State's witnesses.

TEXAS GUIDELINE 11.2 — The Duty to Assert Legal Claims provides in part:

A.    Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should:

3.    Evaluate each potential claim in light of: ...

c.    The importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited; ....

---

B.    Counsel who decide to assert a particular legal claim should:

1.    Present the claim as forcefully as possible, tailoring the presentation to the particular facts   and circumstances in the client's case and the applicable law; and

2.    Ensure that a full record is made of all legal proceedings in connection with the claim.

GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL, TEX. GUIDELINE 11.2*The Duty to Assert Legal Claims* (adopted April 21, 2006).

## 2.    Constitutionally Deficient Performance

### a.    Deficient Performance

Defense counsel's performance was constitutionally deficient because:

- Through medical records, referred to in the testimony of Dr. Lane, who gave his "impression" that Mr. Broadnax was ASPD, defense counsel opened the door to the prosecutor's use of ASPD to contend that Mr. Broadnax was a future danger;

- Even if Dr. Lane had postive testimony defense counsel sought to introduce on behalf of Mr. Broadnax, they did nothing to have Dr. Lane or another expert explain ASPD, why and how it was not a valid or reliable indicator of future dangerousness, and that it was never intended for use in a criminal trial setting;    __

- Defense counsel also failed to cross examine Dr. Price altogether, and or rebut the reliability and validity of the PCL-R in the future dangerousness determination at trial.

As attested to by Dr. Edens:

14.    .... Obviously it is the role of the legal system (rather than social scientists) to determine the legal admissibility of mental health evidence

---

in terms of its probative and prejudicial value, but to the extent that admissibility is to be informed by scientific data, the above-noted research findings lead me to the opinion that the PCL-R should not be introduced in cases such as that of Mr. Broadnax. Given that this evidence was introduced, I am of the opinion that an expert familiar with this area of research should have been called to rebut this evidence rather than simply let it go unchallenged. At a minimum, the cross-examination of Dr. Price should have addressed the points I have noted above regarding the limitations of APD and PCL-R evidence in these cases.

State App Exhibit 26: Affidavit of John Edens, Ph.D. (ASPD & PCL-R) (Emphasis supplied in part).   The performance of defense counsel violated TEXAS GUIDELINE 11.1 – Trial Investigation and TEXAS GUIDELINE 11.2 – The Duty to Assert Legal Claims.

Any assertion of "strategy" is not reasonable because defense counsel lacked the necessary facts relevant to discover and select among plausible options  – a direct and proximate result of the inadequate investigation. *See  Wiggins v. Smith,* 539 U.S. 510, 521 (2003) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.")* (emphasis supplied).

 

       b.     Reasonable Probability of Different Outcome

In *Stricklandv. Washington,* 466 U.S. 668, 695-696 (1984), the Court discussed how the prejudice determination is analyzed:

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, *a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask* if *the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.*

Mr. Broadnax incorporates by reference the arguments in Grounds Seven above. The false and misleading evidence of psychopathy heightened the unfairly prejudicial effect of the media interviews, and overshadowed the mitigation evidence presented by the defense. Ultimately, the jurors answered yes to future dangerousness, and no to the mitigation special issues, that resulted in a sentence of death.(RR 54:4-5; CR3:650, 698).

But for the admission of this unreliable and invalid evidence, there is a reasonable probability the outcome would have been different. The failure of defense counsel to adequately investigate, develop and refute the false and misleading evidence of psychopathy, resulted in a breach of "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Kimmelman v. Morrison,* 477 U.S. 365, 384 (1986), citing *Strickland v. Washington,* 466 U.S. 668, 686 (1984).

Hence, habeas relief should be granted.

# CONCLUSION

Mr. Broadnax is entitled to habeas relief because of the numerous errors of federal constitutional magnitude, which could not have been raised prior to this habeas proceeding.

WHEREFORE, he prays that this court:

1.    Issue a writ of habeas corpus to him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2.    Grant him discovery permitting him to take depositions, and submit interrogatories, and issue subpoenas duces tecum, so that he may present additional evidence in support of these claims.

3.    Grant him an evidentiary hearing pursuant to TEx. CODE CRIM. PROC. 11.071, sec. 9 at which he may present any evidence in support of these claims, and allow him a reasonable period of time subsequent to any hearing this court determines to conduct, in which to brief the issues of fact and of law raised by this habeas application, or such hearing, as more fully detailed in the accompanying Motion for Evidentiary Hearing.

Respectfully submitted,

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas  75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

IN THE
## TEXAS COURT OF CRIMINAL APPEALS
and
### CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TX

Ex Parte James Garfield Broadnax,
*Applicant,*

TCCA No. AP 76,207
Trial Court No. F08-24667-Y

## VERIFICATION

I, Lydia M.V. Brandt, pursuant to Tex. Code Crim. Proc. art. 11.14(5),  *Johnson v State,* 811 S.W.2d 93, 97 (Tex. Crim. App. 1991), acting on behalf of Applicant, Mr. Broadnax as permitted in *Ex parte Burns,* 635 S.W.2d 744, 745 (Tex. Crim. App. 1982), declare under penalty of perjury that based on information and  belief, the foregoing Application for Writ of Habeas Corpus is true and correct.

C4L

Texas Bar No. 00795262

Subscribed and sworn to before me: Date:  **be ν 17( oft**



NOtaliPublic

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TX

---

Ex Parte James Garfield Broadnax,
*Applicant,*

TCCA No. AP 76,207
Trial Court Cause No. F08-24667-Y

---

## MOTION FOR EVIDENTIARY HEARING

Pursuant to TEX. CODE CRIM. PROC. 11.071, sec. 9, Applicant, James Broadnax,

requests that this court set an evidentiary hearing. Under *Ex parte Maldonado,* 688 S.W.2d

114, 115 (Tex. Crim. App. 1985), Mr. Broadnax has the burden of alleging, and if granted an

evidentiary hearing, of proving facts which would entitle him to relief.   Mr. Broadnax

expressly relies upon the factual recitations within this application for habeas relief, as well

as all the facts contained within the Clerk's Record, the Reporter's Record, and all of the

documentation contained within the exhibits to this application. Mr. Broadnax contends that

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                93

he is entitled to relief for all errors substantiated by the factual allegations in this application for habeas relief.

Mr. Broadnax, furthermore, specifically requests a full evidentiary hearing where he may present testimony and other evidence in support of all the claims in this Application and in rebuttal of the state's denials and affirmative defenses as raised in its response to this Application. Mr. Broadnax's claims for relief can not be fully or fairly resolved by this court without the taking of live testimony and presentation of evidence, including evidence pertaining to:

*All claims premised on the introduction by the prosecutor of false and misleading evidence of ASPD, PCL-R, and gang affilation.* The information for these claims lay within the confines of the State Texas, and is evidence that is not otherwise readily accessible to defense counsel. Accordingly, without a hearing, and given the conflict of interest counsel representing the State of Texas would find itself in, in addressing the claims, there are obstacles external to Mr. Broadnax, which would prevent him from offering further proof of his claims.

*All claims pertaining to ineffective assistance of counsel.* TEX. CODE CRIM. PROC. 26.052 provides that counsel that if found to be ineffective are not eligible for appointment in the trial or direct appeal in a capital case. Some of these issues include, by way of example and not limitation:

- the unconstitutionality of the Texas Fair Defense Act, the Dallas County Procedures implementing it;

- the problems with the Dallas County computer system and its impact on case management, and in particular appointment of counsel in Mr. Broadnax's case;

- the extent to which pre-trial investigation had been done into the procedures for appointment of counsel, and the legal theories for the challenge;

---

EX PARTE JAMES BROADNAX:APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                94

- the extent to which the pre-trial investigation had been done into the "media as state agents of law enforcement,"

- false and misleading evidence of ASPD, PCL-R, and gang affilation

Accordingly, without the power of the court, and given the conflict of interest defense counsel would find itself in addressing the IAC claims, there are obstacles external to Mr. Broadnax, which would prevent him from offering further proof of his claims.

To that end, Mr. Broadnax requests that this court grant him an evidentiary hearing pursuant to TEX. CODE CRIM. PROC. 11.071, § 9 at which he may present evidence in support of these claims.

Mr. Broadnax requests that within a reasonable time prior to that evidentiary hearing, that this court enter an order permitting him discovery in the form of depositions, written interrogatories, and subpoenas duces tecum in order to prepare for the hearing and secure witnesses and evidence, pursuant to TEX. CODE CRJM. PROC. 11.071, § 9.

Mr. Broadnax further requests that following the evidentiary hearing, this court allow him a reasonable period of time to brief the issues of fact and of law raised by this habeas application, or such hearing.

_Lydia M. V. Brandt_

---

LydiaM.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                105

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TX

Ex Parte James Garfield Broadnax,           TCCA No. AP 76,207
*Applicant,*                                 Trial Court Cause No. FOS-24667-Y

MOTION FOR ORAL ARGUMENT
BEFORE THE TEXAS COURT OF CRIMINAL APPEALS
(constitutional challenge to statute, facially & as applied)

Applicant, James Broadnax, respectfully suggests that oral argument will materially assist the Texas Court of Criminal Appeals in understanding the constitutional challenge to the Texas Fair Defense Act, and the Dallas County procedures implementing it, facially and as applied. Accordingly, oral argument is requested because these issues presented are of importance to the jurisprudence of the State of Texas.

Lydia M.V. Brandt

## CERTIFICATE OF SERVICE

I certify that on December 20, 2011, I caused a copy of the foregoing Application, Verification, Motion for Evidentiary Hearing, and Request for Oral Argument, together with the exhibits,[15] to be:

*Federal Express Ground (paper format) (and a copy sent by email)*
Edward Marshall, Division Chief (edward.marshall@oag.state.tx.us)
Office of the Attorney General, Post Conviction Division
300 West 15th Street, Suite 800
Austin, Texas, 78701
(512) 936-1400

*Hand delivered (paper format) (and a copy sent by email)*
·Attn: Capital Writs – Appellate Section
Dallas County District Attorney's Office
133 N. Riverfront Blvd., LB 19
Dallas, TX 75207

and, eleven (11) (paper format) copies, together with one copy of the exhibits to be sent by Federal Express Ground to:

*Federal Express Ground (paper format)*
Attn: Betty Hooper
Clerk of Court
Texas Court of Criminal Appeals
Supreme Court Building
201 West 14th Street, RM 106
Austin, TX   78701

Lydia M.V. Brandt

---

[15]   The exhibits are not included in the email transmission because of volwne limits in email program.

---

cc:    *Hand delivered "Judge Copy" (paper format) (and a copy sent by email)*
Michael Snipes, Judge, CDC #7
sa.johnson@dallascounty.org Sharon Johnson (court coordinator)

*(U.S. Mail)*
Mr. James G. Broadnax
#999-549
Polunsky Unit, TDCJ
3872 FM 350 South
Livingston, TX 77351-8580

---

EX PARTE JAMES BROADNAX: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS    98

## EXHIBITS

State App. Exhibit 1:    Dallas County Procedures for Appointment of Counsel in Death Penalty Cases, As Amended May 2007

State App. Exhibit 2:    Dallas Counsel Indigent Defense Plan for the Appointment of Counsel in Felony CasesRevised January 2009

State App. Exhibit 3:    Business Records Affidavitand Sheriffs Dept Records (Dallas County Book In)

State App. Exhibit 4:    2008 Calendar

State App. Exhibit 5:    Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Broadnax)

State App. Exhibit 6:    Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Cummings)

State App. Exhibit 7:    Business Records Affidavit, and Sheriffs Dept Records (Media Requests)

State App. Exhibit 8:    Devin Krause, *County IT in Dismal Shape,* DALLAS MORNING NEWS (Sept 29, 2010)

State App. Exhibit 9:    Devin Krause, *Audit Confirms IT Deficiencies,* DALLAS MORNING NEWS (Jan 18, 2011)

State App. Exhibits
10, 1112:    Tatum Report: Final Report of Findings; Final Report of Recommendations; Summary of Findings and Recommendations

State App. Exhibit 13:    Cmptr Print Out (B070, Lollar/Broadax)

State App. Exhibit 14:    Cmptr Print Out (B070, Maedgen/Cummings)

State App. Exhibit 15:    Email from Dana Wrisner, Criminal District Manager

---

EX PARTE JAMES BROADNAX: APPLICATION FORPOST-CONVICTION WRIT OF HABEAS CoRPUS    99

State App. Exhibit 16:    Cause No. F08-24629, Trial Docket Sheet

State App. Exhibit 17:    Business Records Affidavit, Jail Visitors log

State App. Exhibit 18:    Affidavit of Brad Lollar

State App. Exhibit 19:    (deliberately omitted)

State App. Exhibit 20:    Affidavit of Auditor and Billing Records

State App. Exhibit 21:    Lollar Request: No Media, No Law Enforcement

State App. Exhibit 22:    Scott GOLDSTEIN, *Prosecutors Undecided on Pursuing Death Penalty in Farmers Branch Police Officer's 1983 Slaying*, DALLAS MORNING NEWS (9-10-2010)

State App. Exhibit 23:    Affidavit of Jennifer Reif

State App. Exhibit 24:    Affidavit of Cliff Jenkins

State App Exhibit 25:    Affidavit of Stewart (gang expert)

State App Exhibit 26:    Affidavit of Edens, Ph.D. (ASPD & PCL-R)

---



COPY

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TX

2011 DEC 20 AM 9: 48

GARY
DISTRICT
DALLAS CO. TEXAS

_____ DEPUTY

**TCCA Cause No. AP-76,207**
Criminal District Court No. 7, Cause No. F08-24667-Y

---

**Ex Parte JAMES GARFIELD BROADNAX, Petitioner**

---

*Exhibits – VOLUME I OF II*
Exhibit 1 through and including Exhibit 19

---

**DEATH-PENALTY CASE**

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR JAMES BROADNAX

111

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TX

---

**TCCA Cause No. AP-76,207**
Criminal District Court No. 7, Cause No. F08-24667-Y

---

**Ex Parte JAMES GARFIELD BROADNAX**, Petitioner

---

*Exhibits – VOLUME I OF II*
Exhibit 1 through and including Exhibit 19

---

**DEATH-PENALTY CASE**

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR JAMES BROADNAX

112

## CERTIFICATE OF SERVICE

I certify that on December 20, 2011, I caused a copy of the foregoing Application, Verification, Motion for Evidentiary Hearing, and Request for Oral Argument, together with the exhibits,[1] to be:

*Federal Express Ground (paper format) (and a copy sent by email)*
Edward Marshall, Division Chief (edward.marshall@oag.state.tx.us)
Office of the Attorney General, Post Conviction Division
300 West 15th Street, Suite 800
Austin, Texas, 78701
(512) 936-1400

*Hand delivered (paper format) (and a copy sent by email)*
Attn: Capital Writs – Appellate Section
Dallas County District Attorney's Office
133 N. Riverfront Blvd., LB 19
Dallas, TX 75207

and, eleven (11) (paper format) copies, together with one copy of the exhibits to be sent by Federal Express Ground to:

*Federal Express Ground (paper format)*
Attn: Betty Hooper
Clerk of Court
Texas Court of Criminal Appeals
Supreme Court Building
201 West 14th Street, RM 106
Austin, TX   78701

Lydia M.V. Brandt

---

[1]   The exhibits are not included in the email transmission because of volume limits in email program.

113

cc:    *Hand delivered "Judge Copy" (paper format) (and a copy sent by email)*
Michael Snipes, Judge, CDC #7
sa.johnson@dallascounty.org Sharon Johnson (court coordinator)

*(U.S. Mail)*
Mr. James G. Broadnax
#999-549
Polunsky Unit, TDCJ
3872 FM 350 South
Livingston, TX 77351-8580

114

| | |
|---|---|
| State App. Exhibit 1: | Dallas County Procedures for Appointment of Counsel in Death Penalty Cases, As Amended May 2007 |
| State App. Exhibit 2: | Dallas Counsel Indigent Defense Plan for the Appointment of Counsel in Felony Cases, Revised January 2009 |
| State App. Exhibit 3: | Business Records Affidavit, and Sheriff's Dept Records (Dallas County Book In) |
| State App. Exhibit 4: | 2008 Calendar |
| State App. Exhibit 5: | Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Broadnax) |
| State App. Exhibit 6: | Instructions Relating to Preliminary Initial Appearance, Arraignment Sheet, Defendant's Affidavit of Indigence (Cummings) |
| State App. Exhibit 7: | Business Records Affidavit, and Sheriff's Dept Records (Media Requests) |
| State App. Exhibit 8: | Devin Krause, *County IT in Dismal Shape*, DALLAS MORNING NEWS (Sept 29, 2010) |
| State App. Exhibit 9: | Devin Krause, *Audit Confirms IT Deficiencies*, DALLAS MORNING NEWS (Jan 18, 2011) |
| State App. Exhibits 10, 11, 12: | Tatum Report: Final Report of Findings; Final Report of Recommendations; Summary of Findings and Recommendations |
| State App. Exhibit 13: | Computer Print Out (under B070 entry, Lollar/Broadax) |
| State App. Exhibit 14: | Computer Print Out (under B070 entry, Maedgen/Cummings) |
| State App. Exhibit 15: | Email from Dana Wrisner, Criminal District Manager |

115

State App. Exhibit 16:      Cause No. F08-24629, Trial Docket Sheet

State App. Exhibit 17:      Business Records Affidavit, and attached Jail Visitors list

State App. Exhibit 18:      Affidavit of Brad Lollar

State App. Exhibit 19:      Press Release Plea Bargain Summation

State App. Exhibit 20:      Affidavit of Auditor and Billing Records
                            20A:   Lollar Billing Records
                            20B:   Parks Billing Records
                            20C:   Ross Billing Records

State App. Exhibit 21:      Lollar Request: No Media, No Law Enforcement

State App. Exhibit 22:      SCOTT GOLDSTEIN, *Prosecutors Undecided on Pursuing Death Penalty in Farmers Branch Police Officer's 1983 Slaying*, DALLAS MORNING NEWS (Sept. 10, 2010)

State App. Exhibit 23:      Affidavit of Jennifer Reif

State App. Exhibit 24:      Affidavit of Cliff Jenkins

State App Exhibit 25:       Affidavit of Stewart (gang expert)

State App Exhibit 26:       Affidavit of John Edens, Ph.D. (ASPD & PCL-R)

# *Tab* 1

# DALLAS COUNTY PROCEDURES FOR APPOINTMENT
# OF COUNSEL IN DEATH PENALTY CASES
# AS AMENDED MAY 2007

## PURPOSE

The judges of the Criminal District Courts and the District Courts giving preference to criminal cases of Dallas County, in compliance with Article 26.052 of the Code of Criminal Procedure, establish the procedures for the appointment and payment of counsel to represent indigent defendants in death penalty cases. This statute sets forth the practices and procedures to be followed by the district courts trying capital cases in Dallas County. The purpose of the procedures set forth below is to further codify and publish the statutory requirements so that members of the bar and the public may be more fully informed about the operation of the criminal justice system and the procedures followed in Dallas County in death penalty cases. To that end, a copy of these procedures shall be filed with the Dallas County District Clerk and Indigent Defense Task Force in Austin for publication.

## ATTORNEY QUALIFICATIONS

As required by Article 26.052 of the Code of Criminal Procedure, the Courts adopt the standards and procedures for appointment of counsel in capital cases promulgated by the local selection committee for the First Administrative Judicial Region. The local selection committee is appointed by the Presiding Judge of the First Administrative Judicial Region and is comprised of not less than four members, including the Presiding Judge of the First Administrative Judicial Region, at least one district court judge, a representative from the local bar association, and at least one practitioner who is board certified by the State Bar of Texas in criminal law. [Art. 26.052 (c)]. The standards and procedures for the First Administrative Judicial Region are attached to this plan and are hereby incorporated by reference as if fully set forth in this plan.

In addition to the continuing legal education requirements for first chair or lead attorney set forth in the standards promulgated by the local selection committee for the First Administrative Judicial Region, in order to be qualified for appointment as first chair or lead attorney in a death penalty case in Dallas County, the attorney must have completed a minimum of at least four additional hours of continuing legal education or other training related to criminal defense in death penalty cases over the previous two year period, bringing the minimum amount of such training to sixteen hours over the previous two year period.

## APPOINTMENT OF COUNSEL

The presiding judge of the district court in which a capital case is filed shall appoint two attorneys, at least one of which is from the list of qualified attorneys approved by the local selection committee, to represent an indigent defendant. Attorneys shall be appointed as soon as practicable after charges are filed, unless the state gives notice in writing that the state will not seek the death penalty. [Art. 26.052(e)].

*Indigent Defense - Capital Murder, Amended 5-3-07*

118

In appointing an attorney from the approved list the Court should consider the attorney's schedule or availability, the complexities of the case, the individualized needs of the defendant, and such other relevant factors as the Court deems appropriate.

In lieu of appointing counsel from the list of attorneys approved by the local selection committee, members of the Public Defender's Office may be appointed in accordance with guidelines established by the Dallas County Public Defender's Office. [Art. 26.052 (b)].

The judges shall ensure that appointments are reasonably and impartially allocated.

## FEE SCHEDULE

The following fees shall be paid to appointed counsel in capital cases where the death penalty is sought:

$500.00 per half day of voir dire
$1000.00 for each full day of voir dire
$1500.00 for each day in trial

The judge of the court may approve additional time at a rate of $150.00 per hour for all other reasonable and necessary documented legal activity. Work on capital appeals and capital writs will also be compensated at a rate of $125.00 per hour for all reasonable and necessary documented legal activity. To be compensated for time not accounted for in the flat daily rates, an attorney must submit a separate hourly billing statement. The billing statement must reflect the date an itemized legal activity occurred and each itemized activity must be rounded to the nearest tenth of an hour. The billing statement must be signed by the attorney. The signature of the attorney is an attestation as to the billing statement's accuracy.

The courts shall approve reasonable and necessary expenses for investigators and expert witness fees.

Appointed counsel may file with the trial court a pretrial ex parte confidential request for advance payment of expenses to investigate potential defenses. The request for expenses must state: (1) the type of investigation to be conducted; (2) specific facts that suggest the investigation will result in admissible evidence; and (3) an itemized list of anticipated expenses for each investigation. [Art. 26.052 (f)].

The Court shall grant the request for advance payment of expenses in whole or in part if the request is reasonable. If the Court denies in whole or in part the request for expenses, the Court shall: (1) state the reasons for the denial in writing; (2) attach the denial to the confidential request; and (3) submit the request and denial as a sealed exhibit to the record. [Art. 26.052(g)].

Counsel may incur expenses without prior approval of the Court. On presentation of a claim for reimbursement, the Court shall order reimbursement of counsel for the expenses, if the expenses are reasonably necessary and reasonably incurred. [Art. 26.052(h)].

Advance payment of expenses anticipated, or reimbursement of expenses incurred for purpose of investigation or expert testimony may be paid directly to a private investigator licensed under Chapter 1702, Occupations Code, or to an expert witness in the manner designated by the appointed counsel and approved by the Court. [Art. 26.052 (l)].

*Indigent Defense - Capital Murder, Amended 5-3-07*

119

## RECOMMENDATIONS

The Judges of the Criminal District Courts and the District Courts giving preference to criminal cases of Dallas County recommend that all attorneys appointed pursuant to these procedures for appointment of counsel in death penalty cases read and follow the Guidelines and Standards for Texas Capital Counsel promulgated by the Standing Committee on Legal Services to the Poor in Criminal Matters which were adopted by the State Bar Board of Directors on April 21, 2006.

## FUTURE AMENDMENTS

This plan shall be automatically amended without further action of the judges to conform to any amendments to the standards promulgated by the First Administrative Judicial Region.

The foregoing amended plan was adopted by a unanimous vote of the judges of the Criminal District Courts and the judges of the District Courts giving preference to criminal cases of Dallas County, Texas, on May 3, 2007. The fee schedule contained herein is to be effective immediately.

SIGNED this the _____ day of May, 2007.


_____
JOHN CREUZOT, PRESIDING JUDGE
CRIMINAL DISTRICT COURTS
DALLAS COUNTY, TEXAS

*Indigent Defense - Capital Murder, Amended 5-3-07*

120

# *Tab 2*

## DALLAS COUNTY INDIGENT DEFENSE PLAN
### FOR THE APPOINTMENT OF COUNSEL IN FELONY CASES
### REVISED JANUARY 2009

## SECTION 1 APPLICATION FOR
## PLACEMENT ON THE APPOINTMENT LIST WHEEL

1.1     Attorneys requesting court appointments must submit an application on the approved application form to the district court judges. A majority of the judges - 9 criminal district judges - must screen applicants who meet the objective qualifications and approve those attorneys whom they consider competent to handle cases corresponding to an appropriate level.

1.2     The master list will be multi-level, with four trial levels: 1st degree and non-death penalty capital cases, 2nd degree, 3rd degree, and state jail. Under each level there will be a sub-level for multi-lingual lawyers.

1.3     Attorneys on the master list at a certain level may petition to advance to a higher level by submitting a new application. A majority of the district judges must vote to approve the change.

1.4     An attorney who does not receive sufficient votes to be placed on any level of the master list may re-apply in 90 days.

1.5     A separate list will be maintained for appeals and writ appointments. Attorneys must submit the appropriate application. A majority of the judges - 9 criminal district judges - must screen applicants who meet the objective qualifications and approve those attorneys whom they consider competent to handle appeals and writs.

## SECTION 2 MINIMUM
## QUALIFICATIONS FOR APPOINTMENT

2.1 Requirements for attorneys qualifying at each level of the wheel will increase as the possible consequences to the defendant become more serious. Minimum requirements are as follows:

> State Jail - Licensed for 2 years and at least 6 points on the application form; Third Degree - Licensed for 3 years and at least 12 points on the application form; Second Degree - Licensed for 4 years and at least 18 points on the application form;

First Degree and Non Death Penalty Capital Murder  Licensed for 5
years and at least 25 points on the application form.

2.2 Unusual or exceptional experience demonstrating substantial involvement in criminal law may be substituted for trial experience on the application form. If claiming this exception, the attorney must provide a detailed explanation of the attorney's experience as an attachment to the application.

## SECTION 3 PLACEMENT ON THE APPOINTMENT LIST WHEEL

3.1 An attorney qualified for appointment to any felony level will automatically be qualified for all the levels below. Thus, a lawyer on the highest level will be on the felony levels below and his/her name will come up in rotation on each level independently of all other levels and will not result in a forfeiture of position on any other level.

3.2 Lawyers will be randomly, not alphabetically, listed on each level of the wheel. Names on the initial wheel will be shuffled. Thereafter, additional names will be randomly inserted at each level of the wheel.

## SECTION 4 APPOINTMENT OF COUNSEL

4.1 The court or its designee must evaluate each request for a court appointed attorney to determine whether the defendant is indigent. The court or its designee may not consider whether the defendant has posted or is capable of posting bail, except to the extent that it reflects the defendant's financial circumstances as measured by the following factors: (a) the defendant's income; (b) the source of the defendant's income; (c) the assets and property owned by the defendant; (d) the defendant's outstanding obligations and necessary expenses; (e) the number and age of the defendant's dependents, and (f) income of the defendant's spouse that is available to the defendant. The defendant will fill out a form addressing the above factors and if the court or its designee finds the defendant is indigent the form will be filed in the court file.

4.2 When an eligible defendant requests appointment of counsel and submits the required documents, the request and any required documentation shall be transmitted to the court within 24 hours of the request for appointment of counsel being made.

4.3 Counsel shall be appointed for eligible defendants within one working day of the court's receipt of a request for appointed counsel.

123

4.4    A master list of qualified attorneys will be maintained on the county computer. Daily access to that list will be limited to appointing courts and their designees. Those accessing the list will not be able to preview the order of the attorneys as they appear on the list. The court or its designee may draw as many names from the list, in the order that they appear at the required level, as there are appointments to be made that day. The court shall appoint attorneys from among the next five names on the appointment list unless the court makes a finding of good cause on the record for appointing an attorney out of order.

4.5    A court or its designee may appoint from the master list or the Public Defender's Office.

4.6    An attorney cannot be appointed on a case at a level higher than that for which the attorney has been qualified by a vote of the judges.

4.7    When a defendant has two or more cases one attorney will be appointed to all cases and will be appointed from the level of the greater offense.

4.8    An attorney will be appointed only after a case is pre-assigned to a court.

4.9    Defendants who speak only a foreign language will be matched to an attorney qualified to speak that language if available. Those attorneys will also be on the non-multi-lingual part of each level of the wheel and their names will come up on both parts, but an appointment as a multi-lingual speaker from any level of the wheel will result in forfeiture of position for appointment on the other part at the same level.

4.10    When a defendant is subsequently charged with a higher grade of offense, the court may appoint new counsel from the list.

4.11    Felonies with enhancement paragraphs may, in the discretion of the court, be classified for purposes of appointment at the level of the underlying offense or at the level of the potential maximum punishment.

4.12    A judge, for good cause stated either on the record or by written notation placed in the court's file, may appoint an attorney out of order. The replaced attorney will remain at the top of that level of the list from which the appointment was made.

## SECTION 5 DUTIES OF
## APPOINTED COUNSEL

5.1    A lawyer who is appointed from the wheel must either personally represent the client or withdraw. Cases will not be transferable or tradable.

124

5.2 Any attorney called for an appointment who does not respond to the notifying court by 9:45 a.m. the following morning, will be removed from that appointment and his/her name will go back on the bottom of the list for appointments in the future. Repeated failures to respond may be grounds for removal from the master list.

5.3 A lawyer who withdraws from a case will lose the appointment and will not be restored to his/her former place in the rotation.

5.4 All attorneys on the master list must notify the Court Manager for the Criminal District Courts of any change of address or contact information. Failure to maintain accurate contact information with the Court Manager's Office may result in automatic removal from the appointment list.

## SECTION 6 MAINTAINING ELIGIBILITY FOR APPOINTMENT

6.1 To remain eligible for appointment an attorney must:
(i)     complete a minimum of twelve hours of continuing legal education pertaining to criminal law during each 12 month reporting period; or (ii) attend all sessions of either the State Bar Advanced Criminal Law Course or the TCDLA Advanced Criminal Law Short Course once every two years; or (iii)    be currently certified in criminal law by the Texas Board of Legal Specialization.

6.2 Continuing legal education may include teaching at an accredited CLE activity, or other CLE activities accredited under Section 4 Article XII, of the State Bar Rules, which may include online courses and credit for teaching or publishing criminal law materials.

6.3 Self-study hours may not be included in meeting the required CLE hours.

6.4 CLE hours completed during any reporting period in excess of the minimum required hours may be applied to the following reporting period's requirement. CLE hours may only be carried over for one year.

6.5 The reporting period shall be from January 1st to December 31st of each year. Each attorney must provide proof that the attorney has met the CLE requirements during the reporting period by reporting their CLE hours each January on the form approved by the judges of the criminal district courts and the district courts giving preference to criminal cases. The CLE compliance report must be sworn to by the attorney.

125

6.6 The CLE compliance report form shall be turned in to the Criminal District Court Manager during the month of January following each reporting period and must be received by the Criminal District Court Manager no later than January 31st of each year.

## SECTION 7 REMOVAL FROM LIST AND REINSTATEMENT

7.1 An attorney who fails to comply with the CLE requirements or fails to submit a sworn CLE compliance form each January will be automatically removed from the master list.

7.2 An attorney may be removed from the master list or moved to a lower level of the wheel for reasons other than failure to comply with the CLE requirements by a majority vote (9 judges) of the district judges.

7.3 Any judge, for good cause, may raise an issue regarding representation by an attorney or attorney misconduct at a monthly judges meeting. Specific and timely allegations must form the basis of the complaint.

7.4 Upon motion of one district judge, after being seconded by another district judge, an attorney may be summoned before the district judges during a regularly scheduled judges meeting to explain his/her handling of a case or cases. The attorney is not entitled to the representation of counsel at the meeting. Failure to appear without good cause will be considered against the attorney. An attorney who appears before the judges is subject to questioning by the Judges.

7.5 If an attorney's presence is required, notice of the specific allegations of misconduct or issue must be sent to the investigated attorney in writing no less than two weeks prior to a requested appearance before the judges. A majority (9 judges) of the district judges will determine whether good cause exists for removal or sanctions.

7.6 Sanctions may consist of any of the following:

   a.   written reprimand signed by the Presiding Judge;
   b.   demotion to a lower level of the wheel;
   c.   temporary suspension from the appointment wheel;
   d.   removal from the appointment wheel; or
   e.   obtaining additional CLE hours or working with a mentor.

7.7 An attorney shall automatically be removed from the felony appointment list for following reasons:

   a. conviction or deferred adjudication for any felony offense;

126

b. conviction or deferred adjudication for any crime of moral turpitude;
c. being under indictment or formally charged with a felony or crime of moral turpitude;
d. failure to meet the general qualifications for appointment; or
e. any suspension from the practice of law by the State Bar except for administrative suspensions for failure to pay fees or dues and failure to comply with CLE requirements. (See section 7.9 below regarding temporary suspensions).

7.8   An attorney may be removed from the felony appointment list for the following reasons:

a.   failing to perform the attorney's duty owed the defendant;
b.   failing to maintain compliance with each of the felony appointment guidelines;
c.   finding by a court that the attorney provided ineffective assistance of counsel;
d.   intentional misrepresentation on the application for court appointments or on the request for compensation or the annual re-certification; or
e.   any other good cause at the discretion of the judges of the criminal district courts and district courts trying criminal cases.

7.9   An attorney shall be temporarily removed from the appointment list for the following reasons:

a.   any suspension from the practice of law by the State Bar for failure to comply with CLE requirements or failure to pay dues or fees.

The attorney will be placed back on the appointment list upon providing proof of reinstatement from the State Bar.

7.10   The court coordinators for the district courts shall keep a list of attorneys who do not appear for an initial appointment or who habitually fail to reset cases. This list will be taken into consideration should an attorney's qualifications be under review by the district judges. Failure to reset cases may be grounds for appointing new counsel on an individual, case by case, basis.

7.11   An attorney who has been removed from the master list by a majority vote of the judges for reasons other than failure to comply with the CLE requirements may reapply after one year (12 months). An attorney who has been demoted may reapply after one year (12 months).

7.12   An attorney who has been automatically removed from the list for failure to comply with the CLE requirements will be reinstated to the master list at the

127

attorney's previous level upon providing proof of completion of the required CLE.

7.13 An attorney who has been removed from the master list at the attorney's request may be reinstated to the master list upon request and proof that that the CLE requirements have been met.


# SECTION 8
# COMPENSATION

8.1 Appointed attorneys shall be compensated in accordance with the fee schedule approved by the judges of the criminal district courts and the district courts giving preference to criminal cases.

8.2 Attorneys must submit documentation on the approved forms as required by the fee schedule. Failure to submit proper documentation may result in a delay in receiving payment or in a failure to receive full payment.

8.3 When an attorney has been appointed and the defendant subsequently retains counsel, the appointed attorney shall be compensated for any work performed prior to the substitution of retained counsel.

8.4 The county auditor will not pay any attorney who is not on the approved list at the time of appointment.


# SECTION 9
# APPLICABILITY

9.1 The wheel system set forth in this plan is not applicable to appeals, writs, or probation violations.

9.2 Attorneys appointed to handle probation revocations must be on the master list for court appointments in the felony courts.

9.3 Attorneys appointed to appeals or writs must be on the appellate list for appeal appointments, or the writ list for writ appointments. Attorneys desiring to be on the appeal or writ list must submit the approved application form and be approved by a majority of the judges.

9.4 This plan does not apply to death penalty cases.

9.5 A court may appoint any available, qualified attorney to advise a witness when the law requires representation.

128

## SECTION 10 DUTIES OF
### ARRESTING AGENCY

10.1    Each person arrested in Dallas County shall be brought before a magistrate within 48 hours of arrest.

10.2    Every Dallas County arresting agency shall comply with the requirements of the Order of the judges of the criminal district courts and district courts giving preference to criminal cases regarding detention of persons without charges filed. Any person who has not had charges filed within the time periods required by said Order shall be released in accordance with said Order.

## SECTION 11
### AMENDMENT OF PLAN

11.1    Amendments to this Plan and the Fee Schedule require a two-thirds vote of the judges of the criminal district courts and the district courts giving preference to criminal cases of Dallas County.

Adopted by the judges of the criminal district courts and the district courts giving preference w criminal cases of Dallas County, Texas, January, 2009.

Robert Burns, Judge
Criminal Diswfct Court

Fred Tinsley, Judge
195th Judicial District Court

tdams, Judge
criminal District Court No. 2

Lana        Mypfs, Judge

Gracie Lewis, Judge
Criminal District Court No. 3

203rd Judicial

Jofin Creuzot, Judge
Criminal District Court No  4

tfark Stoltz, Judge "265*
Judicial District Court
District Court
Lefl5T^ey&i£f3udge
204"! Judicial District
Cdurt

129

Carter Thompson, Judge

Criminal District Court No/5

Jeanine Howard, Judge
Criminal District Court No. 6

Mike Snipes, Judge Criminal
District CourtNo. 7

Ernest White, Judge
194th Judicial District Court

Tracy Holmes, Judge
363rd Judicial District Court

Andy Chatham, Judge
182nd Judicial District Court

Rick Magnis, Judge
283rd Judicial District Court

Susan Hawk, Judge
291st Judicial District Court

Larry Mitchell/Judge 292nd
Judicial District Court

130

# *Tab* 3

CAUSE NO. F08-24667-Y

THE STATE OF TEXAS                    CRIMINAL DISTRICT COURT #7

v.

JAMES G. BROADNAX                    DALLAS COUNTY, TEXAS

AFFIDAVIT

Before me, the undersigned authority, personally appeared __Elizabeth Lutton__, who, being by me duly sworn, deposed as follows:

My name is Elizabeth Lutton, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am a custodian of the records of **Dallas Sheriff's Office (DSO), Dallas County, Texas**. Attached hereto is **4 pages** of records from DSO. This said **4 pages** of records are kept by DSO in the regular course of business, and it was the regular course of business of DSO for an employee or representative of **DSO**, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

_____
AFFIANT

SWORN TO AND SUBSCRIBED before me on the __20__ day of June , 2011____.
My commission expires: __9/13/2011__

_____
Notary Public, State of Texas
Notary's printed name:
Roberta Denise Whited

ROBERTA DENISE WHITED
Notary Public
STATE OF TEXAS
Commission Exp. 09-13-2011

132

Page 1 of 2

AIS

Quick Links... 30

**Magistrate Hearing - BROADNAX , JAMES**        Search        Referrals        User  Roberta Whited

| Identification | Offense (3) | Arrest (2) | Book-In | Magistrate | Warrants | Jail | Bonds | Pro-Trial Rel |
| Dist. Attorney | | Grand Jury | | | Divert Court | Court |

Current BookIn No: 10048680 - Released

## Adult Identification Information



Date: 9/10/2010
Photos(2)

| | | | |
|---|---|---|---|
| **AIS Number** 2725502 | **DPS/SID Number** 08189265 | **LAI Number** 1077722 | **FBI Number** |
| **True Last Name** BROADNAX | **Suffix** | **True First Name** JAMES | **Middle Name** GARDIELD |
| **Date of Birth** 10/30/1988 | **Current Age** 22 | **Height** 6' 3" | **Weight** 160 lb |
| **Photo** Unavailable | **Fingerprints** Unavailable | **In Dallas Jail Before** NO | **Native Language** |
| **Race** Black | **Sex** Male | **Ethnicity** Non Hispanic | **Skin Tone** Dark |

**Magistrate Research**

Magistrate Research DT/TM
Jun 21 2008 3:55 AM

Magistrate Staff
Tolbert, Cassandra

**Dallas County Court History**

| Case No. | Agency | Offense Description | L/D | Offense DT/TM | Court | Disposition |
|---|---|---|---|---|---|---|

**Dallas County Criminal History**

| Offense Description (Priors) | OffenseDT | Statute Citation | L/D | Warrant # | Dom./Fam. Viol. |
|---|---|---|---|---|---|
| BENCH WARRANT - CAPITAL MURDER | 06/19/2008 | 19.03 PC | FX | F0824667Y | No |

**TCIC/NCIC Information**

☐ TCIC        ☐ NCIC

**Current Offense/Hold Information**

| Arresting Agency | Offense Description | OffenseDT | Statute Citation | L/D | Warrant # | Court | 1st Setting | Reason Code | PIA |
|---|---|---|---|---|---|---|---|---|---|
| Garland Police | CAPITAL MURDER OF MULTIPLE PERSONS | 06/19/2008 | 19.03 (a)(7) PC | FX | F0824667 | F1 | | Computer Assigned | ☐ |
| Garland Police | CAPITAL MURDER OF MULTIPLE PERSONS | 06/20/2008 | 19.03 (a)(7) PC | FX | F0824629 | F1 | | Computer Assigned | ☑ |

☑ Research Complete

**Reason for Expedition**

**Clerk's Comments**
2. NO PRIOR FELONIES

**Magistrate Hearing**

| | | |
|---|---|---|
| **Arrest DT/TM** Jun 20 2008 12:00 AM | **Book-In #** 08047374 | **Book-In DT/TM** Jun 21 2008 2:51 AM |

**Book-In Comments**
CHG #90824629J ADDED PER PC WRNT. .........TVARGHESE2 062108 BSO F0824629 $1,000,000.00 CASH/SURETY PER JONATHAN VICKERY 06/21/2008 05:45:00......MHUGHES 062108 CHG F0824667 ADDED PER WRNT 070308 BMCLEMORE CHG F0824629 WRNT RECD AND EXECUTED 070308 BMCLEMORE BSO F0824629 $1,000,000.00 CASH/SURETY PER JONATHAN VICKERY 06/21/2008 05:45:00 BSO F0824667 $1,000,000.00 CASH/SURETY PER KATHERINE MIRACLE 07/04/2008 01:25:00 CHG F0824667 JCJP DEFT GIVE NOTICE OF APPEAL TO THE CRTS PER DISPO LITTLES/TSMITH 082109 CASE#F0824629 CASE DISMISSED PER CRT DISPO LITTLES 082809 ZACHARIAH#

AIS

*Magistration Legend:*    **New Offense**        **Judge Reviewed**        **Judge Magistrated**        **Bond Posted**

Current Offenses                    Arresting Agency:  Garland Police

| Chg No. | Offense Description | Offense DT | Statute Citation | L/D | F.V. | Warrant # | No Bond Allowed | Bond Amount | Bond Type | High Bond | EPO | OFD | Bond Remarks | Pre-Trial Release |
|---------|--------------------|-----------|------------------|-----|------|-----------|-----------------|-------------|-----------|-----------|-----|-----|--------------|-------------------|
| 2 | CAPITAL MURDER OF MULTIPLE PERSONS | 06/19/2008 | 19.03 (a)(7) PC | FX | No | F0824667 | ☐ | 1000000.00 | Cash/Surety | | | | Add/Update | ☐ |
| 1 | CAPITAL MURDER OF MULTIPLE PERSONS | 06/20/2008 | 19.03 (a)(7) PC | FX | No | F0824629 | ☐ | 1000000.00 | Cash/Surety | | | | Add/Update | ☐ |

*Magistration Legend:*    **New Offense**        **Judge Reviewed**        **Judge Magistrated**        **Bond Posted**

Holds

| Arresting Agency | Offense Description | Date Issued | Warrant # | No Bond Allowed | Bond Amount | Bond Type | Bond Remarks |
|------------------|--------------------|-----------|-----------|-----------------|-------------|-----------|--------------|

Affidavit of Indigence

| Felony | Misdemeanor | Psychological Assessment Program |
|--------|-------------|----------------------------------|
| English | None | No |

Vienna Convention

Citizenship                    Country
United States

                    Status                Notification

*Magistration Legend:*    **New Offense**        **Judge Reviewed**        **Judge Magistrated**

Documents

| Offense Description | Arraignment Sheet | Interlock Order | Emergency Prot. Order | 24-Hr Det. Order | 48-Hr Det. Order |
|---------------------|-------------------|-----------------|-----------------------|------------------|------------------|
| CAPITAL MURDER OF MULTIPLE PERSONS | Yes | None | None | None | None |
| CAPITAL MURDER OF MULTIPLE PERSONS | No | None | None | None | None |

Conditions of Bond

| UpdateDT | Warrant No | Offense Desc |
|----------|-----------|--------------|
| | F0824667 | CAPITAL MURDER OF MULTIPLE PERSONS |
| | F0824629 | CAPITAL MURDER OF MULTIPLE PERSONS |

■ **Judge's Comments History (empty)**

Judge's Comments

Initial Magistrate DT/TM            Last Updated By        Pre-Trial Release Approval
**Jun 21 2008 5:45 AM**            **Whited, Roberta**        ☐

134

AIS





# Dallas County
## Sheriff's Office
### Mugshot Profile





| | |
|---|---|
| Name: | BROADNAX , JAMES |
| Alias 1 | BROADNAX, JAMES |
| AIS #: | 2725502 |
| Book-In No.: | |
| Book-In Date/Time: | Saturday, June 21, 2008 |
| LAI#: | 1077722 |
| DOB: | 10/30/1988 |
| Arrest Age: | 19 |
| Current Age: | 22 |
| | |
| Sex: | Male |
| Race: | Black |
| Height: | 6' 3" |
| Weight: | 160 |
| Hair Color: | Black |
| Eye Color: | Brown |



# Dallas County
## Sheriff's Office
### Mugshot Profile



| | |
|---|---|
| Name: | BROADNAX , JAMES |
| Alias 1 | BROADNAX, JAMES |
| AIS #: | 2725502 |
| Book-In No.: | |
| Book-In Date/Time: | Friday, September 10, 2010 |
| LAI#: | 1077722 |
| DOB: | 10/30/1988 |
| Arrest Age: | 21 |
| Current Age: | 22 |
| | |
| Sex: | Male |
| Race: | Black |
| Height: | 6' 3" |
| Weight: | 160 |
| Hair Color: | Black |
| Eye Color: | Brown |



Case 3:15-cv-01758-N    Document 42-1    Filed 06/29/16    Page 141 of 258    PageID 10773

# *Tab* 4

http://www.timeanddate.com/calendar/?year=2008&country=1

Search:                                              Go


time_idate.com

# Calendar for year 2008 (United States)

## January
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    | 1  | 2  | 3  | 4  | 5  |
| 6  | 7  | 8  | 9  | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |    |    |

8:● 15:◑ 22:○ 30:◐

## February
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    | 1  | 2  |
| 3  | 4  | 5  | 6  | 7  | 8  | 9  |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 |    |

6:● 13:◑ 20:○ 28:◐

## March
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    |    | 1  |
| 2  | 3  | 4  | 5  | 6  | 7  | 8  |
| 9  | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |    |    |    |    |    |

7:● 14:◑ 21:○ 29:◐

## April
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    | 1  | 2  | 3  | 4  | 5  |
| 6  | 7  | 8  | 9  | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 |    |    |    |

5:● 12:◑ 20:○ 28:◐

## May
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    | 1  | 2  | 3  |
| 4  | 5  | 6  | 7  | 8  | 9  | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

5:● 11:◑ 19:○ 27:◐

## June
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| 1  | 2  | 3  | 4  | 5  | 6  | 7  |
| 8  | 9  | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |    |    |    |    |    |

3:● 10:◑ 18:○ 26:◐

## July
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    | 1  | 2  | 3  | 4  | 5  |
| 6  | 7  | 8  | 9  | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |    |    |

2:● 10:◑ 18:○ 25:◐

## August
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    | 1  | 2  |
| 3  | 4  | 5  | 6  | 7  | 8  | 9  |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |    |    |    |    |    |    |

1:● 8:◑ 16:○ 23:◐ 30:●

## September
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    | 1  | 2  | 3  | 4  | 5  | 6  |
| 7  | 8  | 9  | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |    |    |    |    |

7:◑ 15:○ 22:◐ 29:●

## October
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    | 1  | 2  | 3  | 4  |
| 5  | 6  | 7  | 8  | 9  | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |    |

7:◑ 14:○ 21:◐ 28:●

## November
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    |    | 1  |
| 2  | 3  | 4  | 5  | 6  | 7  | 8  |
| 9  | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 |    |    |    |    |    |    |

5:◑ 13:○ 19:◐ 27:●

## December
| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    | 1  | 2  | 3  | 4  | 5  | 6  |
| 7  | 8  | 9  | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |    |    |    |

5:◑ 12:○ 19:◐ 27:●

## Holidays and Observances:

| | | |
|---|---|---|
| Jan 1   New Year's Day | May 26 Memorial Day | Nov 4  Election Day |
| Jan 21  Martin Luther King Day | Jun 15 Father's Day | Nov 11 Veterans Day |
| Feb 14 Valentine's Day | Jul 4   Independence Day | Nov 27 Thanksgiving Day |
| Feb 18 Presidents' Day | Sep 1   Labor Day | Dec 24 Christmas Eve |
| Mar 23 Easter Sunday | Oct 13 Columbus Day (Most regions) | Dec 25 Christmas Day |
| May 11 Mother's Day | Oct 31 Halloween | |

Copyright © Time and Date AS 1995–2011. All rights reserved

# *Tab* 5

Internet America - Airmail Web Access                    http://mail.airmail.net/email/scripts/view.pl?&mid=67382&folder=...

**Lydia Brandt (lydiamb@airmail.net) - Tue, 11/29/11 15:12:03 -0600**

**Show Full Headers | Print | Close Printer View**

**From:** Fae Lilley <Fae.Lilley@dallascounty.org>
**To:** "LydiaMB@Airmail.Net" <LydiaMB@Airmail.Net>
**Subject:** FW: scan-james broadnax
**Date:** Tue 11/29/11 02:48 PM

**From:** Vickie Dentler
**Sent:** Tuesday, November 29, 2011 2:43 PM
**To:** Fae Lilley
**Subject:** scan-james broadnax

*Vickie Dentler*
*Dallas County District Clerk's Office*
*Criminal Expunctions & Non-Disclosures*
*(214)653-5963*
*(214)653-5986 Fax*
*vdentler@dallascounty.org*

**Attachment:  Save  View**
Name: scan0001.pdf
Type:  application/pdf

**Lydia Brandt (lydiamb@airmail.net) - Tue, 11/29/11 15:12:03 -0600**

# INSTRUCTIONS RELATING TO
## PRELIMINARY INITIAL APPEARANCE



Cause No. **f0824629**

Offense:   **CAPITAL MURDER OF MULTIPLE PERSONS**

The State of Texas

vs.
## JAMES GARDIELD BROADNAX

On this date appeared **JAMES GARDIELD  BROADNAX**, hereafter referred to as defendant, who makes his initial appearance in connection with the above numbered cause. At this appearance a hearing was held, at which the following took place:

1. Defendant was informed as provided in Art. 15.17 CCP.

2. Bail was set in the amount of $ **$1,000,000.00**

3. All    felony    charges associated with this arrest are assigned to and shall be filed in **Robert Burns** Court, **Criminal District Court No. 1 (FH)**

Copies of these instructions served on defendant and transporting officer on this **21** day of **June**, 20 **08**.

141

# ARRAIGNMENT SHEET

Book-in No. 08047374
LAI No.    1077722

Black    Male    10/30/1988

The State of Texas, County of Dallas

I, _____ Jonathan Vickery _____ , of Dallas County, Texas, sitting as a Magistrate, do hereby certify that on this, the __21__ day of _____ June _____ , 2008 at __5:45 AM__ , sitting at 111 Commerce, City of Dallas, Dallas County, Texas appeared _____ JAMES GARDIELD BROADNAX _____ , being a person under arrest, and that I have in clear language informed the person arrested of the accusation against him and of any Affidavit filed herewith, and of his right to retain counsel, and of his right to the appointment of counsel if he is indigent and cannot afford counsel, and of his right to remain silent, and of his right to have an attorney present during any interview with peace officers or attorneys representing the State, and of his right to terminate the interview at any time, and of his right to have an examining trial.

I informed the person arrested that he does not have to make any statement at all, and that any statement made by him may be used in evidence against him on his trial for the offense concerning which the statement is made.

I informed the person arrested that reasonable time and opportunity would be allowed him to consult counsel and of his rights to bail if allowed by law.

I also informed the person arrested that if he is not a citizen of the United States that he may have the right to contact consular officials from his country and that if he is a citizen of certain countries that consular officials would be notified of this arrest without further action required on his part.

[✓] The person arrested stated that he is a citizen of the United States of America

| Offense(s): | Cause No. | Agency Name | Bond Amount |
|---|---|---|---|
| CAPITAL MURDER OF MULTIPLE PERSONS | f0824629 | Garland Police | $1,000,000.00 Cash/Sur |

Remanded to custody of _____ DSO _____ in witness whereof, I have subscribed my name this the __21__ day of _____ June _____ , 2008 .

Magistrate    Dallas County, Texas

Page 1 of 1

142

## DEFENDANT'S AFFIDAVIT
## OF INDIGENCE



Cause No. **f0824629** *Cap Murder Adult*

Court    **Criminal District Court No. 1 (FH)**
Dallas County, Texas

*B/ M 10/30/88*

*BKUU08047374*

The State of Texas
vs.
**JAMES GARDIELD BROADNAX**

Before me, the undersigned authority, of this date, personally appeared the defendant in the above styled and numbered cause, known to me to be the person whose name is subscribed hereto as affiant. The defendant, having stated that he was indigent and unable to employ counsel, was placed under oath and inquiry was made in the following factors: the defendant's income and source of income, property owned, outstanding obligations, necessary expenses, number and ages of dependents, spousal income and other matters indicating that he is in fact indigent.

The defendant then deposed and stated as follows:
On this **21** day of **June**, **08**, I have been advised by the Court of my right to representation by counsel in the trial of the charges pending against me. I certify that I am without means to employ counsel of my own choosing, and I hereby request the Court to appoint counsel for me.

My total monthly income, including spouse's income, SSI, child support, disability or other is:
$ _____

The total value of my assets, including house, cars, cash, stocks, bonds or other is:
$ _____

_____
Defendant/Affiant

SUBSCRIBED AND SWORN before me, the undersigned authority, on this the **21** day of **June**, **08**.

_____
Magistrate

### ORDER

On this the _____ day of _____, _____, the Court, having reviewed the foregoing affidavit finds that the defendant is NOT indigent and is financially able to employ counsel.

Signed this _____ day of _____, _____.

_____
Judge, **Criminal District Court No. 1 (FH)**
Dallas County, Texas

### ORDER

On this the _____ day of _____, _____, the Court, having reviewed the foregoing affidavit finds the defendant is indigent and unable to employ counsel, and hereby approves the affidavit and appoints:
(1.) The Honorable **Brad Killan**, Phone: _____,
(2.) The Chief Public Defender represented by the Honorable _____
    Phone: _____, a practicing attorney of this state to represent the defendant in said causes.

Signed this _____ day of _____, _____.

_____
Judge, **Criminal District Court No. 1 (FH)**
Dallas County, Texas

143

# *Tab* 6

# ARRAIGNMENT SHEET



Book-in No. 08047373
LAI No.    1018730

Black    Male    11/11/1988

## The State of Texas, County of Dallas

I, _____Jonathan Vickery_____, of Dallas County, Texas, sitting as a Magistrate, do hereby certify that on this, the _21_ day of _____June_____, 2008 at _5:32 AM_, sitting at 111 Commerce, City of Dallas, Dallas County, Texas appeared _____DAMARIUS DWIGHT CUMMINGS_____, being a person under arrest, and that I have in clear language informed the person arrested of the accusation against him and of any Affidavit filed herewith, and of his right to retain counsel, and of his right to the appointment of counsel if he is indigent and cannot afford counsel, and of his right to remain silent, and of his right to have an attorney present during any interview with peace officers or attorneys representing the State, and of his right to terminate the interview at any time, and of his right to have an examining trial.

I informed the person arrested that he does not have to make any statement at all, and that any statement made by him may be used in evidence against him on his trial for the offense concerning which the statement is made.

I informed the person arrested that reasonable time and opportunity would be allowed him to consult counsel and of his rights to bail if allowed by law.

I also informed the person arrested that if he is not a citizen of the United States that he may have the right to contact consular officials from his country and that if he is a citizen of certain countries that consular officials would be notified of this arrest without further action required on his part.

[✓] The person arrested stated that he is a citizen of the United States of America

| Offense(s): | Cause No. | Agency Name | Bond Amount |
|---|---|---|---|
| CAPITAL MURDER OF MULTIPLE PERSONS | f0824628 | Garland Police | $1,000,000.00 Cash/Sur |

Remanded to custody of _____DSO_____ this the _21_ day of _____June_____, 2008.

in witness whereof, I have subscribed my name

_____Magistrate_____    Dallas County, Texas

Page 1 of 1

145

## INSTRUCTIONS RELATING TO
## PRELIMINARY INITIAL APPEARANCE



Cause No. **f0824628**

Offense:  **CAPITAL MURDER OF MULTIPLE PERSONS**

The State of Texas

vs.

**DAMARIUS DWIGHT CUMMINGS**

On this date appeared **DAMARIUS DWIGHT CUMMINGS**, hereafter referred to as defendant, who makes his initial appearance in connection with the above numbered cause. At this appearance a hearing was held, at which the following took place:

1.  Defendant was informed as provided in Art. 15.17 CCP.

2.  Bail was set in the amount of $ **$1,000,000.00**

3.  All    felony    charges associated with this arrest are assigned to and shall be filed in _____**Mike Snipes**_____ Court, **Criminal District Court No. 7 (FY)**

Copies of these instructions served on defendant and transporting officer on this **21** day of _____**June**_____, 20**08**.

146

*Capital murder*

*9804 7373*

*west 04p01*

# DEFENDANT'S AFFIDAVIT
## OF INDIGENCE



Cause No. **f0824628**
Court    **Criminal District Court No. 7 (FY)**
Dallas County, Texas

The State of Texas

vs.

## DAMARIUS DWIGHT CUMMINGS

Before me, the undersigned authority, of this date, personally appeared the defendant in the above styled and numbered cause, known to me to be the person whose name is subscribed hereto as affiant. The defendant, having stated that he was indigent and unable to employ counsel, was placed under oath and inquiry was made in the following factors: the defendant's income and source of income, property owned, outstanding obligations, necessary expenses, number and ages of dependents, spousal income and other matters indicating that he is in fact indigent.

The defendant then deposed and stated as follows:
On this **21** day of **June**, **08**, I have been advised by the Court of my right to representation by counsel in the trial of the charges pending against me. I certify that I am without means to employ counsel of my own choosing, and I hereby request the Court to appoint counsel for me.

My total monthly income, including spouse's income, SSI, child support, disability or other is:
$ 0

The total value of my assets, including house, cars, cash, stocks, bonds or other is:
$ 0

X _____
Defendant/Affiant

SUBSCRIBED AND SWORN before me, the undersigned authority, on this the **21** day of **June**, **08**.

_____
Magistrate

## ORDER

On this the _____ day of _____, _____, the Court, having reviewed the foregoing affidavit finds that the defendant is NOT indigent and is financially able to employ counsel.

Signed this _____ day of _____, _____.

_____
Judge, **Criminal District Court No. 7 (FY)**
Dallas County, Texas

## ORDER

On this the _____ day of _____, _____, the Court, having reviewed the foregoing affidavit finds the defendant is indigent and unable to employ counsel, and hereby approves the affidavit and appoints:
(1.) The Honorable _Ward Maldon_, Phone: _2-307-6595_,
(2.) The Chief Public Defender represented by the Honorable _____,
     Phone: _____, a practicing attorney of this state to represent the defendant in said causes.

Signed this _____ day of _____, _____.

_____
Judge, **Criminal District Court No. 7 (FY)**
Dallas County, Texas

147

# *Tab 7*

CAUSE NO. F08-24667-Y

THE STATE OF TEXAS                              CRIMINAL DISTRICT COURT #7

v.

JAMES G. BROADNAX                              DALLAS COUNTY, TEXAS

AFFIDAVIT

Before me, the undersigned authority, personally appeared __Elizabeth Lutton__, who, being by me duly sworn, deposed as follows:

My name is Elizabeth Lutton, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am a custodian of the records of **Dallas Sheriff's Office (DSO), Dallas County, Texas**. Attached hereto are **4 pages** of records from DSO. This said **4 pages** of records are kept by DSO in the regular course of business, and it was the regular course of business of **DSO** for an employee or representative of **DSO**, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

___Elizabeth Lutton___
AFFIANT

SWORN TO AND SUBSCRIBED before me on the __20__ day of June , __2011__ .
My commission expires: ___9/13/2011___

_____
Notary Public, State of Texas
Notary's printed name:
Roberta Denise Whited

ROBERTA DENISE WHITED
Notary Public
STATE OF TEXAS
Commission Exp. 09-13-2011

149

WFAA NEWS            Fax:9999999999            Jun 20 2008  7:38    P.05

5E

JAmes Broadnax
BrV0 0804 7374
West Tower
OJ 8 05

Mr. Broadnax:

On behalf of WFAA TV channel 8 , I would like to request an on-camera interview with you.

This would allow you to tell our viewers your side of the story regarding your recent incarceration. We firmly believe in telling both sides of a story and understand it is important to hear your side.

Thank you for your time and consideration

Carlos Rosales
WFAA Assignment editor
214-977-6213

Yes, James Broadnax

No,

DSO Spratling #5795
Officer/Badge witness

Kimberlee Leach - Broadnax.doc                                                                    Page 1


# KDFW Fox Television
### FOX TELEVISION STATIONS, INC. ● A UNIT OF FOX INC.

June 20, 2008

James Gerdield Broadnax        B NO 08047374
Lew Sterrett                   WeST Tover
                                   O3 PoS

James,

KDFW-TV Fox 4 would like to request an interview with you regarding the charges that have
been filed against you. We are hoping by speaking with you, you will be given this opportunity
to tell your side of the story. If you are interested in talking with KDFW-TV Fox 4, please notify
the Sheriff's department as soon as they deliver this letter.

Yes _____

No _____


Thank you for your consideration,

Gregg Millett
Assignments Editor
KDFW Fox 4 News
214-720-3155                      _____
                                  Officor/Badge # (witness)



Fax to P.I.O. Kim beach
    214-653-2852




                                                          400 N. Griffin Street
                                                          Dallas, Texas 75202
                                                          Tel 214.720.4444

151

Kimberlee Leach - Broadnax.doc                Page 1



# KDFW Fox Television

FOX TELEVISION STATIONS, INC. ● A UNIT OF FOX INC.

June 20, 2008

James Gerdield Broadnax     B NO 08047374
Lew Sterrett             WEST Tower         1:20
                   03 Pos

James,

KDFW-TV Fox 4 would like to request an interview with you regarding the charges that have been filed against you. We are hoping by speaking with you, you will be given this opportunity to tell your side of the story. If you are interested in talking with KDFW-TV Fox 4, please notify the Sheriff's department as soon as they deliver this letter.

Yes: _James Broadnax_

No _____

Thank you for your consideration,

Gregg Millett
Assignments Editor
KDFW Fox 4 News
214-720-3155

_spratling #5795_
Officer / Badge # (witness)


Fax to P.I.O. Kim leach
214-653-2852

400 N. Griffin Street
Dallas, Texas 75202
Tel 214.720.4444

WFAA NEWS            Fax:9999999999            Jun 20 2008   7:38      P.05

JAMES Broadnax
Bow 0804/7374
West Tower
03 # 05

Mr. Broadnax:

On behalf of WFAA TV channel 8 , I would like to request an on-camera interview with you.

This would allow you to tell our viewers your side of the story regarding your recent incarceration. We firmly believe in telling both sides of a story and understand it is important to hear your side.

Thank you for your time and consideration

Carlos Rosales
WFAA Assignment editor
214-977-6213

Yes,

No,

Officer/Badge# witness

153

# *Tab 8*

America's Newspapers - Document Display                    http://infoweb.newsbank.com/iw-search/we/InfoWeb?p_product=N...



*America's Newspapers*

English        Other New:

Search History

## Search Results for **dallas county jail computer problems** in All Text

Dallas Morning News, The

Edit Search | New Search

[

<u>Back To Results</u>        Previous  **Article 5 of 528**  Next        Save this Article ⌐

# County IT in dismal shape

**Dallas Morning News, The (TX)** - Wednesday, September 29, 2010

*Author: KEVIN KRAUSE*

Dallas County commissioners learned Tuesday from a consultant that key **county computer** systems are faulty, inadequate and outdated - including important criminal justice systems - and that their information technology department lacks vision, management, leadership and competence.

The report from Atlanta-based Tatum LLC comes nearly two years after a different consultant issued a report detailing similar failings within the **county** information technology department. Some of the **problems** detailed in the 2008 report still exist today, according to Tatum's presentation, such as lack of a disaster recovery plan.

That shortcoming was highlighted in May when a water main break flooded the Records Building downtown, knocking out the **county** 's **computer** system for three days. The incident caused about $10 million worth of damage.

Also Tuesday, a majority of commissioners said they want a policy that allows them to monitor elected **county** officials' **county** -owned **computers** to make sure they're not being misused. Their concerns stem from allegations that a former constable used his **county computer** for campaign purposes.

But the **county** 's criminal and civil judges objected, saying the commissioners have no authority to inspect their **computers** .

Judge Robert Burns, who presides over the criminal courts, warned commissioners against trying to get access to judges' **computers** , saying any such action would violate an order he signed earlier this year and would result in a contempt charge that carries a fine or jail time.

In late 2008, Miami-based eGov Consulting Services gave the **county computer** system its lowest rating in seven out of eight categories.

Commissioner John Wiley Price said the **county** needed a more thorough report. The eGov report just "recycled what we already knew," he said.

Commissioners hired Tatum for $169,250 about four months ago to conduct a complete assessment of their information technology department. Tatum has met with more than 160 **county** employees.

 Related Arti(

Tell us w
think...

County IT in dism

Commissioners f:
$778,000 questio

Dallas commissio
$778,000 questio

Panel denies clai
prisoners kept in

Computer systen
failing grade

County OKs new
computer

Computer systen
prompt delay in p

Panel denies aw;
inmates kept in j;

Outside compute
rejected- Dallas
commissione...

State is unable tc
promise of compi

**0 Saved Articl(
-◦ this article**

Email

Print

Bibliography (e)

Among the Tatum findings:

·Justice of the peace courts are still using an antiquated mainframe system, and the Sheriff's Department's dispatch system is old "with many issues."

·The Adult Information System, the **county** 's main criminal justice **computer** system, is unstable and has **problems** that affect jail operations, public safety and case management.

Tatum representatives also said the **county** lacks an overall IT strategy and vision and doesn't plan or manage projects well. In addition, Tatum officials said the IT department is dysfunctional, with a leadership void and poor morale.

Price said it's too early to know how much it will cost to fix the department. But he said the **county** should spend "whatever it takes" to get it done.

The Tatum report held no surprises, Price said.

"We knew it was catastrophic," he said. "It's on life support."

Price said the **problems** stem from a lack of leadership.

"That's what happens when no one is minding the store," he said.

The **county** 's IT director, Bob Clines, resigned at the end of last year and has not been replaced. Price said the department must be fixed before the **county** can find a replacement. Tatum will continue working with the **county** , he said, to implement a host of recommendations it made. The company also will help the **county** recruit a replacement for Clines, he said.

Clines was hired in early 2005 in the middle of a crisis involving AIS, which had just launched to disastrous results. The system could not properly track who was in jail . Improvements have since been made but underlying **problems** remain.

While Price singled out Clines, Commissioner Kenneth Mayfield blamed the **county** 's former IT Steering Committee, which included Price and Commissioner Mike Cantrell.

Mayfield, **County** Judge Jim Foster and Commissioner Maurine Dickey voted last year to dissolve the committee. Tatum has recommended a new system of governance that does not involve any commissioners.

Regarding searches of elected officials' **computers** , Mayfield said he wants to know how far the Commissioners Court can go.

"What is our authority to enforce our policy?" he asked.

Bob McGrath, the commissioners' legal adviser, said the **county** should be able to protect its **computer** system from a potentially harmful misuse. But Gordon Hikel, chief of the district attorney's civil division that also advises commissioners, said they have no authority to require such **computer** searches.

Mayfield, Dickey and Foster said they want McGrath to research the issue and seek an attorney general's opinion if necessary to get to the bottom of the matter.

Burns, the presiding criminal court judge, told commissioners they could only search

Quick Links
Find articles by KE'
Find more articles f
Find more from sec
Find all articles fron
29, 2010

elected officials' **computers** with a warrant or grand jury subpoena. The judges, he said, are a separate branch of government that answers only to the Texas Supreme Court, the State Commission on Judicial Conduct and the voters.

"You have no supervisory authority over us," Burns said.

AT A GLANCE **Dallas County** 's **computer** system

What's wrong

·The **county** lacks an overall information technology strategy and vision and doesn't plan or manage projects well.

·The help desk is slow to respond to **problems** , software is old and outdated, and the IT staff's competency is below average.

·The IT department is dysfunctional, with a leadership void and poor morale

· **County** departments lack trust in IT. Most report a total lack of communication.

·Major IT policies and procedures are "either ignored or missing."

·Projects are not properly prioritized, resulting in a system where attention is given to whoever "yells loudest."

·Because of dysfunctional governance, **county** commissioners are inappropriately pulled into management of IT projects.

What needs to be done

·Create a new IT steering committee that doesn't include commissioners.

·Find an offsite location where the **county** 's **computers** can be kept up and running in the event of disaster.

·Overhaul the IT department and hire a new director

Caption: CHART(S): AT A GLANCE **Dallas County** 's **computer** system.

*Edition: EDITION1*
*Section: METRO*
*Page: B01*
*Correction: 10/7/2010 CORRECTIONS, CLARIFICATIONS: A story in Wednesday's Metro section misstated Dallas County commissioners' involvement in a proposal for a new system of governance for the county 's information technology department. The Tatum consulting firm has recommended that one commissioner or the county judge serve on an executive governance committee. (Ran: Thursday, October 30, 2010)*
*Index Terms: TECHNOLOGY ASSESSMENT*
*Record Number: 16073727*
*(c) Copyright, 2010, The Dallas Morning News*

To bookmark this article, right-click on the link below, and copy the link location:
County IT in dismal shape

**Back To Results**        Previous  **Article 5 of 528**  Next

# *Tab* 9



English        **Other New:**

Search History

Search Results for **dallas county jail computer problems** in All Text

Dallas Morning News, The

Edit Search | New Search

Back To Results        Previous **Article 1 of 528** Next        **Save this Article**

# Audit confirms IT deficiencies

**Dallas Morning News, The (TX)** - Tuesday, January 18, 2011
*Author: KEVIN KRAUSE*

**Dallas County** officials already were aware last year that their **computer** system had serious **problems** , so it came as no surprise when an outside auditor pointed out several more.

The Deloitte & Touche accounting firm said in a March 2010 letter to **county** management that it had found several "deficiencies" involving information technology. One of the most serious **problems** was that fired employees as well as two former **county** vendors still had access to **county computer** systems.

"It may lead to a terminated employee accessing the IT systems and executing unauthorized transactions," Deloitte & Touche auditors said in the letter, which was released after inquiries by The **Dallas** Morning News.

Among other **problems** spotted by the auditors:

· **Dallas County** did not periodically review who has access to its **computer** systems to check for such **problems** , as is customary in many **computer** system departments.

·A **computer** programmer had inappropriate access to systems connected to the **county** 's financial system and mainframe **computers** .

·The **county** didn't have strong password requirements such as passwords with a minimum length, the audit said.

**County** officials say the **problems** either have been fixed or are being worked on by a contractor who is reviewing all **county computer** operations and recommending fixes.

Atlanta-based Tatum LLC reported last year that key **county computer** systems were faulty, inadequate and outdated and that the **county** information technology department lacked vision, management, leadership and competence.

The Tatum report came two years after another consultant reported similar failings within the **county computer** system department, including the lack of a disaster recovery plan.

Darryl Martin, the Commissioners Court administrator, said he asked Tatum to look at the Deloitte & Touche findings. He called them "minor but potentially serious if not addressed."

**Related Arti**

Tell us w
think...

Inmates' lawyers
delays- Despite s ·

TI'S PULSE- Woı
computers, satell

Inmates' lawyers
delays- Despite s

EDS PERSISTS '
FINANCIAL ENDI

'POCKETS OF P
Y2K-related failuı
lead...

Judge: Data syst·
County officials c

Why the Market \
With money at st:

EDS nixes deal fc
One- Air woes sc

Judge: Computer
plagues courts- Ľ
Count...

COMPANY PROI
Can-do from the ·
Firm..

**0 Saved Articlı**
**this article**

Email

Print

America's Newspapers - Document Display                http://infoweb.newsbank.com/iw-search/we/InfoWeb?p_product=N...

Commissioner Mike Cantrell said he read the Deloitte & Touche memo and is concerned.

"In my opinion, it ought to be fixed as soon as possible," he said.

Commissioner John Wiley Price said the interim information technology director assured him the ex-employees and vendors did not actually have access to the county network even though it may have appeared they did.

"As a housekeeping measure, they hadn't cleaned it up," Price said.

Price last year acknowledged that the county 's computer problems were "catastrophic" and that the system was on "life support."

The county 's information technology director, Bob Clines, resigned at the end of 2009 and has still not been replaced. Tatum will help the county find a replacement for Clines in addition to helping implement the recommendations, county officials have said.

Clines was hired in early 2005 in the middle of a crisis involving the Adult Information System, which had just launched to disastrous results. The system could not properly track who was in jail . Improvements have been made, but underlying problems remain.

The Deloitte audit also mentioned "deficiencies involving the county 's internal control over financial reporting."

Mistakes on the county 's general ledger, if not caught and fixed, "would have caused the financial statements to be misstated or misleading," the audit said.

The county "still is challenged in issuing timely financial information and in ensuring that the financial statements prepared by management are free from error," according to the audit.

Deloitte recommended that the county improve its review of transactions recorded at the end of the year and make sure all policies and procedures are documented in a written procedures manual.

*Edition: EDITION1*
*Section: METRO*
*Page: B01*
*Index Terms: DALLAS COUNTY*
*Record Number: 17620328*
*(c) Copyright, 2011, The Dallas Morning News*

To bookmark this article, right-click on the link below, and copy the link location:
Audit confirms IT deficiencies

**Back To Results**        Previous  **Article 1 of 528**  Next



**Quick Links**

Find articles by KE'
Find more articles fi
Find more from sec
Find all articles fron
2011

# *Tab* 10



••• Dallas County needs to transform its Information Technology (IT) department to become much more effective, in order to work with the business departments to deliver results that meet the County's priorities.

> Major steps must be taken to:

— Transform the IT organization and culture

— Build partnerships with the County departments

— Establish effective governance over IT going forward

— Provide leadership through the change

••• We met with over 200 people at the County, including over 160 County users in 23 focus groups, plus 35 IT managers and staff. All were very frank, forthcoming, and insightful. We heard a great deal of consistency across the groups, which were also consistent with IT perspectives.

©2010 Tatum. All Rights Reserved

2

**Tatum**

••• County departments and IT are not working well together

> IT is not communicating well with the business departments.

> Previous IT management left IT functional silos that do not communicate well

> There is a lack of leadership, effective management, and accountability.

> There is a lack of consistency in IT policies / processes / procedures

> Crisis management is rampant, with changing priorities causing a lack of continuity

> Performance delivering results is not sufficient to meet the needs

••• IT has no clear, documented IT Strategy with a Vision, Architecture and Plan currently guiding priorities and actions.

2010 Tatum. All Rights Reserved

**Tatum**

••• Overall the IT department is not functioning well enough, largely from contentious past IT leadership. Morale is low.

> Skills and competencies are not up to the challenge.

— There are no development and training plans in place.

— Staff are frustrated at having no direction on how to advance their careers within the IT organization.

> Improved competencies, and improved morale will result in significant improvements in the contribution of staff.

> *Most IT managers and staff expressed the hope for a change in the IT organization, and a passion to work for an organization viewed as competent and professional.*

165

©2010 Tatum  All Rights Reserved

# Recommendations

©2010 Tatum. All Rights Reserved.

••• Business/IT Alignment is the essential foundation of effective governance, so there must be a Business/IT Partnership supported by structure, policy and governance.

> Success is ultimately defined by business department users, from delivered results. Results are measured by impact on the County operations, especially in achieving productivity, cost efficiencies, and service improvements.

> Business users are to be the lifetime customers of IT, working together in partnership since neither can be successful without the other.

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 172 of 258   PageID 10804

## Tatum

- ••• Alignment starts with a CIO who is an Executive Partner with each Business Department Head, confirming priorities that will deliver cost-effective results, and resolving issues.

- ••• Primary day-to-day alignment will primarily be through Business and IT Managers who have Partner responsibility, sharing accountability for results, quality delivery, and user satisfaction.
  - > Partnership teams will assign IT staff along with Business staff, together accountable to deliver results to the users as customers

© 2010 Tatum  All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 173 of 258   PageID 10808

# Tatum

**Conceptual Illustration**

**IT**

IT Senior Management

<u>**County Department /
Communities**</u>
*for example:*

| Security | Network & Operations * | Support * |
|---|---|---|

| Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | <u>**Criminal Justice**</u> Procedures, Training |
|---|---|---|---|---|---|---|
| Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | <u>**Civil Courts**</u> Procedures, Training |
| Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | <u>**Law Enforcement**</u> Procedures, Training |
| Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | <u>**Clerks**</u> Procedures, Training |
| Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | <u>**Finance/Admin.**</u> Procedures, Training |
| Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | <u>**Community Services**</u> Procedures, Training |

***Assigned to projects in each department community**

©2010 Tatum. All Rights Reserved

- • • Projects must be initiated and approved based on documents jointly prepared by the business department and IT to ensure a business case and a written agreement on the expected result.
  - > Define user requirements, evaluation criteria, servers/network and support impact.
  - > Plan for ongoing application maintenance, support of the vendor and IT.
  - > Manage risks by planning backup / disaster recovery.
- • • Project teams must have Business & IT staff, and be jointly managed.
- • • Establish project management standards and processes, consistently applied.
- • • Establish a "systems development life cycle (SDLC)" methodology for Dallas County.

©2006 Tatum. All Rights Reserved.

# Recommendations – Governance

*The governance meetings and approval process is depicted as follows:*

**Individual Project Status Meeting (weekly)**
- Issue resolutions
- Open issues pending resolution

**County Community Priority Meeting (biweekly)**
- Monitor progress across projects, resolve open issues, agree upon proposed projects and priorities
- Forward remaining issues, priorities and proposed projects to IT Executive Governance Committee

**IT Executive Governance Committee (monthly)**
- Agree upon issue resolutions, policies, recommendations, and proposed projects.
- Prioritize projects and resource allocations.
- Finalize IT Executive Governance Progress report for Commissioners Court.

**Commissioners Court**
- Approves funding
- Approves project priorities, policies, and resolutions as needed
- Quarterly briefing in addition.

2010 Tatum. All Rights Reserved

## Tatum

- AIS Deficiencies Resolution
- Wireless Courts
- Digital Court Technical Support
- IT Purchasing to be streamlined and visible
- User Self-Serve
- Allow webinar video streaming for training
- Migrate mission-critical Access data to SQL Server, and update versions
- Desktop Software – Outlook, Office
- Help Desk Ticket Process Improvements
- Establish Disaster Recovery meeting service level requirements.

©2010, Tatum. All rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 177 of 258   PageID 10809

## Tatum

# Recommendations – Major Applications

••• Adult Criminal Justice System is needed

> Jointly fund Phase One definition of CUC TechShare development of an Adult Case Management System (ACMS) with Tarrant County.

> Consider evaluating competing vendor software.

••• Financials must have support maintained, then upgrade

> Engage support for Oracle version 11 to start by November 2011, when Oracle drops their maintenance support, through a certified Oracle VAR .

> Upgrade from version 11 to 12 after 2011 with experienced outside assistance.

©2010 Tatum. All Rights Reserved.

- •• System acquisition/selection decisions must be driven by an enterprise view of the impact, not just a department-specific view.

- •• Plan for technology, software and systems to be "evergreen".

- •• Prepare an IT Strategy guiding forward plans, with all major components
  - > Vision – defines success and strategic positioning of technology in County
  - > Enterprise Architecture and integration is the foundation for the IT vision.
  - > Strategic Policies - guiding direction and actions effectively
  - > Strategic Plan – the action plan prioritizing and sequencing projects for 3+ years

'2010 Tatum  All Rights Reserved

## Tatum

**...** **The IT organization must be restructured and realigned to facilitate communications and partnership with, and accountability to, the customer business departments.  This is a complete transformation of culture that is needed for IT, and business departments.**

> Re-align from a functional structure to a customer partnership structure.

> Redefine roles, job descriptions, structure, management responsibilities, qualifications and performance measures.

> Fill open management positions with qualified candidates, from within or outside.

> Conduct initial meetings between IT and business departments to establish  and model partnership.

> Implement more effective communication and teaming between customer-facing and other IT resources.

> Reevaluate and establish clear policies and processes guiding all IT functions.

14

©2002 Tatum  All Rights Reserved

# Tatum™ Recommendations – Leadership and Communications

- Institute a "change leadership team" immediately to begin the transformation of the IT organization and its relationship with the County business departments.

- Conduct initial IT management planning session, creating assignments to complete the recommendations within this document.

- Institute and conduct regularly scheduled All-Hands meetings and other vehicles for top down management communications.

- Implement an IT Open Door policy welcoming non-threatening written or verbal communications between the staff and management to discuss issues.

- Conduct regularly scheduled weekly or bi-weekly IT management team meetings keeping the entire management team informed on both business and management topics relevant to the IT organization.

©2011 Tatum. All Rights Reserved.

- Review Dallas County job descriptions to update for skills and competency fit for the new organization.

- Ensure that all managers complete Dallas County manager's training.

- Require managers to provide each employee a performance evaluation for the previous six months.

  > Establish a schedule for performance evaluations with the management team and establish a process to track progress.

- Require managers to provide each employee a performance plan for the next six months, and a long-term training and development plan.

2010 Tatum  All Rights Reserved

# Tatum

Questions?

©2010 Tatum. All Rights Reserved.

# Change Leadership Team

©2010 Tatum. All Rights Reserved

## *Essential*

### ••• Business / IT Alignment and Governance

> Governance policies

> Meetings with all major department heads / communities to initiate structured partnership alignment

> Project initiation / work submission standards policy

> Project management standards policy

> Business / IT partnership training

> Joint business partner / IT team meetings, with agreed policies and expectations

> Governance committees established with initial meetings during the period

©2010 Tatum. All Rights Reserved.

Tatum

## Essential

## •••  IT Organizational Restructuring

> IT organization restructured for business customer/partner alignment

> IT job descriptions revised

> IT leadership planning session

> IT department open communications established

> IT performance appraisals for previous six months

> IT managers through County management training

> IT open positions being filled

## •••  IT Policies and Major Process Improvements Defined

> Project management process standards

> Enterprise architecture technical standards draft

181

©2010 Tatum, All Rights Reserved

### *Needed - in Initial Scope*

• • • Prepare for CIO Search

> Develop CIO job description and profile

> Initiate CIO search activity

> Assist HR with job posting, vetting/screening

> Interview candidates

• • • "Quick Hit" Deliveries of Technology to Positively Impact Departments

> IT purchasing process and communications restructured

> Assignment of Quick Hit teams, responsibilities, and plans

> Quick Hits results achieved

> Help desk vendor selected

> Help desk initial improvements in place, with new vendor

> Help desk process improvements including ticket visibility

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N Document 42-1 Filed 06/29/16 Page 187 of 258 PageID 10819

## *Needed - in Initial Scope?*

••• IT Selections, Additional Improvements and Processes Defined

> JP software selection

> CUC ACMS project phase one begun

> Disaster Recovery Plan drafted for highest-priority service level function identified by COOP

> Employee performance plans - initial

> Systems development life cycle methodology process

••• IT Strategy, Vision, Architecture, Direction and Plans

> Mission/vision statements

> IT strategy draft

> Enterprise architecture completed

> IT strategic plan draft

22

©2016 Tatum. All Rights Reserved.

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 188 of 258   PageID 10820

# Tatum

Questions?

# *Tab* 11

185



**Dallas County IT Assessment**

<u>FINAL Report of Findings</u>

September 24, 2010

## Business Perspective

••• Introduction

••• Business/IT Alignment

••• Governance

••• Applications & Projects

## Internal IT Perspective

••• Introduction

••• IT Organization

••• IT Processes and Controls

••• IT Server and Network Architecture

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 191 of 258   PageID 10823

Tatum™

# Business Perspective - Findings

*Business / IT Alignment*
*Governance*
*Applications & Projects*

©2010 Tatum, All Rights Reserved

188

3

## Tatum

- We were asked by all Commissioners, and the business departments, to perform our assessment and then "tell it like it is" without filtering the message. Our findings are presented in a very frank, straightforward manner in this report .

- We conducted 23 Focus Groups of most of the business departments and County communities, with over 160 people participating.

- Business department users were very forthcoming, candid and insightful.

- There was remarkable consistency in what we heard across the groups. Our findings are based on multiple consistent reports, not on any one single individual's critique. Certain findings here also incorporate the perspective of internal IT managers, where not dissimilar.

- The focus of this assessment is on IT. There was no in-depth assessment of the extent of any business department accountability for any issues identified.

  - Our Report of Recommendations proposes an even-handed approach to resolving the issues and jointly taking action going forward.

©2010 Tatum. All Rights Reserved

4

••• **Business departments report a poor working relationship with IT, with a few exceptions.**

> Performance from IT is typically reported to be poor, so expectations are very low.

> IT is not communicating well with the business departments at all; in fact most departments report a total lack of communication from IT, in most respects.

> Business departments recognize a lack of consistency in IT policies, process and procedures. IT personnel therefore too often make them up "on the fly", since they are apparently unknown, ignored, or do not exist. There are unproductive practices in IT that are recognized by the business departments.

> Further inconsistencies are reported due to users having to work with different, uncoordinated IT functional silos (e.g. PMO, Applications) who do not communicate well with each other.

> Business departments report a lack of accountability, professional management and leadership from IT managers at all levels. Management by crisis is predominant, since priorities are not well set, and change frequently.

> Changing priorities cause a lack of continuity in people assigned to work with a department or on a project, thereby further breaking up work relationships.

> The relationship with business users is based on "transactions" more than service or user satisfaction.

> This lack of: performance, working relationship with IT, communication, leadership, continuity, and consistency has created an environment where there is a lack of trust.

©2010 Tatum. All Rights Reserved

••• IT is not clearly aligned with County strategic goals and objectives.

> There is no clear, documented IT Strategy with a Vision, Architecture and Plan currently guiding priorities and actions.

> Policies, processes and standards that provide clear direction for decisions, priorities and architecture do not exist or are not followed.

> IT activities are only driven by previous decisions, projects in-process, and business user requests or demands for priority attention.

6

2010 Tatum. All Rights Reserved.

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 196 of 258   PageID 10828

## Tatum

• • • Business Applications are very often not well supported, with a few exceptions.

> Third party software has been taken off maintenance, and then support dumped on IT. This is not an effective nor appropriate model to follow.

> Vendors have not been recognized and treated as business partners, but often as competitors to IT.

> Responses to application problems reported to the Help Desk are too often very late or nonexistent.

> There is no recognized Service Level Agreement with the Applications group regarding response/communication and resolution.

> IT project reassignments and turnover have contributed to a lack of continuity in support, relationship and business knowledge.

192

7

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N    Document 42-1    Filed 06/29/16    Page 197 of 258    PageID 10829

••• Support Services are generally good, with some room for improvement in Help Desk service

> Desktop Support generally gets very good marks.

> Help Desk gets a wide range of mixed reviews. Many report great attention from the help desk. Others do not, reporting poor recognition of the need for urgency based on operational impact, and assignment of followup to the wrong personnel. This demonstrates a lack of clear policies and procedures, or lack of adherence to them.

••• Project management and planning are generally poor, resulting in underperforming projects.

> There is no methodology of substance that is in place and followed.

> Planning is insufficient to avoid surprises during the project.

— There are no business requirements documented, no project charter, nor design specifications.

— Decision-making on priorities for application fixes or improvements is too often at the discretion of the IT manager. Such application projects or requests are not visible at the biweekly projects meeting. Staff reassignments from priority to priority results in lack of continuity with the business and delays in completion of projects.

> Projects are not managed jointly by IT and the business department. This is a two-way street.

8

©2010 Tatum. All Rights Reserved

••• Governance of IT plans and projects has been dysfunctional and does not currently follow governance best practices.

> The current biweekly projects meeting with the business department heads achieves some limited benefit, but it does not sufficiently meet either management or governance needs. These meetings have not been well run and are of very limited value. There are too many people in attendance, which creates a counter-productive "audience". Currently, however, these are often the only means of communicating with the business partners on project progress. Application projects are typically not reported at the projects meeting.

> There is no clear governance over the initiation, documentation and approval of new projects. Business departments have too often not engaged IT, or not appropriately, at the beginning of a potential project. Project initiation does not typically include necessary documentation of business user requirements and cost/benefit or work plan for all resources.

> There is no clear process for the acceptance and prioritization of projects (or application projects or service tickets) by IT for execution. Projects are currently too often prioritized by "who yells loudest".. As new projects arrive, they are added to the workload. There is no monitoring of available staff capacity against current or predicted demand.

2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 198 of 258   PageID 10830

## Tatum

•• Governance of IT plans and projects has been dysfunctional and does not currently follow governance best practices (continued).

> System acquisition/selection decisions have been driven primarily from a single departmental view.

— The assumption has been made that the system must therefore fit every other department with seemingly similar needs. Other departments' user requirements have not been well considered prior to an acquisition, to ensure applicability in rollout beyond initial implementation. Integration needs also get left out, and long-term maintenance and supportability appears to be assumed rather than planned. True total cost of implementation, ownership and operation, factoring in achievable (TCIO) for five years has not been documented. The breakdown in working relationship between IT and business departments has left a void impacting the governance of IT by the business department heads.

> Commissioners have been pulled into, and involved in, management over IT projects, which is not the appropriate, effective governance role. Governance needs to be reestablished.

10

©2010 Tatum. All Rights Reserved

- Civil Courts - Tyler Odyssey historical support experience was not satisfactory, but recent Tyler support has been more satisfactory, as reported by IT.
  - Applying hot fixes (vs. an upgrade) makes application support much more problematic.
- Justices of the Peace (JPs) are currently still using the mainframe system (aka Forvus), which is quite unsatisfactory for their needs.
- Juvenile is currently supported by JIS and Caseworker, with JCMS Basic (Caseworker) is in test and going live in approximately a month.
- AIS is unstable, and has problems impacting jail operations, public safety and case management. Interfaces between AIS and the mainframe case management ("Forvus") are unstable on a daily basis.
- Prosecution has no application system effectively in place.
  - AIS provides very little support here.
  - The limited Microsoft Access system is on an old unsupported Access 95 version, and its Access database is very large, which impacts its performance and represents risks that need to be mitigated.
  - "Paperless" cannot be achieved as long as hard-copy case files must be kept, until an electronic Adult Case Mgt. System is available.

2010 Tatum. All Rights Reserved

• • • Incident Module Countywide Rollout is pending completions by non-County agencies.

• • • Jury Services Project is effectively complete, pending IVR.

• • • Countywide Imaging has achieved some significant successes in the District Clerk and Justice arenas, and rollout of OnBase scanning continues there.

  ➢ Implementation of Hyland work-flow is expected within a month

  ➢ There may be concerns about whether remaining departments' requirements will be fully met (e.g. redaction, full document management).

  ➢ No agreement has yet been reached with Hyland to complete an enterprise agreement, achieve pricing economies, gain commitments and build partnership.

• • • Public Defender has a "case management system" in custom development by third-party Salem, as arranged by IT Applications, extracting data from Forvus and AIS to identify conflicts of interest.

  ➢ Criminal is in process with limited progress on fixes. Scope was intended to include Family and Juvenile, but misunderstood.

  ➢ Access to AIS also is needed for warrants, holds, releases, jail incidents, court dates, settings, previous bookings, photos

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 201 of 258   PageID 10833

Case 3:15-cv-01758-N  Document 42-1  Filed 06/29/16  Page 202 of 258  PageID 10834

# Tatum · Findings - Applications – Law Enforcement

- **Sheriff's Department – General Services**
  - Computer-Aided Dispatch (CAD) is old, with many issues and needs for application support , although there is none arranged with the vendor or IT.
  - Dictaphone-based CAD recording system is very old, out of support and needs replacement
  - QueTel Property Management System for evidence tracking is old, out-of-date, and has no support arranged with the vendor or IT
  - Biometrics are needed soon, with project to start this month

- **Forensics**
  - Laboratory Information Mgt. System (LIMS) is reportedly ready but awaits the new Forensics building completion to go live. Significant challenges were overcome on this project over a long period of time. IT's wireless, SQL scripting, and data base administration skills fell short. Business users had to step into project responsibilities that IT should have handled.

13

© 2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 203 of 258   PageID 10835

## Tatum·   Findings – Applications – Finance/Administration

- **Finance - Auditor and Treasurer**
  - > Oracle is dropping maintenance support of version 11 by November 2011, which does not allow much time for Dallas County to upgrade, without a lot of urgency, shifting priorities and outside help. Financials and Human Resources would be impacted.
  - > Applications and functions also needed are Grants, and Three-Way Invoice Match, and Treasury available within Oracle, in addition to Bank Reconciliation, Credit Card Reconciliation, and Cash Management Reconciliation system-to-system.
  - > Countywide Receipting project has shown very limited results over a long period of time. Once the initial phase is completed in the fall, results and plans need to be reassessed.

- **Human Resources**
  - > Oracle HR Self-Serve for Managers and for Employees have been on the list for implementation for years, and there is still no project planned. Neither Personnel Performance Evaluations nor iRecruitment background checks have been implemented in Oracle, and no plans are believed to be in process.

199

14

© 2010 Tatum. All Rights Reserved

- **Tax Assessor/Collector**
  - › Vehicle Inventory Tax is an older mainframe system needing replacement
    - — VIT-Centerline311 has been in development by IS Holdings for two years. They are not performing well, and this needs to be resolved or they may need to be replaced.
  - › Receipting based on using a convenience fee – there is an RFP out for this.
  - › Additional SAN shared space allocation is essential to meet department needs.
- **Facilities & QA**
  - › Fleet system on old Access 95 is very fragile (past stated vehicle capacity)
    - — needs quick-hit upsize to SQL database
    - — convert to up-to-date Access program, otherwise select new system to replace it
  - › iProcurement needs multiple windows open at a time with good performance
  - › FAMIS getting "patched" to work for QA Control
  - › Project management software is needed – willing to review Daptiv against requirements
  - › There is no First Responder database for emergency response to County buildings

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N    Document 42-1    Filed 06/29/16    Page 205 of 258    PageID 10837

# Tatum

••• Health and Human Services

> Bioterrorism lab needs hardened, high connectivity, and DR Plan

> TB application needs update to .NET from Fox Pro (just like STD)

> Electronic Medical Records (EMR) is needed for patient info-sharing across all County clinics and Parkland hospital

> Communicable disease tracking daily statistics are needed county-wide across all hospitals, clinics, labs, doctors

••• Elections

> Needs a definition of requirements for servers, network, data communications

> Voting system needed in 2-4 years

> Has funding

16

2010 Tatum. All Rights Reserved

Tatum

**...** Public Works

> Document management is needed, but OnBase and SharePoint need to be evaluated against requirements

> GIS needs to be server-based, and Google Earth at least

> Software packages need upgrade to latest version:

    — MS-Office, Microstation, GeoPac, Creative Suites

> MS-Project is needed by everyone, and Acrobat Pro

> Many computers here need to be beyond the Power User spec, since more computing power is required for specialized applications

2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 08/29/16   Page 207 of 258   PageID 10839

# Internal IT Perspective - Findings

*IT Organization*
*IT Processes and Controls*
*IT Server and Network Architecture*

**19**

©2010 Tatum. All Rights Reserved

## Tatum

• • • **Organizational Structure, Roles, Responsibilities and Resource Deployment**

> The organizational structure at Dallas County is a traditional IT method of organizing responsibilities (Applications, Operations, Support, Project Management)

> There are people in IT responsible for projects, applications and infrastructure but few have any ongoing accountability for the success of their business departments. IT management and staff do not feel a real connection to their users.

> Projects, whether managed by the PMO or by the Applications area, do not often get participation from the other essential IT functions either at project initiation or during execution. Silo communications are discussed below.

> Resources are generally deployed for work in a reactive manner, depending on "who yells the loudest". Assignments change immediately when someone else yells louder

> Several of the IT staff expressed frustration at being moved from assignment to assignment because they do not have the opportunity to establish a trusted relationship with their business partners.

> The Quality Assurance (testing) organization currently resides in PMO but is ineffective and being disbanded because of the lack of engagement by Applications.

> "Floaters" are developers who go from one project to another in Applications resulting in people with little understanding of their roles or responsibilities and less of who governs their work schedules or who will be responsible for their evaluations.

> Job descriptions are inexact and often do not reflect the roles of the IT staff. Gradations of capabilities are generally not reflected in IT job descriptions.

2010 Tatum. All Rights Reserved

21

Case 3:15-cv-01758-N    Document 42-1    Filed 06/29/16    Page 209 of 258    PageID 10841

••• Turnover (continued)

> From Dallas County's HRMS Turnover Report, turnover by IT function for 2008/2009 was:
  - Applications: 28/9%
  - Operations: 0/0%
  - Project Management Office: 0/0%
  - Support: 0/0%
  - Senior Management: 0/13%

> Turnover by skill set within Applications for 2008/2009 was:
  - Programmer: 23/0%
  - Data Base Administrator: 30/20%
  - Analyst: 36/8%
  - Management: 20/20%

> Higher turnover in the Applications area contributes to a lack of continuity and other difficulties between IT and the business users.

> There are 35 separate job descriptions that cover the 74 people in IT. There are 19 job descriptions that have only one person in them. While for senior management positions the individual job descriptions are sometimes valid, having so many job descriptions and associated pay scales contributes to a lack of career pathing and the resulting dissatisfaction of staff on pay and promotion issues.

205

23

©2010 Tatum. All Rights Reserved

••• Skills and Competencies

> Skills, including knowledge and training, of the IT department as a whole is below-average to average as compared appropriately against IT skill sets necessary to achieve generally accepted standards of IT performance. Our assessment is based on interviews and current performance as recognized by IT's customers in focus groups. Current skill levels by area (recognizing that there are individual exceptions) are assessed as:

– Business Technical Analysis – below average
– Project Management – below average
– Management – below average
– Data Base Administration – average to below average
– Programming – average to below average
– Operations – average

— The most critical skills to be addressed would include the top 3-5 areas above, although specific skill requirements need to be determined in the coming months.

> Competencies include such characteristics as dedication, commitment, teamwork, problem solving, customer focus and communications. The current competency level of the IT department as a whole is assessed as below average (with individual exceptions).

> Morale impacts the delivery of skills and competencies to the job. With improved morale, there are several individuals who are capable of significantly improving their contributions.

24

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N  Document 42-1  Filed 08/29/16  Page 211 of 258  PageID 10643

••• Training and Skills Development

> Most of the managers and staff were asked about development and training plans, and all reported that there are none.

> While the County spent a great deal of money on a training offering with Real Solutions, most of the planned use of the training was scrapped as workloads increased.

> Only the acting CIO is known to have completed the County's manager training course.

> Many of the staff expressed a frustration at not being given any direction on how to advance their careers within the IT organization.

> Several members of the staff reported that their management told them that changing positions would make them more susceptible to being laid off.

> Several staff reported that Civil Service regulations regarding requirements for job postings have been given as an excuse for not assisting them with career development.

© 2010 Tatum. All Rights Reserved

• • • Organizational Culture, Morale and Teamwork

> IT management and staff generally view their role as owners of all applications and data. They believe that their business department users are clients in a transactional sense but not in a partnership sense.

> Many of the IT management and staff believe that their business department users are not capable or entitled to make decisions regarding their applications and data. As an example, several of the managers and staff expressed the opinion that the users should have no say in when applications were upgraded to new releases.

> The morale in the department is poor. People have expressed the feelings that the good people are "hunkered down" and the poor people are "getting by".

> Many of the staff have expressed the feeling that they have just gotten tired of caring, given their situation with their leadership over the last few years.

> When staff were asked about communications within the IT organization (top-down, bottom-up, and lateral between functions), they noted that top down communications were non-existent. The "all hands" meeting in June to introduce the Tatum team was the first that most could remember.

26    ·2010· Tatum. All Rights Reserved

**Tatum**

••• IT Financial Funding, Budgeting and Spending Levels

> Many of the staff referenced the lack of increases over the past years and several have had training cancelled for what were said to be financial reasons.

> From the Dallas County Budget in Brief, the IT actual expenditure for 2009 was approximately $23M; the budget for 2010 was $20M less the 10% expense control holdback. For 2011, the IT budget is estimated at $18M.

> For service sector enterprises, IT expenditures of 2-3% of revenue is a general standard. Applying this standard on the 2010 budget total of $816M would yield a range of $16.3-24.4M; therefore budgeted IT expenditures are below the midpoint but within the standard range.

— Organizations in a technology "catch up" mode would be expected to be at or above the high end of the standard range, due to the need for increased spending on software, hardware, and implementation services. Dallas County has many needs for new applications and projects, and may not be spending enough to catch up, and achieve operational efficiencies from automation.

— Staff costs need to be evaluated in light of skill requirements and job responsibilities, striking a balance relative to abilities, experience and compensation. Staff composition may need to be revisited to get the increased output from IT staff necessary to make the progress required to catch up.

28

2010 Tatum. All Rights Reserved

**••• IT Internal Governance Structure and Process**

> Almost unanimously the IT management and staff said there was little or no internal governance within the IT organization.

> Major policies and procedures are either ignored or missing. Inspection of shared drive files revealed a lot of very outdated (from 2000-2004) examples that no longer applied to the current environment.

> There are no defined processes for bringing work into IT, for prioritizing it when received and reporting on its progress.

> The processes for project management, either in the PMO or in the Applications area, are largely done by following the path of least resistance. Either the project or application manager's preferences or those of the business department form the process., so it appears different on each project.

> Almost all of the IT management and staff were asked about performance planning and regular evaluations. All reported that there are none.

> Most of the IT managers said that the reason for not giving performance plans and having regular reviews was that, since there were no raises, there was no purpose.

> Many of the IT staff indicated that they would like a performance plan and regular reviews as it seemed the professional thing to do, regardless of the County's financial situation.

> Many of the staff indicated that having a performance review in the current environment is a sign that you are getting ready to be terminated.

©2010 Tatum. All Rights Reserved

29

- **Application Maintenance and Development**
  - One Applications manager identified several processes used for application development but they were stored on scattered locations on the shared drive. The manager conceded that they were there to use if you knew where to find them. They are not mandated across the Applications area.
  - Most of the other Applications managers and staff did not know of the existence of any application maintenance and development processes.
  - Application maintenance is done by tickets that are assigned to the application areas by the Help Desk. At that point the process breaks down as it is each individual's responsibility to communicate progress to the users and to get their concurrence to close the ticket when fixed. Most conceded that this does not routinely happen.
  - There have been "incidents" where large groups of application maintenance tickets were closed without resolution. This was purported to be the result of the previous Applications Director "hoarding" tickets to prove the workload of the department. Upon termination, they were just closed without notifying the users. Since users did not have solutions to all these issues, many of the tickets had to be resubmitted at additional cost to the County per contract.
  - There is one known past instance where a large number of applications tickets were held open to inflate the level of work pending in that area. These tickets were closed in bulk when the manager left the organization. Many closed tickets had to be reopened. This was described by IT as an "incident".
  - Many of the applications programmers expressed the desire for better automated tools. Upon a closer examination, the toolkit for the County programmers was pretty sparse. Financial constraints are most often given as the reason for the lack of tools.

© 2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/46   Page 216 of 258   PageID 10848

••• Application Integration Needs

- ➢ There is no stated Enterprise Architecture, which would in part describe the application and data architectures and platforms supported by the County. It would also make clear the acceptable methods of interfacing with core County systems, thus guiding new software acquisition projects.

••• Project Organization and Management

- ➢ Projects, whether managed by the PMO or the Applications area, generally are poorly organized at the beginning. Review of several projects showed essential services being engaged late in the project with predictable results. Individual interviews confirmed that, depending on the project, one or more of the functions in IT is not consulted at the start of the project.

- ➢ Daptiv has been adopted as the project management process control tool. The installation is still being completed, but it is used by the project managers as a reporting vehicle. Daptiv is a good tool with a wide following in the marketplace. Key business department users will be given access to facilitate review of their projects.

212

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 217 of 258   PageID 10849

## Enterprise Standards

> There are few enterprise standard processes or controls that were identified during the interview process.

> In the past there were efforts to document standard policies and procedures. Some of the staff went to ITIL training. Staff interviews indicated that the effort did not produce results that were useful.

## Vendor Contracting and Management

> Vendor contracts are in place for several major parts of the IT function, including Help Desk, Support Desk and mainframe operations

## Server and Network Operations

> Operations processes are largely undocumented. The organization indicated that it trains its staff to back up one another as an alternative.

> Team structures are in place within the operations area to support the various functions. However, coverage is stretched since the staff has been reduced. In addition, staff indicate that the team leads often do not communicate constructively with each other.

> Issue management is not handled in a timely fashion, per interviews. Intra-IT communications are poor causing eventual focus on the issue as a result of a production failure.

> Reactive systems management is the norm, rather than forward planning which would help systems availability.

©2010 Tatum. All Rights Reserved

Tatum

• • • Desktop Support and Administration

> Help Desk processes are defined, but not systematically followed or monitored.

> Users report tickets being closed without notification. IT personnel insist that the system is programmed to send out a confirming email when a ticket is closed.

> The ticket tracking process breaks down when the ticket is assigned to one of the IT functional areas. According to the process, each area is responsible for managing and closing their tickets as they see fit. Interviews with IT staff revealed differences in execution between individuals. This is especially true if an outside vendor must be engaged to help solve the problem. Communications to the business department users are mixed, and dependent on the individual.

> While we were informed that each time a ticket is closed, the user receives notification with a request to fill out a satisfaction survey, IT conceded that these surveys are almost never returned. We heard from the business departments that they do not receive such notifications nor surveys, and they are seldom asked ahead of time whether they believe that the problem is resolved. There are also no spot audits done of the ticket resolutions.

214

33

©2010 Tatum. All Rights Reserved

Tatum

- ••• Change Management
  - > Change Management processes are in place and are assigned to one of the senior IT managers. Observation of a change management meeting and discussions with the staff indicate that they are not operating as effectively as is necessary in an installation of the County's size.
  - > Users have said that when they get one thing fixed, often something else has been broken. This suggests poor testing prior to going through the change management process.
  - > There were mixed opinions regarding the ability to modify production instances. Some said that it is a requirement to go through change management. Others said that certain of their colleagues still work in production instances, most notably the DBAs.
  - > The Tatum team attended a weekly change management meeting. It was very informal and did not address the specifics that a normal meeting would. If it is just to communicate to anyone who is interested what is going into production, it served that purpose. If it was to assess the readiness of items to go into production, it missed the mark.

34

2010 Tatum. All Rights Reserved

••• Security Management

> The Tatum team was given an IT Information Security policy and an IT Access Control policy to review. The information security policy was an acceptable use policy, detailing the rules for working with County workstations. The access control policy outlined the rules for account and password maintenance. Both were acceptable.

> There is not a general IT security management policy or procedures/processes documented that were reviewed. This should include all facets of securing the IT environment including infrastructure, data storage, network and workstations

> The timeout interval for all applications in the IT Information Policy is defined as 15 minutes. Business partner reports wide variability in this and the need for a review to make their jobs more productive.

2010 Tatum, All Rights Reserved

35

... Disaster Recovery

- Disaster Recovery is an ongoing area of risk that requires timely resolution.

- The creation of a County disaster recovery plan is still in-process, and sorely needed to make necessary preparations ASAP to mitigate very critical risks.

- Staff interviews indicate that there are no defined, documented processes for incidents requiring recovery. It was noted that they are handled "on the fly".

- There is no Continuity of Operations Plan (COOP) in place for the County.

- There are continuing disaster recovery weaknesses including Crowley (among others), which has no redundancy, servers not hardened, UPS in basement.

- Disaster recovery has not been fully planned for execution, nor has it been factored into all plans for new systems and technologies.

- There is a need for timely offsite virtual backups or mirroring for ready recoverability. This can be addressed using third parties, vs. building new County facilities.

©2010 Tatum. All Rights Reserved

... **Server Infrastructure and Operating Platforms**

> There are over 300 server instances, many virtualized using VMware within the County IT installation.

> With the exception of a few specialty applications, the server infrastructure and operating platforms are standardized. The County uses Dell servers and Microsoft Windows operating platforms. The Microsoft Windows operating platforms are all currently supported versions.

> There are a number of servers maintained at business partner locations that are outside of the control of the IT organization. These are more susceptible to problems of maintenance, backup and disaster recovery in these distributed locations.

> There has been a direction to move off the mainframe, but key remaining systems have no clear plans yet agreed upon for replacement (JP and Criminal Case Management), and won't be completed anytime within the next year.

... **Data Management, Architecture and Storage Technologies**

> Standard, supported versions of Microsoft SQL are used in many applications. Others use Oracle standard support. The County recently invested in a major upgrade to its SAN storage capacity and is configuring for replicated backups and failover.

**37**

©2010 Tatum. All Rights Reserved.

Case 3:15-cv-01758-N   Document 42-1   Filed 08/29/16   Page 223 of 258   PageID 10035

# Tatum · Findings – Server and Network Architecture

- **Network and Communications Systems Infrastructure**
  - The network architecture is based on standard Cisco communications appliances.
  - Standard device configurations are maintained for each device type.
  - Staff interviews indicate that network bandwidth between core buildings is often only 10% saturated.

- **Server, Network and Communications Systems Administration and Maintenance**
  - Power outages are cited as the most frequent reason for managing service interruptions. Staff interviews expressed the opinion that power management and UPS processes need to be improved.
  - Solar Winds is used to monitor the network and all connection points within the network.

- **Security Infrastructure**
  - A standard virus/malware protection application is managed from within IT.
  - Cisco IronPort web access management devices are used to monitor and control access to the Internet.

38

2010 Tatum. All Rights Reserved

# *Tab* 12



Dallas County IT Assessment

FINAL Report of Recommendations

September 24, 2010

Tatum
*Create more value.*

## Business Perspective

●●● Strategic Direction

●●● Governance

●●● Applications

●●● Quick Hits – Technology Deployment

## Internal IT

●●● Organization

●●● Leadership

●●● IT Direction

●●● Policy / Process / Procedures

●●● Internal Communications

●●● Personnel Management

©2010 Tatum. All Rights Reserved

- Success is defined by the business department users, and delivered by results. Results are measured by impact on the operations, especially in achieving productivity, cost efficiencies, and service improvements .

- Business users are to be the lifetime customers of IT, working together in partnership since neither can be successful without the other.

- Technology, software and systems should be planned to be "evergreen", with ongoing life support planned for by the IT/Business Partners from the very beginning, to avoid system "outliers" or "orphans".
  - Define ongoing maintenance and support from the beginning.
  - Stay on annual maintenance and support.
  - Maintain a partnership relationship with the vendor.
  - Over time of course a system may out-live its technology life cycle or its business usefulness, and require replacement

3

©2010 Tatum, All Rights Reserved

••• System acquisition/selection decisions must be driven by an enterprise view of the impact, not just a department-specific view.

- Criteria must include:
  - Business user requirements first (well documented) need to identify all related needs for such an application, as the basis for understanding global requirements before evaluating software
  - Integration needs
  - Supportability – preference for our standard IT technologies and platforms
    - Option: SaaS / ASP model if fully supported by capable vendor
  - Total cost of implementation and ownership (TCIO) for five years
- Preference is for vendor software, or shared development (e. g. CUC/TechShare)
  - Long-term maintenance and support must be provided.
  - Selected vendors must be considered business partners, during implementation and beyond.
  - Avoid or limit internal development, as this is not a core competency.
    - Contracted development with third parties should be very limited, only using IT-supportable technologies or contracted "evergreen" support.

© 2010 Tatum. All Rights Reserved.

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 229 of 258   PageID 10861

- •• Enterprise Architecture and integration must be embraced as the IT vision foundation .
  - ➢ Business process integration enabled by technology
  - ➢ Strategic architecture standards: Microsoft technologies including SQL, .NET, Windows, etc.
    - — Move off the mainframe
  - ➢ Data integration
  - ➢ Require selected solutions to integrate/interface with existing solutions
- •• Disaster recovery must be built into all plans for new systems and technologies.
- •• Self-serve capabilities need to be put into the hands of the users.
  - ➢ IT productivity gains, user productivity gains, and user satisfaction results.
- •• Prepare an IT Strategy with a Vision, Enterprise Architecture, strategic policies and a 3-5 year Strategic Plan of action.
  - ➢ Vision includes agreed positioning of key attributes of technology delivery.
  - ➢ Enterprise Architecture is described above.
  - ➢ Strategic policies guide actions effectively to produce results.
  - ➢ Strategic Plan prioritizes and sequences projects for 3+ years, based on cost/benefit impact on productivity and efficiencies.

©2010 Tatum. All Rights Reserved

••• The foundation for governance starts with effective leadership and management of IT resources, especially as led and managed on projects for business departments.

••• Project initiation criteria must include documents jointly prepared by the key business department and IT, reflecting business case, business user requirements, evaluation criteria, application maintenance, vendor support, IT support, servers/network, and backup / disaster recovery considerations

 ➢ Involvement and/or review by all key IT managers/chiefs is needed to avoid gaps in planning.
 ➢ Each project is a partnership of IT and the key business department(s).
 ➢ Sponsorship of the project is by the key business department(s), so they will have the lead role in ensuring the project meets their needs.

••• Prioritization criteria for acting upon projects (or applications or tickets) must include:

1. Broken functions substantially negatively impacting public safety, operations, or productivity
2. Compliance with statutes and state mandates
3. Mitigation of major risks
4. Cost reductions and productivity gains that are substantial and tangible
5. Funding sources available (if TCIO funding is available from the key department or external agency, its priority can be raised if IT resources are not pulled off otherwise higher-priority projects)
6. Strategic investment for long-term impact, and to achieve the vision and its benefits

6

© 2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 231 of 258   PageID 10863

••• Business/IT Alignment is the next essential foundational component. This must be a Partnership – enforced by structure, policy and governance.

> Priorities within a business department (or major area) will be set and sequenced by the Business Department's Elected Official/Head/Leader/Executive Sponsor, to maintain focus and consistency and to ensure satisfaction with service

> Alignment will primarily be at the level of key managers - business and IT – who become Partners, "joined at the hip" with shared accountability for results, quality delivery, and user satisfaction

— IT Business Partner marshals the resources from IT, pulling from a designated team supporting the business department's key applications, as well as from shared IT services teams as needed for a project. Also act on behalf of business users to run interference with IT shared services teams (e.g. Support, Network Operations) as needed, and monitor Help Desk ticket aging and status regularly.

— Business IT Partner marshals resources from among the business users for subject matter expertise, developing procedures and training materials, and conducting user training. The Business IT Partner represents the Business Dept. Head on all day to day matters.

— Business Dept. Head and CIO will also be aligned as Executive Partners. They should both be involved in evaluating performance of both of their Manager Partners.

> Alignment will also occur through Project teams that must be joint, including the key business users and contributors from all functions of IT, with clear roles, responsibilities and structure.

2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N Document 42-1 Filed 06/29/16 Page 232 of 258 PageID 10864

# Tatum

••• Individual projects' leadership will conduct a weekly status meeting.

> Participants will include the Business Dept. Head, other stakeholders as appropriate, key players from the business and IT team, and those with key roles dealing with applications, operations, and support wherever necessary. The CIO is invited, and may attend whenever appropriate.

> The focus is to identify issue resolutions, and open issues pending resolution.

> Application maintenance estimated to exceed 160 hours also constitutes a project.

••• County Communities of departments will hold biweekly IT priority meetings.

> Communities would be expected to include: Criminal Justice, Law Enforcement, Civil Courts, County/District Clerks, Finance/Administration, Community Services.

> Participants will include department heads, the Business IT Partner(s), the IT Business Partner(s) and the CIO. The Community will select a Chair, or the CIO will act as Chair.

> The focus is to monitor progress across projects, resolve open issues, review proposed projects to signoff, and reaffirm priorities among Community department IT projects.

> Priorities, proposed projects, and unresolved issues will be passed on to the IT Executive Governance Committee for final resolution and agreement.

©2010 Tatum. All Rights Reserved.

•• The IT Executive Governance Committee will consist of a major department head from each Community, the CIO, 1-2 IT Chiefs, one Commissioner /County Judge on a three-month rotating basis, and the County Administrator as the Chair. This Committee will meet monthly and will not exceed twelve participants. This committee will review open issues and proposed resolutions, recommendations, and projects. This committee will resolve priorities and resource allocations across Community projects, and approve IT policies.

> The IT Executive Governance Progress Report will be prepared monthly by the CIO and County Administrator and presented to this group. Pending issues, resolutions, policies and recommended approvals will be updated in the Report following the meeting, and forwarded to all on the Commissioners Court. Commissioners thereby receive the recommendations of the Committee for action when appropriate. This maintains the Commissioners in an appropriate "board" governance position, approving key management / executive decisions as appropriate.

> The County Administrator is proposed to be Chair since IT reports up through this position, it is the chief executive position and it is non-elected and apolitical. The CIO may lead much of the meeting at the discretion of the Chair. Over time, once IT is performing to a high level and the CIO is proven, the CIO is expected to be considered for the Chair position.

> Projects are approved and prioritized by the IT Executive Governance committee, reported up to the Commissioners Court for funding approval. With an IT Strategy / Strategic Plan outlined, projects would be more planned and predictable, with any new projects expected to be proposed on an annual basis in conjunction with a budget submission.

•• Commissioners Court as a whole would be briefed quarterly, or as needed on key issues of strategic importance, by the CIO and County Administrator for more interactive discussion.

2010 Tatum. All Rights Reserved

## Tatum

*The governance meetings and approval process is depicted as follows:*

**Individual Project Status Meeting (weekly)**
- Issue resolutions
- Open issues pending resolution

**County Community Priority Meeting (biweekly)**
- Monitor progress across projects, resolve open issues, agree upon proposed projects and priorities
- Forward remaining issues, priorities and proposed projects to IT Executive Governance Committee

**IT Executive Governance Committee (monthly)**
- Agree upon issue resolutions, policies, recommendations, and proposed projects..
- Prioritize projects and resource allocations.
- Finalize IT Executive Governance Progress report for Commissioners Court.

**Commissioners Court**
- Approves funding
- Approves project priorities, policies, and resolutions as needed

©2010 Tatum. All Rights Reserved

10

Case 3:15-cv-01758-N Document 42-1 Filed 06/29/16 Page 234 of 258 PageID 10866

230

••• IT Executive Governance Committee - Additional Principles

> Committee members are appointed to serve the interests of the County as a whole, by ensuring the needs of all County departments and constituencies are being met.

> While Committee members bring a departmental perspective, they are to act in the best interest of the County as a whole.

> All Committee members are to speak to each other with respect at all meetings.

> Only Committee members present may vote at a meeting.

— Each assigned Committee member is to attend every meeting personally. Multiple missed meetings may be cause to consider reassignment of membership to another.

— If a Committee member is unable to attend, they may provide a written proxy in advance to the Chair, authorizing another assigned Committee member to vote on their behalf.

— It is not recommended that an absent Committee member have an assistant attend in their absence.

— The Committee as a whole may request that a non-member attend a specific meeting for a purpose. They are to observe, only participating as requested. These are the only non-members authorized to attend a Committee meeting.

> Commissioners are to receive 30 days advance notice of their rotation onto the Committee.

2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N Document 42-1 Filed 06/29/16 Page 236 of 258 PageID 10868

- ••• **Civil Courts**
  - ➤ Tyler Odyssey - stay on it, get support and avoid orphaning
    - – Obtain additional functions, features and sustainability by:
      - – Transferring to license it under CUC
      - – Upgrading to the latest release
      - – Preparing to maintain the software on the most-current release in the future
    - – While historical support experience with Tyler was not satisfactory, recent support experience has been more positive in IT. This may have resulted from a new support structure and approach at Tyler.

- ••• **Justice of the Peace (JP)**
  - ➤ RFP is now out, awaiting proposals in response by September 20
  - ➤ Our recommendation is for the evaluation of proposals to be handled in a very objective, transparent, above-board, even-handed manner. This may require some assistance in the evaluation and internal meeting facilitation. Business process, demonstrations, cost/benefit, integration, volumes, risk mitigation, and supportability should be primary decision-making factors.

© 2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N    Document 42-1    Filed 06/29/16    Page 237 of 258    PageID 10869

## Tatum

- **Juvenile**
  - JCMS Basic (Caseworker) is in test going live in a month or so.
  - CUC TechShare joint development with Tarrant County for full JCMS including Probation is in progress, and currently expected 4Q 2011.
  - Blended Docket is another CUC TechShare joint development with Tarrant County, due in about 4-6 weeks.
- **Criminal Justice Systems**
  - Detention
    - Fix the problems impacting operations and public safety very soon
    - Move off unstable AIS over time
  - Case Management
    - Resolve the inconsistent interfaces between AIS and the mainframe case management ("Forvus") ASAP
      - BizTalk would be the appropriate place to investigate first, since it is the common nexus of all, and there was a history of problems with it
  - Get Bonds and Warrants systems off mainframe (aka "Forvus") over time

233

13

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N Document 42-1 Filed 06/29/16 Page 238 of 258 PageID 10870

## ⋯ Criminal Justice Systems (continued)

> Prosecution

- There is no real application system in place, but it is sorely needed
- The Microsoft Access system in use needs to be updated very soon, as it is on a very old unsupported Access 95 version. It will require some redevelopment to meet latest version standards, due to the age of its Access 95 code.
- Its Access database is very large, and should be moved to SQL Server to improve data security and possibly performance well-indexed
- Bring a real prosecution application on-board relatively early in the rollout of an Adult Criminal Justice System

234

14

©2010 Tatum. All Rights Reserved

••• Adult Criminal Justice System – *Alternatives*

> Build on AIS
  - This is not an acceptable alternative, since AIS has significant shortcomings. It is a very shaky foundation with known problems, and it was architected to be a detention system, not for criminal case management or prosecution.

> Build our own
  - This is not an acceptable alternative, since development is not our core competency, particularly on such a large scale, nor is the requisite planning or scope management

> License Odyssey Criminal Case Management
  - There is very limited use of Odyssey Criminal Case Management at other Texas urban counties.
  - Dallas County has not licensed Odyssey for Criminal Courts.
  - The history and reputation of insufficient support by Tyler would be difficult to overcome in the Dallas County user community.
  - Recent support experience with Tyler has been more positive in IT, and may have resulted from their new support structure and approach.
  - This does not appear to be a compelling alternative. If there is a desire to consider it further, references should be checked and Tyler's latest version could be reviewed.

-2010 Tatum, All Rights Reserved

Case 3:15-cv-01758-N Document 42-1 Filed 06/29/16 Page 240 of 258 PageID 10872

••• **Adult Criminal Justice System –** *Alternatives* **(continued)**

> License a competing vendor software package

— This can be considered an alternative, as court case management software is coming available that may fit the environment. An evaluation of such package(s) could determine whether this is an option.

> Jointly fund the CUC TechShare development of the Adult Case Management System (ACMS) with Tarrant County and perhaps another county to help fund it.

— Incremental phased deliveries are planned each 6 months

— Project management, scope management and leadership by CUC – previous governance issues appear to have been resolved, and deserve diligent focus.

— Consortium has not yet delivered development in a big way, but development shows strength feasibility from experience applied on JCMS.

— It is recognized that there is significant cost, time to build, and potential risk of disagreement between counties.

— Proceeding with the proposed Phase One definition of conceptual architecture, criminal case e-filing rules, strategic development plan, and scope of the first module to implement would better define this and its suitability going forward.

2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 241 of 258   PageID 10873

# Tatum    Recommendations – Applications - Finance/Admin.

**...** Financials

> Engage support for Oracle version 11 to start by November 2011.
  — With Oracle dropping their maintenance support of version 11 by November 2011, that would not allow enough time for Dallas County to upgrade, without a lot of urgency, priority shifting, and outside help. No one is yet trained or experienced in version 12, either in IT or in the user department
  — Evaluate engaging a certified Oracle VAR to support it at that time, as the practical approach.

> Upgrade from version 11 to 12 after 2011 with experienced outside assistance.
  — This involves substantial process reengineering.
  — Plan an appropriately phased implementation.
  — New applications' functionality would also be implemented, in particular Grants, Three-Way Invoice Match, Treasury and Reconciliations.

17

'2011 Tatum. All Rights Reserved

## Tatum̈  Recommendations – Applications – Finance/Admin.

- Human Resources
  - Follow the same path as Financials for Oracle support and upgrade
  - Implement Management Self-Serve ASAP
  - Implement Employee Self-Serve ASAP
  - Implement Personnel Performance Evaluations
  - Implement iRecruitment background checks
- Tax Assessor/Collector
  - Replace Vehicle Inventory Tax system.
    - Resolve insufficient performance by developer IS Holdings on VIT-Centerline311, or otherwise replace them.
  - Allocate additional SAN shared space to meet Tax Assessor/Collector department needs.
- Facilities & QA
  - Upsize Fleet system on Access 95 to SQL database
    - Convert it to up-to-date Access program, otherwise select new system to replace it
  - Establish First Responder database for emergency response to County buildings - GIS, wi-fi
  - Establish one physical security access system for all buildings long-term

2010 Tatum. All Rights Reserved

## Document Management and Scanning

> Discuss requirements of remaining departments not yet implemented on OnBase
> Meet with Hyland to discuss their plans for OnBase (e.g. redaction), and an enterprise agreement
> Confirm departments where requirements are met by OnBase, and deploy
> Evaluate document management, sharing and security capabilities of SharePoint against document management requirements
  - Also consider collaboration and communication

## Sheriff's Department

> Maintain AIS for multiple fixes, state mandated changes, and priority requests
> Engage application support and fixes for old Computer-Aided Dispatch (CAD)
  - Identify replacement options for consideration going forward.
> Replace Dictaphone-based CAD recording system that is out of support.
> Replace or upgrade QueTel Property Management System for evidence tracking, with maintenance support, considering the RMS property module.
> Upcoming needs also include:
  - RMS/CAD systems interface
  - Digital car camera systems
  - Personnel training records, considering RMS Training module
  - Crash mapping

19

©2010 Tatum. All Rights Reserved

• • • **Health and Human Services**

> Bioterrorism lab needs hardened, high connectivity, and DR Plan.

> Update TB application to .NET from Fox Pro (just like STD).

> Establish Electronic Medical Records (EMR) for patient info-sharing across all County clinics and Parkland hospital.

> Communicable disease tracking daily statistics are needed county-wide across all hospitals, clinics, labs, doctors long-term.

• • • **Elections**

> Define requirements for servers, network, data communications in the near-term.

> Voting system needed in 2-4 years, and funding is available

• • • **Public Works**

> Upgrade software to latest version - Microstation, GeoPac, Creative Suites

> Provide MS-Project to all, and Acrobat Pro

> Place GIS on a server, and provide Google Earth

20                                                                                      ﹛2010 Tatum, All Rights Reserved

It is standard practice at Tatum to provide recommendations that are practical, actionable and beneficial. Our best practice approach further identifies certain "quick hits" that can deliver meaningful benefits in the very near term, while preparations and plans are being made to deliver medium-term results and long-term strategic projects.

Following are the quick hits we have identified with the user departments; these provide benefits desired across all departments, and also provide relief to some of the more needy departments by addressing fundamental shortcomings and needs in those areas. They are sequenced by their degree of urgency and quick benefit. In short, demonstrating results quickly will go a long way to raise confidence, improve morale, and show the teamwork that is necessary to start building momentum for the IT/Business Partnership.

241

21

©2010 Tatum, All Rights Reserved

Case 3:15-cv-01750-N Document 42-1 Filed 06/29/16 Page 246 of 258 PageID 10878

## Tatum

••• AIS Deficiencies Resolution

> Daily failures of interfaces both directions with mainframe "Forvus" (BizTalk)

> Multiple fixes, state mandated changes, and priority requests by Sheriff's Detention

> Reports are missing and need development – contract third party if necessary

••• Wireless Courts

> Implement wireless in the Criminal Courts first, to achieve major prosecutor gains in productivity and resulting justice improvement

— Lack of wireless leaves prosecutors at a substantial disadvantage to defense attorneys.

— Needed robust security can be provided with a key middleware component.

> Outsource the effort for expediency, transferring knowledge to IT wherever feasible.

••• Digital Court Technical Support

> Engage the Desktop Support vendor to provide onsite support at Crowley for key Digital Court components, requiring that their people are trained and knowledgeable

> Court disruptions could thereby be minimized, and current prosecutor staff would no longer have to attempt to fix technical problems outside their expertise

242

©2010 Tatum. All Rights Reserved

••• IT Purchasing

> Document and streamline the process

> Assess the aging, status and progress of all in-process purchases

> Monitor ongoing performance and ensure accountability

> Provide Intranet visibility to all user departments on status of IT purchases in process

••• User Self-Serve

> Enable password resets to be done by users

— Revise application timeouts to be much longer; debug exceptions

> Put reporting and report writing capabilities in the hands of the users

— SQL Reporting Services for SQL server databases

> Implement HR Self Serve for Managers, then Employees

••• Migrate mission-critical Access data to SQL Server

> Also migrate old Access programs to the current version, since some are as much as 4 versions behind; caution should be applied to mitigate risks.

••• Allow webinar video streaming for training (the basis of Homeland Security training)

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01158-N Document 42-1 Filed 06/29/16 Page 248 of 258 PageID 10880

••• Establish an effective Disaster Recovery Plan (DRP) meeting service level requirements for all business department functions, eliminating single points of failure.

- Identify service level requirements based on the Continuity of Operations Plan (COOP).
- Analyze single points of failure across all County departments.
- Evaluate financial impact of third-party hot site vs. County facility for redundancy.
- Address urgent, essential priorities ASAP, deploying resources to implement the plan.
- Test the plan as implementations complete.

••• Desktop Software

- Deploy Outlook client (free) across the board for all employees
  - Use OWA when external
- Upgrade everyone from older versions to Office 2003 (or later) immediately under the Enterprise Agreement, for compatibility and consistency of support
  - Requires some training on what would be a new user interface
  - Next year migrate to Office 2010 under the Enterprise Agreement, once the version is proven in widespread use elsewhere
  - Use SMS with EA for auto-deployment
- Have HR take responsibility for arranging & coordinating desktop software training offerings.

©2010 Tatum. All Rights Reserved

24

Case 3:15-cv-01358-N   Document 42-1   Filed 06/29/16   Page 249 of 258   PageID 10881

## Quick Hits – Technology Deployment

Tatum

- **Desktop PC**
  - Inform all departments of ability to refresh, and the annual request.
  - Standardize departmental PC images (with identified exceptions).
  - Provide PDF generation for all; provide Project and Access as needed.
  - Review, revise and/or establish a consistent, comprehensive replacement/refresh policy over time.

- **Help Desk Ticket Resolutions**
  - Ensure that Help Desk personnel are consistently well-trained to assign proper urgency/priority, to assign the right type of staff, and to allow supervisors and their employees to setup tickets for each other
  - Ensure that resolutions must automatically be communicated to the affected personnel
  - Assess the aging, status and progress of all in-process tickets
  - Monitor ongoing performance and ensure accountability
  - Provide Intranet visibility to all user departments on Help Desk tickets in process

- **Maintain updates on ongoing and upcoming IT projects with Intranet access for all**
  - Reexamine third-party hosting of Intranet.
  - Consider implementing SharePoint (free), and also for document sharing and collaboration.

- **Define requirements for Elections servers, network, data communications**

- **Allocate additional SAN space to meet Tax Assessor needs, or allocate dynamically.**

©2010 Tatum. All Rights Reserved

25

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 250 of 258   PageID 10882

# Tatum

# RECOMMENDATIONS

## INTERNAL IT

IT Organization

Leadership

IT Direction

Policy / Process / Procedures

Internal Communications

Personnel Management

© 2010 Tatum. All Rights Reserved

... The IT organization must be restructured and realigned to facilitate communications and partnership with, and accountability to, the business departments. This is also the foundation for accomplishing a necessary complete transformation of culture, with the resources at hand.

... In summary, major recommendations for IT organizational restructuring are as follows:

> Re-align key managers and resources from a functional structure to a customer partnership focus, structure and linkage.

> Redefine the organization: roles, structure, management responsibilities, qualifications and performance measures as needed.

> Assign all IT employees (including current "floaters") to a manager, with specified job responsibilities.

> Fill open management positions with qualified candidates, from within or from outside.

> Define and implement more effective communication processes between customer-facing and non-customer-facing IT resources.

> All must be willing to rethink how they work.

©2010 Tatum. All Rights Reserved

27

**Tatum**

**•••** Specific recommendations for restructuring and realigning the IT organization include:

> Revise and publish IT mission and vision statements focused on business partnership.

> Define positions within IT as "IT Business Partner" responsible for all areas of their business partners' access to IT services. There should be several of these positions matched with major departments and/or business communities (e.g. finance, criminal courts). IT Business Partners will be paired with a similar position in the customer partners' organizations to provide full coordination and communication between IT and the business department/community, monitoring and sharing accountability for results.

> Define customer-facing teams that include applications and project management to support the IT Business Partner Liaison in delivering focused attention and results to their specified business partners.

> Define cross-IT service functions to support the customer facing organizations. These would include PMO planning and support, Help Desk, Desktop Support, and Operations. Other functions such as database administration would need to be decided.

> Select and assign managers and staff who fit into the customer-facing teams or the cross-IT service functions. Fill open IT management slots as soon as possible to build the momentum of organizational change.

> Train IT management and staff on partnering with the business, and their requirements.

> Conduct joint business / IT customer-facing team meetings to begin the process of aligning IT to its business partners' operations, priorities, and application requirements. Define success criteria and joint responsibility for results with the business partners.

28

©2010 Tatum. All Rights Reserved

# Tatum

## Recommendations - Organization

*Conceptual Illustration*

**IT**

IT Senior Management

### County Department / Communities
*for example:*

| | | | | | | County Department / Communities |
|---|---|---|---|---|---|---|
| Security | Network & Operations * | Support * | Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | **Criminal Justice** Procedures, Training |

| Function | Maint./Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | Department |
|---|---|---|---|---|---|---|---|
| | Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | **Criminal Justice** — Procedures, Training |
| | Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | **Civil Courts** — Procedures, Training |
| | Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | **Law Enforcement** — Procedures, Training |
| | Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | **Clerks** — Procedures, Training |
| | Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | **Finance/Admin.** — Procedures, Training |
| | Maint./ Dev. | Data Mgt. | PM's | Apps | IT Business Partner | Business IT Partner | **Community Services** — Procedures, Training |

*Assigned to projects in each community*

249

©2010 Tatum. All Rights Reserved

## Tatum

••• Specific recommendations for Business Departments realigning with IT include:

> Review and agree upon the business partnership mission and vision.

> Define a position within a business department as the "Business Partner IT Liaison" with responsibility overall for department access to IT services. Working jointly with their counterpart IT Business Partner, they will ensure full coordination and communication between the department and IT, monitoring and sharing accountability for results.

> Agree on business department responsibility for user procedures, user training, etc.

> Train Business Partner IT Liaison, and then department management and staff, on partnering with IT, including methodology, process / procedure requirements, and joint expectations of one another.

> Conduct joint business partner / IT team meeting to begin the process of fully aligning IT with the business department's' operations, priorities, and application requirements. Define success criteria and joint responsibility for results with the business partners.

> Ensure that both Business and IT Partners and department heads fully understand new Governance process and procedures, and guiding principles around project initiation, approval, prioritization and funding.

— Business departments only initiate potential systems planning or vendor contacts with joint Business and IT Partner agreement and participation.

30

©2013 Tatum. All Rights Reserved

## Tatum

- Implement a "change leadership team" immediately to begin the transformation of the IT organization and its relationship with the County business department communities.

- Review and reorganize the senior managers within the IT organization, appointing senior managers from qualified internal candidates or external hires.

- Conduct initial IT management planning session, creating assignments to complete the recommendations within this document.

- Prepare a presentation on the transformation of the IT organization and present to IT staff, and department heads.

- Once the fundamental IT organization changes are made, accepted and being effectively executed by IT management, introduce a permanent CIO leader to continue the transformation.

2000 Tatum, All Rights Reserved

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 255 of 258   PageID 10887

Case 3:15-cv-01758-N   Document 42-1   Filed 06/29/16   Page 256 of 258   PageID 10888

> Why not seek a permanent CIO at this time?

- Organizational transformation is the most essential to achieve ASAP. It will be uncomfortable and disruptive to some, with a new CIO taking a lot of "arrows in the back", not the best way to start their County career.

- Conversely, IT managers uncomfortable with the transformation would be likely to try to negotiate away the critically necessary changes, rather than adapt. A new CIO may compromise to have loyal managers.

- One new CIO will not be able to achieve the needed wide-ranging internal change without forgoing the building of business department relationships, the critically important other half of the job. This transformational change is bigger than one person can lead effectively.

- The current situation would not be attractive to a CIO that Dallas County would want.

- The CIO the County seeks will embrace the organizational change, new direction and business partnership improvements to be achieved, with momentum gathering to achieve the long-term results.

252

32

2010 Tatum, All Rights Reserved

**Tatum**

> The primary characteristics and competencies of a Dallas County CIO must include:

  – Executive and Leader

  – Relational and Communicative

  – Collaborator - with all parties, within and outside the Dallas County organization

  – Partnership with the Business

  - – Customer Satisfaction and Service Orientation
  - – Work Jointly on Projects and Business Initiatives
  - – Treat Vendors as Business Partners as well

  – Planner to Drive the Enterprise Vision

  - – Architect the Enterprise
  - – Drive Business Process Integration
  - – Incorporate eBusiness to Advantage
  - – Comprehensive Project Planner with the business departments

  – Results Orientation - make the Vision happen

  – Governance Orientation

  - – Recognize and encourage the various appropriate roles of management and governance among the other leaders in the County organization

  – Team Builder

  – Internal IT Management Capability

©2010 Tatum. All Rights Reserved

33

## Tatum

••• IT must develop and communicate its own direction to its staff and its business partners. The key documents include:

> IT Strategy that is clearly supportive of the Dallas County strategy, with:
  — Vision, goals and objectives providing measures of success.
  — Policies that clarify expectations and provide clear guidance for actions that will be effective within the department and with its business customers/partners.
  — A strategic plan prioritizing and sequencing projects for optimal effect on County operational productivity and cost efficiencies.
  — Agreement of the business department partners.

> Enterprise Architecture that outlines the technologies that the County has committed to support over the strategic period.

34

©2010 Tatum. All Rights Reserved

Case 3:15-cv-01758-N Document 42-1 Filed 06/29/16 Page 258 of 258 PageID 10890