**CONCLUSIONS OF LAW (As to Grounds 1, 2 & 3)**

The following Conclusions of Law are integral to all of the aforementioned grounds and incorporated by reference into each of them.

152.  The Court concludes that under Supreme Court precedents, once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227–228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Powell v. Alabama*, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Interrogation by the State, including agents of the State, is such a stage. *Massiah v. United States*, 377 U.S. 201, 204–205 (1964); see also *United States v. Henry*, 447 U.S. 264, 274 (1980).

153.  The Court concludes that adversary judicial process had been initiated and Mr. Broadnax was entitled to appointment of counsel at the time of arraignment. *See United States v. Wade*, 388 U.S. 218, 225 (1967) ("As early as *Powell v. State of Alabama*, [287 U.S. 45 (1932)], we recognized that the period from arraignment to trial was 'perhaps the most critical period of the proceedings ...,' 287 U.S. at 57, during which the accused 'requires the guiding hand of counsel ...,' 287 U.S. at 69, if the guarantee is not to prove an empty right.")

154.  The concludes that Mr. Broadnax was entitled to counsel at the time of the interviews by the media, who were agents of the State of Texas, that followed after arraignment but no counsel had been appointed for him. *See United States v. Wade*, 388 U.S. 218, 226-227 (1967), "[i]t is central to that [Sixth Amendment] principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.[5] The security of that right is as much the aim of the right to counsel as it is of the other guarantees of the  Sixth Amendment-the right of the accused to a speedy and public trial by an impartial jury, his right to be informed of the nature and cause of the accusation, and his right to be confronted with the witnesses against him and to have compulsory process for obtaining witnesses in his favor. The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution. *Cf. Pointer v. State of Texas*, 380 U.S. 400."

155.  The Court concludes that it has scrutinized the pretrial confrontation of Mr. Broadnax by the media, and determined that the presence of counsel was necessary to preserve his rights to a fair trial. *See United States v. Wade*, 388 U.S. 218, 227 (1967) ("the principle of *Powell v. Alabama*, 287 U.S. 45 (1932) and succeeding cases requires that we scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to

cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.").

156. The Court concludes that prior to the enactment of the Texas statutes, Texas Fair Defense Act, (TFDA), and for at least a decade in the 1990s, the Dallas courts appointed counsel for indigent defendants accused of capital murder at the time of Texas Magistration.

157. The Court concludes that after the enactment of Texas statute, TEX. CODE CRIM. PROC. Art. 1.52 became effective on January 1, 2002, the Dallas courts delayed the appointment of counsel for capital defendants sometimes by calendar days because the statue provided that the "court or the court's designee shall appoint counsel as required by this subsection as soon as possible, but not later than the end of the first working day after the date on which the court or the court's designee receives the defendant's request for appointment of counsel."

158. The Court concludes that in the Gap (from request for counsel at the arraignment until appointment of counsel by the Court assigned the capital case), the Dallas County Jailers solicit, encourage, and coordinate and facilitate interviews of capital defendants by the media, making them state agents. *Massiah v. United States*, 377 U.S. 201, 202-203(1964). *See Manns v. State*, 122 S.W.3d 171, 187 (Tex. Crim. App. 2003) ("affirmative conduct by a government official is required to convert an entrepreneurial informant into a government agent, courts have wrestled with what types of conduct will suffice. One question is whether the Sixth Amendment is implicated by placement of an known 'entrepreneur' in the defendant's cell with the hope that incriminating information will be received as a result but without informing the entrepreneur of this purpose. The Third Circuit has affirmatively indicated that such conduct may pose a problem, [*citing* in footnote 83: *United States v. Brink*, 39 F.3d 419 (3rd Cir. 1994)] while other jurisdictions have done so by negative implication, pointing out that there was no evidence of such intentional placement in the case at bar," *citing* at footnote 84: *Hicks*, 798 F.2d at 449; *Hawkins*, 511 N.W.2d at 12; *Desnoyers*, 55 P.3d at 974; *Taylor*, 420 S.E.2d at 420").

159. The Court concludes that the Media were Agents of the State because, among other things, the Dallas County Jailers created a procedure, and a template (the DCS Media Inmate Interview-Request Letter), on which the media based their letters. The media-created Media Inmate Interview-Request Letters contained language and elements that are identical or substantially similar to the DCS Media Inmate Interview-Request Letter. By following the procedure promulgated by the Dallas County Jailers, and patterning their letters on the template created for the media by the Dallas County Jailers, the media is provided, and ensured, expedited access to capital defendants by the Dallas County Jailers at the Dallas County Jail (a/k/a Lew Sterrett). *See Manns v. State*, 122 S.W.3d 171, 183-84 (Tex. Crim. App. 2003) ("to qualify as a government agent, the informant must at least have some sort of agreement with, or act under instructions from, a government official," citing caselaw

58

187

from state and federal jurisdictions, including: *United States v. LaBare*, 191 F.3d 60, 63–66 (1st Cir.1999); *United States v. Birbal*, 113 F.3d 342, 345–346 (2nd Cir. 1997); *United States v. Van Scoy*, 654 F.2d 257, 259–261 (3rd Cir.1981); *Thomas v. Cox*, 708 F.2d 132, 133–137 (4th Cir.1983); *Creel v. Johnson*, 162 F.3d 385, 392–394 (5th Cir.1998); *United States v. Harris*, 9 F.3d 493, 500 n. 2 (6th Cir.1993)(dicta); *United States v. York*, 933 F.2d 1343, 1355–1358 (7th Cir. 1991), *overruled on other grounds, Wilson v. Williams*, 182 F.3d 562 (7th Cir.1999); *United States v. Johnson*, 338 F.3d 918, 919–923 (8th Cir.), *rehearing granted on other grounds*, 338 F.3d 918 (2003); *Brooks v. Kincheloe*, 848 F.2d 940, 942–945 (9th Cir.1988); *United States v. Taylor*, 800 F.2d 1012, 1014–1016 (10th Cir.1986); *Lightbourne v. Dugger*, 829 F.2d 1012, 1019–1021 (11th Cir.1987); *United States v. Watson*, 894 F.2d 1345, 1347–1348 (D.C.Cir.1990).

160. The Court concludes that the Media were Agents of the State because, among other things, if the media letters do not comply with the template and procedures, the Public Relations/Information Officer corrects and completes the missing information to bring the media letters into compliance with the procedures of the Dallas County Jailers. Thereafter, the Public Relations/Information Officer faxes the media letters to the Dallas County Jailers within the jail, who have custody and control over the capital defendant. These steps taken by the Public Relations/Information Officer gives the media access to the capital defendant at the Dallas County Jail for the purposes of interviewing the capital defendant about the offense conduct. (Trial Vol 41 - July 27, 2009 suppression hearing:19-20); *Massiah v. United States*, 377 U.S. 201, 202-203(1964); *Manns v. State*, 122 S.W.3d 171, 183-184, 187 (Tex. Crim. App. 2003).

161. The Court concludes that that the Media were Agents of the State because, among other things, the Dallas County Jailers know or should know that a capital defendant, such as Mr. Broadnax, requested counsel at the Texas Magistration (arraignment) because the request is made in front of the Dallas County Jailer, who provided the pen, remained present while the defendants (including Mr. Broadnax) completed the forms requesting counsel, and delivered the completed forms back to the Dallas County Magistrate, who forwarded them to the district courts. (SWH Vol 3:135 – Brad Lollar testimony; SWH Vol 3:106 – William E. Karo Johnson). Notwithstanding, there are no *Miranda* warnings in the Sample Media Inmate Interview-Request Letter created by the Dallas County Jailers, or in the letters submitted by the media outlets to the Public Relations/Information Officer. *Massiah v. United States*, 377 U.S. 201, 202-203(1964); *Manns v. State*, 122 S.W.3d 171, 183-184, 187 (Tex. Crim. App. 2003).

162. The Court concludes that the Media were agents of the state because, among other things, the Dallas County Jailers hand-deliver the Media Inmate Interview-Request Letters to the defendant, encourage him to consent, and witness his signature. *Massiah v. United States*, 377 U.S. 201, 202-203(1964); *Manns v. State*, 122 S.W.3d 171, 183-184, 187 (Tex. Crim. App. 2003).

59

188

163.    The Court concludes that the Media were Agents of the State because, among other things, the Public Information Officer sets up the interview room, determines the amount of time for the interview, and escorts the media to the interviews, while the Dallas County Jailers stand next to the capital defendant during the inmate interviews. *Massiah v. United States*, 377 U.S. 201, 202-203(1964); *Manns v. State*, 122 S.W.3d 171, 183-184, 187 (Tex. Crim. App. 2003).

164.    The Court concludes that the Media were Agents of the State because, among other things, through the Media Inmate Interview-Request Letters, the Dallas County Jailers facilitated and ensured quick and preferential access to Mr. Broadnax and other capital defendants by the media over and above access by defense counsel in the Gap create by the TFDA. *Massiah v. United States*, 377 U.S. 201, 202-203(1964); *Manns v. State*, 122 S.W.3d 171, 183-184, 187 (Tex. Crim. App. 2003).

165.    The Court concludes that when counsel is appointed either before or at the time the media seeks access to a capital defendant, the Dallas County Jailers impede defense-counsel access to a client, to give the media sufficient time to conduct the media interviews before the attorney is given access to the client, again making the media agents of the State. *Massiah v. United States*, 377 U.S. 201, 202-203(1964); *Manns v. State*, 122 S.W.3d 171, 183-184, 187 (Tex. Crim. App. 2003).

166.    •    **The Media Interviews, Introduced by the State at a Capital Trial, so Prejudice the outcome that a Defendant must be represented to enjoy genuinely effective Assistance of Defense Counsel**: The Court concludes that the Media were Agents of the State because the media interviews were structured to elicit from Mr. Broadnax and other capital defendants:  a confession, statements of lack of remorse and that lethal injection is an appropriate punishment.

167.    The Court concludes that the Media were Agents of the State because the media interviews adversely affect every aspect of the capital trial defense and the State of Texas used those media interviews at the capital trial.

168.    The Court concludes that the Media Interviews of Mr. Broadnax and other capital defendants in Dallas County so prejudiced the outcome of the prosecution that, as a practical matter, Mr. Broadnax and other capital defendants must be represented during the media interviews in order to enjoy genuinely effective assistance of counsel and failure to do is a violation of the Sixth and Fourteenth amendment rights to counsel, and the Fifth Amendment right against self-incrimination.

169.    The Court concludes that the "'right to use counsel at the formal trial [of Mr. Broadnax was] a very hollow thing [because] for all practical purposes, the conviction [was] already assured

60

189

by the pretrial examination' [in the media interviews]." *United States v. Wade*, 388 U.S. 218, 225–226 (1967).

170. •    **The TFDA is Unconstitutional Because Assistance of Counsel in the Wake of a Texas Magistration is Part of the Substantive Guarantee of the Sixth Amendment and a Capital Defendant Like Mr. Broadnax Had a Constitutional Right to Counsel at Texas Magistration:** The Court concludes that the assistance of counsel in the wake of a Texas magistration is part of the substantive guarantee of the Sixth Amendment to the U.S. Constitution. *See Rothgery*, 554 U.S. at 216 (Alito, J. concurring, Roberts, Scalia, JJ. join).

171.    The Court concludes that because the assistance of counsel in the wake of a Texas magistration is part of the substantive guarantee of the Sixth Amendment that Mr. Broadnax had a 6th and 14th amendment right to appointment of counsel at the time of Texas magistration. *See Rothgery*, 554 U.S. at 216 (Alito, J. concurring, Roberts, Scalia, JJ. join).

172.    The Court concludes that capital defendants in Dallas County have the constitutional right to court-appointed counsel during the media interviews, because they are a "critical stage" in the legal proceedings because they so prejudiced the outcome of a capital defendant's prosecution that, as a practical matter, a capital defendant must be represented during the media interviews in order to enjoy genuinely effective assistance of counsel. *Rothgery*, 554 U.S. at 217.

173.    The Court concludes that because the media interviews were a critical stage in the legal proceedings, and Mr. Broadnax was denied counsel despite having made a request, Mr. Broadnax did not validly waive this right to counsel and for counsel to be present at the media interviews. *See Rothgery*, 554 U.S. at 211.

174.    The Court finds that a capital defendant who is represented, and advised, by counsel not to give a media interview, but does so against the advice of counsel, is situated differently from a capital defendant, who the Dallas County Jailers make available to the media for an interview in the Gap. (SWH Vol 3:48 – Bernhardt testimony).

175. •    **Under the TFDA, Appointment of Counsel is Unconstitutionally Premised on a Specified Period (Which Can Span Several Calendar Days) After Texas Magistration Rather than on the Need for Counsel at a Critical Stage, including Media Interviews:** The Court concludes that Mr. Broadnax's 6th and 14th amendment rights to counsel under the U.S. Constitution were violated because the Texas Fair Defense Act, and specifically TEX. CODE CRIM. PROC. Art. 1.051, Right to Representation by Counsel, impermissibly and unconstitutionally premised appointment of counsel for a defendant on a specified period after an accused's magistration, rather than on the need for counsel in a "critical stage" of the

190

post attachment proceedings. *See Rothgery*, 554 U.S. at 216 (Alito, J. concurring, Roberts, Scalia, JJ. join).

176. • **During the Gap Created by the TFDA, the State of Texas Facilitated and Ensured Quick and Preferential Access to Capital Defendants by the Media, who were State Agents, Over and Above that of Defense Counsel**: The Court concludes that Mr. Broadnax had a 6th and 14th amendment right to counsel during the media interviews because the media interviews were a "critical stage" in his legal proceedings and because they were events that so prejudiced the outcome of his capital prosecution that, as a practical matter, only with the counsel during the media interviews could Mr. Broadnax enjoy genuinely effective assistance of counsel throughout the legal proceedings against him. *Rothgery*, 554 U.S. at 217.

177. • **The TFDA Violated Mr. Broadnax's Fifth, Sixth and Fourteenth Amendment rights to Effective Assistance of Counsel, and Right Against Self-Incrimination and Is Unconstitutional**: The Court concludes that because Mr. Broadnax did not have representation of counsel during the media interviews, his Fifth, Sixth, and Fourteenth amendment rights to effective representation of counsel, and his right against self-incrimination were violated.

178. The Court concludes that the Texas Fair Defense Act, both on its face, and as applied,[15] and the Dallas County Procedures implementing it, are unconstitutional because they violated Mr. Broadnax's procedural and substantive 6th and 14th amendment rights to counsel, and right to be free from self-incrimination. Once Texas Magistration occurred, Mr. Broadnax was entitled to the presence of appointed counsel during the media interviews, a "critical stage" of the post attachment proceedings. *See Rothgery*, 554 U.S. at 212 (Alito, J., concurring).

179. • **Trial Counsel Was Constitutionally _In_effective**: The applicable federal law for this ineffective assistance of counsel claim is *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professionally competent assistance," and

---

[15]   Pursuant to TEX. CIV. PRAC. & REM.CODE § 37.006(b) (Vernon 2008), the Office of the Attorney General has been notified of this challenge by service of this pleading.

Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."

*Strickland,* 466 U.S. at 995.

180. • **Deficient Performance**: The Court concludes that the performance of defense counsel in challenging the admissibility of the media videotapes was deficient because of the inadequate pre-trial investigation into:

a. Media: The Defense did not interview any reporter or assignment editor sufficiently in advance of trial despite the *in*applicability of the media shield laws, nor did the defense request a continuance of the trial to do so

b. Law Enforcement: The Defense did not interview the Dallas County Jailers nor law enforcement in Texarkana, Garland, or Dallas, prior to trial

c. Capital Defense Bar: The Defense did not interview the Dallas County Capital Defense prior to trial despite their willingness to testify about their experience with the Gap and media interviews

181. The Court concludes that assertions of defense counsel, such as:

a. Mr. Lollar's rationale to forgo a challenge to the TFDA because he "had *not* thought about it,"

b. Mr. Parks failure to research and investigate *Rothgery* and a challenge to the constitutionality of the TFDA because he thought it was "fruitless," and

c. Mr. Parks "ha[d] been doing this a long time"

were not "strategic" decisions because counsel did not fulfill their obligation to conduct a thorough pre-trial investigation into the media interview of Mr. Broadnax before any "strategic" choice was made. *Compare Sears v. Upton,* 130 S.Ct. 3259, 3265 (2010).

182. The Court concludes that Parks' assertion that a challenge to the constitutionality of the TFDA was "fruitless," is not sustainable as a strategic decision because only after the legal research was performed would counsel have realized that there was a salient issue about the timing of counsel-appointment.[16] Without knowledge of the law, trial counsel could not have

---

[16] *See Rothgery v. Gillespie County, Tex.,* 554 U.S. 191, 214 (2008) (Alito, J., and Scalia, concurring) (whether "the assistance of counsel in the wake of a Texas magistration is part of the substantive guarantee of the Sixth Amendment, .... At the same time, we have recognized that certain pretrial events may so prejudice the outcome of the defendant's prosecution that, as a

63

made an informed strategic decision as to whether to forego, or alternatively proceed with an investigation into the facts about the timing of appointment of counsel in Dallas. (SWH Vol 3:124 – Doug Parks). *See Charles v. Stephens,* 736 F.3d 380, 389 (5th Cir.2013) ("counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary.

183.   Likewise, the Court concludes that Mr. Lollar's rationale to forgo a challenge to the TFDA because he "had *not* thought about it," and Mr. Parks assertion that he "ha[d] been doing this a long time" do not suffice as "strategic" decisions either. "[U]nder a *Strickland* analysis, trial counsel must not ignore pertinent avenues of investigation, or even a single, particularly promising investigation lead." *Charles,* 736 F.3d at 390. *See also Kimmelman v. Morrison,* 477 U.S. 365, 385 (1986) ("Viewing counsel's failure to conduct any discovery from his perspective at the time he decided to forgo that stage of pretrial preparation and applying a "heavy measure of deference," *ibid.,* to his judgment, we find counsel's decision unreasonable, that is, contrary to prevailing professional norms. The justifications Morrison's attorney offered for his omission betray a startling ignorance of the law-or a weak attempt to shift blame for inadequate preparation.").

184.   The Court concludes that because the pre-trial investigation into the media interviews by defense counsel was deficient, the Court rejects any suggestion that a decision to focus on one potentially reasonable trial strategy – that there was State action because the Dallas County Jailers violated their policy by allowing media access to Mr. Broadnax, who was in a psychotic state and were present during the interviews – was "justified by a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough pre-trial investigation into the media interview of Mr. Broadnax. *Compare Sears v. Upton,* 130 S.Ct. 3259, 3265 (2010).[17]

185.   The Court concludes that because of the omission in failing to raise and preserve a challenge to the unconstitutionality of the TFDA, the Gap, and the media interviews as a critical stage in the legal proceedings, defense counsel breached their "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Kimmelman v. Morrison,* 477 U.S. 365, 384 (1986),*citing Strickland v. Washington,* 466 U.S. 668, 686 (1984)

---

practical matter, the defendant must be represented at those events in order to enjoy genuinely effective assistance at trial. )"

[17]      "This point is plain in *Williams:* We rejected any suggestion that a decision to focus on one potentially reasonable trial strategy—in that case, petitioner's voluntary confession—was "justified by a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." 529 U.S., at 396. A "tactical decision" is a precursor to concluding that counsel has developed a "reasonable" mitigation theory in a particular case."

64

193

186.   The Court concludes that because the media interviews were a critical stage in the legal proceedings, and Mr. Broadnax was denied counsel despite having made a request, Mr. Broadnax did not validly waive this right to counsel and for counsel to be present at the media interviews. *See Rothgery*, 554 U.S. at 211.

187.   The Court concludes that because of the deficient performance of defense counsel, the admission of the videotaped interviews by the media violated Mr. Broadnax's 5th, 6th, and 14th amendment rights to effective assistance of counsel and right against self-incrimination.

188.   The Court concludes that the performance of defense counsel was constitutionally deficient because they failed to follow the GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL, TEX. GUIDELINE 11.2 – *The Duty to Assert Legal Claims* (adopted April 21, 2006) (admonishing defense counsel to ensure that a full record is made in a manner that protects the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited).

189.   • **Prejudice**: The Court concludes that the performance of defense counsel was unfairly prejudicial and adversely the outcome of the trial because the media interviews of Mr. Broadnax were events that "so prejudiced] the outcome of [Mr. Broadnax's] prosecution that, as a practical matter, [Mr. Broadnax had to] be represented ... in order to enjoy genuinely effective assistance of counsel." *Rothgery*, 554 U.S. at 217.

190.   The Court concludes that but for the deficient performance of defense counsel there is a reasonable probability that the outcome would have been different    *Strickland v. Washington*, 466 U.S. 668, 686 (1984)

191.   The Court concludes that the performance of defense counsel was constitutionally ineffective because they could not have made strategic decisions in the defense of Mr. Broadnax given the lack of an adequate investigation into the Gap in appointment of counsel, the media as state agents, the media interviews, and the unconstitutionality of the TFDA, which so prejudiced the outcome of Mr. Broadnax's prosecution. *Strickland v. Washington*, 466 U.S. 668, 686 (1984)

65

194

## III.    FFCL (Grounds 4, 5 & 6 – incorporated by reference into each other)

Ground Four (False and Misleading Gang Testimony – 8th & 14th amendment violation). Mr. Broadnax was denied his right to due process and to be free from cruel and unusual punishment, through false and misleading evidence of gang affiliation sponsored by the prosecution

Ground Five (Free Speech & Gang Evidence – 1st and 14th amendment violations). Mr. Broadnax was denied his right to free speech by materially false and misleading evidence of gang affiliation

Ground Six (IAC & Gang Evidence – 6th & 14th amendment violation). Mr. Broadnax was denied his right to effective assistance of counsel, who failed to object to, and/or properly cross examine on, and/or call its own defense gang expert to refute evidence of gang affiliation

\*     *Because the facts and conclusions are integral to each of the aforementioned grounds, the following Findings and Conclusions of Law by this Court, are incorporated by reference into each of the Grounds 4, 5 & 6*


## FINDINGS OF FACT (As to Grounds 4, 5 & 6)

The following Findings of Fact are integral to all three of the aforementioned grounds and incorporated by reference into each of them.


### A.    The Prosecution Discovery Notices

192.    The Court finds that the prosecutor provided defense counsel with several discovery notices. *See e.g.* Discovery and Notice of Extraneous (1st, 2nd, 3rd, 4th, 5th) (CR 1:22, 104, 106, 108; CR 2:370, 535). These notices included CD's of interviews of Mr. Broadnax by the media and law enforcement, and recorded jail phone calls.

193.    The Court finds that Discovery Notice 4th, dated May 18, 2009, contains the photocopied contents from the Red and Black notebooks "found in a suitcase in CW vehicle," (Discovery Notice 4th) that have writings with the words: "Gangsta," "MOB," "Folk;" as well as various symbols such as wings, a five-pointed star, a pitchfork; (CR 1:119, 120, 124, 133, 141, 146, 156, 173, 184).

194.    The Court finds that Discovery Notice 5th , dated June 24, 2009, includes a CD with an

66

195

inmate call log, and "photos of defendant's cell." (CR 2:535).

195.   The Court finds that the prosecutor also filed States [sic] Potential Witnesses, Amended June 22, 2009, which identifies Nelson, Barrett "BK" as a potential witness. (CR 2:528).

**B.     Prosecution Gang Expert, Detective Nelson**

196.   The Court finds that during the punishment phase of the trial, the prosecutor called Detective Barrett Keith Nelson, who testified that he had worked for 12 years in the gang unit for the Dallas Police Department, and was a member of the Texas Investigator Association in the State of Texas. (RR 49:77-78, 80). The scope of Detective Nelson's testimony was defined by prosecutor Alex when he asked:

> Alex:        Did I ask you to find out as much as you could about the Gangster Disciples?
>
> Nelson:      Yes sir, you did.
>
> Alex:        Did I also ask you to review documents, video tapes, phone calls, [including media interviews] all sorts of things in determining whether a young man by the name of James Broadnax was a member, or part of, or associated with a gang? (RR 49:82-83).

197.   The Court finds that Detective Nelson testified that "most of the gangs ... have their own web sites, ... their history, what colors they wear, where they hang out, what they're doing, and ... photos of them too." (RR 49:81). He also testified that in gathering intelligence, he would not stop there. He would corroborate whether a person is a gang member by "talking to other officers, ... talking to principals, talking to teachers, people who have had contact with these individuals." (RR 49:82). Detective Nelson analogized identifying an individual as a gang member akin to "[i]t's like making a cake. You got to add eggs, milk. Once you have all of these elements together, yes, sir, you have a gang member." (RR 49:104).

198.   The Court finds that because he did not base his "cake making" on objective criteria, the testimony from Detective Nelson was more akin to a tea-leaf-reader. Detective Nelson was the only person at trial who, as his own testimony reflects, was able to divine gang membership from what he had been was shown: "... if you read that phrase, me as a gang officer, he's admitting ...." (RR 49:122; RR 49:89, 104, 122).

199.   The Court finds that absent objective, reliable and valid indicia to guide him, Detective Nelson erroneously concluded that Mr. Broadnax was a member of the Gangster Disciples, based on drawings, such as a pitchfork symbol (RR 49:87, 100); his wearing of a bandana as a flag of the gang, (RR 49:87); phone conversations about OG74 (RR 49:89); certain words written in capital letters, like F-O-L-K or boS-S, (RR 49:95-98), the abbreviation,

196

MOB (RR 49:111-112); lyrics to a song (RR 49:108); and various drawings with a devil's tail, or wings or a heart (RR 49:110).

200. The Court finds that at the conclusion of Nelson's testimony, the defense waived any examination whatsoever:

Court:        Cross-examination?

Lollar:       We have no examination?

Court:        No questions?

Lollar:       Un-uh.  (RR 49:133).


C.    **The Jury Notes**

201. The Court finds that the false and misleading testimony of gang affiliation had an adverse impact on the jury deliberation as to future dangerousness.

202. The Court finds that the jury sent three (3) notes to the court, after it had retired to deliberate following the completion of the punishment phase.  (CR 3:645, 646, 648).

203. The Court finds that from those notes, it is apparent that they were interested in the evidence mistakenly identified as indicia of gang membership:

- Note to the Court: Photo titled Free Styling found in Jail (20 Aug 09) (CR 3:645).

- Note to the Court: Is the letter presented to Mr. Swan by the defense attorney evidence and if so, can we review, – Tape of jail conversations on 8/12. And the Court's response (21 Aug 09)  (CR 3:646).

- Note to the Court: Need school records, Journals from car and jail, Transcript of 4:30 phone call on 8/12, Video of Channel 5 Interview, Photos from crime scene shown today by Prosecution, and the Court's response (21 Aug 09) (CR 3:648).

68

197

**CONCLUSIONS OF LAW (As to Grounds 4, 5 & 6)**

The following Conclusions of Law are integral to all three of the aforementioned grounds and incorporated by reference into each of them.

**A.    The Testimony of Nelson Was False and Misleading Testimony**

204.    The Court concludes that in *Ramirez v. State*, 96 S.W.3d 386, 397 (Tex. App. – Austin 2002, pet. ref'd), the court reversed and remanded the judgment of the jury because "the testimony [was] false and misleading to the trier of fact," relying on *Napue v. Illinois*, 360 U.S. 264 (1959); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935).

205.    The Court concludes that there is no need for a defendant to show the witness knew the testimony was false or otherwise harbored a sufficient culpable mental state to render the witness subject to prosecution for perjury. It is sufficient if the witness's testimony gives the trier of fact a false impression. *See, e.g., Pyle,* 317 U.S. at 216, 63 S.Ct. 177; *Napue,* 360 U.S. at 269; *Alcorta,* 355 U.S. at 32; Dix, § 22.53.

206.    The Court concludes that *Ramirez* made it clear that ***it is of no consequence "[w]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."*** *Ramirez,* 96 S.W.3d at 397, *citing Giglio,* 405 U.S. at 154, 92 S.Ct. 763. The outcome hinges on the obligation of the prosecution to do justice.

207.    The Court concludes that TEX. CODE CRIM. PROC. Art. 61.01 (1) states that the terms, "Combination" and "criminal street gang," have the meanings assigned by TEX. PENAL CODE § 71.01.

208.    The Court concludes that TEX. PENAL CODE § 71.01 defines these terms as follows:

(a)    "Combination" means three or more persons who collaborate in carrying on criminal activities, although:

    (1)    participants may not know each other's identity;

    (2)    membership in the combination may change from time to time; and

    (3)    participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations.

....

69

198

(d)   "Criminal street gang" means three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities.

209.   The Court concludes that the criteria for Criminal Combination and Gang is set out in TEX. CODE CRIM. PROC. Art. 61.02, provides in pertinent part:

( c)   Criminal information collected under this chapter relating to a criminal street gang must:

    (1)   be relevant to the identification of an organization that is reasonably suspected of involvement in criminal activity; and

    (2)   consist of:

        (A)   a judgment under any law that includes, as a finding or as an element of a criminal offense, participation in a criminal street gang;

        (B)   a self-admission by the individual of criminal street gang membership that is made during a judicial proceeding; or

        ©   except as provided by Subsection (d), any two of the following:

            (I)   a self-admission by the individual of criminal street gang membership that is not made during a judicial proceeding, including the use of the Internet or other electronic format or medium to post photographs or other documentation identifying the individual as a member of a criminal street gang;

            (ii)   an identification of the individual as a criminal street gang member by a reliable informant or other individual;

            (iii)   a corroborated identification of the individual as a criminal street gang member by an informant or other individual of unknown reliability;

            (iv)   evidence that the individual frequents a documented area of a criminal street gang and associates with known criminal street gang members;

70

199

> (v)    evidence that the individual uses, in more than an incidental manner, criminal street gang dress, hand signals, tattoos, or symbols, including expressions of letters, numbers, words, or marks, regardless of how or the means by which the symbols are displayed, that are associated with a criminal street gang that operates in an area frequented by the individual and described by Subparagraph (iv);
>
> (vi)    evidence that the individual has been arrested or taken into custody with known criminal street gang members for an offense or conduct consistent with criminal street gang activity;
>
> (vii)    evidence that the individual has visited a known criminal street gang member, other than a family member of the individual, while the gang member is confined in or committed to a penal institution; or
>
> (viii)    evidence of the individual's use of technology, including the Internet, to recruit new criminal street gang members.

210.    The Court concludes that the various signs, lyrics, and drawings, by which Detective Nelson attributed gang membership to Mr. Broadnax, did not satisfy the statutory criteria recited above.

211.    The Court concludes that any "gang" persona attributable to Mr. Broadnax is simply the efforts of a scared young man from an impoverished and high risk ground attempting to protect himself, and/or exhibit the free speech rights of an aspiring rap artist.

212.    The Court concludes that MOB is a popular tattoo that is frequently seen on popular rap stars and in its popular usage, has no relevance to gang membership.

213.    The Court concludes that testimony attributing gang membership to Mr. Broadnax created the false and misleading impression that certain gang symbols were the product of Mr. Broadnax's efforts.

214.    The Court concludes that there is a reasonable probability the materially false and misleading testimony of gang membership adversely affected the outcome of the trial. U.S. CONST. Amend. XIV; *Napue v. Illinois*, 360 U.S. 264 (1959); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103, 112–13 (1935).

200

215.  The Court concludes that in the opening argument at the punishment phase of the trial, the prosecutor argued to the jury that the testimony of Detective Nelson was to be taken into consideration in rendering a verdict on the special issues, and in finding future dangerousness. (RR 48:23-24).

216.  The Court concludes that his opening statement was followed by evidence of the murder of Matthew Butler, from his mother, Theresa Butler, and other family members, as well as the medical examiner, Tracy Dyer, M.D. (RR 48:28, 38). The prosecutor also called witnesses to introduce telephone calls made by Mr. Broadnax from the Dallas County jail, that included contents about fighting with jail personnel, a "take down," allegedly because Mr. Broadnax was "very combative, very out of control," and would not comply with a search of his cell that jail personnel wanted to conduct, and fights with other inmates. (RR 48:73, 86, 109-112, 145-147). The prosecutor also called the investigator for the Dallas County District Attorney's Office, who took pictures of the contents of Mr. Broadnax's cell, and the writings on the walls and door, which were introduced into evidence and referred to by Detective Nelson, the prosecutor's gang expert. (RR 48:114).

217.  The Court concludes that the testimony of Detective Nelson, in conjunction with the aforementioned evidence, heightened the unfairly prejudicial effect of the media interviews, and overshadowed the mitigation evidence presented by the defense; thereby, leading the jurors answered yes to future dangerousness, and no to the mitigation special issues, that resulted in a sentence of death.(RR 54:4-5; CR3:650, 698)

218.  The Court concludes that the right of Mr. Broadnax to federal due process of law and to be free from cruel and unusual punishment was violated when the prosecutor sponsored the false, misleading and unfairly prejudicial evidence of gang membership. The objective evidence is that Mr. Broadnax did not meet the criteria for "Criminal Combination," or Criminal Street Gang," under TEX. CODE CRIM. PROC. Chap. 61.

219.  The Court concludes that there is a reasonable likelihood that the use of this materially misleading and false evidence adversely affected the outcome of the punishment phase of the trial. Mr. Broadnax faces a death sentence based on invalid and unreliable evidence of gang membership that had no objective basis in fact or law. U.S. CONST. Amend. VIII; *Graham v. Florida*, 130 S. Ct. 2011 (2010) ("The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'") *citing Weems v. United States*, 217 U.S. 349, 367 (1910). U.S. CONST. Amend. XIV; *Napue v. Illinois*, 360 U.S. 264 (1959); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935) (and its progeny for the proposition that the knowing use of false testimony violates federal requirement of due process and denies an accused of a fair trial).

201

**B.** **The Prosecutor Violated Mr. Broadnax's Free Speech Rights**

220. The Court concludes that the federal guarantee of free speech is applicable to citizens of the State of Texas:

> The First Amendment provides, in relevant part, that "Congress shall make no law ... abridging the freedom of speech." This guarantee of free speech, which was made applicable to the various states by the Due Process Clause of the Fourteenth Amendment, *Gitlow v. New York*, 268 U.S. 652, 666 (1925), generally protects the free communication and receipt of ideas, opinions, and information, *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942).

> *Scott v. State*, 322 S.W.3d 662, 668 (Tex. Crim. App. 2010).

221. The Court concludes that "[a]n individual's right to free speech and expressive conduct is protected from "arbitrary governmental interference...."[67] Therefore, as a general rule, the government is prohibited from "prescrib[ing] the form or content of individual expression." *Martinez v. State*, 323 S.W.3d 493, 504 (Tex. Crim. App. 2010), *citing Cohen v. California*, 403 U.S. 15, 19 (1971); *Tinker v. Des Moines Indept. Comm. School Dist.*, 393 U.S. 503, 513 (1969) ("The Constitution says that Congress (and the States) may not abridge the right to free speech."), *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 812 (2000) ("Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles.").

222. The Court concludes that the prosecutor violated the free speech rights of Mr. Broadnax through the use of false and misleading evidence that various writings by Mr. Broadnax were indicia of gang membership, when they were in fact an exercise of free speech.

223. The Court concludes that the false and misleading evidence of gang membership, violated the free speech rights of Mr. Broadnax, heightened the unfairly prejudicial effect of the media interviews, and overshadowed the mitigation evidence presented by the defense.

**C.** **Trial Counsel was Constitutionally Ineffective in Failing to Investigate and Challenge the Prosecutor's Gang-Membership Evidence**

224. The Court concludes that the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 686 (1984), set out a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

73

202

Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."

225. The Court concludes that The billing records of counsel and their investigators reflect that Mitigation Investigator, Brendan Ross, performed one hour of research into Gangster Disciple of Dallas on March 5, 2009. State App Exhibit 20 C1 & C2: Billing Records Brendan Ross 3/5/2009 entry.

226. The Court concludes that other than the Ross billing records, the available billing records do not reflect additional investigation into gang membership. There is no indication of any effort to consult with, or hire, a gang expert.

227. The Court concludes that defense counsel's performance was constitutionally deficient and prejudicial; defense counsel failed altogether to object to and/or cross-examine the prosecution's gang expert.

74

203

## IV.    FFCL (Grounds 7 & 8 – incorporated by reference into each other)

Ground Seven (ASPD & PCL-R – Use of False and Misleading Evidence – 8th and 14th amendment violations). Mr. Broadnax was denied his right to due process, & to be free from cruel and unusual punishment. The prosecutor used materially false and misleading evidence of future dangerousness based on ASPD and PCL-R

Ground Eight (IAC & ASPD, PCL-R – 6th and 14th amendment violations). Mr. Broadnax was denied his right to effective assistance of trial counsel, who sponsored defense expert testimony of ASPD, which opened the door to the prosecutor-sponsored, unreliable and invalid testimony on psychopathy and ASPD

\*    *Because the facts and conclusions are integral to each of the aforementioned grounds, the following Findings and Conclusions of Law by this Court, are incorporated by reference into each of the Grounds 7 & 8*

## FINDINGS OF FACT (As to Grounds 7 & 8)

The following Findings of Fact are integral to all of the aforementioned grounds and incorporated by reference into each of them.

228.    The Court finds that during the punishment phase of the trial, the defense called Dr. Lane, a psychiatrist, who was one of several medical personnel who had treated Mr. Broadnax at the jail. (RR 50:77, 83).

229.    The Court finds that in response to questioning by Mr. Lollar, Dr. Lane testified that one of his impressions was that Mr. Broadnax had antisocial personality disorder (ASPD):

Q.    ... What other impressions did you have at that time?

A.    A possibility he also had antisocial personality disorder.

Q.    And describe what that is and why you say it was a possibility?

A.    Well, antisocial personality disorder, first of all, a personality disorder is a more entrenched derangement of the personality that can't be diagnosed until the age of 18 or older, and it is an enduring pattern of behavior. And it occurs not simply after exposure to a drug, or, say, in response to a medical

75

204

condition like a brain tumor or hormone imbalance or something of that nature.

The personality disorders include such things as paranoid personality disorder, antisocial personality disorder, histrionic personality disorder, and to nail down those diagnoses of general pattern of behavior, you'd have to have more information from other sources: His family, his teachers, his employers, and – to give you a long range perspective. Otherwise, you wouldn't know what the pattern of his behavior is.

Q.     ... Now, in regard to the antisocial personality disorder, is it required that you know what the person's history was prior to the age of 15?

A.     Yes.

Q.     And you didn't have that type of history available to you; is that correct?

A.     That's correct.

Q.     So what you wrote there was an impression, but not exactly a diagnosis; would that be fair to say?

A.     That's fair to say.

Q.     And I think you noted on other times that he's got traits of antisocial behavior. Certainly, that would apply to what, 85, 90 percent of the people in the jail, because that's one of the traits of antisocial, is that the person's jailed.

A.     Or that – that they're breaking the law.

(RR 50:99-100, 102, 106, 111).

230.   The Court finds that prosecutor, David Alex, cross examined Dr. Lane. (RR 50:114). The thrust of the cross-examination of Dr. Lane, was to have him tie the various diagnostic criteria of ASPD[18] to behaviors of Mr. Broadnax. *See* (RR 50:146-150) (criteria of lack of

---

[18]     Without objection the prosecutor put into evidence Exhibit 581, the definition of ASPD (RR 50:145), and Prosecutor Alex asked Dr. Lane to read the diagnostic criteria into the record:

A.     There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15, as indicated by three or more of the following: One, a failure to conform to

· 76

205

remorse shown by video of defendant; conduct disorder before age 15 as shown by self-report of time in juvenile facility; criteria of aggressiveness shown by fights in jail; reckless disregard for the safety of others as shown on the video; criteria of at least 18 years of age, and Broadnax was 19 going on 20 at time of interview by Dr. Lane)

231.   The Court finds that in a hearing out of the presence of the jury, the prosecutor called Jack Randall Price, Ph.D., a clinical and forensic psychologist.[19] (RR 50:215, 216, 218). Dr. Price was not called to testify that Mr. Broadnax was a psychopath. Instead he was called to educate the jury on characteristics of a psychopathic personality based on the Psychopathy Checklist Revised (PCLR) criteria, as set out in SE-595, so that the jury could apply the facts of the Broadnax case to the criteria in order to answer the special issues, particularly as to future dangerousness. (RR 50:220-222, 224). Dr. Price testified that he did not have a professional opinion about how the jury might use the criteria. (RR 50:226).

232.   The Court finds that Mr. Parks objected that the testimony of Dr. Price was inadmissible under TEX. R. EVID. 401 (definition of relevant evidence"), 403 (probative value outweighed by unfair prejudice and jury confusion), 702 (testimony by experts when specialized knowledge would assist the trier of fact). (RR 50:227-228).

233.   The Court finds that Mr. Alex responded that the testimony of Dr. Price was admissible to rebut the testimony of Dr. Lane who "talke[ed] about a psychopath when he talked about antisocial personality disorder. And if we look at the characteristics of a psychopath and we go through them by each one, the defendant hits on all fours..... the term has been used by

---

social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest; Two, deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure; Three, impulsivity or failure to plan ahead; Four, irritability and aggressiveness as indicated by repeated physical fights or assaults; Five, a reckless disregard for safety of self or others; Six, consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior, or honor financial obligations; And seven, a lack of remorse as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

Criteria B. The individual is at least 18 years of age.

Criteria C. There is evidence of conduct disorder with onset before the age of 15.

And D, the occurrence of antisocial behavior is not exclusively during the course of schizophrenia or a manic episode.

(RR 50:146-148).

[19]   The transcript mistakenly appends M.D. after his name. (RR 50:215).

77

206

Dr. Lane...." (RR 50:229).

234.    The Court finds that the court ruled the testimony admissible:

So I have performed the gatekeeping function.... and find the testimony is sufficiently reliable and relevant, ... could conceivably assist the trier of fact ... in understanding the evidence or in determining a fact in issue, and if the expert has made an effort to sufficiently tie the pertinent facts of the case to meet the requirement, it would be helpful to the jury. The probative value is not substantially outweighed by prejudicial effect.

(RR 50:230).

235.    The Court finds that in the presence of the jury, the prosecutor called Dr. Price. (RR 50:239). Using a power point presentation, Dr. Price discussed the 20 traits of psychopathy. (RR 50:247, SX-595, SX-597). He began by telling the jury that psychopathy, "it's roughly the same thing as what ... you heard about, the antisocial personality disorder." (RR 50:248). "It's a person whose traits, ... are against society.... the kind of person they are." (RR 50:249). These traits included:

- Glibness/Superficial Charm
- Grandiose Sense of Self-Worth
- Need for Stimulation/Proneness to Boredom
- Pathological Lying
- Conning/Manipulative
- Lack of Remorse of Guilt
- Shallow Affect
- Callous/Lack of Empathy
- Parasitic Lifestyle
- Poor Behavioral Controls
- Promiscuous Sexual Behavior
- Early Behavior Problems
- lack of Realistic, Long Term Goals
- Impulsivity
- Irresponsibility
- Failure to Accept Responsibility for Own Actions
- Many Short-Term Marital Relationships
- Juvenile Delinquency
- Revocation of Conditional Release
- Criminal Versatility

(RR 50:249-257).

78

207

236. The Court finds that Dr. Price concluded his testimony by saying that "It's a very persistent condition; ... there is no effective treatment," that it is "relatively infrequent in society in general." (RR 50:258, 259).

**CONCLUSIONS OF LAW (As to Grounds 7 & 8)**

The following Conclusions of Law are integral to all of the aforementioned grounds and incorporated by reference into each of them.

237. The Court concludes that in *Ramirez v. State*, 96 S.W.3d 386, 397 (Tex. App. – Austin 2002, pet. ref'd), the court reversed and remanded the judgment of the jury because "the testimony [was] false and misleading to the trier of fact," relying on *Napue v. Illinois*, 360 U.S. 264 (1959); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935).

238. The Court concludes that there is no need for a defendant to show the witness knew the testimony was false or otherwise harbored a sufficient culpable mental state to render the witness subject to prosecution for perjury. It is sufficient if the witness's testimony gives the trier of fact a false impression. *See, e.g., Pyle*, 317 U.S. at 216, 63 S.Ct. 177; *Napue*, 360 U.S. at 269; *Alcorta*, 355 U.S. at 32; Dix, § 22.53.

239. The Court concludes that *Ramirez* made it clear that it is of no consequence "[w]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." *Ramirez*, 96 S.W.3d at 397, *citing Giglio*, 405 U.S. at 154, 92 S.Ct. 763. The outcome hinges on the obligation of the prosecution to do justice.

240. The Court concludes that Dr. John Edens is an expert and his attestations and testimony are credible and reliable and valid.

241. The Court concludes that Dr. Edens opinion is valid, and agrees "that at the time of the Broadnax trial, for purposes of addressing future dangerousness, there was essentially no scientific justification for introducing into evidence an APD diagnosis, which in this case was merely a clinical impression documented by one of the witnesses in jail medical records." *See* Edens affidavit.

242. The Court concludes that Dr. Edens opinion is valid, and agrees that "following the introduction of APD evidence, there was no legitimate scientific reason to have then introduced evidence concerning the PCL-R in this case, in particular equating it with the DSM-IV diagnosis of APD. Once introduced, there is a strong probability that the PCL-R stigmatized the defendant with an irrelevant and pejorative label ("psychopath") and set of

79

208

personality traits (e.g., superficial charm, grandiosity) having little or nothing to do with his likelihood of future dangerousness if not put to death. At the time of the trial, published scholarly reviews criticizing the use of psychopathy and APD diagnoses in capital murder cases were available in the scientific literature and mental health professionals who work in this area are familiar with these research findings. As such, numerous experts would have been available to aid in a challenge to the introduction of this evidence or, at a minimum, serve as a rebuttal witness to the expert witnesses called by the prosecution." *See* Edens affidavit.

243. The Court concludes that the evidence of ASPD and psychopathy of the prosecution, used to prove future dangerousness, was false and misleading

244. The Court concludes that defense counsel was constitutionally ineffective in opening the door to prosecutor-sponsored evidence of ASPD and psychopathy.

80

209

## PROPOSED ORDER

The Court adopts the Findings of Fact and Conclusions of Law submitted by James Garfield Broadnax.

The CLERK IS ORDERED to prepare a transcript of all papers in Cause No. WR08-24667-Y and to transmit same to the Texas Court of Criminal Appeals as provided by Article 11.071, Texas Code of Criminal Procedure. The transcript shall include certified copies of the following documents:

1. Applicant's Application for Writ of Habeas Corpus filed in Cause No. WR08-24667-Y, including exhibits;

2. State's Original Answer to Applicant's Application for Writ of Habeas Corpus filed in Cause No. WR08-24667-Y, including exhibits;

3. Any motions filed by the parties;

4. The Order Designating Issues;

5. Applicant's Proposed Findings of Fact and Conclusions of Law;

6. The State's Proposed Findings of Fact and Conclusions of Law;

7. This Court's Findings of Fact and Conclusions of Law, and Order;

8. The Reporter's transcript of the hearings on December 6 and December 7, 2012, including exhibits;

9. Any supplemental materials filed by the parties;

10. Any sealed materials;

11. Any other matters used by the trial court in resolving issues of fact;

12. The indictment, judgment, sentence, docket sheet, and appellate record in Cause No.WR08-24667-Y , unless they have been previously forwarded to the Texas Court of Criminal Appeals.

81

210

THE CLERK IS FURTHER ORDERED to send a copy of this Court's Findings of Fact and Conclusions of Law, and Order, to Mr. Broadnax's counsel, Lydia M.V. Brandt, Esq., P.O. Box 850843, Richardson, TX 75085-0843, and to counsel for the State of Texas, c/o Lisa Smith, Esq., Appellate Division, Dallas District Attorney's Office, Dallas, Texas.

SIGNED the _____ day of _____, 2014.


_____
Michael Snipes, Presiding Judge
Criminal District Court No. 7
Dallas County, Texas

211

Respectfully submitted,

_Lydia M.V. Brandt_

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas  75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR BROADNAX

## CERTIFICATE OF SERVICE

I certify that on June 24, 2014, I sent by email, and hand-delivered a print copy of the foregoing to:

Attn: Lisa Smith, Assistant District Attorney
LISA.SMITH@dallascounty.org
Anna Kubalak
Anna.Kubalak@dallascounty.org
Capital Writs – Appellate Section
Dallas County District Attorney's Office
133 N. Riverfront Blvd., LB 19
Dallas, TX 75207

_Lydia M.V. Brandt_

Lydia M.V. Brandt

cc:    Mr. James G. Broadnax
       #999-549
       Polunsky Unit, TDCJ
       3872 FM 350 South
       Livingston, TX 77351-8580

83

212

FILED

2014 JUN 24 PM 1: 39

GA.          .....'
DISTRICT CLERK
DALLAS CO., TEXAS

_____DEPUTY

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TX

Ex Parte James Garfield Broadnax,
*Applicant,*

TCCA No. AP 76,207
Trial Court Cause No. WR08-24667-Y

## APPLICANT, BROADNAX'S, NOTICE OF CLARIFICATION OF DEFENSE EXHIBITS INDEX TO TRANSCRIPT VOLUME 4 OF THE DECEMBER 6 & 7, 2012 EVIDENTIARY HEARING

Comes now Applicant, James Broadnax, and files this Notice of Clarification of Defense Exhibits Index to Volume 4 of the transcript volume containing the exhibits admitted for record purposes at the December 6 & 7, 2012 hearing. The exhibits are listed in detail because the transcript index does not identify the document, which might consist of one or more items. The court reporter was unwilling to provide more specificity.

Mr. Broadnax had filed a Motion for Court-Ordered Discovery, For Court-Order Brady Material from Dallas DA, & For Continuance of the Evidentiary Hearing ("Discovery and Continuance Motion"), a Motion for Evidentiary Hearing, and Motion for Oral Argument Before

213

the Texas Court of Criminal Appeals (Motion).  The trial court held a hearing on the discovery motion on December 6, 2012, and an evidentiary hearing on the state habeas application designated issues on December 7, 2012.

In the December 6, 2012 hearing, *all 23 defense exhibits*, below, and *contained in volume 4 were admitted for record purposes only (rpo)*.  (Vol. 2:27 ).

2

214

### December 6, 2012 Hearing – Exhibit 1

The Motion was the subject of the December 6, 2012 hearing. It and its subparts (A-G) were

admitted for record purposes. Exhibit 1 consists of the following:

Exhibit 1:    Motion for Court-Ordered Discovery, for Court-Order Brady Material From Dallas
              DA, & for Continuance of the Evidentiary Hearing (December 6, 2012 Writ Evid.
              Hg) [admitted for RPO, December 6 hearing vol 2:27]

Exhibit A:    Business Records Affidavit of the Dallas County Sheriff's Dept
              • Dallas County Sheriff's Department Procedure: Inmate Interview
                Requests from the Media
              • Sample Letter: Media Inmate Interview Request

Exhibit B:    Business Records Affidavit for Dallas Sheriff's Office
              • Channel 8 – Media Interview Request Letters in Broadnax (with
                and without jailer witness-signature)
              • Fox 4 – Media Interview Request Letters in Broadnax (with and
                without jailer witness-signature)

Exhibit C:    Letter from Janet Cook to Sheriff Valdez
              • Affidavit of Fact of Janet Cook, Asst Dallas Public Defender
              • Affidavit of Fact of Investigator E. Christian Smith
              • Jan. 13, 2009 Letter from Janet Cook, Assistant Public Defender to
                Kim Leach, Dallas Sheriff's Office re: no media interviews
              • State v. Broadnax, Cause No. F08-24667, CDC #7, Pre-Trial Hearing
                Trial Vol. 41– July 27, 2009 Hearing, pp. 1-4, 84-91, 108-110

Exhibit D:    Affidavit of Fact of Burdette, dated December 1, 2012

Exhibit E:    [Used in examination of defense witness – Cliff Jenkins, Vol. 3 p.11]
              • Affidavit of Fact of Clifton Jenkins, dated November 26, 2012
              • Affidavit of Fact of Clifton Jenkins, dated December 16, 2011 (also
                found in State App. 24 to State Writ Application)

Exhibit F:    Affidavit of Lydia Brandt, November 19, 2012

Exhibit G:    Business Records Affidavit
              • Broadnax Book-in Dallas County Jail (also found in State App.
                Exhibit 3)

3

215

**December 7, 2012 Hearing – Exhibits 2 to and including 23**

The December 7, 2012 hearing defense-exhibits include:

Exhibit 2:     [Used in examination of defense witness - Cliff Jenkins, Exhibit 2 referred in Vol. 3, p.18; admitted for RPO in vol 2, p.27 ] consists of:
Subpoenas
- Fox 4  – Shawn Rab
- Fox 4 – Greg Millett
- Channel 11 – Steven Antonio Pickett
- Channel 8 – Rebecca Lopez
- Dallas Morning News  – Jennifer Emily
- Channel 5 – Ellen Goldberg
- Channel 8  – Carolos Rosales

Exhibit 3:     [Used in examination of defense witness – Catherine Bernhard, Exhibit 3 admitted RPO in Vol 3, p.29 and also admitted for RPO in vol 2, p.27] consists of:
3-1     TCCP Article 1.051 effective: 9-1-2007 (pages 1-4)
3-2     2001 Tex. Sess. Law Serv. Ch. 906 (S.B.7)( Vernon's), pp. 1, 2, 16

Exhibit 4:     [Used in examination of defense witness - Catherine Bernhard, Exhibit 4 admitted RPO in Vol 3, p. 31 and also admitted for RPO in vol 2, p.27] consists of:
- The Dallas County Procedures for Appointment of Counsel in Death Penalty Cases as Amended May 2007, signed by then Presiding Judge John Creuzot on May 4, 2007

Exhibit 5:     [Used in examination of defense witness - Catherine Bernhard, Exhibit 5 referred to in Vol 3, p. 31, admitted for RPO in vol 2, p.27] consists of:
- Dallas County Indigent Defense Plan for the Appointment of Counsel in Felony Cases Revised January 2009

Exhibit 6:     [Used in examination of defense witness - Catherine Bernhard, Exhibit 6 referred to in Vol 3, pp. 32,33  and admitted for RPO in vol 2, p.27]
6-1     Nov 26, 2012 email from Joel Lieurance, Policy Monitor to Lydia Brandt, Subject: TIDC;
6-2     electronic signature page of Dallas District Judge Martin Lowy, Local Administrative District Judge;
6-3     Dallas District Courts Plan;
6-4     TIDC 2001 Biennial Indigent Defense Countywide Plan Instructions, dated Sept 8, 2011
6-5     101st Judicial District Court, Hon. Martin "Marty" Lowy, Presiding, website

4

216

Exhibit 7:    [Used in examination of defense witness - Catherine Bernhard, Exhibit 7 admitted RPO in Vol. 3, p. 34 and also admitted for RPO in vol 2, p.27] consists of:
(The exhibit included by court reporter is for Jessica Henderson, and should be for Teresa Renee Price; defense waives its inclusion)

7-1    Teresa Renee Price - Arraignment Sheet
7-2    Instructions Relating to Preliminary Initial Appearance
7-3    Election of Counsel
7-4    Email of appointment of counsel

Exhibit 8:    [Used in examination of defense witness - Catherine Bernhard, Exhibit 8 admitted RPO in Vol. 3, p. 37 and also admitted for RPO in vol 2, p.27] consists of:

8-1    Mark Anthony Speers- Arraignment Sheet
8-2    Instructions Relating to Preliminary Initial Appearance
8-3    Email of appointment of counsel

Exhibit 9:    [Used in examination of defense witness - Catherine Bernhard, Exhibit 9 admitted RPO in Vol. 3, p. 39  and also admitted for RPO in vol 2, p.27] consists of:

9-1    Brandon Jarod Fulwood - Arraignment Sheet
9-2    Election of Counsel
9-3    Instructions Relating to Preliminary Initial Appearance
9-4    Appointment of Counsel for Indigent Defendant
9-5    Email of appointment of counsel

Exhibit 10:    [Used in examination of defense witness - Catherine Bernhard, Exhibit 10 admitted RPO in Vol. 3, p. 40  and also admitted for RPO in vol 2, p.27] consists of:

10-1    Chloe Menager,  F12-59888 Arraignment Sheet
10-2    Election of Counsel
10-3    Instructions Relating to Preliminary Initial Appearance
10-4    Appointment of Counsel for Indigent Defendant
10-5    email of appointment of counsel

Exhibit 11:    [Used in examination of defense witness - Catherine Bernhard, Exhibit 11 admitted RPO in Vol. 3, p. 40 and also admitted for RPO in vol 2, p.27] consists of:
• Mother Charged with Capital Murder in Infant Son's Drowning, dated Friday Sept 7, 2012

Exhibit 12:    [Used in examination of defense witness - Brook Busbee refers to suppression hg transcript at Vol. 3, p. 59; admitted for RPO in vol 2, p.27 ] consists of:
• State v. Lico Escamilla, Vol 32 of 46 (pp 1-154) (not included by court reporter; defense waives its inclusion)

5

217

Exhibit 13:    [Used in examination of defense witness - Karo Johnson, Exhibit 13 referred to in Vol. 3, p 98; admitted for RPO in vol 2, p.27] consists of:

Franklin Davis, F12-12630 (Media Interview Requests)

13-1    KUVN 23-Univision, faxed dated 9-10-2012 @ 10:25 am

13-2    CW33 News at Nine, email dated 9-9-2012 @ 10:00 pm, and faxed Sept 10, 2012 @ 10:30 am

13-3    Telemundo Dallas, letter dated 9-10-2012

13-4    KTVT-CBS11/21 Television, letter dated and faxed 9-10-2012 @10:24 am

13-5    KXAS Channel 5, email dated 9-10-2012 @10:34 am

13-6    News8/WFAA-TV, email dated 9-9-2012 @ 2:05 pm email

13-7    Fox 4 KDFW, letter faxed 9-10-2012 @ 10:25 am

13-8    Dallas Morning News, email dated 9-10-2012 @ 10:45 am email


Exhibit 14:    [Used in examination of defense witness - Karo Johnson Exhibit 14 admitted RPO in Vol. 3, p. 102 and also admitted for RPO in vol 2, p.27] consists of:

14-1    Business Records Affidavit for Dallas Sheriff's Office (also duplicated as Exhibit 1-2 in Vol. 2 (Dec 6 hg), p.13)

14-2    Procedure: Inmate Interview Requests from the Media (also duplicated as Exhibit 1-2 in Vol. 2 (Dec 6 hg), p.13))

14-3    Sample Letter: Media Inmate Interview Request (also duplicated as Exhibit 1-2 in Vol. 2 (Dec 6 hg), p.13)


Exhibit 15:    [Used in examination of defense witness - Doug Parks, Exhibit 15 admitted RPO in Vol. 3, p. 130 and also admitted for RPO in vol 2, p.27] consists of:

•    Business Records Affidavit from Dallas County Auditor's Office and Billing Records for Douglas Parks


Exhibit 16:    [Used in examination of defense witness - Brad Lollar, Exhibit 16 referred to in Vol. 3, p. 136, admitted for RPO in vol 2, p.27] consists of:

16-1    Business Records Affidavit for Dallas Sheriff's Office

16-2    Book-in for James Broadnax  (2 pages)

16-3    Mug-shot for James Broadnax (2 pages)


Exhibit 17:    [Used in examination of defense witness - Brad Lollar, Exhibit 17 referred to in Vol. 3, p. 136, admitted for RPO in vol 2, p.27] consists of:

17-1    Arraignment Sheet for James Broadnax

17-1    Affidavit of Indigency and Order of Appointment for James Broadnax

17-3    Instructions Relating to Preliminary Initial Appearance


Exhibit 18:    [Used in examination of defense witness - Brad Lollar, Exhibit 18 referred to in Vol. 3, p. 139, admitted for RPO in vol 2, p.27] consists of:

18-1    Business Records Affidavit for Dallas Sheriff's Office

18-2    Jail Visitation Log for James Broadnax


6

218

Exhibit 19:    [Used in examination of defense witness - Brad Lollar, Exhibit 19 referred to in Vol. 3, p. 138, admitted for RPO in vol 2, p.27] consists of:
- Business Records Affidavit from Dallas County Auditor's Office and Billing Records for Bradley Lollar

Exhibit 20:    [Used in examination of defense witness - Brad Lollar, Exhibit 20 referred to in Vol. 3, p. 140, admitted for RPO in vol 2, p.27] consists of:
20-1    Business Records Affidavit for Dallas Sheriff's Office
20-2    FAA TV Channel 8 Request for Media Interview of Broadnax
20-3    Fox 4 Request for Media Interview of Broadnax

Exhibit 21:    [Used in examination of defense witness - Brad Lollar, Exhibit 21 referred to in Vol. 3, p. 143, admitted for RPO in vol 2, p.27] consists of:
21-1    Procedure: Media Relations (Kimberley Leach) Dallas Sheriff's Office (Were also admitted as Defense trial exhibits 10 and 11)

Exhibit 22:    [Used in examination of defense witness - Brad Lollar, Exhibit 22 referred to in Vol. 3, p. 145, and also admitted for RPO in vol 2, p.27] consists of:
- State v. Broadnax, Cause No. F08-24667, CDC #7, Pre-Trial Hearing volume for July 27, 2009 Hearing, pp. 1-4, 84-91, 108-110

Exhibit 23:    [Used in examination of defense witness - Brad Lollar, Exhibit 23 admitted for RPO in Vol. 3, p. 146, and also admitted for RPO in vol 2, p.27, consists of:
23-1    Letter from Janet Cook, Assistant Public Defender to Sheriff Valdez
23-2    Affidavit of Fact of Janet Cook
23-3    Jan. 13, 2009 Letter from Janet Cook, Assistant Public Defender to Kim Leach, Dallas Sheriff's Office re: no media interviews
23-4    Affidavit of Fact of Investigator E. Christian Smith

## CERTIFICATE OF SERVICE

I certify that on June 24, 2014, I sent by email, and hand-delivered a print copy of the foregoing to:

Attn: Lisa Smith, Assistant District Attorney

LISA.SMITH@dallascounty.org
Anna Kubalak
Anna.Kubalak@dallascounty.org
Capital Writs – Appellate Section
Dallas County District Attorney's Office
133 N. Riverfront Blvd., LB 19
Dallas, TX 75207

_____

Lydia M.V. Brandt

cc:   Mr. James G. Broadnax
      #999-549
      Polunsky Unit, TDCJ
      3872 FM 350 South
      Livingston, TX 77351-8580

8

220

122/712

CAUSE NO. _____F-0824667-Y_____

| STATE OF TEXAS, | § | IN THE ___CDC 7_____ COURT |
|---|---|---|
| | § | |
| V. | § | |
| | § | |
| James Broadnax | § | OF DALLAS COUNTY, TEXAS |

## ORDER GRANTING CLERK'S MOTION TO AMEND
## CLERK'S ELECTRONIC FILE IN CRIMINAL WRIT/APPEAL

After considering the Clerk's Motion to Amend Clerk's electronic file in Criminal Writ/Appeal, the Court finds that the Motion should be granted.

Accordingly, the Court orders that the Clerk's Motion to Amend Clerk's electronic file in Criminal Writ/Appeal is granted.

SIGNED: _September__ 3__ , 2014.

_____
JUDGE PRESIDING

CAUSE NO. __F-0824667-Y_____

| | | |
|---|---|---|
| STATE OF TEXAS, | § | IN THE ____CDC 7_____ COURT |
| | § | |
| V. | § | |
| | § | |
| James Broadnax | § | OF DALLAS COUNTY, TEXAS |

## CLERK'S MOTION TO AMEND CLERK'S ELECTRONIC FILE IN CRIMINAL WRIT/APPEAL

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Dallas County __District Clerks Office____, and files this Motion to Amend Clerk's Electronic file in Criminal Writ/Appeal in the above-mentioned cause to add the documents listed below, which were inadvertently omitted:

_____Application for Post Conviction Writ of Habeas Corpus under Tex Code Crim Proc This was filed by attorney Lydia M.V. Brandt but the District Clerk nor the DA has a filed marked copy . We petition the court to allow our office to get a copy of Ms. Brandt's file marked copy to place in our electronic file.

Respectfully submitted,

_____
Clerk

## CERTIFICATE OF SERVICE

In keeping with Rule 21a of the Texas Rules of Civil Procedure, I hereby certify that a true and correct copy of the foregoing instrument has been served upon all attorneys of record via:

\_\_\_\_ CERTIFIED MAIL/RETURN RECEIPT REQUESTED

__X__ TELEPHONIC DOCUMENT TRANSFER   (FAX)

\_\_\_\_ FEDERAL EXPRESS

\_\_\_\_ COURIER/RECEIPT DELIVERY

\_\_\_\_ REGISTERED MAIL/RETURN RECEIPT REQUESTED

__x__        HAND-DELIVERY (IN PERSON)

\_\_\_\_ REGULAR MAIL

DATED:____9-3-14_____          _Anna Bayd - Carpi_

W08-24667-Y(A)

| | | |
|---|---|---|
| EX PARTE | § I | THE CRIMINAL |
| | § | |
| | § | DISTRICT COURT NO. 7 |
| | § | |
| JAMES GARFIELD BROADNAX | § | DALLAS COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having considered the application for writ of habeas corpus, the State's original answer, official court documents and records, and the Court's personal experience and knowledge, the Court makes the following findings of fact and conclusions of law:

## PROCEDURAL HISTORY

A Dallas County jury found Applicant guilty of capital murder. (CR: 698; RR47: 203). In accordance with the jury's answers to the special issues, the trial court sentenced Applicant to death on August 20, 2009. (CR: 650-51, 698; RR54: 4-7). Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b), (e)(1), (g) (West Supp. 2013). On December 14, 2011, the Court of Criminal Appeals affirmed Applicant's conviction. *See Broadnax v. State*, No. AP-76,207, 2011 Tex. Crim. App. Unpub. LEXIS 920 (Tex. Crim. App. Dec. 14, 2011) (not designated for publication).

Applicant filed his application for writ of habeas corpus on December 20, 2011. Applicant alleged eight grounds for relief. The State filed its original answer to the application on June 15, 2012. A hearing was conducted in this Court on December 7, 2012. (Writ RR3: 1).[1]

---

[1] The reporter's record from the trial will be referred to as RR# and the reporter's record from the writ hearing will be referred to as Writ RR#.

224

## TABLE OF CONTENTS

The following table indicates the pages on which the Court's findings and conclusions for each ground may be found:

LENGTH OF EVIDENTIARY HEARING:.........................................................2
GROUNDS ONE AND TWO...............................................................................3
GROUND THREE..............................................................................................10
GROUND FOUR................................................................................................15
GROUND FIVE..................................................................................................22
GROUND SIX ....................................................................................................23
GROUND SEVEN..............................................................................................25
GROUND EIGHT...............................................................................................30

## SPECIFIC FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes the following findings of fact and conclusions of law:

### LENGTH OF EVIDENTIARY HEARING:

1.  Applicant asked the Court to grant him several days over which to present evidence in the form of live testimony.

2.  The Court declined that request, limiting the parties to one full day of testimony (December 7, 2012). *See* "State's Filing of Additional Exhibit" (filed 10/4/13). On December 6, 2012, however, the Court agreed to reconsider this limitation and informed the parties that it could hear testimony on December 10 and 11, 2012, if necessary. (Writ RR3: 6).

3.  In the end, the Court determined that no additional evidence by way of live testimony was necessary.

4.  Nevertheless, neither party has been limited in presenting evidence in other forms since the December 2012 hearing. *See* "State's Filing of Additional Exhibit" (filed 10/4/13); Applicant's "Motion to Reconsider & Rescind the 12-12-2012 Order, to Reopen the Evidentiary Hearing, & to Compel Rosales, Lopez, and WFAA-TV to Testify & Produce Documents" (filed 12/18/12).

## GROUNDS ONE AND TWO:
### Lack of Counsel During Media Interviews

5.    In his first and second grounds for relief, Applicant claims he was entitled to the appointment of counsel to represent him at the time of his various interviews with the media. Applicant argues that the failure to appoint counsel prior to the media interviews violated his Sixth Amendment right to counsel and his Fourteenth Amendment rights to procedural and substantive due process and to equal protection. Applicant further alleges that the Texas Fair Defense Act and the Dallas County Procedures for the Appointment of Counsel in Death Penalty Cases are unconstitutional because they fail to provide for the assistance of counsel during media interviews.

### Claims Are Procedurally Barred

6.    Matters not raised at trial cannot form the basis for habeas relief. *See Ex parte Dutchover*, 779 S.W.2d 76, 77 (Tex. Crim. App. 1989); *Ex parte Crispen*, 777 S.W.2d 103, 105 (Tex. Crim. App. 1989); *Ex parte Bagley*, 509 S.W.2d 332, 333 (Tex. Crim. App. 1974) ("The same rule as to the necessity of an objection to complained of evidence has been applied by this Court in habeas corpus cases."). Additionally, habeas corpus is not to be used as a substitute for appeal. *Ex parte Clore*, 690 S.W.2d 899, 900 (Tex. Crim. App. 1985) (en banc).

7.    If a claim could have been raised on appeal, but was not, the Applicant is procedurally barred from raising the issue for the first time through habeas. *See Ex parte Cruzata*, 220 S.W.3d 518, 520 (Tex. Crim. App. 2007); *see, e.g., Ex parte Ramos*, 977 S.W.2d 616, 617 (Tex. Crim. App. 1998) (holding that because claims concerning the jury charge at punishment should have been raised on direct appeal, the claims will not be addressed on habeas).

8.    Habeas corpus is not to be used to relitigate matters that were addressed on appeal. *See Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App. 1994); *see, e.g., Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984) (holding that matters addressed on direct appeal need not be addressed on habeas).

9.    Applicant could have but did not previously assert at trial or on appeal that the Texas Fair Defense Act and the Dallas County Procedures for the Appointment of Counsel in Death Penalty Cases are unconstitutional. Therefore, these claims are procedurally barred.

3

10. Applicant could have but did not previously assert at trial or on appeal that his constitutional right to equal protection was violated. Therefore, this claim is procedurally barred.

11. Applicant's allegation that the media interviews violated his constitutional rights to procedural and substantive due process could have been but was not presented on appeal. Therefore, this claim is procedurally barred.

12. At trial and on appeal, Applicant alleged a violation of his Sixth Amendment rights and argued that he was incapacitated and could not have consented to the interviews. (RR43: 101-09); *Broadnax*, 2011 Tex. Crim. App. Unpub. LEXIS 920, at *28-30.

13. Applicant's first and second grounds for relief necessitate a finding of State agency in order for relief to be granted on this issue. *United States v. Ash*, 413 U.S. 300, 312-13 (1973); *see also Rothgery*, 554 U.S. at 212 n.15.

14. This Court and the Court of Criminal Appeals have already rejected Applicant's Sixth Amendment claim that the reporters were acting as agents of the State during the interviews. (RR43: 111-13); *Broadnax*, 2011 Tex. Crim. App. Unpub. LEXIS 920, at *28-30.

15. Applicant is procedurally barred from relitigating the issue of State agency on habeas and, thus, his Sixth Amendment claim should be dismissed.

### Applicant's Rights to Counsel and Due Process Were Not Violated by Media Interviews

16. The United States Supreme Court has held that the Sixth Amendment right of the accused to assistance of counsel in all criminal prosecutions is limited by its terms: "it does not attach until a prosecution is commenced." *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008).

17. The United States Supreme Court has, for purposes of the right to counsel, pegged commencement to the "initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* Once attachment occurs, the accused at least is entitled to the presence of appointed counsel during any "critical stage" of the post-attachment proceedings. *Id.* at 212. Thus, counsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself. *Id.*

4

227

18. Generally, an article 15.17 initial appearance and magistration marks the initiation of adversarial judicial proceedings in Texas and "plainly signals" the attachment of a defendant's Sixth Amendment right to counsel. *Pecina v. State*, 361 S.W.3d 68, 77 (Tex. Crim. App. 2012) (citing *Rothgery*, 554 U.S. at 212).

19. Applicant's argues that counsel was not appointed soon enough to provide him with adequate representation at the media interviews, which he asserts was a "critical stage." In support of his arguments, Applicant points to several facts and circumstances surrounding the timing of the appointment of his lead counsel, Brad Lollar. (Broadnax's Writ App., pp. 7-20).

20. Applicant also argues that the Texas Fair Defense Act and the Dallas County Procedures for the Appointment of Counsel in Death Penalty Cases are unconstitutional because (1) they do not anticipate that the media may want to speak with an inmate prior to the appointment of counsel and (2) they do not provide for the appointment of counsel before a media interview occurs.

21. The United States Supreme Court has held that a critical stage is a proceeding between an individual and an agent of the State that amounts to a "trial-like confrontation," at which counsel would help the accused in coping with legal problems or meeting with his adversary. *United States v. Ash*, 413 U.S. 300, 312-13 (1973); *see also Rothgery*, 554 U.S. at 212 n.15. Accordingly, in order for a stage to be "critical" for purposes of the Sixth Amendment, there necessarily must be interaction with a State agent.

22. Attachment in this case occurred when Applicant went before the magistrate on June 21, 2008; at that point, he was entitled to the appointment of counsel within a reasonable time to allow for adequate representation during any "critical stage."

23. The reporters who interviewed Applicant were not acting as agents of the State. (RR43: 111-13).

24. Because the reporters were not acting as agents of the State during their interviews, the interviews were not critical stages. *See Ash*, 413 U.S. at 312-13; *see also Rothgery*, 554 U.S. at 212 n.15.

25. The fact that counsel may not have been appointed until after the media interviews in this case is of no moment because the media interviews were not critical stages.

26. Applicant presents no legal authority supporting his proposition that interviews conducted by private media outlets are critical stages, and the Court finds there is no such authority.

27. Applicant argues that the United States Supreme Court's decision in *White v. Maryland*, 373 U.S. 59 (1963) is directly applicable to his case. However, *White* is distinguishable from the instant case. In *White*, the Supreme Court held that a preliminary hearing where White entered a plea was a "critical stage" requiring counsel. *White*, 373 U.S. at 59-60. The hearing in *White* clearly involved State action. The media interviews in this case did not involve any State action.

28. Applicant fails to establish by a preponderance of the evidence that his Sixth Amendment right to counsel or his due process rights were violated.

29. Accordingly the Court concludes that Applicant's Sixth Amendment right to effective assistance of counsel and his due process rights were not violated.

## Applicant's Equal Protection Rights Were Not Violated by Media Interviews

30. Applicant alleges that his right to equal protection was violated because his co-defendant, Demarius Cummings, was appointed counsel one day prior to him, despite the fact that they requested the appointment of counsel at the same time.

31. The Equal Protection Clause requires that all similarly situated persons be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

32. The purpose of the Equal Protection Clause is to prevent the government from discriminating against any person or class of persons. *Ingram v. State*, 124 S.W.3 d672, 677 (Tex. App. – Eastland 2003, no pet.).

33. Equal protection is implicated if a classification interferes with a fundamental right or burdens a suspect class. *Clark v. State*, 665 S.W.2d 476, 580-81 (Tex. Crim. App. 1984).

34. If no fundamental right or suspect classifications are involved, the challenged government action does not violate equal protection "so long as unequal treatment of persons is based upon a reasonable and substantial classification of person." *Vasquez v. State*, 739 S.W.2d 37, 43 (Tex. Crim. App. 1987).

229

More simply put, the classification will not be set aside if it is rationally related to a legitimate state interest. *Clark*, 665 S.W.2d at 481.

35.    Lastly, equal protection does not require things that are different in fact to be treated in law as though they were the same. *Smith v. State*, 898 S.W.2d 838, 847 (Tex. Crim. App. 1995).

36.    Applicant and his codefendant were not treated differently. Each was arraigned, permitted to invoke their right to counsel, and received counsel within 3 days of their request.

37.    As constitutionally required, the appointment of counsel for both occurred within a reasonable amount of time from their request for counsel.

38.    Applicant's attorney was appointed and notified of his appointment the morning after Cummings attorney was appointed. At this point, Applicant had already given the complained-of media interviews.

39.    The delay was not the product of any discriminatory intent, however. The Court notified Applicant's counsel of his appointment at the earliest opportunity, after receiving notification of Applicant's arraignment and invocation of his right to counsel.

40.    The appointment of Applicant's counsel was not delayed because of Applicant's race or any other suspect classification. And the delay did not implicate any fundamental right of Applicant's. As previously noted, Applicant did not have a right to counsel at the time of his media interviews.

41.    Applicant fails to prove by a preponderance of the evidence a violation of his constitutional right to equal protection.

42.    The Court concludes that Applicant's right to equal protection was not violated.

43.    Applicant also argues a violation of a statute, namely Texas Code of Criminal Procedure 1.051(i), in the delay of appointment of his trial counsel.

44.    Habeas corpus is available only to review jurisdictional defects or denials of fundamental or constitutional rights. *See Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989). Claims alleging a violation of a statute are not cognizable in a writ of habeas corpus. *Ex parte Graves*, 70 S.W.3d 103, 109 (Tex. Crim. App. 2002).

7

45.   To the extent Applicant's claim alleges a statutory violation, it is not cognizable on habeas and, thus, it is procedurally barred.

46.   Even assuming this allegation was cognizable, Applicant fails to prove by a preponderance of the evidence any statutory violation.

47.   Cummings and Applicant were appointed counsel within the statutorily-required time frame, and there is no statutory requirement that co-defendant's be appointed counsel at the same time.   *See* Tex. Code Crim. Proc. art. 1.051(i) (West Supp. 2013).

48.   There was no statutory violation.

49.   Lastly, Applicant fails to prove he was harmed by any violation, constitutional or statutory.

50.   On habeas review, Applicant bears the burden of proving by a preponderance of the evidence that the alleged error actually contributed to his conviction or punishment. *Ex parte Fierro*, 943 S.W.2d 370, 374-75 (Tex. Crim. App. 1996).

51.   The decision to speak to the media belonged to Applicant, and Applicant fails to show that he would have taken counsel's advice and declined the interviews.

**Applicant's Contention that the Interviews Were Material and Unfairly Prejudicial**

52.   Applicant also alleges that "[t]he media interviews were material and unfairly prejudicial, rendering defense counsel ineffective throughout the entirety of trial." In the body of his argument, Applicant asserts that (1) counsel would have stopped the media interviews had he been appointed sooner; (2) Dallas County judges, prosecutors, and the defense bar are aware that the media seeks to have access to persons accused of capital crimes, including Applicant; (3) the presiding judge in this case is aware of the material and unfair prejudice done by uncounseled media interviews; (4) the media interviews were the focal point at both phases of the trial; (5) the Court of Criminal Appeals referred to the media interviews in upholding the sufficiency of the evidence to support the jury's determination that Applicant was a future danger; and (6) the media interviews heavily influenced the jury's verdict.

8

231

53.    This allegation does not present a constitutional violation distinct from the previously addressed claims. Rather, it appears to be a harm argument regarding the alleged Sixth Amendment violation.

54.    As set out above, however, the Court found and concluded that there was no Sixth Amendment or other constitutional violation. Therefore, a harm analysis is not applicable.

55.    If Applicant's allegations were intended as a separate, non-constitutional challenge to the admissibility of the media interviews, they are not cognizable.

56.    The alleged violation of a statute, rule, or non-constitutional doctrine is not cognizable in a writ of habeas corpus. *Ex parte Graves*, 70 S.W.3d 103, 109 (Tex. Crim. App. 2002).

57.    To the extent these allegations are premised on the affidavit of Jennifer Reif (Applicant's Exhibit 23), the affidavit is not competent evidence and is inadmissible under Texas Rule of Evidence 606(b).

58.    Ms. Reif, an intern for the Texas Defender Service, interviewed three of Applicant's jurors – John Vessels, William Kreighbaum, and Alex James Folz – about Applicant's media interviews and the role those interviews played in their deliberations. (Applicant's Exhibit 23).

59.    Rule 606(b) prohibits testimony or affidavits from a juror "as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict." There are only two exceptions to this prohibition. A juror may attest (1) to whether an outside influence was improperly brought to bear upon any juror and (2) to rebut a claim that the juror was not qualified to serve. Tex. R. Evid. 606(b).

60.    The jurors' statements to Ms. Reif do not meet either of the exceptions of Rule 606(b).

### There is No Constitutional Requirement that an Inmate Knowingly and Voluntarily Consent to Media Interviews

61.    Lastly, Applicant alleges that he did not knowingly or voluntarily consent to the media interviews.

62.    Habeas corpus is available only to review jurisdictional defects or denials of fundamental or constitutional rights. *See Ex parte Banks*, 769 S.W.2d at 540.

9

63. Applicant does not cite to any fundamental or constitutional right that was allegedly violated. Thus, this allegation is not cognizable. *See Ex parte Banks*, 769 S.W.2d at 540.

64. Moreover, Applicant could have but did not raise on direct appeal the allegation that his consent to the interviews was unknowing and involuntary. Thus, it is procedurally barred.

65. Lastly, even assuming Applicant's allegation is of constitutional dimension, it fails on the merits.

66. Applicant fails to prove by a preponderance of the evidence that his consent to the media interviews was unknowing and involuntary.

67. Accordingly, the Court concludes Applicant's consent to the media interviews was knowing and voluntary.

68. In sum, all of the relief requested in Applicant's first and second grounds should be denied.

## GROUND THREE:
### Counsel's Investigation and Presentation of Sixth Amendment Claim

69. In his third ground for relief, Applicant alleges that trial counsel was ineffective for failing to investigate and raise the precise Sixth Amendment claims he raises in his first and second grounds for relief. Applicant alleges that he was prejudiced by trial counsel's failure to challenge the admissibility of the media interviews on Sixth Amendment grounds because the interviews were a vital part of both phases of the trial.

70. The benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986).

71. An Applicant asserting a claim of ineffective assistance has the burden to prove, by a preponderance of the evidence, the following: (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Thompson v. State*, 9

233

S.W.3d 808, 812 (Tex. Crim. App. 1999) (explaining the standard under *Strickland*).

72. Effective assistance of counsel does not mean errorless counsel. *See Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993).

73. To prevail on a claim of ineffective assistance, the Applicant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. *See Ex parte McFarland*, 163 S.W.3d 743, 753 (Tex. Crim. App. 2005); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). This highly deferential review is applied to avoid "the distorting effect of hindsight." *Ex parte McFarland*, 163 S.W.3d at 753 (quoting *Strickland*, 466 U.S. at 689).

74. Contrary to Applicant's allegation, trial counsel did object to the admissibility of the media interviews based on violations of the Sixth Amendment. (RR43: 105-06).

75. Having found that the reporters were not agents of the State and the media interviews were not "critical stages," Applicant's Sixth Amendment right to counsel was not violated during the media interviews.

76. Catherine Bernhard, a criminal defense attorney, testified at the writ hearing held on December 7, 2012. (Writ RR3: 22-23). Ms. Bernhard testified regarding her personal experience regarding the past and present procedures on being appointed counsel in capital murder cases and her experience handling media interviews in the high-profile cases. (Writ RR3: 22-49).

77. Brooke Busbee, a criminal defense attorney, testified at the writ hearing held on December 7, 2012. (Writ RR3: 51). Ms. Busbee testified regarding her own personal experience regarding media interviews in high-profile cases. (Writ RR3: 51-65).

78. Although much attention during the testimony was given to the change in appointment procedures for capital cases in 2002, Ms. Busbee testified that media interviews still occurred under the prior procedures. (RR2: 68).

79. William E. Karo Johnson, a criminal defense attorney, testified at the writ hearing held on December 7, 2012. (Writ RR3: 88). Mr. Johnson testified regarding his personal experience with being appointed to high-profile capital murder cases that involve media interviews. (Writ RR3: 88-108).

11

80. The testimony of Ms. Bernhard, Ms. Busbee, and Mr. Johnson established that in 2002, the Texas Fair Defense Act allowed for a greater time in which counsel could be appointed.

81. The testimony of Ms. Bernhard, Ms. Busbee, and Mr. Johnson did not establish that there is state action in media interviews.

82. The testimony of Ms. Bernhard, Ms. Busbee, and Mr. Johnson did not establish that the Texas Fair Defense Act was unconstitutional.

83. The testimony of Ms. Bernhard, Ms. Busbee, and Mr. Johnson did not establish that the defense's representation in this case fell below an objective standard of reasonableness.

84. The testimony of Ms. Bernhard, Ms. Busbee, and Mr. Johnson did not establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

85. Brad Lollar was lead counsel for Applicant during trial. (Writ RR3: 119). Douglas Parks was Applicant's second-chair counsel during trial and was responsible for conducting legal research. (Writ RR3: 119, 123). Attorney Kerri Mallon had a limited role in Applicant's trial team. (Writ RR3: 119).

86. Brad Lollar and Douglas Parks testified at the hearing held on December 7, 2012. The Court finds that Mr. Parks and Mr. Lollar were credible witnesses.

87. Mr. Lollar has been an attorney for 35 years and a criminal defense attorney since 1982. (Writ RR3: 131).

88. Mr. Parks was licensed to practice law in 1970 and has been active in criminal defense since 1972. (Writ RR3: 114). He has focused on criminal defense work since the late 1970's. (Writ RR3: 114). He is the criminal defense lawyer member of the committee for the First Administrative District that approves the applications of other lawyers to be on the list of lawyers who can be appointed as first and second-chair counsel in capital cases. (Writ RR3: 116).

89. The Court finds that based on their extensive experience, trial counsel made a sound and reasonable strategic decision regarding which legal arguments to raise and pursue in challenging the admissibility of the media interviews. (Writ RR3: 121-25, 128).

12

235

90. Mr. Parks did not review the record prior to his testimony at the writ hearing held on December 7, 2012. (Writ RR3: 120). Mr. Parks remembered that he talked with Mr. Lollar regarding strategy to exclude the videotapes of the media interviews. (Writ RR3: 121).

91. Their strategy was to show that the media interviews of Applicant were a product of state action. (Writ RR3: 121).

92. Although Mr. Parks could not recall if the defense team had discussed challenging the constitutionality of the Texas Fair Defense Act, he would not have made the challenge because the trial court had already decided that there was no State action. Without state action, such a challenge could not succeed. (Writ RR3: 128).

93. Mr. Lollar chose not to challenge the constitutionality of the Texas Fair Defense Act because their primary position was that the Sheriff's Department was active in facilitating the interviews. (Writ RR3: 154).

94. Defense counsel did, in fact, object to the admission of the media interviews on Sixth and Fourteenth Amendment grounds. (Writ RR3: 155; RR43: 105-06).

95. Applicant was booked into the Dallas County Jail in the early morning hours of June 21, 2008. (Writ RR3: 136). He appeared before Judge Jonathan Vickery approximately three hours after his book-in and requested the appointment of an attorney. (Writ RR3: 137).

96. Sharon Johnson, court coordinator for Criminal District Court Number 7, contacted Mr. Lollar on June 24, 2008 at the start of the business day regarding his appointment in this case. (Writ RR3: 135).

97. Shortly thereafter, Mr. Lollar typed a letter to the Dallas County Sheriff's Department stating that Applicant was not to be interviewed by media or law enforcement. (Writ RR3: 135-36). This was standard practice for Mr. Lollar in handling his high-profile cases. (Writ RR3: 136).

98. At a pretrial hearing, Kimberly Leach, an employee of the Dallas County Jail, testified that she was in charge of getting the media's requests for interviews to inmates, including Applicant. (RR41: 8).

99. At a pretrial hearing, Ms. Leach outlined the process of getting the media's requests to inmates, including the procedure used in this case. (RR41: 9-29).

13

100. Trial counsel attempted to use Ms. Leach's testimony at the pretrial hearing to establish state action in support of the constitutional challenges to the media interviews. (RR43: 105-09).

101. Mr. Lollar was satisfied with calling Ms. Leach as the only witness regarding the procedure by which the media obtained access to Applicant. (Writ RR3: 150, 152).

102. The reporters and assignments editors would not speak with the defense team outside of court. (Writ RR3: 151).

103. The defense team attempted to establish state action by showing that the Dallas County Sheriff's Office facilitated the interviews, that the sheriff's deputies were present during the interviews, and that Applicant had refused to speak with law enforcement but was willing to speak with the media. (Writ RR3: 152-53).

104. During the pretrial hearing, Mr. Lollar sought to make clear that the defense's position was that lawyers are not appointed quickly enough to prevent media interviews. (Writ RR3: 155-56, 164).

105. The crux of the defensive theory at trial was that Applicant was intoxicated at the time of the offense and during the media interviews. (Writ RR3: 124-25).

106. Although counsel can advise a client not to speak with the media, the ultimate decision is left to the client.

107. Media interviews can be used by an accused to deny involvement in the charged offense or to downplay their role in the charged offense. (Writ RR3: 125).

108. Indeed, Applicant first denied involvement in the murders to Channel 11. (Writ RR3: 125).

109. Applicant fails to rebut the presumption that counsels' decisions regarding what challenges to raise regarding the media interviews constituted sound, reasonable trial strategy.

110. Applicant fails to establish a constitutional deficiency in counsels' decisions regarding what challenges to raise regarding the media interviews.

111. Counsels' attempts to exclude Applicant's statements during the media interviews did not fall below an objective standard of reasonableness.

14

237

112. Also, there is no reasonable probability that had counsel raised additional constitutional challenges to the media interviews, the result of the proceeding would have been different.

113. Counsel was not constitutionally ineffective.

114. The relief requested in Ground Three should be denied.

**GROUND FOUR:**
**Detective B. K. Nelson's Testimony**

115. In his fourth ground for relief, Applicant alleges that his federal constitutional rights to due process and to be free from cruel and unusual punishment were violated when Detective Barrett Keith Nelson gave false and misleading testimony for the State regarding Applicant's gang membership. According to Applicant, Detective Nelson's testimony was false and misleading because he did not follow the statutory criteria of section 71.01 of the Texas Penal Code and article 61.02 of the Texas Code of Criminal Procedure in determining that Applicant was a member of the criminal street gang the Gangster Disciples.

**The Allegations Are Not Cognizable in a Writ of Habeas Corpus**

116. Claims alleging a violation of a statute are not cognizable in a writ of habeas corpus. *Ex parte Graves*, 70 S.W.3d at 109.

117. Applicant's allegation that Detective Nelson's testimony was false and misleading is based in large part on his claim that the testimony did not meet the statutory requirements set forth in Chapter 61 of the Texas Code of Criminal Procedure.

118. Chapter 61 does not govern the admission of evidence regarding gang membership but, rather, governs the compilation of information pertaining to criminal street gangs into intelligence databases. *See* Tex. Code Crim. Proc. Ann. arts. 61.01-61.12 (West 2006 & Supp. 2013).

119. Applicant's reliance on Chapter 61 of the Texas Code of Criminal Procedure is misplaced.

120. To the extent Applicant is alleging a statutory violation, his fourth ground for relief is procedurally barred and relief should be denied.

15

## Claims Procedurally Barred

121. The Court of Criminal Appeals has held that matters not raised at trial cannot form the basis for habeas relief. *See Dutchover,* 779 S.W.2d at 77; *Crispen,* 777 S.W.2d at 105; *Bagley,* 509 S.W.2d at 333 ("The same rule as to the necessity of an objection to complained of evidence has been applied by this Court in habeas corpus cases."). At the pre-trial hearing, Applicant objected to Detective Nelson's testimony under Rules 401 and 403 of the Texas Rules of Evidence and the First and Fourteenth Amendments to the United States Constitution. (RR40: 6, 35).

122. To the extent Applicant contends that Detective Nelson's testimony should have been excluded because it did not comply with the requirements of article 61.02 of the code of criminal procedure and section 71.01 of the penal code, he could have raised these contentions at trial, but did not. Thus, they are procedurally barred and should be dismissed.

## Applicant's Due Process Rights Were Not Violated by Admission of Detective Nelson's Testimony

123. A conviction procured through the use of false testimony is a denial of the due process guaranteed by the Federal Constitution. *Ex parte Ghahremani,* 332 S.W.3d 470, 477 (Tex. Crim. App. 2011). The use of false testimony at the punishment phase is also a due-process violation. *Id.* A due-process violation may arise not only through false testimony specifically elicited by the State, but also by the State's failure to correct testimony it knows to be false. *Id.* It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence. *Id.*

124. Though case law in this area frequently refers to "perjured" testimony, there is no requirement that the offending testimony be criminally perjurious. *Id.* It is sufficient if the witness's testimony gives the trier of fact a false impression. *Id.* These rules are not aimed at preventing the crime of perjury – which is punishable in its own right – but are designed to ensure that the defendant is convicted and sentenced on truthful testimony. *Id.* at 477-78.

125. To constitute a violation of due process under federal precedent, the State must knowingly use false testimony. *Id.* at 478. The Court of Criminal Appeals allows applicants to prevail on due-process claims when the State has unknowingly used false testimony. *Id.* Even under this expanded notion of

16

due process, however, the State's knowledge is still a relevant factor to determine the standard the Court uses for reviewing an applicant's habeas claim. *Id.*

126. The knowing use of false testimony violates due process when there is a "reasonable likelihood" that the false testimony affected the outcome. *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). The Court of Criminal Appeals has characterized this as a requirement that the false testimony must have been material. *Id.* This standard is more stringent than the standard applied to *Brady* claims of suppressed evidence, which requires the defendant to show a "reasonable probability" that the suppression of evidence affected the outcome. *Id.* The "reasonable likelihood" standard is equivalent to the standard for constitutional error, which "requires the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 680 n.9 (1985) (plurality op.)).

127. The Court notes that even if conflicting testimony is presented, that fact alone would not indicate perjury. *Losada v. State*, 721 S.W.2d 305, 312 (Tex. Crim. App. 1986); *Brown v. State*, 477 S.W.2d 617, 623 (Tex. Crim. App. 1972).

128. In addition to his due process claim, Applicant alleges a violation of the Eighth Amendment's proscription against cruel and unusual punishment.

129. The use of false testimony is a violation of due process. It does not implicate the Eighth Amendment. Thus, Applicant's reliance on the Eighth Amendment is misplaced.

130. At trial, Detective Nelson testified that he has been a member of the Dallas Police Department's Gang Unit for twelve years. (RR49: 79-81). At the request of the Dallas County District Attorney's Office, he researched the criminal street gangs Gangster Disciples and Folk Nation. (RR49: 82-83).

131. Detective Nelson testified that the Gangster Disciples and Folk Nation were originally founded in Chicago and are primarily Midwestern gangs. (RR49: 85-86). It is not common to come into contact with a member of the Gangster Disciples in the Dallas/Fort Worth area. (RR49: 82).

132. Detective Nelson reviewed the media interviews, Applicant's phone calls, photographs of Applicant's jail cell, and art, letters, and other writings found in Applicant's notebooks. (RR49: 83-130).

17

240

133. According to Detective Nelson, the Gangster Disciples is a part of the Folk Nation and is a criminal gang involved in multiple criminal activities. (RR49: 86, 91-93).

134. After reviewing the media interviews, Applicant's phone calls, photographs of Applicant's jail cell, and art, letters, and other writings found in Applicant's notebooks, Detective Nelson concluded that Applicant had self-admitted to being a member of the Gangster Disciples. (RR49: 84-133).

135. Detective Nelson testified that the term "Folk" is indicative of the Folk Nation, that the Gangster Disciples use a pitchfork as a symbol of their gang, that the number 74 is a direct reference to the Gangster Disciples (G being the seventh letter of the alphabet and D the second), that the six-pointed star of David is used by the Gangster Disciples as a symbol of their gang, and that Gangster Disciples utilize wings in their drawings. (RR49: 84-103).

136. Detective Nelson based his opinion on the following: (1) Applicant's repeated use of the word "Folk" in his writings and in one of the media interviews; (2) Applicant's use of a pitchfork hand-signal during one of the media interviews; (3) Applicant's reference to wrapping his flag around his pistol during one of the media interviews; (4) Applicant's repeated use of the pitchfork in his drawings; (5) Applicant's reference to his mother's boyfriend as an OG74; (6) Applicant's use of the six-pointed star of David in his artwork; (7) Applicant's sign of allegiance to the founder of the Black Gangster Disciples in his writings; and (8) Applicant's use of wings in his artwork. (RR49: 84-103).

137. Applicant presented the affidavit and testimony of Dwight Stewart in support of his claim that Detective Nelson testified falsely.

138. In his affidavit, Mr. Stewart made the following statements and conclusions:

> (a) that Detective Nelson gave false and misleading testimony regarding Applicant's membership in the Gangster Disciples and the Folk Nation;
>
> (b) that Applicant did not meet the statutory criteria for gang membership set forth in Chapter 61 of the Texas Code of Criminal Procedure;
>
> (c) that the Gangster Disciples and Folk Nation are not recognized criminal street gangs in Dallas;

18

241

(d) that Mr. Stewart has presented Continuing Legal Education seminars on the subject of gang education, specifically for attorneys practicing capital defense;

(e) that Detective Nelson did not offer evidence that Applicant was associated with or frequented any area in which the Gangster Disciples operated as a criminal street gang in the Dallas/Fort Worth area;

(f) that Detective Nelson's testimony offered no evidence that Applicant had anything other than incidental use of various gang references;

(g) that Applicant was not listed in any Dallas gang database;

(h) that Applicant does not have any specific gang-related tattoos, which, according to Mr. Stewart, is a strong indicator that Applicant is not a gang member;

(i) that one of the bases for concluding that Applicant was a member of a gang – Applicant's statement during an interview with the media that he was a "Folk" – was misleading because the terms "Folk" and "Folk Nation" have no current meaning;

(j) that members of gangs reference their individual gangs by signs and symbols, and that Applicant made no mention of the Gangster Disciples in the media interviews;

(k) that based on his experience, a true gang member would have made a "shout out" to his gang in all of the media interviews, not just one; and

(l) that Applicant was not a member of a gang but was, in fact, a "gangsta wanna-be."

(Defense Writ Ex. 25).

139. At trial, Detective Nelson testified that Applicant self-admitted to being a member of the Folk Nation and Gangster Disciples in a phone call to his mother's boyfriend during which Applicant asked the man if he was a member of OG74, a reference to the Gangster Disciples. (RR49: 94-95; State's Trial Ex. 553). In his affidavit, Mr. Stewart stated that this was merely a reference to the older man's knowledge and experience. (Defense Writ Ex. 25).

19

242

140. Detective Nelson based part of his opinion regarding Applicant's membership in the Gangster Disciples on his review of notebooks belonging to Applicant that were found in the victim's car. (RR49: 105). These notebooks contained rap lyrics that reference the gang and symbols used by the gang. (RR49: 105-33). In his affidavit, Mr. Stewart stated that rap lyrics that reference gang membership denote a macho reputation, not membership in the gang. (Defense Writ Ex. 25). He also stated that gang symbolism is merely a prop to portray a macho reputation, financial success, and attractiveness to the opposite sex. (Defense Writ Ex. 25).

141. Detective Nelson testified at trial that Applicant has a tattoo of "MOB." According to Nelson, "MOB" symbolizes the Gangster Disciples' rivalry with the Bloods gang; it stands for "money over bitches" and is indicative of a mentality of getting money any way possible. (RR49: 111-12). Mr. Stewart stated that "MOB" is a popular tattoo that is frequently seen on rap stars and in its popular usage has no relevance to gang membership. (Defense Writ Ex. 25).

142. In his affidavit, Mr. Stewart stated that he reviewed the following materials in reaching his professional opinion that Applicant was not a member of the Gangster Disciples or Folk Nation: (1) David Barger's testimony; (2) Darrell Doty's testimony; (3) Detective Nelson's testimony; (4) Assistant Warden Melodye Nelson's testimony; (5) and State's Exhibit at Trial 405. (Defense Writ Ex. 25).

143. Mr. Stewart also testified at the hearing on Applicant's application for writ of habeas corpus held on December 7, 2012.

144. At the hearing, Mr. Stewart testified that he is an educator with the Texas School Safety Center, but that he did not provide his affidavit in his capacity as an educator, that his employer was unaware that he had provided the affidavit, and that his employer was unaware that he was testifying. (Writ RR3: 71).

145. Mr. Stewart also testified that he was a certified gang awareness trainer. To obtain certification, he only had to take a certain number of classes, and was not required to take an examination. (Writ RR3: 72).

146. Mr. Stewart admitted that he did not know that Chapter 61 of the Texas Code of Criminal Procedure does not govern the admissibility of gang testimony. (Writ RR3: 75). He also admitted that he was unaware that the Court of

Criminal Appeals had already held that Detective Nelson's testimony was properly admitted at trial. (Writ RR3: 75).

147. Also, Mr. Stewart acknowledged that the Gangster Disciples are a recognized criminal street gang in Dallas. (Writ RR3: 75).

148. Although Mr. Stewart stated in his affidavit that Applicant was not in the Dallas gang database, at the hearing, he admitted that he did not check the database and does not have access to the database. (Writ RR3: 77).

149. Also, Mr. Stewart admitted at the hearing that he was unaware that Applicant was not from Dallas, but had lived in Michigan and Georgia. (Writ RR3: 78).

150. Mr. Stewart admitted that he could not testify about the presence of the Gangster Disciples in Michigan or Georgia and that he did not know that Detective Nelson had consulted gang officers in Chicago prior to entering his opinion in this case. (Writ RR3: 78-79).

151. State's Exhibit 1, which was offered at the hearing, is a printout of a Powerpoint presentation created by Mr. Stewart and used by him in giving presentations as part of his responsibilities with the Texas School Safety Center. (Writ RR3: 79-80). The Powerpoint presentation was created after Stewart provided his affidavit in this case. (Writ RR3: 80). The presentation includes a slide titled "Folk Nation." (Writ RR3: 80). On this slide, Stewart states that the six-point star, the pitchfork, the number 26, and wings are all symbols of Folk Nation. (Writ RR3: 80; State's Hearing Ex. 1).

152. At the hearing, Mr. Stewart admitted that he did not know that Detective Nelson had relied on the same symbols in reaching his opinion in this case or that Applicant had drawn these symbols. (Writ RR3: 80-82).

153. At the hearing, Mr. Stewart testified that he did not view any of the exhibits offered during trial that Detective Nelson had relied on in forming his opinion in this case. (Writ RR3: 82, 84).

154. Finally, Mr. Stewart admitted that he did not know that Applicant's brother was a member of the Gangster Disciples. (Writ RR3: 83).

155. Mr. Stewart disavowed his entire affidavit accusing Detective Nelson of giving false and misleading testimony and agreed with much of Nelson's trial testimony.

156. Thus, Mr. Stewart's affidavit is not credible or reliable evidence.

21

244

157. Applicant has not shown that any part of Detective Nelson's testimony was false or misleading.

158. Detective Nelson was a credible witness.

159. Detective Nelson's testimony was true and accurate, not false or misleading in any respect.

160. The Court concludes Applicant's due process rights were not violated by the State's use of Detective Nelson's testimony.

161. Furthermore, even assuming it was implicated, the Eighth Amendment's proscription against cruel and unusual punishment was not violated by the State's use of Detective Nelson's testimony.

162. Applicant's fourth ground for relief should be denied.

## GROUND FIVE:
### Applicant's Writings

163. In his fifth ground for relief, Applicant alleges that the State violated his First Amendment rights by using his various writings to demonstrate that he was a member of a street gang.

164. During the punishment phase, Detective Nelson testified that he reviewed some of the writings and artwork found in Applicant's cell and notebooks found in Swan's car. Detective Nelson testified that several of Applicant's artwork and writings indicated that he was a member of the Gangster Disciples, a criminal street gang. (RR49: 97-125).

165. Applicant alleges that the State violated his rights under the First Amendment to the United States Constitution by using his writings to demonstrate that he was a member of a criminal street gang.

166. States cannot criminalize thoughts. *Goldberg v. State*, 95 S.W.3d 345, 373 (Tex. Crim. App. 2002).

167. Also, the First Amendment prevents a State from using evidence of a defendant's abstract beliefs against him at trial, unless those beliefs have a bearing on the issues in the case. *See id.* (citing *Dawson v. Delaware*, 503 U.S. 159, 167-68 (1992)).

22

245

168. Applicant was not on trial for the ideas expressed in his writings and art work; he was on trial for murder. The issue is not, therefore, whether Applicant's writings and artwork were protected First Amendment speech, but whether they were relevant to an issue in the case.

169. The relevancy of the complained-of evidence has already been raised and rejected. Both this Court and the Court of Criminal Appeals have previously held that the evidence was, indeed, relevant. *Broadnax*, 2011 Tex. Crim. App. Unpub. LEXIS 920, at *44-49.

170. Thus, Applicant's allegation is procedurally barred and should be dismissed. *See Ex parte Ramos*, 977 S.W.2d at 617.

171. Assuming the claim were reviewable on the merits, however, the complained-of evidence was relevant. *See Broadnax*, 2011 Tex. Crim. App. Unpub. LEXIS 920, at *44-49.

172. Applicant fails to establish by a preponderance of the evidence any violation of his First Amendment rights.

173. The State did not violate Applicant's First Amendment right to free speech by using his writings or artwork to prove his gang membership.

174. Thus, Applicant's claim for relief should be denied.

## GROUND SIX:
### Counsel's Response to State's Evidence that Applicant Was a Member of a Criminal Street Gang

175. In his sixth ground for relief, Applicant alleges that trial counsel was ineffective for failing to refute the State's evidence that Applicant was a member of the Gangster Disciples, a criminal street gang.

176. The benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland*, 466 U.S. at 686; *Hernandez*, 726 S.W.2d at 57.

177. An Applicant asserting a claim of ineffective assistance has the burden to prove, by a preponderance of the evidence, the following: (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result

23

of the proceeding would have been different. *See Thompson*, 9 S.W.3d at 812 (explaining the standard under *Strickland*).

178. Effective assistance of counsel does not mean errorless counsel. *See Kunkle*, 852 S.W.2d at 505.

179. To prevail on a claim of ineffective assistance, the Applicant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. *See McFarland*, 163 S.W.3d at 753; *Jackson*, 877 S.W.2d at 771.

180. This highly deferential review is applied to avoid "the distorting effect of hindsight." *McFarland*, 163 S.W.3d at 753 (quoting *Strickland*, 466 U.S. at 689).

181. Applicant alleges that his trial counsel was ineffective because he conducted only a superficial investigation into Applicant's gang membership. He claims that counsel should have objected to Detective Nelson's testimony and/or cross-examined Detective Nelson to show that (1) the criteria set forth in Chapter 61 was not met, (2) Applicant does not have any gang tattoos, and (3) Applicant was not located in the Dallas gang database. He also contends that counsel should have objected to the admission of Detective Nelson's testimony as a violation of the First Amendment and should have called a gang expert who would have refuted Detective Nelson's testimony.

182. At the hearing conducted on Applicant's application for writ of habeas corpus, Brad Lollar testified that he made a strategic decision to downplay evidence of Applicant's gang membership because there was no evidence that the murders were gang-related. (Writ RR3: 162).

183. Mr. Lollar made a strategic decision not to call a gang expert. Instead, he decided to call family members, such as Applicant's sister, to testify that Applicant was not a member of the gang, but was merely a "wannabe" who had learned about the Gangster Disciples from his older brother. (Writ RR3: 162-63).

184. Mr. Lollar testified that Applicant had self-admitted membership in the gang and that it would be difficult to present a credible case that Applicant's use of gang symbolism was meaningless. He believed that if he attempted to argue that the symbolism was meaningless, he would lose credibility with the jury. (Writ RR3: 161-62).

24

247

185. Applicant alleges that trial counsel should have called Dwight Stewart to contradict Detective Nelson's testimony. In support of this allegation, Applicant relies heavily on Mr. Stewart's affidavit.

186. As noted above, however, Mr. Stewart's affidavit was not credible or reliable. Stewart disavowed the statements in his affidavit at the writ hearing and agreed with much of Detective Nelson's trial testimony. (Writ RR3: 72-84).

187. As noted above, defense counsel did object to Detective Nelson's testimony on First Amendment grounds. (RR40: 6).

188. It would have been futile to object to Detective Nelson's testimony under Chapter 61 of the Texas Code of Criminal Procedure because the chapter deals with the creation of gang intelligence databases by law enforcement agencies and not the admissibility of gang evidence at trial. (Writ RR3: 160).

189. Applicant fails to rebut the presumption that his trial counsels' response to the State's offer of evidence of his gang membership constituted reasonable trial strategy. He also fails to demonstrate that counsels' response was deficient and that he was prejudiced by any alleged deficiency.

190. Counsel was not deficient and there is no reasonable probability that, but for counsels' strategic decisions, the result of the proceeding would have been different.

191. The Court concludes that Counsel was not constitutionally ineffective, and relief should be denied.

## GROUND SEVEN:
### Dr. Price's Testimony

192. In his seventh ground for relief, Applicant alleges his federal constitutional rights to due process and freedom from cruel and unusual punishment were violated by false and misleading testimony from Dr. Jack Randall Price concerning anti-social personality disorder (ASPD) and the Hare Psychopathy Checklist – Revised (PCL-R). According to Applicant and his current psychological expert, Dr. Edens, "[t]here seems to be no scientifically valid or reliable reason to have introduced evidence concerning the PCL-R in this case in response to earlier testimony concerning ASPD – which is itself largely

extraneous to a scientifically based assessment of risk factors for future violence in prison." (Application, p. 83; Defense Writ Ex. 26).

### The Allegations Are Not Cognizable in a Writ of Habeas Corpus

193. Claims alleging a violation of a statute, rule, or non-constitutional doctrine are not cognizable in a writ of habeas corpus. *Ex parte Graves*, 70 S.W.3d at 109.

194. Although Applicant couches his argument as a violation of due process due to false and misleading evidence, he argues that Dr. Price's testimony did not meet the requirements for admissibility under the evidentiary rules governing relevancy, unfairly prejudicial evidence, and expert testimony.

195. Thus, Applicant merely alleges a violation of a rule or non-constitutional doctrine, which is not cognizable in writ of habeas corpus.

### The Allegations Are Procedurally Barred

196. To the extent Applicant merely alleges a violation of evidentiary rules, his claim is procedurally barred.

197. At trial, Applicant objected to the admission of Dr. Price's testimony under Rules of Evidence 401, 403, and 702. He did not, however, challenge the Court's ruling on those objections on direct appeal.

198. Habeas review is not to be used as a substitute for direct appeal. *Clore*, 690 S.W.2d at 900. If a claim could have been raised on appeal, but was not, the Applicant is procedurally barred from raising the issue for the first time on habeas. *See Cruzata*, 220 S.W.3d at 520; *Ramos*, 977 S.W.2d at 617.

199. Because Applicant could have raised his evidentiary-rule-based challenges on appeal but did not, they are procedurally barred and should be dismissed.

200. Even if construed as a constitutional claim, Applicant's allegation is meritless.

201. The Eighth Amendment's proscription against cruel and unusual punishment is not implicated by the State's use of false or misleading testimony. The use of false testimony implicates only Applicant's due process rights.

202. A conviction procured through the use of false testimony is a denial of the due process guaranteed by the federal constitution. *Ghahremani*, 332 S.W.3d at 477. The use of false testimony at the punishment phase is also a due-process violation. *Id.* A due-process violation may arise not only through

26

false testimony specifically elicited by the State, but also by the State's failure to correct testimony it knows to be false. *Id.* It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence. *Id.*

203. Though case law in this area frequently refers to "perjured" testimony, there is no requirement that the offending testimony be criminally perjurious. *Id.* It is sufficient if the witness's testimony gives the trier of fact a false impression. *Id.* These rules are not aimed at preventing the crime of perjury – which is punishable in its own right – but are designed to ensure that the defendant is convicted and sentenced on truthful testimony. *Id.* at 477-78.

204. The presentation of conflicting testimony alone does not establish a due process violation. *Losada*, 721 S.W.2d at 312; *Brown*, 477 S.W.2d at 623.

205. To constitute a violation of due process under federal precedent, the State must knowingly use false testimony. *Id.* at 478. The Court of Criminal Appeals has held that the State's unknowing use of false testimony may also give rise to a due process claim. *Id.* Even under this expanded notion of due process, however, the State's knowledge is still relevant to determining the standard for reviewing an Applicant's habeas claim. *Id.*

206. The knowing use of false testimony violates due process when there is a "reasonable likelihood" that the false testimony affected the outcome. *Id.* (quoting *Agurs*, 427 U.S. at 103). The Court of Criminal Appeals has characterized this as a requirement that the false testimony must have been material. *Id.* This standard is more stringent than the standard applied to *Brady* claims of suppressed evidence, which requires the defendant to show a "reasonable probability" that the suppression of evidence affected the outcome. *Id.* The "reasonable likelihood" standard is equivalent to the standard for constitutional error, which "requires the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *Bagley*, 473 U.S. at 680 n.9).

207. Applicant fails to establish any due process violation.

208. Dr. Price testified at trial that he has a Bachelor's, Master's, and Ph.D in psychology, that he has been licensed to practice psychology in Texas since 1983, that he has taught psychology for thirty-eight years, and that he has had a psychology practice for twenty-five years. (RR52: 239-40).

27

250

209. At a hearing held outside the presence of the jury, Dr. Price testified that he had not been asked to testify regarding whether or not Applicant was a psychopath, but that his role was to educate the jury on the characteristics of a psychopathic personality. (RR52: 219-20).

210. At trial, Dr. Price utilized a Power-Point presentation in testifying about the traits of a psychopathic personality. (RR52: 245-46; State's Ex. at trial, 597). He testified regarding the 20 characteristics of psychopathy. (RR52: 249-59). He stated that not all 20 characteristics need to be present in order for a person to be deemed a psychopath. (RR52: 257).

211. Dr. Price testified that psychopathy is a very persistent condition, that in his experience there is no effective treatment, and that under certain conditions, the behavior can be managed. (RR52: 258).

212. Dr. Price testified that he did not obtain the 20 characteristics of psychopathy from the DSM-IV, that the DSM-IV does not contain the diagnosis of psychopathy, and that the closest diagnosis to psychopathy that is contained in the DSM-IV is anti-social personality disorder. (RR52: 259).

213. Dr. Price testified that anyone who has one of the 20 traits discussed is not per se a psychopath. There are people who are immature that would show some of the traits. (RR52: 260, 262-63).

214. Dr. Price testified that he testifies 60% of the time on behalf of the State and 40% of the time on behalf of the defense. (RR52: 262).

215. In support of his claim that Dr. Price's testimony was false and misleading, Applicant relies heavily on an affidavit from Dr. John Edens. (Defense Writ Ex. 26).

216. In his affidavit, Dr. Edens stated that he is a licensed psychologist in the State of Texas and a Professor in the Department of Psychology at Texas A&M University. Since 2000, he has consulted on numerous federal and state death penalty cases in regards to the assessment of future dangerousness and the role of mental health. He has conducted extensive research on psychological assessment and the prediction of human behavior. He is familiar with the checklist used by Dr. Price in his trial testimony. (Defense Writ Ex. 26). He has published on the potential misuses and abuses of the psychopathy scales in forensic evaluations, especially in the context of capital murder trials. (Defense Writ Ex. 26).

28

251

217. Dr. Edens opined that there was essentially no scientific justification for introducing evidence of an anti-social personality disorder diagnosis in Applicant's trial. According to Dr. Edens, the diagnosis and presentation of the personality traits of a psychopath had little or nothing to do with Applicant's likelihood of future dangerousness if not put to death. (Defense Writ Ex. 26).

218. Dr. Edens stated that at the time of trial, there were published scholarly reviews criticizing the use of psychopathy and anti-social personality disorder diagnoses in capital murder cases. He also stated that numerous experts would have been available to aid in a challenge to the admission of this evidence. (Defense Writ Ex. 26).

219. Dr. Edens stated that Dr. Price treated the diagnoses of anti-social personality disorder and psychopathy as interchangeable. (Defense Writ Ex. 26).

220. Dr. Edens stated that admission of evidence regarding the term "psychopath" and the traits typically associated with it are likely to unfairly prejudice jurors against a capital defendant. (Defense Writ Ex. 26).

221. Dr. Edens stated that he conducted a study in which 60% of the participants would support a death sentence for a defendant who had been described as a psychopath, 38% did so when the defendant was described as non-mentally disordered, and 30% did so when the defendant was described as experiencing delusions and hallucinations. (Defense Writ Ex. 26).

222. Dr. Edens stated that the unfair prejudicial effects of introducing evidence of the psychopathy checklist were magnified by the direct testimony of Dr. Price that there is essentially no treatment for psychopathy. (Defense Writ Ex. 26).

223. Dr. Edens stated that there are recent published studies that suggest that there are interventions that can significantly reduce the likelihood for future violent behavior among individuals with psychopathic traits, particularly those who are relatively young. (Defense Writ Ex. 26).

224. Dr. Edens stated that aside from having an unfair prejudicial impact and having little or no demonstrated probative value concerning future dangerousness in capital cases, it is also worth stressing that a growing body of scientific research indicates that scores using the checklist are highly unreliable in real world criminal cases. (Defense Writ Ex. 26).

252

225. In addition to his sworn written statements, Dr. Edens testified at the hearing on Applicant's application for writ of habeas corpus held on December 7, 2012.

226. Dr. Edens testified that the only portions of the record he reviewed prior to his affidavit were provided to him by writ counsel. (Writ RR3: 166-67).

227. Dr. Edens did not recall whether the defense had called mental health experts at trial. (Writ RR3: 167).

228. Dr. Edens was not aware that trial counsel had a mental health expert that was prepared to rebut Dr. Price's testimony. (Writ RR3: 167).

229. Applicant has not shown that Dr. Price's testimony was false, misleading, or perjurious. At most, he has shown a difference of opinion between two qualified experts. If Dr. Edens had testified at Applicant's trial, it would simply have been a "battle of the experts."

230. Dr. Price did not give false, misleading, or perjured testimony.

231. The Court concludes Applicant's due process rights were not violated by the State's use of Dr. Price's testimony.

232. Furthermore, even assuming it was implicated, the Eighth Amendment's proscription against cruel and unusual punishment was not violated.

233. For the above reasons, Applicant's seventh ground for relief should be denied.

**GROUND EIGHT:**
**Counsel's Handling of Testimony Regarding Anti-Social**
**Personality Disorder and Psychopathy**

234. In his eighth ground for relief, Applicant alleges his trial counsel was ineffective for (1) opening the door to Dr. Price's testimony, (2) failing to use Dr. Frank Lane or another defense expert to explain why anti-social personality disorder is not a good indicator of future dangerousness and why it was not intended for use in a criminal setting, and (3) failing to cross-examine Dr. Price altogether and to rebut the reliability and validity of the PCL-R in the future dangerousness determination.

235. The Court notes that the benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper

30

functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland,* 466 U.S. at 686; *Hernandez,* 726 S.W.2d at 57.

236. An Applicant asserting a claim of ineffective assistance has the burden to prove, by a preponderance of the evidence, the following: (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Thompson,* 9 S.W.3d at 812 (explaining the standard under *Strickland).*

237. Effective assistance of counsel does not mean errorless counsel. *See Kunkle,* 852 S.W.2d at 505.

238. To prevail on a claim of ineffective assistance, the Applicant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. *See McFarland,* 163 S.W.3d at 753; *Jackson,* 877 S.W.2d at 771.

239. This highly deferential review is applied to avoid "the distorting effect of hindsight." *McFarland,* 163 S.W.3d at 753 (quoting *Strickland,* 466 U.S. at 689).

240. Applicant alleges that trial counsel did not cross-examine Dr. Price. Applicant is incorrect.

241. The Court told counsel that he would allow a liberal cross-examination of Dr. Price and defense counsel, Doug Parks, effectively questioned him. (RR52: 230, 259-63; Writ RR3: 125-26).

242. In particular, he examined him regarding the fact that psychopathy is not in the DSM-IV, the fact that the closest thing to psychopathy that is in the DSM-IV is anti-social personality disorder, the fact that people may have traits of a psychopath and not be a psychopath, and the fact that some of the traits of a psychopath are traits of an immature person. (Writ RR3: 126).

243. Also, Mr. Parks objected to the admissibility of Dr. Price's testimony based on Texas Rules of Evidence 401, 403, and 702. (RR52: 227-28).

244. Applicant's trial counsel, Brad Lollar, argued during closing argument that it was not possible for the jury to determine if Applicant was a psychopath because it lacked the relevant historical information. (Writ RR3: 160).

254

245. At the hearing on the writ of habeas corpus held on December 7, 2012, Mr. Lollar testified that the trial team did have a mental health expert – Dr. Gilda Kessner. She sat through Dr. Price's testimony and counsel was prepared to call her if needed. Moreover, defense counsel used Dr. Kessner to prepare their cross-examination questions for Dr. Price. (Writ RR3: 157-58).

246. At the conclusion of Dr. Price's testimony, the entire trial team debated whether to call Dr. Kessner, who was present and prepared to testify. (Writ RR3: 158).

247. If defense counsel had called Dr. Kessner to testify, they risked the possibility that the State would pose a hypothetical question using facts related to Applicant and get Kessner to admit that, under the hypothetical, Applicant was a psychopath. (Writ RR3: 159).

248. Defense counsel did not want to take that risk because Dr. Price, the State's witness, had not diagnosed Applicant as a psychopath. (Writ RR3: 159).

249. Brad Lollar and Doug Parks called other mental health experts during the punishment phase: Jason Varghese, Dr. Haideh Mirmesdagh, Cheryl Silver, and Frank Lane. (Writ RR3: 156-57).

250. The defense used Dr. Lane, a jail psychologist, to show Applicant's medical history while in jail, including Applicant's substance abuse. (RR50: 77-99).

251. Dr. Lane did indicate that he believed Applicant may be a psychopath. (RR50: 99-100). But Mr. Lollar questioned Dr. Lane about his inability to make such a diagnosis because he lacked the necessary information regarding Applicant's background and history. (RR50: 100). Moreover, no one at trial testified that Applicant had been diagnosed with psychopathy.

252. Trial counsel was not ineffective for calling Dr. Lane or for failing to call another mental health expert.

253. Applicant fails to rebut the presumption that defense counsel exercised reasonable trial strategy by calling Dr. Lane and not calling another mental health expert.

254. Counsels' representation did not fall below an objective standard of reasonableness, and there is no reasonable probability that, but for the alleged deficiency, the result of the proceeding would have been different.

32

255

255. The Court concludes that Counsel was not constitutionally ineffective, and relief should be denied.

## ORDER

THE CLERK IS ORDERED to prepare a transcript of all papers in cause number W08-24667-Y(A) and to transmit same to the Court of Criminal Appeals as provided by article 11.071 of the Texas Code of Criminal Procedure. The transcript shall include certified copies of the following documents:

1. The Application for Writ of Habeas Corpus filed in cause number W08-24667-Y(A), including any exhibits;

2. The State's Original Answer to the Application for Writ of Habeas Corpus filed in cause number W08-24667-Y(A), including any exhibits;

3. The State's and Applicant's proposed findings of fact and conclusions of law;

4. Any and all other pleadings filed by either party under cause number W08-24667-Y(A);

5. This Court's findings of fact, conclusions of law, and order;

6. This Court's order designating the issues for further evidence gathering;

7. Any and all other orders issued by the Court under cause number W08-24667-Y(A);

8. The Reporter's Record of the writ hearing (December 6-7, 2012); and

9. The indictment, judgment, sentence, docket sheet, and appellate record in cause number W08-24667-Y(A), unless these have been previously forwarded to the Court of Criminal Appeals.

THE CLERK IS FURTHER **ORDERED** to send a copy of this Court's findings of fact and conclusions of law, including its order, to Lydia Brandt, attorney for Applicant, The Brandt Law Firm, P.C., P.O. Box 850843, Richardson, Texas 75085, and to Lisa Smith, Assistant District Attorney, counsel for the State.

SIGNED the _17_ day of September, 2014.

Judge Michael Snipes
Criminal District Court No. 7
Dallas County, Texas

34

257

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
CRIMINAL DISTRICT COURT NO. 7, DALLAS COUNTY, TX

Ex Parte James Garfield Broadnax,
*Applicant,*

TCCA No. WR-81,573-01
Trial Court Cause No. WR 08-24667-Y

**OBJECTIONS TO THE
FINDINGS OF FACT AND CONCLUSIONS OF LAW
SIGNED BY JUDGE SNIPES ON SEPTEMBER 17, 2014**

James Broadnax ("Applicant" or "Broadnax"), through his undersigned counsel, files

these Objections to the Findings of Fact and Conclusions of Law ("FFCL") signed by

Criminal District Court #7 Judge Snipes on September 17, 2014.

Lydia M.V. Brandt, Esq.
THE BRANDT LAW FIRM, P.C.
Texas Bar No. 00795262
P.O. Box 850843, Richardson, Texas  75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
Counsel for Applicant, James Garfield Broadnax

258

# TABLE OF CONTENTS

LENGTH OF EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      OBJECTION:  Applicant objects to the FFCL 1 through and including 4.  Mr. Broadnax objects, in particular, to FFCL #4, which recites that "neither party has been limited in presenting evidence in other forms since the December 2012 hearing."  Nowhere in FFCL ##1-4 does the court take into account that the court denied Broadnax's Discovery Motion and Reconsideration Motion, and granted the State's Motion to Quash "in all things."  Without compulsory process from the state court, Mr. Broadnax was prevented from investigating, developing and presenting documentary/physical evidence and/or witness statements/testimony from uncooperative and obstructive media and other state agents at the December 2012 evidentiary hearing, and "in other forms since the December 2012 hearing" . . . . 9

GROUNDS ONE AND TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      OBJECTION #1:  Broadnax objects to FFCL ## 6 though and including 15, which ruled that Grounds One and Two were procedurally defaulted.  FFCL # 69 finds and concludes that in Ground Three, "Applicant alleges that trial counsel was ineffective for failing to investigate and raise the precise Sixth Amendment claims he raises in his first and second grounds (Grounds One and Two) for relief;" hence, Grounds One and Two are not defaulted because they were incorporated into, and were an inherent foundation for the IAC Claim in Ground Three. *See also* State Application, p. 44.

            Applicant objects to the FFCL ## 5 through and including 68 because the state habeas court failed to address altogether the basic premise of his Grounds One and Two, which was that Mr. Broadnax's Sixth and Fourteenth Amendment rights to appointment of counsel and due process were violated because appointment was premised on a statutorily "specified period after an accused's magistration," rather than on the need for counsel in a "critical stage" of the post attachment proceedings. *Compare* "FFCL #19 ("Applicant argues that counsel was not *appointed soon enough*....) and FFCL #22 ("Attachment in this case occurred when Applicant went before the magistrate on June 21, 2008; at that point, [Broadnax] was entitled to the appointment of counsel *within a reasonable time* to allow for adequate representation during any 'critical stage,'") and FFCL #47 (... Applicant [was] *appointed counsel within the statutorily-required time frame*....") . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      OBJECTION #2:  Applicant also objects because FFCL ## 5-68 completely ignored, and left unaddressed, the facts adduced by Mr. Broadnax at the state habeas evidentiary hearing that the media were state agents and that the videotaped media interviews were a critical stage in the legal proceedings, yet concluded that Mr. Broadnax failed to carry his burden of proof by a preponderance of the evidence.  The State did not controvert Broadnax's evidence of this at all.

2

Instead, in resolving the fact issues in state habeas, the court relied on the trial record, *see* FFCL ## 14, 23; even then the FFCL does not accurately reflect the court's trial ruling. The trial court did not rule that the media are not state agents. The trial court ruled that trial counsel failed to prove they were state agents, and immediately thereafter, made a fact finding of trial-counsel-deficiency. *Compare*

FFCL # 14, 23 ("The reporters who interviewed Applicant were not acting as agents of the State. RR 43:111-13.") *with* (Trial Vol. 43:113: "*On this record* we cannot conclude that the reporter was acting as a State agent when he interviewed appellant. So the issue of whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, *is not even a close one*." . . . . 17

Factual Predicate and Specific Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A.    The Dallas County Jailers solicit, encourage, coordinate and facilitate interviews of capital defendants (including Broadnax) by the media, who are state agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    •    The Media Inmate Interview-Request Letter is a sample-letter created by the Dallas County Sheriff's Office ("Dallas County Jailers"), on which the Media base their requests almost verbatim . . . . . . . . 18

    •    The Dallas County Jailers know capital defendants (Broadnax) requested counsel at the arraignment, but the Media Inmate Interview-Request Letters do *not* contain Miranda Warnings . . . . . . . . . . . 19

    •    The language and elements in the Media Inmate Interview-Request Letters from the media are identical or substantially similar to the Sample Media Inmate Interview-Request Letter created by the Dallas County Jailers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    •    If the Media Inmate Interview-Request Letter is not in compliance with the Media Access Procedure, the Public Relations/Information Officer in the Dallas County Sheriff's Office Fills in required information that the media omitted from the Media Inmate Interview-Request Letters and faxes the letters to the Dallas County Jailers within the jail, who have custody and control over the capital defendant (Broadnax) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    •    The Dallas County Jailers hand-deliver the Media Inmate Interview-Request Letters to the Defendant, encourage him to consent, and witness his signature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    •    The Public Information Officer sets up the interview room, determines the amount of time for the interview, and escorts the media to the interviews, while the Dallas County Jailers stand next to the capital defendant during the inmate interviews . . . . . . . . . . . 20

    •    Even if counsel has been appointed, the Dallas County Jailers will deliberately impede appointed counsel's access to the capitally-charged client during which time, the media conduct its interviews of the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.    The Media Interviews are a Critical Stage in the Legal Proceedings Because

They Are Structured to Elicit from a Defendant: a Confession, Statements of Lack of Remorse and that Lethal Injection is an Appropriate Punishment, and Adversely Affect Every Aspect of the Capital Trial Defense . . . . . . . . . 22

C.    Mr. Broadnax was entitled to counsel at or immediately after Texas Magistration, on June 21, 2008. Instead there was a three (3) calendar day Appointment Gap, during which the media had conducted videotaped interviews of him, which were played by the prosecution to the jury in every phase of the trial, relied on by the jury in its deliberations in sentencing as reflected in the jury note, and even relied on by the Texas Court of Criminal Appeals to deny relief on direct appeal . . . . . . . . . . . . . . . . . . . . . . . . . 22

OBJECTION #3: Applicant objects to FFCL #26 & 27 (FFCL #26: "Applicant presents no legal authority supporting his proposition that interviews conducted by private media outlets are critical stages, and the Court finds there is no such authority."); (FFCL #27: "Applicant argues that ... *White v. Maryland*, 373 U.S. 59 (1963) is directly applicable to his case. However, *White* is distinguishable.... The hearing in *White* clearly involved State action. The media interviews in this case did not involve any State action."

In his state habeas filings, Mr. Broadnax relied on long established Supreme Court precedent, *see infra*, which identifies a "critical stage" as an event in which in the absence of counsel, certain rights might be sacrificed or lost, adversely affecting the whole trial. *United States v. Wade*, 388 U.S. 218, 225 (1967) . . . . . . . . . . . 25

GROUND THREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

OBJECTION #1: Broadnax objects to FFCL ## 6 though and including 15, which ruled that Grounds One and Two were procedurally defaulted. Grounds One and Two are not defaulted because they are an inherent foundation, and were incorporated into, Ground Three. *See* FFCL #69 ("Applicant alleges that trial counsel was ineffective for failing to investigate and raise the precise Sixth Amendment claims he raises in his first and second grounds for relief...."); State Application, p. 44 . . . . . . . . . . 28

OBJECTION #2: Broadnax objects to FFCL ## 69 through and including 114 because Mr. Broadnax raised a *different* Sixth Amendment claim from that raised at trial. FFCL ##69-114 also fail to address altogether the basic premise, and factual development, of the state habeas claim. Instead, the state habeas court denied relief based on the Sixth Amendment trial claim and the trial record

Mr. Broadnax concedes that at trial and in state habeas, counsel raised Sixth Amendment claims. But *the trial claim is different from the state habeas claim*. The trial claim was based on an alleged violation of jail policy that prohibited access by the media to mentally ill defendants.

The state habeas claim was based on the appointment of counsel conditioned on a statutorily specified time period after Texas Magistration, rather than on the

4

261

need for counsel at a critical stage; that through its Media Access Procedure, the Dallas County Jailers solicited, encouraged, and facilitated the media interviews during the Appointment Gap; and that the media interviews were a critical stage in the post-attachment legal proceedings, contrary to FFCL #75. . . . . . . . . . . . . . . 28

Factual Predicate and Specific Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A.    The *trial* Sixth Amendment claim . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1.    The trial claim alleged a violation of a written policy of the Dallas County Sheriff's Office, which prohibited access by the media to mentally ill defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.    Trial counsel never argued the media interviews were a "critical stage" contrary to FFCL #75 . . . . . . . . . . . . . . . . . . . . . . . . . 30

3.    The trial court made a fact finding of deficient performance by trial counsel: "*On this record* we cannot conclude that the reporter was acting as a State agent when he interviewed appellant. So the issue of whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, *is not even a close one.*" (RR 43:113) – contrary to the misstatement of the trial record in FFCL #75 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

B.    The *state habeas* Sixth Amendment claim . . . . . . . . . . . . . . . . . . . . . . 31

1.    The state habeas claim alleged and proved . . . . . . . . . . . . . . . . 31

a.    at the time of the arraignment of Broadnax, Dallas County conditioned counsel appointment for Mr. Broadnax on a statutorily "*specified period after an accused's magistration,*" which created the Appointment Gap, rather than on the need for counsel in a "critical stage" of the post attachment proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

b.    during the Appointment Gap, law enforcement (and the Dallas County Jailers in particular, through its Media Access Procedure) solicited, encouraged, coordinated and facilitated interviews of Broadnax by the media, who acted as state agents, and . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

c.    the media interviews of Mr. Broadnax were a critical stage in the post-attachment legal proceedings. *See* State Application, Ground Three, pp. 44, 47-48, n.10; Grounds One and Two, pp. 5-6 incorporated by reference . . . . . . . . . . 32

2.    Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

a.    Deficient Pre-Trial Investigation (Media): The defense did not conduct pre-trial interviews of first-responder, law-enforcement-and-beat-reporters about media access to Broadnax. Even after having successfully litigated the *in*applicability of the media shield laws, the defense did not ask for a continuance to investigate . . . . . . . . . . . . . . . . 32

b.    Deficient Pre-Trial Investigation (Law Enforcement): The

5

defense did not interview Dallas, Texarkana, or Garland law enforcement, or the Dallas County Jailers, about them soliciting, encouraging, and facilitating access by the media to Broadnax ........................................ 33

c.  Deficient Pre-Trial Investigation (Capital Defense Bar):  The defense did not interview the Dallas County capital defense bar prior to trial despite their willingness to testify about their experience with the Gap & media interviews ......... 35

d.  Deficient Pre-Trial Investigation (No Alternative Theories): Trial counsel did not investigate alternative theories .... 35

3.  No Strategic Decision at Trial ........................... 36

a.  Broadnax's examination of Doug Parks contradicts that trial counsel made a strategic decision.  The four-page, cross-examination by the State did not contradict Broadnax's evidence ...................................... 36

*Mr. Parks testified* that he: ......................... 37

• had not talked to any of the capital defense bar about the appointment delay, (Writ RR 3:120); ....... 37

• did not attempt to talk to any of the reporters because Brad Lollar was handling that aspect of the case, (Writ RR 3:121); ............................... 37

• did not talk to the Dallas County Jailers, nor to any of the Garland law enforcement, because he had not been asked to.  Mr. Lollar was handling the claim, (Writ RR 3:122); ............................... 37

• was not aware that at the time of the Broadnax trial, there were 43 jurisdictions that appointed counsel before, at or just after the initial appearance before a judicial officer, but that Texas was not one of them, (Writ RR 3:122); ......................... 37

• was "probably aware" that it is the ABA position that an accused should be appointed no later than just after the initial appearance before a judicial officer, (Writ RR 3:122); ............................... 37

• although it was Mr. Parks role to do the research, he had not researched or read *Rothgery* in 2008, notwithstanding it had been decided the same day Mr. Broadnax had been interviewed by the media, (Writ RR 3:123, 128); ........................... 37

• had not explore any theory, other than the theory raised that the Dallas Jailers violated their own written policy by giving the media access to Broadnax who was psychotic, (Writ RR 3:128); ............. 37

6

263

- had not considered, and had not discussed, raising a Sixth Amendment claim challenging the appointment of counsel based on the specific time period set out in the TFDA because he had not thought about it, (Writ RR 3:128) ................................ 37

*The Assistant District Attorney elicited* testimony from Mr. Parks that he does "book work," (Writ RR 3:124) (but did not develop what "book work" Mr. Parks did in the Broadnax trial), that the argument and theory at trial was that Broadnax was intoxicated or high at the media interviews and at the commission of the offense, (Writ RR 3:125), and that the trial court concluded there was no state action involving the media interviews. (Writ RR 3:125) ...................... 37

b.   Broadnax's examination of Brad Lollar contradicts that trial counsel made a strategic decision. The four-page, cross-examination by the State did not contradict Broadnax's evidence ........................................ 38

*Mr. Lollar testified* that he: ...................... 38

- knew counsel-appointment was conditioned on a specific period of time, (SWH Vol 3:153-154, 163 – Brad Lollar testimony); .................... 38

- had been one of the court-appointed attorneys who represented capital defendants before 2002, and after the passage of the TFDA, (SWH Vol 3:163 – Brad Lollar testimony); ........................ 38

- had known in 2008 of the Appointment Gap prior to his court-appointment to represent Mr. Broadnax. (SWH Vol 3:163 – Brad Lollar testimony); .... 38

- had done a lot of legal research for the Broadnax case, but Mr. Lollar could not find a particular entry in his billing records that reflected that he had researched the issue about the delay in court-appointments of counsel to represent capital defendants at or before initial appearance. (SWH Vol 3:154 – Brad Lollar testimony); .............................. 39

- on re-direct examination, Mr. Lollar testified that in 2008, he had not thought about a constitutional challenge on the basis that appointment of counsel was impermissibly premised on a "specified period after [an accused's] magistration," rather than on the need for counsel in a "critical stage" of the postattachment proceedings.(SWH Vol 3:165 – Brad Lollar testimony) ......................... 39

7

*The Assistant District Attorney elicited* testimony from Mr. Lollar that the defense had called several mental health experts, and Lollar also testified about the defense perspective on the State's psychopathy (SWH Vol 3:156-161), and gang presentations at trial, (SWH Vol 3:161-163) . . . . . . . . . . 39

c.   The testimony of Brad Lollar and Doug Parks at the state habeas evidentiary hearing, on which the FFCL relies, (Writ R:121-125, 128) – together with the trial court ruling that the record was inadequate and trial counsel failed to prove an agency relationship, *see* FFCL #3 14, 23 citing (Trial Vol. 43:113) – contradicts the FFCL that trial counsel's decisions were strategic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

B.   Unfair Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

8

## LENGTH OF EVIDENTIARY HEARING

**OBJECTION:** Applicant objects to the FFCL 1 through and including 4. Mr. Broadnax objects, in particular, to FFCL #4, which recites that "neither party has been limited in presenting evidence in other forms since the December 2012 hearing." Nowhere in FFCL ##1-4 does the court take into account that the court denied Broadnax's Discovery Motion and Reconsideration Motion, and granted the State's Motion to Quash "in all things." Without compulsory process from the state court, Mr. Broadnax was prevented from investigating, developing and presenting documentary/physical evidence and/or witness statements/testimony from uncooperative and obstructive media and other state agents at the December 2012 evidentiary hearing, and "in other forms since the December 2012 hearing".

**Factual Predicate:** In addition to filing his Application, in which Mr. Broadnax raised eight (8) grounds for relief, he also filed a Motion for Court-Ordered Discovery, For Court-Ordered Brady Material from the Dallas DA, & For Continuance of the Evidentiary Hearing, a Motion for Evidentiary Hearing, and Motion for Oral Argument Before the Texas Court of Criminal Appeals (collectively "Discovery Motion"). [The Discovery Motion is incorporated by reference herein.] The trial court held a hearing on the Discovery Motion on December 6, 2012.

On December 6, 2012, following the hearing on the Discovery Motion, the court denied the Discovery Motion in full ruling:

> The Court, having considered Applicant's Motion for Court-Ordered Discovery and Continuance of the Evidentiary Hearing, the State's Motion to Quash Subpoena, and the arguments of counsel, now enters the following order:

> Applicant's request for this Court to order Channels 4, 5, 8, and 11, to identify and produce for deposition duces tecum employees who interviewed James Broadnax between arraignment and appointment of counsel is DENIED.

> Applicant's request for this Court to issue an order authorizing the Applicant to depose each of the defendants identified in Applicant's motion is DENIED.

> Applicant's request for this Court to enter an order requiring the State of Texas to produce all correspondence of the Dallas Sheriff's Office, the Dallas District Attorney's Office, and the Dallas Police Department to or from any media outlet pertaining to any of the defendants identified in Applicant's motion, is DENIED.

> The State's Motion to Quash Subpoena is in all things GRANTED.

> Applicant's request for additional days to conduct the evidentiary hearing in this case is DENIED at this time.

9

266

Court Order, 12-06-2012.

Mr. Broadnax filed a Motion To Reconsider & Rescind the 12-12-2012 Order, To Reopen the Evidentiary Hearing, To Compel Rosales, Lopez, and WFAA-TV To Testify & Produce Documents ("Reconsideration Motion"). [The Reconsideration Motion is incorporated by reference herein.] In the Reconsideration Motion, Mr. Broadnax argued that the media assertions in state habeas that they were shielded by the Texas Free Flow Act (TFFA), Texas common law, and the Texas Constitution did not apply. The media had made the same arguments prior to the trial of Mr. Broadnax. At the trial stage, the court had ruled that the evidence sought by the defense was obtained or prepared by the media long before the effective date of the TFFA. *In re Raab*, 293 S.W.3d 865, 866-67 (Tex. App. 2009). The same fact at the trial stage, remained operative in state habeas, to wit: the evidence sought by the defense in state habeas was obtained or prepared by the media long before the effective date of the TFFA.

Nonetheless, the trial court, sitting in state habeas denied the Reconsideration Motion:

> The Court, having considered Applicant's Motion to Reconsider and Rescind the 12-12-2012 Order, to Reopen the Evidentiary Hearing, and to Compel Rosales, Lopez, and WFAA-TV to Testify and Produce Documents, finds that there is no need to reopen the evidentiary hearing. The Court finds that the Court has sufficient evidence to resolve the issues before the Court. The Court further finds that Rosales, Lopez, and WFAA-TV would not produce any evidence relevant to the Court's determination, IT IS THEREFORE ORDERED that Applicant's Motion to Reconsider is in all things DENIED.

Court Order, 12-20-2012.

The state habeas court's adverse rulings on the Discovery Motion and the Reconsideration Motion, was a state court process that constrained the investigation, development, and presentation by Mr. Broadnax in state habeas at the December 2012 evidentiary hearing, and "in other forms since the December 2012 hearing," particularly as to the following three grounds:

Ground One (Denial of *Procedural* Right to Counsel and Due Process, and to Equal Protection, Re: Media Interviews – 6th and 14th amendment violations). Mr. Broadnax was denied his procedural 6th & 14th amendment right to counsel, due process of law, and equal protection, during the media interviews

Ground Two (Denial of *Substantive* Right to Counsel and Due Process, and to Equal Protection, Re: Media Interviews – 6th and 14th amendment violations). Mr. Broadnax was denied his substantive 6th & 14th amendment right to counsel, due process of law, and equal protection, during the media interviews

Ground Three (IAC & Media Interviews – 6th and 14th amendment violations). Mr.

10

267

Broadnax was denied his federal constitutional right to effective assistance of counsel, who failed to perform an adequate investigation into, and develop and present, the facts of Lollar's appointment and the media interviews.

The state habeas court's ruling that "that the Court has sufficient evidence to resolve the issues before the Court," Court Order, 12-20-2012, is not supported by either the trial or state habeas records. The trial court ruled at trial that the trial record was inadequate: "*On this record* we cannot conclude that the reporter was acting as a State agent when he interviewed appellant," and "So the issue of whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, *is not even a close one*. (Emphasis supplied)." (Trial Vol. 43:113).

In state habeas, the court's ruling deprived Mr. Broadnax one full, fair and adequate process, particularly in the development of the record. Without compulsory process, the state court prevented Mr. Broadnax from investigating, developing and presenting documentary/physical evidence and/or witness statements/testimony from uncooperative and obstructive media and other state agents, both at the December 2012 evidentiary hearing, as well as "in other forms since the December 2012 hearing," particularly as to Grounds One, Two, and Three.

11

268

## GROUNDS ONE AND TWO

**OBJECTION #1:** Broadnax objects to FFCL ## 6 though and including 15, which ruled that Grounds One and Two were procedurally defaulted. FFCL # 69 finds and concludes that in Ground Three, "Applicant alleges that trial counsel was ineffective for failing to investigate and raise the precise Sixth Amendment claims he raises in his first and second grounds (Grounds One and Two) for relief;" hence, Grounds One and Two are not defaulted because they were incorporated into, and were an inherent foundation for the IAC Claim in Ground Three. *See also* State Application, p. 44.

Applicant objects to the FFCL ## 5 through and including 68 because the state habeas court failed to address altogether the basic premise of his Grounds One and Two, which was that Mr. Broadnax's Sixth and Fourteenth Amendment rights to appointment of counsel and due process were violated because appointment was premised on a statutorily "specified period after an accused's magistration," rather than on the need for counsel in a "critical stage" of the post attachment proceedings.[1] *Compare* "FFCL #19 ("Applicant argues that counsel was not *appointed soon enough*....) and FFCL #22 ("Attachment in this case occurred when Applicant went before the magistrate on June 21, 2008; at that point, [Broadnax] was entitled to the appointment of counsel *within a reasonable time* to allow for adequate representation during any 'critical stage,'") and FFCL #47 (... Applicant [was] *appointed counsel within the statutorily-required time frame*....")(emphasis supplied)

### Factual Predicate and Specific Objections:

1. **Prior to the enactment of the Texas Fair Defense Act (TFDA), Dallas Magistrates personally called capital trial attorneys immediately after the conclusion of Texas Magistration. The Dallas Magistrates appointed only capital trial attorneys who agreed they would arrive within 30 minutes to an hour after the call at the Dallas County Jail and communicate with their capitally-charged client. After the TFDA enactment, capital defendants in Dallas were appointed counsel based on a statutorily "specified period after an accused's magistration," rather than on the need for counsel in a "critical stage" of the post attachment proceedings, which resulted in an Appointment Gap (of days to weeks in length) between request for and appointment of counsel.**

Prior to the year 2002, in Dallas County, the Dallas County Magistrates appointed counsel for a capitally-charged defendant immediately after the arraignment (a/k/a "Texas Magistration"). Drawing from a list of qualified lawyers, the Dallas County Magistrate would personally go down the list and call capital defense counsel, until he found an attorney who was both willing to represent

---

[1] *See Rothgery v. Gillespie County, Tex.*, 554 U.S. 191, 214 (2008) (Alito, J., and Scalia, concurring) ("... we have recognized that certain pretrial events may so prejudice the outcome of the defendant's prosecution that, as a practical matter, the defendant must be represented at those events in order to enjoy genuinely effective assistance at trial. )"

12

269

the defendant and report to the Dallas County Jail to meet and advise the defendant within thirty (30) minutes to one (1) hour of receiving the call from the Dallas County Magistrate – even if that lawyer received the telephone call from the Dallas County Magistrate at night, on a weekend, on a holiday, or during regular business hours. (SWH Vol 3:52-53 – Brooke Busby); (SWH Vol 3:90 – William E. Karo Johnson);   (SWH Vol 3:115 – Doug Parks[2]).

If the attorney indicated that he could not met with the defendant within thirty (30) minutes to one (1) hour, the Dallas County Magistrate would move to the next attorney on the approved list for capital court-appointments. (SWH Vol 3:115 – Doug Parks). If the attorney accepted the appointment, the court-appointed attorney would report to central intake at Lew Sterrett, where the defendant was being held.  The attorney would go to the information booth when counsel first walked in, was given a badge, and then proceeded to the interview rooms where counsel would meet with the defendant. (SWH Vol 3:90-91 – William E. Karo Johnson).  Appointed counsel would make the defendant aware that he or she was appointed to represent the defendant, explain that their communications were confidential attorney-client information, provide information about the situation that the defendant found himself in, and advised the defendant about the importance of not speaking to anyone except the defense team about the offense. (SWH Vol 3:91 – William E. Karo Johnson).

More importantly, upon their appointment the capital defense attorneys would, and currently does, send a Do Not Interview Letter to the Dallas County Jailers.[3]  When a Do Not Interview Letter is filed with the Dallas County Sheriff's Office, the Dallas County Jailers are prohibited from giving the media access to the capitally-charged defendant at all. Capital defense attorney affirmatively act to prevent media interviews of their clients, because it is their experience that their clients frequently have some sort of mental health deficit,[4] as by way of example but not limitation: low intellectual

---

[2]    Doug Parks was one of three attorneys representing Mr. Broadnax.  Mr. Parks was licensed to practice law in Texas in 1970, and became active in criminal defense in 1972. (SWH Vol 3:114).  He is a board certified criminal defense attorney and the criminal defense lawyer member of the First Administrative District that approves the applications of other lawyers to be on the list of lawyers who can be appointed to the first chair capital cases and second chair.(SWH Vol 3:116).

[3]    Broadnax objects to FFCL ##61-68.  By appointing counsel at or immediately at the conclusion of Texas Magistration, the issue of whether a capitally charged defendant has given consent to a media interview is irrelevant because the Do Not Interview Letter prevents the interview from happening at all.

[4]    At the time of the media requests for interviews, James Broadnax had been held in the West Tower in 3P05 in closed behavioral observation.  The 3P05 is a psychiatric ward for the Dallas County Jail.  Two hours before the media interviews, Mr. Broadnax had been seen by a jail psychiatrist and psychological assessor, who determined that Mr. Broadnax was psychotic due to polysubstance abuse. (SWH Vol 3:144 – Brad Lollar testimony).

13

270

functioning, mental retardation, mental illness, or are young. It is rare that a capital murder defendant is high functioning. (SWH Vol 3:25, 44 – Bernhardt testimony; SWH Vol 3:54 – Brooke Busby testimony).

Whether a defendant is mentally impaired or high functioning, the defendant charged with capital murder is, in a sense, in a fog of war, and in need of an attorney to help him or her understand the situation in which the defendant finds himself, and the ramifications of their actions at the beginning of the early stages of the charges and investigation. (SWH Vol 3:93 – William E. Karo Johnson). Without an attorney to advise the defendant, the people the defendant is going to have daily and immediate contact with for advise and support while incarcerated in the Dallas County Jail are law enforcement, their agents, and/or other incarcerated defendants. (SWH Vol 3:91-93 – William E. Karo Johnson).

Capital defense counsel testified to their efforts, both before 2002 and after the enactment of the Texas Fair Defense Act (TFDA)), to being pro-active in preventing the media from obtaining a confession through a media interview. This was accomplished by sending a Do Not Interview Letter. (SWH Vol 3:56 – Brooke Busby); (SWH Vol 3:44 – Bernhardt testimony). In Mr. Broadnax's case, Mr. Lollar testified that:

> The records reflect that I was not appointed by this Court until the next day [June 24, 2008] following these interviews, and at that time I immediately cut off his access to the press and to other law-enforcement agencies. (Trial Vol. 43:108-109).

However, after 2002, and because of the enactment of the Texas Fair Defense Act, the procedure for the appointment of counsel to represent capitally-charged defendants changed. The applicable provision in the TFDA statute in Mr. Broadnax's case was TEX. CODE CRIM. PROC. Art. 1.051, Right to Representation by Counsel (effective September 1, 2007). It provided:

> "In a county with a population of 250,000 or more, the court or the courts' designee shall appoint counsel as required by this subsection as soon as possible, *but not later than the end of the first working day after the date on which the court or the courts' designee receives the defendant's request for appointment of counsel.*" (hereinafter "Appointment Time Period") (emphasis supplied).

Under the statute, the Dallas Magistrate no longer appointed counsel. The District Court Judge, or his designee (a court-coordinator), who was assigned the capital case made the appointment. (SWH Vol 3:94 – William E. Karo Johnson) (SWH Vol 3:64-65 – Busbee testimony). However, before the appointment decision could be made by a district court judge, the presiding judge over the Criminal District Courts in Dallas County, first had to make an administrative decision assigning the capital case to a particular district court (the "Assigned Court"). The purpose of the administrative decision was to evenly distribute the capital case load among the various criminal district courts in Dallas County. (SWH Vol 3:64 – Busbee testimony; (SWH Vol 3:94 – William E. Karo Johnson).

14

271

This created a delay of days, even weeks ("Appointment Delay" or "Gap") from the request for counsel by a capitally-charged defendant at the Texas Magistration, and the actual appointment of counsel because the Appointment Time Period did not begin to run until the capital case was received by the Assigned Court, who then appointed counsel. (SWH Vol 3:27 – Bernhardt testimony; SWH Vol 3:64 – Brooke Busbee testimony: There is a delay "because of the way that they parcel out death penalty cases or capital murder cases."); (SWH Vol 3:94 – William E. Karo Johnson testimony: " ... there's some period of time that goes by for them to decide which court this particular capital case is going to be assigned to."). (SWH Vol 3:27 – Bernhardt testimony: "...there would typically be a day or two, sometimes more, between arraignment and appointment of counsel"). Further delays can result because the Appointment Time Period includes only business days, and excludes Saturdays, Sundays, and holidays. (SWH Vol 3:107-108 – William E. Karo Johnson).

Broadnax's case was initially assigned by the presiding judge to Criminal District Court #1, Judge Robert Burns, but the Appointment Time Period did not begin to run, because Broadnax was reassigned to Criminal District #7, Judge Michael Snipes. (SWH Vol 3:137-138 – Brad Lollar testimony). Judge Snipes appointed Brad Lollar[5] as counsel for Mr. Broadnax three (3) calendar days after Texas Magistration, on June 21, 2008. During this Appointment Gap, the media had conducted videotaped interviews of Mr. Broadnax, which were played by the prosecution to the jury in every phase of the trial. *See infra.*

Experienced capital trial counsel who received capital trial appointments both under the pre- and post-2002 appointment system in Dallas County, such as Catherine Bernhardt,[6] Brook Busbee,[7]

---

[5]    Brad Lollar was first chair in the Broadnax capital murder case. Mr. Lollar graduated from SMU Law School in 1977, and had been doing criminal defense for thirty-five (35) years. He worked for the Dallas District Attorney's Office from 1977 to 1982, and then went into private practice. From 2005 to 2008, Mr. Lollar was appointed as the Chief Public Defender for Dallas County. His wife had been a Dallas County Magistrate for the past seven (7) years and would have presided over the arraignments of defendants in Dallas County. (SWH Vol 3:131-132).

[6]    Catherine Bernhardt is a criminal defense attorney who graduated from University of Texas in 1987, and was licensed to practice in 1987. She worked in the Staff Attorney's Office for the Criminal District Courts of Dallas County, followed by employment in the Dallas County Public Defender's Office until September 2002, when she went into private practice doing criminal defense work. (SWH Vol 3:23).

[7]    Brooke Busby is a criminal defense attorney, who graduated from law school in 1979 and has been doing capital defense since 1989. She practices exclusively in the Dallas County courts and in federal court. She is board certified in criminal law. (SWH Vol 3:51).

15

and William E. Karo Johnson,[8] testified in the state habeas evidentiary hearing to their experience representing capitally charge defendants, and the Appointment Gaps occurring in the time period from 2007 to 2012 [Broadnax was arraigned on June 21, 2008; the Broadnax evidentiary hearing was December 7, 2012]. These capital defense counsel testified that during the Appointment Gap, the Dallas County Sheriff's Office, which runs the Dallas jail (hereinafter "Dallas Jailers") gave expedited and unimpeded access of the defendant to the media, who obtained videotaped interviews of capitally-charged defendants:

> Capital Trial Attorney Catherine Bernhardt
> Defendant: Teresa Renee Price; 5 day Gap (SWH Vol 3:34-36);
> Defendant: Chloe Menager; (SWH Vol 3:42);

> Capital Trial Attorney Brook Busbee (SWH Vol 3:61-64)
> Cause No. F11-61285; Defendant: Defendant: Galaviz; 8 day Gap
> Cause No. F07-33618; Defendant: Francisco Martinez; 5 day Gap
> Cause No. F07-51820; Defendant: Santiago Lara; 6 day Gap
> Cause No. F10-13206; Defendant: Amelia Guerrero; 5 day Gap
> Cause No. F07-59596; Defendant: Adrian Lopez; 4 day Gap
> Cause No. F08-53019; Defendant: Raul Salazar; 6 day Gap

Capital Trial Attorneys William E. Karo Johnson, Brooke Busbee, and former Assistant Dallas Public Defender Janet Cook testified that even after they have been appointed, the Dallas Jailers affirmatively took steps to given the media quick and preferential access while at the same time impeding their access to the capitally-charged client. *See* (SWH Vol 3:95-96 – William E. Karo Johnson); *State v Broadnax*, Trial Vol 41 - July 27, 2009 pretrial hearing at p.86; SWH Vol 4: DX-1C); (SWH Vol 3:56 – Brooke Busby testimony).

So before, at the time of, and after Mr. Broadnax's arraignment (2007-2012), the Dallas County Criminal District Courts appointed counsel for him and other capitally-charged defendants based on a "specified period after an accused's magistration," that is, the Appointment Time Period, rather than on the need for counsel in a "critical stage" of the post attachment proceedings contrary to U.S. Supreme Court precedent. *See Rothgery v. Gillespie County*, TX, 554 U.S. 191, 194-195 (2008); *Michigan v. Harvey*, 494 U.S. 344, 357-58 (1990); *Powell v. Alabama*, 287 U.S. 45, 57 (1932); *Coleman v. Alabama*, 399 U.S. 1, 9 (1970) (plurality opinion) (right to counsel at preliminary hearing, *White v. Maryland*, 373 U.S. 59, 60 (1963) *(per curiam)* (right to counsel guaranteed at a pretrial lineup); *Michigan v. Harvey*, 494 U.S. 344 (1990); *Estelle v. Smith*, 451 U.S. 454, 470-471 (1981) (right to counsel at pretrial interrogation, a pretrial psychiatric exam, and certain kinds of arraignments); *United States v. Ash*, 413 U.S. 300, 312–313 (1973); *United States v. Wade*, 388 U.S. 218 (1967); *Massiah v. United States*, 377 U.S. 201 (1964); *White v. Maryland*, 373 U.S. 59, 60

---

[8]   Karo Johnson is a criminal defense attorney who was licensed to practice law in 1976, and his practice is exclusively criminal defense. He represented persons accused of capital crimes. His first capital case was in 1994. (SWH Vol 3:89).

16

273

(1963).

**OBJECTION #2:** Applicant also objects because FFCL ## 5-68 completely ignored, and left unaddressed, the facts adduced by Mr. Broadnax at the state habeas evidentiary hearing that the media were state agents and that the videotaped media interviews were a critical stage in the legal proceedings, yet concluded that Mr. Broadnax failed to carry his burden of proof by a preponderance of the evidence. The State did not controvert Broadnax's evidence of this at all.

Instead, in resolving the fact issues in state habeas, the court relied on the trial record, *see* FFCL ## 14, 23; even then the FFCL does not accurately reflect the court's trial ruling. The trial court did not rule that the media are not state agents. The trial court ruled that trial counsel failed to prove they were state agents, and immediately thereafter, made a fact finding of trial-counsel-deficiency. *Compare* FFCL # 14, 23 ("The reporters who interviewed Applicant were not acting as agents of the State. RR 43:111-13.") *with* (Trial Vol. 43:113: "*On this record* we cannot conclude that the reporter was acting as a State agent when he interviewed appellant. So the issue of whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, *is not even a close one*." (Emphasis supplied)

17

274

**Factual Predicate and Specific Objections:**

A.     **The Dallas County Jailers solicit, encourage, coordinate and facilitate interviews of capital defendants (including Broadnax) by the media, who are state agents**

Mr. Broadnax objects in particular to FFCL ## 22-25, to wit: that the reporters were not acting as agents of the State, and that the interviews of Mr. Broadnax were not a "critical stage" in the legal proceedings. Mr. Broadnax objects in particular to FFCL ##28, 29 (FFCL #28: "Applicant fails to establish by a preponderance of the evidence that his Sixth Amendment right to counsel or his due process rights were violated;"); (FFCL #29: "Accordingly, the Court concludes that Applicant's Sixth Amendment right to effective counsel and due process rights were not violated").

Mr. Broadnax objects in particular to FFCL # "23. The reporters who interviewed Applicant were not acting as agents of the State. (RR 43:111-13)." The FFCL relied on the testimony presented at trial and its trial court ruling. The trial court did not rule that the media are not state agents. The trial court ruled that trial counsel failed to prove they were state agents; immediately thereafter, the trial court made a fact finding of trial-counsel-deficiency. *Compare* FFCL # 14, 23 ("The reporters who interviewed Applicant were not acting as agents of the State. RR 43:111-13.") *with* (Trial Vol. 43:113: "*On this record* we cannot conclude that the reporter was acting as a State agent when he interviewed appellant. So the issue of whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, *is not even a close one*." (Emphasis supplied).

The State of Texas did not controvert the evidence of Mr. Broadnax, who proved by a preponderance of the evidence that the media were state agents and that the videotaped media interviews were a critical stage in the legal proceedings. The evidence showed:

In the Gap before counsel is appointed, the State of Texas exploits the Appointment Delay or Gap by soliciting, encouraging, coordinating and facilitating interviews of capital defendants by the media through a written policy and procedure (Media Access Procedure), which includes a form letter, created by the Dallas County Sheriff's Department ("DCS Media Inmate Interview-Request Letter"). The Media Access Procedure created by the Dallas County Jailers ensures quick and preferential access by the media (over and above access by court-appointed defense counsel) for interviews with capital defendants, before or at the time that counsel is court-appointed. (SWH Vol 3:56 – Brooke Busby testimony; SWH Vol 3:95 – William E. Karo Johnson). The media pattern their Media Inmate Interview-Request Letters substantially on the DCS Media Inmate Interview-Request Letter. (SWH Vol 3:102-105 – William E. Karo Johnson, letter read into the record) (SWH Vol 4:DX-1A & DX-14).

•       **The Media Inmate Interview-Request Letter is a sample-letter created by the Dallas County Sheriff's Office ("Dallas County Jailers"), on which the Media base their requests almost verbatim.** The DCS Media Inmate Interview-Request Letter reads:

18

275

Channel "?" requests an interview with you regarding the charges that have been filed against you. We would like to give you an opportunity to tell your side of the story. If you are interested, please sign below so that the Sheriff's Department can notify us as soon as they receive your response about your situation."

(SWH Vol 3:102-105 – William E. Karo Johnson, letter read into the record; SWH Vol 4:DX-1A & DX-14).

The DCS Media Inmate Interview-Request Letter recites four elements that should be in Media Inmate Interview-Request Letter drafted by the media outlets:

1. **The Media Logo**: to be reproduced at the top of each of the letter;
2. **The Introduction**: "channel ? requests an interview;"
3. **The Purpose**: "to give you an opportunity to tell your side of the story;"
4. **The Action Step to Be Taken by the Defendant triggering immediate action by the Dallas County Jailers**: "please sign below so that the Sheriff's Department can notify us as soon as they receive your response."

• **The Dallas County Jailers know capital defendants (Broadnax) requested counsel at the arraignment, but the Media Inmate Interview-Request Letters do _not_ contain Miranda Warnings**: The Dallas County Jailers know or should know that a capital defendant, including Mr. Broadnax, requested counsel at the Texas Magistration (arraignment) because the request is made in front of the Dallas County Jailer, who provided the pen, remained present while the defendants (including Mr. Broadnax) completed the forms requesting counsel, and delivered the completed forms back to the Dallas County Magistrate, who forwarded them to the district courts. (SWH Vol 3:135 – Brad Lollar testimony; SWH Vol 3:106 – William E. Karo Johnson).

• **The language and elements in the Media Inmate Interview-Request Letters from the media are identical or substantially similar to the Sample Media Inmate Interview-Request Letter created by the Dallas County Jailers**: The Media Inmate Interview-Request Letters written by the media that are addressed to defendants charged in Dallas County with capital murder, including Mr. Broadnax, contain language that is identical, or substantially similar, to the Media Inmate Interview-Request Letter created by the Dallas County Sheriff's Office. *See* Franklin Davis Case: *Compare* SWH Vol 4:DX-1A & DX-14 _with_ SWH Vol 4:DX, (SWH Vol 3:99-101, 105 – William E. Karo Johnson capital counsel for Davis); *See also* James Broadnax Case: *Compare* (SWH Vol 4:DX-1A and DX-14 _with_ SWH Vol 4:DX20).

19

276

- **If the Media Inmate Interview-Request Letter is not in compliance with the Media Access Procedure, the Public Relations/Information Officer in the Dallas County Sheriff's Office Fills in required information that the media omitted from the Media Inmate Interview-Request Letters and faxes the letters to the Dallas County Jailers within the jail, who have custody and control over the capital defendant (Broadnax).** The media-outlets fax or email their Media Interview Request Letters to the Public Relations/Information Officer, (in Broadnax's case, Ms. Leach). (Trial Vol 41 - July 27, 2009 suppression hearing: pp. 19-20). The Public Information Officer reviews the Media Interview Request-Letters that were faxed or emailed to her looking for missing information that is required, but was omitted by the media in the Media Inmate Interview-Request Letters. If the Media Interview Request Letter does not "ha[ve] the person's correct name," and "the book-in number," the Public Relations Officer "look[s] that up on AIS," and fills in the missing information to ensure the media are in compliance with the Media Access Procedure and are given full and immediate access to the capital defendant. (Trial Vol 41 - July 27, 2009 suppression hearing: pp. 19-20).

- **The Dallas County Jailers hand-deliver the Media Inmate Interview-Request Letters to the Defendant, encourage him to consent, and witness his signature:** Immediately upon receiving the Media Interview Request Letters faxed into the jail by the Public Relations/Information Officer, the Dallas County Jailers hand-deliver the Media Interview Request Letters from the various media-outlets to the capital defendant. When the Dallas County Jailers hand-deliver the Media Interview Request Letters from the various media-outlets to the capital defendant, including Mr. Broadnax, the Dallas County Jailers encourage the capital defendant to consent to the interviews, hand the capital defendant a pen, and witness the signature of the capital defendant. (Trial Vol 41 - July 27, 2009 suppression hearing:18-21; SWH Vol 3:56 – Brooke Busbee testimony). The Dallas County Jailers place their name, signature, and Badge Number underneath that of the capital defendant's on the Media Inmate Interview-Request Letter. (Trial Vol 41 - July 27, 2009 suppression hearing: pp. 18-21).

- **The Public Information Officer sets up the interview room, determines the amount of time for the interview, and escorts the media to the interviews, while the Dallas County Jailers stand next to the capital defendant during the inmate interviews:** The Court finds that the Dallas County Jailers fax back the Media Inmate Interview-Request Letters to the Public Information Officer for the Dallas County Jailers, who sets up the interview room, escorts the media to the room, and determines how much time each media outlet is given for the interview. (Trial Vol 41 - July 27, 2009 suppression hearing: pp. 23-24, 55). The Dallas County Jailers remain on the side of the interview room next to the capital defendant,

20

277

including Mr. Broadnax, during the media interviews. (Trial Vol 41 - July 27, 2009 suppression hearing: pp. 29, 54).

- **Even if counsel has been appointed, the Dallas County Jailers will deliberately impede appointed counsel's access to the capitally-charged client during which time, the media conduct its interviews of the defendant.** Even when counsel has been appointed to represent a defendant charged with capital murder, the Dallas County Jailers impede defense-counsel access to a client, to give the media sufficient time to conduct the interviews. (SWH Vol 3:56 – Brooke Busby testimony; SWH Vol 3:95 – William E. Karo Johnson). Two examples are Charles Payne and Franklin Davis:

*Charles Payne*: The Dallas County Jailers deliberately delayed access by Janet Cook, an Assistant Dallas County Public Defender to her client, so that the Fox 4 employees (media) could interview her capital client, Charles Payne. *See supra State v Broadnax*, Trial Vol 41 - July 27, 2009 pretrial hearing at p.86; SWH Vol 4: DX-1C). Ms. Cook wrote to Dallas County Sheriff Lupez Valdez voicing her objections. It reads, in pertinent part:

> I was denied access to my client; my client was denied access to his attorney and investigator by the Sheriff's Office in a timely manner. I believe it was done intentionally to allow Fox news to get in and interview a potential death penalty defendant. The interview would not have happened without the Sheriff's office aiding Fox 4 to have access to my client and denying me access. My investigator and I were there prior to Fox 4's arrival and were kept waiting longer than 15 minutes after they were taken upstairs.

*State v Broadnax*, Trial Vol 41 - July 27, 2009 pretrial hearing at p.86; SWH Vol 4: DX-1C.

*Franklin Davis*: The Dallas County Jailers also deliberately delayed access by Mr. Johnson appointed to represent Mr. Davis. When Mr. Johnson and the defense team arrived at the Dallas County Jail and submitted their bar cards and drivers' licenses in return for a pass that would allow an attorney/client visit, one of the deputies for the Dallas County Sheriff's Office who was in charge of giving the visitation passes, suggested to Mr. Johnson that the defense team should wait. (SWH Vol 3:95-96 – William E. Karo Johnson). Mr. Johnson said no and the defense team proceeded to the visitation room, but a TV crew was already in the attorney visitation room doing an interview with Mr. Davis. (SWH Vol 3:96 – William E. Karo Johnson).

21

278

**B.      The Media Interviews are a Critical Stage in the Legal Proceedings Because They Are Structured to Elicit from a Defendant: a Confession, Statements of Lack of Remorse and that Lethal Injection is an Appropriate Punishment, and Adversely Affect Every Aspect of the Capital Trial Defense**

The media interviews consist of three topics:
*      Did you do it?
*      Are you remorseful?
*      Do you deserve capital punishment, specifically lethal injection?

(SWH Vol 3:97, 111-112  –  William E. Karo Johnson).

Because of the three-prong approach by the media in the interviews, if the videotaped interviews are incriminating, the State of Texas introduces them at each phase of a capital trial. (SWH Vol 3:47 – Bernhardt testimony). The inculpatory statements made by a defendant in a media interview are introduced by the State of Texas as an admission of guilt by the capital defendant at the suppression hearing and in the guilt/innocence phase of the trial. (SWH Vol 3:47 – Bernhardt testimony). If a defendant is asked in the media interview about remorse and what punishment should be, his or her answer is introduced by the State of Texas in the punishment phase of the trial, particularly if the defendant addresses the issue of capital punishment. (SWH Vol 3:47 – Bernhardt testimony). The media interviews of a capital defendant are a "critical stage" in the proceeding, because they were events that "so prejudice[d] the outcome of the defendant's prosecution that, as a practical matter, [Mr. Broadnax had to] be represented [and appointed counsel at or before the media interviews] in order to enjoy genuinely effective assistance of counsel." *Rothgery*, 554 U.S. at 217.

**C.      Mr. Broadnax was entitled to counsel at or immediately after Texas Magistration, on June 21, 2008. Instead there was a three (3) calendar day Appointment Gap, during which the media had conducted videotaped interviews of him, which were played by the prosecution to the jury in every phase of the trial, relied on by the jury in its deliberations in sentencing as reflected in the jury note, and even relied on by the Texas Court of Criminal Appeals to deny relief on direct appeal**

Mr. Broadnax objects in particular to FFCL ## 22-25, titled: Applicant's Contention that the Interviews Were Material and Unfairly Prejudicial.  The State failed to adduced evidence that contradicted the evidence of Mr. Broadnax.

The videotaped media interviews by the media, who were state agents, were a "critical stage" in the post-attachment legal proceedings because they were an event in which Mr. Broadnax's federal constitutional Sixth and Fourteenth amendment rights to counsel and due process, and his available defenses were irretrievably lost.  As reflected immediately below, the videotaped media

22

279

interviews of Mr. Broadnax consisted of three topics that adversely affected the whole Broadnax trial, and rendered trial counsel ineffective. *See United States v. Wade*, 388 U.S. 218, 225 (1967).

Those three topics were:

- Did you do it?
- Are you remorseful?
- Do you deserve capital punishment, specifically lethal injection?

*See* (SWH Vol 3:97, 111-112 – William E. Karo Johnson).

The evidence introduced in state habeas by Mr. Broadnax, proved by a preponderance that he had been booked-in at the Dallas County Jail on June 21, 2008 (Saturday), a weekend, and had been arraigned and requested counsel that same day. (SWH Vol 3:136-137, 142 – Brad Lollar testimony). SWH Vol 4:DX–1G & DX-16 & DX-17; State App. DX-3 (Book-In) and State App. DX-5 (Affidavit of Indigency containing the request for counsel). Three-days later on Tuesday, June 24, 2008 about 9:00 or 9:30 am,[9] Mr. Lollar had been appointed as Mr. Broadnax's counsel by Criminal District Court No. 7, Judge Snipes. (SWH Vol 3:135-136 – Brad Lollar testimony). Implementing the Media Access Procedure, *supra*, the Dallas County Jailers had given various media outlets access to Mr. Broadnax to conduct videotaped interviews with Mr. Broadnax in the Dallas County Jail where Mr. Broadnax was in custody on June 23, 2008. These interviews were conducted during the Appointment Gap. (SWH Vol 3:139-140 – Brad Lollar testimony).

The videotaped interviews of Mr. Broadnax by the media were provided by the media to the prosecution, who played them in all phases of the capital trial of Mr. Broadnax. The videotaped interviews of Mr. Broadnax were admitted into evidence in the guilt/innocence phase. (Trial Vol 46; SWH Vol 3:151 – Brad Lollar testimony). The prosecutor referred to the videotapes in opening statement. (Trial Vol. 45:56-58). Then the prosecutor presented its evidence, the videotapes of Mr. Broadnax's media interviews, in the guilt/innocence phase on August 10 & 11, 2009. (Trial Vol. 45, 46, 47). As promised in the opening statement, the prosecutor played the media interviews of Mr. Broadnax on each day. (August 10, 2009 – Trial Vol. 45:125 – Channel 11; RR 45:277 – Channel 5); (August 11, 2009 – Trial Vol. 46:230 – Channel 4). The jury returned a verdict of guilty of capital murder. (Trial Vol. 47:203; Trial Clerk's Record 3:635).

The videotapes became the focal point of the future dangerousness special issue in the punishment phase. (Trial Vol. 50:212-213; (Trial Vol. 52:248-249; Trial Vol. 53: 68-69, 74). During their deliberations, the jury sent out a note requesting, among other things: "video of channel

---

[9] Although Mr. Lollar's billing records showed an appointment date of June 23, 2008, Mr. Lollar testified that that was a scrivener's error. Mr. Lollar remembers that he had been appointed on Tuesday, June 24, 2008, and not June 23, 2008, because he had already seen several of the interviews that Mr. Broadnax had given to the media which had occurred on Monday, June 23, 2008. (SWH Vol 3:139-140 – Brad Lollar testimony).

23

5 interview." (Trial Clerk's Record 3:648). The trial judge responded, in pertinent part: "The Bailiff will come to the jury room and play the video of Channel 5 shortly." (Trial Clerk's Record 3:649).

The Texas Court of Criminal Appeals (TCCA) in its direct appeal opinion relied primarily on the media interviews to support a challenge to the sufficiency of the evidence of future dangerousness. The TCCA's opinion made fact findings about Mr. Broadnax's lack of remorse and future dangerousness based on his description of the offense during the media interviews. The Court denied the sufficiency-of-the-evidence claim:

*H. Sufficiency of the Evidence – Future Dangerousness*

... sufficient evidence of future dangerousness can be inferred from the offense itself. [footnote 113 omitted]. Here, the appellant confessed to murdering two defenseless men in order to steal their car so he could return home. The appellant described to reporters how he shot each man a second time after their initial wounds failed to kill them immediately. Then, when the appellant was sure the victims had expired, he rifled through their pockets.

The probability of appellant's future dangerousness also can be inferred from evidence showing a lack of remorse. [footnote 114 omitted]. In the same television interviews discussed above, the appellant coldly and calmly walked reporters through the murders. When asked if he had anything to say to the victims' families, the appellant responded, "Fuck 'em." To the specific question by the interviewer, "Do you have any remorse, none whatsoever?" the appellant only shook his head.

*Broadnax v. State*, 2011 WL 6225399, *17 (Tex. Crim. App. 2011).

The media interviews also asked Mr. Broadnax about punishment:

"Reporter:    What do you think's going to happen to you now?
Appellant:   Whatever they throw at me. Hopefully the death penalty.
Reporter:    Hopefully?
Appellant:   Yea. 'Cuz they give me life I'ma' kill somebody else. Straight up. I'm telling you right now. I can't do no motherfuckin' life. I'ma' go crazy.
Reporter:    So you want the death penalty?
Appellant:   They better. Pick one [the appellant holds up each arm, presumably referencing the lethal injection method of execution]. Or you gon' have some more bodies.
Reporter:    Oh, in here you're gonna kill someone?
Appellant:   Nah. Whichever penitentiary they send me to. They better put me on death row. Tell you just like I'ma tell the judge.

We hold that the State presented sufficient evidence to support the jury's finding that

24

281

the appellant posed a future danger to society."

*Broadnax*, 2011 WL 6225399 at *17.

In summary, the media interviews of Mr. Broadnax "so prejudice[d] the outcome of the defendant's prosecution that, as a practical matter, [Mr. Broadnax had to] be represented [and appointed counsel at or before the media interviews] in order to enjoy genuinely effective assistance of counsel." *Rothgery*, 554 U.S. at 217.

**OBJECTION #3:** Applicant objects to FFCL #26 & 27 (FFCL #26: "Applicant presents no legal authority supporting his proposition that interviews conducted by private media outlets are critical stages, and the Court finds there is no such authority."); (FFCL #27: "Applicant argues that ... *White v. Maryland*, 373 U.S. 59 (1963) is directly applicable to his case. However, *White* is distinguishable.... The hearing in *White* clearly involved State action. The media interviews in this case did not involve any State action."

In his state habeas filings, Mr. Broadnax relied on long established Supreme Court precedent, *see infra*, which identifies a "critical stage" as an event in which in the absence of counsel, certain rights might be sacrificed or lost, adversely affecting the whole trial. *United States v. Wade*, 388 U.S. 218, 225 (1967).

**Factual Predicate and Specific Objections:**

In the court papers filed by Mr. Broadnax, he relied on *Rothgery v. Gillespie County*, TX, 554 U.S. 191, 194-195 (2008); *Michigan v. Harvey*, 494 U.S. 344, 357-58 (1990); *Powell v. Alabama*, 287 U.S. 45, 57 (1932), as well as *Rothgery*, 554 U.S. at 218 (Alito, J. concurring, Roberts, Scalia, JJ. join), *citing Coleman v. Alabama*, 399 U.S. 1, 9 (1970) (plurality opinion) (right to counsel at preliminary hearing, *White v. Maryland*, 373 U.S. 59, 60 (1963) *(per curiam)* (right to counsel guaranteed at a pretrial lineup); *United States v. Wade*, 388 U.S. 218 (1967), *Michigan v. Harvey*, 494 U.S. 344 (1990), *Estelle v. Smith*, 451 U.S. 454, 470-471 (1981) (right to counsel at pretrial interrogation, a pretrial psychiatric exam, and certain kinds of arraignments). *See* State Application pp. 5-6, 20-21, 42, Discovery Motion, pp. 6, 10; Motion for Reconsideration, Proposed FFCL.

In its FFCL #47, the state court wrote: "... Applicant [was] appointed counsel within the statutorily-required time frame, ..." But as Mr. Broadnax plead in the State Application, at 20-21, the Supreme Court held that "the [*procedural*] right to counsel guaranteed by the Sixth Amendment applies ***at the first appearance before a judicial officer*** at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty...." *Rothgery v. Gillespie County*, TX, 554 U.S. 191, 194-195 (2008). *See also Michigan v. Harvey*, 494 U.S. 344, 357-58 (1990) ("The accused's right to the assistance of counsel is not limited to participation in the trial itself. ***A defendant is entitled to the aid of his lawyer from the time of arraignment*** "*when consultation,*

25

282

*thoroughgoing investigation and preparation [are] vitally important,*" *Powell v. Alabama,* 287 U.S. 45, 57 (1932), through the time of first appeal.").

Mr. Broadnax further plead that the <u>substantive</u> right to appointment of counsel is <u>not</u> measured by a "specified period after [an accused's] magistration." Instead, "[o]nce attachment occurs, the accused at least is entitled to the presence of appointed counsel during any "critical stage" of the postattachment proceedings; what makes a stage critical is what shows the need for counsel's presence." *Rothgery,* 554 U.S. at 212 (Alito, J., concurring). State Application, at 20-21.

Mr. Broadnax objects to FFCL #26 which finds that "Applicant presents no legal authority supporting the proposition that interviews conducted by private media outlets are critical stages, and the Court finds there is no such authority." To the contrary, there is long established Supreme Court precedent that identifies a "critical stage" in such a way that the media interviews of Mr. Broadnax clearly fall within it.

The Supreme Court has held:

> As early as *Powell v. State of Alabama, supra,* we recognized that ***the period from arraignment to trial was 'perhaps the most critical period of the proceedings ...*' id.,** at 57, 53 S.Ct. at 59, ***during which the accused 'requires the guiding hand of counsel ...,'*** id., at 69, 53 S.Ct. at 64, ***if the guarantee is not to prove an empty right. That principle has since been applied to require the assistance of counsel*** at the type of arraignment-for example, that provided by Alabama – ***where certain rights might be sacrificed or lost: 'What happens there may affect the whole trial. Available defenses may be irretrievably lost, if not then and there asserted ....'***
>
> It is central to that principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial. The security of that right is as much the aim of the right to counsel as it is of the other guarantees of the Sixth Amendment – the right of the accused to a speedy and public trial by an impartial jury, his right to be informed of the nature and cause of the accusation, and his right to be confronted with the witnesses against him and to have compulsory process for obtaining witnesses in his favor. The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution.

*United States v. Wade,* 388 U.S. 218, 225, 226-227 (1967).

Dallas County failed to appoint counsel for Mr. Broadnax at or immediately following Texas Magistration, as had been done prior to 2002 in Dallas County; thus, he was without counsel who would have affirmatively prevented the media interviews by sending a Do Not Interview Letter to

283

the Dallas County Jailers. FFCL #47 confirms that the Sixth and Fourteen Amendment rights to counsel and due process of Mr. Broadnax were violated because appointment was conditioned on a specified period after Texas Magistration, rather than on his need for counsel at the media interviews, a critical stage in the legal proceedings. *See* FFCL #47: "... Applicant [was] appointed counsel within the statutorily-required time frame, ..." Dallas County Jailers exploited the Appointment Gap by providing the media, as state agents, with immediate and full access to Mr. Broadnax for interviews that were repeatedly played to the jury in every phase of the trial, rendering appointed counsel completely ineffective in their representation of him. *See* TEX. CODE CRIM. PROC. Art. 1.051, Right to Representation by Counsel (effective September 1, 2007).

As Mr. Broadnax proved by a preponderance of the evidence in the state habeas evidentiary hearing, *supra*, the media interviews of Mr. Broadnax were a "critical stage" because they were events that "so prejudice[d] the outcome of the defendant's prosecution that, as a practical matter, [Mr. Broadnax had to] be represented in order to enjoy genuinely effective assistance of counsel." *Rothgery*, 554 U.S. at 217.

*See* OBJECTION #2: Factual Predicate and Specific Objections: A, B, and C, *supra*, incorporated by reference herein.

27

284

## GROUND THREE

**OBJECTION #1:**   Broadnax objects to FFCL ## 6 though and including 15, which ruled that Grounds One and Two were procedurally defaulted.  Grounds One and Two are not defaulted because they are an inherent foundation, and were incorporated into, Ground Three.  *See* FFCL #69 ("Applicant alleges that trial counsel was ineffective for failing to investigate and raise the precise Sixth Amendment claims he raises in his first and second grounds for relief...."); State Application, p. 44.

**OBJECTION #2:**   Broadnax objects to FFCL ## 69 through and including 114 because Mr. Broadnax raised a *different* Sixth Amendment claim from that raised at trial. FFCL ##69-114 also fail to address altogether the basic premise, and factual development, of the state habeas claim. Instead, the state habeas court denied relief based on the Sixth Amendment trial claim and the trial record

Mr. Broadnax concedes that at trial and in state habeas, counsel raised Sixth Amendment claims.  But *the trial claim is different from the state habeas claim*.   The trial claim was based on an alleged violation of jail policy that prohibited access by the media to mentally ill defendants.

The state habeas claim was based on the appointment of counsel conditioned on a statutorily specified time period after Texas Magistration, rather than on the need for counsel at a critical stage; that through its Media Access Procedure, the Dallas County Jailers solicited, encouraged, and facilitated the media interviews during the Appointment Gap; and that the media interviews were a critical stage in the post-attachment legal proceedings, contrary to FFCL #75.

### Factual Predicate and Specific Objections:

### A.    The *trial* Sixth Amendment claim

Mr. Broadnax objects, in particular, to the mischaracterization of his claim in  FFCL ## 69, 74 among others:  FFCL #69 ("... Applicant alleges that he was prejudiced by trial counsel's failure to challenge the admissibility of the media interviews on Sixth Amendment grounds because the interviews were a vital part of both phases of the trial."); FFCL #74: ("Contrary to Applicant's allegation, trial counsel did object to the admissibility of the media interviews based on violations of the Sixth Amendment.  (RR 43:105-06.").

Mr. Broadnax concedes trial counsel sought to suppress the videotaped media interviews alleging the media were state agents.  But *the trial Sixth Amendment claim is different from the state habeas Sixth and Fourteenth Amendment claims*.

28

285

The defense trial-theory was that:

- at the time of the media interviews, Mr. Broadnax was in a psychotic rage because of intoxicants he had ingested, *see* FFCL #105;

- the Dallas County Sheriff's Office violated its written policy (SWH Vol 4:DX-21 (also Defense Trial Exhibit 10)), by making a mentally ill defendant, Mr. Broadnax, accessible to the media for interviews, *see* Trial Vol. 43:105-106, *infra*); and

- the Dallas County Jailers were present during those interviews. (SWH Vol 3:148-149, 153 – Brad Lollar testimony).

Unlike the claim in state habeas, trial counsel never asserted that their appointment was unconstitutionally based on a specified time period after Texas Magistration; that through its Media Access Procedure, the Dallas County Jailers solicited, encouraged, and facilitated the media interviews; or that the media interviews were a critical stage in the post-attachment legal proceedings, contrary to FFCL #75.

1.   **The trial claim alleged a violation of a written policy of the Dallas County Sheriff's Office, which prohibited access by the media to mentally ill defendants**

Mr. Lollar made the following trial objection:

"Our objection to the introduction of these [media video]tapes are under the Fifth, Sixth, Eighth and 14 Amendments of the United States Constitution, Article I, section 92, 13, 15, 19, the Texas State Constitution and Article 38.23 of the Texas Code of Criminal Procedure.

We would suggest to the court that what the Court has seen here is a *concerted effort by law enforcement, that being the Sheriff's Office to get these reporters up to see the defendant in violation of his constitutional rights*.

We suggest that the defendant – *the evidence shows that the defendant had twice requested appointment of counsel*. That had not been complied with. Yet the by the time the Sheriff's Department allowed the defendant to be interviewed, clearly he was in custody. He was in the custody of the Dallas County Jail, and *without the cooperation of the sheriff's Department, as all these reporters stated they would not be able to get up to see the defendant*. (Trial Vol. 43:105-106).

Secondly, *we suggest because the defendant was in the mental state he was, it was*

29

*a violation of the sheriff's own written policies to allow a defendant to be interviewed in the mental state he was.* The record clearly shows that at the time the defendant was interviewed, he had been seen by the psychiatric staff at the jail. They had noted psychiatric problems. They had ordered him confined in the closed behavioral cell in the psych unit of the medical ward of the third and fourth floor of the West Tower. ..... (Trial Vol. 43:105-106).

....

The right to counsel has been violated in violation of the Fifth Amendment. His right to a fair trial had been violated by all of these proceedings conducted through the Dallas County Sheriff's Office, which is a law-enforcement agency that had care, custody and control of the defendant at the time he had allowed them to have them despite their written procedures and policies, which would deny a person of his mental condition being allowed by the Sheriff's Department to make statements to the press.. (Trial Vol. 43:108).

The records reflect that I was not appointed by this Court until the next day following these interviews, and at that time I immediately cut off his access to the press and to other law-enforcement agencies. (Trial Vol. 43:108-109).

As the aforementioned trial record reflects, trial counsel never asserted that their appointment was unconstitutionally based on a specified time period after Texas Magistration; that through its Media Access Procedure, the Dallas County Jailers solicited, encouraged, and facilitated the media interviews; and that the media interviews were a critical stage in the post-attachment legal proceedings.

### 2.    Trial counsel never argued the media interviews were a "critical stage" contrary to FFCL #75

Mr. Broadnax objects in particular to FFCL ##24, 25, 75. *See* #75: "... the media interviews were not 'critical stages,' [so] Applicant's Sixth Amendment right to counsel was not violated during the media interviews." *See also* FFCL ## 14, 23 (same ruling).

There is no record support that trial counsel ever asserted that the media interviews were critical stages in the proceedings contrary to the aforementioned FFCL, including FFCL #75.

30

287

3. **The trial court made a fact finding of deficient performance by trial counsel:** "*On this record* we cannot conclude that the reporter was acting as a State agent when he interviewed appellant. So the issue of whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, *is not even a close one*." (RR 43:113) – contrary to the misstatement of the trial record in FFCL #75

Mr. Broadnax objects in particular to FFCL #75 , which concludes that at the trial, "[h]aving found that the reporters were not agents of the State ... Applicant's Sixth Amendment right to counsel was not violated during the media interviews." *See also* FFCL ## 14, 23 (same ruling). The trial court did not rule that the media are not state agents. The trial court ruled that "*On this [trial] record*," trial counsel failed to prove they were state agents. Immediately thereafter, the trial court made a fact finding of trial-counsel-deficiency: "So the issue of whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, *is not even a close one*." (RR 43:113)").

## B. The *state habeas* Sixth Amendment claim

Broadnax objects to FFCL ## 69 through and including 114 because Mr. Broadnax raised a *different* claim from that raised at trial. FFCL ## 69-114 also fail to address altogether the basic premise, and factual development, of the state habeas claim showing deficient performance and prejudice. The state habeas court, instead, relied on the trial record to deny state habeas relief.

### 1. The state habeas claim alleged and proved

In contrast, Mr. Broadnax plead in his State Application and proved at the evidentiary hearing that – despite common knowledge among the capital defense bar, and the personal knowledge of Broadnax's counsel themselves – defense counsel failed to investigate, develop and present evidence at trial that:

a. at the time of the arraignment of Broadnax, Dallas County conditioned counsel appointment for Mr. Broadnax on a statutorily "*specified period after an accused's magistration*," which created the Appointment Gap, rather than on the need for counsel in a "critical stage" of the post attachment proceedings;

b. during the Appointment Gap, law enforcement (and the Dallas County Jailers in particular, through its Media Access Procedure) solicited, encouraged, coordinated and facilitated interviews of Broadnax by the media, who acted as state agents, and

31

288

      c.      the media interviews of Mr. Broadnax were a critical stage in the post-attachment legal proceedings. *See* State Application, Ground Three, pp. 44, 47-48, n.10; Grounds One and Two, pp. 5-6 incorporated by reference.

## 2.    Deficient Performance

The defense theory was that at the time of the media interviews, Mr. Broadnax was in a psychotic rage because of intoxicants he had ingested, *see* FFCL #105; that the Dallas County Sheriff's Office violated its media relations policy (SWH Vol 4:DX-21 (also Defense Trial Exhibit 10)), by making Mr. Broadnax accessible to the media for interviews, and that the Dallas County Jailers were present during those interviews. (SWH Vol 3:148-149, 153 – Brad Lollar testimony).

The defense team knew, that because their theory-of-the-case was that the media were state agents, they were required to prove state action. (SWH Vol 3:127 – Doug Parks). Even though the defense team knew that they were required to prove the media were state actors, they failed to meet this burden. This was because the defense investigation into the media interviews was inadequate.

      a.      **Deficient Pre-Trial Investigation (Media): The defense did not conduct pre-trial interviews of first-responder, law-enforcement-and-beat-reporters about media access to Broadnax. Even after having successfully litigated the _in_applicability of the media shield laws, the defense did not ask for a continuance to investigate**

Mr. Broadnax objects in particular to FFCL #102 which finds that "the reporters and assignment editors would not speak with the defense team outside of court. (Writ RR 3:151)."

The suppression hearing was six (6) days before the guilt/innocence phase began on August 11, 2009, at which the videotaped interviews of Mr. Broadnax were discussed in opening argument by the prosecutor, and thereafter admitted into evidence in the guilt/innocence phase. (Trial Vol 46; SWH Vol 3:151 – Brad Lollar testimony).

No one on the defense team made any attempt pre-trial or before the suppression hearing to talk to first-responder, law-enforcement-and-beat-reporters about media access to Broadnax (that is, to those persons who had first contact with law enforcement about the offense – in contrast to the reporter/interviewers and desk editors, who had been called at the suppression hearing) to discover how and when law enforcement acted in tandem with the media to make the interviews of Mr. Broadnax happen prior to the appointment of counsel. (SWH Vol 3:151-152 – Brad Lollar testimony).

The media was not successful in litigating that the Texas Free Flow Act (TFDA), Texas common law, and the Texas Constitution shielded them from discovery of evidence of the media

32

interviews of Mr. Broadnax. *In re Raab*, 293 S.W.3d 865, 866-67 (Tex. App. Decided July 31, 2009).[10] Yet, there is no record of a request for a trial continuance made by the defense team after the *In re Raab* decision was released on July 31, 2009, to allow the defense team to investigate and discover "information, documents, or items or the source of any information, document, or item" pertaining to the media interviews of Mr. Broadnax. *See* (Trial Clerk's Record).

**b.     Deficient Pre-Trial Investigation (Law Enforcement): The defense did not interview Dallas, Texarkana, or Garland law enforcement, or the Dallas County Jailers, about them soliciting, encouraging, and facilitating access by the media to Broadnax**

Although the defense stated it was their trial objective to show that there was state action involved in getting the media access to Mr. Broadnax, so that the videotapes would be suppressed, no one on the defense team made any attempt to talk to the jailers in the City of Garland (where Mr. Broadnax had first been incarcerated) or Texarkana law enforcement (who had arrested Mr. Broadnax), or the Dallas County Jailers (where Mr. Broadnax was held in custody awaiting trial), in order to discover evidence that would have made the media state agents in the media interviews of Mr. Broadnax. (SWH Vol 3:151-152 – Brad Lollar testimony; SWH Vol 3:121-122 – Doug Parks).

Although Mr. Lollar had introduced a single instance in which the Dallas County Jailers had denied Janet Cook, an attorney, access to her client, Charles Payne, in 2009, (Defense Trial Exhibit

---

[10] The Court of Appeals, Dallas ruled in *In re Raab*, 293 S.W.3d 865, 866-67 (Tex. App. 2009), decided July 31, 2009:

> Relators argue that the subpoenas cannot be enforced under the Texas Free Flow of Information Act, which was enacted by the legislature on May 13, 2009. *See* Qualified Privilege of a Journalist Not to Testify, 81st Leg., R.S., ch. 29, 2009 Tex. Sess. Law Serv. 29 (Vernon) (to be codified at Tex. Civ. Prac. & Rem.Code §§ 22.021–22.027 and Tex.Code Crim. Proc. Ann. Arts. 38.11 and 38.111). This act, inter alia, creates a "journalist's qualified testimonial privilege in criminal proceedings." The act does not apply in this instance.
>
> By its very terms, the "Act applies only to information, documents, or items or the source of any information, document, or item obtained or prepared for publication in a news medium or communication service provider *on or after* the effective date of this Act." *Id.* at § 3. It is undisputed the evidence sought through the subpoenas relates to information obtained or prepared long before the effective date of the Act."

290

8 at the July 27, 2009 hearing[11]), neither Mr. Lollar nor anyone else on the defense team made any other attempts to conduct investigation into the Dallas County Jailers interaction with the media, that culminated in media interviews of capital defendants in the days and/or years before and after Mr. Broadnax had been indicted in 2008. (SWH Vol 3:145-146 – Brad Lollar testimony; Trial Vol 41 - July 27, 2009 Trial Reporter's Record).

The signature of Dallas County Jailer, Officer Spradling, Badge # 5795, was on the Media Inmate Interview Request Letter from WFAA TV Channel 8 and from KDFX TV Fox 4. (SWH Vol 3:150 – Brad Lollar testimony; SWH Vol 3:121 – Doug Parks).

No one on the defense team made any attempt to talk to the Dallas County Jailers who brought the media requests to Mr. Broadnax, not even Officer Spratling, to discover evidence of the interaction between law enforcement and the media that culminated in the media interviews of Mr. Broadnax. (SWH Vol 3:121-122 – Doug Parks; SWH Vol 3:150 – Brad Lollar testimony).

---

[11]    There was a discrepancy in the numbering of the volumes, which writ counsel Brandt, brought to the attention of the court reporter, Sharon Hazelwood. Two July 27, 2009 volumes in the possession of Brandt had been numbered 40 and 41, respectively.

In addition, Trial Exhibit No.8 was missing from the trial exhibits volume. Trial Exhibit No. 8 consisted of the January 14, 2009 letter from Ms. Janet Cook, an Assistant Dallas County Public Defender, to Sheriff Valdez. The Cook letter described the deliberate delay by the Dallas County Jailers in 2009 to deny Ms. Cook access to her client, while the media conducted their interviews of her client. Appended to the Cook letter were the affidavits of Cook and Dallas County Public Defender Investigator Elizabeth Christian Smith. The State of Texas and the defense agreed at the state writ hearing on December 7, 2012 to the authenticity of reproductions of Trial Exhibit No. 8, and the trial judge admit these documents at the state writ hearing as a substitute for the missing Trial Exhibit No. 8. (SWH Vol 3:145-146 – Brad Lollar testimony).

34

291

c.    **Deficient Pre-Trial Investigation (Capital Defense Bar): The defense did not interview the Dallas County capital defense bar prior to trial despite their willingness to testify about their experience with the Gap & media interviews**

Mr. Broadnax objects in particular to FFCL ## 89, 91. FFCL #89 "finds that based on their extensive experience, trial counsel made a sound and reasonable strategic decision regarding which legal arguments to raise and pursue in challenging the admissibility of the media interviews. (Writ RR 3:121-25, 128)." There was no "sound and reasonable strategic decision" by trial counsel in their Sixth Amendment challenge to the admissibility of the media interviews.

Mr. Lollar testified that in 2008, he had not thought about challenging the constitutionally of the TFDA on the basis that appointment of counsel was impermissibly premised on a "specified period after [an accused's] magistration," rather than on the need for counsel in a "critical stage" of the postattachment proceedings.(SWH Vol 3:165 – Brad Lollar testimony). Mr. Parks had not thought about it either. The defense team did not discuss it. Neither Parks nor Lollar had researched or done any fact investigation into it. (SWH Vol 3:120, 121, 122, 128 – Doug Parks testimony); (SWH Vol 3:153-154, 163, 165 – Brad Lollar testimony)

As a result, no trial team member for Mr. Broadnax made any attempt to talk to any of the Dallas County capital defenders about their experience with the Appointment Gap. (SWH Vol 3:121 – Doug Parks). Although Mr. Lollar testified that he "absolutely" agreed that there is a systemic problem in Dallas County that is arising as a result of that Gap, he did not call experienced capital defense attorneys as witnesses at trial to prove it. (SWH Vol 3:165 – Brad Lollar testimony). Those Dallas County criminal defense attorneys would have made themselves available to testify at the Broadnax trial, had they been asked. (SWH Vol 3:65 – Brooke Busbee testimony). Indeed, they all made themselves available to testify at the state habeas evidentiary hearing.

d.    **Deficient Pre-Trial Investigation (No Alternative Theories): Trial counsel did not investigate alternative theories:** Because the pre-trial investigation was inadequate, the trial team failed to prove an agency relationship between law enforcement and the media that is necessary to sustain a Sixth Amendment challenge:

In particular, at the trial the defense team failed to prove:

- "a concerted effort by law enforcement, that being the Sheriff's Office to get these reporters up to see the defendant in violation of his constitutional rights." (Trial Vol. 43:105-106);

- that the media was a state agent of the Dallas County Jailers merely because there was "cooperation of the sheriff's Department, as all these reporters stated they would not be able to get up to see the defendant." (Trial Vol.

35

292

43:105-106); and

- that the Dallas County Jailers "violat[ed] the sheriff's own written policies to allow a defendant to be interviewed in the mental state he was," (Trial Vol. 43:105-106), because Ms. Leach did not realize Mr. Broadnax had been in closed behavioral observation; Ms. Leach had only been working at the Sheriff's Office for about a month. (SWH Vol 3:149 – Brad Lollar testimony)

In conclusion, trial counsel's performance was deficient because the pre-trial investigation both into the facts and the law was inadequate. At trial, the defense team failed to prove the media were state actors because their fact investigation was inadequate. The trial court ruled that the record they made was not adequate, and that they failed to prove an agency relationship. *See* Trial Vol. 43:113: "*On this record* we cannot conclude that the reporter was acting as a State agent when he interviewed appellant. So the issue of whether the defense was able to prove an agency relationship, which they must in order for their argument to succeed, *is not even a close one*."

Also because of the inadequate pre-trial investigation into law and facts, trial counsel did not have any alternative Sixth Amendment claims, legal theories, or proof of facts. *See Sears v. Upton*, 130 S.Ct. 3259, 3265 (2010) ("We rejected any suggestion that a decision to focus on one potentially reasonable trial strategy – in that case, petitioner's voluntary confession – was "justified by a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." 529 U.S., at 396. A "tactical decision" is a precursor to concluding that counsel has developed a "reasonable" mitigation theory in a particular case.").

### 3.    No Strategic Decision at Trial

#### a.    Broadnax's examination of Doug Parks contradicts that trial counsel made a strategic decision. The four-page, cross-examination by the State did not contradict Broadnax's evidence

Mr. Broadnax objects in particular to FFCL #89, 91. FFCL #89 "finds that based on their extensive experience, trial counsel made a sound and reasonable strategic decision regarding which legal arguments to raise and pursue in challenging the admissibility of the media interviews. (Writ RR 3:121-25, 128)." FFCL #91 finds "their strategy was to show that the media interviews of Applicant were a product of state action." The page citations in these FFCL are to the direct examination of Mr. Parks at the state habeas evidentiary hearing. Mr. Parks testimony does not support the FFCL.

In the direct examination of Mr. Parks by state habeas counsel for Mr Broadnax, Broadnax proved that Mr. Parks did not research the law, or investigate the facts, of any Sixth Amendment

36

293

claim because it was the responsibility of Mr. Lollar. The State did not contradict that showing.

*Mr. Parks testified* that he:

- had not talked to any of the capital defense bar about the appointment delay, (Writ RR 3:120);
- did not attempt to talk to any of the reporters because Brad Lollar was handling that aspect of the case, (Writ RR 3:121);
- did not talk to the Dallas County Jailers, nor to any of the Garland law enforcement, because he had not been asked to. Mr. Lollar was handling the claim, (Writ RR 3:122);
- was not aware that at the time of the Broadnax trial, there were 43 jurisdictions that appointed counsel before, at or just after the initial appearance before a judicial officer, but that Texas was not one of them, (Writ RR 3:122);
- was "probably aware" that it is the ABA position that an accused should be appointed no later than just after the initial appearance before a judicial officer, (Writ RR 3:122);
- although it was Mr. Parks role to do the research, he had not researched or read *Rothgery* in 2008, notwithstanding it had been decided the same day Mr. Broadnax had been interviewed by the media, (Writ RR 3:123, 128);
- had not explore any theory, other than the theory raised that the Dallas Jailers violated their own written policy by giving the media access to Broadnax who was psychotic, (Writ RR 3:128);
- had not considered, and had not discussed, raising a Sixth Amendment claim challenging the appointment of counsel based on the specific time period set out in the TFDA because he had not thought about it, (Writ RR 3:128).

The four-page cross-examination by the assistant district attorney, (Writ R:124-127, 129), did not contradict the facts brought forward by Broadnax.

*The Assistant District Attorney elicited* testimony from Mr. Parks that he does "book work," (Writ RR 3:124) (but did not develop what "book work" Mr. Parks did in the Broadnax trial), that the argument and theory at trial was that Broadnax was intoxicated or high at the media interviews and at the commission of the offense, (Writ RR 3:125), and that the trial court concluded there was no state action involving the media interviews. (Writ RR 3:125).

Without any factual support, the assistant district attorney asked a conclusory question:

Asst. Dist. Attorney: Mr. Parks you made a strategic decision based on your extensive experience to make the challenge to the media interviews that you made, correct?

37

294

Mr. Parks:          Yes.

Thus, the examination of Doug Parks, on which the FFCL relies, (Writ R:121-125, 128) – together with the trial court ruling that the record was inadequate and trial counsel failed to prove an agency relationship, *see* FFCL #3 14, 23 citing (Trial Vol. 43:113) – contradicts the conclusion that "based on their extensive experience, trial counsel made a sound and reasonable decision."

      **b.**     **Broadnax's examination of Brad Lollar contradicts that trial counsel made a strategic decision. The four-page, cross-examination by the State did not contradict Broadnax's evidence**

Mr. Broadnax objects in particular to FFCL ## 94, 104. (FFCL # "94. Defense counsel did, in fact, object to the admission of the media interviews on Sixth and Fourteenth Amendment grounds. (Writ RR 3:155; RR 43:105-106"); (FFCL # "104. Mr. Lollar sought to make clear that the defense's position was that lawyers are not appointed quickly enough to prevent media interviews. (Writ RR 3:155-56, 164)."

The trial proof and objection made by Mr. Lollar did not raise at all, or preserve, Mr. Broadnax's Sixth and Fourteenth amendment challenges to counsel-appointment based on a specified time period, instead of the need for counsel in a critical stage of the post-attachment legal proceedings, which resulted in the Appointment Gap, during which the Dallas County Jailers solicited, encouraged, and facilitated the media interviews, making them state actors. *See In re D.O.,*226 S.W.3d 483, 487 (Tex. App. Houston (1st Dist.) 2006), *citing Maynard v. State*, 685 S.W.2d 60, 64-65 (Tex. Crim. App.1985) ("Specific grounds are required to inform the trial court of the basis of the objection, to afford the trial court the opportunity to rule on the objection, and to provide opposing counsel with an opportunity to supply further testimony."). The Sixth Amendment claim at trial was a different claim from that raised in state habeas.

In the direct examination of Mr. Lollar by state habeas counsel for Mr Broadnax, Broadnax proved that Mr. Lollar did not research the law, or investigate the facts of the Sixth Amendment claim that the Appointment Gap violated Mr. Broadnax's right to counsel at a critical stage in the post-attachment legal proceedings. The State did not contradict that showing.

*Mr. Lollar testified* that he:
- knew counsel-appointment was conditioned on a specific period of time, (SWH Vol 3:153-154, 163 – Brad Lollar testimony);
- had been one of the court-appointed attorneys who represented capital defendants before 2002, and after the passage of the TFDA, (SWH Vol 3:163 – Brad Lollar testimony);
- had known in 2008 of the Appointment Gap prior to his court-appointment to represent Mr. Broadnax. (SWH Vol 3:163 – Brad Lollar testimony);

38

295

- had known in 2008 (at the time he was appointed to represent Mr. Broadnax) that Texas was in the minority and was not among the 43 jurisdictions whose laws required appointment of counsel at or before initial appearance of a defendant. (SWH Vol 3:153-154 – Brad Lollar testimony);.
- had done a lot of legal research for the Broadnax case, but Mr. Lollar could not find a particular entry in his billing records that reflected that he had researched the issue about the delay in court-appointments of counsel to represent capital defendants at or before initial appearance. (SWH Vol 3:154 – Brad Lollar testimony);
- had "absolutely" agreed that there is a systemic problem in Dallas County that is arising as a result of that Gap, but that he did not talk about the Gap or bring in other attorneys to prove that in Dallas County historically there had been a Gap both during and after Mr. Lollar's representation of Mr. Broadnax. (SWH Vol 3:165 – Brad Lollar testimony); and
- on re-direct examination, Mr. Lollar testified that in 2008, he had not thought about a constitutional challenge on the basis that appointment of counsel was impermissibly premised on a "specified period after [an accused's] magistration," rather than on the need for counsel in a "critical stage" of the postattachment proceedings.(SWH Vol 3:165 – Brad Lollar testimony).

The four-page cross examination by the assistant district attorney, (SWH Vol 3:156-163), did not contradict the facts brought forward by Broadnax.

*The Assistant District Attorney elicited* testimony from Mr. Lollar that the defense had called several mental health experts, and Lollar also testified about the defense perspective on the State's psychopathy (SWH Vol 3:156-161), and gang presentations at trial, (SWH Vol 3:161-163). (Writ RR 3:125).

Thus, the examination of Brad Lollar, on which the FFCL relies, (Writ R:121-125, 128) – together with the trial court ruling that the record was inadequate and trial counsel failed to prove an agency relationship, *see* FFCL #3 14, 23 citing (Trial Vol. 43:113) – contradicts the conclusion that "based on their extensive experience, trial counsel made a sound and reasonable decision."

39

296

**c.    The testimony of Brad Lollar and Doug Parks at the state habeas evidentiary hearing, on which the FFCL relies, (Writ R:121-125, 128) – together with the trial court ruling that the record was inadequate and trial counsel failed to prove an agency relationship, *see* FFCL #3 14, 23 citing (Trial Vol. 43:113) – contradicts the FFCL that trial counsel's decisions were strategic**

Mr. Broadnax objects in particular to: FFCL ##3, 14, 23; FFCL ##89-94 and FFCL ##109-114. Trial counsel's various assertions of "strategy"[12] are not sustainable as a 'tactical decision' because they failed to conduct the necessary legal research and adequate fact investigation, *supra*. *See Charles v. Stephens,* 736 F.3d 380, 389 (5th Cir.2013) ("counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary").

"[U]nder a *Strickland* analysis, trial counsel must not ignore pertinent avenues of investigation, or even a single, particularly promising investigation lead." *Charles,* 736 F.3d at 390. *See also Kimmelman v. Morrison,* 477 U.S. 365, 385 (1986) ("Viewing counsel's failure to conduct any discovery from his perspective at the time he decided to forgo that stage of pretrial preparation and applying a "heavy measure of deference," *ibid.,* to his judgment, we find counsel's decision unreasonable, that is, contrary to prevailing professional norms. The justifications Morrison's attorney offered for his omission betray a startling ignorance of the law-or a weak attempt to shift blame for inadequate preparation.").

Because the pre-trial investigation into the media interviews by defense counsel was deficient, defense counsel did *not* make a "tactical decision" to focus on one Sixth Amendment theory – that there was State action because the Dallas County Jailers violated their policy by allowing media access to Mr. Broadnax, who was in a psychotic state and were present during the interviews – to the exclusion of all other theories. *Sears v. Upton,* 130 S.Ct. 3259, 3265 (2010).[13]

---

[12]    (*e.g.,* Mssrs. Lollar's and Parks rationale to forgo a challenge to the TFDA because they "had *not* thought about it," (SWH Vol 3:165, 128); Mr. Parks failure to research and investigate *Rothgery* and a challenge to the constitutionality of the TFDA because he had not thought about it, and it would have been "fruitless," (SWH Vol 3:124); and that Mr. Parks "ha[d] been doing this a long time," and "had extensive experience," (SWH Vol 3:129)).

[13]    "This point is plain in *Williams:* We rejected any suggestion that a decision to focus on one potentially reasonable trial strategy—in that case, petitioner's voluntary confession—was "justified by a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." 529 U.S., at 396. A "tactical decision" is a precursor to concluding that counsel has developed a "reasonable" mitigation theory in a particular case."

297

Because trial counsel failed to raise and preserve a challenge to the Sixth Amendment violation arising from the Appointment Gap, and to the media interviews as a critical stage in the legal proceedings, defense counsel breached their "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986),*citing Strickland v. Washington*, 466 U.S. 668, 686 (1984). They also failed to follow the GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL, TEX. GUIDELINE 11.2 – *The Duty to Assert Legal Claims* (adopted April 21, 2006) (admonishing defense counsel to ensure that a full record is made in a manner that protects the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited).

## B.    Unfair Prejudice

Mr. Broadnax objects in particular to FFCL #112: "There is no reasonable probability that had counsel raised additional constitutional challenges to the media interviews, the result of the proceeding would have been different;" and FFCL #113: "counsel was not constitutionally ineffective."

The performance of defense counsel was unfairly prejudicial and adversely affect the outcome of the trial because the media interviews of Mr. Broadnax were events that "so prejudice[d] the outcome of [Mr. Broadnax's] prosecution that, as a practical matter, [Mr. Broadnax had to] be represented ... in order to enjoy genuinely effective assistance of counsel." *Rothgery*, 554 U.S. at 217. *See* Grounds One and Two, Objection #2, C, *supra*, incorporated by reference herein. But for the deficient performance of defense counsel there is a reasonable probability that the outcome would have been different *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

41

298

WHEREFORE, Mr. Broadnax objects to the FFCL by Judge Snipes on September 17, 2014, and requests that the Court recommend state habeas relief.

Respectfully submitted,

_(signature)_

Lydia M.V. Brandt, Esq.
THE BRANDT LAW FIRM, P.C.
Texas Bar No. 00795262
P.O. Box 850843, Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
Counsel for Applicant, James Garfield Broadnax

## CERTIFICATE OF SERVICE

I certify that on October 8, 2014, I caused a copy of the foregoing Objections to be sent in paper format by hand delivery to:

Lisa Smith, Assistant District Attorney
Attn: Capital Writs – Appellate Section
Dallas County District Attorney's Office
Frank Crowley Courthouse
133 N. Riverfront Blvd., LB-19
Dallas, TX 75207

_(signature)_

Lydia M.V. Brandt

cc:   Judge Michael Snipes (Judge Copy)
      Criminal District Court #7
      Frank Crowley Court Building
      133 North Industrial Blvd.
      Dallas, TX 75207

299

Attn: Betty Hooper
Clerk of Court
Texas Court of Criminal Appeals
Supreme Court Building
201 West 14th Street, RM 106
Austin, TX   78701

James Broadnax #999549
TDCJ, Polunsky Unit
3872 FM 350 South
Livingston, TX 77351-8580

43

300

I M

DEFENDANT  Broadnax, James Gardield          B  M  10301988  CHARGE CAP MUR FEL
     AKA:

ADDRESS      Pinehurst Village.104, Texarkana, Ar          LOCATION  DSO

FILING AGENCY  TX0571100    DATE FILED September 08, 2008        COURT        CDC 7

COMPLAINANT  Swan, Stephen                              F-0824667        VT#:

C/C          Demarius Cummings

## TRUE BILL INDICTMENT

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS: The Grand Jury of

Dallas County, State of Texas, duly organized at the _____July_____ Term, A.D., ___2008___ of the

_____204th Judicial District Court_____ , Dallas County, in said Court at said

Term, do present that one          **BROADNAX, JAMES GARDIELD**          , Defendant,

On or about the      19 th    day of June A.D., 2008        in the County of Dallas and said State, did

unlawfully then and there intentionally cause the death of STEPHEN SWAN, an individual, hereinafter
called deceased, by SHOOTING THE DECEASED WITH A FIREARM, A DEADLY WEAPON, and the
defendant was then and there in the course of committing and attempting to commit the offense of
ROBBERY of said deceased,

against the peace and dignity of the State.

**CRAIG WATKINS**

Criminal District Attorney of Dallas County, Texas                  Foreman of the Grand Jury.

COURT

301



NO. F08-24667-Y

THE STATE OF TEXAS

VS.

JAMES GARFIELD BROADNAX

IN THE CRIMINAL

DISTRICT COURT 7

DALLAS COUNTY, TEXAS

CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

The defendant, JAMES GARFIELD BROADNAX, stands charged by indictment with the offense of capital murder, alleged to have been committed on or about the 19th day of June, 2008 in Dallas County, Texas. The defendant has pleaded not guilty.

## CAPITAL MURDER/MURDER

Our law provides that a person commits murder when he intentionally or knowingly causes the death of an individual.

"Individual" means a human being who is alive.

A person commits capital murder when such person intentionally commits the murder in the course of committing or attempting to commit the offense of robbery.

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

303

## ROBBERY

A person commits a robbery if, in the course of committing theft, as defined in these instructions, and with intent to obtain or maintain control of the property, he intentionally or knowingly or recklessly causes bodily injury to another.

"In the course of committing theft" means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft.

"Attempt" to commit an offense occurs if, with specific intent to commit an offense, a person does an act amounting to more than mere preparation that tends, but fails, to effect the commission of the offense intended.

"Bodily injury" means physical pain, illness, or any impairment of physical condition.

"Theft" as used in these instructions is the unlawful appropriation of the corporeal personal property of another, with the intent to deprive such other person of said property.

304

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

305

"Appropriation" and "appropriate", as those terms are used in these instructions, means to acquire or otherwise exercise control over property other than real property.  Appropriation of property is unlawful if it is without the owner's effective consent.

"Property" as used in these instructions means tangible or intangible personal property or documents, including money, that represents or embodies anything of value.

"Deprive" means to withhold property from the owner permanently.

"Owner" means a person who has title to the property, possession of the property, or a greater right to possession of the property than the person charged.

"Possession" means actual care, custody, control or management of the property.

"Effective consent" means assent in fact, whether express or apparent, and includes consent by a person legally authorized to act for the owner.  Consent is not effective if induced by deception or coercion.

"Individual" means a human being who is alive.

A "firearm" means any device designed, made or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use.

A "firearm" is a deadly weapon.

307

Our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded a defendant, and in the event he elects not to testify, that fact cannot be taken as a circumstance against him. In this case, the defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the defendant.

308

You are instructed that if there is any testimony before you in this case regarding the defendant having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, in connection with the offense alleged against him in the indictment and for no other purpose.

You are instructed that under our law a confession of a defendant made while the defendant was in jail or other place of confinement or in the custody of an officer shall be admissible in evidence if it appears that the same was freely and voluntarily made, without compulsion or persuasion. However, before a statement made orally to law enforcement or persons acting as agents of law enforcement may be considered voluntary, it must be shown beyond a reasonable doubt that, prior to making such statement, the accused was warned by the person to whom the statement was made, or by a magistrate, that : 1) he has the right to remain silent and not make any statement, 2) that anything said by the defendant will be used against him at trial or in court, 3) that he has the right to terminate the questioning at any time during the interview or questioning, and 4) that he is entitled to the services of an attorney, his own, or, if he is unable to employ one, a court-appointed attorney, to advise him prior to and during any questioning or interrogation.

So, if you find from the evidence, or if you have a reasonable doubt thereof, that at the time the defendant gave any statement on June 23, 2008, to a reporter, Steve Pickett, Ellen Goldberg, or Shaun Raab, the reporter was acting as an agent of law enforcement and failed to give the defendant the above warning, you shall disregard any such statement and not consider such statement for any purpose nor any evidence obtained as a result thereof.

310

Moreover, if you find from the evidence, or you have a reasonable doubt thereof, that at the time of the defendant's statement to the reporters on June 23, 2008, the defendant was under the influence of PCP, marijuana, formaldehyde, or any combination thereof to such an extent as to be reduced to a condition of mental impairment such as to render his statement not wholly voluntary, then such statement would not be freely and voluntarily made, and in such case you will wholly disregard the statement referred to and not consider it for any purpose nor any evidence obtained as a result of such statement.

You are instructed that you may only consider evidence of voluntary intoxication or testimony of witnesses Jason Varghese or Dr. Haideh Mirmesdagh to the extent it relates to the voluntariness of the defendant's statements to the various television reporters that previously testified in this case.

311

To warrant a conviction of the defendant of capital murder, you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant, JAMES GARFIELD BROADNAX, was engaged in the commission or attempted commission of the robbery or attempted commission of the robbery, if any, but also that the defendant, JAMES GARFIELD BROADNAX, shot STEPHEN SWAN with the intention of thereby killing him.

Unless you find from the evidence beyond a reasonable doubt that the defendant, JAMES GARFIELD BROADNAX, on the alleged occasion, specifically intended to kill STEPHEN SWAN when he shot him, if he did shoot him, you cannot convict him of the offense of capital murder.

312

CAPITAL MURDER

Now, if you find from the evidence beyond a reasonable doubt that on or about the 19th day of June, 2008, in Dallas County, Texas, the defendant, JAMES GARFIELD BROADNAX, did unlawfully then and there intentionally cause the death of STEPHEN SWAN, an individual, by shooting the said STEPHEN SWAN with a firearm, a deadly weapon, and the defendant, JAMES GARFIELD BROADNAX, was then and there in the course of committing or attempting to commit the offense of robbery of the said deceased, then you will find the defendant guilty of capital murder.

If you do not so believe, or if you have a reasonable doubt thereof, or if you are unable to agree, you will next consider whether the defendant is guilty of the lesser included offense of murder.

313

MURDER

If you find from the evidence beyond a reasonable doubt that on or about the 19th day of June, 2008, in Dallas County, Texas, the defendant, JAMES GARFIELD BROADNAX, did intentionally or knowingly cause the death of STEPHEN SWAN, an individual, by shooting STEPHEN SWAN with a firearm, a deadly weapon, but you have a reasonable doubt as to whether the defendant was then and there engaged in the commission of robbery or attempted robbery of STEPHEN SWAN at the time of the said shooting, if any;

OR

If you find from the evidence beyond a reasonable doubt that on or about the 19th day of June, 2008, in Dallas County, Texas, the defendant, JAMES GARFIELD BROADNAX, did knowingly cause the death of STEPHEN SWAN by shooting him with a firearm, a deadly weapon, but you have a reasonable doubt as to whether the defendant, JAMES GARFIELD BROADNAX, intentionally killed STEPHEN SWAN, as the term "intentionally" has been defined herein, then you will find the defendant guilty of murder, but not capital murder, regardless of whether you find from the evidence beyond a reasonable doubt that the defendant, JAMES GARFIELD BROADNAX, was then and there in the course of committing or attempting to commit the offense of robbery of STEPHEN SWAN of his property.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt that the defendant is guilty of murder, as defined in these instructions, or if you have a reasonable doubt, you will acquit the defendant of murder.

314

If you should find from the evidence beyond a reasonable doubt that the defendant is either guilty of capital murder or murder, but you have a reasonable doubt as to which offense he is guilty of, then you should resolve that doubt in the defendant's favor and find the defendant guilty of the lesser included offense of murder.

If you have a reasonable doubt as to whether the defendant is guilty of any offense defined in this charge, you will acquit the defendant and say by your verdict "Not Guilty."

Voluntary intoxication does not constitute a defense to the commission of crime.

You are instructed that you may consider all relevant facts and circumstances surrounding the killing, if any, and the previous relationship existing between the accused and the deceased, if any, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the shooting in question, if any.

315

In all criminal cases, the burden of proof is on the State. All persons are presumed to be innocent, and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined, or indicted for, or otherwise charged with the offense gives rise to no inference of guilt at their trial.

The prosecution has the burden of proving the defendant guilty, and it must do so by proving each and every element of the offense charged beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant.

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict not guilty.

316

You are the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony, but you are bound to receive the law from the Court, which has been given to you in these instructions.

After you retire to the jury room, you should select one of your members as your Presiding Juror. It is his or her duty to preside at your deliberations, vote with you, and when you have unanimously agreed upon a verdict, to certify your verdict by using the appropriate form attached to these instructions and signing the same as Presiding Juror.

No one has any authority to communicate with you except the bailiff who has you in charge. During your deliberations in this case, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

After you have retired, you may communicate with this Court in writing through the bailiff who has you in charge. Do not attempt to talk to the bailiff, or the attorneys, or the Court, or anyone else concerning any question you may have.

317

Your verdict must be by a unanimous vote of all members of the jury.

After you have reached a unanimous verdict, the Presiding Juror will certify the verdict by filling in the appropriate form attached to this charge and signing his or her name as Presiding Juror. After arguments, you will retire to consider your verdict.

JUDGE MIKE SNIPES
CRIMINAL DISTRICT COURT 7
DALLAS COUNTY, TEXAS

318

VERDICT FORMS

We, the jury, unanimously find the defendant guilty of capital murder as charged in the indictment.

_____
PRESIDING JUROR

Robert L. Patterson, Sr.
(Printed Name of Presiding Juror)

-OR-

We, the jury, unanimously find the defendant guilty of murder as included in the indictment.

_____
PRESIDING JUROR

_____
(Printed Name of Presiding Juror)

-OR-

We, the jury, unanimously find the defendant not guilty.

_____
PRESIDING JUROR

_____
(Printed Name of Presiding Juror)

319

FILED

2009 AUG 19 PM 3: 02

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO. TEXAS
LAMONICA UTTLE DEPUTY

CAUSE NO. F08-24667-Y

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE CRIMINAL |
| VS. | * | DISTRICT COURT 7 |
| JAMES GARFIELD BROADNAX | * | DALLAS COUNTY, TEXAS |

LADIES AND GENTLEMEN OF THE JURY:

In a prior proceeding, JAMES GARFIELD BROADNAX, ("the Defendant") was found guilty of the offense of capital murder, alleged to have been committed on or about June 19th, 2008, in Dallas County, Texas. It is now your duty to determine from all the evidence in the case, answers to certain questions called Special Issues.

You are instructed that the punishment for the offense of capital murder is either death or confinement in the Institutional Division of the Texas Department of Criminal Justice for life without parole.

Two special issues, numbered one and two, are included in this charge. You are instructed to answer these Special Issues either "yes" or "no" in accordance with the instructions given in this charge.

320

Special Issue No. 1:  Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Special Issue No. 2:  Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

321

<u>Instructions Regarding Special Issues No. 1</u>

In deliberating on your answer to Special Issue No. 1, you are instructed that the State has the burden of proving beyond a reasonable doubt that the answer to the issue is "yes."

If you do not so find and believe from the evidence beyond a reasonable doubt that the answer to Special Issue No. 1 should be "yes," or if you have a reasonable doubt thereof, then you shall answer the Special Issue "no."

You may not answer Special Issue No. 1 "yes" unless the jury agrees unanimously, and you may not answer Special Issue No. 1 "no" unless 10 or more members of the jury agree. The members of the jury need not agree on what particular evidence supports a "no" answer to the issue.

If you have answered "no" to Special Issue No. 1, then you shall cease your deliberations. If you have answered "yes" to Special Issue No. 1, then you shall next consider Special Issue No. 2.

In deliberating on Special Issue No. 1, you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

322

<u>Instructions Regarding Special Issue No. 2</u>

In deliberating on your answer to Special Issue No. 2, you are instructed that you may not answer Special Issue No. 2 "no" unless the jury agrees unanimously, and you may not answer Special Issue No. 2 "yes" unless 10 or more members of the jury agree.  The members of the jury need not agree on what particular evidence supports a "yes" answer to Special Issue No. 2.

In arriving at your verdict, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the Defendant's moral blameworthiness.

If the jury answers under Special Issue No. 2 that a circumstance or circumstances warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed, the Court will sentence the defendant to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life without parole.

Under the law applicable in this case, a defendant sentenced to confinement for life without parole is ineligible for release on parole.

323

## General Instructions

You are instructed that if the jury answers "yes" to Special Issue No. 1 and answers "no" to Special Issue No. 2, the Court shall sentence the defendant to death.

If the jury answers "no" to Special Issue No. 1 or answers "yes" to Special Issue No. 2, then the Court shall sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life without parole.

If the jury's answers to the Special Issues are unanimous, then the presiding juror may sign each Special Issue for the entire jury. If any answer or answers are not unanimous, but agreed to by at least 10 members of the jury, as set out above, then the 10 or more jurors who agree shall individually sign the Special Issue.

During your deliberations upon the Special Issues, you must not consider, discuss nor relate any matters not in evidence before you. You shall not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

324

In arriving at the answers to the Special Issues, it will not be proper for you to fix the same by any method of chance other than by a full, fair and free exchange of the opinion of each individual juror.

You are not to be swayed by mere sentiment, conjecture, sympathy, passions, prejudices, public opinion, or public feeling in considering all the evidence before you and in answering the Special Issues.

In determining your answers to the Special Issues, you shall consider all the evidence admitted in this whole trial.

325

## Evidence of Extraneous Offense

You are further instructed that if there is any evidence before you in this case regarding the defendant having committed an offense or offenses other than the offense alleged against him in the indictment, you cannot consider this evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the answers to the Special Issues.

## Right to Testify

You are further instructed the law allows the defendant to testify in his own behalf at this phase of the trial, but a choice on his part not to do so is not a circumstance against him and no presumption can be indulged in by the jury for a choice on his part not to do so. During your consideration of this case, you are instructed not to consider, discuss, or even refer to the choice of the defendant not to testify.

326

After the reading of this Charge, you shall not talk with anyone not of your jury. After the argument of counsel, you will retire to consider your answers to the Special Issues submitted to you. It is the duty of your Presiding Juror to preside in the jury room and vote with you on the answers to the Special Issues submitted.

You are the exclusive judges of the facts proved, of the credibility of the witnesses, and of the weight to be given to the testimony, but you are bound to receive the law from the Court, which is herein given you, and be governed thereby.

JUDGE MIKE SNIPES
CRIMINAL DISTRICT COURT 7
DALLAS COUNTY, TEXAS

327

### SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, JAMES GARFIELD BROADNAX, would commit criminal acts of violence that would constitute a continuing threat to society?

Answer: _Yes_

PRESIDING JUROR

If your answer to this Special is "no," and is not unanimous, then the 10 jurors who agree should sign individually below:

_____      _____

_____      _____

_____      _____

_____      _____

_____      _____

If your answer to Special Issue No. 1 is "yes", you shall proceed to answer Special Issue No. 2.  If your answer to Special Issue No. 1 is "no", you shall cease your deliberations.

328

## SPECIAL ISSUE NO. 2

Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Answer: ___NO___

_____
PRESIDING JUROR

If your answer to this Special Issue is "yes," and is not unanimous, then the 10 or more jurors who agree should sign individually below:

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

329



VOL 77 PAGE 146



## CASE NO. F-0824667-Y
### INCIDENT NO./TRN: 9174212621

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| | § | |
| V. | § | COURT #7 |
| | § | |
| JAMES GARFIELD BROADNAX | § | DALLAS COUNTY, TEXAS |
| AKA: JAMES GARDFIELD BROADNAX | | |
| | § | |
| STATE ID NO.: TX08189265 | § | JULY TERM |

## JUDGMENT OF CONVICTION BY JURY

| | | | |
|---|---|---|---|
| Judge Presiding: | HON. Michael R. Snipes | Date Judgment Entered: | 8/21/2009 |
| Attorney for State: | David Alex | Attorney for Defendant: | BRAD LOLLAR DOUG PARKS Keri Mallon |

| Offense for which Defendant Convicted: | |
|---|---|
| CAPITAL MURDER | |

| Charging Instrument: | Statute for Offense: |
|---|---|
| INDICTMENT | 19.03 Penal Code |

| Date of Offense: |
|---|
| 6/19/2008 |

| Degree of Offense: | Plea to Offense: |
|---|---|
| CAPITAL FELONY | NOT GUILTY |

| Verdict of Jury: | Findings on Deadly Weapon: |
|---|---|
| GUILTY | YES, A FIREARM |

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| Punished Assessed by: | Date Sentence Imposed: | Date Sentence to Commence: |
|---|---|---|
| JURY | 8/21/2009 | |

| Punishment and Place of Confinement: | DEATH, CONFINEMENT IN THE INSTITUTIONAL DIVISION UNIL SENTENCE OF DEATH IS CARRIED OUT |
|---|---|

THIS SENTENCE SHALL RUN **CONCURRENTLY.**

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR **N/A** .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ N/A | $ 460.00 | $ N/A | ☐ VICTIM (see below)   ☐ AGENCY/AGENT (see below) |

**Sex Offender Registration Requirements do not apply to the Defendant.** TEX. CODE CRIM. PROC. chapter 62.

The age of the victim at the time of the offense was **N/A** .

| | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. |
|---|---|
| | From **6/20/2008** to **8/21/2009** From     to          From     to |
| Time Credited: | From     to          From     to          From     to |
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. |
| | **N/A DAYS**    NOTES: **N/A** |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Dallas County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**

☒ Defendant appeared in person with Counsel.

☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

330



It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and Defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of Defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel, if any.

The Court received the verdict and **ORDERED** it entered upon the minutes of the Court.

#### Punishment Assessed by Jury / Court / No election (select one)

☒ **Jury.** Defendant entered a plea and filed a written election to have the jury assess punishment. The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the question of punishment. After due deliberation, the jury was brought into Court, and, in open court, it returned its verdict as indicated above.

☐ **Court.** Defendant elected to have the Court assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

☐ **No Election.** Defendant did not file a written election as to whether the judge or jury should assess punishment. After hearing evidence relative to the question of punishment, the Court assessed Defendant's punishment as indicated above.

The Court **FINDS** Defendant committed the above offense and **ORDERS, ADJUDGES AND DECREES** that Defendant is **GUILTY** of the above offense. The Court **FINDS** the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court **ORDERS** Defendant punished as indicated above. The Court **ORDERS** Defendant to pay all fines, court costs, and restitution as indicated above.

#### Punishment Options (select one)

☒ **Confinement in State Jail or Institutional Division.** The Court **ORDERS** the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, Institutional Division, TDCJ.** The Court **ORDERS** Defendant to be confined for the period and in the manner indicated above. The Court **ORDERS** Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court **ORDERS** that upon release from confinement, Defendant proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **County Jail—Confinement / Confinement in Lieu of Payment.** The Court **ORDERS** Defendant immediately committed to the custody of the Sheriff of Dallas County, Texas on the date the sentence is to commence. Defendant shall be confined in the Dallas County Jail for the period indicated above. The Court **ORDERS** that upon release from confinement, Defendant shall proceed immediately to the Dallas County District Clerk Felony Collections Department. Once there, the Court **ORDERS** Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a **FINE ONLY.** The Court **ORDERS** Defendant to proceed immediately to the Office of the Dallas County District Clerk Felony Collections Department. Once there, the Court **ORDERS** Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

#### Execution / Suspension of Sentence (select one)

☒ The Court **ORDERS** Defendant's sentence **EXECUTED.**

☐ The Court **ORDERS** Defendant's sentence of confinement **SUSPENDED.** The Court **ORDERS** Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is incorporated into this judgment by reference.

The Court **ORDERS** that Defendant is given credit noted above on this sentence for the time spent incarcerated.

#### Furthermore, the following special findings or orders apply:

**Deadly Weapon.**

The Jury **FINDS** Defendant used or exhibited a deadly weapon, namely, **A FIREARM,** during the commission of a felony offense or during immediate flight therefrom or was a party to the offense and knew that a deadly weapon would be used or exhibited. TEX. CODE CRIM. PROC. art. 42.12 §3g.

**DEFT EXCEPTS AND GIVES NOTICE OF APPEAL TO THE COURT OF APPEALS, FIFTH DISTRICT OF TEXAS AT DALLAS.**

---

**Signed and entered on August 21, 2009**

x _Michael R. Snipes_

Michael R. Snipes
JUDGE PRESIDING

Broadnax, James F-0824667Y                    Page 2 of 3

331

**JUDGMENT**
**CERTIFICATE OF THUMBPRINT**

CAUSE NO. *F08-24667*

THE STATE OF TEXAS

IN THE *Criminal*

VS.

*James Darfield Broadnax*

DISTRICT COURT *#7*

DALLAS COUNTY, TEXAS

**RIGHT THUMB**

DEFENDANT'S *Rt* HAND

THIS IS TO CERTIFY THAT THE FINGERPRINTS ABOVE ARE THE ABOVE-NAMED DEFENDANT'S FINGERPRINTS TAKEN AT THE TIME OF DISPOSITION OF THE ABOVE STYLED AND NUMBERED CAUSE.

DONE IN COURT THIS *13* DAY OF *Aug*, 20 *09*.

BAILIFF DEPUTY SHERIFF *#731*

*INDICATE HERE IF PRINT OTHER THAN DEFENDANT'S RIGHT THUMBPRINT IS PLACED IN BOX:

_____ LEFT THUMBPRINT          _____ LEFT/RIGHT INDEX FINGER

_____ OTHER, _____

SIGNED AND ENTERED ON THIS *13* DAY OF *Aug*, 20 *09*

**PRESIDING JUDGE**

332

PageID 11707

Page 148 of 163 · Filed 06/29/16 Document 42-6 Case 3:15-cv-01758-N

## TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

BAIL STATUS:   JAIL

No. _____ F08-24629-QY

FORM III REV

333

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| JAMES GARDIELD BROADNAX | | CAPITAL MURDER, A CAPITAL FELONY OFFENSE AS CHARGED IN THE INDICTMENT/MULT | 9-15-08 |
| | | | |
| | | | |
| | | | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| | 9·23·08  First |
| | 9·30·08  Arr— |
| | 10-7-08  Arr— |
| | 10-13-08  Arr reed Rec |
| | 10·16·08  Arr |
| | 10·30·08  Arr |
| | 11·20·08  Arr |
| | 12·18·08  Arr Rec needed |
| | 12·22·08  Arr  Rec. |
| | 1·30·08  Arr— |
| | 2-11-09  Arr (Trial) |
| | 7·37·09  Trial |
| | 8-10·09  Trial |
| | 6-16·09  Arr  MTQ TV |

Case 3:15-cv-01758-N   Document 42-6   Filed 06/29/16   Page 149 of 163   PageID 11708

## TRIAL DOCKET – CRIMINAL DISTRICT COURT – DALLAS COUNTY, TEXAS

BAIL STATUS:   JAIL

No. F08-24667-QY

FORM III REV

334

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| JAMES GARDIELD BROADNAX | | CAPITAL MURDER, A CAPITAL FELONY OFFENSE AS CHARGED IN THE INDICTMENT/FEL | 9-15-08 |
| | | | |
| | | | |
| | | | |
| | | | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| | 9.23.08 First |
| | 9.30.08 Cont |
| | 10-7-08 Cont |
| | 10-13-08 Cont nud Rec |
| | 10.14.08 Cont |
| | 10.30.08 Cont |
| | 11.20.08 Cont |
| | 12.18.08 Ature Rechudid |
| | 12.22.08 Cont nud Rec |
| | 1.30.09 Cont |
| | 2.11.09 Cont trialDate |
| | 7.27.09 trial |
| 7 APR 09 | Hearing on questionnaire and script for big panel. Hearing on defense motions set for 21 APR at 9:00 [signature] |

STATE OF TEXAS

vs. No. _____

335

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| APR 16 2009 | Defendant served with jury list. Questionnaire admitted as State's A. Motions hearing set for 0830 21 APR. *Michael R. Snipes* |
| 21 APR 09 | Hearing on motions. Granted. as noted. 38.22 Hearing on 23 July. 0830 702-705 " " 24 July 0830 *Michael R. Snipes* |
| 24 APR 09 | Introduction to panel. Set for trial on 10 AUG 2009 at 0820. *Michael R. Snipes* |
| 18 May 2009 | motions hearing. Voir dire. set for 26 May 2009. *Michael R. Snipes* |

Case 3:15-cv-01758-N    Document 42-6    Filed 06/29/16    Page 151 of 163    PageID 11710

#1

336

# TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

BAIL STATUS.                                                                                    No._____

FORM 341 REV

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| Broadnax | | CAPITAL MURDER | |
| | | | |
| | | | |
| | | | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 5/26/09 → | Pettit cr — Jerome Williams ① #1  ²Bragg - cause - ③Duzan - cause ④Ross #2  ⁵Frell cause |
| | ⑥Marigon cause — fontaine no show |
| 5/27/09 | Crowley cr — Haire #3  Swift cause Rang - Desman #4  McConnell #5  Falle cause |
| | Dyer cause Taylor cause |
| 5/28/09 | McCraw #6  Clements #7  Walburn cause, Magner cause Connad cause Ritchie #8 |
| 5/29/09 | Lublin → McGovern - cause Lynch, Clark Cause - Vitali #9  Herrera cause |
| 6/1/09 | Green - cause, Folz #10 ; Herbster - cause ; Essary - cause ; Riley - cause ; Rivera #11 ; |
| | Rizer - #12  Gamez - cause. |
| 6/2/09 | Sanford - #13 . Wood #14 . Trafel - Cause ; Harrison - Cause . ████████ ; |
| | McDonald #15 ; Coleman - CAUSE |
| 6/3/09 | Davis - EXCUSED , Nobel #16 ; Oham - Cause . Larba - Cause ; |
| | Henry #17 |

BAIL STATUS:

No. F08-24667

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| | BRAD LoIIAR<br>DOUG PARKS | Capitol Murder | |
| | | | |
| | | | |
| | | | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| JUN 01 2009 | ~~Reporter~~ Steven Pickett<br>Troy LarKIN are sworn as<br>witnesses for hearing on July 23.<br>michael R. Snipes<br>Hearing on witness Ellen Goldberg.<br>Goldberg sworn. Rebecca Lopez sworn<br>Sean Robb.<br>michael R. Snipes |

TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

BAIL STATUS: _____  No. _____

FORM 515 REV

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| JAMES BROADNAX | | CAPITAL MURDER | |
| | | | |
| | | | |
| | | | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| | Court Reporter - Anna Merideth |
| 6/4/09 | Gallardo - Cause; MARTINEZ - Cause; BukiN - CAUSE; Munson - Cause; EGAR (#18) Jackson - Excused by Agreement. |
| 6/8/09 Ct Rptr Heather Vezina | Maguire (#19). CASTRO - CAUSE - Riddle - Cause. Alexander - Cause Mercer - Challenged; Davis - CAUSE; Murphy - Cause |
| 6/9/09 Ct Rptr Heather Vezina | Herrera - Cause. Davidson (#20). Jackson (#21). Rendon - CAUSE; Shuleter - Cause. Shaffer - Cause; Boehme - Cause; Gruenau - Cause |
| 6/10/09 Ct Rptr Heather Vezina | Kinnard (#22) Davis - Cause. Barbosa - Cause. Gaynor - Cause; Coleman - Excused. Horton - Cause. Fincher - Cause (Theft Case) |
| 6/11/09 | McDonald (#23) LANE - Disqualified (Theft Conviction). Mills - Cause; Parker - Cause; ROACH - Cause; Price - EXcused by Agreement; Aguilera - Cause |

$2

Case 3:15-cv-01758-N   Document 42-6   Filed 06/29/16   Page 154 of 163   PageID 11713

#3.

339

## TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

BAIL STATUS: _____   No. _____

FORM 305 REV

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| JAME "vs BROADNAX | | CAPITAL MURDER. | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 6/15/09 ~Reporter Vicki Tuck #5606 | 6/15/09 - WATSON - EXEMPT (Children under 12); RANDFORD- Qualified #24, HUYNH - CAUSE; DIXON → CAUSE; HORNE - EXCUSED PHLATTS - CAUSE |
| 6/16/09 | HAMILTON - Cause, HENVEY - Cause; Whitton - CAUSE. Morris - Qualified #25 |
| 6/17/09 | Anderson - Cause; FERREIRA - Qualified #26; HARDY - Cause; Woodward - Qualified #27 |
| 6/18/09 | Johnson - CAUSE; Cantwell - Qualified #28; Lopez - CAUSE; Young - CAUSE MOTA - CAUSE |
| 6/22/09 | KONKLE - QUALIFIED #29. Others excused! Jury sworn ordered to officer - Knowles, Cooke Marquvich Cause - |
| 6/23/09 | Marshall Qualified #30 Moreno excused Bedford Qualified #31 |

PageID 11714

Page 155 of 163

Filed 06/29/16

Document 42-6

Case 3:15-cv-01758-N

TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

**BAIL STATUS:**

No. _____

FORM 105 REV

340

| STATE OF TEXAS ✓ | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| BROADNAX | HAWLEY, EVANS, HILL, ALEX | CAPITAL MURDER | |
| | | | |
| | COCHRAN, PARKS, MOSLEY | | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 6/24/09 | Read - excused came. Zeidel Qualified #32 Atinson #33 Holmes cause |
| 6/25/09 | Meyer, Langford, Wilson, Bell cause |
| 6/29/09 | Livingston Qualified #34 Allen came Stockton #35 Jarvis cause |
| 6/30/09 | Hack excused Smith excused Sandlers no show Doug Qualified #36 Jones cause |
| 7/1/09 | Rohauga unqualified Nettles Qualified #37 Just caused Ford excused |
| 7/2/09 | Kreighbaum Qualified #38 Hickman excused Cash — excused |
| 7/6/09 | excused Buligan Caro, Clyde Gatewood, McMahon, Bernardin, Davis, Scobee Campbell, Burton, Alger, Palanga, Perez, Hallan, Lindsey Bripard, Brune Boyden |
| 7/6/09 | Hodges Qualified #39 |
| 7/7/09 | Jackson Qualified #40 Morrison Qualified #41 Plea excused Brupeld Qualified #42 |
| 7/8/09 | Daniels Qualified #43 Trotter excused Byrnes Qualified #44 Sanchez excused |
| 7/9/09 | Riddick Qualified #45 Olivera Qualified #46 Pardue Qualified #47 Jury |
| 7/17/09 | Put on record that prospective #27, Woodward was in prospection have with Severe head injuries. Her Attending Physician sent a fax that she would not be in any condition physically or mentally to participate in trial. She was excused by agreement of parties and |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 7/20/09 | Case called to order — #60 Williams J#1 - #58 Pass state #1 - #34 Sherry state #2 - #101 Desmond Δ#1 - #123 McCannah state #3 - #465 McCraney state #4 Batson challenge denied - #134 Clements J#2 - Valtan state #5 Batson Challenge denied - Nichols |
| 7/20/09 | #29 Alex Foly - Juror #3, #208 Ashley Levies SS#6 - Batson challenge - Denied, #222 - Curtis Riser - SS#7 Batson Challenge - Denied. #265 - Johnny Sanford SS#8, #277 - Vicki Wood Δ#3, #272 Kelly McDonald - Juror #4, #337 Helen Noble - ΔS#4; #301 - Bill Henry - ΔS#5; #284 - Heather Egan - ΔS#6; #289 - John Maurice - ΔS#7. #392 - Lisa Davidson - ΔS#8. #544 Carl Jackson - SS#9, #401 Leah Kennard SS#10. #451 - Bruce McDonald - ΔS#9; #601 - Teresa Randeals - ΔS#10; #626 - Kimberly Morris - Juror #5; #573 - Guy Ferreira - JUROR #6; #474 - John Cantwell - ΔS#11.  Quay J Fail |
| 7/20/09 | #660 Keahler Δ#12 - #551 Marshall Δ#11 - 468 Bedford Δ#13 - Fudel J#7 #684 Stanton J#8 - #797 Livingston Δ#14 - #824 Stockton Δ#15 - #868 Lengat #12 Batson challenge denied - #930 Valtan state #13 Batson challenge denied #874 Greenbaum Juror #9 - #977 Hodges Δ#16 - #1391 - state #14 Batson challenge denied - #1062 Merrian Batson challenge state #15 Batson challenge denied Phillips J#10 - Δ requested additional strike denied - #1345 Gerali J#11 - Δ denied addl strike #1313 Blumin J#12 Δ denied extra strike #1094 Fiddick J#13 - #1178 Owen Δ#1 #1206 Paradise Δ#1 # - #1335 McElroy J#14 |

BAIL STATUS:

No. F08-24662

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| v. | Brad Lollan | Capital Murder | |
| James Broadnax | Doug Parks | | |
| | Keri Mallon | | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 24 July 2009 | Nathan Johnson sworn. <br> Michael R. Snipes <br> DR John Roached qualified as witness after hearing under TRE 702-705 Same for officer Barrett Nelson. Alice Gatewood, Arneshia Luckey, Dymond Smith sworn. <br> Michael R. Snipes |
| 4 July 2009 | Evelyn Berg Courtney Bottie are sworn as witnesses. <br> Michael R. Snipes <br> John Calhoun sworn. <br> Michael R. Snipes <br> DR. Cheryl Silver qualified as expert witness 702-705 <br> Michael R. Snipes |

Case 3:15-cv-01758-N   Document 42-6   Filed 06/29/16   Page 158 of 163   PageID 11717

7 July 2009

Hearing on motion to suppress statements. Stayed as to testimony of various reporters pursuant to order from Court of Appeals, Fifth District of Texas at Dallas.

*Michael R. Snipes*

JUL 30 2009

Hearing on Batson challenge. Challenge granted as to juror 45. Juror reinstated. State moves to strike array. Motion denied.

Sharina

4 AUG 2009

*Michael R. Snipes*

Hearing on motion to statements continued from 27 July 2009 after mandamus denied and stay lifted. Motion to suppress is denied.

*Michael R. Snipes*

6 AUG 2009

Hearing on objections to evidence. All objections overruled except as to State's 52 and punishment exhibits held in abeyance *Michael Snipes*

343

BAIL STATUS:

No. F08-24667

FORM 105 REV
344

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| v.<br>James Broad-<br>nax | Brad Lollar<br>Doug Parks<br>Keri Mallon | Capital Murder | |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| AUG 10 2009 | Jury trial. Plea of not guilty.<br>Michael R. Snipes |
| AUG 11 2009 | Jury trial. verdict of guilty to capital murder<br>Michael R. Snipes |
| AUG 12 2009 | Jury trial. Punishment phase.<br>Michael R. Snipes |
| AUG 13 2009 | Jury trial. Punishment phase.<br>Michael R. Snipes |
| ~~AUG 14 2009~~ | Jury trial. Punishment phase.<br> |
| AUG 14 2009 | Michael R. Snipes |
| ~~~~ | Jury trial. Punishment phase.<br>Michael R. Snipes |
| AUG 17 2009 | Jury trial. Punishment phase.<br>Michael R. Snipes |

AUG 1 8 2009

AUG 1 9 2009

AUG 2 0 2009

JULY 2010

Jury trial. Punishment phase.

*Michael R. Snipes*

Jury trial. Punishment phase.

*Michael R. Snipes*

Jury trial. Punishment phase.

Defendant sentenced to death.

*Michael R. Snipes*

Jan Gitteneier
Jamie Foster
William Krieghbaum

are all sworn on post trial hearing under Article 36.29

*Michael R. Snipes*                    *Michael R. Snipes*

Court determines that juror was not (William Krieghbaum)
disabled. Juror did not have physical illness,
mental condition or emotional state which
hindered his ability to perform his duties as
a juror.

*Michael R. Snipes*



111|124

# TEXAS COURT OF CRIMINAL APPEALS
## Austin, Texas

### M A N D A T E

THE STATE OF TEXAS,

TO THE  <u>**CRIMINAL DISTRICT COURT 7 OF DALLAS COUNTY**</u>  — GREETINGS:

Before our **COURT OF CRIMINAL APPEALS**, on the **DECEMBER 14, 2011**, the cause upon appeal to revise or reverse your Judgment between:

### JAMES GARFIELD BROADNAX

### VS.

### THE STATE OF TEXAS

**CCRA NO. <u>AP-76,207</u>**

**TRIAL COURT NO. <u>F08-24667-Y</u>**

was determined; and therein our said **COURT OF CRIMINAL APPEALS** made its order in these words:

"This cause came on to be heard on the record of the Court below, and the same being considered, because it is the Opinion of this Court that there was no error in the judgment, it is **ORDERED, ADJUDGED AND DECREED** by the Court that the judgment be **AFFIRMED**, in accordance with the Opinion of this Court, and that this Decision be certified below for observance."

**WHEREFORE**, We command you to observe the Order of our said **COURT OF CRIMINAL APPEALS** in this behalf and in all things have it duly recognized, obeyed and executed.

WITNESS, **THE HONORABLE SHARON KELLER,**

Presiding Judge of our said **COURT OF CRIMINAL APPEALS,**

with the Seal thereof annexed, at the City of Austin,

on this day January 09, 2012.

LOUISE PEARSON, Clerk

_____, Chief Deputy Clerk

Abel Acosta

346

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Findings of Fact was served on Applicant: **LYDIA M. V. BRANDT (TX BAR# 00795262) P. O. BOX 850843, RICHARDSON, TX 75085-0843** by depositing same in the United States Mail, on October 16, 2014.

**GIVEN UNDER MY HAND AND SEAL** at my office in Dallas County, Texas, on this <u>October 16, 2014</u>.



Clerk Signature:   *Regina Taylor*

Name          <u>Regina Taylor</u>
              Deputy District Clerk

347

**The State of Texas**    §
                          §
**County of Dallas**      §


I, Gary Fitzsimmons, Clerk of the District Courts of Dallas County, Texas, do hereby certify that the documents contained in this record to which this certification is attached are all of the documents specified by Texas Rule of Appellate Procedure 34.5(a) or Code of Criminal Procedure Section 11.07(3)(a) including all other documents timely requested by a party to this proceeding under Texas Rule of Appellate Procedure 34.5(b), and that have been filed with the trial court clerk, and unless otherwise indicated in this record.


**GIVEN UNDER MY HAND AND SEAL** at my office in Dallas County, Texas, on this <u>OCTOBER 16, 2014</u>.




Clerk Signature:    *Regina Taylor*

Name                REGINA TAYLOR
                    Deputy District Clerk


348